Clerk of the Superior Court
*** Electronically Filed ***
10/29/2020 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439                                     10/28/2020
CV 2019-010792
CV 2019-013252
CV 2019-014760
CV 2019-015233
CV 2020-000576
CV 2020-001434

                                          CLERK OF THE COURT
HONORABLE ROGER E. BRODMAN                   M. Corriveau
                                               Deputy

CITY OF SURPRISE                    J CHRISTOPHER GOOCH

v.

ALLERGAN P L C, et al.

                                    JENNIFER JOAN AXEL
                                    BRADLEY J JOHNSTON
                                    JOHN J KASTNER JR.
                                    WILLIAM G KLAIN
                                    ANDRE H MERRETT
                                    COLE SCHLABACH
                                    J STEVEN SPARKS
                                    JON D WEISS
                                    MEGAN ELIZABETH GAILEY
                                    NATHAN D MEYER
                                    JAKE D CURTIS
                                    FREDERICK M CUMMINGS
                                    DARRELL E DAVIS
                                    GREGORY ALAN DAVIS
                                    JOHN C KELLY
                                    JEFFREY A GOLDBERG
                                    RYAN J LINDER
                                    AARON T LLOYD
                                    RYAN J LORENZ
                                    ROGER N MORRIS

Docket Code 926              Form V000A                    Page 1

Ex. A - Tab 3 - Arizona

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020


BRIAN SCHULMAN
LAURA E SIXKILLER
J RUSSELL SKELTON
LEE D STEIN
RUSSELL PICCOLI
JEAN A ROOF
JAMES E LEDBETTER
NICOLE HANNA
18526 E CARRIAGE WAY
QUEEN CREEK AZ  85142
JUDGE BRODMAN


**UNDER ADVISEMENT RULING**


The following Motions to Dismiss are pending before the Court:

1. Manufacturer Defendants' Motion to Dismiss filed in CV2019-010792 (City of Glendale – lead case) on March 4, 2020;
2. Manufacturer Defendants' Motion to Dismiss filed in CV2019-015233 (City of Prescott) on March 6, 2020;
3. Manufacturer Defendants' Motion to Dismiss filed in CV2020-000576 (Pinal County) on March 6, 2020;
4. Manufacturer Defendants' Motion to Dismiss filed in CV2020-001434 (County of Apache) on March 6, 2020;
5. Manufacturer Defendants' Motion to Dismiss filed in CV2019-003439 (City of Surprise) on March 6, 2020;
6. Manufacturer Defendants' Motion to Dismiss filed in CV2019-013252 (County of La Paz) on March 6, 2020;
7. Manufacturer Defendants' Motion to Dismiss filed in CV2019-014760 (Bullhead City) on March 6, 2020;
8. Defendants Watson and Actavis's Motion to Dismiss filed in CV2019-010792 (City of Glendale – lead case – applicable in all cases) on March 4, 2020;
9. Defendants Johnson & Johnson and Janssen's Motion to Dismiss filed in CV2019-010792 (City of Glendale – lead case – applicable in all cases) on March 4, 2020;

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

10. Defendants Teva and Cephalon's Motion to Dismiss filed in CV2019-010792 (City of Glendale – lead case – applicable in all cases) on March 4, 2020;

11. Defendant Kapoor's Motion to Dismiss filed in CV2019-010792 (City of Glendale – lead case – applicable in all cases) on March 4, 2020;

12. Defendants AmerisourceBergen and Cardinal Health's Motion to Dismiss filed in CV2019-010792 (City of Glendale – lead case – applicable in all cases) on March 4, 2020;

13. Pharmacy Defendants' Amended Motion to Dismiss filed in CV2019-015233 (City of Prescott) on January 8, 2020;

14. Pharmacy Defendants' Motion to Dismiss filed in CV2020-000576 (Pinal County) on March 4, 2020;

15. Defendants Harper and Western Drug's Motion to Dismiss or Motion for More Definite Statement filed in CV2020-001434 (County of Apache) on March 13, 2020.

The Court held oral argument on August 28, September 4, 11 and 18, 2020.

## I. BACKGROUND

The plaintiffs are City of Glendale, City of Prescott, City of Surprise, Bullhead City, Pinal County, Apache County and La Paz County. Each plaintiff filed a separate complaint. The cases were either filed in or transferred to Maricopa County Superior Court where they were consolidated before this Court.

The complaints contain substantially similar allegations against many of the same defendants. There are five categories of defendants: Manufacturers, Distributors, Pharmacy Distributors, Pharmacy Dispensers and Prescribers.[1]

---

1. On August 31, 2020, plaintiff Pinal County filed a notice voluntarily dismissing its claims against defendants Mylan Institutional Inc. and Mylan Pharmaceuticals, Inc. from the Pinal County case. On September 16, 2020, plaintiffs filed a notice of intent to dismiss the claims against defendants Dr. Douglas Campbell, Dr. Robert Brownsberger, Dr. Dax Trujillo and Quezia Hall. On October 12, 2020, defendants Mallinckrodt, LLC, Mallinckrodt PLC, and SpecGx LLC filed a petition for relief under Chapter 11 of the Bankruptcy Code.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                     10/28/2020

The Manufacturers[2] are: Allergan PLC, Actavis PLC, Actavis, Inc., Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. (collectively "Actavis")[3]; Teva Pharmaceuticals USA, Inc. and Cephalon, Inc. (collectively "Cephalon"); Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc. (collectively "Endo"); Janssen Pharmaceuticals, Inc. (and its predecessors Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica, Inc.) and Johnson & Johnson (collectively "Janssen"); Par Pharmaceutical Companies, Inc. and Par Pharmaceutical, Inc. (both in the Prescott and Pinal County cases only) (collectively "Par"); Indivior, Inc. (Pinal County case only); and John Kapoor and Michael Babich (collectively "Insys Individuals").

The Distributors are Cardinal Health, Inc. and AmerisourceBergen Drug Corporation.

The Pharmacy Distributors in the Prescott case are: Walgreen Co., Walmart, Inc. and Smith's Food and Drug Centers, Inc. ("Smith's"). The Pharmacy Distributors in the Pinal County case are: Walgreen Co., Walgreen Arizona Drug Co., Walmart Inc. and Smith's Food & Drug Centers Inc. d/b/a Fry's Pharmacies and Fry's Food and Drug Stores ("Smith's").

The Pharmacy Dispensers, named only in the Pinal County case, are: Smith's; American Drug Stores LLC (formerly known as American Drug Stores Inc.) d/b/a Osco Drug, Inc., Safeway Inc.; Walgreen Arizona Drug Co. and Walmart, Inc.

The Prescribers, named only in the Apache County case, are Western Drug, Inc. and Fred S. Harper (collectively "Harper").

## II. SUMMARY OF COMPLAINT ALLEGATIONS

The following is a summary of allegations made in plaintiffs' complaints. For the purposes of a motion to dismiss, the Court must assume the truth of well-pled factual allegations.

---

2. Unless otherwise indicated, a defendant is named in each of the seven consolidated cases. This ruling only refers to those defendants who filed or joined in at least one of the 15 motions to dismiss listed above.

3. Watson Laboratories, Inc., Actavis, LLC, and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. filed a separate motion to dismiss. Those entities only manufacture generic opioid medications. In the context of their separate motion, they are collectively referred to as the "Actavis Generic Entities."

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

A.   Manufacturers' Scheme to Increase Sales of Opioid Medications[4]

Each Manufacturer makes and sells prescription opioid medicines, some branded, some generic. Opioids are prescribed for the treatment of pain. Opioids are related to illegal substances, such as opium and heroin. As such, they pose a high risk of addiction and abuse. Patients who take opioids at higher doses and for longer periods face higher risks of addiction and death. Due to the serious risks, before the mid-1990s, the generally accepted medical practice was to limit opioids to the treatment of acute pain, cancer-related pain and palliative care. Opioids were thought to be too addictive and debilitating to be used in the treatment of long-term chronic pain for conditions such as arthritis.

Beginning in the late 1990s Manufacturers developed a two-part scheme to dramatically increase the use of opioids. The first part of the scheme involved targeting economically and medically vulnerable populations within plaintiffs' communities who were predisposed to opioid addiction.

The second part of the scheme involved minimizing the risk of opioid addiction and death while overstating opioids' therapeutic benefits. Manufacturers advocated for expanding the use of opioids to patients suffering from chronic pain, despite knowing that there was no scientific evidence to support the long-term use of opioids for chronic pain.

Manufacturers misled patients into taking higher doses of opioids for longer periods by convincing them that opioids could improve the quality of life with low risk of addiction and abuse. Manufacturers promoted the false concept of "pseudoaddiction", which meant that the usual signs of addiction were an indication that the patient required more opioids to relieve pain. In 2016, however, CDC Guidelines rejected the concept of pseudoaddiction. Manufacturers also downplayed the difficulty of opioid withdrawal. They also falsely promoted the concept of "tapering"—a process by which withdrawal symptoms could be avoided by gradually reducing a patient's dosage.

Manufacturers used a variety of tactics to promote misleading claims about opioid medications. They employed aggressive sales representatives to convince and even bribe local prescribers into prescribing medically unnecessary opioids. Manufacturers employed key opinion leaders (KOLs), who appeared to be independent doctors, to promote the use of opioids at continuing medical education (CME) programs and other seminars. Manufacturers funded front

---

4. With the exception of factual allegations related to several additional manufacturer defendants in the Prescott and Pinal County complaints, the allegations against the Manufacturers are nearly identical in all seven complaints.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                          10/28/2020

groups, such as the American Pain Society and the American Pain Foundation ("APF"), to distribute misleading educational materials to doctors and patients. Manufacturers also used unbranded advertising that was not subject to FDA review, but which often contradicted the branded materials reviewed by the FDA. The front groups, KOLs, and advertisements downplayed the risks of addiction to convince patients and doctors that prescription opioids could be safely used for chronic pain more regularly and at higher doses.

Manufacturers' success in expanding the market for opioids created an abundance of the drugs available for non-medical and criminal use and created an addiction epidemic in plaintiffs' communities. An estimated 60% of the opioids abused come directly or indirectly from prescriptions. The explosion in opioid use in plaintiffs' communities led to a public health crisis. Arizona has experienced skyrocketing opioid addictions and opioid-related overdoses and deaths. According to plaintiffs, more than two Arizonans die each day from an opioid overdose, a 74% increase in deaths since 2012. The increase in addiction created an illegal market for prescription opioids and an increased demand for heroin. Plaintiffs claim they have had to expend substantial tax dollars to address increased healthcare costs, crime and homelessness in their communities.

B.   Manufacturer-Specific Allegations

The complaints set out allegations specific to each Manufacturer as summarized here.

1. Actavis. Actavis manufactures the branded drugs Kadian, Norco, a generic version of Kadian, and generic versions of Duragesic and Opana.

Since 2007, Actavis and its predecessor distributed a patient brochure for Kadian, which advised patients that over time they may become tolerant on their current dose and may require a dose adjustment to get the right amount of pain relief. Actavis also distributed an advertisement that claimed using Kadian to treat chronic pain could allow patients to return to work, relieve mental and physical stress and improve enjoyment of life.

In 2010, the FDA reprimanded Actavis for its deceptive marketing of Kadian that omitted and minimized its serious risks. The FDA warned Actavis that there was not substantial evidence demonstrating that Kadian resulted in an overall positive impact on a patient's work, physical and mental functions, daily activities or enjoyment of life after possible side effects were considered.

2. Cephalon. Cephalon manufactures Actiq and Fentora, both of which are approved for the treatment of persistent cancer pain for opioid tolerant individuals. Despite the limits on their

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020


approved use, Cephalon used KOLs, speaker programs and front groups to market these drugs for the treatment of chronic pain.

Cephalon sponsored a 2007 publication of the APF entitled *Treatment Options: A Guide for People Living with Pain,* which falsely stated that addiction is rare and limited to extreme cases involving unauthorized dose escalation, duplicative prescriptions and theft. This guide endorsed the concept that pseudoaddiction described patients whose pain was undertreated. The guide further stated that, unlike over-the-counter nonsteroidal anti-inflammatories (NSAIDs), there was no ceiling dose for opioids. The guide promised that opioids would give patients the life they deserved.

In 2007, Cephalon and Endo sponsored *Responsible Opioid Prescribing,* which taught that demanding and manipulative behaviors, seeing more than one doctor to obtain opioids and hoarding were signs of pseudoaddiction, not actual addiction. The advertisement falsely stated that opioid use alone could improve patients' functioning. Cephalon and Endo distributed a pamphlet entitled *Living with Someone with Chronic Pain*, which also understated the risk of addiction.

In 2008, Cephalon pleaded guilty for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

3. <u>Endo</u>. Endo manufacturers branded opioid medications, such as Opana/Opana ER, Percodan, Percocet and Zydone, and various generic opioid medicines. The marketing statement on Endo's website gives the false impression that opioids can provide long-term relief and functional improvement. Endo falsely advertised that patients using Opana ER for chronic pain could perform demanding tasks like construction work, and portrayed users of the medication as healthy and unimpaired.

Endo's unbranded marketing materials contradicted its branded materials concerning the risks of addiction. In one example, an unbranded advertisement deceptively stated that "People who take opioids as prescribed usually do not become addicted," in contradiction to Endo's branded advertising for Opana ER, which stated that all patients treated with opioids have a risk of addiction even with appropriate medical use.

