**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**

Civil Complex Center
751 W. Santa Ana Blvd
Santa Ana, CA 92701

**SHORT TITLE:** The People of the State of California, acting by and through Santa Clara County Counsel Orry P. Korb and Orange County District Attorney Tony Rackauckas vs. Purdue Pharma L.P.

| **CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE** | CASE NUMBER:<br>**30-2014-00725287-CU-BT-CXC** |
|---|---|

I certify that I am not a party to this cause. I certify that a true copy of the above dated has been placed for collection and mailing so as to cause it to be mailed in a sealed envelope with postage fully prepaid pursuant to standard court practice and addressed as indicated below. This certification occurred at Santa Ana, California on 3/12/21. Following standard court practice the mailing will occur at Sacramento, California on 3/15/21.

HEATHER HOSMER
250 W. 65TH STREET
NEW YORK, NY 10019

OFFICE OF THE COUNTY COUNSEL - COUNTY
OF LOS ANGELES
500 W. TEMPLE STREET 6TH FLOOR
LOS ANGELES, CA 90012

OFFICE OF THE COUNTY COUNSEL OF SANTA
CLARA
70 W HEDDING STREET 9TH FLOOR
SAN JOSE, CA 95110

REBECCA E. ZOLLER
250 W. 65TH STREET
NEW YORK, NY 10019

REED SMITH LLP
1901 AVENUE OF THE STARS 700
LOS ANGELES, CA 90067

WILSON MUDGE
601 MASSACHUSETTS AVENUE NW
WASHINGTON, DC 20001

WREDE SMITH
1213 4TH STREET NW 2
WASHINGTON, DC 20001

Clerk of the Court, by: _V Harting_ , Deputy

I certify that I am not a party to this cause. I certify that the following document(s), dated , have been transmitted electronically by Orange County Superior Court at Santa Ana, CA. The transmission originated from Orange County Superior Court email address on March 12, 2021, at 3:09:48 PM PST. The electronically transmitted document(s) is in accordance with rule 2.251 of the California Rules of Court, addressed as shown above. The list of electronically served recipients are listed below:

ARNOLD & PORTER LLP
JAKE.MILLER@ARNOLDPORTER.COM

ARNOLD & PORTER LLP
JOSHUA.DAVIS@APORTER.COM

# Ex. A - Tab 5 - California

**CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE**

| | |
|---|---|
| ARNOLD & PORTER LLP<br>NEDA.HAJIAN@ARNOLDPORTER.COM | ARNOLD & PORTER LLP<br>SEAN.MORRIS@ARNOLDPORTER.COM |
| COHEN MILSTEIN SELLERS & TOLL PLLC<br>LSINGER@COHENMILSTEIN.COM | COUNTY OF ALAMEDA<br>JILL.SAZAMA@ACGOV.ORG |
| COUNTY OF ALAMEDA<br>KATHLEEN.PACHECO@ACGOV.ORG | DECHERT LLP<br>JAE.LEE@DECHERT.COM |
| DECHERT LLP<br>JONATHAN.TAM@DECHERT.COM | DECHERT LLP<br>MARK.CHEFFO@DECHERT.COM |
| GOODELL, DEVRIES, LEECH & DANN, LLP<br>RLIMBACHER@GDLDLAW.COM | HAGENS BERMAN SOBOL SHAPIRO LLP<br>BENH@HBSSLAW.COM |
| HAGENS BERMAN SOBOL SHAPIRO LLP<br>ELAINE@HBSSLAW.COM | HAGENS BERMAN SOBOL SHAPIRO LLP<br>JENNIFERC@HBSSLAW.COM |
| HAGENS BERMAN SOBOL SHAPIRO LLP<br>STEVE@HBSSLAW.COM | HAGENS BERMAN SOBOL SHAPIRO LLP<br>TOMLOESEN@HBSSLAW.COM |
| HAGENS BERMAN SOBOL SHAPIRO LLP<br>TOMLOESER@HBSSLAW.COM | HUESTON HENNIGAN LLP<br>JBURK@HUESTON.COM |
| HUESTON HENNIGAN LLP<br>JHUESTON@HUESTON.COM | HUESTON HENNIGAN LLP<br>MCAMP@HUESTON.COM |
| HUESTON HENNIGAN LLP<br>MKABA@HUESTON.COM | HUESTON HENNIGAN LLP<br>PFORAN@HUESTON.COM |
| JAE HONG LEE<br>JAE.LEE@DECHERT.COM | JUSTIN E RICE<br>JUSTIN.RICE@TUCKERELLIS.COM |
| K&L GATES<br>CHRISTINE.DART@KLGATES.COM | KIESEL LAW LLP<br>ARCHER@KBLA.COM |
| KIESEL LAW LLP<br>KIESEL@KBLA.COM | KIRKLAND & ELLIS LLP<br>DONNA.WELCH@KIRKLAND.COM |
| KIRKLAND & ELLIS LLP<br>EZOLNER@KIRKLAND.COM | KIRKLAND & ELLIS LLP<br>JENNIFER.LEVY@KIRKLAND.COM |
| KIRKLAND & ELLIS LLP<br>KARL.STAMPFL@KIRKLAND.COM | KIRKLAND & ELLIS LLP<br>ROTHM@KIRKLAND.COM |
| KIRKLAND & ELLIS LLP<br>TKNAPP@KIRKLAND.COM | KIRKLAND & ELLIS LLP<br>ZACHARY.BYER@KIRKLAND.COM |
| MORGAN LEWIS & BOCKIUS LLP<br>ADAM.TEITCHER@MORGANLEWIS.COM | MORGAN LEWIS & BOCKIUS LLP<br>CJAMES@MORGANLEWIS.COM |
| MORGAN LEWIS & BOCKIUS LLP<br>COLLIE.JAMES@MORGANLEWIS.COM | MORGAN LEWIS & BOCKIUS LLP<br>EVAN.JACOB@MORGANLEWIS.COM |

## CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE

Code of Civ. Procedure , § CCP1013a(a)

MORGAN LEWIS & BOCKIUS LLP
SREED@MORGANLEWIS.COM

MOTLEY RICE LLC
CMORIARTY@MOTLEYRICE.COM

MOTLEY RICE LLC
CSOLOMON@MOTLEYRICE.COM

MOTLEY RICE LLC
DACKERMAN@MOTLEYRICE.COM

MOTLEY RICE LLC
FBAKER@MOTLEYRICE.COM

MOTLEY RICE LLC
FFITZPATRICK@MOTLEYRICE.COM

MOTLEY RICE LLC
JCOLOMBO@MOTLEYRICE.COM

MOTLEY RICE LLC
KHERMIZ@MOTLEYRICE.COM

MOTLEY RICE LLC
LSINGER@MOTLEYRICE.COM

MOTLEY RICE LLC
MPENDELL@MOTLEYRICE.COM

MOTLEY RICE LLC
SCOUCH@MOTLEYRICE.COM

O'MELVENY & MYERS LLP
ALAURENDEAU@OMM.COM

O'MELVENY & MYERS LLP
ALUCAS@OMM.COM

O'MELVENY & MYERS LLP
CLIFLAND@OMM.COM

O'MELVENY & MYERS LLP
MYODER@OMM.COM

O'MELVENY & MYERS LLP
SSTRONG@OMM.COM

OFFICE OF THE CITY ATTORNEY CITY OF
OAKLAND
BPARKER@OAKLANDCITYATTORNEY.ORG

OFFICE OF THE CITY ATTORNEY CITY OF
OAKLAND
KARUN.TILAK@CCO.SCCGOV.ORG

OFFICE OF THE CITY ATTORNEY CITY OF
OAKLAND
MBEE@OAKLANDCITYATTORNEY.ORG

OFFICE OF THE CITY ATTORNEY CITY OF
OAKLAND
MMCPHERSON@OAKLANDCITYATTORNEY.ORG

OFFICE OF THE CITY ATTORNEY CITY OF
OAKLAND
ZSAVITSKY@OAKLANDCITYATTORNEY.ORG

OFFICE OF THE COUNTY COUNSEL - COUNTY
OF LOS ANGELES
AROSS@COUNSEL.LACOUNTY.GOV

OFFICE OF THE COUNTY COUNSEL - COUNTY
OF LOS ANGELES
MWICKHAM@COUNSEL.LACOUNTY.GOV

OFFICE OF THE COUNTY COUNSEL - COUNTY
OF LOS ANGELES
RRAGLAND@COUNSEL.LACOUNTY.GOV

OFFICE OF THE COUNTY COUNSEL - COUNTY
OF LOS ANGELES
SKUHN@COUNSEL.LACOUNTY.GOV

OFFICE OF THE COUNTY COUNSEL OF SANTA
CLARA
GRETA.HANSEN@CCO.SCCGOV.ORG

OFFICE OF THE COUNTY COUNSEL OF SANTA
CLARA
HANNAH.KIESCHNICK@CCO.SCGOV.ORG

OFFICE OF THE COUNTY COUNSEL OF SANTA
CLARA
JAMES.WILLIAMS@CCO.SCGOV.ORG

OFFICE OF THE COUNTY COUNSEL OF SANTA
CLARA
JULIA.SPIEGEL@CCO.SCCGOV.ORG

OFFICE OF THE COUNTY COUNSEL OF SANTA
CLARA
KARUN.TILAK@CCO.SCCGOV.ORG

OFFICE OF THE COUNTY COUNSEL OF SANTA
CLARA
KAVITA.NARAYAN@CCO.SCCGOV.ORG

OFFICE OF THE COUNTY COUNSEL OF SANTA
CLARA
LAURA.TRICE@CCO.SCCGOV.ORG

OFFICE OF THE COUNTY COUNSEL OF SANTA
CLARA
LUKE.EDWARDS@CCO.SCCGOV.ORG

OFFICE OF THE COUNTY COUNSEL, COUNTY OF
ALAMEDA
JILL.SAZAMA@ACGOV.ORG

OFFICE OF THE COUNTY COUNSEL, COUNTY OF
ALAMEDA
KATHLEEN.PACHECO@ACGOV.ORG

ORANGE COUNTY DISTRICT ATTORNEY
LESLEY.YOUNG@DA.OCGOV.COM

---

**CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE**

ORANGE COUNTY DISTRICT ATTORNEY
PAULIE.FABIAN@DA.OCGOV.COM

ORANGE COUNTY DISTRICT ATTORNEY
RAY.ARMSTRONG@DA.OCGOV.COM

ORANGE COUNTY DISTRICT ATTORNEY
TRACY.MILLER@DA.OCGOV.COM

R.D. BURNS
RDBURNS988@GMAIL.COM

ROBBINS GELLER RUDMAN & DOWD LLP
MMELAMED@RGRDLAW.COM

ROBINSON CALCAGNIE, INC.
BZWIRNER@ROBINSONFIRM.COM

ROBINSON CALCAGNIE, INC.
DPERKINS@ROBINSONFIRM.COM

ROBINSON CALCAGNIE, INC.
DROBINSION@ROBINSONFIRM.COM

ROBINSON CALCAGNIE, INC.
KCALCAGNIE@ROBINSONFIRM.COM

ROBINSON CALCAGNIE, INC.
LRAZMARA@ROBINSONFIRM.COM

ROBINSON CALCAGNIE, INC.
MROBINSON@ROBINSONFIRM.COM

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
AL.CHUA@SKADDEN.COM

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
AVELKES@SKADDEN.COM

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
BTRAVAGL@SKADDEN.COM

SKIKOS CRAWFORD SKIKOS & JOSEPH LLP
MCRAWFORD@SKIKOS.COM

SKIKOS CRAWFORD SKIKOS & JOSEPH LLP
SSKIKOS@KIKOS.COM

TUCKER ELLIS LLP
AGGIE.LEE@TUCKERELLIS.COM

Clerk of the Court, by: _V Harting_____, Deputy

---

**CLERK'S CERTIFICATE OF MAILING/ELECTRONIC SERVICE**

# SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF ORANGE
## CIVIL COMPLEX CENTER

### MINUTE ORDER

DATE: 03/12/2021                    TIME: 10:00:00 AM        DEPT: CX102

JUDICIAL OFFICER PRESIDING: Peter Wilson
CLERK: Virginia Harting
REPORTER/ERM: Karen Phillips CSR# 4425
BAILIFF/COURT ATTENDANT: Raquel Wangsness

CASE NO: **30-2014-00725287-CU-BT-CXC**  CASE INIT.DATE: 05/21/2014
CASE TITLE: **The People of the State of California, acting by and through Santa Clara County Counsel Orry P. Korb and Orange County District Attorney Tony Rackauckas vs. Purdue Pharma L.P.**
CASE CATEGORY: Civil - Unlimited      CASE TYPE: Business Tort

EVENT ID/DOCUMENT ID: 73489504

**EVENT TYPE:** Motion for Summary Judgment and/or Adjudication
MOVING PARTY: The People of the State of California, acting by and through Santa Clara County Counsel Orry P. Korb and Orange County District Attorney Tony Rackauckas
CAUSAL DOCUMENT/DATE FILED: Motion for Summary Judgment/Adjudication, 01/11/2021

## APPEARANCES

MATTER HEARD REMOTELY VIA ZOOM

Appearances by counsel of record are listed on the attached Appearance Sheet.

**Motion 4.**

Plaintiff The People of the State of California seek summary adjudication on Defendants' affirmative defenses for (1) contributory negligence, comparative negligence or comparative fault; (2) avoidable consequences or failure to mitigate damages; (3) laches; (4) unclean hands; (5) waiver; and (6) equitable estoppel.

Tentative Ruling posted on the Internet.

The Court hears oral argument as to Motion 4. The Court having heard oral argument on March 11, 2021 as to Motion 1, Motion 2 and Motion 3, now rules on the motions for summary judgment/adjudication as follows:

The Court grants the tentative ruling as to Motion 1 and Motion 4, and modifies the tentative ruling as to Motion 2 and Motion 3 as set forth on the attached.

**As to all Motions:** The People are ordered to give notice and file a Proof of Service with the Court.

Upon request of the parties, the Court continues the Pretrial Conference to April 2, 2021 at 10:00 AM. Any deadlines associated with the Pretrial Conference is based on the April 2, 2021 date.

The Motions in Limine remain on calendar for March 19, 2021 at 10:00 AM **via Zoom**.

CASE TITLE: The People of the State of California,          CASE NO: **30-2014-00725287-CU-BT-CXC**
acting by and through Santa Clara County Counsel Orry

Parties' request to extend the date for the filing of the joint statement regarding the remote trial protocol is granted. The joint statement is now due on March 18, 2021.

**Clerk to give notice as to the hearing on March 19, 2021 being held remotely via Zoom.**

10:45 AM Court is adjourned.

*People vs. Purdue*
*Case No. 30-2014-00725287*

<u>Appearance Sheet 3/12/21</u>

## <u>The People</u>

**Skikos, Crawford, Skikos, Joseph, LLP**
Mark Crawford

**Motley Rice LLC**
Frederick Baker

**County Counsel, County of Santa Clara**
Luke Edwards
Karun Tilak

**Robinson Calcagnie, Inc.**
Mark Robinson
Kevin Calcagnie

**County Counsel, County of Los Angeles**
Tracy Hughes
Andrea Ross

**County Counsel, County of Santa Clara**
Kavita Narayan

**Orange County District Attorney**
Paulie Fabian

## <u>Defendants</u>

**Kirkland & Ellis LLP**
Donna Welch
Karl Stampfl
**Allergan Defendants**

**Hueston Hennigan LLP**
Padraic Foran
Sean Morris
**Endo Defendants**

**O'Melveny & Myers LLP**
Michael G. Yoder
Amy Lucas
Amy Laurendeau
Charles Lifland
Steve Brody
**Janssen Defendants**

**Morgan, Lewis & Bockius LLP**
Adam Teitcher
Collie James, IV
Theodore Dayno
Wendy West Feinstein
**Teva Defendants**

***People vs. Purdue***
**Case No. 30-2014-00725287**

## Court's Final Rulings on Motions for Summary Judgment/Adjudication

### Motion 1.

Defendants Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc.; Endo Pharmaceuticals Inc.; Endo Health Solutions Inc.; Allergan plc f/k/a Actavic Plc; Allergan Finance, LLC f/k/a Watson Pharmaceuticals, Inc.; Cephalon, Inc.; Teva Pharmaceuticals USA, Inc.; Actavis LLC; Actavis Pharma, Inc.; and Watson Laboratories, Inc. (collectively, Defendants) seek summary judgment on Plaintiff The People of the State of California's (People) Sixth Amended Complaint (6AC), or in the alternative, summary judgment on the First Cause of Action for Violations of the False Advertising Law, Second Cause of Action for Violations of the Unfair Competition Law, and Third Cause of Action for Public Nuisance. The Motion is DENIED in its entirety.

### Request for Judicial Notice

The Court GRANTS Defendants' request for judicial notice as to Exs. 1, 6-8, 10, 11, 12, 47, 53, 55, 65-68, 69, 79, 80, 81, 83, 85, 89, 103. Judicial notice is taken of the existence and recordation of these documents, as well as their clear legal effects pursuant to Evid. Code § 452(c), (d) and (h). (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 264-265.) The truth of matters asserted in such documents is not subject to judicial notice. (Evid. Code § 452(c)(d). See also, *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482.

The Court DENIES Defendants' request for judicial notice as to Exs. 9, 13, 43, 45-46, 50, 78, 90 and SUSTAINS the People's objections to these exhibits.

Regarding the People's request for judicial notice, the Court GRANTS the request as to Exs. D, E, F, AD, AG, AH, AI, AJ, AK, AM, AO, CR, CS, and CW. Judicial notice is taken of the existence and recordation of these documents, as well as their clear legal effects pursuant to Evid. Code § 452(c), (d) and (h). (Fontenot v. Wells Fargo Bank, N.A. (2011) 198 Cal.App.4th 256, 264-265.) The truth of matters asserted in such documents is not subject to judicial notice. (Evid. Code § 452(c)(d). See also, *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482.

### Legal Standard

Summary judgment or summary adjudication is proper when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc. § 437c(c).) A moving defendant is entitled to summary judgment if it establishes either one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc. § 437(c)(p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.) To show that a claim cannot be established, moving defendant must present affirmative evidence negating, as a matter of law, an essential element of plaintiff's claim (*Guz v. Bechtel Nat'l, Inc.* (2000) 24 Cal.4th 317, 334; *Eriksson v. Nunnink* (2011) 191 Cal.App.4th 826, 849 fn. 16), or show the absence of evidence to support an essential element of plaintiff's claim. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at 854 [absence of evidence basis requires showing plaintiff "does not possess and cannot reasonably obtain, needed evidence"].)

If the moving defendant meets its initial burden to make a prima facie showing that there are no triable issues of material fact, the burden shifts to plaintiff to produce evidence showing a triable issue of material fact exists. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at 850.)  There is no obligation by plaintiff to establish anything by affidavit unless and until the moving defendant by affidavit has established every element necessary to obtain summary judgment. (*Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454 468.)

The moving party also bears the burden of persuasion. (Evid. Code § 500; *Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at 850.)

The pleadings determine what issues are material in a summary judgment motion.  Therefore, the moving party's evidence must be directed to the claims or defenses raised in the pleadings. (*Keniston v. American Nat'l Ins. Co.* (1973) 31 Cal.App.3d 803, 812.)  The moving party must show that the undisputed facts, when applied to the issues framed by the pleadings, entitle the moving party to judgment. (*Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 66.)  However, "the moving party need not address a missing element or … respond to assertions which are unintelligible or make out no recognizable legal claim." (*Stolz v. Wong Communications Ltd. Partnership* (1994) 25 Cal.App.4th 1811, 1817.)

**Federal Preemption**
Defendants argue that conflict-preemption applies to provide a complete defense to the People's claims and precludes them from being held liable for their statements about opioid medications consistent with their FDA-approved labeling. Mem. Supp., at p. 43:13-14.

"Federal preemption applies when state and federal laws 'directly conflict.' (*Wyeth v. Levine, supra*, 555 U.S. at p. 583, 129 S.Ct. 1187 (conc. opn. of Thomas, J.).)  When it is ' "impossible for a private party to comply with both state and federal requirements," ' a direct conflict exists. (*Freightliner Corp. v. Myrick* (1995) 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385.)" (*Teva Pharm. USA, Inc. v. Superior Court* (2013) 217 Cal. App. 4th 96, 104–05. See also, *Yates v. Ortho-McdNail-Jannsen Pharmaceuticals, Inc.* (6th Cir. 2015) 808 F.3d 281, 293-294 [conflict preemption occurs when either (1) compliance with both federal and state laws is a physical impossibility, or (2) state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress].)

The FDA has jurisdiction to regulate safety information on labels of prescriptions drugs marketed in the USA. (*Merck Sharp & Dohme Corp. v. Albrecht* (2019) 139 S.Ct. 1668, 1672.)  The definition of "label" under the Federal Food, Drug and Cosmetic Act (FDCA) and implementing regulations "refers more broadly to the written material that is sent to the physician who prescribes the drugs and written material that comes with the prescription bottle when the drug is handed to the patient at the pharmacy." (*Id.*)

Defendants construe the People's claims too narrowly and focus on the FDA-approved labels. Mem. Supp., at pp. 46-48; SUF Nos. 94, 97.  But a fair reading of the 6AC make it clear that the People's allegations of Defendants' unlawful, unfair and fraudulent marketing and promotions are broader than that.

The marketing and promotion that Defendants engaged in are not limited to labels or written materials provided to physicians.  The People allege that Defendants' complex and sophisticated marketing scheme included false or misleading statements made by "detailers", i.e. marketing representatives, during doctor visits, in patient education brochures and pamphlets, and in online publications and websites.  See e.g. 6AC, at ¶¶37,

53-54, 58, 60, 62, 64. The People also allege Defendants' use of third parties – key opinion leaders (KOLs), continuing medical education courses (CME) and pain advocacy groups – to taint the sources of information that physicians relied on to assist them in making their prescription decisions in order to circumvent regulatory scrutiny. 6AC, at ¶¶4, 38-40, 43-51, 126. Defendants have not demonstrated that any of this marketing and promotion falls within the definition of "label" under FDCA, is otherwise subject to oversight by the FDA, or by any other federal law. See also Opp., at pp. 56-57. Whether and the extent to which these third parties were under the control of Defendants are disputed issues of material fact. See, for example, SUF 26, 77-78 and AMF 162-177.

Defendants have not shown that there is any conflict with federal law. The People's claims are based on traditional state law principles that parallel and do not conflict with federal law. (See *City and County of San Francisco v. Purdue Pharma L.P.*, *supra*, 2020 WL 5816488, *29; *Wyeth v. Levine*, *supra*, 555 U.S. 555, 574-575, 577 (2009) (noting that with limited resources to monitor the 11,000 drugs on the market, the FDA appears to view state tort law as a "complementary" form of drug regulation).

Even if this marketing and promotion could be construed as encompassed in the definition of "label" or as falling within the FDA's authority, the People seek to hold Defendants liable for marketing and promotions to physicians and consumers that are **unsupported, inconsistent or contrary** to the FDA-approved labeling, or that **misleadingly** conveys the FDA-mandated information. The People do not dispute the content of any opioid label. SUF Nos. 104, 106-107.

The People have identified several categories of false or misleading statements made by Defendants, including:

1. Describing the risk of addiction as low and that addiction is unlikely to develop when opioids are prescribed, or failing to disclose the risk of addiction;
2. Falsely instructing doctors and patients that signs of addiction are actually signs of undertreated pain, i.e. pseudoaddiction, and should be treated by prescribing more opioids;
3. Falsely instructing that addiction risk screening tools allow doctors to reliably identify and safely prescribe opioids to patients predisposed to addiction;
4. Falsely claiming opioid dependence can be easily addressed by tapering and that opioid withdrawal is not a problem;
5. Falsely claiming that doctors and patients could increase opioid dosages indefinitely without added risk, and failing to disclose the greater risk to patients at higher dosages;
6. Marketing abuse-deterrent opioids to appear as if they prevent and curb addiction and abuse; opioid use is safer and more effective than alternatives such as NSAIDS; and
7. Long-term opioid use improves function and the quality of life.

6AC, at ¶¶37, 54, 58, 60, 62, 64 and fn. 13, 67, 81.

Defendants have not negated or even disputed each of these allegations. See SUF Nos. 94-121.

Defendants also misconstrue what the People have alleged is false or misleading in order to support their argument that the People are attempting to hold them liable for statements consistent with FDA-approved labels. For example, Defendants argue that the FDA permits the term "pseudoaddiction" to refer to signs of undertreated pain. Mem. Supp., at p. 49:9-12. But it is not the use of that word that the People take issue with; it is advising physicians to prescribe higher doses of opioids to treat pseudoaddiction. 6AC, at ¶58. In the *City and County of San Francisco v. Purdue Pharma L.P.*, *supra*, 2020 WL 5816488, at *32, the court considered a similar argument and found that advising physicians to prescribe higher doses to treat pseudoaddiction was not supported by the FDA-approved label, and therefore, did not present any conflict with the FDA. The *City and County of San Francisco* court also found that the City's arguments regarding the tapering of opioid dosage to avoid withdrawal symptoms, increasing opioid dosages without added risk and the use of risk-screening tools to safely prescribe opioids – similar to arguments made here by the People – did not conflict with the FDA-approved labels, and as such, none of these arguments were preempted. (*Id.* at *32-33.)

Moreover, the weight of authority has rejected similar preemption arguments. (*In re Nat'l Prescription Opiate Litig.* (N.D. Ohio 2019, No. 1:17 MD 2804) 2019 WL 4178591, at *5 fn. 12 [citing cases that have found no preemption based on misrepresentations that go beyond labeling].)

Accordingly, Defendants have failed to meet their initial burden of a prima facie showing that the preemption defense applies to bar all of the People's claims.

**State-Law Safe Harbors**
Defendants argue that California's safe harbor doctrine under *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 and Civil Code § 3482 immunizes their conduct and bars all of the People's claims.

Defendants cannot rely on California's safe harbor doctrine because the People's claims rest on alleged false and misleading representations that are not permitted by law, and consequently, not protected by the safe harbor. California's safe-harbor doctrine forecloses claims, including public nuisance, UCL, and FAL, if some other provision bars the claim or clearly permits the conduct. (*Cel-Tech Communications, Inc.*, *supra*, 20 Cal. 4th at 183-184; Civ. Code § 3482 ["Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance"].) For the same reasons discussed above regarding preemption, the Court rejects Defendants' characterization of the People's allegations as challenges to FDA-approved labeling and marketing and promotion consistent with FDA-approved labels. The People's allegations of false and misleading marketing and promotions go far beyond the FDA-approved label and preclude application of the safe harbor doctrine.

As with preemption, Defendants fail to meet their initial burden that the safe harbor doctrine applies as a complete defense to all of the People's claims.

**Abstention**
Defendants argue that the Court should apply the equitable abstention doctrine and decline to adjudicate the People's claims. Mem. Supp., at pp. 53-54.

"As a general matter, a trial court may abstain from adjudicating a suit that seeks equitable remedies if 'granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere with the functions of an administrative agency.' [Citation.] A court also may abstain when 'the lawsuit involves determining complex economic policy, which is best handled by the Legislature or an administrative agency.'

[Citation.] In addition, judicial abstention may be appropriate in cases where 'granting injunctive relief would be unnecessarily burdensome for the trial court to monitor and enforce given the availability of more effective means of redress.' [Citation.]" (*Arce, supra,* 181 Cal.App.4th at p. 496, 104 Cal.Rptr.3d 545.)" (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal. App. 4th 1342, 1362, as modified.) If one of these conditions exist, the Court must then consider whether the Legislature or other government entity has attempted to remedy the issues raised in plaintiff's complaint or provide an alternative means for doing so. (*Id.* at 1369.) Generally, abstention is "appropriate only if there is an alternative means of resolving the issues raised in the plaintiff's complaint." (*Ibid.*) Further, the Legislature's investigation or intent to remedy the problematic behavior or conduct, standing alone, is not sufficient to support judicial abstention. (*Id.* at 1369-1370.)

Defendants argue that abstention is appropriate in this case because the Court would be required to enact complex policy best left to the FDA, federal legislature or state legislature, the FDA is already regulating the alleged conduct, and granting injunctive relief would be unnecessarily burdensome for the court to monitor and enforce. Defendants fail to adequately provide evidentiary support these arguments.

Defendants contend that the People's theories of liability require the Court to enact complex healthcare policy, including weighing the risks and benefits of prescription medications, assessing whether they are appropriate to treat particular indications and fashioning appropriate risk-benefit disclosures. Mem. Supp., at pp. 54-55. Defendants have not supported these arguments with sufficient evidence. See Defendants SUF, §V, Nos. 122-125. Moreover, Defendants have not shown that any such determinations would be required since the People allege that Defendants' marketing and promotion practices are unlawful, unfair or fraudulent because they make representations that are contrary to or minimize the guidelines from the FDA, CDC or existing medical literature. E.g., 6AC, at ¶¶52, 55-57, 59, 61, 65-66, 81-82. Thus, the Court would use the existing FDA and CDC guidelines and other medical literature as a reference to determine if the Defendants' marketing and promotions are misleading or untrue, not substitute its decisions for the FDA or CDC. Determining whether Defendants' marketing and promotions practices are false, misleading and deceptive is an appropriate Court function.

Further, the unlawful, unfair or fraudulent marketing and promotions practices Defendants are allegedly engaged in do not fall within the FDA's purview. The People allege Defendants engaged in a complex and sophisticated marketing scheme, including direct marketing and promotions to doctors and vulnerable populations, and the use of third parties to promote the use of opioids in ways contrary to and inconsistent with the recommendations from the FDA and CDC. 6AC, at ¶¶30-51. As such, Defendants' marketing and promotions practices go beyond the scope of the FDA regulations on labeling (*In re Nat'l Prescription Opiate Litigation, supra,* 2019 WL 4178591, at *4 [FDA labeling is not so broad as to "encompass the massive marketing campaign" undertaken by opioid manufacturers]), and would complement FDA's work. (*Wyeth v. Levine,* supra, 555 U.S. at 578-79.)

In sum, Defendants have not met their initial burden of demonstrating that abstention would be appropriate. Even if Defendants have met their initial burden, the People have identified triable issues of material fact on the application of abstention. In particular, the People have presented facts that show it is only challenging the marketing and promotion practices that are inconsistent with the FDA-approved information and that there are no more effective means of redress. AMF Nos. 382-383; SUF Nos. 123-125.

**Public Nuisance**

Civil Code § 3479 defines a nuisance as "[a]nything which is injurious to health" or "indecent or offensive to the senses, or an obstruction to the free use of property" so as to interfere "with the comfortable enjoyment of life or property...." "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ.Code, § 3480.)

> Public nuisance liability "does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance." (*City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28, 38, 13 Cal.Rptr.3d 865; accord, *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 306, 40 Cal.Rptr.3d 313.)

(*Melton v. Boustred* (2010) 183 Cal. App. 4th 521, 542.)

The People allege that Defendants' conduct created a public nuisance, i.e. the opioid epidemic, in California and particularly in the Counties of Santa Clara, Los Angeles and Orange, and the City of Oakland.  6AC, at ¶¶114-123, 152-156.  Defendants dispute causation and argue the opioid epidemic is an inappropriate subject of a public nuisance claim because it is too complex, broad and implicates public policy issues.  Neither argument has merit.

    1.  Causation

Causation is an essential element of a public nuisance claim. (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 542; *Citizens for Odor Nuisance Abatement v. City of San Diego* (2017) 8 Cal. App. 5th 350, 359.)  "A connecting element to the prohibited harm must be shown." (*In re Firearm Cases* (2005) 126 Cal.App.4th 959, 988.)  The factual "causation element of a public nuisance cause of action is satisfied if the conduct of a defendant is a substantial factor in bringing about the result." (*People v. ConAgra Grocery Products Company* (2017) 17 Cal. App. 5th 499, 101.)  Additionally, a plaintiff must establish that defendant's wrongful conduct was not "too remote from the current hazard to be its 'legal cause,' i.e. proximate cause." (*Id.* at 103.)

    A.  Factual Causation

While the parties agree that factual causation is satisfied by demonstrating Defendants are a substantial factor, they disagree over the scope and level of proof needed to meet this requirement.  Compare Mem. Supp., at pp. 11-18 with Opp. at pp. 19-31.  Defendants argue that the conduct is not a substantial factor "if the alleged harm would still have occurred in the absence of Defendants' conduct, unless that conduct would have been sufficient to bring about the harm by itself." Mem. Supp., at p. 11:6-9 (citing *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal. 4th 953, 968–69). Defendants also contend that the People must show that each of their marketing and promotions was false or misleading, that such marketing caused specific prescribers to write medically unnecessary opioid prescriptions and that those medically unnecessary opioid prescriptions caused opioid related harms.  Mem. Supp., at p. 11.

The People dispute that the "substantial factor" test requires such a high standard and argue that the threshold is met as long as the People show the injury, or its full extent,

would not have occurred but for Defendants' conduct. The People further argue that direct proof for each link in a chain of causation is not required nor is it necessary to provide proof on an individualized basis as Defendants assert. Opp., at pp. 19-20, 22. The People are correct.

> " 'The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' [Citation.] Thus, 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage, or loss is not a substantial factor' [citation], **but a very minor force that does cause harm is a substantial factor** [citation]." (*Bockrath v. Aldrich Chemical Co., Inc.* (1999) 21 Cal.4th 71, 79, 86 Cal.Rptr.2d 846, 980 P.2d 398.)

(*People v. ConAgra Grocery Prod. Co.* (2017) 17 Cal. App. 5th 51, 101–02, emphasis added.) A plaintiff need only introduce evidence that affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. (*City of Modesto v. Dow Chem. Co.* (2018) 19 Cal. App. 5th 130, 158, as modified on denial of reh'g (Feb. 6, 2018).)

Further, *Rutherford* does not require a showing that the alleged harm would still have occurred in the absence of Defendants' conduct. This argument

> ignore[s] the court's additional conclusion that the substantial factor standard subsumes "but for" causation to also address situations "involving independent or concurrent causes in fact." *Rutherford*, 16 Cal. 4th at 969, 67 Cal.Rptr.2d 16, 941 P.2d 1203 ("[T]he substantial factor standard [was] formulated to aid plaintiffs as a **broader** rule of causality than the 'but for' test ...."). If a defendant's conduct operated concurrently with other forces to produce the harm, it is a substantial factor, so long as "the injury, **or its full extent**, would not have occurred but for that conduct." *In re Ethan* C., 54 Cal. 4th 610, 640, 143 Cal.Rptr.3d 565, 279 P.3d 1052 (2012). The California Supreme Court has reaffirmed this interpretation of the substantial factor standard. See, e.g., *Viner*, 30 Cal. 4th at 1240, 135 Cal.Rptr.2d 629, 70 P.3d 1046 ("[I]f 'two forces are actively operating ... and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.' " (quoting Restatement Second of Torts § 432)).

(*City & Cty. of San Francisco v. Purdue Pharma L.P.*, *supra*, 2020 WL 5816488, at *40–41, emphasis added.)

Contrary to Defendants' arguments, the People need not prove causation on an individualized basis. In *ConAgra*, defendant lead paint manufacturers made similar arguments regarding causation as Defendants make here. Among other things, the manufacturers contended that there was no evidence their promotions actually had an impact on the use of lead paint on residential interiors [cause in fact], and that their alleged wrongful promotions were too remote because of other factors, such as owner neglect, renovations, intervening actors and repainting [proximate cause]. (*Id.* at 543.) The manufacturers also argued that plaintiff must provide proof that the lead paint made by each of them is actually inside the homes in the relevant jurisdictions. (*Id.* at 548.)

The *ConAgra* court explained that the manufacturers persuaded window and door manufacturers to attach written recommendations that lead paint should be used on all

windows and doors and also instructed their consumers to use lead paints on residential interiors. (*Id.* at 544.)  This evidence was sufficient to "reasonably infer that at least some of those who were the targets of these recommendations heeded them" and to satisfy the substantial factor test. (*Ibid.*)  It was unnecessary for plaintiff to identify any individual consumers or individual residences that used lead paint because of any specific manufacturer's instructions.

In explaining why it was unnecessary for proof that individual homes in the relevant jurisdictions had lead paint in their interiors, the *ConAgra* court explained that to the extent the manufacturers' promotions caused lead paint to be used on residential interiors, the identity of the specific manufacturer of the lead paint is irrelevant.  What matters is whether manufacturers' promotions were a substantial factor in leading to the use of lead paint. (17 Cal.App.5th at 548.)

Here, Defendants argue the People have not and cannot establish causation because of the lack of evidence identifying any particular false or misleading statement made to any particular prescriber that caused the specific prescriber to write "medically unnecessary" opioid prescriptions and that those "medically unnecessary" opioid prescriptions caused any opioid-related harms.  But as discussed, the People are not required to present such information.  Thus, Defendants' have failed to demonstrate the People lack evidence of causation.

Defendants also argue the People's experts offer nothing more than conclusory opinions unsupported by any explanation or reasoning and are "untethered" to the People's theory of liability. Mem. Supp., at pp. 12-13.  However, an examination of these experts' reports demonstrate the fallacy in Defendants' arguments.

For example, Defendants argue the People's marketing expert, Matthew Perri, III (Dr. Perri) provides a conclusory opinion that Defendants' false, misleading or deceptive marketing resulted in a substantial increase in the sales and use of opioids (SUF No. 35) and urge the Court to ignore Dr. Perri's opinions and report.  Defendants criticize Dr. Perri for not providing any statistical analysis, for failing to identify any prescription influenced by any false or misleading marketing, any medically unnecessary opioid prescriptions or tie them to any opioid-related harms, failing to identify the "industry standards" Defendants' marketing violated, and assuming that all marketing by Defendants was untrue, false misleading, inaccurate.  Mem. Supp., at pp. 13-14 and fns. 5 and 6; SUF Nos. 35-36.  Defendants' arguments go to the weight of the evidence and show a conflict in the evidence.

As discussed, the People are not required to provide individualized proof and Defendants have not shown that the case study methodology and marketing principles utilized by Dr. Perri (Perri Report, at ¶¶14-16 and fns. 7 and 8) are improper or not generally accepted in his field of expertise.  Dr. Perri's report and opinions that Defendants' marketing and promotions resulted in a change in thinking about opioids, expanded the opioid markets and increased their use are explained and supported by numerous authorities and evidence, including depositions, Defendants' marketing plans, sales training manuals, scripts, and call notes.  See e.g., Perri Report, ¶¶254-256 and fns. 570-571, 259, 263-274 and p. 10, List of Schedules.  Dr. Perri also explains the "industry standards" that apply to Defendants' marketing and how Defendants failed to abide by them.  SUF No. 36; Perri Report, at ¶257 and fn. 575.

Additionally, although Dr. Perri states that he assumed Defendants' marketing was untrue, false, misleading and/or deceptive, he also explains that this assumption is consistent with case study methodology, other expert reports in the MDL litigation, and FDA warning

letters.  Perri Report, at ¶¶254-256 fn. 570-571.  Dr. Perri's report thus supports the People's contention that Defendants' marketing and promotions are a substantial factor.

Other evidence presented by Defendants indicates that there are triable issues of material fact regarding causation.  The People's PMQ Compendium identifies false or misleading marketing information from each defendant and the supporting evidence.  Fortin Decl., Ex. 60, People's PMQ Compendium, at Topic 1 [identifying false or misleading marketing information from each defendant], Topic 2 [Defendants directing or causing third parties to provide false or misleading marketing information about opioids].  The Pain Management Best Practices Inter-Agency Task Force Report: Updates, Gaps, Inconsistencies, and Recommendations (May 2019) refers to the unprecedented rise in the number of deaths from prescription opioids, heroin, and synthetic opioids in the past two decades, repeatedly refers to the "opioid crisis" and explains that the increased use of opioids from the late 1990s is due to a variety of factors, including "aggressive marketing of new opioid formulations".  Fortin Decl., Ex. 1, at pp. 11-12.  This report acknowledges efforts at the federal, state and local level to address this "public health problem" and that the "opioid crisis is quickly moving to a fentanyl crisis".  *Id.* at 12.  The report also recognizes that "the effectiveness of opioids beyond three months requires more evidence." *Id.* at 25.

Dr. Perri's opinions and the circumstantial evidence may lead to the reasonable inference that Defendants' marketing and promotions are a substantial factor.

  B.  Proximate Cause

Proximate cause "is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct." (*Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal. 4th 1037, 1045.) "[T]here is no bright line demarcating a legally sufficient proximate cause from one that is too remote.  Ordinarily the question will be one for the [fact finder], though in some instances undisputed evidence may reveal a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus." (*ConAgra, supra,* 17 Cal.App.5th at 545, quoting People v. Roberts (1992) 2 Cal.4th 271, 320 fn. 11.)

As discussed above, Defendants' own evidence on causation is disputed or ambiguous.  See e.g., SUF Nos. 50 and 51 [alleged statistics on the rates of opioid prescriptions in the jurisdictions and overdose deaths associated with prescription opioids].

Defendants have failed to meet their initial burden of proof to show the People cannot establish causation as a matter of law.  But even if Defendants had met their initial burden of proof, the People presented additional evidence to show that triable issues of material facts regarding causation exist.  See for example SUF Nos. 45, 46, 49-56; AMF Nos. 254, 258-262, 313, 314.

  2.  Existence of a Public Nuisance

Defendants argue that only discrete, identifiable conditions are proper subjects for public nuisance law.  Defendants contend that the opioid epidemic does not qualify as a public nuisance because it raises multi-faceted policy problems.  Mem. Supp., at pp. 22-24.

But there is no requirement under California public nuisance law that the People show the existence of a "discrete" or "concrete" nuisance "condition" or "hazardous condition."  A nuisance is "[a]nything" that is injurious to health so as to interfere with the comfortable enjoyment of life or property and affects at the same time an entire community,

neighborhood or any considerable number of persons.  (See Civ. Code, §§ 3479, 3480; see also Restatement (Second) Torts, § 821B [defining public nuisance as any "unreasonable interference with a right common to the general public."; *People ex rel. Gallo v. Acuna* (1997) 14 Cal. 4th 1090, 1104, citing the Restatement and the five general categories of public rights, which include public health.)

Other courts have permitted a public nuisance claim even in complex cases presenting multi-faceted policy challenges.  For example, in *Acuna,* the Court held that a public nuisance existed where the "conduct of gang members" and the "conditions" and "atmosphere" in the neighborhood caused by their activities "interfere[d] with the enjoyment of life of an entire community." (14 Cal. 4th at 1120.)  Although the harms caused by these gang activities were varied and extensive, the Court found that the gang conduct had created a public nuisance. (*Acuna*, 14 Cal. 4th at 1120. See also *ConAgra*, *supra*, 17 Cal.App.5th at 119 [manufacturers' affirmative promotion of lead paint in residential interiors created a public nuisance because it was injurious to health even though it encompassed a vast area and would take enormous cost to fully catalogue and abate].)

Defendants argue that *In re Firearm Cases*, *supra*, supports their arguments on the limits of what constitutes a public nuisance.  The court there rejected plaintiffs' nuisance theory against the manufacturers based on the lack of evidence of causation because the manufacturers fully complied with the federal law and guidelines. (126 Cal.App.4th 959, 991.)  But while the court cautioned against extending nuisance liability when there is no evidence of causation because the defendants' conduct was entirely lawful, the court expressly stated that it did "not hold that the theories asserted would never be tenable under different evidence." (*Id*. at 992.)

The Court declines to limit what qualifies as a nuisance to "discrete, identifiable conditions" since it not a requirement in the public nuisance statutes or the cases interpreting it.

Defendants also argue that the People's evidence is insufficient to create a triable issue of material fact on the existence of a public nuisance. Mem. Supp., at pp. 24-28.  Defendants point to the People's allegedly changing definition of what the public nuisance is and what conditions constitute the nuisance.  But citations to the 6AC and the evidence demonstrate that the People were not changing the definition of the public nuisance as much as clarifying and adding to the harm that results from the public nuisance.  SUF Nos. 46-48.  Additionally, the opioid statistics and evidence on whether it is a priority in the jurisdictions are ambiguous for the reasons previously explained.  See SUF Nos. 52-59 [opioid statistics and its impact/priority in the jurisdictions].  Defendants' characterization of ambiguous evidence is insufficient to satisfy their initial burden of proof.

The People's theory of liability, i.e. that Defendants' false and misleading marketing led to the overprescribing, overuse and misuse of opioids falls within the statutory definition of a public nuisance.  Civ. Code §§3479, 3480; *People ex rel. Gallo v. Acuna* (1997) 14 Cal. 4th at 1104.  Further, the People's nuisance theory is similar to the nuisance theory in *ConAgra*, *supra*, 17 Cal. App. 5th at 111–12.)  Even if Defendants had met their initial burden of proof, the People have shown there are triable issues of material fact regarding the existence of a public nuisance.  Opp., at pp. 38-42.

For the reasons explained above under abstention, Defendants have not sufficiently demonstrated that this Court will have to intrude on any legislative or executive functions or complex policy issues or that fashioning an appropriate abatement is outside the Court's powers to direct.  See also, Opp., at pp. 44-46.

**FAL AND UCL**

Defendants seek summary adjudication on the People's FAL and UCL claims because they did not have control over third parties or because the statements constitute noncommercial speech. Defendants contend that "most" of these statements are nonactionable. Mem. Supp. at p. 34. Thus, at least some statements are actionable.

Summary adjudication must completely dispose of the cause of action, defense, damages claim or duty issue to which it is directed. (Code Civ. Proc. § 437c(f)(1).) Since some of the statements are actionable, these claims would not be disposed of completely.

Defendants contend that each statement gives rise to a distinct cause of action that this Court may summarily adjudicate. Mem. Supp., at p. 34 fn. 17; Reply, at p. 15. Defendants argue that the People seek a penalty for each violation of the UCL and FAL, and as such, the Court may grant summary adjudication on each violation.

However, as pointed out by the People (Opp., at pp. 47-48), the California Supreme rejected this precise argument in *People v. Superior Court (Jayhill)* (1973) 9 Cal.3d 283, 288.  In considering a claim for false and deceptive advertising under FAL, the California Supreme Court distinguished between a cause of action and a penalty for each statutory violation:

> The [trial] court also ruled that "each claim for penalty is a separate cause of action," apparently on the theory that each violation of section 17500 constitutes a distinct cause of action which must be separately stated. (Code Civ. Proc., § 430, subd. 5.) We do not agree. The Attorney General has only one cause of action against a particular defendant for violating section 17500; for this he seeks several forms of relief, including the civil penalty of $2,500 set forth in section 17536. Since multiple victims are involved he prays for a penalty for each violation, but this does not elevate each violation to a separate cause of action. Defendants, moreover, would derive no advantage from the bare repetition of the alleged misrepresentations in separate paragraphs representing different customers solicited. (6) We hold that the Attorney General has only one cause of action against a defendant for violating section 17500, but that the amount of civil penalties which may be imposed under section 17536 is dependent upon the number of "violations" committed by a defendant.

(9 Cal. 3d at 287–88.)  This holding applies with equal force to UCL claims.  (*People ex rel. Feuer v. Superior Court (Cahuega's the Spot)* (2015) 234 Cal.App.4th 1360, 1380-1381 [confirming that there is only one cause of action against a defendant for violation UCL and FAL based on primary right principles and that each violation provides a remedy of a penalty].)

The cases cited by Defendants do not require a different result since neither were decided under the UCL or FAL.

## Motion 2.

Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. (collectively, Endo Defendants); Teva Pharmaceuticals USA, Inc. (Teva USA); Actavis LLC (Actavis), Actavis Pharma, Inc. (Actavis Pharma), and Watson Laboratories, Inc. (Watson) (collectively Actavis Generic Entities) (collectively Generic Defendants) seek summary judgment on Plaintiff The People of the State of California's Sixth Amended Complaint (6AC) on the ground that they

did not engage in false or misleading marketing and promotions of generic opioids in California.  In the alternative, the Generic Defendants seek summary adjudication on the causes of action for violations of the Unfair Competition Law (UCL) and False Advertising Law (FAL) on the ground of the lack of any false or misleading marketing of generic opioids, the absence of any allegations in the 6AC for the failure to prevent diversion, and preemption, and on the cause of action for public nuisance based on causation since they did not make any false or misleading statements on generic opioids.  For the reasons set forth below, the Motion is DENIED in its entirety.

**Request for Judicial Notice:**
The People's unopposed request for judicial notice is GRANTED as to all Exhibits except Exhibit 59.  The Court takes judicial notice of the existence and recordation of these documents, as well as their clear legal effects pursuant to Evid. Code § 45(b), (c), (d) and (h).  (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 264-265.)  The truth of matters asserted in such documents is not subject to judicial notice.  (Evid. Code § 452(c), (d).  See also, *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482.

The People's request for judicial notice is DENIED as to Exhibit 59.

**Legal Standard**
The Court incorporates by reference the legal standards set forth in the Court's tentative ruling regarding Defendants Joint Motion for Summary Judgment, or in the Alternative, for Summary Adjudication, ROA 4930.

**False and Misleading Marketing and Promotions**
Generic Defendants contend the People "have no evidence" that any of the Generic Defendants made any false or misleading statements in California because none of them have promoted the safety and efficacy of their generic opioids anywhere, including California.  Mem. Supp., at p. 6.  Generic Defendants have not met their initial burden of showing that no triable issue of material fact exists.

As noted in the Opposition, the Endo Defendants and Teva USA marketed and distributed generic <u>and</u> branded opioids (6AC, at ¶¶16-18, 21-22), but they only move for summary adjudication on the People's FAL and UCL claims "based on purported false marketing of generic medicines." Mem. Supp., at p. 1 fn. 1.  As the moving parties, these defendants have the burden of showing they are entitled to judgment with respect to all theories of liability asserted by plaintiff.  (*Lopez v. Superior Court (Friedman Bros. Inv. Co.)* (1996) 45 Cal.App.4th 705, 717.)  Neither the Endo Defendants or Teva USA have done this since they do not address their marketing and promotions with respect to their branded opioids.  Teva USA, along with Cephalon, Inc. (Teva Defendants), has filed a Separate MSJ/MSA to address marketing and promotions of two branded opioids [ROA 4955] as discussed in the separate ruling on that motion.  In connection with the Defendants' Joint MSJ/MSA [ROA 4930], the Defendants admitted that at least some of their statements were actionable.  See Mem. Supp. to Joint MSJ/MSA, at p. 34.

Summary adjudication must completely dispose of the cause of action, defense, damages claim or duty issue to which it is directed.  (Code Civ. Proc. § 437c(f)(1).)  Because Endo Defendants and Teva USA have not addressed their marketing and promotions of their branded opioids, none of the People's causes of action may be disposed of completely.

Regarding the Actavis Generic Defendants, the People have alleged Allergan plc owned the Actavis Generic Defendants as well as Allergan Finance, LLC until 2016 when the Actavis

Generic Defendants were acquired by Teva. 6AC, at ¶23-24; Opp., at p. 1, fn. 1; ROA 4942, James Decl., Ex. 9 [Deposition of Andrew Boyer taken January 15, 2019 in *In re: national Prescription Opiate Litigation*], at pp. 21:3-9; AMF No. 35. The People allege Allergan Defendants exercised control over Actavis Generic Defendants' marketing and sales efforts and profits of Allergan/Actavis products, including branded drugs Kadian and Norco, a generic version of Kadian and generic versions of Duragesic and Opana. 6AC, at ¶¶23-24.

The Actavis Generic Defendants do not address these allegations regarding the marketing and promotions for the branded opioids or Allergan Defendants' control over the Actavis Generic Defendants. As with the Endo Defendants and Teva USA, neither summary judgment nor summary adjudication are available since they have not met their initial burden of negating, as a matter of law, an essential element of the People's claims or completely disposing of any cause of action.

Additionally, Generic Defendants construe the People's theory of liability too narrowly by focusing solely on marketing and promotions of their specific generic opioids. The People's allegations and theory of liability are broader, however, as the People assert that **all** Defendants, including the Generic Defendants, engaged in a complex and sophisticated marketing scheme based on false and misleading information to cause a dramatic increase in opioid prescriptions and use. E.g., 6AC, at ¶¶1, 2, 8-11. Defendants used branded <u>and</u> unbranded marketing and "front groups", such as KOLs, CMEs and advocacy groups, to make the false and misleading statements regarding opioids in general. 6AC, at ¶¶29, 43-51. The People allege that all Defendants engaged in false and misleading marketing of opioids generally so any distinction between those defendants who manufactured brand name opioids and those who manufactured generic opioids, or both, is largely immaterial. (See *People v. ConAgra Grocery Products Company* (2017) 17 Cal.App.5th 51, 103, 108 (specific identity of defendant lead paint manufacturer irrelevant because all defendants promoted use of lead paint on residential interiors),

Even if Generic Defendants had met their initial burden of proof, their motion would still fail because the People have presented evidence to demonstrate that triable issues of material fact exist regarding the Generic Defendants' alleged false and misleading marketing efforts. The People present evidence that promotion of generic opioids was affected by and dependent on branded marketing, and that Defendants used an integrated marketing approach to increase their sales. AMF No. 54 and the evidence there cited.

The People present evidence of Endo Defendants' use of unbranded marketing to promote and expand the use of opioids, including the use of the National Initiative on Pain Control and the American Pain Foundation's publication, "Pain Action Guide". See SUF No. 11 and AMF Nos. 17-20, 23. The Endo Defendants also marketed and promoted branded and generic products. See Crawford Decl., Ex. 151 [Deposition of Brian Lortie taken on July 3, 2019], at p. 41:2-42:23 [Endo promoted branded produced Opana ER from 2006 to late 2016/early 2017].

The People also present evidence of Teva Defendants' sophisticated and integrated marketing plan to promote and expand the use of its opioids, including for off-label use, through direct marketing and third parties through at least 2019 (AMF Nos. 41-52, 60-62, 68-69), the use of unbranded marketing and promotions with third parties, such as American Pain Foundation's book, "Exit Wounds: a Survival Guide to Pain Management for Returning Veterans and Their Families" in 2014, a documentary "Pain Matters" in 2014-2015 (AMF Nos. 76-78), and the promotion of an abuse deterrent opioid, Vantrela. AMF No. 79.

Teva USA argues that the People improperly rely on the conduct of Cephalon to establish that Teva USA engaged in branded or unbranded marketing. But, as shown above, the evidence presented by the People is not limited to actions taken by Cephalon prior to 2011.

The Actavis Generic Defendants also allegedly used a variety of integrated marketing and promotion strategies to promote their branded and generic opioids, including direct marketing, advertisements and promotions. AMF Nos. 6-13. See also, Crawford Decl., Ex. 153, Ex. 3 to 30(b)(6) Depo., at Response to Nos. 3, 4, 8, 30, 32, 36, 37, 38 and Topic 12 Attachment; Crawford Decl., Ex. 155; James Decl., Ex. 8 [Jinping McCormick Depo. In MDL Litigation], at pp. 113:16-259:23 [use of Kadian sales force to raise awareness of Actavis generic opioids].

The Court recognizes that the Actavis Generic Defendants argue that they should not be lumped together with the Allergan Defendants. However, as discussed, the 6AC alleges that the Actavis Generic Defendants were owned by the Allergan Defendants, and that the Allergan Defendants controlled the marketing of the Actavis Generic Defendants, and treats the various entities as one entity. The Actavis Generic Defendants have not presented evidence demonstrating that they are distinct from the Allergan Defendants or that the Allergan Defendants did not control their marketing and promotions. In contrast, the People presented evidence that show there are triable issue of material fact to determine the level of control and unity between the Actavis Generic Defendants and the Allergan Defendants. See Crawford Decl., Ex. 153 [Allergan Defendants' Verified Responses to the People's Additional 30(B)(6) Questions], at pp. 3-4 [Nos. 4 and 5], pp. 7-8 [No. 17] and Ex. 3 to 30(b)(6) Depo., at Response to Nos. 3, 4, 8, 30, 32, 36, 37, 38 [marketing structure and budgets].

**Preemption**
For the same reasons as discussed in the Preemption Section in the Court's tentative ruling regarding Defendants Joint Motion for Summary Judgment, or in the Alternative, for Summary Adjudication, ROA 4930, Generic Defendants' preemption argument fails here.

**Failure to Prevent Diversion**

Because there are triable issues of material fact on the FAL and UCL claims, and summary adjudication must dispose of the entire claim, summary adjudication is not warranted.

**Public Nuisance**
As discussed above, the People have presented sufficient evidence to demonstrate that each of the Generic Defendants was a substantial factor in creating the public nuisance, i.e. an unreasonable and excessive increase in prescriptions and use of opioids.

This argument also fails for the additional reasons discussed in the Public Nuisance – Causation Section in the Court's tentative ruling regarding the Defendants Joint Motion for Summary Judgment, or in the Alternative, for Summary Adjudication, ROA 4930.

**Motion 3.**

Defendants Teva Pharmaceuticals USA, Inc. (Teva USA) and Cephalon, Inc. (Cephalon) (collectively, Teva Defendants) seek summary judgment on the Sixth Amended Complaint (6AC) of Plaintiff The People of the State of California (People), or alternatively, for summary adjudication on each cause of action. For the reasons stated below, the Teva Defendants' Motion (ROA 4955) is DENIED in its entirety.

**Request for Judicial Notice:** The People's unopposed request for judicial notice is GRANTED as to all Exhibits except Exhibits 23, 53, 69. The Court takes judicial notice of the existence and recordation of these documents, as well as their clear legal effects pursuant to Evid. Code § 45(b), (c), (d) and (h). (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 264-265.) The truth of matters asserted in such documents is not subject to judicial notice. (Evid. Code § 452(c), (d). See also, *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482.

The People's request for judicial notice is DENIED as to Exhibits 23, 53 and 69.

**Legal Standard:** The Court incorporates by reference the legal standards set forth in the Court's tentative ruling regarding Defendants' Joint Motion for Summary Judgment, or in the Alternative, for Summary Adjudication (ROA 4930).

### False and Misleading Statements in the Relevant Limitations Period – FAL and UCL Claims

The Teva Defendants contend the People have no evidence that the Teva Defendants have engaged in any actionable conduct within the statute of limitations for the People's claims for violations of the False Advertising Law (FAL) and Unfair Competition Law (UCL). The statute of limitations for the FAL claim is three years, and for UCL claim, it is four years. (Code Civ. Proc. § 338(h); Bus. & Prof Code §§ 17208, 17536; *People v. Overstock.com, Inc.* (2017) 12 Cal.App.5th 1064, 1074 fn. 8, 1077.

It is undisputed that the People omitted the Teva Defendants from the Fourth Amended Complaint (SUF No. 14) and then renamed them as defendants in the Fifth Amended Complaint filed on March 23, 2018. SUF No. 15. The omission of the Teva Defendants in the Fourth Amended Complaint served as a dismissal without prejudice. (*Fireman's Fund Ins. Co. v. Sparks Const., Inc.* (2004) 114 Cal.App.4th 1135, 1142 ["It has long been the rule that an amended complaint that omits defendants named in the original complaint operates as a dismissal as to them."].) Accordingly, the Teva Defendants contend that the FAL and UCL claims are barred by the applicable statutes of limitations unless the People can show they engaged in actionable conduct after March 23, 2014 for the UCL claim and March 23, 2015 for the FAL claim. Mem. Supp., at p. 7 fn. 8.

(In a footnote, the People claim equitable tolling may apply because the People omitted the Teva Defendants based on their reliance on a settlement agreement they thought they had reached. Opp., at p. 9 fn.2. But this theory is not fully developed, and the People have failed to show that equitable tolling applies.)

The Teva Defendants admit that they continued to market and promote Fentora until "late 2015." SUF No. 6. Thus, it is undisputed that the Teva Defendants engaged in marketing and promoting Fentora within the limitations period. (And there are further disputes of material fact regarding promotion of Fentora after 2015 – SUF 6 and response thereto.)

Nevertheless, the Teva Defendants contend that the only branded opioids they marketed and promoted were Actiq and Fentora and that the People cannot show they engaged in any false or misleading statements regarding these branded opioids after March 23, 2014. Mem. Supp., at pp. 5-6. The Teva Defendants also contend that because the Transmucosal Immediate Release Fentanyl Risk Evaluation Mitigation Strategy (TIRF REMS) Program was in effect by 2012, the People have not and cannot identify any false or

misleading statements by the Teva Defendants that were likely to mislead any California doctors.  Mem. Supp., at pp. 7-9.

As discussed more fully in the Court's tentative rulings on Defendants' Joint MSJ/MSA and Generic Defendants' MSJ/MSA, the Teva Defendants construe the People's theory of liability too narrowly by focusing only on the two branded opioids Actiq and Fentora.  To prevail on this Motion, the Teva Defendants are required to show that there is no triable issue of material fact that they did not engage in any false or misleading marketing or promotions for **any** opioids within the applicable limitations period.  For the reasons set forth in those other rulings, which the Court incorporates by reference and adopts here, the Teva Defendants cannot discharge their burden.

In particular, triable issues of material fact exist regarding Teva Defendants' direct marketing of Fentora <u>and</u> unbranded marketing of opioids generally during the limitations periods.  For example, Actiq and Fentora are indicated only for short-acting pain relief to opioid-tolerant cancer patients suffering from breakthrough pain and should be used only by oncologists and pain specialists.  Teitcher Decl., Ex. 7, at p. 157, Ex. 8, Nicholson Expert Report dated 11/13/2020, at ¶21 and fns. 21 and 22, p. 10 and Appendix D.  But it appears the Teva Defendants promoted off-label use through at least 2015.  AMF Nos. 8-13, 45, 49.  There is also evidence of the Teva Defendants' unbranded marketing activities and use of third parties, such as "Pain Matters" program in 2015 that featured doctors discussing "Evolving Roles, Same Goals: The Changing Landscape of Pain Management."  People's AMF No. 75.  See also, AMF Nos. 73-77.

The Teva Defendants argue that they do not control these third-party entities and point to their letters of agreement and policies that provided the educational grants had to be independent of company influence over content.  Reply, at p. 4 and fn. 4; Hassler Depo., at pp. 322:13-323:23; Teitcher Decl., Ex. 10, at ¶3 ["Independent medical education activities must remain independent from Teva and no Teva personnel or Teva agent may control any aspect of an independent education activity."], Ex. 11, at ¶3 [same], Ex. 12 at VII.B.2 ["The grant submission process must be handled independently without the aid of Cephalon sales personnel."]; Ex. 13, at ¶B [same].  But the People presented evidence showing the Teva Defendants had input with these third parties that go beyond mere sponsorship.  E.g., AMF Nos. 67-76.  Whether the Teva Defendants had control of these third parties is a question of fact.

Contrary to the Teva Defendants' arguments, the TIRF REMS Program does not mean that the People cannot show the Teva Defendants engaged in any false or misleading statements as a matter of law.  The California Supreme Court recognized in *Stevens v. Parke Davis* that even adequate warnings to doctors can be watered down or nullified altogether by overpromotion. (*Stevens, supra*, 9 Cal.3d at p. 65.)  In *Stevens*, the Court affirmed it was the trier of fact's province to weigh conflicts of the evidence including the inference that the defendant's overpromotion of the drug may have influenced the doctor's prescribing decisions, even when the doctor directly testified he knew the drug's risk when he prescribed it. (*Id.* at 67-68 (relying on *Incollingo v. Ewing*, 282 A.2d 206, 220 [holding "whether or not the printed words of warning were in effect cancelled out and rendered meaningless in the light of the sales effort made by the detail men, were questions properly before the jury."].)  In upholding those findings, the Supreme Court held, "It is reasonable to assume that the company's efforts consciously or subconsciously influenced [the doctor]." (*Id.* at 68; see also *Evraets v. Intermedics Intraocular, Inc.* (1994) 29 Cal.App.4th 779, 793 [manufacturer downplaying risks not

relieved of liability]; *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 491 ["jury could reasonably infer the drug maker's negligent marketing had influenced the physician's prescription choice"].)

**Causation – Public Nuisance**

This argument fails for the reasons set forth in the Court's tentative rulings on the Defendants' Joint MSJ/MSA, ROA 4930 and the Generic Defendants' MSJ/MSA, which are incorporated by reference and adopted as if set forth in full here.

**Motion 4.**

Plaintiff The People of the State of California seek summary adjudication on Defendants' affirmative defenses for (1) contributory negligence, comparative negligence or comparative fault; (2) avoidable consequences or failure to mitigate damages; (3) laches; (4) unclean hands; (5) waiver; and (6) equitable estoppel. For the reasons stated below, the People's Motion (ROA 4921) is GRANTED in part and DENIED in part.

**Legal Standard:** The Court incorporates by reference the legal standards set forth in the Court's tentative ruling regarding Defendants' Joint Motion for Summary Judgment, or in the Alternative, for Summary Adjudication (ROA 4930).

**Comparative Fault Affirmative Defenses**
The People seek abatement, civil penalties and a prohibitory injunction as remedies in this case. 6AC, at ¶¶159, 162, 167 (injunction), ¶¶160, 163, 164, 165 (civil penalties) and ¶168 (abatement). As such, the People contend that they are entitled to summary adjudication on comparative fault defenses (i.e. contributory negligence, comparative negligence or fault, and avoidable consequences or mitigation of damages) because they apply to damages only.

The seminal California case on comparative fault/negligence is *Ly v. Yellow Cab. Co.* (1975) 13 Cal.3d 804 in which the California Supreme Court held that "the "all-or-nothing" rule of contributory negligence as it presently exists in this state should be and is herewith superseded by a system of 'pure' comparative negligence, the fundamental purpose of which shall be to assign responsibility and liability for damage in direct proportion to the amount of negligence of each of the parties." (*Id.* 828-829.) Thus, California no longer recognizes the affirmative defense of contributory negligence and summary adjudication is GRANTED as to this affirmative defense.

Where a plaintiff seeks only abatement as a remedy in a nuisance action, comparative negligence/fault does not apply; however, if damages are sought comparative negligence may apply. (See *Kafka v. Bozio* (1923) 191 Cal. 746 [where plaintiff dropped all claims for damages and sought only abatement, the California Supreme Court reversed a judgment defendant's favor finding "parties confused the issues herein by importing into the case questions of negligence and contributory negligence, which are wholly irrelevant to the action in so far as it seeks an abatement of the nuisance."]; *Curtis v. Kastner* (1934) 220 Cal. 185 [California Supreme Court affirmed a judgment finding contributory negligence barred plaintiff's claim for damages from a nuisance and acknowledging rule in Kafka that contributory negligence does not apply to abate a nuisance but recognizing that it "was not to be understood" as deciding that contributory negligence "would not be a defense"].)

Defendants do not dispute that *Curtis* and *Kafka* hold that comparative fault is not a defense to abatement for nuisance.  But Defendants point out that the People are seeking $50 billion in monetary relief for harms related to opioid abuse and addiction and argue the monetary relief sought constitutes future damages.  Opp., at pp. 2-3.  Defendants also argue that comparative fault is not "limited to formal damages remedies" and contend that it has been applied when monetary recoveries are premised on fault, including criminal restitution.  Opp., at p. 2.

In *People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, the court rejected a similar argument by the defendant manufacturers in that case.  The defendants claimed the abatement order, which included an abatement fund of $1,150,000, was an order that defendants pay damages for past harm.  (*Id*. at 131-132.)  The *ConAgra* court explained:

> The trial court's abatement order in this case did not attempt to award any already-incurred costs to plaintiff or to any of the 10 jurisdictions.  Instead, the court's abatement order directed defendants to deposit funds in an abatement fund, which would be utilized to prospectively fund remediation of the public nuisance.

(*Id*. at 132.)  The *ConAgra* court further explained that the difference between an abatement order and damages is "stark".  (*Ibid*.)  "An equitable remedy's sole purpose is to eliminate the hazard that is causing prospective harm to the plaintiff. An equitable remedy provides no compensation to a plaintiff for prior harm. Damages, on the other hand, are directed at compensating the plaintiff for prior accrued harm that has resulted from the defendant's wrongful conduct."  (*Id*. at 132-133.)

While past damages compensate plaintiff for loss that has already occurred, future damages compensate the plaintiff for detriment "certain to result in the future".  (Civ. Code § 3283.  See also, *Green Wood Indus. Co. Forceman Intern. Development Group, Inc*. (2007) 156 Cal.App.4th 766, 776-777 [in a tort action, future or prospective damages are defined as any loss that is reasonably certain to occur in the future].)

As discussed in *ConAgra*, an abatement fund may be used in order to prospectively fund remediation of the public nuisance, but not for reimbursement for funds that have already been expended to remediate the public nuisance or for any loss reasonably certain to occur in the future.  Whether the abatement fund the People have requested is actually being used for its proper purpose is an issue that Defendants may litigate.  However, Defendants may not assert comparative fault or comparative negligence as a defense to the public nuisance action.

There does not appear to be any case that has decided whether comparative fault or negligence is a defense to UCL and FAL claims.  UCL and FAL are consumer protection statutes that may be brought by the government or private citizen.  The primary objective of these statutes "is preventative, authorizing the exercise of broad equitable authority to protect consumers from unfair or deceptive business practices and advertising." (*Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 301, 326.) Claims under these statutes are equitable in nature and permit injunctive relief, restitution and civil penalties, not damages. (*Id*. at 279, 301, 306.) However, only the government may seek penalties since the penalties to be imposed go to a government fund to be used by the Attorney General or local prosecutors to prosecute consumer protection laws. (*Id*. at 299 fn. 7, 306, 323.)

In assessing the civil penalty under the UCL and FAL, the court is required to consider a nonexhaustive list of relevant circumstances including, but not limited to "the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." (Bus. & Prof. Code §§ 17206(b) and 17536(b).)  The penalties focus on the defendant's conduct and "unlike the classic legal remedy of damages, are noncompensatory in nature; they require **no showing of actual harm** to consumers and are **not based on the amount of losses** incurred by the targets of unfair practices or misleading advertising." (9 Cal.5[th] at 326.)  Though the penalties have a punitive or deterrent aspect, the primary objective is to secure obedience to the statutes and regulations to assure important public policy objectives. (*Id*.)  "The focus of [both] statutory scheme[s] is *preventative*.  (Italics in original.)" (*Id.* citing *Kizer v. County of San Mateo* (1991) 54 Cal.3d 139, 147-148.)

Accordingly, as with abatement, the penalties under the UCL and FAL are equitable remedies that provide no compensation to a plaintiff and do not even require proof of actual harm to or loss incurred by the plaintiff.  Given the purpose of the UCL and FAL statutes, and particularly, the penalties, the Court agrees with the People that comparative fault or comparative negligence does not apply as a defense to the People's UCL and FAL claims.  Further, applying comparative fault or comparative negligence would undermine the public policy objectives, purpose and focus of the penalties under the UCL and FAL.  Summary adjudication is GRANTED as the affirmative defense of comparative fault or comparative negligence.

Similarly, Defendants may not apply the avoidable consequences or mitigation of damages doctrines to the People's claims.  In *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4[th] 1026, a case cited by both sides, the California Supreme Court explained: "Under the avoidable consequences doctrine [sometimes referred to as mitigation of damages] as recognized in California, a person injured by another's wrongful conduct will not be compensated for damages that the injured person could have avoided by reasonable effort or expenditure." (*Id.* at 1043.)  The California Supreme Court repeatedly referred to this defense as affecting damages.  The California Supreme Court stated: "[The doctrine is] recognized as a **rule of damages** with wide application in civil cases generally" (*id*.); "**the defense affects damages**, not liability" (*id*. at 1045.); and "The avoidable consequences doctrine is **part of the law of damages**" (*id*.).  Additionally, Defendants have not cited any authority allowing this defense to the remedies sought here.  Accordingly, Defendants may not rely on the doctrine of avoidable consequences or mitigation of damages as an affirmative defense.  Summary adjudication is GRANTED as to the affirmative defense of avoidable consequences or mitigation of damages.

**Equitable Affirmative Defenses**
The People contend that none of the equitable defenses (i.e. laches, unclean hands, waiver or estoppel) are available in civil enforcement claims brought to protect the public interest.  The People argue that allowing Defendants to apply equitable defenses against a governmental body would operative to defeat the effective operation of policy adopted to protect the public.

In *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163 (*Cortez*), the plaintiff sued her employer for failure to pay overtime wages and sought restitution under the UCL and its four-year statute of limitations.  The defendant employer asserted the equitable defenses of laches, good faith, waiver, and estoppel, and argued that the court was required to consider them in determining liability. (*Id.* at 179.)  The California Supreme Court explained that while "equitable defenses may not be asserted to wholly defeat a UCL claim

since such claims arise out of unlawful conduct" that "equitable considerations may enter into the court's disposition of a UCL action." (*Id.* at 179.)  UCL remedies are cumulative to other remedies available and "have an independent purpose—deterrence of and restitution for unfair business practices." (*Ibid.*)  Based on that rationale, it is appropriate that equitable defenses be considered by the court when exercising discretion over which, if any, remedies should be awarded. (*Id.* and 179-180.)  The court's discretion in a UCL case is "very broad" and "does not mandate" restitutionary or injunctive relief [or penalties] when an unfair business practice has been shown. (*Id.* at 180.)  "[C]onsideration of the equities between the parties is necessary to ensure an equitable result." (*Id.* at 181.)  The California Supreme Court concluded "while we cannot foresee how any equitable consideration could defeat a claim for unpaid wages, we cannot foreclose the possibility that defendant has evidence that the trial court might consider relevant..." (*Ibid.*)

Although *Cortez* was decided under the UCL, the same reasoning applies to the FAL given the similarities between the two statutes.  Accordingly, the Court declines to preclude Defendants from asserting equitable defenses on the UCL and FAL claims.

The People argue that there is a distinction between allowing Defendants to assert equitable defenses to defeat the People's claims and considering the equitable defenses in fashioning a remedy.  There is some support for this proposition. (*Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal. App. 4th 528, 543–45 [trial court has discretion to consider equitable defenses such as unclean hands in creating the remedies under the UCL but such defenses may not be used to wholly defeat the UCL cause of action].)  However, pursuant to *Cortez*, the Court will not foreclose Defendants ability to present their equitable defenses at this juncture.  Summary adjudication on the equitable defenses of laches, unclean hands, waiver and equitable estoppel are DENIED.

🏳 KeyCite Yellow Flag - Negative Treatment

Distinguished by In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation, N.D.Cal., October 23, 2020

491 F.Supp.3d 610
United States District Court, N.D. California.

CITY AND COUNTY OF SAN
FRANCISCO, et al., Plaintiffs,

v.

PURDUE PHARMA
L.P., et al., Defendants.

Case No. 3:18-cv-07591-CRB
|
Signed 09/30/2020

**Synopsis**

**Background:** City brought action against defendants based on claims that certain defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO) by allegedly operating an illegal opioid marketing enterprise, that certain defendants violated RICO by allegedly operating an illegal opioid supply chain enterprise, that all defendants contributed to the creation of a public nuisance, i.e., the opioid epidemic, in violation of California law, that nearly all defendants violated California's Unfair Competition Law (UCL), that certain defendants violated California's False Advertising Law (FAL), and that certain defendants violated the California Consumers Legal Remedies Act (CLRA). Defendants moved to dismiss for failure to state a claim, lack of personal jurisdiction, lack of standing, and insufficient service of process.

**Holdings:** The District Court, Charles R. Breyer, Senior District Judge, held that:

[1] city alleged a plausible causal relationship between its alleged public-nuisance injury as to opioids and drug-store chain's conduct in order for city to have Article III standing to bring a public-nuisance claim under California law against drug-store chain;

[2] city made a prima facie showing that particular pharmaceutical corporation and its subsidiaries were alter egos, as was relevant to the public-nuisance claim;

[3] city sufficiently pleaded fraud to support its claim that pharmaceutical distributor's conduct regarding opioids violated RICO;

[4] the incurring by city's parking lot and advertising businesses of opioid-related clean-up expenses and the lost revenue of those city-owned businesses constituted cognizable "injuries" to city for purposes of standing to pursue a RICO claim;

[5] city's claims were not impliedly preempted by the Controlled Substances Act (CSA);

[6] city's claims did not conflict with opioid-medication label that was approved by the Food and Drug Administration (FDA); and

[7] city made a sufficient pleading to establish standing to assert claims under the FAL, UCL, and CLRA.

Motions granted in part and denied in part.

West Headnotes (116)

**[1]**    **Health**    Regulation of conduct in general

Implementing regulations of the Controlled Substances Act (CSA) impose a duty on registrants to (1) design and operate a system to disclose to the registrant suspicious orders and (2) inform the Drug Enforcement Administration (DEA) of suspicious orders when discovered by the registrants. 21 C.F.R. §§ 1301.71, 1301.74.

**[2]**    **Nuisance**    Actions for damages

City alleged a plausible causal relationship between its alleged public-nuisance injury as to opioids and drug-store chain's conduct in order for city to have Article III standing to bring a public-nuisance claim under California law against drug-store chain; city alleged that drug-store chain repeatedly failed to maintain effective controls to prevent diversion of opioids, city alleged that drug-store chain installed dispensing and compensation policies that discouraged its

pharmacists from performing due diligence on suspicious prescriptions, and city's allegations demonstrated that, at the very least, drug-store chain's oversupply of opioids caused third parties to act in a way that injured city. U.S. Const. art. 3, § 2, cl. 1; Cal. Civ. Code § 3479 et seq.

**[3]** **Federal Civil Procedure** In general; injury or interest

**Federal Civil Procedure** Causation; redressability

In order to have Article III standing, the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. U.S. Const. art. 3, § 2, cl. 1.

**[4]** **Federal Civil Procedure** Causation; redressability

Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct; what matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain. U.S. Const. art. 3, § 2, cl. 1.

**[5]** **Federal Courts** Presumptions and burden of proof

The plaintiff bears the burden of establishing the court's personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(2).

**[6]** **Federal Courts** Evidence; Affidavits

In assessing whether personal jurisdiction exists, the court may consider evidence presented in affidavits or order discovery on jurisdictional issues. Fed. R. Civ. P. 12(b)(2).

**[7]** **Federal Courts** Weight and sufficiency

When a district court acts on a defendant's motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss. Fed. R. Civ. P. 12(b)(2).

**[8]** **Federal Courts** Weight and sufficiency

A plaintiff can make a prima facie showing of personal jurisdiction as to defendant by producing admissible evidence which, if believed, would be sufficient to establish personal jurisdiction. Fed. R. Civ. P. 12(b)(2).

**[9]** **Federal Courts** Presumptions and burden of proof

On a motion to dismiss for lack of personal jurisdiction, uncontroverted allegations in plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in plaintiff's favor. Fed. R. Civ. P. 12(b)(2).

**[10]** **Federal Courts** Hearing

If the pleadings and submitted materials raise disputed questions of fact with regard to personal jurisdiction, the district court can exercise its discretion to hold a preliminary hearing in order to resolve the dispute; but if the jurisdictional facts are intertwined with the merits such that a decision on a jurisdictional issue is dependent on the merits, it is preferable that the determination be made at trial, where a plaintiff may present his case in a coherent, orderly fashion and without the risk of prejudicing his case on the merits. Fed. R. Civ. P. 12(b)(2).

**[11]** **Federal Courts** Related or affiliated entities; parent and subsidiary

Under federal law, if a corporation is the alter ego of an individual defendant, or one corporation the alter ego of another, the Court may pierce the corporate veil as to personal jurisdiction and

attribute contacts accordingly. Fed. R. Civ. P. 12(b)(2).

**[12]**    **Federal Courts** ⟵ Related or affiliated entities; parent and subsidiary

In order to demonstrate that an alter ego relationship exists such that piercing the corporate veil is warranted for personal-jurisdiction purposes, the plaintiff must make a prima facie case (1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice. Fed. R. Civ. P. 12(b)(2).

1 Cases that cite this headnote

**[13]**    **Federal Courts** ⟵ Related or affiliated entities; parent and subsidiary

Factors suggesting that two entities have a unity of interest and ownership, as is relevant to determining if piercing the corporate veil is warranted for personal-jurisdiction purposes, include: (1) inadequate capitalization, (2) commingling of funds and other assets, (3) disregard of corporate formalities and failure to maintain an arm's length relationship, (4) holding out by one entity that is liable to the debts of the other, (5) identical equitable ownership, (6) use of the same offices and employees, (7) lack of segregation of corporate records, (8) manipulating assets between entities so as to concentrate the assets in one and the liabilities in another, and (9) identical directors and officers. Fed. R. Civ. P. 12(b)(2).

**[14]**    **Corporations and Business Organizations** ⟵ Fraud or illegal acts in general

**Corporations and Business Organizations** ⟵ Alter ego in general

The alter-ego doctrine is not limited to intentional fraud, nor does it require bad faith; so long as there is a unity of interest and ownership, courts will ignore the corporate form

and attribute wrongful or inequitable conduct to the organization controlling the corporation.

**[15]**    **Federal Courts** ⟵ Defective, dangerous, or injurious products; products liability

**Federal Courts** ⟵ Related or affiliated entities; parent and subsidiary

City made a prima facie showing that pharmaceutical corporation and its subsidiaries were alter egos, as was relevant to determining if exercising specific personal jurisdiction over pharmaceutical corporation under alter-ego theory was warranted on city's public-nuisance claim under California law as to actions by pharmaceutical corporation and subsidiaries regarding opioids; city alleged that pharmaceutical corporation controlled subsidiaries' day-to-day activities and alleged that pharmaceutical corporation's total financial control over the subsidiaries, including subsidiaries' trade receivables, protected the subsidiaries from creditors. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(2).

**[16]**    **Federal Courts** ⟵ Evidence; Affidavits

Courts may consider evidence presented in affidavits and declarations in determining personal jurisdiction. Fed. R. Civ. P. 12(b)(2).

**[17]**    **Federal Courts** ⟵ Defective, dangerous, or injurious products; products liability

**Federal Courts** ⟵ Related or affiliated entities; parent and subsidiary

City adequately pleaded the existence of unity of interests and ownership between Irish pharmaceutical corporation and its subsidiaries, as was relevant to determining if exercising specific personal jurisdiction over corporation under alter-ego theory was warranted on city's public-nuisance claim under California as to actions by corporation and subsidiaries regarding opioids; city alleged that corporation controlled its subsidiaries' sales and marketing strategies and implemented programs to review and approve product-specific materials,

presentations, and external communications, city alleged that corporation disregarded corporate formalities by commingling funds, and city alleged that the corporation shared officers with subsidiaries. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(2).

**[18]** **Federal Courts** 👈 Defective, dangerous, or injurious products; products liability

**Federal Courts** 👈 Related or affiliated entities; parent and subsidiary

City failed to allege that Irish pharmaceutical corporation engaged in marketing, selling, manufacturing, or distribution of prescription opiates in the United States, as was relevant to determining if exercising specific personal jurisdiction over corporation under alter-ego theory was warranted on city's public-nuisance claim under California law as to actions by corporation and subsidiaries regarding opioids; city solely relied upon corporate filings to argue that corporation was actively engaged in the pharmaceutical business, but that was not the same as manufacturing, distributing, and selling prescription opioids. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(2).

**[19]** **Federal Courts** 👈 Defective, dangerous, or injurious products; products liability

**Federal Courts** 👈 Related or affiliated entities; parent and subsidiary

City did not plausibly allege that Irish pharmaceutical corporation and its subsidiaries failed to maintain separate books and records, as was relevant to determining if exercising specific personal jurisdiction over corporation under alter-ego theory was warranted on city's public-nuisance claim under California law as to actions by corporation and subsidiaries regarding opioids; although city alleged that corporation's lenders required it to send consolidated budgets, that alone did not suggest that corporation and its subsidiaries did not maintain separate financial records, especially given that it was a requirement under Irish law. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(2).

**[20]** **Federal Courts** 👈 Defective, dangerous, or injurious products; products liability

**Federal Courts** 👈 Related or affiliated entities; parent and subsidiary

City made a prima facie showing of unity of interests and ownership between pharmaceutical corporation and its subsidiaries, as was relevant to determining if exercising specific personal jurisdiction over corporation under alter-ego theory was warranted on city's public-nuisance claim under California law as to actions by corporation and subsidiaries regarding opioids; city alleged that corporation ensured that subsidiaries complied with federal and California law regarding sale and marketing of pharmaceuticals, that corporation's independent directors report stated that corporation governed subsidiaries' interactions, that corporation controlled all employees' stock and options plans, and that corporation had virtually identical officers and directors as United States subsidiaries. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(2).

1 Cases that cite this headnote

**[21]** **Corporations and Business Organizations** 👈 Parent and subsidiary corporations in general

A parent corporation's use of its subsidiary as an instrument for a single venture alone is insufficient to establish an alter-ego relationship, but in conjunction with other factors can establish an alter-ego relationship between the entities, as is relevant to piercing the corporate veil for purposes of personal jurisdiction.

**[22]** **Federal Courts** 👈 Defective, dangerous, or injurious products; products liability

**Federal Courts** 👈 Related or affiliated entities; parent and subsidiary

That Irish pharmaceutical company allegedly guaranteed loans for its subsidiaries was not a basis for exercising specific personal jurisdiction over corporation under alter-ego theory on city's

public-nuisance claim under California law as to actions by corporation and subsidiaries regarding opioids; allegation did not suggest an alter-ego relationship. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(2).

1 Cases that cite this headnote

**[23]** **Federal Courts** ⚷ Particular Entities, Contexts, and Causes of Action

Personal jurisdiction over a successor company exists where (i) the court would have had personal jurisdiction over the predecessor and (ii) the successor company effectively assumed the subject liabilities of the predecessor.

**[24]** **Corporations and Business Organizations** ⚷ Exceptions to Successor Non-Liability

A successor company assumes its predecessor's liabilities, as required for the existence of personal jurisdiction over the successor company, if one of the following exceptions to the presumption of non-liability exists: (1) the successor expressly or impliedly agrees to assume the subject liabilities; (2) the transaction amounts to a consolidation or merger of the successor and the predecessor, i.e., a de facto merger; (3) the successor is a mere continuation of the predecessors; or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping liability for the predecessor's debts.

**[25]** **Courts** ⚷ Different courts or judges, rulings by

**Federal Courts** ⚷ Effect of transfer and subsequent proceedings

Pursuant to law of the case in city's action under federal and California law against pharmaceutical and drug-store companies in regard to their actions concerning opioids, domestic defendants had to accept service on behalf of any foreign defendant that was their parent or subsidiary; action was part of multidistrict litigation (MDL), and the MDL court order regarding service for a foreign entity

that was a parent or subsidiary of any corporate defendant in the MDL applied to all cases in the MDL. Fed. R. Civ. P. 12(b)(5).

**[26]** **Courts** ⚷ Previous Decisions in Same Case as Law of the Case

**Federal Courts** ⚷ Law of the case in general

A court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.

**[27]** **Federal Civil Procedure** ⚷ Insufficiency in general

Dismissal for failure to state a claim may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. Fed. R. Civ. P. 12(b)(6).

**[28]** **Federal Civil Procedure** ⚷ Claim for relief in general

A complaint must plead enough facts to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

**[29]** **Federal Civil Procedure** ⚷ Insufficiency in general

A claim is "plausible," as is relevant to a motion to dismiss for failure to state a claim, when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 12(b)(6).

**[30]** **Federal Civil Procedure** ⚷ Construction of pleadings

When evaluating a motion to dismiss for failure to state a claim, the court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party. Fed. R. Civ. P. 12(b)(6).

**[31]** **Federal Civil Procedure** 🗝 Matters considered in general

When considering a motion to dismiss for failure to state a claim, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on such motions, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. Fed. R. Civ. P. 12(b)(6).

**[32]** **Federal Civil Procedure** 🗝 Fraud, mistake and condition of mind

The heightened pleading standard for fraud requires an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations. Fed. R. Civ. P. 9(b).

**[33]** **Federal Civil Procedure** 🗝 Fraud, mistake and condition of mind

To meet the heightened pleading standards for fraud, the circumstances constituting the fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong. Fed. R. Civ. P. 9(b).

**[34]** **Federal Civil Procedure** 🗝 Form and sufficiency of amendment; futility

Although a court should freely give leave to amend the complaint, the court nevertheless has discretion to deny leave to amend due to, among other things, futility of amendment. Fed. R. Civ. P. 15(a)(2).

**[35]** **Federal Civil Procedure** 🗝 Fraud, mistake and condition of mind

The heightened pleading standard for claims of fraud requires facts specific enough to give defendants notice of the conduct that gave rise to the fraud charge, and there is no flaw in a pleading where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct. Fed. R. Civ. P. 9(b).

**[36]** **Federal Civil Procedure** 🗝 Fraud, mistake and condition of mind

California city sufficiently pleaded fraud to support its claim that pharmaceutical distributor's conduct regarding opioids violated the Racketeer Influenced and Corrupt Organizations Act (RICO); city alleged that distributor failed to maintain the legally required effective controls to detect and report suspicious order, which led to diversion, and city alleged in the eight-year history of distributor's opioid shipments to city, distributor never identified a single suspicious order to the California State Board of Pharmacy, despite its obligations to do so. 18 U.S.C.A. § 1961 et seq.; Fed. R. Civ. P. 9(b).

**[37]** **Federal Civil Procedure** 🗝 Fraud, mistake and condition of mind

The purpose of the heightened pleading standard for a claim of fraud is to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge. Fed. R. Civ. P. 9(b).

**[38]** **Racketeer Influenced and Corrupt Organizations** 🗝 Business, property, or proprietary injury; personal injuries

Alleged extraordinary cost to city of providing governmental services to combat the opioid epidemic was not a cognizable "injury" under the Racketeer Influenced and Corrupt Organizations Act (RICO), and thus such alleged injury could not be a basis for city to have standing to pursue RICO claim against companies that distributed opioids. 18 U.S.C.A. § 1964(c).

RICO Bus.Disp.Guide 13,405

1 Cases that cite this headnote

**[39]** **Racketeer Influenced and Corrupt Organizations**  ⌁  Business, property, or proprietary injury;  personal injuries

Alleged damage to city library's toilet grinders and other real property of city was a cognizable "injury" under the Racketeer Influenced and Corrupt Organizations Act (RICO), as was relevant to determining if city had standing to pursue RICO claim against companies that distributed opioids. 18 U.S.C.A. § 1964(c).

**[40]** **Racketeer Influenced and Corrupt Organizations**  ⌁  Injury in general

As is relevant to standing to pursue a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), a governmental entity can recover losses sustained as a consumer or other type of market participant. 18 U.S.C.A. § 1964(c).

**[41]** **Racketeer Influenced and Corrupt Organizations**  ⌁  Business, property, or proprietary injury;  personal injuries

When a consumer operating as a commercial enterprise suffers a loss of money, it suffers an injury in both its business and property, as is relevant to standing to pursue a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1964(c).

**[42]** **Racketeer Influenced and Corrupt Organizations**  ⌁  Business, property, or proprietary injury;  personal injuries

A consumer suffers an injury to their business when a party inhibits their ability to provide a commercial service, as is relevant to standing to pursue a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1964(c).

**[43]** **Racketeer Influenced and Corrupt Organizations**  ⌁  Business, property, or proprietary injury;  personal injuries

A consumer suffers an injury to property when a party deprives the consumer's commercial enterprise of money, as is relevant to standing to pursue a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1964(c).

**[44]** **Racketeer Influenced and Corrupt Organizations**  ⌁  Business, property, or proprietary injury;  personal injuries

City's purchase of naloxone, buprenorphine, protective equipment, specialized screening equipment, and specialized training courses and materials for handling and disposing of fentanyl did not constitute "injuries" in its proprietary capacity as a consumer or other type of market participant, and thus such injuries could not be a basis for city to have standing to pursue claim under the Racketeer Influenced and Corrupt Organizations Act (RICO) against companies that distributed opioids; expenditures promoted public welfare, which was a core government function. 18 U.S.C.A. § 1964(c).

**[45]** **Racketeer Influenced and Corrupt Organizations**  ⌁  Persons Entitled to Sue or Recover

Sovereign entities that undertake commercial business endeavors, such as providing a service or goods, are "engaged in a business" for purposes of standing to pursue claims under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1964(c).

**[46]** **Racketeer Influenced and Corrupt Organizations**  ⌁  Business, property, or proprietary injury;  personal injuries

The incurring by city's parking lot and advertising businesses of opioid-related clean-up expenses and the lost revenue of those city-owned businesses constituted cognizable

"injuries" to city, as was relevant to determining if city had standing to pursue claim under the Racketeer Influenced and Corrupt Organizations Act (RICO) against companies that distributed opioids. 18 U.S.C.A. § 1964(c).

**[47]** **Racketeer Influenced and Corrupt Organizations** ⚜ Causal relationship; direct or indirect injury

A plaintiff pursuing a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO) must show that a predicate offense not only was a "but for" cause of his injury, but was the proximate cause as well. 18 U.S.C.A. § 1964(c).

1 Cases that cite this headnote

**[48]** **Racketeer Influenced and Corrupt Organizations** ⚜ Causal relationship; direct or indirect injury

When a court evaluates a Racketeer Influenced and Corrupt Organizations Act (RICO) claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries. 18 U.S.C.A. § 1964(c).

1 Cases that cite this headnote

**[49]** **Racketeer Influenced and Corrupt Organizations** ⚜ Causal relationship; direct or indirect injury

When evaluating proximate cause of an alleged injury that is the basis of a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), courts, in addition to evaluating the directness of the causal relationship, typically consider the following three nonexhaustive policy considerations that help determine whether an injury is too remote to permit recovery, with one factor alone being able to be dispositive even if several factors weigh in favor of a particular outcome: (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the

amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries. 18 U.S.C.A. § 1964(c).

**[50]** **Racketeer Influenced and Corrupt Organizations** ⚜ Causal relationship; direct or indirect injury

City failed to establish that pharmaceutical companies' distribution of opioids was the proximate cause of city's alleged injuries of its parking lot and advertising business incurring opioid-related clean-up expenses, its main library suffering damage to its toilet grinders, and its suffering of other damage to its real property, and thus city could not maintain a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO) against pharmaceutical companies over their distribution of opioids; under the most generous reading of city's causal chain, the companies' conduct flowed thorough prescribing physicians, pharmacists, and patients who then illegally misused the opioids, improperly discarded needles, and damaged city-owned property and businesses. 18 U.S.C.A. § 1964(c).

**[51]** **Racketeer Influenced and Corrupt Organizations** ⚜ Causal relationship; direct or indirect injury

An "intervening cause" is a later cause of independent origin that was not foreseeable, as is relevant to evaluating proximate cause of an alleged injury that is the basis of a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1964(c).

**[52]** **Racketeer Influenced and Corrupt Organizations** ⚜ Causal relationship; direct or indirect injury

Courts must evaluate foreseeability retrospectively when assessing whether an intervening event breaks the causal chain, as is relevant to evaluating proximate cause of

an alleged injury that is the basis of a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1964(c).

**[53]** States  Conflicting or conforming laws or regulations

"Implied preemption" occurs when it is impossible for a defendant to comply with both state and federal law, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

**[54]** **Antitrust and Trade Regulation**  Preemption

**Nuisance**  Nature and elements of public nuisance in general

**States**  Particular cases, preemption or supersession

**States**  Trade Regulation; Monopolies

City's claims that pharmaceutical companies' actions regarding opioids contributed to the creation of a public nuisance under California law, violated California's Unfair Competition Law (UCL), and violated California's False Advertising Law (FAL) were not impliedly preempted by the Controlled Substances Act (CSA); city's claims were entirely consistent with the CSA's goals of fostering the beneficial use of those medications and ensuring no interference with the dispensing of lawfully prescribed opioids. Comprehensive Drug Abuse Prevention and Control Act of 1970 § 708, 21 U.S.C.A. § 903; Cal. Bus. & Prof. Code §§ 17200 et seq., 17500 et seq.; Cal. Civ. Code § 3479 et seq.

**[55]** **States**  State police power

Claims that are not based on any sort of "fraud-on-the-agency" theory, but that instead rely on traditional state law principles that parallel, rather than obstruct, federal duties are generally not preempted.

**[56]** **Antitrust and Trade Regulation**  Preemption

**Nuisance**  Nature and elements of public nuisance in general

**States**  Particular cases, preemption or supersession

**States**  Trade Regulation; Monopolies

City's claims that pharmaceutical companies' actions regarding opioids contributed to the creation of a public nuisance under California law, violated California's Unfair Competition Law (UCL), and violated California's False Advertising Law (FAL) did not constitute an attempt to police fraud committed against the Drug Enforcement Administration (DEA), and thus such a "fraud upon the agency" theory was not a basis to find that federal law preempted the claims; city sought to enforce state law that imposed duties that were distinct from the Controlled Substances Act (CSA) and that would exist absent the CSA. Comprehensive Drug Abuse Prevention and Control Act of 1970 § 708, 21 U.S.C.A. § 903; Cal. Bus. & Prof. Code §§ 17200 et seq., 17500 et seq.; Cal. Civ. Code § 3479 et seq.

**[57]** **Antitrust and Trade Regulation**  Preemption

**Nuisance**  Nature and elements of public nuisance in general

**States**  Particular cases, preemption or supersession

**States**  Trade Regulation; Monopolies

City's claims that pharmaceutical companies' actions regarding opioids contributed to the creation of a public nuisance under California law, violated California's Unfair Competition Law (UCL), and violated California's False Advertising Law (FAL) were not preempted by the Federal Food, Drug, and Cosmetic Act (FDCA); city's underlying contention was that the companies engaged in a marketing scheme to understate the risk of opioid addiction, overstate the benefits of opioid use, and trivialize the risks of the long-term use of opioids, and federal law did not permit marketing schemes

comprised of falsehoods and omissions to promote prescription drugs. Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.; Cal. Bus. & Prof. Code §§ 17200, 17500 et seq.; Cal. Civ. Code § 3479 et seq.; 21 C.F.R. § 202.1.

---

**[58]** **Antitrust and Trade Regulation** 👈 Preemption

**Nuisance** 👈 Nature and elements of public nuisance in general

**States** 👈 Particular cases, preemption or supersession

**States** 👈 Trade Regulation; Monopolies

City's contention that pharmaceutical companies, whose marketing of opioids allegedly contributed to the creation of a public nuisance under California law, violated California's Unfair Competition Law (UCL), and violated California's False Advertising Law (FAL), promoted "pseudoaddiction," i.e., that people who exhibited signs of addiction suffered from undertreatment of pain, not addiction, and therefore should receive higher doses of opioids, did not conflict with opioid-medication label that was approved by the Food and Drug Administration (FDA) and that stated that preoccupation with achieving adequate pain relief could be appropriate behavior in a patient with poor pain control, and thus the label could not be a basis to find that city's claims under California law were preempted by the Federal Food, Drug, and Cosmetic Act (FDCA). Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.; Cal. Bus. & Prof. Code §§ 17200, 17500 et seq.; Cal. Civ. Code § 3479 et seq.

---

**[59]** **Antitrust and Trade Regulation** 👈 Preemption

**States** 👈 Trade Regulation; Monopolies

City's contention that pharmaceutical companies, whose marketing of opioids allegedly contributed to the creation of a public nuisance under California law, violated California's Unfair Competition Law (UCL), and violated

California's False Advertising Law (FAL), falsely claimed that physical dependence was not the same as addiction and could be easily addressed did not conflict with opioid-medication label that was approved by the Food and Drug Administration (FDA), that stated that abuse and addiction were separate and distinct from physical dependence and tolerance, and that recommended gradually tapering dosage when discontinuing use, and thus the label could not be a basis to find that city's claims under California law were preempted by the Federal Food, Drug, and Cosmetic Act (FDCA). Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.; Cal. Bus. & Prof. Code §§ 17200, 17500 et seq.; Cal. Civ. Code § 3479 et seq.

---

**[60]** **Nuisance** 👈 Nature and elements of public nuisance in general

Under California law, public nuisance claims require the existence of a duty. Cal. Civ. Code §§ 3479, 3480.

---

**[61]** **Health** 👈 Regulation of conduct in general

**Nuisance** 👈 Provisions of statutes and ordinances

Drug-store chain had a duty under federal regulations regarding controlled substances to provide effective controls to prevent against diversion, as was relevant to city's public-nuisance claim under California law over drug-store chain's conduct in regard to opioids. Cal. Civ. Code § 3479 et seq.; 21 C.F.R. § 1301.71(a).

---

**[62]** **Nuisance** 👈 Provisions of statutes and ordinances

Federal regulation providing that a pharmacist had a responsibility that corresponded to a prescribing practitioner's responsibility for the proper prescribing and dispensing of controlled substances imposed an actionable duty on pharmacies, as was relevant to city's public-nuisance claim under California against drug-store chain over its conduct in regard to opioids. Comprehensive Drug Abuse Prevention and

Control Act of 1970 § 302, 21 U.S.C.A. § 822(a)(1)-(2); Cal. Civ. Code § 3479 et seq.; 21 C.F.R. § 1306.04(a).

**[63]** **Nuisance** 🔑 Nature and elements of public nuisance in general

City sufficiently pleaded that pharmaceutical companies involved in marketing of opioids had actual knowledge of the hazards that their conduct would create, assuming that city was required to plead such actual knowledge, as was relevant to determining if city stated a public-nuisance claim under California law over companies' conduct regarding opioids; city alleged that companies misleadingly promoted prescription opioids despite knowing that their products were being abused and diverted for unlawful purposes, which fueled the opioid epidemic. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(6).

**[64]** **Nuisance** 🔑 Nature and elements of public nuisance in general

City sufficiently pleaded that pharmaceutical companies involved in manufacture and distribution of opioids had actual knowledge of the hazards that their conduct would create, assuming that city was required to plead such actual knowledge, as was relevant to determining if city stated a public-nuisance claim under California law over companies' conduct regarding opioids; city alleged that companies failed to design, implement, and enforce policies and procedures necessary to identify and stop suspicious orders, despite being aware of the growing opioid epidemic, in violation of their duties under the Controlled Substances Act (CSA) and its implementing regulations. Comprehensive Drug Abuse Prevention and Control Act of 1970 § 302, 21 U.S.C.A. § 822(a)(1)-(2); Cal. Civ. Code § 3479 et seq.; 21 C.F.R. § 1306.04(a); Fed. R. Civ. P. 12(b)(6).

**[65]** **Nuisance** 🔑 Persons creating or causing nuisance

Under California law, a public-nuisance cause of action is not premised on a defect in a product or a failure to warn, but on affirmative conduct that assisted in the creation of a hazardous condition. Cal. Civ. Code § 3479 et seq.

**[66]** **Nuisance** 🔑 Persons creating or causing nuisance

City sufficiently pleaded that pharmaceutical companies and drug-store chain engaged in affirmative conduct that enabled the opioid epidemic in city, as was relevant to determining if city stated a public-nuisance claim under California law as to their distribution of opioids; city alleged that defendants distributed and sold opioids in a manner that fueled an illegal, secondary market through their failure to implement effective controls that would effectively deter diversion. Comprehensive Drug Abuse Prevention and Control Act of 1970 § 303, 21 U.S.C.A. § 823; Cal. Bus. & Prof. Code §§ 4164(a), 4169.1, 4301(d), 4301(e); Cal. Health & Safety Code § 11153.5; 21 C.F.R. §§ 1301.74(b), 1306.04(a); Fed. R. Civ. P. 12(b)(6).

**[67]** **Nuisance** 🔑 Persons creating or causing nuisance

"Affirmative conduct that assists in the creation of a hazardous condition," as required to constitute a public nuisance under California law, encompasses any action that assists in creating a system that causes hazardous conditions. Cal. Civ. Code § 3479 et seq.

**[68]** **Nuisance** 🔑 Nature and elements of public nuisance in general

Under California law, causation is an element of a cause of action for public nuisance. Cal. Civ. Code § 3479 et seq.

**[69]** **Nuisance** 🔑 Persons creating or causing nuisance

A plaintiff pursuing a public-nuisance claim under California law must establish causation in

fact, which requires facts demonstrating that the defendant's conduct was a substantial factor in bringing about the result. Cal. Civ. Code § 3479 et seq.

**[70]**    **Nuisance**  👈  Persons creating or causing nuisance

A plaintiff pursuing a public-nuisance claim under California law must establish that the defendant's wrongful conduct was not too remote from the current hazard to be its legal cause, i.e., proximate cause. Cal. Civ. Code § 3479 et seq.

**[71]**    **Nuisance**  👈  Persons creating or causing nuisance

The substantial-factor standard for determining the existence of factual causation required for a public-nuisance claim under California law is broad, requiring only that the contribution of the individual cause be more than negligible or theoretical. Cal. Civ. Code § 3479 et seq.

**[72]**    **Nuisance**  👈  Persons creating or causing nuisance

As is relevant to determining the existence of factual causation required for a public-nuisance claim under California law, if a defendant's conduct operated concurrently with other forces to produce the harm, it is a "substantial factor" in bringing about the results, so long as the injury, or its full extent, would not have occurred but for that conduct. Cal. Civ. Code § 3479 et seq.

**[73]**    **Nuisance**  👈  Persons creating or causing nuisance

City sufficiently pleaded that conduct of pharmaceutical companies that manufactured opioids was necessary in bringing about the full extent of city's injuries and thus a substantial factor so as to be the cause in fact of city's injuries, as relevant to determining if city stated a public-nuisance claim under California law; city alleged that companies' decades-long marketing strategies changed prescribers' willingness to

prescribe opioids, led them to prescribe more of their opioids, and persuaded them not to stop prescribing opioids, and city further alleged that it, as a direct and foreseeable result of companies' conduct, experienced skyrocketing addiction, overdose, and death. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(6).

**[74]**    **Nuisance**  👈  Persons creating or causing nuisance

City sufficiently pleaded that conduct of pharmaceutical companies that distributed opioids was necessary in bringing about the full extent of city's injuries and thus a substantial factor so as to be the cause in fact of city's injuries, as relevant to determining if city stated a public-nuisance claim under California law; city alleged that distributors failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt distribution and dispensing of suspicious orders, thereby contributing to the oversupply of such drugs and fueling an illegal secondary market. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(6).

**[75]**    **Nuisance**  👈  Persons creating or causing nuisance

"Proximate cause," as is relevant to a public-nuisance claim under California law, is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct. Cal. Civ. Code § 3479 et seq.

**[76]**    **Nuisance**  👈  Persons creating or causing nuisance

Courts place great emphasis on foreseeability of harm in determining whether a public-nuisance claim under California law sufficiently alleges proximate cause. Cal. Civ. Code § 3479 et seq.

1 Cases that cite this headnote

Case 3:17-cv-01362  Document 1290-6  Filed 04/26/21  Page 40 of 96 PageID #: 43291
City and County of San Francisco v. Purdue Pharma L.P., 491 F.Supp.3d 610 (2020)
RICO Bus.Disp.Guide 13,405

**[77]  Nuisance** 🔑 **Persons creating or causing nuisance**

A public-nuisance claim under California law satisfies proximate cause if the defendant's conduct is likely to cause a significant invasion of a public right. Cal. Civ. Code § 3479 et seq.

**[78]  Nuisance** 🔑 **Persons creating or causing nuisance**

City sufficiently pleaded that pharmaceutical companies that manufactured opioids could have reasonably foreseen that their alleged conduct of fraudulent marketing and oversupplying of opioids likely would have increased rates of opioid use, addiction, and overdoses, as was relevant to determining if city sufficiently pleaded proximate cause to support public-nuisance claim under California law; manufacturers' alleged conduct violated laws aimed at preventing the harms—increased third-party addiction, overdoses, and deaths—that the laws were designed to prevent. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(6).

**[79]  Nuisance** 🔑 **Persons creating or causing nuisance**

City sufficiently pleaded that pharmaceutical companies that manufactured opioids could have reasonably foreseen that their alleged conduct of fraudulent marketing and oversupplying of opioids would city's injuries of people shooting up on the street, having to use specialized mail screening equipment detect fentanyl being sent into the jails, and increased heroin, fentanyl, and methamphetamine use, as was relevant to determining if city sufficiently pleaded proximate cause to support public-nuisance claim under California law; despite argument that independent and intervening acts of third parties broke the causal chain, such acts—including decisions by prescribers, patients, distributors, pharmacies, and third-party criminals—were reasonably foreseeable. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(6).

1 Cases that cite this headnote

**[80]  Nuisance** 🔑 **Persons creating or causing nuisance**

As is relevant to determining the existence of proximate cause necessary for a public-nuisance claim under California law, the general test of whether an independent intervening act, which operates to produce an injury, breaks the chain of causation is the foreseeability of the act. Cal. Civ. Code § 3479 et seq.

**[81]  Nuisance** 🔑 **Persons creating or causing nuisance**

Public-nuisance claims under California law do not limit governmental entities to "business or property" injuries. Cal. Civ. Code § 3479 et seq.

**[82]  Nuisance** 🔑 **Persons creating or causing nuisance**

City sufficiently pleaded that pharmaceutical companies that distributed opioids could have reasonably foreseen that their alleged conduct of flooding city with massive amounts of opioids and failure to prevent the diversion of opioid orders bound for city would cause city injury, as was relevant to determining if city sufficiently pleaded proximate cause to support public-nuisance claim under California law; distributors had a duty to maintain effective controls against diversion by identifying, reporting, and stopping shipment of suspicious orders until such suspicions were resolved. Comprehensive Drug Abuse Prevention and Control Act of 1970 § 302, 21 U.S.C.A. § 822(a)(1)-(2); Cal. Civ. Code § 3479 et seq.; 21 C.F.R. § 1306.04(a); Fed. R. Civ. P. 12(b)(6).

**[83]  Nuisance** 🔑 **Persons creating or causing nuisance**

City's failure to cite to a specific example of a failure of pharmaceutical distribution companies to prevent a diversion of opioid orders in city did not preclude finding that city sufficiently

pleaded that companies should have foreseen that its conduct of failing to prevent the diversion of opioid orders would cause city injury, as was relevant to determining if city sufficiently pleaded proximate cause to support public-nuisance claim under California law; city cited enforcement actions that various agencies took against the companies' nationwide failure to report suspicious orders of controlled substances, which made it reasonable to infer that companies' conduct occurred in city. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(6).

[84]  **Nuisance** 🔑 Persons creating or causing nuisance

Pharmaceutical marketing companies' alleged false marketing of opioids did not preclude finding that pharmaceutical distribution companies' shipments of opioids could constitute a proximate cause of harm to city in form of increased addiction and overdoses, as was relevant to determining if city sufficiently pleaded a public-nuisance claim under California law; city did not allege that the purported false marketing caused distributors' failure to maintain effective controls on distribution, or vice versa. Cal. Civ. Code § 3479 et seq.; Fed. R. Civ. P. 12(b)(6).

[85]  **Antitrust and Trade Regulation** 🔑 Nature and Elements

To state a claim under California's Unfair Competition Law (UCL), the plaintiff must allege that the alleged conduct is either (1) proscribed by law, (2) "unfair," meaning the harm to the victim outweighs any benefit, or (3) "fraudulent," meaning it is likely to deceive members of the public; each of those prongs provides a separate and distinct theory of liability and an independent basis for relief. Cal. Bus. & Prof. Code § 17200 et seq.

[86]  **Antitrust and Trade Regulation** 🔑 Source of prohibition or obligation; lawfulness

Controlled Substances Act's (CSA) implementing regulations on security requirements for manufacturers, dispensers, and distributors of controlled substances imposed legal duties on pharmaceutical companies that manufactured or distributed opioids, and thus companies' alleged violations of the regulations could be predicate violations to trigger liability under California's Unfair Competition Law (UCL). 21 C.F.R. §§ 1301.71, 1301.74.

[87]  **Antitrust and Trade Regulation** 🔑 Source of prohibition or obligation; lawfulness

Any failure by pharmaceutical companies that manufactured or distributed opioids to comply with California statute requiring a wholesaler, upon discovery, to notify the California Board of Pharmacy in writing of any suspicious orders of controlled substances placed by a California-licensed pharmacy could not be predicate violations of law so as to trigger liability under California's Unfair Competition Law (UCL), absent evidence that the companies failed to report suspicious orders after the notification statute in question came into effect. Cal. Bus. & Prof. Code §§ 4169.1, 17200.

[88]  **Antitrust and Trade Regulation** 🔑 Source of prohibition or obligation; lawfulness

**Antitrust and Trade Regulation** 🔑 Reliance; causation; injury, loss, or damage

To maintain an action under California Consumer Legal Remedies Act (CLRA), plaintiffs must plead facts demonstrating that (1) the defendant committed an unlawful practice and (2) the consumer suffered harm as a result. Cal. Civ. Code § 1770(a).

[89]  **Antitrust and Trade Regulation** 🔑 Private entities or individuals

To establish standing under California's Consumer Legal Remedies Act (CLRA), False Advertising Law (FAL), and Unfair Competition Law (UCL), a plaintiff must allege that the

plaintiff suffered an injury in fact and has lost money or property as a result of a defendant's alleged conduct. Cal. Bus. & Prof. Code §§ 17200 et seq., 17500 et seq.; Cal. Civ. Code § 1750 et seq.

**[90]** **Antitrust and Trade Regulation** 👉 Private entities or individuals

City made a sufficient pleading to establish standing to assert claims under California's False Advertising Law (FAL), Unfair Competition Law (UCL), and Consumer Legal Remedies Act (CLRA) against pharmaceutical companies that manufactured opioids; city's complaint was replete with allegations that manufacturers specifically targeted city physicians, which caused those physicians to over-prescribe opioids to patients, and city alleged that manufacturers' purported false marketing caused substantial injuries to city residents and property through opioid addiction, overdoses, and property damage. Cal. Bus. & Prof. Code §§ 17200 et seq., 17500 et seq.

**[91]** **Antitrust and Trade Regulation** 👉 Exemptions and safe harbors

California's safe-harbor doctrine forecloses claims under the Unfair Competition Law (UCL), the False Advertising Law (FAL), and the Consumer Legal Remedies Act (CLRA) if some other provision bars the claim. Cal. Bus. & Prof. Code §§ 17200 et seq., 17500 et seq.; Cal. Civ. Code § 1750 et seq.

**[92]** **Antitrust and Trade Regulation** 👉 Exemptions and safe harbors

California's safe-harbor doctrine, which foreclosed claims under the Consumer Legal Remedies Act (CLRA) if some other provision barred the claim, did not preclude city's claim under the CLRA against pharmaceutical companies that manufactured or distributed opioids; city alleged that companies made nine misrepresentations that went far beyond the label

approved by the Food and Drug Administration (FDA). Cal. Civ. Code § 1770(a)(5).

**[93]** **Antitrust and Trade Regulation** 👉 Representations concerning others or their products; disparagement

City stated a disparagement claim under California's Consumer Legal Remedies Act (CLRA) against pharmaceutical companies that manufactured opioids, where city alleged that companies disparaged all nonsteroidal anti-inflammatory drugs (NSAIDs), and city relied on particularized facts to support its allegations, e.g., that certain companies each allegedly sponsored separate materials that attributed false risks to NSAIDs. Cal. Civ. Code § 1770(a)(8); Fed. R. Civ. P. 12(b)(6).

**[94]** **Antitrust and Trade Regulation** 👉 Advertising, marketing, and promotion

California's False Advertising Law (FAL) prohibits any unfair, deceptive, untrue, or misleading advertising; it extends to false advertising and advertising which, although true, is either actually misleading or which has a capacity, likelihood, or tendency to deceive or confuse the public. Cal. Bus. & Prof. Code § 17500 et seq.

**[95]** **Antitrust and Trade Regulation** 👉 Source of prohibition or obligation; lawfulness

**Antitrust and Trade Regulation** 👉 Advertising, marketing, and promotion

Any violation of California's False Advertising Law (FAL) necessarily violates California's Unfair Competition Law (UCL). Cal. Bus. & Prof. Code §§ 17200 et seq., 17500 et seq.

**[96]** **Antitrust and Trade Regulation** 👉 Fraud; deceit; knowledge and intent

**Antitrust and Trade Regulation** ⟶ Advertising, marketing, and promotion

Both California's Unfair Competition Law (UCL) and False Advertising Law (FAL) utilize the "reasonable consumer test" to determine whether a business practice is deceptive or misleading; that test requires a probability that a significant portion of the general consuming public or targeted consumers, acting reasonably in the circumstances, could be misled. Cal. Bus. & Prof. Code §§ 17200 et seq., 17500 et seq.

**[97] Antitrust and Trade Regulation** ⟶ Persons liable

"Learned intermediary doctrine," which stated that in the case of prescription drugs, the duty to warn ran to the physician, not to the patient, and that therefore a pharmaceutical manufacturer may not be required to provide warning of a risk known to the medical community, did not preclude pharmaceutical companies from being liable under California's Unfair Competition Law (UCL) and False Advertising Law (FAL) insofar as the liability was based on companies' alleged engagement in a systematic campaign that specifically targeted physicians in order to influence physicians' prescribing decisions and mitigate concerns regarding prescription opioids, thereby misleading both physicians and patients. Cal. Bus. & Prof. Code §§ 17200 et seq., 17500 et seq.

**[98] Antitrust and Trade Regulation** ⟶ Persons liable

The "learned intermediary doctrine," as relevant to a claim under California's Unfair Competition Law (UCL) and False Advertising Law (FAL), states that in the case of prescription drugs, the duty to warn runs to the physician, not to the patient, and thus a pharmaceutical manufacturer may not be required to provide warning of a risk known to the medical community. Cal. Bus. & Prof. Code §§ 17200 et seq., 17500 et seq.

**[99] Antitrust and Trade Regulation** ⟶ Advertising, marketing, and promotion

City sufficiently pleaded that pharmaceutical companies that manufactured opioids made certain statements, such as that long-term use of opioids improved patient function and quality of life, that were false as a matter of law, as was relevant to determining if city stated a claim under California's False Advertising Law (FAL); despite argument that city's complaint cited studies that did not concern specific products or disprove any specific claim, such an argument ignored the cited studies, including a pain study that concluded that patients who received opioid therapy were less likely than the placebo-controlled group to have improved pain and had worsened function. Cal. Bus. & Prof. Code § 17500 et seq.; Fed. R. Civ. P. 12(b)(6).

**[100] Antitrust and Trade Regulation** ⟶ Advertising, marketing, and promotion

When alleging studies showing that a defendant's statement is false, as is relevant to a claim under California's False Advertising Law (FAL) based on allegation that an advertisement's claims lack evidentiary support, i.e., an "unsubstantiated claim," there is no requirement that studies must address a specific brand of product. Cal. Bus. & Prof. Code § 17500 et seq.

**[101] Antitrust and Trade Regulation** ⟶ Omissions and other failures to act in general; disclosure

In order to prevail on a claim under California's False Advertising Law (FAL) premised on omissions of material fact, the omission must be contrary to a representation actually made by the defendants, or an omission of a fact that the defendant was obligated to disclose. Cal. Bus. & Prof. Code § 17500 et seq.

**[102]  Antitrust and Trade Regulation** 👈 **Omissions and other failures to act in general;  disclosure**

As is relevant to a claim under California's False Advertising Law (FAL), a duty to discloses arises when (1) the defendant had exclusive knowledge of material facts not known to the plaintiff, (2) the defendant actively conceals a material fact from the plaintiff, and (3) the defendant makes partial representations but also suppresses some facts. Cal. Bus. & Prof. Code § 17500 et seq.

**[103]  Antitrust and Trade Regulation** 👈 **Omissions and other failures to act in general;  disclosure**

As is relevant to a claim under California's False Advertising Law (FAL), a defendant has exclusive knowledge giving rise to a duty to disclose when according to the complaint, defendant knew of the defect while plaintiffs did not, and, given the nature of the defect, it was difficult to discover. Cal. Bus. & Prof. Code § 17500 et seq.

**[104]  Antitrust and Trade Regulation** 👈 **Omissions and other failures to act in general;  disclosure**

City plausibly alleged that pharmaceutical companies that manufactured opioids had exclusive knowledge of material facts related to defect in opioids, as was relevant to determining if city stated a claim under California's False Advertising Law (FAL) insofar as claim was based on companies' failure to disclose; city alleged that one company knew that its product was widely abused and yet marketed it as tamper resistant and abuse deterrent, and city alleged that certain companies circulated information pertaining to pseudoaddiction when their own key opinion leaders acknowledged that pseudoaddiction had been debunked as a concept. Cal. Bus. & Prof. Code § 17500 et seq.; Fed. R. Civ. P. 12(b)(6).

**[105]  Antitrust and Trade Regulation** 👈 **Advertising, marketing, and promotion**

City sufficiently pleaded facts to support assertion that pharmaceutical companies that manufactured opioids controlled third parties who made unlawful statements, as was relevant to determining if city stated a claim under California's False Advertising Law (FAL); city alleged that companies utilized front groups, key opinion leaders, and continuing medical education (CME) programs, to misrepresent prescription opioids, and city's allegations went well beyond funding and generic oversight of third parties. Cal. Bus. & Prof. Code § 17500 et seq.; Fed. R. Civ. P. 12(b)(6).

**[106]  Antitrust and Trade Regulation** 👈 **Persons liable**

A defendant's liability under California's False Advertising Law (FAL) must be based on his personal participation in the unlawful practices and unbridled control over the practices that are found to violate the FAL. Cal. Bus. & Prof. Code § 17500 et seq.

**[107]  Antitrust and Trade Regulation** 👈 **Persons liable**

Liability may be imposed on those who aid and abet another's violation of California's Unfair Competition Law (UCL) if the individual knows the other's conduct constitutes a violation and gives substantial assistance or encouragement to the other to so act. Cal. Bus. & Prof. Code § 17200 et seq.

**[108]  Federal Civil Procedure** 👈 **Fraud, mistake and condition of mind**

Claims stated under the fraudulent-conduct prong of California's Unfair Competition Law (UCL) are subject to the particularity requirements of the heightened pleading standards for claims of fraud. Cal. Bus. & Prof. Code § 17200 et seq.; Fed. R. Civ. P. 9(b).

**[109]    Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

City sufficiently pleaded that pharmaceutical companies failed to maintain effective controls and report suspicious orders of opioids and that pharmaceutical companies misrepresented that they abided by their legal obligations, as was relevant to determining if city stated a claim under the fraudulent-conduct prong of California's Unfair Competition Law (UCL); city alleged that certain companies were each forced to pay federal and state fines for failing to report suspicious orders to the Drug Enforcement Administration (DEA) as required by law, and city alleged that certain companies agreed not to identify, report, or halt suspicious orders in order to avoid DEA scrutiny. Cal. Bus. & Prof. Code § 17200 et seq.; Fed. R. Civ. P. 9(b), 12(b)(6).

**[110]    Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

Pharmaceutical companies' public statements that they complied with their legal obligations as to opioids was not nonactionable "puffery" so as to preclude the public statements from being a basis for city's claim against the companies under the fraudulent-conduct prong of California's Unfair Competition Law (UCL); the statements went beyond opinion to factually represent that companies had a best-in-class controlled substance monitoring program to help identify suspicious orders, despite being cited by the Drug Enforcement Administration (DEA) for failing to maintain a suspicious monitoring program. Cal. Bus. & Prof. Code § 17200 et seq.; Fed. R. Civ. P. 9(b), 12(b)(6).

**[111]    Antitrust and Trade Regulation** 🔑 **Health care and medical insurance**

City stated a claim of unfair business practices under California's Unfair Competition Law (UCL) against pharmaceutical companies over their conduct in regard to opioids; city alleged that companies promoted the use of opioids in the

manner that minimized serious risks, improperly touted purported benefits, and failed to make reasonable efforts to prevent diversion, and city alleged that companies' practices substantially injured consumers through addiction, abuse, overdoses, and death, in addition to city's remedial costs. Cal. Bus. & Prof. Code § 17200 et seq.; Fed. R. Civ. P. 12(b)(6).

**[112]    Antitrust and Trade Regulation** 🔑 **In general; unfairness**

A practice may be deemed "unfair" under California's Unfair Competition Law (UCL) even if not specifically proscribed by some other law. Cal. Bus. & Prof. Code § 17200 et seq.

**[113]    Antitrust and Trade Regulation** 🔑 **In general; unfairness**

Under California's Unfair Competition Law (UCL), an "unfair business practice" occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Cal. Bus. & Prof. Code § 17200 et seq.

1 Cases that cite this headnote

**[114]    Antitrust and Trade Regulation** 🔑 **Particular cases**

City stated a restitution claim under California's Unfair Competition Law (UCL) against pharmaceutical companies that distributed opioids; city alleged that companies' failure to report suspicious orders led to an oversupply of prescription opioids in city, and while companies were not the direct recipients of city residents' payments, companies' financial success necessarily relied on the societal demand for opioids, which could allegedly be traced to transactions for diverted opioids. Cal. Bus. & Prof. Code § 17200 et seq.; Fed. R. Civ. P. 12(b)(6).

Case 3:17-cv-01362   Document 1290-6   Filed 04/26/21   Page 46 of 96 PageID #: 43297

[115]   **Antitrust and Trade Regulation** 👈 **Monetary Relief;  Damages**

In the context of California's Unfair Competition Law (UCL), "restitution" means the return of money to those persons from whom it was taken or who had an ownership interest in it. Cal. Bus. & Prof. Code § 17200 et seq.

[116]   **Antitrust and Trade Regulation** 👈 **Monetary Relief;  Damages**

A defendant can be liable for restitution under California's Unfair Competition Law (UCL) even if it is not the direct recipient of a plaintiff's misappropriated funds; the UCL requires only that the plaintiff must once have had an ownership interest in the money or property acquired by the defendant through unlawful means. Cal. Bus. & Prof. Code § 17200 et seq.

**Attorneys and Law Firms**

**\*627** Alyssa M. Williams, David S. Casey, Jr., Gayle M. Blatt, Patricia Camille Guerra, James M. Davis, Casey Gerry Schenk Francavilla Blatt and Penfield LLP, Carissa Jasmine Dolan, Thomas Edward Egler, Robbins Geller Rudman and Dowd LLP, Edward D. Chapin, Sanford Heisler Sharp, LLP, San Diego, CA, Dorothy P. Antullis, Pro Hac Vice, Mark J. Dearman, Paul J. Geller, Pro Hac Vice, Mark Dearman, Pro Hac Vice, Robbins Geller Rudman Dowd LLP, Boca Raton, FL, Elizabeth J. Cabraser, Elizabeth Joan Cabraser, Kevin R. Budner, Michael Ian Levin-Gesundheit, Paulina do Amaral, Richard Martin Heimann, Lieff Cabraser Heimann & Bernstein LLP, Jennie Lee Anderson, Audrey Claire Siegel, Paul Laprairie, Andrus Anderson LLP, Louise Hornbeck Renne, Renne Public Law Group, Matthew Seth Melamed, Aelish Marie Baig, Robbins Geller Rudman & Dowd LLP, Owen J. Clements, Jaime Marie Huling Delaye, Sara Jennifer Eisenberg, San Francisco City Attorney's Office Chief of Strategic Advocacy, Yvonne Rosil Mere, Dennis J. Herrera, City Attorney for the City and County of San Francisco, San Francisco, CA, Melinda Davis Nokes, Weitz & Luxenberg, P.C., Los Angeles, CA, Andrew Miller, Pro Hac Vice, Sanford Heisler Sharp, LLP, Washington, DC, Hadiya Khan Deshmukh, Robbins Geller Rudman & Dowd LLP, San

Francisco, CA, Michael P. Piggins, Pro Hac Vice, Paul F. Novak, Pro Hac Vice, Tiffany Rose Ellis, Pro Hac Vice, Weitz & Luxenberg, P.C., Detroit, MI, for Plaintiff City and County of San Francisco.

Dorothy P. Antullis, Pro Hac Vice, Paul J. Geller, Pro Hac Vice, Mark Dearman, Pro Hac Vice, Robbins Geller Rudman Dowd LLP, Boca Raton, FL, James M. Davis, Patricia Camille Guerra, David S. Casey, Jr., Casey Gerry Schenk Francavilla Blatt & Penfield, LLP, Edward D. Chapin, Sanford Heisler Sharp, LLP, Nicole R. Trama, Department of Justice Office of the Attorney General, San Diego, CA, Aelish Marie Baig, Robbins Geller Rudman & Dowd LLP, Elizabeth Joan Cabraser, Kevin R. Budner, Michael Ian Levin-Gesundheit, Paulina do Amaral, Richard Martin Heimann, Lieff Cabraser Heimann & Bernstein, LLP, Dennis J. Herrera, City Attorney for the City and County of San Francisco, San Francisco, CA, Hadiya Khan Deshmukh, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, Michael P. Piggins, Pro Hac Vice, Paul F. Novak, Pro Hac Vice, Tiffany Rose Ellis, Pro Hac Vice, Weitz & Luxenberg, P.C., Detroit, MI, for Plaintiff The People of the State of California.

**ORDERING GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT**

CHARLES R. BREYER, United States District Judge

**\*628** The City and County of San Francisco ("San Francisco") and the People of the State of California (collectively, "the City"), acting by and through San Francisco City Attorney Dennis Herrera, have brought a lawsuit intended to address the impact of the opioid epidemic in San Francisco. The lawsuit targets two distinct sets of defendants, "Marketing Defendants"[1] and "Distributor Defendants"[2] (collectively, "Defendants").[3] See infra App. A. The City alleges that: (1) "RICO Marketing Defendants"[4] violated RICO by forming an illegal Opioid Marketing Enterprise and defrauding San Francisco; (2) "RICO Supply Chain Defendants"[5] also violated RICO by forming an illegal Opioid Supply Chain Enterprise and defrauding San Francisco; (3) all Defendants contributed to the creation of a public nuisance, i.e., the opioid epidemic, in violation of California Civil Code §§ 3479–3480; (4) all Defendants, except Walgreens, violated California's Unfair Competition Law ("UCL"); and (5) Marketing Defendants engaged in acts

that violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 et seq.

Five categories of Defendants—all Defendants,[6] Manufacturers,[7] Distributors,[8] *629 Walgreens,[9] and Anda, Inc.—move to dismiss the City's First Amended Complaint ("FAC") for failure to state a claim. Foreign Defendants also move to dismiss for lack of personal jurisdiction and insufficient service of process, with Endo Int'l and MNK plc also moving to dismiss for insufficient process. The Court hereby GRANTS Defendants' motion to dismiss the City's RICO claims and DENIES all other bases for dismissal.

## I. BACKGROUND

The opioid crisis has infiltrated communities throughout the country. Between 1999 and 2016, more than 350,000 people died from opioid-related overdoses—2017, alone, added nearly 48,000 people to the total number of opioid-related deaths. FAC (dkt. 128) ¶¶ 3–4. San Francisco has been particularly impacted. From 2006 through 2016, the number of people who inject drugs in San Francisco has jumped from 10,000 to over 25,000 persons. Id. ¶ 52. In 2018, San Francisco paramedics administered naloxone[10] to 1,647 people, which was nearly double the amount administered in 2016. Id. ¶ 55 (citing Brian Rinker, Drug Users, Equipped With Naloxone, Are Helping to Reverse Overdoses in San Francisco, ABC News (June 14, 2019), available at https://abcnews.go.com/Health/drug-users-equippednaloxone-helping-reverse-overdoses-san/story?id=63696298). Hospitalizations and overdose deaths have also increased substantially since 2014. Id. ¶ 54 (citing Dr. Phillip O. Coffin, et al., Substance Use Trends in San Francisco Through 2018 at 9 (December 2019), available at https://ndews.umd.edu/sites/ndews.umd.edu/files/San-Francisco-Substance-Use-2019-Annual-Report-Trends-Through-2018.pdf). Not only has the opioid crisis impacted San Francisco's streets, but San Francisco's jails are seeing an influx of opioid contraband. Seeid. ¶ 57. The San Francisco Sheriff's Department purchased mail screening equipment to combat the massive influx of fentanyl. Id. Even though San Francisco budgeted $23.2 million to address the opioid crisis, the opioid epidemic persists. Seeid. ¶ 58 (citing City & County of San Francisco, California Mayor's 2017–2018 & 2018–2019 Proposed Budget, Mayor's Office of Public Policy and Finance at 15 (June 1, 2017), available at https://sfmayor.org/sites/default/files/CSF_Budget_Book_2017_Final_CMYK_LowRes.pdf).

As a result of the epidemic, over 2,700 lawsuits, including this one, were filed against opioid manufacturers, distributors, and dispensers. These actions were transferred to Judge Dan A. Polster in the U.S. District Court for the Northern District of Ohio. In February 2020, Judge Polster remanded this action back to the Northern District of California to proceed as a bellwether trial. One month later, the City filed its FAC.

The City alleges that Defendants are responsible for two primary causes of the opioid crisis in San Francisco. First, Marketing Defendants used false and deceptive advertising techniques in a marketing scheme designed to increase the demand and sale of prescription opioids. Id. ¶¶ 7–11. These defendants allegedly created and used a marketing enterprise that targeted physicians, patients, lawmakers, and enforcement agencies, in a systematic effort *630 to change prescriber habits and public perception regarding prescription opioids. Id. ¶¶ 225–546. Second, Defendants manufactured, distributed, and dispensed greater quantities of opioids than they knew would be necessary for legitimate medical uses, failed to design and implement effective controls over the distribution of opioids, and failed to report and take steps to halt suspicious orders that were being diverted into illegal secondary markets. Id. ¶¶ 7, 12. In doing so, Defendants allegedly violated their legal obligations under the Controlled Substances Act ("CSA"), California law, and common law. Id. ¶¶ 579–83. Despite this conduct, Defendants publicly represented that they complied with their legal obligations. Id. ¶¶ 668–80. These factual allegations form the underlying basis for the City's claims.

Now pending are nine motions to dismiss and one request for judicial notice.

## II. DISCUSSION

### A. The MDL court's decisions are not binding "law of the case."

As a preliminary matter, Defendants argue that this Court should not adopt the MDL's rulings in other cases as the law of this case. Law of the case doctrine is a discretionary practice whereby courts do not redecide issues resolved by the transferee court. 15 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 3867 (4th ed. Apr. 2020 Update). The MDL court has ruled on several pre-trial motions that applied to all cases consolidated before the MDL; however, the MDL court never ruled on a motion to dismiss involving the present case. See, e.g., In re Nat'l Prescription Opiate Litig., No. 1:17-MD-2804, —— F.Supp.3d

——, ——, 2020 WL 4550400, at *7 (N.D. Ohio Aug. 6, 2020) (denying motions to dismiss Lake and Trumbull counties' claims against pharmacy defendants). Defendants argue that the doctrine is inapplicable here because it applies only to rulings in the same case, and thus, the prior MDL rulings on motions to dismiss should not prevent this Court from independently reviewing each of Defendants' arguments in this case. Def. Mot. (dkt. 169) at 5. The City warns that this would result in "piecemeal decision making that MDL centralization is intended to avoid." Opp. (dkt. 208) at 7 (quoting 15 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 3867 (4th ed. Aug. 2019 Update)). But even the City acknowledges that the MDL's decisions are not binding—just, given the similarities, highly persuasive. Id. at 8. This Court agrees: the MDL's rulings will serve as a "springboard." This Court will independently review Defendants' arguments, but will rely on the MDL's rulings as highly persuasive authority to the extent that these decisions are consistent with California and Ninth Circuit authority.

The City relies excessively on this Court's statement that it will "not review or alter any of the rulings [that] have already been entered in the MDL litigation." Id. at 6–7 (internal citations omitted). This Court will not disturb the decisions by Judge Polster with respect to the entire MDL. But a transferee judge's decision to grant a motion depends on the factual record in that case, not on the record of a separate case adjudicated by the MDL court. See In re Nat'l Prescription Opiate Litig., 956 F.3d 838, 845 (6th Cir. 2020); see also Thomas v. Bible, 983 F.2d 152, 154 (9th Cir. 1993) ("[A] court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." (emphasis added) (internal citation omitted)).

Accordingly, this Court will independently consider Defendants' arguments to **631 the extent that they (1) were not raised in the MDL, or (2) rely on California or Ninth Circuit precedent. However, the Court adopts as persuasive the MDL's conclusions regarding one of Defendants' threshold arguments that the MDL court has repeatedly rejected and that is not based on Ninth Circuit precedent: that the CSA and its implementing regulations do not impose duties on Defendants. See, e.g., Def. Mot. at 11–12, 17–19, 19 n.18, 29–30, 30 n.28 (relying on its arguments to the MDL court). The Court begins with this issue because several other issues turn on the question whether the CSA imposes such duties. See infra Subparts II.E.4; II.E.5.a; II.E.5.c.ii; II.E.6.a.i.

**1. Duties under the CSA and its implementing regulations.**

The CSA and its implementing regulations do impose duties on Defendants. The CSA authorizes the Attorney General to "promulgate rules and regulations ... relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances ...." 21 U.S.C. § 821. Pursuant to this authority, the DEA Administrator promulgated § 1301.71(a), which requires all registrants to "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a). The DEA Administrator also promulgated § 1301.74(b), which imposes a legal obligation on non-practitioner registrants—manufacturers and distributors—to "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. 1301.74(b). The MDL court concluded that these regulations impose duties on manufacturers and distributors to identify, report, and refrain from shipping suspicious orders. In re Nat'l Prescription Opiate Litig., No. 1:17-md-2804, 2019 WL 3917575, at *7-9 (N.D. Ohio, Aug. 19, 2019); In re Nat'l Prescription Opiate Litig., No. 1:17-cv-02804, 2019 WL 2477416, at *16-18 (N.D. Ohio Apr. 1, 2019), report and recommendation adopted in part, rejected in part, No. 1:17-md-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019). Defendants argue that these regulations do not create legal duties, and ask the Court to reject the MDL court's contrary conclusion. Def. Mot. at 18. The Court will not do so.

First, the MDL court concluded that both §§ 1301.71 and 1301.74 impose "legal duties" on the defendants. The MDL court noted that the DEA promulgates regulations " 'relating to the registration and control' of the manufacture and distribution of controlled substances," In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7 (emphasis added) (quoting 21 U.S.C. § 821), which demonstrates that the CSA's regulations do not impose duties solely in the context of the registration process. Id. So, while § 1301.74(b) sets out factors for the DEA to evaluate whether an entity may remain a registrant, it also imposes, "as a matter of law, duties that registrants must" abide by. Id. The MDL court's decision is buttressed by the D.C. Circuit's decision in Masters Pharmaceutical, Inc. v. DEA, which concluded that "[§ 1301.71(a)] imposes a general duty on pharmaceutical distributors to 'provide effective controls ... against [the] diversion' of control substances." 861 F.3d 206, 221 (D.C. Cir. 2017) (emphasis added) (quoting 21 C.F.R. § 1301.71(a)).

Thus, §§ 1301.71 and 1301.74 set out factors used to evaluate an entity's registration and impose general duties on registrants to protect against diversion.

[1] Second, the MDL court detailed these duties. Relying on Masters Pharmaceutical, Inc., 861 F.3d at 212, the MDL court concluded that § 1301.74 imposes a duty on registrants to "(1) design and operate a system to disclose to the registrant **632** suspicious orders; and (2) inform the DEA of suspicious orders when discovered by the registrants." In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7. The MDL court held that § 1301.71 requires registrants to "provide effective controls and procedures to guard against theft and diversion of controlled substances." Id. at *8 (quoting 21 C.F.R. § 1301.71(a)) (internal quotation marks omitted). Relying again on the D.C. Circuit's decision in Masters Pharmaceutical Inc., 861 F.3d at 212–213, 222, and the DEA's administrative decision in Southwood Pharmaceuticals, Inc., 72 Fed. Reg. 36487-01, 36498, 2007 WL 1886484 (DEA July 3, 2007), the MDL court concluded that the distributor defendants had a duty, implicit in section 1301.71(a), not to ship suspicious orders. In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *8.

Nothing in Defendants' briefs suggest that the Ninth Circuit has interpreted the CSA differently, nor do Defendants argue any novel theories not heard by the MDL court. See Def. Mot. at 17–19; Def. Reply at 13–16. Rather, Defendants rely on the same positions used in the MDL to argue that the CSA regulatory provisions "merely set out procedures relating to the registration of manufacturers and wholesale distributors," not substantive duties. Def. Mot. at 17.

This Court therefore adopts the MDL court's conclusions on this issue and rejects Defendants' argument that the CSA's implementing regulations do not impose legal duties. SeeIn re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7–8.

The Court now turns to each of the motions to dismiss.

**B. Walgreens' motion to dismiss for lack of Article III standing.**

[2] Walgreens argues that the City lacks Article III standing to bring a public nuisance claim because its alleged injury —San Francisco's opioid epidemic—is not "fairly traceable" to Walgreens' alleged conduct. Wal. Mot. (dkt. 168) at 1 (internal citations omitted). Walgreens' argument fails because the City's allegations demonstrate that, at the very least, Walgreens' oversupply of opioids and failure to report suspicious orders caused third parties to act in a way that injured the City, which satisfies the traceability requirement.

[3] [4] In order to have Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, ––– U.S. ––––, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." Lexmark Int'l, Inc. v. Static Control Components, 572 U.S. 118, 134 n.6, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury .... [W]hat matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain." State v. Ross, 358 F. Supp. 3d 965, 1006 (N.D. Cal 2019) (quoting Mendia v. Garcia, 768 F.3d 1009, 1012–13 (9th Cir. 2014)) (internal quotation marks omitted).

Here, Walgreens relies on the length of the causal chain to argue that its alleged conduct is not traceable to the City's injury. See Wal. Mot. at 3–4. But the City has plausibly alleged that Walgreens' conduct caused the City's public nuisance injury. **633** The City alleges that Walgreens repeatedly failed to maintain effective controls to prevent diversion, including by failing to use its data to identify, investigate, and halt prescriptions that were suspicious. FAC ¶¶ 555–56, 563–78. Further, the FAC states that Walgreens installed dispensing and compensation policies that discouraged its pharmacists from performing due diligence on suspicious prescriptions. Id. ¶ 575. As a result of Walgreens' failure to prevent the diversion of prescription opioids into the illegal market, the City was forced to expend resources to alleviate the effects of Walgreens' failures: abuse, addiction, overdoses, and death. See id. ¶¶ 555, 563, 566, 571–72, 577. These are all concrete and specific examples of how Walgreens' conduct allegedly caused the City to incur extraordinary municipal costs. See id. ¶¶ 22, 57–58, 70 (detailing municipal costs).

Walgreens relies on Kaing v. Pulte Homes, Inc., No. 09-5057 SC, 2010 WL 625365 (N.D. Cal. Feb. 18, 2010), aff'd sub nom.Kaing v. Pultegroup, Inc., 464 F. App'x 630 (9th Cir. 2011), to argue that the City's allegations amount

Case 3:17-cv-01362 Document 1290-6 Filed 04/26/21 Page 50 of 96 PageID #: 43301
City and County of San Francisco v. Purdue Pharma L.P., 491 F.Supp.3d 610 (2020)
RICO Bus.Disp.Guide 13,405

to an "effects-of-effects" causation theory that does not satisfy the traceability requirement. Wal. Mot. at 4–5.[11] Specifically, Walgreens argues that there are "innumerable third parties" that affect the causal chain. Id. at 4. In Kaing, the plaintiffs asserted that local foreclosures by owners who accepted the defendants' subprime mortgages caused the plaintiffs' property values to diminish. 2010 WL 625365, at *5. The court rejected the claim because it concluded that the claim depended upon a variety of independent factors including unemployment, health problems, general weakening economy, and other financial conditions. Id. at *6.

Unlike Kaing, the City's allegations here demonstrate that, at the very least, Walgreens' oversupply of opioids caused third parties to act in a way that injured the City. See Mendia, 768 F.3d at 1013. Walgreens cites several links that it asserts make the City's causal chain more attenuated. Wal. Mot. at 4. Not only has the MDL court rejected these links, In re Nat'l Prescription Opiate Litig., No. 1:18-op-45090, 2018 WL 4895856, at *6 (N.D. Ohio, Oct. 5, 2018)report and recommendation adopted in part, No. 1:17-MD-2804, 2018 WL 6628898, at *1 (N.D. Ohio Dec. 19, 2018) [hereinafter Summit County], but Walgreens ignores that its alleged conduct—distributing and dispensing large amounts of opioids that it knew could not be used for legitimate uses—plausibly resulted in the City's immense costs. See FAC ¶¶ 555–56, 563–78. Thus, the City satisfies the standing requirement's traceability prong because the City alleges a plausible causal relationship between its public nuisance injury and Walgreens' conduct. Walgreens' motion to dismiss for lack of Article III standing is therefore DENIED.

**C. Motions to dismiss for lack of personal jurisdiction.**
Foreign Defendants argue that this Court lacks personal jurisdiction. See Teva **\*634** Mot. (dkt. 165) at 2; Allergan Mot. (dkt. 162) at 1–2; MNK Mot. (dkt. 166) at 6; Endo Mot. (dkt. 176) at 4. The City argues that it has pled a prima facie basis for exercising specific personal jurisdiction over the Foreign Defendants under either the alter-ego theory or successor-in-interest theory. See Teva Opp. (dkt. 205-4 *SEALED*) at 1–4; Allergan Opp. (dkt. 204) at 5–24; MNK Opp. (dkt. 209) at 5–19; Endo Opp. (dkt. 202) at 1–2. As explained below, the Court concludes that the City has made a prima facie showing of personal jurisdiction and DENIES WITHOUT PREJUDICE Foreign Defendants' motion to dismiss for lack of personal jurisdiction.[12]

**1. Legal standard for personal jurisdiction.**

**[5]** **[6]** **[7]** Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move to dismiss for lack of personal jurisdiction. The plaintiff bears the burden of establishing the court's personal jurisdiction over a defendant. Cubbage v. Merchent, 744 F.2d 665, 667 (9th Cir. 1984). In assessing whether personal jurisdiction exists, the court may consider evidence presented in affidavits or order discovery on jurisdictional issues. Data Disc, Inc. v. Systems Technology Associates, Inc., 557 F.2d 1280, 1285 (1977). "When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995) (internal citations omitted).

**[8]** **[9]** **[10]** A plaintiff can make this prima facie showing by producing admissible evidence which, if believed, would be sufficient to establish personal jurisdiction. See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d. 1122, 1129 (9th Cir. 2003). "[U]ncontroverted allegations in [plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor." Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1127 (9th Cir. 2010) (internal citations omitted). Even if a plaintiff makes a prima facie showing, it does not necessarily mean that the case proceeds to the merits; rather, if the pleadings and submitted materials raise "disputed questions of fact with regard to jurisdiction," the district court can exercise its discretion to hold a preliminary hearing in order to resolve the dispute. Data Disc, Inc., 557 F.2d at 1285. But, if the "jurisdictional facts are intertwined with the merits," such that "a decision on a jurisdictional issue is dependent on the merits .... [i]t is preferable that this determination be made at trial, where a plaintiff may present his case in a coherent, orderly fashion and without the risk of prejudicing his case on the merits." Id. at 1285 n.2 (internal citations omitted).

**\*635 2. Alter-ego liability**

**[11]** **[12]** Under federal law, "if a corporation is the alter ego of an individual defendant, or one corporation the alter ego of another, the Court may 'pierce the corporate veil' jurisdictionally and attribute 'contacts' accordingly." RAE

Sys., Inc. v. TSA Sys., Ltd., No. C 04-2030 FMS, 2005 WL 1513124 (N.D. Cal. June 24, 2005) (quoting Certified Building Products, Inc. v. NLRB, 528 F.2d 968, 969 (9th Cir. 1975)). In order to demonstrate that an alter ego relationship exists, the plaintiff must make a prima facie case "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." Ranza v. Nike, Inc., 793 F.3d 1059, 1073 (9th Cir. 2015) (quoting Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001)) (internal quotation marks omitted).

[13] Factors suggesting that two entities have a unity of interest and ownership include: (1) inadequate capitalization, (2) commingling of funds and other assets, (3) disregard of corporate formalities and failure to maintain an arm's length relationship, (4) holding out by one entity that is liable to the debts of the other, (5) identical equitable ownership, (6) use of the same offices and employees, (7) lack of segregation of corporate records, (8) manipulating assets between entities so as to concentrate the assets in one and the liabilities in another, and (9) identical directors and officers. SeeDaewoo Elecs. Am. Inc. v. Opta Corp., 875 F. 3d 1241, 1250 (9th Cir. 2017) (internal citations omitted). These factors help determine whether the parent corporation "totally controls the actions of the subsidiary so that the subsidiary is the mere alter ego of the parent," such that the Court may exercise jurisdiction over both the parent and its subsidiary. Howard v. Everet Sys., Inc., 228 F.3d 1057, 1069 n.17 (9th Cir. 2000).

In addition to demonstrating that a unity of interest exists between a parent company and its subsidiaries, a plaintiff must demonstrate that "an inequitable result will follow if the acts are treated as those of the [subsidiaries'] alone." RRX Indus., Inc. v. Lab-Con, Inc., 772 F.2d 543, 545 (9th Cir. 1985). An inequitable result includes enabling a "shell game," in which an entity deflects liability on to shell corporations to avoid liability, to continue. SeeCadence Design Sys., Inc. v. Pounce Consulting, Inc., No. 17-cv-04732-PJH (SK), 2019 WL 1768619, at *6 (N.D. Cal. Apr. 1, 2019), report and recommendation adopted, No. 17-cv-04732-PJH, 2019 WL 1767332 (N.D. Cal. Apr. 22, 2019).

[14] The alter-ego doctrine is not limited to intentional fraud, nor does it require bad faith. RRX Indus., Inc., 772 F.2d at 546; Pac. Bell Tel. Co. v. 88 Connection Corp., 15-cv-04554-LB, 2016 WL 3257656, at *3 (N.D. Cal. June 14, 2016). So long as there is a unity of interest and ownership, courts will ignore the corporate form and attribute wrongful

or inequitable conduct to the organization controlling the corporation. Pac. Bell, 2016 WL 3257656, at *3 (citing Sonora Diamond Corp. v. Super. Ct., 83 Cal. App. 4th 523, 538, 99 Cal.Rptr.2d 824 (2000)).

The Court now turns to each of the Foreign Defendants.

**a. Teva Ltd.**

[15] The City argues that Teva Ltd.'s subsidiaries—Teva USA, Cephalon, and the Actavis Generic Entities that Teva Ltd. acquired from Allergan plc—are its alter-ego, and thus, the Court can impute **\*636** these subsidiaries' contacts to Teva Ltd.[13] Teva Opp. at 1.

**i. Unity of interests and ownership.**

[16] The City argues that Teva commingled its funds and assets, shared virtually identical officers and committee members on its Executive Committee and subsidiaries' subcommittees, manipulated its subsidiaries assets to benefit itself, controlled both the high-level and day-to-day decisions of its subsidiaries, and integrated its subsidiaries into a single economic unit, known as "One Teva." See Teva Opp. at 6–14.[14] Teva disputes these allegations.

Teva Ltd.'s shared corporate history, structure, management, and officers demonstrates that it sought to fully integrate and control its subsidiaries. Teva Ltd. is an Israeli corporation and parent company of several indirect generic manufacturing subsidiaries, including Teva USA, Cephalon, Watson Laboratories, Inc., Warner Chilcott Company, LLC, Actavis Pharma, Inc., Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc., and Actavis Laboratories FL, Inc. FAC ¶¶ 120–35. Teva Ltd. depicts itself as "One global brand, One story, One Teva," Teva Opp. (dkt. 205-4) at 6, and its indirect subsidiaries report directly to Teva Ltd. See, e.g., Teva Opp. at 6–7. According to a 2018 "Segment Memorandum," Teva Ltd.'s CEO is "ultimately responsible" for allocating all of Teva's resources. Teva Opp. at 8 (quoting Fahey Decl. (dkt. 205-3) at 21) (internal quotation marks omitted). Around the same time, Teva Ltd. implemented "a new organizational structure" to help integrate Teva "into one commercial organization," thereby blurring the layers of separation between Teva Ltd.

and its subsidiaries. Teva Opp. at 8–9 (quoting Fahey Decl. at 22) (internal quotation marks omitted).

Teva Ltd. argues that these facts amount to "appropriate parental involvement and do not indicate that" it is "improperly controlling the subsidiary." Teva Reply (dkt. 219) at 5 (quoting Unocal Corp., 248 F.3d at 926) (internal quotation marks omitted). But that Teva Ltd.'s CEO allocated its subsidiaries' resources, and that Teva Ltd. desired to integrate into "one commercial organization," suggest a desire to "totally control" the subsidiaries. SeeHoward, 228 F.3d at 1069 n.17. These allegations, in conjunction with the following allegations, demonstrate Teva Ltd.'s efforts to control its subsidiaries.

Teva Ltd.'s control encompasses its subsidiaries' day-to-day activities. The City alleges that Teva Ltd. controls its subsidiaries' day-to-day activities. Teva Opp. at 11. For example, Teva Ltd.'s Executive Vice President and Head of North America facilitated a withdrawal of a Teva opioid product that had received FDA approval. Id. (quoting Ex. 25) (internal quotation marks omitted). The head of Teva Ltd.'s Global Research and Development division controls Teva's product formulation, design, and commercial execution and determined that the product would be unprofitable, prompting the Executive Vice President's decision. Id. (quoting Fahey Decl. at 11). Additionally, Teva Ltd. implemented guidelines that enabled it to **\*637** nominate, select, and approve the Executive Committee and Sub-committee members for itself and its U.S. subsidiaries, resulting in substantial control over the subsidiaries' marketing, administration, manufacturing, research and development, purchase of supplies, finance, and "other significant supporting operations conducted in 'shared and commingled assets.' " Id. at 13–14 (quoting Fahey Decl. at 28–29).

Teva Ltd. both disputes the truth of the City's allegations and recharacterizes them as "critical high-level decisions that impact the 'Teva' brand as a whole—not involvement in day-to-day activities." Teva Reply at 9–10. Teva Ltd. cites the testimony of its corporate representative, Doron Herman, who testified that the day-to-day operations are solely controlled by the subsidiaries. Id. at 9 (citing Herman 30(b)(6) Tr., at 190:2-20, 258:1-11, 373:9-374:6, 377:4-17, 378:23-379:1). Teva Ltd. also characterizes the City's allegation that Teva Ltd. Forces all subsidiaries to utilize the same website portal as typical "parental management." Id. at 10 (citing Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir. 1980)). While Mr. Herman's testimony does raise

a factual dispute, Teva Ltd. does not address all of the City's allegations, specifically Teva Ltd.'s alleged control over who sits on certain boards and commercial strategies and execution. These allegations implicate several of the factors listed in Daewoo: (1) the commingling of funds and other assets, (2) the use of the same employees, and (3) virtually identical officers and committee members. See875 F. 3d at 1250. Thus, the City's allegations satisfy several factors indicative of a "unity of interests and ownership."

Teva's shared financial structure that it completely controlled its subsidiaries' finances. The City alleges that Teva Ltd. financially controlled its subsidiaries through "a trade receivables securitization program that took control and commingled its subsidiaries' receivables and collections via a Special Purpose Entity (SPE)," which Teva Ltd. owns, controls, and primarily benefits from. Teva. Opp. at 9 (citing Fahey Decl. at 25) (internal quotation marks omitted). Additionally, the City alleges that Teva used its subsidiaries' cash flows to repurchase its own shares and pay dividends to shareholders. Id. at 10 (citing Fahey Decl. at 26). Teva Ltd. also allegedly controlled large contracts signed by its subsidiaries, to "protect itself from third-party claims from those subsidiaries." Id. (citing Fahey Decl. at 27). These allegations suggest that Teva Ltd. (1) commingled funds and assets and (2) manipulated assets between the two entities, both of which further the City's theory that Teva Ltd. financially controlled its subsidiaries.

Teva Ltd. disputes the underlying allegations and maintains that it did not commingle funds, fail to maintain arms-length relationships, or manipulate assets between its entities. First, Teva Ltd. asserts that "none of Teva Ltd.'s [U.S.]-based subsidiaries even participate in the SPE program ..." which directly conflicts with the City's assertion. Compare Teva Reply at 8 (citing 2nd Herman Decl. ¶ 4) with Teva. Opp. at 9 (citing Fahey Decl. at 25). Second, Teva Ltd. asserts that it did not commingle funds in the SPE program because participating subsidiaries exchange receivables for immediate compensation. Teva Reply at 8 n.9 (citing Herman 30(b)(6) Tr., at 178:5–179:21). Again, this directly conflicts with the City's assertion that Teva Ltd. commingles funds in the SPE program. See Teva Opp. at 9.

While the City's allegations, accepted as true, establish a prima facie case that Teva Ltd. and its U.S. subsidiaries lack separate **\*638** personalities, and thus, are unified in interests and ownership, Teva Ltd. raises questions of fact that must be resolved either at a preliminary hearing or at trial. SeeData

Disc, Inc., 557 F.2d at 1285, 1285 n.2.[15] The Court will permit Teva Ltd. to raise this motion again after trial because these jurisdictional issues are intertwined with the merits. Id.

### ii. **Injustice or fraud.**

Moreover, treating Teva Ltd. and its subsidiaries as separate entities would result in a substantial injustice to the City. In Cadence Design Sys., Inc., the court concluded that treating the defendants—Pounce USA and Pounce SA—as separate entities would lead to an inequitable result because Pounce USA would continue to underfund Pounce SA, preventing the plaintiff from collecting a default judgment from Pounce SA. 2019 WL 1768619, at *6. The plaintiff obtained a default judgement after Pounce SA failed to defend against the plaintiff's copyright lawsuit. Id. at *2. After several attempts to collect the judgment against Pounce SA, the plaintiff sued Pounce USA, alleging that the two entities were alter egos of one another. Id. at *3. The court agreed, noting that the majority shareholder of the two entities used Pounce USA to shield his assets. Id. at *5–6. This "shell game" between Pounce USA and Pounce SA prevented the plaintiff from collecting the judgment, which constituted an "inequitable result." Id. at *6 ("Pounce USA strategically denies its relationship to Pounce SA to obfuscate reality and avoid consequences for both entities. Denial of alter ego liability in this case would enable that shell game to continue ...." (emphasis in original)).

Here, like Cadence, the City plausibly alleges that treating Teva Ltd. and its subsidiaries as separate entities would further a shell game and prevent the City from recovering expenses resulting from both Teva Ltd.'s and its subsidiaries' conduct. The City alleges that Teva Ltd.'s total financial control over its U.S. subsidiaries, including their trade receivables, protects the subsidiaries from creditors. Teva Opp. at 15 (citing Pac. Bell, 2016 WL 3257656, at *6). Teva Ltd. counters that "[t]he plaintiff must be more than just a creditor attempting to recover unsatisfied debts ...." Teva Mot. at 10 (quoting NuCal Foods, Inc. v. Quality Egg LLC, 887 F. Supp. 2d 977, 992 (E.D. Cal. 2012)). But the City does not allege a mere creditor-debtor relationship. The City also alleges that Teva Ltd.'s shell game with its subsidiaries abuses the corporate form. Teva Opp. at 16. The alter ego test's injustice prong contemplates precisely such abuses. Pac. Mar. Freight, Inc. v. Foster, No. 10-cv-0578-BTM-BLM, 2010 WL 3339432, at *7 (S.D. Cal. Aug. 24, 2010) ("Alter-ego theory is essentially an equitable tool used to vindicate the rights of

those damaged by the abuse of the corporate form.") (citing Mesler v. Bragg Mgmt. Co., 39 Cal.3d 290, 301, 216 Cal.Rptr. 443, 702 P.2d 601 (1985)). The City's allegations plausibly suggest that Teva Ltd.'s abuses the corporate form by using its subsidiaries as shells to prevent the City's recovery, and thus constitute a preliminary showing that **\*639** treating these entities as distinct would result in injustice.

Teva Ltd. argues that the City's allegations are false because none of its U.S. subsidiaries participate in the SPE program that allegedly enables Teva Ltd. to control its subsidiaries' finances. Teva Reply at 11. The City and Teva Ltd. rely on conflicting evidence to support their assertions. Compare Teva Opp. Ex. 4 at 19 ("On an individual seller basis, each Teva subsidiary sells receivables to BNP .... Teva is considered to be the primary beneficiary.") with Teva Reply 2nd Herman Decl. ¶ 4 ("None of Teva Ltd.'s United States-based subsidiaries participate or otherwise make use of the Teva corporate family's trade receivables securitization program."). Under Rule 12(b)(2), "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir. 2004) (internal citations omitted). Thus, the City succeeds in making a prima facie showing that Teva Ltd. and its subsidiaries are alter-egos.

Teva Ltd.'s Motion to Dismiss is therefore DENIED WITHOUT PREJUDICE.

### b. **Mallinckrodt plc**

The City also alleges that MNK plc is the alter ego of its U.S. subsidiaries. See MNK Opp. at 7.

### i. **Unity of interests and ownership.**

[17] The City alleges: (1) that MNK plc exerts control over the daily affairs of its subsidiaries, MNK LLC and SpecGx; (2) that MNK plc and its subsidiaries share the same employees and corporate officers; (3) that MNK plc and its subsidiaries engage in the same business enterprise; (4) that they use the same assets; and (5) that they did not maintain separate books and financial statements. Id. at 9–15. Two or three factors can be enough to plead a unity of interest. Johnson v. Serenity Transp., Inc., 141 F. Supp. 3d 974, 985 (N.D. Cal. 2015) (citing Daewoo Elecs. Am. Inc. v. Opta Corporation , 2013 WL 3877596, at *5; Pac. Mar. Freight,

Case 3:17-cv-01362   Document 1290-6   Filed 04/26/21   Page 54 of 96 PageID #: 43305
City and County of San Francisco v. Purdue Pharma L.P., 491 F.Supp.3d 610 (2020)
RICO Bus.Disp.Guide 13,405

Inc., 2010 WL 3339432, at *6). Like Teva Ltd., MNK plc disputes these allegations. See MNK Reply (dkt. 218) at 7–13.

MNK plc manages the day-to-day affairs of its subsidiaries. MNK, LLC and SpecGX, LLC are wholly-owned U.S.-based subsidiaries of MNK plc—an Irish public limited company. FAC ¶¶ 159, 812. According to MNK plc, its board and committees oversee the manufacturing of opioids, in addition to managing the risks of its operation. MNK Opp. at 10 (citing Chalos Dec. Ex. 17 at 40). While MNK plc is correct that "reviewing and approving major decisions" constitutes macro-management that would not fall under "day-to-day business operations," the City's allegations are much more extensive. See MNK Reply at 7–8. For example, the City alleges that "MNK plc controlled its subsidiaries' 'sales and marketing strategies,' " and implemented programs to "review and approve product-specific materials, presentations and external communications." MNK Opp. at 9–10 (quoting Chalos. Dec. Exs. 15, 16). Contrary to MNK plc's argument, this type of oversight-approval program monitors "first-hand" "how approved promotional and other materials are used, as well as monitoring ... sales representative expenses." Chalos. Dec. Ex. 16 at 29. Thus, this degree of control over daily operations of MNK plc's subsidiaries weighs in favor of an alter-ego relationship.

MNK plc uses the same assets as its subsidiaries. The City alleges that MNK plc transferred MNK, LLC's opioid business assets to SpecGx, LLC. MNK Opp. at 11, 14 ("[A]fter MNK plc formed SpecGx LLC ... MNK LLC transferred its assets, operations, and patents to SpecGx, *640 LLC."). Not only did MNK plc transfer assets between subsidiaries, but the City also alleges that MNK plc disregarded corporate formalities by commingling funds through inter-company transfers and using the same assets as its subsidiaries through inter-company transfers. Id. at 14. Specifically, MNK plc allegedly shared facilities, a service office, and "assets used to manage the Company's total business" in the U.S., including "IT, Finance, Human Resources, Corporate Compliance, Communications & Government Affairs." Id. (quoting Chalos Dec. Ex. 6 at 73) (internal quotation marks omitted).

MNK plc argues that that it did not inappropriately commingle funds and assets. MNK Reply at 7 (citing Gardner v. Starkist Co., 418 F. Supp. 3d 443, 463 (N.D. Cal. 2019)). MNK plc and the City dispute whether using "centralized cash pools" constitutes inappropriate commingling of funds. Compare MNK Opp. at 11 with MNK Reply at 11 (citing

Einwalter Decl. ¶¶ 3–10) (claiming that it is "standard corporate practice" to use centralized cash pools). Under Rule 12(b)(2), this type of factual dispute must be resolved in the City's favor, see Schwarzenegger, 374 F.3d at 800; thus, for now, the Court will accept that MNK plc inappropriately commingled funds. MNK plc further argues that sharing offices and services "do not alone establish alter ego, or even where other factors may be met." MNK Reply at 11 (emphasis added) (citing Payoda, Inc. v. Photon Infotech, Inc., No. 14-CV-04103-BLF, 2015 WL 4593911, at *3 (N.D. Cal. July 30, 2015)). Alone, this factor may not be determinative, but it is probative of an alter ego relationship. See Daewoo Elecs. Am. Inc., 875 F. 3d at 1250; Stewart v. Screen Gems-EMI Music, Inc., 81 F. Supp. 3d 938, 954 (N.D. Cal. 2015) ("When assessing whether there is unity of interest for the purposes of alter ego liability courts consider the ... use of the same offices and employees ...." (quoting Sandoval v. Ali, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014) (internal quotation marks omitted))).

MNK plc and its subsidiaries share the same employees and corporate officers. The City cites six officers that SpecGx LLC and MNK LLC share with MNK plc, all of whom actively work on behalf of MNK plc and its U.S. subsidiaries. MNK Opp. at 12. MNK plc argues that it is standard corporate practice for a corporate parent and its subsidiaries to share management. MNK Reply at 9. Further, only four of the six aforementioned officers maintained roles at MNK plc and its subsidiaries at the same time. Id. MNK plc relies on Stewart to support its argument. Id. at 10 (citing Stewart, 81 F. Supp. 3d at 956). However, in Stewart, the court found that the defendant corporation shared two officers with its subsidiaries, which weighed in favor of finding an alter ego relationship. 81 F. Supp. 3d at 956. Even if only four of MNK plc's officers simultaneously worked for both MNK plc and its subsidiaries, these officers had substantial authority in both entities, which weighs in favor of finding an alter ego relationship.

[18] MNK plc does not engage in the same business enterprise at its subsidiaries. MNK plc argues, and the MDL court agreed, that MNK plc never "marketed, sold, manufactured, or distributed prescription opiates in ... the United States .... Nor is [MNK plc] registered with the [DEA] to manufacture or sell opioid drugs." In re Nat'l Prescription Opiate Litig., 2019 WL 3553892, at *4 (internal citations omitted). This Court agrees that the City has failed to allege that MNK plc engaged in any of these operations. See MNK Reply at 10–11. The City solely relies upon corporate

filings to argue that MNK plc is "actively engaged in the pharmaceutical **\*641** business," MNK Opp. at 13, but, as MNK plc notes, that is not the same as manufacturing, distributing, and selling prescription opioids. MNK Reply at 7.

[19]   MNK plc, MNK LLC, and SpecGx LLC each maintain separate financial books and records. The City has not plausibly alleged that MNK plc and its subsidiaries fail to maintain separate books and records. Id. at 12. The City alleges that MNK plc's lenders require it to send consolidated budgets, MNK Opp. at 15, but that alone does not suggest that MNK plc and its subsidiaries do not maintain separate financial records, especially given that it is a requirement under Irish law. See MNK Reply at 12.

In sum, although not every relevant factor supports the City, these allegations are sufficient to make a prima facie showing that MNK plc and its subsidiaries are not distinct entities.

### ii. **Injustice or fraud.**

Treating MNK plc and its subsidiaries as separate entities would result in a substantial injustice to the City. The same analysis that applies to Teva Ltd. applies here. See supra Subpart II.C.2.a.ii. Again, given the disputed facts, this Court will reserve this alter-ego determination until after the parties have the benefit of a full trial record. See, e.g., In re Nat'l Prescription Opiate Litig., 2019 WL 3553892, at \*4. MNK plc's motion to dismiss is therefore DENIED WITHOUT PREJUDICE.

### c. **Endo Int'l**

The City also alleges that Endo Int'l and its U.S. subsidiaries are alter egos. See Endo Opp. at 7.

### i. **Unity of interests.**

[20]   The City relies on the following allegations to argue that Endo Int'l and its subsidiaries have an alter-ego relationship: (1) Endo Int'l uses its subsidiaries in furtherance of a single venture; (2) Endo Int'l is financially inseparable from its U.S. subsidiaries; (3) Endo Int'l shares the same offices as its subsidiaries; (4) the Endo defendants fail to maintain an arm's-length relationship because Endo Int'l

controls the incentive plans for all Endo employees; (5) the Endo defendants share many of the same directors and officers. Endo Opp. at 7–11. Courts accept each of these factors, if alleged with supporting facts, as probative of the existence of an alter-ego relationship. See, e.g., Associated Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825, 840, 26 Cal.Rptr. 806 (1962); Successor Agency to Former Emeryville Redevelopment Agency v. Swagelok Co., 364 F. Supp. 3d 1061, 1078 (N.D. Cal. 2019).

[21]   Endo Int'l's U.S. subsidiaries further a single venture. A parent corporation's use of its subsidiary as an instrument for a single venture alone is insufficient to establish an alter-ego relationship, but in conjunction with other factors can establish an alter-ego relationship between the entities. See, e.g., MP Nexlevel of Cal., Inc. v. CVIN, LLC, No. 1:14-CV-288-LJO-GSA, 2014 WL 5019639, at \*15 (E.D. Cal. Oct. 7, 2014) (concluding that facts demonstrating undercapitalization and use of subsidiaries as conduits were sufficient to raise a plausible inference of an alter ego relationship). The City largely relies on three allegations: (1) Endo Int'l's efforts to ensure that its subsidiaries comply with federal and California law regarding the sale and marketing of pharmaceuticals; (2) Endo Int'l's response and attempt to mitigate opioid sales; and (3) Endo Int'l's Independent Directors Report, which states that Endo Int'l governs its subsidiaries' internal and external interactions. Endo Opp. at 9.

**\*642**   Endo Int'l argues that these facts are insufficient to establish the degree of "pervasive control" necessary to establish jurisdiction under the alter-ego doctrine. Endo Reply (dkt. 216) at 4–5. It relies on Ranza to argue that these facts indicate an active "parent corporation" that is involved with the "macro-management of its subsidiaries." Id. at 4 (quoting Ranza, 793 F.3d at 1074). But Endo Int'l's argument and reliance on Ranza largely depends on disputed allegations. For example, Endo Int'l disputes that the 2018 Independent Board of Directors Report plausibly suggests it had pervasive control over its subsidiaries. Id. at 4–5. However, the plain language of the report describes a Code of Conduct that "applies to every person conducting business for Endo and to all Endo locations, subsidiaries and affiliates." Endo Opp. Ex. E. (dkt. 202-6) at 4 (emphasis added). Further, Endo Int'l's Compliance Department—which is overseen by Endo Int'l's Board of Directors—enforces the Code of Conduct. Id. A parent corporation that oversees its subsidiaries' internal and external interactions suggests control over "routine matters

of day-to-day operation," rather than macro-management. See Ranza, 793 F.3d at 1074.

In Ranza, the Ninth Circuit concluded that Nike and its subsidiary, NEON, remained separate, and therefore, the court did not impute Nike's contacts to NEON. Id. at 1073–74. In order to demonstrate that two entities lack formal separation, the plaintiff must show that one entity "dictates every facet of [the other entity's] business, including routine matters of day-to-day operation." Id. at 1074 (quoting Unocal, 248 F.3d at 926) (internal quotation marks omitted). Ranza sued NEON and Nike for sex and age discrimination in violation of Title VII and argued that the Oregon District Court could impute Nike's contacts to NEON for personal jurisdiction purposes. Id. at 1065. Each entity leased its own facilities, maintained its own books and records, entered into contracts on its own, and had separate boards of directors; however, Nike controlled NEON's budget, approved large purchases, established human resources procedures for both entities, involved itself in NEON's hiring decisions, and ensured that the Nike brand was marketed consistently. Id. at 1074. The court concluded that Nike and NEON were separate entities because NEON negotiated its own contracts and licenses, made purchasing decisions "without Nike's consultation, and ha[d] its own human resources division that handle[d] day-to-day employment issues." Id.

Contrary to Endo Int'l's argument, the crucial allegations missing in Ranza exist here. The 2018 Independent Directors Report notes that Endo Int'l oversees and enforces the implementation of its compliance program. See Endo Opp. Ex. E. at 1–2, 6. This includes training employees, developing policies and procedures, auditing and monitoring the implementation of these procedures, and correcting any behavior that deviates from the program. Id. at 4–5. Such responsibilities reflect the type of "human resources division that handles day-to-day employment issues" absent in Ranza. See 793 F.3d at 1074. Further, the compliance program extends to its salespersons' interactions with healthcare providers, see Endo Opp. Ex. E. at 5, which suggests that "routine [sales] decisions" require some consultation with Endo Int'l's compliance committee—another fact absent in Ranza. See 793 F.3d at 1074. These allegations are therefore sufficient—albeit disputed—to demonstrate a pervasive level of control, indicating the existence of an alter-ego relationship.

[22] Endo Int'l's reliance on its subsidiaries' loans and revenue do not suggest an alter ego relationship. The parties

dispute *643 whether Endo Int'l guaranteed loans for its subsidiaries or vice versa. Compare Endo Opp. at 9 ("Endo International relies on its U.S. Subsidiaries to guarantee its loans and fund its overhead costs.") with Endo Reply at 5–6 ("Endo International has guaranteed certain loans and received revenue from its U.S. operating companies ...."). Even if Endo Int'l guaranteed loans for its subsidiaries, this allegation does not suggest an alter ego relationship. See, e.g., Unocal, 248 F.3d at 928 ("[N]o alter ego relationship was created where the parent company guaranteed loans for the subsidiary ...." (internal citations omitted)). Further, the City has cited no decisions recognizing an alter ego relationship based on a subsidiary guaranteeing loans for its parent company. See Endo Opp. at 9.

Endo Int'l's use of same offices, business, employees, and attorneys as its subsidiaries suggests an alter ego relationship. Endo Int'l does not dispute that it shares its U.S. headquarters with EHS. It also shares the same legal counsel and has virtually identical officers and directors as its U.S. subsidiaries. Endo Opp. at 10. While these facts alone are not determinative, they weigh in favor of an alter-ego relationship. See Daewoo Elecs. Am. Inc., 875 F. 3d at 1250.

Endo Int'l fails to maintain an arm's-length relationship with its subsidiaries because it controls stock and options plans for all Endo employees. Endo Opp. at 10. Decisions regarding compensation and incentives constitute day-to-day decisions that evidence control. See, e.g., Pehle v. Dufour, No. 2:06-cv-1889-EFB, 2012 WL 4490955, at *6 (E.D. Cal. Sept. 28, 2012) ("Here, plaintiff has adequately established that there is a unity of interests ... since [parent] also dictates the day-to-day business of the corporation, including determinations regarding wage and hour policies."); see also Rollins Burdick Hunter of So. Cal., Inc. v. Alexander & Alexander Servs., Inc., 206 Cal. App. 3d 1, 11, 253 Cal.Rptr. 338 (1988) (concluding that the parent corporation's control over incentive decisions supports a finding of alter-ego liability). The parties do not dispute that Endo Int'l has control over the stock and option incentive plans for all Endo employees; rather, Endo Int'l argues that such control does not constitute evidence of control over day-to-day decisions. Endo Reply at 6 (citing Fru-Con Const. Corp. v. Sacramento Municipal Utility Dist., No. 05-cv-583, 2007 WL 2384841, at *5 (E.D. Cal. Aug. 17, 2007); United States v. Pangang Group. Co., Ltd., 879 F. Supp. 2d 1052, 1063–64 (N.D. Cal. 2012)). However, Endo Int'l relies on distinguishable authority, which does not support its argument.[16] Thus, Endo Int'l's control over

incentive plans for all Endo employees indicates that Endo Int'l, EPI, and EHS lack corporate separation.

Thus, the City's allegations, accepted as true, establish a prima facie case that Endo Int'l and its U.S. subsidiaries are alter egos because they lack separate and distinct personalities.

### ii. **Injustice or fraud.**

Treating Endo Int'l and its subsidiaries as separate entities would result in a substantial **\*644** injustice to the City. The same analysis that applies to Teva Ltd. and MNK plc applies here. See supra Subpart II.C.2.a.ii; II.C.2.b.ii. Again, given the disputed facts, this Court shall reserve this alter-ego determination until after the parties have the benefit of a full trial record. See, e.g., In re Nat'l Prescription Opiate Litig., 2019 WL 3553892, at *4. Endo Int'l's motion to dismiss is therefore DENIED WITHOUT PREJUDICE.

### 3. Successor liability

**[23]** **[24]** The City argues that Allergan plc is the successor to Actavis, Inc., (n/k/a Allergan Finance, LLC) and thus, this Court has jurisdiction over Allergan plc pursuant to the successor jurisdiction theory. Allergan Opp. at 8. Personal jurisdiction over a successor company exists where "(i) the court would have had personal jurisdiction over the predecessor and (ii) the successor company effectively assumed the subject liabilities of the predecessor." Swagelok Co., 364 F. Supp. 3d at 1073–74 (internal citations omitted). A successor company assumes its predecessor's liabilities if one of the following exceptions to the presumption of non-liability exists:

> (1) the successor expressly or impliedly agrees to assume the subject liabilities; (2) the transaction amounts to a consolidation or merger of the successor and the predecessor (de facto merger); (3) the successor is a mere continuation of the predecessors; or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping liability for the predecessor's debts.

Lefkowtiz v. Scytl USA, No. 15-cv-05005-JSC, 2016 WL 537952, at *4 (N.D. Cal. Feb. 11, 2016) (citing Ray v. Alad Corp., 19 Cal. 3d 22, 28, 136 Cal.Rptr. 574, 560 P.2d 3 (1977)). The successor liability inquiry is highly fact-specific, and thus, courts tend to avoid ruling "on the substantive merits of plaintiffs' case for successor liability at the pleadings

stage." Wilson v. Metals USA, Inc., No. CIV. S-12-0568 LKK/GGH, 2012 WL 4888477, at *10 (E.D. Cal. Oct. 12, 2012).

Allergan plc (f/k/a Actavis plc) is incorporated in Ireland and maintains its administrative headquarters in Madison, New Jersey. FAC ¶ 115. Between 2013 and 2015, Allergan plc acquired Warner Chilcott plc, Allergan Finance, LLC (f/k/a Actavis, Inc.), and Allergan, Inc. Id. Allergan Finance, LLC—incorporated in Nevada and headquartered in Madison, New Jersey—is a defendant in the present action. Id. ¶ 117. When Allergan Finance, LLC (f/k/a Actavis, Inc.) became Allergan plc's wholly-owned subsidiary, each of Allergan Finance, LLC's common shares were converted into one Actavis plc share. Id. ¶ 115.

The City asserts three theories to support successor jurisdiction: (1) Allergan plc has expressly and impliedly assumed the liability of numerous defendants in this action, including Actavis, Inc.'s debts and liabilities; (2) Allergan plc merged or consolidated with Actavis, Inc.; and (3) Allergan plc continued Actavis, Inc.'s business after it was purchased. Allergan Opp. at 8. Allergan plc argues that successor jurisdiction cannot exist because (1) Allergan Finance, LLC is the true successor to Actavis, Inc., and (2) Allergan plc did not engage in an asset sale with Allergan Finance, LLC. Allergan Reply (dkt. 214) at 2.

Allergan plc disputes the validity and weight of the allegations underlying the City's arguments for successor jurisdiction. For example, in addressing the City's "assumption of liabilities" argument, Allergan plc disputes that the agreement between Teva Ltd. and Allergan plc implies that Allergan plc assumed liability for its former generic opioids business, such as Allergan Finance, LLC. Allergan Reply at **\*645** 4. Moreover, like the arguments in the MDL, Allergan plc disputes that it ever characterized itself as having engaged in the same business as Allergan Finance, LLC, i.e., "distributing, manufacturing, and selling opioids." Compare Allergan Mot. at 10–11 with Allergan Opp. at 10.

As a result of these factual disputes, this Court shall adopt the MDL court's approach and DENY WITHOUT PREJUDICE Teva Ltd., Endo Int'l, MNK plc, and Allergan plc's motions to dismiss for lack of personal jurisdiction until after the parties have the benefit of a full trial record. See Summit Cnty., 2018 WL 3553892, at *5.

### D. Motions to dismiss for insufficient service of process.

**[25]** Counsel for the Foreign Defendants refused to sign a service waiver because they argue that the City's service must conform with the Hague Convention. See, e.g., Allergan Mot. at 12–13; Teva Mot. at 15; MNK Mot. at 5; Endo Mot. at 3[17]; see also Allergan Opp. Ex. 49 (dkt. 204-38). However, the MDL court ordered all MDL defendants to accept service for a "foreign entity that is a parent or subsidiary of any corporate defendant in the MDL." In re Nat'l Prescription Opiate Litig., No. 1:17-md-2804, ECF No. 1108 (N.D. Ohio Nov. 9, 2018). The City relies on this order, arguing that this Court should deem the Foreign Defendants served because the City attempted to serve the Foreign Defendants' outside counsel in accordance with the MDL court's order. See Allergan Opp. at 24–25; MNK Opp. at 19; Endo Opp. at 17–18; Teva Opp. at 24.

**[26]** "[A] court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." Thomas, 983 F.2d at 154 (emphasis added) (internal citation omitted). As discussed earlier, this Court will not disturb Judge Polster's decisions "with respect to the entire MDL." Supra Subpart II.A. The MDL court order regarding service for a "foreign entity that is a parent or subsidiary of any corporate defendant in the MDL" applied to all cases in the MDL, including this one. Id. Thus, the City's attempt to serve the Foreign Defendants' counsel constitutes proper service under Rule 12(b)(5).

The Court DENIES Foreign Defendants' motions to dismiss for insufficient service. In accordance with the MDL court's order, domestic defendants must accept service on behalf of any Foreign Defendant that is their parent or subsidiary. See In re Nat'l Prescription Opiate Litig., No. 1:17-md-2804, ECF No. 1108 (N.D. Ohio Nov. 9, 2018).

### E. Motions to dismiss for failure to state a claim.

Defendants bring five motions to dismiss for failure to state a claim.[18] These motions primarily argue that: (1) the RICO claims fail to allege an injury to property or business, racketeering activity, conspiracy, and causation; (2) federal law preempts all state law claims premised on Defendants' alleged duty to halt suspicious orders, marketing, and Defendants' failure to comply with the CSA and its implementing **\*646** regulations; (3) the public nuisance claim fails to allege affirmative conduct with knowledge of the hazard and causation; and (4) the UCL and FAL claims lack sufficient particularity, do not rely on actionable duties,

and ignore the benefits of opioids, among other bases for dismissal.

### 1. Legal Standard

**[27]** **[28]** **[29]** **[30]** **[31]** Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 697, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678, 129 S.Ct. 1937. When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

**[32]** **[33]** Claims for fraud must meet the pleading standard of Federal Rule of Civil Procedure 9(b), which requires a party "alleging fraud or mistake [to] state with particularity the circumstances constituting fraud or mistake." Rule 9(b) "requires ... an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). "The circumstances constituting the fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.' " Mou v. SSC San Jose Operating Co. LP, 415 F. Supp. 3d 918, 924 (N.D. Cal. 2019) (quoting Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985)).

**[34]** If a court does dismiss a complaint for failure to state a claim, it should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). A court nevertheless has discretion to deny leave to amend due to, among other things, "futility of amendment." Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

## 2. The FAC's sufficiency under Rules 8 and 9(b) as to Anda.

**[35]** Anda argues that the City's RICO claim fails because the City has not alleged tortious acts or omissions specifically by Anda. Anda Mot. at 4–5. Anda contends that Rule 9(b) requires facts "regarding each defendant's involvement in the alleged fraud, including specific facts as to the defendant's alleged misrepresentations ...." Id. at 5 (citing *647 Garrison v. Oracle Corp., 159 F. Supp. 3d 1044, 1075 (N.D. Cal. 2016)). However, as the MDL court concluded, this oversimplifies the law. See In re Nat'l Prescription Opiate Litig., No. 1:18-op-45459, 2019 WL 2468267, at *13 (N.D. Ohio Apr. 1, 2019). Rule 9(b) requires facts specific enough to give defendants notice of the conduct that gave rise to the fraud charge. Swartz, 476 F.3d at 764. "There is no flaw in a pleading ... where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." United States ex rel. Swoben v. United Healthcare Ins. Co., 848 F.3d 1161, 1184 (9th Cir. 2016). Anda mischaracterizes the City's permissible "collective allegations" as prohibited "general allegations." See Anda Mot. at 5.

**[36]** The City alleges that Anda distributed 2,659,892 dosage units of opioids to San Francisco residents over the course of an eight-year period. FAC ¶ 45. During that period, San Francisco experienced 100 to 120 overdose deaths per year, the majority of which were caused by prescription opioids. Id. ¶ 66. Distributors, including Anda, allegedly violated their legal obligations by failing to maintain effective controls to detect and report suspicious orders, which led to diversion. Id. ¶¶ 166, 580. For example, in the eight-year history of Anda's opioid shipments to San Francisco, Anda allegedly never identified a single suspicious order to the California State Board of Pharmacy, despite its obligations to do so. Id. ¶ 913.

Anda, along with the other defendants, allegedly participated in the Healthcare Distribution Association ("HDA"), which Defendants allegedly used as an intermediary to coordinate and ensure that the DEA's aggregate production quotas, individual quotas, and procurement quotas remained high. FAC ¶ 627. Defendants allegedly utilized their membership in the HDA to engage in fraudulent behavior by coordinating their responses to CSA obligations and agreeing not to identify, report, or halt suspicious orders in order to avoid DEA scrutiny. Id. ¶ 714. Anda was allegedly aware that suspicious orders left its facilities, yet it omitted this material information from its reports to the DEA. Id. ¶ 807. Anda and its fellow Supply Chain Defendants also allegedly falsely represented to the DEA that they were complying with their obligations to (1) design systems to prevent diversion and (2) report suspicious orders to the DEA. Id. ¶ 804.

**[37]** While it is true that the City does not identify a specific misrepresentation made by Anda, the law does not impose such a strict pleading requirement. See, e.g., Swartz, 476 F.3d at 764 ("[T]here is no absolute requirement that where several defendants are sued in connection with an alleged fraudulent scheme, the complaint must identify false statements made by each and every defendant."). Rather, "the purpose of Rule 9(b) is 'to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge.' " Anda Reply (dkt. 217) at 4 (quoting Swartz, 476 F.3d at 764). Here, Anda is on notice that, since at least 2006, it has allegedly engaged in fraudulent behavior consisting of failing to maintain effective controls to prevent diversion and omitting material information to the DEA pertaining to suspicious orders of prescription opioids. FAC ¶¶ 166, 580, 609, 612–30, 714, 715, 858. These facts are sufficient to put Anda on notice of the "who, what, when, where, and how of the misconduct alleged." See Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009).

Anda's motion to dismiss is therefore DENIED.

## *648 3. RICO

**[38]** The City brings two claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. The first claim asserts that Purdue, Cephalon, Janssen, Endo, and Mallinckrodt ("RICO Marketing Defendants") knowingly participated in and conducted an Opioid Marketing Enterprise by engaging in mail and wire fraud in violation of 18 U.S.C. §§

1962(c) and (d). FAC ¶¶ 826–54. The second claim asserts that Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, Anda, and AmerisourceBergen ("RICO Supply Chain Defendants") formed an Opioid Supply Chain Enterprise and engaged in patterns of racketeering activity—mail and wire fraud—to profit from increased opioid sales in the United States. FAC ¶¶ 855–85.

Defendants mount numerous challenges to the City's RICO claims, but the Court will address just two: (a) that the City's asserted injuries fail to establish RICO standing because they are not injuries to "business or property," Def. Mot. at 6, 9; and (b) that the City fails to demonstrate proximate causation because its injury is not a direct result of Defendants' predicate acts. Man. Mot. at 2, 4; Distr. Mot. at 4. As explained below, while the City survives the challenge as to injury, it cannot overcome the challenge as to proximate causation.

**a. RICO injury.**

RICO standing is limited to plaintiffs who have suffered (1) an injury to "business or property," that is (2) "by reason of" a RICO violation. In re Volkswagen "Clean Diesel" Mktg. Sales Practices, & Prod. Liab. Litig., No. 15-md-02672 CRB (JSC), 2017 WL 4890594, at *4–5 (N.D. Cal. Oct. 30, 2017) (quoting 18 U.S.C. § 1964(c)) (internal quotation marks omitted). The City argues that Defendants' conduct inflicted three RICO injuries: (1) the extraordinary cost of providing governmental services to combat the opioid epidemic, Plain. Supp. (dkt. 229) at 6; (2) damage to the City's physical property, such as its main library, and losses incurred in the consumer marketplace, id. at 9; and (3) damage to the City's businesses in the form of lost revenue and clean-up costs. Opp. at 58–59; Plain. Supp. at 9–10, 14–15. However, the City may only recover for the second and third categories of injuries. See Canyon Cnty. v. Syngenta Seeds, Inc., 519 F.3d 969, 976 (9th Cir. 2008). See also Diaz v. Gates, 420 F.3d 897, 900 (9th Cir. 2005) (en banc) (cognizable RICO injury requires plaintiff to plead "harm to a specific business or property interest," which is "a categorical inquiry typically determined by reference to state law.").

In Canyon County, the Ninth Circuit dismissed Canyon County's RICO claim, which sought to hold four companies liable for the costs that Canyon County claimed to have incurred for "public health care and law enforcement services for undocumented immigrants." 519 F.3d at 971. First, Canyon County argued that the defendants knowingly

employed undocumented immigrants, which cost Canyon County "millions of dollars for health care services and criminal justice services for the illegal immigrants who have been employed ... in violation of federal law." Id. at 972–73 (internal quotation marks omitted). The court held that a government entity acting in its sovereign capacity, by "seeking to enforce the laws or promote the public well-being ... cannot claim to have been 'injured in [its] ... property' for RICO purposes based solely on the fact that it has spent money in order to act governmentally." Id. at 976 (emphases added). If accepted, Canyon County's argument would have substantially broadened the scope of RICO liability because "[i]f government expenditures alone suffice *649 as injury to property," then "any RICO predicate act that provoked any sort of governmental response would provide the government entity with standing to sue ...." Id. (emphasis added) (citing 18 U.S.C. § 1964(c)). The court considered this interpretation of RICO "highly improbable," yet it acknowledged that a consumer who has been overcharged may claim an injury to her property in the context of a commercial transaction. Id. Thus, while a consumer has sustained an injury if he is overcharged in a transaction, a governmental entity is not " 'injured in its property' when it spends money on ... additional public services, given that those services are based on legislative mandates and are intended to further the public interest."Id.

Canyon County next argued that, if it did not have a property interest in governmental expenditures, it must have a property interest in the services themselves, e.g., "law enforcement or health care services." Id. at 977. The court rejected this argument as well. It reasoned that a governmental entity does not possess a property interest in law enforcement or health care services, and thus, "a governmental entity is not 'injured in its property' when greater demand causes it to provide additional public services of this type." Id. The court primarily relied on two justifications: (1) the ordinary meaning of "property" does not include local government functions, and (2) the Supreme Court has interpreted section 1964(c)'s statutory framework "to exclude claims for damages to governments' non-proprietary interests." Id. (citing Reiter v. Sonotone Corp., 442 U.S. 330, 341–42, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)). Further, the court relied on the Second Circuit's decision in Town of West Hartford v. Operation Rescue, 915 F.2d 92, 104 (2nd Cir. 1990), which concluded that impaired police and emergency services did not qualify as an injury to a government's business or property. Canyon Cnty., 519 F.3d at 978–79 (citing Town of West Hartford, 915 F.2d at 104). Thus, the court concluded

that governmental entities do not have a property interest in governmental services. Id. at 980.

With this understanding of Canyon County, the Court turns to the parties' arguments about the City's claimed RICO injuries in this case.

### i. Governmental expenditures and services.

The City relies on the MDL court's analysis of Canyon County to argue that governmental expenditures plus something else are sufficient to constitute a cognizable RICO injury. Opp. at 58–59 (citing Summit Cnty., 2018 WL 6628898, at *10). The City argues that the extraordinary costs, "scope[,] and magnitude" of the opioid epidemic qualify as a "plus" factor necessary to establish RICO standing. Id.; Plain. Supp. at 7–10. But Canyon County did not hold that governmental expenditures, particularly health care and law enforcement costs, "plus something else" can constitute a cognizable RICO injury. While the MDL court suggested that the extraordinary costs, "scope[,] and magnitude" of the opioid epidemic could create cognizable RICO injuries, it was following Sixth Circuit precedent. See Summit Cnty., 2018 WL 6628898, at *10 ("[U]nder the broadest reading of Sixth Circuit precedent ... [p]laintiffs may recover damages ... [incurred] in their capacity as a sovereign ....").[19] This view of RICO injury conflicts with Ninth Circuit precedent, which this Court must follow.

**\*650** In Summit County, the MDL court held that Summit County's injuries stemmed from alleged violations of the pharmaceutical defendants' duties as distributors and manufacturers of Schedule II controlled substances, which it found distinguishable from the injuries asserted in Canyon County. Id. Further, the MDL court interpreted the use of "solely" in the sentence, "a governmental body ... cannot claim to have been 'injured in [its] ... property' for RICO purposes based solely on the fact that it has spent money in order to act governmentally," to suggest that governmental entities could assert a cognizable injury to their property based on expenditures and "something else." Id. (quoting Canyon Cnty., 519 F.3d at 976). The MDL court thus determined that Canyon County did not establish "a bright-line rule" that "governmental entities are barred from seeking RICO claims for services provided in their sovereign or quasi-sovereign capacities." Id.

Contrary to the MDL court's analysis, Canyon County established that governmental entities cannot assert a RICO claim based on expenditures or services provided in their sovereign or quasi-sovereign capacities. 519 F.3d at 976–77. The Ninth Circuit reaffirmed this rule recently in City of Almaty v. Khrapunov, explaining that in "Canyon County ... we decided that a government's expenditures on healthcare and policing services are not an injury to business or property because the government does not have a property interest in the services it provides to enforce law and promote public welfare." 956 F.3d 1129, 1133 (9th Cir. 2020). The Fifth Circuit also concluded that governmental entities "cannot claim damages for general injury to the economy or 'to the Government's ability to carry out its functions.' " Welborn v. Bank of New York Mellon Corp., 557 Fed. Appx. 383, 387 (5th Cir. 2014) (quoting Hawaii v. Standard Oil Co., 405 U.S. 251, 265, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972)).

Moreover, while both the City and MDL court interpret Canyon County's use of "solely" to imply "that [municipalities] might be able to assert an injury to their property based on the expenditure of money plus something else," context suggests a different interpretation. Plain. Supp. at 8 (quoting Summit Cnty., 2018 WL 4895856, at *10). In Canyon County, the court first rejected any argument that governmental "expenditures alone" were sufficient to confer RICO standing. 519 F.3d at 976 (emphasis added). The court subsequently analyzed whether Canyon County had a RICO property interest in its services:

> As the County cannot satisfy the requirement of injury to a "specific property interest" based solely on its expenditure of money to provide public services, we must examine whether the County can claim a property interest in the services themselves.

Id. (emphases added). In this context, the use of "solely" followed by "themselves" reflects the unique, co-dependent relationship of "expenditures" and the "services" they produce, not an invitation to consider unrelated factors—such as the scope or magnitude of an event—that would cumulatively create a property interest. To the contrary, after determining that governmental services do not qualify—either independently of or in conjunction with expenditures—as a property interest, the court held that "the costs of ... law enforcement and public health care services are not recoverable damages under civil RICO." Id. at 980; see also City of Almaty, 956 F.3d at 1133. Thus, the court's use of "solely" did not endow governmental entities with standing to sue based on expenditures "plus something else." Contra Summit Cnty., 2018 WL 4895856, at *10.

**\*651**  In addition, the City argues that it does not seek to recover the "ordinary and customary costs related to everyday governmental services" that Canyon County addressed. Plain. Supp. at 7–9; Mot. Trans. (dkt. 272) at 14, 17–20. But nothing in Canyon County suggests that the Ninth Circuit distinguished between "extraordinary costs" and "ordinary costs." In fact, the costs in Canyon County largely parallel the costs here. The City seeks to recover the costs for

> 'additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction and disease,' 'training emergency and/or first responders and other city employees in proper treatment of drug overdoses,' 'training emergency and/or first responders and other city employees in proper treatment of drug overdoses,' and 'emergency responses ... to opioid overdoses.'

Plain. Supp. at 8 (citing FAC ¶¶ 851, 882). Canyon County alleged that it was "forced ... to pay millions of dollars for health care services and criminal justice services" as a result of the defendant corporations' conduct. 519 F.3d at 971. The nature of the expenses are virtually identical. Def. Supp. at 5. For example, "training emergency and/or first responders and other city employees in proper treatment of drug overdoses," FAC ¶ 851, falls within the category of "law enforcement and health care services" that the court held are "not recoverable damages under civil RICO." Canyon Cnty., 519 F.3d at 980. Further, neither the City nor the MDL court articulate where the line is between "ordinary" and "extraordinary" costs, aside from the amorphous concept of "scope and magnitude." Opp. at 58–59 (Summit Cnty., 2018 WL 4895856, at \*10).

The Court therefore rejects any "extraordinary cost" exception to RICO standing.

### ii. **Injuries to the City's property interests.**

**[39]**  Real Property. The City also alleges that it has suffered "[i]ncreased costs associated with the destruction of city property and public infrastructure" related to improper needle and syringe disposal. FAC ¶ 851(g). Canyon County does not preclude the City from recovering under RICO for such injuries. See Plain. Supp. at 9–10. Governmental entities have non-sovereign, proprietary interests, which include "own[ing] land or participat[ing] in a business venture." Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 601, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982);

seeOscar v. University Students Co-op. Ass'n, 965 F.2d 783, 786 (9th Cir. 1992) (recognizing as "compensable under RICO" "out-of-pocket expenditures as a ... result of the racketeering activity ... for example costs incurred to repair damage to [ ] personal property ....") abrogated on other grounds byDiaz v. Gates, 420 F.3d 897 (9th Cir. 2005).

Defendants argue that this injury is "identical" to the injuries rejected in Canyon County. Def. Supp. at 2; Def. Mot. at 8. However, Defendants fail to identify any damage to Canyon County's real property that parallels the claimed damage to the City's existing real property. Further, Defendants abandoned their argument at the hearing, conceding that the damage to the main library's toilet grinders amounts to a cognizable RICO injury. Mot. Trans. at 26. The City also asserted that, if granted leave to amend, it would allege additional injuries to its property, including damage to its sewage system, park bathrooms, and navigation centers. Id. at 15–16. Thus, the damages to the City's existing real property constitute cognizable RICO injuries.

**\*652 [40] [41] [42] [43]** Consumer or Market Participant.  A governmental entity can also recover losses sustained "as a consumer or other type of market participant." Canyon Cnty., 519 F.3d at 976. When a consumer operating as a commercial enterprise "suffers a loss of money[,] it suffers an injury in both its 'business' and 'property.' " Reiter, 442 U.S. at 340, 99 S.Ct. 2326. A consumer suffers an injury to their business when a party inhibits their ability to provide a commercial service. Seeid. A consumer suffers an injury to its property when a party deprives the consumer's commercial enterprise of money. SeeCanyon Cnty., 519 F.3d at 976.

**[44]**  The City argues that its purchase of naloxone, buprenorphine, protective equipment, specialized screening equipment, and specialized training courses and materials for handling and disposing of fentanyl constitute injuries in its proprietary capacity as a "consumer or other type of market participant." Plain. Supp. at 10 (quoting Canyon County, 519 F.3d at 976 (internal quotation marks omitted)); FAC ¶¶ 57, 61, 851, 882; Mot. Trans. at 19 ("Training librarians to deal with patrons in crisis and in overdose is different than just hiring or training more librarians as librarians."). The City attempts to distinguish Canyon County by arguing that it is unclear whether Canyon County alleged that it was forced to purchase "weapons and cars" to deal with the corporate defendants' hiring of undocumented immigrants. Plain. Supp. at 12. Regardless, the City argues that its expenditures —naloxone, opioid-screening equipment, training courses

and materials for opioid disposal, buprenorphine—are "qualitatively different." Id. Unlike weapons and cars, the City's expenditures "relate specifically—and exclusively—to combating the opioid pandemic ...." Id. (emphasis included).

There are two flaws with the City's argument. First, Canyon County requires that a consumer injury arise out of a commercial transaction, which the City has not alleged. 519 F.3d at 976 ("[G]overnment entities that have been overcharged in commercial transactions and thus deprived of their money can claim injury to their property."). The City relies on Reiter, 442 U.S. at 342, 99 S.Ct. 2326 and Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), to argue that its "forced" expenditures constitute an injury. Plaintiff's Supp. at 11–12. But in each of these cases, the alleged injuries—typically overcharges in a commercial transaction—arose from the commercial transaction between the parties. See, e.g., Reiter, 422 U.S. at 330, 99 S.Ct. 2326 ("She and the class ... have been forced to pay illegally fixed higher prices."); Standard Oil Co., 405 U.S. at 253, 92 S.Ct. 885 ("[O]vercharges for petroleum products ...."). Unlike Reiter and Standard Oil Co., the City does not allege that its injury derived from some distortion in the marketplace—such as an overcharge—or other wrongful conduct stemming from the transaction itself. Rather, the City's alleged injury stems from Defendants allegedly forcing the City to engage in commercial transactions with third parties. But none of the cases recognize injuries arising from external conduct, like Defendants' predicate acts, that did not impact the terms of a transaction. That Defendants did not engage in wrongful conduct related to the City's transactions for Naloxone and other products demonstrates that these cases are not applicable.

Second, if accepted, the City's argument would blur the distinction between recoverable proprietary harms and unrecoverable governmental harms. This argument would enable all purchases that further a governmental purpose to qualify as a RICO injury, thus creating an end-run **653 around Canyon County's holding. 519 F.3d at 976 ("If government expenditures alone sufficed as injury to property, any RICO predicate act that provoked any sort of governmental response would provide the government entity with standing to sue under § 1964(c)—an interpretation of the statute that we think highly improbable."). The City argues that it would not create an end-run around Canyon County because it draws a line at purchases that would not have been made absent the opioid epidemic. Plain. Supp. at 12. This argument only works if the Court accepts that,

historically, all opioid use, including heroin, stems from Defendants' conduct. But opioid addiction and abuse existed long before Defendants' alleged Marketing and Supply Chain Enterprises, see FAC ¶ 177, and many heroin users never use prescription opioids. Id. ¶ 5. These allegations belie the City's argument that its purchases stem solely from Defendants' conduct. The City presumably incurred opioid-related expenditures for emergency and law enforcement services prior to the opioid epidemic, which suggests that these expenditures are not substantively different from traditional government expenditures. Because the City used these expenditures to promote its residents' public welfare, a core government function, none constitute injuries in the City's proprietary capacity.

### iii. **Injuries to the City's business interests.**

[45]  [46]  Finally, the City argues that its parking lot and advertising businesses have incurred opioid-related clean-up expenses and lost revenue, both of which constitute cognizable injuries to its "businesses." Plain. Supp. at 14–15. Sovereign entities that undertake commercial business endeavors, such as providing a service or goods, are "engaged in a business" for purposes of RICO standing. Reiter, 442 U.S. at 340, 99 S.Ct. 2326. However, the City failed to plead these injuries in its FAC, and only raised the argument in its supplemental brief. At the hearing, the City listed several injuries to its businesses that it would include in its complaint, if granted leave to amend. Mot. Trans. at 17–20. The Court will assume for the following proximate cause analysis that the City has adequately pled injuries to its businesses.

Thus, while the bulk of the City's alleged injuries do not constitute cognizable RICO injuries, the City has alleged a cognizable injury to its real property and businesses.

### b. **Proximate Cause.**

[47]  A plaintiff must show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well." Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). The City must therefore demonstrate that there is "some direct relation between [its asserted injury] and the injurious conduct alleged." Id. at 269, 112 S.Ct. 1311 (emphasis added). The City's only surviving RICO injuries stem from its allegation that Defendants' conduct caused

damage to city-owned property and businesses, such as the City's main library. FAC ¶¶ 57, 851(f); see also supra Subpart II.E.3.a. As discussed below, these injuries are too attenuated to satisfy RICO's narrow definition of proximate cause. See, e.g., City of Oakland v. Wells Fargo & Co., et al., 972 F.3d 1112, 1130, n.22 (9th Cir. 2020) ("[T]he Supreme Court has clearly held that RICO 'should not get ... an expansive reading' ...." (quoting Holmes, 503 U.S. at 266, 112 S.Ct. 1311)).

**i. Basic Legal Framework.**

 [48]   "When a court evaluates a RICO claim for proximate causation, the central  *654  question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006). Proximate cause "is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.' " Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 654–55, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008) (quoting Holmes, 503 U.S. at 272 n.20, 112 S.Ct. 1311).

Three main cases guide this Court's analysis of direct causation: Bridge, 553 U.S. at 639, 128 S.Ct. 2131; Hemi Grp., LLC v. City of New York, 559 U.S. 1, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010) ("Hemi"); and Painters and Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd., 943 F.3d 1243 (9th Cir. 2019) ("Painters"). In Bridge, the Court concluded that the plaintiffs, a group of losing auction bidders, satisfied proximate cause by demonstrating that their injury—the loss of property liens—was the direct result of the defendant bidders' fraudulent misrepresentations to the county. 553 U.S. at 658, 128 S.Ct. 2131. The defendants allegedly engaged in a scheme in which they submitted false statements to the county's office that enabled them to obtain more liens in auctions than would otherwise be permitted under the county's auction rules. Id. at 643–44, 128 S.Ct. 2131. The Court determined that "[i]t was a foreseeable and natural consequence of petitioners' scheme ... that other bidders would obtain fewer liens" because the scheme directly siphoned away property liens from compliant bidders, and there were no independent factors that could account for the plaintiffs' injury. Id. at 658, 128 S.Ct. 2131. Thus, the Court held that the plaintiffs had established proximate cause. Id.

In Hemi, the Supreme Court dismissed a RICO action by the City of New York against an out-of-state tobacco company, Hemi, for failing to file required customer information with the state in conformance with the Jenkins Act. 559 U.S. at 4, 130 S.Ct. 983. Hemi's failure allegedly caused the City of New York to lose millions of dollars in unrecoverable tax revenue because it could not determine which of Hemi's customers had paid the city's tax. Id. at 9, 130 S.Ct. 983. The city of New York and the dissent relied on Bridge to argue that proximate cause should turn on whether the defendant's conduct could foreseeably cause the harm, not just whether it directly caused the harm. Id. at 28, 130 S.Ct. 983 (Breyer, J., dissenting) (citing Bridge, 553 U.S. at 657–59, 128 S.Ct. 2131). The plurality rejected this argument for two reasons. First, it determined that "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm. Indeed, Anza and Holmes never mention the concept of foreseeability." Id. at 12, 130 S.Ct. 983. Second, Bridge's causal chain did not involve any intervening third-party conduct, which meant that the defendants' conduct directly caused the plaintiffs' harm. Id. at 11, 130 S.Ct. 983. Thus, the plurality concluded that the City of New York's theory stretched proximate cause too far because the customers' failure to pay their taxes, not Hemi, was "directly responsible for the City's harm ...." Id. at 11, 130 S.Ct. 983.

Justice Ginsburg concurred with the plurality's judgement because she concluded that the City of New York's RICO claim was an attempt to "assert authority to collect tobacco taxes from Hemi [ ] or to reshape the ... limited remedies Congress imposed for violations of the Jenkins Act." Id. at 19, 130 S.Ct. 983 (Ginsburg, J., concurring). However, Justice Ginsburg expressly did not join the plurality's proximate  *655  cause analysis. Id. Justice Ginsburg's concurring opinion represents the narrowest grounds of agreement between the Justices who concurred in the judgment, and thus, constitutes the controlling opinion in Hemi.[20] See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Therefore, the plurality's deemphasis on foreseeability does not control lower courts' proximate cause inquiries.

Nevertheless, the Ninth Circuit has generally followed the Hemi plurality's approach. See, e.g., Fields v. Twitter, Inc., 881 F.3d 739, 748 (9th Cir 2018) (relying on the Hemi plurality to conclude that "Congress chose to use the phrase 'by reason of' to require proximate cause showing, and the Court has consistently rejected arguments that this language requires only foreseeability[,]" and interpreting

Hemi as "affirming Anza's rejection of foreseeability in favor of focus 'on the directness of the relationship between the conduct and the harm ....' "); Couch v. Cate, 379 Fed. Appx. 560, 565 (9th Cir. 2010) ("The Supreme Court recently clarified that this proximate cause requires 'some direct relation between the injury asserted and the injurious conduct alleged' and explicitly rejected foreseeability as a standard for determining proximate causation." (quoting Hemi, 559 U.S. at 12, 130 S.Ct. 983)). However, recently, in Painters, foreseeability crept back into the Ninth Circuit's proximate cause analysis. 943 F.3d at 1260.

Painters incorporates the Hemi plurality's direct injury requirement while leaving room for foreseeability to play a role in determining whether an intervening event severed the causal chain. See 943 F.3d at 1250, 1260. A group of patients whose physicians prescribed them Actos, a diabetes treatment drug, brought a RICO suit against Takeda Pharmaceuticals—the manufacturer of Actos—for engaging in a marketing campaign to intentionally mislead physicians about the drug's efficacy. Id. at 1247. Takeda argued that the prescribing physicians constituted "intervening causes that sever[ed] the chain of proximate cause ...." Id. at 1257. The court rejected this argument and held that prescribing physicians could not constitute an intervening cause because "[a]n intervening cause is a 'later cause of independent origin that was not foreseeable.' "[21] Id. (quoting Mendez v. Cnty. of Los Angeles, 897 F.3d 1067, 1081 (9th Cir. 2018)). "[I]t was perfectly foreseeable that physicians who prescribed Actos would play a causative role in Defendants' alleged fraudulent scheme to increase Actos's revenues." Id. (emphasis included). Indeed, the fraudulent scheme necessarily contemplated that physicians would play such a role. See id. The court thus concluded that the causal chain alleged was consistent with the Hemi plurality's focus on "the direct relation between the alleged violation and alleged injury," and thus, satisfied proximate cause. Id. (citing Hemi, 559 U.S. at 12, 130 S.Ct. 983).

[49]  In addition to evaluating the directness of the causal relationship, courts typically consider the Holmes factors, which are three nonexhaustive policy considerations that help determine whether an **656** injury is too remote to permit recovery. They are:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's

damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig., 349 F. Supp. 3d 881, 906 (N.D. Cal. 2018) (quoting Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1169 (9th Cir. 2002)); see also In re Bextra & Celebrex Mktg. Sales Practices, No. 11-CV-00310 CRB, 2012 WL 3154957, at *4 n.8 (N.D. Cal. Aug. 2, 2012). Even if several factors weigh in favor of a particular outcome, one factor alone can be dispositive. See Oregon Laborers-Emp. Health & Welfare Tr. Fund v. Philip Morris Inc., 185 F.3d 957, 965 (9th Cir. 1999) ("Oregon Laborers") ("The difficulty of ascertaining the damages attributable to defendants' alleged wrongful conduct and the complexity involved in calculating these damages weigh heavily, if not dispositively, in favor of barring plaintiffs' actions."); City of Los Angeles v. Wells Fargo & Co., 22 F. Supp. 3d 1047, 1058 (C.D. Cal. 2014) ("Oregon Laborers sets forth a three-factor test and not an elements test, so even if one factor tips in favor of Defendants' position, the totality of the circumstances compels the Court to find in favor of the City.").

This Court will first evaluate whether Marketing and Supply Chain Defendants directly caused the injuries to city-owned property, and then address those policy considerations.

### ii. The Causal Chain Most Resembles Hemi.

While the parties agree that the City must allege a causal chain in which the Defendants' violations led directly to the City's injuries, they disagree as to whether the causal chain here is more akin to the chain that the Supreme Court accepted in Bridge, 553 U.S. at 657–58, 128 S.Ct. 2131, and to the one that the Ninth Circuit accepted in Painters, 943 F.3d at 1260, or to the chain that the Supreme Court rejected in Hemi, 559 U.S. at 2, 130 S.Ct. 983. Defendants are correct that this case is more like Hemi.

[50]  The City's theory here is that Defendants' predicate acts—mail fraud, wire fraud, and CSA violations—caused the City's property damage, which it sustained when individuals improperly disposed of the needles they used to inject illegal drugs.[22] See FAC ¶¶ 826–85. But unlike the predicate acts in Bridge and Painters, RICO Marketing and Supply Chain Defendants' predicate acts did not directly cause the City's harm. The City's causal chain resembles the chain

rejected in <u>Hemi</u>: it involves too many links and depends on independent and intervening acts—including criminal conduct—by third and fourth parties. For example, third— and potentially fourth and fifth—parties allegedly diverted or sold illicit opioids, administered opioids intravenously,[23] and improperly **\*657** discarded the used needles, which harmed city-owned property and businesses. While it is plausible that Defendants' conduct <u>enabled</u> this third-party behavior, it is impossible to conclude that Defendants' conduct <u>directly</u> caused the City's harm within the meaning contemplated by <u>Hemi</u>.

First, "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step," see <u>Holmes, 503 U.S. at 272, 112 S.Ct. 1311</u> (quoting <u>Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 533, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)</u>) (internal quotation marks omitted), but the relationship here between Defendants' conduct and the City's harm extends well beyond the first step. Unlike <u>Painters</u>, where the court concluded that the defendant manufacturers' conduct (the predicate act) flowed through intermediary prescribers (Link 1) and pharmacists (Link 2) to directly cause patients to purchase manufacturers' drug (the harm), <u>943 F.3d at 1257</u>, here, under the most generous reading of the City's causal chain, Defendants' conduct (the predicate act) flows through prescribing physicians (Link 1), pharmacists (Link 2), and patients (Link 3) who then illegally misuse opioids, improperly discard the needles, and thus damage city-owned property and businesses (the harm).[24] Neither the Ninth Circuit nor the Supreme Court have ever accepted a RICO proximate cause theory that involves three intermediaries.

Second, the nexus leading to the City's injuries is qualitatively different from the nexus leading to the injuries in <u>Bridge</u> and <u>Painters</u>. <u>City of Oakland</u> instructs courts to focus "on <u>the continuity</u> between the defendant's alleged violation and the plaintiff's indirect injury, not how many 'steps' were in between." <u>972 F.3d at 1132</u> (emphasis added) (citing <u>Bridge, 553 U.S. at 653–58, 128 S.Ct. 2131</u>). There, the court concluded that "plaintiffs need not be the most immediate victims of a defendant's misconduct to satisfy proximate cause, as long as their injuries have some direct relation and are surely attributable to the misconduct." <u>Id.</u> Here, the City's property damage is not "surely attributable" to Defendants' misconduct, and therefore, lacks continuity. See <u>id.</u> The City's injuries are "surely attributable" to drug users, not Defendants. Some of these drug users suffered injuries—such as addiction and overdoses—that directly[25]

stemmed from Defendants' predicate acts. However, unlike <u>Bridge</u> and <u>Painters</u>, where the defendants' conduct flowed through unharmed intermediaries (in <u>Bridge</u>, the county treasurer's office; in <u>Painters</u>, prescribing physicians), here the drug users cannot fairly be characterized as "intermediaries" because they subsequently engaged in separate conduct— discarding needles—that injured the City. This makes them unlike the physicians in <u>Painters</u> who, as contemplated by the fraudulent scheme, would prescribe a harmful drug to their patients. <u>943 F.3d at 1256</u>. And this distinct third-party conduct severed any continuity stemming from Defendants' predicate acts, making the relationship between those acts and the City's injury insufficiently direct. See **\*658** <u>Anza, 547 U.S. at 458, 126 S.Ct. 1991</u> (holding that the causal relationship was insufficiently direct because the plaintiff's asserted harms "were entirely <u>distinct</u> from the alleged RICO violation (defrauding the state)" (emphasis added)).

[51]  [52]  Third, at oral argument, the City argued that drug users' injury-causing conduct was not an independent intervening act because it <u>foreseeably</u> resulted from Defendants' RICO violations, given the impact of addiction on voluntariness. See Mot. Trans. at 35–36. "An intervening cause is a 'later cause of independent origin that was not foreseeable.' " <u>Painters, 943 F.3d at 1257</u> (quoting <u>Mendez, 897 F.3d at 1081</u>). Courts must evaluate foreseeability retrospectively "when assessing whether an intervening event" breaks the causal chain. <u>Mendez, 897 F.3d at 1081–82</u>. It is unclear whether voluntariness is a requirement of the intervening causes doctrine.[26] Compare <u>City and Cnty. of San Francisco v. Philip Morris, Inc., 957 F. Supp. 1130, 1137–38 (N.D. Cal. 1997)</u> (concluding that voluntariness is not a requirement of the intervening causes doctrine) with <u>Falise v. American Tobacco Co., 94 F. Supp. 2d 316, 344 (E.D.N.Y. 2000)</u> (concluding that nicotine addiction cannot be an intervening cause). Regardless, it is unlikely that Defendants could foresee that their predicate violations—wire fraud, mail fraud, and violations of the CSA—would cause drug users to litter needles on municipal property. Defendants' violations foreseeably caused physicians to prescribe more opioids, and consequently increased rates of addiction and overdoses. But it is difficult to foresee the City's harm as the links in the causal chain become more attenuated. See <u>Paroline v. United States, 572 U.S. 434, 445, 134 S.Ct. 1710, 188 L.Ed.2d 714 (2014)</u> ("A requirement of proximate cause thus serves, inter alia, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.").

The City's attenuated chain is unlike any that the Supreme Court or Ninth Circuit has approved in the RICO context; in principle, it is more like Joseph Herscher's Rube Goldberg Machine, "How to Pass the Salt While Maintaining Proper Social Distance," which includes over one hundred steps and ends with the following events: (1) a marble ball knocks over a domino; (2) the domino knocks over other dominoes, (3) those dominoes eventually dislodge a glass cup; (3) the cup rolls, spilling salt until the cup hits another ball; (4) the next ball rolls through a ramp, collides with a barrier, and falls into a hanging cup; (5) the weight of the ball pulls the string attached to the cup; (6) the string pulls a wheel containing the spilled salt; (7) the wheel rotates into a hand broom; and then several more events occur before (8) a toy dump truck pushes the spilled salt into a spoon that slams into a container, tossing the salt onto Joseph's food. Joseph's Machines, How to Pass the Salt While Maintaining Proper Social Distance, YouTube (Mar. 22, 2019) https://www.youtube.com/watch?v=nORRgU8sGdE **659 & list=RD166mE6*Pig4 & index=4. It is foreseeable that the first rolling marble would knock over the domino, and that that domino would knock over other dominoes, but it is not foreseeable that this first event would cause a series of events that resulted in salted food. Although the City's causal chain is not nearly so convoluted, the same principle applies. It is foreseeable that Defendants' predicate acts would result in increased prescriptions by doctors and a subsequent increase in addiction and overdoses, but it is not foreseeable that addicted individuals would turn to illegal opioids, administer them intravenously on City property, then discard the needles in a manner that injured the City. Even if the harm is foreseeable in some sense—because, in retrospect, one can draw a line, however zig-zagged, from the final event (a needle-clogged toilet) back to the first (a pamphlet marketing opioids)—it extends beyond the Supreme Court's acceptable scope of directness. See Hemi, 559 U.S. at 10, 130 S.Ct. 983 (" 'The general tendency of the law, in regard to damages at least, is not to go beyond the first step.' ... Because the City's theory of causation requires us to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement." (quoting Holmes, 503 U.S. at 271–72, 112 S.Ct. 1311)).[27]

Because the City's RICO claim most closely resembles Hemi, the City has failed to establish a direct relationship between its injuries and Defendants' predicate acts. Such failure is fatal to the City's RICO claim.

### iii. Holmes factors.

The Holmes factors further support Defendants' argument that proximate cause does not exist. 503 U.S. at 269, 112 S.Ct. 1311.

First, Holmes establishes that when more directly injured victims can be counted on to vindicate the law, less directly injured victims cannot satisfy RICO's proximate cause requirement. 503 U.S. at 269–70, 112 S.Ct. 1311. In Oregon Laborers, the court rejected health care funds' RICO claims against tobacco manufacturers. 185 F.3d at 964. The health care funds alleged that tobacco companies fraudulently downplayed the health risks associated with smoking, which led to more smoking related diseases. Id. at 961. As a result, the health care funds incurred higher expenditures to cover their participants' medical bills. Id. at 961. The court held that "no direct link [existed] between the alleged misconduct of defendants and the alleged damage to plaintiffs" because all of the health care funds' claims relied on "alleged injuries to smokers" and "without any injury to smokers, plaintiffs would not have incurred" their injuries. Id. at 963 (emphasis included) (internal citations omitted). Further, the court determined that smokers' self-interest would motivate them to vindicate their injuries, making them the most reliable and direct victims. **660 Id. at 964. Thus, the health care funds' injuries were too remote to establish proximate cause.

Here, as in Oregon Laborers, the City's alleged injuries are not directly related to Defendants' conduct because the City would not have suffered its injuries but-for city residents' own injuries: addiction, utilizing intravenously administered drugs, and overdoses. 185 F.3d at 964. As discussed above, the City's injuries result from city residents' improper disposal of needles, which is independent of Defendants' predicate acts. The City argues that its residents are less likely to vindicate their rights because they engaged in illegal conduct that would bar their recovery. See Opp. at 68 (citing Mendoza, 301 F.3d at 1170 (concluding that undocumented workers could not be counted on to bring suit for backpay because several decisions barred their ability to recover backpay wrongfully withheld)). Not so. Illegal drug use does not bar recovery under California's tort regime. See Whittemore v. Owens Healthcare-Retail Pharmacy, Inc., 185 Cal. App. 4th 1194, 1197, 111 Cal.Rptr.3d 227 (2010) ("[T]he doctrine of unclean hands does not preclude recovery in circumstances covered by the [Drug Dealer Liability] Act because the very purpose of the Act is to permit recovery in

specified circumstances by the user and others damaged by the illegal use of drugs.") (citing Cal. Health & Safety Code §§ 11705–06); Kim v. Interdent Inc., C. 08-5565 SI, 2009 WL 3833832, at *3 (N.D. Cal. Nov. 16, 2009) (concluding that the wife of decedent who died of a Fentanyl overdose stated viable negligence and wrongful death claims, based in part on violations of the CSA, against a company that provided Fentanyl); Easley v. 3M Co., C. 07-03507, 2007 WL 3217536, at *2 (N.D. Cal. Oct. 29, 2007) (concluding that the plaintiffs' daughter's consumption of illegal drugs did not bar their negligence claim). The City's harm derives from its residents' harm, and these residents can recover for such harms under state tort law. See Holmes, 503 U.S. at 273, 112 S.Ct. 1311.

Second, difficulty "ascertain[ing] the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors" weighs against finding proximate cause. Holmes, 503 U.S. at 269, 112 S.Ct. 1311. The nature of the City's alleged injuries creates difficulties in ascertaining the damages attributable to Defendants' wrongful conduct. The City's claim would force this Court to parse out individual contributions to the City's injuries among (1) RICO Marketing Defendants, (2) RICO Supply Chain Defendants, (3) opioid-addicted residents that damage city property, (4) individuals who supplied the opioids to the addicted residents, and (5) sources who supplied residents with illegal paraphernalia. See Distr. Reply at 5. This weighs "heavily, if not dispositively, in favor of barring plaintiffs' actions." See Oregon Laborers, 185 F.3d at 965.

Third, "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." Holmes, 503 U.S. at 269, 112 S.Ct. 1311. Like the nicotine users in in Oregon Laborers, opioid users can recover under state tort law theories. 185 F.3d at 966. This raises concerns that courts will not be able to protect Defendants from duplicative recovers. See id. At the very least, courts will be forced to adopt "complicated rules apportioning damages among" a long list of plaintiffs. See Holmes, 503 U.S. at 269, 112 S.Ct. 1311. In addition to individuals claims by opioid users and their families, the State of California, hospitals, physicians, and pharmacists may also seek relief against Defendants. The difficulty of **661 apportioning damages and risk of duplicative recoveries therefore cuts against the City's claim.

Each of the Holmes factors suggest that the City's RICO claim against Defendants is too remote, which suggests a lack of proximate cause.

**iv. Summit County is Distinguishable.**

Nor does Summit County require the Court to conclude that RICO Marketing and Supply Chain Defendants caused damage to city-owned property and business.

First, Summit County's causal chain focused on RICO injuries that the MDL court defined as "costs associated with ... attempts to stop the flow of opioids into local communities." 2018 WL 6628898, at *5. That is not an injury this Court recognizes, as discussed above. The City's RICO injury here consists of costs associated with damage to city property and businesses. See FAC ¶ 882(g).

Second, based on that RICO injury, the MDL court narrowed the causal chain to three links:

i. "RICO Marketing Defendants made deceptive claims in promoting their opioids in order to sell more opioids than the legitimate medical market could support (the conduct);

ii. [T]he excess opioids marketed by the RICO Marketing Defendants and distributed by the RICO Supply Chain Defendants were then diverted into an illicit, black market;

iii. Plaintiffs were forced to expend resources beyond what they had budgeted to attempt to stop the flow of the excess opioids into local communities and to bear the costs associated with cleaning them up."

Summit Cnty., 2018 WL 6628898, at *5. But the MDL court's chain omits the city residents who (1) ingested or injected opioids and (2) subsequently damaged city-owned property and businesses. See FAC ¶ 882(g). This Court has previously rejected four-step causal chains that show such hallmarks of indirectness and that give rise to a risk of duplicative recoveries. See In re Volkswagen "Clean Diesel" Mktg., —— F.Supp.3d ——, ——, 2020 WL 3316116, at *4 (N.D.Cal. 2020) (citing Holmes, 503 U.S. at 15, 112 S.Ct. 1311).

Summit County is therefore distinguishable because the City's injuries here are more attenuated from the injury-causing conduct.

**v. Conclusion as to Proximate Causation.**

The City's causal chain as alleged in the FAC does not satisfy proximate cause under prevailing case law. See Hemi, 559 U.S. at 11, 130 S.Ct. 983; Painters, 943 F.3d at 1250–51. The City's failure to adequately allege proximate cause is fatal to its RICO claims. Thus, the Court GRANTS Defendants' Motions to Dismiss both RICO claims. The Court does so with prejudice because the City can only allege indirect injuries to its property and businesses stemming from conduct by third parties. Such injuries do not satisfy proximate cause, and therefore, any amendment would be futile. See Leadsinger, Inc., 512 F.3d at 532.

**4. Preemption**

Defendants argue that federal law preempts the City's state law claims under three theories: (1) the City's state law claims pose an obstacle to the DEA's ability to enforce the CSA and its implementing regulations; (2) Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) preempts the state law claims to the extent they are attempts to punish fraud on the FDA; and (3) the Federal Food, Drug, **\*662** and Cosmetic Act ("FDCA") conflicts with and therefore preempts any claims premised on Manufacturers' alleged false marketing. Manufacturers provide a fourth argument in support of preemption: the City premises its claims against generic manufacturers on a failure to warn theory that is preempted to the extent that it would require generic manufacturers to change their labels. See Man. Mot. at 14–15. The Court rejects all four theories.

**a. Obstacle preemption theory.**

[53] [54] Implied preemption occurs when it is impossible for a defendant to comply with both state and federal law, or when "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Freightliner Corp. v. Myrick, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) (internal citation omitted). Defendants argue that the City's state law claims conflict with and are therefore impliedly preempted by the CSA, specifically by posing an obstacle to (1) the DEA's obligation to ensure "no interference" with the lawful dispensing of prescription opioids, Def. Mot. at 29 (quoting Dispensing Controlled Substances for the Treatment

of Pain, 71 Fed. Reg. 52,716, 52,719–20 (DEA Sept. 6, 2006)), and (2) Congress's goal of fostering "the beneficial use of [opioid] medications." Def. Mot. at 25–26 (internal citations omitted); see also Def. Reply at 21–22 (quoting Gonzales v. Raich, 545 U.S. 1, 24, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005)).

When Congress enacted the CSA, it included 21 U.S.C. § 903, which states:

> No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.

This provision precludes any argument that Congress intended to preempt state laws that enforce the CSA absent a positive conflict. No such conflict exists. Defendants characterize the City's state law claims as "an absolutist theory that 'the [fewer opioids], and the sooner, the better,'" which is similar to the conflict in Geier v. American Honda Motor Co., Inc., 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). Def. Reply at 22 (quoting Geier, 529 U.S. at 874, 120 S.Ct. 1913). This not only misses the nuance of the City's claim, but also ignores the facts of Geier.

In Geier, the Court concluded that the Federal Motor Vehicle Safety standard preempted the plaintiff's defective design claim, relying on the Department of Transportation's affirmative representation that the plaintiff's tort claims conflicted with the agency's goals. 529 U.S. at 864–65, 120 S.Ct. 1913. Unlike Geier, there is no DEA policy, statement, or CSA regulation here that conflicts with the City's tort claims. Defendants attempt to equate a vague DEA policy statement to the Department of Transportation's affirmative statement in Geier. They argue that the City's claims interfere with the DEA's obligation "to ensure that there is no interference with the dispensing of controlled substances to the American public in accordance with the sound medical judgment of their physicians." Def. Mot. at 29 (quoting Dispensing Controlled Substances for the Treatment of Pain, 71 Fed. Reg. 52,716, 52,719–20). However, the cited excerpt narrowly addresses the DEA's obligation to ensure that it does not make "exaggerated statements regarding the likelihood of a DEA investigation" that result in "physicians mistakenly concluding that they must scale **\*663** back their patients' use of controlled substances to levels below

that which is medically appropriate." Dispensing Controlled Substances for the Treatment of Pain, 71 Fed. Reg. at 52,720. The statement by the DEA is distinct from the City's state law claims, which seek to hold Defendants accountable for allegedly breaching their duties to maintain effective controls and to halt suspicious orders. See Opp. at 51–53; FAC ¶¶ 225–667. Concluding that state law claims conflict with the DEA policy statement on Dispensing Controlled Substances for the Treatment of Pain would mean that state criminal actions conflict with the DEA's policy statement, which the CSA clearly welcomes. See 21 U.S.C. § 903. Thus, the DEA's policy statement is distinguishable from the policy goals in Geier.

Further, the state law claims are entirely consistent with the CSA's goals of "foster[ing] the beneficial use of those medications," and ensuring "no interference with the dispensing" of lawfully prescribed opioids. Gonzales v. Raich, 545 U.S. at 4, 125 S.Ct. 2195 (2005) (interpreting the CSA). Even if Defendants' mischaracterization of the City's position—"fewer opioids, and the sooner, the better"—was true, this does not necessarily conflict with the two aforementioned goals. If anything, that the DEA limits the sale of Schedule I and II substances each year suggests that this characterization is consistent with the CSA's and DEA's goals. See FAC ¶¶ 585–86. But the City does not argue that the "fewer opioids, the sooner, the better." Rather, they allege that Defendants have not implemented effective controls to prevent the unlawful diversion of opioids. Id. ¶ 580, 590. The City's allegation falls within the CSA's goals of "foster[ing] the beneficial use of those medications," and ensuring "no interference with the dispensing" of lawfully prescribed opioids. Gonzales, 545 U.S. at 24, 125 S.Ct. 2195 (interpreting the CSA). Thus, the CSA's provisions demonstrate that state tort actions pose no obstacle to its goals and DEA enforcement.

Defendants also rely on an undeveloped theory that the City's state claims are preempted because parallel claims can "still create[ ] a conflict" with federal law "[w]hen two separate remedies are brought to bear on the same activity ...." Def. Mot. at 30 (quoting Garner v. Teamsters, Chauffeurs & Helpers, Local Union No. 776 (A.F.L.), 346 U.S. 485, 498–99, 74 S.Ct. 161, 98 L.Ed. 228 (1953)); Def. Reply at 23. Defendants rely on the Supreme Court's decision in Garner and this Court's decision in In re Volkswagen "Clean Diesel" Marketing, 310 F. Supp. 3d 1030, 1044–45 (2018). Def. Reply at 23. However, Garner is distinguishable; the Supreme Court has applied its holding only to cases involving the NLRA

due to the unique nature of that statute. See Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters, 436 U.S. 180, 193–94, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) ("This reasoning has its greatest force when applied to state laws regulating the relations between employees, their union, and their employer. It may also apply to certain laws of general applicability which are occasionally invoked in connection with a labor dispute." (footnotes omitted)). Further, the Ninth Circuit recently reversed the portion of this Court's decision in In re Volkswagen "Clean Diesel" Marketing upon which Defendants rely. 959 F.3d 1201, 1211–25 (9th Cir. 2020). For these reasons, Defendants' enforcement preemption theory fails.

**b. Fraud on the DEA.**

[55] [56] Claims that are not based on any sort of "fraud-on-the-agency" theory,[28] *664 but that instead rely on traditional state law principles that parallel, rather than obstruct, federal duties are generally not preempted. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 495, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); see also Stengel v. Medtronic Inc., 704 F.3d 1224, 1228 (9th Cir. 2013) (en banc), cert. denied, 573 U.S. 930, 134 S.Ct. 2839, 189 L.Ed.2d 805 (2014). Defendants argue that Buckman preempts the City's claims because those claims are an attempt to police fraud committed against the DEA. Def. Mot. at 25 (citing 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001)). The MDL court persuasively considered and rejected this argument because the claims are premised on independent common law duties that parallel, and do not conflict with, the duties created under the CSA. See In re Nat'l Prescription Opiate Litig., 2019 WL 4178591, at *5, *12.

In Buckman, the plaintiffs asserted violations of state tort law against several defendants based on injuries they sustained from the manufacturer defendant's bone screws. 531 U.S. at 343, 121 S.Ct. 1012. The claims were premised on the defendant's duty to accurately represent their device to the FDA: but-for the FDA's approval of the screws, the plaintiffs would not have been injured. Id. The Court held that the plaintiffs' state law claims inevitably conflicted with the FDA's "responsibility to police fraud," because an applicant might be deterred from seeking approval of their devices if they had to comply with fifty state tort regimes and the FDA. Id. at 350, 121 S.Ct. 1012. The Court distinguished the disputed fraud-on-the-agency claims from prior decisions focusing on traditional state tort law, concluding that "[i]n the

present case ... the fraud claims exist solely by virtue of the FDCA disclosure requirements." Id. at 353, 121 S.Ct. 1012 (emphasis added) (citing Lohr, 518 U.S. at 481, 116 S.Ct. 2240). Thus, the Court held that state claims are preempted to the extent that federal requirements are the "critical element" of the state claim. Id.

Defendants mischaracterize the CSA and its implementing regulations as "critical aspect[s]" of the City's state law claims. Def. Mot. at 25. In Buckman, the Court used the words "solely" and "critical" to describe the state law claims' relationship with federal law, i.e., federal law was essential to the existence of the state law claims. 531 U.S. at 353, 121 S.Ct. 1012. That type of dependent relationship does not exist here. Plaintiffs seek to enforce state statutes that impose duties distinct from the CSA and that would exist absent the CSA.

In the Ninth Circuit, state duties with a federal parallel are not necessarily preempted. See Stengel, 704 F.3d 1224. In Stengel, the plaintiff sued Medtronic after its medical device paralyzed him, claiming that "because Medtronic failed to comply with its duty [to monitor the product and warn the FDA] under federal law, it breached its 'duty to use reasonable care' under Arizona negligence law." Id. at 1227, 1232. The court distinguished Buckman, noting that those plaintiffs' claims "were concerned exclusively with alleged fraud on the FDA," whereas in Stengel, the plaintiffs' failure to warn claim derived from Arizona law, which developed as a result of Arizona's desire to protect consumers from harms by manufacturers. Id. at 1230. The Ninth Circuit concluded that the claim existed under settled Arizona law and imposed a duty that paralleled the federal duty, and thus was not preempted by the Medical Device Amendments (MDA). Id. at 1233.

*665 Here, the facts are more analogous to Stengel than Buckman. The City's state law claims—public nuisance, unfair competition, and false advertising—are predicated on Defendants' common-law duty to "exercise reasonable care in delivering dangerous narcotic substances." FAC ¶ 580. These are traditional state law claims that exist independent of Defendants' duties under the CSA and its implementing regulations. While the City repeatedly refers to Defendants' duties under the CSA and its implementing regulations, those references do not prove that federal law is "critical" to the existence of the City's state law claim. Overlap should not be mistaken for dependence. Because the City's state law claims are premised on independent duties that overlap with

duties imposed by the CSA and its implementing regulations, Buckman does not apply.[29]

### c. Preemption of marketing-based state law claims.

Defendants' argument as to the marketing-based state law claims is twofold: (1) that the FDCA preempts such claims because they are premised on Defendants' alleged "false position that opioids were safe and effective," FAC ¶ 453, when in fact the FDA approved opioids as "safe and effective"; and (2) that the FDA approved four of the nine categories of alleged misrepresentations on the label.

[57] First, Defendants characterize the City's claims as attempts to hold Defendants liable for either (i) failing to make statements about the safety of prescription opioids beyond those approved by the FDA or (ii) promoting prescription drugs as "safe and effective" in accordance with their FDA labeling, both of which are preempted by the FDCA. Def. Mot. at 27–28 (citing Mut. Pharm. Co., Inc. v. Bartlett, 570 U.S. 472, 488, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013)). In doing so, Defendants rely on the City's assertion that Defendants expressed the "false position that opioids were safe and effective for treatment of chronic pain." Id. (quoting FAC ¶ 453).

While the City does periodically state that opioid medications are unsafe and ineffective for chronic non-cancer pain, none of those allegations are crucial to the City's state law claims. See Def. Reply at 24. The City's state law claims are premised on the following nine categories of alleged misrepresentations, none of which contradict the FDA-approved position that prescription opioids were "safe or effective":

1) The risk of addiction from chronic opioid therapy is low;

2) To the extent there is a risk of addiction, it can be easily identified and managed;

3) Signs of addictive behavior are "pseudoaddiction," requiring more opioids;

4) Opioid withdrawal can be avoided by tapering;

5) Opioid doses can be increased without limit or greater risks;

6) Long-term opioid use improves functioning;

7) Alternative forms of pain relief pose greater risks than opioids;

8) OxyContin provides twelve hours of pain relief; and

9) New formulations of certain opioids successfully deter abuse.

FAC ¶ 228; see also Opp. at 53–54. These nine categories support the City's underlying contention that Manufacturers engaged **666 in a marketing scheme to understate the risk of opioid addiction, overstate the benefits of opioid use, and "trivialize[ ] the risks of the long-term use of opioids." See FAC ¶ 8. There is no preemptive conflict between the City's state law claims and the FDCA, because federal law does not permit marketing schemes comprised of falsehoods and omissions to promote prescription drugs.[30] See 21 C.F.R. § 202.1. Thus, like in the MDL, Defendants interpret the FAC too narrowly.[31]

Second, Defendants rely on Strayhorn v. Wyeth Pharmaceuticals, Inc., 737 F.3d 378 (6th Cir. 2013), to argue that the FDCA preempts challenges to marketing and promotional materials that are consistent with FDA-approval labeling. Def. Mot. at 27. In Strayhorn, the court held that the FDCA preempts state law claims to the extent that they seek to change FDA-approved labeling. 737 F.3d at 394. The plaintiffs sought to correct misleading promotional materials—brochures, booklets, and catalogues—used to "supplement[ ] or explain[ ]" the prescription. Id. at 384, 394. However, the court determined that these materials fell into the definition of "labeling," and were therefore preempted because the FDA had approved the label. Id. at 394 (citing Kordel v. United States, 335 U.S. 345, 349–50, 69 S.Ct. 106, 93 L.Ed. 52 (1948)).

Strayhorn does not apply because the City's claims are premised on nine categories of alleged falsehoods used to promote opioids that go far beyond what was consistent with FDA-approved labels. Opp. at 53–54. Only four even arguably conflict with the approved label. See Def. Reply at 24–25. The Court discusses each below.

[58] Falsehood #3: Defendants argue that the FDA-approved label encompasses **667 Falsehood #3, which alleges that Defendants promoted "pseudoaddiction," i.e., that people who exhibited signs of addiction suffered from undertreatment of pain, not addiction, and therefore, should receive higher doses of opioids. Def. Reply at 24 (quoting

Joint Request for Judicial Notice[32] ("JRJN") (dkt. 172) Exs. 1–8 (§ 9.2)). The relevant part of the label states, "[p]reoccupation with achieving adequate pain relief can be appropriate behavior in a patient with poor pain control." Id. (quoting JRJN Exs. 1–8 (§ 9.2)) (internal quotation marks omitted). This language suggests that there are appropriate instances where a patient's attempt to obtain more opioids stems from existing pain, not an actual addiction to opioids. The City agrees that "[t]here is nothing wrong with" that language, but argues that the label does not suggest that the solution to these symptoms is to increase a patient's dosage. Mot. Trans. at 72, FAC ¶ 268. The City is correct. Defendants have not identified a part of the label that permits, let alone encourages, prescribers to increase a patient's dosage if he exhibits signs of addiction or pseudoaddiction.

[59] Falsehood #4: Defendants argue that the following excerpt of Falsehood #4 conflicts with the FDA-approved label: "Manufacturers 'falsely claimed that ... physical dependence is not the same as addiction' and that 'gradually tapering patients' doses [would] avoid the adverse effects of withdrawal.' " Def. Reply at 24 (quoting FAC ¶ 303). The label states, "[a]buse and addiction are separate and distinct from physical dependence and tolerance," JRJN Exs. 1–8 (§ 9.2), and recommends "gradually taper[ing] the dosage" when discontinuing use. See JRJN Ex. 3 (§ 5.13). But the unabridged excerpt of Falsehood #4 states, " '[Manufacturers] falsely claimed that, while patients become physically dependent on opioids, physical dependence is not the same as addiction and can be easily addressed." FAC ¶ 303 (emphasis added). The City is not alleging that physical dependence and addiction are the same thing. Rather, it is claiming that Defendants depicted "physical dependence" as something that "can be easily addressed," in contrast to addiction. Nothing in the FDA-approved label suggests that physical dependence is "easy to address." Nor does the label assert that patients can "avoid the adverse effects of withdrawal" by gradually tapering. See id. The label only recommends gradually tapering to mitigate withdrawals, but it does not pretend that patients can "avoid" withdrawals altogether if they gradually taper. See id. ¶ 305. Thus, Falsehood #4 does not conflict with the label.

Falsehood #5: Defendants mischaracterize Falsehood #5 as asserting that "[t]he City alleges Manufacturers deceptively claimed that prescribers 'could safely increase a patient's dose to achieve pain relief.' " Def. Reply at 25 (quoting FAC ¶ 307). Falsehood #5 accuses Defendants of deceptively "omit[ing] warnings of increased adverse effects that occur

*City and County of San Francisco v. Purdue Pharma L.P., 491 F.Supp.3d 610 (2020)*

RICO Bus.Disp.Guide 13,405

at higher doses" to get doctors to prescribe a stronger dose of opioids. FAC ¶¶ 305–311. **\*668** Nothing in the FAC suggests that the City disagrees with the proposition that prescribers can increase a patient's dose to achieve pain relief. See Def. Reply at 25. Rather, Falsehood #5 focuses on Defendants' alleged omission of critical information related to increasing dosages.

Falsehood #2: Defendants rely on State ex rel. Stenehjem v. Purdue Pharma L.P., No. 08-2018-cv-01300, 2019 WL 2245743, at *6 (N.D. Dist. May 10, 2019), to argue that Falsehood #2—"doctors can effectively identify and manage [the risk of addiction] by using screening tools or questionnaires"—is entirely consistent with the FDA-approved Risk Evaluation and Mitigation Strategy. Def. Reply at 25. Again, Defendants mischaracterize the City's allegations. While the FDA may have approved screening tools and questionnaires, Falsehood #2 asserts that Defendants promoted the efficacy of these tools well beyond what the FDA contemplated. See e.g., FAC ¶ 286 ("Purdue and Cephalon ... falsely reassured patients that opioid agreements between doctors and patients can 'ensure that you take the opioid as prescribed.' ").

Strayhorn and the other cases cited by Defendants are therefore largely inapplicable because the City's claims are predicated on Defendants' promotion of the use of opioids far beyond what was contemplated in the approved label.

### d. State law claims against generic manufacturer defendants.

Manufacturer Defendants rely on PLIVA, Inc. v. Mensing, 564 U.S. 604, 613, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011), to argue that the FDCA preempts the City's state law claims against Generic Manufacturers[33] to the extent the claims are premised on a duty to disclose the brand-name manufacturers' alleged misrepresentations. Man. Mot. at 2. Not so. The City's claims are not based on a duty to disclose, but on allegations that Generic Manufacturers engaged in the "fraudulent promotion of prescription opioids." Opp. at 54. Mensing does not apply because the City alleges that both generic and brand-name manufacturers participated in a massive marketing campaign based on false and misleading information to promote the use of prescription opioids. See FAC ¶¶ 8–10, 23–37. Nothing in the FAC suggests that the City's claims rest on an alleged duty to disclose

information that would correct brand-name manufacturers' false statements.[34]

### *669 5. The City states a viable public nuisance claim.

A nuisance is "[a]nything which is injurious to health ... or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ...." Cal. Civ. Code § 3479. Public nuisances "affect[ ] at the same time an entire community or neighborhood, or any considerable number of persons ...." Id.§ 3480. The City[35] alleges that Defendants' conduct created a public nuisance—the opioid epidemic— in San Francisco. FAC ¶¶ 223, 892–906. Defendants argue that the City's public nuisance claim fails for two reasons: (1) the FAC does not contain facts showing that Defendants engaged in affirmative conduct with the requisite knowledge that their conduct would create a public health epidemic; and (2) the FAC fails to allege causation. Def. Mot. at 3.[36] Additionally, Walgreens argues that the Court should dismiss the public nuisance claim because the City has not identified any dispensing duty owed by Walgreens. Wal. Mot. at 7. Defendants' arguments all fail.

### a. Dispenser duties under the CSA.[37]

 **[60]**  Public nuisance claims require the existence of a duty. Id. (citing Melton v. Boustred, 183 Cal. App. 4th 521, 542, 107 Cal.Rptr.3d 481 (2010); In re Firearm Cases, 126 Cal. App. 4th 959, 988, 24 Cal.Rptr.3d 659 (2005) ("[T]he necessary elements for proof of a cause of action for public nuisance include the existence of a duty and causation.")).[38] Walgreens argues that the CSA and its implementing regulations—21 C.F.R. §§ 1301.71(a), 1306.04(a)—do not impose a duty on dispensers like Walgreens, just on its pharmacists. Wal. Mot. at 8–9. Not so. Section 1301.71(a) imposes a duty on all registrants to provide effective controls against diversion, and section 1306.04(a) imposes on pharmacists, pharmacies, and pharmacy owners a duty not to dispense illegitimate prescriptions. Both regulations impose duties on Walgreens in its capacity as a dispenser to implement systems designed to prevent diversion, the violations of which can serve as a premise for liability under California's public nuisance law.

i. **Section 1301.71(a)**

Section 1301.71(a) states:

[61]  All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion **\*670** of controlled substances. In order to determine whether a registrant has provided effective controls against diversion, the Administrator shall use the security requirements set forth in §§ 1301.72–1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. Materials and construction which will provide a structural equivalent to the physical security controls set forth in §§ 1301.72, 1301.73 and 1301.75 may be used in lieu of the materials and construction described in those sections.

Walgreens argues that § 1301.71(a)'s duty to maintain effective controls applies only to in-store security systems. Wal. Reply (dkt. 215) at 6; 9 n. 7 (citing ChipRx L.L.C. d/b/a City Center Pharmacy, 82 Fed. Reg. 51,433-02, 2017 WL 5069230 (D.E.A. Nov. 6, 2017)). ChipRx L.L.C. d/b/a City Center Pharmacy involved, but did not limit, § 1301.71(a)'s application to in-store security requirements. 82 Fed. Reg. 51,433-02, 2017 WL 5069230 (D.E.A. Nov. 6, 2017). Further, other authority correctly assumed that § 1301.71 applies to all efforts to divert controlled substances. See e.g., Holiday CVS, L.L.C. v. Holder, 839 F. Supp. 2d 145, 151 (D.D.C.), vacated and remanded on other grounds, 493 F. App'x 108 (D.C. Cir. 2012) ("Under the DEA's regulations, registered pharmacies must 'provide effective controls and procedures to guard against theft and diversion of controlled substances.' 21 C.F.R. § 1301.71(a).... Pharmacies are therefore required to ensure that prescriptions for controlled substances are issued for a legitimate medical purpose...." (internal quotation marks omitted)). The MDL court recently homed in on § 1301.71's use of "and" when distinguishing between "theft and diversion" to conclude that "all registrants have an affirmative obligation to protect not only against diversion via theft but also other forms of diversion more broadly." In re Nat'l Prescription Opiate Litig., —— F.Supp.3d at ——, 2020 WL 4550400, at \*7 (emphasis included). This Court agrees. Section 1301.71(a) requires "all registrants," including dispensers like Walgreens, to provide effective controls to prevent against diversion.

ii. **Section 1306.04(a)**

[62]  The CSA requires "[e]very person who manufacturers or distributes any controlled substance" to register with the Attorney General, and it applies the same rule to "[e]very person who dispenses, or proposes to dispense, any controlled substance." 21 U.S.C. §§ 822(a)(1)–(2). The CSA's implementing regulation further provides:

A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

21 C.F.R. § 1306.04 (a) (emphases added). Walgreens argues unpersuasively that section 1306.04(a) does not impose an actionable duty on pharmacies, just pharmacists. Wal. Mot. at 9.

In **\*671** United States v. Appalachian Regional Healthcare, Inc., 246 F. Supp. 3d 1184 (E.D. Ky. 2017) ("Appalachian"), the district court concluded that § 1306.04(a)'s use of "person" contemplates liability for corporate entities, e.g., pharmacies, in addition to pharmacists. 246 F. Supp. 3d at 1189. The government instituted an enforcement action against Appalachian Regional Hospital (ARH) after learning that it filled fake prescriptions. Id. at 1187. ARH argued that it could not be held liable under § 1306.04(a) because the regulation only applied to individual pharmacists. Id. at 1187–88. The court noted that other provisions of the CSA defined person as "any individual, corporation, government or governmental subdivision or agency, business trust, partnership, association, or other legal entity." Id. at 1189 (quoting 21 U.S.C. § 1300.01) (internal quotation marks omitted). Further, section 1306.04(a)'s use of "practitioner" and "pharmacist," in lieu of "person," demonstrated to the court that the drafters deliberately did not limit liability solely to practitioners and pharmacists. Id. at 1190.

Walgreens argues that Appalachian is distinguishable because that case did not rely on the "corresponding responsibility" of pharmacists to fill prescriptions for legitimate medical

purposes; rather, it relied on the final sentence of § 1306.04(a), "which separately" provides that any person who fills an illegitimate prescription is subject to penalties. Wal. Reply at 9 (emphasis added). But Walgreens cites no authority to support the argument that the last sentence of § 1306.04(a) imposes some separate requirement. To the contrary, several courts treat the last sentence of § 1306.04(a) as one of three elements, which, if met, results in a violation of the regulation: (1) knowingly and intentionally prescribing a controlled substance; (2) outside the usual course of professional medical practice, and (3) for no legitimate medical purposes. See, e.g., United States v. Kohli, 847 F.3d 483, 494 (7th Cir. 2017) (citing 21 U.S.C. § 841(a); 21 C.F.R. § 1306.04(a)); Jones Total Health Care Pharmacy, LLC v. DEA, 881 F.3d 823, 831 (11th Cir. 2018). Further, Walgreens argues that the City cannot cite to any authority aside from Appalachian to support the argument that pharmacies are subject to § 1306.04(a), but it ignores the Eleventh Circuit's conclusion in Jones Total Health Care Pharmacy, 881 F.3d at 831. See Wal. Reply at 8 n.9; Jones Total Health Care Pharmacy, 881 F.3d at 830 ("The record supports the agency's determination that Jones Pharmacy unlawfully filled numerous controlled substance prescriptions that were not issued for a legitimate medical purpose. See 21 C.F.R. § 1306.04(a).").

Walgreens also argues that unlike in Appalachian, the City failed to allege that Walgreens "knowingly participated in the wrongful filling of particular unlawful prescriptions." Wal. Reply at 9–10. However, the City has alleged that, "Walgreens was keenly aware of the oversupply of prescription opioids through the extensive data and information it developed and maintained both as a distributor and a dispenser. Yet ... Walgreens continued to participate in the oversupply and profit from it." FAC ¶ 555. This allegation is sufficient to demonstrate that Walgreens "knowingly filled" prescriptions that were not for legitimate purposes, as Walgreens, a dispenser, had no other means of "participating in the oversupply" than by wrongfully filling unlawful prescriptions.

Appalachian's conclusions are further buttressed by the MDL court's recent decision, which held that pharmacies have a corporate-level obligation to "design and implement systems, policies, or procedures to identify red flag prescriptions." See In re Nat'l Prescription Opiate Litig., —— F.Supp.3d at ——, 2020 WL 4550400, at *12. The MDL court relied on pharmacies' record-keeping duties under 21 C.F.R. § 1304.22(c) to conclude that **672** dispensers must monitor their records to prevent diversion. Id. at ——, 2020 WL

4550400, at *8 ("It would undermine the entire purpose of the CSA (and defy logic) for the Act to require a pharmacy to collect the dispensing data listed in § 1304.22(c), but then allow the pharmacy to ignore this data when fulfilling its fundamental obligation to guard against diversion.").

Walgreens argues that California law "prohibits anyone except for a state-licensed pharmacist from evaluating the legitimacy of a prescription ...." Wal. Reply at 4–5 (citing Cal. Code Regs., tit. 16, § 1793.1). This argument is plainly wrong. The California Board of Pharmacy determined that both pharmacists and pharmacies have obligations "to determine the legitimate medical purpose of controlled prescriptions before dispensing, under Health and Safety Code section 1153, subdivision (a)." In the Matter of the Accusation Against Pacifica Pharmacy; Thang Tran, Precedential Decision No. 2013-01, at *1 (Aug. 9, 2013) https://www.pharmacy.ca.gov/enforcement/fy1011/ac103802.pdf. Thus, contrary to Walgreens' argument, California welcomes, if not requires,[39] pharmacies' corporate-level obligations under the CSA to "design and implement systems, policies, or procedures to identify red flag prescriptions." See In re Nat'l Prescription Opiate Litig., —— F.Supp.3d at ——, 2020 WL 4550400, at *12; see also Plain. Opp. at 22.

**b. Affirmative conduct with actual knowledge.**

"A public nuisance is an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B; see also People v. ConAgra Grocery Prod. Co., 17 Cal. App. 5th 51, 79, 227 Cal.Rptr.3d 499 (2017) ("A public nuisance cause of action is established by proof that a defendant knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right."). The Restatement lists three circumstances that qualify as "unreasonable":

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

City and County of San Francisco v. Purdue Pharma L.P., 491 F.Supp.3d 610 (2020)

RICO Bus.Disp.Guide 13,405

Restatement (Second) of Torts § 821B(2).

The parties agree that California's public nuisance law requires a showing of affirmative conduct that disturbed a public right; however, they disagree as to whether a plaintiff must also allege that the **\*673** defendant acted with "actual knowledge" of the public health hazard allegedly created. Defendants argue that the City's public nuisance claim fails because it has not alleged that (1) Defendants engaged in affirmative conduct (2) with actual knowledge of the hazards its conduct would create. Def. Mot. at 22–23. Relatedly, the parties also disagree on the extent to which California has adopted the Restatement.

i. **Actual knowledge of the nuisance-causing hazards.**

This Court need not decide whether California has incorporated an "actual knowledge" element into its public nuisance law because the City has pled facts that would satisfy the "actual knowledge" requirement. See FAC ¶¶ 7, 12, 20, 51–57, 62–70, 545–46, 557, 567, 580, 584, 592, 597, 659, 668, 681–85, 688, 751, 755, 760, 797, 807–08, 818, 877, 898, 900.

Defendants largely rely on People v. ConAgra to argue that the City has not offered any allegation that Defendants knew that their conduct would enable a public health crisis. See Def. Reply at 19; see also Distr. Mot. at 12. In ConAgra, the California Court of Appeal concluded that the defendants had affirmatively promoted their lead paint despite knowing that the paint could cause harm. 17 Cal. App. 5th at 84, 227 Cal.Rptr.3d 499. The court interpreted California's public nuisance law as containing an actual knowledge element, which requires that the defendant engage in conduct "with knowledge of the hazard that such use would create." Id. at 83, 227 Cal.Rptr.3d 499 (emphasis included) (quoting Cnty. of Santa Clara v. Atl. Richfield Co., 137 Cal. App. 4th 292, 309–10, 40 Cal.Rptr.3d 313 (2006) (internal quotation marks omitted)). The record indicated that the defendants had learned about the harms and hazards of lead exposure by the 1920s, yet still promoted its lead products. Id. at 85, 227 Cal.Rptr.3d 499. Thus, the court concluded that defendants had actual knowledge of the hazards associated with its products. Id.

 **[63]** Here, the City alleges that Defendants misleadingly promoted, distributed, and dispensed opioids, despite knowing "of the hazard that such [conduct] would create"—

the opioid epidemic. See FAC ¶¶ 23, 51, 59, 85 n.56, 124, 126, 130, 132, 135, 142, 149, 161, 163, 180, 259, 375, 434–41, 555–56, 571, 580, 582, 597–603, 631–55, 730–32, 880, 900. The City alleges that Marketing Defendants misleadingly promoted prescription opioids despite knowing that their products were being abused and diverted for unlawful purposes, which fueled the opioid epidemic. Id. ¶¶ 12, 33, 40, 45–49, 59, 69, 547, 555, 571, 580, 632, 634, 655–56, 664, 666–67. In ConAgra, the court concluded that the defendants must have known that lead posed a serious risk of harm to children because defendants received publications from congressional hearings and trade associations detailing the hazards of lead paint. 17 Cal. App. 5th at 87, 227 Cal.Rptr.3d 499. As in ConAgra, the City alleges that Defendants knew that diverted opioids were creating a public health hazard, yet continued to promote their use. FAC ¶¶ 51, 59, 259, 375, 434-41, 555–56, 571, 580, 597–603, 631–55, 730–32, 880, 900; see e.g., FAC ¶ 730 ("All of the Defendants, moreover, knew that large and suspicious quantities of opioids were being poured into communities throughout the United States, yet, despite this knowledge, they took no steps to report suspicious orders, control the supply of opioids, or otherwise prevent diversion."). These allegations are sufficient to demonstrate that the Marketing Defendants had "actual knowledge" that their promotional tactics would increase the manufacture, distribution, and prescription of opioids, thereby **\*674** creating and furthering the opioid epidemic.

 **[64]** Distributors and Walgreens both argue that the City's allegations do not plausibly suggest that Defendants possessed actual knowledge that its conduct would result in the opioid epidemic. See Distr. Mot. at 12–13 (arguing that Distributors were "fooled" just like "doctors [and] state medical boards" and did not know that opioid orthodoxy was the product of deceptive promotion); see also Wal. Mot. at 6–7 (similar). This is a red herring. The City alleges that Distributors failed to design, implement, and enforce policies and procedures necessary to identify and stop suspicious orders, despite being aware of the growing opioid epidemic, in violation of their duties under the CSA and its implementing regulations. See, e.g., FAC ¶ 33 ("Like the Marketing Defendants, the Distributor Defendants (and Walgreens, in its additional role as a dispensing defendant), were aware of a growing epidemic arising from the addiction to, and abuse of, prescription opioids they supplied."); see also id. ¶¶ 547–680, 731 (alleging that Distributors and Walgreens knowingly shipped and filled suspicious orders

City and County of San Francisco v. Purdue Pharma L.P., 491 F.Supp.3d 610 (2020)

RICO Bus.Disp.Guide 13,405

that they knew would flood markets with harmful amounts of opioids).

The City identifies specific instances in which law enforcement sanctioned Distributors for failing to maintain effective controls against diversion, which suggests that Distributors were aware that their conduct could further public health hazards. See, e.g., id. ¶¶ 576–78, 744–61. For example, the City alleges that the DEA sanctioned AmerisourceBergen's distribution center in Orlando and Cardinal's distribution center in Swedesboro for failing to maintain effective safeguards against diverted opioids. Id. ¶ 747. The DEA also sanctioned Walgreens for similar conduct. Id. ¶ 34 ("Walgreens ... paid a then-record $80 million in civil penalties to resolve multiple open investigations alleging an 'unprecedented number of record-keeping and dispensing violations" of the [CSA] .... Walgreens admitted it failed to uphold its obligations as a CSA registrant." (internal citation omitted)). These actions by the DEA strengthen the City's allegations that both Walgreens and Distributors were aware of obligations they had under the CSA and its implementing regulations to prevent diversion. Thus, the City's allegations support its theory that both Walgreens and Distributors had actual knowledge that their actions would contribute to the public health epidemic.

ii. **Affirmative conduct.**

[65] [66] "A public nuisance cause of action is not premised on a defect in a product or a failure to warn but on affirmative conduct that assisted in the creation of a hazardous condition." Santa Clara, 137 Cal. App. 4th at 309–10, 40 Cal.Rptr.3d 313. The City alleges that Defendants engaged in several forms of affirmative conduct: (1) Defendants, particularly Distributors and Walgreens, failed to implement systems designed to identify and stop suspicious orders, Opp. at 13–19; (2) Walgreens failed to provide effective controls against diversion in violation of its duties under the CSA, id. at 16, 22–31; and (3) Defendants engaged in the "illegal sale of controlled substances" by shipping, dispensing, and or failing to report suspicious orders of opioids. Id. at 19–22 (citing FAC ¶¶ 12, 33–34, 36–37, 49, 171, 555, 564–66).[40] The City has plausibly alleged that Defendants engaged **\*675** in affirmative conduct that enabled the opioid epidemic in San Francisco.

First, the City alleges that Distributors and Walgreens failed to implement systems designed to identify and stop suspicious

orders. Distributors and Walgreens rely on Santa Clara to argue that, under California law, the only form of "affirmative conduct" that can give rise to a public nuisance claim is the promotion of a product for hazardous uses, not simply distributing hazardous products. Distr. Mot. at 12; Wal. Mot. at 5–6. In Santa Clara, the California Court of Appeal concluded that manufacturers and distributors could be held liable under California's public nuisance law for intentionally promoting the use of lead paint on buildings' interiors with knowledge of the health hazards that could result. 137 Cal. App. 4th at 310, 40 Cal.Rptr.3d 313. Santa Clara sued lead paint manufacturers and distributors alleging that they created a nuisance by engaging in a pattern of deceit intended to minimize the risks of lead paint and attribute lead poisoning to other sources. Id. at 300, 40 Cal.Rptr.3d 313. The court held that the plaintiffs had established liability, not by simply alleging that defendants distributed hazardous products, but by also alleging that defendants promoted these products with knowledge of the hazards that could result. Id. at 310, 40 Cal.Rptr.3d 313.

[67] Nothing in Santa Clara suggests that promotion is the only form of "affirmative conduct" necessary to state a public nuisance claim. Affirmative conduct encompasses any action that "assist[s] in creating a system that causes" hazardous conditions. Opp. at 13 (quoting City of Modesto Redevelopment Agency v. Superior Court, 119 Cal. App. 4th 28, 40–41, 13 Cal.Rptr.3d 865 (2004)) (internal quotation marks omitted). The court in Santa Clara specifically noted that the affirmative conduct at issue was the defendants' promotion of lead paint, but the court did not limit affirmative conduct to promotional acts. See 137 Cal. App. 4th at 309–10, 40 Cal.Rptr.3d 313 ("A public nuisance cause of action is ... premised on ... affirmative conduct that assisted in the creation of a hazardous condition. Here, the alleged basis for defendants' liability ... is their affirmative promotion of lead paint ....").

Indeed, in the Ninth Circuit, the scope of actionable "affirmative conduct" under public nuisance law is much broader than corporate promotions. See Ileto v. Glock, Inc., 349 F.3d 1191 (9th Cir. 2003). In Ileto, shooting victims and their family members brought a public nuisance claim against firearm manufacturers, distributors, and dealers, alleging that they "knowingly establish[ed], suppl[ied], and maintain[ed] an over-saturated firearms market that facilitates easy access for criminal purposes, including access by persons prohibited to purchase or possess firearms under state or federal law." Id. at 1198. Specifically, the plaintiffs alleged

that the distributors "develop[ed] distribution channels that promote straw purchases and other means of distribution that facilitate[ed] access to guns by prohibited purchasers." Id. at 1215. In concluding that the plaintiffs had asserted sufficient facts to survive a motion to dismiss, the court relied on allegations that the defendant

> knew which distribution channels were providing guns to illegal purchasers and was in a position to use the information the ATF made available to it to modify its distribution practices ... that would help them identify straw purchasers and purchasers who would in turn sell to illegal purchasers ....

Id.

The City alleges that, much like the defendants in Ileto, Distributors and Walgreens distributed and sold opioids in a **\*676** manner that fueled an illegal, secondary market through their failure to implement effective controls that would effectively deter diversion. See FAC ¶ 898; see also Opp. at 14–15 (citing 21 U.S.C. § 823; 21 C.F.R. 13701.71(a); 21 C.F.R. 1301.74(b); 21 C.F.R. § 1306.04(a); Cal. Health & Safety Code § 11153.5; Cal. Bus. & Prof. Code §§ 4164(a), 4169.1, 4301(d)–(e); FAC ¶¶ 558–60, 582, 588, 893–97, 912–13); see, e.g., FAC ¶ 580 ("By flooding San Francisco with more opioids than could be used for legitimate medical purposes and by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, Defendants ... both created and failed to prevent a foreseeable risk of harm."). Like Ileto, Distributors have access to unique insights and information into the ordering activities of their dispensing customers, which places them in a position to protect against dangerous diversion. FAC ¶¶ 590–93. Yet, despite Distributors' legal obligation to implement effective controls against diversion, they allegedly distributed greater quantities of opioids than they knew could be necessary for legitimate uses. FAC ¶¶ 12, 33, 34, 40, 45–49, 59, 69, 547, 555, 571, 580, 597–99, 632, 634, 655–56, 664, 666–67.

For example, the federal government sanctioned McKesson, Cardinal, AmerisourceBergen, and Walgreens for violating their distribution and dispensing duties. FAC ¶¶ 34, 171, 658–66. McKesson admitted that it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers in violation of the CSA and the CSA's implementing regulations ... at the McKesson Distribution Centers." FAC ¶ 659. The City alleges that this conduct led to increased rates of overdose

deaths and addiction in San Francisco. FAC ¶¶ 50–57. Thus, as in Ileto, the City plausibly alleges that Distributors and Walgreens engaged in affirmative conduct that created hazardous conditions. See349 F.3d at 1215.

### c. Legal and factual causation.

[68] [69] [70] "The elements of a cause of action for public nuisance include ... causation." Melton, 183 Cal. App. 4th at 542, 107 Cal.Rptr.3d 481 (internal citations omitted). A plaintiff must establish causation in fact, which requires facts demonstrating that the defendant's conduct was a "substantial factor in bringing about the result." ConAgra, 17 Cal. App. 5th at 101, 227 Cal.Rptr.3d 499 (internal citation omitted). Additionally, a plaintiff must establish that the defendant's wrongful conduct was not "too remote from the current hazard to be its 'legal cause,' " i.e., proximate cause. Id. at 103, 227 Cal.Rptr.3d 499.

The City argues that it has satisfied both factual and legal causation because a jury could reasonably conclude that (1) Manufacturers' misleading marketing tactics substantially increased the supply of prescription opioids; (2) these increases proximately caused harm to the City; (3) each manufacturer failed to maintain effective controls against diversion; (4) Distributors and Walgreens also failed to maintain effective controls against diversion; and (5) each defendants' conduct was a "substantial factor in producing the alleged harm suffered by Plaintiffs." Opp. at 5 (quoting In re Nat'l Prescription Opiate Litig., No. 1:17-MD-2804, 2019 WL 4178617, at *2-4 (N.D. Ohio Sept. 3, 2019)) (internal quotation marks omitted). Manufacturers and Distributors argue that (1) the City has failed to plead facts demonstrating that the nuisance would not have occurred but-for Defendants' conduct, (2) nor has the City demonstrated that the alleged harms were foreseeable. See Man. **\*677** Mot. at 13; Distr. Mot. at 13–15; see also Man. Reply at 8–9; Distr. Reply at 9–10. The City has plausibly alleged both factual and legal causation.

### i. Factual causation.

The factual "causation element of a public nuisance cause of action is satisfied if the conduct of a defendant is a substantial factor in bringing about the result." ConAgra, 17 Cal. App. 5th at 101, 227 Cal.Rptr.3d 499 (citing Citizens for Odor Nuisance Abatement v. City of San Diego, 8 Cal. App. 5th

350, 359, 213 Cal.Rptr.3d 538 (2017)). However, the parties disagree over the scope of the "substantial factor" element. Compare Opp. at 32 ("Thus, even 'a very minor force that does cause harm is a substantial factor.' " (quoting Bockrath v. Aldrich Chem. Co., 21 Cal. 4th 71, 72, 86 Cal.Rptr.2d 846, 980 P.2d 398 (1999))) with Man. Reply at 8 ("[T]o be a substantial factor in causing an injury, a defendant's act must be either a necessary or 'sufficient' cause of that injury." (citing Viner v. Sweet, 30 Cal. 4th 1232, 1240, 135 Cal.Rptr.2d 629, 70 P.3d 1046 (2003))).

[71] [72] The substantial factor standard is broad, "requiring only that the contribution of the individual cause be more than negligible or theoretical." Rutherford v. Owens-Illinois, Inc., 16 Cal. 4th 953, 978, 67 Cal.Rptr.2d 16, 941 P.2d 1203 (1997), as modified on denial of reh'g (Oct. 22, 1997). Manufacturers argue that the California Supreme Court's decision in Rutherford "makes clear that conduct is not a 'substantial factor' if the harm still would have occurred in the absence of defendants' conduct." Man. Reply at 8 (citing Rutherford, 16 Cal. 4th at 968–69, 67 Cal.Rptr.2d 16, 941 P.2d 1203). But Manufacturers ignore the court's additional conclusion that the substantial factor standard subsumes "but for" causation to also address situations "involving independent or concurrent causes in fact." Rutherford, 16 Cal. 4th at 969, 67 Cal.Rptr.2d 16, 941 P.2d 1203 ("[T]he substantial factor standard [was] formulated to aid plaintiffs as a broader rule of causality than the 'but for' test ...."). If a defendant's conduct operated concurrently with other forces to produce the harm, it is a substantial factor, so long as "the injury, or its full extent, would not have occurred but for that conduct." In re Ethan C., 54 Cal. 4th 610, 640, 143 Cal.Rptr.3d 565, 279 P.3d 1052 (2012). The California Supreme Court has reaffirmed this interpretation of the substantial factor standard. See,e.g., Viner, 30 Cal. 4th at 1240, 135 Cal.Rptr.2d 629, 70 P.3d 1046 ("[I]f 'two forces are actively operating ... and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.' " (quoting Restatement Second of Torts § 432)). Thus, the City must demonstrate that Manufacturers' and Distributors' conduct was necessary in bringing about the full extent of the City's injuries.

[73] Manufacturers. The FAC contains allegations against Manufacturers that satisfy the substantial factor standard. The City alleges that "[d]rug manufacturers' deceptive marketing and sale of opioids ... is one of the main drivers of the opioid epidemic." FAC ¶ 23. Manufacturers' decades-

long marketing strategies allegedly "changed prescribers' willingness to prescribe opioids, led them to prescribe more of their opioids, and persuaded them not to stop prescribing opioids ...." Id. ¶¶ 541–44. This alleged marketing strategy entailed "infiltrating professional medical societies and crafting and influencing industry guidelines" to disseminate "[f]alse messages about the safety, addictiveness and efficacy" of opioids. Id. ¶ 28. The FAC even cites conspiracies to "bribe practitioners to prescribe" certain opioids. Id. ¶ 537. As a result, the City alleges that Manufacturers' *678 marketing strategies "caused prescribing ... opioids as a class, to skyrocket." Id. ¶ 550. The City further alleges that "[a]s a direct and foreseeable result" of Defendants' conduct, San Francisco experienced "skyrocketing addiction, overdose and death; black markets for diverted prescription opioids; and a concomitant rise in heroin and fentanyl abuse by individuals who can no longer legally acquire or simply cannot afford prescription opioids." Id. ¶ 14. Contrary to Manufacturers' argument, the City has plausibly alleged that the full extent of its harm would not have occurred absent Manufacturers' conduct.

[74] Distributors. Similarly, the FAC contains allegations against Distributors that satisfy the substantial factor standard. The City alleges that Distributors "failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt distribution and dispensing of suspicious orders, thereby contributing to the oversupply of such drugs and fueling an illegal secondary market." Id. ¶ 7. Further, the opioid crisis was allegedly fueled "by those involved in the supply chain of opioids, including manufacturers, distributors, and pharmacies, who ... actively sought to evade such controls." Id. ¶ 12. These failures allegedly "fueled the flood of pills into and significantly contributed to rising addiction and overdose rates in San Francisco." Id. ¶ 33 (emphasis added). For example, the FAC alleges that in San Francisco between 2006 and 2017 prescription opioids caused more overdose deaths than heroin. Id. ¶ 66 (internal citation omitted). The City has plausibly alleged that its injuries stemming from the oversupply of opioids would not have occurred absent Distributors' failure to halt distribution of suspicious orders. SeeIn re Ethan C., 54 Cal. 4th at 640, 143 Cal.Rptr.3d 565, 279 P.3d 1052. Thus, the City has satisfied factual causation at this stage in the litigation.[41]

ii. **Proximate cause.**

 **[75]**  **[76]**  **[77]** Manufacturers and Distributors argue that the City's public nuisance **\*679** allegations are insufficient to establish proximate cause. See Distr. Mot. at 14; Man. Mot. at 13. Proximate cause "is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct." Ferguson v. Lieff, Cabraser, Heimann & Bernstein, 30 Cal. 4th 1037, 1045, 135 Cal.Rptr.2d 46, 69 P.3d 965 (2003) (quoting Mosley v. Arden Farms Co., 26 Cal. 2d 213, 221, 157 P.2d 372 (1945) (Traynor, J. concurring)) (internal quotation marks omitted). Unlike RICO, courts place great emphasis on "foreseeability of harm" in determining whether a public nuisance claim sufficiently alleges proximate cause. Compare Novak v. Cont'l Tire N. Am., 22 Cal. App. 5th 189, 196, 231 Cal.Rptr.3d 324 (2018), reh'g denied (Apr. 5, 2018) ("One policy consideration subsumed within the broad concept of proximate cause is the extent to which a defendant should be held liable for unforeseeable consequences." (citing Prosser & Keeton, Torts (5th Ed. 1984) § 42, p. 279)); Pac. Shores Properties, LLC v. City of Newport Beach, 730 F.3d 1142, 1168 (9th Cir. 2013) (citing BCS Servs., Inc. v. Heartwood 88, LLC, 637 F.3d 750, 758 (7th Cir. 2011)); with Couch, 379 Fed. Appx. at 565 ("Hemi Group[, LLC v. City of New York, N.Y., 559 U.S. 1, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010)] definitely foreclosed RICO liability for consequences that are only foreseeable without some direct relationship." (internal citation omitted)). While a RICO claim cannot satisfy proximate cause absent a direct relationship between the conduct and injury, a public nuisance claim satisfies proximate cause if the defendant's conduct is likely to cause a significant invasion of a public right. See In re Firearm Cases, 126 Cal. App. 4th at 988, 24 Cal.Rptr.3d 659. As determined above, Defendants' misrepresentations and oversupply of opioids did not foreseeably cause the City's injuries stemming from drug users discarding needles. See supra Subpart II.E.3.b.v. However, at this stage in the litigation, the City has satisfied the proximate cause requirement with respect to some injuries because it has plausibly alleged that Defendants could reasonably foresee (1) that their conduct would likely increase addiction, overdoses, and deaths related to the abuse of prescription opioids, see FAC ¶ 19, 52–71, and (2) each link in the causal chain, such that no intervening acts sever that chain.

 **[78]** Manufacturers. Manufacturers argue that the City fails to plead a causal connection between Defendants' conduct and the City's alleged harm, largely because the City's harm "is just as plausibly the result of a myriad intervening acts —including the decision-making of prescribers, patients,

distributors, pharmacies, and third-party criminals ...." Man. Mot. at 13 (citing In re Firearm Cases, 126 Cal. App. 4th at 973, 24 Cal.Rptr.3d 659; Martinez v. Pac. Bell, 225 Cal. App. 3d 1557, 1566, 275 Cal.Rptr. 878 (1990)). Manufacturers principally rely on In re Firearm Cases, 126 Cal. App. 4th at 959, 24 Cal.Rptr.3d 659, and Martinez, 225 Cal. App. 3d at 1566, 275 Cal.Rptr. 878. However, this argument fails in the context of the public nuisance claim because Manufacturers could reasonably foresee the intervening acts of third parties. Manufacturers' conduct— fraudulent marketing and oversupply of opioids—violated laws aimed at preventing the very harms—increased third-party addiction, overdoses, and deaths—that these laws were designed to prevent.

Public nuisance cases involving no underlying legal violation are therefore inapposite. For example, in In re Firearm Cases, the court rejected several California cities' and counties' public nuisance claims against gun manufacturers, distributors, and retailers because there was no **\*680** "causal connection" between the defendants' lawful manufacture and distribution of firearms and firearm-related crimes. 126 Cal. App. 4th at 989, 24 Cal.Rptr.3d 659. The court concluded that California's public nuisance law requires more than allegations of "risky" behavior; instead, a plaintiff must allege that the "defendant['s] acts are likely to cause" harm. Id. at 988, 24 Cal.Rptr.3d 659 (emphasis added). The plaintiffs alleged that the defendants' marketing, distribution, promotion, and design of firearms facilitated the use of firearms to commit crime, which caused a public nuisance. Id. at 968, 24 Cal.Rptr.3d 659. But the plaintiffs did not seek to hold the manufacturers or distributors liable for any "wrongful or illegal" actions; rather, the plaintiffs sought to hold them liable for "failing to take proactive steps to control" a small number of high-risk retailers. Id. at 972, 24 Cal.Rptr.3d 659. The court relied on defendants having abided by federal law and guidelines to conclude that "there [was] no causal connection between any conduct of the defendants and any incident of illegal acquisition of firearms or criminal acts or accidental injury by a firearm." Id. at 989, 24 Cal.Rptr.3d 659. In part because defendants' conduct did not violate any law, the court concluded that the evidence was not strong enough to establish a causal connection between the defendants' conduct and plaintiffs' alleged harm. See id. at 988, 24 Cal.Rptr.3d 659.[42]

In re Firearm Cases is distinguishable and, if anything, supports the City's public nuisance claim. Unlike the plaintiffs in In re Firearm Cases, the City alleges that Manufacturers

unlawfully marketed prescription opioids and violated their duties to maintain effective controls against diversion. See FAC ¶¶ 224, 582. These violations allegedly resulted in increased opioid addiction, abuse, overdose death, and diversion. Seeid. ¶¶ 686–96. The very existence of the duties to maintain effective controls supports the notion that opioid misuse is foreseeable. "A lack of reasonable care in the handling, distribution, and administration of controlled substances can foreseeably harm the individuals who take them. That's why they're 'controlled' in the first place—overuse or misuse can lead to addictions and long-term health problems." Dent v. National Football League, 902 F.3d 1109, 1119 (9th Cir. 2018) (citing the CSA).

[79] Manufacturers dispute that their conduct could foreseeably cause the full extent of the City's harm—including " 'San Franciscans ... shooting up on the street,' 'specialized mail screening equipment ... to detect fentanyl being sent into the jails,' and 'increased heroin, fentanyl, and methamphetamine use,' "—because independent and intervening acts of third parties break the causal chain. Man. Reply at 8–9 (quoting FAC ¶¶ 56–60) (citing Martinez, 225 Cal. App. 3d at 1565, 275 Cal.Rptr. 878). This argument fails.

Martinez addressed another scenario in which a plaintiff's public nuisance theory rested on no underlying violation of the law. The court dismissed the plaintiff's public nuisance claim against a telephone company for maintaining a public telephone booth that was primarily used to facilitate crime. *681 225 Cal. App. 3d at 1559, 275 Cal.Rptr. 878. The court held that nuisance liability extends to harm that is proximately caused by the defendant's conduct, but "not to damage suffered as a proximate result of the independent intervening acts of others." Id. at 1565, 275 Cal.Rptr. 878. The plaintiff in Martinez was assaulted three times over a two-year period, allegedly stemming from drug dealers using and loitering near the defendant's telephone booth. Id. at 1561, 275 Cal.Rptr. 878. The court noted that the plaintiff sought to impose vicarious liability on the defendant for a separate and intervening act—the battery—rather than liability for any direct harm from the telephone booth. Id. at 1566, 275 Cal.Rptr. 878. The court analogized the dispute to Gonzalez v. Derrington, 56 Cal. 2d 130, 133–34, 14 Cal.Rptr. 1, 363 P.2d 1 (1961), in which the California Supreme Court held that a gas station's unrelated violation of a local ordinance designed to prevent accidental gasoline fires could not make it "more likely" or "foreseeable" that the gasoline would be used to intentionally injure others. Martinez, 225 Cal. App. 3d at 1566–67, 275 Cal.Rptr. 878.

Just as violating a statute designed to prevent accidental fires does not make it foreseeable that a third-party would commit arson, maintaining a telephone booth that is used to facilitate drug crimes did not make it foreseeable that a third-party would assault the plaintiff. Seeid. Thus, the court concluded that the defendant could not be held vicariously liable for intentional torts committed by third parties, despite the tangential connection to a public telephone. Id. at 1559, 275 Cal.Rptr. 878.

[80] Unlike the battery in Martinez, here the intervening acts —including decisions by prescribers, patients, distributors, pharmacies, and third-party criminals—are reasonably foreseeable, and thus not superseding acts. "The general test of whether an independent intervening act, which operates to produce an injury, breaks the chain of causation is the foreseeability of the act." Schrimscher v. Bryson, 58 Cal. App. 3d 660, 664, 130 Cal.Rptr. 125 (1976) (citing Custodio v. Bauer, 251 Cal. App. 2d 303, 59 Cal.Rptr. 463 (1967)). "An act is not foreseeable and thus a superseding cause of the injury 'if the independent intervening act is highly unusual or extraordinary, not reasonably likely to happen ....' " Id. (quoting Witkin Summary of California Law (8th ed) Torts, § 628). In Martinez, the battery constituted a "highly unusual or extraordinary [intervening event], not reasonably likely to happen," because lawfully maintaining a telephone booth is unrelated to and could not foreseeably result in a battery. See225 Cal. App. 3d at 1566, 275 Cal.Rptr. 878. Unlike Martinez, Manufacturers allegedly knew that (1) opioids were highly addictive and subject to abuse; (2) they were "influencing prescribers and increasing prescriptions"; and (3) orders were vulnerable to diversion. See FAC ¶¶ 33, 224, 538–44, 549, 558, 579–96, 654, 675, 686–96, 760.

[81] Yet, Manufacturers argue that harms such as "increased heroin, fentanyl, and methamphetamine use" are "far too attenuated."[43] Man. Reply at 9. This ignores the nature of opioid addiction. The opioid industry is heavily regulated because *682 it is not unforeseeable or "far too attenuated" that opioid-addicted individuals would resort to illicit forms of opioids, such as heroin or fentanyl. See, e.g., Dent, 902 F.3d at 1119 ("That's why they're 'controlled' in the first place ....") (citing the CSA); Direct Sales Co. v. United States, 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943) ("The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, arise[s] from the latter['s] inherent capacity for harm and from the very fact that they are restricted ...."). In Martinez,

the telephone booth lacked a "tangential connection" to the plaintiff's battery theory, but here, opioid addiction, abuse, and diversion provide a much stronger causal connection that could foreseeably result in harms such as increased fentanyl, heroin, and methamphetamine abuse. See 225 Cal. App. 3d at 1559, 275 Cal.Rptr. 878. And in Gonzalez, the gas station violated an ordinance designed to prevent accidental fires rather than intentional injury, but here, opioid regulations are intended to prevent the precise harms that comprise the City's injuries. See 56 Cal. 2d 130, 133–34, 14 Cal.Rptr. 1, 363 P.2d 1 (1961).

In sum, for the reasons discussed supra Subpart II.E.3.b.v., the City's injuries stemming from the improper disposal of needles are not a foreseeable result of Defendants' conduct. But the City has sufficiently pled proximate causation because its alleged harms—costs associated with addressing increased rates of opioid use, addiction, and overdoses, but not needle clean-up—are the foreseeable result of Manufacturers' conduct.[44]

 **[82]**  Distributors. Like Manufacturers, Distributors rely on In re Firearm Cases to argue that the City fails to plead a causal connection between Distributors' conduct and any incident of illegal diversion. Distr. Mot. at 13–14 (citing In re Firearm Cases, 126 Cal. App. 4th at 959, 24 Cal.Rptr.3d 659); see also Distr. Reply at 9. But as stated above, In re Firearm Cases is distinguishable because those distributors lawfully distributed handguns. 126 Cal. App. 4th at 991–92, 24 Cal.Rptr.3d 659. Distributors' argument fails for the same reason as Manufacturers': Distributors, like the rest of the Defendants, had a duty to "maintain effective controls against diversion by identifying, reporting, and stopping shipment of suspicious orders until such suspicions were resolved," see FAC ¶¶ 579–96, and their alleged failure to do so led to diversion and the public health and community harms. See Opp. at 37; FAC ¶¶ 656–96, 887–900.

 **[83]**  The City alleges that Distributors flooded San Francisco with massive amounts of opioids and failed to prevent the diversion of opioid orders bound for San Francisco. FAC ¶¶ 656, 667. While the City does not cite to a specific example of diversion that occurred in San Francisco,  ***683** it does cite enforcement actions that various agencies took against Distributors' nationwide failure to report suspicious orders of controlled substances, which frequently resulted in diversion. See FAC ¶¶ 571 n.206, 644–46, 652, 656–86. Based on the City's allegations and these widespread failures, it is reasonable to infer that Defendants' conduct also

occurred in San Francisco. Further, just as Manufacturers' alleged false promotion could foreseeably result in increased opioid addiction, abuse, and overdoses, Distributors' alleged failure to maintain effective controls against diversion could foreseeably result in the same harms. See, e.g., Dent, 902 F.3d at 1119 ("That's why they're 'controlled' in the first place ....").

 **[84]**  Next, Distributors argue that their shipments "cannot be the legal cause of increased addiction and overdoses in the City" because, according to the FAC, Manufacturers' marketing campaign "created the new standard of care" causing an increase in prescriptions that Distributors had "no ability (and no duty) to second-guess." Distr. Mot. at 15; Distr. Reply at 9–10. Distributors also argue that their conduct cannot be considered "independent and concurring" causes of the City's injury because a concurrent cause "must be 'operative at the moment of injury,' " Distr. Reply at 10 (quoting West's Comm., Cal. Civil Jury Instructions 3.77), and an independent cause must not be causally related to other tortious acts. Id. (citing State Farm Mut. Auto. Ins. Co. v. Partridge, 10 Cal. 3d 94, 103–04, 109 Cal.Rptr. 811, 514 P.2d 123 (1973)). Distributors are incorrect on both fronts.

First, Manufacturers' alleged false marketing and Defendants' alleged failure to maintain effective controls to prevent diversion are both independent causes of the City's harm. Distributors rely on Partridge to argue that Manufacturers' false marketing and Distributors' failure to maintain effective controls are causally related, and thus, cannot be considered "independent" for the purpose of proximate causation. See id. But in Partridge, the California Supreme Court held that the insured's modification to his gun and his negligent driving were independent causes that resulted in a victim's injuries. 10 Cal. 3d at 104 n.10, 109 Cal.Rptr. 811, 514 P.2d 123 ("[B]oth causes were independent of each other: the filing of the [gun's] trigger did not 'cause' the careless driving, nor vice versa. Both, however, caused the injury."). As in Partridge, here the City has not alleged that Manufacturers' false marketing caused the Distributors' failure to maintain effective controls, nor vice versa. Rather, both parties' conduct allegedly caused the City's injuries. See id.

Second, Distributors rely on California Civil Jury Instruction 3.77 to argue that Manufacturers and Distributors' conduct cannot be concurrent because Distributors' conduct was not "operative at the moment of injury." Distr. Reply at 10 (quoting West's Comm., Cal. Civil Jury Instructions

3.77). "We agree with the People that ['operative' and 'substantial factor'] have no special meaning ... beyond the common meaning of the terms themselves." People v. Jennings, 50 Cal. 4th 616, 670, 114 Cal.Rptr.3d 133, 237 P.3d 474 (2010) (internal citations omitted). "Operative" means "characterized by operating or working; being in operation or force; (also) exerting force or influence, or active in producing or having the power to produce effects; productive of something." Oxford English Dictionary (3rd ed., 2004). Distributors' role in the supply chain may end after it delivers prescriptions to pharmacies, but this does not mean that its causal conduct in the transaction ceases to be "operative." Because Distributors' alleged failure to stop suspicious orders remains "active in **684 producing" the City's injury, their conduct falls within the definition of "operative." See California Civil Jury Instruction 3.77.

The City has successfully pled proximate causation, and as a result, Defendants' motion to dismiss the City's public nuisance claim is DENIED.

## 6. Unfair Competition Law and False Advertising Law claims.

 [85]  The City asserts UCL claims against all Defendants except Walgreens, FAC ¶¶ 911–12, and a FAL claim against Manufacturers. Id. ¶ 923. California's UCL is a broad remedial statute that prohibits "unfair competition," which it defines as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising ...." Cal. Bus. & Prof. Code § 17200. On a motion to dismiss, the plaintiff must allege that the alleged conduct is either "(1) proscribed by law, (2) unfair, meaning the harm to the victim outweighs any benefit, or (3) fraudulent, meaning it is likely to deceive members of the public." Quattrocchi v. Allstate Indemnity Co., No. 2:17-cv-01578-JAM-EFB, 2018 WL 347779, at *2 (E.D. Cal. Jan. 9, 2018) (citing Lippitt v. Raymond James Fin. Servs., Inc., 340 F.3d 1033 (9th Cir. 2003)). Each of these prongs provides for a " 'separate and distinct theory of liability' and an independent basis for relief." Cappello v. Walmart Inc., 394 F. Supp. 3d 1015, 1018 (N.D. Cal. 2019) (internal citation omitted).

The City alleges two theories of UCL liability, the second of which overlaps with its FAL claim. FAC ¶ 911, 912. First, the City asserts a claim under each prong of the UCL based on its allegation that Defendants "engaged in fraudulent and unfair practices by failing to design and operate a system

to monitor suspicious orders of controlled substances, and failed to disclose such suspicious orders" in violation of 21 C.F.R. 1301.74(b) and Cal. Bus. & Prof. Code §§ 4301 and 4164. FAC ¶ 912. Second, the City alleges that Manufacturers "circulated false and misleading information concerning, among other things, the safety and efficacy of ... opioids ... and falsely and misleadingly downplayed or omitted the risk of addiction arising from their use," which triggers liability under both the FAL and each prong of the UCL. FAC ¶¶ 911, 923.

Defendants argue that: (1) the unlawful prong fails because the City fails to allege an unlawful act or practice; (2) the fraudulent prong lacks sufficient particularity under Rule 9(b) and none of Defendants' alleged statements would deceive the public; and (3) the unfair prong lacks a cognizable harm to consumers and does not consider Defendants' justification for manufacturing and distributing opioids. Def. Mot. at 16, 17, 21–22.

Manufacturers argue separately that the Court should dismiss the City's FAL and UCL claims against Manufacturers because: (1) California's safe harbor doctrine forecloses both the UCL and FAL claims, Man. Mot. at 6; (2) the statements could not mislead reasonable consumers, Man. Mot. at 7; and (3) third-party statements are not attributable to Manufacturers. Man. Mot. at 10.

Finally, Distributors argue separately that the City is not entitled to restitution from Distributors. Distr. Mot. at 15.

Defendants' arguments are almost all unavailing.

### a. UCL unlawful prong.

"By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). Four **685 alleged predicate violations serve as bases for the City's claims under the unlawful prong: (1) all Defendants violated their obligations under 21 C.F.R. §§ 1301.71 and 1301.74 of the CSA and Cal. Bus. & Prof. Code § 4169.1 to identify, report, and halt, suspicious orders, in addition to their obligation to provide effective controls against diversion; (2) all Defendants violated RICO[45]; (3) Manufacturers violated

Case 3:17-cv-01362 Document 1290-6 Filed 04/26/21 Page 84 of 96 PageID #: 43335
City and County of San Francisco v. Purdue Pharma L.P., 491 F.Supp.3d 610 (2020)
RICO Bus.Disp.Guide 13,405

the FAL, and (4) Manufacturers violated the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.

i. **Violations of 21 C.F.R. §§ 1301.71 and 1301.74.**

[86] Section 1301.74(b) of Title 21 of the Code of Federal Regulations imposes a duty on registrants to "(1) design and operate a system to disclose to the registrant suspicious orders; and (2) inform the DEA of suspicious orders when discovered by the registrants," and section 1301.71(a) requires registrants to "provide effective controls and procedures to guard against theft and diversion of controlled substances." In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7 (internal citation omitted); see supra Subpart II.A.1. Section 4169.1 of the California Business and Professions Code adopts section 1301.74 by requiring wholesalers, including Defendants, to report suspicious orders to California's Board of Pharmacy. Defendants argue that none of these provisions can serve as a basis for the City's UCL claim. Def. Mot. at 17–21. Defendants primarily argue that these provisions constitute "regulatory guidelines and requirements that do not define unlawful acts ... [and thus,] cannot [be the] predicate [of] a cause of action under the UCL." Id. at 19 (quoting Samura v. Kaiser Found. Health Plan, Inc., 17 Cal. App. 4th 1284, 1301, 22 Cal.Rptr.2d 20 (1993) (internal quotation marks omitted)). Defendants also argue that the City cannot assert an unlawful prong claim under Cal. Bus. & Prof. Code § 4169.1 because the FAC lacks any well-pled allegations that Defendants failed to report suspicious orders after section 4169.1's effective date in 2018. Def. Mot. at 19 n.19.

But the MDL court held, and this Court agrees, that 21 C.F.R. §§ 1301.71 and 1301.74 do impose legal duties on manufacturers and distributors. In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7; see supra Subpart II.A.1. While the MDL court opted not to determine the "scope of possible liability for breach of those duties," In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7, California's UCL permits the City to use the CSA's regulations as predicate violations that trigger liability. See Samura, 17 Cal. App. 4th at 1302, 22 Cal.Rptr.2d 20.

In Samura, the plaintiff sought to hold Kaiser Foundation Health Plan, Inc. liable for violating the Knox-Keene Act and its implementing regulations. Id. at 1301, 22 Cal.Rptr.2d 20. According to the court, the Knox-Keene Act and its

implementing regulations did "not define unlawful acts that may be enjoined under [the UCL]." Id. at 1301, 22 Cal.Rptr.2d 20. The plaintiff's UCL claim could not proceed because the subject regulations pertained to the exercise of the Department of Corporation's regulatory power, not a matter of substantive law. Id. at 1302, 22 Cal.Rptr.2d 20. Thus, the court held that a UCL claim requires unlawful acts to be the "predicate [of] a cause of action under [the UCL]." Id.

Unlike Samura, here the MDL court explicitly rejected Defendants' arguments ***686** that these regulations simply amount to "procedures relating to the registration of manufacturers and wholesale distributors." Def. Mot. at 17; see also In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7, *9 ("[B]ut the CSA also sets out, as a matter of law, duties that registrants must shoulder in order that adequate controls are maintained over controlled substances."). Rather, the MDL court determined, and this Court agrees, that violations of 21 C.F.R. §§ 1301.71, 1301.74 constitute a breach of legal duties. See In re Nat'l Prescription Opiate Litig., 2019 WL 3917575, at *7, *9. Thus, the City may use violations of §§ 1301.71, 1301.74 as predicate acts to assert a UCL claim under the unlawful prong. See Samura, 17 Cal. App. 4th at 1302, 22 Cal.Rptr.2d 20.

[87] Defendants are correct, though, in arguing that the City's unlawful claim fails to the extent that it relies on Cal. Bus. & Prof. Code § 4169.1, because the FAC lacks any well-pled allegations that Defendants failed to report suspicious orders after section 4169.1's effective date in 2018. See Def. Mot. at 19 n.19. The City has not identified any failures by Defendants since 2018. The vast majority of the City's allegations regarding 2018 pertain to overdose statistics and budgetary considerations. See FAC ¶ 19, 58, 65, 67, 69, 692, 693. Thus, while the City cannot rely on Cal. Bus. & Prof. Code § 4169.1 for its UCL claim, it may amend the FAC to add allegations supporting its UCL claim premised on violations of section 4169.1.

ii. **Violations of the CLRA.**

[88] The City alleges that Manufacturers' violations of the CLRA constitute predicate acts that give rise to an action under the UCL's unlawful prong. Opp. at 43. To maintain a CLRA action, plaintiffs must plead facts demonstrating that (1) the defendant committed an unlawful practice and (2) the consumer suffered harm as a result. Meyer v. Sprint Spectrum L.P., 45 Cal. 4th 634, 641, 88 Cal.Rptr.3d 859,

City and County of San Francisco v. Purdue Pharma L.P., 491 F.Supp.3d 610 (2020)

RICO Bus.Disp.Guide 13,405

200 P.3d 295 (2009). The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices ... intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). These prohibited methods include falsely misrepresenting a product's characteristics, uses, or benefits, id. § 1770(a)(5), and disparaging another product using false or misleading representations of fact. Id. § 1770(a)(8).

[89] [90] The City alleges that Manufacturers violated § 1770(a)(5) by disseminating false and misleading information pertaining to opioids' efficacy and associated risk of addiction. FAC ¶¶ 336–45. The City also alleges that Defendants violated § 1770(a)(8) by making false misrepresentations about other medications, including nonsteroidal anti-inflammatory drugs ("NSAIDS").[46] Id. Manufacturers' conduct allegedly cost the City millions of dollars to combat the huge spike in opioid abuse and overdoses. Id. ¶¶ 51, 55, 57–58. Manufacturers argue that these allegations suffer from two flaws: (1) California's safe harbor doctrine bars the City's claim based on § 1770(a)(5), Man. Mot. at 11–12; and (2) the FAC fails to allege any disparaging statements to a specific competitor's product that would trigger liability under § 1770(a)(8). Id. at 12.[47] Both arguments fail.

**\*687** [91] [92] First, Manufacturers cannot rely on California's safe harbor doctrine because the City's claim rests on a series of alleged falsehoods that are not permitted by law, and thus not protected by the safe harbor. See Opp. at 43. California's safe-harbor doctrine forecloses claims—including UCL, FAL, and CLRA claims—"if some other provision bars [the claim]." Cel-Tech, 20 Cal. 4th at 184, 83 Cal.Rptr.2d 548, 973 P.2d 527. Manufacturers mischaracterize the City's allegations as "claims regarding a drug's FDA-approved labeling ... [and] advertisements and promotions that 'generally comport' therewith." Man. Mot. at 6 (quoting Prohias v. Pfizer, Inc., 490 F. Supp. 2d 1228, 1235 (S.D. Fla. 2007)). However, the City argues that Defendants made nine misrepresentations that went far beyond the FDA-approved label. Opp. at 43–44 (citing FAC ¶ 228); see supra Subpart II.E.4.c (concluding that the nine categories of misrepresentations were not approved by the FDA). These misrepresentations preclude Manufacturers' use of the safe harbor.

[93] Second, Manufacturers rely on Hartford Cas. Ins. Co. v. Swift Distrib., Inc., to argue that disparagement under section 1770(a)(8) of the California Civil Code requires the

City to, at least, clearly implicate a false or misleading statement that refers to and demeans a specific competitor's product. Man. Mot. at 12 (citing 59 Cal. 4th 277, 284, 172 Cal.Rptr.3d 653, 326 P.3d 253 (2014) ["Hartford"]). But Hartford is distinguishable because in that case, the California Supreme Court dealt with a disparagement claim stemming from an insurance policy, not the CLRA. 59 Cal. 4th at 284, 172 Cal.Rptr.3d 653, 326 P.3d 253. California courts have indicated that the CLRA only requires a party to have made disparaging statements about competing products generally, rather than about specific products. See Shaeffer v. Califia Farms, LLC, 44 Cal. App. 5th 1125, 1139, 258 Cal.Rptr.3d 270 (2020). The City sufficiently alleges that Manufacturers disparaged all NSAIDs and relies on particularized facts to support its allegations. FAC ¶¶ 336, 338–39, 343–45, 911. For example, Purdue, Cephalon, Janssen, and Endo each allegedly sponsored separate materials that attributed false risks to NSAIDs. FAC ¶¶ 336, 338–39, 343–45 (identifying the title and sponsors of materials that falsely attributed risks to NSAIDs). Thus, the City has satisfied the requirements of Cal. Civ. § 1770(a)(8).

### iii. **FAL claim against Manufacturers.**

[94] [95] The City alleges that Manufacturers' violations of California's FAL constitute both an independent basis for finding liability and a predicate act that gives rise to an action under the UCL's unlawful prong. Opp. at 43. California's FAL prohibits any "unfair, deceptive, untrue or misleading advertising." Moore v. Mars Petcare US, Inc., 966 F.3d 1007, 1016 (9th Cir. 2020) (quoting **\*688** Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008)) (internal quotation marks omitted). The FAL extends to false advertising and "advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." Kasky v. Nike, Inc., 27 Cal. 4th 939, 951, 119 Cal.Rptr.2d 296, 45 P.3d 243 (2002) (citation omitted). Any violation of the FAL "necessarily violates the UCL." Id. at 950, 119 Cal.Rptr.2d 296, 45 P.3d 243 (citation omitted). As with the UCL, a FAL claim premised on false advertising or promotional practices requires that "members of the public are likely to be deceived." Id. at 951, 119 Cal.Rptr.2d 296, 45 P.3d 243 (2002) (citation omitted).

Manufacturers argue that: (1) none of the eight misrepresentations[48] would likely deceive a reasonable consumer given that opioid labels disclose potential risks; (2)

claims premised on omissions or lack of substantiation are not cognizable; and (3) the City relies on third-party statements that are not legally attributable to Manufacturers. See Man. Mot. at 6–10.[49] None are persuasive.

(i) **Reasonable consumer**.

[96] [97] Both the UCL and FAL utilize the "reasonable consumer test" to determine whether a business practice is deceptive or misleading. Moore, 966 F.3d at 1017. "[T]he reasonable consumer standard requires a probability 'that a significant portion of the general consuming public or targeted consumers, acting reasonably in the circumstances, could be misled.' " Id. (quoting Ebner v. Fresh, Inc., 838 F.3d 958, 965 (9th Cir. 2016)). Manufacturers argue that the targeted consumers were physicians, not patients, and Manufacturers' labels and branded promotions adequately detail the allegedly misrepresented risks. Man. Mot. at 7–8.

[98] This argument implicitly relies on the "learned intermediary doctrine,"[50] which states that, "in the case of prescription drugs, the duty to warn runs to the physician, not to the patient .... [t]hus a pharmaceutical manufacturer may not be required to provide warning of a risk known to the medical community." Carlin v. Superior Ct., 13 Cal. 4th 1104, 1116, 56 Cal.Rptr.2d 162, 920 P.2d 1347 (1996). The learned intermediary doctrine stems from the rationale that a prescribing doctor typically serves as an intervening party that cuts off the causal chain. See Magee v. Wyeth Labs. Inc., 214 Cal. App. 2d 340, 351–52, 29 Cal.Rptr. 322 (1963) ("Failure to follow an unchallenged method of use prescribed by the manufacturer constitutes a break in causation which exonerates the manufacturer from any liability.").

Manufacturers' argument ignores the crux of the City's allegations. The City alleges that Defendants engaged in a systematic campaign that specifically targeted physicians in order to influence physicians' prescribing decisions and mitigate concerns regarding prescription opioids, thereby misleading both physicians and patients. Opp. at 47. Both the MDL court and California courts have concluded that such allegations are sufficiently plausible, if they are supported by facts, to demonstrate **\*689** that both the public and prescribers were misled.[51] This Court agrees.

Here, the City has pled facts to support its claim. For example, Manufacturers allegedly sent sales representatives to visit physicians in San Francisco and paid these physicians millions of dollars for expenses, including "food and beverage," "charitable contribution," "travel and lodging," and "consulting fees." FAC ¶ 39. They also allegedly published and circulated articles and guides to prescribers that contained false claims regarding opioid abuse and addictiveness. FAC ¶¶ 278, 284–86, 307, 342–43, 396, 488, 504. Some manufacturers allegedly even paid prescribers to prescribe their products. Id. ¶ 514. Manufacturers' data allegedly confirms that their marketing tactics positively impacted prescribers' behavior. Opp. at 47 (citing FAC ¶¶ 538–44). Thus, the learned intermediary doctrine does not apply.

(ii) **Omissions or lack of substantiation**.

[99] [100] Manufacturers argue that the City fails to allege that certain statements by Manufacturers were unsubstantiated or false as a matter of law, because the studies that the FAC cites do not concern "specific products, let alone purports to disprove any specific claim." Man. Mot. at 9 (citing FAC ¶¶ 319, 321, 332, 372, 380, 700). A FAL cause of action premised on allegations that the advertisement's claims "lacks evidentiary support is said to be unsubstantiated." Engel v. Novex Biotech LLC, No. 14-cv-03457-MEJ, 2014 WL 5794608, at *3–4 (N.D. Cal. Nov. 6, 2014). "A claim can survive a lack of substantiation challenge by, for example, alleging studies showing that a defendant's statement is false." Kwan v. SanMedica Int'l, LLC, No. 14-cv-03287-MEJ, 2014 WL 5494681, at *3–4 (N.D. Cal. Oct. 30, 2014) (quoting Bronson v. Johnson & Johnson, Inc., No. C 12-04184 CRB, 2013 WL 1629191, at *8 (N.D. Cal. Apr. 16, 2013)). There is no requirement that studies must address a specific brand of product.[52]

The City argues that Manufacturers made false, not unsubstantiated, statements. Opp. at 48. The FAC is replete with external studies to support the City's allegations that Manufacturers made false assertions. See FAC ¶¶ 30, 232–34, 266, 384–86. For example, the City cites two studies by the CDC and FDA to disprove Manufacturers' **\*690** claim that "long-term use of opioids improves patient function and quality of life." FAC ¶ 332 ("The FDA, for years, has made clear through warning letters to manufacturers the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life. Based upon a review of the existing scientific evidence, the CDC Guideline concluded that 'there is no good evidence that opioids

improve pain or function with long-term use.' " (internal citation omitted). The City also relies on a series of articles stating that long-term opioid use "may actually worsen pain and functioning." FAC ¶¶ 332–35. Manufacturers argue that these studies fail to demonstrate that Manufacturers' claims were false because they use words like "may" and describe opioid benefits as "uncertain." Man. Mot. at 9. However, this argument ignores the studies cited in the FAC, including one describing a study of 69,000 women with recurrent pain, which concluded that the patients who received opioid therapy were less likely than the placebo-controlled group to have improved pain and had worsened function. FAC ¶ 333 (citing Thomas R. Frieden and Debra Houry, Reducing the Risks of Relief—The CDC Opioid Prescribing Guideline, New Eng. J. of Med. 1503 (Apr. 21, 2016)). Such allegations, accepted as true, refute the notion that opioids improve long-term pain and function. Id. Thus, Manufacturers' argument fails.

 **[101]** **[102]** **[103]** Next, Manufacturers argue that they have no duty to disclose omitted risk information related to unbranded promotional materials, and thus, the City cannot rely on these alleged omissions to support its FAL claim. Def. Mot. at 9; Def. Reply at 5. In order to prevail on a FAL claim premised on omissions of material fact, the omission "must be contrary to a representation actually made by the defendants, or an omission of a fact that the defendant was obligated to disclose." Daugherty v. American Honda Motor Co., Inc., 144 Cal. App. 4th 824, 835, 51 Cal.Rptr.3d 118 (2006). A duty to discloses arises when (1) "the defendant had exclusive knowledge of material facts not known to the plaintiff;" (2) "the defendant actively conceals a material fact from the plaintiff;" and (3) "the defendant makes partial representations but also suppresses some facts." Andren v. Alere, Inc., 207 F. Supp. 3d 1133, 1142 (S.D. Cal. 2016). "A defendant has exclusive knowledge giving rise to a duty to disclose when 'according to the complaint, [defendant] knew of this defect while plaintiffs did not, and, given the nature of the defect, it was difficult to discover.' " Id. (citation omitted).

 **[104]** The City plausibly alleges that Manufacturers had "exclusive knowledge of material facts not known to the plaintiff." Id. at 1142. For example, the City alleges that Endo knew that its product, Opana ER, was widely abused, yet still marketed it as tamper resistant and abuse deterrent. FAC ¶¶ 373–89. Additionally, Endo, Janssen, Purdue, and Cephalon allegedly circulated information pertaining to pseudoaddiction, despite their own key opinion leaders ("KOL"),[53] Dr. Lynn Webster, acknowledging that they had

"debunk[ed] [pseudoaddiction] as a concept." Id. ¶¶ 292–302. While the City could theoretically access secondary sources that challenged alleged misrepresentations like pseudoaddiction, they could not discover that Manufacturers knew that concept was "debunk[ed]." Id. ¶ 302. These allegations support the City's assertion that Manufacturers  **\*691** omitted material information related to defects in opioids, and plaintiffs, like the City, were unable to discover the information.

### (iii) Third-party statements.

 **[105]** **[106]** **[107]** Manufacturers argue that the City has not pled facts to support its assertion that Manufacturers controlled third parties who made unlawful statements, and thus, Manufacturers cannot be held liable for the statements. Man. Mot. at 10. "A defendant's liability must be based on his personal participation in the unlawful practices' and 'unbridled control' over the practices that are found to violate section ... 17500." Emery v. Visa Inter'l Serv. Ass'n, 95 Cal. App. 4th 952, 960, 116 Cal.Rptr.2d 25 (2002) (quoting People v. Toomey, 157 Cal. App. 3d 1, 15, 203 Cal.Rptr. 642 (1984)). "Liability may be imposed on those who aid and abet another's violation of the UCL if the individual knows the other's conduct constitutes a violation and gives substantial assistance or encouragement to the other to so act." Decarlo v. Costco Wholesale Corp., No. 14cv00202 JAH-BLM, 2020 WL 1332539, at *5 (S.D. Cal. Mar. 23, 2020) (citing People v. Sarpas, 225 Cal. App. 4th 1539, 1563, 172 Cal.Rptr.3d 25 (2014)).

Manufacturers characterize the City's allegations as general allegations of "funding and generic oversight" over third parties, Man. Mot. at 10, but this ignores the City's detailed allegations of Manufacturers' substantial involvement and control over third-party conduct. FAC ¶¶ 403–06, 410–12, 451–74. Manufacturers allegedly utilized several third parties to misrepresent prescription opioids: Front Groups, KOLs, and Continuing Medical Education ("CME") programs. FAC ¶ 403.

Manufacturers allegedly contributed millions of dollars to front groups, their individual executives, staff members, and board members, who then published and distributed materials that overstated prescription opioids' benefits and understated their risks. Id. ¶¶ 403–06 (citing U.S. S. Homeland Sec. & Governmental Aff. Comm., Ranking Members' Office, Fueling an Epidemic (Feb. 12, 2018),

https://www.hsdl.org/?abstract & did=808171). In order to receive funding from Manufacturers, the American Pain Foundation ("APF")—an alleged front group—submitted grant proposals tailored around activities and publications that Manufacturers had previously suggested. Id. ¶ 412. Not only did Manufacturers allegedly fund front groups, but the City also alleges that Manufacturers controlled front groups by developing, reviewing, approving, and distributing their published content. See e.g., id. ¶ 410 ("[I]t was Endo that substantially controlled NIPC, by funding NIPC projects, developing, specifying, and reviewing its content, and distributing NIPC materials."). Some Manufacturers, like Purdue, even allegedly signed consulting services agreements with APF, which gave Purdue and its KOLs substantial control over APF's promotional projects. Id. ¶ 413. Cephalon, Endo, Purdue, and Janssen, allegedly sponsored and substantially controlled messages espoused by KOLs, like Dr. Lynn Webster, Dr. Russell Portenoy, and Dr. Perry Fine. Id. ¶¶ 451–74. Dr. Fine even allegedly served on Purdue's advisory board, provided medical consulting for Janssen, and participated in CME activities on behalf of Endo. Id. ¶ 468.

Manufacturers claim that these allegations demonstrate only that Manufacturers provided "funding and generic oversight." Man. Mot. at 10 (citing Emery, 95 Cal. App. 4th at 960, 116 Cal.Rptr.2d 25; Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 395, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); Batzel v. Smith, 333 F.3d 1018, 1036 (9th Cir. 2003)). However, *692 Manufacturers rely on authority that does not preclude the existence of funding as an indicator of control. Id. (citing Batzel, 333 F.3d at 1036 ("Sponsorship alone is insufficient to render the sponsor the guarantor of the truth of all statements made in a publication." (internal citation omitted))). Rather, courts have concluded that allegations of creative control are sufficient to raise a plausible inference that a defendant had "unbridled control" over unlawful practices. Sims v. Campbell Soup Company, No. EDCV 18-668 PSG (SPx), 2018 WL 7568640, *8 (E.D. Cal. Sept. 24, 2018) (concluding that an advertisement agency who "wrote or approved" misleading labels and messages was sufficient to raise a plausible inference that they had control over the misstatements).

The City's allegations go well beyond "funding and generic oversight," Man. Mot. at 10, especially in light of the allegations that Manufacturers approved and helped develop these misrepresentations. FAC ¶¶ 257 n.99, 408–15, 447–92. Thus, these allegations are sufficient to

raise a plausible inference that Manufacturers controlled third-party misrepresentations, which are attributable to Manufacturers.[54]

Because the City's allegations plausibly demonstrate that members of the public could be deceived by Manufacturers' statements, the Court hereby DENIES Manufacturers' motion to dismiss the City's FAL claim and the UCL claim to the extent that it relies on the unlawful prong.

b. **UCL fraudulent prong.**

[108] [109] "Claims stated under the fraud[ulent] prong of the UCL are subject to the particularity requirements of [Rule] 9(b)." In re Anthem, Inc. Data Breach Litig., 162 F. Supp. 3d 953, 990 (N.D. Cal. 2016) (citing Kearns, 567 F.3d at 1125). Defendants argue that the City fails to allege a violation of the UCL's fraudulent prong with the degree of particularity required by Rule 9(b) for two reasons: (1) the City does not identify any specific suspicious orders that Defendants should have reported; and (2) members of the public "cannot be ... deceived by Defendants' alleged failure to maintain internal suspicious order monitoring systems or to provide confidential reports to regulators." Def. Mot. at 16 (citing Holmes v. Johnson & Johnson, 617 F. App'x 639 (9th Cir. 2015)); see also Def. Reply at 12. The City must show that members of the public are likely to be deceived by Defendants' conduct. See In re Tobacco II Cases, 46 Cal. 4th 298, 312, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009). It has done so.

In Johnson & Johnson, the plaintiff generally alleged that Johnson & Johnson used false and misleading advertising to promote its drug Levaquin and "failed to disclose the risk of severe subcutaneous adverse reaction conditions." Id. at 643–44. The court rejected the plaintiff's UCL claim under the fraudulent prong because the plaintiff failed to "specify what information was likely to deceive Holmes or her *693 doctor ...." Id. at 944, 119 Cal.Rptr.2d 296, 45 P.3d 243.

Here, the City specifies "the who, what, when, where, and how" of Defendants' failure to maintain effective controls and report suspicious orders, and the misrepresentation that Defendants abided by their legal obligations. Opp. at 46 (citing FAC ¶¶ 579–680).[55]

[110] For example, between 2016 and 2017, McKesson, Cardinal, Mallinckrodt, and AmerisourceBergen were each

forced to pay federal and state fines for failing to report suspicious orders to the DEA as required by law. FAC ¶¶ 34, 658–67. Additionally, in 2017, after McKesson allegedly continued to breach its duties under the CSA by failing to identify and report suspicious orders throughout the U.S., including California, it entered into a settlement agreement with the DEA in which it admitted to repeatedly breaching its duties to monitor and report suspicious orders. Id. ¶¶ 659, 750; see also id. ¶ 665 (alleging that Cardinal did the same between January 1, 2009 and May 14, 2012). Further, Defendants allegedly used the HDA as an intermediary to coordinate and to ensure that the DEA's aggregate production quotas, individual quotas, and procurement quotas remained high. Id. ¶ 627. Defendants allegedly engaged in fraudulent behavior by using the HDA and Pain Care Forum to coordinate responses to their legal obligations and by agreeing not to identify, report, or halt suspicious orders in order to avoid DEA scrutiny. Id. ¶¶ 623, 624, 628–30. Defendants allegedly recorded and maintained data that made them aware of suspicious orders departing their facilities, yet they omitted any of this material information from their reports to the DEA. Id. ¶¶ 630, 633–42. Instead of reporting these orders, Defendants allegedly used this data to target doctors who wrote the largest quantities of opioid prescriptions and encouraged them to prescribe more, despite later claiming that these doctors "fooled" Defendants. Id. ¶¶ 647–55. The FAC alleges that throughout this conduct, Defendants—including Purdue, AmerisourceBergen, Mallinckrodt, Cardinal, McKesson— falsely and publicly maintained that they abided by their legal obligations. Id. ¶¶ 668–80.

Defendants counter that these public statements of compliance "constitute nonactionable puffery." Def. Reply at 13 (citing Vitt v. Apple Computer, Inc., 469 F. App'x 605, 607 (9th Cir. 2012); Oestreicher v. Alienware Corp., 322 F. App'x 489, 493 (9th Cir. 2009)). However, the authority that Defendants rely upon is substantively distinguishable. In Vitt, the court concluded that statements such as "the iBook G4 is mobile, durable, portable, rugged, built to withstand reasonable shock, reliable, high performance, high value, an affordable choice, and an ideal student laptop" constituted inactionable puffery because they were not factual representations. 469 F. App'x at 607 (internal quotation marks omitted). Likewise, in Oestreicher, the court concluded that statements about product superiority such as "superb, uncompromising quality ... faster, more powerful, and more innovative than competing machines," constituted inactionable puffery because they were generalized and

vague. Oestreicher v. Alienware Corp., 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008) aff'd mem. 322 F. App'x 489, 493 (9th Cir. 2009).

Defendants cite no authority suggesting that California treats statements about legal **694 compliance as puffery. If anything, California treats only "statement[s] of opinion," as inactionable puffery. See, e.g., Hauter v. Zogarts, 14 Cal. 3d 104, 111, 120 Cal.Rptr. 681, 534 P.2d 377 (1975) ("If defendants' assertion of safety is merely a statement of opinion—mere 'puffing'—they cannot be held liable for its falsity."). Defendants' statements go beyond opinion to factually represent that they have a "best-in-class controlled substance monitoring program to help identify suspicious orders," despite being cited by the DEA for failing to maintain a suspicious monitoring program. FAC ¶¶ 669, 771. Defendants' use of "best-in-class" may be an opinion, but their claim to have a controlled substance monitoring program is belied by the DEA's determination that they did not maintain their program. Id. The DEA's enforcement action demonstrates that Defendants' statements regarding legal compliance are objectively verifiable, and thus, do not constitute puffery. The City can therefore rely on false claims of legal compliance to assert its UCL fraudulent prong claim.

Thus, this Court DENIES Defendants' motion to dismiss the City's UCL claim to the extent that it relies on the fraudulent prong.

### c. UCL unfair prong.

 [111]  [112]  [113] Defendants argue that the City cannot state a claim under the UCL's unfair prong because prescription opioids "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people." Def. Mot. at 22 (quoting 21 U.S.C. § 801(1) (internal quotation marks omitted)).[56] "[A] practice may be deemed unfair even if not specifically proscribed by some other law." Cel-Tech Comm'ns, 20 Cal. 4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). The definition of "unfair" is currently in flux; however, both parties rely on the Ninth Circuit's balancing test, which weighs "the harm to the consumer" against "the utility of the defendant's practice." Lozano v. AT & T Wireless Servs., Inc., 504 F.3d 718, 736 (9th Cir. 2007). "An unfair business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Bardin

RICO Bus.Disp.Guide 13,405

v. DaimlerChrysler Corp., 136 Cal. App. 4th 1255, 1268, 39 Cal.Rptr.3d 634 (2006).

But the City has alleged a series of practices that led to the oversupply of prescription opioids in San Francisco: "(i) promoting their use in a manner that minimized serious risks; (ii) improperly touting purported benefits; and/or (iii) failing to make reasonable efforts to prevent diversion." Opp. at 45 (quoting FAC ¶ 915) (internal quotation marks omitted). Despite any positive impacts that prescription opioids have on the health and general welfare of society, the practices used to promote such opioids allegedly violated public policies and substantially injured consumers through addiction, abuse, overdoses, and death, in addition to the City's remedial costs. FAC ¶¶ 16–18, 686–96, 911–18.

Defendants also argue that if they had declined to sell and fill opioid orders, they would have violated patients' rights. Def. Reply at 17 (citing Cal. Health & Safety Code § 124960(g)–(i); *695 Cal. Bus. & Prof. Code § 2241.5(a)). But California and the CSA knowingly permit manufacturers and distributors to abridge these rights by imposing duties to halt suspicious orders because the threat of diversion is far more substantial. See21 C.F.R. §§ 1301.71(a), 1301.74(b); Cal. Health & Safety Code § 11135(a); Cal. Bus. & Prof. Code § 4164. The City's alleged harms—such as increased costs associated with opioid addiction, abuse, and overdose deaths —exemplify the substantial threat that Defendants' duties are meant to prevent. See FAC ¶¶ 51, 55, 57–58, 516–22, 538–46. Thus, the City has pled a cognizable UCL claim based on the unfair prong because the City's harm sufficiently outweighs the utility of Defendants' marketing and distribution tactics.

d. **Restitution from Distributors.**

[114] [115] [116] Finally, Distributors argue that the City is not entitled to restitution for the income, profits, and other benefits Distributors allegedly obtained from San Francisco residents, because Distributors did not acquire residents' money by failing to report suspicious orders or maintain effective controls. Distr. Mot. at 16; Def. Reply at 17. "[I]n the UCL context ... restitution means the return of money to those persons from whom it was taken or who had an ownership interest in it." Shersher v. Superior Court, 154 Cal. App. 4th 1491, 1497, 65 Cal.Rptr.3d 634 (2007). A defendant can be liable for restitution under the UCL even if it is not the direct recipient of a plaintiff's misappropriated funds. SeeTroyk v. Farmers Group, Inc., 171 Cal. App. 4th 1305,

1340, 90 Cal.Rptr.3d 589 (2009). "The UCL 'requires only that the plaintiff must once have had an ownership interest in the money or property acquired by the defendant through unlawful means.' " Id. (quoting Shersher, 154 Cal. App. 4th at 1500, 65 Cal.Rptr.3d 634).

The City's demand for restitution rests on a theory that Distributors' failure to report suspicious orders led to an oversupply of prescription opioids in San Francisco, which patients paid money to pharmacists to obtain, and that the pharmacists then paid money to distributors for more opioids. See FAC ¶¶ 12–18, 45, 580. Had Distributors implemented effective controls to prevent against diversion, fewer City residents would have obtained diverted opioids, which would have decreased both demand for Distributors' products and their profits. Seeid. While Distributors were not the direct recipients of City residents' payments, Distributors' financial success necessarily relies on the societal demand for opioids, which can allegedly be traced to transactions for diverted opioids. See FAC ¶¶ 656–67. Because the UCL permits restitution as a remedy for indirectly misappropriated funds, the City's claim against Distributors for restitution may proceed. SeeTroyk, 171 Cal. App. 4th at 1340, 90 Cal.Rptr.3d 589.

## III. CONCLUSION

For the foregoing reasons:

1. Walgreens' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim (dkt. 168) is DENIED.

2. All Defendants' Motion to Dismiss for Failure to State a Claim (dkt. 169) is GRANTED in part, and DENIED in part.

   a. The City's RICO claims are DISMISSED WITH PREJUDICE.

   b. The City's Public Nuisance, Unfair Competition Law, and False Advertising Law claims remain.

3. Distributors' Motion to Dismiss for Failure to State a Claim (dkt. 170) is GRANTED in part, and DENIED in part.

   *696 a. The City's RICO claims are DISMISSED WITH PREJUDICE.

RICO Bus.Disp.Guide 13,405

b. The City's Public Nuisance, Unfair Competition Law, and False Advertising Law claims remain.

4. Manufacturers' Motion to Dismiss for Failure to State a Claim (dkt. 171) is GRANTED in part, and DENIED in part.

a. The City's RICO claims are DISMISSED WITH PREJUDICE.

b. The City's Public Nuisance, Unfair Competition Law, and False Advertising Law claims remain.

5. Anda's Motion to Dismiss for Failure to State a Claim (dkt. 167) is DENIED.

6. Specially Appearing Teva Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service (dkt. 165) is DENIED WITHOUT PREJUDICE.

7. Mallinckrodt plc's Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service (dkt. 166) is DENIED WITHOUT PREJUDICE.

8. Endo International plc's Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service (dkt. 176) is DENIED WITHOUT PREJUDICE.

9. Allergan plc's Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service (dkt. 162) is DENIED WITHOUT PREJUDICE.

The Court retains jurisdiction over the remaining state law causes of action. The City shall have ten days to amend and add allegations to its complaint supporting its UCL claim premised on violations of Cal. Bus. & Prof. Code § 4169.1. The parties will file a status conference statement in twenty days in order to address how they plan to proceed on the state law claims.

**IT IS SO ORDERED.**

**Appendix A**

**\*697**

| Defendants | | |
| --- | --- | --- |
| **Marketing Defendants** (FAC ¶¶ 80–165) | **RICO Marketing Defendants** (FAC ¶ 165 n.65) | **Manufacturers** (Man. Mot. 16–19) |
| - Purdue Entities: Purdue Pharma L.P. ("PPL"); Purdue Pharma Inc. ("PPI"); The Purdue Frederick Company, Inc. ("PFC"); Rhodes Pharmaceuticals L.P. ("Rhodes"); Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David A. Sackler; the Trust for the Benefit of Members of the Raymond Sackler Family.<br>- Actavis Entities: Allergan plc (f/k/a Actavis plc); Allergan Finance, LLC; Allergan Sales, LLC; Allergan USA; Watson Laboratories, Inc.; Warner Chilcott Company LLC; Actavis Pharma, Inc.; Actavis South Atlantic LLC; Actavis Elizabeth LLC; Mid Atlantic LLC; Actavis Totowa LLC; Actavis Kadian LLC; Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc -Salt Lake City); Actavis Laboratories FL., Inc. (f/k/a Wat Laboratories Inc. Florida).<br>- Cephalon Entities: Teva Pharmaceuticals USA, Inc. ("Teva USA"); Teva Pharmaceutical Industries Ltd. ("Teva Ltd.") (collectively "Teva); Cephalon, Inc.;<br>- Janssen Entities: Johnson & Johnson ("J&J"); Janssen Pharmaceuticals, Inc. ("Janssen Pharmaceuticals"); Noramco, Inc. ("Noramco"); Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("OMP"); Janssen Pharmaceutica, Inc. ("Janssen Pharmaceutica");<br>- Endo Entities: Endo International ple ("Endo Int'l"); Endo Health Solutions, Inc. ("EHS"); Endo | - Purdue Entities: PPL; PPI; PFC; Rhodes.<br>- Cephalon Entities: Teva USA, Teva Ltd. Cephalon, Inc.<br>- Janssen Entities: J&J; OMP; Janssen Pharmaceuticals; Noramco; Janssen Pharmaceutica.<br>- Endo Entities: EHS; EPI; and Par Pharmaceutical, Inc.<br>- Mallinckrodt Entities: MNK plc; MNK LLC; and SpecGx LLC. | - Allergan Finance, LLC,<br>- Allergan Sales, LLC<br>- Allergan USA, Inc.,<br>- Endo Pharmaceuticals Inc.,<br>- Endo Health Solutions Inc.,<br>- Par Pharmaceutical, Inc.<br>- Par Pharmaceutical Companies, Inc.,<br>- Johnson & Johnson,<br>- Janssen Pharmaceuticals, Inc.,<br>- Ortho-McNeil-Janssen Pharmaceuticals, Inc.,<br>- Janssen Pharmaceutica, Inc.,<br>- Mallinckrodt LLC,<br>- SpecGx LLC,<br>- Noramco, Inc.,<br>- Teva Pharmaceuticals USA, Inc.;<br>- Cephalon, Inc.;<br>- Actavis LLC;<br>- Actavis Pharma, Inc.<br>- Watson Laboratories, Inc.;<br>- Warner Chilcott Company LLC;<br>- Actavis South Atlantic LLC;<br>- Actavis Elizabeth LLC;<br>- Actavis Mid Atlantic LLC;<br>- Actavis Totowa LLC;<br>- Actavis Kadian LLC;<br>- Actavis Laboratories UT, Inc.;<br>- Actavis Laboratories. |

**\*698**

| Pharmaceuticals, Inc. ("EPI"); Par Pharmaceutical, Inc.<br>- Inys Therapeutics, Inc.<br>- Mallinckrodt Entities: Mallinckrodt ple ("MNK plc"), Mallinckrodt LLC ("MNK LLC"); SpecGx LLC | | |
| --- | --- | --- |
| **Distributor Defendants** (FAC ¶ 166) | **RICO Supply Chain Defendants** (FAC ¶ 797) | **Distributors** (Distr. Mot. at 17; Wal. Mot. at 1; Anda Mot. at 1) |
| - Amerisource Bergen Drug Corporation ("AmerisourceBergen");<br>- Anda, Inc. ("Anda");<br>- Cardinal Health, Inc. ("Cardinal");<br>- McKesson Corporation ("McKesson"); and<br>- Walgreen Co. ("Walgreens") (as both a dispenser and distributor). | - Purdue Entities;<br>- Cephalon Entities;<br>- Endo Entities;<br>- Mallinckrodt Entities;<br>- Actavis Entities;<br>- McKesson;<br>- Cardinal;<br>- Anda; and<br>- AmerisourceBergen | - Amerisource Bergen Drug Corporation ("AmersourceBergen");<br>- Anda, Inc. ("Anda");<br>- Cardinal Health, Inc. ("Cardinal");<br>- McKesson Corporation ("McKesson"); and<br>- Walgreen Co. ("Walgreens") (as both a dispenser and distributor) |

**All Citations**

491 F.Supp.3d 610, RICO Bus.Disp.Guide 13,405

Footnotes

1    See Appendix A (detailing the categories of defendants).

2    Id.

City and County of San Francisco v. Purdue Pharma L.P., 491 F.Supp.3d 610 (2020)

RICO Bus.Disp.Guide 13,405

3    However, the actions against all Purdue Entities and individual Sackler family members are currently stayed pending bankruptcy proceedings. In re Purdue Pharma L.P., et al., No. 19-23649. Additionally, the actions against Insys Therapeutics, Inc. are currently stayed pending different bankruptcy proceedings. In re Insys Therapeutics, Inc., et al., No. 19-11292.

4    See App. A

5    Id.

6    In fact not all Defendants join this motion—Teva Ltd., Mallinckrodt plc ("MNK plc"), Allergan plc, and Endo International ("Endo Int'l") (together, "Foreign Defendants") do not move to dismiss for failure to state a claim.

7    Id.

8    Id.

9    Walgreens files its motion in its capacity as both a distributor and dispenser.

10   Naloxone is a medication designed to reverse opioid overdoses. FAC ¶ 61.

11   Walgreens also relies on City of New Haven v. Purdue Pharma, L.P., No. X07HHDCV176086134S, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019). The Connecticut Superior Court rejected New Haven's claims against Purdue Pharma L.P.; however, it did so under Connecticut state law. Id. at *2. The court engaged in a standing analysis that is meaningfully different from typical Article III standing principles. For example, the court relied on Ganim v. Smith & Wesson Corp., 258 Conn. 313, 780 A.2d 98 (2001), which hinged on a "policy judgment" by the Connecticut Supreme Court to conclude that the plaintiff lacked standing. City of New Haven v. Purdue Pharma, L.P., 2019 WL 423990, at *3. Such "policy judgment[s]" do not factor into Article III's standing analysis.

12   The Court does not address the City's successor liability theory of personal jurisdiction with respect to Teva Ltd., MNK plc, and Endo Int'l for two reasons: (1) the City has made a prima facie showing that this Court has jurisdiction over these entities under the alter ego doctrine, and thus, there is no need to address the successor liability arguments; and (2) like the City's alter-ego theory, the Foreign Defendants each dispute several of the facts underlying the City's successor liability theory—many of which are intertwined with the merits—and so the Court will wait until trial to settle these factual disputes. Similarly, the Court does not address the City's alter-ego theory with regard to Allergan plc because the City has made a prima facie showing that the Court has jurisdiction over Allergan plc under successor liability theory, and there are factual disputes that require a full trial record to resolve.

13   None of these subsidiaries dispute the existence of personal jurisdiction, so there is no minimum contacts issue.

14   "Courts may consider evidence presented in affidavits and declarations in determining personal jurisdiction." Krypt, Inc. v. Ropaar LLC, No. 19-cv-03226-BLF, 2020 WL 3639651, at *3 (N.D. Cal. July 6, 2020) (citing Doe, 248 F.3d at 922).

15   "If the pleadings and other submitted materials raise ... disputed questions of fact with regard to jurisdiction, the district court has the discretion to take evidence at a preliminary hearing in order to resolve the contested issues.... Where the jurisdictional facts are intertwined with the merits, a decision on the jurisdictional issues is dependent on a decision of the merits.... However, it is preferable that this determination be made at trial, where a plaintiff may present his case in a coherent, orderly fashion and without the risk of prejudicing his case on the merits." See Data Disc, Inc., 557 F.2d at 1285, 1285 n.2.

16   In Fru-Con Const. Corp., the court concluded that "setting an annual salary budget for employees" constituted "macro-management" decisions, which is distinct from the City's allegation that Endo Int'l controls all stock and option incentive decisions, not simply the budget. See 2007 WL 2384841, at *5 (emphasis added). Similarly, in Pangang Group. Co., the court did not conclude that the defendant's control over its subsidiaries' salaries weighed against finding "control." On the contrary, the court seemingly acknowledged that it did demonstrate some degree of control. 879 F. Supp. 2d at 1063–64 ("Even if [controlling subsidiaries' salaries] shows some level of control ....").

17   Endo Int'l and MNK plc also assert that the complaint should be dismissed for insufficient process under Rule 12(b)(4). See MNK Mot. at 5; Endo Mot. at 3. The analysis for Rule 12(b)(5) is incorporated and applied to these defendants' motion under Rule 12(b)(4).

18   See Def. Mot.; Man. Mot. (dkt. 171); Distr. Mot. (dkt. 170) Wal. Mot.; Anda. Mot. (dkt. 167).

19   The City also argues that the law of the case doctrine bars this Court from deviating from "MDL rulings absent clear error or intervening change in law or fact," but, as noted earlier, this doctrine does not apply to separate cases. See supra Subpart II.A.

20   Justice Sotomayor recused herself because she joined the Second Circuit's decision below, which considered foreseeability in its proximate cause analysis. See City of New York v. Smokes-Spirits.com, Inc., 541 F.3d 425, 440–42 (2d Cir. 2008).

21   This is consistent with the dissent in Hemi, which asserted that "an intervening third-party act, even if criminal, does not cut a causal chain where the intervening act is foreseeable and the defendant's conduct increases the risk of its occurrence." Hemi, 559 U.S. at 25, 130 S.Ct. 983 (Breyer, J., dissenting).

22   The City alleges that Defendants' conduct caused addicted residents to revert to other illegal and intravenous drugs, such as heroin and methamphetamine. See FAC ¶ 59.

23   To the Court's knowledge, Manufacturers did not design their products to be administered intravenously; however, opioid users allegedly manipulated some products, like Opana ER, to abuse intravenously. See, e.g., FAC ¶ 387. This is significant because it theoretically shortens the chain of causation to a lone third-party, who receives a prescription, manipulates the prescription, administers the opioid intravenously, and improperly disposes of the needle.

24   This chain assumes that damage to city-owned property stems from prescribed opioids that have been manipulated for intravenous use; however, the FAC indicates that addiction and overdoses from heroin, fentanyl, and methamphetamine have skyrocketed, which would add an additional step in the causal chain, namely a drug dealer who provides illegal narcotics or diverted opioids. FAC ¶¶ 5, 16, 19, 52, 59, 62–71.

25   These injuries directly stem from the sources that provide the opioids to drug users, such as a prescribing physician, pharmacist, or drug dealer.

26   Under the City's theory, Defendants would be liable for all conduct perpetuated by addicted individuals, which would not only make damages incalculable but impose "infinite liability" on defendants, a result that the Supreme Court discouraged in Holmes. 503 U.S. at 266 n.10, 112 S.Ct. 1311 ("In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would set society on edge and fill the courts with endless litigation." (internal quotation marks omitted) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984))).

27   Even under the Hemi dissent's broader proximate cause formulation, the City's injury was arguably not foreseeable in the relevant sense. See 559 U.S. at 22–29, 130 S.Ct. 983 (Breyer, J., dissenting). The dissent would apply a test of "reasonable" foreseeability, focusing on factors such as whether the defendant committed its predicate acts "in order to" bring about the alleged injury, and whether that injury falls "within the bounds of the kinds of harms" that the law proscribing those predicate acts "seeks to prevent." Id. at 22–23, 130 S.Ct. 983 (emphasis in original). Here, there is no indication that the drug users' actions that damaged city property furthered Defendants' alleged scheme, or that the laws proscribing Defendants' misrepresentations and oversupply of prescription opioids were intended to prevent drug users from discarding their needles in a manner that injured the City's property and business interests.

28   State claims that rely on a defendant's breach of duty owed to an agency are frequently called "fraud-on-the-agency" claims. Here, the subject agency is the DEA.

29   Nor does Astra USA, Inc. v. Santa Clara County, see Def. Reply at 23, which did not deal with state law claims that exist separately and independently of the subject federal statute. 563 U.S. 110, 118, 131 S.Ct. 1342, 179 L.Ed.2d 457 (2011).

30   Defendants argue that this amounts to the "stop-selling"—or in this case "stop-promoting"—argument that the Supreme Court rejected in Mutual Pharmaceutical Company, Inc. v. Bartlett. 570 U.S. 472, 488, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013). Defendants argue that they can only avoid a conflict and comply with both state and federal requirements by ceasing all marketing efforts. Def. Reply. at 25. However, not only is the principle "stop-selling" distinguishable from "stop-promoting," but the City's claims rest on the allegations that Defendants illegally marketed their opioids. The City's claims would not exist if they were premised on lawful marketing practices. Defendants do not have to "stop promoting" in order to avoid liability.

31   Defendants cite several cases that the MDL court previously distinguished. See Def. Mot. at 27–28 (citing In re Celexa & Lexapro Mktg. Sales Practices Litig., 779 F.3d 34, 42–43 (1st Cir. 2015)); Utts v. Bristol-Myers Squibb Co., 251 F. Supp.3d 644, 663–73 (S.D.N.Y. 2017). But see In re Nat'l Prescription Opiate Litig., 2018 WL 4895856, at *23 ("The cases upon which Defendants rely are all distinguishable.... In In re Celexa, it was argued that the FDA should not have approved Lexapro, and that defendant should have shared negative efficacy information with the FDA. 779 F.3d at 36–43. Because the FDA had reviewed this information and approved the drug, the state law claim was in conflict with federal law. Id. In Utts, the plaintiffs' fraud-based claims were preempted, because they alleged a fraud upon the FDA. 251 F. Supp. 3d at 679–680 (citing Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 350, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (holding that state law fraud on the FDA claims conflict with federal law and are impliedly preempted)). Herein, the state law claims are not premised upon inappropriate labeling or a fraud upon the FDA, but rather fraudulent marketing in the promotion and sale of their opioids." (footnote omitted)). Defendants also rely on Cerveny v. Aventis, Inc., 855 F.3d 1091, 1105 (10th Cir. 2017), to support their preemption argument; however, this case is also factually distinguishable.

See Def. Mot. at 28. Cervenyi is similar to In re Celexa in that the state's claim—failure to warn—was premised on risks not presented in the FDA-approved warning label, which is distinguishable from the nine categories of misrepresentations alleged here. See 855 F.3d at 1105.

32 Defendants ask the Court to take judicial notice of these documents. That is appropriate. A court can take judicial notice of documents properly submitted with the complaint or upon which the complaint necessarily relies if the materials' "authenticity is not uncontested" and comprise "matters of public record." Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) overruled on other grounds by Galbraith v. Cnty. of Santa Clara, 307 F.3d 1119 (9th Cir. 2002) (citation omitted). Documents permitted for judicial notice include those that are "made publicly available by government entities" and in which "neither party disputes the[ir] authenticity." Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010).

33 "Generic Manufacturers," include Watson Laboratories, Inc.; Warner Chilcott Company, LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Actavis LLC; Actavis South Atlantic LLC; Actavis Elizabeth LLC; Actavis Mid Atlantic LLC; Actavis Totowa LLC; Actavis Kadian LLC; Actavis Laboratories UT, Inc.; Actavis Laboratories FL, Inc.; Par Pharmaceutical, Inc.; Par Pharmaceutical Companies, Inc.; Mallinckrodt LLC; and SpecGx LLC. Man. Mot. at 2 n.1.

34 In response, Manufacturers argue that the City simply lumps Generic Manufacturers with brand-name manufacturers without satisfying Rule 9(b)'s requisite particularity. Man. Mot. at 14. "Instances of corporate fraud may also make it difficult to attribute particular fraudulent conduct to each defendant as an individual. To overcome such difficulties ... the allegations should include the misrepresentations themselves with particularity and, where possible, the roles of the individual defendants in the misrepresentations." Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 540 (9th Cir. 1989) (citing Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir. 1987)). The City does just that. It identifies both the misrepresentations and the group of manufacturers who made such misrepresentations, and it attributes these allegations to generic and brand name manufacturers alike. Opp. at 55 (citing FAC ¶¶ 254–62, 272–82). Further, the MDL court concluded that Summit County's almost-identical allegations satisfied Rule 9(b) because they put defendants on notice as to the nature of the City's claims. Summit Cnty., 2018 WL 4895856, at *19–20. Like Summit County, the allegations here satisfy Rule 9(b)'s particularity requirement because the City attributes these allegations to all manufacturers, which is sufficient to put Manufacturers on notice of the circumstances of the City's claim. Id. at *19; see also In re Nat'l Prescription Opiate Litig., 2019 WL 4178591, at *6.

35 Although the Court uses "the City" as shorthand, its use encompasses both the City and County of San Francisco and the People of the State of California for the state law claims.

36 Each category of Defendants—Manufacturers, Distributors, and Walgreens—make different arguments as to why the City fails to allege knowledge and causation.

37 As indicated above, the MDL court held that Marketing Defendants and Distributors both have duties under the CSA and its implementing regulations. Any argument to the contrary has been addressed in supra Subpart II.A.1.

38 Although the City briefly argues that nothing in California's public nuisance statute or Restatement requires that a defendant violate a legal duty, Opp. at 9, the bulk of California cases require the existence of a duty. See,e.g., Melton, 183 Cal. App. 4th at 542, 107 Cal.Rptr.3d 481; In re Firearm Cases, 126 Cal. App. 4th at 988, 24 Cal.Rptr.3d 659.

39 In Vermont & 100th Medical Arts Pharmacy v. Bd. of Pharmacy, the California Court of Appeal held that the defendant pharmacy must have been aware of suspicious orders, in part, because it had filled 10,000 prescriptions over a 45-day period. 125 Cal. App. 3d 19, 22, 177 Cal.Rptr. 807 (1981). The California Board of Pharmacy revoked the pharmacists' individual licenses and the pharmacy's permit because it concluded that such conduct violated Cal. Health & Safety Code § 11153, 21 U.S.C. § 841, and 21 C.F.R. § 1306.04(a). Id. at 23, 177 Cal.Rptr. 807. In affirming the Board of Pharmacy's decision, the court concluded that the statutory scheme contemplates evaluating "the sheer volume of controlled substances prescribed by a single practitioner for a small number of persons" in determining whether orders are suspicious. Id. at 25, 177 Cal.Rptr. 807. This suggests that like the CSA, California requires pharmacies to implement effective controls to prevent diversion.

40 The City also alleges that Marketing Defendants engaged in affirmative conduct by deceptively promoting opioids. Opp. at 11–12. Marketing Defendants and Manufacturers do not dispute that the City has adequately pled affirmative conduct.

41 This conclusion is consistent with the MDL and state decisions. See, e.g.,California v. Purdue Pharma L.P., No. 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct. Orange Cnty. Feb. 13, 2018) (denying demurrer brought, in part, on causation grounds); In re Nat'l Prescription Opiate Litig., 406 F. Supp. 3d 672, 676 (N.D. Ohio 2019) ("[F]actfinders could reasonably infer that Manufacturers' fraudulent marketing and failures to maintain anti-diversion controls were substantial factors in producing the alleged harm suffered by Plaintiffs."); State v. Purdue Pharma L.P., No. 1-173-18, 2019 WL 2331282, at *5 (Tenn. Cir. Ct. Feb. 22, 2019) (applying substantial factor test and finding the same); State v. Purdue

Case 3:17-cv-01362 Document 1290-6 Filed 04/26/21 Page 95 of 96 PageID #: 43346
City and County of San Francisco v. Purdue Pharma L.P., 491 F.Supp.3d 610 (2020)

RICO Bus.Disp.Guide 13,405

Pharma L.P., No. 3AN-17-09966CI, 2018 WL 4468439, at *4 (Alaska Super. Ct. July 12, 2018) (same); State v. Purdue Pharma Inc., No. 217-2017-CV-00402, 2018 WL 4566129, at *4 (N.H. Super. Ct. Sep. 18, 2018) (finding the State had sufficiently pled causation on its public nuisance claims); State v. Purdue Pharma L.P., No. CV2018002018, 2019 WL 1590064, at *3–4 (Ark. Cir. Apr. 05, 2019) (same); In re Opioid Litig., No. 400000/2017, 2018 WL 3115102, at *22 (N.Y. Sup. Ct. June 18, 2018) (same); State v. Purdue Pharma L.P., No. PC-2018-4555, 2019 WL 3991963, at *11 (R.I. Super. Ct. Aug. 16, 2019) ("The Court is satisfied that the State has properly alleged that ... Defendants' conduct caused the public nuisance." (internal citation omitted)); Commonwealth v. Purdue Pharma, L.P., No. 1884CV01808BLS2, 2019 WL 5495866, at *5 (Mass. Super. Ct. Sept. 17, 2019) ("Purdue contends that this case raises several causation issues. Many of these arguments are fact-based, which this Court sees no need to discuss, given the standard applicable to a Rule 12(b)(6) motion."); State v. Purdue Pharma LP, No. CJ-2017-816, 2019 WL 4019929, at *14 (Okla. Dist. Ct. Aug. 26, 2019) ("I further find that the State has satisfied its burden of proof and that the Defendants' actions were the cause -in-fact of its injuries.").

42    Manufacturers' argument is further undermined by the court's affirmative statement that public nuisance claims premised on risky, but not illegal, conduct could establish proximate cause. In re Firearm Cases, 126 Cal. App. 4th at 992, 24 Cal.Rptr.3d 659 ("We do not hold that the theories asserted would never be tenable under different evidence. We merely find, based on the evidence presented here, that the evidence does not sufficiently establish the alleged acts of the defendants caused the diversion of firearms to the criminal market." (footnote omitted)).

43    Unlike the RICO claims, public nuisance claims do not limit governmental entities to "business or property" injuries. See, e.g., Cnty. of Santa Clara, 137 Cal. App. 4th at 309–10, 40 Cal.Rptr.3d 313 (concluding that governmental entities are entitled to seek relief from public nuisances on behalf of the People). Here, the City alleges on behalf of the People that Defendants' conduct caused increased drug-use, addiction, and overdoses. FAC ¶¶ 16–18, 686–96, 911–18. These are all direct and foreseeable harms that stem from over-supplying communities, like San Francisco, with prescription opioids.

44    Manufacturers also argue that the City has not cited any California case law. Man. Reply at 9. But neither party cited any strongly analogous case law on this issue. Further, the Ninth Circuit adopted the City's logic in an unpublished opinion, where it held that a medical clinic's failure to follow its own policy requiring a chaperone to accompany patients during gynecological examinations was the proximate cause under California law of a patient's injuries from sexual assault by a doctor. Avitia v. United States, 24 F. App'x 771, 774–75 (9th Cir. 2001) ("It is no stretch of imagination that such safety concerns would include the prevention of the kind of inappropriate conduct complained of here. If the policy was put in place to prevent such conduct, the assault was foreseeable and Shohayeb's intentional conduct did not supersede the negligent acts of the clinic and Barbosa.").

45    As determined above, the City fails to sufficiently allege a RICO claim. See supra Subpart II.E.3.b.v.

46    NSAIDS include acetaminophen and ibuprofen.

47    Manufacturers also argue that the City fails to plead injury and causation. See Man. Mot. at 11–12. "To establish standing under the CLRA, FAL, and UCL, a plaintiff must allege that the plaintiff suffered an 'injury in fact' and has 'lost money or property' as a result of a defendant's alleged conduct." Tabler v. Panera LLC, 19-CV-01646-LHK, 2019 WL 5579529, at *9 (N.D. Cal. Oct. 29, 2019). Manufacturers do not challenge the City's standing to bring a FAL or UCL claim, nor would they succeed. The FAC is replete with allegations that Manufacturers specifically targeted San Francisco physicians, which caused these physicians to over-prescribe opioids to patients. FAC ¶¶ 38–71. Just as in its public nuisance claim, see supra Subpart II.E.5.c, the City satisfies the CLRA, FAL, and UCL's standing requirements by alleging that Manufacturers' false marketing caused substantial injuries to its residents and property through opioid addiction, overdoses, and property damage. Id. See 1075 Mkt. St. Owners' Assoc. v. U.S. Dep't of Health & Hum. Servs., No. 19-cv-07313-SK, 2020 WL 5229163, at *19 (N.D. Cal. Feb. 11, 2020) (applying the public nuisance injury and proximate cause analysis to the UCL claims).

48    This excludes Purdue's misrepresentations about OxyContin's duration of relief, see FAC ¶ 346, because the actions against Purdue are currently stayed pending bankruptcy proceedings. See In re Purdue Pharma L.P., et al., No. 19-23649.

49    Manufacturers also argue that their statements are protected by California's safe harbor doctrine, but the Court rejected this argument above. See supra Subpart II.E.6.a.ii.

50    While Manufacturers' motion and reply do not specifically identify the "learned intermediary doctrine," Manufacturers conceded at the motion hearing that their argument relies on this doctrine. See Mot. Trans. at 73–74.

51    See e.g., In re Nat'l Prescription Opiate Litig., 2018 WL 4895856, at *23 ("[T]he complaint alleges that prescribing physicians were also targets of the misrepresentations. Given these allegations, the court declines to find that physicians' act of writing prescriptions breaks the causal chain, as a matter of law, when the very purpose of the Defendants' alleged scheme was to achieve exactly that result."); Thompson v. Janssen Pharmaceuticals, Inc., No. CV 16–2628 PSG (AGRx),

2017 WL 5135548, at *9 (C.D. Cal. Oct. 23, 2017) ("California courts have in the past recognized that the learned intermediary doctrine may not apply where medication has been overpromoted to the extent that any warnings would have been nullified."); Stevens v. Parke, Davis & Co., 9 Cal. 3d 51, 65, 107 Cal.Rptr. 45, 507 P.2d 653 (1973) ("[A]n adequate warning to the [medical] profession may be eroded or even nullified by overpromotion of the drug through a vigorous sales program which may have the effect of persuading the prescribing doctor to disregard the warnings give.").

52    See e.g., In re Clorox Consumer Litigation, 894 F. Supp. 2d 1224, 1232–33 (N.D. Cal. 2012) (concluding that studies demonstrating that baking soda-based cat litter is not inferior to carbon-based litter were sufficient to demonstrate that the Clorox's claims about Fresh Step cat litter were false); In re NJOY, Inc. Consumer Class Action Litig., No. 14-428, 2015 WL 12732461, at *18 (C.D. Cal. May 27, 2015) (concluding that plaintiffs did more than allege that there was no competent evidence to support the defendant's claims about its product, NJOY, because plaintiffs cited several studies finding that e-cigarettes, generally, contain dangerous carcinogen, thus making the defendant's assertion false).

53    KOLs are "doctors who were [allegedly] paid by the Marketing Defendants to promote their pro-opioid message ...." FAC ¶ 402.

54    This conclusion negates Manufacturers' argument that the third-party statements constitute protected non-commercial speech. Man. Mot. at 10 (citing Critical Care Diagnostics, Inc. v. Am. Ass'n for Clinical Chemistry, Inc., 13cv1308 L (MDD), 2014 WL 634206, at *8 (S.D. Cal. Feb. 18, 2014)). "In typical commercial speech cases, the speaker is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged ...." Critical Care Diagnostics, Inc., 2014 WL 634206, at *8 (citation omitted). The allegations above plausibly demonstrate that the third parties "act[ed] on behalf of" speakers engaged in the "production, distribution, or sale of goods," and therefore engaged in commercial speech. See id., at *8 (citation omitted).

55    Defendants argue that the City attempts to "amend its Complaint through its opposition brief." Def. Reply. at 13. However, the City incorporated all allegations in its complaint for each cause of action, which includes Defendants' statements regarding regulatory compliance. See FAC ¶ 907.

56    Defendants also argue that the City's claim fails because the City has not alleged (1) that Defendants' conduct directly harmed consumers nor (2) how a failure to report suspicious orders could harm consumers. Def. Mot. at 21. The Court rejected these causation arguments in the public nuisance section above. See supra Subpart II.E.5.c; see also Gamache v. Airbnb., No. A146179, 2017 WL 3431651, at *4 (Cal. Ct. App. Aug. 10, 2017) (applying the same causation analysis to both public nuisance and UCL claims).

---

**End of Document**                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.