2020 WL 1986589
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio, Eastern Division.

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

This Document Relates To:
Broward County, Florida v.
Purdue Pharma L.P., et al.

MDL 2804
|
Case No. 1:17-md-2804, Case No. 18-op-45332
|
Filed: 04/27/2020

**OPINION AND ORDER**

DAN AARON POLSTER, UNITED STATES DISTRICT
JUDGE

 **\*1** Before the Court are three separate motions to
dismiss the Complaint (Doc. #: 525[1]) filed against plaintiff
Broward County, Florida.[2] Pharmacies,[3] Distributors,[4] and
Manufacturers[5] each filed a group motion, seeking dismissal
of Broward's claims against them.[6] Doc. #: 582 (Pharmacies);
Doc. #: 591 (Distributors); Doc. #: 593 (Manufacturers).
Broward filed an omnibus opposition that addressed all three
motions. Doc. #: 730. The three Defendant groups each
filed replies in support of their respective motions. Doc.
#: 825 (Pharmacies); Case No. 18-op-45332, Doc. #: 81
(Distributors); Doc. #: 814 (Manufacturers). Broward later
filed two notices of supplemental authority. Doc. ##: 790;
901.

The Court has reviewed all of the parties' submissions. For
the reasons stated below, the Court now rules as follows:
Defendants' Motions to Dismiss are **GRANTED** with respect
to Counts VII (Negligent Marketing); and Count XIII
(Punitive Damages). The motions are otherwise **DENIED**

**I. Legal Standard for Motion to Dismiss**

 **\*2** The Court incorporates by reference the applicable legal
standards set forth in its Opinion and Order in *West Boca
Medical Center, Inc. v. AmerisourceBergen Drug Corp.,* Case
No. 1:18-op-45530, MDL Doc. #: 3253 at 2-3.

**II. Factual Allegations**

In its Complaint, Broward County asserts the following
claims:

- Count I, Violation of RICO,[7] 18 U.S.C. § 1961 *et
 seq.* - Opioid Marketing Enterprise (Against "RICO
 Marketing Defendants");[8]

- Count II, Violation of RICO, 18 U.S.C. § 1961 *et seq.* -
 Opioid Supply Chain Enterprise (Against "RICO Supply
 Chain Defendants");

- Count III, Violation of The Florida Corrupt Practices
 Act Florida Revised Code §§ 2923.31, *et seq.* - Opioid
 Marketing Enterprise;[9]

- Count IV, Violation of Civil Remedies for Criminal
 Practices Act Fla. Stat. § 772.101, *et seq.* ("Florida
 RICO") - Opioid Supply Chain Enterprise (Against
 RICO Supply Chain Defendants);

- Count V, Violation of Florida Deceptive and Unfair Trade
 Practices Act (Fla. Stat. Ann. § 501.201 *et seq.*) (Against
 All Defendants);

- Count VI, Public Nuisance (Against All Defendants);

- Count VII, Negligence (Against Marketing Defendants);

- Count VIII, Negligence (Against All Defendants);

- Count IX, Gross Negligence (Against All Defendants);

- Count X, Unjust Enrichment (Against All Defendants);

- Count XI, Fraud (Against All Defendants);

- Count XII, Civil Conspiracy (Against All Defendants);

- Count XIII, Punitive Damages (Against All Defendants);

Most of Broward's allegations of Defendants' conduct are
similar to those alleged in complaints filed in (i) *West Boca*
(ii) *Summit County,* (ii) *Muscogee (Creek) Nation,* and (iii)
*Blackfeet Tribe* cases.[10] *See* Doc. ##: 385; 514; 731; Case

Ex. A - Tab 6 - Florida

No. 18-op-45749, Doc. #: 6. The Magistrate Judge and this Court have addressed those factual allegations at length. *See* Doc. #: 3253; *Summit County Report and Recommendation ("R&R"),* Doc. #: 1025; *Muscogee Nation R&R,* Doc. #: 1499; *Blackfeet Tribe R&R,* Doc. #: 1500; *Opinion and Order on Summit County,* Doc. #: 1203; *Opinion and Order on Tribe Cases,* Doc. #: 1680. Thus, the Court provides below only a brief overview of the factual allegations specific to Broward, and incorporates by reference the general factual circumstances surrounding the opioid crisis and the allegations of Defendants' behavior that are common to all of these cases.

### A. Factual Allegations Against Defendants

**\*3** Broward alleges the Manufacturer Defendants, also referred to as "Marketing Defendants," manufacture, sell, and market prescription opioid painkillers. Broward alleges the Marketing Defendants fueled the opioid crisis "through a massive marketing campaign premised on false and incomplete information," which "engineered a dramatic shift in how and when opioids were prescribed by the medical community and used by patients." Doc. #: 520 at ¶13. Broward alleges the Marketing Defendants dramatically increased sales of prescription opioids despite their knowledge "that opioids were addictive and subject to abuse, and that their other claims regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded." Doc. #: 520 at ¶14. Broward alleges Defendants reaped billions of dollars of profit as a result of opioid sales. Doc. #: 520 at ¶¶15-16.

Broward further alleges Defendants "failed to maintain effective controls over the distribution of prescription opioids" and instead "actively sought to evade such controls." Doc. #: 520 at ¶17. Broward alleges Defendants "contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt suspicious orders," which exacerbated the overall supply of opioids and fueled an illegal secondary market. Doc. #: 520 at ¶17. Broward alleges Defendants' conduct has had "severe and far-reaching public health, social services, and criminal justice consequences," the costs of which are borne by Plaintiff and other governmental entities. Doc. #: 520 at ¶22.

### B. Facts Specific to Broward County, Florida

In its complaint, Broward County alleges "it is at the center of the opioid epidemic that plagues the nation," and that "South Florida, and Broward County in particular, have suffered some of the largest numbers of opioid overdose deaths in the country." Doc. #: 520 at ¶2. Broward alleges that, as a result of the "startling number of overdose deaths" in the County, its resources have been strained and it has "incur[ed] substantial and unusual costs for providing, amongst other things, health care, foster care, law enforcement and emergency responder services, criminal justice administration, public assistance, addiction treatment programs, overdose reversal medications, neonatal abstinence syndrome treatment, and other social services and public programs." Doc. #:520 at ¶3.

More specifically, Broward alleges that, due to the severity of the opioid crisis, it was forced to provide additional services above and beyond what it normally provides, causing it to suffer significant financial consequences and unanticipated costs. *See* Doc. #: 520 at ¶¶661-62. The County alleges it incurred the following additional and unanticipated costs:

> increased healthcare expenditures, law enforcement and judicial expenditures, increased jail and public works expenditures, increased substance abuse treatment and diversion plan expenditures, increased emergency and medical care services and autopsies, increased health insurance costs, the costs of processing and paying for fraudulent prescriptions and lost economic opportunity.

Doc. #: 520 at ¶662.

Broward also alleges the opioid crisis caused by Defendants forced the County to make large, unplanned-for expenditures in order to protect the health and welfare of its community, "costing millions in health insurance, treatment services, autopsies, emergency room visits, medical care, treatment for related illnesses and accidents, payments for fraudulent or medically unnecessary prescriptions and lost productivity to Broward County's workforce." Doc. #: 520 at ¶¶662, 999.

## III. Legal Issues Relevant to Multiple Claims

### A. Standing

Defendants assert that Broward is not an appropriate plaintiff to bring these claims. Pharmacies assert that Broward lacks standing under Article III of the Constitution. *See* Doc. #: 582-1 at 2. And Manufacturers assert that Broward, as a municipality, may not infringe upon the exclusive power of the State of Florida under the statewide concern doctrine. *See*

Doc. #: 593-1 at 2-3. As discussed below, the Court finds these arguments not well-taken.

### 1. Article III

**\*4** The Pharmacies and Broward both incorporate briefing on the issue of Article III standing from the briefs in *Summit County*, and add nothing new. *See* Doc. ##: 593-1 at 2; 730 at 9. The analysis of standing pursuant to Article III is unchanged under Florida law; thus the reasoning and conclusion reached in *Summit County* is equally appropriate here. *See* Doc. #: 1025 at 100-02, *adopted by* Doc. #: 1203. Accordingly, Broward has standing under Article III.

### 2. Statewide Concern Doctrine

Manufacturers assert the Statewide Concern Doctrine precludes standing for Broward as a matter of Florida law. *See* Doc. #: 593-1 at 2-3. They assert that, where an issue has statewide significance, the Doctrine prohibits a municipal corporation from vindicating its own rights through litigation because doing so would infringe the State's exclusive power to address that issue. *See* Doc. #: 593-1 at 2-3. In making their argument, Manufacturers assert, without citing any legal support, that "[j]ust as these principles preclude local ordinances that seek to regulate matters of statewide concern, the same limitations apply equally to **litigation** brought by political subdivisions." Doc. #: 593-1 at 2 (emphasis in original). As was the case in *Summit County*, where the Court analyzed a similar argument under Ohio law, Manufacturer's argument fails.

The Florida Constitution grants to counties "all powers of local self-government not inconsistent with general law, or with special law approved by vote of the electors." Fla. Const. art. VIII, § 1(g). In *State v. Broward County*, 468 So. 2d 965 (1985), the Florida Supreme Court stated it has "broadly interpreted the self-governing powers granted charter counties under article VIII, section 1(g)." *Id.* at 969. Further, Section 125.01 of the Florida Statutes sets out the powers of counties: "The legislative and governing body of a county shall have the power to carry on county government. To the extent not inconsistent with general or special law, this power includes, but is not restricted to, the power to: ... Provide for the prosecution and defense of legal causes in behalf of the county or state." Fla. Stat. § 125.01(1)(b). The Florida Supreme Court has explained that, "[u]nless the Legislature has pre-empted a particular subject relating to county government by either general or special law, the county governing body, by reason of this sentence, has full

authority to act through the exercise of home rule power." *Speer v. Olson*, 367 So. 2d 207, 211 (1978).

Thus, Florida's Statewide Concern Doctrine operates in a way substantially similar as Ohio's. At bottom, the Court's analysis of the Statewide Concern Doctrine in *Summit County* is applicable here as well, *see* Doc. #: 1025 at 98-100, *adopted by* Doc. #: 1203. The same result is compelled in this case.

The Court adds one observation. Manufacturers erroneously attempt to impose an affirmative duty on Broward to identify some case or statute authorizing them to bring this action, thereby shifting the burden from themselves onto Broward. But this is inconsistent with *Speer*. Manufacturers have pointed to no authority indicating Broward **lacks** the power to bring this action, so they have not met their burden to demonstrate Broward's lawsuit is "inconsistent with general or special law," or that the Florida Legislature has preempted this suit. Fla. Const. art. VIII, § 1(g). Accordingly, Dismissal is unwarranted under the Statewide Concern Doctrine.

### B. Causation

**\*5** Defendants make several arguments that Broward's claims should be dismissed for lack of causation. None of these arguments compel a different conclusion than those the Court has already reached. Because causation is such an important issue, it has been thoroughly addressed by this Court. *See* Doc. #: 1025 at 24-36 (analyzing RICO causation with respect to municipality plaintiff), 79-82 (negligence causation), 101-02 (Art. III "fairly traceable" requirement); Doc. #: 1203 at 7-10 (RICO causation with respect to municipality plaintiff); Doc. #: 1499 at 23-24 (RICO causation with respect to tribe plaintiff), 61-62 (nuisance causation); Doc. #: 1680 at 6-11 (causation under Oklahoma and Montana law); Doc. #: 3177 at 14-30 (causation with respect to third-party payor plaintiff); Doc. #: 3253 at 8-12 (causation under Florida law), 13-20 (RICO causation with respect to hospital plaintiff), 42-44 (FDUTPA causation); *see also Opinion and Order on Defs. Mot. for Summ. Judgm't on Causation*, Doc. #: 2561.

For example, the Defendants again assert, as they have in each of the motions addressed in the aforementioned orders, that Broward's allegations of causation are too remote or speculative. *See* Doc. ##: 582-1 at 4; 591-1 at 17 n.8; 593-1 at 12 (each expressly incorporating their arguments in *Summit County*). The Pharmacies again assert, as they did in their motion to dismiss West Boca's complaint, that under Florida law the "Sole Proximate Cause" and "Learned Intermediary"

2020 WL 1986589

doctrines defeat causation. *See* Doc. #: 582-1 at 3-4. All Defendants also assert, as they have several times before, that "intervening criminal acts of independent third parties break the chain of causation." Doc. #: 593-1 at 6 (citing *Manufacturers' Summit Cty Br.*, Doc. #: 499-1); *see also* 582-1 at 5; 591-1 at 17. Each of these arguments has been addressed by this Court with respect to municipality plaintiffs, *see* Doc. ##: 1025; 1203, and with respect to Florida law. *See* Doc. #: 3253. Each argument failed. All Defendants either expressly incorporate their *Summit County* briefing, which has been thoroughly addressed by this Court, or incorporated their present briefing into their *West Boca* motions, which were also recently addressed by the Court. There is nothing new for the Court to address with respect to causation, and thus the Court reaches the same result. Broward's claims will not be dismissed for failure to plausibly plead causation.

## C. Federal Preemption

Manufacturers assert that the misrepresentations alleged by Broward have been approved by the FDA, and therefore any state law claim relying on those misrepresentations is preempted by federal law. *See* Doc. #: 593-1 at 5. Both Manufacturers in their motion and Broward in its response incorporate the entirety of their respective briefing on this issue from the *Summit County* briefs. *See* Doc. ##: 593-1 at 5; 730 at 9. Thus, the parties must, by implication, accept the Court's analysis and conclusions based on that briefing. *See* Doc. #: 1025 at 48-54; *adopted by* Doc. #: 1203. Accordingly, Broward's state law claims will not be dismissed as preempted by federal law.

## D. Municipal Cost Recovery Rule

Defendants assert that the Municipal Cost Recovery Rule (also sometimes referred to as the "Free Public Services Doctrine") bars some or all of Broward's claims. Doc. ##: 582-1 at 5; 591-1 at 15-16; 593-1 at 7. All Defendants *cite Penelas v. Arms Tech., Inc.,* 1999 WL 1204353 (Fla. Cir. Ct. Dec. 13, 1999), *aff'd*, 778 So. 2d 1042 (Fla. 3d DCA 2001), for the proposition that, in Florida, "Municipal costs of providing public services are not recoverable as a matter of law." *Id.* at *2.

The Court has carefully reviewed the Florida trial court's decision in *Penelas* and the Florida appellate court's subsequent opinion affirming it. It is important to note at the outset that the *Penelas* court's conclusion regarding the application of the Municipal Cost Recovery Rule in Florida— in addition to being non-precedential—is dicta, as the *Penelas*

court had already determined the county plaintiff lacked standing to bring the claim. *See id.* at *1 ("The Court holds as an initial and fundamental matter that the County is not the proper party plaintiff to bring this lawsuit. The County does not have standing."). Furthermore, the Florida appellate court addressed only product liability law and never reached the Municipal Cost Recovery Rule in Florida.[11] The Florida Supreme Court has not yet ruled on application of the Rule.

**\*6** In situations where a state's highest court has not decided an issue, the Federal Court must make an "*Erie* guess" on how the Florida high court would rule on the issue. Under the *Erie* principles articulated in its *Opinion and Order adopting the Blackfeet and Muscogee R&Rs*, Doc. #: 1680 at 11-13, the Court now concludes that "the Court should reasonably refer to cases that are directly on point, such as *City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062, at *7 (W.D. Wash. Sept. 25, 2017) and *In re Opioid Litigation*, 2018 WL 3115102, at *22 (N.Y. Sup. Ct. June 18, 2018)." Doc. #: 1680 at 13-14. These opinions had not issued when *Penelas* was decided.[12]

After careful review of *Penelas, City of Everett,* and *In re Opioid Litigation*, this Court is persuaded the Florida Supreme Court would find the Municipal Cost Recovery Rule inapplicable to the present case. Rather, this Court concludes the Florida Supreme Court would adopt and follow this Court's own prior analysis as appropriate in opioid cases. *See* Doc. #: 1499 at 17 (quoting Doc. #: 1025 at 21-22) (citing persuasive cases) ("a doctrine that publicly spreads the costs caused by one-time tortfeasors, such as a negligent driver, is inappropriately applied where a defendant engages in a course of repetitive conduct that causes harm of a substantial magnitude and imposes a repeated burden on government services."), *adopted by* Doc. #: 1680; *see also* Doc. ##: 1025 at 17-22; 1203 at 17-20; 1499 at 15-17; 1500 at 8; 1680 at 13-14. Thus, the Court concludes that the Municipal Cost Recovery Rule does not bar Broward's recovery.

## E. Claims against Pharmacies as Dispensaries

The Pharmacies assert that, "to whatever extent Plaintiff intends to assert claims against the Moving Defendants as pharmacies rather than distributors, such claims must be dismissed." Doc. #: 582-1 at 2-3. Broward initially appears to concede this point stating, in its opposition, that it "is suing the National Retail Pharmacies in their capacity as retailers and participants in the supply chain, ***not as dispensing pharmacies***." Doc. #: 730 at 12 (emphasis added). However,

Broward goes on to argue that its "[Complaint] is clear that Broward's claims arise from Defendants' role in the distribution and *sale* of opioids." Doc. #: 730 at 13 (emphasis in original).

It is not clear what distinction Broward is attempting to draw between "retailers and participants in the supply chain" and "dispensing pharmacies." The thrust of Broward's argument, however—taken as a whole and viewed in light of the factual allegations presented in the Complaint—clearly indicates that they do seek to hold Pharmacies liable for their dispensing practices, at least at the corporate level, and they have alleged sufficient facts plausibly to do so. *See* Doc. #: 520 at ¶582 ("Pharmacies' fail[ed] to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers"), ¶583 ("Pharmacies also failed to adequately use data available to them to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids"), ¶584 ("Pharmacies failed to analyze ... the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community"), ¶587 ("Pharmacies were, or should have been, fully aware that the quantity of opioids being distributed ***and dispensed*** by them was untenable, and in many areas patently absurd.") (emphasis added). Thus, the Court concludes that Broward's claims, to the extent they intend to pursue them, may proceed against the Pharmacies as retail dispensers of opioid drugs.

**F. Statutes of Limitation**

 **\*7** Manufacturers assert that any applicable limitations period for Broward's claims has run, so all claims should be dismissed as time-barred. *See* Doc. ##: 593-1 at 15-18. Broward responds that the statutes of limitations are equitably tolled under the doctrines of delayed discovery or fraudulent concealment and that Defendants' conduct constitutes a continuing violation. Broward also asserts that, in any event, a statute of limitations is an affirmative defense and the Manufacturers have failed to meet their burden of proof. *See* Doc. #: 730 at 3-9.

The Court has previously addressed each of these arguments. *See* Doc. ##: 1025 at 54-56; 1203 at 3-6; 1499 at 14-15; 1500 at 7-8. Nothing in the Manufacturers' motion or reply convince the Court that its prior analysis applies differently in Florida. Accordingly, the Court's analysis and conclusion reached in *Summit County* support the same conclusion here.

Broward's claims will not be dismissed as time-barred by the applicable statutes of limitations.

**IV. RICO and Florida RICO**

Distributor and Manufacturer Defendants reassert and incorporate the arguments they made for dismissal of Federal RICO claims in *Summit County. See* Doc. ## 591-1 at 2-3, 593-1 at 3-5. Specifically, Defendants assert Broward has failed to plausibly allege: (1) any cognizable injury; (2) actual or proximate causation; (3) the existence of an enterprise; (4) any actionable racketeering activity; (5) standing to bring RICO claims; or (6) an actionable RICO conspiracy claim. *See* Doc. #: 591-1 at 2-3 (incorporating *Distributors' Summit Cty. Br.*, Doc. #: 491-1 at 7-21); Doc. #: 593-1 at 3-5 (incorporating *Manufacturers' Summit Cty Br.*, Doc. #: 499-1 at 9-34). Furthermore, both Defendants and Broward agree that Fla. Stat. § 772.101 *et seq.* ("Florida RICO") is modeled after 18 U.S.C. § 1961 *et seq.* ("Federal RICO"), and that any analysis of Federal RICO applies with the same force to Florida RICO.[13] *See* Doc. ##: 591-1 at 2; 593-1 at 3; 730 at 56-57.

Because Defendants do not make any new or additional arguments for dismissal of Broward's RICO claims beyond those previously made and addressed in the Court's Opinions in *Summit County*, the Court's prior analysis governs and compels the same results here. *See* Doc. ##: 1025 at 11-48; 1203 at 6-20. Accordingly, Broward's state and federal RICO claims, Counts I-IV, will not be dismissed.

**V. Nuisance**

As this Court has previously described, "Florida, like Ohio, follows the Restatement (Second) of Torts," Doc. #: 3253 at 30; therefore, the Court's previous analyses of nuisance law are applicable to the present motions.

Defendants assert Broward's Nuisance claim fails because: (1) their conduct is protected under a recognized Florida "Safe Harbor";[14] (2) they lacked control over the instrumentality of the nuisance; (3) Florida does not recognize nuisance claims not tied to the use and enjoyment of property; and (4) Broward failed to allege interference with a public right. *See* Doc. ##: 582-1 at 9-10; 591-1 at 9-10; 593-1 at 5-7.

**\*8** As they did in *West Boca,* and in this case when addressing the Municipal Cost Recovery Rule, Defendants rely heavily on *Penelas* as a defense to Broward's nuisance claim. And for the same reasons described above, the Court is not convinced that *Penelas*—a product liability case regarding firearms—represents how the Florida Supreme Court would rule on whether the Defendants' behavior in marketing, distributing, and selling Schedule II narcotics (allegedly in violation of the CSA) within Broward County created a public nuisance.

As this Court has previously concluded, there are important factual distinctions between *Penelas* and the case that Broward brings. *See, e.g.,* Doc. #: 1499 at 56 ("Those decisions [including *Penelas*] are based on alleged facts that differ materially from those Plaintiff alleges. Contrary to the Defendants' contentions, while Plaintiff's nuisance theory concerns a product, it does not sound in products liability."); *adopted by* Doc. #: 1680. It is also noteworthy that no Defendant is able to cite any Florida case law, beyond this twenty-year old, unreported, lower court opinion, which supports its position. Thus, the Court concludes its prior analysis of the *Erie* Doctrine is accurately applied here as well. *See* Doc. #: 1680 at 13-14; *see also* Section III.D., *supra.*

Accordingly, because all of Defendants' arguments were incorporated by reference into their briefing on the nuisance claim in *West Boca*, each of these exact arguments has already been addressed and rejected by this Court under Florida law. *See* Doc. #: 3253 at 29-33. The same result is compelled here. Defendants' motions to dismiss Broward's nuisance claim, Count VI, are denied.

## VI. Florida's Deceptive and Unfair Trade Practices Act

Broward's Fifth Claim for Relief alleges each Defendant engaged in "unconscionable, unfair or deceptive acts or practices" in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 et seq. (2007). Doc. #: 520 at ¶¶920-30. The FDUTPA is Florida's consumer-protection law. In *West Boca*, this Court set forth the legal standard and intent of the FDUTPA. *See* Doc. #: 3253 at 34-35. The Court also analyzed and interpreted case law describing the parameters and application of the FDUTPA. *See* Doc. #: 3253 at 34-47. Broward's allegations against Defendants are identical to those presented in *West Boca*, and the Defendants' arguments to dismiss the allegations are

also identical. In fact, the arguments examined in *West Boca* incorporated the briefing on the present motions by reference.

For the sake of clarity, Defendants assert Broward's FDUTPA claim fails because: (1) it does not meet the heightened pleading requirement under Rule 9(b) of the Federal Rules;[15] (2) Broward does not allege a consumer transaction, so it lacks standing as a consumer under the FDUTPA; and (3) Broward fails to plead a deceptive or unfair act. *See* Doc. ##: 591-1 at 3-6, 593-1 at 12-13; 582-1 at 10-11. Additionally, Manufacturer Defendants argue they are protected by the statute's safe-harbor provision, and Distributor Defendants argue violations of the CSA cannot serve as a proper predicate for an FDUTPA claim. All of these arguments were carefully addressed and rejected in the *West Boca* opinion. *See* Doc. #: 3253 at 34-44. The fact that the Plaintiff herein is a County, whereas the Plaintiff in *West Boca* is a hospital, does not change the outcome of this Court's prior FDUTPA ruling.

**\*9** The only issue in this case that differs materially from *West Boca* is whether Broward properly alleged "actual damages" cognizable under Section 501.207(1) of the FDUTPA. Despite the asserted categories of damages being different between the plaintiffs in this case and *West Boca*, Defendants in this case set forth identical arguments as to why Broward is not entitled to recover damages*, see* Doc. ##: 593-1 at 12-13; 591-1 at 7-8; 582-1 at 14-15. The Court earlier ruled that "West Boca's being in the business of providing healthcare services, does not make its injuries 'derivative' of personal injuries." Doc. #: 3253 at 45.

Moreover, Broward, a municipality, alleges damages that are identical to those alleged in the *Summit County* case. *Compare* Doc. ##: 520 at ¶917, *with* 1203 at 13-17 (listing Summit County's asserted categories of damages). Both Counties assert thirteen identical categories of costs incurred as a result of the opioid epidemic. *See* Doc. ##: 520 at ¶917; 1203 at 15-16. In evaluating the thirteen categories of damages, this Court ruled in *Summit County* that, while some of the costs could conceivably arise directly out of the personal injury of its citizens (and thus "effectively [be] claims to recoup medical expenses"), at least some of the asserted injuries did not. *See* Doc. #: 1203 at 16-17.[16] The Court finds Broward has asserted injuries that do not arise out personal injuries, and are therefore, proper.

