NO. 18-CI-001013

JEFFERSON CIRCUIT COURT
DIVISION TWELVE (12)
JUDGE SUSAN SCHULTZ GIBSON

COMMONWEALTH OF KENTUKY, ex rel.,
ANDY BESHEAR, ATTORNEY GENERAL

PLAINTIFF

V.                  **MEMORANDUM AND ORDER**

CARDINAL HEALTH 5, LLC, ET AL

DEFENDANTS

\* \* \* \* \*

This matter is before the Court on the Motion of Defendants, Cardinal Health 5, LLC; Cardinal Health 100, Inc.; Cardinal Health 108, LLC; Cardinal Health 110, LLC; Cardinal Health 113, LLC; Cardinal Health 132, LLC; Cardinal Health 200, LLC; Cardinal Health 414, LLC; The Harvard Drug Company, LLC, d/b/a Major Pharmaceuticals, LLC, d/b/a Rugby Laboratories (collectively, "Cardinal"), to Dismiss the Complaint of Plaintiff, Commonwealth of Kentucky, *ex rel.*, Andy Beshear, Attorney General (the "Commonwealth"). The Court, after careful review of the record, memoranda and applicable law, and being otherwise sufficiently advised, does **deny** the motion.

### FACTS

For the purpose of determining Cardinal's Motion to Dismiss, the Court will treat the claims asserted in the Commonwealth's Complaint as if they were true. The facts as asserted in the Complaint are stated pertinently below.

This case involves an alleged "public interest lawsuit" brought by the Kentucky Attorney General under Kentucky constitutional, statutory, regulatory and common-law authority to recover any and all damages, restitution, reimbursement and disgorgement, statutory civil penalties, injunctive relief, and other relief deemed appropriate by the Court from Cardinal as a consequence of its alleged role of fueling the opioid epidemic in the Commonwealth of Kentucky through fraudulent, unfair, false, misleading and/or deceptive

Ex. A - Tab 7 - Kentucky

business practices. The actions of Cardinal allegedly include filling massive and/or "suspicious" orders, including orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency, from Kentucky pharmacies for prescription opioids;[1] shipping and/or distributing those massive quantities and/or suspicious orders of opioid drugs throughout the Commonwealth of Kentucky; shipping opioid drugs into the Commonwealth of Kentucky without adequate policies and procedures in place to detect suspicious orders; failing to report to appropriate authorities such suspicious orders; and failing to halt such excessive and suspicious shipments. These opioid drug orders allegedly include those of such large quantities of prescription narcotic pain medication that there could be no associated legitimate medical purpose.

The Food and Drug Administration ("FDA") originally approved opioid treatment for short term post-surgical or trauma-related pain and for palliative (end-of-life) care. Later, the approved use was extended to reach treatment of patients with "chronic pain" – pain lasting for more than three months. Following the extension of the approved use, the companies who manufactured and sold this class of drugs in the United States experienced a boom in their business. However, with this boom came a scourge that infected this country in the form of a public health epidemic caused by widespread addiction to opioids like OxyContin and Percocet, as well as their generic forms, oxycodone and hydrocodone. The scourge is now commonly known as the "opioid epidemic."

---

[1] "Prescription opiates" are narcotic drugs derived from or possessing properties similar to opium and heroin and are generally categorized as "Schedule II" drugs due to their high potential for abuse and potential to cause severe psychological or physiological dependence. The terms "opioids" and "opioid analgesics" describe the entire class of natural and synthetic opiates.

While there are many purported causes related to the opioid epidemic, this case is focused solely on the actions of one of the alleged "dominant pharmaceutical wholesalers and market leaders," Cardinal, who allegedly "saturated and flooded" the Commonwealth of Kentucky with "excessive amounts of dangerous and addictive prescription opioids," while "disregarding its own real-time data, customer thresholds, internal reports and common sense." Cardinal allegedly failed to report "red flag, facially suspicious" orders in the Commonwealth of Kentucky and "opted instead to reap a windfall off the wave of addiction."

Cardinal, the third largest pharmaceutical distributor in North America, distributes pharmaceuticals to retail pharmacy operations, as well as institutional providers like hospitals and county health departments. Cardinal allegedly distributed oxycodone and hydrocodone, among other opioids, in the Commonwealth the Kentucky between January 1, 2007 and December 31, 2016. Cardinal allegedly maintained licensure through the Commonwealth of Kentucky for the wholesale distribution of controlled substances pursuant to multiple regulations, including the Kentucky Controlled Substances Act.[2]

During the creation and inflation of the opioid epidemic, Cardinal allegedly "knew or should have known" of the "dangerous, addictive qualities, and high rates of loss and misappropriation ('diversion rates')" of the drugs it shipped. Cardinal allegedly received millions of dollars per year for distributing excessive volumes of opioids into Kentucky. Cardinal allegedly situated itself to play a significant role in creating a "public nuisance" of historic proportions to maintain or increase its profits and market dominance.

---

[2] Kentucky law mandates that all drug distributors, including Cardinal, apply for and receive a license from the Kentucky Board of Pharmacy under KRS 315.402. Additionally, wholesale distributors of controlled substances, including Cardinal, must apply for and receive a license from the Kentucky Cabinet for Health and Family Services under KRS 218A.150. Continuing licensure is dependent upon compliance with the laws and regulations relating to controlled substances, KRS 218A.160(1)(a), 201 KAR 2:105 § 3(2)(a), 902 KAR Chapter 55, KRS 218A.240 and 21 U.S.C. § 823.

Shipments of massive quantities of opioids into Kentucky by Cardinal, particularly to small sparsely populated rural counties in Eastern Kentucky were allegedly "unfair practices" that were "suspicious and excessive on their face."

Pharmaceutical wholesalers, like Cardinal, are requested to "know their customers" and set thresholds for each customer's anticipated order. When considering both the data available to Cardinal regarding the populations of the towns it shipped to and the customer thresholds it created based on said data, Cardinal allegedly violated several duties charged by law and by the nature of its industry.

Due to the alleged continued influx of dangerous and addictive prescription opioids by Cardinal, citizens of Kentucky suffered from prescription drug addiction and abuse. The reasonably foreseeable result of this widespread addiction was patients' transitioning their use and abuse of prescription opioids to illegal street drugs like heroin and carfentanil. The foreseeable results of Cardinal's alleged actions include loss of jobs and productivity, loss of health and enjoyment of life, increased financial burdens to the Commonwealth of Kentucky to respond to the devastation caused by the wave of addiction and, most tragically, the lost lives of thousands of Kentuckians.[3]

The Commonwealth of Kentucky's response to the health emergency allegedly created by Cardinal includes, but is not limited to, providing or reimbursing for medical treatment; shouldering the increased financial burden of public health insurance; dispatching emergency services; investigating and prosecuting drug-related crimes; incarcerating perpetrators; supervising and rehabilitating the addicted; preventing, investigating and treating overdoses; providing foster care for children whose parents are

---

[3] In 2015, Kentucky had the third highest drug overdose death rate behind only West Virginia and New Hampshire. In 2016, the Kentucky Office of Drug Control Policy reported 1,404 overdose deaths.

in prison or dead from overdosing, or are simply unable to care for the children because of addiction; assembling necessary response teams; and tending to the infirm, dying and dead. The Kentucky Medicaid Program[4] alone has paid millions of dollars for medically unnecessary prescriber visits and improper prescriptions as well as addiction treatment and services, including emergency room admissions, inpatient hospitalizations, drug treatment, rehabilitation services, hepatitis treatments and a multitude of other adverse consequences of addiction afflicting Kentucky Medicaid recipients who became addicted to the controlled substance that Cardinal allegedly excessively distributed in the Commonwealth of Kentucky.

Rather than drug manufacturers selling opioids directly to physicians or pharmacies for ultimate dispensing, a sophisticated "closed distribution system" exists to distribute the drugs across the nation. This sophisticated system, born out of an acknowledgment by Congress that greater control was needed over abused and addictive prescription drugs, is intended to track and account for controlled substances from manufacturing to the ultimate consumer. For many important reasons, this system relies upon the honesty, integrity and accountability of prescription drug distributors to be effective. This "closed" chain of distribution was specifically designed by Congress to prevent the diversion and abuse that is complained of in this action.

States, including Kentucky, enacted similar state laws, rules and regulations to regulate the distribution of drugs and provide oversight over this unique industry. The Kentucky General Assembly determined and declared that "[t]he regulation of controlled

---

[4] The Medicaid Program ("Medicaid") operates under Title XIX of the Social Security Act. Medicaid is a cooperative venture between the Federal and State governments to assist States in the provision of adequate medical care to its most deserving citizens, including the poor, the disabled, the elderly, the blind, pregnant women, infants and dependent children. The Department for Medicaid Services ("Kentucky Medicaid") is the single state agency charged with the administration of the Kentucky Medicaid Program pursuant to Title XIX of the Federal Social Security Act.

substances in this Commonwealth is important and necessary for the preservation of public safety and public health. ..." KRS 218A.005(1). This closed system of state and federal authority imposes specific duties upon wholesale distributors to monitor, identify, halt and, perhaps most importantly, report suspicious orders of controlled substances. 21 C.F.R. § 13.0 1.74; *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017). All registrants of the closed distribution system must adhere to specific security, record keeping, monitoring and reporting requirements that are designed to identify or prevent diversion. The end purpose of these laws is to protect the consuming public.

Pharmaceutical distributors, such as Cardinal, are one of the key components of this closed distribution chain. The role of the pharmaceutical distributor is not simply one of shelf stocker, freight forwarder or simple shipper. If the closed system is to function properly, distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.

To piggyback on the state and federal regulatory schemes, distributors created a system of "self-regulation and best practice sharing" through an industry trading group called the Healthcare Distribution Alliance ("HDA"),[5] formerly known as the Healthcare Distribution Management Association. According to the HDA, "[h]ealthcare distribution has never been just about delivery. It's about getting the right medicines to the right patients at the right time, safely and efficiently." The HDA created "Industry Compliance Guidelines" that stressed the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines provided, pertinently, "[a]t

---

[5] As the alleged dominant player within the healthcare distribution industry, Senior executives from Cardinal historically served on the board of the HDA. The CEO of Cardinal's Medical Segment, Jon Giocomin, is currently the Chairman of the HDA Board of Directors and a member of the executive committee of the HDA. Craig Cowman, Cardinal's Executive Vice President of Global Sourcing, also serves on the HDA's Board of Directors. Mike Kaufman, Cardinal's current CEO, is a former member of the executive committee of the HDA.

the center of a sophisticated supply chain, Distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers." The HDA advises all distributors to "Know Your Customer."

Distributors, including Cardinal, are required to establish expected order thresholds for each customer. These thresholds are vital data points used to determine whether prospective orders are unusual in size, deviate from a prior pattern or are unusual in their frequency. To fulfill their obligations under federal and state laws as well as self-regulation, distributors, including Cardinal, use highly advanced data collection and analytical systems. The sophisticated software systems monitor the inventory and ordering needs of customer in real-time.

Cardinal, by virtue of its stated analytics and "know your customer" initiatives, was allegedly aware of the extent of numerous suspicious orders yet failed to report or halt their shipment. Cardinal was also allegedly aware that several of their pharmacy customers had "indicia of suspicion for diversion or misuse" such as "(1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug 'cocktails,' known for their abuse potential, such as oxycodone and Xanax; (3) individuals who arrived together with identical or nearly identical prescriptions; (4) purported pain patients with prescriptions for immediate-release rather than long-acting narcotics; (5) high percentage of cash purchases; and (6) doctors prescribing outside the scope of their usual practice."

The data collected by distributors and reported to government regulators is often reported in terms of drug dosage or doses.[6] In only 12 months, from February 1, 2016 to January 31, 2017, pharmacies in the Commonwealth of Kentucky filled prescriptions for 307,234,816 doses of Schedule II prescription drugs, which breaks down to 69 doses of

---

[6] A dose is the amount of active ingredient in a particular pill or capsule.

Schedule II narcotics for every man, woman and child in the Commonwealth of Kentucky. Market share analysis indicates that of those, Cardinal distributed 63,597,606 doses. From January 1, 2010 through December 31, 2016, Jefferson County, Kentucky, had an average population of approximately 755,305. Pharmacies located in Jefferson County filled prescriptions for a total of 388,652,108 doses of opioid narcotic drugs in Jefferson County alone. With a 20.7% market share, Cardinal would have contributed 80,450,986[7] of those doses. From 2012 through 2016, Jefferson County experienced 1,066 prescription drug overdose deaths.

The number of pills allegedly shipped or delivered by Cardinal in Kentucky was and is allegedly "unreasonable, dangerous and facially suspicious." With the system and technology used by Cardinal to collect and analyze robust data, Cardinal allegedly had access to information reflecting the full extent of their refill over-shipments in Kentucky. Rather than taking steps to protect the end customer from the massive volume of dangerous addictive drugs, Cardinal allegedly chose to pump addictive pills into the Commonwealth of Kentucky.

In its position as opioid distributor, Cardinal allegedly knew or should have known of Kentucky's exceedingly high rate of suspicious shipments, and the correlating risk of abuse, misuse and diversion of prescription opioids. Cardinal allegedly knew, or should have known, that many of the controlled substances that it was providing to customers in the Commonwealth were being obtained through fraudulent prescriptions from physicians who were prescribing controlled substances for illegitimate medical purposes. Cardinal allegedly knew, or should have known, it was supplying "pill-mill" pharmacies in the

---

[7] The Complaint states "1,186,418" doses. This amount seems mathematically incorrect. Thus, the Court calculated the above stated figure by determining 20.7% of 388,652,108 doses.

Commonwealth of Kentucky. Cardinal was allegedly on notice of the "suspicious orders" it was receiving when it shipped massive quantities of controlled substances to pharmacies in areas that lacked the population dynamics to support the claimed need. Cardinal allegedly knew or should have known that the drugs were being diverted for illegal use.

Cardinal allegedly had a duty, which it knew of by way of the licensure practices in Kentucky, to report diversion of controlled substances through the license application and renewal process through the Cabinet for Health and Family Services Office of Inspector General, Drug Enforcement and Professional Practices Branch ("DEPPB"), which administers and enforces the Kentucky Controlled Substances Act and grants renewals of licenses of wholesalers of controlled substance in part by relying upon the information provided by the applicant.[8] Cardinal acknowledged and made sworn representations as required with each application for license renewal.

Despite the existence of suspicious orders and information available regarding the same through Cardinal's own sophisticated tracking system, Cardinal allegedly did not refuse to ship or supply the often-abused and highly addictive prescription opioids to Kentucky pharmacies between 2010 and the present. Cardinal also allegedly failed to report suspicious orders in Kentucky from 2010 to the present. Cardinal allegedly shipped

---

[8] To maintain a Kentucky wholesaler's license, entities are required to comply with rules regarding controlled substance diversion controls under which, at the time of application or renewal, "the Cabinet for Health Services shall be notified in the event of any theft or other loss of controlled substances." Any problem, such as pilferage, which develops in a facility, must also be reported. To maintain a distributor's license in Kentucky, the Kentucky Board of Pharmacy requires licensed entities to comply with both state and federal law, including rules preventing the diversion of controlled substances. Pursuant to KRS 315.402, failure to report to the Board or willful submission of inaccurate information shall be grounds for disciplinary action, including fines, suspension or revocation of the wholesaler's license at issue. In addition, the Kentucky Board of Pharmacy requires initial and renewal applications for License to Operate as a Wholesale Distributor to acknowledge whether an applicant, owner, partner, officer, agent or employee (1) has been convicted of any felony, (2) had a wholesale distributor license or permit revoked or suspended, and (3) has been convicted under laws related to drug samples and wholesale or retail drug distribution of controlled substances.

millions of doses of highly addictive controlled pain killers into Kentucky, many of which should have been stopped and/or investigated as suspicious orders.

Cardinal allegedly failed to maintain effective controls against diversion in its distribution centers within Kentucky, including those in Jefferson County, as well as those that distributed opioids into Kentucky, including but not limited to its hub in Dublin, Ohio. Cardinal allegedly derived millions of dollars of income from the controlled substances it shipped into the Commonwealth. The rise in prescription opioid use and abuse triggered a resurgence in heroin abuse, imposing additional burdens on state and local governments in the Commonwealth of Kentucky to address heroin use and addiction.

