2020 WL 416406
Only the Westlaw citation is currently available.
Superior Court of Massachusetts,
Suffolk County, Business Litigation Session.
CITY OF BOSTON et al.[1]
v.
PURDUE PHARMA, LP et al.[2] (and a companion case)[3]
1884CV02860
|
January 3, 2020

*MEMORANDUM OF DECISION AND ORDER ON THE DEFENDANT MANUFACTURERS' RULE 12(b)(6) MOTIONS TO DISMISS*

Janet L. Sanders, Justice of the Superior Court

**\*1** The Cities of Boston and Springfield (Cities) commenced these actions against opioid manufacturers (Manufacturer Defendants), opioid distributors, retail pharmacies, and certain individuals, whom they allege each played a role in causing the over-prescription and diversion of prescription opiates in the Cities. The Cities allege that this flood of opiates brought about a crisis of addiction that has caused them severe damage. The matter is presently before the Court on the Manufacturer Defendants' Motions to Dismiss pursuant to Mass.R.Civ.P. 12(b)(6).[4] The Court heard oral argument on the motion on October 21, 2019. For the following reasons, the Motion is *DENIED*.

## BACKGROUND

The Boston and Springfield Complaints contain substantially similar allegations against many of the same Manufacturer Defendants. Those named in both actions are: Purdue; Teva Pharmaceuticals USA, Inc. and Cephalon, Inc. (collectively, Cephalon); Johnson & Johnson and Janssen Pharmaceuticals, Inc. (collectively, Janssen); Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc. (collectively, Endo); and Mallinckrodt, LLC and Mallinckrodt, PLC (collectively, Mallinckrodt). In addition, the Springfield Complaint names opioid manufacturers Collegium Pharmaceuticals (Collegium); and Allergan, PLC; Allergan Finance, LLC; Watson Laboratories, Inc.; Actavis, LLC; and Actavis Pharma, Inc. (collectively, Actavis).[5,6] Except for facts concerning Collegium and Actavis (which are limited to the Springfield Complaint) and as otherwise noted, the following allegations are common to both Complaints and are taken as true for purposes of the instant motions.

### 1. The Manufacturer Defendants' Campaign to Sell Opioids for Chronic Pain

**\*2** Each of the Manufacturer Defendants make and sell prescription opioid medication. Opioids are chemical substances closely related to heroin. As such, they dampen a person's perception of pain, but they can also cause a euphoric high. Opioid use carries with it the risk of respiratory depression, which at high doses can be fatal.

When a patient takes opioid medication for pain relief, increasing doses are often needed to achieve the same level of relief. As doses increase in response to tolerance, the risk of respiratory depression increases as well. Even after a few weeks of therapy, opioid disuse may trigger withdrawal symptoms, including anxiety, nausea, headache, tremors, delirium, and pain. Where opioids are taken in larger doses, withdrawal symptoms upon cessation of the drugs become worse. High dosing strength and extended therapy are correlated to an increased risk of opioid addiction. Opioid addicts who are unable to satisfy their overwhelming cravings through legally obtained prescriptions will often turn to the illegal drug trade. Due to these serious risks, until the mid-1990s, the market for prescription opioids was limited to palliative, end-of-life care and short-term acute pain relief.

In the late 1990s and early 2000s, certain Manufacturer Defendants (with the exception of Collegium, which entered the market much later) began a campaign within the medical community to change the narrative about opioids from the narrow view previously espoused to one advocating for their use over longer periods of time. The category of patients receiving treatment was also

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.                              1

Case 3:17-cv-01362   Document 1290-9   Filed 04/26/21   Page 2 of 18 PageID #: 43475

City of Boston v. Purdue Pharma, LP, Not Reported in N.E. Rptr. (2020)

2020 WL 416406

expanded to include, for example, those suffering from lower back pain or osteoarthritis. At the same time that they worked to change the narrative, the Manufacturer Defendants knew that there was no scientific evidence supporting the long-term use of opioids for chronic pain, particularly when compared to less risky treatments. The Manufacturer Defendants nonetheless launched a multi-faceted, misleading, and deceptive marketing campaign touting the use of opiates for chronic pain so that they could sell more products.

One of the keys to the Manufacturer Defendants' strategy was minimizing addiction risk while at the same time overselling opioids' therapeutic benefit. The Manufacturer Defendants claimed, with no supporting evidence, for example, that opioid therapy would improve patients' quality of life and overall functioning. To increase profits, the Manufacturer Defendants asserted that patients' pain was undertreated, and that higher, more expensive doses were needed if treatment was to be effective. In particular, they advanced the now discredited concept of "pseudo-addiction": unlike true addiction, which would be a cause for alarm, pseudo-addiction meant only that patients needed more opiates because that was what was necessary to relieve their pain. The Manufacturer Defendants falsely asserted that addiction risk was minimal and could be easily managed; at the same time, they failed to disclose just how difficult it was for a patient to discontinue opioid use.[7]

**\*3** The Manufacturer Defendants' deceptive marketing messages were delivered in two ways: 1) through the marketing of particular brands by aggressive sales representatives, and 2) through the use of seemingly independent third-party sources of information designed to influence doctor prescribing. These third-party sources included key opinion leaders (KOLs) and front groups, such as the American Pain Foundation and the American Pain Society. The KOLs were typically doctors who, in return for receiving financial benefits from the Manufacturer Defendants, advocated for the use of opioids through speaking engagements and other work, including in continuing medical education (CME) programs. Front groups, largely funded by the Manufacturer Defendants, published biased "education guides" and other tools that were widely disseminated to doctors and patients.

2. Manufacturer-Specific Allegations

The Complaints also set out allegations specific to each of the Manufacturer Defendants. The allegations against Purdue are substantially similar to those against it in separate litigation brought by the Attorney General and have already been summarized in this Court's decision dated September 17, 2019 (the September 2019 Purdue Decision), denying Purdue's Motion to Dismiss and will not be repeated here. See *Commonwealth v. Purdue Pharma,* 2019 WL 5495866, Civ. No. 1884-01808-BLS 2 (Mass. Super. September 17, 2019) [36 Mass. L. Rptr. 56] (*Purdue*). Apart from Purdue, allegations specific to each Manufacturer Defendant are as follows.

1. *Cephalon*. Cephalon manufactures two fentanyl-based opioids: Actiq, a lollipop or lozenge, and Fentora, a buccal tablet, for the treatment of cancer pain in opioid-tolerant individuals. Despite having Food and Drug Administration (FDA) approval for only this use, Cephalon marketed these products for the treatment of chronic pain through its sales force, the use of KOLs, CMEs, speaker programs, and publications.

Cephalon sponsored a 2007 publication of the Federation of State Medical Boards entitled *Responsible Opioid Prescribing* that falsely stated that long-term opioid therapy improves patient functioning. It purchased the book in bulk to distribute through its sales force. In 2007, Cephalon also sponsored a front group publication and a CME program that each made similar claims about patient functioning. Cephalon sales representatives made the same misrepresentation to prescribers.

Cephalon also misrepresented the risk of opioid addiction through these sponsored publications and its sales force. One such patient guide stated: "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids." Another sponsored publication provided that patient agreements would prevent addiction, and *Responsible Opioid Prescribing* described the concept of pseudo-addiction. These publications also suggested that high-dose opioid therapy was safe, and failed to disclose the risks of opioids as compared to other analgesics. Sales representatives further advanced the falsehood that other analgesics are more toxic than Cephalon's opioids.

In a 2008 plea agreement with the United States, Cephalon agreed to pay $50 million to settle charges against it for the off-label marketing of its products, including Actiq. In a separate civil suit, Cephalon agreed to pay $375 million to resolve False Claims Act charges also related to off-label marketing. Speaking about the charges, the Acting U.S. Attorney involved noted that the company had been selling Actiq lollipops as if they were

Case 3:17-cv-01362   Document 1290-9   Filed 04/26/21   Page 3 of 18 PageID #: 43476

City of Boston v. Purdue Pharma, LP, Not Reported in N.E. Rptr. (2020)
2020 WL 416406

"actual lollipops." Springfield Complaint Table 9 at 107-08, ¶¶346-50; Boston Complaint ¶¶26, 101, 106-13, 117.

2. *Janssen*. Janssen manufactures the fentanyl-based transdermal patch Duragesic and, until 2015, manufactured the opioid tablet Nucynta. It sponsored a 2009 publication targeting older adults that its personnel reviewed and approved and that its salesforce distributed. The publication deceptively stated that "opioids may make it easier for people to live normally" and omitted discussing the risks of high-opioid dosing. Also in 2009, Janssen sponsored, developed, and approved content for a front-group-created website, *Let's Talk Pain,* propounding the same falsehoods about improved quality of life. Janssen targeted veterans by funding the distribution of an American Pain Foundation publication, *Exit Wounds,* which likewise asserted that opioids increase patient functioning at the same time that it omitted critical risk information. Janssen sales representatives repeated these misrepresentations to prescribers.

***4** These same Janssen-sponsored publications misrepresented the risk of addiction. One deemed it "rare" and called addiction a "myth." The *Let's Talk Pain* website discussed pseudo-addiction. A Janssen-sponsored CME falsely asserted "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." Janssen currently runs a website, *PrescribeResponsibly.com,* which maintains that concerns about opioid addiction are "overstated."

