2018 WL 4566129 (N.H.Super.) (Trial Order)
Superior Court of New Hampshire.
Merrimack County

STATE of New Hampshire,
v.
PURDUE PHARMA INC., Purdue Pharma L.P., and The Purdue Frederick Company.

No. 217-2017-CV-00402.
September 18, 2018.

**Order**

[John C. Kissinger, Jr.](), Judge.

**\*1** The State of New Hampshire (the "State") alleges Purdue Pharma Inc., Purdue Pharma L.P., and The Purdue Frederick Company (collectively "Purdue") are culpable for the deleterious effects of widespread opioid abuse within the State and asserts the following claims: Count I, deceptive and unfair acts and practices contrary to the Consumer Protection Act; Count II, unfair competition contrary to the Consumer Protection Act; Count III, false claims in violation of the Medicaid Fraud and False Claims Act; Count IV, public nuisance; Count V unjust enrichment; and Count VI, fraudulent or negligent misrepresentation. Purdue moves to dismiss all claims and the State objects. The Court held a hearing on this matter on April 24, 2018. For the following reasons, Purdue's motion to dismiss is DENIED regarding Counts I, II, III, IV, and VI, and GRANTED regarding Count V.

**I.** *Background*

Prescription opioids are derived from and possess properties similar to opium and heroin and, by binding to receptors on the spinal cord and brain, they dampen the perception of pain following absorption. (Compl. ¶ 2.) Opioids can also be addictive, produce euphoria, and, in high doses, slow a users breathing and possibly cause death. (*Id.*) Withdrawal symptoms such as anxiety, nausea, headaches, tremors, delirium, and pain often result if sustained opioid use is discontinued or interrupted, and users generally grow tolerant of opioids' analgesic effects after extended continuous use, thereby necessitating progressively higher doses. (*Id.*) Purdue manufactures, advertises, and sells prescription opioid medications, including the brand-name drug OxyContin. (*Id.* ¶ 1.)

Due to the drugs' downsides, the State maintains that before the 1990s opioids were generally used only to treat short-term acute pain and during end-of-life care. (*Id.* ¶ 3.) At odds with this understanding, however, Purdue developed OxyContin in the mid-1990s to treat chronic long-term pain. (*Id.* ¶ 4.) To foster the drug's market for this then unconventional use, the State alleges Purdue instigated a deceptive multidimensional marketing effort to unlawfully alter the public's and the medical community's perception of the risks, benefits, and efficacy of opioids for treating chronic pain. (*E.g.*, *id.* ¶¶ 4-41.)

The State claims Purdue's efforts resulted in a dramatic increase in ill-advised or unlawful opioid prescriptions and, correspondingly, in pervasive opioid abuse. (*E.g.*, *id.* ¶¶ 168-86-) The State further claims that Purdue's manipulative conduct wrongfully caused the State's Medicaid program to pay for opioid prescriptions it would have otherwise not or sought to avoid, (*e.g.*, *id.* ¶ 248), necessitated that the State implement costly social, law enforcement, and emergency services to support, police, and treat those impacted by opioid abuse, (*e.g.*, *id.* ¶ 261), and generally hampered the wellbeing and productivity of many individuals, families, and businesses within New Hampshire, (*e.g.*, *id.* ¶ 261).

Ex. A - Tab 15 - New Hampshire

II. *Analysis*

Purdue raises three categories of arguments in favor of dismissal. Initially, Purdue contends that federal law preempts all the State's claims. Next, Purdue argues that, to the extent causation is a necessary element of the State's legal theories, the State has failed to sufficiently plead that Purdue proximately caused the harms for which the State seeks to hold Purdue responsible. Lastly, Purdue raises a series of claim specific arguments. The Court will address these matters in turn.

*i. Preemption*

**\*2** Article VI, Clause 2 of the Federal Constitution provides that federal law "shall be the supreme Law of the Land." The Federal Constitution, therefore, "preempts state laws that interfere with, or are contrary to, federal law." *In re Fosamax (Alendronate Sodium) Prod. Liab. Litig.*, 852 F.3d 268, 282 (3d Cir. 2017) (quotations omitted). There are three general varieties of preemption:

> (1) express preemption, which occurs when the language of the federal statute reveals an express congressional intent to preempt state law; (2) field preemption, which occurs when the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a State to supplement it; and (3) conflict preemption, which occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1097-98 (10th Cir. 2017) (quotation and ellipsis omitted).

Purdue raises only a conflict preemption theory. Specifically, Purdue argues that the United States Food and Drug Administration's (the "FDA") various decisions regarding OxyContin's risks and medically appropriate uses conflict with the State's claims that Purdue improperly promoted its opioid medications because "[a] plaintiff cannot maintain a claim that a prescription medicine's … marketing consistent with the [drug's FDA sanctioned] labeling is inadequate or misleading unless the manufacturer could have unilaterally changed the labeling — that is, changed the labeling without first obtaining FDA approval." (Defs.' Mem. of Law and Authorities in Support of Mot. to Dismiss [hereinafter "Mot. to Dismiss"] at 10.)

Purdue is correct that numerous courts have concluded that state law claims involving an FDA approved prescription drug are preempted when a plaintiff asserts that a defendant unlawfully included misleading information, or failed to include important warnings, in the drug's label" [1] and where the defendant could not unilaterally alter the drug's label and/or there is "clear evidence" that the FDA would not approve a change to the label if sought by the defendant. *See*, *e.g.*, *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 623 (2011); *Wyeth v. Levine*, 555 U.S. 555, 571 (2009); *Cerveny v. Aventis, Inc.*. 855 F.3d 1091, 1095 (10th Cir. 2017): *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 38 (1st Cir. 2015); *Seufert v. Merck Sharp & Dohme Corp.*, 187 F. Supp. 3d 1163, 1165-66 (S.D. Cal. 2016); *Dobbs v. Wyeth Pharm.*, 797 F. Supp. 2d 1264, 1266 (W.D. Okla. 2011).

**\*3** Notably, these cases involved purported misrepresentations within, or material omissions from, a drug's label; meaning to ameliorate the wrongdoing alleged under state law, the drug manufacturer defendants would have been required to alter their product's FDA approved label. In this instance, however, the State maintains that it "does not seek a change to the FDA-approved labeling of Purdue's drugs," but rather that the State "contend[s] that Purdue

aggressively marketed its opioids for long-term use to treat chronic pain through misrepresentations that were intended to lead doctors to prescribe the drugs even in circumstances where they were inappropriate, *i.e.*, to disregard cautions that the FDA itself has recognized as appropriate and necessary." (PL's Resp. in Opp'n to Purdue Defs.' Mot- to Dismiss Pl.'s Compl. [hereinafter "Obj."] at 8.) In other words, the State alleges "Purdue marketed opioids in a manner that *is contrary to, inconsistent with, or outside of* their FDA-approved labels." (*Id.* at 10 (emphasis in original).)

