KeyCite Yellow Flag - Negative Treatment

Clarified on Denial of Reconsideration by In re National Prescription Opiate Litigation, N.D.Ohio, September 22, 2020

477 F.Supp.3d 613
United States District Court,
N.D. Ohio, Eastern Division.

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION
This Document Relates to:
Track Three Cases:
County of Lake, Ohio v.
Purdue Pharma, L.P., et al.,
County of Trumbull, Ohio v.
Purdue Pharma, L.P., et al.,

MDL 2804
|
Case No. 1:17-MD-2804, Case No. 18-
OP-45032, Case No. 18-OP-45079
|
Signed 08/06/2020

**Synopsis**
**Background:** Plaintiffs brought action against corporate owners of pharmacies based on claim of absolute public nuisance under Ohio common law, which was a claim arising out of pharmacies' alleged violations of the federal Controlled Substances Act and Ohio controlled-substance laws in the dispensing of prescription opioids to customers. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Dan Aaron Polster, J., held that:

[1] Ohio statute on the unlawful distribution of drugs of abuse, which was a statute that was part of chapter governing the practice of pharmacy, did not preclude claim;

[2] corporate owners of pharmacies, not just the pharmacists, had a duty under the Controlled Substances Act to prevent diversion of opioids via illegitimate prescriptions; and

[3] plaintiffs stated a claim for absolute public nuisance under Ohio common law.

Motion denied.

See also 440 F.Supp.3d 773.

West Headnotes (14)

[1] **Nuisance** 🗝 Nature and elements of public nuisance in general

Ohio statute on the unlawful distribution of drugs of abuse, which was a statute that was part of chapter governing the practice of pharmacy, did not preclude claim of absolute public nuisance under Ohio common law against pharmacies over their alleged violations of the federal Controlled Substances Act and Ohio controlled-substance laws in the way they dispensed prescription opioids to customers; statute did not expressly abrogate any common law or equitable cause of action or remedy, and the fact that the statute provided authorized persons with a statutory public nuisance claim to enjoin unlawful conduct did not demonstrate an intent to preclude those or other persons from also obtaining relief at common law for harm caused by the same wrongful conduct. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 101 et seq., 21 U.S.C.A. § 801 et seq.; Ohio Rev. Code Ann. §§ 1.47(C), 1.51, 4729.35.

[2] **Statutes** 🗝 Statutory Alteration or Abrogation of Common Law

Under Ohio law, an intent to abrogate the common law must be expressly declared by the legislature or necessarily implied in the language of the statute.

[3] **Statutes** 🗝 Continuance or alteration of existing law by codification

Under Ohio law, where the General Assembly has codified the law on a subject, unless there

Ex. A - Tab 18 - Ohio

is a clear legislative intention expressed or necessarily implied that the statutory provisions are merely cumulative, the statutory provisions govern to the exclusion of prior non-statutory law.

**[4]**  **Nuisance** 🔑 Acts authorized or prohibited by public authority

**Nuisance** 🔑 Persons creating or causing nuisance

Corporate owners of pharmacies, not just the pharmacists, had a duty under the Controlled Substances Act to prevent diversion of opioids via illegitimate prescriptions, as was relevant to determining if plaintiffs stated a claim against the corporate owners for absolute public nuisance under Ohio common law, which was a claim that arose from pharmacies' dispensing of opioid prescriptions; Act made clear that any person, which included the pharmacy itself, who knowingly filled or allowed to be filled an illegitimate prescription was in violation of the Act, and corporate owners had an obligation under the Act to employ someone who could exercise on their behalf the appropriate professional knowledge, judgment, and skill in identifying "red flag" prescriptions. Comprehensive Drug Abuse Prevention and Control Act of 1970 § 102, 21 U.S.C.A. §§ 802(10), 802(21); Ohio Rev. Code Ann. §§ 4729.01(B), 4729.01(J), 4729.01(M), 4729.01(Q), 4729.55, 4729.55(D), 4729.57(B) (7); 21 C.F.R. §§ 1300.01, 1301.71(a), 1304.22(c), 1306.04(a).

2 Cases that cite this headnote

**[5]**  **Nuisance** 🔑 Public annoyance, injury, or danger

Under Ohio law, a "public nuisance" is an unreasonable interference with a right common to the general public, including the rights to public health and public safety.

**[6]**  **Nuisance** 🔑 Nature and elements of public nuisance in general

Under Ohio law, an "absolute nuisance," also called a "nuisance per se," is based on culpable and intentional or unlawful conduct by the defendant resulting in harm; on the other hand, a "qualified nuisance" involves harm caused by the defendant's negligence.

**[7]**  **Nuisance** 🔑 Nature and elements of public nuisance in general

Under Ohio law, an "absolute nuisance" can be based on nonculpable conduct by the defendant that results in accidental harm for which, because of the hazards involved, the law imposes strict or absolute liability notwithstanding the absence of fault.

**[8]**  **Nuisance** 🔑 Matters constituting public nuisances in general

**Nuisance** 🔑 Acts authorized or prohibited by public authority

Plaintiffs stated a claim against corporate owners of pharmacies for absolute public nuisance under Ohio common law based on pharmacies' alleged intentional conduct in the dispensing of prescription opioids, where plaintiffs alleged that pharmacies willfully and systematically ignored red flags that they were fueling a black market, required and rewarded speed and volume by opioid-dispensing employees while minimizing standards of safety and care, and knowingly worked in concert with opioid manufacturers to ensure consistent false messaging surrounding the true addictive nature of opioids, and plaintiffs also alleged that pharmacies failed to comply with statutory and regulatory requirements to provide effective controls against diversion. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 101 et seq., 21 U.S.C.A. § 801 et seq.

1 Cases that cite this headnote

**[9]**  **Nuisance** 🔑 Nature and elements of public nuisance in general

To meet the requisite intent for an absolute nuisance under Ohio law, a plaintiff need not

allege the defendant intended to create the precise alleged nuisance; rather, plaintiff only need allege the defendant intended to bring about the conditions which are in fact found to be a nuisance, or, stated otherwise, where the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, the law of negligence has no application and the rule of absolute liability applies.

**[10]  Federal Civil Procedure** 🔑 Motion and proceedings thereon

District court, when deciding pharmacies' motion to dismiss plaintiffs' claim of absolute public nuisance under Ohio common law, would not address pharmacies' argument that even if their alleged dispensing conduct was unlawful, an absolute nuisance theory would not apply since the Controlled Substances Act and its implementing regulations merely set forth a general duty to exercise ordinary care under the circumstances and did not set forth rules requiring or prohibiting the performance of specific acts; pharmacies raised such an argument for the first time in a reply brief. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 101 et seq., 21 U.S.C.A. § 801 et seq.

**[11]  Nuisance** 🔑 Acts authorized or prohibited by public authority

That pharmacies' conduct of dispensing opioid prescriptions was licensed, authorized, and regulated under the Controlled Substances Act did not preclude plaintiffs' claim against pharmacies for absolute public nuisance under Ohio common law based on pharmacies' dispensing of opioid prescriptions; under Ohio law, "safe harbor" immunity from absolute nuisance liability was available only to those who performed in accordance with their applicable licensing regulatory obligations. Comprehensive Drug Abuse Prevention and

Control Act of 1970, § 101 et seq., 21 U.S.C.A. § 801 et seq.

**[12]  Nuisance** 🔑 Persons creating or causing nuisance

Allegedly intervening conduct of prescribing by medical professionals did not preclude plaintiffs' claim against pharmacies for absolute public nuisance under Ohio common law based on pharmacies' dispensing of opioid prescriptions, despite argument that the prescribing conduct broke the causal chain; plaintiffs were not seeking to hold pharmacies liable for personal injuries to opioid users for harms caused by products or related warnings, but instead plaintiffs' public nuisance claims pertained to broad harms to the public allegedly caused by pharmacies' dispensing conduct that implicated legal obligations independent of manufacturers, physicians, or any other participant in the opioid supply chain.

**[13]  Products Liability** 🔑 Learned intermediary

**Products Liability** 🔑 Drugs in general

Ohio courts apply the learned-intermediary doctrine in strict-products-liability cases to shift a prescription-drug manufacturer's duty to warn onto the prescribing physician, if the manufacturer has adequately warned the physician.

**[14]  Nuisance** 🔑 Actions

Under Ohio law, proximate cause, as is relevant to a nuisance claim, is ordinarily a question of fact for the jury.

**\*616  OPINION AND ORDER**

DAN AARON POLSTER, UNITED STATES DISTRICT JUDGE

Before the Court is the Pharmacy Defendants'[1] Motion to Dismiss Second Amended Complaints. Doc. #: 3340.[2] Plaintiffs (Ohio's Lake and Trumbull Counties) filed an opposition brief. Doc. #: 3366. Pharmacy Defendants filed a reply brief. Doc. #: 3379. For the reasons stated below, the Motion to Dismiss is **DENIED**.

### I. Legal Standard.
The Court incorporates by reference the applicable legal standards set forth in its *Opinion and Order in* **\*617** *Cleveland Bakers & Teamsters Health & Welfare Fund v. Purdue Pharma, L.P.*, Case No. 1:18-OP-45432 (Doc. #: 3177 at 4–6).[3]

### II. Factual Allegations.
Plaintiffs each assert a claim of common law absolute public nuisance against the Pharmacy Defendants.[4] This Opinion addresses the viability of the public nuisance claims as they arise out of Pharmacy Defendants' activity *of dispensing* prescription opioids to customers. The Court previously concluded under Ohio law that nearly identical claims based on the Pharmacy Defendants' *distribution* activity survive a motion to dismiss. *See Opinion and Order in The County of Summit, Ohio v. Purdue Pharma L.P.*, Case No. 18-OP-45090 (Doc. #: 1203).[5]

With respect to dispensing practices, Plaintiffs contend the Pharmacy Defendants violated the Federal Controlled Substances Act and also Ohio controlled substance laws by, among other things, "dispensing and selling [opioids] without maintaining effective controls against the diversion of opioids." *Amended Complaint*, Doc. #: 3327 at ¶630(b).[6] In particular, Plaintiffs allege the Pharmacy Defendants failed to: "adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers," *id.* at 1182; "put in place effective policies and procedures to prevent their stores from facilitating diversion and selling into a black market," *id.* at ¶83; "conduct adequate internal or external reviews of their opioid sales to identify patterns regarding prescriptions that should not have been filled," *id.*; "effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions," *id.* at ¶85; and "take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to

controlled substances," *id.* at ¶86. Plaintiffs further allege the Pharmacies "had the ability, and the obligation, to look for [ ] red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion," *id.* at ¶541, but the Pharmacy Defendants "systemically ignored red flags that they were fueling a black market." *Id.* at ¶81. Plaintiffs allege the result of all this conduct is that the Pharmacy Defendants distributed and dispensed opioids "in a manner which caused prescriptions and sales of opioids to skyrocket in Plaintiff's community, flooded Plaintiff's community with opioids, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market." *Id.* at ¶621.

### III. Analysis.
The Pharmacy Defendants argue there are four reasons why federal and Ohio law require dismissal of Plaintiffs' public nuisance claims based on dispensing activity. The Court considers each argument in turn.

### \*618 A. Statutory Abrogation of Plaintiffs' Public Nuisance Claims.

[1] The Pharmacy Defendants begin their motion with the contention that Ohio statutes (and associated regulations) that govern "distribution of a drug of abuse" displace the common law and thereby entirely preclude Plaintiffs' absolute public nuisance claims. Defendants explain that the "Ohio legislature has comprehensively regulated the field of controlled substance dispensing and distribution, and has provided specific remedies that conflict with any common law cause of action." Doc. #: 3340-1 at 1. Defendants insist the Plaintiff Counties "can bring their claim under the appropriate statute, Ohio Rev. Code ("O.R.C.") § 4729.35, or not at all." *Id.* at 7. The Court finds this position unpersuasive.

The statute at issue falls under Title 47 of the Revised Code, "Occupations–Professions," which establishes professional standards applicable to 66 different occupations. Chapter 4729, titled "Pharmacists; Dangerous Drugs," governs numerous matters related to the practice of pharmacy, including: licensing; required and prohibited conduct; distribution and dispensing of prescription medication; and disciplinary actions against pharmacies and pharmacists.[7] The Chapter also establishes a State Board of Pharmacy ("OBOP") to administer and enforce the provisions of the Chapter, and to adopt rules to carry out its purposes. O.R.C.

§§ 4729.01–4729.99; *see, e.g., Ohio State Bd. of Pharm. v. Dick's Pharmacy*, 150 Ohio App.3d 343, 780 N.E.2d 1075, 1077-82 (2002) (affirming OBOP's imposition of a $25,000 civil fine against a pharmacy based on its determination that the pharmacy and its pharmacist-in-charge engaged in illegal dispensing of dangerous drugs).

Under the OBOP's rules, "[a]ll licensees and registrants shall provide effective and approved controls and procedures to deter and detect theft and diversion of dangerous drugs." Ohio Admin. Code §§ 4729-9-05(A), 4729-9-11, 4720-9-16(H).[8] Section 35 of Chapter 4729 declares violations of federal or state laws and regulations governing the distribution and dispensing of opioids to constitute a public nuisance *per se*.[9] It authorizes the attorney general, county prosecutors, and the OBOP to maintain a civil action "in the name of the state" to enjoin violative conduct. An injunction is the only remedy available under that section.[10]

**\*619**  Plaintiffs, however, do not assert a cause of action under O.R.C. § 4729.35. Rather, they bring *common law* absolute public nuisance claims, alleging that Defendants' violations of anti-diversion laws gave rise to a public nuisance. Doc. #: 3327 at ¶¶71-599, 616-654.

The Pharmacy Defendants insist Ohio law allows only the statutory public nuisance claim provided for in O.R.C. § 4729.35, so Plaintiffs' common law public nuisance claims must be dismissed. In support, Defendants rely on: (1) rules of statutory construction, (2) the doctrine of field preemption, and (3) assertions of irreconcilable conflict. Each topic is addressed below.

### 1. Rules of Construction Regarding Abrogation.

 **[2]**  The Ohio Supreme Court has consistently recognized the following rule of statutory construction:

> Statutes are to be read and construed in the light of and with reference to the rules and principles of the common law in force at the time of their enactment, and in giving construction to a statute the Legislature will not be presumed or held to have intended a repeal of the settled rules of the common law, **unless the language employed by it clearly expresses or imports such intention.**

*State ex rel. Morris v. Sullivan*, 81 Ohio St. 79, 90 N.E. 146, syllabus ¶ 3 (1909) (emphasis added). Put more succinctly, an intent to abrogate the common law "must be expressly declared by the legislature or necessarily implied in the

language of the statute." *LaCourse v. Fleitz*, 28 Ohio St.3d 209, 503 N.E.2d 159, 161-62 (1986) (citation omitted)*; see also Combs v. Ohio Dep't of Nat. Res., Div. of Parks & Recreation*, 146 Ohio St.3d 271, 55 N.E.3d 1073, 1078 (Ohio 2016) ("in the absence of language clearly showing the intention to supersede the common law, the existing common law is not affected by the statute, but continues in full force") (internal quotation marks and citations omitted).[11]

As Plaintiffs note, § 4729.35 does not expressly abrogate any common law or equitable cause of action or remedy (and neither does any other section of Chapter 4729). Despite this, Defendants contend there is an exception to the *Morris* statutory construction rule: it "applies only to the repeal of '*settled* rules of the common law.' " Doc. #: 3379 at 2 (emphasis added). Defendants argue that "diversion of controlled substances" had no meaning at common law, so the General Assembly had no reason to declare the common law was abrogated. Put differently, Defendants assert that common law public nuisance claims asserting diversion of controlled substances "never existed in the first place," *id.* at 2-3, so there was no need for § 4729.35 to include "language clearly showing the intention to supersede th[is] common law." *Combs*, 55 N.E.3d at 1078.

 **\*620**  Defendants' theory, however, constrains the *Morris* rule of construction to an unsupportable level of specificity. Defendants ignore that Ohio courts for many decades have recognized a common law claim for absolute public nuisance based on a defendant's unlawful conduct. *See, e.g., Taylor v. Cincinnati*, 143 Ohio St. 426, 55 N.E.2d 724, 727-32 (1944). Undoubtedly, the General Assembly was aware of the *Morris* rule of construction when it enacted § 4729.35 and could easily have abrogated some or all of the existing species of common law public nuisance claims, whether premised upon diversion of controlled substances or any other intentional, unlawful, or hazardous conduct. Indeed, the General Assembly has abrogated very specific types of common law claims in other statutes, as well as entire categories of common law claims. *See, e.g.,* O.R.C. § 2307.98(E) ("This [shareholder liability] section is intended to codify the elements of the common law cause of action for piercing the corporate veil and to *abrogate the common law cause of action and remedies relating to piercing the corporate veil in asbestos claims*."); O.R.C. § 2307.71(b) (stating that certain provisions in the Revised Code "are intended to *abrogate all common law product liability claims or causes of action*"). The fact that the Legislature did not do so in § 4729.35 negates any presumption that it intended to

abrogate any aspect of the common law. *Morris*, 90 N.E. 146, syllabus ¶ 3.

Ohio case law further supports the conclusion that the Ohio Legislature did not intend to abrogate common law public nuisance claims or remedies when it enacted § 4729.35. Ohio courts have repeatedly held that § 3767.03, a general nuisance statute, does not supersede or preempt common law public nuisance claims. *See, e.g., Pizza v. Sunset Fireworks Co.,* 25 Ohio St.3d 1, 494 N.E.2d 1115, 1120 (1986) ("[T]he appellate court concluded that the existence of R.C. 3767.03 in no way limited the right of a prosecutor to initiate an injunctive action in the case of a common law nuisance. We agree with the appellate court."); *Christensen v. Hilltop Sportsman Club, Inc.*, 61 Ohio App.3d 807, 573 N.E.2d 1183, 1184-85 (1990) ("Although R.C. Chapter 3767 provides a statutory basis for nuisance actions, we do not accept appellant's argument that the statute supersedes all common-law nuisance. There is no language within the statute that provides that it was the legislature's intent to supersede common-law nuisance and no court in Ohio has so held."); *Haas v. Sunset Ramblers Motorcycle Club, Inc.*, 132 Ohio App.3d 875, 726 N.E.2d 612, 614-15 (1999) ("Although R.C. 3767.03 provides that a private citizen, as well as certain enumerated public officials, has the right to bring an action in equity to request a court to abate a presumably public nuisance and to enjoin the defendant from further maintenance of such nuisance, there is no language in the statute that provides that it was the legislature's intent to supersede common-law nuisance."); *Winkelmann v. Cekada*, 137 Ohio App.3d 176, 738 N.E.2d 397, 399-400 (1999) ("In addition, the common-law tort of private nuisance survived the enactment of R.C. Chapter 3767."). These cases all stand for the proposition that common-law nuisance claims should not be deemed superseded by statute, absent clear language that says so.

### 2. Comprehensive Legislation.

Using an argument analogous to field preemption, Defendants also assert the specificity and comprehensive nature of Ohio's regulatory scheme governing distribution and dispensing of controlled substances implies an intent by the General Assembly to displace the common law and "limit[ ] public nuisance liability to the [injunctive] **\*621** relief permitted under Section 4927.35." Doc. ##: 3340-1 at 8-13; 3379 at 3-4. Defendants cite *Thompson v. Ford* for the proposition that common law is superseded when the General Assembly enacts "general and comprehensive legislation, prescribing minutely a course of conduct to be pursued, the parties and things affected, and elaborately describing limitations and exceptions." 164 Ohio St. 74, 128 N.E.2d 111, 115-16 (1955) (quoting 3 Sutherland Statutory Construction § 5305 (3d ed.)). *Thompson*, however, did not hold that the comprehensive nature of a statute necessarily implies legislative intent to displace all common law causes of action. Rather, as Plaintiffs correctly assert, *Thompson* merely concluded the statutory negligence *standard of care* displaced the common law negligence *standard of care.* Doc. #: 3366 at 8. Nothing in the decision indicates an intent by the General Assembly that comprehensive statutory language should work to abolish common law *causes of action* or available remedies.

Defendants also assert Ohio's statutory scheme governing dangerous drugs is analogous to the federal scheme, set out in the Controlled Substances Act ("CSA"), "that balances the competing public health goals of making medications available to patients who need them and controlling against their abuse." Doc. #: 3340-1 at 12-13 (quoting *Gonzales v. Raich*, 545 U.S. 1, 24, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005)). Nothing in *Gonzales*, however, supports Defendants' contention that, as a matter of law, Ohio's statutory scheme precludes a common law public nuisance claim based on conduct the statute proscribes.[12] To the contrary, this Court previously held that, even though the distribution of controlled substances is regulated under a comprehensive federal scheme, a claim under Ohio common law for absolute nuisance is not foreclosed. *See In re Nat'l Prescription Opiate Litig.*, 440 F. Supp. 3d at 808 (Doc. #: 3177 at 45) (rejecting the Distributor Defendants' contention that "they are not subject to nuisance liability because their business activities are authorized and extensively regulated by state and federal law").

### 3. Codification of the Common law and Irreconcilable Conflict.

**[3]** Defendants next offer the related argument that the Plaintiffs' common law public nuisance claims are precluded because the Ohio legislature has "codified" the law governing distribution and dispensing of controlled substances, and has not demonstrated an intent for the statutory provisions to be "cumulative" to common law. Doc. #: 3340-1 at 7-8. Under Ohio law, where the General Assembly has codified the law on a subject, "unless there is a clear legislative intention expressed or necessarily implied that the statutory provisions are merely cumulative," the statutory provisions govern to the exclusion of prior non-statutory law. *Metz v. Unizan Bank,*

2006 WL 8427066, at *10 (N.D. Ohio Feb. 28, 2006) (citing *Bolles v. Toledo Trust Co.*, 144 Ohio St. 195, 58 N.E.2d 381, syllabus ¶ 13 (1944)).

Defendants attempt to support their position with cases involving claims arising **\*622** under the Uniform Commercial Code ("UCC"). *See* Doc. #: 3340-1 at 7-8, 12-13 (citing *Alotech, Ltd. v. Huntington Nat'l Bank*, 2014 WL 281973, at *3-4 (N.D. Ohio Jan. 24, 2014); *Amzee Corp. v. Comerica Bank-Midwest*, 2002 WL 1012998, at *1 (Ohio Ct. App. May 21, 2002); *Peters Family Farm, Inc. v. Sav. Bank*, 2011 WL 497476, at *3 (Ohio Ct. App. Jan. 28, 2011); and *Baggott v. Piper Aircraft Corp.*, 101 F. Supp.2d 556, 561 (S.D. Ohio 1999)). These cases, however, are all readily distinguishable.

Unlike Chapter 4729 (which, as discussed above, governs the State's licensing, regulatory, and enforcement powers regarding pharmacies and does not address claims or remedies available to parties at common law), the UCC clearly codifies the law governing commercial transactions between private parties, including remedies. *See, e.g., Metz*, 2006 WL 8427066, at *11 (UCC § 1-103 expresses the Ohio legislature's intent to: (1) "simplify, clarify, and modernize the law governing commercial transactions;" (2) "permit the continued expansion of commercial practices through custom, usage, and agreement of the parties;" and (3) "make uniform the law among various jurisdictions"); *Baggott*, 101 F. Supp.2d at 561 ("UCC § 2-607(5) is a codification of common law voucher in the context of the sale of goods"). Moreover, the UCC itself expressly provides that its provisions displace some—but not all—common law claims. *See Metz*, 2006 WL 8427066, at *10 (under UCC § 1-103, unless displaced by the UCC's particular provisions, the principals of law and equity shall supplement the UCC's provisions); *Alotech*, 2014 WL 281973, at *3 ("The UCC does not purport to codify the entire body of law affecting the rights and obligations of parties to commercial transactions.").

In the UCC cases cited by Defendants, the courts held that, where the UCC governs the particular conduct at issue, a plaintiff cannot assert a *conflicting* common law claim to circumvent the liabilities, responsibilities, and remedies provided under the UCC.[13] Defendants have not shown that allowing the Plaintiffs' public nuisance claims to proceed would in any way conflict or interfere with an authorized entity's ability to enjoin the same alleged unlawful conduct

under § 4729.35. Nor have they demonstrated § 4729.35 is a codification of the common law.

