2019 WL 2331282 (Tenn.Cir.Ct.) (Trial Order)
Circuit Court of Tennessee.
Knox County

STATE of Tennessee, et al.,

v.

PURDUE PHARMA L.P.

No. 1-173-18.
February 22, 2019.

**Order**

Kristi M. Davis, Judge.

**\*1** In this case, the State of Tennessee makes various allegations against Purdue Pharma L.P. ("Purdue") related to Purdue's marketing of opioid medications, including OxyContin, Butrane, and Hysingla ER. The State alleges that Purdue's marketing is in violation of the Tennessee Consumer Protection Act, Tenn. Code Arm. §47-18-104(a), (b); is in violation of a 2007 Agreed Final Judgment between the parties; and constitutes a common law public nuisance. Purdue has filed a motion to dismiss, contending that it cannot be liable for its proper promotion of FDA-approved medication and that the State's Complaint does not adequately plead causation or public nuisance. For the reasons set forth herein, Purdue's motion is denied.

**I. *STANDARD OF REVIEW***

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the Court is limited to an examination of the complaint alone. *See Walcotts Fin. Serv., Inc. v. McReynolds*, 807 S.W. 708, 710 (Tenn. Ct. App. 1990). Such a motion avers that the allegations in the complaint, when considered alone and taken as true, are insufficient to state a claim as a matter of law. *See Cornpropst v. Sloan*, 528 S.W.2d 188 (Tenn. 1975). In other words, such a motion tests the legal sufficiency of the complaint, not the strength of the plaintiff's proof. *See Bell ex rel. Snyder v. Icard*, 986 S.W.2d 550, 554 (Tenn. 1999). The Court is required to construe the complaint liberally in favor of the plaintiff, taking all the allegations of fact therein as true. *See Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 938 (Tenn. 1994).

**II. *PREEMPTION***

Purdue first contends that the Complaint should be dismissed because federal law preempts the State's claims. It is well-established that states possess sovereignty "concurrent with that of the Federal Government, subject only to the limitations imposed by the Supremacy Clause" of the United States Constitution. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). The Supremacy Clause provides that federal law "shall be the supreme Law of the Land." (U.S. Const. art. VI, cl. 2). Thus, when state law and federal law conflict, federal law controls, and Purdue's argument is based on this conflict preemption. Conflict preemption only occurs "where it is impossible for a private party to comply with both state and federal requirements" or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (quotations and citations omitted). A motion to dismiss based on preemption should only be granted when "the facts alleged in the complaint do not plausibly give rise to a claim that is not preempted." *Galper v. LP Morgan Chase Bank, NA*, 802 F.3d 437, 444 (2d Cir. 2015).

Ex. A - Tab 23 - Tennessee

Importantly, the United States Supreme Court has held that "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). Those police powers include protecting consumers against deceptive business practices. *See California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989). When the issue is one that is traditionally the subject of state control, courts must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.*

**\*2** Synthesized, Purdue's argument is that the Food and Drug Administration ("FDA"), via the Federal Food, Drug, and Cosmetic Act ("FDCA"), controls prescription medication warning labels; that Purdue's labels complied with FDCA requirements; and that the State is seeking to impose state law liability on Purdue when federal law controls. The Court finds that Purdue's argument is based upon a mischaracterization of the State's Complaint, which is not grounded in the content of the medication labels but rather the conduct of Purdue and its pharmaceutical sales representatives.

For example, Purdue contends that the State's Complaint regarding dosing limitations conflicts with the FDA's decision not to recommend a maximum duration of use for the medications. However, me Complaint alleges that Purdue's sales representatives incorrectly asserted mat OxyContin had no dose ceiling at all:

> 58. Purdue represented without qualification that OxyContin did not have a dose ceiling when those claims were false, deceptive, and/or unsubstantiated at the time they were made.
>
> 59, OxyContin has a dose ceiling that is imposed by adverse reactions to patients taking increased doses of the drug, including overdose, respiratory depression, somnolence, addiction, and other serious adverse effects.
>
> 60. While the FDA approved a limited statement on OxyContin's Full Prescribing Information making clear that OxyContin's dose ceiling *was* imposed by adverse reactions, Purdue's Tennessee sales representatives routinely asserted that OxyContin had no dose ceiling *at all.* Further, Purdue failed to discipline or correct sales representatives who made such claims.

