**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| THE CITY OF HUNTINGTON,<br><br>      Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION, et al.,<br><br>      Defendants. | Civil Action No. 3:17-01362<br>Hon. David A. Faber |
| CABELL COUNTY COMMISSION,<br><br>      Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG<br>CORPORATION, et al.,<br><br>      Defendants. | Civil Action No. 3:17-01665<br>Hon. David A. Faber |

**DEFENDANTS' MOTION TO EXCLUDE**
**EXPERT TESTIMONY OF DR. RAHUL GUPTA**

Plaintiffs disclosed Dr. Rahul Gupta, former West Virginia State Health Officer, as a hybrid fact-expert witness under Federal Rule 26(a)(2)(C).  Consistent with the rules governing such witnesses, the Court previously held that "Dr. Gupta's testimony in these cases is limited to his involvement ***in the events*** giving rise to this litigation" and permitted Defendants to take a second deposition of Dr. Gupta regarding his opinions.[1]

---

[1]   Dkt. 1234 at 13 (all emphasis added unless otherwise noted).

1

The case law that the Court relied on for that holding describes a hybrid witness as "*a percipient witness* who happens to be an expert" and instructs that opinions offered by a hybrid witness must be "premised on *personal knowledge and observations*" and not drawn from "facts supplied by others."  *Downey v. Bob's Discount Furniture Holdings, Inc.*, 633 F.3d 1, 6–7 (1st Cir. 2011); *see also Call v. City of Riverside*, 2014 WL 2048194, at *5 (S.D. Ohio May 19, 2014).  The case law further provides that opinions must be analyzed on a case-by-case basis— when a purported hybrid witness is "asked to offer opinions that go beyond information acquired or opinion reached as a result of the treating relationship . . . , the case law establishes that the [witness] may become the kind of 'expert' who is required to submit a report pursuant to Rule 26(a)(2)(B)."  Dkt. 1234 at 12 (quoting *Hoover v. United States*, No. 01C2372, 2002 WL 1949734, *7 (N.D. Ill. Aug. 22, 2002)).

Dr. Gupta's most recent deposition, however, confirmed that most of Dr. Gupta's opinion testimony violates these settled ground rules and Dr. Gupta's opinions are not based on his personal knowledge and observations as a percipient witness in this case, but on "facts supplied by others" through hearsay conversations and publications.  He admitted as much in the deposition, citing studies by Cicero and Mars as the basis for his "gateway" opinions and Stephen Patrick "and others" as the basis for his opinions about the impact of NAS on the classroom.[2]  Thus, much of his testimony—in terms of both scope and substance—amounts to true expert testimony that should have been disclosed in an expert report pursuant to Rule

---

[2]    *See, e.g.,* Ex. A at 118:2-15, 119:9-13, 139:3-23 (gateway theory opinions based on published research by Cicero and Mars); 168:15-24 (Opinion 22 supported by conversations with teachers, school board members, and parents, and "a lot of literature," including work by "Stephen Patrick at Vanderbilt and others"); 150:8–21 (addiction opinions supported by PBS documentary and "textbooks for addiction or papers or otherwise").

26(a)(2)(B).  It was not, and in accordance with the Court's prior ruling and controlling case law, his opinion testimony should be excluded.

That is not to say that Dr. Gupta has **no** relevant knowledge and should be barred from testifying at all.  As the State Health Officer, Dr. Gupta commissioned studies that analyzed opioid-related deaths across the entire state, two of which were identified by Plaintiffs in their Supplemental Rule 26(a)(2)(C) disclosures.  Defendants do not object to Dr. Gupta testifying about these two reports, nor do they object to Dr. Gupta testifying as a percipient fact witness.  But Dr. Gupta's high-level involvement in opioid-related projects during his four-year tenure as State Health Officer does not give him carte blanche to opine ***as a hybrid expert*** on any and all issues relating to the opioid epidemic in West Virginia absent the report and disclosure requirements set forth in Rule 26(a)(2)(B).

Dr. Gupta plans to offer quintessential expert opinion on high-level topics that go far beyond his "personal knowledge or observations," including on (1) causation, (2) the relationship between prescription opioid use and illegal drug use (the "gateway theory"), (3) the impact of addiction on brain chemistry, (4) the ongoing effects of neonatal abstinence syndrome, and (5) the volume of "appropriate" opioid prescribing.  In fact, Dr. Gupta claimed to be an expert in epidemiology during his deposition, stating that in his current position at the March of Dimes, "I am the person that is in charge and not only in charge of other epidemiologists, but I am the person that other epidemiologists look to for expert advice."[3]  And he formed his opinions

---

[3]   Ex. A at 17:11–17.  He also claimed that he developed "significant experience and expertise in epidemiology" through his work in Kanawha County and as State Health Officer.  *Id.* at 19:4–20:7.  He has, however, never heard of the American College of Epidemiology, the country's leading professional organization for epidemiologists, nor is he a member of it.  *Id.* at 40:17–24.

precisely as retained experts do (and as Plaintiffs' retained experts have done[4]):  not based on his percipient involvement in the case—for example, his treatment of addiction patients in Huntington or his contemporaneous analysis of the volume of pills being shipped to pharmacies in Cabell County—but by reading journal articles and performing a post hoc analysis of data and events that he learned about from others in preparation for this litigation.

