# EXHIBIT A
## EXCERPTS FROM THE DEPOSITION OF
## RAHUL GUPTA, M.D.
### 04/15/2021

Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

2

3

* * * * * * * * * * * * * * * * * * * * * *

4

THE CITY OF HUNTINGTON,

5

           Plaintiff,

6

vs.                                    CIVIL ACTION
7                                   NO. 3:17-01362

AMERISOURCEBERGEN DRUG
8  CORPORATION, et al.,
9           Defendants.
10  _____
11  CABELL COUNTY COMMISSION,
12           Plaintiff,
13  vs.                                 CIVIL ACTION
                                     NO. 3:17-01665

14  AMERISOURCEBERGEN DRUG
    CORPORATION, et al.,
15

           Defendants.

16

* * * * * * * * * * * * * * * * * * * *

17

18
19          Videotaped and videoconference deposition
    of RAHUL GUPTA, M.D. taken by the Defendants under
20  the Federal Rules of Civil Procedure in the above-
    entitled action, pursuant to notice, before Teresa
21  S. Evans, a Registered Merit Reporter, all parties
    located remotely, on the 15th day of April, 2021.

22

23

24

Page 12

1   You put them up on the -- for the doctor to see and

2   then he can comment on them.

3           But we don't have printouts right here

4   of all the exhibits.

5           MS. MAINIGI:  Okay.  Steve, are you --

6           MR. RUBY:  I thought -- sorry, Mark, I

7   thought you guys were going to have them printed

8   for -- for doctor Gupta.

9           MR. COLANTONIO:  Yeah, I apologize if

10  that was a -- I didn't -- I just don't have them

11  here, Steve.  But I think -- I think if you put

12  them up that he'll be able to, you know, do it that

13  way.

14          MR. RUBY:  Well, let's do this.  Let

15  me --

16          MS. KEARSE:  Yeah, Steve, I thought

17  you were doing them remotely as well.  We just --

18  and we didn't get copies of them.

19          MR. RUBY:  Hold on.  Let me --

20          MS. MAINIGI:  Well, while -- while we

21  gather up some of the exhibits, I think, Steve,

22  we'd want to -- I'm not even sure we need 51, but I

23  guess 58 would be one of the next ones.

24  BY MS. MAINIGI:

1    Q.   So Doctor Gupta, let's just go ahead and

2  jump in.  Is it correct that you worked in West

3  Virginia from approximately 2009 to 2017?

4    A.   That is correct, but that is not the

5  entirety of my experience in West Virginia.

6    Q.   What other experience did you have in West

7  Virginia beyond -- beyond the experience of those

8  years?

9    A.   I had worked in West Virginia from March of

10 2009 to November of 2018.  And after that, I

11 continued to be a volunteer physician to date with

12 West Virginia Health Right, which is a charitable

13 clinic in Charleston, West Virginia.

14   Q.   And is that something you do through today,

15 Doctor Gupta?

16   A.   Yes.

17   Q.   And how often do you volunteer as a

18 physician at that clinic?

19   A.   I would take advantage of every time I'm

20 able to or most times I'm able to visit West

21 Virginia, to be able to do that.  That could be

22 ranging anywhere from once a month to once every

23 few months.

24   Q.   And that has happened since your departure

Page 14

1   from West Virginia in approximately November of

2   2018.  Is that correct?

3        A.  I have volunteered in my time since my

4   departure from West Virginia in November of 2018.

5        Q.  And your present position, Doctor Gupta, is

6   being the chief medical officer at the March of

7   Dimes; is that correct?

8        A.  My current position at March of Dimes is

9   chief medical and health officer, as well as the

10  interim chief science officer, and senior vice

11  president --

12       Q.  I'm sorry, you cut out there, Doctor.

13  Senior vice president of what?

14       A.  Of March of Dimes.

15       Q.  Did you take the role at the March of Dimes

16  beginning in approximately 2018?

17       A.  Yes.

18       Q.  And you moved to the Washington, D.C. area

19  around that time?

20       A.  I did not move immediately to the

21  Washington area.

22       Q.  Did you commute for some period of time?

23       A.  Yes.

24       Q.  When did you move to the Washington, D.C.

area?
A. Probably around February or March of 2019.
Q. Doctor Gupta, the March of Dimes is a global organization focused on maternal and infant health; is that correct?
A. Yes.
Q. And the March of Dimes works on prenatal education, among other things. Is that correct?
A. That would be part of the work that we do at March of Dimes.
Q. And also professional education?
A. That would be accurate as well.
Q. And also NICU support and resources?
A. That would also be accurate, NICU standing for neonatal ICU.
Q. Thank you. And also health equity, Doctor Gupta?
A. That would also be correct.
Q. And a fairly extensive medical research agenda? Is that correct also?
A. That would be correct.
Q. And the work that the March of Dimes does, that's done on a global basis, true?
A. The work of March of Dimes historically and

1      currently is done both at domestic levels as well

2      as international level.

3          Q.   Now, while at the March of Dimes, Doctor

4      Gupta, you are not acting as a specialist in

5      addiction treatment, correct?

6          A.   That would be correct.

7          Q.   You're not acting as a specialist in pain

8      management, correct?

9          A.   That would be correct.

10         Q.   You're not a specialist in neurobiology,

11     correct?

12         A.   Could you please repeat that last one?

13         Q.   Sure.  You are not acting as a specialist

14     in neuro -- neurobiology, correct?

15         A.   Could you please explain?  I'm not -- no, I

16     mean, I don't understand the question about a

17     specialist in neurobiology.  There's no - to my

18     knowledge - a physician position of being a

19     specialist in neurobiology.

20         Q.   Okay.  Thank you.  And you're not acting as

21     a specialist at the March of Dimes in epidemiology,

22     correct?

23         A.   That would be incorrect.

24         Q.   That would be incorrect?

Page 17

1    A.   That's correct.

2    Q.   Okay.  Could you explain to me how you are

3    -- what your role is as a specialist in

4    epidemiology at the March of Dimes?

5    A.   My work that includes the title of the

6    chief medical and health officer as well as the

7    chief science officer often involves the engagement

8    of the principles of epidemiology, biostatistics,

9    policy, which are all part of my training as well

10   as my experience and expertise.

11   Q.   Do you act as a specialist in epidemiology

12   in -- at the March of Dimes, Doctor Gupta?  Or do

13   you interact with epidemiologists?

14   A.   I am the person that is in charge and not

15   only in charge of other epidemiologists, but I am

16   the person that other epidemiologists look to for

17   expert advice.

18   Q.   And do other epidemiologists look to you

19   for epidemiology advice?

20   A.   That's correct.

21   Q.   In what areas, please?

22   A.   In areas of epidemiology.

23   Q.   And can you give me specific areas, please?

24   A.   Areas of maternal health, infant health,

1    population health, health policy, biostatistics.  I

2    can go on.

