# EXHIBIT D

EXCERPTS FROM THE DEPOSITION OF
RAHUL GUPTA, M.D.
09/11/2020

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

* * * * * * * * * * * * * * * * * * * * * *

THE CITY OF HUNTINGTON,

      Plaintiff,

vs.                                                CIVIL ACTION
                                                   NO. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

      Defendants.
_____

CABELL COUNTY COMMISSION,

      Plaintiff,

vs.                                                CIVIL ACTION
                                                   NO. 3:17-01665

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,

      Defendants.

* * * * * * * * * * * * * * * * * * * * * *

      Videotaped and videoconference deposition of RAHUL GUPTA, M.D., taken by the Defendants under the Federal Rules of Civil Procedure in the above-entitled action, pursuant to notice, before Teresa S. Evans, a Registered Merit Reporter, all parties located remotely, on the 11th day of September, 2020.

Page 40

1   getting into clinical practice.  I could not tell
2   you exactly, but approximately -- I finished my
3   residency was in 1999, so that would have been
4   around the years based on my license, permitted
5   license, that I would have filled out that process.
6           So I would be aware of the DEA
7   registration process since that time.
8       Q.  I see.  Thank you.  I -- my question was
9   confusing.  We started by talking about the system
10  of distribution for controlled substances.  When
11  did you become generally aware of that system of
12  distribution?
13      A.  So it was -- it was more during my term as
14  the health commissioner and the state health
15  officer because I was engaged in addressing the
16  opioid crisis and the public health consequences
17  that I became more aware and became more in contact
18  with the Board of Medicine, the Board of Pharmacy
19  and the controlled substances monitoring program
20  and that was the time during which I came to know
21  much more about the process than I had previously.
22      Q.  And beyond the requirements for all of the
23  actors in the supply chain to be DEA registrants,
24  what else have you learned about the -- that

Page 41

1   process?
2       A.   I'm sorry, if you can ask me a more
3   specific question?  I'm not sure I can answer it
4   and address my four years of experience in one
5   question.
6       Q.   No, so I'm asking specifically with respect
7   to the system of distribution.  For example, are
8   you aware also that distributors are -- as you
9   said, through your work with the Board of Pharmacy,
10  that they're regulated by the West Virginia Board
11  of Pharmacy in West Virginia?  Is that correct?
12      A.   I'm sorry, can you repeat that, please?
13      Q.   Sure.  You said you learned more about the
14  system of distribution during your term as
15  Commissioner, correct?
16      A.   Yes.
17      Q.   And you said part of that learning came
18  from your work with the Board of Pharmacy.
19  Correct?
20      A.   Correct.
21      Q.   Could you describe in detail --
22           MS. JINDAL:  Strike that.
23      Q.   What did you learn from your work with the
24  Board of Pharmacy with respect to the system of

Page 42

1  distribution for controlled opioids?
2      A.   I do think, Ms. Jindal, you know, that this
3  is an area of process that you're meeting with the
4  Board, you're attending their meetings, providing
5  perspective and you're learning over time.
6           So it's very difficult for me to
7  outline that as one, two, three, four, five things.
8  But broadly speaking, I developed a better
9  understanding and a more improved understanding of
10 the process of distribution from the volume to the
11 prescribing and dispensing.
12          We worked closely both to understand
13 what was going well, what was not going well, what
14 were the components of the controlled substances
15 monitoring program; what were the obligations.
16          Also -- within the Bureau of Public
17 Health.  But also, what can we do more?  I mean,
18 part of my work was not just learning, but also
19 trying to and attempting to - oftentimes struggling
20 to - find solutions to a crisis that we did not
21 create.
22     Q.   You said one of the things that you learned
23 more about was the volume.  What do you mean by
24 that?

Page 43

1  A. What I mean by "the volume" aspect is,
2  clearly by the time I became Commissioner, it was
3  becoming more relevant and more clear that there
4  was a volume issue when it came to the deaths and
5  the suffering on the streets.
6           What that meant was, the overwhelming
7  volume that was reaching the people of West
8  Virginia was plainly involved in the killing of
9  West Virginians almost every 12 hours around the
10 clock, and that became important to us, as well as
11 other sufferings that were occurring.
12      Q. Volume of what?
13      A. The volume of prescription opioid pills.
14      Q. And what was the source of that volume?
15      A. So the source of that volume clearly was
16 coming from -- through the manufacturers and
17 distributors into the state of West Virginia and
18 then through the pharmacies, being dispensed into
19 the hands of innocent public.
20      Q. You said you also looked at what was going
21 well and what was not going well. What did you
22 think was going well?
23      A. Well, by the time I came into the office,
24 clearly we had passed some policies -- please mind

