```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
```

**THE CITY OF HUNTINGTON,**

    **Plaintiff,**

**v.**                                   **CIVIL ACTION NO. 3:17-01362**

**AMERISOURCEBERGEN DRUG**
**CORPORATION, et al.,**

    **Defendants.**

_____

**CABELL COUNTY COMMISSION,**

    **Plaintiff,**

**v.**                                   **CIVIL ACTION NO. 3:17-01665**

**AMERISOURCEBERGEN DRUG**
**CORPORATION, et al.,**

    **Defendants.**

_____

## MEMORANDUM OPINION AND ORDER

    Pending before the court is defendants' motion in limine. See ECF No. 1067. That motion is fully briefed and the geographic scope aspect of the motion was argued before the court on April 14, 2021. For the reasons discussed below, defendants' motion is **DENIED**.

I.

    These two cases are related to thousands of other lawsuits that have been filed throughout the country in recent years relating to the opioid crisis. "These cases concern the alleged

improper marketing of and inappropriate distribution of various prescription opiate medications into cities, states, and towns across the country." In re Nat'l Prescription Opiate Litig., 290 F. Supp.3d 1375, 1377 (J.P.M.L. 2017). The Opioid MDL (MDL 2804) was created by the Judicial Panel on Multidistrict Litigation (JPML) in December of 2017 after the JPML determined that a large number of cases should be centralized for pretrial proceedings in the Northern District of Ohio to coordinate the resolution of these actions. See id. at 1378. Given his previous experience with multidistrict litigation, MDL 2804 was assigned to United States District Judge Dan A. Polster. See id. at 1379. Since MDL 2804's formation, well over 2,000 cases have been transferred to the MDL court. See In re Nat'l Prescription Opiate Litig., No. 1:17-MD-2804, 2019 WL 4686815, at *1 (N.D. Ohio Sept. 26, 2019).

"Shortly before the start of the first bellwether trial in the MDL," Judge Polster "delivered oral rulings on a number of pretrial motions in limine ("MIL") and other evidentiary motions." ECF No. 1149-1. According to Judge Polster:

> These rulings will apply to all future cases in this MDL that are tried by this Court. Additionally, as a general matter, these rulings apply to remanded cases tried by transferor courts. See David F. Herr, Multidistrict Litigation Manual § 10:5 (May 2019 update) ("The transferor court (court to which the actions are remanded) receives the cases in the condition they are in at the time of remand. Decisions that have been made in the case continue to apply unless circumstances change warranting their

>modification. The decisions made by the transferee court are considered 'law of the case.'") (footnotes omitted). See also Manual for Complex Litigation, Fourth § 20.132 at 224-25 (2004) (before remand of cases to transferor courts, the transferee court should enter "a pretrial order that fully chronicles the proceedings, summarizes the rulings that will affect further proceedings, outlines the issues remaining for discovery and trial, and indicates the nature and expected duration of further pretrial proceedings."); In re Welding Fume Prods. Liab. Litig., MDL 1535, 2010 WL 7699456 (N.D. Ohio June 4, 2010) (entering this type of order).
>
>   In the future, the parties should generally not file in any MDL case a motion (including a motion for reconsideration) addressing an evidentiary issue already addressed below. Going forward, a party may file a motion in an MDL case to modify the contours of rulings documented in this Order only if that party can show that the particular circumstances of an individual case warrant a revision.

Id. at 1-2.

In January of 2020, these two cases, designated in the MDL as "Track Two" cases, were remanded to this court for further proceedings. The remanded cases were significantly narrowed, in both the number of claims and defendants. Only plaintiffs' public nuisance claim against the "The Big Three" distributor defendants — AmerisourceBergen Drug Corporation, McKesson Corporation, and Cardinal Health, Inc. — is before this court. According to Judge Polster's "vision," these cases were to be remanded only "after some period of discovery" and "after they are streamlined and otherwise made more trial-ready." ECF No. 2950 in Case No. 1:17-MD-2804.

II.

