**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| THE CITY OF HUNTINGTON, | |
|      Plaintiff, | |
| v. | Civil Action No. 3:17-01362 |
| AMERISOURCEBERGEN DRUG CORPORATION, *et al.* | |
|      Defendants. | |
| | |
| CABELL COUNTY COMMISSION, | |
|      Plaintiff, | |
| v. | Civil Action No. 3:17-01665 |
| AMERISOURCEBERGEN DRUG CORPORATION, *et al.* | |
|      Defendants. | |

**DEFENDANTS' MOTION TO EXCLUDE THE**
**HOUSE ENERGY & COMMERCE COMMITTEE**
**MAJORITY STAFF REPORT**

## <u>TABLE OF CONTENTS</u>

Page

I.  INTRODUCTION ................................................................................................. 1

II. BACKGROUND .................................................................................................. 2

    A.  The Energy & Commerce Investigation and Report................................. 2

    B.  The Plaintiffs' Successful Attempts to Influence the Energy & Commerce Committee's Process........................................................................... 4

    C.  Defendants' Unsuccessful Attempts To Obtain DEA Documents Relied on in the Energy & Commerce Report ......................................................... 6

    D.  Plaintiffs' Planned Reliance on the Energy & Commerce Report at Trial ............ 8

III. ARGUMENT ...................................................................................................... 8

    A.  The Report Is Inadmissible Hearsay and Does Not Fall Within the Public Record Exception of Federal Rule of Evidence 803(8) ......................................... 8

        1.  The Report is not a public record because it was drafted by Committee staff................................................................................ 11

        2.  The Report is not sufficiently trustworthy to be admissible under Rule 803(8) ................................................................................ 11

    B.  The Court Also Should Exercise Its Discretion to Exclude the Report Under Federal Rule of Evidence 403................................................................... 16

        1.  The evidence in the Report would be needlessly cumulative .................. 17

        2.  Introduction of the Report would unfairly prejudice Defendants............ 17

        3.  The Report contains unnecessary and unhelpful legal and factual recitations ............................................................................... 18

IV. CONCLUSION.................................................................................................. 20

i

## I.   INTRODUCTION[1]

Defendants move *in limine* to exclude a written report issued by the U.S. House of Representatives Energy & Commerce Committee majority staff, titled *Red Flags and Warning Signs Ignored:  Opioid Distribution and Enforcement Concerns in West Virginia*.  The Report is inadmissible and would not be helpful to the Court for several independent reasons.

*First*, the Report is hearsay.  It is hornbook law that hearsay is not admissible because out-of-court declarations cannot be tested for accuracy and truthfulness by cross-examination. The Energy & Commerce Report was issued by the majority staff and not the Committee itself, and so it does not fall under Rule 803(8)'s exception for public records.  The public records exception also expressly requires circumstantial guarantees of trustworthiness, and for good reason.  As courts have noted, congressional reports such as this one are inherently political, and often partisan, and therefore less trustworthy.  In addition, the evidence shows that Plaintiffs' counsel attempted to—and did—influence the Committee's process for litigation purposes.  The Report, accordingly, should be excluded in its entirety.

*Second*, the Report should be excluded because it implicates many of the concerns raised in Rule 403.  Allowing Plaintiffs to introduce the Report into evidence would be unfairly prejudicial to Defendants.  For example, the Report relies on unknown and unavailable documents and ex parte communications, which cannot be tested through cross-examination or other means.  Most notably, the Report cites and relies on DEA documents that Defendants have repeatedly, but unsuccessfully, sought to obtain from DEA and that this Court ruled DEA need not produce.  Allowing an

---

[1] In advance of the MDL Track 1 trial, McKesson moved *in limine* to exclude materials related to the Energy & Commerce Report, and Judge Polster denied that motion.  *See In re Nat'l Prescription Opiate Litig.*, MDL No. 2804, Dkt. 2663 (Motion *In Limine* No. 2) & Dkt. 3052 (Order) at 20-21.  McKesson's motion, however, was one of many short-form motions filed in that case.  "On this record," the court wrote, McKesson had not shown that the Report lacked trustworthiness.  Here, a more complete record is presented on why the Report is inadmissible.

incomplete, one-sided recitation of what those documents purportedly say, drafted by anonymous congressional political-majority staff without any safeguard of access or cross-examination, would be manifestly unfair.  The Report also includes lengthy legal and factual recitations, which this Court already has explained that it does not need.  But that is exactly what the Report would introduce—and without the safeguards of expert discovery or cross-examination at trial.

The Report undoubtedly does discuss certain facts or documents that Plaintiffs may believe are relevant to this case.  But those facts or documents must be admissible—and they must be introduced as evidence in the normal course, and not through inflammatory hearsay that is the product of partisan politics.  Admission of the Report would be contrary to the law, unfairly prejudicial, unhelpful, and unnecessary.  This Court, therefore, should exclude the Report.

## II.  BACKGROUND

### A.    The Energy & Commerce Investigation and Report

The Energy & Commerce Report, titled *Red Flags and Warning Signs Ignored:  Opioid Distribution and Enforcement Concerns in West Virginia,* was issued on December 19, 2018 ("the "Energy & Commerce Report" or "the Report").[2]  As the cover page of the Report makes clear, the Report was prepared and issued by the "Energy & Commerce Committee, Majority Staff"— not the Committee itself.  The Report is 324 pages.

