UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

THE CITY OF HUNTINGTON,
    Plaintiff,

v.

                                        CIVIL ACTION NO. 3:17-01362

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    Defendants.

_____

CABELL COUNTY COMMISSION,
    Plaintiff,

v.

                                          CIVIL ACTION NO. 3:17-01665

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    Defendants.

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
SECOND MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. RAHUL GUPTA**

       Plaintiffs the City of Huntington and Cabell County Commission ("Plaintiffs") respectfully

submit this memorandum of law in opposition to Defendants' Second Motion to Exclude Expert

Testimony of Dr. Rahul Gupta (ECF No. 1293).

**INTRODUCTION**

       Dr. Rahul Gupta served as Commissioner of the West Virginia Department of Health and

Human Resources from 2015 to 2018, having previously served as Executive Director of the

Kanawha-Charleston Health Department from 2009 to 2014. As State Health Commissioner, one

of Dr. Gupta's first acts was to order "a historical perspective report . . . of West Virginia's opioid

crisis from 2000 to 2015." Ex. A (Gupta Dep. Tr., Sept. 11, 2020) at 96:6-10. In addition, he is

the author of numerous publications that relate to opioids in West Virginia, including the *Opioid*

*Response Plan for the State of West Virginia*[1] in January 2018 and *Overcoming America's Opioid Epidemic Will Need Action Not Words*, an article in the Marshall Journal of Medicine that same year.[2] In 2018, Dr. Gupta was named Public Official of the Year by Governing Magazine[3] and was the subject of *The Immigrant Doctor Who's Solving West Virginia's Opioids Crisis* in Politico Magazine.[4] During the course of his employment as State Health Commissioner, Dr. Gupta witnessed first-hand the opioid epidemic and its effects in West Virginia, including in Plaintiffs' communities.

In the Court's Memorandum Opinion and Order (ECF No. 1234) ("Gupta I Order") denying Defendants' first motion to exclude Dr. Gupta's testimony, the Court ruled that Dr. Gupta's fact and opinion testimony is admissible to the extent it arises from "his involvement in the events giving rise to this litigation." Gupta I Order at 13.

Consistent with the foregoing, Plaintiffs' Fed. R. Civ. P. 26(a)(2)(C) disclosure states that "Dr. Gupta will present evidence and provide testimony on the subject matter of opioid addiction, diversion, the nature of the opioid epidemic and its effects in Cabell County and the City of Huntington, based on his personal knowledge and experience, and in conformance with the facts and opinions expressed during his [first/September 2020] deposition," as summarized in 22 separate subject matters. Defs' Ex. B (ECF No. 1293-2) (Plaintiffs' Suppl. Disclosures) at 7.

[1] Rahul Gupta, MD, MPH, MBA, FACP, *Opioid Response Plan for the State of West Virginia* (Jan. 2018), https://dhhr.wv.gov/bph/Documents/ODCP%20Response%20Plan%20Recs%20Recs/Opioid%20Response%20Plan%20for%20the%20State%20of%20West%20Virginia%20January%202018.pdf.

[2] Rahul Gupta, *Overcoming America's Opioid Epidemic Will Need Action, Not Words*, 4 Marshall J. Med., no. 1, art. 2, 2018, https://mds.marshall.edu/cgi/viewcontent.cgi?article=1171&context=mjm.

[3] Mattie Quinn, *Public Officials of the Year, Rahul Gupta, 2018 Honoree*, Governing Magazine, https://www.governing.com/poy/gov-rahul-gupta.html.

[4] Brianna Ehley, *The Immigrant Doctor Who's Solving West Virginia's Opioids Crisis*, Politico Magazine (May 2, 2018), https://www.politico.com/magazine/story/2018/05/02/west-virginia-opioids-immigrant-doctor-soloution-218118.

In their second motion to exclude, Defendants contend based primarily on Dr. Gupta's testimony in his second deposition, taken April 15, 2021, that large swaths of his opinions covering 14 of Plaintiffs' 22 identified subject areas—including on the broad topics of (A) the gateway theory; (B) causation; (C) Neonatal Abstinence Syndrome (NAS); (D) diversion; and (E) addiction—must be excluded because they allegedly are not based on his involvement as State Health Commissioner in the events giving rise to this litigation.  This is incorrect.  Defendants construct their argument by selectively citing to Dr. Gupta's second deposition transcript, while ignoring substantial testimony set forth below in which he grounds his opinions on these and other topics in his work as State Health Commissioner.  The Court thus should deny Defendants' second motion to exclude in its entirety.

