# EXHIBIT A
## EXCERPTS FROM THE DEPOSITION OF RAHUL GUPTA, M.D.
## 09/11/2020

Page 1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2
3
    * * * * * * * * * * * * * * * * * * * * * *
4
    THE CITY OF HUNTINGTON,
5
                Plaintiff,
6
    vs.                                CIVIL ACTION
7                                      NO. 3:17-01362

    AMERISOURCEBERGEN DRUG
8   CORPORATION, et al.,
9                Defendants.
10  _____
11  CABELL COUNTY COMMISSION,
12              Plaintiff,
13  vs.                                CIVIL ACTION
                                       NO. 3:17-01665
14  AMERISOURCEBERGEN DRUG
    CORPORATION, et al.,
15
                Defendants.
16
    * * * * * * * * * * * * * * * * * * * * * *
17
18
19       Videotaped and videoconference deposition
    of RAHUL GUPTA, M.D., taken by the Defendants under
20  the Federal Rules of Civil Procedure in the above-
    entitled action, pursuant to notice, before Teresa
21  S. Evans, a Registered Merit Reporter, all parties
    located remotely, on the 11th day of September,
22  2020.
23
24

Page 22

1  about?
2      A.   I'm sorry, can you repeat that, please?
3      Q.   Sure.  What is your understanding of this
4  case?  What is it about?
5      A.   My understanding is that this case is
6  related to the number of overdose deaths and
7  generally the suffering and the carnage that has
8  occurred broadly in the state of West Virginia, but
9  narrowly in Cabell County and the City of
10 Huntington as a result of oversupply as well as the
11 over-availability of prescription opioids and the
12 consequences resulting from that.
13     Q.   And what is the basis of your
14 understanding?  How did you come to have that
15 understanding?
16     A.   As I had mentioned before, that including
17 my work as the Commissioner for the Bureau of
18 Public Health as well as the State's chief health
19 officer, having worked in this area, having read
20 the reports as well as public records and accounts
21 and have been deposed and involved in the workings
22 of the Department of Health and Human Resources of
23 West Virginia, is how I come about to have that
24 understanding.

Page 35

1  information and opinions about other issues, so if
2  he's asked the questions, he'll respond.
3      A.  I think one of the challenges for me is to
4  be able to differentiate between what case and what
5  specific legalities, so do let me know on that
6  aspect as you ask those questions.
7      Q.  I will, Doctor.  Your answer is perfectly
8  fine.  I understood what you meant.  Thank you.  I
9  just want to have one little clarifying question.
10 When you said, "solve the problem we're facing," do
11 you mean the opioid abuse problem in West Virginia?
12     A.  Yes.  And the public health ensuing crisis.
13     Q.  Thank you.  Doctor, do you have a general
14 understanding of the system of distribution for
15 prescription opioids?
16     A.  My role as the State Health Commissioner
17 and public health officer, I have a broad bird's
18 eye view of the understanding of the system of
19 distribution.
20     Q.  What is that understanding, sir?
21     A.  My understanding is that based on the quota
22 that's determined by the DEA, manufacturers are
23 able to produce the volume of those pills and then
24 the distributors are able to - as registrants of

1   getting into clinical practice.  I could not tell
2   you exactly, but approximately -- I finished my
3   residency was in 1999, so that would have been
4   around the years based on my license, permitted
5   license, that I would have filled out that process.
6              So I would be aware of the DEA
7   registration process since that time.
8       Q.   I see.  Thank you.  I -- my question was
9   confusing.  We started by talking about the system
10  of distribution for controlled substances.  When
11  did you become generally aware of that system of
12  distribution?
13      A.   So it was -- it was more during my term as
14  the health commissioner and the state health
15  officer because I was engaged in addressing the
16  opioid crisis and the public health consequences
17  that I became more aware and became more in contact
18  with the Board of Medicine, the Board of Pharmacy
19  and the controlled substances monitoring program
20  and that was the time during which I came to know
21  much more about the process than I had previously.
22      Q.   And beyond the requirements for all of the
23  actors in the supply chain to be DEA registrants,
24  what else have you learned about the -- that

