# APPENDIX B

**Condensed Transcript Report**

# Plaintiffs' Affirmative Designations to which Defendants Object Based on Lack of Personal Knowledge

**Prevoznik, Thomas  04-18-2019**
**Prevoznik, Thomas  05-17-2019**

**Plaintiffs' Affirmatives  00:24:37**
**Total Time  00:24:37**



ID:VPTA

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE NORTHERN DISTRICT OF OHIO

3  EASTERN DIVISION

4  - - -

5  IN RE:  NATIONAL   :  HON. DAN A.

6  PRESCRIPTION OPIATE   :  POLSTER   LITIGATION   :

7  :   APPLIES TO ALL CASES  :  NO.

8  :  1:17-MD-2804      :

9  - HIGHLY CONFIDENTIAL -

10  SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11  VOLUME II

12  - - -

13  April 18, 2019

14  - - -

15

16  Continued videotaped   deposition of THOMAS PREVOZNIK, taken

17  pursuant to notice, was held at the law   offices of Williams & Connolly, 725 12th

18  Street, Washington, D.C., beginning at   8:16 a.m., on the above date, before

19  Michelle L. Gray, a Registered   Professional Reporter, Certified

20  Shorthand Reporter, Certified Realtime   Reporter, and Notary Public.

21  - - -

22  GOLKOW LITIGATION SERVICES

23  877.370.3377 ph | 917.591.5672 fax    deps@golkow.com

24

1  APPEARANCES:
2  GREENE, KETCHUM, FARRELL, BAILEY & TWEEL LLP
3  PAUL T. FARRELL, JR., ESQ.   419 Eleventh Street
4  Huntington, WV 25701   (304) 521-4778
5  Paul@greeneketchum.com
6  - and -
7  MCHUGH & FULLER   BY:  MICHAEL J. FULLER, ESQ.
8  97 Elias Whiddon Road   Hattiesburg, Mississippi 39402
9  (800) 939-5580   mike@mchughfuller.com
10  - and -
11  MOTLEY RICE, LLC
12  BY:  LINDA SINGER, ESQ.   401 9th Street, NW, Suite 1001
13  Washington, D.C. 20004   (202) 386-9626
14  Lsinger@motleyrice.com   Representing the Plaintiffs
15  - and -
16  THE DUGAN LAW FIRM
17  BY:  BONNIE A. KENDRICK, ESQ.   One Canal Place
18  365 Canal Place, Suite 1000   New Orleans, Louisiana 70130
19  (504) 648-0180   bonnie@dugan-lawfirm.com
20  Representing the Plaintiffs
21
22
23
24

1  APPEARANCES:  (Cont'd.)
2  US DEPARTMENT OF JUSTICE   BY:  DAVID FINKELSTEIN, ESQ.
3  BY:  NATALIE A. WAITES, ESQ.   175 N Street, NE, Room 10-2222
4  Washington, DC 20002   (202) 616-2964
5  david.m.finkelstein@usdoj.gov   natalie.a.waites@usdoj.gov
6
7  - and -
8  US DEPARTMENT OF JUSTICE
9  BY:  JAMES R. BENNETT, II, ESQ.   United States Courthouse
10  801 West Superior Avenue   Suite 400
11  Cleveland, Ohio 44113   (216) 622-3988
12  James.bennett4@usdoj.gov
13  - and -
14  US DEPARTMENT OF JUSTICE   BY:  MARIAMA C. SPEARS, ESQ.
15  8701 Morrisette Drive   Springfield, Virginia 22152
16  (202) 598-6204   Mariama.c.spears@usdoj.gov
17  Representing the US DOJ
18
19
20
21
22
23
24

1  APPEARANCES:  (Cont'd.)
2  WILLIAMS & CONNOLLY, LLP
3  By:  ENU MAINIGI, ESQ.   BY:  COLLEEN MCNAMARA, ESQ.
4  BY:  BRAD MASTERS, ESQ.   BY:  JENNIFER G. WICHT, ESQ.
5  725 12th Street, NW   Washington, D.C. 20005
6  (202) 434-5148  emainigi@wc.com
7  cmcnamara@wc.com  Bmasters@wc.com
8  Jwicht@wc.com   Representing the Defendant, Cardinal
9  Health
10
11  BARTLIT BECK LLP   BY:  LESTER C. HOUTZ, ESQ.
12  1801 Wewatta Street, Suite 1200   Denver, Colorado 80202
13  (303) 592-3199   lester.houtz@bartlit-beck.com
14  Representing the Defendant, Walgreens
15  ROPES & GRAY LLP
16  BY:  ANDREW O'CONNOR, ESQ.   BY:  JOSHUA E. GOLDSTEIN, ESQ.
17  800 Boylston Street   Boston, Massachusetts 02199
18  (617) 951-7234   Andrew.o'connor@ropesgray.com
19  Joshua.goldstein@ropesgray.com        Representing the Defendant, Mallinckrodt
20
21
22
23
24

1  APPEARANCES:  (Cont'd.)
2
3  DECHERT, LLP   BY:  JENNA C. NEWMARK, ESQ
4  1095 Avenue of the Americas   New York, New York 10036
5  (212) 698-3500   Jenna.newmark@dechert.com
6  Representing the Defendant, Purdue  Pharmaceuticals
7
8  MARCUS & SHAPIRA, LLP   BY:  JOSHUA A. KOBRIN, ESQ.
9  One Oxford Centre, 35th Floor   Pittsburgh, Pennsylvania 15219
10  (412) 338-3990   Kobrin@marcus-shapira.com
11  Representing the Defendant, HBC  Service Company
12
13  ZUCKERMAN SPAEDER, LLP   BY:  R. MILES CLARK, ESQ.
14  1800 M. Street NW, Suite 1000   Washington, D.C. 20036
15  (202) 778-1845   Mclark@zuckerman.com
16  Representing the Defendant, CVS
17  REED SMITH, LLP
18  BY:  ROBERT A. NICHOLAS, ESQ.   BY:  JOSEPH J. MAHADY, ESQ.
19  Three Logan Square   1717 Arch Street, Suite 3100
20  Philadelphia, Pennsylvania 19103   (215) 851-8226
21  rnicholas@reedsmith.com  Jmahady@reedsmith.com
22  Representing the Defendant,        AmerisourceBergen Drug Corporation
23
24

1 APPEARANCES: (Cont'd.)
2
3 MORGAN LEWIS & BOCKIUS, LLP   BY:  JOHN P. LAVELLE, JR., ESQ.
4 1701 Market Street   Philadelphia, Pennsylvania 19103
5 (215) 963-4824   John.lavelle@morganlewis.com
6 Representing the Defendant, Rite Aid   Corporation
7
8 FOLEY & LARDNER, LLP   BY:  KRISTINA J. MATIC, ESQ.
9 777 East Wisconsin Avenue   Milwaukee, Wisconsin 53202
10 (414) 297-5913   kmatic@foley.com
11 Representing Actavis Laboratories   UT, Inc., Actavis Pharma, Inc.,
12 ANDA, Inc., and Actavis, Inc.,   (N/k/a Allergan Finance, LLC, Watson
13 Laboratories, Inc.
14 KIRKLAND & ELLIS, LLP
15 BY:  JENNIFER G. LEVY, ESQ.   1301 Pennsylvania Avenue, N.W.
16 Washington, D.C. 20004   (202) 879-5211
17 Jennifer.levy@kirkland.com
18 - and -
19 KIRKLAND & ELLIS, LLP   BY:  KAITLYN COVERSTONE, ESQ.
20 300 North LaSalle Street   Chicago, Illinois 60654
21 (312) 862-7184   Kaitlyn.coverstone@kirkland.com
22 Representing the Defendant, Allergan
23

1 APPEARANCES: (Cont'd.)
2 BARNES & THORNBURG, LLP
3 BY:  WILLIAM E. PADGETT, ESQ.   11 South Meridian Street
4 Indianapolis, Indiana 46204   (317) 236-1313
5 william.padgett@btlaw.com   Representing the Defendant, H.D. Smith
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1 APPEARANCES: (Cont'd.)
2
3 COVINGTON & BURLING, LLP   BY:   CHRISTOPHER K. EPPICH, ESQ.
4 1999 Avenue of the Stars   Los Angeles, California 90067
5 (424) 332-4764   Ceppich@cov.com
6 - and -
7 COVINGTON & BURLING, LLP
8 BY:  KEVIN KELLY, ESQ.   850 Tenth Street, NW
9 Suite 586N   Washington, D.C. 20001
10 (202) 662-5613   Kkelly@cov.com
11 - and -
12 COVINGTON & BURLING, LLP
13 BY:  MEGHAN E. MONAGHAN, ESQ.   850 Tenth Street, NW
14 Suite 586N   Washington, D.C. 20001
15 mmonaghan@cov.com   (202) 662-5110
16 Representing the Defendant, McKesson   Corporation
17
18 JONES DAY   BY:  NEAL J. STEPHENS, ESQ.
19 1755 Embarcadero Road   Palo Alto, California 94303
20 (650) 739-3939   Nstephens@jonesday.com
21 Representing the Defendant, Walmart
22
23
24

1 TELEPHONIC/STREAMING APPEARANCES:
2 LEVIN PAPANTONIO, P.A.
3 BY:  PETER MOUGEY, ESQ.   316 Baylen Street
4 Pensacola, Florida 32502   (850) 435-7000
5 pmougey@levinlaw.com
6 - and -
7 BARON & BUDD, P.C.   BY:  STERLING CLUFF, ESQ.
8 Encino Plaza   15910 Ventura Boulevard,
9 Suite 1600   Encino, California 91436
10 (818) 839-2333   Scluff@baronbudd.com
11 - and -
12 BARON & BUDD, P.C.
13 BY:   WILLIAM G. POWERS, ESQ.   600 New Hampshire Avenue, NW
14 The Watergate, Suite 10-A   Washington, D.C. 20037
15 (202) 333-4562   Wpowers@baronbudd.com
16 - and -
17 BARON & BUDD, P.C.
18 BY:  THOMAS SIMS, ESQ.   The Centrum
19 3102 Oak Lawn Avenue, Suite 1100   Dallas, Texas 75219
20 (214) 521-3605   Tsims@baronbudd.com
21 Representing the Plaintiffs
22
23
24

1  TELEPHONIC/STREAMING APPEARANCES:   (Cont'd.)
2
3  MOTLEY RICE, LLC  BY:  AMANDA UNTERREINER, ESQ.
4  401 9th Street, NW,   Suite 1001
5  Washington, D.C. 20004   (202) 386-9626
6  aunterreiner@motleyrice.com   Representing the Plaintiffs
7
8  ARNOLD PORTER KAYE SCHOLER, LLP   BY:  JOSHUA M. DAVIS, ESQ.
9  601 Massachusetts Avenue, NW  Washington, DC 20001
10  (202) 942-5000  Joshua.davis@arnoldporter.com
11  Representing the Defendants, Endo Health   Solutions Endo Pharmaceuticals, Inc.; Par
12  Pharmaceutical Companies, Inc. f/k/a Par   Pharmaceutical Holdings, Inc.
13
14  REED SMITH, LLP  BY:  SHANNON E. McCLURE, ESQ.
15  Three Logan Square   1717 Arch Street, Suite 3100
16  Philadelphia, Pennsylvania 19103   (215) 851-8226
17  smcclure@reedsmith.com   Representing the Defendant,
18  AmerisourceBergen Drug Corporation
19  CAVITCH FAMILO & DURKIN, CO., L.P.A.
20  BY:  ERIC J. WEISS, ESQ.   1300 E. 9th Street
21  Cleveland, Ohio 44114   (216) 621-7860
22  Eweiss@cavitch.com   Representing the Defendant, Discount Drug
23  Mart

1  TELEPHONIC/STREAMING APPEARANCES:   (Cont'd.)
2
3  VENABLE, LLP  BY:  JAMES K. O'CONNOR, ESQ.
4  750 E. Pratt Street, Suite 900   Baltimore, Maryland 21202
5  (410) 244-7742  Jko'connor@venable.com
6  Representing the Defendant, Abbott   Laboratories and Abbott Laboratories,
7  Inc.
8  LOCKE LORD, LLP
9  BY:  MADELEINE E. BRUNNER, ESQ.   2200 Ross Avenue
10  Suite 2800   Dallas, Texas 75201
11  (214) 740.8758  Maddie.brunner@lockelord.com
12  Representing the Defendant,   Henry Schein, Inc.
13
14  O'MELVENY & MYERS, LLP  BY:  EMILIE K. WINCKEL, ESQ.
15  1625 Eye Street, NW  Washington, D.C. 20006
16  (202) 383-5300  Ewinckel@omm.com
17  Representing the Defendants, Janssen and   Johnson & Johnson
18
19
20
21
22
23
24

1  TELEPHONIC/STREAMING APPEARANCES:   (Cont'd.)
2
3  MORGAN LEWIS & BOCKIUS, LLP   BY:  LATIERA RAYFORD, ESQ.
4  BY:  ZACHARY R. LAZAR, ESQ.   77 West Wacker Drive
5  Chicago, Illinois 60601   (312) 324-1481
6  L a t i e r a . r a y f o r d @ m o r g a n l e w i s . c o m  Zachary.lazar@morganlewis.com
7  Teva Pharmaceuticals, Inc. Cephalon Inc,   Watson Laboratories, Actavis LLC, Actavis
8  Pharma, Inc.
9  BAILEY & WYANT P.L.L.C.
10  BY:  HARRISON M. CYRUS, ESQ.   500 Virginia Street East
11  Suite 600   Charleston, West Virginia 25301
12  (304) 345-4222  Hcyrus@baileywyant.com
13  Representing the Defendant, West   Virginia Board of Pharmacy
14
15  FOX ROTHSCHILD, LLP  BY:  ZACHARY MARTIN, ESQ.
16  2700 Kelly Road   Suite 300
17  Warrington, Pennsylvania 18976   (215) 918-3680
18  Zmartin@foxrothschild.com   Representing the Defendant, Prescription
19  Supply Inc.
20  JONES DAY
21  BY:  PATRICK J. BEISELL, ESQ.   77 West Wacker
22  Chicago, Illinois 60601   (312) 269-4066
23  Pbeisell@jonesday.com   Representing the Defendant, Walmart

1  APPEARANCES:   (Cont'd.)
2
3  ALSO PRESENT:
4  Kaitlyn Eekhoff - Paralegal
5  (Via telephone)  (Motley Rice)
6  Jenna Forster - Paralegal
7  (Motley Rice)
8
9  VIDEOTAPE TECHNICIAN:   Chris Ritona
10
11  LITIGATION TECHNICIAN:   John Knowles
12
13
14
15
16
17
18
19
20
21
22
23
24

---

```
 1   - - -
 2   I N D E X
 3   - - -
 4   Testimony of:
 5   THOMAS PREVOZNIK
 6
 7   By Mr. Stephens    430
 8   By Mr. Farrell     597
 9
10
11
12   - - -
13   E X H I B I T S
14   - - -
15
16   NO.  DESCRIPTION   PAGE
17   DEA  Prevoznik-15 Hearing Before   437
18   The Subcommittee   On Oversight and
19   Investigations  5/8/18
20   Challenges  and   Solutions in the
21   Opioid Crisis
22
23
24
```

---

```
 1   - - -
 2   E X H I B I T S   (Cont'd.)
 3   - - -
 4
 5   NO.  DESCRIPTION   PAGE
 6   DEA  Prevoznik-21 (Clawed Back)   585
 7   US-DEA-00011196-98
 8   DEA  Prevoznik
 9   P-1  21 USCA 801   685
10   DEA  Prevoznik
11   P-2  House Report No.  686   91-1444
12   9/10/70
13   DEA  Prevoznik
14   P-3  HathiTrust   686   Drug Abuse Control
15   Amendments 1970
16   DEA  Prevoznik
17   P-4  Proposed Rule   687   Making, Part 301
18   Federal Register   Vol. 36
19   3/13/71
20   DEA  Prevoznik
21   P-5  Rules & Regulations   688   Title 21 Food and
22   Drugs   Federal Register
23   Vol. 36   4/24/71
24
```

---

```
 1   - - -
 2   E X H I B I T S   (Cont'd.)
 3   - - -
 4
 5   NO.  DESCRIPTION   PAGE
 6   DEA  Prevoznik-16 DEA Letter,  450
 7   9/27/06   In Re: In Reference
 8   To Registration   US-DEA-00022459
 9   DEA
10   Prevoznik-17 Hearing Before   466   The Subcommittee
11   On Oversight and   Investigations
12   3/20/18   The Drug Enforcement
13   Administration's Role   In Combating the Opioid
14   Epidemic
15   DEA  Prevoznik-18 Hearing Before   473
16   The Committee on the   Judiciary US Senate
17   5/16/17   Rogue Online Pharmacies
18   DEA
19   Prevoznik-19 DEA Announces Tool   536   For Registered
     Drug
20   Manufacturers
21   DEA  Prevoznik-20 Hearing Before the   571
22   Permanent Subcommittee   On Investigations
23   Combatting the Opioid   Crisis
24
```

---

```
 1   - - -
 2   E X H I B I T S   (Cont'd.)
 3   - - -
 4
 5   NO.  DESCRIPTION   PAGE
 6   DEA  Prevoznik
 7   P-6  21 CFR 1301.74   688
 8   DEA
 9   Prevoznik  P-7 NWDA Suspicious   689
10   Order Monitoring   System
11   CAH-MDL2804-01465723-34
12   DEA  Prevoznik
13   P-8  Plaintiff Cardinal   691   Health Reply in Support
14   Of Motion for   Preliminary Injunction
15   DEA
16   Prevoznik  P-9 CSMP Page 16  691
17   MCKMDL00409239
18   DEA  Prevoznik
19   P-10   DEA Letter   703   Request No. 03-1134-F
20   Subject, Diversion   Investigators Manual
21   CAH-MDL2804-02203353-57
22
23
24
```

---

```
 1   - - -
 2   E X H I B I T S   (Cont'd.)
 3   - - -
 4
 5   NO.  DESCRIPTION   PAGE
 6   DEA  Prevoznik
 7   P-11   Report to the   709   US Attorney General
 8   By the Suspicious   Orders Task Force
 9   October 1998   CAH_HOUSE_002207-98
10   DEA
11   Prevoznik  P-12   Reservation of Rights 730
12   Cardinal Health's Third   Supplemental Objections
13   DEA
14   Prevoznik  P-13   Chemical Handler's   754
15   Manual A Guide to Chemical   Control Regulations
16   1/2004  CAH 032635-703
17   DEA
18   Prevoznik  P-14   DEA Letter, 9/27/06  760
19   In Re, In Reference   To Registration
20
21   DEA  Prevoznik
22   P-15   DEA Letter, 12/27/07  764   In Re, In Reference
23   To Registration   ABDCMDL00269685-86
24
```

---

```
 1   - - -
 2   DEPOSITION SUPPORT INDEX
 3   - - -
 4
 5   Direction to Witness Not to Answer
 6   PAGE  LINE 485   4
 7   489  8  489  16
 8   608   1
 9   Request for Production of Documents
10   PAGE  LINE
11   None.
12   Stipulations
13   PAGE  LINE
14   None.
15   Questions Marked
16   PAGE  LINE
17   None.
18
19
20
21
22
23
24
```

---

```
 1   - - -
 2   E X H I B I T S   (Cont'd.)
 3   - - -
 4
 5   NO.  DESCRIPTION   PAGE
 6   DEA  Prevoznik
 7   P-16   Federal Register  772   Vol. 73 9/10/08
 8   08-33
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

```
 1   - - -
 2   THE VIDEOGRAPHER:  Good
 3   morning.  Today is April 18, 2019,
 4   8:15 a.m., and this is the
 5   continuation of the deposition of
 6   Thomas Prevoznik.
 7   - - -
 8   ... THOMAS PREVOZNIK, having
 9   been previously sworn, was
10   examined and testified as follows:
11   - - -
12   THE VIDEOGRAPHER:  I
13   apologize.  We need to go off the
14   record.  8:16.  We are off the
15   video record.
16   (Brief pause.)
17   THE VIDEOGRAPHER:  8:18, we
18   are on the video record.
19   - - -
20   EXAMINATION
21   (Continued)
22   - - -
23   BY MR. STEPHENS:
24   Q. Mr. Prevoznik, good morning.
```

1   A. Good morning.
2   Q. Let me introduce myself.
3   I'm Neal Stephens.
4   MR. FINKELSTEIN: Guys.
5   BY MR. STEPHENS:
6   Q. I represent Jones Day, and
7   I'm asking you questions on behalf of the
8   retail pharmacies. You remember that
9   from yesterday, right?
10  A. Yes, I do.
11  Q. Okay. So let me -- let me
12  go back to where we were yesterday. And
13  we were talking through --
14  A. Could I just clarify
15  something from yesterday, please?
16  Q. Sure.
17  A. Okay. First of all I want
18  to thank everybody for allowing me to try
19  to catch my train. Of course with DC
20  around here, my train was delayed. And
21  while I was delayed, I went to our
22  website because I was reflecting on my
23  testimony earlier.
24  And one of the things that

1   came up was guidance as well as
2   conferences. And I know I didn't mention
3   the conferences and the dates. So I just
4   went to our website. And on our website
5   we do have meetings and it has past
6   meetings. So I just looked on there. I
7   want to be able to say that in 2007 and
8   2009, '7 was in Houston, 2009 was in
9   Oregon, Portland.
10  Those were pharmaceutical
11  industry conferences. That was
12  wholesalers, distributors, some
13  importers. So those conferences were
14  there.
15  And then somehow I
16  completely forgot about the
17  manufacturers, importers, and exporter
18  conferences that were in '13 and '15, in
19  particular the '15 one because I actually
20  gave a presentation. So I apologize for
21  that. But I just wanted to clarify that.
22  Q. Where was the location of
23  the 2013 conference?
24  A. The manufacturers?

1   Q. Correct.
2   A. Both were Inner Harbor in
3   Maryland.
4   Q. Okay. And the 2015 was in
5   Maryland as well?
6   A. Yes.
7   Q. All right. Thank you for
8   that.
9   And if I could,
10  Mr. Prevoznik, I'd like to go back to
11  where I ended last evening and pick back
12  up there again today. I just have a few
13  predicate questions to ask you before we
14  go back into it. Okay.
15  A. Yes.
16  Q. All right. We were talking
17  through Topic 2 and Topic 3 of your
18  30(b)(6) designation. And would you
19  agree that who is diverting in the
20  marketplace is relevant to how someone is
21  designing their SOMs program?
22  MR. FINKELSTEIN: Objection.
23  Vague.
24  THE WITNESS: Could you

1   expand on --
2   BY MR. STEPHENS:
3   Q. DEA looks to where diversion
4   is occurring in the United States, right?
5   A. Correct.
6   Q. Where it's happening in the
7   marketplace?
8   A. Correct.
9   Q. Okay. My point is when
10  you're designing a SOMs system, it's
11  relevant where diversion is occurring as
12  to how you develop your SOMs system,
13  right?
14  MR. FINKELSTEIN: Objection.
15  Vague.
16  THE WITNESS: Well, within
17  the closed system of distribution,
18  the whole -- the whole point of
19  the system is to have effective
20  means to guard against diversion.
21  So each -- it's all
22  interconnected.
23  So I don't want to say one
24  is more important than the other

1   one because each step affects the
2   next step --
3   BY MR. STEPHENS:
4   Q. Okay, but.
5   A. -- in either direction.
6   Q. Okay. Sorry. I didn't mean
7   to interrupt you there.
8   Would you agree that to --
9   and these are just predicate questions.
10  To assess if an order is suspicious, it's
11  relevant where the shipping is going?
12  A. That's -- yeah.
13  Q. Okay.
14  A. That's one of -- yes.
15  That's one of the --
16  Q. Not the only criteria --
17  A. Right. That's one of them.
18  Q. -- it's one of them.
19  Okay. So if it's relevant
20  where it's going, where diversion is
21  occurring in the marketplace is relevant,
22  right? One characteristic of relevance?
23  A. Yes.
24  Q. Yes, okay. That's the only

1   point I'm trying to make.
2   A. Okay.
3   Q. All right. So I would then
4   like to continue asking you questions
5   about DEA's interpretation and
6   enforcement of the Controlled Substances
7   Act and the relevant regulations and how
8   that relates to the design of a
9   reasonable SOMs system. Okay?
10  A. Okay.
11  Q. All right. Now, yesterday
12  when we stopped, I believe we had just
13  referred to Exhibit 14, which was
14  statements that Mr. Rannazzisi had made
15  to Congress about 99.5 percent of the
16  prescribers not overprescribing. Do you
17  recall that testimony?
18  A. Yes.
19  Q. Okay. That testimony
20  occurred in 2014, right?
21  A. Yes.
22  Q. Okay. Now, more recently,
23  in 2018, Mr. Patterson testified in front
24  of Congress that 99.9 percent of doctors

1   are all trying to do right by their
2   patients. Are you familiar with that?
3   A. Could I see the testimony?
4   Q. Sure.
5   (Document marked for
6   identification as Exhibit
7   DEA-Prevoznik-15.)
8   BY MR. STEPHENS:
9   Q. Mr. Prevoznik, I marked as
10  Exhibit Number 15 a hearing dated May 8,
11  2018, entitled "Challenges and Solutions
12  in the Opioid Crisis" before the
13  Committee of the Judiciary, House of
14  Representatives. I would direct you to
15  Page 32.
16  If you look at the top of
17  32, there's a paragraph that indicates
18  that Mr. Patterson is talking.
19  A. Correct.
20  Q. Do you see that?
21  A. Yes.
22  Q. Now, Robert Patterson in
23  2018 was the director -- I'm sorry, the
24  administrator of DEA?

1   A. Acting administrator.
2   Q. Acting administrator.
3   A. Right.
4   Q. It's the number one position
5   at DEA?
6   A. Correct.
7   Q. Okay. So here Mr. Patterson
8   was asked a question, and in part of his
9   response he says, "But I go back to the
10  fact that I look at the vast majority of
11  doctors, 99.99 percent are all trying to
12  do right by their patients."
13  Do you see that?
14  A. Correct.
15  Q. Did I read that accurately?
16  A. Yes.
17  Q. Okay. DEA agrees, as of
18  2018, that 99.9 percent of doctors are
19  all trying to do right by their patients,
20  right?
21  MR. FINKELSTEIN: Scope.
22  THE WITNESS: I don't -- I
23  mean, he's stated that, but I
24  don't think it's a static number.

1  So I mean, I think -- it will
2  fluctuate depending on what a
3  prescriber eventually does.
4  BY MR. STEPHENS:
5  Q. Okay.  As of --
6  A. As of that date, that's what
7  was said, yes.
8  Q. Okay.  He was the number one
9  person at DEA when he made that
10  statement, right?
11  A. Right.
12  MR. FINKELSTEIN:  Asked and
13  answered.
14  MR. FARRELL:  Excuse me.
15  Could you please repeat the
16  exhibit number?
17  MR. STEPHENS:  Sure.  That's
18  number 15, Paul.
19  MR. FINKELSTEIN:  And wait
20  for my objections.
21  BY MR. STEPHENS:
22  Q. Mr. Prevoznik, if
23  99.99 percent of prescribers acted
24  appropriately, the diversion problems DEA

1  confronts are generated by the remaining
2  one-tenth of 1 percent of the
3  prescribers?
4  MR. FINKELSTEIN:  Objection.
5  Foundation.  Mischaracterizes
6  prior testimony.
7  THE WITNESS:  If you go with
8  that number, yes, that's correct.
9  BY MR. STEPHENS:
10  Q. Okay.  DEA currently has
11  more than 1.7 million registrants?
12  A. Correct.
13  Q. Okay.  And as you recall
14  yesterday, we talked about prescribing
15  doctors being registrants, right?
16  A. Yes.
17  Q. Okay.  You would agree --
18  MR. FINKELSTEIN:  I'm sorry.
19  Can I just interrupt for one
20  second.  Your -- the softness of
21  your answer is creating problems
22  for the transcript.  I just
23  noticed.  Please speak louder.
24  THE WITNESS:  Okay.  Sorry.

1  BY MR. STEPHENS:
2  Q. All right.  You would agree
3  that not all registrants distributed
4  controlled substances to the one-tenth
5  of 1 percent of the prescribers who
6  diverted opioids from 1998 to present?
7  MR. FINKELSTEIN:  Objection.
8  Scope.  Foundation.
9  Mischaracterizes prior testimony.
10  THE WITNESS:  I'm sorry.
11  Could you repeat?
12  BY MR. STEPHENS:
13  Q. Sure.  So we're talking
14  about the one-tenth of 1 percent, right,
15  of prescribers?
16  A. Right.
17  Q. Okay.  You would agree that
18  not all registrants distributed
19  controlled substances to the one-tenth of
20  1 percent of prescribers who diverted
21  opioids?
22  MR. FINKELSTEIN:  Same
23  objections.
24  THE WITNESS:  What was the

1  time frame?
2  BY MR. STEPHENS:
3  Q. 1998 to present.
4  A. This statement was in 2018.
5  So the percentage -- the percentage would
6  have been different of that.
7  Q. Do you have --
8  MR. FINKELSTEIN:  Tom, a
9  little louder.
10  THE WITNESS:  Okay.  You're
11  asking me from 1998 forward, and
12  this statement was made May 8,
13  2018.
14  BY MR. STEPHENS:
15  Q. All right.
16  A. So the percentage -- that
17  number would not be 99.99 percent.
18  Again, it's not a static number that goes
19  year to year.
20  Q. In 2014, Mr. Rannazzisi
21  estimated 99.5 percent, right?
22  A. Correct.
23  MR. FINKELSTEIN:
24  Foundation.  Mischaracterizes

1 prior testimony.  Scope.
2 You can answer.
3 THE WITNESS:  Correct.
4 BY MR. STEPHENS:
5 Q. That's one-half of one
6 percent, right?
7 A. Correct.
8 Q. 2018, Mr. Patterson said
9 99.99 percent.
10 MR. FINKELSTEIN:  Asked and
11 answered.
12 BY MR. STEPHENS:
13 Q. That's one-tenth of 1
14 percent, right?
15 MR. FINKELSTEIN:  Asked and
16 answered.
17 You can answer again.
18 THE WITNESS:  Correct.
19 BY MR. STEPHENS:
20 Q. Okay.  Do you have a number
21 from 2005?
22 MR. FINKELSTEIN:  Objection.
23 Scope.  You can answer if you
24 know.

1 THE WITNESS:  With the
2 pharmacy diversion awareness
3 conferences, I was with
4 Mr. Rannazzisi at those
5 conferences.  And when we did the
6 presentation, so that was from --
7 when I joined -- when I went to
8 headquarters in April 2012,
9 Atlanta was the first PDAC that I
10 went to.  So from that point on,
11 pretty much every time that we had
12 a presentation, we would say 1 to
13 2 percent.  So that is the figure
14 that I know of, 1 to 2 percent.
15 BY MR. STEPHENS:
16 Q. Okay.  Would you agree then
17 that not all registrants distributed
18 controlled substance to the 1 or
19 2 percent of prescribers who diverted
20 opioids from 2005 to 2018?
21 MR. FINKELSTEIN:  Objection.
22 Scope.
23 THE WITNESS:  I believe I'd
24 be speculating, but -- I would be

1 THE WITNESS:  I don't know.
2 BY MR. STEPHENS:
3 Q. Okay.  Do you have a number
4 from 1998?
5 MR. FINKELSTEIN:  Objection.
6 Scope.  You can answer if you
7 know.
8 THE WITNESS:  I don't know.
9 BY MR. STEPHENS:
10 Q. Okay.  Do you have any basis
11 to say that it's less than 99 percent of
12 prescribers?
13 MR. FINKELSTEIN:  Objection.
14 Scope.
15 Counsel, do you have any
16 questions within the scope of this
17 notice?
18 MR. STEPHENS:  I've already
19 established that they are within
20 the scope.
21 MR. FINKELSTEIN:  We
22 disagree.  We'll let this continue
23 a little bit longer.
24 You can answer if you know.

1 speculating on that, but, yes.
2 BY MR. STEPHENS:
3 Q. Okay.  I'd like to continue
4 by asking you some additional questions
5 about interpretation enforcement of
6 Title 21 U.S.C. 23, the regulations and
7 how those relate to the design of a
8 reasonable SOMs system.  Okay?
9 A. Yes.
10 Q. Okay.  So yesterday you --
11 you testified about different
12 distributors having different business
13 models, right?
14 A. Correct.
15 MR. FINKELSTEIN:  Objection.
16 Scope.  Characterization.
17 BY MR. STEPHENS:
18 Q. Is it fair to say that a
19 SOMs systems is not a one-size-all
20 proposition, one-size-fits-all
21 proposition?
22 A. Correct.
23 Q. And DEA understands that not
24 all registrants distribute opioids to the

1 same customers, right?
2 A. Correct.
3 Q. DEA understands that
4 registrants have different business
5 models?
6 A. Correct.
7 Q. And DEA expects that each
8 registrant will review its own business
9 model and design a SOM system that fits
10 its specific method of distribution?
11 MR. FINKELSTEIN: Objection.
12 Vague.
13 THE WITNESS: That's correct
14 as -- as per the regulations.
15 BY MR. STEPHENS:
16 Q. Okay. Some registrants
17 distribute to hospitals?
18 A. Correct.
19 Q. Some don't?
20 A. Correct.
21 Q. Some registrants distribute
22 to hospice centers?
23 A. Correct.
24 Q. Some don't?

1 Retail chain pharmacies
2 commonly use a self-distributing model
3 where they distribute to chain pharmacy
4 locations that they own.
5 MR. FINKELSTEIN: Objection.
6 Scope. Answer if you know.
7 THE WITNESS: Some do, and
8 some have changed.
9 BY MR. STEPHENS:
10 Q. Okay. For example,
11 Walmart's distribution centers only
12 distributed to Walmart pharmacies at
13 Walmart store locations?
14 MS. SINGER: Objection.
15 MR. FINKELSTEIN: Objection.
16 Scope. Calls for speculation.
17 THE WITNESS: That was
18 correct, yes.
19 BY MR. STEPHENS:
20 Q. All right. I'd like to ask
21 you some questions about Topic 3 related
22 to the guidance that DEA provides
23 regarding the adequacy of SOM systems.
24 Okay?

1 A. Correct.
2 Q. Some registrant distribute
3 to independent pharmacies that the
4 registrants do not own?
5 A. Correct.
6 Q. Some registrants, like
7 retail chain pharmacies, do not
8 distribute to independent pharmacies that
9 they do not own?
10 A. I don't know if I completely
11 agree with that. Because you can have --
12 you could have a -- a
13 registrant-to-registrant sale of -- a
14 distribution from a chain store to an
15 independent store. You can do it. So I
16 can't say carte blanche that that
17 doesn't -- hasn't occurred or -- I just
18 can't say that --
19 Q. Okay.
20 A. -- because that's not an
21 ARCOS reportable transaction.
22 Q. So let -- let me follow up
23 with a different question. Come at it
24 this way.

1 A. Yes.
2 Q. All right. DEA expected
3 that each registrant would take
4 reasonable steps to avoid shipping
5 prescription opioids to individuals who
6 would divert the controlled substances?
7 A. Is that a question?
8 Q. Yes.
9 A. I thought it was a
10 statement. Yes.
11 Q. All right. Let me show you
12 Exhibit 16 which will be the dear
13 registrant letter dated September 27,
14 2006.
15 (Document marked for
16 identification as Exhibit
17 DEA-Prevoznik-16.)
18 BY MR. STEPHENS:
19 Q. Mr. Prevoznik, you're
20 familiar with Exhibit Number 16, correct?
21 A. Correct.
22 Q. All right. I direct your
23 attention, do you see on the first page
24 where it says background?

1 A. Yes.
2 Q. I would direct you to the
3 second paragraph.  And the first sentence
4 says, "The CSA was designed by Congress
5 to combat diversion by providing for a
6 closed system of drug distribution in
7 which all legitimate handlers of
8 controlled substances must obtain a DEA
9 registration, and, as a condition of
10 maintaining such registration, must take
11 reasonable steps to ensure that the
12 registration is not being utilized as a
13 source of diversion."
14 Do you see that?
15 A. Yes.
16 Q. Do you agree with that
17 statement?
18 A. Yes.
19 Q. Okay.  So the the
20 direction -- the statement here is that
21 distributors need to take reasonable
22 steps, right?
23 A. Yes.
24 Q. The -- the letter does not

1 state that registrants need to take every
2 possible step, does it?
3 A. No.  It says reasonable.
4 Q. Okay.  Now, one key point of
5 the Controlled Substances Act is that DEA
6 wanted registrants to set up their supply
7 chain so they did not supply controlled
8 substances to customers who diverted
9 them, right?
10 A. Correct.
11 Q. Okay.  Would DEA agree that
12 a distributor was acting reasonably if it
13 structured its business so that it only
14 distributed to retail chain pharmacies
15 who were among the 98 to 99.9 percent of
16 registrants who did not divert controlled
17 substances?
18 MR. FINKELSTEIN:  Objection.
19 Incomplete hypothetical, and I
20 will instruct you not to answer to
21 the extent that that answer
22 requires information relating to
23 ongoing enforcement actions or
24 investigations.

1 Subject to that objection,
2 you can answer.
3 THE WITNESS:  Could you
4 please repeat it?
5 BY MR. STEPHENS:
6 Q. Sure.  DEA would agree that
7 a distributor was acting reasonably if it
8 structured its business so it only
9 distributed to retail chain pharmacies
10 who were among the 99 -- 98 to
11 99.9 percent of registrants who did not
12 divert controlled substances?
13 MR. FINKELSTEIN:  Also
14 foundation.
15 You can answer.
16 MR. FARRELL:  Excuse me.  I
17 need -- I think I need to place an
18 objection on the record.
19 Objection.  I think I need
20 to say something on the record.
21 Noting that you represent
22 Walmart, I just want to make sure
23 that we -- the questions that
24 you're asking are tailored in

1 terms of Walmart's capacity as a
2 distributor, instead of Walmart's
3 capacity as a dispenser, because
4 as you know, we've long had
5 litigation quarrels on whether or
6 not we can get into dispensing
7 practices.
8 So I just want to make sure
9 the record is clear that the
10 plaintiffs and the PEC are not
11 waiving their right to one day
12 open discussions on dispensing
13 practices.
14 MR. STEPHENS:  Paul, if --
15 if you look at my question, my
16 question only talks about
17 distribution.
18 MR. FARRELL:  Then you
19 talked about the 99 percent of
20 prescribers.  So that's why I was
21 concerned whether or not --
22 MR. STEPHENS:  It's -- it's
23 simply distribution.  That's all
24 I'm asking.  That's why the

1   question has got two references to
2   distribution, period.
3   MR. FARRELL: Okay. Very
4   good. Sorry.
5   MR. FINKELSTEIN: Do you
6   remember the question?
7   THE WITNESS: One more time
8   please.
9   BY MR. STEPHENS:
10  Q. DEA would agree that a
11  distributor was acting reasonably if it
12  structured its business so it only
13  distributed to retail chain pharmacies
14  who were among the 99.5 percent,
15  98 percent of registrants who did not
16  divert controlled substances?
17  MR. FINKELSTEIN: The
18  objections are foundation,
19  incomplete hypothetical, and don't
20  answer based on confidential law
21  enforcement information.
22  THE WITNESS: Okay. Again,
23  I think this goes back to, you can
24  have the best plans, but in terms

1   MR. FINKELSTEIN: Incomplete
2   hypothetical.
3   MR. FARRELL: Again, my
4   objection is you laid the
5   foundation that the 1 or 2 percent
6   included doctors trying to do the
7   right thing. So I just want to
8   make it clear that if we're
9   getting into dispensing claims,
10  that's a big issue for the
11  plaintiffs.
12  MR. FINKELSTEIN: I'm not.
13  THE WITNESS: I would just
14  repeat that you can have the best
15  strategy planned, but are you
16  executing that plan.
17  BY MR. STEPHENS:
18  Q. Okay. All right. But if a
19  distributor, just generally, a
20  distributor -- if a distributor is not
21  distributing prescription opioids to
22  someone who is diverting them, is the
23  distributor acting reasonably in the eyes
24  of DEA?

1   of execution and implementation of
2   that plan, that business plan
3   you're talking about, we did have
4   a chain that it was specifically
5   on their distribution center that
6   did not report suspicious orders
7   and that was part of a civil
8   settlement of $80 million.
9   So that company thought they
10  had a business strategy in place
11  and they ended up with their
12  distribution center in Florida not
13  doing what they said they were
14  going to do.
15  BY MR. STEPHENS:
16  Q. Okay. Let me re-ask it from
17  a different angle.
18  A. Sure.
19  Q. Does DEA agree
20  distributor is acting reasonably if it
21  structured its business model so it
22  distributes to customers who are not
23  among the 1 or 2 percent of people who
24  divert prescription opioids?

1   MR. FINKELSTEIN: Incomplete
2   hypothetical. That was the third
3   time you asked.
4   You can answer a third time.
5   THE WITNESS: The --
6   their -- according to your --
7   my -- what I understand you're
8   asking is, it's a distributor, a
9   company distributor is sending to
10  their own pharmacies, correct?
11  BY MR. STEPHENS:
12  Q. No. I've changed that.
13  A. Okay.
14  Q. Okay. So my question is, if
15  a distributor is not distributing
16  prescription opioids to someone who is
17  diverting them, is the distributor acting
18  reasonably in the eyes of DEA?
19  MR. FINKELSTEIN: Incomplete
20  hypothetical. Asked and answered.
21  THE WITNESS: This -- this
22  isn't just, I mean, just opioids,
23  you have responsibility for all
24  controlled substances that are

04-18-2019     **Prevoznik, Thomas**     Page 459

```
 1  distributed.  It's not just
 2  opioids.  The responsibility is
 3  all controlled substances.
 4  BY MR. STEPHENS:
 5  Q. Okay.  So let me re-ask the
 6  question.  If a distributor is not
 7  distributing controlled substances to
 8  someone who is diverting them, is the
 9  distributor acting reasonably in the eyes
10  of DEA?
11  MR. FINKELSTEIN:  Incomplete
12  hypothetical.  Asked and answered.
13  Go ahead and answer again.
14  THE WITNESS:  So there's no
15  controlled substances being
16  distributed?
17  BY MR. STEPHENS:
18  Q. Let me re-ask the question.
19  A. Sure.
20  Q. If a distributor is not
21  distributing controlled substances to
22  someone who is diverting them, is the
23  distributor acting reasonably in the eyes
24  of DEA?
```

04-18-2019     **Prevoznik, Thomas**     Page 460

```
 1  MR. FINKELSTEIN:  Incomplete
 2  hypothetical.  Asked and answered.
 3  THE WITNESS:  To -- give me
 4  the last part?  Who is it going
 5  to?
 6  BY MR. STEPHENS:
 7  Q. If a distributor is not
 8  distributing controlled substances to
 9  someone who is diverting them and
10  distributing to others, is the
11  distributor acting reasonably in the eyes
12  of DEA?
13  MR. FINKELSTEIN:  Same
14  objections.
15  THE WITNESS:  Yes.
16  BY MR. STEPHENS:
17  Q. Okay.  The diversion control
18  group at DEA headquarters in Washington
19  DC understand that DEA field division
20  offices across the country will interest
21  act with registrants, true?
22  A. True.
23  Q. And DEA personnel from DEA
24  field offices will communicate with
```

04-18-2019     **Prevoznik, Thomas**     Page 461

```
 1  registrants about a registrant's SOMs
 2  system, true?
 3  A. Yes.  True.
 4  Q. DEA headquarters expects a
 5  registrant to listen to the information
 6  it receives from DEA field office
 7  personnel, true?
 8  MR. FINKELSTEIN:  Vague.
 9  THE WITNESS:  Yeah.  It
10  depends what they are asking,
11  sure.
12  BY MR. STEPHENS:
13  Q. Okay.  And the registrants
14  who are visited by DEA field office
15  personnel can rely on the information
16  that they receive from DEA field division
17  personnel regarding SOMs systems, true?
18  MR. FINKELSTEIN:  Vague.
19  Incomplete hypothetical.
20  THE WITNESS:  Yeah, they get
21  guidance.
22  BY MR. STEPHENS:
23  Q. Would you agree that it's
24  important for DEA's diversion control
```

04-18-2019     **Prevoznik, Thomas**     Page 462

```
 1  leadership at DEA headquarters in
 2  Washington DC to clearly communicate its
 3  interpretation of the requirements of the
 4  CSA and its regulations related to
 5  suspicious order monitoring to DEA's
 6  field offices?
 7  MR. FINKELSTEIN:  Asked and
 8  answered.  I'll note that every
 9  set of attorneys has asked a
10  version of this question.
11  But you can answer again.
12  THE WITNESS:  Yes.
13  BY MR. STEPHENS:
14  Q. Okay.  You would agree that
15  providing clear direction to DEA's field
16  divisions one of the most important
17  functions of the diversion control group
18  leadership at headquarters?
19  A. Yes.
20  Q. If DEA headquarters does not
21  clearly communicate its interpretation of
22  the regulations and statutes related to
23  the suspicious order monitoring programs
24  to DEA's field offices, the field offices
```

1  may give inaccurate information to
2  registrants?
3  MR. FINKELSTEIN:  Vague.
4  MS. SINGER:  Objection.
5  Calls for speculation.
6  THE WITNESS:  I don't -- I
7  don't know specifically what every
8  field office has provided that
9  guidance and oftentimes when there
10  is a question regarding that, we
11  will -- the field is instructed to
12  have the registrant reach out to
13  headquarters for an official
14  review.
15  BY MR. STEPHENS:
16  Q. Okay.
17  A. So the official review would
18  come from the headquarters side.
19  Q. Okay.  My question is a
20  little bit -- I understand what you're
21  saying.  My question is just a little bit
22  different.
23  My question is, if the field
24  office doesn't necessarily understand

1  A. Yes.  That sounds about
2  right.
3  Q. Okay.  After Mr. Rannazzisi
4  left DEA in 2015, DEA's leadership
5  recognized that it needed to make some
6  important changes to improve how DEA
7  communicated with registrants, true?
8  MR. FINKELSTEIN:  Objection.
9  Vague.
10  MS. SINGER:  Lack of
11  foundation.
12  THE WITNESS:  I mean, yeah,
13  yeah.
14  BY MR. STEPHENS:
15  Q. DEA's leadership after
16  Mr. Rannazzisi left DEA in 2015 wanted to
17  increase collaboration with registrants
18  to decrease diversion, correct?
19  A. Correct.
20  Q. DEA's current leadership has
21  acknowledged that it needs to do better
22  in its efforts to collaborate with
23  manufacturers, distributors, and retail
24  chain pharmacies, true?

1  headquarter's position on something
2  related to the statute and the
3  regulations, there's a risk that they
4  could provide inaccurate information to
5  registrants in the field?
6  MS. SINGER:  Objection.
7  Calls for speculation.
8  MR. FINKELSTEIN:  I'll join.
9  Add vague, incomplete
10  hypothetical.
11  THE WITNESS:  I would -- if
12  they don't know, and don't ask,
13  then yes, hypothetically, yes.
14  BY MR. STEPHENS:
15  Q. All right.  So let's now
16  talk about communications between DEA and
17  the registrants.  All right?
18  A. Yes.
19  Q. Okay.  Agree that at some
20  point after -- well, let me strike that
21  and start over.
22  Mr. Rannazzisi ran the
23  diversion control group from 2006 to
24  about 2015, right?

1  A. I believe we all need to do
2  it.
3  Q. Okay.
4  A. Not just one.  It's --
5  everybody has to be involved.
6  Q. My question is maybe a
7  little bit different than your answer.
8  So let me restate it.
9  A. Sure.
10  Q. DEA's current leadership has
11  acknowledged that it needs to do better
12  in its efforts to collaborate with
13  manufacturers, distributors and retail
14  chain pharmacies?
15  A. Correct.
16  MR. FINKELSTEIN:  Just wait.
17  (Document marked for
18  identification as Exhibit
19  DEA-Prevoznik-17.)
20  BY MR. STEPHENS:
21  Q. Mr. Prevoznik, I'm showing
22  you what has been marked as Exhibit
23  Number 17.  It is more summit -- or
24  congressional materials.

1    This one is dated March 20,
2    2018.  It's a hearing in front of the
3    subcommittee of oversight and
4    investigations.  The committee on energy
5    and commerce entitled, "The Drug
6    Enforcement Administration's Role in
7    Combatting the Opioid Epidemic."
8    Do you see that?
9    A. Yes.
10   Q. All right.  I would direct
11   you to Page 21.
12   MR. FINKELSTEIN:  Counsel,
13   whose highlighting is this?
14   MR. STEPHENS:  We can get a
15   clean version at a break.  That
16   highlighting would be -- it may be
17   mine.
18   MR. FINKELSTEIN:  Okay.
19   BY MR. STEPHENS:
20   Q. On Page 21 do you see in
21   bold in the middle of the page it talks
22   about DEA's lessons learned and the
23   response of the proliferation of CPDs?
24   A. Yes.

1    Q. Okay.  And if you look at
2    the -- the first sentence there, it
3    reads, "Due to the complexity of DEA's
4    regulatory program, the diversion control
5    division has worked aggressively to
6    improve its communication and cooperation
7    with its more than 1.7 million
8    registrants who represent medical
9    professionals, pharmaceutical drug
10   manufacturers, and those in the drug
11   chain" -- "drug supply chain."
12   Do you see that?
13   A. Yes.
14   Q. Have I read that accurately?
15   A. Yes.
16   Q. Okay.  And -- and this is a
17   statement indicating that DEA's
18   leadership in March 20th of 2018 was
19   working aggressively to improve its
20   communication and cooperation with
21   registrants, right?
22   A. Right.
23   Q. Okay.  DEA also recognizes
24   that if it improves on its communication

1    responsibilities with its registrants, it
2    would help in the effort to reduce
3    prescription drug abuse?
4    MR. FINKELSTEIN:  Vague.
5    Incomplete hypothetical.
6    THE WITNESS:  That's the
7    goal.
8    BY MR. STEPHENS:
9    Q. Okay.  And would you agree
10   that current leadership at DEA is now
11   willing to collaborate with registrants
12   who can help DEA reduce diversion?
13   A. Yes.
14   Q. Fair to say that DEA's
15   current leadership understands that
16   treating potential good faith
17   collaborators as adversaries is not an
18   effective way to reduce diversion?
19   MR. FINKELSTEIN:  Incomplete
20   hypothetical.
21   THE WITNESS:  Correct.
22   BY MR. STEPHENS:
23   Q. All right.  Mr. Prevoznik,
24   I'd like to transition a little bit here

1    and ask you some questions about the
2    internet distributor initiative,
3    including why DEA gave those internet
4    distributor initiative briefings, when
5    the briefings occurred and who generally
6    received them.  Okay?
7    A. Sure.
8    Q. This is 30(b)(6) Topic 3.
9    Okay?
10   A. Yes.
11   Q. All right.  And -- and you
12   testified about some of this yesterday.
13   I'll try and go quickly through that.
14   All right?
15   A. Yes.
16   Q. In 2006, DEA implemented the
17   internet distributor initiative, right?
18   MR. FINKELSTEIN:  Asked and
19   answered.
20   THE WITNESS:  2005.
21   BY MR. STEPHENS:
22   Q. Okay.  2005, right.  So DEA
23   implements it in 2005, right?
24   A. Correct.

1  Q. Okay. And the -- the
2  program is initially designed to educate
3  wholesale distributors related to rogue
4  internet pharmacies, and then downstream,
5  a little bit later, it was to diverting
6  rogue pain clinics, right?
7  MR. FINKELSTEIN: Asked and
8  answered.
9  THE WITNESS: Correct.
10 BY MR. STEPHENS:
11 Q. Okay. All right. I was
12 just trying to remind you from where we
13 were yesterday.
14 All right. My question is,
15 did DEA ever have a retail chain pharmacy
16 initiative?
17 A. No.
18 Q. Did DEA ever meet with CVS,
19 Rite Aid, Walmart or Walgreens, HBC Giant
20 Eagle, as part of DEA's internet
21 distributor initiative?
22 A. Not to my knowledge.
23 Q. Okay. Now at the time, you
24 know, taking you back to 2005, 2006, DEA

1  believed that some of these internet
2  pharmacies were rogue pharmacies, meaning
3  that those pharmacies were diverting
4  opioids?
5  MR. FINKELSTEIN: Asked and
6  answered.
7  THE WITNESS: Correct.
8  BY MR. STEPHENS:
9  Q. Okay. The DEA also
10 understood that not all pharmacies
11 operating on the internet diverted
12 controlled substances, true?
13 A. Correct.
14 Q. So some internet pharmacies
15 were rogue and diverted opioids, and
16 other internet pharmacies were not rogue
17 and did not divert opioids, true?
18 MS. SINGER: Objection.
19 Scope.
20 THE WITNESS: Could you
21 repeat that?
22 BY MR. STEPHENS:
23 Q. Sure. Some internet
24 pharmacies were rogue and diverted

1  opioids in the eyes of DEA. And others
2  were not rogue and did not divert
3  opioids, correct?
4  MR. FINKELSTEIN: Calls for
5  speculation.
6  THE WITNESS: I am not aware
7  of any pharmacies not on the --
8  the latter part of your question.
9  Because not all -- not all
10 internet pharmacies were
11 dispensing opioids, but they could
12 be dispensing other controlled
13 substances, and that would be
14 diversion of those controlled
15 substances.
16 (Document marked for
17 identification as Exhibit
18 DEA-Prevoznik-18.)
19 BY MR. STEPHENS:
20 Q. Mr. Prevoznik, I've placed
21 in front of you a transcript from the --
22 a hearing before Congress dated May 16,
23 2007. It's a hearing before the
24 committee on the judiciary of the United

1  States Senate entitled, "Rogue Online
2  Pharmacies: The Growing Problem of
3  Internet Drug Trafficking."
4  Do you see that?
5  A. Yes.
6  Q. Okay. If I could direct you
7  to Page 52.
8  If you look at the top of
9  Page 52, Mr. Prevoznik, it's entitled,
10 "Rogue Online Pharmacies: The Growing
11 Problem of Internet Drug Trafficking,"
12 dated May 16, 2007. Questions for the
13 hearing record for Joseph Rannazzisi,
14 deputy assistant administrator, office of
15 diversion control, Drug Enforcement
16 Administration, United States Department
17 of Justice.
18 Do you see that?
19 A. Yes.
20 Q. Okay. The very first
21 question is from Chairman Leahy, do you
22 see that?
23 A. Yes.
24 Q. And 1.a. asks:

1   "Approximately how many websites
2   currently offer to sell controlled
3   substances illegally over the internet?"
4   Do you see that?
5   A. Yes.
6   Q. Okay.  Now, if you look down
7   towards the -- the middle of the
8   response, there's a state -- there's a
9   sentence that starts it should be noted.
10  Do you see that?
11  A. Yes.
12  Q. The statement reads:  "It
13  should be noted that there are legitimate
14  pharmacies that provide controlled
15  substances via the internet and operate
16  daily within the boundaries of the law."
17  Do you see that?
18  A. Yes.
19  Q. Do you agree with that?
20  MR. FINKELSTEIN:  Scope.
21  Calls for speculation.
22  THE WITNESS:  Yeah, this is
23  before the Ryan-Haight Act.  So,
24  yes.

1   sure what you mean by the use of
2   the word "blame."
3   BY MR. STEPHENS:
4   Q. Did DEA take any action,
5   civil, regulatory, administrative,
6   against legitimate internet pharmacies
7   who DEA thought was acting within the
8   boundaries of the law for the actions of
9   the other internet pharmacies who DEA
10  thought were rogue and were diverting
11  controlled substances?
12  MR. FINKELSTEIN:  Vague.
13  Incomplete hypothetical.
14  THE WITNESS:  I'm not aware
15  of it.
16  BY MR. STEPHENS:
17  Q. Okay.  So one aspect that
18  DEA included in its internet distributor
19  briefing related to the percentage of
20  controlled versus noncontrolled
21  substances that a particular pharmacy
22  ordered, right?
23  MR. FINKELSTEIN:  Vague.
24  THE WITNESS:  Correct.

1   BY MR. STEPHENS:
2   Q. Okay.  So my -- my point
3   was, some internet pharmacies in the eyes
4   of DEA were rogue and diverted opioids --
5   or diverted controlled substances, fair?
6   A. Fair.
7   Q. All right.  Other online
8   internet pharmacies were not rogue
9   pharmacies and operated within the
10  boundaries of the law in the eyes of DEA
11  as of May 16, 2007, based on what DEA
12  told the Senate, right?
13  A. Correct.
14  Q. Okay.  Now, did DEA blame
15  the internet pharmacies who were acting
16  within the boundaries of the law for the
17  actions of the rogue internet pharmacies
18  who DEA thought were diverting
19  prescription opioids?
20  MS. SINGER:  Objection.
21  Scope.
22  MR. FINKELSTEIN:  Vague.
23  Incomplete hypothetical.
24  THE WITNESS:  Not really

1   BY MR. STEPHENS:
2   Q. Okay.  And you testified
3   about this a little bit yesterday, right?
4   A. Yes.
5   Q. Okay.  All right.  So I've
6   got a few more questions related to that.
7   I will try not to repeat the exact
8   question.
9   And one characteristic the
10  DEA noticed about rogue internet
11  pharmacies that were diverting controlled
12  substances was an imbalance that they had
13  between the ratio of controlled
14  substances compared to non-controlled
15  substances that they distributed, right?
16  A. That would be one criteria.
17  Yes.
18  Q. And some of the rogue
19  internet pharmacies that were diverting
20  controlled substances had a ratio where
21  they distributed 95 percent controlled
22  substances against 5 percent
23  non-controlled substances, right?
24  A. Yes.

1  Q. And DEA viewed a ratio of
2  95 percent controlled substances versus 5
3  percent non-controlled substances as a
4  possible indication that the internet
5  pharmacy was diverting the controlled
6  substances true?
7  A. I don't -- I don't think we
8  locked in on those specific numbers.  I
9  mean, that was an example he gave of 95
10  and five.  But we were -- we were
11  comparing against a brick-and-mortar
12  store of what typically happens there.
13  Q. Yeah.  Okay.  So -- and a
14  brick-and-mortar store would be like a
15  Walmart or CVS, a Rite Aid, HBC Giant
16  Eagle, CVS, right?
17  A. As well as independent
18  pharmacies as well, yes.
19  Q. Okay.  And Walmart
20  pharmacies never had a ratio of
21  controlled to noncontrolled substances
22  that approached anything like the 95
23  percent to 5 percent ratio that the DEA
24  saw at some rogue internet pharmacies,

1  right?
2  MR. FINKELSTEIN:  Wait.
3  Scope, calls for speculation.
4  THE WITNESS:  Not to my
5  knowledge.
6  BY MR. STEPHENS:
7  Q. Okay.  CVS, Walgreens, Rite
8  Aid, HBC Giant Eagle, they never had a
9  ratio of controlled to noncontrolled
10  substances that was 95 percent controlled
11  to 5 percent non-controlled, right?
12  MR. FINKELSTEIN:  Scope.
13  Calls for speculation.
14  THE WITNESS:  Not to my
15  knowledge.
16  MR. FINKELSTEIN:
17  Mr. Videographer, what's our
18  on-the-record time?
19  THE VIDEOGRAPHER:
20  42 minutes.
21  MR. FINKELSTEIN:  We're past
22  seven hours.  So everybody knows.
23  BY MR. STEPHENS:
24  Q. DEA has acknowledged and has

1  acknowledged in presentations that it
2  gave that no chain pharmacies were rogue
3  pharmacies, right?
4  A. Correct.
5  MR. FINKELSTEIN:  Hang on
6  one second.  I am just reading the
7  question.
8  Okay.
9  BY MR. STEPHENS:
10  Q. Your answer was "correct,"
11  right?
12  A. Yes.
13  Q. Walmart, CVS, Rite Aid,
14  Walgreens, HBC Giant Eagle are all chain
15  pharmacies, true?
16  A. True.
17  Q. DEA is generally aware that
18  Walmart only distributes controlled
19  substances to its own Walmart store
20  pharmacies, right?
21  MR. FINKELSTEIN:  Objection.
22  Scope.  Calls for speculation.
23  THE WITNESS:  Well, that
24  just changed.  But prior to the

1  change, yes.
2  BY MR. STEPHENS:
3  Q. Okay.  And the change now is
4  that they don't distribute at all, right?
5  A. Correct.
6  Q. Okay.  Walmart did not
7  distribute controlled substances to
8  internet pharmacies, right?
9  MR. FINKELSTEIN:  Scope.
10  Calls for speculation.
11  THE WITNESS:  I don't know.
12  I can't answer that, because I
13  don't know if there were any sales
14  store -- from the store to one of
15  those -- one of those potentially
16  rogue pharmacies.
17  BY MR. STEPHENS:
18  Q. I'm only talking about --
19  MR. FINKELSTEIN:  Let him
20  finish his answer.
21  MR. STEPHENS:  I've let him
22  finish his answer.
23  MR. FINKELSTEIN:  No, you
24  haven't let him finish his answer.

1 MR. STEPHENS:  All morning
2 long.
3 BY MR. STEPHENS:
4 Q. Mr. Prevoznik, have I been
5 interrupting you this morning?
6 A. I'm fine.
7 Q. Okay.  Thank you.
8 CVS did not distribute
9 controlled substances to rogue internet
10 pharmacies, correct?
11 MR. FINKELSTEIN:  Vague.
12 THE WITNESS:  Again, I don't
13 know if there were transactions
14 between the -- a pharmacy to
15 pharmacy.
16 BY MR. STEPHENS:
17 Q. I'm talking about
18 distribution.
19 MR. FINKELSTEIN:  Scope.
20 Incomplete hypothetical.  Vague.
21 THE WITNESS:  Well, now that
22 you've added distribution in that,
23 then no, not to my knowledge.
24 BY MR. STEPHENS:

1 Q. My question, Mr. Prevoznik,
2 just to reconfirm, all deal with
3 distribution here.
4 A. Okay.
5 Q. Okay.  So I'll re-ask it.  I
6 think we got an answer.  But let me
7 re-ask it so the record is clear.
8 CVS did not distribute
9 controlled substances to rogue internet
10 pharmacies right?
11 A. Not --
12 MS. SINGER:  Objection
13 scope.
14 MR. FINKELSTEIN:  Wait, Tom.
15 Scope.  Incomplete
16 hypothetical.  Vague.  We're past
17 seven hours, and you're still
18 outside the scope.  I'm going to
19 start instructing him not to
20 answer.
21 You can answer this time.
22 THE WITNESS:  Not to my
23 knowledge.
24 BY MR. STEPHENS:

1 Q. And Rite Aid didn't
2 distribute controlled substances to
3 internet pharmacies, right?
4 MR. FINKELSTEIN:  Scope.
5 I instruct you not to
6 answer.
7 MR. STEPHENS:  What's the
8 basis for that?
9 MR. FINKELSTEIN:  It's
10 outside the scope.  You've spent
11 more than seven hours with this
12 witness.  Ask questions within the
13 scope of the deposition that is.
14 MS. MAINIGI:
15 Mr. Finkelstein, if I may just
16 note on the record.  I don't know
17 what relevance seven hours has and
18 why you continue to reference
19 seven hours to this particular
20 deposition.  The manner in which
21 the time is calculated, as you
22 know, was per Judge Cohen --
23 Special Master Cohen's order.
24 The seven hours is

1 irrelevant.  I think it would
2 certainly be relevant in that we
3 wouldn't want to burden the
4 witness by going longer than seven
5 hours, perhaps, in the course of
6 one particular day.  But I don't
7 think there's any need, the
8 morning of the deposition, to keep
9 referencing seven hours.
10 MR. FINKELSTEIN:  You've
11 noted your position that the seven
12 hours is irrelevant.  My
13 instruction stands.  And we can
14 revisit this with the special
15 master.
16 MS. MAINIGI:  If there's
17 something to revisit, we're happy
18 to do that.  I don't see anything
19 to revisit.
20 MR. FINKELSTEIN:  Good.  I
21 agree.
22 THE REPORTER:  You have to
23 speak up.  There's no mic.
24 MR. KOBRIN:  Sorry.  I'm

1   Josh Kobrin for HBC.  Mr. Stephens
2   is representing all of the chain
3   pharmacies.  And to cut him off
4   when he's trying to ask questions
5   on behalf of all those chain
6   pharmacies when he's in the middle
7   of a question that is clearly not
8   a hypothetical.  On the basis that
9   it's a hypothetical, is totally
10  improper.
11  MR. FINKELSTEIN:  Your
12  objection is noted.
13  MR. STEPHENS:  I would also
14  note that the answers that the
15  witness started with this morning
16  about diversion, where to -- who
17  diverts is relevant to the
18  adequacy of a SOMs program, and
19  where diversion occurs being
20  relevant to the adequacy of a SOMs
21  program, and to -- to assess a
22  suspicious order, where the
23  shipment goes and it's distributed
24  to is relevant, puts me well

1   you not to answer.
2   THE WITNESS:  Correct.
3   MR. FINKELSTEIN:  Tom.  Tom.
4   BY MR. STEPHENS:
5   Q. Walmart -- Walgreens did not
6   distribute controlled substances to
7   internet pharmacies, correct?
8   MR. FINKELSTEIN:  Instruct
9   you not to answer.
10  THE WITNESS:  Taking the
11  advice of my attorney.
12  BY MR. STEPHENS:
13  Q. HBC Giant Eagle did not
14  distribute controlled substances to
15  internet pharmacies, correct?
16  MR. FINKELSTEIN:  Instruct
17  you not to answer.
18  THE WITNESS:  Following my
19  attorney's instructions.
20  BY MR. STEPHENS:
21  Q. Okay.  Mr. Prevoznik,
22  after -- you mentioned the Ryan-Haight
23  Act in 2008, right?
24  A. Correct.

1   within Topic Number 2 and Topic
2   Number 3, that deal with DEA's
3   interpretation and enforcement of
4   the Controlled Substances Act, its
5   regulations, what is suspicious,
6   know your customer, and DEA's
7   guidance on the adequacy of a SOMs
8   program.
9   MR. FINKELSTEIN:  Let -- let
10  me answer.  You are asking him
11  what a specific retail chain
12  pharmacy actually does in
13  operation.  That's outside the
14  scope, and I've instructed him not
15  to answer that question.
16  You can ask your next
17  question.
18  MR. STEPHENS:  Who they
19  distribute to.
20  BY MR. STEPHENS:
21  Q. Rite Aid did not distribute
22  controlled substances to internet
23  pharmacies, correct?
24  MR. FINKELSTEIN:  Instruct

1   Q. Okay.  The Ryan-Haight Act
2   in 2008 dealt with a legislative attempt
3   to try and deal with the problem that DEA
4   was seeing with rogue internet
5   pharmacies, fair?
6   MS. SINGER:  Objection.
7   Scope.
8   THE WITNESS:  Correct.
9   BY MR. STEPHENS:
10  Q. Okay.  So I'm again going to
11  ask you some questions about where DEA
12  saw diversion occurring, okay?
13  A. Yes.
14  Q. Okay.  Now, the -- after the
15  Ryan-Haight Act, DEA took some
16  enforcement actions against rogue
17  internet pharmacies, right?
18  A. Yes.  As -- as well as some
19  distributors.
20  Q. Okay.  And -- and after
21  that, in the 2008-2009 time period, DEA
22  began to see issues with rogue pain
23  clinics, right?
24  MR. FINKELSTEIN:  Asked and

1   answered.
2   THE WITNESS:  Correct.
3   MR. STEPHENS:  I'm just
4   trying to set the time frame for
5   the witness.
6   BY MR. STEPHENS:
7   Q. Do you understand what I'm
8   saying, Mr. Prevoznik?
9   A. Yes.
10  Q. Okay.  All right.  So it was
11  in the -- in -- approximate time frames
12  here, and clarify to whatever degree you
13  feel you need to, Mr. Prevoznik.  But
14  roughly in 2009, 2010, and shortly after
15  that, the DEA started to have more issues
16  with rogue pain clinics, right?
17  A. Correct.
18  Q. Okay.  Did DEA ever conduct
19  a distributor briefing with retail chain
20  pharmacies related to rogue pain clinics?
21  MR. FINKELSTEIN:  Asked and
22  answered.
23  THE WITNESS:  Correct.
24  BY MR. STEPHENS:

1   Q. Okay.  So now like rogue --
2   or I'm sorry, strike that.  Let me re-ask
3   the question.
4   Like internet pharmacies,
5   DEA -- DEA would agree that not all pain
6   clinics diverted controlled substances?
7   MR. FINKELSTEIN:  Calls for
8   speculation.  Asked and answered.
9   THE WITNESS:  Correct.
10  BY MR. STEPHENS:
11  Q. Okay.  There was some good
12  pain clinics who operated within the
13  boundaries of the law and there were some
14  rogue pain clinics that operated outside
15  the boundaries of the law.
16  Is that fair?
17  MS. SINGER:  Same objections
18  as to scope of the questioning
19  here.
20  THE WITNESS:  Yes.
21  BY MR. STEPHENS:
22  Q. Okay.  Did DEA file any
23  lawsuits against the good pain clinics to
24  try and make them pay for the harm caused

1   by the rogue pain clinics?
2   MR. FINKELSTEIN:  Objection.
3   Vague.
4   THE WITNESS:  Not that I'm
5   aware of.
6   BY MR. STEPHENS:
7   Q. Okay.  And like the rogue
8   internet pharmacies that preceded them,
9   these rogue pain clinics that were
10  diverting controlled substances typically
11  distributed a lopsided ratio of
12  controlled substances to noncontrolled
13  substances?
14  MS. SINGER:  Objection.
15  Scope.
16  THE WITNESS:  To my -- yes.
17  BY MR. STEPHENS:
18  Q. Okay.  The -- rogue pain
19  clinics were not full service pharmacies
20  like a retail chain pharmacy like Walmart
21  or CVS, Rite Aid or Walgreens, right?
22  MR. FINKELSTEIN:  Calls for
23  speculation.  Foundation.
24  THE WITNESS:  I'm not sure

1   what you mean by --
2   MS. SINGER:  Objection as to
3   scope.
4   BY MR. STEPHENS:
5   Q. All right.  So rogue pain
6   clinics didn't sell cornflakes, greeting
7   cards, Oreo cookies, that type thing,
8   right?
9   MR. FINKELSTEIN:  Calls for
10  speculation.
11  MS. SINGER:  Objection.
12  Scope.
13  THE WITNESS:  Correct.
14  BY MR. STEPHENS:
15  Q. Okay.  But retail chain
16  pharmacies do sell a full service of
17  other things to their customers, right?
18  MR. FINKELSTEIN:  Calls for
19  speculation.
20  THE WITNESS:  Yes.
21  BY MR. STEPHENS:
22  Q. Mr. Prevoznik, if I could
23  I'd like to transition to Topic Number 9
24  which -- of your 30(b)(6), which relates

1  to ARCOS.  Okay?
2  A. Yes.
3  Q. And I'd like to ask you a
4  few questions about why DEA processes and
5  analyzes ARCOS data to identify and stop
6  sources of diversion.
7  Okay?
8  A. Yes.
9  Q. Okay.  So -- and you've
10  answered some questions about ARCOS
11  yesterday, right?
12  A. Yes.
13  Q. Okay.  So I'll try not to
14  re-ask those.  I'll do the best I can.
15  I'll -- I may have to touch on some of
16  them just to set where I'm going with the
17  other questions that I want to ask.
18  All right?
19  A. Yes.
20  Q. Okay.  So yesterday you
21  mentioned that the ARCOS database has the
22  ability to generate investigative leads
23  that DEA could pursue proactively to
24  discover the identity of individuals

1  responsible for diverting opioids, true?
2  MR. FINKELSTEIN:  Letting
3  this go for now.  You can answer.
4  THE WITNESS:  Yes.
5  BY MR. STEPHENS:
6  Q. And those ARCOS leads could
7  be helpful to DEA's efforts in the field,
8  right?
9  A. Yes.
10  Q. And that would support DEA's
11  mission to prevent diversion where it's
12  occurring, right?
13  A. It points to it.  It might
14  not just be that source.  There's going
15  to be other issues as well, so...
16  Q. Would you agree with a
17  general principle that more investigative
18  leads generated by ARCOS would equate to
19  more proactive investigations of
20  potential diverters?
21  MR. FINKELSTEIN:  Incomplete
22  hypothetical.
23  THE WITNESS:  Yeah.  It's a
24  point.

1  BY MR. STEPHENS:
2  Q. And more proactive
3  investigations of potential diverters
4  should result in more actions filed
5  against suspected diverters?
6  MR. FINKELSTEIN:  Incomplete
7  hypothetical.
8  THE WITNESS:  What kind of
9  actions?
10  BY MR. STEPHENS:
11  Q. Any.  Admin, civil,
12  criminal.
13  MR. FINKELSTEIN:  Same --
14  BY MR. STEPHENS:
15  Q. Basically, the more leads
16  you have, the more cases you can make,
17  right?
18  MR. FINKELSTEIN:  Same
19  objection.
20  THE WITNESS:  Yes.
21  BY MR. STEPHENS:
22  Q. More leads is a good thing
23  for an investigator, right?
24  MR. FINKELSTEIN:  Same

1  objection.
2  THE WITNESS:  Yes.
3  BY MR. STEPHENS:
4  Q. All right.  So let me ask
5  you a few questions about DEA's procedure
6  regarding who at DEA processes the ARCOS
7  data to generate the leads to identify
8  and stop diversion, okay?
9  A. Yes.
10  Q. Topic 9 in your 30(b)(6)
11  designation.
12  Yesterday you testified
13  that, as I understand it, there are
14  currently ten employees who work on the
15  ARCOS unit that analyzes the data; is
16  that right?
17  A. Yeah.  Yes, they analyze the
18  data.
19  Q. Four input, and six output,
20  right?
21  A. Yes.
22  Q. Okay.  The six output, would
23  those be the DEA employees who analyze
24  the data to put out to the field

1   proactive investigative leads that the
2   field can use?  Am I understanding that?
3   A. Actually, the field has
4   access to it as well.  So the field can
5   generate their own leads off it.  So
6   our -- the group at headquarters assists
7   with -- assists -- often assists with
8   case investigations as well.  So the
9   leads could come from either the field
10  themselves, the field investigators
11  themselves, or they may come from our
12  group at headquarters.
13  So it's a combination of
14  either source that would -- that could
15  potentiate those leads.  So I know it's
16  not one particular group that does it.
17  There's various people doing it all
18  across the field.
19  Q. All right.  Are you done?
20  A. Mm-hmm.
21  Q. Okay.  I just wanted to make
22  sure I didn't interrupt you.
23  And my question may be more
24  artfully framed.  Can you describe for me

1   the difference between the duties that
2   the four input analysts have at DEA
3   headquarters and compare that against the
4   duties that the six output employees have
5   at headquarters?
6   A. Sure.  So the input duties
7   are -- that's the uploaded, as the
8   registrants upload their data.  They --
9   that's what the input side does.  They
10  deal with the -- to ensure that the data
11  is going in correctly, that errors are
12  being fixed.  There's constant
13  communication with the registrants on,
14  you know, you have to fix these errors.
15  Is this what you meant?  If they see
16  anomalies, they will call the registrant,
17  say, you know, your decimal point looks
18  like it may be off.  Could you look at
19  your data?
20  And so there's that constant
21  communication to try to verify that what
22  they're reporting is true and accurate.
23  So that's the input side.
24  The output side takes that

1   data that comes from the registrants, and
2   then it -- through case support with the
3   field and with investigations, they do
4   the online statistical reports that we
5   upload.  They respond to FOIAs.  They
6   respond to doing -- for presentations.
7   They also do assessments,
8   trends assessments.  They also do threat
9   assessments for the field.  So that's
10  part of our -- building our scheduled
11  work plan.  So it's a variety of
12  different things that that group does.
13  Q. Okay.  That's helpful.
14  Thank you.
15  So there are ten people
16  there currently, right?
17  MR. FINKELSTEIN:  Asked and
18  answered.
19  THE WITNESS:  Yes.
20  BY MR. STEPHENS:
21  Q. Okay.  And you supervised
22  this group for a while?  Did you
23  supervise these ten employees for a
24  while?

1   A. I was never their direct
2   supervisor.  I'm a step higher.
3   Q. Okay.  No, I understand that
4   you're senior in the org chart.  I'm just
5   trying to make sure that I understand at
6   some point these ten people were in your
7   reporting chain of command.
8   A. Yes, that's correct.
9   Q. Okay.  They are not
10  currently?
11  A. Correct.
12  Q. Okay.  All right.  Has the
13  number -- and what's this -- what's this
14  unit called, this ARCOS unit, what does
15  DEA call it?
16  A. ARCOS unit or targeting and
17  analysis.
18  Q. Okay.  So if I call it the
19  ARCOS unit you understand what I'm
20  talking about?
21  A. Correct.
22  Q. Okay.  All right.  It
23  currently has ten employees.  How many
24  employees did the -- this ARCOS unit have

1   in, say, 2015?
2   A. I'd speculate, because I
3   wasn't up there at that point.  But
4   probably about ten.
5   Q. Okay.  Can you identify any
6   period during your time at DEA where it
7   had more -- that the ARCOS unit had more
8   than ten employees on it?
9   A. Oh, I'm sorry.  What I meant
10  by ten, you had ten in the output side
11  and you had about three on the input
12  side.  So it was a slight increase.  I
13  know -- I believe we're three under right
14  now on our organizational chart.
15  Q. So -- and you've been in DEA
16  for -- since '91?
17  A. Yeah.
18  Q. Okay.  And just -- can you
19  identify any period of time between 2006
20  and 2015 where this ARCOS unit had more
21  than ten people working on it?
22  MR. FINKELSTEIN:  Asked and
23  answered.
24  THE WITNESS:  I don't know.

1   I don't know.
2   BY MR. STEPHENS:
3   Q. Okay.  So DEA currently uses
4   ARCOS data in a proactive way to identify
5   targets to investigate for diverting
6   prescription opioids, right?
7   A. Correct.
8   Q. And in DEA terms, a
9   proactive investigation is where DEA
10  would identify a target and build a
11  forward-looking case using investigative
12  tools at DEA's disposal, right?
13  MR. FINKELSTEIN:  Vague.
14  THE WITNESS:  Yes.
15  BY MR. STEPHENS:
16  Q. Okay.  And in contrast, a
17  reactive case is a situation where a
18  diversion investigator may have already
19  built a case and then, you know looks to
20  ARCOS for some information to confirm its
21  case against someone that's already been
22  built out, right?
23  A. I wouldn't say that it's all
24  the way to, like, the conclusion where we

1   come in.  It's usually we are working
2   together through it --
3   Q. Okay.
4   A. -- as --
5   Q. Describe for me the
6   difference --
7   MR. FINKELSTEIN:  Wait.  Let
8   him finish his answer.
9   BY MR. STEPHENS:
10  Q. Mr. Prevoznik, was I
11  interrupting you?
12  MR. FINKELSTEIN:  You just
13  did interrupt him.
14  BY MR. STEPHENS:
15  Q. I'm sorry.  Did you feel
16  that I was interrupting you?
17  A. I'm fine.
18  Q. Okay.  Thank you.
19  MR. FINKELSTEIN:  The record
20  is going to reflect that he didn't
21  finish his answer.  And I'm asking
22  counsel please let him finish his
23  answer.
24  BY MR. STEPHENS:

1   Q. Mr. Prevoznik, I'll work
2   with you all day long to let you finish
3   your answers.  If you don't think I am, I
4   apologize.  All right?
5   A. I'm good.
6   Q. Okay.  Thank you.  All
7   right.  I'm just trying to understand in
8   DEA land what the difference is between
9   proactive and reactive, right.
10  So how would you describe
11  and define what reactive means?
12  A. Well, to me reactive would
13  be the field generated.  So they are
14  turning to the ARCOS unit to say hey, I'm
15  either at the beginning part, middle
16  part, or I need charts.  The U.S.
17  attorneys asked me to get charts on this.
18  So that would be reactive.
19  Proactive would be something
20  that that group puts out.
21  Q. Right.  I got it.
22  One is an existing
23  investigation.  They are just trying to
24  confirm something through the use of

1 ARCOS.  And another one would be a
2 proactive lead generated from
3 headquarters to try and build a case,
4 right?  Like a threat assessment.
5 A. Correct.
6 Q. A threat assessment would be
7 a proactive use of ARCOS, right?
8 MR. FINKELSTEIN: Objection.
9 Vague.
10 THE WITNESS:  Yes.
11 BY MR. STEPHENS:
12 Q. And in your view, producing
13 threat assessments to the field is a good
14 thing?
15 MR. FINKELSTEIN: Objection.
16 Vague.
17 THE WITNESS:  Yes.
18 BY MR. STEPHENS:
19 Q. Between 2006 and 2015, under
20 the leadership of Joe Rannazzisi, ARCOS
21 analysts did not provide quarterly threat
22 assessments to the 22 field divisions at
23 DEA, right?
24 MR. FINKELSTEIN:  Vague.

1 You can answer.
2 THE WITNESS:  Well, again,
3 we -- in 2010 when we all went off
4 the mainframe, the field had -- I
5 mean, we always had access to
6 ARCOS, so you did have the field
7 generating their own leads.  So
8 they -- that -- that's what they
9 would do.  They would use that
10 data for that.
11 BY MR. STEPHENS:
12 Q. Okay.  All right.  My
13 question is a little bit different.  I
14 understand your response.  My question is
15 a little bit different.
16 Between 2006 and 2015 under
17 the leadership of Joe Rannazzisi, the
18 ARCOS group at DEA headquarters did not
19 provide quarterly threat assessments to
20 the field divisions at DEA, true?
21 MR. FINKELSTEIN:  Vague.
22 THE WITNESS:  To my
23 knowledge, you're right.
24 MS. SINGER:  Is this a good

1 time to take a break, or soon?
2 BY MR. STEPHENS:
3 Q. You okay?  I've got -- I've
4 got a little bit more on these topics.
5 A. About five minutes?
6 About five minutes?
7 Q. Okay.  Yeah, just let me
8 know.
9 A. I just need a break.
10 Q. Okay.
11 All right.  So I've got some
12 additional questions that will focus on
13 the 2006 to 2015 time period.  Okay?  As
14 it relates to ARCOS.
15 A. Yes.
16 Q. Fair to say that DEA's
17 current leadership has improved how DEA
18 uses ARCOS data in its diversion
19 investigations after Mr. Rannazzisi
20 retired in 2015?
21 MR. FINKELSTEIN:  Vague.
22 THE WITNESS:  I'm not sure
23 what you mean by improvements.
24 BY MR. STEPHENS:

1 Q. Well, like using threat
2 assessments and sending those to the
3 field.  You view those as a good thing,
4 right?
5 THE WITNESS:  Yes.
6 MR. FINKELSTEIN: Objection.
7 Vague.
8 BY MR. STEPHENS:
9 Q. And that happened after
10 Mr. Rannazzisi left in 2015, right?
11 A. Yes.
12 Q. And the purpose of putting
13 those threat assessments out to the field
14 division is the hope that they will
15 reduce diversion, right?
16 MR. FINKELSTEIN:  Vague.
17 THE WITNESS:  Yes.  But I do
18 want to emphasize that ARCOS is
19 not the only system that we use to
20 send -- that's analyzed to send
21 field -- leads out to the field.
22 I mean there's other databases
23 that we use and we work with other
24 federal agencies and share data.

1   So ARCOS is just a -- one part of
2   a vast array of analysis that's
3   used.
4   BY MR. STEPHENS:
5   Q. Okay.  Between 2006 and 2015
6   under Mr. Rannazzisi's leadership, did
7   DEA have any published policy about what
8   happens after an ARCOS lead is generated?
9   A. Not to my knowledge.
10  Q. Between 2006 and 2015, under
11  Mr. Rannazzisi's leadership, did DEA have
12  any process where it maintained any
13  report indicating how many ARCOS leads
14  were sent to DEA field investigations for
15  investigation?
16  MR. FINKELSTEIN:  Vague.
17  THE WITNESS:  Not to my
18  knowledge.
19  BY MR. STEPHENS:
20  Q. Between 2006 and 2015, under
21  Mr. Rannazzisi's leadership, did DEA have
22  any process where it maintained any
23  report indicating how many ARCOS leads
24  were actually investigated at the field

1   suspension orders DEA obtained based on
2   ARCOS leads?
3   A. Not to my knowledge.
4   Q. Between 2006 and 2015 under
5   Mr. Rannazzisi's leadership, did DEA have
6   any process where it maintained any
7   report indicating how many orders to show
8   cause DEA generated based on ARCOS leads?
9   A. Not to my knowledge.
10  Q. Between 2006 and 2015 under
11  Mr. Rannazzisi's leadership, did DEA have
12  any process where it maintained any
13  report indicating how many convictions
14  DEA obtained of diverters based on ARCOS
15  leads?
16  MR. FINKELSTEIN:  Vague.
17  THE WITNESS:  Not to my
18  knowledge.
19  BY MR. STEPHENS:
20  Q. Between 2006 and 2015 under
21  Mr. Rannazzisi's leadership, did DEA have
22  any process where it maintained any
23  report indicating how many indictments
24  DEA returned following ARCOS leads that

1   division level?
2   A. Not to my knowledge.
3   Q. Between 2006 and 2015 under
4   Mr. Rannazzisi's leadership, did DEA have
5   any process where it maintained any
6   report indicating how many ARCOS leads
7   were referred out but not by DEA
8   headquarters, but not investigated at the
9   field division level?
10  A. Not to my knowledge.
11  Q. Between 2006 and 2015 under
12  Mr. Rannazzisi's leadership, did DEA have
13  any process where it maintained any
14  report indicating how many ARCOS leads
15  resulted in formal actions by DEA against
16  suspected diverters?
17  MR. FINKELSTEIN:  Vague.
18  THE WITNESS:  Not to my
19  knowledge.
20  BY MR. STEPHENS:
21  Q. Between 2006 and 2015 under
22  Mr. Rannazzisi's leadership, did DEA have
23  any process where it maintained any
24  report indicating how many immediate

1   had been generated?
2   MR. FINKELSTEIN:  Vague.
3   THE WITNESS:  Not to my
4   knowledge.
5   MR. FINKELSTEIN:  Seems like
6   we are at a pause.  Can we take a
7   break?
8   MR. STEPHENS:  Sure.
9   THE VIDEOGRAPHER:  9:27.  We
10  are off the video record.
11  (Short break.)
12  THE VIDEOGRAPHER:  9:48.  We
13  are on the video record.
14  BY MR. STEPHENS:
15  Q. Mr. Prevoznik, let me ask
16  you a couple quick questions and then
17  I'll get back into ARCOS.
18  Okay?
19  A. Sure.
20  Q. You had mentioned at the
21  start today that you had looked at DEA's
22  website and figured out a couple
23  conferences.  You gave us that
24  information, right?

1 A. Yes.
2 Q. Okay.  As to the 2007
3 conference in Houston, you were not
4 physically present at that conference,
5 right?
6 A. Correct.
7 Q. You did not attend, correct?
8 A. Correct.
9 Q. Okay.  All right.
10 Now, one other question.
11 Does a nonregistrant have an obligation
12 to maintain effective controls to prevent
13 diversion?
14 MR. FINKELSTEIN:  Vague.
15 THE WITNESS:  A
16 nonregistrant?
17 BY MR. STEPHENS:
18 Q. Right.
19 A. They're not within the
20 closed system of distribution.
21 Q. Okay.  So they have no duty
22 to maintain effective controls to prevent
23 diversion, correct?
24 MR. FINKELSTEIN:  Vague.

1 THE WITNESS:  Correct.
2 BY MR. STEPHENS:
3 Q. All right.  Turning back to
4 ARCOS.  Between 2006 and 2015, did DEA
5 maintain any report that would show how
6 many ARCOS leads got sent to DEA offices
7 in Ohio in any particular year?
8 MR. FINKELSTEIN:  Scope.
9 THE WITNESS:  Not to my
10 knowledge during that particular
11 period, and we don't do it today,
12 so...
13 BY MR. STEPHENS:
14 Q. Okay.  Between 2006 and
15 2015, did DEA have any process that
16 required the ARCOS team to run pattern
17 evaluation tests to verify whether ARCOS
18 was generating high quality investigative
19 leads as opposed to suboptimal
20 investigative leads?
21 MR. FINKELSTEIN:  Vague.
22 MS. SINGER:  Objection.
23 Foundation.
24 THE WITNESS:  Could you

1 explain that?
2 BY MR. STEPHENS:
3 Q. Sure.  Pattern evaluation
4 test is a qualitative measure by which
5 you look at a computer program and try
6 and determine whether what the output is,
7 is of high quality or suboptimal quality.
8 Was DEA doing anything along those lines
9 between 2006 and 2015 as it related to
10 ARCOS data?
11 MR. FINKELSTEIN:  Vague.
12 THE WITNESS:  I don't know.
13 BY MR. STEPHENS:
14 Q. Between 2006 and 2015 under
15 Mr. Rannazzisi's leadership, did DEA have
16 any procedure that required DEA special
17 agent in charges in the various field
18 divisions to report back to DEA
19 headquarters to give process reports
20 about what the field division had done to
21 investigate ARCOS leads?
22 A. Not to my knowledge.
23 Q. Okay.  And just for
24 definitional purposes, each DEA field

1 position has a number one agent that runs
2 that field division.  That agent's title
3 is a special agent in charge, the SAC,
4 right?
5 A. Correct.
6 Q. SAC.  Correct.  Was there
7 any policy at DEA between 2006 and 2015
8 that would have prevented the deputy
9 administrator in charge of diversion
10 control from instituting that procedure?
11 A. Not to my knowledge.
12 Q. Between 2006 and 2015, did
13 DEA have any procedure that prevented a
14 field -- that prevents a field division
15 from simply ignoring ARCOS information
16 sent to them by DEA headquarters?
17 A. Not to my knowledge.
18 Q. Was there anything
19 preventing the deputy administrator in
20 charge of diversion control,
21 Mr. Rannazzisi, from instituting a
22 process to ensure that DEA's field
23 divisions would not ignore ARCOS leads in
24 their work?

1 MS. SINGER:  Objection.
2 Foundation.
3 MR. FINKELSTEIN:  Objection.
4 Foundation.  Misstates his title.
5 THE WITNESS:  Not to my
6 knowledge.
7 BY MR. STEPHENS:
8 Q. Did the diversion control
9 group under Mr. Rannazzisi's leadership
10 ever form an ARCOS review committee to
11 analyze ARCOS data for leads to identify
12 where diversion was occurring?
13 MR. FINKELSTEIN:  Vague.
14 THE WITNESS:  Could you
15 please repeat that?
16 BY MR. STEPHENS:
17 Q. Sure.  Did the diversion
18 control group under Mr. Rannazzisi's
19 leadership from 2006 to 2015 ever form an
20 ARCOS review committee to analyze ARCOS
21 data for leads to identify where
22 diversion was occurring?
23 MS. SINGER:  Objection.
24 Foundation.

1 MR. FINKELSTEIN:  Vague.
2 THE WITNESS:  Not to my
3 knowledge.
4 BY MR. STEPHENS:
5 Q. Between 2006 and 2015 under
6 Mr. Rannazzisi's leadership, did DEA ever
7 institute any procedure whereby field
8 divisions needed to establish an ARCOS
9 review committee to analyze the leads
10 received from DEA to assess how those
11 leads could stop diversion?
12 MR. FINKELSTEIN:  Asked and
13 answered.  Vague.
14 THE WITNESS:  Not to my
15 knowledge.
16 BY MR. STEPHENS:
17 Q. Was there any policy at DEA
18 between 2006 and 2015 that would have
19 prevented Mr. Rannazzisi, who ran the
20 diversion control group, from instituting
21 a procedure where the field divisions
22 needed to establish an ARCOS review
23 committee to analyze the leads
24 received -- or any leads received from

1 MR. FINKELSTEIN:  Same
2 objection.
3 THE WITNESS:  Not to my
4 knowledge.
5 BY MR. STEPHENS:
6 Q. Okay.  Between 2006 and
7 2015, under Mr. Rannazzisi's leadership,
8 did DEA ever institute any procedure
9 whereby field divisions were required to
10 establish an ARCOS review committee to
11 analyze any ARCOS leads or information
12 received by the field from DEA
13 headquarters to assess how that
14 information from ARCOS could identify
15 where diversion was occurring in that
16 district?
17 MR. FINKELSTEIN:  Vague.
18 THE WITNESS:  Not to my
19 knowledge.
20 BY MR. STEPHENS:
21 Q. Was there any policy at the
22 Drug Enforcement Administration between
23 2006 and 2015 that would have prevented
24 Mr. Rannazzisi from doing so?

1 DEA headquarters to assess how those
2 leads could stop diversion?
3 MR. FINKELSTEIN:  Asked and
4 answered.
5 MS. SINGER:  Same objection
6 to lack of foundation.
7 THE WITNESS:  Not to my
8 knowledge.
9 BY MR. STEPHENS:
10 Q. Between 2006 and 2015 under
11 Mr. Rannazzisi's leadership, did DEA
12 headquarters ever institute a procedure
13 where it placed diversion investigators
14 at DEA headquarters as opposed to a field
15 division who would be responsible for
16 conducting proactive investigations based
17 on leads generated by ARCOS?
18 MS. SINGER:  Objection.
19 Foundation.
20 MR. FINKELSTEIN:  Vague.
21 THE WITNESS:  Could you
22 please repeat that.
23 BY MR. STEPHENS:
24 Q. Sure.

1  Between 2006 and 2015, under
2  Mr. Rannazzisi's leadership of the
3  diversion control group, did DEA
4  headquarters under Mr. Rannazzisi's
5  leadership ever institute a procedure
6  where it placed diversion investigators
7  at DEA headquarters as opposed to being
8  housed in a field division who would be
9  responsible for conducting proactive
10  investigations based on leads generated
11  by ARCOS?
12  MS. SINGER:  Objection.
13  THE WITNESS:  At one point
14  there were no DIs in the ARCOS
15  unit.  But there are -- there were
16  DIs placed in the ARCOS unit
17  during that period.  Kyle Wright
18  was one.  Nancy Jackson was one.
19  Noreen Valentine was one.  So the
20  investigators were placed into
21  that unit.
22  BY MR. STEPHENS:
23  Q. That's three.  Can you
24  identify any others?

1  to repeat the question.  That's all.
2  Q. No, fair.  I know you do.
3  And I'm going to.  I'm just trying to
4  give you a little basis of the -- why I'm
5  asking the question.
6  My question is, if
7  Mr. Rannazzisi was concerned that ARCOS
8  leads were being ignored by the field
9  divisions, he could have assembled a full
10  team of DEA's diversion investigators and
11  stationed that squad at DEA headquarters
12  under his direct command to pursue ARCOS
13  leads, true?
14  MR. FINKELSTEIN:  Incomplete
15  hypothetical.  Foundation.
16  THE WITNESS:  He could do
17  that if he felt that.  But I don't
18  know if he ever felt that.
19  BY MR. STEPHENS:
20  Q. Okay.  He never did that,
21  right?
22  A. He never did that, and we
23  still haven't done that.
24  Q. Okay.  Between 2006 and 2015

1  A. Not off the top of my head.
2  Q. Okay.  If -- if the deputy
3  administrator in charge of the diversion
4  control group was concerned that ARCOS
5  information was being ignored by the
6  field division, he could have assembled a
7  full squad of diversion investigators,
8  stationed them at DEA headquarters under
9  his direct command to pursue that ARCOS
10  information, true?
11  MS. SINGER:  Objection.
12  Foundation.
13  MR. FINKELSTEIN:  Incomplete
14  hypothetical.  Calls for
15  speculation.
16  THE WITNESS:  Could you
17  please repeat that.
18  BY MR. STEPHENS:
19  Q. Yeah.  This is just -- it's
20  like a structural org chart-related-type
21  question.  Okay, Mr. Prevoznik?
22  A. Mm-hmm.
23  Q. Verbal.  Okay?
24  A. I gotcha.  I just want you

1  under Mr. Rannazzisi's leadership, did
2  DEA headquarters ever institute a
3  procedure where it placed diversion
4  investigators at headquarters as opposed
5  to a field division who would be
6  responsible for investigating suspicious
7  order report leads?
8  MR. FINKELSTEIN:  I withdraw
9  my objection.
10  THE WITNESS:  So for -- our
11  investigations are -- are usually
12  from the field, so the field is
13  investigating, headquarters does
14  not investigate.  We support and
15  help coordinate a case.  So the
16  actual investigation is done at
17  the field level, not at
18  headquarters.
19  BY MR. STEPHENS:
20  Q. Okay.  So if I understand
21  your response, your response to my
22  question is no, headquarters never
23  instituted a procedure where it placed
24  diversion investigators at headquarters

1 as opposed to a field division who would
2 then be responsible for investigating
3 suspicious order report leads, correct?
4 MR. FINKELSTEIN: Do you
5 understand counsel's question?
6 THE WITNESS: I do now.
7 MS. SINGER: Objection.
8 MR. FINKELSTEIN: Okay. You
9 can answer counsel's question.
10 THE WITNESS: No, we did not
11 put anything in there.
12 BY MR. STEPHENS:
13 Q. Okay. I apologize. I've
14 got a double negative here that I just
15 want to confirm. I know what you're
16 saying I think, but let me make sure I've
17 got a clean record. Okay?
18 Between 2006 and 2015, did
19 DEA ever institute a procedure where it
20 placed diversion investigators at DEA
21 headquarters as opposed to a field
22 division to investigate suspicious order
23 report leads?
24 MR. FINKELSTEIN: Asked and

1 answered.
2 THE WITNESS: No.
3 BY MR. STEPHENS:
4 Q. If a deputy administrator
5 who ran division control from 2006 to
6 2015 was concerned that suspicious order
7 report leads were being ignored by the
8 field divisions, he could have assembled
9 a team of DEA's diversion investigators,
10 placed that squad at DEA headquarters
11 under his command to pursue those leads,
12 right?
13 MS. SINGER: Objection.
14 Lack of foundation.
15 MR. FINKELSTEIN: Incomplete
16 hypothetical. Lack of foundation.
17 THE WITNESS: So he could
18 have done that. He didn't do it.
19 And we still haven't done it.
20 MR. FINKELSTEIN: Can I just
21 make sure I'm following this?
22 Because I want to make an
23 appropriate objection.
24 Before you were asking about

1 ARCOS analysis. Now you're asking
2 about SORs, right?
3 MR. STEPHENS: I just had
4 that one question on SORs because
5 it was similar to the ARCOS
6 question.
7 I will be asking him about
8 SORs which is another 30(b)(6)
9 topic here in a little bit,
10 counsel.
11 BY MR. STEPHENS:
12 Q. All right. Let's return
13 back to ARCOS.
14 Okay, Mr. Prevoznik?
15 A. Yes.
16 Q. Yesterday, you had mentioned
17 in 2018 DEA changed its process to
18 provide more information out to
19 registrants that related to ARCOS
20 information?
21 MR. FARRELL: Objection.
22 Foundation.
23 MR. STEPHENS: I'm just
24 trying to -- to get back to where

1 we were yesterday.
2 MR. FINKELSTEIN: No.
3 Mischaracterizes prior testimony.
4 THE WITNESS: Are you
5 referring to the ARCOS tool?
6 BY MR. STEPHENS:
7 Q. Yes.
8 So you testified yesterday
9 about an ARCOS tool in 2018, right?
10 A. Yes.
11 Q. Okay. I'm going to give you
12 what my understanding of your testimony
13 was. You tell me if I've got anything
14 wrong. Okay?
15 My understanding of what you
16 testified yesterday was in 2018, DEA
17 leadership decided to provide some more
18 information out to registrants from the
19 ARCOS database that DEA had. Is that
20 fair?
21 A. Yes.
22 Q. Okay. And the information
23 that DEA decided to provide, and this
24 was -- I'm sorry. Strike that and re-ask

1  a new question.
2  This was one of your ideas,
3  right?
4  A. Yes.
5  Q. Okay.  And this was one of
6  your ideas because you were trying to
7  reduce diversion, right?
8  MS. SINGER:  Objection.
9  Foundation.
10  THE WITNESS:  Yeah -- yes.
11  BY MR. STEPHENS:
12  Q. Okay.  The information in
13  2018 that DEA decided to share was with
14  other -- with other distributors -- was
15  whether other -- let me strike it and
16  restate it.
17  And I'm going to -- I'm
18  going to use like Distributor A,
19  Distributor B, and Distributor C just for
20  illustrative purposes.
21  Okay, Mr. Prevoznik?
22  A. Yes.
23  Q. The information that DEA
24  decided to provide in 2018 to a

1  registrant was the number of other
2  distributors who were supplying a
3  particular customer, true?
4  MR. FINKELSTEIN:  Objection.
5  Mischaracterizes.
6  THE WITNESS:  It -- it's --
7  it doesn't have to be a
8  distributor.  It's a supplier.  So
9  it could be manufacturer too.  So
10  whoever supplied that base code of
11  drug, it would give the numerical
12  of how many suppliers.
13  BY MR. STEPHENS:
14  Q. Right.  Right.  So let me
15  state it this way, and you just tell me
16  if I've got it right or I got it wrong.
17  In 2018, if I'm
18  Distributor A, and I'm supplying
19  Customer A, and Distributors B, C, and D
20  are supplying the same Customer A, DEA
21  would tell me, Distributor A, there are
22  three other distributors supplying
23  Customer A.
24  That's the information that

1  was being provided?  Do I have that
2  right?
3  A. Almost.
4  Q. Okay.  Tell me what --
5  A. Because it would include
6  you.
7  Q. Okay.  So you would then --
8  we've got A, B, C and D, right, that's
9  four?
10  A. Correct.
11  Q. So at -- in 2018, what DEA
12  would tell me, Distributor A, is there
13  are four distributors including yourself
14  who are supplying Customer A; is that
15  right?
16  MR. FINKELSTEIN:  Hang on.
17  Objection, Counsel.  It -- it was
18  Customer A first --
19  MR. STEPHENS:  Well, I'm --
20  then I may have misspoken.
21  BY MR. STEPHENS:
22  Q. I don't think I did.  Let me
23  restate it, Mr. Prevoznik, and just tell
24  me if I've got it wrong.

1  In 2018, the change that was
2  made was DEA would now tell Distributor A
3  that there are four distributors
4  including yourself who are supplying
5  Customer A; is that right?
6  A. Correct.
7  Q. Okay.
8  A. If I could --
9  Q. Yeah.
10  A. -- just based on the base
11  code.  Drug base code.
12  Q. Okay.  And what do you mean
13  by that?
14  A. Like hydrocodone.  It's not
15  going into specific products.  It's
16  hydrocodone.
17  Q. Okay.  In 2018, DEA did not
18  tell me, Distributor A, the quantities
19  that were being supplied to Customer A by
20  Distributor B, C, and D, correct?
21  A. Correct.
22  Q. In 2019, DEA amended its
23  process and now provides that
24  information?

1   A. Yes.  De-identified.
2   MR. FINKELSTEIN:  Note for
3   the record that the witness wasn't
4   authorized to testify about
5   decisions on or after
6   February 2018.  But as the witness
7   is knowledgeable, I'll allow
8   testimony.
9   MR. STEPHENS:  And -- and,
10  Counsel, for your benefit, I'm
11  just trying to identify time
12  frames and all that so the record
13  is complete.  That's it.
14  MR. FINKELSTEIN:  Okay.
15  MR. FARRELL:  The plaintiffs
16  continue their objection to any
17  attempt by you to establish
18  evidence that's probative of your
19  affirmative defenses and
20  prejudicial to our case in chief.
21  MR. STEPHENS:  I understand
22  that you don't want me to get
23  evidence that might hurt your
24  case, Paul, but I think that's my

1   job.
2   And if I understand,
3   yesterday, the testimony from the
4   DEA is the DEA does their job, and
5   I'm not here to testify, but I am
6   here trying to do my job.  I hope
7   you respect that.  All right.
8   MR. FINKELSTEIN:  We don't
9   have copies.
10  MR. STEPHENS:  Yes, sir.
11  Yeah, we do.
12  (Document marked for
13  identification as Exhibit
14  DEA-Prevoznik-19.)
15  BY MR. STEPHENS:
16  Q. All right.  Mr. Prevoznik,
17  I'm showing you what's been marked as
18  Exhibit Number 19, which is a DEA press
19  release dated February 26, 2019.
20  Do you see that?
21  A. Yes.
22  Q. So in two-thousand -- if you
23  look at the fourth paragraph on the first
24  page, the very first sentence, I think

1   addresses what we had just been talking
2   about, Mr. Prevoznik.  It states, "In
3   February 2018, DEA launched a new tool in
4   it's ARCOS online reporting system to
5   assist drug manufacturers and
6   distributors with their regulatory
7   obligations under the Controlled
8   Substances Act."
9   Do you see that?
10  A. Yes.
11  Q. And that refers to your
12  idea, right?
13  A. Yes.
14  Q. And that's where you are
15  giving a distributor the number of
16  distributors supplying to Customer A,
17  right?
18  A. Correct.
19  Q. Okay.  If you look at the
20  third sentence in that paragraph, it
21  talks -- it says, "The enhancement will
22  allow a DEA-registered manufacturers and
23  distributors to view and download the
24  number of distributors and the amount,

1   anonymized data, in both grams and dosage
2   units, each distributor sold to a
3   prospective customer in the last
4   available six months of data."
5   Correct?
6   A. Could I get another copy,
7   because the exhibit went off the bottom.
8   Cut off the last part of that sentence.
9   I just want to make sure.
10  MR. FINKELSTEIN:  You can
11  look at mine.
12  THE WITNESS:  Correct.
13  BY MR. STEPHENS:
14  Q. And the sentence that I just
15  read about providing the volumes, that's
16  the change that DEA made in 2019, right?
17  MR. FINKELSTEIN:
18  Mischaracterizes.
19  THE WITNESS:  Correct.
20  BY MR. STEPHENS:
21  Q. Okay.  And then if you look
22  at the last paragraph in this DEA press
23  release, it states, "Manufacturers and
24  distributors have consistently expressed

1   a desire for assistance from DEA in
2   fulfilling these obligations and have
3   requested ARCOS information to help them
4   make informed decisions about whether new
5   customers are purchasing excessive
6   quantities of controlled substances."
7   Do you see that?
8   A. Yes.
9   Q. So DEA in 2019 understood
10   that manufacturers and distributors have
11   consistently expressed a desire for
12   assistance from DEA in fulfilling their
13   obligations, and as part of that,
14   requested ARCOS information from DEA,
15   right?
16   MR. FINKELSTEIN: Objection.
17   Form.
18   MS. SINGER: Objection.
19   Foundation.
20   THE WITNESS: Well, over the
21   years they've expressed this is
22   business strategy protected. So
23   we've done it -- we've done that.
24   But once the new tool, the

1   MR. FINKELSTEIN: 
2   Mischaracterizes. Asked and
3   answered.
4   THE WITNESS: I think I just
5   answered it.
6   BY MR. STEPHENS:
7   Q. Well, is this -- is this
8   press release accurate?
9   A. Well, yeah, because they --
10   because I said, after the first came out,
11   one of the complaints was -- that we've
12   heard a number of times, it's not -- it's
13   not enough.
14   Q. Are you --
15   A. So I'm just relaying what I
16   know from my -- my personal discussions
17   with some of the distributor registrants
18   that asked for that. So that was the
19   first time that I had heard that they
20   wanted that. So -- and then the Support
21   Act came in, and we were -- that was
22   something that we were told that we
23   needed to do, so -- statutorily, so...
24   Q. Mr. Prevoznik, do you view

1   first tool went out in 2018, we
2   had feedback from quite a few of
3   the distributors that said, hey,
4   this would be great if we could
5   get de-identified data. So that's
6   why we put it in there. We were
7   able to -- we felt comfortable
8   enough to put that out there,
9   because they had requested it at
10   that point.
11   They had -- to my knowledge,
12   they had not expressed that they
13   wanted that. When we had
14   mentioned it, they were always --
15   that's business data. Don't
16   provide it. So...
17   BY MR. STEPHENS:
18   Q. You would agree that
19   manufacturers and distributors have
20   consistently expressed a desire for
21   assistance from DEA in fulfilling these
22   obligations and have requested ARCOS
23   information to help them make informed
24   decisions, right?

1   this, sharing of more information with
2   industry, as an example of DEA's current
3   leadership taking additional steps to
4   collaborate with industry to help reduce
5   diversion?
6   MS. SINGER: Objection.
7   Foundation.
8   THE WITNESS: Yes.
9   BY MR. STEPHENS:
10   Q. And do you think that's a
11   good thing?
12   MR. FINKELSTEIN: Vague.
13   THE WITNESS: Yes.
14   BY MR. STEPHENS:
15   Q. All right. Are you familiar
16   with an INNER JOIN process related to
17   database management for databases like
18   ARCOS?
19   MR. FINKELSTEIN: Vague.
20   Hang on. Don't testify based on
21   law enforcement sensitive
22   information.
23   MS. SINGER: Objection.
24   Scope.

1 THE WITNESS: I don't know
2 what an INNER JOIN --
3 BY MR. STEPHENS:
4 Q. Okay. An INNER JOIN process
5 is a common SQL database concept that has
6 been in existence for decades in a
7 relationale database management systems
8 where you can anonymize data and provide
9 data to people who are sending products
10 to the same individuals by using an
11 individual, like customer A here, by
12 using their Tax ID number, their
13 registration number or something along
14 those lines.
15 Is anybody at DEA familiar
16 with INNER JOIN database management
17 protocols from 2006 to 2015 that you're
18 aware of?
19 MS. SINGER: Objection.
20 Scope, and the witness's
21 competence on these issues.
22 MR. FINKELSTEIN: Scope.
23 Calls for speculation.
24 Do you understand the

1 question?
2 THE WITNESS: It sounds like
3 it's a software -- it sounds like
4 to me it's a software question.
5 We do have competent people within
6 DEA. I am not one of the ones who
7 would claim competency for that.
8 MR. FARRELL: Can you spell
9 that, INNER JOIN?
10 MR. STEPHENS: Yeah, it's
11 INNER JOIN, I-N-N-E-R, J-O-I-N.
12 And if you look it up under SQL --
13 SQL database management.
14 BY MR. STEPHENS:
15 Q. All right. So you do have
16 people on staff at DEA who are tasked
17 with understanding ARCOS's capabilities
18 and maximizing the efficiency of ARCOS,
19 true?
20 A. True.
21 Q. And you had mentioned COGNOS
22 yesterday. Can you explain to me again
23 what COGNOS is?
24 A. So COGNOS basically allows

1 you to take huge chunks of data, be able
2 to pull it down, and summarize it or --
3 MR. FINKELSTEIN: Can you
4 spell COGNOS?
5 THE WITNESS: C-O-G-N-O-S, I
6 believe. It's either N-O-S or
7 N-U-S.
8 BY MR. STEPHENS:
9 Q. So COGNOS -- well, let me
10 ask ARCOS first.
11 Is ARCOS a system that DEA
12 built, or is it a system that DEA
13 purchased from a software vendor?
14 MS. SINGER: Objection.
15 Scope.
16 THE WITNESS: It's my
17 understanding it's a system that
18 we built.
19 BY MR. STEPHENS:
20 Q. Okay. So then, if DEA built
21 it, then DEA is going to have the
22 expertise inhouse to understand how it
23 works, right?
24 A. Correct.

1 Q. Okay. And how does COGNOS
2 relate to ARCOS?
3 A. COGNOS is a software that's
4 used so that you can take the ARCOS data,
5 huge quantities of ARCOS data, and be
6 able to actually use it to do an analysis
7 on it.
8 Q. Okay. Is COGNOS software
9 database or software system that DEA
10 purchased from a vendor or did DEA create
11 it?
12 A. I believe it's a vendor.
13 Q. It's a --
14 A. I believe it's IBM.
15 Q. Okay. IBM. A fine company,
16 right?
17 MR. FINKELSTEIN: Scope.
18 MR. FARRELL: If you're
19 representing IBM...
20 MR. STEPHENS: All right.
21 We'll stipulate to that. It's a
22 fine company.
23 BY MR. STEPHENS:
24 Q. All right. But -- but so,

1   you know, part of the function with --
2   with COGNOS and ARCOS is to understand
3   its capabilities.  And if an INNER JOIN
4   process would have been beneficial to
5   reducing diversion, you would have hoped
6   that someone at DEA would have worked on
7   that, right?
8   MR. FINKELSTEIN:  Scope.
9   Calls for speculation.
10  Foundation.
11  You can answer if you
12  understand.
13  THE WITNESS:  I'm not sure I
14  understand.  I mean, we've been
15  making improvements with -- with
16  the system since we started so...
17  BY MR. STEPHENS:
18  Q. But can you agree with me
19  that -- that the DEA would want to
20  maximize the efficiency of that ARCOS
21  database to do everything possible in the
22  DEA's powers to reduce diversion?
23  A. Yes.
24  Q. And if using an INNER JOIN

1   MR. FINKELSTEIN:
2   Foundation, scope.  Incomplete
3   hypothetical.
4   You can answer if you
5   understand.
6   THE WITNESS:  I'm just
7   having a little bit -- because I
8   don't know what INNER JOIN is.
9   You can tell me it's a SQL.  You
10  can tell me whatever.  But is
11  it -- does it have to work off the
12  internet?  Is it -- you know,
13  that's what I'm saying.  I'm not
14  competent enough to -- to be
15  answering that question.
16  BY MR. STEPHENS:
17  Q. Let me just ask a more
18  general question.
19  A. Sure.
20  Q. You would agree with me that
21  if people at DEA who are responsible for
22  managing the architecture of the ARCOS
23  database understood that there was a more
24  efficient way to use ARCOS by making a

1   process earlier would have been
2   beneficial to that effort, you would have
3   supported it, had you known about it?
4   MS. SINGER:  Objection.
5   Foundation.
6   MR. FINKELSTEIN:
7   Foundation.  Scope.  Incomplete
8   hypothetical.
9   You can answer.
10  THE WITNESS:  Me personally?
11  BY MR. STEPHENS:
12  Q. Correct.
13  A. Well, I mean, I'm not in a
14  position to make a decision like that of
15  what software we're going to use.
16  That's -- that's an agency decision.
17  Q. Would you agree that if the
18  people at DEA who are responsible for
19  managing the architecture of this
20  database and its efficiency were aware of
21  an INNER JOIN process earlier and that
22  would have been beneficial to DEA's use
23  of ARCOS, DEA would have supported doing
24  that, right, using an INNER JOIN process?

1   change, you would have supported them
2   making that change to make it more
3   efficient and effective, true?
4   MS. SINGER:  Objection.
5   MR. FINKELSTEIN:
6   Foundation.  Incomplete
7   hypothetical.
8   You can answer.
9   THE WITNESS:  Yes.
10  BY MR. STEPHENS:
11  Q. Okay.  I had asked you one
12  question a little bit earlier about
13  suspicious order reports.  I would now
14  like to turn to that topic and ask you a
15  few questions about how and why DEA
16  analyzes suspicious order reports to
17  identify and stop sources of diversion.
18  Okay?
19  A. Yes.
20  Q. This is Topic 9 of your
21  30(b)(6) designation.
22  Now, yesterday you had
23  mentioned, in reporting suspicious order
24  reports, you had said some come to

1  headquarters, and some go to the field,
2  right, if I understood what you said?
3  A. Yes.  Per the reg, they are
4  supposed to go to the field.  If they --
5  if we've had some sort of action against
6  a registrant, and we directed them to
7  send it to headquarters, those would send
8  it electronically.
9  Q. Okay.  And yesterday you had
10  mentioned a "big three," right?
11  A. Yes.
12  Q. Okay.  Walmart is not one of
13  the big three, right?
14  A. No.
15  Q. And the other retail chain
16  pharmacies that we've talked about today,
17  they are not part of the big three,
18  right?
19  A. Well, just to clarify, we're
20  talking -- because we started with
21  distributors that you wanted to talk
22  about distributors of, you know, of your
23  chain stores.  And then now you're
24  asking -- or you're -- are you talking

1  the distributors of Walmart, or are you
2  talking the pharmacies of Walmart in
3  terms of this?
4  Q. No, no, no -- no, no, no.
5  I'm just trying to say, you had said the
6  big three sends stuff to headquarters,
7  right?
8  A. Right.  Distributors.
9  Q. The big three distributors?
10  A. Right.
11  Q. And all I'm saying is -- is
12  that when you said big three, you weren't
13  referring to Walmart, right?
14  A. Well, I just want -- I just
15  want to clarify that we are talking about
16  the big three distributors, because
17  Walmart is a pretty big -- one of the
18  bigger chain pharmacies out there.  So I
19  just want to make sure we're clear on
20  that.
21  Q. Right.
22  A. That's all.  I'm just
23  clarifying that.
24  Q. Okay, okay.  All right.

1  So when you said big three
2  yesterday, were you referring to Walmart
3  or not?
4  A. No.
5  Q. Okay.  That -- that's all I
6  was asking, Mr. Prevoznik.  I'm sorry.
7  A. Okay.
8  Q. Would you agree that a
9  suspicious order report presents DEA with
10  a possible investigative lead that could
11  result in DEA identifying someone who is
12  diverting controlled substances?
13  MR. FINKELSTEIN:  Asked and
14  answered.
15  THE WITNESS:  Yes.
16  BY MR. STEPHENS:
17  Q. If DEA investigates
18  suspicious order reports, DEA expects and
19  hopes that those investigations will lead
20  to a reduction in diversion, fair?
21  A. If -- if that's where it
22  leads to.  Not every -- not every SORs
23  report is going to lead to diversion.
24  Q. Okay.  But does DEA hope

1  that investigations of SORs reports will
2  lead to a reduction in diversion?
3  A. Yes.
4  Q. Has DEA identified sources
5  of diversion based on information it
6  received in suspicious order reports?
7  MR. FINKELSTEIN:  Don't
8  testify based on ongoing
9  investigations or enforcement
10  activities.
11  You can answer.
12  BY MR. STEPHENS:
13  Q. Just yes or no.
14  A. Could you repeat, please?
15  Q. Sure.
16  MR. FINKELSTEIN:  No current
17  enforcement investigations, yes or
18  no question.
19  Do you want to repeat it?
20  BY MR. STEPHENS:
21  Q. Yes, let -- let me repeat
22  the question.  And I'm just asking for a
23  yes or no.  This is a baseline question.
24  A. I know, but I have to listen

1   to my instruction too.
2   Q. Understood.
3   Has DEA identified sources
4   of diversion based on information DEA has
5   received in suspicious order reports?
6   A. Yes.
7   Q. Okay.  When DEA identifies a
8   source of diversion via information in a
9   suspicious order report, does DEA want to
10  stop the supply of opioids to that source
11  of diversion?
12  A. Yes.
13  Q. And does DEA want to stop
14  the supply of opioids to that source of
15  diversion as soon as DEA learns the
16  identity of the suspected diverter?
17  MR. FINKELSTEIN:  Vague.
18  THE WITNESS:  Yes.
19  BY MR. STEPHENS:
20  Q. All right.  Between 2007 and
21  2018, DEA received over 1.2 million
22  electronic suspicious order reports from
23  registrants.
24  A. Is that a -- it sounds like

1   it was a statement.  I'm sorry.
2   Q. It's a question.  Is that
3   true?
4   A. Could you -- could you
5   repeat the question.
6   Q. Sure.
7   Between 2007 and 2018 DEA
8   received over 1.2 million electronic
9   suspicious order reports from
10  registrants, true?
11  A. Yes.
12  Q. Let me -- if I could point
13  you back to Exhibit 17, which is the
14  transcript from March -- or the senate
15  congressional record from March 20, 2018.
16  Do you have that in front of
17  you?
18  A. Yes.
19  Q. I direct you to Page 93,
20  Mr. Prevoznik.
21  A. Okay.
22  Q. And this is a Q&A, written
23  Q&A between Congress and DEA, right?
24  A. That's what it looks like.

1   Q. Okay.  Question Number 25
2   there on Page 93, Mr. Prevoznik.  Are you
3   with me?
4   A. Yes.
5   Q. It says, "How many
6   suspicious order reports does DEA now
7   receive from distributors annually?"
8   Did I read that right?
9   A. Yes.
10  Q. Okay.  And the response, on
11  the last sentence at the bottom of Page
12  93 says, "DEA headquarters has received
13  1,204,400 electronic suspicious order
14  reports from 135 distinct registrants
15  from 2007 to 2018."
16  Do you see that?
17  A. Yes.
18  Q. Okay.  Does that give you a
19  little bit more precise number that DEA
20  had on March 20th of 2018 when it was
21  reporting back to Congress?
22  A. Yes.
23  Q. Okay.  All right.  So I have
24  a few questions for you about how DEA

1   analyzes those SORs -- analyzed SORs
2   between 2006 and 2015.
3   Is it fair to say that DEA's
4   current leadership has been working hard
5   to improve how DEA reviews suspicious
6   order reports?
7   A. Yes.
8   Q. Between 2006 and 2015 under
9   Mr. Rannazzisi's leadership, did DEA have
10  a published policy that ensured that
11  someone at DEA would investigate every
12  suspicious order report that DEA
13  received?
14  MS. SINGER:  Objection.
15  Lack of foundation.
16  THE WITNESS:  Not that I'm
17  aware of.
18  BY MR. STEPHENS:
19  Q. Okay.  Was there any policy
20  at DEA that would have prevented
21  Mr. Rannazzisi, who ran the diversion
22  control group, from instituting a
23  practice or policy that ensured that
24  someone from DEA would investigate every

1   suspicious order report that DEA
2   received?
3   MR. FINKELSTEIN:  Objection
4   to form.
5   MS. SINGER:  Objection.
6   Foundation.
7   THE WITNESS:  Not to my
8   knowledge.
9   MR. FINKELSTEIN:  For the
10  record, I noticed the witness
11  reached to his binder which
12  contains DEA policies.  Do you
13  want to reference that to refresh
14  your --
15  THE WITNESS:  Yeah, could
16  I -- could I reference it?
17  MR. STEPHENS:  That's fine.
18  Do you want to go off the record
19  and do that?  Let's do that.
20  MR. FINKELSTEIN:  Well,
21  let's wait until there is a
22  question pending.
23  MR. STEPHENS:  Okay.  That's
24  fine.  I just don't want to burn

1   my time on the clock.  If you need
2   to review something, you want to
3   take a break to do it, I'm fine
4   with that, Mr. Prevoznik.  Okay?
5   Just let me know.
6   MR. FINKELSTEIN:  But you're
7   allowed to review it if you need
8   to to answer his question.
9   THE WITNESS:  Right.  Thank
10  you.
11  BY MR. STEPHENS:
12  Q.  Yeah.  Are we good?
13  A.  Yeah.
14  Q.  Okay.  All right.  Have you
15  ever heard of a suspicious activity
16  report known as a SAR?
17  A.  No.  That doesn't --
18  Q.  Are you aware in banking
19  circles that banks report SARs --
20  A.  Yeah.
21  Q.  -- suspicious activity
22  reports, related to suspect transactions
23  that they see traveling through their
24  banks?

1   MR. FINKELSTEIN:  Hang on.
2   MS. SINGER:  Objection.
3   Scope.
4   MR. FINKELSTEIN:  Scope.
5   You can answer if you know.
6   THE WITNESS:  Yes.
7   BY MR. STEPHENS:
8   Q.  Okay.  Mr. Prevoznik, who is
9   the greatest law enforcement agency in
10  the world at investigating money
11  laundering investigations?
12  MS. SINGER:  Objection.
13  MR. FINKELSTEIN:  Objection.
14  Scope.  Calls for speculation.
15  You can answer.
16  THE WITNESS:  Do I have to?
17  FBI.
18  BY MR. STEPHENS:
19  Q.  Oh, you think it's FBI.
20  Okay.  Mr. Prevoznik, hold
21  on.  Hold on.  Hold on.
22  Mr. Prevoznik, you would
23  agree with me that the Drug Enforcement
24  Administration is one of the greatest law

1   enforcement agencies on the planet
2   investigating money laundering
3   investigations, correct?
4   MR. FINKELSTEIN:  Vague.
5   Scope.
6   THE WITNESS:  Yes, correct.
7   BY MR. STEPHENS:
8   Q.  Okay.  And DEA, through
9   OCDETF, the Organized Crime Drug
10  Enforcement Task Force, participates with
11  other agencies, like your colleagues at
12  the FBI, like your colleagues at the IRS,
13  to do the most sophisticated money
14  laundering investigations in the world,
15  right?
16  MR. FINKELSTEIN:  Scope.
17  THE WITNESS:  Correct.
18  BY MR. STEPHENS:
19  Q.  All right.  Now, in
20  conducting those money laundering
21  investigations, it's common for the
22  United States government, including DEA,
23  to work on SAR review committees to
24  review SARs to advance the money

1 laundering investigations that they're --
2 that they're working on through banking
3 institutions, right?
4 MS. SINGER:  Objection.
5 Scope.
6 MR. FINKELSTEIN:  We're well
7 outside the scope.
8 MS. SINGER:  This is so far
9 beyond.
10 MR. FINKELSTEIN:  You can
11 answer if you know.
12 THE WITNESS:  Yeah -- yes.
13 BY MR. STEPHENS:
14 Q. Okay.  Between 2006 and
15 2015, under the leadership of
16 Mr. Rannazzisi, did DEA headquarters have
17 a procedure by which it formed a SORs
18 review committee, a suspicious order
19 review committee, at DEA headquarters to
20 analyze all of the SORs received by DEA
21 from registrants?
22 MR. FINKELSTEIN:  Vague.
23 MS. SINGER:  Lack of
24 foundation.

1 THE WITNESS:  No.  We still
2 haven't, and you have the SORs
3 that go to the field, as well as
4 the SORs electronically, so...
5 BY MR. STEPHENS:
6 Q. Okay.  Is there any central
7 body anywhere within DEA that's organized
8 and formed to review SORs, to have a
9 central point of contact to determine
10 whether a particular SOR would be really
11 good for an investigation for DEA to
12 pursue?
13 MR. FINKELSTEIN:  Vague as
14 to time.  Vague.
15 BY MR. STEPHENS:
16 Q. Let me restate it.
17 Between 2006 and 2015, under
18 the leadership of Mr. Rannazzisi, was
19 there any central body anywhere within
20 DEA organized and formed to review
21 suspicious order reports so that DEA
22 would have a central point of contact to
23 determine whether a particular suspicious
24 order report should be pursued for an

1 investigation by DEA?
2 MR. FINKELSTEIN:
3 Foundation.  Vague.
4 THE WITNESS:  Not to my
5 knowledge.
6 BY MR. STEPHENS:
7 Q. Was there any policy at DEA
8 that would have prevented Mr. Rannazzisi
9 from forming a SORs review committee at
10 DEA headquarters to analyze all of the
11 SORs, the suspicious order reports,
12 received by DEA from registrants between
13 2006 and 2015?
14 MR. FINKELSTEIN:  Vague.
15 THE WITNESS:  Not to my
16 knowledge.
17 BY MR. STEPHENS:
18 Q. Between 2006 and 2015 under
19 Mr. Rannazzisi's leadership, did DEA have
20 any field division institute a SORs
21 review committee to analyze suspicious
22 order reports received from registrants
23 in that field division?
24 A. Not -- no, not for those

1 that received.  But we were doing
2 investigations and analysis on those that
3 we never received.
4 Q. Okay.  So my question is a
5 little bit different.  Let me reframe it.
6 I think I understand your answer.
7 Between 2006 and 2015, under
8 Mr. Rannazzisi's leadership, did any DEA
9 field division form a SORs review
10 committee to analyze all SORs, suspicious
11 order reports, received from registrants
12 in that jurisdiction?
13 MR. FINKELSTEIN:  Vague.
14 THE WITNESS:  Not to my
15 knowledge.
16 BY MR. STEPHENS:
17 Q. Okay.  Was there any policy
18 at DEA between 2006 and 2015, that would
19 have prevented Mr. Rannazzisi from
20 instituting a procedure by which field
21 divisions were required to form a
22 suspicious order review committee to
23 analyze all of the suspicious order
24 reports received within that field

1   division?
2   MR. FINKELSTEIN:  Vague.
3   THE WITNESS:  Not to my
4   knowledge.
5   BY MR. STEPHENS:
6   Q. Between 2006 and 2015 under
7   Mr. Rannazzisi's leadership, did DEA
8   headquarters institute any policy whereby
9   DEA field divisions were required to
10   DEA -- to update DEA headquarters
11   regarding what, if anything, the field
12   division had done to investigate inbound
13   suspicious order reports?
14   MS. SINGER:  Objection.
15   Foundation.
16   THE WITNESS:  Could you
17   please repeat that?
18   BY MR. STEPHENS:
19   Q. Sure.
20   Between 2006 and 2015 under
21   Mr. Rannazzisi's leadership, did DEA
22   headquarters institute any policy whereby
23   DEA field divisions were required to
24   update DEA headquarters regarding what,

1   if anything, the field division had done
2   to investigate inbound suspicious order
3   reports the field division had received
4   from registrants?
5   A. Not to my knowledge.
6   Q. Was there any policy at DEA
7   between 2006 and 2015 that would have
8   prevented Mr. Rannazzisi from instituting
9   a practice that required the field
10   divisions to update headquarters about
11   what the field division had done to
12   investigate inbound suspicious order
13   reports?
14   MR. FINKELSTEIN:  Vague.
15   MS. SINGER:  Objection.
16   Foundation.
17   THE WITNESS:  Not to my
18   knowledge.
19   BY MR. STEPHENS:
20   Q. Between 2006 and 2015 under
21   Mr. Rannazzisi's leadership did DEA have
22   any process that would have allowed the
23   diversion control group at DEA
24   headquarters to know what percentage of

1   suspicious order reports were
2   investigated by the field divisions?
3   MR. FINKELSTEIN:  Asked and
4   answered.
5   THE WITNESS:  Not to my
6   knowledge.
7   BY MR. STEPHENS:
8   Q. Was there any policy at DEA
9   that would have prevented Mr. Rannazzisi
10   and the diversion control group from
11   instituting a practice that required the
12   field division to update headquarters
13   regarding the percentage of SORs reports
14   that the field division had investigated?
15   MR. FINKELSTEIN:  Objection.
16   MS. SINGER:  Continuing
17   objection to this.  Lack of
18   foundation.
19   MR. FINKELSTEIN:  Asked and
20   answered.
21   THE WITNESS:  Not to my
22   knowledge.
23   BY MR. STEPHENS:
24   Q. Between 2006 and 2015 under

1   Mr. Rannazzisi's leadership, did DEA
2   headquarters have any procedure whereby
3   someone at DEA input the suspicious order
4   reports into any DEA central database for
5   tracking purposes?
6   MR. FINKELSTEIN:  Vague.
7   Foundation.
8   THE WITNESS:  Could -- we
9   don't input.  We don't input it,
10   the registrants -- if it's going
11   in electronically, the registrant
12   sends it in via electronic.  We
13   don't input.
14   BY MR. STEPHENS:
15   Q. Okay.  I gotcha.
16   Between 2007 and 2015 under
17   Mr. Rannazzisi's leadership, what
18   percentage of suspicious order reports
19   did DEA convert into immediate suspension
20   orders?
21   MR. FINKELSTEIN:  Asked and
22   answered.
23   THE WITNESS:  I don't know.
24   BY MR. STEPHENS:

1  Q. Okay.
2  (Document marked for
3  identification as Exhibit
4  DEA-Prevoznik-20.)
5  BY MR. STEPHENS:
6  Q. Mr. Prevoznik, I'm showing
7  you what has been marked as DEA
8  exhibit -- or I'm sorry.  What has been
9  marked as Exhibit Number 20.
10  Do you have it in front of
11  you?
12  A. Yes, I have it.  Yes.
13  Q. Okay.  And this is a hearing
14  transcript from January 25, 2018, related
15  to "Combatting the Opioid Crisis:
16  Exploiting Vulnerabilities in
17  International Mail," before the permanent
18  subcommittee on investigations.
19  Do you see that?
20  A. Yes.
21  Q. Okay.  And I would direct
22  you to Page 275.
23  A. That's the top number?
24  Q. Yeah, at the top.

1  Administration at headquarters was
2  reviewing suspicious order reports, if
3  anybody?
4  A. What time, time period?
5  Q. Say 2018.
6  A. So the field had -- the
7  field has access to it, so the field
8  would review them.
9  Q. Okay.
10  A. That's part of their duties,
11  is to review it.
12  Q. Okay.  Between 2006 and
13  2015, was anyone at DEA headquarters
14  reviewing suspicious order reports or was
15  it all done in the field?
16  A. It was done in the field,
17  and I believe it was done at headquarters
18  as well.  It would be with Kyle Wright
19  when he was in charge of the unit.
20  Q. Okay.  Anybody else at
21  headquarters?
22  A. Not that I'm aware of.
23  Q. Okay.  So it would have been
24  Mr. Wright and Mr. Wright's team or

1  All right.  And -- so let me
2  also direct you to Page 269 which is the
3  second page of this exhibit.  Just to set
4  the context, Mr. Prevoznik.
5  A. Okay.
6  Q. So on -- on 269, these are
7  questions for the record, Drug
8  Enforcement Administration before the
9  permanent subcommittee on investigations
10  on January 25, 2018, right?
11  A. Yes.
12  Q. And it's -- it's common for
13  DEA to receive written questions from
14  Congress and then provide written
15  responses, right?
16  A. Yes.
17  Q. Okay.  And then if you look
18  at Page 275, there's a question and an
19  answer.  Do you see that?
20  A. I'm getting there, yep.
21  Q. Okay.  And before we get
22  there, let me ask you one follow-up
23  question.
24  Who at the Drug Enforcement

1  squad, right?
2  A. Correct.
3  Q. Okay.  Now, turning back to
4  Exhibit Number 20.
5  The -- you'll see that
6  the -- the question is -- well, the --
7  the question states:  "The argument has
8  been made in the Washington Post and
9  elsewhere that enforcement efforts at DEA
10  slowed down long before the 2016 law,"
11  right?
12  Do you see that?
13  A. Yes.
14  Q. Okay.  And in response, part
15  of the response, "DEA provides actions
16  leading to registration revocation
17  statistics."
18  Do you see that?
19  A. Did you read that from
20  somewhere or?
21  Q. So I'm just looking at
22  the -- at the top of the chart right
23  here, Mr. Prevoznik.
24  A. Oh okay.  All right.  Yeah,

1  I just wanted --
2  Q. Yeah, sure.
3  A. I wasn't sure exactly where
4  you were.  Go ahead.
5  Q. So DEA provided to Congress
6  a chart of statistics in this response,
7  right?
8  A. Yes.
9  Q. And the chart reflects the
10  actions leading to registration
11  revocation for fiscal year 2007 to 2017,
12  right?
13  A. Yes.
14  Q. And the government's fiscal
15  year runs from October 1st to
16  September 30th, right?
17  A. Yes.
18  Q. All right.  If you look, the
19  question that I had asked before we went
20  to this chart was whether you knew the
21  percentage of suspicious order reports
22  that DEA converted into immediate
23  suspension orders, right?
24  MR. FINKELSTEIN:  Asked and

1  answered.
2  THE WITNESS:  Yes.
3  BY MR. STEPHENS:
4  Q. Okay.  Now, you would agree
5  with me, wouldn't you, that in the
6  suspension orders that are identified
7  here from 2007 to 2017, not all of those
8  were the result of DEA following up on a
9  suspicious order report; is that fair?
10  MR. FINKELSTEIN:  Calls for
11  speculation.
12  THE WITNESS:  Well, I mean
13  some of them were because they
14  weren't being filed, so...
15  BY MR. STEPHENS:
16  Q. Okay.
17  MR. FINKELSTEIN:  You can
18  finish your answer.
19  THE WITNESS:  So they
20  would -- it was registrants that
21  had not filed.  So there was
22  action taken against those that
23  did not file.  So it would be
24  either -- fall under an ISO, order

1  to show cause, and perhaps they
2  got suspended.  There was some
3  administrative action because they
4  did not report them.
5  BY MR. STEPHENS:
6  Q. All right.  But my point,
7  Mr. Prevoznik, is simply that the 254
8  immediate suspension orders that are
9  listed here between 2007 and 2017, not
10  every one of them was the result of DEA
11  following up on a suspicious order report
12  that had been sent to DEA; is that fair?
13  MR. FINKELSTEIN:  Are you
14  representing to the witness that
15  these numbers add up to 254?
16  MR. STEPHENS:  Yes.
17  BY MR. STEPHENS:
18  Q. I will represent to you that
19  for the immediate suspension orders, the
20  totals from 2007 to 2017, is 254.  I will
21  represent to you that the order to show
22  cause filed from 2007 to 2017 is 638.
23  And I'll also represent to you that the
24  total column from 2007 to 2017 is 9,851.

1  Okay?
2  A. Okay.
3  MR. FINKELSTEIN:  Counsel is
4  telling you that.
5  THE WITNESS:  Okay.
6  MR. FINKELSTEIN:  We haven't
7  checked his math.
8  MR. STEPHENS:  You're
9  welcome to do so.
10  BY MR. STEPHENS:
11  Q. So my question,
12  Mr. Prevoznik, was, would you agree with
13  me that the 254 suspension orders that
14  are listed here from 2007 to 2017, not
15  every one of them was generated as the
16  result of DEA following up on an
17  investigation of a SOR report the DEA had
18  received; is that fair?
19  MR. FINKELSTEIN:  Asked and
20  answered.
21  THE WITNESS:  Yes.
22  BY MR. STEPHENS:
23  Q. Okay.  For today's purposes,
24  let's assume that every one of these 254

1   was generated by the -- were all the
2   result of DEA receiving and investigating
3   a suspicious order report.  All right.
4   I'll give you the benefit of that, okay?
5   A. Okay.
6   Q. If you take 254 against the
7   one point -- against the 1,204,400 SORs
8   reports the DEA received, that would
9   equate to something along the lines of
10  2/100 of 1 percent.  Do you agree with
11  that?
12  A. I didn't do the math, but
13  I'll go with -- I'll go with you.
14  Q. Okay.  So would you agree
15  the DEA would have obtained less than
16  1 percent of immediate suspension orders
17  off the 1.2 million suspicious order
18  reports that DEA received?
19  MR. FARRELL:  Objection.
20  Foundation.  And I think you just
21  bait and switched here a little
22  bit.
23  MR. STEPHENS:  I didn't mean
24  to.  So let me check my question.

1   regarding that.
2   I mean, it's a hypothetical.
3   BY MR. STEPHENS:
4   Q. Between 2007 and 2017, the
5   percentage of suspicious order reports
6   the DEA received and converted into
7   immediate suspension orders is less than
8   1 percent, true?
9   A. Yes.  In your hypothetical,
10  true.
11  Q. All right.  So between 2007
12  and 2017, the percentage of suspicious
13  order reports that DEA converted into
14  orders to show cause, the 638 here,
15  that's also less than 1 percent.  It is
16  .005 or 5/100 of 1 percent?
17  MR. FARRELL:  Objection.
18  Foundation.
19  MR. FINKELSTEIN:
20  Foundation.  Misstates prior
21  testimony.
22  THE WITNESS:  It's a
23  hypothetical.  I'll go with you.
24

1   BY MR. STEPHENS:
2   Q. So my question is this:
3   Assuming that all 254 of the immediate
4   suspension orders that DEA received from
5   2007 to 2017 were based off of suspicious
6   order reports, and DEA received
7   1.2 million suspicious order reports, you
8   would agree with me that the percentage
9   of suspicious order reports that DEA
10  converted into immediate suspension
11  orders was less than 1 percent?
12  MR. FINKELSTEIN:
13  Foundation.  Misstates prior
14  testimony.
15  THE WITNESS:  Well, I mean,
16  I think that's a unique way to
17  look at it.  You can also do the
18  flip side and say how many weren't
19  reported that we had cases on.
20  And to just limit it to the ISOs
21  doesn't take you to putting people
22  in compliance, whether through
23  letters of admonition or MOAs that
24  we've come to with companies

1   BY MR. STEPHENS:
2   Q. Okay.  Between 2007 and
3   2017, if you include everything in the
4   table, orders to show cause, immediate
5   suspension orders filed, voluntary
6   surrenders, the 9,851 totaled from 2007
7   and 2017, the percentage of those against
8   the 1.2 million of suspicious order
9   reports would result in a conversion rate
10  of less than 1 percent?
11  MR. FARRELL:  Objection.
12  Fuzzy math.
13  MR. FINKELSTEIN:  Which rule
14  is that?
15  Foundation.  Misstates prior
16  testimony.
17  You can answer if you
18  understand.
19  BY MR. STEPHENS:
20  Q. Let me ask you a more
21  precise question.
22  A. All right.
23  Q. Okay.  What I want you to
24  do, is I'm going to ask about the 9,851,

1 the full total, okay. Are you with me?
2 A. I'm with you.
3 Q. Okay. So between 2007 and
4 2017, if you include the voluntary
5 surrenders, immediate suspension orders,
6 the order to show causes, the percentage
7 of suspicious order reports that DEA
8 converted of the suspicious order reports
9 is less than 1 percent?
10 MR. FINKELSTEIN:
11 Foundation. Misstates prior
12 testimony.
13 THE WITNESS: In your
14 hypothetical situation, yes.
15 BY MR. STEPHENS:
16 Q. Okay. Do you know what
17 percentage of suspicious order reports
18 DEA converted into criminal indictments
19 between 2007 and 2017?
20 MR. FINKELSTEIN: Vague.
21 THE WITNESS: I do not.
22 BY MR. STEPHENS:
23 Q. Do you know -- okay. So
24 between 2007 and 2017, would you know

1 what percentage of suspicious order
2 reports DEA converted into criminal
3 convictions?
4 MR. FINKELSTEIN: Vague.
5 THE WITNESS: I do not.
6 BY MR. STEPHENS:
7 Q. Does DEA keep those kind of
8 statistics?
9 A. No, we don't.
10 Q. Okay. You're aware that DEA
11 keeps those kind of statistics,
12 investigations initiated, indictments
13 returned, convictions obtained on all of
14 their OCDETF cases and reports them. Are
15 you aware of that?
16 A. Correct, yes.
17 Q. Okay.
18 A. I thought you were asking
19 specific to suspicious order reports.
20 Q. I absolutely was.
21 Is there a reason why DEA
22 does not report the number of indictments
23 returned, investigations initiated, and
24 convictions obtained based on information

1 from suspicious order reports like it
2 does in its OCDETF reporting where it
3 identifies investigations initiated,
4 indictments returned, convictions
5 obtained?
6 MR. FINKELSTEIN: Calls for
7 speculation.
8 And I instruct you not to
9 answer based on internal
10 deliberative communications.
11 THE WITNESS: We do have
12 those statistics for that. But
13 not based off of a SOR lead or an
14 ARCOS lead. Those are just
15 pointers. There's various other
16 factors get into what a case --
17 how a case started, where it went,
18 and what its final disposition
19 was.
20 (Document marked for
21 identification as Exhibit
22 DEA-Prevoznik-21.)
23 BY MR. STEPHENS:
24 Q. Okay. Mr. Prevoznik, I'm

1 showing you what's been marked as Exhibit
2 Number 21.
3 MR. STEPHENS: I'm sorry,
4 Counsel.
5 MR. FINKELSTEIN: We're
6 going to attempt to claw 21 back
7 too.
8 MR. STEPHENS: Basis?
9 MR. FINKELSTEIN:
10 Deliberative process.
11 Attorney/client. 21 is an e-mail
12 attaching, I can't remember what
13 exhibit number, but we previously
14 notified you that we were going to
15 clawback.
16 MR. STEPHENS: This one?
17 MR. FINKELSTEIN: Yes.
18 MR. STEPHENS: Okay. I sent
19 this one in -- to counsel on
20 Monday with a stack of potential
21 exhibits and didn't hear anything
22 back.
23 MR. FINKELSTEIN: And we're
24 telling you, as we told you

1  yesterday, that we're attempting
2  to claw it back.
3  If you ask the witness
4  questions I'll instruct him not to
5  answer.
6  MR. BENNETT:  Okay.  And --
7  and for the record, you did send
8  that to me.  I was never able to
9  access it and open it.  So I never
10  reviewed your documents.  They
11  didn't come through.
12  MR. STEPHENS:  All right.
13  So I didn't hear that back --
14  MR. BENNETT:  Well, and I
15  was traveling, so -- yeah, you're
16  right --
17  MR. STEPHENS:  Okay.  But
18  again for the record --
19  MR. BENNETT:  But I never
20  looked at them.
21  MR. STEPHENS:  That's fine.
22  For the record, James, I
23  sent it to everybody on the DEA
24  team.  Okay?

1  Everyone who is counsel here
2  today, all four of you received
3  that from me.
4  MR. FINKELSTEIN:  And you
5  have our answer.
6  MR. FARRELL:  Okay.  So just
7  to be clear, am I allowed to read
8  this or not allowed to read this?
9  MR. FINKELSTEIN:  We're
10  attempting to claw it back.
11  MR. STEPHENS:  And -- and
12  for the record, let me apologize.
13  If this was used yesterday, I am
14  down at the end of the table, I
15  didn't get a copy of it.  So I --
16  I wasn't aware -- I reserve, as my
17  colleague reserves, our position
18  on this document.
19  BY MR. STEPHENS:
20  Q. Mr. Prevoznik?
21  MR. FARRELL:  Not to be
22  rude, but is there an expected
23  break time soon?
24  MR. STEPHENS:  Yeah, like

1  five minutes.
2  MR. FARRELL:  And then after
3  that, what do you think?
4  MR. STEPHENS:  Yeah, I'll
5  need to confer with my colleagues.
6  MR. FARRELL:  Oh, so you're
7  getting close?
8  MR. STEPHENS:  Yes.
9  BY MR. STEPHENS:
10  Q. Mr. Prevoznik, in enforcing
11  the Controlled Substances Act does DEA
12  believe that every individual is entitled
13  to due process in every investigation
14  that DEA conducts to enforce the
15  Controlled Substances Act?
16  MR. FINKELSTEIN:  Scope.
17  Calls for a legal conclusion.
18  You can answer.
19  THE WITNESS:  Yes.
20  BY MR. STEPHENS:
21  Q. Does DEA believe that the
22  DEA must assess the facts as to each
23  individual actor separately to determine
24  whether an individual has violated the

1  Controlled Substances Act?
2  A. Yes.
3  Q. DEA would not take the
4  actions of a few bad actors and seek to
5  indict everyone who might live in the
6  same neighborhood as those bad actors,
7  fair?
8  A. Correct.
9  MS. SINGER:  Objection.
10  Scope.
11  BY MR. STEPHENS:
12  Q. You'd agree that simply
13  being close in proximity to a bad actor
14  does not mean that an individual has done
15  anything wrong, right?
16  MR. FINKELSTEIN:  Vague.
17  You can answer.
18  THE WITNESS:  Correct.
19  BY MR. STEPHENS:
20  Q. For example, if someone
21  overdoses on Colombian cocaine in
22  Cleveland, would DEA arrest every
23  Colombian native who leaves in Cleveland
24  and charge them for causing that

1  overdose?
2  MR. FINKELSTEIN:  Scope.
3  Incomplete hypothetical.
4  MR. FARRELL:  This has a
5  traumatic impact upon like the
6  Colombian nationality, so you have
7  to be careful here.
8  MR. STEPHENS:  Trust me.  I
9  always was.
10  BY MR. STEPHENS:
11  Q. Can you answer the question?
12  A. Not to my knowledge.
13  Q. You'd agree that DEA needs
14  individualized proof to establish exactly
15  who caused that overdose death before
16  deciding to charge anyone with a crime,
17  right?
18  MR. FINKELSTEIN:  Hang on.
19  Incomplete hypothetical.  Scope.
20  THE WITNESS:  Can you repeat
21  it?
22  BY MR. STEPHENS:
23  Q. You would agree the DEA
24  needs individualized proof to establish

1  Q. You would agree that due
2  process principles that existed in our
3  legal system for generations demand that
4  DEA not haul innocent actors into court
5  to answer for the actors for a few bad
6  actions?
7  MS. SINGER:  Scope.  And
8  calls for a legal analysis and
9  conclusion.
10  MR. FINKELSTEIN:  Scope.
11  Calls for a legal conclusion.  And
12  based on your representation that
13  it will be about five minutes, I'm
14  going to let the witness answer.
15  MR. STEPHENS:  Two minutes.
16  THE WITNESS:  Correct.
17  BY MR. STEPHENS:
18  Q. And DEA agrees that those
19  due process principles still protect
20  innocent actors even when the legal issue
21  involves something as tragic as a heroin
22  overdose, right?
23  MS. SINGER:  Continuing
24  objection.

1  exactly who caused that overdose death
2  before deciding to charge anyone with a
3  crime?
4  MS. SINGER:  Objection.
5  Scope.
6  THE WITNESS:  Yes.
7  BY MR. STEPHENS:
8  Q. Okay.  And to counsel's
9  point, it might be a mistake for DEA to
10  assume it was a Colombian native who sold
11  the cocaine to the victim, right?
12  MR. FINKELSTEIN:  Incomplete
13  hypothetical.  Vague.
14  THE WITNESS:  Yes.
15  BY MR. STEPHENS:
16  Q. Okay.  And it's important
17  not to bring any potential bias in
18  analyzing evidence because it could cloud
19  the judgment of the investigator, right?
20  MR. FINKELSTEIN:  Vague.
21  Incomplete hypothetical.
22  MS. SINGER:  Scope.
23  THE WITNESS:  Yes.
24  BY MR. STEPHENS:

1  MR. FINKELSTEIN:  Calls for
2  a legal conclusion.  You can
3  answer.
4  THE WITNESS:  Correct.
5  BY MR. STEPHENS:
6  Q. Does DEA believe that the
7  same due process principles that require
8  individualized proof also apply to the
9  diversion investigations DEA conducts to
10  enforce the provisions of the Controlled
11  Substances Act?
12  MR. FINKELSTEIN:  Calls for
13  a legal conclusion.  You can
14  answer.
15  THE WITNESS:  I was waiting
16  to see -- correct.
17  BY MR. STEPHENS:
18  Q. And you would agree that
19  every manufacturer, distributor, and
20  retail chain pharmacy is entitled to
21  individualized review of its own conduct
22  before being accused for potential
23  violations of the Controlled Substances
24  Act committed by someone else?

1  A. Correct.
2  Q. For example, you'd agree
3  that DEA should not accuse a retail chain
4  pharmacy of diversion committed by a
5  rogue internet pharmacy where there is no
6  evidence showing any connection between
7  the retail chain pharmacy and -- and the
8  rogue internet pharmacy?
9  MR. FINKELSTEIN:  Incomplete
10 hypothetical.
11 MR. STEPHENS:  I'll withdraw
12 the question.
13 All right.  Let me take a
14 break.
15 THE VIDEOGRAPHER:  The
16 parties agree?
17 MR. FINKELSTEIN:  Yes.
18 THE VIDEOGRAPHER:  10:57.
19 We are off the video record.
20 (Short break.)
21 THE VIDEOGRAPHER:  11:34, we
22 are on the video record.
23 MR. STEPHENS:  I think I'm
24 at the end of my questions.  I do

1  THE WITNESS:  Thank you.
2  - - -
3  EXAMINATION
4  - - -
5  BY MR. FARRELL:
6  Q. Will you state your name,
7  rank, and title?
8  A. Thomas Prevoznik.  I am the
9  acting section chief of pharmaceutical
10 investigations for the DEA's diversion
11 control division.
12 Q. Mr. Prevoznik, my name is
13 Paul Farrell, and I am one of the lawyers
14 representing the plaintiffs.  And so I
15 thank you for coming here today.  And I
16 just wanted to set for the record, we
17 sent a list of subject matters to the
18 United States Drug Enforcement Agency and
19 asked for somebody to be designated to
20 testify on its behalf.
21 You understand that the
22 questions that I ask you today are not in
23 your individual capacity, but we're
24 asking for answers as if it was coming

1  have one question for you though,
2  David, and it's to make sure that
3  I understand your complete basis
4  for clawing back the document
5  which is the -- I think it was
6  marked Number 12.  It's the
7  June 3rd, 2017, communication
8  between Mr. Patterson and
9  Mr. Rosenberg that includes a
10 communication from AUSA and Leslie
11 Wizner from Detroit.
12 MR. FINKELSTEIN:  Correct,
13 the basis for the clawback request
14 was that this document is
15 deliberative process, intra-DOJ
16 discussions regarding improvements
17 and enforcement protocols under
18 the Controlled Substances Act and
19 also attorney/client privilege.
20 MR. STEPHENS:  Thank you.
21 And at this point we'll pass the
22 witness.
23 Thank you for your time,
24 Mr. Prevoznik.

1  from the DEA itself.
2  A. Correct.
3  Q. So the million-dollar
4  question right out of the gate is, why
5  didn't the DEA do more?
6  So what I want to do is, I
7  have the testimony from the former acting
8  administrator, Robert Patterson.  And I'm
9  going to show you a video clip and then
10 ask some follow-up questions.  Okay?
11 MS. MAINIGI:  Objection.
12 THE WITNESS:  Okay.
13 MR. FARRELL:  523.
14 BY MR. FARRELL:
15 Q. This is Mr. Patterson's
16 opening statement I believe his testimony
17 before Congress on March 20, 2018, in
18 front of the subcommittee on oversight
19 and investigations, the committee on
20 Energy and Commerce.
21 You're aware that
22 Mr. Patterson testified?
23 A. Yes.
24 Q. And he testified on behalf

1 of the DEA?
2 A. Yes.
3 Q. To Congress under oath?
4 A. Yes.
5 MR. FARRELL:  Show the first
6 clip, please.
7 (Video clip played as
8 follows:)
9 MR. PATTERSON:  Where
10 license revocation is not
11 necessary, we've aggressively
12 pursued civil actions and MOUs
13 designed to ensure compliance.
14 Over the last decade, DEA has
15 levied fines totalling nearly
16 $390 million against opioid
17 distributors nationwide and
18 entered into MOUs with each.
19 (Video concluded.)
20 BY MR. FARRELL:
21 Q. Mr. Prevoznik, can you
22 verify the accuracy of that statement?
23 A. Yes.
24 Q. So the DEA has in fact

1 attempted to impose civil penalties and
2 conducted investigations into opioid
3 distribution and diversion?
4 A. Correct.
5 Q. I'm going to go to the next
6 clip.  This is where the follow-up really
7 begins.
8 (Video clip played as
9 follows:)
10 MR. PATTERSON:
11 Administrative actions, civil
12 fines, and criminal cases are all
13 important steps.  Where we have
14 fallen short in the past, it is by
15 not proactively leveraging the
16 data that has been available to
17 us.
18 (Video concluded.)
19 BY MR. FARRELL:
20 Q. Mr. Prevoznik, are you
21 familiar with that complaint?
22 A. Yes.
23 Q. I'm also going to show you
24 what has been previously referenced in

1 this trial, the jury has heard probably
2 several times, is the Energy and
3 Commerce's report following the testimony
4 of Mr. Patterson as well as the testimony
5 from numerous others.
6 Are you familiar with this
7 report?
8 A. Yes, I am.
9 Q. And this is on one
10 particular page, one of the findings and
11 the markings up are the lawyers, not from
12 Congress.  You'll see where I put the
13 Star.  And it basically says, "Had
14 HDA" -- "Had DEA more proactively used
15 ARCOS data, it could have discovered, in
16 a period of time at a place called
17 Sav-Rite Pharmacy Number 1 that there
18 were a lot of pills that were shipped."
19 Are you familiar with this
20 finding from Congress?
21 MS. MAININGI:  Objection.
22 THE WITNESS:  Yes.
23 BY MR. FARRELL:
24 Q. So when you and I walk

1 through the ARCOS data, what we're
2 talking about is this dataset of
3 information that you had, correct?
4 A. Correct.
5 Q. And these are transactions
6 between manufacturers and distributors,
7 between distributors and pharmacies, that
8 are stored in a large database maintained
9 by the DEA?
10 A. Correct.
11 Q. Okay.  So what -- what does
12 it mean when the DEA's position is that
13 you are not proactively using the ARCOS
14 data during this time frame?
15 A. Well, back during that time
16 frame, we were on what we called the
17 mainframe.  So the process was slower of
18 ARCOS data, so when it would be uploaded
19 and processed.  And so we were months
20 behind on getting that data up into the
21 system.
22 It was -- we were restricted
23 to a million transactions of upload per
24 night.  And we received millions of

1    transactions.  So that took a while.
2    In addition to that, you
3    also had, when they uploaded, there would
4    be errors, the most typical errors would
5    be wrong NDC code, wrong DEA number, or
6    the wrong DEA 222 order form number.
7    Q. It's my understanding that
8    today these transactions are stored
9    digitally with the DEA ARCOS database; is
10   that correct?
11   A. Correct.
12   Q. And now we are able to
13   presently and retrospectively look back
14   and figure out what happened.  Is that
15   fair?
16   MS. MAINIGI:  Objection.
17   MR. EPPICH:  Object to form.
18   MR. STEPHENS:  Objection.
19   MR. O'CONNOR:  Object to
20   form.
21   THE WITNESS:  Yes.
22   BY MR. FARRELL:
23   Q. Okay.  Now, this may be a
24   terrible analogy, but my mind, what I'm

1    thinking is, just like -- let's say if
2    the NSA keeps a log of everybody's cell
3    phone calls in the country, they're not
4    actively listening to everyone's call,
5    but they have the ability to go backwards
6    and piece together what happened.  Is
7    that similar to what the DEA was doing
8    with ARCOS?
9    MS. MAINIGI:  Objection.
10   MR. STEPHENS:  Objection.
11   THE WITNESS:  Yes.
12   BY MR. FARRELL:
13   Q. Same thing with the SEC.
14   There are billions of trades that happen
15   on Wall Street, but the SEC isn't
16   necessarily the clearinghouse for these
17   trades, but it has the capacity to look
18   on a computer backwards and figure out
19   what happened if somebody broke the law.
20   Is that akin to what is going on with the
21   DEA and ARCOS during this time frame?
22   MR. EPPICH:  Objection to
23   form.
24   MR. STEPHENS:  Objection.

1    THE WITNESS:  Yes.
2    BY MR. FARRELL:
3    Q. So going back and looking
4    backwards from this very same energy and
5    commerce report, I happened to be
6    familiar with it because of the West --
7    because of West Virginia.  The Sav-Rite
8    Pharmacy from Page 125, Congress went
9    back and looked at the old ARCOS data.
10   And from it, what it's determined was
11   that McKesson Corporation -- are you
12   familiar with the company called
13   McKesson?
14   A. Yes, I am.
15   Q. And who are they?
16   A. They are a wholesaler,
17   distributor.
18   Q. McKesson Corporation sold
19   five million doses in 2006 and 2007 of
20   opium pills to a pharmacy in Kermit, West
21   Virginia.  Can you, by looking at this
22   exhibit, tell me how many people,
23   according to Congress, live in Kermit,
24   West Virginia?

1    MR. STEPHENS:  Objection to
2    form and scope.
3    MR. O'CONNOR:  Objection.
4    MR. EPPICH:  Objection.
5    Foundation.
6    THE WITNESS:  406.
7    BY MR. FARRELL:
8    Q. All right.  So under any
9    reasonable -- is there any possibly way
10   that a town of 406 has a medical need for
11   over five million pills of opium in a
12   span of two years?
13   MR. EPPICH:  Objection.
14   Foundation.  Calls for
15   speculation.  Scope.
16   MR. STEPHENS:  Scope as
17   well.
18   MR. FINKELSTEIN:  I'll join
19   the scope objection.
20   You can answer if you
21   understand.
22   THE WITNESS:  Could you
23   repeat it, please, one more time?
24   BY MR. FARRELL:

1  Q. Yeah.  Is there any basis
2  that you can make up in reality or
3  otherwise where a town of 400 people have
4  a medical need for five million pills of
5  opium in a span of 24 months?
6  MR. EPPICH:  Objection.
7  Form.  Foundation.  Scope.  Calls
8  for speculation.
9  THE WITNESS:  Correct.
10  There isn't.  There isn't.
11  BY MR. FARRELL:
12  Q. There is absolutely no way,
13  is there?
14  MR. EPPICH:  Same
15  objections.
16  THE WITNESS:  No.
17  BY MR. FARRELL:
18  Q. So while some people may ask
19  the DEA why you didn't catch this, my
20  question to the DEA is why didn't you
21  indict McKesson?
22  MR. EPPICH:  Objection to
23  form --
24  MR. FINKELSTEIN:  I'm going

1  to instruct you not to answer
2  that.
3  MR. EPPICH:  -- calls for a
4  legal conclusion.  Scope.
5  Foundation.
6  THE WITNESS:  Based on my
7  attorney's advice I'm not going to
8  answer that.
9  MR. FARRELL:  Go to the next
10  video clip, please.
11  (Video clipped played as
12  follows:)
13  ROBERT PATTERSON:  I think
14  when you go back to that time
15  frame on the suspicious orders
16  reports, there was two major
17  failures --
18  MR. FARRELL:  Stop right
19  there for a second.
20  ROBERT PATTERSON:  -- there
21  was either a lack of information
22  contained therein.  Or not filing
23  them in -- in this instance that
24  they had.

1  I -- I think that started
2  the problem, quite frankly, and a
3  lot of the frustration came from
4  chasing down the registrants and
5  ultimately reminding them of their
6  responsibility in this regulated
7  area.
8  (Video concluded.)
9  MR. FARRELL:  So I'm going to
10  strike that and we're going to
11  start over, because I didn't lay a
12  proper foundation for that part.
13  BY MR. FARRELL:
14  Q. Beyond the opening statement
15  from the DEA to Congress through
16  Mr. Patterson here, there were also
17  questions and answers.
18  So one of the questions
19  Congress asked the DEA was:  Why did the
20  DEA communications with industry fail to
21  prevent the kinds of major breakdowns
22  apparent in West Virginia?
23  I'm going to play for you
24  Mr. Patterson's response.

1  (Video clip played as
2  follows:)
3  ROBERT PATTERSON:  I think
4  when you go back to that time
5  frame on the suspicious orders
6  reports, there was two major
7  failures.  One was either a lack
8  of information contained therein,
9  or not filing them in -- in this
10  instance that they had.  I think
11  that started the problem, quite
12  frankly, and a lot of the
13  frustration came from chasing down
14  the registrants and ultimately
15  reminding them of their
16  responsibility in this regulated
17  area.
18  (Video concluded.)
19  BY MR. FARRELL:
20  Q. My first question to you is,
21  is which registrants is he referencing?
22  MR. EPPICH:  Objection.
23  MR. NICHOLAS:  I'm going to
24  object on the basis that we're

1  talking about different
2  geographical -- with different
3  geography, this is a Track 1 case
4  relating to Track 1 jurisdictions
5  only.  I object on that basis.
6  These are questions about
7  West Virginia?
8  MR. FARRELL:  Yes, sir.  So
9  for the purposes of creating a
10 record, I understand that you're
11 preserving that right on CT 1.
12 However, the DOJ has requested
13 that we not put up Mr. Prevoznik
14 for all 1600 cases and would
15 prefer him to just to testify
16 once.
17 So to the extent this is
18 relevant to CT 2, I'm going to go
19 down this line.
20 MR. NICHOLAS:  Are you
21 saying that you're not going to
22 introduce this portion of the
23 testimony or seek to introduce it
24 in the Track 1 case?

1  Are we talking about the
2  wholesale distributors?
3  A. Yes.
4  MR. EPPICH:  Objection.
5  Form.  Foundation.
6  BY MR. FARRELL:
7  Q. And then it says that the
8  DEA was -- part of their frustration was
9  having to chase down the registrants and
10 remind them of their responsibilities.
11 Can you explain what that
12 means?
13 What does the DEA mean when
14 it says this to Congress?
15 MR. EPPICH:  Objection to
16 form.  Calls for speculation.
17 THE WITNESS:  It means that
18 we, with our letters in 2006, we
19 were reiterating what their
20 responsibility was to report
21 suspicious orders.  They may
22 needed to -- that the registrants
23 needed to meet effective controls
24 to guard against diversion.

1  MR. FARRELL:  No.  What I'm
2  saying is you preserved your
3  objection to this for the CT 1,
4  and we haven't made a decision on
5  what we'll present in CT 1 or
6  CT 2.
7  MR. NICHOLAS:  I made my
8  objection.
9  MR. EPPICH:  I'll further
10 object that this -- this line of
11 questioning lack -- he lacks
12 foundation for it.  Calls for
13 speculation.
14 MR. FARRELL:  Who do you
15 represent?
16 MR. EPPICH:  McKesson.
17 MR. FARRELL:  Okay.  Pretty
18 good.
19 BY MR. FARRELL:
20 Q. Okay.  Back on -- back on
21 the questions.
22 My question to you is, who
23 is the DEA referencing when they are
24 talking about chasing down registrants.

1  BY MR. FARRELL:
2  Q. Was it the DEA's assessment
3  during this time frame, which is 2006 and
4  2007, was that the wholesale distributors
5  as an industry were not complying with
6  their regulatory duties?
7  MR. STEPHENS:  Object to
8  form.
9  MR. FARRELL:  Excuse me.
10 Let me -- let me make sure I
11 finish my question before you make
12 your objection and let -- and then
13 we'll get it all preserved.
14 MR. STEPHENS:  I thought you
15 were finished.
16 MR. FARRELL:  So --
17 MR. STEPHENS:  I wanted to
18 make sure I had the objection
19 lodged before he answered the
20 question.  I apologize.
21 MR. FARRELL:  No question.
22 So let me repeat the
23 question.
24 BY MR. FARRELL:

1   Q. Was it the DEA's assessment
2   during the time frame of 2006 and 2007
3   that the wholesale distributors, as an
4   industry, were not complying with their
5   regulatory duties?
6   MR. STEPHENS: Object to
7   form.
8   THE WITNESS: Correct.
9   BY MR. FARRELL:
10   Q. Now, we're going to go to
11   the next clip.
12   The follow-up with the DEA
13   is that a congressman asked the DEA about
14   the settlements with industry in the
15   past. And asked them why the past
16   settlements were not effective in
17   achieving compliance.
18   Here is Mr. Patterson's
19   response on behalf of the DEA.
20   (Video clip played as
21   follows:)
22   ROBERT PATTERSON: And
23   again, this goes back to the
24   frustration of the day. And I

1   know that the -- the folks that
2   were in diversion back in 2010 and
3   2012 struggled with the fact that
4   these MOU or MOAs had been put in
5   place with these companies and
6   they blatantly violated them
7   again.
8   (Video concluded.)
9   BY MR. FARRELL:
10   Q. So my question to you is, is
11   what can the DEA do if the civil
12   penalties that they are imposing are not
13   prohibitive or do not cause the wholesale
14   distributors to change their conduct?
15   MS. MAINIGI: Objection.
16   Scope. Objection to form.
17   MR. EPPICH: Object to the
18   form. Calls for speculation.
19   THE WITNESS: Okay. We
20   could take -- we could file an
21   order to show cause on them. If
22   we could show imminent danger to
23   the public, we could file an ISO
24   against them. We could perhaps

1   take other civil action or an
2   injunctive action against the
3   company, or we could criminally
4   prosecute.
5   BY MR. FARRELL:
6   Q. Was the DEA in fact
7   frustrated that registrants were
8   blatantly violating the MOUs from prior
9   administrative actions?
10   MR. EPPICH: Object to form.
11   THE WITNESS: Yes.
12   BY MR. FARRELL:
13   Q. And which registrants are we
14   talking about in particular?
15   MS. MAINIGI: Objection.
16   Scope. I would like to go ahead
17   and get an objection on the record
18   and get a response from DOJ as
19   well as it relates to individual
20   defendants or individual
21   registrants.
22   Our understanding is that
23   individual registrants or
24   defendants are outside the scope

1   of this deposition.
2   MS. SINGER: Just to respond
3   to that, I think counsel for
4   defendants asked numerous
5   questions about whether Rite Aid
6   or Walmart or various different
7   entities engaged in certain
8   conduct.
9   This is consistent with that
10   testimony that defendants
11   themselves have elicited.
12   MS. MAINIGI: It has nothing
13   to do with the scope of what has
14   been allowed by the --
15   MR. STEPHENS: Nor was I
16   talking about current or former
17   investigations.
18   MR. FINKELSTEIN: Well,
19   you're certainly not authorized to
20   talk about current investigations.
21   Topic 2 is about enforcement
22   activities. The clarification is,
23   with respect to the type of
24   enforcement activities, counsel

04-18-2019          Prevoznik, Thomas          Page 619

1  for plaintiffs explained that
2  plaintiffs seek information
3  regarding administrative actions
4  and/or settlements that DEA has
5  entered into with any of the
6  defendants, and our response is
7  Mr. Prevoznik is authorized.
8  So I'm not going to stop the
9  witness from answering that
10 question.
11 MS. MAINIGI:  Mr. Prevoznik
12 is authorized to speak as to what?
13 Because with respect to our
14 Touhy requests, as I understand
15 it, and there may be somebody who
16 has it more at their fingertips
17 than I do, I believe that you
18 indicated that there could not be
19 questioning as it relates to
20 individual companies.  And I think
21 it's clearly stated in the
22 response to one of the topics,
23 either 2 or 3, I believe.
24 MR. FARRELL:  I'll tell you

04-18-2019          Prevoznik, Thomas          Page 620

1  what.  It's ten till 12:00.  If
2  it's okay with the DOJ, why don't
3  we take a lunch break now, and we
4  can argue about this during lunch.
5  MR. FINKELSTEIN:  Sure.
6  THE VIDEOGRAPHER:  11:53, we
7  are off the video record.
8  - - -
9  (Lunch break.)
10 - - -
11 A.F T E R N O O N  S E S S I O N
12 - - -
13 THE VIDEOGRAPHER:  1:09.  We
14 are on the video record.
15 - - -
16 EXAMINATION
17 (Continued)
18 - - -
19 BY MR. FARRELL:
20 Q. Mr. Prevoznik, when we took
21 our lunch break, the last question and
22 answer was followed by a bunch of
23 objections.  And so what I'm going to do
24 is I'm going to withdraw the question

04-18-2019          Prevoznik, Thomas          Page 621

1  that -- where I asked you generally which
2  registrants we are talking about.
3  And I'm going to go and give
4  you more specific information.
5  So the last question that
6  was pending and answered, I asked:  "Was
7  the DEA in fact frustrated that
8  registrants were blatantly violating the
9  MOUs from prior administrative actions?"
10 And your answer was:  "Yes."
11 There were appropriate
12 objections that were made that will be
13 resolved one day in the future.  So
14 here's where my follow-up questions
15 comes.
16 A. Okay.
17 Q. Does that include Cardinal
18 Health's 2008 MOU and settlement which
19 resulted in a second DEA fine?
20 A. Yes.
21 MS. MAINIGI:  Objection.
22 Objection.  Scope.  Objection.
23 Form.  Let me just go ahead and
24 begin at least noting, and then

04-18-2019          Prevoznik, Thomas          Page 622

1  someone else may continue, the
2  fact that there was a discussion
3  off the record during the lunch
4  break between us, DOJ, as well as
5  the plaintiffs about the scope of
6  what DOJ has allowed.  I don't
7  think that there was resolution of
8  that, but for the record,
9  defendants do object to this
10 ongoing line of questioning which
11 involves discussion of individual
12 defendants or individual actions
13 that have been taken in the past
14 against defendants.
15 MR. EPPICH:  And for the
16 record, McKesson further objects
17 to the scope of this as really
18 outside the Touhy request.  You
19 know, the defendants are -- see
20 this as seeking non-public
21 information, information on
22 ongoing investigations,
23 investigation that may implicate
24 the deliberative process or to the

1  specific activities of the DEA.
2  The defendants have not been
3  permitted to question into these
4  lines with other witnesses or
5  yesterday, and the defendants
6  simply are requesting equality in
7  the application of the Touhy.  And
8  that will be our objection on the
9  record.
10  MR. FINKELSTEIN:  To be as
11  clear as I possibly can about the
12  scope of the authorization in the
13  hope that we don't have to keep
14  having this conversation, what we
15  have authorized is information
16  regarding administrative actions
17  and/or settlements that the DEA
18  has entered into with the
19  defendants in this case.
20  What we have not authorized
21  is information regarding
22  investigations that haven't
23  resulted in settlements, or
24  investigative techniques, or for

1  that matter deliberative process
2  or law enforcement sensitive
3  information.
4  I will continue to make
5  appropriate objections, and where
6  appropriate instruct the witness
7  not to answer.  The defendants
8  have made their objections and
9  have preserved them for the
10  record.
11  You can answer.
12  BY MR. FARRELL:
13  Q. Does that include McKesson's
14  2008 MOU and settlement which resulted in
15  a second DEA fine?
16  MR. EPPICH:  Objection.
17  Scope.
18  THE WITNESS:  Yes.
19  BY MR. FARRELL:
20  Q. I'm not going to play this
21  video clip.  Instead I'm going to ask it
22  in a form of a question.
23  During the same testimony
24  acting -- is it administrator?

1  A. Yes.
2  Q. Acting Administrator Robert
3  Patterson testified that the DEA has
4  1,500 people to monitor 1.73 million
5  registrants.  Is that an accurate number?
6  MR. EPPICH:  Objection to
7  form.  Vague.
8  THE WITNESS:  Yes.
9  (Whereupon, a discussion was
10  held off the record.)
11  THE VIDEOGRAPHER:  1:14, we
12  are off the video record.
13  (Brief pause.)
14  THE VIDEOGRAPHER:  1:17.  We
15  are on the video record.
16  BY MR. FARRELL:
17  Q. Again, the last reference
18  that I'm going to bring up with regard to
19  Mr. Patterson's testimony before Congress
20  on behalf of the DEA, is a segment that
21  again talks about the shortcomings in the
22  use of the ARCOS data historically.
23  MR. FARRELL:  Would you
24  please play that clip.

1  (Video clip played as
2  follows:)
3  MR. PATTERSON:  So the key
4  is for us to work together on
5  that, and again, I can say
6  repeatedly in 2008, '9, '10, we
7  did not use this data in the way
8  that we are now using it.  And I
9  think that's the key.
10  I get that we have this
11  issue from a decade ago that we
12  have to resolve, you know, in
13  terms of how we use it.  And
14  again, where we fell short in
15  that, we'll take responsibility
16  for it.
17  (Video playback ended.)
18  BY MR. FARRELL:
19  Q. So has the DEA, in fact,
20  changed the way in which they are using
21  the ARCOS data?
22  A. Yes.
23  Q. And to be clear, to be
24  clear, what we are talking about is the

1   DEA's use of the ARCOS data to
2   retrospectively identify and prosecute
3   criminals?
4   MR. EPPICH:  Object to form.
5   THE WITNESS:  Yes.
6   BY MR. FARRELL:
7   Q. I apologize that I'm going
8   to jump out of order.  There is a system
9   to my madness.
10  What I'm going to do is, is
11  I'm going to hit one particular subject
12  here, and then I'm going to go back
13  and -- and ask some questions as if, you
14  know, a priority from the beginning.
15  A. Okay.
16  Q. So my question is this.  I
17  want to -- I want to ask you if the DEA
18  agrees with the following statement from
19  Cardinal Health:
20  "Cardinal Health's policy
21  about which it informed DEA as early as
22  2009, was that if a customer's order
23  could not be filled because it was
24  suspicious, Cardinal Health would

1   terminate controlled substance sales to
2   the customer and report the termination
3   to the DEA."
4   Do you understand what I
5   just read to you?
6   MS. MAINIGI:  Objection.
7   Form.  Objection.  Scope.
8   THE WITNESS:  Can I get the
9   first -- the first part of the
10  question?
11  BY MR. FARRELL:
12  Q. Yes.  So specifically what
13  I'm referencing is Cardinal Health's
14  reply brief, in Cardinal Health versus
15  Eric Holder, which was a preliminary
16  injunction filed by Cardinal Health in a
17  DC District Court.  And in it -- in the
18  reply brief there's a provision in here
19  that I read to you.  And in essence what
20  it says is that if you get a suspicious
21  order, and you block it, that Cardinal
22  Health would terminate that customer and
23  not sell to it anymore.
24  Do you agree that if a

1   wholesale distributor gets a flag of a
2   suspicious order, that they've determined
3   to be a suspicious order, and that they
4   block that shipment, that they should
5   terminate all future sales to that same
6   customer until they can rule out that
7   diversion is occurring?
8   MS. MAINIGI:  Objection.
9   Form.  Objection.  Scope.  Calls
10  for a hypothetical.
11  MR. EPPICH:  Objection to
12  the foundation.  Calls for
13  speculation.
14  THE WITNESS:  Yes, I would
15  agree.
16  BY MR. FARRELL:
17  Q. The same thing applies to a
18  document involving McKesson.
19  On August 13, 2014, the
20  United States Department of Justice was
21  communicating with the lawyer for
22  McKesson which ended up resulting in a
23  $150 million fine.
24  And in this discussion, the

1   DEA notes, and I'm reading from Bates
2   Stamp MCKMDL 00409224, that the McKesson
3   operations manual says the following
4   quote:
5   "Once McKesson deems an
6   order and/or a customer suspicious,
7   McKesson is required to act.  This means
8   all controlled substance sales to that
9   customer must cease and the DEA must be
10  notified."
11  Does the DEA agree with
12  those duties?
13  A. Yes.
14  MR. EPPICH:  Objection.
15  Scope.  Objection to the extent it
16  mischaracterizes the document.
17  Lacks foundation.  Calls for
18  speculation.  Form.
19  MR. FINKELSTEIN:  The
20  witness has answered the question.
21  I just note that there are
22  no documents in front of him.
23  There are no exhibits.  If you're
24  going to ask him about exhibits,

1  then you should mark them as
2  exhibits.
3  MR. FARRELL:  I can
4  absolutely do that.  And -- and I
5  think that I was trying to save us
6  some time.  To the extent that
7  I've misread anything or the
8  context of it, I apologize.
9  We have those documents and
10  I can circulate them.  I'm just
11  trying to create a quick record
12  before we move on.
13  MR. FINKELSTEIN:  It's your
14  deposition.
15  MR. EPPICH:  We'll have an
16  ongoing objection then, to the
17  extent you're reading from a
18  document that's not in front of us
19  to check, and -- and where you
20  haven't established a foundation,
21  then we will obviously object.
22  MR. FARRELL:  So if it's --
23  if it's not clear, I'm trying to
24  create a record for our experts as

1  well.
2  MR. EPPICH:  I got that,
3  thank you.
4  BY MR. FARRELL:
5  Q. So, cleaning up a couple of
6  other things.
7  There was some testimony
8  yesterday, or today actually, from my
9  learned colleague, that 1.2 million
10  suspicious orders were reported to the
11  DEA between 2007 and 2018.
12  Do you recall that
13  testimony?
14  A. Yes.
15  MR. EPPICH:  Object to form.
16  BY MR. FARRELL:
17  Q. If those suspicious orders
18  were filled, is that a, per se, violation
19  of federal law?
20  MR. EPPICH:  Objection to
21  form.
22  THE WITNESS:  Yes.
23  MS. MAINIGI:  Objection.
24  Calls for speculation, calls for a

1  legal conclusion.
2  THE WITNESS:  Yes.
3  BY MR. FARRELL:
4  Q. The foundation of our
5  democracy arises out of the U.S. code.
6  So I'm going to ask a couple of general
7  questions about some code provisions that
8  I'm sure you're very familiar with.
9  MS. MAINIGI:  Objection.
10  Outside the scope.
11  BY MR. FARRELL:
12  Q. The first one is the statute
13  of United States Code Section 801.  And I
14  ask for it to be shown on the screen.
15  So you've been asked in the
16  past, with the focus on Subparagraph 1,
17  that many of the controlled substances
18  that are distributed in America,
19  prescribed and dispensed, have a useful
20  and legitimate medical purpose and that
21  they are necessary to maintain the health
22  and general welfare of the American
23  people.
24  That's a true statement, is

1  it not?
2  MS. MAINIGI:  Objection.
3  Form.
4  MR. FINKELSTEIN:  Same scope
5  objection.  I allowed the
6  defendants to ask so I'll allow
7  you to ask.
8  BY MR. FARRELL:
9  Q. So we're going to skip down
10  to the part they omitted, which is
11  Subparagraph 2, and I'd ask for you to
12  read that into the record.
13  MR. EPPICH:  Object to form.
14  THE WITNESS:  "The illegal
15  importation, manufacture,
16  distribution and possession and
17  improper use of controlled
18  substances have a substantial and
19  detrimental effect on the health
20  and general welfare of the
21  American people."
22  BY MR. FARRELL:
23  Q. Is this consistent with the
24  guidance provided by the DEA to

1 registrants?
2 MR. EPPICH: Object to form.
3 Vague.
4 THE WITNESS: Yes.
5 BY MR. FARRELL:
6 Q. The next provision is
7 Section 812. And this is the scheduling
8 of -- by the United States Congress,
9 which identifies Schedule II drugs, which
10 include prescription opioids.
11 And Subparagraph A, would
12 you please read into the record?
13 A. "The drug or other substance
14 has" -- "has a high potential for abuse."
15 Q. Subparagraph B?
16 A. "The drug or other substance
17 has a currently accepted medical use and
18 treatment in the United States or a
19 currently accepted medical use with
20 severe restrictions."
21 Q. And Paragraph C?
22 A. "Abuse of the drug or other
23 substances may lead to severe
24 psychological or physical dependence."

1 And it includes a duty imposed upon the
2 registrants to comply with Paragraph 1.
3 Will you please read that into the
4 record?
5 A. "Maintenance of effective
6 control against diversion of particular
7 controlled substances into other than
8 legitimate medical, scientific, and
9 industrial channels."
10 Q. And is this consistent with
11 the guidance provided by the DEA to
12 registrants?
13 MR. EPPICH: Objection to
14 form. Vague.
15 THE WITNESS: Yes. Yes.
16 BY MR. FARRELL:
17 Q. Now, the next thing that I'm
18 going to do is to peer a little bit
19 deeper into some congressional intent
20 from the congressional record.
21 MR. FARRELL: Can you pull
22 up the next slide.
23 BY MR. FARRELL:
24 Q. I'm not going to ask you to

1 Q. And are these provisions
2 consistent with the guidance provided by
3 the DEA to registrants?
4 MR. EPPICH: Objection to
5 form. Vague.
6 THE WITNESS: Yes.
7 BY MR. FARRELL:
8 Q. Go to the next section which
9 is Section 821. This is the enabling
10 statute from the United States Congress
11 that authorizes the Attorney General to
12 promulgate regulations regarding
13 prescription opioids.
14 Has, in fact, the DEA used
15 this authority to enact, in particular,
16 21 C.F.R. 1301.74?
17 MR. FINKELSTEIN: Calls for
18 a legal conclusion. You can
19 answer.
20 THE WITNESS: Yes.
21 BY MR. FARRELL:
22 Q. Go to the next slide. And
23 this is the United States Code Section,
24 which has a registration requirement.

1 be a legal scholar or an academic
2 scholar. I'm going to ask you some
3 specific questions.
4 This comes from the
5 congressional record from the 1970
6 Controlled Substances Act.
7 MR. FARRELL: And so if
8 you'll go to the next slide.
9 BY MR. FARRELL:
10 Q. Title II, Control
11 Enforcement, states, "This bill provides
12 for control by the Justice Department of
13 problems related to drug abuse through
14 registration of manufacturers,
15 wholesalers, retailers, and all others in
16 the legitimate distribution chain, and
17 makes transactions outside the legitimate
18 distribution chain illegal."
19 Is this consistent with the
20 guidance the DEA provided to registrants?
21 MS. MAINIGI: Objection.
22 MR. EPPICH: Objection to
23 form.
24 THE WITNESS: Yes.

1  BY MR. FARRELL:
2  Q. If you violate Section 823,
3  or the provisions, the regulations
4  enacted by the DEA related to the
5  distribution of controlled substances,
6  those acts are illegal.  Agreed or
7  disagree?
8  MS. MAINIGI:  Objection.
9  Calls for a legal conclusion.
10  THE WITNESS:  Agreed.
11  BY MR. FARRELL:
12  Q. The DEA considers violation
13  of federal law related to the
14  distribution of controlled substances as
15  illegal and unlawful?
16  MR. EPPICH:  Objection to
17  form.
18  THE WITNESS:  Yes.
19  MR. FARRELL:  Go to the next
20  slide.
21  BY MR. FARRELL:
22  Q. The quote from the
23  congressional record is, "The bill is
24  designed to improve the administration

1  and regulation by the manufacturer" --
2  "by the manufacturing, distribution and
3  dispensing of controlled substances by
4  providing a quote-unquote closed system
5  of drug distribution for legitimate
6  handlers of such drugs.
7  "Such a closed system should
8  significantly reduce the widespread
9  diversion of these drugs out of
10  legitimate channels into the illicit
11  market, while at the same time providing
12  the legitimate drug industry with a
13  unified approach to narcotic and
14  dangerous drug control."
15  Is this consistent with the
16  guidance provided by the DEA to
17  registrants?
18  MR. EPPICH:  Object to form.
19  Vague.
20  THE WITNESS:  Yes.
21  BY MR. FARRELL:
22  Q. You were asked previously
23  whether every suspicious order results in
24  diversion.  Do you recall that testimony?

1  A. Yes.
2  MR. EPPICH:  Object to form.
3  BY MR. FARRELL:
4  Q. And your answer was, "No,
5  not every suspicious order results in
6  diversion.  That's my recollection."
7  I would like to ask you some
8  corollary to that if you don't mind.
9  MS. MAINIGI:  Objection.
10  THE WITNESS:  Okay.
11  BY MR. FARRELL:
12  Q. You would agree with me --
13  strike that.
14  Does the DEA take the
15  position that the purpose of the
16  Controlled Substances Act and its federal
17  regulations is to prevent diversion?
18  A. Yes.
19  Q. And diversion is foreseeable
20  if registrants fail to comply with
21  federal law?
22  MS. MAINIGI:  Object.
23  MR. EPPICH:  Object to form.
24  MR. FINKELSTEIN:  Vague.

1  MR. O'CONNOR:  Object.
2  BY MR. FARRELL:
3  Q. Does the DEA agree that
4  diversion is foreseeable if registrants
5  fail to comply with federal law?
6  MS. MAINIGI:  Objection.
7  MR. EPPICH:  Objection.
8  Form.  Calls for a legal
9  conclusion.  Vague.
10  THE WITNESS:  Correct.
11  BY MR. FARRELL:
12  Q. And failure to comply
13  enables more diversion.  Does the DEA
14  agree with that?
15  MR. O'CONNOR:  Object to
16  form.
17  MR. EPPICH:  Objection.
18  MR. STEPHENS:  Objection.
19  MR. NICHOLAS:  Objection.
20  MS. MAINIGI:  Objection.
21  MR. EPPICH:  Calls for a
22  legal conclusion.
23  MR. FINKELSTEIN:  Join as to
24  vagueness.

1 THE WITNESS:  Yes.
2 BY MR. FARRELL:
3 Q. Does the DEA believe that
4 more diversion is detrimental to public
5 health and safety?
6 MR. O'CONNOR:  Object to
7 form.  Scope.
8 THE WITNESS:  Yes.
9 BY MR. FARRELL:
10 Q. Does the DEA agree that the
11 more pills which unlawfully enter the
12 market results in more diversion?
13 MR. O'CONNOR:  Objection to
14 form.  Scope.
15 THE WITNESS:  Yes.
16 MR. FARRELL:  Go to the next
17 slide.
18 BY MR. FARRELL:
19 Q. This is a provision about
20 penalties.  Does the DEA agree that the
21 price for participation in illegal
22 traffic of controlled substances should
23 be prohibitive?
24 MR. O'CONNOR:  Objection.

1 III of the bill deal with law enforcement
2 and aspects of drug abuse and provide
3 authority for the Department of Justice
4 to keep track of all drugs subject to
5 abuse manufactured or distributed in the
6 United States in order to prevent
7 diversion of these drugs from legitimate
8 channels of commerce.
9 Is this consistent with the
10 guidance provided by DEA to registrants?
11 MR. EPPICH:  Objection to
12 form.  Vague.
13 MR. O'CONNOR:  Objection.
14 Scope.
15 THE WITNESS:  Yes.
16 MR. FARRELL:  Next slide,
17 please.
18 Next slide.
19 BY MR. FARRELL:
20 Q. Congress found the illegal
21 importation, manufacture, distribution
22 and possession of improper use of
23 controlled substances have a substantial
24 detrimental effect on the public's health

1 MR. EPPICH:  Objection to
2 form, foundation.
3 MR. STEPHENS:  Objection.
4 MR. NICHOLAS:  Objection.
5 MS. MAINIGI:  Objection.
6 MR. O'CONNOR:  Scope.
7 MR. EPPICH:  Calls for
8 speculation.
9 MR. FINKELSTEIN:  Scope.
10 You can answer.
11 THE WITNESS:  Yes.
12 BY MR. FARRELL:
13 Q. Is this one of the reasons
14 that the DEA has escalated the amount of
15 fines that it has levied against
16 registrants that are repeated violators?
17 MR. O'CONNOR:  Objection.
18 Leading.
19 MR. EPPICH:  Objection to
20 form.  Calls for speculation.
21 MR. FINKELSTEIN:  Scope.
22 THE WITNESS:  Yes.
23 BY MR. FARRELL:
24 Q. Next slide.  Titles II and

1 and general welfare.
2 Does the DEA agree with this
3 statement, and is this consistent with
4 the guidance provided by the DEA to
5 registrants?
6 MR. O'CONNOR:  Objection to
7 form and to scope.
8 MR. EPPICH:  Objection to
9 the extent it misstates the
10 document.
11 BY MR. FARRELL:  Very well.
12 That's a good point.  I'll back
13 up.
14 BY MR. FARRELL:
15 Q. In the congressional record
16 is the following statement:
17 "The illegal importation,
18 manufacture, distribution and possession
19 and improper use of controlled substances
20 have a substantial detrimental effect on
21 the public's health and general welfare."
22 Does the DEA agree with this
23 statement?
24 MR. O'CONNOR:  Objection to

1  form and scope.
2  MR. EPPICH:  Objection.
3  Calls for speculation.
4  MR. FINKELSTEIN:  Scope.
5  THE WITNESS:  Yes.
6  BY MR. FARRELL:
7  Q. Is this statement consistent
8  with the guidance provided by the DEA to
9  registrants?
10  MR. O'CONNOR:  Objection to
11  form and scope.
12  MR. EPPICH:  Objection.
13  Vague.
14  THE WITNESS:  Yes.
15  MR. FARRELL:  Next slide
16  please.
17  There's no more?
18  BY MR. FARRELL:
19  Q. All right.  Now we're going
20  to dig a little bit deeper.  These aren't
21  the congressional record.  This comes
22  from the hearing involving the 1970
23  Controlled Substances Act.
24  So, if you go to the front

1  MR. FARRELL:  Sure.
2  MR. NICHOLAS:  I don't want
3  to mess with your flow here, but
4  you're showing these documents
5  that are not -- they are not --
6  they are not being offered as
7  evidence.  They are not being
8  marked.
9  It's a direct examination.
10  I kind of feel like there needs to
11  be a little more formality to the
12  presentation.  Like, you know,
13  these have to be exhibits or
14  something, right?
15  MR. FARRELL:  Noted.
16  MR. NICHOLAS:  So that's my
17  objection.  I don't think you
18  should be able to proceed in this
19  manner without sort of producing
20  these things as exhibits or laying
21  a foundation for these documents.
22  MR. FARRELL:  I will note we
23  spent most of the morning doing
24  the exact same thing with other

1  page, this is a 900-page document that --
2  from the -- I always mispronounce this.
3  The HathiTrust?  HathiTrust?
4  And it contains all of the
5  hearings that are -- that surrounded the
6  enactment of the 1970 Controlled
7  Substances Act.  And there's some
8  particular statements that are made.  I'm
9  not going to ask you to verify them.  I'm
10  going to just ask whether the DEA agrees
11  or disagrees with the premise.
12  The first one comes from a
13  statement of the manager of -- of
14  distribution from a firm called Smith,
15  Kline & French Laboratories.
16  If you --
17  MR. NICHOLAS:  I'll
18  object -- I'm sorry.  I don't want
19  to interrupt.  If you're not done,
20  keep going.
21  MR. FARRELL:  So if you'll
22  go ahead and pull it up.
23  MR. NICHOLAS:  Okay.  Can I
24  just interpose an objection?

1  aspects of the congressional
2  record.
3  MR. NICHOLAS:  This is a
4  direct examination.
5  MR. FARRELL:  Understood.
6  So -- can we stipulate to that?
7  MR. NICHOLAS:  I mean, it's
8  your position that it's a direct,
9  right?
10  BY MR. FARRELL:
11  Q. All right.  So if we go to
12  Page 269, I'm going to read to you this
13  statement:
14  "We cannot overemphasize,
15  however, that no regulatory program will
16  work unless it is backed by sufficient
17  manpower and resources to do what it is
18  designed to do.  The federal and state
19  enforcement agencies in the drug field
20  are all too well aware of this truism.
21  They are often the target for unjustified
22  public criticism for not doing a job that
23  would take many times their present
24  resources to do."

1 The D --
2 MS. MAINIGI: Go ahead.
3 BY MR. FARRELL:
4 Q. Does the DEA agree with this
5 statement?
6 MS. MAINIGI: Objection to
7 form, scope.
8 And can we see a copy of
9 this, Counsel? Because we have no
10 way to know what exactly you are
11 reading from within this document.
12 MR. FULLER: Here you go.
13 MS. MAINIGI: What page?
14 MR. FARRELL: 269.
15 Go to the next slide,
16 please.
17 MR. EPPICH: I'll object to
18 foundation.
19 BY MR. FARRELL:
20 Q. Go to the next slide,
21 please.
22 This is a statement from the
23 Washington representative for the
24 National Association of Retail Druggists.

1 "MR. ROGERS. As we ask
2 groups as they come in where they feel
3 diversion comes from or illegal traffic,
4 when you get to the manufacturers, they
5 don't feel that" -- "that any comes from
6 there.
7 "Then we get to the
8 wholesaler, and they don't think there is
9 any there. And then we get down to the
10 doctors and they tell us it is not in
11 that segment, and the retail druggist now
12 tells us there is none there. Well,
13 where do you feel all of this comes from?
14 We have 900 agents supposedly to track
15 all of this down and they come up with
16 4,000 arrests, five per man for the year.
17 I don't know how society gets inundated
18 with all of these drugs from no sources.
19 Where do you think it mainly comes from?
20 I don't believe there are enough
21 robberies out of warehouses to supply all
22 of this."
23 And then from the National
24 Association of Retail Druggists, their

1 response is:
2 "I don't believe there are
3 either. I think this is a factor and I
4 can certainly appreciate your concern. I
5 think, Mr. Chairman, that you put your
6 finger on the real problem that has to be
7 dealt with."
8 So my question to the DEA:
9 Is this consistent with the DEA's
10 understanding of the purpose and effect
11 of the Controlled Substances Act, as well
12 as the regulations enabled thereunder, is
13 to prevent diversion that happens in the
14 entire chain of distribution?
15 MR. EPPICH: Object to form.
16 MR. O'CONNOR: And scope.
17 MS. MAINIGI: Objection.
18 Outside the scope as well.
19 MR. NICHOLAS: Can we -- can
20 we know the date of this
21 statement, when it was made?
22 MS. MAINIGI: It is in 1970
23 prior to opioids that are at issue
24 here.

1 MR. NICHOLAS: Is that
2 correct, it's a pre-1970
3 statement?
4 MR. FINKELSTEIN: Are you
5 guys done with objections?
6 MS. MAINIGI: Well, it says
7 1970.
8 Paul, could you clarify
9 though. Is it 1970?
10 MR. FARRELL: I've already
11 made the record that I'm going to
12 make.
13 MR. FINKELSTEIN: Once you
14 are done -- are you guys done?
15 MR. NICHOLAS: Yeah.
16 MR. FINKELSTEIN: I object
17 to the scope. Vague.
18 You can answer if you
19 understand.
20 THE WITNESS: Yes.
21 BY MR. FARRELL:
22 Q. Even if it's not admissible,
23 you agree with me that's pretty
24 consistent with what the DEA hears today

1   from those in the chain of distribution.
2   MR. EPPICH:  Object to form.
3   MR. O'CONNOR:  And scope.
4   THE WITNESS:  Could you
5   repeat the question?
6   BY MR. FARRELL:
7   Q. Even if this is from 1970,
8   are those sentiments that we just read
9   consistent with what the DEA presently
10  hears from the manufacturers,
11  distributors, doctors, and pharmacies in
12  the chain of distribution?
13  MR. STEPHENS:  Object to
14  form.
15  MR. FINKELSTEIN:  Vague.
16  MR. O'CONNOR:  Object to
17  scope.
18  THE WITNESS:  Yes.
19  BY MR. FARRELL:
20  Q. All right.  The next thing
21  we're going to go to is the C.F.R. that
22  Congress enabled to be adopted.  And the
23  first thing is going to be from March 13,
24  1971 and it's the rule proposal.  And

1   we're going to flip down to Page 9.
2   Does the DEA recognize the
3   structure of this provision?
4   A. Yes.
5   MS. MAINIGI:  Objection.
6   Foundation.  Scope.  Form.
7   MR. FARRELL:  Well, the
8   foundation of this exhibit is this
9   is part of the rulemaking process
10  which resulted in the adoption of
11  21 C.F.R. 1301.74.
12  MS. MAINIGI:  I don't think
13  you can testify, Mr. Farrell.  You
14  have to establish foundation in
15  other ways.
16  BY MR. FARRELL:
17  Q. The next slide I'm going to
18  show you comes from once public notice
19  was made for this provision.
20  MR. FARRELL:  Will you
21  please show that.
22  BY MR. FARRELL:
23  Q. It comes from April 24,
24  1971.  At the very top of it, I'll have

1   you read that.
2   A. "Many manufacturers and
3   distributors objected to security
4   controls set forth in 301.91 to 301.97."
5   Q. And I'll represent to you
6   that these provisions they are
7   referencing are in fact the security
8   requirements in 1301.74(b).  And I'll ask
9   the DEA:  Do you still have records of
10  the objections lodged by manufacturers
11  and distributors to this regulatory
12  provision?
13  MR. EPPICH:  Objection to
14  form.
15  MS. MAINIGI:  Objection to
16  form, foundation, scope.
17  MR. EPPICH:  Object to
18  scope.  This is way outside of
19  Topic 1 of plaintiffs' topics.
20  MR. FINKELSTEIN:  Scope.
21  You can answer.
22  BY MR. FARRELL:
23  Q. If you know.
24  A. I don't know.

1   Q. Is it something that DEA can
2   look into for me?
3   MR. EPPICH:  Same
4   objections.
5   MS. MAINIGI:  Objection.
6   THE WITNESS:  Yes.
7   BY MR. FARRELL:
8   Q. Because it would be swell
9   if, like, some of the manufacturers and
10  distributors that are here objecting to
11  the DEA have been objecting since 1971.
12  MS. MAINIGI:  Is that a
13  question?
14  MR. EPPICH:  Objection to
15  the characterization.
16  MR. FARRELL:  That was just
17  commentary.
18  MR. EPPICH:  I know.
19  BY MR. FARRELL:
20  Q. The next slide is going to
21  be the actual regulation that exists
22  today, which is 21 C.F.R. 1301.74(b).
23  MR. FINKELSTEIN:  That's not
24  it.

1  MR. STEPHENS:  Paul, just
2  for clarification, are you marking
3  these so that we have a hard copy
4  that we can use in redirect?
5  You're just throwing stuff up on
6  the screen and playing stuff and
7  moving on.
8  MS. MAINIGI:  And sometimes
9  not even waiting for an answer.
10  MR. FARRELL:  Understood.
11  MR. STEPHENS:  Do you
12  understand my point?  If you're
13  using a document, I want to see
14  the whole document so if I've got
15  questions that I can use it in
16  redirect.
17  MR. FARRELL:  We do have
18  copies.  You've got copies of
19  stuff here too.  Yeah, we got
20  copies.
21  MS. MAINIGI:  I thought you
22  were sending these all
23  electronically.
24  MR. FARRELL:  I think you

1  scoffed at me when I made that
2  recommendation.
3  MS. MAINIGI:  I did laugh at
4  you.  That's true.  But I thought
5  you were still doing it.
6  MR. FARRELL:  We'll move on.
7  BY MR. FARRELL:
8  Q. I've shown you up on the
9  screen, which is a verbatim copy of --
10  from the regulations enacted.
11  Does the DEA recognize and
12  acknowledge that 21 C.F.R. 1301.74 is a
13  regulation enacted and under its
14  authority?
15  MS. MAINIGI:  Objection.
16  MR. EPPICH:  Objection.
17  MR. FINKELSTEIN:  Calls for
18  a legal conclusion.
19  THE WITNESS:  Yes.
20  BY MR. FARRELL:
21  Q. And would you please read
22  subparagraph (b) into the record?
23  A. "The registrant shall design
24  and operate a system to disclose to the

1  registrant suspicious orders of
2  controlled substances.  The registrant
3  shall inform the field division office of
4  the administration in his area of
5  suspicious orders when discovered by the
6  registrant.
7  "Suspicious orders include
8  orders of unusual size, orders deviating
9  substantially from a normal pattern, and
10  orders of unusual frequency."
11  Q. Is this consistent with the
12  guidance provided by the DEA to
13  registrants?
14  A. Yes.
15  Q. And has this regulation
16  materially changed since it was
17  originally enacted in 1971?
18  A. No.
19  Q. All right.  The next
20  document that I'm going to show you comes
21  from discovery in this case.  And it's
22  the NWDA suspicious order monitoring
23  system.
24  And I believe that the

1  government has it included in its folder,
2  its materials file.
3  Have you seen this document
4  before?
5  A. Can I see more than that?
6  Q. I think it's under -- it's
7  in one --
8  A. In my tabs, my folder?
9  Q. Yeah.
10  A. Yes.
11  Q. I'll give you a second if
12  you want to flip through it.
13  A. That's all I see.
14  I'm familiar with this.
15  Q. This is a document that was
16  in the files of Cardinal Health.  And
17  it's stamped as received in 1993, but
18  I'll represent to you that it contains
19  some older 1984 references later on.
20  I'm going just to ask you a
21  few basic questions about it.  And I'll
22  represent to you that the NWDA is a trade
23  group for the wholesale distributors at
24  some point in time.

1  Go to Page 3.
2  MR. FARRELL:  Take that down
3  first if you don't mind.  I'm
4  sorry.  I was talking to John.
5  Take out the blowup.
6  Go ahead.  Put it back up.
7  BY MR. FARRELL:
8  Q. So this is something very
9  specific that I want to ask the DEA.
10  MS. MAINIGI:  Objection.
11  Let me object first to the manner
12  in which you're questioning.  You
13  cannot be testifying about various
14  aspects of this document.
15  But objection.  Form.
16  Foundation.  This guy hasn't --
17  this is not a DEA document.
18  You're essentially trying to use
19  him as a vehicle to get testimony
20  from the document itself.  It's
21  ridiculous and objectionable and
22  outside the scope.
23  MR. FARRELL:  You can make
24  your objections without making

1  demeaning comments.  So I'm going
2  to ask you --
3  MS. MAINIGI:  Okay.  Well,
4  it is a mockery of the process.
5  MR. FARRELL:  That's your
6  second demeaning comment.  The
7  third one, we'll get the special
8  master on the phone.
9  MS. MAINIGI:  That's fine.
10  I actually would love that.  Go
11  ahead.
12  MR. FARRELL:  We can do it
13  on a break after we get through
14  this document.
15  MS. MAINIGI:  Sounds fine to
16  me.
17  BY MR. FARRELL:
18  Q. So what I'm going to ask you
19  is, if you look in the middle of the page
20  where it says, "Current month ingredient
21  limit," and then there's a note that says
22  "NN.NN will be provided by the DEA."
23  Do you see that?
24  MS. MAINIGI:  Objection.

1  Form.  Scope.  Foundation.
2  THE WITNESS:  Yes.
3  BY MR. FARRELL:
4  Q. Okay.  Cardinal Health has
5  represented that the DEA provided that
6  factor to them for controlled substances.
7  Is the DEA aware of ever providing the
8  factor for the current month ingredient
9  limit to anybody in industry?
10  MS. MAINIGI:  Objection.
11  Form.  Scope.  Foundation.
12  THE WITNESS:  I don't know.
13  BY MR. FARRELL:
14  Q. Go all the way to Page 7.
15  In the middle of the page in Paragraph 9,
16  "Single suspicious orders."  For purposes
17  of context I'd like you to read this
18  aloud.
19  MS. MAINIGI:  Objection to
20  form, scope, foundation.
21  **THE WITNESS:  "Single orders**
22  **of unusual size or deviation must**
23  **be reported immediately.  The**
24  **submission of a monthly printout**

1  **of after-the-fact sales will not**
2  **relieve a registrant from the**
3  **responsibility of reporting these**
4  **single excessive or suspicious**
5  **orders.**
6  **"DEA has interpreted orders**
7  **to mean prior to shipment."**
8  **BY MR. FARRELL:**
9  **Q. Is this statement consistent**
10  **with the guidance provided by the DEA to**
11  **registrants?**
12  **A. Yes.**
13  MR. O'CONNOR:  Objection.
14  MR. EPPICH:  Objection.
15  MR. STEPHENS:  Objection.
16  MR. NICHOLAS:  Objection.
17  MS. MAINIGI:  Objection.
18  Form.
19  MR. EPPICH:  Foundation,
20  form, calls for speculation.
21  BY MR. FARRELL:
22  **Q. I'm not asking you to**
23  **speculate.  As a matter of fact, is this**
24  **consistent with what the DEA has told its**

1  **registrants is required to comply with**
2  **federal law?**
3  MS. MAINIGI:  Objection.
4  MR. EPPICH:  Objection.
5  Form.  Foundation.  Calls for
6  speculation.  Vague as to time.
7  MR. FINKELSTEIN:  I'll join
8  the objection as to the vagueness
9  as to time.
10  THE WITNESS:  Yes.
11  BY MR. FARRELL:
12  Q. Is the DEA aware of ever in
13  its history of saying anything
14  inconsistent with what you just read?
15  MR. EPPICH:  Objection.
16  Form, foundation, calls for
17  speculation, outside the scope.
18  THE WITNESS:  I have --
19  could you -- could you re-read it?
20  BY MR. FARRELL:
21  Q. I'll strike it.  I got the
22  answer.  I'll strike it.
23  The next thing I'm going to
24  do is I'm going to show you from Page 8,

1  Q. When you look at the
2  reliance materials that you have in front
3  of you, you can flip through it and find
4  if it's not in the back.
5  MS. MAINIGI:  Objection.
6  Form, foundation.
7  THE WITNESS:  No.
8  BY MR. FARRELL:
9  Q. Okay.  So what I'm going to
10  ask you is, is to flip to Page 2 and see
11  Mr. Thomas Gitchell, acting chief
12  diversion of operations section.  Are you
13  familiar with Mr. Gitchell?
14  A. Yes, I know who he -- I know
15  who he is.
16  Q. Is Mr. Gitchell authorized
17  to speak on behalf of the DEA at this
18  time?
19  MS. MAINIGI:  Objection.
20  Outside the scope.  Form.
21  Foundation.
22  MR. FINKELSTEIN:  Objection.
23  Vague.
24  MR. EPPICH:  Objection.

1  attached to this in the Cardinal Health
2  files, is a cover sheet that says letters
3  from DEA approving the format.
4  And if you look, the first
5  letter is dated April 27, 1984.
6  Are you familiar with this
7  correspondence?
8  MS. MAINIGI:  Objection.
9  Outside the scope.  It's 1984.
10  Form and foundation.
11  MR. FARRELL:  Well, the
12  irony of it is, is that Cardinal
13  Health specifically referenced
14  this document in its combined
15  discovery responses.
16  So I'm going to ask you --
17  MS. MAINIGI:  Outside the
18  scope of this deposition.
19  MR. FARRELL:  I'm going to
20  ask the witness again --
21  BY MR. FARRELL:
22  Q. Are you familiar with this
23  document?
24  A. No.

1  Calls for speculation.
2  MR. FARRELL:  It can't be
3  speculation.  It's the DEA
4  testifying on whether or not the
5  chief of the diversion operation
6  section has the authority to make
7  statements on behalf of the DEA.
8  MR. EPPICH:  In 1983?
9  MR. FARRELL:  Correct.
10  Which is reliance by Cardinal
11  Health and others as to its
12  suspicious order monitoring
13  system.
14  MR. EPPICH:  Outside the
15  scope of the authorization.
16  MR. FARRELL:  It's -- this
17  is going to be related to the
18  guidance provided by the DEA.
19  MR. EPPICH:  Well, we'll let
20  him answer.
21  BY MR. FARRELL:
22  Q. So, go back to the prior --
23  prior page.  All right.
24  So taking off --

1   MR. FARRELL:  If you'll take
2   off the blow-off first.
3   BY MR. FARRELL:
4   Q. The date is April 27, 1984.
5   You'll see in the bottom right-hand
6   corner this is a document that is in the
7   Cardinal Health files.
8   MS. MAINIGI:  Objection.
9   Form, scope, foundation.
10  BY MR. FARRELL:
11  Q. And so I'm going to ask that
12  the -- that the main paragraph be blown
13  up so we can read it.
14  So the NWDA policy that
15  was -- that we just walked through, is
16  what this reference is to.
17  And I'd ask for you to read
18  it, the portion that's highlighted.
19  A. "The NWDA's draft format for
20  a suspicious order" -- "order monitoring
21  system provides an excellent framework
22  for distributor registrants to design and
23  operate a system to disclose to the
24  registrant suspicious orders of

1   to time.
2   THE WITNESS:  Yes.
3   BY MR. FARRELL:
4   Q. Now, go to the final
5   sentence.  Will you please read this
6   aloud?
7   A. "As previously discussed, an
8   after-the-fact computer printout of sales
9   data does not relieve a registrant of its
10  responsibility to report excessive or
11  suspicious orders when discovered.  I am
12  enclosing a copy of your draft with my
13  pen and ink changes."
14  Q. Is this consistent with the
15  guidance provided by the DEA to
16  registrants?
17  MS. MAINIGI:  Objection.
18  Form, scope, foundation.
19  THE WITNESS:  Yes.
20  BY MR. FARRELL:
21  Q. Is after the fact reporting
22  of suspicious orders in full compliance
23  with federal law?
24  MS. MAINIGI:  Objection.

1   controlled substances."
2   Q. Very good.
3   Now I'd like you to read the
4   next sentence.
5   MS. MAINIGI:  Objection.
6   Form, scope, foundation.
7   THE WITNESS:  "However, I am
8   compelled to note, as I have in
9   our previous discussions, that any
10  automated data processing system
11  may provide the means and
12  mechanism for compliance when the
13  data is carefully reviewed and
14  monitored by the wholesaler."
15  BY MR. FARRELL:
16  Q. Is this statement consistent
17  with guidance provided by the DEA to
18  registrants?
19  MS. MAINIGI:  Objection.
20  Outside the scope.  Form,
21  foundation.
22  MR. EPPICH:  Objection.
23  Vague.
24  MR. FINKELSTEIN:  Vague as

1   Form, scope, foundation, and vague
2   as to time.
3   MR. EPPICH:  Objection.
4   Calls for a legal conclusion.
5   THE WITNESS:  Could you
6   repeat it?
7   BY MR. FARRELL:
8   Q. Has after the fact reporting
9   of suspicious orders ever been in
10  compliance with federal law according to
11  the DEA's guidance provided to
12  registrants?
13  A. No.
14  MS. MAINIGI:  Objection.
15  Form, foundation.
16  MR. EPPICH:  Objection.
17  Vague.
18  MR. FINKELSTEIN:  For -- for
19  the witness and Paul, we'll go
20  another half hour and then take a
21  break.
22  MR. FARRELL:  Yeah, actually
23  I've got one more page and then it
24  might be a good break point.

1   MR. FINKELSTEIN: Okay.
2   BY MR. FARRELL:
3   Q. So from the Cardinal Health
4   files comes a second letter from the DEA.
5   And it's dated approximately three weeks
6   later, May 16, 1984. And it's again from
7   the DEA.
8   This letter was specifically
9   referenced by Cardinal Health in its
10  discovery responses as a blessing of
11  after the fact reporting of suspicious
12  orders. I'll represent that to you.
13  So what I'd like you to do
14  is we're going to blow up the first
15  paragraph and we're going to walk through
16  it again.
17  Do you see there right in
18  the middle? Would you read the
19  highlighted provision?
20  MS. MAINIGI: Objection.
21  Form, foundation, scope.
22  THE WITNESS: "In order to
23  clarify any misinterpretations, I
24  want to assure you that the DEA

1   question on the record. Yesterday
2   we were prohibited --
3   MR. FARRELL: Hold on. You
4   can do it after he finishes
5   answering the question.
6   MS. MAINIGI: Well, I know.
7   They can answer whenever they want
8   to, but --
9   MR. FARRELL: Counsel for
10  Cardinal, I'm going to ask you not
11  to make another speaking
12  objection.
13  MS. MAINIGI: It's --
14  MR. FARRELL: Your objection
15  is made, it's on the record. And
16  then you can create whatever
17  record you want as soon as the
18  witness is done.
19  So I'm going to ask the
20  witness to read the highlighted
21  section.
22  MS. MAINIGI: My question
23  is, yesterday --
24  MR. FARRELL: You are

1   fully supports the NWDA effort to
2   introduce a uniform reporting
3   system among its members."
4   BY MR. FARRELL:
5   Q. And then the very next
6   sentence, please read it. This is the
7   one quoted by Cardinal Health.
8   A. This --
9   MS. MAINIGI: Objection.
10  Form, foundation, scope.
11  MR. EPPICH: Object to the
12  characterization.
13  BY MR. FARRELL:
14  Q. Go ahead.
15  A. "This system as proposed
16  will meet the reporting requirements of
17  21 C.F.R. 1301.74(b)."
18  Q. Now, what I'd like you to do
19  is read the next sentence which is
20  omitted from the discovery responses
21  filed by Cardinal Health.
22  MS. MAINIGI: Objection.
23  Form, foundation, and scope.
24  And DOJ, I'd like to ask a

1   becoming disruptive. You're
2   becoming disruptive.
3   MS. MAINIGI: Then --
4   MR. FARRELL: And you are
5   intervening. And -- and we will
6   get Special Master Cohen on.
7   MS. MAINIGI: That's fine.
8   I was prohibited from
9   asking, or somebody was prohibited
10  from asking the question --
11  MR. FARRELL: If
12  Judge Polster were sitting here
13  right now, he would sanction you.
14  MS. MAINIGI: Well, then I
15  guess lucky for me he is not. But
16  will you let me get my objection
17  out?
18  MR. FARRELL: No, this is my
19  direct testimony, and you're
20  making a speaking objection.
21  MS. MAINIGI: Just like you
22  made yesterday multiple times.
23  But this is a question to
24  the DEA. It's not a speaking

1 objection.
2 And the question is:
3 Yesterday, we were prohibited and
4 the witness was instructed to not
5 answer questions on communications
6 with trade organizations.
7 Is the DEA/DOJ going to
8 allow this question which is the
9 same type?
10 MR. FINKELSTEIN: I disagree
11 with your characterization of what
12 happened yesterday. You can ask
13 your questions and I will make my
14 objections, and counsel can ask
15 his questions and I will make my
16 objections.
17 BY MR. FARRELL:
18 **Q. Would you please read the**
19 **highlighted section.**
20 **A. "However, I want to make it**
21 **clear that the submission of a monthly**
22 **printout of after-the-fact sales will not**
23 **relieve a registrant from the**
24 **responsibility of reporting excessive or**

1 **suspicious orders. DEA has interpreted**
2 **orders to mean prior to shipment."**
3 **Q. Is this statement consistent**
4 **with the guidance the DEA has always**
5 **provided to registrants?**
6 MS. MAINIGI: Objection.
7 Form. Foundation. Scope.
8 **THE WITNESS: Yes.**
9 MR. FARRELL: This might be
10 a good break point if the DOJ
11 agrees.
12 MR. STEPHENS: Before we
13 break, Paul, just real quick, can
14 we please get a copy of the
15 presentation and the documents so
16 that we can review them
17 simultaneously while you're doing
18 this so we can handle our
19 redirect?
20 MR. FARRELL: Yes, yes.
21 MR. STEPHENS: Okay. If we
22 get them afterwards, then we're
23 going to need time to study them.
24 MR. FARRELL: Yeah, you're

1 going to have more than time.
2 You're going to have days before
3 we reconvene for your redirect.
4 MR. STEPHENS: You
5 understand what I'm saying.
6 You're handing me things. I'm
7 doing the same to you. I've never
8 been in a situation where the
9 witness is being examined and I
10 don't have the document in front
11 of me.
12 MR. FARRELL: I'm putting
13 the document up on the screen as a
14 demonstrative point and then
15 asking the DEA to comment on it.
16 There is nothing that I have shown
17 anybody that is not in the record
18 and that hasn't been used in prior
19 testimony.
20 In fact, it's specifically
21 referenced in y'all's discovery
22 responses.
23 MS. MAINIGI: The 1970
24 hearings?

1 MR. FARRELL: So at this
2 point in time -- at this point at
3 time, can we go off the record for
4 a break?
5 MR. FINKELSTEIN: Oh, I
6 thought we already were.
7 THE VIDEOGRAPHER: 2:04. We
8 are off the video record.
9 (Short break.)
10 MR. FARRELL: As one of the
11 co-leads for the plaintiffs' PEC
12 in the MDL litigation, I'll report
13 to you what David Cohen said.
14 Special Master Cohen
15 admonished us and reminded us of
16 his prior orders that we are to
17 eliminate speaking objections,
18 we're all to make sure that when
19 we state an objection, it's
20 concise.
21 He advised both plaintiffs
22 and defendants to make sure you
23 comply with it. He's not going to
24 tolerate speaking objections or

1  coaching of witnesses.  We've
2  discussed this in other
3  depositions.
4  He also instructed that it's
5  not for us to be disputing or
6  debating the Touhy, that that's
7  for the government and for the
8  government to make the decisions.
9  And the discussion of
10  admissibility is for another day,
11  and that he expects us to conduct
12  ourselves like professionals and
13  move forward as best as we can.
14  And then on day three he's
15  volunteered to make himself
16  available.
17  Is there anything else that
18  anybody else would like to add?
19  MR. BENNETT:  Yes, he also
20  made it very clear that there will
21  not be a fourth day.
22  MR. FARRELL:  All right.
23  Now, what I would like to do is
24  I'm going to provide demonstrative

1  (Document marked for
2  identification as Exhibit
3  DEA-Prevoznik-P-1.)
4  MR. FINKELSTEIN:  So just to
5  be clear, you're handing these out
6  to us so that we have them.
7  MR. FARRELL:  I'm having
8  this marked as an exhibit and then
9  the government can have it.
10  The second demonstrative
11  exhibit, Plaintiffs' 2 is the
12  United States USCCAN, U-S-C-C-A-N,
13  and it was referenced from the
14  congressional history.
15  MR. FINKELSTEIN:  Are you
16  going to mark it?
17  THE VIDEOGRAPHER:  They want
18  video for this.
19  MR. FARRELL:  Okay.  We'll
20  start over.
21  THE VIDEOGRAPHER:  2:47.  We
22  are on the video record.
23  MR. FARRELL:  Can I have
24  that back, please.

1  exhibits.
2  MR. FINKELSTEIN:  One more
3  thing.  We did take issue from the
4  fact that we've been excluded from
5  many of the parties' conversations
6  with the court concerning
7  government witnesses and
8  government rights.  We asked the
9  court formally, as we have in the
10  past, as we have asked the parties
11  many times in the past, to be
12  included in conversations with the
13  court, and the court unambiguously
14  required the parties to do so.
15  MR. FARRELL:  Very good.
16  So the first set of
17  demonstrative exhibits are four
18  slides that I'll have marked as
19  Plaintiffs' 1.  And it is the four
20  sections of the United States
21  code, including 801, 812, and 823.
22  These are the same slides that
23  were used in the McKesson 30(b)(6)
24  deposition.

1  Plaintiffs' Exhibit 1 is the
2  four slides that demonstrate the
3  United States Code 21 U.S.C. 801,
4  812, 821 and 823.
5  Plaintiffs' 2.
6  (Document marked for
7  identification as Exhibit
8  DEA-Prevoznik-P-2.)
9  MR. FARRELL:  Is HR REP
10  Number 1444, 91st Congress.
11  Second session, 1970.  This is the
12  congressional record from the
13  Controlled Substances Act.  It's
14  the same document that was entered
15  in the McKesson 30(b)(6)
16  deposition.
17  (Document marked for
18  identification as Exhibit
19  DEA-Prevoznik-P-3.)
20  MR. FARRELL:  Plaintiffs' 3
21  is from the HathiTrust, and it is
22  the drug abuse control amendments
23  from the 1970 hearings, 91st
24  Congress, second session.  900

1  pages of which we referenced only
2  a couple.
3  This is the first time that
4  was referenced in deposition as --
5  and in the MDL that I'm aware of.
6  (Document marked for
7  identification as Exhibit
8  DEA-Prevoznik-P-4.)
9  MR. FARRELL:  Plaintiffs' 4
10  is -- we referenced Page 9 of the
11  Federal Register.  Volume 36,
12  Number 80, from March 13, 1971.
13  MR. STEPHENS:  This is
14  Number 4, Paul?  Number 4?
15  MR. FINKELSTEIN:  This is
16  Number 4.
17  MR. FARRELL:  Number 5 was
18  the Federal Register from proposed
19  rulemaking from Saturday, March --
20  actually, that's -- this is
21  another copy.  What was that
22  number?  I'm sorry.
23  MR. FINKELSTEIN:  That was
24  4.

1  21 C.F.R. 1301.74.
2  (Document marked for
3  identification as Exhibit
4  DEA-Prevoznik-P-7.)
5  MR. FARRELL:  Plaintiffs' 7
6  is a document produced by Cardinal
7  Health in discovery and MDL2804.
8  It begins with Bates stamp
9  CAH_MDL2804_01465723, and it
10  extends all the way through
11  CAH_MDL2804_01465734.
12  It's Plaintiffs' Exhibit 7.
13  And I'll represent that it was
14  also in the government reliance
15  materials that they produced
16  yesterday at deposition.
17  That brings us up-to-date
18  for all of the demonstrative
19  exhibits that were used so far on
20  the record.
21  MR. STEPHENS:  Thank you.
22  MR. FINKELSTEIN:  So should
23  we go off the record and bring the
24  witness back?

1  MR. FARRELL:  Did I make a
2  mistake?  Sorry I got that
3  backwards.
4  Number 4 is from March 13,
5  1971.  It's Volume 36, Number 50,
6  from the Federal Register.
7  Plaintiffs' Exhibit 5 is
8  from April 24, 1971, from the
9  Federal Register, Volume 36,
10  Number 80.
11  (Document marked for
12  identification as Exhibit
13  DEA-Prevoznik-P-5.)
14  MR. FARRELL:  And we
15  referenced Paragraph 6 at the top
16  of the first page.
17  (Document marked for
18  identification as Exhibit
19  DEA-Prevoznik-P-6.)
20  MR. FARRELL:  Plaintiffs' 6
21  is another slide that's been used
22  in the McKesson depositions of
23  Nate Hardle, 30(b)(6).  And it's
24  simply a demonstrative exhibit of

1  MR. FARRELL:  Yes.
2  MS. MAININGI:  Yes.
3  THE VIDEOGRAPHER:  2:51.  We
4  are off the video record.
5  (Brief pause.)
6  THE VIDEOGRAPHER:  2:55.  We
7  are on the video record.
8  MR. FARRELL:  More
9  housecleaning.  Earlier today we
10  referenced -- more housecleaning.
11  Earlier we referenced a
12  position taken by Cardinal Health
13  in a pleading.  It's United States
14  District Court for the -- United
15  States District Court for the
16  District of Columbia, Cardinal
17  Health versus Eric Holder, Case
18  Number 1:12-cv-00185-RBW.
19  It is Document 16 in the
20  pleading index, filed on
21  February 13, 2012.  It's
22  previously been circulated, I'll
23  show it to you, even though it's
24  not being admitted through this

1 witness.
2 For the record that's the
3 document that I referenced.
4 (Document marked for
5 identification as Exhibit
6 DEA-Prevoznik-P-8.)
7 MR. FARRELL:  Same thing
8 with earlier today, I referenced
9 what's being marked now -- that
10 was Plaintiff 8.  This is going to
11 be Plaintiff 9.
12 (Document marked for
13 identification as Exhibit
14 DEA-Prevoznik-P-9.)
15 MR. FARRELL:  And this is a
16 single page from a document with a
17 Bates stamp MCK MDL 00409239.  And
18 again, this is a document that was
19 produced by McKesson in discovery
20 that I referenced and asked
21 questions about it with this
22 witness.
23 MR. FINKELSTEIN:  Are you
24 going to provide me with copies?

1 Q. On behalf of the DEA, do you
2 recognize this document?
3 A. Yes, I do.
4 Q. What is it?
5 A. It is part of our diversion
6 investigators manual.
7 Q. What does that mean?
8 What -- what is a diversion
9 investigators manual?
10 A. It's a manual that breaks
11 down our responsibilities, our job.
12 It -- it covers the whole gambit of what
13 registration is -- what a registrant is,
14 down to record reports, requirements.  It
15 goes through our scheduled
16 investigations, pre-registration
17 investigations, how to -- conducting
18 audits when we do the scheduled
19 investigation, what topics, what areas to
20 cover.
21 It covers controlled
22 substances -- controlled substances.  It
23 also covers the chemicals, List I
24 chemicals, the requirements of that, as

1 MR. FARRELL:  Yes.
2 Did you get a copy of the
3 NWDA policy?
4 MR. FINKELSTEIN:  Thanks.
5 MR. FARRELL:  That's
6 previously been made.
7 MR. FINKELSTEIN:  Just wait
8 for a question.
9 BY MR. FARRELL:
10 Q. Mr. Prevoznik, the next
11 document I'm going to reference is
12 actually in your notebook.
13 A. Okay.
14 Q. In the reliance materials
15 that you disclosed yesterday.
16 And it's the -- from the
17 1996 diversion investigators manual.
18 Section 5126.
19 MR. FARRELL:  Bring it up on
20 the screen.  And pass it down.
21 Here is some extra copies in
22 case people didn't bring their
23 notebooks back.
24 BY MR. FARRELL:

1 well as preregistration investigations of
2 chemicals, applicants.
3 It covers the -- the gambit
4 of exactly what our job is.
5 Q. Are these -- in this page
6 that we're showing here, the bottom
7 right-hand corner is a Bates stamp.  Can
8 you read that Bates stamp?
9 A. 00025231.
10 Q. Okay.  Is this a document
11 produced by the DEA in this litigation at
12 the request of counsel for the diversion
13 investigators manual from 1996?
14 MR. FINKELSTEIN:  Scope.
15 We'll stipulate that we
16 produced it.
17 MR. FARRELL:  Thank you.
18 BY MR. FARRELL:
19 Q. So the title of Section 5126
20 says what?
21 A. Requirement to report
22 suspicious orders.
23 Q. Would you read the first
24 sentence of the first paragraph aloud?

---

1  A. "Registrants are required to
2  inform DEA of suspicious orders in
3  accordance with 21 C.F.R. 1301.74(b).
4  DEA field offices are not to approve or
5  disapprove supplier shipments of
6  controlled substances.  The
7  responsibility for making the decision to
8  ship rests with the supplier.  No (sic)
9  exception to this occurs when a supplier
10  complies with a DEA field office's
11  request to initiate a controlled delivery
12  of controlled substances."
13  Q. Is this consistent with the
14  guidance provided by the DEA to
15  registrants?
16  MS. MAINIGI:  Objection.
17  THE WITNESS:  Yes.
18  MR. FARRELL:  Now, if you'll
19  go down to -- keep going.
20  BY MR. FARRELL:
21  Q. Beginning with
22  "registrants," could you begin reading,
23  please.
24  A. "Registrants who routinely

---

1  report suspicious orders, yet fill these
2  orders, with reason to believe they are
3  destined for the illicit market, are
4  expressing an attitude of
5  irresponsibility that is detriment to the
6  public health and safety as set forth in
7  21 U.S.C. 823 and 824."
8  Q. Thank you.  Is this
9  consistent with the guidance provided by
10  the DEA to registrants?
11  MS. MAINIGI:  Objection to
12  form.
13  MR. FINKELSTEIN:  Objection.
14  Form.
15  THE WITNESS:  Yes.
16  BY MR. FARRELL:
17  Q. So this is the official
18  policy of the DEA as of 1996, agreed?
19  A. Yes.
20  Q. Is this the position that
21  the DEA was instructing its diversion
22  investigators to take when looking into
23  cases involving the distribution of
24  controlled substances?

---

1  MS. MAINIGI:  Objection to
2  form.
3  MR. FINKELSTEIN:  Vague as
4  to time.
5  BY MR. FARRELL:
6  Q. In 1996.
7  A. Yes.
8  Q. Are you aware of any
9  deviation or change from that position by
10  the DEA since 1996?
11  MS. MAINIGI:  Objection.
12  THE WITNESS:  No.
13  BY MR. FARRELL:
14  Q. So the next sentence is just
15  a recitation of the suspicious order
16  definition.  What I'd like you to do is
17  go down to where it starts, "The supplier
18  can determine," and begin reading aloud.
19  A. "The supplier can determine
20  whether the order is excessive by
21  checking their own sales and establishing
22  the average amount of controlled
23  substances shipped to registrants of the
24  same apparent size in a particular

---

1  geographic area."
2  Q. Read the next sentence,
3  please.
4  A. "If the customer exceeds
5  this threshold, the request should be
6  viewed as suspicious."
7  Q. Is this consistent with the
8  guidance that the DEA provided to
9  registrants since at least 1996?
10  MS. MAINIGI:  Objection to
11  form.
12  **THE WITNESS:  Yes.**
13  BY MR. FARRELL:
14  Q. Is this the position that
15  the DEA -- strike that.
16  The reading of this seems to
17  indicate that if you exceed an average
18  amount, if a customer exceeds an average
19  amount -- let me start over.
20  This directive that DEA had
21  internally seems to indicate that it
22  considered that an order in excess of a
23  customer's average amount should be
24  deemed suspicious.  Is that a fair

---

1   depiction?
2   A. Could you please --
3   MS. MAINIGI:  Objection to
4   form.
5   THE WITNESS:  Could you
6   please repeat that.
7   BY MR. FARRELL:
8   Q. Yeah.  When I read this, it
9   seems to indicate that a wholesale
10  distributor should watch the average
11  purchase by a customer over time, and if
12  that average is exceeded, it should be
13  deemed suspicious.  Is that a fair
14  reading of this provision?
15  MR. FINKELSTEIN:  Object to
16  the characterization.
17  MS. MAINIGI:  Object to
18  form.  Calls for a legal
19  conclusion.
20  THE WITNESS:  Well, I think
21  it also includes that it has to
22  look at the other registrants in
23  that area.  It's not just the
24  registrant that's ordering, but

1   it's also comparing against the
2   other registrants in that area.
3   BY MR. FARRELL:
4   Q. So if you take an average of
5   the registrants in the area and you
6   calculate that, if a customer exceeds
7   that average, is that a red flag for a
8   wholesale distributor that the order may
9   be suspicious?
10  MS. MAINIGI:  Objection.
11  Calls for speculation.  Objection
12  to form.
13  THE WITNESS:  Yes.
14  BY MR. FARRELL:
15  Q. And is that consistent with
16  the directives the DEA has given to
17  registrants since at least 1996?
18  MS. MAINIGI:  Objection to
19  form.
20  THE WITNESS:  Yes.
21  BY MR. FARRELL:
22  Q. The next sentence, would you
23  read, please.
24  A. I forgot where I stopped.

1   Q. "This activity."
2   **A. "This activity, over**
3   **extended periods of time, would lead a**
4   **reasonable person to believe that**
5   **controlled substances possibly are being**
6   **diverted.**
7   **Q. Now, so what I'm asking you**
8   **is, when you read this, is it fair to**
9   **assume that this is consistent with the**
10  **DEA's guidance to industry since at least**
11  **1996?**
12  MR. FINKELSTEIN:  Objection.
13  Vague.
14  MS. MAINIGI:  Objection to
15  form.
16  THE WITNESS:  Yes.
17  BY MR. FARRELL:
18  Q. Would you read the next
19  sentence, please.
20  A. "An investigation will be
21  conducted for possible violation of the
22  CSA and regulations upon determining that
23  the reporting registrant, as a general
24  practice, does not voluntarily halt

1   shipments of controlled substances to
2   registrants involved in suspected
3   diversion or to registrants against whom
4   previous action has been taken."
5   Q. Is this consistent with the
6   guidance provided by the DEA to
7   registrants since at least 1996?
8   A. Yes.
9   MS. MAINIGI:  Objection to
10  form.
11  BY MR. FARRELL:
12  Q. This last sentence that you
13  read contains a statement that "a
14  registrant shall not ship a suspicious
15  order."  Is that a fair reading?
16  MR. FINKELSTEIN:  Objection.
17  MR. EPPICH:  Objection to
18  form.
19  MR. FINKELSTEIN:  Object to
20  the form.
21  BY MR. FARRELL:
22  Q. Strike that.  I'll ask it
23  again.
24  Based upon this 1996

1   document, was it the DEA's position that
2   a registrant should halt shipments of
3   controlled substances that are involved
4   in suspected diversion?
5   A. Yes.
6   Q. And does that include when a
7   registrant has placed orders repeatedly
8   in excess of the regional average?
9   MR. EPPICH:  Objection to
10  form.
11  MS. MAINIGI:  Objection to
12  form.
13  THE WITNESS:  Yes.
14  (Document marked for
15  identification as Exhibit
16  DEA-Prevoznik-P-10.)
17  BY MR. FARRELL:
18  Q. I'm going to have marked
19  next Plaintiffs' Exhibit 10.  And I'll
20  show it to you and provide a copy to
21  counsel and ask that you take a look at
22  it, please.
23  MR. FINKELSTEIN:  Let me
24  make sure that I get one of those.

1   MR. FARRELL:  And for
2   reference to counsel this is
3   Bates-stamped
4   CAH_MDL2804_02203353.
5   BY MR. FARRELL:
6   Q. Mr. Prevoznik, do you
7   recognize this type of document?
8   MS. MAINIGI:  Objection to
9   form.
10  THE WITNESS:  Yes.
11  BY MR. FARRELL:
12  Q. And what is it that you're
13  looking at?
14  A. A FOIA request.
15  Q. And the FOIA request was
16  sent by whom?
17  A. Cardinal Health.
18  Q. And to whom was it sent?
19  A. Robert -- I don't know how
20  to say his last name -- Giacalone.
21  Q. All right.  So let's back
22  up.
23  This is a request -- this
24  isn't a request by Cardinal Health.  The

1   document is from whom?
2   MS. MAINIGI:  Objection to
3   form.  Foundation.
4   THE WITNESS:  I'm sorry,
5   it -- it's Katherine Myrick.  It's
6   from Katherine Myrick, chiefs
7   operations unit, our FOIA records
8   management section.
9   BY MR. FARRELL:
10  Q. What is this document that
11  you're looking at, do you recognize it?
12  MS. MAINIGI:  Objection.
13  Form.  Foundation.
14  BY MR. FARRELL:
15  Q. Not the attached document,
16  the cover letter.
17  MS. MAINIGI:  Same
18  objections.
19  THE WITNESS:  Yeah, I've --
20  I've seen forms very similar to
21  this.
22  BY MR. FARRELL:
23  Q. Okay.  And so what does the
24  DEA use this form for?

1   MS. MAINIGI:  Objection.
2   Form.  Foundation.
3   THE WITNESS:  To respond
4   to --
5   MR. FINKELSTEIN:  Scope.
6   THE WITNESS:  To respond to
7   FOIA requests.
8   BY MR. FARRELL:
9   Q. Okay.  So you see where it
10  says request number?
11  A. Yes.
12  Q. Okay.  Does the DEA know
13  what that number means or represents?
14  MR. FINKELSTEIN:  Scope.
15  MS. MAINIGI:  Objection.
16  Scope.  Foundation.
17  THE WITNESS:  Yes.
18  BY MR. FARRELL:
19  Q. Okay.  What does that number
20  mean?
21  MS. MAINIGI:  Same
22  objection.
23  THE WITNESS:  That is the
24  number that is assigned to this

1  FOIA request when it comes in.
2  BY MR. FARRELL:
3  Q. Is there any particular
4  significance of the first two letters
5  being -- numbers being 03?
6  MR. FINKELSTEIN:  Scope.
7  BY MR. FARRELL:
8  Q. To -- to the extent that you
9  know as the Drug Enforcement Agency that
10  wrote this document?
11  A. It's the year.
12  MS. MAINIGI:  Objection.
13  Scope.  Foundation.
14  BY MR. FARRELL:
15  Q. So this is, to the DEA's
16  best knowledge and information, a
17  document that was generated in the year
18  2003?
19  A. Yes.
20  MR. EPPICH:  Object to form.
21  BY MR. FARRELL:
22  Q. And it was generated by you,
23  the DEA, and sent to Cardinal Health?
24  MS. MAINIGI:  Objection.

1  Foundation.  Scope.
2  MR. FINKELSTEIN:  Scope.
3  THE WITNESS:  Yes.
4  BY MR. FARRELL:
5  Q. And then when you look at
6  the document that is attached, can you
7  tell me what it -- that document is if
8  you know?
9  A. It's a section from our
10  diversion investigators manual.  And this
11  is the cover sheet from our diversion
12  investigators manual.
13  Q. And what year is this
14  diversion investigators manual?
15  A. 1996, April 1996.
16  Q. If you would take a moment,
17  could you tell me whether or not this
18  document that was produced by Cardinal is
19  consistent with the diversion
20  investigators manual that we just went
21  over, produced by the federal government?
22  MS. MAINIGI:  Objection.
23  Form.  Foundation.
24  THE WITNESS:  Yes, it does.

1  BY MR. FARRELL:
2  Q. Is it fair to reach the
3  conclusion that the DEA disclosed to
4  Cardinal Health in the year 2003
5  Section 5126 of the 1996 diversion
6  investigators manual?
7  MS. MAINIGI:  Objection.
8  Scope.  Foundation.
9  MR. FINKELSTEIN:  Scope.
10  THE WITNESS:  Yes.
11  BY MR. FARRELL:
12  Q. The next document that I am
13  going to reference, it was produced and
14  circulated yesterday, but we have
15  additional copies, is the 1998 Janet Reno
16  report.
17  (Document marked for
18  identification as Exhibit
19  DEA-Prevoznik-P-11.)
20  BY MR. FARRELL:
21  Q. I'm going to hand you what
22  has been premarked as deposition
23  plaintiff Exhibit 11.  And have you take
24  a look at it.

1  MR. FARRELL:  Does anybody
2  else need another copy from
3  yesterday?
4  It's the same one.  It's
5  Bates Stamp CAH_HOUSE-002207.  And
6  it's double-Bates-stamped as
7  CAH_MDL_PRIORPROD_HOUSE_0002207.
8  Off the record.
9  (Whereupon, a discussion was
10  held off the record.)
11  BY MR. FARRELL:
12  Q. Mr. Prevoznik, do you
13  recognize this document?
14  A. Yes.
15  Q. What is it?
16  A. It's a report to the U.S.
17  attorneys -- Attorney General.  It's a
18  report by the suspicious orders task
19  force that was mandated to convene, and
20  it's their report based on the
21  Comprehensive Methamphetamine Control Act
22  in 1996.
23  Q. To the best of your
24  knowledge, is this a true and accurate

---

04-18-2019   Prevoznik, Thomas   Page 711

```
 1   copy of the report provided by the United
 2   States Drug Enforcement Administration to
 3   Attorney General Janet Reno?
 4   A. To the best of my knowledge,
 5   yes.
 6   Q. What is the date of the
 7   document?
 8   A. October 1998.
 9   Q. All right. Go to the next.
10   So I'm going to refer you to
11   page Bates stamp 2211. So this is in the
12   executive summary. And if you'll see the
13   second full sentence. There it is.
14   Can you tell me what the
15   implementation mandate was for this
16   report provided by the DEA to Attorney
17   General Janet Reno?
18   MS. MAINIGI: Objection.
19   Foundation.
20   THE WITNESS: It was the
21   mandate that this task force
22   convene together and come up with
23   a report based on their
24   discussions.
```

---

04-18-2019   Prevoznik, Thomas   Page 712

```
 1   BY MR. FARRELL:
 2   Q. All right. So in general,
 3   can you just, as the DEA, tell me, when
 4   we reference this document, can we just
 5   call it the Reno report?
 6   A. Yes.
 7   Q. Can you tell me in general,
 8   do you -- does the DEA have an
 9   understanding of what the purpose was of
10   this report that it generated for the
11   Attorney General?
12   A. It is our understanding that
13   this report was to discuss how to put a
14   suspicious ordering system forward to
15   handle the listed chemicals because of
16   the methamphetamine problem that we were
17   having in the United States.
18   Q. Now, this is also from the
19   executive summary. And it says that "the
20   charter required the establishment of a
21   task force to prepare recommendations
22   concerning additional guidelines to be
23   used by the chemical industry in
24   complying with 21 U.S.C. 830(b)(1)(A)."
```

---

04-18-2019   Prevoznik, Thomas   Page 713

```
 1   Did I read that accurately?
 2   A. Yes.
 3   Q. Are you familiar with
 4   21 U.S.C. 830(b)(1)(A)?
 5   A. Can I look at it and refresh
 6   my memory?
 7   Q. You can. We have a I
 8   believe we have a slide for you. And
 9   it's also probably in -- in --
10   MR. FARRELL: You have it?
11   There we go.
12   BY MR. FARRELL:
13   Q. And I'm going to show you
14   the hardcopy of it and then we have
15   copies of this --
16   MR. FINKELSTEIN: He has his
17   own copy.
18   BY MR. FARRELL:
19   Q. Very good.
20   This provision that we're
21   looking at, and the distinction that I
22   want to make, what is the DEA's
23   understanding of the types of
24   transactions that should be reported as
```

---

04-18-2019   Prevoznik, Thomas   Page 714

```
 1   suspicious pursuant to 21 U.S.C. 830?
 2   MR. FINKELSTEIN: Scope.
 3   MS. MAINIGI: Objection.
 4   Form. Foundation. Scope.
 5   THE WITNESS: To regulate
 6   a -- regulated transactions, a
 7   transaction for -- in this
 8   particular section, regarding
 9   chemicals.
10   BY MR. FARRELL:
11   Q. So we are talking about
12   List I chemicals, not controlled
13   substances?
14   A. Correct.
15   Q. And when we are talking
16   about methamphetamine, what we are
17   specifically talking about are regulated
18   chemicals the DEA refers to as List I,
19   which include ephedrine and
20   pseudoephedrine.
21   MR. FINKELSTEIN: Scope.
22   THE WITNESS: Correct.
23   MS. MAINIGI: Objection to
24   form.
```

---

1  BY MR. FARRELL:
2  Q. I promise I'll get there in
3  a second.
4  So under this report, it's
5  my understanding, is that the DEA was
6  complying with Section 21 U.S.C. 830,
7  which, if you read Paragraph 1(a) out
8  loud, requires what?  Reports to the
9  Attorney General.  It says, "Each
10  regulated person shall report to the
11  Attorney General."  And what does A say?
12  MR. STEPHENS:  Object to
13  form.
14  THE WITNESS:  "Any regulated
15  transaction involving an
16  extraordinary quantity of a listed
17  chemical, an uncommon method of
18  payment or delivery, or any other
19  circumstance that the regulated
20  person believes may indicate that
21  the listed chemical will be used
22  in violation of this subchapter."
23  BY MR. FARRELL:
24  Q. So, I'm asking the DEA, the

1  Reno report from 1998, its authority
2  arises out of the Methamphetamine Act; is
3  that right?
4  MR. STEPHENS:  Object to
5  form.
6  MS. MAINIGI:  Objection.
7  Scope.
8  MR. FINKELSTEIN:  Scope.
9  THE WITNESS:  Yes.
10  BY MR. FARRELL:
11  Q. And the definition of a
12  suspicious order under the
13  Methamphetamine Act is what?  What size
14  transaction?
15  A. The extraordinary quantity.
16  Q. All right.  Now, controlled
17  substances are not governed by the
18  methamphetamine act unless they contain
19  ephedrine or pseudoephedrine; is that
20  right?
21  MR. STEPHENS:  Object to
22  form.
23  BY MR. FARRELL:
24  Q. I'm asking you, the DEA?

1  A. Yeah.  I'm waiting to make
2  sure --
3  MS. MAINIGI:  Objection.
4  Scope and foundation.
5  MR. FINKELSTEIN:  Scope.
6  THE WITNESS:  Yes.
7  BY MR. FARRELL:
8  Q. What size transaction should
9  registrants look for when they're looking
10  for suspicious orders of controlled
11  substances?
12  A. Unusual -- excessive.
13  Excessive.
14  Q. And a definition of
15  suspicious order in the regulation, is
16  unusual what?
17  A. Unusual quantity.
18  MS. MAINIGI:  Objection to
19  form.
20  BY MR. FARRELL:
21  Q. Unusual size --
22  MS. MAINIGI:  Objection to
23  form.
24  THE WITNESS:  Unusual size,

1  patterns deviating from a
2  normal -- can I refresh my memory
3  just looking at it?
4  BY MR. FARRELL:
5  Q. Go ahead, yeah.  You see
6  where I'm going with this.  I'm trying to
7  figure out the difference and whether
8  there's a difference between the
9  definition of a suspicious order, if it
10  contains a List I chemical versus the
11  definition of suspicious order if it's a
12  controlled substance.
13  MS. MAINIGI:  Objection.
14  Coaching the witness.  Objection
15  to form.
16  THE WITNESS:  So suspicious
17  orders for controlled substances
18  include orders of unusual size,
19  orders deviating substantially
20  from a normal pattern, and orders
21  of unusual frequency.
22  BY MR. FARRELL:
23  Q. So from the DEA's
24  perspective, what is bigger?  Unusual or

1   extraordinary?
2   MS. MAINIGI:  Objection.
3   Scope.  Objection.  Form.
4   MR. EPPICH:  Objection.
5   Calls for a legal conclusion.
6   MR. FINKELSTEIN:  I object
7   to the scope.  You can answer.
8   THE WITNESS:  Can you repeat
9   it?
10  BY MR. FARRELL:
11  Q.  Yeah.  From the DEA's
12  perspective and guidance that it provides
13  to industry, what is larger, an order
14  that's unusual, or an order that's
15  extraordinary?
16  MS. MAINIGI:  Objection.
17  Scope, form, foundation.
18  MR. EPPICH:  Objection.
19  Calls for a legal conclusion.
20  MR. FINKELSTEIN:  Scope,
21  calls for a legal conclusion.
22  THE WITNESS:  I believe it's
23  going to be dependent on the
24  product too.  So it's not -- it's

1   not just on size or extraordinary.
2   It's varying criteria.  It could
3   be other criteria.  So is it a
4   chemical?  Is it a controlled
5   substance?  What schedule is it
6   in?  That kind of thing.
7   BY MR. FARRELL:
8   **Q.  Because it -- comparing a**
9   **List I chemical to a controlled**
10  **substance, is comparing apples to**
11  **oranges; is that fair?**
12  MR. STEPHENS:  Object to
13  form.
14  **THE WITNESS:  Yes.**
15  MR. EPPICH:  Objection.
16  Vague.
17  BY MR. FARRELL:
18  Q.  Okay.  So when you're trying
19  to apply -- if you're selling an
20  extraordinary quantity of opioids, is
21  that more than, equal to, or less than
22  unusual sizes?
23  MS. MAINIGI:  Objection.
24  Scope.  Objection.

1   MR. EPPICH:  Objection.
2   Calls for a legal conclusion.
3   MR. FINKELSTEIN:  Object to
4   the form.
5   THE WITNESS:  Can you please
6   repeat it.
7   BY MR. FARRELL:
8   Q.  Yeah, I'm trying to get
9   there.  I'm trying to establish --
10  because has the DEA ever told any
11  distributor of prescription opioids that
12  it can use the definition of suspicious
13  order from the Methamphetamine Act?
14  MR. EPPICH:  Objection to
15  form.  Foundation.
16  THE WITNESS:  The term --
17  the term that you used, "ever,"
18  that's all encompassing.  So I
19  don't know that I can -- I cannot
20  testify that no one has ever said
21  that.
22  BY MR. FARRELL:
23  Q.  So what I'm going to refer
24  back to is this.

1   Let's go to Page 2247 of the
2   Reno report.  This was discussed at
3   length yesterday.  Do you recall this,
4   Exhibit 2?
5   A.  Yes.
6   Q.  Okay.  So the first thing I
7   want you to -- so the first thing that
8   we're going to do is we're going to look
9   at where it says "Note:  Factor equals
10  three."
11  **Okay.  So this was discussed**
12  **yesterday.  I'm just trying to find**
13  **clarification.**
14  **This Reno report, according**
15  **to this note, applies to List I**
16  **chemicals, agreed?**
17  **A.  Yes.**
18  MR. FINKELSTEIN:  Wait.
19  THE WITNESS:  Sorry.
20  MR. FINKELSTEIN:  Scope.
21  MS. MAINIGI:  Objection.
22  Foundation.
23  BY MR. FARRELL:
24  **Q.  Second -- secondly, it can**

1 apply to Control II and Control III
2 controlled substances that contain List I
3 chemicals. Agreed or disagree?
4 MS. MAINIGI: Objection.
5 Scope. Foundation.
6 MR. O'CONNOR: Objection to
7 form.
8 THE WITNESS: Agreed.
9 BY MR. FARRELL:
10 Q. And it applies to Control
11 III. And what does that mean N-V? "N-V
12 controlled substances and noncontrolled
13 over-the-counter products containing
14 List I chemical items."
15 Do you know what that means?
16 A. Looking at it, I would be
17 speculating what it means.
18 Based on what I know, that
19 looks like III-N, would be III,
20 non-narcotic.
21 Q. So more directly, has the
22 DEA ever provided -- I keep using that
23 word "ever."
24 Has the DEA -- does the DEA

1 believe that this algorithm is
2 appropriate for measuring as a metric
3 suspicious orders of controlled
4 substances that do not include List I
5 chemicals?
6 MR. EPPICH: Object to form.
7 MS. MAINIGI: Objection.
8 Scope.
9 THE WITNESS: Can you please
10 repeat that.
11 BY MR. FARRELL:
12 Q. Yes. We agree that this
13 document we're looking at from the Reno
14 report is guidance from the DEA to
15 registrants under the Methamphetamine Act
16 regarding looking for orders of
17 extraordinary size involving List I
18 chemicals. That's been established. And
19 I'm asking you whether or not you agree
20 with it.
21 MR. FINKELSTEIN: Scope.
22 MS. MAINIGI: Objection to
23 form.
24 MR. EPPICH: Objection.

1 THE WITNESS: Yes.
2 BY MR. FARRELL:
3 Q. There was a suggestion made
4 by some of defense counsel yesterday
5 during your examination that it also
6 applies to controlled substances.
7 And so what I would like you
8 to do is take a look at the note and tell
9 me whether or not that note indicates,
10 pursuant to the DEA's understanding,
11 whether or not this applies to all
12 controlled substances, or just controlled
13 substances that contain List I chemicals
14 or some other interpretation that I'm
15 missing?
16 MS. MAINIGI: Objection.
17 Form.
18 Objection. Coaching the
19 witness.
20 MR. FINKELSTEIN: I object
21 to the scope.
22 But you can answer in your
23 personal capacity, if you know.
24 THE WITNESS: Yes, I agree.

1 BY MR. FARRELL:
2 Q. So the DEA agrees that this
3 applies only to List I chemicals and
4 controlled substances that contain List I
5 chemicals, agreed?
6 MR. FINKELSTEIN: Hang on.
7 My instruction was you could ask
8 Tom Prevoznik if he agrees,
9 because this is not within the
10 scope of his authorization.
11 MS. SINGER: Though it does
12 relate to guidance the DEA
13 provided to registrants. That is
14 the context in which defendants
15 offered it yesterday.
16 MR. FINKELSTEIN: I
17 understand the defendants
18 offered -- offered it yesterday.
19 And I made the same objections
20 there.
21 This is about chemicals. We
22 are talking about controlled
23 substances. You can answer in
24 your personal capacity.

1  MR. FARRELL:  Well, I -- I
2  don't -- respectfully don't need
3  his personal capacity.  I need the
4  DEA's position on whether or not
5  the Reno report is --
6  BY MR. FARRELL:
7  Q. Let me ask you this.  Let me
8  ask you in a different way.
9  Has the DEA ever provided
10  guidance to a registrant that it is
11  appropriate in the context of controlled
12  substances, which do not include List I
13  chemicals, to define suspicious orders as
14  orders of extraordinary quantity?
15  MR. EPPICH:  Objection.
16  Foundation.
17  MS. MAINIGI:  Objection.
18  Form.
19  THE WITNESS:  Again, you
20  used the word ever.  I can't -- I
21  don't know if that's never not
22  happened.
23  BY MR. FARRELL:
24  Q. That's -- that's fair.

1  MR. FINKELSTEIN:  Scope.
2  MS. MAINIGI:  Objection.
3  MR. EPPICH:  Objection.
4  Foundation.
5  MR. FARRELL:  You're right.
6  This is -- is she back yet?
7  Do we have the Cardinal
8  Health documents yet?
9  Let's take a quick break if
10  you don't mind.
11  MR. FINKELSTEIN:  Okay.  I'd
12  like this to be our last break.
13  And we're going to break for the
14  day at 5.
15  MR. FARRELL:  Yeah.
16  THE VIDEOGRAPHER:  3:35.  We
17  are off the video record.
18  (Short break.)
19  THE VIDEOGRAPHER:  3:49.  We
20  are on the video record.
21  BY MR. FARRELL:
22  Q. I'm going to try to go at
23  this through a different route.
24  I'm going to show you what

1  Speaking on behalf of the
2  DEA, do you believe that the Reno report
3  is an appropriate standard to measure
4  suspicious orders of controlled
5  substances that do not contain List I
6  chemicals?
7  MS. MAINIGI:  Objection.
8  Scope.  Foundation.
9  MR. EPPICH:  Form.
10  THE WITNESS:  Please repeat
11  that.
12  BY MR. FARRELL:
13  Q. Has the DEA provided
14  guidance to registrants that it can
15  monitor suspicious orders of List I
16  chemicals using the Reno report?
17  A. Not to my knowledge.
18  Q. I forgot what I asked you.
19  (Whereupon, the court
20  reporter read back the requested
21  portion of testimony.)
22  BY MR. FARRELL:
23  Q. What is the purpose of the
24  Reno report?

1  has been premarked as Plaintiffs'
2  Exhibit 12 to your deposition.
3  (Document marked for
4  identification as Exhibit
5  DEA-Prevoznik-P-12.)
6  MR. FARRELL:  I have copies,
7  four copies for counsel.  I have a
8  copy for the DOJ.  And a copy for
9  you.
10  THE WITNESS:  Thank you.
11  BY MR. FARRELL:
12  Q. And I'll represent to you
13  that this is not a document that you've
14  seen before.
15  But this is Cardinal
16  Health's Third Supplemental Objections
17  and Responses to Plaintiffs' First
18  Combined Discovery Requests served in
19  this litigation.
20  And I -- I'll give you a
21  moment to get oriented with it.  But
22  eventually I'm going to be directing your
23  attention to Page 12.
24  Now, specifically what I'm

1   going to reference you to on Page 12 is
2   the last paragraph.
3   And it -- and Cardinal
4   Health says, "From at least 1995 through
5   late 2007, Cardinal Health understood DEA
6   to want suspicious orders reported to the
7   administration in the form of ingredient
8   limit reports."
9   Do you see that?
10  A. Yes.
11  MS. MAINIGI:  Objection to
12  form.
13  BY MR. FARRELL:
14  Q. My question to you as the
15  representative from the DEA, is, has the
16  DEA ever provided guidance to Cardinal
17  Health that it could -- that it could
18  report suspicious orders through the use
19  of ingredient limit reports?
20  MS. MAINIGI:  Objection.
21  Scope.  Objection.  Form.
22  Objection.  Foundation.
23  MR. FINKELSTEIN:  I join the
24  scope objection to the extent that

1   MS. MAINIGI:  Objection.
2   Coaching the witness.
3   BY MR. FARRELL:
4   Q. And so the next sentence,
5   could you read it aloud?
6   A. "Based on guidance from the
7   DEA, see example,
8   CAH_MDL_PRIORPROD_HOUSE_0002207 --
9   Q. Stop right there for a
10  second.  Do you recognize that Bates
11  stamp number?
12  A. Yes.
13  Q. Where do you recognize that
14  Bates stamp number from?
15  A. The Reno report.
16  Q. The exhibit that we just
17  went over?
18  A. That we referred -- yes,
19  right.
20  Q. So this is Cardinal Health
21  representing in this litigation that it
22  understood that it was based on guidance
23  from the DEA using that Reno report.
24  My question to you is, is

1   it calls for guidance outside of
2   the distributor initiative.
3   BY MR. FARRELL:
4   Q. You can answer.
5   A. I'm just reading -- can I --
6   Q. Absolutely.
7   A. Again, I'm just getting
8   familiar with it.
9   Please repeat the question.
10  Q. Yeah, what I'll do is I'll
11  start over.
12  The very first sentence,
13  you'll see Cardinal Health represents
14  from at least '95 through 2007, Cardinal
15  Health understood DEA to want suspicious
16  orders reported to the administration in
17  the form of ingredient limit reports.
18  Do you see that sentence?
19  MS. MAINIGI:  Objection to
20  form.
21  BY MR. FARRELL:
22  Q. That's exactly what it says,
23  correct?
24  A. Yes.

1   the DEA ever aware of providing such
2   guidance to Cardinal Health?
3   MS. MAINIGI:  Objection.
4   Form.  Objection.  Scope.
5   Objection.  Coaching the witness.
6   THE WITNESS:  Again, the use
7   of ever, I don't -- I don't -- I
8   don't know.
9   BY MR. FARRELL:
10  Q. Do you have any knowledge of
11  providing such guidance to Cardinal
12  Health?
13  MS. MAINIGI:  Objection.
14  Asked and answered.  Objection.
15  Form.  Scope.
16  THE WITNESS:  I am not
17  aware.
18  BY MR. FARRELL:
19  Q. Will you continue reading?
20  A. "Cardinal Health understood
21  DEA to want orders for opioids reported
22  that exceeded a calculation endorsed by
23  DEA or that a wholesale distributor
24  otherwise identified as unusual in size,

1  pattern or frequency."
2  Q. Are you aware of the DEA
3  ever endorsing a calculation for opioids
4  to identify orders of unusual size,
5  pattern, or frequency?
6  A. No.
7  MS. MAINIGI:  Objection.
8  Form.  Objection.  Scope.
9  BY MR. FARRELL:
10 Q. Is it appropriate and
11 compliant with federal law for a
12 registrant to use the Reno report as the
13 methodology in which it measures
14 suspicious orders of opioids that do not
15 contain List I chemicals?
16 MS. MAINIGI:  Objection.
17 Calls for a legal conclusion.
18 Form.
19 MR. FINKELSTEIN:  Vague.
20 THE WITNESS:  Well, the
21 statute requires the registrant to
22 design and operate the system.
23 BY MR. FARRELL:
24 Q. Let's be clear about which

1  Q. It's one of the exhibits.
2  Try 1310.05.
3  A. .05 and what section?  A-1.
4  Q. A-1.
5  A. "Extraordinary quantity of a
6  listed chemical, an uncommon method of
7  payment or delivery, or any other
8  circumstance that the regulated person
9  believes may indicate that the listed
10 chemical will be used in violation of
11 this part."
12 Q. So my question to the DEA,
13 is, did the DEA ever provide guidance to
14 Cardinal Health that it could use the
15 Reno report's definition of suspicious,
16 which is extraordinary size, as the
17 algorithm for measuring unusual orders of
18 controlled substances?
19 MS. MAINIGI:  Objection.
20 Scope, form.
21 MR. FINKELSTEIN:  Scope.
22 THE WITNESS:  Not to my
23 knowledge.
24 BY MR. FARRELL:

1  statute we are talking about.
2  A. Correct.
3  Q. Which one are you reading
4  from?
5  A. I'm reading from the C.F.R.
6  Q. For List I chemicals?
7  A. Controlled substances.
8  Q. Controlled substances.  And
9  how does it define suspicious orders?
10 A. Again, "Suspicious orders
11 include orders of unusual size, orders
12 deviating substantially from a normal
13 pattern, or" -- "and orders of unusual
14 frequency."
15 Q. Now, I'd like you to flip to
16 List I chemicals.  What is the DEA's rule
17 on looking for suspicious orders of
18 List I chemicals?
19 MS. MAINIGI:  Objection.
20 Scope.  Form.
21 BY MR. FARRELL:
22 Q. Do you have the C.F.R. or
23 the --
24 A. C.F.R.

1  Q. This is Cardinal Health in
2  its pleading in this litigation, telling
3  the court that the DEA endorsed it to use
4  the Reno report to monitor suspicious
5  orders of controlled substances,
6  including opioids.  Is that statement
7  true or not true?
8  MS. MAINIGI:  Objection.
9  Form.  Coaching witness.  Scope.
10 MR. FINKELSTEIN:  Scope.
11 THE WITNESS:  Can you repeat
12 the question?
13 BY MR. FARRELL:
14 Q. Cardinal Health is stating
15 in its discovery responses to the court
16 that the DEA provided guidance to them,
17 that they could use the Reno report and
18 its algorithm for orders of extraordinary
19 size to identify unusual orders of
20 controlled substances.
21 Are you aware of the DEA
22 providing such guidance to Cardinal
23 Health?
24 MS. MAINIGI:  Objection.

1  Form.  Coaching the witness.
2  Scope.
3  MR. FINKELSTEIN:  Scope.
4  THE WITNESS:  I am not
5  aware.
6  BY MR. FARRELL:
7  Q. Is it the DEA's position
8  that using an algorithm for extraordinary
9  size is an appropriate measurement of
10  orders of unusual size for controlled
11  substances?
12  MS. MAINIGI:  Objection.
13  Form.
14  MR. EPPICH:  Objection.
15  Scope.
16  MR. FINKELSTEIN:  Form.
17  THE WITNESS:  No.
18  BY MR. FARRELL:
19  Q. In fact, in the Reno report,
20  the DEA provided recommendation and
21  guidance to registrants that it could
22  look for orders of extraordinary size of
23  List I chemicals using a factor of three.
24  Is that correct?

1  Paragraph 1, is this the guidance that
2  the DEA was providing to registrants as
3  the current calculation being used to
4  look for orders of extraordinary size of
5  List I chemicals?
6  MR. EPPICH:  Objection.
7  Foundation.
8  MR. FINKELSTEIN:  Scope.
9  THE WITNESS:  Yes.
10  BY MR. FARRELL:
11  Q. So there appear to be five
12  steps that DEA was providing guidance
13  for, agreed?
14  MR. EPPICH:  Objection.
15  Foundation.  Form.
16  THE WITNESS:  Yes.
17  BY MR. FARRELL:
18  Q. And will you read paragraph
19  Step 1?
20  A. "Add purchase quantities for
21  the last 12 months for all customers
22  within same distribution center and for
23  customer type (hospital, pharmacy or
24  other) for any List I chemical-containing

1  MR. EPPICH:  Object to form.
2  MS. MAINIGI:  Objection
3  scope.
4  MR. FINKELSTEIN:  Scope.
5  THE WITNESS:  Yes.
6  BY MR. FARRELL:
7  Q. Would it be appropriate for
8  a registrant to use a factor of four to
9  look for orders of unusual size of
10  controlled substances?
11  MS. MAINIGI:  Objection.
12  Foundation.  Objection.  Scope.
13  MR. FINKELSTEIN:  Incomplete
14  hypothetical.
15  MR. EPPICH:  Objection.
16  Form.
17  THE WITNESS:  I don't know.
18  I don't know what factor three,
19  factor four -- factor -- I don't
20  know what those factors are.
21  BY MR. FARRELL:
22  Q. Okay.  So let's go and look
23  at page -- on the Reno report,
24  Bates-stamped 2247.  So if you look at

1  item stocked by the distribution center."
2  Q. So in Step 1, it appears
3  that the guidance the DEA is providing is
4  for a registrant to add the purchase
5  quantities for the last 12 months by a
6  customer of List I chemicals within the
7  same distribution center for the same
8  customer type, agreed?
9  MR. FINKELSTEIN:  Scope.
10  MS. MAINIGI:  Objection.
11  Scope.
12  MR. EPPICH:  Objection.
13  Form.  Foundation.
14  THE WITNESS:  Yes.
15  BY MR. FARRELL:
16  Q. And then on Number 2, it
17  says, "Add customer months for every
18  record used in above total."
19  Did I read that accurately?
20  MR. EPPICH:  Objection.
21  Form and foundation.
22  THE WITNESS:  Yes.
23  BY MR. FARRELL:
24  Q. Step 3 is to divide that

1  total quantity by the total customer
2  months.
3  Did I read that accurately?
4  MR. EPPICH:  Objection form
5  and foundation.
6  THE WITNESS:  Yes.
7  BY MR. FARRELL:
8  Q. Very good.  Now, once we do
9  this math -- it's not so fuzzy -- what it
10  gives us, is it gives us the average
11  purchases by a customer per month for the
12  past year, agreed?
13  MR. EPPICH:  Object to form.
14  MR. FINKELSTEIN:  Scope.
15  THE WITNESS:  Agreed.
16  BY MR. FARRELL:
17  Q. And then under Paragraph 4,
18  it says multiply that by a factor.  And
19  that gives us the maximum amount that the
20  customer can order per month before
21  showing up on a suspicious order report.
22  Do you see that?
23  A. Yes.
24  Q. So again, this is for List I

1  chemicals arising out of methamphetamine
2  act and the guidance provided by the DEA
3  to Attorney General Janet Reno, and the
4  recommendation is that when you're
5  looking for orders of extraordinary size
6  of List I chemicals, ephedrine,
7  pseudoephedrine, a registrant should look
8  for like-size groups of customers from a
9  distribution facility, add up the total
10  by base weight over the past 12 months,
11  divide it by 12, and multiply it by a
12  factor.  Agreed?
13  MR. EPPICH:  Objection to
14  form.
15  MS. MAINIGI:  Objection to
16  form.  Mischaracterizes the
17  report.
18  MR. EPPICH:  Objection.
19  Foundation.
20  MR. FINKELSTEIN:  Scope.
21  You can answer.
22  THE WITNESS:  Agreed.
23  BY MR. FARRELL:
24  Q. It says here, "The" -- "The

1  factor should be for three, for
2  Control II and Control III controlled
3  substances containing List I chemicals."
4  Do you see that?
5  A. Yes.
6  MR. EPPICH:  Objection to
7  form.
8  BY MR. FARRELL:
9  Q. Now, if it's just a pure
10  List I chemical, and it doesn't
11  contain -- I'm sorry, the other way
12  around.
13  If you take the factor of
14  three for List I chemicals, it gives you
15  the maximum amount before a suspicious
16  order is triggered.  That's the factor
17  the DEA is recommending registrants use
18  for List I chemicals.
19  Agreed?
20  MR. EPPICH:  Object to form.
21  MR. FINKELSTEIN:  Scope.
22  THE WITNESS:  Agreed.
23  BY MR. FARRELL:
24  Q. Okay.  So my question to you

1  is, is it appropriate to use this
2  standard for controlled substances that
3  don't include List I chemicals?
4  MS. MAINIGI:  Objection.
5  Form.  Foundation.
6  MR. FINKELSTEIN:  Can I get
7  the question back?
8  I'm sorry, because my
9  realtime -- can you ask it again?
10  (Whereupon, the court
11  reporter read back the requested
12  portion of testimony.)
13  MR. FINKELSTEIN:  Okay.  You
14  can answer.
15  THE WITNESS:  Can you repeat
16  it?
17  MR. FINKELSTEIN:  Can you
18  repeat it?
19  BY MR. FARRELL:
20  Q. By using this methodology,
21  you are providing guidance to registrants
22  to identify extraordinary orders of
23  List I chemicals by using a multiplier of
24  three times the monthly average for a

1   similar customer.
2   Is that fair?
3   MR. EPPICH:  Object to the
4   form.
5   MS. MAINIGI:  Objection.
6   Form.  Foundation.
7   THE WITNESS:  Correct.
8   BY MR. FARRELL:
9   Q. Has the DEA provided
10  guidance to registrants of controlled
11  substances that don't include List I
12  chemicals that it can multiply the
13  monthly average by three to identify
14  orders that are merely unusual?
15  MS. MAINIGI:  Objection.
16  Foundation.  Form.
17  MR. EPPICH:  Objection.
18  Scope.
19  THE WITNESS:  Not to my
20  knowledge.
21  BY MR. FARRELL:
22  Q. So if you're using a
23  measuring stick that the DEA has
24  provided --

1   MS. MAINIGI:  May I ask for
2   clarification, Counsel?  Is that
3   to your personal knowledge?
4   MR. FARRELL:  Enu, you --
5   you can have redirect.  He's
6   testifying in his official
7   capacity, so --
8   MR. FINKELSTEIN:  I'll say
9   he's here to testify about
10  industrywide guidance, and I took
11  the question in that spirit.
12  And you can ask -- you can
13  ask your next question.
14  BY MR. FARRELL:
15  Q. So if -- if a registrant is
16  making -- are you aware of ever making --
17  providing guidance to a registrant that
18  it could use the Reno report as an
19  effective tool to monitor suspicious
20  orders of controlled substances that
21  don't include List I chemicals?
22  MS. MAINIGI:  Objection.
23  Form.  Foundation.  Scope.
24  MR. FINKELSTEIN:  That

1   question isn't about industrywide
2   guidance.  I join the scope
3   objection.
4   BY MR. FARRELL:
5   Q. Let me try it again then.
6   Has the DEA ever provided
7   industrywide guidance that it could use
8   the definition of suspicious order for
9   the List I chemicals under the
10  methamphetamine act for orders of
11  controlled substances that do not include
12  List I chemicals?
13  A. Not to my knowledge.
14  MS. MAINIGI:  Objection to
15  form.
16  BY MR. FARRELL:
17  Q. So now let's go back to
18  Cardinal's combined discovery requests.
19  Page 12.
20  In the context of the first
21  sentence, has the DEA ever provided
22  guidance to registrants, which are, in
23  this case, distributors of Control II
24  prescription opioids, that it satisfies

1   its compliance obligations under federal
2   law by submitting after-the-fact
3   ingredient limit reports?
4   MS. MAINIGI:  Objection.
5   Form.  Objection.  Foundation.
6   MR. FINKELSTEIN:  Scope.
7   THE WITNESS:  Not to my
8   knowledge.
9   BY MR. FARRELL:
10  Q. Now, you'll recall from the
11  1996 diversion investigators manual, if
12  you'll flip back to it, which is
13  Exhibit 11.
14  A. I'll use mine.  The '96 one?
15  Q. The '96 one.
16  Is there any reference to
17  an -- an approved factor to be used by a
18  registrant to identify unusual orders of
19  controlled substances?
20  MS. MAINIGI:  Objection --
21  excuse me.  Objection to form.
22  THE WITNESS:  No.
23  BY MR. FARRELL:
24  Q. If a registrant used a

1  factor to increase -- that's a bad
2  question.
3  Are you aware of the DEA
4  ever endorsing the use of a factor to use
5  in the calculation of unusual orders of
6  controlled substances that do not include
7  List I chemicals?
8  MR. EPPICH:  Objection to
9  form.
10  MR. FINKELSTEIN:  Scope.
11  THE WITNESS:  Again, it's
12  the use of the word ever.
13  I am not -- I am not aware,
14  but I have concerns of the word of
15  the use ever.
16  BY MR. FARRELL:
17  Q. Is a registrant that uses
18  the factor when calculating orders of
19  unusual size of controlled substances
20  that do not include List I chemicals,
21  compliant with federal regulations?
22  MR. STEPHENS:  Object to
23  form.
24  MR. FINKELSTEIN:  Calls for

1  a legal conclusion.
2  MS. MAINIGI:  Join.
3  THE WITNESS:  Could you
4  please repeat it?
5  BY MR. FARRELL:
6  Q. Would the DEA ever endorse a
7  methodology for use by a registrant that
8  multiplied a monthly average by four to
9  determine orders of unusual size?
10  MR. EPPICH:  Object to form.
11  Foundation.
12  MS. MAINIGI:  Calls for
13  speculation.
14  THE WITNESS:  DEA doesn't
15  endorse the systems.
16  BY MR. FARRELL:
17  Q. Is using a factor of four
18  when calculating orders of unusual size
19  compliant with federal regulations
20  according to the DEA?
21  MS. MAINIGI:  Objection.
22  Calls for a legal conclusion.
23  Form.
24  THE WITNESS:  Not to my

1  knowledge.
2  BY MR. FARRELL:
3  Q. Now, in -- in other places
4  I'll represent to you that some
5  registrants of controlled substances that
6  do not include List I chemicals are
7  relying upon the chemical handlers
8  manual.  That fact will be established in
9  the record.
10  So my question to you first
11  is, are you familiar with the DEA's
12  chemical handlers manual?
13  MS. MAINIGI:  Objection.
14  Coaching the witness.  Objection
15  to form.
16  MR. EPPICH:  Object to form.
17  THE WITNESS:  Yes.
18  BY MR. FARRELL:
19  Q. I'm going to show you what's
20  going to be marked as?
21  MR. FINKELSTEIN:  13.
22  MR. FARRELL:  So what did
23  you say?
24  MR. FINKELSTEIN:  13.  I

1  think it's 13.
2  (Document marked for
3  identification as Exhibit
4  DEA-Prevoznik-P-13.)
5  BY MR. FARRELL:
6  Q. 13?  Plaintiffs' 13.  And it
7  is Bates stamped
8  CAH_MDL_PRIORPROD_DEA07_01198690.
9  I'll hand that to you.
10  MR. FARRELL:  I've got
11  insufficient number of copies.
12  Bonnie will be e-mailing it around
13  as well.
14  BY MR. FARRELL:
15  Q. I'll give you a moment to
16  review it.  And my first question is
17  going to be is whether or not you
18  recognize this document.
19  A. Yes, I recognize it.
20  Q. What is it?
21  A. It's a manual that we put
22  together for those that are handling
23  List I chemicals.
24  Q. Is it publicly available?

1  A. Yes.
2  Q. And is this a true and
3  accurate version of the 2004 chemical
4  handler's manual published by the DEA?
5  MR. FINKELSTEIN:  Scope.
6  MS. MAINIGI:  Objection to
7  form.
8  **THE WITNESS:  Yes.**
9  **BY MR. FARRELL:**
10 **Q. Again, is this a document**
11 **that applies to List I chemicals,**
12 **including ephedrine and pseudoephedrine**
13 **and the chemicals used to make**
14 **methamphetamine?**
15 **A. Yes.**
16 MS. MAINIGI:  Objection to
17 form.
18 MR. FINKELSTEIN:  Scope.
19 BY MR. FARRELL:
20 Q. Does the DEA provide
21 guidance that this document is an
22 appropriate reference point for
23 monitoring suspicious orders of
24 controlled substances that do not include

1  for illicit purposes, good practice
2  requires that every reasonable effort be
3  made to resolve those suspicions.  In
4  addition to making the required reports,
5  the transaction should not be completed
6  until the customer is able to eliminate
7  the suspicions.  The distributor may have
8  to forego some transactions.  When DEA
9  reviews distributors' decisions, minor
10 events are not cause for government
11 action.
12 "At the same time, a
13 regulated person who fails to implement a
14 system to prevent diversion will be
15 closely scrutinized and, if warranted,
16 may be subject to civil, administrative,
17 or criminal penalties."
18 Q. So with regard to List I
19 chemicals that a registrant determines
20 that are suspicious, what guidance has
21 the DEA provided on whether or not the
22 order should be shipped?
23 MS. MAINIGI:  Objection.
24 Scope.  Foundation.

1  List I chemicals?
2  MR. EPPICH:  Objection.
3  MS. MAINIGI:  Objection to
4  form.
5  MR. FINKELSTEIN:  Scope.
6  THE WITNESS:  No.
7  BY MR. FARRELL:
8  Q. Now, I'm going to have you
9  flip to Bates stamp 01198713 which is
10 Page 19.  I'm going to have you go down
11 and look first at the third full
12 paragraph.
13 MR. FINKELSTEIN:  "When a
14 regulated person suspects"?
15 MR. FARRELL:  Yes, sir.
16 BY MR. FARRELL:
17 Q. At the top of the page,
18 you'll see it says, "Recognizing
19 suspicious orders."  And then I'm going
20 to ask you to read the first -- read the
21 paragraph that begins, "When a regulated
22 person."
23 A. "When a regulated person
24 suspects that an order may be intended

1  THE WITNESS:  That they
2  should not do it.
3  BY MR. FARRELL:
4  Q. So is this consistent with
5  the guidance that the DEA provided to
6  registrants of controlled substances that
7  do not include List I chemicals?
8  MS. MAINIGI:  Objection.
9  Vague.  Timing.
10 THE WITNESS:  Yes.
11 BY MR. FARRELL:
12 Q. Now, you'll see directly
13 above that, there's a reference to
14 Exhibit E.  So I'm going to have you flip
15 to Page 41, which is Bates-stamped
16 01198735.
17 Now, if you look at the top
18 left-hand corner there's an appendix
19 number, Appendix E-3.
20 A. I see that.
21 Q. And when you read the
22 language of Appendix E-3, does this track
23 the language from the Reno report?
24 MS. MAINIGI:  Objection.

1  Scope, form, foundation.
2  MR. FINKELSTEIN:  Scope.
3  THE WITNESS:  Yes.
4  BY MR. FARRELL:
5  Q. So if a registrant of --
6  that is a wholesale distributor of
7  controlled substances that do not include
8  List I chemicals is using E-3 to identify
9  suspicious orders of unusual size,
10  frequency, or pattern, is that compliant
11  with federal law?
12  MS. MAINIGI:  Objection.
13  Calls for a legal conclusion.
14  Form.
15  MR. FINKELSTEIN:  Calls for
16  a legal conclusion.
17  THE WITNESS:  Please repeat.
18  BY MR. FARRELL:
**19  Q. If a registrant that is a**
**20  wholesale distributor of controlled**
**21  substances, excluding those that contain**
**22  List I chemicals, is using E-3 to**
**23  identify suspicious orders of unusual**
**24  size, frequency or pattern, is that**

**1  compliant with federal law, according to**
**2  the DEA?**
3  MR. EPPICH:  Object to form.
4  MS. MAINIGI:  Objection.
5  Calls for a legal conclusion.
6  Form.
7  THE WITNESS:  No.
8  BY MR. FARRELL:
9  Q. So I'm going to make this
10  easier.  I'm going to mark as the next
11  sequential exhibit, which is Plaintiffs'
12  Exhibit --
13  A. Oh, right, 14.
14  Q. I'm terrible at exhibit
15  numbers.
16  (Document marked for
17  identification as Exhibit
18  DEA-Prevoznik-P-14.)
19  BY MR. FARRELL:
20  Q. And to make it easier for
21  everybody, this is from the DEA reliance
22  materials that were circulated yesterday.
23  This is the DEA's letter dated
24  September 27th, 2006, that I'll ask you

1  to take a look at.  And tell me if you
2  recognize this document.
3  A. Yes.
4  Q. What is it?
5  A. It's a letter that DEA sent
6  to the distributors, registrants, by
7  Joe -- by Joe Rannazzisi who was the head
8  of the diversion program of DEA, it's
9  dated September 27th, 2006.
10  Q. Is this a true and accurate
11  copy of the letter sent by the DEA to all
12  registrants in the chain of distribution
13  of controlled substances?
14  A. Yes.
15  Q. Can you verify and validate
16  that this letter was sent to every
17  wholesale distributor and manufacturer
18  that sells or distributes controlled
19  substances and are registered with the
20  DEA?
21  MR. STEPHENS:  Object to
22  form.
23  MR. EPPICH:  Object to form.
24  Objection.  Foundation.

1  MR. O'CONNOR:  Objection to
2  form.
3  MS. MAINIGI:  Objection.
4  THE WITNESS:  There were
5  actually two mailings of this.
6  This was one, and then there was
7  one in February.  So it did go out
8  to all of them.
9  BY MR. FARRELL:
10  Q. So did they go out to all --
11  let me back up.
12  What was the purpose of the
13  February letter?
14  A. It was the same.  It was the
15  same letter, but to make sure that all
16  the wholesalers got it.
17  Q. So the same letter was sent
18  twice?
19  A. Yes.
20  Q. And to the DEA's knowledge,
21  was there a shortcoming on the first
22  distribution of the letter, or why did
23  you send it out a second time?
24  MS. MAINIGI:  Object to

1  form.
2  THE WITNESS:  I'm not sure.
3  BY MR. FARRELL:
4  Q. But you know it was sent out
5  twice?
6  A. Yes.
7  Q. Can you validate and affirm
8  that the DEA sent this letter to every
9  wholesale distributor of prescription
10  opioids that are registered with the DEA?
11  MS. MAINIGI:  Objection.
12  Scope, form, foundation.
13  MR. EPPICH:  Objection to
14  form.
15  THE WITNESS:  Back at this
16  time?
17  BY MR. FARRELL:
18  Q. Yes.
19  A. Yes.
20  Q. What about to manufacturers?
21  A. This did not go to the
22  manufacturers.
23  Q. Just to the distributors?
24  A. Correct.

1  Q. So without belaboring the
2  point in going through this, is it the
3  DEA's position that anything in that
4  letter is a new rule?
5  MS. MAINIGI:  Objection.
6  Form.
7  MR. FINKELSTEIN:  Vague.
8  THE WITNESS:  No.
9  BY MR. FARRELL:
10  Q. I'm going to ask you the
11  same questions.  I'm going to have
12  marked -- the 2007 letter that's in my
13  book from reliance materials is just one
14  page.
15  So I'm going to have marked
16  as the next sequential exhibit, which is
17  Plaintiffs' 15.
18  (Document marked for
19  identification as Exhibit
20  DEA-Prevoznik-P-15.)
21  MR. FARRELL:  Document
22  bearing Bates stamp
23  US-DEA-00022459.  And I'm going to
24  hand it to you.

1  BY MR. FARRELL:
2  Q. Do you recognize this
3  document?
4  A. It's the same one that you
5  just gave me.
6  Q. I meant to give you the 2006
7  version.
8  MR. FINKELSTEIN:  You did
9  give him the 2006 version.
10  MR. FARRELL:  I just did it
11  again with 2006, huh?
12  MR. FINKELSTEIN:  Correct.
13  BY MR. FARRELL:
14  Q. Previously been marked as
15  Exhibit 5 in yesterday's deposition.  And
16  I'm going to try to find a clean copy.
17  Now, I'm going to ask you the same
18  question.
19  Is this a true and accurate
20  copy of the second Rannazzisi letter sent
21  by the DEA to wholesale distributors of
22  prescription opioids dated December 27,
23  2007?
24  A. It went to manufacturers and

1  distributors.
2  Q. This one did?
3  A. Yes.
4  Q. Is -- is this a true and
5  accurate copy of that letter?
6  A. Yes.
7  Q. Does the DEA believe that
8  there's anything in this letter that
9  constitutes a new rule?
10  A. No.
11  MS. MAINIGI:  Objection to
12  form.
13  MR. FARRELL:  Bear with me
14  for a second, please.
15  All right.  So the next
16  thing that I'm going to show you
17  is the testimony from Cardinal
18  Health's 30(b)(6) deponent.  And
19  then after we show you the video
20  clip I'm going to ask you a
21  question.
22  Go ahead and play Norris.
23  (Video clip played as
24  follows:)

1 NORRIS:  This letter sets
2 forth the obligations --
3 (Video stopped.)
4 MR. FARRELL:  Can you stop
5 it.  Start it.
6 I'm sorry, we had a little
7 technical gaffe.
8 (Video clip played as
9 follows:)
10 MR. FARRELL:  So as of
11 September 27, 2006, you
12 acknowledge that this letter sets
13 forth the obligations under the
14 Controlled Substances Act and
15 under the code of federal
16 regulations for Cardinal Health?
17 MS. MAINIGI:  Objection.
18 Scope.  Objection.  Form.
19 THE WITNESS:  As to the
20 reiteration of the reporting
21 requirement, yes.
22 Again, the shipping
23 requirement, to use short form,
24 was a new -- new idea to Cardinal

1 Health at the time they received
2 this letter.  So it was not -- I
3 do not agree that that was an
4 obligation in the statute going
5 back."
6 (Video concluded.)
7 MR. FARRELL:  Play the next
8 one, please.
9 MS. MAINIGI:  Is there a
10 question, Mr. Farrell?
11 Just an ongoing objection to
12 just playing video from Cardinal
13 Health's 30(b)(6).
14 (Video clip played as
15 follows:)
16 MR. FARRELL:  During this
17 time frame prior to 2007, did
18 Cardinal report orders as
19 potentially suspicious or
20 suspicious orders, and then still
21 send the shipments out?
22 MS. MAINIGI:  Objection.
23 Time period.
24 THE WITNESS:  Yes, that is

1 the direction we received from the
2 DEA.  We made the reports as
3 required and there was not a
4 shipping requirement.
5 (Video concluded.)
6 BY MR. FARRELL:
7 Q. So my question to you is, is
8 did the DEA ever provide such instruction
9 to a registrant?
10 MS. MAINIGI:  Outside --
11 objection.  Outside the scope.
12 Objection.  Form.
13 MR. EPPICH:  Objection.
14 Foundation.
15 MR. FINKELSTEIN:  Scope.
16 THE WITNESS:  Could you
17 please repeat it?
18 BY MR. FARRELL:
19 Q. Did the DEA ever provide
20 guidance to a registrant that it could
21 report a suspicious order and then still
22 ship it?
23 MS. MAINIGI:  Objection.
24 Scope.  Objection.  Form and

1 foundation.
2 MR. EPPICH:  Scope.
3 BY MR. FARRELL:
4 Q. All right.  So let me repeat
5 it.
6 **Cardinal Health claims that**
7 **it received direction from the DEA that**
8 **it could report suspicious orders and**
9 **then still ship it.**
10 **Is the DEA aware of**
11 **providing such guidance?**
12 MS. MAINIGI:  Objection.
13 Scope.  Objection.  Form.
14 Objection.  Misstates Cardinal
15 Health testimony.  Vague as to
16 time.
17 **THE WITNESS:  Not to my**
18 **knowledge.**
19 BY MR. FARRELL:
20 Q. Does the DEA take the
21 position that a registrant of controlled
22 substances has a duty to block shipment
23 of suspicious orders of controlled
24 substances?

1    MS. MAINIGI:  Objection.
2    Form.  Objection.  Vague as to
3    time.
4    THE WITNESS:  Can you please
5    repeat it?
6    BY MR. FARRELL:
7    Q. Does the DEA take the
8    position that a registrant of controlled
9    substances has a duty to block shipments
10   of suspicious orders?
11   MS. MAINIGI:  Objection.
12   Form.  Objection.  Vague as to
13   time.
**14   THE WITNESS:  Yes.**
**15   BY MR. FARRELL:**
**16   Q. Is that now and always been**
**17   the law in the United States of America?**
18   MS. MAINIGI:  Objection.
19   Form.  Outside the scope.
**20   THE WITNESS:  Yes.**
21   BY MR. FARRELL:
22   Q. And if a registrant says
23   that it was allowed to ship suspicious
24   orders, is that -- has that ever been

1    identification as Exhibit
2    DEA-Prevoznik-P-16.)
3    MR. FARRELL:  And for
4    everybody's reference, I'm -- I'm
5    referring to the Novelty
6    Distributors, Inc., revocation of
7    registration, Federal Register
8    Volume 73, Number 176, dated
9    September 10, 2008.
10   I believe it was referenced
11   yesterday at some point in time.
12   BY MR. FARRELL:
13   Q. Do you recognize the form of
14   this document?
15   A. Yes.
16   Q. What is it?
17   A. It's a Federal Register of
18   notice.
19   Q. And what is the date of it?
20   A. Wednesday, September 10,
21   2008.
22   Q. Is this a publication that
23   is available to the general public?
24   A. Yes.

1    blessed by the DEA?
2    MS. MAINIGI:  Objection.
3    Form.  Objection.  Scope.
4    MR. FINKELSTEIN:  Scope.
5    MR. EPPICH:  Objection.
6    Hypothetical.
7    THE WITNESS:  Please repeat
8    it.
9    BY MR. FARRELL:
**10   Q. Okay.  You saw the testimony**
**11   from Cardinal Health.**
**12   Do you believe the testimony**
**13   is accurate?**
14   MS. MAINIGI:  Objection.
15   Form.  Objection.  Scope.
16   MR. EPPICH:  Objection.
17   Vague.
**18   THE WITNESS:  No.**
19   BY MR. FARRELL:
20   Q. I apologize, I don't have --
21   I've got a copy for you.  And I've got
22   a -- that I'll mark as Plaintiffs'
23   Exhibit 16.
24   (Document marked for

1    Q. Is this a true and accurate
2    copy of the revocation of registration of
3    a wholesale distributor published by the
4    Drug Enforcement Agency?
5    MS. MAINIGI:  Objection.
6    Scope.
7    MR. FINKELSTEIN:  Join the
8    scope objection.
9    THE WITNESS:  Yes.
10   BY MR. FARRELL:
11   Q. I'm going to direct your
12   attention now to Bates -- or the page
13   Number 52699.  In the top right-hand
14   corner.  In the middle paragraph of the
15   middle column.  And I'd ask you to read
16   aloud the highlighted section.
17   A. "Fundamental to its
18   obligation to maintain effective controls
19   against diversion, a distributor must
20   review every order and identify
21   suspicious transactions.  Further, it
22   must do so prior to shipping the
23   products.  Indeed, a distributor has an
24   affirmative duty to forgo a transaction

1  if, upon investigation, it is unable to
2  determine that the proposed transaction
3  is for legitimate purposes.  See DEA
4  chemical handler's manual 21.
5  "Respondents procedure of
6  post-transaction review is incompatible
7  with its obligation to identify and
8  forego suspicious transactions."
9  Q. Is this consistent with the
10  guidance the DEA provided to registrants?
11  MS. MAINIGI:  Objection.
12  Vague as to time period and scope.
13  THE WITNESS:  Yes.
14  BY MR. FARRELL:
15  Q. Is this consistent with the
16  2006 and 2007 letters sent by the DEA,
17  authored by Joe Rannazzisi, to
18  registrants that are involved in the
19  closed system of controlled substances?
20  MS. MAINIGI:  Objection to
21  form.
22  MR. FINKELSTEIN:  I object
23  to the pronunciation of his name.
24  But you can answer.

1  final point.
2  I think I'm going to ask for
3  relief to continue the deposition
4  until we get back together again.
5  Ten till 5:00.
6  MR. FINKELSTEIN:  Okay.
7  MR. FARRELL:  With your
8  permission, we'll adjourn until
9  Day 3.
10  MR. FINKELSTEIN:  Well, we
11  will certainly adjourn.  I
12  understand the parties are going
13  to demand a Day 3.
14  THE VIDEOGRAPHER:  4:50.  We
15  are off the video record.
16  (Excused.)
17  (Deposition adjourned at
18  approximately 4:50 p.m.)
19
20
21
22
23
24

1  THE WITNESS:  I would
2  clarify that it went to -- the
3  first one went to distributors.
4  And the 2007 went to manufacturers
5  and distributors.  So yes.
6  BY MR. FARRELL:
7  Q. Now, go to the very next
8  portion.  I'm going to reference a
9  footnote.
10  A. Same page?
11  Q. No.  It is 52702.  It's
12  Footnote 52, I believe.
13  A. Okay.  I see it.
14  Q. And over on the very last
15  thing, it says, "Moreover, field
16  personnel may approve the renewal of a
17  registration" --
18  Wait a minute.
19  It says -- can I see my copy
20  back real quick?
21  MR. FARRELL:  You can take
22  that down for a second.  I
23  apologize.  We're running out of
24  clock, but I want to get to one

1
2  CERTIFICATE
3
4
5  I HEREBY CERTIFY that the   witness was duly sworn by me
   and that the
6  deposition is a true record of the    testimony given by the
   witness.
7  It was requested before
8  completion of the deposition that the    witness, THOMAS
   PREVOZNIK, have the
9  opportunity to read and sign the   deposition transcript.
10
11
                                        MICHELLE   L.
12  GRAY, _____
13  A. Registered Professional  Reporter, Certified Shorthand
14  Reporter, Certified Realtime  Reporter and Notary Public
15  Dated:  April 22, 2019
16
17
18  (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23

1  INSTRUCTIONS TO WITNESS

2

3  Please read your deposition

4  over carefully and make any necessary

5  corrections.  You should state the reason

6  in the appropriate space on the errata

7  sheet for any corrections that are made.

8  After doing so, please sign

9  the errata sheet and date it.

10 You are signing same subject

11 to the changes you have noted on the

12 errata sheet, which will be attached to

13 your deposition.

14 It is imperative that you

15 return the original errata sheet to the

16 deposing attorney within thirty (30) days

17 of receipt of the deposition transcript

18 by you.  If you fail to do so, the

19 deposition transcript may be deemed to be

20 accurate and may be used in court.

21

22

23

24

1

2  ACKNOWLEDGMENT OF DEPONENT

3

4  I,_____, do

5  hereby certify that I have read the

6  foregoing pages, 410 - 782, and that the

7  same is a correct transcription of the

8  answers given by me to the questions

9  therein propounded, except for the

10 corrections or changes in form or

11 substance, if any, noted in the attached

12 Errata Sheet.

13

14

15 _____

16 THOMAS PREVOZNIK     DATE

17

18

19 Subscribed and sworn  to before me this

20 _____ day of _____, 20____.

21 My commission expires:_____

22 _____

23 Notary Public

24

1  - - - - - -   E R R A T A

2  - - - - - -

3

4  PAGE  LINE  CHANGE

5  ____ ____ _____

6  REASON: _____

7  ____ ____ _____

8  REASON: _____

9  ____ ____ _____

10 REASON: _____

11 ____ ____ _____

12 REASON: _____

13 ____ ____ _____

14 REASON: _____

15 ____ ____ _____

16 REASON: _____

17 ____ ____ _____

18 REASON: _____

19 ____ ____ _____

20 REASON: _____

21 ____ ____ _____

22 REASON: _____

23 ____ ____ _____

24 REASON: _____

1  LAWYER'S NOTES

2  PAGE  LINE

3  ____ ____ _____

4  ____ ____ _____

5  ____ ____ _____

6  ____ ____ _____

7  ____ ____ _____

8  ____ ____ _____

9  ____ ____ _____

10 ____ ____ _____

11 ____ ____ _____

12 ____ ____ _____

13 ____ ____ _____

14 ____ ____ _____

15 ____ ____ _____

16 ____ ____ _____

17 ____ ____ _____

18 ____ ____ _____

19 ____ ____ _____

20 ____ ____ _____

21 ____ ____ _____

22 ____ ____ _____

23 ____ ____ _____

24 ____ ____ _____

| 05-17-2019 | Prevoznik, Thomas | Page 783 |
|---|---|---|

1  UNITED STATES DISTRICT COURT  FOR THE NORTHERN DISTRICT OF OHIO
2  EASTERN DIVISION
3  IN RE: NATIONAL   )
4  PRESCRIPTION   )  MDL No. 2804 OPIATE LITIGATION  )
5  _____  )  Case No.    1:17-MD-2804
6  ) THIS DOCUMENT RELATES  )  Hon. Dan A.
7  TO ALL CASES  )  Polster
8  FRIDAY, MAY 17, 2019
9  HIGHLY CONFIDENTIAL   SUBJECT TO FURTHER
10 CONFIDENTIALITY REVIEW
11
12 Videotaped deposition of Thomas
13 Prevoznik, Volume III, held at the offices of
14 WILLIAMS & CONNOLLY LLP, 725 Twelfth Street,
15 NW, Washington, DC, commencing at 8:10 a.m.,
16 on the above date, before Carrie A. Campbell,
17 Registered Diplomate Reporter and Certified
18 Realtime Reporter.
19
20
21
22 GOLKOW LITIGATION SERVICES
23 877.370.3377 ph | 917.591.5672 fax      deps@golkow.com
24

| 05-17-2019 | Prevoznik, Thomas | Page 784 |
|---|---|---|

1  A.P.P.E.A.R.A.N.C.E.S :
2
3  GREENE, KETCHUM, FARRELL, BAILEY   & TWEEL LLP
4  BY:  PAUL T. FARRELL, JR.   paul@greeneketchum.com
5  419 Eleventh Street   Huntington, West Virginia 25701
6  (314) 525-9115
7
8  MOTLEY RICE LLC   BY:  LINDA SINGER
9  lsinger@motleyrice.com   SARA D. AGUINIGA
10 saguiniga@motleyrice.com   AMANDA UNTERREINER
11 aunterreiner@motleyrice.com   (VIA REALTIME STREAM)
12 401 Ninth Street NW, Suite 1001   Washington, DC 20004
13 (202) 232-5504
14
15 MCHUGH FULLER LAW GROUP   BY:  MICHAEL J. FULLER, JR.
16 mike@mchughfuller.com   97 Elias Whiddon Road
17 Hattiesburg, Mississippi 39402   (601) 261-2220
18
19 THE DUGAN LAW FIRM
20 BY:  BONNIE A. KENDRICK   bonnie@dugan-lawfirm.com
21 One Canal Place   365 Canal Place, Suite 1000
22 New Orleans, Louisiana 70130   (504) 648-0180
23
24

| 05-17-2019 | Prevoznik, Thomas | Page 785 |
|---|---|---|

1  LEVIN PAPANTONIO  THOMAS MITCHELL     RAFFERTY PROCTOR, P.A.
2  BY:  PAGE POERSCHKE   ppoerschke@levinlaw.com
3  (VIA REALTIME STREAM)  316 South Baylen Street
4  Pensacola, Florida 32502   (850) 435-7000
5  Counsel for Plaintiffs
6
7  NAPOLI SHKOLNIK, PLLC   BY:  HUNTER J. SHKOLNIK
8  hunter@napolilaw.com    (VIA TELECONFERENCE)
9  360 Lexington Avenue, 11th Floor    New York, New York 10017
10 (212) 397-1000  Counsel for Cuyahoga County
11
12 BRANSTETTER STRANCH & JENNINGS, PLLC
13 BY:  JOE P. LENISKI, JR.   joeyl@bsjfirm.com
14 223 Rosa L. Parks Avenue, Suite 200    Nashville, Tennessee 37203
15 (615) 254-8801   Counsel for the Tennessee Action
16
17 US DEPARTMENT OF JUSTICE
18 BY:  DAVID FINKELSTEIN   david.m.finkelstein@usdoj.gov
19 NATALIE A. WAITES   natalie.a.waites@usdoj.gov
20 175 N Street, NE, Room 10-2222   Washington, DC 20002
21 (202) 616-2964
22 and
23
24

| 05-17-2019 | Prevoznik, Thomas | Page 786 |
|---|---|---|

1  US DEPARTMENT OF JUSTICE   BY:  JAMES R. BENNETT, II
2  james.bennett4@usdoj.gov   United States Courthouse
3  801 West Superior Avenue, Suite 400   Cleveland, Ohio 44113
4  (216) 622-3988
5  and
6
7  US DEPARTMENT OF JUSTICE   BY:  MARIAMA C. SPEARS
8  mariama.c.spears@usdoj.gov   8701 Morrisette Drive
9  Springfield, Virginia 22152   (202) 598-6204
10 Representing the US DOJ and the Witness
11
12 WILLIAMS & CONNOLLY LLP   BY:  ENU MAINIGI
13 emainigi@wc.com    COLLEEN MCNAMARA
14 cmcnamara@wc.com   BRAD MASTERS
15 bmasters@wc.com   725 Twelfth Street, N.W.
16 Washington, DC 20005   (202) 434-5331
17 Counsel for Cardinal Health, Inc.
18
19 COVINGTON & BURLING LLP   BY:  CHRISTOPHER K. EPPICH
20 ceppich@cov.com   1999 Avenue of the Stars
21 Los Angeles, California 90067   (424) 332-4764
22
23 and
24

## Page 787

```
 1   COVINGTON & BURLING LLP   BY:  ANDREW STANNER
 2   astanner@cov.com    KEVIN M. KELLY
 3   kkelly@cov.com   850 Tenth Street, NW
 4   Washington, DC 20001-4956   (202) 662-6000
 5   Counsel for McKesson Corporation
 6
 7   REED SMITH LLP   BY:  ROBERT A. NICHOLAS
 8   rnicholas@reedsmith.com    JOSEPH J. MAHADY
 9   jmahady@reedsmith.com    SHANNON MCCLURE
10   smcclure@reedsmith.com    (VIA REALTIME STREAM)
11   ABIGAIL PIERCE    abigail.pierce@reedsmith.com
12   (VIA REALTIME STREAM)    ANNE E. ROLLINS
13   arollins@reedsmith.com    (VIA REALTIME STREAM)
14   Three Logan Square    1717 Arch Street, Suite 3100
15   Philadelphia, Pennsylvania 19103   (215) 851-8100
16   Counsel for AmerisourceBergen
17
18   BARTLIT BECK LLP
19   BY:  LESTER C. HOUTZ    lester.houtz@bartlit-beck.com
20   1801 Wewatta Street, Suite 1200   Denver, Colorado 80202
21   (303) 592-3100
22   and
23
24
25
```

## Page 788

```
 1   BARTLIT BECK LLP
 2   BY:  KATHERINE SWIFT    kswift@bartlit-beck.com
 3   (VIA REALTIME STREAM)    54 West Hubbard Street, Suite 300
 4   Chicago, Illinois 60654   (312) 494-4400
 5   Counsel for Walgreens
 6
 7   JONES DAY   BY:  TARA A. FUMERTON
 8   tfumerton@jonesday.com    PATRICK J. BEISELL
 9   pbeisell@jonesday.com    (VIA REALTIME STREAM)
10   77 West Wacker   Chicago, Illinois 60601-1692
11   (312) 782-3939   Counsel for Walmart
12
13   ZUCKERMAN SPAEDER LLP
14   BY:  ANTHONY M. RUIZ    aruiz@zuckerman.com
15   1800 M Street NW, Suite 1000   Washington, DC 20036-5807
16   (202) 778-1800   Counsel for CVS Indiana, LLC, and
17   CVS RX Services, Inc.
18
19   ROPES & GRAY LLP   BY:  ANDREW O'CONNOR
20   andrew.o'connor@ropesgray.com    JOSHUA E. GOLDSTEIN
21   joshua.goldstein@ropesgray.com   800 Boylston Street
22   Boston, Massachusetts 02199-3600   (617) 951-7000
23   Counsel for Mallinckrodt
24
```

## Page 789

```
 1   MARCUS & SHAPIRA LLP   BY:  JOSHUA A. KOBRIN
 2   kobrin@Marcus-Shapira.com   301 Grant Street, 35th Floor
 3   Pittsburgh, Pennsylvania 15219-6401   (412) 338-4690
 4   Counsel for HBC
 5
 6   DECHERT LLP   BY:  MELANIE MACKAY
 7   melanie.mackay@dechert.com    35 West Wacker Drive, Suite 3400
 8   Chicago, Illinois 60601   (312) 646-5800
 9   Counsel for Purdue Pharma
10
11   BARNES & THORNBURG LLP   BY:  WILLIAM E. PADGETT
12   william.padgett@btlaw.com   11 South Meridian Street
13   Indianapolis, Indiana 46204   (317) 236-1313
14   Counsel for HD Smith
15
16   MORGAN, LEWIS & BOCKIUS LLP   BY:  JOHN P. LAVELLE, JR.
17   john.lavelle@morganlewis.com   1701 Market Street
18   Philadelphia, Pennsylvania 19103-2921   (215) 963-5000
19   Counsel for Rite Aid
20
21   KIRKLAND & ELLIS, LLP   BY:  KAITLYN COVERSTONE
22   kaitlyn.coverstone@kirkland.com   300 North LaSalle Street
23   Chicago, Illinois 60654   (312) 862-7184
24   Counsel for Allergan Finance, LLC
```

## Page 790

```
 1   FOLEY & LARDNER, LLP   BY:  KRISTINA J. MATIC
 2   kmatic@foley.com   777 East Wisconsin Avenue
 3   Milwaukee, Wisconsin 53202   (414) 297-5913
 4   Counsel for Actavis Laboratories   UT, Inc., Actavis Pharma, Inc.,
 5   ANDA, Inc., and Actavis, Inc.,   (N/k/a Allergan Finance, LLC, Watson
 6   Laboratories, Inc.
 7
 8   LOCKE LORD LLP   BY:  MADELEINE E. BRUNNER
 9   maddie.brunner@lockelord.com    (VIA TELECONFERENCE)
10   SARAH LANCASTER   (VIA REALTIME STREAM)
11   2200 Ross Avenue, Suite 2800   Dallas, Texas 75201
12   (214) 740-8445   Counsel for Henry Schein, Inc., and
13   Henry Schein Medical Systems, Inc.
14
15   FOX ROTHSCHILD LLP   BY:  STEPHAN CORNELL
16   Scornell@foxrothschild.com    (VIA TELECONFERENCE)
17   2700 Kelly Road, Suite 300   Warrington, Pennsylvania 18976-3624
18   (215) 918-3615   Counsel for Prescription Supply, Inc.
19
20   O'MELVENY & MYERS LLP
21   BY:  RYAN SNYDER    rsnyder@omm.com
22   (VIA TELECONFERENCE)   1999 Avenue of the Stars, 8th Floor
23   Los Angeles, California 90067   (213) 430-6326
```

1  ALSO PRESENT:
2  SPECIAL      MASTER     DAVID     R.    COHEN
   david@specialmaster.law
3  24400 Chagrin Boulevard, Suite 300  Cleveland, Ohio 44122
4  (216) 831-0001
5  JENNA N. FORSTER, paralegal, Motley
6  Rice
7  KAITLYN EEKHOFF, paralegal, Motley Rice  (VIA REALTIME
   STREAM)
8
9  VIDEOGRAPHER:
10 DAN LAWLOR,  Golkow Litigation Services
11
12 TRIAL TECHNICIAN:
13 JAMES BELL,  Golkow Litigation Services
14
15
16
17
18
19
20
21
22
23
24

1  INDEX
2  PAGE
3  APPEARANCES..................................... 784
4  EXAMINATIONS
5  BY MR. FARRELL............................ 801
6  BY MS. SINGER.............................. 861
7  BY MR. MAHADY.............................1060
8  BY MS. FUMERTON..........................1169
9  BY MR. O'CONNOR...........................1187
10 BY MR. EPPICH.............................1201
11 BY MS. MAINIGI............................1203
12
13 EXHIBITS
14 No.  Description   Page
15 Prevoznik P17  Seminar Report Controlled  800     Substances
   Manufacturers and
16 Wholesalers Seminar, San    Antonio, Texas, April 7-9,
17 1987,    US-DEA-00025656 -
18 US-DEA-00025659
19 Prevoznik P18  NWDA Suspicious Order  806     Monitoring
   Systems,
20 US-DEA-00026139 -    US-DEA-00026150
21 Prevoznik P19  December 27, 1988 letter  811
22 from Ronald W. Buzzeo to    Walgreen Company,
23 US-DEA-00025683
24

1  Prevoznik P20  December 8, 1993 letter,   816     Excessive
   Purchase Reports,
2  Phillip E. Jordan and Gene   R. Haislip,
3  US-DEA-00026154 -    US-DEA-00026155
4  Prevoznik P21  Federal Register, Volume 62,   828
5  Number 233, Wednesday,    November 19, 1997, Notices,
6  US-DEA-00025302
7  Prevoznik   July 23, 1998 letter from  1070    Defendant 22
   Patricia M. Good to Bergen
8  Brunswig Corporation,   US-DEA-00025671
9  Prevoznik P22  August 16, 2005 DEA   834
10 Memorandum on Internet    Presentation with
11 AmerisourceBergen on August    10, 2005,
12 US-DEA-00000147 -    US-DEA-00000164
13 Prevoznik  Bergen Brunswig Corporation   1079
   Defendant 23   September 30, 1996 letter to    Mr. G. Thomas
   Gitchel,
14
15 ABDCMDL00269355 -   ABDCMDL00269358
16 Prevoznik P23  August 23, 2005 DEA   834
17 Memorandum on Meeting with    Cardinal Health, Inc.,
18 Concerning Internet    Pharmacies,
19 US-DEA-00000352 -    US-DEA-00000366
20 Prevoznik P24  December 6, 2005 DEA   834
21 Memorandum on Conference    Call with Mr. John Gilbert,
22 US-DEA-00000369 -    US-DEA-00000370
23 Prevoznik  Not Marked
24 Defendant 24

1  Prevoznik   December 30, 1997 letter  1122    Defendant 25
   from Bergen Brunswig
2  Corporation to Mr. G. Thomas    Gitchel,
3  ABDCMDL00269350 -    ABDCMDL00269351
4  Prevoznik P25  January 23, 2006 DEA   834
5  Memorandum on Meeting    Between Office of Diversion
6  Control (OD) and McKesson    Corp. On January 3, 2006,
7  US-DEA-00000371 -    US-DEA-00000373
8  Prevoznik  October 29, 1996 Letter to 1102
   Defendant 26   Bergen Brunswig Corporation    from Mr. G.
   Thomas Gitchel,
9
10 US-DEA-00025672 -    US-DEA-00025673
11 Prevoznik P26  January 14, 2008 letter to  850
12 Larry Cote from Jodi     Avergun,
13 CAH_MDL2804_01376788 -    CAH_MDL2804_01376809
14 Prevoznik  January 14, 2004 letter from   1140
15 Defendant 27  John R. McCarty to Mr. Steve    Mays,
16 ABDCMDL00315827
17 Prevoznik P27  January 23, 2008 letter from   856     Ronald
   W. Buzzeo to Jodi
18 Avergun,    CAH_MDL2804_03309960 -
19 CAH_MDL2804_03309971
20 Prevoznik   AmerisourceBergen   Memorandum   1144
   Defendant 28  dated October 25, 2004,
21 Subject ABC Awarded DEA    Certificate of Appreciation,
22 ABDCMDL00315829 -    ABDCMDL00315861
23

1 Prevoznik US DOJ DEA Diversion Control 1158 Defendant
29 Pharmaceutical Industry
2 Conference, September 11 & 12, 2007 - Houston, Texas
3 printout
4 Prevoznik P29 NWDA Suspicious Order 862 Monitoring System timeline
5 Prevoznik P30 DEA Pharmaceutical Industry 1160
6 Defendant 30 Conference, Wholesale Distribution, Diversion
7 Control Program, September 11, 2007,
8 ABDCMDL00037184 - ABDCMDL00037205
9 Prevoznik P30 Not Marked
10 P31 and P32
11 Prevoznik P33 DEA Diversion Investigators Manual, 866
12 CAH_MDL_PRIORPROD_DEA07_ 01176247 -
13 CAH_MDL_PRIORPROD_DEA07_ 01176558
14 Prevoznik P34 5126 Requirement to Report 871
15 Suspicious Orders, 96-2 Diversion Investigators
16 Manual 04/16/96
17 Prevoznik P35 Controlled Substances 874 Manual, National Wholesale
18 Druggists' Association, HDA_MDL_000219360 -
19 HDA_MDL_000219632
20 Prevoznik P36 NWDA Develops DEA Compliance 875 Institute to Reduce Industry
21 Exposure to Fines
22 Prevoznik P37 DEA Compliance Manual, 885 Cardinal Health,
23 CAH_MDL_PRIORPRO DEA07_ 01178834 -

1 Prevoznik P45 Draft Options for Controlled 958 Substance Regulatory and
2 Related Activity for Review Purpose Only - Not for
3 External Circulation, CAH_MDL2804_01530082 -
4 CAH_MDL2804_01530084
5 Prevoznik P46 E&C, Red Flags and Warning 963 Signs Ignored: Opioid
6 Distribution and Enforcement Concerns in West Virginia,
7 Prepared by the Energy and Commerce Committee, Majority
8 Staff, PPLP0300001799742
9 Prevoznik P47 DEA/OD 11th Pharmaceutical 981
10 Industry Conference, Risk Management of Pharmaceutical
11 Controlled Substances, Tuesday, September 16, New
12 Orleans, Louisiana, PPLP0300001799742
13 Prevoznik P48 Office of Chief Counsel, DEA 986
14 PowerPoint, CAH_MDL2804_00889528 -
15 CAH_MDL2804_00889540
16 Prevoznik P49 15th Annual Controlled 993 Substance, PDMA and State
17 Conference, It's What You Know and Who You Know, D.
18 Linden Barber, April 19, 2012,
19 A n d a _ O p i o i d s _ M D L _ 0 0 0 0 4 7 6 0 5 2 - Anda_Opioids_MDL_0000476080
20 Prevoznik P50 Slide on Dr. Syed Jawed 1000
21 Akhtar-Zaidi - Solon, OH
22 Prevoznik P51 Slide on Dr. Adolph Harper - 1002 Akron, OH
23

1 Prevoznik P38 Transcript of Videotaped 893 Deposition of Thomas
2 Prevoznik, April 17, 2019
3 Prevoznik P39 Industry Compliance 899 Guidelines, HDMA Industry
4 Compliance Guidelines: Reporting Suspicious Orders
5 and Preventing Diversion of Controlled Substances,
6 CAH_MDL2804_00988458 - CAH_MDL2804_00988472
7 Prevoznik P40 Draft DEA Comments from the 923
8 6-04-08 Meeting on Suspicious Orders,
9 CAH_MDL2804_03234535 - CAH_MDL2804_03234540
10 Prevoznik P41 US DEA September 27, 2006 935
11 letter from Joseph T. Rannazzisi,
12 MNK-Ti_0000421086 - MNK-Ti_0000421089
13 Prevoznik P42 "American Pain: The largest 948
14 U.S. Pill Mill's Rise and Fall," Felix Gillette, June
15 6, 2012
16 Prevoznik P43 Re: Report on House Energy & 951 Commerce Subcommittee on DEA
17 and FDA Transparency, MCKMDL0066143 -
18 MCKMDL0066145
19 Prevoznik P44 Summary of DEA-HDMA Meeting 955 (Dec. 19, 201) By the
20 Healthcare Distribution Management Association,
21 Confidential, ABDCMDL00139028 -
22 ABDCMDL00139031
23

1 Prevoznik P52 United States of America vs. 1002 Adolph Harper, Jr.,
2 Government's Sentencing Memorandum,
3 PLTF_2804_000013676 - PLTF_2804_000013694
4 Prevoznik P53 Photo of monkeys, hear no 1008
5 evil, see no evil, speak no evil
6 Prevoznik P54 DEA Update Notes, Mark 1012
7 Caverly and James Crawford, MNK-T1_0008504654 -
8 MNK-T1_0008504657
9 Prevoznik P55 Executive Summary Regarding 1015 the HDMA document,
10 MCKMDL00561303 - MCKMDL00561306
11 Prevoznik P56 DEA Enforcement Actions 1022
12 Against Distributors and Pharmacies timeline
13 Prevoznik P57 US DOJ January 30, 2018 1040
14 letter to Honorable Dan A. Polster
15 Prevoznik P58 Declaration of Michael L. 1049
16 Arpaio, DEA_Rannazzisi-00006060 -
17 DEA_Rannazzisi-00006061
18 Prevoznik P59 Statement of Demetra Ashley 1055 before the Judiciary
19 Committee, United States Senate, December 12, 2017
20 Prevoznik P60 US DEA PowerPoint 1058
21 "Prescription Opioids to Heroin: A Natural
22 Progression," June 14, 2014, DEA_Rannazzisi-00003482
23
24

1
2  CERTIFICATE.................................1265
3  ACKNOWLEDGMENT OF DEPONENT..................... 1267
4  ERRATA.................................1268
5  LAWYER'S NOTES.............................1269
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  VIDEOGRAPHER:  We are now on
2  the record.  My name is Dan Lawlor.
3  I'm a videographer with Golkow
4  Litigation Services.
5  Today's date is May 17, 2019,
6  and the time is 8:10 a.m.
7  This video deposition is being
8  held in Washington, DC, in the matter
9  of National Prescription Opiate
10  Litigation, MDL Number 2804.
11  The deponent is Thomas
12  Prevoznik.
13  Counsel will be noted on the
14  stenographic record.
15  The court reporter is Carrie
16  Campbell and will now swear in the
17  witness.
18
19  THOMAS PREVOZNIK,
20  of lawful age, having been first duly sworn
21  to tell the truth, the whole truth and
22  nothing but the truth, deposes and says on
23  behalf of the Plaintiffs, as follows:
24  (Prevoznik Plaintiff Exhibit
25  P17 marked for identification.

1  EXAMINATION (continued)
2  QUESTIONS BY MR. FARRELL:
3  Q. Good morning.
4  A. Good morning.
5  Q. Welcome back to day three of
6  your deposition, Mr. Prevoznik.
7  I'll remind you or let me ask
8  you to recall that today you'll be testifying
9  on behalf of the United States Drug
10  Enforcement Administration, the DEA, on
11  subject matters that have been requested in
12  this litigation.
13  Continuing the line of
14  discussion, I'm going to -- I have marked,
15  premarked, and am showing you Plaintiff's
16  Exhibit 17, and the first thing I'd like to
17  do is I'd like to direct your attention to
18  the bottom right-hand corner.
19  And you see the numbers
20  US-DEA-00025656?
21  A. Yes, I do.
22  Q. I'll represent to you that's a
23  Bate stamp number provided by the Department
24  of Justice.  And what I wanted to do was to
25  lay a little foundation on the documents that

1  bear such a Bate stamp.
2  The DEA has produced through
3  the United States Department of Justice more
4  than 6,000 documents in this litigation
5  spanning more than 26,000 pages.
6  Do you acknowledge as the
7  representative of the DEA that all such
8  documents bearing the US DEA Bates stamp are,
9  in fact, true and accurate photocopies of
10  documents in the possession, custody and
11  control of the DEA?
12  A. Yes.
13  Sorry.
14  MR. FINKELSTEIN:  Tom.  Scope.
15  You can answer.
16  MR. EPPICH:  Objection.
17  Foundation.
18  THE WITNESS:  Yes.
19  QUESTIONS BY MR. FARRELL:
20  Q. And the DEA is, in fact, the
21  custodian of these documents?
22  MR. FINKELSTEIN:  Scope.
23  MR. O'CONNOR:  Objection.
24  Foundation.
25  THE WITNESS:  Yes.

1  QUESTIONS BY MR. FARRELL:
2  Q. So as the DEA, you acknowledge
3  that the documents produced by the Department
4  of Justice bearing this Bates stamp number
5  are documents that come from the DEA which
6  are held in the usual course of the regularly
7  conducted activity of the DEA?
8  MR. FINKELSTEIN:  Scope.
9  MR. EPPICH:  Objection.
10 Foundation.
11 MR. O'CONNOR:  Objection.
12 MR. FINKELSTEIN:  You can
13 answer.
14 THE WITNESS:  Yes.
15 QUESTIONS BY MR. FARRELL:
16 Q. All right.  Moving to the first
17 document, P17.
18 Do you recognize this document?
19 And this isn't Jeopardy.  This document
20 actually was included in your reliance
21 materials.
22 But could you tell the jury
23 what this document is?
24 A. This document is a report based
25 off of a meeting, a conference that was held

1  for manufacturers and wholesalers that we
2  sponsor.
3  Q. And what is the date?
4  A. April 7th through the 9th,
5  1987.
6  Q. I'm going to have you flip to
7  the very back page of the four-page document
8  that was provided by the DEA, and you'll see
9  there that there is a provision that talks
10 about excessive order monitoring program.
11 Is this a document that was
12 prepared by the DEA?
13 MR. EPPICH:  Objection.
14 Foundation.
15 THE WITNESS:  Yes.
16 QUESTIONS BY MR. FARRELL:
17 Q. So when you're reading this on
18 behalf of the DEA, the very first sentence
19 referenced the fact that the program was
20 chaired by Ronald Buzzeo.
21 Does the DEA know Ronald
22 Buzzeo?
23 A. Yes.
24 Q. Who is Ronald Buzzeo?
25 A. He was a senior manager within

1  DEA back at this time.  I don't know what his
2  specific title was back then.
3  Q. You'll see that in the
4  provision on the demonstrative that I've
5  highlighted, the last sentence of the first
6  paragraph, would you please read that into
7  the record?
8  MR. FINKELSTEIN:  Starting with
9  "another area" or somewhere else?
10 MR. FARRELL:  No, right above
11 it.  The last sentence of that first
12 paragraph.
13 THE WITNESS:  The NWA?
14 QUESTIONS BY MR. FARRELL:
15 Q. Yes, sir.
16 A. "The NWA system, for example,
17 provide an excellent look-back, or trend
18 system, but the ability to identify one-time
19 suspicious orders should not be overlooked as
20 an element of a program."
21 Q. Is that consistent with the
22 guidance the DEA has provided manufacturers
23 and distributors regarding their obligations
24 under the Controlled Substances Act and the
25 regulations promulgated by the DEA?

1  MR. EPPICH:  Object to form.
2  MS. MAINIGI:  Objection.
3  THE WITNESS:  Yes.
4  QUESTIONS BY MR. FARRELL:
5  Q. Okay.  So when we're talking
6  about the NWDA system, we have previously put
7  into the record the NWDA, but recently we've
8  gotten another document, another version of
9  the document, and I'm going to have it marked
10 as P18.
11 (Prevoznik Plaintiff Exhibit
12 P18 marked for identification.)
13 QUESTIONS BY MR. FARRELL:
14 Q. So this is identical to the
15 document that has been circulated in
16 litigation before, but as you recall from the
17 last time we met, there were two pages at the
18 back of this document that were missing.
19 So the first thing I want to do
20 is note that -- you see at the bottom
21 right-hand corner there is a US DEA Bates
22 stamp of 00026139?
23 A. Correct.
24 Q. And what I'd like to do is I'd
25 like to address your attention to what is

1  page 7 of this policy.
2  **And again, building on the**
3  **testimony from the previous two days without**
4  **repeating it, I'm going to show you the**
5  **bottom right-hand corner is US-DEA-00026146,**
6  **and I'd ask you to read Roman Numeral IX into**
7  **the record.**
8  **A. "Single suspicious orders.**
9  **Single orders of unusual size or deviation**
10  **must be reported immediately.  The submission**
11  **of a monthly printout of after-the-fact sales**
12  **will not relieve a registrant from the**
13  **responsibility of reporting these single**
14  **excessive or suspicious orders.  DEA has**
15  **interpreted 'orders' to mean prior to**
16  **shipment."**
17  **Q. So my question to you is, is**
18  **this consistent with the guidance provided by**
19  **the DEA to wholesalers and distributors?**
20  MR. EPPICH:  Objection.
21  Foundation.
22  MS. MAINIGI:  Objection.
23  Foundation.
24  **THE WITNESS:  Yes.**
25

1  QUESTIONS BY MR. FARRELL:
2  Q. Is this consistent with the
3  guidance provided by Ronald Buzzeo at the
4  San Antonio conference hosted by the DEA?
5  MR. EPPICH:  Objection.
6  Foundation.  Calls for speculation.
7  MR. FINKELSTEIN:  Scope.
8  You can answer, if you know.
9  MS. MAINIGI:  Scope.
10  THE WITNESS:  Looking at the
11  two, yes.
12  QUESTIONS BY MR. FARRELL:
13  Q. Now, I'm going to have you turn
14  to the NWDA policy and the comments that come
15  from the DEA that were previously discussed,
16  but I'm going to reference the Bates stamp
17  numbers in the bottom right-hand corner,
18  including US-DEA-00026148.  It's dated
19  April 24, 1984.
20  Have you found it?
21  A. Yes.
22  Q. Okay.  And again, we've already
23  established the foundation for this, but
24  we'll do it again.
25  Do you recognize this document?

1  MR. EPPICH:  Object to the
2  form.
3  THE WITNESS:  Yes.
4  QUESTIONS BY MR. FARRELL:
5  Q. Okay.  As the DEA, can you tell
6  me on page 2 who the author of this document
7  is?
8  A. Thomas Gitchel.
9  Q. And who is Thomas Gitchel?
10  A. He was -- at this point he was
11  the acting chief of diversion operations.
12  Q. Of the DEA?
13  A. Of the DEA.
14  Q. Okay.  And I've highlighted
15  down -- a particular provision for emphasis
16  to build on the previous two days' testimony.
17  Beginning with "As previously discussed,"
18  could you read that provision into the
19  record?
20  A. "An after-the-fact computer
21  printout of sales data does not relieve a
22  registrant of its responsibility to report
23  excessive or suspicious orders when
24  discovered."
25  Q. Is this consistent with the

1  guidance the DEA has provided to the
2  wholesalers and manufacturers of prescription
3  opioids?
4  MR. EPPICH:  Object to form.
5  THE WITNESS:  Yes.
6  QUESTIONS BY MR. FARRELL:
7  Q. I'm going to show you -- which
8  is the last page of this document.  And
9  you'll see in the bottom right-hand corner is
10  US-DEA-00026150.  It has the stamp of May 16,
11  1984.
12  And I would ask do you
13  recognize this document?
14  A. Yes.
15  Q. And what is it?
16  A. It's a letter from Mr. Gitchel,
17  again, from DEA to the National Wholesales
18  Druggists' Association.
19  Q. And again, I've highlighted for
20  your convenience the last sentence of the
21  first paragraph beginning with the word
22  "however," and I'ld ask for you to read it
23  into the record.
24  A. "However, I want to make it
25  clear that the submission of a monthly

1   printout of after-the-fact sales will not
2   relieve a registrant from the responsibility
3   of reporting excessive or suspicious orders.
4   DEA has interpreted 'orders' to mean prior to
5   shipment."
6   Q. Is this consistent with the
7   guidance the DEA has provided to wholesalers
8   and manufacturers of prescription opioids?
9   MS. MAINIGI:  Objection.
10  MR. EPPICH:  Objection.
11  THE WITNESS:  Yes.
12  (Prevoznik Plaintiff Exhibit
13  P19 marked for identification.)
14  QUESTIONS BY MR. FARRELL:
15  Q. The next document I'm going to
16  have marked as Plaintiff's Exhibit 19, it
17  bears Bate stamp US-DEA-00025683.  I'll give
18  you a second to take a look at it, but I'm
19  assuming you're familiar with this document.
20  Do you see the bottom
21  right-hand corner, it bears the Bates stamp
22  US DEA?
23  A. Yes.
24  Q. Do you recognize this document?
25  A. Yes.

1   Q. What is it?
2   A. It's a letter from Mr. Buzzeo,
3   who was at that point the deputy director of
4   diversion control, to Walgreens.
5   Q. And what's the date?
6   A. December 27, 1988.
7   Q. Okay.  Would you read the first
8   sentence that's emphasized on your monitor?
9   A. "References made to our
10  November 4, 1988 meeting regarding a proposed
11  system of detecting and reporting excessive
12  orders."
13  Q. All right.  If you look down at
14  the -- you can read the rest -- the first
15  paragraph, but I'm going to direct your
16  attention to the beginning of the second
17  paragraph where it states, "The Drug
18  Enforcement Administration supports the
19  effort by the Walgreen Company to provide a
20  uniform reporting procedure for its
21  warehouses."
22  Do you see that?
23  A. Yes.
24  Q. In fact, is this consistent
25  that the DEA has encouraged wholesalers and

1   distributors of prescription opioids to adopt
2   uniform reporting procedures?
3   MR. EPPICH:  Object to form.
4   Foundation.
5   THE WITNESS:  Yes.
6   QUESTIONS BY MR. FARRELL:
7   Q. All right.  What I'm going to
8   emphasize is the very last two sentences that
9   begin with "the submission."
10  Do you see that provision?
11  A. Yes.
12  Q. And I'd ask you to read that
13  into the record.
14  A. "The submission of a monthly
15  printout of after-the-fact sales does not
16  relieve the registrant of the responsibility
17  of reporting excessive or suspicious orders.
18  These regulations require that a registrant
19  maintain a system to detect excessive orders
20  rather than sales of controlled substances."
21  Q. Is this statement consistent
22  with the guidance provided by the DEA to
23  wholesale distributors and manufacturers of
24  prescription opioids?
25  MR. EPPICH:  Object to form.

1   Foundation.
2   THE WITNESS:  Yes.
3   QUESTIONS BY MR. FARRELL:
4   Q. Now, not only being consistent,
5   this, in fact, is the actual statement
6   provided by the DEA to Walgreens, agreed?
7   MR. EPPICH:  Object to form.
8   Foundation.
9   THE WITNESS:  Yes.
10  QUESTIONS BY MR. FARRELL:
11  Q. Would you agree with me that
12  since at least 1988, Walgreens has been on
13  notice from the DEA that if they rely upon
14  after-the-fact sales to comply with the
15  Controlled Substances Act and the regulations
16  promulgated by the DEA, that they may not be
17  in compliance with federal law?
18  MR. EPPICH:  Object to form.
19  Foundation.
20  THE WITNESS:  Yes.
21  QUESTIONS BY MR. FARRELL:
22  Q. If any of the wholesale
23  distributors or manufacturers of prescription
24  opioids rely upon after-the-fact reporting of
25  excessive orders to -- as the system they

1   designed under 1301.74(b), is that sufficient
2   to comply with federal law?
3   MR. EPPICH:  Object to form.
4   Foundation.
5   MR. MAHADY:  Objection.  Vague.
6   THE WITNESS:  Could you please
7   repeat it?
8   QUESTIONS BY MR. FARRELL:
9   **Q. If any distributor of**
10  **prescription opioids relies upon**
11  **after-the-fact sales reporting as the full**
12  **scope of its compliance with 1301.74(b), does**
13  **the DEA believe that it's sufficient to**
14  **satisfy the obligations under federal law?**
15  MS. MAINIGI:  Objection.
16  MR. EPPICH:  Object to form.
17  Foundation.  Vague.
18  **THE WITNESS:  No.**
19  QUESTIONS BY MR. FARRELL:
20  Q. If any expert witness in this
21  litigation argues that after-the-fact sales
22  are sufficient to comply with federal
23  regulations, is the expert witness right or
24  wrong?
25  MS. MAINIGI:  Objection to

1   form.  Scope.
2   MR. EPPICH:  Objection.
3   THE WITNESS:  They would be
4   wrong.
5   (Prevoznik Plaintiff's Exhibit
6   P20 marked for identification.)
7   QUESTIONS BY MR. FARRELL:
8   Q. The next document I'm going to
9   have marked is P20.
10  And I'll direct your attention
11  to the bottom right-hand corner with the
12  Bates stamp US-DEA-00026154.  It has the
13  stamp of December 8, 1993, and I'm going to
14  ask you if you recognize this document.
15  A. Yes.
16  Q. What is this document?
17  A. This is an internal document
18  from Gene Haislip, our director of Office and
19  Diversion Control DEA, to the SAC, or special
20  agent in charge, of our Dallas field
21  division.
22  Q. Okay.  Is this the type of
23  document that the DEA keeps in the course of
24  its regularly conducted activity?
25  A. Yes.

1   Q. Okay.  Was this record made at
2   or near the time of someone with knowledge
3   about the conversations therein?
4   MR. FINKELSTEIN:  Scope.
5   MR. EPPICH:  Objection.
6   MS. MAINIGI:  Objection.
7   Scope.  Form.  Foundation.
8   MR. FINKELSTEIN:  Scope.
9   You can answer.
10  THE WITNESS:  Yes.
11  QUESTIONS BY MR. FARRELL:
12  Q. It appears, to give you the
13  short form of it, that this is a discussion
14  between Mr. Haislip and a Mr. Jordan.
15  Who is Mr. Haislip?
16  A. He was the director of the
17  Office of Diversion Control for DEA.
18  Q. What does that mean?
19  A. He's in charge of the diversion
20  program within DEA.
21  Q. So in the ranking, in my mind,
22  where does that put him in the rank?
23  A. He's the top.
24  Q. And then Mr. Jordan.  Who is
25  Mr. Jordan?

1   A. He's the special agent in
2   charge of our Dallas field division, so he's
3   the head of the entire DEA Dallas field
4   division.
5   Q. And how many different field
6   divisions are there?
7   A. At this time or now?
8   Q. At this time.
9   If the DEA remembers in its
10  official capacity.
11  A. Yeah, I don't -- I'd be
12  speculating.  I think it was 20.
13  Q. 20?
14  A. We're now up to 23.
15  Q. And how many people were in the
16  cog between the field division boss and the
17  director?
18  Is there two levels, three
19  levels of reporting or there?
20  MR. FINKELSTEIN:  Vague as to
21  time.
22  QUESTIONS BY MR. FARRELL:
23  Q. In 1993.
24  A. I'm not sure I understand what
25  you're asking.

1   Q. I'm just trying to figure out
2   this communication.
3   Is it normal for a field
4   division boss to be communicating directly
5   with the director?
6   A. Yeah.  I mean, they're both
7   SESes, so they're both --
8   Q. Okay.
9   A. They're both the same level.
10  Q. They're the same rank?
11  A. Yes.
12  Q. All right.  So it appears that
13  this is a discussion on whether or not the
14  DEA is going to provide guidelines on
15  suspicious order reporting.
16  Do you see that?
17  A. Yes.
18  Q. And I'd ask you to begin
19  reading, as you see in the second paragraph,
20  their discussion 1301.74(b).
21  Do you see that?
22  A. Yes.
23  Q. Now, this is in 1993.
24  Is 1301.74(b) the same in 1993
25  as it is today?

1   A. Yes.
2   Q. And is it the same in all
3   meaningful ways to what it looked like when
4   it was enacted in 1971?
5   A. Yes.
6   Q. So beginning with
7   "Section 1301.74(b)," could you read the next
8   sentence?
9   A. "1301.74(b) of Title 21 of the
10  Code of Federal Regulations clearly places
11  the responsibility for designing and
12  operating a system to identify suspicious
13  orders of controlled substances on the
14  registrant.  Implicit in this regulation is
15  the idea that the registrant should not
16  merely be accumulating data on what appear to
17  be excessive purchases for eventual
18  submission to DEA but rather that the system
19  be monitored so that any such orders will be
20  apparent to the registrant so that they -- so
21  that they can be reported to DEA upon
22  discovery and, whenever possible, before the
23  order is shipped."
24  Q. Is this consistent with the
25  guidance provided by the DEA to wholesale

1   distributors and manufacturers of
2   prescription opioids?
3   MR. EPPICH:  Object to form.
4   Foundation.
5   THE WITNESS:  Yes.
6   QUESTIONS BY MR. FARRELL:
7   Q. Now, again, we're going to be
8   talking about the NWDA again.
9   Do you see the beginning of the
10  second paragraph?
11  And it references the fact that
12  the DEA was, in fact, aware that the -- some
13  of the distributors were adopting the NWDA
14  suspicious order monitoring system.
15  Beginning with where I've
16  highlighted, can you please read that into
17  the record?
18  A. Start with "can"?
19  Q. You can, like, a lib to get to
20  can, but, yeah.
21  MR. EPPICH:  Objection.
22  THE WITNESS:  "The NWDA
23  suspicious order monitoring system,
24  SOM, which has been adopted by many
25  distributors throughout the United

1   States, can be an effective monitoring
2   and reporting system provided that the
3   firm's using it to recognize their
4   responsibility to actively monitor
5   sales to detect suspicious orders."
6   QUESTIONS BY MR. FARRELL:
7   Q. Is this consistent with the
8   guidance provided by the DEA to wholesale
9   distributors and manufacturers of
10  prescription opioids?
11  MR. EPPICH:  Object to form.
12  Foundation.
13  THE WITNESS:  Yes.
14  QUESTIONS BY MR. FARRELL:
15  **Q. Now, at the very bottom, there**
16  **is a discussion from the director beginning**
17  **with the last paragraph on the bottom of the**
18  **page beginning "what is -- what is of**
19  **particular concern."**
20  **Can you please read that into**
21  **the record?**
22  **A. "What is of particular concern**
23  **to me is the statement that appears on the**
24  **report submitted by the McKesson Corporation**
25  **in Fort Worth, Texas.  For example, 'With the**

1    submission of this report, we are leaving to
2    the DEA the final determination of whether
3    they are suspicious or unusual.'  This
4    position is unacceptable and clearly in
5    contravention to the requirements of 21 CFR
6    1301.74(b).
7    "A registrant whose own
8    personnel are in the best position to
9    determine what is excessive or unusual based
10   on knowledge of their customers and usual
11   purchasing practices may not abrogate its
12   responsibility to identify suspicious orders
13   and to determine whether to ship or refuse to
14   ship the controlled substance order.
15   "The registrant must also
16   report any suspicious orders as soon as
17   possible to the DEA.  This has been conveyed
18   to the McKesson national management in San
19   Francisco, and they have agreed to remove the
20   statement from reports."
21   Q. So on behalf of the DEA, can
22   you validate that this is a true and accurate
23   summary of the conversation between the DEA
24   and McKesson?
25   MR. FINKELSTEIN:  Scope.

1    MR. MAHADY:  Object to form.
2    THE WITNESS:  Yes.
3    QUESTIONS BY MR. FARRELL:
4    Q. Is this consistent with the
5    guidance that DEA provided not only to
6    McKesson but to every other wholesale
7    distributor and manufacturer of prescription
8    opioids?
9    MR. EPPICH:  Object to form.
10   Foundation.
11   MR. MAHADY:  Objection.
12   MR. FINKELSTEIN:  Scope.
13   THE WITNESS:  Yes.
14   QUESTIONS BY MR. FARRELL:
15   Q. Now, follow up real quick.  You
16   see here where it says that "a registrant may
17   not abrogate its responsibility"?  I have a
18   follow-up question to that.
19   Is a registrant permitted to
20   delegate this -- its obligations to design
21   and operate a system to maintain effective
22   control against diversion to a third party
23   and avoid being held responsible by the DEA?
24   MR. EPPICH:  Object to form.
25   THE WITNESS:  Could you please

1    repeat that?
2    QUESTIONS BY MR. FARRELL:
3    Q. Is a registrant allowed to
4    delegate its obligations under 1301.74(b) to
5    another party to perform and escape liability
6    from the DEA for failure to comply?
7    MR. EPPICH:  Objection to form.
8    MR. MAHADY:  Foundation.
9    MR. FINKELSTEIN:  Scope.
10   THE WITNESS:  No.
11   QUESTIONS BY MR. FARRELL:
12   Q. So if a registrant that has an
13   obligation under the CSA delegates the
14   responsibilities to, say, UPS and/or Federal
15   Express and a violation occurs, is the
16   registrant ultimately still responsible for
17   those violations?
18   MR. EPPICH:  Objection to form.
19   Calls for a legal conclusion.  Scope.
20   MR. FINKELSTEIN:  Incomplete
21   hypothetical.
22   THE WITNESS:  I'm sorry, can
23   you please repeat it?
24   QUESTIONS BY MR. FARRELL:
25   Q. If Actavis delegates to UPS

1    their obligations to maintain effective
2    control, and the DEA determines in their best
3    judgment and upon investigation that a
4    violation has occurred, does the DEA take the
5    position that Actavis is still ultimately
6    responsible for the violation?
7    MS. MATIC:  Objection to form.
8    MR. EPPICH:  Object to form.
9    Calls for a legal conclusion.  Scope.
10   THE WITNESS:  Yes.
11   QUESTIONS BY MR. FARRELL:
12   Q. Would the DEA in fact
13   investigate and, if they found probable
14   cause, prosecute both UPS and Actavis under
15   that hypothetical?
16   MS. MAINIGI:  Objection.
17   Scope.  Calls for a legal conclusion.
18   Hypothetical.  Form.
19   MR. FINKELSTEIN:  Let me
20   object.  Scope.
21   THE WITNESS:  I would agree we
22   would investigate.  I don't -- I don't
23   know where the investigation would go,
24   but we would investigate it.
25

1  QUESTIONS BY MR. FARRELL:
2  Q. And if you found that UPS
3  violated the Controlled Substances Act, would
4  you prosecute both UPS and Actavis?
5  A. It, again, depends --
6  MS. MAINIGI:  Same objections.
7  MR. FINKELSTEIN:  Scope.
8  THE WITNESS:  Depends on what
9  the evidence shows, but we would
10  investigate it, both parties.
11  QUESTIONS BY MR. FARRELL:
12  Q. That's fair.  It's tough to
13  give a hypothetical with this scenario, so
14  let me see if I can be more direct.
15  If Cardinal Health delegates
16  its obligations under 1301.74(b) to CVS to
17  police themselves, is that -- does the DEA
18  consider that in compliance with federal law?
19  MS. MAINIGI:  Objection.
20  Scope.  Incomplete hypothetical.
21  Foundation.  Form.
22  MR. FINKELSTEIN:  Join as to
23  incomplete hypothetical.
24  THE WITNESS:  No.
25  (Prevoznik Plaintiff's Exhibit

1  P21 marked for identification.)
2  QUESTIONS BY MR. FARRELL:
3  Q. I'm going to mark next what's
4  going to be P21 and hand it to you.  And I'll
5  have you look at the bottom right-hand
6  corner.  You'll note that there's a Bates
7  stamp US-DEA-00025302.
8  Do you recognize this document?
9  A. Yes.
10  Q. What is it?
11  A. It's a Federal Register
12  announcing that there's going to be a meeting
13  for the task force on suspicious orders
14  December 16th and 17th of 1997.
15  Q. Does the DEA publish in the
16  Federal Register notices for the entire world
17  that can read English to read?
18  MS. MAINIGI:  Objection.
19  THE WITNESS:  Yes.
20  QUESTIONS BY MR. FARRELL:
21  Q. You'll note that this in
22  particular Federal Register action has been
23  labeled "Notice of Establishment of Task
24  Force on Suspicious Orders."
25  Do you see that?

1  A. Is this a different...
2  Q. It should be the same one.  If
3  you look at what I highlighted there, it's
4  only one page.
5  A. It's only one page?
6  Q. Yeah.  You see where my finger
7  is right here?
8  A. That one.  Sorry.  Yeah.
9  Sorry, I'm good.
10  Q. All right.  Now, if you look,
11  I'm going to -- I'm going to give you a
12  chance to take a read, but I'm going to
13  summarize it for you.
14  Is this the DEA's publication
15  and notice to the public that it was forming
16  a task force on suspicious orders pursuant to
17  the Comprehensive Methamphetamine Control Act
18  of 1996?
19  MR. FINKELSTEIN:  Take your
20  time to read it if you need to.
21  MS. MAINIGI:  Objection.
22  THE WITNESS:  Yes.
23  QUESTIONS BY MR. FARRELL:
24  Q. All right.  Now, when you look
25  at the public notice, it states that "the DEA

1  is establishing a task force on suspicious
2  orders for the purpose of developing
3  proposals to define suspicious orders of
4  listed chemicals."
5  Do you see that?
6  A. Yes.
7  Q. As we discussed at length
8  before, prescription opioids are not
9  necessarily listed chemicals, are they?
10  MR. EPPICH:  Object to form.
11  Foundation.  Calls for speculation.
12  THE WITNESS:  Yes.
13  QUESTIONS BY MR. FARRELL:
14  Q. Well, let's be a little more
15  direct.
16  The DEA makes proposals and
17  provides input on what should be a listed
18  chemical and what should be a controlled
19  substance, agreed?
20  A. Agreed.
21  Q. And the listed chemicals that
22  they're referencing in this public notice for
23  this task force relate to the Methamphetamine
24  Act and ephedrine and pseudoephedrine used to
25  make methamphetamine --

1  MR. EPPICH:  Object to the
2  form.
3  QUESTIONS BY MR. FARRELL:
4  Q. Agreed?
5  MR. EPPICH:  Objection.  Form.
6  THE WITNESS:  Yes.
7  QUESTIONS BY MR. FARRELL:
8  Q. And as we discussed previously,
9  suspicious orders of listed chemicals used to
10  make methamphetamine are defined as orders
11  that are extraordinary in size, agreed?
12  MR. FINKELSTEIN:  Objection to
13  form.  Calls for speculation.
14  THE WITNESS:  Agreed.
15  QUESTIONS BY MR. FARRELL:
16  Q. And there's a different
17  standard and a different regulation that
18  govern controlled substances or suspicious
19  orders of controlled substances, agreed?
20  MR. EPPICH:  Objection to form.
21  THE WITNESS:  Agreed.
22  QUESTIONS BY MR. FARRELL:
23  Q. Now, when you look at this
24  notice, it says, "The proposals establish
25  guidelines that will adequately define

1  suspicious orders of listed chemicals."
2  Do you see that?
3  A. Yes.
4  Q. Does the DEA believe this task
5  force was assigned the project of defining
6  suspicious orders of controlled substances
7  that don't contain listed chemicals?
8  MR. EPPICH:  Object to form.
9  Calls for speculation.  Foundation.
10  THE WITNESS:  No.
11  QUESTIONS BY MR. FARRELL:
12  Q. So the DEA not only was on this
13  task force, it was assigned the obligation by
14  Congress to form this task force.  So I'm not
15  asking you to speculate.  I'm asking the DEA
16  itself.
17  When you promulgated this
18  report to the Attorney General, were you
19  intending to provide any guidance to the
20  wholesale distributors and manufacturers of
21  prescription opioids that it should be using
22  the standards therein to measure whether or
23  not a suspicious order of controlled
24  substances falls under the federal
25  regulations?

1  MR. EPPICH:  Object to form.
2  MR. O'CONNOR:  Objection.
3  Foundation.
4  MS. MAINIGI:  Also scope.
5  THE WITNESS:  No.
6  QUESTIONS BY MR. FARRELL:
7  Q. Now, if you look at the bottom
8  right-hand corner, you'll see who the DEA was
9  tasked to add to this task force.
10  Did the DEA, in fact, add to
11  this task force a member from the National
12  Association of Boards of Pharmacy?
13  A. Yes.
14  Q. And members from the Chemical
15  Manufacturers Association?
16  A. Yes.
17  Q. And members from the National
18  Association of Chemical Distributors?
19  A. Yes.
20  Q. And a member from the
21  Nonprescription Drug Manufacturers
22  Association?
23  A. Yes.
24  Q. And, in fact, four members from
25  the wholesale and retail pharmaceutical

1  marketing associations?
2  A. Yes.
3  (Prevoznik Plaintiff Exhibits
4  P22, P23, P24 and P25 marked for
5  identification.)
6  QUESTIONS BY MR. FARRELL:
7  Q. All right.  I've got three
8  documents I'm going to show you now, and
9  they're going to be marked separately P22,
10  P23 and P24.  Oops, and P25.  There's four
11  documents in total.
12  And I'll give you a second to
13  review it while we pass it around the table.
14  MR. FINKELSTEIN:  I have three
15  documents.  Because mine are not
16  marked, perhaps you can just tell me
17  which is which in terms of exhibit
18  number?
19  MR. FARRELL:  Yeah, the
20  first -- they should be in
21  chronological order.  So it should go
22  AmerisourceBergen first.  The top
23  right is August 16, 2005, Bates stamp
24  US-DEA-00000147.
25  The next one should be --

1  MR. FINKELSTEIN:  You didn't
2  give me 147.
3  Okay.  147 is 22, correct?
4  MR. FARRELL:  Yes.
5  MR. FINKELSTEIN:  Okay.
6  MR. FARRELL:  The next one is
7  Cardinal Health, I believe, and it
8  bears Bates stamp US-DEA, a bunch of
9  zeros, and then 352.
10 MR. FINKELSTEIN:  Okay.
11 MR. FARRELL:  Then the next
12 one, I believe, should be December 6,
13 2005, and in the bottom right-hand
14 corner is US-DEA-00000369.
15 And then the final one is dated
16 January 23, 2006, in the bottom
17 right-hand corner is US-DEA-00000371.
18 MR. FINKELSTEIN:  Okay.
19 QUESTIONS BY MR. FARRELL:
20 Q. Let me know when you're ready
21 to proceed.
22 Do you want to take a few
23 minutes to read these?
24 A. Yes, please.
25 Q. Do you want to take a quick

1  break while we do so?
2  MS. SINGER:  Let's keep going.
3  MR. EPPICH:  Do we typically go
4  off the record to review documents?
5  SPECIAL MASTER COHEN:  No.
6  MR. FARRELL:  I didn't say
7  that.  I said -- I asked him if he
8  wanted to take a break, and he said
9  no.
10 QUESTIONS BY MR. FARRELL:
11 Q. I don't know if this will save
12 you some time.  I'm not intending on quizzing
13 you on the contents of these, other than
14 establishing what they are and the foundation
15 for what the DEA was doing.
16 A. Okay.
17 Q. I'm going to ask you first:  Do
18 you recognize these documents?
19 A. Yes.
20 Q. Okay.  What are they
21 collectively?
22 A. Collectively they represent
23 what happened with meetings with the
24 respective registrants, AmerisourceBergen,
25 Cardinal, McKesson and -- I see McKesson

1  twice.
2  Q. Okay.  So in general, are these
3  the documents the DEA created to internally
4  memorialize the initial meetings in and
5  around 2005 that the jury has heard about
6  related to what's called the distributor
7  initiative?
8  A. Yes.
9  Q. Now, these documents weren't
10 provided to the registrants, were they?
11 A. These reports?
12 Q. Correct.
13 A. Correct.
14 Q. But these documents were
15 created -- let me back up.
16 Do you have knowledge of
17 whether these documents were made at or near
18 the time of the meetings?
19 MR. EPPICH:  Objection.
20 Foundation.
21 THE WITNESS:  Well, from the
22 date stamp, it's around those dates.
23 QUESTIONS BY MR. FARRELL:
24 Q. Is this reflective of the
25 practice of the DEA, with regard to the

1  distributor initiative, to document what
2  happened during the meetings with
3  registrants?
4  A. Yes.
5  Q. Now, the DEA has conducted
6  hundreds of these meetings, correct?
7  MS. MAINIGI:  Objection.
8  THE WITNESS:  Correct.
9  QUESTIONS BY MR. FARRELL:
10 Q. So rather than go through all
11 of them, if one of these memorandums contains
12 a Bates stamp of US DEA and is produced by
13 the Department of Justice in this litigation,
14 is it the DEA's position that the photocopy
15 being submitted is a true and accurate copy
16 of the original?
17 MR. MAHADY:  Objection.
18 Foundation.
19 THE WITNESS:  Yes.
20 QUESTIONS BY MR. FARRELL:
21 Q. Does the DEA acknowledge that
22 all of those such documents bearing the
23 US DEA Bates stamp are, in fact, in the
24 possession, custody and control of the DEA
25 and document the discussions and contents of

| | |
|---|---|
| 05-17-2019  **Prevoznik, Thomas**  Page 839 | 05-17-2019  **Prevoznik, Thomas**  Page 841 |

**Page 839**

1  each distributor initiative meeting?
2  A. Yes.
3  Q. So in particular what I'd ask
4  you to do is to go to the very -- is to go to
5  the first one, which is AmerisourceBergen's,
6  and you'll see that this is the summary of
7  the meeting on August 10, 2005.
8  Do you see that?
9  A. Yes.
10  Q. And it goes through and it
11  describes all of the things that were
12  discussed in the documents that were provided
13  during the meeting.
14  Do you see that?
15  A. Yes.
16  Q. Now, I'll represent to you that
17  I'm not going to produce all of the thousands
18  of pages as an exhibit, but I'll represent to
19  you that there are, in fact, exhibits that go
20  with this that the DEA produced in this
21  litigation.
22  Agreed?
23  MR. MAHADY: Objection. Form.
24  Objection to foundation.
25  THE WITNESS: Yes.

**Page 840**

1  QUESTIONS BY MR. FARRELL:
2  Q. Now, one of the things I'd like
3  to direct your attention to is that many of
4  the distributors have made the statement that
5  this presentation was only related to
6  Internet pharmacies. And in fact, I believe
7  they asked you that question during the time
8  that they deposed you for the previous two
9  days.
10  What I'd ask you to do is I'd
11  ask you to turn to page 7 of the PowerPoint
12  presentation with AmerisourceBergen.
13  And you see where it says,
14  "Report suspicious orders to DEA when
15  discovered"?
16  Do you see that?
17  A. Yes.
18  Q. So this is the PowerPoint slide
19  by the DEA with AmerisourceBergen as early as
20  2005.
21  Agreed?
22  A. Agreed.
23  **Q. And if you look at the next**
24  **slide, it states, "Reporting a suspicious**
25  **order to the DEA does not relieve the**

**Page 841**

1  **distributor of the responsibility to maintain**
2  **effective controls against diversion."**
3  **Did I read that accurately?**
4  **A. Yes.**
5  **Q. Okay. Why did the DEA put the**
6  **word "not" in all caps?**
7  **A. To emphasize that they had to**
8  **provide the suspicious order, not just -- not**
9  **just after-sales reports.**
10  **Q. The next slide, it says, "The**
11  **DEA cannot tell a distributor if an order is**
12  **legitimate or not" and that "the distributor**
13  **must determine which orders are suspicious**
14  **and make a sales decision."**
15  **Is this similar to all of the**
16  **other slide shows the DEA provided to the**
17  **distributors back in the 2000 -- 2005, 2006**
18  **time frame?**
19  MR. MAHADY: Objection to form.
20  Objection to foundation.
21  THE WITNESS: Yes.
22  QUESTIONS BY MR. FARRELL:
23  **Q. In other words, this PowerPoint**
24  **presentation, was it a stock PowerPoint**
25  **presentation that was shown to Cardinal**

**Page 842**

1  **Health?**
2  **A. Yes.**
3  **Q. Was it shown to McKesson?**
4  **A. Yes.**
5  Q. Was it shown to CVS?
6  MS. FUMERTON: Objection.
7  Form. Lack of foundation.
8  MR. FARRELL: That actually
9  might be right.
10  QUESTIONS BY MR. FARRELL:
11  Q. Was it -- to all of the
12  distributors that the DEA met with in 2005
13  and 2006, is this the stock PowerPoint
14  presentation that was used?
15  A. Yes.
16  MS. FUMERTON: Objection.
17  QUESTIONS BY MR. FARRELL:
18  **Q. So I'm also going to have you**
19  **flip to page 12.**
20  **In the summary slides, the very**
21  **last bullet point, can you read what that**
22  **says?**
23  **A. "Not limited to Internet**
24  **pharmacies."**
25  **Q. What does that mean?**

1  MR. EPPICH:  Object to form.
2  Foundation.
3  QUESTIONS BY MR. FARRELL:
4  Q. Go ahead.
5  A. It's not just the -- what the
6  Internet pharmacies was, but it would be any
7  pharmacy, retail.
8  Q. The very next slide, it says,
9  "A pattern of drugs being distributed to
10  pharmacies who are diverting controlled
11  substances demonstrates the lack of effective
12  controls against diversion by the
13  distributor."
14  This PowerPoint presentation in
15  the distributor initiative meeting, it was
16  not just limited to rogue Internet
17  pharmacies, was it?
18  MR. EPPICH:  Object to form.
19  Foundation.  Calls for speculation.
20  THE WITNESS:  No.  The emphasis
21  was regarding the Internet, but it was
22  for the totality of their
23  responsibilities as a registrant.
24  QUESTIONS BY MR. FARRELL:
25  Q. But as consistent with the very

1  QUESTIONS BY MR. FARRELL:
2  Q. Now, the next one is McKesson,
3  and we're going to take a real quick stop to
4  take a look at this one.
5  This is dated -- the first one
6  is December 6, 2005, and it appears to be a
7  conference call with Mr. John Gilbert.
8  Do you see that?
9  A. Yes.
10  Q. And Mr. Mapes and Kyle Wright
11  of the DEA.
12  Who are Mr. Mapes and
13  Mr. Wright of the DEA?
14  A. Mr. Mapes was the section chief
15  of our E-Commerce section, and Kyle Wright at
16  this time was a staff coordinator in
17  Mr. Mapes' section.
18  Q. So the next plaintiff's exhibit
19  has the Bates stamp at the bottom corner of
20  US-DEA-00000371, and you'll see that it's
21  dated January 23, 2006, but it's referencing
22  a January 3, 2006 meeting.
23  Do you see that?
24  A. Yes.
25  Q. And in it you can see where it

1  next sentence, did the DEA make it clear to
2  those distributors that it met with in 2005
3  and 2006 that if they didn't comply with
4  federal law regarding the detection, the
5  reporting and the halting of suspicious
6  orders, that the DEA may revoke their
7  registration?
8  MR. MAHADY:  Objection to form.
9  THE WITNESS:  Yes.
10  QUESTIONS BY MR. FARRELL:
11  Q. Cardinal Health is the next
12  plaintiff's exhibit, Bates-stamped
13  US-DEA-352.  And just to make sure that
14  there's no hanky-panky, you'll see that the
15  PowerPoint slide is attached to this document
16  as well and is consistent with all the other
17  PowerPoint slides provided to the -- or all
18  the other distributor initiative meetings.
19  Would you agree with that?
20  MS. FUMERTON:  Objection.
21  Form.
22  THE WITNESS:  Yes.
23  MS. FUMERTON:  Lack of
24  foundation.
25

1  looks like it contains -- this is the
2  memorandum of the meeting between McKesson
3  and the DEA as a result of the distributor
4  initiative.  Agreed?
5  MR. EPPICH:  Object to form and
6  foundation.
7  THE WITNESS:  Yes.
8  QUESTIONS BY MR. FARRELL:
9  Q. Now, what I'm going to ask you
10  to do is I'm going to ask you to go to the
11  end of page 2.  And at the bottom, starting
12  with the word "after," the very last
13  paragraph, I'd ask you to read that into the
14  record.
15  A. "After the conclusion of this
16  meeting, it was learned from Gary Hilliard of
17  McKesson Corp that one of the reasons they
18  were not able to realize the full volume of
19  hydrocodone product going out to the Florida
20  pharmacies was that their reports only
21  included the name brand hydrocodone products
22  distributed and was leaving out the generic
23  products."
24  Q. The next sentence.
25  A. "It was only after realizing

1  that the generic were not being reported was
2  McKesson Corp then able to see the large
3  quantities that DEA was bringing to
4  McKesson's attention."
5  Q. So I don't know how to say this
6  any other way, but in 2006 when the DEA met
7  with McKesson with its distributor initiative
8  program, was it discovered that McKesson was
9  only tracking the brand name prescription
10 opiates?
11 MR. EPPICH: Object to form.
12 Foundation. Calls for speculation.
13 Scope.
14 THE WITNESS: Could you please
15 repeat it?
16 QUESTIONS BY MR. FARRELL:
17 Q. This document, following the
18 distributor initiative meeting between the
19 DEA and McKesson, appears to present the fact
20 that the DEA discovered McKesson was only
21 tracking brand name prescription opiates.
22 A. Correct.
23 MR. EPPICH: Object to the
24 form. Foundation. Calls for
25 speculation.

1  THE WITNESS: Correct.
2  QUESTIONS BY MR. FARRELL:
3  Q. If, in fact, McKesson was only
4  tracking brand name prescription opiates and
5  leaving out the generic products, is that a
6  violation of federal law?
7  MR. EPPICH: Object to form.
8  Foundation. Calls for speculation.
9  Calls for a legal conclusion.
10 THE WITNESS: Yes.
11 QUESTIONS BY MR. FARRELL:
12 Q. Sitting here today as the
13 custodian of ARCOS and the institutional
14 knowledge of the Drug Enforcement
15 Administration, if this is true, how many
16 generic prescription orders do you estimate
17 that McKesson missed prior to 2005?
18 MR. EPPICH: Object to the
19 form. Calls for speculation. Calls
20 for a legal conclusion, and I believe
21 it would be outside the Touhy
22 authorization.
23 MS. MAINIGI: Join.
24 MR. FINKELSTEIN: Scope. Calls
25 for speculation.

1  You can answer in your personal
2  capacity, but not on behalf of the
3  DEA.
4  THE WITNESS: I have no idea.
5  QUESTIONS BY MR. FARRELL:
6  Q. A lot?
7  MR. EPPICH: Same objections.
8  MR. FINKELSTEIN: Same
9  objection.
10 THE WITNESS: Yes.
11 QUESTIONS BY MR. FARRELL:
12 Q. All right. On a scale of 0 of
13 10 of screw-ups, how big of a screw-up is
14 this?
15 MR. EPPICH: Object to form.
16 Argumentative.
17 MR. FINKELSTEIN: Same
18 objection.
19 You can answer in your personal
20 capacity, but not on behalf of the
21 DEA.
22 THE WITNESS: In my personal
23 capacity, a big one, a really big one.
24 QUESTIONS BY MR. FARRELL:
25 Q. Epic?

1  A. Yes.
2  MR. EPPICH: Same objections.
3  (Prevoznik Plaintiff's Exhibit
4  P26 marked for identification.)
5  QUESTIONS BY MR. FARRELL:
6  Q. We're now going to jump ahead a
7  little bit. I'm going to show you what's
8  next marked as Plaintiff's 26.
9  This is a series of letters
10 that the DEA, institutionally and with
11 perfect recollection, will recall that --
12 between the lawyers for Cardinal Health and
13 the DEA, the first time they got in trouble
14 for breaking the law in 2008.
15 MS. MAINIGI: Objection.
16 Scope. Foundation. Form.
17 QUESTIONS BY MR. FARRELL:
18 Q. Now, without having to go
19 through all of the nuances, what I'm going to
20 ask you to do is I'm going to make a
21 reference now. At the bottom right-hand
22 corner is Bates stamp CAH_MDL2804_01376799.
23 Do you see that? 799 are the
24 last three numbers.
25 A. Yes, I have it.

1   Q. Now, in it, in this letter,
2   Larry -- to Larry Cote from Cardinal Health's
3   lawyers, it seems to indicate that controlled
4   substances that are sold by Cardinal Health
5   to CVS, Walgreens, Kroger, Kmart and Winn
6   Dixie, which are large, national or regional
7   chains, pose no threat of diversion due to
8   their sophisticated anti-diversion systems
9   and historical record of compliance.
10  Do you see that?
11  MS. MAINIGI: Objection. Form.
12  Scope. Foundation.
13  THE WITNESS: Yes.
14  QUESTIONS BY MR. FARRELL:
15  Q. Did I read that accurately?
16  A. Yes.
17  MS. MAINIGI: Objection.
18  THE WITNESS: Yes.
19  QUESTIONS BY MR. FARRELL:
20  Q. Aside from me reading that
21  accurately, is it true that large, national,
22  regional chains of pharmacies pose no threat
23  of diversion of prescription opioids?
24  MS. MAINIGI: Objection. Form.
25  Scope. Foundation.

1   THE WITNESS: It's not true.
2   QUESTIONS BY MR. FARRELL:
3   Q. In fact, the DEA has
4   investigated and prosecuted many of the large
5   national or regional chains, including CVS
6   and Walgreens?
7   MS. MAINIGI: Objection. Form.
8   Scope. Foundation.
9   MR. FINKELSTEIN: Objection.
10  Do not testify based on current
11  or ongoing investigations. You can
12  answer based on historical
13  investigations or prosecutions.
14  THE WITNESS: Yes.
15  QUESTIONS BY MR. FARRELL:
16  Q. If a wholesale distributor
17  decides not to monitor a chain store
18  pharmacy, is that a per se violation of
19  federal law?
20  MR. EPPICH: Object to form.
21  Calls for a legal conclusion.
22  MS. MAINIGI: Scope.
23  QUESTIONS BY MR. FARRELL:
24  Q. According to the DEA.
25  MR. EPPICH: Same objection.

1   THE WITNESS: Could you please
2   repeat it?
3   QUESTIONS BY MR. FARRELL:
4   Q. Does the DEA consider -- if a
5   wholesale distributor came to the DEA and
6   said, "I've got a new customer and it's CVS,
7   which is a national chain store, and because
8   they have such swell security, I don't want
9   to monitor them for suspicious orders. Is
10  that okay?"
11  MR. EPPICH: Object to the
12  form.
13  QUESTIONS BY MR. FARRELL:
14  Q. What would the DEA say?
15  MR. EPPICH: Object to form and
16  incomplete hypothetical. Calls for a
17  legal conclusion. Foundation.
18  MS. MAINIGI: Scope.
19  THE WITNESS: They can't do
20  that.
21  QUESTIONS BY MR. FARRELL:
22  Q. And what if I said, "I'm going
23  to do it anyway"?
24  MR. EPPICH: Same objection.
25  MS. MAINIGI: Same objection.

1   THE WITNESS: It's a decision
2   that they're making, and we're going
3   to investigate it and we're going to
4   do what we -- what we need to do to
5   protect the public.
6   QUESTIONS BY MR. FARRELL:
7   Q. And what would you need to do
8   to protect the public?
9   MR. FINKELSTEIN: Hang on.
10  Incomplete hypothetical.
11  MS. MAINIGI: Objection. Form.
12  THE WITNESS: We would
13  investigate to see where the orders
14  went and how much went and who was --
15  what they were filling and who had
16  knowledge of what. What we normally
17  do with our investigations.
18  QUESTIONS BY MR. FARRELL:
19  Q. All right. Would the DEA
20  provide guidance to such a wholesale
21  distributor, that regardless of whether its
22  customer is a national chain pharmacy, the
23  distributor still must comply with
24  1301.74(b)?
25  A. Yes.

1  MR. EPPICH:  Objection to form.
2  QUESTIONS BY MR. FARRELL:
3  Q. What if I said to you, "Well,
4  how about this:  How about if I only start
5  monitoring them after they reach a cap of
6  20,000 pills in a month?"  Would you deem
7  that to be compliant with federal law?
8  MR. EPPICH:  Object to the
9  form.  Incomplete hypothetical.  Calls
10  for a legal conclusion.
11  MR. FINKELSTEIN:  Incomplete
12  hypothetical.
13  THE WITNESS:  No.
14  QUESTIONS BY MR. FARRELL:
15  Q. Now, in these correspondence
16  Cardinal Health's lawyers represent that
17  they're going to retain -- let me see if I
18  can find the right word and avoid an
19  objection.
20  You'll see here a consulting
21  firm named Cegedim Dendrite and that they're
22  going to provide the reports on controlled
23  substance orders to the DEA.
24  Do you see that?
25  A. What page are we on?

1  Well, I would prefer to know
2  what page we're on.
3  Q. Okay.  This is the -- the last
4  three digits are 803.  And it's the first
5  full paragraph.
6  A. Okay.
7  Q. There's another reference in
8  here to Cegedim Dendrite, and I'll represent
9  to you that the correspondence indicates that
10  Cardinal Health was telling the DEA, "Please
11  don't revoke our license or suspend our
12  license or fine us.  We're going to hire this
13  outside consultant, and we're going to share
14  the report with you."  I'm going to make that
15  representation.
16  Has the DEA, in fact, ever seen
17  that report?
18  MR. FINKELSTEIN:  Scope.
19  THE WITNESS:  I don't know.  I
20  don't know.
21  (Prevoznik Plaintiff's Exhibit
22  P27 marked for identification.)
23  QUESTIONS BY MR. FARRELL:
24  Q. I'm going to have marked as
25  Plaintiff's Exhibit 27 and circulate a

1  document that bears the Bates stamp in the
2  bottom right-hand corner
3  CAH_MDL2804_03309960.
4  Have you -- has the DEA, in its
5  vast institutional knowledge, ever seen this
6  document before?
7  MS. MAINIGI:  Objection.
8  Scope.  Objection.  Form.
9  MR. FINKELSTEIN:  Scope.
10  MS. MAINIGI:  Mr. Finkelstein,
11  I'm assuming when you make a scope
12  objection that means you're
13  instructing him to answer in his
14  individual capacity?
15  MR. FINKELSTEIN:  When I make a
16  scope objection and when I have made
17  such objections in the past, it should
18  be understood that you can answer
19  based on your personal knowledge in
20  your individual capacity, but your
21  answers do not bind the DEA.
22  Do you understand that?
23  THE WITNESS:  Yes.
24  MR. FARRELL:  So we're going
25  to -- David, we're going to need you.

1  I did not understand that when
2  you made an objection for scope that
3  we needed to preserve the right to be
4  able to -- that I was waiving my right
5  to have that objection ruled or
6  overruled.
7  So I disagree that every time
8  the Department of Justice makes an
9  objection on scope that transforms the
10  witness from a Rule 30(b)(6) designee
11  into a witness testifying in his own
12  capacity, because we did not notice
13  the deposition of Mr. Prevoznik in his
14  individual capacity.  We noticed
15  him -- we noticed the DEA put a
16  witness up in its capacity.
17  That being said, perfectly
18  willing to allow the record to be
19  preserved with appropriate objections
20  to be addressed with Judge Polster,
21  but I believe Judge Polster has the
22  ultimate say in whether or not our
23  questions are admissible and whether
24  or not they fall inside or outside of
25  the scope of the 30(b)(6) notice.

1  MR. FINKELSTEIN:  So my
2  response would be if Judge Polster
3  disagrees with my objections, then
4  Judge Polster will make appropriate
5  rulings.
6  If you disagree with my
7  objections, my proposal would be to
8  review the objections I've made at a
9  break, and we can take them up with
10 the Special Master as necessary.
11 MR. FARRELL:  All right.  We've
12 been going for an hour, so maybe this
13 is the right time to take a quick
14 break.
15 VIDEOGRAPHER:  We're going off
16 the record.  The time is 9:12.
17 (Off the record at 9:12 a.m.)
18 VIDEOGRAPHER:  We are back on
19 record.  Beginning of Media File 2.
20 The time is 9:27.
21 SPECIAL MASTER COHEN:  So with
22 regard to the issue that came up just
23 before we went off the record, I think
24 to make the record clear as we go
25 forward, it would help if, rather than

1  merely saying "scope," when the DEA
2  has an objection that the answer is
3  outside the scope of Touhy authority,
4  that you just say that, "outside the
5  scope of Touhy authority."
6  With regard to the question of
7  whether it is outside the scope of
8  Touhy authority, I think the Court
9  does retain jurisdiction to make that
10 determination in the final event, as
11 with any objection.
12 And I will add that my own
13 understanding is that it's unclear
14 exactly whether a witness is allowed
15 to answer questions even though he
16 doesn't have authority under Touhy.  I
17 think that's actually an open question
18 legally.  But in any event, we don't
19 have to address that question now.
20 So when you are directed,
21 Mr. Prevoznik, to answer only within
22 the scope of your personal knowledge
23 and not as a -- with DEA authority,
24 that's what we'll assume you're doing.
25 Okay?

1  THE WITNESS:  Yes.
2  SPECIAL MASTER COHEN:
3  Everybody understand that?  Any
4  questions?
5  MS. SINGER:  Nope.
6  MR. FINKELSTEIN:  I'm happy to
7  expand on my objections, and I'm happy
8  to explain them as necessary.
9  SPECIAL MASTER COHEN:  No, we
10 can do it in shorthand.  I just want
11 to make sure we understand things,
12 that we're all on the same page going
13 forward.
14 Okay?
15 MS. MAINIGI:  There will be no
16 ruling on those objections?
17 SPECIAL MASTER COHEN:  Correct.
18 EXAMINATION
19 QUESTIONS BY MS. SINGER:
20 Q. All right.  Good morning,
21 Mr. Prevoznik.  Mr. Farrell was nice enough
22 to cover some of the things I was planning
23 to, so we're going to shorthand our way
24 through some of the opening topics.
25 Now, remind the jury, how long

1  have you been with the DEA?
2  A. Over 28 years.
3  Q. Okay.  And during the course of
4  your 20 years with the DEA, I imagine that
5  the drugs being diverted may have changed; is
6  that correct?
7  A. Yeah, that's trend shifts.
8  Q. And the means of diverting
9  those drugs may have changed over time as
10 well?
11 A. Yes.
12 Q. And the focus of DEA's
13 enforcement activities may have changed also
14 during that time; is that correct?
15 A. Correct.
16 Q. But the DEA's rules and
17 expectations with respect to the Controlled
18 Substances Act and CFR 1301.74, those have
19 remained the same, have they not?
20 MS. MAINIGI:  Objection.
21 THE WITNESS:  Yes.
22 (Prevoznik Plaintiff's Exhibit
23 P29 marked for identification.)
24 QUESTIONS BY MS. SINGER:
25 Q. All right.  So we're going to

1  go quickly through the guidelines you talked
2  about.  We're going to start with a
3  shorthand.  And the first refers to what we
4  marked as Exhibit 18, is the backup for that.
5  So here you'll see the NWDA
6  suspicious order monitoring system, which we
7  were shown as Exhibit 18.
8  Is that familiar to you?
9  A. Yes.
10  Q. Okay.  So in 1984 --
11  MR. FINKELSTEIN:  I'm sorry,
12  Counsel, is this 18 or 29?
13  MS. SINGER:  I think it's 18.
14  MR. FINKELSTEIN:  It's marked
15  as 29.
16  MS. SINGER:  I'm sorry.  Oh,
17  I'm sorry, the new exhibit is 29.  The
18  backup of the whole policy is
19  Exhibit 18.
20  MR. FINKELSTEIN:  Okay.
21  QUESTIONS BY MS. SINGER:
22  Q. Okay.  And just directing your
23  attention very quickly to 2, sub 2, on your
24  monitor -- I'm sorry, 9 on your monitor,
25  single suspicious orders, is it correct that

1  this suspicious order monitoring system
2  publication from 1984 established that
3  "single orders of unusual size or deviation
4  must be reported immediately, the submission
5  of monthly printout of after-the-fact sales
6  will not relieve a registrant from the
7  responsibility of reporting these single
8  excessive or suspicious orders.  DEA has
9  interpreted orders to mean prior to
10  shipment"?
11  Does that accurately reflect
12  the policy of the DEA?
13  A. Yes.
14  Q. And that's as of 1984, correct?
15  A. Correct.
16  Q. All right.  Turning next to
17  1987 is our next marker in the timeline.
18  And I'm sorry, just to be
19  perfectly clear, from 1971 to the present,
20  when the Controlled Substances Act was first
21  enacted in '71, has it been the DEA's
22  position that ILRs are not suspicious order
23  reports?
24  MS. MAINIGI:  Objection.
25  THE WITNESS:  Yes.

1  QUESTIONS BY MS. SINGER:
2  Q. And do ILRs relieve a
3  registrant -- does submitting ILRs relieve a
4  registrant of the obligation to report
5  suspicious orders?
6  MS. MAINIGI:  Objection.
7  THE WITNESS:  No.
8  QUESTIONS BY MS. SINGER:
9  Q. All right.  The next marker,
10  1987, is that seminar report which was
11  Prevoznik 17, and that established any system
12  must be capable of both detecting individual
13  orders or -- which are suspicious orders,
14  which become suspicious over time due to
15  frequency, quantity or pattern.
16  Is that consistent with the
17  DEA's policy?
18  A. Yes.
19  Q. And the DEA pointed out that
20  the company is still responsible under their
21  registrations for acting in the public
22  interest, reporting the order does not in any
23  way relieve the firm from the responsibility
24  for the shipment.
25  Does that also reflect the

1  DEA's policy consistently over time?
2  MS. MAINIGI:  Objection.
3  MR. O'CONNOR:  Objection.
4  THE WITNESS:  Yes.
5  (Prevoznik Plaintiff Exhibit
6  P33 marked for identification.)
7  QUESTIONS BY MS. SINGER:
8  Q. Okay.  I want to turn next to a
9  new document, and that's the DEA's Diversion
10  Investigators Manual.
11  Can we mark this as -- what are
12  we up to?
13  MR. FINKELSTEIN:  30.
14  MS. SINGER:  Thank you.
15  (Prevoznik Exhibit 33 marked
16  for identification.)
17  MR. FINKELSTEIN:  Is there no
18  28?  Have we skipped 28?  I don't
19  mind.  I just want to make sure I have
20  everything.
21  QUESTIONS BY MS. SINGER:
22  Q. Mr. Prevoznik, showing you
23  Exhibit 33.  Do you recognize this document?
24  A. Yes.
25  Q. And what do you recognize that

1 document to be?
2 MS. MAINIGI:  Excuse me,
3 Counsel.  May I have a copy?
4 QUESTIONS BY MS. SINGER:
5 Q. What do you recognize that
6 document to be?
7 A. DEA's Diversion Investigators
8 Manual.
9 Q. And what is that -- what is the
10 Diversion Investigators Manual used for?
11 MR. EPPICH:  Objection.  Form.
12 THE WITNESS:  It's used to
13 guide us, diversion investigators, on
14 how to do our jobs.
15 QUESTIONS BY MS. SINGER:
16 Q. Okay.  And so that is internal
17 guidance provided by the DEA to its diversion
18 investigators, correct?
19 A. Correct.
20 Q. Okay.  And do you know the year
21 of that version of the manual?
22 And again, it's not a quiz.
23 Does it seem like 1990, which was the
24 information provided to us, is accurate?
25 MR. EPPICH:  Objection.  Calls

1 A. Yep.
2 Q. All right.  Can you read the
3 third paragraph beginning "registrants"?
4 A. "Registrants who routinely
5 report suspicious orders, yet fill these
6 orders with reason to believe they are
7 destined for the illicit market, are
8 expressing an attitude of irresponsibility
9 that is a detriment to the public health and
10 safety as set forth in 21 USC 823 and 824."
11 Q. And 21 USC 823 and 824 the
12 Controlled Substances Act?
13 A. Yes.
14 Q. Okay.  And does that statement
15 that you just read accurately reflect the
16 policy of the DEA in 1990?
17 A. Yes.
18 Q. And has that remained true
19 since then?
20 A. Yes.
21 Q. Okay.  And then read from there
22 "suspicious orders"?
23 A. "Suspicious orders include
24 those which are in excess of legitimate
25 medical use or exhibit characteristics

1 for speculation.
2 THE WITNESS:  Yes.
3 QUESTIONS BY MS. SINGER:
4 Q. Okay.  And is the Diversion
5 Investigators Manual updated periodically by
6 the DEA?
7 A. Yes.
8 Q. And do you know whether at
9 least parts of the Diversion Investigators
10 Manual have been provided to distributors
11 through public record requests?
12 MS. MAINIGI:  Objection.
13 Scope.  Or outside Touhy
14 authorization.
15 THE WITNESS:  I don't know.
16 QUESTIONS BY MS. SINGER:
17 Q. Okay.  All right.  I'd like to
18 turn your attention to Section 5126, which is
19 Bates number ending 301.
20 And I'm sorry, the Bates number
21 for this document is CAH_MDL_PRIOR
22 PRODUCTION_DEA07_01176247.
23 All right.  So turning to 301,
24 which I think has been tabbed in your copy,
25 Mr. Prevoznik.

1 leading to possible diversion, such as orders
2 of unusual size, unusual frequency, or those
3 deviating substantially from the -- from a
4 normal pattern."
5 Q. And keep going.
6 A. "The supplier can determine
7 whether the order is excessive by checking
8 their own sales and establishing the average
9 amount of controlled substances shipped to
10 registrants of the same apparent size in a
11 particular geographic area.  If the customer
12 exceeds this threshold, the request should be
13 viewed as suspicious."
14 Q. One more sentence.
15 A. "This activity over extended
16 periods of time would lead a reasonable
17 person to believe that controlled substances
18 possibly are being diverted."
19 Q. And does the passage you just
20 read again reflect the DEA's policy?
21 A. Yes.
22 MR. EPPICH:  Form.
23 QUESTIONS BY MS. SINGER:
24 Q. And has that policy remained
25 the same since 1990 when this manual was

1   issued?
2   MS. FUMERTON:  Object to form.
3   THE WITNESS:  Yes.
4   (Prevoznik Plaintiff's Exhibit
5   P34 marked for identification.)
6   QUESTIONS BY MS. SINGER:
7   Q. Okay.  Now, moving to the next
8   version of the -- of the Diversion
9   Investigators Manual, we're going to mark
10  that Exhibit 34.
11  And, Mr. Prevoznik, we only
12  have a piece of that manual.
13  Do you recognize the document
14  that I've just shown you as Exhibit 34?
15  A. Yes.
16  Q. And what do you recognize that
17  document to be?
18  A. As being a section from our --
19  the Diversion Investigators Manual.
20  Q. Okay.
21  A. DEA.
22  Q. And with respect to its
23  provisions on suspicious orders, which are
24  the first paragraph of Section 5126, is that
25  the same as what you just read previously?

1   QUESTIONS BY MS. SINGER:
2   Q. Mr. Prevoznik, just to clarify
3   for Cardinal's counsel's benefit, do you
4   recognize this from the materials you
5   reviewed in preparation for your deposition?
6   A. Yes.
7   Q. Okay.  And do you know if this
8   was part of the binder that was provided to
9   counsel in advance of your deposition?
10  A. Yes.
11  Q. Okay.  So can you read aloud
12  that first paragraph?
13  A. "Registrants are required to
14  inform DEA of suspicious orders in accordance
15  with 21 CFR 1301.74(b).  DEA field offices
16  are not to approve or disapprove supplier
17  shipments of controlled substances.  The
18  responsibility for making the decision to
19  ship rests with the supplier.  An exception
20  to this occurs when a supplier" --
21  Q. You can stop there.
22  A. Okay.
23  Q. All right.  And the section you
24  just read, does that reflect DEA's policy?
25  MS. MAINIGI:  Objection.

1   A. I'm sorry, which paragraph?
2   MR. EPPICH:  Object to form.
3   THE WITNESS:  "Registrants"?
4   QUESTIONS BY MS. SINGER:
5   Q. I'm sorry.  I don't have it up
6   on my monitor, so...
7   MS. MAINIGI:  Counsel, may I
8   ask why this document is not
9   Bates-stamped?
10  MS. SINGER:  Excuse me?
11  MS. MAINIGI:  Why is this
12  document not Bates-stamped?
13  MS. SINGER:  I don't know.
14  Because it came from the DEA.  I think
15  the reliance materials for
16  Mr. Prevoznik.
17  MS. MAINIGI:  Is that in fact a
18  representation you're making?
19  MS. SINGER:  Excuse me?
20  MS. MAINIGI:  Is that in fact a
21  representation that you know for
22  certain, or are you guessing?
23  MS. SINGER:  So you can ask
24  your questions in your time.
25

1   THE WITNESS:  Yes.
2   QUESTIONS BY MS. SINGER:
3   Q. And do you know, by the way,
4   the date of this version of the Diversion
5   Investigators Manual?
6   A. I can tell from the -- there
7   was an update on 4/16 of 1996.
8   Q. Okay.  And then if you go down
9   to the third paragraph, "Registrants who
10  routinely report suspicious orders," is that
11  the same language that you read previously?
12  MR. EPPICH:  Object to form.
13  THE WITNESS:  Yes.
14  (Prevoznik Plaintiff's Exhibit
15  P35 marked for identification.)
16  QUESTIONS BY MS. SINGER:
17  Q. Okay.  All right.  Let's turn
18  now to Exhibit 35.
19  All right.  And this is --
20  MR. FINKELSTEIN:  While this is
21  being handed out, since we talked
22  about the reliance materials, I note
23  that the witness doesn't have a copy
24  of his reliance materials in front of
25  him and that I ask that he be provided

1    with that at some point.
2    We left it with the court
3    reporter.  That was his reliance
4    binder.
5    MS. SINGER:  So because we have
6    a different court reporter, I don't
7    think we have it.  If -- we can try to
8    muster an additional copy, but any
9    document I show him, we will have
10   today.
11   MR. FINKELSTEIN:  Okay.
12   QUESTIONS BY MS. SINGER:
13   Q. All right.  So Exhibit 35 is
14   the NWDA Controlled Substances Manual, Bates
15   number HDA_MDL_000219360.
16   Mr. Prevoznik, have you seen
17   that document before?
18   A. It looks familiar.
19   Q. Okay.  Now, I want to show you
20   also -- we're going to mark this Exhibit 36.
21   (Prevoznik Plaintiff's Exhibit
22   P36 marked for identification.)
23   QUESTIONS BY MS. SINGER:
24   Q. Exhibit 36 is from a website.
25   It's titled "NWDA Develops DEA Compliance

1    this doc -- when this press release was
2    issued?
3    MS. MAINIGI:  Objection to the
4    use of this document.  Objection.
5    Foundation.  Scope.
6    THE WITNESS:  I'm not sure what
7    you mean by the term "aggressively."
8    We were doing our job, so that
9    wouldn't...
10   QUESTIONS BY MS. SINGER:
11   Q. All right.  And then going down
12   to the third paragraph -- or fourth
13   paragraph -- you know what?  We're going to
14   leave that one there.  Let's move on.  Let's
15   go back to the manual itself, Exhibit 34.
16   So I want to turn first to --
17   MR. FINKELSTEIN:  34 or 35?
18   THE WITNESS:  35?
19   QUESTIONS BY MS. SINGER:
20   Q. 35, thank you.
21   -- to Bates number 435, which
22   is tabbed in your copy.  It's titled
23   "Suspicious Orders - Controlled Substances."
24   Let me know when you've found
25   it.

1    Institute to Reduce Industry Exposure to
2    Fines."
3    All right.  Giving you a second
4    to look at the document, I just want to read
5    aloud the first paragraph.
6    "In response to increasingly
7    complex regulations, aggressive enforcement
8    and the potential for fines, the National
9    Wholesale Druggists' Association, NWDA, has
10   developed an industry institute on DEA
11   compliance," continued.
12   Would you agree that the DEA
13   had been aggressively enforcing --
14   MS. MAINIGI:  Objection to the
15   use of this document.
16   MS. SINGER:  I haven't even
17   finished --
18   MS. MAINIGI:  I'm sorry.  Go
19   ahead.
20   MS. SINGER:  -- a question.
21   MS. MAINIGI:  Sorry.
22   QUESTIONS BY MS. SINGER:
23   Q. Would you agree that the DEA
24   was aggressively or actively enforcing the
25   Controlled Substances Act in 1997 when

1    A. Yep, I'm good.
2    Q. Okay.
3    MS. MAINIGI:  I'm sorry,
4    Counsel, what's the page number?
5    MS. SINGER:  435.
6    QUESTIONS BY MS. SINGER:
7    Q. It says there, "Distributors
8    are responsible for designing and operating a
9    system that will disclose to the distributor
10   suspicious orders."
11   Do you agree that that is the
12   distributor's responsibility?
13   A. Yes.
14   Q. Okay.  And then the note, "Many
15   distributors have been cited for failing to
16   establish and maintain such a system."
17   Is that also accurate?
18   A. Yes.
19   MS. MAINIGI:  Objection.
20   MR. EPPICH:  Form.
21   QUESTIONS BY MS. SINGER:
22   Q. Move to the next paragraph.
23   "Distributor establishing suspicious order
24   criteria.  Distributors should establish
25   written criteria of what constitutes a

1   suspicious order.  DEA leaves it to the
2   distributor to make this determination.  The
3   key for the distributor is to establish
4   reasonable criteria based upon customer
5   purchasing patterns and then to adhere to
6   them in monitoring orders."
7   Does that several-step passage
8   that I just read accurately reflect a
9   distributor's duties under the CSA?
10   MS. MAINIGI:  Objection.
11   Foundation.  Scope.  Form.
12   MR. EPPICH:  Objection.
13   THE WITNESS:  Yes.
14   QUESTIONS BY MS. SINGER:
15   Q. And do you see in this
16   description of suspicious order criteria any
17   expression of confusion or lack of clarity
18   about what a suspicious order is?
19   MR. EPPICH:  Object to form.
20   MS. MAINIGI:  Objection.
21   Foundation.
22   THE WITNESS:  No.
23   QUESTIONS BY MS. SINGER:
24   Q. And then moving to the next
25   page, Bates number 436, you see the bullet

1   that begins, "Establish trigger levels"?
2   About middle of the page.
3   A. Yes.
4   Q. Okay.  So it says here,
5   "Establish trigger levels, close quote, that
6   only kick out purchasers buying substantially
7   above the average for an item.  The trigger
8   level is established by multiplying the
9   calculated average by an arbitrary factor.
10   It is recommended that at the outset three
11   times the average be used for ARCOS items and
12   four times the average for non-ARCOS items."
13   Do you see where I've just
14   read?
15   A. Yes.
16   Q. Okay.  Is it DEA's position
17   that a fixed multiplier is a sufficient
18   system to identify suspicious orders?
19   MR. EPPICH:  Object to form.
20   MS. MAINIGI:  Foundation.
21   Scope.
22   THE WITNESS:  Could you please
23   repeat it?
24   MS. SINGER:  Yes.
25   QUESTIONS BY MS. SINGER:

1   Q. Is it DEA's position that a
2   fixed multiplier of order levels is
3   sufficient as a system to identify suspicious
4   orders?
5   MR. EPPICH:  Object to form.
6   THE WITNESS:  It could be one
7   criteria, but it can't be the only
8   one.
9   QUESTIONS BY MS. SINGER:
10   Q. Okay.  And it says here, if you
11   keep reading on, "After the monitoring
12   program has been tested with live data and
13   the results analyzed, it may be necessary to
14   revise the factors."
15   Is it DEA's position that
16   distributors have an obligation to make sure
17   that any trigger or threshold they use
18   actually identifies suspicious orders?
19   MS. MAINIGI:  Objection.
20   MR. FINKELSTEIN:  Object to
21   form.
22   MS. MAINIGI:  Form.  Scope.
23   THE WITNESS:  Yes.
24   QUESTIONS BY MS. SINGER:
25   Q. Okay.  Moving next to Bates

1   number 437.  Do you see the note is -- why
2   don't you go ahead and read that note.
3   "It is DEA's position."
4   A. "It is DEA's position that
5   after-the-fact monitoring program as
6   previously described, whether computer or
7   manual, does not relieve the distributor of
8   responsibility for policing individual orders
9   that appear excessive."
10   Q. Keep going.
11   A. "In these situations, DEA
12   should be notified before the order is
13   shipped, and a copy of all such orders should
14   be maintained in the distributor's suspicious
15   orders file, with a notation reflecting the
16   date and person contacted at DEA as well as
17   any guidance received."
18   Q. Go ahead and finish the
19   paragraph, please.
20   A. "The file also should indicate
21   whether the order was shipped.  DEA usually
22   leaves the responsibility for determining
23   whether to ship to the distributor."
24   **Q. And does this statement that**
25   **you just read from the NWDA manual of 1997**

1  **accurately describe the DEA's position on**
2  **what distributors should be -- or what**
3  **registrants should be doing?**
4  MS. MAINIGI: Objection.
5  **THE WITNESS: Yes.**
6  QUESTIONS BY MS. SINGER:
7  Q. All right. And then I want you
8  to turn to the chemical control program at
9  Appendix L. So that, I think, should be
10 marked by the last tab. Nope. Nope.
11 There's one more, I'm sorry. So L6, yes,
12 which is Bates number 571.
13 Do you see the heading there
14 "Suspicious Orders"?
15 MR. FINKELSTEIN: 571. 69, 71.
16 THE WITNESS: Okay.
17 QUESTIONS BY MS. SINGER:
18 Q. All right. So the heading
19 there says, "Suspicious Orders," but it's
20 under 21 CFR 1310.05, correct?
21 A. Correct.
22 Q. And that's the provision that
23 relates to suspicious orders of List I
24 chemicals; is that correct?
25 A. Correct.

1  frequency."
2  Q. Okay. Keep going all the way
3  to the end of that paragraph.
4  A. 21 CFR 1301.74(b).
5  "Registrants should set thresholds as a first
6  step in identifying potential suspicious
7  orders. However, registrants should refrain
8  from reporting all orders above the threshold
9  without a further review of the order or
10 customer. DEA expects that registrants will
11 only report orders that the registrant has
12 determined to be truly suspicious."
13 Q. And does the section you just
14 read reflect the policy of the DEA that
15 registrants should be reporting orders that
16 it deems suspicious?
17 MS. MAINIGI: Objection.
18 THE WITNESS: Yes.
19 (Prevoznik Plaintiff's Exhibit
20 P37 marked for identification.)
21 QUESTIONS BY MS. SINGER:
22 Q. All right. Let's move next to
23 Exhibit 37. We have a lot of paper today.
24 Exhibit 37 is Bates number
25 CAH_MDL_PRIOR PRODUCTION_DEA07_01178834, and

1  Q. Okay. And there it -- the
2  first sentence reads, "DEA has not provided a
3  clear definition of what constitutes a
4  **suspicious order."**
5  **Now that relates to a**
6  **suspicious order of List I chemicals,**
7  **correct?**
8  **A. Correct.**
9  **Q. Okay. And there NWDA is saying**
10 **we don't have a clear definition, correct?**
11 **A. Correct.**
12 **Q. And we didn't see that earlier**
13 **in the manual, correct?**
14 **A. Correct.**
15 **Q. All right. Then let's move to**
16 **Appendix M, which is one more page. Bates**
17 number 574, number 7: "What does DEA
18 consider to be a suspicious order?"
19 And if you can read that first
20 sentence?
21 A. "A registrant must report a
22 suspicious order for controlled substances,
23 which DEA defines as an order of unusual
24 size, orders deviating substantially from a
25 normal pattern and orders of unusual

1  it's titled "DEA Compliance Manual, Cardinal
2  Health."
3  Mr. Prevoznik, have you seen
4  this document before?
5  A. No.
6  Q. Okay. I just want to point you
7  to a few pages. Let's turn first to
8  Bates number 880, which is also tabbed in
9  your copy.
10 Tell me when you're there.
11 A. I'm there.
12 Q. Okay. So it says, "Complying
13 with 21 CFR 1301.74(b) is a two-step process.
14 First, each Cardinal division submits to DEA
15 on a monthly basis an ingredient limit
16 report."
17 Have I read that correctly?
18 A. Yes.
19 Q. Okay. And then it goes down to
20 the next paragraph. "Second, on a daily
21 basis, cage and vault personnel" --
22 Do you know what that means?
23 A. Yes.
24 Q. What is that?
25 A. It's the person -- the people

1 that were -- that are authorized to work in
2 the cage or the vault, which are the secure
3 areas that contain the controlled substances.
4 Q. Okay.
5 -- "should be policing and
6 identifying individual orders that appear
7 excessive in relation to what other customers
8 are buying and/or the customer's purchase
9 history. In most situations, DEA should be
10 notified, if possible, before the order is
11 shipped, and a copy of all such orders should
12 be maintained in the division's suspicious
13 order file, along with a regulatory agency
14 contact form, Form 1, noting any specific
15 instructions from DEA."
16 Have I read that correctly?
17 A. Yes.
18 Q. Okay. And does this Cardinal
19 compliance manual accurately reflect a
20 registrant's obligation to notify DEA before
21 a suspicious order is shipped?
22 MS. MAINIGI: Objection.
23 Outside the scope of the Touhy
24 authorization. Form. Foundation.
25 THE WITNESS: Well, the

1 regulations require immediately upon
2 discovery, so it's not...
3 QUESTIONS BY MS. SINGER:
4 Q. Okay. If that was added, that
5 they should be notified -- that the DEA
6 should be notified immediately before a
7 suspicious order is shipped, would that be
8 accurate?
9 MS. MAINIGI: Objection -- same
10 objections.
11 THE WITNESS: Yes.
12 QUESTIONS BY MS. SINGER:
13 Q. Okay. And would DEA expect
14 that a registrant would remain -- excuse me,
15 would maintain copies of a suspicious order
16 reported to the DEA?
17 A. Yes.
18 Q. Let's turn then to the next
19 tab, which is -- oh, nope, we don't need to
20 do that. Never mind.
21 All right. Let's go back to
22 the slides we started with.
23 So, Mr. Prevoznik, we went
24 through the NWDA suspicious order monitoring
25 system, the seminar report that you went over

1 with Mr. Farrell was skipped over this time,
2 the DEA Diversion Investigators Manual, the
3 NWDA Controlled Substances Manual in 1997 and
4 Cardinal's compliance manual.
5 In each of those manuals, just
6 to be clear, was it true that DEA and the
7 industry recognized that suspicious orders
8 must be reported immediately when they are
9 discovered, not after they are shipped?
10 MS. MAINIGI: Objection.
11 Outside the scope of the Touhy
12 authorization. Foundation. Form.
13 THE WITNESS: Yes.
14 QUESTIONS BY MS. SINGER:
15 Q. And that suspicious -- that
16 orders that a registrant identifies as
17 suspicious cannot be shipped; is that
18 correct?
19 MS. MAINIGI: Objection. Form.
20 Foundation.
21 THE WITNESS: Correct.
22 QUESTIONS BY MS. SINGER:
23 Q. All right. Now, we think about
24 suspicious orders under CFR 1301.74, but the
25 registrant that ships suspicious orders also

1 fails to maintain effective controls to
2 prevent diversion; is that correct?
3 MR. MAHADY: Objection. Form.
4 Objection. Foundation. Calls for a
5 legal conclusion.
6 THE WITNESS: Correct.
7 QUESTIONS BY MS. SINGER:
8 Q. And would it make sense to DEA
9 that a registrant could identify an order as
10 suspicious, report it to the DEA and then
11 send it out to be sold or used?
12 MR. EPPICH: Objection. Form.
13 Calls for a legal conclusion.
14 THE WITNESS: And not do
15 anything to relieve the suspicion?
16 QUESTIONS BY MS. SINGER:
17 Q. That's right.
18 A. No, they shouldn't --
19 MR. EPPICH: Objection. Form.
20 QUESTIONS BY MS. SINGER:
21 Q. Can you say your answer again?
22 A. Could you repeat your question?
23 Q. Would it make sense to the DEA
24 that a registrant could identify an order as
25 suspicious, report it to the DEA, not dispel

1  their suspicion, and then go ahead and ship
2  it so that it could be sold or used?
3  MR. EPPICH:  Object to form.
4  Calls for a legal conclusion.
5  MS. MAINIGI:  Incomplete
6  hypothetical.  Outside the scope.
7  THE WITNESS:  No, it would not
8  be correct.
9  QUESTIONS BY MS. SINGER:
10  Q. Why?
11  A. Because they're not maintaining
12  effective controls over diversion.
13  MS. MAINIGI:  Same objections.
14  QUESTIONS BY MS. SINGER:
15  Q. And what happens if they go
16  ahead and just ship that suspicious order?
17  MS. MAINIGI:  Same objections.
18  MR. EPPICH:  Object to the
19  form.  Calls for speculation.
20  THE WITNESS:  Well, it's --
21  there was a -- there was a reason it
22  triggered the suspicion, so the
23  possibility or potential for it to be
24  diverted into the illicit market is
25  enhanced because it triggered a

1  suspicious order within their system.
2  So that being the underlying
3  cause for it to be triggered, that --
4  the potential for it to be diverted,
5  now it's going -- the potential now is
6  greater that it's going into the
7  public and is going to affect the
8  public health and safety.
9  QUESTIONS BY MS. SINGER:
10  Q. Okay.  And would going ahead
11  and shipping suspicious orders demonstrate an
12  attitude of irresponsibility, which I think
13  is the language of the Diversion
14  Investigators Manual, to the detriment of the
15  public health?
16  MS. MAINIGI:  Objection.
17  Outside the scope of Touhy
18  authorization.  Form.
19  MR. EPPICH:  Objection.
20  THE WITNESS:  Yes.
21  QUESTIONS BY MS. SINGER:
22  Q. And has that always been true,
23  that shipping a suspicious order is a failure
24  of effective controls to prevent diversion?
25  MR. MAHADY:  Objection to form.

1  Objection to foundation.
2  THE WITNESS:  Yes.
3  (Prevoznik Plaintiff's Exhibit
4  P38 marked for identification.)
5  QUESTIONS BY MS. SINGER:
6  Q. Now, one of the -- during the
7  first or second day of your deposition -- and
8  let's turn to your deposition.  I'm sure just
9  what you want to relive.
10  All right.  So we'll mark this
11  as Exhibit 38.
12  And, Mr. Prevoznik, can I
13  direct you -- and this is the deposition of
14  Tom Prevoznik, April 17, 2019.
15  All right.  And if you could
16  turn to page 171.  All right.  And I want to
17  direct your attention to the middle of the
18  page where you testify:  "It was a business
19  decision on whether to ship or not ship, that
20  we, DEA, were not going to direct a
21  registrant don't ship or not ship at that
22  time."
23  Do you see where I am?
24  MS. FUMERTON:  Objection.
25  Form.

1  THE WITNESS:  Yes.
2  QUESTIONS BY MS. SINGER:
3  Q. Okay.  And then if you turn the
4  page -- I'm sorry.  At the bottom of
5  page 171, because -- so in 7, it was clear
6  that you were now directing registrants:  Do
7  not ship.
8  And you said, right, because of
9  the Internet.
10  And then there's a question:
11  "And prior to December 2007, it was a
12  business decision by each registrant
13  recognizing what their own obligations were,
14  correct?"
15  MR. EPPICH:  Object to form.
16  THE WITNESS:  Yes.
17  QUESTIONS BY MS. SINGER:
18  Q. Have I read that accurately?
19  A. Yes.
20  Q. And I just want to be clear.
21  Between -- before and after 2007, was it
22  always the policy of the DEA that registrants
23  could not ship suspicious orders?
24  MR. EPPICH:  Object to form.
25  MS. MAINIGI:  Objection.  Form.

1  Testimony speaks for itself.
2  THE WITNESS:  Yes.
3  MR. MAHADY:  Foundation.
4  QUESTIONS BY MS. SINGER:
5  Q. And when you talk about a
6  change in 2007, you go on to say at the
7  bottom of 172, "Well, I don't know if there
8  was confusion or not because the -- quite a
9  few registrants continue to do what they
10 continue to do, which was continue to sell,
11 to ignore suspicious orders, and they
12 continue to sell huge volumes down the line
13 through retail."
14 Do you see what I just read?
15 A. Yes.
16 Q. And I've read that accurately?
17 A. Yes.
18 Q. And is that the change you're
19 referring to in 2007, was DEA's recognition
20 that registrants continued to sell suspicious
21 orders?
22 MS. MAINIGI:  Objection.
23 Testimony speaks for itself.
24 THE WITNESS:  Yes.  Because
25 when we met with them in 2005, we

1  showed them their own data and said,
2  "These are the things that we see,
3  that we see as very suspicious."
4  So we were telling the
5  registrants up front, "Look, there is
6  a problem.  This is what we're
7  seeing."
8  And then they would say, "Yes,
9  we want to be -- we want to fix this."
10 And then we continued to see
11 those same things continue for some of
12 them.  Some of them did correct it,
13 but some of them continued to go and
14 sell those things.
15 QUESTIONS BY MS. SINGER:
16 Q. Okay.  And then continuing on
17 in your testimony, page 184, you're talking
18 in the middle of the page about the
19 subjective of shipping, of determining a
20 suspicious order.
21 Do you see where I am in the
22 middle of the page?
23 A. Yes.
24 Q. And Cardinal's counsel,
25 Ms. Mainigi, asked you:  "Because it's

1  subjective," right?
2  Do you see where I am?  Towards
3  the bottom of the page?
4  A. Yes.
5  Q. And then on the next page you
6  answered:  "WITNESS:  Yeah, it can be
7  subjective."  Top of page 185.
8  Do you see where I am?
9  A. Yes.
10 Q. Okay.  And I want to make sure
11 that your testimony is clear.  When you say
12 whether a suspicious order is subjective, do
13 you mean that it varies from case to case, or
14 it depends on who's looking at it?
15 MS. MAINIGI:  Objection to
16 form.
17 THE WITNESS:  Both, really.  It
18 depends who's looking at it and
19 what system do they have that's
20 triggering the suspicious order.  So
21 it's whatever that registrant
22 designed, which is specific to that
23 registration.
24 QUESTIONS BY MS. SINGER:
25 Q. Right.

1  But a suspicious order is a
2  suspicious order that's an order of unusual
3  size -- you can say it better than I can, so
4  please go ahead.
5  MS. MAINIGI:  Objection.  Form.
6  Foundation.
7  THE WITNESS:  Unusual --
8  unusual size, deviating from a --
9  substantially deviating from a normal
10 pattern, and unusual frequency.
11 QUESTIONS BY MS. SINGER:
12 Q. Okay.  And that's universally
13 factually true, correct?
14 MS. MAINIGI:  Objection.
15 Foundation.  Vague.  Outside scope.
16 THE WITNESS:  Correct.  And
17 it's disjunctive.  So it could be one,
18 it could be two, it could be other
19 things that we've given guidance on.
20 We gave guidance in the
21 distributor initiative when we went
22 through the various red flags.  We put
23 them in guidance letters as well -- or
24 not guidance, reiteration of the
25 regulations in 2006 and 2007 letters

1  from Mr. Rannazzisi.
2  QUESTIONS BY MS. SINGER:
3  Q. And those criteria don't vary
4  from registrant to registrant, correct?
5  MR. EPPICH:  Object to form.
6  Vague.
7  THE WITNESS:  Correct.
8  QUESTIONS BY MS. SINGER:
9  Q. And what differs is whether an
10 order triggers a suspicious [sic] based on a
11 customer's history, their buying patterns,
12 frequency, et cetera, correct?
13 MR. EPPICH:  Object to form.
14 Vague.
15 THE WITNESS:  Yes, as well as
16 the registrants, have they made any
17 changes to the system.
18 (Prevoznik Plaintiff's Exhibit
19 P39 marked for identification.)
20 QUESTIONS BY MS. SINGER:
21 Q. Okay.  Let's turn very quickly
22 to the industry compliance guidelines.
23 All right.  I'm going to show
24 you what's been marked as Exhibit 39.
25 And this is Bates number

1  CAH_MDL2804_00988458.
2  Mr. Prevoznik, have you seen
3  this document before?
4  A. Yes.
5  Q. Okay.  And do you recognize
6  this to be the Healthcare Distribution
7  Management Association's industry compliance
8  guidelines?
9  A. Yes.
10 Q. Okay.  And do you know -- I
11 don't know if they have a date on them, but
12 does it sound right that they were issued in
13 2008?
14 MR. EPPICH:  Objection.
15 Foundation.  Calls for speculation.
16 QUESTIONS BY MS. SINGER:
17 Q. Or do you know what year they
18 were issued?
19 A. I don't know.
20 Q. Okay.
21 A. I don't know.
22 Q. Okay.  And if you look at the
23 first page, the third paragraph:  "At the
24 center of a sophisticated supply chain,
25 distributors are uniquely situated to perform

1  due diligence in order to help support the
2  security of the controlled substances they
3  deliver to their customers."
4  Do you see what I've just read?
5  A. Yes.
6  Q. And does the DEA agree with
7  that statement?
8  A. Yes.
9  MS. MAINIGI:  Objection.
10 QUESTIONS BY MS. SINGER:
11 Q. And did the DEA approve these
12 industry compliance guidelines?
13 A. No.
14 Q. Now, I just want to go through
15 some specifics with you very briefly, I hope,
16 to see if the DEA agrees that these elements
17 comply with the Controlled Substances Act.
18 Let's start with Bates number 461.
19 Does the DEA agree that a
20 registrant should investigate a customer
21 before agreeing to ship them controlled
22 substances?
23 MS. MAINIGI:  Objection.
24 MR. EPPICH:  Objection.  Form.
25 THE WITNESS:  Am I supposed to

1  be looking at something here or --
2  QUESTIONS BY MS. SINGER:
3  Q. No, just a general statement.
4  A. Oh, okay.
5  MR. EPPICH:  Object to form.
6  QUESTIONS BY MS. SINGER:
7  Q. Do you want me to repeat the
8  question, or do you have it?
9  A. No.  Repeat it.
10 Q. Does the DEA agree that a
11 registrant should investigate a customer
12 before agreeing to ship them controlled
13 substances?
14 MR. EPPICH:  Object to form.
15 THE WITNESS:  What do you mean
16 by the term "investigate"?  Know who
17 they are?
18 QUESTIONS BY MS. SINGER:
19 Q. That they should know their
20 customer.
21 MR. EPPICH:  Object to form.
22 THE WITNESS:  Yes.
23 QUESTIONS BY MS. SINGER:
24 Q. Okay.  And in this guide, it
25 lays out certain elements, including -- if

1   you look towards the bottom of the page under
2   the information-gathering step, would
3   include -- I'm sorry, let's start at the top
4   of the page.
5   Under the first paragraph,
6   Introduction:  "Before opening an account" --
7   do you see where I am?
8   A. Yes.
9   Q. -- "the distributor should,
10  one, obtain background information on the
11  customer and the customer's business; review
12  that information carefully and, where
13  appropriate, verify that information; and
14  independently investigate the potential
15  customer."
16  Do you see what I've just read?
17  A. Yes.
18  Q. And does the DEA agree that
19  those are appropriate and necessary steps for
20  a registrant to take before shipping
21  controlled substances?
22  MR. EPPICH:  Object to form.
23  THE WITNESS:  Yes.
24  QUESTIONS BY MS. SINGER:
25  Q. Okay.  And then moving down the

1   page, second bullet talks about a background
2   questionnaire.
3   Do you see that?
4   A. Yes.
5   Q. And that should cover the
6   average number of prescriptions filled each
7   day, average number of CS item prescriptions
8   filled each day.
9   Do you see where I am?
10  A. Yes.
11  Q. And CS probably means
12  controlled substances, yes?
13  MR. EPPICH:  Objection.
14  Foundation.  Calls for speculation.
15  THE WITNESS:  Yes.  In my
16  experience, yes.
17  QUESTIONS BY MS. SINGER:
18  Q. Okay.  And then percentage of
19  controlled substances purchased compared to
20  overall purchases?
21  A. Yes.
22  Q. Would the DEA agree that those
23  are things that a registrant should be
24  looking at before shipping controlled
25  substances to a new customer?

1   MR. EPPICH:  Object to form.
2   THE WITNESS:  Yes.
3   QUESTIONS BY MS. SINGER:
4   Q. All right.  And turning to the
5   next page, identify -- bottom bullet:
6   "Identification of physicians and other
7   treatment centers that are the potential
8   customer's most frequent prescribers or
9   highest purchasing doctors."
10  Do you see where I am?
11  A. Yes.
12  Q. And is that something that a
13  registrant should be doing as well?
14  MR. EPPICH:  Object to form.
15  THE WITNESS:  Yes.
16  QUESTIONS BY MS. SINGER:
17  Q. Okay.  Turning to the next
18  page, independent investigation, subheading
19  D, it says at the first line, "The
20  distributor should independently investigate
21  the potential customer as follows:"  Checking
22  with the local DEA office, state oversight
23  authorities, DEA website and Federal
24  Register, and conducting an Internet search.
25  Do you see each of those

1   elements?
2   A. Yes.
3   Q. And does the DEA agree that
4   those are things that a responsible
5   registrant should be doing before shipping
6   controlled substances to a customer?
7   MS. MAINIGI:  Objection.  Form.
8   Foundation.  Vague.
9   THE WITNESS:  Yes.
10  QUESTIONS BY MS. SINGER:
11  Q. And merely checking to see
12  whether a customer has a DEA registration,
13  would that be sufficient due diligence or
14  knowing your customer?
15  MR. EPPICH:  Object to form.
16  Calls for a legal conclusion.
17  THE WITNESS:  No.
18  QUESTIONS BY MS. SINGER:
19  Q. And it says here under
20  Additional Recommendations and Documentation,
21  the third bullet, "The performance and
22  results of all steps in the customer review
23  process should be fully documented as to each
24  potential customer, and such documentation
25  should be retained in an appropriate file."

1   Do you see what I've just read?
2   A. Yes.
3   Q. And does the DEA also agree
4   that that is an appropriate element, that
5   documenting due diligence or knowing your
6   customer is an appropriate element of that
7   program?
8   MR. EPPICH:  Object to form.
9   Calls for a legal conclusion.
10  THE WITNESS:  Yes.
11  QUESTIONS BY MS. SINGER:
12  Q. All right.  Turning to 465, so
13  two pages ahead, you see the section Develop
14  Thresholds to Identify Orders of Interest?
15  A. Yes.
16  Q. Okay.  So it says here that
17  distributors -- I'm down at the second set of
18  bullets, the bottom bullet:  "Thresholds for
19  all new customer accounts should be
20  established at the lowest level indicated by
21  information obtained during the know your
22  customer due diligence review."
23  Do you see where I've just
24  read?
25  A. Yes.

1   QUESTIONS BY MS. SINGER:
2   Q. And the registrant should be
3   making its own judgment about what is not
4   suspicious for a particular customer and not
5   just accepting what they've previously
6   ordered, correct?
7   MR. EPPICH:  Object to form.
8   Calls for a legal conclusion.
9   THE WITNESS:  Correct.
10  QUESTIONS BY MS. SINGER:
11  Q. And they shouldn't be building
12  in some excess above that level, correct?
13  MR. EPPICH:  Object to form.
14  Calls for a legal conclusion.
15  THE WITNESS:  Yes.
16  QUESTIONS BY MS. SINGER:
17  Q. All right.  And then looking at
18  the section Cumulative Reviews/Thresholds,
19  the industry compliance guidelines also
20  indicate that "there should be a mechanism to
21  compare percentages of orders for controlled
22  substances, individual products and/or
23  families to orders of noncontrolled substance
24  prescription drugs so as to identify a shift
25  in a customer's business focus that may

1   Q. And does the DEA agree that
2   that is appropriate?
3   MR. EPPICH:  Object to form.
4   MS. MAINIGI:  Objection.
5   THE WITNESS:  I guess my
6   concern would be that if you're --
7   what is the lowest level?  Is it what
8   the customer is reporting what they
9   said they ordered or is it -- you
10  know, it could be like really a large
11  amount, or is the registrant saying
12  this is what we are going to say is
13  the lowest amount.
14  So I have a little trouble with
15  that one.
16  QUESTIONS BY MS. SINGER:
17  Q. Okay.  So just making sure that
18  we get this clear for the jury, the amount
19  that a customer reports may be too high,
20  correct?
21  MR. EPPICH:  Object to form.
22  MS. MAINIGI:  Objection.
23  MR. EPPICH:  Incomplete
24  hypothetical.
25  THE WITNESS:  Yes.

1   warranty further review."
2   Do you see what I've just read?
3   A. Yes.
4   Q. And does the DEA agree that a
5   registrant should not just be looking at a
6   customer's controlled substances orders but
7   their controlled substance orders relative to
8   other products they're ordering?
9   MR. EPPICH:  Object to form.
10  Calls for a legal conclusion.
11  THE WITNESS:  Yes.
12  QUESTIONS BY MS. SINGER:
13  Q. All right.  And then Bates
14  number 466 under E, the last sentence:
15  "Based on the distributor's knowledge of his
16  or her customer's overall drug purchasing
17  trends, information available from DEA and
18  elsewhere, distributors are encouraged to
19  allow for alternative criteria, in addition
20  to those incorporated into the electronic
21  system, to serve as indicators of an order of
22  interest."
23  Do you see what I've just read?
24  A. Yes.
25  Q. And is it DEA's view that --

| 05-17-2019 | Prevoznik, Thomas | Page 911 |
|---|---|---|

1  and I think you testified to this earlier --
2  that a registrant should be looking at other
3  indicators of suspicion, not just an order
4  history?  Correct?
5  MR. EPPICH:  Object to form.
6  THE WITNESS:  Yes.
7  QUESTIONS BY MS. SINGER:
8  Q. And is the DEA aware that
9  distributors have sales representatives or
10  account managers who visit pharmacies, for
11  instance?
12  MR. EPPICH:  Object to form.
13  Foundation.
14  THE WITNESS:  Yes.
15  MS. MAINIGI:  Scope.
16  QUESTIONS BY MS. SINGER:
17  Q. And should distributors be
18  looking at the -- should they be
19  incorporating or factoring the observations
20  of their account managers or sales reps into
21  their evaluation of customers and their
22  orders?
23  MR. EPPICH:  Object to form.
24  Calls for a legal conclusion.
25  Foundation.

| 05-17-2019 | Prevoznik, Thomas | Page 913 |
|---|---|---|

1  MR. EPPICH:  Object to form.
2  Calls for a legal conclusion.
3  MR. MAHADY:  Foundation.
4  THE WITNESS:  Correct.
5  QUESTIONS BY MS. SINGER:
6  Q. All right.  Next page, the top
7  of the page:  "It's recommended that the
8  distributor designate a person with suitable
9  training and experience to investigate orders
10  of interest."
11  Do you see what I've just read?
12  A. Yes.
13  Q. And does the DEA agree that a
14  registrant should have appropriately trained
15  and experienced compliance staff executing
16  its suspicious order monitoring and due
17  diligence process?
18  MR. EPPICH:  Objection.
19  MS. MAINIGI:  Objection.  Form.
20  MR. EPPICH:  Foundation.
21  THE WITNESS:  Yes.
22  QUESTIONS BY MS. SINGER:
23  Q. All right.  Bates number 468,
24  subsection D, Documentation, it says under
25  that, "All investigations should be fully

| 05-17-2019 | Prevoznik, Thomas | Page 912 |
|---|---|---|

1  THE WITNESS:  Yes.  But I would
2  also -- they're drivers as well,
3  because it's on a daily basis they're
4  in the pharmacies.
5  QUESTIONS BY MS. SINGER:
6  Q. Okay.  All right.  And then
7  looking at the bottom of the page, still at
8  Bates number 466, "The drug or drugs that
9  cause an order to become an order of interest
10  should not be shipped to the customer placing
11  the order while the order is an order of
12  interest."
13  Do you see what I've just read
14  there?
15  A. Yes.
16  Q. And do you understand that to
17  be saying that while an order is being
18  evaluated as to whether it's suspicious, it
19  should not be shipped?
20  A. Yes.
21  MS. MAINIGI:  Objection.  Form.
22  QUESTIONS BY MS. SINGER:
23  Q. And it -- again, that is the --
24  that is what the Controlled Substances Act
25  requires, correct?

| 05-17-2019 | Prevoznik, Thomas | Page 914 |
|---|---|---|

1  documented, and all records of the
2  investigation should be retained in an
3  appropriate location within the firm, such as
4  with other records relating to the particular
5  customer."
6  Does the DEA agree with that
7  element of a compliant suspicious order
8  monitoring program?
9  MR. EPPICH:  Object to form.
10  Calls for a legal conclusion.
11  THE WITNESS:  Yes.
12  QUESTIONS BY MS. SINGER:
13  Q. And in the middle of the next
14  paragraph:  "The documentation should include
15  a clear statement of the final conclusion of
16  the investigation, including why the order
17  investigated was or was not determined to be
18  suspicious.  That statement should be signed
19  and dated by the reviewer.  Copies of any
20  written information provided by the customer
21  should also be retained as part of the
22  documentation of the investigation."
23  Does the DEA agree that's
24  appropriate?
25  MR. EPPICH:  Objection to form.

1 Calls for a legal conclusion.
2 THE WITNESS:  Yes.
3 QUESTIONS BY MS. SINGER:
4 Q. All right.  Very last paragraph
5 on that page, "Orders that are determined to
6 be suspicious should be reported to DEA under
7 Section 1301.74(b) immediately upon being so
8 determined."
9 I think you've already
10 testified that that's a requirement, correct?
11 MR. EPPICH:  Objection to form.
12 THE WITNESS:  Correct.
13 QUESTIONS BY MS. SINGER:
14 Q. "It is assumed that the order
15 will continue to be placed on hold and/or
16 canceled once it has been identified as
17 suspicious."
18 Is that also consistent with
19 the DEA's interpretation of the Controlled
20 Substance Act's requirements?
21 MR. EPPICH:  Object to form.
22 Calls for a legal conclusion.
23 THE WITNESS:  Yes.
24 QUESTIONS BY MS. SINGER:
25 Q. Now, if the -- if an order is

1 QUESTIONS BY MS. SINGER:
2 Q. And should the registrant be
3 shipping that the next month?
4 MR. EPPICH:  Object to form.
5 Calls for a legal conclusion.
6 QUESTIONS BY MS. SINGER:
7 Q. Without first dispelling the
8 suspicion?
9 MR. EPPICH:  Object to form.
10 Calls for a legal conclusion.
11 Incomplete hypothetical.
12 THE WITNESS:  Yes, they should
13 be relieving -- or ascertaining is
14 there suspicion or not.
15 QUESTIONS BY MS. SINGER:
16 Q. And not shipping unless they
17 eliminate the basis for that suspicion?
18 A. Correct.
19 MR. EPPICH:  Object to form.
20 Calls for a legal conclusion.
21 Incomplete hypothetical.
22 QUESTIONS BY MS. SINGER:
23 Q. 469, sub F, Future Customer
24 Orders.  "In instances where a distributor
25 concludes that an order is or remains

1 identified as suspicious and not shipped but
2 held and then released the next month when a
3 threshold is reset, does the DEA believe that
4 the registrant is still shipping a suspicious
5 order?
6 MR. EPPICH:  Object to form.
7 Calls for a legal conclusion and
8 incomplete hypothetical.
9 MS. MAINIGI:  Outside the
10 scope.
11 THE WITNESS:  Could you please
12 repeat that?
13 QUESTIONS BY MS. SINGER:
14 Q. Now, if an order is identified
15 as suspicious and not shipped but then held,
16 you know, not shipped, held until the next
17 month when a threshold resets, is that order
18 still suspicious?
19 MR. EPPICH:  Object to form.
20 Calls for a legal conclusion and
21 incomplete hypothetical.
22 MR. FINKELSTEIN:  Incomplete
23 hypothetical.
24 THE WITNESS:  Yes.
25

1 suspicious after conducting an investigation,
2 in addition to notifying DEA, it is
3 recommended that the distributor evaluate its
4 business relationship with the customer that
5 placed that order."
6 Do you see what I've just read?
7 A. Yes.
8 Q. "The distributor may consider
9 whether to subject future orders from that
10 same customer -- from that same customer for
11 the same drug code product or all controlled
12 substances to more rigorous scrutiny than was
13 applied before the determination that the
14 order is suspicious.  The distributor may
15 also consider whether to cease filling all
16 future orders of that drug product code or
17 all controlled substances placed by that
18 customer."
19 Does the DEA agree that when a
20 registrant identifies a suspicious order,
21 they should also be looking more generally at
22 that customer?
23 MS. MAINIGI:  Objection to
24 form.
25 THE WITNESS:  Yes.

1 QUESTIONS BY MS. SINGER:
2 Q. And making a decision as to not
3 only whether to fill that order but to
4 continue filling orders for that customer?
5 MR. EPPICH: Object to form.
6 Calls for a legal conclusion.
7 THE WITNESS: Yes.
8 QUESTIONS BY MS. SINGER:
9 Q. All right. Bottom of page 469.
10 An endless document for one so short. It
11 says at the bottom bullet, "For example, the
12 distributor may identify information that
13 leads them to believe that a potential
14 customer, prior to entering a formal business
15 arrangement with that customer, may
16 intend" -- on the next page -- "to order
17 controlled substances -- controlled substance
18 products with a frequency, volume or other
19 indicator that could be considered
20 suspicious. In such instances, the
21 distributor should provide DEA with a report
22 of this information under 21 CFR
23 Section 1301.74(b)."
24 Do you see what I've just read?
25 A. Yes.

1 Q. And would the DEA agree that if
2 a distributor is evaluating a potential
3 customer, sees indications that it may be
4 engaged in diversion, it is not sufficient
5 for the distributor to simply not do business
6 with that customer, but that they should also
7 be reporting that customer -- that potential
8 customer to the DEA?
9 MR. EPPICH: Object to form.
10 Calls for a legal conclusion.
11 THE WITNESS: Yes.
12 QUESTIONS BY MS. SINGER:
13 Q. All right. Subsection B on
14 Bates number 470, under Correspondence For
15 Reporting, "It is recommended that all
16 correspondence to DEA containing reports of
17 suspicious orders should be sent registered
18 mail with a return receipt requested, by
19 electronic mail or by another system that
20 creates for the distributor a permanent
21 record that DEA has received the
22 notification."
23 Does the DEA agree with that?
24 MS. MAINIGI: Objection to
25 form.

1 THE WITNESS: Well, we have two
2 different things going on. We have
3 those that report to the field and
4 those that have been under an action
5 that is now dictated to go through
6 electronically to headquarters.
7 So, yes, if it's going to the
8 office, that would be a great way to
9 do it, to track that.
10 QUESTIONS BY MS. SINGER:
11 Q. Okay. And that C,
12 Documentation, "All additional contact with
13 DEA, either by telephone or in person, should
14 be documented, and a record of the contact
15 should be maintained."
16 Does the DEA agree with that?
17 A. Yes.
18 Q. And is it fair to say that the
19 DEA would agree that a registrant should be
20 maintaining records of suspicious orders they
21 report to the DEA?
22 MR. EPPICH: Object to form.
23 Calls for a legal conclusion.
24 Foundation.
25 THE WITNESS: Yes.

1 QUESTIONS BY MS. SINGER:
2 Q. So while registrants, in going
3 through all of these different elements of
4 the industry compliance guidelines, which
5 we're now thankfully finished with, would the
6 DEA agree that whatever suspicious order
7 monitoring algorithm or system that a
8 registrant uses, that all of these elements
9 we just went through are elements of a
10 responsible and compliant program to prevent
11 diversion?
12 MR. EPPICH: Object to form.
13 Calls for a legal conclusion.
14 THE WITNESS: Yes.
15 QUESTIONS BY MS. SINGER:
16 Q. All right.
17 MR. FINKELSTEIN: Why don't we
18 take a five-minute break.
19 MS. SINGER: Can I do one more
20 document that connects with this and
21 then --
22 MR. FINKELSTEIN: Okay. One
23 more.
24 MS. SINGER: Thank you.
25 (Prevoznik Plaintiff's Exhibit

1  P40 marked for identification.)
2  QUESTIONS BY MS. SINGER:
3  Q. All right.  Mr. Prevoznik,
4  Exhibit 40 is entitled "Draft DEA Comments
5  From the 6-04-08 Meeting on Suspicious
6  Orders."  It's Bates number
7  CAH_MDL2804_03234535.
8  Have you seen this document?
9  A. No.
10  Q. Okay.  Do you see here at the
11  top of the document a list of DEA attendees?
12  A. Yes.
13  Q. And do you recognize those to
14  be people who have worked for the DEA?
15  A. Yes.
16  Q. Okay.  And do you recognize the
17  HDMA attendees?  Somebody from Williams &
18  Connolly, people identified as with HDMA?
19  A. I don't recognize the names.
20  Q. Okay.  All right.  If you go
21  down to the middle of the page, P.4,
22  Item 1.B, it says, "DEA was pleased to see
23  that the questionnaire would be notarized or
24  provided with the statement declaring that it
25  is true and correct.  DEA does not want

1  this document, which is Bates number 536, it
2  says, "DEA seemed to think that, quote,
3  thresholds, focus principally on volumes, and
4  they express the view that an exclusive or
5  even principal focus on volumes is
6  inadequate."
7  Is that consistent with the
8  testimony you've given that just using volume
9  thresholds aren't sufficient to identify
10  suspicious orders?
11  MR. FINKELSTEIN:  The portion
12  you read isn't in front of the
13  witness.
14  Do you know where she's reading
15  from?
16  THE WITNESS:  No.
17  QUESTIONS BY MS. SINGER:
18  Q. I'm sorry.  It's the bottom of
19  page 536, the underscored language.
20  MS. FUMERTON:  Object to form.
21  MR. EPPICH:  Object to the
22  form.  Calls for a legal conclusion.
23  Vague.
24  THE WITNESS:  Sorry, can you
25  repeat it?

1  changes but wants us to be aware that merely
2  obtaining a signed document isn't going to be
3  enough of a defense.  Distributors will have
4  to do more to identify the pharmacy's
5  legitimacy."
6  Do you understand what this is
7  referring to?
8  MS. MAINIGI:  Objection.
9  Foundation.  Outside the scope of the
10  Touhy authorization.
11  THE WITNESS:  I don't know what
12  question they're talking about.
13  QUESTIONS BY MS. SINGER:
14  Q. Okay.  Would the DEA agree that
15  in addition to completing a question --
16  having a potential customer complete a
17  questionnaire before a registrant agrees to
18  ship them a controlled substance, that a
19  registrant has to verify that the answers to
20  that questionnaire are accurate and complete?
21  MR. EPPICH:  Object to the
22  form.  Calls for a legal conclusion.
23  THE WITNESS:  Yes.
24  QUESTIONS BY MS. SINGER:
25  Q. And then turning to page 2 of

1  QUESTIONS BY MS. SINGER:
2  Q. Yeah.
3  Do you agree with that first
4  underlined sentence, "DEA seemed to think the
5  thresholds focus principally on volumes, and
6  they express the view that an exclusive or
7  even principal focus on volumes is
8  inadequate"?
9  A. Yes.
10  Q. Okay.  They also want the
11  initial screen of orders to focus on, "A,
12  patterns of ordering, comparing the present
13  order to the past orders from the same
14  customers, including whether the frequency of
15  orders is suspicious; 2, orders are from
16  similar customers; and, 3, orders from the --
17  from other establishments of the same type in
18  the locale or region; and on, B, combinations
19  of controlled substances ordered."
20  Does DEA agree that that is
21  also a necessary element of monitoring for
22  suspicious orders?
23  MR. EPPICH:  Object to the
24  form.  Calls for a legal conclusion.
25  THE WITNESS:  Yeah, I'm not --

1  the word "necessary," I mean, it's
2  very important.  It's part of the
3  criteria that should be included.
4  QUESTIONS BY MS. SINGER:
5  Q.  Okay.  And then on Bates
6  number 538, looking at the highlighted
7  language toward the bottom of the page:  "In
8  general" --
9  I want to make sure you see
10 where I am.
11 A.  Yes.
12 Q.  -- "DEA did not object to our
13 recommendation that the particular drug or
14 drugs that cause an order to be an order of
15 interest or a suspicious order should not be
16 shipped but other drugs can be.  Their point
17 was that in some circumstances the connection
18 between that drug and another drug in the
19 order should lead the wholesaler not to ship
20 the other drug as well.  Again, in their
21 view, looking at a volume order drug by drug
22 is not enough, and basing thresholds solely
23 on volume is not enough.  Even an order for a
24 drug that does not meet a volume threshold
25 may be suspicious in light of other aspects

1  form.  Foundation.  Calls for
2  speculation.
3  MS. MAINIGI:  Objection.
4  Foundation.
5  MR. FINKELSTEIN:  Calls for
6  speculation.
7  MS. SINGER:  You know what?
8  Withdrawn.  Don't answer that.
9  QUESTIONS BY MS. SINGER:
10 Q.  The next bullet, "They wanted
11 reports on all suspicious orders even if the
12 order was not shipped."
13 Does the DEA agree that
14 registrants should be reporting all
15 suspicious orders, even orders that aren't
16 shipped?
17 MR. EPPICH:  Object to the
18 form.  Calls for speculation.  Calls
19 for a legal conclusion.
20 **THE WITNESS:  Yes.**
21 **QUESTIONS BY MS. SINGER:**
22 **Q.  "Timeliness is very important.**
23 **DEA wants us to emphasize the need for rapid,**
24 **timely reporting."**
25 **Is that a point that DEA made**

1  of the order."
2  Does DEA agree with that
3  statement?
4  MR. EPPICH:  Object to the
5  form.  Calls for a legal conclusion.
6  THE WITNESS:  Yes.
7  QUESTIONS BY MS. SINGER:
8  Q.  Okay.  And then the final
9  section of this document, Bates number 539,
10 if you look at the bullets on the bottom of
11 the page, additional comments/points raised.
12 Do you see where I am?
13 A.  Yes.
14 Q.  "DEA was emphatic that if there
15 were questions about an order, the order
16 should not be shipped."
17 Do you agree with that
18 statement?
19 MR. EPPICH:  Object to form.
20 Calls for a legal conclusion.
21 THE WITNESS:  Yes.
22 QUESTIONS BY MS. SINGER:
23 Q.  And why do you think the
24 "should not" is underscored there?
25 MR. EPPICH:  Object to the

1  **clear to registrants?**
2  MR. MAHADY:  Objection to form.
3  Objection to foundation.
4  MR. EPPICH:  Calls for
5  speculation.
6  **THE WITNESS:  It's also**
7  **regulation upon discovery, so it's**
8  **immediately upon discovery.**
9  QUESTIONS BY MS. SINGER:
10 **Q.  So that's a yes?**
11 **A.  Yes.**
12 MS. SINGER:  Okay.  All right.
13 Let's take a break.
14 VIDEOGRAPHER:  We're going off
15 record.  The time is 10:30.
16 (Off the record at 10:30 a.m.)
17 VIDEOGRAPHER:  We're going back
18 on the record.  Beginning of Media
19 File 3.  The time is 10:45.
20 MR. FINKELSTEIN:  Before we
21 resume, I just have a request of the
22 parties and of the special master as
23 well.
24 Since it appears that we are
25 deferring argument over the scope of

1  the Touhy authorization until sometime
2  later, we would ask that we be copied
3  on briefings regarding the scope of
4  the Touhy authorization and that we be
5  given an opportunity to respond.
6  MS. MAINIGI:  Fine with us.
7  MR. FINKELSTEIN:  And I ask
8  that those be e-mailed directly to
9  James Bennett.
10  MR. BENNETT:  That's fine.
11  SPECIAL MASTER COHEN:  So
12  stipulated.
13  MS. SINGER:  All right.  Are we
14  ready?
15  QUESTIONS BY MS. SINGER:
16  Q. All right.  Mr. Prevoznik, on
17  the one hand, industry has complained that
18  you didn't give -- you, the DEA, didn't give
19  them enough guidance or the right kind of
20  guidance on identifying suspicious orders,
21  but then one of the lawyers in your first two
22  days of deposition suggested that the
23  Rannazzisi letters, those 2006, 2007 letters,
24  were improper and should have gone through a
25  rulemaking process.

1  Do you remember what I'm
2  referring to?
3  MR. EPPICH:  Object to form.
4  MS. MAINIGI:  Objection.
5  THE WITNESS:  Yes.
6  QUESTIONS BY MS. SINGER:
7  Q. Okay.  Is DEA able to swear
8  these positions, that you didn't give enough
9  guidance, but you also should have given more
10  guidance?  I just said the same thing.
11  MR. EPPICH:  Objection.
12  QUESTIONS BY MS. SINGER:
13  Q. Is the DEA able to swear those
14  positions, that the guidance you gave was
15  improper but you should have given more
16  guidance?
17  MR. EPPICH:  Object to form.
18  Vague.
19  MS. MAINIGI:  Outside the scope
20  also.
21  THE WITNESS:  I'm not sure what
22  you're asking me.
23  QUESTIONS BY MS. SINGER:
24  Q. So when industry complains you
25  didn't give them enough guidance on

1  suspicious orders but also said that the
2  Rannazzisi letters were improper because they
3  didn't go through a rulemaking process, are
4  you able to reconcile those positions?
5  What should DEA have done?
6  MR. EPPICH:  Object to form.
7  MS. MAINIGI:  Objection.
8  Outside the scope of the Touhy
9  authorization.  Improper hypothetical.
10  MR. FINKELSTEIN:  I'll join the
11  scope objection.
12  You can answer if you
13  understand.
14  THE WITNESS:  I'm still not
15  sure what you're asking.
16  MS. SINGER:  Okay.  Skip it.
17  QUESTIONS BY MS. SINGER:
18  Q. Okay.  Let me ask it
19  differently.
20  Did the Rannazzisi letters, the
21  2006, 2007 letters, change the obligations of
22  registrants?
23  A. No.
24  MR. EPPICH:  Object to form.
25  Calls for a legal conclusion.

1  QUESTIONS BY MS. SINGER:
2  Q. Did they reflect a new policy
3  or interpretation by DEA?
4  MR. EPPICH:  Object to the
5  form.
6  THE WITNESS:  No, we were just
7  being more proactive to get the
8  registrants to see this was what was
9  going on.  That's why we did the
10  distributor initiatives, to show them
11  with their own data, these are the
12  anomalies that we were seeing and
13  explaining to them this is what we
14  saw, and you should be paying
15  attention to these as well.
16  So the guidance letter -- or
17  not the guidance.  The reiteration of
18  what their legal obligations were,
19  both statutorily and regulatory, were
20  in those letters, and it was to stop
21  what was going on at that time.
22  QUESTIONS BY MS. SINGER:
23  Q. And "stop" meaning the --
24  A. The diversion of controlled
25  substances into the illicit market.

1  (Prevoznik Plaintiff's Exhibit
2  P41 marked for identification.)
3  QUESTIONS BY MS. SINGER:
4  Q. Okay.  Showing you Exhibit 41.
5  Do you recognize this, Mr. Prevoznik, as one
6  of Joe Rannazzisi's letters from
7  September 27, 2006?
8  A. Yes.
9  Q. And turn to page 3 of that
10  letter, please.
11  Do you see a heading at the top
12  of the page, Circumstances That Might Be
13  Indicative of Diversion?
14  A. Yes.
15  Q. And does this letter then go
16  through a list of ten factors that
17  registrants might look to to determine
18  whether an order is suspicious?
19  MS. MAINIGI:  Objection.
20  THE WITNESS:  Are you talking
21  the middle 10 or the four above it?
22  QUESTIONS BY MS. SINGER:
23  Q. The 1 through 4 -- I'm sorry,
24  and then 1 through 10, so a total of 14.
25  A. Yes.

1  Q. Your math is better than mine.
2  And does this, in fact, reflect
3  information, clarification, that DEA provided
4  to registrants to help them identify
5  suspicious orders?
6  A. Yes.
7  Q. Okay.
8  MR. EPPICH:  Object to form.
9  QUESTIONS BY MS. SINGER:
10  Q. All right.  Now, many of the
11  registrants represented by counsel here are
12  sophisticated, multi-billion dollar
13  companies; is that correct?
14  MR. EPPICH:  Object to form.
15  MS. MAINIGI:  Object to form.
16  Scope.
17  MR. FINKELSTEIN:  Hang on.
18  I'll join the scope objection.
19  You can answer.
20  QUESTIONS BY MS. SINGER:
21  Q. Does DEA believe that they
22  needed DEA to explain the rules to them?
23  MR. EPPICH:  Object to form.
24  Argumentative.
25  MS. MAINIGI:  Scope.

1  THE WITNESS:  Well, I mean,
2  it's -- our job as DEA is as a
3  regulatory and as a law enforcement,
4  is to ensure that the right -- that
5  it's staying within the closest to the
6  distribution.  So that's -- our job is
7  to investigate, detect and pro -- and
8  detect where this might be occurring.
9  So, I mean, that's what our job is.
10  QUESTIONS BY MS. SINGER:
11  Q. Okay.  So let me ask it
12  slightly differently.
13  In your experience, did these
14  companies have lawyers and lobbyists to help
15  them explain the rules for preventing
16  diversion and reporting suspicious orders?
17  MR. EPPICH:  Objection.  Form.
18  Calls for speculation.  Foundation.
19  MS. MAINIGI:  Outside the
20  scope.
21  THE WITNESS:  Yes.
22  QUESTIONS BY MS. SINGER:
23  Q. And do you think, does DEA
24  think, that the industry's failure to comply
25  with the Controlled Substances Act was due to

1  a failure to understand what the law required
2  of them?
3  MR. MAHADY:  Objection.  Form.
4  MS. MAINIGI:  Foundation.
5  Scope.
6  MR. EPPICH:  Objection.  Calls
7  for a legal conclusion.
8  MR. FINKELSTEIN:  Calls for
9  speculation.
10  THE WITNESS:  No.
11  QUESTIONS BY MS. SINGER:
12  Q. And do you think that
13  industry's failure to comply with the
14  Controlled Substances Act and maintain -- and
15  the failure to maintain effective controls
16  was due to -- I'm sorry, let me say that
17  again.
18  Do you think that industry's
19  failure to maintain effective controls to
20  prevent diversion was based on a lack of
21  recognition that diversion imperils public
22  health and safety?
23  MR. EPPICH:  Objection to form.
24  Foundation.  Calls for a legal
25  conclusion.

1  MR. FINKELSTEIN:  Calls for
2  speculation.
3  THE WITNESS:  Can you please
4  repeat it?
5  QUESTIONS BY MS. SINGER:
6  Q. Yeah.  I'll put it differently.
7  Do you think that the reason
8  that the industry didn't comply with the
9  rules is because they didn't understand what
10 would happen if they permitted the diversion
11 of controlled substances?
12 MR. EPPICH:  Objection to form.
13 Calls for speculation.
14 MS. MAINIGI:  Outside the scope
15 of the Touhy authorization.
16 MR. FINKELSTEIN:  Calls for
17 speculation.
18 THE WITNESS:  Can you give it
19 to me one more time?  I'm just having
20 a little hard time interpreting.
21 QUESTIONS BY MS. SINGER:
22 Q. Do you think that industry
23 failed to understand that permitting the
24 diversion of controlled substances
25 jeopardizes public health and safety?

1  MR. EPPICH:  Objection to form.
2  Calls for speculation.  Scope.
3  MR. FINKELSTEIN:  Same
4  objection.
5  THE WITNESS:  Yes, I would
6  agree that they didn't.
7  QUESTIONS BY MS. SINGER:
8  Q. And put a different way,
9  because I've got a lot of negatives in there,
10 do you think industry understood that
11 diversion leads to negative consequences for
12 public health and safety?
13 MR. EPPICH:  Object to form.
14 Calls for speculation.  Legal
15 conclusion.  Scope.
16 MS. MAINIGI:  Foundation.
17 MR. FINKELSTEIN:  Calls for
18 speculation.
19 THE WITNESS:  I think they
20 obviously do now.  I don't know at
21 that time that they realized how bad
22 it was getting.
23 QUESTIONS BY MS. SINGER:
24 Q. But they did understand that
25 the purpose of the controlled -- of the

1  closed system is to prevent diversion and
2  protect public safety and the public
3  interest?
4  MR. EPPICH:  Objection to form.
5  MS. MAINIGI:  Objection to
6  form.  Outside the scope of the Touhy
7  authorization.
8  Special Master Cohen, I do
9  think that this entire line of
10 questioning where somehow the DEA is
11 supposed to define what industry was
12 thinking in some broad sense is
13 totally improper.
14 MR. EPPICH:  Objection.  Calls
15 for speculation.
16 MR. FINKELSTEIN:  Join the
17 speculation objection.
18 SPECIAL MASTER COHEN:
19 Eventually there will be an
20 admissibility ruling on this.  I'm not
21 going to preclude the questions from
22 being asked at this juncture.
23 QUESTIONS BY MS. SINGER:
24 Q. Did you answer the question,
25 that --

1  A. I'm not sure if I answered or
2  not.
3  Q. Okay.  Let me ask one more.
4  Is the -- did the DEA, in the
5  Controlled Substances Act, make clear to
6  industry that the failure to prevent
7  diversion was a threat to public safety and
8  the public interest?
9  MR. EPPICH:  Objection to form.
10 Foundation.
11 THE WITNESS:  Yes, I think it's
12 established in 823 where it's part of
13 our -- part of the registrant that is
14 applying to be a registrant
15 understands that they have to maintain
16 effective controls.  They have to
17 follow the state laws.  They have to
18 not be convicted of, you know,
19 felonies or anything like that.
20 But also they also know that
21 these drugs themselves are scheduled
22 controlled substances for a particular
23 reason, because they're addictive,
24 psychologically and physically they're
25 addictive, so they know that these

1   drugs have these properties within
2   themselves.
3   So they would understand that
4   these drugs are categorized or
5   scheduled in that manner because they
6   have the potential to hurt.
7   MR. FINKELSTEIN:  For what it's
8   worth, the witness said 823, not E 23.
9   QUESTIONS BY MS. SINGER:
10  Q. Now, you were asked in the
11  first two days of your deposition some
12  questions about whether DEA implicitly or
13  explicitly approved of distributors'
14  compliance programs.
15  Do you remember that line of
16  questioning?
17  A. Yes.
18  Q. Okay.  And you testified that
19  if the DEA found problems, like not reporting
20  suspicious orders, you would let the
21  registrant know they needed to make
22  adjustments; is that correct?
23  A. Now, I don't understand that
24  that's the totality of what I stated.
25  Q. Okay.  So --

1   they ask -- or we hear something that
2   doesn't sound quite right, we would
3   offer and say, "Well, you might want
4   to look at this."
5   Sort of exactly like the
6   Rannazzisi letters in which we laid
7   out the foundation of these are the
8   things that we're seeing.  We're
9   having trouble trying to figure out
10  why this is going on.  So we're asking
11  you to ask the same questions of
12  yourselves of the data that you're
13  seeing.
14  So what we're trying to do is
15  we're trying to put people in
16  compliance so that this stops, that
17  the diversion stops.  So, yes, we
18  would -- we would offer suggestions to
19  them.
20  However, if we're into an
21  investigation or something where it --
22  where we are either investigating or
23  litigating, that might -- that
24  conversation might slow down.
25

1   MR. EPPICH:  Well, let me
2   object to it misstates prior
3   testimony, please.
4   QUESTIONS BY MS. SINGER:
5   Q. Okay.  So would the DEA let a
6   registrant know if it was aware of problems
7   with its suspicious order monitoring system?
8   MS. MAINIGI:  Objection.
9   Vague.  Form.  Foundation.
10  MR. FINKELSTEIN:  Incomplete
11  hypothetical.
12  MS. MAINIGI:  And time period.
13  THE WITNESS:  So how I would
14  respond to this particular question is
15  when we sit down with a registrant and
16  they're explaining their system to us,
17  we are in a listening mode.  We are
18  listening to what they say:  "This is
19  what we're going to do.  This is how
20  we're going to implement it.  These
21  are the thresholds.  These are the" --
22  whatever.  They're explaining the
23  system to us, so we listen to what
24  they're saying.
25  If we, in listening to that,

1   QUESTIONS BY MS. SINGER:
2   Q. Understood.
3   And the fact that DEA doesn't
4   alert a registrant to a problem with their
5   suspicious order monitoring program doesn't
6   mean the problem doesn't exist, does it?
7   MR. EPPICH:  Object to form.
8   Calls for speculation.  Calls for a
9   legal conclusion.
10  MS. FUMERTON:  And lack of
11  foundation.
12  THE WITNESS:  Yes.
13  QUESTIONS BY MS. SINGER:
14  Q. Yes.  Okay.
15  So, for instance, if I turn in
16  my taxes and the IRS cashes the check and
17  doesn't send me an audit letter, it doesn't
18  mean that they've approved of a tax shelter
19  that I may have?
20  MR. EPPICH:  Objection.
21  Incomplete hypothetical form.
22  QUESTIONS BY MS. SINGER:
23  Q. Not that I do.
24  MR. EPPICH:  Objection.  Form.
25  Incomplete hypothetical.

1  MS. FUMERTON:  Outside the
2  scope.
3  MR. FINKELSTEIN:  Scope.
4  Unless you're talking about my taxes.
5  THE WITNESS:  Yes.
6  QUESTIONS BY MS. SINGER:
7  Q. Okay.  So you testified, too,
8  that things can look good on paper or look
9  fine on paper, but what matters is how they
10  work in practice, correct?
11  MR. EPPICH:  Objection to the
12  extent it misstates prior testimony.
13  THE WITNESS:  Well, the
14  regulations require two things:
15  design and operate.  So the design
16  would be this is what we propose, this
17  is what our system looks like, and
18  then becomes, well, what, in fact, did
19  you do with the operation of it.
20  QUESTIONS BY MS. SINGER:
21  Q. Okay.  And you, the DEA, can't
22  always see what distributors don't do or do
23  wrong, especially if they're trying not to be
24  caught, correct?
25  MR. EPPICH:  Object to the

1  Q. And if you go down towards the
2  bottom of the page, there's a paragraph that
3  begins with "Gary Boggs, special agent with
4  the DEA's Office of Diversion Control."
5  Do you see where I am?
6  A. Yes.
7  Q. And do you know who Gary Boggs
8  is?
9  A. Yes.
10  Q. And who is Gary Boggs?
11  A. He was one of the assistants to
12  Joe Rannazzisi when Joe was the head of the
13  diversion program.
14  Q. Okay.  And this article, if you
15  look at page 1, is dated 2012.
16  Do you know if Gary Boggs was
17  with DEA in 2012?
18  Or it identifies him here as a
19  special agent with DEA's Office of Diversion
20  Control.
21  A. Yeah, I'm just trying to think,
22  because I got to headquarters in 2012, so he
23  was there for part of it, but I think he may
24  have -- not 100 percent, but he may have
25  retired towards the end of the year.

1  form.  Foundation.
2  MS. MAINIGI:  Incomplete
3  hypothetical and outside the scope.
4  THE WITNESS:  Correct.
5  (Prevoznik Plaintiff's Exhibit
6  P42 marked for identification.)
7  QUESTIONS BY MS. SINGER:
8  Q. Okay.  I want to turn to
9  Exhibit 42.
10  It is Exhibit Number 7 to the
11  Boggs deposition.  It's called "American
12  Pain:  The Largest US Pill Mill's Rise and
13  Fall."
14  Have you seen this article
15  before?
16  A. I don't -- I don't know of this
17  one in particular.  I've seen a lot of
18  articles.
19  Q. Okay.  And I want you to turn
20  to the -- I don't know if it's tabbed on your
21  copy, but page -- the page that starts
22  "Harvard Drug" on the top.  I think it's the
23  fifth page.
24  Do you see that page?
25  A. Yes.

1  Q. Okay.  So it says here, "Gary
2  Boggs, special agent with the DEA's Office of
3  Diversion Control, says the cases that the
4  DEA has brought in recent years involved
5  wholesalers knowingly making enormous sales
6  to customers that were per se in violation of
7  DEA's rules."
8  Do you see where I'm reading?
9  A. Yes.
10  Q. And does the DEA agree with
11  that statement?
12  MR. EPPICH:  Object to the
13  form.  Foundation.  Scope.
14  THE WITNESS:  Yes.
15  QUESTIONS BY MS. SINGER:
16  Q. And then it goes on quoting
17  Mr. Boggs, "The notion put out by HDMA that
18  somehow or another the DEA is not providing
19  essential information to them is simply not
20  accurate, says Boggs.  It's a smokescreen.
21  It's a step out of desperation."
22  Do you see that statement?
23  A. Yes.
24  Q. Okay.  Do you agree with that
25  statement?

1  MR. EPPICH:  Objection to the
2  form.  Scope.  Foundation.
3  MR. FINKELSTEIN:  Object to the
4  form.
5  THE WITNESS:  Yes.
6  (Prevoznik Plaintiff's Exhibit
7  P43 marked for identification.)
8  QUESTIONS BY MS. SINGER:
9  Q. All right.  Moving to the next
10  exhibit.
11  By the way, do you know what
12  Gary Boggs does now?
13  MR. EPPICH:  Objection to form.
14  Calls for speculation.
15  THE WITNESS:  He works for
16  McKesson.
17  QUESTIONS BY MS. SINGER:
18  Q. All right.  Exhibit 43,
19  Mr. Prevoznik.
20  This is MCKMDL00661483.
21  MR. FINKELSTEIN:  Can I get
22  another copy of this, please?
23  QUESTIONS BY MS. SINGER:
24  Q. All right.  And this is an
25  e-mail Re: Report on House Energy and

1  Commerce Subcommittee Hearing on DEA and FDA
2  Transparency.
3  And I'll direct you to the
4  middle of the e-mail from Ann Berkey.
5  Do you see where I am?
6  A. Yes.
7  Q. Okay.  And it's dated Tuesday,
8  April 8, 2014.
9  And if you look in the text of
10  that e-mail, it says, "I met today with Gary
11  Boggs, the new senior director of reg affairs
12  for US pharma for the east of the Mississippi
13  River, that is, who is based in Livonia.
14  He's a former top official with the DEA, and
15  we talked extensively about this bill, the
16  hearing, ways we can work with the Agency, et
17  cetera.  He outlined in some detail the
18  processes that the DEA has had in place for
19  years to, quote, collaborate with wholesalers
20  in the way in which our industry, CAH" --
21  Do you know what CAH refers to?
22  MR. EPPICH:  Objection.
23  Foundation.  Calls for speculation.
24  THE WITNESS:  No, I don't.
25

1  QUESTIONS BY MS. SINGER:
2  Q. Do you know if that might be
3  Cardinal Health?
4  A. It could be.
5  MR. EPPICH:  Objection.
6  Foundation.
7  MS. MAINIGI:  Outside the
8  scope.
9  MR. EPPICH:  Asked and
10  answered.
11  MS. MAINIGI:  Ms. Singer, we
12  would appreciate it if you were not
13  testifying.
14  MS. SINGER:  I don't think I
15  was.
16  QUESTIONS BY MS. SINGER:
17  Q. -- "has blown them off to the
18  point that the DEA is now hammering all of
19  us."
20  Does this accurately reflect
21  the sense of the -- is it true that the DEA
22  felt that the industry did not respond to
23  their guidance and request for compliance?
24  MR. MAHADY:  Objection.  Form.
25  Objection.  Foundation.

1  MS. MAINIGI:  Outside the
2  scope.
3  MR. EPPICH:  Objection.  Form.
4  Calls for speculation.  No foundation.
5  MR. FINKELSTEIN:  Vague as to
6  time.
7  THE WITNESS:  Yes.
8  QUESTIONS BY MS. SINGER:
9  Q. And this is as of 2014,
10  correct?
11  MR. EPPICH:  Objection.
12  Foundation.  Misstates the document.
13  Form.
14  THE WITNESS:  Yes, that's the
15  date on the e-mail.
16  QUESTIONS BY MS. SINGER:
17  Q. All right.  Turn to the next
18  page, please.  It says, towards the top, "Per
19  our discussion with Rep Burgess."
20  Do you see where I am?
21  A. Yes.
22  Q. "Per our discussion with Rep
23  Burgess on Saturday, his office called me
24  this afternoon before the hearing and asked
25  me for questions he could ask DEA.  Stop

---

05-17-2019     **Prevoznik, Thomas**     Page 955

1  there.
2  Now, do you know who Ann Berkey
3  is?
4  MR. EPPICH: Objection. Calls
5  for speculation.
6  QUESTIONS BY MS. SINGER:
7  Q. No?
8  A. No.
9  Q. Okay. Were you aware that the
10  HDA was providing questions to members of
11  Congress, or Representative Burgess in
12  particular, to ask DEA at an upcoming
13  hearing?
14  MR. EPPICH: Objection.
15  Foundation. Scope. Form.
16  MR. FINKELSTEIN: I'll join the
17  scope objection.
18  THE WITNESS: Me personally,
19  no, I did not know that.
20  (Prevoznik Plaintiff's Exhibit
21  P44 marked for identification.)
22  QUESTIONS BY MS. SINGER:
23  Q. Okay. Next exhibit.
24  Okay. Exhibit 44. This is
25  ABDCMDL00139028.

---

05-17-2019     **Prevoznik, Thomas**     Page 956

1  It's called Summary of DEA HDMA
2  meeting, December 19, 2011.
3  Do you recall a meeting between
4  the DEA and HDMA in 2011?
5  MR. EPPICH: Objection.
6  Foundation.
7  THE WITNESS: I don't.
8  QUESTIONS BY MS. SINGER:
9  Q. The DEA did meet with the HDMA
10  periodically, correct?
11  MR. EPPICH: Objection.
12  Foundation.
13  **THE WITNESS: Correct.**
14  **QUESTIONS BY MS. SINGER:**
15  **Q. Okay. And down at the bottom**
16  **of the page here, in the last paragraph, it**
17  **says, "HDMA asked if there was any -- if**
18  **there were any noncompliance trends**
19  **throughout the wholesale distribution**
20  **industry we should inform our members about."**
21  **Do you see where I am?**
22  **A. Yes.**
23  **Q. Okay. "Gary Boggs" --**
24  **Who we talked about just a**
25  **minute ago, correct?**

---

05-17-2019     **Prevoznik, Thomas**     Page 957

1  A. Yes.
2  MR. EPPICH: Objection.
3  QUESTIONS BY MS. SINGER:
4  Q. -- "the executive assistant to
5  the deputy administrator for diversion
6  control, led this response. He stated that
7  DEA's single greatest concern was their
8  belief that wholesaler distributors were lax
9  in analysis, review and acting on their own
10  ARCOS data. He stated that sometimes the
11  data were pretty egregious. He went on to
12  explain," turning the page, "that the Agency
13  had not seen changes in registrants' behavior
14  that it expected after presenting its
15  analysis of ARCOS data to them, so we have --
16  quote, 'so we have upped our game.'"
17  Is this consistent with the
18  DEA's view and your testimony that
19  registrants were lax in their analysis,
20  review and acting on their own ARCOS data?
21  MR. EPPICH: Object to form.
22  Misstates testimony. Foundation.
23  THE WITNESS: Yes.
24  QUESTIONS BY MS. SINGER:
25  Q. And was it pretty egregious?

---

05-17-2019     **Prevoznik, Thomas**     Page 958

1  MR. EPPICH: Objection to form.
2  Foundation.
3  MS. MAINIGI: Vague.
4  **THE WITNESS: Yes.**
5  QUESTIONS BY MS. SINGER:
6  **Q. And when it says here that DEA**
7  **had "upped its game," do you know what that's**
8  **referring to?**
9  MR. EPPICH: Objection to form.
10  Foundation.
11  MS. MAINIGI: Outside scope.
12  **THE WITNESS: At this time**
13  **period, we were investigating and**
14  **litigating against the wholesalers.**
15  **QUESTIONS BY MS. SINGER:**
16  **Q. Okay. Prompted by DEA's sense**
17  **that that's what they needed to do given a**
18  **lack of voluntarily compliance, correct?**
19  MR. EPPICH: Object to the
20  form. Misstates testimony.
21  Foundation.
22  **THE WITNESS: Yes.**
23  (Prevoznik Plaintiff's Exhibit
24  P45 marked for identification.)
25

---

1  QUESTIONS BY MS. SINGER:
2  Q. Exhibit 45. This is
3  CAH_MDL2804_01530082. And I'll represent
4  that this is an HDMA document.
5  And I'd like to direct you to
6  page 2. I'm sorry, not page 2, page 1,
7  number 2. Just throwing you for a loop.
8  Do you see the row that
9  indicates "Petition DEA for a regulation to
10 clarify suspicious orders and/or suspicious
11 order monitoring expectations"?
12 Do you see where I am?
13 A. Yes.
14 Q. Okay. And it says in the far
15 right column, "Favored this option above all
16 the others. Unlikely that DEA would create
17 such a regulation; therefore, low risk of
18 resulting in something overly restrictive or
19 difficult to follow. A good ask. The optics
20 would be positive. We go on the record as
21 asking for clarity. Recognize that this may
22 be -- this may tie into what is done on the
23 Hill or in a PR campaign, as external
24 pressure may be desirable and/or a legislator
25 may use it as the basis of a new bill. Some

1  went so far as to state we should do this.
2  Urged HDMA to carefully articulate, one, what
3  we believe DEA should address; and two, DEA
4  should only inspect/enforce against what is
5  specified in the regulations."
6  Have I just read that
7  accurately, Mr. Prevoznik?
8  A. Yes.
9  Q. And was DEA aware that the
10 reason HDMA was pressing for clarification of
11 suspicious order and suspicious order
12 monitoring expectations was for the optics of
13 it?
14 MR. EPPICH: Object to form.
15 Foundation. Calls for speculation.
16 MS. MAINIGI: And outside
17 scope.
18 THE WITNESS: No.
19 QUESTIONS BY MS. SINGER:
20 Q. Or that they recognized that it
21 was unlikely that DEA would actually create
22 such a regulation?
23 MR. EPPICH: Object to form.
24 Foundation. Scope.
25 MS. MAINIGI: Misstates the

1  document, and it's outside the scope
2  of the Touhy authorization.
3  THE WITNESS: Can you repeat
4  that, please?
5  QUESTIONS BY MS. SINGER:
6  Q. Or that they recognized that it
7  was unlikely that DEA would create such a
8  regulation, so it was a low risk for
9  industry?
10 MS. MAINIGI: Same objections.
11 THE WITNESS: Correct.
12 QUESTIONS BY MS. SINGER:
13 Q. When you were testifying -- and
14 you can put that away, Mr. Prevoznik.
15 When you were testifying
16 earlier in your deposition --
17 MR. BENNETT: If I might
18 interrupt for one second, I believe
19 there was -- in the record you asked
20 the question, and I think the witness
21 said "correct," and it was transcribed
22 as "no." But I just want the record
23 to be clear what your answer was to
24 her last question.
25 THE WITNESS: I believe it was

1  "correct."
2  MS. SINGER: Thank you.
3  QUESTIONS BY MS. SINGER:
4  Q. All right. In your testimony
5  on day one or day two, you were asked whether
6  suspicious orders always lead to diversion.
7  Do you remember?
8  A. Yes.
9  MS. MAINIGI: Objection to
10 form. Vague.
11 QUESTIONS BY MS. SINGER:
12 Q. Okay. And I think your answer
13 to that was, no, it doesn't always lead to
14 diversion.
15 Does that seem right to you?
16 MR. EPPICH: Objection. The
17 transcript speaks for itself.
18 THE WITNESS: Yes.
19 QUESTIONS BY MS. SINGER:
20 Q. Okay. And is that because,
21 Mr. Prevoznik, not all suspicious orders turn
22 out to actually be suspicious?
23 A. Correct.
24 MR. EPPICH: Objection to form.
25

1   QUESTIONS BY MS. SINGER:
2   Q.  Okay.  But if a distributor
3   doesn't investigate a suspicious order, it
4   wouldn't know whether that order was being
5   diverted, right?
6   MR. EPPICH:  Object to the
7   form.  Calls for speculation.
8   THE WITNESS:  Yes.
9   QUESTIONS BY MS. SINGER:
10  Q.  And to use the language we
11  quoted earlier from the Diversion
12  Investigators Manual, sending out potentially
13  suspicious orders without investigating them
14  reflects a, quote, attitude of
15  irresponsibility.
16  Does DEA agree?
17  MS. MAINIGI:  Objection to
18  form.  Outside the scope.  Vague.
19  THE WITNESS:  Yes.
20  (Prevoznik Plaintiff's Exhibit
21  P46 marked for identification.)
22  QUESTIONS BY MS. SINGER:
23  Q.  Let's turn to the Energy and
24  Commerce.  Since we don't have previous --
25  the exhibits from last time, we're going to

1   remark the Energy and Commerce report as
2   Exhibit 46.  It's the same report that went
3   in earlier in your testimony.
4   And industry lawyers asked
5   you -- they showed you a piece of the report
6   that said that DEA could have acted earlier.
7   Do you remember those
8   questions?
9   A.  Vaguely, but, yes.
10  Q.  Okay.  And certainly this
11  Energy and Commerce report finds the DEA
12  could have done more than it did, correct?
13  A.  Correct.
14  Q.  Okay.  But it's also highly
15  critical of distributors, is it not?
16  MR. EPPICH:  Objection.
17  MS. MAINIGI:  Objection.
18  Foundation.  Outside the scope.
19  MR. FINKELSTEIN:  Join the
20  scope objection.
21  THE WITNESS:  Yes.
22  QUESTIONS BY MS. SINGER:
23  Q.  Okay.  And just for context, I
24  want to direct you to page 5 of the report.
25  On the bottom of the page, it

1   says in that last paragraph, "As the opioid
2   epidemic began to surge, the DEA, by 2005,
3   realized that traditional policing of
4   individual doctors and pharmacies was no
5   longer an effective approach against the
6   oncoming avalanche of opioids from rogue
7   Internet pharmacies and pill mills.  Instead,
8   DEA's focus turned to the drug wholesale
9   distributors, a choke point in the
10  pharmaceutical supply chain, who transfer
11  drugs from manufacturers to businesses such
12  as clinics, hospitals and pharmacies where
13  they can be dispensed to patients.
14  Distributors in previous years had not
15  received enforcement attention from the DEA.
16  The new focus looked for greater impact for
17  the highly consolidated industry given the
18  three -- given that the three major drug
19  distributors - AmerisourceBergen, Cardinal
20  Health and McKesson - control about
21  85 percent of the drug supply."
22  Do you agree with the statement
23  I've just read?
24  A.  Yes.
25  MS. MAINIGI:  Objection.

1   QUESTIONS BY MS. SINGER:
2   Q.  And then "Beginning in 2005,
3   the DEA undertook a series of initiatives
4   meant to educate wholesale drug distributors
5   about their legal obligations to prevent
6   controlled substance diversion.  The DEA's
7   distributor initiative included one-on-one
8   meetings with wholesale distributors in which
9   DEA officials provided specific examples
10  regarding distributors' own customers whose
11  ordering habits were suggestive of trends
12  indicating the presence of diversion and
13  illicit Internet pharmacies.  Of the five
14  distributors investigated by the committee,
15  AmerisourceBergen, Cardinal, HD Smith and
16  McKesson, each had one-on-one meetings with
17  DEA as part of this initiative.  In addition,
18  during 2006 and 2007, the DEA sent a series
19  of three letters, sent to all DEA-registered
20  distributors outlining their legal
21  obligations to conduct due diligence and
22  report suspicious orders."
23  Is that also an accurate
24  statement of what happened?
25  MR. EPPICH:  Object to form.

1  Foundation.  Calls for speculation.
2  THE WITNESS:  Yes.
3  QUESTIONS BY MS. SINGER:
4  Q. "Apparently the DEA soon
5  realized that the largest distributors were
6  not taking their compliance requirements with
7  sufficient seriousness.  In 2007 and 2008,
8  the DEA took enforcement action through legal
9  settlements against the three largest
10  wholesale distributors in the US for alleged
11  violations of the CSA, with multi-million
12  dollar fines involving two of them."
13  Is that also accurate?
14  MR. EPPICH:  Object to form.
15  MS. MAINIGI:  Objection to
16  form.
17  **THE WITNESS:  Yes.**
18  **QUESTIONS BY MS. SINGER:**
19  **Q. Last paragraph.  "Despite these**
20  **settlement agreements and the subsequent**
21  **policy enhancements that the three**
22  **distributors made in their aftermath, the**
23  **committee found that the distributors**
24  **continued to ship large volumes of opioids**
25  **into West Virginia.  The three largest**

1  **wholesale drug distributors in the United**
2  **States - AmerisourceBergen, Cardinal Health**
3  **and McKesson - sent more than 900 million**
4  **doses of hydrocodone and oxycodone to West**
5  **Virginia between 2005 and 2016.  Cardinal**
6  **Health was the largest supplier of controlled**
7  **substances to West Virginia out of the five**
8  **companies examined as part of the Committee's**
9  **investigation, and distributed more than 366**
10  **million doses of hydrocodone and oxycodone to**
11  **West Virginia pharmacies between 2005 and**
12  **2016.  From April 2006 through 2016, McKesson**
13  **supplied 299.87 million doses of hydrocodone**
14  **and oxycodone to West Virginia pharmacies,**
15  **AmerisourceBergen distributed 248.16 million**
16  **doses of hydrocodone and oxycodone to West**
17  **Virginia pharmacies between 2005 and 2016."**
18  **Is that also consistent with**
19  **DEA's understanding of what had occurred?**
20  MR. EPPICH:  Object to
21  form.  Foundation.
22  **THE WITNESS:  Yes.**
23  QUESTIONS BY MS. SINGER:
24  **Q. Turn the page, please.  "Among**
25  **the Committee's findings, distributors**

1  **suffered a series of breakdowns or had a lack**
2  **of follow-through in their -- through in**
3  **their due diligence evaluations of**
4  **prospective pharmacy customers.  As**
5  **demonstrated in the report, the committee**
6  **found instances of insufficient due diligence**
7  **by distributors who merely required**
8  **pharmacies to complete new customer**
9  **applications."**
10  **Now, we talked about that**
11  **earlier, correct?**
12  MR. EPPICH:  Object to the
13  form.
14  THE WITNESS:  Correct.
15  QUESTIONS BY MS. SINGER:
16  Q. And that is not sufficient to
17  comply with the registrant's obligation to
18  know their customers, correct?
19  MR. EPPICH:  Object to the
20  form.  Foundation.
21  MS. MAINIGI:  Calls for a legal
22  conclusion.
23  THE WITNESS:  Correct.
24  QUESTIONS BY MS. SINGER:
25  Q. "There were cases where data

1  submitted by a new customer was not
2  critically analyzed to identify any red flags
3  of controlled substance diversion, for
4  example, potential red flags regarding a
5  pharmacy's prescribing physicians that raised
6  concerns about possible diversion were not
7  questioned."
8  Is that consistent with DEA's
9  understanding of what occurred?
10  MR. EPPICH:  Object to form.
11  Foundation.
12  THE WITNESS:  Yes.
13  QUESTIONS BY MS. SINGER:
14  Q. Goes on to say, "The
15  investigation found instances where there
16  were failures to monitor the volume of
17  controlled substances sold to customers.
18  Some distributors used thresholds to track
19  customers' purchases of controlled substances
20  and flag orders as suspicious when purchases
21  exceeded those limits.  But some of these
22  thresholds were assigned arbitrarily and not
23  effective.  Committee found instances in
24  which distributors set thresholds but failed
25  to enforce them, assigned artificially high

1   hydrocodone threshold limits with little to
2   no documented justification, or continued to
3   raise threshold levels without thoroughly
4   investigating or documenting the
5   justifications presented by a customer
6   pharmacy."
7   Again, is that what DEA
8   observed happened during this time period?
9   MR. EPPICH:  Object to the
10  form.  Foundation.  Calls for
11  speculation.
12  MS. MAINIGI:  Join.
13  THE WITNESS:  Yes.
14  QUESTIONS BY MS. SINGER:
15  Q.  Okay.  And is that failure to
16  flag suspicious orders, to approve them
17  without justification and to continue to
18  raise thresholds, a violation of the
19  Controlled Substances Act?
20  MS. MAINIGI:  Objection.  Calls
21  for a legal conclusion.  Outside the
22  scope.
23  MR. EPPICH:  Objection to the
24  form.
25  MR. FINKELSTEIN:  Object to

1   form.
2   THE WITNESS:  Yes.
3   QUESTIONS BY MS. SINGER:
4   Q.  It goes on, "Despite efforts by
5   DEA to educate distributors about their
6   responsibility to report suspicious orders,
7   the companies reviewed by the committee
8   failed to address suspicious orders" -- I'm
9   sorry -- "suspicious order monitoring in
10  critical ways.  Rather than reporting
11  individual suspicious orders as they were
12  identified, some distributors reported a
13  variety of other types of information to DEA
14  over the years.  This information included
15  excessive orders encompassing drug shipments
16  that had already been shipped and suspicious
17  customers such as pharmacies with which
18  distributors had terminated business
19  relationships.  Neither of these types of
20  reports informed DEA about suspicious orders
21  in realtime, nor did they guarantee the
22  suspicious orders reported to DEA were also
23  blocked by the distributors.  The committee
24  also found that one distributor lacked any
25  formal order monitoring program.  Rather, the

1   distributor's employees relied on subjective
2   criteria to investigate [sic] orders it
3   considered suspicious."
4   Does that also reflect what the
5   DEA knew to happen during this time period?
6   MS. MAINIGI:  Objection.  Form.
7   Foundation.  Outside scope.
8   MR. FINKELSTEIN:  Object to the
9   form.
10  THE WITNESS:  Yes.
11  QUESTIONS BY MS. SINGER:
12  Q.  And the last paragraph.
13  "Another critical failure identified by the
14  Committee involved instances in which
15  distributors appeared to turn a blind eye to
16  red flags of possible drug diversion.
17  Despite available information, distributors
18  at times took only minimal steps to
19  investigate possible warning signs of
20  diversion and continued to ship controlled
21  substances to suspect pharmacies.  In several
22  cases, distributors either failed to fully
23  investigate potentially troubling information
24  they obtained from customer pharmacies or
25  willfully ignored it.  These failures raise

1   substantial concern given that DEA has said
2   existing knowledge of a geographic area's
3   problem with controlled substance abuse is a
4   factor that distributors should take into
5   account when evaluating customers."
6   Now, is that true, that DEA had
7   said knowledge of a geographic area's problem
8   with controlled substance abuse is a factor
9   that should be taken into account by
10  registrants?
11  MR. EPPICH:  Object to the
12  form.
13  MS. MAINIGI:  Object to form.
14  THE WITNESS:  Yes.
15  QUESTIONS BY MS. SINGER:
16  Q.  Okay.  "West Virginia has the
17  highest drug overdose rate in the country,
18  meaning distributors should have been
19  particularly attuned to any red flags
20  encountered when conducting due diligence on
21  pharmacies in that state."
22  Is that also an accurate
23  reflection of a registrant's duty when
24  shipping controlled substances into West
25  Virginia or other hotspots?

1  MR. EPPICH:  Object to form.
2  Calls for a legal conclusion.
3  MS. MAINIGI:  Outside the
4  scope.
5  THE WITNESS:  Yes.
6  QUESTIONS BY MS. SINGER:
7  Q.  Okay.  And this whole paragraph
8  that I just read, does that also reflect the
9  DEA's understanding of what happened during
10  this time period?
11  MR. EPPICH:  Object to the
12  form.  Vague.  Calls for a legal
13  conclusion.
14  MR. FINKELSTEIN:  Join in the
15  form objection.
16  THE WITNESS:  Yes.
17  QUESTIONS BY MS. SINGER:
18  Q.  Okay.  Turn to page 10, please.
19  Bottom of page 10 there's a bullet that says,
20  "For due process reasons, it is current DEA
21  practice not to inform distributors or other
22  registrants about customers that may have
23  engaged in improper behavior."
24  Do you see where I am?
25  A.  The bottom?

1  form.  Foundation.  Calls for
2  speculation.
3  MS. MAINIGI:  Outside scope.
4  MR. EPPICH:  May be outside the
5  Touhy authorization as well.
6  MS. MAINIGI:  That's what I
7  meant.
8  THE WITNESS:  I mean, I don't
9  have the data in front of me to
10  confirm those numbers.
11  QUESTIONS BY MS. SINGER:
12  Q.  Okay.  What about the next
13  bullet:  "McKesson did not submit suspicious
14  order reports to the DEA regarding orders
15  placed by West Virginia pharmacies until
16  August 1, 2013."
17  Do you know whether that's
18  accurate?
19  MR. EPPICH:  Object to form.
20  Foundation.  Calls for speculation.
21  Outside the Touhy authorization.
22  MR. FINKELSTEIN:  This is
23  outside the Touhy authorization to the
24  extent that it calls for information
25  about West Virginia specifically.

1  Q.  Yes.
2  A.  Yes.
3  Q.  And does that accurately
4  reflect DEA's policy?
5  MR. EPPICH:  Objection to form.
6  MR. FINKELSTEIN:  Hang on.  We
7  had a different witness to testify
8  about this.  You declined to ask her
9  questions.  I'm going to instruct him
10  not to answer now.
11  MS. SINGER:  Okay.
12  QUESTIONS BY MS. SINGER:
13  Q.  So turning to page 16.
14  And I want to be respectful of
15  the scope of your authorization and not ask
16  you about individual investigations or
17  current matters.  But to the extent you can
18  testify consistent with your authorization, I
19  want to point you to the third bullet:
20  "McKesson supplied just under 300 million
21  doses of hydrocodone and oxycodone to West
22  Virginia pharmacies between April 2006 and
23  2016."
24  Is that accurate?
25  MR. EPPICH:  Object to the

1  MS. MAINIGI:  The entire report
2  calls for information that relates to
3  West Virginia.
4  MR. FINKELSTEIN:  And our
5  authorization to the plaintiffs was --
6  concluded investigations and
7  settlements with the defendants, but
8  we specifically didn't authorize
9  region-specific investigations.
10  MS. SINGER:  Okay.  We will
11  skip this then.
12  QUESTIONS BY MS. SINGER:
13  Q.  Okay.  Let's turn to page 319.
14  You with me?  You at page 319?
15  A.  Uh-huh.
16  Q.  Okay.  Turning towards the
17  middle of the page, just below it, the second
18  paragraph from the bottom.  "But as
19  demonstrated by the Committee's
20  investigation, the DEA did not always receive
21  the level of compliance required under the
22  CSA.  The five distributors whose actions in
23  West Virginia were examined by the Committee
24  each had unique failures.  The companies had
25  various policies and procedures in place to

1   prevent diversion but in some cases did not
2   adequately follow or carry out those
3   policies.  As evidenced in the case studies
4   discussed in each section, distributors had
5   failings on multiple fronts."
6   Is that consistent with the
7   DEA's conclusions?
8   MR. EPPICH:  Object to the
9   form.  Foundation.  Calls for
10  speculation.  Outside the Touhy
11  authorization.
12  THE WITNESS:  Yes.
13  QUESTIONS BY MS. SINGER:
14  Q.  "For instance, it is not
15  sufficient due diligence for a distributor to
16  only require prospective or existing
17  customers to complete pharmacy questionnaires
18  or supply supplemental data.  The information
19  disclosed on such questionnaires or the data
20  submitted must also be critically analyzed to
21  identify any red flags of controlled
22  substance diversion."
23  Does that accurately reflect a
24  distributor's obligations or a registrant's
25  obligations?

1   MR. EPPICH:  Object to the
2   form.
3   THE WITNESS:  Yes.
4   QUESTIONS BY MS. SINGER:
5   Q.  "Once distributors bring
6   pharmacies on board, they need to monitor the
7   volume of controlled substances sold to
8   customers."
9   Does that also accurately
10  reflect a registrant's duties?
11  MR. EPPICH:  Object to form.
12  Calls for a legal conclusion.
13  THE WITNESS:  Yes.
14  QUESTIONS BY MS. SINGER:
15  Q.  And the last sentence,
16  "Subsequently, when distributors set
17  thresholds for customers, they should be
18  enforced.  In such cases where thresholds are
19  adjusted, distributors should be able to
20  document the justification for these
21  changes."
22  Does that also accurately
23  reflect a registrant's obligations?
24  MR. EPPICH:  Object to the
25  form.  Calls for a legal conclusion.

1   MS. MAINIGI:  Vague as to time.
2   THE WITNESS:  Yes.
3   QUESTIONS BY MS. SINGER:
4   Q.  All right.  We can leave this
5   report.
6   Okay.  In questioning during
7   the first two days of your deposition,
8   Mr. Prevoznik, do you remember discussing the
9   fact that a small percentage of doctors are
10  engaged in unlawful prescribing?
11  I think it was .5 percent.
12  Do you remember that
13  conversation?
14  A.  Yes.
15  (Prevoznik Plaintiff's Exhibit
16  P47 marked for identification.)
17  QUESTIONS BY MS. SINGER:
18  Q.  Okay.  So I want to turn to
19  Exhibit 47, please.
20  And that is Bates number
21  PPLP0300001799742.
22  If you turn to the first slide,
23  it's titled "DEA/OD 11th Pharmaceutical
24  Industry Conference."
25  Do you recognize this

1   presentation?
2   A.  Do we know what year?
3   Q.  And what is it?
4   A.  No, I said, "Do we know what
5   year?"
6   Q.  Oh.  So it's Tuesday,
7   September 16th.  And if you look at the
8   calendar in the years that are referenced, we
9   believe it to be 2003 because of when
10  Tuesday -- when September 16th is a Tuesday.
11  MR. EPPICH:  Objection.
12  THE WITNESS:  I've never seen
13  this before.
14  QUESTIONS BY MS. SINGER:
15  Q.  Okay.  It does have on the
16  front page DOJ, DEA logos, correct?
17  A.  Yes.
18  Q.  Okay.  And does it look -- from
19  your knowledge, is this a presentation by the
20  DEA?
21  MR. EPPICH:  Objection.
22  Foundation.  Form.
23  THE WITNESS:  Yes.
24  QUESTIONS BY MS. SINGER:
25  Q.  Okay.  And if you turn to the

1  fifth page, with the slide "retail
2  diversion," 90 percent at doctor, pharmacy,
3  hospital levels.
4  Do you see that slide?
5  A. Yes.
6  Q. Okay.  And if you look at the
7  notes that are at the bottom of that slide,
8  do you see the bottom section that starts,
9  "Estimated 1.5 percent of doctors are
10  negligent and/or dishonest"?
11  Do you see where I'm reading?
12  A. Yes.
13  Q. Okay.  It says, "That portion
14  of DEA-registered physicians is many
15  thousands.  Their CS, or controlled
16  substance, prescribing would total hundreds
17  of thousands of scripts/millions of dosage
18  units into illicit market."
19  Is that accurate?
20  MR. EPPICH:  Objection.
21  Foundation.  Form.  Misstates the
22  document.  Calls for speculation.
23  MR. FINKELSTEIN:  Object to the
24  scope.
25  THE WITNESS:  Yes.

1  QUESTIONS BY MS. SINGER:
2  Q. And is it true, as it says
3  here, that it is impossible for DEA to
4  investigate and discipline that number of
5  professionals?
6  MR. EPPICH:  Object to form.
7  Foundation.
8  MS. MAINIGI:  Scope.
9  THE WITNESS:  I mean, we do the
10  best we can.
11  QUESTIONS BY MS. SINGER:
12  Q. But that's a lot of --
13  A. It's a lot.
14  MR. EPPICH:  Object to the
15  form.
16  QUESTIONS BY MS. SINGER:
17  Q. And the last line here, "Far
18  more effective, address the risk at the apex
19  of the distribution center [sic]."
20  Is that accurate, that that is
21  a more effective way of enforcing compliance
22  with the Controlled Substances Act?
23  MR. EPPICH:  Object to form.
24  Foundation.
25

1  QUESTIONS BY MS. SINGER:
2  Q. Or an important tool for the
3  DEA?
4  MR. EPPICH:  Object to form and
5  foundation.
6  THE WITNESS:  Yes.
7  QUESTIONS BY MS. SINGER:
8  Q. Okay.  And in fact, that's part
9  of the foundation of the Controlled
10  Substances Act, that each participant in the
11  supply chain has to police its own
12  participation in that supply chain, correct?
13  MR. EPPICH:  Object to form.
14  Calls for a legal conclusion.
15  Misstates.
16  THE WITNESS:  Yes.
17  QUESTIONS BY MS. SINGER:
18  Q. All right.  And during the
19  questioning by some of the industry counsel
20  during the first two days of depositions, do
21  you remember the suggestion that prescribers
22  were better situated to identify improper
23  prescriptions?
24  Do you remember that testimony?
25  MR. EPPICH:  Objection to form

1  to the extent it misstates prior
2  testimony.
3  THE WITNESS:  Not really.
4  (Prevoznik Plaintiff's Exhibit
5  P48 marked for identification.)
6  QUESTIONS BY MS. SINGER:
7  Q. Okay.  Is it -- let's just turn
8  to the document.
9  All right.  I'm showing you
10  Exhibit 48.  And the level -- and I'm sorry,
11  this is CAH_MDL2804_00889528.
12  Do you recognize the logo on
13  the front of this presentation?
14  A. Yes.
15  Q. And what is it?
16  A. It's our Chief Counsel's logo.
17  Q. Okay.  And if you turn to the
18  inside first page, How to Keep Or Lose Your
19  DEA Registration, do you recognize this
20  presentation?
21  A. Yes.
22  Q. And what do you recognize it to
23  be?
24  A. It was one of the -- it was --
25  it was given at a conference that we held.

1 Q. A conference --
2 A. For the industry.
3 Q. Okay. A conference that DEA
4 had for industry?
5 A. Yes.
6 Q. And do you know who gave this
7 presentation?
8 Do you know if would have been
9 Linden Barber?
10 MR. EPPICH: Objection. Form.
11 Calls for speculation.
12 THE WITNESS: I believe it was
13 Linden that gave this.
14 QUESTIONS BY MS. SINGER:
15 Q. Okay. And Linden Barber was
16 with the Chief Counsel's Office of DEA,
17 correct?
18 A. Yes.
19 Q. Okay. And if you turn to
20 page 4 of the presentation, titled "Effective
21 Controls Against Diversion," the first point
22 there is what, the first bullet point?
23 A. "Good recordkeeping is
24 essential."
25 Q. Do you agree with that

1 statement?
2 A. Yes.
3 Q. In DEA's experience, is the
4 absence of documentation a fairly good
5 indication that something didn't happen in a
6 registrant's compliance program?
7 MR. EPPICH: Object to the
8 form. Calls for a legal conclusion.
9 THE WITNESS: Yes.
10 QUESTIONS BY MS. SINGER:
11 Q. Okay. Turning to page 9, this
12 is what doesn't work, or how to lose your DEA
13 registration.
14 The second bullet point, what
15 does that say?
16 A. "It is not my job to
17 second-guess the doctor."
18 Q. Okay. And that's not an excuse
19 that the DEA will accept from a registrant,
20 correct?
21 MR. EPPICH: Objection to form.
22 Vague.
23 THE WITNESS: Yes.
24 QUESTIONS BY MS. SINGER:
25 Q. And that's because it's a

1 registrant's responsibility to act on
2 information that points to diversion,
3 correct?
4 MR. EPPICH: Object to form.
5 Calls for a legal conclusion.
6 THE WITNESS: Correct.
7 QUESTIONS BY MS. SINGER:
8 Q. And it's not that the
9 registrant is being asked to judge a
10 prescription or a patient, but to look at red
11 flags like the volume or dose or appearance
12 of a practice, et cetera, correct?
13 MR. EPPICH: Object to the
14 form. Calls for a legal conclusion.
15 Vague.
16 THE WITNESS: Yes, they should
17 look into totality of everything
18 that's presented to them.
19 QUESTIONS BY MS. SINGER:
20 Q. Okay. And the last excuse on
21 this slide, "I'm not responsible for what my
22 customer does with the drugs."
23 Is that an excuse that the DEA
24 accepts from a registrant?
25 MR. EPPICH: Object to form.

1 Vague.
2 THE WITNESS: No.
3 QUESTIONS BY MS. SINGER:
4 Q. And that's because a registrant
5 is responsible to make sure that they are not
6 supplying to potential diversion, correct?
7 MR. EPPICH: Object to the
8 form. Calls for a legal conclusion.
9 Vague.
10 THE WITNESS: Correct.
11 QUESTIONS BY MS. SINGER:
12 Q. And do you know what Linden
13 Barber does now, by the way?
14 MS. MAINIGI: Objection.
15 Outside the scope.
16 THE WITNESS: I believe -- I
17 believe he's still with Cardinal.
18 QUESTIONS BY MS. SINGER:
19 Q. Now, you were asked by --
20 MR. FINKELSTEIN: Let's take
21 our last break before lunch.
22 MS. SINGER: Okay.
23 VIDEOGRAPHER: We're going off
24 record. The time is 11:36.
25 (Off the record at 11:36 a.m.)

1    VIDEOGRAPHER:  We're going back
2    on the record.  Beginning of Media
3    File 4.  The time is 11:48.
4    QUESTIONS BY MS. SINGER:
5    Q.  So, Mr. Prevoznik, just turning
6    back for a minute to the Linden Barber
7    presentation we were talking about before the
8    break, which is Bates number 889528, I want
9    to ask you to turn to page 13, please.
10   And it's a slide titled "How to
11   Keep Your DEA Registration."
12   Do you see that?
13   A.  Yes.
14   Q.  Okay.  And it says in the --
15   under the first master bullet, "Master the
16   obvious:  Recordkeeping, reporting," and the
17   last item, "Does it quack like a diverting
18   duck."
19   Is what Mr. Barber is saying
20   here, what the DEA is saying, is if it looks
21   like a suspicious order, it's a suspicious
22   order?
23   A.  Yes.
24   Q.  And that if it has the signs,
25   quacks like a duck, walks like a duck,

1    whatever that expression is, that it's a
2    duck; it's a suspicious order, correct?
3    MS. MAINIGI:  Objection.  No
4    foundation.  Outside the scope of the
5    Touhy authorization.
6    THE WITNESS:  Yes.
7    QUESTIONS BY MS. SINGER:
8    Q.  Okay.  And then it goes on to
9    say, "Know your customers and, where
10   applicable, the prescriber's business or
11   professional practice."
12   Is that also the DEA's guidance
13   to industry as to what's required?
14   A.  Yes.
15   Q.  And "know the statutory
16   factors, the DEA's final orders," and then
17   lastly, "act consistently with DEA's goal:
18   protect the public health and safety from the
19   harms caused by diversion."
20   Is that also the guidance that
21   DEA gave to industry about complying with the
22   Controlled Substances Act?
23   A.  Yes.
24   MS. MAINIGI:  Objection.  Form.
25   (Prevoznik Plaintiff's Exhibit

1    P49 marked for identification.)
2    QUESTIONS BY MS. SINGER:
3    Q.  Okay.  And then I want to turn
4    you to what we'll mark as Bates -- as
5    Exhibit 49.
6    And this is
7    Anda_Opioids_MDL_0000476052.  It's "What You
8    Know and Who You Know," a presentation by
9    Linden Barber.
10   Do you see where I'm reading
11   from?
12   A.  Yes.
13   Q.  And it's dated April 19, 2012,
14   correct?
15   A.  Yes.
16   Q.  Okay.  And at this point Linden
17   Barber is no longer with the DEA, correct?
18   A.  Correct.
19   Q.  Okay.  And it seems that he's
20   with Cegedim.
21   We heard that name before,
22   correct?
23   MS. MAINIGI:  Objection.
24   Foundation.  Outside the scope of the
25   Touhy authorization.

1    MR. FINKELSTEIN:  Scope.
2    You can answer, if you know.
3    THE WITNESS:  I'm not sure.
4    QUESTIONS BY MS. SINGER:
5    Q.  Okay.  I'd like to direct you
6    to page 10 of the presentation, Bates
7    number 6061.
8    And I'm sorry, before you go
9    there, on the title page of the presentation
10   it indicates Linden Barber is the director of
11   DEA compliance operations at Quarles & Brady?
12   A.  Yes.
13   Q.  Okay.  All right.  So turning
14   to slide 10, Bates number 6061, it says,
15   "Know Your Regulator."
16   Do you see where I'm reading?
17   A.  Yes.
18   Q.  "Access to customer due
19   diligence files."  And it says under the
20   second bullet, "What is a customer's due
21   diligence file?  Not a record required by law
22   to be made or kept.  Proof that a
23   distributor -- the distributor is attempting
24   to prevent diversion.  Proof that the
25   distributor heeded DEA's warning.  Exhibit A

1  in DEA's case against you."
2  Do you understand what
3  Mr. Barber is saying here?
4  MS. MAINIGI:  Objection.
5  Foundation.  Outside the scope of the
6  Touhy authorization.
7  MR. FINKELSTEIN:  Calls for
8  speculation.  I agree with the scope
9  objection.
10  MS. SINGER:  Okay.  Let me --
11  I'm sorry.  Let me rephrase it.
12  QUESTIONS BY MS. SINGER:
13  Q. Is it the DEA's position that a
14  customer due diligence file is not required
15  to be made or kept?
16  MS. MAINIGI:  Objection.  Asked
17  and answered.  Objection.  Form.
18  QUESTIONS BY MS. SINGER:
19  Q. It's certainly not -- when
20  Mr. Barber was with DEA in that presentation
21  we just looked at, he encouraged
22  recordkeeping, correct, as a way a registrant
23  could keep their DEA license, correct?
24  A. Correct.
25  Q. Okay.  And here he's saying not

1  a record required by law to be made or kept,
2  correct?
3  MS. MAINIGI:  Objection to
4  form.  Objection.  Outside the scope
5  of the Touhy authorization.  Calls for
6  a legal conclusion.
7  THE WITNESS:  What he's saying
8  is that -- I'm speculating on this,
9  but what he's saying, to me, is that
10  the actual terms "due diligence" is
11  not in the regulations; however, I
12  mean, the statute's to prevent -- to
13  have effective means to guard against
14  diversion, you would have to know who
15  your customer is.
16  And so doing that, you would
17  have -- I mean, dealing with as many
18  customers that each of these
19  distributors have, you would have to
20  know who your customers are.  So if
21  you don't have files on them, it would
22  be very hard to maintain effective
23  controls.
24  QUESTIONS BY MS. SINGER:
25  Q. Right.  Understood.

1  All right.  We can leave this
2  document.
3  Now, you were asked during
4  day one or two of your deposition how a
5  manufacturer would know if a prescriber was
6  suspicious.
7  Do you remember those
8  questions?
9  A. Yes.
10  MR. EPPICH:  Object to the
11  form.
12  THE WITNESS:  Yes.
13  QUESTIONS BY MS. SINGER:
14  Q. Would DEA agree that a
15  significant increase in a prescriber's volume
16  is a sign of potential diversion?
17  MR. EPPICH:  Object to the
18  form.  Calls for a legal conclusion.
19  THE WITNESS:  Just volume
20  alone?
21  QUESTIONS BY MS. SINGER:
22  Q. That it is one sign of
23  potential diversion, yes.
24  A. It --
25  MR. EPPICH:  Object to the

1  form.
2  THE WITNESS:  Potentially, yes.
3  QUESTIONS BY MS. SINGER:
4  Q. Okay.  And that a prescriber
5  who is prescribing at very high volume
6  relative to other practitioners, that would
7  also be another potential red flag of
8  diversion, correct?
9  MR. EPPICH:  Object to the
10  form.  Form.  Vague.  Improper
11  hypothetical.  Calls for a legal
12  conclusion.
13  THE WITNESS:  It could be.  It
14  just depends on what is the
15  physician's practice; does he
16  specialize in end of life or something
17  like that.  I mean, you'd have to take
18  in other factors.
19  QUESTIONS BY MS. SINGER:
20  Q. Right.  You have to look at the
21  whole picture.
22  But that's one sign that might
23  alert you to take a closer look, correct?
24  A. Correct.
25  MR. EPPICH:  Object to the

1　form.
2　QUESTIONS BY MS. SINGER:
3　Q.　Okay.　And if the prescriber is
4　prescribing at very high doses, again, one
5　factor, depending on their specialty and
6　patients, that might alert a registrant to
7　potential diversion, correct?
8　MR. EPPICH:　Object to the
9　form.　Foundation.　Calls for
10　speculation.　Calls for a legal
11　conclusion.
12　THE WITNESS:　Correct.
13　QUESTIONS BY MS. SINGER:
14　Q.　Okay.　And these are the kinds
15　of commonsense red flags that a registrant
16　should know to apply without the DEA telling
17　them to apply them, correct?
18　MR. EPPICH:　Object to form.
19　Foundation.　Calls for speculation.
20　MR. FINKELSTEIN:　Object to the
21　form.
22　THE WITNESS:　Can you repeat
23　it, please?
24　QUESTIONS BY MS. SINGER:
25　Q.　These are the kinds of

1　commonsense red flags that a registrant
2　should know to apply in looking for diversion
3　without the DEA telling them specifically to
4　look for them, correct?
5　MR. EPPICH:　Same objections.
6　THE WITNESS:　Yes.
7　(Prevoznik Plaintiff's Exhibit
8　P50 marked for identification.)
9　QUESTIONS BY MS. SINGER:
10　Q.　I'm showing you Exhibit 50,
11　Mr. Prevoznik.　These are two -- oh, I'm
12　sorry, this is a prescriber in Solon, Ohio.
13　I'm sorry.　I'm not -- okay.
14　Dr. Akhtar-Zaidi in Solon, Ohio.
15　And it says here, "Wrote over
16　21,000 opioid prescriptions in 2011 when the
17　average doctor in his specialty wrote 500."
18　Would the DEA consider that to
19　be a red flag of potential diversion?
20　MR. MAHADY:　Object to form.
21　Objection.　Foundation.　Objection to
22　the scope.　Outside the Touhy
23　authorization.
24　MR. FINKELSTEIN:　Hang on.
25　MR. MAHADY:　And also, where is

1　this information from, what is this
2　document?　Where was it created?　Was
3　it created by the plaintiffs?
4　MS. MAINIGI:　It says an expert
5　report of Lacey Keller.
6　MR. FINKELSTEIN:　Additionally,
7　information concerning this doctor may
8　be subject to various law enforcement
9　privileges, and it's outside the
10　scope.
11　But I'm going to specifically
12　instruct you not to testify about
13　ongoing investigations.
14　QUESTIONS BY MS. SINGER:
15　Q.　So would writing 21,000
16　prescriptions in a year when the average
17　doctor in the same specialty wrote 500 be a
18　red flag of potential diversion to the DEA?
19　MR. EPPICH:　Object to form.
20　MR. MAHADY:　Objection to form.
21　Objection to scope.　Incomplete
22　hypothetical.　Foundation.
23　THE WITNESS:　Yes.
24　QUESTIONS BY MS. SINGER:
25　Q.　Okay.　And then turning to the

1　next page of that slide.　I'm sorry --
2　A.　I don't have it.
3　Q.　Okay.　Sorry.
4　(Prevoznik Plaintiff's Exhibits
5　P51 and P52 marked for
6　identification.)
7　QUESTIONS BY MS. SINGER:
8　Q.　Showing you slide 51,
9　Dr. Adolph Harper in Akron, Ohio.
10　I'm also going to show you the
11　sentencing memo.　We'll mark that as
12　Exhibit 52.
13　MR. FINKELSTEIN:　So while
14　we're shuffling paper, I can get my
15　concerns and objection on the record.
16　My understanding is that the
17　task force officers have been
18　authorized to give testimony about
19　this doctor and this information.　I
20　can tell you this witness has not been
21　prepped to.
22　And so I'm going to instruct
23　you not to answer questions about this
24　specific doctor.
25　And I think you have a witness

1 who will.
2 MS. SINGER: All right. I'm
3 only asking about whether these are
4 red flags generally.
5 MR. FINKELSTEIN: You can
6 answer about general red flags.
7 MS. SINGER: Okay.
8 QUESTIONS BY MS. SINGER:
9 Q. So if you turn on exhibit --
10 which exhibit is this? 53? 52?
11 Okay. The sentencing memo --
12 MR. COOPER: Do you have an
13 extra copy of the sentencing memo?
14 QUESTIONS BY MS. SINGER:
15 Q. Which is PLTF_2804_000013676.
16 It's the government's sentencing memo,
17 memorandum in United States of America versus
18 Adolph Harper.
19 You on the right document?
20 A. Uh-huh, yes.
21 Q. Okay. And if you turn to
22 page 4, in the second paragraph, the first
23 full paragraph of the page, it says, "The
24 atmosphere of Harper's office, like his
25 prescribing practices, was more akin to a

1 QUESTIONS BY MS. SINGER:
2 Q. Yes.
3 Would those signs observed by a
4 registrant about a prescriber's practice have
5 been red flags of potential diversion?
6 MR. MAHADY: Same objections.
7 THE WITNESS: Yes.
8 QUESTIONS BY MS. SINGER:
9 Q. Are these kinds of red flags
10 that we just went through with these two
11 prescribers things that registrants who are
12 observing the practices or seeing this data
13 should have been able to figure out for
14 themselves, should have been able to identify
15 them as red flags?
16 MR. MAHADY: Objection to form.
17 Foundation. Same objection regarding
18 the scope.
19 THE WITNESS: Yes.
20 QUESTIONS BY MS. SINGER:
21 Q. Did a manufacturer who observed
22 a doctor's office that looked like a drug
23 trafficking operation, with patients passed
24 out or vomiting in the office or urinating on
25 themselves, have a duty to do more than just

1 street-level drug trafficking operation
2 rather than medical office. Harper's
3 customers waited for hours to see Harper.
4 Many of those customers exhibited behaviors
5 consistent with drug abuse. Witnesses
6 reported seeing customers passed out in the
7 hallway and office while waiting to see
8 Harper, were vomiting or urinating on the
9 floor while waiting in the waiting room.
10 Customers were also combative and aggressive
11 with Harper's staff members if there was any
12 delay in receiving their drugs."
13 Would a registrant observing
14 this medical office have seen a red flag of
15 potential diversion?
16 MR. MAHADY: Objection to form.
17 Objection to foundation. Outside the
18 scope of the Touhy authorization as
19 the government just explained it.
20 Question specifically relates
21 to a doctor whose name was used at
22 least four or five times in forming
23 your question.
24 THE WITNESS: Can you repeat
25 it?

1 stopping to market to that doctor but also to
2 report that doctor to the DEA?
3 MR. COOPER: Objection. Form.
4 Foundation. Scope.
5 MR. FINKELSTEIN: Objection.
6 Foundation. Incomplete hypothetical.
7 THE WITNESS: Could you repeat
8 it?
9 QUESTIONS BY MS. SINGER:
10 Q. Did a manufacturer who observed
11 that kind of practice that we just described
12 have an obligation to report that doctor to
13 the DEA or other law enforcement or just to
14 stop marketing to that doctor? Would that
15 have been enough?
16 MR. O'CONNOR: Objection.
17 Form. Foundation. Scope.
18 MR. EPPICH: Objection.
19 Incomplete hypothetical.
20 THE WITNESS: So I just want to
21 make sure I'm clear on the question.
22 If the manufacturer had seen
23 this?
24 QUESTIONS BY MS. SINGER:
25 Q. That's correct.

1 A. Right.
2 They should stop shipments?
3 Q. Is it enough to stop marketing
4 to the doctor, or do they also have to report
5 that doctor as part of maintaining effective
6 controls to prevent diversion?
7 MR. O'CONNOR: Same objections.
8 THE WITNESS: I mean, they
9 should be telling us that.
10 QUESTIONS BY MS. SINGER:
11 Q. Now, does the fact that there
12 are bad doctors who are writing illegitimate
13 prescriptions or pharmacies that are
14 dispensing illegally relieve distributors or
15 manufacturers of their duty to review their
16 own information and data for suspicious
17 orders and signs of diversion?
18 MS. MAINIGI: Objection.
19 Vague. Objection. Outside the scope
20 of the Touhy authorization.
21 Objection. Foundation.
22 MR. FINKELSTEIN: I'll object
23 to the form.
24 THE WITNESS: No.
25

1 QUESTIONS BY MS. SINGER:
2 Q. And in fact, in a closed
3 system, the participants in the supply chain,
4 those who are on the inside, have a duty to
5 look out for bad doctors and bad pharmacies,
6 correct?
7 MR. EPPICH: Object to the
8 form. Foundation. Calls for a legal
9 conclusion.
10 THE WITNESS: Yes.
11 (Prevoznik Plaintiff's Exhibit
12 P53 marked for identification.)
13 QUESTIONS BY MS. SINGER:
14 Q. Okay. Let's go to the -- I'm
15 going to show you Exhibit 53. No Bates
16 number, just monkeys.
17 Do you recognize this image of
18 the see no evil, hear no evil, speak no evil,
19 Mr. Prevoznik?
20 A. Yes.
21 MR. MAHADY: Objection. Form.
22 Foundation. Relevance to anything.
23 MS. MAINIGI: It's completely
24 outside the scope of the Touhy
25 authorization. I think it's highly

1 inappropriate to be marking this in a
2 deposition.
3 QUESTIONS BY MS. SINGER:
4 Q. Do registrants who close their
5 eyes, fail to report signs of suspicious
6 order, comply with the Controlled Substances
7 Act?
8 MR. MAHADY: Objection. Form.
9 Foundation. Calls for a legal
10 conclusion.
11 THE WITNESS: No, they don't.
12 QUESTIONS BY MS. SINGER:
13 Q. We can take down the monkeys.
14 They're probably not compliant with the CSA
15 either.
16 MR. EPPICH: Objection.
17 QUESTIONS BY MS. SINGER:
18 Q. You testified before that the
19 DEA doesn't know what range of information
20 registrants have available to them, correct?
21 A. Correct.
22 Q. And they don't have to share
23 with the DEA all the data and information
24 they have on their customers, correct?
25 A. Correct.

1 Q. Now, you talked about the fact
2 that DEA doesn't set a formula or a threshold
3 for industry to apply, correct?
4 A. Correct.
5 Q. And is that -- is the reason
6 for that because the DEA wouldn't necessarily
7 be able to capture what the industry knows
8 about its own customers in setting a
9 threshold?
10 MR. EPPICH: Object to the
11 form. Vague.
12 THE WITNESS: I think it's
13 part -- a part of -- certainly that's
14 part of it, but the other part would
15 also be we don't regulate the practice
16 of medicine, so we're not interfering
17 with what doctors are doing to treat
18 their patients.
19 So in discussions with -- when
20 these thresholds and things -- it also
21 affects the opposite side. So it's
22 not only the diverted side, but it's
23 also legitimate patients who can't get
24 them because of these thresholds that
25 are in place. So it's affecting both

1   sides of the -- it's a delicate
2   balance.
3   QUESTIONS BY MS. SINGER:
4   Q. And so you leave that to a
5   registrant who has all of that information,
6   correct?
7   MR. EPPICH:  Objection.
8   Foundation.  Form.
9   THE WITNESS:  Correct.
10  QUESTIONS BY MS. SINGER:
11  Q. Okay.  And the danger is if the
12  DEA were to set the threshold too high, it
13  wouldn't be a real check on identifying
14  suspicious orders, correct?
15  MR. EPPICH:  Object to the
16  form.  Incomplete hypothetical.
17  MS. MAINIGI:  Speculation.
18  THE WITNESS:  Yes.
19  QUESTIONS BY MS. SINGER:
20  Q. And if you set it too low, as
21  you said, patients might not be able to get
22  medicine they need, correct?
23  MR. EPPICH:  Object to the
24  form.  Incomplete hypothetical.  Calls
25  for speculation.

1   THE WITNESS:  Yes.
2   QUESTIONS BY MS. SINGER:
3   Q. And so it's not that the DEA
4   has some answer on what the threshold should
5   be and isn't telling industry; it's that the
6   DEA is actually saying that industry knows
7   better from its own customers, correct?
8   MR. EPPICH:  Object to the
9   form.  Calls for speculation.
10  THE WITNESS:  They're in a
11  better position than we are.
12  (Prevoznik Plaintiff's Exhibit
13  P54 marked for identification.)
14  QUESTIONS BY MS. SINGER:
15  Q. Okay.  So let's go to -- I'm
16  showing you Exhibit 54.
17  So do you recognize
18  MNK-T1_0008504654?
19  A. I recognize the names.
20  Q. Okay.  Which names do you
21  recognize?
22  A. Mark Caverly and James
23  Crawford.
24  Q. And who are they?
25  A. Former employees of DEA.

1   Q. Okay.  And it says -- if you
2   look down this document, you see
3   Mr. Crawford, I think, three paragraphs from
4   the bottom.  Okay.  I'm sorry, let's go up
5   from that to the question.
6   "During the distributor
7   breakout session, suspicious order monitoring
8   was certainly a hotbed of discussion.  Are
9   there any plans for DEA to publicize
10  information to implement SOM, or suspicious
11  order monitoring, incorporate algorithms
12  where products are more likely to be
13  diverted?"
14  Do you see where I'm reading?
15  A. Yes.
16  Q. Okay.  And then can you read
17  Mr. Crawford's response?
18  A. "Whatever we put out will be
19  outdated by the time we put it out.  You're
20  looking at a number.  Tell me how much --
21  tell me how much that we can't exceed.  DEA
22  can't do that.  It's part of your due
23  diligence, knowing your customer."
24  Q. And does that reflect what you
25  just testified to in the guidance that DEA

1   gave industry?
2   A. Yes.
3   MR. MAHADY:  Objection.  Form.
4   THE WITNESS:  Yes.
5   QUESTIONS BY MS. SINGER:
6   Q. And then can you read
7   Mr. Caverly's comment at the bottom of the
8   page?
9   A. From the question "What does
10  the DEA expect?"
11  Q. That's right.
12  A. "Previously, DEA sat down with
13  the National Drug Association with an
14  algorithm DEA standpoint - you know your
15  customers better than we do.  DEA stepped
16  away from providing guidelines.  It's not
17  going to happen."
18  Q. Does that also reflect DEA's
19  view as to why it wouldn't provide a
20  threshold to industry?
21  MR. EPPICH:  Object to the
22  form.  Foundation.  Calls for
23  speculation.
24  THE WITNESS:  Yes.
25  (Prevoznik Plaintiff's Exhibit

1 P55 marked for identification.)
2 QUESTIONS BY MS. SINGER:
3 Q. Okay. Showing you Exhibit 55.
4 My goal here is to make your pile go up and
5 mine go down.
6 All right. This is
7 MCKMDL00561303, executive summary regarding
8 the HDMA document.
9 Have you seen this document
10 before, Mr. Prevoznik?
11 A. I'm not sure.
12 Q. Okay. Let me direct you to the
13 last page, Bates number 306. It says in that
14 top bullet to question 10, "This is another
15 area that we have made great strides in over
16 the past few years. Our analytical
17 capabilities provide us with greater insight
18 into our own customer base. We have this
19 data already and frankly are in a position to
20 provide better information to DEA than they
21 could provide to us."
22 Does DEA agree with that
23 statement?
24 MR. EPPICH: Object to the
25 form. Foundation.

1 Q. Okay. Based on your experience
2 in all of your years at DEA in management and
3 as a diversion investigator and as the
4 representative of the DEA here today, did DEA
5 make the best judgments it could at the time
6 to use your authority and resources most
7 effectively to prevent diversion?
8 MR. EPPICH: Object to form.
9 Vague.
10 MS. MAINIGI: And objection.
11 Outside the scope of the Touhy
12 authorization.
13 THE WITNESS: Yes, I think we
14 did.
15 QUESTIONS BY MS. SINGER:
16 Q. Had distributors reported
17 suspicious orders to the DEA as the law
18 required would DEA have been able to use its
19 resources more effectively to identify and
20 prevent diversion?
21 MR. EPPICH: Object to the
22 form. Calls for a legal conclusion.
23 Vague.
24 MS. MAINIGI: And outside the
25 scope of the Touhy authorization.

1 THE WITNESS: Yes.
2 QUESTIONS BY MS. SINGER:
3 Q. And it says as a sidenote, "DEA
4 does not have dispensing data, nor do they
5 have noncontrol data," correct?
6 A. Correct.
7 Q. Okay. All right. Let's move
8 to -- no, new area.
9 In the first two days of your
10 deposition, you were offered -- you were
11 asked a series of questions about things DEA
12 could have done differently: Did you set up
13 task forces or use ARCOS platforms in a
14 different way.
15 Do you remember that line of
16 questioning?
17 A. Yes.
18 Q. Now, when you came into DEA,
19 what was your first position?
20 A. Diversion investigator in the
21 Philadelphia field office.
22 Q. Okay. So you were out there
23 doing investigations and inspections and
24 building cases, correct?
25 A. Correct.

1 MS. DO AMARAL: Incomplete
2 hypothetical.
3 THE WITNESS: I believe so.
4 MR. EPPICH: I second the
5 outside the scope of the Touhy
6 authorization.
7 QUESTIONS BY MS. SINGER:
8 Q. Could you state your answer
9 again?
10 A. I believe so.
11 Q. Okay. And if registrants had
12 reported suspicious orders to the DEA, does
13 the DEA believe that there would have been
14 less diversion, less abuse and less death?
15 MR. EPPICH: Objection. Form.
16 Foundation. Calls for speculation.
17 Incomplete hypothetical. Outside the
18 scope of the Touhy authorization.
19 MR. FINKELSTEIN: Scope. Calls
20 for speculation.
21 THE WITNESS: Yes.
22 QUESTIONS BY MS. SINGER:
23 Q. Would you agree that this line
24 of questions about what the DEA could have
25 done or should have done sounds a lot like

1 blaming the DEA for not catching industry at
2 breaking the law?
3 MR. EPPICH:  Object to the
4 form.  Foundation.  Incomplete
5 hypothetical.  Outside the scope of
6 the Touhy authorization.
7 MR. FINKELSTEIN:  Scope.  Calls
8 for speculation.
9 THE WITNESS:  Could you please
10 repeat it?
11 QUESTIONS BY MS. SINGER:
12 Q. Would you agree that this line
13 of questions about what the DEA could have
14 done and should have done sounds a lot like
15 blaming the DEA for not catching the industry
16 in breaking the law?
17 MR. EPPICH:  Same objections.
18 MR. FINKELSTEIN:  Same
19 objections.
20 THE WITNESS:  You're asking me
21 personally?
22 QUESTIONS BY MS. SINGER:
23 Q. Yes.
24 MR. EPPICH:  Same objections.
25 THE WITNESS:  Me, personally,

1 12-year-old or anyplace else they shouldn't
2 be?
3 MR. EPPICH:  Object to the
4 form.  Incomplete hypothetical.  Calls
5 for a legal conclusion.  Scope.
6 Vague.
7 MR. FINKELSTEIN:  I'll object
8 to the form.
9 THE WITNESS:  Yes.
10 QUESTIONS BY MS. SINGER:
11 Q. And do you think there's
12 anything about that rule that isn't clear or
13 fair to registrants?
14 MR. EPPICH:  Object to the
15 form.  Vague.  Incomplete
16 hypothetical.  Scope.  Calls for a
17 legal conclusion.
18 MR. FINKELSTEIN:  I'm going to
19 object that that's outside the scope
20 of the Touhy authorization.
21 You can answer in your personal
22 capacity.
23 THE WITNESS:  Could you please
24 repeat it?
25

1 it certainly would have made a huge
2 difference.
3 QUESTIONS BY MS. SINGER:
4 Q. Does the obligation to maintain
5 effective controls to prevent diversion exist
6 whether or not you are caught?
7 MR. EPPICH:  Objection to the
8 form.  Incomplete hypothetical.  Calls
9 for a legal conclusion.  Outside the
10 scope of the Touhy authorization as it
11 may divulge the deliberative process
12 of the DEA.
13 MR. FINKELSTEIN:  I appreciate
14 your concern about our deliberative
15 process.
16 You can answer.
17 THE WITNESS:  Yes.
18 QUESTIONS BY MS. SINGER:
19 Q. And is it true that the cost of
20 doing a business, of getting a license that
21 allows you to make money by making and
22 selling and distributing narcotics, is that
23 you have to do your best to follow the law
24 and prevent those narcotics from ending up
25 on -- in the street or in the pockets of a

1 QUESTIONS BY MS. SINGER:
2 Q. I have to scroll back through a
3 lot of objections.
4 Is there anything about that
5 rule, to follow the law to prevent diversion,
6 that isn't clear or fair to registrants?
7 MR. EPPICH:  Same objections.
8 THE WITNESS:  My personal
9 perspective, no, there isn't.
10 (Prevoznik Plaintiff's Exhibit
11 P56 marked for identification.)
12 QUESTIONS BY MS. SINGER:
13 **Q. I'm going to show you**
14 **Exhibit 56.**
15 **Mr. Prevoznik, this is our**
16 **effort to put in a timeline the actions DEA**
17 **took against defendants in this litigation.**
18 **Does this capture the major**
19 **enforcement initiatives that DEA took against**
20 **distributors, manufacturers and distributors,**
21 **including pharmacies?**
22 MR. EPPICH:  Object to the
23 form.  Objection.  Foundation.
24 Objection to inaccuracy of the data
25 that may or may not be in the

1    document.
2    MS. MAINIGI:  Outside the scope
3    of the Touhy authorization.
4    MR. FINKELSTEIN:  Yeah, I'm
5    going to repeat my concern about the
6    scope.  You've been authorized to
7    testify about administrative actions
8    in closed settlements with the
9    defendants.
10   MS. SINGER:  That's what's
11   here.
12   MR. FINKELSTEIN:  If you're
13   representing that, then subject to
14   that instruction, you can answer.
15   MR. MAHADY:  I'm also going to
16   object to the extent that the
17   demonstrative clearly shows things
18   that are not an enforcement action,
19   including references to letters --
20   MS. MAINIGI:  Right.
21   MR. MAHADY:  -- that are not
22   from the DEA, DOJ and, in fact, come
23   from the defendant.
24   MS. MAINIGI:  That is not what
25   it is represented by plaintiffs to be.

1    to do those questions.
2    QUESTIONS BY MS. SINGER:
3    Q.  I'm just asking if this
4    represents the scale and number of
5    enforcement actions that DEA took against the
6    defendants in this litigation.
7    MR. EPPICH:  Objection to form
8    and foundation.
9    QUESTIONS BY MS. SINGER:
10   Q.  To the extent you know.
11   MR. FINKELSTEIN:  And my
12   instruction to you is you're
13   authorized to answer based on
14   administrative actions and/or
15   settlements that the DEA has entered
16   into with any of the defendants, but
17   limit your answer to that.
18   MR. RUIZ:  And objection to the
19   extent that this chart has enforcement
20   actions against entities who are not
21   named defendants in this action.
22   MR. FINKELSTEIN:  Do you
23   understand my instruction?
24   **THE WITNESS:  Yeah.**
25   **It appears to have most of the**

1    MR. RUIZ:  Also object in it
2    lists the alleged enforcement actions
3    and do not relate to distribution.
4    MR. MAHADY:  And enforcement
5    actions by the state courts.
6    MS. SINGER:  So these are all
7    facts that have been established or
8    will be established in the course of
9    this litigation.
10   To the extent that defendants
11   have an argument that something here
12   wasn't tied together, that's an
13   argument they can make as to
14   admissibility.
15   MS. MAINIGI:  You're asking
16   this corporate representative to
17   somehow bless your document when
18   you've just created it and provided it
19   to him.
20   If you want to go point by
21   point through this document and ask
22   him if he knows about those and
23   whether they're enforcement actions,
24   go ahead.
25   MS. SINGER:  So you're welcome

1    highlights.
2    QUESTIONS BY MS. SINGER:
3    Q.  Okay.  And is it fair to say
4    that the DEA has investigated or taken action
5    against virtually every major distributor of
6    opioids over the last 15 years?
7    MR. EPPICH:  Object to form and
8    foundation.  Calls for speculation.
9    THE WITNESS:  Yes.
10   MS. FUMERTON:  Also vague.
11   QUESTIONS BY MS. SINGER:
12   Q.  And also the major pharmacy
13   chains that distribute opioids?
14   MR. EPPICH:  Same objections.
15   THE WITNESS:  Yes.
16   QUESTIONS BY MS. SINGER:
17   Q.  And also manufacturers like
18   Mallinckrodt and Purdue, correct?
19   MR. EPPICH:  Same objections.
20   THE WITNESS:  Correct.
21   QUESTIONS BY MS. SINGER:
22   Q.  Now, this chart doesn't reflect
23   additional actions that the DEA took against
24   doctors and pharmacists, correct?
25   MR. EPPICH:  Objection.

1   Foundation.  Calls for speculation.
2   Form.
3   THE WITNESS:  Yes.
4   QUESTIONS BY MS. SINGER:
5   Q. Or actions you took against
6   independent pharmacies.
7   And I take it the DEA also took
8   enforcement action against non-chain
9   pharmacies, correct?
10  MR. EPPICH:  Objection.
11  Foundation.  Calls for speculation.
12  Form.
13  MR. FINKELSTEIN:  Scope.  I
14  don't want to ask questions.
15  You can answer in your personal
16  capacity.
17  THE WITNESS:  Yes.  In my
18  personal capacity, yes, we would.
19  QUESTIONS BY MS. SINGER:
20  Q. Okay.  So this isn't everything
21  the DEA did in this time period, correct?
22  A. Correct.
23  Q. Okay.  All right.  Moving on.
24  Now, industry has talked about
25  their inability to get access to ARCOS data

1   MR. EPPICH:  Object to the
2   form.
3   QUESTIONS BY MS. SINGER:
4   Q. And you haven't taken those
5   actions based on data from other registrants,
6   correct?
7   MR. EPPICH:  Object to the
8   form.  Vague.
9   THE WITNESS:  Correct.
10  QUESTIONS BY MS. SINGER:
11  Q. Right.
12  So just to be perfectly clear,
13  you didn't expect Cardinal to know what
14  McKesson or AmerisourceBergen was supplying
15  to a customer, correct?
16  A. Correct.
17  MS. MAINIGI:  Objection.  Form.
18  QUESTIONS BY MS. SINGER:
19  Q. Is it the DEA's experience that
20  suspicious orders filled by manufacturers,
21  distributors and pharmacies were suspicious
22  in their own right without anybody else's
23  data?
24  MR. EPPICH:  Object to the
25  form.  Calls for a legal conclusion.

1   on other distributors, correct?
2   Do you remember those
3   questions?
4   A. Yes.
5   Q. Okay.  Now, isn't it true that
6   even without information on a competitor's
7   orders, that registrants can identify
8   suspicious orders and potential diversion?
9   MR. EPPICH:  Objection to form.
10  Foundation.  Calls for speculation.
11  THE WITNESS:  So essentially
12  their own data.
13  QUESTIONS BY MS. SINGER:
14  Q. Yes.
15  A. Yes.
16  Q. Okay.  And when you've taken --
17  when you, the DEA, has taken enforcement
18  actions or entered into settlement agreements
19  with registrants, you've looked at their own
20  data, correct?
21  A. Yes.
22  Q. And what those registrants
23  should have known or did know about their own
24  customers, correct?
25  A. Correct.

1   Vague.
2   MR. RUIZ:  Foundation.
3   THE WITNESS:  Yes.
4   QUESTIONS BY MS. SINGER:
5   Q. And when distributors take on
6   or registrants take on a new customer, DEA
7   recommends that they ask whether that
8   customer uses other distributors, correct?
9   MR. EPPICH:  Object to the
10  form.  Foundation.
11  THE WITNESS:  Yes.
12  QUESTIONS BY MS. SINGER:
13  Q. And with dispensing data -- I'm
14  sorry.
15  And they also -- the DEA also
16  recommends that a registrant obtain -- or a
17  distributor -- let me try that again.
18  DEA also recommends that a
19  distributor obtain dispensing data from a
20  pharmacy before they take them on as a
21  customer, correct?
22  MR. EPPICH:  Object to form.
23  Foundation.  Vague as to time.
24  THE WITNESS:  Yes, if they can
25  get it.

1  QUESTIONS BY MS. SINGER:
2  Q. Okay. And with dispensing
3  data, it would be obvious to a distributor if
4  the pharmacy received controlled substances
5  from more than one distributor, correct?
6  MR. EPPICH: Object to form.
7  Foundation. Calls for speculation.
8  MS. MAINIGI: Outside the scope
9  of the Touhy authorization.
10  MR. FINKELSTEIN: Join in the
11  scope objection.
12  THE WITNESS: Could you run
13  that by me again?
14  QUESTIONS BY MS. SINGER:
15  Q. Yeah, let me try to be clearer
16  in my question.
17  If you get the dispensing
18  data -- if a distributor gets the dispensing
19  data from a customer and it gets more
20  controlled substances than that distributor
21  supplies, then the distributor knows that
22  it's getting controlled substances from other
23  distributors, correct?
24  MR. EPPICH: Object to form.
25  Foundation. Calls for speculation.

1  Outside the scope.
2  THE WITNESS: It could be from
3  another distributor, or it could be
4  from another pharmacy selling stuff to
5  them. So it's not necessarily another
6  distributor. It could be another
7  registrant that's selling them.
8  QUESTIONS BY MS. SINGER:
9  Q. Okay. But it's another
10  supplier other than -- or distributor,
11  correct?
12  A. Yes.
13  MR. EPPICH: Same objections.
14  QUESTIONS BY MS. SINGER:
15  Q. Now, if a pharmacy won't
16  provide dispensing information to a
17  distributor, would that be a red flag that
18  the distributor needs to look more closely at
19  that customer?
20  MR. EPPICH: Object to the
21  form. Vague as to time.
22  MS. MAINIGI: Scope. Outside
23  the scope of the Touhy authorization.
24  MR. FINKELSTEIN: Incomplete
25  hypothetical.

1  MR. EPPICH: Objection. Calls
2  for speculation.
3  THE WITNESS: Yes, they should
4  be.
5  QUESTIONS BY MS. SINGER:
6  Q. They should?
7  A. They should.
8  Q. A distributor should ask?
9  A. Should ask for it.
10  MR. EPPICH: Same objections.
11  QUESTIONS BY MS. SINGER:
12  Q. And if a pharmacy directed a
13  distributor that it should not -- or could
14  not go into its store and talk with its
15  personnel or get a feel for that store,
16  should that be another red flag to that
17  distributor?
18  MR. EPPICH: Same objections.
19  MR. FINKELSTEIN: Incomplete
20  hypothetical.
21  THE WITNESS: Yes.
22  QUESTIONS BY MS. SINGER:
23  Q. Okay. And that's true whether
24  it's a chain pharmacy or an independent
25  pharmacy, correct?

1  MR. EPPICH: Same objections.
2  THE WITNESS: Correct.
3  QUESTIONS BY MS. SINGER:
4  Q. Now, distributors have
5  information on both controlled and
6  noncontrolled substances that are ordered by
7  a customer, correct?
8  MR. EPPICH: Objection.
9  Foundation. Form and vague.
10  THE WITNESS: Yes.
11  QUESTIONS BY MS. SINGER:
12  Q. And that lets them see where a
13  customer's order of controlled substances is
14  disproportionate to its other orders,
15  correct?
16  MR. EPPICH: Objection. Form.
17  Foundation. Calls for speculation.
18  Vague.
19  THE WITNESS: Yes.
20  QUESTIONS BY MS. SINGER:
21  Q. And so if a customer is
22  ordering a lot of opioids and very little
23  antibiotics or diabetes medicine, that would
24  be one potential red flag of diversion,
25  correct?

1  MR. EPPICH:  Objection.  Form.
2  Foundation.  Calls for a legal
3  conclusion.
4  THE WITNESS:  Yes, it could
5  potentially be a red flag.
6  QUESTIONS BY MS. SINGER:
7  Q. A red flag?
8  A. Yes.
9  Q. Okay.  And it's also true that
10  pharmacies that order a certain mix of drugs
11  that are abused together, that that can be
12  another red flag of potential diversion,
13  correct?
14  MR. EPPICH:  Objection.  Form.
15  Foundation.  Calls for a legal
16  conclusion.
17  THE WITNESS:  Yes.
18  QUESTIONS BY MS. SINGER:
19  Q. Now, distributors have that
20  data on other noncontrolled substance orders,
21  correct?
22  MR. EPPICH:  Objection.  Form.
23  Foundation.  Calls for speculation.
24  MR. FINKELSTEIN:  Scope.  Calls
25  for speculation.

1  THE WITNESS:  Yes.
2  QUESTIONS BY MS. SINGER:
3  Q. But DEA doesn't get reporting
4  from distributors on noncontrolled substances
5  ordered by customers, correct?
6  A. No, we do not.
7  We do have some distributors
8  that have told us -- like now everybody is
9  looking at gabapentin, so the distributors
10  have said, "We are going to take a harder
11  look at that, that one."
12  Q. Okay.  But in general, and
13  certainly over the time period we've been
14  talking about from 1996 until now, you --
15  A. There's been -- I mean, there's
16  been other substances that they've said --
17  you know, I remember ketamine.  That was one
18  they said, oh, it was not a noncontrol and we
19  made it controlled.
20  So there's been other drugs
21  that they have stepped up and said, you know,
22  "We need to keep an eye on these.  We're
23  going to -- can we put them in the controlled
24  substance cage because we are seeing that?"
25  So we have had those dialogs with them as

1  well.
2  Q. Okay.  But you don't routinely
3  get antibiotics or other non-diverted or
4  abused drugs, correct?
5  MR. EPPICH:  Objection.  Asked
6  and answered.  Form.
7  THE WITNESS:  Correct.
8  QUESTIONS BY MS. SINGER:
9  Q. And DEA doesn't have
10  prescribing information in ARCOS, correct?
11  MR. EPPICH:  Objection.  Form.
12  Vague.
13  THE WITNESS:  Correct.
14  QUESTIONS BY MS. SINGER:
15  Q. But that information is
16  certainly useful in detecting suspicious
17  orders or potential diversion, correct?
18  MR. EPPICH:  Objection.  Calls
19  for a legal conclusion.  Form.
20  THE WITNESS:  Correct.
21  QUESTIONS BY MS. SINGER:
22  Q. Is DEA aware that registrants
23  have information -- have access to
24  information on cash payments that are
25  received by pharmacies?

1  MR. EPPICH:  Objection.  Form.
2  Calls for speculation.
3  MR. FINKELSTEIN:  Scope.  Calls
4  for speculation.
5  THE WITNESS:  I believe we do.
6  I believe they do.
7  QUESTIONS BY MS. SINGER:
8  Q. They do?
9  A. Yeah.
10  Q. And does DEA have that
11  information?
12  MR. EPPICH:  Objection.
13  THE WITNESS:  If we subpoena
14  it.
15  QUESTIONS BY MS. SINGER:
16  Q. Okay.  But not in the regular
17  course --
18  A. No.
19  Q. -- of identifying potential
20  diversion?
21  A. Right.
22  Q. Now, does ARCOS data tell you
23  whether a customer is near a hospital or a
24  cancer center or a hospice treatment
25  facility?

1  A. No, it's just transactional
2  data.
3  Q. Okay. But distributors and
4  manufacturers would learn that information in
5  their due diligence on customers, correct?
6  MR. EPPICH: Objection. Form.
7  Foundation. Calls for speculation.
8  THE WITNESS: Yes.
9  QUESTIONS BY MS. SINGER:
10  Q. Okay. And when you get, for
11  instance, a -- when you, DEA, gets, for
12  instance, a big stack of ingredient limit
13  reports, you can't tell from that whether
14  orders of large numbers are by facilities
15  that are near hospitals or oncology centers
16  or anything like that, correct?
17  MR. EPPICH: Object to the
18  form.
19  THE WITNESS: I'm sorry, could
20  you repeat it?
21  QUESTIONS BY MS. SINGER:
22  Q. So when you get, you know, a
23  big stack of excess order reports or
24  ingredient limit reports, you can't tell if a
25  large order is from a customer that's near an

1  oncology center or a hospital, for instance,
2  correct?
3  MR. EPPICH: Object to the
4  form.
5  THE WITNESS: Correct. From
6  the reports, you cannot.
7  QUESTIONS BY MS. SINGER:
8  Q. Does the DEA get chargeback
9  data?
10  A. No.
11  (Prevoznik Plaintiff's Exhibit
12  P57 marked for identification.)
13  QUESTIONS BY MS. SINGER:
14  Q. All right. Let's go to the
15  letter. Exhibit 57.
16  This is a letter from the
17  DEA -- I'm sorry, from the Department of
18  Justice to the Honorable Dan A. Polster dated
19  January 30, 2018.
20  Have you seen this letter?
21  A. Yes.
22  Q. Okay. And it's signed by
23  Demetra Ashley --
24  A. Yes.
25  Q. -- is that correct?

1  Okay. And this represents the
2  official position of the Department of
3  Justice and DEA, correct?
4  MR. EPPICH: Objection. Form.
5  Foundation.
6  THE WITNESS: Yes.
7  QUESTIONS BY MS. SINGER:
8  Q. Okay. Turning to page 4,
9  please. The middle paragraph, second
10  sentence says, "Release of the personally
11  identifiable information of individual
12  registrants without their consent would
13  violate the Privacy Act."
14  Do you see where I'm reading?
15  A. Yes.
16  Q. "Therefore, DOJ objects to the
17  production thereof under its Touhy
18  regulations. Disclosure would improperly
19  reveal trade secrets without the owners'
20  consent, and, therefore, the DOJ objects to
21  the production thereof under its Touhy
22  regulations," citing them. "Production of
23  this data would reveal specific details
24  regarding the scope and breadth of their
25  market share, which is likely to cause

1  manufacturers and distributors substantial
2  competitive harm."
3  Have I read that correctly?
4  A. Yes.
5  Q. Okay. And it goes on to say,
6  "In Freedom of Information Act litigation,
7  registrants have articulated the competitive
8  harm that would result from the release of
9  this information in several ways. For
10  example, registrants have expressed concern
11  that ARCOS information, if made publicly
12  available, could be used by competitors to
13  determine market share and sales trends in
14  specific areas and would enable competitors
15  to target existing customers and attempt to
16  take away business. For" --
17  So have I read all of that
18  correctly?
19  A. Yes.
20  Q. "For this reason, registrants
21  have repeatedly asserted that they rely on
22  DEA to protect the confidential business
23  information that they report to DEA through
24  ARCOS."
25  Have I read that correctly?

1  A. Yes.
2  Q. And is it the DEA's experience
3  that registrants have objected to sharing
4  ARCOS data with their competitors?
5  A. Yes.
6  MR. EPPICH:  Object to form and
7  foundation.
8  QUESTIONS BY MS. SINGER:
9  Q. All right.  You can put that
10  aside.
11  So all registrants have the
12  same duty to maintain effective controls to
13  protect diversion and to detect, report and
14  stop shipment of suspicious orders; is that
15  correct?
16  MR. EPPICH:  Objection.  Calls
17  for a legal conclusion.
18  MS. FUMERTON:  Objection.
19  Form.
20  THE WITNESS:  Yes.
21  QUESTIONS BY MS. SINGER:
22  Q. And I think you testified
23  before that the obligation depends on where
24  you sit in the supply chain.
25  Do you remember that?

1  MR. EPPICH:  Objection.
2  THE WITNESS:  You mean in terms
3  of --
4  QUESTIONS BY MS. SINGER:
5  Q. Let me put it a different way
6  rather than focusing on what you testified
7  to.
8  Is it true that your
9  obligations are the same, but what you may
10  observe and have data on depends on where you
11  are in the supply chain, correct?
12  MR. EPPICH:  Object to the
13  form.  Vague.
14  THE WITNESS:  Yes.
15  QUESTIONS BY MS. SINGER:
16  Q. So you have the same
17  obligation -- or a registrant has the same
18  obligation to report and prevent diversion,
19  regardless of where they are in the supply
20  chain, correct?
21  MR. EPPICH:  Object to the
22  form.  Calls for a legal conclusion.
23  THE WITNESS:  Correct.
24  QUESTIONS BY MS. SINGER:
25  Q. And the difference is what

1  diversion you can see from where you sit,
2  correct?
3  MR. EPPICH:  Objection to form.
4  Calls for a legal conclusion.  Vague.
5  THE WITNESS:  Yes.
6  QUESTIONS BY MS. SINGER:
7  Q. And if a registrant has
8  information that would alert it to diversion,
9  it has an obligation under the Controlled
10  Substances Act to use that information to
11  prevent diversion, correct?
12  MR. EPPICH:  Object to form.
13  Calls for a legal conclusion.  Vague.
14  THE WITNESS:  Correct.
15  QUESTIONS BY MS. SINGER:
16  Q. And you can't be like that
17  monkey, hiding your eyes --
18  MR. EPPICH:  Objection.
19  QUESTIONS BY MS. SINGER:
20  Q. -- and say, "We only use that
21  data for marketing" --
22  MR. EPPICH:  Objection.
23  QUESTIONS BY MS. SINGER:
24  Q. -- "or accounting."
25  You have to use that data for

1  compliance, too, correct?
2  MR. EPPICH:  Objection.
3  THE WITNESS:  Yes.
4  QUESTIONS BY MS. SINGER:
5  Q. Before manufacturers sell
6  opioids to a distributor, that manufacturer
7  must make sure that the distributor has an
8  adequate and effective suspicious order
9  monitoring program, correct?
10  MR. O'CONNOR:  Objection.
11  Form.  Foundation.
12  THE WITNESS:  Yes.
13  QUESTIONS BY MS. SINGER:
14  Q. And that would include doing a
15  site visit of the distributor, correct?
16  MR. O'CONNOR:  Objection.
17  Form.
18  THE WITNESS:  Yes.
19  QUESTIONS BY MS. SINGER:
20  Q. And examining its suspicious
21  order monitoring program, correct?
22  A. Yes.
23  Q. And if a manufacturer sees
24  evidence that a distributor is shipping and
25  failing to report suspicious orders, that

1   should suggest to the manufacturer that the
2   distributor does not have effective controls,
3   correct?
4   MR. O'CONNOR:  Objection.
5   Form.
6   MS. MACKAY:  Incomplete
7   hypothetical.
8   THE WITNESS:  Correct.
9   QUESTIONS BY MS. SINGER:
10  Q. And if the information a
11  manufacturer has available to them points to
12  diversion by prescribers, by pharmacies, a
13  manufacturer has an obligation to notify DEA
14  of those prescribers and pharmacies, correct?
15  MR. O'CONNOR:  Objection.
16  Form.  Incomplete hypothetical.
17  THE WITNESS:  Yes.
18  QUESTIONS BY MS. SINGER:
19  Q. And does a manufacturer comply
20  with its obligations to report suspicious --
21  I'm sorry.
22  Does a manufacturer comply with
23  the Controlled Substances Act when it reports
24  that potential diversion to its distributor
25  but not the DEA?

1   P58 marked for identification.)
2   QUESTIONS BY MS. SINGER:
3   Q. Exhibit 58.  It is
4   DEA_Rannazzisi, a lot of zeros, 6060.  It's
5   titled "Declaration of Michael Arpaio."
6   Do you recognize this document?
7   A. No.
8   Q. Okay.  Do you know who Michael
9   Arpaio is?
10  A. Yes.
11  Q. And who is that?
12  A. He is a former DEA diversion
13  investigator.
14  Q. Okay.  And if you turn to
15  page 2, backside.  Now -- I'm sorry, go back
16  to the first page, the caption.
17  Can you read the caption for
18  this, in the matter of Cardinal Health?
19  A. Cardinal Health.
20  Q. Okay.  I'm sorry, now read
21  paragraph 5, if you would, please.
22  A. "I told Mr." --
23  Is it Moni?
24  Q. Yes.
25  A. "I told Mr. Moni that due

1   MR. O'CONNOR:  Objection.
2   Form.
3   THE WITNESS:  I'm sorry, can
4   you run --
5   QUESTIONS BY MS. SINGER:
6   Q. So if the manufacturer only
7   tells its distributor and not the DEA, have
8   they satisfied their obligation under the
9   Controlled Substances Act?
10  MR. O'CONNOR:  Objection.
11  Form.
12  MR. FINKELSTEIN:  Incomplete
13  hypothetical.
14  THE WITNESS:  No.
15  QUESTIONS BY MS. SINGER:
16  Q. Are distributors -- and I'm
17  sorry.  Mr. Farrell asked you these questions
18  about chain pharmacies and whether there are
19  different compliance obligations for chain
20  pharmacies.
21  Do you remember that?
22  A. Yes.
23  Q. And I just want to show you one
24  document.
25  (Prevoznik Plaintiff's Exhibit

1   diligence investigations must be performed on
2   all customers."
3   Q. And if you go back for one
4   second, if you read the top line of
5   paragraph 4, it may explain who Mr. Moni is.
6   A. "Consequently, on July 29,
7   2009, I spoke via teleconference to Mike
8   Moni, quality and regulatory affairs vice
9   president, anti-diversion and supply chain
10  services, who is headquartered in Cardinal
11  Health's Dublin, Ohio, facility but at the
12  time was in Washington, DC."
13  Q. Okay.  You can stop there.
14  And I'm sorry, if you can pick
15  up where you were in paragraph 5.
16  A. Just start --
17  Q. Just start from the beginning
18  on paragraph 5.
19  A. "I told Mr. Moni that due
20  diligence investigations must be performed on
21  all customers, chain pharmacies included,
22  when it appears that suspicious high volume
23  orders of controlled substances are
24  requested, and questionnaires should be sent
25  to those -- to these chains.

1  "Mr. Moni, in turn, stated that
2  QRA is unable to look at chain pharmacy
3  systems in order to identify problem areas
4  when there is not an order of interest or
5  their threshold is not exceeded.  I repeated
6  the chain store due diligence reviews must
7  not be treated any differently than
8  independent retail pharmacy customers."
9  Q. In that last sentence that
10 "chain store due diligence reviews must not
11 be treated any differently than independent
12 retail pharmacy customers," does that
13 represent the view of the DEA?
14 A. Yes.
15 MS. MAINIGI:  Objection.  Form.
16 QUESTIONS BY MS. SINGER:
17 Q. And that is the guidance that
18 DEA gave to registrants, correct?
19 MS. MAINIGI:  Objection to
20 form.  Objection.  Outside the scope
21 of the Touhy authorization.
22 Objection.
23 MR. EPPICH:  Objection to the
24 prior question.
25 MS. MAINIGI:  Objection to the

1  prior question and there also to this
2  current question.
3  QUESTIONS BY MS. SINGER:
4  Q. Go ahead.
5  That's the guidance that DEA
6  gave to registrants?
7  A. Correct.
8  Q. All right.  Should distributors
9  be looking at all of the volume of opioids
10 they supply into a geographic area in
11 determining whether orders may be suspicious?
12 MR. EPPICH:  Object to the
13 form.  Foundation.  Vague.  Calls for
14 a legal conclusion.
15 THE WITNESS:  It would
16 definitely help.
17 QUESTIONS BY MS. SINGER:
18 Q. Okay.  Meaning if they're
19 supplying in ways that are very
20 disproportionate to the population, that
21 should be a sign that they're not supplying
22 to a legitimate market, correct?
23 MR. EPPICH:  Objection to the
24 form.  Calls for a legal conclusion.
25 THE WITNESS:  Correct.

1  QUESTIONS BY MS. SINGER:
2  Q. And distributors may not know
3  all of the pills that are going into an area,
4  but they certainly know what pills they're
5  sending, correct?
6  MR. EPPICH:  Objection to the
7  form.  Calls for a legal conclusion.
8  MS. MAINIGI:  No foundation.
9  Outside the scope of the Touhy
10 authorization.
11 THE WITNESS:  Correct.
12 QUESTIONS BY MS. SINGER:
13 Q. Are orders that are below a
14 threshold set by a distributor sometimes
15 suspicious, too?
16 MR. EPPICH:  Objection.  Calls
17 for a legal conclusion.  Form.  Vague.
18 THE WITNESS:  Yes, they can be.
19 QUESTIONS BY MS. SINGER:
20 Q. And should registrants be
21 reporting orders that are within threshold
22 but are still suspicious for other reasons?
23 MR. EPPICH:  Objection to form.
24 Calls for a legal conclusion.  Scope.
25 THE WITNESS:  Yes.

1  QUESTIONS BY MS. SINGER:
2  Q. If an order exceeds a threshold
3  set by a registrant, is it no longer
4  suspicious if the registrant cuts the order
5  to threshold and ships it anyway?
6  MR. EPPICH:  Objection.  Form.
7  Incomplete hypothetical.  Calls for a
8  legal conclusion.  Vague.
9  MS. MAINIGI:  Outside the scope
10 of the Touhy authorization.
11 MR. FINKELSTEIN:  Incomplete
12 hypothetical.
13 THE WITNESS:  Could you repeat
14 it?
15 QUESTIONS BY MS. SINGER:
16 Q. Yes.  Let me do it as an
17 example.
18 If the threshold says that an
19 order of 10,000 dosage units exceeds
20 threshold and a customer orders 50,000 dosage
21 units, can the distributor just cut the order
22 to 10,000 units and ship it without
23 investigating whether it's suspicious or not?
24 MR. EPPICH:  Objection.  Form.
25 Incomplete hypothetical.  Calls for a

1   legal conclusion and vague.
2   THE WITNESS:  Well, in your
3   hypothetical it sounded like it was
4   already triggered as a suspicious
5   order, so immediately upon discovery
6   they were supposed to tell us anyway
7   that this happened.
8   QUESTIONS BY MS. SINGER:
9   Q. And shipping less of it doesn't
10  make it not suspicious anymore.  If it's a
11  suspicious order, it's a suspicious order,
12  correct?
13  MR. EPPICH:  Objection to form.
14  Calls for a legal conclusion.
15  THE WITNESS:  Right.  So they
16  can either not ship it or they can
17  investigate to determine -- to
18  alleviate the suspicions that they
19  have.
20  QUESTIONS BY MS. SINGER:
21  Q. Okay.  Let's go to...
22  (Prevoznik Plaintiff's Exhibit
23  P59 marked for identification.)
24  QUESTIONS BY MS. SINGER:
25  Q. Okay.  This is exhibit -- can

1   you see the number, Mr. Prevoznik?  I forgot
2   to check it.
3   A. 59.
4   Q. Okay.  And do you recognize
5   this as the testimony of Demetra Ashley from
6   the Office of Diversion Control at DEA?
7   A. Yes.
8   Q. I believe it was an exhibit in
9   the first two days of your deposition.
10  A. Yes.
11  Q. All right.  And it's dated
12  December 12, 2017, correct?
13  A. Correct.
14  Q. Okay.  So I believe that
15  Cardinal's counsel read you some of this, and
16  I just want to complete the record on it.
17  So, first, if you could turn to
18  page 7.
19  Under the title "Ensuring
20  Patient Access and Effective Drug Enforcement
21  Act," first sentence, "The United States is
22  currently facing an opioid epidemic."
23  Is that the view of the DEA?
24  A. Yes.
25  MR. EPPICH:  Objection to form.

1   QUESTIONS BY MS. SINGER:
2   Q. And turning the page, I believe
3   you were asked to read the last sentence of
4   the middle paragraph, "The DEA needs every
5   tool."
6   Can you just read the first
7   part of that paragraph, too, so we have a
8   complete record and not just an
9   out-of-context sentence?
10  MR. EPPICH:  Object to that
11  commentary.
12  THE WITNESS:  "The DEA needs
13  every tool it can to combat the opioid
14  crisis.  DEA supports changing the
15  Ensuring Patient Access and Effective
16  Drug Enforcement Act to allow DEA to
17  more effectively stop bad actors from
18  engaging in opioid diversion.  We are
19  dealing with very dangerous drugs that
20  can result in addiction and even
21  death."
22  QUESTIONS BY MS. SINGER:
23  Q. Okay.  I think that completes
24  the record.  You read the last sentence
25  previously.

1   All right.  Let's now go to
2   the...
3   MR. FINKELSTEIN:  I'm going to
4   ask for our lunch break in a minute.
5   MS. SINGER:  Okay.  I'm just
6   about done.
7   (Prevoznik Plaintiff's Exhibit
8   P60 marked for identification.)
9   QUESTIONS BY MS. SINGER:
10  Q. Okay.  Exhibit 60.
11  And this is
12  DEA_Rannazzisi_00003482.  And that title page
13  is "Prescription Opioids to Heroin:  A
14  Natural Progression, June 14, 2014, Joseph
15  Rannazzisi."
16  Do you recognize this document?
17  A. Yes.
18  Q. And what do you recognize it
19  as?
20  A. Mr. Rannazzisi's presentation.
21  Q. Okay.  And that was an official
22  DEA presentation, correct?
23  A. Correct.
24  Q. Okay.  And there aren't slide
25  numbers.

1  Do we have that tabbed?
2  If you could go to the second
3  tab, please, which is titled "Migration of
4  Pain Clinics."
5  Are you at that page with a
6  map?
7  A. Yes.
8  Q. Okay.  Can you explain what
9  this map represents in terms of DEA's
10 enforcement?
11 MR. O'CONNOR:  Objection.
12 Foundation.
13 MS. MAINIGI:  Outside the scope
14 of the Touhy authorization.
15 MR. FINKELSTEIN:  You can
16 answer this question, but this will be
17 the last question before our lunch
18 break.
19 THE WITNESS:  Okay.
20 What this means is after we
21 took the enforcement actions we did in
22 Florida, this was what the pain -- the
23 bad pain clinics did, the rogue pain
24 clinics did, was they went -- moved --
25 as you can see the directions they

1  moved into.  They moved into states
2  that had weak laws governing pain
3  clinics.  So this was the movement of
4  the rogue pain clinics from Florida
5  out.
6  QUESTIONS BY MS. SINGER:
7  Q. Okay.  And this reflects DEA's
8  experience that when you take enforcement
9  action someplace, the diversion can move into
10 other areas, correct?
11 A. Correct.
12 MS. MAINIGI:  Objection.
13 Outside the scope.  Vague.
14 VIDEOGRAPHER:  Okay.  We're
15 going off the record.  The time is
16 12:46.
17 (Off the record at 12:46 p.m.)
18 VIDEOGRAPHER:  We're going back
19 on the record.  Beginning of Media
20 File 5.  The time is 1:37.
21 EXAMINATION
22 QUESTIONS BY MR. MAHADY:
23 Q. Mr. Prevoznik, good afternoon.
24 My name is Joe Mahady.  I, along with my
25 colleague, Robert Nicholas, are counsel for

1  AmerisourceBergen in this litigation.
2  Before we begin, I do want to
3  sincerely thank you for your patience over
4  last two and a half days.  I know it's been a
5  lot, and it is appreciated.
6  I want to start my questioning
7  with the testimony you provided relating to
8  after-the-fact reporting of suspicious
9  orders.
10 Okay?
11 A. Uh-huh.
12 Q. All right.  And when we're
13 talking about after-the-fact reporting of
14 suspicious orders, what we are talking about
15 is registrants who report suspicious -- who
16 ship suspicious orders after they've been
17 reported to DEA, correct?
18 A. After they reported it?
19 Q. Yes.
20 After-the-fact reporting is
21 when the suspicious order has been shipped
22 and then reported to DEA; is that correct?
23 A. Those were excessive purchases.
24 Q. Okay.
25 A. So it was after-the-fact sales.

1  Q. Okay.  And my understanding of
2  your testimony is that the DEA has always
3  interpreted orders to mean prior to shipment;
4  is that correct?
5  A. Correct.
6  Q. All right.  And that the DEA
7  has consistently provided the guidance --
8  that guidance to registrants, correct?
9  A. Correct.
10 Q. All right.  And that the DEA
11 has never told registrants that
12 after-the-fact reporting is compliant with
13 federal law; is that correct?
14 A. Well, the use of the term -- of
15 the absolute "never," there might be an
16 employee that did, but DEA policy has always
17 been --
18 Q. Okay.  So nobody from DEA
19 headquarters has ever told a registrant, to
20 your knowledge, that after-the-fact reporting
21 is compliant with federal law, correct?
22 A. Well, again, you started it
23 with the "never" -- did somebody at DEA
24 headquarters ever do it.  So I'm -- I can't
25 say that somebody didn't say something, but I

1  can say DEA policy is that they should not.
2  Q. Okay.  I appreciate that.
3  And I believe you testified
4  that the DEA has consistently advised
5  registrants that they should not ship an
6  order that they report as suspicious; is that
7  correct?
8  A. Correct.
9  Q. And when you say
10  "consistently," you were referring to the
11  time period from 1971 when the Controlled
12  Substances Act was passed until present day;
13  is that right?
14  A. Yes.
15  Q. So approximately a 50-year
16  period.  Your testimony is that the DEA
17  guidance on that point has been consistent,
18  correct?
19  A. Correct.
20  Q. All right.  You joined the DEA
21  in 1991, correct?
22  A. Yes.
23  Q. In my home city of
24  Philadelphia?
25  A. Yes.

1  Q. Okay.
2  A. Where you from?
3  Q. Philadelphia.
4  Where?
5  A. Yeah.
6  Q. Well, now I'm in the 'burbs.
7  We had to move.  But I was in city.
8  So -- and you joined
9  headquarters in 2012, correct?
10  A. Yes.
11  Q. Okay.  So I want to understand
12  a little bit better how you can testify that
13  the guidance was consistent for that entire
14  50-year period.
15  Okay?
16  A. Sure.
17  Q. Okay.  So in preparing for your
18  deposition as the representative from the
19  DEA, who did you speak with that -- well, let
20  me back up.
21  You don't have any firsthand
22  knowledge of the guidance that the DEA
23  offered from 1971 until you joined the DEA in
24  1991, correct?
25  A. I have the statute and the

1  regulations that haven't changed since then.
2  Q. Okay.
3  A. So that's what I relied on.
4  Q. So you relied -- for the period
5  from 1971 to 1991, you relied entirely on the
6  statute and the regulation, correct?
7  MR. FINKELSTEIN:  Objection.
8  Argumentative.  Mischaracterizes prior
9  testimony.
10  THE WITNESS:  No, because we
11  went through some of the letters that
12  I had seen in the 1980s in which those
13  topics were discussed in there.
14  But I also know that Burles
15  Vulcom [phonetic], there was a press
16  release that they had to pay a heavy
17  fine back in the 19 -- mid-1980s
18  because they weren't reporting
19  suspicious orders.
20  So I was reviewing documents
21  that would show what was DEA's
22  position and what did we say.  So I
23  was looking at correspondence, any
24  correspondence, I could find in the
25  1980s, 1990s, anything that showed

1  that consistent -- what did we say,
2  what was our policy.
3  QUESTIONS BY MR. MAHADY:
4  Q. Okay.  And what did we say
5  regarding the guidance relating to reporting
6  a suspicious order and then shipping it.
7  That's what we're talking about specifically,
8  right?
9  A. Right.
10  Q. Okay.  Did you speak with
11  anyone at the -- in preparation for your
12  30(b)(6), did you speak with anyone at the
13  DEA who was knowledgeable about the guidance
14  offered by the DEA on that issue from 1971 to
15  1980?
16  MR. FINKELSTEIN:  I'm going to
17  object and note for the record that
18  the witness had a prep sheet which was
19  to stay with his prep materials that
20  has not been provided to him today.
21  MR. MAHADY:  Okay.  And that
22  was a prep sheet that the Department
23  of Justice brought with them last
24  time, so it's not a document that we
25  were to bring.  So --

1  MR. FINKELSTEIN:  No, it was a
2  document that was marked as an
3  exhibit, provided to everyone and kept
4  with the witness himself, kept with
5  the court reporter, so he could rely
6  on them.
7  MR. MAHADY:  Okay.
8  MR. FINKELSTEIN:  This
9  specifically listed his prep.
10  MR. MAHADY:  Okay.  That's
11  fine.
12  MR. FINKELSTEIN:  And so now
13  he's going on memory, where we
14  specifically prepared an exhibit for
15  you.
16  MR. MAHADY:  I appreciate that.
17  MS. MAINIGI:  We'll try to find
18  it.  I think the exhibits went with
19  the prior court reporter, so I think
20  that's what happened.
21  MR. MAHADY:  Okay.
22  QUESTIONS BY MR. MAHADY:
23  Q. In preparation for your
24  30(b)(6), you did not speak with Michael
25  Mapes, correct?

1  18 and went to 20.
2  QUESTIONS BY MR. MAHADY:
3  Q. Okay.  And in preparing for
4  your deposition as a 30(b)(6) on behalf of
5  the DEA, how many representatives from field
6  offices did you speak with?
7  A. Probably about 10 to 12.
8  Q. Okay.
9  A. Sort of off the top of my head.
10  Q. And how many of those
11  individuals worked at field offices in the
12  1990s?
13  A. Worked in the field offices?
14  Q. Correct.
15  A. Eight to ten of them.
16  Q. Okay.  Mr. Prevoznik, are you
17  aware that the DEA has, in fact, approved a
18  suspicious order monitoring system where
19  suspicious orders were to be reported after
20  the purchase was complete?
21  A. No.
22  Q. Okay.  Would it surprise you
23  that the DEA has approved a suspicious order
24  monitoring system where suspicious orders
25  were to be reported after the purchase has

1  A. No.
2  Q. And you did not speak with Kyle
3  Wright, correct?
4  A. No.
5  Q. There was a reference to a Tom
6  Gitchel earlier today; is that right?
7  A. Tom Gitchel, yes.
8  Q. And who is Tom Gitchel?
9  A. Tom Gitchel was a senior
10  manager within the diversion program at DEA.
11  Q. Okay.  And did you speak with
12  Tom Gitchel in preparation for providing
13  testimony on behalf of the DEA?
14  A. No.
15  Q. Okay.  How about Patricia Good?
16  Did you speak with Patricia Good?
17  A. No.
18  Q. How many field offices does the
19  DEA have?
20  A. Currently we have 23.
21  Q. Okay.  And do you know how many
22  field offices the DEA had in the 1990s?
23  MR. FINKELSTEIN:  Objection.
24  Scope.
25  THE WITNESS:  I believe it was

1  been complete?
2  MR. FINKELSTEIN:  Object to
3  form.
4  THE WITNESS:  Yeah.
5  (Prevoznik Exhibit 22 marked
6  for identification.)
7  QUESTIONS BY MR. MAHADY:
8  Q. Okay.  I'm going to mark this
9  as Prevoznik 22.
10  Mr. Prevoznik, let me know when
11  you've had a chance to read this.
12  A. Okay.
13  Q. Okay.
14  MR. FARRELL:  Before you do so,
15  I'm going to place an objection on the
16  record.  This is correspondence dated
17  1998 between Bergen Brunswig
18  Corporation and the DEA, and the scope
19  of this document violates CMO 2, where
20  the defendants requested and the Court
21  granted a limitation with temporal
22  scope of discovery to 2006.
23  MR. MAHADY:  This document was
24  produced to the DEA, was identified as
25  a document that Mr. Prevoznik reviewed

1  in preparing for his corporate
2  designee deposition today.
3  I will also note that the
4  plaintiffs spent a majority of their
5  questioning on issues that predate
6  2007, including using documentation
7  that was between DEA and other
8  registrants that was pre-2007.
9  SPECIAL MASTER COHEN:  Just to
10  clarify, you said produced to the DEA.
11  Did you mean by the DEA?
12  MR. MAHADY:  From the DEA.
13  QUESTIONS BY MR. MAHADY:
14  Q. Mr. Prevoznik, this morning
15  Mr. Farrell asked you questions about
16  documents that bear a US DEA Bates number,
17  correct?
18  A. Yes.
19  Q. All right.  And those are
20  documents that the DEA has produced, correct?
21  A. Correct.
22  Q. Okay.  And these were documents
23  that were in the custody and control of the
24  DEA, correct?
25  A. Yes.

1  Q. Okay.  Have you seen this
2  document before?
3  A. Yes.
4  Q. When was the first time you saw
5  this document?
6  A. It was during my prep.  I don't
7  have a specific date.
8  Q. Did you see -- so you've been
9  deposed on three separate days, correct?
10  A. Yes.
11  Q. And the first two days of your
12  deposition were, I believe, April 17th and
13  April 18th.
14  Did you see this document
15  before you were deposed on April 17th and
16  April 18th?
17  A. Yes.
18  Q. Okay.  Are you aware that the
19  Department of Justice did not produce this
20  document until Tuesday of this week?
21  A. No.
22  Q. Okay.
23  MS. MAINIGI:  I believe it got
24  to us Wednesday.
25  MR. MAHADY:  Correction for the

1  record.  It was Wednesday of this week
2  we received it.
3  MS. MAINIGI:  Actually, it was
4  hand-delivered to Williams on Tuesday.
5  MR. MAHADY:  Well, the point
6  isn't Tuesday or Wednesday, it's
7  that --
8  MR. FINKELSTEIN:  No, it was
9  hand-delivered.  So you knew you had
10  represented previously that it was
11  Federal Express'd, but it wasn't.
12  MR. MAHADY:  Okay.  Well,
13  the -- I would just like to --
14  MS. MAINIGI:  That's what I
15  understood.
16  MR. FINKELSTEIN:  And you were
17  wrong.
18  MR. MAHADY:  -- note for the
19  record that this document was reviewed
20  by the witness in advance of the first
21  two days of his deposition and was
22  produced a month after the fact.
23  MR. FINKELSTEIN:  And now you
24  have it.  Go ahead and ask questions
25  about it.

1  MR. MAHADY:  I will.  Thank
2  you.
3  MR. FINKELSTEIN:  You're
4  welcome.
5  QUESTIONS BY MR. MAHADY:
6  Q. Mr. Prevoznik, can you please
7  direct your attention to the bottom of this
8  document?
9  A. Yes.
10  Q. And before we get there, I'm
11  sorry, this document is dated what?
12  A. July 23, 1998.
13  Q. And this document was sent to,
14  while the name is redacted, the regulatory
15  compliance and security services of Bergen
16  Brunswig Corporation; is that correct?
17  A. Correct.
18  Q. And it's signed, or stamped, by
19  Patricia M. Good, chief liaison and policy
20  section; is that right?
21  A. Yes.
22  Q. Okay.  Can you direct your
23  attention to the bottom of the page below the
24  section that has been redacted, and can you
25  please read for me the subject line?

1 A. "Approved suspicious order
2 monitoring system."
3 Q. Okay. Now, if you can please
4 read to me for the record the first sentence
5 of the letter after "dear."
6 A. "This is to grant approval of
7 your request to implement on a nationwide
8 basis your newly developed system to identify
9 and report suspicious orders for controlled
10 substances and regulated chemicals."
11 Q. Okay. Can you -- so as
12 required by the federal regulations, correct?
13 A. Oh, I'm sorry, yes.
14 Q. Okay. Can you read the next
15 sentence, please?
16 A. "DEA managers who have been
17 involved with the testing of the system have
18 relied -- have relayed their positive
19 opinions regarding its ability to provide
20 information in a fashion which is not only
21 useful overall but is also responsive to the
22 needs of individual DEA offices."
23 Q. Okay. And we can agree that
24 this is an explicit approval from the DEA of
25 a particular system, correct?

1 monitoring system," the position of the DEA
2 is that this was not an approval of the
3 system; is that correct?
4 MR. FINKELSTEIN: Objection.
5 Argumentative. Asked and answered.
6 You can answer again.
7 THE WITNESS: Can you please
8 repeat it?
9 QUESTIONS BY MR. MAHADY:
10 Q. Notwithstanding the fact that
11 the subject line of this letter is "approve
12 suspicious order monitoring system," it is
13 the position of the DEA here today, 20-some
14 years later, that this was not an approval of
15 the actual program itself; is that correct?
16 MR. FINKELSTEIN: Same
17 objections.
18 THE WITNESS: Yeah, that's not
19 what the letter says. The letter says
20 we approve your request to implement
21 your system on a nationwide basis.
22 Your system, Bergen Brunswig system.
23 QUESTIONS BY MR. MAHADY:
24 Q. And do you know if that system
25 was developed in coordination with the DEA?

1 MR. FINKELSTEIN: Objection.
2 Mischaracterizes the document.
3 THE WITNESS: No, it's a --
4 it's a granting -- they asked could
5 they implement this on a nationwide --
6 their newly designed system. So it's
7 this particular registrant, Bergen
8 Brunswig, who developed their own
9 system and asked can we -- can we
10 apply this nationwide.
11 And we said, yes, you may apply
12 it nationwide.
13 QUESTIONS BY MR. MAHADY:
14 Q. Okay. So --
15 A. It's not approving the system.
16 MR. FINKELSTEIN: Let the
17 witness finish his answer.
18 MR. MAHADY: I appreciate that.
19 THE WITNESS: It's just
20 approving the fact that they can now
21 put it nationwide.
22 QUESTIONS BY MR. MAHADY:
23 Q. Okay. So notwithstanding the
24 fact that the subject line of the letter is,
25 "Subject: Approve suspicious order

1 A. Well, it appears that we had
2 some input into it, so it's no different than
3 when I previously testified that you have --
4 the regulations require the registrant to
5 design. So this is designing it.
6 So when -- as I said earlier
7 today, when we go in to listen to the design
8 or what is the system that you're going to
9 implement, DEA is in listening mode, we will
10 make suggestions.
11 If we -- as we listen to it, we
12 will make suggestions: Oh, you may want to
13 think of this; you may want to think of that.
14 Q. Okay.
15 A. So then it jumps to the
16 operational side. So you now have the
17 design, but now you have to operate it. So
18 what is the operation, what was actually --
19 how did the system operate.
20 And that is the registrant
21 running that system, not DEA.
22 Q. Okay. So the DEA approved the
23 design of the system but not the operation;
24 is that what you're saying?
25 MR. FINKELSTEIN: Objection.

1   Mischaracterizes his prior testimony.
2   THE WITNESS:  No, we said we
3   approve the request to implement the
4   system nationwide.
5   QUESTIONS BY MR. MAHADY:
6   Q.  Okay.  So in the eyes of DEA,
7   there's a distinction between approving the
8   system and approving the nationwide
9   implementation of a system.
10  Do I understand you correctly?
11  A.  Well, I understand the request
12  seems to be that they asked, "Can we put this
13  nationwide?" and we said, "Yes, go ahead."
14  (Prevoznik Exhibit 23 marked
15  for identification.)
16  QUESTIONS BY MR. MAHADY:
17  Q.  Okay.  I'm going to mark the
18  next document as Prevoznik 23.
19  MR. FINKELSTEIN:  Do you have a
20  copy for me?
21  MR. MAHADY:  I do.
22  MR. FINKELSTEIN:  Wait till I
23  get my copy before you answer
24  questions.
25  THE WITNESS:  Sure.

1   no response.
2   So I'm going to ask you to
3   instruct Mr. Farrell, who is trying to
4   slow down and impede the questioning,
5   that he not continue to raise this
6   same issue with every document that's
7   introduced.
8   MR. FINKELSTEIN:  I'll note
9   that we let them ask and we're letting
10  you ask, but it appears that you all
11  had a copy of what you were
12  complaining you didn't receive a copy
13  of for a long time, so...
14  MR. MAHADY:  And I'll represent
15  to the Department of Justice that the
16  copy that the Department of Justice
17  produced is different in a material
18  way than the copy that was in the
19  possession of AmerisourceBergen.
20  QUESTIONS BY MR. MAHADY:
21  Q.  Mr. Prevoznik, are you ready?
22  A.  Yes.
23  Q.  Okay.
24  MR. FARRELL:  Hold on.  Am I
25  being instructed not to lodge

1   MR. FARRELL:  Again, for the
2   record, I'm going to place an
3   objection.  This is not a document
4   produced by the DEA.  This is a
5   document bearing the ABDC Bates number
6   in the bottom right-hand corner, a
7   document dated 1996.
8   The defendants argued for and
9   received an order preventing the
10  plaintiffs from conducting discovery
11  on DEA communications with the
12  wholesalers prior to 2006, and yet now
13  they're attempting to introduce
14  selected documents on the very subject
15  matter.
16  So we reserve our right to make
17  a request to the Court to allow us to
18  reopen discovery in this regard.
19  MR. MAHADY:  Special Master
20  Cohen, this issue has been addressed
21  in e-mail correspondence to you this
22  week.  I believe it -- the last
23  request from you was to plaintiffs
24  asking that this resolve the issue.
25  That was over two days ago.  There was

1   objections?
2   SPECIAL MASTER COHEN:  You
3   certainly can lodge an objection in
4   the same way that the defense were
5   objecting to questioning by the
6   plaintiffs.
7   What I suggest you do, though,
8   is find a which to say an objection in
9   five words or less.
10  MR. FARRELL:  If I can have my
11  objections preserved for the record,
12  then I won't need to object at all.
13  SPECIAL MASTER COHEN:  Will you
14  give him a continuing objection on
15  that basis?
16  MR. MAHADY:  That's fine.
17  Can we go off the record?
18  VIDEOGRAPHER:  Going off
19  record.  The time is 1:57.
20  (Off the record at 1:57 p.m.)
21  VIDEOGRAPHER:  We're going back
22  on the record.
23  MR. FINKELSTEIN:  Go ahead,
24  back on the record.
25  VIDEOGRAPHER:  Going back on

1  the record.  Beginning of Media
2  File 6.  Time is 1:58.
3  MR. FINKELSTEIN:  Mr. Mahady,
4  you had represented that there were
5  significant differences.  Do you want
6  to explain those?  Because I have your
7  production right here, and the only
8  difference is it seems that you had an
9  unredacted version of this document.
10 MR. MAHADY:  Sure,
11 Mr. Finkelstein.  I'd just like to
12 start first with that it's not the
13 same document that I just made that
14 representation relating to.  I was
15 referring to the 1998 letter.
16 In the copy of the document
17 that was produced by the Department of
18 Justice, there are redactions, and
19 redactions in areas of the document
20 where there is no text in the version
21 that was in the possession of
22 AmerisourceBergen.
23 I will also note that at the
24 bottom of the version that was
25 produced by the Department of Justice,

1  there is a subject line, a subject,
2  "approve suspicious order monitoring
3  system," which is material and
4  relevant.
5  I would also like to note for
6  the record that the version of the
7  documents that are in possession of
8  AmerisourceBergen were provided to the
9  Department of Justice yesterday
10 afternoon around one o'clock for
11 purposes of completeness and in
12 advance of today's deposition, and I
13 received no response from anyone at
14 the DOJ.
15 MR. FINKELSTEIN:  So we had
16 fewer than 24 hours.
17 But what I'm seeing is two
18 letters dated July 23, 1998.  One is
19 addressed to Chris Zimmerman; the
20 other is addressed to a redacted name.
21 One says, "Dear Mr. Zimmerman," the
22 other says, "redacted."  In every
23 other respect, apart from the
24 redactions and the subject, they
25 appear to be identical.

1  I think you have three hours to
2  ask the witness about the redacted
3  draft.
4  MR. MAHADY:  And I think we're
5  talking about the document from
6  September 30, 1996, that's before the
7  witness.
8  QUESTIONS BY MR. MAHADY:
9  Q. Mr. Prevoznik, can you please
10 read the first paragraph of this letter --
11 before we get there.
12 Thomas Gitchel.  Thomas Gitchel
13 is identified as the chief liaison and policy
14 section of the DEA, correct?
15 A. Correct.
16 Q. And he held that position in
17 1996?
18 A. Yes.
19 Q. Now, if a registrant has
20 questions about the regulation or the DEA's
21 interpretation of the regulations, those
22 questions are directed to the liaison and
23 policy section of the DEA, correct?
24 A. Correct.
25 Q. And is the chief the

1  highest-ranking member of that section?
2  A. Yes.
3  Q. Okay.  This letter dated
4  September 30, 1996, to Thomas Gitchel was
5  sent by Chris Zimmerman of Bergen Brunswig.
6  Do you know Chris Zimmerman?
7  A. I know the name.
8  Q. Okay.
9  A. I don't know if we've ever met.
10 Q. Okay.  I want to start -- and
11 I'll actually read the first paragraph for
12 purposes of time.
13 "The purposes of this letter is
14 to introduce the Drug Enforcement
15 Administration to an innovative new system
16 under development by Bergen Brunswig Drug
17 Company to monitor and report customer orders
18 of controlled substances which fit the
19 suspicious order criteria outlined in 21 CFR
20 1301.74(b)."
21 Did I read that correctly?
22 A. Yes.
23 Q. Okay.  And that is the section
24 that we've been discussing today, right?
25 A. Yes.

1 Q. Okay. And that's the section
2 that governs the reporting of suspicious
3 orders?
4 A. Yes.
5 Q. Okay. Beginning with the next
6 sentence, "By way of background, as you know,
7 BBDC participated in the development of a
8 model excessive purchase report now in use by
9 many distributor registrants."
10 Were you aware that there was a
11 model excessive purchase report that was
12 being used by the registrants?
13 A. A model? Yes.
14 Q. Okay. It says, "As used by
15 BBDC, the excessive purchase report lists
16 total customer purchases for the reported
17 month which exceed predetermined multiples of
18 the average monthly purchase of BBDC's total
19 customer base."
20 Did I read that correctly?
21 A. Yes.
22 Q. Okay. So in describing the
23 model excessive purchase report, it refers to
24 customer purchases, correct?
25 A. Yes.

1 Q. And a monthly report, correct?
2 A. Correct.
3 Q. Okay. And it goes on to say at
4 the end of that paragraph, "This report is
5 produced in hard copy form monthly and is
6 sent via certified mail to each DEA field
7 office having responsibility for the
8 reporting BBDC locations."
9 Did I read that correctly?
10 A. Yes, you did.
11 Q. And is that your understanding
12 of how it worked?
13 A. Yes.
14 MR. FINKELSTEIN: Wait. Hang
15 on. Give me time to object.
16 THE WITNESS: I'm sorry.
17 MR. FINKELSTEIN: Objection.
18 Scope.
19 QUESTIONS BY MR. MAHADY:
20 Q. Next paragraph. "While
21 feedback from DEA users over the years has
22 generally confirmed our belief that the
23 report standing alone is a useful law
24 enforcement tool, BBDC suspicious order
25 compliance program also involves the

1 telephonic reporting of customer orders to
2 DEA."
3 Now, is it your understanding
4 that DEA users did consider the excess
5 purchase reports to be a useful law
6 enforcement tool?
7 A. Yes.
8 Q. Okay. And is it your
9 understanding that distributors like Bergen
10 Brunswig also placed telephonic report --
11 also performed telephonic reporting to the
12 DEA for suspicious orders in the '90s?
13 A. Yes, that's my understanding.
14 Q. Okay. And it goes on to say
15 that "in an average year, BBDC logs over
16 12,000 telephone calls to DEA field offices
17 nationwide to quarterly customer orders of
18 controlled substances which it believes could
19 fit the suspicious order criteria set forth
20 in 1301.74(b)."
21 Did I read that correctly?
22 A. Yes.
23 Q. And you have no reason to
24 dispute the fact stated here that Bergen
25 Brunswig was placing 12,000 calls to DEA

1 field offices a year, do you?
2 MR. FINKELSTEIN: Objection.
3 Scope.
4 THE WITNESS: No, I don't.
5 QUESTIONS BY MR. MAHADY:
6 Q. Okay. And then it goes on to
7 say that "In nearly every instance, the
8 telephonic contacts are made to report orders
9 which later appeared on the month end
10 excessive reports sent to DEA."
11 Did I read that correctly?
12 A. Yes.
13 Q. Okay. So the orders that were
14 being reported to the DEA daily,
15 telephonically, were also being included on
16 the month-end excessive purchase reports,
17 correct?
18 MR. FINKELSTEIN: Objection.
19 Scope.
20 THE WITNESS: That's what it
21 says.
22 QUESTIONS BY MR. MAHADY:
23 Q. Okay. Was that your
24 understanding?
25 MR. FINKELSTEIN: Scope.

1   THE WITNESS:  Based on this,
2   yes, that's my understanding.
3   Q. Okay.  Now, next paragraph,
4   second sentence, "Some field offices have
5   insisted that BBDC not telephonically report
6   suspicious orders at all" --
7   MR. FINKELSTEIN:  Where are
8   you?
9   MR. MAHADY:  Bottom of the
10  page.
11  QUESTIONS BY MR. MAHADY:
12  Q. -- "but rather to mail or fax
13  copies of the order documents, 222 forms or
14  invoices of them instead."
15  Did I read that correctly?
16  A. Yes.
17  Q. Okay.  So a DEA field office
18  could give guidance to registrants about how
19  they wanted suspicious orders reported,
20  correct?
21  MR. FINKELSTEIN:  Scope.
22  THE WITNESS:  Yes.
23  QUESTIONS BY MR. MAHADY:
24  Q. Okay.  And your --
25

1   MS. MAINIGI:  If I could
2   interrupt, why is that scope?
3   MR. FINKELSTEIN:  Because the
4   authorization letter is explicit that
5   he is authorized to testify about
6   industrywide guidance but not
7   individual communications to specific
8   registrants.
9   MS. MAINIGI:  Okay.  Well, I
10  think that's industrywide, but thank
11  you for that clarification.
12  MR. FINKELSTEIN:  Specific
13  phone calls to Bergen Brunswig is
14  industrywide?
15  MS. MAINIGI:  I don't think
16  that's the scope of the question, but
17  I'll -- I apologize for interrupting.
18  I just wanted to know the answer.
19  MR. FINKELSTEIN:  Do you
20  understand my objection?
21  THE WITNESS:  Yeah.
22  MR. FINKELSTEIN:  Okay.
23  QUESTIONS BY MR. MAHADY:
24  Q. So just to go back.
25  DEA field offices could provide

1   guidance to registrants about the suspicious
2   order reporting requirements, correct?
3   MR. FINKELSTEIN:  Scope.
4   THE WITNESS:  Yes.
5   QUESTIONS BY MR. MAHADY:
6   Q. Okay.  And the DEA's
7   expectation would be that the registrants
8   listened to the guidance they were receiving
9   from the field offices, correct?
10  A. Yes.
11  Q. Okay.  And if a DEA field
12  office told to -- advised a registrant to
13  report a suspicious order in one form versus
14  another, they should listen to that DEA field
15  office, correct?
16  A. Yes.
17  Q. Okay.
18  A. Yes.
19  Q. Now, the next sentence there,
20  it says, "Some offices have diplomatically
21  attempted to offer guidance as to the types
22  of orders that their offices would deem
23  reportable in an effort to limit the number
24  of telephone contacts."
25  Did I read that correctly?

1   A. Yes.
2   Q. Are you aware that some DEA
3   field offices in the '90s were trying to
4   limit the number of suspicious orders being
5   reported telephonically by the registrants?
6   MR. FINKELSTEIN:  Foundation.
7   Exceeds the scope of the Touhy
8   authorization.
9   You can answer in your personal
10  capacity.
11  THE WITNESS:  I'm not
12  personally aware of that.
13  QUESTIONS BY MR. MAHADY:
14  Q. Okay.  But you have no reason
15  to dispute the accuracy of that statement?
16  MR. FINKELSTEIN:  Scope.  Calls
17  for speculation.
18  You can answer.
19  THE WITNESS:  I don't.
20  QUESTIONS BY MR. MAHADY:
21  Q. Okay.  I want to go down to the
22  middle of the page where it says, "Against
23  this backdrop."
24  Do you see it?
25  A. Yes.

1   Q. Okay.  "Against this backdrop,
2   BBDC set to work on the development of a
3   suspicious order reporting system that would
4   provide better quality information to DEA in
5   a more efficient manner."
6   Did I read that correctly?
7   A. Yes.
8   Q. And you would agree with me
9   that that's a laudable goal to have for a
10  registrant?
11  A. A lot of what?
12  Q. That's something that a
13  registrant should strive to do, is to provide
14  better quality information to the DEA?
15  A. Yes.
16  Q. Okay.  Now, I'm going to read
17  the next paragraph, which describes the plan.
18  "Our plan involves the creation
19  of a computer program that compares a
20  customer's controlled substance orders
21  expressed in metric units of the active
22  ingredient against a standard representing an
23  average of the customer's prior four months
24  of orders.  Customers whose order exceed by a
25  specified percentage their prior four-month

1   average order history would be printed on a
2   summary report."
3   Did I read that correctly?
4   A. Yes.
5   Q. Okay.  "BBDC's mainframe
6   computer in Orange, California, would
7   automatically fax this report simultaneously
8   to each respective DEA field office daily in
9   the early a.m. hours after the distribution
10  center has completed order processing
11  activities."
12  Did I read that correctly?
13  A. Yes.
14  Q. Okay.  So what's contemplated
15  here is that BBDC would generate a report at
16  the end of the night, after it had completed
17  its order processing for the day, correct?
18  MR. FINKELSTEIN:  Objection.
19  Scope.  Calls for speculation.
20  THE WITNESS:  So they pulled --
21  so the orders were already pulled and
22  already ready to ship?
23  QUESTIONS BY MR. MAHADY:
24  Q. Yes.  Okay.
25  MR. FINKELSTEIN:  Scope.  Calls

1   for speculation.
2   You can answer.
3   QUESTIONS BY MR. MAHADY:
4   Q. "When DEA offices open each
5   day, the summary report would be waiting for
6   their review.  DEA offices could also elect
7   to receive a month-end version of this report
8   via US mail.  The summary report would show
9   the customer name, address, DEA number, item
10  description, NDC number, order date, active
11  ingredient volume ordered, active ingredient
12  shipped and customer allowance, i.e., average
13  of customer's prior four-month orders."
14  Did I read that correctly?
15  A. Yes.
16  Q. Now, what's contemplated here
17  in the summary report that would be faxed
18  daily to the DEA, so the DEA field offices
19  would have it in the morning, included active
20  ingredient shipped, correct?
21  MR. FINKELSTEIN:  Scope.  Calls
22  for speculation.
23  THE WITNESS:  It's what it
24  says.
25

1   QUESTIONS BY MR. MAHADY:
2   Q. Okay.
3   A. But again, these are all
4   after-the-fact shipping.
5   Q. Correct.
6   So these would be suspicious
7   orders that were reported to the DEA after
8   they had already been shipped, right?
9   A. Right.
10  MR. FINKELSTEIN:  Wait.
11  THE WITNESS:  I'm sorry.
12  MR. FINKELSTEIN:  Calls for
13  speculation.
14  QUESTIONS BY MR. MAHADY:
15  Q. And Bergen Brunswig is seeking
16  to implement a program that would do just
17  that, report -- I'm sorry, ship and then
18  report suspicious orders, right?
19  MR. FINKELSTEIN:  Scope.  Calls
20  for speculation.
21  THE WITNESS:  But in -- as this
22  morning's testimony, in all these
23  various communications we have stated
24  that a suspicious order is prior to
25  shipment.

1    QUESTIONS BY MR. MAHADY:
2    Q. Okay.
3    A. So you're giving us, again,
4    after the fact, which does not -- just
5    because you report it doesn't alleviate that
6    you maintain effective controls over
7    diversion.
8    Q. Okay.  But Bergen Brunswig is
9    specifically saying, "We're going to report
10   suspicious orders after they had already been
11   shipped," correct?
12   MR. FINKELSTEIN:  Scope.  Calls
13   for speculation.
14   You can answer in your personal
15   capacity.
16   QUESTIONS BY MR. MAHADY:
17   Q. That's what they're proposing
18   to implement.  That's all I'm trying to ask
19   you based off of this document.
20   A. Right, and --
21   MR. FINKELSTEIN:  You can
22   answer based on your personal
23   understanding of what Bergen Brunswig
24   is proposing to implement.
25   QUESTIONS BY MR. MAHADY:

1    Q. Okay.  And your answer was
2    "right," that's your understanding of what
3    they're proposing?
4    A. That's my understanding of it,
5    yes.
6    Q. Okay.  Next page.  "Our intent
7    is to receive DEA's permission to replace our
8    current manner of daily suspicious order
9    reporting with the daily electronic facsimile
10   report," correct?
11   A. Yes.
12   Q. Okay.  "We would like to have
13   DEA input on the final product because DEA
14   will be the primary users.  One suggestion
15   would be to coordinate with one of your field
16   offices, perhaps the Los Angeles office, to
17   meet with our project development team."
18   Did I read that correctly?
19   A. Yes.
20   Q. Okay.  It goes on to
21   say, "While your field office could beta test
22   the report and provide us with input on
23   aesthetics and content, there are some key
24   questions that DEA would need to provide
25   input on before the report is finalized.  One

1    question would be the assigned -- assignment
2    of the percentage value that a customer's
3    order would have to exceed before that order
4    would appear on the report."
5    Did I read that correctly?
6    A. Yes.
7    Q. Okay.  And then it goes on to
8    say, "Tom, we are excited about the
9    opportunity to make constructive changes in
10   our suspicious order reporting system.  By
11   working in a partnership with your office, we
12   can perhaps lead the way to developing a new
13   system that everyone feels good about."
14   Did I read that correctly?
15   A. Yes.
16   Q. Okay.  And as the
17   representative from the DEA, was it your
18   understanding that Bergen Brunswig in 1996
19   was trying to work with the DEA as part of a
20   partnership to develop a system that everyone
21   could feel good about?
22   MR. FINKELSTEIN:  Scope.  Calls
23   for speculation.
24   You, Tom Prevoznik, can answer.
25   THE WITNESS:  Yes, that's what

1    it appears to be.
2    (Prevoznik Exhibit 26 marked
3    for identification.)
4    QUESTIONS BY MR. MAHADY:
5    Q. Okay.  I'm going to mark P,
6    Prevoznik 24 [sic].
7    Okay.  And there is a back.
8    A. Okay.  Thank you.
9    Q. Okay.  Again, this document has
10   a US DEA Bates number; is that correct?
11   A. Yes.
12   Q. All right.  So this document
13   was in the possession, custody and control of
14   the United States DEA, correct?
15   A. Correct.
16   MR. FINKELSTEIN:  And appears
17   to be identical to ABDC269353.
18   MR. MAHADY:  And I did not say
19   it wasn't.
20   MR. FINKELSTEIN:  Progress.
21   QUESTIONS BY MR. MAHADY:
22   Q. This document is dated
23   October 29, 1996, right?
24   A. It looks like 1996.
25   Q. Yeah, the stamp is really not

1  the best.
2  A. Yeah, it's a little hard to
3  say, but, yeah, it looks like 1996.
4  Q. Okay.  And that's just under
5  one month after Mr. Zimmerman sent his letter
6  describing the proposed program to Thomas
7  Gitchel; is that right?
8  A. Yes.
9  Q. Okay.  And in the first
10  paragraph of this letter which is sent to
11  Bergen Brunswig from Mr. Gitchel, he said
12  that "reference is made to your recent letter
13  in which you requested that Bergen Brunswig
14  be permitted to replace its current
15  telephonic reporting of suspicious orders
16  with a daily report transmitted by
17  facsimile."
18  Did I read that correctly?
19  A. Yes.
20  Q. Okay.  So the DEA understood
21  that Bergen Brunswig was trying to replace
22  its daily suspicious order reporting with
23  this summary fax, right?
24  MR. FINKELSTEIN:  Objection to
25  the characterization.

1  months for ARCOS data to catch up.
2  Q. Okay.
3  A. To catch up.  So...
4  Q. But at least Bergen Brunswig
5  was saying to the DEA these are suspicious
6  orders that we're reporting, correct?
7  A. That's what it says, yes.
8  Q. Okay.  So your expectation
9  would be that the DEA would have corrected
10  them and said, no, you certainly can't be
11  referring to suspicious orders if you're
12  referring to after-the-fact sales; is that
13  right?
14  MR. FINKELSTEIN:  Objection.
15  Mischaracterizes.  Calls for
16  speculation.
17  THE WITNESS:  I'm sorry, can
18  you repeat that?
19  QUESTIONS BY MR. MAHADY:
20  Q. Bergen Brunswig was developing
21  a program to meet with their suspicious order
22  reporting requirements, correct?
23  MR. FINKELSTEIN:  Objection.
24  Scope.  Calls for speculation.
25

1  THE WITNESS:  It looks like --
2  yes, so that's what it looks like, but
3  it -- because it's a daily report of
4  sales that have been commenced, it
5  would be the excessive purchase
6  reports.
7  QUESTIONS BY MR. MAHADY:
8  Q. Okay.  But they're specifically
9  referring to suspicious orders?
10  A. I see that's what -- what
11  they're saying, but I'm just -- I'm telling
12  you that we've already shown and have been
13  clear that suspicious orders are prior to
14  shipment.
15  So you're giving us a -- in
16  reading this, you're giving us after-the-fact
17  purchase reports, and that was --
18  Q. Okay.  So would -- I'm sorry.
19  A. And that was part -- and we at
20  DEA at this time in particular, 1996, where
21  ARCOS was at least 9 to 12 months not being
22  accurate or being caught up to speed, this
23  was -- this was a very good tool for us
24  because it was more up-to-date information
25  than we would have if we waited the 9 or 12

1  QUESTIONS BY MR. MAHADY:
2  Q. That's what these letters are
3  about?
4  A. Well, I mean, it started with
5  an excessive -- we started with an excessive
6  purchase model, and now you jumped to
7  suspicious orders, so --
8  Q. Right.
9  So there was a reference in the
10  last document to excessive purchase reports?
11  A. Right, which are -- which are
12  after the fact.
13  Q. After the fact.
14  A. Right.
15  Q. And this new fax system is to
16  replace the daily phone calls.
17  Are we on the same page?
18  A. Right.
19  Q. Okay.  And the daily phone
20  calls were to report suspicious orders,
21  correct?
22  A. Okay.
23  Q. Okay.  And these faxes are to
24  report suspicious orders as well, as
25  represented by Bergen Brunswig?

1   MR. FINKELSTEIN:  Objection.
2   Foundation.
3   THE WITNESS:  Well, it's a
4   little confusing because you're saying
5   that you're going to pull the orders
6   and then you're going to fax the
7   summaries to us after the fact.
8   QUESTIONS BY MR. MAHADY:
9   Q. Well, let's look at the DEA's
10   response.
11   A. Right?
12   Q. Let's look at the DEA's
13   response.  This is from the DEA.  "Reference
14   is made to your recent letter in which you
15   requested that Bergen Brunswig be permitted
16   to replace its current telephonic reporting
17   of suspicious orders with a daily report
18   transmitted by facsimile."
19   Okay?  So the DEA is saying
20   your request is to report your daily
21   suspicious order reporting, correct?
22   A. Correct.
23   Q. Okay.  The DEA goes on to say,
24   "We have reviewed your proposal and feel that
25   it could be a viable alternative to the

1   A. So it wouldn't be a suspicious
2   order.  It would be an excessive purchase.
3   Q. Okay.  Let's keep reading.
4   A. It's an after-the-fact
5   purchase.
6   Q. "As proposed, the summary
7   report would include the customer's name,
8   address and DEA number, a description of the
9   item ordered, the NDC number, date ordered,
10   active ingredient volume ordered and shipped,
11   and the customer's allowance on average -- or
12   average order."
13   Did I read that correctly?
14   A. Yes.
15   Q. Okay.  And what the DEA is
16   saying is that we understand that you want to
17   replace your daily suspicious order reporting
18   with a summary fax that would include, among
19   other information, the amount of product that
20   was shipped.
21   A. Right.  So they're reporting
22   excessive -- they're doing an excess purchase
23   report, is what they're doing.
24   Q. Okay.  Now, do you see anywhere
25   in the first two paragraphs where the DEA

1   current system.  It is our understanding that
2   a computer program has been created that can
3   compare a customer's controlled substances
4   orders to an average of the customer's order
5   for the prior four months.  Customer orders
6   that exceed their four-month average order
7   history by an as-yet unspecified percentage
8   would be shown on a summary report that would
9   be sent to the appropriate DEA field office
10   on a daily basis."
11   Did I read that correctly?
12   A. Yes.
13   Q. Okay.  And they are talking
14   here about suspicious orders, correct?
15   MR. FINKELSTEIN:  Objection.
16   Scope.  Mischaracterizes.
17   THE WITNESS:  Well, no.  If you
18   keep going, it gets down to a reading
19   of both ordered and shipped.  So
20   they're indicating it's after the
21   fact.
22   QUESTIONS BY MR. MAHADY:
23   Q. Right.
24
25

1   clarifies that what you are proposing Bergen
2   Brunswig is an excessive purchase reporting
3   system, not a suspicious order reporting
4   system?
5   A. No, I don't.
6   Q. Okay.  They -- the DEA says
7   suspicious order, right?
8   MR. FINKELSTEIN:  Objection.
9   Mischaracterizes the document.
10   QUESTIONS BY MR. MAHADY:
11   Q. The first sentence.
12   A. Yes, it's reference to your
13   letter.
14   Q. Suspicious order?
15   A. Yeah.
16   Q. Okay.  Now, these excessive
17   purchase reports, just because we've talked
18   about them in the last document, you just
19   brought them up, the DEA understood that
20   these were also suspicious order reports,
21   right?
22   A. No, because they were after the
23   fact.
24   Q. Okay.  So the DEA did not
25   understand that the monthly reports were

1 suspicious order reports?
2 A. Well, I can just tell you
3 what D -- DEA policy has been not to approve
4 a system. It has also been that a suspicious
5 order is prior to shipment.
6 Q. Is it possible that the DEA
7 deviated from their policy?
8 MR. FINKELSTEIN: Objection.
9 Calls for speculation.
10 THE WITNESS: I can just tell
11 you what the policy is of DEA.
12 QUESTIONS BY MR. MAHADY:
13 Q. I appreciate that.
14 Is it possible that they
15 deviated from their policy?
16 MR. FINKELSTEIN: Calls for
17 speculation.
18 THE WITNESS: Anything is
19 possible.
20 QUESTIONS BY MR. MAHADY:
21 Q. Okay. And it's possible that
22 they deviated from their policy in approving
23 for implementation nationwide a suspicious
24 order monitoring system that reported
25 suspicious orders after the order had already

1 monthly suspicious order report, the new
2 program will compare the customer's order to
3 his or her previous orders rather than to
4 orders placed by other customers."
5 Did I read that correctly?
6 A. Yes.
7 Q. Now, the DEA is the one
8 referring to the monthly report as a
9 suspicious order report, correct?
10 A. Yes.
11 Q. Okay. So at least some
12 individuals at the DEA understood the monthly
13 report of after-the-fact sales to be
14 suspicious order reports, based off of this
15 document?
16 MR. FINKELSTEIN: Calls for
17 speculation.
18 THE WITNESS: I don't know. I
19 mean, it -- I think at this time
20 excessive purchase and suspicious
21 orders were sometimes understood as
22 one or the other, but clearly a
23 suspicious order that we have been
24 clear on, the suspicious order was not
25 to be -- was prior to shipment.

1 been shipped?
2 MR. FINKELSTEIN: Calls for
3 speculation.
4 THE WITNESS: Can you please
5 repeat it?
6 MR. MAHADY: Can you read that
7 back? Because I probably can't do it
8 as well the second time.
9 (Court Reporter read back
10 question.)
11 MR. FINKELSTEIN: Calls for
12 speculation and mischaracterizes the
13 document.
14 You can answer.
15 THE WITNESS: Yeah, I don't
16 know.
17 QUESTIONS BY MR. MAHADY:
18 Q. It's possible?
19 MR. FINKELSTEIN: Calls for
20 speculation.
21 THE WITNESS: It's possible.
22 QUESTIONS BY MR. MAHADY:
23 Q. Okay. Now, the next -- the
24 third paragraph. "We note that unlike the
25 program that generates Bergen Brunswig's

1 So summary reports, if -- any
2 summary report that showed sales that
3 were commenced and done were
4 considered excessive purchase orders.
5 They were not suspicious orders,
6 because suspicious orders would be
7 before the shipment.
8 QUESTIONS BY MR. MAHADY:
9 Q. That's not in the regulation,
10 correct?
11 MR. FINKELSTEIN: Objection.
12 Argumentative. Mischaracterizes the
13 regulation.
14 QUESTIONS BY MR. MAHADY:
15 Q. Does the regulation say that a
16 suspicious order needs to be reported prior
17 to shipment?
18 A. It says immediately upon
19 discovery.
20 Q. Okay.
21 A. And the statute says you
22 have -- that each registrant is to maintain
23 effective controls of that.
24 Q. I appreciate that.
25 But very specifically, does

1  the registrate -- does the statute or the
2  implementing regulations say that a
3  suspicious order must be reported prior to
4  shipment?
5  MR. FINKELSTEIN:  Asked and
6  answered.
7  MR. MAHADY:  I don't believe he
8  answered the question, that specific
9  question.
10  MR. FINKELSTEIN:  I believe he
11  did.
12  You can answer again.
13  THE WITNESS:  I thought I did,
14  too.
15  The statute requires to have
16  effective control to guard against
17  diversion.
18  QUESTIONS BY MR. MAHADY:
19  Q. I appreciate that.
20  A. So if you have a suspicious
21  order, which is prior to shipping, you have a
22  reason or reason to believe that that -- that
23  is going to be diverted into the illicit
24  market, right?  So your system is designed to
25  give -- to find that reason or reasons why

1  this shipment -- or why this order is to be
2  suspicious.  That is prior to shipping.
3  Q. Okay.
4  A. So in order to maintain
5  effective controls, you would then have to
6  look at the suspicion.  What triggered the
7  suspicion -- we're in Bergen Brunswig.  Let's
8  go with Bergen.  What triggered Bergen to
9  say, "Wait a minute, something's not right
10  with this order."
11  Q. Okay.
12  A. So then they should halt and
13  try to figure out, what can we alleviate
14  that.
15  Q. Okay.
16  A. What can we alleviate to that
17  suspicion.
18  So if you're just giving us
19  summary reports at the end where we've
20  already shipped it and say, "these are all
21  suspicious orders," well, what did you -- how
22  did you maintain any effective controls?
23  That would be my question.
24  Q. Okay.  I have a very specific
25  question --

1  A. Sure.
2  Q. -- and I'm just talking about
3  the text of the regulations.  Okay?
4  Does the text of the
5  regulations contain anything that explicitly
6  says that a suspicious order must be reported
7  to the DEA prior to shipment?
8  A. No, it says immediately upon
9  discovery.
10  Q. Okay.  Now --
11  MR. FINKELSTEIN:  Counsel, I'm
12  going to ask for a break in five
13  minutes.
14  MR. MAHADY:  Sure.
15  QUESTIONS BY MR. MAHADY:
16  Q. Tom Gitchel, okay, he's the one
17  that wrote this letter, right?
18  A. Yes.
19  Q. And at least to Tom Gitchel,
20  Bergen Brunswig's monthly report was a
21  suspicious order report?
22  MR. FINKELSTEIN:  Calls for
23  speculation.  Scope.
24  THE WITNESS:  I'm not sure what
25  Tom -- yeah.

1  QUESTIONS BY MR. MAHADY:
2  Q. But Tom refers to it as a
3  monthly suspicious order report, correct?
4  A. Right.
5  Q. All right.  And at least to Tom
6  Gitchel, his understanding of what was being
7  proposed is a daily fax of suspicious orders
8  that would include, among other information,
9  the amount that was shipped, correct?
10  A. Correct.
11  MR. FINKELSTEIN:  Scope.  Calls
12  for speculation.
13  QUESTIONS BY MR. MAHADY:
14  Q. Now, if you can turn to the
15  next page, last paragraph, "We look forward
16  to working with you on this new project which
17  we, too, hope will lead to a more efficient
18  suspicious order reporting system."
19  Did I read that correctly?
20  A. Yes.
21  Q. Now, they clearly were
22  developing a suspicious order reporting
23  system, right?
24  MR. FINKELSTEIN:  Objection.
25  Vague.  Scope.  Calls for speculation.

1  THE WITNESS:  Again, I can only
2  reiterate what the DEA policy is.
3  Suspicious orders are prior to
4  shipment.
5  QUESTIONS BY MR. MAHADY:
6  Q. But you're here on behalf of
7  the DEA and registrant that was provided --
8  or guidance that was provided to registrants.
9  Tom Gitchel was the chief
10  liaison -- the chief of the liaison and
11  policy section, right?
12  A. Yes.
13  Q. He's not some low-level DEA
14  employee, right?
15  A. No.
16  Q. He's pretty high up?
17  A. Yes.
18  Q. Okay.  And his section was the
19  one that was responsible for interpreting the
20  regulations, correct?
21  MR. FINKELSTEIN:  Objection.
22  Scope.  Foundation.
23  You can answer.
24  THE WITNESS:  Yes.
25

1  QUESTIONS BY MR. MAHADY:
2  Q. And at least to Tom Gitchel,
3  the monthly reports, the monthly excessive
4  purchase reports, were suspicious order
5  reports, correct?
6  MR. FINKELSTEIN:  Objection.
7  Scope.  Calls for speculation.  Asked
8  and answered.
9  THE WITNESS:  We've also read
10  letters --
11  QUESTIONS BY MR. MAHADY:
12  Q. Mr. Prevoznik --
13  A. I'm just telling you that
14  Mr. Gitchel also wrote letters that we went
15  through this morning that also said what I
16  had said the DEA's policy is.
17  Q. Okay.
18  A. It's after the shipment --
19  suspicious orders prior to shipment.
20  Q. So was Mr. Gitchel giving
21  inconsistent guidance to the registrants, in
22  your opinion?
23  MR. FINKELSTEIN:  Scope.
24  You can give your opinion.
25  THE WITNESS:  Slightly, yes.

1  MR. MAHADY:  Okay.  We can take
2  a break.
3  VIDEOGRAPHER:  We're going off
4  record.  The time is 2:32.
5  (Off the record at 2:32 p.m.)
6  VIDEOGRAPHER:  We're going back
7  on record.  Beginning of Media File
8  Number 7.  The time is 2:45.
9  QUESTIONS BY MR. MAHADY:
10  Q. All right.  Mr. Prevoznik,
11  sticking with Exhibit Prevoznik 24 for just
12  one more question or two.
13  Turning back to the first page
14  of that document from Mr. Gitchel to
15  Mr. Zimmerman at Bergen Brunswig, it says
16  that -- Mr. Gitchel said, "We agree that it
17  would be prudent to test this new program
18  before instituting it nationwide and concur
19  with your suggestion to use the DEA Los
20  Angeles division office for the beta test."
21  Did I read that correct?
22  A. Yes.
23  Q. All right.  And it says, "We
24  would appreciate it if you could postpone
25  starting the testing until after February 1,

1  1997, as Ms. Betsy Willis, who has been
2  selected for the diversion program manager
3  position in the Los Angeles field division,
4  will not be reporting for duty until the end
5  of January."
6  Did I read that correctly?
7  A. Yes.
8  Q. All right.  And in preparing
9  for your deposition today, did you have the
10  opportunity to speak with Ms. Betsy Willis?
11  A. No, I did not.
12  Q. I would like to mark Prevoznik
13  25.
14  (Prevoznik Exhibit 25 marked
15  for identification.)
16  QUESTIONS BY MR. MAHADY:
17  Q. For the record, while the
18  witness has an opportunity to read the
19  document, the Bates number is
20  ABDCMDL00269350.
21  It's a letter from Chris
22  Zimmerman to Thomas Gitchel, chief liaison
23  and policy section, US DEA, December 30,
24  1997.
25  A. Okay.

1  Q. Okay.  Let's start with the
2  first paragraph of the letter from
3  Mr. Zimmerman to Mr. Gitchel.
4  "This letter serves as a follow
5  up to previous written correspondence, copy
6  enclosed, and telephone conversations
7  between -- Bergen Brunswig Drug Company has
8  had with the DEA pertaining to BBDC's newly
9  developed system to monitor and report
10 customer orders of controlled substances
11 which fit the suspicious order criteria
12 outlined in 21 CFR 1301.74(b)."
13 Did I read that correctly?
14 A. Yes.
15 Q. Okay.  So this correspondence
16 relates to Bergen Brunswig's development of a
17 new suspicious order monitoring system to
18 meet the requirements of 21 CFR 1301.74(b),
19 correct?
20 MR. FINKELSTEIN:  Scope.
21 THE WITNESS:  Yes.
22 QUESTIONS BY MR. MAHADY:
23 Q. Okay.  Next paragraph.  "The
24 system is clearly described in the enclosed
25 September 30, 1996 correspondence.  Per your

1  instruction, BBDC began beta testing the new
2  suspicious order reporting system with the
3  DEA Los Angeles field office in March 1997.
4  Our BBDC Valencia division began the new
5  suspicious order reporting to the LA DEA
6  office in March 1, 1997; BBDC Corona division
7  began the new reporting to the Riverside DEA
8  office on April 1, 1997; and BBDC Hawaii
9  began this new reporting to the LA DEA office
10 on May 1, 1997; and BBDC Orlando began the
11 new reporting to the Tampa DEA office on
12 June 1, 1997.  All BBDC test divisions are
13 currently reporting suspicious orders to DEA
14 via the automated fax function of the new
15 reporting system."
16 Did I read that correctly?
17 A. Yes.
18 Q. Okay.  And in preparing for
19 your testimony today, did you speak with
20 anyone who was at the Los Angeles field
21 office in 1997?
22 A. No.
23 Q. In preparing for your testimony
24 today, did you speak with anyone who was at
25 the Riverside DEA office on April 1, 1997?

1  A. I don't believe so.
2  Q. Okay.  And what about anyone
3  who was at the Tampa DEA office in June
4  of 1997?
5  A. I'm trying to remember where
6  everybody was.  I'm not sure.
7  Q. Okay.  Did you speak with
8  anyone who was involved -- anyone at the DEA
9  who was involved in the development and
10 testing of the Bergen Brunswig suspicious
11 order monitoring system in 1990 -- between
12 1996 and 1998, to your knowledge?
13 A. Not to my knowledge.
14 Q. Okay.  The next paragraph.  "We
15 have had several conversations/meetings with
16 Ms. Betsy Willis, DEA diversion program
17 manager; Ms. Valencia Abrams, DEA Los Angeles
18 division group supervisor; Mr. Thomas Cox,
19 DEA Riverside diversion group supervisor; and
20 Mr. Arthur Fierman-Rentas, DEA Tampa
21 diversion group supervisor.  All DEA
22 personnel currently involved with the beta
23 test program have been very pleased, and
24 Ms. Willis has given BBDC permission to
25 discontinue the submission of monthly ARCOS

1  suspicious order report, parens, variance
2  report, to DEA for the BBDC Corona, Valencia
3  and Hawaii divisions.  Correspondence
4  enclosed."
5  Sitting here today, you have no
6  reason to dispute that all the individuals
7  involved with the testing were very pleased
8  with the suspicious order monitoring program
9  being developed?
10 A. I have no idea.
11 MR. FINKELSTEIN:  Wait.  Scope.
12 Calls for speculation.
13 You can answer in your personal
14 capacity.
15 THE WITNESS:  I have no idea.
16 QUESTIONS BY MR. MAHADY:
17 Q. It goes on to say at the end of
18 the page, "BBDC has approached other DEA
19 field offices regarding the implementation
20 and beta testing of our new suspicious order
21 reporting system.  However, those DEA field
22 offices have indicated that they would not
23 implement the new reporting system until they
24 received direction from Washington, DC."
25 Did I read that correctly?

1  A. Yes.
2  Q. Top of the next page.  "BBDC
3  has already made several changes to our
4  proposed new reporting system at the
5  direction of the DEA field offices in whose
6  jurisdiction it is being tested.  It has been
7  an extremely positive experience working
8  closely with DEA to develop a suspicious
9  order reporting system that benefits both the
10  wholesaler and the DEA."
11  Did I read that correctly?
12  A. Yes.
13  Q. Okay.  Based off of this
14  document, Bergen Brunswig Drug Corporation
15  developed this suspicious order reporting
16  system in '96 to '98 with the DEA?
17  MR. FINKELSTEIN:  Scope.
18  Foundation.  Calls for speculation.
19  THE WITNESS:  From the various
20  letters that you've given me, Bergen
21  Brunswig came with a system that they
22  wanted to show us, asked us for our
23  input.  So they showed us the design
24  of what they were -- the design of the
25  system that they were proposing to put

1  designing it, Bergen Brunswig came to
2  us.  So this is between Bergen and us.
3  QUESTIONS BY MR. MAHADY:
4  Q. Between Bergen and the DEA?
5  A. DEA, right.
6  Q. Okay.  And in designing it, the
7  DEA provided input on the design, correct?
8  A. Yes.
9  MR. FINKELSTEIN:  Wait, scope.
10  THE WITNESS:  Sorry.
11  QUESTIONS BY MR. MAHADY:
12  Q. And the DEA tested the program,
13  correct?
14  MR. FINKELSTEIN:  Scope.
15  THE WITNESS:  Yes.
16  QUESTIONS BY MR. MAHADY:
17  Q. And the DEA, based off of this
18  document, was very pleased with how the
19  suspicious order monitoring program was being
20  run, correct?
21  MR. FINKELSTEIN:  Scope.  Calls
22  for speculation.
23  THE WITNESS:  That's what it
24  appears from the letter.
25

1  nationwide.
2  So we provided input.  We
3  tested it with them.  So, yes.
4  QUESTIONS BY MR. MAHADY:
5  Q. Okay.  So, yes, the DEA
6  developed the program -- the design of the
7  program with Bergen Brunswig, correct?
8  MR. FINKELSTEIN:  Asked and
9  answered.  Scope.  Foundation.
10  You can answer.
11  THE WITNESS:  We did not design
12  it.  It said -- I mean, if we go back
13  to the September letter, it says it's
14  to introduce the DEA to the innovative
15  new system under development by Bergen
16  Brunswig.
17  So Bergen Brunswig, as of
18  September 30th, was the one that says,
19  "Hey, we have this new system."  So
20  they came to us and said, "Hey, could
21  you review it, help us with it," which
22  is exactly what we do with
23  registrants.  We do do that.  We
24  listen.  We present -- the registrant
25  is to design it; not us.  So in

1  QUESTIONS BY MR. MAHADY:
2  Q. Okay.  Next paragraph.  "We are
3  confident that this new suspicious order
4  reporting system will benefit both BBDC and
5  DEA and are optimistic that we will be able
6  to begin implementation of the new suspicious
7  order -- or suspicious reporting system
8  nationwide.  I believe that the new system
9  will not only save both BBDC and DEA valuable
10  time and resources, but will also provide DEA
11  with a more useful tool with which to detect
12  diversion."
13  Did I read that correctly?
14  A. Yes.
15  Q. Okay.  "BBDC is excited about
16  this opportunity and would like to continue
17  moving forward with the implementation of our
18  new suspicious order reporting system."
19  Did I read that correctly?
20  A. Yes.
21  Q. So there's no dispute here that
22  this is -- this relates to the development of
23  a suspicious order reporting system, correct?
24  MR. FINKELSTEIN:  Scope.
25  THE WITNESS:  Well, I mean, it

1 references back to the September 30 --
2 September 30, 1996, where they explain
3 what it is, which we just talked
4 about, excessive purchase
5 after-the-fact reporting.
6 QUESTIONS BY MR. MAHADY:
7 Q. Mr. Prevoznik, they were
8 developing a suspicious order reporting
9 system, correct?
10 MR. FINKELSTEIN:
11 Argumentative. Asked and answered.
12 Scope. Calls for speculation.
13 You can answer.
14 MR. FARRELL: Objection, again,
15 on behalf of plaintiffs. We've never
16 even seen this system that they're
17 talking about.
18 THE WITNESS: Could you please
19 repeat it?
20 MR. MAHADY: Just note for the
21 record that plaintiffs have had this
22 document for approximately ten months.
23 MR. FARRELL: The ABDC system,
24 suspicious order monitoring system,
25 from 1996?

1 MR. MAHADY: You've had these
2 documents for ten months, Paul.
3 MR. FARRELL: Yeah. My
4 understanding is the last version of
5 the suspicious order monitoring system
6 produced by ABDC is when?
7 Excuse me. My point is that --
8 MR. NICHOLAS: He doesn't have
9 to answer your questions.
10 MR. MAHADY: Paul, I don't have
11 to answer your questions.
12 MR. NICHOLAS: You're running
13 the clock. Okay. Let him ask his
14 questions. You don't have to smirk
15 about it either. It's not that funny.
16 Go ahead.
17 THE WITNESS: I'm sorry, can
18 you please repeat it?
19 MR. MAHADY: Neither of us
20 remember it, so I'll take a shot.
21 QUESTIONS BY MR. MAHADY:
22 Q. The DEA and Bergen Brunswig
23 were developing a suspicious order monitoring
24 system that Bergen Brunswig intended to meet
25 the requirements of the regulations, correct?

1 MR. FINKELSTEIN: Scope.
2 Foundation. Calls for speculation.
3 That one mischaracterizes prior
4 testimony. Asked and answered.
5 You can answer again.
6 THE WITNESS: Can you -- can
7 you --
8 QUESTIONS BY MR. MAHADY:
9 Q. Bergen Brunswig and the DEA
10 were developing a suspicious order monitoring
11 system, correct?
12 MR. FINKELSTEIN:
13 Mischaracterizes prior testimony.
14 Scope.
15 MR. MAHADY: It was a question.
16 It wasn't even about his prior
17 testimony. I'm just asking a
18 question.
19 THE WITNESS: Bergen Brunswig
20 was designing a system, and they asked
21 us to review it and test it with them.
22 That's what we did.
23 QUESTIONS BY MR. MAHADY:
24 Q. And the system they were
25 designing was a suspicious order monitoring

1 system, correct?
2 MR. FINKELSTEIN: Asked and
3 answered. Calls for speculation.
4 You can answer again.
5 THE WITNESS: Based on the
6 regulations and the statute to
7 maintain effective controls, the
8 September 30th letter talks about
9 after-the-fact shipping. So it
10 doesn't -- it's not in accordance with
11 DEA policy as being -- suspicious
12 orders are prior to shipping.
13 QUESTIONS BY MR. MAHADY:
14 Q. Okay. And the DEA --
15 A. So the September 30th is
16 specifically talking about shipping. So it's
17 been shipped. That's what it -- that's what
18 the September 30th letter you gave me
19 indicates, that it's been shipped.
20 Q. Now, we've seen at least two
21 responses from DEA about the program.
22 They're approving a suspicious order
23 monitoring system, right?
24 MR. FINKELSTEIN:
25 Argumentative. Asked and answered.

1  You can answer.
2  THE WITNESS:  They're approving
3  the system -- they're approving the
4  implementation of the system that
5  Bergen Brunswig designed.  That's what
6  they're approving.
7  QUESTIONS BY MR. MAHADY:
8  Q.  Okay.  We can go back to
9  Prevoznik 22, please.
10  A.  22.
11  Q.  Mr. Prevoznik, we've already
12  looked at this document, but now that we've
13  reviewed what the program consisted of, I
14  just want to ask a couple follow-up
15  questions.
16  First sentence of this document
17  from Patricia Good, chief liaison and policy
18  section, states, "This is to grant approval
19  of your request to implement on a nationwide
20  basis your newly developed system to identify
21  and report suspicious orders for controlled
22  substances and regulated chemicals as
23  required by federal regulation."
24  Correct?
25  A.  Correct, that's what it says.

1  Q.  And the subject of this
2  document that was drafted by the DEA, within
3  the possession, custody and control of the
4  DEA and produced in [sic] the DEA in this
5  litigation, is "approved suspicious order
6  monitoring system"; is that correct?
7  A.  Yes, that's what it says.
8  Q.  Okay.  Mr. Prevoznik, before
9  the break I think we established that
10  Mr. Gitchel, who at one time served as the
11  chief of the liaison and policy section, was
12  inconsistent in the guidance he reported to
13  registrants relating to the suspicious order
14  regulations, correct?
15  MR. FINKELSTEIN:  Objection.
16  Foundation.
17  THE WITNESS:  That was --
18  MR. FINKELSTEIN:  Wait.  Scope.
19  You can answer in your personal
20  capacity.
21  THE WITNESS:  Yeah, I answered
22  in my personal capacity.  I said yes.
23  QUESTIONS BY MR. MAHADY:
24  Q.  Okay.  And I believe what we
25  were comparing there was Mr. Gitchel's

1  guidance in 1984 versus the guidance that he
2  was providing in relation to the more recent
3  development of the Bergen Brunswig suspicious
4  order monitoring system, correct?
5  MR. FINKELSTEIN:  Foundation.
6  Scope.
7  THE WITNESS:  Can you give it
8  to me one more time?
9  QUESTIONS BY MR. MAHADY:
10  Q.  The inconsistency that
11  Mr. Gitchel was providing to the registrants,
12  one was in 1984 where, based off of your
13  testimony, Mr. Gitchel was advising
14  registrants that they should not ship orders
15  that they reported as suspicious, correct?
16  MR. FINKELSTEIN:  Vague.
17  Foundation.  Mischaracterizes the
18  document.
19  THE WITNESS:  Yes.
20  QUESTIONS BY MR. MAHADY:
21  Q.  Versus 1996 or '7 where
22  Mr. Gitchel, who was then the chief of the
23  liaison policy section of the DEA, is
24  referring to a monthly report of
25  after-the-fact purchases as a suspicious

1  order report and also advising on a
2  suspicious order monitoring system that would
3  entail after-the-fact reporting, right?
4  MR. FINKELSTEIN:  Object to the
5  form.
6  THE WITNESS:  Make sure I got
7  this right.
8  The design is by the
9  registrant.  Then we get into the
10  operate -- the operation of it by the
11  registrant.
12  So the inconsistency -- which
13  I'm talking of me answering this
14  question -- is that the -- it just
15  seems a little convoluted, from me
16  reading this, that the excessive
17  purchase and the suspicious orders
18  were being referred to as the same
19  thing when indeed they are not.
20  Because the reg -- because the
21  statute and regulations of then DEA
22  policy, regulations haven't changed
23  since they came into effect.  The
24  statute hasn't changed.
25  So we have been consistent

1  with -- DEA's consistency has been
2  that, where I think the
3  inconsistency -- this is me
4  speaking -- is that those two words
5  have been interchanged.  Because it's
6  still referring to after-the-fact
7  shipments, and suspicious orders are
8  before shipment.
9  QUESTIONS BY MR. MAHADY:
10  Q. Okay.  Mr. Prevoznik, the DEA
11  approved for implementation nationwide a
12  suspicious order monitoring system that
13  reported suspicious orders to the DEA on a
14  daily basis after the report -- after the
15  orders had already been shipped, correct?
16  A. Yes.
17  Q. Mr. Prevoznik, are you aware
18  that Bergen Brunswig merged with Amerisource
19  in or around 2001 to become AmerisourceBergen
20  Corporation?
21  MR. FINKELSTEIN:  Objection.
22  Scope.
23  THE WITNESS:  I know they
24  merged.  I don't know what year.
25

1  QUESTIONS BY MR. MAHADY:
2  Q. That's fair.
3  And what was your role at the
4  DEA in the early 2000s?
5  A. 2001 I was -- I got promoted to
6  instructor at DEA officer training.
7  Q. Okay.  And in your role as --
8  at the office of training, you were
9  personally familiar with AmerisourceBergen,
10  Bergen Brunswig's, system, correct?
11  A. What do you mean?
12  Q. Do you recall taking the
13  training classes to the Bergen Brunswig,
14  AmerisourceBergen distribution centers in
15  Richmond, Virginia?
16  A. Yes.
17  (Prevoznik Exhibit 27 marked
18  for identification.)
19  MR. MAHADY:  Okay.  I'm going
20  to mark this next document as
21  Prevoznik 27.
22  Unfortunately, I have short
23  arms, Mr. Prevoznik, so...
24  MR. FINKELSTEIN:  The important
25  thing is, do you have extra copies?

1  MR. MAHADY:  I do.  And I'll
2  use my short arms to get you one.
3  MR. FINKELSTEIN:  Thank you.
4  QUESTIONS BY MR. MAHADY:
5  Q. Okay.  I'm going to read this
6  letter, which is dated January 14, 2004,
7  Bates number ABDC MDL 00315827.  And it's
8  from a John R. McCarty, special agent in
9  charge, to Mr. Mays, manager of regulatory
10  affairs, AmerisourceBergen.
11  I want to read the first
12  paragraph of this letter.
13  "This letter is to confirm
14  previous arrangements made by the Drug
15  Enforcement Administration, DEA, office of
16  training class coordinator, Thomas Prevoznik,
17  for a tour of the Bergen Brunswig facility in
18  Richmond, Virginia, by our diversion
19  investigator trainees.  I appreciate your
20  cooperation, and I'm certain that the visit
21  to your distribution plant will be a valuable
22  learning experience for our students."
23  Okay.  So I believe you already
24  testified that you do recall some trainings
25  that were provided by AmerisourceBergen at

1  its distribution center in Virginia to the
2  diversion investigator trainees, correct?
3  A. Yes.
4  Q. Okay.  And do you recall those
5  trainings involved discussions about the
6  applicable rules and regulation that govern
7  distributors?
8  A. Yes.
9  Q. Okay.  And by bringing your
10  diversion investigator trainees to
11  AmerisourceBergen, you obviously thought that
12  there was value in AmerisourceBergen advising
13  them of what their understanding of the
14  regulations were, correct?
15  MR. FINKELSTEIN:  Objection.
16  Scope.
17  You can answer.
18  THE WITNESS:  I'm sorry, can
19  you repeat the -- repeat the question?
20  QUESTIONS BY MR. MAHADY:
21  Q. Well, by bringing your
22  diversion investigator trainees to
23  AmerisourceBergen and having
24  AmerisourceBergen present on the DEA's rules
25  and regulations, you certainly thought that

1  AmerisourceBergen was complying with those
2  rules and regulations, right?
3  MR. FINKELSTEIN:  Objection.
4  Scope.  Mischaracterizes the document.
5  THE WITNESS:  I mean, the goal
6  wasn't for them to -- the goal was to
7  expose them to a real registrant.  So
8  give them -- they had -- we go through
9  security, we go through records,
10  reports, all of those kinds of things
11  while we're in training.
12  We don't have huge cages.  We
13  don't have a bunch of cameras.  We
14  don't have any of the practical things
15  that the registrant has, especially
16  Bergen Brunswig.  At this time at this
17  distribution center they had cages,
18  the locks, the alarms, that kind of
19  thing.
20  So that was -- that was to get
21  them out to expose them that type
22  of a real practical application.
23  QUESTIONS BY MR. MAHADY:
24  Q. Understood.
25  A. Right?

1  exhibit Prevoznik 28.  Provide a copy to the
2  government.
3  You're free to look at the
4  presentation, but I'm only going to ask you
5  questions about the cover document.
6  A. Okay.
7  Q. Let me know when you're ready.
8  The document is Bates-labeled ABDC MDL
9  00315829.
10  Ready?
11  A. Yeah.
12  Q. This is an internal
13  AmerisourceBergen memorandum dated
14  October 25, 2004.  Subject, ABC awarded DEA
15  certificate of appreciation.
16  I'm going to read the document.
17  "As many of you already know,
18  CSRA regularly provides training for
19  diversion investigator trainees from DEA's
20  Quantico, Virginia training academy.  This
21  training takes place at AmerisourceBergen's
22  Richmond distribution center and includes a
23  tour of the facility.
24  "At the conclusion of the
25  training on Friday, October 22, 2004, DEA

1  So part of it was they also --
2  I believe Steve actually gave the
3  presentation.  And he talked about the
4  interaction with DEA, because that's what we
5  were trying -- these were all new trainees,
6  so they had never been exposed to any of
7  this.
8  So we thought this was a great
9  opportunity for that --
10  Q. Okay.
11  A. -- collaboration.
12  Q. And that was valuable -- that
13  was, in fact, a valuable experience for your
14  diversion investigator trainees?
15  MR. FINKELSTEIN:  Scope.
16  THE WITNESS:  Yes.
17  QUESTIONS BY MR. MAHADY:
18  Q. Okay.  And AmerisourceBergen
19  partnered with you to provide that training,
20  right?
21  A. Yes.
22  (Prevoznik Exhibit 28 marked
23  for identification.)
24  QUESTIONS BY MR. MAHADY:
25  Q. Okay.  I'm going to mark

1  presented AmerisourceBergen Corporation with
2  a certificate of appreciation in recognition
3  of ABC's contributions to drug enforcement
4  and to DEA's training program.  Steve Mays
5  accepted the award on behalf of
6  AmerisourceBergen."
7  Do you recall DEA awarded
8  AmerisourceBergen a certificate of
9  appreciation in 2004?
10  MR. FINKELSTEIN:  Scope.
11  THE WITNESS:  Yes.
12  QUESTIONS BY MR. MAHADY:
13  Q. Okay.  And they were deserving
14  of that recognition?
15  MR. FINKELSTEIN:  Scope.
16  THE WITNESS:  Yes.
17  QUESTIONS BY MR. MAHADY:
18  Q. You can put that document
19  aside, Mr. Prevoznik.
20  Now, fortunately for you, I do
21  want to revisit P22, which is the DEA
22  memorandum summarizing the distributor
23  initiative conference presentation with
24  AmerisourceBergen.
25  A. Thank you.

1  MR. FINKELSTEIN:  This is
2  Prevoznik 22 or Plaintiff's 22?
3  MR. MAHADY:  Plaintiff's 22.
4  MR. FINKELSTEIN:  Plaintiff's
5  22.  Give me a second.
6  THE WITNESS:  It's way at the
7  bottom.
8  QUESTIONS BY MR. MAHADY:
9  Q. I know you already looked at
10 this this morning.
11 Are you okay for me to proceed
12 asking questions?
13 A. Yes.
14 Q. All right.  Again, internal
15 memorandum of the DEA.  This document
16 summarizes the DEA's understanding or summary
17 of the meeting, correct?
18 A. Correct.
19 Q. Okay.  You do not attend these
20 meetings?
21 A. No.
22 Q. Okay.  And just, again, so the
23 record's clear, it's from Michael Mapes.
24 You did not speak with Michael
25 Mapes in preparation for your testimony

1  Q. Got it.
2  And based off of the DEA's
3  summary of the meeting, it says, "In
4  consultation with Mr. Trant, it was agreed
5  that if E-Commerce Operations, ODCO, were to
6  identify a highly suspicious pharmacy to
7  which AmerisourceBergen was the wholesaler,
8  ODCO would notify AmerisourceBergen via
9  e-mail of the suspicious activity for
10 AmerisourceBergen to review and take the
11 actions the company deems appropriate."
12 Did I read that correctly?
13 A. Yes.
14 Q. Okay.  So at this meeting, the
15 DEA represented to Mr. Steve Mays of
16 AmerisourceBergen that if the DEA identified
17 a highly suspicious pharmacy to which
18 AmerisourceBergen was the wholesaler, it
19 would notify AmerisourceBergen via e-mail of
20 that pharmacy, correct?
21 A. That's what it says.
22 Q. Okay.  As the representative of
23 the DEA, do you know if the DEA identified
24 highly suspicious pharmacies to
25 AmerisourceBergen?

1  today?
2  A. No.
3  Q. Okay.  The last sentence of the
4  first paragraph, it says, "The purpose of the
5  meeting was to address the illegal domestic
6  Internet pharmacy problem and their source of
7  supply."
8  Did I read that correctly?
9  A. Yes.
10 Q. And that's your understanding
11 of the purpose of the meeting?
12 A. Yes.
13 Q. Okay.  If we turn to the next
14 page, I want to start -- I want to read the
15 sentence -- the paragraph that starts, "In
16 consultation with Mr. Trant."
17 Do you know who Mr. Trant is?
18 A. He was an attorney with our
19 Chief Counsel.
20 Q. Okay.  So he's DEA?
21 A. Yes.
22 Q. Okay.  And E-Commerce
23 Operations, ODCO, that's DEA as well, right?
24 A. Yes, that was Mr. Mapes'
25 section.

1  MR. FINKELSTEIN:  I'm going to
2  object and instruct you not to answer.
3  We had a separate witness for
4  this topic.  AmerisourceBergen had the
5  opportunity to ask questions then and
6  they didn't.  This witness has not
7  been designated to answer questions
8  about this topic.
9  MR. MAHADY:  This witness has
10 already testified in response to
11 questions from plaintiffs about the
12 substance of these meetings.  These
13 questions are based directly on what
14 was represented by the DEA at the
15 meeting.
16 MR. FINKELSTEIN:  So he can
17 definitely talk about the distributor
18 initiative briefing, including the one
19 to AmerisourceBergen.  But if the
20 question is DEA's practice of
21 notifying registrants when a different
22 registrant suspended orders to a
23 particular suspicious customer, that's
24 a separate topic.
25 We had a whole different

1   witness, we had a deposition of that
2   witness, and this is not the witness.
3   MR. MAHADY: Let's keep moving.
4   QUESTIONS BY MR. MAHADY:
5   Q. This one-and-a-half-page
6   summary of the meeting prepared by DEA about
7   the DEA's meeting with AmerisourceBergen,
8   does it say in here, in this summary,
9   anywhere, that the DEA advised
10  AmerisourceBergen that it should not ship
11  orders that it reports as suspicious in
12  the -- I'm not talking about the
13  presentation, we'll get to that in a second,
14  but in the summary itself.
15  A. No.
16  Q. Okay. If you can turn to --
17  sticking with this document but turning to
18  the PowerPoint, I want to revisit the slide
19  that you looked at earlier with either
20  Mr. Farrell or Ms. Singer about suspicious
21  orders. It's on page 7, Bates ending in 155.
22  A. Okay.
23  Q. Okay. "Suspicious orders.
24  Reporting a suspicious order to DEA does not
25  relieve the distributor of the responsibility

1   order to the DEA does not relieve -- so after
2   the fact, yeah.
3   Q. Okay. If the DEA did not want
4   the distributors to ship orders that were
5   reported as suspicious, or stated
6   differently, after-the-fact reporting, why
7   didn't the DEA just say that?
8   A. I think it does say that.
9   Q. This --
10  A. Because the statute says you
11  have to maintain effective controls to guard
12  against diversion.
13  Q. Right.
14  But we've already --
15  MR. FINKELSTEIN: Let the
16  witness answer.
17  QUESTIONS BY MR. MAHADY:
18  Q. Go ahead.
19  A. So the statute's already saying
20  you have to have something in place to
21  maintain effective controls. So if you
22  identify a suspicious order, which is prior
23  to shipping, you have to alleviate that.
24  Otherwise, you're just shipping -- you're
25  just shipping suspicious -- the orders that

1   to maintain effective controls against
2   diversion."
3   If I understood your testimony
4   earlier, you testified that this was the DEA
5   telling the registrants in 2005 that they
6   should not report orders that they deemed
7   suspicious; is that correct?
8   MR. FINKELSTEIN: Objection.
9   Mischaracterizes the testimony.
10  THE WITNESS: Did you just say
11  that the DEA -- I'm not sure I
12  understood what you just said. I
13  thought you said that they weren't
14  supposed to tell us.
15  QUESTIONS BY MR. MAHADY:
16  Q. You testified this morning --
17  A. Right.
18  Q. -- and correct me if I'm wrong,
19  that it was this slide through which the DEA
20  was telling the distributors that they should
21  not ship an order that they report to the DEA
22  as suspicious.
23  Was that your testimony this
24  morning?
25  A. The reporting of suspicious

1   you have a reason or reason to believe that
2   it's going to be going to the illicit market.
3   So if you don't take the step
4   to alleviate the suspicions, then the
5   suspicions are still going down the line.
6   It's not -- it's not stopping.
7   Q. Mr. Prevoznik, I think we've
8   already established that the regulation does
9   not explicitly say do not ship orders that
10  you report as suspicious, right?
11  A. I agree with that, but the
12  statute says you have to have effective
13  means. So if -- effective means is -- if
14  you're -- this whole business is purchasing
15  and selling of controlled substances. A
16  DEA registration, that's what
17  gives you the authority to do it legally in
18  the United States. So once you become a DEA
19  registrant, there's statutes and there's
20  regulations that you have to follow.
21  Q. Understood.
22  A. And the public interest
23  requires that you maintain effective controls
24  of diversion.
25  So if a suspicious order is

1   prior to shipment, which is -- DEA's
2   interpreted that, then it just -- a
3   reasonable deduction is that you shouldn't be
4   sending these down the line if you don't
5   alleviate that suspicion.
6   Q. Mr. Prevoznik, we've already
7   established that the DEA approved a system
8   with after-the-fact reporting.
9   MR. FINKELSTEIN:  Objection.
10  QUESTIONS BY MR. MAHADY:
11  Q. We also established that the
12  guidance from the DEA, including the guidance
13  provided by the chief of the section
14  responsible for interpreting the DEA, was at
15  times inconsistent on this very issue, right?
16  MR. FINKELSTEIN:  Objection.
17  Argumentative.  Also object as to the
18  form.
19  QUESTIONS BY MR. MAHADY:
20  Q. We've already established that.
21  MR. FINKELSTEIN:  Objection.
22  Argumentative.
23  You don't have to accept
24  counsel's representations as to what
25  we've established.

1   MR. MAHADY:  That's a speaking
2   objection.  We can limit the
3   objections, please.
4   MR. FINKELSTEIN:  He's arguing
5   with the witness about what we've
6   established.
7   SPECIAL MASTER COHEN:  You can
8   answer the question.
9   THE WITNESS:  I would say -- I
10  said from my personal view of reading
11  the thing that there was
12  inconsistency.  I'm not speaking on
13  the DEA's behalf on that.  So I don't
14  think that's consistent with what your
15  interpretation of what I said was.
16  QUESTIONS BY MR. MAHADY:
17  Q. Okay.  And --
18  A. And I also said that the
19  request was can we implement the system that
20  Bergen designed.  And we said yes, and we
21  worked with you to do that.
22  Q. Okay.
23  A. So again, it's the design, and
24  now we go to operation.
25  Q. Got it.

1   And the system --
2   MR. FINKELSTEIN:  Let the
3   witness answer.
4   QUESTIONS BY MR. MAHADY:
5   Q. I'm sorry, Mr. Prevoznik.  Were
6   you done or not?
7   A. So the operation now becomes
8   what was actually implemented.
9   Q. Okay.
10  A. Did Bergen follow it.  So
11  that's why we do scheduled investigations.
12  That's why we come out and we review, and we
13  look at your -- are you following what you
14  say you're following.  That's what we do.
15  Q. Okay.  And the system that was
16  designed, that the DEA approved to implement,
17  using your words, had after-the-fact
18  reporting, correct?
19  MR. FINKELSTEIN:  Asked and
20  answered.
21  THE WITNESS:  Yes.
22  QUESTIONS BY MR. MAHADY:
23  Q. Okay.  Mr. Prevoznik, I believe
24  on day one of your testimony you were asked
25  questions about specific DEA pharmaceutical

1   industry conferences, correct?
2   A. Yes.
3   Q. And I believe you came back
4   from a break and you identified some of the
5   industry conferences that have been held over
6   the years.
7   A. Yes, I forgot them.
8   Q. Perfectly understandable.
9   And one of the ones that you
10  identified was the Houston pharmaceutical
11  industry conference in September of 2007,
12  right?
13  A. Yes.
14  Q. Okay.  And I'm going to mark
15  this as an exhibit.
16  (Prevoznik Exhibit 29 marked
17  for identification.)
18  QUESTIONS BY MR. MAHADY:
19  Q. You can feel free to read the
20  whole document.  I'm going to ask you about
21  this section, suspicious orders, on page 2.
22  Okay?
23  A. Okay.
24  Q. This document does not have a
25  Bates number.  I'll represent for the record

1  that I printed it from the DEA's website
2  yesterday.
3  A. Okay.
4  Q. Okay.  On page 2, section
5  captioned "Suspicious Orders."
6  With me?
7  A. Yep.
8  Q. Okay.  The document reads,
9  "Michael Mapes, chief DEA regulatory section,
10  and Chris Zimmerman, vice president,
11  corporate security and regulatory affairs,
12  AmerisourceBergen, updated the attendees on
13  when suspicious orders -- reports should be
14  submitted to authorities."
15  Did I read that correctly?
16  A. Yes.
17  Q. Okay.  If you go to the end of
18  that section, it says, "Presentation slides
19  attached."
20  Have you reviewed any
21  presentation slides from the 2007 industry
22  conference relating to the presentation
23  provided by Mr. Zimmerman and Mr. Mapes?
24  A. No.  We couldn't find them.
25  Q. Okay.  And a company can't just

1  show up and present at the DEA's industry
2  conference; they have to be invited to
3  present by the DEA, right?
4  A. Yes.
5  Q. Okay.  And based off of this
6  summary from the DEA's website, Mr. Zimmerman
7  and Mr. Mapes, who was then at the DEA, were
8  updating the attendees on when suspicious
9  order reports should be submitted to
10  authorities.
11  Did I read that correctly?
12  A. Yes.
13  (Prevoznik Exhibit 30 marked
14  for identification.)
15  QUESTIONS BY MR. MAHADY:
16  Q. Okay.  Now, I'm going to mark
17  as Prevoznik 30 a copy of the September 11,
18  2007 presentation that Mr. Zimmerman and
19  Mr. Mapes gave at the conference.
20  And I'm not going to ask you
21  about the entire presentation.  I'm only
22  going to ask you about a couple different
23  slides.
24  So let me know when you're
25  ready for questions.

1  A. I'm ready.
2  Q. All right.  And before I do so,
3  do you remember --
4  MR. FINKELSTEIN:  What's your
5  basis for saying Mr. Mapes gave this
6  presentation?
7  MR. MAHADY:  The printout from
8  the DEA's website that Mr. Mapes and
9  Mr. Zimmerman gave a presentation on
10  suspicious order.
11  MR. FINKELSTEIN:  But this just
12  says Zimmerman on it.
13  MR. MAHADY:  That's fine.  I
14  can restate.
15  I'll represent for the record
16  that the document only says
17  Mr. Zimmerman.
18  QUESTIONS BY MR. MAHADY:
19  Q. This morning, in response to
20  questions from Ms. Singer, I believe you
21  testified that the DEA has consistently
22  advised registrants that chain pharmacies
23  should be treated no differently than
24  independent retail pharmacies.
25  Was that your testimony?

1  A. Yes.
2  Q. Okay.  And if you turn to
3  ABDCMDL0037190, I have a couple questions on
4  that point.
5  You with me?
6  A. Yep.
7  Q. All right.  The slide is
8  captioned, "New Customer Due Diligence."  The
9  first bullet, "Know your customer, due
10  diligence, investigations completed on all
11  new retail and wholesale accounts."
12  Did I read that correctly?
13  A. Yes.
14  Q. It then says, "Retail chain
15  pharmacies are exempted."
16  That -- did I read that
17  correctly?
18  A. Yes.
19  Q. Okay.  And that piece of
20  information was presented by Mr. Zimmerman at
21  the DEA distributor initiative conference,
22  correct?
23  A. Yes.
24  Q. And that piece of guidance was
25  provided to all registrants in attendance,

---

05-17-2019          Prevoznik, Thomas                Page 1163

1  correct?
2  MR. FINKELSTEIN:  Object to the
3  characterization.
4  THE WITNESS:  Yes, this is
5  Mr. Zimmerman's presentation.  Yes.
6  QUESTIONS BY MR. MAHADY:
7  Q. Okay.  Are you aware that the
8  DEA informed AmerisourceBergen that retail
9  chain pharmacies were exempted from the know
10 your customer requirements?
11 MR. FINKELSTEIN:  Objection.
12 Foundation.
13 THE WITNESS:  No.
14 QUESTIONS BY MR. MAHADY:
15 Q. Okay.  But this was a
16 presentation that Chris Zimmerman gave at the
17 invitation of the DEA, correct?
18 A. Correct.
19 Q. Okay.  Now, if you turn two
20 slides -- before we get to -- this is the
21 slide captioned "Order Monitoring Program."
22 A. Is that 192?
23 Q. Yep.
24 Before we talk about the slide
25 itself, Chris Zimmerman, he was the

---

05-17-2019          Prevoznik, Thomas                Page 1164

1  individual from Bergen Brunswig who was
2  communicating with Mr. Gitchel and later
3  Ms. Good of the DEA, right?
4  A. Yes.
5  Q. Okay.  And so he was very
6  familiar with the program that was approved
7  for implementation by the DEA, right?
8  MR. FINKELSTEIN:  Objection.
9  Scope.  Calls for speculation.
10 THE WITNESS:  Yes.
11 QUESTIONS BY MR. MAHADY:
12 Q. Okay.  Mr. Zimmerman says here,
13 "Historically" -- in the second bullet,
14 "Historically, controlled substances listed
15 chemical order monitoring has been based on a
16 ship and report process."
17 Did I read that correctly?
18 A. Yes.
19 Q. And "ship and report," that's
20 in bold, right?
21 A. Yes.
22 Q. So he's emphasizing the ship
23 and report, right?
24 MR. FINKELSTEIN:  Objection.
25 Scope.  Calls for speculation.

---

05-17-2019          Prevoznik, Thomas                Page 1165

1  QUESTIONS BY MR. MAHADY:
2  Q. Correct?
3  A. Yes, it appears to be.
4  Q. Okay.  And then it goes on to
5  say, "ABC's OMP process is now based on
6  identify, capture, investigate and report
7  suspicious orders, all prior to shipment."
8  Did I read that correctly?
9  A. Yes.
10 Q. And "prior to shipment" is
11 emphasized?
12 A. Yes, it's in bold.
13 Q. Okay.  Did anyone at DEA stand
14 up at this conference and say,
15 "Mr. Zimmerman, what are you talking about?
16 Order monitoring has never been based on a
17 ship and report process"?
18 MR. FINKELSTEIN:  Scope.
19 THE WITNESS:  I don't know.  I
20 wasn't there.  I don't know.
21 I do know based on what's on
22 the line, it said Mr. Mapes stated
23 that the responsibility for making the
24 decision to ship rests with the
25 supplier.

---

05-17-2019          Prevoznik, Thomas                Page 1166

1  QUESTIONS BY MR. MAHADY:
2  Q. But online --
3  A. Registrants who routinely
4  report suspicious orders, yet fill these
5  orders with reason to believe they are
6  destined for the illicit market, are failing
7  to maintain effective controls against
8  diversion.
9  Q. Okay.
10 A. That's what Mr. Mapes said --
11 Q. Right.  And that's --
12 A. -- according to this report.
13 Q. And I appreciate that, and
14 that's based off of the 2007 guidance.
15 But it also says, "Michael
16 Mapes, chief, regulatory section, and Chris
17 Zimmerman, vice president, corporate security
18 of regulatory affairs, AmerisourceBergen,
19 updated the attendees on when suspicious
20 order reports should be submitted to
21 authorities."
22 This is the update, right?
23 MR. FINKELSTEIN:  Objection.
24 Argumentative.  Scope.
25 You can answer.

1 THE WITNESS: Well, no, I would
2 say this -- Mr. Zimmerman presented
3 what he understood as
4 AmerisourceBergen, and Mr. Mapes then
5 clarified what our position was when
6 he made that statement.
7 QUESTIONS BY MR. MAHADY:
8 Q. Okay.
9 A. But I'm just basically going
10 off the documents because I wasn't there.
11 Q. All right.
12 MR. FINKELSTEIN: Let's take
13 our next break in a couple of minutes.
14 MR. MAHADY: Yep.
15 QUESTIONS BY MR. MAHADY:
16 Q. Earlier today Ms. Singer showed
17 you Diversion Investigator Manuals, correct?
18 A. Yes.
19 Q. You don't have to take them
20 out.
21 A. Okay.
22 Q. I don't think so.
23 Diversion Investigator Manuals,
24 those are internal DEA documents, right?
25 A. Yes.

1 Q. Okay. And what's contained in
2 the Diversion Investigator Manuals is not
3 shared with the public, correct?
4 A. Correct.
5 Q. Okay. And so a registrant
6 can't just go online and look up the DEA's
7 Diversion Investigator Manuals from 1990,
8 correct?
9 A. Correct.
10 Q. Okay. And so when those
11 Diversion Investigator Manuals were in
12 effect, AmerisourceBergen did not have a copy
13 of that manual, right?
14 MR. FINKELSTEIN: Calls for
15 speculation. Scope.
16 THE WITNESS: Not to my
17 knowledge.
18 QUESTIONS BY MR. MAHADY:
19 Q. Okay. And the guidance that
20 was in those Diversion Investigator Manuals,
21 there was no tracking system at the DEA to
22 ensure that all diversion investigators were
23 getting guidance consistent with what was
24 contained in those manuals, correct?
25 MR. FINKELSTEIN: Vague.

1 THE WITNESS: I'm not sure I'm
2 following you on that one.
3 QUESTIONS BY MR. MAHADY:
4 Q. There's no way to know whether
5 or not the diversion investigators deviated
6 from what was in those manuals, correct?
7 A. Correct.
8 MR. FINKELSTEIN: Vague.
9 Scope.
10 THE WITNESS: Sorry. Sorry.
11 No.
12 MR. MAHADY: Let's take our
13 break.
14 MR. FINKELSTEIN: Okay. Thank
15 you.
16 VIDEOGRAPHER: We're going off
17 record. The time is 3:40.
18 (Off the record at 3:40 p.m.)
19 VIDEOGRAPHER: We're going back
20 on the record. Beginning of Media
21 File Number 8. The time is 3:51.
22 EXAMINATION
23 QUESTIONS BY MS. FUMERTON:
24 Q. Good afternoon, Mr. Prevoznik.
25 My name is Tara Fumerton. And I know we met

1 during the break, but just for the record, I
2 represent Walmart in this litigation, and I
3 just have a few questions for you that
4 hopefully we'll be able to get through
5 quickly. I'm going to jump around a little
6 bit, so I apologize if it doesn't quite flow.
7 Just as a cleanup and to orient
8 you, during the second day of your testimony
9 you confirmed that the DEA did not meet with
10 CVS, Rite Aid, Walmart, Walgreens or HBC
11 Giant Eagle as part of DEA's distributor
12 initiative concerning Internet pharmacies,
13 correct?
14 A. Correct.
15 Q. And my colleague then asked you
16 a follow-up question to that, and the answer
17 got a little bit muddled, so I just wanted to
18 clear it up.
19 He asked whether the DEA
20 conducted a distributor briefing with these
21 same retail chain pharmacies related to rogue
22 pain clinics.
23 And just so that the record is
24 clear, the DEA did not conduct any
25 distributor briefing with the retail chain

1  pharmacies related to rogue pain clinics,
2  correct?
3  MR. FINKELSTEIN:  Vague.
4  THE WITNESS:  Yes, but we did
5  meet with them in the fall of 2013,
6  the chain -- the chain pharmacies'
7  managements.
8  QUESTIONS BY MS. FUMERTON:
9  Q. And when you say "the chain
10  pharmacies' management," what do you mean?
11  A. We had been doing the pharmacy
12  diversion awareness conferences, and during
13  like the first four, I think it was the first
14  four of these meetings, during breaks we
15  would be kind of scattered and being pulled
16  aside by a lot of -- quite a few pharmacists
17  and pharmacy techs.  Sometimes they would say
18  where they were from.  A lot of times they
19  would say they were from a chain.  And we
20  would have discussions about what was going
21  on in those chains.
22  So after about the fourth
23  conference, Mr. Rannazzisi said, all right,
24  I've had enough.  Let's get the top 33 chain
25  pharmacies.  I want their executive

1  management there at a meeting at NABP.
2  I was not at that meeting, but
3  it was held at NABP.  And the topics that the
4  pharmacists and the pharmacy techs from those
5  chain stores had -- that were brought up were
6  discussed with the executive management.
7  Q. So to be clear, you're talking
8  about a side meeting that occurred at an
9  industrywide conference; is that correct?
10  A. It's not -- it wasn't an
11  industry -- it was specifically for like the
12  top 30, 30, 35 chain pharmacies, that we
13  invited them to come to NABP, the National
14  Board of Pharmacies.
15  Q. And that's 2013, correct?
16  Approximately?
17  A. I think it was the fall
18  of 2012, to be honest with you.
19  Q. Okay.  But that was not a
20  distributor --
21  A. No.
22  Q. -- briefing --
23  A. Correct.
24  Q. -- that you had testified about
25  previously, correct?

1  A. Correct.
2  Q. So there was not a distributor
3  briefing with the chain pharmacies, correct?
4  A. Correct.
5  MR. FARRELL:  I'm not going to
6  take your time.  You used the chain
7  pharmacies with a different lingo.
8  When you're talking chain
9  pharmacies, are you talking about in
10  their role as a distributor?
11  MS. FUMERTON:  Yes.
12  QUESTIONS BY MS. FUMERTON:
13  Q. Now, this morning Ms. Singer
14  asked you a series of questions about HDMA
15  industry compliance guidelines marked as
16  Plaintiff's Exhibit 39 and various HDMA
17  activities.
18  Do you recall that line of
19  questioning?
20  A. Yes.
21  Q. You were aware that Walmart was
22  not a member of HDMA, correct?
23  MR. FINKELSTEIN:  Objection.
24  Scope.
25  THE WITNESS:  I was not aware.

1  QUESTIONS BY MS. FUMERTON:
2  Q. Do you know one way or another
3  whether or not Walmart was a member of HDMA?
4  A. I don't.  I personally don't
5  know.
6  Q. If I represent that Walmart was
7  not a member of HDMA, do you have any reason
8  to disagree with that representation?
9  MR. FINKELSTEIN:  Scope.  Calls
10  for speculation.
11  THE WITNESS:  No.
12  QUESTIONS BY MS. FUMERTON:
13  Q. But you do know, because you
14  testified previously about this, that Walmart
15  only distributed controlled substances to
16  their own stores, correct?
17  MR. FINKELSTEIN:  Scope.  Calls
18  for speculation.
19  THE WITNESS:  Yes.  I don't --
20  I don't know if there was a Walmart
21  pharmacy that may have sold to
22  somebody else, but that would be down
23  the line.
24  Overall I know that it was --
25  Walmart's distribution centers sent it

1  to Walmart stores.
2  QUESTIONS BY MS. FUMERTON:
3  Q. And your other commentary after
4  you said "yes" was simply pure speculation on
5  your part, correct?
6  A. Correct.
7  Q. Walmart was not a wholesale
8  distributor of controlled substances,
9  correct?
10  MR. FINKELSTEIN:  Scope.
11  THE WITNESS:  What do you mean
12  by that?
13  QUESTIONS BY MS. FUMERTON:
14  Q. Well, various terms have been
15  used by plaintiffs when asking questions, and
16  what I'm distinguishing between are
17  distributors who distribute the wholesale to
18  many different pharmacies, independent and
19  the like, and a distributor like Walmart that
20  only self-distributes controlled substances.
21  Do you understand that
22  distinction?
23  A. Yes, correct.
24  Q. Okay.  So under that
25  distinction, Walmart is not a wholesale

1  registrants have to make their
2  decisions based on the registration.
3  HDMA is not a registrant.
4  QUESTIONS BY MS. FUMERTON:
5  Q. You would agree that nonmembers
6  of HDMA might have different business models
7  than HDMA members, correct?
8  A. Yes.  Yes.
9  MR. FINKELSTEIN:  Wait a
10  minute.
11  THE WITNESS:  Oh, sorry.
12  MR. FINKELSTEIN:  Scope.  Calls
13  for speculation.
14  QUESTIONS BY MS. FUMERTON:
15  Q. And the DEA expects that each
16  registrant will review its own business model
17  and design a SOM system that fits its
18  designed method of distribution, correct?
19  A. Yes.
20  Q. Mr. Prevoznik, you're familiar
21  with immediate suspension orders, correct?
22  A. Yes.
23  Q. Are immediate suspension orders
24  also sometimes referred to as ISOs?
25  A. Yes.

1  distributor of controlled substances,
2  correct?
3  MR. FINKELSTEIN:  Scope.
4  THE WITNESS:  Correct.
5  QUESTIONS BY MS. FUMERTON:
6  Q. And that's true for Rite Aid as
7  well, correct?
8  MR. FINKELSTEIN:  Scope.
9  THE WITNESS:  Yes.
10  QUESTIONS BY MS. FUMERTON:
11  Q. And Walgreens, CVS and HBC
12  Giant Eagle, correct?
13  MR. FINKELSTEIN:  Scope.
14  THE WITNESS:  Yes.
15  QUESTIONS BY MS. FUMERTON:
16  Q. And would you agree that
17  nonmembers -- well, let me strike that.
18  You would agree that there may
19  be reasons why nonmembers of HDMA do not need
20  to follow HDMA guidelines, correct?
21  MR. FINKELSTEIN:  Scope.
22  Vague.
23  THE WITNESS:  I don't even know
24  that the HDMA members have to follow
25  the guidelines either.  I mean, the

1  Q. And an immediate suspension
2  order gives DEA the power, without notice, to
3  immediately freeze the prescribing ability of
4  a doctor who DEA believes is diverting
5  prescription opioids, correct?
6  A. Well, it could be used for
7  that.  It could be used for other things,
8  too.
9  Q. But that's one of the things
10  that it could be used for, correct?
11  A. Correct.
12  Q. And an immediate suspension
13  order is an important tool to DEA because it
14  immediately stops the hemorrhaging caused by
15  a doctor who is diverting prescription
16  opioids, correct?
17  A. Again, yes, but it could be
18  more than that.
19  Q. So an immediate suspension
20  order gives DEA the ability to immediately
21  stop the diversion and then backtrack and
22  build a criminal case against the diverting
23  doctor, correct?
24  A. Well, sometimes they run
25  parallel.

1  Q. Sometimes --
2  A. So it's already -- both are
3  already ongoing.
4  Q. Sometimes it can run parallel.
5  But are you also aware that during the 2006
6  to 2015 time frame when Mr. Rannazzisi ran
7  DEA's Office of Diversion Control, DEA
8  sometimes delayed filing an immediate
9  suspension order to allow investigators to
10  gather evidence for a criminal case?
11  MR. FINKELSTEIN:  Scope.
12  THE WITNESS:  I don't have
13  specifics, but I know that that did
14  happen.
15  MS. FUMERTON:  And just to
16  briefly address the scope objection,
17  Mr. Farrell started out with one of
18  his very first questions on day two to
19  Mr. Prevoznik:  "The million dollar
20  question right out of the gate is why
21  didn't the DEA do more?"  And then he
22  went on to ask a series of questions
23  relating to the DEA's actions and to
24  Mr. Patterson's -- and played
25  Mr. Patterson's testimony.

1  And the government didn't once
2  make an objection to scope as to any
3  of that testimony.
4  So I would ask that either I'm
5  permitted to ask these questions or
6  all of Mr. Farrell's testimony -- or
7  all of Mr. Farrell's questions along
8  those lines be stricken.
9  MR. FINKELSTEIN:  Without
10  prejudice to your motion to strike,
11  are you asking for an instruction that
12  I not object to your questions?
13  MS. FUMERTON:  No, I'm asking
14  for --
15  MR. FINKELSTEIN:  Good.  I'll
16  make my objections.  Thank you,
17  Counsel.
18  MS. FUMERTON:  Okay.  Well, I
19  will also then continue.
20  And as I want to make for the
21  record, though, the fact that the
22  government is being inconsistent with
23  respect to its objections regarding
24  scope, depending on whether or not
25  plaintiff's counsel or defendant's

1  counsel is asking the question.
2  MR. FINKELSTEIN:  We believe
3  we're being consistent.
4  You can ask your next question.
5  MR. FARRELL:  And I prefer my
6  questions not be stricken.
7  MS. FUMERTON:  And with that,
8  I've lost track of where we are.  Give
9  me one second.
10  QUESTIONS BY MS. FUMERTON:
11  Q. Okay.  So you -- just to
12  reorient us, you agree that sometimes the DEA
13  would delay issuing an ISO with respect to a
14  doctor that it was investigating for
15  potentially diverting controlled substances,
16  correct?
17  MR. FINKELSTEIN:  Scope.
18  And I'm going to add that
19  you're instructed not to testify based
20  on nonpublic, law-enforcement-
21  sensitive information.
22  THE WITNESS:  Based on that,
23  that advice, I can't answer that one.
24  QUESTIONS BY MS. FUMERTON:
25  Q. Okay.  Well, I'm going to show

1  you what was previously marked as Prevoznik
2  Exhibit 17.
3  And I apologize, I only have
4  two copies because I thought we would have
5  other copies here.
6  And, Mr. Prevoznik, do you
7  recall --
8  MS. SINGER:  I'm sorry, what is
9  it?
10  MS. FUMERTON:  It's Exhibit 17.
11  QUESTIONS BY MS. FUMERTON:
12  Q. Do you recall reviewing this
13  exhibit in your prior testimony?
14  A. Yes.
15  Q. I think your instruction by
16  counsel was to not answer the question unless
17  it was public information; is that correct?
18  A. Law enforcement sensitive.
19  Q. Well, Exhibit 17 is testimony
20  before Congress, correct, dated March 20,
21  2018?
22  A. Yes.
23  Q. And you previously testified
24  about Mr. Patterson's other comments at this
25  hearing, correct?

1   A. Correct.
2   MR. FINKELSTEIN:  Lest there be
3   any doubt, you're permitted to testify
4   about Prevoznik 17.
5   QUESTIONS BY MS. FUMERTON:
6   Q. So I want to turn your
7   attention to page 54.
8   A. Okay.
9   Q. Okay.  And specifically turn to
10  questioning, just to orient everybody, by
11  Congresswoman Susan Brooks to Mr. Patterson.
12  And if you look about three -- one-third way
13  down the page, you'll see a question by
14  Mr. -- I'm sorry, by Mrs. Brooks, and she
15  asks:  "Are there instances in which the DEA
16  pursues an immediate suspension order, the
17  ISO, in parallel with related potential
18  criminal investigation?"
19  Do you see that?
20  A. Yes.
21  Q. And Mr. Patterson replies:
22  "So, ma'am, since October, so the
23  administration's -- the administrator's
24  position signs the ISOs when they're issued.
25  What I've traditionally seen is because of

1   the process of where a criminal case is being
2   investigated, there's been a delay in the ISO
3   process as they're gathering evidence.  One
4   of the concerns I have, and it goes back to
5   again what Mr. Griffith said, is that cuts
6   against the very argument that we have an
7   imminent problem that we are trying to deal
8   with."
9   Do you see that?
10  A. Yes.
11  Q. And so Mr. Patterson was
12  testifying here that the DEA, in fact, was
13  delaying in issuing ISOs to allow criminal
14  investigations to occur, correct?
15  MR. FINKELSTEIN:  Objection.
16  Mischaracterizes the document.
17  You can answer.
18  THE WITNESS:  Yes.
19  MS. SINGER:  Can I just
20  interject and ask that you get copies
21  at the next break in case there's any
22  redirect that needs to be done here?
23  It's a little unfair to question the
24  witness when there isn't a copy of the
25  exhibit.

1   MS. FUMERTON:  Well, you can
2   use one of the government's exhibits
3   or we can get a copy if you need that
4   as well.  But it was used previously,
5   so you should have a copy from the
6   prior time's exhibit.
7   MS. MAINIGI:  It's your
8   document, Linda.
9   QUESTIONS BY MS. FUMERTON:
10  Q. And then if you go down on that
11  same page, about to the bottom third, you'll
12  see another question from Mrs. Brooks, and
13  she asks:  "And are you saying that the US
14  Attorneys were asking -- as a former
15  US Attorney, are you saying that US Attorneys
16  were asking or telling DEA not to issue
17  ISOs?"
18  And Mr. Patterson replies:  "In
19  trying to gather evidence in their criminal
20  case."
21  Mrs. Brooks responds:  "I
22  understand, but that can take months, if not
23  years, sometimes in criminal cases.  Do you
24  believe that's what happened prior to you
25  coming in October of 2017, that delays

1   happened?"
2   And Mr. Patterson replies:  "I
3   think that's been an ongoing theme of what
4   some of these delays are caused by."
5   Do you see that?
6   A. Yes.
7   Q. Do you have any reason to
8   disagree with Mr. Patterson's testimony?
9   MR. FINKELSTEIN:  Scope.
10  THE WITNESS:  No.
11  QUESTIONS BY MS. FUMERTON:
12  Q. And so that meant that for
13  months, if not years, while these
14  investigations were occurring, the DEA
15  permitted doctors it believed were diverting
16  opioids to continue to divert opioids,
17  correct?
18  MR. FINKELSTEIN:  Foundation.
19  Argumentative.
20  THE WITNESS:  I'm sorry, can
21  you repeat it?
22  QUESTIONS BY MS. FUMERTON:
23  Q. Sure.
24  And so that means that for
25  months, if not years, the DEA permitted

1  doctors it believed were diverting opioids to
2  continue to divert opioids, correct?
3  MR. FINKELSTEIN: Same
4  objections.
5  THE WITNESS: It's possible,
6  yeah.
7  MS. FUMERTON: I am going to
8  pass the witness at this time.
9  Thank you very much for your
10  time.
11  Can we go off the record while
12  we switch?
13  VIDEOGRAPHER: We're going off
14  the record. The time is 4:07.
15  (Off the record at 4:07 p.m.)
16  VIDEOGRAPHER: We're going back
17  on record. Beginning of Media File
18  Number 9. Time is 4:08.
19  EXAMINATION
20  QUESTIONS BY MR. O'CONNOR:
21  Q. Mr. Prevoznik, I'm Andrew
22  O'Connor. I represent one of the
23  manufacturers in the case. We met last time
24  we were here.
25  A. Good to see you again.

1  Q. Good to see you.
2  I'll try to be brief here.
3  Is it fair for me to say that
4  DEA does not advise registrants on whether
5  they have an adequate and effective
6  suspicious order monitoring program?
7  A. We don't advise?
8  Q. Correct.
9  A. No, I don't think that's fair
10  to say that. I think when we -- when we sit
11  down and talk to them and they present what
12  they're having, we're in listening mode. We
13  offer suggestions, so that would be advising.
14  Q. Okay. Does DEA approve any
15  particular suspicious order monitoring
16  program?
17  A. No.
18  Q. And why is that?
19  A. Because it's ultimately -- it's
20  incumbent upon the registrant to design and
21  operate the system, so it's a business
22  decision made by the registrant.
23  Q. And I believe you testified
24  earlier to the fact that one of the reasons
25  is because the registrant is the one that has

1  relevant information.
2  Is that a fair characterization
3  of what you said earlier?
4  A. They're in a better position.
5  They deal with the customer on a more daily
6  basis.
7  Q. And would you say they're in a
8  better position than DEA?
9  A. To assess their customer? Yes.
10  Q. And to assess the adequacy and
11  effectiveness of their suspicious order
12  monitoring program?
13  A. I'm sorry, you're losing me on
14  that one.
15  Q. Would you say that a registrant
16  is in a better position than DEA to assess
17  the adequacy and effectiveness of its
18  suspicious order monitoring program?
19  MR. FINKELSTEIN: Objection.
20  Vague.
21  THE WITNESS: No, I wouldn't
22  agree with that.
23  QUESTIONS BY MR. O'CONNOR:
24  Q. Okay. So DEA is in a better
25  position than the registrant to assess the

1  program?
2  MR. FINKELSTEIN: Vague.
3  Mischaracterizes prior testimony.
4  THE WITNESS: I think -- I
5  think, again, it's the design and it's
6  the operating. So what is the
7  operating -- what is the registrant
8  doing to make the -- when they
9  implement it, what are they -- what
10  are -- are they following the
11  guidelines that they said that they
12  were going to design, or are they
13  starting the shift to change when a
14  customer comes in and asks for -- is
15  on-boarding. Are they looking at all
16  the parameters that the customer --
17  whether it's the questionnaire. Are
18  they validating all those types of
19  things.
20  It has to do with are they
21  increasing thresholds when they're
22  asked for a threshold increase. Are
23  they just arbitrarily increasing it to
24  some higher number or is there a
25  scientific basis that makes that

1   determination.
2   So that's what we look at when
3   we go back and look at the system.
4   QUESTIONS BY MR. O'CONNOR:
5   Q. I just want to get back to my
6   question, because I had understood your
7   testimony earlier today to be that DEA would
8   not weigh in on the adequacy of a suspicious
9   order monitoring program because it was the
10  registrant and not DEA who had the right
11  information to make that assessment.
12  MR. FINKELSTEIN:  Asked and
13  answered.  Mischaracterizes prior
14  testimony.
15  QUESTIONS BY MR. O'CONNOR:
16  Q. Do you agree with my
17  characterization of what you said earlier
18  today?
19  A. No, I don't agree with your
20  characterization.
21  Q. Okay.  So do you think the DEA
22  then is in a better position to make
23  assessments about the suspicious order
24  monitoring programs than the registrants are?
25  MR. FINKELSTEIN:  Vague.  Asked

1   their customer -- if the next -- if the next
2   line down is to the distributors, they should
3   know what kind of program they have.
4   Q. And I believe you indicated
5   it's DEA's position that manufacturers are
6   supposed to make that assessment of the
7   distributor's suspicious order monitoring
8   program before they begin a business
9   relationship with the distributor; is that
10  fair?
11  A. Yes.  Know your customer.
12  Q. And just to be clear,
13  manufacturers are supposed to assess whether
14  the distributor's program is adequate and
15  effective?
16  A. They should know what it is,
17  but, again, as I -- manufacturers also
18  distribute not just to distributors.  They
19  also go to practitioners, sometimes
20  pharmacies, directly.  So they also have to
21  have the ability to have a suspicious order
22  monitoring system for those registrants as
23  well in place.
24  Q. I understand.
25  Q. I just want to be very clear

1   and answered.
2   THE WITNESS:  The suspicious
3   order monitoring system is incumbent
4   upon the registrant to design it and
5   operate it.  They are in the position
6   that knows their customers.  We don't
7   know their customers.
8   QUESTIONS BY MR. O'CONNOR:
9   Q. Okay.  Only the registrant --
10  A. So therefore --
11  MR. FINKELSTEIN:  Let him
12  finish.
13  THE WITNESS:  So, therefore,
14  the registrant is in a better position
15  to assess their customers.
16  How they assess it is something
17  that they do and that we do.
18  QUESTIONS BY MR. O'CONNOR:
19  Q. Okay.  Earlier today I believe
20  you testified that manufacturers should make
21  sure that distributors' suspicious order
22  monitoring programs are adequate and
23  effective.
24  Did I get that right?
25  A. Yeah, they should know what

1   about what the DEA contends a manufacturer
2   has to do, because earlier it sounded like
3   you were saying they need to assess whether a
4   distributor's suspicious order monitoring
5   program was, in fact, effective.
6   Is that correct?
7   A. Well, they should know if their
8   customer's system is guarding -- is it
9   guarding against the diversion into the
10  illicit market.
11  Q. And is the DEA's position that
12  they should make that assessment even in
13  situations where the DEA has refused to make
14  that assessment?
15  MR. FINKELSTEIN:
16  Argumentative.  Foundation.
17  THE WITNESS:  You lost me on
18  that one.
19  QUESTIONS BY MR. O'CONNOR:
20  Q. Well, DEA doesn't tell a
21  registrant whether its program works or not,
22  does it?
23  A. Well --
24  MR. FINKELSTEIN:
25  Mischaracterizes prior testimony.

1   THE WITNESS:  When --
2   MR. O'CONNOR:  Just a question.
3   THE WITNESS:  When we sit with
4   the registrant, the registrant
5   explains what their ordering sys --
6   their suspicious order system is to
7   us.
8   So then when we come back, we
9   look.  Are, in fact, they -- are they
10  doing what they said they're doing,
11  and is the system able to identify
12  suspicious orders.  That's what we do.
13  And our parameters of doing
14  that are the public interest.  So are
15  there -- do they have in place the
16  means to identify them and also
17  safeguard and have effective measures
18  to not allow for diversion.
19  QUESTIONS BY MR. O'CONNOR:
20  Q. Is there any statute or
21  regulation that you're aware of that says
22  manufacturers are supposed to assess whether
23  a distributor's suspicious order monitoring
24  program is adequate?
25  A. Not specifically that language.

1   review -- or registrants generally should
2   review information regarding physician
3   prescribing information.
4   Is that a fair assessment of
5   what you said?
6   A. Yes, if they have it.
7   Q. Okay.  Did DEA have physician
8   prescribing information?
9   MR. FINKELSTEIN:  I'm going to
10  instruct you not to answer about the
11  availability of data sources to the
12  extent that they're nonpublic.
13  THE WITNESS:  Could you repeat
14  the question?
15  QUESTIONS BY MR. O'CONNOR:
16  Q. Sure.
17  Did DEA have physician
18  prescribing information?
19  MR. FINKELSTEIN:  And my
20  instruction, no nonpublic data or
21  techniques.
22  THE WITNESS:  Right.  No, we
23  didn't -- we have to get it through a
24  different means.
25  QUESTIONS BY MR. O'CONNOR:

1   Q. Okay.
2   A. It would fall under the statute
3   of effective means.
4   Q. And that provision that talks
5   about effective controls doesn't mention
6   anything about assessing another registrant's
7   suspicious order monitoring program, correct?
8   A. Correct.
9   Q. And DEA never issued any
10  guidance to manufacturers informing them that
11  they were supposed to assess another
12  registrant's program, correct?
13  A. Not to my knowledge.
14  Q. DEA never sent a letter to that
15  effect to manufacturers?
16  A. Probably happened in the
17  manufacturing -- when we met with the
18  manufacturer.  Like the distributor
19  initiative with a manufacturer, we went over
20  that.
21  Q. Can you say, sitting here today
22  under oath, that that happened?
23  A. I don't know, but I --
24  Q. Okay.  Earlier today I believe
25  you testified that manufacturers should

1   Q. Okay.  Let me ask you this:
2   Are you familiar with IMS or IQVIA data?
3   A. Yes.
4   Q. Did DEA have access to IMS or
5   IQVIA data that described the number of
6   prescriptions written by particular
7   physicians?
8   MR. FINKELSTEIN:  Scope.  No
9   law-enforcement-sensitive information.
10  Okay?
11  THE WITNESS:  Yes.
12  We do use IQVIA data, but
13  that's for quotas.  Quota section uses
14  that.  It doesn't go down to that
15  granular -- that's my understanding,
16  it does not go down to that granular
17  level that you're describing.
18  We have asked.  We have been
19  trying to get that data, but we have
20  been unsuccessful at this point.
21  QUESTIONS BY MR. O'CONNOR:
22  Q. And as someone who oversees the
23  targeting and analysis unit, if there was
24  information available publicly that you felt
25  was useful to the DEA identifying diversion,

1  you would seek it out, correct?
2  MR. FINKELSTEIN:  Incomplete
3  hypothetical.
4  THE WITNESS:  Yes.
5  QUESTIONS BY MR. O'CONNOR:
6  Q. Okay.  But you do not have
7  prescriber-level IMS or IQVIA data, true?
8  MR. FINKELSTEIN:  Same
9  instruction.
10  THE WITNESS:  As I previously
11  said, we do have some, but it's used
12  at the quota level, not to the
13  granular level that you're talking
14  about.  We do not have it.
15  QUESTIONS BY MR. O'CONNOR:
16  Q. And there is no statute or
17  regulation that you're aware of that
18  indicates that manufacturers were required to
19  analyze prescriber-level data in connection
20  with their DEA compliance activities,
21  correct?
22  MR. FINKELSTEIN:  Asked and
23  answered.
24  THE WITNESS:  Correct.  But if
25  they have it, then they should look at

1  Go off the record.
2  VIDEOGRAPHER:  Going off the
3  record.  The time is 4:19.
4  (Off the record at 4:19 p.m.)
5  VIDEOGRAPHER:  Going back on
6  the record.  Beginning of Media
7  File 10.  The time is 4:20.
8  EXAMINATION
9  QUESTIONS BY MR. EPPICH:
10  Q. Good afternoon, Mr. Prevoznik.
11  You may recall my name is Chris Eppich, and I
12  represent the McKesson distributors in this
13  litigation.  I just have a couple of
14  questions for you this afternoon.
15  Are you aware of the federal
16  sentencing guidelines?
17  MR. FINKELSTEIN:  Scope.
18  THE WITNESS:  Yes.
19  QUESTIONS BY MR. EPPICH:
20  Q. Are you aware that the federal
21  sentencing guidelines are used by courts in
22  sentencing after a verdict in a criminal
23  case?
24  MR. FINKELSTEIN:  Scope.
25  THE WITNESS:  Yes.

1  it.
2  QUESTIONS BY MR. O'CONNOR:
3  Q. Even though it's not in the
4  statute or the regulation?
5  A. It's knowing your customer.
6  It's putting effective means -- guarding
7  against diversion.  So if the information
8  helps you understand your customer better and
9  stops diversion, then you should be looking
10  at it.
11  Q. Did DEA ever indicate in any
12  kind of written guidance document that
13  manufacturers should be analyzing prescriber
14  data in order to fulfill their DEA
15  obligations?
16  A. Not to my knowledge.
17  Q. DEA never sent any letters to
18  the industry to that effect?
19  A. I'm not aware of it.
20  Q. And DEA never posted anything
21  on its website informing manufacturers of its
22  view on this issue?
23  A. Not to my knowledge.
24  MR. O'CONNOR:  Thank you for
25  your time.

1  QUESTIONS BY MR. EPPICH:
2  Q. The DEA doesn't use the federal
3  sentencing guidelines to evaluate
4  registrants' suspicious order monitoring
5  programs, correct?
6  MR. FINKELSTEIN:  Scope.
7  Vague.
8  THE WITNESS:  Yes.  Correct.
9  QUESTIONS BY MR. EPPICH:
10  Q. Correct that they do not?
11  A. Do not.
12  Q. Thank you, sir.
13  Now, when you were training
14  diversion investigators, did you ever
15  instruct diversion investigators to rely on
16  the federal sentencing guidelines to evaluate
17  registrants' suspicious order monitoring
18  programs?
19  MR. FINKELSTEIN:  Scope.
20  THE WITNESS:  No.
21  MR. EPPICH:  Thank you.  Let's
22  go off the record.
23  VIDEOGRAPHER:  Going off
24  record.  The time is 4:21.
25  (Off the record at 4:21 p.m.)

1 VIDEOGRAPHER:  We're going back
2 on record.  Beginning of Media
3 File 11.  The time is 4:23.
4 EXAMINATION
5 QUESTIONS BY MS. MAINIGI:
6 Q. Mr. Prevoznik, you recall we
7 met a few weeks ago on the first day or two
8 of your deposition.
9 I'm going to ask you some more
10 questions.  I'm here representing Cardinal
11 Health.
12 Mr. Prevoznik, you did not
13 speak to Mr. Mapes prior to coming here
14 today, did you?
15 MR. FINKELSTEIN:  Asked and
16 answered several times.
17 THE WITNESS:  No.
18 QUESTIONS BY MS. MAINIGI:
19 Q. Okay.  And you had not spoken
20 to him prior to day one and day two?
21 A. Correct.
22 Q. And you did not speak to
23 Mr. Wright prior to coming today?
24 MR. FINKELSTEIN:  Asked and
25 answered.

1 Q. And you were a diversion
2 investigator until 2001?
3 A. Well, I still think I am.
4 Q. That's right.
5 A. Still have the same job series.
6 Q. Your primary duty was as a
7 diversion investigator until 2001?
8 A. Yes.
9 Q. And in that situation, you were
10 out in the field offices?
11 A. Yes.
12 Q. Okay.  And you joined the
13 Office of Diversion Control at headquarters
14 in May 2012?
15 A. I believe it was April.
16 Q. Okay.  Now, the last several
17 days you've been asked a number of questions
18 about suspicious orders, true?
19 A. True.
20 Q. And suspicious, that term has a
21 particular meaning in the context of
22 controlled substances, correct?
23 A. Correct.
24 Q. And the CFR defines suspicious
25 order as including orders of unusual size,

1 THE WITNESS:  Correct.
2 QUESTIONS BY MS. MAINIGI:
3 Q. And is it true that you've only
4 still reviewed the questions from
5 Mr. Wright's deposition, not the answers?
6 A. Yes.
7 Q. You've never gone back to
8 review the answers to Mr. Wright's
9 deposition, only the questions?
10 A. Correct.
11 Q. And that was at the instruction
12 of your counsel?
13 MR. FINKELSTEIN:  Objection.
14 I'm going to instruct you not
15 to answer that.
16 MS. MAINIGI:  I think he
17 answered that before.
18 I'll withdraw the question.
19 MR. FINKELSTEIN:  I don't think
20 he did, but I appreciate you
21 withdrawing the question.
22 QUESTIONS BY MS. MAINIGI:
23 Q. Mr. Prevoznik, you arrived at
24 the DEA in 1991; is that right?
25 A. Yes.

1 orders of unusual frequency and orders that
2 deviate substantially from a normal ordering
3 pattern, correct?
4 A. Correct.
5 Q. Excuse me.
6 Now, not every order of unusual
7 size is indicative of diversion, correct?
8 MR. FINKELSTEIN:  Asked and
9 answered.
10 THE WITNESS:  Correct.
11 QUESTIONS BY MS. MAINIGI:
12 Q. There could be legitimate
13 reasons for a pharmacy to place an order of
14 unusual size, correct?
15 MR. FINKELSTEIN:  Asked and
16 answered.
17 THE WITNESS:  Correct.
18 QUESTIONS BY MS. MAINIGI:
19 Q. Can you think of any examples
20 that come to mind for that, Mr. Prevoznik?
21 MR. FINKELSTEIN:  Calls for
22 speculation.
23 THE WITNESS:  For which one?
24 QUESTIONS BY MS. MAINIGI:
25 Q. Why a pharmacy may place a

1   larger than usual order.
2   MR. FINKELSTEIN: Scope. Calls
3   for speculation.
4   You can answer in your
5   individual capacity.
6   THE WITNESS: It could be a new
7   hospital opened, a new clinic opened.
8   A. new hospice center could have
9   opened. Any one of those.
10  QUESTIONS BY MS. MAINIGI:
11  Q. And, Mr. Prevoznik, not every
12  order of unusual frequency is indicative of
13  diversion, correct?
14  MR. FINKELSTEIN: Asked and
15  answered.
16  THE WITNESS: Correct.
17  QUESTIONS BY MS. MAINIGI:
18  Q. There could be legitimate
19  reasons for an order of unusual frequency,
20  true?
21  MR. FINKELSTEIN: Same
22  objection.
23  THE WITNESS: True.
24  QUESTIONS BY MS. MAINIGI:
25  Q. Can you think of some examples

1   answered.
2   THE WITNESS: Correct.
3   QUESTIONS BY MS. MAINIGI:
4   Q. And could there be legitimate
5   reasons for an ordering pattern that is
6   abnormal in some manner?
7   A. Yeah, there could be.
8   Q. And what are some of those
9   reasons?
10  MR. FINKELSTEIN: Scope. Calls
11  for speculation.
12  You can answer in your
13  individual capacity.
14  THE WITNESS: I'm not really
15  sure I have an example off the top of
16  my head on that one right now.
17  QUESTIONS BY MS. MAINIGI:
18  Q. Well, how does one define a
19  normal ordering pattern or something that
20  diverges from a normal ordering pattern?
21  A. Well, the example I would give
22  you is you have a pharmacist, they have their
23  order, and they will put two down. But they
24  don't see that one of their employees, who is
25  either working or not working, has added to

1   as to why a pharmacy may place an order that
2   is of unusual frequency?
3   MR. FINKELSTEIN: Scope. Calls
4   for speculation.
5   You can answer in your
6   individual capacity.
7   THE WITNESS: Again, it could
8   be a new customer base, prescriber, a
9   new doctor's office opened.
10  That probably would be for a
11  period of time, and then it would not
12  keep going and going. It would level
13  out at some point.
14  QUESTIONS BY MS. MAINIGI:
15  Q. But it could certainly explain
16  a deviation that resulted in an unusual
17  frequency for a month or two, correct?
18  MR. FINKELSTEIN: Vague.
19  THE WITNESS: Yes.
20  QUESTIONS BY MS. MAINIGI:
21  Q. Now, Mr. Prevoznik, not every
22  order that deviates substantially from a
23  normal ordering pattern is indicative of
24  diversion, correct?
25  MR. FINKELSTEIN: Asked and

1   the order. So they could be at their house,
2   whatever, added a bottle, two bottles, but
3   it's later.
4   So at the end of the day, the
5   pharmacist -- they know the pattern of the
6   pharmacist is not to review, that they just
7   hit "submit," but they know that they're
8   going to be on the job the next day. So they
9   come in the next day, they already know
10  there's two extra bottles or an extra bottle
11  coming in. So that they've been doing this
12  for months and month and months, that they've
13  been stealing from, diverting out of the
14  pharmacy, because they know the habits of the
15  pharmacist.
16  It could be at a hospital. It
17  could be at a -- just anywhere. If they know
18  the habits, they're going to figure it out.
19  Q. So the placing of an order of
20  unusual size, pattern or frequency, standing
21  alone, does not indicate that a customer is
22  diverting controlled substances, correct?
23  A. Well, I mean, it's disjunctive,
24  so it could be one of them; it could be two
25  of them; it could three of them; it could be

1 a combination.
2 And so in the example I
3 would -- I would say is -- I think I've used
4 it before was the veterinarian that is
5 ordering Vicodin with the acetaminophen that
6 is toxic to cats and dogs.  So that in
7 itself, an order of that, would be why are
8 they doing that.
9 Q. But standing alone, without
10 follow-up due diligence, it is not
11 necessarily always possible to determine
12 whether an order that is an unusual size,
13 unusual pattern or frequency is, by itself,
14 for that reason, indicative of diversion,
15 correct?
16 MR. FINKELSTEIN:  Asked and
17 answered.  Incomplete hypothetical.
18 THE WITNESS:  Correct.
19 QUESTIONS BY MS. MAINIGI:
20 Q. And so some sort of follow-up
21 due diligence needs to be done by the
22 distributor or registrant, correct?
23 MR. FINKELSTEIN:  Incomplete
24 hypothetical.  Asked and answered.
25 THE WITNESS:  Right.

1 QUESTIONS BY MS. MAINIGI:
2 Q. And with respect to -- we've
3 talked a bit about due diligence in the last
4 couple of days of your deposition.
5 Do you recall that?
6 A. Yes.
7 Q. Okay.  And with respect to --
8 you've been asked questions by both
9 Mr. Farrell and Ms. Singer about
10 documentation related to due diligence.
11 Do you recall that?
12 A. Yes.
13 Q. And I believe that you
14 indicated that there was not any sort of
15 requirement by the DEA of the maintenance of
16 due diligence files, correct?
17 MR. FINKELSTEIN:
18 Mischaracterizes prior testimony.
19 THE WITNESS:  Yes.
20 QUESTIONS BY MS. MAINIGI:
21 Q. Now certainly the DEA's view
22 appears to be that due diligence is a good
23 practice or a best practice, fair?
24 MR. FINKELSTEIN:  Foundation.
25 Mischaracterizes prior testimony.

1 THE WITNESS:  Yes, it would be
2 good practice.
3 QUESTIONS BY MS. MAINIGI:
4 Q. And but the DEA has not issued
5 any sort of guidelines indicating how due
6 diligence should be conducted, true?
7 A. I mean, I would say that the
8 letters in 2006 and 2007 have certain
9 questions to be asked, so that's a guide of
10 what should be asked or what should be looked
11 for.
12 Q. Those are Mr. Rannazzisi's
13 letters?
14 A. Yes.
15 Q. And Mr. Rannazzisi's letters
16 touched on a few different areas, correct?
17 A. Correct.
18 Q. Let me try to focus on
19 guidelines that might be specific to the idea
20 of due diligence.
21 Are there -- are you aware of
22 DEA ever issuing any guidelines specific to
23 due diligence that describe how due diligence
24 should be conducted?
25 MR. FINKELSTEIN:  Asked and

1 answered.
2 THE WITNESS:  No, not -- it's
3 the statute and the regulation.
4 QUESTIONS BY MS. MAINIGI:
5 Q. And the statute and regulation
6 do not specifically speak to due diligence,
7 correct?
8 MR. FINKELSTEIN:  Asked and
9 answered.
10 THE WITNESS:  No.  I mean, they
11 do, because they're saying you have to
12 have effective means to guard against
13 diversion.  So that's the guide.
14 QUESTIONS BY MS. MAINIGI:
15 Q. Let me come back to -- it's
16 effective controls, correct?
17 A. Effective.
18 Q. Let me come back to that.
19 Let's focus just on the phrase "due
20 diligence."
21 Are you aware of the phrase
22 "due diligence" being in either the statute
23 or the regulation?
24 MR. FINKELSTEIN:  Asked and
25 answered.

1  THE WITNESS:  It's not.
2  QUESTIONS BY MS. MAINIGI:
3  Q. Now, you've referred, I think,
4  just now and in the last several days to the
5  term "effective controls," correct?
6  A. Correct.
7  Q. And that term is in the statute
8  or the regulation, correct?
9  MR. FINKELSTEIN:  Asked and
10  answered.
11  THE WITNESS:  Correct.
12  QUESTIONS BY MS. MAINIGI:
13  Q. Okay.  Has the DEA ever
14  explained in guidance what effective controls
15  means?
16  MR. FINKELSTEIN:  Vague.  Asked
17  and answered.
18  THE WITNESS:  Effective
19  controls.  Well, they have to follow
20  the rest of the statute to meet
21  effective controls to guard against
22  diversion.
23  QUESTIONS BY MS. MAINIGI:
24  Q. So has the DEA ever issued any
25  guidance, Mr. Prevoznik, that serves as a

1  checklist, for example, of everything that
2  would go into effective controls?
3  MR. FINKELSTEIN:  Vague.  Asked
4  and answered.
5  THE WITNESS:  Not to my
6  knowledge.
7  QUESTIONS BY MS. MAINIGI:
8  Q. Coming back to the concept of
9  due diligence, the DEA has not issued any
10  guidance specifying how long a registrant
11  must hold on to due diligence, correct?
12  A. Correct.
13  Q. Does the DEA have any sort of
14  guidelines as to how long the DEA is required
15  to hold on to certain types of documents?
16  MR. FINKELSTEIN:  Scope.
17  You can answer, if you know.
18  THE WITNESS:  Yes, they do.
19  QUESTIONS BY MS. MAINIGI:
20  Q. Can you describe some for me?
21  A. I don't know.
22  MR. FINKELSTEIN:  Scope.
23  THE WITNESS:  I don't know
24  them, but I know they're out there.
25

1  QUESTIONS BY MS. MAINIGI:
2  Q. They might have some sort of
3  requirement to hold on to documents or data
4  for seven years or something of the sort?
5  MR. FINKELSTEIN:  Scope.
6  Foundation.
7  You can answer in your personal
8  capacity.
9  THE WITNESS:  I know that there
10  are certain years that certain
11  documents can be -- that are supposed
12  to be either archived or -- and then
13  once it gets archived, I have no idea.
14  QUESTIONS BY MS. MAINIGI:
15  Q. Are there certain documents
16  that you hold on to in your job at DEA that
17  you hold on to for a certain number of years
18  because you know you're required to?
19  MR. FINKELSTEIN:  Scope.
20  THE WITNESS:  Yes.
21  QUESTIONS BY MS. MAINIGI:
22  Q. And what kind of documents are
23  those?
24  A. Oh --
25  MR. FINKELSTEIN:  Scope.

1  MS. MAINIGI:  I'm sorry.
2  THE WITNESS:  I was waiting for
3  him.
4  MR. FINKELSTEIN:  Scope.
5  You can answer in your personal
6  capacity.
7  THE WITNESS:  I know that we
8  hold on to ARCOS, ARCOS data, drug
9  theft loss.
10  QUESTIONS BY MS. MAINIGI:
11  Q. And do you know approximately
12  how long you're required to hold on to ARCOS
13  data?
14  MR. FINKELSTEIN:  Scope.
15  THE WITNESS:  I don't know.
16  QUESTIONS BY MS. MAINIGI:
17  Q. The DEA has certainly never
18  issued any sort of guidance indicating that
19  registrants must hold on to due diligence
20  files for 15 years, correct?
21  A. Yes.  The only guidance I know
22  is it's two years, two years for
23  recordkeeping for the registrant.
24  Q. Okay.
25  A. For us.

1  Q. But there's no requirement that
2  a due diligence file even be maintained,
3  correct?
4  A. Correct.
5  Q. So the two-year rule does not
6  apply to any due diligence files, per se,
7  correct?
8  A. Correct.  I was just pointing
9  out that within the regs, there is records
10  for a two-year period.
11  Q. Due diligence is certainly an
12  important part of this process, right?
13  MR. FINKELSTEIN:  Vague.
14  THE WITNESS:  Yes.
15  QUESTIONS BY MS. MAINIGI:
16  Q. Why do you think the DEA has
17  never issued any specific guidance on due
18  diligence?
19  MR. FINKELSTEIN:  Vague.
20  Instruct you not to answer to
21  the extent that the answer calls for
22  predecisional deliberative
23  communications within the Department
24  of Justice.
25  THE WITNESS:  I don't know.

1  THE WITNESS:  No.
2  QUESTIONS BY MS. MAINIGI:
3  Q. Has the DEA issued any sort of
4  guidance indicating how long a suspicious
5  order that's been reported must be
6  maintained?
7  A. No.
8  Q. Now, I think with one of the
9  prior questioners there was reference to --
10  well, let me back up.
11  You prepared back to 1996 for
12  this deposition, approximately, correct?
13  A. Well, I mean, I had -- I --
14  from the letters that you saw, I had some
15  letters from 1980s that I saw.
16  Q. So you prepared for various
17  earlier periods of time?
18  A. I looked for what I could find.
19  Q. Okay.  And did you speak to any
20  folks in the field offices to help yourself
21  prepare for this deposition?
22  MR. FINKELSTEIN:  Asked and
23  answered.
24  THE WITNESS:  Yes.
25

1  QUESTIONS BY MS. MAINIGI:
2  Q. Now, is there any sort of
3  requirement -- I'm going to come back to
4  suspicious orders.
5  Is there any kind of
6  requirement to hold on to suspicious orders
7  themselves that are reported?
8  MR. FINKELSTEIN:  Vague.
9  THE WITNESS:  I'm not sure I'm
10  following on that.
11  QUESTIONS BY MS. MAINIGI:
12  Q. Well, so, for example, if -- I
13  think when you were talking to one of the
14  other questioners, there was some reference
15  to perhaps at some point in time suspicious
16  orders being faxed in to the DEA.
17  Do you remember that
18  discussion?
19  A. Yes.
20  Q. Is there any sort of
21  requirement, either by the DEA or by the
22  registrant, to hold on to an actual
23  suspicious order being reported to the DEA?
24  MR. FINKELSTEIN:  Scope.
25  Vague.  Calls for speculation.

1  QUESTIONS BY MS. MAINIGI:
2  Q. And who were the folks you
3  spoke to from the field office?
4  MR. FINKELSTEIN:  Asked and
5  answered.
6  THE WITNESS:  Scott Collier,
7  Ruth Carter, Susan Langston, Lisa
8  Sullivan, David White, Scott Garriott.
9  I'm trying to think.
10  QUESTIONS BY MS. MAINIGI:
11  Q. And those were all folks that
12  were in the field offices in years prior?
13  A. Yeah, they were in the field.
14  They've been -- they're in the field now.
15  Q. Okay.  So you're aware through
16  your own experience in the field as well as
17  the conversations you had that the
18  requirement of the regulation and the statute
19  is that suspicious orders generally are
20  reported to the local or regional DEA
21  offices, correct?
22  A. Correct.
23  Q. And then it's up to the local
24  or regional DEA offices to ultimately make a
25  decision about whether to investigate a

1  suspicious order, correct?
2  A. That's part of the process.
3  The other part is if it's not in their area,
4  then they would send it to that respective
5  office. So that would be the other part.
6  Q. But once it gets to the right
7  regional office, it is incumbent upon that
8  regional office to make a decision about what
9  to do with a suspicious order, correct?
10  A. Correct.
11  Q. And is it fair to say not every
12  suspicious order that is reported to a
13  regional office actually results in some sort
14  of investigation?
15  MR. FINKELSTEIN: Asked and
16  answered.
17  THE WITNESS: Yes.
18  QUESTIONS BY MS. MAINIGI:
19  Q. Do you have any sense of how
20  many, percentagewise, ballpark, of actual
21  reported suspicious orders result in
22  investigations by the DEA?
23  MR. FINKELSTEIN: Scope. Asked
24  and answered. Calls for speculation.
25  THE WITNESS: No, I don't.

1  QUESTIONS BY MS. MAINIGI:
2  Q. Do you think more than half do?
3  MR. FINKELSTEIN: Same
4  objections.
5  You can answer in your personal
6  capacity.
7  THE WITNESS: No, I don't. I
8  don't know. I couldn't put a number
9  on it.
10  QUESTIONS BY MS. MAINIGI:
11  Q. You don't have any sort of
12  educated guess on that even?
13  MR. FINKELSTEIN: Same
14  objection.
15  You can answer in your personal
16  capacity.
17  THE WITNESS: The reports that
18  you got, it would be -- when we would
19  go out, we would be like, was one
20  filed or wasn't one filed.
21  So if one was filed, then we
22  would know -- we would typically go
23  out and ask: Why did you file this?
24  Because sometimes -- I mean, I
25  don't know -- what is the time frame

1  we're talking about? That would help
2  me a little bit.
3  QUESTIONS BY MS. MAINIGI:
4  Q. I'm sorry. Let's say 1996
5  through 2006 for the first time period.
6  A. So if they came in, then we
7  would follow up with the registrant and ask:
8  Why did you file this? Ask for a reason as
9  to why you filed this. Because sometimes it
10  was just a sheet of paper that said,
11  diazepam, one bottle of 500. Well, that
12  doesn't really give us much of a --
13  information to act on, so we would have to
14  follow up on that.
15  Q. And I think you spoke to
16  earlier the fact that sometimes suspicious
17  orders would be called in to the regional
18  office, correct?
19  A. Yes.
20  Q. And I assume that -- if we kind
21  of use 1996 as a baseline, then in the late
22  '90s, early aughts, there were often
23  suspicious orders called in to the regional
24  offices, true?
25  MR. FINKELSTEIN: Scope. Calls

1  for speculation.
2  THE WITNESS: I wouldn't say
3  often. I mean, it was more the
4  excessive purchase reports is what we
5  got.
6  QUESTIONS BY MS. MAINIGI:
7  Q. Well, and I asked you to just
8  focus on whatever universe of suspicious
9  orders you got in that time period. Let's
10  say late '90s, early aughts.
11  Of the suspicious orders that
12  were being reported in that time period, is
13  it fair to say that a good number were called
14  in to the regional offices?
15  MR. FINKELSTEIN: Scope.
16  Vague. Calls for speculation.
17  THE WITNESS: I personally
18  don't know because I worked in the
19  Philadelphia office, so I don't know
20  how registrants were reporting during
21  that period in '96.
22  QUESTIONS BY MS. MAINIGI:
23  Q. But you were in the
24  Philadelphia regional office, correct?
25  A. Correct.

1  Q. And were you generally aware of
2  registrants calling in to report suspicious
3  orders from time to time?
4  MR. FINKELSTEIN: Scope.
5  THE WITNESS: At that point, it
6  was more chemicals. They were calling
7  in chemicals.
8  QUESTIONS BY MS. MAINIGI:
9  Q. Because that --
10  A. That would be it. It was the
11  methamphet -- we had the methamphetamine
12  epidemic at that point.
13  Q. Because there was an obligation
14  to report not just suspicious orders of
15  controlled substances but suspicious orders
16  of meth as well, true?
17  A. Listed chemicals to -- that
18  make meth.
19  Q. But --
20  A. We would have loved to have the
21  means for meth, but...
22  MR. FINKELSTEIN: Tom, answer
23  the questions.
24  QUESTIONS BY MS. MAINIGI:
25  Q. The suspicious orders of -- the

1  suspicious orders that were reported for
2  controlled substances from time to time did
3  get phoned in, correct?
4  A. There were some that were
5  phoned in, yes.
6  Q. And there were some that were
7  faxed in, correct?
8  A. Correct.
9  Q. And what are the other means
10  that suspicious orders came in to the field
11  offices?
12  A. Mailed in. Pretty much it.
13  They were phone, fax or mail.
14  Q. Okay. And if a suspicious
15  order was phoned in, how did the DEA then
16  maintain a record of that suspicious order?
17  MR. FINKELSTEIN: '96 to 2006?
18  MS. MAINIGI: Sure. Go with
19  that.
20  THE WITNESS: Document.
21  QUESTIONS BY MS. MAINIGI:
22  Q. Documented?
23  A. Document.
24  Q. And then are those documents
25  still in existence?

1  MR. FINKELSTEIN: Scope.
2  You can answer, if you know.
3  THE WITNESS: Don't know.
4  QUESTIONS BY MS. MAINIGI:
5  Q. You don't know how long the DEA
6  was required to hold on to suspicious orders
7  reported?
8  MR. FINKELSTEIN: Scope.
9  THE WITNESS: I don't know.
10  QUESTIONS BY MS. MAINIGI:
11  Q. Okay. And would the suspicious
12  orders that were phoned or faxed in or mailed
13  in, for that matter, to the regional offices,
14  would they ever even find their way to
15  headquarters for any reason?
16  A. It was on --
17  MR. FINKELSTEIN: Scope. Calls
18  for speculation.
19  THE WITNESS: If it was on a
20  report it would, because the reports
21  get -- go to headquarters.
22  QUESTIONS BY MS. MAINIGI:
23  Q. If it was on what type of
24  report?
25  A. One of our official reports.

1  Q. An internal report?
2  A. An internal report, yes.
3  Q. And what are some of the type
4  of internal reports?
5  You don't need to describe them
6  for me, but just what are some of the types
7  of internal reports that would get sent from
8  the field offices to headquarters --
9  MR. FINKELSTEIN: Scope.
10  QUESTIONS BY MS. MAINIGI:
11  Q. -- that would contain
12  suspicious orders?
13  MR. FINKELSTEIN: Scope.
14  THE WITNESS: It could be
15  scheduled investigation reports. It
16  could be part of the preregistration.
17  It could just be the suspicious order
18  itself.
19  QUESTIONS BY MS. MAINIGI:
20  Q. And what are some of the
21  reasons that the suspicious orders would be
22  sent up to headquarters?
23  A. We have a system that all
24  reports have to go to this one section to
25  update a system that we have.

1  Q. That's the ARCOS system or some
2  other system?
3  A. No, some other system.
4  Q. What's the name of the system?
5  MR. FINKELSTEIN:  Scope.
6  THE WITNESS:  I mean, it's --
7  MR. FINKELSTEIN:  Wait.  Hang
8  on.  If this was law enforcement
9  sensitive, don't testify.
10 QUESTIONS BY MS. MAINIGI:
11 Q. Is this related to law
12 enforcement?
13 A. Yes.
14 Q. Okay.  We can -- I can withdraw
15 that question.
16 Now, let me take you -- let me
17 switch gears for a moment here.
18 I think either -- I think the
19 second day you testified, you were asked if
20 the DEA agreed that if the distributor
21 determined that an order is suspicious and
22 should be blocked, the distributor should
23 terminate all sales to that customer until
24 they can rule out diversion is occurring.
25 Do you recall that question?

1  A. Yeah, I recall the question.
2  Q. Vaguely?
3  A. Vaguely.
4  Q. Okay.  Do you remember
5  answering along the lines of yes to that
6  question?
7  A. I might have.  I don't
8  remember.
9  Q. Well, is that the case?
10 If the distributor determines
11 an order is suspicious and should be blocked,
12 the distributor needs to terminate all sales
13 to a customer?
14 MR. FINKELSTEIN:  Incomplete
15 hypothetical.
16 QUESTIONS BY MS. MAINIGI:
17 Q. Until they can rule out that
18 diversion is occurring?
19 A. Yeah, it should hold it until
20 they can rule out the suspicion.
21 Q. Now, has DEA ever issued any
22 sort of guidance or pronouncement essentially
23 saying that you must -- as a distributor in
24 that circumstance, you must terminate all
25 future controlled substance sales to a

1  customer if you report an order to the DEA?
2  MR. FINKELSTEIN:  Asked and
3  answered.  Mischaracterizes the
4  testimony.
5  THE WITNESS:  Well, it depends
6  what they're -- what are they sending
7  as the order.  What is the order that
8  they're saying is suspicious, correct?
9  QUESTIONS BY MS. MAINIGI:
10 Q. Well, the distributor reports a
11 suspicious order for customer X.
12 A. Of what?
13 Q. Of controlled substances.
14 A. So they're reporting the entire
15 order as being suspicious?
16 Q. Correct.
17 That's what they're obligated
18 to do, correct?  Right?
19 A. Correct.
20 Q. Okay.  So they report a
21 suspicious order to the DEA for customer X.
22 Customer X may have other
23 orders that are pending down the line.
24 Should the distributor cut off all orders to
25 customer X?

1  MR. FINKELSTEIN:  Asked and
2  answered.  Incomplete hypothetical.
3  THE WITNESS:  Well, first of
4  all, I think you started your
5  statement with the DEA reports it.
6  It's not DEA that reports the
7  suspicious order.  It's the registrant
8  that --
9  QUESTIONS BY MS. MAINIGI:
10 Q. I'm sorry if I misspoke.
11 A. That's fine.  I just want to
12 make sure we're clear on that.
13 Q. Absolutely.
14 A. So it's the registrant that
15 has -- the system that they have has deemed a
16 suspicious order, for a reason or reasons,
17 that they believe that this will -- that has
18 the potential to be diverted.
19 Q. Correct.
20 A. So that registrant has made the
21 decision -- has -- from their system they've
22 deemed it a suspicious order.  So they should
23 not ship until -- if they choose to, if they
24 want to alleviate that suspicion.  If they
25 choose not to, then they shouldn't ship.

1 But if they choose to, then it
2 becomes they need to look into it further to
3 alleviate that suspicion.
4 MR. FINKELSTEIN: Let's --
5 QUESTIONS BY MS. MAINIGI:
6 Q. So they shouldn't ship the
7 order, right?
8 MR. FINKELSTEIN: Just a
9 second. Let's take our final break
10 when you're done with this line of
11 questioning.
12 QUESTIONS BY MS. MAINIGI:
13 Q. So they shouldn't ship the
14 order, right?
15 MR. FINKELSTEIN: Incomplete
16 hypothetical.
17 THE WITNESS: When they deem --
18 when they've determined that it's
19 suspicious --
20 QUESTIONS BY MS. MAINIGI:
21 Q. Correct.
22 A. -- a suspicious order?
23 Correct.
24 Q. They shouldn't ship it?
25 A. Correct, they should not ship

1 orders that may not appear suspicious.
2 So let's say they take a while
3 to investigate that particular suspicious
4 order. They don't send it out. But in the
5 meantime they have in the queue other orders
6 from that pharmacy that do not look
7 suspicious to them.
8 MR. FINKELSTEIN: Incomplete --
9 QUESTIONS BY MS. MAINIGI:
10 Q. Are they okay to ship those
11 orders?
12 MR. FINKELSTEIN: Incomplete
13 hypothetical.
14 THE WITNESS: Well, I think if
15 they have one in the queue that's
16 already saying it's suspicious, then I
17 would -- I would think that they would
18 be at least questioning it like, well,
19 what are they doing?
20 QUESTIONS BY MS. MAINIGI:
21 Q. Are they required to hold the
22 other orders that they don't deem to be
23 suspicious, or is it okay to exercise their
24 business judgment to send those orders on?
25 MR. FINKELSTEIN: Asked and

1 it.
2 Q. Okay. But they could choose to
3 ship it if they wanted to. That's a business
4 judgment, right?
5 MR. FINKELSTEIN:
6 Mischaracterizes prior testimony.
7 THE WITNESS: They could ship
8 it if they -- yeah, it's a business
9 decision.
10 QUESTIONS BY MS. MAINIGI:
11 Q. So let's say they choose to not
12 ship it and hold the order. Are they then
13 required to not ship any orders to that same
14 customer?
15 MR. FINKELSTEIN: Incomplete
16 hypothetical. Asked and answered.
17 THE WITNESS: Have they
18 alleviated the suspicion? Did they do
19 anything to alleviate the suspicion?
20 If they haven't alleviated the
21 suspicion, then it's still a
22 suspicious order.
23 QUESTIONS BY MS. MAINIGI:
24 Q. Okay. I'm not talking about
25 that order; I'm talking about any additional

1 answered. Incomplete hypothetical.
2 And I'd appreciate the break.
3 THE WITNESS: Could you please
4 repeat it?
5 QUESTIONS BY MS. MAINIGI:
6 Q. Are they required to hold the
7 other orders that they don't view to be
8 suspicious, or is it okay for the distributor
9 in that instance to exercise their business
10 judgment and send those nonsuspicious orders
11 out?
12 MR. FINKELSTEIN: Asked and
13 answered. Incomplete hypothetical.
14 THE WITNESS: Yes.
15 QUESTIONS BY MS. MAINIGI:
16 Q. Yes what?
17 A. They can.
18 Q. Okay. They can ship those
19 other orders out?
20 A. Yes.
21 MS. MAINIGI: Okay. Let's go
22 ahead and take your break.
23 VIDEOGRAPHER: We're going off
24 record. The time is 4:53.
25 (Off the record at 4:53 p.m.)

1   VIDEOGRAPHER:  We're going back
2   on record, beginning of Media File
3   Number 12.  The time is 5:03.
4   QUESTIONS BY MS. MAINIGI:
5   Q. So, Mr. Prevoznik, just
6   following up on our last line of questioning,
7   is it fair to say that DEA has no internal
8   policy defining the circumstances under which
9   a distributor is required to terminate the
10  distribution of controlled substances to a
11  pharmacy?
12  MR. FINKELSTEIN:  Objection.
13  Mischaracterizes his prior testimony.
14  THE WITNESS:  Could you please
15  repeat that?
16  QUESTIONS BY MS. MAINIGI:
17  Q. Sure.
18  Is it fair to say that DEA has
19  no internal policy defining the circumstances
20  under which a distributor is required to
21  terminate the distribution of controlled
22  substances to a pharmacy?
23  A. Yes.
24  Q. Now, do you recall being asked
25  last time a number of questions about the

1   NWDA suspicious order monitoring system?  And
2   we may have even looked at it today.
3   Do you remember that?
4   A. Yes.
5   Q. And I believe it was
6   Exhibit P7.  If you don't have it handy, I am
7   sure we can get you a new copy.
8   MR. FINKELSTEIN:  May the
9   record reflect that James is now
10  screwing with my exhibits, but I
11  appreciate it.
12  MS. MAINIGI:  I think that's
13  obvious.  It doesn't even need to be
14  reflected on the record.
15  QUESTIONS BY MS. MAINIGI:
16  Q. You got one, Mr. Prevoznik?
17  A. Yes.
18  Q. Okay.  Perfect.
19  And I think it had been
20  previously marked P7 for the record.
21  Now, you testified you were --
22  you were familiar with this document.  You
23  had looked at it in preparation for your
24  deposition?
25  A. Yes.

1   Q. Okay.  And the NWDA, just for
2   the record, is the National Wholesale
3   Druggists' Association?
4   A. Yes.
5   Q. And that was the trade
6   organization for distributors at this point
7   in time, which is about 1993?
8   A. Yes.
9   Q. Now, can you tell us your
10  understanding of the purpose of this document
11  that describes the NWDA suspicious order
12  monitoring system?
13  MR. FINKELSTEIN:  Calls for
14  speculation.
15  THE WITNESS:  I think it was --
16  the association was assisting their
17  members to come up with a suspicious
18  order monitoring system that they
19  could use.
20  QUESTIONS BY MS. MAINIGI:
21  Q. And it appears that the NWDA
22  was working at that point in time with both
23  DOJ and the DEA in establishing controls
24  aimed at reducing diversion, fair?
25  MR. FINKELSTEIN:  Scope.  Calls

1   for speculation.
2   THE WITNESS:  I'm not sure
3   where I see DOJ.
4   I see DEA listed.  I don't see
5   DOJ.
6   QUESTIONS BY MS. MAINIGI:
7   Q. So if we take a look at page 1
8   of the NWDA document, Mr. Prevoznik --
9   A. Yes.
10  Q. -- second paragraph under
11  background, could you read that out loud?
12  A. "The National Wholesale
13  Druggists' Association voluntarily began
14  working with the Department of Justice, Drug
15  Enforcement Administration, in establishing
16  controls clearly aimed at reducing or
17  eliminating illegal product distribution."
18  Q. And why would the DEA have
19  worked with this trade organization to help
20  develop these controls?
21  MR. FINKELSTEIN:  Foundation.
22  Calls for speculation.
23  THE WITNESS:  To protect the
24  public.
25

1 QUESTIONS BY MS. MAINIGI:
2 Q. And the DEA at that point in
3 time thought it was a good thing to help a
4 trade organization develop guidelines because
5 it would help everybody, correct?
6 MR. FINKELSTEIN:  Foundation.
7 Calls for speculation.
8 THE WITNESS:  I -- yeah, I
9 mean -- yeah.
10 QUESTIONS BY MS. MAINIGI:
11 Q. Most of all, it would help the
12 public, as you said?
13 A. Yes.
14 Q. Now, the system -- I think you
15 went over this earlier.  The system that they
16 came up with had two components to it, right?
17 It had the monthly after-the-fact reporting?
18 A. Are you on a specific page?
19 Q. It had the monthly
20 calculations, page 2.
21 Do you see it?
22 MR. FINKELSTEIN:  Page 2 where?
23 MS. MAINIGI:  Page 2 under
24 monthly calculations.
25 MR. FINKELSTEIN:  Okay.

1 THE WITNESS:  Okay.
2 QUESTIONS BY MS. MAINIGI:
3 Q. And then it had -- so was that
4 the monthly after-the-fact reporting?
5 A. Yes.
6 Q. Okay.  And so essentially --
7 and then I think it's further described at
8 page 4.
9 Do you see that?
10 A. Where specifically on page 4?
11 The report --
12 Q. I think the top, the top part
13 of page 4.  It kind of rolls into page 3 and
14 then the top part of page 4.
15 A. Okay.
16 Q. And then this also -- I think
17 Mr. Farrell asked you, and Ms. Singer may
18 have as well.  On page 7, there's a part 2 to
19 the reporting.  In addition to the
20 after-the-fact monthly reporting, there's a
21 reference to the single suspicious orders.
22 Do you see that?
23 A. Yes.
24 Q. Now, the DEA did not require
25 the single suspicious orders to be reported

1 in a specific way; is that right?
2 MR. FINKELSTEIN:  Vague as to
3 time.
4 THE WITNESS:  That's correct.
5 QUESTIONS BY MS. MAINIGI:
6 Q. And the DEA worked with NWDA to
7 come up with a reporting system for the
8 monthly after-the-fact reports, correct?
9 MR. FINKELSTEIN:  Foundation.
10 Scope.
11 THE WITNESS:  From my review of
12 the document, yes.
13 QUESTIONS BY MS. MAINIGI:
14 Q. And those monthly
15 after-the-fact reports were sometimes called,
16 but not always, excessive purchase reports,
17 true?
18 A. Yes, correct.
19 Q. So in working with the NWDA,
20 the DEA essentially supported the concept of
21 two tiers of reporting, true?
22 A. The excessive purchase after
23 the fact and identifying the suspicious order
24 prior to shipping?  Yes.
25 Q. And is it fair to say that a

1 distributor that was sending in the excessive
2 purchase reports after the fact and was
3 calling or faxing in suspicious orders was in
4 compliance with these guidelines that DEA
5 worked on with the NWDEA [sic]?
6 MR. FINKELSTEIN:  Vague.
7 Incomplete hypothetical.  Scope.
8 THE WITNESS:  So again, this
9 goes back to the design and the
10 operating.  So this is the design.
11 So what -- what did the
12 registrant do to operate?  I don't
13 know.  It's --
14 QUESTIONS BY MS. MAINIGI:
15 Q. Well, in my hypothetical -- in
16 my hypothetical, Mr. Prevoznik, if the
17 registrant was submitting the excessive
18 purchase reports pursuant to some of the
19 guidelines in this document, the NWDA
20 document, and calling in suspicious orders,
21 that's the execution, right?
22 They were essentially in
23 compliance with at least these guidelines
24 that the NWDA put out, right?
25 MR. FINKELSTEIN:  Incomplete

1   hypothetical.  Scope.
2   THE WITNESS:  I don't have
3   enough information to make that
4   determination because there could
5   be -- it could be just what they're
6   reporting.  There could be a whole
7   bunch of things they're not reporting
8   to us.
9   So it goes back to these are --
10  these are the orders that they did
11  report, and these are the orders they
12  did not report, which is essentially
13  why a lot of -- we took enforcement
14  actions on quite a few of these
15  distributors because they were not
16  reporting.
17  So it's only based on what
18  they're reporting to us.
19  QUESTIONS BY MS. MAINIGI:
20  Q. Operationally, however, having
21  a two-tier system in place that includes the
22  excessive purchase reports and then the
23  reporting separately of suspicious orders,
24  operationally in this time period, in the
25  late '90s, that was a system that certainly

1   seemed to make sense to the DEA, correct?
2   MR. FINKELSTEIN:  Foundation.
3   THE WITNESS:  I think it made
4   sense in terms of the -- at this point
5   we were in -- we were dealing with the
6   meth situation.  We were -- and I
7   think I believe I testified to this,
8   that this was more -- at this point
9   this was more of a regional issue.
10  With the on -- with the
11  Internet and things like that where it
12  became a national thing, that's when
13  it was -- that's when orders were
14  clearly not being reported to us.
15  QUESTIONS BY MS. MAINIGI:
16  Q. So my question was a little bit
17  different, right?
18  The structure itself for the
19  late -- that was in place in the late '90s,
20  as outlined by the NWDA suspicious order
21  monitoring system document, that was a system
22  that the DEA thought worked for that time
23  period, correct?
24  MR. FINKELSTEIN:  Foundation.
25  THE WITNESS:  I think they were

1   leaving it up to the -- to the
2   registrant to do that, because it --
3   in here it's with the -- the number 9,
4   single suspicious order, we determined
5   orders to mean prior to shipment.  So
6   it's incumbent upon that registrant.
7   So this is -- this is a
8   whole -- this is a wholesaler
9   association, so its members are going
10  to put this into -- implement it into
11  their system.  So if they're following
12  what they're supposed to be doing,
13  then you would hope that it was
14  identifying the suspicious orders as
15  they should have.
16  QUESTIONS BY MS. MAINIGI:
17  Q. Well, let's take a look.  We
18  remember Mr. Gitchel, right?  Let's take a
19  look at what he wrote.
20  And I think we've got a couple
21  of letters of his attached that relate to
22  this system.
23  So if you take a look at the
24  very last page, page 11, Mr. Gitchel, who at
25  that point was -- what was his role?

1   A. He was the IP chief over
2   operations, diversion operations.
3   Q. So he was the top dog, right,
4   in diversion at DEA?
5   A. Just over operations.
6   Q. And he was communicating with a
7   lot of people during this time period, right?
8   We've seen a few of his letters?
9   A. Yes.
10  Q. Okay.  And if you take a look
11  at the letter which is on page 11, he writes
12  a letter to Ronald Streck of the National
13  Wholesale Druggists' Association, right?
14  A. Yes.
15  Q. Okay.  And did you review this
16  letter in preparation for your deposition
17  here today?
18  A. Yes.  In the past I did, yes.
19  Q. Okay.  So you're familiar with
20  this letter?
21  A. (Witness nods head.)
22  Q. Can you read -- do you see a
23  sentence that begins with "this system" in
24  the middle of the first paragraph?
25  A. "This system as proposed will

1  test the reporting" -- will test or meet --
2  "will meet the reporting requirements of 21
3  CFR 1301.74(b)."
4  Q. So what does that mean to you?
5  MR. FINKELSTEIN: Calls for
6  speculation.
7  THE WITNESS: I'm not sure what
8  he's saying, because the next two
9  sentences below that are -- he's --
10  QUESTIONS BY MS. MAINIGI:
11  Q. Well, what's he saying in this
12  sentence?
13  MR. FINKELSTEIN: Let the
14  witness finish his answer.
15  THE WITNESS: The next two
16  sentences after that are talking about
17  the after-the-fact sales, and it
18  doesn't relieve the registrant from
19  the responsibility of reporting
20  excessive or suspicious orders.
21  So -- and he clearly, again,
22  reiterates what I've been saying.
23  DEA's interpreted orders to mean prior
24  to shipment.
25

1  QUESTIONS BY MS. MAINIGI:
2  Q. Okay. So we just went over
3  this system that the DEA obviously had input
4  into that included two components, right?
5  A. Yes.
6  Q. And the two components -- what
7  was the first component?
8  A. It was the after sales.
9  Q. Okay. So the excessive
10  purchase, right?
11  A. Yes.
12  Q. What was the second component?
13  A. The -- let me check. The
14  suspicious orders.
15  Q. Right.
16  So those are the two components
17  of the NWDA system, right?
18  A. Yes.
19  Q. And the sentences that he's got
20  after the one I asked you to read, he's
21  essentially saying, doing the first doesn't
22  relieve you of the obligation to do the
23  second, right?
24  A. Correct.
25  Q. Okay. So read that sentence to

1  me again that begins with "this system."
2  A. "This system, as proposed, will
3  meet the reporting requirements of 21 CFR
4  1301.74."
5  Q. And what is 1301.74(b) of 21
6  CFR?
7  A. Suspicious orders.
8  Q. Okay. So Mr. Gitchel, who's
9  acting chief of diversion operations, is
10  saying in this letter that this two-component
11  system that we've been discussing, as
12  proposed, will meet the reporting
13  requirements of suspicious orders, correct?
14  A. That's what it says.
15  Q. And so a distributor --
16  MR. FINKELSTEIN: I signaled
17  ten minutes remaining to the witness.
18  QUESTIONS BY MS. MAINIGI:
19  Q. A distributor, Mr. Prevoznik,
20  who in that time period followed this system
21  that NWDA proposed, their system, at least,
22  would be in compliance with 21 CFR
23  1301.74(b), correct?
24  MR. FINKELSTEIN: Incomplete
25  hypothetical.

1  THE WITNESS: Yes, but this
2  date is 1984. You've been asking me
3  1996 to 2006, so -- so, yeah, 1984.
4  QUESTIONS BY MS. MAINIGI:
5  Q. Do you -- are you aware of any
6  communication by Mr. Gitchel subsequently
7  that overruled his statements?
8  MR. FINKELSTEIN: Scope.
9  THE WITNESS: Not to my
10  knowledge.
11  QUESTIONS BY MS. MAINIGI:
12  Q. Now, in this letter that
13  Mr. Gitchel wrote, he doesn't say anything
14  about halting shipment of excessive or
15  suspicious orders, right?
16  A. No.
17  Q. Now, the next time there is
18  some sort of communication with the industry
19  in written form, or an industry group in
20  written form, about approaches to suspicious
21  order monitoring are Mr. Rannazzisi's letters
22  in 2006 and 2007, right?
23  MR. FINKELSTEIN: Foundation.
24  THE WITNESS: No, we had -- we
25  had those conferences. I mean, I

1   think we had one from 1987, the one in
2   San Antonio, so we were meeting with
3   manufacturers and distributors.
4   QUESTIONS BY MS. MAINIGI:
5   Q. The one in 2007?
6   A. No.  19 -- it's in here
7   somewhere.
8   Q. Well, just listen to my
9   question, though.
10  A. Sure.
11  Q. So Mr. Gitchel was
12  communicating with a trade group, right?
13  A. Yes.
14  Q. The National Wholesale
15  Druggists' Association, right?
16  A. Yes.
17  Q. And that was a trade group that
18  communicated then with its distributors, its
19  member distributors, right?
20  MR. FINKELSTEIN:  Calls for
21  speculation.
22  THE WITNESS:  Yes.
23  QUESTIONS BY MS. MAINIGI:
24  Q. And distributor conferences or
25  conferences that DEA has, those are

1   definitely important, but there's no
2   guarantee that you're going to reach every
3   single distributor out there, right?
4   A. No, but I thought you were
5   asking what guidance DEA has given.
6   Q. No.
7   A. Okay.
8   Q. The question that I asked you
9   was:  So Mr. Gitchel wrote a communication to
10  the NWDA which theoretically could have been
11  shared with its member distributors, right?
12  MR. FINKELSTEIN:  Calls for
13  speculation.
14  THE WITNESS:  Yes.
15  QUESTIONS BY MS. MAINIGI:
16  Q. And it gave them some guidance
17  about their suspicious order monitoring
18  system, correct?
19  A. Correct.
20  Q. And next time the DEA issued
21  any sort of guidance, or anything that could
22  be called guidance, in a written form out to
23  all distributors about their suspicious order
24  monitoring systems was in the form of
25  Mr. Rannazzisi's letters in 2006, 2007?

1   MR. FINKELSTEIN:  Foundation.
2   THE WITNESS:  Yes.
3   QUESTIONS BY MS. MAINIGI:
4   Q. And obviously we had
5   conversations previously about the statements
6   in those letters, right?
7   A. Yes.
8   Q. Now, prior to Mr. Rannazzisi's
9   letters, you all, the DEA, began the
10  distributor initiative, right?
11  MR. FINKELSTEIN:  Asked and
12  answered.
13  THE WITNESS:  Yes.
14  QUESTIONS BY MS. MAINIGI:
15  Q. And I think you mentioned that
16  some of the earlier distributor initiatives
17  took place in the fall of 2005; is that
18  right?
19  MR. FINKELSTEIN:  Asked and
20  answered.
21  THE WITNESS:  I actually think
22  it was August.  Some of the documents
23  today were August.
24  QUESTIONS BY MS. MAINIGI:
25  Q. Okay.  Do you want to find your

1   document?  Let's find the Cardinal one.
2   There's a meeting with
3   Cardinal, and you're right, it's August.  At
4   least the date of this memo is August 23,
5   2005.
6   A. August 23rd, got it.  P23.
7   Q. Perfect.  Thank you.
8   Now, you did not attend this
9   meeting with Cardinal Health, right?
10  MR. FINKELSTEIN:  Asked and
11  answered.
12  THE WITNESS:  No.
13  QUESTIONS BY MS. MAINIGI:
14  Q. Mr. Mapes and Ms. Seeger
15  attended the meeting?
16  A. Yes.
17  Q. And all DEA has at this point
18  in time reflective of what got said or not
19  said at this meeting is this memo and the
20  attached PowerPoint, true?
21  A. Yes.
22  Q. What points were emphasized at
23  this meeting in 2005 versus any meeting that
24  took place in 2009, 2010, you're not in a
25  position to say beyond the documents you have

1   in front of you, correct?
2   A. Correct.
3   Q. Now, look at the last paragraph
4   of this memo.  Do you see that Cardinal was
5   requesting that DEA provide them with certain
6   information?
7   A. Yes.
8   Q. Do you know if the DEA ever
9   provided Cardinal with that information it
10  was seeking?
11  MR. FINKELSTEIN:  Scope.
12  THE WITNESS:  I don't know.
13  MR. FINKELSTEIN:  Vague.
14  QUESTIONS BY MS. MAINIGI:
15  Q. Now, do you recall the industry
16  group that represented distributors at some
17  point morphed its name into HDMA, correct?
18  A. Correct.
19  Q. So it went from NWDA to HDMA,
20  right?
21  A. Yeah.  I don't know if there
22  was one in between, but, yes.
23  Q. And now I think they're HDA.
24  Does that sound right to you?
25  A. Yeah.

1   A. Can you repeat it?
2   Q. Sure.
3   Do you recall from the time
4   period of about 2007 to 2013, DEA did not
5   want to sit down with HDMA to provide them
6   with guidance or guidelines related to an
7   adequate suspicious order monitoring system?
8   A. Yes.
9   Q. "Yes" meaning they did not want
10  to sit down with HDMA?
11  A. Right.
12  Q. Whereas in the late '90s, we
13  saw that they were willing to sit down with
14  HDMA, right?
15  A. Correct.
16  Q. And sitting down with HDMA or
17  its predecessor organization in the late '90s
18  helped the public, right?
19  MR. FINKELSTEIN:  Calls for
20  speculation.
21  QUESTIONS BY MS. MAINIGI:
22  Q. Isn't that what you told me, it
23  helped the public?
24  A. What, by meeting with them?
25  Q. Yes.

1   Q. I don't know why they keep
2   changing their names.
3   But do you recall that that was
4   a group that continued to want to meet with
5   DEA to continue to give guidance on how to
6   update their suspicious order monitoring
7   systems?
8   MR. FINKELSTEIN:  Scope.  Calls
9   for speculation.
10  THE WITNESS:  Yes.
11  QUESTIONS BY MS. MAINIGI:
12  Q. Do you recall though that
13  within DEA there was an evolution of thought
14  related to dealing with groups like HDMA
15  where, let's say, from 2007 through to 2013
16  DEA did not want to sit down and provide
17  specific guidance or guidelines to the HDMAs
18  of the world as to how to put their
19  suspicious order monitoring systems together?
20  MR. FINKELSTEIN:  Scope.
21  Foundation.
22  THE WITNESS:  Is that a
23  question?
24  QUESTIONS BY MS. MAINIGI:
25  Q. Yes.

1   A. Yes.  Well, we hoped that it
2   helped the public, yes.  But, again, it's the
3   registrants that have to design the system
4   and operate the system.  It's not NWDA, and
5   it's not HDA, and it's not HDMA.  It's the
6   registrant, which is why we shifted to that.
7   Q. Okay.  You didn't want to sit
8   down with HDMA to help the public?
9   A. No.
10  MR. FINKELSTEIN:  Wait.  Vague.
11  Argumentative.  Mischaracterizes prior
12  testimony.
13  THE WITNESS:  No, we sat
14  with -- we did the distributor
15  initiative because of what we saw, and
16  we saw that the registrants needed to
17  be -- have -- to sit down with the
18  registrants, talk to them and go over
19  their own data with them to show the
20  anomalies that are going on, in the
21  hope that they would stop what they
22  were doing.
23  They said they were going to
24  fix it; they didn't fix it.  So we
25  weren't going to go to a trade

1 association if the registrant isn't
2 going to fix their own internal system
3 that they have.
4 MR. FINKELSTEIN: One minute,
5 Ms. Mainigi.
6 QUESTIONS BY MS. MAINIGI:
7 Q. With respect to -- you made
8 some reference, and I think you're doing it
9 again, to some failures in the industry. Do
10 you remember that? Failures by the industry
11 to comply.
12 Do you remember having those
13 discussions with Ms. Singer earlier today?
14 A. Yes.
15 Q. Okay. And by "failures in the
16 industry," I assume you're referring to the
17 various legal actions that distributors had
18 with Cardinal, true? Or excuse me, the
19 various legal actions that distributors had
20 with DEA, true?
21 A. Yes.
22 Q. And so various distributors at
23 various points in time entered into legal
24 settlements with the DEA, true?
25 A. True.

1 CERTIFICATE
2
3 I, CARRIE A. CAMPBELL, Registered Diplomate Reporter,
Certified Realtime
4 Reporter and Certified Shorthand Reporter, do hereby certify
that prior to the commencement
5 of the examination, Thomas Prevoznik was duly sworn by me
to testify to the truth, the
6 whole truth and nothing but the truth.
7 I DO FURTHER CERTIFY that the foregoing is a verbatim
transcript of the
8 testimony as taken stenographically by and before me at the
time, place and on the date
9 hereinbefore set forth, to the best of my ability.
10 I DO FURTHER CERTIFY that I am
11 neither a relative nor employee nor attorney nor counsel of
any of the parties to this
12 action, and that I am neither a relative nor employee of such
attorney or counsel, and
13 that I am not financially interested in the action.
14
15
16 _____
17 CARRIE A. CAMPBELL, NCRA Registered Diplomate
Reporter
18 Certified Realtime Reporter  Notary Public
19
20 Dated: May 21, 2019
21
22

1 MR. FINKELSTEIN: We're at
2 2:30, Special Master. I'd ask to go
3 off the record.
4 SPECIAL MASTER COHEN: I think
5 we're done.
6 MS. MAINIGI: Thank you very
7 much, Mr. Prevoznik.
8 VIDEOGRAPHER: All right. This
9 concludes today's deposition. The
10 time is 5:30.
11 (Deposition concluded at 5:30 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 INSTRUCTIONS TO WITNESS
2
3 Please read your deposition over
4 carefully and make any necessary corrections.
5 You should state the reason in the
6 appropriate space on the errata sheet for any
7 corrections that are made.
8 After doing so, please sign the
9 errata sheet and date it. You are signing
10 same subject to the changes you have noted on
11 the errata sheet, which will be attached to
12 your deposition.
13 It is imperative that you return
14 the original errata sheet to the deposing
15 attorney within thirty (30) days of receipt
16 of the deposition transcript by you. If you
17 fail to do so, the deposition transcript may
18 be deemed to be accurate and may be used in
19 court.
20
21
22
23
24
25

1   ACKNOWLEDGMENT OF DEPONENT

2

3

4   I,_____, do   hereby certify that I have
read the foregoing

5   pages and that the same is a correct   transcription of the
answers given by me to

6   the questions therein propounded, except for   the corrections
or changes in form or

7   substance, if any, noted in the attached   Errata Sheet.

8

9

10

11

12   _____         Thomas
Prevoznik, Volume III   DATE

13

14

15   Subscribed and sworn to before me this

16   _____ day of _____, 20 _____.

17   My commission expires: _____

18

19   Notary Public

20

21

22

23

1   LAWYER'S NOTES

2

3   PAGE   LINE

4   _____ _____ _____

5   _____ _____ _____

6   _____ _____ _____

7   _____ _____ _____

8   _____ _____ _____

9   _____ _____ _____

10   _____ _____ _____

11   _____ _____ _____

12   _____ _____ _____

13   _____ _____ _____

14   _____ _____ _____

15   _____ _____ _____

16   _____ _____ _____

17   _____ _____ _____

18   _____ _____ _____

19   _____ _____ _____

20   _____ _____ _____

21   _____ _____ _____

22   _____ _____ _____

23   _____ _____ _____

24   _____ _____ _____

25

1   ERRATA

2

3   PAGE   LINE   CHANGE/REASON

4   _____ _____ _____

5   _____ _____ _____

6   _____ _____ _____

7   _____ _____ _____

8   _____ _____ _____

9   _____ _____ _____

10   _____ _____ _____

11   _____ _____ _____

12   _____ _____ _____

13   _____ _____ _____

14   _____ _____ _____

15   _____ _____ _____

16   _____ _____ _____

17   _____ _____ _____

18   _____ _____ _____

19   _____ _____ _____

20   _____ _____ _____

21   _____ _____ _____

22   _____ _____ _____

23   _____ _____ _____

24   _____ _____ _____

25