```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                         AT CHARLESTON


_____x
                                :
THE CITY OF HUNTINGTON,         :      Civil Action
                                :
               Plaintiff,       :      No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
               Defendants.  :
_____x
                                :
CABELL COUNTY COMMISSION,       :      Civil Action
                                :
               Plaintiff,       :      No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
               Defendants.  :
_____x



                   BENCH TRIAL - VOLUME 4
    BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
                 UNITED STATES DISTRICT COURT
                 IN CHARLESTON, WEST VIRGINIA


                       MAY 6, 2021
```

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell Law
422 Ninth Street, 3rd Floor
P.O. Box 1180
Huntington, WV  25701

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MR. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:              Ayme Cochran, RMR, CRR
Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
1              PROCEEDINGS had before The Honorable David A. Faber,

2     Senior Status Judge, United States District Court, Southern

3     District of West Virginia, in Charleston, West Virginia, on

4     May 6, 2021, at 9:00 a.m., as follows:

5              THE COURT:  Mr. Farrell, you have something?

6              MR. FARRELL:  Yes, Your Honor.  Two preliminary

7     matters.  One is scheduling.  So, today we'll continue with

8     the final part of Dr. Gupta and then our intention is we're

9     attempting to have an on-deck batter and a double-deck

10    batter.  So, we're hoping to have today Connie Priddy, who

11    will testify.  She's on deck.  On double deck and prepared

12    today is Scott Lemley from the City.  Both of them --

13             THE COURT:  If you were a baseball fan, you'd say

14    below deck.

15             MR. FARRELL:  So, tomorrow -- I'm hoping we get

16    through all three today, maybe spill a little tomorrow.

17    Tomorrow, we have Jan Rader planned for the early morning

18    and we don't -- after Jan Rader, we don't have anybody

19    planned on deck, or double deck, or under deck, below deck,

20    but we do intend to submit, as everybody knows, the two

21    deposition transcripts for your enjoyment to watch.  That's

22    Hartle and Prevosnick.

23             THE COURT:  Well, I may have given you an unclear

24    signal, but I intended to say that I was going to review

25    those depositions on my own time so that we wouldn't use
```

```
 1    court time to do that.  I'll -- I will, no doubt, regret

 2    having said that, but that's the plan.

 3              MR. FARRELL:  So, I guess to be clear, it's our

 4    intention to finish the week with Jan Rader.

 5              THE COURT:  Okay.

 6              MR. FARRELL:  And so, if we ask questions and at

 7    10:30 in the morning the defense says no questions, we don't

 8    have anybody scheduled on Friday after Jan Rader, if that's

 9    okay with the Court, and we understand that your video

10    watching time will count against the parties.

11              THE COURT:  Okay.  Well, I don't really have any

12    problem with that.

13              MR. FARRELL:  Thank you.

14              THE COURT:  And your opponents will probably be

15    relieved to know that they'll be done by that early on

16    Friday.

17              MR. FARRELL:  Well, it depends on the amount of

18    cross examination, Your Honor, but yes.

19         The second thing I would like do before we start is I

20    would like to make a proffer for the Court.

21              THE COURT:  Okay.

22              MR. FARRELL:  And it's regarding disclosures of

23    Dr. Gupta.  Not making any argument.  I'm just going to

24    state a couple of facts.

25         Dr. Gupta was originally deposed in the AG action,
```

1    *Morissey v. AmerisourceBergen,* on August 10th, 2016 by

2    AmerisourceBergen.  That deposition transcript was attached

3    as Exhibit A to his deposition in this case on

4    September 11th, 2020.

5         Now, importantly, Judge, on October 30th, 2020, the

6    plaintiffs following that deposition re-disclosed in a

7    pleading the opinions that Dr. Gupta we anticipated would

8    present in this trial.  This is the source of a lot of

9    personal pain.  This is the plaintiffs' supplemental Federal

10   Rule of Civil Procedure 26(a)(2)(C) disclosure where,

11   beginning on Page 7, we line item the things we anticipate

12   Dr. Gupta would say in this courtroom.

13        The defendants asked you to strike those opinions.  You

14   offered them the opportunity to re-depose Dr. Gupta and he

15   was re-deposed on April 15th, 2021.  And I wanted to make

16   the record clear that these opinions that he's been

17   expressing have been disclosed in this case and subject to

18   cross examination.  Thank you.

19             MR. HESTER:  Your Honor, Timothy Hester.  Just to

20   make the record clear from our perspective, we do not

21   believe that his opinions were properly disclosed.  I know

22   Mr. Farrell made a proffer and, just to preserve the record,

23   we do not agree with his proffer.

24             THE COURT:  I understand.

25             MR. FARRELL:  Judge, if I may, I brought a copy of

1    ECF filing 1146-1 that contains the actual disclosures to

2    tender to the Court.

3              MS. MAINIGI:  Your Honor, this -- we were not

4    aware that this was going to be raised this morning.  We're

5    prepared to finish out the cross examination of Dr. Gupta.

6    What I would ask is we be allowed to finish that out and

7    then, certainly, if Mr. Farrell wants to continue discussing

8    this, we're happy to do that.

9              THE COURT:  Yes.  I think that's the proper way to

10   go, Mr. Farrell.  So, we'll finish with Dr. Gupta and we'll

11   then deal with this, if you have anything else.

12             MR. FARRELL:  Thank you.

13             THE COURT:  Dr. Gupta, are you in the courtroom?

14        You may resume the stand.  You're still under oath,

15   sir.

16             MS. MAINIGI:  May I proceed, Your Honor?  Your

17   Honor, may I proceed?

18             THE COURT:  Yes, please.

19             MS. MAINIGI:  Thank you.

20                **CONTINUED CROSS EXAMINATION**

21             **BY MS. MAINIGI:**

22   **Q.**   Good morning, Dr. Gupta.

23   **A.**   Good morning.

24        Good morning, Your Honor.

25   **Q.**   I think yesterday we looked at the 2016 West Virginia

1    Overdose Fatality Analysis.  Do you recall that?

2    **A.**    Yes.

3    **Q.**    If you could pull that up, I just double checked this

4    morning.  It still seems to be there.  Now, I'd like you to

5    turn to Page 58 of your Overdose Fatality Analysis, please,

6    sir.  And this is where the Summary of Key Recommendations

7    are, correct?

8    **A.**    Yes.

9    **Q.**    Now, do you recall when I asked you yesterday about

10   whether you made recommendations about distributors, you

11   testified that was because -- that you had not because

12   distributors are -- and I think you said something like not

13   within the purview of the Bureau of Public Health.  Do you

14   recall that yesterday afternoon?

15   **A.**    Yes.

16   **Q.**    You also testified that the Bureau of Public Health

17   does not regulate law enforcement or distributors.  Do you

18   recall saying that yesterday?

19   **A.**    Yes.

20   **Q.**    I just want to draw your attention to a couple of the

21   recommendations.  If we look at the sixth bullet down, sir.

22   The sixth bullet down --

23   **A.**    Yes.

24   **Q.**    -- states as follows:  "Corrections officials should

25   work with judges to assure naloxone availability, treatment

1    referral, and peer supports at release of incarceration."

2    Do you see that?

3    **A.**    Yes.

4    **Q.**    Now, the Department of Corrections is not within the

5    purview of the Bureau of Public Health, correct?

6    **A.**    Correct.

7    **Q.**    And the Bureau of Public Health does not regulate the

8    Department of Corrections, right?

9    **A.**    Correct.

10    **Q.**    And judges are not within the purview of the Bureau of

11    Public Health either, correct?

12    **A.**    Correct.

13    **Q.**    And the Bureau of Public Health does not regulate

14    judges, right?

15    **A.**    That's correct.  And I am happy to explain that

16    recommendation, if you would allow me to.

17    **Q.**    I don't think it's necessary right now, but thank you.

18    Let's look at number -- the third recommendation down.  And

19    that third recommendation is, "Enhance CSMP Advisory

20    Committee legislation to identify abnormal or unusual

21    prescribing and dispensing patterns and to permit sharing

22    this data with appropriate professional licensing boards and

23    other agencies."  Do you see that, sir?

24    **A.**    Yes.

25    **Q.**    Now, the Board of Pharmacy runs the CSMP, correct?

```
 1   A.    Correct.

 2   Q.    Not the Bureau of Public Health, correct?

 3   A.    That's not correct.

 4   Q.    The Board of Pharmacy is within the purview of the

 5   Bureau for Public Health?

 6   A.    That's not correct.

 7   Q.    Okay.  So, the Board of Pharmacy is not within the

 8   purview of the Bureau of Public Health, correct?

 9   A.    That's correct.

10   Q.    And the Bureau of Public Health does not regulate the

11   Board of Pharmacy?

12   A.    That's correct.

13   Q.    And the Bureau of Public Health does not regulate the

14   state legislature, I assume?

15   A.    That would be correct.

16   Q.    Now, you have made several recommendations to the

17   legislature about what it should do or should consider

18   doing; is that not true?

19   A.    That is true.  And, once again, I'm really happy to

20   explain the intricate relationships of agencies in the State

21   of West Virginia, including the Bureau of Public Health

22   relationship with the Board of Pharmacy --

23   Q.    Thank you, sir.

24   A.    -- and with Corrections.

25   Q.    Thank you.  I think one of the -- one of the
```

1    contributions that I assume you are the most proud of from

2    your time as State Commissioner is your involvement with the

3    Opioid Reduction Act, right?

4    **A.**   Yes.

5    **Q.**   Now, coming back to the Board of Pharmacy, the Board of

6    Pharmacy regulates distributors, right?

7    **A.**   I have -- I have -- again, once again, I do not --

8    Board of -- Bureau for Public Health does not regulate as

9    you correctly outlined.  Board of Pharmacy, you would have

10   to ask Board of Pharmacy who they regulate and who they do

11   not.

12   **Q.**   Fair enough.  Now, coming back to your involvement,

13   from time to time, as you said, you get involved in

14   recommendations to the legislature, correct?

15   **A.**   Correct.

16   **Q.**   And that's from your purview originally -- well, from

17   recent -- most recently from your purview as the State

18   Commissioner of Health, correct?

19   **A.**   That's one of the ways.

20   **Q.**   And another way is that when you were the Health

21   Officer, the lead Health Officer at Kanawha-Charleston, you

22   also made some recommendations or were involved with

23   legislation, right?

24   **A.**   So, I sit -- I sat on about 30-plus boards.  Once

25   again, I'm happy to explain my involvement but, yes, that

1      would be correct, as well, but one of the several, several

2      other ways.

3      **Q.**   Okay.  You can set that report aside for now, Mr.

4      Gupta.

5             So, are you familiar with Senate Bill 437, Dr. Gupta?

6      **A.**   Ms. Mainigi, you would have to state the year and I

7      would have to look at it because the Senate Bill 437

8      potentially occurs in every legislative session in state

9      legislature.

10     **Q.**   That's a great point.  I apologize for that.  This is

11     Senate Bill from -- Senate Bill 437 from 2012.  And why

12     don't I get a copy to you of that so you can take a look at

13     it.

14                UNIDENTIFIED SPEAKER:  May I approach?

15                THE COURT:  Yes.

16                BY MS. MAINIGI:

17     **Q.**   Now, Dr. Gupta, while you are taking a look at that, I

18     will just note for you for the record that Senate Bill 437,

19     I think, is something that I saw on your CV and you noted it

20     as substance abuse legislation and you noted on your CV your

21     role as the following:  "Supported the Governor's Substance

22     Use Disorder initiative as social determinate of health

23     initiative, passed the legislature, and approved by Governor

24     Tomblin on 3/29/2012."  And I offer that to you just to jog

25     your memory on this.

1         Let me know when you're ready, Dr. Gupta.

2     **A.**   I have not had the opportunity to review this bill and

3     I have made my best attempt to take a very superficial look

4     at this, but I just want to say for the record again that

5     this is prior to my position as being the Bureau for Public

6     Health Commissioner.

7     **Q.**   Understood, Dr. Gupta.  I raise it as -- and I'm happy

8     to put your CV in front of you.  I don't think we need to,

9     though, unless you really want it, but your CV refers to

10    Senate Bill 437, as I mentioned, as substance abuse

11    legislation that in the role that you had in 2012 was --

12    which was as Kanawha-Charleston Health Officer, that you

13    supported the Governor's Substance Use Disorder initiative.

14    Do you agree with that?

15    **A.**   I would agree with that.  And I'm happy to look at

16    which portions of this.  I did not draft the bill.

17    **Q.**   Understood.  Understood.  I understand that.

18    **A.**   So, there are pieces that -- I think it would be unfair

19    to characterize supporting the entire bill and I am happy to

20    look at the pieces that were relevant to my position at the

21    time that I would have supported it.

22    **Q.**   Okay.  Fair enough.  Well, let me ask you a couple of

23    questions and you're obviously free to continue looking at

24    the bill.  Dr. Gupta, you're aware that Senate Bill 437

25    required continuing medical education for all prescribers of

```
 1    controlled substances, correct?

 2    A.    Yes, correct.

 3    Q.    And the purpose of the continuing education was to

 4    educate prescribers about when they should and should not

 5    prescribe opioids, correct?

 6    A.    Again, having said that, I have not reviewed the entire

 7    bill.  The purpose of the legislation was to ensure that

 8    prescribers had the appropriate training and understanding

 9    what it takes in order to prescribe opioid prescriptions.

10    Q.    Thank you.  Another thing that Senate Bill 437 did in

11    2012 was it enhanced the use of the Controlled Substances

12    Monitoring Program, correct?

13    A.    If you say so.

14    Q.    Do you recall that it did?

15    A.    In my position as the local health officer of

16    Kanawha-Charleston Health Department, I had no role with the

17    Controlled Substance Monitoring Program.

18    Q.    You came to have a role with it as the State Health

19    Officer or no?

20    A.    Ms. Mainigi, I was trying to explain that, but you

21    denied my request to explain that just a minute ago.

22    Q.    Because the -- excuse me -- because the Board of

23    Pharmacy oversees the CSMP, correct?

24    A.    I will be very happy to explain my role as the

25    Commissioner for Public Health and involvement of the
```

1    Controlled Substance Monitoring Program and the Board of

2    Pharmacy, if I'm allowed to, in this court.

3    **Q.**   Well, let's just step back for a moment and let's

4    define it.  The CSMP, Dr. Gupta, the Controlled Substances

5    Monitoring Program, is essentially a database of all the

6    controlled substances prescriptions filled in the state,

7    right?

8    **A.**   In my role as Commissioner for Bureau for Public

9    Health, my understanding of the Controlled Substance

10   Monitoring Program was that it's a database of between

11   Schedule II and Schedule IV.  So, it does not have Schedule

12   I substances.  So, I just wanted to correct you on that.

13   **Q.**   And the CSMP, as it's known, is not open to the public,

14   correct?

15   **A.**   Controlled Substance Monitoring Program is not open to

16   the public.

17   **Q.**   And distributors don't have access to the CSMP,

18   correct?

19   **A.**   I do not have that information.

20   **Q.**   Okay.  So.  Coming back to SB-437, do you recall that

21   one of the things that SB-437 accomplished was to enhance

22   the use of the CSMP?

23   **A.**   I can explain to you, Ms. Mainigi, what my role was in

24   this legislation as we're speaking here as a local health

25   officer at the time.  I am not able to testify to exact --

1    every piece of this legislation because I did not have that

2    role, as I explained.

3    **Q.**   When you became the State Health Officer, obviously,

4    with the ownership for the whole state, you obviously had an

5    interest in the CSMP, right?

6    **A.**   Yes, and I would love to explain that to you, if you

7    allow me to.

8    **Q.**   Okay.  Well, we don't need to do that right now.  If

9    you could turn to -- if you look at the bottom numbers on

10   the lower right, DEF-WV-00027696, Dr. Gupta.

11   **A.**   I'm there.

12   **Q.**   And you'll see Article 9 relates to the Controlled

13   Substances Monitoring Program.  And why don't you just take

14   a moment and read that to yourself, sir.

15              MS. KEARSE:  Can you give me that page number

16   again?

17              MS. MAINIGI:  Sure.  It is bottom right, 00027696.

18              THE WITNESS:  I've been able to read Article 9,

19   Section 60(a)-9-3, subsections (a), (b), (c), numbers 1 and

20   2.

21              BY MS. MAINIGI:

22   **Q.**   Terrific.  And do you agree that one of the purposes of

23   SB-437 was to enhance the use of the CSMP?

24   **A.**   I would agree not being practically engaged in SB-437

25   on this matter.

1   **Q.**   And the continuing -- the CSMP, the enhancement of the

2   CSMP, that related to doctors, correct?

3   **A.**   Not only doctors.

4   **Q.**   Prescribers?

5   **A.**   Not only prescribers.

6   **Q.**   It certainly affected prescribers, correct?

7   **A.**   Not only prescribers.

8   **Q.**   And the medical education certainly affected

9   prescribers, correct?

10   **A.**   It did affect prescribers of Schedule II to Schedule IV

11   substances.

12   **Q.**   And were you aware that one of the other things that

13   SB-437 accomplished was that it established state regulation

14   of pain clinics and MAT programs?

15   **A.**   I was generally aware as a member of the public.  I did

16   not have a specific role in this particular legislation with

17   relation to that.

18   **Q.**   And the regulation that pain clinics and MAT programs

19   also related to doctors, correct?

20   **A.**   In my role as local health officer, I could not tell

21   you that at this time.

22   **Q.**   And are you aware that Senate Bill 437 did not impose

23   new regulatory requirements on distributors?

24   **A.**   I am not aware.

25   **Q.**   Are you aware it didn't impose any new licensing

1    requirements on distributors?

2    **A.**    I am not aware.

3    **Q.**    Are you aware that it didn't impose any new reporting

4    requirements to the Board of Pharmacy?

5    **A.**    I'm not sure.  If you can repeat the question in

6    regards to Board of Pharmacy.

7    **Q.**    Are you aware that it did not impose new reporting

8    requirements for distributors to the Board of Pharmacy?

9    **A.**    I'm not aware.

10   **Q.**    Are you aware that Senate Bill 437 did not limit the

11   volume of opioids that a pharmacy could purchase?

12   **A.**    I am not aware of that.

13   **Q.**    Now, you can set that aside, sir.

14          Let me come back to the Controlled Substances

15   Monitoring Program for a moment.  Before 2016, is it fair to

16   say prescribers were not required to utilize the CSMP?

17   **A.**    I could not give you an opinion on that.

18   **Q.**    Okay.  As State Health Officer you don't have knowledge

19   -- you didn't have knowledge in that period of time

20   regarding the CSMP?

21   **A.**    I came into the office in 2015 and I can provide you

22   information and knowledge as to my role with the CSMP, as

23   well as Board of Pharmacy, and I can also provide you my

24   role as a practitioner.  I can also provide you information

25   on my role as a Secretary of the Board of Medicine and the

1    relationship to the Board of Pharmacy and CSMP.  So, I'm

2    happy to provide the Court all of that information if -- if

3    it desires so.

4    **Q.**    Okay.  Thank you, Dr. Gupta.  Let me just ask you

5    again, in your role as State Health Officer, were you

6    familiar with the CSMP?

7    **A.**    Yes.

8    **Q.**    And are you familiar with the fact that prior to 2016,

9    prescribers were not required to register with the CSMP?

10   **A.**    I do not exactly remember that, recall that.  I would

11   -- I would say that the guidelines prior were more

12   voluntary.  That's the way I would characterize that.

13   **Q.**    And while you were State Health Officer, obviously with

14   a great concern about opioids and other controlled

15   substances, do you recall that in 2016 Senate Bill 454 which

16   related to the CSMP was signed into law by Governor Tomblin?

17   **A.**    I do recall that.

18   **Q.**    And you supported this legislation, correct?

19   **A.**    That would be accurate.

20   **Q.**    And that bill made it a requirement that all physicians

21   who prescribed controlled substances had to register with

22   the West Virginia CSMP, correct?

23   **A.**    Once again, I would love to see the bill before I can

24   assert to that statement.

25   **Q.**    Is that what you generally recall about the bill,

however?

**A.**   I would -- I recall legislation requiring registration of prescribers of Schedule II to IV with the State's Controlled Substance Monitoring Program around that time period.

**Q.**   And do you recall that the number of prescriber registrants nearly doubled as a result of this legislation?

**A.**   I do not have factual knowledge to that fact at this time.

**Q.**   Do you recall that Senate Bill 454 also required prescribers to check a patient's history before prescribing an opioid?

**A.**   Around that time, the legislation would have required, along with registration, to also ensure that physicians were looking to see if there are more than one pharmacy or more than one prescriber, actually, for Controlled Substance Monitoring Program.

**Q.**   So, prior to Senate Bill 454, physicians were not required to check the patient's prescription history before writing an opioid prescription, correct?

**A.**   I believe the appropriate statement of that would be that physicians were able to voluntarily do that, but they were not required by state law.

**Q.**   And one of the things, a requirement to check the patient's prescription history accomplished, was prescribers

1    could now see, since they were required to do it, if a

2    patient had filled prescriptions at multiple pharmacies,

3    right?

4            MR. FARRELL:  Objection, Your Honor.

5            THE COURT:  Basis?

6            MR. FARRELL:  She's asking a witness about the

7    purpose of a law.

8            MS. MAINIGI:  Your Honor, I'm not asking him about

9    the purpose of the law.  I'm asking --

10           THE COURT:  You're asking what the law said,

11   right?

12           MS. MAINIGI:  Correct, Your Honor.

13           THE COURT:  Overruled.  Go ahead.  You can answer

14   it.

15           THE WITNESS:  Thank you, Your Honor.  I'm not able

16   to answer accurately and factually to your question.

17           BY MS. MAINIGI:

18   Q.   Okay.  Let me put Senate Bill 454 in front of you, Dr.

19   Gupta.  I'm sorry I failed to do that.  Senate Bill 454, for

20   the record, is DEF-WV-03015 and, Dr. Gupta, you're welcome

21   to read any page you want, but I'll draw your attention to

22   one of the last pages, Page 25 in the bottom right.  And I

23   think the section is entitled, sir -- it's Section 60A-9-5a

24   and it's entitled "Practitioner Requirements to Access

25   Database and Conduct Annual Search of the Database; Required

1    Rulemaking."

2         Let me know when you're ready, Dr. Gupta.

3    **A.**   I'm here on the page.

4    **Q.**   And let me just -- I'm not sure I have that much more,

5    Dr. Gupta, on this, but I just wanted to confirm that the

6    record is clear Senate Bill 454 required prescribers to

7    check a patient's history before prescribing an opioid,

8    correct?

9    **A.**   I am trying to look for that particular language before

10   I can answer your question.  It says, "Upon initially

11   prescribing or dispensing any pain-relieving controlled

12   substance for a patient and at least annually thereafter

13   should be -- should the practitioner or dispenser continue

14   to treat the patient with controlled substances, all persons

15   with prescriptive or dispensing authority and in possession

16   of a valid Drug Enforcement Administration registration

17   identification number and, who are licensed by the Board of

18   Medicine as set forth in Article III, Chapter 30 of this

19   code, the Board of Registered Professional Nurses as set

20   forth in Article 7, Chapter 30 of this code."  It goes on to

21   say, basically, according to that.

22   **Q.**   Thank you, Dr. Gupta.  Now, you're not aware that this

23   bill provided distributors with access to the CSMP, correct?

24   **A.**   Once again, I have not thoroughly studied the bill.  I

25   cannot provide that answer to you.

1      **Q.**   You can set that aside, sir.

2          Now, in 2016, Dr. Gupta, while you were State Health

3      Commissioner, you are aware that the CDC issued guidelines

4      for prescribing opioids for chronic pain, correct?

5      **A.**   Yes.

6      **Q.**   Okay.  And after the CDC guidelines came out, you are

7      aware that West Virginia convened an expert panel to issue

8      new pain management guidelines, correct?

9      **A.**   Correct.

10     **Q.**   And you were a member -- and those were called the SEMP

11     guidelines; is that right?

12     **A.**   I would recall that at this point, yes.

13     **Q.**   The -- and SEMP stands for Safe and Effective

14     Management of Pain Guidelines; does that sound right?

15     **A.**   That would sound accurate to my recollection, but I

16     don't have the guidelines in front of me right now, so I am

17     not sure.

18     **Q.**   Okay.  Let me get those for you, please.  And, Dr.

19     Gupta, I probably won't spend that much time on these, but

20     do you agree that the SEMP -- that the -- excuse me -- the

21     expert panel that issued the new pain management guidelines,

22     that those guidelines were called the Safe and Effective

23     Management of Pain Guidelines?

24     **A.**   I'm sorry.  What's the question?

25     **Q.**   Do you agree that the guidelines were called the Safe

1    and Effective Management of Pain Guidelines?

2    **A.**    Yes.

3    **Q.**    And those were issued in 2016, correct?

4    **A.**    That's the date on this document.

5    **Q.**    And if you turn to Page 4 of the document, sir, that

6    document, that page of the document, lists the members of

7    the panel, correct?

8    **A.**    That's correct.

9    **Q.**    And you were on that panel, as you said, correct?

10   **A.**    That's correct.

11   **Q.**    And the panel was chaired by Dr. Timothy Deer, correct?

12   **A.**    Correct.

13   **Q.**    And the panel issued guidance to prescribers and

14   dispensers as an expansion to the CDC Chronic Pain Opioid

15   Guidelines, correct?

16   **A.**    I wouldn't describe it like that.

17   **Q.**    If you could take a look at Page 4, sir, do you see the

18   first sentence in the first full paragraph?

19   **A.**    I do.

20   **Q.**    And that sentence reads, "This overall pain management

21   guidance is intended for both prescribers and dispensers as

22   an expansion to the 2016 CDC Chronic Pain Opioid

23   Guidelines."  Is that what it says?

24   **A.**    It says that.

25   **Q.**    Now, these guidelines ultimately came to be endorsed by

```
 1    multiple health professional organizations in West Virginia,

 2    correct?

 3    A.    There are several.  Multiple would be correct, but I

 4    can -- I am happy to explain the context of it, if you would

 5    like me to.

 6    Q.    Do you recall that the West Virginia State Medical

 7    Association endorsed these guidelines?

 8    A.    I'm going to go through and see which ones.  I don't

 9    see it listed in my quick browsing.

10    Q.    Okay.  Let me come back to the sentence for a moment.

11    A prescriber is someone who prescribes opioids, right?

12    A.    Not necessarily.  A prescriber can prescribe many more

13    pharmaceutical compounds, non-pharmaceutical compounds, in

14    addition to opioids.

15    Q.    Fair enough.  And a dispenser is someone like a

16    pharmacist who dispenses drugs?

17    A.    Dispenser in medicine could be a lot of people beyond

18    pharmacy.

19    Q.    Okay.  Now, in 2018, I think we talked about this

20    yesterday.  You also -- you can set that aside, sir.

21          You also helped draft Senate Bill 273; is that correct,

22    which it came to be known as the Opioid Reduction Act?

23    A.    That's correct.  I'm much more familiar with that one.

24    Q.    And you viewed the Opioid Reduction Act as a reasonable

25    effort to address the contemporary crisis that we were
```

1    facing, correct?

2    **A.**    That would be accurate.

3    **Q.**    And the Opioid Reduction Act imposed new limits on

4    opioid prescriptions; is that right?

5    **A.**    As a state level effort, yes.

6    **Q.**    And, for example, it limited prescriptions for minors

7    to three days, correct?

8    **A.**    I would love to see that, once again, in front of me

9    because I do not recall every section of the Senate Bill 273

10   sitting right here.

11   **Q.**    But you recall as a general matter that there were days

12   supply limitations imposed on opioids as part of the Opioid

13   Reduction Act?

14   **A.**    I recall as a general matter the attempt of the Opioid

15   Reduction Act was to follow good science, good evidence, and

16   create guidelines based on that in legislation.

17   **Q.**    And what that involved in part was setting days supply

18   of limitations on the prescription of opioids, correct?

19   **A.**    What that involved in part was following CDC guidelines

20   and transitioning those evidence-based guidelines into

21   legislation that included limitation of initial

22   prescriptions to -- for prescribers.

23   **Q.**    So, for example, do you recall that it allowed for a

24   seven-day prescription if the medical purpose said that it

25   supported it in the record?

1   **A.**   So, once again, I would love to see that in front of me

2   because we had debated back and forth three days, four days

3   with different committees and it was a matter of

4   negotiation.  So, but I do recall that for initial

5   prescribing, I believe it was about four days and, for some

6   other reasons, it was seven days.  So, there were variations

7   in that within the legislation.

8   **Q.**   And there was limitations imposed on dentists, also,

9   correct?

10   **A.**   That would be accurate.

11   **Q.**   Because some dentists -- dentists were allowed to

12   prescribe opioids after certain dental procedures, correct?

13   **A.**   You've asked me why it was a limitation on dentists.

14   My answer is there were limitations on prescribers for

15   controlled substances beyond physicians because there was

16   such a volume that was being provided and prescribed by and

17   in communities that was -- that included prescriptions from

18   dentists and other providers, as well.

19   **Q.**   And do you recall that there was a three-day limitation

20   for dentists?

21   **A.**   I don't recall the exact limitation of every profession

22   in the bill at this time while I'm sitting here.

23   **Q.**   Do you recall it was around three days?

24   **A.**   Three to seven days, three to five days is usually the

25   evidence-based best practice for initial prescribing.  So,

1    that would be the area, but if I saw the legislation, I

2    would be able to tell you more definitively.

3    **Q.**   And prior to this Opioid Reduction Act, a dentist could

4    have prescribed a 30-day supply of opioids, correct?

5    **A.**   Certainly.

6    **Q.**   And, to your knowledge, the Opioid Reduction Act did

7    not contain any new requirements for distributors, correct?

8    **A.**   I do not have that stationed in front of me to say that

9    at this point.

10   **Q.**   And, to your knowledge, the Opioid Reduction Act did

11   not impose limits on the distributions of opioids to

12   pharmacies, correct?

13   **A.**   Could you please repeat that again?

14   **Q.**   Sure.  To your knowledge, the Opioid Reduction Act did

15   not impose limitations on the distributions of opioids to

16   pharmacies?

17   **A.**   I -- I cannot recall for or against that.

18   **Q.**   Now, one of the things you said yesterday, Dr. Gupta,

19   when you were being asked questions by Ms. Kearse was where

20   West Virginia ranks compared to the country is -- was

21   important for you to know as the State Health Commissioner,

22   correct?

23   **A.**   Correct.

24   **Q.**   Let me put another exhibit in front of you.

25          MS. MAINIGI:  Could I have DEF-WV-00747, State of

1    Health presentation?

2            BY MS. MAINIGI:

3    **Q.**   Now, Dr. Gupta, this is a PowerPoint presentation that

4    you put together in August, 2018 entitled "Public Health in

5    West Virginia:  Brief History and Current State of Health,"

6    correct?

7    **A.**   That's what it states, correct.

8    **Q.**   And this particular report happens to have your name on

9    the front, correct?

10   **A.**   This one does.  This presentation does, as well.

11   **Q.**   And was this a presentation that you made to others in

12   the State of West Virginia?

13   **A.**   This was a presentation and it states on the report I

14   made on August 6th, 2018 to the sanitarian training.

15   **Q.**   If you could turn to Page 38 of your report, Dr. Gupta.

16   **A.**   I'm here.

17   **Q.**   Now, at Slide 38, there's a chart comparing annual

18   prescription per capita in 2016 across all the states; is

19   that right?

20   **A.**   That's correct.

21   **Q.**   And where does West Virginia rank?

22   **A.**   It's highlighted as ranking number one.

23   **Q.**   Okay.  And what does the number 20.8 mean?

24   **A.**   That means 20.8 prescriptions per 100 -- per --

25   actually, per person, per capita.

1    **Q.**   And that means West Virginia ranked number one in total

2    prescriptions at that point in time, correct?

3    **A.**   That's correct.

4    **Q.**   And that's not just opioid prescriptions.  This is all

5    prescriptions, correct?

6    **A.**   That's correct.

7            THE COURT:  Does that mean 20 prescriptions for

8    every person in the state at that time?

9            THE WITNESS:  Yes, Your Honor.

10           THE COURT:  Is that what that means?

11           THE WITNESS:  Yes, Your Honor.

12           BY MS. MAINIGI:

13   **Q.**   Now, if you could take a look at Page 68 -- oh, excuse

14   me.  Not 68.  Let me back up.

15       I believe you have testified before, Dr. Gupta, that

16   West Virginia has a higher than average incidence of people

17   in circumstances that lead to pain, like manual labor jobs,

18   correct?

19           MR. FARRELL:  Excuse me, Your Honor.  Can we have

20   a date and page reference to his prior testimony?

21           THE COURT:  Yes.  Yes

22           MS. MAINIGI:  Sure.  Let's go ahead and put Dr.

23   Gupta's 2016 deposition up at Page 68, Lines 6 through 15.

24           MR. FARRELL:  Objection, Your Honor, unless we

25   intend to do cross examination by showing cross examination.

```
 1              MS. MAINIGI:  Well, you asked for a citation, so I
 2   thought I'd put it up.  Do you not want me to put it up?
 3              THE COURT:  Do you want it down, Mr. Farrell?
 4              MR. FARRELL:  No.  I'm just curious as to whether
 5   or not we're going to be allowed to show cross examination
 6   to witnesses before we actually cross examine them.  I'm
 7   okay with that.
 8              MS. MAINIGI:  I thought you asked for a citation,
 9   so I thought I'd put it up because you might not have it
10   handy.
11              THE COURT:  Well, I'm going to let -- I'm going to
12   allow this.  We need to get through this.  Go ahead, please.
13              MS. MAINIGI:  Yes, Your Honor.
14        Let's go ahead and put it up, Matt, please.
15              BY MS. MAINIGI:
16   Q.   And in your 2016 deposition, you were asked, Doctor
17   Gupta, How would you characterize the rate of legitimate
18   pain in West Virginia", and you responded at that point in
19   time, "I would characterize it by the following.  There's
20   reason to believe, certainly, that because of the mining and
21   number of other labor activities that West Virginians have -
22   traditionally have had a lot of laborious work in the
23   industry and, as a result, that one can argue that
24   historically that could be higher levels of pain related to
25   the work in those industries."  Do you recall testifying in
```

1    that manner?

2    **A.**    Ms. Mainigi, I do not have in front of me this

3    deposition from five years ago and you're going to have to

4    allow me to explain those statements if you expect me to

5    answer questions related to these statements.

6    **Q.**    Okay.  Let me turn first, before we come back to that,

7    to Slide 27 of your presentation.  Now, this slide lists

8    West Virginia morbidity indicators, correct?

9    **A.**    This slide lists West Virginia morbidity indicators as

10   per the Behavior Risk Factor Surveillance System of 2016 as

11   reported by Health Statistics Center at DHHR.

12   **Q.**    West Virginia ranks number one in arthritis; is that

13   correct?

14   **A.**    That's correct.

15   **Q.**    And can you explain to me what that means?

16   **A.**    Thank you for the opportunity.  Arthritis is a

17   condition one can develop from a lot of reasons and we --

18   the ranking of arthritis in the nation is important where

19   West Virginia ranks, but the trend data is equally

20   important.  For example, we have seen a mere two percentage

21   point of increase in arthritis over more than a decade in

22   West Virginia.

23        So, while it ranks number one, it has always been close

24   to number one.  So, there was not a tsunami of increase in

25   the cases of arthritis in the period of time we're talking

```
 1    about.
 2    Q.    Dr. Gupta, let's take a look at the number there.  38.9
 3    percent is the West Virginia prevalence of arthritis in
 4    2016?
 5    A.    Yes.
 6    Q.    And the country was at 25.3 percent --
 7    A.    Yes.
 8    Q.    -- on average?  Okay.  Poor health limitations, where
 9    did West Virginia rank?
10    A.    Once again, in 2016, it ranked --
11    Q.    Dr. Gupta --
12    A.    I'm answering your question.
13    Q.    Okay.  Where did West Virginia rank in 2016?
14    A.    It ranked number one at 23.6 percent for that
15    particular year.
16    Q.    Okay.  And for cardiovascular disease, where did West
17    Virginia rank in the country?
18    A.    For 2016, it ranked at 14.6 percent, number one, which
19    has been consistent over the years, without a significant
20    change over the years.
21    Q.    And, Dr. Gupta, I'd appreciate it if you would just
22    answer the question.  Where did West Virginia rank for COPD
23    in 2016 according to your chart?
24    A.    One.
25    Q.    And where did West Virginia rank in hypertension
```

1    according to your chart in 2016?

2    **A.**    One.

3    **Q.**    And where did West Virginia rank for diabetes in 2016

4    according to your chart?

5    **A.**    Two.

6    **Q.**    And where did West Virginia rank for depression in 2016

7    according to your chart?

8    **A.**    Two.

9    **Q.**    And where did West Virginia rank in 2016 for cancer

10   according to your chart?

11   **A.**    Three.

12   **Q.**    And all of the conditions I just described, Dr. Gupta,

13   all of those conditions could result in pain for the

14   individuals who suffer from them, correct?

15   **A.**    Not necessarily.  And I'm happy to explain that again,

16   if you would like me to.

17   **Q.**    Thank you.  Now, let's turn to Page 24 of your

18   presentation.  This page is entitled "West Virginia

19   Demographics", correct?

20   **A.**    Correct.

21   **Q.**    And the median age for West Virginians in 2016 was the

22   fourth highest in the nation based on census data, correct?

23   **A.**    That's what it says.

24   **Q.**    This page also notes that West Virginia had a higher

25   than average disabled population, correct?

**A.**   It states there was -- 18 percent report being disabled.

**Q.**   And turning to Page --

          MS. MAINIGI:  Actually, why don't we go ahead and take that down.

          BY MS. MAINIGI:

**Q.**   Thank you, Dr. Gupta.

          Dr. Gupta, you are an expert for the plaintiffs in the MLP opioid cases, correct?

**A.**   Correct.

**Q.**   And you are an expert in abatement?

**A.**   Correct.

**Q.**   And you get paid $500.00 an hour; is that correct?

**A.**   As I mentioned in my deposition, I don't exactly recall the exact hourly rate.

**Q.**   Is that approximately how much you get paid an hour?

**A.**   Could be plus, minus.

**Q.**   And you were originally retained by Mr. Colantonio in this case?

**A.**   I do not -- that would not be accurate.

**Q.**   Who were you originally retained by?

**A.**   That was Natalie Shkolnik.

**Q.**   And are you retained by Mr. Colantonio in this case?

**A.**   As my personal attorney capacity.  He's functioning as my personal attorney on this.

```
 1              MS. KEARSE:  Can I get clarification of what, Your
 2    Honor, just -- what case?  When you say "this case"?
 3              MS. MAINIGI:  I apologize.  That was unclear.  I
 4    will clarify.
 5              BY MS. MAINIGI:
 6    Q.   In -- Mr. Colantonio is serving as your personal
 7    attorney in this matter that you're testifying --
 8    A.   Yes.
 9    Q.   -- here for today?
10    A.   Yes.
11    Q.   Okay.  Is Mr. Colantonio also your attorney in the MLP
12    cases?
13    A.   Natalie Shkolnik is the attorney that I'm dealing with
14    in the MLP case.
15    Q.   Now, Mr. Colantonio is here today in the courtroom,
16    right?
17    A.   Correct.
18    Q.   Okay.  And Mr. Colantonio, did he take part of your
19    deposition when you were deposed by us in this matter?
20    A.   There was two depositions.  Could you please clarify
21    which one?
22    Q.   Let me clarify for you.
23    A.   You're confusing me.
24    Q.   That's a fair point.  That's a fair point.  So, in
25    2020, you were deposed in this matter, correct?
```

1    **A.**    There was one deposition in September of 2020, correct.

2    **Q.**    And at that deposition in September of 2020, you were

3    deposed by the defendants in this case, correct?

4    **A.**    Correct.

5    **Q.**    And you were also deposed by Mr. Colantonio in that

6    case, correct?

7    **A.**    I was asked questions by Mr. Colantonio at that

8    deposition, yes.

9    **Q.**    Okay.  And are you aware that Mr. Colantonio is also

10   counsel to Cabell County and City of Huntington in this

11   matter?

12             MR. FARRELL:  Objection.  Lack of foundation.

13             THE COURT:  Overruled.

14             BY MS. MAINIGI:

15   **A.**    I'm not aware of that, actually.

16   **Q.**    Now, do you recall what year you were first retained as

17   an expert?  Was it 2019?

18   **A.**    It would be close to that.

19   **Q.**    Now, do you recall speaking at a plaintiffs counsel

20   conference in 2018 in Fort Lauderdale, Florida?

21   **A.**    If you could tell me more specifics about it, I used to

22   travel a lot in my role as the Commissioner for Bureau for

23   Public Health, so I'm happy to recall that, the details.

24   **Q.**    Sure.  Let's go ahead and put that up on the screen and

25   see if it jogs your memory.  We can back up to the Opioid

1  Crisis Summit, July 21st-22nd, 2018.  Do you recall speaking

2  at this conference called the Opioid Crisis Summit,

3  July 21st-22nd in 2018?

4  **A.**   I would have traveled there in my capacity as the

5  Commissioner of Bureau for Public Health.  Again, my

6  schedule travels.

7  **Q.**   Are you aware that the purpose of this conference was

8  explaining to plaintiffs firms how to make money in mass

9  tort cases?

10  **A.**   No.

11  **Q.**   But your testimony is you traveled there as the

12  Commissioner of Public Health?

13  **A.**   My testimony is that I was asked to speak specifically

14  about the opioid crisis in West Virginia to -- to this

15  meeting and in that role I was traveling to many

16  conferences, including the American Automobile Association

17  and, you know, a number of other organizations that were not

18  pure public health.  That was the role I was -- and this was

19  in that role.

20  **Q.**   Now, if we look at the second page of this --

21         MS. MAINIGI:  Matt, if we we could turn to the

22  next page.

23         BY MS. MAINIGI:

24  **Q.**   Were you aware that people paid $1,495.00 to attend

25  this conference?

1    **A.**    No, I was not aware.

2    **Q.**    Were you aware that the purpose of the conference was

3    to teach plaintiffs lawyers how to file more opioid cases?

4    **A.**    No, Ms. Mainigi.  My role as Commissioner for Bureau

5    for Public Health is to go speak and talk about the public

6    health impact of the opioid crisis in West Virginia.  When I

7    get invited, I will go speak and explain what is happening

8    in order to advance the knowledge and understanding of all

9    types of people from the country and I do not go back to

10   figure out who is paying what and who is there.  I just --

11   that's not what I did in my role.

12          MS. MAINIGI:  If we could turn to the agenda of

13   events, please, Matt.  Next page, please.  If we could go to

14   the next page, please.  Okay.  Maybe you can blow that up a

15   little bit, Matt.

16          BY MS. MAINIGI:

17   **Q.**    And so, do you see your name here as one of the

18   speakers, Dr. Gupta?

19   **A.**    This is the first time I've seen this, so I'm happy, if

20   you have paperwork, to look at that because I have never

21   seen this particular agenda before, but I do see my name

22   there.

23   **Q.**    Okay.  And do you see that at the bottom of this page

24   it says as follows:  "Attorneys in attendance will be given

25   specific information regarding the signing of both entity

1    and individual cases, regarding case criteria, damage models

2    and estimated time frames for settlement"?  Do you see that?

3    **A.**   I see it, but this is my first time seeing it.

4    **Q.**   So, is it your testimony you weren't aware that the

5    purpose of the conference was to educate plaintiffs

6    attorneys to bring opioid cases?

7    **A.**   I was absolutely not aware of that.

8         MS. MAINIGI:  I have no further questions.  Thank

9    you, Dr. Gupta.

10        MR. FARRELL:  Judge, before Ms. Mainigi retires,

11   can we get a copy of the demonstrative that was just --

12        MS. MAINIGI:  I'm happy to provide a copy.

13   Actually, for housekeeping purposes, Your Honor, it may be

14   simpler if I -- if Mr. Hester is going next, if I provide a

15   list -- we provide a list together at the end of the

16   exhibits we'd like to move into evidence.  Would that --

17        THE COURT:  Is that all right with you, Mr.

18   Farrell?

19        MS. MAINIGI:  Just to save time.

20        MR. FARRELL:  I'd like do it now.  I'd like to

21   make a record, as well.

22        MS. MAINIGI:  Sure.  Sure.  Absolutely.

23      Your Honor, I'd like to move Senate Bill 437 into the

24   record.  That is DEF-WV-03105.

25        THE COURT:  Any objection?

```
 1                MS. KEARSE:  No objection, Your Honor.

 2                THE COURT:  It's admitted.

 3                  DEFENSE EXHIBIT DEF-WV-03105 ADMITTED

 4                MS. MAINIGI:  I'd like to move Senate Bill 454

 5     into the record.  That is DEF-WV-03015.

 6                THE COURT:  Any objection?

 7                MS. KEARSE:  No objection, Your Honor.

 8                THE COURT:  Admitted.

 9                  DEFENSE EXHIBIT DEF-WV-03015 ADMITTED

10                MS. MAINIGI:  I'd like to move the 2016 SEMP

11     Guidelines into the record.  That is DEF-WV-03036.

12                MS. KEARSE:  No objection, Your Honor.

13                THE COURT:  Admitted.

14                  DEFENSE EXHIBIT DEF-WV-03036

15                MS. MAINIGI:  I'd like to move into the record

16     DEF-WV-00747, which is the Public Health in West Virginia

17     Brief History and Current State of Health.

18                MS. KEARSE:  No objection.

19                THE COURT:  Admitted.

20                  DEFENSE EXHIBIT DEF-WV-00747 ADMITTED

21                MS. MAINIGI:  And I believe that's it, Your Honor.

22     Thank you.

23                THE COURT:  Thank you.

24                MR. FARRELL:  I'm sorry.  Did we get the CLE

25     program admitted?
```

```
 1              MS. MAINIGI:  He didn't recognize it, so I didn't
 2    move it into the record, but I'm happy to move it into the
 3    the record, if you would like.
 4              THE COURT:  Do you want it in, Mr. Farrell?
 5              MR. FARRELL:  I just want a copy, is all I would
 6    like.
 7              MS. MAINIGI:  We'll get him a copy right here and,
 8    Your Honor, could I go ahead and just ask that that also be
 9    moved into the record, that agenda?
10              THE COURT:  Is there any objection?
11              MR. FARRELL:  None.
12              THE COURT:  It's admitted.
13              MS. KEARSE:  Can I object?
14              COURTROOM DEPUTY CLERK:  Judge, we need a number,
15    an exhibit number.
16              THE COURT:  We need exhibit numbers.
17              MS. MAINIGI:  Yes, Your Honor.
18              THE COURT:  Can you give those to the clerk so she
19    can keep her record straight?
20              MS. MAINIGI:  Oh, 861.  That sounds more like it.
21    So, Opioid Crisis Summit, July 21st-22nd, 2018 is
22    Exhibit 861.
23                    DEFENSE EXHIBIT 861 ADMITTED
24              MR. HESTER:  Your Honor, should I go ahead now or
25    do you want to take a break?
```

1          THE COURT:  Well, it's only 10:00.  Let's press

2     on, Mr. Hester, if you're ready.

3          MR. HESTER:  We'll press on.  All right.  Just

4     take us a minute, Your Honor, to get set up.

5                    **CROSS EXAMINATION**

6          **BY MR. HESTER:**

7     **Q.**   Good morning, Dr. Gupta.

8     **A.**   Good morning.

9     **Q.**   My name is Timothy Hester.  I represent McKesson.

10         Dr. Gupta, I want to begin just by asking a couple of

11    threshold questions where I think we can have pretty ready

12    agreement.  Do you agree with me that licensed doctors and

13    other healthcare providers in West Virginia are responsible

14    for making prescribing decisions?

15    **A.**   Yes.

16    **Q.**   And so, the number of prescriptions written in

17    Huntington and Cabell County for prescription opioids would

18    be based on the decisions made by doctors and other

19    prescribers, correct?

20    **A.**   The number of prescriptions that would -- would be

21    going to pharmacies would be coming out of offices of

22    healthcare providers.

23    **Q.**   So, based on the judgment of healthcare providers,

24    doctors, and other prescribers, correct?

25    **A.**   I would say they were the ones writing the

 1    prescriptions.

 2    **Q.**    And so, they were the ones making the decision to write

 3    the prescriptions, correct?

 4    **A.**    That would be accurate.

 5    **Q.**    And so, you also agree and understand that an opioid

 6    pill cannot leave a pharmacy lawfully unless a prescriber

 7    decides to write a prescription and the pharmacist decides

 8    to dispense it, correct?

 9    **A.**    That would be accurate.

10    **Q.**    So, the number of prescriptions written in Huntington

11    and Cabell determines the amount of legal opioid pills that

12    would have been dispensed in the community, correct?

13    **A.**    That would not be correct.

14    **Q.**    The pills can't leave the pharmacy shelf unless

15    prescriptions are written for them, correct?

16    **A.**    That's correct.

17    **Q.**    And so, the total volume of prescriptions would be

18    total volume of pills that would be -- would reflect the

19    total volume of pills that could leave the pharmacy,

20    correct?

21    **A.**    That's correct.

22    **Q.**    Let me ask you to return a bit to the discussion you

23    just had with Ms. Mainigi relating to pain needs in West

24    Virginia.  Do you agree that West Virginia historically has

25    had a very significant proportion of its population engaged

```
 1    in labor-intensive jobs such as mining?

 2    A.    That would be correct.

 3    Q.    And are those labor intensive jobs a factor that have

 4    tended to drive higher levels of pain needs in this state?

 5    A.    I would characterize it a different way, so I could not

 6    exactly agree with that characterization.

 7    Q.    You understand that heavy manual labor jobs tend to

 8    create over time higher needs for pain in a given

 9    population?

10    A.    I do not understand the term "higher needs for pain".

11    Q.    Let me ask to -- let me put up on the screen the 2016

12    deposition pages, Page 68 Line 6 to 15, please.  And, Dr.

13    Gupta --

14          MS. KEARSE:  Your Honor, I'm going to -- is this

15    impeachment?  I don't know that he's actually set a

16    foundation.

17          MR. HESTER:  I think the witness said he didn't --

18    wouldn't characterize the question the way I asked him and

19    this is meant to respond to that.

20          MS. KEARSE:  And I think --

21          THE COURT:  He hasn't identified the document and

22    related it to this witness, is that what you're saying?

23          MS. KEARSE:  Yeah.  I think he was about to

24    explain his answer with that and so, I don't think this is

25    proper impeachment.
```

```
1              THE COURT:  Overruled.  I'm going to let him go
2    ahead.  This is cross examination.  We need to give Mr.
3    Hester some latitude here.
4         So, go ahead, sir.
5              BY MR. HESTER:
6    Q.   Dr. Gupta, you were deposed in 2016 in this litigation.
7    Do you remember this?
8    A.   I remember being deposed.  I do not remember signing an
9    errata statement to review this deposition and correct it to
10   the accuracy of my deposition.  So, I cannot speak to this
11   because I have not signed an errata statement and I have not
12   reviewed the deposition.
13             MR. HESTER:  Well, Your Honor, if the witness --
14   if the witness didn't sign an errata statement, it's been
15   waived by now.
16             THE COURT:  Well, is this -- is this the testimony
17   you gave in this deposition?
18             THE WITNESS:  Your Honor, I was -- I did not -- I
19   was deposed.  I never signed an errata statement, so I have
20   never had an opportunity to go back and review my deposition
21   of 2016.
22             THE COURT:  Well, I understand that, but if you
23   testified under oath and this is your testimony, then I
24   think this is fair game.
25        Go ahead, Mr. Hester.
```

```
1              BY MR. HESTER:
2    Q.   Dr. Gupta, you were under oath when you gave this
3    testimony, correct?
4    A.   Yes.
5    Q.   And the testimony, the question was, "Has, or how would
6    you characterize the rate of -- let me use the words
7    legitimate pain in West Virginia."  Do you see that
8    question?
9    A.   Yes.
10   Q.   And your answer was, "I would characterize it by the
11   following.  There's reason to believe, certainly, that
12   because of the, the mining and number of other labor
13   activities, that West Virginians have, traditionally have
14   had a lot of laborious work in the industry.  And, as a
15   result, that one can argue that, historically, that could be
16   higher levels of pain related to the work in those
17   industries."  You gave that answer, correct?
18   A.   Yes, sir, and that's very different than the question
19   you asked me previously about pain needs.
20   Q.   I was asking you, Dr. Gupta, this question.  The
21   laborious work done by many people in this state, mining,
22   heavy labor, that's a factor that can lead to higher levels
23   of pain need, correct?
24   A.   Correct.
25   Q.   Okay, thank you.  Let me ask you, also, do you
```

1    understand that West Virginia has a relatively aged

2    population?

3    **A.**   It has one of the more aged populations in the nation

4    as a state.

5    **Q.**   And that's another factor that can lead to higher pain

6    needs for a population, correct?

7    **A.**   Mr. Hester, you keep saying "pain needs" and there's a

8    big difference between words, between "pain needs" and

9    "levels of pain".  I would -- either you could correct it or

10   I could keep having problems.

11   **Q.**   Okay.  So, maybe we'll go -- we'll try to get on the

12   same wavelength.

13   **A.**   Please.

14   **Q.**   That -- and more aged population tends to have higher

15   levels of pain, correct?

16   **A.**   This is the way I would characterize it.  As we age,

17   one could have pain levels that could be higher, generally

18   speaking, than when you are very young.

19   **Q.**   I think we're communicating.  I understand.  I hope.  I

20   know what you're talking about.

21        And I think with Ms. Mainigi, you also noted that there

22   is a higher level of disability among the population in West

23   Virginia than compared to the nation, correct?

24   **A.**   The percent of disability rates in West Virginia are

25   higher than the average U. S. percentage rates.

1    **Q.**   And people who are disabled in the aggregate may have

2    higher levels of pain; is that correct?

3    **A.**   That's correct.

4    **Q.**   And you also talked with Ms. Mainigi about the fact

5    that there's higher levels of obesity in West Virginia

6    compared to the country as a whole; is that correct?

7    **A.**   That's correct.

8    **Q.**   And obesity is another factor that can lead to higher

9    levels of pain; is that correct?

10   **A.**   Not necessarily, but from obesity, if you end up having

11   neuropathy, or disability, or arthritis, that may be a

12   reason that you're suffering from pain, but just by itself,

13   obesity, being obese, many of us are here, shouldn't be

14   causing us pain.

15           MR. HESTER:   Let me ask to put up on the screen

16   from the 2016 deposition of Dr. Gupta Page 69, Lines 20-24.

17           BY MR. HESTER:

18   **Q.**   Dr. Gupta, you were under oath again in this

19   deposition, correct?

20   **A.**   Correct.

21   **Q.**   Let me read the question that was asked to you in that

22   deposition.  "Obesity can cause pain of various types,

23   right?"  And your answer was, "It certainly could."  And

24   then the next question, "Chronic pain, constant pain?"  Your

25   answer, "It could."  Do you see that?

1    **A.**    Yes, sir.  My testimony today is a very consistent

2    explanation with this testimony at that time.

3    **Q.**    But the point is, if somebody -- if there is a level of

4    obesity in a population, that can create greater strains on

5    the skeletal structure of the body, can lead to higher

6    levels of pain, correct?

7    **A.**    Can I characterize this way?  Just -- I just -- I'm

8    just trying to explain, which is in its black and white way,

9    no, but obesity tends to change our body structure over time

10   and we call that potentially sometimes arthritis.  Other

11   cases, obesity could lead to cancer.  In other cases, it

12   could lead to diabetes, which could lead to neuropathy.  So,

13   these are factors, but just pure simple being obese if I'm

14   overweight right now does not cause pain for just itself.

15   **Q.**    So, other factors come out of obesity that lead to

16   higher levels of pain; is that your point?

17   **A.**    That potentially could, just like I said in 2016.

18   **Q.**    And you also mentioned arthritis as another factor for

19   the health of this population in West Virginia, that West

20   Virginia has the highest level of arthritis in the country,

21   correct?

22   **A.**    That's correct.

23   **Q.**    And arthritis is often associated with pain; is that

24   correct?

25   **A.**    That's very correct.

1   Q.   The West Virginia Board of Medicine oversees the

2   practice of medicine in the State of West Virginia, correct?

3   A.   It sees it for MDs, for podiatrists, and for physician

4   assistants.  Not for all practitioners.

5   Q.   So, let's focus on the ones that the West Virginia

6   Board of Medicine regulates and the regulation of the West

7   Virginia Board of Medicine, for instance, would extend to

8   general care practitioners, family doctors, primary care

9   physicians, correct?

10  A.   As long as you had an MD, as opposed to a DO, which

11  have their own Board for DOs.

12  Q.   So, the Board of Medicine of West Virginia would be

13  regulating doctors in the state and would issue their

14  licenses to practice medicine; is that correct?

15  A.   For the ones that have MD, yes.

16  Q.   And you're aware that the Board of Medicine from time

17  to time issues guidelines or policy statements that it

18  circulates to doctors in West Virginia?

19  A.   Yes.

20  Q.   And the Board of Medicine over time has issued policy

21  statements relating to the use of opioids in the treatment

22  of pain; is that correct?

23  A.   Yes.

24  Q.   And a doctor practicing in West Virginia should be

25  familiar with the guidelines and policy statements that were

 1   issued by the Board of Medicine; is that correct?

 2   **A.**   That would be correct.

 3   **Q.**   And a doctor practicing in West Virginia should seek to

 4   follow the guidelines and policy statements that are issued

 5   by the Board of Medicine; is that correct?

 6   **A.**   You are correct.

 7   **Q.**   And are you also aware that the Board of Medicine

 8   issues quarterly newsletters to all licensed physicians and

 9   physician's assistants in the State of West Virginia from

10   time to time?

11   **A.**   I'm peripherally aware to the point it comes to my

12   e-mail inbox.

13   **Q.**   You probably receive them.

14   **A.**   Yes.  It doesn't mean I read them, though, always.

15   **Q.**   Yes.  Let me ask you to look at a document I'm going to

16   show you.

17           MR. HESTER:  May I approach, Your Honor?

18           THE COURT:  Yes.

19           BY MR. HESTER:

20   **Q.**   Dr. Gupta, I've shown you a document that's marked as

21   Defendant's Exhibit 3616.  It's a quarterly newsletter from

22   the West Virginia Board of Medicine from 2009, early 2009 or

23   I guess -- I'm sorry -- late -- late October, October, 2008

24   and December, 2008.  Have you seen this before?

25   **A.**   No, sir, primarily because I wasn't in state in

1    December -- on October of 2008.  I had not moved in until

2    March of 2009.

3    **Q.**   Let me ask you to look at this, the sixth page of the

4    document.  Do you see at the bottom of the page there is a

5    heading "Responsible Opioid Prescribing, A Physician's

6    Guide, now available for online purchase"?  Do you see that?

7    **A.**   I see that.

8    **Q.**   And there's a reference, if you look down into the next

9    paragraph of the document, that it says in the Spring of

10   2008, the Board of Medicine was able to distribute a book to

11   every licensed physician and physician's assistant in West

12   Virginia, and it's a book written by Scott Fishman.  I'm

13   paraphrasing, Dr. Gupta.  Do you see that paragraph?

14   **A.**   I see that paragraph.

15   **Q.**   And I really wanted to use this as a jog for your

16   memory to see if you remember.  Do you remember that the

17   West Virginia Board of Medicine distributed this book by Dr.

18   Fishman on responsible opioid prescribing?

19   **A.**   Absolutely not, sir, because I wasn't in state and I

20   wasn't licensed at the time, so I would not have received

21   this newsletter, and I would never have read this prior to

22   you showing it to me.

23   **Q.**   And so, you have never in your -- in your subsequent

24   work in the state, you hadn't heard about this being

25   distributed, the book being distributed?

1    **A.**   Not to my recollection at this time, but I can

2    certainly not -- I do not remember seeing this document ever

3    before.

4    **Q.**   All right.  Thank you.

5        Dr. Gupta, am I correct that in recent years there has

6    been an effort to educate doctors in West Virginia to think

7    more carefully about their prescribing of opioids?

8    **A.**   That would be correct.

9    **Q.**   And that's something that you've been involved in,

10   correct?

11   **A.**   That would be correct.

12   **Q.**   And, for instance, in the 2012-13 time frame, West

13   Virginia established mandatory training for all prescribers

14   on opioid prescribing; is that right?

15   **A.**   I think we discussed it this morning.

16   **Q.**   And before that time there was no such mandatory

17   training; is that correct?

18   **A.**   That's correct.

19   **Q.**   And I take it over time with more training, more

20   knowledge, better use of the databases that you've discussed

21   earlier today, that doctors in West Virginia in this current

22   time frame are, in fact, writing fewer prescriptions for

23   opioids; is that right?

24   **A.**   That would be correct.  Yes, sir, that would be

25   correct.  And, again, to the context of the training,

1    legislature, Board of Medicine tend to usually do

2    reactionary work, so this was a reaction to the challenge we

3    were facing.

4    **Q.**   So, there has been a significant decline in the levels

5    of opioid prescribing in recent years, correct?

6    **A.**   Yes.

7    **Q.**   Is it correct to say it's roughly a 50% decline in

8    opioid prescribing over the last decade?

9    **A.**   If we speak specifically about West Virginia, I think

10   there has been quite significant decline.  In fact, between

11   2014 and 2019, in my estimate, there was about 52% decline.

12   **Q.**   In the levels of prescribing of opioids?

13   **A.**   Opioid prescribing.

14   **Q.**   Let me ask you to look at another document that you've

15   discussed before but we haven't gotten it into the record

16   yet.

17          MR. HESTER:  May I approach, Your Honor?

18          BY MR. HESTER:

19   **Q.**   Dr. Gupta, I've handed you Defendant's Exhibit 2523.

20   On the front page, it's headed "CDC Guideline For

21   Prescribing Opioids For Chronic Pain, United States, 2016."

22   Dr. Gupta, I take it you've seen this document before?

23   **A.**   Yes, sir.

24   **Q.**   And these are the CDC guidelines that you discussed in

25   your testimony over the last two days, correct?

1    **A.**   That's accurate.

2    **Q.**   And the CDC published these guidelines in March, 2016?

3    **A.**   That's correct.

4    **Q.**   And I -- the way you spoke about them, I assume this is

5    true, but I'll ask you anyway.  I assume you've read these

6    guidelines, correct?

7    **A.**   It's been awhile since my last review, but yes.

8    **Q.**   And these are the guidelines that you referred to in

9    your testimony yesterday when you mentioned the CDC

10    guidelines, correct?

11    **A.**   For chronic pain, 2016, yes.

12    **Q.**   And if you look at Page 2 of these guidelines and, Dr.

13    Gupta, I should explain.  There's a lot of numbers on these

14    documents because we're in litigation here.  But why don't

15    you work off of the printed number that's really the number

16    of the document, the number that the CDC put on it.  So.

17    There's a number 2 there you can see.  We can work off of

18    that, okay?

19        And you can -- let me point you to the right-hand

20    column on Page 2.  The beginning of the first full paragraph

21    that says, "This guideline provides recommendations for the

22    prescribing of opioid pain medication by primary care

23    clinicians for chronic pain, I.e., pain conditions that

24    typically last more than three months."  Do you see that?

25    **A.**   I do.

1    Q.   And is that your understanding of what this document

2    was about, that it was to provide guidelines for the

3    prescribing of opioids by primary care clinicians?

4    A.   My understanding was these guidelines were primarily

5    directed at primary care physicians and for chronic pain for

6    opioids, the role of opioids.

7              MR. HESTER:  Your Honor, I move that Defendant's

8    Exhibit 2523 be admitted into evidence.

9              THE COURT:  Is there any objection?

10             MR. FARRELL:  I'm sorry.  Are we talking about --

11             MS. KEARSE:  The CDC guidelines.

12             MR. FARRELL:  No objection.

13             MS. KEARSE:  No objection.

14             THE COURT:  It's admitted.

15                  **DEFENSE EXHIBIT 2523 ADMITTED**

16             BY MR. HESTER:

17   Q.   Let me ask you to look, Dr. Gupta, at Page 1 of the

18   document.  And I wanted to point you to the left-hand column

19   at the end of the first paragraph under background.  And

20   there's this last phrase that says the CDC refers to the,

21   quote, "lack of consensus among clinicians on how to use

22   opioid pain medication."  Do you see that?

23   A.   I am seeing this as a part of a full sentence.

24   Q.   Yes, yes, yes.  I mean, feel free to look at the whole

25   sentence.  I just wanted to ask you about that phrase.

1    **A.**   I read the sentence.

2    **Q.**   Yes.  And when the CDC refers here to a lack of

3    consensus among clinicians on how to use opioid pain

4    medication, when it wrote these guidelines in 2016, that was

5    a correct statement, right?

6    **A.**   A lack of consensus among physicians is very different

7    than the science and data behind the evidence to support use

8    of opioids for chronic pain.  I would have to go back and

9    see their reference because there's one reference here that

10   says in parentheses, too, and I would have to see what type

11   of evidence are they referring to when they make that claim.

12   **Q.**   So, you don't know whether it's true or not when they

13   refer to a lack of consensus among clinicians about how to

14   use --

15   **A.**   So, it's not about black and white, I know or I don't

16   believe it or not.  It is about evidence.  If there is a

17   certain amount of evidence that I can put my weight behind,

18   then I would agree with the statement.  If it's referring to

19   one meaning, then I would have trouble agreeing with that.

20   **Q.**   It refers -- if you look at Footnote 2, it refers to

21   the Palouse article or epidemiological study.  Have you

22   looked at that Palouse article before?

23   **A.**   I haven't recently and I would have to look at that

24   before I can -- because, again, that's a statement based on

25   a reference and I would have to evaluate the reference for

```
1    its legitimacy, credibility, as well as validity and

2    science, before I can agree to that.

3    Q.   Maybe we can back up a little bit.  When the CDC issues

4    a guideline like this, it's issuing the guideline for the

5    medical community to provide its base of knowledge on how it

6    views the situation at a point in time, correct?

7    A.   That would be correct.

8    Q.   So, this --

9             THE COURT:  Mr. Hester, when you get to a stopping

10   point, we need to switch out the court reporters and it

11   would be a good time to take a break.

12            MR. HESTER:  Yes.  I'm happy to stop now, Your

13   Honor, if that's good for you.

14            THE COURT:  Let's be in recess for about ten

15   minutes.

16       (Recess taken)

17   BY MR. HESTER:

18   Q.   Dr. Gupta, right before we broke I was asking you

19   the point that the CDC when it issues a guideline like

20   this is providing its view to the medical community on

21   where the state of knowledge lies; correct?

22   A.   This is how I would characterize it.  Once CDC issues a

23   guideline on any matter, they're using the best possible

24   available science and data to put together it into a

25   recommendation which are voluntary in nature.
```

```
 1    Q.   And the purpose of the CDC guidelines is to inform the
 2    medical community based on the work that the CDC puts in to
 3    develop that insight and guidance?
 4    A.   Medical community, the public at large because these
 5    are public guidelines, they're not secretive guidelines, to
 6    the entire nation.
 7    Q.   And, so, for instance, to reflect that point, if you
 8    look at Page 3 of the document, at the top of the right-hand
 9    column it says, "The guideline is intended to inform
10    clinicians who are considering prescribing opioid pain
11    medication for painful conditions that have or become
12    chronic."
13         Do you see that?
14    A.   I see that.
15    Q.   So it reflects the point I think you're making that the
16    CDC develops guidelines like this to provide information to
17    clinicians who are considering the prescribing of opioids;
18    correct?
19    A.   That's correct.
20    Q.   So when the CDC said at Page 1, going back to where we
21    were before the break, when it says there's a lack of
22    consensus among clinicians on how to use opioid pain
23    medication, that's the CDC's view based on its study and
24    evaluation of the current state of the science; correct?
25    A.   Not really, sir.  That's background introduction.  So
```

1    what they're saying is here's what exists in literature

2    right now.  It would be hard to pin that to CDC because what

3    they're providing you as a nation is here's where we are

4    today.  And they are regurgitating whatever they find.  It's

5    not -- background is not somebody's view particularly.

6    **Q.**   Okay.  Let me turn you then -- maybe I can make that

7    sharper and make the point a little more clearer if we turn

8    to Page 2.

9         At the top of the left-hand column there's a sentence

10   that begins -- it's the second or third full sentence on the

11   left-hand column.  It begins, "However, it is hard to

12   estimate the number of persons who could potentially benefit

13   from opioid pain medication long-term."

14        Do you see that?

15   **A.**   I see that.

16   **Q.**   And I take it that's the CDC's judgment based on what

17   they've looked at.  They concluded it was hard to estimate

18   the number of persons who could potentially benefit from

19   long-term care?

20   **A.**   That statement would, if you were to characterize it,

21   would mean that CDC does not have a really good estimate of

22   the -- amongst all the people that are suffering from

23   chronic pain as to in what percentage of people you could or

24   could not have benefit from chronic long-term opioid care.

25   **Q.**   And they go on to say, "Evidence supports short-term

1    efficacy of opioids for reducing pain and improving function

2    in non-cancer, nociceptive, and neuropathic pain in

3    randomized clinical trials lasting primarily less than 12

4    weeks."  Correct?

5    **A.**   That's a statement along with two references.

6    Reference does not intend, in parentheses, to cite the

7    evidence.

8    **Q.**   So there the CDC was concluding that there was evidence

9    of short-term efficacy of opioids for treating chronic

10   non-cancer pain in durations of less than 12 weeks; correct?

11   **A.**   Durations of less than 12 weeks would not be chronic

12   non-cancer pain.  You mentioned chronic non-cancer pain.

13   What they're saying is that -- and I want to read that

14   because it's important.

15        "The efficacy -- short-term efficacy of opioids for

16   reducing pain and improving function in non-cancer,

17   nociceptive, and neuropathic pain."  So they're also saying

18   not all pain, but these two types of pain in randomized

19   clinical trials.  That's less than 12 weeks.

20   **Q.**   And nociceptive means what?

21   **A.**   What it means where actually you have receptors that

22   actually could react to it.  And neuropathic, obviously

23   we've talked about from the nerve involvement and things

24   like that.

25   **Q.**   So those two phrases together, nociceptive and

```
 1   neuropathic pain, that's a broad category of pain; correct?
 2   A.   Those are two reasons, particular reasons that
 3   clinicians might find an opportunity at some level of their
 4   management of that patient to prescribe for short-term the
 5   pain.  And they go on to state when the opioid should be
 6   prescribed.
 7   Q.   So here the CDC finds that there is evidence to support
 8   short-term efficacy of opioids for treatment of these
 9   categories of pain in durations of less than 12 weeks;
10   correct?
11   A.   They do that.  And the rest of the report, sir, they
12   say it's not first line.  It's -- so that's a, that's a
13   statement and it's weighted as a statement only.  It's not a
14   finding.  It's a statement, a regurgitation of two studies.
15   Q.   Based on their review of all of the scientific evidence
16   that was available at the time; correct?
17   A.   I would generally say so.  They would have studied it.
18   Q.   And then the next sentence goes on to say, "However,
19   few studies have been conducted to rigorously assess the
20   long-term benefits of opioids for chronic pain."  And then
21   in parentheses they say "pain lasting more than three
22   months."
23        Do you see that?
24   A.   Yes.
25   Q.   So, again, here the CDC was reporting that the state of
```

```
 1   the knowledge at the time based on its review reflected that

 2   there were few studies reflecting in a rigorous way the

 3   long-term benefit?

 4   A.   Yes.

 5   Q.   And then I put that together with the statement up

 6   above where they say, "It's hard to estimate the number of

 7   persons who could benefit from opioid medication long-term."

 8        So putting those together, the CDC was saying there's

 9   just not enough science yet to decide what the answer is for

10   long-term pain treatment with opioids; correct?

11   A.   This is the way I would characterize it.  What they

12   were saying is that the data on long-term benefits of opioid

13   use is there, but it is not entirely sufficient.  And,

14   therefore, these guidelines and that gap would help

15   providers fill that gap in terms of recommendations.

16   Q.   So the CDC was saying there is some data suggesting

17   benefits for long-term pain but it's not clear enough?

18   A.   They're not really saying that in that statement.

19   Q.   But it -- okay.  I'll get to it another way.  I think

20   we can get to this point another way.

21        When -- let me point you to Page 2 again, the

22   right-hand column toward the bottom just before "rationale,"

23   Dr. Gupta.

24        You see there's a sentence -- it's the third sentence I

25   think from the bottom of that paragraph before "rationale."
```

1    It begins, "Clinical decision-making should be based on a

2    relationship between the clinician and patient, and an

3    understanding of the patient's clinical situation,

4    functioning, and life context."

5         Do you see that?

6    **A.**   Yes.

7    **Q.**   And here the CDC was saying ultimately the decision on

8    using opioids for chronic pain treatment should be entrusted

9    to the decision of a doctor acting in concert with the

10   patient; correct?

11   **A.**   That's broadly correct.

12   **Q.**   And they go on at the end of that paragraph to say,

13   "Clinicians should consider the circumstances and unique

14   needs of each patient when providing care."

15        Do you see that?

16   **A.**   I do see that.

17   **Q.**   So the point the CDC was making there is that judgments

18   about whether or not to prescribe opioids for individual

19   patients should be made by the individual doctor taking

20   account of all of the patient circumstances; correct?

21   **A.**   What they were trying to say was these guidelines are

22   voluntary to help physicians make better, more informed

23   decisions while they're managing their individual patients

24   in a doctor/patient, physician/patient relationship.

25   **Q.**   And another way to put that might be the decision

```
 1    ultimately had to be the doctor in consultation with the

 2    patient on whether or not to use opioids for chronic --

 3    A.   That's --

 4    Q.   -- pain?

 5    A.   That's true.  The decision -- it has to be informed by

 6    the best available science and, and it cannot be exclusively

 7    by the doctor and the patient without any knowledge of the

 8    current science and recommendation that exists nationally.

 9    Q.   And that was the purpose for which they issued these

10    guidelines; correct?

11    A.   Yes, sir.

12    Q.   And then if, if we go to Page 17 of the document --

13    A.   Yes, sir.

14    Q.   -- and I think we're on the same page here, Dr. Gupta,

15    but I just wanted to make sure.  There's a heading at the

16    right -- at the left-hand side that says "Determining When

17    to Initiate or Continue Opioids for Chronic Pain."

18         Do you see that heading?

19    A.   I do.

20    Q.   And, so, here the CDC in these guidelines was not

21    apprising clinicians that they should not use opioids for

22    chronic pain; correct?

23    A.   That would be a reasonable conclusion.

24    Q.   The CDC, in fact, was contemplating that clinicians

25    armed with this evidence could decide properly to initiate
```

1    opioid treatment for chronic long-term non-cancer pain;

2    correct?

3    **A.**   The CDC was saying that there are several

4    non-pharmacological options as well as non-opioid

5    pharmacological options available at the behest of the

6    doctor prior to jumping to opioids for the use of chronic

7    pain.  And that's kind of what the message here is.  But not

8    to say that they should not use it.

9    **Q.**   Shouldn't -- yeah, that's -- I understand that the CDC

10   was giving guidance to clinicians that they should think

11   about other options too for the treatment of chronic

12   non-cancer pain; correct?

13   **A.**   Correct.

14   **Q.**   But the CDC was contemplating that it was appropriate

15   for clinicians armed with sufficient knowledge and

16   information to prescribe prescription opioids for chronic

17   non-cancer pain; correct?

18   **A.**   The CDC was saying that in certain positions, it is

19   appropriate with certain factors to -- for utilizing opioid

20   therapy for chronic pain.

21   **Q.**   And that judgment would be left to the doctors armed

22   with knowledge the CDC was providing and in consultation

23   with their patients; correct?

24   **A.**   That judgment would -- physicians with these specific

25   tools and information and science that the CDC was providing

1   to, to be able to provide the best, most current care to

2   their patient.

3   **Q.**   And the CDC guidelines did not suggest any limits on

4   using opioids for the treatment of acute pain; correct?

5   **A.**   These guidelines were not intended to focus on acute

6   pain.

7   **Q.**   And the CDC has never issued guidelines trying to limit

8   or add to the base of knowledge around the treatment of

9   acute pain with prescription opioids; correct?

10   **A.**   There's been a lot of discussions.  To my knowledge, no

11   such guidelines have been forthcoming.

12   **Q.**   And, so, to date, the CDC has not issued any guidance

13   to clinicians to suggest restricting the use of prescription

14   opioids for treating acute pain; correct?

15   **A.**   I'm not aware of any.

16   **Q.**   And when we speak about acute pain, we're speaking

17   generally of pain that lasts three months or less; correct?

18   **A.**   When we're speaking of acute pain in the duration

19   aspect, you might -- you're correct.  But also in an

20   individual specific person aspect, we're talking about when

21   you have broken bones, when you have operations and surgery.

22       So there are circumstances which you need it for --

23   certainly you need it, but definitely you need it for much,

24   much, much less than three months.

25   **Q.**   And -- but just to make sure we're communicating with

1    each other, Dr. Gupta, the CDC has never issued a statement

2    saying you should not use prescription opioids as a first

3    line of treatment for acute pain?

4    **A.**   I'm not aware of any such statements.

5    **Q.**   It's also correct, Dr. Gupta, that the CDC did not say

6    in these guidelines that prescription opioids should never

7    be used during pregnancy; correct?  I can point you to a

8    page so you don't have to guess.

9    **A.**   Please point me to the page.

10   **Q.**   Let's go to Page 26.  This, this stood out at me, Dr.

11   Gupta, because of the discussion yesterday around NAS

12   babies.  And I wanted to ask you about the discussion.  It's

13   at the bottom of the right-hand column on pregnant women.

14   Do you see that?

15   **A.**   I see that.

16   **Q.**   And there's a sentence -- it's the third sentence down

17   under that heading where the CDC says, "Importantly, in some

18   cases, opioid use during pregnancy leads to neonatal opioid

19   withdrawal syndrome."

20        Do you see that?

21   **A.**   I see that.

22   **Q.**   And that's what you were discussing yesterday, this

23   problem of withdrawal symptoms for a child or a baby that's

24   exposed in utero to opioids; correct?

25   **A.**   Yes.  We were discussing the, the additional risks to a

```
 1    pregnant mother in addition to an average non-pregnant

 2    individual of which -- one of which was NAS.

 3    Q.   But here in the next sentence the CDC recognizes that

 4    clinicians and patients together could decide to initiate

 5    opioid therapy for chronic pain during pregnancy; correct?

 6    A.   That's correct.

 7    Q.   So the CDC here was saying you need to weigh risks and

 8    benefits in initiating opioid therapy for chronic pain even

 9    during the time a woman is pregnant; correct?

10    A.   The CDC is saying that there may be extraordinary

11    circumstances in which chronic opioid therapy might be

12    needed in pregnancy.  However, it is even a higher risk than

13    an average person.  You should really have a discussion and

14    understand the science behind it before you do that.

15    Q.   And the point I wanted to make is, and it's notable,

16    the CDC did not issue a recommendation saying you should

17    never use opioids while a woman is pregnant?

18    A.   That's correct.

19    Q.   And, again, the CDC was leaving the judgment of whether

20    to use opioids to the decision made jointly by a doctor in

21    consultation with the patient; correct?

22    A.   Correct, in the context of providing all the cautions

23    and evidence and knowledge that they could to the

24    clinicians.

25    Q.   And that was what the CDC was trying to do here was to
```

```
 1   flag this issue around the risks of NAS that could be
 2   associated with using opioids during pregnancy?
 3   A.   Yes, amongst other poor outcomes of pregnancy as well.
 4   Q.   Dr. Gupta, let me ask you to look at a document that I
 5   think you'll recognize.
 6        Dr. Gupta, I've handed you Defendant's Exhibit 2556.
 7   It's headed "State of West Virginia Board of Medicine Policy
 8   on Chronic Use of Opioid Analgesics."
 9        I take it you've seen this document before?
10   A.   Yes.
11   Q.   And it bears your signature; correct?
12   A.   It does.
13   Q.   And you were involved in developing this policy on the
14   chronic use of opioid analgesics?
15   A.   I was the Secretary of the Board of Medicine as part of
16   my role as the Commissioner of the Bureau of Public Health.
17   Q.   And, so, as part of that function, you were involved in
18   evaluating whether this made sense as a policy statement for
19   the State of West Virginia?
20   A.   Yes.
21   Q.   And the policy statement was intended to apprise
22   doctors and others involved in prescribing opioids on
23   standards which apply to the use of opioids in the State of
24   West Virginia?
25   A.   It was -- yes, it was Board of Medicine's role that we
```

1    were trying to address this.

2           MR. HESTER:  Your Honor, I would move Defendant's

3    Exhibit 2556 into evidence.

4           THE COURT:  Is there any objection?

5           MS. KEARSE:  No objection, Your Honor.

6           THE COURT:  It's admitted.

7    BY MR. HESTER:

8    Q.   And just to make it totally clear, this was adopted

9    on September 11, 2017; correct, Dr. Gupta?

10   A.   Yes.

11   Q.   And is this the most recent statement that's been

12   issued by the Board of Medicine concerning opioid

13   prescribing for chronic pain?

14   A.   I would not be able to attest to this.  I've been out

15   of the system since November of 2018.

16   Q.   You're not aware of any other guidelines that have been

17   issued?

18   A.   There may be some during the COVID period as part of

19   that, but I'm generally not aware of any other guidelines.

20   Q.   And these guidelines apply only to the use of opioids

21   for treating chronic non-cancer pain; is that correct?

22   A.   Let me remind myself.

23        (Pause)

24        Yes.

25   Q.   And the guidelines were intended to provide guidance to

1    the doctors of West Virginia and others who prescribe

2    opioids on the standards they should follow when using

3    prescription opioids to treat chronic non-cancer pain; is

4    that correct?

5    **A.**    That would be correct.

6    **Q.**    And the guidelines do not preclude the use of opioids

7    for long-term treatment of chronic non-cancer pain; correct?

8    **A.**    Correct.

9    **Q.**    And the guidelines recognize that doctors can properly

10   make the decision to institute or commence opioid treatment

11   for chronic non-cancer pain if they follow the procedures

12   outlined in the guidelines; correct?

13   **A.**    When it's appropriate, the doctors can do that, yes.

14   **Q.**    And let me point you in particular to Page 8 of the

15   document.  And, again, we can use the numbers on the, on the

16   document itself, not the production numbers.

17        And I wanted to point you, Dr. Gupta, in particular to

18   the first sentence under "Informed Consent and Treatment

19   Agreement."

20        And it reads, "The decision to initiate chronic opioid

21   therapy is a shared decision between the clinician and the

22   patient."

23        Do you see that?

24   **A.**    Yes.

25   **Q.**    And, so, again, here it reflects advice from the Board

1    of Medicine that doctors should make the decision about

2    whether to prescribe opioids for chronic non-cancer pain in

3    consultation with the patient; correct?

4    **A.**    The statement reflects a shared decision between the

5    clinician and the patient.

6    **Q.**    And it reflects that the judgment ultimately about

7    whether to prescribe an opioid for any given patient should

8    be made as a consequence of that shared decision between

9    doctor and patient; correct?

10   **A.**    It's a shared decision, that's correct.

11   **Q.**    Let me point you to Page 2 of the document, Dr. Gupta.

12        There's -- it's in the second paragraph on that page.

13   There's a phrase -- and I'm going to read a phrase, but we

14   can look at the whole sentence if you want to, but I want to

15   focus on a phrase.  It's the last phrase of that middle

16   paragraph.

17        It says, "The guidelines recognize the responsibility

18   of clinicians to view pain management as essential to

19   quality of medical practice and to the quality of life for

20   patients who suffer from pain."

21        Do you see that?

22   **A.**    I see that.

23   **Q.**    So here the Board of Medicine is giving guidance to

24   doctors and other prescribers in the State of West Virginia

25   that they should view pain management as essential to the

1    quality of medical practice; correct?

2    **A.**    The guidelines are saying -- and I'll just repeat the

3    beginning of it because it's very important in the context

4    of the sentence that these guidelines do not encourage the

5    prescribing of opioids over other pharmacological and

6    non-pharmacological means of treatment but, rather, the

7    guidelines recognize the responsibility of clinicians to

8    view pain management as essential to quality of their

9    practice and the quality of life for patients who suffer

10   from pain.

11   **Q.**    So -- right.  Okay.  Thank you.  So, in other words,

12   the point is the guidelines were not espousing that one form

13   of pain treatment should be favored over another, but they

14   were highlighting that pain treatment is essential to the

15   practice of medicine; correct?

16   **A.**    I would alter that a little bit.  What the guidelines

17   are espousing is one form of treatment should be favored

18   over the other which is non-pharmacological and

19   pharmacological non-opioid treatment should be favored over

20   opioid treatment.  Yet, the importance of managing and

21   addressing pain in a patient is also important.

22   **Q.**    The guidelines also recognize that, in fact, doctors

23   armed with the proper knowledge could, in fact, properly

24   decide to initiate opioid treatment for chronic non-cancer

25   pain; correct?

1    **A.**    The guidelines acknowledge that opioids are one of the

2    arrows in the quiver that should be taken out but not the

3    first arrow that should be taken out.

4    **Q.**    And -- let's follow your metaphor.  That's the first

5    time -- when these guidelines were issued in 2017 it's

6    correct that this is the first time there was a statement by

7    the Board of Medicine that prescription opioids should not

8    be the first arrow in the quiver?

9    **A.**    To my knowledge.  My tenure was between 2015 and 2018

10   on the Board.  And I, I -- to my knowledge and recollection,

11   that was the first time following CDC guidelines that these

12   guidelines were issued.

13   **Q.**    So these guidelines were really a follow-on or were

14   inspired by the CDC guidelines that we've already looked at;

15   correct?

16   **A.**    Yes.

17   **Q.**    The guidelines also make it clear that they're not

18   intended for the treatment of acute pain, management of pain

19   in the perioperative setting, emergency care, cancer related

20   pain or palliative care, end of life care; correct?

21   **A.**    If you could point me to the page.

22   **Q.**    Sorry, my apologies.  It was the next paragraph down.

23   I had meant to point you there, Dr. Gupta.  I forgot.

24   **A.**    That's what it says, yes.

25   **Q.**    So, in other words, the guidelines that were issued by

```
 1    the Board of Medicine in 2017 only focused on using

 2    prescription opioids for chronic non-cancer pain treatment;

 3    correct?

 4    A.    Correct, because that's where the most volume of the

 5    prescriptions were coming from.

 6    Q.    The, the guidelines were not intended to affect the

 7    decisions that doctors were making in other settings in

 8    using prescription opioids; correct?

 9    A.    The guidelines were intended generally to inform the

10    decisions the doctors were making over all the context of

11    opioids, but they were not specific to acute pain and other

12    settings as you've highlighted.

13    Q.    And, and, so, the Board of Medicine has never issued

14    guidelines to doctors in West Virginia suggesting any limits

15    on the use of prescription opioids for the treatment of pain

16    in settings outside chronic non-cancer pain; correct?

17    A.    The Senate Bill 273 which the Board of Medicine of West

18    Virginia and all the prescribing, boards of prescribers are

19    required to follow the state law.  So that term -- I would

20    say that to the extent that the Senate Bill 273 requires

21    that certain prescription narrowing of that, that, that has

22    happened.  But beyond that, the Board of Medicine has not,

23    in my knowledge and memory, has issued any such other

24    guidelines.

25    Q.    So there was not an intention through these guidelines
```

```
 1    to alter doctors' practices in relation to the use of pain

 2    outside chronic non-cancer pain; correct?

 3    A.   That would be accurate.

 4    Q.   Let me ask you to look at -- do you have the exhibit

 5    from your direct examination up there, Dr. Gupta?

 6    A.   Yes.

 7    Q.   So I wanted to have you look back at Plaintiffs'

 8    Exhibit 44223.

 9    A.   I have it.

10    Q.   And this is the January, 2018, Opioid Response Plan

11    that you commissioned; correct?

12    A.   Correct.

13    Q.   And I'd like to review some passages from this document

14    which you didn't have a chance to discuss yesterday with

15    Ms. Kearse.

16         Let me ask you to look at Page 4, Dr. Gupta.

17    A.   I'm here.

18    Q.   And it states -- and I wanted to point you to the

19    middle of the, middle of the paragraph under "Background."

20    I'm trying to find it.  Okay.

21         The second sentence begins, "Initially, the overdose

22    death increases were driven by pharmaceuticals, first

23    methadone, which was prescribed for pain, and then

24    oxycodone, hydrocodone, and oxymorphone."

25         Do you see that?
```

1    **A.**    Yes, I do.

2    **Q.**    And then if you go two sentences down, it says, "In

3    2012 just as prescriptions for opioids were beginning to

4    decline, a major shift from pharmaceuticals to illicit drugs

5    began."

6          Do you see that?

7    **A.**    I see that.

8    **Q.**    That's a true statement; correct?

9    **A.**    That's a true statement in the context of the other

10   statements that are also listed there.

11   **Q.**    And then the, the next sentence reads, "The shift began

12   with heroin in 2012 and then shifted to fentanyl and

13   fentanyl analogues alone or in combination starting in

14   2014."

15         Do you see that?

16   **A.**    I see that.

17   **Q.**    And that's a true statement; correct?

18   **A.**    That would be accurate.

19   **Q.**    And the reference there to fentanyl and fentanyl

20   analogues are two illicit analogues that were being used by

21   drug dealers; correct?

22   **A.**    The reference for both heroin, fentanyl, and fentanyl

23   analogues alone or in combination is for non-prescriber

24   drugs.

25   **Q.**    Or what we might call illicit drugs or illegal drugs?

1    **A.**    Drugs that were not prescribed.

2    **Q.**    I was just trying to make sure we were on the right

3    phraseology.  These are illicit fentanyl or fentanyl

4    analogues; correct?

5    **A.**    Yes.

6    **Q.**    And I guess we can see that -- I could have answered

7    may own question with the next sentence.  "The fentanyl

8    driving the unprecedented increase in deaths is illicitly

9    sourced and generally not of pharmaceutical origin."

10         Do you see that?

11   **A.**    Yes, I see that.

12   **Q.**    And that's the point you just made; correct?  These

13   were, these were illicitly sourced fentanyl derivations;

14   correct?

15   **A.**    That's exactly why I said non-prescriber drugs there,

16   yeah.  That was my point.

17   **Q.**    And, so, that's a true statement, that the fentanyl

18   driving the unprecedented increases in deaths was illicitly

19   sourced; correct?

20   **A.**    Yes, that's a true statement in the context of most of

21   the time when people die from fentanyl, which is, I'm sure

22   the Court has heard, much more potent, is in combination

23   with heroin.  It's not the heroin but the fentanyl that

24   kills them.  That's my point.

25   **Q.**    And the point you're making there, Dr. Gupta, is that

1    drug dealers often will spike or adulterate heroin with

2    fentanyl; correct?

3    **A.**   Yeah, they call it on the street cut, cut the heroin

4    with fentanyl.  So they could, they could be less -- it

5    could be cheaper to them.  They can make more money off of

6    it.

7    **Q.**   Cheaper because the fentanyl is cheaper than the

8    heroin.  And, so, if they adulterate the heroin with

9    fentanyl, it's cheaper for the drug dealer?

10   **A.**   So the fentanyl is a lot more potent, so you have to

11   use much more smaller amounts and you have to use heroin in

12   it.  So if you cut it with fentanyl, you can save a lot of

13   cost of heroin.  So that's exactly right.

14   **Q.**   And the, and the fentanyl is, is typically -- the

15   illicit fentanyl in the country now is typically sourced out

16   of China and illegally smuggled to the U.S.  Is that your

17   understanding?

18   **A.**   My understanding is there are foreign nations that are

19   responsible for, for fentanyl in this country.

20   **Q.**   And then, and then often times users may not even be

21   aware that a drug dealer has cut or adulterated the heroin

22   with fentanyl.  The drug dealer might be doing that to save

23   cost without even telling the user.  Correct?

24   **A.**   That's the tragedy of all of those deaths as well.

25   **Q.**   Let me ask you to turn to Page 7 of the document.  I

1    wanted to point you toward the bottom of that page under

2    "Data and Evidence."

3    **A.**   Okay.

4    **Q.**   There's a first sentence that reads, "A critical factor

5    fueling the national opioid epidemic is the rapid rise in

6    opioid prescriptions for pain."

7         Do you see that?

8    **A.**   Yes.

9    **Q.**   And that's a true statement; correct?

10   **A.**   Correct.

11   **Q.**   And those are the decisions on opioid prescriptions

12   that we've discussed before that were being made by doctors;

13   correct?

14   **A.**   The meaning of the statement is the total volume in

15   communities resulting from these prescriptions is resulting

16   in a lot of spreading or diversion of that, those

17   prescriptions and pills across populations that did not

18   intend to take those medications or they were not prescribed

19   for.  So that's the meaning of that.

20   **Q.**   But the, but the first point is when it refers here to

21   prescriptions, these are prescriptions being written by

22   doctors; correct?

23   **A.**   That, that would be the -- these, these pills that are

24   out there legitimately or illegitimately are coming out of

25   pharmacies from prescriptions that are coming out of offices

```
 1    of prescribers.

 2    Q.   And then I think this is the point you were just

 3    making, Dr. Gupta.  Let's look at the top of Page 8.  It

 4    says, "Excessive prescribing can lead to substance use

 5    disorders directly, as the risk of developing such a

 6    disorder increases with higher doses for longer durations,

 7    or indirectly, as extra pills are provided to or stolen by

 8    others."

 9         I think that's the point you were just making; correct?

10    A.   Yes, that's exactly the point I was making.

11    Q.   And, so, let's, let's break that down into two halves.

12         First, it refers to excessive prescribing that leads to

13    substance use disorders directly.  That's somebody taking

14    pills under a doctor's instruction who over time develop a

15    substance use disorder because they've taken it for too long

16    or in too high a dose; correct?

17    A.   So the prescribing of this could happen because of good

18    doctors and bad doctors.  And when bad doctors keep

19    prescribing high doses for a long time to people

20    unnecessarily, for that first part of the discussion,

21    substance use disorder can develop in those people as well.

22    Q.   And there can also be circumstances where a good doctor

23    is trying to make good decisions but mistakenly leads

24    somebody into a substance use disorder because they've given

25    them too high a dose for too long; correct?
```

**A.**   That would be much rarer as opposed to a pill mill
situation where a lot of bad doctors can produce a lot of
prescriptions in a short amount of time.  And that could
overflow in volume to a lot of people, including their
patients.  And they could -- all of them could end up
becoming -- suffering from substance use disorder.

**Q.**   When, when you use this phrase "directly" here, you
mean people who are getting prescription opioids via a
prescription and using them, they're prescribed pills,
correct, whether by a legitimate doctor or a bad doctor?

**A.**   Correct.

**Q.**   Then "indirectly." I want to take the second half of
the reference here.  You refer to "indirectly."  And it --
again, to put it in context, excessive prescribing leads
indirectly to problems as extra pills are provided to or
stolen by others.

       And the point you're making there is the doctor might
have a legitimate reason to prescribe a certain number of
pills, but prescribes many more, gives too many pills and
they end up in the medicine cabinet and get stolen or sold
or borrowed by somebody else.  Correct?

**A.**   Yeah.  I can explain this really because I've lived
this.

       So you could have good doctors.  You could have bad
doctors.  The good doctors could prescribe adequate

1    prescriptions or more than adequate prescriptions.

2        And in a good doctor case, which is less common, but if

3    you prescribe for a tooth pull 30 days worth of opioids at a

4    dentist, then those -- 29 days of that opioid is going to

5    sit in your closet.  And your kids are going to get their

6    hands on it or somebody else is going to get their hands on

7    it.

8        The bad doctors are writing regularly and habitually a

9    large amount of prescriptions regardless of condition.  And

10   those are primarily going to -- for people who don't need

11   them and were not prescribed.

12   **Q.**   But either way, they're coming from a doctor, either a

13   good doctor who's writing a prescription and including too

14   many pills in that prescription or a bad doctor who's

15   willy-nilly sending out pills by prescription; right?

16   **A.**   That's correct.

17   **Q.**   And, so, let's focus on the good doctor.  So the good

18   doctor who extracts -- well, I guess it's not going to be a

19   doctor.  A dentist who extracts a tooth or a good doctor who

20   treats somebody who's got an ankle sprain and they give 30

21   days of pills when two days were necessary, those were

22   judgments being made by the doctors, correct, about how many

23   pills were warranted?

24   **A.**   So the good doctor who writes a thirty-day prescription

25   to a high school football injury, a kid for 30 days who

1    didn't need it is someone who's writing that, that decision

2    is being made in context with the doctor and the patient

3    together.

4         However, it's influenced by a lot of other factors like

5    ultimately the judgment and decision is made by the doctor,

6    but the influence of that goes beyond just the physician,

7    just -- or just the prescriber.

8    **Q.**   But the point I wanted to make is there, there was a

9    standard clinical practice for a number of years in West

10   Virginia and elsewhere to write prescriptions with too many

11   days of pills; correct?

12   **A.**   I don't know if it was standard practice but, yes, the

13   culture was of -- typically would be that if you got a, you

14   know, a kid got a football injury or a tooth pulled, you

15   would easily write several more days of prescriptions than

16   you would require or evidence would suggest that you would

17   need.

18   **Q.**   And, so, -- and, and that's the point made here in this

19   document, extra pills.  When you refer there to "extra,"

20   you're talking about pills that weren't needed to treat the

21   pain for which they were prescribed; right?

22   **A.**   So, so any pills that are used for any purpose other

23   than specifically for reasons are all illegitimate pills.

24   And that's part of the diversion.

25   **Q.**   But you could have a good doctor who writes a perfectly

1    legitimate prescription for a knee sprain, but writes for

2    too many days; correct?

3    **A.**   Correct.  And all of those extra days are illegitimate

4    prescriptions and illegitimate dose and leads to diversion.

5    **Q.**   Yeah.  Maybe it's just this word "legitimate" or

6    "illegitimate," but it's a, it's a medical judgment that's

7    appropriate.  The doctor might appropriately decide somebody

8    needed some pain pills for a knee sprain, but the doctor

9    gave too many days in that prescription; correct?

10   **A.**   Yeah.  It's, it's, it is possible.  It's probable for a

11   good doctor to make a good sound judgment for the need of

12   opioids, but make a mistake on the duration of the need of

13   opioids.

14        So instead of three days, you write for 30 days, that's

15   a problem.  And not everybody who does that is necessarily a

16   bad doctor or bad prescriber.  That's what was happening.

17   **Q.**   That was a common mistake in the medical profession;

18   correct?

19   **A.**   It was.  It was a behavior.  It was a culture.

20   **Q.**   It was a culture of writing too many days of pills for

21   a given need; correct?

22   **A.**   A culture of attempting to reduce pain from a scale of

23   whatever to zero for every American, every West Virginian

24   that they could possibly do.

25   **Q.**   But I'm focusing particularly on this point about the

1    culture of writing more days than was needed.  If the kid

2    has a high school knee sprain, the kid's not going to need

3    30 days of pills, but the doctors were often writing 30 days

4    of pills; correct?

5    **A.**   So, Mr. Hester, you have to look for the intent behind

6    that.  What's the intent of a good physician?  Physicians

7    don't go through medical school, residency, Board of

8    Medicine, license to hurt their patients.

9         So the intent here was because the belief was you have

10   to bring the patient down from whatever level to zero.  So

11   intent was good for good doctors.  Yet, because of that

12   intent, they perhaps wrote for longer than they should have

13   written for.

14   **Q.**   And now what we ended up with is a whole series of

15   these.  We take all those prescriptions that were written by

16   all these doctors that were for too many days, and what we

17   end up with in the aggregate is a lot of pills that are in

18   medicine cabinets or drawers of people's homes and they end

19   up then out in the community; correct?

20   **A.**   So all of these prescriptions -- and, and I go back to

21   the pill mills and bad doctors because that's where the

22   volume is.  It's going on and they were all going to the

23   pharmacy and they were all being brought in and they were

24   dispensed and that's exactly where they end up as you

25   stated.

1    **Q.**   Let me ask you to look just a little further down on

2    this same page.  It's in "Discussion and Recommendations."

3        And there you say in the first sentence, "The most

4    promising approaches to opioid prescribing combine education

5    and tools for all prescribers with an enhanced enforcement

6    for the relatively few prescribers who are violating

7    standards of care."

8        Do you see that?

9    **A.**   I do.

10   **Q.**   And I think this is exactly what we were talking about,

11   Dr. Gupta, but let me just confirm it.

12       When you talk about a promising approach to address

13   opioid prescribing is education and tools for all

14   prescribers, that was to address the problem of the good

15   doctor who was writing for too many days; correct?

16   **A.**   Correct, and, and also make sure that the bad doctors

17   were understanding that these tools and other things were

18   available as well.

19   **Q.**   Exactly.  So for all doctors, the point was educate

20   them more that if you've got a kid with a high school knee

21   injury, don't send him home with 30 days of pills.  Send him

22   home with a fewer number of days of pills.  Correct?

23   **A.**   We believe if we can help educate doctors and other

24   prescribers and provide those tools, especially in terms of

25   the best knowledge in opioid prescribing, it would help make

1    a dent in the entire volume problem.

2         And then we'd be left with the bad doctors and we would

3    have to obviously -- the second statement, part of the

4    statement says "enhance enforcement."  It would help us get

5    better control over the bad doctors.

6    **Q.**   But let's keep focusing on the good doctors.  I haven't

7    asked you about the bad doctors.  But on the good doctors,

8    you've actually seen this play out, haven't you, that this

9    thinking that you have has led to a significant reduction in

10   opioid prescribing levels in West Virginia because doctors

11   become better educated.  Correct?

12   **A.**   I would say amongst a number of other factors.

13   Clearly, the education, the tools have been helpful in

14   reducing and changing the culture of, of writing large

15   prescriptions, high dose for long periods.

16   **Q.**   Let's talk about the second half.  There's a reference

17   to enhanced enforcement for the relatively few prescribers

18   who are violating standards of care.  Do you see that?

19   **A.**   Yes.

20   **Q.**   So when you say there are relatively few prescribers

21   who are violating the standards of care, your point is most

22   prescribers thought they were doing the right thing with the

23   standard of care at the time and there were relatively few

24   who weren't?

25   **A.**   Yeah.  There were more prescribers trying to do the

1    right thing than those who weren't, meaning in West Virginia

2    there were more good doctors than bad doctors at any one

3    point in time.

4    **Q.**   Most of the doctors thought they were doing the right

5    thing.  As you said, they were sending somebody home trying

6    to treat their pain.  They thought they were doing the right

7    thing, but they were giving too many pills.

8    **A.**   Their intent was to help their patient because that was

9    the culture.  That was the education.  That was the

10   influence.  That was their understanding.

11   **Q.**   And, and you and others in the State of West Virginia

12   have worked on changing that culture of prescribing behavior

13   to tighten it up; correct?

14   **A.**   We have tried to do our best.

15   **Q.**   But -- again, at the end of the day, you ultimately

16   have to rely on the good judgment and thoughtful approach of

17   individual doctors to get prescribing under control;

18   correct?

19   **A.**   Yes, but there's a number of factors that influences

20   that judgment.

21        One of those things we did in Bureau of Public Health

22   was we began something called counter-detailing.  This is,

23   this is our folks going to doctors' officers and providing

24   them this education and tools, knowing there was already

25   detailing happening that was telling them the other way

1    around for years.

2         So one of the things we would do is academic detailing.

3    So instead of pharmaceutical detailing, we were doing

4    academic detailing.  That's actually a term.  And we were

5    doing that because this was part of the education, as we

6    discussed, to get those doctors to understand the science,

7    the evidence.  It was a tool they need to be able to more

8    judiciously prescribe opioids.

9    **Q.**   That was a statewide program you ran?

10   **A.**   Yes.

11   **Q.**   And did it help?

12   **A.**   We believed so.

13   **Q.**   And the way it helped was doctors then had more

14   knowledge about imposing reasonable limits on how many days

15   of prescriptions they would write?

16   **A.**   We were sharing the best practices, science that was

17   available with doctors attempting to get them to take the

18   best possible care of their patients with, within safety and

19   efficacy, safety from opioids and understanding addiction

20   but, at the same time, understanding that here are all these

21   non-pharmaceutical options.  Here are all the pharmaceutical

22   non-opioid options.  And then you think about opioids.

23   **Q.**   And then going back to the relatively few, the other

24   side of the coin, the relatively few prescribers who were

25   violating the standards of care, it's only been a handful of

1    really bad doctors in this state who drove a lot of volume;

2    correct?

3    **A.**    There have been shut-downs of these pain pills, but

4    they had a tremendous lot of volume that was going through.

5    And those shut-downs, as I've stated before, has led to a

6    lot of that transition of people from pills to heroin.

7    **Q.**    I wanted to ask you just about the shut-downs, though.

8    How many were shut down?

9    **A.**    I don't have an exact number.  I do know that there

10   have been several.

11        But one other important thing also I want to mention is

12   because we're a border state, we're not a state by itself,

13   we have other states.  And when those shut-downs happened,

14   the people that live in West Virginia, it affects people

15   because some of our people have been not only within state

16   but they were going out-of-state to get these.  So the

17   shut-down affects not just the ones in West Virginia but

18   also in contiguous states.

19   **Q.**    So it needs to be a multi-state process to deal with

20   issues of the opioid crisis?

21   **A.**    It is certainly a national crisis, as we discussed.

22   West Virginia is at ground zero.

23   **Q.**    The -- you said it's -- you're only aware of a handful

24   of doctors who are violating the standards of care?

25   **A.**    I don't have exact numbers, but what I would say to you

1     is, is there's a faction of doctors who we disciplined at

2     the Board of Medicine.  There's another set of doctors

3     who -- and businesses with pill mills were shut down

4     legally.

5          And when that information comes to our knowledge, both

6     at the Board of Pharmacy as well as the Board of Medicine,

7     we do take action.

8     Q.   And, and can you think of any in recent years or is

9     this back more in time?

10    A.   I don't have any in recent years to speak of.

11    Q.   Most of what you're talking about with shutting down

12    doctors was back a number of years; correct?

13    A.   During my tenure is when I'm talking about.

14    Q.   All right.  Let me ask you, Dr. Gupta, to look at

15    Plaintiffs' Exhibit 41913.  This was the White Paper, the

16    Need for Harm Reduction Programs in West Virginia.  Do you

17    have that one?

18    A.   Yes, sir.

19    Q.   I, I have just a few simple questions on this.  You'll

20    recall discussing this document yesterday with Ms. Kearse?

21    A.   Yes.

22    Q.   And this Harm Reduction Program is one that's focused

23    on persons who inject drugs; right?

24    A.   Yes.

25    Q.   And, so, I wanted to make sure we knew where, where the

1    focus is for a program like this on harm reduction.

2         So it's -- this is exclusively dealing with people who

3    inject drugs?

4    **A.**   Yes.

5    **Q.**   And, so, that would include heroin users or people who

6    are abusing prescription opioids by crushing them and

7    injecting them?

8    **A.**   Yes, or, or meth or other substances.  The idea here of

9    a Harm Reduction Program is to, you know, set up several

10   strategies that I mentioned yesterday.

11        One of those were to provide people clean, free

12   syringes so they are not at risk of spreading infectious

13   diseases.

14        Another one is to make sure they screen for hepatitis

15   and HIV.  Another one is to give them immunizations, the

16   shots, so they don't develop disease.  Another one is family

17   planning.  And another important one is make sure that

18   people are connected to help to get treatment.

19   **Q.**   But, but in particular, I wanted to say that in

20   relation to anybody who's using prescription opioids, these

21   would be people misusing prescription opioids who would be

22   covered by this program; correct?

23   **A.**   In the context of what we discussed, these are the

24   people who were illegitimately using prescriptions or using

25   non-prescribed medications.

1    **Q.**   Because they would be -- for instance, with a

2    prescription opioid, they would be crushing or otherwise

3    turning it into a powder that they could then inject;

4    correct?

5    **A.**   Yes, sir.  And that would be illegitimate use of

6    prescription pills.

7    **Q.**   Let me ask you to look at your 2016 Overdose Fatality

8    Analysis.  It's Plaintiffs' Exhibit 44211.  Do you have that

9    one in your stack?

10   **A.**   Yes, I do.

11   **Q.**   Let me ask you to look at Page 8, please.

12   **A.**   I'm here.

13   **Q.**   And there's a sentence -- you may have talked about

14   this yesterday.  I'm not sure.  But there's a sentence that

15   says -- under "Overdose Trends in West Virginia" about four

16   sentences down, it says, "Approximately 705 (85 percent) of

17   the overdose deaths that occurred in West Virginia were

18   opioid related."

19        Do you see that?

20   **A.**   I see that.

21   **Q.**   And I just wanted to clarify as a matter of

22   phraseology, when you refer in this paper to opioids, you're

23   talking about heroin, illicit fentanyl, prescription opioids

24   that are being misused.  That's all within this opioid

25   phraseology.  Correct?

**A.**   Correct.

**Q.**   If you could look at the next page, Page 9.  And, again, I think this is, this is easy given what we've discussed, but I just wanted to make it clear.

There's a paragraph that begins, "Since 2014 the percent of overdose deaths in West Virginia involving fentanyl or fentanyl analogues has increased tremendously from nine percent of overdose deaths involving fentanyl or fentanyl analogues to 41 percent of overdose deaths in 2016."

Do you see that?

**A.**   I see that.

**Q.**   And that's a correct statement?

**A.**   That's a statement -- correct statement, and it's in the context of we're finding most that fentanyl or fentanyl analogues as part of heroin, which that trend, as we discussed, went from 2012 to 2013.  So just to add, the 2012 to 2013 trend, heroin, and then from 2014 we started to see fentanyl come into it.

**Q.**   And this is the illicit fentanyl we've been discussing that's used to cut or adulterate heroin?

**A.**   Yes.

**Q.**   And then further down in that same paragraph there's a reference to a cluster of non-fatal overdoses that occurred in August, 2016, in Cabell County.  Do you see that?

1    **A.**   I see that, yes.

2    **Q.**   And that's the, that's the cluster investigation that

3    you discussed yesterday with Ms. Kearse; right?

4    **A.**   Yes.

5    **Q.**   And here it indicates that there was evidence that a

6    high-potency synthetic opioid had entered the local illicit

7    drug supply and contributed to these overdoses; correct?

8    **A.**   Yes, carfentanil, which we also know as elephant

9    tranquilizer.  That was one.

10   **Q.**   So that's the, that's the -- fentanyl or carfentanil,

11   that was the drug that led to that cluster of overdoses in

12   August, 2016?

13   **A.**   That three cases out of the total of 20 cases in that

14   one particular overdose.

15   **Q.**   Well, in the prior sentence it says a high-potency

16   synthetic opioid had entered the drug supply contributing to

17   20 persons overdosing within a 53-hour period.  Do you see

18   that?

19   **A.**   I do see that.  And following that it says three cases

20   were positive for carfentanil.  So what we could find was

21   three cases out of 20.

22   **Q.**   But then the rest, the rest of that cluster was

23   attributed to some other high-potency synthetic opioid;

24   correct?

25   **A.**   Yes, and that fentanyl is included in that.

**Q.**   So the carfentanil is even more potent.  It's used to tranquilize elephants?

**A.**   Yes.  And we put that three people there because pleasantly we were kind of surprised that they didn't die because carfentanil, you don't live to tell about it generally.

**Q.**   It says here in the paper it's estimated to be 10,000 times more potent than morphine; is that correct?

**A.**   That's correct.

**Q.**   And, so, carfentanil is being used by drug dealers to adulterate heroin?

**A.**   We have seen evidence in spotty places.  It's rare, but we are seeing elephant tranquilizers at occasional places show up.

**Q.**   Let me ask you to look at Page 10 of the document, please.  This is discussing maternal drug use and Neonatal Abstinence Syndrome.  Do you see that, that section?

**A.**   Yes.

**Q.**   And we, we've talked about this a little bit already in relation to the CDC guidelines.  But I wanted to make clear how NAS occurs.  And, again, as we were discussing, NAS is something that afflicts a baby who's exposed to opioids in utero; correct?

**A.**   Yes.

**Q.**   And am I right, Dr. Gupta, that there's two ways that

1  that could happen?  One way is a doctor prescribes opioids

2  for a medical purpose during a woman's pregnancy; correct?

3  **A.**   Yes.

4  **Q.**   The other way is a woman is misusing prescription

5  opioids for a non-medical purpose not under doctor's

6  instructions during pregnancy; correct?

7  **A.**   That's one of the, one of the second ways and -- yes.

8  **Q.**   Those are the only two ways that NAS would occur;

9  correct?  Either the doctor has instructed that opioids be

10  used, even though the woman is pregnant, or the woman is

11  misusing opioids during pregnancy?

12  **A.**   With relation to prescription drugs, yes.

13  **Q.**   So that -- there's no other way that NAS occurs.  The

14  baby has to be in utero during the time the woman is using

15  the prescription opioids; correct?

16  **A.**   In relation to prescription opioids, that's correct.

17  **Q.**   And in relation to illegal drugs, it sounds like you're

18  drawing a distinction.  You're suggesting that NAS could

19  occur for a baby through an illegal drug even if the woman

20  isn't using the illegal drug during pregnancy?

21  **A.**   Certainly, NAS is basically a withdrawal.  What the

22  baby -- so when the cord is cut, you separate the baby from

23  the mom.  And just like an adult, if you were to stop

24  somebody who was using substances every day, they would

25  undergo withdrawal because of the dependency.  So does the

1    poor baby.

2        And, so, that withdrawal can happen if the mother was

3    using prescription opioids, if the mother was using

4    illegitimately prescription opioids, or the mother was using

5    illicit opioids, knowing that heroin is also an opioid.

6    **Q.**   Right.  So, so the point is when we see a baby with

7    NAS, that NAS could have resulted from the mother using

8    heroin during pregnancy; correct?

9    **A.**   Technically you're correct.  But what we saw in West

10   Virginia was that the increased use of prescription opioids

11   were not exclusively to non-pregnant people.

12       So with increased use of West Virginians for opioids,

13   we also saw a parallel increase in pregnant people with

14   opioids as well.  So we saw that trend happen.

15   **Q.**   And, again, just to make it clear, the NAS would occur,

16   that increase would occur either because the woman was

17   misusing prescription opioids during pregnancy or a doctor

18   had told the woman to use prescription opioids during

19   pregnancy.  That's the way it happens.

20   **A.**   Or illicitly or a combination of all of those, so two

21   more things on there.

22   **Q.**   And, of course, when a baby has NAS, we don't know

23   where the mom sourced the opioid.  We don't know whether it

24   was an illegal heroin.  We don't know if it was an illicitly

25   trafficked prescription opioid.  We don't know where it came

1    from.  We just know the baby has been exposed to an opioid.

2    **A.**   We know because we are able to then match that mother

3    with the Controlled Substance Monitoring Program and see

4    what she was prescribed.  So we are able to tell that.

5    **Q.**   But there will be -- there's a number of cases, I take

6    it, that you've seen where the baby has NAS but the mother

7    was not prescribed an opioid during pregnancy?

8    **A.**   That would be the part of the diversion of those

9    prescriptions or illicit use, but that does exist.

10   **Q.**   And is the percentage of, of babies with NAS more

11   attributable to women who have been told by a doctor to use

12   a prescription opioid during pregnancy or to women who are

13   misusing prescription opioids that have been diverted?

14   **A.**   So as you mentioned that only a certain percentage of

15   women that are using substances will the kids of theirs

16   develop NAS.

17       What we found is about 14.7 percent of women had a

18   positive uterine test for a controlled substance.  And, of

19   course, only five percent developed NAS.

20       So NAS is one that's not a one-to-one relationship with

21   use.  But -- so it's very hard to say that this percentage

22   is because of that because what we do see is overall, the

23   number of pregnant people using prescriptions, whether

24   legitimately or illegitimately, went up relatively

25   proportionally to the general population.

1    Q.    Your, your expectation is that most of the NAS that

2    you've seen would be the consequence of misuse of

3    prescription opioids by women who are pregnant?

4    A.    Use or misuse.

5    Q.    It would have to be one or the other; correct?

6    A.    In most cases.

7    Q.    Let me ask you to look at Page 33 of this document,

8    please.  And I wanted to point you, Dr. Gupta, to Figure 20

9    at the top of Page 33.  This shows drug category by decedent

10   age group.  Do you see that?

11   A.    I see that.

12   Q.    And, so, where we -- if we look -- let's just focus on

13   a column.  Let's look at the 25-to-34-year-old column.  And

14   it shows that the illicit use is the blue bar, the one at

15   the bottom.  And then there's an Rx only and then there's a

16   multi-category.  Do you see that?

17   A.    Yes.

18   Q.    And, so, when it says "illicit only," that would mean

19   that these were decedents who only had an illicit drug in

20   their system at the time of death?

21   A.    That's correct.

22   Q.    And that would be heroin or fentanyl or some other

23   illicit drug; correct?

24   A.    Correct.

25   Q.    And then the Rx only, that would, that would be

1    referring to somebody who had a prescription opioid in their

2    body at the time of death; correct?

3    **A.**    That would be correct.

4    **Q.**    But we would not know from looking at the decedent, we

5    wouldn't know whether they sourced that from a drug

6    trafficker, whether they had taken that prescription opioid

7    out of somebody else's medicine cabinet, or bought it on the

8    street.  We wouldn't know.  All we can tell is that they

9    have a prescription opioid in their system; correct?

10   **A.**    That's correct except that at the beginning of the

11   report I think somewhere we said in the decedents, I think

12   it was 36 percent, but almost a third of decedents had

13   prescription drugs in their system but didn't have a

14   prescription for it.  So we do have a broad understanding of

15   diversion.

16   **Q.**    But, but somebody could have a prescription for

17   prescription opioids but might have overdosed by buying a

18   whole bunch of additional opioids on the street; correct?

19   **A.**    That's possible.

20   **Q.**    So you can't really tell from whether somebody has a

21   prescription whether they -- if they, if they took 20

22   prescription opioids and died, they might have gotten 19 of

23   those on the street and one from a doctor.  Correct?  You

24   just can't tell.

25   **A.**    Yeah.  And that kind of goes back to the behavior and

1    the pattern.  The pattern is that those individuals would

2    have a likelihood of using, you know, the doctor's

3    prescription, the street prescription, and multiple other

4    things.

5    **Q.**  And, so, the point is we can't tell from looking at

6    when it says Rx only here, this small little orange bar in

7    the middle, we can't tell whether that's, in fact, a

8    legitimate prescribed opioid that led to a death and, in

9    fact, the likelihood would be it's misused opioids.

10   Correct?

11   **A.**  It, it could be, but there's no way to prove one from

12   the other, as you stated.

13   **Q.**  And then the, the gray bar at the top, that's

14   multi-category.  That means it's, it's multiple, different

15   kinds of drugs.  And as you pointed out yesterday, the

16   average is over three different drugs that are found in

17   decedents at the time of death; correct?

18   **A.**  Correct.  And that could include, once again, the Rx.

19   So that could include prescribed drugs as well.

20   **Q.**  So if we add it up, I, I tried to figure this out.  It

21   looks to be 95 percent in that 25 to 34 age group.  95

22   percent either had multiple drugs in their system at the

23   time of death or only illicit.  Correct?

24   **A.**  That's what it about seems like.

25   **Q.**  Let me ask you to go to your Historical Overview, the

1    Plaintiffs' Exhibit 41213, please.  I just have a few

2    questions on this, Dr. Gupta.

3        If you could look at Page 3 of this document.  And this

4    shows the drug overdose maps that you discussed with

5    Ms. Kearse yesterday; right?

6    **A.**   Yes.

7    **Q.**   These maps are not limited to prescription opioids;

8    correct?

9    **A.**   These are not limited to prescription opioids, correct.

10    **Q.**   So these are, these are, in fact, all drug overdoses

11    from any kind of drug; correct?  Cocaine, methamphetamine,

12    prescription opioids, heroin, fentanyl, all of them are

13    included; correct?

14    **A.**   Correct.

15    **Q.**   And they would certainly include people who have

16    overdosed on heroin or carfentanil or anything else;

17    correct?

18    **A.**   Correct.  And that's why it's important to understand

19    the trends over time, not one particular area, but over time

20    what happened because some of these things transition from

21    one to the other.

22    **Q.**   The, the -- let me ask you to look at Page 3 in the

23    first paragraph.

24    **A.**   Page 3?

25    **Q.**   Yes, same page.  We don't have to move.  And there's a

1    sentence that says, "In 2015 there were 5,000 opioid deaths

2    attributed to powerful synthetic opiates (fentanyl) creating

3    an increase of 75 percent from 2014."

4        Do you see that?

5    **A.**   Yes.

6    **Q.**   And that's what we've been discussing.  That's

7    typically going to be an adulterated heroin that's been

8    adulterated with fentanyl; correct?

9    **A.**   Correct.  And, and this is at a national level that

10   we're reading out.  And what we're seeing is the very same

11   thing we've been talking about.  In 2012, 2013, a trigger

12   happened to heroin.  And in 2014 almost we had started to

13   see increases in contamination of that heroin with the

14   synthetic opioid called fentanyl which is much more potent,

15   much more deadly.

16   **Q.**   And is it your understanding that the spike in heroin

17   that you started seeing in 2012, 2013, one factor in that

18   spike was that there was an increased purity and a reduction

19   in price of heroin in West Virginia?

20   **A.**   You said increased purity and reduction in price?

21   **Q.**   Both.

22   **A.**   So in any market in illicit, the price depends on

23   demand.  So, so the point becomes that demand and supply are

24   very important factors.  So the purity is obviously

25   controlled beyond those elements.  But the price is usually

1    dependent on what the demand is.

2    **Q.**   But I wanted to ask you specifically, are you aware

3    that in 2012, 2013 there was a, an increase in the purity of

4    heroin in West Virginia?

5    **A.**   I'm not aware that there was -- specifically in that

6    year it was much more pure than previously, but I'm aware

7    generally around that period that there was purity,

8    increased purities of heroin.

9    **Q.**   And, and were you also aware that the increased purity

10   was accompanied by a reduction in price in heroin in West

11   Virginia?  Were you aware of that?

12   **A.**   By the fact we were seeing people transition to cheaper

13   alternatives readily available, we surmised that it is much

14   cheaper at the time, heroin is, as opposed to --

15   **Q.**   I was asking about the price of heroin.

16   **A.**   Yes, yes.

17   **Q.**   You knew the price of heroin had declined?

18   **A.**   I wasn't aware acutely that the price in 2012, '13 had

19   declined.  I'm not aware of that specifically.  I'm aware

20   generally.

21   **Q.**   Generally that the price of heroin had gone down?

22   **A.**   Generally, price is affordable as opposed to purchasing

23   prescription pills on the market.

24          MR. HESTER:  Move to strike, Your Honor.  I just

25   asked the witness about the price of heroin.

```
 1              THE COURT:  Just try to answer the precise
 2    question, Dr. Gupta.
 3    BY MR. HESTER:
 4    Q.   So you're aware that the price of heroin has been
 5    reduced while the purity of heroin has increased in West
 6    Virginia over the last number of years?
 7    A.   Yes.
 8    Q.   Let me ask you to turn to Page 5 of this document,
 9    please, Dr. Gupta.  And, and this is a chart I believe you
10    discussed yesterday with Ms. Kearse, Figure 3.  Do you see
11    that?
12    A.   Yes.
13    Q.   And I wanted to confirm again, just like the CDC maps
14    we were looking at on Page 3, this is not limited to
15    overdoses of opioids; correct?
16    A.   Correct.
17    Q.   It includes overdoses from all drugs?
18    A.   Correct.
19    Q.   And that would include illegal drugs such as heroin and
20    illicit fentanyl as we've been discussing?
21    A.   Correct.
22    Q.   And then let me ask you to look at Figure 8, Page 7.
23    This is another table you discussed with Ms. Kearse
24    yesterday; right?
25    A.   Yes.
```

1   **Q.**   And this again is, is relating to all drug overdoses in

2   West Virginia.  It's not confined to opioid overdoses.

3   Correct?

4   **A.**   This particular figure is.

5   **Q.**   It's headed "Total Drug Overdose Deaths by Range."

6   This is not -- this is all drug overdoses; correct?

7   **A.**   Yeah, this particular one is, yes.

8   **Q.**   Okay.  Thank you.  That's what I thought.  I just

9   wanted to confirm.  So it includes deaths from cocaine,

10  methamphetamine, other drug overdoses aside from opioids?

11  **A.**   Yes.

12  **Q.**   And it would also include heroin and illicit fentanyl

13  overdoses; correct?

14  **A.**   This would include all overdose deaths, this particular

15  one.

16  **Q.**   Let me ask you to look at Figure 11 which is I think on

17  Page 10.  So this one is headed "Oxycodone Related Overdose

18  Death."  Do you see that?

19  **A.**   Yes.

20  **Q.**   And this would include people who at the time of death

21  had multiple drugs in their system, one of which was

22  oxycodone; correct?

23  **A.**   This particular figure talks about only oxycodone

24  related overdose deaths.

25  **Q.**   Well, is it sourced, is it sourced from the table from

1    the same West Virginia death certificates you've discussed

2    previously in the report?

3    **A.**   Let me look at that.

4       (Pause)

5       So you would have to add up the years for oxycodone,

6    2012, 2013, 2014 and 2015.  So I'm going to do that to make

7    sure those are right.

8    **Q.**   Let me make sure I know what you're doing.  Are you

9    looking at Table 1, the oxycodone line in Table 1?

10   **A.**   Yes.  And we should be able to add the four years from

11   2012 to 2015.  That number should come to 755.  And if

12   that's the case, then that's appropriate.

13   **Q.**   But I'm not saying it's appropriate or inappropriate.

14   I just wanted to make sure we knew what we were looking at.

15      The Table 1 where people who have oxycodone in their

16   system at the time of death, they could also have other

17   drugs in their system at the time of death; correct?

18   **A.**   They potentially could, but these are the opioids

19   recorded on the West Virginia death certificates for those

20   individuals.

21   **Q.**   No, but look at the paragraph above Table 1 explains

22   that --

23   **A.**   Yes.

24   **Q.**   This reflects people who might have multiple drugs in

25   their system at the time of death.  And it lists oxycodone

```
1    if that was one of the drugs in their system.  Correct?
2    A.   Yes, they could.  My response is they could, but it
3    does not mean they did always.
4    Q.   But the point I'm trying to get to is that Figure 11
5    where you're showing these deaths by age range, that's going
6    to include people who had other drugs in their system,
7    heroin, fentanyl, as well as prescription opioids at the
8    time of death.  It includes those numbers.
9    A.   So, so I just, for the Court's understanding, when we
10   state on death certificates this particular oxycodone as
11   opposed to heroin, it is a clinical judgment of the Office
12   of the Chief Medical Examiner that the cause of death was
13   oxycodone.  Now, --
14            MR. HESTER:  Move to strike, Your Honor.  That's
15   not responsive to my question.
16            MR. FARRELL:  Your Honor, if I may.
17            THE COURT:  Mr. Farrell.
18            MR. FARRELL:  I think it was exactly responsive,
19   Your Honor.
20            THE COURT:  Well, I think he was explaining his
21   answer.  I'm going to let him go ahead.
22            THE WITNESS:  So just trying to explain, so the
23   Chief Medical Examiner in the state has to make a decision
24   ultimately what is the responsible cause on the death
25   certificate because it has its own consequences.
```

1        So those are the causes.  These people can have -- they

2    could have other substances found.

3        So when we take that and look at the oxycodone for

4    the -- from 2012 to 2015, that's what you're seeing on

5    Figure 11.

6        So to answer your question, theoretically they could.

7    I'm not opposing that at all.  But the predominant cause of

8    death are these substances, the oxycodone.

9    BY MR. HESTER:

10   **Q.**   Well, let me look -- let me ask you to look at Page

11   8.  At the top of the page above Table 1 there's a

12   sentence that reads, "Due to the fact that most drug

13   overdose deaths involve multiple substances,

14   (polypharmacy) any individual death may involve multiple

15   types of drugs."

16       Do you see that?

17   **A.**   That's accurate.

18   **Q.**   And you agree with that; correct?

19   **A.**   Yes.

20   **Q.**   And then in the table there's a specific point made

21   that the bottom number doesn't add up to the, to the --

22   because you could have multiple drugs in somebody's system

23   at the time of their death; correct?

24   **A.**   Yes, Mr. Hester.  We still have to at the end of the

25   day make a decision:  What killed the person.  You can have

1    three things, four things, but you still have to figure out

2    what caused the ultimate death.  And this is what this is.

3    **Q.**   The -- so you could have an individual who had heroin,

4    oxycodone, and fentanyl in their system at the time of death

5    and there, there's a chemical comparability to those;

6    correct?

7    **A.**   Correct.

8    **Q.**   And you have testified previously, I believe, that it's

9    difficult to, to tell which drug is which because they break

10   down in the same ways in the body; correct?

11   **A.**   What I'm -- so what I'm -- my response is this.  That

12   for the Chief Medical Office to decide -- Chief Medical

13   Examiner's Office to decide it's oxycodone, if someone had

14   in their system codeine, oxycodone, and tramadol, when you

15   use three different drugs, they would be able to tell.

16       The reason that's important is then you can judge the

17   patterns over the years; what drugs are causing death in

18   2011, what drugs are causing death in '12, '13.  So if we --

19   if we attributed every drug in the system to all deaths, we

20   would never be able to examine and understand better what

21   are the trend lines in the state of deaths.  So this is,

22   this is the fundamental principle.

23   **Q.**   My question was a little different.  My question was I

24   believe you've testified previously that when heroin,

25   oxycodone are in somebody's system, they, they decompose or

1    they interact in the body in the same way and it's difficult

2    to separate one from the other; correct?

3    **A.**    Yes.

4    **Q.**    So, so you could have somebody and these numbers could

5    include somebody who's got heroin in their system and

6    oxycodone in their system and fentanyl in their system and

7    they're all opioids, but they're -- and it's very difficult

8    to separate the three because they, they have the same rough

9    chemical composition; correct?

10   **A.**    So, Mr. Hester, for the benefit of the Court, can I

11   just explain in a non-technical way what happens in a death?

12   **Q.**    No, I need you to answer my question.

13              THE COURT:   Just answer his specific question,

14   please.

15              THE WITNESS:   It's possible.

16   BY MR. HESTER:

17   **Q.**    And when we're looking at these, at this bar chart

18   on Figure 11, we, of course, don't know --

19              THE COURT:   It's a little after noon, Mr. Hester,

20   so whenever you, you're ready to get to a point where you

21   want to stop.

22              MR. HESTER:   I had I think two or three more

23   questions, Your Honor, and then I can stop --

24              THE COURT:   Go ahead.

25              MR. HESTER:   -- and have a nice lunch.  I'll just

```
1    take three or so minutes.
2              THE COURT:  Okay.
3    BY MR. HESTER:
4    Q.   When you say that it -- when we look at this bar
5    chart, Figure 11, we don't know whether these deaths
6    were from people who misused oxycodone.  We don't know
7    where they got the oxycodone that's listed here in this
8    bar chart; correct?
9    A.   We would not be able to tell that.
10   Q.   Okay.  One more question, or one more set of questions.
11             On Exhibit P-44227, this is the Viral Hepatitis
12   Epidemiological Profile.
13   A.   I have it.
14   Q.   I want to just point you to Page 6 on this document,
15   please.
16   A.   Yes.
17   Q.   I'm sorry.  It's Page -- yes, on Page 6.
18             MR. HESTER:  Your Honor, I should probably stop
19   because I'm not as well organized on this document as I
20   should be and I can just clean this up.
21             THE COURT:  All right.  We'll be in recess until
22   2:00.
23        And I hate to make you come back, Dr. Gupta.
24             THE WITNESS:  It's okay, Your Honor.  Thank you.
25             MR. HESTER:  Thank you, Your Honor.
```

```
 1              MS. KEARSE:  Your Honor, I think for timing

 2     purposes, we'll have about maybe 30 minutes.  I'm going to

 3     have some questions.  Mr. Farrell may have a couple

 4     questions, but just so the Court's timing.  But what I've

 5     got is 30 minutes of redirect and we should be done this

 6     afternoon, Your Honor.

 7              THE COURT:  Well, you're going to cross-examine,

 8     too, are you not?

 9              MS. CALLAS:  Yes, we are, Your Honor.

10              MS. KEARSE:  I'm sorry.  Nevermind.

11              MS. CALLAS:  That's all right.

12              THE COURT:  All right.  I'll see everybody at

13     2:00.

14         (Recess taken at 12:06 p.m.)

15              THE COURT:  You have some more questions, Mr.

16     Hester?

17              MR. HESTER:  Just a few, Your Honor.  Just a few.

18              THE COURT:  Okay.

19              BY MR. HESTER:

20     Q.  Good afternoon, Dr. Gupta.

21     A.  Good afternoon.

22     Q.  I just have a few questions.  We spoke this morning

23     about NAS.  Do you recall that discussion generally?

24     A.  Yes.

25     Q.  And I just wanted to clarify one thing.  Am I -- it's
```

1  correct that a number of different kinds of drugs can cause

2  NAS; is that right?

3  **A.**   Correct.

4  **Q.**   And that includes heroin and illicit Fentanyl?

5  **A.**   Correct.

6  **Q.**   Cocaine?

7  **A.**   It may be.

8  **Q.**   Barbiturates?

9  **A.**   I do not have a lot of experience with data on that,

10  but potentially.

11  **Q.**   Antidepressants can also cause NAS?

12  **A.**   I do not -- I'm not aware of specific data to that at

13  this point.

14  **Q.**   But definitely heroin and Fentanyl could -- could be

15  sources of NAS?

16  **A.**   Certainly could be.

17  **Q.**   Let me ask you, Dr. Gupta, to turn to Exhibit 44227,

18  the document we were on just before lunch when I was having

19  trouble finding my way.  Let me ask you to look at Page 6,

20  please.  And under the executive summary in the first

21  paragraph, I wanted to point you to the next to the last

22  sentence.  It says, "The most common risk factors reported

23  among cases of hepatitis B and C are drug misuse, both

24  injection use and non-injection use."  Do you see that?

25  **A.**   I see that.

1    **Q.**    Is that a correct statement?

2    **A.**    That's -- evidence points to that, yes, sir.

3    **Q.**    So, that drug misuse is the most common factor or cause

4    of hepatitis B and C?

5    **A.**    For new cases in West Virginia, yes, sir.

6    **Q.**    And let me ask you to look at Page 12 of the document,

7    please, and I wanted to point you to the bottom of the page.

8    Do you have it there?

9    **A.**    Yes, sir.

10   **Q.**    The bottom of the page, there's a chart, and this is a

11   chart headed "Risk Factors Reported in Acute Confirmed

12   Hepatitis B Cases, 2012-16", correct?

13   **A.**    Correct.

14   **Q.**    And the leading risk factor is injection drug use; is

15   that right?

16   **A.**    Yes.

17   **Q.**    And so, injection drug use would include use of heroin

18   and Fentanyl?

19   **A.**    Yes.

20   **Q.**    And it would include misuse of prescription opioids

21   that have been crushed and then injected; is that right?

22   **A.**    It could be.

23   **Q.**    And what other forms of injection drug use are there?

24   **A.**    It could be -- the others probably close to it would be

25   some version of meth.

1    **Q.**   Meth injected by --

2    **A.**   Methamphetamine could also -- could also be injected.

3              MR. HESTER:  Okay, thank you.  Those are all the

4    questions I have, Dr. Gupta.

5         Your Honor, one housekeeping point.  I did want to move

6    into evidence Defendant's Exhibit 3616, the West Virginia

7    Board of Medicine Quarterly Newsletter.

8              THE COURT:  Is there any objection to that?

9              MR. FARRELL:  No objection, Your Honor.

10             THE COURT:  It's admitted.

11                  **DEFENSE EXHIBIT 3616 ADMITTED**

12             MR. HESTER:  Thank you.

13        Thank you, Your Honor.

14             MS. CALLAS:  Good afternoon, Your Honor.

15        Good afternoon, Dr. Gupta.  My name is Gretchen Callas.

16   I represent AmerisourceBergen.

17        I may wait one moment while I have a tech person come

18   in.  His name is Richie.  He should be here shortly.

19             THE WITNESS:  Certainly.

20             MS. CALLAS:  But I promise just to have a few

21   questions for you.

22             THE WITNESS:  Sure.

23        (Pause)

24             MR. FARRELL:  Your Honor, while we're filling dead

25   space, I'd like the record to reflect that Ms. Gretchen

1    Callas was my mentor on the Law Review at West Virginia

2    University in 1996, now that it's placed in the permanent

3    record.

4             MS. CALLAS:  I have to move to strike, Your Honor,

5    all of that.

6             THE COURT:  Farrell always finds a way to tell me

7    that he was on Law Review.  I've got it.

8         (Laughter)

9             MS. CALLAS:  At my expense, no less.

10        All right.  Are we ready?  I hope.

11            THE COURT:  Technology, we're imprisoned by it,

12   aren't we?

13            MS. CALLAS:  Yes, that's true.

14                       **CROSS EXAMINATION**

15            **BY MS. CALLAS:**

16   **Q.**   Okay.  Dr. Gupta, we've spent a good bit of time over

17   the past two days talking about the Controlled Substances

18   Monitoring Program and I do want to ask you a few more

19   detailed questions about that, sir.  You, in your role as

20   the Commissioner for the Bureau of Public Health, mentioned

21   that program in a number of reports; is that correct?

22   **A.**   Yes.

23   **Q.**   And you believed it was an important tool to use as we

24   dealt with overdose death rates; is that right?

25   **A.**   Yes, as well as the overall volume of prescriptions out

1    there.

2    **Q.**    There were a number of specific key recommendations you

3    had in some of your reports that related to the CSMP; is

4    that right?

5    **A.**    That would be accurate.

6    **Q.**    And in your role as the Commissioner for the Bureau of

7    Health, you gained some understanding of what West

8    Virginia's system could and could not do; is that right?

9    **A.**    That would be correct.

10   **Q.**    And you were familiar with the fact that each year,

11   beginning in about 2012, the Board of Pharmacy did publish

12   an Annual Report regarding the CSMP.  Were you aware of that

13   report, sir?

14   **A.**    I am aware generally that the reports are published.

15   **Q.**    Okay.  So, I'm going to have Defendant's Exhibit 2904.

16            MS. CALLAS:  May I approach, Your Honor?

17            THE COURT:  Yes.

18            MS. CALLAS:  Thank you.

19            BY MS. CALLAS:

20   **Q.**    So, Dr. Gupta, take a moment just to look that over.

21   I'll represent to you this is the 2014 Annual Report of the

22   West Virginia Board of Pharmacy related to the West Virginia

23   Controlled Substances Monitoring Program.  It would have

24   been published around the time you took office as the

25   Commissioner of the Bureau of Public Health; that is, it

1    looked back at the entire year of 2014.  Is this the type of

2    document you may have used as you studied the issues in West

3    Virginia related to opioid use and abuse?

4    **A.**   This would certainly be one of the several documents we

5    would consider looking at.

6          MS. CALLAS:  Okay.  I would move the admission of

7    Defendant's 2904.

8          THE COURT:  Any objection?

9          MS. KEARSE:  No objection.

10          THE COURT:  It's admitted.

11          **DEFENSE EXHIBIT 2904 ADMITTED**

12          BY MS. CALLAS:

13   **Q.**   Okay.  Let's start, Dr. Gupta, by looking at the very

14   first sentence of the Executive Summary.  This report is

15   actually required by West Virginia statute 60A-9-5(j).  Do

16   you see that?

17   **A.**   Yes.

18   **Q.**   Okay.  If you proceed down through that paragraph,

19   you'll see that this report will recommend legislation to

20   enhance the CSMP in an attempt to reduce the quantity of

21   pharmaceutical controlled substances obtained by individuals

22   attempting to engage in fraud and deceit.  Do you see that

23   language, sir?

24   **A.**   I read that.

25   **Q.**   And do you understand that was one of the objectives of

1      the CSMP system, to reduce fraud and deceit?

2      **A.**    Sitting here, I couldn't tell you exact objectives of

3      the establishment of CSMP.  I do read this and I believe

4      this was a genuine effort on this part for this purpose.

5      **Q.**    Okay.  At the bottom of this first page, you'll see a

6      description of the history of the CSMP.  Do you see that,

7      sir?

8      **A.**    I see it.

9      **Q.**    The West Virginia Controlled Substances Monitoring Act

10     was implemented in 1995 to track only Schedule II controlled

11     substances.  Do you see that?

12     **A.**    Yes.

13     **Q.**    Okay.  Further in the paragraph, it indicates that the

14     CSMP was modified in 2002 by a legislative act that

15     encouraged -- an initiative to encourage safer prescribing

16     of all controlled substances in Schedules II, III and IV, to

17     reduce their abuse and limit the diversion of those

18     substances within the state; is that right?

19     **A.**    That's correct.

20     **Q.**    So, we expanded our CSMP in 2002 to include both

21     Schedule II, III and IV substances, right?

22     **A.**    That would be accurate.

23     **Q.**    Okay.  The next page, at the top, the last sentence of

24     the first paragraph indicates that in December of 2004, the

25     Board of Pharmacy implemented further changes to the CSMP to

1    eliminate the third party data collection and to permit both

2    direct reporting and direct access via an internet-based

3    program.  Do you see that?

4    **A.**   I see.  I read that.

5    **Q.**   And am I correct, sir, that when we talk about

6    reporting, we're talking about dispensers of controlled

7    substances, such as pharmacies?  They would report to the

8    CSMP; is that right?

9    **A.**   I could speak to my knowledge from 2015 to 2018 and

10   ongoing as a licensee for the State of West Virginia for

11   medicine.  If I was to prescribe a controlled substance,

12   Schedule II to IV, I would have to obviously register with

13   CSMP and then obviously utilize that to look at.

14   **Q.**   Okay.  But do you understand as your role as

15   Commissioner for the Bureau of Health that pharmacists had

16   an obligation to report what they were dispensing to the

17   CSMP?  And I can rephrase that question, if you would like.

18   **A.**   As the Commissioner, I did not have oversight of either

19   the CSMP, or Board of Pharmacy, or the pharmacies.  So, a

20   it's little difficult for me to really talk to the fact

21   matters of other organizations.  I can speak to what was a

22   role of the Board of Pharmacy and CSMP with the Bureau of

23   Public Health, but it's hard for me to talk about what the

24   role of Board of Pharmacy's regulations of pharmacies was.

25   **Q.**   Okay.  But as a physician, you do understand that by

1    2004, physicians in West Virginia had direct access via an

2    internet-based program if they wanted to check or register

3    with the CSMP?

4    **A.**    Once again, not having come to the state before 2009, I

5    can definitely read the document and say it, but I did not

6    have fact or knowledge of that.

7    **Q.**    Okay.  Let's look down the page a little further.

8    Under the heading "West Virginia's Controlled Substance

9    Monitoring Program Description and Reporting", it indicates

10   that this is a central repository maintained by the West

11   Virginia Board of Pharmacy for collected data related to the

12   prescription and dispensing of all Schedule II, III and IV

13   controlled substances.  Is that your understanding, sir?

14   **A.**    That -- that is.

15   **Q.**    And you'll see there's a list, a bullet point list,

16   right below that paragraph that begins with "name of

17   prescribing practitioner".  Do you see that list, sir?

18   **A.**    I see the list.

19   **Q.**    Okay.  And this is information that is collected and

20   housed in this West Virginia CSMP; is that your

21   understanding?

22   **A.**    That's my understanding.

23   **Q.**    Okay.  So that a prescriber who accesses the system

24   should be able to see his or her name as the prescribing

25   practitioner, their address, DEA number.  There is available

1    in this database the date the prescription was filled or

2    dispensed.  There is in this database the number of refills

3    authorized by the prescription, the source of payment, the

4    patient's name, address and date of birth, the name,

5    national drug control number, quantity and strength of the

6    controlled substance dispensed.  Do you see that?

7    **A.**   I do see that.

8    **Q.**   That's quite a bit of helpful information; would you

9    agree?

10   **A.**   That would be helpful.

11   **Q.**   And all of this information had been collected in West

12   Virginia from pharmacists and was available to physicians

13   for a long time; would you agree?

14   **A.**   I could not testify in my position as either the

15   Commissioner or the State Health Officer as to the facts of

16   that matter.

17   **Q.**   If you'll go down one more paragraph as required by

18   West Virginia Code 60A-9-5, you'll see there, sir, a list of

19   those who have access to all of this information.  Do you

20   see that description?

21   **A.**   I'm trying to read through it.  Which paragraph?  Which

22   sentence is that?

23   **Q.**   It starts with, "As required by West Virginia Code,

24   information contained in this central repository is

25   confidential."  Do you understand that to be true?

1    **A.**    Yes.

2    **Q.**    Okay.  And that's because it's -- it is protected

3    healthcare information, is it not?

4    **A.**    Correct.

5    **Q.**    Patient's name, date of birth, their doctor and their

6    medications; is that right?

7    **A.**    Right.

8    **Q.**    Okay.  So, this is not public information housed in the

9    CSMP and it indicates in this paragraph the information is

10   open to inspections only by, and then there's a list

11   specifically, inspectors and agents of the Board of

12   Pharmacy, correct?

13   **A.**    That's correct.  And if you would like me to, I can

14   help the Court understand really what it meant, just

15   information I can share.  I'm happy to.

16   **Q.**    Yes.  If you have information about who can access this

17   CSMP, I would be interested to hear that.

18   **A.**    Yes.  So, these individuals, my understanding is, could

19   access on a case-by-base basis, but what they could not do

20   is what we call fishing.  They could not go out and start

21   looking for cases random.

22   **Q.**    And that is actually something that was changed

23   slightly in 2012, was it not, with the enactment of the

24   Senate Bill 437?

25   **A.**    We could go back and look at that, but my understanding

```
 1    when I came into the office in 2015, you still could not do
 2    fishing.
 3    Q.   Okay.  Well, let's look.  So, we'll leave this document
 4    for a moment or two and let's go to Defendant's
 5    Exhibit 3105, which is the Senate Bill 437.
 6              THE COURT:  Would the DEA have access to that
 7    information?
 8              MS. CALLAS:  I think they are likely to be
 9    identified in that paragraph, Your Honor, as specific law
10    enforcement members.
11              BY MS. CALLAS:
12    Q.   Okay, Dr. Gupta, let's look at -- it is identified in
13    the lower left corner as a 16 in Defendant's 3105.
14    Actually, let's go to 18.  So, toward the back of that
15    exhibit, lower left side, you'll see 3105.00018.
16    A.   I see it.
17    Q.   And I'll direct you to the middle of the page.
18              MS. CALLAS:  I don't know.  Do we have this
19    document?  Okay, thank you.
20              BY MS. CALLAS:
21    Q.   You'll see a 3.  "The Board shall establish an Advisory
22    Committee to develop, implement and recommend parameters to
23    be used in identifying abnormal and unusual usage patterns
24    of patients in this state."  Do you see that language?
25    A.   I see it.
```

1    **Q.**    Okay.  So, this is the creation in this bill of an

2    Advisory Committee and if we go down to B toward the bottom

3    of that same page, it also states that, "The Board of

4    Pharmacy shall create a West Virginia Controlled Substances

5    Monitoring Program Database Review Committee of

6    individuals", and then they're described there.  Do you see

7    that?

8    **A.**    One second.  Yes, I see it.

9    **Q.**    Okay.  Is it your understanding, Dr. Gupta, that this

10   was a newly created committee that could do, in some ways,

11   what you just described as using the data in the Controlled

12   Substances Monitoring Program?

13   **A.**    So, if I can expand.

14   **Q.**    Yes, please.

15   **A.**    The fishing piece was still not allowed, meaning if you

16   had Jane Doe taking prescriptions, you cannot go and follow

17   up with Jane Doe because this was a very sensitive matter

18   that could be of use for many other purposes.  So, what you

19   could do with this new created Advisory Committee is perhaps

20   look at who are the top physicians who may be having more

21   associated overdose deaths or things like that.  So, there

22   was some purpose, but it was not an end-all be-all.

23   **Q.**    Would you agree, Dr. Gupta, that until this law was

24   enacted in West Virginia in July of 2012, we could not use

25   the data sitting in the CSMP to identify the top ten

1    prescribers in West Virginia?

2    **A.**   That would be accurate.

3    **Q.**   Okay.  We could not use this data to identify patients

4    who were seeing multiple doctors or visiting multiple

5    pharmacies with multiple prescriptions?

6    **A.**   You technically could by -- and so, if I was a

7    physician prior to this legislation and if I went in and I

8    saw my patient had gone to other places, then I technically

9    could see that, but what you -- one cannot do before and

10    cannot do after this legislation is target individuals

11    through this fishing piece.  So, that could not be done.

12    **Q.**   I am going to suggest we go back and look at the 2014

13    Annual Report one more time because it does discuss the

14    Committee.  So, if we go to the last -- or the next page.

15    One more page.

16        So, we'll see right in the middle of that page a

17    paragraph that begins, "As created by Senate Bill 437",

18    which we were just looking at, "the Controlled Substances

19    Monitoring Program Advisory Committee and the Controlled

20    Substances Monitoring Program Database Review Committee have

21    been actively trying to address substance abuse issues in

22    the state through use of the CSMP"; is that correct?

23    **A.**   That's accurate.

24    **Q.**   And you understood in your role as the Commissioner

25    they were attempting to use the CSMP for that purpose?

**A.**   I understood and we partnered with them.

**Q.**   If we go down one paragraph, "The Database Review Committee evaluates those who have been identified as outliers to decide appropriate action.  Individuals that have been classified as patients, prescribers or dispensers that warrant additional scrutiny are being pursued in a number of ways."  So, that's what you and I were just discussing; is that right?

**A.**   Correct.

**Q.**   And so, this was ongoing in 2014 but, as you've testified, none of this could happen prior to 2012; is that right?

**A.**   That would be accurate.

**Q.**   Okay.  The next sentence, "Thousands of letters have been sent to practitioners concerning patients visiting large numbers of prescribers and getting prescriptions."  Do you see that?

**A.**   Yes.

**Q.**   So, were you aware that the Board of Pharmacy was sending out thousands of letters to West Virginia doctors about their patients?

**A.**   We certainly had discussed that with Board of Pharmacy so, yes.

**Q.**   And one of the reasons that the Board of Pharmacy had to send out thousands of letters to doctors was because the

1    doctors were not accessing the information available to them

2    on the CSMP; is that right?

3    **A.**   Can I explain that?

4    **Q.**   Sure.

5    **A.**   So, doctors practice culture behavior is not easy to

6    change and we have to deploy all the tools that are -- in

7    our ability to do that.  And the thought behind this was to,

8    once again, look at the high prescribers and then begin to

9    nudge those prescribers and remind them of their both

10   obligation to their patients, as well as obligation to law.

11   **Q.**   Now, my understanding of these letters was also to let

12   a doctor know when they had a patient who was seeing not

13   only this doctor, but perhaps up to ten, or more than ten

14   other doctors for controlled substance prescriptions; is

15   that right?

16   **A.**   I don't recall the contents of the letter but,

17   certainly, as we found in our social autopsy, if you were

18   seeing more practitioners, more pharmacies, you were so many

19   more times likely to die.  So, this is very consistent with

20   that, to tell doctors that you have maybe patients -- that

21   you have a high volume of patients.  I don't exactly

22   remember if it was also -- because that would be divulging

23   other information to patients, so I don't exactly remember

24   that.

25   **Q.**   Let's talk a little bit about the usage by West

1    Virginia doctors of this system.  It was an on-line system

2    beginning in 2004.  I'm going to ask you, Doctor, to look

3    for Exhibit 3036, which was introduced earlier today.  It's

4    the West Virginia Expert Pain Management Panel Guidelines.

5    Do you see that?

6    **A.**   Yes.

7    **Q.**   On Page 9 of that, those guidelines, you'll see a

8    reference to the Controlled Substances Monitoring Programs

9    and the description of those programs.  "The Prescription

10    Drug Monitoring Programs, PDMPs, also known as Controlled

11    Substance Monitoring Programs, CSMPs, must be fully utilized

12    to reach their potential in controlling prescription drug

13    abuse and diversion."  Do you agree with that statement?

14    **A.**   Yes.

15    **Q.**   "However, in the majority of the 49 states with

16    operational PDMPs, participation by prescribers and

17    dispensers is voluntary with utilization rates well below

18    50%."  Is that right?

19    **A.**   It's written there.  It must be accurate.

20    **Q.**   Okay.  Do you know what percentage of West Virginia

21    physicians are registered to use our Controlled Substance

22    Monitoring Program?

23    **A.**   I could not tell you right now.

24    **Q.**   Before we leave this document, Dr. Gupta, I would like

25    you to turn back to Page 4 and I would just like to ask you

1    somewhat randomly about Dr. Ahmet Ozturk.  Do you see his

2    name below your name on the panel member list?

3    **A.**   I do see it.

4    **Q.**   Do you know Dr. Ozturk?

5    **A.**   I do not.

6    **Q.**   Okay, but he is a -- it suggests a physician at

7    Marshall University who was a participant on this expert

8    panel?

9    **A.**   I see his name.

10   **Q.**   Okay.  So, let's go back to physicians and physician

11   usage of the CSMP.  It's correct, if I am a physician and I

12   am writing a prescription for a controlled substance, I

13   could utilize this West Virginia database to see if my

14   patient is receiving this same prescription from anyone

15   else; is that right?

16   **A.**   That's right and that's the best practice.

17   **Q.**   Okay.  Now, doctors in West Virginia needed to be

18   encouraged to register for the CSMP; is that right?

19   **A.**   Correct.

20   **Q.**   In fact, they had to be forced to do so in 2016 by law?

21   **A.**   There was legislation requiring that, yes.

22   **Q.**   And we talked about that a little bit earlier.  It's

23   Exhibit 3015.  And I am going to ask you to look at a

24   particular page in that exhibit.  It's the very last page.

25   So, I think you were asked earlier about whether doctors

1    were required in West Virginia to register and we concluded

2    after reviewing this document that they were not required to

3    until 2016; is that right?

4    **A.**    I believe so.

5    **Q.**    Okay.  In fact, practitioner -- "Any practitioner who

6    fails to register with the West Virginia Controlled

7    Substance Monitoring Program and obtain and maintain online

8    or other electronic access", this is paragraph F., "to the

9    program will be fined $1,000.00."  Do you see that?

10   **A.**    I see that.

11   **Q.**    So, there was actually a penalty attached to failure to

12   register and maintain your online access?

13   **A.**    Yes.  That made me register.

14   **Q.**    Okay.  I have one other Board of Pharmacy Annual

15   Report, the Controlled Substances Monitoring Program 2016

16   Annual Report.  So, we're going to jump ahead two years and

17   we'll look at that.

18            MS. CALLAS:  May I approach?

19            THE COURT:  Yes.

20            MS. CALLAS:  Thank you.

21            BY MS. CALLAS:

22   **Q.**    So, Dr. Gupta, it's now two years after the last report

23   we looked at.  This is the 2016 Annual Report of the

24   Controlled Substances Monitoring Program and, particularly,

25   I'd like to direct your attention to Page 4 of this

1    document, which is entitled "CSMP Dispensing Statistics".

2    **A.**   Yes.

3    **Q.**   It does indicate in the very first sentence that,

4    "Overall dosage unit dispensing numbers have declined over

5    the last several years", and that would be specific to

6    controlled substances, correct?

7    **A.**   Correct.

8    **Q.**   And not -- not other medications.

9         I'm actually on the wrong page.  I apologize.  I was

10   getting onto a different topic.  It's the page before.

11   That's what I wanted to look at.

12        So, Page 3.  Sorry about that.

13        This page has a chart and a bar graph and the first --

14   the chart actually indicates active users of the CSMP for

15   2014.  Do you see that?

16   **A.**   I see the table.

17   **Q.**   Okay.  And I think what I would like you to notice is

18   if we look at the number of prescribers who are indicated to

19   be active users of our Controlled Substances Monitoring

20   Program in 2014, we had 2,537?

21   **A.**   Yes.

22   **Q.**   And, by 2016, we had almost tripled that number, not

23   quite; certainly doubled that number to 6,618; is that

24   right?

25   **A.**   Yes.

1    **Q.**   So, we had 4,000 more physicians or prescribers using

2    the CSMP over a two-year period?

3    **A.**   Correct.

4    **Q.**   Okay.  At the bottom of the page we have the number of

5    user queries, so those are usage basically of the system;

6    would you agree?

7    **A.**   Yes.

8    **Q.**   And we can see over time going back to 2008 how many

9    more queries we have by prescribers of our system.

10   **A.**   Yes.

11   **Q.**   Okay.  And you would agree this is all a positive

12   improvement?

13   **A.**   Certainly.

14   **Q.**   Okay.  But the fact of the matter is that even in 2008

15   when we had, oh, what, 300,000 queries, as opposed to nearly

16   a million, in 2008, this system was still in place and was

17   available for physicians to be using; is that right?

18   **A.**   As I testified prior, it was available in a voluntary

19   capacity.

20   **Q.**   Now, there's no reason to believe there's anybody but

21   physicians that could access this in a regular user

22   capacity; is that right?

23   **A.**   Can I expand on that, please?

24   **Q.**   Of course.

25   **A.**   So, there is some ability for Advanced Practice

1   Registered Nurses to prescribe, as well.  So -- and for even

2   physicians, it's usually the staff that does it.  And so, in

3   the answer can anybody else, it's usually the staff was

4   doing the query, but there's nothing beyond their office or

5   any prescriber for that who is licensed to prescribe.

6   **Q.**   Okay.  Thank you, Dr. Gupta.

7        Okay.  Let's switch gears and then we'll wrap up.  The

8   Board of Medicine, you've testified that you served as the

9   Secretary of the Board of Medicine for approximately four

10  years; does that sound right?

11  **A.**   Yes, Ms. Callas.

12  **Q.**   And the Board of Medicine for those doctors that are

13  MDs in the State of West Virginia is both a regulatory body,

14  the licensing body, and they also conduct investigations; is

15  that your understanding?

16  **A.**   Yes.  And educational body, as well, I think we can

17  agree on.

18  **Q.**   Okay.  The Board of Medicine decides and can

19  investigate whether a physician has engaged in the improper

20  practices of medicine; is that right?

21  **A.**   If they are violating the -- what we have called the

22  West Virginia Medical Practice Act, then there could be

23  complaint lodged.  There's a formal procedure and a Board

24  does not itself make that decision and go and pick doctors.

25  There has to be a formal complaint launched according to

1    clearly the statute.  And then, that complaint could be

2    investigated through the Board of Medicine's investigators.

3    And there is a Complaint Committee to which the complaint

4    goes through.  So, it is an entire process that has -- that

5    has elements to it.

6    **Q.**   Okay.  Well, let's break that down a little bit.  That

7    was helpful.  So, if -- if there is no complaint, the Board

8    of Medicine does not just initiate an investigation of a

9    doctor on its own; is that right?

10   **A.**   That's correct.

11   **Q.**   And if the Board of Medicine were to receive

12   information from, let's say, this CSMP Review Committee,

13   then here are your top five prescribers, that is not a basis

14   to initiate an investigation, is it?

15   **A.**   That's correct.

16   **Q.**   Okay.  So, we need a complaint about a prescriber to

17   initiate an investigation of that doctor's prescribing

18   practices?

19   **A.**   A formal complaint has to be filed in accordance with

20   the law regulating the Board of Medicine.

21   **Q.**   And, as the Secretary of the Board of Medicine, you

22   were at times involved in that investigation process to the

23   extent there might be a consent order that was issued?

24   **A.**   So, I can talk about my role.  I was not a member of

25   the Complaint Committee, but I was the Secretary of Board.

```
 1    I definitely -- the orders, consent orders, were signed by

 2    myself, the Board President, and there were rare occasions

 3    in which the President, the Vice President would be

 4    conflicted in making that decision in which I would chair

 5    the Committee to make the decision on that particular

 6    physician specifically.

 7              THE COURT:  Where did the complaints come from

 8    typically?

 9              THE WITNESS:  Your Honor, they could come from

10    individuals like patients.  They can come from a pharmacy.

11    They could come from -- the State Health Commissioner can

12    file a complaint if a physician -- so, and all of those

13    things have happened, but anybody, any member of the public,

14    can file a complaint.

15              BY MS. CALLAS:

16    Q.   Now --

17              THE COURT:  Okay.  So, if I knew there was a

18    pharmacy downtown and I -- that was writing these

19    prescriptions and basically running a pain clinic, I could

20    file a complaint and it would be investigated?

21              THE WITNESS:  Yes, Your Honor.  If anyone would

22    file -- it's an on-line system, as well, anonymous.  It's

23    held anonymous by law and anyone can file a complaint if

24    they know anything about any wrongdoings of any physician

25    licensed under the Board and they would initiate the
```

```
 1    complaint and investigate it.
 2            BY MS. CALLAS:
 3    Q.   Now, those complaints are confidential; is that right?
 4    A.   Anonymous and confidential.
 5    Q.   Okay.  So, I cannot, as a member of the public, do a
 6    search for a doctor to see if he is subject to a complaint?
 7    A.   So, I've just explained that.  So, a complaint is
 8    filed.  The first thing that happens, anonymously, the
 9    complaint goes to the Complaint Committee.  Oftentimes, it
10    can be adjudicated without further investigation, depending
11    on the merits of the case.
12         Other cases, it is investigated.  Should a cause be
13    found to take it to the Discipline Committee and make a
14    discipline, only when the found discipline is voted upon by
15    the Board does it go public and goes in the permanent record
16    of the physician and is public, publically available.
17    Q.   So, the complaint and the investigation process; that
18    is prior to a decision, is all confidential or shielded from
19    public view; is that right?
20    A.   Until the final decision is made.  At that point, all
21    of that becomes public, a matter of public.
22    Q.   I'm going to ask to use an example.  There is a doctor
23    by the name of Deleno Webb.  Does that name ring a bell to
24    you?
25    A.   It does not.
```

1   Q.   Okay.  I have a document that might refresh your

2   recollection.  Your signature is on it.

3        MS. CALLAS:  So, I would ask to approach the

4   witness with that document.

5        Would you like to see this, Your Honor?  I don't --

6   it's not an exhibit.  It's just to refresh his recollection.

7        THE COURT:  Do you remember now, Dr. Gupta?

8        THE WITNESS:  Your Honor, West Virginia is only

9   one of a very rare few states in the country where the

10  President of the Board and the Secretary have to physically,

11  by ink, sign every license in the State of West Virginia.

12  So, I signed way more of these type things than I can

13  remember.  I do, I'm trying to recollect.

14       THE COURT:  Do you remember at all?

15       THE WITNESS:  I remember -- I remember the case.

16  I'd have to go through the whole thing to remember it, but I

17  do remember the case.

18       THE COURT:  Well, when you've refreshed him.  You

19  need to take the document.

20       MS. CALLAS:  I -- you're right.  You're right.

21       Let me take that back.

22       I wasn't sure if you were going to let me get away with

23  that.

24       BY MS. CALLAS:

25  Q.   Okay.  Dr. Gupta, do you recall that the West Virginia

1    Board of Medicine received a complaint about Dr. Deleno Webb

2    in or about the June of 2014 time frame?

3    **A.**   I do not recall.

4    **Q.**   Okay.  Do you recall that Dr. Deleno Webb had a

5    complaint at some point in time related to the prescribing

6    of controlled substances?

7    **A.**   Consequent to what I just viewed, I -- I -- there seems

8    to be -- obviously there, but I do not recall that.

9    **Q.**   Do you recall that there was an investigation that the

10   Board of Medicine did engage in over a period of time

11   related to this doctor?

12   **A.**   I do not recall beyond what I just saw.

13   **Q.**   Okay.  Do you recall that there was some action taken

14   by the Board after that investigation?

15   **A.**   Once again, beyond what I just reviewed, I do not

16   recall.

17   **Q.**   So, it sounds like you don't really recall the

18   specifics of this doctor's case, or do you?

19   **A.**   I do not.

20   **Q.**   Okay.  Okay.  Well, I appreciate you making the

21   attempt, nonetheless.  I think we have established though,

22   assuming there was an investigation of this particular

23   doctor, or any other doctor related to allegations of

24   improper prescribing, the complaint and the investigation

25   would be kept confidential and there would be no notice

```
 1    provided to pharmacists, pharmacies or patients that this
 2    was an ongoing investigation; is that right?
 3    A.    I think that's correct.  An ongoing investigation of
 4    the Board of Medicine in West Virginia is not subject to
 5    publicity, and media reports, and reports to other people.
 6    Q.    And while this doctor, or any other doctor is subject
 7    to an investigation for improper prescribing, they can
 8    continue to prescribe; is that right?
 9    A.    I can explain.
10    Q.    Okay.
11    A.    So, there are remedies in the law that they -- that's a
12    decision of the Board.  There are remedies that include
13    seeking an immediate injunction that can make us if that's
14    where the determination is.  And in other circumstances, the
15    -- if it's not an immediate recognized threat to the public,
16    then they can continue to do their work until such a time a
17    finding is found.
18         MS. CALLAS:  Thank you, Dr. Gupta.  That's all the
19    questions I have.
20         THE COURT:  Is there any redirect, Ms. Kearse?
21         MS. KEARSE:  Briefly, Your Honor.  I think Mr.
22    Farrell may have a couple after me.
23                    REDIRECT EXAMINATION
24              BY MS. KEARSE:
25    Q.    Good afternoon, Mr. Gupta.  I just have a couple of
```

```
 1    things I want to follow up on.  You were shown again the

 2    West Virginia Drug Overdose Deaths and Historical Overview,

 3    41213, and I just want to go to Page 5.

 4              MS. KEARSE:  Is this working, Gina?  I can use the

 5    ELMO.

 6              BY MS. KEARSE:

 7    Q.   And you were shown on the top of Page 5 --

 8              MS. KEARSE:  Go to Figure 3 first.

 9              BY MS. KEARSE:

10    Q.   Do you recall that?

11    A.   I do.

12    Q.   Okay.  And you were being asked about other drugs.

13              MS. KEARSE:  I want to go down to the bottom of

14    that paragraph, Gina.

15              BY MS. KEARSE:

16    Q.   The number -- if you can read this on that same page

17    that you were being asked about drug overdoses and the drugs

18    used?

19    A.   The last sentence -- last sentence of the first

20    paragraph here, it says, "The number one cause of drug

21    overdose deaths was associated opiates, making West Virginia

22    number one in the nation."

23    Q.   And that was in relation to the report that you did; is

24    that right?

25    A.   That was a -- that was part of the report.
```

1    **Q.**   And I want to go quickly to the 2016 document,

2    Exhibit 03036.  This was the West Virginia Expert Pain

3    Management Panel.  You just actually reviewed it.

4              MS. KEARSE:  And, Gina, if we could put the cover

5    page on that.

6              BY MS. KEARSE:

7    **Q.**   So you know which one, do you have that in front of

8    you?  Okay.  And this is the one that had you listed there.

9    I want to go to the first page on that document, Page 3,

10   actually.  In the middle of Paragraph 2, can you read that

11   to the Court, Dr. Gupta?  "Approximately", do you see that

12   section?

13   **A.**   I see it now.  "Approximately 2 million Americans live

14   with prescription opioid abuse or dependence.  That's per

15   SAMHSA, 2013.

16   **Q.**   And the next sentence?

17   **A.**   "About 75 percent of opioid addiction patients" -- I'm

18   sorry.  "About 75 percent of opioid addiction disease

19   patients switch to heroin as a cheaper opioid source."

20   That's SAMHSA, 2013.

21   **Q.**   And that was part of the Executive Summary of that

22   Panel Report?

23   **A.**   Yes.

24              MS. KEARSE:  Thank you, Doctor.  No more

25   questions.  I was quick today.  Mr. Farrell may have a

1    couple.

2              MR. FARRELL:  With permission?

3              THE COURT:  Yes.  Go ahead.  I assume there's no

4    objection to the double teaming here?

5              MR. FARRELL:  I would like to refer to it as

6    double dipping, Your Honor.  They get to triple dip, we only

7    get to double dip.

8              THE COURT:  Okay.

9              MR. FARRELL:  I promise I'll make it entertaining,

10   if not brief.

11                    **REDIRECT EXAMINATION**

12              **BY MR. FARRELL:**

13   **Q.**   The first thing I'd like to do is with reference to the

14   demonstrative on Dr. Deleno Webb, despite the fact that you

15   don't recall this particular one, your name is on this

16   document, is it not?

17   **A.**   It is.

18   **Q.**   And it's in your official capacity as the Secretary to

19   the West Virginia Board of Medicine?

20   **A.**   It is.

21   **Q.**   And when you reviewed this document, what is the action

22   taking place?  I'm sorry.  I think the copy was taken away

23   from him.

24              THE COURT:  Well, she used it to refresh his

25   recollection and that's the right way to do it.

1          MS. CALLAS:  Yes, and I'll object to the extent

2     you're using something that's not really an exhibit.  It was

3     used to refresh his recollection.  It did not work.

4          BY MR. FARRELL:

5     Q.   The document that was attempted to be used to refresh

6     your recollection, I would like to show you as a potential

7     exhibit to identify it.

8          MR. FARRELL:  May I approach, Your Honor?

9          MS. CALLAS:  Well, let me object because it's not

10    an exhibit.  It is not identified by either party in this

11    case as an exhibit for its use at trial.

12         THE COURT:  Mr. Hester, did you want to say

13    something?

14         MR. HESTER:  I'm with Ms. Callas.  I agree, Your

15    Honor, it wasn't -- it didn't refresh the witness's

16    recollection.

17         THE COURT:  Yes.  I'm not going to let you do

18    this, Mr. Farrell.  Where are you going with this?

19         MR. FARRELL:  Well, this is a consent decree

20    surrendering a medical license from a doctor who was

21    prescribing in Huntington, Cabell County, West Virginia at

22    pharmacies that the distributor supplied.  So, I'd like to

23    begin creating a record with a surrendered license that

24    you'll see his name throughout their documents in Weeks 3

25    and 4.

```
 1              THE COURT:  Well, I'm not going to let you do it
 2    now.  You can do it later if you can get it in.
 3              MR. FARRELL:  The only problem, Judge, is that I
 4    don't know if there's anybody else whose signature is on
 5    here that I can get other than Dr. Gupta.
 6              THE COURT:  Well --
 7              MR. FARRELL:  If he can authenticate it, then it's
 8    a simple --
 9              THE COURT:  And the purpose of it is to show that
10    this was a doctor who was prescribing opioids in Cabell
11    County, or Huntington, or wherever?
12              MR. FARRELL:  Yes, Your Honor, to such extent that
13    he lost his -- he surrendered his license to Dr. Gupta.
14              THE COURT:  Okay.  And what does it show?  What's
15    --
16              MR. FARRELL:  What we intend to show --
17              THE COURT:  I mean what is the ultimate purpose of
18    this?
19              MR. FARRELL:  The ultimate purpose of this is that
20    the volume of pills that were coming into Cabell County were
21    responsible to, in part, the bad doctors that McKesson spent
22    most of this morning discussing.  I've got one here.
23              THE COURT:  Well, I'm going to let you do it.
24    I'll allow it.  Go ahead.
25              MR. FARRELL:  May I approach?
```

1          THE COURT:  The objection is overruled.

2          MS. CALLAS:  Your Honor --

3          THE COURT:  Do you want to put anything on the

4    record, Ms. Callas?

5          MS. CALLAS:  Well, my only comment, Your Honor, is

6    that if I had been permitted and, of course, I did not seek

7    to introduce the document because it was not on an exhibit

8    list of either party, or any of the parties, I would have

9    asked more questions about it.  So, perhaps if Mr. Farrell

10   is going to go into much detail, if I have any additional

11   questions, one or two at the end, I would request the right

12   to recross.

13         THE COURT:  Well, go ahead.  He can authenticate

14   it, if he can, and I'll conditionally admit it and then make

15   up my mind whether I'm going to really consider it or not.

16         MR. FARRELL:  Okay.  And to be fair, I will yield

17   the floor to Ms. Callas, if she would like to --

18         THE COURT:  Just do it.

19         BY MR. FARRELL:

20   Q.   Dr. Gupta, what is this document?

21   A.   This is a consent order by the West Virginia Board of

22   Medicine.

23   Q.   And is your signature on the document?

24   A.   Yes.

25   Q.   In what capacity?

1    **A.**    In the capacity of the Secretary of the Board of

2    Medicine.

3    **Q.**    And what does your signature indicate by affixing it to

4    this document?

5    **A.**    It indicates an official order in my capacity

6    representing the West Virginia Board of Medicine.

7    **Q.**    So, is this a formal action taken by the West Virginia

8    Board of Medicine?

9    **A.**    Yes.

10    **Q.**    And is this your signature endorsing or validating this

11    action?

12    **A.**    Yes.

13    **Q.**    And is this a document that is created in the usual

14    course of the licensing of physicians in the State of West

15    Virginia through the West Virginia Board of Medicine?

16    **A.**    Created in the course of disciplining of licensing in

17    the State of West Virginia through the West Virginia Board

18    of Medicine.

19              MR. FARRELL:  Judge, at this time, I would have

20    the document marked as an exhibit and entered into the

21    record.

22              THE COURT:  Do you have an exhibit number for it?

23              MR. FARRELL:  I did.  Can we -- can I make one up?

24              MR. HESTER:  Your Honor, simply to preserve the

25    record, we do note our objection to this.  It wasn't on

```
1     either parties' exhibit list.

2               MR. FARRELL:  We'll mark it at P-9999.

3               THE COURT:  Okay.

4               MR. FARRELL:  Thank you.

5               THE COURT:  My deputy gets very upset with me if I

6     don't make you put numbers on the exhibits.

7               MR. FARRELL:  Yes, Your Honor.

8               THE COURT:  She's got to keep track of all this.

9               MR. FARRELL:  Yes, Your Honor.

10              BY MR. FARRELL:

11    Q.   Dr. Gupta, I think I have five categories of follow-up

12    from cross.  The first is document P-44211, which was the

13    social autopsy.

14    A.   I have it.

15    Q.   And the questions that you were asked related to a

16    correlation between prescription opioids and illicit opioids

17    resulting in death.  So, let me ask you initially this.

18    Through your research and in your role with the -- as the

19    State's health officer, have you been able to identify a

20    direct correlation -- let me get the words right.  Have you

21    been able to identify a direct correlation between diverted

22    prescription pills and the transition to using street drugs,

23    such as heroin, Fentanyl or methamphetamine?

24              MS. MAINIGI:  Objection, Your Honor.  This is the

25    same discussion we had yesterday.  Mr. Farrell is now just
```

1    trying to gateway -- back-door the gateway discussion.

2            THE COURT:  Sustained.

3            MR. FARRELL:  Judge, if I can beg your indulgence

4    for a moment, the reason I'm not trying to go in through the

5    back door, I'm trying to go in through the front door, this

6    was literally disclosed by the plaintiffs.

7            THE COURT:  Well, you're trying to get an opinion

8    from him about the gateway point, aren't you?

9            MR. FARRELL:  Yes, because we disclosed it.  Yes,

10   that's exactly what I'm attempting to do since we disclosed

11   it.  This isn't a sandbag or a last minute attack.  This

12   literally was disclosed by us last year, October.

13           THE COURT:  Ms. Mainigi, go ahead, please.

14           MS. MAINIGI:  Yes.  Your Honor, I'd rely primarily

15   on the argument I made to Your Honor yesterday, which is

16   that this is covered under -- Your Honor said he was going

17   to reserve ruling on this and I think, yesterday, we had

18   argument on it back and forth, including from Mr. Farrell.

19   This falls under *Downey v. Bob's Discount Furniture.*

20           COURT REPORTER:  I'm sorry.  Can you speak into

21   the mic?  Is it on?

22           MS. MAINIGI:  Oh, you know what?  I'm so sorry.

23   It was not on.  I apologize.

24           COURT REPORTER:  It's okay.

25           MS. MAINIGI:  This falls, Your Honor, into *Downey*

1    *v. Bob's Discount Furniture Holdings,* which is a case Your

2    Honor cited.  Dr. Gupta was never -- Ms. Kearse with Dr.

3    Gupta was never able to lay a foundation for the gateway.

4    Dr. Gupta, in his capacity, would not be in a position to

5    have -- to be a percipient witness, personal knowledge and

6    observations, as opposed to facts supplied by others, which

7    is what he is operating under.

8        He was allowed to testify as to hybrid opinions if his

9    -- his hybrid opinions are limited to his involvement in the

10   events giving rise to this litigation.  Dr. Gupta does not

11   have that information.  He relied on studies, as he

12   testified at his deposition for the gateway theory.

13            MR. HESTER:  Your Honor -- I'm sorry, Your Honor.

14            THE COURT:  All right.  That's all right.  You go

15   ahead.

16            MR. HESTER:  Sorry, Your Honor.  I didn't mean to

17   interrupt.

18            THE COURT:  That's all right.

19            MR. HESTER:  I was going to add, as well, I

20   believe this is beyond the scope of our cross.

21            MS. MAINIGI:  That is -- that's correct.

22            THE COURT:  Well, I think that's right.  I'm going

23   to let you mark it, and we'll put it in the record, and you

24   can ask -- you've already had him identify it, but I'm not

25   going to let you go down the path of questioning him about

1    the gateway theory because -- for the reasons counsel have

2    so articulately placed on the record.  So, that's where you

3    are, Mr. Farrell.

4              MR. FARRELL:  I understand, Judge, and I also

5    understand that you don't care for people arguing with your

6    rulings.  And so, the plaintiffs believe we've made

7    appropriate disclosures and disagree with the positions

8    taken by the defendants and I'll move on.

9              THE COURT:  Well, you can argue with me to the

10   extent of placing your objections on the record and the

11   reasons for them, period.

12             MR. FARRELL:  Yes.

13             THE COURT:  And you've done that and I thank you.

14             MR. FARRELL:  Thank you, Judge.

15             THE COURT:  Okay.

16             BY MR. FARRELL:

17   **Q.**   Dr. Gupta, you just spent some time talking about the

18   CSMP as a tool that you use in your role in public health.

19   In general, aside from the CSMP, where else would a person

20   in public health be able to find data regarding physician

21   prescribing patterns?

22   **A.**   There are several other sources that folks in my

23   position --

24   **Q.**   So, let's start with direct sources.  Where is the most

25   district source to get information on where doctors'

1    prescriptions are being filled?

2    **A.**    The -- if you're asking the sources available to me as

3    Commissioner, State Health Officer, those direct sources

4    could be -- there are CDC sources that provide us that, but

5    there's also -- we used to use Quintiles IMS data.  That is

6    something that I think one of the counsel today, this

7    morning, showed a graph at 20.8 prescriptions.  That's where

8    that comes from.

9    **Q.**    That's a good point.  I think that's Exhibit --

10   DEF-WV-747.  Can we pull it up, please?  So, one of the

11   exhibits that you were asked about was the number of

12   prescriptions per person and I wanted to follow up with

13   that, as well.

14           MR. FARRELL:  I think it is Page 38.  There it is.

15       No.  Can you go to Page 38 first?  The next page.

16   Yeah.  Back up one.  There we go.

17           BY MR. FARRELL:

18   **Q.**    So, can you in more detail describe what does this

19   factor mean, "RX per capita"?  Can you explain for the Court

20   what that means?

21   **A.**    This means the total number of prescriptions for all

22   prescription-level medications in -- by state per person,

23   man, woman, baby, child, by State for the year of 2016.

24   **Q.**    And is this the type of data that you would rely upon

25   in the field of public health when exercising your duties?

```
 1    A.   Yes.  Clearly, I would be presenting on it, so yes.

 2    Q.   And not just in public health, but does the CDC rely

 3    upon this data when attempting to reach positions on

 4    physician prescribing trends or patterns.

 5         MS. MAINIGI:  Objection, foundation, Your Honor.

 6    This witness is not in a position to know what the CDC is

 7    relying on.

 8         THE COURT:  Sustained.

 9         BY MR. FARRELL:

10    Q.   You mentioned earlier --

11         MR. FARRELL:  Okay, that's fair.

12    I would like to have blown up the bottom right-hand

13    corner.

14         BY MR. FARRELL:

15    Q.   In this exhibit that you published that the defendants

16    entered into evidence, did you rely upon Quintiles Xponent

17    2017 data when creating this document?

18    A.   Yes.

19    Q.   Go to the next slide, please.  Again, this is another

20    data point from the document entered into evidence by the

21    defendants.  Is this data point, does it rely upon Quintiles

22    IMS Xponent data?

23         MS. MAINIGI:  Objection, outside the scope of the

24    direct -- of the cross examination.

25         THE COURT:  Well, I'm going to sustain the
```

1   objection.  This is getting pretty far --

2         MR. FARRELL:  Well, then I'll get right to the

3   point.

4         THE COURT:  Good.

5         BY MR. FARRELL:

6   **Q.**   Is Quintiles IMS Xponent, is that now known as IQVIA?

7   **A.**   Yes.

8   **Q.**   And is IQVIA data part of the data that you rely upon

9   in the field of public health when identifying prescriber

10  trends of prescriptions, including opioids?

11        MS. MAINIGI:  Objection, Your Honor, outside of

12  the scope of the cross examination.

13        THE COURT:  Sustained.

14        BY MR. FARRELL:

15  **Q.**   The data that's down here that says Quintiles IMS

16  Xponent, is this the type of data that you relied upon, and

17  specifically relied upon, when creating this --

18        THE COURT:  That's the same question.  Mr.

19  Farrell.

20        MR. FARRELL:  Judge, I'm struggling to understand

21  how the defendants --

22        THE COURT:  Well, I'm -- I'm sorry.  I didn't mean

23  to interrupt you.  Go ahead.

24        MR. FARRELL:  I'm struggling to understand how the

25  defendants can spend the better part of today challenging

1      the data sources of this witness and then, when I point out

2      what the data sources are, their objections get sustained.

3      I apologize.

4              THE COURT:  Well, I've made a ruling.  Go ahead.

5      This is plowing ground that we've been over and over, I

6      believe.

7              MR. FARRELL:  Well, now -- and I believe you

8      offered me the opportunity to lay the foundation through

9      other means.

10             THE COURT:  Well, I did, but I -- I'm not sure

11     this is the proper way to do it at this point in the trial.

12             BY MR. FARRELL:

13     **Q.**   Now, there are a number of questions that were asked of

14     you during direct regarding why opioids are at a higher

15     prescription rate in West Virginia than other states.  In

16     your role as a public health officer, have you seen any

17     indication that obesity, say, is a driving factor in higher

18     opioid rates?

19     **A.**   Can I explain that further?

20     **Q.**   Sure.

21     **A.**   Shortly.  So, I had mentioned this morning it's not

22     just obesity.  It's the consequences of obesity.  It's what

23     happens because of that.  It's how much disability you have

24     from obesity.  It's how much arthritis you get from obesity.

25             So, if you start to look at the data from arthritis,

 1     for example, from, you know, 2003 to 2017, you will see

 2     there's two points increase in arthritis.

 3          If you similarly look -- start to look at the data of

 4     mortality from obesity, thinking if you're about to die,

 5     you're going to have need for pain because of neuropathy and

 6     other complications of diabetes.

 7          You see that a mortality rate from obesity, Your Honor,

 8     went down over the years.  They didn't go up.  Similarly,

 9     the chronic conditions, the other things you will see, a

10     disability or any level of impairment from obesity, if

11     you'll look at that over the -- from 2000 to 2010, those

12     levels went down, didn't go up.

13          Another factor is cancer that can happen from obesity.

14     If you look at the West Virginia cancer rates, we went --

15     and not just cancer rates because, if you get a little spot

16     on the skin cancer, you don't need opioids for that.  It's

17     the cancers that kill you because, end of life, that's what

18     you use opioids for.  Those numbers went down 18 percent,

19     cancer morality, between 2000 and 2010, I believe.  So, the

20     numbers actually were trending in the opposite direction.

21     Q.   What about age?  Is the fact that West Virginia has an

22     older population a justification for a higher rate of a

23     prescribing of opioids?

24               MS. MAINIGI:  Objection, foundation.  He's not

25     here as a prescribing doctor, Your Honor.

```
 1                    THE COURT:  Sustained.

 2                    BY MR. FARRELL:

 3      Q.   Are you familiar with -- in the field of public health

 4      whether or not age is a factor in the prescribing of

 5      opioids?

 6      A.   Yes.

 7      Q.   Please explain.

 8      A.   As I testified earlier, the older one goes, there is

 9      more likely of having conditions that lead you to have

10      chronic pain, things like arthritis, things like cancer.

11      So, there are conditions which cause you to have an

12      appropriate management of pain.

13           They could be no medication.  They could be

14      non-pharmaceutical intervention for pain.  It could be

15      pharmaceutical intervention for pain.  A non-opioid.  And

16      there could be opioid interventions for chronic pain, as

17      well.  Given all of these options but, clearly, when you're

18      older, the needs for pain management is a lot more than you

19      are younger.

20      Q.   Thank you.  Final question.  In the Exhibit P-41213

21      there was a discussion about the scope of your historical

22      analysis and the testimony was that you had used the

23      reference point of 2001 and you were asked on cross

24      examination, or it was elicited earlier, that you looked

25      back to 1999 and your testimony was that, in '99, West
```

1    Virginia was below the national average.

2         My question is, can you quantify from 1999, based on

3    your recollection, where West Virginia fell within the

4    national average?

5              MS. MAINIGI:  Objection, Your Honor, foundation.

6              THE COURT:  I'm going to let him answer that one.

7    Overruled.

8         Answer it if you can.

9              THE WITNESS:  Yes, sir.  In 1999, according to the

10   data of the Health Sciences Center, Health Statistics Center

11   in West Virginia, our rate for overdose death rate was 4.1

12   per hundred thousand people.  The national rate at the time

13   was six per 100,000 people.  So, our rate in West Virginia,

14   overdose death rate, was lower significantly than the

15   national rate and that flipped in 2001.  And, by 2017-2018,

16   it was all the way up to 57 -- 52 to 57 deaths, depending on

17   which area you're looking at.

18             THE COURT:  Hasn't he already testified to all

19   this?

20             MR. FARRELL:  Sir, he did not quantify the 1999

21   numbers.

22             THE COURT:  All right.

23             MR. FARRELL:  And I believe he did quantify the

24   current ones.  He just didn't quantify 1999.

25        That's all the questions I have, Judge.  Thank you.

1          MS. MAINIGI:  No recross, Your Honor.

2          THE COURT:  Mr. Hester, do you have anything?

3          MR. HESTER:  I have one question, Your Honor, and

4     I will be very brief.

5                    **RECROSS EXAMINATION**

6          **BY MR. HESTER:**

7     **Q.**   Dr. Gupta, just one question for you.  Ms. Kearse asked

8     you to look at Plaintiff's Exhibit 41213.  This is the

9     Historical Overview of Drug Overdose Deaths, 2001 to '15.

10    And Ms. Kearse pointed you to Page 5 and asked you to read

11    into the record the sentence that the number one cause of

12    drug overdose deaths was associated with opiates.  Do you

13    recall that?

14    **A.**   Yes.

15    **Q.**   And the reference opiates there includes illegal drugs,

16    illegal heroin, illicit Fentanyl.  It's not prescription

17    opioids; it's all opiates, correct?

18    **A.**   Opiates, particularly, are naturally synthesized.  That

19    would include several of the nonsynthetic, natural

20    so-called, opioids.  That would include illicit, as well.

21    **Q.**   So, include heroin?

22    **A.**   Yes.

23    **Q.**   And would include Fentanyl that's laced into heroin,

24    correct?

25    **A.**   To the point that -- Fentanyl, I'm not -- I have not

```
 1    known Fentanyl to be a naturally occurring opioid, so I

 2    would include Fentanyl in that.

 3              MR. HESTER:  Okay, thank you.  That's all the

 4    questions I have.

 5         Thank you, Your Honor.

 6              THE COURT:  Ms. Callas, do you have anything?

 7              MS. CALLAS:  No, Your Honor.  Thank you.

 8              THE COURT:  May Dr. Gupta be excused?

 9              MS. MAINIGI:  Yes, Your Honor.

10              THE COURT:  Thank you, sir, very much, and we

11    appreciate your indulgence with us.  And I know you've got

12    things you need to deal with and I wish you the best.  And

13    thank you, sir, very much for being here.  Appreciate it.

14              THE WITNESS:  Thank you, Your Honor.

15              THE COURT:  You're free to go.

16              THE WITNESS:  Thank you.

17              MR. FARRELL:  Judge, may we have five minutes to

18    make a witness change?

19              THE COURT:  Yes.  Let's be in recess for five

20    minutes.

21         (Recess taken)

22              MS. CALLAS:  Your Honor, I have one housekeeping

23    matter.  If I might move the admission of Defendant's

24    Exhibit 2906.  It was the 2016 Annual Report.

25              MS. KEARSE:  No objection.
```

```
 1              THE COURT:  Thank you.  Is there any objection to
 2    that?
 3              MS. KEARSE:  No objection, Your Honor.
 4              THE COURT:  All right.  It's admitted.
 5              MR. MAHADY:  Your Honor, Joe Mahady from
 6    AmerisourceBergen.
 7         There's one other issue we'd like to raise at this time
 8    if that's okay with you.
 9         This issue relates to Dr. McCann who will be appearing
10    on behalf of the plaintiffs on Monday.  You recall Dr.
11    McCann is their ARCOS expert.  And the plaintiffs intend to
12    use Dr. McCann to present his analysis of the ARCOS data.
13         A few weeks back, the parties reached a stipulation
14    that required the plaintiffs to disclose two weeks prior to
15    Mr. McCann's testimony the charts and summaries and graphs
16    that they intend to use with Dr. McCann.  That deadline was
17    last Monday.
18         Last Monday we received 7,000-plus pages of charts and
19    summaries from the plaintiffs for Dr. McCann.
20         The large majority of these charts were from Dr.
21    McCann's expert report in Track Two.  It has a massive
22    appendices.  And it was the very reason we entered into the
23    stipulation, so we could have some understanding of what
24    they actually intended to use with Dr. McCann.
25         We have worked with the other side, and Mr. Mougey
```

1    specifically.  And while we have made some progress, we are

2    pretty far apart.

3        A few days after the disclosure of 7,000-plus charts,

4    we got a more limited disclosure of 4,200 charts.

5        Where we are at right now a few days before he is

6    called at trial is roughly 3,500 pages of charts and

7    summaries and graphs.

8        And what we are looking for from the Court is some

9    guidance here and for the plaintiffs to provide real

10   disclosures about what they actually intend to use with Dr.

11   McCann on Monday.

12            THE COURT:  Yeah.  I think it's reasonable to

13   provide specifically what you're going to use.  That's the

14   purpose of working these things out.

15            MR. MOUGEY:  May I respond, Your Honor?  Peter

16   Mougey for the plaintiffs.  If I could have the ELMO, it

17   would be great.

18       And I agree with Mr. Mahady that some guidance would be

19   good, but let me, if you don't mind, Judge, give you a

20   little more detail than opposing counsel just provided.

21       I've put these into buckets or categories and I

22   apologize for my rudimentary chart here.

23       I'm going to start off with what we have summarized,

24   which is 500 million lines of data.  And, Your Honor, if I

25   were to print that out, that would be 25,000 banker boxes.

1       Now, I assume if I showed up with anywhere near that amount

2   of banker boxes, I would be in trouble.

3       So I've broken them down here for you and I'm going to

4   give you the conclusion.  And the conclusion that Mr. Mahady

5   is objecting to is approximately two banker's boxes.  And

6   let me break those down even further, Your Honor.

7       The data summaries that I provided Mr. Mahady two weeks

8   ago were 150, 200 pages approximately.  Each one of those

9   pages has a footnote at the bottom that references the

10  source material from the backup.  That's the 4,000 pages.

11  So the 4,000 pages are the support.

12      As you know, Mr. Fuller, Mr. Farrell, Mr. Majestro have

13  tried a few times to get -- reach some conclusion with the

14  defendants about what to do and how to get this data in.

15      So I have the 4,000 page back-up to the 150, 200 pages

16  of -- which is the primary source of what we want to use.

17  In the event that the defendants object, call for a specific

18  number, this is the reference in the back-up for the data

19  summaries.

20      I believe where most of the volume is coming from,

21  Judge, is on the pharmacy summaries, in the pharmacy

22  packets.  The pharmacy packets are approximately 3,000

23  pages.

24      Now, about 700 of those pages are charts and summaries

25  pertaining to -- and I'm not going to go into any color, but

1    I'm going to give you an example, Judge.

2         So the example I'm going to give you is just simply

3    hydrocodone and oxycodone.

4         I have this chart, as you see here, in dosage unit and

5    in MME and in base weight.  Some of the -- we'll call them

6    just generally algorithms or tests from the defendants rely

7    on differences; dosage units, base weight, and MME.

8         So what I've done, Judge, is I've provided these charts

9    three different ways.  So when Your Honor is asked to make a

10   decision several months down the road, we have them each

11   way.

12        Now, further adding to the detail is if for a specific

13   chart or -- I'm sorry -- a test or an algorithm, let's just

14   use, for example, that the chart -- that the test or the

15   algorithm is 10,000 just to make it random.  And you can't

16   tell from that bar chart what the exact number is.

17        So in order to anticipate a potential objection that

18   you can't tell the specific number and it exceeded that

19   threshold, I've provided the detailed back-up so you can see

20   the exact numbers.

21        So most of this volume in the two banker's boxes that

22   we've distilled down from 27,000, most of that volume is in

23   these pharmacy packets that we've provided charts with

24   dosage units, base weight, MME, and then the specific

25   back-up for Your Honor.

```
1              THE COURT:  Well, what are you actually going to
2     use when he testifies?
3              MR. MOUGEY:  That was my next point.  Thank you.
4         So, Your Honor, what I would like to do, and that's why
5     I'm glad we're having this conversation today, is I would
6     prefer -- these pharmacy packets are set up in the exact
7     same way, same table of contents, same chart up front.  And
8     every single chart will obviously have different numbers,
9     but it's the same chart every time.
10        So what I was hoping to do, Your Honor, is to go
11    through a handful of these, four, five, six, a couple per
12    defendant in detail demonstrating to Your Honor what's
13    there.
14        The -- Dr. McCann will testify that the remaining
15    pharmacy packets are duplicative in the way they're
16    organized, the way the charts are formatted.  They have DU,
17    MME, and that they're repetitive.  And I'd like to use
18    exemplars of the five or six and then introduce the entirety
19    of the pharmacy package, packets with -- there's about 3,000
20    pages.
21        But at the end, Your Honor, I've got -- which I gave to
22    Mr. Mahady the specific slide deck that we're going to use,
23    that we're going to introduce into evidence, the 1006s, the
24    couple hundred pages.  And most of this falls into the
25    pharmacy packets.
```

1        But, Judge, I've got 500 million lines of data down

2   into two boxes.  I feel like we've done a -- we've worked

3   really hard to get it down to a manageable amount that the

4   Court can, can, can process and the defendants can process.

5        And -- but for varying reasons, what I am a little

6   worried about is sitting down after we put in Dr. McCann and

7   then two weeks from now, you're going to have a specific

8   question about a test or a threshold as we go further and

9   further down.  And I want you to have the tools to be able

10  to make a decision.  And by doing that, I've given you a few

11  different options of whether it's a chart or whether it's a

12  table.

13       But for the most part, Judge, I think we've got

14  everything dialed in pretty tight.

15            MR. MAHADY:  Your Honor, if I may respond.

16       Mr. Mougey does not disagree with me that their

17  disclosure currently rests at over 3,000 pages of charts.

18  And I don't disagree with Mr. Mougey's characterization that

19  a lot of it is I believe he said duplicative and repetitive.

20  We think a lot of it is unnecessary.

21       But what Mr. Mougey is trying to say is we are going to

22  give you a couple examples of some pharmacy charts.  And

23  then we're going to ask you to take into the record 3,000

24  pages of charts that the witness did not go through in

25  court.

1          There is a separate fundamental issue we have as to

2     whether or not these charts and summaries even fall under

3     Rule 1006 and we can deal with that at a separate time.

4          But for today's purposes, we're four days out from this

5     witness testifying.  We have a universe of 3,200 charts and

6     we're being left to guess as to what's actually being --

7               THE COURT:  Well, I think you ought to tell him

8     specifically what you plan to offer through Dr. McCann and,

9     and if -- and leave it at that.  And so they can have a

10    legitimate opportunity to prepare.

11         And if we have to get into any -- if a situation

12    develops that we have to get into any of this other

13    documentation, then I'll deal with that at that time.

14         But I think the defendants are entitled to notice of

15    what you're actually going to use and so that it will be in

16    a form that is manageable.

17              MR. MOUGEY:  I agree with you, Judge, and I think

18    we have.  We've given them the pharmacy packets.  We've

19    given them a couple hundred pages of decs.

20              THE COURT:  Well, I'm not going to expect them to

21    be prepared to respond to 3,000 pages of documentation

22    produced just a few days before the testimony.

23              MR. MOUGEY:  I'm glad you asked that because I can

24    point that out.  Let me further clarify when this was -- let

25    me go back to this bucket chart for a second.

1        The only one of these categories, Judge, that was

2    produced at the 1006 deadlines is that, the 150 to 200

3    pages.

4        These pharmacy packets, the pharmacy summaries -- I'm

5    glad you brought this up.  The pharmacy packets were

6    produced in two pieces.  One is Cabell County Bates number 1

7    which were -- some of the documents were included back in

8    2019.

9        But the entirety of the pharmacy summaries were

10    provided to the defendants in Dr. McCann's expert report in

11    August of 2020.

12        So this -- the only thing that was produced within the

13    two weeks is that 150, 200 pages.  Every single piece of

14    paper in this pharmacy and every one of the back-ups,

15    depending on what their objections are, were produced as

16    attachments to Dr. McCann's report.

17             THE COURT:  Well, it seems to me they're entitled

18    to know what you're specifically going to offer through Dr.

19    McCann so they can prepare to confront that.  And that's

20    what I expect you to do.  And I, I don't think we need to be

21    cluttered with all this other paper.  I mean, you can

22    introduce the summary and then -- well, I'm not going to go

23    beyond that.

24        Does that satisfy you, Mr. Mahady?

25             MR. MAHADY:  Your Honor, I appreciate what you're

```
1    saying and I agree with you.  Hearing Mr. Mougey speak right
2    now, I think we're still passing each other because what he
3    is saying is that they have satisfied the direction you're
4    giving.
5         We're at 3,200 pages of charts.  That's not
6    satisfactory.  And he keeps talking about these pharmacy
7    packets and saying, "We've told the defendants exactly what
8    we're going to do."
9         What Mr. Mougey said was, "Here take a look at this
10   packet."  It's 80-plus pages.  He also pointed to another
11   packet that's 300-plus pages.  That's not what they're going
12   to show Dr. McCann on Monday.
13             THE COURT:  I want you to let them know what
14   you're going to show Dr. McCann on Monday and provide that.
15   And --
16             MR. MOUGEY:  May I ask for some direction, Your
17   Honor, because I think this is where the issue is?
18        I would be more than happy and -- to limit myself to
19   these charts.  What my concern is, and what I said earlier,
20   Your Honor, when you narrow down the charts, it gets down to
21   a few hundred pages, which is what I've identified to Mr.
22   Mahady.
23        Bear with me, Judge, one second.
24        If, if I leave it at these charts without the back-up
25   data and say my partner, Mr. Rafferty, goes to put it in the
```

1    McKesson case and they're talking about specific thresholds

2    on specific numbers for a test and they increase those

3    thresholds and Your Honor asks Mr. Rafferty how many pills

4    specifically --

5              THE COURT:  Well, we'll deal with it when it comes

6    up.

7              MR. MOUGEY:  But what my concern is if Dr.

8    McCann's off the stand, and based on your direction to us so

9    far -- and I apologize but I do appreciate your guidance.

10   If Mr. Rafferty needs a specific number on the threshold

11   that's in this packet --

12             THE COURT:  You're arguing with me now and I think

13   I've made it as clear as I can where I stand on this.  And

14   both of you are going to have to make the best of it.

15             MR. MAHADY:  Thank you, Your Honor.

16             MR. MOUGEY:  Thank you, Your Honor.

17             MR. SCHMIDT:  Your Honor, may I raise one

18   hopefully much smaller issue?  Paul Schmidt from McKesson.

19             THE COURT:  Okay.

20             MR. SCHMIDT:  It's 15 documents.  Yesterday we got

21   a new reliance list for Mr. Rafalski who the Court may

22   recall is the plaintiffs' DEA expert.

23        When we got these new reliance documents, we said, "Can

24   we have an update deposition?  It would be short."  We were

25   told, "No."

```
 1         By chance, Mr. Rafalski was set to be deposed in
 2    another Georgia opioid case on Saturday and that deposition
 3    got pulled down because they told us he was too busy doing
 4    work in this case.
 5         So we're in this position where they're giving us new
 6    documents for him, but actually pulling down available
 7    deposition opportunities.  We have a request, and we can put
 8    it in a paper, that either we get a couple hours with him
 9    or -- on these new documents or he's not allowed to use
10    them.
11              THE COURT:  Well, when do you want to do that?
12    I'm not sure I understand.  You want a couple hours to --
13              MR. SCHMIDT:  To depose him on these new
14    documents, and we can do that any time.
15              THE COURT:  Okay.  Let me hear from the other side
16    on this.  Do you have any objection to that?
17              MR. FULLER:  Yes, Your Honor, and I responded to
18    them last night.
19         These are additional reliance documents, Judge.  It
20    does not change his opinion whatsoever.  They've spent
21    between this case and the other cases over 20 hours with Mr.
22    Rafalski.  There's no reason --
23              THE COURT:  When did you produce these?
24              MR. FULLER:  When did I indicate they were
25    additional reliance documents?
```

```
 1              THE COURT:  Yes.

 2              MR. FULLER:  Yesterday, Judge, but they're

 3   documents they've had in their possession -- we've all had

 4   in our possession for an extended period of time.

 5              THE COURT:  But they were just identified to you;

 6   is that right?

 7              MR. SCHMIDT:  Yes.

 8              THE COURT:  A big stack of -- a flood of paper --

 9              MR. SCHMIDT:  Tens of millions of documents.  It's

10   new documents he's used that we've never had a chance to ask

11   him about at a deposition which, of course, is why there is

12   a disclosure requirement under Rule 26 that the witness

13   identify documents they might use so you can depose them on

14   those documents.

15              THE COURT:  So the options would be to allow the

16   deposition or not let him use the documents.

17              MR. SCHMIDT:  Yes, that's our request.  And we'll

18   take either.

19              THE COURT:  How about that?

20              MR. FULLER:  Judge, I forego using the documents.

21   Again, it's reliance documents.  It doesn't change his

22   opinion.  It's just further support.  And, again -- so the

23   Court's clear, it's not somebody else's documents.  It's

24   their own documents.

25              MR. SCHMIDT:  But we've had major issues with Mr.
```

1   Rafalski in terms of how much he's actually reviewed our

2   documents, what he has to say about our documents, things

3   like that.  That's why we're asking for the deposition.

4       One of them is actually someone's lengthy deposition

5   testimony.  That is a proper subject of, of deposition

6   discovery.

7                THE COURT:  You can do this in two hours?

8                MR. SCHMIDT:  Yep.

9                THE COURT:  And you're representing in good faith

10  to me you're genuinely surprised by this?

11               MR. SCHMIDT:  Yes.

12               THE COURT:  Okay.  I'm going to allow it.

13               MR. FULLER:  Judge, can I withdraw the documents

14  then?

15               MR. SCHMIDT:  We have no objection to that, Your

16  Honor.

17               THE COURT:  Yes, you may withdraw the documents.

18               MR. FULLER:  Thank you, Judge.

19               THE COURT:  This problem is hopefully solved.

20               MR. SCHMIDT:  Yes, Your Honor.

21               MR. FULLER:  Yes, Your Honor.

22               MR. SCHMIDT:  No 25-page brief on that.

23               THE COURT:  Well, my clerk will be glad to hear

24  that.

25       (Laughter)

```
 1              THE COURT:  I just revealed that I haven't read
 2    every word that you've submitted.
 3         (Laughter)
 4              MR. SCHMIDT:  No one understood it that way, Your
 5    Honor.
 6              THE COURT:  Okay.  Call another witness.
 7              MS. QUEZON:  Yes, Your Honor.  Good afternoon.
 8    Amy Quezon, Q-u-e-z-o-n, on behalf of the plaintiffs.  And
 9    we call Connie Priddy to the stand.
10              THE CLERK:  Would you please state your name.
11              THE WITNESS:  Yes.  Connie Priddy, P-r-i-d-d-y.
12              THE CLERK:  Thank you.  Please raise your right
13    hand.
14    CONNIE PRIDDY, PLAINTIFFS' WITNESS, SWORN
15              THE CLERK:  Thank you.  Please take a seat.
16              THE WITNESS:  Thank you.
17              MS. QUEZON:  May it please the Court.
18                        DIRECT EXAMINATION
19    BY MS. QUEZON:
20    Q.   Good afternoon.  Please introduce yourself to His
21    Honor.
22    A.   Good afternoon, Your Honor.  My name is Connie Priddy.
23    Q.   Okay.  And, Ms. Priddy, can you please tell His Honor
24    where you work?
25    A.   I work for Cabell County EMS.
```

1  **Q.**   And what is your title or role at Cabell County EMS?

2  **A.**   My official title is Director of Quality Compliance.

3  **Q.**   Do you have any other titles or roles with Cabell?

4  **A.**   I actually do.  I'm the Program Coordinator for the

5  Huntington Quick Response Team.

6  **Q.**   And we'll talk a little bit about your roles.  Before

7  we do, if we can give the Court a little bit about your

8  background.  Where did you -- where were you born and

9  raised?

10  **A.**   I was born and raised in Huntington, West Virginia.

11  I've been there my entire life.

12  **Q.**   Where did you go to college?

13  **A.**   I went to Marshall University.

14  **Q.**   And did you -- is that where you got your nursing

15  degree?

16  **A.**   Yes, ma'am.  I graduated in 1981 from Marshall

17  University School of Nursing.  And also in 2000 I received

18  my Master's Degree in sociology from Marshall University.

19  **Q.**   And, Ms. Priddy, once you were licensed as a nurse, can

20  you tell the Court where you went to work?

21  **A.**   Yes.  I originally went to work at Huntington Hospital.

22  It was a very small hospital there in Huntington right out

23  of nursing school.  I worked there for about a year and a

24  half.  And then I went to Cabell-Huntington Hospital also in

25  their emergency department.

1   **Q.**   So you were an emergency room nurse at both hospitals?

2   **A.**   Yes.

3   **Q.**   Okay.  And how long did you serve as an ER nurse at

4   Cabell-Huntington?

5   **A.**   At Cabell-Huntington I was -- it was about six and a

6   half years.

7   **Q.**   So are we up to, what, 1989-ish?

8   **A.**   Yes.  '88, early '89.

9   **Q.**   And can you tell the Court where you went to work

10   around 1989?

11   **A.**   We actually ended up with a medical helicopter that

12   flew out of Cabell-Huntington Hospital.  And I applied and

13   got the position with the medical helicopter.  So I was a

14   flight nurse after that period of time.

15   **Q.**   Did you obtain any additional certifications or

16   training in order to become a flight nurse?

17   **A.**   Yes.  You have to be registered with the West Virginia

18   Office of EMS.  So there was multiple certifications

19   involved for that.

20   **Q.**   And did you all only respond to trauma cases in West

21   Virginia?

22   **A.**   No, ma'am.  We actually crossed state lines.  We went

23   into Ohio, West Virginia, and Kentucky just because

24   Huntington is so close to the border there.

25   **Q.**   And are you licensed in all those states as a nurse as

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    well?

2    **A.**    Yes, uh-huh.

3    **Q.**    And how long did you serve as a flight nurse, Ms.

4    Priddy?

5    **A.**    25 years, a very, very long time.

6    **Q.**    And can you tell the Court when you started at Cabell

7    County EMS?

8    **A.**    In 2011 they actually asked me if I would like to come

9    and work for them part-time.  I told them I wasn't ready to

10   quit flying yet.  So I did that for about a year part-time.

11   **Q.**    And did you eventually take a full-time position at

12   Cabell?

13   **A.**    I did.  In 2012 I went full-time there at Cabell County

14   EMS.

15   **Q.**    And what -- if you can remind the Court, what's your

16   title there and what has it been since 2012?

17   **A.**    So originally I went as Compliance Officer.  That was

18   actually just a continuous quality improvement person

19   that -- my true goal was to improve the patient care of the

20   field personnel.  And then over the years, that title

21   evolved to Director of Quality Compliance.

22   **Q.**    And tell the Court, if you, if you will, how do you go

23   about achieving that goal of making sure that the people of

24   Cabell are receiving quality care from the, from the EMS

25   paramedics and EMTs?

1    **A.**    So various different ways, but a lot of the things that

2    I did in the beginning were chart review, you know, look

3    over a patient's care to make sure that they were following

4    West Virginia protocols.  We have a monthly meeting that we

5    call a continuous quality improvement meeting.  And, you

6    know, I work directly with the field personnel on that.

7    **Q.**    I want to talk to you a little bit about those charts

8    if we can, Ms. Priddy, and eventually about EMS suspected

9    overdose calls.  But let's back up a little bit.  What

10   charting -- what type of charting do the paramedics and EMTs

11   do out in the field?

12   **A.**    So there's an electronic medical record that they have

13   to fill out on every single patient contact they have.

14   There is a certain demographic area, vital signs area, and

15   also a narrative on that.

16   **Q.**    And what are these referred to as in your industry?

17   **A.**    Those are EMS run sheets.  So -- and I had to do those

18   for 25 years with helicopter too so --

19   **Q.**    Now, are the EMTs and the paramedics the ones that are

20   actually completing these, these run sheets?

21   **A.**    Yes.  The actual individual who goes on that particular

22   run is the person that completes that chart.

23   **Q.**    Do they have a computer in the ambulance?

24   **A.**    What it is is the internet-based service where you can

25   actually start it on like an iPad.  They have what they call

1    tough-book computers.  So they can go ahead and start that

2    patient documentation when they first have patient contact.

3    And then they can download it and finish it in the ambulance

4    station afterwards.

5    **Q.**   And, so, are the paramedics and EMTs, are they

6    documenting at or near the time of whatever they're, the

7    incident that they respond to?

8    **A.**   Absolutely, yes.

9    **Q.**   Okay.  And can you tell the Court, what happens to

10   these forms once the paramedics or the EMT has completed it?

11   **A.**   So the form itself, you have to go through every

12   process that it asks for.  The chart is then locked.  And

13   then it is actually sent to the West Virginia Office of the

14   EMS.  And we require that they finish it before they go off

15   shift.

16   **Q.**   Okay.  And can it be changed or altered in any way once

17   it's been locked?

18   **A.**   No, ma'am.  There is an area where you can do an

19   addendum to it, but that is time and date stamped.  So if

20   they make any additions to that, you know, it's documented

21   there.  So they cannot go back once it's locked and make

22   changes.

23   **Q.**   Now, Ms. Priddy, is the completion of these forms

24   within the regular practice of the paramedics and EMTs?

25   **A.**   Yes, that is part of their job description.

1    **Q.**   And are these EMS run sheets that you've described for

2    the Court, are they kept in the regular course of business

3    by Cabell County EMS?

4    **A.**   Yes, uh-huh.

5    **Q.**   Now, you, you mentioned that when you first started

6    working at Cabell County in 2011, was it the same type of

7    electronic monitoring or electronic run sheets as are being

8    used now?

9    **A.**   No, ma'am.  There was -- it was definitely electronic

10   charting, but it was a different company at that point when

11   I very first came.

12   **Q.**   And did Cabell County EMS track overdose calls,

13   suspected overdose calls in any way back in 2011 when you

14   first started working there?

15   **A.**   Yes, they did.  Our Director of EMS actually had the

16   people that work in billing to just sort of go through the

17   charts as they were doing that billing, review them, and

18   sort of very informally -- because that was the only way we

19   had to track them at that point -- to do just rough

20   guesstimates of how many overdose calls our reports were

21   running at that point.

22   **Q.**   And did the way Cabell EMS track suspected overdose

23   calls change at some point?

24   **A.**   Yes.  So in 2014 we went to a different electronic

25   medical record.  And at that point, we were already aware

 1   that we were seeing overdoses and we needed a more accurate

 2   objective way to track them.

 3        So at that point, we were able to create a drop-down

 4   box.  And one of the categories was suspected overdose.  And

 5   that was something that the medical personnel on the scene

 6   would select.

 7   **Q.**   And when did this type of tracking, the more objective

 8   that you've described to the Court, when did Cabell County

 9   begin using that type of tracking for suspected overdose

10   calls?

11   **A.**   So we actually put the box in in October of 2014.

12   **Q.**   And, Ms. Priddy, would showing the Judge an example of

13   this new EMS run chart help explain the information that's

14   included on that form?

15   **A.**   Absolutely, yes.

16        MS. QUEZON:  Your Honor, may I have permission to

17   show you an example of the EMS form for demonstrative

18   purposes only?

19        THE COURT:  Yes.

20   BY MS. QUEZON:

21   **Q.**   All right.  So, Ms. Priddy, first of all, can you

22   point out for the Court where that drop-down menu, the

23   choice that the EMT or the paramedic has, where does

24   that appear on the form we see on the screen?

25   **A.**   So would you want me to touch the screen?

1    **Q.**   If you, if you say where it is, I think someone will

2    highlight it so everyone knows what you're talking about.

3    **A.**   Okay, okay.  In that Chief Complaint area, it says

4    "Category," that is where that is captured.

5    **Q.**   Now, you mentioned a drop-down menu.  Can you tell the

6    Judge how many choices do they have?

7    **A.**   They have 45 choices.

8    **Q.**   And what are some of the other choices, just a couple?

9    **A.**   Abdominal pain, electrocution, cardiac arrest, a

10   multitude of any type issue.

11   **Q.**   Now, we've used the term "suspected overdose" and it's

12   present here.  It says "drug/alcohol overdose suspected."

13   Can you tell the Court why the term "suspected" is used?

14   **A.**   In my practice as a nurse, I was responsible for -- I

15   didn't personally create the box because I'm not near that

16   technical.  But when I was having that box selected or

17   developed, we were taught that you do not make a medical

18   diagnosis in the field.

19        So it's suspected based on the fact that this is your

20   best medical judgment, your expertise.  In this particular

21   field, this is what you are suspecting.

22   **Q.**   Now, is there a way by looking at this form that, that

23   you, Ms. Priddy, can, can look at the suspected overdose?

24   Is there anywhere that you can look to see whether more

25   likely than not this was an actual overdose?

1   **A.**   So what I do is I actually -- there's a narrative.  So

2   you can see that in front of you.  Would you want me to

3   highlight some of the areas that I look at?

4   **Q.**   Sure, yes, ma'am.

5   **A.**   Okay.  So, certainly, the first line that says

6   "overdose on heroin," that would be an indicator.  But what

7   we are looking at more is the presentation of the patients

8   themselves.

9        So we would look at things like -- the Sp02 is their

10  oxygen level.  A normal oxygen level is above 94 percent.

11  So something that is not 60 percent means they're not

12  oxygenating well.

13       I'm looking here to see -- the person also had a strong

14  pulse.  A lot of times people still have a pulse when they

15  have an opioid overdose, but their respirations are

16  affected, so their level of oxygen getting in and out is

17  affected.  But a lot of times they still have a strong

18  pulse.  So that would be something else that they would look

19  at.

20       What we see is that they were breathing two times a

21  minute, and they were actually assisted.  Their respirations

22  were assisted, which we call bag valve mask.  It's what you

23  see on TV where you squeeze the bag and you assist those

24  ventilations.

25       So those are some of the indicators that we see that

1    lead you to believe that this is an overdose situation.  The

2    narrative is very clear on that.

3    Q.   Now, on the narrative here it says two milligrams of

4    Narcan was administered to patient nasally.  Does that in

5    any way -- is that in any way significant?

6    A.   Yes.  So we may have somebody that's unconscious and

7    unresponsive.  If we administer Narcan and the patient

8    responds and becomes alert, then that is an indicator that

9    it's an opioid overdose.  It's not due to something else.

10   It's an opioid overdose.  If somebody is having a heart

11   attack, they don't immediately respond from Narcan.  So

12   that's a really good indicator for us.

13   Q.   Now, do you look at each one of these suspected

14   overdose EMS run sheets personally?

15   A.   Yes, ma'am.  So what we do is through the Quick

16   Response Team I actually review these every day.  So I'm

17   looking at them.  I have eyes on them I guess is what you'd

18   say.

19   Q.   Now, let's go to just one more example for the Court.

20   All right.  Once again, if we -- up at the Chief Complaint,

21   what's there?

22   A.   Yes.

23   Q.   All right.  Anything in the narrative here that would

24   lead you to the conclusion that not only is this a suspected

25   overdose, but more likely than not it's an actual overdose

 1    and more likely than not it's an opioid overdose?

 2    **A.**    Okay.   Initially, I would list the patient as

 3    unresponsive, if they had pinpoint pupils.   In any type of

 4    opioid overdose, the pupils are pinpoint.   And that's

 5    another very good indicator that it is from an opioid.   And,

 6    of course, again, you see that they were given

 7    two milligrams of Narcan and they responded to it.

 8    **Q.**    Now, you mentioned that pinpoint pupils is indicative

 9    of an opioid overdose.   Have you -- in your career as a

10    nurse and at Cabell EMS, have you responded to situations

11    where the patient is -- has taken too much of a different

12    type of substance like methamphetamine or cocaine?

13    **A.**    Oh, yes, yes.   And if, if they have what I call

14    overdosed, they don't present without that -- with that

15    depressed breathing.   But if they've taken too much of a

16    stimulant, then their pupils are dilated.

17         So it's a different presentation.   They generally

18    present in a very agitated state.   We call it excited

19    delirium.   So they present in a whole different way than

20    someone who has an opioid overdose.

21    **Q.**    All right.   Now, is there any way to determine what

22    type of opioid caused the overdose just by looking

23    observationally, meaning can you tell whether it was a

24    prescription pill or heroin or fentanyl?

25    **A.**    No, ma'am.

1    **Q.**   And do -- does EMS commonly run a toxicology screen out

2    on the field, out in the field?

3    **A.**   No, that's not what we do at all.  We're just in the,

4    you know, that emergent situation of saving their life which

5    is restoring their breathing generally.

6    **Q.**   Now, you mentioned that you have since 2014, and 2014

7    with the new system, that you review these on a regular

8    basis.  Can you tell the Court how often you review the

9    suspected overdose run sheets?

10   **A.**   Yes.  So I work Monday through Friday.  My job is

11   generally administrative.  I review those every single day.

12   I look at those and pull those after I come in in the

13   morning.

14   **Q.**   And have you, Ms. Priddy, calculated how many suspected

15   overdoses occurred in Cabell County for 2015, 2016, 2017,

16   and 2018?

17   **A.**   Yes, ma'am.  I -- that is one of the things that I have

18   done is -- I'm the data keeper at Cabell County EMS as far

19   as running that information.

20           MS. QUEZON:  Your Honor, may I approach the

21   witness?

22           THE COURT:  Yes.

23   BY MS. QUEZON:

24   **Q.**   Ms. Priddy, what are we looking at?

25   **A.**   I am looking at a form that I had put together in just

1    a regular little Word file that states the overdose calls

2    for Cabell County EMS.

3    **Q.**   And are these numbers for overdose calls from 2015 to

4    2018 by quarter, did you yourself calculate these?

5    **A.**   Yes, I did.

6    **Q.**   And did you do this by calculating the -- just as we've

7    gone through with the Court looking at suspected overdose

8    calls and then verifying that it was more likely than not an

9    actual overdose call?

10   **A.**   Yes, uh-huh.  And I, I do a search field with that

11   drop-down box.  And this is the numbers that objectively

12   come out the other end.  So --

13           MS. QUEZON:  Your Honor, at this time we would

14   move into evidence P-41060-0001.

15           THE COURT:  Is there any objection?

16           MS. WU:  No objection.

17           THE COURT:  It's admitted.

18   BY MS. QUEZON:

19   **Q.**   I'll do it better this time.

20       In addition to tracking the overdose -- suspected

21   overdose calls that EMS did, did you also take it upon

22   yourself to track the use of Narcan?

23   **A.**   Yes, I did.  I thought that would be valuable

24   information to have to coincide with this information.

25   **Q.**   And let me you ask, Ms. Priddy, are there times when a

1    patient receives more than one dose of Narcan?

2    **A.**    Yes, uh-huh.

3    **Q.**    And the tracking that you did, did you simply track

4    when it was used or if they received multiple doses?

5    **A.**    Just when it was used.  So it was individual patient

6    records, not how many was given to each patient.

7    **Q.**    All right.

8              MS. QUEZON:  Your Honor, may I approach the

9    witness?

10             THE COURT:  Yes.

11   BY MS. QUEZON:

12   **Q.**    All right.  Ms. Priddy, what are we looking at

13   here?

14   **A.**    So this is another document that I've created.  It

15   contains the same information, but I also included Narcan

16   administration on this particular document.

17   **Q.**    And would this be the drug overdose statistics from

18   Cabell County Emergency Medical Service from 2015 patient

19   transport -- is that really transport or what is -- is that

20   something else?

21   **A.**    So in the very beginning, I actually called them

22   transports.  And I realized that the more correct term is

23   patient calls because not every single person is transported

24   to the hospital, but they absolutely have to have a medical

25   record.

1         So if I have patient contact, I have to make a medical

2    record.  I can't say because they didn't go to the hospital

3    I don't have to make a chart because the boss would get mad.

4    So they have to make a chart.

5    **Q.**  And, so, is what we're looking at, 2015 and 2016, both

6    Cabell County EMS overdose runs and Narcan administration?

7    **A.**  Yes.

8              MS. QUEZON:  Your Honor, at this time we would

9    seek to move into evidence Plaintiffs' P-44281-0001.

10             THE COURT:  Any objection?

11             MS. WU:  No objection.

12             THE COURT:  It's admitted.

13             MS. QUEZON:  All right, last one, Your Honor.  May

14   I approach the witness?

15             THE COURT:  Yes, you may.

16   BY MS. QUEZON:

17   **Q.**   Now, Ms. Priddy, I realize this information is

18   attached to an email and I'm more interested in the

19   information itself.  So if you can turn to Pages 2 and 3

20   of the document and tell us what we're looking at.

21   **A.**   Okay.  So these are -- in addition to the ones I have

22   done -- and I continue to keep these each year.  You can see

23   the totals for the number of overdoses in 2017 was 1,831 for

24   the year.  And then in 2018 we actually have attached the

25   numbers which are 1,089.  So I've sort of documented at the

```
 1    bottom the level of decrease in the overdoses between those

 2    two years.

 3              MS. QUEZON:  Your Honor, at this time the

 4    plaintiff would seek to move into evidence Exhibit

 5    P-41054-00001.

 6              THE COURT:  Any objection?

 7              MS. WU:  No objection.

 8              THE COURT:  It's admitted.

 9    BY MS. QUEZON:

10    Q.   Okay.  Now, Ms. Priddy, as the Director of Quality

11    Compliance, did you personally observe any effect on the

12    Cabell County EMS first responders as a result of the

13    increase in suspected overdoses?

14    A.   So as the Director of Quality Compliance, I feel like

15    my job is to improve patient care.  So when I was having our

16    field personnel come to me and say, "I feel angry and I

17    don't know why --" we had one individual that was talking

18    about suicidal thoughts.

19         We actually have an Employee Assistance Program in

20    place that we can refer individuals to.  We partner with one

21    of the local hospitals.

22              COURT REPORTER:  I'm sorry.  Could you speak up,

23    please?

24              THE WITNESS:  I'm sorry.

25         So we, we have an Employee Assistance Program through
```

```
 1    one of the local hospitals.  There's a counselor that's
 2    associated with that.  They will take referrals, immediate
 3    referrals if we see an individual that is struggling and we
 4    immediately refer them.
 5         As we started to see increased incidences and -- can
 6    I -- so one of the incidences that really prompted this
 7    program that we ended up developing was there was a mother
 8    on the interstate that was opioid-impaired.  She crashed her
 9    vehicle.  Her children were killed.
10         We had police, fire, and ambulance on the scene.  They
11    were able to fly the young daughter out in critical
12    condition.  And the little girl that could still speak said,
13    "Sissy, I don't know where Sissy is.  I can't find Sissy."
14         And, so, the first responders found a really small shoe
15    on the interstate and they knew that there was another child
16    there.  So they searched for an hour and a half for this
17    child.  They went over the embankment.  They walked up and
18    down the interstate.  And they never found her.
19         And then someone looked down in the wreckage and they
20    saw a little, teeny tuft of blond hair coming out of the
21    wreckage.  And they realized that little girl had been
22    trapped all that time.
23         So at that point, the first responders on the scene
24    broke down.  We ended up having a debriefing, which happened
25    very few and far between, but we ended up having a formal
```

1    debriefing.  We had a group come in from another county.

2         Our EMS supervisor who had done his job for 25 years

3    was in tears.  One of the police officers that had been, you

4    know, doing his job for 20 years, they were all in tears.

5         And suddenly we realized what we needed was something

6    more than just this Employee Assistance Program where if

7    somebody is in crisis, you refer them.  We needed something

8    to actually help the first responders prior to getting to

9    that crisis situation in their life.

10   **Q.**   I think there were two programs.  What were the two

11   programs if you can tell the Court?

12   **A.**   Okay.  So we had -- we developed a Critical Incident

13   Stress Management Team, and that had all the first

14   responders in Cabell County.  So we had law enforcement.  We

15   had police, fire, and EMS in that.  And we developed that.

16   That is that debriefing team, and they're still in place

17   now.

18        And we also developed what we call a Second Responders

19   Program.  We felt like this was a program to help the

20   helpers.

21   **Q.**   And, Ms. Priddy, did you create a poster to sort of let

22   the, the first responders know that there was someone there

23   that could help them?

24   **A.**   Yes, absolutely.  And it was developed with resource

25   numbers on it.  And we put it in each individual ambulance

1   station where the crews actually work out of.

2           MS. QUEZON:  Your Honor, permission to publish it

3   just for demonstrative purposes.

4           THE COURT:  Yes.

5   BY MS. QUEZON:

6   Q.   Is this the poster that you put together?

7   A.   Yes, it is.  So you can see we provided some basic

8   information, things like EMS providers are 10 times more

9   likely to commit suicide, some of the warning signs which

10  people do not realize sometimes.  You know, you go home and

11  you feel angry with your family and you don't know why.

12      So we were trying to just let them see some of those

13  and then give them resource numbers.  So we gave them the

14  Employee Assistance Program number.  There's a crisis line

15  with Prestera that is answered 24 hours a day.  And also the

16  National Suicide Hotline number is on there.  So just trying

17  to give them some resources because we knew they were

18  hurting.

19  Q.   Now, Ms. Priddy, as a result of the increase in

20  overdoses that we've looked at with the Court, and some of

21  the other issues that, that we've talked about that you saw

22  going on in your community as a result of the increase in

23  opioid overdoses, what, if anything, did you and some of the

24  other community members do?

25  A.   So we actually had an individual -- his name was Bob

1    Hanson.  He was the Director of Addiction Sciences at

2    Marshall Health.  He's -- he was what I call -- he corralled

3    the cats into the same room.  We had police, fire, EMS.  We

4    had political leaders.  We had Marshall University.  We had

5    both hospitals.

6         We very quickly realized when we got together that

7    everyone saw the issues, but they saw it from their own

8    perspective, you know.  They saw how it was affecting their

9    agency.

10        As we talked, we realized this is overwhelming our

11   community.  It's overwhelming our resources.  We have got to

12   look for answers.  We've got to look for a way to address

13   these issues.

14        And, so, I really feel so strongly about what our

15   community did, that it came together and it said, "We are

16   going to look for solutions."  And I think that that's where

17   we were at that point.

18   **Q.**   And what did Mr. Hanson -- what was one of his

19   suggestions?

20   **A.**   So one of Mr. --

21             MS. WU:  Objection, hearsay.

22             THE WITNESS:  I'm sorry?

23             MS. WU:  Objection, Your Honor, hearsay.

24   BY MS. QUEZON:

25   **Q.**   What, if anything, did you do as a group?

```
1              THE COURT:  I'm going to sustain the objection.

2    Go ahead.

3              MS. QUEZON:  Yes, sir.  My apologies.

4    BY MS. QUEZON:

5    Q.   What, if anything, did you decide to do as a group?

6    A.   So as a group, we decided to look for ways to address

7    this.  And one of the things that we found was a Quick

8    Response Team model in Colerain, Ohio.  And they were able

9    to come to Huntington and sort of just tell us basically

10   what they were doing and how they were doing it and the

11   level of success that they had with that.

12   Q.   And after meeting with the group from Colerain

13   regarding QRT, what, if anything, did you do?

14   A.   We thought it was a wonderful idea.  We said that this

15   was utilizing first responders, which are the first point of

16   contact in an overdose, and actually going to see people.

17   We thought this was a great idea.  We had no funding.

18   Q.   So without money, what did you do then?

19   A.   So without money, we applied for two federal grants.

20   We applied for the first one hoping against hope we might

21   get it.  And then we found another grant opportunity that we

22   thought we will apply, possibly we might get one or the

23   other.

24   Q.   And what happened?

25   A.   We actually got approved for both.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**    And how -- how long is the grant period, Ms. Priddy?

2    **A.**    So we got approved in late September of 2017 for a

3    three-year period.

4    **Q.**    And how much was the grant from each of the two federal

5    agencies?

6    **A.**    Total close to 1.3 million, so roughly 400,000 a year.

7    **Q.**    All right.  Now, what does the Quick Response Team do?

8    **A.**    So the Quick Response Team is what is called a First

9    Responder Diversion Program.  So that means first

10    responders, EMS, law enforcement go out and actually visit

11    an individual after they have overdosed.

12    **Q.**    And how do you make that determination?

13    **A.**    So we utilize the EMS data and, so, that way we know.

14    We know who to go see.  Very, very quickly we realized that

15    we need to make sure -- because we had individuals say, "So

16    you have to overdose to get help from the Quick Response

17    Team?"  And we're like, "Oh, absolutely not."

18        So we developed a referral number so you could call in

19    and ask for help, so families could call in and ask for

20    help, so individuals could call in and ask for help, so you

21    did not have to have an overdose event.

22    **Q.**    Who is on the team?

23    **A.**    Okay.  So on the team we have an EMS personnel, so we

24    have a paramedic.  We have a police officer.  We have what I

25    generally call a treatment provider, so somebody that's been

1    in behavioral health who has dealt with people with

2    substance use disorder in the past.  And also we have a

3    faith leader.  So we have many, many churches in our

4    community that want us to do something and they wanted to be

5    a part of, of the solution.

6         So I offered up.  I said, "Well, you could offer your

7    church as a safe haven.  You could maybe provide food or

8    clothing."  And they said, "Absolutely not.  We want to go

9    out with the team and visit these individuals.  We want to

10   make that personal contact with them."

11        So we have four members of the team at any given day.

12   **Q.**   And can you tell the Court when you -- when the first

13   knock on the door happened?

14   **A.**   So we found out that we had gotten grant approval

15   October of 2017, and we knocked on the first door December

16   4th, 2017.  We were ready.  We were up and running.  We had

17   the resources.  We had the community buying in.  We were, we

18   were so ready.

19        And what we said was if we wait until we solve all of

20   these problems and all these questions, we'll still be

21   talking about them a year from now.  Let's just start going

22   out and visiting these individuals.

23   **Q.**   And, Ms. Priddy, how -- what was the reception -- well,

24   first of all, let me ask you, in what time frame -- you say

25   that often these are people that have overdosed.  How

1    quickly does the Quick Response Team try to get to that

2    person after they have had an overdose experience?

3    **A.**   So that's a really good question.  What we do generally

4    is we say 24 to 72 hours.  That's because the team only

5    works Monday through Friday.  We don't have enough funding

6    to work weekends.

7        So really quickly.  It is that rapid response within a

8    24-hour period during the week generally and maybe up to 72

9    hours.  They still get the medical care they need.  The

10   ambulance still responds.  They still get Narcan.  You know,

11   whatever they need, they still get, but they don't get that

12   follow-up piece sometimes until 72 hours after.

13   **Q.**   And do you call ahead or do you just show up at their

14   house?  How does what happen?

15   **A.**   So we, we literally do what I call a cold call.  We go

16   and knock on their door.  We don't call ahead.  We don't

17   make an appointment.  We've got such buy-ins from our field

18   personnel on occasion they'll say, "Somebody will come and

19   talk to you tomorrow."

20       If you want help or you need in treatment or if you

21   need anything, somebody's going to come.  But generally we

22   just show up and knock on the door.

23   **Q.**   And what was the reception like initially from the

24   people that you were trying to reach?

25   **A.**   So sometimes at the scene of that overdose, it's a

1    little confrontational.  Someone may have overdosed in

2    public.  They're embarrassed.  They just want to get out of

3    there.  You know, our crews were very cynical at this point.

4         So we were a little bit leery that we may not be well

5    received when we knock on somebody's door.  And that first

6    week we had the first two or three individuals and they

7    looked at us and said, "So you're here to check on me?  You

8    cared enough to come to my house and check on me to see if

9    I'm okay."

10        And we, we looked at each other and said, "We've got

11   something here.  This is going to work."

12        And I can't even tell you how grateful the families

13   are.  The families are just -- you know, they, they don't

14   know where to turn.  They don't know who to call.  So if you

15   knock on the door and you get a family member, they're

16   thrilled.

17   **Q.**  Does the team take anything with them on these QRT

18   visits?

19   **A.**  So we do provide Narcan, you know, because our, our

20   first priority is to save somebody's life.  That is our

21   first priority.

22        Once the American Heart Association realized what we

23   were doing they provided a little teeny -- it is truly a

24   disposable CPR mannequin.  It's in a little box about this

25   big (indicating) and you blow it up.  It's really tiny.

1          But to leave like a CPR mannequin -- which our

2     paramedic makes sure to have the family understand that

3     generally somebody's respirations are decreased.  So you

4     might be helping with their breathing.  You may not be

5     performing chest compressions.  But give them that tool to

6     explain that to them and then to provide that Narcan to

7     them.  They are so grateful.

8          We provide information on the Harm Reduction Program.

9     So if they're not ready for treatment, they still have an

10     option.

11          We, we also very -- within probably about a year, one

12     of the things that we were doing was providing information

13     in a little brown paper bag.  And we had a research partner

14     say, "A brown paper bag is a sandwich bag.  That's a lunch

15     bag."

16          So we started making peanut butter and jelly sandwiches

17     for individuals.  And I tell you what.  They thought it was

18     a steak dinner.  They were just so excited.

19          And then once our churches realized that, they started

20     donating peanut butter, donating bread, donating jelly,

21     donating coats.  And we even have one of our faith leaders

22     like knit hats and scarves for individuals.  I've got

23     pictures of this massive amount of, you know, scarves that

24     she was sitting and knitting.

25          So we really were going great guns.  COVID sort of put

1    a nix on being able to distribute that.

2    **Q.**   I was going to ask about that.  So did you notice a

3    change in tracking the overdose calls after QRT started

4    their work?

5    **A.**   So what happened initially is we started doing our

6    visits in December of 2017.  Within that first quarter, we

7    started seeing some numbers trending downward.

8         By the second quarter after that, we saw them trending

9    downward.  But we were sort of afraid in the beginning to

10   say these numbers are trending downward because we were

11   afraid if we say that, it's going to jinx us.

12        So we waited really pretty much for two quarters before

13   we reported out that downward trending of those numbers.

14        We, we actually had the Director of the Office of Drug

15   Control Policy from the presidential office come and I did a

16   presentation for him.  He said, you know, "These numbers are

17   going down.  Why, why doesn't everybody know about this, you

18   know, this model?"  And --

19   **Q.**   Ms. Priddy, would it help you to show just the, the

20   tracking in a graph form?

21   **A.**   Absolutely.

22             MS. QUEZON:  Your Honor, may I show it for

23   demonstrative purposes only?

24             THE COURT:  Yes.

25             THE WITNESS:  So you can see how the numbers were

1    trending up and up and up.  And this is by month.  Most

2    people are very aware of the August of 2016 incident that we

3    reported out about 28 overdoses in about a four-or-five-hour

4    period.  Something that became very obvious after that is no

5    one was referred for treatment after that date.

6        And I continued to track those numbers.  Every single

7    month after 2016, that August of 2016, the numbers continued

8    to trend upward until August of 2017.  We had nearly 200

9    overdoses in one month which was averaging about six a day.

10   **Q.**   And then this is the month in which -- December 17th is

11   when you all started the QRT?

12   **A.**   Yes, yes, ma'am.

13   **Q.**   Now, you mentioned COVID.  Can you tell the Judge what

14   happened when QRT couldn't go out anymore?

15   **A.**   So we went -- you know, I think it was probably about

16   mid March in 2020 government services were shut down.  We

17   were working out of a government building.  So the QRT shut

18   down.

19        All those trending downward numbers tripled from April

20   to May in 2020.  So we realized really quickly how important

21   that personal engagement component was to put your hand on

22   somebody and tell them that we're here to help you, you

23   know.  This is a really, really difficult system to

24   navigate.  Healthcare in general is really hard to navigate.

25   **Q.**   Well, Ms. Priddy, do people that QRT go to actually go

1    into treatment?

2    **A.**    So of the individuals that we contact, we have contact

3    with, about 30 percent of those individuals go into some

4    type of formalized treatment.

5    **Q.**    And even when they're willing, are there any other

6    barriers?  I think you mentioned the, the complicated

7    healthcare system.  Any other barriers to people getting

8    treatment when they're willing to do so?

9    **A.**    Cost.  You know, they, they don't have the ability to

10   pay.  Sometimes -- our team has gotten really good that if

11   they're eligible for some type of state funded, you know,

12   insurance, they can link them with that.

13        But facilities a lot of times were asking for a huge

14   amount of money up front and, you know, these individuals

15   and their families couldn't afford that.  So cost was

16   probably number one on our list.

17        Transportation.  You know, we make the assumption that

18   somebody can get in their car and drive to treatment,

19   especially if they're doing an out-patient treatment.  But a

20   lot of individuals can't go into a facility for like 30 days

21   because they have a family.  They have children at home.

22   They have a job.  They can't leave that.

23        So they're forced into like a -- not even forced.  They

24   elect into an out-patient setting.  But they don't have the

25   transportation to get there three times a week or, you know,

1    whatever is required of them.

2    **Q.**    Now, Ms. Priddy, for purposes of the grant recording,

3    have you personally looked at the EMS and QRT data to

4    determine if there's a typical overdose patient?

5    **A.**    So demographic wise we certainly -- you know, I learned

6    a lot.  The average age of someone who overdoses is 37 years

7    old.

8         As far as male versus female, probably about 60 percent

9    male, 40 percent female.

10        After that, there is no typical overdose person.  There

11   really -- it cuts across every socioeconomic line.  Our team

12   will tell you that they have sat in an apartment with a dirt

13   floor and a mattress and they sit in million-dollar homes.

14   And it cuts across gender.  It cuts across race.  It cuts

15   across every socioeconomic line.

16        So there is no typical person that overdoses.  I say

17   this, and I believe this with all my heart.  When you see an

18   individual now who may be gaunt with a hoodie on, it's not

19   where they started.  They started as somebody's son or

20   somebody's daughter playing in the backyard, playing T-ball.

21   I mean, you know, there isn't a typical.  I know too many

22   people.

23   **Q.**    Ms. Priddy, you mentioned that you received that grant.

24   Were you able to renew the grant?

25   **A.**    So the grant was actually set to expire last year in

1    2020.  That was the three-year period.  We were able to,

2    because we actually managed the funds really, really well,

3    to ask for a no-cost extension.  So they didn't provide us

4    any more money.  They just provided us some more time.  So

5    that is set to expire in just a few weeks.

6    **Q.**   When does it expire?

7    **A.**   July 1st.  Well, actually June 30th.

8    **Q.**   Can you tell the Court what does, what does the -- what

9    does QRT need to continue its work?

10   **A.**   So we need reliable, sustainable funding.  This will go

11   on long after I'm retired because I'm old.  This will be

12   generational.  This will continue to go.

13       This model works.  This model needs sustainable

14   funding.  And it has been picked up all across the country.

15   And what makes this model work is that people out there

16   touching individuals where they are, not waiting for them to

17   come to them sitting behind a desk.  They are going to those

18   individuals and offering help, and help to families.

19            MS. QUEZON:  Your Honor, may I have a moment to

20   confer?

21            THE COURT:  Yes.

22       (Pause)

23   BY MS. QUEZON:

24   **Q.**   Ms. Priddy, in addition to the, to what the QRT

25   team does now, are there ways that you would like to

1    improve it?

2    **A.**    Absolutely.  What I would love to have is a follow-up

3    team so if an individual maybe goes into treatment that we

4    could follow up with that individual because right now we're

5    sort of relying on the facility that we've referred them to

6    to do that follow-up piece.  That would be so nice to have

7    our team be able to follow up, see if they need anything.

8    "Are you still doing good?"  You know, because we've seen so

9    many people get well.  We want to make sure that they

10   continue on that path.

11        We would love to focus more on that healthcare aspect.

12   We were able during COVID, because we were having a hard

13   time reaching everyone, is that we actually set up a tent

14   and backed an ambulance in and opened the doors.  We gave

15   flu shots.  We did Narcan training.  We did HIV testing.

16   And even the last event we did, we did COVID testing.

17   **Q.**    And is this partnering with other agencies and other

18   hospitals?

19   **A.**    Absolutely, our Health Department, our local health.

20             MS. QUEZON:  Thank you, Your Honor.  Nothing

21   further.  We pass the witness.

22             THE COURT:  You may cross-examine.

23                      CROSS EXAMINATION

24   BY MS. WU:

25   **Q.**    Good afternoon, Ms. Priddy.  I'm Laura Wu and I

1    represent McKesson.

2        You spoke earlier this afternoon about some of your

3    nursing career and I'd like to circle back to start there.

4        You spent nearly a decade as an ER nurse both at

5    Huntington Hospital and Huntington/Cabell Hospital; correct?

6    **A.**   Yes, uh-huh.

7    **Q.**   You're still licensed as a nurse today?

8    **A.**   Yes.

9    **Q.**   When you were working as a nurse, you administered

10   opioids to patients; correct?

11   **A.**   Yes.

12   **Q.**   Opioids have medically appropriate purposes; correct?

13   **A.**   Yes.

14   **Q.**   Physicians can legitimately prescribe opioids?

15   **A.**   Yes.

16   **Q.**   Nurses such as yourself can administer them?

17   **A.**   Yes.

18   **Q.**   Pharmacies can legitimately dispense prescription

19   opioids; correct?

20   **A.**   Yes.

21   **Q.**   In fact, opioids are indicated for use in many

22   emergency situations; correct?

23   **A.**   Yes.

24   **Q.**   For example, you use opioids, prescription opioids for

25   a burn patient; correct?

1    **A.**    Absolutely, yes.

2    **Q.**    Or a patient with a broken bone?

3    **A.**    Yes.

4    **Q.**    As part of your job as a flight nurse, you collected

5    information from patients on the medications that they were

6    taking; correct?

7    **A.**    Yes.

8    **Q.**    That was part of your intake process?

9    **A.**    Yes, it was.

10   **Q.**    At some point in the early 2000s you started to see

11   more patients who had been prescribed opioids by their

12   physicians; correct?

13   **A.**    Yes, uh-huh.

14   **Q.**    During the course of your nursing career, you learned

15   that team management became a higher priority in the medical

16   profession; correct?

17   **A.**    So on the helicopter we always addressed pain

18   management.  So I can't speak to really what they were doing

19   in the hospital.  I just know what we were doing in the

20   field.

21   **Q.**    Ms. Priddy, you're familiar with an organization called

22   the Joint Commission on Accreditation of Healthcare

23   Organizations; correct?

24   **A.**    Yes, uh-huh.

25   **Q.**    That's an organization that accredits hospitals around

1    the country like the hospitals in Cabell County where you

2    work; correct?

3    **A.**   Yes, uh-huh.

4    **Q.**   You understand that pain management became one of the

5    criteria that the Joint Commission evaluated in deciding

6    whether or not to accredit a hospital; correct?

7    **A.**   I, I did not work -- I worked for Cabell-Huntington

8    Hospital, but I was not part of the JCAH interview process.

9    So I honestly don't know.

10    **Q.**   You didn't learn that in the course of your nursing

11    career?

12    **A.**   That JCAH made that a criteria for them?  No.

13    **Q.**   Okay.  Ms. Priddy, you obtained your nursing degree in

14    1981 I believe you said?

15    **A.**   Yes, uh-huh.

16    **Q.**   And at that time, nurses were not taught to treat pain

17    as the fifth vital sign; correct?

18    **A.**   Correct.

19    **Q.**   At some point thereafter, the concept of pain as a

20    fifth vital sign was introduced; correct?

21    **A.**   Yes.  I had heard that term absolutely.

22    **Q.**   That put pain on the same level of importance as a

23    patient's temperature or respiration; correct?

24    **A.**   Yes.

25    **Q.**   And nurses then had to ask the patients to rate their

1    scale on a -- rate their pain on a scale of 1 to 10?

2    **A.**   Yes.

3    **Q.**   And if a patient indicated pain, the medical

4    professional needed to address it; correct?

5    **A.**   Yes, even though that was not our criteria we used on

6    the helicopter, but, yes.

7    **Q.**   Now I'd like to talk about the time you spent at EMS in

8    Cabell County.

9         You understand that in recent years doctors have been

10   encouraged to prescribe fewer opioids; correct?

11   **A.**   Yes, ma'am.

12   **Q.**   But even today, opioids have a legitimate role in

13   medical care; correct?

14   **A.**   Correct.

15   **Q.**   West Virginia requires all EMS ambulances in the state

16   to carry certain medications in order to obtain

17   certification; correct?

18   **A.**   Correct.

19   **Q.**   West Virginia requires all ambulances to stock opioid

20   medications; correct?

21   **A.**   Correct.

22   **Q.**   West Virginia also puts out protocols that every EMS

23   must follow; correct?

24   **A.**   Correct.

25   **Q.**   Now, I'd like to show you some of those and I'd like to

1    mark Defendants' West Virginia Exhibit 263.  Sorry.  This is

2    a big one.

3         Ms. Priddy, you have in front of you a copy of the 2019

4    edition of the Paramedic Treatment Protocols.  Do you see

5    that?

6    **A.**   Yes, uh-huh.

7    **Q.**   Ms. Priddy, you're familiar with this document from

8    your work with Cabell County EMS; correct?

9    **A.**   Yes.

10             MS. WU:  Your Honor, I move the document into

11   evidence.

12             THE COURT:  Is there any objection?

13             MS. QUEZON:  No objection, Your Honor.

14   BY MS. WU:

15   **Q.**   Ms. Priddy, I'd like to ask you to turn to Page 47

16   of the document.  This is the protocol for chest pain

17   discomfort/acute coronary syndrome. Do you see that?

18   **A.**   No, I don't.  Wait.

19   **Q.**   I'm sorry.  I jumped ahead.

20   **A.**   I'm looking for the actual page number.  Oh, I see it.

21   Okay.  I see it.

22   **Q.**   I'll repeat my question, Ms. Priddy.  So Page 47 of the

23   document is the protocol for chest pain discomfort/acute

24   coronary syndrome.  Do you see that?

25   **A.**   Yes, I do.

```
 1    Q.   And it instructs if chest pain persists, EMS agencies

 2    throughout the state are directed to either administer

 3    morphine sulfate or administer fentanyl.  Do you see that?

 4    A.   Uh-huh.

 5    Q.   Both morphine sulfate and fentanyl are prescription

 6    opioids products; correct?

 7    A.   Correct.

 8    Q.   Ms. Priddy, I'd like you to turn to Page 157 of the

 9    document.  Page 157 is a protocol for patient comfort or

10    pain management.  Do you see that, Ms. Priddy?

11    A.   Yes, I do.

12    Q.   It states if a patient is in severe pain, EMS agencies

13    throughout the state are directed to either administer

14    fentanyl or administer morphine sulfate.

15         Do you see that, Ms. Priddy?

16    A.   Yes, uh-huh.

17    Q.   And, again, fentanyl and morphine sulfate are

18    prescription opioids?

19    A.   Yes.

20    Q.   I'd like to ask you to turn to Page 159 of the

21    document.

22         Ms. Priddy, Page 159 is the protocol for rapid sequence

23    intubation.  Do you see that?

24    A.   Yes, I do.

25    Q.   This refers to the -- this provides instructions for
```

1  when a patient needs rapid airway; correct?

2  **A.**   Yes, uh-huh.

3  **Q.**   Now, if we turn to the next page, Page 160, step two of

4  the RSI procedure is to administer fentanyl.  Do you see

5  that?

6  **A.**   Yes, I do.

7  **Q.**   And on the next page, Page 161, it says once intubation

8  is confirmed, if patient requires continued sedation or

9  analgesics, EMS agencies are to provide and repeat as

10  necessary fentanyl or morphine for sedation.  Do you see

11  that?

12  **A.**   I do.

13  **Q.**   And, again, fentanyl and morphine are both opioid

14  medications?

15  **A.**   Yes.

16  **Q.**   Ms. Priddy, administration of opioids is part of the

17  accepted treatment for EMS; correct?

18  **A.**   Correct.

19  **Q.**   And pursuant to these protocols that we've reviewed,

20  Cabell County EMS carries opioids in all of its ambulances;

21  correct?

22  **A.**   Yes, uh-huh.

23  **Q.**   And Cabell County EMS used opioids in emergency

24  response situations?

25  **A.**   Yes.

1    **Q.**   And that's consistent with the statewide protocols that

2    you've just reviewed?

3    **A.**   Yes.

4    **Q.**   In fact, Cabell County administered fentanyl just --

5    I'm sorry.  Cabell County -- Ms. Priddy, in fact, Cabell

6    County administers fentanyl when required to patients in its

7    care; correct?

8    **A.**   Yes.

9    **Q.**   In the first nine months of 2017 alone, Cabell County

10   EMS administered fentanyl at least 137 times; that right?

11   **A.**   I'm assuming.  I don't see a document, so I don't know.

12   I don't have those statistics in front of me.

13   **Q.**   Sure.  Let me show you a document just to help you

14   there.

15   **A.**   Thank you.

16   **Q.**   Ms. Priddy, I'm showing you a document which is

17   Defendants' West Virginia 260 for identification.  And this

18   is a spreadsheet logging Cabell County EMS administrations

19   of fentanyl and morphine.  Do you see this, Ms. Priddy?

20   **A.**   Yes, I do, uh-huh.

21   **Q.**   Are you familiar with this document, Ms. Priddy?

22   **A.**   Not particularly.  I did not create this document.

23   But --

24   **Q.**   Are you aware that Cabell County EMS tracks

25   administration of fentanyl and morphine?

1    **A.**    Absolutely, yes.

2    **Q.**    And are you familiar with this document as the form in

3    which Cabell County EMS tracks those administrations?

4    **A.**    I'm not -- not this particular form.  I know that it is

5    tracked.  I don't know if it's always put into this type of

6    form but, yes.

7    **Q.**    Thank you, Ms. Priddy.  If you look at Pages 2 and 3,

8    it reflects that Cabell County EMS administered fentanyl 137

9    times.  Do you see that tally?

10   **A.**    Was that this page?

11   **Q.**    If you look at the bottom of -- I'm sorry, page --

12   **A.**    I see it.  Okay.  Nevermind.  I'm sorry.

13   **Q.**    We get the tally of 137 administrations.  Do you see

14   that?

15   **A.**    Yes, I do see that.

16   **Q.**    Thank you.  Ms. Priddy, I'd like to return to a topic

17   you testified about earlier which is the EMS overdose data.

18   **A.**    Yes, ma'am.

19   **Q.**    You discussed Cabell County's experience responding to

20   opioid overdoses.  And you described the records that EMS

21   now keeps.  Correct?

22   **A.**    Yes.

23   **Q.**    Among other things, for each run EMS records the type

24   of call.  That's using the drop-down box that you referenced

25   earlier.  Correct?

 1   **A.**    Yes, Uh-huh.

 2   **Q.**    One type of call which you described is the suspected

 3   overdose call; correct?

 4   **A.**    Yes.

 5   **Q.**    All suspected overdoses are categorized the same no

 6   matter what substance is involved; correct?

 7   **A.**    Yes.

 8   **Q.**    Cabell County EMS does not make any determination in

 9   the field about the type of substance involved; correct?

10   **A.**    Correct.

11   **Q.**    Even when a toxicology report is prepared, that report

12   is not sent back to Cabell County EMS; correct?

13   **A.**    Correct.

14   **Q.**    So Cabell County EMS does not record how many suspected

15   overdose runs were due to opioids versus any other

16   substance; correct?

17   **A.**    No.  Cabell County EMS does not, no.  Is that what

18   you're asking?

19   **Q.**    That's correct.  So Cabell County does not have a --

20   I'm sorry.  Let me try that again.  So Cabell County does

21   not have a record of suspected overdose runs specific to

22   opioid events; correct?

23   **A.**    Other than the fact that they are categorized as such

24   and then I physically review them.  And within my experience

25   level, probably about 95 percent of our calls are opioid

1   related.

2   **Q.**   The overdose run data that you maintain does not

3   specify a type of drug involved in the overdose run data;

4   correct?

5   **A.**   No, it does not.

6   **Q.**   Cabell County EMS does not attempt to identify the

7   source of the drug involved in the overdose event; correct?

8   **A.**   Correct.

9   **Q.**   Ms. Priddy, you cannot say, for example, whether the

10   vast majority of opioid overdoses include heroin and

11   fentanyl or a prescription opioid medication; correct?

12   **A.**   Correct.

13   **Q.**   Nonetheless, you do know that heroin is a problem in

14   Cabell County; correct?

15   **A.**   Correct.

16   **Q.**   And you also know that fentanyl is a problem in Cabell

17   County; correct?

18   **A.**   Correct.

19   **Q.**   Drug cartels lace fentanyl into heroin; correct?

20   **A.**   I'm assuming, yes.

21   **Q.**   And drug cartels also lace fentanyl into cocaine and

22   other non-opioid class drugs; correct?

23   **A.**   Correct.

24   **Q.**   They also lace fentanyl into meth which is on the rise

25   in Cabell County; correct?

1    **A.**    I'm assuming, yes.  I don't know that specifically.

2    **Q.**    You also know that carfentanil is a problem in Cabell

3    County; correct?

4    **A.**    I do not have personal knowledge of that, but --

5    **Q.**    Ms. Priddy, are you aware that in August of 2016, 26

6    people overdosed in a single day when a drug dealer from

7    Akron, Ohio, was giving away free samples that were laced

8    with carfentanil?

9    **A.**    Yes.

10   **Q.**    And that's the overdose event that you described in

11   your testimony earlier today?

12   **A.**    It is.

13   **Q.**    Carfentanil is an illicit drug; correct?

14   **A.**    Correct.

15   **Q.**    Ms. Priddy, to the extent an individual overdoses on a

16   prescription opioid, Cabell County EMS does not make any

17   attempt to determine whether the individual who overdosed

18   had a valid prescription for that medication; correct?

19   **A.**    No.  We are just treating the patient's condition.

20   **Q.**    And you would not have any way to investigate that as

21   EMS; correct?

22   **A.**    No.

23   **Q.**    In fact, you're not aware of anyone who has tried to

24   determine the percent of opioids in Cabell County that were

25   taken for something other than a legitimate medical purpose;

1    correct?

2    **A.**    I do not know, no.

3    **Q.**    Ms. Priddy, to the extent that an individual overdoses

4    on a prescription, prescription opioid, EMS does not make

5    any attempt to determine the pharmacy that dispensed that

6    medication; correct?

7    **A.**    Correct.

8    **Q.**    Or the distributor who supplied that pharmacy; correct?

9    **A.**    Correct.

10   **Q.**    To the extent that an individual overdoses on an

11   illegal opioid like heroin or fentanyl, EMS does not make

12   any attempt to determine whether the individual ever had a

13   valid prescription for an opioid medication; correct?

14   **A.**    Correct.

15   **Q.**    And you're not aware of any data on the percentage of

16   people using illegal drugs in Cabell County who started with

17   a legal prescription medication for an opioid; correct?

18   **A.**    Am I aware of any data that is out there?

19   **Q.**    That's correct, in Cabell County.

20   **A.**    Yes.

21   **Q.**    Ms. Priddy, you are, you are aware of data specific to

22   Cabell County which identifies the prescription drug history

23   for individuals currently using illicit heroin and fentanyl?

24   **A.**    Yes.

25   **Q.**    What's the source of that information?

1    **A.**    The Cabell-Huntington Health Department.  They actually

2    interview the individuals that come into their Harm

3    Reduction Program.

4    **Q.**    And that's not an EMS data set?

5    **A.**    No, it is not.

6    **Q.**    And you don't know how that information is compiled;

7    correct?

8    **A.**    No, through an interview process.

9    **Q.**    Earlier today, Ms. Priddy, you described that the

10   average overdose victim that EMS encounters is a 37-year-old

11   individual; correct?

12   **A.**    Yes.

13   **Q.**    Through your medical career, have you come to know that

14   the average recipient of a prescription opioid medication

15   through a doctor's prescription is 55 to 65 years old?

16   **A.**    No, I do not.

17   **Q.**    You don't know that?

18   **A.**    No.

19   **Q.**    Now, a short while ago you described a turn-around in

20   Cabell County; correct?

21   **A.**    Yes, ma'am.

22   **Q.**    Suspected overdose runs have declined in recent years;

23   correct?

24   **A.**    Correct.

25   **Q.**    You looked at some data, but I've got a little bit

1    more.

2            MS. WU:  Could I get McKesson West Virginia 2098,

3    2099, 2100, 2101, please.

4    BY MS. WU:

5    **Q.**  Ms. Priddy, the document which I've identified for

6    you includes overdose statistics maintained by Cabell

7    County EMS; correct?

8    **A.**   Correct.

9    **Q.**  You looked at a similar set of data with counsel just a

10   short while ago; correct?

11   **A.**   Uh-huh.

12   **Q.**  Now, the documents that we've put in front of you show

13   every month from October, 2014, through March, 2021.  Do you

14   see that?

15   **A.**   I do.

16   **Q.**  And this is all overdose runs recorded by Cabell County

17   EMS regardless of what type of substance was involved in the

18   overdose event; correct?

19   **A.**   Yes.  This is from the medical category drop-down box.

20   **Q.**  And it's not limited to opioids generally or

21   prescription opioids specifically.  It's all drugs?

22   **A.**   Yes, anything that would be classified suspected

23   overdose, yes.

24   **Q.**  Okay.  Thank you, Ms. Priddy.

25           Now, I'm going to show you our version of a chart.

```
 1              MS. WU:  So, Mr. Reynolds, could I ask you to pull

 2    up the demonstrative which accompanies this data.

 3    BY MS. WU:

 4    Q.   Ms. Priddy, this is a chart that we've made which

 5    tracks this longer period of data which is reflected in

 6    the four exhibits that you have in front of you.  We've

 7    plotted that data just so we could speak about it here.

 8          As you mentioned in your testimony earlier today,

 9    suspected overdoses peaked in 2017; correct?

10    A.   Yes, uh-huh.

11    Q.   Between 2017 and 2018, the number of suspected overdose

12    runs declined by 40 percent; correct?

13    A.   Correct.

14    Q.   That amounts to a decline of nearly 750 overdose runs

15    by Cabell County EMS; correct?

16    A.   Yes.

17    Q.   The number of suspected overdose runs declined by

18    another 200 runs in 2019; correct?

19    A.   Correct.

20    Q.   In fact, from 2017 to 2019 the suspected overdose runs

21    declined by more than half; correct?

22    A.   Yes, uh-huh.

23    Q.   That decline corresponds to a decline in overdoses

24    overall in Huntington/Cabell County; correct?

25    A.   Correct.
```

1    **Q.**   Between 2017 and 2018 fatal overdoses declined by

2    24 percent; correct?

3    **A.**   Correct.

4    **Q.**   In fact, Cabell County's decline in fatal overdoses

5    outpaced West Virginia's decline as a whole; correct?

6    **A.**   Correct.

7    **Q.**   Ms. Priddy, in your experience, the decrease in

8    overdoses is due to the collaboration in the community which

9    you described a short while ago; correct?

10   **A.**   Correct.

11   **Q.**   For instance, the community has opened several

12   treatment facilities; correct?

13   **A.**   Correct.

14   **Q.**   The Quick Response Team is now able to find a treatment

15   bed for every person in need; correct?

16   **A.**   Most generally, more so than in '17.

17          MS. WU:  Mr. Reynolds, could I ask you to pull up

18   Ms. Priddy's deposition, Page 275, Line 19.

19          MS. QUEZON:  Objection, improper impeachment if

20   that's what's being attempted.

21          THE COURT:  Well, overruled.  I don't know where

22   you're going with this.

23   BY MS. WU:

24   **Q.**   Ms. Priddy, you were deposed in this case last

25   summer; correct?

1    **A.**    Correct.

2    **Q.**    And you testified under oath at your deposition?

3    **A.**    Yes.

4              MS. WU:  And, Chris, could you go to Page 257,

5    please.

6    BY MS. WU:

7    **Q.**    And if we go to Line 19, it reads, "Is there some

8    issue with the capacity for treatment recovery referral

9    in your area?"

10              You answered, "You mean the ability to accept patients

11    once they would want treatment?"

12              MS. QUEZON:  Where are you reading?  It's not on

13    the screen.  I apologize.

14              MS. WU:  Oh, I'm sorry.  Deposition Page 275, Line

15    19.  I'm sorry.

16              MS. QUEZON:  No worries.

17              MS. WU:  Thank you, counsel.

18    BY MS. WU:

19    **Q.**    And then your answer:  "In the beginning, certainly

20    there was, but there's a lot more resources now.  So I

21    do not hear the team saying we could not find a bed, we

22    could not find a program.  You know there's a lot more

23    resources now than there were three years ago."

24              Do you see that, Ms. Priddy?

25    **A.**    I see the big screen.  I don't --

1    **Q.**    I apologize for the technical difficulties.

2    **A.**    That's okay.  I'm not very technical.

3    **Q.**    Do you see that, Ms. Priddy?

4    **A.**    Yes, I see it, uh-huh.

5    **Q.**    And that was your testimony under oath; correct?

6    **A.**    Yes, uh-huh.

7    **Q.**    Ms. Priddy, in fact, you've been -- you've stated that

8    you have enough resources in the community now in that in

9    your opinion it can only get better; correct?

10   **A.**    We have much more resources than we had in '17, yes,

11   absolutely.

12   **Q.**    And in your opinion, it can only get better; correct?

13   **A.**    I think if we continue to address the issue, it can

14   only get better, yes.

15   **Q.**    Your experience has shown a big part of the improvement

16   is due to the work of the QRT team; correct?

17   **A.**    Correct.

18   **Q.**    And the QRT team, as you mentioned a short while ago,

19   has become a model for other cities throughout the country?

20   **A.**    Correct.

21   **Q.**    The QRT has had a significant impact on the number of

22   overdoses in Cabell County; correct?

23   **A.**    I would like to believe that, yes.

24   **Q.**    And that's been borne out by the COVID-19 pandemic;

25   correct?

1    **A.**    Correct.

2            MS. WU:  Now, Mr. Reynolds, could we put the

3    demonstrative of overdose runs back up.

4    BY MS. WU:

5    **Q.**    Earlier you described the impact that COVID had on

6    overdoses in Cabell County.  In the first three months

7    of 2020, which we see at the end of this graph, the

8    number of suspected overdose runs was about equal to

9    what it was in 2019.  Do you see that, Ms. Priddy?

10   **A.**    I do.

11   **Q.**    But when COVID hit, the QRT team was not able to make

12   face-to-face visits as you've just testified; correct?

13   **A.**    Correct.

14   **Q.**    People were isolated; correct?

15   **A.**    Correct.

16   **Q.**    They didn't have personal connections; correct?

17   **A.**    Correct.

18   **Q.**    They couldn't have face-to-face interactions with the

19   QRT team; correct?

20   **A.**    Correct.

21   **Q.**    And that inhibited access to treatment; correct?

22   **A.**    Yes.  They did not have that information on hand being

23   given by an individual.

24   **Q.**    As a result, when QRT stopped operating in person, the

25   number of suspected overdose runs started to increase in

1    April of 2020; correct?

2    **A.**    Correct.

3    **Q.**    After overdoses --

4    **A.**    No, not until May.  I'm sorry.  In April they were --

5    **Q.**    And -- I'm sorry.  Did you say they spiked in May?

6    **A.**    Yes.

7    **Q.**    I'm sorry.

8    **A.**    I'm sorry.  Yes.

9    **Q.**    So after the overdoses spiked at the beginning of the

10   pandemic, they came back from their peak; correct?

11   **A.**    We battled it all through the summer, yes, once we were

12   out there making personal visits again.

13   **Q.**    And the overdose run rate went down once the QRT

14   program was up and running in person again; correct?

15   **A.**    Yes.

16   **Q.**    Now, as you described a short while ago, funding for

17   the QRT team has come from grants up to this point; correct?

18   **A.**    Correct.

19   **Q.**    Huntington and Cabell received $1.35 million in federal

20   grant money for the QRT team; correct?

21   **A.**    Correct.

22   **Q.**    And those grants have covered all of the QRT team's

23   costs up to this point; correct?

24   **A.**    Correct.  Well, not, not all of them.  We've been

25   provided in kind -- Cabell County EMS has provided a

1    vehicle, maintenance, fuel, medical, I'm sorry, insurance.

2    We have also been provided an office.  So it has paid the

3    salaries of the individuals on the scene, but not a lot of

4    the other expenses.

5    **Q.**   The grants cover the personnel costs for QRT; correct?

6    **A.**   Yes.

7    **Q.**   In addition, the QRT receives naloxone at no cost;

8    correct?

9    **A.**   Not directly, no.  There was grants that provided

10   naloxone to the QRT team in the very beginning.  So, yes,

11   through that grant program.  That was not a state-funded

12   program.

13   **Q.**   So the QRT has not had to pay for naloxone; correct?

14   **A.**   Correct.

15   **Q.**   It's received naloxone through grant funding; correct?

16   **A.**   Correct.

17   **Q.**   In fact, the QRT team actually saves Cabell County

18   money by reducing the number of overdoses in the area;

19   correct?

20   **A.**   The way we view it is we are not getting reimbursed for

21   those costs.  And, yes, that would be a money-saving to the

22   agency itself.

23   **Q.**   Now, Ms. Priddy, I'd like to switch topics and talk a

24   little bit about the resiliency plan.

25        Ms. Priddy, the resiliency plan purports to have set

```
 1    out a plan to respond to the opioid crisis in Cabell County.
 2              THE COURT:  Ms. Wu, it's obvious to me we're going
 3    to have to bring Ms. Priddy back tomorrow.  This might be a
 4    good place to stop.
 5              MS. WU:  I'm happy to, Judge.
 6              THE COURT:  Okay.  I assume we're not going to be
 7    able to finish her in 10 or 15 minutes, are we?
 8         Ms. Priddy, the bad news is you're going to have to
 9    come back tomorrow.
10              THE WITNESS:  Okay.  I will do whatever is needed,
11    sir.
12              THE COURT:  All right.  We'll be in recess until
13    9:00 in the morning.  And we'll just go half a day tomorrow.
14         (Trial recessed at 4:59 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

```
1        CERTIFICATION:

2                    I, Ayme A. Cochran, Official Court

3    Reporter, and I, Lisa A. Cook, Official Court Reporter,

4    certify that the foregoing is a correct transcript from

5    the record of proceedings in the matter of The City of

6    Huntington, et al., Plaintiffs vs. AmerisourceBergen

7    Drug Corporation, et al., Defendants, Civil Action No.

8    3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9    reported on May 6, 2021.

10

11            S\Ayme A. Cochran            s\Lisa A. Cook

12              Reporter                     Reporter

13        _

14

15        May 6, 2021

16            Date

17

18

19

20

21

22

23

24

25
```

**$**

**$1,000.00** [1] - 139:9
**$1,495.00** [1] - 41:24
**$1.35** [1] - 235:19
**$500.00** [1] - 38:13

**'**

**'12** [1] - 117:18
**'13** [2] - 111:18, 117:18
**'15** [1] - 167:9
**'17** [2] - 231:16, 233:10
**'88** [1] - 184:8
**'89** [1] - 184:8
**'99** [1] - 165:25

**0**

**00027696** [1] - 19:17
**00907** [1] - 2:17
**03036** [1] - 150:2

**1**

**1** [10] - 19:19, 60:17, 63:20, 114:9, 114:15, 114:21, 116:11, 176:6, 218:1
**1,089** [1] - 197:25
**1,831** [1] - 197:23
**1.3** [1] - 204:6
**10** [5] - 102:15, 113:17, 201:8, 218:1, 237:7
**10,000** [2] - 102:7, 172:15
**100** [1] - 32:24
**100,000** [1] - 166:13
**1001** [2] - 2:10, 4:6
**1006** [2] - 175:3, 176:2
**1006s** [1] - 173:23
**1022** [1] - 3:6
**10:00** [1] - 46:1
**10:30** [1] - 8:7
**10th** [1] - 9:1
**11** [6] - 75:9, 113:16, 115:4, 116:5, 118:18, 119:5
**1146-1** [1] - 10:1
**1180** [1] - 2:5
**11th** [1] - 9:4
**12** [6] - 65:3, 65:10, 65:11, 65:19, 66:9, 122:6
**126** [1] - 3:5
**12:06** [1] - 120:14
**1300** [1] - 6:15

**1311** [1] - 2:17
**137** [3] - 222:10, 223:8, 223:13
**14.6** [1] - 36:18
**14.7** [1] - 105:17
**15** [4] - 33:23, 48:12, 178:20, 237:7
**150** [4] - 171:8, 171:15, 176:2, 176:13
**157** [2] - 220:8, 220:9
**159** [2] - 220:20, 220:22
**15910** [1] - 3:18
**15th** [1] - 9:15
**16** [1] - 132:13
**160** [1] - 221:3
**1600** [1] - 3:18
**161** [1] - 221:7
**17** [1] - 69:12
**1717** [2] - 6:6, 6:13
**17th** [1] - 210:10
**18** [3] - 38:1, 132:14, 164:18
**19** [4] - 107:22, 231:18, 232:7, 232:15
**19087** [1] - 6:16
**19103** [2] - 6:7, 6:14
**1981** [2] - 183:16, 217:14
**1989** [1] - 184:10
**1989-ish** [1] - 184:7
**1995** [1] - 127:10
**1996** [1] - 124:2
**1999** [5] - 165:25, 166:2, 166:9, 166:20, 166:24
**1st** [1] - 213:7

**2**

**2** [12] - 19:20, 59:12, 59:17, 59:20, 61:20, 64:8, 67:21, 77:11, 150:10, 150:13, 197:19, 223:7
**2,537** [1] - 140:20
**20** [8] - 33:7, 101:13, 101:17, 101:21, 106:8, 107:21, 179:21, 200:4
**20-24** [1] - 52:16
**20.8** [3] - 32:23, 32:24, 160:7
**200** [6] - 171:8, 171:15, 176:2, 176:13, 210:8, 230:18
**2000** [3] - 164:11,

164:19, 183:17
**20001** [1] - 5:13
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:6
**2000s** [1] - 216:10
**2001** [3] - 165:23, 166:15, 167:9
**2002** [2] - 127:14, 127:20
**2003** [1] - 164:1
**2004** [3] - 127:24, 129:1, 137:2
**2008** [7] - 55:23, 55:24, 56:1, 56:10, 141:8, 141:14, 141:16
**2009** [4] - 55:22, 56:2, 129:4
**2010** [2] - 164:11, 164:19
**2011** [4] - 117:18, 185:8, 188:6, 188:13
**2012** [20] - 15:11, 16:11, 17:11, 82:3, 82:12, 100:17, 110:11, 110:17, 111:3, 111:18, 114:6, 114:11, 116:4, 125:11, 131:23, 133:24, 135:11, 185:13, 185:16
**2012-13** [1] - 57:12
**2012-16** [1] - 122:12
**2013** [8] - 100:17, 100:18, 110:11, 110:17, 111:3, 114:6, 150:15, 150:20
**2014** [19] - 58:11, 82:14, 100:5, 100:18, 110:3, 110:12, 114:6, 125:21, 126:1, 134:12, 135:10, 140:15, 140:20, 147:2, 188:24, 189:11, 194:6, 229:13
**2015** [12] - 21:21, 79:9, 110:1, 114:6, 114:11, 116:4, 128:9, 132:1, 194:15, 195:3, 196:18, 197:5
**2016** [50] - 9:1, 10:25, 21:15, 22:8, 22:15, 26:2, 27:3, 27:22, 32:18, 33:23, 34:16,

35:10, 36:4, 36:10, 36:13, 36:18, 36:23, 37:1, 37:3, 37:6, 37:9, 37:21, 44:10, 48:11, 49:6, 49:21, 52:16, 53:17, 58:21, 59:2, 59:11, 61:4, 99:7, 100:10, 100:25, 101:12, 138:20, 139:3, 139:15, 139:23, 140:22, 150:1, 160:23, 168:24, 194:15, 197:5, 210:2, 210:7, 226:5
**2017** [17] - 75:9, 79:5, 80:1, 161:17, 164:1, 194:15, 197:23, 204:2, 205:15, 205:16, 209:6, 210:8, 222:9, 230:9, 230:11, 230:20, 231:1
**2017-2018** [1] - 166:15
**2018** [16] - 28:19, 32:4, 32:14, 40:20, 41:1, 41:3, 45:21, 75:15, 79:9, 81:10, 128:9, 194:16, 195:4, 197:24, 230:11, 231:1
**2019** [7] - 40:17, 58:11, 176:8, 219:3, 230:18, 230:20, 234:9
**202** [1] - 2:16
**2020** [11] - 9:4, 9:5, 39:25, 40:1, 40:2, 176:11, 210:16, 210:20, 213:1, 234:7, 235:1
**2021** [6] - 1:19, 7:4, 9:15, 229:13, 238:9, 238:15
**2098** [1] - 229:2
**2099** [1] - 229:3
**2100** [1] - 229:3
**2101** [1] - 229:3
**21st-22nd** [3] - 41:1, 41:3, 45:21
**2216** [1] - 3:8
**23.6** [1] - 36:14
**24** [4] - 37:17, 201:15, 206:4, 231:2
**24-hour** [1] - 206:8
**25** [6] - 5:5, 24:22, 108:21, 185:5, 186:18, 200:2
**25,000** [1] - 170:25
**25-page** [1] - 181:22

**25-to-34-year-old** [1] - 106:13
**25.3** [1] - 36:6
**2523** [3] - 58:19, 60:8, 60:15
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**2556** [2] - 74:6, 75:3
**257** [1] - 232:4
**25701** [2] - 2:5, 3:11
**26** [3] - 72:10, 180:12, 226:5
**26(a)(2)(C** [1] - 9:10
**260** [1] - 222:17
**263** [1] - 219:1
**27** [1] - 35:7
**27,000** [1] - 172:22
**273** [4] - 28:21, 29:9, 80:17, 80:20
**275** [2] - 231:18, 232:14
**28** [4] - 3:15, 4:4, 4:9, 210:3
**29** [1] - 88:4
**2904** [2] - 125:15, 126:7, 126:11
**2906** [1] - 168:24
**29464** [3] - 3:16, 4:4, 4:10
**2:00** [2] - 119:22, 120:13

**3**

**3** [13] - 63:8, 109:3, 109:22, 109:24, 112:10, 112:14, 132:21, 140:12, 149:8, 150:9, 152:24, 197:19, 223:7
**3,000** [5] - 171:22, 173:19, 174:17, 174:23, 175:21
**3,200** [2] - 175:5, 177:5
**3,500** [1] - 170:6
**3/29/2012** [1] - 15:24
**30** [13] - 25:18, 25:20, 88:3, 88:20, 88:25, 90:14, 91:3, 92:21, 120:2, 120:5, 211:3, 211:20
**30-day** [1] - 31:4
**30-plus** [1] - 14:24
**300,000** [1] - 141:15
**300-plus** [1] - 177:11
**3015** [1] - 138:23

**3036** [1] - 137:3
**30th** [2] - 9:5, 213:7
**3100** [2] - 6:6, 6:12
**3105** [2] - 132:5, 132:13
**3105.00018** [1] - 132:15
**316** [1] - 2:14
**32502** [1] - 2:14
**33** [2] - 106:7, 106:9
**34** [1] - 108:21
**36** [1] - 107:12
**3616** [3] - 55:21, 123:6, 123:11
**37** [1] - 212:6
**37-year-old** [1] - 228:10
**38** [4] - 32:15, 32:17, 160:14, 160:15
**38.9** [1] - 36:2
**3843** [1] - 5:15
**3:17-cv-01362** [2] - 1:5, 238:8
**3:17-cv-01665** [2] - 1:11, 238:8
**3rd** [1] - 2:4

**4**

**4** [7] - 1:16, 27:5, 27:17, 81:16, 137:25, 139:25, 152:25
**4,000** [4] - 141:1, 171:10, 171:11, 171:15
**4,200** [1] - 170:4
**4.1** [1] - 166:11
**40** [2] - 212:9, 230:12
**400,000** [1] - 204:6
**401** [2] - 2:11, 4:7
**405** [1] - 2:8
**41** [1] - 100:9
**41213** [3] - 109:1, 149:3, 167:8
**41913** [1] - 97:15
**422** [1] - 2:4
**437** [13] - 15:5, 15:7, 15:11, 15:18, 16:10, 16:24, 17:10, 20:22, 21:10, 43:23, 131:24, 132:5, 134:17
**44211** [1] - 99:8
**44223** [1] - 81:8
**44227** [1] - 121:17
**45** [1] - 190:7
**454** [7] - 22:15, 23:10, 23:18, 24:18, 24:19, 25:6, 44:4

**47** [2] - 219:15, 219:22
**49** [1] - 137:15
**4:59** [1] - 237:14
**4th** [1] - 205:16

**5**

**5** [4] - 112:8, 149:3, 149:7, 167:10
**5,000** [2] - 110:1
**50%** [2] - 58:7, 137:18
**500** [2] - 170:24, 174:1
**52** [1] - 166:16
**52%** [1] - 58:11
**53-hour** [1] - 101:17
**55** [1] - 228:15
**553** [1] - 6:9
**56** [1] - 3:5
**56th** [1] - 3:5
**57** [2] - 166:16
**58** [1] - 11:5

**6**

**6** [9] - 1:19, 7:4, 33:23, 48:12, 119:14, 119:17, 121:19, 238:9, 238:15
**6,618** [1] - 140:23
**60** [2] - 191:11, 212:8
**60(a)-9-3** [1] - 19:19
**600** [1] - 2:13
**60A-9-5** [1] - 130:18
**60A-9-5(j)** [1] - 126:15
**60A-9-5a** [1] - 24:23
**65** [1] - 228:15
**68** [4] - 33:13, 33:14, 33:23, 48:12
**69** [1] - 52:16
**6th** [2] - 3:5, 32:14

**7**

**7** [4] - 9:11, 25:20, 84:25, 112:22
**7,000-plus** [2] - 169:18, 170:3
**700** [1] - 171:24
**70130** [1] - 3:8
**705** [1] - 99:16
**707** [1] - 4:19
**716** [1] - 3:13
**72** [3] - 206:4, 206:8, 206:12
**725** [2] - 4:14, 4:16
**75** [3] - 110:3, 150:17, 150:18
**750** [1] - 230:14
**755** [1] - 114:11

**8**

**8** [5] - 76:14, 86:3, 99:11, 112:22, 116:11
**80-plus** [1] - 177:10
**801** [1] - 3:10
**85** [1] - 99:16
**850** [1] - 5:12
**861** [3] - 45:20, 45:22, 45:23

**9**

**9** [4] - 19:12, 19:18, 100:2, 137:7
**901** [1] - 4:18
**91436** [1] - 3:19
**94** [1] - 191:10
**95** [3] - 108:21, 224:25
**9:00** [2] - 7:4, 237:13
**9th** [1] - 2:11

**A**

**a.m** [1] - 7:4
**abatement** [1] - 38:11
**Abdominal** [1] - 190:9
**ability** [4] - 136:7, 141:25, 211:9, 212:10
**able** [32] - 18:25, 19:18, 23:22, 24:15, 31:2, 56:10, 71:1, 75:14, 95:7, 105:2, 105:4, 114:10, 117:15, 117:20, 119:9, 129:24, 156:19, 156:21, 158:3, 159:20, 174:9, 189:3, 199:11, 203:8, 209:1, 212:24, 213:1, 214:7, 214:12, 231:14, 234:11, 237:7
**abnormal** [2] - 12:20, 132:23
**absolutely** [7] - 43:7, 56:19, 196:24, 200:24, 204:17, 217:21, 233:11
**Absolutely** [9] - 43:22, 187:8, 189:15, 205:8, 209:21, 214:2, 214:19, 216:1, 223:1
**Abstinence** [1] - 102:17
**abuse** [7] - 15:20,

16:10, 126:3, 127:17, 134:21, 137:13, 150:14
**abusing** [1] - 98:6
**academic** [2] - 95:2, 95:4
**accept** [1] - 232:10
**accepted** [1] - 221:17
**Access** [1] - 24:24
**access** [12] - 18:17, 25:23, 128:2, 129:1, 130:19, 131:16, 131:19, 132:6, 139:8, 139:12, 141:21, 234:21
**accesses** [1] - 129:23
**accessing** [1] - 136:1
**accompanied** [1] - 111:10
**accompanies** [1] - 230:2
**accomplished** [3] - 18:21, 20:13, 23:25
**accordance** [1] - 143:19
**according** [8] - 25:21, 36:23, 37:1, 37:4, 37:7, 37:10, 142:25, 166:9
**account** [1] - 68:20
**accredit** [1] - 217:6
**Accreditation** [1] - 216:22
**accredits** [1] - 216:25
**accuracy** [1] - 49:10
**accurate** [18] - 2:19, 26:15, 29:2, 30:10, 38:20, 47:4, 47:9, 59:1, 81:3, 82:18, 116:17, 125:5, 127:22, 134:2, 134:23, 135:13, 137:19, 189:1
**accurately** [1] - 24:16
**achieving** [1] - 185:23
**ACKERMAN** [1] - 2:9
**acknowledge** [1] - 79:1
**act** [1] - 127:14
**Act** [12] - 14:3, 28:22, 28:24, 29:3, 29:13, 29:15, 31:3, 31:6, 31:10, 31:14, 127:9, 142:22
**acting** [1] - 68:9
**Action** [4] - 1:4, 1:10, 238:7, 238:8
**action** [8] - 8:25, 97:7, 135:4, 147:13, 151:21, 155:7,

155:11
**active** [2] - 140:14, 140:19
**actively** [1] - 134:21
**activities** [2] - 34:21, 50:13
**actual** [6] - 10:1, 186:21, 190:25, 192:25, 195:9, 219:20
**Acute** [1] - 122:11
**acute** [9] - 71:4, 71:5, 71:9, 71:14, 71:16, 71:18, 72:3, 79:18, 80:11
**acutely** [1] - 111:18
**add** [7] - 71:8, 100:17, 108:20, 114:5, 114:10, 116:21, 158:19
**addendum** [1] - 187:19
**addiction** [3] - 95:19, 150:17, 150:18
**Addiction** [1] - 202:1
**adding** [1] - 172:12
**addition** [6] - 28:14, 73:1, 195:20, 197:21, 213:24, 236:7
**additional** [7] - 72:25, 107:18, 135:6, 154:10, 179:19, 179:25, 184:15
**additions** [1] - 187:20
**address** [11] - 28:25, 75:1, 92:12, 92:14, 129:25, 130:4, 134:21, 202:12, 203:6, 218:4, 233:13
**addressed** [1] - 216:17
**addressing** [1] - 78:21
**adequate** [2] - 87:25, 88:1
**adjudicated** [1] - 145:10
**administer** [7] - 192:7, 215:16, 220:2, 220:3, 220:13, 220:14, 221:4
**administered** [5] - 192:4, 215:9, 222:4, 222:10, 223:8
**administers** [1] - 222:6
**Administration** [1] - 25:16
**administration** [4] - 196:16, 197:6,

221:16, 222:25
**administrations** [3] -
222:18, 223:3,
223:13
**administrative** [1] -
194:11
**admission** [2] - 126:6,
168:23
**admit** [1] - 154:14
**admitted** [15] - 44:2,
44:8, 44:13, 44:19,
44:25, 45:12, 60:8,
60:14, 75:6, 123:10,
126:10, 169:4,
195:17, 197:12,
198:8
**ADMITTED** [7] - 44:3,
44:9, 44:20, 45:23,
60:15, 123:11,
126:11
**adopted** [1] - 75:8
**adult** [1] - 103:23
**adulterate** [4] - 84:1,
84:8, 100:21, 102:11
**adulterated** [3] -
84:21, 110:7, 110:8
**advance** [1] - 42:8
**Advanced** [1] - 141:25
**advice** [1] - 76:25
**Advisory** [5] - 12:19,
132:21, 133:2,
133:19, 134:19
**affect** [2] - 20:10, 80:6
**affected** [4] - 20:6,
20:8, 191:16, 191:17
**affecting** [1] - 202:8
**affects** [2] - 96:14,
96:17
**affixing** [1] - 155:3
**afflicts** [1] - 102:22
**afford** [1] - 211:15
**affordable** [1] - 111:22
**afraid** [2] - 209:9,
209:11
**afternoon** [12] - 11:14,
120:6, 120:20,
120:21, 123:14,
123:15, 148:25,
182:7, 182:20,
182:22, 214:25,
215:2
**afterwards** [1] - 187:4
**AG** [1] - 8:25
**age** [8] - 37:21, 51:16,
106:10, 108:21,
115:5, 164:21,
165:4, 212:6
**aged** [3] - 51:1, 51:3,
51:14
**agencies** [7] - 12:23,

13:20, 204:5,
214:17, 220:1,
220:12, 221:9
**agency** [2] - 202:9,
236:22
**agenda** [3] - 42:12,
42:21, 45:9
**agents** [1] - 131:11
**aggregate** [2] - 52:1,
91:17
**agitated** [1] - 193:18
**ago** [9] - 17:21, 35:3,
171:8, 228:19,
229:10, 231:9,
232:23, 233:18,
235:16
**agree** [25] - 9:23,
16:14, 16:15, 19:22,
19:24, 26:20, 26:25,
46:12, 47:5, 47:24,
48:6, 61:18, 62:2,
116:18, 130:9,
130:13, 133:23,
137:13, 141:6,
141:11, 142:17,
152:14, 170:18,
175:17, 177:1
**agreeing** [1] - 61:19
**agreement** [1] - 46:12
**Agreement** [1] - 76:19
**ahead** [26] - 24:13,
33:22, 34:12, 34:14,
38:4, 40:24, 45:8,
45:24, 49:2, 49:4,
49:25, 115:21,
118:24, 139:16,
151:3, 153:24,
154:13, 157:13,
158:15, 162:23,
163:4, 187:1, 203:2,
206:13, 206:16,
219:19
**Ahmet** [1] - 138:1
**airway** [1] - 221:1
**Akron** [1] - 226:7
**al** [4] - 1:7, 1:13,
238:6, 238:7
**alert** [1] - 192:8
**algorithm** [2] - 172:13,
172:15
**algorithms** [1] - 172:6
**allegations** [1] -
147:23
**allow** [7] - 12:16, 19:7,
34:12, 35:4, 153:24,
180:15, 181:12
**allowed** [8] - 10:6,
18:2, 29:23, 30:11,
34:5, 133:15, 158:8,
179:9

almost [3] - 107:12,
110:12, 140:22
**alone** [3] - 82:13,
82:23, 222:9
**alter** [2] - 78:16, 81:1
**altered** [1] - 187:16
**alternatives** [1] -
111:13
**ambulance** [6] -
186:23, 187:3,
199:10, 200:25,
206:10, 214:14
**ambulances** [3] -
218:15, 218:19,
221:20
**American** [3] - 41:16,
90:23, 207:22
**Americans** [1] -
150:13
**AmerisourceBergen**
[6] - 6:3, 9:1, 9:2,
123:16, 169:6, 238:6
**AMERISOURCEBER
GEN** [2] - 1:7, 1:13
**amount** [9] - 8:17,
47:11, 61:17, 87:3,
88:9, 171:1, 174:3,
208:23, 211:14
**amounts** [2] - 84:11,
230:14
**Amy** [1] - 182:8
**Analgesics** [1] - 74:8
**analgesics** [2] - 74:14,
221:9
**analogues** [8] - 82:13,
82:20, 82:23, 83:4,
100:7, 100:9, 100:16
**analysis** [2] - 165:22,
169:12
**Analysis** [3] - 11:1,
11:5, 99:8
**ANDREW** [1] - 5:11
**angry** [2] - 198:16,
201:11
**ankle** [1] - 88:20
**ANNE** [1] - 4:3
**ANNIE** [1] - 3:14
**Annual** [8] - 24:25,
125:12, 125:21,
134:13, 139:14,
139:16, 139:23,
168:24
**annual** [1] - 32:17
**annually** [1] - 25:12
**anonymous** [3] -
144:22, 144:23,
145:4
**anonymously** [1] -
145:8
**answer** [22] - 24:13,

24:16, 25:10, 25:25,
30:14, 35:5, 36:22,
48:24, 50:10, 50:17,
52:23, 52:25, 67:9,
112:1, 115:21,
116:6, 118:12,
118:13, 142:3,
166:6, 166:8, 232:19
**answered** [3] - 83:6,
201:15, 232:10
**answering** [1] - 36:12
**answers** [1] - 202:12
**ANTHONY** [1] - 2:6
**anticipate** [2] - 9:11,
172:17
**anticipated** [1] - 9:7
**antidepressants** [1] -
121:11
**anyway** [1] - 59:5
**apart** [1] - 170:2
**apartment** [1] - 212:12
**apologies** [2] - 79:22,
203:3
**apologize** [9] - 15:10,
39:3, 140:9, 157:23,
163:3, 170:22,
178:9, 232:13, 233:1
**appear** [1] - 189:24
**APPEARANCES** [6] -
2:1, 3:1, 5:1, 5:7,
6:1, 6:10
**appearing** [1] - 169:9
**appendices** [1] -
169:22
**applied** [3] - 184:12,
203:19, 203:20
**apply** [3] - 74:23,
75:20, 203:22
**appointment** [1] -
206:17
**appreciate** [6] - 36:21,
147:20, 168:11,
168:13, 176:25,
178:9
**apprise** [1] - 74:21
**apprising** [1] - 69:21
**approach** [3] - 15:14,
55:17, 58:17, 92:12,
94:16, 125:16,
139:18, 146:3,
152:8, 153:25,
194:20, 196:8,
197:14
**approaches** [1] - 92:4
**appropriate** [13] -
12:22, 17:8, 23:21,
70:14, 70:19, 76:13,
90:7, 114:12,
114:13, 135:4,
159:7, 165:12,

215:12
**appropriately** [1] -
90:7
**approval** [1] - 205:14
**approved** [3] - 15:23,
203:25, 204:2
**April** [4] - 9:15,
210:19, 235:1, 235:4
**Arch** [2] - 6:6, 6:13
**ARCOS** [2] - 169:11,
169:12
**area** [9] - 31:1, 109:19,
166:17, 186:14,
187:18, 190:3,
232:9, 236:18
**areas** [1] - 191:3
**argue** [3] - 34:23,
50:15, 159:9
**arguing** [2] - 159:5,
178:12
**argument** [3] - 8:23,
157:15, 157:18
**armed** [4] - 69:25,
70:15, 70:21, 78:23
**arrest** [1] - 190:9
**arrow** [2] - 79:3, 79:8
**arrows** [1] - 79:2
**arthritis** [15] - 35:12,
35:16, 35:18, 35:21,
35:25, 36:3, 52:11,
53:10, 53:18, 53:20,
53:23, 163:24,
163:25, 164:2,
165:10
**article** [2] - 61:21,
61:22
**Article** [4] - 19:12,
19:18, 25:18, 25:20
**articulately** [1] - 159:2
**ASHLEY** [1] - 5:4
**aside** [6] - 15:3, 21:13,
26:1, 28:20, 113:10,
159:19
**aspect** [3] - 71:19,
71:20, 214:11
**assert** [1] - 22:24
**assess** [1] - 66:19
**assist** [1] - 191:23
**Assistance** [4] -
198:19, 198:25,
200:6, 201:14
**assistant** [1] - 56:11
**assistants** [2] - 54:4,
55:9
**assisted** [2] - 191:21,
191:22
**associated** [6] -
53:23, 74:2, 133:21,
149:21, 167:12,
199:2

**Association** [3] - 28:7, 41:16, 207:22
**assume** [7] - 13:14, 14:1, 59:4, 59:5, 151:3, 171:1, 237:6
**assuming** [4] - 147:22, 222:11, 225:20, 226:1
**assumption** [1] - 211:17
**assure** [1] - 11:25
**AT** [1] - 1:2
**attached** [4] - 92:2, 139:11, 197:18, 197:24
**attachments** [1] - 176:16
**attack** [2] - 157:11, 192:11
**attempt** [8] - 16:3, 29:14, 126:20, 147:21, 225:6, 226:17, 227:5, 227:12
**attempted** [2] - 152:5, 231:20
**attempting** [7] - 7:9, 90:22, 95:17, 126:22, 134:25, 157:10, 161:3
**attend** [1] - 41:24
**attendance** [1] - 42:24
**attention** [3] - 11:20, 24:21, 139:25
**attest** [1] - 75:14
**attorney** [5] - 38:24, 38:25, 39:7, 39:11, 39:13
**Attorneys** [1] - 42:24
**attorneys** [1] - 43:6
**attributable** [1] - 105:11
**attributed** [3] - 101:23, 110:2, 117:19
**August** [10] - 9:1, 32:4, 32:14, 100:25, 101:12, 176:11, 210:2, 210:7, 210:8, 226:5
**authenticate** [2] - 153:7, 154:13
**authority** [1] - 25:15
**authorized** [1] - 130:3
**Automobile** [1] - 41:16
**autopsy** [2] - 136:17, 156:13
**availability** [1] - 11:25
**available** [16] - 56:6,

62:24, 66:16, 69:6, 70:5, 92:18, 95:17, 111:13, 129:25, 130:12, 136:1, 141:17, 141:18, 145:16, 160:2, 179:6
**average** [12] - 33:16, 36:8, 37:25, 51:25, 73:1, 73:13, 108:16, 166:1, 166:4, 212:6, 228:10, 228:14
**averaging** [1] - 210:9
**Avin** [1] - 3:7
**aware** [54] - 10:4, 16:24, 20:12, 20:15, 20:22, 20:24, 20:25, 21:2, 21:3, 21:7, 21:9, 21:10, 21:12, 25:22, 26:3, 26:7, 40:9, 40:15, 41:7, 41:24, 42:1, 42:2, 43:4, 43:7, 54:16, 55:7, 55:11, 71:15, 72:4, 75:16, 75:19, 84:21, 96:23, 111:2, 111:5, 111:6, 111:9, 111:11, 111:18, 111:19, 112:4, 121:12, 125:12, 125:14, 135:19, 188:25, 210:2, 222:24, 226:5, 226:23, 227:15, 227:18, 227:21
**awhile** [1] - 59:7
**Ayme** [2] - 6:18, 238:2

**B**

**babies** [2] - 72:12, 105:10
**baby** [12] - 72:23, 102:22, 103:14, 103:19, 103:22, 104:1, 104:6, 104:22, 105:1, 105:6, 160:23
**back-door** [1] - 157:1
**back-up** [5] - 171:15, 171:18, 172:19, 172:25, 177:24
**back-ups** [1] - 176:14
**backed** [1] - 214:14
**Background** [1] - 81:19
**background** [4] - 60:19, 63:25, 64:5, 183:8
**backup** [1] - 171:10
**backyard** [1] - 212:20

**bad** [18] - 86:18, 87:2, 87:10, 87:24, 88:8, 88:14, 90:16, 91:21, 92:16, 93:2, 93:5, 93:7, 94:2, 96:1, 153:21, 237:8
**bag** [6] - 191:22, 191:23, 208:13, 208:14, 208:15
**ball** [1] - 212:20
**banker** [2] - 170:25, 171:2
**banker's** [1] - 171:5, 172:21
**bar** [8] - 106:14, 108:6, 108:13, 118:17, 119:4, 119:8, 140:13, 172:16
**barbiturates** [1] - 121:8
**Baron** [1] - 3:17
**barriers** [2] - 211:6, 211:7
**base** [6] - 62:5, 71:8, 131:19, 172:5, 172:7, 172:24
**baseball** [1] - 7:13
**based** [18] - 29:16, 29:20, 30:25, 37:22, 46:18, 46:23, 61:24, 63:2, 63:23, 64:16, 67:1, 68:1, 128:2, 129:2, 166:2, 178:8, 186:24, 190:19
**Based** [1] - 66:15
**basic** [1] - 201:7
**basis** [4] - 24:5, 131:19, 143:13, 194:8
**Bates** [1] - 176:6
**batter** [2] - 7:9, 7:10
**battled** [1] - 235:11
**Baylen** [1] - 2:14
**be-all** [1] - 133:22
**Bear** [1] - 177:23
**bears** [1] - 74:11
**became** [4] - 19:3, 210:4, 216:15, 217:4
**become** [4] - 63:11, 93:11, 184:16, 233:19
**becomes** [3] - 110:23, 145:21, 192:8
**becoming** [1] - 87:6
**bed** [2] - 231:15, 232:21
**BEFORE** [1] - 1:17
**beg** [1] - 157:3
**began** [3] - 82:5,

82:11, 94:22
**begin** [4] - 46:10, 136:8, 152:23, 189:9
**beginning** [13] - 9:11, 59:20, 78:3, 82:3, 107:10, 125:11, 137:2, 186:2, 196:21, 209:9, 232:19, 235:9, 236:10
**begins** [7] - 64:10, 64:11, 68:1, 81:21, 100:5, 129:16, 134:17
**behalf** [2] - 169:10, 182:8
**Behavior** [1] - 35:10
**behavior** [4] - 90:19, 94:12, 107:25, 136:5
**behavioral** [1] - 205:1
**behest** [1] - 70:5
**behind** [6] - 61:7, 61:17, 73:14, 91:5, 136:7, 213:17
**belief** [1] - 91:9
**bell** [1] - 145:23
**below** [6] - 7:14, 7:19, 129:16, 137:17, 138:2, 166:1
**BENCH** [1] - 1:16
**benefit** [6] - 64:12, 64:18, 64:24, 67:3, 67:7, 118:10
**benefits** [4] - 66:20, 67:12, 67:17, 73:8
**best** [13] - 16:3, 30:25, 62:23, 69:6, 71:1, 92:25, 94:14, 95:16, 95:18, 138:16, 168:12, 178:14, 190:20
**better** [10] - 57:20, 68:22, 93:5, 93:11, 117:20, 162:25, 195:19, 233:9, 233:12, 233:14
**between** [15] - 18:10, 51:8, 58:10, 68:2, 76:21, 77:4, 77:8, 79:9, 156:16, 156:21, 164:19, 179:21, 198:1, 199:25
**Between** [2] - 230:11, 231:1
**beyond** [10] - 28:17, 30:15, 80:22, 89:6, 110:25, 142:4, 147:12, 147:15, 158:20, 176:23

**big** [6] - 51:8, 180:8, 207:25, 219:2, 232:25, 233:15
**Bill** [25] - 15:5, 15:7, 15:11, 15:18, 16:10, 16:24, 17:10, 20:22, 21:10, 22:15, 23:10, 23:18, 24:18, 24:19, 25:6, 28:21, 29:9, 43:23, 44:4, 80:17, 80:20, 131:24, 132:5, 134:17
**bill** [12] - 16:2, 16:16, 16:19, 16:24, 17:7, 22:20, 22:23, 22:25, 25:23, 25:24, 30:22, 133:1
**billing** [2] - 188:16, 188:17
**birth** [2] - 130:4, 131:5
**bit** [17] - 42:15, 47:22, 62:3, 78:16, 102:19, 124:16, 130:8, 136:25, 138:22, 143:6, 183:6, 183:7, 186:7, 186:9, 207:4, 228:25, 236:24
**black** [2] - 53:8, 61:15
**blond** [1] - 199:20
**blow** [2] - 42:14, 207:25
**blown** [1] - 161:12
**blue** [1] - 106:14
**Blvd** [3] - 3:15, 4:4, 4:9
**Board** [92] - 12:25, 13:4, 13:7, 13:11, 13:22, 14:5, 14:8, 14:9, 14:10, 17:22, 18:1, 21:4, 21:6, 21:8, 21:23, 21:25, 22:1, 25:17, 25:19, 54:1, 54:6, 54:7, 54:11, 54:12, 54:16, 54:20, 55:1, 55:5, 55:7, 55:22, 56:10, 56:17, 58:1, 74:7, 74:15, 74:25, 75:12, 76:25, 77:23, 79:7, 79:10, 80:1, 80:13, 80:17, 80:22, 91:7, 97:2, 97:6, 123:7, 125:11, 125:22, 127:25, 128:19, 128:22, 128:24, 129:11, 131:11, 132:21, 133:3, 135:19, 135:22, 135:24, 139:14, 142:8, 142:9,

142:12, 142:18, 142:23, 143:2, 143:7, 143:11, 143:20, 143:21, 143:25, 144:2, 144:25, 145:15, 146:10, 147:1, 147:10, 147:14, 148:4, 148:12, 151:19, 154:21, 155:1, 155:6, 155:8, 155:15, 155:17
**boards** [3] - 12:22, 14:24, 80:18
**Bob** [1] - 201:25
**Bob's** [2] - 157:19, 158:1
**body** [8] - 53:5, 53:9, 107:2, 117:10, 118:1, 142:13, 142:14, 142:16
**Bonasso** [1] - 5:14
**bone** [1] - 216:2
**bones** [1] - 71:21
**book** [5] - 56:10, 56:12, 56:17, 56:25, 187:1
**border** [2] - 96:12, 184:24
**born** [2] - 183:8, 183:10
**borne** [1] - 233:24
**borrowed** [1] - 87:21
**boss** [1] - 197:3
**bottom** [21] - 19:9, 19:17, 24:22, 42:23, 56:4, 67:22, 67:25, 72:13, 85:1, 106:15, 116:21, 122:7, 122:10, 127:5, 133:2, 141:4, 149:13, 161:12, 171:9, 198:1, 223:11
**bought** [1] - 107:7
**Boulevard** [1] - 3:18
**box** [8] - 189:4, 189:11, 190:15, 190:16, 195:11, 207:24, 223:24, 229:19
**Box** [3] - 2:5, 5:15, 6:9
**boxes** [5] - 170:25, 171:2, 171:5, 172:21, 174:2
**bread** [1] - 208:20
**break** [7] - 45:25, 62:11, 63:21, 86:11, 117:9, 143:6, 171:6
**breathing** [4] - 191:20, 193:15, 194:5, 208:4

**Bridgeside** [3] - 3:15, 4:4, 4:9
**brief** [3] - 151:10, 167:4, 181:22
**Brief** [2] - 32:5, 44:17
**briefly** [1] - 148:21
**bring** [3] - 43:6, 91:10, 237:3
**broad** [2] - 66:1, 107:14
**broadly** [1] - 68:11
**broke** [2] - 62:18, 199:24
**broken** [3] - 71:21, 171:3, 216:2
**brought** [3] - 9:25, 91:23, 176:5
**brown** [2] - 208:13, 208:14
**browsing** [1] - 28:9
**bucket** [1] - 175:25
**buckets** [1] - 170:21
**Budd** [1] - 3:17
**building** [1] - 210:17
**bullet** [3] - 11:21, 11:22, 129:15
**bunch** [1] - 107:18
**Bureau** [2] - 11:13, 11:16, 12:5, 12:7, 12:10, 12:13, 13:2, 13:5, 13:8, 13:10, 13:13, 13:21, 14:8, 16:5, 18:8, 40:22, 41:5, 42:4, 74:16, 94:21, 124:20, 125:6, 125:25, 128:15, 128:22
**Burling** [1] - 5:11
**burn** [1] - 215:25
**business** [1] - 188:2
**businesses** [1] - 97:3
**busy** [1] - 179:3
**butter** [2] - 208:16, 208:20
**buy** [1] - 206:17
**buy-ins** [1] - 206:17
**buying** [2] - 107:17, 205:17
**BY** [70] - 10:21, 15:16, 19:21, 24:17, 32:2, 33:12, 34:15, 38:6, 39:5, 40:14, 41:23, 42:16, 46:6, 49:5, 52:17, 55:19, 58:18, 60:16, 62:17, 75:7, 112:3, 116:9, 118:16, 119:3, 120:19, 124:15, 125:19, 126:12, 132:11, 132:20,

139:21, 144:15, 145:2, 146:24, 148:24, 149:6, 149:9, 149:15, 150:6, 151:12, 152:4, 154:19, 156:10, 159:16, 160:17, 161:9, 161:14, 162:5, 162:14, 163:12, 165:2, 182:19, 189:20, 194:23, 195:18, 196:11, 197:16, 198:9, 201:5, 202:24, 203:4, 213:23, 214:24, 219:14, 229:4, 230:3, 231:23, 232:6, 232:18, 234:4

# C

**CA** [1] - 3:19
**Cabell** [76] - 3:3, 40:10, 46:17, 47:11, 100:25, 152:21, 153:10, 153:20, 176:6, 182:25, 183:1, 183:3, 183:24, 184:4, 184:5, 184:12, 185:6, 185:12, 185:13, 185:24, 188:3, 188:6, 188:12, 188:22, 189:8, 193:10, 194:15, 194:18, 195:2, 196:18, 197:6, 198:12, 200:14, 217:1, 217:7, 218:8, 219:8, 221:20, 221:23, 222:4, 222:5, 222:9, 222:18, 222:24, 223:3, 223:8, 223:19, 224:8, 224:12, 224:14, 224:17, 224:19, 224:20, 225:6, 225:14, 225:16, 225:25, 226:2, 226:16, 226:24, 227:16, 227:19, 227:22, 228:1, 228:20, 229:6, 229:16, 230:15, 231:4, 233:22, 234:6, 235:19, 235:25, 236:17, 237:1

**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell-Huntington** [6] - 183:24, 184:4, 184:5, 184:12, 217:7, 228:1
**cabinet** [2] - 87:20, 107:7
**cabinets** [1] - 91:18
**calculate** [1] - 195:4
**calculated** [1] - 194:14
**calculating** [1] - 195:6
**Callas** [7] - 123:15, 124:1, 142:11, 152:14, 154:4, 154:17, 168:6
**CALLAS** [33] - 6:8, 120:9, 120:11, 123:14, 123:20, 124:4, 124:9, 124:13, 124:15, 125:16, 125:18, 125:19, 126:6, 126:12, 132:8, 132:11, 132:18, 132:20, 139:18, 139:20, 139:21, 144:15, 145:2, 146:3, 146:20, 146:24, 148:18, 152:1, 152:9, 154:2, 154:5, 168:7, 168:22
**CAMPBELL** [1] - 6:15
**cancer** [26] - 37:9, 53:11, 65:2, 65:10, 65:12, 65:16, 70:1, 70:12, 70:17, 75:21, 76:3, 76:7, 76:11, 77:2, 78:24, 79:19, 80:2, 80:16, 81:2, 164:13, 164:14, 164:15, 164:16, 164:19, 165:10
**cancers** [1] - 164:17
**cannot** [11] - 25:25, 31:17, 47:6, 49:10, 69:6, 133:16, 134:9, 134:10, 145:5, 187:21, 225:9
**capacity** [10] - 38:24, 41:4, 141:19, 141:22, 151:18, 154:25, 155:1, 155:5, 158:4, 232:8
**capita** [3] - 32:18, 32:25, 160:19
**Capitol** [1] - 2:8
**captured** [1] - 190:4
**car** [1] - 211:18

**cardiac** [1] - 190:9
**Cardinal** [2] - 4:11, 5:3
**cardiovascular** [1] - 36:16
**care** [27] - 54:8, 59:22, 60:3, 60:5, 64:19, 64:24, 68:14, 71:1, 79:19, 79:20, 92:7, 93:18, 93:21, 93:23, 95:18, 95:25, 96:24, 159:5, 185:19, 185:24, 186:3, 198:15, 206:9, 218:13, 222:7
**cared** [1] - 207:8
**career** [5] - 193:9, 215:3, 216:14, 217:11, 228:13
**carefully** [1] - 57:7
**Carey** [1] - 4:18
**Carfentanil** [1] - 226:13
**carfentanil** [9] - 101:8, 101:10, 101:20, 102:1, 102:5, 102:10, 109:16, 226:2, 226:8
**carries** [1] - 221:20
**carry** [1] - 218:16
**cartels** [2] - 225:19, 225:21
**case** [24] - 9:3, 9:17, 38:19, 38:23, 39:2, 39:14, 40:3, 40:6, 43:1, 88:2, 114:12, 131:19, 145:11, 146:15, 146:17, 147:18, 152:11, 158:1, 178:1, 179:2, 179:4, 179:21, 231:24
**case-by-base** [1] - 131:19
**cases** [22] - 35:25, 38:9, 39:12, 41:9, 42:3, 43:1, 43:6, 53:11, 72:18, 101:13, 101:19, 101:21, 105:5, 106:6, 121:23, 122:5, 131:21, 145:12, 179:21, 184:20
**Cases** [1] - 122:12
**categories** [5] - 66:9, 156:11, 170:21, 176:1, 189:4
**categorized** [2] - 224:5, 224:23
**Category** [1] - 190:4

**category** [5] - 66:1, 106:9, 106:16, 108:14, 229:19
**cats** [1] - 202:3
**caused** [2] - 117:2, 193:22
**causes** [1] - 116:1
**causing** [3] - 52:14, 117:17, 117:18
**cautions** [1] - 73:22
**CDC** [56] - 26:3, 26:16, 27:14, 27:22, 29:19, 58:20, 58:24, 59:2, 59:9, 59:16, 60:11, 60:20, 61:2, 62:3, 62:19, 62:22, 63:1, 63:2, 63:16, 63:20, 64:2, 64:21, 65:8, 66:7, 66:25, 67:8, 67:16, 68:7, 68:17, 69:20, 69:24, 70:3, 70:9, 70:14, 70:18, 70:22, 70:25, 71:3, 71:7, 71:12, 72:1, 72:5, 72:17, 73:3, 73:7, 73:10, 73:16, 73:19, 73:25, 79:11, 79:14, 102:20, 112:13, 160:4, 161:2, 161:6
**CDC's** [2] - 63:23, 64:16
**census** [1] - 37:22
**Center** [3] - 3:12, 5:12, 35:11, 166:10
**central** [2] - 129:10, 130:24
**certain** [9] - 30:12, 61:17, 70:18, 70:19, 80:21, 87:18, 105:14, 186:14, 218:16
**Certainly** [1] - 103:21
**certainly** [21] - 10:7, 20:6, 20:8, 31:5, 34:20, 50:11, 52:23, 57:2, 71:23, 96:21, 109:15, 121:16, 123:19, 126:4, 135:22, 136:17, 140:23, 141:13, 191:5, 212:5, 232:19
**certificate** [1] - 115:25
**certificates** [3] - 114:1, 114:19, 115:10
**certification** [1] - 218:17
**CERTIFICATION** [1] - 238:1

**certifications** [2] - 184:15, 184:18
**certify** [1] - 238:4
**chair** [1] - 144:4
**chaired** [1] - 27:11
**challenge** [1] - 58:2
**challenging** [1] - 162:25
**chance** [3] - 81:14, 179:1, 180:10
**change** [8] - 36:20, 53:9, 136:6, 168:18, 179:20, 180:21, 188:23, 209:3
**changed** [2] - 131:22, 187:16
**changes** [1] - 127:25, 187:22
**changing** [2] - 93:14, 94:12
**Chapter** [2] - 25:18, 25:20
**characterization** [2] - 48:6, 174:18
**characterize** [13] - 16:19, 22:12, 34:17, 34:19, 48:5, 48:18, 50:6, 50:10, 51:16, 53:7, 62:22, 64:20, 67:11
**CHARLES** [1] - 3:12
**Charleston** [9] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:3, 14:21, 16:12, 17:16
**CHARLESTON** [2] - 1:2, 1:18
**chart** [32] - 32:17, 36:23, 37:1, 37:4, 37:7, 37:10, 112:9, 118:17, 119:5, 119:8, 122:10, 122:11, 140:13, 140:14, 170:22, 172:4, 172:13, 172:14, 172:16, 173:7, 173:8, 173:9, 174:11, 175:25, 186:2, 186:22, 187:12, 189:13, 197:3, 197:4, 229:25, 230:4
**charting** [3] - 186:10, 188:10
**charts** [21] - 169:15, 169:18, 169:20, 170:3, 170:4, 170:6, 171:24, 172:8, 172:23, 173:16, 174:17, 174:22,

174:24, 175:2, 175:5, 177:5, 177:19, 177:20, 177:24, 186:7, 188:17
**Chase** [1] - 4:18
**cheaper** [6] - 84:5, 84:7, 84:9, 111:12, 111:14, 150:19
**Cheaper** [1] - 84:7
**check** [7] - 23:11, 23:19, 23:24, 25:7, 129:2, 207:7, 207:8
**checked** [1] - 11:3
**chemical** [2] - 117:5, 118:9
**chest** [4] - 208:5, 219:16, 219:23, 220:1
**Chesterbrook** [1] - 6:16
**Chief** [6] - 115:12, 115:23, 117:12, 190:3, 192:20
**child** [4] - 72:23, 160:23, 199:15, 199:17
**children** [2] - 199:9, 211:21
**China** [1] - 84:16
**choice** [1] - 189:23
**choices** [3] - 190:6, 190:7, 190:8
**Chris** [1] - 232:4
**chronic** [38] - 26:4, 59:11, 59:23, 60:5, 61:8, 63:12, 64:23, 64:24, 65:9, 65:11, 65:12, 66:20, 68:8, 69:2, 69:22, 70:1, 70:6, 70:11, 70:16, 70:20, 73:5, 73:8, 73:11, 74:14, 75:13, 75:21, 76:3, 76:7, 76:11, 76:20, 77:2, 78:24, 80:2, 80:16, 81:2, 164:9, 165:10, 165:16
**Chronic** [6] - 27:14, 27:22, 52:24, 58:21, 69:17, 74:8
**church** [1] - 205:7
**churches** [2] - 205:3, 208:19
**circle** [1] - 215:3
**circulates** [1] - 54:18
**circumstances** [7] - 33:17, 68:13, 68:20, 71:22, 73:11, 86:22, 148:14

**citation** [2] - 34:1, 34:8
**cite** [1] - 65:6
**cited** [1] - 158:2
**cities** [1] - 233:19
**CITY** [1] - 1:4
**City** [5] - 4:2, 5:12, 7:12, 40:10, 238:5
**Civil** [4] - 1:4, 9:10, 238:7, 238:8
**civil** [1] - 1:10
**claim** [1] - 61:11
**clarification** [1] - 39:1
**clarify** [6] - 39:4, 39:20, 39:22, 99:21, 120:25, 175:24
**class** [1] - 225:22
**classified** [2] - 135:5, 229:22
**CLE** [1] - 44:24
**clean** [2] - 98:11, 119:20
**clear** [13] - 8:3, 9:16, 9:20, 25:6, 67:17, 75:8, 79:17, 100:4, 102:20, 104:15, 178:13, 180:23, 192:2
**clearer** [1] - 64:7
**clearly** [3] - 143:1, 161:1, 165:17
**Clearly** [1] - 93:13
**CLERK** [4] - 45:14, 182:10, 182:12, 182:15
**clerk** [2] - 45:18, 181:23
**clinic** [1] - 144:19
**clinical** [5] - 65:3, 65:19, 68:3, 89:9, 115:11
**Clinical** [1] - 68:1
**clinician** [3] - 68:2, 76:21, 77:5
**clinicians** [18] - 59:23, 60:3, 60:21, 61:3, 61:13, 63:10, 63:17, 63:22, 66:3, 69:21, 69:24, 70:10, 70:15, 71:13, 73:4, 73:24, 77:18, 78:7
**Clinicians** [1] - 68:13
**clinics** [2] - 20:14, 20:18
**close** [5] - 35:23, 40:18, 122:24, 184:24, 204:6
**closet** [1] - 88:5
**clothing** [1] - 205:8
**cluster** [4] - 100:24,

101:2, 101:11, 101:22
**cluttered** [1] - 176:21
**coats** [1] - 208:21
**Cocaine** [1] - 109:11
**cocaine** [4] - 113:9, 121:6, 193:12, 225:21
**Cochran** [3] - 6:18, 238:2, 238:11
**code** [2] - 25:19, 25:20
**Code** [2] - 130:18, 130:23
**codeine** [1] - 117:14
**coin** [1] - 95:24
**coincide** [1] - 195:24
**Colantonio** [9] - 38:18, 38:23, 39:6, 39:11, 39:15, 39:18, 40:5, 40:7, 40:9
**cold** [1] - 206:15
**Colerain** [2] - 203:8, 203:12
**collaboration** [1] - 231:8
**collected** [4] - 129:11, 129:19, 130:11, 216:4
**collection** [1] - 128:1
**college** [1] - 183:12
**color** [1] - 171:25
**column** [9] - 59:20, 60:18, 63:9, 64:9, 64:11, 67:22, 72:13, 106:13
**combination** [4] - 82:13, 82:23, 83:22, 104:20
**combine** [1] - 92:4
**comfort** [1] - 220:9
**coming** [1] - 14:5, 14:12, 18:20, 46:21, 80:5, 85:24, 85:25, 88:12, 153:20, 171:20, 199:20
**commence** [1] - 76:10
**comment** [1] - 154:5
**COMMISSION** [1] - 1:10
**Commission** [4] - 2:2, 3:3, 216:22, 217:5
**commissioned** [1] - 81:11
**Commissioner** [21] - 14:2, 14:18, 16:6, 17:25, 18:8, 26:3, 31:21, 40:22, 41:5, 41:12, 42:4, 74:16, 124:20, 125:6, 125:25, 128:15,

128:18, 130:15, 134:24, 144:11, 160:3
**commit** [1] - 201:9
**committee** [1] - 133:10
**Committee** [15] - 12:20, 132:22, 133:2, 133:5, 133:19, 134:14, 134:19, 134:20, 135:3, 143:3, 143:12, 143:25, 144:5, 145:9, 145:13
**committees** [1] - 30:3
**common** [4] - 88:2, 90:17, 121:22, 122:3
**commonly** [1] - 194:1
**communicating** [2] - 51:19, 71:25
**communities** [2] - 30:17, 85:15
**community** [15] - 47:12, 62:5, 62:20, 63:2, 63:4, 91:19, 201:22, 201:24, 202:11, 202:15, 205:4, 205:17, 231:8, 231:11, 233:8
**company** [1] - 188:10
**comparability** [1] - 117:5
**compared** [3] - 31:20, 51:23, 52:6
**comparing** [1] - 32:17
**compiled** [1] - 228:6
**complaint** [19] - 142:23, 142:25, 143:1, 143:3, 143:7, 143:16, 143:19, 144:12, 144:14, 144:20, 144:23, 145:1, 145:6, 145:7, 145:9, 145:17, 147:1, 147:5, 147:24
**Complaint** [5] - 143:3, 143:25, 145:9, 190:3, 192:20
**complaints** [2] - 144:7, 145:3
**completed** [1] - 187:10
**completes** [1] - 186:22
**completing** [1] - 186:20
**completion** [1] - 187:23
**Compliance** [5] - 183:2, 185:17,

185:21, 198:11, 198:14
**complicated** [1] - 211:6
**complications** [1] - 164:6
**component** [1] - 210:21
**composition** [1] - 118:9
**compounds** [2] - 28:13
**compressions** [1] - 208:5
**computer** [2] - 6:20, 186:23
**computers** [1] - 187:1
**concept** [1] - 217:19
**concern** [3] - 22:14, 177:19, 178:7
**concerning** [2] - 75:12, 135:15
**concert** [1] - 68:9
**concluded** [2] - 64:17, 139:1
**concluding** [1] - 65:8
**conclusion** [5] - 69:23, 171:4, 171:13, 192:24
**condition** [4] - 35:17, 88:9, 199:12, 226:19
**conditionally** [1] - 154:14
**conditions** [7] - 37:12, 37:13, 59:23, 63:11, 164:9, 165:9, 165:11
**conduct** [1] - 142:14
**Conduct** [1] - 24:25
**conducted** [1] - 66:19
**confer** [1] - 213:20
**conference** [6] - 40:20, 41:2, 41:7, 41:25, 42:2, 43:5
**conferences** [1] - 41:16
**confidential** [5] - 130:25, 145:3, 145:4, 145:18, 147:25
**confined** [1] - 113:2
**confirm** [4] - 25:5, 92:11, 112:13, 113:9
**confirmed** [1] - 221:8
**Confirmed** [1] - 122:11
**conflicted** [1] - 144:4
**confront** [1] - 176:19
**confrontational** [1] - 207:1
**confusing** [1] - 39:23

**connected** [1] - 98:18
**connections** [1] - 234:16
**Connie** [4] - 7:10, 182:9, 182:11, 182:22
**CONNIE** [1] - 182:14
**Connolly** [2] - 4:13, 5:5
**CONROY** [1] - 3:4
**consensus** [5] - 60:21, 61:3, 61:6, 61:13, 63:22
**consent** [4] - 143:23, 144:1, 152:19, 154:21
**Consent** [1] - 76:18
**consequence** [2] - 77:8, 106:2
**consequences** [2] - 115:25, 163:22
**consequent** [1] - 147:7
**consider** [4] - 13:17, 68:13, 126:5, 154:15
**considering** [2] - 63:10, 63:17
**consistent** [4] - 36:19, 53:1, 136:19, 222:1
**constant** [1] - 52:24
**consultation** [4] - 69:1, 70:22, 73:21, 77:3
**contact** [7] - 186:13, 187:2, 197:1, 203:16, 205:10, 211:2
**contain** [1] - 31:7
**contained** [1] - 130:24
**contains** [2] - 10:1, 196:15
**contamination** [1] - 110:13
**contemplating** [2] - 69:24, 70:14
**contemporary** [1] - 28:25
**contents** [2] - 136:16, 173:7
**context** [12] - 28:4, 57:25, 68:4, 73:22, 78:3, 80:10, 82:9, 83:20, 87:14, 89:2, 98:23, 100:15
**contiguous** [1] - 96:18
**Continue** [1] - 69:17
**continue** [11] - 7:7, 10:7, 16:23, 25:13, 148:8, 148:16, 197:22, 213:9,

213:12, 214:10, 233:13
**continued** [3] - 210:6, 210:7, 221:8
**Continued** [5] - 3:1, 5:1, 5:7, 6:1, 6:10
**CONTINUED** [1] - 10:20
**continuing** [3] - 16:25, 17:3, 20:1
**continuous** [2] - 185:18, 186:5
**contributed** [1] - 101:7
**contributing** [1] - 101:16
**contributions** [1] - 14:1
**Control** [1] - 209:15
**control** [3] - 93:5, 94:17, 130:5
**controlled** [20] - 17:1, 18:6, 22:14, 22:21, 25:11, 25:14, 30:15, 105:18, 110:25, 126:21, 127:10, 127:16, 128:6, 128:11, 129:13, 130:6, 136:14, 138:12, 140:6, 147:6
**Controlled** [26] - 17:11, 17:17, 18:1, 18:4, 18:9, 18:15, 19:12, 21:14, 23:4, 23:16, 105:3, 124:17, 125:23, 127:9, 129:8, 133:4, 133:11, 134:18, 134:19, 137:8, 137:10, 137:21, 139:6, 139:15, 139:24, 140:19
**controlling** [1] - 137:12
**convened** [1] - 26:7
**conversation** [1] - 173:5
**Cook** [3] - 6:18, 238:3, 238:11
**Coordinator** [1] - 183:4
**COPD** [1] - 36:22
**copy** [8] - 9:25, 15:12, 43:11, 43:12, 45:5, 45:7, 151:22, 219:3
**cord** [1] - 103:22
**corner** [2] - 132:13, 161:13
**coronary** [2] - 219:17, 219:24

**Corporation** [2] - 6:3, 238:7
**cORPORATION** [2] - 1:7, 1:13
**corralled** [1] - 202:2
**correct** [392] - 11:7, 12:5, 12:6, 12:9, 12:11, 12:12, 12:15, 12:25, 13:1, 13:2, 13:3, 13:6, 13:8, 13:9, 13:12, 13:15, 14:14, 14:15, 14:18, 15:1, 17:1, 17:2, 17:5, 17:12, 17:23, 18:12, 18:14, 18:18, 20:2, 20:6, 20:9, 20:19, 22:18, 22:22, 23:20, 24:12, 25:8, 25:23, 26:4, 26:8, 26:9, 27:3, 27:7, 27:8, 27:9, 27:10, 27:11, 27:12, 27:15, 28:2, 28:3, 28:21, 28:23, 29:1, 29:7, 29:18, 30:9, 30:12, 31:4, 31:7, 31:12, 31:22, 31:23, 32:6, 32:7, 32:9, 32:20, 33:2, 33:3, 33:5, 33:6, 33:18, 35:8, 35:13, 35:14, 37:14, 37:19, 37:20, 37:22, 37:25, 38:9, 38:10, 38:12, 38:13, 39:17, 39:25, 40:1, 40:3, 40:4, 40:6, 46:19, 46:24, 47:3, 47:8, 47:12, 47:13, 47:15, 47:16, 47:20, 47:21, 48:2, 49:9, 50:3, 50:17, 50:23, 50:24, 51:6, 51:9, 51:15, 51:23, 52:2, 52:3, 52:6, 52:7, 52:9, 52:19, 52:20, 53:6, 53:21, 53:22, 53:24, 53:25, 54:2, 54:9, 54:14, 54:22, 55:1, 55:2, 55:5, 55:6, 57:5, 57:8, 57:10, 57:11, 57:17, 57:18, 57:24, 57:25, 58:5, 58:7, 58:25, 59:3, 59:6, 59:10, 61:5, 62:6, 62:7, 62:21, 63:18, 63:19, 63:24, 65:10, 66:1, 66:10, 66:16, 67:10, 68:10, 68:11, 68:20, 69:10, 69:22, 70:2, 70:12, 70:17, 70:23, 71:4,

71:9, 71:14, 71:17, 71:19, 72:5, 72:7, 72:24, 73:5, 73:6, 73:9, 73:18, 73:21, 74:11, 75:9, 75:21, 76:4, 76:5, 76:7, 76:12, 77:3, 77:9, 77:10, 78:1, 78:15, 78:25, 79:6, 79:15, 79:20, 80:3, 80:8, 80:16, 81:2, 81:11, 82:8, 82:17, 82:21, 83:4, 83:12, 83:14, 83:19, 84:2, 85:9, 85:13, 85:22, 86:9, 86:16, 86:25, 87:10, 88:16, 88:22, 89:11, 90:2, 90:9, 90:18, 90:21, 91:4, 91:19, 92:15, 94:13, 94:18, 96:2, 97:12, 98:22, 99:4, 100:13, 100:14, 101:7, 101:24, 102:8, 102:9, 102:23, 103:2, 103:6, 103:9, 103:15, 103:16, 104:8, 104:9, 106:5, 106:21, 106:23, 107:2, 107:3, 107:9, 107:10, 107:18, 108:17, 109:8, 109:9, 109:11, 109:13, 109:17, 110:8, 112:15, 113:6, 113:13, 113:22, 114:17, 116:18, 116:23, 117:6, 117:10, 118:2, 118:9, 119:8, 121:1, 121:3, 121:5, 122:1, 122:12, 122:13, 124:21, 125:9, 127:19, 128:5, 131:4, 131:12, 131:13, 134:22, 135:9, 138:11, 138:19, 140:6, 140:7, 141:3, 143:10, 143:15, 148:3, 158:21, 167:17, 167:24, 196:22, 215:5, 215:10, 215:12, 215:19, 215:22, 215:25, 216:6, 216:12, 216:16, 216:23, 217:2, 217:6, 217:17, 217:20, 217:23, 218:4, 218:10,

218:13, 218:17, 218:20, 218:23, 219:8, 220:6, 221:1, 221:17, 221:21, 222:7, 224:3, 224:6, 224:9, 224:12, 224:16, 224:19, 224:22, 225:4, 225:7, 225:11, 225:14, 225:17, 225:19, 225:22, 225:25, 226:3, 226:13, 226:18, 226:21, 227:1, 227:6, 227:8, 227:13, 227:17, 227:19, 228:7, 228:11, 228:20, 228:23, 229:7, 229:10, 229:18, 230:9, 230:12, 230:15, 230:18, 230:21, 230:24, 231:2, 231:5, 231:9, 231:12, 231:15, 231:25, 233:5, 233:9, 233:12, 233:16, 233:22, 233:25, 234:12, 234:14, 234:16, 234:19, 234:21, 235:1, 235:10, 235:14, 235:17, 235:20, 235:23, 236:5, 236:8, 236:13, 236:15, 236:19, 238:4

**Correct** [73] - 65:4, 70:13, 73:22, 76:8, 80:4, 81:12, 84:23, 85:10, 87:11, 87:21, 90:3, 92:16, 92:22, 93:11, 99:25, 100:1, 106:24, 107:23, 108:10, 108:18, 108:23, 109:14, 109:18, 110:9, 112:16, 112:18, 112:21, 113:3, 115:1, 117:7, 217:18, 218:14, 218:18, 218:21, 218:24, 220:7, 221:18, 223:21, 223:25, 224:10, 224:13, 225:8, 225:12, 225:15, 225:18, 225:23, 226:14, 227:7, 227:9, 227:14, 228:24, 229:8,

230:13, 230:19, 230:25, 231:3, 231:6, 231:10, 231:13, 232:1, 233:17, 233:20, 234:1, 234:13, 234:15, 234:17, 234:20, 235:2, 235:18, 235:21, 235:24, 236:14, 236:16

**Corrections** [4] - 11:24, 12:4, 12:8, 13:24

**correctly** [1] - 14:9

**correlation** [3] - 156:16, 156:20, 156:21

**corresponds** [1] - 230:23

**cost** [5] - 84:13, 84:23, 211:15, 213:3, 236:7

**Cost** [1] - 211:9

**costs** [3] - 235:23, 236:5, 236:21

**counsel** [7] - 40:10, 40:19, 159:1, 160:6, 170:20, 229:9, 232:17

**counselor** [1] - 199:1

**count** [1] - 8:10

**counter** [1] - 94:22

**counter-detailing** [1] - 94:22

**country** [12] - 31:20, 36:6, 36:17, 42:9, 52:6, 53:20, 84:15, 84:19, 146:9, 213:14, 217:1, 233:19

**COUNTY** [1] - 1:10

**county** [1] - 200:1

**County** [63] - 2:2, 3:3, 40:10, 46:17, 100:25, 152:21, 153:11, 153:20, 176:6, 182:25, 183:1, 185:7, 185:13, 188:3, 188:6, 188:12, 189:8, 194:15, 194:18, 195:2, 196:18, 197:6, 198:12, 200:14, 217:1, 218:8, 219:8, 221:20, 221:23, 222:4, 222:5, 222:6, 222:9, 222:18, 222:24, 223:3, 223:8, 224:8,

224:12, 224:14, 224:17, 224:19, 224:20, 225:6, 225:14, 225:17, 225:25, 226:3, 226:16, 226:24, 227:16, 227:19, 227:22, 228:20, 229:7, 229:16, 230:15, 230:24, 233:22, 234:6, 235:25, 236:17, 237:1

**County's** [2] - 223:19, 231:4

**couple** [15] - 8:24, 11:20, 16:22, 46:10, 120:3, 148:22, 148:25, 151:1, 173:11, 173:24, 174:22, 175:19, 179:8, 179:12, 190:8

**course** [12] - 104:22, 105:19, 118:18, 141:24, 154:6, 155:14, 155:16, 180:11, 188:2, 193:6, 216:14, 217:10

**Court** [36] - 6:18, 6:18, 7:2, 8:9, 8:20, 10:2, 22:2, 83:22, 118:10, 131:14, 150:11, 160:19, 170:8, 174:4, 178:21, 182:17, 183:7, 183:20, 184:9, 185:6, 185:15, 185:22, 187:9, 188:2, 189:8, 189:22, 190:13, 192:19, 194:8, 195:7, 200:11, 201:20, 205:12, 213:8, 238:2, 238:3

**court** [4] - 8:1, 18:2, 62:10, 174:25

**COURT** [171] - 1:1, 1:17, 7:5, 7:13, 7:23, 8:5, 8:11, 8:14, 8:21, 9:24, 10:9, 10:13, 10:18, 15:15, 24:5, 24:10, 24:13, 33:7, 33:10, 33:21, 34:3, 34:11, 40:13, 43:17, 43:25, 44:2, 44:6, 44:8, 44:13, 44:19, 44:23, 45:4, 45:10, 45:12, 45:16, 45:18, 46:1, 48:21, 49:1,

49:16, 49:22, 55:18, 60:9, 60:14, 62:9, 62:14, 75:4, 75:6, 112:1, 115:17, 115:20, 118:13, 118:19, 118:24, 119:2, 119:21, 120:7, 120:12, 120:15, 120:18, 123:8, 123:10, 124:6, 124:11, 125:17, 126:8, 126:10, 132:6, 139:19, 144:7, 144:17, 146:7, 146:14, 146:18, 148:20, 151:3, 151:8, 151:24, 152:12, 152:17, 153:1, 153:6, 153:9, 153:14, 153:17, 153:23, 154:1, 154:3, 154:13, 154:18, 155:22, 156:3, 156:5, 156:8, 157:2, 157:7, 157:13, 157:20, 157:24, 158:14, 158:18, 158:22, 159:9, 159:13, 159:15, 161:8, 161:25, 162:4, 162:13, 162:18, 162:22, 163:4, 163:10, 165:1, 166:6, 166:18, 166:22, 167:2, 168:6, 168:8, 168:10, 168:15, 168:19, 169:1, 169:4, 170:12, 173:1, 175:7, 175:20, 176:17, 177:13, 178:5, 178:18, 178:19, 179:11, 179:15, 179:23, 180:1, 180:5, 180:8, 180:15, 180:19, 181:7, 181:9, 181:12, 181:17, 181:19, 181:23, 182:1, 182:6, 189:19, 194:22, 195:15, 195:17, 196:10, 197:10, 197:12, 197:15, 198:6, 198:8, 198:22, 201:4, 203:1, 209:24, 213:21, 214:22,

219:12, 231:21,
237:2, 237:6, 237:12
**Court's** [3] - 115:9,
120:4, 180:23
**courtroom** [3] - 9:12,
10:13, 39:15
**COURTROOM** [1] -
45:14
**cover** [2] - 150:4,
236:5
**covered** [3] - 98:22,
157:16, 235:22
**COVID** [7] - 75:18,
208:25, 210:13,
214:12, 214:16,
234:5, 234:11
**COVID-19** [1] - 233:24
**Covington** [1] - 5:11
**CPR** [2] - 207:24,
208:1
**crashed** [1] - 199:8
**create** [8] - 29:16,
48:8, 53:4, 133:4,
189:3, 190:15,
200:21, 222:22
**created** [6] - 133:10,
133:19, 134:17,
155:13, 155:16,
196:14
**creating** [4] - 110:2,
152:23, 161:17,
162:17
**creation** [1] - 133:1
**credibility** [1] - 62:1
**crews** [2] - 201:1,
207:3
**crisis** [9] - 28:25,
41:14, 42:6, 96:20,
96:21, 200:7, 200:9,
201:14, 237:1
**Crisis** [3] - 41:1, 41:2,
45:21
**criteria** [4] - 43:1,
217:5, 217:12, 218:5
**Critical** [1] - 200:12
**critical** [2] - 85:4,
199:11
**cross** [15] - 8:18, 9:18,
10:5, 33:25, 34:5,
34:6, 49:2, 120:7,
156:12, 158:20,
161:24, 162:12,
165:23, 214:22
**CROSS** [4] - 10:20,
46:5, 124:14, 214:23
**cross-examine** [2] -
120:7, 214:22
**crossed** [1] - 184:22
**CRR** [2] - 6:18, 6:18
**crushed** [1] - 122:21

**crushing** [2] - 98:6,
99:2
**CSMP** [50] - 12:19,
12:25, 17:23, 18:4,
18:13, 18:17, 18:22,
19:5, 19:23, 20:1,
20:2, 21:16, 21:20,
21:22, 22:1, 22:6,
22:9, 22:16, 22:22,
25:23, 125:3,
125:12, 126:20,
127:1, 127:3, 127:6,
127:14, 127:20,
127:25, 128:8,
128:13, 128:17,
128:19, 128:22,
129:3, 129:20,
131:9, 131:17,
133:25, 134:22,
134:25, 136:2,
138:11, 138:18,
140:1, 140:14,
141:2, 143:12,
159:18, 159:19
**CSMPs** [1] - 137:11
**culture** [8] - 89:13,
90:19, 90:20, 90:22,
91:1, 93:14, 94:9,
94:12, 136:5
**curious** [1] - 34:4
**current** [5] - 57:21,
63:24, 69:8, 71:1,
166:24
**Current** [2] - 32:5,
44:17
**cut** [6] - 84:3, 84:12,
84:21, 100:21,
103:22
**cuts** [4] - 212:11,
212:14
**CV** [4] - 15:19, 15:20,
16:8, 16:9
**cynical** [1] - 207:3

**D**

**damage** [1] - 43:1
**data** [53] - 12:22,
35:19, 37:22, 61:7,
62:24, 67:12, 67:16,
121:9, 121:12,
128:1, 129:11,
133:11, 133:25,
134:3, 159:20,
160:5, 160:24,
161:3, 161:17,
161:20, 161:21,
161:22, 162:8,
162:15, 162:16,
163:1, 163:2,

163:25, 164:3,
166:10, 169:12,
170:24, 171:7,
171:14, 171:18,
174:1, 177:25,
194:18, 204:13,
212:3, 223:17,
225:2, 225:3,
227:15, 227:18,
227:21, 228:4,
228:25, 229:9,
230:2, 230:5, 230:7
**Data** [1] - 85:2
**Database** [5] - 24:25,
133:5, 134:20, 135:2
**database** [5] - 18:5,
18:10, 130:1, 130:2,
138:13
**databases** [1] - 57:20
**Date** [1] - 238:16
**date** [8] - 27:4, 33:20,
71:12, 130:1, 130:4,
131:5, 187:19, 210:5
**daughter** [2] - 199:11,
212:20
**DAVID** [2] - 1:17, 2:9
**David** [1] - 7:1
**days** [38] - 29:7,
29:11, 29:17, 30:2,
30:5, 30:6, 30:23,
30:24, 58:25, 88:3,
88:4, 88:21, 88:25,
89:11, 89:15, 90:2,
90:3, 90:9, 90:14,
90:20, 91:1, 91:3,
91:16, 92:15, 92:21,
92:22, 95:14,
124:17, 170:3,
170:5, 175:4,
175:22, 211:20
**DC** [6] - 2:11, 4:7,
4:14, 4:16, 5:6, 5:13
**De** [1] - 2:17
**DEA** [3] - 129:25,
132:6, 178:22
**dead** [1] - 123:24
**deadline** [1] - 169:16
**deadlines** [1] - 176:2
**deadly** [1] - 110:15
**deal** [6] - 10:11, 96:19,
168:12, 175:3,
175:13, 178:5
**dealer** [4] - 84:9,
84:21, 84:22, 226:6
**dealers** [3] - 82:21,
84:1, 102:10
**dealing** [2] - 39:13,
98:2
**dealt** [2] - 124:24,
205:1

**Death** [1] - 113:18
**death** [28] - 81:22,
106:20, 107:2,
108:8, 108:17,
108:23, 113:20,
114:1, 114:16,
114:17, 114:19,
114:25, 115:8,
115:10, 115:12,
115:24, 116:8,
116:14, 116:23,
117:2, 117:4,
117:17, 117:18,
118:11, 124:24,
156:17, 166:11,
166:14
**Deaths** [3] - 113:5,
149:2, 167:9
**deaths** [20] - 83:8,
83:18, 84:24, 99:17,
100:6, 100:8, 100:9,
110:1, 113:9,
113:14, 113:24,
115:5, 116:13,
117:19, 117:21,
119:5, 133:21,
149:21, 166:16,
167:12
**debated** [1] - 30:2
**debriefing** [3] -
199:24, 200:1,
200:16
**decade** [3] - 35:21,
58:8, 215:4
**decedent** [2] - 106:9,
107:4
**decedents** [4] -
106:19, 107:11,
107:12, 108:17
**deceit** [2] - 126:22,
127:1
**December** [6] - 55:24,
56:1, 127:24,
205:15, 209:6,
210:10
**decide** [9] - 67:9,
69:25, 73:4, 78:24,
90:7, 117:12,
117:13, 135:4, 203:5
**decided** [1] - 203:6
**decides** [3] - 47:7,
142:18
**deciding** [1] - 217:5
**decision** [26] - 47:2,
68:1, 68:7, 68:9,
68:25, 69:5, 73:20,
76:10, 76:20, 76:21,
77:1, 77:4, 77:8,
77:10, 89:1, 89:5,
115:23, 116:25,

142:24, 144:4,
144:5, 145:18,
145:20, 148:12,
172:10, 174:10
**decision-making** [1] -
68:1
**decisions** [7] - 46:14,
46:18, 68:23, 80:7,
80:10, 85:11, 86:23
**deck** [10] - 7:9, 7:11,
7:14, 7:19, 173:22
**decline** [10] - 58:4,
58:7, 58:10, 58:11,
82:4, 230:14,
230:23, 231:4, 231:5
**declined** [8] - 111:17,
111:19, 140:4,
228:22, 230:12,
230:17, 230:21,
231:1
**decompose** [1] -
117:25
**decrease** [2] - 198:1,
231:7
**decreased** [1] - 208:3
**decree** [1] - 152:19
**decs** [1] - 175:19
**Deer** [1] - 27:11
**DEF-WV-00027696** [1]
- 19:10
**DEF-WV-00747** [3] -
31:25, 44:16, 44:20
**DEF-WV-03015** [3] -
24:20, 44:5, 44:9
**DEF-WV-03036** [2] -
44:11, 44:14
**DEF-WV-03105** [2] -
43:24, 44:3
**DEF-WV-747** [1] -
160:10
**Defendant** [4] - 4:11,
5:2, 5:8, 6:2
**defendant** [1] - 173:12
**Defendant's** [11] -
55:21, 58:19, 60:7,
74:6, 75:2, 123:6,
125:15, 126:7,
132:4, 132:13,
168:23
**Defendants** [3] - 1:8,
1:14, 238:7
**defendants** [14] -
9:13, 40:3, 159:8,
161:15, 161:21,
162:21, 162:25,
171:14, 171:17,
172:6, 174:4,
175:14, 176:10,
177:7
**Defendants'** [2] -

219:1, 222:17
**defense** [1] - 8:7
**DEFENSE** [8] - 44:3, 44:9, 44:14, 44:20, 45:23, 60:15, 123:11, 126:11
**define** [1] - 18:4
**definitely** [5] - 71:23, 121:14, 129:5, 144:1, 188:9
**definitively** [1] - 31:2
**degree** [2] - 183:15, 217:13
**Degree** [1] - 183:18
**Deleno** [4] - 145:23, 147:1, 147:4, 151:14
**delirium** [1] - 193:19
**demand** [3] - 110:23, 111:1
**demographic** [2] - 186:14, 212:5
**Demographics** [1] - 37:19
**demonstrating** [1] - 173:12
**demonstrative** [7] - 43:11, 151:14, 189:17, 201:3, 209:23, 230:2, 234:3
**denied** [1] - 17:21
**dent** [1] - 93:1
**dental** [1] - 30:12
**dentist** [3] - 31:3, 88:4, 88:19
**dentists** [6] - 30:8, 30:11, 30:13, 30:18, 30:20
**Department** [5] - 12:4, 12:8, 17:16, 214:19, 228:1
**department** [1] - 183:25
**dependence** [1] - 150:14
**dependency** [1] - 103:25
**dependent** [1] - 111:1
**deploy** [1] - 136:6
**depose** [3] - 9:14, 179:13, 180:13
**deposed** [11] - 8:25, 9:15, 39:19, 39:25, 40:3, 40:5, 49:6, 49:8, 49:19, 179:1, 231:24
**Deposition** [1] - 232:14
**deposition** [32] - 7:21, 9:2, 9:3, 9:6, 33:23, 34:16, 35:3, 38:14,

39:19, 40:1, 40:2, 40:8, 48:12, 49:9, 49:10, 49:12, 49:17, 49:20, 52:16, 52:19, 52:22, 158:12, 178:24, 179:2, 179:7, 180:11, 180:16, 181:3, 181:4, 181:5, 231:18, 232:2
**depositions** [2] - 7:25, 39:20
**depressed** [1] - 193:15
**depression** [1] - 37:6
**deputy** [1] - 156:5
**DEPUTY** [1] - 45:14
**derivations** [1] - 83:13
**describe** [2] - 27:16, 160:18
**described** [13] - 37:12, 133:6, 133:11, 188:1, 189:8, 223:20, 224:2, 226:10, 228:9, 228:19, 231:9, 234:5, 235:16
**description** [4] - 127:6, 130:20, 137:9, 187:25
**Description** [1] - 129:9
**desires** [1] - 22:3
**desk** [1] - 213:17
**despite** [1] - 151:14
**detail** [5] - 154:10, 160:18, 170:20, 172:12, 173:12
**detailed** [2] - 124:19, 172:19
**detailing** [5] - 94:22, 94:25, 95:2, 95:3, 95:4
**details** [1] - 40:23
**determinate** [1] - 15:22
**determination** [3] - 148:14, 204:12, 224:8
**determine** [6] - 193:21, 212:4, 226:17, 226:24, 227:5, 227:12
**determines** [1] - 47:11
**Determining** [1] - 69:16
**develop** [7] - 35:17, 63:3, 86:14, 86:21, 98:16, 105:16, 132:22

**developed** [7] - 105:19, 190:17, 200:12, 200:15, 200:18, 200:24, 204:18
**developing** [3] - 74:13, 86:5, 199:7
**develops** [2] - 63:16, 175:12
**DHHR** [1] - 35:11
**diabetes** [3] - 37:3, 53:12, 164:6
**diagnosis** [1] - 190:18
**dialed** [1] - 174:14
**die** [4] - 83:21, 102:4, 136:19, 164:4
**died** [1] - 107:22
**difference** [1] - 51:8
**differences** [1] - 172:7
**different** [19] - 30:3, 48:5, 50:18, 61:6, 108:14, 108:16, 117:15, 117:23, 121:1, 140:10, 172:9, 173:8, 174:11, 186:1, 188:10, 188:24, 193:11, 193:17, 193:19
**difficult** [5] - 117:9, 118:1, 118:7, 128:20, 210:23
**difficulties** [1] - 233:1
**dilated** [1] - 193:16
**dinner** [1] - 208:18
**dip** [2] - 151:6, 151:7
**dipping** [1] - 151:6
**direct** [12] - 81:5, 128:2, 129:1, 132:17, 139:25, 156:20, 156:21, 159:24, 160:3, 161:24, 163:14
**DIRECT** [1] - 182:18
**directed** [3] - 60:5, 220:2, 220:13
**direction** [4] - 164:20, 177:3, 177:16, 178:8
**directly** [5] - 86:5, 86:13, 87:7, 186:6, 236:9
**Director** [7] - 183:2, 185:21, 188:15, 198:10, 198:14, 202:1, 209:14
**dirt** [1] - 212:12
**disability** [5] - 51:22, 51:24, 52:11, 163:23, 164:10
**disabled** [3] - 37:25,

38:2, 52:1
**disagree** [3] - 159:7, 174:16, 174:18
**Discipline** [1] - 145:13
**discipline** [2] - 145:14
**disciplined** [1] - 97:1
**disciplining** [1] - 155:16
**disclose** [1] - 169:14
**disclosed** [7] - 9:6, 9:17, 9:21, 157:6, 157:9, 157:10, 157:12
**disclosure** [5] - 9:10, 170:3, 170:4, 174:17, 180:12
**disclosures** [4] - 8:22, 10:1, 159:7, 170:10
**discomfort/acute** [2] - 219:17, 219:23
**Discount** [2] - 157:19, 158:1
**discovery** [1] - 181:6
**discuss** [2] - 81:14, 134:13
**discussed** [17] - 57:15, 57:20, 58:15, 58:24, 85:12, 95:6, 96:21, 98:23, 100:4, 100:17, 101:3, 109:4, 112:10, 112:23, 114:1, 135:22, 223:19
**discussing** [11] - 10:7, 72:22, 72:25, 97:20, 100:20, 102:16, 102:21, 110:6, 112:20, 135:8, 153:22
**discussion** [9] - 47:22, 72:11, 72:12, 73:13, 86:20, 120:23, 156:25, 157:1, 165:21
**Discussion** [1] - 92:2
**discussions** [1] - 71:10
**disease** [3] - 36:16, 98:16, 150:18
**diseases** [1] - 98:13
**disorder** [6] - 86:6, 86:15, 86:21, 86:24, 87:6, 205:2
**Disorder** [2] - 15:22, 16:13
**disorders** [2] - 86:5, 86:13
**dispense** [2] - 47:8, 215:18
**dispensed** [5] - 47:12,

91:24, 130:2, 130:6, 227:5
**dispenser** [2] - 25:13, 28:15, 28:17
**dispensers** [5] - 27:14, 27:21, 128:6, 135:5, 137:17
**dispenses** [1] - 28:16
**Dispensing** [1] - 140:1
**dispensing** [6] - 12:21, 25:11, 25:15, 128:16, 129:12, 140:4
**disposable** [1] - 207:24
**distilled** [1] - 172:22
**distinction** [1] - 103:18
**distribute** [2] - 56:10, 209:1
**distributed** [3] - 56:17, 56:25
**distributions** [2] - 31:11, 31:15
**distributor** [2] - 152:22, 227:8
**distributors** [10] - 11:10, 11:12, 11:17, 14:6, 18:17, 20:23, 21:1, 21:8, 25:23, 31:7
**district** [1] - 159:25
**District** [2] - 7:2, 7:3
**DISTRICT** [3] - 1:1, 1:1, 1:17
**Diversion** [1] - 204:9
**diversion** [7] - 85:16, 89:24, 90:4, 105:8, 107:15, 127:17, 137:13
**diverted** [2] - 105:13, 156:21
**divulging** [1] - 136:22
**DO** [1] - 54:10
**Doctor** [3] - 34:16, 137:2, 150:24
**doctor** [49] - 54:24, 55:3, 68:9, 68:19, 69:1, 69:7, 70:6, 73:20, 77:9, 86:22, 87:10, 87:17, 88:2, 88:12, 88:13, 88:14, 88:17, 88:18, 88:19, 88:24, 89:2, 89:5, 89:25, 90:7, 90:8, 90:11, 90:16, 92:15, 103:1, 103:9, 104:17, 105:11, 107:23, 131:5, 136:12, 136:13,

143:9, 145:6,
145:22, 147:11,
147:23, 148:6,
152:20, 153:10,
164:25
**doctor's** [6] - 86:14,
103:5, 108:2,
143:17, 147:18,
228:15
**doctor/patient** [1] -
68:24
**doctors** [72] - 20:2,
20:3, 20:19, 46:12,
46:18, 46:24, 54:8,
54:13, 54:18, 57:6,
57:21, 70:21, 74:22,
76:1, 76:9, 76:13,
77:1, 77:24, 78:22,
80:7, 80:10, 80:14,
85:12, 85:22, 86:18,
87:2, 87:24, 87:25,
88:8, 88:22, 91:3,
91:11, 91:16, 91:21,
92:16, 92:19, 92:23,
93:2, 93:5, 93:6,
93:7, 93:10, 94:2,
94:4, 94:17, 95:6,
95:13, 95:17, 96:1,
96:24, 97:1, 97:2,
97:12, 134:4,
135:20, 135:25,
136:1, 136:5,
136:14, 136:20,
137:1, 138:17,
138:25, 142:12,
142:24, 153:21,
218:9
**doctors'** [3] - 81:1,
94:23, 159:25
**document** [74] - 27:4,
27:5, 27:6, 48:21,
55:15, 55:20, 56:4,
56:9, 57:2, 58:14,
58:22, 59:16, 60:1,
60:18, 63:8, 69:12,
74:4, 74:9, 76:15,
76:16, 77:11, 81:13,
84:25, 89:19, 97:20,
102:15, 106:7,
109:3, 112:8,
119:14, 119:19,
121:18, 122:6,
126:2, 129:5, 132:3,
132:19, 137:24,
139:2, 140:1, 146:1,
146:4, 146:19,
150:1, 150:9,
151:16, 151:21,
152:5, 154:7,
154:20, 154:23,

155:4, 155:13,
155:20, 156:12,
161:17, 161:20,
196:14, 196:16,
197:20, 219:7,
219:10, 219:16,
219:23, 220:9,
220:21, 222:11,
222:13, 222:16,
222:21, 222:22,
223:2, 229:5
**documentation** [3] -
175:13, 175:21,
187:2
**documented** [2] -
187:20, 197:25
**documenting** [1] -
187:6
**documents** [26] -
59:14, 126:4,
152:24, 176:7,
178:20, 178:23,
179:6, 179:9,
179:14, 179:19,
179:25, 180:3,
180:9, 180:10,
180:13, 180:14,
180:16, 180:20,
180:21, 180:23,
180:24, 181:2,
181:13, 181:17,
229:12
**Doe** [2] - 133:16,
133:17
**dollar** [1] - 212:13
**donating** [4] - 208:20,
208:21
**done** [10] - 8:15,
50:21, 120:5,
134:11, 159:13,
172:8, 174:2,
194:18, 197:22,
200:2
**door** [9] - 157:1,
157:5, 205:13,
205:15, 206:16,
206:22, 207:5,
207:15
**doors** [1] - 214:14
**DOs** [1] - 54:11
**dosage** [4] - 140:4,
172:4, 172:7, 172:24
**dose** [5] - 86:16,
86:25, 90:4, 93:15,
196:1
**doses** [3] - 86:6,
86:19, 196:4
**double** [7] - 7:9, 7:11,
7:19, 11:3, 151:4,
151:6, 151:7

**double-deck** [1] - 7:9
**doubled** [2] - 23:7,
140:23
**doubt** [1] - 8:1
**Douglas** [1] - 4:18
**down** [57] - 11:21,
11:22, 12:18, 34:3,
38:5, 56:8, 72:16,
79:22, 82:2, 86:11,
91:10, 92:1, 96:8,
96:17, 97:3, 97:11,
99:16, 100:23,
111:21, 117:10,
126:18, 129:7,
130:17, 133:2,
135:2, 143:6,
149:13, 158:25,
162:15, 164:8,
164:12, 164:18,
171:3, 171:6,
172:10, 172:22,
174:1, 174:3, 174:6,
174:9, 177:20,
179:3, 179:6, 189:3,
189:22, 190:5,
195:11, 199:18,
199:19, 199:24,
209:17, 210:16,
210:18, 223:24,
229:19, 235:13
**Downey** [2] - 157:19,
157:25
**download** [1] - 187:3
**downs** [4] - 96:3, 96:5,
96:7, 96:13
**downtown** [1] -
144:18
**downward** [5] - 209:7,
209:9, 209:10,
209:13, 210:19
**Dr** [129] - 7:8, 8:23,
8:25, 9:7, 9:12, 9:14,
10:5, 10:10, 10:13,
10:22, 15:5, 15:17,
16:1, 16:7, 16:24,
18:4, 19:10, 22:4,
24:18, 24:20, 25:2,
25:5, 25:22, 26:2,
26:18, 27:11, 31:18,
32:3, 32:15, 33:15,
33:22, 36:2, 36:11,
36:21, 37:12, 38:7,
38:8, 42:18, 43:9,
46:7, 46:10, 48:12,
49:6, 50:2, 50:20,
52:16, 52:18, 55:20,
56:13, 56:17, 57:5,
58:19, 58:22, 59:12,
60:17, 62:18, 67:23,
69:14, 72:1, 72:5,

72:10, 74:4, 74:6,
75:9, 76:17, 77:11,
79:23, 81:5, 81:16,
83:25, 86:3, 92:11,
97:14, 102:25,
106:8, 109:2, 112:2,
112:9, 119:23,
120:20, 121:17,
123:4, 123:15,
124:16, 125:20,
126:13, 132:12,
133:9, 133:23,
137:24, 138:1,
138:4, 139:22,
142:6, 146:7,
146:25, 147:1,
147:4, 148:18,
150:11, 151:14,
153:5, 153:13,
154:20, 156:11,
158:2, 158:4,
158:10, 159:17,
167:7, 168:8, 169:9,
169:10, 169:12,
169:16, 169:19,
169:20, 169:24,
170:10, 173:14,
174:6, 175:8,
176:10, 176:16,
176:18, 177:12,
177:14, 178:7
**draft** [2] - 16:16, 28:21
**draw** [2] - 11:20, 24:21
**drawers** [1] - 91:18
**drawing** [1] - 103:18
**drive** [2] - 48:4, 211:18
**Drive** [1] - 6:15
**driven** [1] - 81:22
**driving** [3] - 83:8,
83:18, 163:17
**drop** [6] - 189:3,
189:22, 190:5,
195:11, 223:24,
229:19
**drop-down** [6] -
189:3, 189:22,
190:5, 195:11,
223:24, 229:19
**drove** [1] - 96:1
**Drug** [9] - 6:3, 25:16,
113:5, 137:10,
149:2, 167:9,
209:14, 225:19,
238:7
**DRUG** [2] - 1:7, 1:13
**drug** [42] - 82:21, 84:1,
84:9, 84:21, 84:22,
101:7, 101:11,
101:16, 102:10,
102:16, 103:19,

103:20, 106:9,
106:19, 106:23,
107:5, 109:4,
109:10, 109:11,
113:1, 113:6,
113:10, 116:12,
117:9, 117:19,
121:23, 122:3,
122:14, 122:17,
122:23, 130:5,
137:12, 149:17,
149:20, 167:12,
196:17, 225:3,
225:7, 225:21,
226:6, 226:13,
227:22
**drug/alcohol** [1] -
190:12
**drugs** [35] - 28:16,
82:4, 82:24, 82:25,
83:15, 97:23, 98:3,
103:12, 103:17,
107:13, 108:15,
108:16, 108:19,
108:22, 112:17,
112:19, 113:21,
114:17, 114:24,
115:1, 115:6,
116:15, 116:22,
117:15, 117:17,
117:18, 121:1,
149:12, 149:17,
156:22, 167:15,
225:22, 227:16,
229:21
**Drugs** [1] - 83:1
**DU** [1] - 173:16
**Due** [1] - 116:12
**due** [4] - 192:9,
224:15, 231:8,
233:16
**duplicative** [2] -
173:15, 174:19
**duration** [2] - 71:18,
90:12
**durations** [3] - 65:10,
66:9, 86:6
**Durations** [1] - 65:11
**During** [2] - 97:13,
216:14
**during** [19] - 72:7,
72:18, 73:5, 73:9,
74:2, 75:18, 103:2,
103:6, 103:11,
103:14, 103:20,
104:8, 104:17,
104:18, 105:7,
105:12, 163:14,
206:8, 214:12
**duties** [1] - 160:25

# E

**e-mail** [1] - 55:12
**early** [5] - 7:17, 8:15, 55:22, 184:8, 216:10
**easily** [1] - 89:15
**East** [3] - 3:5, 3:13, 4:19
**easy** [2] - 100:3, 136:5
**ECF** [1] - 10:1
**edition** [1] - 219:4
**educate** [5] - 17:4, 43:5, 57:6, 92:19, 92:23
**educated** [1] - 93:11
**education** [9] - 16:25, 17:3, 20:8, 92:4, 92:13, 93:13, 94:9, 94:24, 95:5
**educational** [1] - 142:16
**effect** [1] - 198:11
**Effective** [3] - 26:13, 26:22, 27:1
**efficacy** [6] - 65:1, 65:9, 65:15, 66:8, 95:19
**effort** [4] - 28:25, 29:5, 57:6, 127:4
**Eighth** [1] - 3:10
**Either** [1] - 103:9
**either** [15] - 12:11, 51:9, 88:12, 104:16, 108:22, 128:18, 130:14, 152:10, 154:8, 156:1, 179:8, 180:18, 220:2, 220:13
**elect** [1] - 211:24
**electrocution** [1] - 190:9
**electronic** [6] - 139:8, 186:12, 188:7, 188:9, 188:24
**elements** [2] - 110:25, 143:5
**elephant** [2] - 101:8, 102:13
**elephants** [1] - 102:2
**elicited** [1] - 165:24
**eligible** [1] - 211:11
**eliminate** [1] - 128:1
**ELIZABETH** [1] - 6:15
**ELMO** [2] - 149:5, 170:16
**elsewhere** [1] - 89:10
**email** [1] - 197:18
**embankment** [1] - 199:17
**embarrassed** [1] -

207:2
**emergency** [5] - 79:19, 183:25, 184:1, 215:22, 221:23
**Emergency** [1] - 196:18
**emergent** [1] - 194:4
**Employee** [4] - 198:19, 198:25, 200:6, 201:14
**EMS** [65] - 182:25, 183:1, 184:18, 185:7, 185:14, 185:24, 186:8, 186:17, 187:14, 188:1, 188:3, 188:12, 188:15, 188:22, 189:13, 189:17, 192:14, 193:10, 194:1, 194:18, 195:2, 195:21, 197:6, 198:12, 200:2, 200:15, 201:8, 202:3, 204:10, 204:13, 204:23, 212:3, 218:7, 218:15, 218:22, 219:8, 220:1, 220:12, 221:9, 221:17, 221:20, 221:23, 222:10, 222:18, 222:24, 223:3, 223:8, 223:17, 223:20, 223:23, 224:8, 224:12, 224:14, 224:17, 224:25:6, 226:16, 226:21, 227:4, 227:11, 228:4, 228:10, 229:7, 229:17, 230:15, 235:25
**EMT** [2] - 187:10, 189:23
**EMTs** [5] - 185:25, 186:10, 186:19, 187:5, 187:24
**enacted** [1] - 133:24
**enactment** [1] - 131:23
**Encino** [1] - 3:19
**encounters** [1] - 228:10
**encourage** [2] - 78:4, 127:15
**encouraged** [3] - 127:15, 138:18, 218:10

**end** [18] - 43:15, 52:10, 60:19, 68:12, 79:20, 87:5, 87:20, 91:17, 91:18, 91:24, 94:15, 116:24, 133:22, 154:11, 164:17, 173:21, 195:12, 234:7
**end-all** [1] - 133:22
**ended** [5] - 91:14, 184:11, 199:7, 199:24, 199:25
**endorsed** [2] - 27:25, 28:7
**endorsing** [1] - 155:10
**enforcement** [7] - 11:17, 92:5, 93:4, 93:17, 132:10, 200:14, 204:10
**Enforcement** [1] - 25:16
**engage** [2] - 126:22, 147:10
**engaged** [3] - 19:24, 47:25, 142:19
**engagement** [1] - 210:21
**Enhance** [1] - 12:19
**enhance** [4] - 18:21, 19:23, 93:4, 126:20
**enhanced** [3] - 17:11, 92:5, 93:17
**enhancement** [1] - 20:1
**enjoyment** [1] - 7:21
**ensure** [2] - 17:7, 23:14
**entered** [6] - 101:6, 101:16, 155:20, 161:16, 161:20, 169:22
**entertaining** [1] - 151:9
**entire** [7] - 16:19, 17:6, 63:6, 93:1, 126:1, 143:4, 183:11
**entirely** [1] - 67:13
**entirety** [2] - 173:18, 176:9
**entitled** [7] - 24:23, 24:24, 32:4, 37:18, 140:1, 175:14, 176:17
**entity** [1] - 42:25
**entrusted** [1] - 68:8
**ENU** [1] - 4:12
**epidemic** [1] - 85:5
**epidemiological** [1] - 61:21
**Epidemiological** [1] -

119:12
**equal** [1] - 234:8
**equally** [1] - 35:19
**ER** [2] - 184:3, 215:4
**errata** [4] - 49:9, 49:11, 49:14, 49:19
**especially** [2] - 92:24, 211:19
**espousing** [2] - 78:12, 78:17
**essential** [4] - 77:18, 77:25, 78:8, 78:14
**essentially** [1] - 18:5
**establish** [1] - 132:21
**established** [3] - 20:13, 57:13, 147:21
**establishment** [1] - 127:3
**estimate** [5] - 58:11, 64:12, 64:17, 64:21, 67:6
**estimated** [2] - 43:2, 102:7
**et** [4] - 1:7, 1:13, 238:6, 238:7
**evaluate** [1] - 61:25
**evaluated** [1] - 217:5
**evaluates** [1] - 135:3
**evaluating** [1] - 74:18
**evaluation** [1] - 63:24
**event** [6] - 171:17, 204:21, 214:16, 225:7, 226:10, 229:18
**events** [3] - 42:13, 158:10, 224:22
**eventually** [2] - 185:11, 186:8
**evidence** [29] - 29:15, 29:20, 30:25, 43:16, 60:8, 61:7, 61:11, 61:16, 61:17, 65:7, 65:8, 66:7, 66:15, 69:25, 73:23, 75:3, 89:16, 95:7, 101:5, 102:12, 122:2, 123:6, 161:16, 161:20, 173:23, 195:14, 197:9, 198:4, 219:11
**Evidence** [2] - 64:25, 85:2
**evidence-based** [2] - 29:20, 30:25
**evolved** [1] - 185:21
**exact** [9] - 18:25, 30:21, 38:15, 96:9, 96:25, 127:2, 172:16, 172:20, 173:6

**exactly** [13] - 22:10, 38:14, 48:6, 83:15, 84:13, 86:10, 91:24, 92:10, 115:18, 136:21, 136:23, 157:10, 177:7
**Exactly** [1] - 92:19
**examination** [11] - 8:18, 9:18, 10:5, 33:25, 34:5, 49:2, 81:5, 161:24, 162:12, 165:24
**EXAMINATION** [8] - 10:20, 46:5, 124:14, 148:23, 151:11, 167:5, 182:18, 214:23
**examine** [4] - 34:6, 117:20, 120:7, 214:22
**Examiner** [2] - 115:12, 115:23
**Examiner's** [1] - 117:13
**example** [13] - 29:6, 29:23, 35:20, 145:22, 164:1, 172:1, 172:2, 172:14, 189:12, 189:17, 192:19, 215:24, 225:9
**examples** [1] - 174:22
**exceeded** [1] - 172:18
**except** [1] - 107:10
**Excessive** [1] - 86:4
**excessive** [2] - 86:12, 87:14
**excited** [2] - 193:18, 208:18
**exclusively** [3] - 69:6, 98:2, 104:11
**excuse** [4] - 17:22, 26:20, 33:13, 33:19
**excused** [1] - 168:8
**Executive** [2] - 126:14, 150:21
**executive** [1] - 121:20
**exemplars** [1] - 173:18
**exercising** [1] - 160:25
**exhibit** [16] - 31:24, 45:15, 45:16, 81:4, 132:15, 138:24, 146:6, 152:2, 152:7, 152:10, 152:11, 154:7, 155:20, 155:22, 156:1, 161:15
**EXHIBIT** [8] - 44:3,

44:9, 44:14, 44:20, 45:23, 60:15, 123:11, 126:11
**Exhibit** [25] - 9:3, 45:22, 55:21, 58:19, 60:8, 74:6, 75:3, 81:8, 97:15, 99:8, 109:1, 119:11, 121:17, 123:6, 125:15, 132:5, 137:3, 138:23, 150:2, 160:9, 165:20, 167:8, 168:24, 198:4, 219:1
**exhibits** [4] - 43:16, 156:6, 160:11, 230:6
**exist** [1] - 105:9
**exists** [2] - 64:1, 69:8
**expand** [2] - 133:13, 141:23
**expanded** [1] - 127:20
**expansion** [2] - 27:14, 27:22
**expect** [3] - 35:4, 175:20, 176:20
**expectation** [1] - 106:1
**expense** [1] - 124:9
**expenses** [1] - 236:4
**experience** [6] - 121:9, 206:2, 223:19, 224:24, 231:7, 233:15
**Expert** [2] - 137:4, 150:2
**expert** [10] - 26:7, 26:21, 38:8, 38:11, 40:17, 138:7, 169:11, 169:21, 176:10, 178:22
**expertise** [1] - 190:20
**expire** [3] - 212:25, 213:5, 213:6
**explain** [26] - 12:15, 13:20, 14:25, 17:20, 17:21, 17:24, 18:23, 19:6, 28:4, 35:4, 35:15, 37:15, 42:7, 48:24, 53:8, 59:13, 87:22, 115:22, 118:11, 136:3, 148:9, 160:19, 163:19, 165:7, 189:13, 208:6
**explained** [2] - 19:2, 145:7
**explaining** [2] - 41:8, 115:20
**explains** [1] - 114:21
**explanation** [1] - 53:2

**exposed** [3] - 72:24, 102:22, 105:1
**expressing** [1] - 9:17
**extend** [1] - 54:7
**extended** [1] - 180:4
**extension** [1] - 213:3
**extent** [8] - 80:20, 143:23, 152:1, 153:12, 159:10, 226:15, 227:3, 227:10
**extra** [5] - 86:7, 87:15, 89:19, 90:3
**extracts** [2] - 88:18, 88:19
**extraordinary** [1] - 73:10
**eyes** [1] - 192:17

## F

**FABER** [1] - 1:17
**Faber** [1] - 7:1
**face** [4] - 234:12, 234:18
**face-to-face** [2] - 234:12, 234:18
**facilities** [2] - 211:13, 231:12
**facility** [2] - 211:20, 214:5
**facing** [2] - 29:1, 58:3
**fact** [31] - 22:8, 23:8, 52:4, 57:22, 58:10, 69:24, 78:22, 78:23, 108:7, 108:9, 109:10, 111:12, 116:12, 125:10, 128:20, 129:6, 138:20, 139:5, 141:14, 151:14, 164:21, 190:19, 215:21, 222:4, 222:5, 224:23, 226:23, 230:20, 231:4, 233:7, 236:17
**faction** [1] - 97:1
**factor** [13] - 48:3, 50:22, 51:5, 52:8, 53:18, 85:4, 110:17, 122:3, 122:14, 160:19, 163:17, 164:13, 165:4
**Factor** [1] - 35:10
**Factors** [1] - 122:11
**factors** [8] - 53:13, 53:15, 70:19, 89:4, 93:12, 94:19, 110:24, 121:22
**facts** [3] - 8:24,

130:15, 158:6
**factual** [1] - 23:8
**factually** [1] - 24:16
**failed** [1] - 24:19
**fails** [1] - 139:6
**failure** [1] - 139:11
**fair** [9] - 14:12, 16:22, 21:15, 28:15, 39:24, 49:24, 154:16, 161:11
**faith** [3] - 181:9, 205:3, 208:21
**fall** [1] - 175:2
**falls** [3] - 157:19, 157:25, 173:24
**familiar** [1] - 15:5, 22:6, 22:8, 28:23, 54:25, 125:10, 165:3, 216:21, 219:7, 222:21, 223:2
**families** [5] - 204:19, 207:12, 207:13, 211:15, 213:18
**family** [6] - 54:8, 98:16, 201:11, 207:15, 208:2, 211:21
**fan** [1] - 7:13
**far** [6] - 162:1, 170:2, 178:9, 194:18, 199:25, 212:8
**FARRELL** [71] - 2:3, 7:6, 7:15, 8:3, 8:6, 8:13, 8:17, 8:22, 9:25, 10:12, 24:4, 24:6, 33:19, 33:24, 34:4, 40:12, 43:10, 43:20, 44:24, 45:5, 45:11, 60:10, 60:12, 115:16, 115:18, 123:9, 123:24, 151:2, 151:5, 151:9, 151:12, 152:4, 152:8, 152:19, 153:3, 153:7, 153:12, 153:16, 153:19, 153:25, 154:16, 154:19, 155:19, 155:23, 156:2, 156:4, 156:7, 156:9, 156:10, 157:3, 157:9, 159:4, 159:12, 159:14, 159:16, 160:14, 160:17, 161:9, 161:11, 161:14, 162:2, 162:5, 162:14, 162:20, 162:24, 163:7, 163:12, 165:2,

166:20, 166:23, 168:17
**Farrell** [21] - 2:4, 2:16, 7:5, 9:22, 10:7, 10:10, 34:3, 43:18, 45:4, 115:17, 120:3, 124:6, 148:22, 150:25, 152:18, 154:9, 156:25, 157:18, 159:3, 162:19, 171:12
**fatal** [3] - 100:24, 231:1, 231:4
**Fatality** [3] - 11:1, 11:5, 99:7
**favored** [3] - 78:13, 78:17, 78:19
**FCRR** [1] - 6:18
**Federal** [1] - 9:9
**federal** [3] - 203:19, 204:4, 235:19
**fell** [1] - 166:3
**felt** [1] - 200:19
**female** [2] - 212:8, 212:9
**fentanyl** [65] - 82:12, 82:13, 82:19, 82:22, 83:3, 83:7, 83:13, 83:17, 83:21, 83:23, 84:2, 84:4, 84:7, 84:9, 84:10, 84:12, 84:14, 84:15, 84:19, 84:22, 99:23, 100:7, 100:8, 100:9, 100:15, 100:19, 100:20, 101:10, 101:25, 106:22, 109:12, 110:2, 110:8, 110:14, 112:20, 113:12, 115:7, 117:4, 118:6, 193:24, 220:3, 220:5, 220:14, 220:17, 221:4, 221:10, 221:13, 222:4, 222:6, 222:10, 222:19, 222:25, 223:8, 225:11, 225:16, 225:19, 225:21, 225:24, 227:11, 227:23
**Fentanyl** [9] - 121:4, 121:14, 122:18, 156:23, 167:16, 167:23, 167:25, 168:1, 168:2
**few** [25] - 66:19, 67:2, 92:6, 93:17, 93:20, 93:23, 95:23, 95:24,

97:19, 109:1, 120:17, 120:22, 123:20, 124:18, 146:9, 169:13, 170:3, 170:5, 171:13, 174:10, 175:22, 177:21, 199:25, 213:5
**fewer** [3] - 57:22, 92:22, 218:10
**field** [15] - 160:25, 162:9, 165:3, 185:20, 186:6, 186:11, 190:18, 190:21, 194:2, 195:10, 198:16, 206:17, 216:20, 224:9
**fifth** [2] - 217:17, 217:20
**Figure** [9] - 106:8, 112:10, 112:22, 113:16, 115:4, 116:5, 118:18, 119:5, 149:8
**figure** [5] - 42:10, 108:20, 113:4, 113:23, 117:1
**file** [7] - 42:3, 144:12, 144:14, 144:20, 144:22, 144:23, 195:1
**filed** [2] - 143:19, 145:8
**filing** [1] - 10:1
**fill** [2] - 67:15, 186:13
**filled** [4] - 18:6, 24:2, 130:1, 160:1
**filling** [1] - 123:24
**final** [2] - 7:8, 145:20, 165:20
**fined** [1] - 139:9
**finish** [7] - 8:4, 10:5, 10:6, 10:10, 187:3, 187:14, 237:7
**fire** [3] - 199:10, 200:15, 202:3
**Firm** [2] - 3:4, 3:7
**firms** [1] - 41:8
**first** [61] - 27:18, 35:6, 40:16, 42:19, 43:3, 59:20, 60:19, 66:12, 72:2, 76:18, 79:3, 79:4, 79:6, 79:8, 79:11, 81:22, 85:4, 85:20, 86:20, 92:3, 109:23, 121:20, 126:14, 127:5, 127:24, 140:3, 140:13, 145:8,

149:8, 149:19, 150:9, 151:13, 156:12, 160:15, 187:2, 188:5, 188:11, 188:14, 189:21, 191:5, 198:12, 199:14, 199:23, 200:8, 200:13, 200:22, 203:15, 203:20, 204:9, 205:12, 205:15, 205:24, 207:5, 207:6, 207:20, 207:21, 209:6, 222:9, 234:6
**First** [2] - 86:12, 204:8
**fishing** [4] - 131:20, 132:2, 133:15, 134:11
**Fishman** [2] - 56:12, 56:18
**five** [10] - 30:24, 35:3, 105:19, 143:13, 156:11, 168:17, 168:19, 173:11, 173:18, 210:3
**FL** [1] - 2:14
**flag** [1] - 74:1
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flew** [1] - 184:12
**flight** [4] - 184:14, 184:16, 185:3, 216:4
**flipped** [1] - 166:15
**flood** [1] - 180:8
**floor** [2] - 154:17, 212:13
**Floor** [2] - 2:4, 3:5
**Florida** [1] - 40:20
**flu** [1] - 214:15
**fly** [1] - 199:11
**flying** [1] - 185:10
**focus** [7] - 54:5, 71:5, 77:15, 88:17, 98:1, 106:12, 214:11
**focused** [2] - 80:1, 97:22
**focusing** [2] - 90:25, 93:6
**folks** [2] - 94:23, 159:22
**follow** [17] - 29:15, 55:4, 76:2, 76:11, 79:4, 79:13, 80:19, 133:16, 149:1, 156:11, 160:12, 206:12, 214:2, 214:4, 214:6, 214:7, 218:23
**follow-on** [1] - 79:13

**follow-up** [4] - 156:11, 206:12, 214:2, 214:6
**following** [8] - 9:6, 15:21, 29:19, 34:19, 50:11, 79:11, 101:19, 186:3
**follows** [3] - 7:4, 11:24, 42:24
**food** [1] - 205:7
**football** [2] - 88:25, 89:14
**Footnote** [1] - 61:20
**footnote** [1] - 171:9
**FOR** [1] - 1:1
**forced** [3] - 138:20, 211:23
**forego** [1] - 180:20
**foregoing** [1] - 238:4
**foreign** [1] - 84:18
**forgot** [1] - 79:23
**form** [13] - 78:12, 78:17, 175:16, 187:11, 189:14, 189:17, 189:24, 190:22, 194:25, 209:20, 223:2, 223:4, 223:6
**formal** [5] - 142:23, 142:25, 143:19, 155:7, 199:25
**formalized** [1] - 211:4
**formatted** [1] - 173:16
**forms** [3] - 122:23, 187:10, 187:23
**Fort** [1] - 40:20
**forth** [4] - 25:18, 25:20, 30:2, 157:18
**forthcoming** [1] - 71:11
**foundation** [7] - 40:12, 48:16, 158:3, 161:5, 163:8, 164:24, 166:5
**four** [11] - 30:2, 30:5, 99:15, 114:10, 117:1, 142:9, 173:11, 175:4, 205:11, 210:3, 230:6
**four-or-five-hour** [1] - 210:3
**fourth** [1] - 37:22
**frame** [4] - 57:12, 57:22, 147:2, 205:24
**frames** [1] - 43:2
**fraud** [2] - 126:22, 127:1
**free** [5] - 16:23, 60:24, 98:11, 168:15, 226:7
**Friday** [4] - 8:8, 8:16, 194:10, 206:5

**front** [19] - 16:8, 24:18, 26:16, 29:8, 30:1, 31:8, 31:24, 32:9, 35:2, 58:20, 150:7, 157:5, 173:7, 191:2, 211:14, 219:3, 222:12, 229:12, 230:6
**fuel** [1] - 236:1
**fueling** [1] - 85:5
**full** [6] - 27:18, 59:20, 60:23, 64:10, 185:11, 185:13
**full-time** [2] - 185:11, 185:13
**FULLER** [8] - 2:15, 179:17, 179:24, 180:2, 180:20, 181:13, 181:18, 181:21
**Fuller** [2] - 2:16, 171:12
**fully** [1] - 137:11
**function** [3] - 65:1, 65:16, 74:17
**functioning** [2] - 38:24, 68:4
**fundamental** [2] - 117:22, 175:1
**funded** [2] - 211:11, 236:11
**funding** [6] - 203:17, 206:5, 213:10, 213:14, 235:16, 236:15
**funds** [1] - 213:2
**Furniture** [1] - 157:19, 158:1

---

# G

**gained** [1] - 125:7
**games** [1] - 49:24
**gap** [2] - 67:14, 67:15
**gateway** [6] - 157:1, 157:8, 158:3, 158:12, 159:1
**gaunt** [1] - 212:18
**gears** [1] - 142:7
**gender** [1] - 212:14
**general** [6] - 29:11, 29:14, 54:8, 105:25, 159:19, 210:24
**Generally** [2] - 111:21, 111:22
**generally** [24] - 20:15, 22:25, 51:17, 66:17, 71:17, 75:19, 80:9, 83:9, 102:6, 111:7, 111:20, 120:23,

125:14, 172:6, 193:17, 194:5, 194:11, 204:25, 206:3, 206:8, 206:21, 208:3, 229:20, 231:16
**generational** [1] - 213:12
**genuine** [1] - 127:4
**genuinely** [1] - 181:10
**Georgia** [1] - 179:2
**Gina** [3] - 149:4, 149:14, 150:4
**girl** [2] - 199:12, 199:21
**given** [15] - 7:23, 42:24, 48:8, 77:7, 86:24, 90:21, 100:3, 165:17, 174:10, 175:18, 175:19, 193:6, 196:6, 205:11, 234:23
**glad** [4] - 173:5, 175:23, 176:5, 181:23
**goal** [2] - 185:19, 185:23
**government** [2] - 210:16, 210:17
**Governor** [2] - 15:23, 22:16
**Governor's** [2] - 15:21, 16:13
**graduated** [1] - 183:16
**grant** [11] - 203:21, 204:1, 204:4, 205:14, 212:2, 212:23, 212:24, 212:25, 235:20, 236:11, 236:15
**grants** [5] - 203:19, 235:17, 235:22, 236:5, 236:9
**graph** [4] - 140:13, 160:7, 209:20, 234:7
**graphs** [2] - 169:15, 170:7
**grateful** [2] - 207:12, 208:7
**gray** [1] - 108:13
**great** [5] - 15:10, 22:14, 170:17, 203:17, 208:25
**greater** [1] - 53:4
**GRETCHEN** [1] - 6:8
**Gretchen** [2] - 123:15, 123:25
**ground** [2] - 96:22, 163:5
**group** [7] - 106:10,

108:21, 200:1, 202:25, 203:5, 203:6, 203:12
**guess** [7] - 8:3, 55:23, 72:8, 83:6, 88:18, 175:6, 192:17
**guesstimates** [1] - 188:20
**guidance** [10] - 27:13, 27:21, 63:3, 70:10, 71:12, 75:25, 77:23, 170:9, 170:18, 178:9
**Guide** [1] - 56:6
**guideline** [6] - 59:21, 62:4, 62:19, 62:23, 63:9
**Guideline** [1] - 58:20
**guidelines** [69] - 22:11, 26:3, 26:6, 26:8, 26:11, 26:16, 26:21, 26:22, 26:25, 27:25, 28:7, 29:16, 29:19, 29:20, 54:17, 54:25, 55:4, 58:24, 59:2, 59:6, 59:8, 59:10, 59:12, 60:2, 60:4, 60:11, 61:4, 63:1, 63:5, 63:16, 67:14, 68:21, 69:10, 69:20, 71:3, 71:5, 71:7, 71:11, 72:6, 75:16, 75:19, 75:20, 75:25, 76:6, 76:9, 76:12, 77:17, 78:2, 78:4, 78:7, 78:12, 78:16, 78:22, 79:1, 79:5, 79:11, 79:12, 79:13, 79:14, 79:17, 79:25, 80:6, 80:9, 80:14, 80:24, 80:25, 102:20, 137:7
**Guidelines** [7] - 26:14, 26:23, 27:1, 27:15, 27:23, 44:11, 137:4
**guns** [1] - 208:25
**Gupta** [107] - 7:8, 8:23, 8:25, 9:7, 9:12, 9:14, 10:5, 10:10, 10:13, 10:22, 15:4, 15:5, 15:17, 16:1, 16:7, 16:24, 18:4, 19:10, 22:4, 24:19, 24:20, 25:2, 25:5, 25:22, 26:2, 26:19, 31:18, 32:3, 32:15, 33:15, 34:17, 36:2, 36:11, 36:21, 37:12, 38:7, 38:8, 42:18, 43:9, 46:7, 46:10, 48:13, 49:6, 50:2, 50:20,

52:16, 52:18, 55:20, 56:13, 57:5, 58:19, 58:22, 59:13, 60:17, 62:18, 67:23, 69:14, 72:1, 72:5, 72:11, 74:4, 74:6, 75:9, 76:17, 77:11, 79:23, 81:5, 81:16, 83:25, 86:3, 92:11, 97:14, 102:25, 106:8, 109:2, 112:2, 112:9, 119:23, 120:20, 121:17, 123:4, 123:15, 124:16, 125:20, 126:13, 132:12, 133:9, 133:23, 137:24, 139:22, 142:6, 146:7, 146:25, 148:18, 148:25, 150:11, 153:5, 153:13, 154:20, 156:11, 158:2, 158:3, 158:4, 158:10, 159:17, 167:7, 168:8
**Gupta's** [1] - 33:23

# H

**habitually** [1] - 88:8
**hair** [1] - 199:20
**half** [7] - 87:12, 93:16, 183:24, 184:6, 199:16, 230:21, 237:13
**halves** [1] - 86:11
**hand** [12] - 59:19, 60:18, 63:8, 64:9, 64:11, 67:22, 69:16, 72:13, 161:12, 182:13, 210:21, 234:22
**handed** [2] - 58:19, 74:6
**handful** [3] - 95:25, 96:23, 173:11
**hands** [2] - 88:6
**handy** [1] - 34:10
**Hanson** [2] - 202:1, 202:18
**happy** [19] - 10:8, 12:15, 13:19, 14:25, 16:7, 16:15, 16:19, 17:24, 22:2, 28:4, 37:15, 40:23, 42:19, 43:12, 45:2, 62:12, 131:15, 177:18, 237:5
**hard** [9] - 64:2, 64:11,

64:17, 67:6, 105:21, 128:23, 174:3, 210:24, 214:12
**HARDIN** [1] - 5:4
**Harm** [5] - 97:16, 97:22, 98:9, 208:8, 228:2
**harm** [1] - 98:1
**Hartle** [1] - 7:22
**hate** [1] - 119:23
**hats** [1] - 208:22
**haven** [1] - 205:7
**Hawkins** [1] - 3:7
**headed** [5] - 58:20, 74:7, 113:5, 113:17, 122:11
**heading** [5] - 56:5, 69:15, 69:18, 72:17, 129:8
**health** [19] - 15:22, 17:15, 18:24, 20:20, 28:1, 36:8, 41:18, 42:6, 53:19, 156:19, 159:18, 159:20, 160:25, 161:2, 162:9, 163:16, 165:3, 205:1, 214:19
**Health** [55] - 4:11, 5:3, 11:13, 11:16, 12:5, 12:7, 12:11, 12:13, 13:2, 13:5, 13:8, 13:10, 13:13, 13:21, 14:8, 14:18, 14:20, 14:21, 16:6, 16:12, 17:16, 17:18, 17:25, 18:9, 19:3, 21:18, 22:5, 22:13, 26:2, 31:21, 32:1, 32:4, 32:5, 35:11, 40:23, 41:5, 41:12, 42:5, 44:16, 44:17, 74:16, 94:21, 124:20, 125:7, 125:25, 128:15, 128:23, 130:15, 144:11, 160:3, 166:10, 202:2, 214:19, 228:1
**Healthcare** [1] - 210:24, 216:22
**healthcare** [6] - 46:13, 46:22, 46:23, 131:3, 211:7, 214:11
**hear** [4] - 131:17, 179:15, 181:23, 232:21
**heard** [3] - 56:24, 83:22, 217:21
**Hearing** [1] - 177:1
**hearsay** [2] - 202:21, 202:23

**heart** [2] - 192:10, 212:17
**Heart** [1] - 207:22
**heavy** [2] - 48:7, 50:22
**held** [1] - 144:23
**helicopter** [5] - 184:11, 184:13, 186:18, 216:17, 218:6
**help** [23] - 67:14, 68:22, 92:23, 92:25, 93:4, 94:8, 95:11, 98:18, 131:14, 189:13, 200:8, 200:19, 200:23, 204:16, 204:19, 204:20, 206:20, 209:19, 210:22, 213:18, 222:13
**helped** [2] - 28:21, 95:13
**helpers** [1] - 200:20
**helpful** [4] - 93:13, 130:8, 130:10, 143:7
**helping** [1] - 208:4
**Hepatitis** [2] - 119:11, 122:12
**hepatitis** [3] - 98:14, 121:23, 122:4
**heroin** [61] - 82:12, 82:22, 83:23, 84:1, 84:3, 84:8, 84:11, 84:13, 84:21, 96:6, 98:5, 99:23, 100:16, 100:18, 100:21, 102:11, 104:5, 104:8, 104:24, 106:22, 109:12, 109:16, 110:7, 110:12, 110:13, 110:16, 110:19, 111:4, 111:8, 111:10, 111:14, 111:15, 111:17, 111:21, 111:25, 112:4, 112:5, 112:19, 113:12, 115:7, 115:11, 117:3, 117:24, 118:5, 121:4, 121:14, 122:17, 150:19, 156:23, 167:16, 167:21, 167:23, 191:6, 193:24, 225:10, 225:13, 225:19, 227:11, 227:23
**Hester** [15] - 9:19, 43:14, 46:2, 46:9, 49:3, 49:25, 51:7,

62:9, 91:5, 116:24, 118:10, 118:19, 120:16, 152:12, 167:2
**HESTER** [43] - 5:9, 9:19, 45:24, 46:3, 46:6, 48:17, 49:5, 49:13, 50:1, 52:15, 52:17, 55:17, 55:19, 58:17, 58:18, 60:7, 60:16, 62:12, 62:17, 75:2, 75:7, 111:24, 112:3, 115:14, 116:9, 118:16, 118:22, 118:25, 119:3, 119:18, 119:25, 120:17, 120:19, 123:3, 123:12, 152:14, 155:24, 158:13, 158:16, 158:19, 167:3, 167:6, 168:3
**high** [12] - 86:16, 86:19, 86:25, 88:25, 91:2, 92:20, 93:15, 101:6, 101:15, 101:23, 136:8, 136:21
**high-potency** [3] - 101:6, 101:15, 101:23
**higher** [24] - 33:16, 34:24, 37:24, 48:4, 48:8, 48:10, 50:16, 50:22, 51:5, 51:14, 51:17, 51:22, 51:25, 52:2, 52:5, 52:8, 53:5, 53:16, 73:12, 86:6, 163:14, 163:17, 164:22, 216:15
**highest** [2] - 37:22, 53:20
**highlight** [2] - 190:2, 191:3
**highlighted** [2] - 32:22, 80:12
**highlighting** [1] - 78:14
**historical** [1] - 165:21
**Historical** [3] - 108:25, 149:2, 167:9
**historically** [3] - 34:24, 47:24, 50:15
**History** [2] - 32:5, 44:17
**history** [6] - 23:11, 23:19, 23:25, 25:7, 127:6, 227:22
**hit** [1] - 234:11

**HIV** [2] - 98:15, 214:15
**Holdings** [1] - 158:1
**home** [5] - 92:21, 92:22, 94:5, 201:10, 211:21
**homes** [2] - 91:18, 212:13
**honestly** [1] - 217:9
**Honor** [133] - 7:6, 8:18, 9:19, 10:3, 10:16, 10:17, 10:24, 24:4, 24:8, 24:12, 24:15, 33:9, 33:11, 33:19, 33:24, 34:13, 39:2, 43:13, 43:23, 44:1, 44:7, 44:12, 44:21, 45:8, 45:17, 45:24, 46:4, 48:14, 49:13, 49:18, 55:17, 58:17, 60:7, 62:13, 75:2, 75:5, 111:24, 115:14, 115:16, 115:19, 118:23, 119:18, 119:24, 119:25, 120:1, 120:6, 120:9, 120:17, 123:5, 123:9, 123:13, 123:14, 123:24, 124:4, 125:16, 132:9, 144:9, 144:21, 146:5, 146:8, 148:21, 151:6, 152:8, 152:15, 153:12, 154:2, 154:5, 155:24, 156:7, 156:9, 156:24, 157:14, 157:15, 157:16, 157:25, 158:2, 158:13, 158:16, 161:5, 162:11, 164:7, 164:25, 166:5, 167:1, 167:3, 168:5, 168:7, 168:9, 168:14, 168:22, 169:3, 169:5, 170:15, 170:24, 171:6, 172:9, 172:25, 173:4, 173:10, 173:12, 173:21, 174:15, 176:25, 177:17, 177:20, 178:3, 178:15, 178:16, 178:17, 179:17, 181:16, 181:20, 181:21, 182:5, 182:7, 182:21,

182:22, 182:23,
189:16, 194:20,
195:13, 196:8,
197:8, 197:13,
198:3, 201:2,
202:23, 209:22,
213:19, 214:20,
219:10, 219:13
**HONORABLE** [1] -
1:17
**Honorable** [1] - 7:1
**hoodie** [1] - 212:18
**hope** [3] - 51:19,
124:10, 203:20
**hopefully** [2] - 178:18,
181:19
**hoping** [4] - 7:10,
7:15, 173:10, 203:20
**Hospital** [6] - 183:21,
183:24, 184:12,
215:5, 217:8
**hospital** [5] - 183:22,
196:24, 197:2,
216:19, 217:6
**hospitals** [7] - 184:1,
198:21, 199:1,
202:5, 214:18,
216:25, 217:1
**Hotline** [1] - 201:16
**hour** [4] - 38:13,
38:16, 199:16, 210:3
**hourly** [1] - 38:15
**hours** [8] - 179:8,
179:12, 179:21,
181:7, 201:15,
206:4, 206:9, 206:12
**house** [2] - 206:14,
207:8
**housed** [2] - 129:20,
131:8
**housekeeping** [3] -
43:13, 123:5, 168:22
**huge** [1] - 211:13
**hundred** [4] - 166:12,
173:24, 175:19,
177:21
**HUNTINGTON** [1] -
1:4
**Huntington** [23] - 2:5,
3:11, 4:2, 40:10,
46:17, 47:10,
152:21, 153:11,
183:5, 183:10,
183:21, 183:22,
183:24, 184:4,
184:5, 184:12,
184:24, 203:9,
215:5, 217:7, 228:1,
235:19, 238:6
**Huntington/Cabell** [2]

- 215:5, 230:24
**hurt** [1] - 91:8
**hurting** [1] - 201:18
**hybrid** [2] - 158:8,
158:9
**hydrocodone** [2] -
81:24, 172:3
**hypertension** [1] -
36:25

**I**

**I.e** [1] - 59:23
**idea** [3] - 98:8, 203:14,
203:17
**identification** [2] -
25:17, 222:17
**identified** [8] - 48:21,
132:9, 132:12,
135:3, 152:10,
177:21, 180:5, 229:5
**identifies** [1] - 227:22
**identify** [9] - 12:20,
133:25, 134:3,
152:7, 156:19,
156:21, 158:24,
180:13, 225:6
**identifying** [2] -
132:23, 162:9
**II** [8] - 18:11, 20:10,
23:3, 127:10,
127:16, 127:21,
128:12, 129:12
**III** [4] - 25:18, 127:16,
127:21, 129:12
**illegal** [10] - 82:25,
103:17, 103:19,
103:20, 104:24,
112:19, 167:15,
167:16, 227:11,
227:16
**illegally** [1] - 84:16
**illegitimate** [5] -
89:23, 90:3, 90:4,
90:6, 99:5
**illegitimately** [4] -
85:24, 98:24, 104:4,
105:24
**illicit** [24] - 82:4,
82:20, 82:25, 83:3,
84:15, 99:23,
100:20, 101:6,
104:5, 105:9,
106:14, 106:18,
106:19, 106:23,
108:23, 110:22,
112:20, 113:12,
121:4, 156:16,
167:16, 167:20,
226:13, 227:23

**illicitly** [5] - 83:8,
83:13, 83:18,
104:20, 104:24
**immediate** [3] -
148:13, 148:15,
199:2
**immediately** [2] -
192:11, 199:4
**immunizations** [1] -
98:15
**impact** [3] - 42:6,
233:21, 234:5
**impaired** [1] - 199:8
**impairment** [1] -
164:10
**impeachment** [3] -
48:15, 48:25, 231:19
**implement** [1] -
132:22
**implemented** [2] -
127:10, 127:25
**importance** [2] -
78:20, 217:22
**important** [13] - 31:21,
35:18, 35:20, 65:14,
78:3, 78:21, 96:11,
98:17, 109:18,
110:24, 117:16,
124:23, 210:20
**Importantly** [1] - 72:17
**importantly** [1] - 9:5
**impose** [6] - 20:22,
20:25, 21:3, 21:7,
31:11, 31:15
**imposed** [3] - 29:3,
29:12, 30:8
**imposing** [1] - 95:14
**imprisoned** [1] -
124:11
**improper** [4] - 142:19,
147:24, 148:7,
231:19
**improve** [3] - 185:19,
198:15, 214:1
**improvement** [4] -
141:12, 185:18,
186:5, 233:15
**improving** [2] - 65:1,
65:16
**IMS** [4] - 160:5,
161:22, 162:6,
162:15
**IN** [2] - 1:1, 1:18
**inappropriate** [1] -
114:13
**inbox** [1] - 55:12
**incarceration** [1] -
12:1
**incidence** [1] - 33:16
**incidences** [2] -

199:5, 199:6
**Incident** [1] - 200:12
**incident** [2] - 187:7,
210:2
**include** [20] - 98:5,
108:18, 108:19,
109:15, 112:19,
113:12, 113:14,
113:20, 115:6,
118:5, 122:17,
122:20, 127:20,
148:12, 167:19,
167:20, 167:21,
167:23, 168:2,
225:10
**included** [7] - 29:21,
30:17, 101:25,
109:13, 176:7,
189:14, 196:15
**includes** [6] - 112:17,
113:9, 115:8, 121:4,
167:15, 229:6
**including** [6] - 13:21,
41:16, 87:4, 88:13,
157:18, 162:10
**increase** [13] - 35:21,
35:24, 83:8, 104:13,
104:16, 110:3,
111:3, 164:2, 178:2,
198:13, 201:19,
201:22, 234:25
**increased** [9] - 100:7,
104:10, 104:12,
110:18, 110:20,
111:8, 111:9, 112:5,
199:5
**increases** [4] - 81:22,
83:18, 86:6, 110:13
**indicate** [3] - 140:3,
155:3, 179:24
**indicated** [3] - 140:18,
215:21, 218:3
**indicates** [7] - 101:5,
127:13, 127:24,
129:9, 131:9,
140:14, 155:5
**indicating** [1] - 207:25
**indication** [1] - 163:17
**indicative** [1] - 193:8
**indicator** [4] - 191:6,
192:8, 192:12, 193:5
**indicators** [3] - 35:8,
35:9, 191:25
**indirectly** [4] - 86:7,
87:12, 87:13, 87:15
**individual** [26] - 43:1,
68:18, 68:19, 68:23,
71:20, 73:2, 94:17,
116:14, 117:3,
186:21, 196:5,

198:17, 199:3,
200:25, 201:25,
204:11, 212:18,
214:3, 214:4,
226:15, 226:17,
227:3, 227:10,
227:12, 228:11,
234:23
**individuals** [26] -
37:14, 108:1,
114:20, 126:21,
131:18, 133:6,
134:10, 135:4,
144:10, 198:20,
204:15, 204:20,
205:9, 205:22,
207:6, 208:17,
208:22, 211:2,
211:3, 211:14,
211:20, 213:16,
213:18, 227:23,
228:2, 236:3
**indulgence** [2] -
157:3, 168:11
**industries** [2] - 34:25,
50:17
**industry** [3] - 34:23,
50:14, 186:16
**infectious** [1] - 98:12
**influence** [2] - 89:6,
94:10
**influenced** [1] - 89:4
**influences** [1] - 94:19
**inform** [3] - 63:1, 63:9,
80:9
**informally** [1] - 188:18
**information** [39] -
18:19, 21:22, 21:24,
22:2, 42:25, 63:16,
70:16, 70:25, 97:5,
129:19, 130:8,
130:11, 130:19,
130:24, 131:3,
131:8, 131:9,
131:15, 131:16,
132:7, 136:1,
136:23, 143:12,
158:11, 159:25,
189:13, 194:19,
195:24, 196:15,
197:17, 197:19,
201:8, 208:8,
208:12, 216:5,
227:25, 228:6,
234:22
**informed** [2] - 68:22,
69:5
**Informed** [1] - 76:18
**inhibited** [1] - 234:21
**initial** [3] - 29:21, 30:4,

30:25
**Initiate** [1] - 69:17
**initiate** [8] - 69:25, 73:4, 76:20, 78:24, 143:8, 143:14, 143:17, 144:25
**initiating** [1] - 73:8
**initiative** [4] - 15:22, 15:23, 16:13, 127:15
**inject** [3] - 97:23, 98:3, 99:3
**injected** [3] - 122:21, 123:1, 123:2
**injecting** [1] - 98:7
**injection** [5] - 121:24, 122:14, 122:17, 122:23
**injunction** [1] - 148:13
**injury** [3] - 88:25, 89:14, 92:21
**ink** [1] - 146:11
**insight** [1] - 63:3
**inspections** [1] - 131:10
**inspectors** [1] - 131:11
**inspired** [1] - 79:14
**instance** [5] - 54:7, 57:12, 63:7, 99:1, 231:11
**instead** [2] - 90:14, 95:3
**institute** [1] - 76:10
**instructed** [1] - 103:9
**instruction** [1] - 86:14
**instructions** [2] - 103:6, 220:25
**instructs** [1] - 220:1
**insurance** [2] - 211:12, 236:1
**intake** [1] - 216:8
**intend** [8] - 7:20, 33:25, 65:6, 85:18, 153:16, 169:11, 169:16, 170:10
**intended** [10] - 7:24, 27:21, 63:9, 71:5, 74:21, 75:25, 79:18, 80:6, 80:9, 169:24
**intensive** [2] - 48:1, 48:3
**intent** [6] - 91:5, 91:6, 91:9, 91:11, 91:12, 94:8
**intention** [3] - 7:8, 8:4, 80:25
**interact** [1] - 118:1
**interactions** [1] - 234:18
**interest** [1] - 19:5

**interested** [2] - 131:17, 197:18
**internet** [3] - 128:2, 129:2, 186:24
**internet-based** [3] - 128:2, 129:2, 186:24
**interrupt** [2] - 158:17, 162:23
**interstate** [3] - 199:8, 199:15, 199:18
**intervention** [2] - 165:14, 165:15
**interventions** [1] - 165:16
**interview** [3] - 217:8, 228:2, 228:8
**intricate** [1] - 13:20
**introduce** [5] - 154:7, 173:18, 173:23, 176:22, 182:20
**introduced** [2] - 137:3, 217:20
**introduction** [1] - 63:25
**intubation** [2] - 220:23, 221:7
**investigate** [3] - 142:19, 145:1, 226:20
**investigated** [3] - 143:2, 144:20, 145:12
**investigation** [14] - 101:2, 143:8, 143:14, 143:17, 143:22, 145:10, 145:17, 147:9, 147:14, 147:22, 147:24, 148:2, 148:3, 148:7
**investigations** [1] - 142:14
**investigators** [1] - 143:2
**invited** [1] - 42:7
**involve** [2] - 116:13, 116:14
**involved** [15] - 14:13, 14:22, 29:17, 29:19, 57:9, 74:13, 74:17, 74:22, 143:22, 184:19, 224:6, 224:9, 225:3, 225:7, 229:17
**involvement** [6] - 14:2, 14:12, 14:25, 17:25, 65:23, 158:9
**involving** [2] - 100:6, 100:8
**iPad** [1] - 186:25

**IQVIA** [2] - 162:6, 162:8
**Irpino** [1] - 3:7
**ISIA** [1] - 5:4
**isolated** [1] - 234:14
**issue** [12] - 26:7, 54:13, 73:16, 74:1, 169:7, 169:9, 175:1, 177:17, 178:18, 190:10, 232:8, 233:13
**issued** [19] - 26:3, 26:21, 27:3, 27:13, 54:20, 55:1, 55:4, 69:9, 71:7, 71:12, 72:1, 75:12, 75:17, 79:5, 79:12, 79:25, 80:13, 80:23, 143:23
**issues** [12] - 54:17, 55:8, 62:3, 62:19, 62:22, 96:20, 126:2, 134:21, 180:25, 201:21, 202:7, 202:13
**issuing** [1] - 62:4
**item** [1] - 9:11
**itself** [8] - 52:12, 53:14, 76:16, 96:12, 142:24, 187:11, 197:19, 236:22
**IV** [7] - 18:11, 20:10, 23:3, 127:16, 127:21, 128:12, 129:12

## J

**Jackson** [1] - 6:8
**Jan** [4] - 7:17, 7:18, 8:4, 8:8
**Jane** [2] - 133:16, 133:17
**January** [1] - 81:10
**JASIEWICZ** [1] - 5:4
**JCAH** [2] - 217:8, 217:12
**JEFFREY** [1] - 5:14
**jelly** [2] - 208:16, 208:20
**JENNIFER** [1] - 4:13
**jinx** [1] - 209:11
**job** [7] - 187:25, 194:10, 198:15, 200:2, 200:4, 211:22, 216:4
**jobs** [4] - 33:17, 48:1, 48:3, 48:7
**Joe** [1] - 169:5
**jog** [2] - 15:24, 56:15
**jogs** [1] - 40:25

**Joint** [2] - 216:22, 217:5
**jointly** [1] - 73:20
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:15
**Juan** [1] - 2:17
**Judge** [24] - 7:2, 9:5, 153:3, 159:4, 159:14, 166:25, 170:19, 171:21, 172:1, 172:8, 174:1, 174:13, 175:17, 176:1, 177:23, 179:19, 180:2, 180:20, 181:13, 181:18, 189:12, 190:6, 210:13, 237:5
**JUDGE** [1] - 1:17
**judge** [8] - 9:25, 43:10, 45:14, 117:16, 155:19, 157:3, 162:20, 168:17
**judges** [3] - 11:25, 12:10, 12:14
**judgment** [13] - 46:23, 64:16, 70:21, 70:24, 73:19, 77:6, 89:5, 90:6, 90:11, 94:16, 94:20, 115:11, 190:20
**judgments** [2] - 68:17, 88:22
**judiciously** [1] - 95:8
**July** [5] - 41:1, 41:3, 45:21, 133:24, 213:7
**jump** [1] - 139:16
**jumped** [1] - 219:19
**jumping** [1] - 70:6
**June** [2] - 147:2, 213:7
**justification** [1] - 164:22

## K

**Kanawha** [3] - 14:21, 16:12, 17:16
**Kanawha-Charleston** [3] - 14:21, 16:12, 17:16
**KEARSE** [30] - 4:3, 19:15, 39:1, 44:1, 44:7, 44:12, 44:18, 45:13, 48:14, 48:20, 48:23, 60:11, 60:13, 75:5, 120:1, 120:10, 126:9, 148:21, 148:24, 149:4, 149:6, 149:8, 149:9, 149:13, 149:15,

150:4, 150:6, 150:24, 168:25, 169:3
**Kearse** [11] - 31:19, 81:15, 97:20, 101:3, 109:5, 112:10, 112:23, 148:20, 158:2, 167:7, 167:10
**keep** [7] - 45:19, 51:7, 51:10, 86:18, 93:6, 156:8, 197:22
**keeper** [1] - 194:18
**keeps** [2] - 177:6, 223:21
**Kelly** [1] - 6:8
**Kentucky** [1] - 184:23
**kept** [2] - 147:25, 188:2
**Kessler** [1] - 4:18
**Key** [1] - 11:6
**key** [1] - 125:2
**kid** [4] - 88:25, 89:14, 91:1, 92:20
**kid's** [1] - 91:2
**kids** [2] - 88:5, 105:15
**kill** [1] - 164:17
**killed** [2] - 116:25, 199:9
**kills** [1] - 83:24
**kind** [5] - 70:7, 102:4, 107:25, 109:11, 235:25
**kinds** [2] - 108:15, 121:1
**knee** [4] - 90:1, 90:8, 91:2, 92:20
**knit** [1] - 208:22
**knitting** [1] - 208:24
**knock** [5] - 205:13, 206:16, 206:22, 207:5, 207:15
**knocked** [1] - 205:15
**knowing** [2] - 94:24, 104:5
**knowledge** [29] - 21:18, 21:19, 21:22, 23:8, 31:6, 31:10, 31:14, 42:8, 57:20, 62:5, 62:21, 67:1, 69:7, 70:15, 70:22, 71:8, 71:10, 73:23, 78:23, 79:9, 79:10, 80:23, 92:25, 95:14, 97:5, 128:9, 129:6, 158:5, 226:4
**known** [5] - 18:13, 28:22, 137:10, 162:6, 168:1
**knows** [2] - 7:20, 190:2

**KOUBA** [1] - 3:14

## L

**LA** [1] - 3:8
**labor** [7] - 33:17, 34:21, 48:1, 48:3, 48:7, 50:12, 50:22
**labor-intensive** [1] - 48:1
**laborious** [3] - 34:22, 50:14, 50:21
**lace** [3] - 225:19, 225:21, 225:24
**laced** [2] - 167:23, 226:7
**lack** [6] - 40:12, 60:21, 61:2, 61:6, 61:13, 63:21
**language** [3] - 25:9, 126:23, 132:24
**Lanier** [1] - 3:4
**large** [5] - 63:4, 88:9, 93:14, 135:16, 169:20
**last** [24] - 24:22, 58:8, 58:25, 59:7, 59:24, 60:20, 77:15, 112:6, 121:21, 127:23, 134:14, 138:24, 139:22, 140:5, 149:19, 157:11, 157:12, 169:17, 179:18, 197:13, 212:25, 214:16, 231:24
**Last** [1] - 169:18
**lasting** [2] - 65:3, 66:21
**lasts** [1] - 71:17
**late** [3] - 55:23, 204:2
**latitude** [1] - 49:3
**Lauderdale** [1] - 40:20
**Laughter** [3] - 124:8, 181:25, 182:3
**launched** [1] - 142:25
**LAURA** [1] - 5:10
**Laura** [1] - 214:25
**law** [16] - 11:17, 22:16, 23:23, 24:7, 24:9, 24:10, 80:19, 132:9, 133:23, 136:10, 138:20, 143:20, 144:23, 148:11, 200:14, 204:10
**Law** [6] - 2:4, 3:4, 3:7, 3:12, 124:1, 124:7
**lawfully** [1] - 47:6
**lawyers** [1] - 42:3
**lay** [2] - 158:3, 163:8

**lead** [14] - 14:21, 33:17, 50:22, 51:5, 52:8, 53:5, 53:11, 53:12, 53:15, 86:4, 165:9, 192:1, 192:24
**leader** [1] - 205:3
**leaders** [2] - 202:4, 208:21
**leading** [1] - 122:14
**leads** [5] - 72:18, 86:12, 86:23, 87:14, 90:4
**learn** [1] - 217:10
**learned** [2] - 212:5, 216:14
**least** [2] - 25:12, 222:10
**leave** [9] - 47:6, 47:14, 47:19, 132:3, 137:24, 175:9, 177:24, 208:1, 211:22
**leaving** [1] - 73:19
**led** [4] - 93:9, 96:5, 101:11, 108:8
**Lee** [1] - 3:13
**leery** [1] - 207:4
**left** [9] - 60:18, 64:9, 64:11, 69:16, 70:21, 93:2, 132:13, 132:15, 175:6
**left-hand** [4] - 60:18, 64:9, 64:11, 69:16
**legal** [2] - 47:11, 227:17
**legally** [1] - 97:4
**legislation** [20] - 12:20, 14:23, 15:20, 16:11, 17:7, 18:24, 19:1, 20:16, 22:18, 23:2, 23:7, 23:13, 29:16, 29:21, 30:7, 31:1, 126:19, 134:7, 134:10, 138:21
**legislative** [2] - 15:8, 127:14
**legislature** [6] - 13:14, 13:17, 14:14, 15:9, 15:23, 58:1
**legitimacy** [1] - 62:1
**legitimate** [10] - 34:17, 50:7, 87:10, 87:18, 90:1, 90:5, 108:8, 175:10, 218:12, 226:25
**legitimately** [4] - 85:24, 105:24, 215:14, 215:18
**Lemley** [1] - 7:12
**lengthy** [1] - 181:4

**Leon** [1] - 2:17
**less** [10] - 65:3, 65:10, 65:11, 65:19, 66:9, 71:17, 71:24, 84:4, 88:2, 124:9
**letter** [1] - 136:16
**letters** [4] - 135:14, 135:20, 135:25, 136:11
**level** [16] - 29:5, 51:22, 53:3, 53:20, 66:3, 91:10, 110:9, 160:22, 164:10, 191:10, 191:16, 198:1, 203:11, 217:22, 224:25
**levels** [16] - 34:24, 48:4, 50:16, 50:22, 51:9, 51:15, 51:17, 52:2, 52:5, 52:9, 53:6, 53:16, 58:4, 58:12, 93:10, 164:12
**Levin** [1] - 2:13
**LEYIMU** [1] - 4:8
**license** [5] - 91:8, 146:11, 152:20, 152:23, 153:13
**licensed** [10] - 25:17, 46:12, 55:8, 56:11, 56:20, 142:5, 144:25, 183:19, 184:25, 215:7
**licensee** [1] - 128:10
**licenses** [1] - 54:14
**licensing** [5] - 12:22, 20:25, 142:14, 155:14, 155:16
**lies** [1] - 62:21
**life** [9] - 68:4, 77:19, 78:9, 79:20, 164:17, 183:11, 194:4, 200:9, 207:20
**likelihood** [2] - 108:2, 108:9
**likely** [8] - 132:8, 136:19, 165:9, 190:25, 192:25, 193:1, 195:8, 201:9
**limit** [4] - 21:10, 71:7, 127:17, 177:18
**limitation** [4] - 29:21, 30:13, 30:19, 30:21
**limitations** [6] - 29:12, 29:18, 30:8, 30:14, 31:15, 36:8
**limited** [7] - 29:6, 109:7, 109:9, 112:14, 158:9, 170:4, 229:20
**limits** [5] - 29:3, 31:11,

71:3, 80:14, 95:14
**LINDA** [1] - 4:5
**line** [10] - 9:11, 66:12, 72:3, 114:9, 137:1, 144:22, 191:5, 201:14, 212:11, 212:15
**Line** [4] - 48:12, 231:18, 232:7, 232:14
**lines** [4] - 117:21, 170:24, 174:1, 184:22
**Lines** [1] - 33:23, 52:16
**link** [1] - 211:12
**Lisa** [2] - 6:18, 238:3
**list** [14] - 43:15, 129:15, 129:17, 129:18, 130:18, 131:10, 138:2, 154:8, 156:1, 178:21, 193:2, 211:16
**listed** [4] - 28:9, 82:10, 119:7, 150:8
**lists** [4] - 27:6, 35:7, 35:9, 114:25
**literally** [3] - 157:6, 157:12, 206:15
**literature** [1] - 64:1
**litigation** [3] - 49:6, 59:14, 158:10
**live** [3] - 96:14, 102:5, 150:13
**lived** [1] - 87:22
**local** [7] - 17:15, 18:24, 20:20, 101:6, 198:21, 199:1, 214:19
**locked** [3] - 187:12, 187:17, 187:21
**lodged** [1] - 142:23
**Logan** [2] - 6:5, 6:13
**logging** [1] - 222:18
**long-term** [11] - 64:13, 64:19, 64:24, 66:20, 67:3, 67:7, 67:10, 67:12, 67:17, 70:1, 76:7
**look** [88] - 11:21, 12:18, 15:7, 15:12, 15:17, 16:3, 16:15, 16:20, 19:9, 25:9, 27:17, 33:13, 36:2, 41:20, 42:20, 55:15, 56:3, 56:8, 58:14, 59:12, 60:17, 60:24, 61:20, 61:23, 63:8, 74:4, 77:14, 81:4,

81:7, 81:16, 86:3, 91:5, 92:1, 97:14, 99:7, 99:11, 100:2, 102:15, 106:7, 106:12, 106:13, 109:3, 109:22, 112:22, 113:16, 114:3, 114:21, 116:3, 116:10, 119:4, 121:19, 122:6, 125:20, 128:13, 129:7, 131:25, 132:3, 132:12, 133:20, 134:12, 136:8, 137:2, 138:23, 139:17, 140:11, 140:18, 163:25, 164:3, 164:11, 164:14, 167:8, 177:9, 186:2, 190:23, 190:24, 191:3, 191:9, 191:18, 192:13, 194:12, 202:12, 202:16, 203:6, 223:7, 223:11
**looked** [14] - 10:25, 61:22, 64:17, 79:14, 126:1, 139:23, 165:24, 199:19, 201:20, 207:7, 207:10, 212:3, 228:25, 229:9
**looking** [26] - 16:23, 23:15, 107:4, 108:5, 112:14, 114:9, 114:14, 118:17, 126:5, 126:13, 131:21, 134:18, 166:17, 170:8, 190:22, 191:7, 191:13, 192:17, 193:22, 194:24, 194:25, 195:7, 196:12, 197:5, 197:20, 219:20
**looks** [1] - 108:21
**lost** [1] - 153:13
**love** [6] - 19:6, 22:23, 29:8, 30:1, 214:2, 214:11
**lower** [4] - 19:10, 132:13, 132:15, 166:14
**lunch** [3] - 118:25, 121:18, 208:14

## M

**ma'am** [12] - 183:16,

184:22, 187:18,
188:9, 191:4,
192:15, 193:25,
194:17, 210:12,
218:11, 223:18,
228:21
**mad** [1] - 197:3
**Magazine** [1] - 3:8
**Mahady** [7] - 169:5,
170:18, 171:4,
171:7, 173:22,
176:24, 177:22
**MAHADY** [5] - 6:4,
169:5, 174:15,
176:25, 178:15
**mail** [1] - 55:12
**Mainigi** [9] - 15:6,
17:20, 18:23, 35:2,
42:4, 43:10, 51:21,
52:4, 157:13
**MAINIGI** [52] - 4:12,
10:3, 10:16, 10:19,
10:21, 15:16, 19:17,
19:21, 24:8, 24:12,
24:17, 31:25, 32:2,
33:12, 33:22, 34:1,
34:8, 34:13, 34:15,
38:4, 38:6, 39:3,
39:5, 40:14, 41:21,
41:23, 42:12, 42:16,
43:8, 43:12, 43:19,
43:22, 44:4, 44:10,
44:15, 44:21, 45:1,
45:7, 45:17, 45:20,
156:24, 157:14,
157:22, 157:25,
158:21, 161:5,
161:23, 162:11,
164:24, 166:5,
167:1, 168:9
**mainigi** [1] - 47:23
**maintain** [3] - 139:7,
139:12, 225:2
**maintained** [2] -
129:10, 229:6
**maintenance** [1] -
236:1
**MAJESTRO** [1] - 2:6
**Majestro** [2] - 2:7,
171:12
**major** [2] - 82:4,
180:25
**majority** [3] - 137:15,
169:20, 225:10
**male** [2] - 212:8, 212:9
**man** [1] - 160:23
**manageable** [2] -
174:3, 175:16
**managed** [1] - 213:2
**management** [14] -

26:8, 26:21, 27:20,
66:4, 77:18, 77:25,
78:8, 79:18, 165:12,
165:18, 216:15,
216:18, 217:4,
220:10
**Management** [6] -
26:14, 26:23, 27:1,
137:4, 150:3, 200:13
**managing** [2] - 68:23,
78:20
**mandatory** [2] - 57:13,
57:16
**mannequin** [2] -
207:24, 208:1
**manner** [1] - 35:1
**manual** [2] - 33:17,
48:7
**maps** [3] - 109:4,
109:7, 112:13
**March** [4] - 56:2, 59:2,
210:16, 229:13
**mark** [3] - 156:2,
158:23, 219:1
**MARK** [1] - 3:17
**marked** [2] - 55:20,
155:20
**market** [2] - 110:22,
111:23
**Marshall** [6] - 138:7,
183:13, 183:16,
183:18, 202:2, 202:4
**mask** [1] - 191:22
**mass** [1] - 41:8
**massive** [2] - 169:21,
208:23
**Master's** [1] - 183:18
**MAT** [2] - 20:14, 20:18
**match** [1] - 105:2
**material** [1] - 171:10
**maternal** [1] - 102:16
**Matt** [3] - 34:14, 42:13,
42:15
**matt** [1] - 41:21
**matter** [17] - 19:25,
29:11, 29:14, 30:3,
39:7, 39:19, 39:25,
40:11, 62:23, 99:21,
130:16, 133:17,
141:14, 145:21,
168:23, 224:6, 238:5
**matters** [2] - 7:7,
128:21
**mattress** [1] - 212:13
**MAY** [1] - 1:19
**McCann** [13] - 169:9,
169:11, 169:12,
169:16, 169:19,
169:24, 170:11,
173:14, 174:6,

175:8, 176:19,
177:12, 177:14
**McCann's** [5] -
169:15, 169:21,
176:10, 176:16,
216:18, 217:4
**MCCLURE** [1] - 6:4
**MCGINNESS** [1] - 4:3
**McKesson** [7] - 5:8,
46:9, 153:21, 178:1,
178:18, 215:1, 229:2
**MD** [2] - 54:10, 54:15
**MDs** [2] - 54:3, 142:13
**mean** [15] - 32:23,
33:7, 55:14, 60:24,
64:21, 87:8, 106:18,
115:3, 153:17,
158:16, 160:19,
162:22, 176:21,
212:21, 232:10
**meaning** [6] - 61:19,
85:14, 85:19, 94:1,
133:15, 193:23
**means** [13] - 32:24,
33:1, 33:10, 35:15,
65:20, 65:21, 78:6,
108:14, 160:20,
160:21, 163:9,
191:11, 204:9
**meant** [3] - 48:19,
79:23, 131:14
**mechanical** [1] - 6:19
**media** [1] - 148:5
**median** [1] - 37:21
**Medical** [8] - 28:6,
63:4, 115:12,
115:23, 117:12,
142:22, 196:18
**medical** [31] - 16:25,
20:8, 29:24, 62:5,
62:20, 63:2, 77:19,
78:1, 90:6, 90:17,
91:7, 103:2, 103:5,
152:20, 184:11,
184:13, 186:12,
188:25, 189:5,
190:17, 190:20,
196:24, 197:1,
206:9, 216:15,
218:3, 218:13,
226:25, 228:13,
229:19, 236:1
**medically** [1] - 215:12
**medication** [14] -
59:22, 60:22, 61:4,
63:11, 63:23, 64:13,
67:7, 165:13,
225:11, 226:18,
227:6, 227:13,
227:17, 228:14

**medications** [9] -
85:18, 98:25, 131:6,
140:8, 160:22,
216:5, 218:16,
218:20, 221:14
**Medicine** [47] - 21:25,
25:18, 54:1, 54:6,
54:7, 54:12, 54:16,
54:20, 55:1, 55:5,
55:7, 55:22, 56:10,
56:17, 58:1, 74:7,
74:15, 75:12, 77:1,
77:23, 79:7, 80:1,
80:13, 80:17, 80:22,
91:8, 97:2, 97:6,
123:7, 142:8, 142:9,
142:12, 142:18,
143:8, 143:11,
143:20, 143:21,
147:1, 147:10,
148:4, 151:19,
154:22, 155:2,
155:6, 155:8,
155:15, 155:18
**medicine** [9] - 28:17,
54:2, 54:14, 78:15,
87:20, 91:18, 107:7,
128:11, 142:20
**Medicine's** [2] - 74:25,
143:2
**meeting** [4] - 41:15,
186:4, 186:5, 203:12
**member** [7] - 20:15,
26:10, 138:2,
143:24, 144:13,
145:5, 207:15
**members** [4] - 27:6,
132:10, 201:24,
205:11
**memory** [4] - 15:25,
40:25, 56:16, 80:23
**mention** [1] - 96:11
**mentioned** [19] -
16:10, 38:14, 53:18,
59:9, 65:12, 98:10,
105:14, 124:20,
161:10, 163:21,
188:5, 190:5, 193:8,
194:6, 210:13,
211:6, 212:23,
230:8, 233:18
**mentor** [1] - 124:1
**menu** [2] - 189:22,
190:5
**mere** [1] - 35:20
**merits** [1] - 145:11
**message** [1] - 70:7
**metaphor** [1] - 79:4
**meth** [4] - 98:8,
122:25, 123:1,

225:24
**methadone** [1] - 81:23
**methamphetamine** [5]
- 109:11, 113:10,
123:2, 156:23,
193:12
**mic** [1] - 157:21
**MICHAEL** [2] - 2:15,
3:9
**mid** [1] - 210:16
**middle** [7] - 77:15,
81:19, 108:7,
132:17, 134:16,
150:10
**might** [20] - 34:9, 66:3,
68:25, 71:19, 73:11,
82:25, 84:22, 87:17,
90:7, 107:17,
107:22, 114:24,
143:23, 146:1,
168:23, 180:13,
203:20, 203:22,
208:4, 237:3
**MILDRED** [1] - 3:4
**mill** [1] - 87:1
**milligrams** [2] - 192:3,
193:7
**million** [7] - 141:16,
150:13, 170:24,
174:1, 204:6,
212:13, 235:19
**million-dollar** [1] -
212:13
**millions** [1] - 180:9
**mills** [2] - 91:21, 97:3
**mind** [2] - 154:15,
170:19
**mining** [4] - 34:20,
48:1, 50:12, 50:21
**minors** [1] - 29:6
**minus** [1] - 38:17
**minute** [4] - 17:21,
46:4, 157:11, 191:21
**minutes** [7] - 62:15,
119:1, 120:2, 120:5,
168:17, 168:20,
237:7
**mistake** [2] - 90:12,
90:17
**mistakenly** [1] - 86:23
**misuse** [5] - 106:2,
106:4, 121:23,
122:3, 122:20
**misused** [3] - 99:24,
108:9, 119:6
**misusing** [5] - 98:21,
103:4, 103:11,
104:17, 105:13
**Mitchell** [1] - 2:13
**MLP** [3] - 38:9, 39:11,

39:14

**MME** [4] - 172:5, 172:7, 172:24, 173:17

**model** [6] - 203:8, 209:18, 213:13, 213:15, 233:19

**models** [1] - 43:1

**modified** [1] - 127:14

**mom** [2] - 103:23, 104:23

**moment** [9] - 18:3, 19:14, 21:15, 28:10, 123:17, 125:20, 132:4, 157:4, 213:19

**Monday** [8] - 169:10, 169:17, 169:18, 170:11, 177:12, 177:14, 194:10, 206:5

**money** [9] - 41:8, 84:5, 203:18, 203:19, 211:14, 213:4, 235:20, 236:18, 236:21

**money-saving** [1] - 236:21

**monitoring** [1] - 188:7

**Monitoring** [27] - 17:12, 17:17, 18:1, 18:5, 18:10, 18:15, 19:13, 21:15, 23:4, 23:17, 105:3, 124:18, 125:23, 127:9, 129:9, 133:5, 133:12, 134:19, 134:20, 137:8, 137:10, 137:11, 137:22, 139:7, 139:15, 139:24, 140:19

**month** [5] - 210:1, 210:7, 210:9, 210:10, 229:13

**monthly** [1] - 186:4

**months** [7] - 59:24, 66:22, 71:17, 71:24, 172:10, 222:9, 234:6

**morality** [1] - 164:19

**morbidity** [2] - 35:8, 35:9

**Morissey** [1] - 9:1

**morning** [16] - 7:17, 8:7, 10:4, 10:22, 10:23, 10:24, 11:4, 46:7, 46:8, 57:15, 120:22, 153:22, 160:7, 163:21, 194:13, 237:13

**morphine** [9] - 102:8,

220:3, 220:5, 220:14, 220:17, 221:10, 221:13, 222:19, 222:25

**Morris** [1] - 6:15

**mortality** [2] - 164:4, 164:7

**most** [21] - 14:1, 14:17, 71:1, 75:11, 80:4, 83:20, 92:3, 93:21, 100:15, 106:1, 106:6, 116:12, 121:22, 122:3, 153:22, 159:24, 171:20, 172:21, 172:22, 173:24, 174:13

**Most** [4] - 94:4, 97:11, 210:1, 231:16

**mother** [8] - 73:1, 104:2, 104:3, 104:4, 104:7, 105:2, 105:6, 199:7

**Motley** [5] - 2:10, 3:15, 4:3, 4:6, 4:9

**Mougey** [6] - 169:25, 170:16, 174:16, 174:21, 177:1, 177:9

**MOUGEY** [8] - 2:12, 170:15, 173:3, 175:17, 175:23, 177:16, 178:7, 178:16

**Mougey's** [1] - 174:18

**move** [9] - 43:16, 43:23, 44:4, 44:10, 44:15, 45:2, 60:7, 75:2, 109:25, 123:5, 124:4, 126:6, 159:8, 168:23, 195:14, 197:9, 198:4, 219:10

**Move** [2] - 111:24, 115:14

**moved** [2] - 45:9, 56:1

**MR** [157] - 2:3, 2:6, 2:9, 2:12, 2:15, 3:9, 3:12, 3:17, 4:17, 5:4, 5:10, 5:11, 5:14, 6:4, 7:6, 7:15, 8:3, 8:6, 8:13, 8:17, 8:22, 9:19, 9:25, 10:12, 24:4, 24:6, 33:19, 33:24, 34:4, 40:12, 43:10, 43:20, 44:24, 45:5, 45:11, 45:24, 46:3, 46:6, 48:17, 49:5, 49:13, 50:1, 52:15, 52:17, 55:17, 55:19, 58:17, 58:18, 60:7, 60:10, 60:12,

60:16, 62:12, 62:17, 75:2, 75:7, 111:24, 112:3, 115:14, 115:16, 115:18, 116:9, 118:16, 118:22, 118:25, 119:3, 119:18, 119:25, 120:17, 120:19, 123:3, 123:9, 123:12, 123:24, 151:2, 151:5, 151:9, 151:12, 152:4, 152:8, 152:14, 152:19, 153:3, 153:7, 153:12, 153:16, 153:19, 153:25, 154:16, 154:19, 155:19, 155:23, 155:24, 156:2, 156:4, 156:7, 156:9, 156:10, 157:3, 157:9, 158:13, 158:16, 158:19, 159:4, 159:12, 159:14, 159:16, 160:14, 160:17, 161:9, 161:11, 161:14, 162:2, 162:5, 162:14, 162:20, 162:24, 163:7, 163:12, 165:2, 166:20, 166:23, 167:3, 167:6, 168:3, 168:17, 169:5, 170:15, 173:3, 174:15, 175:17, 175:23, 176:25, 177:16, 178:7, 178:15, 178:16, 178:17, 178:20, 179:13, 179:17, 179:24, 180:2, 180:7, 180:9, 180:17, 180:20, 180:25, 181:8, 181:11, 181:13, 181:15, 181:18, 181:20, 181:21, 181:22, 182:4

**MS** [177] - 3:4, 3:7, 3:14, 4:3, 4:5, 4:8, 4:12, 4:13, 4:15, 5:4, 5:10, 6:4, 6:8, 6:15, 10:3, 10:16, 10:19, 10:21, 15:16, 19:15, 19:17, 19:21, 24:8, 24:12, 24:17, 31:25, 32:2, 33:12, 33:22, 34:1, 34:8, 34:13,

34:15, 38:4, 38:6, 39:1, 39:3, 39:5, 40:14, 41:21, 41:23, 42:12, 42:16, 43:8, 43:12, 43:19, 43:22, 44:1, 44:4, 44:7, 44:10, 44:12, 44:15, 44:18, 44:21, 45:1, 45:7, 45:13, 45:17, 45:20, 48:14, 48:20, 48:23, 60:11, 60:13, 75:5, 120:1, 120:9, 120:10, 120:11, 123:14, 123:20, 124:4, 124:9, 124:13, 124:15, 125:16, 125:18, 125:19, 126:6, 126:9, 126:12, 132:8, 132:11, 132:18, 132:20, 139:18, 139:20, 139:21, 144:15, 145:2, 146:3, 146:20, 146:24, 148:18, 148:21, 148:24, 149:4, 149:6, 149:8, 149:9, 149:13, 149:15, 150:4, 150:6, 150:24, 152:1, 152:9, 154:2, 154:5, 156:24, 157:14, 157:22, 157:25, 158:21, 161:5, 161:23, 162:11, 164:24, 166:5, 167:1, 168:7, 168:9, 168:22, 168:25, 169:3, 182:7, 182:17, 182:19, 189:16, 189:20, 194:20, 194:23, 195:13, 195:16, 195:18, 196:8, 196:11, 197:8, 197:11, 197:13, 197:16, 198:3, 198:7, 198:9, 201:2, 201:5, 202:21, 202:23, 202:24, 203:3, 203:4, 209:22, 213:19, 213:23, 214:20, 214:24, 219:10, 219:13, 219:14, 229:2, 229:4, 230:1, 230:3, 231:17, 231:19, 231:23, 232:4, 232:6, 232:12, 232:14,

232:16, 232:17, 232:18, 234:2, 234:4, 237:5

**Mt** [3] - 3:16, 4:4, 4:10

**multi** [3] - 96:19, 106:16, 108:14

**multi-category** [2] - 106:16, 108:14

**multi-state** [1] - 96:19

**multiple** [16] - 24:2, 28:1, 28:3, 108:3, 108:14, 108:22, 113:21, 114:24, 116:13, 116:14, 116:22, 134:4, 134:5, 184:18, 196:4

**multitude** [1] - 190:10

**must** [3] - 137:11, 137:19, 218:23

### N

**naloxone** [5] - 11:25, 236:7, 236:10, 236:13, 236:15

**name** [21] - 32:8, 42:17, 42:21, 46:9, 123:15, 123:18, 129:16, 129:24, 130:4, 131:5, 138:2, 138:9, 145:23, 151:15, 152:24, 182:10, 182:22, 201:25

**Narcan** [12] - 192:4, 192:7, 192:11, 193:7, 195:22, 196:1, 196:15, 197:6, 206:10, 207:19, 208:6, 214:15

**narrative** [5] - 186:15, 191:1, 192:2, 192:3, 192:23

**narrow** [1] - 177:20

**narrowing** [1] - 80:21

**NAS** [23] - 72:11, 73:2, 74:1, 102:21, 103:8, 103:13, 103:18, 103:21, 104:7, 104:15, 104:22, 105:6, 105:10, 105:16, 105:19, 105:20, 106:1, 120:23, 121:2, 121:11, 121:15

**nasally** [1] - 192:4

**Natalie** [2] - 38:22, 39:13

**nation** [7] - 35:18,

37:22, 51:3, 51:23, 63:6, 64:3, 149:22
**National** [1] - 201:16
**national** [8] - 85:5, 96:21, 110:9, 130:5, 166:1, 166:4, 166:12, 166:15
**nationally** [1] - 69:8
**nations** [1] - 84:18
**natural** [1] - 167:19
**naturally** [2] - 167:18, 168:1
**nature** [1] - 62:25
**navigate** [2] - 210:24
**near** [3] - 171:1, 187:6, 190:15
**nearly** [5] - 23:7, 141:15, 210:8, 215:4, 230:14
**necessarily** [4] - 28:12, 37:15, 52:10, 90:15
**necessary** [3] - 12:17, 88:21, 221:10
**Need** [1] - 97:16
**need** [36] - 16:8, 19:8, 34:12, 45:14, 45:16, 49:2, 50:23, 62:10, 71:22, 71:23, 73:7, 88:10, 89:1, 89:17, 90:11, 90:12, 90:21, 91:2, 95:7, 118:12, 143:16, 146:19, 164:5, 164:16, 168:12, 176:20, 204:15, 206:9, 206:11, 206:20, 206:21, 213:9, 213:10, 214:7, 231:15
**needed** [10] - 73:12, 89:20, 90:8, 91:1, 138:17, 189:1, 200:5, 200:7, 218:4, 237:10
**needs** [14] - 47:23, 48:4, 48:8, 48:10, 50:19, 51:6, 51:7, 51:8, 68:14, 96:19, 165:18, 178:10, 213:13, 221:1
**negotiation** [1] - 30:4
**Neonatal** [1] - 102:16
**neonatal** [1] - 72:18
**nerve** [1] - 62:25
**neuropathic** [4] - 65:2, 65:17, 65:22, 66:1
**neuropathy** [3] - 52:11, 53:12, 164:5

**never** [15] - 42:20, 49:19, 49:20, 56:21, 56:23, 71:7, 72:1, 72:6, 73:17, 80:13, 117:20, 158:2, 158:3, 180:10, 199:18
**Nevermind** [2] - 120:10, 223:12
**New** [2] - 3:6, 3:8
**new** [18] - 20:23, 20:25, 21:3, 21:7, 26:8, 26:21, 29:3, 31:7, 122:5, 133:19, 178:21, 178:23, 179:5, 179:9, 179:13, 180:10, 189:13, 194:7
**newly** [1] - 133:10
**news** [1] - 237:8
**newsletter** [2] - 55:21, 56:21
**Newsletter** [1] - 123:7
**newsletters** [1] - 55:8
**next** [22] - 41:22, 42:13, 42:14, 43:14, 52:24, 56:8, 66:18, 73:3, 79:22, 82:11, 83:7, 100:2, 121:21, 127:23, 134:14, 135:14, 150:16, 160:15, 161:19, 173:3, 221:3, 221:7
**nice** [2] - 118:25, 214:6
**NICHOLAS** [1] - 6:11
**night** [1] - 179:18
**nilly** [1] - 88:15
**nine** [2] - 100:8, 222:9
**Ninth** [2] - 2:4, 4:7
**nix** [1] - 209:1
**no-cost** [1] - 213:3
**nociceptive** [4] - 65:2, 65:17, 65:20, 65:25
**non** [37] - 28:13, 65:2, 65:10, 65:12, 65:16, 70:1, 70:4, 70:12, 70:17, 73:1, 75:21, 76:3, 76:7, 76:11, 77:2, 78:6, 78:18, 78:19, 78:24, 80:2, 80:16, 81:2, 82:23, 83:15, 95:21, 95:22, 98:25, 100:24, 103:5, 104:11, 118:11, 121:24, 165:14, 165:15, 225:22
**non-cancer** [17] - 65:2, 65:10, 65:12,

65:16, 70:1, 70:12, 70:17, 75:21, 76:3, 76:7, 76:11, 77:2, 78:24, 80:2, 80:16, 81:2
**non-fatal** [1] - 100:24
**non-injection** [1] - 121:24
**non-medical** [1] - 103:5
**non-opioid** [5] - 70:4, 78:19, 95:22, 165:15, 225:22
**non-pharmaceutical** [3] - 28:13, 95:21, 165:14
**non-pharmacological** [3] - 70:4, 78:6, 78:18
**non-pregnant** [2] - 73:1, 104:11
**non-prescribed** [1] - 98:25
**non-prescriber** [2] - 82:23, 83:15
**non-technical** [1] - 118:11
**none** [2] - 45:11, 135:11
**nonetheless** [1] - 147:21
**Nonetheless** [1] - 225:13
**nonsynthetic** [1] - 167:19
**noon** [1] - 118:19
**normal** [1] - 191:10
**notable** [1] - 73:15
**note** [2] - 15:18, 155:25
**noted** [3] - 15:19, 15:20, 51:21
**notes** [1] - 37:24
**nothing** [1] - 142:4
**Nothing** [1] - 214:20
**notice** [4] - 140:17, 147:25, 175:14, 209:2
**November** [1] - 75:15
**nudge** [1] - 136:9
**number** [76] - 12:18, 19:15, 23:6, 25:17, 32:22, 32:23, 33:1, 34:21, 35:12, 35:23, 35:24, 36:2, 36:14, 36:18, 41:17, 45:14, 45:15, 46:16, 46:20, 47:10, 50:12, 59:15, 59:16, 59:17, 64:12, 64:18, 67:6, 87:18,

89:9, 92:22, 93:12, 94:19, 96:9, 97:12, 105:5, 105:23, 112:6, 114:11, 116:21, 121:1, 124:21, 125:2, 129:25, 130:2, 130:5, 135:7, 140:18, 140:22, 140:23, 141:4, 149:16, 149:20, 149:22, 155:22, 160:11, 160:21, 163:13, 167:11, 171:18, 172:16, 172:18, 176:6, 178:10, 197:23, 201:14, 201:16, 204:18, 211:16, 219:20, 230:11, 230:17, 233:21, 234:8, 234:25, 236:18
**numbers** [31] - 19:9, 19:19, 45:16, 59:13, 76:15, 76:16, 96:25, 115:8, 118:4, 135:16, 140:4, 156:6, 164:18, 164:20, 166:21, 172:20, 173:8, 178:2, 195:3, 195:11, 197:25, 200:25, 201:13, 209:7, 209:10, 209:13, 209:16, 209:25, 210:6, 210:7, 210:19
**nurse** [13] - 183:19, 184:1, 184:3, 184:14, 184:16, 184:25, 185:3, 190:14, 193:10, 215:4, 215:7, 215:9, 216:4
**nurses** [2] - 217:16, 217:25
**Nurses** [3] - 25:19, 142:1, 215:16
**nursing** [6] - 183:14, 183:23, 215:3, 216:14, 217:10, 217:13
**Nursing** [1] - 183:17
**NW** [6] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12
**NY** [1] - 3:6

**O**

**oath** [6] - 10:14, 49:23, 50:2, 52:18, 232:2, 233:5
**obese** [2] - 52:13, 53:13
**obesity** [18] - 52:5, 52:8, 52:10, 52:13, 52:22, 53:4, 53:9, 53:11, 53:15, 163:17, 163:22, 163:24, 164:4, 164:7, 164:10, 164:13
**object** [4] - 45:13, 152:1, 152:9, 171:17
**objecting** [1] - 171:5
**objection** [44] - 24:4, 33:24, 40:12, 43:25, 44:1, 44:6, 44:7, 44:12, 44:18, 45:10, 60:9, 60:12, 60:13, 75:4, 75:5, 123:8, 123:9, 126:8, 126:9, 151:4, 154:1, 155:25, 156:24, 161:5, 161:23, 162:1, 162:11, 164:24, 166:5, 168:25, 169:1, 169:3, 172:17, 179:16, 181:15, 195:15, 195:16, 197:10, 197:11, 198:6, 198:7, 203:1, 219:12, 219:13
**Objection** [1] - 202:21, 202:23, 231:19
**objections** [3] - 159:10, 163:2, 176:15
**objective** [2] - 189:2, 189:7
**objectively** [1] - 195:11
**objectives** [2] - 126:25, 127:2
**obligation** [3] - 128:16, 136:10
**observationally** [1] - 193:23
**observations** [1] - 158:6
**observe** [1] - 198:11
**obtain** [3] - 139:7, 184:15, 218:16
**obtained** [2] - 126:21, 217:13

**obvious** [2] - 210:4, 237:2
**obviously** [11] - 16:23, 19:3, 19:4, 22:13, 65:22, 93:3, 110:24, 128:12, 128:13, 147:8, 173:8
**occasion** [1] - 206:18
**occasional** [1] - 102:13
**occasions** [1] - 144:2
**occur** [4] - 103:8, 103:19, 104:15, 104:16
**occurred** [3] - 99:17, 100:24, 194:15
**occurring** [1] - 168:1
**occurs** [3] - 15:8, 102:21, 103:13
**October** [8] - 9:5, 55:23, 56:1, 157:12, 189:11, 205:15, 229:13
**OF** [2] - 1:1, 1:4
**offer** [4] - 15:24, 175:8, 176:18, 205:6
**offered** [3] - 9:14, 163:8, 205:6
**offering** [1] - 213:18
**office** [6] - 21:21, 125:24, 132:1, 142:4, 209:15, 236:2
**Office** [6] - 115:11, 117:12, 117:13, 184:18, 187:13, 209:14
**Officer** [11] - 14:21, 16:12, 17:19, 19:3, 21:18, 22:5, 22:13, 130:15, 160:3, 185:17
**officer** [6] - 17:15, 18:25, 20:20, 156:19, 163:16, 204:24
**officers** [2] - 94:23, 200:3
**offices** [2] - 46:21, 85:25
**Official** [2] - 238:2, 238:3
**official** [3] - 151:18, 155:5, 183:2
**officials** [1] - 11:24
**often** [6] - 53:23, 84:1, 84:20, 91:3, 194:8, 205:25
**oftentimes** [1] - 145:9
**Ohio** [3] - 184:23, 203:8, 226:7

**old** [3] - 212:7, 213:11, 228:15
**older** [3] - 164:22, 165:8, 165:18
**on-deck** [1] - 7:9
**on-line** [2] - 137:1, 144:22
**Once** [3] - 62:22, 192:20, 207:22
**once** [21] - 13:19, 14:7, 14:24, 22:23, 25:24, 29:8, 30:1, 36:10, 108:18, 129:4, 136:8, 147:15, 183:19, 187:10, 187:16, 187:21, 208:19, 221:7, 232:11, 235:11, 235:13
**one** [129] - 7:7, 13:25, 14:19, 15:1, 18:21, 19:22, 20:12, 23:15, 23:16, 23:24, 24:22, 28:23, 31:18, 32:10, 32:22, 33:1, 34:23, 35:12, 35:17, 35:23, 35:24, 36:14, 36:18, 36:24, 37:2, 39:21, 40:1, 42:17, 50:15, 51:3, 51:17, 61:9, 61:19, 73:2, 78:12, 78:17, 79:1, 94:2, 95:2, 96:11, 97:17, 97:22, 98:14, 98:15, 98:16, 98:17, 99:9, 101:9, 101:14, 103:7, 105:20, 106:5, 106:14, 107:23, 108:11, 109:19, 109:21, 110:17, 113:7, 113:15, 113:17, 113:21, 115:1, 118:2, 119:10, 120:25, 123:5, 123:17, 126:4, 126:25, 130:17, 133:8, 134:9, 134:13, 134:15, 135:2, 135:24, 139:14, 146:9, 149:20, 149:22, 150:7, 150:8, 151:15, 153:22, 154:11, 155:23, 160:6, 160:10, 160:16, 165:8, 166:6, 167:3, 167:7, 167:11, 168:22, 169:7, 171:8, 176:1,

176:14, 177:23, 178:17, 182:4, 189:4, 192:13, 192:19, 194:17, 196:1, 197:13, 198:17, 198:20, 199:1, 199:6, 202:18, 202:20, 203:7, 203:20, 203:22, 208:11, 208:21, 210:5, 210:9, 211:16, 217:4, 219:2
**One** [9] - 5:12, 94:21, 98:11, 103:1, 119:10, 176:6, 181:4, 200:3, 224:2
**one-to-one** [1] - 105:20
**ones** [9] - 28:8, 46:25, 47:2, 54:5, 54:15, 96:17, 166:24, 186:19, 197:21
**ongoing** [4] - 128:10, 135:10, 148:2, 148:3
**online** [3] - 56:6, 139:7, 139:12
**open** [3] - 18:13, 18:15, 131:10
**opened** [2] - 214:14, 231:11
**operating** [2] - 158:7, 234:24
**operational** [1] - 137:16
**operations** [1] - 71:21
**opiates** [6] - 110:2, 149:21, 167:12, 167:15, 167:17, 167:18
**opinion** [6] - 21:17, 157:7, 179:20, 180:22, 233:9, 233:12
**opinions** [6] - 9:7, 9:13, 9:16, 9:21, 158:8, 158:9
**Opioid** [18] - 14:3, 27:14, 27:22, 28:22, 28:24, 29:3, 29:12, 29:14, 31:3, 31:6, 31:10, 31:14, 40:25, 41:2, 45:21, 56:5, 74:8, 81:10
**opioid** [109] - 17:9, 23:12, 23:20, 25:7, 29:4, 33:4, 38:9, 41:14, 42:3, 42:6, 43:6, 47:5, 47:11, 56:18, 57:14, 58:5,

58:8, 58:13, 59:22, 60:22, 61:3, 63:10, 63:22, 64:13, 64:24, 66:5, 67:7, 67:12, 70:1, 70:4, 70:19, 72:18, 73:5, 73:8, 73:11, 74:14, 75:12, 76:10, 76:20, 77:7, 78:19, 78:20, 78:24, 85:5, 85:6, 85:11, 88:4, 92:4, 92:13, 92:25, 93:10, 95:22, 96:20, 99:2, 99:18, 99:24, 101:6, 101:16, 101:23, 104:5, 104:23, 104:25, 105:1, 105:7, 105:12, 107:1, 107:6, 107:9, 108:8, 110:1, 110:14, 113:2, 126:3, 150:14, 150:17, 150:18, 150:19, 163:18, 165:15, 165:16, 168:1, 179:2, 191:15, 192:9, 192:10, 193:1, 193:4, 193:5, 193:9, 193:20, 193:22, 199:8, 201:23, 218:19, 221:13, 223:20, 224:22, 224:25, 225:10, 225:11, 225:22, 226:16, 227:4, 227:11, 227:13, 227:17, 228:14, 237:1
**opioid-impaired** [1] - 199:8
**Opioids** [3] - 58:21, 69:17, 215:12
**opioids** [129] - 17:5, 21:11, 22:14, 26:4, 28:11, 28:14, 29:12, 29:18, 30:12, 31:4, 31:11, 31:15, 46:17, 54:21, 57:7, 57:23, 58:12, 60:3, 60:6, 61:8, 63:17, 65:1, 65:9, 65:15, 66:8, 66:20, 67:10, 68:8, 68:18, 69:2, 69:21, 70:6, 70:16, 71:4, 71:9, 71:14, 72:2, 72:6, 72:24, 73:17, 73:20, 74:2, 74:22, 74:23, 75:20, 76:2, 76:3, 76:6, 77:2, 78:5, 79:1, 79:7,

80:2, 80:8, 80:11, 80:15, 82:3, 87:8, 88:3, 90:12, 90:13, 95:8, 95:19, 95:22, 98:6, 98:20, 98:21, 99:22, 99:23, 102:22, 103:1, 103:5, 103:9, 103:11, 103:15, 103:16, 104:3, 104:4, 104:5, 104:10, 104:12, 104:14, 104:17, 104:18, 105:13, 106:3, 107:17, 107:18, 107:22, 108:9, 109:7, 109:9, 109:12, 112:15, 113:10, 114:18, 115:7, 118:7, 122:20, 153:10, 156:16, 162:10, 163:14, 164:16, 164:18, 164:23, 165:5, 167:17, 167:20, 215:10, 215:14, 215:19, 215:21, 215:24, 216:11, 218:10, 218:12, 220:6, 220:18, 221:16, 221:20, 221:23, 224:15, 226:24, 229:20, 229:21
**opponents** [1] - 8:14
**opportunities** [1] - 179:7
**opportunity** [8] - 9:14, 16:2, 35:16, 49:20, 66:3, 163:8, 175:10, 203:21
**opposed** [7] - 54:10, 87:1, 111:14, 111:22, 115:11, 141:15, 158:6
**opposing** [2] - 116:7, 170:20
**opposite** [1] - 164:20
**option** [1] - 208:10
**options** [8] - 70:4, 70:5, 70:11, 95:21, 95:22, 165:17, 174:11, 180:15
**orange** [1] - 108:6
**order** [8] - 17:9, 42:8, 143:23, 154:21, 155:5, 172:17, 184:16, 218:16
**orders** [2] - 144:1
**organization** [2] -

216:21, 216:25
**organizations** [3] - 28:1, 41:17, 128:21
**Organizations** [1] - 216:23
**organized** [2] - 119:19, 173:16
**origin** [1] - 83:9
**originally** [6] - 8:25, 14:16, 38:18, 38:21, 183:21, 185:17
**Orleans** [1] - 3:8
**otherwise** [1] - 99:2
**ought** [1] - 175:7
**out-of-state** [1] - 96:16
**out-patient** [2] - 211:19, 211:24
**outcomes** [1] - 74:3
**outliers** [1] - 135:4
**outlined** [2] - 14:9, 76:12
**outpaced** [1] - 231:5
**outside** [4] - 80:16, 81:2, 161:23, 162:11
**overall** [4] - 27:20, 105:22, 124:25, 230:24
**Overall** [1] - 140:4
**overdose** [79] - 81:21, 99:17, 100:6, 100:8, 100:9, 101:14, 109:4, 113:14, 113:24, 116:13, 124:24, 133:21, 149:21, 166:11, 166:14, 167:12, 186:9, 188:12, 188:13, 188:20, 188:22, 189:4, 189:9, 190:11, 190:12, 190:23, 190:25, 191:6, 191:15, 192:1, 192:9, 192:10, 192:14, 192:25, 193:1, 193:4, 193:9, 193:20, 193:22, 194:9, 195:1, 195:3, 195:7, 195:9, 195:20, 195:21, 196:17, 197:6, 203:16, 204:16, 204:21, 206:2, 206:25, 209:3, 212:4, 212:10, 223:17, 224:3, 224:15, 224:21, 225:2, 225:3, 225:7, 226:10, 228:10,

228:22, 229:6, 229:16, 229:18, 229:23, 230:11, 230:14, 230:17, 230:20, 234:3, 234:8, 234:25, 235:13
**Overdose** [8] - 11:1, 11:5, 99:7, 99:15, 113:5, 113:17, 149:2, 167:9
**overdosed** [8] - 107:17, 109:16, 193:14, 204:11, 205:25, 207:1, 226:6, 226:17
**overdoses** [39] - 100:24, 101:7, 101:11, 109:10, 112:15, 112:17, 113:1, 113:2, 113:6, 113:10, 113:13, 149:17, 189:1, 194:15, 197:23, 198:1, 198:13, 201:20, 201:23, 210:3, 210:9, 212:6, 212:16, 223:20, 224:5, 225:10, 226:15, 227:3, 227:10, 230:9, 230:23, 231:1, 231:4, 231:8, 233:22, 234:6, 235:3, 235:9, 236:18
**overdosing** [1] - 101:17
**overflow** [1] - 87:4
**overruled** [6] - 24:13, 40:13, 49:1, 154:1, 166:7, 231:21
**oversees** [2] - 17:23, 54:1
**oversight** [1] - 128:18
**Overview** [3] - 108:25, 149:2, 167:9
**overweight** [1] - 53:14
**overwhelming** [2] - 202:10, 202:11
**own** [7] - 7:25, 54:11, 83:7, 115:25, 143:9, 180:24, 202:7
**ownership** [1] - 19:4
**Oxycodone** [1] - 113:17
**oxycodone** [19] - 81:24, 113:22, 113:23, 114:5, 114:9, 114:15, 114:25, 115:10,

115:13, 116:3, 116:8, 117:4, 117:13, 117:14, 117:25, 118:6, 119:6, 119:7, 172:3
**oxygen** [2] - 191:10, 191:16
**oxygenating** [1] - 191:12
**oxymorphone** [1] - 81:24
**Ozturk** [2] - 138:1, 138:4

### P

**P-1200** [1] - 2:7
**P-41054-00001** [1] - 198:5
**P-41060-0001** [1] - 195:14
**P-41213** [1] - 165:20
**P-44211** [1] - 156:12
**P-44227** [1] - 119:11
**P-44281-0001** [1] - 197:9
**P-9999** [1] - 156:2
**P-r-i-d-d-y** [1] - 182:11
**p.m** [2] - 120:14, 237:14
**P.O** [3] - 2:5, 5:15, 6:9
**PA** [3] - 6:7, 6:14, 6:16
**package** [1] - 173:19
**packet** [3] - 177:10, 177:11, 178:11
**packets** [11] - 171:22, 172:23, 173:6, 173:15, 173:19, 173:25, 175:18, 176:4, 176:5, 177:7
**Page** [65] - 9:11, 11:5, 24:22, 27:5, 27:17, 32:15, 33:13, 33:23, 37:17, 38:3, 48:12, 52:16, 59:12, 59:20, 60:17, 63:8, 63:20, 64:8, 67:21, 69:12, 72:10, 76:14, 77:11, 81:16, 84:25, 86:3, 99:11, 100:2, 102:15, 106:7, 106:9, 109:3, 109:22, 109:24, 112:8, 112:14, 112:22, 113:17, 116:10, 119:14, 119:17, 121:19, 126:6, 137:7, 137:25, 139:25, 140:12, 149:3,

149:7, 150:9, 160:14, 160:15, 167:10, 219:15, 219:22, 220:8, 220:9, 220:20, 220:22, 221:3, 221:7, 231:18, 232:4, 232:14
**page** [51] - 19:15, 24:21, 25:3, 27:6, 33:20, 37:18, 37:24, 41:20, 41:22, 42:13, 42:14, 42:23, 56:3, 56:4, 58:20, 69:14, 72:8, 72:9, 77:12, 79:21, 85:1, 92:2, 100:2, 109:25, 116:11, 122:7, 122:10, 127:5, 127:23, 129:7, 132:17, 133:3, 134:14, 134:15, 134:16, 138:24, 140:9, 140:10, 140:13, 141:4, 149:16, 150:5, 150:9, 160:15, 171:15, 219:20, 221:3, 221:7, 223:10, 223:11
**pages** [23] - 24:22, 48:12, 169:18, 170:6, 171:8, 171:9, 171:10, 171:11, 171:15, 171:23, 171:24, 173:20, 173:24, 174:17, 174:24, 175:19, 175:21, 176:3, 176:13, 177:5, 177:10, 177:11, 177:21
**Pages** [2] - 197:19, 223:7
**paid** [4] - 38:13, 38:16, 41:24, 236:2
**Pain** [9] - 26:14, 26:23, 27:1, 27:14, 27:22, 58:21, 69:17, 137:4, 150:2
**pain** [135] - 9:9, 20:14, 20:18, 25:11, 26:4, 26:8, 26:21, 27:20, 33:17, 34:18, 34:24, 37:13, 47:23, 48:4, 48:8, 50:7, 50:16, 50:19, 50:23, 51:5, 51:7, 51:8, 51:15, 51:17, 52:2, 52:9, 52:12, 52:14, 52:22,

52:24, 53:6, 53:14, 53:16, 53:23, 54:22, 59:11, 59:22, 59:23, 60:5, 60:22, 61:3, 61:8, 63:10, 63:22, 64:13, 64:23, 65:1, 65:2, 65:10, 65:12, 65:16, 65:17, 65:18, 66:1, 66:5, 66:9, 66:20, 66:21, 67:10, 67:17, 68:8, 69:4, 69:22, 70:1, 70:7, 70:12, 70:17, 70:20, 71:4, 71:6, 71:9, 71:14, 71:16, 71:17, 71:18, 72:3, 73:5, 73:8, 75:13, 75:21, 76:3, 76:7, 76:11, 77:2, 77:18, 77:20, 77:25, 78:8, 78:10, 78:13, 78:14, 78:21, 78:25, 79:18, 79:20, 80:2, 80:11, 80:15, 80:16, 81:1, 81:2, 81:23, 85:6, 89:21, 90:8, 90:22, 94:6, 96:3, 144:19, 164:5, 165:10, 165:12, 165:14, 165:15, 165:16, 165:18, 190:9, 216:17, 217:4, 217:16, 217:19, 217:22, 218:1, 218:3, 219:16, 219:23, 220:1, 220:10, 220:12
**pain"** [2] - 48:10, 51:9
**pain-relieving** [1] - 25:11
**painful** [1] - 63:11
**palliative** [1] - 79:20
**Palouse** [2] - 61:21, 61:22
**pandemic** [2] - 233:24, 235:10
**Panel** [3] - 137:4, 150:3, 150:22
**panel** [8] - 26:7, 26:21, 27:7, 27:9, 27:11, 27:13, 138:2, 138:8
**Papantonio** [1] - 2:13
**paper** [8] - 99:22, 102:7, 176:14, 176:21, 179:8, 180:8, 208:13, 208:14
**Paper** [1] - 97:15
**paperwork** [1] - 42:20
**Paragraph** [1] -

150:10
paragraph [30] - 27:18, 56:9, 56:13, 56:14, 59:20, 60:19, 67:25, 68:12, 77:12, 77:16, 79:22, 81:19, 100:5, 100:23, 109:23, 114:21, 121:21, 126:18, 127:13, 127:24, 129:16, 130:17, 130:21, 131:9, 132:9, 134:17, 135:2, 139:8, 149:14, 149:20
parallel [1] - 104:13
paramedic [3] - 189:23, 204:24, 208:2
Paramedic [1] - 219:4
paramedics [6] - 185:25, 186:10, 186:19, 187:5, 187:10, 187:24
parameters [1] - 132:22
paraphrasing [1] - 56:13
parentheses [3] - 61:10, 65:6, 66:21
part [31] - 7:8, 29:12, 29:17, 29:19, 39:18, 60:23, 74:15, 74:17, 75:18, 86:20, 89:24, 93:3, 95:5, 100:16, 105:8, 127:4, 149:25, 150:21, 153:21, 162:8, 162:25, 174:13, 185:9, 185:10, 187:25, 205:5, 216:4, 216:8, 217:8, 221:16, 233:15
part-time [2] - 185:9, 185:10
participant [1] - 138:7
participation [1] - 137:16
particular [24] - 20:16, 25:9, 32:8, 36:15, 42:21, 66:2, 76:14, 76:17, 98:19, 101:14, 109:19, 113:4, 113:7, 113:14, 113:23, 115:10, 138:24, 144:5, 147:22, 151:15, 186:21, 190:20, 196:16, 223:4

particularly [5] - 64:5, 90:25, 139:24, 167:18, 222:22
parties [3] - 8:10, 154:8, 169:13
parties' [1] - 156:1
partner [3] - 177:25, 198:20, 208:13
partnered [1] - 135:1
partnering [1] - 214:17
party [3] - 128:1, 152:10, 154:8
pass [1] - 214:21
passages [1] - 81:13
passed [1] - 15:23
passing [1] - 177:2
past [2] - 124:17, 205:2
path [2] - 158:25, 214:10
patient [49] - 24:2, 25:12, 25:14, 66:4, 68:2, 68:10, 68:14, 68:20, 69:2, 69:7, 71:2, 73:21, 76:22, 77:3, 77:5, 77:7, 77:9, 78:21, 89:2, 91:10, 94:8, 134:8, 136:12, 138:14, 185:19, 186:13, 187:2, 192:4, 192:7, 193:2, 193:11, 196:1, 196:5, 196:6, 196:18, 196:23, 197:1, 198:15, 211:19, 211:24, 212:4, 215:25, 216:2, 218:3, 220:9, 220:12, 221:1, 221:8
patient's [10] - 23:11, 23:19, 23:25, 25:7, 68:3, 130:4, 131:5, 186:3, 217:23, 226:19
patients [29] - 68:19, 68:23, 70:23, 73:4, 77:20, 78:9, 87:5, 91:8, 95:18, 132:24, 134:3, 135:5, 135:15, 135:21, 136:10, 136:20, 136:21, 136:23, 144:10, 148:1, 150:17, 150:19, 191:7, 215:10, 216:5, 216:11, 217:25, 222:6, 232:10
pattern [2] - 108:1

patterns [5] - 12:21, 117:17, 132:23, 159:21, 161:4
PAUL [2] - 2:3, 5:10
Paul [1] - 178:18
Pause [4] - 75:23, 114:4, 123:23, 213:22
pay [2] - 211:10, 236:13
paying [1] - 42:10
payment [1] - 130:3
PDMPs [2] - 137:10, 137:16
peak [1] - 235:10
peaked [1] - 230:9
peanut [2] - 208:16, 208:20
PEARL [1] - 3:7
peer [1] - 12:1
penalty [1] - 139:11
Pensacola [1] - 2:14
People [1] - 234:14
people [56] - 28:17, 33:16, 41:24, 42:9, 50:21, 52:1, 64:22, 64:23, 83:21, 86:19, 86:21, 87:4, 87:8, 88:10, 96:6, 96:14, 96:15, 98:2, 98:5, 98:11, 98:18, 98:21, 98:24, 102:3, 104:11, 104:13, 105:23, 109:15, 111:12, 113:20, 114:15, 114:24, 115:6, 116:1, 119:6, 148:5, 159:5, 166:12, 166:13, 185:23, 188:16, 191:14, 201:10, 203:16, 205:1, 205:25, 206:24, 210:2, 210:25, 211:7, 212:22, 213:15, 214:9, 226:6, 227:16
people's [1] - 91:18
per [13] - 32:18, 32:24, 32:25, 35:10, 150:14, 160:12, 160:19, 160:22, 166:12, 166:13, 173:11
percent [28] - 36:3, 36:6, 36:14, 36:18, 38:1, 51:24, 99:16, 100:6, 100:8, 100:9, 105:17, 105:19, 107:12, 108:21,

108:22, 110:3, 150:17, 150:18, 164:18, 191:10, 191:11, 211:3, 212:8, 212:9, 224:25, 226:24, 230:12, 231:2
percentage [8] - 35:20, 51:25, 64:23, 105:10, 105:14, 105:21, 137:20, 227:15
percipient [1] - 158:5
perfectly [1] - 89:25
performing [1] - 208:5
perhaps [4] - 91:12, 133:19, 136:13, 154:9
period [17] - 21:19, 23:5, 35:25, 75:18, 101:17, 111:7, 141:2, 147:10, 159:11, 180:4, 184:14, 204:1, 204:3, 206:8, 210:4, 213:1, 230:5
periods [1] - 93:15
perioperative [1] - 79:19
peripherally [1] - 55:11
permanent [2] - 124:2, 145:15
permission [3] - 151:2, 189:16, 201:2
permit [2] - 12:21, 128:1
permitted [1] - 154:6
persists [1] - 220:1
person [19] - 32:25, 33:8, 71:20, 73:13, 116:25, 123:17, 159:19, 160:12, 160:22, 185:18, 186:22, 191:13, 196:23, 206:2, 212:10, 212:16, 231:15, 234:24, 235:14
personal [10] - 9:9, 38:24, 38:25, 39:6, 158:5, 205:10, 210:21, 226:4, 234:16, 235:12
personally [4] - 190:15, 192:14, 198:11, 212:3
personnel [7] - 185:20, 186:6, 189:5, 198:16,

204:23, 206:18, 236:5
persons [6] - 25:14, 64:12, 64:18, 67:7, 97:23, 101:17
perspective [2] - 9:20, 202:8
pertaining [1] - 171:25
PETER [1] - 2:12
Peter [1] - 170:15
pharmaceutical [9] - 28:13, 83:9, 95:3, 95:21, 126:21, 165:14, 165:15
pharmaceuticals [2] - 81:22, 82:4
pharmacies [12] - 24:2, 31:12, 31:16, 46:21, 85:25, 128:7, 128:19, 128:24, 134:5, 136:18, 148:1, 152:22
Pharmacies [1] - 215:18
pharmacist [2] - 28:16, 47:7
pharmacists [3] - 128:15, 130:12, 148:1
pharmacological [6] - 70:4, 70:5, 78:5, 78:6, 78:18, 78:19
pharmacy [27] - 21:11, 23:15, 28:18, 47:6, 47:14, 47:19, 91:23, 144:10, 144:18, 171:21, 171:22, 172:23, 173:6, 173:15, 173:19, 173:25, 174:22, 175:18, 176:4, 176:5, 176:9, 176:14, 177:6, 227:5, 227:8
Pharmacy [29] - 12:25, 13:4, 13:7, 13:11, 13:22, 14:5, 14:6, 14:9, 14:10, 17:23, 18:2, 21:4, 21:6, 21:8, 21:23, 22:1, 97:6, 125:11, 125:22, 127:25, 128:19, 128:22, 129:11, 131:12, 133:4, 135:19, 135:22, 135:24, 139:14
Pharmacy's [1] - 128:24
Philadelphia [2] - 6:7,

6:14
**phrase** [7] - 60:20, 60:25, 77:13, 77:15, 87:7
**phraseology** [3] - 83:3, 99:22, 99:25
**phrases** [1] - 65:25
**physically** [2] - 146:10, 224:24
**physician** [16] - 54:3, 56:11, 89:6, 91:6, 128:25, 134:7, 138:6, 138:10, 138:11, 142:19, 144:6, 144:12, 144:24, 145:16, 159:20, 161:4
**physician's** [2] - 55:9, 56:11
**Physician's** [1] - 56:5
**physician/patient** [1] - 68:24
**Physicians** [2] - 91:6, 215:14
**physicians** [22] - 22:20, 23:14, 23:18, 23:22, 30:15, 54:9, 55:8, 60:5, 61:6, 68:22, 70:24, 129:1, 130:12, 133:20, 137:21, 138:10, 141:1, 141:17, 141:21, 142:2, 155:14, 216:12
**pick** [1] - 142:24
**picked** [1] - 213:14
**pictures** [1] - 208:23
**piece** [6] - 19:1, 133:15, 134:11, 176:13, 206:12, 214:6
**pieces** [3] - 16:18, 16:20, 176:6
**PIFKO** [1] - 3:17
**pill** [5] - 47:6, 87:1, 91:21, 97:3, 193:24
**pills** [36] - 47:11, 47:14, 47:18, 47:19, 85:17, 85:23, 86:7, 86:14, 87:9, 87:15, 87:19, 88:14, 88:15, 88:21, 88:23, 89:11, 89:19, 89:20, 89:22, 89:23, 90:8, 90:20, 91:3, 91:4, 91:17, 92:21, 92:22, 94:7, 96:3, 96:6, 99:6, 111:23, 153:20, 156:22, 178:3
**pin** [1] - 64:2

**pinpoint** [3] - 193:3, 193:4, 193:8
**place** [5] - 141:16, 151:22, 198:20, 200:16, 237:4
**placed** [2] - 124:2, 159:2
**places** [3] - 102:12, 102:13, 134:8
**placing** [1] - 159:10
**Plaintiff** [1] - 1:5, 1:11, 2:2, 3:2, 4:1
**plaintiff** [1] - 198:4
**Plaintiff's** [1] - 167:8
**plaintiffs** [15] - 9:6, 38:8, 40:19, 41:8, 42:3, 43:5, 157:6, 159:6, 169:10, 169:11, 169:14, 169:19, 170:9, 170:16, 182:8
**Plaintiffs** [1] - 238:6
**Plaintiffs'** [5] - 81:7, 97:15, 99:8, 109:1, 197:9
**PLAINTIFFS'** [1] - 182:14
**plaintiffs'** [2] - 9:9, 178:22
**plan** [5] - 8:2, 175:8, 236:24, 236:25, 237:1
**Plan** [1] - 81:10
**planned** [2] - 7:17, 7:19
**planning** [1] - 98:17
**play** [1] - 93:8
**playing** [2] - 212:20
**pleading** [1] - 9:7
**Pleasant** [3] - 3:16, 4:4, 4:10
**pleasantly** [1] - 102:4
**plotted** [1] - 230:7
**plowing** [1] - 163:5
**plus** [1] - 38:17
**podiatrists** [1] - 54:3
**point** [89] - 15:10, 26:12, 31:9, 33:2, 34:18, 35:21, 39:24, 53:3, 53:16, 55:11, 59:19, 60:18, 62:6, 62:10, 62:19, 63:7, 63:15, 64:7, 67:20, 67:21, 68:17, 72:7, 72:9, 73:15, 76:14, 76:17, 77:11, 78:12, 79:21, 79:23, 81:18, 83:12, 83:16, 83:24, 83:25, 85:1, 85:20, 86:2, 86:9, 86:10,

87:17, 89:8, 89:18, 90:25, 92:19, 93:21, 94:3, 104:6, 106:8, 108:5, 110:23, 115:4, 116:20, 118:20, 119:14, 121:13, 121:21, 122:7, 123:5, 129:15, 145:20, 147:5, 157:8, 160:9, 161:20, 161:21, 162:3, 163:1, 163:11, 165:23, 167:25, 173:3, 175:24, 188:10, 188:19, 188:21, 188:23, 188:25, 189:3, 189:22, 199:23, 202:17, 203:15, 207:3, 216:10, 217:19, 235:17, 235:23
**pointed** [3] - 108:15, 167:10, 177:10
**points** [2] - 122:2, 164:2
**police** [5] - 199:10, 200:3, 200:15, 202:3, 204:24
**policy** [7] - 54:17, 54:20, 54:25, 55:4, 74:13, 74:18, 74:21
**Policy** [2] - 74:7, 209:15
**political** [1] - 202:4
**polypharmacy** [1] - 116:14
**Ponce** [1] - 2:17
**poor** [3] - 36:8, 74:3, 104:1
**population** [11] - 37:25, 47:25, 48:9, 51:2, 51:6, 51:14, 51:22, 53:4, 53:19, 105:25, 164:22
**populations** [2] - 51:3, 85:17
**portions** [1] - 16:16
**position** [10] - 16:5, 16:20, 17:15, 130:14, 158:4, 159:23, 161:6, 179:5, 184:13, 185:11
**positions** [3] - 70:18, 159:7, 161:3
**positive** [3] - 101:20, 105:18, 141:11
**possession** [1] - 25:15, 180:3, 180:4

**possible** [5] - 62:23, 90:10, 95:18, 107:19, 118:15
**possibly** [2] - 90:24, 203:22
**poster** [2] - 200:21, 201:6
**potency** [3] - 101:6, 101:15, 101:23
**potent** [5] - 83:22, 84:10, 102:1, 102:8, 110:14
**potential** [3] - 137:12, 152:6, 172:17
**potentially** [7] - 15:8, 53:10, 53:17, 64:12, 64:18, 114:18, 121:10
**powder** [1] - 99:3
**Powell** [1] - 2:7
**powerful** [1] - 110:2
**PowerPoint** [1] - 32:3
**PR** [1] - 2:17
**practically** [1] - 19:24
**Practice** [2] - 141:25, 142:22
**practice** [10] - 30:25, 54:2, 54:14, 77:19, 78:1, 78:9, 78:15, 89:9, 89:12, 136:5, 138:16, 187:24, 190:14
**practices** [4] - 81:1, 95:16, 142:20, 143:18
**practicing** [2] - 54:24, 55:3
**Practitioner** [1] - 24:24
**practitioner** [5] - 21:24, 25:13, 129:25, 139:5
**practitioner"** [1] - 129:17
**practitioners** [4] - 54:4, 54:8, 135:15, 136:18
**precise** [1] - 112:1
**preclude** [1] - 76:6
**predominant** [1] - 116:7
**prefer** [1] - 173:6
**pregnancy** [12] - 72:7, 72:18, 73:5, 73:12, 74:2, 74:3, 103:2, 103:6, 103:11, 103:20, 104:8, 104:17, 104:19, 105:7, 105:12
**pregnant** [10] - 72:13,

73:1, 73:9, 73:17, 103:10, 104:11, 104:13, 105:23, 106:3
**preliminary** [1] - 7:6
**prepare** [2] - 175:10, 176:19
**prepared** [4] - 7:11, 10:5, 175:21, 224:11
**prescribe** [20] - 17:5, 17:9, 28:12, 30:12, 66:4, 68:18, 70:16, 76:1, 77:2, 77:7, 87:18, 87:25, 88:3, 95:8, 128:11, 142:1, 142:5, 148:8, 215:14, 218:10
**prescribed** [16] - 22:21, 30:16, 31:4, 66:6, 81:23, 83:1, 85:18, 87:9, 88:11, 89:21, 98:25, 105:4, 105:7, 108:8, 108:19, 216:11
**prescriber** [13] - 23:6, 23:16, 28:11, 28:12, 47:6, 82:23, 83:15, 89:7, 90:16, 129:23, 142:5, 143:16, 162:9
**prescribers** [44] - 16:25, 17:4, 17:8, 20:4, 20:5, 20:6, 20:7, 20:9, 20:10, 21:16, 22:9, 23:3, 23:11, 23:25, 25:6, 27:13, 27:21, 29:22, 30:14, 46:19, 46:24, 57:13, 77:24, 80:18, 86:1, 92:5, 92:6, 92:14, 92:24, 93:17, 93:20, 93:22, 93:25, 95:24, 134:1, 135:5, 135:16, 136:8, 136:9, 137:16, 140:18, 141:1, 141:9, 143:13
**prescribes** [3] - 28:11, 87:19, 103:1
**prescribing** [48] - 12:21, 23:11, 25:7, 25:11, 26:4, 30:5, 30:25, 46:14, 56:18, 57:7, 57:14, 58:5, 58:8, 58:12, 58:13, 59:22, 60:3, 63:10, 63:17, 74:22, 75:13, 78:5, 80:18, 86:4, 86:12, 86:17, 86:19, 87:14, 92:4, 92:13, 92:25, 93:10, 94:12,

94:17, 127:15, 129:17, 129:24, 143:17, 147:5, 147:24, 148:7, 152:21, 153:10, 159:21, 161:4, 164:23, 164:25, 165:4
**Prescribing** [2] - 56:5, 58:21
**prescription** [91] - 23:19, 23:20, 23:25, 29:18, 29:24, 32:18, 46:17, 47:7, 70:16, 71:9, 71:13, 72:2, 72:6, 76:3, 79:7, 80:2, 80:8, 80:15, 80:21, 87:8, 87:9, 88:13, 88:14, 88:15, 88:24, 90:1, 90:9, 98:6, 98:20, 98:21, 99:2, 99:6, 99:23, 103:4, 103:12, 103:15, 103:16, 104:3, 104:4, 104:10, 104:17, 104:18, 104:25, 105:12, 105:13, 106:3, 107:1, 107:6, 107:9, 107:13, 107:14, 107:16, 107:17, 107:21, 107:22, 108:3, 109:7, 109:9, 109:12, 111:23, 115:7, 122:20, 129:12, 130:1, 130:3, 137:12, 138:12, 138:14, 150:14, 156:16, 156:22, 160:22, 163:15, 167:16, 193:24, 215:18, 215:24, 220:5, 220:18, 225:11, 226:16, 226:18, 227:4, 227:13, 227:17, 227:22, 228:14, 228:15, 229:21
**Prescription** [1] - 137:9
**prescription-level** [1] - 160:22
**prescriptions** [54] - 17:9, 18:6, 24:2, 29:4, 29:6, 29:22, 30:17, 32:24, 33:2, 33:4, 33:5, 33:7, 46:16, 46:20, 47:1,

47:3, 47:10, 47:15, 47:17, 57:22, 80:5, 82:3, 85:6, 85:11, 85:15, 85:17, 85:21, 85:25, 87:3, 88:1, 88:9, 89:10, 89:15, 90:4, 91:15, 91:20, 93:15, 95:15, 98:24, 105:9, 105:23, 124:25, 133:16, 134:5, 135:16, 136:14, 144:19, 160:1, 160:7, 160:12, 160:21, 162:10
**prescriptive** [1] - 25:15
**present** [6] - 9:8, 169:12, 190:12, 193:14, 193:18, 193:19
**presentation** [10] - 32:1, 32:3, 32:10, 32:11, 32:13, 35:7, 37:18, 191:7, 193:17, 209:16
**presenting** [1] - 161:1
**preserve** [2] - 9:22, 155:24
**President** [4] - 144:2, 144:3, 146:10
**presidential** [1] - 209:15
**press** [2] - 46:1, 46:3
**Prestera** [1] - 201:15
**pretty** [5] - 46:11, 162:1, 170:2, 174:14, 209:12
**prevalence** [1] - 36:3
**previously** [5] - 50:19, 111:6, 114:2, 117:8, 117:24
**Prevosnick** [1] - 7:22
**price** [12] - 110:19, 110:20, 110:22, 110:25, 111:10, 111:15, 111:17, 111:18, 111:21, 111:22, 111:25, 112:4
**Priddy** [64] - 7:10, 182:9, 182:11, 182:22, 182:23, 183:19, 185:4, 186:8, 187:23, 189:12, 189:21, 190:23, 194:14, 194:24, 195:25, 196:12, 197:17, 198:10, 200:21,

201:19, 204:1, 205:23, 209:19, 210:25, 212:2, 212:23, 213:24, 214:25, 216:21, 217:13, 219:3, 219:7, 219:15, 219:22, 220:8, 220:10, 220:15, 220:22, 221:16, 222:5, 222:16, 222:19, 222:21, 223:7, 223:16, 225:9, 226:5, 226:15, 227:3, 227:21, 228:9, 229:5, 229:24, 230:4, 231:7, 231:24, 232:24, 233:3, 233:7, 234:9, 236:23, 236:25, 237:3, 237:8
**PRIDDY** [1] - 182:14
**Priddy's** [1] - 231:18
**primarily** [5] - 55:25, 60:4, 65:3, 88:10, 157:14
**primary** [5] - 54:8, 59:22, 60:3, 60:5, 171:16
**principle** [1] - 117:22
**print** [1] - 170:25
**printed** [1] - 59:15
**priority** [3] - 207:20, 207:21, 216:15
**probable** [1] - 90:10
**problem** [10] - 8:12, 72:23, 90:15, 92:14, 93:1, 153:3, 181:19, 225:13, 225:16, 226:2
**problems** [3] - 51:10, 87:15, 205:20
**Procedure** [1] - 9:10
**procedure** [2] - 142:23, 221:4
**procedures** [2] - 30:12, 76:11
**proceed** [3] - 10:16, 10:17, 126:18
**proceedings** [1] - 238:5
**Proceedings** [1] - 6:19
**PROCEEDINGS** [1] - 7:1
**process** [10] - 96:19, 143:4, 143:22, 145:17, 174:4, 187:12, 216:8,

217:8, 228:8
**Proctor** [1] - 2:13
**produce** [2] - 87:2, 179:23
**produced** [6] - 6:20, 175:22, 176:2, 176:6, 176:12, 176:15
**production** [1] - 76:16
**products** [1] - 220:6
**profession** [3] - 30:21, 90:17, 216:16
**professional** [3] - 12:22, 28:1, 218:4
**Professional** [1] - 25:19
**proffer** [3] - 8:20, 9:22, 9:23
**Profile** [1] - 119:12
**Program** [34] - 17:12, 17:17, 18:1, 18:5, 18:10, 18:15, 19:13, 21:15, 23:4, 23:17, 97:22, 98:9, 105:3, 124:18, 125:23, 129:9, 133:5, 133:12, 134:19, 134:20, 137:22, 139:7, 139:15, 139:24, 140:20, 183:4, 198:19, 198:25, 200:6, 200:19, 201:14, 204:9, 208:8, 228:3
**program** [14] - 44:25, 95:9, 98:1, 98:22, 124:21, 128:3, 129:2, 139:9, 199:7, 200:19, 232:22, 235:14, 236:11, 236:12
**programs** [5] - 20:14, 20:18, 137:9, 200:10, 200:11
**Programs** [4] - 97:16, 137:8, 137:10, 137:11
**progress** [1] - 170:1
**promise** [2] - 123:20, 151:9
**promising** [2] - 92:4, 92:12
**prompted** [1] - 199:6
**proper** [5] - 10:9, 48:25, 78:23, 163:11, 181:5
**properly** [4] - 9:21, 69:25, 76:9, 78:23
**proportion** [1] - 47:25
**proportionally** [1] -

105:25
**protected** [1] - 131:2
**protocol** [4] - 219:16, 219:23, 220:9, 220:22
**protocols** [4] - 186:4, 218:22, 221:19, 222:1
**Protocols** [1] - 219:4
**proud** [1] - 14:1
**prove** [1] - 108:11
**provide** [25] - 21:21, 21:23, 21:24, 22:2, 25:25, 43:12, 43:14, 43:15, 60:2, 62:5, 63:16, 71:1, 75:25, 92:24, 98:11, 160:4, 170:9, 170:13, 177:14, 205:7, 207:19, 208:6, 208:8, 213:3, 221:9
**provided** [18] - 25:23, 30:16, 86:7, 87:15, 148:1, 170:20, 171:7, 172:8, 172:19, 172:23, 176:10, 201:7, 207:23, 213:4, 235:25, 236:2, 236:9
**provider** [1] - 204:25
**providers** [6] - 30:18, 46:13, 46:22, 46:23, 67:15, 201:8
**provides** [2] - 59:21, 220:25
**providing** [8] - 62:20, 64:3, 68:14, 70:22, 70:25, 73:22, 94:23, 208:12
**public** [24] - 18:13, 18:16, 20:15, 41:18, 42:5, 63:4, 63:5, 131:8, 144:13, 145:5, 145:15, 145:16, 145:19, 145:21, 148:15, 159:18, 159:20, 160:25, 161:2, 162:9, 163:16, 165:3, 207:2
**Public** [27] - 11:13, 11:16, 12:5, 12:7, 12:11, 12:13, 13:2, 13:5, 13:8, 13:10, 13:13, 13:21, 14:8, 16:5, 17:25, 18:8, 32:4, 40:23, 41:5, 41:12, 42:5, 44:16, 74:16, 94:21, 124:20, 125:25,

128:23
**publically** [1] - 145:16
**publicity** [1] - 148:5
**publish** [2] - 125:11, 201:2
**published** [4] - 59:2, 125:14, 125:24, 161:15
**pull** [6] - 11:3, 88:3, 160:10, 194:12, 230:1, 231:17
**pulled** [2] - 89:14, 179:3
**pulling** [1] - 179:6
**pulse** [3] - 191:14, 191:18
**pupils** [4] - 193:3, 193:4, 193:8, 193:16
**purchase** [2] - 21:11, 56:6
**purchasing** [1] - 111:22
**pure** [3] - 41:18, 53:13, 111:6
**purities** [1] - 111:8
**purity** [7] - 110:18, 110:20, 110:24, 111:3, 111:7, 111:9, 112:5
**purports** [1] - 236:25
**purpose** [21] - 17:3, 17:7, 24:7, 24:9, 29:24, 41:7, 42:2, 43:5, 63:1, 69:9, 89:22, 103:2, 103:5, 127:4, 133:22, 134:25, 153:9, 153:17, 153:19, 170:14, 226:25
**purposes** [10] - 19:22, 43:13, 120:2, 133:18, 175:4, 189:18, 201:3, 209:23, 212:2, 215:12
**pursuant** [1] - 221:19
**pursued** [1] - 135:6
**purview** [7] - 11:13, 12:5, 12:10, 13:4, 13:8, 14:16, 14:17
**put** [37] - 16:8, 24:18, 31:24, 32:4, 33:22, 34:2, 34:9, 34:14, 40:24, 48:11, 52:15, 59:16, 61:17, 62:24, 67:5, 68:25, 87:14, 102:3, 150:4, 154:3, 156:6, 158:23, 170:21, 174:6, 177:25, 179:7,

189:11, 194:25, 200:25, 201:6, 208:25, 210:21, 217:22, 223:5, 229:12, 234:2
**puts** [2] - 63:2, 218:22
**putting** [1] - 67:8

**Q**

**QRT** [25] - 203:13, 207:17, 209:3, 210:11, 210:14, 210:17, 210:25, 212:3, 213:9, 213:24, 233:16, 233:18, 233:21, 234:11, 234:19, 234:24, 235:13, 235:17, 235:20, 235:22, 236:5, 236:7, 236:10, 236:13, 236:17
**quality** [8] - 77:19, 78:1, 78:8, 78:9, 185:18, 185:24, 186:5
**Quality** [4] - 183:2, 185:21, 198:10, 198:14
**quantify** [4] - 166:2, 166:20, 166:23, 166:24
**quantity** [2] - 126:20, 130:5
**quarter** [3] - 195:4, 209:6, 209:8
**Quarterly** [1] - 123:7
**quarterly** [2] - 55:8, 55:21
**quarters** [1] - 209:12
**queries** [3] - 141:5, 141:9, 141:15
**query** [1] - 142:4
**questioning** [1] - 158:25
**questions** [28] - 8:6, 8:7, 16:23, 31:19, 35:5, 40:7, 43:8, 46:11, 97:19, 109:2, 118:23, 119:10, 120:3, 120:4, 120:15, 120:22, 123:4, 123:21, 124:19, 148:19, 150:25, 154:9, 154:11, 156:15, 163:13, 166:25, 168:4, 205:20
**QUEZON** [30] - 182:7,

182:8, 182:17, 182:19, 189:16, 189:20, 194:20, 194:23, 195:13, 195:18, 196:8, 196:11, 197:8, 197:13, 197:16, 198:3, 198:9, 201:2, 201:5, 202:24, 203:3, 203:4, 209:22, 213:19, 213:23, 214:20, 219:13, 231:19, 232:12, 232:16
**Quezon** [1] - 182:8
**quick** [2] - 28:9, 150:25
**Quick** [8] - 183:5, 192:15, 203:7, 204:7, 204:8, 204:16, 206:1, 231:14
**quickly** [6] - 150:1, 202:6, 204:14, 206:1, 206:7, 210:20
**Quintiles** [5] - 160:5, 161:16, 161:21, 162:6, 162:15
**quit** [1] - 185:10
**quite** [3] - 58:10, 130:8, 140:23
**quiver** [2] - 79:2, 79:8
**quote** [1] - 60:21

**R**

**race** [1] - 212:14
**Rader** [4] - 7:17, 7:18, 8:4, 8:8
**Rafalski** [4] - 178:21, 179:1, 179:22, 181:1
**Rafferty** [4] - 2:13, 177:25, 178:3, 178:10
**raise** [4] - 16:7, 169:7, 178:17, 182:12
**raised** [3] - 10:4, 183:9, 183:10
**ran** [1] - 95:9
**random** [2] - 131:21, 172:15
**randomized** [2] - 65:3, 65:18
**randomly** [1] - 138:1
**Range** [1] - 113:5
**range** [1] - 115:5
**rank** [9] - 32:21, 36:9, 36:13, 36:17, 36:22, 36:25, 37:3, 37:6, 37:9

**ranked** [4] - 33:1, 36:10, 36:14, 36:18
**ranking** [2] - 32:22, 35:18
**ranks** [4] - 31:20, 35:12, 35:19, 35:23
**rapid** [4] - 85:5, 206:7, 220:22, 221:1
**rare** [3] - 102:12, 144:2, 146:9
**rarer** [1] - 87:1
**rate** [15] - 34:17, 38:15, 50:6, 163:15, 164:7, 164:22, 166:11, 166:12, 166:13, 166:14, 166:15, 217:25, 218:1, 235:13
**rates** [7] - 51:24, 51:25, 124:24, 137:17, 163:18, 164:14, 164:15
**rather** [1] - 78:6
**rationale** [2] - 67:22, 67:25
**re** [3] - 9:6, 9:14, 9:15
**re-depose** [1] - 9:14
**re-deposed** [1] - 9:15
**re-disclosed** [1] - 9:6
**reach** [4] - 137:12, 161:3, 171:13, 206:24
**reached** [1] - 169:13
**reaching** [1] - 214:13
**react** [1] - 65:22
**reaction** [1] - 58:2
**reactionary** [1] - 58:2
**read** [19] - 19:14, 19:18, 24:21, 52:21, 55:14, 56:21, 59:5, 61:1, 65:13, 77:13, 126:24, 127:3, 128:4, 129:5, 130:21, 149:16, 150:10, 167:10, 182:1
**readily** [1] - 111:13
**reading** [2] - 110:10, 232:12
**reads** [6] - 27:20, 76:20, 82:11, 85:4, 116:12, 232:7
**ready** [10] - 16:1, 25:2, 46:2, 46:11, 118:20, 124:10, 185:9, 205:16, 205:18, 208:9
**real** [1] - 170:9
**realize** [2] - 197:17, 201:10

**realized** [9] - 196:22, 199:21, 200:5, 202:6, 202:10, 204:14, 207:22, 208:19, 210:20
**really** [38] - 8:11, 13:19, 16:9, 56:15, 59:15, 63:25, 64:21, 67:18, 73:13, 79:13, 87:22, 96:1, 107:20, 128:20, 131:14, 147:17, 152:2, 154:15, 174:3, 192:12, 196:19, 199:6, 199:14, 202:14, 206:3, 206:7, 207:25, 208:25, 209:12, 210:20, 210:23, 210:24, 211:10, 212:11, 213:2, 216:18
**reason** [9] - 34:20, 50:11, 52:12, 87:18, 117:16, 141:20, 157:4, 169:22, 179:22
**reasonable** [4] - 28:24, 69:23, 95:14, 170:12
**reasons** [9] - 30:6, 35:17, 66:2, 89:23, 135:24, 159:1, 159:11, 174:5
**receive** [2] - 55:13, 143:11
**received** [9] - 56:20, 147:1, 169:18, 183:17, 196:4, 207:5, 212:23, 235:19, 236:15
**receives** [2] - 196:1, 236:7
**receiving** [2] - 138:14, 185:24
**recent** [8] - 14:17, 57:5, 58:5, 75:11, 97:8, 97:10, 218:9, 228:22
**recently** [2] - 14:17, 61:23
**reception** [2] - 205:23, 206:23
**receptors** [1] - 65:21
**recess** [4] - 62:14, 119:21, 168:19, 237:12
**Recess** [3] - 62:16, 120:14, 168:21
**recessed** [1] - 237:14

**recipient** [1] - 228:14
**recognize** [6] - 45:1, 74:5, 76:9, 77:17, 78:7, 78:22
**recognized** [1] - 148:15
**recognizes** [1] - 73:3
**recollect** [1] - 146:13
**recollection** [10] - 26:15, 57:1, 79:10, 146:2, 146:6, 151:25, 152:3, 152:6, 152:16, 166:3
**recommend** [2] - 126:19, 132:22
**recommendation** [6] - 12:16, 12:18, 12:19, 62:25, 69:8, 73:16
**Recommendations** [2] - 11:6, 92:2
**recommendations** [8] - 11:10, 11:21, 13:16, 14:14, 14:22, 59:21, 67:15, 125:2
**record** [37] - 9:16, 9:20, 9:22, 15:18, 16:4, 24:20, 25:6, 29:25, 43:21, 43:24, 44:5, 44:11, 44:15, 45:2, 45:3, 45:9, 45:19, 58:15, 123:25, 124:3, 145:15, 152:23, 154:4, 155:21, 155:25, 158:23, 159:2, 159:10, 167:11, 174:23, 186:12, 188:25, 196:25, 197:2, 224:14, 224:21, 238:5
**recorded** [3] - 6:19, 114:19, 229:16
**recording** [1] - 212:2
**records** [3] - 196:6, 223:20, 223:23
**recovery** [1] - 232:8
**RECROSS** [1] - 167:5
**recross** [2] - 154:12, 167:1
**redirect** [2] - 120:5, 148:20
**REDIRECT** [2] - 148:23, 151:11
**reduce** [4] - 90:22, 126:20, 127:1, 127:17
**reduced** [1] - 112:5
**reducing** [4] - 65:1, 65:16, 93:14, 236:18

**Reduction** [15] - 14:3, 28:22, 28:24, 29:3, 29:13, 29:15, 31:3, 31:6, 31:10, 31:14, 97:16, 97:22, 98:9, 228:8, 228:3
**reduction** [5] - 93:9, 98:1, 110:18, 110:20, 111:10
**Reed** [2] - 6:5, 6:12
**refer** [8] - 61:13, 87:13, 89:19, 99:22, 151:5, 198:20, 199:4, 200:7
**reference** [16] - 33:20, 56:8, 61:9, 61:25, 82:19, 82:22, 87:13, 93:16, 100:24, 137:8, 151:13, 165:23, 167:15, 171:18
**Reference** [1] - 65:6
**referenced** [1] - 223:24
**references** [2] - 65:5, 171:9
**referral** [3] - 12:1, 204:18, 232:8
**referrals** [2] - 199:2, 199:3
**referred** [4] - 59:8, 186:16, 210:5, 214:5
**referring** [3] - 61:11, 61:18, 107:1
**refers** [8] - 16:9, 60:20, 61:2, 61:20, 85:20, 86:12, 220:25
**refills** [1] - 130:2
**reflect** [3] - 47:18, 63:7, 123:25
**reflected** [2] - 67:1, 230:5
**reflecting** [1] - 67:2
**reflects** [6] - 63:15, 76:25, 77:4, 77:6, 114:24, 223:8
**refresh** [6] - 146:1, 146:6, 151:24, 152:3, 152:5, 152:15
**refreshed** [1] - 146:18
**regarding** [8] - 8:22, 21:20, 42:25, 43:1, 125:12, 159:20, 163:14, 203:13
**regardless** [2] - 88:9, 229:17
**regards** [1] - 21:6
**register** [9] - 22:9, 22:21, 128:12, 129:2, 138:18,

139:1, 139:6, 139:12, 139:13
**registered** [2] - 137:21, 184:17
**Registered** [2] - 25:19, 142:1
**registrants** [1] - 23:7
**registration** [3] - 23:2, 23:14, 25:16
**regret** [1] - 8:1
**regular** [5] - 141:21, 187:24, 188:2, 194:7, 195:1
**regularly** [1] - 88:8
**regulate** [7] - 11:17, 12:7, 12:13, 13:10, 13:13, 14:8, 14:10
**regulates** [2] - 14:6, 54:6
**regulating** [2] - 54:13, 143:20
**regulation** [3] - 20:13, 20:18, 54:6
**regulations** [1] - 128:24
**regulatory** [2] - 20:23, 142:13
**regurgitating** [1] - 64:4
**regurgitation** [1] - 66:14
**reimbursed** [1] - 236:20
**Related** [1] - 113:17
**related** [19] - 20:2, 20:19, 22:16, 34:24, 35:5, 48:22, 50:16, 79:19, 99:18, 113:24, 125:3, 125:22, 126:3, 129:11, 147:5, 147:11, 147:23, 156:15, 225:1
**relates** [2] - 19:12, 169:9
**relating** [3] - 47:23, 54:21, 113:1
**relation** [8] - 20:17, 81:1, 98:20, 102:20, 103:12, 103:16, 103:17, 149:23
**relationship** [5] - 13:22, 22:1, 68:2, 68:24, 105:20
**relationships** [1] - 13:20
**relatively** [8] - 51:1, 92:6, 93:17, 93:20, 93:23, 95:23, 95:24, 105:24

**release** [1] - 12:1
**relevant** [1] - 16:20
**reliable** [1] - 213:10
**reliance** [5] - 178:21, 178:23, 179:19, 179:25, 180:21
**relied** [3] - 158:11, 162:16, 162:17
**relieved** [1] - 8:15
**relieving** [1] - 25:11
**rely** [8] - 94:16, 157:14, 160:24, 161:2, 161:16, 161:21, 162:8, 172:6
**relying** [2] - 161:7, 214:5
**remaining** [1] - 173:14
**remedies** [2] - 148:11, 148:12
**remember** [16] - 22:10, 49:7, 49:8, 56:16, 57:2, 136:22, 136:23, 146:7, 146:13, 146:14, 146:15, 146:16, 146:17
**remind** [3] - 75:22, 136:9, 185:15
**renew** [1] - 212:24
**repeat** [5] - 21:5, 31:13, 78:2, 219:22, 221:9
**repetitive** [2] - 173:17, 174:19
**rephrase** [1] - 128:17
**Report** [8] - 125:12, 125:21, 134:13, 139:15, 139:16, 139:23, 150:22, 168:24
**report** [21] - 15:3, 32:8, 32:13, 32:15, 38:1, 66:11, 107:11, 114:2, 125:13, 126:14, 126:19, 128:7, 128:16, 139:22, 149:23, 149:25, 169:21, 176:10, 176:16, 224:11
**Reported** [1] - 122:11
**reported** [5] - 35:11, 121:22, 209:13, 210:3, 238:9
**Reporter** [6] - 6:18, 6:18, 238:3, 238:12
**REPORTER** [3] - 157:20, 157:24, 198:22
**reporters** [1] - 62:10

**Reporting** [1] - 129:9
**reporting** [5] - 21:3, 21:7, 66:25, 128:2, 128:6
**reports** [6] - 124:21, 125:3, 125:14, 148:5, 188:20
**repository** [2] - 129:10, 130:24
**represent** [4] - 46:9, 123:16, 125:21, 215:1
**representing** [2] - 155:6, 181:9
**request** [4] - 17:21, 154:11, 179:7, 180:17
**require** [2] - 89:16, 187:14
**Required** [1] - 24:25
**required** [18] - 16:25, 21:16, 22:9, 23:10, 23:13, 23:19, 23:23, 24:1, 25:6, 80:19, 126:15, 130:17, 130:23, 139:1, 139:2, 169:14, 212:1, 222:6
**requirement** [3] - 22:20, 23:24, 180:12
**requirements** [5] - 20:23, 21:1, 21:4, 21:8, 31:7
**Requirements** [1] - 24:24
**requires** [4] - 80:20, 218:15, 218:19, 221:8
**requiring** [2] - 23:2, 138:21
**research** [2] - 156:18, 208:13
**reserve** [1] - 157:17
**residency** [1] - 91:7
**resiliency** [2] - 236:24, 236:25
**resource** [2] - 200:24, 201:13
**resources** [7] - 201:17, 202:11, 205:17, 232:20, 232:23, 233:8, 233:10
**respiration** [1] - 217:23
**respirations** [3] - 191:15, 191:21, 208:3
**respond** [8] - 48:19, 170:15, 174:15,

175:21, 184:20,
187:7, 192:11, 237:1
**responded** [4] - 34:18,
179:17, 193:7,
193:10
**Responder** [1] - 204:9
**responders** [8] -
198:12, 199:14,
199:23, 200:8,
200:14, 200:22,
203:15, 204:10
**Responders** [1] -
200:18
**responding** [1] -
223:19
**responds** [2] - 192:8,
206:10
**response** [4] - 115:2,
117:11, 206:7,
221:24
**Response** [9] - 81:10,
183:5, 192:16,
203:8, 204:7, 204:8,
204:16, 206:1,
231:14
**responsibility** [2] -
77:17, 78:7
**Responsible** [1] - 56:5
**responsible** [6] -
46:13, 56:18, 84:19,
115:24, 153:21,
190:14
**responsive** [2] -
115:15, 115:18
**rest** [3] - 66:11, 101:22
**restoring** [1] - 194:5
**restricting** [1] - 71:13
**rests** [1] - 174:17
**result** [8] - 23:7,
34:23, 37:13, 50:15,
198:12, 201:19,
201:22, 234:24
**resulted** [1] - 104:7
**resulting** [3] - 85:15,
156:17
**resume** [1] - 10:14
**retained** [4] - 38:18,
38:21, 38:23, 40:16
**retired** [1] - 213:11
**retires** [1] - 43:10
**return** [2] - 47:22,
223:16
**revealed** [1] - 182:1
**review** [15] - 7:24,
16:2, 49:9, 49:20,
59:7, 66:15, 67:1,
81:13, 186:2,
188:17, 192:16,
194:7, 194:8,
194:11, 224:24

**Review** [6] - 124:1,
124:7, 133:5,
134:20, 135:2,
143:12
**reviewed** [8] - 17:6,
49:12, 147:15,
150:3, 151:21,
181:1, 221:19, 222:2
**reviewing** [1] - 139:2
**Reynolds** [3] - 230:1,
231:17, 234:2
**Rice** [5] - 2:10, 3:15,
4:3, 4:6, 4:9
**Richie** [1] - 123:18
**right-hand** [5] - 59:19,
63:8, 67:22, 72:13,
161:12
**rigorous** [1] - 67:2
**rigorously** [1] - 66:19
**ring** [1] - 145:23
**rise** [3] - 85:5, 158:10,
225:24
**risk** [5] - 73:12, 86:5,
98:12, 121:22,
122:14
**Risk** [2] - 35:10,
122:11
**risks** [3] - 72:25, 73:7,
74:1
**RMR** [2] - 6:18, 6:18
**road** [1] - 172:10
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:7
**role** [35] - 15:21,
16:11, 17:16, 17:18,
17:24, 18:8, 18:23,
19:2, 20:16, 20:20,
21:22, 21:24, 21:25,
22:5, 40:22, 41:15,
41:18, 41:19, 42:4,
42:11, 60:6, 74:16,
74:25, 124:19,
125:6, 128:14,
128:22, 128:24,
134:24, 143:24,
156:18, 159:18,
163:16, 183:1,
218:12
**roles** [2] - 183:3,
183:6
**room** [2] - 184:1,
202:3
**rough** [2] - 118:8,
188:19
**roughly** [3] - 58:7,
170:6, 204:6
**RPR** [1] - 6:18
**RPR-RMR-CRR-
FCRR** [1] - 6:18
**RSI** [1] - 221:4

**RUBY** [1] - 4:17
**Ruby** [1] - 4:18
**rudimentary** [1] -
170:22
**Rule** [3] - 9:10, 175:3,
180:12
**Rulemaking** [1] - 25:1
**ruling** [2] - 157:17,
163:4
**rulings** [1] - 159:6
**run** [13] - 186:17,
186:20, 186:22,
188:1, 188:7,
189:13, 192:14,
194:1, 194:9,
223:23, 225:2,
225:3, 235:13
**running** [5] - 144:19,
188:21, 194:19,
205:16, 235:14
**runs** [14] - 12:25,
197:6, 224:15,
224:21, 228:22,
229:16, 230:12,
230:14, 230:17,
230:18, 230:20,
234:3, 234:8, 234:25
**Rx** [4] - 106:15,
106:25, 108:6,
108:18
**RX** [1] - 160:19

---

# S

**s\Ayme** [1] - 238:11
**s\Lisa** [1] - 238:11
**safe** [1] - 205:7
**Safe** [3] - 26:13,
26:22, 26:25
**safer** [1] - 127:15
**safety** [2] - 95:18,
95:19
**salaries** [1] - 236:3
**SALGADO** [1] - 4:15
**SAMHSA** [2] - 150:15,
150:20
**samples** [1] - 226:7
**San** [1] - 2:17
**sandbag** [1] - 157:11
**sandwich** [1] - 208:14
**sandwiches** [1] -
208:16
**sanitarian** [1] - 32:14
**sat** [2] - 14:24, 212:12
**satisfactory** [1] -
177:6
**satisfied** [1] - 177:3
**satisfy** [1] - 176:24
**Saturday** [1] - 179:2
**save** [4] - 43:19,

84:12, 84:22, 207:20
**saves** [1] - 236:17
**saving** [2] - 194:4,
236:21
**saw** [13] - 15:19, 31:1,
104:9, 104:13,
104:14, 134:8,
147:12, 199:20,
201:21, 202:7,
202:8, 209:8
**SB-437** [5] - 18:20,
18:21, 19:23, 19:24,
20:13
**SC** [3] - 3:16, 4:4, 4:10
**scale** [3] - 90:22,
218:1
**scarves** [2] - 208:22,
208:23
**scene** [5] - 189:5,
199:10, 199:23,
206:25, 236:3
**Schedule** [10] - 38:11,
20:10, 23:3, 127:10,
127:21, 128:12,
129:12
**schedule** [1] - 41:6
**scheduled** [1] - 8:8
**Schedules** [1] -
127:16
**scheduling** [1] - 7:7
**SCHMIDT** [14] - 5:10,
178:17, 178:20,
179:13, 180:7,
180:9, 180:17,
180:25, 181:8,
181:11, 181:15,
181:20, 181:22,
182:4
**Schmidt** [1] - 178:18
**School** [1] - 183:17
**school** [5] - 88:25,
91:2, 91:7, 92:20,
183:23
**science** [12] - 29:15,
61:7, 62:2, 62:24,
63:24, 67:9, 69:6,
69:8, 70:25, 73:14,
95:6, 95:16
**Sciences** [2] - 166:10,
202:1
**scientific** [1] - 66:15
**scope** [4] - 158:20,
161:23, 162:12,
165:21
**Scott** [2] - 7:12, 56:12
**screen** [9] - 40:24,
48:11, 52:15, 98:14,
189:24, 189:25,
194:1, 232:13,
232:25

**scrutiny** [1] - 135:6
**search** [2] - 145:6,
195:10
**Search** [1] - 24:25
**searched** [1] - 199:16
**seat** [1] - 182:15
**second** [13] - 8:19,
41:20, 64:10, 77:12,
81:21, 87:12, 93:3,
93:16, 103:7, 133:8,
175:25, 177:23,
209:8
**Second** [1] - 200:18
**Secretary** [8] - 21:25,
74:15, 142:9,
143:21, 143:25,
146:10, 151:18,
155:1
**secretive** [1] - 63:5
**section** [4] - 24:23,
29:9, 102:17, 150:12
**Section** [2] - 19:19,
24:23
**sedation** [2] - 221:8,
221:10
**see** [174] - 12:2, 12:23,
19:12, 22:23, 23:15,
24:1, 27:17, 28:8,
28:9, 29:8, 30:1,
40:25, 42:17, 42:21,
42:23, 43:2, 43:3,
50:7, 52:25, 56:4,
56:6, 56:7, 56:13,
56:14, 56:16, 59:17,
59:24, 60:22, 61:9,
61:10, 63:13, 63:14,
64:14, 64:15, 66:23,
67:24, 68:5, 68:15,
68:16, 69:18, 72:14,
72:15, 72:20, 72:21,
76:23, 77:21, 77:22,
81:25, 82:6, 82:7,
82:15, 82:16, 83:6,
83:10, 83:11, 85:7,
92:8, 93:18, 99:19,
99:20, 100:11,
100:12, 100:18,
100:25, 101:1,
101:17, 101:19,
102:17, 104:6,
105:3, 105:22,
106:10, 106:11,
106:16, 110:4,
110:13, 112:10,
113:18, 116:16,
120:12, 121:24,
121:25, 126:16,
126:19, 126:22,
127:5, 127:6, 127:8,
127:11, 128:3,

128:4, 129:15, 129:17, 129:18, 129:24, 130:6, 130:7, 130:18, 130:20, 132:15, 132:16, 132:21, 132:24, 132:25, 133:6, 133:8, 134:9, 134:16, 135:17, 137:5, 137:7, 138:1, 138:3, 138:9, 138:13, 139:9, 139:10, 140:15, 140:16, 141:8, 145:6, 146:5, 150:11, 150:13, 152:24, 164:1, 164:7, 164:9, 172:4, 172:19, 189:24, 190:24, 191:2, 191:13, 191:20, 191:23, 191:25, 193:6, 197:22, 199:3, 199:5, 201:7, 201:12, 203:16, 204:14, 207:8, 209:25, 212:17, 214:7, 216:10, 219:4, 219:17, 219:20, 219:21, 219:24, 220:3, 220:10, 220:15, 220:23, 221:4, 221:10, 222:11, 222:19, 223:9, 223:12, 223:13, 223:15, 229:14, 232:24, 232:25, 233:3, 233:4, 234:7, 234:9

**seeing** [13] - 43:3, 57:2, 60:23, 102:13, 110:10, 110:17, 111:12, 116:4, 134:4, 136:12, 136:18, 189:1, 209:7

**seek** [4] - 55:3, 154:6, 197:9, 198:4

**seeking** [1] - 148:13

**sees** [1] - 54:3

**select** [1] - 189:6

**selected** [1] - 190:16

**SEMP** [4] - 26:10, 26:13, 26:20, 44:10

**Senate** [25] - 15:5, 15:7, 15:11, 15:18, 16:10, 16:24, 17:10, 20:22, 21:10, 22:15, 23:10, 23:18, 24:18, 24:19, 25:6, 28:21,

29:9, 43:23, 44:4, 80:17, 80:20, 131:24, 132:5, 134:17

**send** [2] - 92:21, 135:25

**Send** [1] - 92:21

**sending** [3] - 88:15, 94:5, 135:20

**Senior** [1] - 7:2

**SENIOR** [1] - 1:17

**Sensabaugh** [1] - 5:14

**sense** [1] - 74:18

**sensitive** [1] - 133:17

**sent** [3] - 135:15, 187:13, 224:12

**sentence** [37] - 27:18, 27:20, 28:10, 60:23, 60:25, 61:1, 64:9, 64:10, 66:18, 67:24, 72:16, 73:3, 76:18, 77:14, 78:4, 81:21, 82:11, 83:7, 85:4, 92:3, 99:13, 99:14, 101:15, 110:1, 116:12, 121:22, 126:14, 127:23, 130:22, 135:14, 140:3, 149:19, 150:16, 167:11

**sentences** [2] - 82:2, 99:16

**separate** [5] - 103:22, 118:2, 118:8, 175:1, 175:3

**September** [5] - 9:4, 40:1, 40:2, 75:9, 204:2

**sequence** [1] - 220:22

**series** [1] - 91:14

**serve** [2] - 184:3, 185:3

**served** [1] - 142:8

**Service** [1] - 196:18

**service** [1] - 186:24

**services** [1] - 210:16

**serving** [1] - 39:6

**session** [1] - 15:8

**set** [19] - 15:3, 21:13, 25:18, 25:19, 26:1, 28:20, 46:4, 48:15, 97:2, 98:9, 119:10, 173:6, 179:1, 212:25, 213:5, 214:13, 228:4, 229:9, 236:25

**setting** [3] - 29:17, 79:19, 211:24

**settings** [3] - 80:7, 80:12, 80:16

**settlement** [1] - 43:2

**seven** [3] - 29:24, 30:6, 30:24

**seven-day** [1] - 29:24

**several** [14] - 13:16, 15:1, 28:3, 70:3, 89:15, 96:10, 98:9, 126:4, 140:5, 159:22, 167:19, 172:10, 231:11

**severe** [1] - 220:12

**shall** [2] - 132:21, 133:4

**SHANNON** [1] - 6:4

**share** [1] - 131:15

**shared** [4] - 76:21, 77:4, 77:8, 77:10

**sharing** [2] - 12:21, 95:16

**sharper** [1] - 64:7

**sheets** [6] - 186:17, 186:20, 188:1, 188:7, 192:14, 194:9

**shelf** [1] - 47:14

**shielded** [1] - 145:18

**shift** [3] - 82:4, 82:11, 187:15

**shifted** [1] - 82:12

**Shkolnik** [2] - 38:22, 39:13

**shoe** [1] - 199:14

**short** [12] - 64:25, 65:9, 65:15, 66:4, 66:8, 87:3, 178:24, 228:19, 229:10, 231:9, 233:18, 235:16

**short-term** [5] - 64:25, 65:9, 65:15, 66:4, 66:8

**shortly** [2] - 123:18, 163:21

**shots** [2] - 98:16, 214:15

**show** [18] - 34:5, 55:16, 102:14, 152:6, 153:9, 153:14, 153:16, 177:12, 177:14, 189:17, 206:13, 206:22, 209:19, 209:22, 218:25, 222:13, 229:12, 229:25

**showed** [2] - 160:7, 171:1

**showing** [5] - 33:25, 56:22, 115:5, 189:12, 222:16

**shown** [4] - 55:20,

149:1, 149:7, 233:15

**shows** [3] - 106:9, 106:14, 109:4

**shut** [9] - 96:3, 96:5, 96:7, 96:8, 96:13, 96:17, 97:3, 210:16, 210:17

**shut-down** [1] - 96:17

**shut-downs** [4] - 96:3, 96:5, 96:7, 96:13

**shutting** [1] - 97:11

**side** [5] - 69:16, 95:24, 132:15, 169:25, 179:15

**sign** [4] - 49:14, 146:11, 217:17, 217:20

**signal** [1] - 7:24

**signature** [6] - 74:11, 146:2, 153:4, 154:23, 155:3, 155:10

**signed** [5] - 22:16, 49:11, 49:19, 144:1, 146:12

**significant** [7] - 36:19, 47:25, 58:4, 58:10, 93:9, 192:5, 233:21

**significantly** [1] - 166:14

**signing** [2] - 42:25, 49:8

**signs** [2] - 186:14, 201:9

**similar** [1] - 229:9

**similarly** [2] - 164:3, 164:8

**simple** [3] - 53:13, 97:19, 153:8

**simpler** [1] - 43:14

**simply** [3] - 155:24, 172:2, 196:3

**SINGER** [1] - 4:5

**single** [7] - 173:8, 176:13, 186:13, 194:11, 196:23, 210:6, 226:6

**Sissy** [3] - 199:13

**sit** [3] - 14:24, 88:5, 212:13

**sitting** [7] - 29:10, 30:22, 127:2, 133:25, 174:6, 208:24, 213:17

**situation** [7] - 62:6, 68:3, 87:2, 175:11, 192:1, 194:4, 200:9

**situations** [3] - 193:10, 215:22, 221:24

**six** [5] - 166:13, 173:11, 173:18, 184:5, 210:9

**sixth** [3] - 11:21, 11:22, 56:3

**skeletal** [1] - 53:5

**skin** [1] - 164:16

**Slide** [2] - 32:17, 35:7

**slide** [4] - 35:7, 35:9, 161:19, 173:22

**slightly** [1] - 131:23

**small** [3] - 108:6, 183:22, 199:14

**smaller** [2] - 84:11, 178:18

**Smith** [2] - 6:5, 6:12

**smuggled** [1] - 84:16

**so-called** [1] - 167:20

**social** [3] - 15:22, 136:17, 156:13

**socioeconomic** [2] - 212:11, 212:15

**sociology** [1] - 183:18

**sold** [1] - 87:20

**solution** [1] - 205:5

**solutions** [1] - 202:16

**solve** [1] - 205:19

**solved** [1] - 181:19

**someone** [9] - 28:11, 28:15, 89:1, 117:13, 190:1, 193:20, 199:19, 200:22, 212:6

**Someone** [1] - 207:1

**Sometimes** [1] - 211:10

**sometimes** [4] - 53:10, 201:10, 206:12, 206:25

**somewhat** [1] - 138:1

**somewhere** [1] - 107:11

**son** [1] - 212:19

**Sorry** [2] - 79:22, 219:1

**sorry** [31] - 24:19, 26:24, 44:24, 55:23, 60:10, 119:17, 120:10, 140:12, 150:18, 151:22, 157:20, 157:22, 158:13, 158:16, 162:22, 172:13, 198:22, 198:24, 202:22, 219:19, 222:5, 223:11, 223:12, 224:20, 232:14, 232:15, 235:4, 235:5, 235:7, 235:8, 236:1

**sort** [8] - 188:16, 188:18, 197:25, 200:21, 203:9, 208:25, 209:9, 214:5
**sound** [4] - 26:14, 26:15, 90:11, 142:10
**sounds** [3] - 45:20, 103:17, 147:17
**source** [8] - 9:8, 130:3, 150:19, 159:25, 171:10, 171:16, 225:7, 227:25
**sourced** [8] - 83:9, 83:13, 83:19, 84:15, 104:23, 107:5, 113:25
**sources** [8] - 121:15, 159:22, 159:24, 160:2, 160:3, 160:4, 163:1, 163:2
**South** [1] - 2:14
**Southern** [1] - 7:2
**SOUTHERN** [1] - 1:1
**Sp02** [1] - 191:9
**space** [1] - 123:25
**SPEAKER** [1] - 15:14
**speakers** [1] - 42:18
**speaking** [6] - 18:24, 40:19, 41:1, 51:18, 71:16, 71:18
**specific** [22] - 20:16, 42:25, 70:24, 71:20, 80:11, 116:20, 118:13, 121:12, 125:2, 132:9, 140:5, 171:17, 172:12, 172:18, 172:24, 173:22, 174:7, 178:1, 178:2, 178:10, 224:21, 227:21
**specifically** [16] - 41:13, 58:9, 89:23, 111:2, 111:5, 111:19, 131:11, 144:6, 162:17, 170:1, 170:13, 175:8, 176:18, 178:4, 226:1, 229:21
**specifics** [2] - 40:21, 147:18
**specify** [1] - 225:3
**spend** [2] - 26:19, 162:25
**spent** [6] - 124:16, 153:21, 159:17, 179:20, 215:4, 218:7
**spike** [3] - 84:1, 110:16, 110:18

**spiked** [2] - 235:5, 235:9
**spill** [1] - 7:16
**spot** [1] - 164:15
**spotty** [1] - 102:12
**sprain** [4] - 88:20, 90:1, 90:8, 91:2
**spreading** [2] - 85:16, 98:12
**spreadsheet** [1] - 222:18
**Spring** [1] - 56:9
**Square** [2] - 6:5, 6:13
**squeeze** [1] - 191:23
**stack** [2] - 99:9, 180:8
**staff** [2] - 142:2, 142:3
**stamped** [1] - 187:19
**stand** [4] - 10:14, 178:8, 178:13, 182:9
**standard** [3] - 89:9, 89:12, 93:23
**standards** [7] - 74:23, 76:2, 92:7, 93:18, 93:21, 95:25, 96:24
**stands** [1] - 26:13
**STANNER** [1] - 5:11
**start** [11] - 8:19, 126:13, 131:20, 159:24, 163:25, 164:3, 170:23, 186:25, 187:1, 205:21, 215:3
**started** [18] - 100:18, 110:12, 110:17, 185:6, 188:5, 188:14, 199:5, 208:16, 208:19, 209:3, 209:5, 209:7, 210:11, 212:19, 216:10, 227:16, 234:25
**starting** [1] - 82:13
**starts** [1] - 130:23
**state** [44] - 8:24, 13:14, 15:6, 15:8, 18:6, 19:4, 20:13, 23:23, 29:5, 33:8, 48:4, 50:21, 51:4, 54:13, 55:25, 56:19, 56:24, 62:21, 63:24, 66:5, 66:25, 80:19, 96:1, 96:12, 96:15, 96:16, 96:19, 115:10, 115:23, 117:21, 127:18, 129:4, 132:24, 134:22, 160:22, 182:10, 184:22, 193:18, 211:11, 218:15, 220:2,

220:13, 236:11
**State** [31] - 13:20, 14:2, 14:17, 17:18, 19:3, 21:18, 22:5, 22:13, 26:2, 28:6, 31:21, 31:25, 32:3, 32:12, 44:17, 54:2, 55:9, 74:7, 74:19, 74:23, 77:24, 94:11, 128:10, 130:15, 142:13, 144:11, 146:11, 155:14, 155:17, 160:3, 160:23
**State's** [2] - 23:3, 156:19
**state-funded** [1] - 236:11
**statement** [36] - 22:24, 23:21, 49:9, 49:11, 49:14, 49:19, 61:5, 61:18, 61:24, 64:20, 65:5, 66:13, 66:14, 67:5, 67:18, 72:1, 74:18, 74:21, 75:11, 77:4, 79:6, 82:8, 82:9, 82:17, 83:17, 83:20, 85:9, 85:14, 93:3, 93:4, 100:13, 100:14, 122:1, 137:13
**statements** [8] - 35:4, 35:5, 54:17, 54:21, 54:25, 55:4, 72:4, 82:10
**states** [15] - 11:24, 32:7, 32:13, 32:18, 38:1, 81:18, 96:13, 96:18, 133:3, 137:15, 146:9, 163:15, 184:25, 195:1, 220:12
**STATES** [2] - 1:1, 1:17
**States** [2] - 7:2, 58:21
**statewide** [2] - 95:9, 222:1
**station** [2] - 187:4, 201:1
**stationed** [1] - 31:8
**statistics** [3] - 196:17, 222:12, 229:6
**Statistics** [2] - 35:11, 166:10
**Statistics"** [1] - 140:1
**Status** [1] - 7:2
**STATUS** [1] - 1:17
**statute** [2] - 126:15, 143:1
**steak** [1] - 208:18
**stenography** [1] - 6:19

**step** [2] - 18:3, 221:3
**STEVEN** [1] - 4:17
**still** [20] - 10:14, 11:4, 116:24, 117:1, 132:1, 133:15, 141:16, 177:2, 191:14, 191:17, 199:12, 200:16, 205:20, 206:9, 206:10, 206:11, 208:9, 214:8, 215:7
**stimulant** [1] - 193:16
**stipulation** [2] - 169:13, 169:23
**stock** [1] - 218:19
**stolen** [3] - 86:7, 87:16, 87:20
**stood** [1] - 72:10
**stop** [6] - 62:12, 103:23, 118:21, 118:23, 119:18, 237:4
**stopped** [1] - 234:24
**stopping** [1] - 62:9
**straight** [1] - 45:19
**strains** [1] - 53:4
**strategies** [1] - 98:10
**street** [6] - 84:3, 107:8, 107:18, 107:23, 108:3, 156:22
**Street** [16] - 2:4, 2:8, 2:11, 2:14, 3:5, 3:8, 3:10, 3:13, 4:7, 4:14, 4:16, 4:19, 5:5, 5:12, 6:6, 6:13
**strength** [1] - 130:5
**Stress** [1] - 200:13
**strike** [4] - 9:13, 111:24, 115:14, 124:4
**strong** [2] - 191:13, 191:17
**strongly** [1] - 202:14
**structure** [2] - 53:5, 53:9
**struggling** [3] - 162:20, 162:24, 199:3
**studied** [3] - 25:24, 66:17, 126:2
**studies** [4] - 66:14, 66:19, 67:2, 158:11
**study** [2] - 61:21, 63:23
**subject** [5] - 9:17, 145:6, 148:4, 148:6, 181:5
**submit** [1] - 7:20
**submitted** [1] - 182:2

**subsections** [1] - 19:19
**subsequent** [1] - 56:23
**substance** [21] - 15:20, 16:10, 25:12, 86:4, 86:13, 86:15, 86:21, 86:24, 87:6, 105:18, 128:11, 130:6, 134:21, 136:14, 138:12, 193:12, 205:2, 224:6, 224:9, 224:16, 229:17
**Substance** [13] - 15:21, 16:13, 17:17, 18:1, 18:9, 18:15, 23:4, 23:16, 105:3, 129:8, 137:11, 137:21, 139:7
**substances** [23] - 17:1, 18:6, 18:12, 20:11, 22:15, 22:21, 25:14, 30:15, 98:8, 103:24, 105:15, 116:2, 116:8, 116:13, 126:21, 127:11, 127:16, 127:18, 127:21, 128:7, 129:13, 140:6, 147:6
**Substances** [15] - 17:11, 18:4, 19:13, 21:14, 124:17, 125:23, 127:9, 133:4, 133:12, 134:18, 134:20, 137:8, 139:15, 139:24, 140:19
**success** [1] - 203:11
**suddenly** [1] - 200:5
**suffer** [3] - 37:14, 77:20, 78:9
**suffering** [3] - 52:12, 64:22, 87:6
**sufficient** [2] - 67:13, 70:15
**suggest** [4] - 71:3, 71:13, 89:16, 134:12
**suggesting** [3] - 67:16, 80:14, 103:18
**suggestions** [1] - 202:19
**suggests** [1] - 138:6
**suicidal** [1] - 198:18
**suicide** [1] - 201:9
**Suicide** [1] - 201:16
**Suite** [8] - 2:7, 2:10, 2:13, 2:16, 3:18, 4:6, 6:6, 6:12

sulfate [4] - 220:3, 220:5, 220:14, 220:17
summaries [10] - 169:15, 169:19, 170:7, 171:7, 171:19, 171:21, 171:24, 175:2, 176:4, 176:9
summarized [1] - 170:23
summary [2] - 121:20, 176:22
Summary [3] - 11:6, 126:14, 150:21
summer [2] - 231:25, 235:11
Summit [3] - 41:1, 41:2, 45:21
superficial [1] - 16:3
supervisor [1] - 200:2
supplemental [1] - 9:9
supplied [3] - 152:22, 158:6, 227:8
supply [6] - 29:12, 29:17, 31:4, 101:7, 101:16, 110:23
support [4] - 61:7, 66:7, 171:11, 180:22
supported [5] - 15:21, 16:13, 16:21, 22:18, 29:25
supporting [1] - 16:19
supports [2] - 12:1, 64:25
surgery [1] - 71:21
surmised [1] - 111:13
surprised [2] - 102:4, 181:10
surrendered [2] - 152:23, 153:13
surrendering [1] - 152:20
Surveillance [1] - 35:10
suspected [28] - 186:8, 188:13, 188:22, 189:4, 189:9, 190:11, 190:12, 190:13, 190:19, 190:23, 192:13, 192:24, 194:9, 194:14, 195:7, 195:20, 198:13, 224:2, 224:5, 224:14, 224:21, 229:22, 230:9, 230:11, 230:17, 230:20, 234:8, 234:25

Suspected [1] - 228:22
suspecting [1] - 190:21
sustain [2] - 161:25, 203:1
sustainable [2] - 213:10, 213:13
sustained [5] - 157:2, 161:8, 162:13, 163:2, 165:1
SUZANNE [1] - 4:15
switch [4] - 62:10, 142:7, 150:19, 236:23
SWORN [1] - 182:14
symptoms [1] - 72:23
Syndrome [1] - 102:17
syndrome [3] - 72:19, 219:17, 219:24
synthesized [1] - 167:18
synthetic [5] - 101:6, 101:16, 101:23, 110:2, 110:14
syringes [1] - 98:12
system [31] - 75:15, 106:20, 107:9, 107:13, 108:22, 113:21, 114:16, 114:17, 114:25, 115:1, 115:6, 116:22, 117:4, 117:14, 117:19, 117:25, 118:5, 118:6, 125:8, 127:1, 129:23, 137:1, 141:5, 141:9, 141:16, 144:22, 194:7, 210:23, 211:7
System [1] - 35:10

T

T-ball [1] - 212:20
table [6] - 112:23, 113:25, 116:20, 140:16, 173:7, 174:12
Table [5] - 114:9, 114:15, 114:21, 116:11
talks [1] - 113:23
tally [2] - 223:9, 223:13
target [1] - 134:10
taught [2] - 190:17, 217:16
teach [1] - 42:3
Team [9] - 183:5,

192:16, 200:13, 203:8, 204:7, 204:8, 204:17, 206:1, 231:14
team [22] - 200:16, 204:22, 204:23, 205:9, 205:11, 206:4, 207:17, 211:10, 212:11, 213:25, 214:3, 214:7, 216:15, 232:21, 233:16, 233:18, 234:11, 234:19, 235:17, 235:20, 236:10, 236:17
team's [1] - 235:22
teaming [1] - 151:4
tears [2] - 200:3, 200:4
tech [1] - 123:17
technical [4] - 118:11, 190:16, 233:1, 233:2
technically [2] - 134:6, 134:8
Technically [1] - 104:9
technology [1] - 124:11
teeny [2] - 199:20, 207:23
TEMITOPE [1] - 4:8
temperature [1] - 217:23
ten [4] - 62:14, 133:25, 136:13
tend [2] - 48:7, 58:1
tended [1] - 48:4
tender [1] - 10:2
tends [2] - 51:14, 53:9
Tens [1] - 180:9
tent [1] - 214:13
Tenth [1] - 5:12
tenure [2] - 79:9, 97:13
term [23] - 48:10, 64:13, 64:19, 64:24, 64:25, 65:9, 65:15, 66:4, 66:8, 66:20, 67:3, 67:7, 67:10, 67:12, 67:17, 70:1, 76:7, 80:19, 95:4, 190:11, 190:13, 196:22, 217:21
terms [3] - 67:15, 92:24, 181:1
terrific [1] - 19:22
test [5] - 105:18, 172:13, 172:14, 174:8, 178:2
testified [15] - 11:11, 11:16, 33:15, 49:23,

117:8, 117:24, 135:11, 141:18, 142:8, 158:12, 165:8, 166:18, 223:17, 232:2, 234:12
testifies [1] - 173:2
testify [5] - 7:11, 18:25, 130:14, 158:8, 173:14
testifying [1] - 34:25, 39:7, 175:5
testimony [20] - 33:20, 41:11, 41:13, 43:4, 49:16, 49:23, 50:3, 50:5, 53:1, 53:2, 58:25, 59:9, 165:22, 165:25, 169:15, 175:22, 181:5, 226:11, 230:8, 233:5
testing [2] - 214:15, 214:16
tests [1] - 172:6
THE [196] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:13, 7:23, 8:5, 8:11, 8:14, 8:21, 9:24, 10:9, 10:13, 10:18, 15:15, 19:18, 24:5, 24:10, 24:13, 24:15, 33:7, 33:9, 33:10, 33:11, 33:21, 34:3, 34:11, 40:13, 43:17, 43:25, 44:2, 44:6, 44:8, 44:13, 44:19, 44:23, 45:4, 45:10, 45:12, 45:16, 45:18, 46:1, 48:21, 49:1, 49:16, 49:18, 49:22, 55:18, 60:9, 60:14, 62:9, 62:14, 75:4, 75:6, 112:1, 115:17, 115:20, 115:22, 118:13, 118:15, 118:19, 118:24, 119:2, 119:21, 119:24, 120:7, 120:12, 120:15, 120:18, 123:8, 123:10, 123:19, 123:22, 124:6, 124:11, 125:17, 126:8, 126:10, 132:6, 139:19, 144:7, 144:9, 144:17, 144:21, 146:7, 146:8, 146:14, 146:15, 146:18, 148:20, 151:3, 151:8,

151:24, 152:12, 152:17, 153:1, 153:6, 153:9, 153:14, 153:17, 153:23, 154:1, 154:3, 154:13, 154:18, 155:22, 156:3, 156:5, 156:8, 157:2, 157:7, 157:13, 158:14, 158:18, 158:22, 159:9, 159:13, 159:15, 161:8, 161:25, 162:4, 162:13, 162:18, 162:22, 163:4, 163:10, 165:1, 166:6, 166:9, 166:18, 166:22, 167:2, 168:6, 168:8, 168:10, 168:14, 168:15, 168:16, 168:19, 169:1, 169:4, 170:12, 173:1, 175:7, 175:20, 176:17, 177:13, 178:5, 178:12, 178:19, 179:11, 179:15, 179:23, 180:1, 180:5, 180:8, 180:15, 180:19, 181:7, 181:9, 181:12, 181:17, 181:19, 181:23, 182:1, 182:6, 182:10, 182:11, 182:12, 182:15, 182:16, 189:19, 194:22, 195:15, 195:17, 196:10, 197:10, 197:12, 197:15, 198:6, 198:8, 198:24, 201:4, 202:22, 203:1, 209:24, 209:25, 213:21, 214:22, 219:12, 231:21, 237:2, 237:6, 237:10, 237:12
theirs [1] - 105:15
themselves [1] - 191:8
theoretically [1] - 116:6
theory [2] - 158:12, 159:1
therapy [5] - 70:20, 73:5, 73:8, 73:11, 76:21

**thereafter** [2] - 25:12, 217:19
**therefore** [1] - 67:14
**They've** [1] - 179:20
**they've** [5] - 64:17, 86:15, 86:24, 180:3, 193:15
**thinking** [2] - 93:9, 164:4
**third** [7] - 12:18, 12:19, 64:10, 67:24, 72:16, 107:12, 128:1
**thirty** [1] - 88:24
**thirty-day** [1] - 88:24
**Thomas** [1] - 2:13
**thoroughly** [1] - 25:24
**thoughtful** [1] - 94:16
**thoughts** [1] - 198:18
**thousand** [1] - 166:12
**Thousands** [1] - 135:14
**thousands** [2] - 135:20, 135:25
**threat** [1] - 148:15
**Three** [1] - 6:5
**three** [31] - 6:13, 7:16, 29:7, 30:2, 30:19, 30:23, 30:24, 37:11, 59:24, 66:21, 71:17, 71:24, 90:14, 101:13, 101:19, 101:21, 102:3, 108:16, 117:1, 117:15, 118:8, 118:22, 119:1, 172:9, 204:3, 207:6, 211:25, 213:1, 232:23, 234:6
**three-day** [1] - 30:19
**three-year** [2] - 204:3, 213:1
**threshold** [4] - 46:11, 172:19, 174:8, 178:10
**thresholds** [2] - 178:1, 178:3
**thrilled** [1] - 207:16
**throughout** [4] - 152:24, 220:2, 220:13, 233:19
**tight** [1] - 174:14
**tighten** [1] - 94:13
**timing** [2] - 120:1, 120:4
**TIMOTHY** [1] - 5:9
**Timothy** [3] - 9:19, 27:11, 46:9
**tiny** [1] - 207:20
**title** [4] - 183:1, 183:2, 185:16, 185:20

**titles** [1] - 183:3
**today** [19] - 7:7, 7:10, 7:12, 7:16, 39:9, 39:15, 53:1, 57:21, 64:4, 137:3, 150:25, 160:6, 162:25, 173:5, 215:7, 218:12, 226:11, 228:9, 230:8
**today's** [1] - 175:4
**together** [12] - 32:4, 43:15, 62:24, 65:25, 67:5, 67:8, 73:4, 89:3, 194:25, 201:6, 202:6, 202:15
**Tomblin** [2] - 15:24, 22:16
**tomorrow** [7] - 7:15, 7:16, 7:17, 206:19, 237:3, 237:9, 237:13
**took** [2] - 107:21, 125:24
**tool** [4] - 95:7, 124:23, 159:18, 208:5
**tools** [9] - 70:25, 92:5, 92:13, 92:17, 92:24, 93:13, 94:24, 136:6, 174:9
**tooth** [3] - 88:3, 88:19, 89:14
**top** [11] - 63:8, 64:9, 86:3, 106:9, 108:13, 116:11, 127:23, 133:20, 133:25, 143:13, 149:7
**topic** [2] - 140:10, 223:16
**topics** [1] - 236:23
**tort** [1] - 41:9
**Total** [2] - 113:5, 204:6
**total** [7] - 33:1, 47:17, 47:18, 47:19, 85:14, 101:13, 160:21
**totally** [1] - 75:8
**totals** [1] - 197:23
**touch** [1] - 189:25
**touching** [1] - 213:16
**tough** [1] - 187:1
**tough-book** [1] - 187:1
**toward** [4] - 67:22, 85:1, 132:14, 133:2
**Tower** [2] - 3:5, 4:18
**toxicology** [1] - 194:1, 224:11
**Track** [1] - 169:21
**track** [9] - 127:10, 156:8, 188:12, 188:19, 188:22, 189:2, 195:22,

196:3, 210:6
**tracked** [1] - 223:5
**tracking** [6] - 189:7, 189:9, 195:20, 196:3, 209:3, 209:20
**tracks** [3] - 222:24, 223:3, 230:5
**traditionally** [1] - 34:22, 50:13
**trafficked** [1] - 104:25
**trafficker** [1] - 107:6
**tragedy** [1] - 84:24
**training** [8] - 17:8, 32:14, 57:13, 57:17, 57:19, 57:25, 184:16, 214:15
**tramadol** [1] - 117:14
**tranquilize** [1] - 102:2
**tranquilizer** [1] - 101:9
**tranquilizers** [1] - 102:13
**transcript** [3] - 6:20, 9:2, 238:4
**transcripts** [1] - 7:21
**transition** [4] - 96:6, 109:20, 111:12, 156:22
**transitioning** [1] - 29:20
**transport** [2] - 196:19
**Transportation** [1] - 211:17
**transportation** [1] - 211:25
**transported** [1] - 196:23
**transports** [1] - 196:22
**trapped** [1] - 199:22
**trauma** [1] - 184:20
**travel** [1] - 40:22
**traveled** [2] - 41:4, 41:11
**traveling** [1] - 41:15
**travels** [1] - 41:6
**treat** [5] - 25:14, 76:3, 89:20, 94:6, 217:16
**treating** [4] - 65:9, 71:14, 75:21, 226:19
**treatment** [39] - 11:25, 54:21, 66:8, 67:10, 68:8, 70:1, 70:11, 71:4, 71:8, 72:3, 76:7, 76:10, 78:6, 78:13, 78:14, 78:17, 78:19, 78:20, 78:24, 79:18, 80:2, 80:15, 98:18, 204:25, 206:20, 208:9, 210:5, 211:1, 211:4,

211:8, 211:18, 211:19, 214:3, 221:17, 231:12, 231:14, 232:8, 232:11, 234:21
**Treatment** [2] - 76:18, 219:4
**treats** [1] - 88:20
**tremendous** [1] - 96:4
**tremendously** [1] - 100:7
**trend** [6] - 35:19, 100:16, 100:18, 104:14, 117:21, 210:8
**trending** [7] - 164:20, 209:7, 209:8, 209:10, 209:13, 210:1, 210:19
**trends** [3] - 109:19, 161:4, 162:10
**Trends** [1] - 99:15
**Trial** [1] - 237:14
**TRIAL** [1] - 1:16
**trial** [4] - 9:8, 152:11, 163:11, 170:6
**trials** [2] - 65:3, 65:19
**tried** [4] - 94:14, 108:20, 171:13, 226:23
**trigger** [1] - 110:11
**triple** [1] - 151:6
**tripled** [2] - 140:22, 210:19
**trouble** [3] - 61:19, 121:19, 171:2
**true** [14] - 13:18, 13:19, 59:5, 61:12, 69:5, 82:8, 82:9, 82:17, 83:17, 83:20, 85:9, 124:13, 130:25, 185:19
**truly** [1] - 207:23
**try** [4] - 51:11, 112:1, 206:1, 224:20
**trying** [25] - 17:20, 25:9, 53:8, 68:21, 71:7, 73:25, 75:1, 81:20, 83:2, 86:23, 93:25, 94:5, 115:4, 115:22, 130:21, 134:21, 146:13, 157:1, 157:4, 157:5, 157:7, 174:21, 201:12, 201:16, 206:24
**tsunami** [1] - 35:24
**tuft** [1] - 199:20
**turn** [21] - 11:5, 19:9, 27:5, 32:15, 35:6,

37:17, 41:21, 42:12, 64:6, 64:7, 84:25, 112:8, 121:17, 137:25, 197:19, 207:14, 219:15, 220:8, 220:20, 221:3, 228:19
**turn-around** [1] - 228:19
**turning** [2] - 38:3, 99:3
**TV** [1] - 191:23
**Twelfth** [3] - 4:14, 4:16, 5:5
**two** [47] - 7:6, 7:20, 35:20, 37:5, 37:8, 39:20, 58:25, 65:5, 65:18, 65:25, 66:2, 66:14, 82:2, 82:20, 86:11, 88:21, 102:25, 103:8, 104:20, 118:22, 124:17, 132:4, 139:16, 139:22, 141:2, 154:11, 164:2, 169:14, 171:5, 171:7, 172:21, 174:2, 174:7, 176:6, 176:13, 181:7, 191:20, 192:3, 193:7, 198:2, 200:10, 203:19, 204:4, 207:6, 209:12, 221:3
**Two** [1] - 169:21
**two-year** [1] - 141:2
**type** [21] - 61:10, 126:1, 146:12, 160:24, 162:16, 186:10, 188:6, 189:7, 189:9, 190:10, 193:3, 193:12, 193:22, 211:4, 211:11, 223:5, 223:23, 224:2, 224:9, 225:3, 229:17
**types** [4] - 42:9, 52:22, 65:18, 116:15
**typical** [4] - 212:4, 212:10, 212:16, 212:21
**typically** [6] - 59:24, 84:14, 84:15, 89:13, 110:7, 144:8

## U

**U.S** [1] - 84:16
**ultimate** [3] - 117:2,

153:17, 153:19
**ultimately** [7] - 27:25, 68:7, 69:1, 77:6, 89:5, 94:15, 115:24
**unclear** [2] - 7:23, 39:3
**unconscious** [1] - 192:6
**under** [24] - 7:19, 10:14, 49:23, 50:2, 52:18, 60:19, 72:17, 76:18, 81:19, 85:1, 86:14, 94:17, 99:15, 103:5, 121:20, 129:8, 144:25, 157:16, 157:19, 158:7, 175:2, 180:12, 232:2, 233:5
**undergo** [1] - 103:25
**understood** [6] - 16:7, 16:17, 134:24, 135:1, 182:4
**unfair** [1] - 16:18
**UNIDENTIFIED** [1] - 15:14
**unique** [1] - 68:13
**unit** [2] - 140:4, 172:4
**UNITED** [2] - 1:1, 1:17
**United** [2] - 7:2, 58:21
**units** [2] - 172:7, 172:24
**universe** [1] - 175:5
**University** [6] - 124:2, 138:7, 183:13, 183:17, 183:18, 202:4
**unless** [4] - 16:9, 33:24, 47:6, 47:14
**unnecessarily** [1] - 86:20
**unnecessary** [1] - 174:20
**unprecedented** [2] - 83:8, 83:18
**unresponsive** [2] - 192:7, 193:3
**unusual** [2] - 12:20, 132:23
**up** [87] - 11:3, 33:14, 33:23, 34:2, 34:9, 34:14, 40:24, 40:25, 42:14, 46:4, 48:11, 52:10, 52:15, 62:3, 67:5, 81:5, 87:5, 87:20, 91:14, 91:17, 91:19, 91:24, 94:13, 98:9, 102:14, 105:24, 108:20, 114:5, 116:21, 119:20, 133:17,

136:13, 142:7, 149:1, 154:15, 155:23, 156:11, 160:10, 160:12, 160:16, 161:12, 164:8, 164:12, 166:16, 171:1, 171:15, 171:18, 172:19, 172:25, 173:6, 173:7, 176:5, 177:24, 178:6, 184:7, 184:11, 186:9, 192:20, 198:22, 199:7, 199:17, 199:24, 199:25, 205:6, 205:16, 206:8, 206:12, 206:13, 206:22, 207:25, 210:1, 211:14, 213:14, 214:2, 214:4, 214:6, 214:7, 214:13, 230:2, 231:17, 234:3, 235:14, 235:17, 235:23
**update** [1] - 178:24
**ups** [1] - 176:14
**upset** [1] - 156:5
**upward** [1] - 210:8
**usage** [4] - 132:23, 136:25, 138:11, 141:5
**user** [3] - 84:23, 141:5, 141:21
**users** [4] - 84:20, 98:5, 140:14, 140:19
**usual** [1] - 155:13
**uterine** [1] - 105:18
**utero** [3] - 72:24, 102:23, 103:14
**utilization** [1] - 137:17
**utilize** [2] - 21:16, 128:13, 138:13, 204:13
**utilized** [1] - 137:11
**utilizing** [2] - 70:19, 203:15

**V**

**valid** [2] - 25:16, 226:18, 227:13
**validating** [1] - 155:10
**validity** [1] - 62:1
**valuable** [1] - 195:23
**valve** [1] - 191:22
**variations** [1] - 30:6
**various** [2] - 52:22, 186:1

**varying** [1] - 174:5
**vast** [1] - 225:10
**vehicle** [2] - 199:9, 236:1
**ventilations** [1] - 191:24
**Ventura** [1] - 3:18
**verifying** [1] - 195:8
**version** [2] - 122:25, 229:25
**versus** [2] - 212:8, 224:15
**via** [3] - 87:8, 128:2, 129:1
**Vice** [1] - 144:3
**victim** [1] - 228:10
**video** [1] - 8:9
**view** [8] - 62:20, 63:23, 64:5, 77:18, 77:25, 78:8, 145:19, 236:20
**viewed** [2] - 28:24, 147:7
**views** [1] - 62:6
**violating** [6] - 92:6, 93:18, 93:21, 95:25, 96:24, 142:21
**Viral** [1] - 119:11
**Virginia** [150] - 4:19, 7:3, 10:25, 13:21, 22:22, 26:7, 28:1, 28:6, 31:20, 32:5, 32:12, 33:16, 34:18, 35:8, 35:9, 35:12, 35:19, 35:22, 36:3, 36:9, 36:13, 36:17, 36:22, 36:25, 37:3, 37:6, 37:9, 37:18, 37:24, 41:14, 42:6, 44:16, 46:13, 47:24, 50:7, 51:1, 51:23, 51:24, 52:5, 53:19, 53:20, 54:1, 54:2, 54:5, 54:7, 54:12, 54:18, 54:24, 55:3, 55:9, 55:22, 56:12, 56:17, 57:6, 57:13, 57:21, 58:9, 74:7, 74:19, 74:24, 76:1, 77:24, 80:14, 80:18, 89:10, 93:10, 94:1, 94:11, 96:14, 96:17, 96:22, 97:16, 99:15, 99:17, 100:6, 104:10, 110:19, 111:4, 111:11, 112:6, 113:2, 114:1, 114:19, 122:5, 123:6, 124:1,

125:22, 126:3, 126:15, 127:9, 128:10, 129:1, 129:11, 129:20, 130:12, 130:18, 130:23, 133:4, 133:24, 134:1, 135:20, 137:1, 137:4, 137:20, 138:13, 138:17, 139:1, 139:6, 142:13, 142:22, 146:8, 146:11, 146:25, 148:4, 149:2, 149:21, 150:2, 151:19, 152:21, 154:21, 155:6, 155:7, 155:15, 155:17, 163:15, 164:14, 164:21, 166:1, 166:3, 166:11, 166:13, 183:10, 184:17, 184:21, 184:23, 186:4, 187:13, 218:15, 218:19, 218:22, 219:1, 222:17, 229:2
**VIRGINIA** [2] - 1:1, 1:18
**Virginia's** [3] - 125:8, 129:8, 231:5
**Virginian** [1] - 90:23
**Virginians** [4] - 34:21, 37:21, 50:13, 104:12
**visit** [2] - 204:10, 205:9
**visiting** [3] - 134:4, 135:15, 205:22
**visits** [4] - 207:18, 209:6, 234:12, 235:12
**vital** [3] - 186:14, 217:17, 217:20
**volume** [18] - 21:11, 30:16, 47:17, 47:18, 47:19, 80:4, 85:14, 87:4, 91:22, 93:1, 96:1, 96:4, 124:25, 136:21, 153:20, 171:20, 172:21, 172:22
**VOLUME** [1] - 1:16
**voluntarily** [1] - 23:22
**voluntary** [5] - 22:12, 62:25, 68:22, 137:17, 141:18
**voted** [1] - 145:14
**vs** [1] - 238:6

**W**

**Wait** [1] - 219:18
**wait** [2] - 123:17, 205:19
**waited** [1] - 209:12
**waiting** [1] - 213:16
**waived** [1] - 49:15
**WAKEFIELD** [1] - 5:14
**walked** [1] - 199:17
**wants** [1] - 10:7
**warning** [1] - 201:9
**warrant** [1] - 135:6
**warranted** [1] - 88:23
**Washington** [6] - 2:11, 4:7, 4:14, 4:16, 5:6, 5:13
**watch** [1] - 7:1
**watching** [1] - 8:10
**wavelength** [1] - 51:12
**ways** [12] - 14:19, 15:2, 102:25, 103:7, 103:8, 117:10, 133:10, 135:7, 172:9, 186:1, 203:6, 213:25
**WEBB** [1] - 3:12
**Webb** [5] - 3:12, 145:23, 147:1, 147:4, 151:14
**week** [4] - 8:4, 206:8, 207:6, 211:25
**weekends** [1] - 206:6
**weeks** [11] - 65:4, 65:10, 65:11, 65:19, 66:9, 169:13, 169:14, 171:7, 174:7, 176:13, 213:5
**Weeks** [1] - 152:24
**weigh** [1] - 73:7
**weight** [4] - 61:17, 172:5, 172:7, 172:24
**weighted** [1] - 66:13
**welcome** [1] - 24:20
**WEST** [2] - 1:1, 1:18
**West** [157] - 7:3, 10:25, 13:21, 22:22, 26:7, 28:1, 28:6, 31:20, 32:5, 32:12, 32:21, 33:1, 33:16, 34:18, 34:21, 35:8, 35:9, 35:12, 35:19, 35:22, 36:3, 36:9, 36:13, 36:16, 36:22, 36:25, 37:3, 37:6, 37:9, 37:18, 37:21, 37:24, 41:14, 42:6, 44:16, 46:13, 47:23, 47:24, 50:7, 50:13,

51:1, 51:22, 51:24, 52:5, 53:19, 54:1, 54:2, 54:5, 54:6, 54:12, 54:18, 54:24, 55:3, 55:9, 55:22, 56:11, 56:17, 57:6, 57:12, 57:21, 58:9, 74:7, 74:19, 74:24, 76:1, 77:24, 80:14, 80:17, 89:9, 90:23, 93:10, 94:1, 94:11, 96:14, 96:17, 96:22, 97:16, 99:15, 99:17, 100:6, 104:9, 104:12, 110:19, 111:4, 111:10, 112:5, 113:2, 114:1, 114:19, 122:5, 123:6, 124:1, 125:7, 125:22, 126:2, 126:15, 127:9, 128:10, 129:1, 129:8, 129:10, 129:20, 130:11, 130:18, 130:23, 133:4, 133:24, 134:1, 135:20, 136:25, 137:4, 137:20, 138:13, 138:17, 139:1, 139:6, 142:13, 142:22, 146:8, 146:11, 146:25, 148:4, 149:2, 149:21, 150:2, 151:19, 152:21, 154:21, 155:6, 155:7, 155:14, 155:15, 155:17, 163:15, 164:14, 164:21, 165:25, 166:3, 166:11, 166:13, 183:10, 184:17, 184:20, 184:23, 186:4, 187:13, 218:15, 218:19, 218:22, 219:1, 222:17, 229:2, 231:5
**whatsoever** [1] - 179:20
**White** [1] - 97:15
**white** [2] - 53:8, 61:15
**whole** [9] - 19:4, 52:6, 60:24, 77:14, 91:14, 107:18, 146:16, 193:19, 231:5
**WICHT** [1] - 4:13
**Williams** [2] - 4:13, 5:5

**willing** [2] - 211:5, 211:8
**willy** [1] - 88:15
**willy-nilly** [1] - 88:15
**wise** [1] - 212:5
**wish** [1] - 168:12
**withdraw** [2] - 181:13, 181:17
**withdrawal** [5] - 72:19, 72:23, 103:21, 103:25, 104:2
**witness** [19] - 24:6, 48:17, 48:22, 49:13, 49:14, 111:25, 146:4, 158:5, 161:6, 163:1, 168:18, 174:24, 175:5, 180:12, 182:6, 194:21, 196:9, 197:14, 214:21
**WITNESS** [24] - 19:18, 24:15, 33:9, 33:11, 49:18, 115:22, 118:15, 119:24, 123:19, 123:22, 144:9, 144:21, 146:8, 146:15, 166:9, 168:14, 168:16, 182:11, 182:14, 182:16, 198:24, 202:22, 209:25, 237:10
**witness's** [1] - 152:15
**witnesses** [1] - 34:6
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:10
**woman** [10] - 73:9, 73:17, 103:4, 103:10, 103:14, 103:19, 104:16, 104:18, 160:23
**woman's** [1] - 103:2
**women** [6] - 72:13, 105:11, 105:12, 105:15, 105:17, 106:3
**wonderful** [1] - 203:14
**word** [2] - 90:5, 182:2
**Word** [1] - 195:1
**words** [5] - 50:6, 51:8, 78:11, 79:25, 156:20
**works** [2] - 206:5, 213:13
**worried** [1] - 174:6
**worries** [1] - 232:16
**worth** [1] - 88:3
**wrap** [1] - 142:7
**wreckage** [2] - 199:19, 199:21

**write** [6] - 47:2, 47:7, 89:10, 89:15, 90:14, 95:15
**writes** [3] - 88:24, 89:25, 90:1
**writing** [13] - 23:20, 46:25, 57:22, 88:8, 88:13, 89:1, 90:20, 91:1, 91:3, 92:15, 93:14, 138:12, 144:18
**written** [8] - 46:16, 47:10, 47:15, 56:12, 85:21, 91:13, 91:15, 137:19
**wrongdoings** [1] - 144:24
**wrote** [2] - 61:4, 91:12
**WU** [23] - 5:10, 195:16, 197:11, 198:7, 202:21, 202:23, 214:24, 219:10, 219:14, 229:2, 229:4, 230:1, 230:3, 231:17, 231:23, 232:4, 232:6, 232:14, 232:17, 232:18, 234:2, 234:4, 237:5
**Wu** [2] - 214:25, 237:2
**WV** [7] - 2:5, 2:8, 3:11, 3:13, 4:19, 5:15, 6:9

## X

**Xponent** [4] - 161:16, 161:22, 162:6, 162:16

## Y

**year** [19] - 15:6, 36:15, 40:16, 111:6, 125:10, 126:1, 141:2, 157:12, 160:23, 183:23, 185:10, 197:22, 197:24, 204:3, 204:6, 205:21, 208:11, 212:25, 213:1
**years** [31] - 35:3, 36:19, 36:20, 57:5, 58:5, 89:9, 95:1, 97:8, 97:10, 97:12, 112:6, 114:5, 114:10, 117:17, 139:16, 139:22, 140:5, 142:10, 164:8, 184:6, 185:5, 185:20, 186:18,

198:2, 200:2, 200:4, 212:6, 218:9, 228:15, 228:22, 232:23
**yesterday** [21] - 10:25, 11:9, 11:14, 11:18, 28:20, 31:18, 59:9, 72:11, 72:22, 81:14, 97:20, 98:10, 99:14, 101:3, 108:15, 109:5, 112:10, 112:24, 156:25, 157:15, 157:17
**Yesterday** [2] - 178:20, 180:2
**yield** [1] - 154:16
**York** [1] - 3:6
**young** [2] - 51:18, 199:11
**younger** [1] - 165:19
**yourself** [5] - 19:14, 182:20, 195:4, 195:22, 215:16

## Z

**zero** [3] - 90:23, 91:10, 96:22