# Exhibit 34

Case: 3:17-cv-01362 Document 1329-3 Filed 05/08/21 Page 2 of 47 PageID #: 50500
Case: 1:17-md-02804-DAP Doc #: 3303-3 SEALED Filed: 09/28/20 1 of 46. PageID #:
494684                                                                        1

```
 1                     UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
 2                          EASTERN DIVISION

 3    ------------------------------------X
      IN RE: NATIONAL PRESCRIPTION      : Case No. 1:17-md-2804
 4    OPIATE LITIGATION                 : Cleveland, Ohio
                                        :
 5                                      :
      THIS DOCUMENT RELATES TO:         : Thursday, May 28, 2020
 6                                      : 1:03 p.m.
      County of Summit, Ohio, et al.    :
 7    v. Purdue Pharma L.P., et al.,    :
      Case No. 18-op-45090              :
 8                                      :
                                        :
 9    The County of Cuyahoga, Ohio, et  :
      al. v. Purdue Pharma L.P., et al., :
10    Case No. 17-op-45004              :
                                        :
11                                      :
      Track 1B Cases                    :
12                                      :
      ------------------------------------X
13

14                         ** SEALED **

15        TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
           BEFORE THE HONORABLE DAN AARON POLSTER
16             UNITED STATES DISTRICT JUDGE
                       - AND -
17         BEFORE THE HONORABLE DAVID A. RUIZ
             UNITED STATES MAGISTRATE JUDGE
18

19    SPECIAL MASTER:            DAVID R. COHEN

20
      Court Reporter:            Donnalee Cotone, RMR, CRR, CRC
21                               United States District Court
                                 801 West Superior Avenue
22                               Court Reporters 7-189
                                 Cleveland, Ohio 44113
23                               donnalee_cotone@ohnd.uscourts.gov

24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer-aided transcription.
```

Case 3:17-cv-01362 Document 1329-3 Filed 05/08/21 Page 3 of 47 PageID #: 50501
Case 1:17-md-02804-DAP   Doc #: 3303-3   SEALED   Filed: 09/28/20   3 of 46.  PageID #:
494685
2

```
 1        APPEARANCES (ALL PARTICIPANTS APPEARING TELEPHONICALLY):

 2

 3           On behalf of Plaintiffs:

 4                  PETER H. WEINBERGER, ESQ.
                    Spangenberg, Shibley & Liber
 5                  1001 Lakeside Avenue, Suite 1700
                    1900 East Ninth Street
 6                  Cleveland, Ohio 44114
                    216-696-3232
 7                  pweinberger@spanglaw.com

 8

 9                  W. MARK LANIER, ESQ.
                    The Lanier Law Firm
                    6810 FM 1960 West
10                  Houston, Texas 77069
                    813-659-5200
11                  wml@lanierlawfirm.com

12

                    HUNTER J. SHKOLNIK, ESQ.
13                  400 Broadhollow Road, Suite 305
                    Melville, New York 11747
14                  212-397-1000
                    hunter@napolilaw.com
15

16

17

18

19

20

21

22

23

24

25
```

Case 3:17-cv-01362 Document 1329-3 *SEALED* Filed 05/08/21 Page 4 of 47 PageID #: 50502
Case 1:17-md-02804-DAP Doc #: 2830-3 Filed: 09/26/2043 Page 4 of 48. PageID #:
494686
3

```
 1     APPEARANCES (ALL PARTICIPANTS APPEARING TELEPHONICALLY):

 2

 3          On behalf of Plaintiffs:

 4
                    DONALD MIGLIORI, ESQ.
 5                  LINDA SINGER, ESQ.
                    JOSEPH F. RICE, ESQ.
 6                  Motley Rice LLC
                    28 Bridgeside Boulevard
 7                  Mount Pleasant, South Carolina 29465
                    843-216-9140
 8                  dmigliori@motleyrice.com
                    lsinger@motleyrice.com
 9                  jrice@motleyrice.com

10

11                  PAUL T. FARRELL, JR., ESQ.
                    Greene, Ketchum, Farrell, Bailey & Tweel LLP
12                  419 Eleventh Street
                    Huntington, West Virginia 25701
13                  304-525-9115
                    paul@greeneketchum.co
14

15

16

17

18

19

20

21

22

23

24

25
```

    1    APPEARANCES (*ALL PARTICIPANTS APPEARING TELEPHONICALLY*):

    2

    3           On behalf of Defendants Walgreen Co. and Walgreen
                Eastern Co.:
    4
                       **KASPAR J. STOFFELMAYR, ESQ.**
    5                  (*CHAIN PHARMACY LIAISON COUNSEL*)
                              - and -
    6                  **KATHERINE M. SWIFT, ESQ.**
                       Bartlit Beck LLP
    7                  54 West Hubbard Street, Suite 300
                       Chicago, Illinois  60654
    8                  312-494-4400
                       kaspar.stoffelmayr@bartlitbeck.com
    9                  kate.swift@bartlitbeck.com

   10
                On behalf of Defendants CVS Pharmacy, Inc. and Ohio
   11           CVS, L.L.C. ("CVS"):

   12                  **ERIC R. DELINSKY, ESQ.**
                       **SASHA MILLER, ESQ.**
   13                  **GRAEME W. BUSH, ESQ.**
                       Zuckerman Spaeder
   14                  1800 M Street, NW
                       Washington, DC 20036
   15                  202-778-1831
                       edelinsky@zuckerman.com
   16                  smiller@ zuckerman.com
                       gbush@zuckerman.com

   17

   18           On behalf of Defendants HBC Service Company, an
                unincorporated operating division of Giant Eagle,
   19           Inc. ("HBC/Giant Eagle"):

   20                  **ROBERT M. BARNES, ESQ.**
                       **JOSH A. KOBRIN, ESQ.**
   21                  Marcus & Shapira
                       35th Floor
   22                  One Oxford Centre
                       301 Grant Street
   23                  Pittsburgh, PA 15219
                       412-471-3490
   24                  rbarnes@marcus-shapira.com
                       kobrin@marcus-shapira.com
   25

Case 3:17-cv-01362 Document 1329-3 * SEALED * Filed 05/08/21 Page 6 of 47 PageID #: 50504
Case 1:17-md-02804-DAP Doc #: 2301-3 Filed: 08/28/20 6 of 46. PageID #: 494688

5

```
1    APPEARANCES (ALL PARTICIPANTS APPEARING TELEPHONICALLY):

2

3         On behalf of Defendant Discount Drug Mart, Inc.:

4              TIMOTHY D. JOHNSON, ESQ.
               Cavitch Familo & Durkin
5              20th Floor
               1300 East Ninth Street
6              Cleveland, OH 44114
               216-621-7860
7              tjohnson@cavitch.com

8
          On behalf of Defendants Rite Aid of Maryland, Inc.
9         d/b/a Mid-Atlantic Customer Support Center, Rite Aid
          of Ohio,Inc. and Rite Aid Hdqtrs. Corp. ("Rite Aid"):
10

11             KELLY A. MOORE ESQ.
               Morgan, Lewis & Bockius
12             101 Park Avenue
               New York, NY 10178
13             212-309-6612
               kelly.moore@morganlewis.com
14
                - and -
15
               JOHN P. LAVELLE, JR., ESQ.
16             Morgan, Lewis & Bockius LLP
               1701 Market St.
17             Philadelphia, PA 19103-2921
               215-963-5000
18             john.lavelle@morganlewis.com

19              - and -

20             GREGORY T. FOUTS, ESQ.
               Morgan, Lewis & Bockius LLP
21             77 West Wacker Dr.
               Chicago, IL 60601-5094
22             312-324- 1776
               gregory.fouts@morganlewis.com
23

24

25
```

APPEARANCES (*ALL PARTICIPANTS APPEARING TELEPHONICALLY*):

On behalf of Defendant Walmart, Inc.:

**TINA M. TABACCHI, ESQ.**
**TARA A. FUMERTON, ESQ.**
**JOHN M. MAJORAS, ESQ.**
Jones Day
77 West Wacker
Suite 3500
Chicago, Illinois 60601
312-782-3939
ttabacchi@jonesday.com
tfumerton@jonesday.com
jmajoras@jonesday.com

Case 3:17-cv-03362 Document 1329-3 Filed 05/08/21 Page 8 of 47 PageID #: 50506
Case 1:17-md-02804-DAP Doc #: 3303-8 *SEALED* Filed: 09/28/20 7 of 46. PageID #: 494690

7

AFTERNOON SESSION, THURSDAY, MAY 28, 2020

(Proceedings commenced at 1:03 p.m. p.m.)

