# EXHIBIT A

1

```
 1                      UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF OHIO
 2                            EASTERN DIVISION

 3      ------------------------------X
        IN RE: NATIONAL PRESCRIPTION   : Case No. 1:17-md-2804
 4      OPIATE LITIGATION              : Cleveland, Ohio
                                       :
 5                                     :
        FINAL PRETRIAL PROCEEDINGS     : Tuesday, October 15, 2019
 6                                     : 12:34 p.m.
                                       :
 7                                     :
                                       :
 8                                     :
        ------------------------------X
 9

10

11            TRANSCRIPT OF FINAL PRETRIAL PROCEEDINGS

12          BEFORE THE HONORABLE DAN AARON POLSTER

13               UNITED STATES DISTRICT JUDGE

14

15      SPECIAL MASTER:           DAVID R. COHEN

16

17

        Court Reporter:           Donnalee Cotone, RMR, CRR, CRC
18                                United States District Court
                                  801 West Superior Avenue
19                                Court Reporters 7-189
                                  Cleveland, Ohio 44113
20                                216-357-7078
                                  donnalee_cotone@ohnd.uscourts.gov
21

22

23

24      Proceedings recorded by mechanical stenography, transcript

25      produced by computer-aided transcription.
```

                                                                                  2

1      APPEARANCES:

2

3          On behalf of Plaintiffs:

4
                        **PETER H. WEINBERGER, ESQ.**
5                       Spangenberg, Shibley & Liber
                        1001 Lakeside Avenue, Suite 1700
6                       1900 East Ninth Street
                        Cleveland, Ohio 44114
7                       216-696-3232
                        pweinberger@spanglaw.com
8

9                       **W. MARK LANIER, ESQ.**
                        6810 FM 1960 West
10                      Houston, Texas 77069
                        813-659-5200
11                      wml@lanierlawfirm.com

12

13                      **HUNTER J. SHKOLNIK, ESQ.**
                        400 Broadhollow Road, Suite 305
14                      Melville, New York 11747
                        212-397-1000
15                      hunter@napolilaw.com

16

17                      **JAYNE CONROY, ESQ.**
                        Simmons Hanly Conroy LLC
18                      112 Madison Avenue
                        New York, New York 10016
19                      212-784-6400
                        jconroy@simmonsfirm.com
20

21

22

23

24

25

3

1    APPEARANCES (Continued):

2

3         On behalf of Plaintiffs:

4              LINDA SINGER, ESQ.
               Motley Rice LLC
5              28 Bridgeside Boulevard
               Mount Pleasant, South Carolina 29465
6              843-216-9140
               dmigliori@motleyrice.com
7              lsinger@motleyrice.com

8
          On behalf of Defendant Cardinal Health, Inc.:
9
               ENU MAINIGI, ESQ.
10             Williams & Connolly LLP
               725 Twelfth Street, NW
11             Washington, DC 20005
               202-434-5000
12             emainigi@wc.com

13

14        On behalf of Defendant AmerisourceBergen Drug
          Corporation:
15
               ROBERT A. NICHOLAS, ESQ.
16             Reed Smith, LLP
               Three Logan Square, Suite 3100
17             1717 Arch Street
               Philadelphia, Pennsylvania  19103
18             251-851-8100
               rnicholas@reedsmith.com
19

20        On behalf of Defendants Walgreen Co. and Walgreen
          Eastern Co.:
21
               KASPAR J. STOFFELMAYR, ESQ.
22             Bartlit Beck LLP
               54 West Hubbard Street, Suite 300
23             Chicago, Illinois  60654
               312-494-4400
24             kaspar.stoffelmayr@bartlit-beck.com

25

| | |
|---|---|
| 1 | AFTERNOON SESSION, TUESDAY, OCTOBER 15, 2019 |
| 2 | (Proceedings commenced at 12:34 p.m.) |
| 3 | - - - |
| 4 | DEPUTY CLERK:  All rise. |
| 12:39:53 5 | THE COURT:  All right.  Good afternoon. |
| 6 | Please be seated. |
| 7 | All right.  Well, we're here for the final pretrial in |
| 8 | the opoid MDL, first bellwether trial, Summit County, |
| 9 | Cuyahoga County, against various defendants. |
| 12:40:16 10 | So the lawyers, parties, are here.  We have a number |
| 11 | of matters I wanted to cover. |
| 12 | All right.  We're set to begin jury selection |
| 13 | tomorrow.  We'll have 50, the first 50 jurors brought in. |
| 14 | The jury department will pick them at random from the |
| 12:40:59 15 | roughly 150 people that we have left. |
| 16 | The Court and the parties will know this afternoon |
| 17 | which 50, and then the order will be determined randomly |
| 18 | tomorrow morning, and we'll -- that will be the order. |
| 19 | If we question jurors privately in chambers, we'll |
| 12:41:30 20 | just have one lawyer for each of the two plaintiffs and one |
| 21 | lawyer for each of the defendants.  There will be no |
| 22 | parties, no consultants, just -- I don't want to overwhelm |
| 23 | the jurors. |
| 24 | There were many motions in limine filed, and I'm going |
| 12:41:57 25 | to summarize my rulings now. |

1          I'll try to be efficient, and I will say at the outset

2     that my main job in this trial, once we pick a fair and

3     impartial jury, is to have the same strike zone for each

4     side.  Probably no one is going to like my strike zone, but

12:42:23  5     I worked very hard to have the same strike zone for each

6     side.  And I will say at the outset, I'm going to have a

7     very wide strike zone when it comes to the parties

8     introducing evidence about what the federal government, DEA,

9     FDA, did or did not do.  That's an essential part of the

12:42:49 10     story, the narrative.

11          The facts are the facts.  Each side is going to use

12     those facts in their narrative for the jury and for public

13     consumption, and I'm going to let both sides have a great

14     deal of latitude on that.  We're obviously not going to have

12:43:09 15     witnesses purporting to tell the jury what the law is, but

16     in terms of what the DEA and FDA did or didn't do, and what

17     implications that would have, I'm going to let both sides

18     have at it.

19          All right.  I'm going to start with a series of

12:43:34 20     motions filed by defendant Henry Schein.

21          Schein's number 1, pleading 2645, is denied.  But it

22     is important that if the plaintiffs or witnesses use the

23     term defendants, if they don't mean it to mean all of the

24     defendants in this case, they've got to be specific, because

12:44:10 25     it isn't fair just to lump everyone together.  That isn't

6

1    fair, and it's going to be confusing.

2         So the witnesses and the lawyers need to be careful

3    about that.  If they do mean all of the defendants in this

4    case, fine; but if it's less than all, then they need to be

12:44:28  5    specific.

6         Schein number 2 is also denied.

7         Schein number 3 is denied without prejudice, but the

8    Schein defendants may object to any specific evidence or

9    argument that they feel is factually inaccurate and/or lacks

12:44:56 10    foundation.

11         Schein number 4 is denied.  That relates to

12    medications distributed by Schein to Dr. Brian Heim.  That

13    evidence can come in.

14         Schein number 5 is denied, reference's to Dr. Heim's

12:45:19 15    indictment.

16         Schein number 6, references to Dr. Harper, is also

17    denied.

18         Schein number 7 is denied.

19         Schein number 8 is also denied.  It may be relevant.

12:45:40 20    Evidence about drugs distributed outside of Summit County

21    may also be denied.

22         Schein 9 is also denied.  It references the DEA fines,

23    investigations, or admonitions.  It's denied without

24    prejudice.  If defendant Schein thinks that something is

12:45:59 25    relevant or extremely prejudicial, they can raise that

1    again.

2           Schein number 10 references the cease and desist

3    letter, is also denied.

4           And Schein number 11 is denied as to statute of

12:46:23  5    limitations.

6           And Schein number 12 is denied, references to Henry

7    Schein Animal Health.

8           All right, turning to Walgreens motions in limine.

9           Number 1, evidence or argument about Walgreens'

12:46:49 10    ownership interest in AmerisourceBergen is denied.

11           Number two, evidence relating to Florida DEA

12    enforcement action and related settlement, that's denied.

13    That goes with my general comments.

14           Number 3, references to DEA witness Joseph Rannazzisi

12:47:13 15    as the 60-Minute man.  I'm going to allow brief accurate

16    references to the fact that Mr. Rannazzisi, who was a former

17    DEA deputy administrator, did appear on *60 Minutes* and other

18    news reports because that happened, but the plaintiffs can't

19    overemphasize or dwell on these facts, and they're not to

12:47:37 20    refer to him at all as the 60-Minute man unless that's a

21    nickname that -- in fact, I don't think -- I'm not going to

22    allow that at all.  It's not relevant that someone may have

23    called him the 60-Minute man, so he'll just be Mr.

