UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

THE CITY OF HUNTINGTON,
    Plaintiff,

v.

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    Defendants.

CIVIL ACTION NO. 3:17-01362

CABELL COUNTY COMMISSION,
    Plaintiff,

v.

AMERISOURCEBERGEN DRUG
CORPORATION, et al.,
    Defendants.

CIVIL ACTION NO. 3:17-01665

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO PRECLUDE IRRELEVANT EVIDENCE OF FIRST AMENDMENT IMMUNIZED SPEECH AND ASSOCIATION CONDUCT**

Plaintiffs the City of Huntington and Cabell County Commission respectfully submit this memorandum of law in opposition to Defendants' Motion *in Limine* to Preclude Irrelevant Evidence of First Amendment Immunized Speech and Association Conduct (ECF No. 1331).

## INTRODUCTION

Evidence of Defendants' public relations activity carried out through their trade association, the Healthcare Distribution Alliance, is relevant to Defendants' knowledge and intent in engaging in the conduct at issue for Plaintiffs' public nuisance claim. Defendants construct their motion to exclude this evidence around a three-part statement as follows:

> The Constitution precludes the imposition of liability based on such First Amendment petitioning activity. Because evidence of Defendants' petitioning

>activity cannot be used to establish liability, and because such evidence is not relevant to any other issue in the case, it should be excluded under Federal Rule of Evidence 401.

Motion at 2. The first of these statements—that the Court may not impose liability based solely upon petitioning activity protected by the First Amendment—is a correct statement of the law. The second and third statements pertaining to relevance and admissibility, however, are incorrect and indeed have been rejected by both Judge Polster and Your Honor, respectively.

First, in the MDL, Judge Polster twice has rejected opioid defendants' arguments to exclude evidence of lobbying activity based on the First Amendment and *Noerr-Pennington* doctrine. Defendants acknowledge the first ruling, *see* Motion at 2 n.2 and 8-9 (citing MDL *Nunc Pro Tunc* Evidentiary Order (MDL ECF No. 3058)), and try to distinguish it on the ground that it was made in a case involving RICO and conspiracy claims. However, they ignore the second MDL ruling, which rejected this exact distinction and held that trade association activity is equally relevant to a public nuisance claim and the element of intent. *See In re Nat'l Prescr. Opiate Litig.*, No. 1:17-md-2804, 2020 WL 6450290, at \*20 (N.D. Ohio Nov. 3, 2020) ("Although RICO and conspiracy claims are not at issue in Track One-B, intentional conduct is a way in which Plaintiffs can prove public nuisance . . . . Therefore, with respect to participation in trade associations, the Court agrees with Plaintiffs that this evidence is admissible . . . .").

Second, Your Honor similarly has recognized that, "[a]lthough the *Noerr-Pennington* doctrine has been extended beyond the antitrust context, it has not been applied . . . [to] bar otherwise admissible evidence in a state law private nuisance lawsuit." *Gillis v. Murphy-Brown, LLC*, No. 7:14-cv-185, 2018 WL 5928010, at \*1 (E.D.N.C. Nov. 13, 2018) (Faber, J.). In *Gillis*, the Court held that, as to any concern that a jury might base a finding of liability on a ground protected by the First Amendment:

> '[T]he proper remedy for those concerns is care in instructing the jury with respect to what it must find in order to hold [defendant] liable and, if [defendant] requests it, perhaps also curative instructions making clear to the jury on what it may not base its verdict. The proper remedy is not exclusion of evidence that is otherwise relevant and admissible in connection with Plaintiff's claims.' Based on the foregoing, it is clear that the evidence defendant seeks to exclude is not inadmissible under the *Noerr-Pennington* doctrine.

*Id.* at *2 (quoting *In re GM LLC Ignition Switch Litig.*, No. 14-cv-8176, 2015 WL 8130449, at *2 (S.D.N.Y. Dec. 3, 2015) (internal citations omitted)). Here, even that concern is not present because this case, unlike *Gillis*, is proceeding through a bench trial. *Cf. Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) ("For a bench trial, we are confident that the district court can hear relevant evidence, weigh its probative value, and reject any improper inferences.").

Since Defendants' trade association activity is relevant to knowledge and intent, as set forth below, and there is no countervailing concern that liability may be based upon protective speech or activity, the Court should deny Defendants' motion *in limine*.

## LEGAL STANDARD

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 401's "basic standard of relevance is a liberal one." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993); *see also Alig v. Quicken Loans, Inc.*, No. 5:12-cv-114, 2016 WL 10489897, at *26 (S.D. W. Va. June 2, 2016) ("Rule 401 of the Federal Rules of Evidence establishes a broad liberal test for relevancy.").

In *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), the Supreme Court held that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or monopoly[,]" *id.* at 136, in part

3

because the "right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade those freedoms." *Id.* at 138. In *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965), the Court reaffirmed that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition" because "[s]uch conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Id.* at 670. Although originally developed in antitrust cases, the *Noerr-Pennington* doctrine "has now universally been applied to business torts." *IGEN Int'l, Inc. v. Roche Diagn. GMBH*, 335 F.3d 303, 310 (4th Cir. 2003).