In 2009, Endo sponsored a National Initiative on Pain Control (NIPC) CME program titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo was also a sponsor of a series of educational programs titled persistent *Pain in the Older Patient*, which claimed that chronic opioid therapy had been shown to reduce pain

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                          10/28/2020

and improve depressive symptoms and cognitive functioning. Endo distributed a pamphlet entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which advised that doses could be increased to relieve pain.

In 2009, Endo sponsored a website, Painknowledge.com, which falsely claimed that "[p]eople who take opioids as prescribed usually do not become addicted." The website also advised patients that opioid dosages could be increased until they reached the correct dose to relieve pain. The website further touted that opioid patients could experience improved quality of life and functioning that would allow them to participate in activities of daily living, such as work and hobbies that could not be enjoyed because of pain. The website was maintained by NIPC, but did not disclose Endo's involvement.

Another Endo sponsored website, PainAction.com, falsely stated "[m]ost chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo and Cephalon distributed a pamphlet entitled *Living with Someone with Chronic Pain*, which also understated the risk of addiction.

In 2016, Endo settled a claim with the New York Attorney General ("NYAG") related to its unfounded advertising claims about addiction. As part of the settlement, Endo agreed to refrain from making statements in New York that opioids are non-addictive or that most patients who take opioids do not become addicted. The NYAG found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing. The NYAG also found that Endo paid bonuses to sales representatives for detailing prescribers who had been arrested or convicted for illegally prescribing opioids and failed to prevent sales representatives from visiting suspicious prescribers who had been placed on the no-call list. Endo's Vice President for Pharmacovigilance and Risk Management testified that he was not aware of any research validating the concept of pseudoaddiction and agreed not to use the term in its training and marketing materials in New York.

Endo marketed Opana ER as tamper or crush-resistant and less prone to misuse and abuse, even though its own studies showed that Opana ER could be ground and chewed. In 2012, the FDA rejected Endo's petition to approve Opana ER as abuse-deterrent and in 2013 warned Endo that there was no evidence that Opana ER would provide a reduction in intranasal or intravenous abuse. The NYAG found Endo's statements about Opana ER's crush resistance to be false and misleading. In 2017, the FDA requested that Endo withdraw Opana ER from the market.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

4. <u>Par</u>. Par is the fifth largest manufacturer of generic pharmaceuticals in the world, including oxycodone, oxymorphone, and hydrocodone. In 2013, Par pleaded guilty to misbranding its drugs.

5. <u>Janssen</u>. Janssen manufacturers the opioid medication Duragesic and, until 2015, developed and sold the opioids Nucynta and Nucynta ER.

Although Janssen has disclaimed any responsibility for causing the opioid crisis, internal communications between high-level executives show that the company funded bogus research to lend credibility to the fiction that opioids are rarely addictive when used for chronic pain. Janssen used these studies to promote the idea that its medications were safer and less addictive than competitor brands.

In 2009, Janssen approved and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults*, which described addiction as a myth and falsely asserted that studies had shown that opioids are rarely addictive when used properly for chronic pain. The guide also listed dosage limitations as "disadvantages" of other pain medicines, but omitted any discussion of the risks of increased opioid dosages. The guide stated that use of opioids could make it easier to live a normal life and users could expect functional improvements in sleep, returning to work, recreation, sex, walking and climbing stairs, thus allowing people with chronic pain to return to a normal life.

In 2009, Janssen funded and edited the *Let's Talk Pain* website, which promoted falsehoods about pseudoaddiction. The website also featured an interview claiming that opioids allowed a patient to "continue to function." Janssen also ran the website, PrescribeResponsibly.com, which falsely claimed that concerns about addiction were "overestimated."

6. <u>Insys Individuals: John Kapoor and Michael Babich</u>. Insys Therapeutics, Inc. ("Insys") manufactures several types of opioids, including Subsys, a fentanyl sublingual spray and semi-synthetic opioid antagonist, and Syndros, a cannabinoid medicine used to treat side-effects of opioid use. Subsys is approved for breakthrough pain in opioid-tolerant cancer patients. In June 2019, Insys pleaded guilty to federal charges that the company bribed doctors to prescribe opioid medications to patients who did not need them, which was part of a $225 million deal with the federal government.

John Kapoor is the founder and majority owner of Insys. In May 2019, he was found guilty of racketeering conspiracy and running a scheme in several states, including Arizona, to bribe healthcare providers to prescribe Subsys. Kapoor personally made false and misleading

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                                  10/28/2020

representations regarding the proper use of Subsys and engaged in a nationwide conspiracy using bribes and fraud to promote the illegal distribution of Subsys.

Michael Babich is the former CEO and President of Insys. In January 2019, Babich pleaded guilty to charges of racketeering conspiracy, conspiracy to commit wire fraud, and conspiracy to violate the anti-kickback law.

Kapoor and Babich conspired to bribe practitioners in Arizona and other states to encourage the prescription of Subsys. In exchange for bribes and kickbacks, the practitioners wrote large numbers of prescriptions for patients, many of whom had no medical need for Subsys. Kapoor and Babich also conspired to mislead health insurance providers who were reluctant to approve coverage for opioid medications for non-cancer patients. To do this, they set up a reimbursement unit dedicated to obtaining prior authorizations from insurers and pharmacy benefit managers.

C.   Distributors'/Pharmacy Distributors' Involvement in Opioid Diversion

The Distributors supply opioids to hospitals, pharmacies and doctors in plaintiffs' communities. Since 2007, the Drug Enforcement Administration (DEA) has advised Distributors about diversion trends, "red flags" to identify potential diversion and their responsibility to maintain effective controls against diversion and report suspicious opioid orders. A Cardinal Health executive claimed that the company used "advanced analytics" to monitor supply chain and that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

Distributors knowingly or negligently allowed diversion, resulting in the assessment of numerous fines and penalties. In 2008, Cardinal Health paid a $34 million penalty to settle allegations about opioid diversion taking place at seven warehouses around the United States. In 2012, Cardinal Health reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states. In 2016, Cardinal Health reached a $34 million settlement with the United States.

In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center due to allegations that it was not controlling shipments of prescription opioids to internet pharmacies. In 2012, AmerisourceBergen was implicated in failing to protect against the diversion of controlled substances into non-medically necessary channels.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

Despite the various fines and penalties, Distributors have continued to allow the diversion of opioids. Distributors profited from the diversion of opioids by ignoring and not reporting the impossibly large orders they shipped into plaintiffs' communities.

Pharmacy Distributors Walmart, Walgreens and Smith's distributed opioids to their respective retail pharmacies in Prescott and Pinal County. Plaintiffs allege the Pharmacy Distributors failed to monitor and report suspicious orders of opioids. They ignored inconceivably large orders that far exceeded any legitimate medical need in the communities. They reaped enormous profits by flooding the market with prescription opioids.

D.   Pharmacy Dispensers' Involvement

Pharmacy Dispensers dispensed prescription opioids to residents in Pinal County. Plaintiff Pinal County asserts that the Pharmacy Dispensers had a duty to prevent opioid diversion and to report any suspicious orders. The Pharmacy Dispensers failed to report suspicious orders made obvious by certain "red flags." They had unique knowledge about the excessive supply of opioids into Pinal County. The Pharmacy Dispensers earned enormous profits by flooding Pinal County with prescription opioids.

E.   Prescribers

Fred Harper and Western Drug, Inc. (collectively "Harper") are pharmacists. The Apache County complaint improperly identified Harper as Prescribers. As discussed below, the complaint's allegations against these defendants are insufficient. Thus, the motion for more definite statement is granted and Apache County may amend its complaint against Harper.

F.   Harms Alleged

The Complaints allege that defendants made untold billions of dollars from their involvement in the prescription opioid epidemic. At the same time, plaintiffs have been severely harmed by defendants' actions. The cities and counties allege that defendants' actions have caused a devastating public health crisis in their communities.

The specific harms alleged include increased costs for providing opioid-related health services, such as emergency medical services, skilled nursing care, substance abuse treatment, and pain management clinics. Plaintiffs have also had to increase spending on foster care placement, family services and other social programs due to the rise of abuse and neglect of children. Increased funds have also been used to pay crime-related costs, including for arrests and investigations, probation and supervision services, jail services, court costs and community

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

victim assistance services. Plaintiffs also claim they have lost tax revenue as a result of the
incapacitation of their residents who were no longer productive citizens because of opioid
addiction. The county plaintiffs assert that they have had to make larger contributions to
AHCCCS and county health departments to cover increased demands for opioid-related services.

The complaints assert the following causes of action against each of the defendants:
Count 1: Public Nuisance; Count 2: Negligence; Count 3: Negligence per se; and Count 4:
Unjust Enrichment.[5]

## III.  PENDING MOTIONS TO DISMISS

There are 15 motions to dismiss pending. Manufacturers filed separate, but nearly
identical, motions to dismiss in each of the seven consolidated cases. The only difference in
these seven motions, responses and replies appears to be the arguments concerning the authority
of the cities and counties to bring these actions. Defendants Kapoor and Babich joined in all the
issues raised in Manufacturers' Motions to Dismiss. Pharmacy Distributors in the Prescott case
joined in Manufacturers' Motion to Dismiss on two issues: 1) whether the plaintiffs have
authority to bring these lawsuits; and 2) whether the claims are barred by the municipal cost
recovery rule. Pharmacy Distributors/Dispensers in the Pinal County case joined in the
Manufacturers' Motion to Dismiss on the same two issues.

The Actavis Generic Entities filed a separate Motion to Dismiss in all seven cases.
Cephalon and Kapoor also filed separate Motions to Dismiss in all seven cases.

Janssen filed a separate Motion to Dismiss in all cases. Babich joined in the motion on
two issues: 1) whether the fraud claims were pled with particularity; and 2) whether the claims
should be dismissed because the product labels and other materials disclosed the known risks of
opioid medications.

Distributors filed a separate Motion to Dismiss in all seven cases. Pharmacy Distributors
in the Prescott case joined in Distributors' motion on seven issues: 1) whether the complaints
pled causation-in-fact; 2) whether the claims are barred by the derivative injury rule; 3) whether
the complaints state a claim for public nuisance; 4) whether the complaints state a claim for
negligence; 5) whether the complaints state a claim for unjust enrichment; 6) whether the
complaints state a claim for negligence *per se*; and 7) whether plaintiffs are authorized to bring

---

5. On August 21, 2020, plaintiffs filed a notice of intent to dismiss Count 5 for negligent failure
to warn asserted against the Manufacturers. On September 2, 2020, plaintiffs filed a notice of
intent to dismiss Count 8 for violations of the Arizona Consumer Fraud Act.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                         10/28/2020

these lawsuits. Pharmacy Distributors/Dispensers in the Pinal County case joined in the same seven issues.

Pharmacy Distributors in the Prescott case filed a separate Motion to Dismiss. Babich joined in the motion to dismiss on the issue of proximate causation.

Pharmacy Dispensers/Dispensers in the Pinal County case filed a separate Motion to Dismiss. They incorporated most of the arguments raised in the motion filed by Pharmacy Distributors in the Prescott case, as well as raising some additional arguments. Babich joined in many of the issues raised in the motion to dismiss.

Harper filed a separate Motion to Dismiss or Motion for More Definite Statement in the Apache County case.

## IV. STANDARD OF REVIEW

Motions to dismiss are not favored. The purpose of a Rule 12(b)(6) motion is to test the sufficiency of the complaint, and the motion will only be granted if it demonstrates that plaintiffs would not be entitled to relief "under any facts susceptible of proof in the statement of the claim." *ELM Retirement Center, LP v. Callaway*, 226 Ariz. 287, 289, ¶ 5 (App. 2010) (*quoting Mohave Disposal, Inc. v. City of Kingman,* 186 Ariz. 343, 346 (1996)). In ruling on a motion to dismiss, the Court will assume the truth of the well-pled factual allegations and indulge all reasonable inferences therefrom in favor of the opposing party. *Cullen v. Auto-Owners, Ins. Co*., 218 Ariz. 417, 419, ¶ 7 (2008). The Arizona Supreme Court has warned trial courts against resolving factual disputes on an undeveloped record. *See Coleman v. City of Mesa*, 230 Ariz. 352, 363, ¶ 46 (2012).

"Arizona follows a notice pleading standard." *Id*. at 356, ¶ 9 (*quoting Cullen,* 218 Ariz. at 419, ¶ 6). The purpose of the complaint is to "give the opponent fair notice of the nature and basis of the claim and indicate generally the type of litigation involved." *Cullen*, 218 Ariz. at 419, ¶ 6. Thus, under Rule 8(a), a valid complaint need only have "a statement of the ground upon which the court's jurisdiction depends, a statement of the claim showing that the pleader is entitled to relief and a demand for judgment." *Rowland v. Kellogg Brown & Root, Inc*., 210 Ariz. 530, 533, ¶ 10 (App. 2005) (finding complaint sufficient despite "numerous technical deficiencies").[6] Notice pleading does not require a plaintiff to allege the evidentiary details of its claims for relief. *Verduzco v. American Valet*, 240 Ariz. 221, 225, ¶ 9 (App. 2016).

---

6. Defendants cite *Steinberger v McVey*, 234 Ariz. 125 (App. 2014), and argue that the complaints improperly group defendants together without identifying the particular fraudulent

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                              10/28/2020


## V.   THE ARIZONA SUPREME COURT'S GRANT OF REVIEW IN *TUCSON MEDICAL*

Plaintiffs repeatedly referred to a decision in *Tucson Medical Center v. Purdue Pharma L.P., et al.,* No. C20184991 (Pima County Superior Court), as persuasive authority on several issues in this case. *Tucson Medical* also concerns the prescription opioid crisis.