In sum, for all the reasons stated in *West Boca*, Defendants are not entitled to dismissal of Broward's claim under FDUTPA.

## VII. Negligence

Plaintiff has alleged three negligence claims: negligence against all Defendants (Count VIII); negligence (essentially, negligent marketing) against only the Marketing Defendants (Count VII); and gross negligence against all Defendants (Count IX).

### A. Common-Law Negligence

In *West Boca*, this Court analyzed virtually identical negligence arguments under the same Florida law as those presented herein. Both Florida and Ohio law require the following four elements to allege a negligence claim: (1) the existence of a legal duty, (2) breach of that duty, (3) causation, and (4) cognizable injury. *Tynes v. Buccaneers Ltd. P'ship*, 134 F.Supp.3d 1352, 1357 fn.1 (M.D. Fla. 2015). Therefore, the Court's analyses in both *Summit County* and *West Boca* are applicable to the negligence claim asserted by Broward.

Defendants assert Broward's negligence claims fail because: (1) the Complaint does not plead actual and proximate causation, *see* Doc. ##: 593-1 at 7-8; 591-1 at 16-17; (2) the claims are preempted, *see* Doc. #: 593-1 at 7; and (3) the learned intermediary doctrine precludes a finding of proximate cause. *See* Doc. #: 582-1 at 4.

Each of Defendants' arguments have been specifically rejected by this Court. *See, e.g.*, Section III.B., *supra*; *see also* Doc. #: 1025 at 30, 78 (finding, for example, that the learned intermediary doctrine is inapplicable and "declin[ing] to find that the physicians' act of writing prescriptions breaks the causal chain, as a matter of law, when the very purpose of the Defendants' alleged scheme was to achieve exactly that result."); Doc. #: 3253 at 52 (finding "West Boca's asserted injuries plausibly fall within the foreseeable zone of risk created by Defendants' manufacturing, distributing, and dispensing activities related to opioid drugs."). For the same reasons, the Court finds that Broward has alleged a proper claim of common law negligence against Defendants.

### B. Negligent Marketing

**\*10** In its Seventh Claim for Relief, Broward alleges Marketing Defendants breached their statutory[17] and common-law duties to Broward by "promoting and marketing the use of opioids for indications not federally approved, circulating false and misleading information concerning their

safety and efficacy, and downplaying or omitting the risk of addiction arising from their use." Doc. #: 520 at ¶942. Broward argues these breaches caused it to suffer, and continue to suffer, both injuries and pecuniary losses directly and proximately caused by Marketing Defendants. *See* Doc. #: 520 at ¶944.

These allegations mirror the negligent marketing claim analyzed in *West Boca*, where this Court found that Florida courts have not deemed "negligent marketing" a separate cause of action, and dismissed West Boca's claim. *See* Doc. #: 3253 at 55-56.[18] For the same reasons, Defendants' motion to dismiss Count Seven in this case is granted.

### C. Gross Negligence

In its Ninth Claim for Relief, Broward alleges gross negligence against all Defendants. In Florida, liability for gross negligence requires (in addition to the elements of common-law negligence) that the defendant has knowledge of the existence of circumstances which constitute a "clear and present danger," yet still undertakes "a conscious, voluntary act or omission ... which is likely to result in injury." *Hager v. Live Nation Sports, Inc., 665 F. Supp. 2d 1290 (S.D. Fla. 2009)* (citing *Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc., 206 F.3d 1373, 1377 (11th Cir. 2000)*). Defendants do not offer any argument relating to gross negligence specifically. Rather, they incorporate their general negligence argument, simply asserting they do not owe a duty to Plaintiff. *See* Doc. ##: 593-1 at 7-9; 591-1 at 10-13; 582-1 at 6-9.

Broward makes many of the same allegations as West Boca did in its complaint. For example, Broward alleges the Marketing Defendants recklessly published false and misleading information despite knowing the truth about opioids, and that all Defendants were repeatedly admonished and fined by regulatory authorities but continued their behavior. See Doc. #: 520 at ¶¶364-96, 723. Broward further alleges Defendants "knew or should have known about the imminent danger posed by continuing to manufacture and/or supply millions of doses of opioids to Broward County," but "Defendants continued to manufacture and/or supply these pharmaceutical products to Broward County, demonstrating their conscious disregard of the consequences of these actions," and "Defendants' conduct was so reckless and wanting in care that it constituted a conscious disregard and/or indifference to the life, safety, and rights of all those

2020 WL 1986589

exposed to their conduct in Broward County." Doc. #: 520 at ¶¶961-62.

The Court concludes that these factual allegations, taken as true, rise to the level of gross negligence. In fact, this Court in *West Boca* found similar allegations could support a finding of wanton negligence, which is a more culpable level of negligence. *See* Doc. #: 3253 at 52-54; *see also Greathouse v. CECO Concrete Constr., LLC*, No. 5:06cv2, 2007 WL 624550, at *4 (N.D. Fla. Feb. 23, 2007) (citations omitted). Broward has adequately pled allegations against Defendants which incorporate conscious disregard of consequences, and has also alleged facts that could, ultimately, support a finding of gross negligence against Defendants. Therefore, Defendants' Motion to Dismiss the gross negligence claim is denied.

## VIII. Unjust Enrichment

**\*11** In the Tenth Claim for Relief, Broward alleges unjust enrichment against all Defendants, claiming the County made payments for opioids manufactured, distributed, or filled by each Marketing Distributor Defendant, thereby conferring a benefit on each such Defendant. Doc. #: 520 at ¶¶966-67. Broward alleges it would be inequitable for Defendants to retain this benefit and Defendants must disgorge their unjustly acquired profits. Doc. #: 520 at ¶¶966-69.

In Florida, the elements of unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff. *See Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So.3d 689, 693 (Fla. 3d DCA 2018). The basis of the remedy for unjust enrichment is to provide restitution where one person has been unjustly enriched at the expense of another. *See id.* Disgorgement is an equitable remedy in unjust enrichment actions, and is measured by the defendant's ill-gotten gains rather than the plaintiff's losses. *See, e.g., S.E.C. v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017).

Defendants argue Broward does not allege any benefit conferred on Defendants. Doc. ##: 582-1 at 16; 591-1 at 15; 593-1 at 13. Distributors and Manufacturers argue the claim fails because it is duplicative. Doc. ##: 591-1 at 14; 593-1 at 13. Manufacturers further argue Broward fails to plead facts

showing Manufacturers "knowing and voluntarily" accepted any direct benefit from Broward. Doc. #: 593-1 at 13.

For the reasons stated in *Summit County*, *see* Doc. ##: 1025 at 91-95; 1203 at 36-38, and repeated by this Court in *Cleveland Bakers*, *see* Doc. #: 3177 at 61-63, and *West Boca*, *see* Doc. #: 3253 at 58-60, these arguments do not persuade the Court to dismiss Broward's unjust enrichment claim. The Ohio law of unjust enrichment parallels Florida law; accordingly, the Court's prior rulings apply here. *See City of Miami v. Bank of America Corp.*, 800 F.3d 1262, 1288 (11th Cir. 2015).

First, as in *Summit County* and *West Boca*, Broward's Complaint pleads a facially plausible unjust enrichment cause of action "on the theory that [the plaintiff] conferred a benefit upon all Defendants by alleging that they paid for the cost of harm caused by the defendant's conduct, *i.e.*, the defendants' externalities." Doc. ##: 1025 at 95; 3253 at 58.[19] Furthermore, Defendants' argument that there was no direct transaction between the parties, and therefore no direct benefit conferred, does not warrant dismissal of the unjust enrichment claim under Florida law. *See, e.g., Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1236-37 (S.D. Fla. 2015) (citing cases in the Southern District of Florida that permit an unjust enrichment claim to stand where the benefit is conferred through an intermediary); *see also Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1229 (S.D. Fla. 2009) ("Whether [Defendants] did or did not receive a direct benefit from Plaintiff is a question of fact that cannot be resolved at the motion to dismiss stage.").

**\*12** The Court also addressed and rejected in its *Summit County* and *West Boca* rulings each of Defendants' remaining arguments. First, the Court previously ruled that allegations similar to Broward's allegations herein—that the benefit was "known to and accepted by" Defendants—adequately supports the unjust enrichment element of knowledge in the pleading stage. *See* Doc. #: 1025 at 94. Second, the argument that Broward's unjust enrichment claim should be dismissed as "duplicative" was rejected in *Summit County* and is expressly rejected by courts in the Southern District of Florida. *Id.* at 94-95; *In re Monat Hair Card Prods. Mktg., Sales Practices, and Prods. Liab. Litig.*, 2019 WL 5423457, at *4 (S.D. Fla. Oct. 23, 2019) (citations omitted) ("The general rule that 'equitable remedies are not available under Florida law when adequate legal remedies exist' ... does not apply to unjust enrichment claims."); *Martorella v. Deutsche Bank Nat. Trust. Co.*, 931 F. Supp. 2d 1218, 1227 (S.D. Fla. 2013) (finding plaintiff could "maintain an equitable unjust

enrichment claim in the alternative to her legal claims against Defendants").

For these reasons, Defendants' Motion to Dismiss Broward's unjust enrichment claim is denied.

## IX. Fraud

In the Eleventh Claim for Relief, Broward alleges fraud against all Defendants. The elements of a claim of common law fraud in Florida are the same as those in Ohio. Those elements are: " '(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation.' " *Sciolino v. John Hancock Life Ins. Co. (U.S.A.)*, 2017 WL 700215, at *2 (M.D. Fla. Feb. 22, 2017) (quoting *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010)). In their motion to dismiss Broward's fraud claim, the Manufacturer Defendants make the same arguments against the same allegations as in their *Summit County* motion to dismiss and incorporate that briefing by reference. *See* Doc. #: 593 at 9-10. As elsewhere in this opinion, the Court is not convinced by any of the present briefing that its prior analysis needs to be revisited and, therefore, adopts and incorporates its reasoning and conclusions from its *Summit County Opinion*, Doc. #: 1025 at 39-42 (discussing *Fed. R. Civ. P. Rule 9(b)*), 85-88 (discussing common-law fraud); *adopted by* Doc. #: 1203, with respect to the Manufacturers. Thus, the Manufacturer Defendants' Motion to Dismiss Broward's fraud claim is denied.

However, uniquely in the present complaint, Broward alleges that Distributor and Pharmacy Defendants also committed common-law fraud. No analysis has yet been done by this Court with respect to a fraud claim against those defendant groups. The Court concludes Broward has sufficiently alleged common-law fraud against Distributor and Pharmacy Defendants.

Distributors and Pharmacies both assert Broward's fraud allegations are deficient for not complying with the particularity requirement of Federal Rule 9(b). *See* Doc. ##: 582 at 11-12; 591 at 13-14. They further assert that, to the extent Broward's claims are predicated on alleged failures to report suspicious orders or to disclose the prevalence of diversion in the County—which they assert is a claim of fraud by omission—Broward's claim should fail because: (1)

neither Distributors nor Pharmacies had a duty to disclose such information to Broward; and (2) the alleged omission was not made in the course of any specifically-identified transaction with the County.

This Court has carefully set forth its analysis of the application of Federal Rule 9(b) to allegations of fraud in this MDL:

"The sufficiency of a fraud pleading tends to vary with the complexity of the transaction in question in the litigation. When the issues are complicated or the transactions cover a long period of time, a number of federal courts have required less of the pleader." Charles Alan Wright *et al*, 5A Fed. Prac. & Proc. Civ. § 1298 (4th ed.); *see also, cf., United States v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017) (describing that " 'particular' allegations of fraud may demand different things in different contexts."). The Sixth Circuit has relaxed pleading standards in certain contexts to aid in judicial efficiency. *See, e.g., U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 509–10 (6th Cir. 2007) (describing how "pleading every instance of fraud would be extremely ungainly, if not impossible" in situations where allegations are "complex and far-reaching.")

**\*13** "Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony." *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 526 (6th Cir. 2007) (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006)). That is, when considering Rule 9's particularity requirement, " 'a court must also consider the policy favoring simplicity in pleading, codified in the 'short and plain statement of the claim' requirement of Federal Rule of Civil Procedure 8.' " *Id.* Thus, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Williams v. Duke Energy Intern., Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

Doc. #: 1680 at 3-4; *see also* Doc. #: 1025 at 39-42 ("Especially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control." (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988))), *adopted by* Doc. #: 1203.

## A. Fraud by Affirmative Statements

Distributor and Pharmacy Defendants assert Broward has not alleged any affirmative statement made by them at all, and in any event none with the particularity required under Federal Rule 9(b). They assert the only non-conclusory misstatements alleged in the Complaint were made by Manufacturing Defendants. See Doc. ##: 582-1 at 11; 591-1 at 13-14 (citing Doc. #: 520 at ¶¶143–454). However, Broward alleges that, "[a]fter being caught failing to comply with particular obligations at particular facilities, Distributor Defendants made broad promises to change their ways and insisted that they sought to be good corporate citizens." Doc. #: 520 at ¶556. Broward further alleges that "Distributor Defendants publicly portrayed themselves as committed to working with law enforcement, opioid manufacturers, and others to prevent diversion of these dangerous drugs."[20] Doc. #: 520 at ¶557. Broward also specifically alleges that Defendants "continued to violate the laws in contrast to [their] written agreement[s] not to do so."[21] Doc. #: 520 at 556 (describing McKesson, specifically).

Broward also alleges reliance on these false and fraudulent public statements made by Distributor and Pharmacy Defendants. Broward alleges that, had it not relied on Defendants' statements that they were working to prevent diversion, Broward would have taken action sooner to prevent the opioid crisis. See Doc. #: 520 at § III.E.6. ("Defendants Delayed a Response to the Opioid Crisis by Pretending to Cooperate with Law Enforcement."); see also Doc. #: 520 at ¶555 ("Without reporting by those involved in the supply chain, law enforcement may be delayed in taking action—or may not know to take action at all.").[22] Broward alleges that, "acting on its own behalf and on behalf of its inhabitants, [it] relied to its detriment on the misinformation and has suffered, and continues to suffer, both injuries and pecuniary losses as a result of this reliance."[23] Doc. #: 984.

**\*14** The Court concludes Broward has alleged, with sufficient particularity under Rule 9(b), facts sufficient to put Defendants on notice of the common-law fraud claims against them for affirmative statements they made to the public, which includes Broward County.

## B. Fraud by Omission

"Florida law recognizes that fraud can occur by omission." Woods v. On Baldwin Pond, LLC, 634 F. App'x 296, 297 (11th Cir. 2015) (quoting ZC Ins. Co. v. Brooks, 847 So.2d 547, 551

(Fla. 4th DCA 2003)); see also Scolieri v. John Hancock Life Ins. Co. (U.S.A.), 2017 WL 700215, at *3 (M.D. Fla. Feb. 22, 2017). Case law makes clear, however, that:

> [f]raud based upon a failure to disclose material information exists only when a duty to make such disclosure exists. This duty arises when one party has information which the other party has a right to know because there is a fiduciary or other relation of trust or confidence between the two parties. Where a party in an arm's-length transaction undertakes to disclose information, all material facts must be disclosed.

Friedman v. Am. Guardian Warranty Servs., Inc., 837 So. 2d 1165, 1166 (Fla. 4th DCA 2003) (citing State v. Mark Marks, P.A., 698 So.2d 533 (Fla. 1997)); Gutter v. Wunker, 631 So.2d 1117, 1118–19 (Fla. 4th DCA 1994) (internal citations omitted).

Florida courts have remarked that "[t]he term 'fiduciary or confidential relation,' is a very broad one." Quinn v. Phipps, 93 Fla. 805, 809 (1927); see also Doe v. Evans, 814 So. 2d 370, 374 (Fla. 2002) (citing Quinn, 93 Fla. at 809).

> The relation and duties involved need not be legal; they may be moral, social, domestic or personal. If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief. The origin of the confidence is immaterial.

Id. at 811. "A fiduciary relationship may be implied by law, and such relationships are 'premised upon the specific factual situation surrounding the transaction and the relationship of the parties.' " Doe v. Evans, 814 So. 2d 370, 374 (Fla. 2002) (quoting Capital Bank v. MVB, Inc., 644 So.2d 515, 518 (Fla. 3d DCA 1994)).

Broward alleges that, as registrants under the CSA, "Defendants are placed in a position of special trust and responsibility and are uniquely positioned, based on their knowledge of prescribes and orders, to act as a first line of defense." Doc. #: 520 at ¶142. As described above, it appears to be true under Florida law that a Court may find a fiduciary relationship exists, based on the specific factual circumstances that exist between the parties, "when one party has information which the other party has a right to know." Friedman, 837 So. 2d at 1166.

The Court has previously determined, as a matter of law, that CSA registrants have a duty to disclose evidence of

possible diversion (*i.e.*, suspicious orders) *to the DEA. See Opinion and Order Regarding the CSA*, Doc. #: 2483 at 14-15. The Court has also observed that the CSA contains many consumer protection and public interest elements. *See* Doc. #: 3253 at 42 n.44. It is also undisputed that the DEA's mission is to "enforce the controlled substances laws and regulations of the United States." *Michel v. United States*, 2017 WL 4922831, at \*14 (S.D. Cal. Oct. 31, 2017) (quoting DEA Mission Statement (available at https://www.dea.gov/mission)).

   **\*15**  As part of its mission, DEA manages the 'national drug intelligence program *in cooperation with federal, state, local, and foreign officials* to collect, analyze, and *disseminate strategic and operational drug intelligence information*.' *Id.* It also *coordinates and cooperates with* other federal, state and *local law enforcement officials* on 'mutual drug enforcement efforts.' *Id.*
*Id.* (emphasis added). Given the DEA's stated mission of cooperation, collaboration, and sharing information with local officials—which includes Broward County—and in light of Florida law construing fiduciary relationships broadly, it is not unreasonable to assume that the omission of material facts in statements made to the DEA would be passed on to Broward specifically, so that it could engage in the very drug enforcement efforts from which it allegedly abstained in reliance on those omissions.

Broward alleges that "each of the Defendants assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully." Doc. #: 520 at ¶472. As described above, Broward has specifically alleged affirmative misstatements by the Defendants. Broward further argues that Distributors and Pharmacies have been endowed with a special trust as registrants under the CSA; and because of their special knowledge regarding the number and type of pills shipped into Broward County, these Defendants serve as a last line of defense for the County. *See, generally*, Doc. #: 730 at 59 (citing Doc. #: 520 at ¶¶142, 777). These allegations are sufficient to support a conclusion that a fiduciary relationship exists under Florida law. The allegations are also sufficient to demonstrate that Broward trusted these Defendants to inform it—either via the DEA or directly—that pills were being diverted into the County.

Regarding Broward's allegations of reliance, the Court concludes Broward has also sufficiently alleged reliance upon Defendants' omissions. For example, Broward alleges the "Distributor Defendants failed to disclose the prevalence of

diversion of controlled substances, including opioids within Broward County," Doc. #: 520 at ¶972, and "Each Defendant knew its concealment of or failure to disclose these material facts would induce Broward County to act, specifically to purchase prescription opioids." Doc. #: 520 at ¶981.

Finally, it has been a point of contention between the Plaintiffs and Defendants in the MDL since its inception whether Plaintiffs should have to identify specific transactions that were suspicious, negligent, wrongful, or fraudulent, and whether Defendants may be held liable when their alleged malfeasance only comes to light when all of the actions of each Defendant are considered in the aggregate. Thus far, the Court has generally allowed plaintiffs' aggregate theories to survive. Viewed through this framework, the fact that Broward does not, at the pleading stage, point to one or several specific transactions is not surprising; nor is it fatal to its fraud claim. Where "the facts underlying the claims are within the defendant's control," as they frequently are in the case of an alleged omission of material fact, the Court should be "reluctant to dismiss the action." *Michaels Bldg. Co.*, 848 F.2d at 680. And, in a complex and far-reaching case such as this, where the unprecedented scope of the alleged fraud was carried out by multiple defendants over multiple decades, and where there may have been hundreds or even thousands of individual statements or omissions of material fact making up the alleged fraud, "courts should not be 'too exacting' or 'demand clairvoyance from pleaders' in determining whether the requirements of Rule 9(b) have been met." Doc. #: 1025 at 40 (quoting *Ford v. Pa. Higher Educ. Assist. Agency*, 2018 WL 1377858 at \*4 (N.D. Ohio Mar. 19, 2018) (Lioi, J.)).

   **\*16**  Under this framework—as laid out by the Court in this and its previous opinions and viewed in light of the circumstances of this case—Broward has provided sufficient particularity in its pleading to support its allegations of fraud by omission, and has put each Defendant on notice as to the nature of the claim against it.

In sum, Distributors' and Pharmacies' motions to dismiss Broward's fraud claim are denied.

## X. Civil Conspiracy

Count Twelve alleges Civil Conspiracy against all Defendants. Under Florida law, to plead civil conspiracy, Broward must allege: (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act

by unlawful means; (3) an overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts done. *Philip Morris USA, Inc. v. Russo*, 175 So.3d 681, 686 n.9 (Fla. 2015). Implicit in the claim is that Broward must allege an underlying illegal act or tort. *Alhassid v. Bank of America, N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014); *Wilder v. JP Morgan Chase Bank, N.A.*, 2018 WL 5629922, at *4 (S.D. Fla. Oct. 30, 2018). A party may establish a conspiracy through circumstantial evidence. *See Koch v. Royal Wine Merchants, Ltd.*, 907 F. Supp. 2d 1332, 1346 (S.D. Fla. 2012).

Broward's Complaint shows fraud is the underlying unlawful act or tort forming the basis for the civil conspiracy claim. *See* Doc. # 520 at ¶993. Defendants argue Broward failed to plead this claim with particularity. Doc. ##: 582-1 at 10-11; 591-1 at 17; 593-1 at 14. The Court rejects this argument for the reasons stated in Section IX, *supra*, finding Broward has pled its claims sounding in fraud with particularity. Thus, Broward has sufficiently alleged an underlying illegal act or tort.

Pharmacy Defendants further argue Broward failed to allege a conspiratorial agreement. Doc. #: 582 at 15-16. Manufacturers argue Broward fails to adequately allege any of the elements of the claim. Doc. #: 593 at 14.

The Court previously has considered and rejected these same arguments in *Summit County* and the *Tribe cases*. *See* Doc. ##: 1025 at 97; 1499 at 68-69; 1500 at 41-42. The parties have not identified, and the Court has not found, Florida authority requiring a different outcome here. Consequently, Defendants' Motion to Dismiss Broward's civil conspiracy claim is denied.

## XI. Punitive Damages

Broward's Thirteenth Claim for Relief is one for Punitive Damages for Defendants' conduct that was "fraudulent,

malicious, willful, deliberately violate or oppressive, and/ or committed with such gross negligence as to indicate wanton and conscious disregard for the rights and safety of others." Doc. #: 520 at ¶1000. Broward also includes punitive damages in its Prayer for Relief. Doc. #: 520 at 299-300.

Pharmacy and Manufacturer Defendants assert Claim 13 should be dismissed because a cause of action for punitive damages does not exist. Doc. ##: 582-1 at 16; 593-1 at 15. Manufacturer Defendants further argue Broward's "conclusory allegations" are insufficient. Doc. #: 593-1 at 15.

The Court agrees Claim Thirteen should be dismissed for failing to state a claim for an independent cause of action. *See Echols v. RJ Reynolds Tobacco Co.*, 2014 WL 5305633, at *6 (S.D. Fla. Oct. 15, 2014) ("A claim for punitive damages is not a separate and distinct cause of action; rather it is auxiliary to, and dependent upon, the existence of an underlying claim."). But the Court will not strike the prayer for punitive damages at this time. Defendants' arguments are more appropriately raised "at a later phase in this litigation." *Berene v. Nationstar Mortg. LLC*, 2016 WL 3944742, at *5 (S.D. Fla. Feb. 5, 2016), *rev'd and remanded on other grounds*, 686 F. App'x 714 (11th Cir. 2017).

## XII. Conclusion

**\*17** Accordingly, Defendants' Motions to Dismiss are **GRANTED** with respect to Count VII (Negligent Marketing); and Count XIII (Punitive Damages). The motions are otherwise **DENIED.**

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 1986589

## Footnotes

1   Unless otherwise indicated, all document numbers refer to the master MDL docket, Case No. 17-md-2804. Page numbers, when necessary, refer to the documents' native format pagination.

2   Broward's Complaint was refiled redacted at Doc. #: 525 and after briefing on the motions to dismiss, Broward filed a Second Amended Complaint to add new Defendants, Case No. 18-op-45322, Doc. #: 88. Although the Court refers to the sealed Amended Complaint, paragraph numbers in the redacted version should be the same.

3   The Pharmacies' motion was filed collectively by defendants CVS Health Corporation ("CVS"), Walgreens Boots Alliance, Inc. ("Walgreens"), and Walmart Inc. ("Walmart") (collectively "Pharmacies" or "Pharmacy Defendants").

4    The Distributors' motion was filed collectively by defendants AmerisourceBergen Drug Corporation ("ABDC"); Cardinal Health, Inc. ("Cardinal"); and McKesson Corporation ("McKesson") (collectively "Distributors" or "Distributor Defendants").