Cardinal's inventory system allows for real-time inventory control and item look up. These products additionally permit for streamlined ordering, purchasing, reconciliations and account management. Cardinal utilized Six Sigma methodology, "an analytical approach that emphasizes setting high-quality objectives, collecting data and analyzing the results to a fine degree in order to improve processes, reduce costs and minimize errors." Cardinal allegedly possesses real-time data that fully and accurately depicts the exact number of pills, pill type, and anticipated consumer order threshold they have set. It is allegedly conceivable that such data monitoring systems could, and likely did, track and/or record facially suspicious orders from within the Commonwealth of Kentucky. Said data "likely reflects the exact, grossly inflated orders" that allegedly "caused or contributed" to the opioid crisis in Kentucky, including where Cardinal allegedly overrode its own internal controls and thresholds in order to consistently increase shipment volumes.

On or about February 19, 2018, the Commonwealth filed the Complaint in this action with the purported purpose of "(1) stop[ping] [Cardinal] from fulfilling suspicious

orders for opioids; (2) recover[ing] the damages suffered by Kentucky and its citizens; (3) recoup[ing] the expenses, penalties owed and disgorge the amounts Cardinal unjustly enriched itself with; and (4) to enjoin and abate the continuing public nuisance caused in whole or in part by the actions of Cardinal and force it to help solve the problems it both created and profited from." In the Complaint, the Commonwealth alleges that Cardinal committed "unfair, false, misleading or deceptive acts or practices in the conduct of the pharmaceutical wholesale trade or commerce by failing to investigate, report, and cease fulfilling suspicious orders of controlled substances to pharmacies in the Commonwealth[;]" that Cardinal has committed "negligent and/or intentional and reckless actions by failing to investigate, report, and cease fulfilling suspicious orders of controlled substances to pharmacies in the Commonwealth[;]" that Cardinal's actions have created a "public nuisance" by "failing to investigate, report, and cease fulfilling suspicious orders of controlled substances to pharmacies in the Commonwealth[;]" and that Cardinal's "actions have caused and will continue to cause the Commonwealth to expend substantial sums of funds from the State Treasury to deal with the effects of [the] epidemic of prescription drug addiction that was substantially fueled by [Cardinal's] illegal action in flooding the Commonwealth with highly addictive prescription medications without regard for the consequences to the Commonwealth and its citizens." The Commonwealth "seeks recuperation of the costs to its society caused by [Cardinal's] failure to act in accordance with the various laws cited herein, general disregard for the law, misrepresentations, actions, and inactions with regard to the distribution of opioids in the Commonwealth's communities." The Commonwealth further alleges that the "scope of conduct alleged herein has proximately caused damages to Kentuckians and their government in the form of a multigenerational healthcare epidemic of addiction, and resulting disease and

deaths[;]" and that, "[d]espite being acutely aware of the risks of oversupplying opioids, and despite being acutely aware of the increases in orders that were suspicious, Cardinal continued to oversupply opioids to Kentucky." The Commonwealth asserts the following claims: violations of the Consumer Protection Act, public nuisance, breach of statutory duties/negligence per se, negligence, unjust enrichment, fraud by omission, Medicaid fraud under KRS Chapters 205 and 194A, and seeks punitive damages from Cardinal's alleged fraudulent conduct and gross negligence.

In lieu of filing an Answer, Cardinal makes a Motion to Dismiss, contending that the Commonwealth fails to allege proximate causation for all its claims. Cardinal argues that the public nuisance claim should be dismissed as the Commonwealth fails to allege a public right with which Cardinal interfered; the Commonwealth fails to adequately allege that Cardinal had control of prescription opioids at the time of injury; and the Commonwealth's claim is an unprecedented expansion of public nuisance law. Cardinal asserts that the Commonwealth's negligence and negligence per se claims fail as a matter of law, since Cardinal does not owe the Commonwealth a statutory duty to halt or report suspicious orders under either Kentucky or federal law; that the claim that Cardinal had a duty to halt or report the steady upsurge in pharmacy orders for legal prescriptions as "suspicious" contends pertinently that it should have second-guessed both the doctors who prescribed the drugs and the DEA; that, to the extent that the Commonwealth's claims are about illegal prescription opioid use, Cardinal had no duty to prevent the downstream, inherently criminal "diversion" of opioids as a matter of law; that Cardinal cannot be held liable for failing to prevent the criminal misconduct of third parties with whom it has no relationship and over whom it has no control; that Cardinal's role in the distribution chain is limited to delivering pharmaceutical products from manufacturers to

licensed retail pharmacies and is responsible for securing those drugs while they are in its possession; and that the allowance of the Attorney General, through tort litigation, to use the blunt instrument of common-law decision-making to determine the circumstances under which a wholesale distributor's conduct was reasonable would impermissibly encroach on the federal and state enforcement prerogatives and insert the Court into a policy debate.

Cardinal argues that the Commonwealth's Kentucky Consumer Protection Act ("KCPA") claim fails for multiple overlapping reasons, as Cardinal had no duty under Kentucky law to halt or report to the Commonwealth suspicious pharmacy orders; that the claim is not pleaded with the requisite particularity under CR 9.02; that the Commonwealth fails to allege the sort of consumer-directed conduct that is actionable under the KCPA; that the Commonwealth fails to allege that Cardinal's purported failure to disclose suspicious orders which occurred "in the conduct of any trade or commerce," as the KCPA requires; and that the Commonwealth's claim for money damages under the KCPA fails as a matter of law, as the Complaint does not allege that Cardinal's purported regulatory reporting violations defrauded consumers. Cardinal contends that the Commonwealth's fraud by omission claim should be dismissed, as the Complaint alleges no cognizable "duty to the other to disclose" a material fact, since Cardinal does not have the same obligation that it has to report "suspicious" orders to the Commonwealth as it does to the Federal DEA; that the Complaint wholly fails to identify a misleading statement or omission by Cardinal and does not identify even a single pharmacy order that Cardinal fraudulently failed to report; that the Commonwealth does not explain how Cardinal's alleged omissions induced it to act and does not even attempt to explain what actions it allegedly took in reliance on Cardinal's purported omissions;

and that the Commonwealth has not shown that Cardinal's purported omission proximately caused it any actual damages.

Cardinal further argues that the claims for Medicaid fraud should be dismissed, as the Attorney General lacks authority to attempt to "enforce" KRS 205.8463 through a civil damages claim against a wholesale distributor for allegedly reporting and licensing violations; that the Complaint does not allege and could not allege that Cardinal provided opioids to recipients under the Kentucky Medicaid program, as it is a wholesale distributor whose role in the distribution of controlled substances is limited to delivering FDA-approved medicines to Commonwealth-licensed dispensaries; that nothing in the statutory language even remotely suggests that KRS 205.8463's criminal provisions were intended by the General Assembly to impose liability on wholesale distributors of pharmaceutical products for alleged regulatory reporting failures or licensing violations; that the Court should reject the Attorney General's strained reading of the statute and dismiss the KRS Chapter 205 Medicaid fraud claim; that the KRS Chapter 205 claim should be dismissed because the Complaint fails to properly allege that Cardinal violated KRS 205.8463 with adequate particularity; that the Complaint fails to allege that Cardinal submitted any false or fraudulent claims or documents; that the Complaint fails to plead that Cardinal's alleged wrongdoing was a "substantial factor" in causing the Commonwealth's harm in compliance with KRS 446.070; that the Complaint fails to identify any specific license renewal that was deceptive or the purportedly false or fraudulent statement contained therein which is fatal to its claim; and that the Complaint does not plead that Cardinal's purported benefit of payments for opioids was obtained by means of its allegedly fraudulent representations to the Commonwealth's licensing

authorities, as the only payments Cardinal received were from its retail pharmacy customers for contractually agreed upon prices.

Cardinal contends that the Commonwealth has asserted no facts to support any of the elements of its unjust enrichment claim, as the Commonwealth does not allege that it conferred a direct benefit on Cardinal; that the Commonwealth's allegation that Cardinal appreciated the benefit allegedly conferred upon it is wholly conclusory; and that there is no injustice under these circumstances, as the Commonwealth seeks funds that pharmacies or insurance programs paid Cardinal, which were owed Cardinal for opioid medications, and such funds cannot be simultaneously unjust enrichment conferred by the Commonwealth of Kentucky on Cardinal. Lastly, Cardinal contends that the free public services doctrine precludes the Commonwealth's claims for costs associated with responding to the opioid epidemic including law-enforcement costs and the cost of treating addiction.

The Commonwealth responds that it has adequately alleged causation; and that the derivative injury rule does not bar the Commonwealth's claims, as the action was brought in the Commonwealth's role as *parens patriae* under public nuisance law and statutorily under the Kentucky Consumer Protection Act for the protection and interest of its citizens. The Commonwealth argues that the purported intervening causes of the FDA approval process, prescribers, the dispensing pharmacist, and intervening criminal acts of third parties are not shields from any duty owed to the Commonwealth of Kentucky and do not act to bar the Commonwealth's action against Cardinal; that the result of Cardinal's wrongdoings is not extraordinary and the widespread devastation is a natural and predictable result of Cardinal's actions, considering Cardinal's superior position as a distributor, its access to information, its understanding of the regulatory schemes related

to controlled substances, and its admissions and prior statements, and it was reasonably foreseeable that the over-distribution of opioids would result in increasing diversion rates, addiction and overdose; that any actions by prescribers, pharmacists and third-party criminals could not have succeeded in fueling addiction without the availability of the addiction-causing product, something Cardinal controlled; and that Cardinal's causation arguments should likewise be rejected. The Commonwealth further argues that the public service doctrine fails to operate as Cardinal would like and should not be given credence in this case as it has not been adopted in Kentucky.

The Commonwealth asserts that it stated a valid public nuisance claim in the Complaint, facially pleading that Cardinal's conduct violated multiple statutes and regulations; that the conduct has been continuing in nature, creating long lasting effects, such as the influx of opioids and resulting increase in opioid abuse, addiction and overdoses and has had a significant and long-lasting effect upon the public right to health and safety; that Cardinal cannot escape liability by simply claiming that it did not control the instrumentality at the time of the injury; that the nuisance for which Cardinal is liable is the opioid epidemic which was caused by the over-supply of opioids into the Commonwealth of Kentucky, and led to diversion, misuse and abuse which has caused significant long-term interference with public health and safety; and that, contrary to Cardinal's logic and arguments on this issue, Kentucky has not limited public rights to those connected with "public property, public resources or public highways," as Kentucky has long recognized a wide scope of public nuisance, including where a defendant has contributed to narcotics trafficking.

The Commonwealth next argues that it has adequately pleaded negligence and negligence *per se*, as the failure of Cardinal to uphold its reporting duties under federal

law resulted in devastating harm to the Commonwealth of Kentucky and violations of the regulatory and license related statutes also give rise to negligence per se; that the Complaint clearly indicates the statutory and regulatory duties that apply to Cardinal, along with the conduct that resulted in the breach of said duties; that the claims are pleaded sufficiently with respect to the negligence *per se* claims; that the Commonwealth is within the class that the applicable statutes and regulations protect and the language of the statutes and regulations further establish the conduct expected of wholesale distributors like Cardinal, all with the purpose of protecting public safety and health; that the violations of these very statutes and regulations resulted in the public harm complained of by the Commonwealth and the Complaint sufficiently pleads that Cardinal's misconduct substantially contributed to this harm; that the Commonwealth is a member of the class intended to be protected by KRS Chapter 218A and related statutes; that the Commonwealth's claims for violation of 201 KAR 2:105 are sufficiently pleaded; that Cardinal's position that no duty existed under Kentucky law is unsupported, since Kentucky statutes and regulations create duties for Cardinal with the intent of protecting the public and the Commonwealth seeks to rectify the wrong that has resulted to the Kentucky Public as a result of Cardinal's statutory and regulatory violations.

The Commonwealth next argues that the Complaint sufficiently alleges that a common-law duty exists and was violated by Cardinal; that the harm to the Commonwealth was broader than focusing on the prescription rate within Kentucky as the harm that occurred, as Kentucky has suffered higher addiction and overdose rates, an increase in heroin usage, associated injuries like increased crime, increased need for foster care, increased health care expenses associated with medically unnecessary opioid prescriptions, and a decrease in quality of life which resulted from the influx of

unreasonable amounts of opioids which was a reasonably foreseeable consequence of excess supply; that Cardinal's attempt to hide behind purported interveners such as physicians and pharmacies cannot succeed; that the Commonwealth does not seek recovery for the acts of third parties but seeks damages from Cardinal negligently setting the wheel in motion, pushing opioids in Kentucky and creating an environment in which diversion, addiction, misuse and overdoses became an increasing reality and concern; and that the prescribers, pharmacists and even the criminals served only to connect consumers with the mass of opioids that Cardinal wrongfully pumped into the community and the actions of third parties, many who are revered customers of Cardinal, serve only as a natural and foreseeable extension of the wrongdoings by Cardinal.

The Commonwealth next argues that it has stated a valid claim under the KCPA; that claims brought by the Commonwealth under the KCPA are not subject to CR 9.02, as the elements of a cause of action under the KCPA differ from elements of fraud; that every prescription opioid distributed by Cardinal without the appropriate systems in place and without acceptable operational procedures was an unfair act under the KCPA; that the Commonwealth sues here as a sovereign and on behalf of the public and those consumers who ingested opioids that reached them as the result of that conduct in commerce as well as for the medically unnecessary prescriptions that the Commonwealth of Kentucky paid for as a result of that conduct in commerce; that the alleged unfair, false, misleading and deceptive conduct by Cardinal falls well within the conduct that may be prosecuted by the Attorney General under the KCPA; and that the Commonwealth properly seeks damages under its KCPA claim through KRS 367.200 and penalties under KRS 367.900.

The Commonwealth next asserts that it has stated a valid claim for fraud by omission, as Cardinal had a duty to the Commonwealth of Kentucky to disclose losses and thefts and protect against death and diversion yet it failed to disclose those facts, instead choosing to pump opioids into the Commonwealth of Kentucky without regard to those duties; that the Complaint alleges that Cardinal's reporting failures were in connection with opioid shipments occurring between January 1, 2007 and the present; that Cardinal omitted its failure to comply with state and federal regulations when applying for and using its Kentucky licensure to distribute drugs in the Commonwealth of Kentucky; that the Commonwealth of Kentucky relied on the information that Cardinal provided to the detriment of its population, while Cardinal refused to disclose the truth about its distribution practices; and that the requirements for pleading fraud are appropriately relaxed in its fraud by omission claim, given the extent and complexity of Cardinal's fraud and its control over relevant information.

The Commonwealth next argues that it has stated a valid cause of action under the Kentucky Medicaid Fraud and the Kentucky Assistant Program Fraud Statutes, as both of the fraud statutes reach beyond health care providers who submit fraudulent claims to those, like Cardinal, that cause or induce a submission of false claims for payment or participate in a scheme to defraud the Kentucky Medicaid program and actually benefit from the false submissions; that, although certain of the fraud statutes themselves may not incorporate a civil damages remedy, they give rise to a cause of action for damages under KRS 446.070; that Kentucky's Medicaid fraud statute does not require the Commonwealth to plead with specificity the six elements of fraud required under Kentucky common-law such that the Commonwealth has sufficiently pleaded these claims; that both of the medical assistance fraud statutory chapters impose liability for

misconduct beyond the mere submission of false claims of health care providers by also prohibiting the type of misconduct the Commonwealth alleges has been committed by Cardinal; and that the Commonwealth has sufficiently pleaded and properly alleged the violations by Cardinal under each of these statutes. The Commonwealth lastly argues that the Complaint clearly and properly sets forth each element of unjust enrichment, alleging that Cardinal profited and benefited from medically unnecessary and improperly shipped opioids purchased in the Commonwealth of Kentucky as an expected and intended result of its conscious wrongdoing; that due to and as intended by its deceptive acts, Cardinal has made millions of dollars at the expense of the Commonwealth of Kentucky; and that it would be inequitable for Cardinal to retain profits and benefits reaped from its deception, misrepresentation, and unlawful activity.