Janssen sales representatives reinforced this narrative. They falsely told prescribers that Janssen products were less addictive or likely to be abused, and that Nucynta is not an opioid. In fact, Nucynta's label confirms that it is an opioid agonist and Schedule II drug. They also omitted discussion of the addiction risk associated with Janssen's opioid products, Nucynta in particular. Sales representative training materials contained these misrepresentations, including unsupported statements about reduced withdrawal symptoms associated with Nucynta. Springfield Complaint at Table 9, 110-13, ¶¶135, 285; Boston Complaint ¶¶27-29, 71-72, 82, 101-02, 117.

3. *Endo*. Endo manufactured the oxymorphone tablets Opana and Opana ER until 2017, when, at the request of the FDA, it removed them from the marketplace. The FDA found that "the benefits of the drug may no longer outweigh its risks." Endo continues to manufacture Percodan, an oxycodone tablet.

Endo sales representatives and marketing materials informed prescribers that its opioids would improve patient functioning, but failed to discuss addiction risk. Sales representatives also falsely told prescribers that other analgesics were more toxic than opioids. Like other Manufacturer Defendants, Endo funded the distribution of *Responsible Opioid Prescribing* and *Exit Wounds,* which contain misrepresentations about opioid benefits and addiction risk. Endo sponsored a pain website, *painknowledge.com,* which provided that opioid treatment will improve a patient's functioning, and stated that "[p]eople who take opioids as prescribed usually do not become addicted." Another Endo website made similar misleading statements about addiction risk. Endo-sponsored CMEs likewise promised improved functioning, and deceptively minimized addiction risk. One such CME stated that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse." Endo also distributed a pamphlet edited by KOL Dr. Russell Portenoy, which falsely implied that patients taking opioids for pain relief will not become addicted.

In 2016, Endo entered into a settlement agreement with the New York State Attorney General regarding its unsupported advertising claims. As part of the settlement, Endo paid a $200,000 penalty and agreed to refrain from making statements in New York that: 1) Opana ER or opioids generally are non-addictive; 2) most patients who take opioids do not become addicted; and 3) use the term pseudo-addiction in any training or marketing. Springfield Complaint at Table 9, 122, ¶¶79-84, 320-27; Boston Complaint ¶¶31, 69-70, 94-95, 101-02, 116-17.

4. *Mallinckrodt*. Mallinckrodt manufactures Exalgo, a hydromorphone tablet, and Roxicodone, an oxycodone tablet. Another oxycodone tablet it manufactured, Xartemis, has since been discontinued. Mallinckrodt is also one of the largest manufacturers of generic oxycodone. In 2010, Mallinckrodt sponsored an initiative called C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance, through which it published and promoted a book intended for laypersons, *Defeat Chronic Pain Now!*, which is still available online. The book contains false and misleading statements about the risk of addiction, including statements that addiction is rare in people without a recent history of drug and alcohol problems, and that the issue of tolerance is "overblown" and can be "easily remedied."

***5** Until at least 2009, Mallinckrodt provided an education grant to a now defunct, unbranded website, *Pain-Topics.org,* which promoted itself as a resource for healthcare professionals. Among other content, the

**City of Boston v. Purdue Pharma, LP, Not Reported in N.E. Rptr. (2020)**
2020 WL 416406

website included a handout advising practitioners that "[p]atients' fears of opioid addiction should be dispelled" and contained a section describing pseudo-addiction, and the related phenomena "therapeutic dependence" and "pseudo-opioid resistance." False and misleading assertions about these concepts included the statement that: "Patient anxieties about receiving inadequate pain control can be profound, resulting in demanding or aggressive behaviors that are misunderstood by healthcare practitioners and ultimately detract from the provision of adequate pain relief." Mallinckrodt also created a document, "Commonsense Oxycodone Prescribing & Safety," which falsely suggested that generic oxycodone is less prone to abuse and diversion than branded oxycodone.

In 2009, Mallinckrodt received a warning letter from the FDA regarding its misbranding and marketing of an unapproved morphine formulation. Springfield Complaint at Table 9, 119-22, ¶¶74-75, 168; Boston Complaint ¶¶33, 73-76.

5. *Collegium*. Collegium manufactures the opioid Xtampza ER, an extended release oxycodone tablet, which it began selling in April 2016. In September 2016, an office of the FDA sent Collegium advisory comments about its promotion of Xtampza, recommending that it not misrepresent its approved indication, or omit risk information. In February 2018, citing the earlier comments, the FDA sent a warning letter about a certain Collegium promotion, stating that it created a misleading impression about the drug's safety, including about Xtampza's risk of addiction, abuse, misuse, overdose, and death.

Nevertheless, at a 2018 speaking engagement, Collegium's vice president deceptively minimized Xtampza's risk for use in the elderly, and in a March 2018 Securities and Exchange Commission filing, Collegium falsely stated that prescription opioids remain the primary treatment for chronic pain. Collegium has also deceptively marketed the abuse-deterrent properties of Xtampza, falsely suggesting that abuse-deterrence somehow minimizes addiction risk. This claim is false for many reasons, including that the primary avenue of opioid abuse is through overuse, which is not addressed through abuse-deterrent formulations.

Even though other opioid manufacturers have now ceased using aggressive in-person sales tactics, Collegium still engages in this discredited practice. Collegium sales representatives falsely assert that its products should be used even when other safer methods have not been tried and shown to be ineffective. Collegium also uses KOLs to market its opioids. Springfield Complaint Table 9 at 109-10, ¶¶135, 281-85.

6. *Actavis*. Actavis manufactures Kadian, an extended-release morphine tablet, and Norco, a hydrocodone and acetaminophen tablet. It misleadingly advertised Kadian as a product that would allow chronic pain patients to return to work and enjoy their lives. Despite a 2010 FDA warning about that marketing claim, Actavis sales representatives continued to repeat the falsehood that opioid therapy improves patients' quality of life and functioning. Sales representatives also made misleading statements to prescribers about Kadian's abuse-deterrent formulation, falsely stated that other analgesics are more toxic than opioids, and omitted from their statements any discussion about addiction risk.

A 2010 Actavis training module contained many false and misleading statements. It minimized risk addiction, falsely stating that long-acting opioids are less addictive than short-acting ones, and that most patients who abuse opioids have a drug problem before entering a medical practice. It also referred to pseudo-addiction, suggested that high-dose opioids are safe, and advised sales representative to tell prescribers that they can use risk screening tools to limit the development of addiction, and that discontinuing opioid therapy can be handled "simply," at home, with the withdrawal period lasting about a week, even in addicted patients. These assertions are unsupported. See Springfield Complaint Table 9 at 117-19, ¶¶147-78, 328-30.

### 3. Harms Alleged

**\*6** The Complaints allege that the Cities have been severely harmed by the Manufacturer Defendants' actions in promoting illegitimate opioid prescriptions. The Springfield Complaint refers to a "devastating public health epidemic[ ] of addiction and overdose" in Springfield while the Boston Complaint alleges that, "by increasing opioid prescriptions and use, defendants collectively fueled the opioid epidemic and significantly harmed Boston and its residents." Springfield Complaint ¶414, Boston Complaint ¶294. For purposes of these motions, this Court assumes these allegations are true.

The specific harms alleged include the costs of treating indigent persons affected by opioid addiction, including first aid, hospitalizations resulting from overdoses, addiction treatment costs, and the care of other illnesses

Case 3:17-cv-01362   Document 1290-9   Filed 04/26/21   Page 5 of 18 PageID #: 43478

City of Boston v. Purdue Pharma, LP, Not Reported in N.E. Rptr. (2020)
2020 WL 416406

made more complex by opioid addiction. Increased funds have also been required for the implementation of prevention efforts, law enforcement efforts, neonatal care for addicted newborns, maternal care for addicted mothers, and care for children whose parents suffer from opioid addiction. The training of emergency personnel, including police officers, firefighters, and first responders, in the effective use of naloxone, which blocks opioid overdoses, and the purchase of the naloxone itself are another significant cost.

The Cities additionally cite the costs associated with cleaning public spaces of needles and other opioid-use-related detritus, the loss of property values and tax revenue from areas where the opioid epidemic has taken root, and decreases in the available labor market. Boston alleges particular harm to the residents of its public housing, where opioid addicts have broken in and taken up residence in hallways and stairwells, leaving behind needles, urine, and feces. Boston Complaint ¶323. The Cities have also suffered losses through the diversion of funds meant for other public services to public services aimed at combating the opioid epidemic. Springfield Complaint ¶¶416-82; Boston Complaint ¶¶310-51.

### 4. The Present Actions

The Springfield Complaint asserts the following claims against the Manufacturer Defendants: public nuisance (Count 1); common-law fraud (Count 2); negligent misrepresentation (Count 3); negligence (Count 4); violations of G.L.c. 93A (Count 5); unjust enrichment (Count 6); and civil conspiracy (Count 7). The Boston Complaint alleges claims of: public nuisance (Count 1); violations of G.L.c. 93A (Count 2); negligence and negligence misrepresentation (Count 3); fraud and fraudulent misrepresentation (Count 4); and unjust enrichment (Count 5).