Notwithstanding the State's characterization of its claims, Purdue insists it is nevertheless entitled to dismissal because "each of the … alleged misrepresentations the State has identified involves statements or conduct that *are consistent* with the FDA-approved labeling for its medications or with other regulatory decisions of the FDA." (Defs.' Reply in Supp. of Mot. to Dismiss [hereinafter "Reply"] at 7 (emphasis added).) Thus, at bottom, Purdue grounds its preemption argument on the notion that the Court should decide that Purdues marketing of its opioid medications was consistent, as opposed to inconsistent, with FDA decisions relating to the drugs' labeling. Even assuming it is proper to take up such a necessarily fact intensive inquiry in a motion to dismiss, it is reasonable to construe Purdue's purported marketing efforts as *inconsistent* with the FDA's approvals when drawing ail inferences in the State's favor. *See Tessier v. Rockefeller*, 162 N.H. 324, 330 (2011) (setting forth the Court's standard for reviewing motions to dismiss).

For example, beginning sometime in the mid-2000s, Purdue updated OxyContin to include a new coating designed to make the drug difficult to crush and added certain elements intended to make the drug unsuitable for injection. (Compl. ¶ 110.) These changes were purportedly meant to deter OxyContin abuse via snorting and injection. The State alleges, however, that evidence shows, and "Purdue knew or should have known," that the "reformulated OxyContin is not better at tamper resistance than the original OxyContin and is still regularly tampered with and abused," (*id*. ¶ 114 (quotation omitted)), because the abuse-deterrent "properties can be defeated" and the drug "can be abused orally notwithstanding their abuse-deterrent properties," (*id.* ¶ 113). Therefore, the State claims Purdue deceptively marketed OxyContin, considering its "sales representatives regularly use the so-called abuse-deterrent properties … as a primary selling point" to differentiate the drug from its competitors, (*id.* ¶ 112), and, more specifically, that Purdue's sale representatives:

> (1) claim that Purdue's [abuse-deterrent] formulation *prevents* tampering and that its [abuse-deterrent] products *cannot he* crushed or snorted; (2) claim that Purdue's [abuse-deterrent] opioids *prevent or reduce* opioid abuse, diversion, and addiction; (3) assert or suggest that Purdue's [abuse-deterrent] opioids are "safer" than other opioids; and (4) fail to disclosed that Purdue's [abuse-deterrent] opioids do not impact oral abuse or misuse and that its [abuse-deterrent] properties are and can be easily overcome.

(*Id.* (emphasis in original as well as added).)

Purdue counters that these allegations are "consistent with FDA-approved labeling," (Mot. to Dismiss at 17), because, in 2013, the FDA approved a change to OxyContin's label, stating "OXYCONTIN is formulated with inactive ingredients intended to make the tablet more difficult to manipulate for misuse and abuse." (Mot. to Dismiss, Ex. 6 § 9.2.)

**\*4** Drawing all inferences in the State's favor statements to the effect that OxyContin's abuse-deterrent properties "*prevent* tampering," result in a drug that "*cannot* be crushed or snorted," and in practice "*prevent or reduce* opioid abuse" may reasonably be read as attributing more significance to the abuse-deterrent properties than the FDA intended when it seemingly found the abuse-deterrent properties merely make the drug somewhat "more difficult to manipulate." In this way, Purdue's alleged conduct could be found materially inconsistent with FDA approved labeling.

The parties' dispute over the proper inferences to draw from the State's claims regarding OxyContin's abuse-deterrent properties relates to only one of many allegations of wrongdoing raised in the complaint. It is inappropriate at this

stage to comprehensively parse each of the remaining allegations in writing. However, having thoroughly reviewed the complaint and its many allegations, and considered the parties' voluminous filings relevant to Purdue's motion and their accompanying exhibits, the Court concludes Purdue has not shown that the State's allegations wholly reflect conduct consistent with FDA approved labeling. Accordingly, because Purdue's conflict preemption theory presupposes its alleged marketing efforts were consistent with its drugs' labeling, Purdue's motion is DENIED to the extent it raises preemption.

### ii. Causation

Next, Purdue maintains that the State has not properly pled causation for three general reasons. First, Purdue argues that "the State fails to adequately allege a causal connection between any misrepresentation by Purdue and any reimbursement decision by, or other alleged harm to, the State." (Mot. to Dismiss at 19.) Second, Purdue contends that, even if the State has articulated a "causal connection," independent acts and actors necessarily intervened such as to "break any connection between any alleged misrepresentation by Purdue and the litany of alleged harms." (*Id.* at 3.) Lastly, Purdue asserts that "[e]ven if the State had alleged a causal chain linking any alleged wrongdoing with any alleged harm … its claims would still fail because any such chain would be far too attenuated as a matter of law." (*Id.* at 3-4.)

### a. Alleged Causal Connection

As a preliminary matter:

> It is axiomatic that in order to prove actionable negligence,[2] a plaintiff must establish that the defendant['s wrongdoing] proximately caused the claimed injury. The proximate cause element involves both cause-in-fact and legal cause. Cause-in-fact requires the plaintiff to establish that the injury would not have occurred without the negligent conduct. The plaintiff must produce evidence sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence and the injury probably existed.

*Estate of Joshua T.*, 150 N.H. 405, 407-08 (2003) (citations and quotations omitted).

Contrary to Purdue's position, the State has in fact articulated a causal connection linking Purdue's purported misconduct to the State's alleged harms. For example, the State asserts that, beginning in approximately 2011, an "increase in prescribing opioids correspond[ed] with [a] Purdue[] marketing push." (Compl. ¶ 171.) Allegedly, "the largest component of this [marketing push] was sale representative visits to individual prescribes," (*id.*), because Purdue "knows that in-person marketing works," (*id.* ¶ 173.) Indeed, an Amherst, New Hampshire, physician opines in the complaint that Purdue's in-person sales representatives impact prescribing behavior because, "[i]f it didn't, they wouldn't do it." (*Id.* ¶ 176.) Furthermore, as detailed in the previous section, the State alleges Purdue's sale representatives misleadingly marketed OxyContin. (*See also*, *e.g.*, id. ¶ 30 ("To spread its false and misleading messages supporting chronic opioid therapy, Purdue marketed its opioids directly to health care providers and patients … in New Hampshire. It did so principally through its sales force … who made in-person sales calls to prescribers in which they misleadingly portrayed chronic opioid therapy.").)