Defendants also cite an Ohio rule of statutory construction, O.R.C. § 1.51,[14] which provides that "special or local" provisions control over irreconcilable general provisions – a rule this Court applied in its Track One Order addressing Plaintiffs' statutory nuisance claims. Doc.:# 3340-1 at 13 (citing *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *17 (Doc. #: 1203 at 30)). Defendants write: "Much as this Court concluded that the specific provision, Section 4729.35, must control over **\*623** an irreconcilable general [public nuisance] statute, this same provision must prevail over an irreconcilable common law cause of action." *Id.* But the Track One Order addressed a conflict between statutory causes of action and did not address an alleged conflict between statutory and common law claims.[15]

The fact that § 4729.35 provides authorized persons with a statutory public nuisance claim to enjoin unlawful conduct does not demonstrate an intent to preclude those or other persons from also obtaining relief at common law for harm caused by the same wrongful conduct. In fact, in Track One, the Court found the City of Akron lacked standing to bring a *statutory* public nuisance claim under § 4729.35, *see* Doc. #: 1203 at 30-31, yet also found the City stated a *common law* public nuisance claim under Ohio law, *see id.* at 23-28 (finding the Ohio Products Liability Act did not abrogate plaintiffs' common law absolute nuisance claims). Defendants point to no facts or authority demonstrating an irreconcilable conflict between a claim brought by a county under § 4729.35 and a common law public nuisance claim.

### 4. Conclusion.

Under the approach urged by Defendants, pharmacists, pharmacies, and "other person[s]"[16] who violate a state or federal law or regulation governing controlled substances would be subject only to an order enjoining the misconduct. This reading would immunize an entity from common law liability for the consequences of this conduct, even if it causes a dire nuisance by unreasonably interfering with the public's right to health and safety. To find the General Assembly intended this outcome strains credulity and would contradict its fundamental instruction that, "[i]n enacting a statute, it is presumed that ... [a] just and reasonable result is intended." O.R.C. § 1.47(C).

In sum, the Court perceives nothing in § 4729.35 expressly stating or necessarily implying abrogation of common law public nuisance claims. Accordingly, the Pharmacy Defendants' motion to dismiss on that basis is denied.

### B. Pharmacy Duties Under the CSA.

 [4]   The Pharmacy Defendants next argue they are entitled to dismissal of Plaintiffs' claims because *only* their pharmacist-employees—and not also they, themselves—have a duty under the Controlled Substances Act to prevent diversion of opioids via illegitimate prescriptions. This contention is deeply troubling and, for the reasons below, the Court firmly rejects it.

In its *Opinion and Order Regarding Plaintiffs' Summary Judgment Motions Addressing the Controlled Substances Act* (Doc. #: 2483),[17] this Court held that, "as a **\*624** matter of law, Section 1301.74 [of Title 21 of the Code of Federal Regulations] imposes a legal duty on registrants to design and operate a system to disclose to the registrant suspicious orders." Doc. #: 2483 at 15. Section 1301.74 applies specifically to non-practitioners—that is, manufacturers and distributors, but *not* pharmacies. The Pharmacy Defendants acknowledge that corporate *distributors* of opioids have a duty to prevent diversion by monitoring suspicious orders, but assert "there is no equivalent corporate-level obligation with respect to *dispensing.*" Doc. #: 3340-1 at 14 (emphasis added).[18] Defendants contend, instead, that "the responsibility to guard against invalid prescriptions rests with individual pharmacists, and *only* with individual pharmacists." *Id.* (emphasis in original). In other words, the Pharmacy Defendants now ask the Court to conclude that the CSA, as a matter of law, does not impose any obligation on a pharmacy-registrant, itself, to identify or investigate dubious prescriptions prior to filling them. The Court declines to do so, as this strained interpretation of the CSA would turn the fundamental purpose of the Act on its head.

In a prior opinion, the Court described the statutory and regulatory framework of the CSA and its implementing regulations. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575, at *3 (Doc. #: 2483 at 5). In short, all persons who dispense controlled substances (including pharmacies) must register with the Attorney General.[19] 21 U.S.C. § 822. Generally, in the case of pharmacies, the Attorney General must issue them a registration so long as they are authorized to

dispense controlled substances by and in the State where they practice. 21 U.S.C. § 823(f). However, the Attorney General may deny a registration if he deems it inconsistent with the public interest. *Id.*; *see also* 21 U.S.C. § 824(a)(4).

To help the Attorney General determine the public interest, the CSA provides a nonexclusive list of five factors the Attorney General must consider, including "[t]he applicant's experience in dispensing ... controlled substances" and its "[c]ompliance with applicable State, Federal, or local laws relating to controlled substances." 21 U.S.C. § 823(f)(2), (4). Chapter II of Title 21 of the Code of Federal Regulations further expands upon these general provisions. *See generally* 21 C.F.R. Ch. II.

The Regulations at Title 21, Chapter II have been properly promulgated pursuant to Congressional authorization and, thus, carry the full force and effect of law. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575 at *3, *7 (Doc. #: 2483 at 6, 15) (citing *Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The CSA—as interpreted through these implementing regulations—is unequivocal:

   **\*625** *All* applicants and registrants shall provide effective controls and procedures to guard against [i] theft *and* [ii] diversion of controlled substances.

21 C.F.R. § 1301.71(a) (emphasis added). The Court has previously explained that, "pursuant to this [Congressional] authorization, the DEA has promulgated regulations that set forth security requirements for registered manufacturers, distributors, and dispensers of controlled substances." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575 at *3 (Doc. #: 2483 at 6) (citing 21 C.F.R. §§ 1301.71-77 (the "Security Requirements")).

The Pharmacy Defendants do not disagree that the CSA's Security Requirements apply to them. But they assert that, at least with respect to pharmacies, these regulations "only impose[ ] requirements for in-store physical security controls and ha[ve] never been understood to require a 'system' for monitoring prescriptions and disclosing 'suspicious orders of controlled substances.' " Doc. #: 3340-1 at 16 n.6. In other words, even though *all* other registrants (including their own pharmacist-employees) need to guard against theft *and* other species of diversion, the Pharmacy Defendants assert *they* need only guard against theft.

The Regulation's use of the word "and," however, unambiguously indicates that *all* registrants have an

affirmative obligation to protect not only against diversion via theft but also other forms of diversion more broadly. To conclude otherwise, as the Pharmacy Defendants suggest, disregards the plain meaning of the text, undermines the purpose of the CSA, and would allow a frightening abdication of responsibility. Furthermore, as explained below, the CSA *explicitly* requires pharmacies to collect prescription data and use it to monitor for questionable prescriptions that might lead to diversion.

### 1. Statutory Obligations of Registrants.

The Pharmacy Defendants are certainly correct that the CSA includes provisions addressing physical theft of drugs from pharmacies. Specifically, the Regulation's Security Requirements lay out a non-exhaustive list of controls that a registrant must implement in order to store and dispense Schedule II controlled substances safely at their stores. *See* 21 C.F.R. § 1301.75-76.

But it is equally certain that the Pharmacy Defendants' statutory obligations do not end there. With respect to diversion more broadly, the CSA and its implementing regulations impose many other obligations on registrants —*all* registrants—that serve to advance the CSA's overall stated purpose of preventing diversion. For example, the CSA imposes specific record-keeping requirements on registrants who handle controlled substances. Specifically, a pharmacy-registrant must, at a minimum and among other things, record and maintain:

> the number of units or volume of such finished form dispensed, including the name and address of the person to whom it was dispensed, the date of dispensing, the number of units or volume dispensed, and the written or typewritten name or initials of the individual who dispensed or administered the [controlled] substance on behalf of the dispenser.

21 C.F.R. § 1304.22(c). Whatever other information a pharmacy may choose to collect about its own dispensing practices, those of its stores, or those of its pharmacists, the CSA mandates the collection and retention of specific data-points that would inarguably be useful to the pharmacy (or the DEA) in identifying suspicious prescribing and dispensing activity. This **\*626** record-keeping requirement is clearly intended as a guard against diversion. *See Medicine Shoppe-Jonesborough*, 73 FR 364-01, 365 (DEA Jan. 2, 2008) (because "Respondent [retail *pharmacy*] violated federal law and DEA regulations by failing to maintain complete and accurate records," "revocation of its registration is necessary

to protect the public interest"), *petition for review denied, Med. Shoppe-Jonesborough v. Drug Enf't Admin.*, 300 F. App'x 409, 411 (6th Cir. 2008) ("Medicine Shoppe fell short of meeting its duty to maintain accurate records of the controlled substances it dispensed."). It would undermine the entire purpose of the CSA (and defy logic) for the Act to require a pharmacy to collect the dispensing data listed in § 1304.22(c), but then allow the pharmacy to ignore this data when fulfilling its fundamental obligation to guard against diversion.

In addition to the Security Requirements and record-keeping requirements, the CSA also mandates that a pharmacy-registrant must employ a properly licensed and trained pharmacist. The Pharmacy Defendants, as non-pharmacist corporate entities, attempt to interpose this requirement to insulate themselves from liability. But the result the Pharmacy Defendants espouse can only be reached through a strained reading of the CSA as a whole.

Under the CSA, a pharmacy is itself a "Practitioner." *See* 21 U.S.C. § 802(21) ("The term 'practitioner' means a physician, dentist, veterinarian, scientific investigator, ***pharmacy***, hospital, or other person licensed, registered, or otherwise permitted ... to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice") (emphasis added). Further, a pharmacy is also a "dispenser." *See* 21 C.F.R. § 1300.01 ("Dispenser means an individual practitioner, institutional practitioner, ***pharmacy*** or pharmacist who dispenses a controlled substance.") (emphasis added); *see also* 21 U.S.C. § 802(10) (a dispenser is "a practitioner who so delivers a controlled substance to an ultimate user").

The Pharmacy Defendants attempt to draw a distinction between the roles of a pharmacist and a pharmacy. The Pharmacy Defendants then insist that individual, licensed pharmacists, and only those pharmacists, bear responsibility for dispensing controlled substances improperly. *See* Doc. #: 3340-1 at 17 (citing 21 C.F.R. § 1306.04(a)). But the CSA does not make this distinction. ***Both*** pharmacists and pharmacies are "practitioners" under the Act. And *both* are "dispensers." Accordingly, both pharmacists and pharmacies bear all the obligations imposed upon practitioners and dispensers. And, the statutory definitions of these two terms—especially the statutory definition of "practitioner"— expressly anticipate that a pharmacy has the ability to dispense controlled substances in the course of its own

professional practice. Thus, under the CSA, any **person** (which, to be clear, includes corporate entities) who dispenses or delivers a controlled substance to an ultimate user must adhere to all of the obligations imposed by the Act.

This understanding is further confirmed by the language of Section 1306.04(a):

> The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with **the pharmacist** who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act ( **\*627** 21 U.S.C. 829) and **the person** knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

21 C.F.R. § 1306.04(a) (emphasis added). Put plainly, although this regulation recognizes it is "**the pharmacist**" who physically hands the controlled substance over to the patient, the regulation intentionally and explicitly subjects **the person**—which is a much broader term, applying not just to the pharmacist but also to the pharmacy—to penalties for violation of the CSA. This interpretation has been adopted and ratified by the DEA and at least one other district court. *See Top RX Pharmacy; Decision and Order*, 78 FR 26069-01, 26082 (DEA May 3, 2013) ("The corresponding responsibility to ensure the dispensing of valid prescriptions extends to the pharmacy itself.") (citing multiple agency rulings);[20] *see also United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d 1184, 1189-90 (E.D. Ky. 2017) (finding "nothing inconsistent about articulating the responsibilities of individual practitioners and pharmacists while simultaneously indicating that other entities may be subject to penalties for their role in issuing and filling invalid prescriptions.").

Seeking support outside of the CSA itself, the Pharmacy Defendants also turn to Ohio law, asserting it supports their contention that "[o]nly a licensed pharmacist—not the non-pharmacist corporate owner of a pharmacy—may engage in the practice of pharmacy." Motion at 15. Specifically, the Pharmacy Defendants rely on O.R.C. § 4729.27, which states: "A person not a pharmacist, who owns, manages, or conducts a pharmacy, shall employ a pharmacist to be in full and actual charge of such pharmacy." The Pharmacy

Defendants **\*628** submit this language indicates that only a pharmacist can be held liable for the dispensing practices of a pharmacy, because "[q]uestioning the validity of a prescription requires ... specialized knowledge, judgment, and skill, and is a task that Pharmacy Defendants cannot lawfully usurp from their pharmacists." *Id.*

This logic fails. Ohio controlled substance law largely mirrors the federal scheme and sets out identical obligations. In Ohio, the Pharmacy Defendants are classified as "Terminal Distributors." The Ohio Revised Code defines "Terminal Distributor of Dangerous Drugs" as:

> a **person** who is engaged in the sale of dangerous drugs at retail, or any person, **other than a ... pharmacist**, who has possession, custody, or control of dangerous drugs for any purpose other than for that person's own use and consumption.

> "Terminal distributor" includes **pharmacies** ... who procure dangerous drugs for sale or other distribution **by or under the supervision of a pharmacist** ... authorized by the state board of pharmacy.

O.R.C. § 4729.01(Q) (emphasis added). Furthermore, the licensure requirements for Terminal Distributors of Dangerous Drugs, pursuant to O.R.C. § 4729.55, require that:

> No license shall be issued to an applicant for licensure as a terminal distributor of dangerous drugs unless the applicant has furnished satisfactory proof to the state board of pharmacy that:

> \* \* \*

> (B) A pharmacist ... authorized by the board ... will maintain supervision and control over the possession and custody of dangerous drugs and controlled substances that may be acquired by or **on behalf of the applicant.**

> \* \* \*

> (D) Adequate safeguards are assured that the applicant will **carry on the business of a terminal distributor** of dangerous drugs in a manner that allows pharmacists and pharmacy interns employed by the terminal distributor to practice pharmacy in a safe and effective manner.

O.R.C. § 4729.55 (emphasis added).

Combined, these provisions mean that a pharmacy owner, who is not him- or herself a licensed pharmacist, must employ a licensed pharmacist as a control against diversion, and the

pharmacy must conduct its business in a way that allows its pharmacist to properly dispense the pharmacy-licensee's controlled substances on its behalf. These provisions cannot be read to mean that pharmacy owners who **are not themselves pharmacists** are absolved of responsibility for their own dispensing practices simply because they must employ a pharmacist, whereas pharmacy owners who **are pharmacists**—and thus need not employ a separate pharmacist—are not.[21] Such a reading would undermine the purpose of Ohio's controlled substance law, and would disincentivize licensed pharmacists from owning and operating their own pharmacies.

Finally, the Ohio Revised Code specifically contemplates disciplinary action against **pharmacies** that "[c]eas[e] to satisfy the qualifications of a terminal distributor of dangerous drugs set forth in section 4729.55." O.R.C. § 4729.57(B)(7). That is, if a **pharmacy** fails to conduct its business **\*629** in a way that allows its pharmacists to be effective, it is in violation of Ohio controlled substance laws.[22] The Pharmacy Defendants' invocation of Ohio law in support of their attempt to avoid their legal obligations under the CSA is unavailing.

In sum, the Court concludes the Pharmacy Defendants have not shown that sole responsibility for their dispensing practices rests with their pharmacist-employees. Rather, the CSA makes clear that any **person**, which includes a pharmacy itself, who knowingly fills or allows to be filled an illegitimate prescription is in violation of the Act.

### 2. System Requirement.

Beyond the aforementioned statutory obligations, Plaintiffs assert the CSA also imposes duties on the Pharmacy Defendants to maintain systems, policies, or procedures to identify prescriptions that bear indicia ("red flags") that the prescription is invalid, or that the prescribed drugs may be diverted for illegitimate use. The Pharmacy Defendants admit an equivalent duty exists for manufacturers and distributors with respect to suspicious **orders**, but insist no such duty exists for pharmacies with respect to suspicious **prescriptions**.[23] Defendants are wrong.

There is no question that dispensers of controlled substances are obligated to check for and conclusively resolve red flags of possible diversion prior to dispensing those substances.[24] The DEA, in Agency decisions interpreting its regulations, routinely conducts a "red flag analysis." In fact, the Agency

has even articulated the specific elements of a *prima facie* violation of a pharmacy-registrant's responsibility under 21 C.F.R. § 1306.04(a) using the term "red flag." *See Holiday CVS,* 77 FR at 62341 ("to show a violation of a corresponding responsibility, the Government must establish that: (1) the Respondent [a pharmacy] dispensed a controlled substance; (2) a *red flag* was or should have been recognized at or before the time the controlled substance was dispensed; and (3) the question created by the *red flag* was not resolved conclusively prior to the dispensing of the controlled substance.") (emphasis added).[25] Agency precedent, in **\*630** analyzing whether a registrant properly identified and resolved red flags, uses a combination of factors (2) and (4) of 21 U.S.C. 823(f) as the statutory basis for the requirement.[26]

Many of the red flags that the Agency examines (which a registrant should have at least identified and, if possible, resolved) include indicia that would be very difficult, if not impossible, for a human pharmacist to identify consistently absent a system to aggregate, analyze, and provide feedback to the pharmacist about the prescription.[27] In other words, some prescriptions are not suspicious on their face but raise bright red flags when compared with other prescriptions in a database. One example of such a red flag is " 'pattern prescribing,' defined as 'prescriptions for the same drugs, the same quantities[,] coming in from the same doctor." *Holiday CVS,* 77 FR at 62344. Identifying prescriptions presented over time for the same drugs or combinations of drugs, in the same quantities, issued by the same doctor (and possibly presented to different pharmacists in different stores owned by the same pharmacy), would test the limits of human memory; this red flag would be nearly impossible for any individual pharmacist to discern absent some global mechanism for reference to other prescriptions. However, given that a **pharmacy-registrant** is required to collect the specific data needed to identify exactly such a pattern, the pharmacy—not the pharmacist—is in the best position to identify such a red flag (or at least provide the pharmacist with data reports to do so). Indeed, the fact that the DEA has revoked registrations of **pharmacies** for failure to identify such red flags necessarily means pharmacies are required to look for them, which can only be done by putting into place systems to identify them.

The Pharmacy Defendants assert they cannot be responsible for identifying red flags because they do not have the requisite "specialized knowledge, judgment, and skill" to engage in the practice of pharmacy. Doc. #: 3340-1 at 15 (citing O.R.C. § 4729.01(B)). But the Pharmacy Defendants

do have an obligation under the CSA to employ someone who does have and can exercise appropriate professional knowledge, judgment, and skill on their behalf. The same is expressly true under Ohio **\*631** law. *See* O.R.C. § 4729.55(D). Pharmacies also have an obligation under Ohio law to "allow[ ] pharmacists ... to practice pharmacy in a safe and effective manner." *Id.* These objectives are accomplished fully only when a pharmacy actually uses the data it is required to collect under 21 C.F.R. § 1304.22(c) to provide a tool otherwise unavailable to its pharmacists.

The Pharmacy Defendants also assert the CSA cannot impose an obligation on them to identify red flags because, as corporate-entity non-pharmacists, they cannot override the professional decisions of their pharmacists to determine the propriety of a prescription. *See* Doc. #: 3340-1 at 16. But nothing about using data to identify a suspicious prescription would work to override a pharmacist's ability to determine if the prescription was proper. To the contrary, a data-driven analysis should assist and work in synergy with a pharmacist's expertise. Ultimately, pharmacists cannot best employ their "professional knowledge, judgment, and skill" to prevent diversion if their pharmacy-employer does not provide useful access to the "red-flag-revealing" data it has gathered.

Although the CSA is not perfectly clear about what a pharmacy-registrant must do with the prescription data it must collect, what is clear is that a pharmacy is required to: (1) collect and maintain specific records and data regarding its dispensing activity; (2) employ a properly licensed pharmacist; and (3) properly dispense controlled substances and avoid diversion. Therefore, both the pharmacy and the pharmacist must cooperatively identify and resolve "red flags" prior to dispensing controlled substances. The Court concludes these requirements collectively mean that the Pharmacy Defendants cannot collect data as required by the statute, employ a licensed pharmacist as required by the statute, identify red flags as required by Agency decisions, but then do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled. Possessing, yet doing nothing with, information about possible diversion would actually *facilitate* diversion, and thus violate the CSA's fundamental mandate that "*All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances.*" 21 C.F.R. § 1301.71(a) (emphasis added).

In sum, the Court concludes the Pharmacy Defendants have failed to meet their burden of demonstrating there is no corporate-level obligation to design and implement systems, policies, or procedures to identify red flag prescriptions. And the Pharmacy Defendants' ultimate argument—that they cannot be liable to Plaintiffs because only their pharmacist-employees are responsible for preventing diversion of opioids via illegitimate prescriptions—is premised upon a tortured reading of the CSA and its regulations. Because Defendants' reading of the CSA is antithetical to its very purpose, the Court rejects Defendants' positions.

## C. Ohio Absolute Public Nuisance.

Plaintiffs allege common law claims for absolute public nuisance based on the Pharmacy Defendants' alleged intentional and unlawful misconduct involving both *distribution* and *dispensing* of prescription opioids. To the extent these claims are based on *dispensing* activities, the Pharmacy Defendants argue the claims are simply not cognizable under Ohio law of public nuisance.[28] Doc. #: 3340-1 at 23-26. **\*632** For the reasons stated below, the Court rejects this argument.

**[5] [6] [7]** A "public nuisance" is an unreasonable interference with a right common to the general public, including the rights to public health and public safety.[29] *Cincinnati v. Deutsche Bank Nat'l Trust Co.*, 863 F.3d 474, 477 (6th Cir. 2017); *Cincinnati v. Beretta USA Corp.*, 95 Ohio St.3d 416, 768 N.E.2d 1136, 1142 (2002). Ohio law recognizes two categories of nuisance claims—"absolute" and "qualified"—and the distinction between the two depends on the conduct of the defendant. *Nottke v. Norfolk S. Ry. Co.*, 264 F. Supp.3d 859, 862 (N.D. Ohio 2017) (citation omitted). An "absolute" nuisance, also called a nuisance *per se*, is based on culpable and intentional or unlawful conduct by the defendant resulting in harm.[30] *Taylor*, 55 N.E. 2d at 727-732; *Barnett v. Carr*, 2001 WL 1078980, at \*11 (Ohio Ct. App. Sept. 17, 2001). A "qualified" nuisance, on the other hand, involves harm caused by the defendant's negligence. *Taylor*, 55 N.E.2d at 727-732; *Angerman*, 2003 WL 1524505, at \*2.

**[8]** Here, the Plaintiffs assert absolute public nuisance claims based on alleged *intentional* and *unlawful* dispensing conduct. *See* Doc. #: 3327 at ¶620. The Pharmacy Defendants, however, contend the Plaintiffs' allegations "fundamentally sound in negligence" and do not sufficiently describe

intentional or unlawful conduct necessary to support an absolute nuisance action. Doc. #: 3340-1 at 23-25. More specifically, the Defendants contend Plaintiffs merely allege that the Pharmacies engaged in lawful conduct and "should have innovated new ways to identify and prevent diversion." *Id.* at 24-25.

**\*633** Contrary to the Pharmacy Defendants' contention, Plaintiffs clearly allege Defendants engaged in *intentional* conduct to dispense opioids in a manner that caused an oversupply of highly addictive drugs in Plaintiffs' communities. Plaintiffs allege the Pharmacy Defendants: (i) were "keenly aware of the oversupply of prescription opioids;" (ii) willfully and "systematically ignored red flags that they were fueling a black market;" (iii) required and rewarded speed and volume by opioid-dispensing employees, while minimizing standards of safety and care; (vi) purposefully implemented performance metrics and prescription quotas to increase dispensing of opioids; (v) "facilitated the supply of far more opioids than could have been justified to serve a legitimate market;" (vi) knowingly worked in concert with opioid manufacturers "to ensure that false messaging surrounding the treatment of pain and the true addictive nature of opioids was consistent and geared to increase profits for all stakeholders;" (vii) "worked together to ensure that the opioid quotas allowed by the DEA remained artificially high;" and (viii) falsely assured the public that Defendants were working to curb the opioid epidemic. Doc. #: 3327 at ¶¶74-77, 81, 413-425, 454-478, 480-494, 600-606, 609-611.