(Complaint) (emphasis original). Similarly, regarding me State's claim that Purdue pushed the concept of "pseudoaddiction" in order to increase prescriptions, Purdue contends that its FDA- approved label addresses these concerns. However, the State's allegation is that Purdue invented and pushed the concept of pseudoaddiction (which Purdue described as "the misinterpretation by members of the health care team of relief-seeking behaviors in a person whose pain is inadequately treated as though they were drug-seeking behaviors")[1] for the purpose of getting around the FDA-required language regarding red flags for drug-seeking behaviors.

Purdue further takes issue with the State's allegations regarding Purdue's use of screening tools and failure to disclose the efficacy of OxyContin use beyond twelve weeks. Again, the State has not alleged liability for Purdue's use of the FDA-mandated Risk Evaluation and Mitigation Strategy Program; rather, the State alleges that "[i]n order to make health care providers more willing to prescribe its addictive opioid products, Purdue overstated the efficacy of abuse and diversion mitigation tools like patient contracts, urine drug testing, pill counts, and similar strategies" and that a 2016 CDC Guideline "confirms the lack of adequate substantiation to support Purdue's claims regarding the utility of screening tools and patient management strategies in managing addiction risk." (Complaint, ¶¶93, 96). The Complaint then gives specific examples of ways in which Purdue allegedly overstated the efficacy of abuse prevention programs, including the use of a "General Objection Handler" to address provider concerns, as well as specific notes from sales representatives documenting their touting of the various screening tools. In addition, the Complaint alleges that Purdue "downplayed the increased risk of addiction from higher doses of its opioid products through material omissions" and "failed to disclose the material fact that there is an increased risk of addiction at higher doses of its opioid products." (Complaint, ¶¶ 139, 140).

**\*3** In sum, Purdue's argument with respect to preemption is based upon its erroneous assertion that the Complaint seek to hold it liable for actions that were approved or required by the FDA and the FDCA. In reality, the Complaint seeks to hold Purdue liable for alleged misleading and deceptive practices in violation of Tennessee's Consumer Protection Act and actions

that constitute Tennessee's common law tort of public nuisance. Thus, the Court concludes that the State's claims do not conflict with FDA and FDCA requirements, and preemption does not apply.

### III. *THE 2007 AGREED FINAL JUDGMENT*

Purdue also seeks dismissal of the State's claim that Purdue violated portions of a 2007 Agreed Final Judgment between the parties. The Judgment required Purdue to stop promoting and marketing off-label uses for OxyContin and to establish and implement an abuse and diversion detection program to identify providers who were over-prescribing OxyContin. Upon discovery of these "red-flag" providers, Purdue was obligated to "take further steps as may be appropriate based on the facts and circumstances, which may include ceasing to promote Purdue products to the particular Health Care Professional, providing further education to the Health Care Professional about appropriate use of opioids, or providing notice of such potential abuse or diversion to appropriate medical, regulatory or law enforcement authorities." (Agreed Final Judgment, ¶13). Purdue characterizes the State's Complaint as alleging that "the 2007 Agreed Judgment requires Purdue to stop promoting opioid medication for long-term treatment of chronic pain." Purdue contends that the State is judicially estopped from making claims of misrepresentation based on statements that were permitted or required by the Agreed Judgment

The Court again disagrees with Purdue's characterization of the Complaint The State has not alleged that Purdue is liable for promoting opioids in a manner consistent with FDA requirements, nor has the State alleged liability for promotion of Purdue's products in accordance with the 2007 Agreed Final Judgment. Rather, the State has alleged that Purdue was required but failed to stop promoting its products to specific health care providers or otherwise failed to take any appropriate action once Purdue had knowledge of behaviors indicative of over-prescribing. The Complaint describes in great detail the specific factual bases for these allegations- in fact, these allegations comprise the bulk of the 273-page complaint. The State describes and names specific red-flag providers and explains when, how, and why Purdue continued to market to these providers, as well as Purdue's alleged failure to take the steps required in paragraph 13 of the Agreed Final Judgment The Complaint adequately states a claim for relief for violation of the 2007 Agreed Final Judgment

### IV. *TENNESSEE CONSUMER PROTECTION ACT*

Purdue seeks dismissal of the Tennessee Consumer Protection Act ("TCPA") claim, contending that the State has failed to adequately plead causation. The Tennessee Supreme Court explained the purpose and construction of the TCPA in *Faye v. Vincent*, 301 S.W.3d 162, 177-78 (Tenn. 2009):