Dr. Gupta's former employment as a State Health Officer, standing alone, does not render him a true hybrid witness as the case law defines such a witness.  For instance, Dr. Gupta's former job as State Health Officer did not involve analysis or understanding of how or if individuals addicted to prescription opioids transitioned to heroin use, the regulatory framework governing prescription drug distribution, the proportion of appropriate/inappropriate opioid prescriptions written over a 20-year period in Cabell-Huntington (or anywhere in the state), the overarching causes and effects of neonatal abstinence syndrome in children in general, or the effects of opioids on the brain.  Whether or not Dr. Gupta otherwise is qualified to discuss those topics, they go beyond his personal knowledge and observations as a percipient witness and are the subject matter of true expert testimony subject to the requirements of Rule 26(a)(2)(B).

Examples of true hybrid witnesses include the treating physician who testifies about her diagnosis and treatment of the plaintiff, bringing to bear her expertise only as it concerns what she did as a matter of historical fact, or the licensed exterminator who inspected the plaintiff's house and discovered a bed bug infestation, or the financial analyst who testifies about his decade-long personal involvement in the financing of the project at issue, which provided him with "first-hand knowledge of the Project's finances, tax revenues, interest expenses, and all

---

[4]    Dr. Gupta's testimony would duplicate testimony to be given by several of Plaintiffs' experts, including Daniel Ciccarone, Katherine Keyes (an epidemiologist), Anna Lembke, Sean Loudin, Gordon Smith, Michael Siegel, and Corey Waller, among others.

payments made into and from the trust accounts[.]"  *See* Dkt. 1234 at 3.[5]  In each of these examples, the witness brings to bear his or her expertise only as it concerns what he or she did as a matter of historical fact.  Dr. Gupta's opinion testimony is entirely different.  He is like the "treating physician [who is] asked to offer opinions that go beyond information acquired or opinion reached as a result of the treating relationship," and therefore is "required to submit a report pursuant to Rule 26(a)(2)(B)."  Dkt. 1234 at 12 (quoting *Hoover*, 2002 WL at *7).[6]

If Plaintiffs wanted Dr. Gupta to offer those opinions, they should have timely disclosed him as an expert witness and served his expert report.  They did not.  Allowing Dr. Gupta to offer expert testimony now would give rise to exactly the situation that the Court instructed would not be permitted:  a "smuggl[ing of] expert testimony into the case … by characterizing it as lay testimony."  Dkt. No. 1234 at 13 (citing 8A Charles A. Wright, Arthur R. Miller, and Richard L. Marcus, Fed. Prac. & Proc. Civ. § 2031.1 (3d ed. 2020)).

---

[5]  Cases cited in the Court's Order include *Downey*, 633 F.3d at 3 (hybrid witness was a "licensed and experienced exterminator" who responded to a service call, inspected plaintiffs' home, discovered a bedbug infestation, prepared a contemporaneous incident report, and encouraged the defendant to cover the costs of extermination, which defendant declined to do); *Compass Bank v. Eager Road Assocs., LLC*, 2013 WL 5786634, at *2–3 (hybrid witness was the president of a financial consulting firm who had "worked with [the defendant] on all facets of the TIF financing" of the project at issue for over 10 years); and *Hoover v. U.S.*, 2002 WL 1949734, at *7 (N.D. Ill. Aug. 22, 2002) (a "treating physician who testifies about the examination, diagnosis, and treatment of a patient" is not required to submit an expert report, but a treating physician "asked to offer opinions that go beyond information acquired or opinion reached as a result of the treating relationship" does).  *See also Call v. City of Riverside*, 2014 WL 2048194, at *5–6 (S.D. Ohio May 19, 2014) (discussing *Ulbrick v. UPR Prods.*, 2011 WL 500034, at *4, distinguishing between a mechanic who formed opinions during an attempt to repair the vehicle, rather than in an effort to determine the cause of the accident).

[6]  *See also Wreath v. United States*, 161 F.R.D. 448, 450 (D. Kan. 1995) ("[W]hen the physician's proposed opinion testimony extends beyond the facts made known to him during the course of the care and treatment of the patient and the witness is specially retained to develop specific opinion testimony, he becomes subject to the provisions of Fed. R. Civ. P. 26(a)(2)(B).").