3         Q.  Do you have any training in epidemiology,

4    Doctor Gupta?

5         A.  I have both training and experience.

6         Q.  Do you have -- let me ask this first:  Do

7    you have any formal training in epidemiology?

8         A.  Yes.

9         Q.  What is the formal training you have in

10   epidemiology?

11        A.  Beyond my medical degree where I had

12   extensive training in public health and

13   epidemiological practices of five and a half years,

14   I have a master's in public health from University

15   of Alabama-Birmingham.

16        Q.  Have you ever held yourself out as an

17   epidemiologist when you were practicing medicine,

18   Doctor Gupta?

19        A.  I do not understand the nature of the

20   question.  Could you please rephrase?

21        Q.  Sure.  You have a -- you have training in

22   internal medicine, correct?

23        A.  Correct.

24        Q.  And I -- as I understand it, for some

1   period of time, you were in private practice and

2   you held yourself out as an internist.  Correct?

3       A.   Amongst other areas as well, correct.

4       Q.   And my question to you then, with that

5   background, is:  Have you ever held yourself out as

6   an epidemiologist and solely an epidemiologist?

7       A.   I still do not understand the nature of the

8   question of being a physician solely as an

9   epidemiologist.  I can help to answer the question

10  this way:  That as the local health officer and

11  physician director, which is the official position

12  at Kanawha-Charleston Health Department, my role

13  from March of 2009 to December of 2014 - which was

14  almost six years - involved leading a team of

15  epidemiologists in a variety of work that included

16  conducting epidemiological surveys, studies,

17  analysis and policy making as a result of that work

18  for the largest county in the state of West

19  Virginia, which is Kanawha County.

20              Following that, because partly of that

21  work, the Governor of the state of West Virginia

22  asked me to serve as the State Health Officer,

23  which also requires to have - similar to

24  Kanawha-Charleston Health Department - a

Page 20

1  significant experience and expertise in

2  epidemiology in order to serve in that position.

3              So both of those positions, from March

4  of 2009 to November of 2018, required significant

5  expertise in epidemiology as -- as per stated in

6  statute for the State of West Virginia and the

7  policies of Kanawha Charleston Health Department.

8        Q.   Okay.  We'll come back to that time period.

9              MR. RUBY:  Enu, not to interrupt, but

10  we are set up to screen share the exhibits whenever

11  you want.

12              MS. MAINIGI:  Oh, terrific.

13        Q.   Speaking of West Virginia, when you were in

14  West Virginia, did you ever live in Huntington?

15        A.   No.

16        Q.   Did you ever live in Cabell County?

17        A.   No.

18        Q.   Did you ever work in Huntington?

19        A.   Yes.

20        Q.   And when -- from when to when did you work

21  in Huntington?

22        A.   My work as the health commissioner for the

23  State and the State Health Officer required me to

24  ensure that my work involved not just in Kanawha

1   County, but for all 55 counties and all the cities

2   within the jurisdiction of the State of West

3   Virginia.

4            That work involved a number of

5   activities, including visits, as well as

6   epidemiological work, investigatory work,

7   regulatory work, as well as other facets that

8   included Cabell County as well as the City of

9   Huntington.

10           And part of my job was to not only

11  work with the public health department, but also

12  the elected and other officials from Cabell County

13  and the City of Huntington.

14       Q.   How often do you think while you were in

15  that role, Doctor Gupta, that you visited

16  Huntington or Cabell County?

17       A.   Could you please define the time period?

18       Q.   The time period that you were State

19  commissioner.

20       A.   I would visit the City of Huntington and

21  Cabell County, broadly speaking, anywhere from, you

22  know, once every couple of weeks to once every

23  couple of months.

24       Q.   Were -- was there a system at the

1    Commission of keeping track of where you traveled?

2    Was there a log or something that was maintained?

3          A.   I'm sorry, which commission?

4          Q.   Well, let's see.   You became the State --

5    you're speaking about the State health commission,

6    correct?   In that role as the State Health Officer,

7    you visited Cabell and Huntington.   Right?

8          A.   No, Ms. Mainigi, I was the Commissioner of

9    the Bureau of Public Health at the West Virginia

10   Department of Health and Human Resources, which is

11   -- also provides the -- by statute, the position of

12   the State Health Officer, so I'll just step back a

13   little bit and help to -- help --

14         Q.   That's okay.   I -- not to interrupt you,

15   but thank you for that clarification.   So let me

16   just keep going.   While you were the Commissioner

17   of public health, that's when you made somewhat

18   periodic visits to Cabell and Huntington, correct?

19         A.   That is not the only time.

20         Q.   Okay.   Well, let's stick with the time you

21   were in that role.   You mentioned that you ranged

22   from one time every couple of weeks to one time

23   every couple of months, correct?

24         A.   Yes.

Page 39

1   neurobiology?

2       A.   Once again, I'm not aware of particular

3   licensing around neurobiology physicians.

4       Q.   And once again, you would say, Doctor

5   Gupta, that you did act as a specialist in

6   epidemiology while you were executive director; is

7   that right?

8       A.   That would be accurate.

9       Q.   And do you have any licensing in

10  epidemiology?

11      A.   I'm -- I'm not sure -- which particular

12  licensing are you asking about?

13      Q.   Well, to your knowledge, is there licensing

14  that exists for epidemiology?

15      A.   I am not aware of a physician specialty

16  through the Board of Medicine that is exclusive for

17  epidemiologists' practice.

18      Q.   So you're not aware of any licensing

19  related to epidemiology.

20      A.   I'm not aware of any specialist licensing

21  in the medical practice of West Virginia that

22  provides that type of licensing.

23      Q.   Okay.   And what about outside of West

24  Virginia?   Are you aware of any medical

1    organizations that license in epidemiology?

2        A.   I would not be aware at this time of any

3    particular organizations.   Knowing that the

4    practice of medicine is regulated by State Board of

5    Medicine, not outside organizations, in the State

6    of West Virginia.

7        Q.   Now, in 2014, you became the State Health

8    Officer for West Virginia, correct?

9        A.   I'm sorry, could you repeat that, please?

10       Q.   In 2014, you assumed the role of the State

11   Health Officer for West Virginia?

12       A.   That would be incorrect.

13       Q.   Tell me how it's incorrect.

14       A.   I assumed the role in January of 2015 of

15   commissioner for the Bureau of Public Health at

16   DHHR and the State Health Officer.

17       Q.   Let me just go back to the epidemiology

18   point.   Are you aware of an organization called the

19   American College of Epidemiology?

20       A.   Not -- that doesn't sound like an

21   organization that I have worked with.

22       Q.   So if you haven't heard of it, you're not a

23   member of it, I assume.