1  MR. COLANTONIO: I'm sorry, object to
2  the form of the question. Are you asking him as a
3  State Health Officer if he somehow can regulate
4  through the Controlled Substances Act the
5  distributors?
6  I'm not sure I understand your
7  question.
8  MS. JINDAL: Sure. Let me rephrase.
9  Q. Doctor, as State Health Officer and as
10 Commissioner for the Bureau of Public Health, you
11 were in a position to propose legislation, correct?
12 A. Yes.
13 Q. And you were also on the Governor's Council
14 -- Advisory Council on Substance Abuse, correct?
15 A. That's correct.
16 Q. And these positions put you in a position
17 to offer suggestions for what could be done to
18 abate the opioid problem in West Virginia, correct?
19 A. Yes.
20 Q. And you also testified that you learned
21 about the system of distribution through your work
22 on these -- on these committees and in your
23 position as Commissioner for the Bureau of Public
24 Health, correct?

Page 49

1   A.   Yes.
2   Q.   At the end of all that, did you propose any
3   solution or regulation or law that was directed at
4   the conduct of wholesale distributors?
5   A.   As a result of all of the aspect of
6   questions that you've asked me, we did put a task
7   force together and did everything possible under
8   the sun under my authority in the state of West
9   Virginia that we could do to address this terrible
10  killer of a crisis that was happening.
11              And I'd be happy to talk to you about
12  that.
13  Q.   Okay.  Doctor, that was not my question.
14  Did you ever propose a course of action with
15  respect to the conduct of wholesale distributors
16  and geared at abating the opioid problem in West
17  Virginia?
18              MR. COLANTONIO:  Objection to the
19  form.
20              Go ahead, Doctor, if you can answer
21  that.
22  A.   I did not have -- as State Health Officer,
23  did not have the authority to propose and control
24  the Controlled Substance Act, a federal law, and as

1  part of the authority of state health commissioners
2  all across the country, we have the ability to do
3  what we can within our states and our communities,
4  and that's exactly what I was attempting to do:
5              MR. RUBY:  I'm going to call a
6  time-out here and just note for the record that the
7  witness' answer is parroting the improper speaking
8  objection in which his counsel coached him to give
9  testimony as to the Controlled Substances Act, and
10 I'm going to ask counsel to refrain from speaking
11 objections to coach the witness as to how you'd
12 like him to answer.
13             MR. COLANTONIO:  Well, that wasn't
14 intended as a speaking objection, Steve.  It was an
15 objection intended to be a proper objection, so
16 we'll move on and I'll object as I see fit, and you
17 can --
18             MR. RUBY:  Well, no, no, the -- we
19 make objections to form.  We don't make an
20 objection and ask if the question is asking the
21 witness whether he had the authority do thus and
22 such under the Controlled Substances Act and then
23 invite him to testify - as he just did - that he
24 didn't have the authority to do thus and such under

Page 51

1  the Controlled Substances Act.
2              That's exactly what happened there,
3  and we're not going to -- we're not going to put up
4  with that as the day goes on.
5              MR. COLANTONIO:  Yeah.  Whatever.
6              MR. FITZSIMMON:  Steve, the witness
7  wants a break also.
8              MR. COLANTONIO:  Oh, okay.  Can we
9  take a break now for a few minutes?
10             MS. JINDAL:  I just have a couple more
11 questions, and then I think we can take a break if
12 that's okay.
13             MR. COLANTONIO:  Go ahead.
14 BY MS. JINDAL:
15     Q.   Doctor Gupta, through your work with the
16 Board of Pharmacy, are you aware that the Board of
17 Pharmacy licenses and regulates distributors in the
18 state of West Virginia?
19     A.   What I'm aware of is that the Board of
20 Pharmacy does have the ability and the authority to
21 provide the licensing and -- for the distributors,
22 yes.
23     Q.   And members of the Board of Pharmacy were
24 on the Governor's Advisory Council for Substance