The instant motion seeks to revisit Judge Polster's rulings with respect to four categories of evidence:

No. 1: To Preclude Plaintiffs from Presenting Individualized Evidence of Opioid Misuse and Diversion

No. 2: To Preclude Lay Testimony About Prescription Opioids Being a "Gateway" to Illicit Drug Use

No. 3: To Bar Plaintiffs from Introducing Evidence of Defendants' Prescription Opioid Shipments to Places Outside Cabell County and the City of Huntington

No. 4: To Preclude Plaintiffs From Offering Evidence of, or Arguments about, Defendants' Settlements with the DEA or the Track One MDL Plaintiffs

*A. Individualized Evidence of Opioid Misuse and Diversion*

Defendants argue that plaintiffs should be prohibited from introducing individual evidence of opioid misuse and diversion for three reasons: 1) plaintiffs' alleged vow not to rely on such evidence at trial; 2) plaintiffs' failure to link such evidence to defendants; and 3) the evidence is inadmissible hearsay.

According to Judge Polster:

> The parties have a long history of dispute, during discovery, concerning Plaintiffs' willingness and duty to respond to discovery requests for information regarding specific prescriptions, shipments, patients, pharmacies, and so on. Ultimately, the Court ordered Plaintiffs to either produce certain individualized information or forever forswear relying on individualized proof at trial. Faced with this option, Plaintiffs agreed to provide individualized information regarding, inter alia: (a) 300 persons who became addicted to or were harmed as a result of any opioid prescription; (b) 500 prescriptions that were

4

unauthorized, medically unnecessary, ineffective, or harmful; and (c) 500 prescriptions that caused or led to Plaintiffs' alleged harm. Defendants raised various objections over the adequacy of Plaintiffs' responses, and Special Master David R. Cohen ultimately ruled that Plaintiffs had satisfied their burden to respond with sufficient examples of individualized evidence.

In each of the motions discussed below, the movant seeks to preclude various types of individualized evidence. On balance, the Court finds this information would be helpful to the jury's understanding of the evidence at trial. However, Plaintiffs may only introduce evidence that they produced in discovery. Accordingly, Plaintiffs may present individualized evidence to the extent they produced the information in discovery and it is otherwise admissible.

\* \* \*

Defendants seek to exclude evidence of individualized prescriptions and shipments on the ground that Plaintiffs elected to proceed on a theory of aggregate proof. Defendants assert that, although Plaintiffs produced in discovery "cherry-picked" examples of individualized transactions, Defendants were not allowed to obtain broader discovery that would have uncovered counter-examples – that is, examples that would show "that allegedly 'suspicious' orders went to fill legitimate prescriptions and were not diverted, or that allegedly improper prescriptions went to alleviate genuine suffering without negative long-term effects on the patients who received them. Defendants assert the Court directed Plaintiffs to produce in discovery examples of individualized prescriptions and shipments only to help Defendants <u>understand</u> the aggregate proof, and not as a permissible way to <u>bolster</u> the aggregate proof. But the Court ruled on this issue at the time of discovery. The Court stated that it would allow at trial evidence of individual shipments and prescriptions to the extent the parties produced it in discovery and it is otherwise admissible. Thus, this motion is denied.

\* \* \*

Defendants seek to preclude witnesses from testifying about anecdotal personal stories relating to

5

> opioid use and related harms to themselves and others. Whether this evidence is admissible depends on the individual circumstances surrounding each witness's testimony, including whether Plaintiffs produced the evidence in discovery and whether Plaintiffs can establish a foundation for the testimony and show it is relevant and not otherwise inadmissible. Accordingly, the Court declines to make a blanket ruling and instead will address Defendants' objections when a party seeks to introduce specific testimony at trial. As to the issue of relevance, the Court notes that anecdotal stories may be relevant to supplement expert testimony or statistical evidence. See, e.g., Middleton v. City of Flint, Mich., 92 F.3d 396, 405 (6th Cir. 1996) ("Anecdotal evidence is most useful as a supplement to strong statistical evidence.") (citation omitted). That said, the Court will not allow any party to make improper appeals to a fact-finder's passions and emotions, and will also hold Plaintiffs to the promises made in the "Singer memo."

ECF No. 1149-1 at 40-44 (footnotes omitted).

The court sees no reason to deviate from Judge Polster's ruling at this juncture. If, as defendants argue, plaintiffs are unable to link the evidence to defendants in any meaningful way, the court will find it irrelevant and, therefore, inadmissible. Any hearsay objections can be lodged at trial where the court may deal with them in context. Finally, if plaintiffs offer evidence that defendants believe is inconsistent with their discovery responses, defendants can and should point it out at trial. Therefore, individualized evidence will be allowed if it was produced in discovery and is otherwise admissible. The ruling is subject to the caveat that the court will cut off such evidence if it becomes needlessly cumulative.