The Report provides a history of the events leading up to its publication.  Report at 36-44. The Committee launched its "bipartisan investigation into the distribution of prescription opioids by wholesale distributors" in May 2017.  *Id.* at 36.  The investigation originally was focused on ABDC, Cardinal Health, and McKesson.  *Id.* at 36.  The scope later expanded to cover two other distributors, Miami-Luken and H.D. Smith.  *Id.* at 36-37.  Although the Committee's investigation

---

[2]  The Report is available at https://republicans-energycommerce.house.gov/wp-content/uploads/ 2018/12/Opioid-Distribution-Report-FinalREV.pdf.

began in a "bipartisan" fashion, the conclusions issued in the Report were not, as demonstrated by the fact that it was issued only by the majority staff.

The Committee requested information and documents from each of the five distributors. *Id.* at 36-40.  The requests to ABDC, Cardinal Health, and McKesson included policies and procedures, customer due diligence materials, information on distribution volumes and suspicious order reporting, and other information.  *Id.*  In response, the distributors provided the Committee with thousands of pages of documents.  *Id.* at 40.  The Committee also reviewed ARCOS data.  *Id.* at 37.  The Subcommittee on Oversight and Investigations held a hearing on May 8, 2018, in which it received testimony from executives representing each of the five distributors.  *Id.* at 40.

The Committee also contacted DEA and requested information regarding opioid distribution in West Virginia and DEA's enforcement practices.  *Id.* at 41.  After delays and disputes between DEA and the Committee regarding redactions DEA applied to the documents, "[t]he Committee ultimately reached an accommodation with the DEA that provided the Committee with the information needed to complete its investigation."  *Id.* at 42-43.  DEA representatives testified at two hearings related to the inquiry, before the full Committee on October 25, 2017 and before the Subcommittee on Oversight and Investigations on March 20, 2018.  *Id.* at 43.  The Report also includes references to ex parte briefings by DEA to the Committee Staff on February 27, 2018 and June 25, 2018.  *See, e.g.*, *id.* at 46 n.140, 53 n.177.

The Report was forthright about its limitations.  The portions of the Report related to distributors are based in large part on "case studies."  *Id.* at 5.  And the Report notes that "[t]he findings from these individual case studies are not necessarily generalizable of the conduct of the distributors more broadly."  *Id.*  The Report also had a narrow scope:

> This investigation is a start to establish some accountability and understanding about the epidemic, but this inquiry is only a look at a piece of the overall puzzle.

3

> There are other actors involved in the epidemic including manufacturers,
> pharmacies, physicians, and drug traffickers.

*Id.* at 4-5. The Report, however, did not purport to assess the role or conduct of these other actors.

Nor did the Committee hold any hearings on these other actors' conduct. In concluding, the Report

emphasized that its findings were incomplete and its investigation unfinished:

> ***Blame for the opioid epidemic is widespread and goes far beyond the bounds of
> this investigation.*** Pharmaceutical manufacturers, pharmacists, physicians, drug
> traffickers, and others have contributed to this problem as well. This investigation
> has revealed that neither the DEA nor the distributors rose to the occasion to help
> mitigate the opioid epidemic. ***The Committee will continue its bipartisan work
> to examine the causes and effects of the opioid epidemic.***

*Id.* at 322 (emphases added).

### B.    The Plaintiffs' Successful Attempts to Influence the Energy & Commerce Committee's Process

Plaintiffs' counsel's fingerprints—and specifically those of counsel of record in this case—

are on the Committee's investigation. Indeed, the record establishes that Plaintiffs' counsel

successfully exerted influence over the Committee's proceedings, with the specific intent of

benefitting the plaintiffs in the opioid litigation.

On May 2, 2018, two of Plaintiffs' counsel of record, Mike Papantonio and Archie Lamb,

held a briefing session for congressional staff in advance of the May 8, 2018 hearing featuring

distributor executives.[3] At that session, Plaintiffs' counsel distributed handouts that purported to

include "the facts" about distributors and their alleged "breach of legal dut[ies]."[4] In addition to

---

[3] *See Sphere Holding Opioid Distributors Accountable*, Sphere (May 9, 2018), *available at* http://www.sphereconsulting.com/sphere-holding-opioid-distributors-accountable/ (discussing Plaintiffs' counsel's briefing) (attached as **Exhibit 1**); 'People are dying every day': Drug distributors to face lawmakers, Theodoric Meyer, POLITICO (May 8, 2018), *available at* https://www.politico.com/story/2018/05/08/opioid-epidemic-drugs-congress-hearings-573224 ("Papantonio and one of his colleagues held a briefing in the Capitol last week that drew aides for more than a dozen committee members, according to Sphere Consulting, the firm that organized it.") (attached as **Exhibit 2**).
[4] Papantonio & Lamb Briefing Materials (attached as **Exhibit 3**).