## LEGAL STANDARD

A party's disclosure of an expert witness, with non-applicable exceptions, "must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."  Fed. R. Civ. P. 26(a)(2)(B).  For other expert witnesses not required to provide a written report, the proffering party's disclosure must state the subject matter of and a summary of the facts and opinions contained in the witness's expected testimony.  Fed. R. Civ. P. 26(a)(2)(C).  "A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or  705.  Frequent examples include physicians or other health care professionals and employees of a party who do not regularly provide expert testimony."  Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment, subdivision (a)(2)(C) (emphasis added).

As the Court recognized, a Rule 26(a)(2)(C) expert witness's testimony must be based on his or her "involvement in the events giving rise to th[e] litigation." Gupta I Order at 13; *see also Downey v. Bob's Discount Furniture Holdings, Inc.*, 633 F.3d 1, 7 (1st Cir. 2011) (Rule 26(a)(2)(C) expert's opinion must be "premised on personal knowledge and observations made in the course of treatment"); *LaShip, LLC v. Hayward Baker, Inc.*, 296 F.R.D. 475, 480 (E.D. La. 2013) ("A 26(a)(2)(C) witness's opinion must be based on facts or data obtained or observed in the course of the sequence of events giving rise to the litigation.").

This testimony may address matters of expert opinion such as causation of the condition that gave rise to the litigation.  *See, e.g., Downey*, 633 F.3d at 7 ("Consequently, where, as here, the expert is part of the ongoing sequence of events and arrives at his causation opinion during treatment, his opinion testimony is not that of a retained or specially employed expert."); *McCranie v. Home Depot U.S.A., Inc.*, No. 4:15-cv-00423, 2016 WL 7626597, at *7 (E.D. Tex. Aug. 25, 2016) (Rule 26(a)(2)(C) "experts may offer testimony as to causation only where the physician formed such opinion in the course of treatment."); *cf. State of Okla. v. Purdue Pharma LP*, No. CJ-2017-816, 2019 WL 4019929, at *9-10 (Aug. 26, 2019) (Judgment After Non-Jury Trial) (findings of fact on causation of increased opioid use disorder, addiction, overdose deaths, and NAS, based in part upon testimony of Commissioner of Oklahoma Department of Mental Health and Substance Abuse Services).

## ARGUMENT

Plaintiffs previously have demonstrated that Dr. Gupta's general understanding of the subject matter of this litigation is derived from his work as Commissioner of the West Virginia Department of Health and Human Resources from 2015 to 2018.  As Dr. Gupta explained, his understanding that "this case is related to the number of overdose deaths and generally the

4

suffering and the carnage that has occurred broadly in the state of West Virginia, but narrowly in

Cabell County and the City of Huntington as a result of the oversupply as well as the over-

availability of prescription opioids and the consequences resulting from that," Ex. A at 22:5-12, is

based upon his work as State Health Commissioner:

> [M]y work as the Commissioner for the Bureau of Public Health as well as the
> State's chief health officer, having worked in this area, having read the reports as
> well as public records and accounts and hav[ing] been deposed and involved in the
> workings of the Department of Health and Human Resources of West Virginia, is
> how I come about to have that understanding.

*Id.* at 22:16-24; *see also id.* at 35:16-19 ("My role as the State Health Commissioner and public

health officer, I have a broad bird's eye view of the understanding of the system of [prescription

opioid] distribution."); *id.* at 40:8-17 ("Q. When did you become generally aware of that system

of distribution?  A.  So it was – it was more during my term as the health commissioner and the

state health officer because I was engaged in addressing the opioid crisis and the public health

consequences that I became more aware . . . .").