Page 96

1  You said you focus on the opioid --
2  detailing the opioid crisis in that class. Does
3  your investigation include the causes of the opioid
4  epidemic?
5      A.   We have a discussion on the description of
6  charts and historical perspective. We created -- I
7  ordered - as one of the first acts of being a
8  Commissioner - a historical perspective report that
9  - it's online available - of West Virginia's opioid
10 crisis from 2000 to 2015 data.
11           I take several pieces of information
12 from that report, that's a public report, done
13 under -- I believe, it was Governor Justice. And I
14 use that as an example to talk about historical.
15 We talk about, obviously, all aspects/facets --
16 it's a pandemic -- it's an epidemic of epidemics.
17           We talk about all the consequences that
18 are happening. And then we talk about things that
19 we're doing to solve. The bottom line is, we do
20 talk about, you know, how we got here; but our
21 focus often is: How do we fix this?
22           And we want, you know, in West Virginia
23 our students to understand that while we didn't
24 break it, we'll have to fix it. And we're going to

Page 113

1  the epidemic - at least the ones that you have the
2  most information on - is that prescribers wrote too
3  many prescriptions for opioids?
4      A.   Could you please restate that question?
5      Q.   Yes.  Let me put it this way:  Why do you
6  discuss the volume of prescriptions in West
7  Virginia and in the rest of the nation as part of
8  this presentation focusing on supply-side factors?
9      A.   Because the total volume that was available
10 had a direct relationship and a correlation with
11 the death and destruction that was happening
12 related to overall overdoses in the state of West
13 Virginia.
14     Q.   And when you say that the "total volume
15 that was available," do you mean the total volume
16 of prescriptions?
17     A.   "Prescription" is a surrogate for the
18 amount of pills that were flowing through in
19 communities across towns of West Virginia.
20     Q.   And the number of prescriptions are a
21 surrogate for the number of pills why, in your
22 opinion?
23     A.   Because that is probably the closest way
24 for a public health commissioner like me to be able

Page 114

1 to correlate. I would not have access to the
2 actual data other than published reports, you know,
3 to the tune of what we found later to be 780
4 million or what have you pills.
5         We at the time - as I recollect -
6 weren't really aware of actual numbers, or we were
7 close to aware of that -- being aware of that, but
8 at the same time, prescriptions is the way to have
9 the pills out there. I mean, there is appropriate
10 prescribing and there is inappropriate prescribing.
11         But at the end of the day, it is
12 through prescriptions that the flow of the pills
13 are gonna end up there and be diverted.
14    Q.   Okay, Doctor, I think we're almost at noon
15 now. Why don't we go ahead and take that lunch
16 break for about, say, until 12:30 and then we can
17 come back and opposing counsel can take their -- do
18 their questioning?
19    A.   Okay.
20         MR. COLANTONIO:  Okay, thank you.
21         THE DEPONENT:  Thank you.
22         VIDEO OPERATOR:  Going off the record.
23 The time is 11:53 a.m.
24         (A recess was taken for lunch after

Page 124

1  like to see the work that we had done replicated
2  across the country and other areas as well.
3           We've had also -- hosted the
4  then-secretary of HHS, Tom Price, as well as the
5  counsel to the president, you know, to demonstrate
6  and showcase what was happening in West Virginia
7  with Kellyanne Conway.
8      Q.   And I've heard this term before of social
9  autopsy.  Have you heard that term often?
10     A.   Yes.  We -- so we seeing the declines in
11 death about 10 to 15 to 20 percent each year during
12 my tenure from 2016 and prior to that to -- finally
13 in 2017, I asked -- one of the responsibility of
14 the Commissioner is to be able to produce reports.
15 So I asked my department to work at cross
16 structures in West Virginia - for example, the
17 Medicaid program, the EMS program, the Office of
18 Medical Examiner, the Board of Pharmacy, the Board
19 of Medicine - payors, to create a social autopsy.
20          What that meant was:  We went back to
21 all of the thousand or so deaths in 2016 from
22 overdose and we basically conducted - a simplistic
23 way to say it - a CSI-type of investigation.
24          So we up and did, we wanted to learn

1  from the dead to help inform those who are living.
2              And one of the ways we did that is:  We
3  looked at every single death and we investigated
4  their past one year prior to death and understand
5  what happened, what led to them dying, and then we
6  cataloged that and published that report.
7              That report helped form -- helped us
8  form an opioid task force where we brought in
9  experts from Johns Hopkins, Marshall University,
10 West Virginia University, as I had helped create
11 the Office of Drug Control Policy under the
12 supervision of the State Health Office and
13 Commissioner at the time.
14             The drug czar that I hired who was the
15 former police chief of Huntington, West Virginia,
16 he led this task force that came up with
17 recommendations that then subsequently resulted in
18 two pieces of legislation - the Senate Bill 273 and
19 Senate Bill 272 in 2018 - one of which was called
20 the Opioid Reduction Act.
21             Now, back to the social autopsy, why we
22 ended up with the Senate -- two Senate bills
23 essentially passing unanimously for both parties
24 and being signed by the Governor is because of the