- - -

JUDICIAL ASSISTANT:  Before Judge Polster
13:03:53 starts, I would like to remind everyone that there is a
court reporter on your line -- on the line.

I would ask that you mute your phones if you're not
speaking.  I would ask that you identify yourself every
single time you speak.

13:04:09 I would also ask that because this is a teleconference
and not an in-person conference, we can lose a little
something in translation.  It's very hard for her to hear,
and she works very hard to get everything correctly.

So please speak a little slow, speak a little loud,
13:04:25 pronounce your words clearly.

Okay.  Judge, you're on.  Go ahead.

THE COURT:  All right.  Good afternoon,
everyone.  This is a status conference in the opioid MDL,
primarily the Track 1B and Track 3.

13:04:45 There's sort of a clicking on the background.  If
everyone could mute their phones when you're not speaking, I
would appreciate it.  I don't know if everyone else is
hearing that.

MR. WEINBERGER:  Yes, Judge.  I think we all
13:05:03 are.

Case 3:17-cv-01362 Document 1329-3 *SEALED* Filed 05/08/21 Page 9 of 47 PageID #: 50507
Case 1:17-md-02804-DAP Doc #: 2830-3 Filed: 09/29/19 Page 9 of 48. PageID #: 494691

8

```
                    1              THE COURT:  There it goes again.

                    2         Okay.  All right.  We've been getting filings back and

                    3    forth.  There's volleys back and forth.  And I'm trying to

                    4    sort them out, and I want to get both of these cases on

         13:05:32   5    track.  One is set for November.  One is going to be May

                    6    of 2021.

                    7         I didn't want to have two trials with pharmacies.  All

                    8    right?  That wasn't my intent.  My intent was to have one.

                    9    It was set for November.  It was to cover everything that

         13:05:54  10    pharmacies do.  Pharmacies primarily dispense drugs.  They

                   11    also distribute to themselves, but distribution is to

                   12    themselves.

                   13         So I've been, you know, struggling for two years to

                   14    understand how you separate a pharmacy's responsibility as a

         13:06:18  15    distributor from its responsibilities as a dispenser.  And

                   16    I'm still struggling with it.  So I wanted one trial, and

                   17    that's why I did what I did, committed the plaintiffs to

                   18    amend their complaints to add dispensing claims.

                   19         The pharmacies filed their mandamus action.  The Sixth

         13:06:42  20    Circuit ruled the way they did, so we now have -- we are

                   21    where we are.

                   22         But I'm curious.  You know, the pharmacies, in your

                   23    filings, you seem to complain that either the plaintiffs are

                   24    doing something wrong or the Court is doing something wrong

         13:06:59  25    in creating Track 3 trial.
```

Case 3:17-cv-01362 Document 1229-3 Filed 05/08/21 Page 10 of 47 PageID #: 50508
Case 1:17-md-02804-DAP Doc #: 3307-3 *SEALED* Filed 05/28/20 Page 9 of 48 PageID #:
494692                                                                              9

            1         But had you given any thought to what would happen if

            2    you prevailed in your mandamus action what I would do?  I'm

            3    just curious.

            4         I mean, had you given any thought as to what I was

13:07:19    5    likely to do?

            6              MR. STOFFELMAYR:  All right.  Judge, it's

            7    Kaspar Stoffelmayr.

            8         Maybe I can address that as current liaison counsel.

            9    I don't want to, you know, overstep my bounds speaking on

13:07:31   10    behalf of anybody.  But I think -- I mean the short answer

           11    is yes.  The longer answer, you know, probably involves work

           12    product and privilege discussions.

           13         But at least to deal to with our --

           14              THE COURT:  I'm not --

13:07:47   15              MR. STOFFELMAYR:  -- with our --

           16              THE COURT:  I'm not looking to pervade work

           17    product, obviously.

           18              MR. STOFFELMAYR:  I understand.  I wouldn't --

           19    I didn't . . .

13:07:53   20         But I think you know what our position is, and I don't

           21    know that it's useful to reargue it on the phone today.

           22         But our position going back many, many months has been

           23    that there is a -- you know, a full slate of bellwether

           24    trials before the federal courts and a lot of cases in front

13:08:15   25    of state courts as well, including multiple cases involving

1    dispensing claims, and that's where we -- you know, that's

2    where we believe it would make most sense to focus --

3                    THE COURT:  Well, I know --

4                    MR. STOFFELMAYR:  -- our efforts, and --

13:08:27  5          THE COURT:  -- I know, Mr. Stoffelmayr, that

6    has been your position, but what have you -- what have --

7    you all must have given some thought to what you thought I

8    would likely do.  I'm the MDL judge.

9          Well, you know, I'm not going to waste time on this.

13:08:46 10   I think if you had all given some -- any thought at all, you

11   would have guessed that I did what I have done.  It's my job

12   as the MDL judge to do most of the -- most of the MDL work.

13   That's how it goes.

14         So I'm the one who is supposed to oversee the

13:09:09 15   discovery, deal with all the motions, get at least one case

16   ready for trial.  If it goes to trial, try it.  So that all

17   of my colleagues around the country, state court, federal

18   court, don't have to reinvent the wheel.  If they want to,

19   of course, they can.  They're not bound to follow any of my

13:09:32 20   rulings.  It's not binding.  But typically judges do it.

21         And since, you know, if -- pharmacies should have

22   figured that if they prevailed in their argument to the

23   Sixth Circuit that it wasn't proper for the Court to permit

24   the plaintiffs to add dispensing claims to Track 1B, then I

13:09:55 25   would just come up with another case in the Northern

1    District of Ohio to include those claims so we could have

2    the discovery and the motions and a trial, if necessary.  So

3    I would have the first trial.

4        I mean, that's what I did with the manufacturers and

5    the distributors.  We went all the way up to the night

6    before the trial and then that settled.  But that wasn't my

7    doing.  I wasn't involved in that settlement.  I was ready

8    to try the case.

9        So I've done what everyone should have expected me to

10   do and what I think the MDL court would expect me to do and

11   that's what I've done.

12       So we now have a trial set for next May with

13   everything the pharmacies do, distributing and dispensing.

14       And I know everyone is working on the schedule.  You

15   know, I'll go pretty much with whatever schedule you all

16   come up with so long as it leaves me enough time to address

17   all the motions, which I'm sure I'll get.

18       One change is the Sixth Circuit conference is in mid

19   to late June of 2021.  It was supposed to be June of this

20   year, but because of COVID-19, it was cancelled.

21       So I need the trial to start May the 10th, two weeks

22   before what you proposed, so if you just factor that in.

23       Now, we have the Track 1B, which is dispensing claims

24   only.  And I am still struggling, as I have been for two

25   years, to figure out how to separate the two halves of what

      1          a pharmacy does into an intelligible trial.

      2               All right.  There's one claim, the public nuisance.

      3          And I'm going to go back to Track 3.  The idea of Track 3

      4          was to recreate what Track 1B was going to be.  We just had

13:12:07  5          two different counties.  Everything else was going to be the

      6          same.