24    Rannazzisi.  And if he appeared on *60 Minutes*, quite

12:48:02 25    frankly, either side can raise that, and the defendants may

1    use it to impeach him.

2          All right.  Plaintiffs' omnibus motion *in limine*.  I'm

3    going to grant the motion.  There's not going to

4    be -- number one, there's not going to be any evidence or

12:48:24  5    testimony about attorneys' fee arrangements or how

6    litigation expenses are paid, or anything about that.  That

7    is not relevant.

8          Number two, the plaintiffs have withdrawn their motion

9    to preclude testimony as to when parties selected, hired, or

12:48:49 10    were considering hiring attorneys.  I will grant the second

11    part of the motion, any testimony as to the actual

12    arrangements or details of how attorneys are being paid or

13    how they're being retained; but when a Summit County or

14    Cuyahoga official retained or considered retaining an

12:49:22 15    attorney may be relevant.

16          Number three is denied as moot.  The parties have

17    worked that out, as with number four.

18          Number five, I'm granting in part.  There will not be

19    any reference to how attorneys for either side are being

12:49:51 20    paid, how much they're being paid, how they travel.  It is

21    always admissible to ask an expert witness how much he or

22    she is being paid directly or indirectly.  Any form of

23    compensation is fair game.

24          And a mode of transportation, if one is, you know,

12:50:14 25    flying lavishly to or from court or around, and where

1    they're getting the money to do that, parties can probe

2    that.  So it's fair game for witnesses, expert witnesses,

3    it's not for attorneys.

4         Number six, reference to defendants' philanthropy or

12:50:38  5    good deeds.  Plaintiffs' motion is overbroad because it

6    would preclude the defendants from saying anything about

7    themselves.

8         So defendants are allowed to introduce themselves,

9    describe accurately what they do, but evidence that parties

12:51:04  10    and/or their employees are good citizens, do good deeds in

11    the community, such as providing scholarships, community

12    service, that's not relevant for the corporation or for any

13    individual.  That has nothing to do with this case, unless

14    somehow someone feels that something specific that an

12:51:25  15    employee is doing is relevant; but as a general rule, it's

16    not, so that part is granted.

17         Number seven, reference to any alleged malpractice

18    claims involving the parties' designated experts.  I can't

19    decide this in the abstract, so it may be relevant as to a

12:51:44  20    particular witness.  We'll have to deal with it as it comes.

21         Number eight, it's granted in part.  The

22    defendants -- well, I mean, I think it actually is fair game

23    to call or refer or use expert reports of the other side if

24    they were noticed in the litigation but not called, so I'm

12:52:15  25    not sure what this refers to.  If they weren't noticed,

1       neither side can refer to the other sides' experts that

2       weren't noticed; but if they were noticed and then a side

3       decides not to call them, the other side is free to use

4       them.

12:52:39    5       But if the witness isn't being called or the report is

6       not being used by either side, the fact that there might be

7       a malpractice claim against the witness is irrelevant.  So

8       you can't just generally say, well, the plaintiffs had on

9       their list someone, and so-and-so has a malpractice claim,

12:53:00   10       because if the person is not testifying, it's irrelevant.

11              All right.  Number nine is denied without prejudice.

12       People can use, you know -- can use technology to present

13       their testimony or documents.

14              Number ten was resolved.  It's moot, the parties

12:53:23   15       worked that out.

16              Obviously, number 11 is granted.  The reference to

17       what motions *in limine* the parties filed or didn't file or

18       the Court's ruling is not relevant to anything.

19              Number 12, related to punitive damages, is resolved as

12:53:43   20       moot because the plaintiffs aren't seeking punitive damages,

21       so there obviously won't be any reference to them.

22              Number 13 is granted.  Defendants may not argue or

23       suggest that the Controlled Substances Act and its

24       implementing regulations have not always imposed the duties

12:54:08   25       that the Court has already determined, but this ruling does

11

1    not prevent any defendant from presenting evidence that

2    DEA's guidance has been inconsistent and/or shifted over

3    time, or to produce direct evidence of communications from

4    DEA to that defendant as to anything the defendant was

12:54:35  5    doing.

6        Number 14 is granted.  I'm going to exclude any

7    evidence or argument that plaintiffs' claims or verdicts

8    would interfere and/or negatively impact the pharmaceutical

9    industry and/or the government's regulation of the

12:54:54 10    pharmaceutical industry.

11        Number 15, reference to the DEA approving or endorsing

12    a particular defendant's suspicious order monitoring

13    program.  Again, this goes to what I said, so this is denied

14    without prejudice.  If the defendants have documents from

12:55:16 15    the DEA relevant to one of their programs, they can

16    introduce it.

17        16 is denied.  That goes along with what I said, this

18    is a suggestion or argument that DEA's failure to sanction

19    or initiate enforcement.  Both sides are free to bring in

12:55:48 20    evidence about what DEA did or didn't do with their

21    enforcement actions or their investigations and ask the jury

22    to draw conclusions therefrom.  That's fair game for both

23    sides.  So that was really 16 and 17 go together in that

24    regard.

12:56:12 25        All right.  18 is granted, any reference to any award

1   of damages might adversely affect the ability of any member

2   of the jury or the public to purchase or have available

3   medication.  We're obviously not going to have any testimony

4   or speculation on that.

12:56:44  5   19 is granted for the same reason.  We're not going to

6   have any testimony or speculation that a judgment might have

7   an adverse affect on any defendant's ability to compete in

8   the marketplace.

9   The same with 20.  We're not going to have any

12:57:00 10   testimony about that any verdict might adversely impact any

11   defendant's incentive or ability to develop new drugs.

12   21 is also granted for the same reason.

13   22 is denied without prejudice.  I can't address this

14   in the abstract.  If someone is trying to use deposition

12:57:33 15   testimony from a deposition where the other side didn't have

16   a -- wasn't present or didn't have a fair opportunity to be

17   there, I'll have to address it in advance of that witness.

18   So we'll have to take it up on a case-by-case basis,

19   witness-by-witness basis.

12:57:53 20   23, relative to learned intermediary, is granted in

21   part.  The defendants may not argue or suggest they

22   satisfied the duty to warn because of the mere existence of

23   the learned intermediary doctrine.  But of course defendants

24   may argue that their warnings to doctors were accurate and

12:58:15 25   that whatever happened is the doctor's responsibility after

1     that.  That's part of their defense.  They can defend

2     against these claims using that if they wish.

3          Number 24 is denied.  This relates to alleged failure

4     to mitigate.  If the defendants want to make that argument

12:58:36  5     or evidence, they can do so.

6          25 is, obviously, going to be granted.  We're not

7     going to have the personal identification data of any

8     children or any children in child protective custody.

9          And 26 is granted, too.  We're not going to have

12:58:57  10     testimony or evidence about individually-identifiable health

11     information or medical records of any individual person.  If

12     someone somehow feels it's become relevant then to -- notice

13     the Court in advance, and I'll address that.

14          Number 27, reference of identity of any undercover law

12:59:24  15     enforcement personnel.  I agree with plaintiffs, that

16     everyone has got to take reasonable steps to protect the

17     identity of undercover law enforcement personnel, but I'll

18     need to know that in advance, because a lot of these people

19     have testified in other proceedings, and if they have, well,

12:59:46  20     there's no more confidentiality.

21          The same with number 28, about reference to

22     individuals in the Cuyahoga County Jail.  I'm not sure how

23     it's relevant, but we'll take that up on a specific basis.

24          29, obviously there's not going to be any evidence

13:00:14  25     about allegations of any county corruption, but if there's

1    actual evidence of it and it's bearing on this case, well,

2    then, that may be relevant.

3         All right.  Number 30, I think, both sides agree that

4    the fact of the grand jury proceeding is inadmissible.  So

13:00:44  5    there won't be any reference to a grand jury investigation,

6    but if there are underlying facts that led to an

7    investigation, that's fair game for either side.

8         31 is granted as unopposed.

9         32 is granted as unopposed.

13:01:08 10    33, again, is granted.  We're not going to refer to

11   general investigations of people.  That's not relevant.  If

12   it led to an indictment and the charge is somehow relevant,

13   then so be it.

14        34 represented about podcasts or media coverage

13:01:30 15   regarding Cuyahoga County courts, that's -- I don't

16   understand exactly what plaintiffs are trying to preclude or

17   what the defendants are trying to admit, so that's denied

18   without prejudice.

19        35, reference to any investigation regarding the death

13:01:51 20   of Aniya Day Garrett.  I'm not going to issue a blanket

21   exclusion of this.  I'm not sure how it's going to be

22   relevant.  So before someone introduces that, they're going

23   to have to make a showing that it's relevant.