The *Noerr-Pennington* doctrine is a rule of substantive law, not one of evidentiary admissibility. The Supreme Court's *Pennington* decision recognizes this. After holding that the jury should have been instructed of this rule of law and that the trial court's failure to do so in connection with evidence of petitioning activity was a reversible error, the Supreme Court also recognized that:

> It would of course still be within the province of the trial judge to admit this evidence, if he deemed it probative and not unduly prejudicial, under the 'established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if its tends reasonably to show the purpose and character of the particular transactions under scrutiny.'

381 U.S. at 670 n.3 (quoting *Standard Oil Co. v. U.S.*, 221 U.S. 1, 46-47 (1911)); *see also North Carolina Elec. Memb. Corp. v. Carolina Power and Light Co.*, 666 F.2d 50, 53 (4th Cir. 1981) ("Noerr-Pennington is . . . not a bar to discovery of evidence. As noted above, the court in Pennington held that evidence of legislative activity, if relevant, must be accompanied by an instruction which limits the jury's consideration to non-legislative activities. That holding presumes the admissibility of relevant evidence.").

4

## ARGUMENT

A. **Evidence of Defendants' Knowledge and Intent is Relevant to Plaintiffs' Public Nuisance Claim.**

In denying Defendants' motion for summary judgment on failure to prove fault, the Court held that fault is not a necessary element of a public nuisance claim under West Virginia law. *See* Memo. Op. and Order (ECF No. 1294) at 4. The Court also recognized, however, that Plaintiffs may choose to prove that Defendants' conduct constitutes an unreasonable interference with public rights through evidence of intent, and that "there are disputed issues of material fact about whether defendants' conduct was intentional." *Id.* at 6.

The Court further recognized that "intent" in this setting means intent to commit the conduct at issue, not intent to cause the harms that occurred. *Id.* at 5-6. Defendants' knowledge or reason to know of these harms is sufficient. *See Restatement (Second) of Torts* § 821B(2)(c) (interference may be found unreasonable where, *inter alia*, "the conduct . . . has produced a . . . long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right."). Defendants' knowledge and intent thus are relevant to Plaintiffs' public nuisance claim. *See In re Nat'l Prescr. Opiate Litig.*, *supra*, 2020 WL 6450290, at *20 ("[I]ntentional conduct is a way in which Plaintiffs can prove public nuisance; thus, the Pharmacy Defendants' intent remains an important element of Plaintiffs' nuisance claim.").

B. **The HDA's Lobbying and Public Relations Activity Helps Demonstrate Defendants' Knowledge and Intent.**

The trade association activity addressed in Defendants' motion is relevant to their intent and/or knowledge in engaging in the conduct that is at issue. The Healthcare Distribution Alliance ("HDA") is a national trade association that represents prescription drug distribution

companies.[1] Defendants each were and are members of the HDA.[2] Defendants each have permanent seats on HDA's Board of Directors, hold three permanent seats on the Board's seven-member Executive Committee, and are represented on HDA's government affairs committees.[3] The Board played an active role in determining HDA's activity.[4] HDA staff, in turn, reported to the Board and its Executive Committee on the organization's activity, including communications with government officials.[5]

HDA's lobbying and public relations activity and communications help demonstrate that Defendants engaged in the distribution conduct at issue with knowledge of the following:

- That in the year 2012, there was a serious national problem of prescription drug diversion, abuse, and addiction that distributors could help to address;[6]

- That in 2013, one American was dying every 19 minutes from an overdose of a prescription drug;[7]

- That distributors played a key role within the prescription drug supply chain and were "uniquely situated to perform due diligence in order to help support the security of the controlled substances distribution system";[8]

- That as far back as 1984, the U.S. Drug Enforcement Agency ("DEA") believed that Defendants' suspicious order reporting duties required reporting at the time the suspicious order was discovered, and not after the fact;[9]

---

[1] HDA previously was named Healthcare Distribution Management Association ("HDMA") and National Wholesale Druggists' Association ("NWDA").

[2] See Ex. A (Tr. of Deposition of Patrick Kelly) at 36:12-37:1.

[3] See id. at 38:23-40:3; Ex. B (Tr. of Deposition of John Gray) at 99:2-100:9.

[4] See Ex. A (Kelly Dep.) at 68:24-70:5.

[5] See id. at 42:17-44:3.

[6] See Ex. B (Gray Dep.) at 80:11-83:12.

[7] See id. at 277:9-279:20.

[8] See Ex. A (Kelly Dep.) at 190:11-22, 192:1-20;

[9] See id. at 421:16-424:13.