In a January 23, 2020 decision, the trial court in *Tucson Medical* denied CVS Pharmacy's ("CVS") motion to dismiss. Among other things, the trial court found within the Arizona Controlled Substances Act (AZCSA) a "separate public policy in favor of regulating and preventing harm from opioids." CVS Petition for Review at 4. CVS filed a petition for special action, which the court of appeals denied. CVS filed a petition for review of the denial in the Arizona Supreme Court. One of the arguments made by CVS in its petition was that the trial court erred by finding a tort duty based on AZCSA. CVS Petition for Review at 10-11.

On September 16, 2020, the Arizona Supreme Court granted CVS's petition for review on two questions:

(2) Whether a hospital may assert a direct claim against a third party it contends caused personal injuries to its patient, even if the patient is covered by Medicaid.
(3) Whether a pharmacy that self-distributes prescription opioids to its affiliated pharmacies owes a duty to the hospital.

---

statements made by each defendant. *Steinberger* holds that fraud-based claims, such as common law fraud, concealment, and consumer fraud, must be pled with particularity under Rule 9(b) as to each defendant. *Id.* at 141, ¶¶ 73-74. *Steinberger* does not hold that negligence and other non-fraud claims must be pled with particularity. In fact, while the court dismissed the fraud-based claims for lack of particularity, it sustained the negligence-based claims. *Id.* at 136-40, ¶¶ 44-62.

Here, plaintiffs have dismissed the consumer fraud claims. Thus, the pleading standard set out in *Steinberger* no longer applies. Defendants have not cited a case requiring particularized pleading of negligence and other non-fraud-based claims. There is nothing wrong with "group pleading" non-fraud claims where the defendants allegedly engaged in the same conduct. *See United States v. United Healthcare Ins. Co.,* 848 F.3d 1161, 1184 (9th Cir. 2016) ("There is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct.").

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

Arizona Supreme Court minutes, 9/16/2020, *CVS Pharmacy v. Bostwick/Tucson Medical*, CV-20-0120-PR. CVS also asked the supreme court to address the public nuisance and unjust enrichment claims. CVS Petition for Review at 15.

These cases are related to *Tucson Medical*. The decision by the supreme court may have a bearing on one or more issues in this case, including the question of the duty of care, remoteness and derivative injuries. Thus, some of the issues addressed in this ruling may need to be reevaluated after the supreme court rules on the special action. The parties may wish to file a special action of this ruling and seek consolidation with the *Tucson Medical* case.

Based on the special action, defendants filed a Motion to Stay on October 8, 2020. Plaintiffs filed an objection on October 26, 2020. In light of the instant ruling on the motions to dismiss, the parties may file a supplemental pleading (not to exceed five pages) concerning the merits of a stay as affected by this ruling.

**VI.  ANALYSIS**

Defendants first argue that the complaints are barred by the following six defenses common to all counts: (1) plaintiffs lack authority to bring the claims; (2) plaintiffs' injuries are derivative and too remote; (3) plaintiffs have not sufficiently pled causation; (4) local governments cannot recover for expenditures of funds to provide public services; (5) federal regulation of prescription opioid medications preempts plaintiffs' state tort claims; and (6) product labels disclosed the known risks of opioid medications.

Defendants then argue that each remaining count fails to state a claim upon which relief can be granted. Each issue will be addressed in turn.

A.  Analysis of Defenses Common to Multiple Claims.

1.  Plaintiffs' Authority to Bring These Actions.

Defendants challenge plaintiffs' authority to bring these actions. Defendants make two arguments: (1) the opioid crisis is a public health issue of statewide concern that the Arizona Attorney General has exclusive authority to address; and (2) the cities and counties have no authority to bring these actions.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

      a.  Statewide concern

Defendants argue that the opioid crisis is a statewide public health concern and only the Attorney General can bring lawsuits to address statewide issues. Although the opioid crisis is an issue throughout the State, defendants have not demonstrated that plaintiffs are precluded from bringing these lawsuits.

Defendants cite to *City of Flagstaff v. Associated Dairy Prod. Co*., 75 Ariz. 254 (1953), and *Associated Dairy Prod. Co. v. Page*, 68 Ariz. 393 (1949). In both cases, the cities sought to regulate the milk industry through local ordinance. The Arizona Supreme Court struck down the ordinances because the legislature had enacted statutes to regulate the milk industry throughout the state to the exclusion of local government regulation.

Defendants claim that the Arizona Attorney General recognized that the opioid claims are a matter of statewide concern when he argued in an amicus brief before the Sixth Circuit in the Ohio multidistrict opioid litigation that, "the opioid crisis is a matter of statewide impact that requires a statewide response." Attorneys General Amicus Brief in Support of Writ of Mandamus, *In re Nat'l Prescription Opiate Litig*., No. 19-3827, at 14 (6th Cir. Sept. 6, 2019). There, the Attorney General urged the court to stay the multidistrict litigation, arguing that the states should bring the claims, not individual local agencies. *Id*. at 13-14. Defendants also note that the Attorney General has filed several opioid related actions, including *Brnovich v. Purdue Pharma L.P.*, No. C20072471 (Pima Cty. Super. Ct. Sept. 10, 2018); *Brnovich v. Insys Therapeutics, Inc.,* No. CV2017-012008 (Maricopa Cty. Super. Ct. Aug. 30, 2017); and *Arizona v. Sackler*, No. 220151 (U.S. July 31, 2019).

Plaintiffs claim that their complaints are not public health lawsuits, and they are not seeking to address statewide problems. Rather, plaintiffs assert they are only bringing claims held by the cities and counties themselves for losses they sustained, not the public. Plaintiffs claim they are suing to recover on their own behalf the damages they incurred as a result of defendants' misconduct and that these are not matters of statewide harm, but only for harm distinct to them, based on health and crime expenses and losses specific to them.

The opioid crisis is certainly a statewide, and even a nationwide, concern. Defendants, however, have not cited any authority holding that local governments cannot sue for harms they have sustained. The *Associated Dairy Products* cases only held that a local government cannot regulate a field already regulated by the state. Those cases do not suggest that a local government cannot sue to recover for harms it has suffered.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

Further, the Sixth Circuit denied the State of Ohio's attempt to stop the local governments from moving forward with their claims in the Multidistrict Opioid Litigation. *See* Order, *In re Nat'l Prescription Opiate Litig.,* No. 19-3827 (6th Cir. October 10, 2019).[7]

At oral argument, this Court expressed concerns about the inelegant and inefficient process of allowing every city, town or county affected by the opioid crisis (*i.e.*, every city, town or county) to bring a separate state court action against conduct occurring on a national scale particularly when, as here, the claim is based on nuisance and the requested relief includes an injunction.[8] Although defendants allege that the Attorney General "has made clear that local government suits like this one 'undermine' and 'impede' any statewide resolution," Pima County Motion at 1:19-20, the Attorney General has not expressed any opposition to plaintiffs' claims in the cases before this Court.

Federal courts on occasion will ask for amicus briefing from governmental agencies with an interest in the outcome of litigation. Here, the Court invites the Arizona Attorney General to weigh in by submitting an amicus brief addressing the issue of whether the Attorney General supports, objects to or has no position on these opioid-related actions filed by cities and counties in Arizona state court.

---

7. Arizona Supreme Court Rule 111(c)(3) provides that "[a] party citing a memorandum decision must provide either a copy of the decision or a hyperlink to the decision where it may be obtained without charge." A memorandum decision is "a written disposition of a matter not intended for publication." Arizona Supreme Court Rule 111(a)(2). The parties have cited numerous unpublished trial court and appellate decisions from courts throughout the country. In most instances, the parties have failed to comply with this supreme court rule. The Court has tried to locate those cases. In the future, however, the Court will not consider the citation to an unpublished memorandum decision that does not comply with the supreme court rule.

8. This concern was expressed by the supreme court in *Hopi Tribe v. Arizona Snowbowl Resort Ltd.*, 245 Ariz. 397, 400, ¶ 10 (2018). In discussing the "special injury" requirement for a private plaintiff's prima facie public nuisance claim, the court noted that the "so-called 'special injury' requirement serves two important functions. First, it 'relieves[s] defendants and the courts of the multiple actions that might follow if every member of the public were allowed to sue for a common wrong. Second, in keeping with the principles of separation of powers and judicial restraint, it ensures that 'harm[s]. . . affecting all members of the public [are] handled by public officials' rather than by courts in private litigation." (Citations omitted.) Multiple lawsuits from multiple jurisdictions concerning the same, statewide common conduct implicate the same concerns.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020


For the purpose of these motions, plaintiffs' complaints survive a Rule 12(b)(6) motion to dismiss on the basis that the Attorney General has exclusive authority to sue the opioid defendants.

      b.  Cities and counties as plaintiffs

Defendants next argue that the cities and counties have no authority to bring these lawsuits. They argue that cities and counties have only those powers granted by the State and plaintiffs have not been granted authority to bring these suits. Defendants rely on *City of Scottsdale v. Superior Court,* 103 Ariz. 204, 205 (1968), in which the Arizona Supreme Court stated, "cities and towns of this state are municipal corporations created by the state and possessory of no greater powers than those delegated to them by the constitution and the general laws of the state." Defendants further argue that plaintiffs cannot bring these suits to recover injuries to their residents. *See, e.g., Town of Wickenburg v. State*, 115 Ariz. 465, 469 (App. 1977) (Arizona law "does not allow the municipality to bring a lawsuit in court to protect personal rights guaranteed to its citizens as individuals.").

Plaintiffs concede that they are not authorized to sue on behalf of others, including their own residents. Plaintiffs argue they are not bringing claims for harm done to their residents. Rather, they claim they are seeking to recover for harm to plaintiffs themselves caused by defendants' conduct. The complaints allege plaintiffs have suffered harm that is direct and unique to them. Plaintiffs can bring these actions to seek redress for those harms. *See City of Tucson v. Woods*, 191 Ariz. 523, 525-26 (App. 1997).

The cities argue that, as municipal corporations, they are authorized to do business, just like any other corporation in Arizona. *See* Ariz. Const. Art. § 13, sec. 5 ("Every municipal corporation within this state shall have the right to engage in any business or enterprise which may be engaged in by a person, firm, or corporation, by virtue of a franchise from said municipal corporation."). The charters for Glendale, Bullhead City and Prescott provide that they have "all the powers granted to municipal corporations and to cities by the constitution and laws of this state and by this charter, together with all the implied powers necessary to carry into execution all the powers granted." *E.g.,* Glendale Charter, Article I, section 3. A.R.S. § 11-201(A)(1) gives counties the power to sue and be sued. Further, A.R.S. § 13-2917(C), expressly authorizes local governments (cities and counties) to bring public nuisance actions.

Defendants' argument is not persuasive. Constitutional and statutory authority support plaintiffs' ability to bring these actions to recover for their own harms.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

2.  Remoteness/Derivative Injury Rule

The doctrine of remoteness or derivative injury rule provides that "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." *Laborers' & Operating Engineers' Util. Agreement Health & Welfare Trust Fund for Ariz. v. Philip Morris, Inc.,* 42 F. Supp. 2d 943, 948 (D. Ariz. 1999) (*quoting Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268–69 (1992)). In *Laborers' & Operating Engineers,* a pension fund sued tobacco companies for increased healthcare costs flowing from its participants' tobacco-related illnesses. *Id.* at 945. The plaintiff alleged that various companies "fraudulently misrepresented the risks associated with tobacco use and engaged in deceitful marketing" which "increased tobacco-related illnesses and associated health care costs," which plaintiff was responsible for paying. *Id.* The pension fund sought to recoup the increased healthcare costs from the tobacco companies. The court dismissed the RICO and state law claims because plaintiff's alleged injuries were "entirely dependent upon injuries sustained by [its] participants and beneficiaries, making [it] at least one step removed from the challenged harmful conduct." *Id.* at 947.

Manufacturers and Distributors argue that plaintiffs' alleged injuries are barred because they are too remote and derivative of injuries suffered by third-party opioid users. Defendants claim that plaintiffs' damages for lost tax revenue and expenditures for healthcare and criminal justice services flow from the injuries suffered by its residents who became addicted to opioids.

Plaintiffs respond that they are seeking recovery for their own damages, not for the harms inflicted on their residents. The complaints devote 10 to 15 pages each detailing the categories of damages plaintiffs allege they have suffered. Some of the injuries include: (1) healthcare costs for specialty services such as detoxification, residential and inpatient treatment; (2) cost of foster care for children abused and neglected because of opioid addiction; (3) costs for emergency medical services, including providing specialized treatment for drug overdoses; (4) increased crime-related costs, including specialized training, community and victim services; and (5) loss of tax revenue due to the decrease in the productive, working population.

Some of these categories of damages might be derivative, such as the healthcare-related costs, because they arise out of injuries to the residents. *See Id.* at 948; *Perry v. Am. Tobacco Co.,* 324 F.3d 845 (6th Cir. 2003) (plaintiffs were insureds who alleged their cost of premiums was increased by the tobacco companies' conduct; Sixth Circuit joined eight other federal circuit courts of appeal to rule that such claims fail because the alleged injuries are too remote). Other categories of damages, such as crime-related costs, do not appear to arise directly out of injuries to residents.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                          10/28/2020

In *In re National Opiate Litigation*, 440 F.Supp.3d 773, 802 (N.D. Ohio 2020), the district court denied a motion to dismiss and distinguished the tobacco cases as follows:

> Plaintiffs have alleged a plausible claim that their injuries are the direct result of the RICO Marketing Defendants' misrepresentations to them and their agents, and have also alleged a plausible claim that the RICO Defendants' participation in the creation of an illicit opioid market resulted in Plaintiffs' damages. Although Defendants identify third parties within the causal chain, Plaintiffs' economic injuries were incurred by Plaintiffs and not passed on by any intermediate party that was "closer" to Defendants' actions. . . Plaintiffs seek damages for payments they made and these claims are theirs and theirs alone.