5    The Manufacturers' motion was filed collectively by defendants Purdue Pharma LP, Purdue Pharma Inc., and The Purdue Frederick Company Inc. ("Purdue"); Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. ("Allergan/Actavis"); Watson Laboratories, Inc., Actavis Pharma, Inc.; Actavis LLC; Teva Pharmaceuticals. USA, Inc.; and Cephalon, Inc. ("Teva"); Johnson & Johnson ("J&J") and Janssen Pharmaceuticals, Inc., Ortho-McNeil Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. ("Janssen"); Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. ("Endo"); Insys Therapeutics, Inc. ("Insys"); Mallinckrodt LLC ("Mallinckrodt"); and Noramco, Inc., to the extent applicable (collectively "Manufacturers" or "Manufacturer Defendants").

6    The Court recognizes that some Defendants have or are contemplating filing for bankruptcy protection, and litigation against those Defendants has or may be stayed pending those proceedings. For the sake of simplicity, the Court addresses these motions as they were filed by the parties.

7    Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

8    In its Complaint, Broward uses the following definitions:

- "Collectively, Purdue, Actavis, Cephalon, Janssen, Endo, Insys, and Mallinckrodt are referred to as 'Marketing Defendants.' " *See* Doc. #: 520 at ¶82.
- "Collectively, Defendants CVS, Health Mart, H.D. Smith, Walgreens, and Wal-Mart are referred to as 'National Retail Pharmacies.' " Doc. #: 520 at ¶95.
- "Cardinal, McKesson, AmerisourceBergen and the National Retail Pharmacies are collectively referred to as the 'Distributor Defendants.' " Doc. #: 520 at ¶95.
- "Together, Purdue, Actavis, Cephalon, Endo, Mallinckrodt, Cardinal, McKesson and AmerisourceBergen are sometimes referred to as "RICO Supply Chain Defendants." Doc. #: 520 at ¶95 n.14. These parties are also referred to as the "Opioid Supply Chain Enterprise."
- "Together, Purdue, Cephalon, Janssen, Endo and Mallinckrodt are also sometimes referred to as "RICO Marketing Defendants," Doc. #: 520 at ¶82 n.13, and these parties are also referred to as part of the "Opioid Marketing Enterprise." Doc. #: 520 at ¶742.

9    Broward indicated that it "erroneously referred to Florida Revised Code §§ 2923.31 *et seq.* in the heading of its Third Claim for Relief, SAC at 273, when it intended to refer to Fla. Stat. §§ 772.101 *et seq.* ("Florida RICO")." Doc. #: 730 at 56 n.33. Broward properly argued Florida RICO in its pleadings, and the Court and Defendants addressed the Florida RICO claim accordingly.

10   Those cases are *West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corp., et al.*, 1:18-op-45530; *County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*, 18-op-45090; *The Muscogee (Creek) Nation v. Purdue Pharma L.P., et al.*, 18-op-45459; and *The Blackfeet Tribe of the Blackfeet Indian Reservation v. AmerisourceBergen Drug Corp, et al.*, 18-op-45749.

11   This Court has carefully reviewed addressed the *Penelas* opinions in the context of products liability in *West Boca.* Doc. #: 3253 at 31-32.

12   Broward cited these two cases in its Response. Doc. #: 730 at 3 n.4.

13   Broward also asserts that, like Ohio RICO (and unlike Federal RICO), "Florida RICO is not limited to 'business or property' injuries." Doc. #: 730 at 57. (quoting *Townsend v. City of Miami*, No. 03-21072-CIV, 2007 WL 9710944, at *2 (S.D. Fla. Nov. 7, 2007)). The distinction, arguably broadening Florida RICO's reach, is immaterial in this context because the Court concludes here, as it did in *Summit County*, that Broward plausibly alleged an injury to its "business or property" on the arguably narrower grounds required under federal law. *See* Doc. #: 1025 at 13-17, *adopted by* Doc. #: 1203.

14   Distributors assert that "Florida courts have resisted efforts by political subdivisions to regulate issues through litigation that are more properly within the jurisdiction of state and federal agencies." Doc. #: 591-1 at 9 (citing *Penelas, 778 So. 2d at 1045*). The Court views this as, at most, a minor variation on the Manufacturers' safe harbor argument, and thus reaches the same conclusion. *See* Doc. #: 593-1 at 6 (citing *Manufacturers' Summit Cty Br.*). In any event, Distributors' also incorporate the arguments in their own *Summit County* brief (which also cites *Penelas*), which the Court considered and rejected. Thus, the Court addressed Distributors' arguments adequately in *West Boca* and *Summit County*.

15   Rule 9 requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

16   While the damages in the *Summit County* case were analyzed with respect to RICO, neither RICO nor the FDUTPA allow recovery for damages that arise directly out of a personal injury. *See, e.g., Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 565-66 (6th Cir. 2013).

17    Broward's Complaint defines negligence *per se*, but does not specifically allege negligence *per se* as a separate cause of action against Defendants. *See* Doc. #: 520 at ¶¶ 939, 947. Broward presents negligence *per se* arguments in subsequent pleadings, *see, e.g.,* Doc. #: 730 at 28-30. To the extent Broward intends to assert a negligence *per se* clam against these Defendants, negligence *per se* claims under the CSA were addressed and rejected by this Court in *Blackfeet*, and the same result is compelled here. *See* Doc. #: 1680 at 23-25.

18    As stated in *West Boca*, this conclusion does not prohibit Broward from presenting factual evidence of Marketing Defendants' alleged negligence as it relates to marketing and/or distribution of opioids.

19    *See also* Doc. #: 1499 at 67-68 (citing to the *Summit County* holding and denying the motion to dismiss plaintiff's unjust enrichment claim, where plaintiff paid for the costs of the harm caused be Defendants' conduct).

20    Broward's definition of Distributor Defendants includes the Pharmacy Defendants.

21    Broward offers specific allegations of these types of allegedly false and fraudulent statements made to the public, which includes the County itself, against most of the Defendants individually. *See, e.g.,* Doc. #: 520 at ¶¶557 (Cardinal); 558 (McKesson); 559 (AmerisourceBergen); 591 n.237 (CVS); 603 n247 (Walgreens).

22    The Court notes that a statement in which a defendant affirmatively represents that it ***is*** disclosing material facts—in this case, submitting appropriate reports as required under the CSA—when it is not, in fact, making those disclosures, is a fraudulent statement about a fraudulent omission. Thus, Broward effectively alleges its delayed response by law enforcement was caused by its reliance on both the alleged affirmative misstatement (that nothing has been omitted) as by the alleged fraudulent omission (of material evidence of diversion).

23    It is noteworthy that Florida courts have cited with approval cases indicating that reliance may be inferred from a plaintiff's behavior where evidence is presented of a "broad-based public campaign for many years disseminating misleading information." *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1069–70 (Fla. Dist. Ct. App. 2010) (*citing Bullock v. Philip Morris USA, Inc.*, 159 Cal.App.4th 655, 71 Cal.Rptr.3d 775, 792 (2008)); *see id.* ("jury could infer plaintiff's reliance where evidence showed RJR and co-conspirators 'represented to the public that they would take it upon themselves to investigate and determine whether there were health consequences of smoking,' but despite evidence of cigarettes' harmful effects RJR 'engaged in a publicity campaign telling the public that whether there were negative health consequences from smoking remains an 'open question.'"") (citing *Burton v. R.J. Reynolds Tobacco Co.*, 208 F.Supp.2d 1187, 1203 (D. Kan. 2002)).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

452 F.Supp.3d 745
United States District Court,
N.D. Ohio, Eastern Division.

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

This Document Relates To: West Boca
Medical Center, Inc. v. AmerisourceBergen
Drug Corporation, et al. 1:18-op-45530

MDL 2804
|
Case No. 1:17-md-2804
|
Signed April 3, 2020

**Synopsis**

**Background:** Hospital filed suit against pharmacies, distributors, and manufacturers of prescription opioid medications, claiming violations of Racketeer Influenced and Corrupt Organizations Act (RICO) and Florida's Deceptive And Unfair Trade Practices Act (FDUTPA) and asserting state law claims for misleading advertising, breach of implied warranty of fitness for particular purpose, common-law negligence, wanton negligence, negligence per se, negligent marketing, negligent distribution, nuisance, and unjust enrichment, by allegedly overstating benefits and downplaying risks of use of opioid painkillers, aggressively marketing opioids to physicians, and failing to monitor, investigate, refuse, and report suspicious orders of prescription opiates, thereby creating opioid crisis and extracting billions of dollars of revenue from addicted American public while tens of millions of dollars of injury were caused to hospitals. Defendants moved to dismiss for failure to state claim.

**Holdings:** The District Court, Dan Aaron Polster, J., held that:

[1] sole proximate cause doctrine did not apply;

[2] learned intermediary rule did not apply;

[3] hospital sufficiently alleged proximate cause under RICO;

[4] hospital sufficiently alleged standing under RICO;

[5] investment injury was not sufficiently alleged for RICO claim;

[6] public nuisance claim was sufficiently alleged;

[7] FDUTPA claim was sufficiently alleged;

[8] misleading advertising claim was sufficiently alleged;

[9] common law negligence claim was sufficiently alleged;

[10] wanton negligence claim was sufficiently alleged;

[11] negligence per se claim was not actionable;

[12] negligent marketing claim was not actionable;

[13] negligent distribution claim was not actionable; and

[14] unjust enrichment claim was sufficiently alleged.

Motions granted in part and denied in part.

West Headnotes (75)

**[1]** **Federal Civil Procedure** 🔑 Construction of pleadings

**Federal Civil Procedure** 🔑 Matters deemed admitted; acceptance as true of allegations in complaint

On a motion to dismiss for failure to state a claim, district court is required to accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff. Fed. R. Civ. P. 12(b)(6).

**[2]** **Federal Civil Procedure** 🔑 Claim for relief in general

Under the notice pleading rule, a complaint need not contain detailed factual allegations; however, it requires more than labels and conclusions or a formulaic recitation of the elements of a cause of action. Fed. R. Civ. P. 8(a)(2).

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 1

**[3]**   **Federal Civil Procedure**  ☞ **Claim for relief in general**

The notice pleading rule demands more than an unadorned, the-defendant-harmed-me accusation, and a complaint will not suffice if it tenders naked assertions devoid of further factual enhancement. Fed. R. Civ. P. 8(a)(2).

**[4]**   **Federal Civil Procedure**  ☞ **Insufficiency in general**

**Federal Civil Procedure**  ☞ **Matters deemed admitted; acceptance as true of allegations in complaint**

A complaint will survive a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

**[5]**   **Federal Civil Procedure**  ☞ **Insufficiency in general**

Facial plausibility exists, as required to survive a motion to dismiss for failure to state a claim, when the plaintiff pleads factual content that allows district court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 12(b)(6).

**[6]**   **Federal Civil Procedure**  ☞ **Claim for relief in general**

Deciding if a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

**[7]**   **Federal Civil Procedure**  ☞ **Clear or certain nature of insufficiency**

A district court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Fed. R. Civ. P. 12(b)(6).

**[8]**   **Negligence**  ☞ **Proximate Cause**

Under Florida law, generally, issues of causation required to support a negligence claim are problematic and, under most circumstances, should be left to the jury.

**[9]**   **Products Liability**  ☞ **Misuse of product**

Under Florida law, a plaintiff's knowing misuse of a product does not bar recovery, as a matter of law, on a products liability claim sounding in negligence, even if that misuse was done in an unforeseeable manner.

**[10]**   **Products Liability**  ☞ **Misuse of product**

Product misuse, under Florida law, is a form of comparative negligence.

**[11]**   **Products Liability**  ☞ **Proximate Cause**

Under Florida law, if a court determines as a matter of law, or a jury determines as a matter of fact, that a claimant's negligence was the sole legal cause of her injury, then, in such event, the claimant could not recover on a products liability claim sounding in negligence.

**[12]**   **Products Liability**  ☞ **Proximate Cause**
       **Products Liability**  ☞ **Drugs in general**

Under Florida law, sole proximate cause doctrine did not apply to preclude finding of proximate cause for hospital's negligence claims against pharmacies, distributors, and manufacturers of prescription opioid medications; harms to hospital were not solely caused by patients who consumed opioids, as hospital alleged that both doctors and patients were intentionally misled about dangers of opioids legally and properly prescribed for large doses over long periods of time, that misrepresentations caused doctors to prescribe opioids for other than their safe uses, and that abuse of opioids by many patients was not voluntary as they became addicted even

when taking opioids as directed, prescribed, and advertised.

**[13]** **Products Liability** ⬥ Learned intermediary
**Products Liability** ⬥ Drugs in general

Under Florida law, learned intermediary rule did not apply to relieve pharmacists from all liability for negligence stemming from filling of opioid prescriptions written by physicians who did not supersede or break any causal link back to distributor's prior shipment of medication to pharmacy at which patient happened to fill prescription, since pharmacist was also medical expert relied upon to protect consuming public from injury by product use when product was prescription drug. Fla. Stat. Ann. § 500.02(1).

**[14]** **Racketeer Influenced and Corrupt Organizations** ⬥ Constitutional and statutory provisions

Racketeer Influenced and Corrupt Organizations Act (RICO) should be liberally construed and should apply broadly in civil cases. 18 U.S.C.A. § 1962(c).

**[15]** **Racketeer Influenced and Corrupt Organizations** ⬥ Persons Entitled to Sue or Recover
**Racketeer Influenced and Corrupt Organizations** ⬥ Causal relationship; direct or indirect injury

Racketeer Influenced and Corrupt Organizations Act's (RICO) civil suit provision imposes two distinct but overlapping limitations on claimants: standing and proximate cause. 18 U.S.C.A. § 1962(c).

**[16]** **Racketeer Influenced and Corrupt Organizations** ⬥ Causal relationship; direct or indirect injury

Racketeer Influenced and Corrupt Organizations Act (RICO) requires that a private plaintiff show

proximate cause in order to have standing to sue. 18 U.S.C.A. § 1962(c).

**[17]** **Racketeer Influenced and Corrupt Organizations** ⬥ Causal relationship; direct or indirect injury

Under Racketeer Influenced and Corrupt Organizations Act (RICO), proximate cause consists of two distinct elements: foreseeability and directness. 18 U.S.C.A. § 1962(c).

**[18]** **Racketeer Influenced and Corrupt Organizations** ⬥ Causal relationship; direct or indirect injury

Under Racketeer Influenced and Corrupt Organizations Act (RICO), directness, in the proximate cause context, requires both an analysis of the closeness of the relationship between the asserted injury and the alleged injurious conduct, and an evaluation of public policy considerations that reflect ideas of what justice demands or of what is administratively possible and convenient. 18 U.S.C.A. § 1962(c).

**[19]** **Racketeer Influenced and Corrupt Organizations** ⬥ Causal relationship; direct or indirect injury

Hospital sufficiently alleged at least one plausibly direct and foreseeable chain of causation from injurious conduct to alleged injury, as required to satisfy proximate cause for Racketeer Influenced and Corrupt Organizations Act (RICO) claims against prescription opioid manufacturers, distributors, and pharmacies for their purported false marketing and failure to prevent diversion that allegedly created opioid crisis; hospital alleged that opioid crisis foreseeably led to their direct increased costs in that they were legally obligated to treat patients, and their unreimbursed costs increased due to additional hospitalizations for opioid-related injuries such as overdoses and cost of providing care for other conditions such as childbirth that were exacerbated by opioids. 18 U.S.C.A. §

1962(c); Social Security Act § 1867, 42 U.S.C.A. § 1395dd.

**[20] Racketeer Influenced and Corrupt Organizations** 🔑 Causal relationship; direct or indirect injury

Even when a causal connection between the asserted injury and the alleged injurious conduct is foreseeable, as required for proximate cause to support a Racketeer Influenced and Corrupt Organizations Act (RICO) claim, a disconnected and efficient intervening cause may break the causal chain. 18 U.S.C.A. § 1962(c).

**[21] Racketeer Influenced and Corrupt Organizations** 🔑 Causal relationship; direct or indirect injury

When an intervening cause is foreseeable to the defendant, he may still be held liable under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1962(c).

**[22] Racketeer Influenced and Corrupt Organizations** 🔑 Business, property, or proprietary injury; personal injuries

As it pertains to standing, under Racketeer Influenced and Corrupt Organizations Act (RICO), providing that any person injured in his business or property by reason of a violation of RICO may sue therefor and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fees, the "by reason of" limitation is used to analyze whether a plaintiff is asserting an injury that was borne directly by that plaintiff or whether the injury was derivative or passed on to the plaintiff by some intermediate party. 18 U.S.C.A. § 1964(c).

**[23] Racketeer Influenced and Corrupt Organizations** 🔑 Business, property, or proprietary injury; personal injuries

Under Racketeer Influenced and Corrupt Organizations Act's (RICO) standing

requirements, providing that any person injured in his business or property by reason of a violation of RICO may sue therefor, money is a form of "property." 18 U.S.C.A. § 1964(c).

**[24] Racketeer Influenced and Corrupt Organizations** 🔑 Business, property, or proprietary injury; personal injuries

Under Racketeer Influenced and Corrupt Organizations Act's (RICO) standing requirements, providing that any person injured in his business or property by reason of a violation of RICO may sue therefor, a person whose property is diminished by a payment of money wrongfully induced is injured in his "property." 18 U.S.C.A. § 1964(c).

**[25] Racketeer Influenced and Corrupt Organizations** 🔑 Business, property, or proprietary injury; personal injuries

Personal injuries and pecuniary losses flowing from those personal injuries fail to confer relief under the Racketeer Influenced and Corrupt Organizations Act's (RICO) standing requirements, providing that any person injured in his business or property by reason of a violation of RICO may sue therefor. 18 U.S.C.A. § 1964(c).

**[26] Racketeer Influenced and Corrupt Organizations** 🔑 Business, property, or proprietary injury; personal injuries

A pecuniary loss flows from a personal injury, and thus fails to confer standing under the Racketeer Influenced and Corrupt Organizations Act (RICO), when the RICO injury merely acts as an alternate theory for recovering damages otherwise available in a tort claim for personal injury and is asserted by the plaintiff. 18 U.S.C.A. § 1964(c).

**[27] Racketeer Influenced and Corrupt Organizations** 🔑 Business, property, or proprietary injury; personal injuries

Hospital suffered injury to its healthcare services business or property by reason of violation of Racketeer Influenced and Corrupt Organizations Act (RICO) by prescription opioid manufacturers, distributors, and pharmacies due to their purported false marketing and failure to prevent diversion that allegedly created opioid crisis, and thus, hospital had standing under RICO; hospital's alleged injuries from opioid crisis stemmed from inadequate compensation for services, increased operational costs of providing services, and increased cost of purchasing supplies necessary to provide services. 18 U.S.C.A. § 1964(c).

**[28]** **Racketeer Influenced and Corrupt Organizations** ⚷ Persons liable

Hospital sufficiently alleged claim against pharmacies as distributors and dispensers of opioids for violation of Racketeer Influenced and Corrupt Organizations Act (RICO); hospital alleged that pharmacies participated in false narrative conspiracy through their intentional acts designed to conceal conspicuous anomalies in distribution patterns of opioids and reaped tremendous profits in that process. 18 U.S.C.A. § 1962(c).

**[29]** **Racketeer Influenced and Corrupt Organizations** ⚷ Separate or distinct racketeering or criminal enterprise injury

In order to state a claim under Racketeer Influenced and Corrupt Organizations Act (RICO), for person receiving any income derived, directly or indirectly, from a pattern of racketeering activity using or investing, directly or indirectly, any part of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce, a plaintiff must plead a specific injury to the plaintiff caused by the investment of income into the racketeering enterprise, distinct from any injuries caused by the predicate acts of racketeering. 18 U.S.C.A. § 1962(a).

**[30]** **Racketeer Influenced and Corrupt Organizations** ⚷ Investment or use of funds derived from racketeering or criminal activity

When an enterprise receives the proceeds of its racketeering activity against a plaintiff, and then merely reinvests the proceeds of its racketeering activity in itself so that it can continue to operate and presumably further injure the plaintiff via continued racketeering activity, such investment does not give rise to a Racketeer Influenced and Corrupt Organizations Act (RICO) claim. 18 U.S.C.A. § 1962(a).

**[31]** **Racketeer Influenced and Corrupt Organizations** ⚷ Causal relationship; direct or indirect injury

Under Racketeer Influenced and Corrupt Organizations Act (RICO), a plaintiff may have standing due to an investment injury in one of two ways, by alleging that a defendant either: (1) used or invested its ill-gotten racketeering income in a separate enterprise that injured the plaintiff, or (2) used for itself or invested in itself ill-gotten racketeering income from prior separate racketeering activity, thus allowing it to injure the plaintiff. 18 U.S.C.A. § 1962(a).

**[32]** **Racketeer Influenced and Corrupt Organizations** ⚷ Causal relationship; direct or indirect injury

Hospital failed to sufficiently allege that prescription opioid manufacturers, distributors, and pharmacies derived income and invested proceeds in enterprise that injured hospital in violation of Racketeer Influenced and Corrupt Organizations Act (RICO); hospital's alleged injuries did not stem from some investment of allegedly ill-gotten income of manufacturers, distributors, and pharmacies from creating opioid crisis by false marketing and failure to prevent diversion, as hospital alleged that manufacturers, distributors, and pharmacies merely reinvested their allegedly ill-gotten racketeering income in themselves as enterprises

and used that reinvestment to further propagate their alleged pattern of racketeering activity. 18 U.S.C.A. § 1962(a).

**[33]** **Nuisance** 🔑 Special annoyance, injury, or danger to individuals

Under Florida law, in order for plaintiff to have standing to assert a public nuisance claim, plaintiff must assert a special or peculiar injury to an individual different in kind and not merely in degree from the injury to the public at large.

**[34]** **Nuisance** 🔑 Special annoyance, injury, or danger to individuals

Under Florida law, hospital sufficiently alleged that opioid crisis caused hospital to sustain concrete economic losses differing in kind from generalized injury to public health, safety, and wellness, as required to state public nuisance claim against prescription opioid manufacturers, distributors, and pharmacies for their purported false marketing and failure to prevent diversion to general public that was incompatible with their statutory authority and allegedly created opioid crisis; hospital alleged that it had unreimbursed increased operational costs, as well as additional expenses from direct purchase of excess opioid pills, that were unique to hospitals and different than alleged interference with human health outcomes suffered by general public. Fla. Stat. Ann. §§ 500.02(1), 500.151.

**[35]** **Nuisance** 🔑 Nature and elements of public nuisance in general

Florida nuisance law does not require an interference with the use and enjoyment of property.

1 Cases that cite this headnote

**[36]** **Nuisance** 🔑 Acts authorized or prohibited by public authority

In Florida, any safe harbor provision for the manufacture, distribution, or sale of lawful products provides immunity from absolute nuisance liability only to those who perform in accord with their applicable licensing regulatory obligations.

1 Cases that cite this headnote

**[37]** **Antitrust and Trade Regulation** 🔑 Nature and Elements

A successful claim for damages under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) contains three elements: (1) a deceptive act or unfair practice in the course of trade or commerce, (2) causation, and (3) actual damages. Fla. Stat. Ann. § 501.201 et seq.

**[38]** **Antitrust and Trade Regulation** 🔑 Persons and Transactions Covered Under General Statutes

Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) applies not only to consumers, but to other entities able to prove the remaining elements of the claim as well. Fla. Stat. Ann. § 501.211(2).

**[39]** **Antitrust and Trade Regulation** 🔑 Persons and Transactions Covered Under General Statutes

Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) is not limited to purely consumer transactions; instead, it applies to any act or practice occurring in the conduct of any commerce. Fla. Stat. Ann. § 501.201 et seq.

**[40]** **Antitrust and Trade Regulation** 🔑 Private entities or individuals

A plaintiff need not be party to any consumer transaction to bring a claim under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA). Fla. Stat. Ann. § 501.201 et seq.

1 Cases that cite this headnote

**[41]** **Antitrust and Trade Regulation** 🔑 Private entities or individuals

Hospital alleging that prescription opioid manufacturers, distributors, and pharmacies engaged in false marketing and failure to prevent diversion of opioids to general public constituted "person," within meaning of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), and thus, hospital had standing to bring FDUTPA claim against manufacturers, distributors, and pharmacies, since FDUTPA was intended to be construed liberally, applied to non-consumers, and did not require consumer transaction. Fla. Stat. Ann. § 501.211(2).

[42] **Antitrust and Trade Regulation** 🔑 Fraud; deceit; knowledge and intent

Under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), a "deceptive act" is one where a representation, omission, or practice occurred that was likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment, and an "unfair practice" is one that offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Fla. Stat. Ann. § 501.201 et seq.

1 Cases that cite this headnote

[43] **Antitrust and Trade Regulation** 🔑 Trade or Commerce; Business Activity

Under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), "trade or commerce" is the advertising, soliciting, providing, offering, or distributing any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. Fla. Stat. Ann. § 501.201 et seq.

[44] **Antitrust and Trade Regulation** 🔑 Exemptions and safe harbors

Defendants bear the burden of establishing the applicability of the safe-harbor provision to a claim under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) and must show that a specific federal or state law affirmatively

authorized defendants to engage in the conduct alleged. Fla. Stat. Ann. § 501.212(1).

[45] **Antitrust and Trade Regulation** 🔑 Exemptions and safe harbors

Prescription opioid manufacturers, that allegedly misrepresented risk of addiction to opioids, ease of withdrawal, and improved patient functionality with long-term use, did not fall within safe harbor of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), since manufacturers' methods of promoting and marketing opioids were outside parameters specifically authorized by state or federal law regarding opioid safety and effectiveness. Fla. Stat. Ann. § 501.212(1).