Cardinal filed a reply responding to the assertions of the Commonwealth and further setting forth arguments in support of its position. The parties presented oral argument before this Court on May 23, 2019. The matter now stands submitted for this Court's determination.

## CONCLUSIONS

A motion to dismiss for failure to state a claim should not be granted unless it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his or her claim. *Pari-Mutuel Clerks' Union, Local 541 v. Kentucky Jockey Club*, 551 S.W.2d 801 (Ky. 1977). It is well settled, when considering a motion to dismiss, that the pleadings should be liberally construed in a light most favorable to the plaintiff and all allegations taken in the complaint to be true. *Mims v. Western-Southern Agency, Inc.*, 226 S.W.3d 833, 835 (Ky.App.2007), citing, *Gall v. Scroggy*, 725

S.W.2d 867 (Ky.App. 1987). Therefore, "the question is purely a matter of law." *James v. Wilson*, 95 S.W.3d 875, 884 (Ky.App. 2002).

CR 8.01(1) requires "(a) a short and plain statement of the claim showing that the pleader is entitled to relief and (b) a demand for judgment for the relief to which he deems himself entitled." *Id.* "It is not necessary to state a claim with technical precision under this rule, as long as a complaint gives a defendant fair notice and identifies the claim." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005), citing, *Cincinnati, Newport & Covington Transp. Co. v. Fischer*, 357 S.W.2d 870, 872 (Ky.1962). "But the simplification and liberality extend to the manner of stating a case and are not so great as to obviate the necessity of stating the elements of a cause of action or defense, as the case may be." *Johnson v. Coleman*, 288 S.W.2d 348, 349 (Ky. 1956). "There must be maintained some minimum standard in the art of pleading which must be met." *Morgan v. O'Neil*, 652 S.W.2d 83, 85 (Ky. 1983), citing, *Pike v. George*, 434 S.W.2d 626 (Ky. 1968); *Johnson v. Coleman*, 288 S.W.2d 348 (Ky. 1956). "'The basic elements thereof must still be fairly shown, i.e., (a) a primary right of the plaintiff, and (b) a wrong of the defendant which breaches the right and results in damage.'" *Burkhart v. Community Medical Center*, 432 S.W.2d 433, 435 (Ky. 1968), quoting, *Clay's Kentucky Practice, Volume 6*, under Author's Comments, Rule 8.01. As noted by the Supreme Court of the United States in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), all that is required to defeat a motion to dismiss for failure to state a claim upon which relief can be granted is "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 547.

The Court will first address Cardinal's argument that the Complaint pleads, at most, a remote and indirect connection between Cardinal's alleged wrongdoing and the

Commonwealth's claimed harm. Cardinal argues that the Commonwealth's failure to adequately plead proximate causation requires dismissal of both its common-law and statutory causes of action. Causation is an element to the Commonwealth's claims for nuisance, negligence, consumer protection, fraud by omission and Medicaid fraud. Cardinal argues that the Complaint contains no allegations suggesting that its alleged wrongdoing (i.e., purported regulatory reporting failures) was a direct cause of the Commonwealth's injury. Cardinal asserts that the rule barring recovery for remote and derivative injuries applies with full force to claims by the Commonwealth to recover expenses incurred in the course of providing services to Kentucky's citizens. Cardinal argues that these alleged injuries – health care costs, law enforcement costs and social services costs – lack any direct causal link to its actions in Kentucky. Rather, according to Cardinal, it is the criminal intervening act of a third-party – a doctor who prescribes, a patient who sells a lawful prescription, or a thief of the drug – that causes injuries to Commonwealth of Kentucky. The Commonwealth argues that it has adequately pleaded causation in its Complaint; and that proximate cause is a matter for the jury because it is often, except in cases where no disputes about essential facts exist, a factual question.

"[L]egal causation[] presents a mixed question of law and fact." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003)(citations omitted).

> The causal connection or proximate cause component traditionally was composed of two elements: cause-in-fact and legal or consequential causation. Cause-in-fact involves the factual chain of events leading to the injury; whereas, consequential causation concerns the concepts of foreseeability and the public policy consideration on limiting the scope of responsibility for damages. In Kentucky, the cause-in-fact component has been redefined as a "substantial factor" element as expressed in Restatement (Second) of Torts § 431.13 The scope of duty also includes a foreseeability component involving whether the risk of injury was reasonably foreseeable.

*Lewis v. B & R Corporation*, 56 S.W.3d 432, 436-37 (Ky.App. 2001) (citations omitted). "'Consequent injury' consists of what hornbooks separate into two distinct elements: actual injury or harm to the plaintiff and legal causation between the defendant's breach and the plaintiff's injury." *Hammons*, 113 S.W.3d at 88-89 (citations omitted). Thus, the Commonwealth needs to show that Cardinal's conduct was a "substantial factor" to bring about the injury to the Commonwealth to establish a proximate cause. The Commonwealth avers that its allegations about the oversupply of pharmaceutical opioids by Cardinal in Kentucky is sufficient to establish causation.

The Commonwealth also asserts that the derivative injury rule does not bar its claims because it brought the action as *parens patriae* under the public nuisance law and the Kentucky Consumer Protection Act for the protection and interest of its citizens. Cardinal argues conversely that the holding in *Kentucky Laborers Dist. Council Health and Welfare Tr. Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755 (W.D. Ky. 1998), is "instructive." In that case, third-party payors[9] attempted to sue tobacco companies to recover medical costs that they expended for treatment of people with smoking related illnesses. The United States District Court for the Western District of Kentucky dismissed the action because the payors' claims were "remote" and entirely "derivative" of members' injuries. *Id.* at 762-63. The role of the Attorney General is distinct from that of the typical third-party payor seeking recovery from suit. The Attorney General has a special role as *parens patriae* to bring actions on behalf of its citizens. As noted by the United States Supreme Court in *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982):

---

[9] The plaintiff, third-party payors, in *Kentucky Laborers* were non-profit union multi-employer health and welfare trust funds that paid medical expenses incurred by those employed under various collective bargaining agreements and their dependents. *Id* at 760.

> In order to maintain [a *parens patriae*] action, the State must
> articulate an interest apart from the interests of particular
> private parties, i.e., the State must be more than a nominal
> party. The State must express a quasi-sovereign interest.
> Although the articulation of such interests is a matter for case-
> by-case development – neither an exhaustive formal definition
> nor a definitive list of qualifying interests can be presented in
> the abstract – certain characteristics of such interests are so
> far evident. These characteristics fall into two general
> categories. First, a State has a quasi-sovereign interest in the
> health and well-being – both physical and economic – of its
> residents in general. Second, a State has a quasi-sovereign
> interest in not being discriminatorily denied its rightful status
> within the federal system.

*Id.* at 607. This case clearly falls within the first category. Thus, *Kentucky Laborers* is

clearly distinguishable from the case at bar and does not support a dismissal under the

derivative injury rule in this action. The Court finds that expenditures made related to

opioid distribution in the Commonwealth of Kentucky are ripe for the remedies sought in

the Commonwealth's Complaint. Likewise, the Commonwealth's allegations reflect that

Cardinal's action of distributing opioids as alleged by the Commonwealth may be deemed

to constitute proximate causation for opioid abuse, dependency and injuries as is alleged

in the Complaint. The Court will note that the arguments of Cardinal with respect to

proximate causation will be more appropriate after the parties are provided an ample

opportunity to conduct discovery.  At this point, there appear to be disputed facts that

would be more appropriately reviewed by the fact finder. The allegations in the Complaint

were sufficiently pleaded to provide Cardinal fair notice of the Commonwealth's claims

with respect to proximate causation.

Cardinal next argues that the Commonwealth's claim for public nuisance should

be dismissed because the Commonwealth fails to allege that Cardinal interfered with a

public, as opposed to a private, right; that the Commonwealth fails to allege that Cardinal

controlled prescription opioids at the time of the alleged injury; and that the

Commonwealth's claim is an unprecedented attempt to regulate prescription opioids through a "rarely-invoked common-law doctrine" typically used to remedy interferences with public rights involving land use.  The Commonwealth argues that it stated a valid public nuisance claim in the Complaint, facially pleading that Cardinal's conduct violated multiple statutes and regulations; that the conduct has been continuing in nature, creating long lasting effects, such as the influx of opioids and resulting increase in opioid abuse, addiction and overdoses and has had a significant and long-lasting effect upon the public right to health and safety; that Cardinal cannot escape liability by simply claiming that it did not control the instrumentality at the time of the injury; that the nuisance for which Cardinal is liable is the opioid epidemic which was caused by the over-supply of opioids into the Commonwealth of Kentucky, and led to diversion, misuse and abuse that has caused significant long-term interference with public health and safety; and that, contrary to Cardinal's logic and arguments on this issue, Kentucky has not limited public rights to those connected with "public property, public resources or public highways," as Kentucky has long recognized a wide scope of public nuisance, including where a defendant has contributed to narcotics trafficking.

The Restatement provides that a public nuisance is "an unreasonable interference with a right common to the general public."  Restatement (2nd) of Torts §821B (Am. Law Inst. 1979). Further, the Restatement provides guidance on circumstances that determine what constitutes an unreasonable interference with a public right. *Ibid.* According to the Restatement,

> [c]ircumstances that may sustain a holding that an interference with a public right is unreasonable include the following:
>
> (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

> (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
>
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

*Ibid.* In the commentary following that section which discusses the meaning of the phrase

"interference with a public right," the drafters note, pertinently:

> Conduct does not become a public nuisance merely because it interferes with the use and enjoyment of land by a large number of persons. There must be some interference with a public right. A public right is one common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured. ... It is not, however, necessary that the entire community be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large. The obstruction of a public highway is a public nuisance, although no one is travelling upon the highway or wishes to travel on it at the time.

Restatement (Second) of Torts § 821B, cmt. g (1979). The Commonwealth argues that

Cardinal has interfered with the public health and safety in Kentucky by oversupplying

opioids in a fashion that contributed to increased risk of diversion, abuse, addiction and

overdose in a long-lasting manner. A public nuisance "includes maintaining a condition of

things which is prejudicial to the health, safety, comfort, property, sense of decency, or

morals of the citizens at large. *Maum v. Commonwealth*, 490 S.W.2d 748, 749 (Ky. 1973),

citing 66 C.J.S. Nuisances §§ 1-2 (1950). In *Maum*, the defendants were originally

"charged with maintaining a public nuisance specifically because they permitted persons

to traffic in narcotics on the property under their control." *Id.* at 749-50. Though it reversed

for other matters, the Supreme Court of Kentucky noted that the trafficking of narcotics

was offensive to the public health, safety and quality of life, and could arise to a cause of

action for public nuisance. *Ibid.* Similar to the case at bar, the alleged influx of large quantities of opioids, at a disproportionate rate related to the population appears to meet the pleading requirements of violating the public right the *Maum* Court contemplated in its decision. Citizens share the right to be free from the adverse implications of drug abuse, diversion and overdose. Thus, the Court finds that the Commonwealth has adequately pleaded a public right that Cardinal has allegedly violated through its public nuisance claim. Likewise Cardinal has been provided fair notice of the claim.

Cardinal argues that the Commonwealth failed to allege that it had control of the prescriptions at the time of the alleged injuries sustained by Kentuckians. Cardinal asserts that the opioids only allegedly created the nuisance after the company sold prescriptions to licensed retailers and consumers then diverted the opioids for their illicit uses; and that the nuisance arose at the time of the drug's misuse, abuse or overdose. The Commonwealth argues that Cardinal simply misplaces the creation of the nuisance and, instead, created the nuisance at the time it over shipped a disproportionate number of opioids for the population into the Commonwealth, which would not have occurred but for Cardinal's actions. A party may only be liable for nuisance if the party controlled the instrumentality of the nuisance at the time of the injury. *Old Lewis Hunter Distillery Co. v. Commonwealth*, 273 Ky. 16, 116 S.W.2d 647, 649 (1938). In *Old Lewis*, the Court held that the distillery was not liable for the public nuisance associated with the smell of cattle where a third party fed cattle on property not owned by the distillery with slop from the distillery's byproducts. *Ibid.* The nuisance in that case was created at the time the cattle ate the slop, which was clearly controlled by the third party who fed the cattle the distillery's byproduct. In the case at bar, the nuisance to Kentucky, based on the Commonwealth's pleadings, arose at the time the Company distributed the opioids to

retailers. The volume of the opioids available to licensed retailers and prescribers allegedly caused the nuisance that has plagued the Commonwealth's right to be safe and healthy. The Commonwealth's pleadings consistently refer to the oversupply and overdistribution of opioids within this Commonwealth. Thus, the alleged nuisance occurred at the time when Cardinal maintained control of its products. Accordingly, the Commonwealth has sufficiently pleaded that Cardinal had control of opioids at the time of the alleged creation of the nuisance.

Cardinal's contention that the Commonwealth seeks to expand public nuisance law beyond the scope of Kentucky case law is unavailing. Kentucky has not limited public rights to those connected with "public property, public resources, or public highways." As shown above, Kentucky case law recognizes a wide scope of public nuisance, including where a defendant has contributed to narcotics trafficking.

The Court will next address Cardinal's argument with respect to the Commonwealth's claims of negligence and negligence per se. Cardinal argues that it does not owe the Commonwealth a statutory duty to "monitor, detect, investigate, refuse to fill and report suspicious orders of prescription opioids," as the Kentucky Attorney General Is not authorized to enforce the federal Controlled Substances Act and violations of federal laws and regulations do not create a cause of action under KRS 446.070; and that none of the multiple state statutory and regulatory provisions cited by the Commonwealth in support of its claim for negligence *per se*, KRS 205.177,[10] KRS

---

[10] KRS 205.177 deals with information that may be shared by state and local government agencies and the conditions upon which such information may be shared between those agencies.

205.5634,[11] KRS 128A.170,[12] 201 KAR 2:105 §2(4)(d),[13] and 201 KAR 2:105 §7,[14] gives

rise to a cognizable claim under KRS 446.070.[15] Cardinal asserts that the doctrine of

*ejusdem generis* applies in this case.[16] The Commonwealth responds that it adequately

identified and pleaded violations of a statutory duty in its negligence *per se* claim; that the

Commonwealth is a member of the class intended to be protected by KRS Chapter 218A

and the other related statutes and regulatory provisions; and that the Commonwealth's

claims for violation of 201 KAR 2:105 are sufficiently pleaded.

"A negligence *per se* claim 'is merely a negligence claim with a statutory standard

of care substituted for the common law standard of care.'" *Lewis*, 56 S.W.3d at 438

(footnote omitted).

> While it is unquestioned that violations of statutes constitute
> negligence *per se*, that statement is coextensive with the
> requirement that the violation "must be a substantial factor in
> causing the result." *Britton v. Wooten*, Ky., 817 S.W.2d 443,
> 447 (1991). However, the mere violation of a statute does not

---

[11] KRS 205.5634 deals with the coordination of use of utilization data by the Drug Management Reviewed Advisory Board to identify appropriate use of pharmaceuticals and determine any need for educational interventions.

[12] KRS 218A.170 deals pertinently with the sale, distribution, administration or prescription of controlled substances by manufacturers, distributors, wholesalers, pharmacists or practitioners.

[13] 201 KAR 2:105 §2(4)(d) provides, pertinently, "[a] license shall not be issued or renewed unless the applicant demonstrates or continues to demonstrate acceptable operational procedures, including[] ... [p]roviding proof of registration with state controlled substance authority, and with the U.S. Drug Enforcement Administration and shall comply with all DEA regulations."

[14] 201 KAR 2:105 §7 provides:

> (1) A wholesale distributor shall not distribute legend drugs directly to a consumer or a patient or operate in a manner that endangers the public health.
>
> (2) Violation of any of these provisions shall be grounds for the suspension or revocation of the license.