### DISCUSSION

The standard that this Court applies to the instant motions is well established. Although the complaint must contain more than "labels and conclusions," *Iannacchino v. Ford Motor Co.,* 451 Mass. 623, 636 (2008), the "ultimate inquiry" is whether the plaintiffs have alleged adequately detailed facts "so as to plausibly suggest an entitlement to relief." *Greenleaf Arms Realty Trust, LLC v. New Boston Fund, Inc.,* 81 Mass.App.Ct. 282, 288 (2012) (reversing lower court's allowance of Rule 12(b)(6) motion). Plausibility is not the same as credibility. Thus, that the complaint relies on facts that are improbable does not support dismissal as long as those allegations, "even if doubtful in fact[,]" "raise a right to relief above the speculative level." *Iarmachino,* 451 Mass. at 636, quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). Finally, this Court must draw all reasonable inferences from those factual allegations in favor of the nonmoving party. *Greenleaf Arms Realty Trust, LLC,* 81 Mass.App.Ct. at 288.

**\*7** The Manufacturer Defendants have jointly moved to dismiss both Complaints, filing a separate memorandum in each case. In addition to the joint motions, Cephalon and Janssen have each filed separate motions to dismiss both Complaints, and Collegium and Actavis have filed separate motions to dismiss the Springfield Complaint.[8] After careful review of the Complaints and of the parties' submissions, together with consideration of court decisions in other jurisdictions where opioid-related cases have been brought against the same defendants, this Court concludes that none of the Manufacturer Defendants' joint and separate arguments warrant dismissal of the Cities' Complaints. Indeed, this Court has already examined and rejected many of the same arguments raised here in the September 2019 Purdue Decision. This Court nevertheless summarizes its reasons for rejecting these joint and separate arguments.

### I. Joint Arguments

#### A. Federal Preemption

As Purdue did in the litigation against it by the Attorney General, the Manufacturer Defendants (including Purdue) argue that the Cities' claims are in impermissible conflict with FDA decisions approving the sale of their prescription opioid medications. Citing the FDA approval of opioids for the treatment of chronic pain together with its approval of labeling that includes prominent warnings, the Manufacturer Defendants maintain that their alleged conduct falls within those federally set bounds. Stated another way, the Cities (it is argued) are seeking to

Case 3:17-cv-01362 Document 1290-9 Filed 04/26/21 Page 6 of 18 PageID #: 43479

City of Boston v. Purdue Pharma, LP, Not Reported in N.E. Rptr. (2020)
2020 WL 416406

prevent the Manufacturer Defendants from selling a legal product. This Court rejects this preemption argument.

The September 2019 Purdue Decision sets out the relevant law of federal preemption. *Purdue,* 2019 WL 5495866 at *3. In a nutshell, preemption does not apply unless the restraints the lawsuit seeks to impose would make compliance with both federal and state laws and regulations impossible. As did Purdue in that other litigation, the Manufacturer Defendants here take an unsupported view of the Complaints in advocating their position. A fair reading of the Complaints suggests that the Cities do not seek to remove opioids from the market, require additional warnings, or change opioid labeling. Rather, the allegations detail numerous instances of marketing that were *inconsistent* with the product labels, most notably the minimization of addiction risk. The Complaints also allege that the Manufacturer Defendants made marketing claims unsupported by scientific evidence—namely, that opioids would improve patients' quality of life and functioning and that other analgesics are more toxic than opioids. The Manufacturer Defendants make no argument that these alleged misrepresentations enjoy specific FDA approval or that the FDA has required the defendants to make such claims in the sale and distribution of their products. That these claims are not preempted is also consistent with conclusions reached by numerous other courts against these same defendants. See, e.g., *In re Nat'l Prescription Opiate Litig.,* 2018 WL 4895856, at *23 (Report and Recommendation), adopted in relevant part, 2018 WL 6628898, at *1 (Opinion and Order) (N.D. Ohio 2018).

### B. Causation

The Manufacturer Defendants' causation arguments are almost identical to those that Purdue made in the case against it brought by the Attorney General. Chief among these is their argument that the learned intermediary doctrine breaks the chain of causation so that the Manufacturer Defendants cannot as a matter of law be a cause of the harm for which the Cities seek compensation. This doctrine is based on the proposition that a drug manufacturer's duty to warn may be discharged if the manufacturer provided an adequate warning to the prescribing doctor, who is presumed to make an independent and educated prescribing decision. As explained in this Court's September 2019 Purdue Decision, the chain of causation would not be broken if the prescribing decision was affected by the deceptive and misleading conduct of the manufacturer. *Purdue,* 2019 WL 5495866 at *5. That is precisely what is alleged here.

**\*8** At oral argument on these motions, the Manufacturer Defendants apart from Purdue did raise one difference (at least in their view) between the Cities' cases and the case brought against Purdue by the Attorney General: as compared to Purdue, the other Manufacturer Defendants occupy only a small percentage of the opioid market, and yet they are lumped together with Purdue in the Cities' efforts to pin responsibility on them for what is a complex problem.[9] While this market share argument has some appeal, it necessarily depends on disputed questions of fact that cannot be decided on a motion to dismiss. That any one defendant may have had only a small market share, for example, may not get that defendant off the hook if the Manufacturer Defendants collectively worked together in creating a false narrative about the benefits of opioids that in turn can be causally connected to the opioid epidemic. Moreover, although there are doubtless other factors that contributed to causing the epidemic, they do not absolve the Manufacturer Defendants of responsibility and would, in any event, require a factual record. For example, the role that the illicit drug trade played in the opioid epidemic, and whether the Manufacturer Defendants' conduct led to the diversion of prescription opioids into the black market, are questions of fact.

In order to show proximate cause, the Cities will ultimately have to prove that the injuries for which they seek compensation are the foreseeable results of each defendant's conduct, and that the defendant's role in causing the harm was not insignificant. Proving that may very well be difficult to do. At this point in the litigation, however, this Court is not deciding the likelihood that the Cities will be able to shoulder that burden, but only whether the allegations of the Complaints are sufficient. This Court concludes that the Complaints here set forth plausible, foreseeable, and direct harms that are causally connected to the wrongful conduct alleged.

### C. Public Nuisance

The Manufacturer Defendants make the same arguments with regard to the public nuisance claims against them that Purdue made in the case brought against it by the Attorney General. This Court rejected those arguments in its September 2019 Purdue Decision and sees no reason to reach a different result here. *Purdue,* 2019 WL 5495866

Case 3:17-cv-01362   Document 1290-9   Filed 04/26/21   Page 7 of 18 PageID #: 43480

City of Boston v. Purdue Pharma, LP, Not Reported in N.E. Rptr. (2020)
2020 WL 416406

at *4-*6. Although a public nuisance claim requires an interference with a public right, conduct that significantly interferes with public health and safety meets that requirement. For example, Courts have allowed public nuisance claims to go forward against cigarettes manufacturers, see *Evans v. Lorillard Tobacco Co.,* 2007 WL 796175, at *18-*19 (Mass.Super.Ct. 2007) [22 Mass. L. Rptr. 91], and firearms makers, see *Boston v. Smith & Wesson Corp.,* 2000 WL 1473568, at *14 (Mass.Super. 2000) [12 Mass. L. Rptr. 225] (*Smith & Wesson*). In the instant cases, the Complaints adequately allege a significant interference with public health and safety.

### D. G.L.c. 93A

The Manufacturer Defendants make two arguments as to why this claim should be dismissed. The first argument (closely related to the preemption claim) is that their conduct falls within the "permitted practice" exemption to c. 93A liability that is set forth in G.L.c. 93A, § 3. This is the same argument that Purdue made in the case brought against it by the Attorney General. This Court concludes that this argument has no merit, for the same reasons set forth in the September 2019 Purdue Decision. *Purdue,* 2019 WL 5495866 at *4.

The second argument merits some discussion. It is that the c. 93A claims must be dismissed because the Cities were not engaged in trade or commerce as G.L.c. 93A, §§ 2 and 11 require; as a consequence, the Cities have no standing to assert a c. 93A violation. Relevant factors that a court should consider in deciding whether an entity is engaged in trade or commerce include "the nature of the transaction, the character of the parties and their activities, and whether the transaction was motivated by business or personal reasons." *All Seasons Services, Inc.,* 416 Mass. 269, 271 (1993), citing *Begelfer v. Najarian,* 381 Mass. 177, 191 (1980). That the conduct at issue had some commercial aspects to it is not necessarily enough to show that the plaintiff was engaged in trade or commerce. Similarly, the mere fact that the plaintiff is a public entity does not mean that it cannot pursue a 93A claim. Rather, whether a public entity has standing to assert a c. 93A claim turns on determining whether the entity entered into a commercial transaction in pursuit of a public purpose (in which case the public entity has no standing) or whether it was instead acting in a purely "business context." *All Seasons Serv., Inc.,* 416 Mass. at 271 (citation omitted). Determining the difference is not an easy task. For example, in *All Seasons,* the SJC held that a publicly funded hospital did not engage in trade or commerce in managing vending machines because the contracts in question did not generate any profit for the hospital and were incidental to its public purpose. In contrast, a public hospital *was* held to be engaged in trade or commerce where it was acting as an assignee of patients' claims against the defendant insurance company. *Boston v. Aetna Life Ins. Co.,* 399 Mass. 569, 575 (1987).