**\*5** The State also alleges that

> Purdue buttressed its direct promotion of its opioids with an array of marketing approaches that bolstered the same deceptive messages by filtering them through seemingly independent and objective sources. Purdue recruited and paid physician speakers to present talks on opioids to their peers at lunch and dinner events. It funded biased research and sponsored [continuing medical education ("CME")] that misleadingly portrayed the risks and benefits of chronic opioid therapy. It collaborated with professional associations and pain advocacy organizations, such as the American Pain Foundation ("APF"), to develop and disseminate pro-opioid educational materials and guidelines for prescribing opioids. And it created "unbranded" websites and materials, copyrighted by Purdue but implied to be the work of separate organizations, that echoed Purdue's branded marketing. Among these tactics, all of which organized in the late 1990s and early 2000s, three stand out for their lasting influence on opioid prescribing nationwide and in New Hampshire: Purdue's capture, for its own ends, of physicians' increased focus on pain treatment; its efforts to seed the scientific literature on chronic opioid therapy; and its corrupting influence on authoritative treatment guidelines issued by professional associations.[3]

(*Id.* ¶¶ 40-41.)

Considering the State claims that "[s]cientific evidence demonstrates a close link between opioid prescriptions and opioid abuse,"[4] and because the allegations outlined above indicate Purdue successfully increased opioid prescriptions using misleading methods, the complaint asserts a prima facie causal connection between Purdue's purported wrongdoing and increased opioid prescriptions and abuse.[5]

**\*6** Nevertheless, Purdue contends that the State's supposedly "general allegations do not satisfy the State's burden to plead the essential element of a causal connection between an actual alleged fraudulent or improper statement or action by Purdue and an actual alleged injury to the State" and that the State cannot "avoid its pleading obligation by arguing that it will be able to rely on statistical evidence and extrapolation to prove causation and injury at trial." (Reply at 10 (quotation omitted).) in other words, Purdue seemingly maintains that to satisfy its burden the State must principally rely upon individualized evidence, *i.e.* evidence that specific doctors were influenced by specific Purdue misconduct and that any alleged injury to the State must be tied directly to these specific incidents.

Purdue, however, cites no authority mandating such a standard.[6] Conversely, the First Circuit found "aggregate" evidence of the sort the State apparently intends to rely sufficient to prove wrongdoing on the part of a different drug manufacturer alleged to have undertaken comparable deceptive marketing efforts. *See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 46 (1st Cir. 2013); *State v. Exxon Mobil Corp.*, 168 N.H. 211, 255-56 (2015) ("[T]he trial court's determination that the use of statistical evidence and extrapolation to prove injury-in-fact was proper was not an unsustainable exercise of discretion." (Citing *Neurontin,* 712 F.3d at 42 ("[C]ourts have long permitted parties to use statistical data to establish causal relationships."))). Accordingly, the Court is not persuaded that the State has insufficiently articulated a causal connection nor that it has referenced inadequate factual support for its assertions at this stage.

### b. intervening Acts or Actors

Purdue next argues that "any connection between Purdue's alleged misconduct and the State's alleged injuries depends on multiple independent, intervening events and actors." (Mot. to Dismiss at 21.) Specifically, Purdue maintains that, in New Hampshire, individuals may only legally obtain opioids via a prescription following an in-person doctor's visit and, therefore, "the role of the prescribing physician as a 'learned intermediary' breaks the causal chain that the State attempts to use to connect Purdue to the State's payments for prescriptions." (*Id.*)

"The learned intermediary' doctrine creates an exception to the general rule that one who markets goods must warn foreseeable ultimate users about the inherent risks of his products" and, in the prescription drug context "provides that a drug manufacturers duty is limited to the obligation to advise the prescribing physician of any potential dangers that may result from the use of the drug." *Bodie v. Purdue Pharma Co.*, 236 F. App'x 511, 519 (11th Cir. 2007) (emphasis omitted). In other words, 'application of the 'learned intermediary doctrine' may have the effect of destroying the causal link between the allegedly defective product, and the plaintiff's claimed injury." *Id.*

Under the doctrine, however, a drug manufacturer's duty is only fulfilled "once it *adequately* warns the physician." *Garside v. Osco Drug, Inc.*, 976 F.2d 77, 80 (1st Cir. 1992) (emphasis added). The State argues that "the adequacy of any warning provided by Purdue is an issue of fact that cannot be resolved on a motion to dismiss." (Obj. at 19.) Given the fact intensive nature of such an inquiry, the Court agrees. See *McNeil v. Wyeth*, 462 F.3d 364, 368 (5th Cir. 2006) (reasoning that where, as here, the plaintiff's claim is not whether a prescription drug warning "is inadequate because [certain dangers were] not mentioned" but, "[r]ather, [that the warning was] misleading as to the risk level [of those dangers]," the "adequacy questions [should] go to the jury"); *see generally Carignan v. New Hampshire Int'l Speedway, Inc.*, 151 N.H. 409, 414 (2004) ("Proximate cause is generally for the trier of fact to resolve").

*7 Moreover, "[o]ne escape hatch from the application of the learned intermediary rule is if the Plaintiff can demonstrate it was reasonably foreseeable that physicians, despite awareness of the dangers of [the drug], would be consciously or subconsciously *induced* to prescribe the drug when it was not warranted." *Doe v. Solvay Pharm., Inc.*, 350 F. Supp. 2d 257, 272 (D. Me. 2004) (quotation omitted) (emphasis added). Indeed, the court attributed as the first to formulate the doctrine [7] only did so after making the following observation:

it is difficult to see on what basis this defendant can be liable to plaintiff. It made no representation to plaintiff, nor did it hold out its product to plaintiff as having any properties whatsover. To physicians it did make representations. *And should any of these be false it might be claimed with propriety that they were made for the benefit of the ultimate consumers.* But there is no such claim.

*Marcus v. Specific Pharm.*, 77 N.Y.S.2d 508, 509 (N.Y. Spe. Term 1948) (emphasis added).