**[9]** The Pharmacy Defendants contend these allegations are insufficient to show they intended to cause the harms allegedly suffered by the Plaintiffs. Doc. #: 3340-1 at 25. To meet the requisite intent for an absolute nuisance, however, a plaintiff need not allege the defendant intended to create the precise alleged nuisance; rather, plaintiff only need allege the defendant "intended to bring about the conditions which are in fact found to be a nuisance." *Nottke*, 264 F. Supp.3d at 863 (quoting *Angerman*, 2003 WL 1524505 at *2). Stated otherwise, "[w]here the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, the law of negligence has no application and the rule of absolute liability applies." *Taylor*, 55 N.E.2d at 727; *see also In re Nat'l Prescription Opiate Litig.*, 406 F. Supp. 3d at 675-76 (Doc. #: 2578 at 5-7) (material fact issues regarding the opioid manufacturers' intent precluded

summary judgment for defendants on absolute nuisance claims in the Track One cases).

Here, Plaintiffs allege the conditions created by the Pharmacies' intentional conduct – that is, oversupply of opioids in Plaintiffs' communities – necessarily resulted in the devastating consequences that Plaintiffs allegedly suffered because of the opioid epidemic. Doc. #: 3327 at ¶¶573-599, 621-626, 633-637. Accepting these allegations as true and construing them in the light most favorable to Plaintiffs, the Court finds Plaintiffs have fairly and sufficiently stated plausible claims for absolute public nuisance based on the Pharmacy Defendants' alleged intentional conduct involving their dispensing activities. *See Nottke*, 264 F. Supp.3d at 863-864 (plaintiffs stated a facially plausible claim for absolute nuisance where the harms allegedly suffered were the necessary consequence of defendant's intentional operation of braking systems that repeatedly produced "very loud, unbearable high-pitched squealing" sounds); *Angerman*, 2003 WL 1524505, at *1-3 (where defendants intentionally built and operated a motocross track that generated a great deal of noise as an unavoidable byproduct of their intentional activity, the law of absolute public nuisance applied).

**[10]** Additionally, as discussed in the previous section, Plaintiffs have sufficiently alleged the Pharmacy Defendants engaged **\*634** in unlawful dispensing conduct by failing to comply with statutory and regulatory requirements to provide effective controls against diversion, including ensuring proper dispensing of controlled substances. These allegations provide an additional and alternative basis to support the absolute nuisance claims. *See In re Nat'l Prescription Opiate Litig.*, 406 F. Supp. 3d at 676 (Doc. #: 2578 at 7) (evidence of the opioid manufacturers' failure to comply with their anti-diversion obligations under the CSA precluded summary judgment in Track One on plaintiffs' absolute public nuisance claims based on unlawful conduct); *Kramer v. Angel's Path, LLC*, 174 Ohio App.3d 359, 882 N.E.2d 46, 53 (2007) (strict liability is imposed under absolute nuisance "when there is 'the violation of law resulting in a civil wrong or harm,' especially when a safety statute is violated") (quoting *Taylor*, 55 N.E.2d at 728).[31]

**[11]** The Pharmacy Defendants also argue that, as a matter of law, an absolute nuisance theory cannot apply because their dispensing conduct was licensed, authorized, and regulated under the CSA. Doc. #: 3340-1 at 24 n.24, 25; Doc. #: 3379 at 14. This Court has previously rejected identical

arguments, finding that, under Ohio law, " 'safe harbor' immunity from absolute nuisance liability is available only to those who perform in accordance with their applicable licensing regulatory obligations." *In re Nat'l Prescription Opiate Litig.*, 440 F. Supp. 3d at 808 (Doc. #: 3177 at 45-47). The same analysis applies here. As discussed, Plaintiffs allege the Pharmacy Defendants did not comply with the regulatory scheme but, rather, violated it. Accordingly, the Court declines to dismiss the absolute nuisance claims on this ground. *Id.*[32]

Last, the Pharmacy Defendants assert Plaintiffs cannot pursue liability based on Defendants' First-Amendment-protected participation in trade groups that lobbied against additional regulation of the opioid supply chain. Completely aside from any alleged lobbying or trade group activities, however, Plaintiffs allege ample intentional and unlawful conduct by Defendants to support their absolute nuisance claims. Moreover, this Court has previously found that evidence of lobbying activities may be admissible for other purposes, such as to show motive or intent. *See Evidentiary Order,* Doc. #: 3058 at 51-53. On this record, the Court concludes Plaintiffs have sufficiently stated common law claims for **\*635** absolute public nuisance based on the Pharmacy Defendants' alleged dispensing activities.

## D. Proximate Causation – Learned Intermediary Doctrine.

[12] Finally, the Pharmacy Defendants argue that, under the learned intermediary doctrine, the intervening conduct of prescribing medical professionals breaks the causal chain between the Pharmacy Defendants' conduct and the Plaintiffs' injuries. Doc. #: 3340-1 at 26.

The Court previously found allegations similar to Plaintiffs' here sufficient to overcome a motion to dismiss on proximate cause grounds.[33] Specifically, the Court declined to find, under Florida and Oklahoma law, a doctor's prescribing decision breaks the causal chain between the Pharmacies' dispensing conduct and the plaintiffs' injuries as a matter of law. *See In re Nat'l Prescription Opiate Litig.*, 452 F.Supp.3d at 762 (Doc. #: 3253 at 12) (finding Florida law does not "relieve a pharmacist ... from all responsibility stemming from the filling of prescriptions written by doctors"); *In re Nat'l Prescription Opiate Litig.*, 2020 WL 1986589, at \*5 (Doc. #: 3274 at 8–9) (same); *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3737023, at \*5 (Doc. #: 1680 at 9) ("[T]he

Court is not convinced that the learned intermediary doctrine [under Oklahoma law] applies to the causal chain that has been alleged by the Muscogee Nation.").[34] In each instance, the Court noted that causation should be left to the trier of fact.[35]

[13] Ohio law calls for the same result. Ohio courts apply the learned intermediary doctrine in strict products liability cases to shift a prescription drug manufacturer's duty to warn onto the prescribing physician, if the manufacturer has adequately warned the physician. *Tracy v. Merrell Dow Pharms., Inc.*, 58 Ohio St.3d 147, 569 N.E.2d 875, 878 (1991). This shift recognizes manufacturers and physicians have distinct relationships with product users and are in different positions to issue warnings regarding a product. *See id.* at 878 ("The rationale behind [the doctrine] is that the physician stands between the manufacturer and the patient...."); *see also Seley v. G.D. Searle & Co.*, 67 Ohio St.2d 192, 423 N.E.2d 831, 840 (1981) ("A direct relationship between the manufacturer and the patient does not arise as a result of the provision of [warning] brochures.").

These cases, on which the Pharmacy Defendants rely, confirm the learned intermediary doctrine is wholly inapplicable here. Plaintiffs are not seeking to hold the Defendants liable for personal injuries to **\*636** opioid users for harms caused by products or related warnings. Plaintiffs' public nuisance claims instead pertain to broad harms to the public allegedly caused by the Pharmacies' dispensing conduct that implicates legal obligations independent of manufacturers, physicians, or any other participant in the opioid supply chain. The Pharmacy Defendants have not identified any legal authority that shifts their obligation to prevent diversion to any other person or entity, or otherwise establishes that prescribers are an intervening or superseding cause of Plaintiffs' alleged injuries.[36]

[14] Finally, Ohio law instructs that proximate cause is ordinarily a question of fact for the jury. *Brondes Ford, Inc. v. Habitec Sec.*, 38 N.E.3d 1056, 1086 (Ohio Ct. App. 2015). Because Defendants have not demonstrated Plaintiffs' allegations of proximate cause fail as a matter of law, the Court declines to dismiss Plaintiffs' claims.

## IV. Previously Adjudicated Issues.

In the final section of their Motion, the Pharmacy Defendants expressly incorporate by reference their and other defendants' briefing on various substantive motions previously ruled on

by this Court in Track One. In response, the Track Three Plaintiffs incorporate by reference the responsive briefing on those motions as well. Although the Pharmacy Defendants assert the Court erred in these rulings, they do not seek reconsideration and only assert they would like to have these prior arguments preserved for appellate review. Accordingly, the Court will not reconsider its prior rulings at this time, but the relevant briefs shall be part of the judicial record in these Track Three cases.[37]

### V. Conclusion.

The Pharmacy Defendants have not shown Plaintiffs failed to state a claim for which relief can be granted. Accordingly, *Pharmacy Defendants' Motion to Dismiss*, Doc. #: 3340, is **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

477 F.Supp.3d 613

### Footnotes

1    The Motion was filed collectively by the following defendant families: (1) Walmart Inc., Wal-Mart Stores East, LP, WSE Management, LLC, WSE Investment LLC, and Wal-Mart Stores East, Inc. (collectively, "Walmart"); (2) CVS Health Corporation, CVS Pharmacy, Inc., CVS Indiana, L.L.C., CVS Rx Services, Inc., CVS TN Distribution, L.L.C., and Ohio CVS Stores L.L.C. (collectively, "CVS"); (3) Rite Aid Hdqtrs. Corp., Rite Aid of Ohio, Inc., Rite Aid of Maryland, Inc., and Eckerd Corp. d/b/a Rite Aid Liverpool Distribution Center (collectively, "Rite Aid"); (4) Walgreen Boots Alliance, Inc., Walgreen Co., and Walgreen Eastern Co. (collectively, "Walgreens"); and (5) Giant Eagle, Inc., and HBC Service Company (collectively, "Giant Eagle"). The Court refers to all of these entities collectively as "Pharmacies" or "Pharmacy Defendants."

2    Unless otherwise indicated, all document numbers refer to the MDL docket, Case No. 17-MD-2804. Page numbers refer to the documents' native format pagination. The amended complaints are filed at Doc. ##: 3326 & 3327.

3    *In re Nat'l Prescription Opiate Litig.*, 440 F. Supp. 3d 773, 783-84 (N.D. Ohio 2020).

4    The Motion and this Opinion and Order address only Plaintiffs' public nuisance claims against the Pharmacy Defendants (Count XI). Pursuant to this Court's Order, Doc. #: 3315, Plaintiffs' other claims against the Pharmacy Defendants and all claims against other defendants are stayed for later discovery and trial.

5    *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018).

6    Because the Plaintiffs' Amended Complaints are nearly identical, the Court, like the parties, cites to Lake County's Amended Complaint for ease of reference.

7    *See, e.g.*, O.R.C. §§ 4729.07 (licensing application and examination); 4729.071 (criminal records check); 4729.08 (qualifications); 4729.28 (unlawful selling of drugs or practice of pharmacy); 4729.35 (unlawful distribution of drugs of abuse; prosecution); 4729.37 (record keeping); 4729.46 (limitations on dispensing opioid analgesics); 4729.01(Q) (" 'terminal distributor' includes pharmacies ... who procure dangerous drugs for sale or other distribution by or under the supervision of a pharmacist"); 4729.77 (terminal distributor pharmacies to submit prescription information); 4729.80 (submission of database information); 4729.281 (dispensing of drug without written or oral prescription); 4729.292 (annual on-site inspection of opioid treatment program).

8    Sections 4729-9-05(A) and 4729-9-16(H) of the Code were recently rescinded, revised, and reorganized. The provisions of the Code cited above presently appear at §§ 4729:5-3-14 and 4729:6-3-05.

9    O.R.C. §§ 3719.01(C) & 3719.011(A) define "opiate" as "a drug of abuse."

10    O.R.C. § 4729.35 provides:

     The violation by a pharmacist or other person of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse as defined in section 3719.011 of the Revised Code or the commission of any act set forth in division (A) of section 4729.16 of the Revised Code, is hereby declared to be inimical, harmful, and adverse to the public welfare of the citizens of Ohio and to constitute a public nuisance. The attorney general, the prosecuting attorney of any county in which the offense was committed or in which the person committing the offense resides, or the state board of pharmacy may maintain an action in the name of the state to enjoin such person from engaging in such violation.

11  *See also Frantz v. Maher*, 106 Ohio App. 465, 155 N.E.2d 471, 476 (1957) ("An intention of the General Assembly to abrogate common-law rules must be manifested by express language. There is no repeal of the common law by mere implication."); *In re Nicole Gas Prod.*, 581 B.R. 843, 850 (B.A.P. 6th Cir. 2018) (citing *Morris* and applying the same rule).

12  In *Gonzales*, the United States Supreme Court found that applying the CSA's criminal provisions regarding the manufacture, distribution, or possession of marijuana to California's in-state growers and medical marijuana users did not violate the Commerce Clause. *Gonzales*, 545 U.S. at 24-33, 125 S.Ct. 2195. In reaching this conclusion, the *Gonzales* court noted the CSA creates a "comprehensive frame work for regulating the production, distribution, and possession of 'controlled substances,' " most of which "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people." *Id.* at 24, 125 S.Ct. 2195.

13  *See Peters Family Farm*, 2011 WL 497476, at *3-4; *Alotech*, 2014 WL 281973, at *4 (the UCC's statutory duty of care displaced the common law's duty of ordinary care; thus, plaintiff's exclusive remedy for its negligence claim was under the UCC); *Amzee*, 2002 WL 1012998, at *9-10 (the UCC provides different liabilities and responsibilities for negotiable instruments than those existing at common law and therefore supplants common law claims based on conduct governed by the UCC).

14  *See* O.R.C. § 1.51 ("If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail.").

15  The Track One Plaintiffs asserted a statutory public nuisance claim under (i) O.R.C. § 4729.35 and also (ii) general sections O.R.C. §§ 715.44(A) (authorizing municipalities to "abate any nuisance") and 3767.03 (Ohio's general nuisance provision). Section 3767.03 confers standing on a broader range of persons than § 4729.35 and provides abatement *and* injunctive remedies. After finding the special Section was irreconcilable with the general Sections, the Court concluded the provisions of § 4729.35 prevailed to limit the categories of relief and parties with standing to sue. Doc. #: 1203 at 28-31 (citing *United Tel. Co., v. Limbach*, 71 Ohio St.3d 369, 643 N.E.2d 1129 (1994)).

16  Chapter 4729 defines "Person" as including "any individual, partnership, association, limited liability company, or corporation, the state, any political subdivision of the state, and any district, department, or agency of the state or its political subdivisions." O.R.C. § 4729.01(S).

17  *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575 (N.D. Ohio Aug. 19, 2019).

18  The Court previously described the distinction between distribution and dispensing as follows: " 'distribution' involves movement of opioid products from (for example) a warehouse to a specific pharmacy, while 'dispensing' refers to the 'final step' in the distribution process, from the pharmacy to an individual patient." *Discovery Ruling No. 8* at 1 (Doc. #: 1055). Although many of the Pharmacy Defendants are also registered as distributors, this order pertains specifically to their role in dispensing.

19  The CSA expressly authorizes the Attorney General to regulate the distribution of controlled substances. In turn, the Attorney General delegated this authority to the DEA Administrator. *See John Doe, Inc. v. Gonzales*, 2006 WL 1805685 at *1 (D.C. Cir. June 29, 2006); *United States v. Caudle*, 828 F.2d 1111, 1111 n.1 (5th Cir. 1987) (citing 38 FR 18380 (DEA Jul. 10, 1973)).

20  The Pharmacy Defendants insist that, "[a]lthough DEA has sometimes referred to the *pharmacist's* responsibility as the *pharmacy's* responsibility, that occasional imprecision does not create an independent regulatory responsibility for a pharmacy." Doc. #: 3340-1 at 18 (citations omitted) (emphasis added). However, given the large number of agency actions that refer to a pharmacy-registrant's corresponding responsibility, the Court finds it highly unlikely that the Agency is so routinely "imprecise." This Court assumes, rather, that the Agency knows how to draw a distinction between a pharmacist and a pharmacy and, to the extent an ALJ or the Administrator wrote that a pharmacy has a responsibility to ensure prescriptions are legitimate, they did so intentionally. *See, e.g., Top RX Pharmacy; Decision and Order*, 78 FR 26069-01, 26082 (DEA May 3, 2013) ("a pharmacist *or pharmacy* may not dispense a prescription in the face of a red flag") (emphasis added); *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195, Decision and Order*, 77 FR 62316-01, 62343 (DEA Oct. 12, 2012) ("on various occasions, each of the Respondents [*pharmacies*] dispensed controlled substances in the face of red flags that were or should have been recognized"); *Role of Authorized Agents in Communicating Controlled Substance Prescriptions to Pharmacies*, 75 FR 61613, 61617 (DEA Oct. 6, 2010) ("Providing a copy [of the agency agreement] to *pharmacies* ... may assist those *pharmacies* with their corresponding responsibility regarding the dispensing of controlled substances."); *Medicine Shoppe-Jonesborough*, 73 FR 364-01, 383 ("Here again, the evidence establishes that Mr. Street [a pharmacist] *and Respondent [a pharmacy]* failed to comply with their corresponding responsibility under federal law."); *United Prescription Services, Inc. Revocation of Registration*, 72 FR

50397-10, 50409 (DEA Aug. 31, 2007) ("**Respondent [pharmacy]** thus violated 21 CFR 1306.04 by filling these [illegal] prescriptions."); *Issuance of Multiple Prescriptions for Schedule II Controlled Substances*, 72 FR 64921, 69424 (DEA Nov. 19, 2007) ("physicians **and pharmacies** have a duty as DEA registrants to ensure that their prescribing and dispensing of controlled substances occur in a manner consistent with effective controls against diversion and misuse.") (citing *Clarification of Existing Requirements Under the Controlled Substances Act for Prescribing Controlled Substances*, 70 FR 50408 (DEA Aug. 26, 2005)).

21  Such a reading would be tantamount to a statutory "safe harbor" by providing that a pharmacy owner could not be held liable for its role in dispensing controlled substances simply by employing a pharmacist. Employment of a properly licensed pharmacist must be read as a feature of the law, not a way to subvert it.

22  The Court notes that, under Ohio law: (1) a Terminal Distributor is **not a pharmacist**, *see* O.R.C. § 4729.01(Q); (2) a Terminal Distributor is engaged in the Retail Sale of dangerous drugs, *see id.*; (3) a Retail Seller is "**any person** that sells any dangerous drug to consumers without assuming control over and responsibility for its administration, *see* § 4729.01(M); and (4) "sell" includes "**any transaction made by any person**" that effectively transfers the dangerous drug to another. *See* § 4729.01(J). Thus, the Ohio Revised Code expressly contemplates that a pharmacy's business includes dispensing of dangerous drugs to consumers.

23  The Court notes that many, if not all, of the Pharmacy Defendants maintain (or did maintain during the relevant time period) DEA registrations as distributors as well.

24  The Pharmacy Defendants assert that any analogy between (i) a duty of dispensers to identify and resolve red flags before filling subscriptions and (ii) a duty of distributors to identify and conduct due diligence prior to shipping suspicious orders, is "unfounded and unworkable." Doc. #: 3379 at 5 (referring to the Court's August 19, 2019 *Opinion and Order Regarding the CSA* (Doc. #: 2483)). But Agency decisions have made abundantly clear there exists a duty of dispensers to identify and resolve red flags before filling opioid prescriptions. Therefore, the Court need not rely upon "analogy" to conclude this duty exists.

25  Regarding the second prong recited in *Holiday CVS*—whether "a red flag was or should have been recognized at or before the time the controlled substance was dispensed"—the DEA "has consistently interpreted [section 1306.04(a)] as prohibiting a pharmacist from filling a prescription for a controlled substance when he either **knows or has reason to know** that the prescription was not written for a legitimate medical purpose." *E. Main St. Pharmacy*, 75 FR 66149-01, 66163 (DEA Oct. 27, 2010) (citing agency and Sixth Circuit precedent) (internal quotations omitted). The Pharmacy Defendants assert that, absent identification by Plaintiffs of any *specific* prescription filled by Defendants that they knew or should have known was illegitimate, Plaintiffs do not state viable claims. Plaintiffs have alleged, however, that the Pharmacy Defendants had reason to know that at least some of the prescriptions they dispensed were illegitimate. At the motion to dismiss stage, with factual allegations in the complaint accepted as true and viewed in favor of the nonmoving party, the Court easily concludes that Plaintiffs allegations are plausible.

26  Those factors are "[2] The applicant's experience in dispensing ... controlled substances," and "[4] Compliance with applicable State, Federal, or local laws relating to controlled substances." 21 U.S.C. § 823(f)(2), (4). *Compare Holiday CVS*, 77 FR at 62341-42 (relying on factor (4)); *with E. Main St. Pharmacy*, 75 FR 66149-01, 66150 (DEA Oct. 27, 2010) (relying on factor (2)). Frequently, the two factors are analyzed together. *See, e.g.*, *Top RX Pharm.*, 78 FR at 26081.

27  The DEA has unequivocally accepted certain "red flag" indications that some prescriptions are suspicious, and many of these red flags have nothing to do with the specialized knowledge or training of a pharmacist; rather, these red flags are patterns in prescription data that a human pharmacist normally would never see. Computer algorithms, when applied to sufficient data (which the pharmacies are required to collect), are particularly well-suited to identify these patterns.

28  As to claims based on the Pharmacies' *distribution* activities, this Court has previously found similar allegations sufficiently support an absolute public nuisance claim under Ohio law. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 440 F. Supp. 3d at 805-08 (Doc. #: 3177 at 41-47) (plaintiffs sufficiently pled Ohio absolute public nuisance claims based, in part, on defendants' alleged failure to maintain effective controls with respect to distribution activities); *Opinion and Order Regarding Manufacturers' Summary Judgment Motion in Track One, In re Nat'l Prescription Opiate Litig.*, 406 F. Supp. 3d 672, 672-76 (N.D. Ohio 2019) (Doc. #: 2578 at 1-7) (material fact issues regarding defendants' alleged failure to maintain anti-diversion controls precluded summary judgment on Ohio absolute public nuisance claims); *see also Opinion and Order Regarding Motions to Dismiss West Boca, In re Nat'l Prescription Opiate Litig.*, 452 F.Supp.3d 745, 773–75 (N.D. Ohio Apr. 3, 2020) (Doc. #: 3253 at 29-33) (same under Florida law); *Report and Recommendation Regarding Motions to Dismiss Blackfeet Tribe, In re Nat'l Prescription Opiate Litig.*, 2019 WL 2477416, at *9-18 (N.D. Ohio Apr. 1, 2019) (Doc. #: 1500 at 26-34) (same under Montana law), *adopted by* 2019 WL 3737023, at *9-11 (N.D. Ohio June 13, 2019) (Doc. #: 1680 at 16-20); *Report and Recommendation Regarding Motions to Dismiss Muscogee Nation, In re Nat'l Prescription*

*Opiate Litig.*, 2019 WL 2468267, at \*26-33 (N.D. Ohio Apr. 1, 2019) (Doc. #:1499 at 50-62) (same under Oklahoma law), *adopted by* 2019 WL 3737023, at \*9-11 (N.D. Ohio June 13, 2019) (Doc. #: 1680 at 16-20).

29 The Court has previously ruled claims similar to the Counties' sufficiently pled interference with a common public right to be free from the negative consequences allegedly suffered as a result of the opioid epidemic. *See* Doc. #: 1500 at 28-30 (Montana law), *adopted by* Doc. #: 1680 at 16-20; Doc. #: 1499 at 50-62 (Oklahoma law), *adopted by* Doc. #: 1680 at 16-20; *see also* Doc. #: 2578 at 3-4 ("A factfinder could reasonably conclude that [plaintiffs'] evidence demonstrates an interference with public health and public safety rights.") (Ohio law).

30 An "absolute" nuisance can also be based on nonculpable conduct by the defendant that results in "accidental harm for which, because of the hazards involved, the law imposes strict or absolute liability notwithstanding the absence of fault." *Taylor*, 55 N.E.2d at 727; *Nottke*, 264 F.Supp.3d at 862; *Angerman v. Burick*, No. 02CA0028, 2003 WL 1524505, at \*2 (Ohio Ct. App. March 26, 2003). Plaintiffs here do not allege an absolute public nuisance based on inherently dangerous conduct.