> The Tennessee Consumer Protection Act, enacted in 1977, was passed, in part, to protect consumers from unfair and deceptive acts and practices occurring "in the conduct of any trade or commerce" in the state and to provide a means "for maintaining ethical standards of dealing between persons engaged in business and the consuming public." Tenn. Code Ann. §47-18-102(2),-102(4). The Act is to be liberally construed in order to enable it to protect the consumer and to promote the other policies which motivated its passage. Tenn. Code Ann. § 47-18-102; *Myint v. Allstate Ins. Co.*, 970 S.W.2d at 926; *Morris v. Mack's Used Cars*, 824 S.W.2d 538, 540 (Tenn. 1992); *see also* Tenn. Code Ann. § 47-18-115 (noting that the Act is "remedial legislation" which would be construed to effectuate its purposes). It is also to be construed consistently with the Federal Trade Commission and federal courts' interpretations of the Federal Trade Commission Act. Tenn. Code Ann. § 47-18-115. The Tennessee Consumer Protection Act forbids "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(b).... The Act defines "trade," "commerce," or "consumer transaction" as "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated." Tenn. Code Ann. § 47-18-103(11).

**\*4** A "deceptive act or practice" under the TCPA is "one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct App. 2005).

Purdue first contends that that the State failed to plead an ascertainable loss of money or property. In response, the State contends that at least part of its claim is based on the TCPA's enforcement provision, not its private right of action. The State is correct that the TCPA's enforcement provision, Tenn. Code Ann. § 47-18-108, does not require that a person suffer an ascertainable loss. The enforcement provision provides as follows: "Whenever the division has reason to believe that any person has engaged in, is engaging in, or, based upon information received from another law enforcement agency, is about to engage in any act or practice declared unlawful by this part and that proceedings would be in the public interest, the attorney general and reporter, at the request of the division, may bring an action in the name of the state against such person to restrain by temporary restraining order, temporary injunction, or permanent injunction the use of such act or practice." Tenn. Code Ann. § 47-18-108(a)(1). Thus, to the extent the State's Complaint seeks injunctive relief, civil penalties, and other remedies contemplated by the enforcement provision of the TCPA, the State correctly asserts that pleading an ascertainable loss of money or property is not required.

In addition to the enforcement provision, however, the State acknowledges that it also seeks recovery of ascertainable losses as a remedy under Tenn. Code Ann. § 47-18-108(b)(1). An "ascertainable loss" is broadly defined in the TCPA as "[a]n identifiable deprivation, detriment, or injury arising from … any unfair, misleading, or deceptive act or practice even when the precise amount of the loss is not known. Whenever a violation of this part has occurred, an ascertainable loss shall be presumed to exist." Tenn. Code Ann. § 47-18-2102(1). Purdue's objection to the Complaint is that the State has failed to adequately causally link the alleged deceptive behavior to any such ascertainable loss. The Court disagrees. As set forth in the State's response to Purdue's motion, "the Complaint alleges Purdue made widely-disseminated, deceptive, and express health and safety claims, material omissions of health and safety information, and material omissions of Purdue's financial connections to third-party groups it substantially funded," and that, as a result, persons purchased Purdue's opioid products. The State then alleges that Purdue's conduct "led to addiction, abuse, diversion, and other negative outcomes that have caused the State and its political subdivisions to spend substantial resources to attempt to address." (Complaint, ¶ 874). The State further alleges that it and its political subdivisions "have spent significant public resources on treatment, toxicology reports and autopsies, law enforcement, corrections, intervention programs, drug courts, prosecution, probation, and child welfare related to opioids, OxyContin, and heroin and more funds are needed to address this public health crisis." (Complaint, ¶ 909). At this juncture, the Court does not inquire into whether the State can actually prove its assertions. It must assume the State's assertions are true and determine whether the assertions state a claim for relief. The Court finds that the State has properly pleaded a claim for violation of the Tennessee Consumer Protection Act.

## V. PUBLIC NUISANCE

**\*5** Finally, Purdue seeks dismissal of the State's public nuisance claim and contends that the States seeks to hold Purdue liable for a sweeping array of societal harms that have occurred as a result of the opioid crisis. Purdue contends that the Complaint fails to adequately plead causation, that the derivative injury rule applies, and that the State does not allege an interference with any right common to the public.

A public nuisance is an act or omission that unreasonably interferes with or obstructs rights common to the public. *See Metropolitan Gov't of Nashville v. Counts*, 541 S.W.2d 133, 138 (Tenn. 1976); Restatement (Second) of Torts §821B (1977). In *Sherrod v. Dutton*, 635 S.W.2d 117, 119 (Tenn. Ct. App. 1982), the Tennessee Court of Appeals explained that a nuisance "extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property." (Citations omitted); *see also State ex rel. Swann v. Pack*, 527 S.W.2d 99, 113 (Tenn. 1975) (defining a public nuisance as "a condition of things which is prejudicial to the health, comfort, safety, property, sense of decency, or morals of the citizens at large, resulting either from an act not warranted by law, or from neglect of a duty imposed by law.") (Citations omitted).