Additional infirmities independently require the exclusion of Dr. Gupta's testimony regarding the so-called "gateway theory" and neonatal abstinence syndrome ("NAS").  Dr. Gupta's testimony on those subjects was based entirely on hearsay, including various academic articles that he read in order to prepare for his testimony in this litigation.  Plaintiffs did not disclose those articles to Defendants in advance, and therefore prevented Defendants from meaningfully cross-examining him regarding the bases for his opinions.  Moreover, while retained experts may be entitled to rely on hearsay, there is no basis for allowing Dr. Gupta to do so here—in the absence of the disclosure and other gatekeeping requirements for retained experts that Plaintiffs sought to evade by erroneously characterizing Dr. Gupta's testimony as that of a hybrid witness.

## BACKGROUND

### A.    Dr. Gupta's Professional Background

Dr. Gupta moved to West Virginia in March 2009, and spent the next five years as Executive Director and Health Officer of the Kanawha-Charleston Health Department.  From January 2015 to November 2018, he served as Commissioner and State Health Officer for the Bureau of Public Health. [7]  In late 2018, he became Chief Medical Officer of the March of Dimes and moved to the Washington, DC area.[8]

Dr. Gupta gained most of his "25 years of clinical experience" as a practicing internist[9] outside the state of West Virginia.  Following a three-year residency in Illinois, Dr. Gupta spent the next nine years practicing medicine in Florida, Alabama, and Tennessee.[10]  He has not

---

[7]   Deposition of Rahul Gupta, M.D. (Apr. 15, 2021) [Ex. A], at 13:1–13.

[8]   *Id.*  at 14:15–5:2.

[9]   *See* Pls.' Supp. Fed. R. Civ. P. 26(a)(2)(C) expert Disclosures at 7 ("Supp. Discl.") [Ex. B].

[10]   *See* Ex. C (Resumé of Rahul Gupta, MD), at WVSMA_FEDWV_0039037-3, 6.

received specialized training in pain management or addiction treatment, and does not hold

himself out as an expert in either of those fields.[11]  Nor has he specialized in pediatrics or treated

NICU babies diagnosed with NAS.[12]

### B.    Procedural History

On August 3, 2020, Plaintiffs disclosed Dr. Gupta as a "hybrid" fact-expert witness but

failed to serve the disclosures required by Federal Rule 26(a)(2)(C).  Dkt. No. 1234 at 8.

Defendants deposed Dr. Gupta on September 11, 2020 without the benefit of those disclosures

and subsequently moved to exclude Dr. Gupta's expert testimony.  On October 30, 2020,

Plaintiffs served supplemental disclosures that identified 22 opinions that they intend to elicit

from Dr. Gupta at trial. Those 22 opinions fall into six general categories:

- Gateway theory[13];

- Causation[14];

---

[11]   Ex. A at 174:24–175:2 ("I have not received any formal training on pain management beyond my residency training"); 158:2–4 ("I'm not an addiction psychiatrist.").

[12]   *Id.* at 165:18–166:3 (experience in pediatrics limited to medical school and emergency room coverage and primary care practice that happened to involve children); 166:4–7 ("I have not taken care of NICU babies[.]").

[13]   *See* Ex. B at 8–9 [Exhibit B has been supplemented by numbering the 22 opinions *seriatim* in red for ease of reference.], Opinions 3 ("direct correlation" between diverted prescription pills and use of illegal drugs); 4 (individual struggling with addiction will use "any means necessary," including illegal activities, to obtain the addictive substance); 5 (IV drug use problem is an "evolution of the prescription drug problem"); 6 (HIV outbreak is a "result of IV drug use"); 18 (the "overwhelming volume that was reaching the people of West Virginia was plainly involved in the killing of West Virginians every 12 hours around the clock").

[14]   *Id.* at 8, Opinions 1 (the volume of opioid prescriptions and "the consequential addiction and other diseases associated with OUD" rose by "thousands of percent over a decade"); 7 ("oversupply" and "over-availability" of opioids caused overdose deaths and "more generally, communal suffering and devastating carnage" in Cabell County and Huntington); 12 (increase in overdose deaths in West Virginia in 2015 and 2016 "was caused by the large volume of opioid pills that were originally deposited or delivered to West Virginia").

- Inappropriate prescribing and diversion[15];

- How addiction affects behavior[16];

- Impact on the foster care and educational systems[17]; and

- Statewide statistics from a 2016 Overdose Fatality Analysis Report;[18]

Plaintiffs did not disclose the specific facts underlying Dr. Gupta's broad opinions.