24       A.   I don't think I'm a member of it.

1   Q.  Now, your role that you assumed in January

2   of 2015 as the State Health Officer for West

3   Virginia, I assume that had a wider range of duties

4   than the duties you had at Kanawha Charleston,

5   correct?

6   A.  That would be accurate.

7   Q.  And so as the State Health Officer, as I

8   understand it, you oversaw more than 130 separate

9   programs; is that right?

10  A.  That would be accurate, and just wanted to

11  add so -- in case -- I know you probably didn't

12  mean to miss this out on purpose, but during that

13  time, I was also the health officer and physician

14  director for Putnam County Health Department as

15  well, part of the time that I was in Kanawha

16  County.

17          That's -- and by the way, just to --

18  for your knowledge, that's the connection county

19  between Cabell and Kanawha.  You have to drive

20  through Putnam County to get to Cabell.

21          So during that time also - going back

22  to your previous question - I was in the most

23  contiguous county next to Cabell and the City of

24  Huntington, and that was another level of

1    he's able to finish his questioning regarding your

2    questions about this document.

3                    So I think it's quite appropriate now

4    that he's reviewed it.  You didn't let him review

5    it while he was on the record, so he's now reviewed

6    it, so if he just --

7                    MR. COLANTONIO:  I just want to place

8    on --

9                    MS. MAINIGI:  Okay, Doctor --

10                   MR. COLANTONIO:  Hold on a second.  I

11   want to place on the record that I object to your

12   statement that somehow there's a rehearsed answer,

13   and I take umbrage to that, and just for the

14   record, I want to put that on the record.

15                   MS. MAINIGI:  Okay, understood.

16   BY MS. MAINIGI:

17      Q.  Doctor Gupta, could you please pull out

18   Exhibit 58 again?  I don't know if your counsel has

19   printed it out for you now, but it is -- it is the

20   statement that they filed with the Court with all

21   of your opinions that has led to this deposition.

22                   Let me know if you just want it on the

23   screen, and we are happy to leave it on the screen.

24      A.  It's already on the screen.

1    Q.   Okay, terrific.  I'm going to ask you about

2  the first bullet, and that first bullet reads as

3  follows:  "Opiate prescription drugs, their volume,

4  and the consequential addiction and other diseases

5  associated with OUD rose by thousands of percent

6  over a decade."

7              Did I read that correctly?

8    A.   That's what it says.

9    Q.   Do you agree with this statement?

10    A.   I'm not sure if I agree with the entirety

11  of the statement.

12    Q.   Okay.  What part of the statement -- and I

13  don't need the reasons yet, we can break that down,

14  but what part of the statement do you agree with or

15  disagree with?

16    A.   I don't agree with the statement, period.

17    Q.   Okay.  So let me just ask you one follow-up

18  question on that and then we can move on to another

19  opinion of yours.  Where it says "thousands of

20  percent over a decade," do you have any idea what

21  decade is referenced there?

22    A.   Ms. Mainigi, you're providing me this

23  document.  I don't have -- you know, I'm -- you're

24  asking me a question if I agree to the statement.

Page 74

1    I said I don't agree with the statement.  So you're

2    welcome to ask me questions, but I can't guess what

3    you're thinking.

4        Q.  Okay.  Do you recall making this statement

5    at your last deposition?

6        A.  I do not.

7        Q.  Okay.  So you don't know what -- just for

8    the record, the word "decade" in that statement,

9    the first bullet, you don't know what decade is

10   being referred to there.

11       A.  I would request to you once again, after

12   the break now, that if you intend to show me a

13   statement, please provide me the context, because

14   it's really unfair and misleading for me to be able

15   to react to a statement without having any context,

16   and you're doing it again.

17       Q.  Okay.

18           MS. KEARSE:  Enu, if you want to show

19   him the page numbers on the deposition --

20           MS. MAINIGI:  I don't.  I'm just going

21   to go off of this document that you all filed on

22   his behalf, Anne.

23       Q.  Okay.  So let's move on to --

24           MS. KEARSE:  You referred to his

1   BY MS. MAINIGI:

2        Q.  Doctor Gupta, I'm going to show you

3   Statement No. 3, Bullet No. 3 of Exhibit 58.

4             MS. MAINIGI:  Steve, could we scroll

5   down to it, please?

6             MR. RUBY:  Yep.  There's a little lag

7   here.  Sorry.

8             MS. MAINIGI:  Sorry.

9        Q.  Okay.  Doctor Gupta, why don't you take a

10  moment and read that?  Let me know when you're

11  ready.

12       A.  Okay.

13       Q.  Okay.  Statement 3 reads, "There is a

14  direct correlation between diverted prescription

15  pills and the transition to using street drugs such

16  as heroin, fentanyl, methamphetamine, etc."  Do you

17  agree with this statement, Doctor Gupta?

18       A.  Yes.

19       Q.  And what is your basis for this statement?

20       A.  Well, it's both the literature that exists

21  to support that as well as my experience and the

22  opinions that have resulted from my experience.

23       Q.  Okay.  Can you give me specific literature

24  references that would support that statement,

 1  Statement 3?

 2      A.  Sure.  You know, as -- I think back as

 3  2014, Theo Cicero actually published a 50-year

 4  analyses in general psychiatry that showed that,

 5  you know, as much as 75 to 80 percent of the

 6  transition that was happening in people who were

 7  using heroin was actually -- they were the people

 8  that were in fact looking at -- nowadays, were

 9  transitioning from prescription drugs, as opposed

10  to the '60s where 80 percent of people were going

11  in the opposite direction.

12           So there's been a lot more literature

13  since that that shows about 80 percent of the

14  people that use heroin today have had their start

15  from prescription opioids to begin with.

16           Now, having said that, we saw very

17  similar facts in West Virginia.  We started to see

18  people that were often - because of a large volume

19  and diversion that resulted often in addiction were

20  utilizing prescription drugs, and as there was more

21  policy and actions that were being taken to address

22  that - part of that was reduction in supply - these

23  people really often, as an example, when there was

24  action on shutting down a pill mill, there were

Page 119

1    often people that would then not have a supply.

2            As a result of that, they would either

3    have two or three options.  One option was to go to

4    the emergency room.  We saw flooding of the

5    emergency room.

6            Second was to go to street drugs which

7    were much more readily available, cheap in terms of

8    heroin, or just die, overdose and die.

9            And we were seeing all of this.  So

10   our findings matched what was being published.  In

11   fact, there's been some work done by Sarah Mars in

12   Philly population that also showed very similar

13   numbers, and we were matching that up.

14           So as that began to happen, more and

15   more people transitioned to heroin, there began an

16   infiltration of cutting heroin with fentanyl by

17   drug dealers primarily to save costs, to make more

18   money.

19           And as that was happening, fentanyl,

20   of course, is a substance that's about 80 times

21   more potent than morphine, so because it was

22   uncontrolled, we were seeing batches of deaths

23   happening together because of bad batch of

24   fentanyl-cut heroin.