1  order more than 5,000 prescription opioids for any
2  month in any year"?
3          MR. COLANTONIO:  Object to the form of
4  the question.
5      Q.   Is that -- does that make the question
6  clearer?
7      A.   Yeah.  There is something called the
8  Controlled Substances Act that already requires the
9  distributors and pharmacists to ensure that their
10 suspicious orders that are monitored, raised,
11 investigated, quarantined.
12          Why would we do that when there was
13 already existing federal law to prevent that?
14     Q.   There is also existing federal law about --
15          MS. JINDAL:  Strike that.
16     Q.   Prescribers are also regulated by federal
17 law with respect to their prescribing of controlled
18 substances, correct?
19     A.   Yes.
20     Q.   They also have to be regulated by DEA,
21 correct?
22     A.   Yes.
23     Q.   And yet you still passed law that regulated
24 their conduct within the state of West Virginia,

Page 271

1  correct?
2        MR. COLANTONIO: Object to the form of
3  the question.
4     A.   Yes.
5     Q.   So why does the fact that there is federal
6  law that also regulates the conduct of pharmacies
7  impact your decision whether or not to propose any
8  legislation with -- that would amount -- that would
9  regulate pharmacies under West Virginia law?
10         MR. COLANTONIO: Object to the form of
11  the question.
12     A.   The law that we passed with respect to what
13  you're stating had to do with standards of care.
14  This was -- it was to align ourselves with CDC
15  recommendations, following CDC recommendations and
16  guidelines that came out.
17         We wanted to make sure we were aligned
18  with that, and it's about people of West Virginia.
19  It's about making sure that the people and the
20  residents of West Virginia are getting the highest
21  standard of care, and that's what that related --
22  the law was related to.
23         We expect that -- to do that. That's
24  our responsibility. Now, let's be clear. It is

1  not our responsibility to ensure that there's
2  enforcement of the federal law. That's not our
3  job. That's your job. That's your client's job.
4          And we did everything we could to make
5  sure that the standards of care for health, for
6  medicine, were being held to the highest standards
7  possible, and that includes the CDC guidelines.
8          Now, when it comes to maintaining
9  suspicious orders - and I'll call them suspicious
10 orders - and adhering to rules and laws that
11 already exist, we depend on this relationship for
12 the system to function that we are all doing our
13 own respective jobs. And that clearly wasn't the
14 case here.
15    Q.  If you had limited the number of
16 prescription opioids that a pharmacy could order,
17 then there's a certain percentage of prescriptions
18 that they would not have been able to fill.
19 Correct?
20          MR. COLANTONIO: Object to form.
21    A.  That would be inherently unfair to the
22 citizens of West Virginia, because if you
23 understand a rural state like West Virginia, you
24 would understand that oftentimes -- and you

Page 273

1  yourself mentioned that we have an aging
2  population.  You mentioned yourself that we have a
3  disabled population.  50 percent higher than the
4  rest of the country.
5            And the last thing we want them to be
6  doing is driving 80 miles because the quota for
7  some pharmacy has been filled.  So this is a
8  balancing act, and we -- we really need all actors
9  to be working in good faith, to be doing their part
10 of the work.
11           If we have -- if we had one fix to all
12 solutions, believe me, we would have done it.
13 Everything that we could have done was on the
14 table.
15           But what happens -- or maybe -- what
16 states in policy, we have to make sure that at the
17 end of the day, we're not hurting the people of
18 West Virginia more than what they're already being
19 hurt.
20           So this is the reason why it was
21 important for all of us to do it our own
22 respectives -- to take on our own due diligence and
23 do our jobs.
24           That's my response.

STATE OF WEST VIRGINIA,
COUNTY OF JACKSON, to wit;

I, Teresa S. Evans, a Notary Public within and for the County and State aforesaid, duly commissioned and qualified, do hereby certify that the foregoing deposition of RAHUL GUPTA, M.D. was duly taken by me and before me at the time and place and for the purpose specified in the caption hereof, the said witness having been by me first duly sworn.

I do further certify that the said deposition was correctly taken by me in shorthand notes, and that the same were accurately written out in full and reduced to typewriting and that the witness did request to read his transcript.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties or financially interested in the action and that the attached transcript meets the requirements set forth within article twenty-seven, chapter forty-seven of the West Virginia Code.

My commission expires October 25, 2020.
Given under my hand this 15th day of September,

*[signature]*

Teresa S. Evans
RMR, CRR, RPR, WV-CCR

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to wit;

    I, Teresa Evans, owner of Realtime Reporters, LLC, do hereby certify that the attached deposition transcript of RAHUL GUPTA, M.D. meets the requirements set forth within article twenty-seven, chapter forty-seven of the West Virginia Code to the best of my ability.

    Given under my hand this 15th day of September, 2020.

*[signature: Teresa Evans]*

Registered Professional Reporter/Certified Realtime Reporter