6

*B. Gateway Evidence*

"[T]he Gateway Effect refers to evidence that some individuals exposed to prescription opioids tend to become addicted, and once addicted tend to later feed their addition with illicit opioids, such as heroin." In re Nat'l Prescription Opiate Litig., No. 1:17-MD-2804, 2019 WL 4043943, at *2 (N.D. Ohio Aug. 26, 2019). Defendants seek to preclude plaintiffs from introducing lay testimony about prescription opioids being a gateway to illicit drug use. In the MDL, Judge Polster found that lay testimony on the Gateway Theory or Effect would only be admissible if "the proposed testimony is 'factual' and otherwise admissible, i.e. it has foundation, is relevant, and is not inadmissible hearsay." ECF No. 1149-1 at 30 n.59.

Federal Rule of Evidence 701 governs lay opinion evidence and authorizes a witness "not testifying as an expert" to present opinion evidence that is: (1)"rationally based on the witness's perception"; (2)"helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and (3)"not based on scientific, technical, or other specialized knowledge within the scope of [Federal Rule of Evidence] 702." Fed. R. Evid. 701.

The court will not issue a blanket ruling excluding all lay testimony regarding the Gateway Effect. Rather, the better course of action is to evaluate such testimony at trial, where the court will have additional context to evaluate whether the

7

proposed testimony satisfies Rule 701 and, as Judge Polster noted, is otherwise admissible.

*C.   Locations Outside Cabell County and City of Huntington*

Defendants ask the court to bar plaintiffs from introducing evidence of defendants' prescription opioid shipments to places outside Cabell County and the City of Huntington. According to defendants, such evidence is (1) irrelevant; (2) impermissible "prior bad acts" evidence; (3) unfairly prejudicial; and (4) a waste of judicial resources.

Of this type of evidence, Judge Polster concluded:

> Defendants seek to exclude evidence regarding opioid distributions and other acts that occurred in, or had an impact on, locations outside the Track One Counties. But evidence of what occurred outside the Track One Counties is generally relevant to Defendants' conduct within the Track One Counties, and the damages allegedly caused therein. For example, the shipment of suspicious orders to locations outside the Track One Counties tends to show (and is thus relevant to) whether Defendants shipped suspicious orders to the Track One Counties. This is particularly true because there is evidence that Defendants acted pursuant to practices and policies that were national in scope. Accordingly, the Court denies these motions.

\* \* \*

> Defendants assert evidence of opioid shipments to places outside the Track One Counties is irrelevant and unduly prejudicial, because Plaintiffs cannot show these opioids "migrated" to the Track One Counties. Plaintiffs disagree, pointing to Rafalski's expert testimony that Defendants had a "nationwide" and "systemic" failure to report suspicious orders and maintain effective controls against diversion, and knew that opioids distributed in Florida were migrating to Ohio. Defendants provide no valid grounds to exclude evidence of these shipments.

ECF No. 1149-1 at 8-9 (footnotes omitted).

On November 3, 2020, Judge Polster clarified his ruling in this way:

> Pharmacy Defendants assert "[t]he Court should bar [evidence, testimony, or argument concerning alleged conduct that occurred outside of Cuyahoga or Summit Counties] unless Plaintiffs first establish — outside of the presence of the jury — a foundation showing a specific nexus connecting that extraterritorial conduct to harm suffered by one of the Counties and a specific Defendant's distribution conduct." . . .
>
> As stated above regarding settlements, the Court has addressed the relevance of various evidence from outside the Plaintiff Counties and specifically ruled that "evidence of national trends and national shipments is relevant to demonstrate the national scope of the opioid crisis." . . . Notwithstanding this prior ruling, Pharmacy Defendants assert that Track One-B is different because (1) [Plaintiffs' SOMS expert,] Rafalski[,] does not offer any opinions about most Track 1-B defendants," . . . and (2) "Track 1-B Pharmacy Defendants distributed only to themselves, and not to third-party 'pill mills' or pain clinics." . . .
>
> The Court is not persuaded that there is any reason to revisit its prior rulings on the issues of extraterritoriality but it offers these clarifying comments. The context of the Court's prior rulings were made with broad-scope aggregate evidence in mind. What this means is, where evidence tends to show nation-wide trends and shipments, national policies and procedures, or systemic failures that are national in scope and become clear in the aggregate, the Court will <u>generally</u> permit such evidence—so long as it is otherwise admissible under the Federal Rules. Additionally, the Court will also <u>generally</u> allow specific extraterritorial evidence that has some demonstrable nexus to the Plaintiff Counties. For example, evidence that a distribution center located outside the Plaintiff Counties distributes prescription opioids into them is admissible; and evidence that CSA violations by distribution centers in other parts of the country for failure to follow a national policy or protocol also applicable to distribution centers that

9

> shipped to the Plaintiff Counties may also be admissible. On the other hand, evidence that is specific in nature and does not have a nexus to the Plaintiff Counties, without more, will <u>generally</u> not be permitted.