inappropriate and inflammatory PowerPoint slides,[5] Plaintiffs' counsel also provided several pages of questions they suggested members of Congress ask the distributors' executives during the hearing.[6]   The questions focus on legal concepts related to Plaintiffs' liability theories against distributors, including duty, foreseeability, causation, the purposes and requirements of the Controlled Substances Act, and whether "the prescription opiate epidemic is a ***public nuisance***." *Id.* (emphasis in original).   Plaintiffs' counsel has described the briefing as a "roadmap to use during next week's hearing on ***how distributors should be liable to the cities and counties*** who have been financially impacted."[7]   Plaintiffs' counsel also identified the clients they represented at the time of their congressional briefing, which ***included Cabell County***.[8]

A public relations company hired by Plaintiffs' counsel to facilitate the briefing session, Sphere Consulting, publicly touted the session and the impact it had on the Hearing:

> Today was an important day for Sphere, as the U.S. House Energy and Commerce Committee held a hearing to address the largest national opioid pandemic since Big Tobacco. ***Sphere is proud to represent the largest group of lawyers holding pharmaceutical distributors accountable by suing them for their role in this epidemic.***
>
> During Tuesday's hearing, the executives of the five major distribution companies faced the House Energy Committee as they investigate their role in this crisis. In its efforts, ***Sphere has successfully organized a briefing for Mike Papantonio*** and one of his colleagues, two of the lawyers suing the distribution companies, on the Hill that drew aides for more than a dozen committee members. ***The lawyers distributed a six-page list of suggested questions for lawmakers to ask***; ***most of the content was used by lawmakers' questioning during Tuesday's hearing.***

Ex. 1 (emphases added).

---

[5] For example, one slide included numerous headshots of distributor executives surrounding a chart purporting to compare the number of opioid deaths to the number of deaths during the Vietnam War.

[6] Papantonio & Lamb Briefing Materials:  Questions for the Wholesale Distributors (attached as **Exhibit 4**).

[7] Retweet by Archie Lamb (@ArchieLamb3) of Tweet by @RingOfFireMedia, the twitter account for the talk-radio program co-hosted by Mike Papantiono (emphasis added) (tagging Mr. Papantonio's twitter account, @americaslawyer, and including photo of the briefing session), *available at* https://twitter.com/ArchieLamb3 (attached as **Exhibit 5**).

[8] *See* Ex. 3 at 6-9.

The record confirms that lawmakers used Plaintiffs' proposed questions.  For example, one Congressman's "Additional Questions for the Record"[9] included the following seven questions that are identical or nearly identical to the Plaintiffs' proposed questions, which are laden with legal terms of art designed to elicit out-of-court "admissions" that Plaintiffs wanted for these cases:

| "Additional Questions for the Record" Submitted by Member of Congress | Plaintiffs' Counsels' Proposed "Questions for the Wholesale Distributors" |
|---|---|
| Do you agree that the foreseeable harm of a breach of this duty is the diversion of prescription opiates for nonmedical purposes? | The foreseeable harm resulting from a breach of these duties is the diversion of prescription opiates for nonmedical purposes? |
| In other words, if you ship a suspicious order, it is likely that prescription opiates will be diverted into the illicit market. Agree? | In other words, if you ship a suspicious order, it is likely that prescription opiates will be diverted into the illicit market. Agree? |
| Do you concur that filling suspicious orders is a direct and proximate cause of prescription opiate abuse, addiction, morbidity and mortality? | Do you concur that filling suspicious orders is a direct and proximate cause of prescription opiate abuse, addiction, morbidity and mortality? |
| Do you agree the United States is in the midst of a prescription opiate epidemic? | Do you agree the United States is in the midst of a prescription opiate epidemic? |
| Do you concur that filling suspicious orders is a direct and proximate cause of the prescription opiate epidemic plaguing our country? | Do you agree that filling suspicious orders of prescriptions opiates is a direct and proximate cause of the heroin epidemic plaguing our country? |
| Do you believe the prescription opiate epidemic is an immediate hazard to public health and safety? | Do you believe the prescription opiate epidemic is an immediate hazard to public health and safety. |
| Do you believe the prescription opiate epidemic is a public nuisance? | Do you believe the prescription opiate epidemic is a public nuisance. |

*Compare* Ex. 6, *with* Ex. 4.[10]

### C.   Defendants' Unsuccessful Attempts To Obtain DEA Documents Relied on in the Energy & Commerce Report

The Report extensively cites and relies on documents DEA provided to the Committee—but that DEA has refused to produce in this litigation.  Defendants specifically requested these

---

[9] AmerisourceBergen Drug Corporation responses to Additional Questions for the Record Submitted by The Honorable David B. McKinley, ABDC-WVFED00132077 to 80 (attached as **Exhibit 6**).

[10] These questions were submitted to the distributors after the Hearing, and each responded in writing. These written responses are part of the record for the Energy & Commerce Report.

materials from DEA in a request dated February 21, 2020.  Among the materials requested, Defendants sought:  "Documents submitted by DEA to the House Energy and Commerce Committee as part of its investigation that resulted in the report *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia*."[11]  DEA objected to this and other requests on numerous grounds and refused to produce the documents.[12]

In light of DEA's refusal, Defendants filed a motion to compel in this case on April 14, 2020.  Dkt. 321.  Special Master Wilkes granted Defendants' motion as to their request for the Energy & Commerce documents on May 27, 2020.  Dkt. 474 at 4.  In so ruling, the Special Master concluded that the documents were not privileged and not unduly burdensome for DEA to produce.  *Id.*  DEA objected to the ruling on June 3, 2020.  Dkt. 502.  Following briefing, the Court concluded that DEA's refusal to comply with the subpoenas issued to it was reasonable, sustained DEA's objections to the Special Master's ruling, and denied Defendants' motion to compel.  Dkt. 832.