      As State Health Commissioner, Dr. Gupta oversaw creation of a historical perspective

report on the opioid crisis in West Virginia.  As he explains:

> I ordered – as one of the first acts of being a Commissioner – a historical perspective
> report that – it's online available – of West Virginia's opioid crisis from 2000 to
> 2015 data.
>
> I take several pieces of information from that report, that's a public report, done
> under – I believe – it was Governor Justice.  And I use that as an example to talk
> about historical.  We talk about, obviously, all aspects/facets – it's a pandemic –it's
> an epidemic of epidemics.

*Id.* at 96:6-16.[5]

---

[5] Dr. Gupta also, in his prior position as Executive Director of the Kanawha-Charleston Health Department from
2009 to 2014, "involved leading a team of epidemiologists in a variety of work that included conducting
epidemiological surveys, studies, analysis and policy making as a result of that work for the largest county in the
state of West Virginia . . . ."  Ex. B (Gupta Dep. Tr. April 15, 2021) at 19:14-19.

Notwithstanding the foregoing, Defendants contend that most of Dr. Gupta's proffered expert opinions spanning a broad range of subject areas are not admissible because they are not, in fact, based upon his work as State Health Commissioner.  *See* Motion at 10 ("Dr. Gupta's opinion testimony is not based on his personal knowledge and observations as required for a Rule 26(a)(2)(C) hybrid witness.").  This is incorrect, as demonstrated below with respect to each of the subject areas Defendants identify and on which they seek to preclude Dr. Gupta from testifying.

A.      **Gateway Theory of Illegal Street Drug Use**

Among Dr. Gupta's expert opinions on which Plaintiffs intend to call him to testify is his opinion that "[t]here is a direct correlation between diverted prescription pills and the transition to using street drugs such as heroin, fentanyl, methamphetamine, etc."  Defs' Ex. B (ECF No. 1293-2) at 8, Opinion 3; *see also id.* at 8-9, Opinions 4, 11, 12, 19 (addressing same connection).  This opinion is based in significant part upon Dr. Gupta's experience and leadership of initiatives as State Health Commissioner.

An extended excerpt from Dr. Gupta's first deposition testimony, which Defendants did not include with their motion filing of selected excerpts, demonstrates how Dr. Gupta's understanding of the connection between prescription opioid and street drug use is based upon his work and initiatives as State Health Commissioner:

> Q. So turning back to the evolution of this opioid problem in West Virginia, did you at some point see an evolution, a change, from opioids to heroin?
>
> A. As I came in as the Commissioner in 2015, I think that evolution was occurring. I think we were starting to see some of the laws that had been taking place in 2012-2013 – certainly Governor Tomblin had initiated the Governor's Advisory Committee on Substance Abuse and some of the results were happening.
>
> So we had a sliver of hope at the time that, 'Listen, I think we're starting to see a light at the end of the tunnel' in the sense that, look, we're seeing slight reductions, and that's in the presentation you saw where I showed from 2015 to 2016, we went down 15 percent.

6

So we were becoming very hopeful that now perhaps the deaths will follow, meaning reduction in deaths and suffering and other things.

. . .

Reduction in prescriptions.  So we started to see from 2015 to 2016, about a 15 to 20 percent reduction in opioid prescriptions.

. . .

And then we were hopeful that we would start to see a reduction in deaths.  But we didn't.  And then we started to search that why that we're seeing reduction in prescribing but we're not seeing reduction in the deaths from overdose, we're not seeing significant reduction in the substances of overdose people when they died.

And one of the elements that was happening at the time that, again, now it's easier – a little bit more easier to recognize, is that every time law enforcement would go a and do a drug bust of the bad doc[tors], those people would end up on the street that once were addicted to medication – prescription medications, now would have to find – seek and find an alternative, and they would go to the street.

And then they started to use IV drugs, heroin.  That was not the only reason it was happening.  It was also because the supply of prescription drugs from a diversion standpoint was drying up a little bit.

So as the diverted drugs – opioid prescription drugs – were drying up, then people still needed that fix, as I explained the addiction pathway.  . . .

And what actually happened is the opioid crisis began to evolve, evolve into a second crisis, which would then started to become this heroin crisis.

Ex. A (Gupta Dep. Tr., Sept. 11, 2020) at 161:14-164:1.  This testimony makes clear that Dr. Gupta's starting expectation or prior understanding was that a reduction of prescription opioid supply would lead to a reduction of opioid epidemic harms, but that his experience and observation as State Health Commissioner showed him otherwise and shaped his current opinion—that the harms would continue or even escalate as addicted prescription opioid users turned to street drugs such as heroin.