Page 161

1  the monster is off their head.
2              "Now when I go to my family, I can
3  actually have a conversation and remember it with
4  my family.  I can start to feel feelings.  I feel
5  I've come back from death.  I can watch television,
6  I can remember and I can understand what's
7  happening."
8              So that piece -- it allows these
9  medications allow you not to worry about just
10 seeking your next fix; it allows you to actually
11 get a job, have a purpose in life, rebuild your
12 community, rebuild your family and actually be able
13 to function.
14     Q.   All right.  So turning back to the
15 evolution of this opioid problem in West Virginia,
16 did you at some point see an evolution, a change,
17 from opioids to heroin?
18     A.   As I came in as the Commissioner in 2015, I
19 think that evolution was occurring.  I think we
20 were starting to see some of the laws that had been
21 taking place in 2012-2013 -- certainly Governor
22 Tomblin had initiated the Governor's Advisory
23 Committee on Substance Abuse and some of the
24 results were happening.

Page 162

1  So we had a sliver of hope at the time
2  that, "Listen, I think we're starting to see a
3  light at the end of the tunnel" in the sense that,
4  look, we're seeing slight reductions, and that's in
5  the presentation you saw where I showed from 2015
6  to 2016, we went down 15 percent.
7  So we were becoming very hopeful that
8  now perhaps the deaths will follow, meaning
9  reduction in deaths and suffering and other things.
10 Q.  I'm sorry, you said reduction -- reduction
11 in --
12 A.  Reduction in deaths.
13 Q.  I'm sorry, you said you saw a slight
14 reduction --
15 A.  Reduction in prescriptions.  So we started
16 to see from 2015 to 2016, about a 15 to 20 percent
17 reduction in opioid prescriptions.
18 Q.  Okay.
19 A.  And then we were hopeful that we would
20 start to see a reduction in deaths.  But we didn't.
21 And then we started to search that why that we're
22 seeing reduction in prescribing but we're not
23 seeing reduction in the deaths from overdose; we're
24 not seeing significant reduction in the substances

1  of overdose people when they died.
2            And one of the elements that was
3  happening at the time that, again, now it's easier
4  -- a little bit more easier to recognize, is that
5  every time law enforcement would go and do a drug
6  bust of the bad docs, those people would end up on
7  the street that once were addicted to medication --
8  prescription medications, now would have to find --
9  seek and find an alternative, and they would go to
10 the street.
11           And then they started to use IV drugs,
12 heroin.  That was not the only reason it was
13 happening.  It was also because the supply of
14 prescription drugs from a diversion standpoint was
15 drying up a little bit.
16           So as the diverted drugs - opioid
17 prescription drugs - were drying up, then people
18 still needed that fix, as I explained the addiction
19 pathway.  That doesn't solve the problem.  We were
20 too naive to think just reducing the prescription
21 -- diversions would just cure the problem.
22           And what actually happened is the
23 opioid crisis began to evolve -- evolve into a
24 second crisis, which would then started to become

Page 164

1  this heroin crisis.  As we were dealing with that
2  current crisis within the first, a third crisis,
3  which is --
4           You know, everyone asking -- you know,
5  wanting to make most profit from its product, and
6  we saw the -- this happen, the phenomenon happen,
7  with -- where people were dealing heroin, frankly.
8  So they found -- they realized that they could get
9  a bigger profit if they were -- if they could cut
10 their heroin with another substance that could
11 still give the high or give the need that needs to
12 be fed to the people.
13          That was called fentanyl.  It was a
14 clandestine lab-produced fentanyl that's about 50
15 to 100 times more potent than morphine.  So they
16 would -- they began to cut the heroin with this
17 substance on the street.
18          The problem that became for people who
19 are addicted is:  A, they wouldn't know that; the
20 second, B, every time they inject themselves, not
21 only are they risking HIV or hepatitis or what have
22 you, but they're also basically playing Russian
23 roulette with their life, because they wouldn't
24 know if this is the time they were going to die/