      7               So that's why we're only going to try the claim of

      8          public nuisance, and as I made clear with Track 1B, there

      9          will be no further trial against the pharmacy -- pharmacies

13:12:26 10          in Track 3 of any claim other than public nuisance.  That

     11          isn't going to happen.  So they're going to trial, Lake

     12          County, Trumbull County, public nuisance only.  All right?

     13          So you don't have to worry about the other claims.

     14               And all these different entities the plaintiffs have

13:12:46 15          added, my intent was to have the same entities that we had

     16          in Track 1B unless some additional entities are needed for

     17          the dispensing claims.  I'm not quite sure why they would

     18          be.  And we had -- everyone had agreed that for purposes of

     19          trial, everyone could just refer to a corporate entity.

13:13:07 20               So we have six corporate entities; Walmart, Discount

     21          Drug Mart, Rite Aid, Giant Eagle, Walgreens, and CVS.  With

     22          the exception of CVS -- and I understand the statute of

     23          limitations argument, and that for one period there was one

     24          CVS entity that was a distributor, and then for another

13:13:27 25          period there was another entity.  So for CVS we'll have two.

1        But it's my intent that for Track 3, again, we'll just

2   be referring to Walmart, Rite Aid, Giant Eagle, et cetera.

3   So the parties are to work that out.  I don't -- and the one

4   name on the jury form, jury verdict forms is for the jury.

13:13:51  5   So you all can work that out.  We're doing it -- basically

6   it's a re-creation.

7        All right.  I'm going to ask some questions.  I'm

8   not -- these aren't rhetorical.  I'm really struggling with

9   the answers.

13:14:09 10        I sent out today the jury instructions, the final jury

11   instructions that I plan to give.  My staff and I have been

12   working on this for months.  We got a lot of comments from

13   both sides.  We have factored those in.  My objective was to

14   craft instructions that are legally correct and readily

13:14:33 15   understandable for a lay jury, and I think I've got it.

16        Everyone agrees that, you know, the plaintiffs have to

17   prove that the defendants committed, each of them, some

18   either intentional conduct or unlawful conduct that caused

19   the significant interference to the public right to health

13:15:00 20   or safety.  Here's it's the opioid epidemic.  All right?

21        But that isn't enough.  That isn't enough.  There's

22   also a causation element, and we defined that pretty

23   clearly, that the plaintiff would have to prove that each of

24   the defendants, whatever they did or didn't do, was a

13:15:19 25   substantial factor in creating the public nuisance.

1          Now, am I correct that the public nuisance is the
2     pills getting out into the community, not just sitting in
3     the pharmacies, locked up in the pharmacies, but getting out
4     into the community?
13:15:48  5          And do both sides agree with that?
6               MR. WEINBERGER:  On behalf of plaintiff, we
7     agree.  This is Pete Weinberger.
8               THE COURT:  Okay.  What about the defendant?
9               MR. STOFFELMAYR:  Again, Kaspar Stoffelmayr.
13:16:04 10         I think I can say on behalf of everybody, the pills
11    are not in the community as they're sitting in a locked
12    cabinet.  As far as I can see, nobody would assert that
13    they're doing any harm to anybody.
14              THE COURT:  Okay.  Well, that's what I
13:16:19 15    thought.  I mean, but, you know, there's been disagreement
16    on a whole lot of things.
17         All right.  So and, of course, pharmacies, you know,
18    that's what they do.  They dispense drugs.  Everyone knows
19    that.  That's where you get your prescriptions filled.
13:16:39 20         The next question is for the plaintiffs.  I guess,
21    Peter, you were responding.
22         It's my understanding that you will -- you are going
23    to attempt to prove for each of the corporate defendants one
24    of -- one, two, or three of the following:
13:17:01 25         One, for all or most of the period that the

Case: 3:17-cv-01362 Document #: 329-13 *SEALED* Filed: 05/08/21 Page 16 of 47 PageID #: 50514
Case: 1:17-md-02804-DAP Doc #: 3307 Filed: 05/23/20 15 of 46. PageID #:
494698
15

```
          1    corporation didn't have a SOMS, a suspicious order monitored

          2    system, or two, even if they had one, it wasn't a robust

          3    one, and/or three, even if they had one and it was robust,

          4    they really didn't use it.  They had this policy, but they

13:17:27  5    didn't use it.

          6         Am I right that your proof is going to be for each of

          7    the defendants, one, two, and/or three?

          8              MR. WEINBERGER:  Yes, Your Honor.

          9         This is Pete Weinberger again.

13:17:40 10         Yes.  The answer is yes.

         11              THE COURT:  Okay.  All right.

         12         Now, the next question is:  What are your witnesses

         13    going to say that a distributor is legally obligated to do

         14    if they receive a suspicious order from one of their, in

13:18:10 15    this case, one of their pharmacies?  They're distributing to

         16    themselves.  All right?

         17         So what is a prudent corporate pharmacy supposed to do

         18    if they receive a suspicious order?

         19              MR. WEINBERGER:  They are to perform due

13:18:26 20    diligence and --

         21              THE COURT:  Okay.

         22              MR. WEINBERGER:  -- I'm happy to expand on

         23    that.

         24              THE COURT:  Yeah, what --  all right.  Yeah.

13:18:33 25              MR. WEINBERGER:  Sure.
```

1    THE COURT:  I'd like you to expand on what are

2    they to do to exhibit or perform due diligence.

3    MR. WEINBERGER:  So they are to required to

4    look at that order and compare it to prior orders that came

13:18:52  5    from that pharmacy that resulted in distribution of pills to

6    that pharmacy.

7    They are to look at similar -- similarly situated

8    pharmacies and determine whether or not the particular order

9    that is flagged as suspicious meets certain criteria that

13:19:20 10    the -- that the distribution side should be looking at, and

11    then they are to utilize information that they have with

12    respect to the pharmacy's dispensing -- prior dispensing

13    practices and also current dispensing practices to determine

14    whether at the store level there is information that

13:19:57 15    suggests that prescriptions that were dispensed resulted in

16    or triggered red flags.

17    So it's utilizing the unique position that pharmacies

18    as distributors are in in that they have knowledge and

19    control and visibility not only at the distribution level,

13:20:34 20    but they also have evidence from the pharmacy side in terms

21    of knowledge, control, and visibility.

22    All of -- and if you combine all of this information,

23    it is information that they are required to utilize to

24    discharge their distribution responsibilities under the CSA

13:21:03 25    1301.74(b).

Case: 1:17-md-02804-DAP Doc #: 3307 Filed: 05/28/20 17 of 46. PageID #:

```
  1                    THE COURT:  Okay.  All right.  I think that

  2           was a very clear description.

  3                Do the pharmacies agree that that's -- that that's

  4           what they're required to do to exercise due diligence?

13:21:25  5                    MR. STOFFELMAYR:  Judge, Kaspar Stoffelmayr

  6           again.

  7                I don't think anybody would agree with the way

  8           Mr. Weinberger put it, and there's a couple of different

  9           levels of disagreement probably.

13:21:39 10                    THE COURT:  All right.

 11                    MR. STOFFELMAYR:  One is from the plaintiffs'

 12           perspective, 80 to 90 percent of orders were suspicious.

 13                The way it works in the real world, obviously, that's

 14           not the case.

13:21:56 15                    THE COURT:  Well, all right.  I'm not -- I'm

 16           not asking you whether you would agree with whether a given

 17           order is suspicious or not.  I'm just -- I asked

 18           Mr. Weinberger to go through the steps of what a pharmacy

 19           should do if they received an order that they deem

13:22:15 20           suspicious.  All right?  The steps they should take.  And I

 21           want to know if you have -- if you have any serious quarrel

 22           with, All right, this is what we as a prudent pharmacy

 23           should do if we get an order from one of our stores that we

 24           deem suspicious.

13:22:37 25                    MR. STOFFELMAYR:  Yeah.  The answer is going
```

Case 3:17-cv-01362 Document 1329-13 Filed 05/08/21 Page 19 of 47 PageID #: 50517
Case 1:17-md-02804-DAP Doc #: 3307 SEALED Filed: 09/28/20 18 of 46. PageID #: 494701

18

1       to -- there isn't a one-size-fits-all answer is the -- you

2       know, the short version.