24        36, again, relates to corruption in Summit County.

13:02:17 25   The same thing, there's going to be no testimony about

15

1    allegations.  If there's evidence, actual evidence of

2    corruption, it may be relevant.

3         37, deaths of an individual while in the Summit County

4    Jail.  That's denied without prejudice.  Again, I fail to

13:02:38  5    see how it would be relevant.

6         All right.  Turning to Cardinal's motions *in limine*.

7         Number 1, evidence concerning 14,000 suspicious orders

8    which Cardinal did not report and did not ship, that's

9    denied.

13:02:54  10         Number 2 is denied, evidence and argument containing

11    an interest in gossip e-mail.

12         Number 3, evidence based on data produced by Cardinal

13    for the years 1996 through 2005 are denied, but all sides

14    are to be careful so we're not comparing apples with oranges

13:03:19  15    and drawing conclusions therefrom.  So if you have 20 years

16    of data, you can't say it leads to the same inference as 10

17    years, or the numbers are equivalent.

18         Turning to Track One defendants' omnibus motions *in

19    limine*.  Number 1, evidence or argument concerning future

13:03:42  20    damages, that's granted, because plaintiffs can't seek

21    future damages.

22         Number 2 is denied without prejudice.  Plaintiffs can

23    introduce individualized evidence of description and

24    shipments, but only if it was produced by the plaintiffs

13:04:08  25    during discovery.

1          Number 3, I can't rule on these in the abstract, so

2     it's denied without prejudice.

3          Number 4, lay and hearsay testimony about prescription

4     opioids being a gateway.  It's denied as to factual

13:04:46   5     testimony, testimony about facts is allowed.  I'm not going

6     to allow fact witnesses to give expert testimony, however.

7          Number 5, evidence concerning lobbying, that's denied

8     without prejudice.  It may be relevant.  Obviously, everyone

9     is free to lobby state, local, federal officials.  And

13:05:14  10     there's nothing wrong about that, but it may be relevant to

11     go to intent, or it may be relevant -- again, there's a wide

12     open strike zone about what the federal government did or

13     didn't do, and it may be relevant as to why the federal

14     government did or didn't do something.

13:05:31  15          Number 6 I'm denying.  Shipments to areas of the

16     country outside of Summit and Cuyahoga County may be

17     relevant.

18          I'm denying number 7.

19          I'm denying number 8.  We've already addressed number

13:05:52  20     eight with Daubert rulings.  I don't need to do it again.

21          Number 9, denying.

22          And 10, people can use charts and data.

23          Number 11, I'm granting in part and denying in part.

24     Evidence as to defendants' overall financial conditions,

13:06:19  25     sales, revenues, are not relevant.  Defendants' evidence as

         1        to revenues and profitability directly relating to opoid

         2        sales may be relevant.

         3               Number 12 is denied without prejudice.  I think it's

         4        too broad, but, again, I don't think -- we're not going to

13:06:47  5        have individual witnesses being asked about their personal

         6        feelings about the opoid crisis or who is responsible.  That

         7        would be improper questioning.

         8               Number 13 was resolved by the parties, so that's moot.

         9               14, I'm granting it.  Some of the defendants will have

13:07:12 10        corporate representatives at counsel table, some won't.

        11        Some may have them some days, some may have them not other

        12        days.  We're not going to have any comment.  It's not

        13        relevant whether a corporate representative is here every

        14        day or some of the days, so we're granting that.

13:07:31 15               All right.  McKesson's motions *in limine*.

        16               All right.  Number 1 is denied without prejudice.

        17        It's too broad.  I'll deal with it as it comes up.

        18               Number 2 is denied.  Evidence relating to the U.S.

        19        House Energy and Commerce Committee investigation, that may

13:07:55 20        be relevant.

        21               Number 3, nationwide trends in drug deaths may be

        22        relevant.

        23               Number 4, evidence or argument about allegations

        24        contained in letters from the DEA or DOJ.  They may be

13:08:15 25        admissible, so I'm denying that.

1          Number 5, I'm denying that, but additional rulings may

2     be made via objections to deposition designations.

3          Number 6, testimony, documents, relating to McKesson's

4     relationship with CVS and Rite Aid.  That's denied, it may

13:08:49  5     be relevant.

6          Turning to distributors' omnibus motions *in limine*.

7          Number 1 is denied.  Settlements with the DEA in West

8     Virginia may be relevant.

9          Number 2, nonparty corporate representatives

13:09:06 10     testifying to matters outside their personal knowledge, I'm

11     denying that without prejudice.  But, obviously, a witness

12     may only testify to evidence within his or her personal

13     knowledge.  If the witness is a corporate representative and

14     the witness knows from his or her experience what their own

13:09:31 15     company's practice is, they can testify to that, but they

16     can't speculate as to practices they don't know about or

17     something in some other department, or from a period of time

18     they don't know about.

19          I think everyone knows that.

13:09:47 20          All right.  Evidence of criminal indictments and

21     investigations without corresponding proof of final judgment

22     or conviction.  It's granted as to indictments that did not

23     lead to a conviction.

24          It's denied as to general criminal investigations,

13:10:05 25     unless the source of the information or other circumstances

1        lack trustworthiness.

2             Number 4, prohibit plaintiffs from stating expressly

3        or suggesting that the jury may infer that an older document

4        never existed just because it cannot be found.

13:10:35  5         I'm denying this.  This is -- this is for the jury.

6        If either sides wants to ask the jury to draw conclusions

7        from the fact that a document can't be found, they can make

8        the argument.  The jury can draw whatever conclusion it

9        wishes.

13:10:51 10         Number 5, evidence or arguments suggesting

11       distributors committed a fraud on the DEA.  Well, we don't

12       have a fraud on the DEA claim here, so plaintiffs can't

13       argue that there's a fraud on the DEA.  But it's open game,

14       open season on what DEA did or didn't do, or what the

13:11:24 15      parties produced to DEA.

16             Number 6 ties in with something I said before,

17       references broadly and generally to defendants.  So I'm

18       going to caution the plaintiffs that when -- if they mean

19       argument or a question or -- question to apply to all

13:11:46 20      defendants, fine; but if not, they're not just to lump them

21       all in, they're to be specific.

22             Number 7, evidence and arguments about RICO predicates

23       that plaintiffs did not identify in their discovery

24       responses, that's denied.

13:12:07 25         Number 8 is denied.

20

1          All right.   Turning to Teva and Actavis motions *in*

2     *limine*.

3          Number one, reference to the Cephalon misdemeanor

4     plea, that's denied.

13:12:26   5          Reference to off-label promotion is denied.   Reference

6     to the civil settlement between Cephalon and the Office of

7     Inspector General along with the settlement of the opoid

8     action brought by the Oklahoma attorney general, that's

9     denied.

13:12:42  10          Evidence of any harm that may have occurred outside of

11     these two counties is denied.

12          Evidence of market relating shipments outside of these

13     two counties is denied.

14          Evidence regarding Teva's financial support of

13:12:57  15     third-party groups is denied, it may be relevant.

16          Testimony from Russell Portenoy is denied, but it's

17     probably moot because I'm not sure he's going to be

18     appearing.

19          Number eight, argument that the Actavis generic

13:13:17  20     defendants should have made additional warnings regarding

21     their generic medicines or should have stopped selling them

22     is granted in part and denied in part.

23          Under the Supreme Court established law, a defendant

24     doesn't have to stop selling.   Defendants don't have to stop

13:13:39  25     selling, so no one can argue that they should have or were

21

1    required to.  But any evidence that any defendant engaged in

2    false marketing, that's an essential part of the plaintiffs'

3    claim.  That can come in.

4         All right.  I'm going to grant 9 and 10.  The purchase

13:14:22  5    price paid by Teva for Actavis I think is more prejudicial

6    than probative, so it's out.  And any reference to the

7    settlement agreement between Teva and Allergan, that's

8    granted, unopposed.

9         All right.  I think that takes care of all the motions

13:14:44 10    *in limine*.

11         All right.  Obviously, I've given each side 100 hours

12    so we get this trial to the jury well before Christmas.

13    Cardinal has raised a concern that it should get some

14    additional time because so many of the Cardinal witnesses

13:15:12 15    are going to be testifying live because it's within

16    100 miles of the Northern District of Ohio.

17         And the Court has some sympathy for Cardinal's

18    argument.  Obviously, you know, witnesses that are appearing

19    by deposition, their testimony is limited.  It's going to be

13:15:34 20    limited to certain excerpts, and there won't be any live

21    cross-examination.