- That in 2007, DEA's policy was to expect more from registrants than just reporting suspicious orders, so that simple compliance with the suspicious orders reporting requirement did not mean that a registrant was maintaining an effective program to detect and prevent diversion;[10]

- That in 2008, DEA expected that when distributors identified any suspicious orders, those orders were not to be shipped while they were under suspicion;[11]

- That in maintaining effective controls against diversion of the controlled substances they distributed, a focus on the quantities shipped alone was not sufficient to identify potentially suspicious orders;[12]

- That another indicator or measure for assessing the likelihood of diversion was the percentage of controlled substances as compared to non-controlled substances ordered by a pharmacy customer,[13] even though evidence shows that Defendants McKesson and AmerisourceBergen did not do this;[14]

- That another indicator or measure for assessing the likelihood of diversion was the variety and type of controlled substances purchased by a pharmacy customer,[15] even though evidence again shows that Defendants McKesson and AmerisourceBergen did not do this;[16]

- That another indicator or measure for assessing the likelihood of diversion was the percentage of sales reimbursed by insurance compared to cash sales by a pharmacy customer,[17] even though evidence again shows that Defendants McKesson and AmerisourceBergen did not do this;[18]

- That another indicator or measure for assessing the likelihood of diversion was the location of a customer relative to other healthcare entities such as hospitals or

---

[10] *See id.* at 85:2-88:16.

[11] *See id.* at 263:20-274:15.

[12] *See* Ex. B (Gray Dep.) at 101:18-102:10; *see also* Ex. A (Kelly Dep.) at 268:8-24.

[13] *See* Ex. B (Gray Dep.) at 102:14-25.

[14] *See id.* at 106:14-112:7.

[15] *See id.* at 102:14-103:2.

[16] *See id.* at 112:8-114:2.

[17] *See id.* at 102:14-103:4.

[18] *See id.* at 115:13-21.

    long-term care facilities that would explain particular ordering patterns,[19] even though evidence again shows that Defendants McKesson and AmerisourceBergen did not do this;[20]

- That HDA was representing to Congress and to a federal appeals court that Defendants and other distribution companies did not have the capacity to investigate whether and to what extent their pharmacy customers were placing and receiving orders from any other distributor besides themselves,[21] when they in fact did have this capacity;[22] and that

- HDA and its member companies drafted distribution Industry Compliance Guidelines which stated that they were "prepared in recognition of the growing problem of misuse of controlled substances and the key role distributors play within the prescription drug supply chain,"[23] when their actual purpose was to head off further DEA enforcement or regulatory action.[24]

All of the foregoing is relevant to Defendants' knowledge and intent throughout the time period in which they engaged in the conduct substantially contributing to the opioid epidemic in Plaintiffs' communities.

    Since the *Noerr-Pennington* doctrine is not a rule of evidence and the HDA's lobbying and other public relations activity on behalf of Defendants helps demonstrate their knowledge and intent in engaging in the conduct at issue, this activity is relevant to Plaintiffs' public nuisance claim and should be admitted into evidence. *See In re Nat'l Prescr. Opiate Litig.*, *supra*, 2020 WL 6450290, at *20 ("Therefore, with respect to participation in trade associations, the Court agrees with Plaintiffs that this evidence is admissible . . . ."); *Gillis*, 2018 WL 5928010

---

[19] *See id.* at 102:14-103:8.

[20] *See id.* at 115:24-117:10.

[21] *See id.* at 245:11-246:9 (testimony to Congress), 187:14-191:4 (amicus brief to U.S. Court of Appeals);

[22] *See id.* at 261:12-262:8 (Congressional finding); *id.* at 263:9-264:7 (AmerisourceBergen's capacity); *id.* at 264:8-265:15 (Cardinal Health's capacity).

[23] Ex. A (Kelly Dep.) at 190:11-191:23.

[24] *Id.* at 291:21-292:8.

at *2 ("Based on the foregoing, it is clear that the evidence defendant seeks to exclude is not inadmissible under the *Noerr-Pennington* doctrine.").

## CONCLUSION

For all of the reasons set forth, the Court should deny Defendants' Motion *in Limine*.

Dated: May 12, 2021

Respectfully submitted,

**THE CITY OF HUNTINGTON**

/s/ *Anne McGinness Kearse*
Anne McGinness Kearse (WVSB No 12547)
Joseph F. Rice
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
akearse@motleyrice.com
jrice@motleyrice.com

Linda Singer
David I. Ackerman
**MOTLEY RICE LLC**
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel: 202-232-5504
Fax: 202-386-9622
lsinger@motleyrice.com
dackerman@motleyrice.com

Charles R. "Rusty" Webb (WVSB No. 4782)
**The Webb Law Centre, PLLC**
716 Lee Street, East
Charleston, West Virginia 25301
Telephone: (304) 344-9322
Facsimile: (304) 344-1157
rusty@rustywebb.com

**CABELL COUNTY COMMISSION**

/s/ *Paul T. Farrell Jr.*
Paul T. Farrell, Jr. (WVSB Bar No. 7443)
**FARRELL & FULLER LLC**
1311 Ponce de Leon Ave., Suite 202
San Juan, Puerto Rico 00907
Mobile: 304-654-8281
paul@farrellfuller.com

/s/ *Anthony J. Majestro*
Anthony J. Majestro (WVSB No. 5165)
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

Michael A. Woelfel (WVSB No. 4106)
**WOELFEL AND WOELFEL, LLP**
801 Eighth Street
Huntington, West Virginia 25701
Tel. 304.522.6249
Fax. 304.522.9282
mikewoelfel3@gmail.com

## **CERTIFICATE OF SERVICE**

I certify that on May 12, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Anthony J. Majestro*