*Id*. at 801-02 (citations omitted). The district court expressed some reservations about whether a plaintiff can recoup actual monetary costs "paid as a result of treatment provided to or medical expenses incurred by third-party individuals" for whom the plaintiff had some obligation to provide or pay for care. The court nevertheless denied the motion to dismiss because plaintiffs asserted some direct damages:

> However, even if *Jackson [v. Sedgwick Claims Mgmt. Serv., Inc.,* 731 F.3d 556, 565-66 (6th Cir. 2013] precludes a RICO claim where the asserted economic harm is created by personal injury to a third-party, the Funds also allege other categories of injury: claims paid for reimbursement for opioids premised on misrepresentations made to them or their agents, and payments unknowingly made for opioids destined for diversion into the secondary black market created by the RICO Supply Chain Defendants. These claims do not arise from third-party personal injuries. Because some of Plaintiffs' claims are not dependent on medical costs and expenses, the Court will not, at the motion to dismiss stage, deny Plaintiffs the opportunity to proceed with their claims.

*Id*. at 802.

This Court cannot find on this motion that all of plaintiffs' injuries are derivative. These are issues more appropriate for summary judgment when the parties develop a record concerning plaintiffs' damages.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020


3.  <u>Causation</u>

Defendants argue that all of plaintiffs' claims require proximate cause as an element and that the complaints fail to plead that defendants' conduct was the proximate cause of the alleged injuries.[9]

To establish causation, a plaintiff must show that the injury would not have occurred "but for" the defendant's negligent conduct. *Ontiveros v. Borak*, 136 Ariz. 500, 505 (1983). Proximate cause is defined as "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Smith v. Chapman*, 115 Ariz. 211, 214 (1977) (*quoting McDowell v. Davis*, 104 Ariz. 69, 71 (1969)). The mere possibility of causation is not enough. *Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix*, 216 Ariz. 454, 460, ¶ 21 (App. 2007) (affirming grant of summary judgment on lack of proximate causation).

A defendant's acts are the proximate cause of a plaintiff's injury only if they are a substantial factor in bringing about the harm. *Barrett v. Harris*, 207 Ariz. 374, 381, ¶ 26 (App. 2004). However, the defendant's conduct does not need to be the sole cause of plaintiff's harm. Proximate cause can exist even if defendant's acts contributed only a little to plaintiff's injury. *Ontiveros*, 136 Ariz. at 505. Thus, more than one person may be liable for causing an injury and a defendant cannot escape liability by claiming that the conduct of some other person was also a contributing cause. *Id.*

In some circumstances, a supervening cause may be sufficient to relieve a defendant of liability but only when the intervening event was unforeseeable by a reasonable person in defendant's position and, when looking back, the event appears extraordinary. *Grafitti-Valenzuela*, 216 Ariz. at 462, ¶ 29. Whether an intervening act was foreseeable and extraordinary to break the chain of causation requires consideration of all the facts. *McMurtry v. Weatherford Hotel, Inc.*, 231 Ariz. 244, 256, ¶ 38 (App. 2013). A plaintiff must also show some reasonable connection between defendant's act or omission and plaintiff's damages. *Robertson v. Sixpence Inns of Am., Inc.*, 163 Ariz. 539, 546 (1990). The issue of causation is ordinarily a question for the trier of fact that can rarely be decided on a motion to dismiss.

---

9. Because the failure to warn claims have been dismissed, the Court will not address the issues briefly alluded to in the motions concerning the learned intermediary doctrine and whether the complaints alleged doctors would have made different prescribing decisions had they been given different warnings. *See D'Agnese v. Novartis Pharmaceuticals, Corp.*, 952 F. Supp. 2d 880, 889 (D. Ariz. 2013).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020


a.  Manufacturers' motions

Manufacturers argue that there are too many links in the chain of causation.
Manufacturers list six links in the chain between their actions and the alleged harm: (1)
Manufacturers misleadingly marketed opioid medications; (2) doctors wrote inappropriate
prescriptions for opioid medications based on the misleading marketing claims; (3) patients in
plaintiffs' communities took the medications based on the misleading claims; (4) the medications
led to addiction, overdose or other injury; (5) the injuries led to hospitalization, job loss, foster
care, crime or other harm; and (6) plaintiffs incurred costs to mitigate the problems in their
communities. Manufacturers claim there are seven links in the chain of causation on the
allegations that Manufacturers failed to report suspicious orders, the failure-to-prevent diversion
claim. Defendants argue the causal chain from their conduct to plaintiffs' injury is far too
attenuated.

Plaintiffs argue that they have adequately pled causation and the issue should not be
decided on a motion to dismiss. Plaintiffs claim it was foreseeable to Manufacturers that their
scheme to mislead doctors and the public about the risks and benefits of opioid medications
would lead to an abuse and addiction crisis, which the cities and counties would have to address,
leading to increased health and safety costs and lost revenue. They allege Manufacturers'
targeted their communities and the vulnerable citizens within them in order to sell more of the
opioids they produced, and used KOLs, front groups and other marketing ploys to convince
doctors to prescribe the medications for purposes other than their intended use. Plaintiffs allege
the scheme was designed to influence physicians in order to increase sales of opioids in
plaintiffs' communities and, without Manufacturers' deception, the addiction and abuse of
opioids would not have become such a widespread, severe problem.

Because the addictive qualities of opioids were known, it was foreseeable to
Manufacturers that their misleading claims would lead to addiction and societal problems the
local governments would have to address. If Manufacturers deceived doctors and targeted
vulnerable residents, as alleged, they cannot claim that those doctors and patients who fell for the
scheme are superseding causes that break the chain of causation. Thus, the Court cannot rule as a
matter of law that causation is too attenuated. Taking the allegations as true and drawing all
inferences therefrom in plaintiffs' favor, the Court finds that the causation allegations survive a
motion to dismiss.

Courts in other opioid-related cases have come to the same conclusion on causation at the
pleading stage. *See, e.g., In re National Prescription Opiate Litig.*, No. 1:17-md-2804, 2018 WL
6628898, *5 (N.D. Ohio Dec. 19, 2018) ("Under this potential chain of causation, the
relationship between Plaintiffs' injury and Defendants' alleged conduct . . . is not too remote to

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

support a finding of proximate cause here."); *City of Everett v. Purdue Pharma L.P.*, No. C17-209RSM, 2017 WL 4236062, *6 (W.D. Wash. Sept. 25, 2017) (although there were multiple links in the chain of causation, issue was a fact question that could not be decided on a motion to dismiss).

Defendants also argue that the factual allegations of causation are insufficient. They complain that the complaints do not identify the specific prescribers who relied on a misleading statement in deciding to write an opioid prescription for a patient living in plaintiffs' communities.[10]

Rule 8 applies to causation. Under notice pleading, a plaintiff does not need to include all the factual support for its allegations in the complaint. Plaintiffs are not required to identify the doctors who prescribed specific medications and to whom. That level of specificity is unnecessary in a complaint. Nothing would be served by requiring plaintiffs to plead their claims with that level of detail, other than to double or triple the length of the already lengthy complaints.

In a related argument, defendants argue that plaintiffs' damages are too speculative and difficult, if not impossible, to calculate. *See Rancho Pescado, Inc. v. Northwestern Mut. Life Ins. Co.*, 140 Ariz. 174, 186 (App. 1984) (summary judgment granted where evidence of lost profits was nothing more than speculation and conjecture; "It is well settled that conjecture or speculation cannot provide the basis for an award of damages. The evidence must make an approximately accurate estimate possible."). Defendants argue that to prove damages plaintiffs must plead and prove: (1) which doctors prescribed opioid medications based on Manufacturers' misleading claims; (2) that the prescriptions were harmful to a resident within plaintiffs' communities; and (3) which instances of crime or other societal harm resulted from Manufacturers' wrongdoing.

Like causation, the potential difficulty in ascertaining and apportioning damages is not a basis for granting a motion to dismiss. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,

10. Cephalon argues that plaintiffs cannot establish proximate causation because the labels for Actiq and Fentora have black box warnings and are subject to the TIRF REMS program, which imposes strict requirements on medical providers before prescribing those medications. Thus, Cephalon claims prescribers and patients could not have been misled about the appropriate uses and risks of those medications. As discussed below, the Court will only consider the complaints' allegations and will not consider the product labels and the documents concerning the TIRF REMS programs in ruling on these motions to dismiss. For purposes of these motions, the Court will accept as true the allegations that doctors and patients were misled.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                          10/28/2020

572 U.S. 118, 135 (2014) (the "potential difficulty in ascertaining and apportioning damages is not . . . an independent basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects"); *see* CJS Pleading § 653 (2020) ("[A] motion to dismiss will not lie on the ground that the damages claimed are remote, uncertain, or speculative in character and cannot be the subject of recovery.").

Manufacturers rely primarily on two opioid-related cases, *State ex. rel. Stenehjem v. Purdue Pharma L.P.*, No. 08-2018-CV-01300, at 10 (N.D. Dist. Ct. May 10, 2019), *and City of New Haven v. Purdue Pharma, L.P.,* No. X07-HHD-CV-17-6086134-S, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019). Both are unpublished trial court rulings. In both cases, the trial courts held that the multiple links between the opioid manufacturers' alleged misconduct and the plaintiffs' harm was too attenuated and dismissed the claims. These cases do not support dismissal of this case at this stage.

*Stenehjem* was decided on a motion to dismiss that had been converted to a motion for summary judgment. S*tenehjem,* No. 08-2018-CV-01300, at 4. The court stated that there were multiple intervening events and actors, such as a doctor's decisions to prescribe medications and the patient's response to the medication. The court believed that it is "nearly impossible to trace any of the harms the State alleges back to solely [defendant's] own medications" and it would be incomprehensible to hold defendant "solely responsible for the entire opioid epidemic in North Dakota" given defendant's small share of the market. *Id.* at 22. In *New Haven*, the court dismissed similar claims against opioid manufacturers finding the causal chain too remote. The court believed that deciding damages would be too complex and involve "rank speculation." *New Haven,* 2019 WL 423990, * 4.

Defendants also rely on tobacco-related cases, such as *Steamfitters Loc. Union No. 420 Welfare Fund v. Phillip Morris, Inc.,* 171 F.3d 912 (3d Cir. 1999). In *Steamfitters*, union health funds brought a class action against tobacco companies. The plaintiffs claimed that defendants' fraudulent misconduct caused plaintiffs' members and beneficiaries to suffer personal injuries in the form of increased smoking-related illnesses. *Id.* at 917–18. As a result, plaintiffs claimed that they were damaged by having to pay increased medical insurance costs to treat their members. *Id.* The court dismissed the case finding it would be too speculative to determine the extent to which plaintiffs' increased costs for smoking-related illnesses were caused by the tobacco companies' conspiracy to suppress information, as opposed to other factors, such as the smokers' other health problems or the smokers' independent decisions to ignore health and safety warnings and continue smoking. *Id.* at 933.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                              10/28/2020

*Stenehjem*, *New Haven* and *Steamfitters* do not reflect Arizona law and are not persuasive authority to grant the motions to dismiss. Although proving causation and damages may be difficult, difficulty of proof is not a basis for dismissing the claims at the pleading stage. As the Arizona Supreme Court stated:

> The complexity of proving damages through multiple levels of sales is a daunting task, but one to which our courts are equal. The plaintiffs bear the burden of proving the damages caused by a defendant's wrongful conduct. If the plaintiffs cannot present admissible and convincing proof, they cannot recover. For the purposes of these cases, in which we are compelled to accept the allegations of the complaints as true, . . . we assume that these Plaintiffs can present sufficient evidence of injury caused by illegal conduct. Unlike the Supreme Court, we are unwilling to foreclose their opportunity to attempt to prove their injury.

*Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 18, ¶ 31 (2003) (citations omitted). Difficulty in proving damages is not a basis for dismissal and plaintiffs should be given an opportunity to present admissible and convincing proof of causation and damages.

Construing the allegations in the complaints as true, the Court finds that the complaints contain sufficiently detailed allegations of causation and the harms suffered by plaintiffs. The causal links are not too remote or the damages too speculative to require dismissal at this stage.

    b.  Distributors' motion

In their separate motion, Distributors argue that cause-in-fact and proximate cause have not been alleged against them. They assert that the upsurge in addiction in plaintiffs' communities resulting in plaintiffs' damages had nothing to do with the actions of the wholesale opioid distributors. They claim that plaintiffs' harms were actually caused by the opioid users' decisions to abuse drugs, the doctors who prescribed them and the manufacturers who made and sold them. Distributors claim their role is limited to shipping opioids to pharmacies and that the mere act of shipping these medications could not have caused the harms alleged. In short, they claim there are too many links in the causal chain. Distributors also rely on *Stenehjem* and *New Haven*.