[46] **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Hospital alleged with particularity that distributors of prescription opioid medications deceived public by failing to report suspicious orders of opioids, as required to state claim for violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA); hospital alleged that distributors recklessly disregarded falsity of their representations and omissions regarding compliance with their legal duties under federal law to report and halt suspicious orders of opioids, wrongfully and repeatedly disavowed those duties in effort to mislead regulators and public, and intended that hospital would rely upon those misrepresentations and omissions, which resulted in actual pecuniary damage to hospital, physicians, and patients. Fla. Stat. Ann. § 501.201 et seq.; Fed. R. Civ. P. 9(b).

[47] **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Hospital alleged with particularity unconscionable, deceptive, or unfair acts or practices by prescription opioid distributors, as required to state claim for violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA); hospital alleged that distributors

joined and conspired in false and deceptive marketing of prescription opioids in order to dramatically increase demand for and sale of opioids and opioid prescriptions, and that while conducting those activities engaged in trade or commerce. Fla. Stat. Ann. §§ 501.202(2), 501.203(8), 501.204; Fed. R. Civ. P. 9(b).

1 Cases that cite this headnote

**[48]**  **Antitrust and Trade Regulation** 🗝️ Reliance; causation; injury, loss, or damage

To prove the causation element of a consumer claim under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), plaintiff must show that the practice was likely to deceive a consumer acting reasonably in the same circumstances. Fla. Stat. Ann. § 501.211(2).

**[49]**  **Antitrust and Trade Regulation** 🗝️ Reliance; causation; injury, loss, or damage

For the causation element of a consumer claim under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), plaintiff need not prove reliance on the allegedly false statement, but rather, plaintiff must simply prove that an objectively reasonable person would have been deceived. Fla. Stat. Ann. § 501.211(2).

**[50]**  **Antitrust and Trade Regulation** 🗝️ Reliance; causation; injury, loss, or damage

For a claim under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), causation must be direct, rather than remote or speculative. Fla. Stat. Ann. § 501.211(2).

**[51]**  **Federal Civil Procedure** 🗝️ Fraud, mistake and condition of mind

Hospital alleged with particularity that actions of prescription opioid manufacturers, distributors, and pharmacies were objectively likely to deceive reasonable person and caused hospital's

injuries from unreimbursed increased costs, as required to state claim for violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA); hospital alleged that deceptive practices worked to deceive both regulators and public, including hospital, in manner specifically designed to increase ability to manufacture, distribute, and sell more prescription opioids, and that resulting commercial transactions were allegedly legitimized by those deceptive practices and created opioid epidemic that injured hospital. Fla. Stat. Ann. § 501.211(2); Fed. R. Civ. P. 9(b).

**[52]**  **Antitrust and Trade Regulation** 🗝️ Grounds and Subjects

Under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), actual damages are limited to compensatory damages; consequential damages are not available under the FDUTPA. Fla. Stat. Ann. § 501.211(2).

1 Cases that cite this headnote

**[53]**  **Antitrust and Trade Regulation** 🗝️ Private entities or individuals

Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) affords civil private causes of action for equitable relief in the form of a declaratory judgment or an injunction. Fla. Stat. Ann. § 501.211(1).

**[54]**  **Antitrust and Trade Regulation** 🗝️ Grounds and Subjects

The inclusion of diminished value as an actual damage under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) is an addition to those damages that are already easily recognized as actual damages, that is, the amounts necessary to compensate adequately an injured party for losses sustained as the result of a defendant's wrongful or negligent actions. Fla. Stat. Ann. § 501.211(2).

1 Cases that cite this headnote

**[55]    Antitrust and Trade Regulation** 🖙 **Particular cases**

Hospital sufficiently alleged compensatory damages from unreimbursed increased operational costs, as well as additional expenses from direct purchase of excess opioid pills, as required to state claim for violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) by prescription opioid manufacturers, distributors, and pharmacies due to their allegedly false and deceptive marketing to dramatically increase demand for and sale of opioids that resulted in opioid crisis. Fla. Stat. Ann. § 501.211(2).

**[56]    Antitrust and Trade Regulation** 🖙 **Particular cases**

Hospital sufficiently alleged that it would be harmed in future by prescription opioid manufacturers, distributors, and pharmacies, from their false and deceptive marketing to dramatically increase demand for and sale of opioids that resulted in opioid crisis, as required to state claim for equitable relief under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA). Fla. Stat. Ann. § 501.211(1).

**[57]    Antitrust and Trade Regulation** 🖙 **Advertising, marketing, and promotion**

To prove misleading advertising under Florida law, a plaintiff must prove reliance on the alleged misleading advertising, as well as each of the other elements of the common law tort of fraud in the inducement. Fla. Stat. Ann. § 817.40(5).

**[58]    Federal Civil Procedure** 🖙 **Fraud, mistake and condition of mind**

Under Florida law, hospital alleged with particularity that it relied on false and misleading statements of prescription opioid manufacturers that deceived public about efficacy and safety of opioids, as required to state claim for misleading advertising; hospital identified specific examples of allegedly misleading statements by manufacturers, including nine falsehoods that they promoted to increase market for opioids, as well as multiple channels they used to disseminate those misleading statements, in over 300 paragraphs of its complaint that specifically identified allegedly misleading documents or statements, source of statements, various methods used to disseminate statements, and when and to whom statements were made. Fla. Stat. Ann. § 817.40(5).

**[59]    Federal Civil Procedure** 🖙 **Fraud, mistake and condition of mind**

Where multiple defendants are alleged to have engaged in the same pattern of conduct, plaintiff asserting fraud claim need not reiterate its allegations against each defendant individually; such a finding would exponentially increase the length of pleadings while adding no substantive value.

**[60]    Federal Civil Procedure** 🖙 **Motion and proceedings thereon**

Hospital abandoned claim against prescription opioid manufacturers, distributors, and pharmacies for breach of implied warranty for particular purpose, under Florida law, where hospital's brief in opposition to motion to dismiss for failure to state claim was entirely devoid of any factual statements or legal arguments regarding breach of warranty. Fla. Stat. Ann. § 672.315.

**[61]    Negligence** 🖙 **Necessity and Existence of Duty**

Under Florida law, there are four elements to a common law negligence claim: (1) a duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risk, (2) breach of that duty, (3) a reasonably close causal connection between the conduct and the resulting injury, or proximate cause, and (4) damages.

**[62] Negligence** 🔑 Foreseeability

In Florida, the touchstone for determining whether a duty exists to support a common law negligence claim is foreseeability.

**[63] Negligence** 🔑 Foreseeability

Under Florida law, where a person's conduct is such that it creates a foreseeable zone of risk posing a general threat of harm to others, a legal duty will ordinarily be recognized, as required to support a common law negligence claim, to ensure that the underlying threatening conduct is carried out reasonably.

**[64] Negligence** 🔑 Necessity and Existence of Duty

Under Florida law, in order to determine whether a duty arises, as required to support a common law negligence claim, four sources provide such a duty: (1) legislative enactments or administration regulations, (2) judicial interpretations of such enactments or regulations, (3) other judicial precedent, and (4) a duty arising from the general facts of the case.

**[65] Products Liability** 🔑 Foreseeability in general; foreseeable accident or injury

**Products Liability** 🔑 Drugs in general

Under Florida law, manufacturers, distributors, and pharmacies had common law duty to exercise reasonable care in manufacturing, marketing, selling, and distributing highly dangerous prescription opioid drugs, as required for hospital to state common law negligence claim based on breach of duty that allegedly proximately caused hospital's injury from unreimbursed treatment of opioid-related conditions; hospital's injuries plausibly fell within foreseeable zone of risk created by manufacturing, distributing, and dispensing activities related to potentially dangerous and highly addictive opioid drugs that created general threat of harm to others.

**[66] Negligence** 🔑 Willful or wanton conduct

Under Florida law, conduct rises to the level of willful and wanton misconduct, as required to support a wanton negligence claim, when the actor has knowledge, actual or constructive, of the likelihood that his conduct will cause injury to other persons and this conduct indicates a reckless indifference to the rights of others.

**[67] Negligence** 🔑 Reckless conduct

Under Florida law, reckless misconduct differs from negligence in that reckless misconduct requires a conscious choice of a course of action with knowledge of the serious dangers to others involved in it or with knowledge of facts which would disclose the danger to any reasonable man.

**[68] Products Liability** 🔑 Negligence or fault

**Products Liability** 🔑 Drugs in general

Under Florida law, hospital sufficiently alleged reckless indifference of prescription opioid manufacturers, distributors, and pharmacies to likelihood that they would cause injury to hospital, as required to state wanton negligence claim; hospital alleged that they knowingly promoted and distributed misleading and false information in order to increase market for prescription opioids, that they willfully failed to monitor, report, or halt shipments of suspicious orders of opioids, that their conduct continued in face of numerous enforcement actions, fines, and other warnings from state and local governments and regulatory agencies, and that they paid fines, made promises to do better, and then continued on with their schemes.

**[69] Action** 🔑 Statutory rights of action

**Negligence** 🔑 Violations of statutes and other regulations

Under Florida law, negligence per se cannot be premised upon a violation of the Controlled Substance Act (CSA) or the Florida Drug and Cosmetic Act (FDCA), as there is no evidence of a legislative intent to create a private cause of action. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 101 et seq., 21 U.S.C.A. § 801 et seq.; Fla. Stat. Ann. § 499.002(1).

[70]    **Products Liability** 👉 Representations or concealment; fraud

In Florida, negligent marketing is not a separate cause of action.

[71]    **Products Liability** 👉 Negligence or fault
**Products Liability** 👉 Drugs in general

A negligent distribution claim against a pharmaceutical distributor does not exist under Florida law.

[72]    **Implied and Constructive Contracts** 👉 Unjust enrichment

In Florida, the elements of unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof, (2) defendant voluntarily accepts and retains the benefit received, and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff.

[73]    **Implied and Constructive Contracts** 👉 Unjust enrichment
**Implied and Constructive Contracts** 👉 Restitution

In Florida, the basis of the remedy for unjust enrichment is to provide restitution where one person has been unjustly enriched at the expense of another.

[74]    **Implied and Constructive Contracts** 👉 Unjust enrichment

Disgorgement is an equitable remedy in unjust enrichment actions, and is measured by the defendant's ill-gotten gains rather than the plaintiff's losses.

[75]    **Implied and Constructive Contracts** 👉 Unjust enrichment

Under Florida law, hospital sufficiently alleged unjust enrichment claim against prescription opioid manufacturers, distributors, and pharmacies on theory that hospital conferred benefit upon them by paying for cost of harm they caused in creating opioid epidemic; hospital alleged that manufacturers, distributors, and pharmacies appreciated and knew of benefit that hospital conferred on them, and that benefit was unjust because hospital's increased expenses for treating opioid patients were not part of normal and expected costs and were from allegedly wrongful acts that were not reasonably expected.

1 Cases that cite this headnote

**\*755  OPINION AND ORDER**

DAN AARON POLSTER, UNITED STATES DISTRICT JUDGE

**\*756**  Before the Court are three separate motions to dismiss plaintiff West Boca Medical Center, Inc.'s ("West Boca," or the "Hospital") Complaint. Doc. #: 385.[1] Distributors,[2] Pharmacies,[3] and Manufacturers[4] each filed a group motion, seeking dismissal of West Boca's claims against them.[5] Doc. #: 684-1 (Distributors); Doc. #: 686 (Pharmacies); Doc. #: 691 (Manufacturers). West Boca filed an omnibus response in opposition that addressed all three motions. Doc. #: 806. Distributors and Pharmacies filed replies in support of their respective motions. Doc. #: 887 (Distributors); Doc. #: 890 (Pharmacies). Manufacturers also filed a reply in support of their motion. Case No. 18-op-45530, Doc. #: 55.[6]

West Boca later filed a notice of supplemental authority, Doc. #: 911, and then (purportedly on behalf of all hospitals whose cases have been transferred into this MDL) filed another notice of supplemental authority ("Second Notice"), Doc. #: 2618. Distributors filed a response to West Boca's second notice. Doc. #: 2681. West Boca filed a reply to Distributors' response, again on behalf of all hospitals in the MDL. Doc. #: 2705. West Boca then filed a third notice of supplemental authority. Case No. 1:18-op-45530, Doc. #: 65.[7]

The Court has reviewed all of the parties' submissions. For the reasons stated below, the Court now rules as follows: Defendants' Motions to Dismiss are **GRANTED** with respect to Count II (RICO § 1962(a)); Count V (Breach of Implied Warranty); Count VIII (Negligence Per Se); Count IX (Negligent **\*757** Marketing); and Count X (Negligent Distribution). The motions are otherwise **DENIED**.

## I. Legal Standard for a Motion to Dismiss

[1] The principles governing review of a Motion to Dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* are well-settled, as this Court has previously articulated. *See, e.g.*, *Report and Recommendation ("R&R") on Motions to Dismiss Muscogee (Creek) Nation Claims*, Doc. #: 1499 at 2-3; *R&R on Motion to Dismiss Summit County Claims*, Doc. #: 1025 at 2-3. A court is "required to 'accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff.' " *Dinwiddie v. Beshear*, 2019 WL 4009835, at \*2 (6th Cir. Apr. 24, 2019) (quoting *Dubay v. Wells*, 506 F.3d 422, 426 (6th Cir. 2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

[2] [3] Federal courts require only "notice pleadings" containing "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. Accordingly, "a complaint need not contain 'detailed factual allegations,' however, it requires more than 'labels and conclusion' or 'a formulaic recitation of the elements of a cause of action.' " *Dinwiddie*, 2019 WL 4009835, at \*2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Rule 8 "demands more than an unadorned, the-defendant-harmed-me accusation," and a complaint will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

[4] [5] [6] [7] A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). Deciding if a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937. A district court may dismiss a complaint for failure to state a claim "only if it's clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)); *Hishon v. King & Spalding*, 467 US. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

## II. Factual Allegations

In its Complaint, West Boca asserts the following claims:

- Count I, Violation Of RICO,[8] *18 U.S.C. 1961, et seq.* – Opioid False Narrative Enterprise (Against All Defendants);

- Count II, Violation Of RICO, *18 U.S.C. § 1962(a)*&*(d)* (Against All Defendants);

- Count III, Violation Of Florida's Deceptive And Unfair Trade Practices Act (*Fla. Stat. Ann. § 501.201, et seq.*) (Against All Defendants);

- Count IV, Fraudulent Practices – Misleading Advertising, **\*758** Florida Statutes Title XLVI, Crimes § 817.41 (Against Marketing Defendants);[9]

- Count V, Breach of Implied Warranty of Fitness For a Particular Purpose (*Fla. Stat. Ann. §§ 672.315* and 672.11, *et seq.*) (Against All Defendants);

- Count VI, Negligence (Against All Defendants);

- Count VII, Wanton Negligence (Against All Defendants);

- Count VIII, Negligence Per Se (Against All Defendants);

• Count IX, Negligent Marketing (Against Marketing Defendants);

• Count X, Negligent Distribution (Against All Defendants);

• Count XI, Nuisance (Against All Defendants); and

• Count XII, Unjust Enrichment (Against All Defendants). Many of the factual allegations that pertain to the Defendants' alleged behavior are the

same as those alleged in the complaints filed in the (i) *Summit County*, (ii) *Muscogee (Creek) Nation*, and (iii) *Blackfeet Tribe* cases.[10] *See* Doc. ##: 514; 731; 6.[11] The Magistrate Judge and this Court have addressed those factual allegations at length. *See Summit County R&R*, Doc. #: 1025; *Muscogee Nation R&R*, Doc. #: 1499; *Blackfeet Tribe R&R*, Doc. #: 1500; *Opinion and Order on Summit County*, Doc. #: 1203; *Opinion and Order on Tribe Cases*, Doc. #: 1680. Thus, the Court only provides below a brief overview of the factual allegations specific to West Boca, and incorporates by reference the general factual circumstances surrounding the opioid crisis and the allegations of Defendants' behavior that are common to the cases addressed in the aforementioned R&Rs and Orders.

## A. Factual Allegations Against Defendants

Plaintiff, West Boca Medical Center, is a 195-bed, acute-care hospital located in Palm Beach County, Florida, which includes a pharmacy, emergency room **\*759** ("ER"), and a 35-bed Neonatal Intensive Care Unit ("NICU"). West Boca also operates a separate ER facility in Broward County, Florida. Doc. #: 385 at ¶20.

West Boca alleges that the Manufacturer Defendants, also referred to as "Marketing Defendants," manufacture, sell, and market prescription opioid painkillers and fueled the opioid crisis "through a massive marketing campaign premised on false and incomplete information," which engineered a "dramatic shift in how and when opioids are prescribed by the medical community and used by patients." Doc. #: 385 at ¶15. West Boca alleges the Marketing Defendants dramatically increased sales of prescription opioids despite their knowledge "that opioids were addictive and subject to abuse, and that their other claims regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded." Doc. #: 385 at ¶16.

West Boca also alleges that the Distributor and Pharmacy Defendants, also referred to as "Supply Chain Defendants," "participated in the conspiracy by ignoring their legal responsibilities under the Controlled Substance Act, and flooded affected areas with opioids well knowing they were contributing to, but profiting from, widespread addiction and human misery." Doc. #: 385 at ¶17. West Boca further alleges that Marketing and Supply Chain Defendants "extract billions of dollars of revenue from the addicted American public while tens of millions of dollars of injury are caused to hospitals as the reasonably foreseeable consequences of the prescription opioid epidemic." Doc. #: 385 at ¶19.

West Boca further alleges that hospitals in Southern Florida, where it is located, have been hit especially hard by the opioid crisis. West Boca alleges that, prior to 2009, Florida's medical laws allowed physicians to prescribe and dispense opioids from their offices, with no prescription-monitoring system in place. Doc. #: 385 at ¶30. West Boca cites to statistics showing that "[b]y 2009, of the top oxycodone-prescribing counties in American, nine were in Florida...Broward County had four pain clinics in 2007 and 115 two years later." Doc. #: 385 at ¶30. West Boca also provides statistics showing that "[i]n 2009, 25% of nationwide shipments of oxycodone were sent to the state of Florida. By 2010, 98 of the 100 doctors in the country who dispensed the highest quantities of oxycodone from their offices were located in Florida." Doc. #: 385 at ¶31. West Boca further provides statistics regarding the costs of this epidemic, showing that in 2015, "health care costs related to opioid abuse in Florida reached $1,246,526,068.00." Doc. #: 385 at ¶38.

## B. Facts Specific to Hospitals

In its Complaint, West Boca alleges that hospitals, such as itself, and especially those in south Florida, have been negatively impacted by the opioid crisis in at least three ways. First, West Boca alleges that hospitals must provide un- or under-compensated medical treatment to victims of the opioid crisis, at great expense to hospitals. Under various state and federal laws, hospitals are required to provide care to all patients who come in with any medical condition, including opioid addiction, regardless of whether the patient has the ability to pay for treatment. Further, it is often the case that patients who arrive at West Boca with opioid dependency issues will require extra or especially-complicated care compared with patients who do not have opioid-use issues. Exacerbating this situation, these "opioid patients" frequently do not have health insurance coverage or the ability to pay otherwise; and even when they do have

insurance, hospitals are not compensated fully for the special care **\*760** that may be required. *See* Doc. #: 385 at ¶¶53; 55; 57.

Second, West Boca alleges that hospitals have been forced to incur additional operational costs associated with the opioid crisis. Because healthcare providers, such as those employed by West Boca, are themselves a potential source of opioid medication, hospitals frequently must utilize additional capital and human resources to identify and handle individuals who attempt to obtain opioids by deception— so-called "pill-seekers." Hospital staffs require additional training and diagnostic tools to distinguish pill-seekers from legitimate patients, and hospitals need to hire additional personnel to help them keep their opioids secure. *See* Doc. #: 385 at ¶58.

Finally, West Boca alleges hospitals are also direct consumers of opioid pills. *See* Doc. #: 385 at ¶¶52; 62. Hospitals often run their own pharmacies, which purchase pills from distributors to be dispensed to hospital patients. Hospitals, of course, also have doctors and nurses on staff who were direct targets of the Defendants' alleged misrepresentations. West Boca asserts these alleged misrepresentations caused their physicians to write more prescriptions than they otherwise would have, in turn causing them to have to purchase, stock, and fill more prescriptions for opioid medications than were warranted. *See* Doc. #: 385 at ¶52; 63.[12]

### III. Causation under Florida Law

**[8]** The Pharmacies assert that Florida's "sole proximate cause" doctrine, and also the learned intermediary rule, each preclude a finding of proximate cause as a matter of law.[13] *See* Doc. #: 686-1 at 2. They refer the Court to their briefing in *Broward County, Florida v. Purdue Pharma L.P., et al.*, Case No. 18-op-45332, MDL Doc. #: 582-1. As set forth below, the Court concludes neither of these doctrines compel dismissal of West Boca's claims. As a general principle under Florida law, "[i]ssues of causation are problematic and, under most circumstances, should be left to the jury." *Simon v. Shearson Lehman Bros.*, 895 F.2d 1304, 1316 (11th Cir. 1990).

### A. Sole Proximate Cause Doctrine

In their motion to dismiss Broward County's claims, the Pharmacies assert that, "under Florida's 'sole proximate cause' doctrine, the intentional misuse of a product such as

a prescription opioid is, as a matter of law, the only legally relevant proximate cause of resulting injuries." Doc. #: 582-1 at 3. The Pharmacies assert that "[a]ny injuries that [West Boca] might try to connect to the Moving Defendants' conduct necessarily stem from the intentional misuse of diverted prescription opioids" and must, therefore, be dismissed. Doc. #: 582-1 at 3. Put simply, the Pharmacies assert the harms identified by West Boca were caused by the patients who consumed the opioid drugs. The Pharmacies cite three product liability cases to support this assertion: *Labzda v. Purdue Pharma, L.P.*, 292 F. Supp. 2d 1346, 1356 (S.D. Fla. 2003); *Bruner v. Anheuser-Busch, Inc.*, 153 F. Supp. 2d 1358, 1361 (S.D. Fla. 2001); and *Clark v. Boeing Co.*, 395 So. 2d 1226, 1229 (Fla. Dist. Ct. App. 1981).

**\*761** **[9]** **[10]** **[11]** All three cases are distinguishable. The Florida Supreme Court has concluded that, under Florida law, a plaintiff's knowing misuse of a product ***does not*** bar recovery, as a matter of law, on a products liability claim sounding in negligence, even if that misuse was done in an unforeseeable manner. *Standard Havens Prod., Inc. v. Benitez*, 648 So. 2d 1192, 1193 (Fla. 1994). Product misuse, under Florida law, is "a form of comparative negligence." *Id.* at 1197. "Of course, if a court determines as a matter of law, or a jury determines as a matter of fact...that a claimant's negligence was the ***sole*** legal cause of her injury, then, in such event, the claimant could not recover." *Id.* (emphasis added).

As a threshold matter, West Boca does not assert a products liability claim, so it is not clear that the sole proximate cause doctrine even applies in the present case. Regardless, *Clark* is a Florida Appellate Court decision that was issued before *Standard Havens*, so to the extent the two cases conflict, *Standard Havens* is controlling.[14] Similarly, *Bruner* and *Labzda* are cases decided by the Southern District of Florida; but the Supreme Court of Florida remains the ultimate arbiter of Florida law. *See Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 488, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976) ("We are, of course, bound to accept the interpretation of [state] law by the highest court of the State."). Thus, *Standard Havens* controls to the extent *Bruner* and *Labzda* conflict. In sum, *Standard Havens* trumps all three cases that defendants cite.

**[12]** Moreover, the three cited cases are distinguishable and do not demand dismissal by their holdings. In *Clark*, the court clearly articulated the test for finding strict product liability: "The test is whether or not the product was reasonably safe for its intended use as manufactured and designed when it left

the plant of the manufacturer." 395 So. 2d at 1229. Here, West Boca has alleged that opioids are not reasonably safe for at least some of their advertised intended uses, and Defendants' misrepresentations caused doctors to prescribe them for other than their safe uses. *See* Doc. #: 385 at ¶131 ("Defendants, however, have manufactured, promoted, marketed, and distributed opioids for the management of chronic pain by misleading consumers and medical providers."). In *Labzda*, the court held that "foreseeable *voluntary* abuse of a non-defective product, such as alcohol, results in the legal conclusion that the proximate cause of the injury to the consumer was his *voluntary* abuse."[15] 292 F. Supp. 2d at 1356 (emphasis added). Similarly, in *Bruner*, the court concluded that, although there are dangers associated with the use of alcohol, "beer is not considered an 'unreasonably dangerous' product...because of the *common knowledge of these dangers*." 153 F. Supp. 2d at 1360–61 (emphasis added). **\*762** Here, West Boca has alleged that the "abuse" by many patients was *not* voluntary because patients became addicted even when taking opioids as directed and prescribed by a doctor, and as advertised by Defendants; and both the doctors and patients were intentionally misled by Defendants about the dangers of opioids that were legally and "properly" prescribed for large doses over long periods of time. *See, e.g.*, Doc. #: 385 at ¶131 (quoted above); ¶188. Accordingly, Florida's sole proximate cause doctrine does not demand dismissal of West Boca's claims.