[15] KRS 446.070 provides, " A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

[16] The doctrine of *ejusdem generis,* a rule of statutory construction, provides, "where, in a statute, general words follow or precede a designation of particular subjects or classes of persons, the meaning of the general words ordinarily will be presumed to be restricted by the particular designation, and to include only things or persons of the same kind, class, or nature as those specifically enumerated, unless there is a clear manifestation of a contrary purpose." *McCarty*, 476 S.W.3d at 235, quoting *Kentucky Retirement Systems v. Brown*, 336 S.W.3d 8, 16 (Ky.2011) (quoting *Steinfeld v. Jefferson County Fiscal Court*, 312 Ky. 614, 229 S.W.2d 319, 320 (1950)).

> necessarily create liability unless the statute was specifically
> intended to prevent the type of occurrence which has taken
> place. Not all statutory violations result in liability for that
> violation. The violation must be a substantial factor in causing
> the injury and the violation must be one intended to prevent
> the specific type of occurrence before liability can attach.

*Ibid.* Under Kentucky law, three conditions must be satisfied to constitute a claim of negligence *per se* under KRS 446.070, (1) the plaintiff must fall within a class of persons the statute intends to protect; (2) the statute must be specifically intended to prevent the action that occurred; and (3) the violation of the statute must substantially contribute to the cause of the resulting harm. *McCarty v. Covol Fuels No. 2, LLC*, 476 S.W.3d 224, 227 (Ky. 2015).

The statutes contained in KRS Chapter 205, which relate to "Public Assistance and Medical Assistance," did not create a statutory duty for Cardinal, but rather fully explain the ability of the Attorney General's office to pursue civil remedy in this action. KRS 205.177(1) allows an agency to share patient information with "any other state or local governmental agency of similar function if the agency has a direct, tangible, legitimate interest in the individual concerned." KRS 205.5634 allows the Drug Management Review Advisory Board to coordinate data related to pharmaceutical drug use and determine the need for educational interventions. While these two statutes do not directly name the Attorney General's office in their text, the statutes implicitly confer the Attorney General with the authority to receive both specific patient information about opioid consumption and side effects from state agencies as well as larger, statistical information about the effect of opioids across the state. As previously noted, the Attorney General has a special role as *parens patriae* and may bring an action on behalf of the Commonwealth. Part of its ability to bring such an action requires it to collect information related to the Public Assistance and Medical Assistance as defined in KRS Chapter 205.

Therefore, the statutes provide the Commonwealth with the ability to collect information related to medical patients and overarching patterns across the Commonwealth of Kentucky.

KRS Chapter 218A implicitly includes the Commonwealth as a member of the class protected by its statutes. KRS 218A.005 includes a declaration and legislative finding that the regulation of controlled substances "it is important and necessary for the preservation of public safety and public health." KRS 218A.005(1). This declaration and legislative finding serves the entire chapter, which the Commonwealth's Complaint alleges Cardinal violated. The legislative finding establishes that the Kentucky public, represented here as the Commonwealth, is the protected class. The language of the statute further establishes conduct expected of wholesale distributors, including Cardinal, with the purpose of protecting public safety and health. KRS 218A.160(1)(a) requires pharmaceutical distributors to provide controlled substances to a list of approved recipients. The sale and distribution of drugs must be conducted in accordance with KRS 218A.200, which requires distributors to keep records that comply with state and federal laws. KRS 218A.140(4) prohibits any person from knowingly assisting "a person in obtaining or attempting to obtain a prescription in violation" of the statutes in KRS Chapter 218A. Additionally, KRS 218A.1402 provides for penalties for a criminal conspirator in violating sections of the chapter in the sale and transfer of illicit prescription drugs in the Commonwealth.

The scheme of KRS Chapter 218A and the regulations clearly indicates that the legislature intended to curtail improper handling of opioids and other controlled substances within the Commonwealth. Thus, the Commonwealth has correctly inferred from the concert of statutes within KRS Chapter 218A that distributors of controlled

substances have a duty to act within the best interest of public safety and health.

Likewise, the Commonwealth has sufficiently pleaded claims for violation of 201 KAR 2:105. Section 7 of the regulation prohibits a wholesale distributor from operating in a manner that endangers public health. The section is not limited to the direct distribution of drugs to a consumer or patient, but rather relates to the public health and safety considerations when it governs the licensure process from the Board of Pharmacy. See, 201 KAR 2:105 §3(1)(b). When read together as an entire scheme, it appears clear that the Legislature intended the regulations to safeguard against wholesale distributors acting in a manner that violates public health and safety concerns.

Viewing them as a whole or individually, the statutes and regulations were intended to prevent the type of harm alleged to have taken place in this case. The purpose of each is to protect the public by mandating requirements that would accomplish that goal. KRS 446.070 permits the Commonwealth to recover for injuries resulting from statutory or regulatory violations even though a penalty or forfeiture is imposed by the statute or regulation itself. Thus, the Commonwealth has sufficiently pleaded its claim for negligence *per se* as a matter of law.

Cardinal further argues that the Complaint fails to allege any harm to the Commonwealth under common law that should have been "foreseeable" to Cardinal; and that Cardinal had no duty to halt or report the steady upsurge in pharmacy orders for legal prescriptions as "suspicious" since it would be second-guessing both the doctors who prescribed the prescriptions and the DEA's increase of the manufacturing quotas for prescription opioids. Cardinal contends that it has no duty to prevent the downstream, inherently criminal "diversion" of opioids as a matter of law, as the duty does not extend to the downstream acts of third parties whose criminal acts Cardinal cannot foresee or

control.  Cardinal asserts that its role in the distribution chain is limited to delivering pharmaceutical products from manufacturers to licensed retail pharmacies; and that allowing the Attorney General, through tort litigation, to utilize "the blunt instrument of common-law decision-making" to determine the circumstances under which a wholesale distributor's conduct was reasonable impermissibly encroaches upon the federal and state enforcement prerogatives and inserts the Court into a policy debate.  The Commonwealth argues that it adequately identified and pleaded violations of a common-law duty in its negligence claim.

"Actionable negligence consists of a duty, a violation thereof, and a consequent injury.  The absence of any one of the three elements is fatal to the claim." *Howard v. Fowler*, 207 S.W.2d 559, 561 (Ky. 1947).  A plaintiff must present some evidence that the named defendant caused the injuries.  *Holbrook v. Rose*, 458 S.W.2d 155, 157 (Ky. 1970).  In order to prove causation, the Plaintiff must

> … introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the results.  A mere possibility of such causation is not enough; and when the matter remains one of speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

*Savill v. Hodges*, 460 S.W.2d 828, 830 (Ky. 1970).

> Where it is sought to recover damages for negligence or wrongful acts, there must be some evidence to show that [plaintiff was injured] through the negligence of the defendant, and this evidence must be sufficient to charge the defendant with a breach of duty, and recovery cannot be had on mere surmises or speculation as to how the injury complained of happened, nor will it be presumed that the defendant was guilty of actionable negligence if the injury may as reasonably be attributed to a cause that will excuse the defendant as to a cause that will subject it to liability.

*Hearell v. Illinois Cent. R. Co.*, 185 Ky. 41, 213 S.W. 561, 562 (1919).

Kentucky recognizes a general, "universal" duty to exercise ordinary care to prevent foreseeable injury. *T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006) (footnote omitted). "The examination must be focused so as to determine whether a duty is owed, and consideration must be given to public policy, statutory and common law theories in order to determine whether a duty existed in a particular situation." *Id* at 531, quoting *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 849 (Ky. 2005).

The focus of Cardinal on the prescription rate within Kentucky as the harm that occurred is extremely short sighted. As alleged by the Commonwealth, the harm was broader and foreseeable. According to the Complaint, Kentucky has suffered higher addiction and overdose rates, an increase in heroin usage, associated injuries like increased crime, increased need for foster care, increased health care expenses associated with medically unnecessary opioid prescriptions, and a decrease in the quality of life. This harm allegedly resulted from the influx of unreasonable amounts of opioids and was a reasonably foreseeable consequence of excess supply. The Commonwealth seeks damages from Cardinal for negligently setting the wheel in motion, pushing opioids in Kentucky and creating an environment in which diversion, addiction, misuse and overdose became an increasing reality and concern. The Commonwealth's Complaint does not allege that Cardinal is responsible for the acts of third parties, such as doctors, pharmacists or even criminals. Cardinal's continued pleas to find an intervening, superseding cause are no more persuasive here than they were in its argument with respect to causation. The prescribers, pharmacists and even criminals served only to connect the consumers with the mass of opioids that Cardinal allegedly wrongfully pumped into the community. The actions of the third parties, many of whom are revered

customers of Cardinal's, serve only as a natural extension of the alleged wrongdoings by Cardinal which were foreseeable to Cardinal. Accordingly, the Court finds that Cardinal has sufficiently pleaded its negligence claim in the Complaint as a matter of law. Likewise, the allegations in the Complaint provide Cardinal fair notice of the negligence claim.

The Court will next address Cardinal's argument that the Commonwealth's claim under the Kentucky Consumer Protection Act must be dismissed. Cardinal argues that it had no duty under Kentucky law to halt or report to the Commonwealth suspicious pharmacy orders; that the claim is not pleaded with the requisite particularity; and that the Commonwealth fails to allege the sort of consumer-directed conduct that is actionable under the KCPA. Cardinal further argues that the Commonwealth fails to allege that Cardinal's purported failure to disclose suspicious orders occurred "in the conduct of any trade or commerce," as is required by the KCPA, were not made to consumers or to businesses and did not "relate to the entrepreneurial, commercial or business aspect" of Cardinal's activities; and that the Commonwealth's claim for money damages under the KCPA fails as a matter of law, as the only KCPA provision that authorizes the Attorney General to bring a claim for money damages is KRS 367.200 and the Complaint does not allege that Cardinal's purported regulatory reporting violations defrauded consumers.

The Commonwealth argues that Cardinal's attempt to "graft" additional arguments to prove violations of the KCPA is misguided; and that each unit of opioids Cardinal shipped into Kentucky in the absence of the system to detect and halt delivery of suspicious orders constituted an unfair act under the KCPA. The Commonwealth contends that claims brought under the KCPA are not subject to CR 9.02, as the elements of a cause of action under the KCPA differ from those of fraud; that the KCPA was designed to enable the carrying out of law enforcement duties regardless of the persons

identified as being victimized by the wrongful practice of another "in the conduct of commerce" and the office of the Attorney General should not be "limited to prosecuting only selected types of illegal business acts or practices;" and that the Commonwealth has authority under the KCPA to ensure that all participants in the marketplace refrain from unfair, false, misleading or deceptive conduct.

The KCPA makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade[.]" KRS 367.170(1). Courts are to give the KCPA "the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts." *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988). The KCPA permits a court to impose civil penalties after it finds a person has "willfully used a method, act, or practice declared unlawful by KRS 367.170[.]" KRS 367.990(2).

Claims brought by the Commonwealth under the KCPA are not subject to the specificity requirements under CR 9.02,[17] as the elements of a cause of action under the KCPA differ from the elements of fraud.[18] The KCPA does not require "proof of actual deception of some person in order to find a violation thereof." *Telcom Directories, Inc. v. Commonwealth ex rel. Cowan*, 833 S.W.2d 848, 850 (Ky.App. 1991). Thus, there would be no reason to require the heightened standard for pleading time, place and to whom the representation was made. Furthermore, imposing a heightened pleading requirement

---

[17] CR 9.02 provides, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

[18] A claim of fraud requires proof of six elements under Kentucky common law: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury. *Farmers Bank and Tr. Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005); *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999), citing *Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky.App. 1978).

on a KCPA claim would be inconsistent with the purposes of the KCPA, "which is designed to provide broad protection to consumers victimized by unlawful and deceptive trade practices." *Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897, 903 (Ky. 2008). Likewise, as noted by the Supreme Court of Kentucky in *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819 (Ky. 1988), "Our examination and analysis of the various cases indicates clearly that the Kentucky legislature created a statute which has the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts." *Id.* at 821. Thus, the specificity requirements under CR 9.02 do not apply to KCPA actions as a matter of law.

"[T]he plain wording of the [KCPA] authorizes the Attorney General to proceed on behalf of the Commonwealth in his law enforcement authority when (1) he has reason to believe that any person is using, has used or is about to use any method, act or practice declared to be unlawful, and (2) that said proceeding would be in the public interest." *Commonwealth ex rel. Stephens v. North American Van Lines, Inc.*, 600 S.W.2d 459, 461 (Ky.App. 1979). "[T]he Kentucky Consumer Protection Act was broadly designed to curtail unfair, false, misleading or deceptive practices in the conduct of commerce[.]" *Id.* at 462. "[T]he Attorney General is therefore not limited to prosecuting only those selected types of illegal business acts or practices which are used in the merchandising of goods or services intended for personal, family or household use." *Ibid.* This is consistent with the legislative intent of enacting "a strong and effective consumer protection program to protect the public interest and the wellbeing of both the consumer public and the ethical sellers of goods and services." *Id.* at 460, quoting KRS 367.120. Thus, the Commonwealth may bring the claim in the public interest under the KCPA as a matter of law. Additionally, the Court will note that Cardinal has been provided adequate notice

- 37 -

through the pleadings that the Commonwealth of the KCPA claim in this action. The issue of damages would be best resolved at the final disposition of this case.

The Court will next address Cardinal's argument that the fraud by omission claim should be dismissed. Cardinal argues that the Commonwealth has not adequately pleaded the elements of fraud by omission and has not done so with particularity, as the Complaint alleges no cognizable "duty to the other to disclose" a material fact, since the Kentucky Controlled Substances Act imposes no duty on Cardinal "to disclose or report" suspicious pharmacy orders and only has an obligation to report "suspicious" orders to the federal DEA; that the Commonwealth's allegations of breach are wholly conclusory and fail to identify a misleading statement or omission by Cardinal; that the Commonwealth does not even attempt to explain what actions it allegedly took in reliance on Cardinal's purported omissions; and that the Commonwealth has not shown that Cardinal's purported omission proximately caused it any actual damages.

The Commonwealth responds that Cardinal had a duty to disclose facts with respect to the concerns of losses and debts, and protect against death and diversion, and wholly failed to report, provided inaccurate reporting, and/or provided partial reporting that omitted information that it had a duty to disclose; that Cardinal's alleged reporting failures were in connection with opioid shipments occurring between January 1, 2007 and the present; that Cardinal allegedly omitted its failure to comply with state and federal regulations when applying for and using its Kentucky licensure to distribute drugs in the Commonwealth; and that the Commonwealth relied on the information that Cardinal provided to the detriment of its population, as Cardinal refused to disclose the truth about its distribution practices. The Commonwealth argues that the requirements for pleading fraud are relaxed for circumstances which do not allow plaintiffs to access information

necessary to detail a claim and the relevant information is within the defendant's exclusive possession and control; and that, given the extent and complexity of Cardinal's alleged fraud and its control over the relevant information, the circumstances are fully met in this case.

"[A] fraud by omission claim is grounded in a duty to disclose. … To prevail, a plaintiff must prove: (1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence." *Giddings & Lewis, Inc. v. Industrial Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011), citing *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky.App. 2003). "The existence of a duty to disclose is a matter of law for the court." *Ibid.*

In the Complaint, the Commonwealth alleges that Cardinal was under a duty required by law to disclose or report orders of unusual size, orders deviating substantially from a normal pattern, or orders of unusual frequency and failed to provide the reporting required by law, instead, providing minimal, inaccurate or partial reporting, if any reporting was provided that all; and that the Commonwealth of Kentucky acted in reliance on such failure to disclose and suffered grievous injury as a result of the failure to disclose through Cardinal's fraud by omission. (Compl. at ¶¶ 167-69). The Complaint also alleges that Cardinal admitted to prior violations of the federal controlled substances act in such a manner as to violate the Kentucky Controlled Substances Act and caused harm to the Commonwealth of Kentucky due to its clear fraud by omission for which the Commonwealth is entitled to recover all damages proximately caused by the fraudulent omissions. (*Id.* at ¶ 170).