**\*9** In the instant cases, the question is a close one. The Cities contend that their direct purchases of opioids from the Manufacturer Defendants through their self-funded health care plans constitute trade or commence. Springfield Complaint ¶441; Boston Complaint ¶296. Springfield also cites opioid and opioid-related payments through its self-funded workers' compensation program. The Cities argue that they engaged in in these transactions not for the benefit of the public at large but for the benefit of individual city employees. Moreover, the transactions were not part of the broader governmental services that municipalities provide their residents, nor were they undertaken pursuant to a legislative mandate. Compare *Lafayette Place Assoc. v. Boston Redevelopment Auth.,* 427 Mass. 509, 535-36 (1998) (urban renewal agency that entered into land sale with private entity pursuant to its legislatively prescribed development mandate was not engaged in trade or commerce for c. 93A purposes). The problem with the Cities' position is that the Complaints seek damages far beyond the damages that could possibly flow from the sets of transactions upon which the Cities rely in their effort to show c. 93A standing. Nevertheless, this Court declines to dismiss this Count at this early stage in the litigation, where the proper scope of damages has yet to be determined. Certainly, leaving this count in the cases will not change the scope of discovery.

### E. Negligence and Negligent Misrepresentation

The Manufacturer Defendants raise two primary challenges to the Cities' negligence claims: 1) that they owe no legal duty to the Cities to prevent harm from the illegal drug trade; and 2) that the economic loss doctrine bars recovery.

Turning first to existence of a duty, the Cities correctly observe that courts do not hesitate to impose a duty of care upon entities who participate in creating known or knowable risks and who are well situated to mitigate them. *Tobin v. Norwood Country Club, Inc.,* 422 Mass. 126, 135 (1996). The Manufacturer Defendants argue,

Case 3:17-cv-01362   Document 1290-9   Filed 04/26/21   Page 8 of 18 PageID #: 43481

City of Boston v. Purdue Pharma, LP, Not Reported in N.E. Rptr. (2020)
2020 WL 416406

however, that the Cities are attempting to impose a duty upon them to remedy harm caused by and to third parties through the illegal drug market and drug addiction. In essence, the Manufacturer Defendants recast the argument that they made with regard to causation in asserting that they cannot be held responsible for harms caused by others over whom they have no control. As already discussed above, the Complaints contain sufficient allegations of harm to patients who suffered addiction, overdose, and other consequences as a result of the Manufacturer Defendants' misrepresentations. Because the foreseeability of that harm is a question of fact that in turn defines the scope of the duty owed, the Manufacturer Defendants' argument that they have no duty cannot be decided at this early stage of the litigation.

As for the economic loss doctrine, it provides that "purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage." *Wyman v. Ayer Properties, LLC,* 469 Mass. 64, 69 (2014), quoting *FMR Corp. v. Boston Edison Co.,* 415 Mass. 393, 395 (1993). "The rule was developed in part to prevent the progression of tort concepts from undermining contract expectations[,]" *Wyman,* 469 Mass. at 70, and seeks to enforce risk-allocation among parties in defective product cases. *Id.*; *Smith & Wesson,* 2000 WL 1473568 at *9. In the instant cases, however, the Complaints do not assert contract-based claims against the Manufacturer Defendants or seek recovery that is typical of contract-based losses, such as lost profits, inadequate value, or the cost to repair and replace a defective item. See *Wyman,* 469 Mass. at 69-70. Rather, the Cities seek damages for a myriad of public costs that they allege they have been forced to expend to combat an opioid epidemic. Because the claims are not contract-related, the economic loss doctrine does not apply. See *Smith & Wesson,* 2000 WL 1473568, at *9 (economic loss doctrine inapplicable in municipality's case against firearms manufacturer); *In re Nat'l Prescription Opiate Litig.* Opinion and Order, 2018 WL 6628898, at *20 (economic loss rule inapplicable to plaintiffs' tort claims); *In re Opioid Litigation,* 2018 WL 3115102, at *27 (N.Y.Sup.Ct. 2018) (same).

### F. Adequacy of Fraud Claims

The Manufacturer Defendants argue that the fraud claims are not pleaded with particularity, as Mass.R.Civ.P. 9(b) requires. As to particular deficiencies, they cite the Complaints' use of national statistics, and their failure to allege localized facts of specific doctors acting in reliance on specific misrepresentations.

*10 The Manufacturer Defendants are correct that a plaintiff alleging fraud must identify the persons making the representation, its contents, and where and when it took place; the plaintiff should also specify the materiality of the misrepresentation, its reliance thereon, and resulting harm. *Friedman v. Jablonski,* 371 Mass. 482, 488-89 (1976). The purpose of this requirement is to place the defendant on notice of the claims against it. *Id.* The requirement also serves to safeguard defendants from unwarranted damage to their reputations. *Fitzer v. Security Dynamics Technologies, Inc.,* 119 F.Sup.2d 12, 17-18 (D.Mass. 2000). Like other courts that have examined similar complaints, this Court concludes that the Complaints here meet the requirements of Rule 9(b).[10]

The Complaints set out in copious detail the complex scheme of disinformation that the plaintiffs allege the Manufacturer Defendants engineered. That scheme included specific misrepresentations that the defendants allegedly distributed through nationally available publications and other educational materials, and directed at doctors' offices located in the Cities through the defendants' sales representatives.[11] The Complaints also allow for the permissible inference that prescribers in the Cities relied on these misrepresentations, as evidenced by the increase in opioid distribution, fatalities, overdoses, and other related costs in the Cities during the relevant time. In short, this is not a situation where fraud is pleaded by way of minimal, conclusory allegations. Moreover, the Manufacturer Defendants cannot credibly argue that the purpose behind the rule—notice of the claims against them and other safeguards—applies here, given the colossal amount of opioid litigation they have already faced.

### G. Unjust Enrichment

To prove unjust enrichment, a plaintiff must establish that: (1) it conferred a benefit upon the defendant; (2) the defendant appreciated or knew of the benefit; and (3) acceptance or retention of the benefit would be inequitable under the circumstances. *Finard & Co., LLC v. Sitt Asset Mgmt.,* 79 Mass.App.Ct. 226, 229 (2011); *Massachusetts Eye & Eye Infirmary v. OLT Phototherapeutics, Inc.,* 552 F.3d 47, 57 (1st Cir. 2009). The Complaints satisfy these elements by alleging that the

Case 3:17-cv-01362   Document 1290-9   Filed 04/26/21   Page 9 of 18 PageID #: 43482

City of Boston v. Purdue Pharma, LP, Not Reported in N.E. Rptr. (2020)

2020 WL 416406

Manufacturer Defendants unjustly benefited from opioid-related profits while the Cities expended enormous sums to abate the damage caused by those same opioid sales. See *In re Nat'l Prescription Opiate Litig.* Opinion and Order, 2018 WL 6628898, at *20-*21 (denying motion to dismiss unjust enrichment claim). This Court understands that this claim is available only if there is no adequate remedy at law and therefore that it is pleaded in the alternative. To dismiss this claim on this basis, however, would be premature. See *Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1555 (1st Cir. 1994) (parties "may be allowed to maintain alternative contentions at least until the evidence is closed").

### H. Municipal Cost Recovery Rule

**\*11** The Manufacturer Defendants argue that the municipal cost recovery rule bars the Cities from recovering the damages they seek. That rule, sometimes called the "free public services doctrine," is a common-law rule providing that "the cost of public services for protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service." *Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.,* 719 F.2d 322, 323 (9th Cir. 1983). See *Freetown v. New Bedford Wholesale Tire, Inc.,* 384 Mass. 60, 61 (1981) (no recovery for plaintiff town for its expenses in fighting fire). The court in *Flagstaff* observed, however, that "[r]ecovery has ... been allowed where the acts of a private party create a public nuisance which the government seeks to abate." 719 F.2d at 324. Those are the facts alleged here, i.e., that private parties created a public nuisance. Under these circumstances, this rule does not bar the Cities from recovery.

This conclusion is consistent with the decisions reached by many other courts that have examined this rule in the context of the nationwide opioid crisis. See *In re Nat'l Prescription Opiate Litig.* Report and Recommendation, 2018 WL 4895856, at *9 (where "chronic wrongdoers engaged in a pattern of conduct that creates great public expense" rule does not apply), citing *Cincinnati v. Beretta U.S.A. Corp.,* 95 Ohio St.3d 416, 428 (2002) (distinguishing train derailment that occurred in *Flagstaff* case, "which was a single, discrete incident requiring a single emergency response," from "the misconduct alleged in this case [that] is ongoing and persistent"). See also *State ex rel. Jennings v. Purdue Pharma L.P.,* 2019 WL 446382, at *6 (Del.Super.Ct. 2019) (declining to apply municipal cost recovery rule to case against opioid manufacturer). As Judge Polster noted in a decision rendered in the federal multistate opioid litigation, "[t]he current trend among state court judges' ruling in opioid-related cases around the country is that the municipal cost recovery rule does not apply when, as alleged here, an ongoing and persistent course of intentional misconduct creates an unprecedented, man-made crisis that a governmental entity plaintiff could not have reasonably anticipated as part of its normal operating budget for municipal, county, or in this case, tribal services." *In re Nat'l Prescription Opiate Litig.,* 2019 WL 3737023, at *8 (N.D. Ohio 2019). This Court sees no basis to diverge from this trend.