The State alleges here that Purdue's purported deceptive marketing efforts were "intended to lead doctors to prescribe [opioids] even in circumstances where they were inappropriate, *i.e.*, to disregard cautions that the FDA itself has recognized as appropriate and necessary." (Obj. at 8.) Thus, because the State maintains that Purdue sought to induce physicians to ignore or rely less heavily on the well understood risks of opioid use when making prescribing decisions, the learned intermediary doctrine may offer no safe harbor notwithstanding Purdue's contention that "it is beyond dispute that FDA-approved labeling for Purdue's opioid products discloses [the drugs'] risks prominently." (Mot. to Dismiss at 22.)

This conclusion finds support in jurisdictions that have considered the issue. As referenced in the previous section, several years ago the First Circuit considered comparable claims of wrongdoing on the part of a different drug manufacturer. *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013). [8] Like Purdue, that drug manufacturer "agree[d] that because doctors exercise independent medical judgment in making decisions about prescriptions, the actions of these doctors are independent intervening causes." *Id.* at 39. The *Neurontin* court rejected this argument, concluding that the defendant's "scheme relied on the expectation that physicians would base their prescribing decisions in part on

[its] fraudulent marketing" and "[t]he fact that some physicians may have considered factors other than [the defendant's] detailing materials in making their prescribing decisions does not add such attenuation to the causal chain as to eliminate proximate cause." *Id.*

More recently, the District of California also addressed claims akin to the State's. *U.S. ex rel. Brown v. Celgene Corp.*, No. CV 10-3165-GHK SSX, 2014 WL 3605896 (C.D. Cal. July 10, 2014). In that case, the drug manufacturer defendant similarly argued that the court should "presume that physicians based their prescription decisions on their own independent medical judgment and the needs of their patients." *Id.* at *8. That court likewise rejected this argument, reasoning that "[t]o suggest that [the defendant's] alleged expansive, multi-faceted efforts to create an off-label market for [certain relevant drugs] did not cause physicians to prescribe [the drugs] for [those] uses strains credulity. It is implausible that a fraudulent scheme on the scope of that alleged … would be entirely feckless." *Id.*; *see also U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, No. 1:09-CV-1086 AJT, 2011 WL 3911095, at *5 (E.D. Va. Sept. 6, 2011) (remarking that causation will be sufficiently pled, notwithstanding the learned intermediary doctrine, where there are "allegations that the judgment of a physician was altered or affected by the defendant's fraudulent activities"); see *generally Stevens v. Parke, Davis & Co.*, 507 P.2d 653, 661 (Cal. 1973) ("[A]n adequate warning to the profession may be eroded or even nullified by overpromotion of the drug through a vigorous sales program which may have the effect of persuading the prescribing doctor to disregard the warnings given.").

### c. Attenuation

**\*8** Lastly on the topic of causation, Purdue cites cases from other jurisdictions it contends demonstrate that claims founded upon overly attenuated and/or indirect chains of causation may be dismissed as a matter of law and that the rationales of these cases demand such a result in this instance. (See Motion to Dismiss at 23-26; Reply at 11-13.) The Court finds Purdue's argument unavailing.

Purdue principally relies on *Bank of America Corporation v. City of Miami, Florida*, 137 S. Ct. 1296, 1305 (2017), in which the City of Miami accused certain banks of unlawfully "lending to minority borrowers on worse terms than equally creditworthy nonminority borrowers and inducing defaults by failing to extend refinancing and loan modifications to minority borrowers on fair terms." Miami asserted that this "misconduct led to a disproportionate number of foreclosures and vacancies in specific Miami neighborhoods," causing Miami to "lose property-tax revenue when the value of the properties in those neighborhoods fell and [forced it] to spend more on municipal services in the affected areas." *Id.* In that case, the United States Supreme Court concluded that the Eleventh Circuit erred in solely considering the foreseeability of the City's alleged injury when determining whether the City had adequately pled causation. *Id.* at 1306. Citing *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268 (1992), the United States Supreme Court reasoned that the Eleventh Circuit should have also examined whether "some direct relation between the injury asserted and the injurious conduct alleged" existed and remanded the issue for further deliberation. *City of Miami* at 137 S. Ct. *at* 1306.

In *Holmes*, plaintiff brought a statutory action against a defendant it claimed participated in a scheme to manipulate prices of certain stocks, which the plaintiff alleged ultimately necessitated its payment of claims to the clients of various broker-dealers who became insolvent as a result of the defendant's fraud. 503 U.S. at 262-63. The United States Supreme Court concluded that the relevant statute only conferred the plaintiff standing under the circumstances if the defendant's fraud was the "proximate cause" of the plaintiff's injury, *Id.* at 268. The United State Supreme Court employed "proximate cause" in this context as a stand-in for the common law "judicial tools used to limit a person's responsibility for the consequences of that person's own acts," and noted that, "[a]t bottom, the notion of proximate cause reflects ideas of what justice demands, or of what is administratively possible and convenient." *Id.* (quotation omitted). Further gleaning that "among the many shapes this concept [has taken] at common law, [is] a demand for some direct relation between the injury asserted and the injurious conduct alleged," the United States Supreme Court summarized that "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's

acts [is] generally said to stand at too remote a distance to recover." *Id.* at 268-69 (citation omitted); *see also generally Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003) ("Because the *Holmes* Court emphasized that the RICO statute incorporates general common law principles of proximate causation, remoteness principles are not limited to cases involving the RICO statute." (Citation omitted)).

**\*9** Applying this standard, the United States Supreme Court held that, even assuming the plaintiff in that case could "stand in the shoes" of the clients injured as a result of the broker-dealers' insolvency, such a "link … between the stock manipulation alleged and the customers' harm" was nonetheless "too remote" because it was "purely contingent on the harm suffered by the broker-dealers." *Id.* at 271. That is, the alleged wrongdoers "injured the[] customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims." *Id.*

Relying upon this line of authority, Purdue now maintains that, "[g]iven the series of intervening acts and actors involved in the State's allegations, including the independent decisions and actions of prescribing physicians, patients, and even criminals, there is no 'direct relation' between Purdue's alleged marketing statements and the injuries alleged by the State" and, therefore, "[t]he State fails to plead facts showing how Purdue — as opposed to the various superseding actors at issue here — proximately caused the injuries it alleged." (Mot. to Dismiss at 25.)