31 In their reply brief, the Pharmacy Defendants argue that, even if their alleged dispensing conduct was *unlawful*, an absolute nuisance theory would not apply, because the CSA and its implementing regulations merely set forth a general duty to exercise ordinary care under the circumstances and do not set forth rules requiring or prohibiting the performance of specific acts. *See* Doc. #: 3379 at 13 (citing *Taylor*, 55 N.E.2d at 733; and *Natale v. Everflow E., Inc.*, 195 Ohio App.3d 270, 959 N.E.2d 602, 609-11 (2011)). The Court declines to address arguments raised for the first time in a reply brief. *Ross v. Choice Hotels Int'l, Inc.*, 882 F.Supp.2d 951, 958 (S.D. Ohio 2012). Moreover, the Court disagrees with the Pharmacy Defendants' contention that the CSA and its regulations merely establish a general duty to exercise reasonable care. As discussed in the previous section, the CSA statutory and regulatory framework imposes specific obligations on pharmacies to protect against the diversion of controlled substances.

32 *See also In re Nat'l Prescription Opiate Litig.*, 452 F.Supp.3d at 774–75 (Doc. #: 3253 at 32-33) (allegations of conduct incompatible with defendants' statutory authority stated an actionable public nuisance claim) (Florida law); *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3737023, at \*10 (Doc. #: 1680 at 17-18) ("to allege an absolute public nuisance, the Tribe needed only to allege that Distributors exceeded their statutory authority") (Montana law).

33 *See Opinion and Order in Broward, In re Nat'l Prescription Opiate Litig.*, 2020 WL 1986589, at \*5 (N.D. Ohio Apr. 27, 2020) (Doc. #: 3274 at 8–9); *Opinion and Order in West Boca, In re Nat'l Prescription Opiate Litig.*, 452 F.Supp.3d at 763 (Doc. #: 3253 at 10-11); *Opinion and Order in Tribal Track, In re Nat'l Prescription Opiate Litig.*, 2019 WL 3737023, at \*4-6 (Doc. #: 1680 at 7-10); *Opinion and Order in Cleveland Bakers, In re Natl. Prescription Opiate Litig.*, 440 F. Supp. 3d at 797, 812-813 (Doc. #: 3177 at 27-54).

34 The Court has also concluded the Pharmacies cannot transfer to prescribes their liability (if any) to Plaintiffs, because Plaintiffs' liability theory relies on legal obligations and evidence independent of prescriber conduct. *Order Regarding Plaintiffs' Motion to Strike or Sever Third-Party Complaints, In re Nat'l Prescription Opiate Litig.*, 2020 WL 1526726, at \*2-3 (N.D. Ohio Mar. 31, 2020) (Doc. #: 3246 at 4–5).

35 *See In re Nat'l Prescription Opiate Litig.*, 452 F.Supp.3d at 760–61 (Doc. #: 3253 at 8); *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3737023 at \*5 (Doc. #: 1680 at 8).

36 Indeed, the Court questions whether, as Defendants assert, prescribers' conduct is in fact situated *between* the Pharmacies' relevant conduct and Plaintiffs' alleged injuries, such that the prescribers' conduct could be an intervening or superseding cause of the injuries. Even if some of the Pharmacies' alleged culpable conduct occurs before a doctor writes an opioid prescription (for example, creating opioid dispensing policies), Plaintiffs' allegations also include conduct that necessarily occurs after doctors write prescriptions. *See* Doc. #: 3327 at ¶¶83–85 ("Pharmacies failed ... to conduct adequate internal or external reviews of their opioid sales to identify patterns regarding prescriptions that should not have been filled, or ... failed to take any meaningful action as a result").

37 The specific documents the parties ask to incorporate are:
  • Doc. #: 497 – Pharmacy Defendants' Motion to Dismiss;
  • Doc. #: 491 – Distributor Defendants' Motion to Dismiss;
  • Doc. #: 654 – Plaintiffs' Opp. to Defs.' Motion to Dismiss;
  • Doc. #: 1874 – Pharmacy Defendants' Motion for Summary Judgment on Statute of Limitations;
  • Doc. #: 1883 – Pharmacy and Distributor Defendants' Motion for Summary Judgment on Preemption;
  • Doc. #: 1885 – Pharmacy Defendants' Motion for Summary Judgment on Causation;
  • Doc. #: 2171 – Plaintiffs' Opp. to Defs.' Motion for Summary Judgment on Preemption;
  • Doc. #: 2179 – Plaintiffs' Opp. to Defs.' Motion for Summary Judge on Statute of Limitations; and
  • Doc. #: 2203 – Plaintiffs' Opp. to Defs.' Motion for Summary Judgment on Causation.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

406 F.Supp.3d 672
United States District Court,
N.D. Ohio, Eastern Division.

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION
This Document Relates to: Track One Cases

MDL 2804
|
Case No. 1:17-md-2804
|
Signed 09/09/2019

**Synopsis**
**Background:** In multidistrict litigation brought by public entities against manufacturers of prescription opioid medications, seeking to recover costs of opioid epidemic and alleging that manufacturers overstated the benefits and downplayed the risks of the use of their opioids, manufacturers moved for summary judgment on public nuisance claims.

**[Holding:]** The District Court, Dan Aaron Polster, J., held that fact issues precluded summary judgment on public entities' public nuisance claim against manufacturers under Ohio law.

Motion denied.

West Headnotes (5)

**[1]** **Federal Civil Procedure** 🔑 Tort cases in general

Genuine issues of material fact existed regarding whether opioid manufacturers violated a public right through interference with public health and public safety issues in the promotion and sale of opioids, precluding summary judgment on public entities' public nuisance claim against manufacturers under Ohio law.

**[2]** **Federal Civil Procedure** 🔑 Tort cases in general

Genuine issues of material fact existed regarding whether conduct of opioid manufacturers in the promotion and sale of opioids proximately caused misuse of opioids, precluding summary judgment on public entities' public nuisance claim against manufacturers under Ohio law.

1 Cases that cite this headnote

**[3]** **Federal Civil Procedure** 🔑 Tort cases in general

Genuine issues of material fact existed regarding whether opioid manufacturers intentionally misrepresented risks attending opioid use for the purpose of increasing prescription opioid sales, precluding summary judgment on public entities' public nuisance claim against manufacturers under Ohio law.

**[4]** **Nuisance** 🔑 Nature and elements of public nuisance in general

"Intentional," in the context of absolute public nuisance under Ohio law, means not that a wrong or the existence of a nuisance was intended but that the creator of it intended to bring about the conditions which are in fact found to be a nuisance.

1 Cases that cite this headnote

**[5]** **Nuisance** 🔑 Nature and elements of public nuisance in general

For purposes of a public nuisance claim under Ohio law, where the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, the rule of absolute liability applies.

1 Cases that cite this headnote

## OPINION AND ORDER DENYING MANUFACTURER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' PUBLIC NUISANCE CLAIMS

DAN AARON POLSTER, UNITED STATES DISTRICT JUDGE

Before the Court is the Manufacturer Defendants' Motion for Summary Judgment on Plaintiffs' Public Nuisance Claims (**Doc. #: 1893**). Upon careful consideration of the parties' respective arguments[1] and **\*673** for the reasons stated below, the motion is **DENIED.**

\* \* \* \* \*

The Manufacturer Defendants ("Manufacturers") move the Court for an order dismissing Plaintiffs' common law absolute public nuisance and statutory public nuisance claims, as a matter of law, based on failure to define sufficiently the alleged nuisance, and an absence of evidence supporting essential elements of the claims.

## I. Sufficiency of the nuisance definition.

Manufacturers contend that the nuisance allegedly attributable to their conduct encompasses adverse conditions so unspecified and broad that they are deprived of a fair and "reasonable opportunity to know the claims of the opposing party." (Doc. #: 1893-1 at 2-4) (citing *In re Paradyne Corp.,* 803 F.2d 604, 612 (11th Cir. 1986)).[2] This argument is amply contradicted, however, by the extensive specific details regarding the conditions comprising the multifaceted nuisance alleged in Plaintiffs' complaints. And these allegations are now further developed through discovery, as well as motion practice, during which Defendants vigorously challenged each claim. Plaintiffs contend correctly that Manufacturers' argument is irreconcilable with the fact that the public nuisance claims withstood Rule 12(b)(6) dismissal, where the Court was required to determine whether the complaint "contain[ed] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face," citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). (Doc. #: 2170-1 at 1-2).[3]

The Ohio Supreme Court has expressly recognized the breadth of the absolute public nuisance cause of action, finding that "under the Restatement's broad definition, a public-nuisance action can be maintained" where the facts establish that the "design, manufacturing, marketing or sale of [a] product unreasonably interferes with a right common to the general public." *Cincinnati v. Beretta, U.S.A. Corp.,* 95 Ohio St.3d 416, 768 N.E.2d 1136, 1142 (2002). Plaintiffs' absolute public nuisance claims fit within that framework. Accordingly, dismissal of the Plaintiffs' public nuisance causes of action because the Manufacturers find them "breathtakingly broad" is unwarranted.[4]

## \*674 II. Sufficiency of evidence supporting essential elements.

### A. Violation of a public right.

[1] Manufacturers contend that Plaintiffs fail to identify any violation of a public right.[5] (Doc. #: 1893-1 at 407; Doc. #: 2445 at 7-8). The Court has previously rejected arguments that: (i) Plaintiffs' claims rely on an aggregation of individual rights, as opposed to rights commonly held by the public; and (ii) none of the allegedly interfered-with rights constitute public rights. (*See* Doc. #: 1680 at 18-19 (Muscogee and Blackfeet Order) adopting (Doc. #: 1499 at 58-61 (Muscogee) and Doc. #: 1500 at 28-34 (Blackfeet)). There is no need to reiterate that analysis here.

Plaintiffs introduce fact and expert evidence demonstrating material factual issues regarding interference with public health and public safety interests. (Doc. #: 1890 at 4-14).[6] *See Cincinnati v. Beretta,* 768 N.E.2d at 1142 ("A public nuisance is an unreasonable interference with a right common to the general public," and unreasonable interference includes acts that "significantly interfere with public health, safety, peace, comfort or convenience") (internal quotation marks and citations omitted). Plaintiffs cite statistics showing an unprecedented opioid-related increase in, for example, overdose deaths over the last decade (Report of Katherine Keyes at 23-24, Exh. 104; Doc. #: 1890, Exh. 5); instances of neonatal abstinence syndrome (Keyes Rpt. at 23-24; Report of Scott Wexelblatt at 5; Doc. #: 1890, Exh. 6); overdose hospital admissions and emergency room visits (Doc. #: 1890, Exhs. 8, 45); crisis center detoxifications (*Id.* Exh. 8); and hepatitis diagnoses (*Id.* Exh. 9). They also identify evidence they contend will demonstrate that the Manufacturers' conduct interfered with the right to public safety. For example,

Plaintiffs point to: a nalaxone administration rate in Summit County that was among the highest in Ohio (Doc. #: 1890, Exhs. 12-13, 55-57); a growing need for foster care placements for children who lost parents to overdoses or incarceration (*Id.*, Exhs. 14-19); and increases in drug-related arrests and prosecutions. (*Id.* at Exhs. 14, 57-58).

A factfinder could reasonably conclude that this evidence demonstrates an interference with public health and public safety rights.

### B. Evidence of proximate cause.

 **[2]**  The Manufacturers contend Plaintiffs are unable to establish, as a matter of law, that Manufacturers conduct proximately caused the claimed nuisance. Manufacturers first assert there is no evidence demonstrating they exercised any control over illegal drugs. As the Court previously observed, however, that argument is premised on a misconception of Plaintiffs' theory **\*675** of nuisance liability. (Doc. #: 1680 at 19-20 (Muscogee and Blackfeet Order) adopting the analyses set forth in Reports and Recommendation, Doc. #: 1499 at 57 (Muscogee) and Report and Recommendation, Doc. #: 1500 at 31 (Blackfeet)). Plaintiffs do not allege the claimed nuisance is the consequence of use or misuse of the opioid medication itself, but rather is the result of Defendants' business conduct: "Defendants had control over the instrumentality of the nuisance by virtue of their control over their own opioid marketing, distribution, or dispensing practices." (*Id.*).

The Manufacturers also contend that an absence of evidence linking their alleged misconduct to harms Plaintiff seeks to remedy defeats the absolute nuisance claims. (Doc. #: 1893-1 at 8-9; Doc. #: 2445 at 1-6). Plaintiffs respond that evidence to the contrary identified in their opposition to Defendants Motion for Summary Judgment on Proof of Causation, (Doc. #: 2204), raises genuine issues of material fact regarding causation. (Doc. #: 7120 at 5-7). Ruling on that Motion, the Court concluded summary judgment was unwarranted because Plaintiffs presented fact and expert evidence showing the injuries alleged are of the sort that would be an expected consequence of Manufacturers' alleged misleading marketing activities and failures to maintain anti-diversion controls. (*Id.*). (*See* Doc. #: 2561 at 2-8 (Causation Order)). That conclusion applies here for the same reasons.

### C. Evidence of intentional and unlawful conduct.

 **[3]**    **[4]**    **[5]**  Manufacturers also insist that the element of intent fails for lack of evidentiary support. (Doc. # 1893-1 at 10-11; Doc. #: 2445 at 6-7). The parties agree that "Intentional, in this context [of absolute public nuisance], means not that a wrong or the existence of a nuisance was intended but that the creator of it intended to bring about the conditions which are in fact found to be a nuisance." *See Nottke v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 859 at 863 (N.D. Ohio 2017) (citing *Angerman v. Burick*, 2003 WL 1524505, at *2 (Ohio Ct. App. March 26, 2003).* (Doc. #: 1893-1 at 10; Doc. #: 2170 at 6-7). Stated otherwise, "Where the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, *** the rule of absolute liability applies." *Taylor v. City of Cincinnati*, 143 Ohio St. 426, 55 N.E.2d 724, 727 (1944).

Plaintiffs assert the testimonial evidence of Dr. Russell Portenoy, one of the key opinion leaders funded by the Manufacturers, demonstrates the Manufacturers intentionally misrepresented the risks attending opioid use for the purpose of increasing prescription opioid sales. For example, Dr. Portenoy states that his work "at various times emphasized the potential benefits (that I believe could be achieved by a subgroup of patients), and deemphasized the risks that are always present when opioids are administered." He further stated that drug companies used his work to support a "strongly positive message about opioids" that "lacked context and warning," and the ultimate "effect was to promote opioid therapy to prescribers." (Doc. #: 2170-1 at 41 (Declaration of Russel K. Portenoy)). Other evidence of intent includes testimony and documents indicating Purdue falsely represented OxyContin as weaker than morphine (even though it was twice as potent) for the purpose of neutralizing any impression that the drug was dangerous and should be reserved only for severe pain; the alleged purpose of this false representation was to avoid "a negative effect on [sales to] the much larger non-cancer pain market." (*See* Doc. #: 2170-2 (Deposition of Richard Sackler) at 394:3-396:20, 399:14-406:17, 411:13-413:13). Plaintiffs also point **\*676** to training materials for sales representatives allegedly showing deliberate misrepresention of the risks attending opioid use, particularly the risk of addiction. (Doc. 2170 at 8-11). The Court agrees with Plaintiffs that this evidence creates material issues of fact regarding Manufacturers' intent.

As to the intent to bring about the conditions creating the alleged nuisance, the Court recently determined that factfinders could reasonably infer that Manufacturers'

fraudulent marketing and failures to maintain anti-diversion controls were substantial factors in producing the alleged harm suffered by Plaintiffs. The Court concluded: "Because Plaintiffs have presented evidence that shows they have suffered the sort of injury that would be an expected consequence of the alleged wrongful conduct, Plaintiffs have made a sufficient showing to withstand summary judgement" on the causation issues. (Doc. #: 2561 at 6, 8 (Causation Order)). The same conclusion applies here.[7]

Plaintiffs also rely on unlawful conduct to support their absolute nuisance claim, and argue that evidence of federal Controlled Substances Act violations by the Manufacturers is undisputed. They incorporate the arguments and evidence asserted on their Motion seeking partial summary adjudication based on those violations. (Doc. #: 2107 at 12, referring to Doc. #: 2483 at 13014, 26-68). The Court recently ruled on that motion, finding the record "replete with disputes of material fact as to whether each Defendant complied with its obligations under the CSA, which preclude summary judgment." (Doc. #: 2483 at 19-27 (CSA Order)).

The evidence Plaintiffs introduce is sufficient to raise material issues of disputed facts regarding each essential element of their nuisance claims and therefore summary judgment is unwarranted.

## III. Statutory public nuisance

Manufacturers contend Plaintiffs' statutory nuisance claims are defeated by an absence of evidence demonstrating actionable conduct. (Doc. #: 1893-1 at 11-12). Ohio Rev. Code ("O.R.C.") 4729.35. For nuisance liability to attach, the statute requires a plaintiff to demonstrate "[t]he violation by a pharmacist or other person of any laws of Ohio

or the United States of America...or of any rule of the board of pharmacy controlling the distribution of a drug of abuse" ....[8] Defendants maintain Plaintiffs have not identified specific conduct constituting the predicate acts for a statutory nuisance claim, but rather rely only on "general assertions that Manufacturer Defendants turned a blind eye to suspicious order monitoring requirements." (Doc. #: 1893-1 at 11-12; Doc. #: 2445 at 8). Plaintiffs counter that their complaints specifically allege violations of, *inter alia,* the federal Controlled Substance Act (Doc. #: 1466 at 985 and Doc. #: 1631 at 1026), and that this issue was already addressed by the parties in motion practice and the Report and Recommendation on those motions (Doc. #: 2701 at 13 referring to Doc. #: 1025 at 70-72).

As stated above, the Court recently determined that the record demonstrates material issues of fact as to whether each Defendant complied with CSA obligations, and that conclusion applies here. (*See* Doc. #: 2483 at 19-27 (CSA Order)). Manufacturers' contention that no violation supporting the statutory nuisance claim has been identified in this litigation is without **\*677** merit and does not warrant summary judgment.

## IV. Conclusion.

Based on the foregoing, the Manufacturer Defendants' Motion for Summary Judgment on Plaintiffs' Public Nuisance Claims (Doc. #: 1893), is **DENIED**.

**IT IS SO ORDERED.**

## All Citations

406 F.Supp.3d 672

Footnotes

1    Manufacturer Defendants' Memorandum in Support of Motion for Summary Judgment on Plaintiffs' Public Nuisance Claims (Doc. #: 1893-1); Plaintiffs' Memorandum in Opposition to Manufacturer Defendants' Motion for Summary Judgment on Plaintiffs' Public Nuisance Claims (Doc. #: 2170); Manufacturer Defendants' Reply Brief in Support of Motion for Summary Judgment on Plaintiffs' Public Nuisance Claims (Doc. #: 2445).

2    *In re Paradyne Corp.*, concerning a mandamus petition, concluded that excluding criminal defendants from hearings and information concerning disqualification of their counsel would violate 6th amendment rights.

3    The Court denied motions to dismiss substantially similar public nuisance claims filed by the Muscogee (Creek) Nation (Doc. #: 713), and the Blackfeet Tribe of the Blackfeet Indian Reservation (Doc. #: 892). The Court's Order on motions to dismiss those complaints ("Muscogee and Blackfeet Order") is Doc. #: 1680, and the Report and Recommendations it adopted (except for recommendations as to negligence per se) are Doc. #: 1499 (Muscogee) and Doc. #: 1500 (Blackfeet).

4    Nor does the caselaw cited by Manufacturers persuade a different conclusion. *See Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL 1183332, at *3 (dismissing nuisance claim for failure to plead a causal relationship between the alleged

conduct and harm, stating, "the tort of public nuisance only reaches so far. Ohio remains a notice pleading state, but the complaint must still advance a rational basis for holding a defendant liable"); *In re Lead Paint Litig.,* 191 N.J. 405, 924 A.2d 484, 503, 505 (2007) (finding nuisance causes at issue were cognizable only as product liability claims and remarking, "[a]lthough there may be room, in other circumstances, for an expanded definition of the tort of public nuisance, we find no basis in this record to conclude that these plaintiffs have stated such a claim"); *District of Columbia v. Beretta, U.S.A., Corp.,* 872 A.2d 633, 650 (D.C. 2005) ("In keeping with our own decisions and others we have found persuasive, we decline to relax the common-law limitations of duty, foreseeability, and direct causation so as to recognize the broad claim of public nuisance the District has alleged."). All of these cases are distinguishable.

5       Because numerous issues raised in these motions have been determined by other decisions in this litigation, the Court incorporates the following: Opinion and Order Regarding Defendants' Summary Judgment Motions on Causation (Doc. #: 2561 ("Causation Order")); Order Regarding Plaintiffs' Summary Judgment Motions Addressing the Controlled Substances Acts (Doc. #: 2483 ("CSA Order"); and the Muscogee and Blackfeet Order (Doc. #: 1680), and the Reports and Recommendations it adopted in relevant part (Doc. #: 1499 (Muscogee) and Doc. #: 1500 (Blackfeet)).

6       Plaintiffs refer to evidence recited in the memorandum supporting their Motion for Partial Summary Adjudication of their Equitable Claims for Abatement of An Absolute Public Nuisance. (Doc. #: 1890).

7       Defendants also argue Plaintiffs cannot prove they are strictly liable for the alleged wrongful conduct. Plaintiffs, however, do not allege strict liability.

8       Opioids are a "drug of abuse" under O.R.C. §§ 3719.011(A), 3719.01(C).

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:17-cv-01362   Document 1290-19   Filed 04/26/21   Page 25 of 53 PageID #: 43645

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)
2018 WL 6628898, RICO Bus.Disp.Guide 13,115

KeyCite Yellow Flag - Negative Treatment
Disagreed With by City and County of San Francisco v. Purdue Pharma L.P.,
N.D.Cal., September 30, 2020

2018 WL 6628898
United States District Court,
N.D. Ohio, Eastern Division.

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATIONThis Document
Relates To: The County of Summit,
Ohio, et al. v. Purdue Pharma
L.P., et al., Case No. 18-op-45090

MDL 2804
|
Case No. 1:17-md-2804
|
Signed 12/15/2018
|
Filed 12/19/2018

## OPINION AND ORDER

DAN AARON POLSTER, UNITED STATES DISTRICT
JUDGE

 **\*1**  This matter is before the Court upon the Report and
Recommendation ("R&R") of the United States Magistrate
Judge. **Doc. #: 1025** (hereinafter cited as "R&R"). On
November 2, 2018 Manufacturer,[1] Distributor, and Retail
Pharmacy Defendants and Plaintiffs all filed Objections to
various portions of the R&R. Doc. ##: 1082, 1079, 1078,
and 1080. On November 12, 2018 Plaintiffs and Defendants
filed Responses to the Objections. Doc. ##: 1115 and 1116.
Upon a *de novo* review of the record, and for the reasons set
forth below, the Court **ADOPTS IN PART** and **REJECTS
IN PART** the Report and Recommendation.

The District Court reviews proper objections pursuant to its
duty under Federal Rule of Civil Procedure 72(b). Fed. R. Civ.
P. 72(b) ("The district judge must determine *de novo* any part
of the magistrate judge's disposition that has been properly
objected to.") In a footnote, Manufacturer Defendants purport
to object to "the entirety of the R&R." Doc #: 1082 at n.1. This
objection is not proper insofar as it does not include any bases
in or support from legal authority. Therefore, as there are no

proper objections to the facts or procedural history, the Court
adopts the facts and procedural history as stated in the R&R.
Further, there are no objections to the R&R with respect to
the following sections:

- Section III.B. Preemption

- Section III.H. Count Eight: Fraud

- Section III.L. Statewide Concern Doctrine

- Section III.M. Article III Standing[2]

The Court presumes the parties are satisfied with these
determinations and adopts the R&R with respect to these
sections. "Any further review by this Court would be
a duplicative and inefficient use of the Court's limited
resources." *Graziano v. Nesco Serv. Co.*, No. 1:09 CV 2661,
2011 WL 1131557, at \*1 (N.D. Ohio Mar. 29, 2011) (citing
*Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary
of Health and Human Services*, 932 F.2d 505 (6th Cir.1991);
*United States v. Walters*, 638 F.2d 947 (6th Cir.1981) ).