With respect to causation, the Court finds that the complaint is adequately pleaded. As has been set forth previously, the Complaint describes with great specificity the actions of Purdue with respect to its marketing of opioid products, including alleged misrepresentations regarding the safety, efficacy, and benefits of its products and an alleged practice of marketing its products to known "pill mills." The Court will not rehash the allegations, but the Complaint is replete with specific examples of

behavior on the part of Purdue that, if proven, would establish interference with the health, comfort, and safety of the citizens of the State of Tennessee. Furthermore, the Complaint alleges resulting damages, including but not limited to "increased opioid use, abuse, addiction, and overdose deaths" and "[t]he greater demand for emergency services, law enforcement, addiction treatment, and other social services," which place "an unreasonable burden on governmental resources including the State and its political subdivisions." (Complaint, ¶ 960, 961).

Purdue further argues that intervening and superseding acts prohibit a finding of causation. Specifically, Purdue contends that any alleged nuisance was caused not by Purdue's sale of its medications but rather by doctors who wrote "improper prescriptions" and/or by third parties who allowed persons without prescriptions to obtain opioid medications illegally. However, the State's Complaint alleges that the foregoing acts were foreseeable and made possible by Purdue's acts. In addition, "[t]here is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result.... An intervening act will not exculpate the original wrongdoer unless it appears that the negligent intervening act could not have been reasonably anticipated." *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991).

Purdue contends that the Complaint should be dismissed because "where a plaintiff's injuries are wholly derivative of harm to a third party, the injuries are generally deemed indirect and consequently, too remote as a matter of law to support recovery." *Steamfitters Local Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.*, 2000 WL 1390171 (Tenn. Ct App. Sept. 26, 2000). However, the Complaint seeks damages for injuries to the State, not for the injuries of those who have become addicted to opioids. Purdue's reliance on the *Steamfitters* case is misplaced. In that case, the union's Health and Welfare Fund sued tobacco companies to recover money spent by the Fund to treat its members' smoking-related illnesses. The premise of the Fund's claim was that the tobacco companies' activities prevented the Fund from implementing programs to educate its participants on the addictive qualities of tobacco. Ultimately, the Court of appeals held that "it would be 'virtually impossible' for the Funds to prove with reasonable certainty the effect education or smoking cessation programs would have had on the physical injuries suffered by plan participants since the damages stem from individual smokers' decisions whether to continue smoking and, if so, how frequently to smoke." *Id* at *6. The Court noted that "'it would be the sheerest sort of speculation to determine how these damages might have been lessened had the Funds adopted the measures defendants allegedly induced them not to adopt.'" *Id* (citing *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 238-39 (2d Cir. 1999)).

*6 The allegations in the present case are wholly different in that they are not based upon the State being fraudulently induced to inaction, nor does the State seek damages for the physical injuries of the individual opioid users. Rather, the State seeks damages sustained by it and its political subdivisions as a direct result of Purdue's alleged marketing activities designed to increase prescriptions. The claims are simply different

Lastly, Purdue contends that the Complaint must be dismissed because the State does not allege interference with any right common to the public, "such as clean air or water." Purdue's argument takes too narrow a view of public nuisance. As set forth above, a public nuisance can encompass virtually anything that endangers life or health. In fact, the Tennessee Supreme Court has deemed a church's handling of snakes to be a public nuisance:

> Under this record, showing as it does, the handling of snakes in a crowded church sanctuary, with virtually no safeguards, with children roaming about unattended, with the handlers so enraptured and entranced that they are in a virtual state of hysteria and acting under the compulsion of "anointment", we would be derelict in our duty if we did not hold that respondents and their confederates have combined and conspired to commit a public nuisance and plan to continue to do so. The human misery and loss of life at their 'Homecoming' of April 7, 1970 is proof positive.

> Our research confirms the general pattern. Tennessee has the right to guard against the unnecessary creation of widows and orphans. Our state and nation have an interest in having a strong, healthy, robust, taxpaying citizenry capable of self-support and of bearing arms and adding to the resources and reserves of manpower. We, therefore, have a substantial and compelling state interest in the face of a clear and present danger so grave as to endanger paramount public interests.

*Pack*, 99 S.W.2d at 113-14.