On March 11, 2021, the Court ruled that Dr. Gupta would be permitted to testify, but limited his "expert" testimony to his personal knowledge of the events giving rise to this litigation. *See* Dkt. 1234 at 3, 12–13 (citing cases discussing appropriate parameters of hybrid witness testimony). The Court allowed Defendants to re-open Dr. Gupta's deposition for cross-examination on the late-disclosed opinions. The Court noted "the need "to be alert to efforts to smuggle expert testimony into the case . . . by characterizing it as lay testimony" and expressly held that Defendants would be free to argue that testimony elicited during the direct examination of Dr. Gupta by his personal counsel "is beyond the scope of his status as a non-retained expert witness." *Id.* at 12.

---

[15] *Id.* at 8, Opinion 2 (number of appropriate prescriptions was "dwarfed" by the number of "inappropriate prescriptions that were being diverted").

[16] *Id.* at 8–10, Opinions 4 (individuals struggling with addiction will "often" resort to illegal activities to obtain the addictive substance "by any means necessary"); 19 (addiction "tells people to seek opioids in one form, shape or other"); and 20 ("chemically speaking, synthetic opioids, semi-synthetic opioids and prescription opioids work through the same receptors and feed the same need to the body").

[17] *Id.* at 8–10, Opinions 9 (opioid epidemic is a "transgenerational crisis"); 17 ("NAS babies are a causative issue in terms of the opioid epidemic."); 21 (children diagnosed with NAS will have "noticeable difficulties learning and paying attention"); and 22 ("As children with NAS enter the classroom, there will be noticeable interruptive and impulsive behavioral issues.").

[18] *Id.* at 8–9, Opinions 6 (HIV outbreak), 10 (air-conditioned trailers), 13 (overdose decedents who had filled a prescription), 14 (deaths after incarceration),

Defendants deposed Dr. Gupta again on April 15, 2021.  He declined to adopt three of the opinions as written and, with the help of Plaintiffs' counsel, modified them as he went.[19] Contrary to Plaintiffs' supplemental Rule 26(a)(2)(C) disclosure, Dr. Gupta testified that his opinions are based ***not*** on his personal knowledge as a percipient witness, but rather on journal articles, published research (disclosed for the first time ***during*** his second deposition),[20] as well as unspecified "reports" and "literature" on the topics, medical textbooks and training, conversations with state employees and teachers, and his general "experience" practicing medicine and serving as a public health administrator in West Virginia.[21]

## LEGAL STANDARD

As the Court already recognized, if Dr. Gupta testifies as "a nonretained expert, [his] testimony … is limited to his involvement in the events giving rise to this litigation."  Dkt. 1234 at 13.  Otherwise, Rule 26(a)(2)(B) applies, and he is precluded from testifying as a true expert because Plaintiffs did not serve a report from Dr. Gupta.  *See id.* at 12 (citing *Hoover*, 2002 WL 1949734, at *7).  "A party seeking to avoid producing an expert report bears the burden of demonstrating that the witness is a hybrid."  *Meredith v. Int'l Marine Underwriters*, 2011 WL 1466436, at *4 (D. Md. Apr. 18, 2011).

---

[19]  *See* Ex. B at 8–9, Opinions 1, 4, and 19.

[20]  For example, Dr. Gupta testified that his opinion relating to the correlation between diversion of prescription opioids and the transition to illegal drugs was based on a study by Cicero published in JAMA (Journal of the American Medical Association) Psychiatry, a study by Sarah Mars relating to Philadelphia, and work by Chris Jones at the CDC.  Ex. A at 118:2–15 (Cicero study), 119:9–13 (JAMA Psychiatry), 139:3–23 (Sarah Mars), 121:14–20.

Those studies are the only specific information identified by Dr. Gupta.  Although Dr. Gupta asserts that "we saw very similar facts in West Virginia" and claims that "our findings matched what was being published," he did not identify where those "findings" were published or the process through which they were determined.  *See* Ex. A at 118:16–119:13.

[21]  *See supra* n.3.

9

Courts have described a hybrid witness as "a percipient witness who happens to be an expert," whose "opinion testimony arises… from his ground-level involvement in the events giving rise to the litigation." *Call v. City of Riverside*, 2014 WL 2048194, at *5 (S.D. Ohio May 19, 2014) (quoting *Downey*, 633 F.3d at 6). Opinion testimony from a hybrid witness must be "premised on personal knowledge and observations" made during the course of the expert's involvement in the events giving rise to the litigation, and not drawn from "facts supplied by others." *Downey*, 633 F.3d at 7. Courts evaluate these requirements on a case-by-case, opinion-by-opinion basis. Whether a witness falls within the requirements of Rule 26(a)(2)(B) "is determined primarily by the scope, substance, and source of the intended testimony—not on whether the witness is being compensated." *Ulbrick v. UPR Prods.*, 2011 WL 500034, at *4 (E. D. Mich. Feb. 8, 2011).