Page 120

1          Across West Virginia, that was the

2     case.  When we had in 2016, fall of 2016 or so, an

3     outbreak in Huntington, West Virginia that was

4     first but not the only of its kind across the

5     country, where in a matter of hours, dozens of

6     people were overdosed and had to be taken to the

7     hospital.

8          This was an example of where disease

9     from overdose was starting to simulate an

10    infectious disease, meaning you have a patient zero

11    and -- or -- which would actually be a drug dealer

12    that would have a bad batch, and that many people

13    would get impacted.

14         Same thing happened in Beckley during

15    my tenure, and other places as well.

16         So that -- that first phase was

17    prescription drugs.  The second phase, because of

18    increased volume -- the volume, diversion and

19    addiction was actually getting it on.

20         And the action that followed was to

21    transition to heroin.  That was wave two, as CDC

22    describes it.

23         The third wave was actually mixing of

24    heroin with synthetic opioids like fentanyl, and I

Page 128

1    but you've got leftover pills presumably lying

2    around.   Fair?

3         A.   The two-thirds approximately on the survey

4    that was reported was often -- were prescriptions,

5    prescription drugs - so we're only talking about

6    the prescription drugs at this point - that people

7    have brought home.

8              Now, these could be legitimate

9    prescriptions; they could be illegitimate

10   prescriptions.

11             And -- but if those that are flooding

12   the population because of the large volume that

13   happens.  So someone had a -- you know, I use a

14   tooth pulled example.  But you could use a cataract

15   example, but something for a one-time event but

16   somebody got 30 days with three refills, well,

17   that's going to lay around and that's going to get

18   into the hand of children -- hands of children or

19   somebody else, for all types of purposes, and

20   that's the diversion.

21             Now, on the other hand, when somebody

22   gets it for a legitimate prescription and also

23   either goes and sells it or misuses it or gives it

24   to somebody else to misuse, that's also diversion.

Page 129

1        So -- and then obviously diversion

2   leads to addiction which leads to the constant need

3   to have some sort of opioids in your system that

4   when those volumes start to shrink, people

5   transition to other types of alternatives.

6        Q.   Now, you are aware, Doctor Gupta, are you

7   not, that the vast majority of people who use

8   prescription opioids do not become addicted to

9   street drugs?

10       A.   I'm sorry, could you repeat that, please?

11       Q.   Sure.  Do you agree that studies

12   demonstrate that the vast majority of people who

13   use prescription opioids do not become addicted to

14   street drugs?

15       A.   We're talking about two very different

16   populations, so I'm not sure of the correlation.

17   Are you talking about -- I need to have more data

18   on that.

19       Q.   Okay.  In your experience then, as a

20   practicing physician as well as the various roles

21   you've held in West Virginia, do you agree that the

22   vast majority of people who use prescription

23   opioids do not become addicted to street drugs?

24       A.   What time frame are we talking about?  I'd

Page 130

1   like to -- you know, like I said, I'd like to know

2   more about that.

3        Q.   The time frame that you held the positions

4   in West Virginia that we've been discussing.

5        A.   That's not what I'm asking you.   I'm asking

6   what -- for what duration of prescription opioids

7   do those people use, and for what purpose?   Because

8   context is important.

9        Q.   During the -- the vast majority -- do most

10  people use prescription opioids for long-term

11  periods?

12       A.   So in 2012, United States, we had

13  255,000,000 prescriptions.   That was 80

14  prescriptions for 100 people across the country.   I

15  hope that answers my question -- your question.

16       Q.   Well, why don't we -- so you don't have --

17  I'll just ask you one more time.   You -- from your

18  experience, you don't have an opinion on whether

19  the following statement is true or false.   The --

20  and the statement is:   "The vast majority of people

21  who use prescription opioids do not become addicted

22  to street drugs."

23       A.   According to the 2016 March guidelines for

24  chronic pain from the Centers for Disease Control

Page 131

1    and Prevention, use of prescription drugs, opioid
2    prescriptions, for more than five or seven days,
3    puts you at a very high risk for addiction.
4         Q.   For addiction to that prescription drug,
5    correct?
6         A.   For addiction -- for the disease of
7    addiction.   Period.
8         Q.   Let's go to Statement 4.   Why don't you
9    take a moment and read it.
10        A.   Okay.
11        Q.   Okay.   Statement says, "Once an addiction
12   is formed, an individual struggling with addiction
13   will obtain the addictive substance by any means
14   necessary, which often results in illegal activity
15   and the use of illegal substances."
16             Do you agree with that statement?
17        A.   Here's what my opinion is:   I believe that
18   once someone is suffering from substance use
19   disorder, that individual is struggling with a
20   disease, is -- has a actual chronic relapsing
21   disease, and it becomes then very important that
22   that individual is offered the help in order to
23   treat that disease, just like we would do for
24   diabetes or cancer or anything else.

Page 132

1          Going untreated, there are a number of

2     risks to that individual that include all the way

3     from -- from suffering from disease, other mental

4     health conditions, to all the way to death.

5          Q.   Doctor Gupta, I'm going to explore some of

6     what you just told me in a minute.  But before we

7     do that, can I just ask you to look at statement --

8     the statement that's marked 4 and tell me whether,

9     as written, whether you agree with it or disagree

10    with it.

11         A.   I'm not sure I have an opinion about that

12    statement, the way it's written.

13         Q.   Do you know what percentage of people

14    struggling with addiction do illegal things to

15    support their addiction?

16         A.   I don't have a percentage at this time.

17         Q.   Do you know what percentage of people who

18    become addicted to prescription opioids go on to

19    use other illegal substances?

20         A.   From the data that I've highlighted prior,

21    it's -- what we know now is about 80 percent of

22    people who are using heroin got their start from

23    using prescription opioids.

24         Q.   That is not the question I asked.  Right?

Page 133

1     A.  That is the answer.

2     Q.  What percentage -- I'm sorry?

3     A.  That is exactly the answer I provided,

4 so --

5     Q.  That's the only figure that you have then.

6 Fair?

7     A.  Well, I'm happy to rephrase it if you have

8 -- you know --

9     Q.  Well, let me ask you the question again,

10 just in case I misunderstood your answer.  Can you

11 tell me what percentage of people who become

12 addicted to prescription opioids go on to use other

13 illegal substances?

14          So this is the percentage of people

15 who become addicted to prescription opioids.

16     A.  So to my previous statement, I think by

17 phrasing the question the way you have, you're

18 discounting the thousands of West Virginians and

19 hundreds of thousands of Americans who have

20 actually perished as a result of addiction, and I

21 think it's an unfair question to ask that way.