In re Nat'l Prescription Opiate Litig., No. 1:17-MD-2804, 2020 WL 6450290, at *18 (N.D. Ohio Nov. 3, 2020) (emphasis in original).

Defendants offer no persuasive reason to disturb Judge Polster's rulings on the issue of geographic scope. The court agrees with Judge Polster that evidence of conduct occurring outside Cabell County and the City of Huntington "is generally relevant to Defendants' conduct within the Track [Two] Counties" given plaintiffs' allegations that systemic failures on the part of defendants caused the public nuisance in those locations. However, as Judge Polster cautioned, any extraterritorial evidence offered by plaintiffs must have a demonstrable nexus to Cabell County or the City of Huntington and/or tend to show nation-wide trends and shipments, national policies and procedures, or systemic failures that are national in scope. With respect to the perceived deficiencies in the opinion of plaintiffs' expert James Rafalski that bear on this issue, defendants are reminded that they will have broad latitude on cross-examination to point out those deficiencies.

D.  *Settlements*

Defendants ask the court to preclude plaintiffs from offering evidence or making arguments related to Defendants'

settlements (1) in opioid-related litigation outside West Virginia and (2) in administrative settlements with the federal Drug Enforcement Administration ("DEA") or other government agencies. According to defendants, these settlements are inadmissible under Federal Rules of Evidence 408 and 403, and irrelevant under Federal Rules of Evidence 401 and 402.

Of this type of evidence, Judge Polster wrote:

> In this subgroup of motions, the movants seek to exclude evidence of enforcement actions by, and related settlements with, the DEA or other governmental entities. Under Rule 408, evidence of "conduct or a statement made during compromise negotiations" is not admissible "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(a). However, the Court may admit this evidence for "another purpose," such as to show a particular Defendant's knowledge or notice of potential harm. Fed. R. Evid. 408(b) and Committee Notes on 2006 amendment.
>
> Here Plaintiffs assert that evidence of prior enforcement actions and settlements establish a pattern of conduct that demonstrates: (1) Defendants knew their SOM [suspicious order monitorning] systems were inadequate and likely to cause harm; and (2) Defendants' conduct was intentional and persisted over a lengthy period of time. The Court agrees this evidence is relevant and permissible and therefore denies these motions.

* * *

> The Distributors seek to exclude evidence of settlements they entered into with the DEA and the State of West Virginia. Between 2007 and 2017, AmerisourceBergen, Cardinal Health, and McKesson each entered into one or more settlements with the DEA. These agreements resolved accusations by the DEA that the Distributors failed to maintain effective controls against diversion in multiple facilities across the

> United States. Under the settlements, the Distributors agreed to take specific measures to maintain compliance programs to prevent diversion, i.e., to detect and report suspicious orders and conduct due diligence or not ship them. Moreover, at least two Distributors (Cardinal and McKesson) subsequently faced additional charges of failure to maintain effective controls, and executed new settlements where they agreed to improve their SOMS and admitted certain wrongdoing. For the reasons discussed above, evidence of these agreements is relevant and admissible to show, inter alia, the Distributors' knowledge of their duties under the CSA and whether their conduct was in violation of those duties.

ECF No. 1149-1 at 12-14 (footnotes omitted). The court agrees with Judge Polster that evidence regarding prior settlements is not barred by either Federal Rule of Evidence 408 or 403. Nor can the court find that such evidence is necessarily irrelevant to plaintiffs' public nuisance claim.

### III.

For the reasons discussed above, defendants' motions in limine are **DENIED**.

The Clerk is directed to send copies of this Memorandum Opinion and Order to those counsel of record who have registered to receive an electronic NEF.

**IT IS SO ORDERED** this 29th day of April, 2021.

ENTER:

David A. Faber
Senior United States District Judge