DEA has taken a different position more recently in other opioid litigation.  In response to a request from the Washington Attorney General (who, like the City of Huntington, is represented by Motley Rice), DEA agreed to search for and produce documents in response to a specific, targeted request.[13]  In light of this change in position, Defendants contacted DEA to revisit the matter of the Energy & Commerce documents, and significantly narrowed the scope of their renewed request to a single document:  the report titled *Pharmaceutical Trafficking and Abuse Situation in West Virginia*, which is cited in the Energy & Commerce Report.  *Id.*; Report at 49-50.  DEA refused to produce this single document, despite its willingness to respond to other similar requests by opioid ***plaintiffs*** elsewhere.  Ex. 9 at 4.  DEA's position largely appears to be

---

[11] Feb. 21, 2020 Touhy Letter from Defs. to Dept. of Justice at 2 (attached as **Exhibit 7**).

[12] Apr. 24, 2020 Response Letter from Dept. of Justice to Defs. (attached as **Exhibit 8**).

[13] Mar. 12, 2021 to Apr. 1, 2021 Email between Defs. and Dept. of Justice at 7 (attached as **Exhibit 9**).

based on the timing of Defendants' request.  *Id.* at 2-3.  But Defendants' request was not untimely;

they requested this exact document (among others) as far back as February 2020.  *See* Ex. 7.

### D.      Plaintiffs' Planned Reliance on the Energy & Commerce Report at Trial

Plaintiffs have indicated their intent to offer the Report as evidence at trial.  It is included

on their Exhibit List,[14] and in advance of the prior trial date in this case, Plaintiffs' counsel advised:

> Please be advised we will be filing a motion on Monday for the Court to take
> judicial notice and admit *in limine* for the record the documents linked below
> arising from and related to the REPORT prepared by the Energy and Commerce
> Committee titled *Red Flags and Warning Signs Ignored: Opioid Distribution and
> Enforcement Concerns in West Virginia*.

Sep. 11, 2020 Email from P. Farrell to Defs. (attached as **Exhibit 10**).  The documents referenced

in Plaintiffs' email include the Report itself and other supporting material.  *Id.*  While Plaintiffs

have not yet filed such a motion, this correspondence makes clear that they intend to introduce the

Report in its entirety at trial.

## III.    ARGUMENT

The Energy & Commerce Report should be excluded for two reasons.  First, the Report is

hearsay and not subject to a hearsay exception.  Second, the Court should exercise its discretion to

exclude the entire Report pursuant to Rule 403 because the Report is cumulative, the probative

value of the report is far outweighed by the prejudice to Defendants (particularly because of their

inability to cross-examine) that will result from admission of the Report, and the Report includes

unhelpful and unnecessary legal and factual recitations.

### A.      The Report Is Inadmissible Hearsay and Does Not Fall Within the Public
        Record Exception of Federal Rule of Evidence 803(8)

The Energy & Commerce Report is hearsay.  It is evident that Plaintiffs seek to admit the

Report for the truth of the thousands upon thousands of statements asserted within it.  Plaintiffs do

---

[14] Pls.' Exhibit List P-06076.

not have a live witness who could testify as to the substance of the Report and all of the assertions contained in it.  Plaintiffs' prior statement that they will ask the Court to take judicial notice of the Report demonstrates that they likely will seek wholesale admission of the document, divorced from any showing that it passes muster under the Federal Rules of Evidence relating to admissibility and foundation.  Plaintiffs presumably will invoke the hearsay exception contained in Rule 803(8), colloquially referred to as the "public records exception."  But the case law demonstrates that the Report does not qualify under that exception.

Rule 803(8) sets forth an exception to the rule against the admission of hearsay for public records.  The Rule applies to a "record or statement of a public office if: (A) it sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; *and* (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8) (emphasis added).

The seminal case on Rule 803(8) is *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988). *Beech Aircraft* concerned a product liability lawsuit following a crash of a Navy-operated plane, and the admissibility of a report prepared by the Judge Advocate General (JAG) in the weeks following the crash.  *Id.* at 156-57.  The JAG Report contained findings of fact, opinions, and recommendations.  *Id.* at 157.  The Supreme Court granted certiorari to resolve a circuit split as to whether Rule 803(8) operated only to allow admission of factual findings, or also could extend to opinions.  *Id.* at 156.

Relying on the Advisory Committee's comments to the rule, the Court concluded that the exception provided in Rule 803(8) is not limited to factual findings and can extend to cover

opinions as well.  *Id.* at 165-67.  The Court emphasized, however, that Rule 803(8) also provides "ample provision for escape if sufficient negative factors are present" that would call into question the reliability of the information.  *Id.* at 167.  "That 'provision for escape' is contained in the final clause of the Rule: evaluative reports are admissible 'unless the sources of information or other circumstances indicate lack of trustworthiness.'"[15]  *Id.*  Thus, the Court explained, "a trial judge has the discretion, and indeed the ***obligation***, to exclude an entire report or portions thereof—whether narrow 'factual' statements or broader 'conclusions'—that she determines to be untrustworthy." *Id.* (emphasis added)  The Court also emphasized that "other portions of the Federal Rules, such as those dealing with relevance and prejudice, provide the court with additional means of scrutinizing and, where appropriate, excluding evaluative reports or portions of them."  *Id.* at 167-68.