Based on this new understanding he gained as Commissioner, Dr. Gupta took action.  He ordered his department to conduct an investigation of opioid-related deaths, what he calls a "social autopsy."  Ex. B (Gupta Dep. Tr. April 15, 2021) at 61:10-15.  This investigation only underscored Dr. Gupta's understanding of the connection between prescription opioid use and the continuation of harms from street drug use after prescription use declined.  *See id.* at 61:16-21 ("We had very significant findings that included that 90 percent of decedents have an interaction with the . . . Controlled Substances Monitoring Program in West Virginia . . . ."); *id.* at 117:13-22 (basis for opinion on transition from prescription opioids to street drugs is "both the literature that exists to support that as well as my experience and the opinions that have resulted from my experience."); *id.* at 118:12-17 ("So there's been a lot more literature since that that shows about 80 percent of the people that use heroin today have had their start from prescription opioids to begin with.  Now, having said that, we saw very similar facts in West Virginia.").  Dr. Gupta's opinions on the connection between prescription opioid and street drug use that are exactly the type of percipient observations on which a Rule 26(a)(2)(C) expert should be permitted to testify.

In arguing to the contrary, Defendants contend that Dr. Gupta's testimony on the prescription opioid-street drug connection is impermissible because "Dr. Gupta did not form these opinions in the course of treating or interviewing Huntington of Cabell County residents who transitioned from prescription opioid use to heroin use . . . ."  Motion at 11.  The Court should reject this argument for two related reasons.

First, Rule 26(a)(2)(C) does not *require* that a non-retained expert witness be a physician whose knowledge is obtained from treating one or more patients.  Although this is a common fact setting for application of the rule, it is no more than an *example* of the rule's possible applications.  *See* Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment, subdivision (a)(2)(C)

("*Frequent examples include* physicians or other health care professionals and employees of a party who do not regularly provide expert testimony.") (emphasis added).  Thus, the fact that Dr. Gupta did not treat individual patients as State Health Commissioner does not preclude applying Rule 26(a)(2)(C).

Second, Plaintiffs are not required to provide individual patient-level evidence through their experts or otherwise in order to prove their claims.  *See, e.g.*, *In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804, 2019 WL 3934597, at * 7 (N.D. Ohio Aug. 20, 2019) ("[Dr.] Rosenthal's choice to treat all detailing data uniformly likewise does not present a problem of fit.  This aggregate approach to detailing data, like Plaintiffs' other decisions to use aggregate data, is consistent with Plaintiffs' theory of liability."); *see also In re Neurontin Mktg. & Sales Practs. Litig.*, 712 F.3d 21, 42 (1st Cir. 2013) ("[C]ourts have long permitted parties to use statistical data to establish causal relationships.").

Dr. Gupta is providing Rule 26(a)(2)(C) expert testimony based on his experience and observations as State Health Commissioner and West Virginia's chief *public* health officer.  The fact that he did not treat patients in formulating the State's response to the opioid epidemic, an "epidemic of epidemics," Ex. A at 96:16, does not preclude him from testifying as to what he *did* do and the opinions he formed in carrying out the State's response to the epidemic.  Dr. Gupta's opinions on the relationship between prescription opioids and street drugs are admissible.

B.    **Causation of Opioid Epidemic Harms**

Plaintiffs also intend to call Dr. Gupta to testify as to his opinion that "[i]n Cabell County and the City of Huntington, the consequences of the oversupply and over-availability of prescription opioids ha[ve] led to overdose deaths, and, more generally, communal suffering and devastating carnage."  Defs' Ex. B at 8, Opinion 7; *see also id.* at 7-9 (Opinions 1, 12, and 18).

9

These opinions, too, are based upon Dr. Gupta's experience as State Health Commissioner in implementing and overseeing the State's response to the opioid epidemic.