3               Different chains are going to have done different

4       things at different points in time, and they were all in the

13:22:55 5      view -- or certainly in the view of DEA and others, you

6       know, we were appropriate at the time.

7               In some cases, the required step may be as simple as a

8       phone call to the pharmacy.  In some cases, it may be a

9       simple glance at the pharmacy's ordering history that shows

13:23:15 10     you, for example, that they received no shipment the prior

11      week because it was Independence Day, and so unsurprisingly

12      they are receiving a -- they have placed a larger order and

13      they're receiving a larger order.

14              THE COURT:  All right.  I'm --

13:23:31 15             MR. STOFFELMAYR:  This is -- might require --

16              THE COURT:  I'm not -- I understand that the

17      level of inquiry is simply, you know, equivalent to the

18      suspicion.  Okay, obviously.  There's a big order, and you

19      determined they got none the prior week, you're satisfied.

13:23:46 20             But Mr. Weinberger outlined some steps that said at

21      sometime -- sometimes a corporate pharmacy might need to

22      look at the dispensing practices of that particular store in

23      exercising its due diligence.  And I'm just asking, does

24      anyone's pharmacies quarrel with that; that at times your

13:24:18 25     due diligence could extend to looking at dispensing

1    practices of that pharmacy?

2              MR. STOFFELMAYR:  I am aware of no authority

3    to support that position, that the due diligence for a

4    suspicious order would require a consideration of dispensing

13:24:34 5   data, detailed dispensing information at a particular store.

6         Some of the experts talk about a very general

7    know-your-customer requirement.  But the requirements are

8    exactly the same.

9              COURT REPORTER:  Mr. Stoffelmayr.

10        Mr. Stoffelmayr, this is the court reporter.

11             MR. STOFFELMAYR:  Yes.

12             COURT REPORTER.  Can you -- we're getting some

13   feedback.  Can you please make sure you take it off speaker

14   or . . .

13:25:03 15            MR. STOFFELMAYR:  Let me try something

16   different.  I don't know if this is any better.  There was a

17   headphone involved before.

18        Is this better?

19             COURT REPORTER:  Yes.

13:25:16 20            MR. STOFFELMAYR:  What I said is, I'm not

21   aware of any -- there is authority.  Some of the experts

22   talk about a very general idea that you need to know your

23   customer.  And the requirements on a distributor are not

24   going to -- the requirements for a -- the requirements on a

13:25:32 25  distributor is to know your customer.  That may mean

| | |
|---|---|
| 1 | something different if you are a Cardinal or a McKesson |
| 2 | distributing to unaffiliated pharmacies than it does to a |
| 3 | pharmacy inside your own, you know, corporate family |
| 4 | college. |
| 13:25:51 5 | But I'm aware of no authority that ever says the |
| 6 | evaluation of a red flag means to pull patient level |
| 7 | dispensing data at the individual source.  I've never heard |
| 8 | anyone say that.  I've never seen anything that says that. |
| 9 | THE COURT:  Well, you mean you would |
| 13:26:10 10 | never -- I'm not saying you necessarily would go to the |
| 11 | point of identifying -- of looking at each and every |
| 12 | prescription. |
| 13 | But are you saying that your due diligence as a |
| 14 | distributor would never entail checking to see if in a given |
| 13:26:31 15 | month the pharmacy had -- actually had received the -- the |
| 16 | number of prescriptions that would have justified that |
| 17 | order? |
| 18 | MR. STOFFELMAYR:  Well, if the question is -- |
| 19 | if the question is whether the pharmacy actually had |
| 13:26:55 20 | prescriptions, that's different than this -- what I |
| 21 | understood Mr. Weinberger to say.  That would be a theft |
| 22 | issue.  And there are all sorts of controls, you know, |
| 23 | inventory controls to identify pills that go missing, so to |
| 24 | speak, that are not dispensed to a prescription.  I don't |
| 13:27:16 25 | know -- even know if -- again, this might depend by the |

```
              1    company at the point in time, but that's not typically

              2    considered a suspicious order monitoring problem; that's a

              3    theft prevention -- a pilferage prevention issue.

              4             THE COURT:  Could the --

13:27:31      5             MR. STOFFELMAYR:  There's all sorts of layers

              6    of control.

              7             THE COURT:  It could be a lot of things.  All

              8    right?  Going out the back door, in other words, you know,

              9    as a catchall.  Out the front door, you're filling

13:27:43     10    prescriptions.  Out the back door is theft, pilferage, black

             11    market, whatever.

             12             MR. STOFFELMAYR:  And if the computer system

             13    shows, you know, inventory coming in that's not reflected by

             14    prescriptions being filled, I think just about everywhere,

13:28:00     15    that is a big issue covered by, you know, asset prescription

             16    and compliance programs.  That's not a suspicious order

             17    monitoring function.

             18         Although, I suppose if a pharmacy's orders were large

             19    only because the pharmacy technician was a thief and, you

13:28:21     20    know, stealing large volumes, you know, you could make an

             21    argument if they overlap.

             22         But that's not the purpose of this suspicious order

             23    monitoring system.  They're not there to address theft.

             24    There are many layers of control to address theft, but

13:28:33     25    that's a different issue from the regulatory perspective.
```

1    THE COURT:  Well, all right.  Maybe I wasn't

2    aware that you separated the two.

3    But you have to have those -- you have to have those

4    controls or else you don't have a good -- you don't have a

13:28:50 5    good system.

6    MR. STOFFELMAYR:  The -- and, in fact, the

7    regulations are -- if you, you know, pull out the

8    regulations, you know -- is for more attention paid to

9    physical security measures than this sort of order

13:29:10 10    monitoring that we're talking about.

11    COURT REPORTER:  Can you repeat that,

12    Mr. Stoffelmayr.  There is static coming on --

13    MR. STOFFELMAYR:  Certainly.

14    I said the regulations are, in some senses, in some

13:29:15 15    ways very focused on physical security measures designed to

16    address exactly this issue, pilferage, whether it is a bad

17    employee, or somebody who has found a way to break in,

18    things fall off trucks, whatever it is that can happen out

19    in the world is, of course, something that is of, you know,

13:29:36 20    intense interest to the people who own the pills.  You know,

21    obviously it's a loss to the pharmacy and it's of great

22    interest to law enforcement.

23    THE COURT:  Well, what I'm -- what I'm trying

24    to determine -- you know, I had asked the pharmacies

13:30:03 25    individually whether they anticipated calling

Case: 3:17-cv-02804 Document #: 330-3 *SEALED* Filed: 09/28/20 Page 2 of 23 PageID #: 50522

1    pharmacies -- pharmacists as witnesses, not just someone who

2    has a pharmacist license, but active pharmacists from their

3    stores to testify in trial.  And several of them said they

4    would and they outlined the testimony, and candidly, I -- it

13:30:26  5    looked to me like dispensing testimony, at least in part.

6        And, you know, the pharmacists were very successful in

7    getting that cut out of the case, and I'm certainly not

8    going to let it back in.

9        So it seems to me that -- I mean, the plaintiffs'

13:30:45  10    proof really -- the plaintiffs' proof requires few, if any,

11    witnesses.  It's all documents.  And the defendants -- the

12    defendants should require few, if any, witnesses, just

13    documents.

14        The issue is, look at the records.  Were there

13:31:02  15    suspicious orders, and if so, what did the defendants do to

16    show due diligence?  And that's what we've got.

17        And so we don't need testimony from -- on the

18    plaintiffs' side from pharmacists as to what happened in

19    individual pharmacies and we don't need it from the

13:31:27  20    defendants either because whatever happened and whatever was

21    done was done years ago, and it's in the records.