22         I'm not -- I mean, the 100 hours is for the defendants

23    to use as they please.  I'm not saying that each defendant

24    has to have, you know, 16 and a half hours or whatever.  So

13:15:53 25    I think that the testimony that -- that the hours should be

22

 1    used fairly, and obviously there needs to be and likely need

 2    to be more cross-examination of witnesses that are appearing

 3    live.

 4         But I'm not going to -- I'm going to suggest that

13:16:10  5    that's something for the defendants to work out among

 6    themselves.  I'm not going to give Cardinal more hours or

 7    direct that the defendants allocate more to Cardinal, but

 8    I'm suggesting that everyone needs to be fair about that.

 9         I think Special Master Cohen has dealt with how he

13:16:31 10    wants the parties to deal with these deposition excerpt

11    objections, to get them to him on a rolling basis.  Everyone

12    knows when the witnesses will appear, and he will deal with

13    that.

14         All right.  There were objections to witnesses.  There

13:16:52 15    were two or three that came in very late, and may be I can

16    deal with them.  If I can deal with them quickly now, I

17    will.

18         All right.  The first one, this is a third-party

19    witness.  David Gustin filed a motion to quash the

13:17:14 20    plaintiffs' subpoena that he appear and testify.

21         All right.  Mr. Gustin is a former employee of

22    McKesson.  He retired in 2016.  He was director of

23    regulatory affairs for the central region in early 2014.  He

24    gave a seven-hour videotape deposition in August of 2018,

13:17:42 25    500-page deposition.

1          On March 21st of this year, Mr. Gustin was indicted in

2     the Eastern District of Kentucky, a federal indictment on a

3     felony charge alleging conspiracy with unnamed

4     coconspirators to distribute and dispense a quantity of

13:18:02  5     pills containing controlled substances between 2008 and

6     2016.

7          Mr. Gustin has represented through counsel that he

8     will exercise his Fifth Amendment right if he testifies.

9          Now, I always took the position when I was a

13:18:24 10     prosecutor that it was improper and prejudicial just to

11     bring a witness in to a trial or jury to take the Fifth when

12     everyone knew he was going to take the Fifth.

13          Can the plaintiffs articulate why it would be more

14     probative than prejudicial to bring in Mr. Gustin just to

13:18:47 15     take the Fifth?  He's a former employee of McKesson.  You

16     have his deposition.  You can seek to use his deposition.

17     He's clearly an unavailable witness.  He certainly has a

18     Fifth Amendment right, and if anyone would challenge it, I

19     most likely would overrule that challenge.

13:19:09 20          Can you articulate to me why it won't be unfairly

21     prejudicial to him and to McKesson to bring him in and take

22     the Fifth?

23               MR. WEINBERGER:  Your Honor, Peter Weinberger

24     on behalf of plaintiffs.  He doesn't have a right to

13:19:25 25     exercise his Fifth Amendment rights when he is not a

24

 1    defendant in the civil action.  And so I understand your

 2    analysis, Your Honor, but he can be compelled to testify,

 3    and it is our preference that he respond to the subpoena,

 4    and that we not have to play a seven-hour deposition.

13:19:46  5              THE COURT:  Well, I'm not sure -- you

 6    think -- whatever testimony he's given, he's given.  All

 7    right?  Anyone can use that.  All right?

 8        But now he has a present Fifth Amendment right because

 9    he's facing criminal indictment, and he's going to be asked

13:20:05 10   questions about the conduct during the time period when he

11    worked for McKesson during the indictment.  You can

12    challenge that, but I'm the one who would have to rule on

13    the challenge, and I think you'd have a very, very uphill

14    battle.

13:20:19 15        If you want to go through that, you can.  And if I,

16    you know -- but if I -- if you want to challenge his

17    assertion of the Fifth Amendment privilege, we're going to

18    do that one night.  We're not going to take up trial time,

19    and -- but I think you're going to lose.  He's got a Fifth

13:20:39 20   Amendment right.  If you're going to be asking him about

21    anything he did during the time frame of that indictment,

22    and I'm sure you are -- you're not going to be worried about

23    what he did in 2003 or something -- I'm going to sustain his

24    privilege.

13:20:56 25        I think we're going to leave it -- unless you can

25

 1   articulate in writing why he does not have a Fifth Amendment

 2   privilege to answer questions about conduct that forms the

 3   basis of the indictment, I'm going to quash it.  But I'll

 4   wait for your response.

13:21:19   5                  MR. SHKOLNIK:  Judge Polster, Hunter Shkolnik.

 6        Just if I can add to that.  In situations like this,

 7   one option is that there's a stipulation that if the witness

 8   was called and asked about any of these facts, he would

 9   exercise his right under the Fifth Amendment, and it's a

13:21:34  10   stipulation that we can rely upon and utilize as part of our

11   evidence in chief.  We're entitled to it.

12                  THE COURT:  But the only evidence then would

13   be some prejudice that a former employee of McKesson is

14   saying the Fifth.  That's the whole point.

13:21:49  15                  MR. SHKOLNIK:  But the fact --

16                  THE COURT:  You think -- I mean, I don't think

17   you can use against McKesson in this trial the fact that a

18   retired employee whose now been indicted is exercising his

19   Fifth Amendment right, the same way I don't think you can

13:22:08  20   introduce against McKesson the fact that this guy has been

21   indicted and say, well, that somehow shows that McKesson did

22   something wrong.

23                  MR. SHKOLNIK:  Well, the indictment goes

24   directly to his job title and the distribution, which serves

13:22:21  25   as the basis of the claims.

1           THE COURT:  I understand.  An indictment is

2    only an allegation.  That's the same reason I ruled on these

3    motions *in limine*.  You can't just introduce evidence of

4    indictments that didn't lead to convictions.  That's unfair.

13:22:38 5        So unless the plaintiffs can convince me in writing,

6    clearly, that Mr. Gustin doesn't have a valid Fifth

7    Amendment right, I'm going to grant the motion to quash.

8           All right.  Then we've got Cardinal Health's motion to

9    quash the trial subpoena of Jennifer Norris, who is

13:23:00 10  Cardinal's in-house counsel.

11          All right.  I haven't read her deposition, all right?

12   I don't know what the plaintiffs are going to ask her.

13   Clearly, she can be subpoenaed to testify to anything within

14   her personal knowledge that's not privileged, and personal

13:23:25 15  knowledge could include her knowledge of Cardinal's general

16   practice and procedures.  All right.  That's her personal

17   knowledge.  Anything beyond that would be speculation.

18          So I don't know -- you know, I think everyone knows

19   that.  So I'm not going to quash the subpoena, because she

13:23:45 20  may have relevant testimony in this case which the

21   plaintiffs, if they want to have her live, can ask.

22          But if they ask her to guess or speculate, the

23   objection is going to be sustained.

24          MS. MAINIGI:  Enu Mainigi for Cardinal.  If I

13:24:02 25  may address that.

27

1          Miss Norris was not a percipient witness with anything

2     having to do with anti-diversion.  She did serve as the

3     corporate representative, and in that capacity, she learned

4     information for the purpose of providing 30(b)(6) testimony.

13:24:24  5     She has now been issued a trial subpoena to appear live

6     personally.

7          So she does not have personal knowledge, Your Honor,

8     she served as the 30(b)(6).

9                THE COURT:  Well, Ms. Mainigi, I don't have

13:24:40 10     any reason to doubt what you're saying.  I don't know what

11     the plaintiffs are going to ask her.  They can subpoena

12     anyone they want.  They know they can't ask someone to guess

13     or speculate.  They're pretty experienced lawyers.  They

14     know I'm not going to allow a witness to guess or speculate

13:24:55 15     or repeat hearsay, what someone told him or her, so I'm

16     assuming they're calling her to ask permissible questions,

17     the same way I'm assuming your witnesses, when you call

18     them, you intend to ask them admissible questions.

19          So I'm denying the motion to quash the subpoena on the

13:25:17 20     assumption that the plaintiffs understand the Rules of

21     Evidence.

22                MR. WEINBERGER:  Your Honor, Peter Weinberger

23     again.  I just want to note for the record, we did file a

24     written response with respect to the Gustin issue.

13:25:35 25                THE COURT:  I guess I didn't see it.  Anyway,

 1    I'm denying the motion to quash.  Obviously, you can only

 2    ask -- well, you filed something on Gustin?

 3                    MR. WEINBERGER:  Yes.

 4                    THE COURT:  Well, can you articulate why you

13:25:50  5    don't think he has a Fifth Amendment privilege?

 6                    MR. WEINBERGER:  Well, he may have a Fifth

 7    Amendment privilege, but not one that he can assert in this

 8    action.  That's our point, Your Honor.

 9                    THE COURT:  Well, that wouldn't be much of a

13:26:08 10    Fifth Amendment privilege, Mr. Weinberger.