Plaintiffs allege that Distributors ignored the impossibly large and suspicious opioid orders shipped into plaintiffs' communities, failed to take steps to stop these large orders and continued to supply these communities with large amounts of opioids in order to maximize their profits. By failing to stop the supply of opioids, Plaintiffs claim that Distributors contributed to the opioid crisis and the resulting harm to plaintiffs.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

These allegations sufficiently allege causation. Whether there has been an intervening, superseding event cannot be determined at this stage. *See Robertson,* 163 Ariz. at 546.

c.   Pharmacy Distributors'/Dispensers' motions (Prescott and Pinal County cases)

Pharmacy Distributors/Dispensers also argue causation is too attenuated. They assert that too many intervening events and actors, including the criminal acts and abuse by third parties, interrupt the causal chain. They claim there is no connection between shipping opioids to retail pharmacies and dispensing them to patients and plaintiffs' alleged injuries. For instance, the Pharmacy Distributors argue there are no allegations that a shipment was diverted to plaintiffs' communities that caused the need for more public services. The Pharmacy Dispensers assert that there are no allegations linking the dispensing of an opioid by a licensed pharmacist to plaintiffs' injuries. They contend that multiple third-party actors break the causal chain.

The cases defendants cite do not support dismissal. For example, *Hannosh v. Segal*, 235 Ariz. 108 (App. 2014), concerned whether gambling losses were injuries to the person under Arizona's racketeering statute. In *Bloxham v. Glock Inc.,* 203 Ariz. 271, 277, ¶ 20 (App. 2002), the court of appeals did not address the proximate cause issue, but held that the that the gun manufacturer and gun show operator owed no duty to parents of child killed by a gun purchased at a gun show.

The Court finds the complaints sufficiently plead causation. Plaintiffs are not required to plead every fact in the causal chain. Further, proximate causation is rarely decided on a motion to dismiss. *See, e.g., Patterson v. Thunder Pass, Inc.,* 214 Ariz. 435, 440, ¶ 19 (App. 2007) (on summary judgment motion, court found a superseding, intervening event of independent origin that negated any negligence on the part of defendant).

4.   The Municipal Cost Recovery Rule

Defendants argue that the municipal cost recovery rule bars plaintiffs' claims. The municipal cost recovery rule holds that local governments cannot recover for the costs of providing public services from a tortfeasor whose conduct caused the need for the services. The principal case adopting this rule is *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322 (9th Cir. 1983).

In *Flagstaff*, the city sued to recover the costs of providing emergency services from a train derailment near the city. *Id.* at 323. The city alleged that its fire department had incurred expenses related to the evacuation of the city, including "overtime pay, emergency equipment,

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

emergency medical personnel, and the cost of food provided to evacuated residents.*" Id.* The city claimed that these costs were compensable damages arising from the railroad's negligence and ultrahazardous activity. *Id.* The Ninth Circuit, interpreting Arizona law, held that the city could not recover its costs.[11] The Ninth Circuit reasoned, "the cost of public services for protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service. Where such services are provided by the government and the costs are spread by taxes, the tortfeasor does not expect a demand for reimbursement." *Id.* The court noted that while sometimes "new tort doctrines are required to cure an unjust allocation of risks and costs," such was not the case "where a fair and sensible system for spreading the costs of an accident is already in place." *Id*. The policy underpinning the rule is that the government has chosen to bear the cost of such expenditures, and any change in that "fiscal policy" should be addressed by the Legislature, rather than the courts. *Id*. The Ninth Circuit recognized that the rule was not a blanket prohibition and that a governmental entity could recover public service costs when authorized by statute or when the tortfeasor has created a public nuisance which the government seeks to abate. *Id.* at 324.

Manufacturers argue that the harms alleged here are the type of public expenditures that are barred by the municipal cost recovery rule. Manufacturers point out that in Glendale's complaint, for example, plaintiff alleges that defendants' involvement in the opioid crisis imposed enormous tax-based economic damages on Glendale, including tax revenue expended incident to providing various public services that Glendale is required to provide to its citizens under Arizona law, including healthcare- and crime-related costs." (Glendale Complaint at ¶ 286). Glendale seeks, for instance, damages for "tax dollars [spent] to maintain the public safety of places, such as city parks, schools and public lands, where patients-turned-addicts attempt to congregate," and for services provided to crime victims. (*Id.* at ¶¶ 302, 305). Glendale also seeks damages for "foster care placement" and "arrests and investigations" costs. (*Id.* at ¶¶ 295-99, 302-04).

Plaintiffs argue that *Flagstaff* is not binding and no Arizona state court has adopted the rule. Plaintiffs further argue that *Flagstaff* does not apply here for two reasons: (1) their claims fall within the nuisance abatement exception recognized in *Flagstaff,* and (2) the rule has only been applied to discrete incidents, not persistent, ongoing misconduct as alleged here.

The municipal cost recovery rule does not bar plaintiffs' claims. *Flagstaff* expressly recognized that the rule does not apply to claims for abatement of a nuisance. As discussed

---

11. Although *Flagstaff* involved the interpretation of Arizona law, no Arizona appellate court has applied the municipal cost recovery rule. The Ninth Circuit acknowledged that its interpretation was not definitive. *Id.* at 323.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

below, the complaints state a claim for public nuisance. Thus, the costs plaintiffs seek to recover here arguably fall within the exception recognized in *Flagstaff*.

Further, the train derailment in *Flagstaff* was a single, discrete incident requiring a single emergency response. By contrast, the alleged misconduct here is substantial, ongoing and persistent. The complaints allege this conduct has been occurring for decades. In similar cases, courts have declined to bar tort claims where a defendant engages in a course of repetitive conduct that causes substantial harm that imposes a repeated burden on government services. *See, e.g., Cincinnati v. Beretta U.S.A. Corp.,* 95 Ohio St. 3d 416, 428, ¶ 45 (2002) (public nuisance and negligence action by city against handgun manufacturers, trade associations, and handgun distributor); *James v. Arms Technology, Inc.*, 820 A.2d 27, 49-50 (N.J. Super. 2003) (declining to apply the municipal cost recovery rule to a public nuisance claim against gun manufacturers, distributors, and dealers).

This decision is consistent with decisions by other courts in opioid-related cases. As Judge Polster noted in a recent decision in the MDL, "[t]he current trend among state court judges ruling in opioid-related cases around the country is that the municipal cost recovery rule does not apply when, as alleged here, an ongoing and persistent course of intentional misconduct creates an unprecedented, man-made crisis that a governmental entity plaintiff could not have reasonably anticipated as part of its normal operating budget for municipal [or] county . . . services*." In re National Prescription Opiate Litig.*, 1:17-MD-2804, 2019 WL 3737023, *8 (N.D. Ohio June 13, 2019).

5.  Federal Preemption

    a.  Manufacturers' Motion

"The preemption doctrine derives from the Supremacy Clause of the Constitution, which states: 'This Constitution, and the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Fiore v. Collagen Corp*., 187 Ariz. 400, 402-03 (App. 1996) (*quoting* U.S. Const. Art. VI, Cl. 2). Thus, federal law preempts state statutes, regulations and state-law causes of action that conflict with federal law. *Id*. (*citing Hillsborough County v. Automated Medical Lab., Inc.,* 471 U.S. 707, 713 (1985)). A conflict exists when it is impossible for defendant to comply with state and federal laws at the same time. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011); *Reed-Kaliher v. Hoggatt*, 237 Ariz. 119, 124, ¶ 19 (2015).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

In the context of prescription drugs, federal preemption arises when a state enacts a statute or regulation which imposes labeling requirements on medications regulated by the FDA. *See Wyeth v. Levine,* 555 U.S. 555, 571 (2009). Preemption also can arise through a tort action alleging insufficient labeling that seeks to impose upon a manufacturer a duty to warn beyond what the FDA would approve. *Id.* Such claims are preempted because it would be impossible for the manufacturer to comply with both federal and state law. Defendants have the burden of showing by clear evidence that the claims are preempted. *Id.* at 571; *Conklin v. Medtronic, Inc.,* 245 Ariz. 501, 504, ¶ 8 (2018).

Manufacturers argue that all of plaintiffs' claims are preempted because they conflict with federal law and FDA regulations regarding the approval and labeling of opioid medications. Manufacturers claim that plaintiffs seek to hold them liable for promoting opioid medications for FDA-approved uses. They assert their marketing and promotion was consistent with the FDA-approved labeling and any claims the warnings were inadequate or misleading are preempted.

Manufacturers characterize the complaints as alleging that they falsely represented prescription opioid medications as safe and effective for the long-term treatment of chronic, non-cancer pain. They claim that the FDA has approved the long-acting opioid medications for this use "for an extended period of time, which indicates the FDA found that the opioids to be safe and effective for this use, the benefits outweigh the potential risks and the approved labeling is not false or misleading." Manufacturers mostly rely on *Stenehjem,* No. 08-2018-CV-01300, at 10, an unpublished trial court decision, which held that claims alleging opioid labeling should have included additional warnings were preempted.

Plaintiffs dispute that their claims are based on the marketing of opioid medication for their FDA-approved uses. Rather, they assert that their claims are premised on Manufacturers' deceptive promotion of these medications. They insist that they are not claiming Manufacturers should have changed their FDA-approved labels or that they should have affirmatively disseminated information already contained in the labels. Rather, they contend Manufacturers deceptively marketed the drugs through aggressive and misleading claims about the risks and benefits of opioids. Plaintiffs cite a number of recent opioid-related cases which have held that state law claims based on the promotion of opioids in a manner inconsistent with the FDA-approved labeling were not preempted. *E.g., In re National Prescription Opiate Litigation*, No. 1:17 MD 2804, 2019 WL 4178591, at *5, n.12 (N.D. Ohio Sept. 3, 2019) (collecting cases holding that state law claims based on manufacturers' deceptive, off-label marketing of opioids were not preempted); *In re National Prescription Opiate Litig.*, MDL No. 1:17-CV-02804, 2018 WL 4895856, *25 (N.D. Ohio Oct. 5, 2018) (Magistrate Judge Report and Recommendation) (holding that claims alleging misleading promotion of opioids are not preempted); *Commonwealth v. Purdue Pharma, L.P.,* No. 1884CV01808BLS2, 2019 WL 5495866, *3 (Mass.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

Super. Sept. 17, 2019) (holding claims alleging marketing of opioids that were inconsistent with approved labels were not preempted); *see also, Arters v. Sandoz Inc.,* 921 F. Supp. 2d 813, 819-820 (S.D. Ohio 2013) (state law fraud claims based on defendants' allegedly fraudulent or unreasonably dangerous off-label promotion of generic drug were not preempted).

A fair reading of the complaints suggests that plaintiffs do not seek to require additional warnings or change opioid labeling. Rather, the allegations detail numerous instances of marketing that were inconsistent with the product labels, most notably the minimization of addiction risk. The complaints also allege that Manufacturers made marketing claims unsupported by scientific evidence, for example that opioids were indicated for the treatment of chronic pain, that opioids could improve patient's functioning and quality of life and that opioids were more efficacious and less dangerous than over-the-counter alternatives.

*Stenehjem* is distinguishable.[12] In that case, the court treated the motion to dismiss as a motion for summary judgment and considered several exhibits, including drug labels and FDA letters.[13] *Stenehjem*, No. 08-2018-CV-01300, at 3-4. The court found that although the plaintiff claimed it was not alleging inadequate labeling, it was in fact arguing that the manufacturer "could have, and should have, strengthened its labeling and warnings to include additional risk information without prior FDA approval." *Id.* at 10. The court further found that there was clear evidence the FDA would not have approved the labeling changes plaintiff claimed were required to make them not misleading. *Id.* at 14.

Here, the complaints allege Manufacturers deceptively marketed their products through branded and unbranded marketing, front groups, CME seminars, and KOLs. Plaintiffs claim that the off-label advertising often contradicted the FDA-approved material. Unlike *Stenehjem*, the complaints here do not propose that any changes should be made to the FDA-approved labels.

_____

12. The court in *Commonwealth*, 2019 WL 5495866, *3, criticized *Stenehjem*, stating it was "an outlier" and of "questionable value." In *In re National Opiate Litig.*, 2019 WL 4178591, at *5, the court stated that *Stenehjem* was "by leaps and bounds, an outlier on the question of preemption."

13. In support of their preemption argument, Manufacturers provide links to products labels for Opana ER, Duragesic, Nucynta ER, Kadian and other opioid medicines. They claim that the Court can consider these materials in its ruling on a motion to dismiss because the complaints referred to "opioid medication labeling" and the documents are publicly available. Plaintiffs respond that the Court cannot consider the labels in ruling on the motions without converting them to motions for summary judgment. As discussed more fully below, the labels are matters outside of the complaints and the Court will not consider them in deciding these motions.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020


Nor are plaintiffs claiming the labeling was inappropriate or misleading. Rather, they allege Manufacturers engaged in a deceptive marketing scheme to downplay the risks of opioid products. At this stage, Manufacturers have not shown by clear evidence that plaintiffs' claims would impose state law duties that would render it impossible for them to comply with federal law. As such, plaintiffs' claims are not preempted.

     b.  Actavis Generic Entities' Motion

     The Actavis Genetic Entities make a slightly different preemption argument. They argue that as manufacturers of generic medications, they compete solely on price and avoid marketing their products to physicians. *See New York v. Actavis, PLC*, No. 14 CIV. 7473, 2014 WL 7015198, at *27 (S.D.N.Y. Dec. 11, 2014), aff'd sub nom. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015).

     The FDA requires all generic medications to be the same as their brand name counterparts. Generic medications must have the same active ingredients and therapeutic effects, the same route of administration and the same FDA-approved labeling as the brand-name drugs. *See* 21 U.S.C. § 355(j)(2)(A). This duty of "sameness" applies to any promotional and advertising materials as well. 21 U.S.C. § 321(m). In short, federal law requires that "generic drug labels be the same at all times as the corresponding brand-name drug labels." *Mensing*, 564 U.S. at 618 (state law claims seeking to require generic drug manufacturers to change FDA-approved labeling are preempted).