## B. Learned Intermediary Rule

 **[13]** The Pharmacies also assert, in their motion to dismiss Broward County's case, that a "doctor's independent prescribing decision supersedes and breaks any causal link back to a distributor's prior shipment of the medication to a pharmacy where the patient happened to fill it." Doc. #: 582-1 at 4. The cases cited by the Pharmacies to support this assertion conclude that "[a] manufacturer of a dangerous commodity, such as a drug, does have a duty to warn but when the commodity is a prescription drug we hold that this duty to warn is fulfilled by an *adequate* warning given to those members of the medical community lawfully authorized to prescribe, dispense and administer prescription drugs." *Buckner v. Allergan Pharm., Inc.*, 400 So. 2d 820, 822 (Fla. Dist. Ct. App. 1981) (citing *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir. 1974)) (emphasis added).

Again, the Defendants' argument fails. First, the *Buckner* court's analysis expressly turns on whether a drug manufacturer *adequately* warns a medical professional—

precisely what West Boca alleges manufacturers did ***not*** do. Second, the same argument was expressly considered and rejected by Magistrate Judge Ruiz in the *Summit County Report and Recommendation*, and that analysis and conclusion remain applicable here. *See* Doc. #: 1025 at 29-30 ("the complaint alleges that prescribing physicians were also targets of the misrepresentations. Given these allegations, the court declines to find that the physicians' act of writing prescriptions breaks the causal chain, as a matter of law, when the very purpose of the Defendants' alleged scheme was to achieve exactly that result.") This Court adopted this part of the *Summit County* R&R, *see* Doc. #: 1203.

The cases relied on by the Pharmacies do not purport to relieve a pharmacist—also a medical expert—from all responsibility stemming from the filling of prescriptions written by doctors. In fact, the court in *Buckner* expressly states that "Chapters 458, 465 and 500, Florida Statutes, evidences legislated public policy to rely on physicians ***and pharmacists*** to protect the consuming public from injury by product use when the product is a prescription drug." *Buckner*, 400 So. 2d at 822 n.3 (citing Fla. Stat. Ann. (1979) at §§ 500.02(1) and 500.151 (repealed)) (emphasis added). Nowhere in its opinion does the *Buckner* court extend the learned intermediary rule under Florida law to pharmacies, which was the case under Oklahoma law in the *Muscogee* case. And even in *Muscogee*, this Court concluded that the Tribes' claims against the Pharmacies, as both dispensers and distributors, would be allowed to proceed to fact discovery. *See* Doc. #: 1680 at 7-10. The same result is compelled here.

## IV. RICO

West Boca's allegations of RICO violations are similar to those alleged by other plaintiffs in this MDL. Specifically, West Boca alleges that all Defendants conducted and participated—through various acts of **\*763** mail and wire fraud and violations of the Controlled Substances Act ("CSA")—in the conduct of a False Narrative Enterprise that created the opioid epidemic and injured West Boca, in violation of 18 U.S.C. § 1962(c). *See* Doc. #: 385 at ¶¶812-884. West Boca further alleges each Defendant derived income and invested the proceeds in an enterprise that injured West Boca, in violation of § 1962(a), and that each Defendant conspired with one another to do so in violation of § 1962(c). *See* Doc. #: 385 at ¶¶885-894.

[14]  [15]  [16]  Nothing in the parties' briefs convinces the Court to revisit any of its prior analysis of the applicable RICO standard. *See* Doc. ##: 1025; 1203. The question is whether and to what extent that standard should apply differently to a different type of plaintiff (a Hospital) alleging different types of injuries. In its previous orders, the Court explained that the RICO statute should be liberally construed and should apply broadly in civil cases. *See* Doc. #: 1025 at 12 (citing *Boyle v. United States*, 556 U.S. 938, 944, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009)); Doc. #: 1203 at 6 (citing *Sedima, SPRL v. Imrex Co., Inc.*, 473 U.S. 479, 498, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). The Court also explained that "RICO's civil-suit provision imposes two distinct but overlapping limitations on claimants—standing and proximate cause." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613 (6th Cir. 2004). RICO law has also been "interpreted to require that a private plaintiff show proximate cause in order to have standing to sue." *Id.* at 612. Thus, as before, the Court will address the Defendants' proximate cause arguments and then address their standing arguments; this time, however, the analysis involves claims by a Hospital, not a municipal entity, Indian Tribe, or third-party-payor.

**A. Proximate Cause**

[17]  [18]  Under RICO, proximate cause consists of two distinct elements: foreseeability and directness. *See Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003) (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268-69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)) ("Though foreseeability is an element of the proximate cause analysis, it re distinct from the requirement of a direct injury."). Directness, in the proximate cause context, requires ***both*** an analysis of the closeness of the relationship between the asserted injury and the alleged injurious conduct, ***and*** an evaluation of public policy considerations that reflect "'ideas of what justice demands, or of what is administratively possible and convenient.'" *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984)).

[19]  As stated previously, the alleged injurious conduct of these Defendants is substantially similar to that which was alleged by Summit and Cuyahoga Counties in Track One, the first Opiate MDL bellwether trial. West Boca's asserted injuries, however, are different. Where Summit County alleged thirteen categories of injuries,[16] West Boca asserts only three:

1. Unreimbursed charges for treatment of patients with opioid conditions. Doc. #: 385 at ¶55.

2. Increased operational costs for: (a) providing more and more-complicated care to opioid addicts, and (b) dealing with "pill seekers." Doc. #: 385 at ¶55-58.

3. Increased costs as a purchaser of opiates from Defendants. Doc. #: 385 at ¶¶62-63.

***764**  [20]  [21]  The Court concludes that West Boca has presented sufficient factual allegations that at least some of their asserted injuries are a foreseeable result of the Defendants' purported failures that allegedly created the opioid crisis. However, even when a causal connection is foreseeable, it is well-settled that a disconnected and efficient intervening cause may break the causal chain. *See Johnson v. Kosmos Portland Cement Co.*, 64 F.2d 193, 195 (6th Cir. 1933); *see also Tardif v. P.E.T.A.*, 829 F. Supp. 2d 1219, 1234 (M.D. Fla. 2011) ("[A] Defendant is not liable when a separate force or action is the active and efficient intervening cause, the sole proximate cause or an independent cause of the plaintiff's damages."). On the other hand, "when an intervening cause is foreseeable to the defendant, he may still be held liable." *Tardif*, 829 F. Supp. 2d at 1234.

The Manufacturer Defendants attempt to rely on the fact that West Boca is legally obligated to treat patients to conclude that, but for this purported intervening obligation, West Boca might not have been damaged at all. They assert that "applicable federal and state law defeats causation because any alleged harm to West Boca stems from these legislative public-policy decisions." Doc. #: 691-1 at 5. Thus, according to the Manufacturers, an intervening legislative public-policy decision breaks the causal chain. The Manufacturers cite no case law to support this assertion. West Boca, on the other hand, asserts that its legal obligation to treat patients actually makes it *more* foreseeable that it would be harmed by the opioid crisis. *See* Doc. #: 806 at 17-18. The Court finds West Boca's argument more persuasive. The Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, was enacted by congress in 1986 and requires hospitals to provide, at a minimum, medical screening and stabilization of every patient's medical condition prior to transfer. Doc. #: 385 at ¶41. EMTALA and related state statutes requiring hospitals to treat all patients make West Boca's injuries, if anything, a more foreseeable consequence of the Defendants' actions related to the opioid crisis. Thus, the Court concludes at least

some of West Boca's asserted injuries are a foreseeable result of Defendants' alleged conduct.[17]

That the creation of an opioid crisis foreseeably led to increased costs for hospitals, however, does not end the inquiry. Under RICO law, the injury must also be a direct consequence of a Defendant's injurious conduct. No Defendant meaningfully develops any argument that either the second or third categories of West Boca's alleged damages are too tenuous to support proximate cause. The Defendants' arguments for dismissal of West Boca's RICO claims only address the first category of damages – the cost of unreimbursed medical treatment.[18]

**\*765** Regarding this first category of damages, closer scrutiny under *Holmes* is warranted. Some of the Defendants' arguments regarding the first category of damages are persuasive, and the Court has some reservations about the viability of this category of claimed damages under the applicable RICO standard.[19]

Defendants rely primarily on two cases, in which hospitals brought claims seeking damages for unreimbursed medical expenses related to tobacco use: *Association of Washington Pub. Hosp. Districts v. Philip Morris Inc.*, 241 F.3d 696, 702 (9th Cir. 2001), and *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 435 (3d Cir. 2000). In both cases, the plaintiffs' claims were dismissed. However, the circuit courts analogized the plaintiffs' claims to the claims of third-party payors. After carefully reviewing and comparing the complaints of West Boca and Cleveland Bakers, Doc. #: 3031, the Court is not convinced that the claims are, in fact, similar. Thus, the third-party payor cases cited by West Boca and the Defendants may be of limited value.[20]

**\*766** The factual and legal distinctions between third-party payors and hospitals are manifest. As a general matter, when West Boca provides care to a patient, West Boca becomes a creditor to that patient, who in turn owes a debt to West Boca for services rendered. It is not uncommon, therefore, for hospitals to sell patient debt to a collection agency or to bring a creditor lawsuit against the patient. It is, thus, also not surprising that courts have found medical debt is consumer debt under various statutes. *See, e.g., Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338 (6th Cir. 2016) (Telephone Consumer Protection Act ("TCPA")); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014) (Fair Debt Collection Practices Act ("FDCPA")).

This creditor-debtor relationship is factually distinct from the legal relationship that exists between a third-party payor and its members. While a hospital provides a service and then seeks compensation from the patient (regardless of whether the patient has a right to recover from a third-party tortfeasor or not), a third-party payor generally has a subrogation right to recover medical expenses from a third-party tortfeasor on its member's behalf. A hospital, so far as the Court is aware, has no analogous right; and West Boca does not argue that it does.[21] On this point, Defendants assert there is long-standing, common-law precedent that hospitals ***do not*** have a direct cause of action in tort against a tortfeasor who allegedly injures the patient, even if it imposes increased costs on the hospital. Doc. #: 684-1 at 4 (citing *United Food & Commercial Workers Unions, Employers Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1274 (11th Cir. 2000)). Thus, it appears that, while a third-party payor may pursue a claim against a third-party tortfeasor who injures a patient-insured, a hospital's only claim is against the patient. Unfortunately, this distinction is not briefed by the parties or carefully drawn in the tobacco cases cited by Defendants.[22]

At least with respect to unreimbursed charges for medical treatment, this distinction places West Boca's injury at least one step further removed from the injurious conduct of the Defendants. The *Holmes* factors are thus implicated regarding the first category of West Boca's alleged damages in a way that West Boca's other alleged categories of injuries are not. In *Holmes*, the Supreme Court articulated three policy concerns that arise when an injury is not a sufficiently direct result of a defendants' conduct:

> First, the less direct an injury is, the more difficult it becomes to ascertain the **\*767** amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes*, 503 U.S. at 269–70, 112 S.Ct. 1311 (internal citations omitted).

The first *Holmes* factor is applicable to the present analysis.[23] West Boca alleges its unreimbursed costs have increased due to an increase in both: (1) hospitalizations for opioid-related injuries (e.g. overdoses) and (2) the cost of providing care for "normal" conditions exacerbated by opioid use (e.g. child-birth). West Boca asserts that instances like the latter are made more complicated and expensive when the patient has an opioid use disorder. While it is likely relatively easy to ascertain damages in the former situation—that the care provided for an opioid overdose is easily attributable to the opioid crisis—the latter situation is more complicated.

Child birth presents a good illustration of the potential difficulty. If a woman is considered a high-risk pregnancy due to advanced age or a preexisting medical condition, but is also addicted to opioids, it is not clear to the Court how it will be possible to distinguish what portion of West Boca's increased costs for those pregnancy services will be attributable to one complicating factor over any other. Nevertheless, such apportionment is rightfully the subject of expert discovery, and the Court will allow that discovery to occur.

Despite these reservations, the situation in this case is not that meaningfully different from *Summit County* and *Cleveland Bakers*. In those cases, the Court also expressed its reservations about the viability of certain categories of damages. In each case, however, where the plaintiff had alleged at least one category of damages that set forth a plausible claim for relief, the Court declined to dismiss the entire claim. *See* Doc. #: 1203 at 15-16; Doc. #: 3177 at 35-36. The same conclusion is equally appropriate here. Therefore, the Court concludes West Boca has sufficiently alleged at least one plausibly direct and foreseeable chain of causation from injurious conduct to alleged injury to survive a motion to dismiss for lack of proximate cause.

**B. Standing**

[22]   [23]   [24]   Having determined that West Boca's injures are not too far removed from Defendants' conduct, the Court turns to the standing analysis—that is, whether hospitals are the appropriate plaintiffs to bring these claims. As the Court has previously articulated:

Title 18 of the U.S. Code, section 1964(c), has been deemed the standing provision of RICO. It provides that "[a]ny person injured in his business or property by reason

of a violation of section 1962 of this chapter may sue therefor ...and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's **768** fee." 18 U.S.C. § 1964(c). The two operative portions of this section are the "business or property" limitation and the "by reason of" limitation.

"The 'by reason of' limitation...bundles together a variety of 'judicial tools,' some of which are traditionally employed to decide causation questions and some of which are employed to decide standing questions." *Trollinger*, 370 F.3d at 613 (citing *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311.). As it pertains to standing, the "by reason of" limitation is used to analyze whether a plaintiff is asserting an injury that was borne directly by that plaintiff or whether the injury was "derivative or passed- on" to the plaintiff by some intermediate party. *See id.* at 614.

\* \* \*

Even if Plaintiffs' asserted injuries were proximately and directly caused "by reason of" Defendants' alleged injurious conduct, Plaintiffs still may not bring a RICO claim if the injuries asserted were not to their "business or property." 18 U.S.C. § 1964(c). As a general principal, "money, of course, is a form of property." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). It is also true that, "[a] person whose property is diminished by a payment of money wrongfully induced is injured in his property." *County of Oakland v. City of Detroit*, 866 F.2d 839, 845 (6th Cir. 1989) (quoting *Chattanooga Foundry and Pipe Works v. City of Atlanta*, 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906)).

Doc. #: 1203 at 10-11; 12-13.

[25]   [26]   Defendants rely heavily on *Jackson v. Sedgwick Claims Mgmt. Services*, 731 F.3d 556 (6th Cir. 2013), to argue that West Boca has not alleged any injury to any business or property, but has instead only alleged injuries that flow from the personal injuries of its patients. *See* Doc. ##: 684-1 at 9; 691-1 at 2. However, as articulated in its *Summit County* Opinion, the Court believes *Jackson* is factually distinct from these opioid cases generally, and also disagrees with Defendants' characterization of the law as set forth by the Sixth Circuit in *Jackson*. Doc. #: 1203 at 13. It is true that *Jackson* stands for the proposition that "personal injuries and pecuniary losses flowing from those personal injuries fail to confer relief under § 1964(c)." *Jackson* at 565-66,. However, after carefully reviewing the facts of *Jackson* and the several cases cited therein, the Court concluded that a pecuniary loss

"flows from" a personal injury "when the alleged RICO injury merely acts as an alternate theory for recovering damages otherwise available in a tort claim for personal injury and is asserted by the plaintiff him- or herself." Doc. #: 1203 at 14.

[27] Here, West Boca is in the business of providing a service. Its asserted injuries stem from (1) not being adequately compensated for the services provided, (2) the increased operational costs of providing those services, and (3) the increased cost of purchasing supplies necessary for the provision of those services, respectively. These categories of injuries are injuries to business or property. That West Boca is in the business of providing **healthcare** services, does not make its injuries "derivative" of personal injuries, because "[i]f any claim merely derivative of a personal injury barred RICO liability, then...doctors, hospitals, and any number of nonprofits directly injured in their business dealings *involving* personal injuries would as well. This is not how the Court interprets the holding in *Jackson*." *State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc.*, No. 14-CV-10266, 2014 WL 5427170, at *8 (E.D. Mich. Oct. 24, 2014) (emphasis added).

**\*769** Furthermore, operational costs such as "capital improvement costs," "additional security costs," and "additional training and educational costs for hospital personnel," Doc. #: 806 at 34-35. (citing Doc. #: 385 at ¶¶51-58), as well as costs associated with being falsely induced to purchase and prescribe more opioid pills than were appropriate, are direct costs to hospitals that allegedly were borne as a result of the opioid crisis itself, not simply as a result of treating injured patients. Doc. #: 806 at 7-8. As alleged, these are classic business costs.

Again, however, the Court must draw what it views as an important distinction between unreimbursed medical expenses and the other two asserted categories of injury. In the case of unpaid medical bills, it is not entirely clear that the medical expenses injury does not belong, in whole or in part, to the patients. That is, in terms of RICO law, it is not immediately apparent that West Boca's alleged injury from the provision of unreimbursed medical services was caused "by reason of" a substantive RICO violation, or instead that this particular category of injury was "passed-on" by the injured patients (specifically those patients' inability to pay for the services rendered).

As stated in the proximate cause section above, the Defendants maintain that a hospital does not have a direct

cause of action in tort against a tortfeasor who allegedly injures the patient. Doc. #: 684-1 at 4 (citing *United Food*, 223 F.3d at 1274). The Third Circuit in *Allegheny Gen. Hosp.* articulated the slippery slope that forms the policy rationale behind this argument. *See Allegheny Gen. Hosp.*, 228 F.3d at 445 ("The Hospitals are dangerously close to asserting that they have standing to sue any company that causes a nonpaying patient's disease or illness."). As a general matter, the Court is concerned, as was the Third Circuit, about the precedent of allowing healthcare providers to recover the increased costs of providing care to their allegedly wrongfully-injured patients. While the opioid crisis is inarguably unlike any mass tort this country has ever faced, the Court is skeptical that it should attempt to engage in the type of line-drawing necessary to determine what type of crises a defendant would need to create in order to give hospitals standing to sue that defendant for the unreimbursed costs of treating such a crisis, especially where individual plaintiffs are also attempting to vindicate their own rights.

In this MDL alone, there are scores of cases brought by individual parties seeking compensation for various damages, including their medical bills. If hospitals are damaged by patients not paying their medical bills, their remedy—as discussed above—should be to seek compensation from the patients who are not paying those bills. To the extent the Defendants are liable to the patients for the costs of medical bills, it ought to be the patients' responsibility to hold the Defendants liable as "private attorneys general."[24] *See Holmes*, 503 U.S. at 269-70, 112 S.Ct. 1311. The Court is concerned it might be forced to establish a complicated remedial scheme to adequately apportion damages between patients and hospitals, so that Defendants will not be subject to duplicative recoveries from each. This is the exact problem about which the second and third *Holmes* factors caution, *see id.*, and, as Defendants point **\*770** out, something courts in the tobacco cases nearly unanimously declined to do.

Nevertheless, West Boca asserts that reliance on prior tobacco cases as precedent for the opioid crisis is misplaced and articulates nine paragraphs of factual distinctions between their opioid case and the tobacco cases. *See* Doc. #: 806 at 19-21. While the Court is hesitant to find that hospitals have standing to bring a RICO claim for their unreimbursed medical expenses, the Court will allow the RICO claim with respect to this injury to proceed for two reasons. First, in the municipality cases, the Tribe cases, and the third-party payor case, the Court concluded it would not (***at the motion to dismiss stage***) draw distinctions between the various alleged

categories of injuries. Such distinctions regarding damages are better drawn after discovery has fleshed out the factual record. Second, as West Boca carefully points out, there are a large number of factual distinctions between opioid cases and tobacco cases generally, and some of those factual distinctions may reasonably require further development. Thus, because the RICO claim is plausible on at least one theory of damages and because West Boca raises significant factual issues not suitable for resolution on a motion to dismiss, discovery will proceed as to the entire claim.

As a final thought, neither the tobacco cases cited by the parties, nor the parties' briefs, adequately draw any meaningful distinctions between hospitals' asserted injuries and those of third-party payors. The parties should have an opportunity to address the factual distinctions between hospitals, third-party payors, and municipalities with respect to the injuries alleged and with respect to the legal standard articulated by the Court. Thus, the Court concludes that West Boca has standing to bring its RICO claims against these Defendants.

### C. Other RICO Arguments

#### 1. Previously Addressed RICO Arguments

Defendants make several arguments that the Court has addressed in prior orders. The Defendants assert that reporting-based violations of the CSA cannot constitute predicate acts under RICO;[25] that West Boca did not adequately plead the existence of a RICO enterprise;[26] and that West Boca failed to adequately plead an agreement sufficient to support a RICO conspiracy claim under § 1962(d).[27] The Defendants also argue that West Boca's allegations of mail and wire fraud do not meet the heightened pleading requirements under Rule 9(b) of the Federal Rules of Civil Procedures, and constitutes impermissible "group pleading."[28]

The Court has addressed the merits of each of these arguments before. *See* Doc. #: 1025 at 36-39 (existence of an enterprise), 39-48 (predicate acts), 39-42 (Rule 9(b)), 37-44 (conspiracy generally), 97-98 (conspiratorial agreement);[29] Doc. #: 1680 at 2-4 (Rule 9(b)), 4-5 (group pleading); *see also Opinion and Order Regarding Conspiracy claims*, Doc. #: 2562 (setting out an analysis of the alleged agreement between **\*771** many of the same Defendants on substantially similar factual allegations); *Opinion and Order Regarding RICO claims*, Doc. #: 2580 at 2-3 (CSA violations as predicate acts), 3-6

(existence of an enterprise); *Evidentiary Order Regarding Track One Pretrial Motions*, Doc. #: 3058 at 24 (CSA violations as predicate acts).

Upon careful review of the parties' briefs, the Court concludes its prior analyses apply with equal force to the facts alleged in West Boca's complaint. Accordingly, the Court incorporates its legal analyses from the aforementioned orders and rejects the Defendants' contentions that dismissal is mandated in this action by inadequate pleading of (1) the existence of an enterprise, (2) predicate acts, (3) conspiratorial agreement,[30] or (4) Fed. R. Civ. P. 9(b)'s particularity requirement.

#### 2. Pharmacy Liability Under RICO

The Pharmacy Defendants assert that:

> [i]f anything, Plaintiff's RICO claims against [the Pharmacies] are even more implausible than RICO claims against the other defendants. Whatever the other bellwether plaintiffs may have believed to be the merits of a RICO claim against the manufacturer or major distributor defendants, they have uniformly recognized that no such claim is feasible against the Moving Defendants. Alone among the bellwether plaintiffs, Plaintiff here asserts RICO claims against the Moving Defendants as well.

Doc. #: 686-1 at 3. The Pharmacies' argument appears to be that, since no other plaintiffs alleged RICO claims against them, West Boca's claims against them should be dismissed. This is, of course, not the legal standard for a motion to dismiss. The Court is not persuaded by what claims may or may not have been filed by other types of plaintiffs in other cases (e.g., municipal entities or Tribes), but instead must look at the plausibility of what the Plaintiff in this case actually alleged in its complaint.

The Pharmacy Defendants also assert, conclusorily, that "to whatever extent Plaintiff intended to assert claims against the Moving Defendants as pharmacies rather than as distributors, its pleading does not pass muster under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)." Doc. #: 686-1 at 2. This assertion is plainly inaccurate.[31]

 [28]  In its response, West Boca asserts that the Pharmacy Defendants "participated **\*772** in the False Narrative conspiracy through their intentional acts designed (among other things) to conceal conspicuous anomalies in the

distribution patterns of opioids, and reaped tremendous profits in the process." Doc. #: 806 at 22-23; (citing Doc. #: 385 at ¶¶870 (alleging a common purpose); 509-514, 519-569 (alleging breach of duty to prevent diversion by Distributors); 663-707 (alleging breach of duty to prevent diversion by National Retail Pharmacies). These allegations are sufficient to state plausible claims against and provide notice to the Pharmacies as distributors and dispensers of opioids generally, and also with respect to West Boca's RICO claim as described above.

**D. Investment Injury Under 18 U.S.C. § 1962(a)**

Defendants assert that West Boca's Section 1962(a) claim fails because West Boca does not allege an injury specifically caused by any of the Defendants' investment of income obtained through racketeering activity. *See* Doc. #: 684-1 at 12-13; Doc. #: 961-1 at 67. For the reasons that follow, the Court agrees.

Section 1962(a) of RICO provides in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity...to use or invest, directly or indirectly, any part of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

 **[29]** A majority of Circuits, including the Sixth, have concluded that, "in order to state a claim under § 1962(a), a plaintiff must plead a specific injury to the plaintiff caused by the investment of income into the racketeering enterprise, distinct from any injuries caused by the predicate acts of racketeering." *Vemco, Inc. v. Camardella*, 23 F.3d 129, 132 (6th Cir. 1994) (citing *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 494 (6th Cir.1990)); *see also Beck v. Prupis*, 529 U.S. 494, 506 n.9, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) (while expressing no view on the issue, noting that "most courts of appeals have adopted the so-called investment injury rule, which requires that a plaintiff suing for a violation of § 1962(a) allege injury from the defendant's 'use or invest[ment]' of income derived from racketeering activity") (citing *Vemco*, 23 F.3d at 132).

 **[30]**  **[31]** When an enterprise receives the proceeds of its racketeering activity against a plaintiff, and then merely reinvests the proceeds of its racketeering activity in itself

so that it can continue to operate (and presumably further injure the plaintiff via continued racketeering activity), such investment does not give rise to a § 1962(a) claim under the majority rule. This is because,

> [o]ver the long term, corporations generally reinvest their profits, regardless of the source. Consequently, almost every racketeering act by a corporation will have some connection to the proceeds of a previous act. Section 1962(c) is the proper avenue to redress injuries caused by the racketeering acts themselves. If plaintiffs' reinvestment injury concept were accepted, almost every pattern of racketeering activity by a corporation would be actionable under § 1962(a), and the distinction between § 1962(a) and § 1962(c) would become meaningless.