"It is not necessary that the 'particularity' commanded by CR 9.02 attain such detail as to recite each minute detail; it is enough to plead the time, the place, the substance of the false representations, the facts misrepresented, and the identification of what was obtained by the fraud." *Scott v. Farmers State Bank*, 410 S.W.2d 717, 722 (Ky. 1966). "'Rule requiring that averments of fraud be made with particularity does not require textbook pleading of all elements of fraud ....'" *Ibid.* "Compliance with the particularity required by CR 9.02 merely commands that the claimant set forth with sufficient particularity to apprise [a party opponent] fairly of the charges against him or her." *Denzik v. Denzik*, 197, S.W.3d 108, 110 (Ky. 2006). "[T]he rule requiring pleading of fraud and mistake with particularity is to be considered in light of the entire spirit of modern pleading which lays emphasis upon short, concise and direct pleading." *Scott*, 410 S.W.2d at 722.

Viewing all the allegations in the Complaint in this action, it appears to this Court that the Commonwealth has sufficiently pleaded the fraud by omission claim with the particularity commanded by CR 9.02. While the time and place of the omissions is not specifically pleaded in the count itself, it is pleaded elsewhere in the allegations of the Complaint. The content of the alleged misrepresentations and the damages are sufficiently pleaded in the Count. Likewise, the Commonwealth has established that there is a duty to disclose which was allegedly breached by Cardinal. It will be best if the other arguments asserted by Cardinal are addressed through future dispositive motions after sufficient discovery is conducted by the parties. Accordingly, the Commonwealth has sufficiently pleaded the claim of fraud by omission as a matter of law. Likewise, Cardinal as been provided fair notice of the fraud by omission claim asserted in the Complaint.

The Court will next address Cardinal's position that the Commonwealth has failed to state a valid cause of action under the Kentucky Medicaid Fraud and Kentucky

Assistant Program Fraud statutes. Cardinal argues that KRS 205.8463 is a criminal statute outlawing medical fraud and has nothing to do with regulatory reporting or licensing violations by wholesale distributors and does not itself authorize civil damage actions. Within this argument, Cardinal notes that, as a wholesale distributor, it is not a health care provider under these programs and does not submit claims for payment to them; but, instead is paid for its drugs by pharmacies which, in turn, submit claims to the Commonwealth and private insurers when they dispense those drugs. Cardinal contends that there is no authority to support the Commonwealth's attempt to "enforce" this criminal statute in its civil damages claim against a wholesale distributor for alleged reporting and licensing violations; and that the Commonwealth cannot "salvage" its claim by invoking KRS 446.070. Cardinal further argues that the Commonwealth has not pleaded its claim with the required specificity under CR 9.02. The Commonwealth responds that both of the fraud statutes reach beyond healthcare providers who submit fraudulent claims to reach those, like Cardinal, that cause or induce a submission of false claims for payment or participation in a scheme to defraud the Kentucky Medicaid Program and actually benefits from the false submissions; that, although certain of the fraud statutes themselves may not encompass a civil damages remedy, they give rise to a cause of action for damages under KRS 446.070; and that Kentucky's Medicaid Fraud Statute does not require the Commonwealth to plead with specificity the six elements of fraud required under Kentucky common law, and, in terms of the statutory elements, the Commonwealth has sufficiently pleaded the claims.

KRS 205.8463 provides, pertinently:

> (1) No person shall knowingly or wantonly devise a scheme or plan a scheme or artifice, or enter into an agreement, combination, or conspiracy to obtain or aid another in obtaining payments from any medical assistance program

under this chapter by means of any fictitious, false, or fraudulent application, claim, report, or document submitted to the Cabinet for Health and Family Services, or intentionally engage in conduct which advances the scheme or artifice.

(2) No person shall intentionally, knowingly, or wantonly make, present, or cause to be made or presented to an employee or officer of the Cabinet for Health and Family Services any false, fictitious, or fraudulent statement, representation, or entry in any application, claim, report, or document used in determining rights to any benefit or payment.

…

(4) No person shall, in any matter within the jurisdiction of the Cabinet for Health and Family Services under this chapter, knowingly falsify, conceal, or cover up by any trick, scheme, or device a material fact, or make any false, fictitious, or fraudulent statement or representation, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry.

KRS 194A.505(6) provides, "No person shall, with intent to defraud or deceive, devise a scheme or plan a scheme or artifice to obtain benefits from any assistance program by means of false or fraudulent representations or intentionally engage in conduct that advances the scheme or artifice." KRS 194A.505(8) provides, "The Attorney General on behalf of the Commonwealth of Kentucky may commence proceedings to enforce this section, and the Attorney General shall in undertaking these proceedings exercise all powers and perform all duties that a prosecuting attorney would otherwise perform or exercise."

In the Complaint, the Commonwealth alleges, pertinently, that Cardinal's "conduct, as described in the Complaint, violated KRS 205.8463(1), (2), & (4)[;]" that "Cardinal, through its annual deceptive license renewals through the Commonwealth's Cabinet for Health and Family Services ("CHFS") and Board of Pharmacy as well as its failure to identify, track, and reject suspicious orders of addictive prescription opioids: (a) schemed

to obtain payment from a medical assistance program through false application or document presented to the CHFS; (b) caused to be presented false or fraudulent claims to the CHFS; and (c) knowingly used or caused to be used a false statement, or statement which concealed or covered up a material fact, to get a false or fraudulent claim paid or approved by a program within the jurisdiction of the CHFS." (Compl. at ¶ 178). The Commonwealth also alleges in the Complaint that "Cardinal, by reason of the acts and/or omissions set forth herein, with the intent to defraud or deceive, devised a scheme or artifice to obtain benefits from the Kentucky Medicaid program and intentionally engaged in conduct that advanced said scheme, in violation of KRS 194A.505(6)[;]" and that "Cardinal, through its annual deceptive license renewals through the Commonwealth's CHFS and Board of Pharmacy as well as its failure to identify, track, and not distribute suspicious orders of addictive prescription opioids, schemed to obtain benefits from an assistance program through false representations and intentionally engaged in conduct that advanced the scheme." (*Id.* at ¶¶ 187-88).

Through the allegations in the Commonwealth's Complaint that Cardinal failed to identify, report and halt suspicious orders inform the Commonwealth of Kentucky of specific violations, the Commonwealth has sufficiently pleaded a claim for relief under KRS 205.8643 for Medicaid Fraud. The Commonwealth is properly seeking relief for Cardinal's alleged violations of KRS 205.8643 under KRS 446.070, which specifically provides for civil damages even though a penalty is imposed under the statute. The Commonwealth also sufficiently pleads a claim for relief under KRS 194A.505(6) of the Kentucky Assistance Program Fraud Statute. That claim is also properly before this Court under KRS 446.070. Cardinal has been provided adequate notice to the allegations in the Complaint of the Commonwealth's claims under the Kentucky Medicaid Fraud and

Kentucky Assistant Program Fraud statutes. It would be more proper for Cardinal to assert many of its arguments in opposition of the Commonwealth's claims that Cardinal violated the Kentucky Medicaid Fraud and Kentucky Assistant Program Fraud statutes after discovery is conducted by the parties in this action.

Lastly, the Court will address Cardinal's contention that the unjust enrichment claim should be dismissed. Cardinal argues that the Commonwealth has not alleged that it conferred a direct benefit on Cardinal; that the Commonwealth's allegation that Cardinal appreciated the benefit allegedly conferred on it is wholly conclusory; that there is no injustice under the circumstances, as the Commonwealth seeks funds that "pharmacies or insurance programs" paid Cardinal, which they owed Cardinal for opioid medications; and that the funds paid cannot be, simultaneously, unjust enrichment conferred by the Commonwealth.  The Commonwealth responds that it has properly satisfied the pleading requirements for unjust enrichment, as it has alleged that Cardinal profited and benefited from medically unnecessary and improperly shipped opioids purchased in the Commonwealth as an expected and intended result of its conscious wrongdoing; that, due to and as intended by its deceptive acts, Cardinal has made millions of dollars at the expense of the Commonwealth; and that it would be inequitable for Cardinal to retain profits and benefits reaped from oversight failures and unlawful activity. The Commonwealth argues that the direct benefit to Cardinal was the continued payment for opioids distributed by Cardinal and allowing it to profit from its deception and the misconduct alleged, which not only caused the Commonwealth to pay for medically unnecessary opioid prescriptions but created a public health epidemic in the community, would plainly be unjust.

"For a party to prevail under the theory of unjust enrichment, [it] must prove three elements: (1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky.App. 2009). The doctrine of unjust enrichment "is applicable as a basis of restitution to prevent one person from keeping money or benefits belonging to another." *Haeberle v. St. Paul Fire and Marine Ins. Co.*, 769 S.W.2d 64, 67 (Ky. App. 1989), citing *Union Central Life Ins. Co. v. Glasscock*, 270 Ky. 750, 110 S.W.2d 681 (1937); 66 Am.Jur.2d *Restitution and Implied Contracts* § 1 *et seq.* (1973). The justification for restitution "is that one should not be unjustly enriched at the expense of another." *Alexander Hamilton Life Ins. Co. of America v. Lewis*, 550 S.W.2d 558, 559 (Ky. 1977) (citation omitted). "The obligation to do justice rests upon all persons, natural and artificial; if one obtains the money or property of others without authority, the law, independently of express contract, will compel restitution or compensation." *Marshall's Adm'r v. Webster*, 287 Ky. 692, 155 S.W.2d 13, 18 (1941).

In the Complaint, the Commonwealth alleges that "Cardinal created and maintained an artificial market for opioids within the Commonwealth that served only the purpose of spreading the addiction to create a reliable and growing stream of revenue[;]" that "Cardinal received financial benefit from the excessive distribution of opioids across Kentucky[, which] clear overuse and diversion was not reported to the appropriate authorities because … Cardinal did not want to disrupt or diminish its highly profitable business practices[;]" that "[e]ach year, Defendant Cardinal renewed its license to operate as a pharmaceutical distributor in Kentucky, all the while misusing and abusing its privilege to do so by failing to report and halt suspicious orders and by failing to inform the Commonwealth of Kentucky of its continuing violations[;]" that "[t]he Commonwealth

of Kentucky, through its insurers, including but not limited to the Department for Medicaid Services, paid direct reimbursement to the pharmacies or insurance programs which were pass through entities in order to allow financial benefits to be received by … Cardinal[;] that "Cardinal was unjustly enriched and received an inequitable financial benefit as a result of their own unlawful action[;] ... and that "Cardinal should be required to disgorge all such unjust enrichment and to reimburse the Commonwealth for all sums to which Defendant Cardinal were not entitled." (Compl. at ¶¶ 159-64).

The Commonwealth has adequately pleaded facts to support its unjust enrichment claim. The Commonwealth has alleged that Cardinal profited from unnecessary and improperly shipped opioids purchased in the Commonwealth the Kentucky, profited from its endeavors, and equity would preclude Cardinal from keeping profits it unjustly earned off deception in the Commonwealth. Cardinal is provided fair notice through the Complaint that the Commonwealth is seeking a claim of unjust enrichment. Many of the arguments Cardinal has asserted against the unjust enrichment claim here would be more appropriately asserted after the parties are provided an opportunity to conduct sufficient discovery.

### ORDER

WHEREFORE, IT IS HEREBY ORDERED AND ADJUDGED that the Motion of Cardinal to Dismiss is **DENIED**.

Date: _____9/12/19_____

SUSAN SCHULTZ-GIBSON, JUDGE

cc:   Brian C. Thomas, Esq.
      Linda Singer, Esq.
      James D. Young, Esq.
      W. Mark Lanier, Esq.

ENTERED IN COURT
DAVID L. NICHOLSON, CLERK

SEP 1 2 2019

BY_____
DEPUTY CLERK

- 46 -

**COMMONWEALTH OF KENTUCKY
BOONE CIRCUIT COURT
DIVISION III
CASE NO. 18-CI-00846**



ENTERED
BOONE CIRCUIT/DISTRICT COURT
JUL 22 2019
DAVID S. MARTIN, CLERK
BY:_____ D.C.

**COMMONWEALTH OF KENTUCKY,
Ex. rel. ANDY BESHEAR, ATTORNEY GENERAL**                           **PLAINTIFF**

**VS.**

**WALGREENS BOOTS ALLIANCE, INC.,
WALGREEN CO., WALGREENS MAIL
SERVICE, LLC, WALGREENS SPECIALTY
PHARMACY, LLC, WALGREENS.COM
INC. d/b/a WALGREENS #05823**                                      **DEFENDANT**

## ORDER

This matter comes before the Court on Defendants Walgreens Boots Alliance, Inc.;

Walgreen Co.; Walgreens Mail Service, LLC; Walgreens Specialty Pharmacy, LLC; and

Walgreens.com, Inc. d/b/a Walgreens #05823 ("Walgreens") Motion to Dismiss Plaintiff's

Complaint pursuant to Civil Rule 12.02(f). Additionally, Defendant Walgreen Boots Alliance has

filed a Motion to Dismiss the claims against it for lack of personal jurisdiction. The Court

having reviewed the memoranda filed by the parties, the court file, heard argument from counsel,

and being in all ways sufficiently advised, finds as follows:

The underlying Complaint was filed by Kentucky Attorney General Andy Beshear

against Walgreens alleging that they perpetuated Kentucky's opioid crisis by abusing the closed

distribution system created by Congress in an effort to exaggerate the need for opioid

medications in Kentucky, then recklessly shipping and dispensing outrageous quantities of

opioids into Kentucky. Plaintiff argues that Walgreens' actions violated Kentucky law and

resulted in an opioid epidemic, devasting the Commonwealth's families and communities and

1

forcing the Commonwealth to fund the expenses associated with the epidemic and rehabilitation of its citizen victims.

Walgreens has now brought this Motion to Dismiss Pursuant to Civil Rule 12.02(f), requesting that this Court dismiss the Complaint against them in that it fails to adequately allege facts that would support its claims. Walgreens argues that although Attorney General Beshear has brought nine other lawsuits in eight different counties related to the opioid crisis, Walgreens occupies a much different place in the chain of distribution of opioids than the defendants in the other matters, in that they solely dispense opioid medications to patients who present prescriptions written by physicians. They do not manufacture opioid medications, nor do they advertise them to the public or promote them to doctors.

When considering a motion to dismiss, Civil Rule 12.02 requires the Court to construe the pleadings liberally "in a light most favorable to the plaintiff" and to take all factual allegations in the complaint to be true. *Gall v. Scroggy*, 725 S.W. 2d 867 (Ky. Ct. App. 1987) (citing *Ewell v. Central City*, 340 S.W. 2d 479 (Ky. 1960)). "The Court shall not grant the motion unless it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his claim." *Mims v. W.S. Agency, Inc.*, 226 S.W.3d 833, 835 (Ky. Ct. App. 2007) (quoting *James v. Wilson*, 95 S.W. 3d 875, 883-84 (Ky. Ct. App. 2002). In reviewing a Motion to Dismiss, the trial court is not required to make any factual findings, and it may properly consider matters outside of the pleadings in making its decision. *D.F. Bailey, Inc. v. GRW Engineers, Inc.*, 350 S.W. 3d 818, 820 (Ky. Ct. App. 2011).

## I.    Public Nuisance

Walgreens argues the Commonwealth's public nuisance claim fails on two fronts. The first is that the Complaint does not identify any public right allegedly infringed upon as there is

2

no public right to be free from the threat that a lawful product will be abused and thereby cause injury. They cite to *City of Chicago v. Beretta* U.S.A., Corp., 821 N.E.2d 1099, 1116 (Ill. 2004) in which the Illinois Court stated; "[w]e are reluctant to state that there is a public right to be free from the threat that some individuals may use an otherwise legal product (be it a gun, liquor, a car, a cell phone, or some other instrumentality) in a matter that may create a risk of harm to another." Defendants argue that adopting the Attorney General's view that abuse by an individual who presents a valid prescription written by a physician, or abuse of a valid opioid prescription by someone subsequent, constitutes a "public right" would instantaneously convert into public nuisance virtually any societal ill that affects a substantial number of people—a floodgate which should not be opened.