### I. Statutes of Limitations

The Boston Complaint was filed on September 13, 2018; the Springfield Complaint was filed on December 18, 2018. Claims under G.L.c. 93A have a four-year statute of limitations, G.L.c. 260, § 5A; the other tort-based claims have a three-year statute of limitations, G.L.c. 260, § 2A. The Manufacturer Defendants argue that these limitations periods bar any claim that relies on allegations predating 2014 or 2015. However, as this Court noted in the September 2019 Purdue Decision, *Purdue,* 2019 WL 5495866 at *13, the statute of limitations begins to run only when the plaintiff knew or should have known of the defendant's harmful conduct, and that is typically a question of fact. *Koe v. Mercer,* 450 Mass. 97, 101 (2007); *Doe v. Creighton,* 439 Mass. 281, 283-84 (2003); *Szymanski v. Boston Mut. Life Ins. Co.,* 56 Mass.App.Ct. 367, 370 (2002). Because the Complaints sufficiently raise factual issues about when the Cities knew or should have known about the harms alleged, and contain background information that may be relevant going forward, the statutes of limitations do not support dismissal of the Complaints at this early stage.

### J. Civil Conspiracy

The Springfield Complaint asserts a claim of concerted action civil conspiracy against the Manufacturer Defendants. That claim requires, first, proof of a "common design or an agreement, although not necessarily express, between two or more persons to do a

Case 3:17-cv-01362 Document 1290-9 Filed 04/26/21 Page 10 of 18 PageID #: 43483

City of Boston v. Purdue Pharma, LP, Not Reported in N.E. Rptr. (2020)
2020 WL 416406

wrongful act and, second, proof of some tortious act in furtherance of the agreement." *Aetna Cas. Sur. Co.*, 43 F.3d at 1564. See, *Kyte v. Philip Morris, Inc.*, 408 Mass. 162, 166 (1990), citing Restatement (Second) of Torts § 876 (1979); *Kurker v. Hill*, 44 Mass.App.Ct. 184, 188 (1998).

**\*12** The Springfield Complaint reasonably alleges: 1) that the Manufacturer Defendants had a common design and/or tacit agreements among each other and with third parties to wrongfully misinform the public and prescribers about the addictiveness and effectiveness of their opioid medications, and their liability in relation to the opioid crisis; and 2) that in furtherance of these agreements, the Manufacturer Defendants made such tortious misrepresentations and engaged those third parties, including KOLs and funded front groups, to also tortiously disseminate this misinformation. See, e.g., Springfield Complaint In 246-66, 285, 366. These allegations suffice to allege a claim of civil conspiracy. See, *In re Nat'l Prescription Opiate Litig.,* Report and Recommendation, 2018 WL 4895856, at \*46-\*47 (concluding that dismissal of civil conspiracy claim against opioid manufacturers was unwarranted). Nor is this Court persuaded that communications made by third-party actors at the Manufacturer Defendants' direction is conduct that is somehow protected by the First Amendment. That the Manufacturer Defendants used third parties to speak for them is not the basis for liability; rather, it is the liability stems from the allegation that these third-party actors disseminated misinformation about opioids on behalf of the Manufacturer Defendants.

II. Separate Arguments

A. Cephalon

Cephalon argues that the Complaints must be dismissed against it because its opioid products, Actiq and Fentora, are short-acting pain medications indicated for breakthrough cancer pain, and, as such, are subject to an additional risk mitigation program required by the FDA. This program requires doctors and patients to receive additional information and warnings about those products. As a consequence of these additional warnings, Cephalon argues that it cannot be held liable. Whether the risk mitigation program effectively counteracted Cephalon's alleged misstatements is a factual dispute, however, that cannot be resolved on a motion to dismiss. Cephalon's additional arguments—that the Complaints fail to sufficiently plead fraud with particularity, that they do not link Cephalon to the harm alleged, and that they fall short of alleging an agreement in support of a civil conspiracy claim—all fail for the same reasons already discussed, *supra*.

B. Janssen

In its separate memorandum, Janssen argues that the Cities have not stated a claim against both it, Janssen, *and* its parent corporation, Johnson & Johnson, and, further, that the Complaints fail to allege sufficient facts to pierce the corporate veil. The argument is belied, however, by the Complaints, which allege direct wrongdoing by both Janssen and Johnson & Johnson. See Springfield Complaint ¶¶62-63 (referring to the companies collectively, and alleging that Johnson & Johnson controls the sale and development of Janssen products); Boston Complaint ¶¶27-28 (same). Under these circumstances, no veil piercing is required for the Cities to sue both entities. See, generally, *Scott v. NG U.S. 1, Inc.,* 450 Mass. 760, 766 (2008) (corporate veil piercing is an equitable tool used to overcome wrongs where separate parent corporation otherwise would not be liable for acts of its subsidiary).[12]

C. Collegium

Collegium, which entered the opioid market in 2016, argues that it could not be a cause of any of the harms alleged because it did not participate in the alleged misconduct occurring prior to that point; this earlier conduct largely forms the basis of the Springfield Complaint. Collegium additionally argues that the allegations that do specifically refer to it are insufficient to state a claim against it. This Court is not persuaded by these arguments. The Springfield Complaint reasonably alleges that Collegium engaged in misleading sales practices that served to exacerbate an already existing opioid crisis in Springfield. See, e.g., Springfield Complaint ¶282 ("Upon information and belief, members of [Collegium's] sales force personnel are marketing the use of Xtampza ER to physicians, and nurse practitioners

Case 3:17-cv-01362   Document 1290-9   Filed 04/26/21   Page 11 of 18 PageID #: 43484

**City of Boston v. Purdue Pharma, LP, Not Reported in N.E. Rptr. (2020)**
2020 WL 416406

with prescription-writing authority, within Springfield and its surrounding area, and are falsely representing that their oxycodone product Xtampza ER should be used even where safer methods of pain relief have not been tried and failed").[13] That Collegium may, at some point in the future, be deemed less responsible than other defendants (or absolved entirely) is not a basis to dismiss the Springfield Complaint before any discovery has been conducted.

### D. Actavis

**\*13** Actavis's argument centers on its assertion that several of the entities collectively referred to in the Springfield Complaint as "Actavis" produce only generic opioids. Because the Springfield Complaint concerns only misrepresentations made about branded opioids, not generic opioids, those entities (it is argued) are entitled to dismissal of the claims against them.

The problem with this argument is that it relies on facts that are outside the pleadings. The Springfield Complaint alleges as follows: "Allergan Finance, LLC and its predecessors, affiliates, and/or combining entities, including, but not limited to, Actavis, Inc., Actavis, LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., and Watson Laboratories, Inc. are collectively referred to as 'Actavis.' ... Actavis manufactures, promotes, sells, and distributes opioids nationally and in Springfield, including the following [branded] opioids, as well as their generic versions." Springfield Complaint ¶70. This Court accepts as true for the purposes of these motions, and reasonably infers from the quoted allegation, that the entities collectively referred to Actavis each have a role in the promotion and sale of Actavis's branded opioids. If Actavis is correct that some of these entities are not involved in the marketing conduct alleged, it can pursue the matter on a later motion for summary judgment.

### ORDER

For the forgoing reasons, the Manufacturer Defendants' Motions to Dismiss pursuant to Rule 12(b)(6) are *DENIED*.

**All Citations**

Not Reported in N.E. Rptr., 2020 WL 416406

### Footnotes

1   The Boston Public Health Commission and the Boston Housing Authority.

2   Purdue Pharma, Inc.; The Purdue Frederick Company; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Endo Health Solutions, Inc.; Endo Pharmaceuticals, Inc.; Cardinal Health, Inc.; Mallinckrodt, LLC; Mallinckrodt, PLC; SpecGx, LLC; McKesson Corporation; AmerisourceBergen Drug Corporation; Walgreens Boots Alliance; Dr. Fathallah Mashali, New England Wellness & Pain Management P.C.; and Jane Does 1-15.

3   *City of Springfield v. Purdue Pharma, L.P.*; Purdue Pharma, Inc.; The Purdue Frederick Company; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Collegium Pharmaceuticals, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Endo Health Solutions, Inc.; Endo Pharmaceuticals, Inc.; Allergan, PLC; Allergan Finance, LLC; Watson Laboratories, Inc.; Actavis, LLC; Actavis Pharma, Inc.; Mallinckrodt, PLC; Mallinckrodt, LLC; McKesson Corporation; Cardinal Health, Inc.; AmerisourceBergen Drug Corporation; CVS Pharmacy, Inc.; Rite Aid of Massachusetts, Inc.; Walgreens Co.; Walgreens Eastern Co., Inc.; Walgreens Mail Service, LLC; Walgreens of Massachusetts, LLC; Walgreens Specialty Pharmacy, Inc.; Walmart, Inc.; Wal-Mart Stores East, L.P.; John Kapoor; Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; and Ilene Sackler Lefcourt; Suffolk Superior Court, Civil No. 1984CV01733.