To properly consider this challenge, it is necessary to further construe the United States Supreme Court's basis in *Holmes* for holding that proximate cause ordinarily demands a direct relation between the alleged wrongdoing and the plaintiff's injury. To that end, the United State Supreme Court articulated three policy rationales justifying its conclusion:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes*, 503 U.S. at 269-70.

It is equally necessary to differentiate the State's two general alleged chains of causation, *i.e.* that Purdue's purportedly deceptive marketing efforts resulted in the State; (1) paying for or reimbursing the costs of medically unnecessary and/or improper opioid prescriptions; and (2) bearing the costs of responding to societal strife wrought by increased opioid abuse.

Regarding the first chain, Purdue emphasizes that the "Complaint does not allege any facts that would support a conclusion that the State or any of its agents was ever exposed to or relied on any alleged misrepresentation when reimbursing opioid prescriptions." (Reply at 12.) Indeed, "[c]ourts considering [third-party payor]'s off-label … claims have reached differing conclusions as to whether the link between the alleged misrepresentations made by pharmaceutical company defendants and the ultimate injury suffered by [the third-party payor] plaintiffs is sufficiently direct to meet [the] proximate cause requirement," and "[o]ne key distinction between the facts in these … cases is whether the defendant pharmaceutical companies made the alleged misrepresentations directly to the [third-party payor] or indirectly to physicians who then prescribed the drugs that the [third-party payor] covered." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs. & Abbvie Inc.*, 192 F. Supp. 3d 963, 968-69 (N.D. Ill. 2016).

 **\*10**  The First Circuit's reasoning on this issue in *In re Neurontin Marketing & Sales Practices Litigation.*, 712 F.3d 21 (1st Cir. 2013) is persuasive. Comparable to the State's allegations here, in that case a healthcare third-party payor ("TPP") alleged a pharmaceutical company's deceptive marketing efforts had resulted in the TPP wrongly reimbursing prescriptions. Also like this case, the pharmaceutical company argued "that its supposed misrepresentations went [only] to prescribing doctors, and so the causal link to [the TPP] must have been broken." *Id.* at 37.

The *Neurontin* court rejected this argument, finding that proximate cause's direct relation mandate does not impose a "direct reliance requirement." *Id.*; *accord Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 576 (7th Cir. 2017). This conclusion was influenced by *Bridge v. Phoenix Bond & indemnity Co.*, 553 U.S. 639, 657-58 (2008), which expressly held that "first-party reliance [is not] necessary to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles articulated in *Holmes*."

The *Neurontin* court next went on to apply the three *Holmes* factors laid-out above, ultimately concluding that they did not demand dismissal because "the causal chain [was] anything but attenuated," considering the defendant's "fraudulent marketing plan, meant to increase its revenues and profits, only became successful once [the defendant] received payments for the additional… prescriptions it induced" and that "[t]hose payments came from [the plaintiff] and other TPPs." *Neurontin*, 712 F.3d at 38-39. Thus, the court reasoned, "the adoption of [the defendant's] view would undercut the core proximate causation principle of allowing compensation for those who are directly injured, whose injury was plainly foreseeable and was in fact foreseen, and who were the intended victims of a defendant's wrongful conduct." *Id.* at 38.

This reasoning resonates here. Because at least some doctors presumably exercised independent medical judgment in choosing to prescribe Purdue's opioids and some patients prescribed these medications for long-term chronic pain likely benefited, the State will seemingly shoulder a heavy burden at trial. The Court is aware that other jurisdictions consider these impediments as proximate cause maladies demanding dismissal. *See Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 578 (7th Cir. 2017) (collecting cases and noting that the First Circuit's stance is unique among the Federal Courts of Appeals to consider the issue). The Court nevertheless adopts the First Circuit's view that, "[r]ather than showing a lack of proximate causation, this [issue] presents a question of proof regarding the total number of prescriptions that were attributable to [the defendant's] actions" and that, ultimately, "[t]his is a damages question." *Neurontin*, 712 F.3d at 39.

The Court next turns to the State's second general chain of causation, which alleges Purdue is culpable, *inter alia,* for "high rates of opioid abuse, injury, overdose, and death, and their impacts on New Hampshire families and communities; lost employee productivity; the creation and maintenance of a secondary, criminal market for opioids; greater demand for emergency services, law enforcement, addiction treatment, and social services; and increased health care costs for individuals, families, and the State." (Compl. ¶ 261 (list-headings omitted).) Purdue contends that "[t]hese are serious challenges facing the State, fueled by any number of third-party actions, both innocent and criminal, but they are too remote from Purdue's alleged marketing activity to satisfy the proximate cause requirement." (Mot. to Dismiss at 24.)

 **\*11** Some of these alleged injuries are Sess remote from Purdue's purportedly deceptive marketing efforts than others, considering a significant percentage of the State's claims are not necessarily derivative of harm suffered by third parties. For instance, where municipalities accuse gun manufacturers of fostering illicit firearm markets, courts often reason that, "[e]ven if no individual is harmed, [the municipalities] sustain many of the damages they allege," including "costs for law enforcement increased security, prison expenses and youth intervention services," and that the municipalities' claims, therefore, do not fail for lack of a direct relation to the gun manufacturers' alleged wrongdoing. *City of Boston v. Smith & Wesson Corp.*, No. 199902590, 2000 WL 1473568, at \*6 (Mass. Super. July 13, 2000); *accord*, *e.g.*, *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1148 (Ohio 2002) (The complaint in this case alleged that as a *direct* result of the misconduct of appellees, appellant has suffered actual injury and damages including, but not limited to, significant

expenses for police, emergency, health, prosecution, corrections and other services." (Emphasis added and quotation omitted)). [9] This reasoning is applicable here because, for example, the State's law enforcement efforts to combat the illegal distribution and possession of opioids are not purely contingent on harm from opioid abuse to any third party.

Moreover, although some of the State's supposed damages — for example the costs of administering emergency medical services to overdose victims — are contingent on the injuries of third persons, the Court is simply not persuaded that application of the *Holmes* factors to this case demands dismissal. [10]

Regarding the first factor — which concerns the difficulty of ascertaining what percentage of the plaintiff's damages are attributable to the defendant — given the preliminary stage of this litigation, the Court does not yet fully grasp the State's trial strategy and the precise manner it hopes to prove its allegations. It is, therefore, premature to foreclose the State's endeavor purely on the assumption that the scope of its allegations and the harms for which it seeks to hold Purdue accountable are so expansive that its efforts may hypothetically prove too complex for the Court to oversee.