As an initial matter, Retail Pharmacy Defendants have asked
the Court to clarify that the claims brought against them
are only brought in their capacity as distributors, not as
dispensers. *See* Doc. #: 1078 at 2. The Court understands
that Plaintiffs have disclaimed any cause of action against
Retail Pharmacies in their capacity as retailers or dispensers
of opioids, *see* Doc. #: 654 at 75 n.47, and thus considers
the parties' arguments while keeping in mind that the Retail
Pharmacies may only be held liable as distributors.

### A. Tolling of the Statute of Limitations
 **\*2**  The R&R concluded that Plaintiffs have alleged
sufficient facts "to raise a plausible inference that the
applicable limitations periods are subject to tolling." R&R
at 55-56. Manufacturer Defendants object, stating that
Plaintiffs' Complaint indicates that they knew or should have
known of both the Manufacturers' marketing practices and
the costs Plaintiffs were incurring. Defendants argue that it
follows that Plaintiffs, by their own allegations, did not act
with sufficient diligence to support a fraudulent concealment
theory. In addition to tolling under a fraudulent concealment
theory, Plaintiffs also assert that the continuing violations
doctrine should be applied to save their claims from the
relevant statute of limitations.

## 1. Fraudulent Concealment

The R&R correctly states that "resolving a motion to dismiss based on statute-of-limitations grounds is appropriate when the undisputed facts 'conclusively establish' the defense as a matter of law." R&R at 54 (citing *Estate of Barney v. PNC Bank*, 714 F.3d 920, 926 (6th Cir. 2013); *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012), *cert. denied*, 568 U.S. 1157 (2013) ). "In order for Plaintiff's delay in filing to be excused due to Defendants' fraudulent concealment, Plaintiff must affirmatively plead with particularity: '(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.' " *Reid v. Baker*, 499 F. App'x 520, 527 (6th Cir. 2012) (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir.1975) ). However, as the R&R also points out, "courts should not dismiss complaints on statute-of-limitations grounds when there are disputed factual questions relating to the accrual date." *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016) (citing as examples of disputed factual questions, "claims that the defendant fraudulently concealed facts, thereby preventing the plaintiff from learning of its injury...and complex issues about whether information in the plaintiff's possession sufficed to alert it of the claim").

Defendants' assertions that Plaintiffs were aware, at least since 2007, of their marketing practices and knew about the effects of the opioid crisis, effectively admitted in the Complaint,[3] are insufficient to *conclusively establish* that any of Plaintiffs' claims are time-barred by the statute of limitations. If Plaintiffs relied solely on Defendants' concealment of their marketing practices, Plaintiffs' assertion that the statutes of limitation were tolled due to fraudulent concealment would fail. However, Plaintiffs' allegations of fraudulent concealment do not rely solely on Defendants' alleged concealment of their marketing practices. Plaintiffs also allege that Defendants concealed their lack of cooperation with law enforcement and that they affirmatively misrepresented that they had satisfied their duty to report suspicious orders, concealing the fact that they had not done so. *See* Doc. #: 514 at 232-33 (hereinafter cited as "SAC").

Plaintiffs additionally point out that they could not have discovered "the nature, scope, and magnitude of Defendants' misconduct, and its full impact on Plaintiffs, and could not

have acquired such knowledge earlier through the exercise of reasonable diligence," because until this Court ordered production of the ARCOS database in this litigation, Plaintiffs did not have access to that information. *Id.* at 233 (citing Doc. #: 233 at 6-7). Without access to the ARCOS data, Plaintiffs were forced to take Defendants at their word that they were complying with their obligations under consent decrees, statutes, and regulations. Plaintiffs inarguably knew about Defendants' marketing practices, but whether they had sufficient information, in the absence of the ARCOS data, to identify Defendants' alleged concealment and thus the scope or magnitude of Defendants' alleged misconduct is a disputed factual question.

## 2. Continuing Violations

**\*3** Plaintiffs also assert that the applicable statute of limitations should be tolled under the continuing violations doctrine. *Id.* at 231. In the Sixth Circuit, a " 'continuous violation' exists if: (1) the defendants engage in continuing wrongful conduct; (2) injury to the plaintiffs accrues continuously; and (3) had the defendants at any time ceased their wrongful conduct, further injury would have been avoided." *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009) (citing *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 521 (6th Cir.1997) ). Although Ohio courts are generally reluctant to apply the doctrine outside the Title VII context, "this doctrine is rooted in general principles of common law and is independent of any specific action." *Id.* Further, the Sixth Circuit has noted that "no opinion has articulated a principled reason why the continuing-violation doctrine should be limited to claims for deprivations of civil rights and employment discrimination." *Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 480 F.3d 410, 416–17 (6th Cir. 2007). "Courts have allowed the statute of limitations to be tolled [under the continuing violations framework] when...there is a 'longstanding and demonstrable policy' of the forbidden activity." *Ohio Midland, Inc. v. Ohio Dep't of Transp*, 286 F. App'x 905, 912 (6th Cir. 2008) (citing *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 857 (6th Cir.2003).).

Here, taking the factual allegations in the Complaint as true, Plaintiffs have alleged a longstanding and demonstrable policy of misrepresentations and omissions on the part of Defendants sufficient to demonstrate their engagement in continuing wrongful conduct. In addition, whether further injury could have been avoided had Defendants ceased this

Case 3:17-cv-01362 Document 1290-19 Filed 04/26/21 Page 27 of 53 PageID #: 43647

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

conduct is another disputed factual question. Therefore, the Court finds that Plaintiffs have alleged facts sufficient to raise a plausible inference that the applicable limitations periods are subject to tolling—under either a fraudulent concealment theory or a continuing violation theory—and that no claims should be dismissed on statute of limitations grounds at this early stage in the litigation.

## B. RICO

After a lengthy discussion of RICO, the R&R concluded that Plaintiffs' RICO claims should survive Defendants' motions to dismiss. R&R at 11-44. "RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime." *Sedima, SPRL v. Imrex Co., Inc.*, 473 U.S. 479, 498 (1985) (citing *Russello v. United States*, 464 U.S. 16, 26-29 (1983) ). In *Sedima*, the Supreme Court acknowledged the Second Circuit's distress over the "extraordinary, if not outrageous," uses to which civil RICO claims had been applied. *Id.* at 499. "Instead of being used against mobsters and organized criminals, it had become a tool for everyday fraud cases brought against respected and legitimate enterprises." *Id.* However, in reversing the 2nd Circuit, the *Sedima* Court observed:

> ...Congress wanted to reach both "legitimate" and "illegitimate" enterprises. *United States v. Turkette*, [452 U.S. 576 (1981) ]. The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences. The fact that § 1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued. Nor does it reveal the "ambiguity" discovered by the court below. "[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Haroco, Inc. v. American National Bank & Trust Co. of Chicago*, [747 F.2d 384, 398 (1984) ].

*Id.*

The RICO analysis is complicated because, "RICO's civil-suit provision imposes two distinct but overlapping limitations on claimants—standing and proximate cause...[a]nd as a matter of RICO law, the two concepts overlap." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613 (6th Cir. 2004). Defendants object to the R&R's conclusions regarding both "overlapping" limitations. Regarding standing, Defendants argue that Plaintiffs' injuries are 1) not to Plaintiffs' "business or property" as required by the statute, and 2) derivative of

a third-party's injuries (i.e. not direct). Regarding proximate cause, Defendants argue that Plaintiffs' injuries are too remote to hold Defendants liable under RICO (i.e. not direct). Manufacturing Defendants succinctly summarize the way "directness" applies to RICO analysis.

**\*4** For standing to exist, an injury must be "direct" in the sense of being both (1) non-derivative of some third party's injury (***the standing analysis***), *See Trollinger*, 370 F.3d at 614; and (2) having an uninterrupted, direct, and not overly attenuated causal chain from conduct to injury (***the proximate cause analysis***), *See Anza*, 547 U.S. at 457.

Doc. #: 1082 at 3 (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ) (emphasis in original). "Because Congress modeled [the RICO] provision on similar language in the antitrust laws (§ 4 of the Clayton Act and § 7 the Sherman Act) and because the antitrust laws have been interpreted to require that a private plaintiff show proximate cause in order to have standing to sue, RICO civil claims also require proximate cause. *Trollinger*, 370 F.3d at 612 (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267-68 (1992); *Sedima*, 473 U.S. at 496). Thus, although standing is a threshold issue, because proximate cause analysis is necessarily incorporated within the standing analysis, the Court begins with proximate cause.

## 1. Proximate Cause

In *Holmes*, the Supreme Court described proximate cause as "the judicial tools used to limit a person's responsibility for the consequences of that person's own act," and further stated "the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.' " 503 U.S. at 268 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984) ). In a RICO claim, "[t]he proximate-cause inquiry...requires careful consideration of the 'relation between the injury asserted and the injurious conduct alleged.' " *Anza*, 547 U.S. at 462 (quoting *Holmes*, 503 U.S. at 268). "Though foreseeability is an element of the proximate cause analysis, it is distinct from the requirement of a direct injury." *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003) (citing *Holmes*, 503 U.S. at 268-69.). Additionally, the *Holmes* Court provided several reasons why "some direct relation between the injury asserted and the injurious conduct alleged" is so important to the proximate cause analysis. *Holmes*, 503 U.S. at 268. The Court stated:

Case 3:17-cv-01362  Document 1290-19  Filed 04/26/21  Page 28 of 53 PageID #: 43648

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Id.* at 269–70 (internal citations omitted). Thus, it is important to first carefully consider the relationship between the injury asserted by Plaintiffs and the alleged injurious conduct of Defendants and then further consider whether that relationship implicates any of the concerns highlighted by the *Holmes* Court.

**\*5** Plaintiffs allege that "RICO Marketing Defendants...conducted an association-in-fact enterprise...to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain" thereby creating the opioid epidemic.[4] SAC at 270. Plaintiffs further allege that RICO Supply Chain Defendants...formed an association-in-fact enterprise...for the purpose of increasing the quota for and profiting from the increased volume of opioid sales in the United States" thereby creating the opioid epidemic.[5] It is important to note that Plaintiffs never expressly define what they mean by the term "opioid epidemic." The term may reasonably refer to the massive rate of addiction, overdose, and death associated with taking opioids. *See, e.g., id.* at 214-15 ("Ohio is among the states hardest hit by the opioid epidemic....Overdose deaths have become the leading cause of death for Ohioans under the age of 55.").

However, the term "opioid epidemic" may just as reasonably include black markets for diverted opioids. *See, e.g., id.* at 284 ("[Defendants' violations] allowed the widespread diversion of prescription opioids out of appropriate medical channels and into the illicit drug market— causing the opioid epidemic."); *see also id.* at 7 ("The increased volume of opioid prescribing correlates directly to skyrocketing addiction, overdose and death [and] black markets for

diverted prescription opioids.). Regarding their asserted injuries, however, Plaintiffs are more explicit. Plaintiffs expressly assert thirteen categories of damages. *See id.* at 285-86. Among these is, for example, the "costs associated with ...attempts to stop the flow of opioids into local communities." *Id.*

Manufacturer Defendants argue that the chain of causation from conduct to injury is as follows:

(i) a Manufacturer made deceptive claims in promoting its opioids (***the conduct***);

(ii) some physicians were exposed to that Manufacturer's claims; (iii) which caused some of those physicians to write medically inappropriate opioid prescriptions they would not have otherwise written; (iv) which caused some of their patients to decide to take opioids; (v) which caused some of those individuals to become addicted to opioids; (vi) which caused some of those addicted individuals to need additional medical treatment, to neglect or abuse their families, to lose their jobs, and/or to commit crimes; (vii) which caused Plaintiffs to expend additional resources on emergency services, and to lose revenue from a decreased working population and/or diminished property values (***the injury***).

Doc. #: 1082 at 9-10 (emphasis in original). However, Plaintiffs have alleged sufficient facts to support a far more direct chain of causation: (i) RICO Marketing Defendants made deceptive claims in promoting their opioids in order to sell more opioids than the legitimate medical market could support (***the conduct***); (ii) the excess opioids marketed by the RICO Marketing Defendants and distributed by the RICO Supply Chain Defendants were then diverted into an illicit, black market; (iii) Plaintiffs were forced to expend resources beyond what they had budgeted to attempt to stop the flow of the excess opioids into local communities and to bear the costs associated with cleaning them up. Under this potential chain of causation, the relationship between Plaintiffs' injury and Defendants' alleged conduct is less remote than prior Sixth Circuit precedent finding proximate cause, and is not too remote to support a finding of proximate cause here. *See, e.g., Trollinger,* 370 F.3d at 619 (finding proximate cause where Tyson "hired sufficient numbers of illegal aliens to impact the legal employees' wages," having an "impact on the bargained-for wage-scale," which "allowed Tyson not to compete with other businesses for unskilled labor," and finally where "Tyson's legal workers did not 'choose' to remain at Tyson for less money than other businesses offered").

Case 3:17-cv-01362 Document 1290-19 Filed 04/26/21 Page 29 of 53 PageID #: 43649

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

**\*6** Thus, it is incumbent upon the Court to consider whether any of the *Holmes* Court's reasons for requiring directness are implicated. Here, Plaintiffs' alleged damages are not speculative, but concrete and ascertainable. No other party can vindicate the law and deter Defendants' alleged conduct because Plaintiffs' asserted damages are not recoverable by any other party. Finally, there is no potential for—and thus no reason for the Court to have to adopt complicated rules to prevent—duplicative recoveries. As none of the *Holmes* concerns are implicated in this case, the Court finds that Plaintiffs have sufficiently alleged proximate cause for their RICO claims.

### 2. Standing

Having determined that Plaintiffs have alleged sufficient facts to find that they do not stand at too remote a distance to recover, the Court now turns to standing. Title 18 of the U.S. Code, section 1964(c), has been deemed the standing provision of RICO. It provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor...and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fee." 18 U.S.C. § 1964(c). The two operative portions of this section are the "business or property" limitation and the "by reason of" limitation.

"The 'by reason of' limitation...bundles together a variety of 'judicial tools,' some of which are traditionally employed to decide causation questions and some of which are employed to decide standing questions." *Trollinger*, 370 F.3d at 613 (citing *Holmes*, 503 U.S. at 268.). As it pertains to standing, the "by reason of" limitation is used to analyze whether a plaintiff is asserting an injury that was borne directly by that plaintiff or whether the injury was "derivative or passed-on" to the plaintiff by some intermediate party. *See id.* at 614.

### a. The "by reason of" Limitation (Direct Versus Passed-On Injury)

Defendants claim that Plaintiffs' asserted injuries are "necessarily derivative of harms to individual opioid users." Doc. #: 1082 at 4. They state that "it is the opioid user who (if anyone) was directly harmed, and it is only as a result of this harm—in the aggregate—that Plaintiffs can claim to have experienced additional public expenditures, lost tax revenue, and diminished property values." *Id.* Defendants cite *Perry* as a paradigmatic example from the Sixth Circuit of the distinction between derivative and non-derivative injuries. Defendants characterize *Perry* as follows: "Plaintiffs [in *Perry*] were individual insurance plan subscribers who alleged that because of the tobacco manufacturers' conduct, they paid increased premiums to account for medical care provided to smokers in the same insurance pool." *Id.* at 4-5 (citing *Perry*, 324 F.3d at 847) (internal citations omitted).

Defendants' characterization of *Perry* is correct, but *Perry* is factually distinct from this case. In *Perry*, tobacco users suffered smoking-related injuries which increased healthcare costs. That is where the similarities with the present case end. In *Perry*, the increased healthcare costs were borne by insurance companies who then passed-on those costs to individual insurance plan subscribers in the form of higher insurance premiums. The non-smoking individual subscribers then sued the tobacco companies for the costs passed-on to them by the insurance companies. *See Perry*, 324 F.3d at 847. Thus, *Perry* represents a classic case of "passed-on" economic injury. Here, as described above, Plaintiffs have alleged a plausible claim that their injuries are the direct result of Defendants' creation of an illicit opioid market within their communities.[6] Plaintiffs' asserted economic injuries are borne by them and not passed-on by any intermediate party standing less removed from Defendants' actions.

**\*7** The tobacco cases, in general, are factually distinct from the present case for an additional reason. In the tobacco cases, no one asserted, nor could they have, that tobacco defendants created an "illicit cigarette market" the attendant consequences of which might have caused the government plaintiffs to expend their limited financial resources to mitigate. This "opioid epidemic as an illicit market" concept is an important distinction underlying many of Plaintiffs' allegations. *See, e.g.*, SAC at 150-51. Therefore, assuming as it must that Plaintiffs can prove their allegations, the Court finds it plausible that Plaintiffs' asserted injuries were directly caused "by reason of" Defendants' injurious conduct.

### b. The "business or property" Limitation

Even if Plaintiffs' asserted injuries were proximately and directly caused "by reason of" Defendants' alleged injurious conduct, Plaintiffs still may not bring a RICO claim if the injuries asserted were not to their "business or property." 18 U.S.C. § 1964(c). As a general principal, "money, of course,

Case 3:17-cv-01362   Document 1290-19   Filed 04/26/21   Page 30 of 53 PageID #: 43650

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

is a type of property." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979). It is also true that, "[a] person whose property is diminished by a payment of money wrongfully induced is injured in his property." *County of Oakland v. City of Detroit*, 866 F.2d 839, 845 (6th Cir. 1989) (quoting *Chattanooga Foundry and Pipe Works v. City of Atlanta*, 203 U.S. 390, 396 (1906) ). Plaintiffs assert thirteen categories of expenditures that they contend represent a substantial monetary loss, and are therefore an injury to their property. *See* SAC at 285. Defendants contend that none of the monetary costs asserted by Plaintiffs are the type of property injury anticipated (and thus permitted) by the RICO statute.

**(i) Personal Injuries**

The Sixth Circuit has held that "personal injuries and pecuniary losses flowing from those personal injuries fail to confer relief under § 1964(c)." *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 565-66 (6th Cir. 2013). "Courts interpreting RICO have remained faithful to this distinction [between non-redressable personal injury and redressable injury to property] by excluding damages '*arising directly out of* a personal injury, even though personal injuries often lead to monetary damages that would be sufficient to establish standing if the plaintiff alleged a non-personal injury." *Id.* (emphasis added).

The *Jackson* court's holding that RICO claims that allege damages "arising directly out of a personal injury" are not redressable adds another layer to the "directness" requirement summarized by Defendants above. As stated previously, Defendants explained two ways in which RICO allegations must be sufficiently direct to maintain a RICO claim. First, the relationship between the asserted injury and the alleged injurious conduct must have a *direct* causal connection. (the proximate cause analysis). And second, the asserted injury must also be borne *directly* by Plaintiffs and not passed-on to them by intermediate parties (the standing "by reason of" analysis). Under *Jackson*, there is an additional element of *directness* to consider—whether Plaintiffs' alleged injury arises *directly* out of a personal injury. While the first two analyses require closeness of the relationship between injury and injurious conduct, the *Jackson* analysis requires separation between personal injury and pecuniary losses that arise therefrom.

To determine what type of pecuniary losses arise directly out of personal injury, the Court first looks to the facts of *Jackson* itself. In *Jackson*, former employees who suffered personal

injuries at work sued their employer for a RICO violation. They alleged that their employer's workers' compensation administrator and physician engaged in a fraudulent scheme to avoid paying workers' compensation benefits to them, causing them to suffer monetary losses (i.e. receiving less money from their personal injury claim than they felt they were entitled to). *See id.* at 561-62. The *Jackson* court rejected the plaintiffs' theory that their workers' compensation benefits created an intervening legal entitlement to money, which is property under RICO. *See id.* at 566. The *Jackson* court also cites several examples where other circuits have considered when a pecuniary harm arises directly out of a personal injury. *See, e.g.,id.* at 564 n.4. Reviewing these cases, the Court determines that their unifying character is that pecuniary losses "arise directly out of" a personal injury when the alleged RICO injury merely acts as an alternate theory for recovering damages otherwise available in a tort claim for personal injury and is asserted by the plaintiff him- or herself.[7]

**\*8** In other words, damages that result from a personal injury to a plaintiff (such as attorney fees, lost wages, lost workers' compensation benefits, or medical expenses), that are recoverable in a typical tort action are not recoverable in RICO, even if caused by a defendant's racketeering activity. These are costs that arise directly out of the plaintiff's personal injury, and are not injuries to plaintiff's "business or property" under the statute.

Defendants contend that Plaintiffs are attempting to recover the pecuniary losses resulting directly from their addicted residents' physical injuries, citing *Jackson*. Plaintiffs respond that their economic losses are not pecuniary losses resulting from their addicted residents' personal injuries; rather, they are concrete economic losses to the cities and counties resulting directly from Defendants' relinquishment of their responsibility to maintain effective controls against diversion of Schedule II narcotics. *See, e.g.*, 21 U.S.C. § 823(a)-(b).

Plaintiffs have the better argument. None of Plaintiffs' thirteen categories of costs arise directly out of a personal injury to Plaintiffs themselves. *See* Doc. #: 654 at 36-37 ("Plaintiffs' damages claims are not for personal injuries, but police and fire services, lost taxes, revenue and funding."). Even if *Jackson* can be read to preclude a RICO claim by a plaintiff who is tasked to protect the well-being of a third-party where the asserted economic harm is created by a personal injury to that third-party, it still does not follow that all thirteen categories of damages asserted by Plaintiffs arise directly out of such personal injuries. In that scenario, it

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

would still be crucial to determine whether Plaintiffs' alleged injuries result directly from the personal injuries sustained by their citizens.

Plaintiffs assert the following injuries:

a. Losses caused by the decrease in funding available for Plaintiffs' public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

b. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; c. Costs of training emergency and/or first responders in the proper treatment of drug overdoses;

d. Costs associated with providing police officers, firefighters, and emergency and/or first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

e. Costs associated with emergency responses by police officers, firefighters, and emergency and/or first responders to opioid overdoses;

f. Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

g. Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

h. Costs associated with law enforcement and public safety relating to the opioid epidemic, including but not limited to attempts to stop the flow of opioids into local communities, to arrest and prosecute street-level dealers, to prevent the current opioid epidemic from spreading and worsening, and to deal with the increased levels of crimes that have directly resulted from the increased homeless and drug-addicted population;

**\*9** i. Costs associated with increased burden on Plaintiffs' judicial systems, including increased security, increased staff, and the increased cost of adjudicating criminal matters due to the increase in crime directly resulting from opioid addiction;

j. Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

k. Loss of tax revenue due to the decreased efficiency and size of the working population in Plaintiffs' communities;

l. Losses caused by diminished property values in neighborhoods where the opioid epidemic has taken root; and

m. Losses caused by diminished property values in the form of decreased business investment and tax revenue.

SAC at 285-286. Perhaps it can be said that items b and e above (the provision of medical treatment and emergency response services) arise directly out of the personal injury of the citizens because they are effectively claims to recoup the costs of medical expenses. However, there are other categories of costs, for example item h (the costs associated with "attempts to stop the flow of opioids into [Plaintiffs'] communities...[and] prevent the current opioid epidemic from spreading and worsening"), that cannot be said to arise directly out of Plaintiffs' residents' personal injuries. *Id.* Thus, under no reading of *Jackson* can it be maintained that *all* of Plaintiffs' asserted injuries arise directly out of a personal injury, and it is more likely, in this Court's opinion, that most do not.

**(ii) Sovereign Capacity**

Finally, Defendants argue that regardless of the above, Plaintiffs cannot recover injury to their property to the extent they seek to recover costs associated with services provided in Plaintiffs' sovereign or quasi-sovereign capacities, which Defendants argue, accounts for the entirety of Plaintiffs' claimed injuries. Doc. #: 1082 at 6-7. Defendants implore the Court to follow the Ninth Circuit's holding in *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008). Defendants claim that *Canyon County's* holding that "money 'expended on public health care and law enforcement services' by a city or county does not constitute injury to 'business or property' under RICO" is applicable to the present case. *See* Doc. #: 1079 at 6 (quoting *Canyon County*, 519 F.3d at 971). Defendants point out that the Sixth Circuit has previously relied on *Canyon County* (albeit for its analysis of the proximate cause requirement of RICO and not for its "business or property" analysis) in *City of Cleveland v. Ameriquest Mort. Sec., Inc.*, 615 F.3d 496 (6th Cir. 2010). The

Case 3:17-cv-01362 Document 1290-19 Filed 04/26/21 Page 32 of 53 PageID #: 43652

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

R&R declined to follow *Canyon County*, however, stating that, "Defendants ...have not identified any Supreme Court or Sixth Circuit case directly on point with the facts of this case."