In the present case, the State's Complaint alleges that Purdue engaged in misleading and deceptive marketing practices for the purpose of increasing opioid prescriptions and that, as a result, Purdue created an opioid epidemic that has endangered the health and safety of the citizens of Tennessee and has resulted in financial loss to the State. The Complaint adequately states a claim for public nuisance.

## V. *CONCLUSION*

Having carefully considered the arguments set forth in Purdue's motion to dismiss, the Court finds that the State's Complaint sets forth a cause of action for violation of the Tennessee Consumer Protection Act, violation of the 2007 Agreed Final Judgment, and public nuisance. Accordingly, Purdue's motion to dismiss is respectfully **DENIED**.

Entered this 22 day of February, 2019.

<<signature>>

JUDGE KRISTI M. DAVIS

Footnotes

1   Complaint, ¶79.

**End of Document**  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

IN THE CIRCUIT COURT FOR KNOX COUNTY, TENNESSEE

STATE OF TENNESSEE, )
ex rel. HERBERT H. SLATERY III, )
ATTORNEY GENERAL and REPORTER, )
)
Plaintiff, )
)
v. ) Case No. 1-345-19
)
AMERISOURCEBERGEN DRUG )
CORPORATION, a foreign corporation, )
)
Defendant. )

**ORDER**

In this case, the State of Tennessee makes various allegations against Amerisourcebergen Drug Corporation ("Amerisource") related to Amerisource's distribution of opioid medications throughout Tennessee, but particularly in East Tennessee. The State alleges three causes of action: (1) violation of the Tennessee Consumer Protection Act; (2) common law or public nuisance; and (3) violation of the Tennessee Racketeer Influences and Corrupt Organization Act of 1989 ("RICO"). Amerisource has filed a motion to dismiss, contending generally that, as a distributor, it is simply a "middleman," and cannot be liable for its distribution to pharmacies for the fulfillment of customers' prescriptions. Amerisource makes specific arguments with respect to each of the causes of action. For the reasons set forth herein, Amerisource's motion is denied.

**I.    STANDARD OF REVIEW**

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the Court is limited to an examination of the complaint alone. *See Walcotts Fin. Serv., Inc. v. McReynolds*, 807 S.W. 708, 710 (Tenn. Ct. App. 1990). Such a motion avers that the allegations in the complaint, when considered alone and taken as true, are insufficient to state a

1

claim as a matter of law. *See Cornpropst v. Sloan*, 528 S.W.2d 188 (Tenn. 1975). In other words, such a motion tests the legal sufficiency of the complaint, not the strength of the plaintiff's proof. *See Bell ex rel. Snyder v. Icard*, 986 S.W.2d 550, 554 (Tenn. 1999). The Court is required to construe the complaint liberally in favor of the plaintiff, taking all the allegations of fact therein as true. *See Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 938 (Tenn. 1994).

## II. AMERISOURCE'S STATUS AS A REGISTERED DISTRIBUTOR

The Court will first address Amerisource's claim that it is insulated from all liability because it merely distributed opioids in accordance with its authorization to do so. Amerisource contends that as a "middleman," it simply processes and ships the orders it receives from its customers and, therefore, has no responsibility for unlawful prescriptions or diversions. The Complaint alleges otherwise. Specifically, the Complaint alleges that distributors of controlled substances have a duty under both Tennessee and federal regulations to maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." Tenn. Code Ann. § 53-11-303; 21 U.S.C. § 823(b)(1). Distributors are required to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and to inform the Board of Pharmacy and the Drug Enforcement Agency of suspicious orders when discovered by the registrant. Tenn. Code Ann. § 53-10-312(c); 221 C.F.R. § 1301.74(b). The Complaint alleges that distributors are also required to stop shipment of any order that is flagged as suspicious. Far from being just a supplier, these statutes place the distributor squarely within the chain of entities responsible for ensuring safe, compliant, legal distribution of controlled substances. In other words, the distributor has a statutory responsibility to take action to prevent diversion of controlled substances.

2

The Complaint, spanning 232 pages, is replete with allegations that Amerisource ignored its statutory duties and continued to distribute opioids to its customers (grocery stores, chain pharmacies, and independent pharmacies) in mind-boggling amounts despite significant and repeated diversionary "red flags." The State alleges that Amerisource's failure to comply with its statutory requirements as a distributor rendered its subsequent distribution "unlawful." The Court agrees with the State that a company's registration as a distributor does not, *ipso facto*, insulate the company from liability if the company fails to fulfill its statutory duties. This is the State's allegation, and the Court declines Amerisource's invitation to grant wholesale immunity to it based on the simple fact that it is a registered distributor of controlled substances.