## ARGUMENT

Despite his experience as a state-level administrator, Dr. Gupta is not "a percipient witness" to the "events giving rise to this litigation." He has little (if any) ground-level knowledge of the events in Cabell/Huntington as it relates to the issues on which he plans to opine on trial, and he conceded that his work in the area was limited to occasional visits.[22] Put simply, Dr. Gupta's opinion testimony is not based on his personal knowledge and observations, as required for a Rule 26(a)(2)(c) hybrid witness. If they were, he would have touted that knowledge and experience in his deposition, rather than relying on external sources and other facts supplied to him. Dr. Gupta's reliance on a combination of external sources, hearsay conversations, and pure speculation are not are appropriate bases for hybrid expert witness testimony as a matter of settled law.

---

[22]   Ex. A at 20:22–21:3.

**A.      Dr. Gupta's opinions on the "gateway theory" should be excluded.**

Dr. Gupta should be precluded from opining that opioids are a "gateway" to use of illegal street drugs.  Whether the gateway theory is reliable (and, if so, to what degree), is the subject of extensive expert reports by retained experts on both sides.  Dr. Gupta plans to offer his own set of opinions, which would include:

- "There is a direct correlation between diverted prescription pills and the transition to using street drugs such as heroin, fentanyl, methamphetamine, etc.";

- "The IV drug use problem in Cabell County and the City of Huntington is an evolution of the prescription drug problem";

- "Although there was a 15-20% reduction in opioid prescriptions in 2015 and 2016, there was no reduction in overdose deaths because the addiction had already been formed, and people with opioid use disorder were turning to illicit, more lethal forms to feed their addictions that were initially formed by prescription opioids";

- "The increase in overdose deaths in West Virginia during that time was caused by the large volume of opioid pills that were originally deposited or delivered to West Virginia"; and

- "Addiction tells people to seek opioids in one form, shape or other."[23]

These opinions are not "premised on personal knowledge and observations made in the course of" Dr. Gupta's work as State Health Officer, *Downey*, 633 F.3d at 7—at least not of the type that qualifies someone as a hybrid witness.  Dr. Gupta had no on-the-ground involvement with the people who allegedly transitioned from prescription opioids to illegal drugs because, according to him, their addiction caused them to "seek opioids."  More specifically, Dr. Gupta did not form these opinions in the course of treating or interviewing Huntington or Cabell County residents who transitioned from prescription opioid use to heroin use, because he has identified no such experience.

---

[23]   Ex. B at 8–10, Opinions 3, 4, 11, 12, and 19.

Instead, Dr. Gupta relied exclusively on "facts supplied by others," including journal articles and studies, all of which constitute inadmissible hearsay.  In relying on those external sources and not his own personal knowledge or observations, Dr. Gupta's opinions are that of a retained expert—not a hybrid expert—and Plaintiffs were required to submit a report under Rule 26(a)(2)(B).  *See, e.g.*, *Downey*, 633 F.3d at 7; *Ulbrick v. UPR Prod., Inc.*, 2011 WL 500034, at *4 (E.D. Mich. Feb. 8, 2011) (concluding that expert was subject to report requirement because his "opinions were not formed as a result of witnessing or experiencing the accident which is the subject matter of this lawsuit.  Rather, they were presumably formed as a result of a process that any expert witness would undertake; namely, an 'after-the-fact' examination of the vehicle in question.").  Because Plaintiffs did not provide a report for Dr. Gupta, his expert opinions must be excluded.  *See, e.g.*, *Pierre v. Intuitive Surgical, Inc.*, 476 F. Supp. 3d 1260, 1275 (S.D. Fla. 2020), *aff'd*, 2021 WL 1235697 (11th Cir. Apr. 2, 2021) ("[I]f a treating physician's opinion is based on information outside of his or her personal observations, the treating physician's opinion is inadmissible unless the physician provides a written expert report in compliance with Rule 26(a)(2)(B).")

Moreover, Plaintiffs failed to disclose the journal articles and studies that Dr. Gupta was relying on in advance, as required by Rule 26(a)(2)(C).  *See Meredith*, 2011 WL 1466436, at *7 (Rule 26(a)(2)(C) must contain "those facts upon which the witness' opinions are based").  Instead, those articles and studies were identified for the first time during Dr. Gupta's April 15, 2021 deposition.  This untimely disclosure—on top of the previous untimely disclosure of the opinions themselves—is an independent reason why his expert gateway opinions cannot  be "'smuggle[d] … into the case . . . by characterizing it as lay testimony.'"  Dkt. No. 1234 at 13

12

(citing 8A Wright & Miller, Fed. Prac. & Proc. Civ. § 2031.1).[24]   Dr. Gupta's opinions on the gateway theory should be excluded.