22     Q.  Okay.  I will take from your answer that

23 you don't have a number, Doctor Gupta.  Let me move

24 on to your Statement No. 5, if I could.  Let's move

1    we include illegitimate prescribing; we include

2    diverted in the sense of borrowing, stealing,

3    purchasing, all of those things.

4         Q.   Have you done any independent analysis -

5    besides relying on this study that you referenced -

6    to determine if this 80 percent number is

7    applicable to Cabell County?

8         A.   As I've stated, that's my opinion to a

9    reasonable degree of certainty.

10        Q.   And my question is:  Have you done any

11   independent research to determine if that 80

12   percent number is applicable to Cabell County?

13        A.   I can't recollect at the time, so I can't

14   say yes or no.  I just don't -- I don't remember at

15   this point.

16        Q.   And do you remember whether you did any

17   independent research in the City of Huntington to

18   determine if that 80 percent number is applicable

19   to the City of Huntington?

20        A.   No, I don't think I -- I can't recollect.

21   But also, you know, we have 55 counties in the

22   state, first of all.  Second, there was an outbreak

23   of overdose, and I can't recollect at this time the

24   exact findings of the outbreak in 2016.

1           So that's another resource for you to

2    go and look at if you -- if you're willing to.

3       Q.  By the way, the 80 percent number that you

4    cite, what study does that come from?

5       A.  That's -- a number of people have done

6    that.  So the Theo Cicero, as I mentioned, JAMA

7    Psychiatry.  It's something that has generally been

8    accepted.  You know, I can help -- I can provide

9    you the specific resources.  But Theo Cicero found,

10   I think, about 75 percent.

11          And I think most -- most of the data

12   has usually quoted 80 percent.

13      Q.  But you recall -- the one you're

14   specifically recalling is Cicero.

15      A.  Yeah.  Cicero had 75; I think Sarah Mars

16   may have 80.  But that's an agreed-upon -- and I

17   want to say with a reasonable degree of certainty

18   that CDC utilizes that number as well.

19      Q.  The CDC uses that number as well.  Okay.

20      A.  Yeah.  I -- I want to say -- again, I'd

21   have to -- if I was allowed to look at it, I would

22   look at the stats.  But you know, we're not in that

23   phase right now.

24      Q.  And what stats would you be looking at

Page 140

1    besides the ones you've mentioned, Doctor Gupta?

2         A.   I would be confirming my statements that

3    CDC numbers --

4         Q.   Let's shift to Statement 11, if we could.

5    Why don't you take a moment and read that.

6                   MR. RUBY:   This spans two pages,

7    Doctor, so let me know when you're ready to --

8                   THE DEPONENT:   Okay.  Go ahead,

9    please.

10                  MS. MAINIGI:   Steve, there's no way to

11   get both pieces in?

12                  MR. RUBY:   Let's see.  We might be

13   able to shrink it.  There we go.

14                  MS. MAINIGI:   There we go.  You're

15   such a pro, Steve.

16   BY MS. MAINIGI:

17        Q.   Okay, Doctor Gupta, Statement 11 reads as

18   follows:   "Although there was a 15-20% reduction in

19   opioid prescriptions in 2015 and 2016, there was no

20   reduction in overdose deaths because the addiction

21   had already been formed and people with opioid use

22   disorder were turning to illicit, more lethal forms

23   to feed their addictions that was initially formed

24   by prescription opioids."

Page 148

1  late '90s, early aughts.  One was an ethical

2  reason, the doctors had an ethical obligation to

3  reduce patients' pain down to zero.  Is that fair?

4       A.  I don't think I said that doctors -- I said

5  the manufacturers, you know, and others created a

6  system or an environment where physicians were made

7  to feel that there was an obligation to bring

8  everyone's pain down -- across America, down to

9  zero level.

10          And the pills that we were provided

11  should be provided liberally, and there is no

12  problem, there's no addiction, there's no side

13  effects of those pills.

14          So that was a -- that was a -- the

15  effect that was created.  Purposefully, now we

16  know.

17          But -- and clearly organized medicine

18  was engaged in that.

19       Q.  And so the efforts that were made in West

20  Virginia in 2015, '16, '17 were to help counter

21  balance that through the physician population.

22       A.  The efforts were to educate prescribers -

23  not just physicians, all prescribers - for Schedule

24  II to ensure that they understood what good

1    practice guidelines are for pain.  They understood

2    the risk of addiction, especially with longer --

3    higher doses and longer durations, and they were

4    more judicious in prescribing.

5              And for those who already were

6    suffering from substance use disorder were able to

7    seek the help that they could so they do not

8    overdose and they do not die.

9        Q.  Let's switch gears to Statement 19, Doctor

10   Gupta.  It's --

11             MS. MAINIGI:  Let's scroll down to

12   that.

13       A.  Okay.

14       Q.  That statement reads, "Addiction tells

15   people to seek opioids in one form, shape or

16   other."  Do you agree with that statement?

17       A.  I would -- I would say it this way:  It's

18   my opinion that substance use disorder makes people

19   seek substances to continue to feed the habit

20   because there's a constant need for Dopamine in

21   the -- in the brain.

22             So -- and then people would do - in

23   the grips of addiction - as a result, what they

24   need to do to continue to seek those substances.

Page 150

1      Q.   What is your basis for this opinion, Doctor

2  Gupta?

3      A.   The basis for my opinion is my training in

4  medicine; my experience, 25 years of practice of

5  medicine; and with a reasonable degree of

6  certainty, as well as my understanding of the

7  science of addiction and substance use disorder.

8      Q.   Do you have any research papers that you

9  can cite to me as support for this statement?

10     A.   Sure.  You can probably -- there's a PBS

11 documentary on Nova called "Addiction."  They have

12 featured the director of the NIDA, National

13 Institute of Drug Abuse, a few addition -- an

14 addiction psychiatrist and myself, to talk about

15 addiction.

16                And you're welcome to see that.

17 That's kind of one aspect.  But then I'm happy to

18 get you textbooks for addiction or papers or

19 otherwise.  But this is the -- the science of

20 addiction, while developing and evolving, this is

21 what we understand today in medicine.

22     Q.   Now, you are not an expert in addiction

23 psychiatry, correct?

24     A.   That's correct.

Page 151

1     Q.   You're not an expert in neurobiology?

2     A.   I don't know what that expertise is, as I

3   said before.

4     Q.   Let me go back to one of the things -- one

5   of the statements we were discussing previously,

6   Doctor Gupta.  When there was a reduction in the

7   levels of opioid prescriptions in the 2015-'16 time

8   period, were you surprised?  Were you and your

9   colleagues surprised that heroin overdoses

10   increased?

11               Had you anticipated a decline in drug

12   overdoses as the prescribing levels dropped?  Or

13   was -- was that something that did come as a shock

14   to you?

15               MS. KEARSE:  Objection.

16     Q.   Let me -- let me ask the question again to

17   avoid objection.  You referenced a reduction in the

18   levels of opioid prescriptions in that '15-'16 time

19   period.  Correct, Doctor Gupta?