Courts routinely conclude that congressional reports are not sufficiently trustworthy to be admitted under the public records exception.  *See, e.g.*, *Barry v. Trustees of Int'l Ass'n Full-Time Salaried Officers & Emps. of Outside Loc. Unions & Dist. Counsel's (Iron Workers) Pension Plan*, 467 F. Supp. 2d 91, 101 (D.D.C. 2006) (excluding a House committee report); *Pearce v. E.F. Hutton Grp.*,  653 F. Supp. 810, 812-13, 815-16 (D.D.C. 1987) (concluding that a report prepared by the staff of the House Judiciary Committee's Subcommittee on Crime was inadmissible hearsay); *see also Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 264 (4th Cir. 2005) (affirming exclusion of a Department of Energy report that was not sufficiently trustworthy including because it was a draft and lacked foundation for its conclusions).

---

[15] The language of Rule 803(8) was amended in 2014 to "clarify that if the proponent has established that the record meets the stated requirements of the exception—prepared by a public office and setting out information as specified in the Rule—then the burden is on the opponent to show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803 Advisory Committee Notes, 2014 Amendments, [Subdivision (8)].

The public records exception is not applicable here for two reasons.  First, the Energy & Commerce Report does not qualify as a public record.  Second, the Report is not sufficiently trustworthy to qualify for the hearsay exception.

### 1.    The Report is not a public record because it was drafted by Committee staff

The Energy & Commerce Report does not qualify for admission under the public records exception in the first instance because it is not a "record or statement of a public office."  Fed. R. Evid. 803(8).  The Report was not issued by the Energy & Commerce *Committee*; it was issued by the Committee's *majority staff*.  This distinction is important.

In *Pearce v. E.F. Hutton Group*, the court concluded that a draft report prepared by the staff of the House Judiciary Committee's Subcommittee on Crime was inadmissible hearsay. 653 F. Supp. at 812-13, 815-16.  The court explained:  "In the first place, the staff of the Subcommittee on Crime are not public officers or agencies with 'authority granted by law' to render factual findings."  *Id.* at 816.  And because the draft report "was never itself adopted as factual findings by the Subcommittee on Crime," then "[b]y its very nature, therefore, the staff analysis cannot satisfy the requirements of rule 803(8)(C)."  *Id.*; *see also United States v. Am. Tel. & Tel. Co.*, 498 F. Supp. 353, 367 (D.D.C. 1980) (concluding that staff memoranda were inadmissible, including because they were "even further removed from final findings of fact by a public agency" than a Committee's draft findings, which were also inadmissible).

Because the Report was issued by committee staff, it is not a public record and it is not admissible under Rule 803(8).  That is reason enough to conclude that it is inadmissible.

### 2.    The Report is not sufficiently trustworthy to be admissible under Rule 803(8)

There is another reason why the Report does not clear Rule 803(8)'s hurdle.  Courts must assess whether a public report is adequately trustworthy to be admissible, typically considering a

nonexclusive list of four factors:  (1) the timeliness of the investigation; (2) the special skill or expertise of the investigating official; (3) whether a hearing was held and the level at which it was conducted; and (4) possible motivation problems."  *Barry*, 467 F. Supp. 2d at 97; *see also Beech Aircraft*, 488 U.S. at 167 n.11.  These motivational problems can include both concerns related to the political process and the influence of related litigation.  *Barry*, 467 F. Supp. 2d at 100-01; *Beech Aircraft*, 488 U.S. at 167 n.11.  Each of these factors weighs against admission of the Energy & Commerce Report here.[16]

 ***Timeliness of the investigation.***  The Energy & Commerce Report regularly discusses facts dating back to the late 1990s.  *See, e.g.*, Report at 21-23 (history of the opioid epidemic); *id.* at 25 (the epidemic in West Virginia); *id.* at 45-48 (DEA's history).  The Report also discusses notable events related to DEA's regulation of controlled substances, many of which date from around 2005 to 2007.  *See id.* at 107-110.  And the Report's "case studies," which comprise a large portion of the content related to distributors, primarily focus on events reaching back as far as approximately 2005 to 2015.  This significant passage of time between the underlying events and the Committee' investigation cuts against a finding that the Report is adequately trustworthy.

 ***Special skill or expertise.***  The Energy & Commerce Committee describes itself as having "the broadest jurisdiction of any authorizing committee in Congress."[17]  This is a notable contrast to other specialized entities and agencies that produce government reports, like the National Transportation Safety Board or OSHA—and it cuts against admission.  By comparison with these

---

[16] It bears emphasis that Defendants do not seek to criticize or question the motivations or work of the Energy & Commerce Committee, any member of the Committee, or its staff.  Instead, Defendants simply seek to apply the standard set forth in the Rules and case law governing whether a particular type of evidence (government reports) may be sufficiently trustworthy, as that term is used in the case law, to overcome the general prohibition on hearsay evidence in court proceedings, such that it can be admitted during trial without the normal protections of cross-examination.