An extended excerpt from Dr. Gupta's April 15, 2021 deposition testimony, which Defendants also did not include with their motion filing of selected excerpts, demonstrates how Dr. Gupta's understanding of the causes of the opioid epidemic harms in West Virginia is based in significant part upon his work and initiatives as State Health Commissioner:

> [W]hen I came into the office in January of 2015, it became my priority number one, priority number two and priority number three, to start addressing or help address the problem of the overdose deaths that we were facing, as well as the nonfatal overdoses and the carnage and the killing that was happening in West Virginia around the clock of people because of the opioid crisis.
>
> So the first thing we did was: We created the first – funded the first Harm Reduction Program by providing seed funding to Cabell-Huntington Health Department in Cabell County, so we initiated that program.
>
> I hoped not only fund, but helped begin that program with Doctor Kilkenny, as I mentioned, worked very closely with Doctor Kilkenny in Cabell-Huntington Health Department.
>
> We then continued to utilize the model of Cabell-Huntington Health Department's Harm Reduction Program to expand to other areas of the state. In early 2017, I continued to see 15 to 20 percent rise in overdose deaths year after year after year, so . . .
>
> One of the important things we did is: We conducted a social autopsy. The social autopsy that was conducted, we looked at all of the deaths from overdose that happened in 2016. We – we did a CSI type of investigation to look at people's deaths in the year before their deaths.

Ex. B at 60:7-61:15.

The findings of the Department's social autopsy that Dr. Gupta initiated and oversaw showed a strong connection between overdose deaths and prescription opioid use. *See id.* at 61:16-62:3 (90% of decedents had interaction with State's Controlled Substances Monitoring Program; half of the women who died had filled a prescription within 30 days of their death; people who

went to multiple pharmacies had vastly elevated likelihood of overdose death).  Thus, again, Dr. Gupta's opinions on the relationship between prescription supply and opioid epidemic harms are exactly the type of percipient observations on which a Rule 26(a)(2)(C) expert should be permitted to testify.

In arguing to the contrary, Defendants contend that Dr. Gupta's "state jobs never involved monitoring, reviewing, or regulating the 'volume' or 'supply' of prescription opioid pills distributed to pharmacies in West Virginia[,]" and therefore he cannot provide testimony related to oversupply.  Motion at 14.  This is factually incorrect.  Dr. Gupta's opinion on the relationship between pill supply and opioid epidemic harms is based in significant part on his understanding of the pill supply that he obtained as Commissioner through available prescription data:

> Q. Why do you discuss the volume of prescriptions in West Virginia and in the rest of the nation as part of this presentation focusing on supply-side factors?
>
> A. Because the total volume that was available had a direct relationship and a correlation with the death and destruction that was happening related to overall overdoses in the state of West Virginia.
>
> . . .
>
> 'Prescription' is a surrogate for the amount of pills that were flowing through in communities across towns of West Virginia.
>
> . . .
>
> [T]hat is probably the closest way for a public health commissioner like me to be able to correlate.  I would not have access to the actual data other than published reports, you know, to the tune of what we found later to be 780 million or what have you pills.
>
> We at the time – as I recollect – weren't really aware of actual numbers, or we were close to aware of that – being aware of that, but at the same time, prescriptions is the way to have the pills out there.  I mean, there is appropriate prescribing and there is inappropriate prescribing.
>
> But at the end of the day, it is through prescriptions that the flow of the ills are gonna end up there and be diverted.

11

Ex. A at 113:5-114:14.

In sum, Dr. Gupta's opinions on the causal relationship between pill supply and opioid epidemic harms are based upon observations arrived at through his work as State Health Commissioner and should be admitted. *See generally Downey*, 633 F.3d at 7 ("[W]here, as here, the expert is part of the ongoing sequence of events and arrives at his causation opinion during treatment, his opinion testimony is not that of a retained or specially employed expert."); *see also State of Okla.*, *supra*, 2019 WL 4019929, at *9 (finding, based in part upon testimony of Commissioner of State Department of Mental Health and Substance Abuse Services, that the "increase in opioid addiction and overdose deaths following the parallel increase in opioid sales in Oklahoma was not a coincidence; these variables were 'causally linked.'"); *id.* at *10 ("Commissioner White testified that the oversupply and 'significant widespread rapid increase in the sale of prescription medications' beginning in the mid-1990s caused the 'significant rise in opioid overdose deaths' and 'negative consequences' associated with opioid use, including addiction, opioid use disorder, the rise in NAS, and children entering the child welfare system."). The Court should reject Defendants' attempt to prevent Plaintiffs from introducing this very same type of participant-expert opinion evidence on causation as was relied upon in the Oklahoma case Judgment After Non-Jury Trial.