22        So this is a historic case.

23        Now, but the problem -- the problem I'm still

24    struggling with is, how do the plaintiffs prove and how do

13:31:52  25    the defendants defend on the causation element without

```
        1    getting into dispensing practices or testimony to the trial

        2    as to how pills got out into the community?

        3         Because we agree that there's -- if the pills stay in

        4    the pharmacists [sic], there's no public nuisance.  It's

13:32:21  5    only -- if they get out in the community and people get

        6    addicted and die, and that's the -- that's the health harm,

        7    and the issue is, did anything the pharmacist did or didn't

        8    do substantially cause that?

        9         But there's got to be testimony that the drugs got out

13:32:41 10    into the community.  But how are the plaintiffs going to

       11    produce that evidence?

       12         How are you going to produce that in a trial?

       13              MR. WEINBERGER:  So, Your Honor, we have from

       14    the ARCOS data on the distribution side, what number of

13:33:07 15    pills were distributed to the pharmacy -- to their own

       16    pharmacies, and how many of those pills ended up getting

       17    dispensed.  So we're --

       18              COURT REPORTER:  This is the court reporter.

       19    I'm assume this is Mr. Weinberger?

13:33:26 20              MR. WEINBERGER:  I'm sorry.  I'm sorry.  Yes.

       21    This is Pete Weinberger.

       22         And as it states in our expert reports, we have done

       23    an analysis of that -- of those quantities, and we're using

       24    that analysis then to establish our causation case.

13:33:55 25         And what -- to add on to that -- and, of course, we
```

```
  1        have experts to testify as to which of those orders

  2        from -- that were filled by their own distribution centers

  3        were suspicious.

  4                   THE COURT:  All right.  Have you identified to

13:34:14  5        the defendants which orders you're going to be relying on

  6        you're claiming are suspicious?

  7                   MR. WEINBERGER:  Yes, we have.

  8                   THE COURT:  Okay.  And ballpark we -- you

  9        know, per defendant -- and like per defendant per year, are

13:34:37 10        we talking about hundreds?  Thousands?

 11             I mean, I just want to get a sense of what your

 12        experts are going to be saying.

 13                   MR. WEINBERGER:  Pete Weinberger again.

 14             I don't have the numbers, I'm sorry, in front of me

13:34:53 15        right now.  But I know that over the relevant time frame,

 16        which would be from 2000- -- where we have data, from 2006

 17        to 2014, which is when these defendants stopped distributing

 18        to themselves, you know, it's certainly into the millions

 19        per defendant.

13:35:18 20                   MR. STOFFELMAYR:  Judge, it's

 21        Kaspar Stoffelmayr.

 22             I can say for Walgreens that plaintiffs' expert

 23        believes that 95 percent of the orders were suspicious.

 24                   THE COURT:  95 percent of the orders were

13:35:29 25        suspicious?
```

```
 1                   MR. STOFFELMAYR:  95 percent, yes.

 2                   THE COURT:  Okay.

 3                   MR. STOFFELMAYR:  So it's tens of thousands of

 4       orders easily -- or not millions as Mr. Weinberger says.

 5                   THE COURT:  Okay.  All right.  So you've got

 6       the ARCOS data, so you know how many were -- you know, that

 7       they were dispensed, they were distributed.

 8            Well, then -- I mean, I -- as I said, we're -- the

 9       only way to conduct the Track 1B is if -- is to really --

10       merely separate distributing from dispensing and have no

11       testimony about dispensing, because if we have testimony

12       about dispensing, we're going to have to have discovery on

13       it, and that's what the defendants clearly argued was not

14       proper and the Sixth Circuit agreed.

15            So the plaintiffs are not putting in any evidence

16       about dispensing; is that right?

17                   MR. STOFFELMAYR:  Judge, may I?  -- sorry.

18       It's Kaspar.  May I be heard for one moment on the first --

19                   THE COURT:  All right.

20                   MR. STOFFELMAYR:  It is, I think, incorrect.

21       We will be responding in due course to plaintiffs' Rule 37

22       motion filed yesterday or the day before.

23            It is not correct that over the course of Track 1 the

24       defendants collectively or individually ever said that all

25       dispensing discovery was inappropriate.  They never said
```

```
 1   that to the Sixth Circuit.  We have -- and it is unfair to

 2   group defendants on this issue, I think, because different

 3   defendants will take different positions for all sorts of

 4   reasons.

 5       But through -- it's a misunderstanding -- and we will

 6   clear this up when we respond to their motion -- but it is a

 7   misunderstanding that we ever took the position that

 8   dispensing, per se, was irrelevant to the Track 1

 9   distribution case and resisted all discovery.

10       Now, I can hear -- you know, my friends are going to

11   tell me that I'm wrong, but I think that we're entitled to

12   present that to the Court.

13            THE COURT:  Well, you can present it, but

14   candidly, it's not going to get -- it's not going to get

15   very far, Mr. Stoffelmayr.  You were the ones -- I didn't

16   want to do the separation, because I didn't think -- I

17   thought it was intellectually very difficult, practically

18   very difficult.  It's going to get the Court involved

19   in -- there will be millions of objections to this trial

20   about whether we're getting into dispensing or not.  All

21   right?

22       The pharmacists chose to ask -- chose to raise this

23   when you knew very well why I had allowed the plaintiffs to

24   amend their complaints, and so we had one trial.  One trial.

25   And the jury can examine the totality of what each of these
```

Case: 1:17-cv-01362 Document 1:339-13 Filed: 05/08/21 Page: 29 of 47 PageID #: 5052-7
SEALED 494711 Filed: 09/28/20 28 of 46. PageID #:

28

1    corporations did and whether they contributed to a public

2    nuisance or not.  We don't need to do it over two trials.

3    But now we've got it split.

4        But I'm not going to let the pharmacies defend with

13:39:01  5    documents or testimony on dispensing.  If we can -- if we

6    can do a trial on pure distribution, that's what we're going

7    to have.  All right?  Because that's what the -- that's what

8    the defendants wanted apparently.  You'll get what you

9    wanted.

13:39:22  10    So it seems to me we won't have any pharmacists

11    testifying from either side, because what any pharmacy did

12    or didn't do on filling prescriptions isn't part of this

13    case.  And the defendants at least believe that their due

14    diligence, you know -- that's not part of their due

13:39:47  15    diligence.

16        So the problem is if the plaintiffs think it is -- if

17    the plaintiffs think it is, then we're getting into

18    dispensing.  Because if the plaintiffs think it is, then

19    defendants are going to say we want the defend the case the

13:40:01  20    plaintiffs are bringing.

21        And then we get into testimony about dispensing

22    practices at given pharmacies and the defendants will need

23    to call the pharmacists who were there, and then the

24    plaintiffs are going to say, Well, we want to have the

13:40:21  25    dispensing records of at least those pharmacies -- or those

Case 3:17-cv-01362 Document 1329-13 Filed 05/08/21 Page 30 of 47 PageID #: 50528
Case 1:17-md-02804-DAP Doc #: 3307-3 SEALED Filed: 09/28/20 29 of 46. PageID #: 494712

29

           1    pharmacists for the time that they were pharmacists at those

           2    stores so we can cross-examine them, and there we go going

           3    right back into, you know, the mess we -- the mess that

           4    we've got.  And then the Track 1B goes back into a

13:40:47   5    dispensing trial.

           6         So I'm -- I -- you know, you all have sort of created

           7    this mess.  I mean, again, the plaintiffs chose to separate,

           8    you know, distribution claims from dispensing claims way

           9    back with the pharmacies, and I never really

13:41:08  10    understood -- and I understand the words, but I was

          11    concerned whether it could be done, and I am no more

          12    comfortable with it now two years down the road.

          13         And so I'm not really interested in dealing with a lot

          14    of motions on it, and I'm certainly -- this trial can't

13:41:31  15    function if every question is subject to an objection, and

          16    now you're getting into dispensing.

          17         So, again, it seems to me we could have a trial purely

          18    on the historic record, and we literally need no witnesses.

          19    You know, the documents are what they are, and the

13:41:56  20    plaintiffs can say, all right, these orders were suspicious.