11                    MR. WEINBERGER:  It has to do with whether or

12    not he has been civilly sued in this case, which he has not.

13    And I think --

14                    THE COURT:  But that has nothing to do -- his

13:26:23 15    Fifth Amendment privilege, he just needs a well-founded

16    belief that answers to these questions could, you know,

17    could hurt him, you know, could be used against him in a

18    criminal investigation, and he's under indictment.  It's not

19    a guess or a speculation.  He's under indictment, and you're

13:26:46 20    going to be asking him questions about that same period.

21         All right.  I'm going to grant that motion.

22                    MS. SINGER:  Linda Singer for the plaintiffs.

23    Just to speak to the arguments that were made in the motion,

24    if I may, Your Honor, without speaking to whether he has a

13:27:01 25    right to invoke a Fifth Amendment privilege, I think

29

1     plaintiffs have argued with case law support in its motion,

2     which I do not have in front of me, unfortunately, that a

3     witness taking a Fifth Amendment privilege which applies in

4     a criminal proceeding, the plaintiffs are still entitled to

13:27:19  5     claim an adverse inference in the civil litigation.

6          Mr. Gustin's responsibilities go directly to

7     McKesson's enforcement responsibilities that are at issue in

8     this case.  And the fact that he cannot get up and testify

9     as to what he did or didn't do, as Your Honor has said, in

13:27:39 10    that capacity at McKesson goes directly to plaintiffs'

11    claims, and the jury is entitled to make an inference.

12          THE COURT:  All right.  I think it is far more

13    prejudicial than probative, particularly since you have a

14    500-page deposition.  You have the testimony, and you can

13:27:56 15    put into evidence anything he testified to about what he did

16    or didn't do, assuming it's within his personal knowledge,

17    about all those things.  You've got his answers.

18          So I'm granting that motion, that motion to quash is

19    granted.

13:28:30 20          All right.  I've already told the parties -- I'm going

21    to reiterate, we're not going to be hopefully cluttering up

22    this trial about objections to the admissibility of

23    documents on grounds of authenticity.  And if we do, and the

24    objection is denied, I'm going to charge all that time to

13:28:49 25    the party that objected.  So both sides are aware of that.

1          There was a motion that was filed this week by some or

2     all of defendants asking me to order lawyers and witnesses

3     not to discuss this case outside of the courtroom.

4          I mean, we already have it for lawyers.  Specifically,

13:29:51  5     it was to preclude attorneys and witnesses from discussing

6     this case outside of the courtroom.

7          Certainly, my -- does anyone think there's a reason

8     for the Court not to issue this order?  I'm concerned -- I

9     mean, I'm not sequestering this jury.  There's already been

13:30:19 10     a tremendous amount of publicity about this, all right.  The

11     jury is going to hear from the lawyers what the lawyers need

12     to tell them with opening statements, closing arguments.

13     They'll hear the questions.  They'll hear from the witnesses

14     what the witnesses need to tell them from their testimony.

13:30:38 15          Certainly, lawyers shouldn't be talking to the press

16     about the case, and I don't think witnesses should be

17     either.  I don't think I've ever gagged witnesses, though,

18     and then there's a question of should it apply to parties.

19          And the problem is, the plaintiffs are public

13:30:59 20     officials, and so what does everyone think about this?

21          MR. SHKOLNIK:  Your Honor, on behalf of

22     Cuyahoga County, I think I feel comfortable.  We just spoke

23     with counsel.  We don't have intentions of making statements

24     regarding the trial, the case, but certainly, as government

13:31:26 25     officials and the government, if issues related to opioids

1    do come up, to curtail the government or its representatives

2    or its officials from talking about it, I think that's too

3    far --

4                THE COURT:  Mr. Shkolnik, no way am I going to

13:31:42  5    try and curtail a public official's right to, you know, to

6    deal with the opoid crisis or talk about it.

7        I think the defendants' motion had to do with, like,

8    commenting on the trial or adding to their testimony, or

9    saying, you know, "I thought it was" you know what.  If they

13:32:05 10    want to criticize me, that's fine.  I don't care.  But

11    something having to do with directly commenting on what

12    happened in the courtroom, that's what I'm talking about.

13                MR. SHKOLNIK:  And I understood that,

14    Your Honor.

13:32:18 15        The county has no problem with not commenting upon the

16    trial and what is happening here.

17                THE COURT:  All right.

18                MR. SHKOLNIK:  I just wanted to make that --

19                THE COURT:  All right.  I think I'm going to

13:32:30 20    issue that order.  I don't want there to be any comment,

21    discussion by attorneys, parties, and witnesses, about

22    what's happened in the courtroom.

23        All right.  Everyone has worked extremely hard and

24    done, I think, a terrific job in getting this case ready for

13:33:04 25    trial.

 1          The one aspect where I'm disappointed is the fact that

 2     we are about to begin this trial, and we don't have any

 3     semblance of final jury instructions.  The parties only

 4     agreed on my boilerplate, which I didn't ask agreement about

13:33:26  5     that.  We sent that out so you wouldn't have to worry about

 6     that.

 7          The submissions would lead one to conclude that this

 8     is the first civil RICO trial in this country.  It obviously

 9     isn't, or the first public nuisance trial in any court in

13:33:43 10     Ohio, which it's not.

 11          And, you know, as a result, I didn't need those jury

 12     instructions for myself at the beginning.  You all needed

 13     them.  When I was a trial lawyer, I wanted to know what the

 14     law was before the case started, not after the evidence

13:33:58 15     submissions were in, and I'm encouraging the parties who are

 16     here to urge their lawyers to work constructively.

 17          The idea is not to gain these instructions or get

 18     every last ounce of argument in them.  A jury instruction is

 19     to be conservative.  By conservative, I mean it's what the

13:34:19 20     law is, not what the law might be or should be.  The law in

 21     this district, this circuit, this country, what it is on

 22     these issues.

 23          You want an instruction that's going to be affirmed

 24     one way or the another; in other words, it's accurate.  It's

13:34:34 25     not argument, it's accurate.  And you want it as clear as

33

1       possible to laypersons, which means as little legalese as

2       possible.  Some is inevitable, it's legal instructions.

3       That's what it should be.

4           And I know that if both sides, all sides work

13:34:52  5     constructively, they can produce instructions that are

6       90 percent agreed upon.  Yes, there may be a couple critical

7       legal issues I'm going to have to rule on, okay, but I've

8       never started a trial where there was nothing agreed on.

9           So as it now stands, you know, I'm going to be working

13:35:11 10    on it.  And if it takes two months it will take two months,

11      and it won't be good for either side.  But I'm making it

12      clear now on the record that both sides, all parties,

13      plaintiffs and the defendants, have waived any objection

14      they have to not getting timely jury instructions, because

13:35:28 15    it's of your own doing, their own doing.

16          You know, one of the key issues is joint and several

17      liability.  I'm going to have to decide that.  I believe

18      that the law imposes joint and several liability, but I'll

19      certainly have to carefully look at that.  But, again, I

13:35:49 20    will work on that.  If we've got to do it all ourselves from

21      scratch, which is the way it is now, it's going to take a

22      long time.

23          So, again, I would encourage some lawyers who aren't

24      going to be in this courtroom daily doing the witnesses to

13:36:06 25    work together, and to the extent you can submit anything

1     that you agree upon, the odds are 99.9 percent that I'm

2     going to give it, so I would encourage that.

3          I am working on preliminary jury instructions right

4     now, and I've got to tell the parties something -- the

13:36:28  5     jurors something about what they're going to be doing, what

6     the claims are, and what they're going to have to consider.

7          And I'm going to have it to do it somewhat generally,

8     and I will get that out to the parties this week so you can

9     look at them.  And if you think there's anything, you know,

13:36:48 10     that's just flat out wrong, let me know.  I don't want to

11     create an error, but, again, it's preliminary instructions.

12     So I'll get those out as soon as I can in a short turnaround

13     time.

14          All right.  We have some stipulations.  I guess I need

13:37:05 15     to know from all of you what you want me to do with them.

16          In some trials, the parties have wanted the judge to

17     read them all at the beginning or all at the end, or at

18     certain points; or sometimes the lawyers read them, you

19     know, in conjunction with a particular witness.  I really

13:37:24 20     don't care, I just want to know.

21          And I generally include those in the final

22     instructions, just so the jury is reminded of it, but you

23     all have to figure out, you know, how you want to -- what

24     you want to do with those.

13:37:39 25          And I'll take my cue from you.

1              LAW CLERK:  Right now we've got them in the

2     preliminary instructions.

3              THE COURT:  Well, I don't know.  I mean, one

4     idea I thought of would be to actually give each juror a

13:38:00  5   copy of them that they can keep and have.  I mean, if I read

6     off 20 stipulations, guess what?  After number one or two,

7     they're going to glaze over and not know what it counts for.