     The Actavis Generic Entities argue that this duty of "sameness" preempts any state law claim alleging that they had a duty to provide additional or different warnings beyond the FDA-approved brand labeling. They argue that it would be impossible for them to comply with the supposed duty without violating the federal duty of sameness. They also deny marketing and promoting opioids, contrary to the allegation in the complaints.

     Plaintiffs argue that defendants mischaracterize the complaints and insist that they are not alleging the Actavis Generic Entities failed to warn about opioid risks or that the labels should have included warnings other than those required by the FDA. Rather, plaintiffs' allegations against the generic entities are similar to the brand-name manufacturers. Like the brand-name manufacturers, the complaints allege that the Actavis Generic Entities marketed and promoted their opioid medications in a deceptive and misleading way that was inconsistent with the approved uses and contradicted the approved labels. The Actavis Generic Entities allegedly downplayed the risks of addiction and abuse and exaggerated the benefits through various marketing practices, such as front groups and KOLs. Other courts have held that similar allegations of off-label promotional activities against generic drug manufacturers are not

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                        10/28/2020

preempted by the doctrine of sameness. *See, e.g., Arters,* 921 F. Supp. 2d at 819-820 (plaintiffs' claims against generic drug manufacturer were "based on the idea that defendants promoted the drug in a fraudulent or unreasonably dangerous way" and the claims based on off-label promotion were not preempted); *In re National Prescription Opiate Litig*., 2018 WL 4895856, at *24-25 (N.D. Ohio Oct. 5, 2018).

As discussed below, these allegations are sufficient under Rule 8. Although Actavis Generic Entities deny that they were engaged in any of the alleged marketing and promotional activities, the Court must accept these allegation as true.[14]

6.   Opioid Product Labels

Janssen and Cephalon argue that all claims must be dismissed because they did not make any misleading statements about their opioid medications. They assert that the FDA-approved product labels and other materials adequately disclosed the known risks of prescription opioid medications.

In support of its motion, Janssen submitted a large stack of materials, including current and previous versions of drug labels for Duragesic, Nucynta ER, and Nucynta IR and summaries of the labels created by counsel. Janssen attached various pamphlets, book excerpts, website materials and guidelines cited in the complaints. It also attached a copy of a document entitled "Extended-Release (ER) and Long-Acting (LA) Opioid Analgesics Risk Evaluation and Mitigation Strategy (REMS)."

Cephalon argues that the complaints fail to state a claim against it. Cephalon argues that the opioids it manufactured and sold, Actiq and Fentora, are different than the medications sold by other manufacturers because they were FDA-approved for the management of breakthrough cancer pain for opioid-tolerant individuals. Cephalon claims its sales represented only a small fraction of the opioid market. Further, it asserts that the risks of addiction were adequately disclosed in the approved labels. It further claims that its medications were subject to a Special REMS program applicable to transmucosal immediate release fentanyl ("TIRF") prescription medications. The TIRF REMS Program imposes rigorous requirements on prescribers of Actiq and Fentora to ensure they are only prescribed when medically appropriate. The TIRF REMS includes detailed educational materials and prescribing information and requires a knowledge assessment before being prescribed. Further, both patients and physicians must sign an

_____

14. Plaintiffs have dismissed the failure to warn claims. Thus, the Court will not consider whether the failure to warn allegations are preempted. *See Strayhorn v. Wyeth Pharms., Inc*., 737 F.3d 378 (6th Cir. 2013).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

agreement stating they understand the risks and approved uses. To support its motion, Cephalon referred to various materials outside of the complaints and attached copies of its product labels and documents related to the TIRF-REMS program.

Defendants ask the Court to take judicial notice of these product labels and other materials and consider them in ruling on the motions to dismiss. The Court only will consider the allegations in the complaint and will not consider the labels and other documents submitted by defendants.

Generally, when adjudicating a Rule 12(b)(6) motion to dismiss, the court can only consider the allegations in the complaint itself. *Coleman,* 230 Ariz. at 363, ¶ 46. If matters outside the complaint are considered, the motion must be treated as one for summary judgment. Ariz. R. Civ. P. 12(d). A complaint's exhibits, or public records regarding matters referenced in a complaint, are not "outside the pleading," and courts may consider such documents without converting a Rule 12(b)(6) motion into a summary judgment motion. *See ELM Retirement Center*, 226 Ariz. at 289, ¶¶ 6-8 (trial court's consideration of purchase contract attached to motion to dismiss did not convert it to a motion for summary judgment); *Strategic Dev. & Constr., Inc. v. 7th & Roosevelt Partners, LLC*, 224 Ariz. 60, 64, ¶ 13 (App. 2010) (court did not err in considering a notice of lien which was a matter of public record in the Maricopa County Recorder's office). The trial court has discretion to disregard matters submitted outside of complaint and consider the sufficiency of complaint based on the complaint allegations alone. *See Cullen v. Koty–Leavitt Ins. Agency, Inc.*, 216 Ariz. 509, 514, ¶ 10 (App. 2007), reversed and vacated in part on other grounds by *Cullen v. Auto–Owners Ins. Co.*, 218 Ariz. 417 (2008).

In its discretion, the Court will not consider the vast amount of material filed with the motions. The materials submitted are far beyond matters central to the complaint and cannot be considered without converting the motions into motions for summary judgment. The rule that allows the Court to consider attachments to the complaint and public records is reserved for documents that are central to a dispute, such as a contract. Here, there are not one or two documents that could resolve this case. Instead, defendants attached over a thousand pages of materials claiming that these materials prove they did nothing wrong.

Defendants claim that at least some of the materials, such as the product labels, are public records that the Court should consider. As plaintiffs point out, the fact that the documents are publically available on the internet does not make them public records. "Public records" are defined under Arizona law. *See Griffis v. Pinal Cty.*, 215 Ariz. 1, 4, ¶ 9 (2007). The Court does not need to decide now if these materials are public records because the Court declines to consider large volumes of contested documents when ruling on fifteen motions to dismiss. Even if the Court reviewed the labels and other documents, the Court could not determine whether

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

there was some inconsistency in defendants' messaging. That may be an issue for a motion for summary judgment or it may be a question for the trier of fact, but it cannot be resolved on a motion to dismiss.

   B.   Analysis of Plaintiffs' Specific Claims

        Having addressed defendants' arguments concerning plaintiffs' authority to sue, remoteness, causation, municipal cost recovery, preemption and labeling, the Court now turns to the defendants' claim-specific arguments.

   1.   Count 1: Public Nuisance

        The complaints allege a public nuisance claim under A.R.S. § 13-2917 against every defendant for having "created or assisted in the creation of a condition that is injurious to health and interferes with the comfortable enjoyment of life and property in entire communities or neighborhoods or of any considerable number of persons" in plaintiffs' jurisdictions. Defendants allegedly violated the public nuisance statute through the false and misleading promotion and distribution of opioids. Plaintiffs allege that defendants' conduct has caused and continues to cause a public health epidemic in their communities. Plaintiffs seek "to abate, enjoin, and prevent" the public nuisance created by defendants.

        A.R.S. § 13-2917(A)(1) defines a public nuisance as "anything . . . injurious to health, indecent, offensive to the senses or an obstruction to the free use of property that interferes with the comfortable enjoyment of life or property by an entire community or neighborhood or by a considerable number of persons."

        "[P]ublic nuisances are characteristically broad in scope and 'encompass[ ] any unreasonable interference with a right common to the general public.'" *Hopi Tribe,* 245 Ariz. at 400, ¶ 9 (*quoting Armory Park Neighborhood Ass'n v. Episcopal Community Services in Arizona,* 148 Ariz. 1, 4 (1985); *see also* Restatement (Second) of Torts § 821B(1). Arizona has adopted the Restatement (Second) of Torts § 821B, which recognizes that an "unreasonable interference with a public right includes circumstances in which 'the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience.'" *Mutschler v. City of Phoenix,* 212 Ariz. 160, 166, ¶ 20 (App. 2006) (*quoting* Restatement § 821B(2)(a)). A public nuisance "must affect a considerable number of persons or an entire community or neighborhood." *City of Phoenix v. Johnson,* 51 Ariz. 115, 123 (1938).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                   10/28/2020

Defendants assert that the complaints fail to state a claim because Arizona nuisance law concerns the misuse or interference with real property and does not extend public nuisance to the sale and distribution of legal products such as a prescription medications. Defendants have not cited an Arizona case rejecting a public nuisance claim on the basis that it alleged something other than harm to real property or involved the misuse of a legal product.

The Arizona Supreme Court has stated that public nuisance in Arizona is "broad in scope." *Armory Park,* 148 Ariz. at 4. The public nuisance statute is also broad. A.R.S. § 2917(A) defines a public nuisance as "anything . . . injurious to health." "Anything" could include the misuse of legal products. Moreover, in *Armory Park*, the court expressly rejected the argument that conduct must be illegal to be a nuisance, holding that "conduct which unreasonably and significantly interferes with the public health, safety, peace, comfort or convenience is a public nuisance within the concept of tort law, even if that conduct is not specifically prohibited by the criminal law." *Armory Park*, 148 Ariz. at 10.

Nor is the statute limited to nuisances directly affecting land. By its express terms, the statute applies to problems "injurious to health." Moreover, as noted in the comments to Restatement § 821B, "a public nuisance does not necessarily involve interference with use and enjoyment of land." Restatement (Second) of Torts § 821B, cmt. h.

Defendants argue they lack control over the instrumentality. However, the complaints allege that defendants controlled the continuous distribution of the opioids. Taking the allegations in the complaints to be true, the defendants were in a position to anticipate or prevent the claimed injuries.

Defendants urge this Court to adopt the approach in the Restatement (Third) of Torts, which appears to reject the expansion of public nuisance to the misuse of products. *See* Restatement (Third) of Torts: Liability for Economic Harm § 8, cmt. g. The Court rejects defendants' argument for a couple of reasons. First, Restatement Third § 8 applies to common-law claims brought by private plaintiffs, not civil actions brought by public officials. *See* Restatement Third § 8, cmt. a (public officials' ability to bring claims "is widely a matter of statute, and tends to be considerably broader than the common-law definition recognized by this Section as a basis for a private suit"). Second, even if Restatement Third § 8 took a more restrictive view of public nuisance claims than Restatement Second § 821B, Restatement Second § 821B has been adopted by Arizona's appellate courts, *see Mutschler v. City of Phoenix,* 212 Ariz. at 166, ¶ 20, and this trial court is in no position to disregard it.

Defendants claim that the plaintiffs have failed to plead substantial interference with a public right. The Court disagrees. The complaints allege that defendants' conduct was injurious

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

to the public health, affected a "considerable number of persons," and that plaintiffs incurred costs of abating the public health problem.

The Court will not strike the damage claim at the motion to dismiss stage. A.R.S. § 13-2917(C) allows counties and cities to bring actions to "abate, enjoin and prevent" a public nuisance. The word "abate" means to "decrease in force or intensity." Merriam-Webster Dictionary. The statute allows a plaintiff to recover the costs of abatement. *See Hughes v. City of Phoenix*, 64 Ariz. 331, 336 (1946) (city allowed to recover the costs to remove motor vehicles under a nuisance statute). If the Legislature's intent was to limit a public entity's nuisance claim to an injunction, there is no reason to include the word "abate" in the statute. In addition, the Arizona Supreme Court has recognized the right of a person "to recover damages for or enjoin the maintenance of a public nuisance." *Armory Park*, 148 Ariz. at 5.

The reasoning of courts dismissing public nuisance claims in other states is not persuasive because other states appear to have narrower definitions of public nuisance. For example, *In State ex rel. Jennings v. Purdue Pharma L.P.*, No. N18C-01-223 MMJ CCLD, 2019 WL 446382, *11-12 (Super. Ct. Del. Feb. 4, 2019), involved Delaware law which defined public nuisance as an "activity which produces some tangible injury to neighboring property or persons." Arizona's statute is much broader and includes "anything" that is "injurious to health."

The complaints allege that defendants created a condition that is injurious to health and interferes with the comfortable enjoyment of life in plaintiffs' communities at large. These allegations are sufficient to state a claim. The motions to dismiss the public nuisance claim are denied.

2. Count 2: Negligence

Count 2 in each complaint is a claim for negligence. The complaints allege that each of the defendants owed a duty to plaintiffs to take reasonable steps to prevent the misuse, abuse and over-prescription of opioids. Manufacturers violated their duty by making misleading claims about the risks and benefits of opioids. Distributors failed in their duty to prevent the diversion of large opioid orders. Pharmacy Distributors and Dispensers failed in their duty to keep accurate records and stem the overflow of opioids in the communities.

To plead negligence in Arizona, a plaintiff must allege: (1) a duty of care; (2) a breach of that duty; (3) a causal connection; and (4) damages. *Ontiveros*, 136 Ariz. at 504. All of the defendants have moved for dismissal of the negligence claim arguing that they owed no duty to plaintiffs. Whether a duty exists is a legal question for the court. *Gipson v. Kasey*, 214 Ariz. 141,

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

143, ¶ 9 (2007). Whether a defendant owes a duty of care is a threshold issue. If there is no duty, the negligence claim must be dismissed. *Id.* at 143, ¶ 11.