*Brittingham v. Mobil Corp.*, 943 F.2d 297, 305 (3d Cir. 1991), *overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258 (3d Cir. 1995). Thus, under the majority rule, a  **\*773** plaintiff may have standing under § 1962(a) in one of two ways. A plaintiff can allege that a defendant either: (1) used or invested its ill-gotten racketeering income in a separate enterprise that injured the plaintiff;[32] or (2) used for itself or invested in itself ill-gotten racketeering income from prior separate racketeering activity, thus allowing it to injure the plaintiff.[33]

 **[32]** The question at issue here, then, is whether any of West Boca's asserted injuries stem from some investment of the Defendants allegedly ill-gotten income. The Court concludes that, as alleged in West Boca's Complaint, they do not. West Boca expressly alleges that "Defendants, having income derived, directly or indirectly, from a pattern of racketeering, in which it participated as a principal within the meaning of 18 U.S.C. § 2, *used or invested, directly or indirectly, part of such income in itself*, an enterprise." and that West Boca "was injured...through the above-referenced acts of racketeering" Doc. #: 385 at ¶¶892; 894 (emphasis added). Thus, West Boca expressly asserts that the Defendants merely reinvested their allegedly ill-gotten racketeering income in themselves as enterprises and used that reinvestment to further propagate their alleged pattern of racketeering activity (false marketing and failure to prevent diversion). Under controlling Sixth Circuit precedent, these allegations are insufficient to confer standing on West Boca to assert a § 1962(a) claim. West Boca's Second Claim for Relief must be dismissed.[34]

**V. Nuisance**

West Boca alleges the opioid epidemic is a public nuisance. Doc. #: 385 at ¶153. Specifically, West Boca asserts "[t]he nuisance is the over-saturation of opioids in the patient population of [West Boca] and in the geographic area served by [West Boca]..., as well as the adverse social, economic, and human health outcomes associated with widespread illegal opioid use." Doc. #: 385 at ¶991. West Boca alleges that Defendants "substantially participated in nuisance-causing activities" through facilitating the sale of prescription opioids and failing to maintain effective controls to prevent diversion to the general public. Doc. #: 385 at ¶¶992-994.

 **[33]** As with RICO, many of Defendants' arguments for dismissal were raised and ruled upon in other actions in this MDL. Although most of those actions, *Summit County*, *Muscogee (Creek) Nation*, **\*774** and *Blackfeet Tribe*, involve governmental entities, at least one action, *Cleveland Bakers*, was brought by a private plaintiff. Florida, like Ohio, follows the Restatement (Second) of Torts, so in order for West Boca to have standing to assert a public nuisance claim, it must assert a "special or peculiar injury to an individual different in kind and not merely in degree from the injury to the public at large." *Brown v. Fla. Chautauqua Ass'n*, 59 Fla. 447, 451, 52 So. 802 (1910); *see also Fla. Wildlife Fed'n v. State Dep't of Envtl. Regulation*, 390 So. 2d 64, 67 (Fla. 1980).

Defendants assert West Boca has not alleged any injury that is different from that suffered by the general public. In addition, Defendants also assert: (1) they lacked control over the instrumentality of the nuisance; (2) West Boca's injuries are not connected to the use and enjoyment of property; and (3) West Boca has not alleged an interference with a public right. Finally, Defendants assert their actions are protected by a Florida "Safe Harbor" law.[35] The Court addresses each assertion below.

 **[34]** First, Defendants assert "West Boca's injuries are merely derivative, and, for that reason, they are not different or special, but the same as the alleged 'public' injury." Doc. #: 684-1 at 15. As described in Section IV.B. above, however—at least with respect to increased operational costs and direct purchase of excess opioid pills—West Boca has alleged concrete economic costs, unique to hospital entities, that are different than the alleged interference with human health outcomes suffered by the general public as a result of the opioid crisis. Therefore, as in *Cleveland Bakers*, and subject to the Court's prior analysis that the unreimbursed costs of medical care may not be West Boca's injury to assert, the

Court concludes that "Plaintiffs have plausibly pled they sustained concrete economic losses differing in kind from the generalized injury to public health, safety, and wellness suffered by the general public as a consequence of the multi-faceted opioid crisis." Doc. #: 3177 at 43.

Next, with respect to Defendants' arguments regarding control over the instrumentality of the nuisance and interference with a public right, the Court has carefully addressed each of these arguments in prior orders and nothing in the parties' briefs here convinces the Court to revisit that analysis. *See, e.g.*, Doc. #: 1680 at 19 (concluding that "Defendants had control over the instrumentality of the nuisance by virtue of their control over their own opioid marketing, distribution, and dispensing practices.") (adopting Doc. #: 1499 at 57; Doc. #: 1500 at 31); Doc. #: 1680 at 18-19 (reviewing the Restatement (Second) of Torts § 821B and concluding that " 'public health' has traditionally been considered a 'public right.' ") (adopting Doc. #: 1499 at 59-61 and Doc. #: 1500 at 28-30); *see also* Doc. #: 3177 at 45 (same).

Distributor Defendants also assert that nuisance law in Florida requires an interference with the use and enjoyment of property. In support of this conclusion, Distributors cite an unreported Florida circuit court decision concluding that "[p]ublic nuisance does not apply to the design, manufacture, and distribution of a lawful product." Doc. #: 591-1 at 9 (citing *Penelas v. Arms Tech., Inc.*, No. 99-1941 CA-06, 1999 WL 1204353, at \*4 (Fla. Cir. Ct. Dec. 13, 1999), aff'd, **\*775** 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001)). Even if the Court found this Florida trial court decision persuasive (much less precedential), the case still does not require a nuisance claim to allege interference with the use and enjoyment of land.

 **[35]** In response to this argument, West Boca refers the Court to *Estep v. State ex rel. Caro*, where the Florida Supreme Court concluded that "the practice of medicine by one without a license and also without learning and skill in treating the sick is a nuisance *per se*."[36] 156 Fla. 433, 434, 23 So.2d 482 (1945). While also not directly on point, this opinion from the state's highest court suggests that Florida allows for at least some non-property-related nuisance claims. As dictated by the Court's prior application of the *Erie* doctrine to nuisance law, West Boca's argument is better taken. *See* Doc. #: 1680 at 11-13; 16-17 (adopting and expanding on the analysis from Doc. ##: 1499; 1500). The Court concludes that Florida nuisance law does not require an interference with the use and enjoyment of property.

[36] Finally, regarding Florida's "safe harbor," the parties implicitly agree that, to whatever extent Florida law incorporates a safe harbor provision for the manufacture, distribution, or sale of lawful products, the Court's prior analysis under Ohio law is controlling. *See* Doc. ##: 684-1 at 14-17; 686-1 at 4;[37] 691-1 at 15-17; 806 at 31-39 (each Party expressly incorporating *Summit County* briefs by reference). The Court has previously concluded under Ohio and Montana law that " ' safe harbor' immunity from absolute nuisance liability is available only to those who perform in accord with their applicable licensing regulatory obligations. The Complaint alleges Defendants did not comply with the regulatory scheme, but rather violated it." Doc. #: 3177 at 47. The Court concluded in those cases, as it does here, that West Boca's complaint sufficiently pleads conduct that is incompatible with defendants' statutory authority and that the nuisance claim is therefore viable.[38] *See* Doc. #: 3177 at 46-47 (citing Doc. #: 1680 at 17-18, concurring with the analysis of Doc. #: 1500 at 26-28). Accordingly, the Court concludes West Boca has sufficiently alleged an actionable public nuisance claim.

## VI. Florida's Deceptive and Unfair Trade Practices Act

### A. Plaintiff's FDUTPA Claims Against All Defendants

West Boca's Third Claim for Relief alleges each Defendant engaged in "unfair or deceptive acts or practices" in violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. § 501.201, *et seq.* (2007). Doc. #: 385 at ¶¶895-913. Specifically, West Boca alleges:

**\*776** [e]ach of the Defendants have engaged in unfair and/or deceptive trade practices by omitting the material fact of its failure to design and operate a system to disclose suspicious orders of controlled substances ("SOMS"), as well as by failing to actually disclose such suspicious orders, as required of 'registrants' by the federal CSA, 21 C.F.R. § 1301.74(b), which is incorporated into Florida law by the FLDCA [Drug and Cosmetic Act], including Fla. Stat. § 499.0121.

Doc. #: 385 at ¶902. West Boca further asserts that Defendants' violations of the FDUTPA "offend Florida's public policy, are immoral, unethical, oppressive and unscrupulous, as well as malicious, wanton and manifesting of ill will," thereby causing substantial injury to West Boca, and that "[b]y reason of their reliance on Defendants' misrepresentations and omissions of material fact, Plaintiff,

physicians, patients, and/or others suffered actual pecuniary damage." Doc. #: 385 at ¶903; ¶911.

Finally, West Boca alleges "the Marketing Defendants have each engaged in unfair and deceptive acts or practices in commerce in violation of the FDUTPA by actively promoting and marketing the use of opioids for indications not federally approved, circulating false and misleading information concerning opioids' safety and efficacy, and downplaying or omitting the risk of addiction arising from their use." Doc. #: 385 at ¶901.

### B. FDUTPA Legal Standards

[37] The FDUTPA is Florida's consumer-protection law. It is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §§ 501.202(2) and 501.204. A successful claim for damages under FDUTPA contains three elements: (1) a deceptive act or unfair practice in the course of trade or commerce; (2) causation; and (3) actual damages. *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983-84 (11th Cir. 2016). The Florida legislature specifically provided that the FDUTPA "shall be construed liberally." Fla. Stat. § 501.202(2); *see also State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 315 F.Supp.3d 1291, 1307 (S.D. Fla. 2018) ("when considering whether a defendant's actions support a finding of 'unfair methods of competition, unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce,' courts have regarded the concept as 'extremely broad' ").

### C. FDUTPA Analysis

#### 1. Pleading Requirements

Defendants assert West Boca's FDUTPA claim should be dismissed because West Boca has not pled sufficient factual allegations to support the claim. Distributors and Pharmacies assert West Boca's FDUTPA claim must meet the heightened pleading requirements under Rule 9(b) of the Federal Rules.[39] *See* Doc. #: 684-1 at 23-25; Doc. #: 686-1 at 5. Courts in Florida are split on whether Rule 9(b) applies to FDUTPA claims. *See State Farm*, 278 F.Supp.3d at 1327-28 (S.D. Fla. 2017) (comparing cases finding that Rule 9(b) does not apply to FDUTPA claims with cases finding it does); *see also Weiss v. General Motors LLC*, 418 F.Supp.3d 1173 (S.D. Fla. 2019) (following prior court decisions and holding that

the requirements of Rule 9(b) do not apply to a claim under **\*777** FDUTPA "[b]ecause 'FDUTPA claims seek a remedy for conduct distinct from traditional common law torts such as fraud[,]' ") (citing *Harris v. Nordyne, LLC*, No. 14-cv-21884, 2014 WL 12516067, at \*4 (S.D. Fla. Nov. 13, 2014)).

The Court need not analyze whether Rule 9(b) applies to West Boca's FDUTPA claims, however, because in any event the allegations within the Complaint are "sufficiently detailed to meet the requirements of Rule 9(b)." *Marty v. Anheuser-Busch Cos., LLC*, 43 F.Supp.3d 1333, 1338 (S.D. Fla. 2014). The Court has addressed similar Rule 9 arguments in its prior opinions and the same analysis applies to the allegations—and the sufficiency thereof—in West Boca's Complaint. *See, e.g.*, Doc. #: 1680 at 2-4 (finding similarly detailed allegations sufficient to meet the pleadings standard under Rule 9 because "the circumstances of the fraud [are] pled with enough specificity to put defendants on notice as to the nature of the claim.").

### 2. Standing Under the FDUTPA

West Boca alleges it is a "person" within the meaning of Section 501.203(6) of the FDUTPA. Doc. #: 385 at ¶899. Manufacturer Defendants argue that West Boca "is not a 'consumer' of any medicine sold by Manufacturer Defendants" and "does not allege facts showing that it was involved in a consumer transaction." Doc. #: 691-1 at 9; Case No. 18-op-45530, Doc. #: 55 at 12. Distributor Defendants argue West Boca doesn't allege they were involved in "trade or commerce," Doc. #: 684-1 at 24, and Pharmacy Defendants argue West Boca hasn't identified whether it purchased an opioid from any Defendant. Doc. #: 686-1 at 8. Having carefully considered each of Defendants' arguments, the Court finds that West Boca has sufficiently established it is a proper party to bring this FDUTPA action.

[38] Prior to 2001, the FDUTPA limited the class of plaintiffs who could file suit to "consumers who have suffered a loss as a result of [the Act]." *See* Fla. Stat. § 501.211(2); *Bailey v. St Louis*, 196 So. 3d 375, 382 (Fla. 2d DCA 2016). In 2001, the Florida legislature amended the statute to replace the word "consumer" with the term "person," thereby giving non-consumers standing to sue. *See id.* A Florida appellate court has confirmed that "[t]his change indicates that the legislature no longer intended the FDUTPA to apply to only consumers, but to other entities able to prove the remaining elements of the claim as well." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So.3d 164, 169 (Fla. 4th DCA 2015).

This Court chooses to follow the majority of recent opinions from Florida's District Courts of Appeal concluding that, "in amending the Act, the legislature intended to give non-consumers standing." *Collier HMA Physician Mgmt., LLC v. NCH Healthcare Sys., Inc.*, 2019 WL 277733, at \*11 (M.D. Fla., Jan. 22, 2019) (citing *Bailey*, 196 So. 3d at 383); *see also Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc.*, 187 So. 3d 868, 869 n. 2 (Fla. 3d DCA 2016) (same); *Caribbean Cruise Line*, 169 So. 3d at 169); *Wallace v. Southern Cable Sys., LLC*, 2016 WL 9308535, at \*2 (N.D. Fla. Nov. 4, 2016) (collecting cases) (the FDUTPA "is not limited to consumers, but, rather, it applies to all individuals and entities that are able to prove the three elements on a FDUTPA claim") (citations omitted); *Stewart Agency Inc. v. Arrigo Enterprises, Inc.*, 266 So.3d 207, 212 (Fla. 4th DCA 2019) ("an entity does not have to be a consumer to bring a FDUTPA claim, but it still must prove the elements on the claim, including an injury to a consumer).

[39] [40] [41] Furthermore, West Boca itself need not be involved in a "consumer transaction," **\*778** because the FDUTPA is not limited to purely consumer transactions. Instead, it applies to "any act or practice occurring 'in the conduct of any...commerce.' " *Beacon Property Mgt., Inc. v. PNR, Inc.*, 890 So.2d 274, 278 (Fla. Dist. Ct. App. 2004) (citation omitted). A plaintiff need not be party to any consumer transaction to bring a FDUTPA claim. *See, e.g., BPI Sports, LLC v. Labdoor, Inc.*, 2016 WL 739652, at \*5 (S.D. Fla. Feb. 25, 2016) (even though the plaintiff admitted it was not a party to any consumer transaction, the case survived a motion to dismiss and the court analyzed the remaining elements of the FDUTPA claim). Because the FDUTPA is intended to be construed liberally, applies to non-consumers, and does not require a consumer transaction between West Boca and the Defendants, the Court concludes West Boca has standing to assert its FDUTPA claim.

### 3. Allegations of Unfair and Deceptive Acts

[42] [43] Federal Courts in the Southern District of Florida have held that a "deceptive act" is one where a "representation, omission, or practice occurred that was likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment;" and an "unfair practice" is one that "offends established public policy and ... is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Cox v. Porsche Fin. Serv., Inc.*, 342 F.Supp.3d 1271, 1286 (S.D. Fla. 2018) (internal citations omitted). Courts have defined "trade

or commerce" as "the advertising, soliciting, providing, offering, or distributing...any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." *Nazario v. Prof'l Account Servs., Inc.*, No. 2:16-cv-772, 2017 WL 1179917, at *4 (M.D. Fla., Mar. 30, 2017).

West Boca alleges that "each of the Defendants have engaged in unfair and/or deceptive trade practices" in commerce, in violation of the FDUTPA, by omitting the material fact of its failure to design and operate a SOMS, as well as by failing to actually disclose suspicious orders. Doc. #: 385 at ¶902. West Boca also alleges that "Defendants, individually and acting through their employees and agents, and in concert with each other, knowingly made material misrepresentations and omissions of facts to Plaintiff to induce it to purchase, administer, and consume opioids," and such false or misleading statements violate the FDUTPA. Doc. #: 385 at ¶¶905-06. Each Defendant argues that West Boca cannot meet the first element of proving an FDUTPA claim because it failed to properly plead a "deceptive act."

### A. Marketing Defendants

West Boca alleges the Marketing Defendants have each engaged in unfair and deceptive acts or practices in commerce by actively promoting and marketing the use of opioids for indications not federally approved, circulating false and misleading information concerning opioids' safety and efficacy, and downplaying or omitting the risk of addiction arising from their use. Doc. #: 385 at ¶901.

 **[44]**  Marketing Defendants argue that Florida law provides a "safe harbor" from FDUTPA claims, which they fall within: FDUTPA does not apply to any "act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1). Manufacturer Defendants bear the burden of establishing the applicability of the safe-harbor provision in a FDUTPA claim, and must show that a specific federal or state law affirmatively authorized it to engage in the conduct alleged.  **\*779**  *Anheuser-Busch Cos.*, 43 F.Supp.3d at 1343 (citing *Florida v. Tenet Healthcare Corp.*, 420 F.Supp.2d 1288, 1310 (S.D. Fla. 2005)). Manufacturer Defendants argue that, since "the FDA has approved most of the ER/ LA [extended release / long-acting] opioid medications at issue here for the treatment of chronic pain and Florida law authorizes such use of opioids," the safe-harbor provisions of

the FDUTPA apply and West Boca's claim must fail. Doc. #: 691-1 at 9.

 **[45]**  West Boca alleges Manufacturer Defendants' misrepresentations and omissions regarding the risk of opioid use fall into nine "categories of falsehoods," which include misrepresentations regarding: (i) addiction risk; (ii) ease of withdrawal; and (iii) improved patient functionality with long-term use. *See* Doc. #: 385 at ¶¶146–317. West Boca argues these misrepresentations and omissions are not based on any of the Manufacturer Defendants' proffered "FDA determinations about opioid safety and effectiveness," and thus are not "specifically permitted by federal or state law." Doc. #: 806 at 65-66. West Boca concludes therefore, that the safe-harbor provision does not apply.

The Court finds that the Manufacturer Defendants' have not met their burden. The Manufacturers do not provide unambiguous evidence showing that their methods of promoting and marketing opioids remained within the parameters specifically authorized by state or federal law. *See* Case No. 18-op-45530, Doc. #: 55 at 17.[40] The Manufacturer Defendants have not established that the safe-harbor provision of the FDUTPA applies to their challenged conduct as a matter of law, and the FDUTPA claim will not be dismissed on this ground. *See Prohias v. AstraZeneca Pharmaceuticals, L.P.*, 958 So.2d 1054, 1056 (Fla. Dist. Ct. App. 2007) (the moving party in an FDUTPA case must "demonstrate that a specific federal or state law affirmatively authorized it to engage in the conduct alleged in the Complaints").

### B. Supply Chain Defendants

West Boca alleges that Distributor and Pharmacy Defendants "knowingly made material misrepresentations and omissions of facts to Plaintiff to induce it to purchase, administer, and consume opioids," and "engaged in unfair and/or deceptive trade practices by omitting the material fact of its failure to design and operate a SOMS, and by failing to actually disclose such suspicious orders," as required under the CSA. Doc. #: 385 at ¶¶902; 905; 906.

### i. Deceiving Customers

 **[46]**  Distributor Defendants argue the Complaint is "entirely devoid" of any allegation that West Boca, "let alone any

consumer – was likely to be deceived by Distributors' alleged omission and reporting failures." Doc. #: 684-1 at 25. West Boca's Complaint, however, specifically contains allegations that "Defendants recklessly disregarded the falsity of their representations and omissions," intending that West Boca and others would rely upon them, and "[b]y reason of their reliance on Defendants' misrepresentations and omissions of material fact, Plaintiff, physicians, patients, and/or others suffered actual pecuniary damage." Doc. #: 385 at ¶¶908-911. More specifically, West Boca alleges "Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under federal law [to report and halt suspicious orders of opioids] and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Distributor **\*780** Defendants' compliance with their legal duties." Doc. #: 385 at ¶649. At this stage, it is sufficient that West Boca plausibly alleges the public was misled; whether West Boca, regulators, or the public was actually deceived by the alleged false statements is a factual question not properly resolved in a motion to dismiss. *See Schojan v. Papa John's Int'l., Inc.*, 2014 WL 6886041, at \*6 (M.D. Fla., Dec. 8, 2014) (denying defendant's motion to dismiss because "[w]hether particular conduct constitutes an unfair or deceptive trade practice is a question of fact"). Therefore, West Boca has properly pled that the Distributors' failure to report suspicious orders could plausibly have deceived it and/or the public.[41]

**ii. CSA Violations: Actionable under the FDUTPA**

Distributor Defendants assert that violations of the CSA cannot serve as a predicate for an FDUTPA claim because the CSA does not proscribe "unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices," and any CSA violation did not occur in the conduct of "trade or commerce." Doc. #: 684-1 at 24-25.[42] Distributor and Pharmacy Defendants argue for dismissal, claiming "the only deceptive or unfair act or practice asserted against [Pharmacy Defendants] is a supposed failure to disclose alleged noncompliance with [CSA] regulatory reporting requirements." *See e.g.* Doc. #: 825 at 13.

West Boca incorporates by reference arguments made by Broward County in its opposition to Defendants' motions to dismiss its FDUTPA Claim – that is, the CSA is considered a consumer protection law. In its opposition, Broward County asserts that "[t]he FDCA, which incorporates the CSA, proscribes deceptive and unfair practices, as its purpose

is 'to protect the public health, safety, and welfare' [of consumers]."[43] Doc. #: 730 at 47. Broward County further asserts that the Defendants' failure to operate a system to disclose suspicious orders of controlled substances "offends established public policy," and is therefore actionable under the FDUTPA. Doc. #: 730 at 47-48.

**[47]** Whether violations of the CSA serve as an appropriate predicate is not dispositive of West Boca's FDUTPA claim.[44] The Court finds that West Boca **\*781** has plausibly alleged "unconscionable, deceptive, or unfair acts or practices" by Distributor Defendants other than those acts that allegedly violate the CSA. Fla. Stat. §§ 501.202(2) and 501.204. One such allegation reads: "members of the supply chain joined and conspired in the false and deceptive marketing of prescription opioids, which was designed dramatically to increase the demand for and sale of opioids and opioid prescriptions." Doc. #: 385 at ¶14; *see also* Doc. #: 385 at Section XV (alleging facts pertaining to substantive RICO violations, including mail and wire fraud). West Boca also alleges that, while conducting these activities, "[a]ll Defendants engaged in '[t]rade or commerce' within the meaning of Fla. Stat. § 501.203(8)." Doc. #: 385 at ¶900. The Court finds that West Boca has sufficiently alleged unfair or deceptive acts against each of the Defendants.

**C. Causation**

**[48]** **[49]** **[50]** Section 501.211(2) of the FDUTPA provides that a "person who has suffered a loss as a result of a violation [of the statute] may recover actual damages." To prove the causation element of a consumer claim under the FDUTPA, West Boca must show that "the practice was likely to deceive a consumer acting reasonably in the same circumstances." *Office of Attorney Gen. v. Bilotti*, 267 So.3d 1, 3 (Fla. 4th DCA 2019) (citation omitted). West Boca "need not prove reliance on the allegedly false statement...but rather a plaintiff must simply prove that an objectively reasonable person would have been deceived." *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 3691 F.App'x 565, 567 (11th Cir. 2009); *see Lombardo v. Johnson & Johnson Consumer Cos. Inc.*, 124 F.Supp.3d 1283, 1290 (citation omitted). Nonetheless, "causation must be direct, rather than remote or speculative." *Lombardo*, 124 F.Supp.3d at 1290 (citation omitted).

**[51]** Defendants each argue that West Boca has not sufficiently pled the existence of an actionable

misrepresentation or omission which would establish causation. (*See* Doc. #: 691-1 at 16; Doc. #: 684-1 at 12-13; Doc. #: 686-1 at 8 (incorporating Doc. #: 582-1 at 3-5). In response, West Boca asserts that Defendants deceived not only regulators, but also the general public. West Boca alleges that "[p]ublic statements by the [Manufacturer and Distributor] Defendants and their associates created the false and misleading impression to regulators, prescribers, *and the public* that the Defendants rigorously carried out their legal duties...and further created the false impression that these Defendants also worked voluntarily to prevent diversion as a matter of corporate responsibility to the communities their business practices would necessarily impact." Doc. #: 385 at ¶616 (emphasis added). Furthermore, West Boca alleges that, "[i]n addition to taking actions to limit regulatory prosecutions and suspensions, the Distributor Defendants undertook *to fraudulently convince the public* that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Distributor Defendants **\*782** attempted to assure the public they were working to curb the opioid epidemic." Doc. #: 385 at ¶655 (emphasis added). Lastly, West Boca alleges that Supply Chain Defendants, which include the Pharmacies, had unlawful "policies and practices [which] remained in place even as the [opioid] epidemic raged," Doc. #: 385 at ¶676, and that "members of the supply chain joined and conspired in the false and deceptive marketing of prescription opioids, which was designed dramatically to increase the demand for and sale of opioids and opioid prescriptions" to the medical community and the public. Doc. #: 385 at ¶14.