The Commonwealth refutes this, arguing that the public nuisance claim is sufficiently pled and satisfies not one, but all, of the circumstances identified in the Restatement (Second) of Torts § 821B that may "sustain a holding that an interference with a public right is unreasonable." The Restatement asserts that an unreasonable violation of a public right can occur in the following circumstances:

    (a) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

    (b) whether the conduct is proscribed by statute, ordinance or administrative regulation, or

    (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B. The Commonwealth contends that Walgreens interfered with the public health and safety of the citizens of Kentucky by saturating Kentucky

with addictive medications while ignoring applicable laws and regulations pertaining to the safe distribution of addictive drugs.

"A common or public nuisance is a condition of things which is prejudicial to the health, comfort, safety, property, sense of decency or morals of the citizens at large, resulting either (a) from an act not warranted by law, or (b) from neglect of a duty imposed by law." *Nuchols v. Commonwealth*, 226 S.W. 2d 796, 798 (Ky. App.1950). The Court finds that the Commonwealth has properly alleged a public right that Walgreens has violated.

Secondly, Walgreens argues the public nuisance claim fails in that the Complaint does not allege that Walgreens had control of the opioid medications at the time of the alleged harm. Defendants argue that the alleged public nuisance "increases in illicit drug use, crime, and overdoses," did not arise until after the prescription opioids were in the hands of third parties.

Conversely, the Commonwealth argues that the public harm occurred when Walgreens ignored applicable laws, regulations, and its own internal protocols in furtherance of flooding Kentucky's communities with addictive medications. They contend that Defendants controlled the products at the time of dispensation and distribution and, by virtue of its role as a licensed distributor, promised to control the supply of opioids into the Commonwealth.

The Court agrees with the Commonwealth that it has sufficiently pled the control element of the public nuisance claim, alleging the cause of the nuisance was the dispensation and distribution of the opioids at a time in which Walgreens had control of them.

## II.   Negligence

Walgreens argues that the Commonwealth's negligence claim fails because Walgreens does not owe a common law duty to the Commonwealth to protect it from the economic injuries alleged in the Complaint. They claim that even if the allegations against them are true, and they

4

did dispense an excessive number opioids medications without adequately investigating or reporting potential diversion, those acts alone could not have caused the harms alleged in the Complaint as those harms could only have occurred once third parties illicitly diverted the prescription opioid medications for improper use. They argue they cannot therefore be held liable for failing to prevent the criminal misconduct of third parties with whom they have no relationship and over whom they have no control. Thus, they claim they owed the Commonwealth no duty to protect it from the economic consequences of such third-party actions. They cite to *Briscoe v. Amazing Products, Inc.*, 23 S.W.3d 228, 230 (Ky. App. 2000) as instructive. In *Briscoe*, a suit was brought against the distributor of "Liquid Fire," a drain-cleaning product, after it was used to assault a third party. The Court looked to the analysis found in *Sturm, Ruger & Co., v. Bloyd*, 586 S.W. 2d 19 (Ky. 1979) which held that the manufacturer of a firearm could not be held liable for the gun's accidental discharge because the manufacturer had no duty to anticipate the unreasonable use of the firearm by its owner. The *Briscoe* Court then opined that the "principles at work in *Sturm* would apply with even greater force where, as here, the intervening cause was an intentional criminal act." *Id.* at 230. Walgreens contends that *Sturm* and *Briscoe* are controlling, and the application of such requires the Commonwealth's claim of negligence to fail as a matter of law.

The Commonwealth argues that Walgreens' reliance on *Sturm* and *Briscoe* is misplaced as the diversion and abuse of opioids is not an extraordinary or unforeseeable result of Walgreens' unabated, excessive distribution and dispensation of opioids in Kentucky, but rather the obvious result of supplying quantities of drugs that exceed the population and are not necessitated by legitimate medicals needs. They contend that Walgreens is mischaracterizing the claims against them as the Commonwealth is not arguing Walgreens' duty arises from the

intentional acts of third parties pursuant to *Norris v. Corr. Corp. of Am.*, 521 F. Supp. 2d 586, 590 (W.D. Ky. 2007), but that its duty arises based on its own actions of negligently failing to protect against theft and diversion and for saturating Kentucky with opioids.

The Court agrees that the Commonwealth has adequately pled their claim for negligence. Kentucky recognizes a general "universal" duty to exercise ordinary care to prevent foreseeable injury. "The examination of which must be focused so as to determine whether a duty is owed, and consideration must be given to public policy, statutory and common law theories in order to determine whether a duty existed in a particular situation." *T& M Jewelry, Inc., v. Hicks*, 189 S.W.3d. 526, 530-531 (Ky. 2006) (citing *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 849)). Here the Commonwealth has alleged harm - higher addiction and overdose rates, increased heroin usage, associated injuries like increased crime, more children placed in foster care, skyrocketing healthcare expenses, and a declining quality of life for its citizens, as a not unforeseeable result of Walgreens' actions - excessive distribution and dispensation of opioids.

### III.    Unjust Enrichment

Walgreens next argues that the Commonwealth has not adequately pled or established the elements of their unjust enrichment claim. A claim for unjust enrichment has three elements: "(1) a benefit conferred upon defendant at the plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Collins v. Ky. Lottery Corp.*, 399 S.W.3d 449, 455 (Ky. App. 2012) (quoting *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky.App.2009)). Walgreens argues that although the Complaint alleges the Commonwealth "paid direct reimbursement to pharmacies or insurance programs, which were pass through entities in order to allow financial benefits to be received by Walgreens," it then

6

jumps to the legal conclusion that Walgreens "received an inequitable financial benefit" as a result of the Commonwealth's payment for opioid medicines. The Complaint, they argue, does not allege that the Commonwealth did not receive the opioid medication it paid for and, therefore, they cannot claim unjust enrichment, as "(t)he doctrine of unjust enrichment is an equitable and restitutionary tool designed to prevent one person from keeping money or benefits belonging to another." *Noble Royalties Access Fund V LP v. Elk Horn Coal Co., LLC, 2015 WL 7352587, at 5 (Ky. App. Nov. 20, 2015) (*quoting *Haeberle v. St. Paul Fire and Marine Ins. Co.,* 769 S.W.2d 64, 67 (Ky.App.1989)).

The Commonwealth contends that it has adequately alleged all the elements of their unjust enrichment claim, asserting that: (1) Walgreens benefited from improperly distributed and dispensed opioids, which were purchased in the Commonwealth as an intended result of its conscious wrongdoing; (2) that due to, and as intended by, its deceptive acts, Walgreens has made millions of dollars at the expense of the Commonwealth, and; (3) it would be inequitable for Walgreens to retain profits and benefits reaped from its oversight failures and unlawful activity.

The Court finds that the Commonwealth has adequately pled facts to support its unjust enrichment claim.

## IV.    Medicaid Claims

Walgreens argues that the Commonwealth's Medicaid claims should be dismissed as they fail to allege any false statements or concealments in connection with Medicaid or medical assistance.   They further argue that these claims must be pled "with particularity" and the Commonwealth has failed to do so.

The Kentucky Medicaid Fraud Statute, KRS 205.8463, prohibits any person from "intentionally, knowingly, or wantonly…cause to be made or presented to an employee or officer of the Cabinet for Health and Family Services any false fictitious, or fraudulent statement, representation, or entry in any application, claim, report, or document used in determining rights to any benefit or payment." KRS 205.8463(2). It further prohibits any person from intentionally engaging in conduct to advance a scheme to receive or aid others to receive payments. KRS 205.8463(4).  The Commonwealth argues that Walgreens, acting as a distributor, caused false Medicaid claims to be filled by virtue of their failure to report and halt suspicious orders, as well as through their failure to inform the Commonwealth of continuing violations when it renewed its licenses, constituting violations of Kentucky law and Kentucky Administrative Regulations. The Court finds that by alleging Walgreens failed to identify, report and halt suspicious prescriptions and inform the Commonwealth of specific violations in its license renewals, the Commonwealth has adequately pled its claim under the Kentucky Medicaid Fraud Statute.

As to the Kentucky Assistance Program Fraud Statute, Ky. Rev. Stat.§ 194A.505(6) which precludes "…intent to defraud or deceive, devise a scheme or plan a scheme or artifice to obtain benefits from any assistance program by means of false or fraudulent representations or intentionally engage in conduct that advances the scheme or artifice," the Court finds the Commonwealth's allegations that Walgreens perpetuated the filing of allegedly false claims constitutes a valid claim under this statute as well.

## V.    Kentucky's Consumer Protection Act

Walgreens argues that the Commonwealth's claims under Kentucky's Consumer Protection Act should be dismissed because the purpose of the Act is to protect customers from misleading practices in the marketplace and the Complaint does not allege that Walgreens did

8

anything "unfair, false, misleading, or deceptive" in its interactions with individual Kentucky consumers.  They contend that they do not, and did not, engage in consumer-based conduct and, as the Commonwealth failed to allege that they defrauded consumers, the claim is not appropriate.

The Commonwealth argues that Walgreens' argument is meritless as the Kentucky Consumer Protection Act prohibits all acts "in trade or commerce" that are "unfair, false, misleading, or deceptive." KRS 367.170. Further, the Attorney General has broad authority to bring suit "in the public interest" and has the authority to ensure the compliance of all participants in the marketplace. KRS 367.190.

The Court agrees with the Commonwealth, and finds they have appropriately pled their claim under the Kentucky Consumer Protection Act. The Court also finds that the Kentucky Consumer Protection Act is not limited to "only those selected types of illegal business acts or practices which are used in the merchandising of goods or services intended for personal, family, or household use." *North American Van Line*, 600 S.W.2d 459, 462 (Ky. App. 1979).

## VI.     Fraud by Omission

Walgreens further argues that there is no basis for a claim of fraud by omission. They contend that the Complaint never identifies any provision of Kentucky statutory or common law that creates a duty to disclose "suspicious orders" to the Commonwealth and, absent such a duty, the claim must fail. They further argue that the claim must fail on the basis of proximate cause in that even if such a duty existed, the Complaint does not allege how increased reporting of suspicious orders to Kentucky regulators would have changed the Commonwealth's behavior and avoided or reduced the damages allegedly incurred.

9

A fraud by omission claim requires the following elements: (1) a duty to disclose a material fact at issue; (2) the defendant failed to disclose such fact, (3) the failure to disclose induced the plaintiff to act; and (4) the plaintiff suffered actual damages therefrom. *Giddings v. Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011) (quoting *Rivermont Inn, Inc. v. Bass Hotels Resorts, Inc.,* 113 S.W.3d 636, 641 (Ky.App.2003)). In its Complaint, the Commonwealth alleges Walgreens had a duty to disclose suspicious orders of prescription opioids and to prevent theft and diversion, and that by failing to report on these matters, providing inaccurate reporting and/or providing partial reporting with critical information omitted, Walgreens breached its duties.

Kentucky law requires all pharmacies to apply for and receive a license from the Kentucky Board of Pharmacy. KRS 315.035. They must also apply for and receive a license from the Kentucky Cabinet for Health and Human Services. KRS 218A.150, repealed by 2018 Kentucky Laws Chapter 112. Continuing licensure is dependent upon compliance with laws and regulations relating to controlled substances. KRS 218A.160(1) (repealed), 902 KAR 55.010, KRS 218A.240 and 21 U.S.C. § 823. The Commonwealth also argues Walgreens' omissions constituted a failure to comply with state and federal regulations when applying for and using its Kentucky licensure to distribute drugs in the Commonwealth, and further that the Commonwealth relied on the untruthful and/or incomplete information that Walgreens provided in its license applications to the detriment of the citizens of Kentucky.

The Court finds that the Commonwealth has adequately pled their claim for fraud by omission in that they have alleged Walgreens' failed to disclose suspicious orders of prescription opioids and to prevent theft and diversion, and that by failing to report on these matters, providing inaccurate reporting and/or providing partial reporting with critical information

omitted, Walgreens breached statutory duties, and the Commonwealth has adequately alleged

with particularity facts to support its theory regarding each element of the claim.

## VII. Negligence Per Se

As Walgreens argues, to bring a negligence *per se* claim, a plaintiff must show that (1)

the plaintiff "comes within the class of person intended to be protected by the statute;" (2) the

statute "must have been specifically intended to prevent the type of occurrence that took place;"

and (3) the violation of the statute "must have been a substantial factor in causing the result."

*McCarty v. Covol Fuel No. 2, LLC*, 476 S.W. 3d 224, 227-28 (Ky. 2015). Additionally, to bring

a claim of negligence *per se* based on a violation of a regulation, the plaintiff must meet the same

three requirements and, additionally, must aim at the safety of the citizenry and be specifically

authorized by an enabling statute. *Id.* at 233. Walgreens argues that as the Commonwealth has

not adequately alleged a violation of any statute or regulation, because there are no enumerated

duties that they have violated, the Commonwealth's claim must fail as a matter of law. The

Defendants further argue that 201 KAR 2:105§ 2(4)(d); 201 KAR 2:105§ 5(4); 201 KAR 2:105§

7; 902 KAR 55:010 (repealed); KRS 205.5634; KRS 218A.160(10)(a) (repealed); KRS

218A.170, KRS 218A.200 and KRS 218A.180(3) do not create any obligation on Walgreens to

"monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids"

as alleged in the Complaint. Further, they argue, none of these provisions meet the basic

requirements for a negligence *per se* claim because as the Commonwealth is not "within the

class of person intended to be protected" and the statute was not "specifically intended to prevent

the type of occurrence that took place." They contend that these statutes and regulations were

intended to protect patients and consumers from physical harm, not against the economic injuries

alleged by the Commonwealth.

11

Conversely, the Commonwealth argues that as a wholesale distributor, Walgreens has a duty to comply with all state laws and regulations relating to controlled substances. KRS 218.160(1)(a). Pursuant to this same statute, Walgreens is required to develop internal security policies to reasonably protect against theft and diversion, 201 KAR 2:105 § 5(2)(c). They must also:

> establish, maintain, and adhere to written policies and procedures, which shall be followed for the receipt, security, storage, inventory, and distribution of prescription drugs, including policies and procedures for identifying, recording, and reporting losses or thefts and to assure that the wholesale distributor prepares for, protects against, and handles crisis situation that affect the security or operation of the facility. These crises shall include fires, floods, or other natural disasters, and situations of local, state, or national emergency.

201 KAR 2:105 § 5(4)(a). They further argue that Kentucky statutes clearly require compliance with federal law and to the extent that Walgreens' conduct violated the Federal Controlled Substance Act, it, therefore, also violated state law. KRS 218A.170(8) (2018), 201 KAR 1:105 § 2(4)(d), KRS 218A.160(1)(a). They contend that Walgreens' breach of its duty to report and refuse to ship "suspicious orders" to the DEA caused devastating harm to the Commonwealth.

The Court finds that the Commonwealth has adequately pled its claims for relief for negligence *per se* as statutory duties of care exist for wholesale distributors of opioids in the Commonwealth. The Court also finds the Commonwealth to be a member of the protected class of the enumerated statutes as they create a way to safeguard wholesale distributors from acting in a way that violates public health and safety concerns.

**VIII. Proximate Cause**

Walgreens argues that the Commonwealth's Complaint does not adequately establish that Walgreens' actions are the proximate cause of the alleged injury. They claim that the asserted causal chain between the alleged conduct and the alleged injuries is too attenuated to sustain a

finding of proximate case in that, in order for the alleged damages to have occurred, there had to

have been an intervening cause: a third party must have either abused the drug or illegally

provided it to others who then abused it. They cite to *Liberty Mut. Fire Ins. V. JM Smith Corp.*,

602 F. Appx 115 (4th Cir. 2015), which found in favor of a wholesale pharmaceutical distributor,

opining the chain of causation was hardly direct between the wholesaler and drugs ending up in

an abuser's hands. The Commonwealth argues an intervening cause only supersedes proximity

where the injury was not reasonably foreseeable. *NKC Hospitals, Inc. v. Anthony*, 849 S.W.2d

564, 568 (Ky. Ct. App. 1993). The criteria for determining whether an intervening act is

superseding includes the requirement that the act be: (1) of independent origin, unassociated with

the original act; (2) capable of bringing about the injury; (3) not reasonably foreseeable by the

original actor, and (4) involved the unforeseen negligence of a third party or a natural force. *Id.*

*See also*, *Briscoe v. Amazing Products, Inc.*, 23 S.W.3d 228, 229.