4   The moving parties include, among others named *infra*, Purdue Pharma LP; Purdue Pharma, Inc.; The Purdue Frederick Company (collectively, Purdue); and certain Purdue officers and directors. On September 15, 2019, Purdue filed for bankruptcy, triggering an automatic stay pursuant to 11 U.S.C. § 362; a bankruptcy judge also preliminarily enjoined litigation against Purdue's officers and directors. The stay and the related order prevented the parties in these cases from taking any action regarding the claims against Purdue and its officers/directors. Therefore, no one spoke on

**City of Boston v. Purdue Pharma, LP, Not Reported in N.E. Rptr. (2020)**

2020 WL 416406

|   |   |
|---|---|
|   | behalf of Purdue or in opposition to it at the motion hearing. However, the instant motions were fully briefed before the stay took effect and before the preliminary injunction issued. This Court concludes that it may include Purdue in this decision, particularly since the arguments that Purdue made in its motion papers have already been made to and rejected by this Court in related litigation instituted by the Attorney General. |
| 5 | Where parties are alleged to be related through acquisition, common ownership, or otherwise, the Court refers to them collectively by a single name. |
| 6 | The Springfield Complaint also names certain individual officers and directors of Purdue. They have separately moved to dismiss the Complaint pursuant to both Rule 12(b)(6) and Rule 12(b)(2). That Motion will be dealt with in a separate Memorandum of Decision. |
| 7 | The Boston Complaint discusses the alleged falsehoods the Manufacturer Defendants propounded about the effectiveness of patient screening tools to mitigate addiction risk, while the Springfield Complaint details the false statements they made about the effectiveness of tapering doses as an effective tool for managing withdrawal. |
| 8 | The Cephalon and Actavis motions are each styled as a "Supplemental Memorandum of Law" in support of the joint motion to dismiss. |
| 9 | As this Court recalls, however, Purdue also made a similar argument regarding market share in support of its motion to dismiss the case brought against it by the Attorney General. That is, it contended that Purdue's OxyContin accounts for only a small percentage of the overall prescription opioid market, thus making its connection to any opioid epidemic remote. |
| 10 | See, e.g., *Chicago v. Purdue Pharma L.P.,* 211 F.Sup.3d 1058, 1071-74 (N.D.Ill. 2016); *In re Nat'l Prescription Opiate Litig.,* Report and Recommendation, 2018 WL 4895856, at *19-*20, adopted in relevant part by Opinion and Order, 2018 WL 6628898, at *1. |
| 11 | The Boston Complaint lists one specific recipient of the Manufacturer Defendants' misrepresentations, Dr. Fathallah Mashali, who pleaded guilty to federal health care fraud charges in 2017. Boston Complaint ¶43. Although no other prescribers are identified, this Court does not consider that omission to be fatal to the Complaints, particularly in the context of all the other factual allegations. |
| 12 | The argument is further undermined by the fact that Johnson & Johnson has already gone to trial as a defendant opioid manufacturer in a case against it in another jurisdiction. See *Oklahoma ex rel., Mike Hunter v. Purdue Pharma L.P.,* Case No. CJ-2017-816, Judgment After Non-Jury Trial, entered August 26, 2019. |
| 13 | See also Springfield Complaint ¶¶186, 216, 246, 261, 281-85. |

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:17-cv-01362   Document 1290-9   Filed 04/26/21   Page 13 of 18 PageID #: 43486

Commonwealth v. Purdue Pharma, L.P., Not Reported in N.E. Rptr. (2019)
36 Mass.L.Rptr. 56

36 Mass.L.Rptr. 56
Superior Court of Massachusetts,
Suffolk County..

COMMONWEALTH of Massachusetts

v.

PURDUE PHARMA, L.P. et al.[1]

1884CV01808BLS2
|
September 17, 2019

MEMORANDUM OF DECISION AND ORDER ON THE DEFENDANT PURDUE'S MOTION TO DISMISS

Janet L. Sanders, Justice of the Superior Court

**\*1** The Commonwealth commenced this action against Purdue Pharma, L.P. and Purdue Pharma, Inc. (collectively, Purdue) seeking redress for harms that it claims were caused by Purdue's deceptive marketing and sale of its opioid products in Massachusetts. The First Amended Complaint (the Complaint) also names as defendants current and former Purdue directors, CEOs, and a vice president of sales. All defendants have moved to dismiss the claims against them pursuant to Mass.R.Civ.P. 12(b)(6). This Memorandum concerns only the Motion to Dismiss by Purdue.[2] For the following reasons, this Court concludes that it must be *DENIED*.

BACKGROUND

The Complaint is notable both in its length (274 pages) and its level of detail, including its citation to and quotations from Purdue's own internal communications. This Court only briefly summarizes those allegations, which are taken as true for purposes of this Motion.

Purdue manufactures prescription opioid medications used for the treatment of chronic pain. The Complaint largely focuses on Purdue's OxyContin, which is a tablet patients take orally, and which is sold in different dosing strengths. Butrans and Hysingla are Purdue's other opioid products.[3] Purdue's opioid formulations include "extended release" or "long acting" doses because they release the active ingredient into a person's system over time. Other opioids on the market are "immediate release" formulations. Opioids, including Purdue's products, carry several risks to the user, including physical dependence, addiction, and related withdrawal symptoms. Opioids can also cause respiratory depression, which is life-threatening.

Purdue released OxyContin in 1996. In the years thereafter, opioid-related deaths rose across the nation and in Massachusetts in particular. In 2007, after multiple state and federal investigations, a predecessor corporation and three executives pleaded guilty to illegal misbranding. An agreed statement of facts submitted in connection with that plea stated that Purdue supervisors and employees intentionally deceived doctors about OxyContin's addictive properties in the previous six years. Also in 2007, Purdue reached a consent judgment with several states, including Massachusetts (the 2007 Judgment). The 2007 Judgment prohibited Purdue from making "any written or oral claim that is false, misleading, or deceptive" in the promotion or marketing of OxyContin. It also required Purdue to establish and follow an abuse and diversion detection program to identify high-prescribing doctors who show signs of inappropriate prescribing, to stop promoting drugs to them, and to report them to authorities.

In the years following the 2007 Judgment, Purdue, despite its promises, did not substantively alter its deceptive and illegal marketing practices. Rather, it continued to downplay its opioids' propensities for addiction and abuse in its messaging to doctors so as to persuade them to prescribe the opioids at greater frequency, at ever-higher (and more expensive) doses, and for longer treatment durations. Purdue also influenced prescribing to inappropriate patient populations. For example, it promoted opioids for use by geriatric osteoarthritis patients, even though opioids were more dangerous for elderly individuals and studies had not shown opioids to be a more effective treatment for them. According to the Complaint, Purdue knew that its marketing tactics caused more patients to become addicted and substantially increased the likelihood that they would overdose and die. Despite this knowledge, Purdue continued to minimize the dangers associated with the use of its drugs and to make false representations regarding their safety. It did so in order to maximize its profits.

**\*2** The Complaint goes into extensive detail about Purdue's marketing tactics. For example, Purdue deployed its sales staff to make frequent in-person visits to doctors' offices in Massachusetts, targeting doctors who were already suspected of overprescribing. It dispensed money, meals,

Case 3:17-cv-01362 Document 1290-9 Filed 04/26/21 Page 14 of 18 PageID #: 43487

**Commonwealth v. Purdue Pharma, L.P., Not Reported in N.E. Rptr. (2019)**
36 Mass.L.Rptr. 56

or other gifts to prescribers, and paid doctors to act as spokespersons for its opioids. Purdue funded programs at Tufts University and Massachusetts General Hospital in order to influence physicians associated with those institutions. Its sales representatives dispensed savings cards, knowing that their use would encourage patients to stay on opioids longer.

The Complaint alleges that, because of Purdue's unfair and deceptive conduct, the Commonwealth has sustained substantial damage. In particular, the Commonwealth asserts that Purdue's actions significantly contributed to the opioid epidemic in Massachusetts, which has been the cause of thousands of deaths and non-fatal overdoses. Included within the thousands who have died are 671 people who filled prescriptions for Purdue opioids. Those that have survived their addictions have imposed a heavy burden on the Commonwealth: many cannot work, and they require lengthy and expensive care and treatment, for both themselves and their dependents. The Commonwealth is seeking damages from the defendants to offset the costs of the opioid epidemic, which has been declared a public health emergency in Massachusetts.