The second factor considers the difficulty of forestalling multiple recoveries. In light of the multitudes seemingly implicated within the State's allegations, there is likely some risk of multiple recoveries. Nevertheless, for many of these individuals — such as those who abused opioids via illegal means or with sufficient understanding of the drug's harmful effects — it is possible their conduct and/or knowledge precludes their right to seek redress. As well, many of the State's alleged injuries, although contingent on the harm to third parties, are easily distinguishable from such wrongs. For example, the State claims that "[f]rom 2007-2013 [its] Medicaid spending on drugs to counter overdose or addiction increased six-fold." (Compl. ¶ 192.) Should the State prove this increase is sufficiently attributable to Purdue's alleged wrongdoing and should the State recover damages in the amount of this increase, there would be little apparent risk that an individual who received such drugs at the State's expense would herself recover damages based on the costs of their administration.

**\*12** The third factor asks whether deterring wrongdoing justifies grappling with the difficulties covered by the first two factors. It is no secret that opioid abuse is a particularly pernicious problem in New Hampshire. The State alleges Purdue shoulders significant blame for this reality. Considering the gravity of this matter and the scope of Purdue's alleged wrongdoing, the Court is not convinced there are parties other than the State better suited to litigate these issues and that the interests of justice weigh in favor of dismissal.

Accordingly, Purdue's motion to dismiss is DENIED to the extent it raises lack of causation. [11]

### iii. Claim Specific Arguments

### a. Consumer Protection Act

Purdue challenges the State's Consumer Protection Act ("CPA") claims on several grounds. First, Purdue maintains that statements and transactions before August 6, 2012, cannot form the basis of a CPA claim. Pursuant to RSA 358-A:3, IV-a "transactions … exempt from the provisions of [the CPA]" include

> [t]ransactions entered into more than 3 years prior to the time the plaintiff knew, or reasonably should have known, of the conduct alleged to be in violation of this chapter; provided, however, that this section shall not ban the introduction of evidence of unfair trade practices and deceptive acts prior to the 3-year period in any action under this chapter.

Relying on this provision, Purdue contends that "the latest the State knew or reasonably should have known of the [complaint's allegations] is August 6, 2015," because, "[o]n that date, the State served Purdue with a subpoena" relating to the State's investigation into these matters, and, therefore, all alleged statements and transactions attributed to Purdue more than three years prior to that date, *i.e.* August 6, 2012, are exempt from the CPA's ambit. (Mot. to Dismiss at 28.) The State counters that the date it knew or should have known of Purdue's actions is a question of fact not appropriate for resolution at this time. The Court agrees. [12]

Next Purdue argues that neither the State's allegation that Purdue failed to report its knowledge of suspicious opioid prescriptions nor its assertion that Purdue should be held accountable for unbranded publications properly state a CPA claim. (Mot. to Dismiss at 26-27, 29-30.) Purdue's positions are both unavailing. The former issue requires little analysis considering the State acknowledges — contrary to Purdue's characterization — that it does not premise its CPA claim on Purdue's purported failure to comply with the federal Controlled Substances Act and associated regulations. (*See* Obj. at 23.) The Court finds the State's stance is fairly reflected in the complaint. Regarding its latter position, Purdue cites *Green Mountain Realty Corporation v. Fifth Estate Tower LLC*, 161 N.H. 78 (2010) seemingly for the proposition that marketing efforts that do not directly include offers to sell or distribute a product as part of an entity's day-to-day business are not actionable under the CPA. *Green Mountain*, however, offers no such support, considering the New Hampshire Supreme Court in that case merely concluded that "a publicity campaign directed at a general electorate" for the purpose of influencing "the passage of … warrant articles does not violate the CPA" and the New Hampshire Supreme Court did not contemplate whether all marketing efforts presented in not-strictly-business arenas fall outside the CPA's scope. 161 N.H. at 87. Because Purdue offers no additional support, the Court will not consider the issue further.

**\*13** Lastly, Purdue seeks to strike the State's request — pursuant to RSA 358-A:4, III(b) — of "an order assessing a civil penalty of $10,000 against Purdue for each violation of the [CPA]." (Compl. ¶ 225; Mot. to Dismiss at 30-31.) Purdue maintains that, although New Hampshire courts have yet to consider the issue, some jurisdictions apply an "individualized proof rule" to statutes comparable to the CPA and that this rule purportedly "prevents civil penalties where calculating them would require individualized proof as to each transaction at issue." (Mot. to Dismiss at 30 (citing *In re Zyprexa Prods. Liab. Lititg.*, 671 F. Supp. 2d 397, 456, 458-59 (E.D.N.Y. 2009)).) Purdue argues that the State cannot sustain such a burden and, therefore, its request for civil penalties must be stricken. Even assuming that it is appropriate to adopt an individualize proof rule with regards to the CPA (notwithstanding the New Hampshire Supreme Court's holding in *Exxon Mobil* that it is otherwise proper to employ "statistical evidence and extrapolation to prove injury-in-fact"), it is nevertheless inappropriate to strike the State's request at this time as discovery could provide the State the individualize proof it may ultimately require. 168 N.H. at 255-56.

### b. Medicaid Fraud and False Claims Act

Purdue advocates for the complete dismissal of the State's Medicaid Fraud and False Claims Act ("FCA") count for two alternative reasons. Initially, Purdue reiterates its position that the State's claims, including its FCA count, demand individualized proof. In the FCA context, Purdue contends this proof must at least comprise specifically identified instances of "a physician or pharmacy submitting a claim for reimbursement for opioid medications to New Hampshire's Medicaid program." (Mot. to Dismiss at 32.) The Court disagrees. Even assuming Purdue is correct that the pleading requirements imposed by some federal jurisdictions on claims implicating the federal analogue to the FCA equally apply in this matter, where, as here, "the defendant allegedly induced third parties to file false claims with the government" the plaintiff can satisfy these requirements merely "by providing factual or statistical evidence to strengthen the inference of fraud … without necessarily providing details as to each false claim." *United States ex rel. Narqol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 39 (1st Cir. 2017) (quotations, emphasis, and ellipsis omitted). The State's allegations satisfy this standard and contain "reliable indicia that lead to a strong inference that [false] claims were actually submitted for … reimbursement" despite the absence of any specific claim for reimbursement being described in the complaint. *Id.* at 41 (quotation and citation omitted).