The R&R is correct because there has never been a case with facts analogous to those alleged by Plaintiffs here. It cannot be stressed strongly enough that the prescription opiates at issue in this case *are Schedule II controlled substances*.[8] Plaintiffs have alleged a wanton disregard for public health and safety exhibited by Defendants with respect to their legal duty to try to prevent the diversion of prescription opioids. With the privilege of lawfully manufacturing and distributing Schedule II narcotics—and thus enjoying the profits therefrom—comes the obligation to monitor, report, and prevent downstream diversion of those drugs. *See* 21 U.S.C. § 823(a)-(b). Plaintiffs allege that Defendants have intentionally turned a blind eye to orders of opiates they knew were suspicious, thereby flooding the legitimate medical market and creating a secondary "black" market at great profit to Defendants and at great cost to Plaintiffs.[9] Plaintiffs must shoulder the responsibility for attempting to clean up the mess allegedly created by Defendants' misconduct.

 **\*10** In *Canyon County*, the County brought a RICO claim against four defendant companies for "knowingly employ[ing] and/or harbor[ing] large numbers of illegal immigrants within Canyon County, in an 'Illegal Immigrant Hiring Scheme.' " *Canyon County*, 519 F.3d at 972. The County claimed that it "paid millions of dollars for health care services and criminal justice services for the illegal immigrants who [were] employed by the defendants in violation of federal law." *Id.* Based on these facts, the Ninth Circuit concluded that "when a governmental body acts in its sovereign or quasi-sovereign capacity, seeking to enforce the laws or promote the public well-being, it cannot claim to have been 'injured in [its]...property' for RICO purposes based *solely* on the fact that it has spent money in order to act governmentally." *Canyon County*, 519 F.3d at 976 (emphasis added). As stated above, neither the Sixth Circuit nor the Supreme Court have adopted the holding in *Canyon County*, and certainly not for the broad proposition that governmental entities are *barred* from seeking RICO claims for services provided in their sovereign or quasi-sovereign capacities. Not even *Canyon County* established such a bright-line rule. The *Canyon County* court held that governmental entities are not injured in their property based *solely* on the expenditure of money to act governmentally. Use of the word "solely" implies that governmental entities might be able to assert an injury to their property based on the expenditure of money

plus something else, perhaps, for example, the assumption of a statutory burden relinquished by a defendant.

In this case, the scope and magnitude of the opioid crisis—the illicit drug market and attendant human suffering—allegedly created by Defendants have forced Plaintiffs to go far beyond what a governmental entity might ordinarily be expected to pay to enforce the laws or promote the general welfare. Plaintiffs have been forced to expend vast sums of money far exceeding their budgets to attempt to combat the opioid epidemic. The Court thus concludes that while Cities and Counties cannot recover ordinary costs of services provided in their capacity as a sovereign, Cities and Counties should be able to recover costs greatly in excess of the norm, so long as they can prove the costs were incurred due to Defendants' alleged RICO violations.

Additionally, the Ninth Circuit held in *Canyon County* that governmental entities can, in fact, recover in RICO for the costs associated with doing business in the marketplace. *See, e.g., id.* ("government entities that have been overcharged in commercial transactions and thus deprived of their money can claim injury to their property.").

It is Defendants' position that *all* of Plaintiffs' costs responding to Defendants' alleged misconduct are sovereign or quasi-sovereign public services derivative of their residents' opioid problems, for which they cannot recover. *See* Doc. #: 1082 at 7. The Court disagrees. Certainly, some of Plaintiffs' alleged costs are costs associated with the ordinary provision of services to their constituents in their capacity as sovereigns. *See, e.g.,* SAC at 285 (asserting injury due to the provision of emergency first responder services). These costs cannot be recovered unless Plaintiffs can prove they go beyond the ordinary provision of those services. However, some of Plaintiffs' alleged costs are clearly associated with Plaintiffs' *participation in the marketplace*, and for those costs, Plaintiffs can undoubtedly recover. *See, e.g., id.* (asserting injury due to the costs associated with purchasing naloxone to prevent future fatal overdoses).

Therefore, under the broadest reading of Sixth Circuit precedent, the Court finds that Plaintiffs may recover damages based on the provision of governmental services in their capacity as a sovereign to the extent they can prove the asserted costs go beyond the ordinary cost of providing those services and are attributable to the alleged injurious conduct of Defendants. Under a more restrictive reading of *Jackson*, Plaintiffs still may recover those costs

associated with preventing the flood of these narcotics into their communities, which do not directly arise from the personal injuries of their citizens (e.g. providing medical care, addiction treatment, etc.). Lastly, Plaintiffs have sufficiently alleged that at least some of their claimed injuries are recoverable under RICO due to Plaintiffs' participation in the marketplace. Thus, the Court concludes that it is not appropriate to dismiss the RICO claims at this early stage in the litigation.

### C. Civil Conspiracy

**\*11** The R&R concluded that Plaintiffs sufficiently pled a claim for civil conspiracy. R&R at 95-98. Distributor Defendants object, stating that the Complaint "alleges no facts to support the assertion that Distributors participated in the marketing of opioids [or]...in applying or lobbying for increased opioid production quotas from DEA,...[and] no facts to support the claim that Distributors conspired not to report the unlawful distribution practices of their competitors to the authorities." Doc. #: 1079 at 2-3 (emphasis removed). Pharmacy Defendants also object, arguing that to the extent a civil conspiracy is alleged through Defendants' participation in industry groups, the Complaint is deficient with respect to the Retail Pharmacies, because it does not allege their participation in those groups.

The R&R correctly identifies the elements of a cognizable conspiracy claim as: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy") *Hale v. Enerco Grp., Inc.*, 2011 WL 49545, at \*5 (N.D. Ohio Jan. 5, 2011) (citation and internal quotation marks omitted). Distributor Defendants take exception to the R&R's finding of independent unlawful acts. Pharmacy Defendants object to the R&R's finding of a malicious combination. Defendants miss the forest for the trees.

Distributor Defendants characterize the R&R's finding of unlawful acts as "(1) fraudulently marketing opioids; (2) fraudulently increasing the supply of opioids by seeking increased quotas; and (3) failing to report suspicious orders." Doc #: 1079 at 2. This mischaracterizes the R&R's actual finding that "the statutory public nuisance, Ohio RICO, and injury through criminal acts claims" would all suffice to "fulfill the underlying unlawful act element." R&R at 96. The Court agrees that any of these claims is sufficient to satisfy the underlying unlawful act element.

Pharmacy Defendants assert that, because the Complaint fails to expressly allege their participation in industry groups such as the Healthcare Distribution Alliance and Pain Care Forum, that Plaintiffs failed to adequately plead a civil conspiracy claim, at least regarding them. However, the R&R did not rely on industry group participation to find a malicious combination. The R&R concluded that:

> Pleading the existence of a malicious conspiracy requires "only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden v. Louis*, 687 N.E.2d 481, 496-98 (Ohio Ct. App. 1996). "All that must be shown is that...the alleged coconspirator shared in the general conspiratorial objective." *Aetna Cas. & Sur. Co. v. Leahey Const. Co., Inc.*, 219 F.3d 519, 538 (6th Cir. 2000) (citation and internal quotation marks omitted).

*Id.* at 97. In other words, the R&R concluded that even absent evidence of participation in industry groups, alleging a "shared conspiratorial objective" is sufficient to demonstrate a "malicious combination" and thus survive Pharmacy Defendants' motion to dismiss. Plaintiffs allege "*all Defendants* took advantage of the industry structure, including end-running its internal checks and balances, to their collective advantage." SAC at 229 (emphasis added). Additionally, with respect to Retail Pharmacy Defendants specifically, Plaintiffs assert, "instead of taking any meaningful action to stem the flow of opioids into communities, they continued to participate in the oversupply and profit from it." *Id.* at 184. Thus, the R&R concluded, and this Court agrees, that Plaintiffs adequately pled that Defendants shared a general conspiratorial objective of expanding the opioid market and that there was a common understanding between all Defendants to disregard drug reporting obligations to effectuate that goal. Therefore, the Court adopts the R&R with respect to section III.K.

### D. Abrogation of Common Law Claims Under the Ohio Products Liability Act

**\*12** The R&R concluded that Plaintiffs' Statutory Public Nuisance and Negligence Claims are not abrogated by the Ohio Product Liability Act ("OPLA").[10] R&R at 58-60, 61-62. As further discussed below, the Court concurs with and adopts the R&R's recommendation and reasoning with respect to these findings. However, the R&R also concluded that Plaintiffs' Common Law Absolute Public Nuisance Claim is abrogated by the OPLA. *Id.* at 62-65. The Court disagrees.

### 1. Abrogation of the Common Law Public Nuisance Claims

The Ohio Product Liability Act, Ohio Rev. Code § 2307.71 *et seq.*, was enacted in 1988. It was amended in 2005 and amended again in 2007. Despite the General Assembly's attempts to clarify the language and intent of the statute's definition of "product liability claim," the Court finds that the definition remains ambiguous, and thus reviews the legislative history pursuant to Ohio Rev. Code § 1.49(C) ("If a statute is ambiguous, the court, in determining the intention of the legislature, may consider among other matters:...The legislative history.").

The OPLA, at the time of its enactment, did not explicitly state that it was intended to supersede all common law theories of product liability. It was also ambiguous regarding whether it superseded common law claims seeking only economic loss damages. The Ohio Supreme Court attempted to clarify these ambiguities in two cases, *Carrel v. Allied Prods. Corp.*, 677 N.E.2d 795, 799 (1997) (holding that "the common-law action of negligent design survives the enactment of the Ohio Products Liability Act.") and *LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996) (holding that "although a cause of action may concern a product, it is not a product liability claim within the purview of Ohio's product liability statutes unless it alleges damages other than economic ones, and that a failure to allege other economic damages does not destroy the claim, but rather removes it from the purview of those statutes.").

In 2005, the General Assembly added the following provision to the OPLA ("the 2005 Amendment"): "Sections 2307.71 to 2307.80 of the Revised Code are intended to abrogate all common law product liability causes of action." 2004 Ohio Laws File 144 (Am. Sub. S.B. 80) (codified at Ohio Rev. Code § 2307.71(B) ). The associated legislative history of the 2005 Amendment states:

> The General Assembly declares its intent that the amendment made by this act to section 2307.71 of the Revised Code is ***intended to supersede the holding of the Ohio Supreme Court in Carrel v. Allied Products Corp.*** (1997), 78 Ohio St.3d 284, that the common law product liability cause of action of negligent design survives the enactment of the Ohio Product Liability Act, sections 2307.71 to 2307.80 of the Revised Code, and to abrogate all common law product liability causes of action.

*\*13 Id.* (emphasis added). Notably, the General Assembly cited the *Carrel* holding while conspicuously omitting the contemporary *LaPuma* holding. The Court therefore interprets the General Assembly's inclusion of *Carrel* to imply the intentional exclusion and therefore the tacit acceptance of the Ohio Supreme Court's holding in *LaPuma*.

In 2007, the Ohio Legislature further amended section 2307.71(A)(13) of the OPLA ("the 2007 Amendment") to add the following to the definition of "product liability claim:"

> "Product liability claim" ***also includes*** any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product unreasonably interferes with a right common to the general public.

2006 Ohio Laws File 198 (Am. Sub. S.B. 117) (emphasis added). The associated legislative history of the 2007 Amendment further states:

> The General Assembly declares its intent that the amendments made by this act to sections 2307.71 and 2307.73 of the Revised Code are ***not intended to be substantive but are intended to clarify the General Assembly's original intent*** in enacting the Ohio Product Liability Act, sections 2307.71 to 2307.80 of the Revised Code, as initially expressed in Section 3 of Am. Sub. S.B. 80 of the 125th General Assembly, to abrogate all common law product liability causes of action ***including*** common law public nuisance causes of action, regardless of how the claim is described, styled, captioned, characterized, or designated, including claims against a manufacturer or supplier for a public nuisance allegedly caused by a manufacturer's or supplier's product.

*Id.* (emphasis added). Senate Bill 80 of the 125th General Assembly (the 2005 Amendment) was a "tort reform" bill that was enacted to create limitations on various types of non-economic damages. *See* 2004 Ohio Laws File 144 (Am. Sub. S.B. 80). Both the 2005 and 2007 Amendments demonstrate the General Assembly's intent to limit non-economic damages on all common law theories of product liability regardless of how the claim was characterized.

Throughout these amendments, however, the overarching substantive definition of a "product liability claim" has not changed much from the original 1988 OPLA definition. To fall within the statute's definition a plaintiff's product liability claim must 1) seek to recover compensatory damages 2) for death, physical injury to a person, emotional distress,

Case 3:17-cv-01362  Document 1290-19  Filed 04/26/21  Page 35 of 53 PageID #: 43655

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

or physical damage to property other than the product in question (*i.e.* "harm" as defined by the statute).[11] The subsequent amendments make clear that any civil action concerning liability for a product due to a defect in design, warning, or conformity—including any common law public nuisance or common law negligence claim, regardless of how styled—that 1) seeks to recover compensatory damages 2) for "harm" is abrogated by the OPLA. Conversely, a claim *not* seeking to recover compensatory damages or seeking to recover solely for "economic loss" (*i.e. not* "harm")does not meet the definition of a product liability claim and is not abrogated by the OPLA. The OPLA is explicit that "Harm is not 'economic loss,'" and "Economic Loss is not 'harm.'" Ohio Rev. Code § 2307.71(A)(2) and (7). This reading of § 2307.71(A)(13) is consistent with the legislative intent, the holding in *LaPuma*, and with § 2307.72(C) which states:

> **\*14** Any recovery of compensatory damages for economic loss based on a claim that is asserted in a civil action, other than a product liability claim, is not subject to sections 2307.71 to 2307.79 of the Revised Code, but may occur under the common law of this state or other applicable sections of the Revised Code.

Ohio Rev. Code § 2307.72(C).

Further, by defining a "product liability claim" in terms of damages, the OPLA does not provide for any form of equitable remedy.[12] To conclude that all public nuisance claims, including those seeking equitable remedies, are subsumed by the OPLA would effectively be a substantive change in the law in contravention of the General Assembly's express intent that the amendment *not* be substantive. In other words, if all public nuisance claims, including those only seeking equitable relief, were abrogated by the OPLA, a party merely seeking an equitable remedy to stop a public nuisance would be forced instead to sue for compensatory damages under the OPLA, a result that appears completely at odds with the legislative intent to limit non-economic compensatory damages. Therefore, a claim seeking only equitable relief is not abrogated by the OPLA.

The R&R concluded that the 2007 Amendment added public nuisance claims as a second category of actions that fall under the definition of a product liability claim. *See* R&R at 58 n.37. In support of this conclusion, Defendants cite *Mount Lemmon Fire Dist. v. Guido*, 139 S. Ct. 22 (2018). *See* Doc. #: 1116 at 3. In *Mount Lemmon*, the Supreme Court interpreted Congress' addition of a second sentence to the definition of "employer" under the ADEA.[13] The Supreme Court held that

the phrase "also means" adds a new category of employers to the ADEA's reach. *Mount Lemmon* is factually inapposite, and the R&R's conclusion is incorrect for two reasons. First, there is a substantive difference between the phrases "also means" and "also includes." The term "means" is definitional, while "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." *In re Hartman*, 443 N.E.2d 516, 517–18 (Ohio 1983) (quoting *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ). In this case, the general principal is that to be a product liability claim, a plaintiff's cause of action must seek compensatory damages for harm. Thus, a public nuisance claim—to be "also include[d]" as a "product liability claim" under the OPLA—must likewise seek compensatory damages for harm. Ohio Rev. Code § 2307.71(A)(13).

**\*15** Second, as the *Mount Lemmon* opinion points out, "Congress amended the ADEA to cover state and local governments." *Mount Lemmon*, 139 S. Ct. at 23. This amendment to the ADEA certainly amounts to—and was intended to be—an intentional, substantive change in the law. As highlighted above, however, the 2007 Amendment to the OPLA was not intended to be a substantive change.

Therefore, in light of the legislative history, the Court finds it at least plausible, if not likely, that the 2005 and 2007 Amendments to the OPLA intended to clarify the definition of "product liability claim" to mean "a claim or cause of action [*including* any common law negligence or public nuisance theory of product liability...] that is asserted in a civil action...that seeks to recover compensatory damages...for [harm]...." This definition is the most consistent with the statute, the legislative history, and the caselaw. *See LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996) ("Failure to allege other than economic damages...removes it from the purview of [the OPLA].") (intentionally not overruled by the 125th General Assembly); *Volovetz v. Tremco Barrier Sols., Inc.*, 74 N.E.3d 743, 753 n.4 (Ohio Ct. App. Nov. 16, 2016) ("We recognize that a claim for purely economic loss is not included in the statutory definition of 'product liability claim,' and, consequently, a plaintiff with such a claim may pursue a common-law remedy."); *Ohio v. Purdue Pharma*, Case No. 17 CI 261 (Ohio C.P. Aug. 22, 2018) (finding that the Plaintiff's common law nuisance claim not seeking compensatory damages is not abrogated under the OPLA.); *see also*, 76 Ohio Jur. 3d Claims Within Scope of Product Liability Act § 1 ("Ohio's products liability statutes,

Case 3:17-cv-01362  Document 1290-19  Filed 04/26/21  Page 36 of 53 PageID #: 43656
In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)
2018 WL 6628898, RICO Bus.Disp.Guide 13,115

by their plain language, neither cover nor abolish claims for purely economic loss caused by defective products.").

Using this definition, Plaintiffs' absolute public nuisance claim, at least insofar as it does not seek damages for harm,[14] is not abrogated by the OPLA. Section III.E of the R&R is rejected to the extent it held that Plaintiffs' absolute public nuisance claim is abrogated by the OPLA.

### 2. City of Akron's Ability to Bring a Statutory Public Nuisance Claim

The R&R concluded that Plaintiffs' statutory public nuisance claim was not abrogated. R&R at 62. No party objected to this conclusion, therefore the Court adopts the R&R with respect to this finding. The R&R further concluded that the City of Akron lacked standing to bring a statutory public nuisance claim, and that the County of Summit, which had standing, was not limited only to injunctive relief under the statute. The Pharmacy Defendants object to the R&R's conclusion that § 4729.35 of the Ohio Revised Code does not limit the remedy that can be sought under the statute to an injunction, and Plaintiffs object to the R&R's conclusion that § 4729.35 limits who may maintain a nuisance action. The issue then, is whether § 4729.35 is limiting and if so, to what extent.

The operative statutes involved in Plaintiffs' Statutory Public Nuisance Claim are:

Ohio Rev. Code § 715.44(A) (emphasis added):[15]

A municipal corporation may abate *any nuisance* and prosecute *in any court of competent jurisdiction*, any person who creates, continues, contributes to, or suffers such nuisance to exist.

Ohio Rev. Code § 3767.03 (emphasis added):[16]

**\*16** *Whenever a nuisance exists*, the attorney general; the village solicitor, city director of law, or other similar chief legal officer of the municipal corporation *in which the nuisance exists*; the prosecuting attorney of the county in which the nuisance exists; the law director of a township that has adopted a limited home rule government under Chapter 504. of the Revised Code; or any person who is a citizen of the county in which the nuisance exists may bring an action in equity in the name of the state, upon the relation of the attorney general; the village solicitor, city director of law, or

other similar chief legal officer of the municipal corporation; the prosecuting attorney; the township law director; or the person, to abate the nuisance and to perpetually enjoin the person maintaining the nuisance from further maintaining it.

Ohio Rev. Code § 4729.35 (emphasis added):[17]

The violation...of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse...is hereby declared to...constitute a public nuisance. The attorney general, the prosecuting attorney of any county in which the offense was committed or in which the person committing the offense resides, or the state board of pharmacy may maintain an action in the name of the state *to enjoin such person* from engaging in such violation. Any action under this section shall be brought *in the common pleas court of the county where the offense occurred or the county where the alleged offender resides*.

If § 4729.35 had ended after the first sentence, there would be no question as among the three statutes that the City of Akron would have the authority to bring an action to abate a nuisance caused by the violation of applicable drug laws. However, the subsequent sentences of § 4729.35 can be read as either limiting or expanding (or both). Section 4729.35 is potentially limiting, for example, in that it does not also list city directors of law, chief legal officers of municipal corporation, or law directors of townships as parties that may maintain a nuisance action. It is also potentially limiting in that it only mentions injunctive relief rather than (or in addition to) relief in the form of abatement (or equitable relief generally). However, as Plaintiffs point out, § 4729.35 might be read as an expansion of § 3767.03 in that it additionally allows the state board of pharmacy and the prosecuting attorney of the county in which the alleged offender resides to maintain a nuisance action.[18] It also provides jurisdiction in either the county where the offense occurred or the county where the alleged offender resides.

The R&R succinctly summarizes the applicable Ohio rule of statutory construction, "a court should construe various statutes in harmony unless their provisions are irreconcilably in conflict." R&R at 65 (citing Ohio Rev. Code § 1.51; *United Tel. Co. v. Limbach*, 643 N.E.2d 1129, 1131 (Ohio 1994) ). In the event statutory provisions are irreconcilable, the special or local provision prevails. *See id.* Additionally, as before, the Court interprets the inclusion of certain elements in a statute to imply the intentional exclusion of others.

Case 3:17-cv-01362 Document 1290-19 Filed 04/26/21 Page 37 of 53 PageID #: 43657

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

Here, § 4729.35 is a special or local provision. It is irreconcilable with §§ 715.44(A) and 3767.03 because the plain language of these sections explicitly allows the chief legal officer of *any* municipal corporation, for example a city law director, to bring an action for abatement of *any* nuisance, whereas § 4729.35—at least implicitly—excludes a city law director from bringing a nuisance action for violations of the drug laws. Further, even a statutorily authorized party may only bring an action to enjoin such violations, not one for abatement.

**\*17** Thus, the Court concludes, as the R&R did, that the General Assembly's inclusion of the attorney general, county prosecuting attorney, and state board of pharmacy in § 4729.35 implies the intentional exclusion of a city law director. Similarly, the Court concludes, though the R&R did not, that the General Assembly's reference to "an action...to enjoin such person from engaging in such violation" implies the exclusion of other forms of relief. Ohio Rev. Code § 4729.35.

While it may not have been the General Assembly's intent to limit the parties who can maintain a nuisance action or to limit the available relief, the Court declines to second guess the unambiguous text of the General Assembly's statute. Further, because § 4729.35 is a special or local provision, irreconcilable with the more general provision, the Court reads § 4729.35 as an exception to the general provision. Therefore, the Court adopts the R&R's conclusion that the City of Akron lacks standing to bring a statutory public nuisance claim but rejects the R&R's conclusion that Ohio Rev. Code § 4729.35 does not expressly limit the categories of relief available for a nuisance claim to an injunction.

### 3. Abrogation of the Negligence Claim

The R&R concluded that the OPLA does not abrogate Plaintiffs' negligence claims. R&R at 60. Distributor Defendants object to that determination. *See* Doc. #: 1079 at 12. As discussed above, the OPLA only abrogates civil actions that seek to recover compensatory damages for death, physical injury, or physical damage to property caused by a product. Distributor Defendants do not meaningfully develop any argument with respect to Plaintiffs' negligence claim other than to cite several cases where courts purportedly dismissed various tort claims as preempted by the OPLA. The cases are all distinguishable.

Defendants cite *Chem. Solvents, Inc. v. Advantage Eng'g, Inc.*, 2011 WL 1326034 (N.D. Ohio Apr. 6, 2011). Regarding the plaintiff's negligence claim, the *Chem. Solvents* court first determined that "the Plaintiff [was] not saying that the product itself was defective."*Id.* at \*13. The court then held, "Thus, this is not a 'products liability' claim, but a claim premised upon subsequent negligent actions by Advantage. Accordingly, the Court finds this claim is not preempted by the OPLA." *Id.* (citing *CCB Ohio LLC v. Chemque, Inc.*, 649 F. Supp. 2d 757, 763– 64 (S.D. Ohio 2009) ("Similarly, the Court finds actions for fraud and negligent misrepresentation as outside the scope of the OPLA's abrogation, as neither fit neatly into the definition of a 'common law product liability claim.' ") ). Here, Plaintiffs likewise are not asserting that the opioid products themselves are defective, rather that Defendants negligently permitted (or even encouraged) diversion of those products.