The Court will also address Amerisource's claim that it is too far removed from the ultimate injurious acts to be legally responsible for them. In other words, Amerisource challenges the State's ability to prove causation, both for its Tennessee Consumer Protection Act claims and its public nuisance claims. With respect to causation, the Court finds that the Complaint is adequately pleaded. The Complaint alleges with great specificity that Amerisource failed in its duties as a distributor by: (1) continuing to ship opioids to its customers even when the amounts were suspiciously high and repeatedly over set thresholds; (2) ignoring red flags, including out-of-state license plates in its customers' parking lots, cash-only policies, the presence of armed guards, direct solicitation in parking lots for controlled substances, and its own employee's notation that "we know this stuff is being diverted"; and (3) shipping more OxyContin 30's to one pharmacy than it did to thirty-eight other individual states. These are just a few of the examples of the allegations in the Complaint. Furthermore, the Complaint alleges resulting damages, including but not limited to a "greater demand for emergency services, law enforcement, addiction treatment,

3

children's services, foster care, and other social services [that] places an unreasonable burden on governmental resources including the State and its political subdivisions." (Complaint, ¶ 608).

To the extent Amerisource argues that other intervening and superseding acts prohibit a finding of causation, the Court notes that "[t]here is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result.... An intervening act will not exculpate the original wrongdoer unless it appears that the negligent intervening act could not have been reasonably anticipated." *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991).

Amerisource also contends that the State's claims are barred by the derivative injury rule and the free public services doctrine. Amerisource contends that the Complaint should be dismissed because the State alleges derivative injuries that are contingent on harm to third-party users. The Court disagrees with Amerisource's interpretation of the Complaint. The Complaint does not seek damages for the injuries of specific, individual opioid users. Rather, it seeks damages allegedly sustained by the State and its political subdivisions as a foreseeable result of over-distribution of and subsequent abuse of opioids. In this way, the claims are different from those in *Steamfitters Local Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.*, 2000 WL 1390171 (Tenn. Ct. App. Sept. 26, 2000), a case relied upon by Amerisource. In *Steamfitters*, the union's Health and Welfare Fund sued tobacco companies to recover money spent by the Fund to treat its members' smoking-related illnesses. The premise of the Fund's claim was that the tobacco companies' activities prevented the Fund from implementing programs to educate its participants on the addictive qualities of tobacco. Ultimately, the Court of appeals held that "it would be 'virtually impossible' for the Funds to prove with reasonable certainty the effect education or smoking cessation programs would have had on the physical injuries suffered by plan

4

participants since the damages stem from individual smokers' decisions whether to continue smoking and, if so, how frequently to smoke." *Id.* at *6. The Court noted that "'it would be the sheerest sort of speculation to determine how these damages might have been lessened had the Funds adopted the measures defendants allegedly induced them not to adopt.'" *Id.* (citing *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 238-39 (2d Cir. 1999)).

The allegations in the present case are wholly different in that they are not based upon the State being fraudulently induced to inaction, nor does the State seek damages for the physical injuries of the individual opioid users. Rather, the State seeks damages sustained by it and its political subdivisions as a direct result of Amerisource's failure to comply with its statutory duties to prevent and report diversion. The claims are simply different.

With respect to the free public services doctrine, the State correctly asserts that Tennessee courts have not recognized the doctrine, that there is an exception for public nuisance actions in those states that do recognize the doctrine, and that the Tennessee legislature has expressly announced the State's public policy of shifting the costs sought by the State from taxpayers to those who are responsible for the public nuisance. *See* Tenn. Code Ann. § 29-3-110(c) (authorizing courts to "assess costs of public services required to abate or manage the nuisance, including but not limited to, law enforcement costs, if any, caused by the public nuisance.").

### III.   TENNESSEE CONSUMER PROTECTION ACT

Amerisource seeks dismissal of the Tennessee Consumer Protection Act ("TCPA") claim, contending that (1) it did not sell illegal or unlawful goods because it held a valid registration to distribute opioids; (2) the claim is not pled with particularity; (3) the complaint does not allege facts showing that Amerisource misled or injured consumers; (4) the complaint fails to allege that

5

the State suffered an ascertainable loss of money or property; and (5) the complaint is barred by the one-year statute of limitations.