**B.      Dr. Gupta's Opinions on Causation Should Be Excluded.**

A hybrid witness cannot offer opinions on "what happened and why" based on an after-the-fact review of information—particularly when that information is itself hearsay.  *Express Energy Svcs. Operating, L.P. v. Hall Drilling, LLC*, 2015 WL 3743795, at *3; *see also Ulbrick v. UPR Prods., Inc.*, 2011 WL 500034, at *4 (E.D. Mich. 2011) (expert report required where opinions were formed "not, for example, in an attempt to repair the vehicle, but rather in an effort to determine the cause of the accident").  Dr. Gupta's causation opinions do just that.  He plans to testify that:

- "Opiate prescription drugs, their volume, and the consequential addiction and other diseases associated with OUD rose by thousands of percent over a decade"[25] (Opinion 1);

- "In Cabell County and the City of Huntington, the consequences of the oversupply and over-availability of prescription opioids has led to overdose deaths, and more generally, communal suffering and carnage";

- "The increase in overdose deaths in West Virginia during that time [2015 and 2016] was caused by the large volume of opioid pills that were originally deposited or delivered to West Virginia"; and

---

[24]   *See Mohney v. USA Hockey, Inc.*, 138 Fed. App'x 804, 811 (6th Cir. 2005) (striking opinions based on the witness's review of the video of an accident).  To hold otherwise would "permit circumvention of the policies underlying the expert report requirement," by allowing parties to avoid Rule 26(a)(2)(B)'s requirements "by having a [non-retained expert] testify on an issue instead of having an expert do so."  *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 870 (6th Cir. 2007).

[25]   Dr. Gupta also should be precluded from offering this opinion at trial because he disavowed it during his deposition. Ex. A at 73:1–16 ("I don't agree with the statement, period.")  On re-direct, the witness provided an amended opinion: "The opioid prescription drugs and *the volume of prescribing* has risen by thousands of percent over a decade," *id.* at 185:23–186:1, and that "[w]hen *prescription volume* increases by thousands of percent, then obviously there will be a proportional increase in OUD," *id.* at 186:20–22.

13

- "The overwhelming volume that was reaching the people of West Virginia was plainly involved in the killing of West Virginians every 12 hours around the clock."[26]

Like his gateway theory opinions, none of these causation opinions are based on Dr. Gupta's personal experience.  His state jobs never involved monitoring, reviewing, or regulating the "volume" or "supply" of prescription opioid pills distributed to pharmacies in West Virginia.  None of his roles have required an in-depth knowledge of the controlled substance distribution system or the ordering patterns and practices of pharmacies, and he did not even begin to develop an understanding of the system until at least 2015.[27]  As he acknowledged in his deposition, he obtained such knowledge only through hearsay conversations with unidentified employees of the Board of Pharmacy, the West Virginia entity responsible for regulating distributors.[28]

Plaintiffs therefore cannot claim that Dr. Gupta is a percipient witness who formed his causation opinion in the process of addressing the problems of "oversupply" or "over-availability" of prescription opioids because Dr. Gupta was never responsible for doing so.[29]  Instead, Dr. Gupta formed his opinions using the same process "that any expert witness would undertake; namely, an 'after-the-fact' examination" of the issue in question, likely based on materials provided by plaintiffs or reviewed for purposes of litigation.  *Call v. City of Riverside*, 2014 WL 2048194, at *6 (S.D. Ohio May 19, 2014).

---

[26]   Ex. B at 7–9, Opinions 1, 7, 12, and 18.

[27]   Deposition of Rahul Gupta, M.D. (Sept. 11, 2020) [Ex. D], at 41:23–42:21.

[28]   *Id.*

[29]   Dr. Gupta testified that he had no authority to limit the volume of opioids being shipped to West Virginia, *id.* at 49:13–50:4, and he could not identify any action he took to regulate the conduct of distributors. *id.* at 49:13–50:4.  In his view, it was "not [the State's] responsibility to ensure that there's enforcement of the federal [controlled substances] law.  That's not [the State's] job."  *Id.* at 271:25–272:3.