20     A.   Yes.

21     Q.   When you saw the reduction in opioid

22   prescriptions in that time period, were you

23   surprised that heroin overdoses increased?

24     A.   So we know again that opioid prescribing

1          So we created protocols where via

2   doctor letters would go to in that area or that

3   county before a pill mill was about to be shut down

4   around that time.

5          We created educational resources.  We

6   created all of these protocols.  So we were working

7   closely with federal, state and local law

8   enforcement behind the scenes so that when that

9   action took place, you didn't just see police

10  officers and people being taken to jail, like bad

11  doctors and their staff.

12         But then we worked behind the scenes

13  to make sure those people would have resources to

14  go to so they don't end up being on the street and

15  using IV heroin.  They don't end up flooding the

16  emergency room or they don't end up, worse enough,

17  dying.

18         So those are the actions that we took.

19     Q.  I'm going to ask you to move to Statement

20  20.   Statement 20 reads, "Chemically speaking,

21  synthetic opioids, semi-synthetic opioids and the

22  prescription opioids work through the same

23  receptors and feed the same need to the body."  Do

24  you agree with that statement?

Page 158

1     A.  Yes.

2     Q.  You're not an expert in addiction sciences,

3  you've already said, though, correct?

4     A.  I'm not an addiction psychiatrist.

5     Q.  Have you done any research on the effects

6  of various opioid substances on the brain?

7     A.  I've not conducted any lab research on the

8  effects of opioids on the brain.

9     Q.  Let's go backwards to Statement 12.

10  Statement 12 reads, "The increase in overdose

11  deaths in West Virginia during that time was caused

12  by the large volume of opioid pills that were

13  originally deposited or delivered to West

14  Virginia."

15         Do you agree with this statement?

16     A.  That is my opinion.

17     Q.  What is the time period that you would

18  agree that this statement is true?

19     A.  I would say at the beginning of 2000-2001

20  to date.

21     Q.  Now, you don't mean by the statement that

22  prescription opioids were the sole cause of the

23  increase in opioid deaths, do you?

24     A.  Could you repeat that, please?

Page 159

1      Q.  Sure.  You don't mean by this statement

2  that prescription opioids were the sole cause of

3  the increase in opioid deaths, do you?

4      A.  If I heard you correctly, you said, "the

5  prescription opioids were the sole cause of opioid

6  overdose deaths."  Is that what you're asking me?

7      Q.  I'm asking you whether you think that

8  prescription opioids were the sole cause of the

9  increase in opioid deaths.

10     A.  Prescription opioids were a substantial

11 factor in the significant rise in overdose, drug

12 overdose, deaths in West Virginia.

13     Q.  Now, was the criminal distribution of

14 heroin a cause?

15     A.  Heroin certainly -- heroin cut with

16 fentanyl was also a cause.  But just to remember,

17 that was driven from prescription drugs,

18 prescription opioids, transitioning.

19     Q.  What are some of the other causes?

20     A.  So there's often not a one-to-one

21 relationship.  What that means is, what we were

22 finding, that an average decedent had anywhere

23 between three and five substances in their body.

24              What would they be?  They could be

Page 164

1              And all of the doctors - meaning the

2      birthing physicians in Cabell County and all across

3      West -- across West Virginia, agreed to a common

4      definition.  Once we did that, we then started to

5      capture that definition and those diagnoses in a

6      program called Birth Score out of West Virginia

7      University.

8              We worked very closely with experts in

9      Marshall, at Marshall University, to measure the

10     amount of NAS that was happening.  And I'm using

11     NAS intermittently with NOWS, which is neonatal

12     opioid withdrawal syndrome, and we then

13     characterized the rate of NAS per county, and we

14     found that the average rate of NAS in the state was

15     5 percent.  That's 1 in 20 babies, which is the

16     highest by far of any state in the nation.

17             But we also found that some of the

18     counties had much higher rate, to the tune of 10

19     and over 10 percent.  Again, that's a published

20     report, available in the public domain.  And I -- I

21     don't have a -- you know, a lot of recollection

22     about every aspect of it.

23         Q.  Do you remember who within your

24     organization primarily did the research for that

Page 165

1    report?

2         A.   It would have been the -- under my

3    supervision, the Department of Family and

4    Children's Services.

5         Q.   Statement 21.  Let's turn to that for a

6    moment.  "Children diagnosed with at birth have

7    noticeable difficulties learning and paying

8    attention."  Do you agree with that statement?

9         A.   Once again, diagnosed with NAS is what's

10   missing here, but if we could put "with" blank,

11   because that's just -- it's an error in the

12   statement.

13        Q.   Okay.

14        A.   So -- yeah.

15        Q.   So with that "NAS" added, do you agree with

16   that statement?

17        A.   Yes.

18        Q.   Now, you don't have any training in

19   neonatology or pediatrics, correct?

20        A.   Actually, I have had rotations during my

21   training in pediatrics and neonatology.

22        Q.   When you were a resident; is that correct?

23        A.   When I was in medical school, and I don't

24   remember if it was residency too.  But I've also

1    done emergency room coverage that included -- as

2    well as my primary care practice, that included

3    children.

4         Q.   Okay.  And that includes neonatology as

5    well?

6         A.   I have not taken care of NICU babies, so

7    no.

8         Q.   Have you done any research on the incidence

9    of attention or learning deficits in children

10   diagnosed with NAS?

11        A.   Not personally, I have not.

12        Q.   Do you know what percentage of children

13   diagnosed with NAS exhibit noticeable difficulties

14   learning and paying attention?

15        A.   We are just at the precipice and that data

16   is evolving, so I can't tell you for certain what

17   that percent is.

18                  (Background noise.)

19             MS. MAINIGI:  If someone is off mute,

20   could you please go on mute?  I hear some

21   background or interference.  Is there a --

22             MS. KEARSE:  Someone needs to be put

23   on mute.

24                  (A discussion was had off the record

Page 167

1              after which the proceedings continued

2              as follows:)

3  BY MS. MAINIGI:

4      Q.   Doctor Gupta, do you have any studies or

5  reports that would support the statement in 21 that

6  you --

7      A.   Yes.

8      Q.   -- can give me?

9      A.   Yes.

10     Q.   What are they?

11     A.   There's a number of reports, including --

12 if you go to the CDC website, and that clearly

13 talks about some of the challenges in learning as

14 well as memory development, cognitive development

15 as a consequence of NAS.

16     Q.   Now, can you tell me what percentage of NAS

17 diagnoses result from prescription opioid use

18 versus illicit opioid use?