[17] *About E&C*, House Committee on Energy & Commerce, *available at* https://energycommerce.house.gov/about-ec (last visited May 1, 2021).

other types of entities, Energy & Commerce "legislates on a wide variety of issues" that include things as varied as the environment, broadcast and cable television, motor vehicle safety, and travel and tourism.  *Id.*  While Energy & Commerce's jurisdiction does include food, drug, device, and cosmetic safety, it does not have any specialized skill or expertise in matters related to controlled substances regulations and wholesale drug distribution.   This is even more so true for the Committee's staff members.

> *Whether a hearing was held and the level at which it was conducted.*  Three hearings were conducted as part of the investigation:  one related to distributors and one related to DEA, both before the Subcommittee on Oversight and Investigations; and a third related to DEA before the full Committee.  Report at 40, 43.  These hearings only scratched the surface on the relevant issues, as the Report itself acknowledges.  The Executive Summary states that the Report is "only a look at a piece of the overall puzzle," noting that there are "other actors involved in the epidemic including manufacturers, pharmacies, physicians, and drug traffickers."  *Id.* at 4-5.  And the Report concluded that "[b]lame for the opioid epidemic is widespread and goes far beyond the bounds of this investigation."  *Id.* at 322.  Thus, despite the fact that three hearings were held, the Report, by its own admission, has a narrow scope and contains an incomplete analysis.

> *Possible motivational problems—politics.*  The Report also falters on trustworthiness because of the presence of motivational issues and potential bias.  The first concern is the unavoidable issues of politics and partisanship that come with any Congressional report, issued by the staff of those on only one side of the aisle.  In *Barry*, the court noted that "a theme" in the cases is "that Congressional reports are not entitled to an additional presumption of trustworthiness or reliability—beyond the one already established in the Advisory Committee Notes—simply by virtue of having been produced by Congress."  467 F. Supp. 2d at 98 (collecting cases).  The court

added that "[t]hese courts have based their decisions in part on the possibility that partisan political considerations, as well as elected officials' tendency to 'grandstand,' have influenced the factual findings, conclusions, or opinions included in Congressional reports."  *Id.*

The court in *Pearce* likewise described Congress as "a politically-motivated, partisan body" and distinguished it from a "government office with the same objectivity and independence" as the Federal Communications Commission.  653 F. Supp. at 814.  *Pearce* went so far as to question whether such a report could ***ever*** be admissible:

> Given the obviously political nature of Congress, it is questionable whether any report by a committee or subcommittee of that body could be admitted under rule 803(8)(C) against a private party. There would appear to be too great a danger that political considerations might affect the findings of such a report.

*Id.*; *see also, e.g.*, *Baker v. Firestone Tire & Rubber Co.*, 793 F.2d 1196, 1199 (11th Cir. 1986) (agreeing with the district court that a congressional subcommittee report on tire safety "did not contain the factual findings necessary to an objective investigation, but consisted of the rather heated conclusions of a politically motivated hearing").

The Committee's investigation here certainly displays the hallmarks of politics.  During the hearing, a Congressman addressed Defendants' executives by saying, "[t]he fury inside me right now is bubbling over" and "I just want you to feel shame about your roles, respectively, in all of this."[18]  And while the Report claims to be the product of a bipartisan investigation, it was drafted by the majority party only, which is notable and a relevant factor cutting against trustworthiness.  *See Barry*, 467 F. Supp. 2d at 98 (noting that courts will consider "whether members of both parties joined in the report").

---

[18] *Drug executives express regret over opioid crisis, one tells Congress his company contributed to the epidemic*, Katie Zezima & Scott Higham, Wash. Post (May 8, 2018), *available at* https://www.washingtonpost.com/national/drug-executives-to-testify-before-congress-about-role-in-opioid-crisis-one-is-deeply-sorry/2018/05/08/f4d91536-5259-11e8-a551-5b648abe29ef_story.html.

The appearance of partisanship is even greater because anonymous and unelected Committee staff drafted the Report.  The *Pearce* court was emphatic that a report drafted by congressional staff poses even more significant concerns as to trustworthiness:

> The "staff" of the Subcommittee on Crime is an anonymous group of individuals. They served at the pleasure of the members of the Subcommittee majority. The staff had no independence (because of the need for loyalty to the Subcommittee members) or accountability to the public. To suggest that their "Analysis" could be an objective evaluation free from most [of] the dangers of partisan politics which could undermine the report's trustworthiness is ludicrous.

653 F. Supp. at 816.

***Possible motivational problems—influence of litigation.***  A further concern related to motivational problems and bias is the influence of litigation.  *See Beech Aircraft*, 488 U.S at 167 n.11; *Anderson*, 406 F.3d at 264 (excluding a report in part because it was based on "a complaint from an individual who is a plaintiff" in related litigation").