### C. Neonatal Abstinence Syndrome Harms

Plaintiffs also intend to call Dr. Gupta to testify as to his opinions that "NAS babies are a causative issue in terms of the opioid epidemic" and that the "opioid epidemic has led to an increase in the number of children entering the foster care system . . . ." Defs' Ex. B at 8-9 (Opinions 17 and 8); *see also id.* at 8-10 (Opinions 9, 21-22). Dr. Gupta likewise formed these opinion based upon his experience as State Health Commissioner and State Health Officer.

Dr. Gupta was deeply involved as State Health Commissioner in tracking and studying

NAS births.  As he explains,

> We, first of all, created a clinical definition for NAS that we had all the birthing facilities in the state of West Virginia, including Cabell County and City of Huntington's hospitals agree to.
>
> And all of the doctors – meaning the birthing physicians in Cabell County and all across West – across West Virginia, agreed to a common definition.  Once we did that, we then started to capture that definition and those diagnoses in a program called Birth Score out of West Virginia University.
>
> We worked very closely with experts in Marshall, at Marshall University, to measure the amount of NAS that was happening.   And I'm using NAS intermittently with NOWS, which is neonatal opioid withdrawal syndrome, and we then characterized the rate of NAS in the state was 5 percent.  That's 1 in 20 babies, which is the highest by far of any state in the nation.
>
> But we also found that some of the counties had much higher rate, to the tune of 10 and over 10 percent.  Again, that's a published report, available in the public domain.  And I –I don't have a – you know, a lot of recollection about every aspect of it.
>
> Q. Do you remember who within your organization primarily did the research for that report?
>
> A. It would have been the – under my supervision, the Department of Family and Children's Services.

Ex. B at 163:20-165:4; *see also id.* at 170:1-171:22 (opinions on increased number of children

entering foster care and increased child welfare costs are based on role as State Health Officer,

interaction with relevant sub-department, and review of foster care system data).  Thus, again, Dr.

Gupta's opinions on the relationship between opioid supply and NAS and other child welfare

harms are exactly the type of percipient observations on which a Rule 26(a)(2)(C) expert should

be permitted to testify.

In arguing to the contrary, Defendants contend that Dr. Gupta lacks sufficient expertise in

pediatrics or child welfare.  *See* Motion at 15-16 ("Dr. Gupta did not oversee or manage the budget

for the state foster care system.  Nor has he specialized in pediatrics, researched the incidence of

attention or learning deficits in children diagnosed with NAS, or personally observed" child

behavioral issues).  The Court should reject Defendants' NAS argument for reasons similar to why

it should reject their gateway theory arguments.  The fact that Dr. Gupta does not specialize in

pediatrics or treat individual children does not preclude him from providing Rule 26(a)(2)(C)

expert testimony based on his experience and observations as State Health Commissioner and West

Virginia's chief public health officer, in which capacity he initiated and oversaw the State's system

for monitoring NAS births.  *See Downey*, 633 F.3d at 7 ("[W]here, as here, the expert is part of the

ongoing sequence of events and arrives at his causation opinion during treatment, his opinion

testimony is not that of a retained or specially employed expert."); *see also State of Okla.*, 2019

WL 4019929, at *10 (finding of fact on causation of NAS harms based in part upon State Mental

Health and Substance Abuse Services Commissioner's testimony).  The Court likewise should

reject Defendants' child welfare argument because it ignores Dr. Gupta's explanation of his access

as Commissioner and Health Officer to foster care system data, from which his department

determined that much of the State's foster care system was associated with the opioid epidemic or

other substance abuse disorders.  *See* Ex. B at 170:16-171:15; *see also State of Okla.*, 2019 WL

4019929, at *10 (finding of fact on causation of child welfare harm based in part upon State Mental

Health and Substance Abuse Services Commissioner's testimony).[6]

For all of these reasons, the Court should reject Defendants' arguments for exclusion of

Dr. Gupta's NAS and child welfare-related opinions.