          21    Then the defendants should have done X, Y, and Z.

          22         And the defendants can attack on a number of bases.

          23    They can say, Well, guess what?  Most of these weren't

          24    suspicious at all, you know, so there was nothing we needed

13:42:14  25    to do, or if it was suspicious, here's what we did, and this

 1   was reasonable, and here are the documents to show what we

 2   did, and then you'd make your arguments.

 3        So I -- we could -- we could -- we could have a trial

 4   like that, and then no one is going to call the pharmacists

13:42:32  5   from individual stores to testify what -- you know, what did

 6   or didn't happen at those pharmacies, because it's not those

 7   pharmacists who were doing the due diligence.

 8        So how does that sound for a trial?  The plaintiffs'

 9   side and the defendants' side?

13:42:58 10               MR. WEINBERGER:  Your Honor, this is

11   Pete Weinberger.

12        We are prepared to try the case using those

13   parameters.

14               MR. STOFFELMAYR:  I'm sorry.

13:43:09 15   Kaspar Stoffelmayr speaking through the defendants.

16        It is so for me personally impossible to understand

17   how the plaintiffs can prove their case with those

18   parameters.  Maybe I'm not imaginative enough or I just

19   don't understand how they connect the dots.

13:43:31 20        But it sounds to me that if plaintiffs (inaudible)

21   actually put their case in that way, the case is over

22   before --

23               COURT REPORTER:  Mr. Stoffelmayr.

24   Mr. Stoffelmayr, can you say that again.  We're getting

13:43:52 25   really bad static here.

1          MR. STOFFELMAYR:  Yeah.  I can hear the

2  clicking, too.  I'm not sure -- I'm not sure what that is.

3  I apologize if it's something at our end.

4      Well, what I was trying to say is, I don't understand

13:44:04  5  how plaintiffs can prove their case that way, and what we

6  would want to do for a defense case, and what we would want

7  to do -- see what the Court really allows us to do -- would

8  obviously depend on what the plaintiffs' case actually looks

9  like.  If their case is actually a stack of documents and

13:44:25 10  that's it, our case would look very different than if -- if

11  it's something else -- if it's something beyond that.

12          THE COURT:  They've got a stack of documents

13  and a bunch of experts.

14          MR. STOFFELMAYR:  If what you're asking me,

13:44:41 15  Judge, is do we consent to a trial without any live

16  witnesses who work in -- at pharmacies in Cuyahoga and

17  Summit Counties?  The answer is obviously no.  We don't

18  consent to that.  But I don't think that's what you were

19  asking for.

13:44:56 20          THE COURT:  Well, I'm not going to -- I'm --

21  the point is, I'm not going to let any of those people

22  discuss any dispensing practices they did, and the point is,

23  their testimony may -- as I see it, I don't know what

24  relevant testimony they have unless there's -- I mean, if

13:45:17 25  there's a document that says, all right, you know, on

```
 1        March 3rd, 2012, someone from Walmart corporate called

 2        Walmart pharmacy on 55th and Euclid, all right, and there's

 3        an issue as to whether that really happened, well, the

 4        person who got the call can certainly testify, Yeah, they

 5        did call me.  All right?  Okay?  Fine.

 6             But to talk about -- other than that, there would be

 7        no -- nothing relevant for that pharmacist to say.  The

 8        pharmacist isn't doing the due diligence.  Someone at

 9        corporate.  And it would not be at all relevant or proper

10        for the pharmacist to talk about any dispensing practices at

11        that pharmacy.  I wouldn't -- I wouldn't permit it, because

12        the pharmacies have gotten the Sixth Circuit to truncate the

13        case.  So you can't put it back in.

14                     MR. DELINSKY:  Your Honor, this is

15        Eric Delinsky on behalf of CVS.

16                     THE COURT:  Yes.

17                     MR. DELINSKY:  There's -- there are other

18        issues that pharmacists should be able to testify on.  The

19        plaintiffs' case is that pharmacies place suspicious orders

20        to distribution centers.  The pharmacies are part of the

21        transaction, the ordering transaction, that comprises

22        plaintiffs' case.  It --

23                     THE COURT:  All right.  Mr. Delinsky, what

24        is -- all right.  You call a pharmacist, describe -- say,

25        all right, to explain how he or she places orders?
```

Case 3:17-cv-01362 Document 1339-13 Filed 05/09/21 Page 34 of 47 PageID #: 50532
Case 1:17-md-02804-DAP Doc #: 3307 SEALED Filed: 09/28/20 33 of 46. PageID #:
494716                                                                    33

```
              1              MR. DELINSKY:  Correct.

              2              THE COURT:  Well, what are they going to say?

              3         How does a pharmacist place an order?

              4              MR. DELINSKY:  They are going to -- they -- a

   13:47:33   5    pharmacist could talk about what they take into account in

              6    the course of placing an order or approving an order or

              7    adjusting an order.

              8              THE COURT:  Yeah.  Well, that's my concern.  I

              9    don't -- the pharmacist is going to say, Well, I take into

   13:47:55  10    account the number of prescriptions I expect to receive.

             11         Isn't that one of the main things they take into

             12    account?

             13         Hello?

             14              MR. DELINSKY:  Your Honor, I don't think the

   13:48:11  15    testimony necessarily would come in that way.  They -- a lot

             16    of what they take into account is what's on the shelves and

             17    what's not on the shelves, what they think they may need.

             18              THE COURT:  Well, but how --

             19              MR. DELINSKY:  And that's more --

   13:48:31  20              THE COURT:  The only thing that -- the only

             21    reason they would need it, Mr. Delinsky, is if they

             22    anticipated demand, and the demand certainly isn't black

             23    market or theft, the demand would be people coming in with

             24    prescriptions for that drug, right?

   13:48:53  25              MR. DELINSKY:  Even if the testimony went that
```

1    far, Your Honor, much of this could be controlled in terms

2    of what questions are allowed and what questions are not

3    allowed.

4            THE COURT:  Yeah.  Well, I'm not -- that's

13:49:05 5    what we're not going to have.  We're not going to have.  You

6    all got the Sixth Circuit to truncate this case, and so be

7    it.  It will be truncated.

8        Plaintiffs aren't going to put in any testimony about

9    the dispensing practices at all and I'm not going to allow

13:49:21 10   any testimony about dispensing or reference to dispensing,

11   because the moment that pharmacist says, you know, I've got

12   to fill the shelves, I anticipate I -- you know, got a

13   thousand prescriptions in February, I'm anticipating at

14   least a thousand in March, well, that begs the question of

13:49:43 15   whether, you know, they were lawful, suspicious, whatever,

16   and the plaintiffs are going to want to have their records

17   to cross-examine that pharmacist.  And then we're back into

18   the dispensing practices of particular pharmacists, and I'm

19   not --

13:50:01 20          MR. DELINSKY:  Your Honor -- I apologize,

21   Your Honor.

22          THE COURT:  So --

23          MR. DELINSKY:  I fear there's an apples and

24   oranges problem.

13:50:09 25       The Sixth Circuit litigation pertains to substantive

Case 3:17-cv-01362 Document 1329-18 Filed 05/08/21 Page 36 of 47 PageID #: 50534
Case 1:17-md-02804-DAP Doc #: 3307-2 SEALED Filed: 05/28/20 35 of 46. PageID #: 494718

35

1    causes of action and claims seeking to impose.

2              COURT REPORTER:  Can you repeat that?  It is

3    hard to hear.

4              MR. DELINSKY:  The Sixth Circuit litigation

13:50:26  5    was focused on requests for relief based on dispensing, and

6    the Sixth Circuit determined, as we know, that those claims

7    can't lie in Track 1.

8         That is a different question of admissibility in a

9    distribution case.  That is not an issue that the

13:50:53 10    Sixth Circuit was asked to rule on or that the Sixth Circuit

11    did rule on, and the effect of the ruling -- the evidence

12    limitation that you are proposing, Your Honor, would be to

13    go back in time -- to go back to Track 1A and find out of

14    the Track 1A distribution records, the dispensing evidence

13:51:24 15    that was permitted, and, in fact, that was ordered.