8          A stipulation only makes sense in the context of some

9     testimony or documents.  So what do you all think about

13:38:21 10   giving each juror a printed copy of them?

11          I give each juror a copy of the final jury

12     instructions at the end.  I don't give them the preliminary

13     instructions, but they're going to take back into their

14     room -- and I do that because, believe it or not, I had a

13:38:38 15   case where I was trying the case, and the judge gave one

16     copy, and the foreperson monopolized it and didn't show it

17     to anyone else.

18          It's hard to fathom, but it did happen to me.  So when

19     I became a judge, every juror is going to get his or her own

13:38:58 20   copy.  But what do you think about getting the copies.

21              MR. LANIER:  Your Honor, Mark Lanier for the

22     plaintiffs.  Currently we have scheduled a meeting with

23     Special Master Cohen at 1:00 p.m. on Sunday to deal with

24     exhibit issues.

13:39:11 25              THE COURT:  Okay.

                                                                          36

            1              MR. LANIER:  If the Court would indulge us,

            2    we'll communicate with defense counsel between now and then,

            3    and if we can't come up with an agreement deal with it with

            4    the special master on Sunday.

13:39:23    5              THE COURT:  Okay.  If I just start off the

            6    trial by reading 20 stipulations, Mr. Lanier, it's really a

            7    waste.

            8              MR. LANIER:  Agreed.

            9              THE COURT:  At the end it may be useful with

13:39:34   10    the -- you know, after the summary and everything, but, so,

           11    I'll take my cue from you.

           12              MR. LANIER:  Thank you, Judge.

           13         All right.  I'm reminding everyone that in terms of

           14    our schedule, it looks like next Monday we'll be completely

13:39:55   15    opening statements.  I don't think there will be time for

           16    any witnesses.  But we'll start with the testimony on

           17    Tuesday.

           18         There is no trial next Friday, October 25th.  There's

           19    no trial Monday, November the 11th, that being Veterans Day.

13:40:11   20    It's a federal holiday.  And Thanksgiving week, the last

           21    week of November, we're in trial only Monday and Tuesday,

           22    the 25th and 26th.

           23         So I'm going to tell all of the jurors that, so they

           24    know.

13:40:33   25         I think I've got everything on my list.  But now, is

1    there anything that -- and let me say, with the jury, what

2    I'm going to do is, we're bringing in 50 tomorrow, and I've

3    got some questions for the whole panel which I will ask.

4    That's my customary practice.

13:40:59  5        Then I will let each side take a short period of time

6    to ask any additional questions, or maybe the same ones if

7    you want to ask it in a different way.  That's fine.

8        And then if there are questions often from

9    the -- maybe from the questionnaire that we want to question

13:41:25 10   individual jurors, since there are so many, just having

11   everyone congregate at the sidebar isn't very efficient, and

12   so I would bring the jurors into my chambers with just one

13   representative from each party, for no more than five

14   minutes of questioning.

13:41:41 15       And then we'll have for cause challenges, which I'll

16   deal with on the record, to any of the 50.  And if after

17   those for cause challenges we have at least 24 jurors, I

18   will then have the parties do their peremptory challenges.

19   We have up to six for the plaintiffs, up to six for the

13:42:11 20   defendants.  I want to end up with 12, so we need 24, and

21   we'll do it.

22       If we don't have 24, let's say we have only 20, what

23   we'll do is I'll direct those 20 to come back Thursday, and

24   we'll start up the process with the next 50.  And, you know,

13:42:36 25   when it's clear we'll have -- you know, then we'll have some

1    for cause challenges, and then I guess we'll have to do the

2    peremptories with the 20 left from day one and however is

3    left with day two, is what we'll do.  That's the way we'll

4    do it.

13:42:56  5        And I believe based on the very good and excellent

6    work we did last week, it won't take more than two days to

7    pick the jury.  We may be able to do it just in one.

8        But the process has worked very well and everyone

9    worked very hard, and I want to appreciate that cooperation,

13:43:15 10   and we excused a lot of jurors who clearly should have been

11   excused.

12        Okay.  Anything that any counsel for any of the

13   parties wish to raise?

14             MR. WEINBERGER:  Yes, Your Honor.  On behalf

13:43:31 15   of plaintiffs, Peter Weinberger.

16        On the voir dire issue, so maybe this is -- maybe I'm

17   wrongly assuming, but I'm assuming that we're going to be

18   able to voir dire the entire panel.

19             THE COURT:  Correct.  I'm going to be asking

13:43:44 20   my questions of, Mr. Weinberger, of the 50, and you can

21   address your questions to the whole 50, or you can say,

22   juror number 33, what do you think of this; either way.

23   And, yes, and challenges for cause will be to the whole 50

24   that we're having Wednesday, right.

13:44:05 25             MR. WEINBERGER:  And when we exercise

1     peremptories, is it going to be with respect to the first 12

2     in the box?

3                    THE COURT:  You can exercise your peremptory

4     on anyone.  I mean, you only have six.  If you want to use

13:44:18 5     your six on jurors 45 through 50, you can.

6          And the way I do it, just say we had 12 in the box,

7     and someone strikes number 6, well, then, I bring up the

8     first -- the next numbered juror, and he or she takes the

9     spot of number 6.  And we're going to end up with 12.

13:44:47 10          And the way I work it, whoever is left -- hopefully

11     all 12 are here at the end of the trial, and if so, we have

12     12 deliberate.  If someone has gotten sick or had a family

13     emergency we have only 11, and then we have only 11.  But

14     any one of the 12 stays on.

13:45:05 15                    MR. WEINBERGER:  So tomorrow we'll know sort

16     of the seating chart, you know, where is the next juror up

17     sitting at?

18                    THE COURT:  Yes, Mr. Weinberger, you'll know,

19     and you probably won't know until right then.  They'll come

13:45:19 20     in, and they'll have a name and number, and we'll know.  I

21     mean, we'll all have the questionnaires, so we'll know then.

22          The jury department will be doing that randomly.

23     You'll know tonight which are the 50, and then they'll come

24     in, and then we'll have to sort our questionnaires so we

13:45:35 25     know who is seated where.

40

1          MR. WEINBERGER:  And in terms of time for each

2     side for voir dire questioning, Your Honor?

3          THE COURT:  Well, what do you think is

4     reasonable? I normally don't allow a lot:  15, 20 minutes is

13:45:56 5    what I'm thinking.  Because, again, these jurors have been

6     asked a lot of questions, a lot of very good probing

7     questions, and we have their answers.

8          And obviously, if a juror has expressed on his or her

9     questionnaire some hesitation, some uncertainty in the

13:46:16 10   question, do you believe you can be fair and impartial, I'm

11     not going to question this juror out in this room.  That's

12     what I'm going to ask that juror back in my chambers.

13          So I'm thinking maybe 20 minutes for the plaintiffs,

14     20 minutes for the defendants on, you know, other questions,

13:46:35 15   or repeating my questions.

16          MR. LANIER:  Mark Lanier for plaintiffs.

17          If I understand your process right, you don't want us

18     to get answers in the global voir dire that would

19     commit -- that would be sufficient for cause.  If we look

13:46:58 20   like we've got someone who may have a for cause reason --

21          THE COURT:  Right.

22          MR. LANIER:  -- then we take them back

23     individually, and not try to mess up the whole panel.

24          THE COURT:  That's the whole point, correct,

13:47:11 25   Mr. Lanier, of doing it back there.

41

1          Obviously, I don't want some juror to blurt out why he

2     or she might have a problem, and everyone is going to --

3                    MR. LANIER:  Hear it.

4                    THE COURT:  One of two things will happen.  It

13:47:24  5     may taint everyone, or someone may think, hah, that's how

6     I'll get off this jury.  See what number 33 said?  That's

7     me, too.

8                    MR. LANIER:  In light of that, if that's the

9     approach, then the 20 minutes should be valid for us to get

13:47:38 10     the questions we need to get out to elicit to know who to

11     take back to chambers.

12                    THE COURT:  That's the idea.  Or, you know,

13     introduce yourself, or there's some general things you want

14     to throw out there, that's what it for.

13:47:53 15                    MS. MAINIGI:  Your Honor, may I ask a

16     follow-up?  Enu Mainigi for Cardinal.

17          As I understood it, each one of the 50 will be taken

18     back for individual voir dire; is that correct?

19                    THE COURT:  I think so; or maybe to save time,

13:48:08 20     if no one has a reason to do it, then I won't.  I mean, I've

21     been going back and forth as to whether we just bring

22     everyone back just to bring everyone back, or if there's

23     absolutely nothing on the questionnaire that creates any

24     issue, I don't know.  I mean, do you have a strong opinion

13:48:38 25     either way?