In Arizona, a duty must be based on either recognized common law special relationships or relationships created by public policy. *Quiroz v. ALCOA Inc*., 243 Ariz. 560, 565, ¶ 14 (2018). The special relationships that could give rise to a duty include those based on "contract, family relations, or conduct undertaken by the defendant." *Gipson*, 214 Ariz. at 145, ¶ 18. The primary source for identifying a duty based on public policy is state statutes. *Quiroz,* 243 Ariz. at 566, ¶ 18. Arizona courts are hesitant to recognize a public policy duty in the absence of a statute. *Id*. at ¶ 19.

Plaintiffs have not alleged a duty based on a recognized common law special relationship. Rather, they allege two sources of duty: (1) a common law duty "to plaintiffs to take reasonable steps to prevent the misuse, abuse and over-prescription of opioids"; and (2) a public policy duty based on the AZCSA and the Pharmacy Board dispensing statutes.[15]

Plaintiffs rely on *Ontiveros* to support their argument for a common law duty to prevent misuse and abuse of opioids. *Ontiveros* does not support such a duty. In *Ontiveros*, the Arizona Supreme Court found that tavern owners owed a duty of care and could be liable for the harm caused by their intoxicated patrons. The supreme court found a duty based on the combination of common law and liquor licensing statutes. *Ontiveros,* 136 Ariz. at 511. *Ontiveros* is limited to the duties of tavern owners. It does not create a generalized duty to prevent harm to others.

Later in *Gipson*, the supreme court expressly eliminated foreseeability as a factor in determining duty. *Gipson*, 214 Ariz. 141, 144, ¶ 17. In *Quiroz*, the supreme court clarified that a duty must be based on a special relationship or public policy. *Quiroz*, 243 Ariz. at 565, ¶ 14. The supreme court rejected a "duty of care owed by all people at all times." *Id*. at 576, ¶ 75. As the supreme court stated in *Quiroz*: "*Ontiveros* did not recognize the existence of a presumed duty based on risk creation," but found a duty based on "special relationships and public policy." *Id*. at 574, ¶ 65. Thus, based on these precedents, plaintiffs have not established that Arizona law

---

15. In their responses and at oral argument, plaintiffs argued for a public policy duty based on the Arizona Consumer Fraud Act (AZCFA), claiming they were direct buyers of opioid medications. However, the complaints do not allege plaintiffs were direct purchasers of opioids. The complaints also do not assert that the AZCFA is the basis for a duty for the negligence and negligence *per se* claims. In any event, unless plaintiffs purchased opioids from a defendant, it is unlikely plaintiffs will be able to establish they are within the "class of persons", *i.e*., consumers, that the AZCFA was designed to protect. *See Estate of Hernandez v. Ariz. Bd. of Regents*, 177 Ariz. 244, 253 (1994). And plaintiffs dismissed their claims under the AZCFA.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                              10/28/2020

recognizes a common law duty to prevent the misuse and abuse of prescription opioid medications.

Plaintiffs argue that a public policy duty arises under the AZCSA or the Pharmacy Board statutes regulating the dispensing of prescription medicines. A statute may create a public policy duty but only when the plaintiff "is within the class of persons to be protected by the statute and the harm that occurred ... is the risk that the statute sought to protect against." *Quiroz,* 243 Ariz. at 565, ¶ 15 (*quoting Gipson,* 214 Ariz. at 146, ¶ 26); *Estate of Hernandez,* 177 Ariz. at 253.

In the complaints, plaintiffs alleged violations of various provisions of the Pharmacy Board dispensing and record-keeping statutes. For example, A.R.S. § 32-1964(A) requires pharmacists to maintain records of every prescription order of drugs dispensed. A.R.S. § 32-1983 regulates the wholesale distribution of prescription medications. Although plaintiffs referred to these statutes in the complaints, plaintiffs made no argument that they are within the class of persons the statutes are intended to protect. These statutes were enacted to regulate the dispensing of prescription drugs in Arizona. Nothing in these statutes suggests they were intended to protect local governments against the effects of opioid addiction and abuse.

Plaintiffs argue that the AZCSA enumerates the responsibilities of manufacturers, distributors and dispensers of controlled substances. For example, the AZCSA makes it a crime to make false records (A.R.S. § 362531(A)(3)), to sell a controlled substance for other than a legitimate medical purpose (A.R.S. § 36-2531(A)(6)) and to acquire a controlled substance by means of forgery, fraud or deception (A.R.S. § 36-2531(E)).

Plaintiffs argue that these provisions and others in the AZCSA establish a public policy duty. They claim that they are within the class of persons the statute is intended to protect and that the injuries they have suffered are the type of harm the statute was enacted to prevent.

Plaintiffs rely on *Gipson.* In *Gipson,* the defendant gave an acquaintance his prescription pain medications for recreational purposes. When the acquaintance died from a drug overdose, decedent's family filed a wrongful death action. *Gipson,* 214 Ariz. at 142-43, ¶¶ 3-7. The supreme court found that the AZCSA and other statutes prohibiting the distribution of prescription drugs to persons lacking a valid prescription were designed "to avoid injury or death to people who have not been prescribed prescription drugs, who may have no medical need for them and may in fact be endangered by them, and who have not been properly instructed on their usage, potency, and possible dangers." *Id.* at 146, ¶ 26. Thus, the supreme court held that these drug laws created a legal duty of care between a person to whom opioids had been prescribed and a third person who was injured as a result of taking the unauthorized medications. *Id.* at 147, ¶ 32.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                              10/28/2020

*Gipson* does not support plaintiffs' positon. The *Gipson* court found the AZCSA's restrictions on controlled substances were designed to protect people who had not been prescribed medications because those people may be endangered by the drugs and may not have been properly instructed on their usage, potency, and possible dangers. *Id*. *Gipson* does not support expanding the class of persons protected by the AZCSA to local governments providing public services to mitigate the drug epidemic.

The prefatory notes to the Uniform Controlled Substances Act do not help plaintiffs' position. The prefatory notes state the uniform act from which the AZCSA was derived was designed to provide tools for state and local governments "to control more effectively the drug abuse problem." However, the notes do not suggest the controlled substances statutes are intended to give local governments a claim for damages to recover the costs of providing health and crime-related services in their communities.

In short, plaintiffs have not established that defendants owed a public policy duty based on the AZCSA because plaintiffs are not within the class of persons the statutes were enacted to protect and their damages are not the type of harm the statutes were designed to protect against. Courts in other opioid-related cases have reached the same conclusion. For example, in *In re: National Prescription Opiate Litig.*, 2019 WL 3737023 (N.D. Ohio June 13, 2019), the court dismissed the negligence *per se* claim based on violations of the federal version of the CSA and Oklahoma's CSA. Like plaintiffs here, several Native American nations sued to recover the costs of public services. The court found that the CSA was "not intended to protect sovereigns like the Tribes from spending more on addiction-related public services when rates of addiction increase." *Id.* at *13; *see also In re National Opiate Litig.,* 452 F.Supp.3d 745, 788 (N.D. Ohio 2020) (negligence claim allowed to continue under the "foreseeability" standard under Florida law, but dismissed negligence *per se* claims on the ground that a hospital is not an intended beneficiary of the CSA).

Plaintiffs have not cited an opioid–related case that found a duty under a controlled substances statute. The opioid cases that have allowed negligence claims to proceed have found a duty under a foreseeability standard, a standard that Arizona law rejects. *See, e.g*., *In re National Prescription Opiate Litig*., 2018 WL 4895856, *36 (N.D. Ohio Oct. 5, 2018) ("The existence of a duty depends on the foreseeability of the injury."); *City of Everett,* 2017 WL 4236062, *4 (duty existed centered on the extent to which the corporate manufacturer defendant "engaged in an affirmative act which created or exposed [the plaintiff city] to a high degree of risk of harm.").

The motions to dismiss the negligence counts based on a lack of duty are granted.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020


3.  Count 3: Negligence *Per Se*

Count 3 in each complaint is a claim for negligence *per se.* The negligence *per se* claims
are based on violations of the AZCSA and the Arizona Pharmacy Board. According to the
complaints, the AZCSA is designed to protect the public from harm. The AZCSA has record-
keeping requirements for opioids and prohibits the sale or distribution of opioids except for
legitimate medical purposes. The statute further makes it unlawful to give false or misleading
information in any required report or document. It makes it unlawful to obtain opioids through
forgery, fraud or deception. The Pharmacy Board statutes set out requirements for dispensing
medications, including maintaining records of prescription drugs they dispensed. The complaints
allege that defendants violated the AZCSA and the Pharmacy Board statutes.

"A person who violates a statute enacted for the protection and safety of the public is
guilty of negligence *per se*." *Alaface v. National Inv. Co.*, 181 Ariz. 586, 596 (App. 1994); *Good
v. City of Glendale*, 150 Ariz. 218, 221 (App. 1986). There is no dispute here that the AZCSA
and the Pharmacy Board statutes were enacted for the protection and safety of the public.
However, violation of a statute is not enough to state a negligence *per se* claim. Like a duty
based on public policy, to bring a negligence *per se* claim, a plaintiff must establish that it is
"within the class of persons the statute is intended to protect." *Steinberger,* 234 Ariz. at 139, ¶
57.

As discussed above, plaintiffs have not established a public policy duty because they are
not within the class of persons the AZCSA and Pharmacy Board statutes were designed to
protect. Plaintiffs' negligence *per se* claims fail for the same reasons their negligence claims are
deficient.

4.  Count 4: Unjust Enrichment

Under Arizona law, "[u]njust enrichment occurs when one party has and retains money or
benefits that in justice and equity belong to another." *Trustmark Ins. Co. v Bank One, Arizona,
NA*, 202 Ariz. 535, 541, ¶ 31 (App. 2002). A claim for unjust enrichment has five elements: "(1)
an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the
impoverishment, (4) the absence of justification for the enrichment, and (5) the absence of a
remedy provided by law." *Wang Elec., Inc. v. Smoke Tree Resort, LLC,* 230 Ariz. 314, 318, ¶ 10
(App. 2012). The essence of unjust enrichment is the conferral of a benefit on the defendant.
*Freeman v. Sorchych*, 226 Ariz. 242, 251, ¶ 27 (App. 2011) (*citing Murdock–Bryant Constr.,
Inc. v. Pearson,* 146 Ariz. 48, 53 (1985)). Further, the plaintiff must show "that it was not
intended or expected that the services be rendered or the benefit conferred gratuitously, and that
the benefit was not 'conferred officiously.'" *Id.* at 251-52, ¶ 27. The "benefit may be any type of

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                      10/28/2020

advantage, including that which saves the recipient from any loss or expense." *Pyeatte v. Pyeatte*, 135 Ariz. 346, 352 (App. 1982). But, under Arizona law, there must be a nexus between the alleged impoverishment and the enrichment conferred. *See Laborers' and Operating Engineers' Utility,* 42 F. Supp. 2d at 951.

The unjust enrichment claims fail because plaintiffs have not alleged they were impoverished because of a benefit they conferred on defendants. The complaints allege that "[e]ach Defendant therefore received a benefit from the sale, distribution, or prescription of prescription opioids to and in [plaintiffs' communities], and these Defendants have been unjustly enriched at the expense" of plaintiffs. But this alleged benefit, the profits from sale and distribution of prescription opioids, is not a benefit conferred by plaintiffs on defendants. The purchasers of opioid medications conferred the benefit, not plaintiffs.

Plaintiffs argue they conferred a benefit by paying healthcare-related costs, foster care placement costs, and crime-related costs, etc. Plaintiffs also lost tax revenue. Plaintiffs fail to explain how the loss of tax revenue conferred a benefit on defendants. Further, plaintiffs have not alleged any nexus between the impoverishment, the payment for public services, and any enrichment conferred on defendants. In other words, public services benefit the residents of plaintiffs' communities. The services did not confer a benefit on defendants.

An unjust enrichment claim under Arizona law requires a connection between the enrichment and the impoverishment. *Id.* (applying Arizona law, "Laborers' Trust paid health care benefits to its participants and their beneficiaries. Laborers' Trust does not allege it conferred any benefit on Philip Morris. No benefit was conferred on Philip Morris."). Here, plaintiffs had increased costs for health care, crime and other programs to deal with the myriad of problems associated with addiction and abuse. However, plaintiffs cannot show that these costs conferred a benefit on defendants. Defendants benefited from the deceptive sale of opioids through sales and profits, but that benefit was not conferred by plaintiffs and is not connected to plaintiffs' costs. Plaintiffs have not alleged that they provided these services with the expectation of being repaid by defendants. *See Freeman,* 226 Ariz. at 251, ¶ 27.

Plaintiffs rely on a decision in the Ohio opioid MDL in which the court held that the plaintiff city conferred a benefit by paying for "defendants' externalities", meaning the costs of the harm caused by defendants' misconduct. *See, e.g., In re National Prescription Opiate Litig*., 2018 WL 4895856, *46 (N.D. Ohio Oct. 5, 2018) ("Based on the alleged facts in this case, Plaintiffs state a facially plausible unjust enrichment claim on the theory that they conferred a benefit upon all Defendants by alleging that they paid for the cost of harm caused by the defendant's conduct, *i.e*., the defendant's externalities."). Judge Polster agreed with this theory under Ohio law, stating that defendants' "conduct allowed the diversion of opioids and thereby

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

created a black market for their drugs", which "allowed Defendants to continue to ship large volumes of opioids into Plaintiff's communities at great profit to Defendants and great expense to Plaintiffs." *In re National Prescription Opiate Litig.*, 2018 WL 6628898, at *21 (N.D. Ohio Dec. 19, 2018).