The Court concludes West Boca has plausibly alleged that deceptive practices undertaken by all Defendants worked to deceive both regulators and the public, including West Boca, in a manner specifically designed to increase the Defendants' ability to manufacture, distribute, and sell more prescription opioids. The resultant increase in Defendants' commercial transactions were allegedly legitimized by Defendants' deceptive practices, and created the opioid epidemic which injured West Boca. This causal chain is consistent with that described elsewhere in this opinion and the Court's prior opinions. *See* Sec. IV.A., *infra*; Doc. ##: 1203; 3177. Therefore, West Boca has plausibly alleged that actions taken by each Defendant were objectively likely to deceive a reasonable person and caused West Boca's asserted injuries. Defendants' Motions to Dismiss on this ground are denied.[45]

**4. Actual Damages**

**[52]** **[53]** The FDUTPA provides that, "[i]n any action brought by a person who has suffered a loss as a result of a violation of [the Act], such person may recover actual damages, plus attorney's fees and court costs." § 501.211(2). Actual damages are limited to compensatory damages; consequential damages are not available under the Act. *Dorestin v. Hollywood Imports, Inc.*, 45 So.3d 819 (Fla. 4th DCA 2010). In addition, the FDUTPA affords civil private causes of action for equitable relief in the form of a declaratory judgment or an injunction. *See Nazario*, 2017 WL 1179917, at \*4.

**[54]** First, Defendants insists West Boca hasn't alleged "actual damages" cognizable under Section 501.207(1) of the FDUTPA, arguing damages are defined as "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered." *See, e.g.*, Doc. #: 582-1 at 14 (incorporated by reference). While this is true, "the inclusion of diminished value as an actual damage under the FDUTPA is *an addition* to those damages that are already easily recognized as actual damages," that is, the "amounts necessary to compensate adequately an injured party for losses sustained as the result of a defendant's wrongful or negligent actions." *See Diamond v. Porsche Cars N. Am., Inc.*, 2012 WL 6837916, at \*4-5 (Cir. Ct. Fla. Sept. 28, 2012) (citation omitted). West Boca has alleged adequately these other types of compensatory damages.

Defendants also argue West Boca has not alleged a cognizable damages claim because "its purported damages arise from personal injuries." *See, e.g.* Doc. #: 684-1 at 26. The Court concluded above, in Section IV.B., that West Boca's being in the **\*783** business of providing healthcare services, does not make its injuries "derivative" of personal injuries.

**[55]** Defendants make additional arguments, but the Court need not undertake an itemized evaluation of the validity of each type of claimed damages on a motion to dismiss, so long as some alleged damages are sufficient to support West Boca's claim. It remains West Boca's burden to prove at trial that the damages presented are actual, quantifiable damages. *See State Farm*, 315 F.Supp.3d at 1311 ("[a]ll questions regarding the reasonableness and quantification of damages are generally issues of fact...[and] should be left to the jury") (citation omitted). But West Boca's pleading of alleged damages is sufficient. Defendants' Motions to Dismiss are denied on these grounds.

### 5. Equitable Relief

Regardless of whether a plaintiff can recover "actual damages" under Section 501.211(2), it may obtain injunctive relief under Section 501.211(1). *See Ahearn v. Mayo Clinic, 180 So.3d 165, 172 (1st DCA Fla. 2015)* (citation omitted). To state a claim for equitable relief, West Boca "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." Fla. Stat. § 501.211(1); *Stewart Agency, Inc.*, 266 So.3d at 214. The equitable relief available under FDUTPA is limited to a declaratory judgment or an injunction. Fla. Stat. § 501.211.

[56] West Boca has asked the Court for "equitable relief, including injunctive relief," alleging specific examples of how West Boca "continues to suffer from the unlawful actions by the Defendants." *See* Doc. #: 385 at ¶¶10; 748; 769. Defendants do not specifically address West Boca's requests for equitable relief. Absent briefing to the contrary, the Court concludes West Boca has shown "a sufficient likelihood that [it] will be affected by the allegedly unlawful conduct in the future." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328-29 (11th Cir. 2013). West Boca may seek equitable relief under the FDUTPA.

### VII. Misleading Advertising

In its Fourth Claim for Relief, West Boca alleges the Marketing Defendants "engaged in misleading advertising in the conduct of a business, trade or commerce" in Florida, "deceiving the public about the efficacy and safety of opioid pharmaceuticals" in violation of Fla. Stat. § 817.41. Doc. #: 385 at ¶¶915, 917-18. "Misleading advertising" is defined by Section 817.40(5) as:

> any statements made, or in oral, written, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or thorough the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, or selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.

Fla. Stat. § 817.40(5).

[57] To prove misleading advertising under Florida law, a plaintiff must "prove reliance on the alleged misleading advertising, as well as each of the other elements of the common law tort of fraud in the inducement." *Koens v. Royal Caribbean Cruises, Ltd.*, 774 F.Supp.2d 1215, 1220 (S.D. Fla. 2011) (citation omitted).

**\*784** [58] West Boca alleges Marketing Defendants' advertising was misleading in the following ways:

a. Misrepresenting the truth about how opioids lead to addiction;

b. Misrepresenting that opioids improve function;

c. Misrepresenting that addiction risk can be managed;

d. Misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"

e. Falsely claiming that withdrawal is simply managed;

f. Misrepresenting that increased doses pose no significant additional risks;

g. Falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

Doc. #: 385 at ¶919.

[59] Marketing Defendants argue West Boca has failed to allege any false or misleading statement and failed to allege it was exposed to, and relied upon, any alleged misrepresentation by Marketing Defendants.[46] Doc. #: 691-1 at 11. But this is plainly incorrect. West Boca identifies specific examples of allegedly-misleading statements made by Marketing Defendants, setting forth nine "falsehoods" Marketing Defendants promoted to increase the market for opioids. *See* Doc. #: 385 at ¶¶155-327. West Boca also identifies the "multiple channels" Marketing Defendants used to disseminate these allegedly misleading statements. *See* Doc. #: 385 at ¶¶328-480. In fact, West Boca dedicates over 300 paragraphs of its Complaint to specifically identifying documents or statements it believes were misleading, the source of the statements, the various methods used to disseminate the statements, and when and to whom the statements were made. *See* Doc. #: 385 at ¶¶155-480.[47] *See also Doria v. Royal Caribbean Cruises, Ltd.*, 393 F.Supp.3d 1141, 1145 (S.D. Fla. 2019) (finding plaintiff's allegations met the heightened pleading standard of Rule 9(b), as it provided the statements alleged to be misleading or false, the sources of

the misleading materials, and identified when the misleading statements were made.) The Court has previously concluded that, "where multiple defendants are alleged to have engaged in the same pattern of conduct," a plaintiff need not "reiterate its allegations against each defendant individually." Doc. #: 1499 at 25-26 (adopted by Doc. #: 1680 at 5). "Such a finding would exponentially increase the length of pleadings while adding no substantive value." Doc. #: 1499 at 26. West Boca's allegations are sufficient, even under the heightened pleading standard of Rule 9.

West Boca has also sufficiently alleged throughout its Complaint that it relied upon Marketing Defendants' allegedly misleading advertisements. Accordingly, this Court finds that West Boca has stated a claim for Misleading Advertising, and Marketing Defendants' Motion to Dismiss is denied on this ground.

**\*785  VIII. Breach of Implied Warranty of Fitness For a Particular Purpose**

West Boca alleges each Defendant breached implied warranties of fitness for a particular purpose, in violation of Fla. Stat. Ann. §§ 672.315 (the "Florida UCC").[48] Doc. #: 385 at ¶¶922-928. West Boca alleges Defendants knew or had reason to know that: (i) West Boca was purchasing opioids "for a particular purpose, namely to provide pain relief in an appropriate way that did not unnecessarily endanger its patients if the opioids were used as sold and marketed by Defendants,;" and (ii) "[t]he opioids that Plaintiff purchased were not suitable for the particular purpose for which Plaintiff purchased them." West Boca claims it suffered damages as a result of justifiably relying upon Defendants' "skill, judgment and narrative to provide opioids that were suitable." Doc. #: 385 at ¶¶924-28.

[60]  However, West Boca's opposition brief is entirely devoid of any factual statements or legal arguments regarding a breach of warranty. Doc. #: 806. As Defendants correctly argue, a plaintiff abandons its claims by failing to raise them in its brief opposing a defendant's motion to dismiss. *See, e.g.* Doc. #: 55 at 14 (citing *Doe v. Bredesen,* 507 F.3d 998, 1007 (6th Cir. 2007)). Therefore, the Court finds that West Boca has abandoned its breach of implied warranty claim. Defendants' Motions to Dismiss Count V are granted.[49]

**IX. Negligence**

West Boca asserts five variations of negligence claims: Negligence (Count VI); Wanton Negligence (Count VII); Negligence Per Se (Count VIII); Negligent Marketing (Count IX); and, Negligent Distribution (Count X). The Court examines each claim separately.

**A. Common-Law Negligence**

[61]  There are four elements to a common-law negligence claim under Florida law: (1) a duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risk; (2) breach of that duty; (3) a reasonably close causal connection between the conduct and the resulting injury, or "proximate cause;" and (4) damages. *See Clay Elec. Co-op., Inc. v. Johnson,* 873 So. 2d 1182, 1185 (Fla. 2003).* In its Sixth Claim for Relief, West Boca alleges each Defendant breached "its duty to exercise reasonable care in the manufacturing, marketing, selling, and distributing of highly dangerous opioid drugs." Doc. #: 385 at ¶¶930-931. West Boca further alleges that, "[a]s a proximate result, Defendants have caused Plaintiff's injury related to the treatment of opioid-related conditions." Doc. #: 385 at ¶¶933. Defendants only challenge the sufficiency of the allegations **\*786** with respect to the duty of care.[50] *See* Doc. #: 691-1 at 14-15; Doc. #: 684-1[51] at 19-20; Doc. #: 686-1 at 4.

[62]  [63]  [64]  In Florida, "[t]he touchstone for determining whether a duty exists is 'foreseeability.' '[W]here a person's conduct is such that it creates a "foreseeable zone of risk" posing a general threat of harm to others, a legal duty will ordinarily be recognized to ensure that the underlying threatening conduct is carried out reasonably.' " *Sewell v. Racetrac Petroleum, Inc.,* 245 So. 3d 822, 825 (Fla. Dist. Ct. App. 2017) (citing *McCain v. Florida Power Corp.,* 593 So.2d 500, 503 (Fla. 1992); *Williams v. Davis,* 974 So.2d 1052, 1056 (Fla. 2007)); *see also U.S. v. Stevens,* 994 So.2d 1062, 1066-67 (Fla. 2008). In order to determine whether a duty arises, the Florida Supreme Court has identified four sources that provide such a duty: "(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case." *Clay Elec.,* 873 So. 2d at 1185 (quoting *McCain,* 593 So.2d at 503 n.2).

[65] West Boca relies upon the general facts of this case as the source of Defendants' common-law duty. *See* Doc. #: 806 at 41-42. West Boca asserts its injuries were within the "foreseeable zone of risk" created by Defendants' manufacturing, distributing, and dispensing activities, because: (a) if not conducted with a requisite level of care, these activities could (and, in fact, did) foreseeably allow opioids to be diverted in large quantities into West Boca's service area; (b) this diversion could (and, in fact, did) foreseeably lead to widespread injury to people's health, creating a public health crisis; and (c) hospitals are necessarily and foreseeably on the "front lines" of any and all health crises. *See* Doc. #: 806 at 41 (citing Doc. #: 385 at ¶¶16-17; 47; 58; 60). West Boca alleges that, not only could the Defendants have reasonably foreseen that hospitals would bear the responsibility for treating individuals with opioid addiction, but the Defendants may have even counted on it -- West Boca alleges "defendants knew that but for West Boca's providing at least some aspect of a safety net, the number of overdose deaths and other related health consequences arising from opioid addictions would have even been far greater than actually occurred." Doc. #: 385 at ¶19. Although this allegation will need to be proved, it is taken as true at the motion to dismiss stage.

The Court concludes West Boca's asserted injuries plausibly fall within the foreseeable zone of risk created by Defendants' manufacturing, distributing, and dispensing activities related to opioid drugs. In other words, Defendants' activities regarding these potentially dangerous and highly addictive opioid drugs create a "general threat of harm to others," and it is therefore appropriate, under Florida law, to recognize a legal duty "to ensure that the underlying threatening conduct is carried out reasonably." *Sewell*, 245 So. 3d at 825. At this stage in the case, a complaint need only set forth a plausible claim for relief and should not be dismissed unless it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Trollinger*, 370 F.3d at 615; **\*787** *Krehling v. Baron*, 900 F.Supp. 1574, 1577 (M.D. Fla. 1995). Thus, the Court finds West Boca has sufficiently pled that Defendants owe it a duty of care. Defendants Motion to Dismiss Count VI is denied.

**B. Wanton Negligence Allegations Against All Defendants**
In the Seventh Claim for Relief, West Boca alleges Wanton Negligence. West Boca alleges:

> Defendants conducted themselves with reckless indifference to the consequences of their acts and omissions, in that they were conscious of their conduct and were aware, from their knowledge of existing circumstances and conditions, that their conduct would inevitably result in injury to others, specifically hospitals such as Plaintiff, which would be subject to providing unreimbursed healthcare treatment to patients with opioid conditions.

Doc. #: 385 at ¶938.

Distributor Defendants argue that willful and wanton negligence is considered a "more culpable" form of misconduct than ordinary negligence, as it relates to "conduct which is more in the nature of an intentional wrong." Distributor Defendants assert West Boca's allegations do not even support a simple negligence claim, and therefore cannot support a claim for wanton negligence. Doc. #: 684-1 at 30. Manufacturer Defendants argue that West Boca did not properly plead its negligence claim to allege Manufacturer Defendants owed it a duty of care. Doc. #: 691-1 at 14.[52]

[66] [67] Under Florida law, conduct rises to the level of willful and wanton misconduct when the actor has "knowledge, actual or constructive, of the likelihood that his conduct will cause injury to other persons" and this conduct "indicate[s] a reckless indifference to the rights of others." *Bell v. Circle K Stores Inc.*, No. 8:18-cv-1296, 2019 WL 5190907, at \*4 (M.D. Fla. Oct. 15, 2019) (citing *Boyce v. Pi Kappa Alpha Holding Corp.*, 476 F.2d 447, 452 (5th Cir. 1973). Reckless misconduct differs from negligence in that "reckless misconduct requires a conscious choice of a course of action...with knowledge of the serious dangers to others involved in it or with knowledge of facts which would disclose the danger to any reasonable man." *Id.* (citing Restatement (Second) of Torts § 500).

[68] As outlined in the RICO section of this Order, the Complaint details the alleged manner in which Defendants knowingly promoted and distributed misleading and false information in order to increase the market for prescription opioids, and willfully failed to monitor, report, or halt shipments of suspicious orders of opioids. West Boca's Complaint sets forth alarming statistics related to the opioid epidemic, further alleging each Defendant was aware of, yet ignored, these statistics. *See* Doc. #: 385 at ¶¶1-50. West Boca also alleges the Defendants' conduct "continued in the face of numerous enforcement actions, fines, and other warnings from state and local governments and regulatory agencies," and that "Defendants paid their fines, made promises to do

better, and **\*788** continued on with their marketing and supply schemes." Doc. #: 385 at ¶783.

The Court concludes these factual allegations, taken as true, rise to the level of reckless indifference. West Boca has adequately pled allegations against Defendants which reflect intentional misconduct and could ultimately, if proved, support a finding of wanton negligence against Defendants. Therefore, Defendants' Motion to Dismiss the wanton negligence claim is denied.

### C. Negligence Per Se Allegations Against All Defendants

In the Eighth Claim for Relief, West Boca alleges negligence per se, claiming Defendants violated their duties under the CSA by "knowingly or intentionally furnishing false or fraudulent information in, and/or omitting material information from, documents filed with the DEA." Doc. #: 385 at ¶942. West Boca also alleges "Defendants failed to comply with the FDCA" in failing "to provide effective controls and procedures to guard against diversion of controlled substances in contravention of Florida and federal law." Doc. #: 385 at ¶¶944; 948.

The Defendants argue that neither the CSA nor the FDCA establish a private right of action, so West Boca cannot pursue a negligence per se claim premised on these statutes. *See* Doc. #: 684-1 at 27-28; Doc. #: 691-1 at 14-15. The Court agrees with Defendants.

**[69]** As this Court has ruled previously, "[t]he CSA was intended to protect individual members of the public from falling victim to drug misuse and abuse." *See* Doc. #: 1680 at 24; Doc. #: 3177 at 53. West Boca, a hospital system, is not an "individual member of the public" that could fall victim to drug misuse and abuse. West Boca is not an intended beneficiary of the CSA. *See* Doc. #: 3177 at 53. Nor is West Boca the intended beneficiary of the FDCA, which was enacted to "[s]afeguard the public health and promote the public welfare by protecting the public from injury" caused by using products relating to drugs, devices and cosmetics. *See* § 499.002(1), Fla. Stat. (1993); *Fields v. Mylan Pharm's Inc.*, 751 F.Supp.2d 1257, 1259 (N.D. Fla. 2009). Furthermore, under Florida law, negligence per se cannot be premised upon a violation of the CSA or the FDCA, as there is no "evidence of a legislative intent to create a private cause of action." *Rowe v. Mentor Worldwide, LLC*, 297 F.Supp.3d 1288 (M.D. Fla. 2018).

For these reasons, West Boca has failed to state a claim for negligence per se. Defendants' Motion to Dismiss is granted, and Count VIII is dismissed.

### D. Negligent Marketing Allegations Against Marketing Defendants

In the Ninth Claim for Relief, West Boca alleges "negligent marketing" against Marketing Defendants, claiming they "marketed opioids in an improper manner" by overstating the benefits of chronic opioid therapy and opioids' superiority compared with other treatments. Doc. #: 385 at ¶973(a) and (c). West Boca alleges Marketing Defendants also mischaracterized the serious risks and adverse outcomes of opioid use, including the "serious risk of addiction, overdose and death," the difficulty of withdrawal from opioids, and West Boca contends that opioids were marketed for indications and benefits that were outside of the opioids' labels and not supported by substantial evidence. Doc. #: 385 at ¶973(b), (d)-(e). West Boca also alleges the Marketing Defendants "knew or should have known that opioids were unreasonably dangerous and cause addiction" when used to treat chronic pain. Doc. #: 385 at ¶977.

**\*789** **[70]** Manufacturing Defendants argue that a claim for "negligent marketing" does not exist under Florida law and cannot serve as an independent cause of action. Doc. #: 691-1 at 14. West Boca responds that several courts in Florida have recognized negligent marketing claims. However, the case law cited by West Boca does not support this argument. *See* Doc. #: 806 at 45.[53] While there is Florida case law to support "fraudulent marketing" or "negligent misrepresentation" claims against drug manufacturers, *see, e.g.*, *Hamblen v. Davol, Inc.*, 2017 WL 6406888, at *3 (M.D. Fla. Dec. 15, 2017) (denying motion to dismiss plaintiff's negligent misrepresentation claim alleging manufacturer of hernia patch omitted information about the risks of its product), Florida courts have not yet deemed "negligent marketing" a separate cause of action.[54]

For these reasons, West Boca has failed to state a viable claim for negligent marketing. Marketing Defendants' Motion to Dismiss is granted with respect to Count IX.

### E. Negligent Distribution Allegations Against All Defendants

In the Tenth Claim for Relief, West Boca alleges "Negligent Distribution" against all Defendants, alleging they

"distributed opioids in an improper manner" when they failed to maintain effective controls against diversion of opioids, (i.e. failed to monitor, report, or stop or suspend shipments of suspicious orders). West Boca alleges Defendants distributed and sold "opioids in a way that facilitated and encouraged their flow into the illegal, secondary market" (i.e. "knew or should have known they were distributing and selling opioids prescribed by 'pill mills.' "). Doc. #: 385 at ¶986.

Similar to Count IX, Manufacturing and Pharmacy Defendants argue that "negligent distribution" claims do not exist in Florida law, Doc. #: 691-1 at 14; Doc. #: 686-1 at 4. Distributor Defendants argue West Boca's negligent distribution claim "is entirely duplicative of its negligence claim," and therefore, fails. Doc. #: 684-1 at 21-22.

[71] As with West Boca's negligent marketing claim, there is no specific case law holding that a negligent distribution claim against a pharmaceutical distributor exists under Florida law. Thus, for the same reasons as with Count IX, West Boca has failed to state a viable claim for negligent distribution. Defendants' Motion to Dismiss is granted with respect to Count X.

## X. Unjust Enrichment

In the Twelfth Claim for Relief, West Boca alleges unjust enrichment against all Defendants, claiming "Plaintiff provided unreimbursed healthcare treatment to patients with opioid conditions that Defendants are responsible for creating," and West Boca thereby conferred a benefit on **\*790** Defendants. Doc. #: 385 at ¶1006. West Boca also argues it was a "purchaser and dispenser of opioids which conferred pecuniary benefits upon the Defendants." Doc. #: 806 at 51-52; 58. West Boca alleges it would be "inequitable for Defendants to retain the benefit without payment of its value" and Defendants must disgorge their unjustly acquired profits by providing restitution to West Boca. Doc. #: 385 at ¶¶1008-11.

[72] [73] [74] In Florida, the elements of unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff. *See Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So.3d 689, 693 (Fla. 3d

DCA 2018). The basis of the remedy for unjust enrichment is to provide restitution where one person has been unjustly enriched at the expense of another. *See id.* Disgorgement is an equitable remedy in unjust enrichment actions, and is measured by the defendant's ill-gotten gains rather than the plaintiff's losses. *See, e.g., S.E.C. v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017).

Defendants argue that West Boca does not plausibly allege any benefit it conferred upon the Defendants, arguing West Boca only conferred benefits upon its patients. *See* Doc. #: 691-1 at 17; Doc. #: 684-1 at 22-23. Distributors further argue that: (1) West Boca fails to allege the Distributors were aware of the benefit conferred upon them; (2) the unjust enrichment claim fails because it is duplicative, as it is based on the same alleged conduct underlying its other claims; and (3) because West Boca is obligated under both state and federal law to provide emergency medical care to indigent patients, West Boca's garnering of unreimbursed medical expenses is not unjust. *See* Doc. #: 684-1 at 22-23.

For the reasons stated in *Summit County*, *see* Doc. ##: 1025 at 91-95; 1203 at 36-38, and repeated by this Court in *Cleveland Bakers*, *see* Doc. #: 3177 at 61-63, these arguments do not persuade the Court to dismiss West Boca's unjust enrichment claim. The Ohio law of unjust enrichment parallels Florida law; accordingly, the Court's prior rulings apply here. *See City of Miami v. Bank of America Corp.*, 800 F.3d 1262, 1288 (11th Cir. 2015).

[75] First, as in the *Summit County* case, West Boca's Complaint pleads a facially plausible unjust enrichment cause of action "on the theory that [the plaintiff] conferred a benefit upon all Defendants by alleging that they paid for the cost of harm caused by the defendant's conduct, *i.e.*, the defendants' externalities." Doc. #: 1025 at 95.[55] Furthermore, Defendants' argument that there was no direct transaction between the parties, and therefore no direct benefit conferred, does not warrant dismissal of the unjust enrichment claim under Florida law. *See, e.g., Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1236–37 (S.D. Fla. 2015) (citing cases in the Southern District of Florida that permit an unjust enrichment claim to stand where the benefit is conferred through an intermediary); *see also Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC*, 650 F.Supp.2d 1213, 1229 (S.D.Fla. 2009) ("Whether [Defendants] did or did not receive a direct benefit from Plaintiff is a **\*791** question of fact that cannot be resolved at the motion to dismiss stage.").

The Court has also addressed and rejected in its *Summit County* ruling each of the Distributor Defendants' remaining arguments. First, the Court previously ruled that allegations similar to West Boca's allegations herein—that "Defendants appreciated and knew of this benefit"—adequately supports the unjust enrichment element of knowledge in the pleading stage. *See* Doc. #: 1025 at 94. Second, the argument that West Boca's unjust enrichment claim should be dismissed as "duplicative" was rejected in *Summit County* and is expressly rejected by courts in the Southern District of Florida. *See* Doc. #: 1025 at 94-95; *In re Monat Hair Care Prods. Marketing, Sales Practices, and Prods. Liab. Litig.*, MDL No. 2841, 2019 WL 5423457, at *5 (S.D. Fla. Oct. 23, 2019) ("The general rule that 'equitable remedies are not available under Florida law when adequate legal remedies exist'...does not apply to unjust enrichment claims.") (citations omitted); *Martorella v. Deutsche Bank Nat. Trust Co.*, 931 F.Supp.2d 1218, 1227 (S.D. Fla. 2013) (finding plaintiff could "maintain an equitable unjust enrichment claim in the alternative to her legal claims against Defendants").