Walgreens also argues the Commonwealth cannot recover as their claimed injuries were

suffered indirectly as a result of an injury to another. Walgreens relies on *Kentucky Laborers*

*District Council v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 761-64 (W.D. Ky. 1998), a case in

which third-party payors attempted to sue tobacco companies to recover medical costs they

expended to treat people with smoking related ailments. The Western District Court dismissed

the action, finding that the payor's claims were too "remote" and "entirely "derivative" of

members injuries. *Id* at 762-763. The Commonwealth argues that the instant matter is

distinguishable as this is not a case of a company misrepresenting the health risks, smoking, but

that it involves Walgreens causing countless unnecessary prescriptions to be written and

fraudulently inducing the Commonwealth to pay for them.

Additionally, the Commonwealth contends that proximate cause falls within the purview of the jury, becoming a matter of law only where "there is no dispute about the essential facts" and "reasonable minds cannot differ as to the existence of causation." *McCoy v. Carter*, 323 S.W. 2d 210, 215 (Ky. Ct. App. 1959). They argue that they must only show that Walgreens' conduct was a "substantial factor" in bringing about the harm alleged to establish legal causation. *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 91-92 (Ky. 2003) (adopting the substantial factor test from Restatement (Second) of Torts, § 431).

The Court finds that the Commonwealth has sufficiently pled proximate cause in its Complaint.

### IX.   Public Service Doctrine

Walgreens asserts that the Commonwealth's claims to recover response costs are barred under the Free Public Services Doctrine. Arguing that "absent authorizing legislation," the cost of public services, "is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service." *District of Columbia v. Air Fla., Inc.*, 750 F.2d. 1077, 1080 (D.C. Cir. 1984). They claim that numerous jurisdictions apply the doctrine to preclude the government from seeking reimbursement of police, medical, and other costs incurred in the performance of public duties and, therefore, there is no reason to think that Kentucky would differ from other states in this regard.

Conversely, the Commonwealth argues that the Free Public Services Doctrine does not apply as it has not been adopted by Kentucky. In the alternative, they argue that even if the Free Public Services Doctrine does apply, it does not preclude recovery as the doctrine permits recovery in a tort suit "where the acts of a private party create a public nuisance which the government seeks to abate." *Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1145 (Ill. 2004).

The Court finds that it would not be appropriate to apply (and Adopt) the Free Public Services Doctrine under current Kentucky law.

### X.    Personal Jurisdiction over Walgreens Boots Alliance, Inc.

Defendant, Walgreens Boots Alliance, Inc. ("WBA") has filed an additional Motion to Dismiss which applies to them specifically. They argue that the Court has no personal jurisdiction over them under KRS 454.210 as WBA is a Delaware Company that conducts no activities in Kentucky. WBA was incorporated in September 2014 and, on December 31, 2014, became the parent company of Walgreen Co. pursuant to a merger and corporate reorganization into a holding company structure. WBA is incorporated under Delaware law and has its principal place of business in Deerfield, Illinois. They argue they are a legally distinct entity that does not conduct business in the name of Walgreen Co. or any of the other Walgreens Defendants. They are simply a parent holding company with no employees or operations outside of Illinois and have never distributed opioid medications and do not own or operate pharmacies. They further argue that even if personal jurisdiction were permissible through the Kentucky Long-Arm Statute, it would be barred by federal due process standards. The Commonwealth cites to WBA's public website to argue that WBA conducts activities including operating pharmacies and distributing and dispensing medications.

"The proper analysis of long-arm jurisdiction over a nonresident defendant consists of a two-step process. First, review must proceed under KRS 454.210 to determine if the cause of action arises from conduct or activity of the defendant that fits into one of the statute's enumerated categories. If not, then *in personam* jurisdiction may not be exercised. When that initial step results in a determination that the statute is applicable, a second step of analysis must be taken to determine if exercising personal jurisdiction over the non-resident defendant offends

his federal due process rights." *Caesars Riverboat Casino, LLC v. Beach*, Ky., 336 S.W.3d 51, 57 (2011).

KRS 454.210(2)(a) states in pertinent part:

(2) (a) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's:
    1. Transacting any business in this Commonwealth;
    2. Contracting to supply services or goods in this Commonwealth;
    3. Causing tortious injury by an act or omission in this Commonwealth;
    4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth, provided that the tortious injury occurring in this Commonwealth arises out of the doing or soliciting of business or a persistent course of conduct or derivation of substantial revenue within the Commonwealth; …

The Commonwealth argues that KRS 454.210(2)(a) provides for agency as a basis for personal jurisdiction, and that the above 4 prongs of KRS 454.210(2)(a) apply to WBA's conduct as the parent company of all Walgreens entities, which are being operated and controlled by WBA. Therefore, they argue, this Court has personal jurisdiction over WBA pursuant to Kentucky's Long-Arm Statute.

The Commonwealth also argues Walgreens is the alter-ego of WBA, and Kentucky has jurisdiction over WBA as they dominate the Walgreens enterprise. See *Audiovox Corp. v. Moody,* 737 S.W.2d 468, 470 (Ky. App. 1987).

Additionally, the Court's exercise of jurisdiction must also be consistent with constitutional due process, which can be satisfied by a showing of general jurisdiction, requiring general systematic contacts with the forum or, specific jurisdiction, requiring contacts relating to the specific transactions at issue. To be subject to general personal jurisdiction a nonresident defendant's affiliations with Kentucky must be so "continuous and systematic as to render them essentially at home there." *Daimler AG v. Bauman*, 57 U.S. 117, 127 (2014) (quoting *Goodyear*

*Dunlap Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  Specific jurisdiction requires a showing of "minimum contacts" between the defendant and the forum and that the exercise of the Court's jurisdiction would be "consistent with traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). This does not require the defendant to be, or have been, physically present in the Commonwealth. Kentucky courts have long recognized the exercise of jurisdiction over a parent company if their subsidiary is doing business within the Commonwealth. *See Pro Tanks Leasing v. Midwest Propane & Refined Fuels*, LLC, 988 F.Supp. 2d (W.D.Ky. 2013); *Dare to be Great, Inc. v. Commonwealth ex rel. Hancock*, 511 S.W.2d 224, 227 (Ky. App. 1974).

WBA next argues that specific personal jurisdiction does not exist because federal due process requires a close nexus between the defendant's activities, the forum state, and the plaintiff's claims. *Intera Corp. v. Henderson*, 428 F.3d 605, 615 (6th Cir. 2005). The Court must find that: (1) the defendant "purposefully availed himself of the privilege of acting in the forum state;" (2) that the plaintiff's cause of action "arises from the defendant's activities" in the forum state; and (3) that the defendant's conduct has a "substantial enough connection" with the forum state to make the exercise of jurisdiction reasonable. *Id.* (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).  WBA argues that, based on this three-prong test, there is no conceivable basis for the Court to exercise specific personal jurisdiction over them.

Finally, WBA argues that potential jurisdiction over WBA subsidiaries does not create personal jurisdiction over WBA. They contend that specific jurisdiction over a parent company based on a subsidiary's contacts with the forum state requires a showing that "the parent company exerts so much control over the subsidiary that the two do not exist as separate entities, but are one and the same for the purposes of jurisdiction." *Estate of Thomson ex rel. Estate of*

17

*Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008). They claim that the Commonwealth has not alleged—and could not allege—any facts that would allow for specific jurisdiction over WBA.

The Commonwealth argues that WBA, as the parent company of all Walgreen entities, is subject to personal jurisdiction in Kentucky. They contend that, despite WBA's protestations to the contrary, they are intertwined with Walgreens so much as to be the same entity for purposes of jurisdiction. WBA manages and directs Walgreens' operations and, therefore, is involved in the distribution and dispensation of drugs in Kentucky.

The Court finds that WBA is the parent company of Walgreens and is directly involved in the management and directing of Walgreen's activities. They are therefore subject to the jurisdiction of this Court. Through Walgreens, WBA transacted business in Kentucky, contracted to supply services or goods in Kentucky, caused alleged tortious injury in Kentucky, and engaged in out-of-state conduct which allegedly caused tortious injury in Kentucky, while regularly soliciting and doing business in Kentucky and obtaining substantial revenue from these activities in Kentucky. These contacts satisfy both the requirements of Kentucky's Long Arm Statute, KRS 454.210, and the requirements of Constitutional due process.

**IT IS HEREBY ORDERED AND ADJUDGED** as follows:

1. Defendants Walgreens Boots Alliance, Inc.; Walgreen Co.; Walgreens Mail Service, LLC; Walgreens Specialty Pharmacy, LLC; and Walgreens.com, Inc. d/b/a Walgreens #05823 ("Walgreens") Motion to Dismiss Plaintiff's Complaint pursuant to Civil Rule 12.02(f) is **DENIED**;

2. Defendant Walgreen Boots Alliance's Motion to Dismiss the claims against it for lack of personal jurisdiction is **DENIED**.

DATED this _18th_ day of July 2019.

**JAMES R. SCHRAND, JUDGE**
**BOONE CIRCUIT COURT**

COPIES TO:  ALL ATTORNEYS AND PARTIES OF RECORD

CERTIFICATE
I, DAVID S. MARTIN, CLERK OF THE BOONE DISTRICT/CIRCUIT
COURT, THEREBY CERTIFY THAT I HAVE MAILED A COPY OF
THE FOREGOING ORDER AND NOTICE TO ALL PARTIES HERETO
AT THEIR LAST KNOWN ADDRESSES OR THEIR COUNSEL
OF RECORD, THIS ____ DAY OF _____
DAVID S. MARTIN
BOONE DISTRICT/CIRCUIT COURT
_____ D.C.

19

2018 WL 3635765 (Ky.Cir.Ct.) (Trial Order)
Circuit Court of Kentucky.
Division II
Franklin County

COMMONWEALTH of Kentucky, ex rel. Andy Beshear, Attorney General, Plaintiff,

v.

ENDO HEALTH SOLUTIONS INC.; and Endo Pharmaceuticals Inc., Defendants.

No. 17-CI-1147.
July 10, 2018.

**Order**

Hon. Robert J. Benvenuti III, Wesley R. Butler, Holly R. Iaccarino, Barnett Benvenuti & Butler PLLC, 489 East Main Street, Suite 300, Lexington, Kentucky 40507.

Hon. Jonathan L. Stern, Arnold & Porter Kaye Scholer LLP, 601 Massachusetts Ave, NW, Washington, DC 20001.

Hon. John Lombardo, Arnold & Porter Kaye Scholer LLP, 44 th Floor, 777 South Figueroa Street, Los Angeles, California 90017.

Hon. LeeAnne Applegate, Hon. Elizabeth U. Natter, Hon. Charlie Rowland, Office of the Attorney General, 1024 Capital Center Drive, Suite 200, Frankfort, Kentucky 40601.

Hon. C. David Johnstone, Hon. Brian C. Thomas, Office of the Attorney General, 1024 Capital Center Drive, Suite 200, Frankfort, Kentucky 40601.

Thomas D. Wingate, Judge.

**\*1** This matter is before the Court upon Defendants' *Motion to Dismiss* and Defendants' *Motion to Strike*. The case was called before the Court during for a hearing on Tuesday, May 22, 2018 at 10:00 a.m. Upon review of the parties' briefs and papers, and after being sufficiently advised, the Court hereby **DENIES** Defendants' *Motion*.

**STANDARD OF REVIEW**

Under Kentucky law, when a court considers a motion to dismiss under Civil Rule 12.02, "the pleadings should be liberally construed in a light most favorable to the plaintiff and all allegations taken in the complaint to be true." *Gall v. Scroggy*, 725 S.W.2d 867, 869 (Ky. Ct. App. 1987) *citing Ewell v. Central City*, 340 S.W.2d 479 (Ky. 1960). "The court should not grant the motion unless it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his claim." *Mims v. W.-S. Agency, Inc.*, 226 S.W.3d 833, 835 (Ky. Ct. App. 2007) *quoting James v. Wilson*, 95 S.W.3d 875, 883-84 (Ky. Ct. App. 2002). In *D.F. Bailey, Inc. v. GRW Engineers Inc.*, 350 S.W.3d 818 (Ky. Ct. App. 2011), the Kentucky Court of Appeals discussed a trial court's standard of review when ruling on a motion to dismiss. "[T]he question is purely a matter of law. [...] Further, it is true that in reviewing a motion to dismiss, the trial court is not required to make any factual findings, and it may properly consider matters outside of the pleadings in making its decision. *Id.* at 820 (internal citations omitted).

# ANALYSIS

## I. Causation

Defendants argue that the Commonwealth's claims require more specific proof of causation than what it pled in its complaint. The Commonwealth alleged a causal theory of loss it has suffered because Defendants misrepresented the risks of opioid medications it manufactured and marketed; physicians heard and believed the representations Defendants made about the product, which undermined the warning labels contained on the medication packaging; the misrepresentations caused physicians to administer pharmaceutical opioids to patients in higher doses, which created a greater risk of addiction; the effects of this over prescription of opioids caused a concurrent rise in opioid-related criminal activity as well as an increase in addiction and opioid-related health problems; and the activity caused Kentucky Medicaid program to spend over $117 million in 2016 to treat opioid addiction while Defendants continue to profit on drug sales in the Commonwealth. The Court will address Defendants' specific arguments for dismissal based on the causation alleged in the Commonwealth's argument below.

### a. Remoteness of damages

Defendants argue that the derivative injury rule, the doctrine that precludes recovery against an alleged wrongdoer for losses derived from an injury to a third-party, bars the Commonwealth's suit. *Fireman's Fund Ins. Co. v. Gov't Emps. Ins. Co.*, 635 S.W.2d 475, 475 (Ky. 1982). In *Kentucky Laborers District Council v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755 (W.D. Ky. 1998), the Western District Court held that the plaintiff could not bring an aggregate claim on behalf of thousands of individuals, both directly and indirectly injured, who did not meet the class certification requirements. Duplicative recovery would occur for directly injured plaintiffs who had already brought suit against the tobacco company. *Id.* at 763. Defendants assert that the third-party payor claims, just like those in *Kentucky Laborers*, cannot be brought against the drug manufacturer because the Commonwealth's damages are too remote to seek third party recovery for damages in the form of Medicaid and workers' compensation programs in an indirect injury setting.

**\*2** Conversely, the Commonwealth contends that its suit does not fall under the derivative injury rule. The Commonwealth brings suit under the law of public nuisance and the Kentucky Consumer Protection Act (KCPA) in its role as *parens patriae*, rather than as an insurer. The Office of the Attorney General is uniquely situated to take legal action on behalf of citizens of the Commonwealth, and it asserts claims against Defendants for their actions related to the marketing and sale of their products in Kentucky. Further, the Commonwealth argues that, even if the rule did apply, the derivative injury rule would not bar its claim against Defendants. The Commonwealth contends that an insurance "carrier's rights against a third-party tortfeasor are entirely derivative and are not independent of the injured party's tort claim. *Fireman's Fund Ins.*, 635 S.W.2d at 476.