DISCUSSION

The standard that this Court applies to the instant motion is well established. Although the complaint must contain more than "labels and conclusions," *Iannacchino v. Ford Motor Co.,* 451 Mass. 623, 636 (2008), the ultimately inquiry is whether the plaintiff has alleged facts that are "adequately detailed so as to plausibly suggest an entitlement to relief." *Greenleaf Arms Realty Trust, LLC v. New Boston Fund, Inc.,* 81 Mass.App.Ct. 282, 288 (2012) (reversing lower court's allowance of Rule 12(b)(6) motion). In ruling on the motion, the Court accepts the factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Sisson v. Lhowe,* 460 Mass. 705, 707 (2011). Its review is also confined to the four corners of the complaint, with consideration of other materials appropriate only where the complaint attaches them or where they are of the type of which this Court can take judicial notice. *Schaer v. Brandeis Univ.,* 432 Mass. 474, 477 (2000).

Many of Purdue's arguments in support of its Motion disregard this standard. A good portion of Purdue's memoranda and a large part of its oral argument dispute the factual basis for the Commonwealth's allegations. For example, it argues that addiction is complex and multifaceted, and that the Commonwealth has itself contributed to the problem. It argues that OxyContin makes up only a small fraction of the opioids prescribed nationally and that Purdue is being unfairly scapegoated for a problem not of its making. Such arguments are better made to the fact finder at trial. They cannot be resolved under Rule 12(b)(6). Purdue also asks this Court to take into account matters beyond the four corners of the Complaint that it says contradict the Complaint's allegations, citing to findings by the Massachusetts Department of Public Health, for example. This too ignores the standard this Court applies at this early stage of the case. The Court therefore declines to address these arguments, and turns instead to the legal arguments Purdue offers in support of the Motion.

The Complaint asserts two causes of action: violations of G.L.c. 93A (Count I) and public nuisance (Count II). In support of its Motion, Purdue argues that the Complaint fails to state a claim because its allegations conflict with federal law—namely, FDA approval of the opioids at issue. In a related vein, it contends that the challenged conduct is exempt from Chapter 93A because it is a "permitted practice." As to the nuisance claim, Purdue asserts that it fails as a matter of law because there is no allegation that Purdue has infringed on any "public right." More generally, Purdue contends that it cannot be legally liable for harms flowing from prescriptions written by doctors because the "learned intermediary" doctrine breaks the chain of causation between its conduct and the harms alleged. Similar arguments have been raised and rejected in litigation against Purdue proceeding in other states. See, e.g., *Alaska v. Purdue Pharma, L.P.,* 2018 WL 4468439 (Alaska Super.Ct. 2018); *State of Arkansas v. Purdue Pharma, L.P.*, No. 60CV-18-2018 (Ark.Cir.Ct. Apr. 5, 2019); *Minnesota v. Purdue Pharma, L.P.,* No. 27-CV-18-10788 (Minn.Dist.Ct. Jan. 4, 2019); *New Hampshire v. Purdue Pharma, Inc.,* 2018 WL 4566129 (N.H.Super.Ct. 2018); *Ohio v. Purdue Pharma, L.P.,* 2018 WL 4080052 (Ohio C.P. 2018); *Oklahoma v. Purdue Pharma, L.P.,* 2017 WL 10152334 (Okl.Dist.Ct. 2017); *Tennessee v. Purdue Pharma L.P.,* No. 1-173-18 (Tenn.Cir.Ct. Feb. 22, 2019); *Vermont v. Purdue Pharma L.P.*, No. 757-9-18 (Ver.Super.Ct. March 19, 2019). In line with these other states, this Court concludes that Purdue's arguments do not support dismissal and offers the following by way of explanation.

1. Conflict with Federal Law

Case 3:17-cv-01362   Document 1290-9   Filed 04/26/21   Page 15 of 18 PageID #: 43488

Commonwealth v. Purdue Pharma, L.P., Not Reported in N.E. Rptr. (2019)
36 Mass.L.Rptr. 56

**\*3** Purdue argues that the Commonwealth's claims conflict with FDA decisions approving the sale of the opioids at issue in this litigation and the labeling that accompanied them. In particular, Purdue maintains that, because the representations and conduct that the Commonwealth claims to be deceptive conform to determinations the FDA made in the exercise of its regulatory authority, then it necessarily follows that those statements are not actionable as a matter of law. Although Purdue does not use the term "preemption," that appears to be the doctrine upon which it is relying. Neither the law nor the facts as alleged in the Complaint support Purdue's position, however.

"In all preemption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, [the court starts] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress" (alterations removed; internal quotations and citations omitted). *Wyeth v. Levine,* 555 U.S. 555, 565 (2009). Conflict preemption (which Purdue appears to assert) is a type of implied preemption that "occurs where compliance with both federal and state regulations is a physical impossibility, ... or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (internal quotations and citations omitted). *Reckis v. Johnson & Johnson,* 471 Mass. 272, 283 (2015). A party's contention that state law claims are preempted because it is impossible it to comply both with state and federal law has been described as a "demanding defense." *Wyeth,* 555 U.S. at 573. Purdue falls well short of demonstrating what the case law requires for this type of preemption to apply. In particular, there is nothing about this lawsuit which seeks to impose restraints on Purdue that would put it at odds with the FDA, or which would make it impossible for Purdue to comply both with federal and state regulations.

This becomes particularly apparent upon a fair reading of the Complaint itself. It does not challenge the contents of the relevant opioid labels, nor does it seek to remove Purdue's opioids from the marketplace. Instead, the Complaint contains numerous allegations that Purdue's marketing activities were *inconsistent* with label warnings. For example, despite prominent warnings in the label concerning the risk of abuse and addiction, Purdue put out publications which sought to minimize those risks in a false and deceptive manner.[4] Its sales force also actively and forcefully marketed opioids for elderly arthritis patients, even though the FDA approved label clearly warned against use in that population.[5]

The Commonwealth points out that courts in other states have rejected similar arguments made by Purdue. See, e.g., *Delaware v. Purdue Pharma, L.P.,* 2019 WL 446382 (Del.Super. 2019); *Grewal, Attorney General of New Jersey v. Purdue Pharma, L.P.,* 2018 WL 4829660 (N.J.Super.Ct. 2018), and state decisions cited at page 5, *supra.* Those courts reasoned that there was no conflict between the state and federal law, given the allegations leveled against Purdue that it promoted use of opioids far beyond that which was consistent with the FDA-approved labeling. Purdue makes no effort to explain why the reasoning of these other courts is flawed except to direct this Court to a single decision handed down by a North Dakota court which concluded that federal law did preempt that state's claims against Purdue. See *North Dakota v. Purdue Pharma L.P.*, Case No. 08-2018-CV-01300 (May 10, 2019), attached to Purdue's Reply Brief as Exhibit A. This holding appears to be an outlier and is of questionable value, however, particularly given a decision handed down by the United States Supreme Court that same day which clarified the showing a drug manufacturer must make on a claim of "impossibility preemption." *Merck Sharp & Dohme Corp. v. Albrecht,* 139 S.Ct. 1668 (May 20, 2019).

2. Permitted Practice Under c. 93A

**\*4** Purdue argues that even if federal law does not preempt the state law claims, it cannot be held liable on a c. 93A claim because the conduct that the Commonwealth challenges is actually permitted by federal law and, as such, is a "permitted practice" exempt from c. 93A liability. In support, it relies on G.L.c. 93A, § 3, which expressly exempts from the reach of the statute "transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States." Purdue argues that, because the FDA approved high-dose opioids, the conduct at issue here falls within that § 3 exemption. This Court disagrees, for much the same reasons that it concludes there is no federal preemption.

Section 3 precludes the assertion of a 93A claim "when a regulator authorized to review the defendant's actions has determined that those actions, in particular, were not unfair or deceptive." *O'Hara v. Diageo-Guinness, USA, Inc.,* 306 F.Sup.3d 441, 454 (D.Mass. 2018), and cases cited therein. A defendant who seeks protection from c. 93A liability

Case 3:17-cv-01362 Document 1290-9 Filed 04/26/21 Page 16 of 18 PageID #: 43489

Commonwealth v. Purdue Pharma, L.P., Not Reported in N.E. Rptr. (2019)
36 Mass.L.Rptr. 56

under this section bears a "heavy" burden of proving that the exemption applies. *Aspinall v. Philip Morris, Inc.,* 453 Mass. 431, 434 (2009). In particular, the defendant "must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction." *Bierig v. Everett Sq. Plaza Assocs.,* 34 Mass.App.Ct. 354, 367 n.14 (1993). Rather, the defendant must demonstrate that the regulatory scheme "affirmatively *permits* the practice which is alleged to be unfair or deceptive." *Id.* (italics in original).

The Complaint in the instant case does not describe conduct that has been affirmatively approved by the FDA. Instead, it describes marketing practices that minimized addiction risks, promoted misuse of the drugs, and targeted inappropriate patient populations—conduct which no state or federal regulatory authority has condoned. Citing a September 10, 2013, letter from the FDA in response to a citizen's petition, Purdue argues that the FDA rejected proposed labeling restrictions on the dose and duration for opioid use. It does not follow, however, that this action authorized Purdue to make the false claims the Complaint alleges that it did regarding addiction and abuse. In any event, the exemption enunciated in § 3 is an affirmative defense that is rarely decided on a Rule 12(b)(6) motion. Compare *Fleming v. Nat'l Union Fire Ins. Co.,* 445 Mass. 381, 389-91 (2005).