Purdue also argues that, because the State supposedly "admits that it continues to pay for opioid medications prescribed for chronic pain, despite the Attorney General's belief that Purdue has been falsely marketing opioid medications for years," the State does not sufficiently plead that Purdue's alleged wrongdoing was "material" to the State's purported reimbursement decisions. (Mot. to Dismiss at 33 (citing Compl. ¶ 254).) These are issues of fact not amenable for consideration at this stage. *See generally Ellis v. Candia Trailers & Snow Equip., Inc.*, 164 N.H. 457, 466 (2012) ("[M]ateriall[ity] is a question of fact....").

### c. Public Nuisance

Regarding the State's public nuisance claim, Purdue contends that such a cause of action must "arise from the active or passive use of real property, whereas the State challenges only manufacturing and marketing activity." (Mot. to Dismiss at 33.) In *Robie v. Lillis*, 112 N.H. 492, 495 (1972), the New Hampshire Supreme Court explained that "[a] public nuisance ... is 'an unreasonable interference with a right common to the general public'" and "is *behavior* which unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." (Quoting Restatement (Second) of Torts § 821 B(1)) (emphasis added). The use of "behavior" in this context suggests Purdue's position, *i.e.* that the origin of a public nuisance must arise from the use of real property, is a too narrow reading of the law. Indeed, numerous other jurisdictions that, like the New Hampshire Supreme Court, look to the Restatement (Second) of Torts to guide their analysis of public nuisance claims have expressly concluded that "[a]n action for public nuisance may lie even though neither the plaintiff nor the defendant acts in the exercise of private property rights." *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 315 (3d Cir. 1985) (reasoning further that "'[a] public nuisance is a species of catch-all low-grade criminal offense, consisting of an interference with the rights of the community at large, which may include anything from the blocking of a highway to a gaming-house or indecent exposure.'" (Quoting Prosser, *Private Action for Public Nuisance*, 52 Va. L. Rev. 997, 999 (1966))); *see*, *e.g.*, *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002) ("[T]here need not be injury to real property in order for there to be a public nuisance."); *City of Boston v. Smith & Wesson Corp.*, No. 199902590, 2000 WL 1473568, at *14 (Mass. Super. July 13, 2000) ("[A] public nuisance is not necessarily one related to property."); Restatement (Second) of Torts §821B, Comment h ("Unlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land.").

 *14 Purdue also maintains that the State's claim fails because "the alleged public nuisance identified in the complaint is not reasonably subject to abatement." (Mot. to Dismiss at 33.) This issue demands little consideration as it is a question of fact whether Purdue can abate the alleged public nuisance for which the State seeks to hold it liable and, drawing all inferences in the State's favor, the complaint adequately alleges that Purdue is in fact capable of doing so. (*See* Compl. ¶ 266 (This public nuisance can be abated through health care provider and consumer education on appropriate prescribing, honest marketing of the risks and benefits of long-term opioid use, addiction treatment, disposal of unused opioids, and other means.").)

### d. Unjust Enrichment

Purdue argues that the State's claim for unjust enrichment must be dismissed because "unjust enrichment generally does not form an independent basis for a cause of action." (Mot. to Dismiss at 35 (quoting *Gen Insulation Co. v. Eckman Const.*, 159 N.H. 601, 611 (2010)).) The New Hampshire Supreme Court has not categorically barred independent unjust enrichment claims, however, it has made clear that such claims are predominately rooted in quasi-contract theory. See *Gen. insulation*, 159 N.H. at 611 ("[U]njust enrichment [is] allowed by the courts as [an] alternative remed[y] to an action for damages for breach of contract." (Quotation omitted)). Although a fair reading of the complaint is that Purdue may have enriched itself via "deceptive and illegal acts," (Compl. ¶ 272), this inference alone is insufficient to state a claim. See *Clapp v. Goffstown Sch. Dist.*, 159 N.H. 206, 210 (2009) ("Unjust enrichment is not a boundless doctrine, but is, instead, narrower, more predictable, and more objectively determined than the implications of the words 'unjust

enrichment.'" (Quotation omitted)); *Am. Univ. v. Forbes*, 88 N.H. 17, 19 (1936) ("The doctrine of unjust enrichment is that one shall not be allowed to profit or enrich himself at the expense of another contrary to equity. While it is said that a defendant is liable if 'equity and good conscience' requires, this does not mean that a moral duty meets the demands of equity. There must be some specific legal principle or situation which equity has established or recognized to bring a case within the scope of the doctrine."). Considering the State has not articulate an underlying "specific legal principle" nor cited authority allowing an unjust enrichment claim to proceed under comparable circumstances, the Court must agree with Purdue on this issue.

### e. Fraudulent or Negligent Misrepresentation

Finally, Purdue argues that the State's fraudulent and negligent misrepresentation claim demands dismissal "because the State fails to allege that it justifiably relied on any statement made by, or attributable to, Purdue." (Mot. to Dismiss at 35; *see also* Reply at 12.) The Court disagrees. The United States Supreme Court in *Bridge* considered and rejected a similar argument, finding that "while it may be that first-party reliance is an element of a common-law fraud claim, there is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it.... And any such notion would be contradicted by the long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation." 553 U.S. at 656-57 (citing Restatement (Second) of Torts §§ 435A, 548A, 870).

Likewise, the New Hampshire Supreme Court has relied upon the Restatement (Second) of Torts to conclude that "[t]he fact that [an] alleged misrepresentation was not made directly to the plaintiff does not defeat [the] cause of action." *Tessier v. Rockefeller*, 162 N.H. 324, 333 (2011) (citing Restatement (Second) of Torts § 533 ("The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved." [13] )).

 **\*15**  In light of this authority, the State's claim — which, *inter alia*, alleges that Purdue made misrepresentations to health care providers and patients for the purpose of inducing opioid prescriptions, along with the common sense understanding that some would in turn seek reimbursements from the State for these opioid prescriptions — is satisfactory.

### Conclusion

For the foregoing reasons, Purdue's Motion to Dismiss is DENIED as it pertains to Count I (deceptive and unfair acts and practices contrary to the Consumer Protection Act), Count II (unfair competition contrary to the Consumer Protection Act), Count III (false claims in violation of the Medicaid Fraud and False Claims Act), Count IV (public nuisance), and Court VI (fraudulent or negligent misrepresentation), and GRANTED as it relates to Count V (unjust enrichment).