Defendants also cite *McKinney v. Microsoft Corp.*, No. 1:10-CV-354, 2011 WL 13228141 (S.D. Ohio May 12, 2011). *McKinney* is a traditional products liability case where the plaintiff, in addition to his products liability claim under the OPLA, asserted a claim for negligent manufacture (i.e. a defective product claim), the exact type of claim considered by the General Assembly when it overruled *Carrel*. Plaintiffs' negligence claim in this case, again, does not assert that Defendants' opioids were defective.

Finally, Defendants turn to *Leen v. Wright Med. Tech., Inc.*, 2015 WL 5545064, at \*2 (S.D. Ohio Sept. 18, 2015). In *Leen*, the plaintiff did not oppose the defendant's abrogation arguments in the motion to dismiss, so the court dismissed the common law negligence claim without considering the merits. *See id.* Therefore, based on this Court's analysis of the OPLA and the cases cited by Defendants, the Court adopts the R&R's conclusion that Plaintiffs' negligence claim is not abrogated.

**\*18** Defendants also assert that the R&R's reliance on *Cincinnati v. Beretta U.S.A. Corp.* is misplaced because, they claim, it was effectively overruled by the General Assembly's amendments to the OPLA. 768 N.E.2d 1136 (Ohio 2002); *see* Doc. #: 1079 at 14. Whether and to what extent the OPLA abrogates negligence claims is a separate and distinct question from whether there is a common law duty to prevent or attempt to prevent the alleged negligent creation of an illicit secondary market.

Case 3:17-cv-01362   Document 1290-19   Filed 04/26/21   Page 38 of 53 PageID #: 43658

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

As previously stated, the OPLA does not abrogate Plaintiffs' negligence claim, which seeks only relief from economic losses. However, even if the Court had found that Plaintiffs' negligence claim was abrogated, it does not follow that *Beretta's* analysis of what constitutes a legal duty in Ohio is somehow flawed.[19] Thus, *Beretta's* discussion of Ohio common law duty is still relevant to the present case and is analyzed further below.

### E. Negligence

The R&R concluded that Plaintiffs have pled sufficient facts to plausibly support their claims that Defendants owed them a duty of care, that their injuries were proximately and foreseeably caused by Defendants' failure to take reasonable steps to prevent the oversupply of opioids into Plaintiffs' communities, and that their claim is not barred by the economic loss doctrine. R&R at 74-85. Defendants object to the finding that they owed Plaintiffs any duty and the conclusion that the economic loss doctrine does not bar Plaintiffs' claim.

### 1. Duty of Care

Defendants make several objections to the R&R's analysis regarding the duty of care. "The existence of a duty of care, as an element of a negligence claim under Ohio law, depends on the foreseeability of the injury, and an injury is 'foreseeable' if the defendant knew or should have known that his act was likely to result in harm to someone." 70 Ohio Jur. 3d Negligence § 11 (citing *Bailey v. U.S.*, 115 F. Supp. 3d 882, 893 (N.D. Ohio 2015) ). The R&R concluded that "it was reasonably foreseeable that [Plaintiffs] would be forced to bear the public costs of increased harm from the over-prescription and oversupply of opioids in their communities if Defendants failed to implement and/or follow adequate controls in their marketing, distribution, and dispensing of opioids," and therefore, that "Plaintiffs have plausibly pleaded facts sufficient to establish that Defendants owed them a common law duty." R&R at 78-79.

First, Manufacturer Defendants assert that to the extent they owe a statutory duty, it is owed to the U.S. Drug Enforcement Agency, not to plaintiffs. Doc. #: 1082 at 14. They also assert that they have no legal duty under 21 U.S.C. § 827 or 21 C.F.R. § 1301.74(b) to monitor, report, or prevent downstream diversion. *Id.* These objections are not well-taken. The R&R expressly did not reach whether

any Defendant owed a duty to Plaintiffs under the statutes or regulations. R&R at 79. It also did not address whether the statutes or regulations create a common law duty under a negligence *per se* theory. *Id.* at n.49. The R&R instead concluded that the common law duty pled by Plaintiffs was sufficient to support a negligence claim. *See* R&R at 79. This Court agrees.

**\*19** Distributor Defendants assert that the R&R "refus[ed] to confront a key duty question [ (whether a duty, if one exists, flows to the County) ] head on." Doc. #:1079 at 14. They assert that "the R&R identified no Ohio case recognizing a common-law duty to *report or halt suspicious orders of controlled substances*," and "even if there were a common-law duty to *report or halt suspicious orders*, no authority suggests that such a duty runs to the cities or counties." *Id.* (emphasis added). The duty that Plaintiffs allege is not so narrow. Plaintiffs allege that Defendants, like all reasonably prudent persons, have a duty "to not expose Plaintiffs to an unreasonable risk of harm." SAC at 312.

In reaching its conclusion on the duty of care, the R&R relies on *Cincinnati v. Beretta*. The R&R provides this summary:

> In *Cincinnati v. Beretta*, the Ohio Supreme Court addressed the question of whether gun manufacturers owed a duty of care to a local government concerning harms caused by negligent manufacturing, marketing and distributing of firearms. *Beretta* involved allegations that the defendants failed to exercise sufficient control over the distribution of their guns, thereby creating an illegal secondary market in the weapons. The *Beretta* court concluded that the harms that resulted from selling these weapons were foreseeable—that Cincinnati was a foreseeable plaintiff. 768 N.E.2d at 1144. Plaintiffs argue that the harm caused by the marketing and distribution of opioids are similarly foreseeable.

R&R at 75-76. Here, taking Plaintiffs' allegations as true, by failing to administer responsible distribution practices (many required by law), Defendants not only failed to prevent diversion, but affirmatively created an illegal, secondary opioid market. Opioids are Schedule II drugs. Despite Manufacturer Defendants' marketing campaign to the contrary it is well known that opioids are highly addictive. When there is a flood of highly addictive drugs into a community it is foreseeable—to the point of being a foregone conclusion—that there will be a secondary, "black" market created for those drugs. It is also foreseeable that local governments will be responsible for combatting the creation of that market and mitigating its effects. Thus, the Court

Case 3:17-cv-01362 Document 1290-19 Filed 04/26/21 Page 39 of 53 PageID #: 43659
In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)
2018 WL 6628898, RICO Bus.Disp.Guide 13,115

affirms the R&R's conclusion that Defendants owe Plaintiffs a common law duty of care.

### 2. Economic Loss Doctrine

Defendants also object to the R&Rs conclusion that Plaintiffs' negligence claim is not precluded by the economic loss doctrine. Defendants' objections merely rehash arguments already made in their motions to dismiss. The R&R does a thorough analysis of the application of the economic loss rule, and this Court finds no fault with it. The R&R states:

The economic loss rule recognizes that the risk of consequential economic loss is something that the parties can allocate by agreement when they enter into a contract. This allocation of risk is not possible where, as here, the harm alleged is caused by involuntary interactions between a tortfeasor and a plaintiff. Thus, courts have noted that in cases involving only economic loss, the rule "will bar the tort claim if the duty arose only by contract." *Campbell v. Krupp*, 961 N.E.2d 205, 211 (Ohio Ct. App. 2011). By contrast, "the economic loss rule does not apply—and the plaintiff who suffered only economic damages can proceed in tort—if the defendant breached a duty that did not arise solely from a contract." *Id.*; *see also Corporex*, 835 N.E.2d at 705 ("When a duty in tort exists, a party may recover in tort. When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract."); *Ineos USA LLC v. Furmanite Am., Inc.*, 2014 WL 5803042, at *6 (Ohio Ct. App. Nov. 10, 2014) ("[W]here a tort claim alleges that a duty was breached independent of the contract, the economic loss rule does not apply.").

**\*20** R&R at 84 (citing *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 835 N.E.2d 701 (Ohio 2005) ). Thus, the Court concurs with and affirms the R&R's analysis of the economic loss rule and its conclusion that it is not applicable to Plaintiffs' tort claims.

### F. The Injury Through Criminal Acts Objections

The R&R concluded that Defendants' motion to dismiss Plaintiffs' Injury Through Criminal Acts Claim should not be dismissed. R&R at 88-90. Defendants' primary objection to this conclusion merely rehashes the argument initially made in their motions to dismiss: that they have not been convicted of a crime. Their objection cites no new facts or case law that were not already presented to and considered by Magistrate Judge Ruiz. Whether Ohio Rev.

Code § 2307.60(A)(1) requires an underlying conviction is a question this Court recently certified to the Ohio Supreme Court in *Buddenberg v. Weisdack*, Case No. 1:18-cv-00522, 2018 WL 3159052 (N.D. Ohio June 28, 2018) (Polster, J.); *see also* 10/24/2018 Case Announcements, 2018-Ohio-4288 (available at http://www.supremecourt.ohio.gov/ROD/docs/) (accepting the certified question). In *Buddenberg*, this Court denied the defendants' motion to dismiss and ordered, "Defendants may renew their challenge in the form of a motion for summary judgment after discovery and further research." *Buddenberg*, 2018 WL 3159052 at *6. Nothing in any Defendants' briefing convinces this Court that the same approach is not appropriate here. Therefore, the Court adopts the R&R with respect to Section III.I. Defendants' objections are overruled.[20]

### G. Unjust Enrichment

The R&R concluded that Defendants' motion to dismiss Plaintiffs' Unjust Enrichment Claim should be denied. *See* R&R at 91-95. The issue at the heart of Defendants' objections to the R&R's conclusion is whether Plaintiffs conferred a benefit upon the Defendants. Defendants argue that "the rule in Ohio is that to show that a plaintiff conferred a benefit upon a defendant, an economic transaction must exist between the parties." Doc. #: 1078 at 13 (internal quotations omitted) (citing *Ohio Edison Co. v. Direct Energy Bus.*, LLC, No. 5:17-cv-746, 2017 WL 3174347 (N.D. Ohio July 26, 2017); *Caterpillar Fin. Servs. Corp. v. Harold Tatman & Sons Enters., Inc.*, 50 N.E.3d 955 (Ohio Ct. App. 2015); *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 684 F. Supp. 2d 942 (N.D. Ohio 2009) ).

This is not the rule in Ohio. All the cases cited by Defendants refer back to one sentence in *Johnson v. Microsoft Corp.*: "*The facts in this case* demonstrate that no economic transaction occurred between Johnson and Microsoft, and, therefore, Johnson cannot establish that Microsoft retained any benefit 'to which it is not justly entitled.' " 834 N.E.2d 791, 799 (Ohio 2005) (emphasis added) (citing *Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 141 N.E.2d 465 (Ohio 1957) ). This holding is expressly limited to the facts of that case. *Johnson* does state the rule in Ohio, however. It provides: "The rule of law is that an *indirect purchaser* cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser." *Id.* (emphasis added).

Case 3:17-cv-01362   Document 1290-19   Filed 04/26/21   Page 40 of 53 PageID #: 43660

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

**\*21**  As Defendants are quick to point out, Plaintiffs do not claim to be purchasers of opioids, indirect or otherwise. *See, e.g.*, Doc. #: 1078 at 11 ("Plaintiffs do not allege that *they* purchased opioids from the Pharmacy Defendants."). As such, the R&R rightly concludes that "Plaintiffs' theory of recovery is not based on a financial transaction, therefore the claim is not barred by *Johnson's* limiting indirect purchasers from maintaining unjust enrichment claims against parties other than those with whom they dealt directly." R&R at 92.

Plaintiffs' claim is that "Plaintiffs have conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper distribution practices." SAC at 328. According to Plaintiffs, Defendants' conduct allowed the diversion of opioids and thereby created a black market for their drugs. *See id.* at 7. This black market allowed Defendants to continue to ship large volumes of opioids into Plaintiffs' communities at great profit to Defendants and great expense to Plaintiffs. *See id.* at 328. Under Ohio law, "one is unjustly enriched if the retention of a benefit would be unjust, and one should not be allowed to profit or enrich himself or herself inequitably at another's expense." 18 Ohio Jur. 3d Contracts § 279. Therefore, for the reasons stated, Defendants' objections are overruled. The Court adopts Section III.J of the R&R.

Having considered Plaintiffs' Second Amended Complaint, Defendants' Motions to Dismiss, Plaintiffs' Omnibus Response, Defendants' Replies, Magistrate Judge Ruiz's Report and Recommendation, the parties' Objections to the R&R, and their Responses, Defendants' Motions to Dismiss, Doc. ##: 491, 497, 499, are **DENIED** with the following exception: The City of Akron's Statutory Public Nuisance claim is dismissed for lack of standing under Ohio Rev. Code § 4729.35. The County of Summit's Statutory Public Nuisance claim is limited to seeking injunctive relief.

It is accurate to describe the opioid epidemic as a man-made plague, twenty years in the making. The pain, death, and heartache it has wrought cannot be overstated. As this Court has previously stated, it is hard to find anyone in Ohio who does not have a family member, a friend, a parent of a friend, or a child of a friend who has not been affected.

Plaintiffs have made very serious accusations, alleging that each of the defendant Manufacturers, Distributors, and Pharmacies bear part of the responsibility for this plague because of their action and inaction in manufacturing and distributing prescription opioids. Plaintiffs allege that Defendants have contributed to the addiction of millions of Americans to these prescription opioids and to the foreseeable result that many of those addicted would turn to street drugs.

While these allegations do not fit neatly into the legal theories chosen by Plaintiffs, they fit nevertheless. Whether Plaintiffs can prove any of these allegations remains to be seen, but this Court holds that they will have that opportunity.

The Court, thus having ruled on all of Defendants' Motions to Dismiss, orders Defendants to file their Answers to Plaintiffs' Corrected Second Amended Complaint, Doc. #: 514, no later than January 15, 2019.
**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6628898, RICO Bus.Disp.Guide 13,115

Footnotes

1   Defendant Noramco, Inc. states that it joined in Manufacturers' Motion to Dismiss "to the extent applicable," Doc. #: 499-1 at 1 n.2, and requests clarification that it is included among the moving Manufacturer Defendants and is entitled to all applicable relief. Doc. #: 1082 at 1 n.1. The Court clarifies that Noramco is included among the moving Manufacturer Defendants and is entitled to all applicable relief.

2   Pharmacy Defendants, in their objections, mention Article III standing only briefly in a section dedicated to the RICO claims. *See* Doc. #: 1078 at 2-3. They mischaracterize the R&R's analysis of the Article III standing directness requirement, rehash arguments already made in their motion to dismiss, and then move on to address their RICO analysis concerns. The Court finds this objection without merit, and therefore it is overruled.

3   *See, e.g.*, Doc. #: 514 at 238 ("In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risks of addiction."); *see also Id.* at 212 ("the increase in fatal overdoses from prescription opioids has been widely publicized for years.").

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

4    According to the Complaint, the RICO Marketing Defendants are "Purdue, Cephalon, Janssen, Endo, and Mallinckrodt." *See* Doc. #: 514 at 270.

5    According to the Complaint, the RICO Supply Chain Defendants are "Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen" *See* Doc. #:514 at 279.

6    Plaintiffs allege that "Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market....All registrants—which includes all manufacturers and distributors of controlled substances—must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion." Doc. #: 514 at 150-51 (citing 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74).

7    Footnote 4 of the *Jackson* opinion cites the following exemplary cases: *Evans v. City of Chicago*, 434 F.3d 916 (7th Cir.2006) (false imprisonment causing loss of income not an injury to "business or property"); *Diaz v. Gates*, 420 F.3d 897 (9th Cir.2005) (*en banc*) (false imprisonment causing loss of employment and employment opportunity *is* an injury to "business or property"); *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417 (5th Cir.2001) (assault claim against tobacco company causing wrongful death of smoker not an injury to "business or property"); *Hamm v. Rhone–Poulenc Rorer Pharm., Inc.*, 187 F.3d 941 (8th Cir.1999) (retaliatory firing causing damage to reputation not an injury to "business or property"); *Bast v. Cohen, Dunn & Sinclair, PC*, 59 F.3d 492, 495 (4th Cir.1995) (surreptitiously recorded phone calls causing mental anguish not an injury to "business or property"); *Doe v. Roe*, 958 F.2d 763 (7th Cir.1992) (coercion into sexual relationship by attorney causing emotional harm not an injury to "business or property"); *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir.1986) (exposure to toxic chemicals during employment with defendant causing personal injuries not an injury to "business or property").

8    "Since passage of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* ("CSA" or "Controlled Substances Act"), opioids have been regulated as controlled substances. As controlled substances, they are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the most dangerous. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs; hydrocodone and tapentadol were recently reclassified from Schedule III to Schedule II. Schedule II drugs have a high potential for abuse, and may lead to severe psychological or physical dependence. Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence." SAC at 16 n.5.

9    For example, Plaintiffs allege that "between 2012 and 2016, Summit County estimates that it spent roughly $66 million on costs tied to the opioid crisis. Those costs are projected to add up to another $89 million over the next five years, representing a total cost to the County of $155 million over the ten year period "simply trying to keep up with the epidemic.' " Doc. #: 514 at 226.

10    Pharmacy Defendants argue, without any legal analysis, that Plaintiffs' Unjust Enrichment Claim is abrogated by the OPLA. Doc. #: 1078 at 11. The R&R does not address whether Plaintiffs' Unjust Enrichment Claim is abrogated by the OPLA, likely because the Pharmacies merely made a similarly undeveloped argument in their motion to dismiss, and only rehash them here. Due to the conspicuous lack of legal development in either Pharmacy Defendants' Motion to Dismiss or Objections to the R&R, the Court finds this objection improper. Regardless, per the analysis below, the Court finds that Plaintiffs' Unjust Enrichment Claim is not abrogated by the OPLA.

11    Section 2307.71(A)(13) of the OPLA also requires that the claim allegedly arise from any of:

   (a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

   (b) Any warning or instruction, or lack of warning or instruction, associated with that product;

   (c) Any failure of that product to conform to any relevant representation or warranty. Ohio Rev. Code § 2307.71(A)(13).

12    Defendants identify section 2307.72(D)(1) as expressly carving out abatement relief for contamination of the environment as an indication that the OPLA supersedes all other forms of equitable relief. *See* Doc. #: 1116 at 4. However, a far more natural reading of this section is the carving out of all forms of relief for pollution of the environment from preemption by federal environmental protection laws and regulations.

13    Under the ADEA, "the term 'employer' means a person engaged in an industry affecting commerce who has twenty or more employees....The term *also means* (1) any agent of such a person, and (2) a State or political subdivision of a State...." 29 U.S.C. § 630(b) (emphasis added).

14    " 'Harm' means death, physical injury to person, serious emotional distress, or physical damage to property other than the product in question. Economic loss is not 'harm.' " Ohio Rev. Code § 2307.71(A)(2).

Case 3:17-cv-01362  Document 1290-19  Filed 04/26/21  Page 42 of 53 PageID #: 43662

In re National Prescription Opiate Litigation, Not Reported in Fed. Supp. (2018)

2018 WL 6628898, RICO Bus.Disp.Guide 13,115

15    Page's Ohio Revised Code Annotated, Title 7: *Municipal Corporations*, Chapter 715: *General Powers*, §§ 715.37- 715.44: Health and Sanitation, § 715.44: Power to abate nuisance and prevent injury.

16    Page's Ohio Revised Code Annotated, Title 37: Health-Safety-Morals, Chapter 3767: Nuisances, §§ 3767.01- 3767.11: Disorderly houses, § 3767.03: Abatement of nuisance; bond.

17    Page's Ohio Revised Code Annotated, Title 47: Occupations-Professions, Chapter 4729: Pharmacists; Dangerous Drugs, §§ 4729.27-4729.46: Prohibitions, § 4729.35: Violations of drug laws as public nuisance.

18    As opposed to only the county prosecuting attorney in which the nuisance exists as allowed by section 3767.03.

19    The *Beretta* court determined that the defendants' negligent manufacturing, marketing, and distributing, and failure to exercise adequate control over the distribution of their products created an illegal, secondary market resulting in foreseeable injury and that from Defendants' perspective, the City of Cincinnati was a foreseeable plaintiff. *See Beretta*, 768 N.E.2d at 1144.

20    Should the Ohio Supreme Court rule that a criminal conviction is required, this claim will of course be dismissed.

---

**End of Document**                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4080052 (Ohio Com.Pl.) (Trial Order)
Court of Common Pleas of Ohio.
Ross County

STATE of Ohio, EX REL. Mike DEWINE, Ohio Attorney General, Plaintiff,
v.
PURDUE PHARMA L.P., et al, Defendant.

No. 17 CI 261.
|
August 22, 2018.

**Decision and Entry**

Mark H. Troutman, Attorney at Law, Two Miranova Place, Suite 700, Columbus, OH 43215-5098.

John R. Mitchell, Attorney at Law, 3900 Key Center, 127 Public Square, Cleveland, OH 44114-1291.

Carole S. Rendon, Attorney at Law, Key Tower, 127 Public Square, Suite 2000, Cleveland, OH 44114-1214.

Albert J. Lucas, Attorney at Law, 1200 Huntington Center, 41 South High Street, Columbus, OH 43215.

John Q. Lewis, Attorney at Law, 950 Main Avenue, Suite 1100, Cleveland, OH 44113-7213.

Daniel J. Buckley, Attorney at Law, 301 East Fourth Street, Suite 3500, Great American Tower, Cincinnati, OH 45202.

Scott W. Nusbaum, Judge.

**\*1** This action came on for hearing on the Defendants' various motions to dismiss, Defendant Endo's motion to strike, certain defendants' motion for judicial notice, Defendants' motion to stay, Plaintiff's responses, and the Defendants' replies thereto. All parties were represented and heard through counsel.

The Plaintiff's Complaint alleges that Defendants misrepresented to the general public, physicians, and the State of Ohio the effectiveness of opioids for the treatment of chronic pain and the dangers of opioid addiction. Plaintiff alleges that these misrepresentations were directly and indirectly communicated by the Defendants, their representatives, and various third parties. The Complaint alleges the following claims:
1. Public nuisance under the Ohio Product Liability Act, 2307.71 ORC.

2. Public nuisance – common law.

3. Ohio Consumer Sales Practices Act, 1345.02 ORC et seq.

4. Medicaid Fraud, 2913.40/2307.60 ORC.

5. Common Law Fraud.

6. Ohio Corrupt Practices Act, 2923.31 ORC et seq.

Case 3:17-cv-01362   Document 1290-19   Filed 04/26/21   Page 44 of 53 PageID #: 43664

State, ex rel. Dewine v. Purdue Pharma L.P., 2018 WL 4080052 (2018)

Plaintiff seeks declaratory judgment, injunctive relief, compensatory damages, punitive damages, civil penalties, pre and post-judgment interest, and attorney fees.

Defendants argue that all of Plaintiff's claims fail for a multitude of reasons and that the Complaint should be dismissed.

### STANDARD

A motion to dismiss for failure to state a claim is procedural and tests the sufficiency of the complaint. A trial court reviews only the complaint and accepts all factual allegations as true. Every reasonable inference is made in favor of the non-moving party. This Court must assume the Plaintiff's allegations are true. However, the unsupported conclusions of the Complaint are not sufficient to withstand a motion to dismiss the complaint. The Complaint must be construed as a whole within the four corners of the Complaint. A trial court may not dismiss a complaint "unless it appears **beyond doubt** that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (Emphasis added) *O'Brien v Univ. Community Tenants Union, Inc.*, 42 Ohio State 2d, 242 (1975). (Emphasis added). *Gannett GP Media, Inc. v Chillicothe, Ohio Police Department*, 2018 Ohio 1552; *State, ex rel. Hanson v Guernsey Cty. Bd. of Commrs.*, 65 Ohio State 3d 545 (1992); *Struckman v Bd. of Edn. of Teays Valley Local Sch. Dist.*, 2017 Ohio 1177; *Martin v. Lamrite W., Inc.*, 2015 Ohio 3585.

Ohio remains a notice pleading state. Civil Rule 8(A) requires only the following:
"(1) A short and plain statement of the claim showing that the pleader is entitled to relief, and

(2) A demand for judgment for the relief to which he deems himself entitled."