The Court rejects Amerisource's first contention, that it had a valid registration for distribution, for the reasons set forth in Section II, *supra*. The Court also rejects Amerisource's claim that the State failed to plead TCPA violations with particularity. The TCPA defines "trade or commerce" to include "the distribution of any goods ... or things of value wherever situated." Tenn. Code Ann. § 47-18-103(20). Further, the TCPA prohibits "directly or indirectly ... selling or offering for sale any good or service that is illegal or unlawful to sell in this state." Tenn. Code Ann. § 47-18-104(b)(43)(C). Again, the State's complaint sets forth myriad, detailed factual allegations to support its claim that Amerisource unlawfully distributed opioids.

Amerisource next contends that the TCPA claim should be dismissed because the Complaint does not allege facts showing that Amerisource misled or injured consumers, does not allege that the State suffered an ascertainable loss of money or property, and is barred by the one-year statute of limitations. In response, the State contends that none of these arguments apply because its cause of action arises under the Act's state enforcement provisions, not its private right of action. The Court agrees.

The TCPA's enforcement provision, Tenn. Code Ann. § 47-18-108, requires the State to establish a violation of the TCPA to obtain civil penalties, injunctive relief, and attorney fees. The State has alleged that Amerisource violated the TCPA by "directly or indirectly advertising, promoting, selling, or offering for sale any good or service that is illegal or unlawful to sell in this state." With respect to an ascertainable loss of money or property, the State correctly argues that state enforcement does not require such a showing. Thus, to the extent the State's Complaint seeks injunctive relief, civil penalties, and other remedies contemplated by the enforcement provision of

6

the TCPA, pleading an ascertainable loss of money or property is not required. To the extent the State also seeks recovery of ascertainable losses under Tenn. Code Ann. § 47-18-108(b)(1), the Court finds Amerisource's reliance on *Birdsong v. Eli Lilly & Co.*, 2011 WL 1259650 (M.D. Tenn. Mar. 31, 2011), misplaced. The Court in *Birdsong* determined that the plaintiff failed to allege an ascertainable loss of money or property that exists independently of the personal injuries suffered. In contrast, the State in the present case does not seek damages for the personal injuries sustained by the individual opioid users. Rather, the State seeks damages sustained directly by the State and its political subdivisions, including monies allocated to "the greater demand for emergency services, law enforcement, addiction treatment, children's services, foster care, and other social services...." (Complaint, ¶503). Lastly, the State correctly asserts that the TCPA does not contain a statute of limitation or repose for state enforcement actions. *See* Tenn. Code Ann. § 28-1-113.

## IV.    PUBLIC NUISANCE

Amerisource challenges the State's claim of public nuisance. Amerisource contends that the State seeks to expand the doctrine and that the State has not alleged interference with a public right, has not alleged that Amerisource was in control of the opioids at the time the injury occurred, has not complied with the Tennessee Products Liability Act, and is barred from recovery by the economic loss doctrine.

A public nuisance is an act or omission that unreasonably interferes with or obstructs rights common to the public. *See Metropolitan Gov't of Nashville v. Counts*, 541 S.W.2d 133, 138 (Tenn. 1976); Restatement (Second) of Torts §821B (1977). In *Sherrod v. Dutton*, 635 S.W.2d 117, 119 (Tenn. Ct. App. 1982), the Tennessee Court of Appeals explained that a nuisance "extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property." (Citations omitted); *see also State*

*ex rel. Swann v. Pack*, 527 S.W.2d 99, 113 (Tenn. 1975) (defining a public nuisance as "a condition of things which is prejudicial to the health, comfort, safety, property, sense of decency, or morals of the citizens at large, resulting either from an act not warranted by law, or from neglect of a duty imposed by law.") (Citations omitted).

Given the foregoing, the Court rejects Amerisource's claim that application of the public nuisance doctrine is too broad in this case. The Complaint has alleged that because of Amerisource's unlawful opioid distribution, the State of Tennessee and its political subdivisions have suffered damages due to the resulting endangerment of the health and safety of the citizens of Tennessee. The Complaint states a claim for public nuisance.

The Court also finds unavailing Amerisource's argument that it did not have control over the opioids at the time they allegedly caused injury to the State or its residents. As the State points out, the Tennessee Supreme Court has held that liability for a public nuisance can be applied to those who aid and abet. *See Pack*, 527 S.W.2d at 113. In addition, the Complaint alleges that Amerisource had control over the opioids because it delivered the product to customers when it knew the product was being diverted.