### C.    Dr. Gupta's Opinions on Neonatal Abstinence Syndrome Should Be Excluded.

Dr. Gupta's opinions on the impact of the opioid epidemic on the foster care and educational systems should be excluded for the same reason.  Dr. Gupta plans to opine that:

- "The opioid epidemic has led to an increase in the number of children entering the foster care system, rapidly increasing child welfare costs to the state";

- "The opioid epidemic is a transgenerational crisis";

- "NAS babies are a causative issue in terms of the opioid epidemic";

- "Children diagnosed with NAS at birth have noticeable difficulties learning and paying attention"; and

- "As children with NAS enter the classroom, there will be noticeable, interruptive, and impulsive behavioral issues."[30]

None of this is based on knowledge of underlying facts.  Dr. Gupta did not oversee or manage the budget for the state foster care system.[31]  Nor has he specialized in pediatrics, researched the incidence of attention or learning deficits in children diagnosed with NAS,[32] or personally observed the "noticeable, interruptive and impulsive behavioral issues" that he predicts will occur "[a]s children with NAS enter the classroom."  Instead, Dr. Gupta's opinions are based on a combination of (1) studies disclosed for the first time during his deposition;[33] (2)

---

[30]   Ex. B at 8–10, Opinions 8, 9, 17, 21, and 22.

[31]   Ex. A at 170:7–13.

[32]   Dr. Gupta could not even say how often these "noticeable difficulties learning and paying attention" actually occur, because "we are just at the precipice and that data is evolving, so I cannot tell you what the percentage is."  *Id.* at 166:2–17.

[33]   *See* Ex. A at 167:4–168:19 (Opinion 21 supported by a study published by Dr. Stefan Maxwell); 169:15–24 (Opinion 22 supported by studies by "people like Stephen Patrick at Vanderbilt and others").

other unspecified "reports" and "literature" relating to children diagnosed with NAS;[34] and (3) conversations with other state employees and teachers.[35]  These opinions are true expert opinions that cannot be "smuggle[d] … into the case … as lay testimony,"

Dr. Gupta's reliance on undisclosed external sources independently justifies exclusion of his opinions.  If testifying as a non-retained expert, Dr. Gupta cannot fall back on hearsay conversations—even years' worth of them.  The hybrid witness must perform a role "analogous to that of a treating physician, the example offered by the Advisory Committee of an employee exempt from the written report requirement.   Dr. Gupta has never performed such a role with respect to children diagnosed with NAS who experience learning difficulties, attention deficits, or behavioral issues.  He therefore lacks the "direct, personal knowledge of any of [the] facts" for a hybrid expert witness.  *See id.* at 1318–19 (expert report for a witness who "had no connection to the specific events underlying this case" was required).

### D.    Dr. Gupta's Opinion About the Amount of "Inappropriate Prescriptions That Were Diverted" Should Be Excluded.

Using his own criteria for when "it might make sense to prescribe opioids,"[36] Dr. Gupta opines that "[t]he amount of appropriate prescriptions was dwarfed by the amount of inappropriate prescriptions that were being diverted" (Opinion 2).  This opinion inherently relates to the standard of care and thus is barred by the rule that "[t]estimony with regard to the standard of care [falls] within the category of expert testimony that is required to be disclosed

---

34    *Id.* at 167:4–14 (Opinion 21 supported by "a number of reports… if you go to the CDC website"); 169:15–24 (Opinion 22 supported by "a lot of literature" that "is there and is evolving").

35    *Id.* at 171:14–22.

36    Ex. A at 173:10–18 (describing situations in which Dr. Gupta believes "it might make sense to prescribe opioids").

under Rule 26." *Harville v. Vanderbilt Univ., Inc.*, 95 Fed. App'x. 719, 725 (6th Cir. 2003) ("despite the fact that the two doctors had been involved in the treatment of the plaintiff… their testimony with regard to the standard of care fell within the category of expert testimony that is required to be disclosed under Rule 26").

And his opinion surely does not qualify as hybrid testimony.  Like his other opinions, Dr. Gupta's "inappropriate prescribing" opinion extends beyond his personal "involvement with the facts underlying this litigation."  Dkt. 1234 at 13.  During the period when prescriptions increased, Dr. Gupta had no role in licensing doctors, regulating the practice of medicine, establishing treatment guidelines for opioid prescribing, or disciplining doctors who failed to follow the standard of care.  Nor did he have anything to do with determining whether "inappropriate" prescriptions were diverted, who diverted them, with what frequency, or what the resulting impact was in Cabell/Huntington.

As a consequence, Dr. Gupta's personal opinion on the standards for "appropriate" opioid prescribing should be excluded because "such testimony is beyond the scope of his status as a non-retained expert witness."  Dkt. 1234 at 12.

### E.     Dr. Gupta's Opinions on Addiction Should Be Excluded.

Dr. Gupta claims no expertise in addiction psychiatry[37] and has identified no personal experience treating individuals with substance use disorder.  Nevertheless, Plaintiffs plan to put Dr. Gupta on the stand to offer three opinions relating to addiction (two of which he declined to adopt as written, and modified on the record):

- "[O]nce someone is suffering from substance use disorder, that individual is struggling with a disease, is—has a actual chronic relapsing disease, and it

---

[37]   Ex. A at 150:22–24.

becomes then very important that that individual is offered the help in order to treat that disease, just like we would do for diabetes or cancer or anything else.