19     A.   Once again, very similar to people who die

20 and you cannot tell in them because the metabolites

21 are the same.  To the developing baby, it doesn't

22 really matter whether it's prescription or

23 otherwise, so --

24              What I can tell you is:  We did

1  studies in West Virginia at Bureau of Public Health

2  and we found that one out of five babies' cord

3  blood had a substance positive.  That was with --

4  that was inclusive of prescription as well as

5  illicit.

6           We also found that almost 15 percent

7  of intrauterine exposure was positive for

8  substances.  And I believe that was prescriptions.

9           But once again, I don't have access to

10  that data right now, so I cannot be 100 percent

11  certain at this point.

12      Q.  The one-out-of-five statistic, was that

13  something that was published by --

14      A.  Yes.

15      Q.  -- by who?

16      A.  We have published that.  So the first study

17  was published by -- by one of the neonatologists -

18  we funded the study at CAMC - Doctor Stefan

19  Maxwell.

20      Q.  22, "As children with NAS enter the

21  classroom, there will be noticeable, interruptive

22  and impulsive behavioral issues."  Do you agree

23  with that statement?

24      A.  Yes.

Page 169

1      Q.  Are you making that statement as a mental

2   health professional?

3      A.  I'm making that statement as a Commissioner

4   who has interacted with hundreds of teachers,

5   school board members and parents and has learned a

6   lot through interacting with actual West Virginians

7   on the ground.

8           It is my opinion with a reasonable

9   degree of certainty that children, as they're

10  growing up who are diagnosed initially with

11  neonatal abstinence syndrome have a significant

12  difficulty oftentimes with impulse control, with

13  focus in classroom issues and may sometimes get

14  misdiagnosed as ADD.

15     Q.  Do you -- besides your own experience

16  talking to teachers and so forth, do you have any

17  studies that you can cite to?

18     A.  Yes.  So there's a lot of literature.  I'm

19  happy to share with you.  Some of the folks that

20  have worked on this is people like Stephen Patrick

21  at Vanderbilt and others.  That literature is there

22  and is evolving and includes - which is not

23  mentioned here - some of the birth defects as well

24  of children with NAS.

Page 170

1      Q.   Okay.  And let's go back to No. 8.  No. 8

2  reads, "The opioid epidemic has lead to an increase

3  in the number of children entering the foster care

4  system, rapidly increasing child welfare costs to

5  the state."  Do you agree with that statement?

6      A.   Yes.

7      Q.   Now, the foster care system in West

8  Virginia was the responsibility of a different part

9  of DHHR than your office; is that correct?

10      A.   That's correct.

11      Q.   You did not oversee the foster care system,

12  did you?

13      A.   I did not.

14      Q.   Where did -- what's your basis for this

15  statement then?

16      A.   In addition to being the Commissioner of

17  the Bureau for Public Health, as I mentioned

18  before, I'm also -- I was also the State Health

19  Officer.  That being, it was my responsibility in

20  that role to be overseeing the -- you know, number

21  of other aspects of the public health system.

22           So we interacted frequently with and

23  worked closely with -- with the -- that particular

24  department, as well as our parent department, which

Page 171

1    is the Department of Health and Human Resources, as

2    I -- and I reported to my boss, which is the

3    Cabinet Secretary.

4              Now, clearly I was open to looking at

5    the data for the foster care system, and saw and

6    experienced in our budget presentations to the

7    legislature each year that we worked together with

8    the commissioners who create that, and we reported

9    on this.

10             The Cabinet Secretary is on the record

11   stating in his testimony - where I was present -

12   that about 90 percent of the cost of foster system

13   in West Virginia is associated in some form or

14   other with the opioid crisis or the substance use

15   disorder crisis.

16             So that's something that is on the

17   record from my boss, and of course, it's my opinion

18   based on that and some of the budgetary and other

19   factors and working closely with the -- my

20   co-agency, that this statement holds true with a

21   substantial -- and again, a reasonable degree of

22   certainty.

23       Q.   So opioid prescription medications require

24   a prescription; is that correct?

Page 172

1      A.   Not always.   As we discussed, that people

2  do not need to have a prescription in order to have

3  access to prescription opioids when -- especially

4  when the volume in a community is overwhelming.

5      Q.   Well, to legally obtain prescription

6  opioids, you need a prescription, correct?

7      A.   Correct.

8      Q.   Okay.   You can't buy them over the counter,

9  correct?

10      A.   Correct.

11      Q.   And the prescription must be written by a

12  health care provider who is licensed by the State

13  and registered with the DEA, correct?

14      A.   Correct.

15      Q.   And it must be dispensed by a pharmacist

16  who's also licensed by the State and registered

17  with the DEA, correct?

18      A.   Correct.

19      Q.   And no prescription opioid can leave a

20  pharmacy lawfully unless a doctor decides to

21  prescribe the prescription and a pharmacist decides

22  to dispense the prescription, correct?

23      A.   Incorrect.

24      Q.   And why is that?

Page 173

1      A.   Because doctor is not the only prescriber.

2 You could have other prescribers as well.

3      Q.   Fair enough.   So let me ask it again then.

4 So a prescription opioid cannot lawfully leave a

5 pharmacy unless a doctor or other qualified

6 prescriber decides to prescribe the prescription

7 and the pharmacist decides to dispense the

8 prescription.   Correct?

9      A.   Correct.

10      Q.   Your Statement No. 2, let's go to that for

11 a moment, please.   "The amount of appropriate

12 prescriptions was dwarfed by the amount of

13 inappropriate prescriptions that were being

14 diverted."   Is that a statement you agree with?

15      A.   Yes.

16      Q.   What do you mean by the term "inappropriate

17 prescription"?

18      A.   Prescriptions could be - as I mentioned

19 here, or you can see here - is appropriate

20 prescription.   That means there are criteria in

21 which it might make sense to prescribe opioids.   In

22 other situations, it may not make sense to

23 prescribe opioids, and in those situations, you

24 know, we would call that inappropriate prescribing.

Page 174

1          So getting 30 days of Vicodin for a

2   tooth pull would be an example of inappropriate

3   prescribing.  Seeing 100 patients in a day without

4   doing appropriate background, looking at patients,

5   understanding their history, doing a physical exam,

6   is another example of what we consider pill mill or

7   inappropriate prescribing in a large volume.

8          So these are some of the -- you know,

9   dentists, others that -- you know, I said,

10  cataract, an ophthalmologist prescribing 30 days of

11  prescription, is an inappropriate example.

12         So that's my -- but someone who has --

13  is -- has terminal cancer and has exhausted any

14  other options, is on opioids, well controlled, is

15  an example of appropriate prescribing for opioids.

16         So that's my description between

17  "appropriate prescription" and "inappropriate

18  prescriptions."

19     Q.  You're not an expert in pain management,

20  correct?

21     A.  I have served on some panels in terms of

22  the West Virginia SEMP panel and others.  I have

23  provided training and talks to the State-level

24  conferences.  But I have not received any formal

1   training on pain management beyond my residency

2   training and beyond my ex -- sort of expertise of

3   25 years of managing private care physicians,

4   primarily where we were the ones that were --

5   became the target of writing these prescriptions.