Plaintiffs' counsel—specifically counsel of record in this case—successfully exerted influence over the Committee's proceedings.  *See* Exs. 1 to 6.  They did this through a briefing session for congressional staff in advance of the May 8, 2018 distributor hearing.  *See id.* Plaintiffs' counsel circulated inflammatory materials and even suggested questions for Committee members to ask. *See* Exs. 3 & 4.  These questions—concerning duty, foreseeability, causation, the Controlled Substances Act, and public nuisance—were designed as a "roadmap" to elicit admissions from Defendants' executives that could be used for litigation purposes. *See* Ex. 4.  The contact with Committee staff had its intended effect because one member of Congress asked seven of Plaintiffs' proposed questions, either verbatim or nearly verbatim.  *Compare* Ex. 6, *with* Ex. 4. And Plaintiffs' public relations firm boasted about its success, noting that the "lawyers distributed

a six-page list of suggested questions for lawmakers to ask; most of the content was used by lawmakers' questioning during Tuesday's hearing." Ex. 1.[19]

As shown, there are numerous independent grounds to question the trustworthiness of the Report, for the purposes of the hearsay analysis. Taken together, they compel exclusion of the Report.

**B.     The Court Also Should Exercise Its Discretion to Exclude the Report Under Federal Rule of Evidence 403**

Courts routinely acknowledge that even if a document may be admissible as a public record, Rule 403 may still call for its exclusion. *Beech Aircraft* emphasized this very point: "safeguards built into other portions of the Federal Rules, such as those dealing with relevance and prejudice, provide the court with additional means of scrutinizing and, where appropriate, excluding evaluative reports or portions of them." 488 U.S. at 167-68; *see also s v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 304 (11th Cir. 1989) (noting that an otherwise admissible public record may be excluded on the basis that it is cumulative, irrelevant, or more prejudicial than probative).

Under Rule 403, the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. While there is no risk of misleading the jury in this bench trial, the Energy & Commerce Report implicates many of Rule 403's remaining concerns.

---

[19] Commentators understood Plaintiffs' tactic. One report noted that "the executives' answers before members of Congress will almost certainly be incorporated into the litigation" and that "[s]ome of the questions on the list distributed by the lawyers, which was obtained by POLITICO, wouldn't sound out of place in a courtroom." Ex. 2.

### 1.      The evidence in the Report would be needlessly cumulative

The Energy & Commerce Report itself has no probative value.  The fact that the Committee chose to investigate the topic of opioid distribution in West Virginia and then the majority staff prepared and issued a written report has no bearing on any of the factual or legal questions actually at issue in this case.  And to the extent any of the *evidence* relied upon in the Report is relevant and otherwise admissible, Plaintiffs can present that evidence directly.  For example, if Plaintiffs intend to focus on Defendants' policies and procedures, due diligence efforts, or suspicious order reporting, they can and should do so with actual, admissible evidence.  Plaintiffs should not be permitted to take the short-cut of admitting a congressional report that discusses the same topics.  Conversely, if Plaintiffs cannot muster admissible evidence on such topics, then they do not belong in this case, and Plaintiffs should not be allowed to bootstrap them into evidence through the Report.  Thus, the content of the Energy & Commerce Report is at best cumulative and duplicative, and at worst it is inadmissible.

### 2.      Introduction of the Report would unfairly prejudice Defendants

Admission of the Report would be unfairly prejudicial to Defendants, especially when compared to its lack of probative value.  The Report purports to reach factual and legal conclusions that are similar to, or the same as, some of the issues in this case.  But a congressional investigation is subject to entirely different procedural rules and does not present the safeguards that are required in a civil trial.  Defendants do not have access to or even know the entirety of the materials relied upon by the Committee.  Defendants were not allowed to cross-examine witnesses.  Defendants do not even know the identity of the person or persons who drafted the Report.

The documents produced to the Committee by DEA present especially compelling concerns of prejudice.  Defendants specifically requested these documents from DEA in February 2020.  After DEA refused to produce them, Defendants filed a motion to compel.  The Court denied

that motion, ruling that DEA did not have to produce the documents.  Having so ruled, the Court should not now admit a congressional report that is based on and selectively quotes from those very same DEA documents.

Defendants have had no opportunity or ability to review the documents and cannot cross-examine the Report's incomplete and potentially biased recitation of the documents' purported content.  Defendants do not even know the universe of documents DEA produced to the Committee.  Instead, the Committee noted that DEA was initially withholding documents, but that "the Committee ultimately reached an accommodation with the DEA that provided the Committee with the information needed to complete its investigation."  Report at 43.

Other DEA-related material is equally concerning.  For example, the Report repeatedly cites private briefings DEA provided to the Committee staff, including on topics such as DEA's use of ARCOS data, DEA's decision not to devote significant resources to West Virginia until 2015, and DEA's apparent admission that "more could and should have been done in West Virginia."  Report at 46 & n.140, 51 & n.165, 52 & n.175.  Defendants have no way of knowing who was present for these discussions, what specifically was said, or what else was discussed. And there are no witnesses to cross-examine on those private discussions.

These significant issues of unfair prejudice are grounds alone to exclude the Report.

### 3. The Report contains unnecessary and unhelpful legal and factual recitations

The Report also should be excluded because it contains lengthy legal summaries and factual recitations that are not necessary or helpful.