---

[6] The Court also should reject any argument by Defendants for exclusion of Dr. Gupta's NAS and child welfare opinions based upon his reference to "studies disclosed for the first time during his deposition[.]"  Motion at 15. Defendants do not argue that they were or are unable to cure any surprise from this disclosure or the allowing Dr. Gupta's testimony to the extent it is informed by these studies would disrupt the trial.  *See Southern States Rack Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

### D.    Diversion of Inappropriate Prescriptions

Plaintiffs also intend to call Dr. Gupta to testify as to his opinion that the "amount of appropriate prescriptions was dwarfed by the amount of inappropriate prescriptions that were being diverted." Defs' Ex. B at 7, Opinion 2. Dr. Gupta likewise formed this opinion based upon his experience as State Health Commissioner. *See* Ex. B at 118:16-20 ("[W]e saw very similar facts in West Virginia. We started to see people that were often – because of a large volume and diversion that resulted often in addiction were utilizing prescription drugs . . . ."); *id.* at 120:16-19 ("So that – that first phase was prescription drugs. The second phase, because of increased volume – the volume, diversion and addiction was actually getting it on. And that action that followed was to transition to heroin."). This, therefore, is again exactly the type of percipient observation on which a Rule 26(a)(2)(C) expert should be permitted to testify.

In arguing for exclusion, Defendants contend first that Dr. Gupta's opinion on the occurrence of diversion "inherently relates to the standard of care" in prescribing and therefore must be disclosed under Rule 26. Motion at 16-17. Defendants cite *Harville v. Vanderbilt Univ., Inc.*, 95 Fed. Appx. 719 (6th Cir. Aug. 27, 2003), for this proposition, but fail to explain that this decision requiring expert reports from treating physicians testifying on the standard of care, *see id.* at 725, predates the 2010 enactment of Rule 26(a)(2)(C), with which Plaintiffs complied for Dr. Gupta. In any event, Dr. Gupta again is not opining that a specific doctor violated the standard of care, but rather is opining based on his experience and observation as State Health Commissioner that the prescription opioid supply vastly exceeded the amount of possibly legitimate prescription.

Defendants thus separately argue that Dr. Gupta's opinion on the occurrence of diversion is impermissible as hybrid testimony because it extends beyond his involvement with the facts of this litigation. *See* Motion at 17. This, too, is incorrect. Although Dr. Gupta had no role in

licensing physicians or establishing prescribing guidelines, he *did* have responsibility and authority

related to public health, pursuant to which he launched the afore-referenced "social autopsy" in

2017 in which, as he explains:

> I asked my department to *work at cross structures in West Virginia* – for example,
> the Medicaid program, the EMS program, the Office of Medical Examiner, *the
> Board of Pharmacy*, *the Board of Medicine* – payors, to create a social autopsy.
>
> . . .
>
> So we up and did, we wanted to learn from the dead to help inform those who are
> living.
>
> And one of the ways we did that is:  We looked at every single death and we
> investigated their past one year prior to death and understand what happened, what
> led to them dying, and then we cataloged and published that report.

Ex. A at 124:15-125:6.  It was through this close work with the Board of Pharmacy, the Board of

Medicine, and other State agencies that Dr. Gupta and his colleagues were able to determine the

close connection between opioid prescriptions and overdose mortality.  *See* Ex. B at 61:10-62:3.

The Court therefore should hold that Dr. Gupta's opinions on the occurrence of

inappropriate prescribing and diversion are formed based on his experience and observations made

as State Health Commissioner and are admissible.

### E.    Opioid Addiction

Plaintiffs also intend to call Dr. Gupta to testify as to his opinion that "[o]nce an addiction

is formed, an individual struggling with addiction will obtain the addictive substance by any means

necessary, which often results in illegal activity and the use of illegal substances."  Defs' Ex. B at

8, Opinion 4; *see also id.* at 10, Opinion 20.  Dr. Gupta's addiction opinions substantially overlap

with his gateway theory opinions, and likewise are based in significant part upon his experience

and leadership of initiatives as State Health Commissioner.