16         And our position is is that the Track 1 trial could

17    proceed with the record established in the Track 1A case.

18    It has a certain component of dispensing in it, and we do

19    not believe it would be appropriate to go back and excise

13:51:57 20    that from the case.

21              THE COURT:  All right.  Look.  All right.

22    Look.  This is what I'm going to rule.  I'm going to make it

23    very simple.

24         I'm not going to tell the pharmacists [sic] they can't

13:52:07 25    call pharmacists to testify.  But I am ruling this way.

Case 3:17-cv-01362 Document 1329-3 Filed 05/09/21 Page 37 of 47 PageID #: 50535
Case 1:17-md-02804-DAP Doc #: 3307 SEALED Filed: 09/28/20 36 of 46. PageID #:
494719
36

1    If you call a pharmacist, you must have produced well

2    in advance of trial the dispensing records of that pharmacy

3    of prescription opioids for the period that that pharmacist

4    was the pharmacist.  All right?

13:52:32  5    So if you've got a pharmacist who is there since 2010,

6    you've got to produce the dispensing records of that

7    pharmacy from 2010 to 2014.  All right?  So you know who you

8    want to call.  They've been identified and you produce those

9    records so the plaintiff has them for cross-examination.

13:53:00  10   And then they may or may not need them for cross-examination

11   depending on what the witness says.

12        But they'll be ready if they need to.

13        So I think that's the simplest way to do it.

14             SPECIAL MASTER COHEN:  Judge, this is David.

13:53:19  15   May I ask --

16             THE COURT:  Everyone is clear on that?

17   Everyone is clear on that?

18        Yes, who had a question?

19             SPECIAL MASTER COHEN:  I'm sorry, Judge.  This

13:53:25  20   is David.  I just had a clarification question.

21        I believe that three of the defendants stated that

22   they would -- that they did intend to call pharmacists, and

23   many of those pharmacists, of course, were listed in witness

24   lists, but they were not deposed.

13:53:44  25        And so my question simply is, do you have a ruling now

```
           1   or do you want to think about it with regard to whether
           2   those pharmacists, if the defendants still want to call them
           3   and after the data is produced, you would allow deposition
           4   or not?
13:54:00   5           THE COURT:  We'll cross that bridge when I
           6   come to it.  If someone feels they need to depose someone
           7   that was previously identified and not deposed, they'll have
           8   to make a case for it.
           9           SPECIAL MASTER COHEN:  Thank you, Judge.
13:54:16  10           THE COURT:  So any pharmacist --
          11           COURT REPORTER:  I'm sorry.  Who was --
          12           THE COURT:  -- any pharmacist who is
          13   testifying, you've got to produce those dispensing records
          14   for the period that pharmacist was at that store.
13:54:29  15           SPECIAL MASTER COHEN:  And I just want to say,
          16   this is David Cohen for the court reporter.  Excuse me for
          17   not identifying myself earlier.
          18           THE COURT:  So it may be this trial will go a
          19   lot faster than four weeks.
13:54:47  20       Okay.  And, again, I think that -- I think that, you
          21   know, it's -- again, I didn't want to have two trials, but
          22   that's what we've got.  So that will be the November trial,
          23   and the May trial will be everything.
          24       There were one or two questions I had on the status
13:55:41  25   report.  I didn't see any reference to West Virginia -- the
```

Case: 3:17-cv-01362 Document #: 330-3 *SEALED* Filed: 05/08/21 Page: 39 of 47 PageID #: 50537
Case: 1:17-md-02804-DAP Doc #: 3307-3 Filed: 05/28/20 39 of 46. PageID #: 494721

38

| | |
|---|---|
| 1 | case that was remanded to the federal court in West Virginia |
| 2 | involving the distributors, and that case is there.  I know |
| 3 | it's moving forward. |
| 4 | MR. WEINBERGER:  Your Honor, this is |
| 13:55:59 5 | Pete Weinberger.  I'm going to -- I think Paul Farrell is on |
| 6 | the phone.  He can address where things stand on CT2 with |
| 7 | respect to the distributor case. |
| 8 | The reason that we didn't include it in the status |
| 9 | report is that generally the status report relates to, you |
| 13:56:21 10 | know, the Track 1B and now the three cases, and I don't |
| 11 | believe -- well, it's quite possible there are attendees |
| 12 | from the three distributors on this call. |
| 13 | THE COURT:  Oh, I see. |
| 14 | MR. WEINBERGER:  But perhaps not.  But if you |
| 13:56:44 15 | want Paul Farrell to address where we are before -- |
| 16 | THE COURT:  No.  I see you only -- it's number |
| 17 | 5.  It updates on remanded cases, including any Track 1B |
| 18 | defendants, and that case only involves a distributor.  So, |
| 19 | okay.  I see why it was omitted. |
| 13:57:04 20 | Everyone should know it's still there.  It's still |
| 21 | active.  That's all.  I don't want anyone to think that it |
| 22 | wasn't. |
| 23 | MR. FARRELL:  Judge, this is Paul Farrell. |
| 24 | It is still there and it is still active. |
| 13:57:18 25 | THE COURT:  Oh, I know that.  I just didn't |

Case 3:17-cv-01362 Document 1329-13 *SEALED* Filed 05/08/21 Page 40 of 47 PageID #: 50538
Case 1:17-md-02804-DAP Doc #: 3307-3 Filed: 05/28/20 39 of 46. PageID #: 494722

39

|  | 1 | want anyone to think that it wasn't because it's not on the |
|  | 2 | report and I see why it's not. |
|  | 3 | All right.  Well, I think there was -- I guess there |
|  | 4 | was some issue we were holding off issuing the final |
| 13:57:47 | 5 | schedule for the Track 1B in November. |
|  | 6 | I can't -- I don't recall what -- there's some issue |
|  | 7 | between the parties who were still -- they were still |
|  | 8 | disagreeing over.  I can't -- we had held off doing it. |
|  | 9 | Does anyone recall what -- |
| 13:58:09 | 10 | MS. SWIFT:  Judge, this is Kate Swift on |
|  | 11 | behalf of Walgreens. |
|  | 12 | We -- and when I say we, I mean, both defendants and |
|  | 13 | plaintiffs -- submitted to Special Master Cohen on May 20th |
|  | 14 | a proposed list of dates that we have agreed upon for the |
| 13:58:28 | 15 | remainder of the Track 1B schedule.  I think that is where |
|  | 16 | that stands. |
|  | 17 | THE COURT:  All right.  Well, we'll get one |
|  | 18 | out.  Now that we've clarified things, we'll get that order |
|  | 19 | out. |
| 13:58:48 | 20 | Now, of course, our federal court, and to my |
|  | 21 | knowledge, you know, every federal court in the country, no |
|  | 22 | one has had any jury trial since the middle of March. |
|  | 23 | We have -- our court meets every few weeks to take |
|  | 24 | pulse of things.  We've determined we will not resume jury |
| 13:59:15 | 25 | trials before August.  We haven't said we'll definitely do |

Case 3:17-cv-01362 Document 1329-13 Filed 05/08/21 Page 41 of 47 PageID #: 50539
Case 1:17-md-02804-DAP Doc #: 3307-3 SEALED Filed: 05/28/20 41 of 46. PageID #: 494723

40

1    them in August.  They won't be before August.  We're meeting

2    Friday the June the 12th to assess things and to supplement

3    our orders.

4        I looked at the schedule for Track 1A, and I believe

13:59:35  5    that's about three months before that trial.  So sometime in

6    the mid to late August, which was several months before the

7    trial, we sent out an inquiry to several hundred jurors

8    inquiring whether they would be able to sit for a one-month

9    trial.