1          MS. MAINIGI:  I do, Your Honor, on behalf of

2    Cardinal.  We had understood that each individual juror

3    would be invited back, and it may be that one juror, we're

4    going to be done with them in 30 seconds because no one has

13:48:51 5    any questions; but we do think we need that opportunity to

6    ask those questions, especially if we're getting 20 minutes

7    on the front end.

8          THE COURT:  I may do it -- I may do it, if not

9    for that reason, I don't want any of the jurors to feel like

13:49:08 10    there was something wrong with them and they, you know, or

11    other jurors wondering, well, why did the Judge talk to him

12    and not me, or her or not me.

13        So I think probably out of fairness, I think it makes

14    sense to bring everyone back even if it turns out it's

13:49:26 15    really quick and nothing to ask.

16        I think it looks better, so we'll follow your

17    suggestion.

18          MS. MAINIGI:  Thank you.

19          MR. NICHOLAS:  Your Honor, Bob Nicholas from

13:49:35 20    AmerisourceBergen.  I have a follow-up question on that --

21          THE COURT:  Okay.

22          MR. NICHOLAS:  -- which is when jurors are

23    taken back individually, are we going to be making our

24    strike motions -- our cause motions back -- you know, one by

13:49:48 25    one, or are you bringing them all back and then we do it at

1      the end?

2                      THE COURT:  Well, I think what's efficient,

3      Mr. Nicholas, is that after we finish asking the juror the

4      questions, the juror goes back, and then I think I might

13:50:11  5    say, does anyone feel this juror should be excused for

6      cause.  And I'll take it up right then, right there, when

7      we're fresh on it, rather than waiting what could be an hour

8      or something, and then going back to Juror Number 23.  I

9      think that's more efficient, and I think that's what we'll

13:50:30 10    do, and I'll rule on it.  And if no one has a challenge for

11     cause, then that's quick.  And if someone does, well, then,

12     I'll rule on it.

13         I think that makes sense, because what that juror has

14     said and how he or she has said it will be fresh in

13:50:47 15    everyone's mind, and it's the way to do it.

16                      MR. NICHOLAS:  I would agree.

17                      MR. WEINBERGER:  Your Honor, a couple of more

18     things on the plaintiffs' side.

19         As I understood your earlier ruling, you were allowing

13:51:05 20    each of the defendants to have a lawyer back and

21     interviewing an individual juror, and you were allowing us

22     one lawyer per plaintiff?

23                      THE COURT:  Right.

24                      MR. WEINBERGER:  Can we have three lawyers on

13:51:20 25    our side?  There's going to be six lawyers --

44

 1              THE COURT:  All right.  You can have three.

 2     It's all right, two or three.  I didn't want to overwhelm

 3     the -- I don't want the juror to feel uncomfortable.

 4          Okay.  All right.  Any --

13:51:41  5              MR. WEINBERGER:  Yes, Your Honor.  Sorry,

 6     I'm --

 7              THE COURT:  No.  I understand, Mr. Weinberger,

 8     these aren't all your questions.  You might have received

 9     some from colleagues.  You're a spokesperson.

13:51:52 10              (Overlapping speakers.)

 11              MR. WEINBERGER:  I spent all night --

 12              UNIDENTIFIED SPEAKER:  *Mea culpa*.

 13              THE COURT:  That's all right.

 14              MR. WEINBERGER:  We've been discussing with

13:52:02 15     Special Master Cohen the issue of the length of the opening

 16     statements, and we've made a couple of proposals.

 17          Have you made a ruling on that, Your Honor?

 18              THE COURT:  I thought we did.

 19              LAW CLERK:  We did.

13:52:21 20              THE COURT:  Yeah, I thought we did.  I even

 21     brought it out with me.

 22              SPECIAL MASTER COHEN:  Judge, there were three

 23     versions that were floating through the e-mail, and all of

 24     the parties agreed on what was called Version 3.

13:52:35 25              THE COURT:  Well, I'll just put it on.  It's

45

1       my understanding that everyone agreed on two and a quarter

2       hours total for plaintiffs, and 30 minutes for each

3       defendant family, so that would be 6 times 30 is 3 hours

4       total.

13:52:49  5       Now, that's a long opening statement for plaintiffs,

6       and I know, Mr. Lanier, you have a very fine reputation, but

7       I don't know too many people who can keep anyone's attention

8       for two and a quarter hours.  I've seen people who have

9       tried, and they didn't do too well.

13:53:15 10       So if you don't want to use all two and a quarter

11      hours, that's fine with me, and you may be helping your

12      clients.  But the parties agreed on it, so I'm not going to

13      pull the trapdoor on you.

14              MR. LANIER:  Thank you, Judge.

13:53:34 15             MR. WEINBERGER:  Your Honor, we submitted an

16      e-mail to you with respect to the issue of live video

17      streaming of the proceedings to a remote location, and we

18      learned after that that the defendants have objection to

19      that because of security issues.

13:53:54 20       And not to go through all of the details --

21              THE COURT:  On that, Mr. Weinberger -- I don't

22      want to cut you off.  I'm not certain that the Court has

23      ever permitted like live streaming of a trial outside of the

24      courtroom.  We're live streaming inside the courtroom to the

13:54:19 25      overflow rooms, two of them, and I hope people can hear and

1    see.

2              I mean, is it working okay in those other courtrooms?

3                       DEPUTY CLERK:  There wasn't anyone there.

4                       THE COURT:  Oh, there wasn't anyone there.  I

13:54:33  5    thought of it late.  All right.  I thought of it late.

6              But I don't think we've ever had actual live streaming

7    to a location outside of the courtroom.  Is that right?

8    Courthouse.  We've never done it, and I'm not sure it's even

9    permissible.

13:55:00  10                   MR. WEINBERGER:  So what our hope is, and it

11   has to do with room in the courthouse and, you know, both

12   sides have large teams.

13                       THE COURT:  Right.

14                       MR. WEINBERGER:  And we would want to live

13:55:13  15   stream it just to one location outside of the courthouse.

16   And I don't have the details now, but I have been assured by

17   my tech person, who has been in contact with Court Connect

18   on this, that it can be done in a way that assures both

19   sides that it's secure, and so there won't be a problem with

13:55:39  20   security.  It will help, and it has to do, frankly, Your

21   Honor, with the whole logistics and the large teams that we

22   have.

23             So let me address another issue that relates to that.

24                       THE COURT:  Well, let's stick with -- I mean,

13:55:55  25   the defendants had -- I mean, are you proposing while the

 1    defendants don't want to do it, you just want to do it for

 2    your side?

 3                   MR. WEINBERGER:  Right.  Right.

 4         And, again, I can -- look.  You ordered us to, earlier

13:56:11  5    on in this case, not to release ARCOS data.  And despite the

 6    fact that it was shared with large numbers of people on our

 7    side, it never got leaked out.

 8         You know, I think that's a demonstration that you can

 9    trust the lawyers on our side to, with the security of this

13:56:32  10    video feed, and it's just going to one location, Your Honor.

11                   THE COURT:  Well, look.  It's just come up.

12    To say I'm not a technological expert would be a gross

13    understatement.

14         I can understand, we've got lots of lawyers.  Everyone

13:56:52  15    can't fit in the courtroom.  I mean, even being in -- you

16    know, coming in the overflow room, as a principal matter, if

17    there's a secure way for only lawyers to see it, I don't

18    have any problem with it.  I don't know if it can be done

19    securely.  At least if it's done, both sides should have it.

13:57:15  20                   MS. MAINIGI:  Your Honor, Enu Mainigi for

21    Cardinal Health.

22         As Your Honor is aware, we do object to the live

23    streaming outside the courtroom.  We do think that there's

24    too much room for abuse.  We're not suggesting at all that

13:57:31  25    plaintiffs would do that.

 1                      THE COURT:  Well, how could it be abused?

 2                      MS. MAINIGI:  Well, we are worried that it

 3          could be taped.  We're worried you can take your phone and

 4          tape it.  As I understand it, in the courtroom, people are

13:57:43  5          not going to be allowed to videotape what's on stream.

 6                      THE COURT:  Right.  No one can walk in with

 7          their cell phone and turn it on.

 8                      MS. MAINIGI:  But that cannot be prevented if

 9          you're live streaming to the Ritz, for example.  You

13:57:57 10          can't --

11                      THE COURT:  Well, that's a good point.

12                      MS. MAINIGI:  You can't monitor people walking

13          in and out of the war room that are not lawyers.  People,

14          witnesses who have been sequestered, perhaps, Your Honor --

13:58:11 15          and I know we haven't necessarily gotten to that -- those

16          witnesses could inadvertently be wandering through.