Here, however, plaintiffs have not cited an Arizona appellate decision that has accepted plaintiffs' externalities theory. Indeed, the theory runs counter to the requirement in Arizona law that there must be a connection between the impoverishment and the enrichment. *See Wang Elec.*, 230 Ariz. at 318, ¶ 10. The externalities theory would change the elements and the very concept of unjust enrichment. Instead of requiring a connection between the enrichment and impoverishment, a plaintiff could state an unjust enrichment claim by simply alleging it was harmed by defendant's wrongdoing. Such a theory if adopted would create duties where none otherwise existed and would result in claims without boundaries. The unjust enrichment claims are dismissed.

C.   Sufficiency of Allegations in the Complaints

1.   Harper's Motion for More Definite Statement (Apache County case)

Western Drug owns and operates two retail pharmacies in Apache County. Fred Harper owns Western Drug. The Apache County Complaint identified Harper as "Prescriber Defendants" and accused Harper of engaging in the same conduct alleged against the "Prescribers." There are no allegations in the complaint specific to pharmacy defendants.

Harper argues that a more definite statement is required because the allegations are confusing. As pharmacists, Harper could not have done the things the prescribers are accused of doing. For example, Harper could not have passed out "savings cards" to encourage patients to try opioids or increased patient dosages. Indeed, it appears that the only allegations specific to Harper concern Harper's failure to adequately supervise one of its former pharmacists who was arrested for DUI and drug possession and disciplined by the Arizona State Board of Pharmacy more than four years ago for forging prescriptions and possessing illegal narcotics.

At oral argument, Apache County acknowledged the complaint misidentified Harper and that the allegations were confusing and deficient. Plaintiff even admitted that some of the allegations against Harper did not make sense. Plaintiff requested leave to amend the complaint to clarify the allegations and include some additional allegations concerning Harper's role in dispensing and compounding opioid medications. Plaintiff stated it also intended to add factual allegations about unlawful conduct of other pharmacists employed by Harper. Harper did not object to plaintiff's request to file an amended complaint.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

The decision to grant or deny a motion to amend a complaint is within the Court's discretion. *Tumacacori Mission Land Development, Ltd. v. Union Pacific R.R. Co.*, 231 Ariz. 517, 519, ¶ 4 (App. 2013). Generally, amendments are liberally allowed to cure any defects in the initial pleading, absent a finding of undue delay, bad faith, undue prejudice, or futility of the amendment. *See Wigglesworth v. Maudlin,* 195 Ariz. 432, 439, ¶ 26 (App. 1999); Ariz. R. Civ. P. 15(a)(2) ("Leave to amend must be freely given when justice requires.").

The allegations against Harper are confusing, deficient and do not comply with Rule 8(a). The motion for more definite statement is granted, and the complaint is dismissed without prejudice. Plaintiff's oral motion for leave to amend is granted. Plaintiff has ten days to file an amended complaint.

Further, for the reasons discussed above, the negligence claim (Count 2), the negligence *per se* claim (Count 3) and the unjust enrichment claim (Count 4) against Harper are dismissed with prejudice.

2.  Allegations against Actavis Generic Entities

The Actavis Generic Entities manufacture certain generic opioid medications. They allege that generic manufacturers compete on price and do not engage in any marketing or advertising. Thus, they claim they could not have participated in any of the alleged deception in the marketing campaigns that the branded manufacturers are alleged to have participated in. They claim there are no allegations they promoted generic medicines and no allegations linking their medications to a false or misleading statement.

The complaints allege: Manufacturers, which include the three Actavis Generic Entities, engaged in a deceptive marketing and distribution scheme to convince doctors and patients that long-term opioid use is both safe and beneficial for the treatment of chronic pain. Manufacturers downplayed the known risks of addiction and abuse and exaggerated the benefits. Manufacturers used various marketing tactics and funded front groups and KOLs to legitimize their false claims about opioids. These deceptive practices were perpetrated against doctors and patients in plaintiffs' communities. The three Actavis Generic Entities are included within the label "Actavis," along with four other manufacturing entitles. The group of "Actavis" entities distributed misleading information about Kadian.

Because the fraud claim has been dismissed, there is no requirement that the claims be pled with particularity, *see Steinberger,* 234 Ariz. at 136-40, ¶¶ 44-62, and including the Actavis Generic Entities within groups of other defendants is not fatal to the public nuisance claim. *See*

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                         10/28/2020

*United Healthcare,* 848 F.3d at 1184. Furthermore, when deciding this motion, the complaints'
allegations must be accepted as true. The allegations in the complaints are sufficient to survive a
motion to dismiss.

    3.   Allegations against Janssen/J&J

        a.  Allegations of wrongdoing against Janssen

Janssen argues that the complaints do not allege any wrongdoing against it and fail to
state a claim based on unbranded promotional and educational activities. Janssen claims that it is
not responsible for any statements made in the unbranded promotional materials referred to in
the complaints. It further argues that those unbranded advertising materials are not false or
misleading.

The complaints contain fairly detailed allegations about Janssen's involvement in the
alleged scheme to relax the standards for prescribing opioids. The complaints allege that Janssen
did several things to foster the scheme, such as funding bogus studies to promote the use of
opioids for chronic pain. Janssen also funded and approved guides and websites that downplayed
the risks of addiction and overstated the benefits of opioid use for chronic pain. The complaints
also allege that Janssen funded front groups and KOLs.

The complaints allege that Janssen is responsible for the unbranded promotional
materials and that the materials contain deceptive statements. These allegations must be accepted
as true, and the Court cannot consider Janssen's denial of its involvement. *See Cullen,* 218 Ariz.
at 419, ¶ 7. The Court finds that the allegations against Janssen are sufficient under Rule 8.

        b.  Allegations against J&J

The complaints allege direct wrongdoing against J&J. "Janssen" is used in the complaint
to include both Janssen and J&J. Thus, the factual allegations against "Janssen" are also
allegations against J&J.

The complaints also include allegations specific to J&J. For example, paragraph 34 of the
Glendale complaint states "J&J made payments to front groups . . . who perpetrated and
disseminated Defendants' misleading marketing messages regarding the risks and benefits of
opioids." (*See also* Glendale Complaint at ¶ 98.) The complaints include more specific
allegations against J&J. For example, paragraph 101h of the Glendale complaint alleges that J&J
and others minimized the risks of opioid addiction and abuse to doctors in Arizona and
specifically in Glendale. The complaints allege J&J was responsible for funding the bogus

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

research to support the use of opioids for chronic pain patients. (*Id.* at ¶ 108.) Taken as true, these allegations are sufficient to state a claim for direct liability against J&J.

    4.  <u>Dispensing-related Allegations against the Pharmacy Distributors (Prescott case)</u>

      a.  Sufficiency of Dispensing-related allegations

The Prescott complaint categorizes defendants Walmart, Walgreens and Smith's as "Pharmacy Distributors." The complaint alleges that the Pharmacy Distributors were within the chain of distribution of opioids and that, like the Distributors, they earned substantial profits flooding the market with opioid medications. The complaint further alleges that the Pharmacy Distributors had "a duty to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescriptions opioids." It further alleges that the Pharmacy Distributors participated in the diversion of opioids by regularly filling suspicious prescriptions and failing to report suspicious orders.

The Pharmacy Distributors argue that these allegations conflate the distinction between distribution and dispensing related conduct. The Pharmacy Distributors claim that they only delivered opioids to the pharmacies within their own chain stores. They did not fill prescriptions or dispense opioids to patients. Thus, they assert the dispensing allegations are deficient and do not state a claim based on dispensing-related conduct.

The Court finds the complaint states a claim based on dispensing-related activities. Although defendants deny they engaged in any dispensing activities, the complaints allege otherwise, and those allegations must be taken as true for purposes of this motion. *See Cullen*, 218 Ariz. at 419, ¶ 7.

      b.  Are the dispensing-related allegations barred?

The Pharmacy Distributors further argue that the Arizona Board of Pharmacy alone is charged with ensuring compliance with the AZCSA. Thus, they argue, plaintiffs have no common law claim based on dispensing activities and cannot bring a claim for enforcement under the AZCSA.

As discussed above, Prescott does not have a negligence *per se* claim based on a violation of the AZCSA. That does not mean, however, that there is no public nuisance claim based on the alleged dispensing conduct. Thus, the motion to dismiss is denied on this ground.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                      10/28/2020

Next, the Pharmacy Distributors argue that Prescott failed to comply with the preliminary certification requirements for medical malpractice claims in A.R.S. § 12-2603(A). Prescott claims that although it does not believe the certification requirements apply to its claims, it filed an A.R.S. § 12-2603 certification with its complaint on April 23, 2019, and an amended certification on February 18, 2020.

Defendants do not deny that the certifications were timely filed. Rather, they raise two new issues in the reply: (1) the complaints do not plead the elements of a medical malpractice claim as required under A.R.S. § 12-563; and (2) plaintiff failed to serve the certifications with the complaint. The Court will not consider arguments raised for the first time in the reply. *Westin Tucson Hotel Co. v. State Dep't of Revenue,* 188 Ariz. 360, 364 (App. 1997) ("a claim raised for the first time in a reply is waived"). Nevertheless, as a practical matter the negligence count has been dismissed.

    5.   <u>Allegations against Pharmacy Distributors and Dispensers (Pinal County case)</u>

      a.  Medical malpractice

The Pharmacy Distributors and Dispensers in the Pinal County case argue that the complaint fails to plead the elements of negligent medical malpractice under A.R.S. § 12-563. They assert there are no allegations in the complaint that defendants failed to exercise the requisite standard of care in filling facially valid prescriptions for opioid medications.

Plaintiff responds that A.R.S. § 12-563 does not apply because it is not asserting a claim for medical malpractice. The negligence claims are dismissed. Thus, it is not necessary for the Court to decide whether the claims must be pled under A.R.S. § 12-563.

      b.  Sufficiency of allegations

The Pharmacy Distributors and Dispensers argue that the allegations against them in the Pinal County complaint are too ambiguous and not sufficient to state a claim.

The complaint alleges the Pharmacy Distributors and Dispensers had extensive knowledge of the oversupply of opioids in plaintiff's community through the data they collected and maintained. Although they were aware of the risks, defendants took no steps to stop the flood of opioids and profited handsomely from the oversupply. Defendants understood the harm their conduct was causing and, although they made public statements indicating they were taking steps to curb abuse, the misconduct continued.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020

The complaint adequately alleges that Pharmacy Distributors and Dispensers failed to prevent opioid diversion and report obvious suspicious orders. These allegations are sufficient to give defendants notice of the claims against them under Rule 8. The motion to dismiss on this ground is denied.

6.   Allegations against Kapoor

Kapoor was the founder and on the board of Insys, the manufacturer of the opioid medication Subsys. Although Kapoor did not personally make and sell opioids, he is categorized as a Manufacturer in the complaints. Kapoor argues that the facts against him are meager and do not support the claims asserted against him.

The complaints allege that Kapoor and Babich, another Insys executive, participated in the scheme to profit from the sale of opioids using bribes, kickbacks and deception to cause the illegal distribution of Subsys. Plaintiffs allege that bribes and kickbacks caused doctors and pain clinics to write large numbers of prescriptions for many non-cancer patients who did not need Subsys. Plaintiffs allege that Kapoor was part of scheme to mislead health insurance companies to provide coverage for Subsys when prescribed for non-cancer patients and that, by promoting the unauthorized use of Subsys, Kapoor put patients at risk and contributed to the opioid crisis.

Kapoor should be aware of the nature of the claims against him. Kapoor was found guilty of fraud, conspiracy and racketeering based on some of the same conduct alleged here. He and Insys also have been named as defendants in other opioid-related civil cases around the country. These allegations are sufficient to state a claim under Rule 8. Plaintiffs do not need to amend the complaints to add detail about Kapoor's involvement.

**VII.  DISPOSITION**

**IT IS ORDERED** granting defendants Harper and Western Drug's Motion to Dismiss or Motion for More Definite Statement. The complaint against defendants Harper and Western Drug in the Apache County case, CV2020-001434, is dismissed without prejudice.

**IT IS FURTHER ORDERED** granting plaintiff Apache County's motion for leave to amend its complaint against Harper and Western Drug in CV2020-001434. Apache County has ten business days from the filed date of this order to file an amended complaint.

**IT IS FURTHER ORDERED** dismissing the negligence claims (Count 2), the negligence *per se* claims (Count 3) and the unjust enrichment claims (Count 4) against defendants in each of the seven consolidated cases.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2019-003439 *et al.*                                    10/28/2020


**IT IS FURTHER ORDERED** denying the motions to dismiss in all other respects.

**IT IS FURTHER ORDERED** that the parties may file a supplemental brief concerning defendants' Motion to Stay (filed October 8, 2020) reflecting on that Motion in light of the instant ruling. The supplemental brief is due ten business days from the filed date of this ruling. The supplemental brief may not exceed five pages.

## VIII.  FINAL OBSERVATIONS

After this ruling, the only remaining claim is for public nuisance. Public nuisance law is not well developed in Arizona, and the motion to dismiss the nuisance count is a close call. The law of nuisance is aptly described as an "impenetrable jungle" that has been "applied indiscriminately . . . as a substitute for any analysis of a problem." *Hopi Tribe*, 245 Ariz. at 404, ¶ 24 (citation omitted). As a result, this Court would encourage the Arizona Appellate Courts to add the public nuisance claim to the list of issues to be resolved by special action.

In addition, the Court will issue a separate minute entry inviting the Arizona Attorney General to submit an amicus brief on defendants' claim that local jurisdictions do not have the authority to bring these claims.