Finally, Distributor Defendants' argument that "there is nothing unjust" about the costs incurred by West Boca, because it was obligated to provide care to patients adversely affected by opioids, was also rejected in *Summit County*. *See* Doc. #: 1025 at 94 ("the complaint pleads that the costs Plaintiffs assumed 'are not part of the normal and expected costs' and that 'Defendants' alleged wrongful acts' were not the sort to be reasonably expected"); *but see City of*

*Miami v. Bank of America Corp.*, 800 F.3d 1262 (11th Cir. 2015) (upholding dismissal of City's unjust enrichment claim, finding it was not clear that the municipal expenditures at issue are "among the types of benefits that can be recovered by unjust enrichment under Florida law").

For these reasons, Defendants' Motion to Dismiss West Boca's unjust enrichment claim is denied.

## XI. Conclusion

Accordingly, Defendants' Motions to Dismiss are **DENIED** with respect to Counts I (RICO § 1962(c)); II (RICO § 1962(d)); III (FDUTPA); IV (Misleading Advertising); VI (Negligence); VII (Wanton Negligence); XI (Nuisance); and XII (Unjust Enrichment).

Defendants' Motions to Dismiss are **GRANTED** with respect to Counts II (RICO § 1962(a)); V (Breach of Implied Warranty); VIII (Negligence Per Se); IX (Negligent Marketing); and X (Negligent Distribution).

**IT IS SO ORDERED.**

## All Citations

452 F.Supp.3d 745

Footnotes

1   Unless otherwise indicated, all document numbers refer to the master MDL docket, Case No. 17-md-2804. Page numbers, when necessary, refer to the documents' native format pagination. West Boca's Complaint was refiled unredacted at Doc. #: 2985 and although the Court refers to the sealed complaint, Doc. #: 385, paragraph numbers in the unredacted version should be the same.

2   The Distributors' motion was filed collectively by defendants AmerisourceBergen Drug Corporation ("ABDC"); Cardinal Health, Inc. ("Cardinal"); and McKesson Corporation ("McKesson") (collectively, "Distributors" or "Distributor Defendants").

3   The Pharmacies' motion was filed collectively by defendants CVS Health Corporation ("CVS"); The Kroger Co. ("Kroger"); Walgreens Boots Alliance, Inc. ("Walgreens"); and Walmart Inc. ("Walmart") (collectively "Pharmacies" or "Pharmacy Defendants").

4   The Manufacturers' motion was filed collectively by defendants Purdue Pharma LP, Purdue Pharma Inc., and The Purdue Frederick Company Inc. ("Purdue"); Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. ("Allergan"); Watson Laboratories, Inc., Actavis Pharma, Inc.; Actavis LLC; Teva Pharmaceuticals, USA, Inc.; and Cephalon, Inc. ("Teva"); Johnson & Johnson ("J&J") and Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. ("Janssen"); Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. ("Endo"); Insys Therapeutics, Inc. ("Insys"); Mallinckrodt LLC ("Mallinckrodt"); and Noramco, Inc. ("Noramco") (collectively "Manufacturers" or "Manufacturer Defendants").

5    The Court recognizes that some Defendants have or are contemplating filing for bankruptcy protection, and litigation against those Defendants has or may be stayed pending those proceedings. For the sake of simplicity, the Court addresses these motions as they were filed by the parties.

6    The Manufacturers' Reply was not filed on the master MDL docket.

7    Additionally, on April 5, 2019, various hospital plaintiffs, including West Boca, filed a tangentially-related Brief in Response to Defendants' Briefing on the Viability of Public Nuisance Nationwide. Doc. #: 1523.

8    Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961, *et seq.*

9    In its Complaint, West Boca uses the following definitions:

- "Collectively, Purdue, Actavis, Cephalon, Janssen, Endo, Insys, and Mallinckrodt are referred to as 'Marketing Defendants.' " *See* Doc. #: 385 at ¶131. West Boca's definition of Janssen includes J&J and Noramco, thus the "Marketing Defendants" are the same as the Manufacturers defined in footnote 4 by their joint participation in the Manufacturers' Motion to Dismiss.
- "Cardinal, McKesson, and AmerisourceBergen are collectively referred to as the 'Distributor Defendants.' " Doc. #: 385 at ¶148.
- "Collectively, Defendants CVS, Kroger, Rite Aid, Walgreens, and Wal-Mart are referred to as 'National Retail Pharmacies.' " Doc. #: 385 at ¶154. Although incorporated in this definition, Rite-Aid of Maryland, Inc. was voluntarily dismissed on May 29, 2018. *See* Case No. 18-op-45530, Doc. #: 5; *see also* Doc. #: 760 (redacted complaint filed with Rite Aid removed).
- "Additionally, the Distributor Defendants and the National Retail Pharmacies are collectively referred to as the 'Supply Chain Defendants.' " Doc. #: 385 ¶154.

10    Those cases are *County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*, 18-op-45090; *The Muscogee (Creek) Nation v. Purdue Pharma L.P., et al.*, 18-op-45459; and *The Blackfeet Tribe of the Blackfeet Indian Reservation v. AmerisourceBergen Drug Corp., et al.*, 18-op-45749.

11    The Magistrate Judge's R&R and the Court's Opinion and Order addressed the then-operative *Summit County* Complaint, Doc. #: 514. This complaint has since been amended. *See* Doc. ##: 2943; 3020. The *Blackfeet Tribe* Complaint was not filed on the master MDL docket. The referenced Doc. #: 6 corresponds to case no. 18-op-45749.

12    It seems this third category of damages might be offset entirely by the profit West Boca made on the sale of the opioid medications to patients. At this stage of the litigation, however, the Court accepts that this third category of damages does exist.

13    The Court has previously addressed these legal concepts under Ohio and Oklahoma law. *See* Doc. ##: 1025 at 29- 32, 79-82; 1680 at 6-10. Although not dispositive, the analysis remains instructive and is incorporated herein by reference.

14    It is worth noting as well that in *Benitez v. Standard Havens Prod., Inc.*, 7 F.3d 1561, 1565 (11th Cir. 1993), the case from which the Eleventh Circuit certified the question of whether knowing product misuse was a complete bar to recover on a products liability claim to the Florida Supreme Court, the Eleventh Circuit distinguished *Clark* as being "based on the particular facts of the case and the lack of causation between any alleged defect and the plaintiff's injuries, not on an absolute bar to recovery for knowing misuse." *Benitez*, 7 F.3d at 1565, *certified question answered*, 648 So. 2d 1192 (Fla. 1994).

15    Additionally, as Broward County points out in its own opposition brief (incorporated by West Boca), *Labzda* was decided on a full record at summary judgment. Doc. #: 730 at 23 n.16. If the sole proximate cause doctrine did not preclude Labzda's claims on a motion to dismiss, there is no reason to believe dismissal is appropriate here. Causation questions are best left to a jury. *Simon*, 895 F.2d at 1316.

16    The injuries asserted by *Summit County* are listed in Doc. #: 1203 at 15-16.

17    The foreseeability element is evaluated further in the Court's analysis of West Boca's negligence claims in Section IX below.

18    Distributors, for example, assert that "[t]he Hospital's claimed injuries consist entirely of 'unreimbursed charges for its treatment of patients.' " Doc. #: 684-1 at 4 (citing Doc. #: 385 at ¶55) (emphasis added). This assertion is plainly inaccurate, as it identifies only the first of the three categories of alleged damages. The Defendants' failure to argue that the second and third categories of alleged damages are not a direct consequence of their conduct leaves the Court with no choice but to conclude its prior analyses in its opinions in *Summit County* and *Cleveland Bakers and Teamsters Health and Welfare Fund, et al.*, Case No. 1:18-op-45432 ("*Cleveland Bakers*"), remains valid and applicable to West Boca's claims. *See* Doc. #: 1203; *Opinion and Order Regarding Motions to Dismiss Cleveland Bakers Claims*, Doc. #: 3177. The Court concludes now, as it has before, that the Defendants' alleged behavior—false marketing and/or failure to prevent diversion—led

to the opioid crisis, and the opioid crisis led to West Boca's injuries. Thus, West Boca has alleged a foreseeable and sufficiently direct chain of causation to cross the plausibility threshold. *See* Doc. #: 1203 at 7-10; Doc. #: 3177 at 24-27. The motion to dismiss standard precludes dismissal if there is any set of facts upon which relief may be available. Because West Boca has alleged a set of facts upon which relief can be granted (relief being compensation for the second and third categories of asserted injuries, for example), the Court will allow West Boca's RICO claim to survive Defendants' motions to dismiss with respect to unreimbursed medical expenses as well. But the Court expects its concerns regarding these different categories of damages, described further below, will be addressed on a more fulsome factual record at summary judgment.

19  As mentioned below, the Court's concern regarding the viability of the first category of alleged damages attaches to all of West Boca's claims, not just its RICO claims.

20  Distributors rely heavily on *International Brotherhood of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999). *See* Doc. #: 684 at 5-6. *Brotherhood of Teamsters* is even less instructive. Where *Allegheny* and *Washington Public* are hospital cases, *Brotherhood of Teamsters* is a third-party payor case. Furthermore, all three cases arise out of the tobacco litigation. In *Brotherhood of Teamsters*, the Seventh Circuit concluded that "[t]he problem for [the third-party payor plaintiffs] is...that they do not deal with tobacco producers, the supposed wrongdoers." *Id.* at 827. Here, West Boca asserts that it does deal directly with "supposed- wrongdoer" opioid manufacturers. And given the litany of other legal and factual distinctions that, in this Court's view, were not adequately briefed or were overlooked entirely, it is not clear whether or to what extent *Brotherhood of Teamsters* is applicable at all, let alone to the Distributors. West Boca, on the other hand, relies heavily on *In re Neurontin Marketing and Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013). *See* Doc. #: 806 at 6-7; 12; 16; 18. Unlike the tobacco cases mentioned above, *Neurontin* is a pharmaceutical case and is noteworthy for its acceptance of aggregate evidence to prove RICO causation. While this Court has stated it will allow Plaintiffs to use aggregate evidence to attempt to prove causation in the RICO context, it is also worth noting there are important differences between *Neurontin* and the opioid cases. For example, in *Neurontin*, plaintiff Kaiser used aggregate data to link marketing activity of a *single* manufacturer's *single* drug to a *single* alleged injury (payment for off-label prescriptions) by a *single* plaintiff. The First Circuit concluded that Kaiser's regression analysis, in conjunction with other non-aggregate-data evidence, was sufficient to prove causation and not just correlation. *See Neurontin*, 712 F.3d at 46. In contrast, in the opioid litigation there are *many* manufacturers that marketed *many* different opiate drugs to *many* plaintiffs, who seek *many* types of damage. For example, opioid cases include non-marketing theories of liability against Distributors and Pharmacies, and many categories of injury that were not at issue in *Neurontin*. Ultimately, due to the more complex nature of the MDL cases, the causation analysis accepted by the First Circuit in *Neurontin* may have no application in opioid litigation.

21  West Boca does, however, argue that many states have enacted hospital lien laws, which allow hospitals to claim a portion of a legal award that an uninsured patient might receive for their accident if West Boca attaches the lien within a specified time period. Doc. #: 385 at ¶61. If anything, this heightens the Court's concern that allowing West Boca to pursue the first category of damages would lead to double recovery against the Defendants.

22  The Ninth Circuit, in *Washington Public*, in the factually-distinct context of tobacco litigation, acknowledges the difference between third-party payors and healthcare providers, but concludes it is immaterial. 241 F.3d at 702 ("The fact that Plaintiff Districts are health care providers rather than third party health care payers like the union trusts in *Oregon Laborers* is immaterial for purposes of RICO and antitrust standing."). The Third Circuit, in *Allegheny*, does not even draw the distinction. 228 F.3d at 435 ("Plaintiffs raise antitrust and RICO claims that are essentially identical to those the union funds raised in Steamfitters. Therefore, Steamfitters controls.").

23  Because of the overlap between proximate cause and standing with respect to RICO, the second and third *Holmes* factors are addressed in Section IV.B below.

24  Interestingly, it is Defendants who assert that those patients cannot, in fact, seek compensation for their medical expenses and thus vindicate the law as private attorneys general in the interest of deterring injurious conduct. *See, e.g.,* Doc. #: 684-1 at 1 ("[T]hese victims brought claims against the prescription-opioid manufacturers...seeking recovery of personal-injury damages. As far as Distributors are aware, those claims all failed.").

25  *See* Doc. #: 961-1 at 5.

26  *See* Doc. #: 961-1 at 4; Doc. #: 684-1 at 11-12.

27  *See* Doc. #: 961-1 at 7-8; Doc. #: 684-1 at 13.

28  *See* Doc. #: 961-1 at 5; Doc. #: 684-1 at 10; Doc. #: 686-1 at 3-4. Federal Rule 9(b) is also analyzed in section VI.C below regarding West Boca's FDUTPA claims.

29    The R&R of the Magistrate Judge with respect to the analysis of these sections was adopted by the Court. *See* Doc. #: 1203.

30    It is not clear from West Boca's complaint or from briefing by the parties whether West Boca's RICO conspiracy claim under 18 U.S.C. § 1962(d) is premised solely upon its § 1962(a) claim, or whether West Boca also intended to allege a conspiracy to commit a substantive violation of § 1962(c). By the express language of paragraph 893 of the Complaint, West Boca's second cause of action appears to be premised on the § 1962(a) claim alone, which as discussed below, must be dismissed. Doc. #: 385 at ¶893 ("In violation of Section 1962(d) of RICO, 18 U.S.C. § 1962(d), Defendants, with full knowledge and purpose, conspired to violate Section 1962(a) of RICO."). However, given that (1) all parties briefed the issue as though the conspiracy claim applied to both §§ 1962(a) and (c), and (2) there appear to be sufficient allegations within the complaint addressing § 1962(c) to support a claim for conspiracy to violate that section, the Court assumes West Boca's conspiracy claim is premised upon both § 1962(a) and (c). *See, e.g.*, Doc. #: 385 at ¶773.

31    *See, e.g.*, Doc. #: 385 at ¶155 (noting the defendants are being sued "to the extent that they are engaged in the manufacture, promotion, distribution, sale **and/or dispensing** of opioids") (emphasis added); Doc. #: 385 at ¶¶663- 717 (describing in detail that the National Retail Pharmacies "business includes the distribution ***and dispensing*** of prescription opioids.").

32    *See Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 322 (2d Cir.2011) (reversing dismissal of § 1962(a) claim upon conclusion that defendant, Anza, defrauded the State of New York (a prior victim) out of tax revenue and subsequently invested the ill-gotten racketeering income into a new enterprise, Easton Corporation, in order to purchase property for a competing store that directly injured plaintiff, Ideal Steel).

33    *See Vemco*, 23 F.3d at 131 (distinguishing *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385 (6th Cir.1989)). In *Newmyer*, the Sixth Circuit reversed dismissal of plaintiffs' § 1962(a) claim where "*Newmyer* plaintiffs could have been injured by the investment itself if the investment plan into which they put their money (i.e., the enterprise) was itself funded with monies from ***prior*** racketeering against ***prior*** victims" concluding that "an injury resulting from the investment of racketeering proceeds itself was possible." *Id.* (emphasis added).

34    West Boca attempts to rely on *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837 (4th Cir. 1990), to support its assertion that it need not plead a distinct investment injury to bring a claim under § 1962(a). *Busby* cannot help West Boca. The Fourth Circuit is one of the few circuits not following the majority rule, and this Court is bound to follow controlling Sixth Circuit precedent. *See Vemco*, 23 F.3d at 132.

35    Defendants also assert West Boca has not sufficiently alleged the Defendants proximately caused the alleged injuries. Causation is addressed in multiple locations throughout this opinion and the Court found it was alleged sufficiently in each instance. *See, e.g.*, Sections III. IV.A; and VI.C.2. For the same reasons, it is alleged sufficiently here.

36    West Boca refers the Court to *Broward County's Opposition Response to the Defendants' Motions to Dismiss*. Doc. #: 703 at 17-18. Broward County cites *Estep*.

37    Pharmacy Defendants give short shrift to their own motion to dismiss West Boca's public nuisance claim. The entirety of their briefing on the issue consists of the following sentence: "The Moving Defendants' brief in *Broward County* explains why Florida law does not allow Plaintiff's nuisance claim. *See* Moving Defs. Broward County Br. 9-10." The Pharmacies' *Broward County* brief subsequently incorporates the *Summit County* brief by reference. *See* Doc. #: 582-1 at 9. Overlooking the differences in types of plaintiffs and the law of the different states at issue in these cases, the Court can only assume that the Pharmacies accept the Court's analysis in *Summit County* as applicable to its motion to dismiss West Boca's claims.

38    This conclusion is on all fours with the Court's analysis of the FDUTPA safe harbor provision in Section VI.C.a below.

39    Rule 9 requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

40    For instance, Manufacturer Defendants fail to address the myriad factual allegations set forth by Plaintiff regarding false and misleading statements made in marketing the use of opioids for indications not approved. *See* Doc. #: 806 at 77-78.

41    As it relates to reporting requirements, Pharmacy Defendants argue that Plaintiff is asking the Court to "read FDUTPA to impose a duty on every business in Florida to inform all government entities of noncompliance with any regulation ... even when the regulation creates no duty to that government entity ***and no consumer has been misled***." (Emphasis added.) Of course, that is not what Plaintiff actually argues.

42    Distributor Defendants also argue these CSA allegations do not meet the Rule 9(b) heightened pleading requirement, see Doc. #: 684 at 24, but for the reasons discussed above, the Court finds Plaintiff's allegations are sufficient under Rule 9(b).

43    "FDCA" is the Florida Drug and Cosmetic Act, Florida Statutes, Title XXXIII, Chapter 499, *et seq.*

44    Although the Court declines to decide whether violations of the CSA constitute predicate acts under the FDUTPA, the Court makes the following observations. When the CSA was amended in 2008 to prohibit the distribution of controlled substances over the internet, the amendment was titled the "Ryan Haight Online Pharmacy Consumer Protection Act of 2008," presumably indicating its consumer protection goals. *See* 21 U.S.C.A. §§ 829(e)(1), 841(h). Furthermore, this Court has previously ruled on the significance of Defendants' duties under the CSA. In Track One, this Court articulated that Section 1301.74 of the CSA is a regulation promulgated pursuant to Congressional authority and has the full force and effect of law. *See* Doc. #: 2483 at 15. The Court also observed that one goal of the CSA is to protect the "public interest" by regulating the "manufacture, distribution, and dispensing of controlled substances." 21 U.S.C. §§ 821 and 823. Still further, Section 1301.74 imposes a legal duty on registrants to design and operate a SOMS, and to inform the DEA of suspicious orders when discovered by the registrants. Doc. #: 2483 at 15. Finally, the Court ruled that, as part of their duty to maintain effective controls against diversion, registrants under the CSA have a duty not to ship suspicious orders. Doc. #: 2483 at 18. That is, the CSA creates a duty not to put a suspicious order into the stream of commerce where the opioids will be used **by consumers**, absent due diligence.

45    Of course, the Court's determination does not mean Plaintiff will ultimately prevail or that the Court agrees with any or all of the theories advanced by Plaintiff. Rather, the court finds only that Plaintiff has alleged facts necessary to withstand a motion to dismiss and will now have the opportunity to pursue, and the burden to prove, its claims.

46    Marketing Defendants also argue Plaintiff's allegations do not meet the heightened pleading requirement of Rule 9(b). Doc. #: 691-1 at 11.

47    For example, in paragraph 192, Plaintiff identifies a 2009 patient education publication entitled "*Pain: Opioid Therapy*," funded by Endo and posted online, that omitted the term "addiction" from the list of "common risks" of opioid use. This allegation identifies the document, the source of the statement, the methods used to disseminate the statement, and the date and intended audience of the statement.

48    Plaintiff purportedly also brought this claim under "Section 672.11," but there is no such section within the Florida UCC.

49    Confusingly, in *Plaintiff's Reply in Support of its Second Notice*, Doc. #: 2705, West Boca states it "had also asserted a claim for breach of implied warranty of **merchantability**, but that claim was withdrawn." Case No. 1:18- op-45530, Doc. #: 62 at n.3 (emphasis added). Although Florida law does recognize a separate claim for breach of implied warranty of merchantability, Fla. Stat. § 672.314, the Court is not aware that Plaintiff ever alleged that cause of action. Further, West Boca does not cite to any document purporting to withdraw this (or any) claim. Thus, for clarification, the Court hereby dismisses West Boca's claim for Breach of Implied Warranty of Fitness For a Particular Purpose **and**, to the extent it was ever alleged and not properly withdrawn, dismisses West Boca's Breach of Implied Warranty of Merchantability as well.

50    Defendants also challenge proximate causation generally, and those challenges are addressed elsewhere in this opinion.

51    Distributor Defendants assert they did not breach any duty of care. Breach is addressed in the Negligent Distribution section (IX.E.) below.

52    Manufacturer Defendants also argue Plaintiff's request for punitive damages based on false advertising and wanton negligence should be stricken because "the Complaint contains only conclusory allegations plainly insufficient to justify such extraordinary relief." Doc. #: 691-1 at 20. This Court will not Strike Plaintiff's request for punitive damages, as motions to strike are disfavored and rarely granted, and the argument raised by Manufacturer Defendants is more appropriately raised at a later phase of this litigation. *See, e.g.*, *Berene v. Nationstar Mortg. LLC*, 2016 WL 3944742, at *5 (S.D. Fla. Feb. 5, 2016), *rev'd and remanded on other grounds*, 686 F.App'x 714 (11th Cir. 2017).

53    For instance, West Boca's reliance on *Godelia v. Doe 1*, 881 F.3d 1309 (11th Cir. 2018) is misplaced, as that Court upheld plaintiff's claim for negligent misrepresentation, and did not address whether "negligent marketing" claims exist under Florida law.

54    Further, Plaintiff indicated that it pled negligent marketing out of "an abundance of caution" and "[w]hether considered (in aggregate) as components of a single negligence count or as separate claims, there is ample authority confirming that allegations of negligence in marketing and distribution are actionable." *See* Doc. #: 806 at 44. Thus, the Court considers Count IX as essentially pleading in the alternative. Given that Plaintiffs' other negligence claims (Counts VI and VII) survive the motions to dismiss, Count IX is unnecessary and redundant. As noted below, the same is true for Count X.

55    *See also* Doc. #: 1499 at 67-68 (citing to the *Summit County* holding and denying the motion to dismiss plaintiff's unjust enrichment claim, where plaintiff paid for the costs of the harm caused by Defendants' conduct).

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT**
**IN AND FOR PASCO COUNTY, WEST PASCO DIVISION**
**NEW PORT RICHEY, FLORIDA**

STATE OF FLORIDA, OFFICE OF THE
ATTORNEY GENERAL, DEPARTMENT
OF LEGAL AFFAIRS,                                      CASE NO. 2018-CA-001438

      Plaintiff,

v.

PURDUE PHARMA L.P., PURDUE
PHARMA, INC., THE PURDUE
FREDERICK COMPANY, INC., ENDO
HEALTH SOLUTIONS, INC., ENDO
PHARMACEUTICALS, INC., JANSSEN
PHARMACEUTICALS, INC., JOHNSON &
JOHNSON, CEPHALON, INC., TEVA
PHARMACEUTICALS USA, INC.,
ALLERGAN FINANCE, LLC, ACTAVIS
PHARMA, INC., ACTAVIS LLC, INSYS
THERAPEUTICS, INC.,
AMERISOURCEBERGEN DRUG
CORPORATION, CARDINAL HEALTH,
INC., MCKESSON CORPORATION,
MALLINCKRODT LLC, WALGREEN CO.
CVS HEALTH CORPORATION, and CVS
PHARMACY, INC.

      Defendants.

_____/

OFFICIAL DOCUMENT

FILED FOR RECORD
PASCO COUNTY, FLORIDA
19 APR 11  PM 4: 05
*Paula S. O'Neil*
*Clerk & Comptroller*
*Pasco County, Florida*

## <u>ORDER ON DEFENDANTS' MOTIONS TO DISMISS</u>

    THIS MATTER, having come before the Court on April 2, 2019, on the motions listed

below, and the Court, having reviewed the motions, heard argument of counsel, and being

otherwise advised in the premises, it is hereby **ORDERED** that the following motions are

Denied.

    1.   Motion to Dismiss Complaint Against Distributors and Incorporated Memorandum of
       Law (*filed February 9, 2019*)

2. Manufacturer Defendants' Joint Motion to Dismiss the State of Florida's Amended Complaint (*filed February 10, 2019*)

3. Amended Motion of Defendants Actavis Pharma, Inc. and Actavis LLC, Inc. to Dismiss Plaintiff's Amended Complaint (*filed February 10,2019*)

4. Amended Motion of Defendants Teva Pharmaceuticals USA, Inc. and Cephalon, Inc. to Dismiss Plaintiff's Amended Complaint (*filed February 10, 2019*

5. Janssen Pharmaceuticals, Inc. and Johnson & Johnson's Amended Motion to Dismiss the State of Florida's Amended Complaint, and Incorporated Memorandum of Law (*filed February 8, 2019*)

6. Defendant Insys Therapeutics, Inc.'s Amended Motion to Dismiss Amended Complaint (*filed February 10, 2019*)

7. Defendants' Walgreen Co., CVS Health Corporation and CVS Pharmacy, Inc's Amended Motion to Dismiss and Incorporated Memorandum of Law (*filed February 10, 2019*)

Defendants shall have forty-five (45) days from the date of the hearing to answer the Amended Complaint.

DONE AND ORDERED in Chambers in Pasco County, New Port Richey, Florida, this __11__ day of April 2019.

_____
HONORABLE DECLAN P. MANSFIELD
CIRCUIT COURT JUDGE

Copies furnished to all counsel of record.

117731626.1                                                   2