The Court holds that the Commonwealth's claims do not fail for remoteness. First, the Court holds that the derivative injury rule does not bar the Office of the Attorney General from redress in this matter. This Court has previously addressed this issue in *Commonwealth of Kentucky ex rel. Andy Beshear, Attorney General v. Fresenius Medical Care Holdings, Inc., et al.*, Civ. Action No. 16-CI-946, Order on Motion to Dismiss at 6-7 (Franklin Circuit Court Feb. 15, 2017). In that case, the defendant "cites *Kentucky Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F.Supp.2d 755 (W.D. Ky. 1998), for the proposition that the remoteness doctrine bars insurers, and other benefit providers, from bringing claims and recovering for injuries to third parties." This argument is strikingly similar to that which Defendants raise in the current case make. However, the Court distinguished the Fresenius matter from that in *Kentucky Laborers* because in *Kentucky Laborers* the Western District, which based its decision in the "law of anti-trust, held that strong anti-competitive consequences to the marketplace from which the fund suffered must be present to recover for a claim based on misrepresentation. *Id.* at 766." *Id.*

The Court reaches the same conclusion in this case as it did in its February 15, 2017 order on the issue of remoteness of injury for the Attorney General's claim:

> Unlike *Kentucky Laborers*, in this case the Commonwealth raised claims based upon the alleged misrepresentations of Fresenius, none of which are based in the law of anti-trust. The Court, taking the pleadings in the light most favorable to the Commonwealth, at this juncture, finds that remoteness does not bar the Commonwealth's claims. The Commonwealth seeks to recover for expenditures it made in purchasing GranuFlo with Medicaid funds based upon Fresenius' misrepresentations. The Court finds that the expenditures constitute a claim of injury unique to the Commonwealth that is not founded upon the medical expenses or bills the Fresenius users acquired. Therefore, remoteness does not bar the Commonwealth's claims.

*Id.* The injury the Commonwealth has allegedly suffered due to Defendants' marketing and alleged misrepresentations of the health effects and consequences is an injury specific to the Commonwealth. The expenditures made in workers compensation and Medicaid claims to treat Kentuckians who, after receiving improper medical prescriptions and advisement, became addicted and experienced various opioid related injuries and illnesses, are injuries the Commonwealth allegedly inured, despite not being the individual who experienced opioid addiction. Therefore, the Commonwealth's claims are not too remote for the Commonwealth's theory of causation.

### b. Knowledge of risks and the causal chain

Next, Defendants contend that the Commonwealth's long-standing knowledge of the risk of opioid medications breaks the causal connection between Defendants' marketing and representations about their products and the injuries suffered by Kentuckians. Defendants cite *Sandoz Inc. v. Commonwealth*, 405 S.W.3d 506 (Ky. App. 2013), for the proposition that if the state knew of the risks of the prescription drugs and did nothing with that knowledge to prevent the widespread use and misuse of the products, the state cannot recover damages. In *Sandoz*, the Commonwealth knew of inflated average wholesale pricing for drugs. The state used this inflated formula for over-reimbursing pharmacies. The Court of Appeals held that the Commonwealth's awareness of the inflation prevented the state from proving that the defendants caused harm in the state's systematic over-reimbursing pharmacies. *Id.* In this case, Defendants argue that the Commonwealth knew of the risks of addiction, abuse, and diversion of opioids from FDA-approved warnings, statewide drug taskforces and policy investigations, and other reported information. Thus, Defendants contend that the Commonwealth cannot now, after having significant information relating to the dangers of opioid addiction, seek redress for Defendants' alleged misrepresentations.

**\*3** The Commonwealth argues that it never "acquiesced" in this case, as the state did in *Sandoz* to the inflation information. *Id.* at 511. Over the last fifteen years, the state has taken measures to combat opioid abuse. Here, the Commonwealth contends that when it learned of Defendants' alleged fraudulent conduct it timely acted to fight Defendants' conduct. Further, the Attorney General avers that whether the Commonwealth took action in a timely fashion against Defendants or acquiesced to Defendants' conduct is a matter of fact that is improper for decision at this time.

The Court holds that the Attorney General timely brought suit in this matter. The Commonwealth notably knew of the dangers and ongoing societal problems caused by the abuse of opioids by Kentuckians over the past fifteen years. However, the Court agrees with the Commonwealth that knowing of the harm a product may create does not equate to knowing of specific alleged misrepresentations made about the properties of Defendants' products nor the improper, unnecessarily induced prescriptions of Defendants' drugs for which the state paid. The date the Commonwealth learned

of any alleged malfeasance by Defendants tolled the statute of limitations for bringing this action. Neither party has presented the Court with any factual pleadings related to Defendants' claim that the Commonwealth acquiesced to Defendants' specific marketing and prescription strategies. The Commonwealth learned of Defendants' alleged misconduct and timely brought this lawsuit.

### c. Doctors as learned intermediaries and the chain of causation

Next, Defendants argue that the learned intermediary doctrine bars the Commonwealth's liability theory. A physician is an intermediary between Defendants and the patient, and the intermediary bears the responsibility to 'read and understand all warnings from the manufacturer and relay them to the patient." *See Larkin v. Pfizer, Inc.*, 153 S. W.3d 758, 770 (Ky. 2004). Defendants contend that their products contained adequate warning labels, which therefore absolves them of liability. *Id.* The FDA approved Defendants' warning labels on their products; and, Defendants contend, because the Commonwealth recognizes the presence of the warnings on the prescription bottles it cannot state a claim against Defendants based upon misleading physicians. *See Larkin*, 153 S.W.3d at 763.

The Commonwealth, alternatively, argues that the learned intermediary doctrine requires Defendants to provide an adequate warning to doctors about the potential effects of their products. *Id.* at 764. Defendants' warnings on the prescription bottles, the Attorney General avers, failed to apprise physicians of the harmful nature of the product. Further, the Commonwealth asserts that the adequacy of warnings provided to physicians constitutes an issue of material fact that cannot be dealt with on a motion to dismiss.

In *Commonwealth of Kentucky ex rel. Andy Beshear, Attorney General v. Johnson & Johnson, et al.*, Civ. Action No. 16-CI-867, Order on Motion to Dismiss at 6-7 (Franklin Circuit Court June 7, 2017), this Court held that

> …the learned intermediary doctrine applies in this jurisdiction. Physicians, who have studied medicine, are better learned in medical science than the average consumer to interpret Defendants' marketing of products. Therefore, Plaintiff must distinguish claims brought on behalf of physicians who relied on the alleged misrepresentations when prescribing the surgical mesh product to patients, and claims brought on behalf of consumers who relied on Defendants' specific representations about the product when choosing to use the product.

**\*4**  The Court holds that the Office of the Attorney General must distinguish claims that it brings on behalf of physicians who relied on Defendants' representations, and those on which the consumers of the prescriptions relied. To hold in opposition to the *Johnson & Johnson* ruling in this matter would imply that doctors issuing prescription opioids are held to a different standard than those who treat any other ailment Kentuckians suffered. Therefore, the Court requires the Commonwealth, pursuant to the learned intermediary doctrine, to specify claims of misrepresentation as they relate to consumers who chose to use Defendants' products and physicians who prescribed opioids to patients.

### d. Causation and costs of Commonwealth addressing consequence of diversion and abuse

Defendants' final attack on the Commonwealth's causation argument is that the Office of the Attorney General cannot prove a causal link between Defendants' alleged misrepresentations and all opioid diversion and abuse costs that the state has incurred. Defendants contend that under the theory of proximate causation other illegal acts surrounding the misuse of opioids and other opiate abuse and problems in the Commonwealth constitute superseding causes and intervening acts that break the chain of causation from any alleged misrepresentations Defendants made about their products. *Bruck v. Thompson*, 131 S.W.3d 764, 767-69 (Ky. App. 2004).

The Commonwealth counters Defendants' arguments with the notion that intervening acts only break the causal chain if an act is a superseding cause, which is rooted in an event entirely independent of the original liability and that the original actor could not reasonably foresee. *Bruck v. Thompson*, 131 S.W.3d at 767-68. The Attorney General contends that the third-party actions that contributed to Kentucky's opioid crisis were foreseeable and were, in fact, a direct consequence of Defendants' alleged misrepresentations. The Commonwealth asserts that it has adequately alleged that Defendants' conduct served as the proximate cause for the harms.

The Court holds that the issue of proximate cause is a factual determination that is unsuited for a decision at the juncture of a motion to dismiss. The Commonwealth has adequately pled that the results of Defendants' alleged misrepresentations served as a proximate cause for the harms the Commonwealth has endured from the opioid epidemic. The presence of intervening causes and the relative foreseeability of each superseding event is a factual question that is inappropriate for the Court to decide at this time.

## II. Particularity

Defendants next assert that the Commonwealth's claims do not meet the particularity required by CR 9.02, Kentucky's pleading standard for claims based in fraud. Conversely, the Office of the Attorney General contends that CR 9.02 does not apply to the Commonwealth's claims for public nuisance, unjust enrichment, which do not sound in fraud and are subject to CR 8.01(1); nor the claims founded in the Kentucky Consumer Protection Act, which contains its own standard for pleading.

The Court holds that the Commonwealth is not required to meet the pleading standards in CR 9.02 because the Attorney General does not bring fraud claims, but rather it asserts claims based on other common law causes of action or the Kentucky Consumer Protection Act. This Court previously addressed this issue, as it pertained to the Kentucky Consumer Protection Act in *Commonwealth of Kentucky ex rel. Andy Beshear, Attorney General v. Johnson & Johnson, et al.*, Civ. Action No. 16-CI-867, Order on Motion to Dismiss at 4-5 (Franklin Circuit Court June 7, 2017):

The KCPA deems "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" unlawful. Ky. Rev. Stat. § 367.170(1). To bring a claim under the KCPA against Defendants for misleading and omitted representations about a surgical mesh device, Plaintiff must show that Defendants committed an act or engaged in a practice in the conduct of trade or commerce of the surgical mesh product that was unfair, false, misleading, or deceptive. *Id.* The legislature enacted this statute with the intention to provide a remedy for consumers who have allegedly suffered wrongs based upon consumer transactions with an entity engaged in commerce. The nature of the claim, limited in this way to "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" specify the nature of the claims that qualify under the KCPA. Unlike common law fraud claims for which CR 9.02 requires heightened pleading particularity standards, the legislature has determined the qualities of claims brought under the KCPA. Therefore, the Court rejects Defendants' argument that Plaintiff's claims are based in fraud and must comply with CR 9.02. This matter falls under the purview of KCPA, and the pleading particularity enumerated in CR 9.02 is irrelevant.

**\*5** Similarly, in this case, the Court holds that the Commonwealth need not meet the heightened fraud pleading requirements contained in CR 9.02. Rather, the state must meet the requirements set forth in CR 8.01 for the nuisance and unjust enrichment claims and the requirements set forth in the Kentucky Consumer Protection Act for the consumer protection claims.

The Court holds the Commonwealth's pleadings to be sufficient to plead claims for which relief may be granted, and the Court denies Defendants' arguments that the Commonwealth must be required to abide by a standard of heightened

particularity in pleading. However, as noted above, this is a jurisdiction that recognizes the learned intermediary doctrine. The Commonwealth must specify the claims of misrepresentation that relate to doctor and those that relate to patients.

### III. Claim Specific Reasons

#### a. Statutory false claims

Defendants contend that the Medicaid Fraud Statute, KRS § 205.8451(2), imposes civil liability exclusively for providers, which the statute defines as an entity "which is providing or has been approved to provide medical services, goods, or assistance to recipients under the Medical Assistance Program." *Id.*, at (17). Defendants manufacture pharmaceutical drugs and do not supply patients with prescriptions, therefore they argue that they are not liable under KRS § 205.8451 for any alleged Medicaid Fraud. Further, Defendants similarly assert that they are not liable under the Assistant Program Fraud Statute and the Fraudulent Insurance Acts Statute because they do not receive benefits from any assistance program. Ky. Rev. Stat. § 194.A505(6); Ky. Rev. Stat. § 304.47-020(1)(a). Reimbursement for these assistance programs exclusively goes to physicians who participate in the Kentucky Medicaid Program, not drug manufacturers. 907 KAR 3:010 § 2. Courts in other jurisdictions, Defendants aver, have dismissed analogous claims against pharmaceutical drug manufacturers because they do not meet the statutory definitions for providers or recipients of payments from state assistance funds. *See In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*, 190 So. 3d 829, 857-58 (Miss. 2015).

Conversely, the Attorney General asserts that Defendants' arguments fail for three reasons. First, the Commonwealth contends that the scopes of each of the fraud statutes in question reach any defendant that causes physicians to submit false claims for payment or participate in fraudulent schemes. Defendants' alleged misrepresentations, according to the Commonwealth, satisfy this component of liability. Next, the Commonwealth argues that KRS 446.070, Kentucky's negligence *per se* statute, allows recovery for damages even if the violated statute does not explicitly provide civil damages. Third, the Attorney General argues that the Medical Fraud Statute and the Fraudulent Insurance Act do not require the Commonwealth to prove the six element of common law fraud.

The Kentucky Medicaid Fraud Statute imposes civil liability against any person who "intentionally, knowingly, or wantonly…cause to be made or presented to an employee or officer of the Cabinet for Health and Family Services any false, fictitious, or fraudulent statement, representation, or entry in any application, claim, report, or document used in determining rights to any benefit or payment. Ky. Rev. Stat. § 205.8463(2). The Court holds that the Commonwealth has sufficiently pled allegations against Defendants that satisfy this component of Medicaid Fraud liability. Further, under the Kentucky Assistance Program Fraud Statute, the Court holds that the Commonwealth has sufficiently pled allegations as to Defendants "scheme or artifice to obtain benefits from any assistance program by means of false or fraudulent representations…" Ky. Rev. Stat. § 194.A505(6). Similarly, under the Fraudulent Insurance Acts Statutes, the Attorney General has sufficiently pled allegations that would impose potential liability against Defendants. Ky. Rev. Stat. § 304.47-020(1)(a). Whether or not Defendants were "providers," as defined by the statute, the Court is persuaded that KRS 446.070 creates a cause of action for civil damages is irrelevant because the statutes on which the Commonwealth relies serve the purpose of ferreting out fraudulent behavior in Kentucky. Therefore, any allegedly fraudulent action conducted in concert with the causes of action in each statute create a viable claim for civil liability.

#### b. Public nuisance

**\*6** Defendants also assert that the Commonwealth failed to plead an essential element of public nuisance: the interference with a public right. "A public right is one common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured." Restatement (Second) of Torts § 821B cmt. G (Am. Law Inst. 1979). Defendants contend that the injuries experienced by individual patients by the mis-prescription of Defendants' pharmaceuticals constitute private rights, not public rights. Defendants also express concern about the policy of potentially expanding the public nuisance doctrine.

The Attorney General argues that the Restatement identifies three circumstance that may "sustain a holding that an interference with a public right is unreasonable":

(a) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon a public right.

Restatement (Second) of Torts § 821B. The Commonwealth argues that Defendants' alleged conduct interferes with public health, violates Kentucky laws, and has produced harmful effects in the state, and therefore Defendants violated Kentucky's public rights.

The Court holds that the Commonwealth has sufficiently pled its public nuisance claim. The Kentucky Supreme Court adopted the Restatement Second of Torts' definition of public nuisance. The opioid crisis in Kentucky has caused a public health crisis and crime crisis throughout the Commonwealth. The Commonwealth's pleadings have alleged a claim that Defendants have interfered with public health, Defendants have violated a Kentucky statute, and Defendants misrepresented the effects of its products to physicians in the Commonwealth. The Court holds that the Attorney General has clearly pled that Defendants' conduct allegedly violates a public right in the state and may proceed with the public nuisance claim.

### c. Kentucky Consumer Protection Act

Finally, Defendants argue that the claim under the Kentucky Consumer Protection Act fails to allege conduct that would qualify as an unfair act or practice, and the Attorney General conflates restitution and damages with the remedy it prays from the Court.

The Court holds that the Attorney General's Kentucky Consumer Protection Act pleadings are sufficient to survive a motion to dismiss. The Commonwealth pled that the Defendants' conduct was "false, misleading, and deceptive," which meet the statutory language of the Kentucky Consumer Protection Act, in addition to being "unfair." Next, the Court holds that the Commonwealth has pled a remedy adequate for the claim it brings in its complaint. The Court, at the final disposition of the case, if a remedy is in fact warranted from the merits of this case, will resolve any problems related to damages or restitution at that time.

### CONCLUSION

The Court **DENIES** Defendants' *Motion to Dismiss*. Plaintiff has alleged claims for which relief may be granted against Defendants. The Commonwealth, however, must specify any claims of misrepresentation Defendants made to physicians directly and to consumers of opiate prescription drugs directly.

**SO ORDERED,** this 10th day of July, 2018.

<<signature>>

**THOMAS D. WINGATE**

**Judge Frankling Circuit Court**