3. Public Nuisance

Purdue attacks Count II of the Complaint both on factual and legal grounds. As already, explained, factual disputes cannot be resolved on a motion to dismiss. As to the legal basis, Purdue contends that the Complaint fails to state a claim for public nuisance because it does not allege an interference with a public right. Rather, the Commonwealth's nuisance claim is (according to Purdue), "exactly the sort of poorly disguised, repackaged products liability claim courts have rejected." Purdue cites decisions by courts in Delaware and Connecticut dismissing similar public nuisance claims against it. See *Delaware,* 2019 WL 446382 at *12-*13; *New Haven v. Purdue Pharma, L.P.,* 67 Conn. L. Rptr. 644, 2019 WL 423990 (January 8, 2019). Applying Massachusetts law, this Court reaches a different conclusion.

A public nuisance, as opposed to a private nuisance, is one that "interferes with the exercise of a public right by directly encroaching on public property or by causing a common injury." *Sullivan v. Chief Justice for Admin. & Mgmt. of Trial Court,* 448 Mass. 15, 34 (2006), quoting *Connerty v. Metropolitan Dist. Comm'n,* 398 Mass. 140, 148 (1986), and citing Restatement (Second) of Torts § 821B (1979) ("A public nuisance is an unreasonable interference with a right common to the general public"). "In determining whether there has been an unreasonable interference with a public right, a court may consider, *inter alia,* '[w]hether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience.' " *Sullivan,* 448 Mass. at 15, quoting Restatement (Second) of Torts § 821B. Applying these legal principles, this Court concludes that the Complaint's allegations are sufficient to support a claim that Purdue's conduct has interfered with public health and safety.

**\*5** This Court also disagrees with Purdue that this is simply a repackaged product liability claim that cannot as a matter of law be brought as a public nuisance claim. In fact, Massachusetts courts have allowed public nuisance claims concerning dangerous products. See, e.g., *Evans v. Lorillard Tobacco Co.,* 2007 WL 796175 at *18-*19 (Mass.Super.Ct. 2007) [22 Mass. L. Rptr. 91] (denying motion to dismiss public nuisance action against cigarette manufacturer); *Boston v. Smith & Wesson Corp.,* 2000 WL 1473568 at *14 (Mass.Super. 2000) [12 Mass. L. Rptr. 225] (denying motion to dismiss public nuisance action against gun manufacturer). In support of its position that the claims here fall outside the traditional scope of public nuisance law, Purdue relies on *Jupin v. Kask,* 447 Mass. 141 (2006). In that case, however, the SJC concluded only that the storage of a lawfully obtained unloaded weapon in one's home could not support a claim for public nuisance. The allegations in the Complaint against Purdue are far different.

4. Causation

Purdue argues that the Complaint does not contain sufficient factual allegations to show causation. In opposing the Motion, the Commonwealth points out (quite correctly) that questions of causation generally should not be decided on a motion to dismiss, given their fact-intensive nature. The Commonwealth also contends that, at least with respect to the c. 93A claim, it need not prove that any consumer actually was harmed. See *Commonwealth v. Equifax, Inc.,* 35 Mass. L. Rptr. 106, 2018 WL 3013918 at *5 (Mass.Super. 2018) (the Attorney General, unlike a private litigant, need only prove that the unfair and deceptive acts took place in trade or commerce, not that they caused any quantifiable economic injury). That is because, in actions by the Attorney General

Case 3:17-cv-01362   Document 1290-9   Filed 04/26/21   Page 17 of 18 PageID #: 43490

**Commonwealth v. Purdue Pharma, L.P., Not Reported in N.E. Rptr. (2019)**
36 Mass.L.Rptr. 56

under c. 93A, the court may impose civil penalties and require the defendant to pay the costs of abatement in lieu of damages. See G.L.c. 93A, § 4. For purposes of this Motion, however, this Court assumes that some causation between the conduct at issue and some quantifiable harm must be established. The Court concludes that the Complaint contains sufficient allegations to meet the standard applicable to a 12(b)(6) motion.

In order to show causation, the Commonwealth must plead and prove both "cause in fact" and proximate cause. Cause in fact means injury or harm that would not have occurred but for the defendant's conduct. Proximate cause is an injury to a plaintiff that was a "foreseeable result" of the defendant's actions. Kent v. Commonwealth, 437 Mass. 312, 320 (2002). Purdue contends that this case raises several causation issues. Many of these arguments are fact-based, which this Court sees no need to discuss, given the standard applicable to a Rule 12(b)(6) motion. There is one legal issue that does merit some comment, however. Purdue argues that, because doctors prescribed the drugs alleged to have caused the harm here, they are an intervening cause that shields Purdue from liability. This argument appears to rely in large part on the learned intermediary doctrine.

The learned intermediary doctrine is based on the proposition that a drug manufacturer's duty to warn may be discharged if the manufacturer provides the physician with an adequate warning about any risks associated with its prescription drug. Niedner v. Ortho-McNiel Pharm., Inc., 90 Mass.App.Ct. 306, 309 (2016). If an adequate warning is provided, then the chain of causation between the defendant drug maker and the consumer plaintiff is broken, since the physician is presumed to make an independent and educated prescribing decision. Liu v. Boehringer Ingelheim Pharm., Inc., 230 F.Sup.3d 3, 9 (D.Mass. 2017). That causation chain is not broken, however, where the prescribing decision is affected by deceptive and misleading conduct on the part of the drug manufacturer. See, e.g., In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 21, 39 (1st Cir. 2013) (physician held not to be an independent intervening cause in case involving fraudulent marketing of prescription drug). In other words, because of the defendant's wrongful conduct, the physician is no longer acting independently and the learned intermediary doctrine is not applicable. That is precisely what the Complaint alleges here: by actively undermining the warnings on its products through its deceptive conduct, Purdue is alleged to have caused physicians to write prescriptions they otherwise would not have written. That is sufficient.

5. Miscellaneous Arguments

*6 Purdue's remaining arguments require little discussion. It asserts that the 2007 Judgment estops the Commonwealth from bringing the present action because its terms require Purdue to market its products consistently with approved uses and labeling, which it has done. This is not what the Complaint alleges, however: it accuses Purdue of engaging in marketing practices that were inconsistent with the relevant approved product labels, and, thus, in violation of the 2007 judgment. Purdue next argues that the statute of limitations bars any claim that relies on allegations predating 2012.[6] The statute of limitations begins to run, however, only when the plaintiff knew or should have known of the defendant's harmful conduct. Koe v. Mercer, 450 Mass. 97, 101 (2007); see also Szymanski v. Boston Mut. Life Ins. Co., 56 Mass.App.Ct. 367, 370 (2002) (discovery rule applies to G.L.c. 93A actions). That is ordinarily a question of fact. Doe v. Creighton, 439 Mass. 281, 283-84 (2003). The Complaint contains sufficient factual allegations with regard to the pre-2012 conduct to raise at least a factual issue. Finally, Purdue argues that certain of the damages the Commonwealth seeks are unavailable, and, for that reason, those portions of the Complaint must be dismissed. A motion to dismiss, however, tests the plaintiff's entitlement to *any* relief under the causes of action pleaded, not the scope of that relief following a determination of liability. Mass.R.Civ.P. 12(b)(6); Iannacchino, 451 Mass. at 635-36. Purdue may pursue these arguments at later stages of litigation, where appropriate.

**All Citations**

Not Reported in N.E. Rptr., 36 Mass.L.Rptr. 56, 2019 WL 5495866

Footnotes

1   Purdue Pharma, Inc., Richard Sackler, Theresa Sackler, Kathe Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Peter Boer, Paulo Costa, Cecil Pickett, Ralph Snyderman, Judith Lewent, Craig Landau, John Stewart, Mark Timney, and Russell J. Gasdia.

Case 3:17-cv-01362   Document 1290-9   Filed 04/26/21   Page 18 of 18 PageID #: 43491

**Commonwealth v. Purdue Pharma, L.P., Not Reported in N.E. Rptr. (2019)**
36 Mass.L.Rptr. 56

2   The Court expects to issue decisions on the motions made by the individual defendants within the next few weeks.
3   Butrans releases opioids into the body from a skin patch; the Complaint does not describe Hysingla's dosing route.
4   One Purdue publication cited in the Complaint stated: "addiction is rare in patients who become physiologically dependent on opioids while using them for pain control." Another stated that only "a small minority of people may not be reliable or trustworthy" and therefore not suitable for opioids. A third stated that addiction "is not caused by drugs."
5   The OxyContin label provides: "Life-threatening respiratory depression is more likely to occur in elderly ... patients because they may have altered pharmacokinetics or altered clearance compared to younger, healthier patients ... Monitor such patients closely, particularly when initiating and titrating OXYCONTIN and when OXYCONTIN is given concomitantly with other drugs that depress respiration ... Alternatively, consider the use of non-opioid analgesics in these patients."
6   The Complaint was filed on June 12, 2018. Claims under G.L.c. 93A have a four-year statute of limitations, G.L.c. 260, § 5A. Moreover, the parties entered into a consent agreement to toll the statute of limitations during the period from August 2, 2016, through May 18, 2018.

**End of Document**                                                       © 2021 Thomson Reuters. No claim to original U.S. Government Works.