**SO ORDERED**.

9/18/18

**Date**

<<signature>>

**John C. Kissinger, Jr.**

**Presiding Justice**

Footnotes

1 The federal Food, Drug, and Cosmetic Act requires that drug manufacturers obtain FDA approval prior to marketing or selling a drug in interstate commerce. 21 U.S.C. § 355(a). The FDA only approves a drug if the manufacturer demonstrates "substantial evidence that the drug will have the effect it purports or is represented to have." 21 U.S.C. § 355(d)(5). A drug manufacture must also submit for approval "the labeling proposed to be used for [a] drug." 21 U.S.C. § 355(b)(1)(F); 21 C.F.R. § 314.50(c)(2)(i). The FDA will approve a proposed label if, "based on a fair evaluation of all material facts," it is not "false or misleading in any particular." 21 U.S.C. § 355(d)(7); 21 C.F.R. § 314.125(b)(6). Once approved, a manufacturer may distribute a drug without violating federal law as long as it uses the approved labeling. *See* 21 U.S.C. §§ 331(c), 333(a), and 352(a), (c). Pursuant to 21 U.S.C. § 321(m), a drug's "labeling" means "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."

2 The parties dispute to what extent causation is an element of all or some of the State's claims. However, given the Court's conclusion that the State has sufficiently pled causation, it need not reach these issues.

3 Purdue argues that the State has failed, as a matter of law, to allege that Purdue "controlled" these third-parties. (Mot. to Dismiss at 25-26.) Taking all reasonable inferences in the State's favor, the Court disagrees.

4 For example, the State cites a 2007 study that found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse, with particularly compelling data for … OxyContin." (*Id.* (quotation omitted).) The State also relies upon a 2016 letter issued by the then United States Surgeon General opining "that the push to aggressively treat pain, and the devastating results that followed, had coincided with heavy marketing to doctors many of whom were even taught — incorrectly — that opioids are not addictive when prescribed for legitimate pain." (*Id.* ¶ 182 (quotations, ellipsis, and brackets omitted).)

5 Additionally, the State provides numerous examples of expenditures, *i.e.* harms, it has borne in combating opioid abuse. (*E.g.*, id. ¶ 191 ("The number of children removed from homes with substance abuse problems went from 85 in 2010 to 329 in 2015 — a 387% increase."); ¶ 192 ("From 2007-2013 … state Medicaid spending on drugs to counter overdose or addiction increased six-fold."). As another example, the State maintains "damages from false claims submitted, or caused to be submitted, by [Purdue]," and indicates that "[f]rom 2011-2015, the State's Medicaid program spent $3.5 million to pay for some 7, 886 prescriptions and suffered additional damages for the costs of providing and using opioids long-term to treat chronic pain." (*Id.* ¶ 254.)

6 For example, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 25 (1st Cir. 2016), is easily distinguishable, considering the court in that case found the plaintiffs' allegations insufficient not because they were based upon aggregate or statistical analysis, but rather because they were wholly lacking in *any* factual support and were, therefore, "mere conjecture."

7 *See Larkin v. Pfizer, Inc.*, 153 S.W.3d 758, 762 (Ky. 2004).

8 The court in that case summarized the defendant's purported misconduct as a "fraudulent marketing" scheme, which "included, but was not limited to. three strategies, each of which included subcomponents: (1) direct marketing … to doctors, which misrepresented [the relevant prescription drug's] effectiveness for off-label indications; (2) sponsoring misleading informational supplements and continuing medical education ("CME") programs; and (3) suppressing negative information about [the drug] while publishing articles in medical journals that reported positive information about [the drug's] off-label effectiveness." *Id.* at 28.

9 The court in *City of Boston* illustrated this point with the following example:
Plaintiffs allege that Defendants' conduct places firearms in the hands of juveniles causing Plaintiffs to incur increased costs to provide more security at Boston public schools, Thus, wholly apart from any harm to the juvenile (who may even believe himself to be benefited by acquisition of a firearm), and regardless whether any firearm is actually discharged at a school, to ensure school safety Plaintiffs sustain injury to respond to Defendants' conduct.

10 Separately, the Court is not bound by the United States Supreme Court's judgment on these issues nor has Purdue cited New Hampshire authority explicitly echoing *Holmes*'s reasoning. Indeed, Purdue's briefing on this issue (and the State's for that matter) does not even directly address the Holmes factors. Considering, moreover, that the New Hampshire Supreme Court maintains that legal cause simply "requires the plaintiff to establish that the negligent conduct was a *substantial factor* in bringing about the harm" and that this requirement does not demand that "[t]he negligent conduct … be the sole cause of

| | |
|---|---|
| | the injury." but rather merely a "contribut[ion]," the Court is not inclined to adopt *Holmes* at this time. *Carignan v. Mew Hampshire Int'l Speedway, Inc.*, 151 N.H. 409, 414 (2004) (emphasis added): *Young v. Clogston*, 127 N.H. 340, 342 (1985) (The jury determines the facts, *i.e.* … whether the defendant's conduct is a legal cause of the plaintiffs injuries, [and] the trial judge's discretion to remove questions of fact from the jury is very limited."); *see also City of Boston v. Smith & Wesson Corp.*, No. 199902590, 2000 WL 1473568, at *6 (Mass. Super. July 13, 2000) (discussing exceptions to the direct relation requirement that may be applicable to this case). |
| 11 | The Court's conclusion is in keeping with those of recent trial courts across the country that have considered similar claims against Purdue. *See*, *e.g.*, *State v. Purdue Pharma L.P.*, No-3AN-17-09966CI (Alaska Super. Ct. July 12, 2018); *In re Opioid Litigation*, Index No. 400000/2017 (N.Y. Sup. Ct. March 21, 2018). |
| 12 | Although the State raises additional counterarguments for the proposition that RSA 358-A:3, IV-a's exception provision does not apply to the State at all pursuant to the doctrine of *nullum tempus* (*see* Index # 29 at 1-2; Defs.' Reply to PL's Supp. Oppo. to Mot. to Dismiss at 1-3) and that, in any case, the provision is inapplicable to "misleading marketing statements," (Obj. at 24), the Court need not reach these issues at this time as it is undisputed, even crediting Purdue's August 6. 2012, cutoff, that the State's CPA claims do not wholly rely on exempted transactions. |
| 13 | This rule "is applicable not only when the effect of the misrepresentation is to induce the other to *enter* into a transaction with the maker, but also when he is induced to enter into a transaction with a third person." Restatement (Second) of Torts § 533, Comment c. |

---

**End of Document**  © 2019 Thomson Reuters. No claim to original U.S. Government Works.