Ohio courts have rejected the heightened federal pleading standard set forth in *Bell Atlantic Corp. v Twombly*, 550 U.S. 544, and have acknowledged that Ohio remains a notice pleading state. *Smiley v City of Cleveland*, 2016-Ohio 7711; *Mangelluzzi v Morley*, 2015 Ohio 3143. This Court notes the language of the Eighth District Court of Appeals in *Smiley*, supra wherein the court stated that "(the) motion to dismiss is viewed with disfavor and should rarely be granted" and that "few complaints fail to meet the liberal (pleading) standards of Rule 8 and become subject to dismissal,".

**\*2** Civil Rule 9(B) does impose upon a plaintiff a heightened standard of pleading in cases of fraud.
"(B) **Fraud, mistake, condition of mind.** In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity…"

In Ohio, a complaint alleging fraud must allege with particularity the "circumstances constituting fraud." The complaint must assert "the time, place, and content of the false representation; the fact misrepresented; the identification of the individual giving the false representation; and the nature of what was obtained or given as a consequence of a fraud." *Aluminum Line Prods. Co. v Brad Smith Roofing Co.*, 109 Ohio App. 3d 246 (1996); *Dottore v Vorys, Sater, Seymour & Pease, LLP.* 2014 Ohio 25; *First-Knox Nat'l Bank v MSD Props., Ltd.*, 2015 Ohio 4574.

Civil Rule 9(B) should be read in conjunction with the general directive of Civil Rule 8, that pleadings should be "simple, concise, and direct." Even if the pleadings are vague, so long as defendants have been placed on notice of the claims, a strict application is not necessary. *Aluminum Line Prods. Co.*, supra; *F&J Roofing Co. v McGinley & Sons, Inc.*, 35 Ohio App. 3d 16 (1987). This Court notes that the Complaint in *Aluminum Line Prods. Co.*, supra, asserted that the fraud occurred over the course of several years. There was no specific assertion of the date of the fraud. Similarly, the Ninth District Court of Appeals found that a complaint alleging fraud within a six year period did not violate the requirements of Civil Rule 9(B). *Bear v Bear*, 2014 Ohio 2919. See also *Pierce v Apple Valley, Inc.*, 597 F. Supp. 1480.

A determination whether a complaint satisfies the heightened pleading standards of Civil Rule 9(B) should be made on a case by case basis depending upon the facts of each case. *City of Chicago v Purdue Pharma L.P., et al*, 14C4361211 F. Supp. 3d. 1058 (N.D. Ill. 2016).

The heightened pleading standards of Civil Rule 9(B) may also be relaxed in circumstances where relevant facts lie exclusively within the control of the opposing party. *Wilkins, ex rel. U.S. v State of Ohio*, 885 F. Supp. 1055; *Craighead v E.F. Hutton and Co.*, 899 F. 2d. 485.

## GROUP PLEADING

In *State of Missouri, ex rel. Joshua D. Hawley v Purdue Pharma, LP, Case No. 1722-CC10626*, the 22 nd Circuit Court of the State of Missouri found that there was no rule against "group pleading" in Missouri. Similarly, this Court finds that there is no specific rule against "group pleading" in the state of Ohio. The *Dottore* case cited by the Defendants, does not mention "group pleading" and more specifically addresses the heightened pleading requirements of Civil Rule 9(B) in mail fraud cases. The Plaintiff's 101 page Complaint sufficiently asserts that all defendants engaged in conduct which would constitute a claim under the pleading rules in the State of Ohio.

## CIVIL RULE 9(B)

In the case at bar, the prima facia case for fraud is:
(1) A representation or concealment of a fact;

(2) Material to the transaction at hand;

(3) Made falsely with knowledge of its falsity;

(4) Intent to mislead another into relying upon it;

**\*3**  (5) Justifiable reliance;

(6) Injury proximately caused by the reliance. *Marjul, LLC v. Hurst*, 2013 Ohio 479.

As previously stated, this Court will examine the Plaintiff's compliance with Civil Rule 9(B) under the Ohio pleading standards. The Plaintiff's complaint must assert the time, place, and content of the false representation; the fact misrepresented; the identification of the individual giving the false representation; and the nature of what was obtained or given as a consequence of a fraud. *Aluminum Line Prods. Co.*, supra.

The Plaintiff's complaint adequately identifies the Defendants and their actions and representations. The complaint sufficiently asserts the time frame which in the representations were made and that they were made in the state of Ohio. The complaint sufficiently identifies that the representations were made by representatives of the Defendants and various groups and third parties sponsored by the Defendants.

The complaint contains over 40 pages which explain in detail the marketing tactics utilized by Defendants, their representatives, and various groups connected to Defendants. Similarly, the complaint adequately sets forth the representations made, how these representations were distributed to physicians and citizens of Ohio, that the representations were false and that the Defendants knew the falsity of the representations.

Under Ohio pleading standards, it is not necessary for the complaint to identify physicians who relied upon the misrepresentations of the Defendants. Even so, as argued by Plaintiff, the identification of prescribing physicians is solely within the knowledge of Defendants and can be obtained through discovery. Further, the complaint adequately states that the Plaintiff specifically relied upon the misrepresentations in issuing reimbursement payments under the Medicaid program. Further, reliance is a question of fact or appropriately addressed in a motion for summary judgment. *Kelly v. Georgia-Pac. Corp.*, 46 Ohio St. 3d 134. Lastly, the Plaintiff has sufficiently pled causation in compliance with *City of Cincinnati v. Beretta USA Corp.*, 95 Ohio St. 3d 416 and the damages suffered by the state of Ohio. In summary, this Court finds that Plaintiff has sufficiently pled the fraud related claims under Civil Rule 9(B).

### PREEMPTION/FDA APPROVAL

The parties agree that the FDA approved the labeling for opioids for long-term treatment. However, it is evident in the Plaintiff's complaint that its claims are based upon misrepresentations made by the Defendants concerning the use and safety of opioids which go far beyond the labeling. As noted by the court in *City of Chicago v. Purdue Pharma LP*, supra, the allegations of the Plaintiff's complaint primarily sound in fraud and not the propriety of the labeling of opioids. The Chicago court also concluded that drug labeling does not preclude fraud claims. See also *Wyeth v. Levine*, 555 U.S. (2009).

The claims set forth in Plaintiff's complaint are not barred by the FDA's approval of labeling or the doctrine of preemption as to Defendants' branded or unbranded labeling.

### PUBLIC NUISANCE

 **\*4**  This Court finds that *Cincinnati vs Beretta*, 95 Ohio St. 3d 416, is not substantially distinguishable and applies to the case at bar. In *Beretta*, supra, the Ohio Supreme Court adopted a broader definition of public nuisance. The court determined that the restatement of the law of torts (2nd) sets forth a broad definition of public nuisance allowing an action to be maintained "for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unnecessarily interferes with a right common to the general public." Under the broad definition of public nuisance and the liberal pleading rules of the state of Ohio, this Court finds that the Plaintiff has adequately pled public nuisance under Ohio common law and the Ohio Product Liability Act.

### OHIO CONSUMER SALES PRACTICES ACT

Section 1345.07 ORC specifically authorizes the Ohio Attorney General to initiate an action under the OSCPA. The statute also sets forth the remedies which the Attorney General can seek: declaratory judgment; injunction; and civil penalties. The provisions of the OSCPA must be liberally construed. *State, ex rel Celebreeze v. Hughes*, 58 Ohio St. 3rd 273. The complaint sets forth a "consumer transaction" as defined by the statute. The complaint need not, at this stage, identify an Ohio citizen as a consumer. A consumer action is alleged by the complaint regardless of whether the plaintiff is an actual consumer. The complaint, as previously stated, sets forth in detail over 40 pages of allegations which are prohibited by Sections 1345.02 and 1345.03 and the administrative regulations promulgated thereunder. Plaintiff's prayer for civil penalties should not be stricken, at this stage, because they are statutorily authorized.

It is premature at this time to determine whether the plaintiff's OSCPA claim is time barred. *Savoi v. Univ. of Akron*, 2012 Ohio 1962; The complaint alleges a continuing course of conduct by the defendants. Where a plaintiff alleges a continuing violation of the OSCPA, the statute of limitations does not begin to run until the date when the violation ceases. *Roelle v. Orkan Exterminating Co.*, 2000 WL 1664865; *Martin v. Servs. Corp. Intl*, 2001 WL 68896.

### ABROGATION

Section 2307.72(C) ORC specifically exempts claims for economic loss from abrogation under the Ohio Products Liability Act. Further, "product liability claim" is statutorily defined as a claim seeking "compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress or physical damage to property." Reviewing the four corners of the complaint, it does not appear that the plaintiff is seeking these types of damages. The plaintiff's common law nuisance claim, OSCPA claim, and fraud claims are not abrogated under the OPLA. See *Catepillar Fin. Servs. Corp. v. Harold Tatman and Sons Ents., Inc.*, 2015 Ohio 4884.

### MEDICAID FRAUD

Section 2901.23 ORC provides that a corporation may be criminally liable if it meets one of the criteria set forth in subsection (A)(1)-(4). Section 2913.40(B) provides:
"No person shall knowingly make or cause to be made a false or misleading statement or representation for use in obtaining reimbursement from the Medicaid program."

This language clearly includes persons who cause false or misleading statements or representations to be made for the purpose of reimbursement for the Medicaid program. The complaint adequately sets forth that defendants, their employees or agents and third parties under defendant's control knowingly made or caused to be made false or misleading statements for the purpose of obtaining for defendants reimbursement under the Medicaid program. These allegations meet the requirements of the liberal pleading rules in the state of Ohio.

**\*5** Section 2307.60(A)(1) ORC provides:
"Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law,…"

This Court construes this section liberally to include the state of Ohio. To construe this section to exclude a state from seeking damages from criminal actions would prohibit the state from initiating litigation to collect damages from persons who have been convicted of causing damage to public property. This Court finds that at this juncture, the plaintiff is not barred by this section from pursuing an action for damages caused as the result of the commission of Medicaid fraud. See *Jacobson v. Kaforey*, 149 Ohio St. 3 [rd] 398.

The plaintiff's Medicaid fraud claim is not time barred. There is no specific statutory provision which imposes a time bar against the state in this case. The only time bar is set forth in a generally worded statute, 2305.11(A) ORC. As stated in *State, Dep't. of Transp. v. Sullivan*, 38 Ohio St. 3d (1988), the Ohio Supreme Court approved the continued exception of the state from generally worded statutes of limitation.

### OHIO CORRUPT PRACTICES ACT

Section 2929.32(A)(1) ORC states:
"No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity…"

Section 2923.31(C) defines "Enterprise" as follows:
"Any individual, sole proprietorship, partnership, limited partnership, corporation…"

"Enterprise" includes an illicit or licit enterprises. "Person" includes a corporation.

Section 2923.31(E) ORC defines "Pattern of corrupt activity" as:
"Two or more incidents of corrupt activity whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."

A prima facia case for a civil claim under the OCPA requires:

(1)"(v)" Conduct of the defendant involves the commission of two or more specifically prohibited state or federal offenses;

(2) The prohibited criminal conduct of the defendant constitutes a pattern;

(3) The defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise." *Morrow v. Reminger & Reminger Co. L.P.A.*, 2009 Ohio 2665.

The plaintiff's complaint sets forth in detail the conduct of the defendants in violating federal mail fraud provisions (18 U.S.C. 1341), federal wire fraud (18 U.S.C. 1343), and telecommunications fraud in violation of Section 2913.05 ORC. This Court has previously determined that the plaintiff has met the particularity requirements of Civil Rule 9(B) in pleading fraud and similarly finds that the plaintiff has met these particularity requirements in pleading the predicate acts of federal mail fraud and wire fraud and telecommunications fraud under the Ohio Revised Code. This Court finds that the liberal pleading rules in Ohio do not require the plaintiff to set forth specific communications and identify senders and recipients and their locations. Further, this specific information would be within the defendants' knowledge and not available to plaintiff. Further, the plaintiff's complaint sets forth the defendants' intent in committing various criminal acts. *Wilkins*, supra; *Swanson v. McKenzie* (4 th District Scioto County) 1988 WL 50478.

**\*6** Section 2923.31 defines "Enterprise" as **any** corporation which may engage in illicit or licit conduct. As stated by plaintiff, the definition of an enterprise is "open-ended" and "should be interpreted broadly." *State vs Beverly*, 143 Ohio St. 3d, 2015 Ohio 219; *CSAHA/UHHS-Canton, Inc. v Aultman Health Found.*, 2012-Ohio-897. At the pleading stage, the complaint adequately sets forth the purpose of defendants in engaging in a loosely structured hierarchy to achieve a stated purpose. Further, the complaint sets forth in detail the pattern of criminal conduct in violating federal and state laws. The plaintiff's complaint adequately pleads a violation of Ohio's Corrupt Practices Act.

### ENDO'S MOTION TO STRIKE

Civil Rule 12(F) allows a party to move for an order striking language from a pleading that is redundant, immaterial, impertinent, or scandalous. Although this Court questions the inclusion of the New York settlement in the complaint, this Court cannot find that it is immaterial, impertinent, or scandalous. Endo's Motion to Strike is overruled.

### JANSSEN PHARMACEUTICALS, INC. AND JOHNSON & JOHNSON

The allegations in plaintiff's complaint are very similar to the allegations contained in the complaint considered by the United States District Court, Northern Division, Illinois, Eastern Division. *City of Chicago v Purdue Pharma LLP*, 211 F. Supp. 3d. Plaintiff's complaint does not seek to pierce the corporate veil of Janssen but rather to hold Johnson

& Johnson liable under agency doctrines. The court, in City of Chicago, found that for the purposes of a motion to dismiss, the plaintiff's complaint had sufficient allegations to infer an agency relationship between Johnson & Johnson and Janssen and to assert vicarious liability for Janssen's conduct. This Court adopts that reasoning and the Motion of Janssen and Johnson & Johnson is overruled.

### JURISDICTION ALLERGAN PLC

The parties agree upon the law which this Court must employ in determining jurisdiction over Allergan PLC. The Plaintiff must show that the exercise of jurisdiction complies with Ohio's long-arm statute, Section 2307.382, and the related *Civil Rule 4.3(A)*. *U.S. Sprint Commc,n Co. Ltd. P'ship v. Mr. K's Foods, Inc.*, 3d 181, 1994 Ohio 504. This Court must go further and determine whether the grant of jurisdiction under the long-arm statute and civil rule comports with due process under the 14th Amendment to the United States Constitution. *Goldstein v. Christiansen*, 70 Ohio St. 3d 232, 1994 Ohio 229; *Joffe v. Cable Tech., Inc.*, 163 Ohio App. 3d 479, 2005 Ohio 4930.

Section 2307.382(A) provides in pertinent part:
"(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's:

(1) Transacting any business in this state

(2) Contracting to supply services or goods in this state

(3) Causing tortious injury by an act or omission in this state

(4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business or engages in any persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;"

In the case at bar, the Plaintiff must establish a prima facia showing that jurisdiction exists over Allergan PLC. The Court must consider the "allegations in the pleadings and documentary evidence in a light most favorable to the Plaintiff and resolving all reasonable competing inferences in favor of the Plaintiff." *Kauffman Racing Equip., L.L.C. v. Roberts*, 126 Ohio St. 3d 81, 210 Ohio 2551; *Fallang v. Hickey*, 40 Ohio St. 3d 106.

**\*7** In determining whether this Court has jurisdiction over Allergan PLC, this Court must consider whether there are minimum contacts with the state of Ohio so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice under *Goldstein v. Christiansen* supra. The Court must employ a tri-partite test to establish minimum contacts.

"1. The defendant must purposefully avail himself of the privilege of acting in the foreign state or causing a consequence in the foreign state.

2. The cause of action must arise from the defendant's activities there.

3. The acts of the defendant or consequences caused by the defendant must have a substantial connection with the foreign state to make the exercise of jurisdiction over the defendant reasonable." *Kauffman*, supra.

State, ex rel. Dewine v. Purdue Pharma L.P., 2018 WL 4080052 (2018)

This Court has considered the affidavits submitted by the parties on this issue and the request by Plaintiff for this Court to take judicial notice of the Plaintiff's exhibits 40-49 attached to the Troutman affidavit. The Court takes judicial notice of these filings.

These filings establish, by the requisite degree of proof necessary on a motion to dismiss for lack of jurisdiction, the following: Actavis, Inc. and Actavis PLC are predecessors to Allergan PLC. Both entities referenced the United States as it's "largest commercial market." Allergan PLC maintains a "major manufacturing" site in Cincinnati, Ohio. All three entities maintain that they are engaged in the "global market." This Court also adopts the reasoning of the court in *City of Chicago v. Purdue Pharma L.P. N.D. Ill. No. 14C4361*, 215 WL 2208423, finding the evidence sufficient at the stage of a motion to dismiss that Actavis PLC is the successor to Actavis, Inc. The same reasoning applies that Allergan PLC is the successor to Actavis PLC and Actavis, Inc.

This Court finds that the Plaintiff has established a prima facia case for jurisdiction over Allergan PLC under the long-arm statute, Section 2307.382(A) ORC. Further, this Court finds that the Plaintiff has established by the requisite degree of proof that the defendant, Allergan PLC, acted and caused consequences in the state of Ohio. This Defendant's actions and the consequences therefrom alleged by the Plaintiff create a sufficient substantial connection with Ohio and allow the assertion of personal jurisdiction over this Defendant to be reasonable.

### ACQUIRED ACTAVIS ENTITIES

As already set forth in this opinion, this Court finds that the Complaint meets the relaxed pleading requirements of Ohio set forth in Civil Rules 8 and 9. This applies also to the "Acquired Actavis Entities." The Complaint in Section III(B) sufficiently identifies the entities and sets forth allegations concerning the individual entities and their representation/misrepresentations and actions concerning opioid uses and dangers. These entities are placed on notice, like all of the other defendants, of the claims against them. This is sufficient to overcome the challenges at the pleading stage. However, it might be a different story under different standards in dispositive motion practice.

### JURISDICTION-TEVA PHARMACEUTICAL INDUSTRIES LTD.

This Court has in the previous section has set forth the law which governs the analysis concerning jurisdiction under Ohio's Long-arm Statute, the Ohio Civil Rules, and due process under the 14th Amendment to the United States Constitution. This Court takes judicial notice of exhibits 50-59 attached to the Troutman affidavit as requested by the Plaintiff under Evidence Rule 201(B). This Court notes that Teva Ltd. published its "2016 Social Impact Report" stating that the company had 10,855 employees employed in the United States and Canada. Exhibit #50 at #12, Exhibit #51 to the Troutman affidavit is Teva Limited's filing with the United States Securities and Exchange Commission. This filing states:

 **\*8** "The specialty business may continue to be affected by price reforms and changes in the political landscape, following recent public debate in the U.S. We believe that our primary competitive advantages include our commercial marketing teams,…"

This filing further states:
"Our U.S. specialty medicines revenues were 6.7 billion in 2016, comprising the most significant part of our specialty business."

The Court notes that Teva's specialty medicines revenues in the U.S. were almost six times that of its revenue in the European market. Page 46 of Exhibit #51 states that Teva Limited's "worldwide operations are conducted through a network of global subsidiaries." Teva Pharmaceuticals USA, Inc. is listed as a subsidiary in the United States which is

Case 3:17-cv-01362 Document 1290-19 Filed 04/26/21 Page 51 of 53 PageID #: 43671

State, ex rel. Dewine v. Purdue Pharma L.P., 2018 WL 4080052 (2018)

owned by Teva Limited. Exhibit #54 to the Troutman affidavit lists Teva USA as the North American headquarters of Teva Limited.

As stated in the previous section, the Plaintiff is required only to make a prima facia showing of jurisdiction. This Court must view the pleadings and documentary evidence in a light most favorable to Plaintiff. At this point in the litigation, the evidentiary materials support the Plaintiff's prima facia showing of personal jurisdiction under 2307.382 ORC, Civil Rule 4.3(a) and the due process clause of the 14th Amendment to the United States Constitution.

All Defendants' Motions to Dismiss are overruled.

## *JUDICIAL NOTICE*

Pursuant to Ohio Evidence Rule 201, the Motions of all parties for judicial notice are granted. The Court takes judicial notice of all materials filed by the moving parties with their Motions.

## *MOTION TO STAY*

The Defendants have filed a joint Motion to Stay this litigation pursuant to the doctrine of primary jurisdiction and this Court's inherent power to control litigation pending in its court. *State, ex rel Banc One Corp. v. Rocker*, 86 Ohio St. 3d 169 (1999); *United States v. W. Pacific R.R. Co.*, 352 U.S. 59 (1956); *Lazarus v. Ohio Cas. Group*, 144 Ohio App. 3d 716 (2001); *Pacific Chem. Prods. Co. v. Teletronics Servs., Inc.*, 29 Ohio App. 3 45 (1985). Defendants claim that a stay of litigation should be enacted when claims are pending in a court and the resolution of issues pertaining to the claims are also before the special expertise of an administrative body. A trial court should defer action on an issue when there are administrative proceedings pending before a government regulatory agency which can resolve the lawsuit. The claims pending in the court must require a body of experts capable of handling the complex facts of the case before the court. The stay of litigation under the primary jurisdiction doctrine or the inherent authority of the court rests with the sound discretion of the trial court.

Article VII of the Ohio Rules of Evidence provides for and governs the presentation of evidence by expert witnesses in litigation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, establishes that the trial court is the gatekeeper in determining what expert testimony from witnesses is admissible at trial. The *Daubert* Court sets forth numerous factors to consider in evaluating the reliability of scientific evidence. The Supreme Court expressed confidence in the ability of trial courts to evaluate complicated scientific evidence.

 **\*9** Defendants are correct that the FDA currently has pending before it numerous complex issues concerning the application of opioids and the addictive nature of opioids. There is no guarantee when the FDA will complete its review of the numerous complex issues before it.

This Court agrees with the United States District Court in *City of Chicago v. Purdue Pharma LP*, supra, that the issue before this Court is whether opioids were marketed truthfully in the state of Ohio and whether Defendants misrepresented the risks, benefits, and superiority of opioids to treat long-term chronic pain. This Court agrees with the district court that federal and state courts are equipped to adjudicate these types of claims. See also *State of Missouri v. Purdue Pharma, LP*, Missouri Circuit Court, 22nd Judicial Circuit, Case No. 1722-CC10626. This Court is not aware of any pending stay order in any state or federal court concerning these issues. The Court further finds that the Plaintiff would be unduly prejudiced by an open-ended court order which stays these proceedings pending the determination of the FDA. This Court is equipped to handle the issues raised in this litigation. A stay order would unduly prejudice the Plaintiff. The Motion to Stay is overruled. The stay on discovery is vacated. Discovery in this action may commence forthwith.

Case 3:17-cv-01362   Document 1290-19   Filed 04/26/21   Page 52 of 53 PageID #: 43672

State, ex rel. Dewine v. Purdue Pharma L.P., 2018 WL 4080052 (2018)

DATE: 8/21/18

<<signature>>

SCOTT W. NUSBAUM, JUDGE

COMMON PLEAS COURT #2

ROSS COUNTY, OHIO

SITTING BY ASSIGNMENT

*Recipients of Decision and Entry*:

Mark H. Troutman

Attorney at Law

Two Miranova Place, Suite 700

Columbus, OH 43215-5098

John R. Mitchell

Attorney at Law

3900 Key Center

127 Public Square

Cleveland, OH 44114-1291

Carole S. Rendon

Attorney at Law

Key Tower

127 Public Square, Suite 2000

Cleveland, OH 44114-1214

Albert J. Lucas

Attorney at Law

1200 Huntington Center

41 South High Street

Case 3:17-cv-01362  Document 1290-19  Filed 04/26/21  Page 53 of 53 PageID #: 43673

State, ex rel. Dewine v. Purdue Pharma L.P., 2018 WL 4080052 (2018)

Columbus, OH 43215

John Q. Lewis

Attorney at Law

950 Main Avenue

Suite 1100

Cleveland, OH 44113-7213

Daniel J. Buckley

Attorney at Law

301 East Fourth Street

Suite 3500, Great American Tower

Cincinnati, OH 45202

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.  11