With respect to the Products Liability Act, the State correctly notes that "[p]roducts liability law governs the private litigation of product accidents." 1 Owen & Davis on Prod. Liab. § 1.2 (4th ed.), at 3 (2019). Likewise, the TPLA speaks to consumer use, not state enforcement: "[A] primary purpose of [the TPLA] is to 'ensure that an injured consumer may maintain a strict liability action against whomever is most likely to compensate him for his injuries.'" *Fox v. Amazon.com, Inc.*, 930 F.3d 415, 424 (6th Cir. 2019) (quoting *Owens v. Truckstops of Am.*, 915 S.W.2d 420, 432 (Tenn. 1996)). The State's Complaint simply does not sound in products liability. It is not a claim for injuries due to a defective or unreasonably dangerous product.

8

Lastly, the Court disagrees with Amerisource's assertion that the economic loss doctrine bars the State's claims. The economic loss doctrine "is a judicially created principle that requires the parties to live by their contracts rather than to pursue tort actions for purely economic losses arising out of the contract[,]" which "comes into play when the purchaser of a product sustains economic loss without personal injury or damage to property under the product itself." *McLean v. Bourget's Bike Works, Inc.*, 2005 WL 2493479 (Tenn. Ct. App. Oct. 7, 2005). The State is not seeking tort damages for a breach of contract. There is no contract between the State and Amerisource. The economic loss doctrine is simply inapplicable to the facts of this case.

## V.   RICO

Amerisource seeks dismissal of the State's RICO claims. Amerisource contends that the State failed to plead a predicate act of racketeering activity and, further, that application of RICO is limited to organized crime. The Court respectfully disagrees.

A civil RICO claim in Tennessee requires a showing that: (1) the defendant received proceeds derived directly or indirectly from a pattern of racketeering activity; (2) the defendant used or invested such proceeds into the acquisition of real or personal property or in the establishment or operation of an enterprise; and (3) the defendant did so with criminal intent. *See* Tenn. Code Ann. § 39-12-204(a). Racketeering activity includes criminal offenses involving controlled substances. *See* Tenn. Code Ann. § 39-12-203(9). Amerisource contends that because it was a registered distributor of controlled substances, it could not have engaged in a criminal offense involving a controlled substance. The Court, however, agrees with the State that a claim for RICO can be established when it is alleged, as here, that Amerisource knowingly distributed controlled substances for *improper purposes*.[1] In its brief, Amerisource cites to Tenn. Code Ann.

---

[1] The Complaint alleges that: (1) Oxycodone is a Schedule II controlled substance that is unlawful to distribute absent limited exceptions; (2) registered distributors must lawfully possess a controlled substance, and no statute allows a

9

§ 53-11-302, which provides that one who is registered by the appropriate occupational or professional licensing board may "possess, manufacture, warehouse, distribute, or dispense those substances *to the extent authorized by their registration.*" (Emphasis added). The State's Complaint alleges that Amerisource's distribution was *not authorized* because it knowingly shipped to customers engaging in diversion. The allegations are sufficient to state a claim under RICO.

Lastly, Amerisource contends that RICO claims should be limited to cases involving organized crime. However, Tenn. Code Ann. § 39-12-202(b)(1) and (b)(2) speak directly to the liability of owners or businesses licensed to dispense controlled substances when the owners or corporations know or have reason to know of violations involving controlled substances, i.e., the repeated, knowing unauthorized distribution of controlled substances, as alleged by the State in this case.

## VI.   CONCLUSION

Having carefully considered the arguments set forth in Amerisource's motion to dismiss, the Court finds that the State's Complaint sets forth a cause of action violation of the Tennessee Consumer Protection Act, public nuisance, and RICO violations. Accordingly, Amerisource's motion to dismiss is respectfully **DENIED**.

Entered this 14 day of July, 2020.

JUDGE KRISTI M. DAVIS

---

registered distributor to knowingly ship a Schedule II narcotic to a pharmacy where diversion is occurring and from which the pharmacy is dispensing invalid prescriptions; (3) it is unlawful to distribute a controlled substance in a manner *not* authorized by the registrant's registration, which is based on, among other things, "maintenance of effective controls against diversion of controlled substances into other than legitimate medical, scientific, or industrial channels" (Tenn. Code Ann. § 53-11-303(a)(1); (4) Amerisource knowingly shipped significant amounts of oxycodone after it knew that diversion was occurring and that its customers were dispensing significant quantities of invalid prescriptions.

10

CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify pursuant to Rule 58, Tenn. R. Civ. P., that a copy of this ORDER has been served on all parties or their counsel of record by mail.

This 14 day of July, 2020.

Charles D. Susano, III
Knox County Circuit Court Clerk

By: _____
Deputy Clerk

11