Going untreated, there are a number of risks to that individual that include all the way from—from suffering from disease, other mental health conditions, all the way to death."[38]

- "Substance use disorder makes people seek substances to continue to feed the habit because there's a constant need for Dopamine in the—in the brain.  So—and then people would do—in the grips of addiction—as a result, what they need to do to continue to seek those substances."[39]

- "Chemically speaking, synthetic opioids, semi-synthetic opioids and prescription opioids work through the same receptors and feed the same need to the body."[40]

None of this is appropriate hybrid-witness testimony.  "[A] treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment" of the patient whose medical condition is at issue. *Goodman*, 644 F.3d at 826.  Dr. Gupta was not a treating physician; he did not form these opinions in the course of treating patients in Cabell/Huntington for addiction.[41]  He has not "conducted any lab research on the effects of opioids on the brain."[42]  Instead, he relies on the same types of sources used by retained experts (including the retained experts on this very

---

[38] Plaintiffs disclosed the following opinion: "Once an addiction is formed, an individual struggling with addition [sic] will obtain the addictive substance by any means necessary, which often results in illegal activity and the use of illegal substances." Ex. B at 8 (Opinion 4).  During his deposition, Dr. Gupta was "not sure I have an opinion about the statement, the way it's written," *id.* at 132:5–12, and provided the modified opinion quoted above.

[39] Ex. A at 149:9–21.  As disclosed by Plaintiffs, the opinion stated: "Addiction tells people to seek opioids in one form, shape or other." Ex. B at 9 (Opinion 19).  Dr. Gupta declined to adopt the opinion as written and modified it on the record, as reflected in the quote above.

[40] Ex. B at 0, Opinion 20.

[41] Moreover, Dr. Gupta's assertions that addiction causes people to engage in illegal activity is purely speculative.  He could not say, for example, what percentage of people struggling with addiction actually resort to illegal activities to obtain or purchase the addictive substance.  Nor could he say what percentage of people who become addicted to prescription opioids actually transition to illegal drugs.  Ex. A at132:13–23.

[42] *Id.* at 158:5–8.

subject in this case): his "training in medicine, my experience, 25 years of practice of medicine" (which did not involve any specialized training or practice in addiction psychiatry) and "textbooks on addiction or papers and otherwise."[43]  Because Dr. Gupta "functioned exactly as an expert witness normally does," his opinions on addiction are outside the scope of the testimony that can be offered by a hybrid witness.  *See Prieto*, 361 F.3d at 1319.

## CONCLUSION

Consistent with the case law interpreting Rule 26(a)(2)(C), the Court limited Dr. Gupta's expert testimony in these cases "to his involvement in the events giving rise to this litigation." Order at 13.  But Dr. Gupta's deposition revealed that, other than his lack of compensation, he is virtually indistinguishable from any other expert witness subject to Rule 26(a)(2)(B).  His opinions therefore fall outside the scope of Rule 26(a)(2)(C)'s exemption to the written report requirement and should be excluded from the trial.

Dated:  April 28, 2021

Respectfully submitted,

*/s/ Steven R. Ruby*
Michael W. Carey (WVSB No. 635)
Steven R. Ruby (WVSB No. 10752)
David R. Pogue (WVSB No. 10806)
Raymond S. Franks II (WVSB No. 6523)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile: (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
drpogue@cdkrlaw.com
rsfranks@cdkrlaw.com

---

[43]  *Id.* at 150:1–21.

*/s/ Ashley W. Hardin*
Enu Mainigi
F. Lane Heard III
Jennifer G. Wicht
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
emainigi@wc.com
lheard @wc.com
jwicht@wc.com
ahardin@wc.com

*Counsel for Cardinal Health, Inc.*

*/s/ Timothy C. Hester*
Timothy C. Hester (DC 370707)
Laura Flahive Wu
Andrew P. Stanner
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
lflahivewu@cov.com
astanner@cov.com

*/s/ Paul W. Schmidt*
Paul W. Schmidt
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: (212) 841-1000
pschmidt@cov.com

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box. 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

*Counsel for McKesson Corporation*


*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
JACKSON KELLY PLLC
Post Office Box 553
Charleston, WV 25322
Tel: (304) 340-1000
Fax: (304) 340-1050
gcallas@jacksonkelly.com


*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Drug Corporation*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on this 28th day of April, 2021, the foregoing "Defendants' Motion to Exclude Expert Testimony of Dr. Rahul Gupta" was served using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Steve Ruby*

Steven R. Ruby (WVSB #10752)