6                So that would be my answer.

7        Q.   Your definition of "inappropriate", as I

8   heard it, Doctor Gupta, may include prescriptions

9   that were written legally, correct?

10       A.   Correct.

11       Q.   And it could include, in fact, millions of

12  prescriptions that were written legally, correct?

13       A.   Sure.

14       Q.   And your definition of "inappropriate" may

15  also include prescriptions that were within the

16  standard of care that existed at the time they were

17  written, correct?

18       A.   They may or may not be.

19       Q.   Give me an example of a prescription that

20  you would call "inappropriate" but that was written

21  within the standard of care for the time.

22       A.   So the standard of care did not require --

23  strike that.

24                We had ample evidence to demonstrate,

1   through studies, that opioids do not help control

2   or improve function in chronic pain, yet millions

3   of prescriptions were being written for chronic

4   pain for opioids.  That's an example.

5       Q.  And at some point in time, at least,

6   prescribing opioids for chronic pain was within the

7   standard of care, correct?

8       A.  One can argue that, but the fact of the

9   matter is that opioids as a first line of therapy

10   for chronic pain were never standard of care.

11          So prescribing opioids in high volume,

12   in high doses, high strength, as a first line for

13   chronic pain, without any other alternatives, I

14   don't understand to be the standard of care.

15       Q.  And so what did West Virginia do about that

16   through the Board of Pharmacy, the Board of

17   Medicine or any other institution within the

18   state of West Virginia?

19       A.  Clearly, as I mentioned - I'll go from --

20   you know, from now to backwards - when the 2016 CDC

21   guidelines came out in March of 2016, we assembled

22   a panel at the Department of Health and Human

23   Resources.  We brought together all the experts,

24   including insurers, exec -- you know,

Page 184

1   diseases, it says "OUD rose by thousands of percent

2   over a decade."  And I want to show you just what I

3   was -- what I think where we looked in the

4   transcript, and maybe we can clarify whether it's

5   thousands or, you know, substantial.

6              But you were asked some questions

7   about addiction, and this is on page 324, and you

8   were -- and I don't know if you'll recall this, and

9   this is just a very quick just section of your

10  transcript.

11             But you were talking about that

12  alcohol challenges did not rise by a thousand of

13  percent when you were asked about alcohol and you

14  were trying to -- you were testifying to the extent

15  if it's different with the opioid with that too,

16  and with the opiate prescription drugs and volumes

17  that did rise, it's followed by the thousands.

18             If you'll just read that and maybe we

19  can just clarify whether it's thousands or a

20  substantial rise on that.  We can look at --

21             MS. MAINIGI:  Objection to form.

22        Q.  Okay.  So let me ask you this -- if you'll

23  read -- we cited in the disclosure to the actual

24  page number, and on page 324 and 325, we -- you

1   testified that to now take that out "wouldn't be

2   fair because alcohol -- alcoholism and alcohol

3   challenge did not rise by thousands of percent over

4   a decade.  Opiate prescription drugs and volume"

5   did rise.

6                    So let me say if we took out

7   "thousands," and maybe that's where you're not

8   comfortable.  And I can ask you that question.

9   What in Bullet Point No. 1 are you not comfortable

10  with in regards to your opinion?

11                    MR. HESTER:  Objection to form.

12                    MS. MAINIGI:  Objection to form.

13  Objection, Ms. Kearse, to you testifying and trying

14  to put words in the mouth of this witness.  This

15  witness has already testified that he did not

16  object -- that he did not agree with this

17  statement, Statement No. 1.

18                    MS. KEARSE:  And I can ask him what is

19  it he does not agree with?

20      A.  Yes, so the -- my deposition of September

21  2020 very accurately describes what I meant to say.

22  And I'll say that again for  the record.  What I

23  said was that the opioid prescription drugs and the

24  volume of prescribing has risen by thousands of

1    percent over a decade.  And I stand by that.

2        Q.  Okay, Doctor.  And that -- that would

3    reflect -- is there anything else in No. 1 that you

4    -- that you have issue with, the addiction and

5    others associated with OUD rose as well?

6                MS. MAINIGI:  Objection to form.

7        A.  I'd have to read it again.

8        Q.  Okay.

9        A.  So you know, again, in public health

10   epidemiology, if -- you know, just because a

11   thousand people take a bad batch of drugs doesn't

12   mean everybody dies.  A few people will die, a few

13   will be really, really sick.  I mean, we can use

14   the pandemic right now as an example.  Not

15   everybody who gets the infection from COVID dies or

16   ends up in a hospital.

17               Some people will be fine.  Others will

18   end up in a hospital.  Some will end up on a

19   ventilator, and others will die.  Just like that.

20               When a prescription volume increases

21   by thousands of percent, then obviously there will

22   be a proportional increase in OUD.  That doesn't

23   necessarily have to be thousands of percent.  But

24   people suffering from it would clearly be way more

Page 198

1  STATE OF WEST VIRGINIA,
2  COUNTY OF JACKSON, to wit;

3

4       I, Teresa S. Evans, a Notary Public within
and for the County and State aforesaid, duly
5  commissioned and qualified, do hereby certify that
the foregoing deposition of DR. RAHUL GUPTA was
6  duly taken by me and before me at the time and
place and for the purpose specified in the caption
7  hereof, the said witness having been by me first
duly sworn.

8

         I do further certify that the said
9  deposition was correctly taken by me in shorthand
notes, and that the same were accurately written
10 out in full and reduced to typewriting and that the
witness did request to read his transcript.

11

         I further certify that I am neither
12 attorney or counsel for, nor related to or employed
by, any of the parties to the action in which this
13 deposition is taken, and further that I am not a
relative or employee of any attorney or counsel
14 employed by the parties or financially interested
in the action and that the attached transcript
15 meets the requirements set forth within article
twenty-seven, chapter forty-seven of the West
16 Virginia Code.
17       My commission expires October 15, 2030.
   Given under my har          day of April, 2021.
18
19

   Teresa S. Evans
20 RMR, CRR, RPR, WV-CCR
21
22
23
24

Page 199

1    STATE OF WEST VIRGINIA

2    COUNTY OF KANAWHA, to wit;

3         I, Teresa Evans, owner of Realtime Reporters,

4    LLC, do hereby certify that the attached deposition

5    transcript of DR. RAHUL GUPTA meets the

6    requirements set forth within article twenty-seven,

7    chapter forty-seven of the West Virginia Code to

8    the best of my ability.

9
10        Given under my hand this 19th day of April,

11   2021.

12
13
14
15              Given under my hand
16

17              Registered Professional
             Reporter/Certified Realtime Reporter
18
19
20
21
22
23
24