First, the Report contains inadmissible legal analysis and conclusions.  *See e.g.* Report at 26-30 (discussing and interpreting the statutory and regulatory framework).  Even if the Court concludes that the Report qualifies under Rule 803(8), legal conclusions do not become admissible

18

merely because they are contained in a public record.  *See Hines*, 886 F.2d at 302 ("We agree that

Rule 803(8)(C) does not provide for the admissibility of the legal conclusions contained within an

otherwise admissible public report."); *Zeus Enters., Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 243

(4th Cir. 1999) (concluding that a National Transportation Safety Board order that "involved no

factual determinations and was strictly a legal ruling . . . was not admissible under Rule 803(8)(C)");

*Hernandez v. Colegio Y Noviciado Santa Maria Del Camino, Inc.*, 2015 WL 1416684, at *5 (D.P.R.

Mar. 27, 2015) ("Legal conclusions are beyond the scope of the [public records] exception.").

Second, the Report contains lengthy factual recitations—many of which are not relevant to

this case.  For example, many of the Report's "case studies" focus on pharmacies that are outside

of the jurisdictions at issue here.  And the Report includes other content related to parts of West

Virginia that does not have a "demonstrable nexus to Cabell County or the City of Huntington."

*See* Dkt. 1297 at 10 (identifying standard for admission of evidence emanating from outside Cabell

and Huntington).  Nor are the out-of-jurisdiction "case studies" probative of "nation-wide trends

and shipments, national policies and procedures, or systemic failures that are national in scope"—

at a minimum, they are not probative enough to outweigh the unfair prejudice or waste of time that

would result from their admission.  *See id.*

In this bench trial, the Court is responsible for both finding the facts and applying the law.

Factual and legal findings reached by a different government entity based on a partially-undisclosed

factual record are not helpful or necessary.  The Court recently confirmed as much in its rulings

related to expert discovery.  In an April 8, 2021 Order, the Court explained that "[e]xpert testimony

which 'merely regurgitates factual information that is better presented directly to the jury rather

than through the testimony of an expert witness' is properly excluded."  Dkt. 1262 at 4.  But the

Energy & Commerce Report does just that.  And in an April 15, 2021 ruling, the Court noted that

the Geldhof report—which summarizes the history and applicability of DEA regulations—would be nothing more than "a sounding board for plaintiffs to relate certain facts and suggest the legal conclusions that flow therefrom." Dkt. 1269 at 4. Accordingly, the Geldhof report would not assist the trier of fact. *Id.* The same can be said of the Report—including because Plaintiffs directly influenced the investigation itself. In its Order excluding Geldhof, the Court further noted that it "is capable of understanding the law at issue here with the assistance of the highly qualified attorneys who are litigating the case." *Id.* at 5. The Report likewise is not needed for that reason.

The Energy & Commerce Report is, in some ways, similar to an expert report. It would be an easy mistake, for example, to review the Reports' Table of Contents and mistake it for an expert report. But there are, of course, critical differences. First, the Report was not written by an expert as part of litigation. Instead, it was written by an anonymous group of congressional staffers, of unknown qualifications, experience, and background. Second, Defendants do not have access to all of the materials relied upon in the Report, as they would with an expert witness. And third, the authors of the Report are not subject to deposition or trial testimony, so there is no means to test their assumptions and conclusions. The reasoning of the Court's rulings on the proper scope of expert testimony are therefore all the more applicable to the Energy & Commerce Report. If lengthy factual and legal recitations are unhelpful and inappropriate coming from an expert witness, they are even more so coming from a congressional staff report.

## IV.    CONCLUSION

The Energy & Commerce Report is inadmissible hearsay. It also is cumulative, prejudicial, unhelpful, and unnecessary. For all these reasons, the Court therefore should exclude the Energy & Commerce Report.

20

Dated:  May 1, 2021

Respectfully submitted,


*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB #7136)
JACKSON KELLY PLLC
Post Office Box 553
Charleston, WV  25322
Telephone: (304) 340-1000
Facsimile: (304) 340-1050
gcallas@jacksonkelly.com


*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
Joseph J. Mahady
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com
jmahady@reedsmith.com


*Counsel for AmerisourceBergen Drug Corporation*

*/s/ Steven R. Ruby*
Steven R. Ruby (WVSB #10752)
Raymond S. Franks II (WVSB #6523)
CAREY DOUGLAS KESSLER & RUBY PLLC
707 Virginia St. E., Ste. 901
Charleston, West Virginia 25301
Tel.: (304) 345-1234
Fax: (304) 342-1105

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW

21

Tel.: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard@wc.com
ahardin@wc.com

*Counsel for Cardinal Health, Inc.*

*/s/ Timothy C. Hester*
Timothy C. Hester
Laura Flahive Wu
Andrew P. Stanner
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5324
thester@cov.com
lflahivewu@cov.com
astanner@cov.com

*/s/Paul W. Schmidt*
Paul W. Schmidt
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000
pschmidt@cov.com

*/s/ Jeffrey M. Wakefield*
Jeffrey M. Wakefield (WVSB #3894)
jwakefield@flahertylegal.com
Jason L. Holliday (WVSB #12749)
jholliday@flahertylegal.com
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box. 3843
Charleston, WV 25338-3843
Telephone: (304) 345-0200

*Counsel for McKesson Corporation*

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2021, the forgoing ***Defendants' Motion to Exclude the House Energy & Commerce Committee Majority Staff Report*** was sent to Counsel for the Plaintiffs and Defendants using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.


*/s/ Gretchen M. Callas*
Gretchen M. Callas (WVSB # 7136)