After describing the scientific literature on addiction and the transition between prescription and street drugs, Dr. Gupta explains in another extended excerpt from his April 15 deposition that:

> [W]e saw very similar facts in West Virginia.  We started to see people that were often – because of a large volume and diversion that resulted often in addiction were utilizing prescription drugs, and . . . when there was action on shutting down a pill mill there were often people that would then not have a supply.
>
> As a result of that, they would either have two or three options.  One option was to go to the emergency room.  We saw flooding of the emergency room.
>
> Second was to go to street drugs which were more readily available, cheap in terms of heroin, or just die, overdose and die.
>
> And we were seeing all of this.  So our findings matched what was being published.
>
> . . .
>
> So as that began to happen, more and more people transitioned to heroin, there began an infiltration of cutting heroin with fentanyl by drug dealers primarily to save costs, to make more money.
>
> And as that was happening, fentanyl, of course, is a substance that's about 80 times more potent than morphine, so because it was uncontrolled, we were seeing batches of deaths happening together because of bad batch of fentanyl-cut heroin.
>
> Across West Virginia, that was the case.  When we had in 2016, fall of 2016 or so, an outbreak in Huntington West Virginia that was first but not the only of its kind across the country, where in a matter of hours, dozens of people were overdosed and had to be taken to the hospital.

Ex. B at 118:17-120:7.  This, therefore, is again exactly the type of percipient observation on which a Rule 26(a)(2)(C) expert should be permitted to testify.

In arguing for exclusion, Defendants again argue that Dr. Gupta's opinions on addiction are impermissible as hybrid testimony because he "was not a treating physician; he did not form these opinions in the course of treating patients in Cabell/Huntington for addiction."  Motion at 18.  And here again, it is not required that Dr. Gupta be a physician treating a patient for him to

17

provide expert opinions pursuant to Rule 26(a)(2)(C).  *See* Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment, subdivision (a)(2)(C) ("*Frequent examples include* physicians or other health care professionals and employees of a party who do not regularly provide expert testimony.") (emphasis added).

Here again, Dr. Gupta is providing Rule 26(a)(2)(C) expert testimony based on his experience and observations as State Health Commissioner and West Virginia's chief *public* health officer.  The fact that he did not treat patients in formulating the State's response to the opioid epidemic does not preclude him from testifying as to what he observed and the opinions he formed in carrying out the State's response.  *See State of Okla.*, *supra*, 2019 WL 4019929, at *9 (citing testimony of State Commissioner of Mental Health and Substance Abuse services in support of finding that the "increase in opioid addiction and overdose deaths following the parallel increase in opioid sales in Oklahoma was not a coincidence; these variables were 'causally linked.'").

This Court should permit Plaintiffs to present the same type of hybrid fact and expert opinion testimony of an eminently qualified and deeply engaged State public health official here.

## CONCLUSION

For all of the reasons set forth, the Court should deny Defendants' second Motion to Exclude Expert Testimony of Dr. Rahul Gupta.

Dated: May 2, 2021                                        Respectfully submitted,

**THE CITY OF HUNTINGTON**                  **CABELL COUNTY COMMISSION**

/s/ *Anne McGinness Kearse*                        /s/ *Paul T. Farrell Jr.*
Anne McGinness Kearse (WVSB No 12547)   Paul T. Farrell, Jr. (WVSB Bar No. 7443)
Joseph F. Rice                                            **FARRELL LAW**
**MOTLEY RICE LLC**                                422 Ninth Street, 3rd Floor (25701)
28 Bridgeside Blvd.                                      PO Box 1180
Mount Pleasant, SC 29464                            Huntington, West Virginia 25714-1180
Tel: 843-216-9000

Fax: 843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com

Linda Singer
David I. Ackerman
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel:  202-232-5504
Fax:  202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com

Charles R. "Rusty" Webb (WVSB No. 4782)
**The Webb Law Centre, PLLC**
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

Mobile: 304-654-8281
paul@farrell.law

*/s/ Anthony J. Majestro*
Anthony J. Majestro (WVSB No. 5165)
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

Michael A. Woelfel (WVSB No. 4106)
**WOELFEL AND WOELFEL, LLP**
801 Eighth Street
Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

**CERTIFICATE OF SERVICE**

I certify that on May 2, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Anthony J. Majestro*