14:00:01  10    And then we got -- the ones who said they could, then

11    we sent them the detailed questionnaire.  Then we went

12    through that process.  I would do the same process.  It

13    worked very well.  The point is, that's -- for a November

14    trial, that would mean sending those inquiries out in

14:00:24  15    August.

16        You know, no one knows how people are going to feel

17    about sitting on a jury, and we can take all the precautions

18    we want in court to try and keep people safe, but if jurors

19    don't feel they'll be safe, they'll ask to be excused or

14:00:45  20    they won't come or really won't want to come.

21        No one is contemplating arresting people to be jurors.

22    I'm not being facetious.  No one would do that.  But no one

23    wants a jury composed of people who are so fearful that they

24    can't concentrate on the testimony.

14:01:06  25        So it remains to be seen what we can do.  I'm

Case 1:17-md-02804-DAP Doc #: 3307 SEALED Filed: 05/26/20 4 of 46. PageID #: 497490

1    guardedly optimistic, but no one knows exactly how -- you

2    know, the course of this pandemic or how people are going to

3    feel.  So that's the reality.  But we'll keep going as we

4    can.

14:01:30  5    So we'll get the schedule out and then everyone should

6    work on getting the Track 3 schedule back with the one

7    revision.  I want the trial to start on -- opening

8    statements on May the 10th.  So that's when it will begin.

9    All right.  Was there anything that anyone else wanted

14:01:57 10   to bring up?  I think I've covered the things I wanted to

11   cover, and I've done most -- I have asked my questions and

12   done most of the talking, but there may be some other things

13   that I've left out.

14              MR. STOFFELMAYR:  Judge, it's

14:02:10 15   Kaspar Stoffelmayr again, if I could just ask one question.

16              THE COURT:  Sure.

17              MR. STOFFELMAYR:  You asked us maybe a month

18   ago now to meet and confer with the Ohio Board of

19   Pharmacy --

14:02:19 20             THE COURT:  Oh, right.

21              MR. STOFFELMAYR:  -- about writing something

22   to the Sixth Circuit.  We have discussed this with their

23   outside counsel.  But I just want to let you know we have

24   been pursuing, discussed it with their outside counsel,

14:02:36 25   explained the situation and also what's going on between the

```
 1    Track 2 cases -- sorry -- Track 1B cases --

 2                THE COURT:  Right.

 3                MR. STOFFELMAYR:  -- Track 3 cases.

 4        They told us they needed to confer with their client.

 5    That was a couple of weeks ago.  We haven't heard back.  I

 6    just wanted to make sure you were aware that, A, that has

 7    not happened yet.

 8                THE COURT:  All right.

 9                MR. STOFFELMAYR:  But not that we have been

10    ignoring your request.

11                THE COURT:  Well, I'm making a suggestion that

12    it is -- the specific issue that is -- that is the subject

13    of the mandamus doesn't exist anymore the way it was set up

14    because that has been mooted by the earlier order.

15        But the same -- the same issue is going to arise very

16    shortly in Track 3 because the defendants will want the

17    exact same records from the Ohio Board of Pharmacy that they

18    would have wanted for Track 2 when it included dispensing

19    claims.

20        Am I correct?

21                MR. STOFFELMAYR:  Yes.  We agree.

22                THE COURT:  All right.  So -- but because

23    judges are very careful and they don't want to decide things

24    that are moot, they need to -- someone has to advise the

25    Court of that, okay, that those records are not -- not
```

         1    needed for the November trial, but they are going to be --

         2    they are going to be needed for the May 2021 trial.  And the

         3    issue is the same.  They're the same records.  And

         4    presumably the Ohio Board of Pharmacy will have exactly the

14:04:25 5    same objections.

         6         But I think you need -- you've got to -- I mean, the

         7    parties won't do it.  You know, I -- someone should do that.

         8         Now, I haven't received any inquiry from the

         9    Sixth Circuit anything about that.  I haven't seen that

14:04:45 10   they've set a briefing schedule.  They haven't asked me to

         11   make a response if I wish.  And I haven't -- I've received

         12   no notification.

         13        So I'm just strongly suggesting you meet with the --

         14   you know, and tell them this is what -- this is what I think

14:05:06 15   should be done.  And maybe the Court will just say, Okay.

         16   We'll address it in this way, or we've got to wait until,

         17   you know, there's a new objection and you've got to

         18   promulgate the same -- the same third-party subpoena,

         19   whatever, in Track 3.  I don't know.  They'll tell

14:05:26 20   you -- you'll get some directive.

         21        But whatever ruling would be the same.  It's the same

         22   document for the same purpose.

         23        All right.  Or maybe that -- maybe the simplest thing

         24   is for me to do it.  I don't know.  I mean, I didn't

14:05:45 25   initiate the mandate.

Case 3:17-cv-01362 Document 1329-3 Filed 05/09/21 Page 45 of 47 PageID #: 50543
Case 1:17-md-02804-DAP Doc #: 3307-8 SEALED Filed: 09/28/20 45 of 48. PageID #: 494727

44

14:06:08

14:06:13

14:06:43

14:07:03

14:07:17

1     I mean, certainly if they ask me -- if they ask me for

2     a response, that's what I would include.  But I think it's

3     more appropriate for the parties to advise the Court.

4         Okay.  Was there anything else?

5                 MR. RICE:  Judge.

6                 THE COURT:  Yes.

7                 MR. RICE:  This is Joe Rice.  This is

8     Joe Rice.

9         We've got some -- in the status report it talks about

10    some motions that have been pending for quite a while of a

11    general nature.  I'm just trying to get some insight.

12                THE COURT:  Well, all right.

13        Well, the oldest is that common benefits fund.  I have

14    not forgotten about that, Joe, and I -- that's still on the

15    Court's attention.  I have not at all forgotten about that

16    and I'll be turning to that.

17        I think the other things I've pretty much dealt with

18    other than the --

19                MR. RICE:  Joe Rice again.

20        It was the common benefit thing that I was addressing.

21                THE COURT:  All right.  Thank you.

22        That's the oldest one on the status report.  The Court

23    has not forgotten about it.  I'll be turning to that

24    shortly.

25        The one that is -- that I'll need to rule on is

1    probably the last one.  May 24th the plaintiffs filed a

2    motion to propound nationwide dispensing data.  So the

3    defendants will be responding to that.

4         I think the other things, you know, are the other

14:07:42  5    things I dealt with through my rulings today.

6         Okay.  Anything else?

7         The last thing, I guess, I do want to -- I think it's

8    a good idea to have one of these conferences once a month,

9    and I think I'm suggesting maybe Thursday, June 25th, the

14:08:16 10    last Thursday in June.  I guess we could do it at -- we

11    could do it at 1:00 on Thursday, June 25th.

12         And we can have the same call instructions.  And then,

13    I guess, if I get a status report two days before, which

14    would be, say, noon on Tuesday the 23rd.  I think these are

14:08:58 15    useful to keep both of these cases on track and deal with

16    things that come up.

17         So we'll keep that practice going, and at some point

18    we may be able to meet in person, but candidly, given that

19    everyone is all over the country, we save a whole lot of

14:09:16 20    time and money by doing it this way, and I'm comfortable

21    doing it by phone, except this -- someone has this very bad

22    clicking that made it hard for all of us, particularly our

23    court reporter.  So hopefully we can figure out what that

24    was.

14:09:32 25         Okay.  Thank you, everyone, and I hope you and your

1    families continue to stay safe.

2            And with that, we're adjourned.

3                    COUNSEL EN MASSE:  Thank you, Judge.

4                          -  -  -

5                (Proceedings concluded at 2:09 p.m.)

6

7                  **C E R T I F I C A T E**

8

9        I certify that the foregoing is a correct transcript

10    from the record of proceedings in the above-entitled matter.

11

12    */s/ Donnalee Cotone _____28th of May, 2020*
     DONNALEE COTONE, RMR, CRR, CRC                   DATE
13    Realtime Systems Administrator

14

15

16

17

18

19

20

21

22

23

24

25