17              We think there's way too much room for abuse here, so

18          I think it is for good reason that this Court has never

19          allowed live streaming outside the courtroom.

13:58:29 20                      THE COURT:  Well, to be fair, Ms. Mainigi, no

21          one has ever asked me to do it.  I haven't refused to, it

22          never came up, so I never had to deal with it.

23                      MR. WEINBERGER:  So let me tell you, so we

24          have an office in the Old Post Office building so we're not

13:58:47 25          talking about the Ritz, Your Honor.  And we can represent to

49

```
          1    the Court that where we would video stream it into that

          2    office would be a segregated room with no phones and no

          3    recording equipment.  And if we need to hire a deputy to

          4    assure the defense that we're following whatever order comes

13:59:09  5    out of the Court, we're happy to do that.

          6                    THE COURT:  So, you know, I mean --

          7                    MS. MAINIGI:  Your Honor, it seems like a

          8    whole lot of work and effort.  I don't understand why all

          9    the lawyers here --

13:59:21  10                   THE COURT:  Well, I mean, it --

          11                   MS. MAINIGI:  -- cannot come to the courtroom

          12   in the overflow courtroom.  That's what everybody is

          13   planning to do.  That is what Your Honor indicated we needed

          14   to do.

14:00:02  15                   THE COURT:  Well, since I've never done this,

          16   I'm concerned.  And particularly since the defendants are

          17   objecting, I'm concerned about the security.

          18                   SPECIAL MASTER COHEN:  Just so everybody is

          19   clear, there are two --

14:00:19  20                   THE COURT:  And apparently, I've been reminded

          21   that live streaming was discouraged at a Judges' meeting.  I

          22   must have not been paying attention at that meeting, or

          23   maybe I was absent; but I'm concerned about it.

          24                   SPECIAL MASTER COHEN:  Judge, there are two

14:00:42  25   overflow courtrooms, and the wells in both of those
```

```
  1    courtrooms are available for counsel.

  2                 THE COURT:  Right.  Counsel can sit there.

  3                 SPECIAL MASTER COHEN:  The entire well.

  4                 THE COURT:  You can sit there and work, do

14:00:53  5    whatever you want.  The only thing you can't do a record.

  6                 DEPUTY CLERK:  First come, first seated.

  7                 THE COURT:  Right.  But the point is, I mean,

  8    you can -- that's what they are there for.  That's why I

  9    provided for two overflow courtrooms, to make sure, you

14:01:11 10    know, anyone will be able to sit.  And there's a lot of

 11    room.  You see all the seats there.  Those wells are empty.

 12    So all those seats will be available.  The jury box is

 13    available.  There should be plenty of room.

 14       So I think we're not going to have the live streaming.

14:01:30 15                 MR. WEINBERGER:  All right.  One follow-up

 16    issue, Your Honor.

 17       The directive that we heard is that, particularly in

 18    here, we can't have our lawyers using laptops when they're

 19    sitting behind the rail.  And so people at the trial table

14:01:50 20    here are going to be communicating with people who have

 21    laptops and smartphones to get exhibits, to plan for the

 22    next day, et cetera, et cetera.

 23                 THE COURT:  Right.

 24                 MR. WEINBERGER:  So we would ask the Court's

14:02:05 25    indulgence to allow the lawyers working with us, who are
```

51

1 lucky enough to get seated behind the jury rail in this

2 courtroom, to be able to use laptops and smartphones.

3 Obviously, turning off any sound or any -- it will also

4 facilitate that people won't be walking back and forth

14:02:27  5 between --

6     THE COURT:  Right.

7     MR. WEINBERGER:  -- the space behind the jury

8 rail and the trial tables.

9     MR. STOFFELMAYR:  Your Honor, if I may, Kapsar

14:02:38 10 Stoffelmayr for Walgreens.  I was asked on behalf of the

11 defendants to raise the same issue.  We think we will be

12 able to be much more efficient, run a smoother operation.

13     THE COURT:  Well, I do, too.  I'm going to

14 trust lawyers.  If the public says what are you doing; well,

14:02:56 15 they're on the trial team, and they're communicating with

16 each other, and rather than having to interrupt and walk

17 back and forth, and stuff.  All right.

18  I trust all of you to not be secretly recording.  I

19 mean, quite frankly, someone could have some device in their

14:03:11 20 briefcase or whatever, and no one would know.

21     LAW CLERK:  We're not reserving seats.

22     THE COURT:  I know.  We're not reserving

23 seats, but I will allow lawyers working on this case.

24  I'll allow lawyers to do it in this courtroom so long

14:03:34 25 as they're not being obtrusive.  There can't be typing

```
 1    noise, tapping that's disruptive.

 2                    MR. STOFFELMAYR:  Your Honor, can I just ask

 3    that that ruling include at least one paralegal per party?

 4    We were especially concerned about the exhibits.

 5                    LAW CLERK:  Now we're talking about reserving

 6    sheets.

 7                    THE COURT:  No, we're not reserving any seats.

 8    I will allow a paralegal to have a laptop to communicate

 9    with the lawyers.

10                    MR. STOFFELMAYR:  Thank you.

11                    THE COURT:  But, again, you got to do it in a

12    way not to allow any sound.  I'll allow that, we'll just do

13    it.

14                    MR. WEINBERGER:  And finally, Your Honor,

15    realizing that you have portable microphones, we are

16    wondering how strict you are in terms of having to stay at

17    the podium when we're giving opening, when we're inquiring

18    of a witness, et cetera.

19                    THE COURT:  All right.  I'm not strict.  The

20    only thing, I have two rules, Mr. Weinberger:  One, you have

21    to be audible for our court reporter, wherever you are; and

22    number two, I don't let anyone, like, crowd into the jurors'

23    space.  I've seen lawyers who have done that, and I've

24    required them to step back.

25        But if you, you know, so you've got to be -- those are
```

          1    my only two rules.  So if you want to --

          2                   DEPUTY CLERK:  The batteries on the portable

          3    microphones are not the greatest, and they don't last two

          4    and a quarter hours.  So --

14:05:23  5                   THE COURT:  That may be the way to limit you,

          6    Mr. Lanier.

          7                   DEPUTY CLERK:  So the only question would be,

          8    if you're done, please put the one that you've used back on

          9    the track, take another one, so they're constantly charging.

14:05:39 10                   THE COURT:  I wouldn't do that, intentionally

         11    give you a short-life battery, Mr. Lanier.

         12        But the point is, make sure that the court reporter

         13    can hear you clearly and you're not crowding the jurors.

         14    But I don't mind, some lawyers like to be at counsel table,

14:05:58 15    some at the podium, some like to walk around.  It's okay.

         16                   MR. STOFFELMAYR:  Your Honor, we had one

         17    additional question.  It's Kaspar Stoffelmayr, back in the

         18    corner here.

         19        We were just curious if the Court intended to issue a

14:06:21 20    Rule 16 order to exclude witnesses.  And if so, our request

         21    is that it would not include expert witnesses, so that

         22    expert witnesses can be in court to watch testimony, but

         23    fact witnesses could not.

         24                   THE COURT:  No one has raised it, so I don't

14:06:37 25    generally in a civil case exclude witnesses, but if there's

54

 1    a particular reason to do so someone should raise it with

 2    me.

 3         Mr. Stoffelmayr, no one has raised that, and I

 4    generally don't issue it in a civil case as a --

14:06:58  5              MR. STOFFELMAYR:  All right.  Why don't we

 6    discuss it --

 7              THE COURT:  Why don't you discuss it and see

 8    what you want to do.

 9              MR. STOFFELMAYR:  Great.  Thank you.

14:07:21 10              THE COURT:  Okay.  Special Master Cohen

11    advised me that -- well, I figured it would be around now.

12         The jury department has identified the 50 who we're

13    calling in now, so we can share that with counsel.

14              DEPUTY CLERK:  I would just like to ask all of

14:07:39 15    you, if you do have any staff that manages to get a seat in

16    the Front Row, can you please have them bring some kind of

17    identification for the Court security officers so they know

18    that those people are allowed to use the laptops.

19              THE COURT:  That's a good idea.

14:07:59 20              DEPUTY CLERK:  Thank you.

21              THE COURT:  Okay.  Thank you very much.

22         We're adjourned.

23              DEPUTY CLERK:  All rise.

24                        - - -

25              (Proceedings adjourned at 2:08 p.m.)

1                          **C E R T I F I C A T E**

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6      */s/ Donnalee Cotone _____15th of October, 2019*
       DONNALEE COTONE, RMR, CRR, CRC                      DATE
7      Realtime Systems Administrator

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25