IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
             Plaintiff,        :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
             Defendants.  :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
             Plaintiff,        :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
             Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 8
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

MAY 12, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:              Ayme Cochran, RMR, CRR
Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A. Faber,

 2     Senior Status Judge, United States District Court, Southern

 3     District of West Virginia, in Charleston, West Virginia, on

 4     May 12, 2021, at 9:00 a.m., as follows:

 5               THE COURT:  Dr. McCann, we'll ask you to come

 6     forward, sir.

 7          Do you have anything else, Mr. Schmidt?

 8               MR. SCHMIDT:  A little bit more, Your Honor, if I

 9     may.  May I proceed?

10               THE COURT:  Good morning, Dr. McCann.

11               THE WITNESS:  Good morning, Your Honor.

12               MR. SCHMIDT:  May I proceed, Your Honor?

13               THE COURT:  Yes.

14               MR. SCHMIDT:  Thank you.

15     BY MR. SCHMIDT:

16     Q.   Dr. McCann, I'm going to try to briefly wrap up the

17     final lines of questioning.  Thanks for bearing with us

18     for yet another day.

19          I'd like to pick up on the discussion we had yesterday

20     about ARCOS data and what you, what you were able to learn

21     or not learn about what DEA can do with their ARCOS data.

22          And I want to return to your testimony about the fact

23     that you looked at some DEA documents by showing you

24     something from the DEA website that was a presentation in

25     2011.
```

```
 1              MR. SCHMIDT:  May I approach, Your Honor?

 2              THE COURT:  Yes.

 3              THE WITNESS:  Thank you.

 4              MR. SCHMIDT:  Pleasure.

 5   BY MR. SCHMIDT:

 6   Q.   And if we could, Dr. McCann, let's just put the

 7   front page up on the screen.  This is Defendants' West

 8   Virginia 642 Exhibit.  On the front screen we see the

 9   DEA logo and you can see this is a presentation about

10   ARCOS.  Do you see that?

11   A.   Yes.

12   Q.   Turn to the second page.  The presentation was given in

13   2011 by a DEA agent named Kyle Wright, Unit Chief, Targeting

14   and Analysis with responsibility for ARCOS.  Are you

15   familiar with Mr. Wright?

16   A.   No.

17   Q.   You didn't -- he wasn't one of the folks you talked to

18   or had communications with?

19   A.   I didn't know any of the individuals' names, but that

20   name doesn't ring a bell.

21   Q.   Did you read his testimony in this case?

22   A.   No.

23   Q.   Let's look at Page 16, please.  Do you see where it

24   says "trends, sample charts"?

25   A.   Yes.
```

1    **Q.**   And then if you look after this -- after that page do

2    you see that there's a series of illustrative charts that

3    he's put together for his 2011 presentation?

4    **A.**   Yes.

5    **Q.**   If you look at the first one on Page -- and I'm using

6    the page numbers in the bottom left corner after the exhibit

7    number, Page 17 which is also up on the screen.

8    **A.**   Yes.

9    **Q.**   Do you see that?  And do you see that this shows that

10   the DEA was able to use ARCOS data to track state and

11   national trends month over month?

12   **A.**   That ability seems to be illustrated here.  I don't

13   know if this reflects actual data or not.  But the ability

14   or the concept appears to be illustrated here.

15   **Q.**   And, by the way, do you see how these numbers, the U.S.

16   and the state level are, are going up in this illustration?

17   **A.**   Yes.

18   **Q.**   Are you -- as part of your work, did you study the DEA

19   quota, the limit that the DEA sets on the amount of

20   prescription opioids that manufacturers can make in a given

21   year?

22   **A.**   No.

23   **Q.**   Did you study the fact that the quota always rose

24   throughout the time that you say distribution was rising?

25   **A.**   No.

```
 1    Q.   Do you have an understanding as to the fact that when
 2    the DEA sets the quota, they're setting it based on
 3    estimated medical, scientific research dates?
 4    A.   I'm not aware of how they set the quota.
 5    Q.   Okay.  Let's continue on to Page 18, please.  Do you
 6    see that this indicates ARCOS analysis on a per capita
 7    basis?
 8    A.   At least illustrates that, yes.
 9    Q.   If we turn to Page 20, do you see that this illustrates
10    using ARCOS data to conduct analyses at a zip code level
11    including whether a given zip code is above or below average
12    or average?
13    A.   Yes.
14    Q.   If we turn to Page 21, do you see that this shows the
15    DEA using ARCOS data to analyze distribution at a county
16    level, again in terms of whether it's average, above
17    average, or below average?
18    A.   Yes.
19    Q.   And if we look at 24, just as a final illustration, do
20    you see that this shows the DEA using ARCOS data to analyze
21    a specific type of prescription opioid with a specific
22    pharmacy, again comparing that pharmacy to, in this case,
23    the state average and the U.S. average?
24    A.   Yes.
25    Q.   Okay.
```

```
1              MR. SCHMIDT:  For good order, Your Honor, we'd
2    move this into evidence, Defendants' West Virginia 642.
3              MR. MOUGEY:  We object, Your Honor.  There's no
4    foundation laid.  The witness has never seen the document.
5    You've ruled already multiple times getting third-party
6    documents in through an expert witness is inappropriate.
7              THE COURT:  Well, I think he can question him
8    about it.  Overruled.
9         Go ahead, Mr. Schmidt.
10             MR. MOUGEY:  I'm sorry.  I thought Mr. Schmidt
11   just moved to enter it into evidence as opposed to
12   questioning about it.
13             THE COURT:  Did you move it into evidence?
14             MR. SCHMIDT:  Yes, I did, Your Honor.
15             THE COURT:  How is it admissible through this
16   witness?
17             MR. SCHMIDT:  I think it's the type of DEA
18   document he looked at in terms of educating himself about
19   ARCOS and learning how ARCOS works.
20             THE COURT:  Was he able to specifically identify
21   it?
22             MR. SCHMIDT:  He was not.  And I'll ask the
23   question and maybe if he can't identify it, I'll move it in
24   through someone else.
25   BY MR. SCHMIDT:
```

```
 1   Q.   Have you seen this document at all?  Did you look
 2   at this document in terms of coming to this, these
 3   opioid cases not knowing about ARCOS and trying to learn
 4   about ARCOS and what DEA could do about it?
 5   A.   No, not this document or any other PowerPoint
 6   presentation on the DEA website.
 7            MR. SCHMIDT:  Then I'll reserve that, Your Honor.
 8            THE COURT:  All right.
 9   BY MR. SCHMIDT:
10   Q.   Let's go to that matrix that you were asked about.
11   Let's go to the matrix if we could, if I could just get
12   my copy.
13        Do you have yours in front of you, sir?
14   A.   I do, yes.
15   Q.   Okay.  It's P-43225.  And I want to just quickly orient
16   us to this document.
17        If we go to Page 13 of the document, we see McKesson
18   for oxycodone and -- let me see if I can make this work
19   again.
20        We see McKesson oxycodone, 2006 to 2014, national, West
21   Virginia, Huntington averages, the four pharmacies we've
22   talked about in Huntington, four Rite-Aid pharmacies, and
23   then a number of pharmacies outside of Huntington, outside
24   of Huntington/Cabell.  Is that correct?
25   A.   Yes.
```

1    **Q.**   And some of these pharmacies outside of

2    Huntington/Cabell are in West Virginia.  One is in Ohio.

3    One is in Kentucky.  Correct?

4    **A.**   Yes.

5    **Q.**   If we then go to Page 16 -- and this chart, in

6    particular, continues for a few pages.  And if we go to Page

7    17, there's a new chart.  This time it's hydrocodone, same

8    national, West Virginia -- not the same averages.  Now

9    they're for hydrocodone, but national, West Virginia, and

10   Huntington averages; correct?

11   **A.**   Correct.

12   **Q.**   Same four pharmacies; correct?

13   **A.**   Correct.

14   **Q.**   And then, again, you've got a group of pharmacies.

15   Some of them are the same as for oxycodone.  Some of them

16   are different.  Correct?

17   **A.**   Correct.

18   **Q.**   Did you select these pharmacies for inclusion on the

19   chart, both these ones on Page 16 and the ones that are on

20   Page 13?

21   **A.**   No.

22   **Q.**   Did you personally select them?

23   **A.**   No.

24   **Q.**   Who selected them?

25   **A.**   My understanding is counsel.

1   **Q.**   And what was the criteria you understand counsel used

2   to select them?

3   **A.**   I don't know.

4   **Q.**   Our best estimate is that these are literally the

5   pharmacies in West Virginia, -- let's go back to 13 if we

6   could, please -- in West Virginia and then in nearby parts

7   of Ohio and Kentucky that have the highest monthly averages

8   that could possibly be found.  Do you know if that's true or

9   not?

10  **A.**   No, I don't.

11  **Q.**   What about the ones in Huntington/Cabell?  Do you know

12  why those ones were selected by counsel?

13  **A.**   No.

14  **Q.**   If I tell you we believe those are the ones that had

15  the highest overall volume, do you know whether that's true

16  or not?

17  **A.**   No.

18  **Q.**   So to dig into these numbers a little bit, if -- let me

19  ask you to look at just one thing if I may, Dr. McCann.  If

20  I look at the numbers for oxycodone in Huntington/Cabell, do

21  you have that number there in front of you?  The

22  2.8 million?

23  **A.**   Yes.

24  **Q.**   And if we go to Page 16 and do the same for the

25  1.6 million, Huntington/Cabell, do you see that number?

1    **A.**    I do, yes.

2    **Q.**    You can tell by looking at those numbers that you've

3    again excluded the V.A. Hospital shipments as well as some

4    other shipments; correct?

5    **A.**    Right, to McKesson's credit.  I'm focusing only on the

6    retail and chain pharmacies not including the roughly

7    80 percent of the shipments that came to the V.A.

8    **Q.**    Now, if we stick with this slide and -- 16 and look at

9    the average monthly hydrocodone shipments into

10   Huntington/Cabell County, it's 2,102; correct?

11   **A.**    Yes.

12   **Q.**    That's roughly half the levels, or more than half the

13   levels of West Virginia and roughly half the levels

14   nationally; correct?

15   **A.**    Correct.

16   **Q.**    If we go back to 13 and look at the same data for

17   oxycodone, it's a little higher in terms of the average for

18   Huntington-Cabell, the national, and West Virginia, but

19   they're close; correct?

20   **A.**    They're about the same as the average.  Rather than

21   half as much as it was for hydrocodone, they're roughly the

22   same average within Huntington City and Cabell County as for

23   the state and for the country.

24   **Q.**    Okay.  You spent some time yesterday talking about the

25   Rite-Aid pharmacies in detail, so I'm not going to go back

1     into those pharmacies.  I would like to ask you just a few

2     questions about the other pharmacies.

3          And I counted 16 pharmacies between Page 13 and Page 16

4     that were unique and not in Huntington/Cabell.  Is that the

5     correct count?

6     **A.**   I didn't count them, but that sounds right.

7     **Q.**   And that means that on this chart, four-fifths of the

8     pharmacies you discussed are outside Huntington/Cabell;

9     correct?

10    **A.**   Well, I didn't discuss them all, but you're right.  It

11    would seem that roughly four-fifths of the pharmacies on

12    these two charts are outside of the City of Huntington and

13    Cabell County.

14    **Q.**   If we look at just to that point I was asking you

15    about, these being the largest volume pharmacies or largest

16    average monthly pharmacies that could be found in West

17    Virginia and the region, if we look at these average numbers

18    along the second row starting with the 25,002 for Crab

19    Orchard going all the way over to the 27,876 for Broadway

20    Clinic, every single one of those is larger than the

21    national average, the West Virginia average, the

22    Huntington/Cabell average by several factors.  Correct?

23    **A.**   Yes.

24    **Q.**   In some instances by -- what's the largest variation

25    just if you could help me with the math?  I guess it would

1   be this 27,000 or the 32,000 I guess.  What's the variation

2   between 32,000 and the Huntington/Cabell average?

3   **A.**   It's not, not quite eight times as much.

4   **Q.**   Okay.  Do you agree that, that by definition with that

5   variation in the numbers they do not reflect the national

6   average?

7   **A.**   Well, I wouldn't compare it to Huntington/Cabell to say

8   they don't, they don't compare to the national average, but

9   I agree they're substantially higher than the national

10  average.

11  **Q.**   Okay.  Each one of them is outside the national

12  average.  Let me rephrase if I could.  Each one of them is,

13  is higher -- is outside the national average by a factor of,

14  of several times.  Correct?

15  **A.**   Correct.

16  **Q.**   Each one of them is outside the West Virginia national

17  average by a factor of several times; correct?

18  **A.**   Correct.

19  **Q.**   And each one of them is outside the Huntington/Cabell

20  average by a factor of several times; correct?

21  **A.**   Correct.

22  **Q.**   Just for completeness, if we go to slide 16, please,

23  which is the oxycodone numbers, we see the same thing.  And,

24  in fact, here, just to give us a comparison, how much bigger

25  is this first one, Family Discount, than Huntington/Cabell

1    in terms of factor difference between them?  How much larger

2    is it roughly?

3    **A.**   Well, it's more than 50 times as big.

4    **Q.**   And, so, same set of questions.  And in an effort to

5    streamline, I'll ask you them all at once.  Is it true that

6    each of these selected non-Huntington pharmacies on Page 16

7    are larger than the national, West Virginia, and

8    Huntington/Cabell averages by, by quite a margin?

9    **A.**   Yes.

10   **Q.**   And it's safe to say that these pharmacies, both on

11   Page 16 and on Page 13, were not picked because they were

12   close to the national average, the West Virginia average, or

13   the Huntington/Cabell average?

14   **A.**   I don't know why they weren't picked, but it would seem

15   they were not picked for that reason.

16   **Q.**   Is there anything about these pharmacies that you would

17   point me to on Page 16 or Page 13 in saying these reflect

18   national average, county average, state average?

19   **A.**   No.  As you suggest, I don't think they were intended

20   to reflect average pharmacies.

21   **Q.**   Okay.  Let's go back to 13, please.  And on Page 13

22   you'll see that at the top and the same is true on Page 16,

23   the location of these pharmacies.  And that's where you can

24   see some of them on different counties in West Virginia,

25   some of them are outside of West Virginia.  Do you see that?

1   **A.**   Yes.

2   **Q.**   Do you know of any geographic commonality that led to

3   the selection of those pharmacies other than the fact that

4   some of them are in the State of West Virginia and some of

5   them are close to the State of West Virginia?

6   **A.**   No.

7   **Q.**   Do you know of any geographic commonality between those

8   pharmacies and Huntington/Cabell other than some of them are

9   in the State of West Virginia, some of them are close to

10  West Virginia?

11  **A.**   No.

12  **Q.**   And just to take a concrete example, one of these

13  pharmacies is a Rite-Aid in Hancock County.  Do you see that

14  one?

15  **A.**   Yes.

16  **Q.**   Do you know where Hancock County is in the State of

17  West Virginia?

18  **A.**   No.

19  **Q.**   Do you know how far it is from Huntington?

20  **A.**   No.

21  **Q.**   I'm going to ask you, if you could, just to keep that,

22  that demonstrative in front of you, P-43225.  I'm going to

23  show a map of the State of West Virginia if we could.

24       Do you recognize the State of West Virginia here

25  with -- we've only highlighted Cabell.  Of course,

```
1    Huntington is crossing the Cabell line.  Do you recognize
2    this as a map of the State of West Virginia?
3    A.   Yes.
4    Q.   And if we highlight where Hancock is up at the top, do
5    you know how far away that is from the City of Huntington or
6    from Cabell County?
7    A.   No.
8    Q.   If you look back at 43225, the matrix, if we look at
9    that again and if you go to Page 1 for ABDC, there's a
10   pharmacy called Moundsville.  It's the third non-Huntington
11   pharmacy listed for ABDC.
12   A.   Yes.
13   Q.   It's in Marshall County.  Do you know how far that is
14   from Huntington/Cabell?
15   A.   No.
16   Q.   And let's just keep the map up if we could,
17   Mr. Reynolds.
18       Could we go back to the map and show where Marshall
19   County is?
20       And you didn't measure the distance from there to
21   Cabell, did you?
22   A.   I did not.
23   Q.   Two more and then I'll, I'll be done with this.
24       If we look back at your exhibit -- let's keep the map
25   up.  But if we look back at your exhibit at Page 13 back to
```

1    the McKesson section, there's a pharmacy called Four Seasons

2    in Mercer County.  And we can show that on the map just

3    where that is, Dr. McCann.  Do you know how far that is from

4    Huntington/Cabell?

5    **A.**    No.

6    **Q.**    And last one.  If we look at Page 7 of your chart for

7    Cardinal, there's a pharmacy called -- there's actually

8    three pharmacies, but I'll just focus on one in Jefferson

9    County.  There's a pharmacy called CVS 1428 in Jefferson

10   County.  Do you see that on Page 7?

11   **A.**    Yes.

12   **Q.**    And could we show where Jefferson County is on the map?

13   That's actually closer to where you work in the Washington,

14   D.C. suburbs than the 350 miles it is to Cabell.  Do you see

15   that?

16   **A.**    I do, yes.

17   **Q.**    Is there -- now I'm asking about all these pharmacies

18   that are outside Huntington/Cabell.  Is there any link you

19   know of between these pharmacies or the others and

20   Huntington/Cabell?  Any geographic link?

21   **A.**    Well, with your addendum geographic link, I would have

22   to say "no" other than they're in West Virginia.  There are

23   other links between them, but geographically the only

24   commonality I see is that they're in West Virginia.

25   **Q.**    And for any of those pharmacies that are outside

1    Huntington/Cabell did you identify any patients from

2    Huntington/Cabell who went to one of those pharmacies?

3    **A.**   No.  We don't have data on that.

4    **Q.**   In your work on McKesson, did you see that it had

5    supplied over 50,000 pharmacies over the past few decades at

6    various points in time?

7    **A.**   I don't recall the number for any particular

8    distributor.  I have the numbers for each distributor, so I

9    had that number in my mind fleetingly perhaps at one time.

10   I don't recall what the number is.  But it might be, it

11   might be that number higher or lower.

12   **Q.**   Do you know what the order of magnitude is?  Is it tens

13   of thousands?

14   **A.**   Yes, certainly tens of thousands.

15   **Q.**   Okay.  And we talked a moment ago about how there are

16   16 pharmacies outside Huntington/Cabell that are featured on

17   this matrix?

18   **A.**   Yes.

19   **Q.**   If the number is 50,000, what percentage of those

20   50,000 national pharmacies were featured on the matrix,

21   roughly, if you could, 16 over 50,000?  And I don't mean to

22   put you on the spot trying to calculate it.  I can give you

23   the calculator.

24   **A.**   I might prefer a calculator for that, but it's

25   something like three one thousandths of a percent.

1    **Q.**   And if it's just 10,000, can you give us a rough

2    estimate?

3    **A.**   If it's just 10,000 -- well, one percent would be 100.

4    And, so, it would be fifteen hundredths of a percent.

5    **Q.**   Okay.

6    **A.**   So .15 percent.

7    **Q.**   Thank you, Dr. McCann.  That's all I have for right

8    now.  I appreciate your time.

9              THE COURT:  Ms. Salgado.

10             MS. SALGADO:  One minute, please, as we switch our

11   technical.

12             THE COURT:  Yes.

13        (Pause)

14                    CROSS EXAMINATION

15   BY MS. SALGADO:

16   **Q.**   Good morning, Dr. McCann.

17   **A.**   Good morning.

18   **Q.**   Thanks for your patience over these last few days.  I'm

19   Suzanne Salgado.  I represent Cardinal Health and I'll ask

20   you just a few more questions.

21   **A.**   Thank you.

22   **Q.**   Dr. McCann, as part of your work as an expert in this

23   case, you prepared tables that reflect your analysis of the

24   market share of each of the wholesale distributors in Cabell

25   County and the City of Huntington.  Is that right?

1    **A.**    I don't know if I would describe it as analysis, but

2    calculations of the market shares.  Again, they're really

3    subtotals of the data, and we do that for the distributors

4    for various jurisdictions including Cabell County and the

5    City of Huntington.

6    **Q.**    Okay.  I'm going to show you one of those charts and

7    those set of calculations.  It's from your Appendix 9-I and

8    it's Page 25 of that that I'll bring up here.  But let me

9    know if you'd like a hard copy and we can provide you with

10   that as well.

11   **A.**    Thank you.

12   **Q.**    Now, this table presents your analysis -- or excuse

13   me -- your calculations, subtotals of some of the data

14   regarding total dosage units of oxycodone and hydrocodone

15   shipped by all distributors to all dispensers in

16   Cabell/Huntington from 2006 to 2014; correct?

17   **A.**    Correct.

18   **Q.**    And that analysis, as you said, is based on ARCOS data;

19   right?

20   **A.**    Yes.  It might be supplemented a little bit with

21   defendant transaction data, but the primary source is the

22   ARCOS data.

23   **Q.**    Now, according to your analysis of the ARCOS data and

24   any supplementation you may have done, from 2006 to 2014

25   Cardinal Health distributed 17 percent of the oxycodone and

1    hydrocodone shipped to Cabell and Huntington; correct?

2    **A.**    Correct.

3    **Q.**    And it's your understanding that Cardinal Health

4    reported those transactions to the DEA in the ARCOS

5    database; correct?

6    **A.**    Correct.

7    **Q.**    So Cardinal Health knew about the 17 percent of the

8    oxycodone and hydrocodone prescription opioids that were

9    shipped into Cabell and Huntington during that time frame;

10   correct?

11   **A.**    Yes.

12   **Q.**    And as far as you know, -- and the DEA -- excuse me --

13   on the other hand knew about all of the oxycodone and

14   hydrocodone prescription opioids shipped into

15   Cabell/Huntington during that time frame; correct?

16   **A.**    Correct.

17   **Q.**    And I think we discussed this a little bit yesterday,

18   but as far as you're aware, at least before 2018, other than

19   the data on the volume -- or excuse me -- other than

20   Cardinal Health's own shipments, a distributor would not

21   have had access to the data that other wholesale

22   distributors reported to ARCOS; correct?

23        I'll rephrase.  You're not aware of Cardinal Health

24   having access to the data of other distributors during this

25   time frame; correct?

1    **A.**   Correct.

2    **Q.**   Dr. McCann, yesterday you were referring to some

3    tables -- or excuse me -- a table showing the pharmacies in

4    Cabell and Huntington that received shipments of oxycodone

5    and hydrocodone between 2006 and 2014.  And I want to go

6    through one of those.

7         If we could please pull up P-44752 and go to the second

8    page of that document.

9         I'd like to focus in particular on A-Plus Care Pharmacy

10   listed here.  According to your chart, how many dosage units

11   of oxycodone and hydrocodone were shipped to A-Plus Care

12   Pharmacy?

13   **A.**   583,000.

14   **Q.**   And how many MMEs of oxycodone and hydrocodone were

15   shipped to A-Plus Care Pharmacy according to your chart?

16   **A.**   17,365,587.

17   **Q.**   And A-Plus Care Pharmacy is listed here because it is

18   in Cabell, right, or it was in Cabell?

19   **A.**   Correct.

20   **Q.**   But you didn't testify about which distributor sold

21   oxycodone and hydrocodone to A-Plus Care Pharmacy during

22   Mr. Mougey's questioning of you; right?

23   **A.**   I don't recall discussing this pharmacy.

24   **Q.**   Let me show you a table that you prepared as part of

25   your expert materials before you came to testify.  In

1   particular, I'm going to look at Appendix 9-H to your expert

2   report and Page 84 of that pdf.  This chart that you

3   prepared reflects opioid shipments to A-Plus Care Pharmacy;

4   correct?

5   **A.**   Yes.

6   **Q.**   According to your chart, A-Plus Care Pharmacy received

7   shipments of oxycodone and hydrocodone exclusively from

8   Miami-Luken, a different distributor; correct?

9   **A.**   Correct.

10   **Q.**   According to your chart, A-Plus Care Pharmacy did not

11   receive any shipments from AmerisourceBergen, Cardinal

12   Health, or McKesson; correct?

13   **A.**   Correct.

14   **Q.**   Miami-Luken is not a defendant in this trial, is it?

15   **A.**   Not that I'm aware of.

16   **Q.**   In compiling your analysis and opinions did you

17   consider that according to the DEA, A-Plus Care Pharmacy was

18   the third largest seller of oxycodone in West Virginia for

19   2014?

20   **A.**   I'm sorry.  Could you repeat that again?

21   **Q.**   Sure.  In compiling your analysis and opinions in this

22   case, did you consider that according to the DEA, A-Plus

23   Care Pharmacy was the third largest seller of oxycodone in

24   West Virginia for 2014?

25   **A.**   Yes, at least the substance of what the DEA would know

1   because we're both looking at the DEA and, and I -- we're

2   both looking at the shipments from distributors of oxycodone

3   and hydrocodone into this pharmacy.

4       I don't, I don't have any knowledge of any statement by

5   the DEA or any classification or ranking of these

6   pharmacies.

7       So I guess the direct answer would be -- to your

8   question would be "no," but I think literally I'd know the

9   same thing.

10  **Q.**   So you were -- you had the information available to

11  determine that it was one of the largest sellers of

12  oxycodone in West Virginia for 2014?

13  **A.**   Yes.  It's reflected in these voluminous appendices.

14  **Q.**   But you didn't testify about it during plaintiffs'

15  questioning of you at trial; correct?

16  **A.**   Correct.

17  **Q.**   Dr. McCann, some of the charts you presented show

18  changes in the volume of opioids shipped to particular

19  pharmacies at particular times.  I'm going to walk through a

20  couple of those.

21      Your analyses revealed that the pharmacy customers that

22  each distributor serviced changed over time at various

23  points; correct?

24  **A.**   Yes.

25  **Q.**   For example, and we'll talk about this in just a moment

1    in a little more detail, the Fruth Pharmacy chain was a

2    customer of AmerisourceBergen until around 2010 when Fruth

3    became a customer of Cardinal Health.  Do you recall that?

4    **A.**   I don't recall the details, but I recall pharmacies,

5    including Fruth, changing distributors.

6    **Q.**   And a distributor's shipments to a particular

7    jurisdiction may rise or fall depending on how many

8    customers that distributor serviced in that jurisdiction at

9    any particular time; correct?

10   **A.**   Yes.

11   **Q.**   So at times, a distributor's total shipments to a

12   particular jurisdiction may decrease, at least in part,

13   because a customer stopped ordering from that distributor

14   and started ordering from a different distributor; correct?

15   **A.**   Yes.

16   **Q.**   And, conversely, sometimes a distributor's total

17   shipments to a given jurisdiction may increase, at least in

18   part, because a customer started ordering from that

19   distributor as opposed to a different one; correct?

20   **A.**   Yes.

21   **Q.**   Let's look back at a chart that you reviewed I believe

22   on Monday.  And that's on P-44711, Page 29.

23        Dr. McCann, this reflects your calculations of

24   oxycodone and hydrocodone dosage units per capita by

25   distributors into Cabell and Huntington; is that right?

1    **A.**   Yes.

2    **Q.**   I want to draw your attention to the 2009 and 2010 time

3    frame.  According to your chart, AmerisourceBergen's

4    distributions of hydrocodone and oxycodone into Cabell and

5    Huntington decreased around that time frame; is that right?

6    **A.**   Yes.

7    **Q.**   And during that same time frame, Cardinal Health's

8    distributions increased; correct?

9    **A.**   Correct.

10   **Q.**   And the amount by which AmerisourceBergen's

11   distributions decreased was roughly similar to the amount by

12   which Cardinal Health's distributions increased.  Is that

13   fair?

14   **A.**   Yes.

15   **Q.**   And we discussed that you were aware of certain

16   pharmacies changing suppliers, and I want to talk in

17   particular about Fruth Pharmacy.  You're generally familiar

18   with the Fruth Pharmacy chain; correct?

19   **A.**   I am, yes.

20   **Q.**   Are you aware it's a family-owned West Virginia based

21   pharmacy chain that's been in business since the 1950s?

22   **A.**   No, I'm not aware of those details.  I've just driven

23   past some and recognized the sign.

24   **Q.**   You presented some detailed charts showing

25   distributions to the Fruth Pharmacies in Cabell-Huntington;

1    correct?

2    **A.**   Yes.

3    **Q.**   And broken down by distributor as to some of those

4    charts; correct?

5    **A.**   Correct.

6    **Q.**   I just want to pull up a couple of those examples,

7    P-44752, Page 15, as well as Page 18.

8        The chart on the left shows your analysis of

9    hydrocodone shipments to the Fruth Pharmacies in Cabell and

10   Huntington; correct?

11   **A.**   Yes.

12   **Q.**   And before 2010, almost all distributions were coming

13   from AmerisourceBergen based on the data that you present

14   here; correct?

15   **A.**   Yes.

16   **Q.**   And starting in around 2010, almost all distributions

17   were coming from Cardinal Health based on this data; right?

18   **A.**   Yes.

19   **Q.**   And the chart on the right shows your analysis of

20   oxycodone shipments to those same pharmacies during the same

21   time frame; correct?

22   **A.**   Yes.

23   **Q.**   And, similarly, before 2010 almost all distributions

24   were coming from AmerisourceBergen and that switches over to

25   Cardinal Health after that point; is that right?

1    **A.**    Yes.

2    **Q.**    So based on your analysis in these two graphs, the

3    Fruth Pharmacies shift to Cardinal Health in 2010 didn't

4    cause the total shipment to Fruth Pharmacies to increase; is

5    that right?

6    **A.**    Correct.

7    **Q.**    In fact, distributions to them after 2010 generally

8    appear to decrease over time; correct?

9    **A.**    More clearly so for hydrocodone, but sometime later

10   almost with respect to oxycodone.

11   **Q.**    And then going back to 44711, Page 29, the Fruth

12   Pharmacy shift to Cardinal Health did cause Cardinal

13   Health's total shipments to Cabell and Huntington to

14   increase because Cardinal Health gained a customer; correct?

15   **A.**    Correct.

16   **Q.**    But the actual shipments to that customer were

17   relatively unchanged; is that right?

18   **A.**    Correct.

19   **Q.**    Now, sticking with this chart for a moment, I'd like to

20   draw your attention now to the gray lines that reflect

21   shipments from distributors other than Cardinal Health,

22   AmerisourceBergen, and McKesson.  Those gray lines start in

23   2006 and stop in 2014; correct?

24   **A.**    Yes.

25   **Q.**    And that's not because those are the only years in

1    which other distributors shipped oxycodone or hydrocodone to

2    Cabell and Huntington; correct?

3    **A.**    Correct.

4    **Q.**    They just are reflective of those years because those

5    are the only years for which you had ARCOS information;

6    correct?

7    **A.**    Correct.

8    **Q.**    And you didn't have any non-ARCOS distribution data

9    from other distributors not in this courtroom; right?

10   **A.**    At least not, not in this jurisdiction, that's correct.

11   **Q.**    So -- okay.  So 2006 through 2014 were the only years

12   in this jurisdiction for which you had data for distributors

13   other than Cardinal Health, AmerisourceBergen, and McKesson;

14   correct?

15   **A.**    Yes, I believe that's correct.

16   **Q.**    Focusing now on the red line reflecting distributions

17   from Cardinal Health, that line goes farther back in time

18   than all of the other lines, all the way back to 1996;

19   correct?

20   **A.**    Correct.

21   **Q.**    And that's because Cardinal Health produced data going

22   back to 1996 while others did not; right?

23   **A.**    That's my understanding.

24   **Q.**    The data from ABDC appears to start here around 2002;

25   correct?

1    **A.**    Yes.

2    **Q.**    And for McKesson, that data goes back to around 2004?

3    **A.**    Yes.

4    **Q.**    So for Cardinal Health, you had at least six years of

5    data that you did not have for any other distributor; is

6    that right?

7    **A.**    Correct.

8    **Q.**    And you have no idea how Cardinal Health's

9    distributions during that time period compare to shipments

10   from any other distributor; correct?

11   **A.**    Correct.

12   **Q.**    Looking now at the 2014 to '15 time frame, Cardinal's

13   distributions in 2015 are higher than they were in 2014;

14   correct?

15   **A.**    I'm sorry.  Could you ask that again, please?

16   **Q.**    Sure.  Cardinal Health's distributions in 2015 are

17   higher than they were in 2014; correct?

18   **A.**    Yes.

19   **Q.**    And I believe you testified about this briefly that

20   you're aware of the -- something about a rescheduling of one

21   of the drugs, hydrocodone; is that correct?

22   **A.**    Yes.

23   **Q.**    So are you aware that CVS, a chain pharmacy, stopped

24   distributing hydrocodone products to its own pharmacies in

25   Cabell-Huntington in late 2014 when that rescheduling

1    happened, and Cardinal Health became the CVS Pharmacy's main

2    supplier of hydrocodone products after that time?

3    **A.**    I don't recall the precise details, but I recall

4    generally that the chain pharmacies that were

5    self-distributing stopped self-distributing hydrocodone

6    around that time and switched to these, these three major

7    distributors for the hydrocodone needs.

8    **Q.**    Okay.  Let's look briefly at one of the charts that

9    reflects some of those more specific distributions.

10   P-44748, Page 13.

11           THE COURT:  Ms. Salgado, I'm sorry.  I've got to

12   interrupt you.  We need to make an early court reporter

13   switch to accommodate one of the other judges, and also my

14   real-time is on the blink.  So --

15           MS. SALGADO:  I want to make sure you're

16   following.  We're happy to take a break.

17           THE COURT:  Let's keep it to 10 minutes subject to

18   what the technicians have to do.

19           MS. SALGADO:  No problem.

20       (Recess taken at 9:46 a.m.)

21           THE COURT:  Okay, Ms. Salgado.  Salgado.  I keep

22   mispronouncing your name.

23           MS. SALGADO:  No, you got it right.

24           THE COURT:  Did I get it right that time?

25           MS. SALGADO:  You got it completely right.  Thank

1    you.

2              BY MS. SALGADO:

3    **Q.**   Okay, take two.  We're all set.  Thank you so much.

4    Welcome back, Dr. McCann.

5    **A.**   Thank you.

6    **Q.**   I want to refer you to one of the charts you put

7    together regarding distributions to CVS Pharmacies in

8    Cabell-Huntington building off of what we were just

9    discussing before the break.  So, let's look at P-4478, Page

10   13, please.  So, this chart shows your analysis of

11   hydrocodone distributions to I believe it's four CVS

12   Pharmacies in Cabell and Huntington; is that correct?

13   **A.**   Yes.

14   **Q.**   And before October, 2014, most of the hydrocodone that

15   was being shipped to CVS Pharmacies in Cabell and Huntington

16   were being self-distributed by CVS itself shown in orange on

17   the graph, correct?

18   **A.**   Yes.  Or yellow, yes.

19   **Q.**   Oh, fair enough.  It printed a little orange for me,

20   but it looks a little yellower there.  And the CVS data only

21   goes back to 2006 because of the time frame of the ARCOS

22   data, correct?

23   **A.**   Correct.

24   **Q.**   And Cardinal Health's distributions are shown in red

25   here, correct?

1    **A.**    Correct.

2    **Q.**    And before October, 2014, Cardinal Health was shipping

3    just a small fraction of the total amount of hydrocodone

4    going to these CVS Pharmacies, right?

5    **A.**    Yes.

6    **Q.**    And we discussed just before the break that you were

7    generally familiar with the rescheduling of the hydrocodone,

8    right?

9    **A.**    Correct.

10   **Q.**    And you're aware of the fact that the DEA moved

11   hydrocodone combination products from a Schedule III drug to

12   a Schedule II drug around October, 2014, correct?

13   **A.**    That's generally my understanding, yes.

14   **Q.**    And are you generally aware that there are additional

15   physical security requirements relating to the distribution

16   of Schedule II products that do not apply to Schedule III

17   products?

18   **A.**    No, I'm not aware of those differences.

19   **Q.**    So, the very same month that the hydrocodone -- excuse

20   me that hydrocodone -- was rescheduled, around October,

21   2014, as we see in your graph, CVS stopped self-distributing

22   to its stores in Cabell and Huntington and after that date

23   Cardinal Health provided most of the distributions, right?

24   **A.**    Correct.

25   **Q.**    And the CVS Pharmacies shipped to Cardinal Health did

1    not cause the total hydrocodone shipments to those

2    pharmacies to increase, right?

3    **A.**   Correct.

4    **Q.**   And in general -- or excuse me.  The hydrocodone

5    shipments, according to your graph, tended to go down over

6    time after October, 2014, correct?

7    **A.**   Correct.

8    **Q.**   So, this shift did cause Cardinal Health's total

9    shipment of hydrocodone to increase to Cabell-Huntington in

10   that time frame because Cardinal Health gained a portion of

11   CVS's business, correct?

12   **A.**   Correct.

13   **Q.**   But it didn't cause additional hydrocodone shipments to

14   go to those pharmacies, right?

15   **A.**   Not any more than had been previously shipped by CVS as

16   a self-distributor, that's correct.

17   **Q.**   Okay.  Dr. McCann, just moving on to another topic

18   briefly, you testified that the ARCOS data that you reviewed

19   appeared to be missing data from Cardinal Health from March,

20   2008; do you recall that?

21   **A.**   Yes.

22   **Q.**   You have no idea whether those transactions are missing

23   because Cardinal Health did not report them, or because of

24   an error on DEA's end, or some other reason, correct?

25   **A.**   Correct.

1    **Q.**   And the absence of that March, 2008 data did not

2    prevent you from concluding that the ARCOS data accurately

3    and reliably reflected Cardinal Health's distributions,

4    correct?

5    **A.**   Correct.  I think I may have articulated it in slightly

6    different ways in different contexts and at different times,

7    but what I determined was that the shipments from

8    manufacturers and distributors to dispensers in the ARCOS

9    data appear to be complete and the data reliable.

10   **Q.**   Let's talk a little bit more about your analysis of the

11   ARCOS data.  Part of your assignment in this case was to

12   process, validate and augment the ARCOS data produced by the

13   DEA and internal transactional data produced by defendants,

14   correct?

15   **A.**   Correct.

16   **Q.**   And you explained in some of your earlier testimony

17   some of the steps you took to validate that data, including

18   comparing it against defendants' data, correct?

19   **A.**   Correct.

20   **Q.**   And you also testified about some of the steps you took

21   to augment the data, right?

22   **A.**   Correct.

23   **Q.**   I want to focus now on some of the steps you took after

24   that to process the data.  You explain in Appendix II of

25   your report some of the corrections you made to the ARCOS

1    data and, according to your description, you made eight

2    types of changes to the produced ARCOS data; is that

3    correct?

4    **A.**   They're not all corrections, but -- and I don't recall

5    the precise number, but there are item -- there's an

6    itemized list in that appendix of the things that we did to

7    narrow down the overall dataset to the shipments of opioids

8    that we then subtotaled.

9    **Q.**   Sure.  If we could pull up the appendix, please,

10   Appendix II.  I believe it's Paragraph 156.  You described

11   them as eight types of changes, correct?

12   **A.**   Correct.

13   **Q.**   And one of those changes was excluding certain

14   transactions that you determined were duplicate transactions

15   in the ARCOS data, right?

16   **A.**   Correct.

17   **Q.**   You also checked the accuracy of the calculated base

18   weight in grams in the ARCOS data and found that some were

19   incorrectly calculated in ARCOS; is that right?

20   **A.**   That's a very tiny number but, yes, some.

21   **Q.**   But that's -- that is correct?

22   **A.**   Yes.

23   **Q.**   And you corrected the calculated base weight in grams,

24   in particular, I think I'm looking on Paragraph 162 of your

25   report.  285,891 reported transactions; is that right?

1    **A.**   I don't recall the precise number, but that sounds

2    approximately right.

3    **Q.**   If we could just pull up Paragraph 162, please, on Page

4    109.  And there it is.  So, it says you corrected the

5    calculated base weight in grams for 285,891 reported

6    transactions; is that right?

7    **A.**   Yes.  The full sentence includes .06% of the total

8    transactions, that's correct.

9    **Q.**   Right.  But I'm just confirming that the number 285,891

10   is correct; is that right?

11   **A.**   Correct.

12   **Q.**   And you created a table showing all of the exclusions

13   and corrections that you made to the ARCOS data; is that

14   right?

15   **A.**   Correct.

16   **Q.**   And in total, let's see, if we could please bring up

17   the Page 114, the bottom, or we can just leave it there.

18   You determined it was appropriate to exclude over 61 million

19   transactions, right?

20   **A.**   Correct.

21   **Q.**   Okay.  Good with that.  Thank you.

22        Dr. McCann, as to the testimony you have provided

23   regarding distribution of opioid medications, the only

24   Cardinal Health information that you reviewed was Cardinal's

25   distribution data and the DEA data that included Cardinal's

1    distributions, correct?

2    **A.**    I think the answer is yes, but I may not understand

3    your question.  Would you ask it again, please?

4    **Q.**    Sure.  Dr. McCann, as to the testimony you've provided

5    regarding distribution of opioid medication, the only

6    Cardinal Health information you reviewed was Cardinal's

7    distribution data and the DEA data that included Cardinal's

8    distributions; is that right?

9    **A.**    I think very narrowly interpreted to mean in my

10   analysis of -- or summaries of Cardinal Health shipments, I

11   only looked at the ARCOS data reflecting those shipments and

12   the defendant production from Cardinal.  I think the answer

13   is yes, if that's what you mean.

14   **Q.**    Yes.  You didn't look into how Cardinal Health uses its

15   own data to monitor its customers' purchases, correct?

16   **A.**    Correct.

17   **Q.**    And that's the same for ABDC?

18   **A.**    Correct.

19   **Q.**    And that's the same for McKesson?

20   **A.**    Correct.

21   **Q.**    Dr. McCann, broadly speaking, you analyzed in various

22   ways the volume of opioid medications shipped by

23   AmerisourceBergen, Cardinal Health and McKesson, right?

24   **A.**    Yes.

25   **Q.**    And your analysis covered the distribution of 14 types

```
 1   of opioid medications, correct?

 2   A.   Yes.

 3   Q.   And much of your analysis focused only on distribution

 4   of two specific opioid medications, oxycodone and

 5   hydrocodone, correct?

 6   A.   I don't think that's correct.  I think that out of

 7   roughly 10,000 pages of exhibits to my expert report include

 8   exhibits on -- on all of the drugs, sometimes grouped as 14,

 9   sometimes as 12, sometimes as two, sometimes individually.

10   I think that roughly 50 or 100 exhibits that we walked

11   through here in the courtroom, they all dealt with either

12   oxycodone or hydrocodone.  Only a few dealt with all of the

13   14 drugs.

14   Q.   Okay.  So, you agree that your testimony that's been

15   elicited by the plaintiffs in court here has largely been

16   around the distribution of oxycodone and hydrocodone,

17   correct?

18   A.   Yes.

19   Q.   Your analysis and charts do not show us the

20   non-controlled medications that distributors shipped,

21   correct, so non-opioid substances or non-controlled

22   substances?

23   A.   Correct.  I don't have that data, that's correct.

24   Q.   Are you aware that the data for distribution of

25   non-controlled substances into Cabell-Huntington was
```

```
 1    produced by Cardinal Health in this case?

 2    A.    I'm not aware of that.

 3    Q.    Are you aware that it was produced by other defendants

 4    in this case?

 5    A.    I am not aware of that.

 6    Q.    So, the lawyers didn't ask you to do that analysis,

 7    correct?

 8    A.    Correct.

 9    Q.    So, for a pharmacy with a high volume of oxycodone and

10    hydrocodone shipments into Cabell and Huntington, your

11    analysis doesn't tell us anything about whether they also

12    received a high volume of other medications like blood

13    pressure or cholesterol medications, right?

14    A.    Correct.

15    Q.    Moving on to a different topic, Dr. McCann, you're

16    aware that the DEA regulates the supply chain for controlled

17    substances, correct?

18    A.    Right.

19    Q.    And I believe you talked about it a little bit, but are

20    you aware that the DEA decides how much of each opioid

21    medication like oxycodone or hydrocodone can be made by

22    manufacturers each year?

23    A.    If you're referring to what I know very generally as

24    quotas, then the answer is yes.  I don't know if that

25    characterization is consistent with my understanding of the
```

1    quotas, but I understand the DEA publishes something that is

2    supposed to put an upper bound on the amount of opioids

3    produced.

4    **Q.**    And you understand that when the DEA sets a quota, that

5    authorizes production of a certain amount of medication and

6    no more, correct?

7    **A.**    That's generally my understanding.  I don't really know

8    anything in any detail about how these quotas work but,

9    generally, that's my understanding.

10   **Q.**    And are you aware that the DEA is required by law to

11   set the quota at the amount needed to meet legitimate

12   medical need?

13   **A.**    No.  I don't know what the requirements are for setting

14   the quotas.

15   **Q.**    But you do understand that distributors cannot ship any

16   more prescription opioids than are manufactured each year

17   pursuant to the DEA quota, correct?

18   **A.**    I'm sorry.  Could you ask that again please?

19   **Q.**    You understand that distributors cannot ship any more

20   prescription opioids that are manufactured pursuant to the

21   DEA quota, correct?

22   **A.**    Well, really independent of the quota, they can't ship

23   more drugs than are manufactured, that's correct.

24   **Q.**    Are you aware that the DEA increased the quota for

25   prescription opioids that could be manufactured almost every

1    year from 1993 until 2013?

2    **A.**   I don't recall that detail.  I recall seeing in perhaps

3    one of your expert's reports perhaps in an earlier case a

4    graph of these quotas that appear to be increasing through

5    time, but I don't recall the details.

6    **Q.**   So, you don't -- you're not recalling that, by 2013,

7    the quota limit for oxycodone was about 40 times greater

8    than it was in 1993?

9    **A.**   Correct.

10   **Q.**   But you said you are familiar with graphs showing the

11   general increase in quotas over time; is that right?

12   **A.**   Correct.

13   **Q.**   Let's take a look at one of those graphs.  Just for

14   demonstrative purposes, I'm going to show you a graph of the

15   DEA's aggregate quota for oxycodone over time in kilograms

16   and this is from the DEA OIG's report, a publicly available

17   document published in 2019.  If we could please pull that

18   up.

19        So, let's focus on the 1997 to 2010 time period.

20   According to this graph, in 1997, the quota was less than

21   10,000 kilograms, correct?

22   **A.**   Yes.

23   **Q.**   And, in 2010, it was more than 100,000 kilograms,

24   right?

25   **A.**   Yes.

1   **Q.**   Would you agree with me that this chart shows that the

2   DEA aggregate production quota for oxycodone in 2010 was at

3   least ten times greater than it was in 1997?

4   **A.**   Yes.

5   **Q.**   You testified about several other charts that showed

6   distributions of oxycodone and hydrocodone by all

7   distributors to all dispensers from 1997 to 2019; do you

8   recall that?

9   **A.**   Yes.

10  **Q.**   Let's pull up Plaintiffs' 44711, Page 4, please.  This

11  is one of your charts and it represents shipments of

12  oxycodone and hydrocodone reflected in the ARCOS Retail Drug

13  Summary Reports converted by you into MMEs for the entire

14  United States, correct?

15  **A.**   Correct.

16  **Q.**   You've testified that this chart showed that from 1997

17  to 2010 the volume of oxycodone and hydrocodone for the

18  entire United States increased by approximately ten or

19  eleven-fold; do you recall that?

20  **A.**   Yes.

21  **Q.**   Let's pull up Plaintiffs' Exhibit 44711, Page 8,

22  please.  This chart represents shipments of oxycodone and

23  hydrocodone also reflected in the ARCOS Retail Drug Summary

24  Reports and converted by you into MMEs for the entire State

25  of West Virginia; is that right?

1    **A.**   Yes.

2    **Q.**   You testified that this chart shows that from 1997 to

3    2010 the volume of oxycodone and hydrocodone shipped to the

4    entire State of West Virginia increased also by

5    approximately ten or eleven-fold; do you recall that?

6    **A.**   Yes.

7    **Q.**   So, the magnitude of the increase was approximately the

8    same for the State of West Virginia as it was for the United

9    States as a whole, correct?

10    **A.**   Yes.

11    **Q.**   Let's pull up P-44711, Page 11, please.  This chart

12    represents shipments of oxycodone and hydrocodone also

13    reflected in the ARCOS Retail Drug Summary Reports and

14    converted by you into MMEs for the three-digit zip codes in

15    West Virginia that encompass Cabell and Huntington, correct?

16    **A.**   Yes.

17    **Q.**   And you testified that this chart shows that from 1997

18    to 2010 the volume of oxycodone and hydrocodone shipped to

19    the three-digit zip codes that encompass Cabell and

20    Huntington also increased by approximately ten-fold; do you

21    recall that?

22    **A.**   Yes.

23    **Q.**   So, the magnitude of the increase was approximately the

24    same in Cabell-Huntington as it was for the State of West

25    Virginia, as well as the United States as a whole, correct?

```
1    A.    Correct.

2    Q.    So, across the DEA oxycodone quota and your analysis of

3    total distributions of oxycodone and hydrocodone to the

4    United States, West Virginia, and Cabell, and Huntington,

5    the trend is the same, we see about a ten-fold increase; do

6    you agree?

7    A.    Yes.

8    Q.    If we could pull up the demonstrative putting those

9    side-by-side.  So, that's why when you look at these charts

10   together, you see the similar upward slope from 1997 to

11   2010, correct?

12   A.    I'm sorry.  What do you mean by "that's why"?

13   Q.    Because it's a similar factor, because it's the same

14   factor of ten, we see a similar trend across all of these

15   graphs, correct?

16   A.    I'm sorry.  Yes.  The -- the graphs all reflect a

17   roughly ten-fold increase and so, visually, they appear to

18   have the same slope.

19   Q.    Okay.  Now, you created these -- the charts that you

20   made, the ones that the orange and blue lines, using

21   publicly available information from the ARCOS Retail Drug

22   Summary Reports, correct?

23   A.    Yes.

24   Q.    And you accessed those reports on-line?

25   A.    Yes.
```

1   Q.   Those Retail Drug Summary Reports reflect distributions

2   to each state broken up by three digit zip code within that

3   state year by year and quarter by quarter, right?

4   A.   Correct.

5   Q.   And you testified that those Retail Drug Summary

6   Reports, which date back to 1997, have been publicly

7   available for many years, potentially as early as 1998,

8   correct?

9   A.   Correct.

10  Q.   So, individuals in Cabell and Huntington, law

11  enforcement, public health officials, City Council members,

12  Cabell County Commissioners, could have access to this

13  publicly available information of quarterly shipments to the

14  255 and 257 zip codes when it was posted, correct?

15  A.   I don't know one way or another, but I don't know any

16  reason why not.

17  Q.   You don't know any reason why not, right?

18  A.   Correct.

19  Q.   You can take that back down.  Thank you.

20       Many of the charts and graphs you testified about with

21  Mr. Mougey reflect your calculation of how many prescription

22  opioids were shipped to jurisdictions on a per capita basis;

23  do you recall that?

24  A.   Yes.

25  Q.   So, let's discuss briefly the per capita calculations

1    that you -- that you did.  For West Virginia, you calculated

2    MMEs per capita for West Virginia and other states based on

3    the publicly available Retail Drug Summary Reports with data

4    going back to 1997, correct?

5    **A.**   Correct.

6    **Q.**   And you testified that the MMEs per capita was higher

7    in West Virginia than it was in many other states, correct?

8    **A.**   Correct.

9    **Q.**   And that was true across the graph even in the early

10   years as far back as the late '90s before prescriptions and

11   distributions increased significantly across the country,

12   right?

13   **A.**   I don't have that early part of the graph visually in

14   my mind right now, but that may be the case.

15   **Q.**   Let's pull up Plaintiffs' 44711, Page 6, please.  Do

16   you agree that, as far back as the late '90s, the MMEs per

17   capita was higher in West Virginia than it was in many other

18   states in the country according to your chart?

19   **A.**   Yes.

20   **Q.**   And you understand, don't you, that a larger proportion

21   of West Virginia's population suffers from conditions that

22   cause pain, correct?

23   **A.**   I'm not aware of that beyond just a general

24   understanding that that's been asserted.  I don't know that

25   that's -- whether that's true or not.

1    **Q.**   Okay.  Let's talk about the per capita calculations you

2    did specifically for Cabell and Huntington.  You did those

3    calculations by dividing the total number of MMEs

4    distributed to pharmacies in Cabell and Huntington by the

5    population of Cabell and Huntington residents in the Census

6    data you reviewed, correct?

7    **A.**   Correct.

8    **Q.**   And you testified that you're aware that Cabell County

9    is a healthcare hub for the surrounding area, correct?

10   **A.**   Just generally.  Again, I understood that to be

11   asserted and I saw some City of Huntington/Cabell County

12   website claiming that.  I have no reason to doubt it.

13   **Q.**   Okay.  And are you aware from that, or otherwise, that

14   people from the broader Huntington/Ashland Metro area come

15   into Cabell County and Huntington for medical treatment?

16   **A.**   I've heard that said.  I don't know.  I don't have any

17   personal knowledge of that.

18   **Q.**   Okay.  But you have no idea how many patients who lived

19   outside of Cabell and Huntington got their prescriptions

20   filled there, correct?

21   **A.**   Correct.  That type of data is available, but I don't

22   have that data.

23   **Q.**   Okay.  Dr. McCann, you provided testimony about

24   distributions to a number of pharmacies outside of Cabell

25   and Huntington and I'm going to ask you a few more follow-up

```
 1     questions.  I know we've already discussed this a few times.
 2          If we could please pull up P-43225, Page 7.  I just
 3     want to look at the headers here with the pharmacies that
 4     you identified outside of Cabell and Huntington.  This chart
 5     reflects data and analysis regarding oxycodone distributions
 6     to specific pharmacies in Cabell Huntington and as reflected
 7     on the chart here, 13 select pharmacies that are not located
 8     in Cabell or Huntington, correct?
 9     A.   Correct.
10     Q.   And I think we looked at a few examples in your
11     testimony earlier this morning, but several of the select
12     pharmacies here are in the Eastern Panhandle of West
13     Virginia, aren't they?
14     A.   I'm sorry.  I'm not really familiar with the counties
15     in West Virginia.
16     Q.   So, you're not aware that Hancock and Brooke Counties
17     are in the Eastern Panhandle?
18     A.   Correct.
19     Q.   Are you aware that a couple of these pharmacies are in
20     the Northern Panhandle?
21     A.   No.  Same answer.
22     Q.   Okay.  So, you're not aware that Berkeley County and
23     Jefferson County are in the Northern Panhandle?
24     A.   Right.
25     Q.   Let's take a look at another page of your analysis.
```

1          THE COURT:  You've got your panhandles backwards

2     here.

3          MS. SALGADO:  Oh, excuse me.  I'm sorry.  Thank

4     you, Judge.  Thank you.

5          THE WITNESS:  Apparently, neither of us are.

6          BY MS. SALGADO:

7     **Q.**   Let's take a look at the next page, please.  Let's take

8     a look at the headers for these outside of Cabell and

9     Huntington pharmacies.

10          MS. SALGADO:  Now, we don't have to worry about

11     panhandles here for this one, I think, Your Honor.

12          BY MS. SALGADO:

13     **Q.**   But I do know that three of those pharmacies are in

14     Harrison County, correct?

15     **A.**   Yes.

16     **Q.**   And according to my math, that's about 170-mile drive

17     from Huntington.  Are you aware of that?

18     **A.**   No.

19     **Q.**   You also presented information and analysis regarding

20     other pharmacies outside of Cabell and Huntington in what

21     we've referred to as some of the pharmacy-specific packets,

22     correct?

23     **A.**   Yes.

24     **Q.**   So, by my count, you presented data and analysis on 21

25     pharmacies that are located outside of Cabell and Huntington

1    to which Cardinal Health shipped oxycodone or hydrocodone;

2    does that sound correct?

3    **A.**   Yes.

4    **Q.**   And for all of the pharmacies you selected outside of

5    Cabell and Huntington, you just analyzed Cardinal Health's

6    shipments of oxycodone or hydrocodone, correct?

7    **A.**   Well, it mischaracterizes my prior testimony a little

8    bit.  I didn't select these pharmacies, but the pharmacies

9    that are listed on here are only on the oxycodone and

10   hydrocodone versions of these charts.  I don't have similar

11   charts for other opioids.

12   **Q.**   Okay.  So, just to clarify for the pharmacies that

13   counsel selected for you, you just analyzed Cardinal

14   Health's shipments of oxycodone and hydrocodone in these

15   charts, correct?

16   **A.**   Correct.

17   **Q.**   And --

18            THE COURT:  Can I interrupt you for a minute?

19            MS. SALGADO:  Please.

20            THE COURT:  I'm unclear as to how -- what criteria

21   was used to select the pharmacies here?  I mean, obviously,

22   there are a whole lot more pharmacies in the area than the

23   ones that are depicted on the chart.  How did these

24   pharmacies on the chart make the chart?

25            THE WITNESS:  Well, I can give you my general

1    understanding.  We were given these, as what I understand to

2    be illustrative choices by counsel of illustrative examples

3    of bad behavior on the part of the distributors in Cabell

4    County and the City of Huntington and in the counties

5    outside.  So, these are not all of the pharmacies and

6    they're not intended to be selected randomly, I don't

7    believe.  I think that they're intended to show that there

8    -- that the problems with the pharmacies that are identified

9    in Cabell County and Huntington City are not unique to

10   Cabell County and Huntington City, but part of a broader

11   problem with the supervision of the distribution of drugs by

12   these distributors.  That's my general understanding.

13       I didn't choose these pharmacies, but that's -- that

14   was what I understand the purpose of the exhibit is, to be

15   used with other witnesses to provide testimony about the

16   compliance and supervision issues.

17           MS. SALGADO:  Your Honor, I'm just going to object

18   to his characterization of bad behavior by distributors and

19   his understanding as to how this is illustrative.

20           THE COURT:  I'll overrule that.  Just so I'll be

21   clear, who selected the pharmacies that you included in the

22   chart?

23           THE WITNESS:  Counsel.

24           THE COURT:  Counsel for the plaintiffs?

25           THE WITNESS:  Correct.

1          THE COURT:  Okay.

2          BY MS. SALGADO:

3     Q.   As to these pharmacies outside of Cabell and Huntington

4     that the distributors here serviced, you didn't look at the

5     data on these distributors' distribution of non-controlled

6     substances to those pharmacies, correct?

7     A.   Correct.

8     Q.   So, you don't know whether Cardinal Health also

9     distributed above average volume of other medications,

10    right?

11    A.   Correct.

12    Q.   And the same is true for ABDC?

13    A.   Correct.

14    Q.   And the same is true for McKesson?

15    A.   Correct.

16    Q.   And you, in fact, have no way of knowing the volume of

17    other medications that Cardinal Health distributed to those

18    pharmacies because Cardinal Health has not produced data on

19    its distribution of non-controlled substances for pharmacies

20    located outside of Cabell and Huntington, correct?

21    A.   I'm not aware of that data being produced.

22    Q.   Are you aware that for pharmacies and non-pharmacy

23    customers in Cabell and Huntington the plaintiffs requested

24    and Cardinal Health produced extensive data and numerous

25    types of documents reflecting diligence regarding those

```
 1    customers and their orders?

 2    A.    No, I'm not aware of that.

 3    Q.    And so, you're not aware of that as to

 4    AmerisourceBergen, as well?

 5    A.    Correct.

 6    Q.    And you're not aware of that as to McKesson?

 7    A.    Correct.

 8    Q.    Are you aware that plaintiffs did not request the same

 9    type of data and diligence documents regarding Cardinal

10    Health's customers outside of Cabell and Huntington in this

11    case?

12    A.    I apologize.  I may have -- I may have agreed to the

13    sort of sequence of questions about the three distributors

14    just now too quickly.  Would you ask me that question again?

15    It's re-playing in my mind and I'm not sure that I

16    understood it the first time I answered.

17    Q.    I'm happy to -- yeah, happy to make sure we're all on

18    the same page here, so I will repeat the first question I

19    asked, which was are you aware that for pharmacies and

20    non-pharmacy customers in Cabell and Huntington the

21    plaintiffs requested and Cardinal Health produced extensive

22    data and numerous types of documents reflecting diligence

23    regarding those customers and their orders?

24    A.    Yes, I did answer too quickly.  I know generally that

25    the plaintiffs requested what I -- what I have heard
```

1    described as due diligence files.  And so, if that is

2    encompassing the data and numerous types of documents you

3    reference in your question, then I know that generally those

4    due diligence files were requested.

5        I think not just for Huntington City and Cabell County,

6    but more broadly, and -- and I understand that those files

7    have been produced, or at least some version of what I'm

8    calling due diligence files were produced.  I've received

9    and seen some of them.

10       So, rather than answer as I did to that series of three

11   questions, I probably should have given the opposite answer.

12   I didn't understand the question the first time you asked

13   it.

14   **Q.**   That's okay.  And due diligence files, as you call

15   them, I think are -- or diligence files are part of what I'm

16   talking about, but are you aware that plaintiffs requested

17   and defendants produced many other types of documents and

18   data reflecting diligence in this case?

19   **A.**   I don't know anything beyond what I would describe as

20   due diligence files.

21   **Q.**   Are you aware, for example, that defendants ran in

22   their e-mails of their anti-diversion personnel search terms

23   specific to the pharmacies and customers in

24   Cabell-Huntington so that they produced e-mail files that

25   reflect discussions and diligence of those customers?  Were

1    you aware of that?

2    **A.**   Yes, although I would have grouped down in what I

3    thought of as due diligence files.  I have some general

4    understanding of that.  I didn't review those files myself

5    personally, but I have some general understanding of them

6    being produced.

7    **Q.**   Are you aware also of the production of data beyond

8    general distribution data?  So, for example, data showing

9    every time a threshold is changed or every time there is the

10   exceedence (sic) of a threshold?  Are you aware that that

11   type of data was produced for defendants' customers in

12   Cabell and Huntington?

13   **A.**   I have some general understanding.  I don't recall

14   reviewing those documents specifically in this case.  I

15   think I have reviewed similar documents in related cases.  I

16   just am not placing them in this case.

17   **Q.**   Okay.  So, are you aware then that plaintiffs did not

18   request the same type of data and diligence documents

19   regarding distributors' customers outside of Cabell and

20   Huntington in this case?

21   **A.**   I'm not aware one way or the other.

22   **Q.**   So, are you aware that Cardinal Health and other

23   defendants did not produce the same type of data or

24   documents reflecting diligence for customers outside of

25   Cabell and Huntington in this case?

1    **A.**    No.  I'm not aware of that one way or the other.

2    **Q.**    Moving on to a different topic, Dr. McCann, let's cull

3    up Plaintiffs' Exhibit 71128, please, and I'd like to focus

4    in particular on the Cardinal Health pie chart here.

5         Dr. McCann, you testified about this chart -- I believe

6    it was back on Monday, many moons ago, correct?

7    **A.**    Yes.

8    **Q.**    And you explained that this shows for each defendant

9    which distribution center has shipped oxycodone and

10   hydrocodone to Cabell-Huntington, right?

11   **A.**    Yes.

12   **Q.**    So, looking at the chart you made for Cardinal, this

13   shows that 99.55% of the oxycodone and hydrocodone that

14   Cardinal Health shipped into Cabell-Huntington was shipped

15   from Cardinal Health's Wheeling, West Virginia distribution

16   center.  Do you see that?

17   **A.**    Yes.

18   **Q.**    And it further shows which distribution centers account

19   for the remaining .45% of oxycodone and hydrocodone that

20   Cardinal shipped into Cabell-Huntington, right?

21   **A.**    Yes.

22   **Q.**    And you have identified in this chart every

23   distribution center that appeared in the ARCOS data and

24   Cardinal Health's produced data that shipped oxycodone or

25   hydrocodone into Cabell-Huntington, right?  That's the

1    source of your data?

2    **A.**    Correct.

3    **Q.**    And so, as far as you're aware, there were no other

4    Cardinal Health distributions other than those identified

5    here that shipped any oxycodone or hydrocodone into

6    Cabell-Huntington during this time frame, correct?

7    **A.**    Correct, or at least these are the last Cardinal

8    Distribution Center before the drug arrived in Cabell County

9    and the City of Huntington.  It could be that drug came from

10   some distribution center other than Wheeling, West Virginia

11   to Wheeling, West Virginia and then into the county, but

12   this is -- all three of these pie charts are reflecting the

13   last distribution center in the chain before the drugs

14   entered Cabell County and City of Huntington.

15   **Q.**    So, for example, a drug might be shipped from a

16   national logistics center to a regional distribution center

17   before being shipped to a customer, correct?

18   **A.**    Correct.

19   **Q.**    But you're not aware of any distributions from any

20   other distribution centers directly other than what's

21   reflected here, correct?

22   **A.**    Correct.

23   **Q.**    And you've provided the names and locations for some of

24   the distribution centers identified.  For example, Niagra

25   Falls, New York appears at the bottom of the page, correct?

**A.**   Yes.

**Q.**   And for other of the distribution centers, you didn't

provide the names or locations, but you did provide the

unique DEA registration number, correct?

**A.**   Correct.

**Q.**   And each of those numbers corresponds to an

identifiable distribution center, right?

**A.**   Correct.

**Q.**   And you may not have identified it, but it would be

possible to be identified, correct?

**A.**   Correct.  I'm not sure why the city and state is not on

this for those two or three -- three that just have the DEA

number.

**Q.**   Okay.  So --

        THE COURT:  Excuse me.  Dr. McCann, did the

documentation that was furnished to you include the

shipments to every pharmacy by these three defendants in

West Virginia, for example?

        THE WITNESS:  Yes, Your Honor.

        BY MS. SALGADO:

**Q.**   On this chart, if none of these -- assuming none of

these DEA registration numbers corresponds to Cardinal

Health's distribution center in Lakeland, Florida, then that

means, according to your analysis, the Cardinal Health

distribution center in Lakeland didn't ship any hydrocodone

1    or oxycodone to Cabell-Huntington, correct?

2             THE COURT:  I'm sorry to interrupt again.

3             MS. SALGADO:  That's okay.

4             THE COURT:  I didn't ask the precise question I

5    wanted you to answer.  I asked you if the data included the

6    shipments of every pharmacy.  What I meant to ask was did it

7    show the specific shipments to each specific pharmacy?

8             THE WITNESS:  Oh, yes.  The data is -- if you

9    visualized it, it would be millions of lines of data, each

10   line showing a specific shipment of a specific drug package

11   from -- from a distributor and identifying which

12   distribution facility it came from to a specific pharmacy.

13   It will give the pharmacy's DEA number and the physical

14   location of the pharmacy, as well as the name and some other

15   information, but that's for every single shipment into

16   Cabell County and the City of Huntington.

17            THE COURT:  Okay.  I'm sorry to interrupt you.

18            MS. SALGADO:  That's okay.  No problem.

19            BY MS. SALGADO:

20   Q.   Just back on this, Dr. McCann, I believe you answered

21   this, but making sure we're clear, that if none of the DEA

22   registration numbers on this chart corresponds to Cardinal

23   Health's Lakeland, Florida distribution center, then that

24   means, according to your analysis, the Cardinal Health

25   Lakeland Distribution Center did not ship any oxycodone or

1    hydrocodone into Cabell-Huntington, correct?

2    **A.**   At least not directly into Cabell County and the City

3    of Huntington.

4    **Q.**   And the same is true for Cardinal Health's Auburn,

5    Washington facility?

6    **A.**   Yes.  Same answer, not directly, at least into Cabell

7    County and the City of Huntington.

8    **Q.**   And the same is true for Cardinal Health's Swedesboro,

9    New Jersey Distribution Center?

10   **A.**   Correct.

11   **Q.**   And the same is true for Cardinal Health's Stafford,

12   Texas Distribution Center, correct?

13   **A.**   Correct.

14   **Q.**   Dr. McCann, you're not aware of any shipment by any

15   distributor in this courtroom to a pharmacy that was not

16   registered with the DEA and licensed by its state regulator,

17   correct?

18   **A.**   Correct.

19   **Q.**   And of all the distributor shipments that you've

20   analyzed, you're not aware of a single shipment shipped to a

21   pharmacy without an order placed by that pharmacy for that

22   shipment, correct?

23   **A.**   Correct.

24        MS. SALGADO:  That's all I have.  Thank you so

25   much.

```
1              Thanks, Your Honor.

2                    THE WITNESS:  Thank you.

3                    THE COURT:  Any redirect?

4                    MR. MOUGEY:  Thank you, Your Honor.

5              Good morning, Dr. McCann.  Your Honor.

6                    THE COURT:  Good morning.

7                    THE WITNESS:  Good morning.

8                        REDIRECT EXAMINATION

9              BY MR. MOUGEY:

10   Q.   Dr. McCann, let's talk about the scope of what you were

11   asked to do for Your Honor with processing and summarizing

12   the data.  Dr. McCann, were you asked to perform an analysis

13   of the adequacy of the due diligence from each of these

14   defendants into these pharmacies?

15   A.   No.

16   Q.   Were you asked to review the due diligence documents

17   and I think what was just referred to as just an

18   extraordinary amount of due diligence and apply that to the

19   specific pharmacies?

20   A.   No.

21   Q.   Dr. McCann, were you asked to identify whether specific

22   doctors in West Virginia were arrested or stripped of their

23   medical licenses in relation to their prescriptions of

24   opiates?

25   A.   No.
```

1    **Q.**   Same question, Your Honor (sic) -- same question, Dr.

2    McCann.  Were you asked to analyze specific pharmacies and

3    whether or not they were investigated and shut down by

4    local, state or federal regulators?

5    **A.**   No.

6    **Q.**   Dr. McCann, were you asked to review whether or not

7    each or any of these defendants, AmerisourceBergen, McKesson

8    or Cardinal, had notice of issues relating to specific

9    pharmacies and the volume of shipments into those pharmacies

10   of opiates; specifically, oxycodone and hydrocodone?

11   **A.**   No.

12   **Q.**   Dr. McCann, were you asked to analyze the

13   responsibilities of each of these pharmacies under the

14   Controlled Substance Act; most specifically, 130174 orders

15   of size, due diligence -- I'm sorry -- size, frequency or

16   pattern and compare that to the due diligence in each of

17   these defendants' files?

18            MR. MAHADY:  Your Honor, I think this is outside

19   the scope of the cross examination.

20            THE COURT:  Well, I'm going to overrule it and let

21   him answer.  It may -- it -- it's close, but go ahead.

22            BY MR. MOUGEY:

23   **Q.**   Dr. McCann, were you asked to analyze whether any of

24   these defendants had notice of whether or not residents of

25   Cabell County, or any county for that matter, were traveling

1    distances to fill opiate prescriptions?

2    **A.**   No.

3    **Q.**   Dr. McCann, were you asked to perform any analysis

4    whether or not any of these defendants had notice that West

5    Virginia, most -- more specifically, Cabell County

6    residents, were traveling from West Virginia to places as

7    far away as Florida to fill prescriptions, opiate

8    prescriptions?

9    **A.**   No.

10            MR. MOUGEY:  If we could please publish

11   Plaintiffs' Exhibit 24013.

12        May I approach, Your Honor?

13            THE COURT:  Yes.

14            THE WITNESS:  Thank you.

15            BY MR. MOUGEY:

16   **Q.**   Dr. McCann, Plaintiffs' Exhibit 24013 is a list of each

17   of the counties in West Virginia and you were asked a series

18   of questions, I believe, by each defendant about residents

19   from counties surrounding Cabell into -- to fill

20   prescriptions in Cabell County, correct, sir?

21            THE COURT:  Mr. Schmidt?

22            MR. SCHMIDT:  Your Honor, we'll object to this as

23   outside the scope.  I don't see how a new document listing a

24   new ranking that we were given last night of different

25   counties is inside the scope of any cross examination.

```
 1              THE COURT:  Where are you going with this, Mr.
 2     Mougey?
 3              MR. MOUGEY:  Pretty easy, Your Honor.  First of
 4     all, on notice issue, this was provided back in 20 -- either
 5     '19 or '20.  Had this for at least a year or two.
 6              Secondly, Your Honor, as far as where I'm going, we've
 7     heard from each of the defendants that the surrounding
 8     counties' residents are coming to Cabell to fill opiate
 9     prescriptions and what I simply wanted to do, Your Honor, is
10     point out the dosage units and the pills per cap in those
11     surrounding counties that the defendants claim were coming
12     to Cabell to fill prescriptions.  Six or seven -- let's see.
13     I think it's a total of one, two, three, four, five counties
14     that are attached or connect to Cabell and then the counties
15     that are within one county of Cabell.
16              MR. MAHADY:  Your Honor, I have the additional
17     objection that the witness has already testified very
18     clearly that he knows nothing about these counties, where
19     they are, what relation they have to Cabell County.  And so,
20     to now try and bootstrap this in through Mr. Mougey, I
21     think, is inappropriate.
22              THE COURT:  I'm going to sustain the objection.
23              MR. MOUGEY:  Your Honor, may I respond just
24     quickly?  We've allowed each of these defendants to question
25     extensively Dr. McCann about --
```

1          THE COURT:  Well, I'm going to sustain the

2     objection to this.  I think he's basically said he doesn't

3     know the answers to what you're asking to ask him.  So, I'll

4     sustain the objection.

5          MR. MOUGEY:  Your Honor, just -- just hear me out.

6     Your Honor, you can take judicial notice of where these

7     counties are.  I want to point out the counties surrounding

8     Cabell.  That's it, Your Honor.  They've made extensive --

9          THE COURT:  Objection's sustained.

10          BY MR. MOUGEY:

11     **Q.**   Dr. McCann, in preparation for your testimony today,

12     did you -- did you create an extensive packet on each of the

13     pharmacies that you've covered?

14     **A.**   Yes.

15     **Q.**   What I've put in front of you, Dr. McCann, is

16     Plaintiffs' Exhibit 44759-A and I'm not going to walk you

17     through this entirely, but what I'd like you to do is flip

18     through Plaintiffs' Exhibit 44759 and explain how these

19     packages were created and, most specifically, did your

20     office create computer code to generate a series of charts

21     and graphs that you've included in these packages?

22     **A.**   Yes.  This is a set of standard charts and tables for

23     each pharmacy.  We create a package like this literally for

24     every pharmacy in the country.  A lot of what you and I

25     spoke about on Monday and yesterday morning were a few

1      excerpted pages from this basic document, which is larger,

2      and includes more information for each of the pharmacies.

3      **Q.**   So, when -- earlier in the week when we were referring

4      to pharmacy reports or pharmacy packages, you had created a

5      package similar to this for almost every pharmacy that we've

6      discussed this week, correct?

7      **A.**   Correct.

8      **Q.**   And Mr. Schmidt asked you questions about pulling out

9      specific documents to get -- to provide to Your Honor,

10     correct?

11     **A.**   Yes.

12     **Q.**   What you prepared, however, was a series of charts and

13     graphs on each of the distributors for each of the

14     pharmacies, correct?

15     **A.**   Yes.  Each of these packages are 40 or 50 pages and I

16     think, given time and space constraints, only three or four

17     pages were presented.

18     **Q.**   And, Dr. McCann, if you would please turn to Page 20 --

19     I'm sorry.  Wrong page.  Page 3.  I apologize.  Is Page 3

20     one of the -- is an example of the type of chart that is in

21     every single one of these pharmacy packets that we narrowed

22     down at the request of the defendants?

23             MR. SCHMIDT:  I'll object to that

24     characterization, Your Honor.  We didn't ask them to

25     selectively pick out pages to show the Court from their

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    exhibit.  We asked them to narrow the volume of their

 2    overall demonstratives.

 3              MR. MOUGEY:  That wasn't my question, Your Honor.

 4    I asked if we were requested to narrow it down.

 5              MR. SCHMIDT:  I think that's an unfair

 6    construction for the witness about discussions that the

 7    witness wouldn't know about between counsel and us.

 8              THE COURT:  I'm going to allow him to answer it.

 9    Go ahead if you can answer it, Dr. McCann.  Go ahead.

10              THE WITNESS:  I'm sorry.  Could you ask it again,

11    please, Mr. Mougey?

12              BY MR. MOUGEY:

13    Q.   Yes, sir.  Page 2 that's in front of you, did -- is

14    this sample that identifies each and every distributor that

15    sent shipments into Sav-Rite, was that a standard page in

16    each of your pharmacy packets?

17    A.   Yes.  Every single package shows every single

18    distributor of oxycodone and hydrocodone each year to each

19    pharmacy.

20    Q.   So, for example, the McKesson shipment in 2006 to

21    Sav-Rite of hydrocodone of 2.2 million pills is identified

22    in each of these packets?

23    A.   Or the analogous number, yes, that's correct.

24    Q.   And also, Miami-Luken of 342,000 pills in 2006, that

25    type of chart and graph is in each one of these so Your
```

1    Honor could look and see which of the distributors supplied

2    each and every one of the defendants -- yes, each around

3    everyone of the pharmacies?

4    **A.**    Correct.

5    **Q.**    Dr. McCann, just looking quickly at 2007, McKesson,

6    2.6 million dosage units of hydrocodone in 2007, correct?

7    **A.**    Correct.

8    **Q.**    So, in two successive years, 2.2 million and

9    2.6 million from McKesson into Sav-Rite pharmacy in Kermit,

10   West Virginia, correct?

11   **A.**    Correct.

12   **Q.**    Total of 4.8 million dosage units into Kermit, correct,

13   sir?

14   **A.**    Correct.

15   **Q.**    And, Dr. McCann, proceeding quickly so Your Honor can

16   get a feel for what's in each of these pharmacy packets,

17   please turn to Page 9.  Each one of these pharmacy packets

18   identifies the distribution from McKesson and others,

19   correct, sir?

20   **A.**    Correct.

21   **Q.**    And if you turn to Page 14 --

22   **A.**    Yes.

23   **Q.**    Each and every one of these pharmacy packets contains a

24   table showing the monthly distribution to those pharmacies

25   and the monthly changes, correct, sir?

1    **A.**    Correct.

2            THE COURT:  And you did a packet for each one of

3    the pharmacies that was selected for you by counsel for the

4    plaintiffs; is that right?

5            THE WITNESS:  More broadly than that, a packet for

6    every pharmacy, I think, literally in the country.  There's

7    -- there's hundreds of thousands of these.  And so, that

8    includes every pharmacy in West Virginia and every pharmacy

9    that's selected for that exhibit that we looked at.

10           THE COURT:  Well, you didn't do a packet for every

11   pharmacy in America, did you?

12           THE WITNESS:  We did.

13           THE COURT:  You did?

14           THE WITNESS:  We did.

15           MR. MOUGEY:  Yes, sir.  We're going to get into

16   that.

17           BY MR. MOUGEY:

18   **Q.**    So, Dr. McCann, each --

19           MS. SALGADO:  Your Honor, just to note, I don't

20   believe that those pharmacy packets have been provided in

21   this case for every pharmacy in the country; is that right?

22           BY MR. MOUGEY:

23   **Q.**    Dr. McCann, where are these pharmacy charts and reports

24   that contain a -- most or a lot of information that are in

25   these packets?  Where can anyone find those?

1    **A.**    They're on my website, Your Honor.

2    **Q.**    And how long have they been on your website?

3    **A.**    Over a year.

4    **Q.**    They don't contain all of the information in these

5    packets, but they contain charts and reports on each

6    pharmacy?

7              THE COURT:  Just a minute.

8              MS. SALGADO:  Right.  I just was noting that --

9    the characterization that there are these packets provided

10   for every pharmacy in America.  I don't believe that we have

11   had access to those; is that correct?

12             BY MR. MOUGEY:

13   **Q.**    Dr. McCann, who can --

14             MR. SCHMIDT:  Your Honor, can I make a separate --

15   or if you're rephrasing, then that moots my objection.

16             THE COURT:  Go ahead.

17             MR. SCHMIDT:  I was just going to say, I haven't

18   been objecting to the leading that's been going on for the

19   past five minutes, but I think we're now getting testimony,

20   so I will object.

21             THE COURT:  Don't lead him, Mr. Mougey.

22             MR. MOUGEY:  Yes, sir.

23             BY MR. MOUGEY:

24   **Q.**    Dr. McCann, the pharmacy reports that are on your

25   website, how can anyone access those?

1    **A.**    Well, on my firm's website, there's a tab for opioid

2    data.  It was put up there to make the raw and processed

3    ARCOS data available and to make reports available on every

4    -- every state, every county, every pharmacy, and the only

5    -- I think the main difference between those reports and

6    these reports is that the reports that are on our website

7    have to be based solely on the ARCOS data, the 2006 to 2014

8    time period, where the data has been publicly -- made

9    publicly available by Judge Polster.  These exhibits that

10   we're looking at, these pharmacy reports, include the

11   defendant transaction data before and after, but other than

12   that, I think they're the same.

13   **Q.**    Dr. McCann, I hand you what we've marked as Plaintiffs'

14   Exhibit 44758.  Dr. McCann, this is a SafeScript Report.  Is

15   this laid out similar to the exhibit that we just went

16   through?

17   **A.**    Yes.

18   **Q.**    And does this report contain charts and graphs

19   identifying each and every distribution to each of the

20   pharmacies?  I mean to SafeScript pharmacy?

21           THE COURT:  Mr. Mahady?

22           MR. MAHADY:  Your Honor, I don't understand the

23   point of this.  The plaintiffs have spent plenty of time

24   going through the charts they selected to use for SafeScript

25   Pharmacy.  We're now on redirect and they're trying to use a

```
1     much broader set.  I simply don't understand the purpose.

2     It just seems cumulative and unnecessary at this point.

3               MR. MOUGEY:  I'll explain the purpose.

4               THE COURT:  Okay, please.

5               MR. MOUGEY:  Your Honor, Mr. Schmidt spent about

6     45 minutes questioning the witness that the charts were

7     cherry-picked and selected.  What we're trying to

8     demonstrate, Your Honor, just to give you two examples,

9     that's all I'm trying to go through of what these pharmacy

10    packets looked like and what we tried to introduce over Mr.

11    Mahady's objection and Mr. Schmidt's objection.

12        I just wanted you to get -- see two packets so you

13    could see what we put together, Your Honor.  That's it.

14        And, Your Honor, one of the issues that concerns me

15    going forward is exactly what happened yesterday with Mr.

16    Schmidt.  The questioning of Dr. McCann, you didn't include

17    this, you didn't include this, and you didn't include this.

18        And, Your Honor, you got a preview of -- I -- the very

19    first day I appeared in front of you, Your Honor, I

20    predicted that this was going to be a problem, is that we

21    wanted to put these pharmacy packets in as tools for the

22    Court to use and the parties to use to know exactly what was

23    distributed.

24        The defendants spent a significant amount of time over

25    the last two days arguing about what wasn't included when,
```

```
 1    in fact, Judge, we tried to include it and we tried to
 2    include extensive tools.  I just wanted you to see what was
 3    available so, going forward to today, we have a pharmacy
 4    packet for 25 different pharmacies in CT2 if the Court needs
 5    them.  That's all I'm trying to do, Judge, is show you what
 6    we have and what we've created.  That's it.
 7                MR. MAHADY:  Your Honor --
 8                THE COURT:  Yeah, but you've picked -- you've
 9    selectively picked pharmacies for him to use.  I mean, I
10    don't understand your point.
11                MR. MOUGEY:  Well, my -- I'm sorry, Judge.  I must
12    be doing a terrible job of explaining it.
13                THE COURT:  Well, I may not --
14                MR. MOUGEY:  If I may take another crack at it and
15    I appreciate your patience, just so we understand.
16        The CC2 packets, the Cabell County packets, Your Honor,
17    are approximately 20, 25 pharmacies from Cabell County.  All
18    right.  We've shown each one of those.  Each one of these
19    packets contain a list and they contain detailed information
20    about where the pills came from, from any and every
21    distributor.
22        What I was worried about not getting these in is
23    exactly what happened with Mr. Schmidt's questioning of Dr.
24    McCann of what we didn't put in.  So, on one hand, the
25    defendants are objecting to the volume of us trying to put a
```

1   complete record in and then -- and which you agreed, told me

2   to narrow down.  And then, on the other hand, another

3   defendant's questioning about why things weren't included.

4        And all I'm simply trying to point out, Your Honor, is

5   we tried to include them and we tried to include and

6   identify every single distributor distribution to every

7   pharmacy, especially for the Cabell County pharmacies.

8   That's it, Your Honor.

9        THE COURT:  Well, if I remember correctly, you

10  tried to put in the entire universe of the ARCOS data, which

11  is unintelligible, until Dr. McCann used his computer magic

12  on it.

13       MR. MOUGEY:  Yes, sir.

14       THE COURT:  And pulled out the parts that were --

15  that we needed.

16       MR. MOUGEY:  Yes, sir.  And that's exactly right.

17  And you put it perfectly.

18       So, we had the ARCOS data in total, which the

19  defendants objected, and you -- and you pointed out, Judge,

20  it was cumulative.  And then, we attempted to put in these

21  packets for the pharmacies in Cabell County and the

22  defendants objected that they were voluminous.

23       So, all I'm trying to point out, Your Honor, is these

24  tools are available to the Court because what I am worried

25  about is that when Dr. McCann leaves the stand, that the

1    type of questioning that Mr. Schmidt did yesterday about

2    what we didn't include is right in these packets sitting in

3    the jury room for every pharmacy, but they've objected to

4    volume.

5        The tools are available.  We've identified detailed

6    information in these packages, Your Honor.  That's all I'm

7    trying to demonstrate.

8            MR. MAHADY:  Your Honor, if I may, this Court has

9    to consider evidence, not tools hand-picked by the

10   plaintiffs' lawyers.  And I know we are going to address

11   this issue of what constitutes a 1006 summary, but we

12   continue to maintain that these are not 1006.  They are not

13   evidence.

14       So, while it may help facilitate the plaintiffs' case

15   here to give the Court essentially an expert's work product,

16   it's not evidence and, if they haven't established that, the

17   Court should not consider it.  And we can address that at

18   the appropriate time, but we strongly object to the use of

19   tools to help the Court as we go forward.

20           THE COURT:  Okay.  Mr. Schmidt, do you want to say

21   something?

22           MR. SCHMIDT:  Yes, briefly, just to respond to Mr.

23   Mougey's comments, which are not at all what I was trying to

24   communicate with my cross examination.

25       With the Strosnider Sav-Rite pharmacy, there was a

1    three-page document that was shown to Dr. McCann.  They read

2    global numbers without ever making clear that most of those

3    numbers did not apply to McKesson.  They then only showed

4    data that applied to McKesson.

5         We did not ask them to cull out of this document that

6    they showed the court direct examination data regarding

7    other distributors.  When I showed Dr. McCann the data he

8    had provided regarding other distributors, I did my level

9    best to make it clear that we had been provided with that

10   data.  We didn't make that data up, but it came from Dr.

11   McCann from this very packet that Mr. Mougey is now trying

12   to introduce into evidence.

13        So, the point of the cross examination was not to

14   suggest that he had not done these broader analyses.  The

15   point of the cross examination was that, in the direct

16   presentation, the culling down of those analyses to three

17   pages that make no express mention of the other

18   distributors, but that included reading their numbers into

19   the record, that we needed to make a complete record on

20   that.

21             MR. MOUGEY:  Your Honor, that's -- that's not

22   accurate.

23             THE COURT:  Well, I'm going to sustain the

24   objection, Mr. Mougey, and you can move on.

25             MR. MOUGEY:  Your Honor, we move to admit each of

1    the pharmacy packets that we have tried to admit now three

2    different times that we've been -- we've been, by the

3    objections of the defendants, have been told to narrow those

4    down to a handful of pages.  Mr. Mahady just -- just argued

5    to the Court that those -- these are tools, not evidence.

6         Your Honor, we move every single one of these packets

7    to the place where we started and the Court can make -- even

8    conditionally, Your Honor, the Court can make decisions

9    moving forward about what evidence is in and not in, but it

10   does give the Court the flexibility to reference these so we

11   do not have to have discussions like we're having right now

12   with Mr. Schmidt about what was in and what wasn't because,

13   Your Honor, I do believe I showed a chart immediately

14   thereafter that identified the specific McKesson shipments.

15        And this is all unnecessary, Your Honor.  This is

16   classic 1006 summary evidence, classic, that the -- that the

17   underlying database is so voluminous and is impractical to

18   use.  Therefore, we've turned it into charts and packets and

19   summaries for the Court to use, which is exactly what 1006

20   is designed to do.

21        So, I believe, Your Honor, what I think would be a

22   smart approach to this, is Mr. Mahady suggested this just a

23   few days ago, is that -- it seems like two weeks ago --

24   which would be for each of the parties to submit some briefs

25   based on where we are and you allow the defendants to cross.

```
 1    Let's get this put in an organized fashion for Your Honor

 2    with the -- with some short briefings for you to be able to

 3    review and make a decision about whether or not this is

 4    appropriate 1006 because we believe it squarely falls, is

 5    exactly what 1006 is designed to do.  Otherwise, Your Honor,

 6    how in the world are we going to get the database in as you

 7    just said?

 8            MR. MAHADY:  Your Honor, I would like to respond

 9    on 1006.  I think we're probably at the appropriate time to

10    do so.  Do you mind if I go to the podium and address it --

11            MR. MOUGEY:  No.  I --

12            MR. MAHADY:  -- or do you want to hold of on this?

13            THE COURT:  I think -- let me get one other oar in

14    the water here.

15            MS. SALGADO:  No.  I'll let Mr. Mahady go first,

16    but I appreciate it, Your Honor.

17            MR. MAHADY:  Your Honor, to address one point if

18    we're not going to argue this right now, we do not think

19    that these should be conditionally admitted and, while we

20    are happy to brief the issue, we do not think until that

21    briefing has been submitted and decided that these 1006

22    summaries, purported evidence, should be used with witnesses

23    on cross examination.  So --

24            MR. MOUGEY:  Exactly my point, Your Honor.

25    Chicken -- chicken or the egg, which we've been trying to
```

```
1   get these admitted for three months and get this issue

2   framed up for Your Honor.

3             THE COURT:  I -- I want this issue briefed whether

4   this is appropriate 1006 and whether it comes in as evidence

5   or whether it's just demonstrative under 1006.  I think you

6   ought to brief it and let me consider it further on paper

7   because I think it's a crucial issue in the case and I need

8   all the help on the law I can get.  So --

9             MR. MOUGEY:  That -- that sounds perfect, Your

10  Honor, and I think we just need to figure out what the

11  timetable is so we can get it in front of Your Honor and I

12  think Mr. Mahady --

13            THE COURT:  Okay.  How much time do you need?

14            MR. MAHADY:  Today is Wednesday, Your Honor.  We

15  need to have the transcripts, obviously, which I believe we

16  do.  We -- I -- I'm not writing the briefs, so I've got to

17  be careful here I don't get in trouble back at the ranch.

18            MR. MOUGEY:  I think I heard Mr. Mahady say end of

19  the day, he was ready.

20            MR. MAHADY:  If you'd want to call ABC witnesses,

21  I'd commit to that.  But why don't we say end of the day

22  Friday?

23            THE COURT:  Well, that's okay with me.

24            MR. MOUGEY:  I'm okay with that, but you heard Mr.

25  Mahady say that they're going to object.  So, when Mr.
```

1    Farrell is going to try to use the numbers that we've just

2    put in with the next series of witnesses from ABC, that

3    you're going to hear an objection that they're not admitted,

4    Your Honor.  So, that's kind of what I meant.

5            The -- I think I said the chicken before the cart,

6    but I think I mixed my examples there.  The horse before the

7    cart.

8            MR. MAHADY:  Your Honor --

9            THE COURT:  Go ahead.

10           MR. MAHADY:  I'm sorry.  Go ahead, Your Honor.

11           THE COURT:  I can hear the testimony and then

12   decide later.  We don't have to --

13           MR. MOUGEY:  Exactly.

14           THE COURT:  -- worry about confusing a jury.  We

15   only have to worry about confusing me.  And so, I think the

16   thing to do is go ahead with the evidence and the testimony

17   and see where it leads and then consider the briefs and I

18   can go back and sort it out after the fact.

19           MR. MOUGEY:  That sounds like a plan, Your Honor.

20           MR. MAHADY:  Your Honor, appreciating Your Honor's

21   guidance there, the one thing we would request is that they

22   cannot show the witness, an AmerisourceBergen witness or a

23   Cardinal, a McKesson witness, a chart that they didn't use

24   with Dr. McCann.

25           What Mr. Mougey is saying is we decided which ones we

1    wanted to show him yesterday when we were questioning, but

2    here's the 50-page packet which has all the background

3    stuff.  That has not come in at all.

4        So, to the extent they're going to show our witnesses

5    anything, we think it should be -- it should be absolutely

6    limited to what Dr. McCann has testified to.

7            MR. MOUGEY:  Just quickly.  What I was trying to

8    demonstrate this morning, Your Honor, is the kind of

9    catch-22 we're in with the objection over volume and then

10   pointing out that there's specific data points that are not

11   in when we've tried to get them in, Your Honor.  So, the

12   defendants can't have it both ways with, say, it's too much

13   volume when I've told Your Honor there's 500 million lines

14   and, if you printed it out, there were 27,000 banker's

15   boxes.

16       I've got these pharmacies packets to one -- we're

17   arguing about one banker's box worth of pharmacy packets to

18   get into evidence.  All I'm asking, Your Honor, let's get

19   the 1006 briefed.  Let's hold this decision because, if the

20   defendants go -- and the witnesses go a different route than

21   the charts that are in, I've said this the other day, Your

22   Honor, my concern was, is that the packets weren't into

23   evidence.

24       So, Judge, I think we don't have to make this decision

25   now.  Let's not argue it hypothetically.  We have the

1    specific charts that I have into evidence.  Let's get this

2    briefed and have Your Honor make a ruling and a decision

3    and, if issues arise, I just -- to steal Mr. Mahady's

4    phrase, I've put a pin in it and let's decide it as it

5    arises because I don't think you need to make this decision

6    right now before the 1006s, Your Honor.

7         All I wanted you to see is the types of packets that I

8    had prepared and that we have -- we tried to get into

9    evidence over their objection.  That was it, Your Honor.

10        MR. MAHADY:  Your Honor, I think we have a problem

11   here because I think what the plaintiffs are trying to do is

12   saying let's brief it, let's let it, you know, sit out there

13   to the extent it needs to sit out there and, by the time we

14   get a ruling, all of the company witnesses will have already

15   testified and, at that point, it's tough to undo if the

16   Court rules that these 1006 summaries that they call them

17   are not evidence.

18        We can brief this on an accelerated basis.  I think

19   I've committed to that.  If we have to bump it up a day to

20   tomorrow, we'll have it briefed by tomorrow.

21        But we would like a ruling on this.  We are not

22   comfortable with a conditional ruling letting all of this

23   come in with our witnesses and then finding out after the

24   fact that they are, in fact, not evidence.  So --

25        MR. MOUGEY:  Which is --

1            MR. MAHADY:  We certainly defer to Your Honor on

2      his schedule and how he wants to decide these things, but I

3      am concerned that this could be somewhat of a drawn out

4      process in briefing and it's going to be tough to undo.

5            MR. MOUGEY:  Your Honor, which is exactly why

6      we've been trying to address this for three months, to avoid

7      taking trial time to go back and forth on this.

8         I agree with Mr. Mahady.  We are beyond time to get

9      this decided.  And I'll avoid any color of what I believe

10     cross did or didn't reveal at this point but, Your Honor,

11     let's get it briefed, let's get it in.

12        And you made the best point so far out of either of us

13     is, the gatekeeper function of having a jury here is not an

14     issue, and I don't think anybody in this courtroom is

15     concerned with your ability to make decisions and give the

16     weight the -- the evidence the appropriate weight it

17     deserves, but this is exactly why we tried to address this

18     issue prior to trial, and I think what's playing out right

19     now is exactly what we've been saying for what feels like

20     months.

21            MR. MAHADY:  Your Honor, if I could just make two

22     more points.  This issue has been playing out for months.

23     The reason this issue has been playing out for months was

24     because these purported 1006 summaries are layered with

25     analysis and relevancy decisions made by the plaintiffs and

1    their expert.

2        If these were true 1006 summaries, we wouldn't be

3    fighting about it.  We probably would have come into court

4    with some stipulation that they can come in.  But this is a

5    problem of the plaintiffs' own making.  The fact that they

6    are not able to get these into evidence easily should not be

7    -- it should not be implied that we caused this.

8        The other issue is that Mr. Mougey references that this

9    is a bench trial, and that's absolutely true, and we

10   certainly appreciate that Your Honor can make decisions as

11   to weight and everything.

12       But in addition to being a bench trial, this is the

13   first trial in the federal MDL.  Decisions that are made

14   here on these critical issues will have a ripple effect into

15   other trials; not just other federal trials, but other state

16   court trials, including trials where the same plaintiff

17   lawyers and Dr. McCann are a part of it.

18       And so, we are a little concerned about the suggestion

19   that this is just a bench trial.  We can be a little more

20   relaxed, to the extent that is what they're suggesting.  I'm

21   not saying it is.

22       But this is a critical issue.  There's pretty strong

23   case law on this from the Fourth Circuit.  And that's why we

24   feel so strongly here.  And we're going to brief it and

25   we'll have it to you by the end of the day tomorrow, Your

1    Honor.

2              THE COURT:  Can you brief it and have it to me by

3    the end of the day tomorrow, as well?

4              MR. MAJESTRO:  Yes, Your Honor

5              MR. MOUGEY:  Yes, Your Honor.

6              THE COURT:  Okay.  Does that get around the

7    problem of calling witnesses without having this resolved,

8    Mr. Mahady?

9              MR. MAHADY:  Your Honor, our position is that they

10   should not be using expert demonstratives with our witnesses

11   until the Court has ruled on it.

12             MR. MOUGEY:  Your Honor, many of these charts the

13   defendants have had for a year and if they had issues of --

14             THE COURT:  Well, okay.  I've got that point, that

15   they've had it for a year, and that's beside the point now,

16   as far as I'm concerned.

17             MR. MOUGEY:  I agree.

18             MR. MAHADY:  Your Honor -- I'm sorry.

19             THE COURT:  Yes, sir?

20             MR. NICHOLAS:  Well, since I'm -- it's Bob

21   Nicholas.  Since I'm going to be handling the first witness

22   that's called for ABDC this afternoon, or later this

23   morning, my suggestion is that the witness -- that

24   plaintiffs not be permitted to show these charts to the

25   witness.

1    They can ask questions, you know, that -- they can ask

2    their questions.  I mean, whatever is in the charts that

3    they want to ask, they can just ask the question.  I don't

4    think this is the time to start displaying these charts.

5         THE COURT:  Well, that's exactly right, isn't it,

6    Mr. Mougey?  You can ask the questions; don't show them the

7    chart.

8         MR. MAHADY:  And, Your Honor, I will note that's

9    the same thing that we were held to yesterday with the

10   expert report.

11        THE COURT:  Right.

12    Mr. Farrell?

13        MR. FARRELL:  The first witness we intend to call

14   is the Senior Vice President of Corporate Security and

15   Regulatory Affairs, Chris Zimmerman.  It has been our

16   intention for three, four years now to be able to take the

17   amount of pills that were sold by his company under his

18   watch to SafeScript and ask him how is it possible this

19   occurred if you were maintaining effectively --

20        THE COURT:  Well, you don't need the exhibit to

21   ask him that, Mr. Farrell.

22        MR. FARRELL:  So, what we've done is we've taken

23   the data and we've asked you to admit the raw data and you

24   said it was cumulative.  What we have done after that is we

25   have attempted to take that data and put it into components

1   and the defendants have objected and you've yet to rule.

2       The reason it's important is this, is that in certain

3   months, you will see that -- I'll give you an example.  In

4   July of 2007, with SafeScript, an event happened.  Then, the

5   month after that, they sold more pills.  The month after

6   that, they sold less pills.  The months after that, they

7   sold three times the pills.

8       One of the metrics required we argue under law is to

9   look in change of patterns.  This packet, P-44758, doesn't

10  contain the 40,000 lines of individual transactions.  It

11  summarizes it into months, into compartments.

12      As you were asking Mr. -- Dr. McCann earlier, we can

13  literally pull up on the screen, and we will today, if need

14  be, the actual transactions in a spreadsheet, 40,000 of

15  them, and be able to scroll through them to ask this witness

16  what happened between Point A and Point B.

17      So, it's one or the other.  We're either going to need

18  to go through the transaction data line by line by line to

19  illustrate a systemic and nationwide failure to maintain

20  effective control or we can put in the packets that convert

21  the Excel spreadsheet into charts.  We're asking you for one

22  or the other.  We have both.

23      And, importantly, Judge, respectfully, Dr. McCann has

24  laid the foundation for this to be admitted into the record

25  not as anything else other than actual evidence.  He's laid

1     the foundation.  Authenticity is stipulated.  He's testified

2     that -- now you can apply weight to it as you deem fit, but

3     it is evidence of what they did, when they did it, and where

4     they did it.

5               MR. MAHADY:  Your Honor, if I may respond.  I

6     think yesterday actually illustrated the concern with just

7     showing a witness a chart.  We saw on McCloud Family

8     Pharmacy that the chart that the plaintiffs prepared for one

9     month where there was a large spike overstated our

10    distribution by, as Mr. McCann testified, 20-some percent.

11         If that chart was shown to one of our witnesses, they

12    would have no idea that those 15,200 pills actually were

13    returned to AmerisourceBergen, were never on the shelves for

14    the pharmacy, and that's the concern.

15         Now, instead, if the plaintiffs showed them the

16    transactional data, Mr. Zimmerman would look at it and he

17    would say, okay, what I see here are five separate

18    transactions showing negative numbers, which shows that it's

19    not the 57,000 number you're telling me.  It's actually 42.

20         So, it gets at the inherent problem with the charts.

21    The charts are based off of relevancy determinations made by

22    the plaintiffs.  It does not accurately reflect what our

23    actual distribution was.  So, that's the problem we have

24    with just showing them charts.

25               MR. MOUGEY:  Your Honor, when Mr. Mahady yesterday

1    brought up the 15,200, I typed that into my calculator using

2    -- turning it into a percentage.  It's .000003 of the pills,

3    and I might have a couple 0s missing, into McCloud Pharmacy,

4    Your Honor.

5          So, one issue, as far as the reliability, Dr. McCann

6    has testified that 99.9% of the transactions match.  They've

7    done nothing to undermine that reliability with that

8    example, number -- number one.

9          Number two, there has been no relevancy decisions about

10   tracking these shipments into pharmacy by pharmacy.  The

11   retail and chain pharmacies have been identified for Your

12   Honor.  The hospitals have been removed.  And the shipments

13   per distributor are included.  We've put all of that into

14   the record.

15         And there are additional -- as I have just shown with

16   the SafeScript chart, there's no relevancy determination

17   and, after hearing all of this cross that they've asked for

18   over the last day, you've heard nothing besides weight, Your

19   Honor.

20              THE COURT:  Well, let me -- let me try to cut to

21   the chase here.  The issue is whether the documentation here

22   is admissible into evidence as the summary chart of -- under

23   -- I can't remember the rule, but as a summary chart.  The

24   information has been shown to the witness and so, it's -- in

25   its current form, it's a demonstrative that hasn't been

1   admitted into evidence, but it is a piece of paper that has

2   illustrated his testimony as a demonstrative.  So, it's

3   already before the Court.

4        The issue is whether I'm going to admit it as evidence

5   or leave it in its current form as a demonstrative, which

6   will assist the trier of factor and it will not be admitted

7   into evidence.  Since it's already been displayed as a

8   demonstrative, why can't the plaintiffs use it to testify --

9   to -- to question the witness even if it's not admissible?

10             MR. MAHADY:  One -- go ahead.

11             MR. NICHOLAS:  Well, I think the answer is because

12  the witness doesn't have the benefit -- the witness is

13  seeing the chart for the first time.  The witness will not

14  have the benefit of the challenges that have been made to

15  its accuracy and the limitations that, you know, could

16  result in the witness answering a question about the

17  document that assumes things that don't turn out to be

18  correct and the witness will have no way of knowing that.

19       I don't -- I'm having trouble understanding why -- this

20  all sounds very complicated, but it seems to me that if Mr.

21  Farrell, who I assume is going to question the next witness,

22  I don't know why he can't formulate a question that gets at

23  whatever information he wants to try to elicit to see if the

24  witness knows about without the benefit of the piece of

25  paper.

```
 1              THE COURT:  Yeah.  What about that, Mr. Farrell?
 2              MR. FARRELL:  Great point.  So, when -- if I may?
 3    When I stand up to ask Mr. Zimmerman, please turn to Page --
 4    to Page 16 and look at this, they're going to stand up and
 5    say Page 16 isn't in the record.
 6         When I stand up and say please go to Line 43,728 and
 7    explain why you shipped 50,000 pills on August 2nd, they're
 8    going to object and say it's not in the record.
 9         It's the chicken or the egg.  This is the box that we
10    are being placed in.
11              MR. NICHOLAS:  I feel like -- I'm sorry.  I feel
12    like we're --
13              THE COURT:  Well, you're suggesting that he can --
14    he can ask the question without the use of the paper, right?
15              MR. NICHOLAS:  Yes.
16              MR. FARRELL:  So, I can go through each of the
17    transactions from the dataset that you have not allowed to
18    be entered into the record, I can pull up this, read it to
19    him, and ask him if he can confirm it, and he's going to say
20    yes or no?  I mean, he's going to say I haven't seen the
21    data.
22              MR. NICHOLAS:  Well, I don't know what he'll say
23    about the particular data that he's going to be shown.  He
24    may well say I haven't seen this or I haven't seen that.
25         But one other point is that we have produced
```

```
 1    transactional data in this case.  If they want to use what
 2    we've produced, that's a different story.  It seems to me
 3    they can show him that.
 4         What we're talking about now is something different.
 5    It's something created by an expert that he has not -- he
 6    doesn't know anything about.  He hasn't read their reports.
 7    He has -- you know, he hasn't seen whatever he is going to
 8    be shown before.
 9         He's going to be given a cold -- you know, what we
10    would argue is pejorative, or biased possibly, or unreliable
11    summary that -- that's based on things, you know, decisions
12    that were made by counsel.  We've already heard that counsel
13    was cherry-picking -- I'll withdraw the word.
14              THE COURT:  Okay.  Okay.  Here's what I'm going to
15    do.  I'm going to pull the plug on this.  I need advice of
16    counsel, so I need to confer with my law clerks.
17         I have another matter to take up at noon.  Let's come
18    back.  Let's pull the plug on it now and come back at 1:30
19    and we'll see where we are, okay?
20              MR. HESTER:  And, Your Honor, should we be aiming
21    to submit briefs by tomorrow on this issue?
22              THE COURT:  Yes.  I want the issue briefed.  I
23    would like to have the issue briefed.
24              MR. MAHADY:  Thank you, Your Honor.
25              MR. NICHOLAS:  Thank you, Your Honor.
```

```
 1              (Recess taken)

 2                   THE COURT:  Dr. McCann?  Dr. McCann?

 3                   MR. MOUGEY:  He's outside, Judge.  We'll get him.

 4         Sorry.  I wasn't sure.

 5                   THE COURT:  We might be a little early here.

 6              All right.  Mr. Mougey, you may proceed.

 7                   MR. MOUGEY:  Thank you, Your Honor.

 8                   BY MR. MOUGEY:

 9         Q.   Dr. McCann, before the lunch break, you had responded

10         to a question from the Court about the scale or how large of

11         the summary charts and graphs and market share you've

12         produced around the country.

13         A.   Yes.

14         Q.   Would you please explain to the Court how you were able

15         to create those charts and graphs for every county in the

16         country?

17         A.   Sure.  So, once the data was defined to be -- for the

18         charts and tables that we've been talking about these three

19         days to be shipments from manufacturers to distributors and

20         then shipments from manufacturers and distributors to

21         dispensers --

22                   THE COURT:  Mr. Mougey, I didn't mean to open

23         another line of questioning.

24                   MR. MOUGEY:  It was actually in response to Mr.

25         Schmidt and I promise it will be just a second, Judge.
```

1          THE WITNESS:  Once that data was prepared, sub-set

2     it and prepared, it was a fairly simple matter of developing

3     a template for each of these figures and tables and then

4     writing software code.  I say a relatively simple matter,

5     but to run the code to produce all of these reports for

6     every pharmacy in the country literally takes a few days of

7     computer time on several fast computers to run, but once

8     it's programmed, it creates the same report for every --

9     every pharmacy.

10    **Q.**   Mr. Schmidt asked you about the scale of a couple of

11    particular charts.  Are there individuals in your office

12    that sit and create chart by chart by chart subjectively

13    changing the scale on each chart?

14    **A.**   No.  All of that is programmed and it's programmed just

15    as we saw on those couple of examples so that the vertical

16    scale just exceeds the highest bar on the chart.  That's the

17    way the program is written and I think the right way to

18    reflect the data.

19    **Q.**   Dr. McCann, you were asked yesterday about your

20    compensation for the work in this case.  Would you please

21    explain to the Court the number of different bellwethers

22    you've worked on for the MDL or the Executive Committee?

23    **A.**   Well, initially, there was a lot of work done just

24    generally for the MDL.  The first year or year and a half's

25    worth of work, I think, was sort of general purpose work.

1    And then, I've done work specifically on what we've been

2    referring to as CT21, CT2 and CT23.  Some of that work,

3    significantly in addition to the sort of common development

4    that was done on -- during the initial year.

5    **Q.**   Let me just -- instead of the acronyms, let's, if you

6    would, help the Court with the counties.  We have Cabell

7    County.  You list them off for the Court.

8    **A.**   So, Cabell County and the City of Huntington here.

9    Initially, it was Cuyahoga and Summit County.  And then,

10   more recently, I filed an expert report and will give a

11   deposition in Lakewood in Trumbull County.

12   **Q.**   San Francisco?

13   **A.**   San Francisco.

14   **Q.**   Have you also done work on the New York case on behalf

15   of the MDL even though that's a state court case?

16   **A.**   Yes.  I filed an expert report, gave a deposition, and

17   testified during a Frye hearing.

18   **Q.**   Are there active Attorney General cases that you're

19   working on around the country, as well?

20   **A.**   Yes.  There's somewhere between eight and twelve.  I'm

21   not just sure exactly how many, but quite a large number,

22   and then some other sort of work that doesn't fall into

23   either of those two categories.

24   **Q.**   Dr. McCann, Mr. Mahady yesterday asked you about a

25   Texas federal court opinion and asked you to read a couple

1    of sections off the lower court opinion, correct, sir?

2    **A.**   Right.  Not the -- not the opinion on the motion to

3    vacate, but an opinion denying my motion to intervene.

4    **Q.**   And, Dr. McCann, so the Court understands the whole

5    story --

6              MR. MOUGEY:  May I approach, Your Honor?

7              THE COURT:  Yes.

8              BY MR. MOUGEY:

9    **Q.**   And the entire picture, I've handed you, sir, the Fifth

10   Circuit opinion.  Dr. McCann, just to cover this briefly, if

11   you would, sir, turn to Westlaw Page 2.

12   **A.**   Yes.

13   **Q.**   And the sentence three quarters of the way down the

14   paragraph on the right -- left-hand side that begins with

15   "The District Court vacated", would you please read that

16   sentence into court?  Actually, the next two sentences?

17   **A.**   "The District Court vacated the award and granted

18   Morgan Keegan attorneys' fees and expenses.  The Court based

19   its decision on a finding that either the award was procured

20   by fraud or, alternatively, that the arbitration panel

21   exceeded its powers.  Because we conclude that these

22   holdings were in error, we reverse and remand with the --

23   with instructions to enter judgment enforcing the

24   arbitration award."

25   **Q.**   Dr. McCann, would you please turn to Page 4 and read

1    the last sentence of the Fifth Circuit's reversal under the

2    underlying court that begins with, "Thus, even"?

3    **A.**    "Thus, even if the evidence supported a finding of

4    fraud, which it does not, this prong is unsatisfied.  We

5    conclude that the District Court erred in vacating the

6    arbitration award on fraud grounds and expressly vacate the

7    finding that Dr. McCann committed fraud."

8    **Q.**    Dr. McCann, would you please turn to Page 6 and read

9    Footnote 4 into the record?

10   **A.**    "We note, however, the total absence of any evidence

11   supporting a finding that Dr. McCann committed intentional

12   fraud.  The evidence presented supports nothing more than a

13   conclusion that a member of Dr. McCann's staff made a

14   calculation error that he did not discover until after he

15   testified in the *Garrett* arbitration."

16   **Q.**    All right.  Dr. McCann, I would like to go full circle

17   to where we started on Exhibit 44711, Page 17.

18   **A.**    Yes.

19            MR. MOUGEY:  Bear with me, Your Honor.

20            BY MR. MOUGEY:

21   **Q.**    Dr. McCann, these were the markings that I made on the

22   board yesterday as we were going through Page 17 and I want

23   to just conclude with just a couple of questions from these

24   charts.

25            This top conclusory row that I have circled with 63

1    dosage units per cap from The Big Three, 37 from West

2    Virginia and 17.08, are those from simply retail and chain

3    pharmacies?

4    **A.**   Yes.

5    **Q.**   And, Dr. McCann, are these the NPI definition of retail

6    and chain pharmacies or the NPI definition of retail and

7    chain pharmacies?

8    **A.**   These are the DEA/ARCOS definition.

9    **Q.**   And Mr. Schmidt asked you several questions about your

10   testimony that had left off the VA and -- from McKesson's

11   numbers, correct, sir?

12   **A.**   Correct.

13   **Q.**   And as we evidenced on Page 17, sir, what were the

14   numbers that were focused on when reviewing Page 17 of

15   Exhibit 44711?

16   **A.**   The retail and chain pharmacies, the VA is listed

17   there, but my focus and your notations are on the retail and

18   chain pharmacies, and we -- we did not count the VA clinic

19   shipments against McKesson in this calculation.

20   **Q.**   And, Dr. McCann, on Page 18 of the same exhibit with

21   all three of the defendants, does the following slide

22   include the VA?

23   **A.**   No, it does not.

24   **Q.**   And, Dr. McCann, did you use the NPI definition of

25   retail and chain pharmacies in -- on Page 18?

1    **A.**    Yes.   That is the way we've been saying it.   Perhaps a

2    slightly different way of saying it is we used the NPI

3    Dictionary to identify what we thought were closed-door

4    facilities and I articulate in the report the six or seven

5    categories under the NPI Dictionary that would be

6    closed-door pharmacies.   And so, we take those out of the

7    retail and chain pharmacies identified by ARCOS to create

8    this exhibit.

9    **Q.**    And we've covered a lot of summary data the last two

10   and a half days, Dr. McCann.   Just 30,000-foot-view, what

11   impact does using the NPI definition of retail and chain

12   have on the number of dosage units that came into Cabell

13   County?

14   **A.**    Well, it reduces the number a little bit because it

15   doesn't include extended care facilities and other what

16   we've called closed-door facilities.

17   **Q.**    Can we move back one page, please?   So, Dr. McCann, the

18   57.09 dosage unit number excludes chain -- I'm sorry --

19   excludes closed-door and mail order pharmacies, correct?

20   **A.**    That's correct.

21   **Q.**    Would you consider then the NPI definition more

22   conservative or more aggressive when calculating the number

23   of dosage units into Cabell County through retail and chain

24   pharmacies?

25   **A.**    Well, it's more conservative.   First, we excluded, of

1    course, the VA clinic and all other hospitals and clinics,

2    but then we further exclude any extended care facilities.

3    So, the numbers across the board are about ten percent lower

4    when you exclude those extended care facilities and similar

5    closed-door pharmacies.

6    **Q.**    Now, Dr. McCann, this Page 18 was in the first exhibit

7    that we covered when you were on the stand in the first

8    couple of hours.  Every number, almost every number that you

9    gave the Court from that point for the rest of the time you

10   testified on retail and chain, did that include the NPI

11   definition of retail and chain or the ARCOS definition of

12   retail and chain?

13              MR. MAHADY:  Your Honor, leading.

14              THE COURT:  Sustained.

15              BY MR. MOUGEY:

16   **Q.**    Did you use the NPI definition or the ARCOS definition

17   after this slide pointing out the differentiation?

18   **A.**    In each section, when we got to the first time, the NPI

19   definitions were used.  The rest of the illustration's

20   subtotals that followed within that packet were -- were

21   based on the NPI definitions.

22   **Q.**    Dr. McCann, when I took a -- when you and I calculated

23   the summary slides for the 81,229,625 dosage units of

24   oxycodone and hydrocodone into Cabell County, did this

25   include just retail and chain pharmacies?

1   **A.**   Yes.

2   **Q.**   Did 81 million and some change include only the NPI

3   definition?

4   **A.**   Yes.

5   **Q.**   Are your answers the same for the 980,649,200 dosage

6   units of oxycodone and hydrocodone into Cabell County?

7   **A.**   Yes.

8            MR. MOUGEY:  No further questions, Your Honor.

9            THE COURT:  Is there any recross?

10           MR. MAHADY:  Good afternoon, Your Honor.

11      Dr. McCann, I have no additional questions.  Thank you

12   for your time.

13           THE WITNESS:  Thank you.

14           MR. SCHMIDT:  Your Honor, no additional recross.

15      Thank you, Dr. McCann.

16           THE COURT:  Ms. Salgado?

17           MS. SALGADO:  No additional recross from me.

18      Thanks very much, Dr. McCann.

19           THE COURT:  Well, I want to ask you a couple of

20   questions before we turn you loose here, Dr. McCann.  I

21   believe you said you -- in considering the ARCOS data, you

22   made eight different kinds of changes to that data in

23   constructing the exhibits that have been offered here, the

24   summary charts.  One of the things you excluded were the

25   transactions where the action indicator, code correction

1   number, or both, suggests that the reported transaction is

2   erroneous.  Just tell me how you made that determination.

3   How did you know it was erroneous?

4        THE WITNESS:  Well *The ARCOS Handbook* says that

5   both of those fields can't be filled in simultaneously in a

6   transaction.  So, when we saw that, and it's in a very small

7   number of transactions, less than one hundredth of 1%, but

8   where we saw both of those fields filled in, it's

9   inconsistent with *The ARCOS Handbook* and so, we excluded

10  those transactions.

11       THE COURT:  You also excluded transactions

12  involving reverse distributors and some other people and you

13  concluded that reverse distributors overstate the quantity

14  of opioids shipped for destruction.  How did you know that?

15       THE WITNESS:  Well, so the reverse distributors

16  are primarily receiving opioids and shipping them where

17  they're going to be destroyed to analytical labs.  Both the

18  reverse distributors and the analytical labs have DEA

19  registration numbers.  And so, we could see that the receipt

20  of the -- of the drug by the reverse distributor, typically

21  from a manufacturer or a distributor, we could see it being

22  reported both by the manufacturer and distributor.  We can

23  see it simultaneously being reported by the reverse

24  distributor.  And then, we see the follow-on transaction to

25  the DEA's destruction facility, the analytical lab.  We see

1   both sides identifying it or reporting it, the reverse

2   distributor and the analytical lab.

3       Now, the critical thing is that the analytical lab is

4   reporting one side of the transaction coming from the

5   distributor and one side of it coming -- going on to the

6   analytical lab for destruction.  The distributors' and

7   manufacturers' side of that reporting appears to be

8   accurate.

9       The -- on the very same transaction, the reverse

10  distributor reports a quantity that is maybe a million times

11  or a billion times higher.  And the same thing when that

12  reverse distributor reports the transaction to the DEA

13  analytical lab for destruction, it's being reported both by

14  the DEA analytical lab and by the reverse distributor.

15      And, again, we see the reverse distributor reporting a

16  number that is maybe a billion times higher than what's

17  coming into the analytical lab.  So, the -- it's really one

18  -- primarily one reverse distributor in Alabama that seemed

19  to just code the units wrong, calling something maybe

20  kilograms instead of micrograms, and so they're off by a

21  factor of a million or a billion.

22      It turns out none of those transactions are included in

23  shipments from manufacturers to distributors, but it was

24  fairly easy to see that those were all in error.  We could

25  check the reverse distributors' reporting against the

1    distributors of the same transaction.  We could also check

2    it against the analytical lab.  So, we know that they're

3    wrong.

4         It's not an exaggeration to say that some of the

5    shipments reflect from the -- as reported by the reverse

6    distributor reflect what would be whole trainloads of

7    Fentanyl, which we know were not shipped from Alabama to

8    Miami.

9              THE COURT:  Similarly, you eliminated transactions

10   with obvious errors.  How do you determine what error is

11   obvious and what isn't?  Is that a subjective determination

12   on your part or do you have some objective standard that you

13   use there?

14             THE WITNESS:  I don't believe that there was any

15   subjectivity used in any of this.  I've tried to lay out the

16   steps.  So, for instance, we -- we observed some -- some of

17   the data produced by the government includes and, for that

18   matter, by some of the defendants in their transaction data,

19   some NDC codes that don't reflect opioids.  And so, those

20   shouldn't have been included in the production, and we would

21   not -- we would include those.

22        We -- and in another example on that list, there were,

23   as I said, if -- if two DEA registrants are involved in a

24   transaction and they're reporting registrants, both of them

25   report the transaction and we wouldn't count both of those

1    reported transactions.  That would be double counting the

2    shipment from one party to another.

3        So, each step we took were instances like that where

4    there was some very obvious reason why that item should not

5    be included.  The one that was discussed yesterday at some

6    length was the R transactions and I could articulate why the

7    R transactions were included in the summaries.  But for each

8    thing that we did, I believe it was objective and clear.  I

9    don't believe there was really any subjectivity.

10            THE COURT:  Okay.  I want to ask you about the

11   pharmacies that were selected by the plaintiffs' counsel

12   that were outside the geographical area here.  If you take

13   those out, would that have changed any of your ultimate

14   conclusions?

15            THE WITNESS:  No.  I don't believe so.  All -- I

16   can elaborate, if you like.

17            THE COURT:  Yes, please.

18            THE WITNESS:  I apologize.  Sometimes my answers

19   are too long.

20            THE COURT:  Well, I'm going to exempt you

21   temporarily from that, Dr. McCann.

22            THE WITNESS:  Thank you, Your Honor.  The primary

23   opinions that I gave were about the levels of opioids that

24   were shipped into Cabell County and West Virginia and I sort

25   of subset those quantities in various ways by year, by

1    distributor, by drug, by drug strength.

2        And then, with Mr. Mougey's help, I pointed out the

3    percentage increases between one year and another year for

4    some of these items.  None of that would be affected by not

5    including those pharmacies outside of Cabell County and

6    Huntington.

7        Also, none of that would be affected except

8    imperceptibly by treating the R Transactions differently

9    than we did.  So, I don't really believe that any of my

10   conclusions -- and, in fact, I feel confident that none of

11   the conclusions that I expressed would be changed by any of

12   the discussion we've had here the last day and a half.

13           THE COURT:  So, if I understand, your testimony is

14   even though you made eight changes to the ARCOS data, eight

15   different types of changes, none of the changes

16   significantly impacted or affected your ultimate

17   conclusions; is that correct?  That's a bad question.

18       What I'm driving at is, is the final product ARCOS data

19   or is it yours?  Is it your interpretation of that?  I mean

20   --

21           THE WITNESS:  No.  It's ARCOS data.  If I may, you

22   could think of -- the most of the reports that I -- I

23   explained were for Cabell County and the City of Huntington.

24   So, if you think about it conceptually, the ARCOS data

25   starts with the entire nation.  So, most of my reports

1    narrow down this geographic scope to the City of Huntington

2    and Cabell County.

3         In similar ways, my analysis first narrows the scope to

4    shipments from distributors to pharmacies in Huntington

5    County (sic).  So, when you see that I made eight changes, a

6    significant part of that is excluding the transactions that

7    didn't involve shipments from distributors to pharmacies,

8    just like I don't include tables and charts on Washington

9    State.  I narrow the geographic scope and then I further

10   narrow the data to be shipments to pharmacies in -- or

11   dispensers generally in Cabell County and the City of

12   Huntington.

13        Once you do that and don't double count by making sure

14   that you're not including the same transaction twice because

15   they're reported by two different registrants, what's left

16   is what I would call corrections after that.  And the

17   corrections account for something like less than a tenth of

18   1%, maybe less than five one hundredths of a percent.

19        So, there's -- what I -- what I summarize here is ARCOS

20   data with very minimal, very minimal corrections, trivial.

21             THE COURT:  Does counsel want to ask him anything

22   based on what I asked him?

23             MR. MAHADY:  Your Honor, I think a number of the

24   questions you asked got at the processing of the underlying

25   data.  I believe Dr. McCann testified yesterday that there

```
1    was a distinction between the processing phase of his work

2    and the analysis side of his work.

3              BY MR. MAHADY:

4    Q.   Would the eight exclusions, Dr. McCann --

5              MR. MAHADY:  If I may ask the question?

6              THE COURT:  Yes, please.

7              BY MR. MAHADY:

8    Q.   Did that relate primarily to the processing side of

9    your work to get you a dataset that you could then analyze?

10   A.   No.  The -- at least measured by -- by dosage units, or

11   weight, or MME, the vast majority was narrowing the focus to

12   the shipments from distributors to dispensers.  That gets

13   rid of the problem with the reverse distributors and it gets

14   rid of the double counting of the same shipment counted

15   twice in the records.  That's the vast majority.

16        And you really should think of that as prior to

17   processing, although you could do -- you could process the

18   entire database and then subset it down to shipments from

19   distributors to dispensers or it's the same logically.  You

20   could think of it as narrowing the raw ARCOS to shipments

21   from distributors to dispensers and then processing from

22   that point.  It's the same thing.

23   Q.   Okay.  But the decision not to include transaction

24   codes that may reflect an offset on the shipments, that was

25   not merely processing the data to get it in a useable form,
```

1    correct?  That was a decision that you made in performing

2    your analysis?

3    **A.**   Yes.  I've offered to explain that three times.  No one

4    wants to take me up on it.

5           THE COURT:  Well, I'm going to take you up on it

6    right now.

7           THE WITNESS:  Thank you, Your Honor.  I've been

8    dying.  So, there was an example presented to you yesterday

9    in my cross examination of McCloud Pharmacy and one

10   particular month where there was 15,000 pills returned out

11   of I think it was 57,000 gross shipped that month.  What --

12   what I waned to explain is that these R Transactions account

13   for approximately six tenths of 1% of the shipment data and

14   of the -- of the shipments from wholesalers and distributors

15   to dispensers.

16      And there are problems with that R coded data.  There

17   are problems with their interpretation and, even if you can

18   agree on the interpretation, there are problems with how it

19   ought to be presented in graphs and tables.

20      A perfect example would be, earlier today, I was asked

21   about switches from self-distributing CVS to, I believe it

22   was Cardinal Health, or perhaps yesterday, switches between

23   one distributor to a Fruth Pharmacy and another distributor.

24      Now, what you see in those R Transactions is if you

25   just look at, for instance, Cardinal Health's shipments to

1      that pharmacy, you see a -- an R Transaction in an NDC code

2      with no prior purchase.  So, in the Cardinal Health data

3      right here in Cabell County, in the City of Huntington, you

4      can see lots of examples of returns that -- with no prior

5      purchase of that same NDC code from Cardinal Health.

6          Well, if you dig a little bit deeper, what you'll see

7      is the previous distributor maybe shipped that NDC code to

8      that pharmacy a year earlier.  In the intervening year, the

9      pharmacy changes distributors and perhaps it's not an error.

10     Perhaps it really is a return to the Cardinal, the new

11     distributor of an NDC package that was bought at a previous

12     distributor.

13         Now, when I'm calculating market shares, should that

14     return be counted as an offset against the previous

15     distributor, maybe AmerisourceBergen, of a thousand pills or

16     should it be counted as an an offset against Cardinal

17     Health's contemporaneous shipments because it was initially

18     shipped by AmerisourceBergen?  Should we continue to count

19     that as a thousand pills in the AmerisourceBergen or should

20     we credit AmerisourceBergen and count the full 57,000 pills

21     against Cardinal?

22         It turns out that across all three distributors,

23     whether you're looking at nationally, West Virginia or

24     Huntington and the -- and Cabell County, the percent that

25     these R Transactions plus the Ps, which may reflect a

1    return, account for approximately six tenths of 1% of the

2    shipments.

3        The graph that we're looking at on the white board

4    there would not be changed.  If you took out about one-half

5    of 1% of the heights of those bars, the -- the numbers that

6    were in the tables that I presented to you showing the total

7    shipments or the per capita shipments from these

8    distributors would not change beyond the rounding error and

9    the percentage increases over time or the relative

10   magnitudes of the shipments in Cabell County and the City of

11   Huntington to West Virginia and the country would change in

12   no way.

13       So, it was my view -- we do use the R Transactions in

14   some testimony that I'll offer you later in a few weeks, but

15   for purposes of the tables that I put in front of you here

16   this week, those R Transactions don't belong.

17            MR. MAHADY:  Your Honor, if I just may ask a few

18   follow-up questions?

19            THE COURT:  Yes, please.

20                    **CROSS EXAMINATION**

21        **BY MR. MAHADY:**

22   **Q.**   In the case of McCloud Family Pharmacy,

23   AmerisourceBergen was the only pharmacy servicing McCloud in

24   October of 2011, when those 15,200 pills were returned to

25   AmerisourceBergen, correct?

1    **A.**    Correct.

2    **Q.**    And AmerisourceBergen, based off of your analysis, was

3    not credited with the return of those 15,200 pills, correct?

4    **A.**    Correct.

5    **Q.**    And the chart that you demonstrated to the Court did

6    not reflect AmerisourceBergen being credited with those

7    15,200 pills, correct?

8    **A.**    Correct, for the reasons I just explained.

9    **Q.**    Okay.  And I know you just testified that your work was

10   really the ARCOS data, but a lot of your work and a lot of

11   the charts are based off of per capita analysis and we can

12   agree, right, that you cannot do a per capita analysis just

13   based off the ARCOS data alone?  You need to introduce a

14   separate dataset and, in this case, that was the U. S.

15   Census Bureau data, correct, Dr. McCann?

16   **A.**    Yes.  I wouldn't say it was a lot of what I presented,

17   but to the extent that there were per capita numbers, those

18   are based on -- including the Census data numbers.

19   **Q.**    Okay.

20        MR. MAHADY:  I have no further questions, Your

21   Honor.  I'm not sure if McKesson or Cardinal do.

22        THE COURT:  Mr. Schmidt, do you want to ask him

23   anything?

24        MR. SCHMIDT:  Yes.  I was going to ask the Census

25   question, but Mr. Mahady covered it, so I'll just ask two

1     others.

2                      **CROSS EXAMINATION**

3              **BY MR. SCHMIDT:**

4     **Q.**   Do you see that chart up there that's, I think, set up

5     for the next witness that's based on your work, Dr. McCann?

6     **A.**   Yes.

7     **Q.**   Is that MME data?

8     **A.**   Yes.  I'm sorry.  No, it's calculated base weight in

9     grams.

10             COURT REPORTER:  I'm sorry.  Could you repeat

11    that?

12             THE WITNESS:  It's what's referred to as

13    calculated base weight in grams.

14             COURT REPORTER:  Thank you.

15             BY MR. SCHMIDT:

16    **Q.**   You did perform various MME calculations, correct?

17    **A.**   Correct.

18    **Q.**   And those MME -- the MME data that you used, that does

19    not appear in ARCOS, correct?

20    **A.**   Correct.

21    **Q.**   You had to draw documentation and data from the CDC to

22    conduct conversions for the MME data, correct?

23    **A.**   Correct.

24    **Q.**   And in other of your analyses, including some we just

25    looked at, you used NPI pharmacy types to sort some of your

1      ARCOS data according to those NPI pharmacies types, correct?

2   **A.**   Correct.

3            MR. SCHMIDT:  Thank you.

4            THE COURT:  Ms. Salgado?

5                    **CROSS EXAMINATION**

6            **BY MS. SALGADO:**

7   **Q.**   Dr. McCann, you testified just now that the exclusion

8   of the R and P data did not affect -- or was diminimous

9   essentially on an aggregate level; is that right?

10  **A.**   Correct.

11  **Q.**   But you would agree, wouldn't you, that when you drill

12  down to the pharmacy level and particular transactions, for

13  example, in the McCloud example, there could be a material

14  difference in what you're seeing in the transactional level

15  for that pharmacy and what actually occurred; do you agree

16  with that?

17  **A.**   Well, there could be, but even in the McCloud case, it

18  accounted -- it amounted to about 2% of the total shipments

19  to McCloud.  As I said, on average, it's about seven tenths

20  of a percent across Cabell County, West Virginia and the

21  country.  For McCloud, it was around 2%.

22  **Q.**   And if we're looking at particular transactions for

23  McCloud, though, it could affect what we see as the

24  particular -- what was shipped in a particular month and

25  whether that volume was particularly high or low?  It could

```
 1    impact that, correct?

 2    A.    No.  Those are still shipments to McCloud.  The only

 3    question is whether either earlier in the month or later in

 4    the month, if there were -- if there were returns to the

 5    distributor, maybe not the distributor that first sent the

 6    drugs to McCloud, but if there are returns to the

 7    distributor, how they should be treated.  And for the

 8    reasons I explained for these charts and tables, I don't

 9    believe they should be included.

10    Q.    Right.  And I guess I understand that the other data

11    still reflects the shipments, but the charts that you show

12    may not reflect the net shipments that went from that

13    particular distributor to that particular pharmacy in a

14    particular month if there were returns, correct?

15    A.    Correct.

16              MS. SALGADO:  Thank you.

17              MR. MOUGEY:  Your Honor, I'm still here behind the

18    podium.

19              THE COURT:  Are you back there, Mr. Mougey?

20              MR. MOUGEY:  I may have just a couple quick

21    follow-up.

22                         EXAMINATION

23              BY MR. MOUGEY:

24    Q.    The eight, I'll call them categories that Your Honor

25    mentioned, Dr. McCann, are you familiar with the terms
```

1    correlation coefficient?

2    **A.**   Yes.

3    **Q.**   Is -- explain to the Court what correlation coefficient

4    is just very 30,000-foot.

5    **A.**   Well, it's a measure of how two variables move

6    together, how observations on those two variables relate to

7    one another either what we call positively, if they go up

8    and down together around their averages after you subtract

9    their averages or negatively if they move in opposite

10   directions.

11   **Q.**   Is the correlation coefficient a mathematical

12   computation that is routinely used by experts when comparing

13   different datasets?

14   **A.**   Yes.

15   **Q.**   And were you able in this case, despite the eight

16   categories and some of the issues raised, were you able to

17   perform a correlation coefficient calculation on the ARCOS

18   dataset in comparison to the defendant's transactional

19   dataset?

20   **A.**   Yes.  I report that in my expert report.

21   **Q.**   And, Dr. McCann, would you explain the kind of

22   numerical range from perfectly inversely correlated to no

23   correlation to perfectly correlated?

24   **A.**   Sure.  A negatively correlated, a perfectly negatively

25   correlated variable, would have a -- pair of variables would

1    have a correlation coefficient of minus one and a perfectly

2    positively correlated pair variables would have a

3    correlation coefficient of plus one.  You can think of plus

4    one as being really even just the same thing measured twice

5    in different units.

6        So, if we measured people's heights here in inches and

7    then in centimeters, you know, everybody has the same

8    height.  It's the same distribution of heights.  We're just

9    measuring them two different ways.  If you calculate a

10   correlation coefficient across those two series, the

11   correlation coefficient would be one.  It would be 1.00.

12   **Q.**   Now, Dr. McCann, were you able to calculate the

13   correlation coefficient based on the West Virginia dataset

14   and the defendants' transactional dataset?

15   **A.**   Yes.

16   **Q.**   And what was that correlation coefficient, Dr. McCann?

17   **A.**   Well, we report a couple of different things.  I'd have

18   to -- the precise number, I would have to look up, but it's

19   .99-something.  These are perfectly correlated, just as the

20   ARCOS data, once we've -- we've sort of subset it down to

21   the shipments to dispensers and made the corrections that we

22   made, the correlation between it and the Retail Drug Summary

23   Reports is .999 or something.  These are effectively the

24   same datasets.

25   **Q.**   Dr. McCann, the pharmacies outside of Cabell County on

1     the larger spreadsheets, were these -- were these given any

2     additional or different weight in the series of summaries

3     than other pharmacies in West Virginia?

4     **A.**   No.  The statewide average is -- just includes all of

5     the pharmacies and, to the extent there are one or two

6     pharmacies on the spreadsheet that are not in the state,

7     they're not included at all in the calculations.

8                  MR. MOUGEY:  No further questions, Your Honor.

9     Thank you.

10                 THE COURT:  And you used the ARCOS data and

11    information submitted by the defendants?

12                 THE WITNESS:  Correct.

13                 THE COURT:  And where it overlapped, you made

14    appropriate adjustments?

15                 THE WITNESS:  Right.  The overlap is almost

16    perfect.  It's really where they didn't overlap or there

17    might have been a few transactions missing, let's say, from

18    the ARCOS data.  Cardinal Health was the example we talked a

19    little bit about.

20         There were three weeks in March of 2008.  For some

21    reason, the ARCOS data shows blanks for Cardinal during that

22    time period, but the Cardinal data produced in discovery

23    shows shipments during those three weeks.  And so, we import

24    those shipments from the Cardinal data into the ARCOS data

25    before we do the analysis and that's actually necessary.

 1   That then allows the ARCOS data to match up with the Retail

 2   Drug Summary Reports in that quarter.

 3        So, it's -- other than that, there might be -- there

 4   might be a few transactions here or there that we found in

 5   the defendant transaction data not in the ARCOS data and

 6   brought it over, but it was primarily really just those

 7   three weeks in March.

 8             THE COURT:  Okay.  Let me -- let me ask counsel,

 9   is there any argument about whether the ARCOS data and the

10   defendants' discovery data used by Dr. McCann are admissible

11   in evidence?  Is there any argument about the admissibility

12   of any of that?

13             MR. MAHADY:  Your Honor, the processed ARCOS data,

14   like the whole set, or are you just talking about --

15             THE COURT:  What he used?

16             MR. MAHADY:  I don't think that there's an issue

17   with the underlying data or R transactional data.  I think

18   where the rub is, is with his analysis and subjective

19   decisions that were made in the supplementation with it.

20        So, as far as AmerisourceBergen goes for R

21   transactional data, I do not think that there is an issue as

22   to whether or not it is admissible.  It's more of the

23   analysis.  And that's really the rub that we're going to be

24   briefing.

25             MR. SCHMIDT:  And that's where we are, as well,

1    Your Honor, for McKesson.

2           MS. SALGADO:  Same for Cardinal Health, Your

3    Honor.

4           THE COURT:  Well, as I understand it, for Rule

5    1006 apply, the data has to be admissible in evidence.  It

6    doesn't have to be admitted, but it has to be admissible; is

7    that right?

8           MR. MAHADY:  Right.  It has to be -- the

9    underlying data that's being summarized has to be admissible

10   and the summary has to be an objective summary of that data.

11          THE COURT:  And you're telling me that you don't

12   have any quarrel about the admissibility of the underlying

13   data, right?

14          MR. MAHADY:  I think that's correct, Your Honor.

15          MR. SCHMIDT:  Our quarrel is with the adjustments

16   that have been made to it and merging datasets.

17          THE COURT:  Right.  I understand that.

18          MS. SALGADO:  Yes, Your Honor.

19          MR. MOUGEY:  I agree that's where the difference

20   is and that's what we're going to brief, Your Honor.

21          THE COURT:  May Dr. McCann be temporarily excused?

22          MR. MAHADY:  Yes.

23          MS. SALGADO:  Yes, Your Honor.

24          MR. MAHADY:  He may not come back.

25          THE COURT:  Dr. McCann, thank you very much.

1   You're free to go until you have to come back.

2              THE WITNESS:  Thank you.  If I may, Your Honor,

3   it's been a pleasure and an honor.  Thank you.

4              THE COURT:  Thank you.

5       All right.  Here's what I'm going to do on the -- on

6   the big issue.  I'm going to conditionally admit the

7   summaries under Rule 1006 at this time subject to possibly

8   revising or reversing that ruling after I receive the briefs

9   and allow the plaintiffs to proceed and use the summaries in

10  their questioning, but with a warning.  They do so at their

11  peril.  If I ultimately determine that the charts are not

12  admissible, that may require striking some or all of the

13  accompanying testimony.

14      So, rather than delay things, I'm going to -- we're

15  going to move forward on that basis and you all can put your

16  objections on the record, if you wish.

17             MR. SCHMIDT:  Yes.  I think we've maintained our

18  objections on the 1006 and will through our briefing.  It's

19  not ripe now, but I do want to flag a subsidiary issue,

20  which is this geographic scope issue, particularly with

21  respect to the pharmacies outside of Huntington-Cabell.  I

22  think it is a distinct issue and I think that will come up

23  in the context of specific witness testimony, but I just

24  wanted to put a marker down for that.

25             MS. SALGADO:  Same objections, Your Honor.

```
 1              THE COURT:  Mr. Mahady?

 2              MR. MAHADY:  Same objections, Your Honor.

 3              THE COURT:  All right.

 4         All right.  Mr. Farrell, if you're ready to go, you can

 5     call your next witness.

 6              MR. FARRELL:  Yes, sir.  Plaintiffs call Chris

 7     Zimmerman.

 8         Judge, if you don't mind, we've got just a few minutes

 9     of moving papers.

10              THE COURT:  No, not at all.

11         (Pause)

12              THE COURT:  Mr. Zimmerman, you may take the

13     witness stand.  Wait a minute.

14              LAW CLERK:  Wait.

15              THE COURT:  She needs to swear you first.

16              THE WITNESS:  Oh, I'm sorry.

17              LAW CLERK:  Please raise your right hand.

18         **CHRIS ZIMMERMAN, PLAINTIFF WITNESS, SWORN**

19              COURTROOM DEPUTY CLERK:  Thank you.  Please be

20     seated.

21              MR. MAHADY:  Judge, we have a pileup of documents

22     the witnesses have been seeing.  Your Honor, may I come up

23     here just to grab this stuff?

24              THE COURT:  Yes, please.

25                        **DIRECT EXAMINATION**
```

**BY MR. FARRELL:**

**Q.**   Good afternoon.  Would you please state your name for the record?

**A.**   Good afternoon.  My name is Chris Zimmerman.

**Q.**   And which of the parties here are you identified with?

**A.**   I identify with the AmerisourceBergen Drug Company.

**Q.**   What is your current role?

**A.**   My current title is Senior Vice President of Corporate Security and Regulatory Affairs.

**Q.**   Mr. Zimmerman, you've been employed with AmerisourceBergen since 1990?

**A.**   That's correct.

**Q.**   And my records or my notes indicate that you took the role of Vice President of Corporate Security and Regulatory Affairs sometime in 2001; is that accurate?

**A.**   That's accurate, correct.

**Q.**   Approximately when in 2001?

**A.**   I think it was probably -- it was after the merger, so probably around August.  I'm not sure.

**Q.**   The merger, I think, is March of 2001, so does that give you a better idea?

**A.**   So, it would have been -- let me rephrase that.  I think it was towards the end of 2001.  I'm not sure exactly the month.

**Q.**   And so, Corporate Security and Regulatory Affairs, the

129

1    shorthand for that at AmerisourceBergen is CSRA; is that

2    right?

3    **A.**   That's correct.

4    **Q.**   So, I may use that as shorthand as we -- as we move on.

5    **A.**   Most people have forgotten about the Corporate Security

6    and Regulatory Affairs part.  CSRA is quite normal.

7    **Q.**   The other reference point I saw is that your title

8    sometimes was shortened from Senior Vice President of

9    Corporate Security and Regulatory Affairs down to Chief

10   Compliance Officer.  Is that a fair depiction?

11   **A.**   No.  I've always -- since that 2001 time frame, I've

12   always been Senior Vice President of CSRA and there was a

13   period of time where I was, in addition to that, also the

14   Chief Compliance Officer.

15   **Q.**   That's a separate role?

16   **A.**   It's a separate title.  Additional title.  Both titles.

17   **Q.**   I'm going to try and front-end to load in some facts

18   for the record.  As the Senior Vice President of CSRA, do

19   you acknowledge that AmerisourceBergen sold 36 million pills

20   of hydrocodone and Oxycodone to pharmacies in Huntington and

21   Cabell County?

22   **A.**   I don't --

23             MR. NICHOLAS:  Objection.  I'll object for lack of

24   foundation.

25             THE COURT:  Well, what do you have to say about

1    that, Mr. Farrell?

2           MR. FARRELL:  Well, I would find it interesting if

3    the Vice President of Corporate Security and Regulatory

4    Affairs doesn't know how many pills were sold.

5           THE COURT:  Well, do you know the answer to that,

6    Mr. Zimmerman?

7           THE WITNESS:  I don't know the exact number of

8    pills that were sold.

9           THE COURT:  I'll sustain the objection.

10          BY MR. FARRELL:

11   Q.   At any point in time have you looked to determine how

12   many pills AmerisourceBergen sold to Huntington, Cabell

13   County, West Virginia?

14   A.   Me personally?

15   Q.   You personally?

16   A.   No.

17   Q.   How about anybody under your -- your command?

18   A.   The people in my department are constantly looking at

19   data in certain areas and customers and pharmacies.  That's

20   just part of their normal duty.

21   Q.   Are you aware of how many pills of hydrocodone and

22   oxycodone were sold by AmerisourceBergen to SafeScript

23   Pharmacy in Huntington, West Virginia?

24   A.   I don't know the exact number, no.

25   Q.   And can you estimate?

1    **A.**   I wouldn't want to estimate, no.

2    **Q.**   Well, the same applies to any other pharmacy in

3    Huntington and Cabell County.  Sitting here today, you do

4    not know the numbers of pills sold by AmerisourceBergen?

5    **A.**   I don't know the exact number of pills and I'm not sure

6    if your question is for like annually, what length of time

7    period.

8    **Q.**   Well, if I were to modify my question to include a time

9    increment like annually or monthly, would that -- would you

10   be able to offer any testimony on that?

11   **A.**   No.  I wouldn't know the exact numbers for any of that.

12   **Q.**   And I'm not -- I'm not asking you to memorize or guess.

13   I'm just trying to get a feel before we go down the road of

14   what your knowledge base is.

15   **A.**   I --

16   **Q.**   I'd like --

17   **A.**   Oh, sorry.

18   **Q.**   Go ahead.

19   **A.**   I was going to say, I know we've sold products into

20   those counties and those customers.  I just don't know the

21   exact number.

22   **Q.**   I want to talk briefly about your chain of command.

23           MR. FARRELL:  And I understand that the -- there

24   was an objection to the front page.

25           MR. NICHOLAS:  I'm just not -- I'm not clear on

1    the document.  I need to understand better what you've done

2    on the front page.

3              MR. FARRELL:  Okay.  Well, how about we just do it

4    as a demonstrative?

5         Can you bring up -- can you bring up the chain of

6    command with the Demo 213?  Do I need to hit a button?

7    There we go.

8         Judge, may I step down?

9              THE COURT:  Yes.

10             BY MR. FARRELL:

11   **Q.**   Mr. Zimmerman, I don't know if you can see this or read

12   this or not.  I think it's on your camera, as well.  I'll

13   represent to you that we're not going to enter this into the

14   record, but in general, I'll represent to you in good faith

15   that this is a document produced by AmerisourceBergen with a

16   chain of command sometime around 2007 and do you recognize

17   the general structure of -- that's contained within this

18   document?

19   **A.**   I do.

20   **Q.**   Okay.  Have you seen this document before?

21   **A.**   I've seen a lot of charts in my department and that --

22   I recognize the individuals in the boxes, so --

23   **Q.**   Would you say that this document, this Demo 213, Page

24   1, is an accurate depiction of the chain of command for

25   AmerisourceBergen CSRA in approximately 2007?

1          MR. NICHOLAS:  Well, I'll object for lack of

2     foundation at this point.  I mean, he's asking about an org

3     chart in 2007.  I'm not sure it's -- I'm just not sure it's

4     --

5          THE COURT:  Well, he said he didn't recognize the

6     document, if I understood his testimony.

7       Do you or do you not recognize this as an accurate

8     diagram, for want of a better term, for AmerisourceBergen at

9     that time?

10          THE WITNESS:  At that time frame, it looks -- it

11     looks like it could have been.  That's the --

12          THE COURT:  Okay.  I'll overrule the objection.

13          BY MR. FARRELL:

14     **Q.**   So, at the top of the chain of command would be you,

15     Chris Zimmerman, CSRA, agreed?

16     **A.**   Correct.

17     **Q.**   And then it looks like there is a pyramid of people

18     that you supervise or oversee.  Is that a fair depiction of

19     what this diagram is intended to portray?

20     **A.**   Those are my -- correct, the reporting structure.

21     **Q.**   This is the reporting structure that you supervise and

22     oversee, yes?

23     **A.**   Correct.

24     **Q.**   In this, it looks like that Mr. Paul Ross, Bob Crow,

25     Mr. Bruce Gundy, Mr. Mike Mapes and Mr. Steve Mays report

1    directly to you.

2              MR. NICHOLAS:  Your Honor, I'm just -- this is a

3    minor objection, but he's using the present tense and he's

4    saying -- he's talking about this as if this is a current

5    organization and it's not.

6              THE COURT:  All right.  I'll sustain the

7    objection.  You can put it in a time frame, Mr. Farrell, if

8    you can.

9              MR. FARRELL:  Yes, sir.

10             BY MR. FARRELL:

11   **Q.**   I'm going to write here.  I'm going to write here in a

12   different color the numbers 2007.  So, just in general, this

13   would be what your chain of command looks like in the year

14   2007?

15   **A.**   Approximately, yes.

16   **Q.**   All right.  The next org chart that we pulled is for

17   sometime around 2011.

18        Can we bring that one up?  Well, go to the next one.

19   Yes, that's it.  I think that's it.

20        And, again, it's not a memory contest, but there was an

21   expansion of the CSRA by AmerisourceBergen and does this

22   document look like a fair depiction of the chain of command

23   for CSRA in sometime around 2011?

24   **A.**   There's no date on it.  It does.

25   **Q.**   And I just -- the only reason I really want to do this

1    is because we're going to go through some documents later

2    with names and I want to go through now and have you

3    identify some of the people.  It's sort of like the

4    beginning of a playbill where you see the cast of

5    characters.  So, at the very top you see it says "Chris

6    Zimmerman".  That would be you, correct?

7    **A.**   Correct.

8    **Q.**   All right.  We'll start to the left.  Mike Mapes, do

9    you know Mike Mapes?

10   **A.**   I do.

11   **Q.**   Did he work for you?

12   **A.**   He is a consultant.

13   **Q.**   And did he consult for you in your role as the Vice

14   President of CSRA?

15   **A.**   He consults for the department, correct.

16   **Q.**   And is he still there working?

17   **A.**   No.

18   **Q.**   But at some -- at points in time, he was within the

19   command structure and under your supervision?

20   **A.**   As a consultant.

21   **Q.**   And what about Steve Mays, what was his title and --

22   who is he and what did he do?

23   **A.**   Reading that org chart at that time, he was the Senior

24   Director of Drug Distribution.

25   **Q.**   What does that mean?

1   **A.**   So, he's responsible for CSRA for the drug distribution

2   business.

3   **Q.**   Okay.  How about Bruce Gundy, do you recognize that

4   name?

5   **A.**   Yes.

6   **Q.**   And it says here "Director of Corporate Security and

7   Investigations".  What does that job do under your command?

8   **A.**   So, Bruce Gundy does -- he's exactly what it says.

9   He's -- well, it's titled Director of Investigations.  So,

10  he conducts investigations.

11  **Q.**   What would he be investigating?

12  **A.**   Anything from workplace violence, theft, shrinkage,

13  contract diversion, counterfeit product, anything on the

14  security --

15  **Q.**   How about -- how about suspicious orders?

16  **A.**   At one time, he could be involved.  He could be also

17  involved in that portion, as well.

18  **Q.**   How about Clifford Flood, do you recognize that name?

19  **A.**   I do.

20  **Q.**   Okay.  Who is Clifford Flood?

21  **A.**   That slide says his title is Investigator at that

22  point.  He's no longer with the company.

23  **Q.**   How about Robert Crow?

24  **A.**   Bob Crow.  Robert Crow, yes.  He's -- what's his title?

25  The Director of Corporate Security.

**Q.**   How about Ed Hazewski?  It says Manager Diversion

Control.

**A.**   Correct.

**Q.**   Do you know Ed Hazewski?

**A.**   I do.

**Q.**   Okay.  What is Ed's role?

**A.**   Ed's role was to oversee the Diversion Control Program.

**Q.**   And what does diversion control mean?

**A.**   Diversion control means the oversight of the customer

due diligence and the order monitoring processes.

**Q.**   And we'll talk about that a little bit later, OMP.  OMP

stands for order monitoring processing?

**A.**   Program.

**Q.**   Program?  All right.  Underneath Ed Hazewski is Kevin

Kreutzer, DCP Specialist.  Do you know Kevin Kreutzer?

**A.**   I know Kevin, yes.

**Q.**   Does he work under you?

**A.**   He works under -- yeah, he works under me.  He is wit

-- still with the company.

COURT REPORTER:  Still with the company, did you

say?

THE WITNESS:  Yes.  I'm sorry.

BY MR. FARRELL:

**Q.**   So, for nomenclature, is this a division, a department,

a section?  What do we call this CSRA?

1    **A.**    We would call it a department.

2    **Q.**    A department?  Okay.  So, Kevin Kreutzer works in your

3    department?

4    **A.**    Correct.

5    **Q.**    Okay.  What about Joe -- and I'm going to butcher this

6    name.

7    **A.**    Tomkiewicz.

8    **Q.**    Tomkiewicz.  Do you know Joe Tomkiewicz?

9    **A.**    I do.

10   **Q.**    Does he work in your department?

11   **A.**    He did at that time.

12   **Q.**    Okay.  How about David Breitmeyer, does he work in your

13   department?

14   **A.**    He did at that time.

15   **Q.**    Now, moving over here to the left side, it looks like

16   from -- there are other -- at this point in time, in 2011,

17   it looks like there are five direct reports to you; is that

18   accurate?

19   **A.**    I count seven, eight.

20   **Q.**    Oh, I see.  I apologize.  You're right.  Let's do this.

21   Paul Ross, who is Paul Ross?

22   **A.**    Senior Director of Pharmacy and Specialty.

23   **Q.**    And what's his job?

24   **A.**    He is responsible for the other non-distribution

25   businesses.

```
 1    Q.    So, I missed the line.

 2    A.    And then Nicole down there next to Ed Hazewski.

 3    Q.    And she's the Facilities Manager.  What's that mean?

 4    A.    And for a brief time, Facilities Department reported up

 5    into my group, which is, you know, your office buildings and

 6    stuff like that.

 7    Q.    So, I'm going to change the color so we can see it, but

 8    it looks like from the drawing that Robert "Bob" Crow would

 9    report to you, correct?

10    A.    At this point in time, yes.

11    Q.    Bruce Gundy would report to you?

12    A.    Yes.

13    Q.    Paul Ross would report to you?

14    A.    Yes.

15    Q.    Steve Mays would report to you?

16    A.    Yes.

17    Q.    Mike Mapes would report to you?

18    A.    As a consultant.

19    Q.    As a consultant.

20          Ed Hazewski would report to you?

21    A.    Yes.

22    Q.    And Nicole Frost would report to you?

23    A.    Correct.

24    Q.    All right.  I'm also going to identify a few other

25    names that will be -- we'll be saying throughout.  The next
```

```
 1   is Eric Cherveny.  Do you know Eric?

 2   A.   I do.

 3   Q.   Did I pronounce his name correctly?

 4   A.   Cherveny.

 5   Q.   Cherveny?  Who is Eric Cherveny?

 6   A.   At that time, he looks like he was the Regional

 7   Director for the East Region.

 8   Q.   And what does that mean?

 9   A.   So, the drug distribution company is broken into

10   several regions and each region has a Director of CSRA that

11   oversees the operations at the individual distribution

12   centers, which each has a manager, which are those yellow

13   boxes that drop down, Compliance Managers, and then there's

14   a subset of specialists and lead specialists underneath the

15   managers at each of the distribution centers.

16   Q.   So, in the blue, the blue would be a regional manager

17   for a distribution center, correct?

18   A.   For a region of distribution centers, not one

19   distribution center.

20   Q.   So, an East Region, there would be one, two, three,

21   four, five, six distribution centers, correct?

22   A.   Correct.

23   Q.   And then -- so, Cathy Marcum is the North Region

24   Director.  Do you know Cathy Marcum?

25   A.   I do.
```

1    **Q.**   All right.  And it looks like that Cathy is in charge

2    of one, two, three, four, five, six, seven distribution

3    centers; is that a fair conclusion?

4    **A.**   That's -- those are the boxes under it at that time,

5    yes.

6    **Q.**   Now, I'm going to circle one particular name and that's

7    Eric Martin.  Do you know Eric Martin?

8    **A.**   I do or did.  He's no longer with the company, but yes.

9    **Q.**   That's -- for some period of time, Eric Martin was

10   employed by AmerisourceBergen?

11   **A.**   Yes.

12   **Q.**   He was in CSRA?

13   **A.**   Yes.

14   **Q.**   And he was the Distribution Center Manager for one of

15   the distribution centers, agreed?

16   **A.**   That's correct, at that time.

17   **Q.**   And which distribution center, if you recall?

18   **A.**   I don't.  He moved.  He was in several different ones.

19   I don't know which one.  That one, it doesn't have a name on

20   it, but he was a Compliance Manager, and I believe he -- at

21   that time, he was a Compliance Manager at one of the DCs.

22   **Q.**   And so, does that mean he was the boss of the

23   distribution center?

24   **A.**   No.  No, no.  The CSRA is a completely separate

25   function than the operational function of the distribution

1  center, specifically focused on regulatory and security

2  issues, making sure divisions are doing what they need to

3  do.

4  **Q.**   So, there would be somebody in charge of a distribution

5  center for operations?

6  **A.**   You would have a district -- you would have a

7  Distribution Center Manager that would be in charge of the

8  entire operation, correct.

9  **Q.**   And that would be outside of this chain of command?

10  **A.**   Correct.

11  **Q.**   And then, you would have somebody within your chain of

12  command assigned to a distribution center in charge of CSRA?

13  **A.**   Correct.

14  **Q.**   And that would include making sure things don't get

15  stolen, correct?

16  **A.**   That's one.

17  **Q.**   It would make sure you have a safe workplace?

18  **A.**   Correct.

19  **Q.**   And it would execute its duties to prevent diversion of

20  controlled substances?

21  **A.**   Correct.  Make sure the divisions were following all

22  the appropriate policies and procedures that you would find

23  in the Code of Federal Regulations.

24  **Q.**   I'm going to circle, I think, one more.  That would be

25  a Greg Madsen.  Do you know who Greg is?

1   **A.**   Yes.

2   **Q.**   Who is Greg?  Who is Greg Madsen?

3   **A.**   Greg's the Regional Director at that time for the West

4   Region.

5   **Q.**   All right.  So, to be clear, all of these people in

6   your department, you're in charge of?

7   **A.**   In one way or another, yes.  They all roll up to me.

8   **Q.**   And you're responsible for their training?

9   **A.**   Yes.

10  **Q.**   You're responsible for them following guidelines and

11  policies?

12  **A.**   Ultimately.

13  **Q.**   This is your department?

14  **A.**   It's my department.

15  **Q.**   And I believe I've caught all of the names that we're

16  going to get to, but can we -- can we go to the very next

17  slide please?

18       You know what I'm going to do is, I'm going to see, if

19  I don't screw this up, I think I can save this.  You know

20  what?  We'll come back to it if we can.

21       All right.  So, I believe this is the next iteration in

22  my notes, and I won't hold you to it, sometime around 2015.

23  And the only reason I bring it up is because there's a

24  couple of new names that I want to identify so that we know

25  who they are and I'm going to give you the privilege of

```
 1    introducing one of the next witnesses and that would be

 2    David May.  Do you know David May?

 3    A.    I do.

 4    Q.    And he's identified in this as the Senior Director

 5    Diversion Controls and Federal Investigations; is that

 6    right?

 7    A.    At that time period, correct.

 8    Q.    All right.  So, was Mr. May hired by you?

 9    A.    Yes.

10    Q.    Did you interview him?

11    A.    I did.

12    Q.    Did you think he was qualified?

13    A.    I did.

14    Q.    And why did you think he was qualified?

15    A.    His experience.  Based upon his experience and I

16    figured he would fit our department well.  It was a good

17    hire.

18    Q.    What experience did Mr. May have that you thought would

19    fit well in CSRA at AmerisourceBergen?

20    A.    He had -- he was a former DEA agent.  He had a

21    different -- a little bit different perspective on things

22    than Mike Mapes that was on the diversion side of DEA that

23    we used as a consultant in the past.  And he had also had

24    some complex investigation background in his history.  So,

25    he could handle -- had a multitude of skills, whether it's
```

1   investigatory or administratively in just handling large

2   projects, as well, based upon his past experience.

3   **Q.**   And it looks like he's a direct report to you now,

4   correct?

5   **A.**   Correct.

6   **Q.**   But it looks like that Mr. Steve Mays is still in the

7   chain of command and he's also going to testify here today.

8   Can you talk very briefly about the dual roles Steve Mays

9   and David May play, how they interact?

10  **A.**   Today?  Like current that time or the -- when this

11  presentation was?

12  **Q.**   Well, to save some time, from a macro view, what -- was

13  Steve Mays demoted?

14  **A.**   No.

15  **Q.**   Was David May inserted in the leadership command

16  structure?

17  **A.**   He was -- yes.

18  **Q.**   And in what capacity was he inserted?

19  **A.**   He was inserted -- I'm looking at the org chart.  So,

20  he -- he took over the Diversion Control Program at that

21  time.  Steve Mays was Senior Director of Regulatory, as I

22  explained, and was in charge of the distribution centers and

23  the CSRA requirements.  The Diversion Control Program is the

24  Customer Due Diligence and Order Monitoring Program.

25  Separate functions.  There's an evolution to the timeline.

1    I mean, if you want me to --

2    **Q.**   Absolutely.

3    **A.**   So, in -- so, the evolution of the time frame is that

4    we've always had -- CSRA always included our Code of Federal

5    Regulations and our responsibility to prevent diversion.  WE

6    just didn't have it called Diversion Control Program.  It

7    was embedded into the --

8    **Q.**   I'm going to interrupt you real quick only to give -- I

9    promise I'm not going to be rude -- to ask you to slow down.

10   **A.**   Oh, I'm sorry.

11   **Q.**   Because the court reporter will like me more if you do.

12   **A.**   Okay.

13   **Q.**   So, starting over, what's the evolution of OMP?

14   **A.**   Not evolution, but just -- you know, you're going

15   through the org charts.  I just wanted to make sure I didn't

16   lose any contacts, right?  So, the CSRA Group always was

17   responsible for DEA Code of Federal Regulations

18   responsibilities to have adequate --

19            COURT REPORTER:  What was that?  Adequate?  What

20   was it?

21            THE WITNESS:  You did tell me to slow down.

22   Sorry.  I don't remember.  Apologize for that.  What was the

23   --

24            BY MR. FARRELL:

25   **Q.**   Adequate controls to prevent --

**A.**   To prevent -- to prevent diversion under the Code of Federal Regulations.  We just broke out a portion of those requirements in the Diversion Control Program at sometime, you know, 2007 forward.

Steve's been with the company for 45 years so, he's been dealing with those requirements for the last 45 years. The people that you'll see in senior -- in the director levels have also dealt with those policies and procedures for all of those years.

So, when we broke out the Diversion Control Group, at one point, Ed briefly reported to me, but also reported to Steve.  And then, we decided to bring David in to take over the Diversion Control Program.

Steve still maintains the operational responsibilities that you see underneath in each of the distribution centers because they're a little bit different in responsibilities. The Diversion Control Program is more of a corporate function.  It has tentacles into the -- unfortunately, the distribution isn't as simple as it seems, so they -- they do work closely -- all of those groups work closely with one another.

**Q.**   Let me see if I captured this right.  You said diversion control is more of a corporate function?

**A.**   The Diversion Control Department, but diversion control is embedded in everything within CSRA.  So, part of

1    diversion control for a distributor is having adequate

2    security controls.  So, you have to have cases involved

3    within the distribution centers.  Well, that's not the

4    portion that's corporate.  That's very specific to the

5    distribution center and so that we make sure those

6    requirements are followed by the -- the yellow boxes there

7    at each of the distribution centers.

8    **Q.**   Mr. Zimmerman, is there a difference between, in your

9    mind organizationally, between Corporate Security and

10   Regulatory Affairs?  Is there a difference between the CS

11   and the RA?

12   **A.**   Over time, we've tried that, right, but we've just

13   never -- they're intertwined.  And when I started with the

14   company 30 years ago, the department was called the Security

15   Department and I was a Security Investigator during my first

16   few years and I don't think regulatory got added to the

17   title until the group -- even though we were performing DEA,

18   Board of Pharmacy, those type of regulatory requirements way

19   back then, most of those, we were just called the Security

20   Department.  So, they've always been closely intertwined.

21   **Q.**   Before we get to the individual functions, I want to

22   re-visit.  Have the number of distribution centers operated

23   by AmerisourceBergen involving controlled substances

24   remained the same over the past 20 years?

25   **A.**   Rough last 20 years, you say?  Yes.  At the time of the

merger, we had two companies coming together and there was a

lot of divisions.  I don't know, 55, however many.  And

then, over time, we consolidated them into -- where we had

two in the same city, we would consolidate them.  And then,

it got down to the 25-30 has been a pretty good number over

that time.

**Q.**   So, today, how many distribution centers does

AmerisourceBergen have?

**A.**   I think they have 27.

**Q.**   27?  And, in 2010, can you estimate or do you know how

many distribution centers there were?

**A.**   I would say it wouldn't be too far one way or another

from that.

**Q.**   All right.  Are you familiar with the location of

Huntington-Cabell County, West Virginia?

**A.**   I -- I mean, it's in West Virginia, yeah.

**Q.**   Have you ever been to Huntington-Cabell County, West

Virginia?

**A.**   I have not.

**Q.**   You know you're in Charleston, Kanawha County, West

Virginia?

**A.**   Yes.

**Q.**   Okay.  So, do you know which of your distribution

centers ship to pharmacies in Huntington-Cabell County, West

Virginia?

1    **A.**    I believe it's Columbus Distribution Center and now we

2    call it Lockbourne.  It's a newer facility.

3    **Q.**    Yes, sir.  Why do you call it Lockbourne?

4    **A.**    I think that's the city it's in.

5    **Q.**    And that's near Columbus?

6    **A.**    Yeah.  Must be a subsidiary, yeah.

7    **Q.**    And just for purposes of clarity, can you bring up

8    44711_28?

9          This is a chart that has been referenced on several

10   occasions taken from the ARCOS data and it's simply -- this

11   is 44711_28.  This is the pie charts of the distribution

12   centers.  There we go.

13         I'm going to represent to you that on the left-hand

14   side here, you'll see AmerisourceBergen, and do you

15   recognize what I just circled there?

16   **A.**    Yes.

17   **Q.**    What is that?

18   **A.**    Our logo -- or was our logo.  Not any longer.

19   **Q.**    Like, but literally, what is it?

20   **A.**    What is the logo?

21   **Q.**    Yes.

22   **A.**    So, at the time of the merger, they came up with -- I

23   was with Bergen Brunswig, Amerisource, they combined the

24   names and they -- the story behind the logo is that is like

25   the -- a sail, but each of those lines are all coming

1    together as one at the bottom.  You know, I don't -- I'm not

2    -- I'm not a marketing person.  I'm a -- that's the purpose

3    of it.

4    **Q.**   E pluribus unum, out of many come one?

5    **A.**   Yeah, I guess.

6    **Q.**   So, in this distribution pie chart, it has identified

7    what looks to be 98% of the pills coming from Lockbourne,

8    Ohio Distribution Center.  Does that sound about right based

9    on your knowledge of geography?

10   **A.**   I know they've distributed the majority.  I don't --

11   you know, I don't know if it's 98, or 95, or 100.

12   **Q.**   Do you have a number of -- currently, how many people

13   do you supervise in CSRA?

14   **A.**   Direct reports or within the department?

15   **Q.**   Both.

16   **A.**   My direct reports just changed a little bit, so it's

17   probably -- I think it's eight right now.

18   **Q.**   And how many of -- how many employees?  How many staff

19   members?

20   **A.**   I believe we're about around 150.

21   **Q.**   All right, Doc -- or, Mr. Zimmerman, I've got a couple

22   of follow-up questions for you.  Let's talk about the

23   function of CSRA.  You would agree with me that

24   AmerisourceBergen is responsible for maintaining effective

25   control to prevent diversion?

1   **A.**   Right.  Well, products under our care, correct.

2          COURT REPORTER:  I'm sorry.  What was that?

3          THE WITNESS:  When products are under our control,

4   that's correct.  That's our responsibility.

5   **Q.**   We'll put a pin in that.  I promise we'll come back to

6   that.

7   **A.**   Okay.

8   **Q.**   In general, will you agree with me that

9   AmerisourceBergen is responsible for maintaining effective

10   control to prevent diversion of controlled substances?

11   **A.**   While under our DEA registration, correct.

12   **Q.**   While under your DEA registration?

13   **A.**   Correct.

14   **Q.**   What does that mean?

15   **A.**   So, the way the closed system works in the DEA is they

16   designed it that each element is responsible for their

17   adequate controls diversion and their own security and

18   safety and record keeping requirements based upon their

19   categories.  The manufacturers have their own requirements.

20   Distributors have their own requirements.  Pharmacies have

21   their own requirements.  And prescribers have requirements

22   that they have to have a DEA license.

23          So, while -- to practice under your DEA license, you

24   have to have adequate security controls.  You have to have

25   inventory controls.  There's reporting processes that you're

1    required to perform.

2         Whether it's inventory or loss reporting, destruction

3    reporting; and then, there's also suspicious order reporting

4    requirement.  And, lastly, you need to make sure that the

5    customer you sell to, you make a good faith effort they have

6    a license to take possession of the product.

7         Once they sign for that product then, their

8    registration takes over the adequate controls to prevent

9    diversion.  So, the pharmacy must have similar-type

10   processes and requirements in place to protect the drugs.

11   **Q.**  I'm going to try to distill down exactly where perhaps

12   you and I are going to diverge this afternoon.

13   **A.**  Okay.

14        MR. NICHOLAS:  Your Honor, I will object to the --

15   that kind of commentary.

16        THE COURT:  Sustained.

17        MR. FARRELL:  I apologize.

18        BY MR. FARRELL:

19   **Q.**  In the closed chain of distribution, you have

20   manufacturers, correct?

21   **A.**  Correct.

22   **Q.**  They're the ones that make the pills, agreed?

23   **A.**  They make the pill -- if you're talking about -- are we

24   going to talk about controlled substance?  I mean, it --

25   there's different requirements depending on what type of

1    products you're handling.  And so, as a distributor, we

2    handle all classes of trade, prescription controls, opioids.

3    So, if you're a controlled substance manufacturer, just so

4    I'm clear --

5    **Q.**   I appreciate clarity.  For purposes of this next hour

6    or so, we're going to be talking about controlled

7    substances.  You're familiar with controlled substances?

8    **A.**   Yes.

9    **Q.**   And controlled substances include narcotics?

10   **A.**   Correct.

11   **Q.**   And they include Schedule II narcotics made from opium?

12   **A.**   They -- yes.

13   **Q.**   And that includes hydrocodone and oxycodone?

14   **A.**   Hydrocodone now -- I mean, it's been rescheduled to a

15   II, but previously it was a III, right.

16   **Q.**   So, today, hydrocodone opiate pills and oxycodone

17   opiate pills are Schedule II narcotics regulated by the

18   Controlled Substances Act?

19   **A.**   That's correct.

20   **Q.**   There was a period of time where hydrocodone pills

21   called HCP, or hydrocodone combination products, were

22   Schedule III?

23   **A.**   Correct.

24   **Q.**   Okay.  So, Schedule II controlled substances are

25   defined in the Controlled Substances Act as substances with

1    a high potential for abuse; agreed?

2    **A.**   That's how the scheduling system works, I agree.

3    **Q.**   I'm asking you, the Controlled Substances Act, the

4    pills, the opiate pills that AmerisourceBergen is selling,

5    are pills that have a high potential for abuse; agreed?

6    **A.**   The Schedule II drugs have a -- are a Schedule II

7    because of their high potential for abuse and we sell them,

8    correct.

9    **Q.**   And that these pills have severe restrictions on them

10   according to the Controlled Substances Act?

11   **A.**   I'm not sure what restrictions you're referring to.

12   The regulations that are established in the Code of Federal

13   Regulations based upon the Act?

14   **Q.**   I'll read it to you.  Under -- this is under Section

15   812(b)(2)(a), and it says that if you're a Schedule II drug,

16   the drug or other substance has a high potential for abuse.

17   You agree with that?

18   **A.**   Yes.

19   **Q.**   The second section, (b), says, "The drug or other

20   substance has a currently accepted medical use in treatment

21   in the United States or a currently accepted medical use

22   with severe restrictions."  You agree with that?

23   **A.**   If that's what it says.  I mean, I'm not familiar with

24   what you're reading from, but -- I mean, you're reading from

25   the Controlled Substances Act, but I don't know if that's

```
 1    exactly what it says, but --

 2    Q.   If I've read it accurately, that's what it says?

 3    A.   Yes.

 4    Q.   And then (c) says that, "Abuse of a Schedule II drug

 5    may lead to severe psychological and physical dependence."

 6    You agree with that?

 7              MR. NICHOLAS:  Your Honor, I will only object

 8    because if the witness is going to be asked if that's what

 9    it says, then I think he ought to be shown the document.

10              THE COURT:  Well, how about that, Mr. Farrell?

11              MR. FARRELL:  I think you would probably enjoy him

12    reading it as much as you enjoy hearing me read it.

13              THE COURT:  Well, show it to him.

14              MR. FARRELL:  Okay.

15              BY MR. FARRELL:

16    Q.   Under the Controlled Substances Act, are you aware of

17    the purpose of scheduling these drugs?

18    A.   Yes.

19    Q.   Okay.  Do you have it memorized?

20    A.   No.  I --

21    Q.   Would you like to see it?

22    A.   I don't have -- you asked if I had it memorized.

23    Q.   Yes.  Do you know what the Controlled Substances Act

24    says is the purpose for enacting these laws?

25    A.   No.
```

1    **Q.**   Okay.

2            MR. FARRELL:  Judge, may I approach?

3            THE COURT:  Yes.

4            BY MR. FARRELL:

5    **Q.**   I'm going to show you what is marked 801 and will you

6    read for the record what the title is?

7    **A.**   You want me to read?

8    **Q.**   The title of 801, bottom left-hand corner.

9    **A.**   "Congressional findings and declarations of controlled

10   substances."

11   **Q.**   And you see where I've highlighted Section I?  Or I've

12   highlighted Section II.  I'll have you read Section I aloud,

13   please.

14   **A.**   "Any of the drugs included within this sub-chapter have

15   a useful and legitimate medical purpose and are necessary to

16   maintain the health and general welfare of American people."

17   **Q.**   Do you agree with that?

18   **A.**   I do.

19   **Q.**   What about Paragraph 2, will you read that, please?

20   **A.**   "The illegal importation, manufacturing, distribution"

21   --

22           COURT REPORTER:  I'm sorry.  Can you slow down for

23   me, please?

24           THE WITNESS:  "The illegal importation,

25   manufacturing, distribution and possession and improper use

1      of controlled substances have a substantial and detrimental

2      effect on the health and general welfare of American

3      people."

4              BY MR. FARRELL:

5      Q.    Mr. Zimmerman, do you agree with that statement?

6      A.    Yes.

7      Q.    Thank you.  Mr. Zimmerman, do you agree with me that

8      the Controlled Substances Act, the law, the statute passed

9      by Congress in the Code of Federal Regulations where

10     Congress authorized the DEA to promulgate rules, these are

11     intended to close the system of distribution?

12     A.    Correct.

13     Q.    And the purpose of closing the system of distribution

14     is to prevent diversion?

15     A.    Correct.

16     Q.    And so, under this closed system that I'm going to

17     draw, the manufacturer of prescription opiates sells the

18     pills to the distributors, agreed?

19     A.    Correct.

20     Q.    And AmerisourceBergen, the party you are identified

21     with, is one of the distributors that purchases Schedule II

22     prescription opiates for sale to pharmacies across America?

23     A.    Correct.  One of the items we purchased was opioids,

24     correct.

25     Q.    Another one of the distributors is McKesson, who is

```
 1    also here.  You're aware of that?
 2    A.   Yes.
 3    Q.   And another one is Cardinal Health?  You're aware of
 4    that?
 5    A.   Yes.
 6    Q.   Between the three of the companies, do you sometimes
 7    refer to yourself internally as The Big Three?
 8    A.   It's referenced as The Big Three.
 9    Q.   How much of a market share does The Big Three hold
10    nationally?
11    A.   I've heard upwards of 90%, but I don't know if that
12    still holds true today.
13    Q.   All right.  Now, from the distributors you sell to
14    pharmacies, correct?
15    A.   Correct.
16    Q.   And so, the patient has to go and take -- go to a
17    pharmacy to get these drugs; agreed?
18    A.   Correct.
19    Q.   And when I say "these drugs", I'm talking about
20    prescription opiates.  They're only legally sold through
21    pharmacies.
22              MR. NICHOLAS:  Objection.
23              THE COURT:  What's the basis?
24              MR. NICHOLAS:  I don't think it's an accurate
25    statement.
```

```
 1                    THE WITNESS:  I mean, they're sold in -- I mean --
 2                    THE COURT:  I'll let him answer if he knows.
 3                    MR. FARRELL:  Your Honor, I will allow Mr.
 4     Nicholas to --
 5                    MR. NICHOLAS:  I'll withdraw it.  I'll withdraw.
 6                    THE COURT:  We don't need the smart-aleck remarks,
 7     Mr. Farrell, and you can stop that right now.
 8                    MR. NICHOLAS:  I'll withdraw the objection.
 9                    THE WITNESS:  I was just going to say, we also
10     sell to hospitals in addition to -- I mean, you said they're
11     only sold to pharmacies, but we also sell opioids to
12     hospitals, as well.
13                    BY MR. FARRELL:
14     Q.   All right.  And so, you have to have a prescription
15     from a medical doctor; agreed?
16     A.   That's correct.
17     Q.   All right.  So, it's your position that the duties
18     imposed upon AmerisourceBergen are while the pills are in
19     your possession and end when you drop them off at the
20     pharmacy?
21     A.   Correct.
22     Q.   You don't believe you have any responsibility to
23     prevent diversion after you drop the pills off at the
24     pharmacy?
25     A.   The closed -- I have no control over what happens -- so
```

1    the way the closed -- and let's just talk about the

2    recordkeeping requirements.  If there's diversion in the

3    pipeline, the way the -- the way the CFR is written, they

4    can go to the manufacturer and the manufacturer says they

5    manufactured a thousand pills and I sold a thousand pills.

6    No diversion.  They go to our -- we get audited every year,

7    multiple times a year, and they come to our warehouse and

8    say show me all the opioids you bought.  They minus how much

9    we sold.  They count the shelf and determine if any

10   diversion occurred while it's under our control.

11        They go to the pharmacy who has a DEA registration and

12   they can say how many drugs did -- how many opioids did you

13   get from the distributor?  How many prescriptions did you

14   fill?  And if it doesn't match, there could be diversion.

15        And so, you're asking me can I be responsible for a

16   pharmacy's recordkeeping requirements?  We don't.  We don't.

17   We don't -- that's why they issue a pharmacy a separate DEA

18   registration and that's why they have the authority to

19   revoke a registration or whatever action they can, is

20   because the diversion occurred under that registration.

21        If the diversion occurs under the distributor's

22   registration, they have the authority to take action against

23   our -- our registration.

24   **Q.**   So, to be clear, your position on behalf of

25   AmerisourceBergen is that your duty is to receive

1    prescription opiates that you purchased from the

2    manufacturers and provide security for those until they're

3    delivered to the pharmacy and to ensure the pharmacy has a

4    DEA registration?

5    **A.**   Our responsibility is, right, to keep -- receive those

6    drugs, safeguard them as outlined in the Code of Federal

7    Regulations to ensure no diversion occurs and then make them

8    available for pharmacies to order.

9         We also need to make sure that the pharmacies have an

10   appropriate license, that they submit the appropriate forms.

11   So, with a narcotic, it requires a narcotic order form or a

12   blank and we're required to make sure we get that

13   information, but the product doesn't leave until we are

14   satisfied.

15   **Q.**   So, the answer to my question is yes, you believe from

16   AmerisourceBergen's perspective, that your duty or

17   responsibility ends once you drop off the pills to a

18   licensed DEA registrant pharmacy?

19   **A.**   Our duty for diversion -- right.  Correct.  Our

20   responsibility to prevent diversion occurs under our

21   registration, correct.

22   **Q.**   Do you believe that the DEA has a duty -- or, I'm

23   sorry, that ABC has a duty to maintain effective control

24   when considering the entire chain of distribution?

25   **A.**   I have no control over the manufacturer.  I can't --

1    you're imposing that we have a duty that they have effective

2    control as to how they box the product at the manufacturing

3    site.  That's impossible.  I -- we -- that's not how the --

4    that's not how the system was designed.

5    **Q.**   So, let's take the manufacturers and let's remove them.

6    Let's just take once the pills get to you safely and

7    securely.

8    **A.**   Correct.

9    **Q.**   Do you have a duty to block shipment of suspicious

10   orders to pharmacies?

11   **A.**   We have a duty to design and operate a system that

12   identifies suspicious orders and then we have a duty to

13   report those to the DEA.

14   **Q.**   So, the answer to my question is yes or no?  Do you

15   have a duty to block suspicious orders to pharmacies?

16   **A.**   We -- we have a -- agreement that we won't ship orders

17   that we deem to be suspicious to pharmacies.

18   **Q.**   Mr. Zimmerman, you are aware that you testified

19   previously in this case, in the opioid litigation; do you

20   recall that?

21   **A.**   If I testified or I --

22   **Q.**   You gave a deposition?

23   **A.**   Yes, correct.

24   **Q.**   In 2018?

25   **A.**   Uh-huh.

1    **Q.**   And you testified in your individual capacity and you

2    also testified as the 30(b)(6) deponent, did you not?

3    **A.**   I have, yes.  I'm not sure what one you're referencing,

4    but yes.

5    **Q.**   I'm talking about the deposition that was taken in the

6    MDL 2804 related to this opiate litigation.  A 30(b)(6)

7    notice was served on ABC.  Are you aware of that?

8    **A.**   Yes.

9    **Q.**   Do you know what a 30(b)(6) is?

10   **A.**   I'm representing the company, yes.

11   **Q.**   And so, you were speaking on behalf of the -- of

12   AmerisourceBergen when you testified under oath in this

13   case?

14   **A.**   For the 30(b)(6)?

15   **Q.**   Yes.

16   **A.**   Yes.

17   **Q.**   And you are asked whether or not AmerisourceBergen has

18   a duty to prevent diversion and your answer was no; do you

19   recall that?

20   **A.**   No.

21   **Q.**   Let me pull up Clip 1.

22         (Recording played in open court)

23              BY MR. FARRELL:

24   **Q.**   So, you -- your position officially on behalf of

25   AmerisourceBergen is you have no duty to maintain effective

```
 1    controls as imposed under federal regulatory law?

 2                MR. NICHOLAS:  Your Honor, I'll object to the --

 3    I'll object to the questioning that included a deposition

 4    snippet that was not inconsistent with his testimony.

 5                THE COURT:  I'll sustain the objection.

 6                BY MR. FARRELL:

 7    Q.   All right.  So, how about the duty not to ship, do you

 8    believe you have a duty not to ship?

 9    A.   I have -- we have an agreement not to ship.

10    Q.   Sir, do you have a duty to block shipments of

11    prescription opiates?

12                MR. NICHOLAS:  Objection, asked and answered.

13                THE COURT:  Sustained.

14                MR. FARRELL:  Well, Your Honor, if he's answered

15    it, I don't recall what his answer is.

16                THE COURT:  Well, you're arguing with him.  He's

17    answered your question.  You didn't get the answer you

18    wanted.  Let's move on.

19                BY MR. FARRELL:

20    Q.   All right.  So, you previously testified that

21    AmerisourceBergen as a company does not have a duty to block

22    shipments; agreed?

23    A.   If you're referring to that video, we are talking about

24    the word duty, not whether -- and it was a discussion -- it

25    was a long discussion about that and -- as I remember it
```

1    from three years ago.

2    Q.   So, we're moving past the duty to maintain effective

3    control.  We're now talking about the duty to block -- to

4    block suspicious orders.  That's a separate topic.  Do you

5    recall testifying about that?

6              MR. NICHOLAS:  I'll object to the -- I'll object

7    to the question as just confusing and I think at this point

8    -- I just think it's very confusing.

9              THE COURT:  I'll sustain the objection.

10             BY MR. FARRELL:

11   Q.   So let me start over.  Is the official position of

12   AmerisourceBergen that it has a duty to block shipment of

13   suspicious orders?

14             MR. NICHOLAS:  Objection, asked and answered.

15             THE COURT:  Sustained.

16             MR. FARRELL:  Well, Judge, can I impeach him with

17   the testimony from his previous deposition?

18             THE COURT:  You just did, didn't you?

19             MR. FARRELL:  This is a second topic.  This is the

20   duty to block shipment.

21             THE COURT:  Well, if he testified inconsistently

22   with what he just said, you may impeach him.

23             MR. FARRELL:  Yes, sir.

24        Can you play video clip 2, please?

25        (Recording played in open court)

```
 1              BY MR. FARRELL:
 2    Q.   So, that's 2018.  You were unfamiliar with the shipping
 3    requirement from the Masters Pharmaceutical case; agreed?
 4              MR. NICHOLAS:  I'll object to the question.  I
 5    don't believe that the testimony that was shown was
 6    inconsistent with his testimony.
 7              THE COURT:  Sustained.  I don't think it was
 8    either.
 9              BY MR. FARRELL:
10    Q.   Mr. Zimmerman, have you gone back to look at -- look
11    backwards and to determine the -- AmerisourceBergen's role
12    in shipping suspicious orders or otherwise into
13    Huntington-Cabell County?
14    A.   Our department has looked at -- have I personally?
15    Q.   Yes.
16    A.   No.
17    Q.   All right.  You're aware that this case has been
18    pending for four years?
19    A.   I don't -- okay.  I don't know that for sure, but if
20    you're saying that, then I don't have any reason to not know
21    that or I don't -- I don't know how long it's been.  Let me
22    answer it that way.
23    Q.   You understand that there are a number of counties and
24    cities across America that have filed lawsuits?
25    A.   Yes.
```

```
 1    Q.    And you've testified on behalf of AmerisourceBergen in

 2    that case?

 3    A.    Yes.

 4    Q.    Okay.

 5    A.    And -- yes.

 6    Q.    Have you read any of the other deposition transcripts

 7    from this case?

 8    A.    Mine or other people's or --

 9    Q.    Any of the other ones?

10    A.    No.

11    Q.    Have you gone back and read the discovery responses

12    from AmerisourceBergen regarding the Suspicious Order

13    Policy?

14    A.    I have not.

15    Q.    Have you read any of the deposition transcripts from

16    the people from Huntington and Cabell County that have been

17    deposed by AmerisourceBergen in this case?

18    A.    I have not.

19    Q.    You have complained in the past that the DEA has not

20    done a very effective job of communicating with you at

21    AmerisourceBergen about your duties under federal

22    regulations; agreed?

23    A.    I wouldn't characterize it that way.  I would state

24    that I had wished that the communications were better with

25    DEA.
```

**Q.**   Why is that?

**A.**   When I started with the company 30 years ago, we had a great working relationship with the DEA.  We worked together on a lot of different issues when I first started.  Steroids was the big thing, roid rage.  We worked with DEA.  They made it a Schedule III and we were able to -- you know, that was very positive movement.

The Methamphetamine Control Act was another one.  I worked with DEA giving them Pseudoephedrine Sales Reports years in advance so they could see where they had pockets of areas.  Since pseudoephedrine tablets were an over-the-counter drug, DEA had no access to that information, so we cooperated with them to then help launch into the Methamphetamine Control Act that passed that had a big impact on the methamphetamine problem in the U. S.

We've worked with them on other issues, whether it's train their DEA officers or diversion investigators to help them understand the distribution network.  We've worked with them on that.

They had an issue with Methadone in hospitals causing overdose.  They had us come down and asked if we could voluntarily stop selling Methadone diskettes to pharmacies, which all the distributors agreed upon and we were able to resolve that.

So, when we worked together, we were able to resolve

 1   issues.  Over the years, opioid crisis happens, and it just

 2   seems like there's been a breakdown.  The crisis continues.

 3   No communication.  No resolution.  So, it's frustrating.

 4   **Q.**   So, in fact, you served on the 1998 Attorney General

 5   Methamphetamine Act Panel, correct?

 6   **A.**   The wholesalers were only given one member and I wasn't

 7   that one.  I worked with them, but I wasn't the one.  I

 8   think I was -- I was -- they had a more senior person at the

 9   time in the 90s than I, but I sat in on the meetings and

10   participated.

11   **Q.**   We call that the Reno Report colloquy.  Do you know

12   what that means?

13   **A.**   Yeah.  Janet Reno was leading it up.

14   **Q.**   And you've testified about that before.  You're

15   familiar with the Reno Report?

16   **A.**   I -- I don't know if I've seen it for decades, but

17   yeah.

18   **Q.**   All right.  So, you're aware that, in this case, the

19   DEA has been deposed several times?

20   **A.**   I'm not aware of that.

21   **Q.**   Did you know that the DEA actually put up a 30(b)(6)

22   witness over a three-day period by the name of Thomas

23   Prevosnik?

24   **A.**   If you're -- if you're telling me that, yes.  I know

25   Tom, but --

1    **Q.**   Have you read the deposition transcript of Thomas

2    Prevosnick to learn what the DEA says about the opioid

3    epidemic?

4            MR. NICHOLAS:  Your Honor, I will object.  I'm

5    trying not to object too often, but he said he doesn't know

6    anything about any other depositions and said he didn't read

7    anything, didn't know any DEA people were deposed.  So, I

8    don't think this line of questioning is fruitful and I think

9    it's irrelevant.

10           THE COURT:  Have you read the deposition

11   transcript of Thomas Prevoznik?

12           THE WITNESS:  I have not.

13           THE COURT:  I'll sustain the objection.

14           BY MR. FARRELL:

15   **Q.**   All right.  Have you read the deposition transcript of

16   any of the other DEA agents, including Joe Rannazzisi,

17   Demetra Ashley, Laurie Costello (phonetic), Stacy

18   Harper-Avilla, June Howard, Michael Mapes, Keith Martin,

19   Matt Strait, Don Tush, or Kyle Wright?

20   **A.**   I have not.

21   **Q.**   Have you read the complaint that was filed in this

22   matter?

23           THE COURT:  I think the court reporter needs a

24   break, Mr. Farrell.  Let's -- it's quarter after 3:00.

25   Let's be in recess until 3:30.

1          (Recess taken)

2              THE COURT:  Mr. Zimmerman, you're still under oath

3      of course, sir.  You may resume the witness stand.

4              THE WITNESS:  Thank you.

5              THE COURT:  Go ahead, Mr. Farrell.

6      BY MR. FARRELL:

7      **Q.**   Mr. Zimmerman, you're familiar with the controlled

8      substance ratio and the function it was used for by

9      CSRA?

10     **A.**   I'm not sure exactly what you're referring to.

11     **Q.**   When looking for suspicious orders, does CSRA look to

12     the percentage of product sold to a pharmacy compared to

13     controlled substances?

14     **A.**   It's one of the many elements that they, they consider.

15     **Q.**   So the answer is, yes, it's a component?

16     **A.**   Yes.

17     **Q.**   Okay.  Would you agree with me that the average retail

18     pharmacy purchases between 5 and 15 percent of controlled

19     substances from your distribution centers?

20     **A.**   I, I'm not sure what the average is from our

21     distribution centers, but I've seen reference to 10, 12, 15.

22     **Q.**   I've got a couple questions for you in general about

23     the opioid epidemic.

24          Mr. Zimmerman, do you acknowledge that there presently

25     exists an opioid epidemic in the United States?

1    **A.**    Yes.

2    **Q.**    Do you acknowledge there presently exists an opioid

3    epidemic in the State of West Virginia?

4    **A.**    Yes.

5    **Q.**    Do you acknowledge there presently exists an opioid

6    epidemic in Huntington, Cabell County?

7    **A.**    I -- again, I don't know that specific, but I know West

8    Virginia for sure, yes.

9    **Q.**    You're unfamiliar with the circumstances of the opioid

10   epidemic within Huntington/Cabell County?

11   **A.**    There's an opiate epidemic in West Virginia.  I'm not

12   sure if you want me to say city but city or --

13   **Q.**    Well, I'm referencing the plaintiffs in this case.

14   **A.**    Yes.

15   **Q.**    The city -- sorry.  The City of Huntington and Cabell

16   County, do you acknowledge there's an opioid epidemic within

17   the city and county?

18   **A.**    Yes.

19   **Q.**    Do you acknowledge that the opioid epidemic has had a

20   devastating impact on public health and public safety?

21   **A.**    I believe so.

22   **Q.**    Do you acknowledge the opioid epidemic involves opioid

23   use and abuse?

24   **A.**    Yes.

25   **Q.**    Do you acknowledge the opioid epidemic involves

1    morbidity?

2    **A.**   Death?

3          MR. NICHOLAS:  I'll object to that.  I'm not sure

4    what is meant by that.

5          THE COURT:  Yeah.  What do you mean by morbidity,

6    Mr. Farrell, in this context?

7    BY MR. FARRELL:

8    **Q.**   Mr. Zimmerman, do you know what morbidity means?

9    **A.**   I was going to ask you.  Are you referring to death?

10   **Q.**   That would be mortality.  I'm asking you if you know

11   whether morbidity or impact to a person's health.

12   **A.**   I'm not still understanding the, your question.

13   **Q.**   Do you believe the opioid epidemic has had adverse

14   impacts on individuals' well-being, physical well-being in

15   Huntington, Cabell County, West Virginia?

16   **A.**   That were, that were addicted?  Is that your question?

17   **Q.**   I'm asking you whether or not you believe the opioid

18   epidemic has had an adverse effect on the physical

19   well-being of human beings that live in Huntington and

20   Cabell County, West Virginia.

21   **A.**   It would have an effect, yes.

22   **Q.**   Do you believe the opioid epidemic has had -- involves

23   more -- let me strike that and start over.  Do you believe

24   the opioid epidemic involves mortality in Huntington, Cabell

25   County, West Virginia?

1    **A.**    Yes.

2    **Q.**    Do you acknowledge that the DEA has warned

3    AmerisourceBergen about the risks of selling too many pills

4    of prescription opiates into communities?

5                 MR. NICHOLAS:  Objection for lack of foundation.

6                 THE COURT:  Yeah.  I'll sustain the objection.

7          You can go at it another way, Mr. Farrell, if you can.

8    But --

9    BY MR. FARRELL:

10   **Q.**    Are you aware of whether or not the DEA has warned

11   AmerisourceBergen of the risks of selling too many

12   prescription opiates into communities?

13                MR. NICHOLAS:  Same objection.

14                THE COURT:  Well, if he knows.

15                THE WITNESS:  I'm not sure of the con- -- I'm not

16   sure of the context of your question.

17   BY MR. FARRELL:

18   **Q.**    It's fair.  We'll come back to that shortly.

19         Has the DEA sanctioned AmerisourceBergen for failing to

20   maintain effective control to prevent diversion of

21   prescription opioids?

22   **A.**    I'm not sure how to answer that.  We have entered into

23   an agreement with DEA, but there's no guilt identified.  I'm

24   not sure how to answer your question.

25   **Q.**    Did the agreement include a sanction?

```
 1              MR. NICHOLAS:  Object to the form.

 2              THE COURT:  Overruled.  You can answer.

 3              THE WITNESS:  What do you mean by sanction?

 4   BY MR. FARRELL:

 5   Q.   Do you know what a sanction is?

 6   A.   No.  I'm not sure what -- if you could just tell me

 7   what you -- I just want to make sure I answer, answer your

 8   question correctly.

 9   Q.   Mr. Zimmerman, to be fair, I'm not going to -- I'm

10   going to show you the documents.  I'm just trying to

11   understand before we start on the documents what your

12   general understanding is.

13        You're aware AmerisourceBergen -- in fact, you

14   personally negotiated an agreement with the DEA back in

15   2007?

16   A.   Yes, correct.

17   Q.   And as part of that agreement, your distribution center

18   got its license reinstated.  Agreed?

19   A.   Correct.

20   Q.   And you got the license reinstated when two things

21   happened.  Number one is you agreed to modify how you were

22   reporting suspicious orders.  Agreed?

23   A.   Fair.

24   Q.   Instead of reporting the suspicious orders like

25   everybody else in the country to the local distribution
```

 1    center, AmerisourceBergen was required to report suspicious

 2    orders to headquarters?

 3    **A.**   That was one element, uh-huh.

 4    **Q.**   That's a change -- that's different than what anybody

 5    else was doing; correct?

 6    **A.**   Correct.

 7    **Q.**   In addition to that, AmerisourceBergen made promises or

 8    pledges to implement new policies and procedures.  Agreed?

 9    **A.**   We changed our processes and procedures, yes.

10    **Q.**   Mr. Zimmerman, I didn't ask you if you changed them.

11    I'm asking you whether or not as part of your negotiations

12    with the Drug Enforcement Agency following the Immediate

13    Suspension Order you entered into an agreement, you

14    negotiated a deal to get your license back by making

15    promises that you would make changes?

16    **A.**   Correct.

17    **Q.**   Do you acknowledge that the more prescription opioid

18    pills that you sell into the community, the more likely

19    diversion is to take place?

20    **A.**   I, I don't know that.  I mean, we sell, we sell to

21    licensed pharmacies.  Right?  And then the amount of product

22    that goes to those pharmacies because they receive more,

23    does that mean they're more susceptible to diversion?  I

24    guess they could be.

25    **Q.**   Is that a factor you take into account as CSRA?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **A.**   The size of the pharmacy?

2    **Q.**   Size of the volume of shipments.

3    **A.**   We look at that, yes.

4    **Q.**   So the reason that you're looking at it is what?

5    **A.**   We're looking for anything that would raise our

6    suspicion of -- totality of, of items that we look at.  I

7    mean, there's all sorts of things that we take a look at.

8    **Q.**   You're looking for suspicion of what?

9    **A.**   Could be a potential suspicious order.

10   **Q.**   And it's suspicious why?

11   **A.**   It could be -- you know, the Code of Federal

12   Regulations says it could be quantity, pattern, or frequency

13   is the way it's stated in the CFR.  But we're looking at

14   anything that we feel to be -- makes it a suspicious order.

15   **Q.**   Suspicious --

16   **A.**   The totality of the circumstances.

17   **Q.**   Suspicious of what?  What is it that you're suspicious

18   of?

19   **A.**   We're suspicious it's a larger order going to a

20   pharmacy and we don't have -- we just don't feel comfortable

21   about shipping that product.

22   **Q.**   Why is that a bad thing?

23   **A.**   It's just the process that we, that we operate under.

24   We have no specific information on the patient or the

25   prescriber or those individuals.  So we have to go with the

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    information that we have.  If they're a licensed pharmacy,

2    we report those orders to DEA.  And then we have an

3    obligation to review orders to see if there's again -- that

4    we identify as suspicious but report to the DEA.

5    **Q.**   Mr. Zimmerman, I think we're talking past each other.

6    **A.**   Okay.  Sorry.

7    **Q.**   You're suspicious that it's too, too big?  Are you

8    suspicious that the pills are being -- what?  Help me

9    understand what you're suspicious of.  Why are suspicious

10   orders bad?

11           MR. NICHOLAS:  I'll object to the -- I'll object

12   to the question.

13           THE COURT:  On what basis?

14           MR. NICHOLAS:  It's, it's confusing and it's

15   vague.  It's just not specific enough.

16           THE COURT:  Well, I'll overrule the objection.

17       Can you explain why suspicious orders are bad, if they

18   are?

19           THE WITNESS:  I don't know they're bad.  They're

20   suspicious.  That's the purpose of -- that's the purpose of

21   reporting them.  Pharmacies are licensed and they fill

22   prescriptions.  We believe that the DEA, the Board of

23   Pharmacy would not issue a registration to a pharmacy that

24   wasn't meeting the requirements.

25       If we have an order that we feel may be suspicious just

1    because it seems suspicious doesn't mean it's bad.  We

2    report it to the DEA and all issues, then the DEA would then

3    investigate.  If your concept is all suspicious orders are

4    bad, then DEA should be taking action on every single

5    suspicious order reported.  And I, I'm not sure if I can

6    recall one.

7         So I'm just -- I don't know if I can say that a

8    suspicious order is bad.  Suspicious orders are suspicious.

9    That's the reason they put it in the Code of Federal

10   Regulations so we had a mechanism to alert DEA of the

11   potential suspicion that if they had other information at

12   their disposal, they can investigate and take action on the

13   pharmacy to see if there's diversion occurring at the

14   pharmacy.  That's the whole purpose of the suspicious order,

15   not that -- it doesn't say report bad orders.  It says

16   report suspicious orders.  So I can't make that nexus.

17   BY MR. FARRELL:

18   **Q.**   So I guess my question to you, Mr. Zimmerman, to be

19   more direct, is that what you're suspicious of is that

20   the prescription opiates are getting diverted into the

21   illicit market.  Would you agree with that?

22   **A.**   Well, what's suspicious of the -- whatever made it

23   suspicious on the totality of the review of the order of why

24   the investigator decided to report it to DEA is that they

25   just didn't feel comfortable releasing that order and they

1    would report to DEA.

2         And, again, the way the system works is the DEA has a

3    lot more information.  They see who that pharmacy is buying

4    from in addition to AmerisourceBergen.  They have records --

5    they have investigative techniques at their disposal which

6    we don't have.  And we're, we're a company.  We're not an

7    enforcement agency and we're not a regulatory agency.

8         Our regulatory requirement is to report a suspicious

9    order so then the authorities that have that jurisdiction

10   can then conduct that part.  And if there are bad actors,

11   then they can revoke the license and that tells us not to

12   ship to them anymore.

13   **Q.**   Let's try this a different way.

14        Can you, can you bring up the five questions?

15             MR. FARRELL:  Judge, may I approach the screen?

16             THE COURT:  Yes.

17   BY MR. FARRELL:

18   **Q.**   I'm going to ask you five questions, Mr. Zimmerman,

19   and I ask that you answer them with an affirmative and

20   negative and then you can explain all you want.  Okay?

21   **A.**   Okay.

22   **Q.**   Question Number 1:  Does AmerisourceBergen take the

23   position that the purpose of the Controlled Substances Act

24   and its federal regulations is to prevent diversion?  Yes or

25   no?

1          MR. NICHOLAS:  Your Honor, I will object to the

2     format of the question, both the display and the yes/no box.

3     I recognize that the witness is on -- is being treated as an

4     adverse witness, but this is a bit much and I, I don't think

5     this is an appropriate way to ask questions in this context.

6          THE COURT:  Well, I'm going to overrule the

7     objection and let him answer.

8          Go ahead, Mr. Farrell.

9     BY MR. FARRELL:

10    **Q.**   Does AmerisourceBergen take the position that the

11    purpose of the Controlled Substances Act and its federal

12    regulations is to prevent diversion?

13    **A.**   That's one, correct.

14    **Q.**   Does AmerisourceBergen agree that diversion is

15    foreseeable if registrants fail to comply with federal law?

16         MR. NICHOLAS:  Object to the question.

17         THE COURT:  Well, it's a loaded question, isn't it

18    Mr. Farrell?

19         MR. FARRELL:  Judge, I'll represent to you that

20    all five questions were asked of the DEA 30(b)(6) witness.

21    And I think it would be probative to be able to compare and

22    contrast the positions taken by AmerisourceBergen and the

23    positions taken by the United States Drug Enforcement

24    Agency.

25         THE COURT:  All right.  I'll let him --

1          Do you have something else to say?

2               MR. NICHOLAS:  Well, if, if --

3               THE COURT:  I'm going to let him answer.  I'm not

4     sure how helpful this is but, Mr. Zimmerman, go ahead and

5     answer if you can.

6               THE WITNESS:  What part of federal law?  I mean,

7     I'm just curious.  There's a lot of federal law.

8     BY MR. FARRELL:

9     Q.   We'll start with the Controlled Substances Act.

10    A.   So, no.  It depends, it depends on -- so you can't just

11    ask open-ended.  So one of the requirements of a cage is

12    your bolts, your cage bolts need to be welded to the floor.

13         If you don't weld the cage bolt -- it's in the C.F.R.

14    If you don't weld the cage bolt, is it foreseeable that

15    there's going to be diversion.  I don't think so.

16         So it depends on what aspect or technicality you're

17    referring to.  I don't -- so some, yes, right.  If I'm

18    shipping to somebody that doesn't have a license, yes, it's

19    foreseeable that diversion would be occurring.  If I don't

20    weld -- if I only weld three of my bolts instead of four on

21    my cage to the floor, I don't think diversion is foreseeable

22    in that case.

23    BY MR. FARRELL:

24    Q.   Well, let's take, for example, selling a couple

25    million pills to SafeScript Pharmacy.  If you don't

1    maintain effective control according to federal law, is

2    diversion foreseeable?

3    **A.**   Not under our registration it's not.  We didn't have

4    diversion from our warehouse I don't believe.

5    **Q.**   If you fail to comply with federal law, more diversion

6    happens.  Do you agree with that?

7    **A.**   I guess you're just looking -- it says -- failure to

8    comply to every regulation?  One regulation?  I mean, a yes

9    or no question to a multitude of requirements?

10   **Q.**   I had you read aloud the purpose of the Controlled

11   Substances Act was to prevent diversion.  Agreed?

12   **A.**   Correct.

13   **Q.**   And, so, what I'm asking you is if you don't follow the

14   laws of the Controlled Substances Act, the foreseeable

15   result is diversion.  Agreed?

16          MR. NICHOLAS:  Your Honor, I'm sorry to interrupt.

17   I hate to keep objecting.  I don't want to.  But I do

18   object.

19          THE COURT:  I'm going to sustain the objection to

20   that.  The "yes" or "no" format doesn't embrace the universe

21   of possible, possibilities.  And I think the witness's

22   answer to the last question illustrated that.  So I'm going

23   to sustain the objection.

24   BY MR. FARRELL:

25   **Q.**   How about if I skip just to the last question and

1    ask you directly.  Do you agree that the more pills a

2    distributor ships unlawfully into a community results in

3    more diversion into the illicit market?

4              MS. MAINIGI:  Objection, Your Honor, calls for a

5    legal conclusion.

6              THE COURT:  Yeah.  How would he know?  Sustained.

7              MR. FARRELL:  Judge, this is the elements of

8    causation that the DEA is --

9              THE COURT:  Well, I understand that, Mr. Farrell,

10   but you're loading the, the gun against him here in a way

11   that appears to me to be unfair because the "yes" or "no"

12   format doesn't embrace all of the possibilities of the

13   answer.  And --

14             MR. FARRELL:  That's fair.  Yes, sir.

15             THE COURT:  I'm going to sustain the objection.

16             MR. FARRELL:  Will you take it down, please.

17   BY MR. FARRELL:

18   **Q.**   Let's talk briefly about your policies and

19   procedures.  You would -- you said something earlier,

20   and I forget the exact words, that your CSRA -- your

21   policies and procedures were -- was it a corporate

22   responsibility?

23   **A.**   We have CSRA policy.  I assume that's what you're

24   referring to, CSRA policy and procedures.

25   **Q.**   So your CSR policies and procedures relating to

1    diversion control, do they apply to all of your distribution

2    centers?

3    **A.**   So we have -- I'd have to see the policies and

4    procedures because some are strictly for the distribution

5    center because of the function, and then some are corporate.

6    So it depends on the policy you're referring to.

7    **Q.**   All right.  So if we talk about in general suspicious

8    orders, identifying suspicious orders, or monitoring -- you

9    agree with me that AmerisourceBergen has an obligation to,

10   to design and operate a system to identify suspicious

11   orders?

12   **A.**   Yes.

13   **Q.**   And that system that you have put in place applies

14   equally to all distribution centers?

15   **A.**   Yes.  It --

16   **Q.**   And, so, your -- what we call it is SOMS, S-O-M-S.

17   Correct?

18   **A.**   Okay.

19   **Q.**   I'm asking you, do you have a different understanding

20   of -- do you know what the word SOMS means?

21   **A.**   I'm just trying to figure out what you're getting at.

22   So we have policies and procedures that we train our

23   diversion people that work in the cage involve.  They see a

24   suspicious order, they have an obligation to report it.

25        That's over and completely different than the automated

1    suspicious order reporting process.  So, it's a two-step

2    process.  I'm just trying to understand which one -- are we

3    talking about the manual process of the distribution centers

4    which would be in all the distribution centers or the

5    corporate one which is managed at the corporate level which

6    is more of the due diligence and order reviewing on an

7    electronic scale?

8    **Q.**    That one, the latter one.  What, what shall we call

9    that?

10   **A.**    The Order Monitoring Program.

11   **Q.**    Okay.  We'll call it the OMP?

12   **A.**    Yeah.

13   **Q.**    Is that OMP policy applicable nationwide?

14   **A.**    Yes.

15   **Q.**    Okay.  Would you call it then systemic, meaning it's a

16   system, it's a process that applies across the country?

17   **A.**    It's a program, yeah.

18   **Q.**    So to the extent that your OMP program is effective in

19   preventing control, do you believe that your successes are

20   systemic?

21   **A.**    Our successes?

22           MR. NICHOLAS:  I'll object to the form, or

23   whatever.  I mean, I'll object to the question, but I will

24   add that it would probably be helpful to have some of these

25   questions put into a time frame.

```
 1              THE COURT:  Sustained.
 2    BY MR. FARRELL:
 3    Q.   During the time frame that you were disclosed as a
 4    30(b)(6) witness -- I believe it's 2006 to 2014 -- are
 5    you familiar with the OMP program being operated by
 6    AmerisourceBergen?
 7    A.   Yes.
 8    Q.   Do you believe it was effective?
 9    A.   Yes.
10    Q.   Do you believe it was effective nationwide?
11    A.   You said '06 to '14?
12    Q.   Yes.
13    A.   The program changed in '07.
14    Q.   So we'll say from '07 to '14 do you believe your
15    program was effective?
16    A.   Yes.
17    Q.   Do you believe it was effective in '06?
18    A.   Yes.
19    Q.   So let's back up.  Between 2006 and 2014 do you believe
20    your OMP program was effective?
21    A.   Yes.  I think we've had an OMP program since I started
22    in 1990.  And I think it met all the federal requirements
23    and has been effective.
24    Q.   Okay.  So it was effective at preventing diversion?
25    A.   From our -- under our, under our control, yes.
```

1  **Q.**   Under your definition of, of diversion, it was

2  effective?

3  **A.**   It met all of our requirements, correct.

4  **Q.**   And to the extent that there are problems with your

5  OMP, those problems are nationwide as well.  Do you follow

6  me?  If you're wrong and there's some problem with your OMP

7  system, program, that's a problem that we'll see across

8  distribution centers?

9  **A.**   I would --

10       MR. NICHOLAS:  Objection.  I will object to

11  foundation and relevance.

12       THE COURT:  Sustained.  I don't see -- well, I'll

13  sustain the objection.

14  BY MR. FARRELL:

15  **Q.**   Were your OMP policies -- I'm sorry.  Strike that.

16  Was your OMP, Order Monitoring Program, were its

17  practices and policies national in scope?

18  **A.**   Yes.  We're talking about the corporate -- we're

19  talking about the corporate one, not the -- they both were,

20  but just different policies, yes.

21  **Q.**   Mr. Zimmerman, the position that you're taking with

22  regard to your duties under your -- in your OMP, you, you

23  are aware that the DEA has disagreed with your position on

24  federal regulatory law?

25  **A.**   On what aspect?

1    **Q.**   I'm asking you.

2    **A.**   Oh, I'm sorry.  No.

3    **Q.**   Are you aware of whether or not the DEA disagrees with

4    you?

5    **A.**   I don't know that.  I don't know what portion you're

6    talking about.

7    **Q.**   Let's start with the duty to maintain effective control

8    and limit it to while the product is in your possession.  Do

9    you understand the DEA has told AmerisourceBergen that it

10   believes its duty goes beyond that?

11            THE COURT:  You've already asked him all this, Mr.

12   Farrell.

13            MR. FARRELL:  Well, I'm going to get ready to go

14   into the actual DEA letters, the registrant letters, the

15   Immediate Suspension Order, the settlement agreement, the

16   letters between, between this witness and others.  So I'm

17   just trying to understand whether or not he is --

18            THE COURT:  You asked him the question that you

19   asked him a while ago that he's already answered.  That's

20   all I have to say.

21            MR. NICHOLAS:  That's about all I have to say,

22   too.  I guess if we have, if we have something to show the

23   witness or ask him about, it would be good to just get to

24   that at this point.

25            MR. FARRELL:  I thought I was getting there by

1      asking a foundation question.

2              THE COURT:  Well, go ahead.

3      BY MR. FARRELL:

4      **Q.**   Are you aware of whether or not the DEA agrees with

5      your interpretation of the responsibility to maintain

6      effective control?  Is that in your knowledge base?

7      **A.**   In my -- I believe we have the same understanding that

8      we have, we have to maintain effective controls to prevent

9      diversion.  And they issue a DEA registration to each

10     segment with those same requirements.

11         If you're asking me do I think that our -- we're

12     responsible for a pharmacy or doctors prescribing it under

13     their DEA registration, no, we're not.  And if they, they

14     think we do, then I disagree with them.

15     **Q.**   Mr. Zimmerman, I'm not asking you that.  I'm asking you

16     very simply, do you know whether or not the DEA agrees with

17     your interpretation of your duties under federal law?

18     **A.**   And I said "no."

19     **Q.**   While we're pulling up the first, the first exhibit, I

20     have a couple questions for you.

21         There was reference made earlier -- when you're

22     designing -- when you're doing your due diligence, when

23     you're looking into it, do you consider patient population

24     around a pharmacy when you're determining a suspicious

25     order?

```
1    A.    It, it depends on the time frame.  Our program has

2    evolved over time.

3    Q.    Okay.  So my understanding is that you --

4    AmerisourceBergen basically had three evolutions of its OMP

5    program.  Is that fair?

6    A.    It's three larger evolutions.  It's continually

7    evolved, if not daily.  So, you know, we add things as we

8    find more information.  That works.  They keep adding.

9    Q.    My understanding is that you had one version of OMP

10   that was in existence up until about 2007?

11   A.    Correct.

12   Q.    And then from 2007 to approximately 2014 there was

13   another iteration of your OMP?

14   A.    Correct.

15   Q.    And then from 2015 to the present is the third

16   evolution of the OMP?

17   A.    Those are the major ones, but it's evolved, you know,

18   somewhat, not major overhauls.  I would consider those

19   significant changes.

20   Q.    So are you aware of when Oxycontin was launched?

21   A.    Oxycontin?

22   Q.    Oxycontin.

23   A.    I don't know when it was originally launched.

24   Q.    Do you know what Oxycontin is?

25   A.    Yes, yes.
```

1   **Q.**   And did AmerisourceBergen sell Oxycontin?

2   **A.**   Yes.

3   **Q.**   So I'll represent to you that it was sometime around

4   1996 that the FDA approved it.  Are you aware from CSRA of

5   any abuse or use of Oxycontin that is problematic in

6   America?

7           MR. NICHOLAS:  Objection, foundation.  It's just a

8   super broad question, Your Honor.  I'll object to it.

9           THE COURT:  Overruled.

10       Answer it if you can, Mr. Zimmerman.

11          THE WITNESS:  Today or in -- I mean, what time

12  frame?

13  BY MR. FARRELL:

14  **Q.**   Any time frame.

15  **A.**   Yes.

16  **Q.**   Are you aware of whether Oxycontin is being used and

17  abused in America?

18  **A.**   I was aware, yes.

19  **Q.**   Okay.  When did you become aware of that?

20  **A.**   I don't know the day and year but, I mean, I know it

21  became -- it was an issue of abuse, the immediate release --

22  or not the immediate release but the time-release Oxycontin

23  became a problem.  I don't know what year it was, but it was

24  after it was released of course.

25  **Q.**   Are you aware of the Congressional hearings in 2001 on

1    Oxycontin use and abuse?

2    **A.**   I'm sure I was, but I can't think of it.

3    **Q.**   So this is about the time that you became the Vice

4    President of Corporate Security and Regulatory Affairs at

5    the newly formed AmerisourceBergen; correct?

6    **A.**   2001, correct.

7    **Q.**   And, so, do you have any recollection of following at

8    that time the Congressional reports about Oxycontin use and

9    abuse?

10   **A.**   I don't recall.

11   **Q.**   Are you familiar with the Distributor Initiative in the

12   meetings with the DEA in 2005?

13   **A.**   Yes.

14            MR. FARRELL:   Judge, may I approach?

15   BY MR. FARRELL:

16   **Q.**   I'm going to show you what has been marked as

17   P-9112 and we have copies circulating to counsel.  And

18   I'm going to put a flag down here in 2005.  Have you

19   seen this document before?

20   **A.**   I've seen it looking through documents but I -- not,

21   not before just the other day.

22   **Q.**   Well, you testified about this two years ago in 2018,

23   did you not?

24   **A.**   I -- maybe -- I'm confused.  The top memorandum is from

25   DEA to DEA.  I've never seen that memo before just the other

1    day.  Are you talking about the presentation?  I've seen

2    that.  I testified to the presentation.  But I have never

3    seen the --

4    **Q.**   Take the, take the cover memo and put it to the side.

5    Let's talk about the presentation.  You've seen this

6    presentation before; correct?

7    **A.**   I have seen the -- I wasn't at the presentation with

8    the DEA, but I've seen the presentation, correct.

9    **Q.**   Who gave it to you?

10   **A.**   Steve Mays.

11   **Q.**   Do you know when he gave it to you?

12   **A.**   I believe when he came back from the meeting.

13   **Q.**   Okay.  Did you know about the meeting beforehand?

14   **A.**   I don't -- I, I would have.  I mean, he reported to me,

15   so I would have, but I don't recall in my head.

16   **Q.**   I'm not being pejorative, but you're the head of CSRA?

17   **A.**   Yes.

18   **Q.**   And the DEA has called a meeting to talk about

19   diversion of prescription opioids and you did not attend it.

20   Was there -- do you recall whether or not you had other

21   obligations or there was some reason you weren't there?

22   **A.**   I don't recall that.

23   **Q.**   But Steve Mays was there on behalf of

24   AmerisourceBergen; correct?

25   **A.**   Yes.  And it could have been that he was the one that

1    the DEA contacted to come to the meeting.  I, I don't

2    remember the mechanics of it.

3                MR. FARRELL:  Judge, P-9112 is a document that is

4    referenced as an exhibit for the deposition of Thomas

5    Prevoznik that has been submitted to you.

6          What I will do is I will remove the front page that --

7    which is Bates stamped 0001 and 0002.  And I would ask for

8    the admission of P-9112a which will be just the pages Bates

9    stamped 0003 through 00018.

10               THE COURT:  Any objection to this?  Do you want it

11   admitted?

12               MR. FARRELL:  Yes, sir.

13               THE COURT:  Any objection?

14               MR. NICHOLAS:  Could we hear a little bit more

15   about it before, before it's admitted?

16               THE COURT:  Well, it's -- he said he knew about

17   the meeting and he knew one of his people went.  But that

18   doesn't -- it doesn't seem to me that that sufficiently

19   identifies the exhibit to make it admissible.  And it's

20   probably got all kinds of hearsay in it.

21   BY MR. FARRELL:

22   Q.   So let's start with just the examination of it.

23   Can you, can you bring up -- we're going to go through

24   some of the slides.  Okay, Mr. Zimmerman?

25   A.   Yeah.

1    **Q.**   Can you go to Page 2 on the slide that is Bates stamped

2    Page 4.  Go to the next page, please.  I think you can back

3    up one, "Issues to Consider."

4         So you see at the bottom right-hand corner US-DEA Bates

5    stamp 150, Mr. Zimmerman?

6    **A.**   Yeah.

7    **Q.**   And then this is actually P-9112 and we'll designate it

8    little a for the time being, Page 4.  Will you read what it

9    says up above, "Issues to Consider."

10   **A.**   Want me to read it out loud?

11   **Q.**   Sure.

12   **A.**   "Frequency of orders, size of orders, range of products

13   purchased, payment method, pharmacy location, percent

14   controlled versus non-controlled, customer pick-up at

15   distributor."

16   **Q.**   Okay.  So are you aware that the DEA, at least as of

17   2005, was advising AmerisourceBergen that you had issues to

18   consider beyond just the frequency and size of orders, but

19   that you needed to look into payment method, the pharmacy

20   location, percent versus -- controlled versus percent

21   non-controlled, and whether or not the customers were

22   picking up at the distributors?  Were you aware of this?

23   **A.**   I mean, it's on the slide.  I mean --

24   **Q.**   I'm not asking you if it's on the slide.  I'm asking

25   you whether in 2005 you were aware that the DEA was so

1    advising AmerisourceBergen.

2    **A.**    They did it in -- through the presentation in the

3    meeting with Steve.  They did this presentation, correct.

4    **Q.**    The bottom portion of the slide says DEA distributor

5    registrations.  Would you please read the section below, the

6    last bullet point?

7    **A.**    "Maintenance of effective controls against diversion of

8    particular controlled substances into other than legitimate

9    medical channels."

10   **Q.**    Were you aware that the DEA was advising

11   AmerisourceBergen in 2005 that your registration was

12   dependent upon maintaining effective controls against

13   diversion?

14   **A.**    And the illegitimate medical channels like unlicensed

15   pharmacies, that's correct.

16   **Q.**    Go to the next slide.  Do you see up here it says

17   Supreme Court case, *Direct Sales* vs. *United States*, 1943?

18   Do you see that?

19   **A.**    I do.

20   **Q.**    All right.  Did the DEA tell CSRA to be aware of the

21   *Direct Sales* case from 1943 during the distributor meeting

22   with them in 2005?

23   **A.**    It's on the slide, so it would have  -- again, you're

24   asking me if they covered that.  I wasn't at the meeting.

25   **Q.**    Okay.  Did Mr. Mays come and tell you about the

1    meeting?

2    **A.**    Yes.

3    **Q.**    So you, the head of CSRA, had this in your hand and you

4    knew it came from the DEA; correct?

5    **A.**    Yes.

6    **Q.**    You were on notice that the DEA in 2005 was citing this

7    case from 1943 in a private meeting with AmerisourceBergen's

8    CSRAs; correct?

9    **A.**    Yes.

10   **Q.**    And are you familiar with the holding of this case and

11   the meaning of citing this case in this document?

12   **A.**    I don't.

13   **Q.**    Did you read this case?

14   **A.**    I don't recall.

15   **Q.**    Were you interested in what this case had to say?

16   **A.**    I don't recall.

17   **Q.**    All right.  Next slide, please.  Go to page -- it will

18   be slide Page 7.  It will be Page 9.  There we go.

19        This says "Suspicious Orders."  And we don't need to go

20   through this again.  But do you see the second bullet point,

21   "Report Suspicious Orders to DEA When Discovered."  Do you

22   see that?

23   **A.**    Yes.

24   **Q.**    All right.  So do you acknowledge that this is a

25   communication by the DEA to CSRA that you have a duty to

1    report suspicious orders when discovered?

2    **A.**   Yes.

3    **Q.**   That was the DEA's position is that when you discover

4    it, you have to tell us; correct?

5    **A.**   Yes.

6    **Q.**   And did you infer in that that you were still allowed

7    to ship it?

8           MR. NICHOLAS:  Object to the -- I'll object to the

9    lack of foundation.  It's a loaded question.

10          THE COURT:  Well, if he knows.

11          THE WITNESS:  What, what time frame again are you

12   referencing?

13   BY MR. FARRELL:

14   **Q.**   This is 2005.

15   **A.**   Yes, report, report suspicious orders to DEA when

16   discovered, correct.

17   **Q.**   And, so, did you, the head of CSRA, interpret this to

18   mean that you could still ship the order after you reported

19   it?

20   **A.**   Yes.

21   **Q.**   Why would they have -- what would be the purpose of

22   reporting an order that's suspicious when it's discovered to

23   still ship it?

24   **A.**   Because a suspicious is not a bad order.  A suspicious

25   order -- when we stop an order that affects -- it affects

1    patient care.  These are legitimate drugs.  Right?  They're,

2    they're -- there's patients that need those drugs.  The

3    pharmacy places the order.  The patient's going to be coming

4    to pick it up.  You have a doctor that made the decision to

5    write this prescription.  You have a pharmacy that sees the

6    patient and has a corresponding responsibility to fill the

7    prescription.  And then you want us to override it.

8         The regulation was written to report a suspicious order

9    and then ship it not to affect patient care.  If there's

10   something bad with the order, DEA has it suspicious.  They

11   should take action, either close the pharmacy, revoke the

12   doctor's license.  Our responsibility is to report the

13   suspicious order, not the bad order.

14   **Q.**  So is it fair to say that you believe this is not your

15   job?

16   **A.**  What job?  Our job is to report suspicious orders and

17   the DEA takes that information and they perform their

18   enforcement or regulatory responsibility, correct.

19   **Q.**  So once the pills leave your physical control, it's not

20   your job to prevent diversion?

21   **A.**  I have no ability to prevent diversion outside of the

22   control of those products, correct.  We're responsible to

23   make sure we get the transportation company that delivers to

24   the pharmacy.  And there's a reason why the pharmacist has

25   to sign, or the pharmacy has to sign for to change control

1    from our registration.  It transfers.  The quantity

2    transfers from our registration to their registration with

3    the same requirements.

4    **Q.**   Okay.  Let's go to the next slide, same slide deck,

5    same time frame, suspicious orders.  Will you read the

6    bullet point the DEA was communicating to AmerisourceBergen?

7    **A.**   "Reporting a suspicious order to DEA does not relieve a

8    distribution [sic] of the responsibility to maintain

9    effective controls."

10   **Q.**   So I take it you disagree with this?

11   **A.**   No, I agree with that.  We have a lot of other controls

12   to prevent diversion.  Just because we report suspicious

13   orders, that doesn't mean we can't keep product in the

14   vault, have an order keeping recommendations, the same

15   criminal background.

16        All those are under the C.F.R. for -- adequate controls

17   to prevent diversion include a multitude of things, one

18   being a suspicious order.

19        I read that if you do not -- by reporting a suspicious

20   order doesn't mean you relieve yourself of all those other

21   requirements under the C.F.R. to prevent diversion.  That's

22   how I read that.  I, I agree with that.

23   **Q.**   Go to Page 13, summary page of this slide deck.

24        "The pattern of drugs being distributed to pharmacies

25   who are diverting controlled substances demonstrates the

```
1    lack of effective controls against diversion by the

2    distributor."

3         Does this slide not communicate to you, Mr. Zimmerman,

4    that the DEA is telling you your obligations go beyond just

5    ensuring that the pharmacy has a DEA registration?

6    A.   If we have knowledge that the -- "The pattern of drugs

7    being distributed to pharmacies --"

8              COURT REPORTER:  Excuse me, Mr. Zimmerman.  Slow

9    down, please.

10             THE WITNESS:  I'll slow down.

11        I don't know they're diverting controlled substances.

12   That statement says the pattern of drugs you're selling to

13   the pharmacies, if they're diverting those controlled

14   substances demonstrates a lack of effective controls.  I

15   agree with that statement.  But I don't -- we don't know

16   those pharmacies are diverting those drugs or we wouldn't be

17   selling them to them.

18   BY MR. FARRELL:

19   Q.   Sure.  Let's talk -- let's switch topics real

20   quick.  Let's talk about an argument that was made

21   that -- does AmerisourceBergen consider whether or not a

22   community is a healthcare hub when determining

23   thresholds or the volume of pills sold to a pharmacy?

24   A.   I'm not familiar with that term.

25   Q.   Yeah, that's, that's inartful.  Does AmerisourceBergen
```

1    consider whether or not there are hospitals within a

2    community when determining whether or not the volume of

3    pills is suspicious?

4    **A.**   I'm not sure.

5    **Q.**   Does AmerisourceBergen consider any patient

6    demographics when determining the appropriate volume of

7    pills or setting thresholds in the community?

8    **A.**   In what time frame?

9    **Q.**   Let's just say 2007.

10   **A.**   I don't believe we were looking at that.

11   **Q.**   How about does AmerisourceBergen look into age or, or

12   obesity or any other demographics when determining an

13   appropriate level of opioids to sell?

14   **A.**   In 2007, no.

15   **Q.**   Are you aware of any justification for -- internally at

16   CSRA when you do your due diligence on proximity of a

17   pharmacy to, say, a pain clinic or a physician's office or a

18   tertiary care facility?

19   **A.**   I think that's one of the items they look at.

20   **Q.**   For instance, your lawyers in this case in both opening

21   and on several other occasions mentioned the fact that there

22   are 29 other counties that send patients to the hospitals in

23   Huntington.  Have you heard this before?

24   **A.**   No.  I mean, I'm not sure what you're referencing.

25   **Q.**   Let me ask you --

**A.**   I know people have traveled to the hospitals.  I just don't know the exact statement you're making.

**Q.**   Have you been following this trial so far?

**A.**   You mean like reading transcripts and stuff?  No.

**Q.**   Have you been watching it?

**A.**   Not from -- I've been told not to watch it.

**Q.**   Did you see opening or read about opening?

**A.**   No.

**Q.**   Okay.  So you're aware, though, that one of the defenses that AmerisourceBergen is raising is that CSRA was justified in clearing orders into Cabell County because it was a hub of healthcare for the 29 surrounding counties?  You're aware of that?

         MR. NICHOLAS:  I'll object to the question in light of the last, the previous three or four answers and in light of the fact that he's characterizing I guess what I said in my opening.  I'll object to the -- I'll object to the question.

         THE COURT:  Sustained.

         MR. FARRELL:  Your Honor, they've asked our witnesses on no less than 10 occasions --

         THE COURT:  Well, I sustained the objection, Mr. Farrell.  You're stuck with that.

         MR. FARRELL:  Yes, sir.

BY MR. FARRELL:

```
1    Q.   Does it -- you said that it does make a difference

2    if a community is a healthcare hub in a, in a particular

3    region.  Agreed?

4    A.   I said they take into account.

5    Q.   Take into account?

6    A.   Right.  That's one of the elements that they look at,

7    correct.

8    Q.   So do you also take into account the volume of pills in

9    the surrounding communities?

10   A.   In 2007?

11   Q.   At any point.

12   A.   I'm not sure.  I don't know.

13   Q.   You're the head of CSRA and you've said that a factor

14   in determining whether or not a volume of pills is excessive

15   is whether or not it's a hub for healthcare for surrounding

16   counties.  That was your testimony.  Correct?

17   A.   I said that's one of the elements they look at.

18   Q.   It's one of the elements?

19   A.   Right.

20   Q.   So my question to you is whether or not you also look

21   as an element on what the surrounding counties --

22   A.   Right.

23   Q.   -- are, are purchasing to determine whether or not the

24   shipments are appropriate.

25   A.   And I said I don't know.
```

1    **Q.**   For instance, reference was made earlier to the fact

2    that the two hospitals in Huntington/Cabell County, West

3    Virginia, serve the 29 surrounding counties.

4         My question to you is, is in the surrounding counties

5    would you have looked at the volume of pills at those places

6    or looked up which counties serviced the hospitals?

7              MR. NICHOLAS:  Objection, asked and answered

8    several times.

9              MR. FARRELL:  This is different.  This is

10   different.

11             THE COURT:  Yeah, overruled.

12             THE WITNESS:  I don't know.

13   BY MR. FARRELL:

14   **Q.**   I'm going to give you a specific example.

15        Will you bring up the Mountain Health Network.

16        So it was referenced earlier and you've said as an

17   element there are two big hospitals in Huntington/Cabell

18   County.  And, so, it's not surprising that perhaps those

19   numbers are elevated.  Do you understand what that position

20   would be?

21   **A.**   Did I -- I said that?

22   **Q.**   I'm asking you this.

23   **A.**   Oh, I thought you said I said there were two large --

24   **Q.**   You testified that it is an element as to whether or

25   not a particular location is a hub or a tertiary care

1    facility that justifies elevated numbers.  Okay?  You said

2    that's a factor.

3    **A.**    That's just one of the elements they look at, yes.

4    **Q.**    So this is -- from the healthcare hospital in

5    Huntington, Cabell County that services other counties,

6    would your CSRA have considered, in addition to the volume

7    of pills coming into Cabell County, would you expect your

8    CSR investigators to look at what other counties are

9    referring patients to Cabell County, including in Kentucky

10    Boyd County, Carter County, Greenup County, Johnson County,

11    Lawrence County, Martin County; in Ohio, Gallia County,

12    Lawrence County, Meigs County, Scioto County, the Dreamland,

13    Portsmouth; and in West Virginia Boone County, Fayette

14    County, Jackson County, Kanawha County, Lincoln County,

15    Logan County, Mason County, Mingo County, Putnam County,

16    Raleigh County, Wayne County, and Wyoming County?

17              MR. NICHOLAS:  I'll object to -- I guess I'd like

18    to see the -- I think this is based on a document.  Mr.

19    Farrell is holding a document in his hand.  I don't know if

20    that's the document that we're talking about.  This is

21    simply a display that he's reading from and I guess he's put

22    together.  And I think there's a lack of foundation or

23    backup for it.

24              THE COURT:  Well, I don't understand where you're

25    going with this, Mr. Farrell.

```
1              MR. FARRELL:  Well, so, the, the witness has

2    testified that he would consider the fact that there are two

3    big hospitals in Huntington as justification for there being

4    a higher volume of pills because --

5              THE COURT:  So you're saying patients would come

6    from other places and that would impact the numbers.

7    Correct?

8              MR. FARRELL:  So that's what I'm saying, Judge.

9              THE COURT:  I got the point, didn't I?

10             MR. FARRELL:  Yes, sir.

11             THE COURT:  I'm going to overrule the objection.

12        Can you answer the question?

13             THE WITNESS:  I don't know.

14             THE COURT:  Okay.

15   BY MR. FARRELL:

16   Q.   All right.  I think we can put away the Distributor

17   Initiative.

18             MR. FARRELL:  Oh, can I renew my admission to

19   admit P-9112a that removes the front page?

20             THE COURT:  Well, is there any objection to it?

21             MR. HESTER:  Your Honor, we would object to its

22   introduction for the truth.

23             THE COURT:  Well, that's right, isn't it,

24   Mr. Farrell?

25             MR. FARRELL:  Well, it may, it may be right, but
```

it doesn't matter because it's more of the notice, of the DEA putting AmerisourceBergen of notice of the contents therein.

THE COURT: How about that, Mr. Hester?

MR. HESTER: We don't object to its introduction on the basis that it was stated, but it just can't be introduced for the truth in our view. That would be our objection, Your Honor.

MR. NICHOLAS: I don't object to the admission of the document, but I would ask actually that the entire document be put in including the cover page.

THE COURT: Including the title?

Do you want the cover in, Mr. Farrell?

MR. FARRELL: I, I feel like I'm on a merry-go-round, Judge. I'm the one that tried to put it in and they objected.

THE COURT: Well, the situation has changed now. They're wanting it in.

MR. FARRELL: I need to be adaptable. So, yes, I want it in, Judge.

THE COURT: We haven't heard from Cardinal.

MS. SALGADO: Your Honor, we also object to its introduction for the truth.

THE COURT: All right. I'm going to admit it for the limited purpose that it bears upon notice. And I'm not

1    going to admit it for the truth of the matter asserted

2    because it's obviously loaded with hearsay.

3              MR. FARRELL:  Thank you, Your Honor.

4    BY MR. FARRELL:

5    Q.   All right.  The next document is P-32.  And I'm

6    going to have to make an explanation of this.

7              MR. FARRELL:  P-32 is a composite exhibit.  And,

8    Judge, may I approach?

9              THE COURT:  Pardon me?

10             MR. FARRELL:  May I approach?

11             THE COURT:  Yes, you may.

12             MR. FARRELL:  This is the series of letters from

13   the DEA to AmerisourceBergen.  And it's all of the letters,

14   but we're going to, we're going to take them in

15   chronological order.

16   BY MR. FARRELL:

17   Q.   So I'd have you flip to Page 9 at the bottom, --

18   A.   Okay.

19   Q.   -- the document dated September 27th, 2006.

20        Mr. Zimmerman, let me know when you're ready.

21   A.   Is this the first document?

22   Q.   Yes, the September 27th, 2006, letter.

23   A.   Okay.

24   Q.   Have you seen this document before?

25   A.   I have.

Q.   What is it?

A.   It's a -- I think it's somekind of guidance letter that the DEA mailed to registrants.

Q.   Have you, have you read it before?

A.   I have.

Q.   And do you recognize it as a communication from the United States Drug Enforcement Agency to AmerisourceBergen related to the duties to maintain effective control and for the purposes of monitoring suspicious orders?

A.   Yeah.  It doesn't say -- I mean, it's not addressed to anybody, but I think they mass mailed it to the distribution, the registrants.

Q.   Okay.  You've testified about this letter, have you not?

A.   I'm sure they asked me questions about that in my deposition, yes.

Q.   And you acknowledge on behalf of AmerisourceBergen that you received this letter from the DEA?

A.   Yes.

Q.   We have referred to it as the Rannazzisi Letter Number 1.  Have you heard that phrase used before?

A.   I have not.

Q.   I'm going to call it Rannazzisi Letter Number 1 because it's signed by Joe Rannazzisi.  Do you know who Joe Rannazzisi is?

1    **A.**    I think he was the assistant administrator at the time.

2    **Q.**    Have you met Joe Rannazzisi?

3    **A.**    I have.

4    **Q.**    How many times?

5    **A.**    A couple.

6    **Q.**    Have you talked to him about suspicious order

7    monitoring and diversion?

8    **A.**    In a group.

9    **Q.**    Are you aware that this letter was intended to be sent

10   to AmerisourceBergen to place it on notice of the positions

11   taken by the DEA?

12   **A.**    I don't know -- I don't know the actual intent.  It was

13   distributed to all the distribution centers.

14   **Q.**    And you read it?

15   **A.**    We've read it, yes.  I've read it.

16   **Q.**    Did you circulate this to your group?

17   **A.**    I think it was sent to the -- it wasn't sent to me

18   because it was sent to the registrant.  So it would have

19   went to the distribution center, then probably made its way

20   up to my group.

21   **Q.**    And when you say to your group, did you forward this to

22   the other members of your department?

23   **A.**    I probably did or they forwarded it to me.

24   **Q.**    So let's start with the date.  What's the date of the

25   letter?

1    **A.**    September 27th, 2006.

2    **Q.**    Do you see down in the bottom right-hand corner the

3    Bates stamp with the letters ABDC-MDL?

4    **A.**    Yes.

5    **Q.**    Okay.  You don't have to name the zeros, but can you

6    read the numbers?

7    **A.**    MDL-00378501.

8    **Q.**    And do you recognize this as a Bates stamp from

9    AmerisourceBergen's files?

10   **A.**    Yes.

11   **Q.**    All right.  I'm also going to have you reference the P

12   numbers, P-32 underscore 9.  Do you see that?

13   **A.**    Yes.

14   **Q.**    So there are other letters that are in this block that

15   we'll be talking about.  But for right now, we're just going

16   to be talking about Pages 9 and 10.

17          So what I'd like you to do is let's start with the very

18   first paragraph.  Will you read the first sentence?

19   **A.**    "This letter is being sent to every commercial entity

20   in the United States registered with the Drug Enforcement

21   Administration to distribute controlled substances."

22   **Q.**    And what did the DEA tell you was the purpose of this

23   letter?

24   **A.**    To reiterate the responsibilities of controlled

25   substance distributors in view of the prescription drug

```
 1    abuse problem our nation currently faces.

 2    Q.   All right.  So let's go to the very first paragraph

 3    now.  Do you see where it says "Background"?

 4    A.   Yes.

 5    Q.   Will you read the first sentence.

 6    A.   "As each of you is undoubtedly aware, the abuse of

 7    non-medical use of controlled prescription drugs is a

 8    serious and growing health problem in this country."

 9    Q.   Do you agree that as of 2006, from your perspective at

10    AmerisourceBergen, that the abuse, non-medical use of

11    controlled prescription drugs was a serious and growing

12    health problem in the United States?

13    A.   Yes.

14    Q.   Do you see where it has a footnote?

15    A.   Yes.

16    Q.   All right.  At the very bottom, can we blow up the

17    footnote?

18         When you got this letter, did you go look up what that

19    footnote says?

20    A.   I don't recall.

21    Q.   All right.  Let's go to the next paragraph.

22    A.   Want me to read it?

23    Q.   Starting with, "The CSA was designed," and read the

24    next sentence, please.

25    A.   "The CSA was designed by Congress to combat diversion
```

1    by providing for a closed system of drug distribution in

2    which all legitimate handlers of controlled substances must

3    obtain a DEA registration and, as a condition of maintaining

4    such registration, must take reasonable steps to ensure that

5    their registration is being utilized as a source of

6    diversion."

7    **Q.**   Do you agree with that statement?

8              MR. NICHOLAS:  Your Honor, it was misread.

9              MR. HESTER:  I object.  The witness missed a

10   "not."

11             THE WITNESS:  It says "not utilized."  Sorry.  You

12   shouldn't have me read.

13   BY MR. FARRELL:

14   **Q.**   That's okay.  The next sentence is really the one

15   that is the most key that I'm interested in.  Will you

16   read it, please?

17   **A.**   "Distributors are, of course, one of the key components

18   of the distribution chain."

19   **Q.**   Do you agree with that?

20   **A.**   We are a key component of the distribution chain.

21   **Q.**   What's the next one?

22   **A.**   "If the closed system is to function properly as

23   Congress envisioned, distributors must be vigilant in

24   deciding whether a prospective customer can be trusted to

25   deliver controlled substances only for lawful purposes."

1    **Q.**   Do you agree with that?

2    **A.**   I think we have a responsibility to make sure they have

3    their license.  I, I differ in your inference that just

4    because we give you a DEA registration you should, you

5    shouldn't sell them drugs.  I don't agree with that portion.

6    I think DEA has a responsibility for issuing registrations

7    and it's their responsibility for the pharmacies to maintain

8    them, and they have the authority to revoke them.  We don't

9    have any of that authority, nor should we.

10   **Q.**   It's not your job?

11   **A.**   It's not our job to police the pharmacies?  It's not

12   our job to police the pharmacies, that's correct.

13   **Q.**   The next sentence?

14   **A.**   "This responsibility is critical as Congress has

15   expressly declared that the illegal distribution of

16   controlled substances has a substantial and detrimental

17   effect on the health and general welfare of the American

18   people."

19   **Q.**   Do you agree with that?

20   **A.**   Yeah, illegal distribution, yes.

21   **Q.**   So let's go to Page 2.

22        We're not going to go through -- oh, there it is, Page

23   2.

24        I'm going to -- I'm not going to have you read the

25   entire document.  I'm going to ask for its admission to the

1  Court eventually.

2        What I am going to want you to do is I want you to go

3  to the word "nonetheless" in the second full paragraph.  Do

4  you see that?

5  **A.**   Yes, second paragraph.

6        "Nonetheless, given the extent of the prescription drug

7  abuse in the United States, along with the dangerous and

8  potentially lethal consequences of such abuse, even just one

9  distributor that uses its DEA registration to facilitate

10  diversion can cause enormous harm."

11  **Q.**   Do you agree with that?

12  **A.**   After "illegally distributed product," yes.

13  **Q.**   If the distributor is illegally distributing a product?

14  **A.**   Yeah.

15  **Q.**   And, so -- okay.  Let's go to, let's go to the

16  paragraph starting "thus."  Keep going, please.  Do you see

17  this paragraph here?  I think it's the third from the

18  bottom.  Would you please read that paragraph?

19  **A.**   "Thus, in addition to reporting all suspicious orders,

20  a distributor has a statutory responsibility to exercise due

21  diligence to avoid filling suspicious orders that might be

22  diverted into other than legitimate medical, scientific and

23  industrial channels.  Failure to exercise such due diligence

24  could, as circumstances warrant, provide a statutory basis

25  for revocation or suspension of a distributor's

1    registration."

2    **Q.**   Now, this appears to conflict with your view of the

3    statutory requirements.  Would you agree with that?

4    **A.**   Yes.  I don't agree with it.

5    **Q.**   You do not agree with it?

6    **A.**   Huh-uh.

7    **Q.**   But you concede, though, that in 2006 the DEA is

8    putting you on notice that that was their interpretation.

9    **A.**   So I worked with the DEA from '96 to '98 to devise a

10   suspicious order reporting program.  I worked with them for

11   two years.  And we worked with the different offices and we

12   created a suspicious order report that shipped orders after

13   they were identified.

14        It was signed off on by the program managers of the

15   DEA.  It was signed off by the chief of the diversion unit

16   at DEA.  And that was the program that we had in place at

17   this time.

18        Now, I can take my two years of work and a letter from

19   the chief of the diversion unit or a letter that's not even

20   addressed to us.  It just says "registrant."  I'm going to

21   go with my two years of work.  And never once did they

22   mention what they felt their interpretation was because

23   their interpretation was you do ship the order.  And all I

24   could -- so I'm going to go with my two years and approved

25   letter versus an unregistered letter.

1   **Q.**   Did you follow up on this letter?  Did you call Mr.

2   Rannazzisi?

3   **A.**   I don't think so.

4   **Q.**   Did you send them a letter?

5   **A.**   I know I didn't.  Excuse me?

6   **Q.**   Did you send them a letter?  Did you write to them?

7   **A.**   No.

8   **Q.**   Let's go to the next paragraph starting with, "Given

9   the requirement under Section 823(e) that a distributor

10  maintain effective controls against diversion," will you

11  finish the sentence, please?

12  **A.**   "Given the requirement under Section 823(e) that a

13  distributor maintain effective controls against diversion, a

14  distributor may not simply rely on the fact that the person

15  placing the suspicious order is a DEA registrant and turn a

16  blind eye to the suspicious circumstances."

17  **Q.**   Do you agree with that?

18  **A.**   Yeah.  I don't think you should -- you can't ignore

19  what's going on.

20  **Q.**   Mr. Zimmerman, this is, this is saying something a

21  little different.  So the court reporter has it, this

22  sentence from the DEA is literally saying that you may not

23  rely upon the fact that the person you're selling these

24  drugs to has a DEA registration and turn a blind eye to

25  suspicious circumstances or you may lose your license.

1          That's what the DEA is telling you at ABC; correct?

2               MR. NICHOLAS:  I'll object.  He's testifying.

3     He's interpreting.

4               THE COURT:  Yeah, I agree.  You're, you're --

5     that's not the witness, Mr. Farrell.

6               MR. FARRELL:  That's a very poor question.

7     BY MR. FARRELL:

8     Q.   You would agree with me, then, that -- did the DEA

9     provide notice to AmerisourceBergen that selling to a

10    registrant, a duly licensed registrant is insufficient

11    to comply with federal regulations?

12    A.   Say that one more time, sir.

13    Q.   Did the DEA provide notice to you, Chris Zimmerman, as

14    the head of CSRA at AmerisourceBergen that you had to do

15    more than just check to see if the pharmacy had a valid DEA

16    registration?

17    A.   I mean, in this letter -- he, he mentions it in the

18    letter.  But there's no change in regulation, no change --

19    again, they're trying to regulate by letter and there's a

20    process.  If you want to change the regulations or your

21    requirements, then there's a process to do that, and it's

22    usually not from an unregistered letter that's not even a

23    mention at the top.  I mean, so --

24    Q.   Sir, you were on notice that the DEA was requiring ABC

25    to prevent diversion.

1    **A.**    We prevent diversion and we don't just rely on the

2    license, correct.  We would have a whole host of other

3    things that we looked at to make sure that all the other

4    regulatory requirements to prevent diversion are in place,

5    including reporting suspicious orders.

6    **Q.**    So we're going to put a pin on this and come back to

7    the other letters.  But you are aware, are you not, that

8    soon after this in April of 2007 the DEA suspended your, one

9    of your distribution centers for failing to maintain

10   effective control?

11   **A.**    Correct.

12   **Q.**    For the very things that were in the Rannazzisi Letter

13   1, AmerisourceBergen got one of its distribution center's

14   license temporarily suspended?

15   **A.**    Correct.

16   **Q.**    And in the allegations in the Immediate Suspension

17   Order was that --

18         Well, first, can we have the copies, please?

19         Judge, may I approach?

20             THE COURT:  Yes.

21   BY MR. FARRELL:

22   **Q.**    This is P-49.  Mr. Zimmerman, do you recognize this

23   document?

24   **A.**    I do.

25   **Q.**    What is it?

1    **A.**    It's an order to show cause and immediate suspension of

2    registration dated April 19th.

3    **Q.**    And is this -- was this served on AmerisourceBergen?

4    **A.**    It was served on April 24th, five days after.

5    **Q.**    But you know what it is?  You've seen it, you've read

6    it?

7    **A.**    Yes.

8    **Q.**    You were involved in the process following the service

9    of the Immediate Suspension Order?

10   **A.**    Yes.

11   **Q.**    And you negotiated a resolution of it?

12   **A.**    I worked on that, yes.

13          MR. FARRELL:  Judge, I'd move P-49 into the

14   record.

15          MR. NICHOLAS:  We have no objection, Your Honor.

16          THE COURT:  Is there any objection?

17          MR. HESTER:  No objection.

18          MR. NICHOLAS:  No objection, Your Honor.

19          THE COURT:  It's admitted.

20   BY MR. FARRELL:

21   **Q.**    So if you look at Paragraph 1 on the front page,

22   the allegation is that AmerisourceBergen sold to a

23   single pharmacy over a period of 13 months 3.8 million

24   dosage units of hydrocodone.  You're aware of that

25   allegation?

1    **A.**    Yes.

2    **Q.**    Was that true?

3    **A.**    I believe so.

4    **Q.**    And look at Paragraph 3.  The allegation was that from

5    January '06 to January '07 to a different pharmacy, that

6    AmerisourceBergen sold over a million hydrocodone dosage

7    units.  Was that allegation true?

8    **A.**    Yes, which, which was identified by us, reported to the

9    DEA, and closed by us --

10   **Q.**    So --

11   **A.**    -- prior to this order.

12   **Q.**    Then go to Page 3, the top of Page 3.  The Immediate

13   Suspension Order says that there was a meeting on

14   August 10th, 2015, where AmerisourceBergen was warned that

15   they had sold over 5.2 million dosage units to pharmacies

16   that bore characteristics that describe -- that were

17   described during that meeting.

18   **A.**    Uh-huh.

19   **Q.**    Do you understand that's the allegation?

20   **A.**    That's the allegation.

21   **Q.**    And you understand that this is now following that

22   distributor initiative meeting, following Rannazzisi Letter

23   1, AmerisourceBergen was still doing the same thing under

24   their same policies?

25   **A.**    Under the approved program by the DEA, correct.  We

1    were following our approved DEA program, correct.

2    **Q.**   And that's why you got an Immediate Suspension Order?

3    **A.**   I don't know why we -- I don't know that for sure.

4    **Q.**   Well, it says right here that in the allegations of the

5    Immediate Suspension Order that they met with you, they

6    warned you, and you continued to sell after the meeting in

7    volumes that were excessive, and that's why you were getting

8    suspended.  Agreed?

9    **A.**   We closed three or four on here well before -- we

10   conducted over 100 investigations after that '05 meeting to

11   go over the things that were identified in the presentation.

12   We closed some of those accounts and then we created

13   additional forums to protect the company.

14        So we took action from 2005 to 2007.  And then prior to

15   2006 working with the local DEA office in Orlando, we shut

16   down other pharmacies that were diverting product.

17        So this was a surprise to me when we received it

18   because we were doing the things that they went over in the

19   meeting.  We were working with the local DEA office.  We had

20   shut down the majority of the pharmacies noted in here.  And

21   it took them five days to serve an immediate order.

22   **Q.**   Okay.  Subsequent to that, you personally negotiated a

23   settlement agreement with the DEA; correct?

24   **A.**   Correct.

25             MR. FARRELL:  Judge, may I approach?

```
 1              THE COURT:  Yes.
 2   BY MR. FARRELL:
 3   Q.   I'm going to hand you what's P-9.  I'll give you a
 4   second to read it.  Is this the Settlement Agreement and
 5   Release that you entered into on behalf of
 6   AmerisourceBergen following the Immediate Suspension
 7   Order?
 8        (Pause)
 9        Mr. Zimmerman, please tell me when you're ready.
10   A.   Yep.
11   Q.   This is a settlement agreement dated June 22, 2007.
12   Have you seen this document before?
13   A.   I have.
14   Q.   Can you verify and validate that this is the settlement
15   agreement entered into between the DEA and AmerisourceBergen
16   following the Immediate Suspension Order we just discussed?
17   A.   Yes.
18              MR. FARRELL:  Judge, I'd ask for the admission of
19   P-9.
20              THE COURT:  Any objection?
21              MR. NICHOLAS:  No objection.
22   BY MR. FARRELL:
23   Q.   As you go to Page 2 --
24              THE COURT:  Wait a minute.
25              MR. HESTER:  No objection, Your Honor.
```

```
1            MS. MAINIGI:  No objection.

2            THE COURT:  There being no objection, it's

3    admitted.

4    BY MR. FARRELL:

5    Q.   Let's go to Page 2.  There's no admission of fault

6    in this, is there, sir?

7    A.   That's what it says, yeah.

8    Q.   But if you look at Paragraph 3, "Covered Conduct," it

9    includes not only the facility -- I wish I had my glasses --

10   in Orlando, but this release also covers all other

11   distribution facilities controlled by AmerisourceBergen with

12   respect to all sales of ARCOS reportable controlled

13   substances.  Correct?

14   A.   Yes.

15   Q.   You negotiated a release on behalf of every

16   distribution center in America; correct?

17   A.    It includes -- the system included all distribution

18   centers, correct.

19   Q.    And, in fact, they list -- on the back page they list

20   an appendix.  And one of those distribution centers included

21   in this release and agreement is the Lockbourne, Ohio, one

22   that shipped to Huntington/Cabell County.  Agreed?

23   A.    I would assume so.

24   Q.    Let's go back to Page 2, "Obligations of

25   AmerisourceBergen."  You negotiated an agreement with the
```

```
 1    DEA and you made a promise down here, Paragraph A,

 2    "AmerisourceBergen agrees to maintain a compliance program

 3    designed to detect and prevent diversion of controlled

 4    substances," and it shall apply to all of your facilities in

 5    America.  Do you agree with that?

 6    A.   Yes.

 7    Q.   And this is the, this is the spawning of the 2007 OMP

 8    program; correct?

 9    A.   Correct.

10    Q.   So following the, this agreement, following the MOU,

11    are you aware of correspondence between your counsel and the

12    DEA regarding effectuating this settlement agreement and the

13    implementation of your new OMP program?

14    A.   There was communication, yes.

15    Q.   I'm sorry?

16    A.   There was -- I'm not sure what you're referencing to.

17              MR. FARRELL:  Judge, may I approach?

18              THE COURT:  Yes.

19    BY MR. FARRELL:

20    Q.   I'm going to hand you what's marked as P-877.

21    A.   Thank you.

22    Q.   When you get a chance, Mr. Zimmerman, tell me when

23    you're ready.

24    A.   Okay.

25    Q.   What is this document, Mr. Zimmerman, if you know?
```

1  **A.**   It's a letter from a Reed Smith attorney to Linden

2  Barber, an attorney at DEA.

3  **Q.**   So have you seen this letter before today?

4  **A.**   I have.

5  **Q.**   In fact, you were courtesy-copied on this letter;

6  correct?

7  **A.**   Yes.

8  **Q.**   This is a communication by AmerisourceBergen through

9  its counsel to the DEA's counsel regarding the

10  implementation of the promises you made in the settlement

11  agreement.  Agreed?

12  **A.**   Yes.

13          MR. FARRELL:  Judge, I'd ask for P-877 to be

14  admitted into the record.

15          THE COURT:  Any objection?

16          MR. NICHOLAS:  No objection.

17          MR. HESTER:  No objection, Your Honor.

18          THE COURT:  All right.  It's admitted.

19  BY MR. FARRELL:

20  **Q.**   Now, when you look at it, the first paragraph, it

21  basically sets up the premise that, hey, we had these

22  discussions.  We're going to talk about the

23  implementation of the agreement.  Correct?

24  **A.**   Yes.

25  **Q.**   And then the second paragraph is the one that says, "To

1    begin, as noted in the telephone voicemail message to me

2    from Larry Cote --" I don't know how you pronounce that.

3    **A.**    Cote.

4    **Q.**    Cote?

5    **A.**    Yeah.

6    **Q.**    So do you know who Larry Cote is?

7    **A.**    Yes.

8    **Q.**    Do you know who Linden Barber is?

9    **A.**    Yes.

10   **Q.**    In 2007 what were they to you?

11   **A.**    Linden Barber was the senior attorney and Larry Cote

12   was the, was also an attorney within DEA.  They were

13   involved in all the negotiations.

14   **Q.**    So they were the -- they were the United States

15   Attorneys that were prosecuting AmerisourceBergen in 2007;

16   correct?

17   **A.**    They were -- I don't think -- they weren't U.S.

18   Attorneys.  They were in the -- let's see.  What does it

19   say?  They were in the Office of Diversion and Regulatory

20   Litigation Section of the DEA.  Maybe -- I'm sorry.  I'm not

21   an attorney, so maybe that's -- I don't think they worked

22   for the U.S. Attorney's Office.  I think they were employed

23   by the DEA which is I guess a subset of the DOJ but --

24   **Q.**    Right.  But later on did your relationship turn from

25   adversarial to collaborative with both Mr. Barber and Mr.

1    Cote?

2    **A.**    Adversarial -- I mean, we worked together to resolve

3    the issue.  But if you mean adversarial because they were on

4    the DEA side and we were on the industry side, and I think

5    they've since left the DEA but, I mean, my relationship with

6    them didn't change.

7    **Q.**    Now they work for your industry, do they not?

8    **A.**    Linden I believe may.  Larry I believe worked for a law

9    firm.  I'm not sure.

10   **Q.**    Okay.  So going to this, it basically says in this

11   second paragraph that the DEA has had frequent direct

12   telephone contact with Chris Zimmerman, Vice President for

13   Corporate Security and Regulatory Affairs, to implement the

14   technical exchange, the technical exchange of electronic

15   information which AmerisourceBergen is to provide to the DEA

16   under the agreement.  Did I read that accurately?

17   **A.**    Yes.

18   **Q.**    Now, during this time of your frequent direct telephone

19   contact with the DEA, did you communicate to them your

20   disagreement with the Rannazzisi letter?

21   **A.**    No.

22   **Q.**    Did you communicate with them your disagreement of

23   their interpretation of the regulatory requirements outlined

24   in the Immediate Suspension Order?

25   **A.**    No.

1    **Q.**   Go to the bottom paragraph.

2            MR. FARRELL:  I'm going to try to get through this

3    document quickly, Judge.

4    BY MR. FARRELL:

5    **Q.**   Let's go to the next page.  You don't need to blow

6    up the next page.  It's right here.  What I'm going to

7    point to is I'm going to point to the top paragraph

8    here.  I'm going to read it for you.

9            "As AmerisourceBergen and DEA have agreed, the local

10   distribution center will review such orders in a timely

11   fashion in order to determine whether or not the order

12   appears to be legitimate, notwithstanding the automated

13   system having flagged the order."

14           Did I read that correctly?

15   **A.**   Yes.

16   **Q.**   It goes on to say such orders that get flagged but then

17   after diligent review get released need not be reported to

18   the DEA; correct?  That's the rest of that paragraph.

19   **A.**   Correct.

20   **Q.**   The DEA is telling you that if you flag it and then

21   eyeball it and clear it, you don't need to report it.  We

22   don't need voluminous reports of everything you flagged.

23   Agreed?

24   **A.**   Correct.

25   **Q.**   Now, next paragraph says, "Any orders which the local

233

1    distribution center cannot confirm as legitimate are to be

2    held and not shipped to the customers pending more in-depth

3    inquiry by ABDC's national CSRA investigatory group."

4         Did I read that accurately?

5    **A.**   Yes.

6    **Q.**   You promised the DEA in 2007 that you would block

7    suspicious orders until they're cleared by due diligence,

8    didn't you?

9    **A.**   That was the program we designed.  If they cleared it

10   at the DC, they could ship it.  And I'm not sure what your

11   question is.

12   **Q.**   We just argued earlier about whether or not you had a

13   duty to block shipments of suspicious orders.  Your position

14   is you do not.  Agreed?

15   **A.**   My position as -- was written as the Code of Federal

16   Regulations is written.  I also wouldn't categorize it as

17   arguing with you.

18   **Q.**   That's fair.

19   **A.**   Okay.

20   **Q.**   I apologize for that reference.  Your position,

21   succinctly stated, is that this block of suspicious orders

22   isn't written in the code; correct?

23   **A.**   Correct.

24   **Q.**   And the DEA believes it's inferred in the law and that

25   it's a duty for you to maintain effective control.  Is that

```
 1   succinctly stated?

 2           MR. HESTER:  Object to the form, Your Honor.  It's

 3   asking for speculation of the DEA's position.

 4           THE COURT:  Sustained.

 5   BY MR. FARRELL:

 6   Q.   The DEA's position is stated in the Prevoznik depo.

 7   We'll leave that alone.  Nonetheless, you promised the

 8   DEA in 2007 you would block suspicious orders?

 9   A.   I agree this is the, this is the -- that was part of

10   the agreement, correct.

11   Q.   That was a promise made by you at AmerisourceBergen

12   that you would start blocking suspicious orders?

13   A.   Correct.

14   Q.   Go to the paragraph, "The remaining orders."

15           THE COURT:  When you get to a stopping place, Mr.

16   Farrell, we'll have to adjourn until tomorrow.

17           MR. FARRELL:  I was just getting a roll going,

18   Judge.  This will be the last document for the day, Judge.

19           THE COURT:  Okay.

20           MR. FARRELL:  There may be one more if I can beg

21   your leniency.

22   BY MR. FARRELL:

23   Q.   This last paragraph here, Mr. Zimmerman, "The

24   remaining orders," flagged orders, "will be investigated

25   under your direction and will not be shipped unless they
```

1    can be confirmed as bona fide."

2         That's the promise made to the DEA as of July 11th,

3    2007.  Agreed?

4    **A.**    That -- this was the letter that they were discussing.

5    Keep in mind that the agreement was signed in June, but we

6    didn't -- they didn't release our license in August.  So

7    from June to August we were going back and forth designing

8    the system, you know, the every day phone calls with Mike

9    Mapes.

10        And then pursuant at the completion of the process,

11   they would inspect our facilities and then release our

12   license.

13        So what's in this letter is communication from Efrem to

14   Linden.  I wouldn't say it's black and white at this point,

15   not until they released the license was the system

16   completed.

17        We were still -- like I said, it was a brand new system

18   that we were putting in place for nationwide.  It was a

19   complete shift in the industry at that time.

20   **Q.**    And this shift you acted on by making a promise to the

21   DEA as set forth in July of 2007?

22   **A.**    We made an agreement, yeah.

23   **Q.**    And, so, what you said was give us our license back.

24   We will do this.

25   **A.**    We will put the system in place.  You will inspect it

1    and approve -- once you approve our system that we put in

2    place in August, then they'll give us our license back.

3    **Q.**   And 24 years later you -- no, that's not right.   14

4    years later you still disagree with the position taken by

5    the DEA?

6    **A.**   It's -- again, I think my interpretation -- I think the

7    interpretation is one of -- one to protect the supply chain,

8    have adequate control for the diversion, but also keeping in

9    mind the patients that needed the product.

10        These are FDA approved drugs.   Everyone is licensed

11   along the supply chain.   They each have their

12   responsibilities.

13        Was the suspicious order meant to block it?   Then why

14   didn't they say you can't ship suspicious orders in the Code

15   of Federal Regulations?   Or was it alert DEA that there

16   could be a suspicious circumstance so we can investigate?

17        I don't -- again, it was written in 1970.   Rannazzisi

18   sent some letters giving his opinion of it.   We worked with

19   DEA for two years, had a different opinion of it.

20        There's other issues that I'm sure are going to come up

21   through this case.   You're going to see other opinions on

22   the suspicious order process.

23        So it's, it's a very vague requirement.   It's, you

24   know, it's not black and white, so there's a lot open to

25   interpretation.

**Q.**   Mr. Zimmerman, 14 years later you still disagree with the DEA?

**A.**   That's the program we have in place.

**Q.**   One last time.  14 years later, you still disagree with the DEA?

**A.**   I disa- -- I agree, or I feel the regulation was written as such to report suspicious orders and not to stop. It doesn't mean you can't stop the orders, but I just don't see that requirement in the Code of Federal Regulations when I read it.

**Q.**   You disagree with the DEA still 14 years later?

          MR. NICHOLAS:  I object.

          THE COURT:  It's been asked and answered about three times, Mr. Farrell.

     I think this is a good place to stop until tomorrow morning.

          MR. FARRELL:  Yes, sir.

          THE COURT:  I'll see everybody at 9:00.

     (Trial recessed at 5:06 p.m.)

```
1        CERTIFICATION:

2                I, Ayme A. Cochran, Official Court

3   Reporter, and I, Lisa A. Cook, Official Court Reporter,

4   certify that the foregoing is a correct transcript from

5   the record of proceedings in the matter of The City of

6   Huntington, et al., Plaintiffs vs. AmerisourceBergen

7   Drug Corporation, et al., Defendants, Civil Action No.

8   3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9   reported on May 12, 2021.

10

11        S\Ayme A. Cochran              s\Lisa A. Cook

12           Reporter                       Reporter

13        _

14

15        May 12, 2021

16           Date

17

18

19

20

21

22

23

24

25
```

**'**

**'05** [1] - 225:10
**'06** [3] - 188:11, 188:17, 224:5
**'07** [3] - 188:13, 188:14, 224:5
**'14** [2] - 188:11, 188:14
**'15** [1] - 34:12
**'19** [1] - 69:5
**'20** [1] - 69:5
**'90s** [2] - 51:10, 51:16
**'96** [1] - 219:9
**'98** [1] - 219:9

## 0

**000003** [1] - 94:2
**0001** [1] - 196:7
**00018** [1] - 196:9
**0002** [1] - 196:7
**0003** [1] - 196:9
**00907** [2] - 2:5, 2:17
**06%** [1] - 41:7
**0s** [1] - 94:3

## 1

**1** [9] - 20:9, 132:24, 164:21, 181:22, 212:21, 212:23, 222:13, 223:21, 224:23
**1%** [5] - 107:7, 112:18, 114:13, 116:1, 116:5
**1.00** [1] - 122:11
**1.6** [1] - 14:25
**10** [4] - 35:17, 172:21, 205:21, 214:16
**10,000** [4] - 23:1, 23:3, 43:7, 46:21
**100** [4] - 23:3, 43:10, 151:11, 225:10
**100,000** [1] - 46:23
**1001** [2] - 2:10, 4:6
**1006** [17] - 80:11, 80:12, 82:16, 82:19, 83:4, 83:5, 83:9, 83:21, 84:4, 84:5, 86:19, 87:16, 88:24, 89:2, 125:5, 126:7, 126:18
**1006s** [1] - 87:6
**1022** [1] - 3:5
**109** [1] - 41:4
**10th** [1] - 224:14
**11** [1] - 48:11
**114** [1] - 41:17
**11th** [1] - 235:2

**12** [6] - 1:19, 7:4, 43:9, 172:21, 238:9, 238:15
**126** [1] - 3:5
**13** [15] - 12:17, 13:20, 14:5, 15:16, 16:3, 18:11, 18:17, 18:21, 20:25, 35:10, 36:10, 53:7, 202:23, 223:23
**1300** [1] - 6:15
**130174** [1] - 67:14
**1311** [2] - 2:4, 2:16
**14** [8] - 42:25, 43:8, 43:13, 73:21, 236:3, 237:1, 237:4, 237:11
**1428** [1] - 21:9
**15** [4] - 23:6, 31:7, 172:18, 172:21
**15,000** [1] - 114:10
**15,200** [5] - 93:12, 94:1, 116:24, 117:3, 117:7
**150** [2] - 151:20, 197:5
**156** [1] - 40:10
**15910** [1] - 3:18
**16** [16] - 8:23, 13:5, 13:19, 14:24, 15:8, 16:3, 17:22, 18:6, 18:11, 18:17, 18:22, 22:16, 22:21, 96:4, 96:5
**1600** [1] - 3:17
**162** [1] - 40:24, 41:3
**17** [8] - 9:7, 13:7, 24:25, 25:7, 102:17, 102:22, 103:13, 103:14
**17,365,587** [1] - 26:16
**17.08** [1] - 103:2
**170-mile** [1] - 54:16
**1717** [2] - 6:6, 6:13
**18** [5] - 10:5, 31:7, 103:20, 103:25, 105:6
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1943** [3] - 198:17, 198:21, 199:7
**1950s** [1] - 30:21
**1970** [1] - 236:17
**1990** [2] - 128:11, 188:22
**1993** [2] - 46:1, 46:8
**1996** [3] - 33:18, 33:22, 193:4
**1997** [10] - 46:19, 46:20, 47:3, 47:7, 47:16, 48:2, 48:17, 49:10, 50:6, 51:4
**1998** [2] - 50:7, 170:4

**19th** [1] - 223:2
**1:30** [1] - 97:18

## 2

**2** [10] - 72:13, 101:11, 157:19, 166:24, 197:1, 217:21, 217:23, 226:23, 227:5, 227:24
**2%** [2] - 119:18, 119:21
**2,102** [1] - 15:10
**2.2** [2] - 72:21, 73:8
**2.6** [2] - 73:6, 73:9
**2.8** [1] - 14:22
**20** [6] - 10:9, 69:4, 71:18, 78:17, 148:24, 148:25
**20-some** [1] - 93:10
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2001** [2] - 128:15, 128:17, 128:20, 128:23, 129:11, 193:25, 194:6
**2002** [1] - 33:24
**2004** [1] - 34:2
**2005** [9] - 194:12, 194:18, 197:17, 197:25, 198:11, 198:22, 199:6, 200:14, 225:14
**2006** [18] - 12:20, 24:16, 24:24, 26:5, 32:23, 33:11, 36:21, 72:20, 72:24, 76:7, 188:4, 188:19, 211:19, 211:22, 214:1, 215:9, 219:7, 225:15
**2007** [25] - 73:5, 73:6, 92:4, 132:16, 132:25, 133:3, 134:12, 134:14, 147:4, 176:15, 192:10, 192:12, 204:9, 204:14, 206:10, 222:8, 225:14, 226:11, 228:7, 230:10, 230:15, 233:6, 234:8, 235:3, 235:21
**2008** [3] - 38:20, 39:1, 123:20
**2009** [1] - 30:2
**2010** [15] - 29:2, 30:2, 31:12, 31:16, 31:23,

32:3, 32:7, 46:19, 46:23, 47:2, 47:17, 48:3, 48:18, 49:11, 149:10
**2011** [7] - 7:25, 8:13, 9:3, 116:24, 134:17, 134:23, 138:16
**2013** [2] - 46:1, 46:6
**2014** [22] - 12:20, 24:16, 24:24, 26:5, 27:19, 27:24, 28:12, 32:23, 33:11, 34:12, 34:13, 34:17, 34:25, 36:14, 37:2, 37:12, 37:21, 38:6, 76:7, 188:4, 188:19, 192:12
**2015** [5] - 34:13, 34:16, 143:22, 192:15, 224:14
**2018** [4] - 25:18, 163:24, 167:2, 194:22
**2019** [2] - 46:17, 47:7
**202** [2] - 2:4, 2:16
**2021** [4] - 1:19, 7:4, 238:9, 238:15
**21** [2] - 10:14, 54:24
**213** [2] - 132:6, 132:23
**22** [1] - 226:11
**2216** [1] - 3:7
**24** [2] - 10:19, 236:3
**24013** [2] - 68:11, 68:16
**24th** [1] - 223:4
**25** [4] - 5:5, 24:8, 78:4, 78:17
**25,002** [1] - 16:18
**25-30** [1] - 149:5
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**255** [1] - 50:14
**257** [1] - 50:14
**25701** [1] - 3:10
**27** [2] - 149:9, 149:10
**27,000** [2] - 17:1, 86:14
**27,876** [1] - 16:19
**27th** [3] - 211:19, 211:22, 214:1
**28** [3] - 3:15, 4:3, 4:9
**2804** [1] - 164:6
**285,891** [3] - 40:25, 123:8, 123:11
**29** [5] - 29:22, 32:11, 204:22, 205:12, 207:3
**29464** [3] - 3:15, 4:4,

4:9
**2nd** [1] - 96:7

## 3

**3** [6] - 71:19, 224:4, 224:12, 227:8
**3.8** [1] - 223:23
**30** [2] - 148:14, 169:2
**30(b)(6** [7] - 164:2, 164:6, 164:9, 164:14, 170:21, 182:20, 188:4
**30,000-foot** [1] - 121:4
**30,000-foot-view** [1] - 104:10
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**32,000** [2] - 17:1, 17:2
**32502** [1] - 2:14
**342,000** [1] - 72:24
**350** [1] - 21:14
**36** [1] - 129:19
**37** [1] - 103:1
**3843** [1] - 5:14
**3:00** [1] - 171:24
**3:17-cv-01362** [2] - 1:5, 238:8
**3:17-cv-01665** [2] - 1:11, 238:8
**3:30** [1] - 171:25

## 4

**4** [5] - 47:10, 101:25, 102:9, 197:2, 197:8
**4.8** [1] - 73:12
**40** [2] - 46:7, 71:15
**40,000** [2] - 92:10, 92:14
**401** [2] - 2:10, 4:6
**405** [1] - 2:7
**42** [1] - 93:19
**43,728** [1] - 96:6
**43225** [1] - 20:8
**44711** [6] - 32:11, 47:10, 47:21, 51:15, 102:17, 103:15
**44711_28** [2] - 150:8, 150:11
**44758** [1] - 76:14
**44759** [1] - 70:18
**44759-A** [1] - 70:16
**45** [3] - 77:6, 147:5, 147:6
**45%** [1] - 61:19

## 5

**5** [1] - 172:18

**5.2** [1] - 224:15
**50** [3] - 18:3, 43:10, 71:15
**50,000** [5] - 22:5, 22:19, 22:20, 22:21, 96:7
**50-page** [1] - 86:2
**500** [1] - 86:13
**55** [1] - 149:2
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**57,000** [3] - 93:19, 114:11, 115:20
**57.09** [1] - 104:18
**583,000** [1] - 26:13
**5:06** [1] - 237:19

## 6

**6** [2] - 51:15, 102:8
**600** [1] - 2:13
**61** [1] - 41:18
**63** [1] - 102:25
**642** [2] - 8:8, 11:2
**6th** [1] - 3:5

## 7

**7** [4] - 21:6, 21:10, 53:2, 199:18
**70130** [1] - 3:8
**707** [1] - 4:18
**71128** [1] - 61:3
**716** [1] - 3:12
**725** [2] - 4:13, 4:15

## 8

**8** [2] - 1:16, 47:21
**80** [1] - 15:7
**801** [3] - 3:10, 157:5, 157:8
**81** [1] - 106:2
**81,229,625** [1] - 105:23
**812(b)(2)(a** [1] - 155:15
**823(e** [2] - 220:9, 220:12
**84** [1] - 27:2
**850** [1] - 5:12

## 9

**9** [5] - 73:17, 199:18, 211:17, 214:12, 214:16
**9-H** [1] - 27:1
**9-I** [1] - 24:7

**90%** [1] - 159:11
**901** [1] - 4:18
**90s** [1] - 170:9
**91436** [1] - 3:18
**95** [1] - 151:11
**98** [1] - 151:11
**98%** [1] - 151:7
**980,649,200** [1] - 106:5
**99-something** [1] - 122:19
**99.55%** [1] - 61:13
**99.9%** [1] - 94:6
**999** [1] - 122:23
**9:00** [2] - 7:4, 237:18
**9:46** [1] - 35:20
**9th** [1] - 2:10

## A

**A-Plus** [10] - 26:9, 26:11, 26:15, 26:17, 26:21, 27:3, 27:6, 27:10, 27:17, 27:22
**a.m** [2] - 7:4, 35:20
**ABC** [6] - 84:20, 85:2, 162:23, 164:7, 221:1, 221:24
**ABDC** [7] - 20:9, 20:11, 33:24, 42:17, 57:12, 90:22, 214:3
**ABDC's** [1] - 233:3
**ABDC-MDL** [1] - 214:3
**ability** [4] - 9:12, 9:13, 88:15, 201:21
**able** [16] - 7:20, 9:10, 11:20, 83:2, 89:6, 91:16, 92:15, 98:14, 121:15, 121:16, 122:12, 131:10, 169:6, 169:23, 169:25, 182:21
**absence** [2] - 39:1, 102:10
**absolutely** [3] - 86:5, 89:9, 146:2
**abuse** [14] - 155:1, 155:5, 155:7, 155:16, 173:23, 193:5, 193:21, 194:1, 194:9, 215:1, 215:6, 215:10, 218:7, 218:8
**Abuse** [1] - 156:4
**abused** [1] - 193:17
**accelerated** [1] - 87:18
**accepted** [2] - 155:20, 155:21
**access** [6] - 25:21,

25:24, 50:12, 75:11, 75:25, 169:12
**accessed** [1] - 49:24
**accommodate** [1] - 35:13
**accompanying** [1] - 126:13
**According** [4] - 26:10, 27:6, 27:10, 30:3
**according** [14] - 24:23, 26:15, 27:17, 27:22, 38:5, 40:1, 46:20, 51:18, 54:16, 63:24, 64:24, 119:1, 155:10, 184:1
**account** [8] - 61:18, 112:17, 114:12, 116:1, 177:25, 206:4, 206:5, 206:8
**accounted** [1] - 119:18
**accounts** [1] - 225:12
**accuracy** [2] - 40:17, 95:15
**accurate** [8] - 81:22, 108:8, 128:15, 128:16, 132:24, 133:7, 138:18, 159:24
**accurately** [5] - 39:2, 93:22, 156:2, 231:16, 233:4
**ACKERMAN** [1] - 2:9
**acknowledge** [12] - 129:19, 172:24, 173:2, 173:5, 173:16, 173:19, 173:22, 173:25, 175:2, 177:17, 199:24, 212:17
**acronyms** [1] - 100:5
**Act** [18] - 67:14, 154:18, 154:25, 155:3, 155:10, 155:13, 155:25, 156:16, 156:23, 158:8, 169:8, 169:14, 170:5, 181:23, 182:11, 183:9, 184:11, 184:14
**acted** [1] - 235:20
**Action** [4] - 1:4, 1:10, 238:7, 238:8
**action** [7] - 106:25, 161:19, 161:22, 180:4, 180:12, 201:11, 225:14
**active** [1] - 100:18
**actors** [1] - 181:10

**actual** [7] - 9:13, 32:16, 92:14, 92:25, 93:23, 190:14, 213:12
**adaptable** [1] - 210:19
**add** [2] - 187:24, 192:7
**added** [1] - 148:16
**addendum** [1] - 21:21
**addicted** [1] - 174:16
**adding** [1] - 192:8
**addition** [8] - 89:12, 100:3, 129:13, 160:10, 177:7, 181:4, 208:6, 218:19
**additional** [10] - 37:14, 38:13, 69:16, 94:15, 106:11, 106:14, 106:17, 123:2, 129:16, 225:13
**address** [6] - 80:10, 80:17, 83:10, 83:17, 88:6, 88:17
**addressed** [2] - 212:10, 219:20
**adequacy** [1] - 66:13
**adequate** [8] - 146:18, 146:25, 148:1, 152:17, 152:24, 153:8, 202:16, 236:8
**Adequate** [1] - 146:19
**adjourn** [1] - 234:16
**adjustments** [2] - 123:14, 125:15
**Administration** [1] - 214:21
**administratively** [1] - 145:1
**administrator** [1] - 213:1
**admissibility** [2] - 124:11, 125:12
**admissible** [10] - 11:15, 94:22, 95:9, 124:10, 124:22, 125:5, 125:6, 125:9, 126:12, 196:19
**admission** [6] - 196:8, 209:18, 210:9, 217:25, 226:18, 227:5
**admit** [8] - 81:25, 82:1, 91:23, 95:4, 126:6, 209:19, 210:24, 211:1
**admitted** [13] - 83:19, 84:1, 85:3, 92:24, 95:1, 95:6, 125:6, 196:11, 196:15, 223:19, 227:3,

229:14, 229:18
**advance** [1] - 169:10
**adversarial** [2] - 230:25, 231:3
**Adversarial** [1] - 231:2
**adverse** [3] - 174:13, 174:18, 182:4
**advice** [1] - 97:15
**advising** [3] - 197:17, 198:1, 198:10
**Affairs** [10] - 91:15, 128:9, 128:15, 128:25, 129:6, 129:9, 130:4, 148:10, 194:4, 231:13
**affect** [3] - 119:8, 119:23, 201:9
**affected** [3] - 111:4, 111:7, 111:16
**affects** [2] - 200:25
**afternoon** [5] - 90:22, 106:10, 128:2, 128:4, 153:12
**age** [1] - 204:11
**Agency** [3] - 177:12, 182:24, 212:7
**agency** [2] - 181:7
**agent** [2] - 8:13, 144:20
**agents** [1] - 171:16
**aggregate** [3] - 46:15, 47:2, 119:9
**aggressive** [1] - 104:22
**ago** [22] - 22:15, 61:6, 82:23, 148:14, 166:1, 169:2, 190:19, 194:22
**agree** [47] - 17:4, 17:9, 43:14, 47:1, 49:6, 51:16, 88:8, 90:17, 114:18, 117:12, 119:11, 119:15, 125:19, 151:23, 152:8, 155:2, 155:17, 155:22, 156:6, 157:17, 158:5, 158:7, 172:17, 180:21, 182:14, 184:6, 185:1, 186:9, 202:11, 202:22, 203:15, 215:9, 216:7, 216:19, 217:1, 217:5, 217:19, 218:11, 219:3, 219:4, 219:5, 220:17, 221:4, 221:8, 228:5, 234:9,

237:6
**agreed** [16] - 58:12, 79:1, 133:15, 141:15, 153:22, 155:1, 155:5, 158:18, 159:17, 160:15, 165:22, 167:3, 168:22, 169:23, 176:21, 232:9
**Agreed** [12] - 176:18, 176:22, 177:8, 184:11, 184:15, 206:3, 225:8, 227:22, 229:11, 232:23, 233:14, 235:3
**agreement** [21] - 163:16, 165:9, 175:23, 175:25, 176:14, 176:17, 177:13, 190:15, 225:23, 226:11, 226:15, 227:21, 227:25, 228:10, 228:12, 229:11, 229:23, 231:16, 234:10, 235:5, 235:22
**Agreement** [1] - 226:4
**agrees** [3] - 191:4, 191:16, 228:2
**ahead** [14] - 11:9, 67:21, 72:9, 75:16, 85:9, 85:10, 85:16, 95:10, 131:18, 172:5, 182:8, 183:4, 191:2
**Aid** [3] - 12:22, 15:25, 19:13
**aiming** [1] - 97:20
**al** [4] - 1:7, 1:13, 238:6, 238:7
**Alabama** [2] - 108:18, 109:7
**aleck** [1] - 160:6
**alert** [2] - 180:10, 236:15
**allegation** [6] - 223:22, 223:25, 224:4, 224:7, 224:19, 224:20
**allegations** [2] - 222:16, 225:4
**allow** [4] - 72:8, 82:25, 126:9, 160:3
**allowed** [3] - 69:24, 96:17, 200:6
**allows** [1] - 124:1
**almost** [8] - 31:12,

31:16, 31:23, 32:10, 45:25, 71:5, 105:8, 123:15
**alone** [2] - 117:13, 234:7
**aloud** [2] - 157:12, 184:10
**alternatively** [1] - 101:20
**America** [8] - 74:11, 75:10, 158:22, 167:24, 193:6, 193:17, 227:16, 228:5
**American** [3] - 157:16, 158:2, 217:17
**Amerisource** [1] - 150:23
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**AmerisourceBergen** [104] - 6:2, 27:11, 29:2, 31:13, 31:24, 32:22, 33:13, 42:23, 58:4, 67:7, 85:22, 93:13, 115:15, 115:18, 115:19, 115:20, 116:23, 116:25, 117:2, 117:6, 124:20, 128:6, 128:11, 129:1, 129:19, 130:12, 130:22, 131:4, 132:15, 132:25, 133:8, 134:21, 141:10, 144:19, 148:23, 149:8, 150:14, 151:24, 152:9, 155:4, 158:20, 160:18, 161:25, 164:12, 164:17, 164:25, 165:21, 166:12, 168:1, 168:12, 168:17, 168:21, 175:3, 175:11, 175:19, 176:13, 177:1, 177:7, 181:4, 181:22, 182:10, 182:14, 182:22, 186:9, 188:6, 190:9, 192:4, 193:1, 194:5, 195:24, 197:17, 198:1, 198:11, 202:6, 203:21, 203:25, 204:5, 204:11, 205:10, 210:2, 211:13, 212:7, 212:17,

213:10, 215:10, 221:9, 221:14, 222:13, 223:3, 223:22, 224:6, 224:14, 224:23, 226:6, 226:15, 227:11, 227:25, 228:2, 229:8, 230:15, 231:15, 232:9, 234:11, 238:6
**AmerisourceBergen's** [6] - 30:3, 30:10, 162:16, 167:11, 199:7, 214:9
**amount** [11] - 9:19, 30:10, 30:11, 37:3, 45:2, 45:5, 45:11, 66:18, 77:24, 91:17, 177:21
**amounted** [1] - 119:18
**analogous** [1] - 72:23
**analyses** [5] - 10:10, 28:21, 81:14, 81:16, 118:24
**Analysis** [1] - 8:14
**analysis** [38] - 10:6, 23:23, 24:1, 24:12, 24:18, 24:23, 27:16, 27:21, 31:8, 31:19, 32:2, 36:10, 39:10, 42:10, 42:25, 43:3, 43:19, 44:6, 44:11, 49:2, 53:5, 53:25, 54:19, 54:24, 63:24, 64:24, 66:12, 68:3, 88:25, 112:3, 113:2, 114:2, 117:2, 117:11, 117:12, 123:25, 124:18, 124:23
**analytical** [10] - 107:17, 107:18, 107:25, 108:2, 108:3, 108:6, 108:13, 108:14, 108:17, 109:2
**analyze** [6] - 10:15, 10:20, 67:2, 67:12, 67:23, 113:9
**analyzed** [4] - 42:21, 55:5, 55:13, 65:20
**ANDREW** [1] - 5:10
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**annually** [2] - 131:6, 131:9
**Answer** [1] - 193:10
**answer** [35] - 28:7, 42:2, 42:12, 44:24, 53:21, 58:24, 59:10,

59:11, 64:5, 65:6, 67:21, 72:8, 72:9, 95:11, 130:5, 160:2, 162:15, 163:14, 164:18, 165:15, 165:17, 167:22, 172:15, 175:22, 175:24, 176:2, 176:7, 181:19, 182:7, 183:3, 183:5, 184:22, 185:13, 209:12
**answered** [9] - 58:16, 64:20, 165:12, 165:14, 165:17, 166:14, 190:19, 207:7, 237:13
**answering** [1] - 95:16
**answers** [4] - 70:3, 106:5, 110:18, 205:15
**ANTHONY** [1] - 2:6
**anti** [1] - 59:22
**anti-diversion** [1] - 59:22
**apologize** [7] - 58:12, 71:19, 110:18, 138:20, 146:22, 153:17, 233:20
**appear** [5] - 32:8, 39:9, 46:4, 49:17, 118:19
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appeared** [3] - 38:19, 61:23, 77:19
**appendices** [1] - 28:13
**Appendix** [4] - 24:7, 27:1, 39:24, 40:10
**appendix** [3] - 40:6, 40:9, 227:20
**applicable** [1] - 187:13
**applied** [1] - 81:4
**applies** [3] - 131:2, 186:13, 187:16
**apply** [7] - 37:16, 66:18, 81:3, 93:2, 125:5, 186:1, 228:4
**appreciate** [5] - 23:8, 78:15, 83:16, 89:10, 154:5
**appreciating** [1] - 85:20
**approach** [12] - 8:1, 68:12, 82:22, 101:6, 157:2, 181:15, 194:14, 211:8,

211:10, 222:19, 225:25, 228:17
**appropriate** [14] - 41:18, 80:18, 83:4, 83:9, 84:4, 88:16, 123:14, 142:22, 162:10, 182:5, 204:6, 204:13, 206:24
**approve** [2] - 236:1
**approved** [5] - 193:4, 219:24, 224:25, 225:1, 236:10
**April** [3] - 222:8, 223:2, 223:4
**arbitration** [4] - 101:20, 101:24, 102:6, 102:15
**Arch** [2] - 6:6, 6:13
**ARCOS** [70] - 7:20, 7:21, 8:10, 8:14, 9:10, 10:6, 10:10, 10:15, 10:20, 11:19, 12:3, 12:4, 24:18, 24:22, 24:23, 25:4, 25:22, 33:5, 33:8, 36:21, 38:18, 39:2, 39:8, 39:11, 39:12, 39:25, 40:2, 40:15, 40:18, 40:19, 41:13, 42:11, 47:12, 47:23, 48:13, 49:21, 61:23, 76:3, 76:7, 79:10, 79:18, 104:7, 105:11, 105:16, 106:21, 107:4, 107:9, 111:14, 111:18, 111:21, 111:24, 112:19, 113:20, 117:10, 117:13, 118:19, 119:1, 121:17, 122:20, 123:10, 123:18, 123:21, 123:24, 124:1, 124:5, 124:9, 124:13, 150:10, 227:12
**area** [4] - 52:9, 52:14, 55:22, 110:12
**areas** [2] - 130:19, 169:11
**argue** [4] - 83:18, 86:25, 92:8, 97:10
**argued** [2] - 82:4, 233:12
**arguing** [4] - 77:25, 86:17, 165:16, 233:17
**argument** [3] - 124:9,

124:11, 203:20
**arise** [1] - 87:3
**arises** [1] - 87:5
**arrested** [1] - 66:22
**arrived** [1] - 62:8
**articulate** [2] - 104:4, 110:6
**articulated** [1] - 39:5
**Ashley** [1] - 171:17
**ASHLEY** [1] - 5:3
**aspect** [2] - 183:16, 189:25
**asserted** [3] - 51:24, 52:11, 211:1
**assigned** [1] - 142:12
**assignment** [1] - 39:11
**assist** [1] - 95:6
**assistant** [1] - 213:1
**assume** [3] - 95:21, 185:23, 227:23
**assumes** [1] - 95:17
**assuming** [1] - 63:21
**AT** [1] - 1:2
**attached** [1] - 69:14
**attempted** [2] - 79:20, 91:25
**attend** [1] - 195:19
**attention** [2] - 30:2, 32:20
**Attorney** [2] - 100:18, 170:4
**attorney** [5] - 229:1, 229:2, 230:11, 230:12, 230:21
**Attorney's** [1] - 230:22
**Attorneys** [2] - 230:15, 230:18
**attorneys'** [1] - 101:18
**Auburn** [1] - 65:4
**audited** [1] - 161:6
**augment** [2] - 39:12, 39:21
**August** [6] - 96:7, 128:19, 224:14, 235:6, 235:7, 236:2
**authenticity** [1] - 93:1
**authorities** [1] - 181:9
**authority** [4] - 161:18, 161:22, 217:8, 217:9
**authorized** [1] - 158:10
**authorizes** [1] - 45:5
**automated** [2] - 186:25, 232:12
**available** [14] - 28:10, 46:16, 49:21, 50:7, 50:13, 51:3, 52:21, 76:3, 76:9, 78:3, 79:24, 80:5, 162:8

**average** [36] - 10:11, 10:12, 10:16, 10:17, 10:23, 15:9, 15:17, 15:20, 15:22, 16:16, 16:17, 16:21, 16:22, 17:2, 17:6, 17:8, 17:10, 17:12, 17:13, 17:17, 17:20, 18:12, 18:13, 18:18, 18:20, 57:9, 119:19, 123:4, 172:17, 172:20
**averages** [7] - 12:21, 13:8, 13:10, 14:7, 18:8, 121:8, 121:9
**Avilla** [1] - 171:18
**Avin** [1] - 3:7
**avoid** [3] - 88:6, 88:9, 218:21
**award** [4] - 101:17, 101:19, 101:24, 102:6
**aware** [80] - 10:4, 25:18, 25:23, 27:15, 30:15, 30:20, 30:22, 34:20, 34:23, 37:10, 37:14, 37:18, 43:24, 44:2, 44:3, 44:5, 44:16, 44:20, 45:10, 45:24, 51:23, 52:8, 52:13, 53:16, 53:19, 53:22, 54:17, 57:21, 57:22, 58:2, 58:3, 58:6, 58:8, 58:19, 59:16, 59:21, 60:1, 60:7, 60:10, 60:17, 60:21, 60:22, 61:1, 62:3, 62:19, 65:14, 65:20, 130:21, 156:16, 159:1, 159:3, 163:18, 164:7, 167:17, 170:18, 170:20, 175:10, 176:13, 189:23, 190:3, 191:4, 192:20, 193:4, 193:16, 193:18, 193:19, 193:25, 197:16, 197:22, 197:25, 198:10, 198:20, 204:15, 205:9, 205:13, 213:9, 215:6, 222:7, 223:24, 228:11
**Ayme** [2] - 6:17, 238:2

---

**B**

---

**background** [3] - 86:2, 144:24, 202:15

**Background** [1] - 215:3
**backup** [1] - 208:23
**backwards** [2] - 54:1, 167:11
**bad** [15] - 56:3, 56:18, 111:17, 178:22, 179:10, 179:17, 179:19, 180:1, 180:4, 180:8, 180:15, 181:10, 200:24, 201:10, 201:13
**banker's** [2] - 86:14, 86:17
**bar** [1] - 99:16
**Barber** [4] - 229:2, 230:8, 230:11, 230:25
**Baron** [1] - 3:17
**bars** [1] - 116:5
**base** [4] - 40:17, 40:23, 41:5, 118:8, 118:13, 131:14, 191:6
**based** [26] - 10:2, 24:18, 30:20, 31:13, 31:17, 32:2, 51:2, 76:7, 82:25, 93:21, 97:11, 101:18, 105:21, 112:22, 117:2, 117:11, 117:13, 117:18, 118:5, 122:13, 144:15, 145:2, 151:8, 152:18, 155:13, 208:18
**basic** [1] - 71:1
**basis** [8] - 10:7, 50:22, 87:18, 126:15, 159:23, 179:13, 210:6, 218:24
**Bates** [6] - 196:7, 196:8, 197:1, 197:4, 214:3, 214:8
**Baylen** [1] - 2:13
**bear** [1] - 102:19
**bearing** [1] - 7:17
**bears** [1] - 210:25
**became** [5] - 29:3, 35:1, 193:21, 193:23, 194:3
**become** [1] - 193:19
**BEFORE** [1] - 1:17
**beforehand** [1] - 195:13
**beg** [1] - 234:20
**begin** [1] - 230:1
**beginning** [1] - 135:4
**begins** [2] - 101:14,

102:2
**behalf** [9] - 100:14, 161:24, 164:11, 164:24, 168:1, 195:23, 212:17, 226:5, 227:15
**behavior** [2] - 56:3, 56:18
**behind** [2] - 120:17, 150:24
**beings** [1] - 174:19
**believes** [2] - 190:10, 233:24
**bell** [1] - 8:20
**bellwethers** [1] - 99:21
**belong** [1] - 116:16
**below** [3] - 10:11, 10:17, 198:5
**BENCH** [1] - 1:16
**bench** [3] - 89:9, 89:12, 89:19
**benefit** [3] - 95:12, 95:14, 95:24
**Bergen** [1] - 150:23
**Berkeley** [1] - 53:22
**beside** [1] - 90:15
**best** [3] - 14:4, 81:9, 88:12
**better** [4] - 128:21, 132:1, 133:8, 168:24
**Between** [1] - 188:19
**between** [24] - 16:3, 17:2, 18:1, 19:7, 21:19, 21:23, 26:5, 72:7, 76:5, 92:16, 100:20, 111:3, 113:1, 114:22, 122:22, 148:8, 148:9, 148:10, 159:6, 172:18, 190:16, 226:15, 228:11
**beyond** [8] - 51:23, 59:19, 60:7, 88:8, 116:8, 190:10, 197:18, 203:4
**biased** [1] - 97:10
**big** [7] - 18:3, 126:6, 169:5, 169:15, 179:7, 207:17, 209:3
**Big** [4] - 103:1, 159:7, 159:8, 159:9
**bigger** [1] - 17:24
**billion** [3] - 108:11, 108:16, 108:21
**bit** [16] - 7:8, 14:18, 24:20, 25:17, 39:10, 44:19, 55:8, 104:14, 115:6, 123:19,

137:11, 144:21, 147:16, 151:16, 182:4, 196:14
**black** [2] - 235:14, 236:24
**blank** [1] - 162:12
**blanks** [1] - 123:21
**blind** [2] - 220:16, 220:24
**blink** [1] - 35:14
**block** [5] - 163:9, 163:15, 165:10, 165:21, 166:3, 166:4, 166:12, 166:20, 214:14, 233:6, 233:13, 233:21, 234:8, 236:13
**blocking** [1] - 234:12
**blood** [1] - 44:12
**blow** [2] - 215:16, 232:5
**blue** [3] - 49:20, 140:16
**Blvd** [3] - 3:15, 4:3, 4:9
**board** [3] - 102:22, 105:3, 116:3
**Board** [2] - 148:18, 179:22
**Bob** [4] - 90:20, 133:24, 136:24, 139:8
**bolt** [2] - 183:13, 183:14
**bolts** [3] - 183:12, 183:20
**bona** [1] - 235:1
**Bonasso** [1] - 5:14
**Boone** [1] - 208:13
**bootstrap** [1] - 69:20
**bore** [1] - 224:16
**boss** [1] - 141:22
**bottom** [12] - 9:6, 41:17, 62:25, 151:1, 157:8, 197:4, 198:4, 211:17, 214:2, 215:16, 218:18, 232:1
**bought** [2] - 115:11, 161:8
**Boulevard** [1] - 3:18
**bound** [1] - 45:2
**Box** [2] - 5:14, 6:8
**box** [4] - 86:17, 96:9, 163:2, 182:2
**boxes** [5] - 86:15, 132:22, 140:13, 141:4, 148:6
**Boyd** [1] - 208:10

**brand** [1] - 235:17
**break** [5] - 35:16,
36:9, 37:6, 98:9,
171:24
**breakdown** [1] - 170:2
**Breitmeyer** [1] -
138:12
**Bridgeside** [3] - 3:15,
4:3, 4:9
**brief** [8] - 83:20, 84:6,
87:12, 87:18, 89:24,
90:2, 125:20, 139:4
**briefed** [7] - 84:3,
86:19, 87:2, 87:20,
88:11, 97:22, 97:23
**briefing** [4] - 83:21,
88:4, 124:24, 126:18
**briefings** [1] - 83:2
**briefly** [11] - 7:16,
34:19, 35:8, 38:18,
50:25, 80:22,
101:10, 131:22,
145:8, 147:11,
185:18
**briefs** [5] - 82:24,
84:16, 85:17, 97:21,
126:8
**bring** [11] - 24:8,
41:16, 132:5,
134:18, 143:23,
147:12, 150:7,
181:14, 196:23,
207:15
**broad** [1] - 193:8
**broader** [4] - 52:14,
56:10, 77:1, 81:14
**broadly** [3] - 42:21,
59:6, 74:5
**Broadway** [1] - 16:19
**broke** [2] - 147:2,
147:10
**broken** [3] - 31:3,
50:2, 140:9
**Brooke** [1] - 53:16
**brought** [2] - 94:1,
124:6
**Bruce** [4] - 133:25,
136:3, 136:8, 139:11
**Brunswig** [1] - 150:23
**Budd** [1] - 3:17
**building** [1] - 36:8
**buildings** [1] - 139:5
**bullet** [3] - 198:6,
199:20, 202:6
**bump** [1] - 87:19
**Bureau** [1] - 117:15
**Burling** [1] - 5:11
**business** [3] - 30:21,
38:11, 136:2
**businesses** [1] -

138:25
**butcher** [1] - 138:5
**button** [1] - 132:6
**buying** [1] - 181:3
**BY** [85] - 7:15, 8:5,
11:25, 12:9, 23:15,
36:2, 54:6, 54:12,
57:2, 63:20, 64:19,
66:9, 67:22, 68:15,
70:10, 72:12, 74:17,
74:22, 75:12, 75:23,
98:8, 102:20,
105:15, 113:3,
113:7, 116:21,
118:3, 118:15,
119:6, 120:23,
128:1, 130:10,
132:10, 134:10,
137:23, 146:24,
153:18, 156:15,
157:4, 158:4,
160:13, 164:23,
165:6, 165:19,
166:10, 167:1,
167:9, 171:14,
172:6, 174:7, 175:9,
175:17, 176:4,
180:17, 181:17,
182:9, 183:8,
183:23, 184:24,
185:17, 188:2,
189:14, 191:3,
193:13, 194:15,
196:21, 200:13,
203:18, 205:25,
207:13, 209:15,
211:4, 211:16,
216:13, 221:7,
222:21, 223:20,
226:2, 226:22,
227:4, 228:19,
229:19, 232:4,
234:5, 234:22

---

**C**

---

**C.F.R** [3] - 183:13,
202:16, 202:21
**CA** [1] - 3:18
**Cabell** [123] - 3:2,
15:18, 15:22, 16:13,
19:25, 20:1, 20:6,
20:21, 21:14, 23:24,
24:4, 25:1, 25:9,
26:4, 26:18, 29:25,
30:4, 30:25, 31:9,
32:13, 33:2, 34:25,
36:8, 36:12, 36:15,
37:22, 38:9, 43:25,
44:10, 48:15, 48:19,
48:24, 49:4, 50:10,

50:12, 52:2, 52:4,
52:5, 52:8, 52:15,
52:19, 52:24, 53:4,
53:6, 53:8, 54:8,
54:20, 54:25, 55:5,
56:3, 56:9, 56:10,
57:3, 57:20, 57:23,
58:10, 58:20, 59:5,
59:24, 60:12, 60:19,
60:25, 61:10, 61:14,
61:20, 61:25, 62:6,
62:8, 62:14, 64:1,
64:16, 65:1, 65:2,
65:6, 67:25, 68:5,
68:19, 68:20, 69:8,
69:12, 69:14, 69:15,
69:19, 70:8, 78:16,
78:17, 79:7, 79:21,
100:6, 100:8,
104:12, 104:23,
105:24, 106:6,
110:24, 111:5,
111:23, 112:2,
112:11, 115:3,
115:24, 116:10,
119:20, 122:25,
126:21, 129:21,
130:12, 131:3,
149:15, 149:17,
149:24, 167:13,
168:16, 173:6,
173:15, 174:15,
174:20, 174:24,
205:11, 208:5,
208:7, 208:9
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell-Huntington**
[14] - 30:25, 34:25,
36:8, 38:9, 43:25,
48:24, 59:24, 61:10,
61:14, 61:20, 61:25,
62:6, 64:1, 65:1
**Cabell/Huntington** [2]
- 24:16, 25:15
**cage** [6] - 183:11,
183:12, 183:13,
183:14, 183:21,
186:23
**calculate** [3] - 22:22,
122:9, 122:12
**calculated** [8] - 40:17,
40:19, 40:23, 41:5,
51:1, 105:22, 118:8,
118:13
**calculating** [2] -
104:22, 115:13
**calculation** [4] -
50:21, 102:14,
103:19, 121:17

**calculations** [9] -
24:2, 24:7, 24:13,
29:23, 50:25, 52:1,
52:3, 118:16, 123:7
**calculator** [3] - 22:23,
22:24, 94:1
**CALLAS** [1] - 6:7
**camera** [1] - 132:12
**CAMPBELL** [1] - 6:14
**cannot** [5] - 45:15,
45:19, 85:22,
117:12, 233:1
**cap** [2] - 69:10, 103:1
**capacity** [2] - 145:18,
164:1
**capita** [12] - 10:6,
29:24, 50:22, 50:25,
51:2, 51:6, 51:17,
52:1, 116:7, 117:11,
117:12, 117:17
**Capitol** [1] - 2:7
**captured** [1] - 147:22
**Cardinal** [85] - 4:11,
5:2, 21:7, 23:19,
24:25, 25:3, 25:7,
25:20, 25:23, 27:11,
29:3, 30:7, 30:12,
31:17, 31:25, 32:3,
32:12, 32:14, 32:21,
33:13, 33:17, 33:21,
34:4, 34:8, 34:16,
35:1, 36:24, 37:2,
37:23, 37:25, 38:8,
38:10, 38:19, 38:23,
39:3, 41:24, 42:6,
42:10, 42:12, 42:14,
42:23, 44:1, 55:1,
55:5, 55:13, 57:8,
57:17, 57:18, 57:24,
58:9, 58:21, 60:22,
61:4, 61:12, 61:14,
61:15, 61:20, 61:24,
62:4, 62:7, 63:22,
63:24, 64:22, 64:24,
65:4, 65:8, 65:11,
67:8, 85:23, 114:22,
114:25, 115:2,
115:5, 115:10,
115:16, 115:21,
117:21, 123:18,
123:21, 123:22,
123:24, 125:2,
159:3, 210:21
**Cardinal's** [5] - 34:12,
41:24, 41:25, 42:6,
42:7
**Care** [10] - 26:9, 26:11,
26:15, 26:17, 26:21,
27:3, 27:6, 27:10,
27:17, 27:23

**care** [8] - 104:15,
105:2, 105:4, 152:1,
201:1, 201:9,
204:18, 207:25
**careful** [1] - 84:17
**Carey** [1] - 4:17
**cart** [2] - 85:5, 85:7
**Carter** [1] - 208:10
**case** [46] - 8:21, 10:22,
23:23, 27:22, 39:11,
44:1, 44:4, 46:3,
51:14, 58:11, 59:18,
60:14, 60:16, 60:20,
60:25, 74:21, 80:14,
84:7, 89:23, 97:1,
99:20, 100:14,
100:15, 116:22,
117:14, 119:17,
121:15, 163:19,
164:13, 167:3,
167:17, 168:2,
168:7, 168:17,
170:18, 173:13,
183:22, 198:17,
198:21, 199:7,
199:10, 199:11,
199:13, 199:15,
204:20, 236:21
**cases** [4] - 12:3,
60:15, 100:18, 148:2
**cast** [1] - 135:4
**catch-22** [1] - 86:9
**categories** [5] -
100:23, 104:5,
120:24, 121:16,
152:19
**categorize** [1] -
233:16
**Cathy** [3] - 140:23,
140:24, 141:1
**caught** [1] - 143:15
**causation** [1] - 185:8
**caused** [1] - 89:7
**causing** [1] - 169:20
**CC2** [1] - 78:16
**CDC** [1] - 118:21
**Census** [4] - 52:5,
117:15, 117:18,
117:24
**center** [26] - 61:9,
61:16, 61:23, 62:10,
62:13, 62:16, 63:7,
63:23, 63:25, 64:23,
140:17, 140:19,
141:17, 141:23,
142:1, 142:5,
142:12, 148:5,
176:17, 177:1,
186:5, 213:19,
227:16, 232:10,

233:1
**Center** [10] - 3:12, 5:11, 62:8, 64:25, 65:9, 65:12, 141:14, 142:7, 150:1, 151:8
**center's** [1] - 222:13
**centers** [30] - 61:18, 62:20, 62:24, 63:2, 140:12, 140:15, 140:18, 140:21, 141:3, 141:15, 145:22, 147:15, 148:3, 148:7, 148:22, 149:7, 149:11, 149:24, 150:12, 172:19, 172:21, 186:2, 186:14, 187:3, 187:4, 189:8, 213:13, 222:9, 227:18, 227:20
**centimeters** [1] - 122:7
**certain** [5] - 30:15, 40:13, 45:5, 92:2, 130:19
**certainly** [3] - 22:14, 88:1, 89:10
**CERTIFICATION** [1] - 238:1
**certify** [1] - 238:4
**CFR** [2] - 161:3, 178:13
**chain** [39] - 15:6, 29:1, 30:18, 30:21, 34:23, 35:4, 44:16, 62:13, 94:11, 103:2, 103:6, 103:7, 103:16, 103:18, 103:25, 104:7, 104:11, 104:18, 104:23, 105:10, 105:11, 105:12, 105:25, 131:22, 132:5, 132:16, 132:24, 133:14, 134:13, 134:22, 142:9, 142:11, 145:7, 153:19, 162:24, 216:18, 216:20, 236:7, 236:11
**challenges** [1] - 95:14
**chance** [1] - 228:22
**change** [11] - 92:9, 106:2, 116:8, 116:11, 139:7, 177:4, 201:25, 221:18, 221:20, 231:6
**changed** [10] - 28:22,

60:9, 110:13, 111:11, 116:4, 151:16, 177:9, 177:10, 188:13, 210:17
**changes** [13] - 28:18, 40:2, 40:11, 40:13, 73:25, 106:22, 111:14, 111:15, 112:5, 115:9, 177:15, 192:19
**changing** [3] - 29:5, 30:16, 99:13
**channels** [3] - 198:9, 198:14, 218:23
**chapter** [1] - 157:14
**characteristics** [1] - 224:16
**characterization** [4] - 44:25, 56:18, 71:24, 75:9
**characterize** [1] - 168:23
**characterizing** [1] - 205:16
**characters** [1] - 135:5
**charge** [6] - 141:1, 142:4, 142:7, 142:12, 143:6, 145:22
**CHARLES** [1] - 3:11
**Charleston** [7] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:3, 149:20
**CHARLESTON** [2] - 1:2, 1:18
**chart** [60] - 13:5, 13:7, 13:19, 16:7, 21:6, 26:10, 26:15, 27:2, 27:6, 27:10, 29:21, 30:3, 31:8, 31:19, 32:19, 36:10, 47:1, 47:16, 47:22, 48:2, 48:11, 48:17, 51:18, 53:4, 53:7, 55:23, 55:24, 56:22, 61:4, 61:5, 61:12, 61:22, 63:21, 64:22, 71:20, 72:25, 82:13, 85:23, 91:7, 93:7, 93:8, 93:11, 94:16, 94:22, 94:23, 95:13, 99:12, 99:13, 99:16, 117:5, 118:4, 133:3, 134:16, 135:23, 145:19, 150:9, 151:6
**charts** [52] - 8:24, 9:2, 16:12, 24:6, 28:17, 30:24, 31:4, 35:8, 36:6, 43:19, 47:5,

47:11, 49:9, 49:19, 50:20, 55:10, 55:11, 55:15, 62:12, 70:20, 70:22, 71:12, 74:23, 75:5, 76:18, 76:24, 77:6, 82:18, 86:21, 87:1, 90:12, 90:24, 91:2, 91:4, 92:21, 93:20, 93:21, 93:24, 98:11, 98:15, 98:18, 99:11, 102:24, 106:24, 112:8, 117:11, 120:8, 120:11, 126:11, 132:21, 146:15, 151:11
**Chase** [1] - 4:18
**chase** [1] - 94:21
**check** [3] - 108:25, 109:1, 221:15
**checked** [1] - 40:17
**cherry** [2] - 77:7, 97:13
**cherry-picked** [1] - 77:7
**cherry-picking** [1] - 97:13
**Cherveny** [4] - 140:1, 140:4, 140:5
**Chesterbrook** [1] - 6:15
**chicken** [4] - 83:25, 85:5, 96:9
**chief** [2] - 219:15, 219:19
**Chief** [3] - 8:13, 129:9, 129:14
**choices** [1] - 56:2
**cholesterol** [1] - 44:13
**choose** [1] - 56:13
**CHRIS** [1] - 127:18
**Chris** [7] - 91:15, 127:6, 128:4, 133:15, 135:5, 221:13, 231:12
**chronological** [1] - 211:15
**circle** [3] - 102:16, 141:6, 142:24
**circled** [2] - 102:25, 150:15
**Circuit** [2] - 89:23, 101:10
**Circuit's** [1] - 102:1
**circulate** [1] - 213:16
**circulating** [1] - 194:17
**circumstance** [1] - 236:16
**circumstances** [5] -

173:9, 178:16, 218:24, 220:16, 220:25
**cities** [1] - 167:24
**citing** [2] - 199:6, 199:11
**City** [26] - 4:1, 5:11, 15:22, 16:12, 20:5, 23:25, 24:5, 50:11, 52:11, 56:4, 56:9, 56:10, 59:5, 62:9, 62:14, 64:16, 65:2, 65:7, 100:8, 111:23, 112:1, 112:11, 115:3, 116:10, 173:15, 238:5
**city** [7] - 63:11, 149:4, 150:4, 173:12, 173:15, 173:17
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 238:7, 238:8
**civil** [1] - 1:10
**claim** [1] - 69:11
**claiming** [1] - 52:12
**clarify** [1] - 55:12
**clarity** [2] - 150:7, 154:5
**classes** [1] - 154:2
**classic** [2] - 82:16
**classification** [1] - 28:5
**clear** [10] - 56:21, 64:21, 81:2, 81:9, 110:8, 131:25, 143:5, 154:4, 161:24, 232:21
**cleared** [2] - 233:7, 233:9
**clearing** [1] - 205:11
**clearly** [2] - 32:9, 69:18
**CLERK** [3] - 127:14, 127:17, 127:19
**clerks** [1] - 97:16
**Clifford** [2] - 136:18, 136:20
**Clinic** [1] - 16:20
**clinic** [3] - 103:18, 105:1, 204:17
**clinics** [1] - 105:1
**Clip** [1] - 164:21
**clip** [1] - 166:24
**close** [7] - 15:19, 18:12, 19:5, 19:9, 67:21, 158:11, 201:11
**closed** [15] - 104:3, 104:6, 104:16, 104:19, 105:5,

152:15, 153:19, 158:16, 160:25, 161:1, 216:1, 216:22, 224:9, 225:9, 225:12
**closed-door** [5] - 104:3, 104:6, 104:16, 104:19, 105:5
**closely** [3] - 147:20, 148:20
**closer** [1] - 21:13
**closing** [1] - 158:13
**Cochran** [3] - 6:17, 238:2, 238:11
**Code** [12] - 142:23, 146:4, 146:17, 147:1, 155:12, 158:9, 162:6, 178:11, 180:9, 233:15, 236:14, 237:9
**code** [12] - 10:10, 10:11, 50:2, 70:20, 99:4, 99:5, 106:25, 108:19, 115:1, 115:5, 115:7, 233:22
**coded** [1] - 114:16
**codes** [5] - 48:14, 48:19, 50:14, 109:19, 113:24
**coefficient** [10] - 121:1, 121:3, 121:11, 121:17, 122:1, 122:3, 122:10, 122:11, 122:13, 122:16
**cold** [1] - 97:9
**collaborative** [1] - 230:25
**colloquy** [1] - 170:11
**color** [3] - 88:9, 134:12, 139:7
**Columbus** [2] - 150:1, 150:5
**combat** [1] - 215:25
**combination** [2] - 37:11, 154:21
**combined** [1] - 150:23
**comfortable** [3] - 87:22, 178:20, 180:25
**coming** [14] - 12:2, 31:12, 31:17, 31:24, 69:8, 69:11, 108:4, 108:5, 108:17, 149:1, 150:25, 151:7, 201:3, 208:7
**command** [14] - 130:17, 131:22,

132:6, 132:16,
132:24, 133:14,
134:13, 134:22,
135:19, 136:7,
142:9, 142:12,
145:7, 145:15
**commentary** [1] -
153:15
**comments** [1] - 80:23
**commercial** [1] -
214:19
**COMMISSION** [1] -
1:10
**Commission** [2] - 2:2,
3:2
**Commissioners** [1] -
50:12
**commit** [1] - 84:21
**committed** [3] - 87:19,
102:7, 102:11
**Committee** [1] - 99:22
**common** [1] - 100:3
**commonality** [3] -
19:2, 19:7, 21:24
**communicate** [4] -
80:24, 203:3,
231:19, 231:22
**communicating** [2] -
168:20, 202:6
**communication** [6] -
170:3, 199:25,
212:6, 228:14,
229:8, 235:13
**communications** [2] -
8:18, 168:24
**communities** [3] -
175:4, 175:12, 206:9
**community** [6] -
177:18, 185:2,
203:22, 204:2,
204:7, 206:2
**companies** [2] -
149:1, 159:6
**company** [15] - 87:14,
91:17, 136:22,
137:19, 137:20,
140:9, 141:8, 147:5,
148:14, 164:10,
165:21, 169:2,
181:6, 201:23,
225:13
**Company** [1] - 128:6
**compare** [5] - 17:7,
17:8, 34:9, 67:16,
182:21
**compared** [1] - 172:12
**comparing** [3] - 10:22,
39:18, 121:12
**comparison** [2] -
17:24, 121:18

**compartments** [1] -
92:11
**compensation** [1] -
99:20
**compiling** [2] - 27:16,
27:21
**complained** [1] -
168:19
**complaint** [1] - 171:21
**complete** [4] - 39:9,
79:1, 81:19, 235:19
**completed** [1] -
235:16
**completely** [3] -
35:25, 141:24,
186:25
**completeness** [1] -
17:22
**completion** [1] -
235:10
**complex** [1] - 144:24
**compliance** [2] -
56:16, 228:2
**Compliance** [5] -
129:10, 129:14,
140:13, 141:20,
141:21
**complicated** [1] -
95:20
**comply** [4] - 182:15,
184:5, 184:8, 221:11
**component** [2] -
172:15, 216:20
**components** [2] -
91:25, 216:17
**composite** [1] - 211:7
**computation** [1] -
121:12
**computer** [4] - 6:19,
70:20, 79:11, 99:7
**computers** [1] - 99:7
**con** [1] - 175:15
**concede** [1] - 219:7
**concept** [2] - 9:14,
180:3
**conceptually** [1] -
111:24
**concern** [3] - 86:22,
93:6, 93:14
**concerned** [4] - 88:3,
88:15, 89:18, 90:16
**concerns** [1] - 77:14
**conclude** [3] - 101:21,
102:5, 102:23
**concluded** [1] -
107:13
**concluding** [1] - 39:2
**conclusion** [3] -
102:13, 141:3, 185:5
**conclusions** [4] -

110:14, 111:10,
111:11, 111:17
**conclusory** [1] -
102:25
**concrete** [1] - 19:12
**condition** [1] - 216:3
**conditional** [1] - 87:22
**conditionally** [2] -
82:8, 83:19, 126:6
**conditions** [1] - 51:21
**conduct** [3] - 10:10,
118:22, 181:10
**Conduct** [1] - 227:8
**conducted** [1] -
225:10
**conducts** [1] - 136:10
**confer** [1] - 97:16
**confident** [1] - 111:10
**confirm** [2] - 96:19,
233:1
**confirmed** [1] - 235:1
**confirming** [1] - 41:9
**conflict** [1] - 219:2
**confused** [1] - 194:24
**confusing** [5] - 85:14,
85:15, 166:7, 166:8,
179:14
**Congress** [5] - 158:9,
158:10, 215:25,
216:23, 217:14
**Congressional** [2] -
193:25, 194:8
**congressional** [1] -
157:9
**connect** [1] - 69:14
**Connolly** [2] - 4:13,
5:4
**CONROY** [1] - 3:3
**consequences** [1] -
218:8
**conservative** [2] -
104:22, 104:25
**consider** [15] - 27:17,
27:22, 80:9, 80:17,
84:6, 85:17, 104:21,
172:14, 191:23,
192:18, 197:18,
203:21, 204:1,
204:5, 209:2
**Consider** [2] - 197:3,
197:9
**considered** [1] - 208:6
**considering** [2] -
106:21, 162:24
**consistent** [1] - 44:25
**consolidate** [1] -
149:4
**consolidated** [1] -
149:3
**constantly** [1] -

130:18
**constitutes** [1] - 80:11
**constraints** [1] - 71:16
**constructing** [1] -
106:23
**construction** [1] -
72:6
**consult** [1] - 135:13
**consultant** [5] -
135:12, 135:20,
139:18, 139:19,
144:23
**consults** [1] - 135:15
**contact** [2] - 231:12,
231:19
**contacted** [1] - 196:1
**contacts** [1] - 146:16
**contain** [7] - 74:24,
75:4, 75:5, 76:18,
78:19, 92:10
**contained** [1] - 132:17
**contains** [1] - 73:23
**contemporaneous** [1]
- 115:17
**contents** [1] - 210:2
**contest** [1] - 134:20
**context** [4] - 126:23,
174:6, 175:16, 182:5
**contexts** [1] - 39:6
**continually** [1] - 192:6
**continue** [3] - 10:5,
80:12, 115:18
**continued** [1] - 225:6
**Continued** [5] - 3:1,
5:1, 5:6, 6:1, 6:10
**continues** [2] - 13:6,
170:2
**contract** [1] - 136:13
**contrast** [1] - 182:22
**control** [29] - 92:20,
137:8, 137:9,
147:23, 147:24,
148:1, 151:25,
152:3, 152:10,
160:25, 161:10,
162:23, 162:25,
163:2, 166:3,
175:20, 184:1,
186:1, 187:19,
188:25, 190:7,
191:6, 201:19,
201:22, 201:25,
212:8, 222:10,
233:25, 236:8
**Control** [12] - 137:2,
137:7, 145:20,
145:23, 146:6,
147:3, 147:10,
147:13, 147:17,
147:24, 169:8,

169:14
**Controlled** [14] -
67:14, 154:18,
154:25, 155:3,
155:10, 155:25,
156:16, 156:23,
158:8, 181:23,
182:11, 183:9,
184:10, 184:14
**controlled** [38] -
43:20, 43:21, 43:25,
44:16, 57:5, 57:19,
142:20, 148:23,
152:10, 153:24,
154:3, 154:6, 154:7,
154:9, 154:24,
157:9, 158:1, 172:7,
172:13, 172:18,
197:14, 197:20,
197:21, 198:8,
202:25, 203:11,
203:13, 214:21,
214:24, 215:7,
215:11, 216:2,
216:25, 217:16,
227:11, 227:12,
228:3
**Controls** [1] - 144:5
**controls** [18] - 146:25,
148:2, 152:17,
152:24, 152:25,
153:8, 154:2, 165:1,
191:8, 198:7,
198:12, 202:9,
202:11, 202:16,
203:1, 203:14,
220:10, 220:13
**conversely** [1] - 29:16
**conversions** [1] -
118:22
**convert** [1] - 92:20
**converted** [3] - 47:13,
47:24, 48:14
**Cook** [3] - 6:18, 238:3,
238:11
**cooperated** [1] -
169:13
**copied** [1] - 229:5
**copies** [2] - 194:17,
222:18
**copy** [2] - 12:12, 24:9
**corner** [4] - 9:6, 157:8,
197:4, 214:2
**corporate** [9] - 147:17,
147:23, 148:4,
185:21, 186:5,
187:5, 189:18,
189:19
**Corporate** [12] -
91:14, 128:8,

128:14, 128:25,
129:5, 129:9, 130:3,
136:6, 136:25,
148:9, 194:4, 231:13
cORPORATION [2] -
1:7, 1:13
Corporation [2] - 6:2,
238:7
correct [300] - 12:24,
13:10, 13:12, 15:4,
15:10, 15:14, 15:19,
16:5, 16:9, 17:17,
17:20, 24:16, 25:1,
25:5, 25:10, 25:15,
25:22, 25:25, 27:4,
27:8, 27:12, 28:15,
28:23, 29:9, 29:14,
29:19, 30:8, 30:18,
31:1, 31:4, 31:10,
31:14, 31:21, 32:8,
32:14, 32:23, 33:2,
33:6, 33:10, 33:14,
33:15, 33:19, 33:25,
34:10, 34:14, 34:17,
34:21, 36:12, 36:17,
36:22, 36:23, 36:25,
37:1, 37:9, 37:12,
37:24, 38:3, 38:6,
38:7, 38:11, 38:12,
38:16, 38:24, 38:25,
39:4, 39:5, 39:14,
39:15, 39:18, 39:19,
39:22, 40:3, 40:11,
40:12, 40:16, 40:21,
41:8, 41:10, 41:11,
41:15, 41:20, 42:1,
42:15, 42:16, 42:18,
42:20, 43:1, 43:5,
43:6, 43:17, 43:21,
43:23, 44:7, 44:8,
44:14, 44:17, 45:6,
45:17, 45:21, 45:23,
46:9, 46:12, 46:21,
47:14, 47:15, 48:9,
48:15, 48:25, 49:1,
49:11, 49:15, 49:22,
50:4, 50:8, 50:9,
50:14, 50:18, 51:4,
51:5, 51:7, 51:8,
51:22, 52:6, 52:7,
52:9, 52:20, 52:21,
53:8, 53:9, 53:18,
54:14, 54:22, 55:2,
55:6, 55:15, 55:16,
56:25, 57:6, 57:7,
57:11, 57:13, 57:15,
57:20, 58:5, 58:7,
61:6, 62:2, 62:6,
62:7, 62:17, 62:18,
62:21, 62:22, 62:25,
63:4, 63:5, 63:8,

63:10, 63:11, 64:1,
65:1, 65:10, 65:12,
65:13, 65:17, 65:18,
65:22, 65:23, 68:20,
71:6, 71:7, 71:10,
71:14, 72:23, 73:4,
73:6, 73:7, 73:10,
73:11, 73:12, 73:14,
73:19, 73:20, 73:25,
74:1, 75:11, 95:18,
101:1, 103:11,
103:12, 104:19,
104:20, 111:17,
114:1, 116:25,
117:1, 117:3, 117:4,
117:7, 117:8,
117:15, 118:16,
118:17, 118:19,
118:20, 118:22,
118:23, 119:1,
119:2, 119:10,
120:1, 120:14,
120:15, 123:12,
125:14, 128:12,
128:16, 129:3,
133:16, 133:20,
133:23, 135:6,
135:7, 135:15,
137:3, 138:4, 139:9,
139:23, 140:17,
140:21, 140:22,
141:16, 142:8,
142:10, 142:13,
142:15, 142:18,
142:21, 144:7,
145:4, 145:5, 152:1,
152:4, 152:11,
152:13, 153:20,
153:21, 154:10,
154:19, 154:23,
155:8, 158:12,
158:15, 158:19,
158:23, 158:24,
159:14, 159:15,
159:18, 160:16,
160:21, 162:19,
162:21, 163:8,
163:23, 170:5,
176:16, 177:5,
182:13, 189:3,
194:5, 194:6, 195:6,
195:8, 195:24,
198:3, 198:15,
199:4, 199:8, 200:4,
200:16, 201:18,
201:22, 206:7,
217:12, 221:1,
222:2, 224:25,
225:1, 225:23,
227:16, 227:18,
228:8, 229:6,

230:16, 232:18,
233:22, 234:10,
238:4
Correct [49] - 13:3,
13:11, 13:13, 13:16,
13:17, 15:15, 16:22,
17:14, 17:15, 17:18,
17:21, 24:17, 25:2,
25:6, 25:16, 26:1,
26:19, 27:9, 27:13,
28:16, 30:9, 31:5,
32:6, 32:15, 32:18,
33:3, 33:7, 33:20,
34:7, 34:11, 176:19,
177:6, 177:16,
184:12, 186:17,
192:11, 192:14,
206:16, 209:7,
222:11, 222:15,
225:24, 227:13,
228:9, 229:23,
232:19, 232:24,
233:23, 234:13
corrected [2] - 40:23,
41:4
correction [1] - 106:25
corrections [7] -
39:25, 40:4, 41:13,
112:16, 112:17,
112:20, 122:21
correctly [4] - 79:9,
140:3, 176:8, 232:14
correlated [6] -
121:22, 121:23,
121:24, 121:25,
122:2, 122:19
correlation [12] -
121:1, 121:3,
121:11, 121:17,
121:23, 122:1,
122:3, 122:10,
122:11, 122:13,
122:16, 122:22
correspondence [1] -
228:11
corresponding [1] -
201:6
corresponds [3] -
63:6, 63:22, 64:22
Costello [1] - 171:17
Cote [6] - 230:2,
230:3, 230:4, 230:6,
230:11, 231:1
Council [1] - 50:11
counsel [19] - 13:25,
14:1, 14:12, 55:13,
56:2, 56:23, 56:24,
72:7, 74:3, 97:12,
97:16, 110:11,
112:21, 124:8,

194:17, 228:11,
229:9
count [10] - 16:5, 16:6,
54:24, 103:18,
109:25, 112:13,
115:18, 115:20,
138:19, 161:9
counted [4] - 16:3,
113:14, 115:14,
115:16
counter [1] - 169:12
counterfeit [1] -
136:13
Counties [1] - 53:16
counties [24] - 18:24,
53:14, 56:4, 68:17,
68:19, 68:25, 69:11,
69:13, 69:14, 69:18,
70:7, 100:6, 131:20,
167:23, 204:22,
205:12, 206:16,
206:21, 207:3,
207:4, 207:6, 208:5,
208:8
counties' [1] - 69:8
counting [2] - 110:1,
113:14
country [15] - 15:23,
51:11, 51:18, 70:24,
74:6, 74:21, 98:12,
98:16, 99:6, 100:19,
116:11, 119:21,
176:25, 187:16,
215:8
county [8] - 10:15,
18:18, 62:11, 67:25,
69:15, 76:4, 98:15,
173:17
COUNTY [1] - 1:10
County [103] - 2:2, 3:2,
15:10, 15:22, 16:13,
19:13, 19:16, 20:6,
20:13, 20:19, 21:2,
21:9, 21:10, 21:12,
23:25, 24:4, 50:12,
52:8, 52:11, 52:15,
53:22, 53:23, 54:14,
56:4, 56:9, 56:10,
59:5, 62:8, 62:14,
64:16, 65:2, 65:7,
67:25, 68:5, 68:20,
69:19, 78:16, 78:17,
79:7, 79:21, 100:7,
100:8, 100:9,
100:11, 104:13,
104:23, 105:24,
106:6, 110:24,
111:5, 111:23,
112:2, 112:5,
112:11, 115:3,

115:24, 116:10,
119:20, 122:25,
129:21, 130:13,
131:3, 149:15,
149:17, 149:20,
149:24, 167:13,
168:16, 173:6,
173:10, 173:16,
174:15, 174:20,
174:25, 205:11,
207:2, 207:18,
208:5, 208:7, 208:9,
208:10, 208:11,
208:12, 208:13,
208:14, 208:15,
208:16, 227:22
couple [18] - 28:20,
31:6, 53:19, 94:3,
99:10, 99:15,
100:25, 102:23,
105:8, 106:19,
120:20, 122:17,
143:24, 151:21,
172:22, 183:24,
191:20, 213:5
course [5] - 19:25,
105:1, 172:3,
193:24, 216:17
COURT [199] - 1:1,
1:17, 7:5, 7:10, 7:13,
8:2, 11:7, 11:13,
11:15, 11:20, 12:8,
23:9, 23:12, 35:11,
35:17, 35:21, 35:24,
54:1, 55:18, 55:20,
56:20, 56:24, 57:1,
63:15, 64:2, 64:4,
64:17, 66:3, 66:6,
67:20, 68:13, 68:21,
69:1, 69:22, 70:1,
70:9, 72:8, 74:2,
74:10, 74:13, 75:7,
75:16, 75:21, 76:21,
77:4, 78:8, 78:13,
79:9, 79:14, 80:20,
81:23, 83:13, 84:3,
84:13, 84:23, 85:9,
85:11, 85:14, 90:2,
90:6, 90:14, 90:19,
91:5, 91:11, 91:20,
94:20, 96:1, 96:13,
97:14, 97:22, 98:2,
98:5, 98:22, 101:7,
105:14, 106:9,
106:16, 106:19,
107:11, 109:9,
110:10, 110:17,
110:20, 111:13,
112:21, 113:6,
114:5, 116:19,
117:22, 118:10,

118:14, 119:4,
120:19, 123:10,
123:13, 124:8,
124:15, 125:4,
125:11, 125:17,
125:21, 125:25,
126:4, 127:1, 127:3,
127:10, 127:12,
127:15, 127:24,
129:25, 130:5,
130:9, 132:9, 133:5,
133:12, 134:6,
137:20, 146:19,
152:2, 153:16,
156:10, 156:13,
157:3, 157:22,
159:23, 160:2,
160:6, 165:5,
165:13, 165:16,
166:9, 166:15,
166:18, 166:21,
167:7, 171:10,
171:13, 171:23,
172:2, 172:5, 174:5,
175:6, 175:14,
176:2, 179:13,
179:16, 181:16,
182:6, 182:17,
182:25, 183:3,
184:19, 185:6,
185:9, 185:15,
188:1, 189:12,
190:11, 190:18,
191:2, 193:9,
196:10, 196:13,
196:16, 200:10,
203:8, 205:19,
205:22, 207:11,
208:24, 209:5,
209:9, 209:11,
209:14, 209:20,
209:23, 210:4,
210:12, 210:17,
210:21, 210:24,
211:9, 211:11,
221:4, 222:20,
223:16, 223:19,
226:1, 226:20,
226:24, 227:2,
228:18, 229:15,
229:18, 234:4,
234:15, 234:19,
237:13, 237:18
**court** [15] - 35:12,
43:15, 81:6, 89:3,
89:16, 100:15,
100:25, 101:1,
101:16, 102:2,
146:11, 164:22,
166:25, 171:23,
220:21

**Court** [36] - 6:17, 6:18,
7:2, 71:25, 77:22,
78:4, 79:24, 80:8,
80:15, 80:17, 80:19,
82:5, 82:7, 82:8,
82:10, 82:19, 87:16,
90:11, 95:3, 98:10,
98:14, 99:21, 100:6,
100:7, 101:4,
101:15, 101:17,
101:18, 102:5,
105:9, 117:5, 121:3,
198:17, 218:1,
238:2, 238:3
**courtesy** [1] - 229:5
**courtesy-copied** [1] -
229:5
**courtroom** [4] - 33:9,
43:11, 65:15, 88:14
**COURTROOM** [1] -
127:19
**cover** [4] - 101:10,
195:4, 210:11,
210:13
**Covered** [1] - 227:8
**covered** [6] - 42:25,
70:13, 104:9, 105:7,
117:25, 198:24
**covers** [1] - 227:10
**Covington** [1] - 5:11
**Crab** [1] - 16:18
**crack** [1] - 78:14
**create** [6] - 70:12,
70:20, 70:23, 98:15,
99:12, 104:7
**created** [8] - 41:12,
49:19, 70:19, 71:4,
78:6, 97:5, 219:12,
225:12
**creates** [1] - 99:8
**credit** [2] - 15:5,
115:20
**credited** [2] - 117:3,
117:6
**criminal** [1] - 202:15
**crisis** [2] - 170:1,
170:2
**criteria** [2] - 14:1,
55:20
**critical** [4] - 89:14,
89:22, 108:3, 217:14
**cross** [10] - 67:19,
68:25, 80:24, 81:13,
81:15, 82:25, 83:23,
88:10, 94:17, 114:9
**CROSS** [4] - 23:14,
116:20, 118:2, 119:5
**crossing** [1] - 20:1
**Crow** [5] - 133:24,
136:23, 136:24,

139:8
**CRR** [2] - 6:17, 6:18
**crucial** [1] - 84:7
**CS** [1] - 148:10
**CSA** [2] - 215:23,
215:25
**CSR** [2] - 185:25,
208:8
**CSRA** [40] - 129:1,
129:6, 129:12,
129:18, 132:25,
133:15, 134:21,
134:23, 135:14,
136:1, 137:25,
140:10, 141:12,
141:24, 142:12,
144:19, 145:23,
146:4, 146:16,
147:25, 151:13,
151:23, 172:9,
172:11, 177:25,
185:20, 185:23,
185:24, 193:4,
195:16, 198:20,
199:3, 199:25,
200:17, 204:16,
205:10, 206:13,
208:6, 221:14, 233:3
**CSRAs** [1] - 199:8
**CT2** [2] - 78:4, 100:2
**CT21** [1] - 100:2
**CT23** [1] - 100:2
**cull** [2] - 61:2, 81:5
**culling** [1] - 81:16
**cumulative** [3] - 77:2,
79:20, 91:24
**curious** [1] - 183:7
**current** [6] - 94:25,
95:5, 128:7, 128:8,
134:4, 145:10
**customer** [11] - 29:2,
29:3, 29:13, 29:18,
32:14, 32:16, 62:17,
137:9, 153:5,
197:14, 216:24
**Customer** [1] - 145:24
**customers** [16] -
28:21, 29:8, 57:23,
58:1, 58:10, 58:20,
58:23, 59:23, 59:25,
60:11, 60:19, 60:24,
130:19, 131:20,
197:21, 233:2
**customers'** [1] - 42:15
**cut** [1] - 94:20
**Cuyahoga** [1] - 100:9
**CVS** [13] - 21:9, 34:23,
35:1, 36:7, 36:11,
36:15, 36:16, 36:20,
37:4, 37:21, 37:25,

38:15, 114:21
**CVS's** [1] - 38:11

## D

**D.C** [1] - 21:14
**daily** [1] - 192:7
**dangerous** [1] - 218:7
**data** [154] - 7:20, 7:21,
9:10, 9:13, 10:10,
10:15, 10:20, 15:16,
22:3, 24:3, 24:13,
24:18, 24:21, 24:22,
24:23, 25:19, 25:21,
25:24, 31:13, 31:17,
33:8, 33:12, 33:21,
33:24, 34:2, 34:5,
36:20, 36:22, 38:18,
38:19, 39:1, 39:2,
39:9, 39:11, 39:12,
39:13, 39:17, 39:18,
39:21, 39:24, 40:1,
40:2, 40:15, 40:18,
41:13, 41:25, 42:7,
42:11, 42:15, 43:23,
43:24, 51:3, 52:6,
52:21, 52:22, 53:5,
54:24, 57:5, 57:18,
57:21, 57:24, 58:9,
58:22, 59:2, 59:18,
60:7, 60:8, 60:11,
60:18, 60:23, 61:23,
61:24, 62:1, 64:5,
64:8, 64:9, 66:12,
76:2, 76:3, 76:7,
76:8, 76:11, 79:10,
79:18, 81:4, 81:6,
81:7, 81:10, 86:10,
91:23, 91:25, 92:18,
93:16, 96:21, 96:23,
97:1, 98:17, 99:1,
99:18, 104:9,
106:21, 106:22,
109:17, 109:18,
111:14, 111:18,
111:21, 111:24,
112:10, 112:20,
112:25, 113:25,
114:13, 114:16,
115:2, 117:10,
117:13, 117:15,
117:18, 118:7,
118:18, 118:21,
118:22, 119:1,
119:8, 120:10,
122:20, 123:10,
123:18, 123:21,
123:22, 123:24,
124:1, 124:5, 124:9,
124:10, 124:13,
124:17, 124:21,

125:5, 125:9,
125:10, 125:13,
130:19, 150:10
**database** [4] - 25:5,
82:17, 83:6, 113:18
**dataset** [8] - 40:7,
96:17, 113:9,
117:14, 121:18,
121:19, 122:13,
122:14
**datasets** [3] - 121:13,
122:24, 125:16
**Date** [1] - 238:16
**date** [5] - 37:22, 50:6,
134:24, 213:24
**dated** [3] - 211:19,
223:2, 226:11
**dates** [1] - 10:3
**David** [7] - 7:1,
138:12, 144:2,
145:9, 145:15,
147:12
**DAVID** [2] - 1:17, 2:9
**days** [8] - 23:18,
77:25, 82:23, 98:19,
99:6, 104:10, 223:4,
225:21
**DC** [7] - 2:11, 4:7,
4:14, 4:16, 5:5, 5:12,
233:10
**DCP** [1] - 137:15
**DCs** [1] - 141:21
**De** [2] - 2:4, 2:16
**DEA** [177] - 7:21, 7:23,
7:24, 8:9, 8:13, 9:10,
9:18, 9:19, 10:2,
10:15, 10:20, 11:17,
12:4, 12:6, 25:4,
25:12, 27:17, 27:22,
27:25, 28:1, 28:5,
37:10, 39:13, 41:25,
42:7, 44:16, 44:20,
45:1, 45:4, 45:10,
45:17, 45:21, 45:24,
46:16, 47:2, 49:2,
63:4, 63:12, 63:22,
64:13, 64:21, 65:16,
107:18, 108:12,
108:14, 109:23,
144:20, 144:22,
146:17, 148:17,
152:11, 152:12,
152:15, 152:22,
152:23, 158:10,
161:11, 161:17,
162:4, 162:18,
162:22, 163:13,
168:19, 168:25,
169:3, 169:5, 169:9,
169:12, 169:17,

170:19, 170:21,
171:2, 171:7,
171:16, 175:2,
175:10, 175:19,
175:23, 176:14,
179:2, 179:4,
179:22, 180:2,
180:4, 180:10,
180:24, 181:1,
181:2, 182:20,
185:8, 189:23,
190:3, 190:9,
190:14, 191:4,
191:9, 191:13,
191:16, 194:12,
194:25, 195:8,
195:18, 196:1,
197:4, 197:16,
197:25, 198:4,
198:10, 198:20,
199:4, 199:6,
199:21, 199:25,
200:15, 201:10,
201:17, 202:6,
202:7, 203:4, 203:5,
210:2, 211:13,
212:3, 212:18,
213:11, 214:22,
216:3, 217:4, 217:6,
218:9, 219:7, 219:9,
219:15, 219:16,
220:15, 220:22,
220:24, 221:1,
221:8, 221:13,
221:15, 221:24,
222:8, 224:9,
224:25, 225:1,
225:15, 225:19,
225:23, 226:15,
228:1, 228:12,
229:2, 230:12,
230:20, 230:23,
231:4, 231:5,
231:11, 231:15,
231:19, 232:9,
232:18, 232:20,
233:6, 233:24,
234:8, 235:2,
235:21, 236:5,
236:15, 236:19,
237:2, 237:5, 237:11
**DEA's** [7] - 38:24,
46:15, 107:25,
200:3, 229:9, 234:3,
234:6
**DEA/ARCOS** [1] -
103:8
**deal** [1] - 177:14
**dealing** [1] - 147:6
**dealt** [3] - 43:11,

43:12, 147:8
**Death** [1] - 174:2
**death** [1] - 174:9
**decades** [2] - 22:5,
170:16
**decide** [3] - 85:12,
87:4, 88:2
**decided** [5] - 83:21,
85:25, 88:9, 147:12,
180:24
**decides** [1] - 44:20
**deciding** [1] - 216:24
**decision** [9] - 83:3,
86:19, 86:24, 87:2,
87:5, 101:19,
113:23, 114:1, 201:4
**decisions** [8] - 82:8,
88:15, 88:25, 89:10,
89:13, 94:9, 97:11,
124:19
**deck** [2] - 202:4,
202:23
**declarations** [1] -
157:9
**declared** [1] - 217:15
**decrease** [2] - 29:12,
32:8
**decreased** [2] - 30:5,
30:11
**deem** [2] - 93:2,
163:17
**deeper** [1] - 115:6
**Defendant** [4] - 4:10,
5:2, 5:7, 6:2
**defendant** [7] - 24:21,
27:14, 42:12, 61:8,
68:18, 76:11, 124:5
**defendant's** [2] - 79:3,
121:18
**Defendants** [3] - 1:8,
1:14, 238:7
**defendants** [28] -
39:13, 44:3, 59:17,
59:21, 60:23, 63:17,
66:14, 67:7, 67:24,
68:4, 69:7, 69:11,
69:24, 71:22, 73:2,
77:24, 78:25, 79:19,
79:22, 82:3, 82:25,
86:12, 86:20, 90:13,
92:1, 103:21,
109:18, 123:11
**Defendants'** [2] - 8:7,
11:2
**defendants'** [5] -
39:18, 60:11, 67:17,
122:14, 124:10
**defenses** [1] - 205:10
**defer** [1] - 88:1
**defined** [2] - 98:17,

154:25
**definition** [13] - 17:4,
103:5, 103:6, 103:8,
103:24, 104:11,
104:21, 105:11,
105:16, 106:3, 189:1
**definitions** [2] -
105:19, 105:21
**delay** [1] - 126:14
**deliver** [1] - 216:25
**delivered** [1] - 162:3
**delivers** [1] - 201:23
**Demetra** [1] - 171:17
**Demo** [2] - 132:6,
132:23
**demographics** [2] -
204:6, 204:12
**demonstrate** [3] -
77:8, 80:7, 86:8
**demonstrated** [1] -
117:5
**demonstrates** [2] -
202:25, 203:14
**demonstrative** [9] -
19:22, 46:14, 49:8,
84:5, 94:25, 95:2,
95:5, 95:8, 132:4
**demonstratives** [2] -
72:2, 90:10
**demoted** [1] - 145:13
**denying** [1] - 101:3
**Department** [4] -
139:4, 147:24,
148:15, 148:20
**department** [17] -
130:18, 132:21,
135:15, 137:24,
138:1, 138:2, 138:3,
138:10, 138:13,
143:6, 143:13,
143:14, 144:16,
148:14, 151:14,
167:14, 213:22
**dependence** [1] -
156:5
**dependent** [1] -
198:12
**depicted** [1] - 55:23
**depiction** [4] - 129:10,
132:24, 133:18,
134:22
**depo** [1] - 234:6
**deponent** [1] - 164:12
**deposed** [3] - 168:17,
170:19, 171:7
**deposition** [13] -
100:11, 100:16,
163:22, 164:5,
165:3, 166:17,
168:6, 168:15,

171:1, 171:10,
171:15, 196:4,
212:16
**depositions** [1] -
171:6
**depth** [1] - 233:2
**DEPUTY** [1] - 127:19
**describe** [3] - 24:1,
59:19, 224:16
**described** [3] - 40:10,
59:1, 224:17
**description** [1] - 40:1
**deserves** [1] - 88:17
**design** [2] - 163:11,
186:10
**designate** [1] - 197:7
**designed** [8] - 82:20,
83:5, 152:16, 163:4,
215:23, 215:25,
228:3, 233:9
**designing** [2] -
191:22, 235:7
**despite** [1] - 121:15
**destroyed** [1] - 107:17
**destruction** [5] -
107:14, 107:25,
108:6, 108:13, 153:2
**detail** [4] - 15:25, 29:1,
45:8, 46:2
**detailed** [3] - 30:24,
78:19, 80:5
**details** [4] - 29:4,
30:22, 35:3, 46:5
**detect** [1] - 228:3
**determination** [3] -
94:16, 107:2, 109:11
**determinations** [1] -
93:21
**determine** [8] - 28:11,
109:10, 126:11,
130:11, 161:9,
167:11, 206:23,
232:11
**determined** [3] - 39:7,
40:14, 41:18
**determining** [6] -
191:24, 203:22,
204:2, 204:6,
204:12, 206:14
**detrimental** [2] -
158:1, 217:16
**devastating** [1] -
173:20
**developing** [1] - 99:2
**development** [1] -
100:3
**devise** [1] - 219:9
**diagram** [2] - 133:8,
133:19
**Dictionary** [2] - 104:3,

104:5
**differ** [1] - 217:3
**difference** [7] - 18:1,
76:5, 119:14,
125:19, 148:8,
148:10, 206:1
**differences** [1] - 37:18
**different** [44] - 13:16,
18:24, 27:8, 29:14,
29:19, 39:6, 44:15,
61:2, 68:24, 78:4,
82:2, 86:20, 97:2,
97:4, 99:21, 104:2,
106:22, 111:15,
112:15, 121:13,
122:5, 122:9,
122:17, 123:2,
134:12, 141:18,
144:21, 147:16,
153:25, 169:4,
177:4, 181:13,
186:19, 186:25,
189:20, 207:9,
207:10, 219:11,
220:21, 224:5,
236:19
**differentiation** [1] -
105:17
**differently** [1] - 111:8
**dig** [2] - 14:18, 115:6
**digit** [3] - 48:14,
48:19, 50:2
**Diligence** [1] - 145:24
**diligence** [26] - 57:25,
58:9, 58:22, 59:1,
59:4, 59:8, 59:14,
59:15, 59:18, 59:20,
59:25, 60:3, 60:18,
60:24, 66:13, 66:16,
66:18, 67:15, 67:16,
137:10, 187:6,
191:22, 204:16,
218:21, 218:23,
233:7
**diligent** [1] - 232:17
**diminimous** [1] -
119:8
**DIRECT** [1] - 127:25
**Direct** [2] - 198:17,
198:21
**direct** [10] - 28:7, 81:6,
81:15, 138:17,
145:3, 151:14,
151:16, 180:19,
231:11, 231:18
**direction** [1] - 234:25
**directions** [1] - 121:10
**directly** [5] - 62:20,
65:2, 65:6, 134:1,
185:1

**Director** [11] - 135:24, 136:6, 136:9, 136:25, 138:22, 140:7, 140:10, 140:24, 143:3, 144:4, 145:21
**director** [1] - 147:7
**disa** [1] - 237:6
**disagree** [6] - 191:14, 202:10, 236:4, 237:1, 237:4, 237:11
**disagreed** [1] - 189:23
**disagreement** [2] - 231:20, 231:22
**disagrees** [1] - 190:3
**disclosed** [1] - 188:3
**Discount** [1] - 17:25
**discover** [2] - 102:14, 200:3
**Discovered** [1] - 199:21
**discovered** [3] - 200:1, 200:16, 200:22
**discovery** [3] - 123:22, 124:10, 168:11
**discuss** [2] - 16:10, 50:25
**discussed** [8] - 16:8, 25:17, 30:15, 37:6, 53:1, 71:6, 110:5, 226:16
**discussing** [3] - 26:23, 36:9, 235:4
**discussion** [4] - 7:19, 111:12, 165:24, 165:25
**discussions** [4] - 59:25, 72:6, 82:11, 229:22
**diskettes** [1] - 169:22
**dispensers** [10] - 24:15, 39:8, 47:7, 98:21, 112:11, 113:12, 113:19, 113:21, 114:15, 122:21
**display** [2] - 182:2, 208:21
**displayed** [1] - 95:7
**displaying** [1] - 91:4
**disposal** [2] - 180:12, 181:5
**distance** [1] - 20:20
**distances** [1] - 68:1
**distill** [1] - 153:11
**distinct** [1] - 126:22
**distinction** [1] - 113:1
**distribute** [1] - 214:21

**distributed** [11] - 24:25, 36:16, 52:4, 57:9, 57:17, 77:23, 151:10, 202:24, 203:7, 213:13, 218:12
**distributing** [6] - 34:24, 35:5, 37:21, 114:21, 218:13
**distribution** [100] - 9:24, 10:15, 33:8, 37:15, 41:23, 41:25, 42:5, 42:7, 42:25, 43:3, 43:16, 43:24, 56:11, 57:5, 57:19, 60:8, 61:9, 61:15, 61:18, 61:23, 62:10, 62:13, 62:16, 62:20, 62:24, 63:2, 63:7, 63:23, 63:25, 64:12, 64:23, 73:18, 73:24, 76:19, 79:6, 93:10, 93:23, 122:8, 136:1, 138:24, 140:9, 140:11, 140:15, 140:17, 140:18, 140:19, 140:21, 141:2, 141:15, 141:17, 141:23, 141:25, 142:4, 142:12, 145:22, 147:15, 147:19, 148:3, 148:5, 148:7, 148:22, 149:7, 149:11, 149:23, 150:11, 151:6, 153:19, 157:20, 157:25, 158:11, 158:13, 162:24, 169:18, 172:19, 172:21, 176:17, 176:25, 186:1, 186:4, 186:14, 187:3, 187:4, 189:8, 202:8, 212:12, 213:13, 213:19, 216:1, 216:18, 216:20, 217:15, 217:20, 222:9, 222:13, 227:11, 227:16, 227:17, 227:20, 232:10, 233:1
**Distribution** [9] - 62:8, 64:25, 65:9, 65:12, 135:24, 141:14, 142:7, 150:1, 151:8
**distributions** [29] - 30:4, 30:8, 30:11, 30:12, 30:25, 31:12,

31:16, 31:23, 32:7, 33:16, 34:9, 34:13, 34:16, 35:9, 36:7, 36:11, 36:24, 37:23, 39:3, 42:1, 42:8, 47:6, 49:3, 50:1, 51:11, 52:24, 53:5, 62:4, 62:19
**Distributor** [2] - 194:11, 209:16
**distributor** [60] - 22:8, 25:20, 26:20, 27:8, 28:22, 29:8, 29:13, 29:14, 29:19, 31:3, 34:5, 34:10, 38:16, 64:11, 65:15, 65:19, 72:14, 72:18, 78:21, 79:6, 94:13, 107:20, 107:21, 107:22, 107:24, 108:2, 108:5, 108:10, 108:12, 108:14, 108:15, 108:18, 109:6, 111:1, 114:23, 115:7, 115:11, 115:12, 115:15, 120:5, 120:7, 120:13, 148:1, 154:1, 161:13, 185:2, 197:15, 198:4, 198:21, 203:2, 218:9, 218:13, 218:20, 220:9, 220:13, 220:14, 224:22
**distributor's** [5] - 29:6, 29:11, 29:16, 161:21, 218:25
**Distributors** [1] - 216:17
**distributors** [55] - 23:24, 24:3, 24:15, 25:22, 25:24, 28:2, 29:5, 29:25, 32:21, 33:1, 33:9, 33:12, 35:7, 39:8, 43:20, 45:15, 45:19, 47:7, 56:3, 56:12, 56:18, 57:4, 58:13, 71:13, 73:1, 81:7, 81:8, 81:18, 98:19, 98:20, 107:12, 107:13, 107:15, 107:18, 108:23, 109:1, 112:4, 112:7, 113:12, 113:13, 113:19, 113:21, 114:14, 115:9, 115:22, 116:8,

152:20, 158:18, 158:21, 158:25, 159:13, 169:23, 197:22, 214:25, 216:23
**distributors'** [4] - 57:5, 60:19, 108:6, 108:25
**District** [5] - 7:2, 7:3, 101:15, 101:17, 102:5
**district** [1] - 142:6
**DISTRICT** [3] - 1:1, 1:1, 1:17
**diverge** [1] - 153:12
**diversion** [71] - 59:22, 136:13, 137:8, 137:9, 142:19, 144:22, 146:5, 147:1, 147:23, 147:24, 148:1, 151:25, 152:10, 152:17, 153:9, 158:14, 160:23, 161:2, 161:6, 161:10, 161:14, 161:20, 161:21, 162:7, 162:19, 162:20, 164:18, 169:17, 175:20, 177:19, 177:23, 180:13, 181:24, 182:12, 182:14, 183:15, 183:19, 183:21, 184:2, 184:4, 184:5, 184:11, 184:15, 185:3, 186:1, 186:23, 188:24, 189:1, 191:9, 195:19, 198:7, 198:13, 201:20, 201:21, 202:12, 202:17, 202:21, 203:1, 213:7, 215:25, 216:6, 218:10, 219:15, 219:19, 220:10, 220:13, 221:25, 222:1, 222:4, 228:3, 236:8
**Diversion** [12] - 137:1, 137:7, 144:5, 145:20, 145:23, 146:6, 147:3, 147:10, 147:13, 147:17, 147:24, 230:19
**diverted** [2] - 180:20, 218:22

**diverting** [5] - 202:25, 203:11, 203:13, 203:16, 225:16
**dividing** [1] - 52:3
**division** [1] - 137:24
**divisions** [3] - 142:2, 142:21, 149:2
**Doc** [1] - 151:21
**doctor** [2] - 160:15, 201:4
**doctor's** [1] - 201:12
**doctors** [2] - 66:22, 191:12
**document** [40] - 11:4, 11:18, 12:1, 12:2, 12:5, 12:16, 12:17, 26:8, 46:17, 68:23, 71:1, 81:1, 81:5, 95:17, 132:1, 132:15, 132:18, 132:20, 132:23, 133:6, 134:22, 156:9, 194:19, 196:3, 199:11, 208:18, 208:19, 208:20, 210:10, 210:11, 211:5, 211:19, 211:21, 211:24, 217:25, 222:23, 226:12, 228:25, 232:3, 234:18
**documentation** [3] - 63:16, 94:21, 118:21
**documents** [18] - 7:23, 11:6, 57:25, 58:9, 58:22, 59:2, 59:17, 60:14, 60:15, 60:18, 60:24, 66:16, 71:9, 127:21, 135:1, 176:10, 176:11, 194:20
**DOJ** [1] - 230:23
**Don** [1] - 171:19
**done** [12] - 20:23, 24:24, 81:14, 91:22, 91:24, 94:7, 99:23, 100:1, 100:4, 100:14, 132:1, 168:20
**door** [5] - 104:3, 104:6, 104:16, 104:19, 105:5
**dosage** [16] - 24:14, 26:10, 29:24, 69:10, 73:6, 73:12, 103:1, 104:12, 104:18, 104:23, 105:23, 106:5, 113:10, 223:24, 224:6,

224:15
**double** [3] - 110:1, 112:13, 113:14
**doubt** [1] - 52:12
**Douglas** [1] - 4:17
**down** [37] - 31:3, 38:5, 40:7, 50:19, 60:2, 67:3, 71:22, 72:4, 79:2, 81:16, 82:4, 101:13, 112:1, 113:18, 119:12, 121:8, 122:20, 126:24, 129:9, 131:13, 132:8, 139:2, 140:13, 146:9, 146:21, 149:5, 153:11, 157:22, 169:21, 185:16, 194:18, 203:9, 203:10, 214:2, 225:16, 225:20, 228:1
**Dr** [99] - 7:5, 7:10, 7:16, 8:6, 14:19, 21:3, 23:7, 23:16, 23:22, 26:2, 28:17, 29:23, 36:4, 38:17, 41:22, 42:4, 42:21, 44:15, 52:23, 61:2, 61:5, 63:15, 64:20, 65:14, 66:5, 66:10, 66:12, 66:21, 67:1, 67:6, 67:12, 67:23, 68:3, 68:16, 69:25, 70:11, 70:15, 71:18, 72:9, 73:5, 73:15, 74:18, 74:23, 75:13, 75:24, 76:13, 76:14, 77:16, 78:23, 79:11, 79:25, 81:1, 81:7, 81:10, 85:24, 86:6, 89:17, 92:12, 92:23, 94:5, 98:2, 98:9, 99:19, 100:24, 101:4, 101:10, 101:25, 102:7, 102:8, 102:11, 102:13, 102:16, 102:21, 103:5, 103:20, 103:24, 104:10, 104:17, 105:6, 105:22, 106:11, 106:15, 106:18, 106:20, 110:21, 112:25, 113:4, 117:15, 118:5, 119:7, 120:25, 121:21, 122:12, 122:16, 122:25, 124:10,

125:21, 125:25
**draw** [4] - 30:2, 32:20, 118:21, 158:17
**drawing** [1] - 139:8
**drawn** [1] - 88:3
**Dreamland** [1] - 208:12
**drill** [1] - 119:11
**drive** [1] - 54:16
**Drive** [1] - 6:15
**driven** [1] - 30:22
**driving** [1] - 111:18
**drop** [4] - 140:13, 160:19, 160:23, 162:17
**Drug** [7] - 6:2, 47:12, 47:23, 48:13, 49:21, 50:1, 50:5, 51:3, 122:22, 124:2, 128:6, 135:24, 177:12, 182:23, 212:7, 214:20, 238:7
**DRUG** [2] - 1:7, 1:13
**drug** [19] - 37:11, 37:12, 62:8, 62:9, 62:15, 64:10, 107:20, 111:1, 136:1, 140:9, 155:15, 155:16, 155:19, 156:4, 169:12, 214:25, 216:1, 218:6
**drugs** [26] - 34:21, 43:8, 43:13, 45:23, 56:11, 62:13, 120:6, 153:10, 155:6, 156:17, 157:14, 159:17, 159:19, 161:12, 162:6, 201:1, 201:2, 202:24, 203:6, 203:12, 203:16, 215:7, 215:11, 217:5, 220:24, 236:10
**dual** [1] - 145:8
**due** [18] - 59:1, 59:4, 59:8, 59:14, 59:20, 60:3, 66:13, 66:16, 66:18, 67:15, 67:16, 137:10, 187:6, 191:22, 204:16, 218:20, 218:23, 233:7
**Due** [1] - 145:24
**duly** [1] - 221:10
**duplicate** [1] - 40:14
**During** [1] - 188:3
**during** [17] - 25:9, 25:15, 25:24, 26:21,

28:14, 30:7, 31:20, 34:9, 62:6, 100:4, 100:17, 123:21, 123:23, 148:15, 198:21, 224:17, 231:18
**duties** [6] - 142:19, 160:17, 168:21, 189:22, 191:17, 212:8
**duty** [27] - 130:20, 161:25, 162:16, 162:19, 162:22, 162:23, 163:1, 163:9, 163:11, 163:12, 163:15, 164:18, 164:25, 165:7, 165:8, 165:10, 165:21, 165:24, 166:2, 166:3, 166:12, 166:20, 190:7, 190:10, 199:25, 233:13, 233:25
**dying** [1] - 114:8

---

# E

**e-mail** [1] - 59:24
**e-mails** [1] - 59:22
**early** [5] - 35:12, 50:7, 51:9, 51:13, 98:5
**easily** [1] - 89:6
**East** [5] - 3:5, 3:12, 4:18, 140:7, 140:20
**Eastern** [2] - 53:12, 53:17
**easy** [2] - 69:3, 108:24
**Ed** [6] - 137:1, 137:4, 137:14, 139:2, 139:20, 147:11
**Ed's** [2] - 137:6, 137:7
**educating** [1] - 11:18
**effect** [5] - 89:14, 158:2, 174:18, 174:21, 217:17
**effective** [32] - 92:20, 151:24, 152:9, 162:23, 163:1, 164:25, 166:2, 168:20, 175:20, 184:1, 187:18, 188:8, 188:10, 188:15, 188:17, 188:20, 188:23, 188:24, 189:2, 190:7, 191:6, 191:8, 198:7, 198:12, 202:9, 203:1, 203:14, 212:8,

220:10, 220:13, 222:10, 233:25
**effectively** [2] - 91:19, 122:23
**effectuating** [1] - 228:12
**effort** [2] - 18:4, 153:5
**Efrem** [1] - 235:13
**egg** [2] - 83:25, 96:9
**eight** [13] - 17:3, 40:1, 40:11, 100:20, 106:22, 111:14, 112:5, 113:4, 120:24, 121:15, 138:19, 151:17
**Eighth** [1] - 3:10
**either** [10] - 43:11, 69:4, 88:12, 92:17, 100:23, 101:19, 120:3, 121:7, 167:8, 201:11
**elaborate** [1] - 110:16
**electronic** [2] - 187:7, 231:14
**element** [5] - 152:16, 177:3, 206:21, 207:17, 207:24
**elements** [6] - 172:14, 185:7, 206:6, 206:17, 206:18, 208:3
**elevated** [2] - 207:19, 208:1
**eleven** [2] - 47:19, 48:5
**eleven-fold** [2] - 47:19, 48:5
**elicit** [1] - 95:23
**elicited** [1] - 43:15
**eliminated** [1] - 109:9
**ELIZABETH** [1] - 6:14
**embedded** [2] - 146:7, 147:25
**embrace** [2] - 184:20, 185:12
**employed** [3] - 128:10, 141:10, 230:22
**employees** [1] - 151:18
**enacting** [1] - 156:24
**Encino** [1] - 3:18
**encompass** [2] - 48:15, 48:19
**encompassing** [1] - 59:2
**end** [8] - 38:24, 84:18, 84:21, 89:25, 90:3, 128:23, 129:17, 160:19

**ended** [1] - 183:11
**ends** [1] - 162:17
**Enforcement** [4] - 177:12, 182:23, 212:7, 214:20
**enforcement** [3] - 50:11, 181:7, 201:18
**enforcing** [1] - 101:23
**enjoy** [2] - 156:11, 156:12
**enormous** [1] - 218:10
**ensure** [3] - 162:3, 162:7, 216:4
**ensuring** [1] - 203:5
**enter** [3] - 11:11, 101:23, 132:13
**entered** [6] - 62:14, 96:18, 175:22, 177:13, 226:5, 226:15
**entire** [12] - 47:13, 47:18, 47:24, 48:4, 79:10, 101:9, 111:25, 113:18, 142:8, 162:24, 210:10, 217:25
**entirely** [1] - 70:17
**entity** [1] - 214:19
**ENU** [1] - 4:12
**envisioned** [1] - 216:23
**epidemic** [15] - 171:3, 172:23, 172:25, 173:3, 173:6, 173:10, 173:11, 173:16, 173:19, 173:22, 173:25, 174:13, 174:18, 174:22, 174:24
**equally** [1] - 186:14
**Eric** [6] - 140:1, 140:5, 141:7, 141:9
**erred** [1] - 102:5
**erroneous** [2] - 107:2, 107:3
**error** [7] - 38:24, 101:22, 102:14, 108:24, 109:10, 115:9, 116:8
**errors** [1] - 109:10
**especially** [1] - 79:7
**essentially** [2] - 80:15, 119:9
**established** [2] - 80:16, 155:12
**estimate** [5] - 14:4, 23:2, 130:25, 131:1, 149:10
**estimated** [1] - 10:3
**et** [4] - 1:7, 1:13,

238:6, 238:7
**event** [1] - 92:4
**eventually** [1] - 218:1
**evidence** [32] - 11:2,
11:11, 11:13, 80:9,
80:13, 80:16, 81:12,
82:5, 82:9, 82:16,
83:22, 84:4, 85:16,
86:18, 86:23, 87:1,
87:9, 87:17, 87:24,
88:16, 89:6, 92:25,
93:3, 94:22, 95:1,
95:4, 95:7, 102:3,
102:10, 102:12,
124:11, 125:5
**evidenced** [1] - 103:13
**evolution** [5] - 145:25,
146:3, 146:13,
146:14, 192:16
**evolutions** [2] - 192:4,
192:6
**evolved** [3] - 192:2,
192:7, 192:17
**exact** [7] - 130:7,
130:24, 131:5,
131:11, 131:21,
185:20, 205:2
**exactly** [18] - 77:15,
77:22, 78:23, 79:16,
82:19, 83:5, 83:24,
85:13, 88:5, 88:17,
88:19, 91:5, 100:21,
128:23, 136:8,
153:11, 156:1,
172:10
**exaggeration** [1] -
109:4
**examination** [9] -
67:19, 68:25, 80:24,
81:6, 81:13, 81:15,
83:23, 114:9, 196:22
**EXAMINATION** [7] -
23:14, 66:8, 116:20,
118:2, 119:5,
120:22, 127:25
**example** [19] - 19:12,
28:25, 59:21, 60:8,
62:15, 62:24, 63:18,
71:20, 72:20, 92:3,
94:8, 109:22, 114:8,
114:20, 119:13,
123:18, 183:24,
207:14
**examples** [7] - 31:6,
53:10, 56:2, 77:8,
85:6, 99:15, 115:4
**exceeded** [1] - 101:21
**exceedence** [1] -
60:10
**exceeds** [1] - 99:16

**Excel** [1] - 92:21
**except** [1] - 111:7
**excerpted** [1] - 71:1
**excessive** [2] -
206:14, 225:7
**exchange** [2] - 231:14
**exclude** [3] - 41:18,
105:2, 105:4
**excluded** [5] - 15:3,
104:25, 106:24,
107:9, 107:11
**excludes** [2] - 104:18,
104:19
**excluding** [2] - 40:13,
112:6
**exclusion** [1] - 119:7
**exclusions** [2] -
41:12, 113:4
**exclusively** [1] - 27:7
**excuse** [8] - 24:12,
25:12, 25:19, 26:3,
37:19, 38:4, 54:3,
63:15
**Excuse** [2] - 203:8,
220:5
**excused** [1] - 125:21
**execute** [1] - 142:19
**Executive** [1] - 99:22
**exempt** [1] - 110:20
**exercise** [2] - 218:20,
218:23
**Exhibit** [10] - 8:8,
47:21, 61:3, 68:11,
68:16, 70:16, 70:18,
76:14, 102:17,
103:15
**exhibit** [15] - 9:6,
20:24, 20:25, 56:14,
72:1, 74:9, 76:15,
91:20, 103:20,
104:8, 105:6,
191:19, 196:4,
196:19, 211:7
**exhibits** [5] - 43:7,
43:8, 43:10, 76:9,
106:23
**existence** [1] - 192:10
**exists** [3] - 172:25,
173:2, 173:5
**expansion** [1] -
134:21
**expect** [1] - 208:7
**expenses** [1] - 101:18
**experience** [4] -
144:15, 144:18,
145:2
**expert** [12] - 11:6,
23:22, 26:25, 27:1,
43:7, 89:1, 90:10,
91:10, 97:5, 100:10,

100:16, 121:20
**expert's** [2] - 46:3,
80:15
**experts** [1] - 121:12
**explain** [12] - 39:24,
70:18, 77:3, 96:7,
98:14, 99:21, 114:3,
114:12, 121:3,
121:21, 179:17,
181:20
**explained** [6] - 39:16,
61:8, 111:23, 117:8,
120:8, 145:22
**explaining** [1] - 78:12
**explanation** [1] -
211:6
**express** [1] - 81:17
**expressed** [1] -
111:11
**expressly** [2] - 102:6,
217:15
**extended** [3] - 104:15,
105:2, 105:4
**extensive** [5] - 57:24,
58:21, 70:8, 70:12,
78:2
**extensively** [1] - 69:25
**extent** [8] - 86:4,
87:13, 89:20,
117:17, 123:5,
187:18, 189:4, 218:6
**extraordinary** [1] -
66:18
**eye** [2] - 220:16,
220:24
**eyeball** [1] - 232:21

**F**

**FABER** [1] - 1:17
**Faber** [1] - 7:1
**faces** [1] - 215:1
**facilitate** [2] - 80:14,
218:9
**facilities** [8] - 104:4,
104:15, 104:16,
105:2, 105:4,
227:11, 228:4,
235:11
**Facilities** [2] - 139:3,
139:4
**facility** [7] - 64:12,
65:5, 107:25, 150:2,
204:18, 208:1, 227:9
**fact** [24] - 7:22, 9:23,
10:1, 17:24, 19:3,
32:7, 37:10, 57:16,
78:1, 85:18, 87:24,
89:5, 111:10, 170:4,
176:13, 204:21,

205:16, 207:1,
209:2, 220:14,
220:23, 227:19,
229:5
**factor** [11] - 17:13,
17:17, 17:20, 18:1,
49:13, 49:14, 95:6,
108:21, 177:25,
206:13, 208:2
**factors** [1] - 16:22
**facts** [1] - 129:17
**fail** [2] - 182:15, 184:5
**failing** [2] - 175:19,
222:9
**failure** [2] - 92:19,
184:7
**Failure** [1] - 218:23
**fair** [12] - 30:13, 36:19,
129:10, 133:18,
134:22, 141:3,
175:18, 176:9,
185:14, 192:5,
201:14, 233:18
**Fair** [1] - 176:23
**fairly** [2] - 99:2, 108:24
**faith** [2] - 132:14,
153:5
**fall** [2] - 29:7, 100:22
**falls** [1] - 83:4
**Falls** [1] - 62:25
**familiar** [15] - 8:15,
30:17, 37:7, 46:10,
53:14, 120:25,
149:14, 154:7,
155:23, 170:15,
172:7, 188:5,
194:11, 199:10,
203:24
**family** [1] - 30:20
**Family** [3] - 17:25,
93:7, 116:22
**family-owned** [1] -
30:20
**far** [17] - 19:19, 20:5,
20:13, 21:3, 25:12,
25:18, 51:10, 51:16,
62:3, 68:7, 69:6,
88:12, 90:16, 94:5,
124:20, 149:12,
205:3
**FARRELL** [109] - 2:3,
91:13, 91:22, 96:2,
96:16, 127:6, 128:1,
130:2, 130:10,
131:23, 132:3,
132:10, 133:13,
134:9, 134:10,
137:23, 146:24,
153:17, 153:18,
156:11, 156:14,

156:15, 157:2,
157:4, 158:4, 160:3,
160:13, 164:23,
165:6, 165:14,
165:19, 166:10,
166:16, 166:19,
166:23, 167:1,
167:9, 171:14,
172:6, 174:7, 175:9,
175:17, 176:4,
180:17, 181:15,
181:17, 182:9,
182:19, 183:8,
183:23, 184:24,
185:7, 185:14,
185:16, 185:17,
188:2, 189:14,
190:13, 190:25,
191:3, 193:13,
194:14, 194:15,
196:3, 196:12,
196:21, 200:13,
203:18, 205:20,
205:24, 205:25,
207:9, 207:13,
209:1, 209:8,
209:10, 209:15,
209:18, 209:25,
210:14, 210:19,
211:3, 211:4, 211:7,
211:10, 211:12,
211:16, 216:13,
221:6, 221:7,
222:21, 223:13,
223:20, 225:25,
226:2, 226:18,
226:22, 227:4,
228:17, 228:19,
229:13, 229:19,
232:2, 232:4, 234:5,
234:17, 234:20,
234:22, 237:17
**Farrell** [28] - 2:4, 2:15,
85:1, 91:12, 91:21,
95:21, 96:1, 127:4,
130:1, 134:7,
156:10, 160:7,
171:24, 172:5,
174:6, 175:7, 182:8,
182:18, 185:9,
190:12, 205:23,
208:19, 208:25,
209:24, 210:13,
221:5, 234:16,
232:11
**fashion** [2] - 83:1,
232:11
**fast** [1] - 99:7
**fault** [1] - 227:5
**Fayette** [1] - 208:13

**FCRR** [1] - 6:18
**FDA** [2] - 193:4, 236:10
**featured** [2] - 22:16, 22:20
**federal** [17] - 67:4, 89:13, 89:15, 100:25, 165:1, 168:21, 181:24, 182:11, 182:15, 183:6, 183:7, 184:1, 184:5, 188:22, 189:24, 191:17, 221:11
**Federal** [13] - 142:23, 144:5, 146:4, 146:17, 147:2, 155:12, 158:9, 162:6, 178:11, 180:9, 233:15, 236:15, 237:9
**fees** [1] - 101:18
**felt** [1] - 219:22
**Fentanyl** [1] - 109:7
**few** [19] - 13:6, 16:1, 22:5, 23:18, 23:20, 43:12, 52:25, 53:1, 53:10, 70:25, 82:23, 99:6, 116:14, 116:17, 123:17, 124:4, 127:8, 139:24, 148:16
**fide** [1] - 235:1
**fields** [2] - 107:5, 107:8
**fifteen** [1] - 23:4
**Fifth** [2] - 101:9, 102:1
**fifths** [2] - 16:7, 16:11
**fighting** [1] - 89:3
**figure** [2] - 84:10, 186:21
**figured** [1] - 144:16
**figures** [1] - 99:3
**filed** [4] - 100:10, 100:16, 167:24, 171:21
**files** [12] - 59:1, 59:4, 59:6, 59:8, 59:14, 59:15, 59:20, 59:24, 60:3, 60:4, 67:17, 214:9
**fill** [8] - 68:1, 68:7, 68:19, 69:8, 69:12, 161:14, 179:21, 201:6
**filled** [3] - 52:20, 107:5, 107:8
**filling** [1] - 218:21
**final** [3] - 7:17, 10:19, 111:18

**findings** [1] - 157:9
**finish** [1] - 220:11
**Firm** [2] - 3:4, 3:7
**firm** [1] - 231:9
**firm's** [1] - 76:1
**first** [31] - 9:5, 17:25, 58:16, 58:18, 59:12, 69:3, 77:19, 83:15, 89:13, 90:21, 91:13, 95:13, 99:24, 104:25, 105:6, 105:7, 105:18, 112:3, 120:5, 127:15, 148:15, 169:4, 191:19, 211:21, 214:18, 215:2, 215:5, 222:18, 229:20
**fit** [3] - 93:2, 144:16, 144:19
**five** [12] - 69:13, 75:19, 93:17, 112:18, 138:17, 140:21, 141:2, 181:14, 181:18, 182:20, 223:4, 225:21
**FL** [1] - 2:14
**flag** [3] - 126:19, 194:18, 232:20
**flagged** [4] - 232:13, 232:16, 232:22, 234:24
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**fleetingly** [1] - 22:9
**flexibility** [1] - 82:10
**flip** [2] - 70:17, 211:17
**Flood** [2] - 136:18, 136:20
**Floor** [1] - 3:5
**floor** [2] - 183:12, 183:21
**Florida** [3] - 63:23, 64:23, 68:7
**focus** [7] - 21:8, 26:9, 39:23, 46:19, 61:3, 103:17, 113:11
**focused** [3] - 43:3, 103:14, 142:1
**focusing** [1] - 15:5
**Focusing** [1] - 33:16
**fold** [5] - 47:19, 48:5, 48:20, 49:5, 49:17
**folks** [1] - 8:17
**follow** [8] - 52:25, 107:24, 116:18, 120:21, 151:22, 184:13, 189:5, 220:1
**follow-on** [1] - 107:24

**follow-up** [4] - 52:25, 116:18, 120:21, 151:22
**followed** [2] - 105:20, 148:6
**following** [15] - 35:16, 103:21, 142:21, 143:10, 177:12, 194:7, 205:3, 223:8, 224:21, 224:22, 225:1, 226:6, 226:16, 228:10
**follows** [1] - 7:4
**Footnote** [1] - 102:9
**footnote** [3] - 215:14, 215:17, 215:19
**FOR** [1] - 1:1
**foregoing** [1] - 238:4
**foreseeable** [6] - 182:15, 183:14, 183:19, 183:21, 184:2, 184:14
**forget** [1] - 185:20
**forgotten** [1] - 129:5
**form** [7] - 94:25, 95:5, 113:25, 162:11, 176:1, 187:22, 234:2
**format** [3] - 182:2, 184:20, 185:12
**formed** [1] - 194:5
**former** [1] - 144:20
**forms** [1] - 162:10
**formulate** [1] - 95:22
**forth** [3] - 88:7, 235:7, 235:21
**forums** [1] - 225:13
**forward** [8] - 7:6, 77:15, 78:3, 80:19, 82:9, 126:15, 147:4, 213:21
**forwarded** [1] - 213:23
**foundation** [11] - 11:4, 92:24, 93:1, 129:24, 133:2, 175:5, 189:11, 191:1, 193:7, 200:9, 208:22
**Four** [1] - 21:1
**four** [15] - 12:21, 12:22, 13:12, 16:7, 16:11, 36:11, 69:13, 71:16, 91:16, 140:21, 141:2, 167:18, 183:20, 205:15, 225:9
**four-fifths** [2] - 16:7, 16:11
**Fourth** [1] - 89:23
**fraction** [1] - 37:3
**frame** [23] - 25:9, 25:15, 25:25, 30:3,

30:5, 30:7, 31:21, 34:12, 36:21, 38:10, 62:6, 129:11, 133:10, 134:7, 146:3, 187:25, 188:3, 192:1, 193:12, 193:14, 200:11, 202:5, 204:8
**framed** [1] - 84:2
**Francisco** [2] - 100:12, 100:13
**fraud** [5] - 101:20, 102:4, 102:6, 102:7, 102:12
**free** [1] - 126:1
**Frequency** [1] - 197:12
**frequency** [2] - 67:15, 178:12, 197:18
**frequent** [2] - 231:11, 231:18
**Friday** [1] - 84:22
**front** [16] - 8:7, 8:8, 12:13, 14:21, 19:22, 70:15, 72:13, 77:19, 84:11, 116:15, 129:17, 131:24, 132:2, 196:6, 209:19, 223:21
**front-end** [1] - 129:17
**Frost** [1] - 139:22
**fruitful** [1] - 171:8
**frustrating** [1] - 170:3
**Fruth** [11] - 29:1, 29:2, 29:5, 30:17, 30:18, 30:25, 31:9, 32:3, 32:4, 32:11, 114:23
**Frye** [1] - 100:17
**full** [4] - 41:7, 102:16, 115:20, 218:3
**Fuller** [2] - 2:4, 2:15
**FULLER** [1] - 2:15
**function** [9] - 88:13, 141:25, 147:18, 147:23, 151:23, 172:8, 186:5, 216:22
**functions** [2] - 145:25, 148:21
**furnished** [1] - 63:16

**G**

**gained** [2] - 32:14, 38:10
**Gallia** [1] - 208:11
**Garrett** [1] - 102:15
**gatekeeper** [1] - 88:13
**General** [2] - 100:18, 170:4
**general** [20] - 38:4,

46:11, 51:23, 55:25, 56:12, 60:3, 60:5, 60:8, 60:13, 99:25, 132:14, 132:17, 134:12, 152:8, 157:16, 158:2, 172:22, 176:12, 186:7, 217:17
**generally** [14] - 30:17, 32:7, 35:4, 37:7, 37:13, 37:14, 44:23, 45:7, 45:9, 52:10, 58:24, 59:3, 99:24, 112:11
**generate** [1] - 70:20
**geographic** [7] - 19:2, 19:7, 21:20, 21:21, 112:1, 112:9, 126:20
**geographical** [1] - 110:12
**geographically** [1] - 21:23
**geography** [1] - 151:9
**given** [12] - 8:12, 9:20, 10:11, 29:17, 56:1, 59:11, 68:24, 71:16, 97:9, 123:1, 170:6, 218:6
**Given** [2] - 220:8, 220:12
**glasses** [1] - 227:9
**global** [1] - 81:2
**government** [1] - 109:17
**grab** [1] - 127:23
**grams** [5] - 40:18, 40:23, 41:5, 118:9, 118:13
**granted** [1] - 101:17
**graph** [10] - 36:17, 37:21, 38:5, 46:4, 46:14, 46:20, 51:9, 51:13, 72:25, 116:3
**graphs** [12] - 32:2, 46:10, 46:13, 49:15, 49:16, 50:20, 70:21, 71:13, 76:18, 98:11, 98:15, 114:19
**gray** [2] - 32:20, 32:22
**great** [2] - 96:2, 169:3
**greater** [2] - 46:7, 47:3
**Greenup** [1] - 208:10
**Greg** [2] - 142:25, 143:2
**Greg's** [1] - 143:3
**GRETCHEN** [1] - 6:7
**gross** [1] - 114:11
**grounds** [1] - 102:6
**Group** [2] - 146:16, 147:10

**group** [8] - 13:14, 139:5, 148:17, 213:8, 213:16, 213:20, 213:21, 233:3
**grouped** [2] - 43:8, 60:2
**groups** [1] - 147:20
**growing** [2] - 215:8, 215:11
**guess** [14] - 16:25, 17:1, 28:7, 120:10, 131:12, 151:5, 177:24, 180:18, 184:7, 190:22, 205:16, 208:17, 208:21, 230:23
**guidance** [2] - 85:21, 212:2
**guidelines** [1] - 143:10
**guilt** [1] - 175:23
**gun** [1] - 185:10
**Gundy** [4] - 133:25, 136:3, 136:8, 139:11

### H

**half** [7] - 15:12, 15:13, 15:21, 104:10, 111:12, 116:4
**half's** [1] - 99:24
**Hancock** [4] - 19:13, 19:16, 20:4, 53:16
**hand** [15] - 25:13, 76:13, 78:24, 79:2, 80:9, 101:14, 127:17, 150:13, 157:8, 197:4, 199:3, 208:19, 214:2, 226:3, 228:20
**hand-picked** [1] - 80:9
**Handbook** [2] - 107:4, 107:9
**handed** [1] - 101:9
**handful** [1] - 82:4
**handle** [2] - 144:25, 154:2
**handlers** [1] - 216:2
**handling** [3] - 90:21, 145:1, 154:1
**happy** [4] - 35:16, 58:17, 83:20
**hard** [1] - 24:9
**HARDIN** [1] - 5:3
**harm** [1] - 218:10
**Harper** [1] - 171:18
**Harper-Avilla** [1] - 171:18
**Harrison** [1] - 54:14

**hate** [1] - 184:17
**Hawkins** [1] - 3:7
**Hazewski** [5] - 137:1, 137:4, 137:14, 139:2, 139:20
**HCP** [1] - 154:21
**head** [6] - 195:15, 195:16, 199:3, 200:17, 206:13, 221:14
**headers** [2] - 53:3, 54:8
**headquarters** [1] - 177:2
**Health** [51] - 4:11, 5:2, 23:19, 24:25, 25:3, 25:7, 25:23, 27:12, 29:3, 31:17, 31:25, 32:3, 32:12, 32:14, 32:21, 33:13, 33:17, 33:21, 34:4, 35:1, 37:2, 37:23, 37:25, 38:10, 38:19, 38:23, 41:24, 42:6, 42:10, 42:14, 42:23, 44:1, 55:1, 57:8, 57:17, 57:18, 57:24, 58:21, 60:22, 61:4, 61:14, 62:4, 63:24, 64:24, 114:22, 115:2, 115:5, 123:18, 125:2, 159:3, 207:15
**health** [8] - 50:11, 157:16, 158:2, 173:20, 174:11, 215:8, 215:12, 217:17
**Health's** [21] - 25:20, 30:7, 30:12, 32:13, 34:8, 34:16, 36:24, 38:8, 39:3, 55:5, 55:14, 58:10, 61:15, 61:24, 63:23, 64:23, 65:4, 65:8, 65:11, 114:25, 115:17
**healthcare** [6] - 52:9, 203:22, 205:12, 206:2, 206:15, 208:4
**hear** [4] - 70:5, 85:3, 85:11, 196:14
**heard** [11] - 52:16, 58:25, 69:7, 84:18, 84:24, 94:18, 97:12, 159:11, 204:23, 210:21, 212:21
**hearing** [3] - 94:17, 100:17, 156:12
**hearings** [1] - 193:25
**hearsay** [2] - 196:20, 211:2

**height** [1] - 122:8
**heights** [3] - 116:5, 122:6, 122:8
**held** [2] - 91:9, 233:2
**help** [8] - 16:25, 80:14, 80:19, 84:8, 100:6, 111:2, 169:13, 169:17
**Help** [1] - 179:8
**helpful** [2] - 183:4, 187:24
**Hester** [1] - 210:4
**HESTER** [9] - 5:9, 97:20, 209:21, 210:5, 216:9, 223:17, 226:25, 229:17, 234:2
**high** [7] - 44:9, 44:12, 119:25, 155:1, 155:5, 155:7, 155:16
**higher** [11] - 7:17, 17:9, 17:13, 22:11, 34:13, 34:17, 51:6, 51:17, 108:11, 108:16, 209:4
**highest** [3] - 14:7, 14:15, 99:16
**highlight** [1] - 20:4
**highlighted** [3] - 19:25, 157:11, 157:12
**himself** [1] - 11:18
**hire** [1] - 144:17
**hired** [1] - 144:8
**history** [1] - 144:24
**hit** [1] - 132:6
**hold** [4] - 83:12, 86:19, 143:22, 159:9
**holding** [2] - 199:10, 208:19
**holdings** [1] - 101:22
**holds** [1] - 159:12
**Honor** [148] - 7:8, 7:11, 7:12, 8:1, 11:1, 11:3, 11:14, 12:7, 54:11, 56:17, 63:19, 66:1, 66:4, 66:5, 66:11, 67:1, 67:18, 68:12, 68:22, 69:3, 69:6, 69:9, 69:16, 69:23, 70:5, 70:6, 70:8, 71:9, 71:24, 72:3, 73:1, 73:15, 74:19, 75:1, 75:14, 76:22, 77:5, 77:8, 77:13, 77:14, 77:18, 77:19, 78:7, 78:16, 79:4, 79:8, 79:23, 80:6, 80:8, 81:21, 81:25, 82:6, 82:8,

82:13, 82:15, 82:21, 83:1, 83:5, 83:8, 83:16, 83:17, 83:24, 84:2, 84:10, 84:11, 84:14, 85:4, 85:8, 85:10, 85:19, 85:20, 86:8, 86:11, 86:13, 86:18, 86:22, 87:2, 87:6, 87:9, 87:10, 88:1, 88:5, 88:10, 88:21, 89:10, 90:1, 90:4, 90:5, 90:9, 90:12, 90:18, 91:8, 93:5, 93:25, 94:4, 94:12, 94:19, 97:20, 97:24, 97:25, 98:7, 101:6, 102:19, 105:13, 106:8, 106:10, 106:14, 110:22, 112:23, 114:7, 116:17, 117:21, 120:17, 120:24, 123:8, 124:13, 125:1, 125:3, 125:14, 125:18, 125:20, 125:23, 126:2, 126:25, 127:2, 127:22, 134:2, 153:14, 156:7, 160:3, 165:2, 165:14, 171:4, 182:1, 184:16, 185:4, 193:8, 205:20, 209:21, 210:8, 210:22, 211:3, 216:8, 223:15, 223:18, 226:25, 229:17, 234:2
**honor** [1] - 126:3
**Honor's** [1] - 85:20
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**horse** [1] - 85:6
**Hospital** [1] - 15:3
**hospital** [1] - 208:4
**hospitals** [12] - 94:12, 105:1, 160:10, 160:12, 169:20, 204:1, 204:22, 205:1, 207:2, 207:6, 207:17, 209:3
**host** [1] - 222:2
**hour** [1] - 154:5
**hours** [1] - 105:8
**Howard** [1] - 171:18
**hub** [6] - 52:9, 203:22, 205:12, 206:2,

206:15, 207:25
**human** [1] - 174:19
**hundreds** [1] - 74:7
**hundredth** [1] - 107:7
**hundredths** [2] - 23:4, 112:18
**Huntington** [105] - 3:10, 4:1, 12:21, 12:22, 12:23, 13:10, 15:18, 15:22, 16:12, 18:6, 19:19, 20:1, 20:5, 20:10, 23:25, 24:5, 25:1, 25:9, 26:4, 29:25, 30:5, 30:25, 31:10, 32:13, 33:2, 34:25, 36:8, 36:12, 36:15, 37:22, 38:9, 43:25, 44:10, 48:15, 48:20, 48:24, 49:4, 50:10, 52:2, 52:4, 52:5, 52:15, 52:19, 52:25, 53:4, 53:6, 53:8, 54:9, 54:17, 54:20, 54:25, 55:5, 56:4, 56:9, 56:10, 57:3, 57:20, 57:23, 58:10, 58:20, 59:5, 59:24, 60:12, 60:20, 60:25, 61:10, 61:14, 61:20, 61:25, 62:6, 62:9, 62:14, 64:1, 64:16, 65:1, 65:3, 65:7, 100:8, 111:6, 111:23, 112:1, 112:4, 112:12, 115:3, 115:24, 116:11, 126:21, 129:20, 130:12, 130:23, 131:3, 149:15, 149:17, 149:24, 167:13, 168:16, 173:6, 173:15, 174:15, 174:19, 174:24, 204:23, 208:5, 209:3, 238:6
**HUNTINGTON** [1] - 1:4
**Huntington-Cabell** [6] - 15:18, 126:21, 149:15, 149:17, 149:24, 167:13
**Huntington/Ashland** [1] - 52:14
**Huntington/Cabell** [28] - 12:24, 13:2, 14:11, 14:20, 14:25, 15:10, 16:4, 16:8, 16:22, 17:2, 17:7, 17:19, 17:25, 18:8,

18:13, 19:8, 20:14, 21:4, 21:18, 21:20, 22:1, 22:2, 22:16, 52:11, 173:10, 207:2, 207:17, 227:22

**hydrocodone** [74] - 13:7, 13:9, 15:9, 15:21, 24:14, 25:1, 25:8, 25:14, 26:5, 26:11, 26:14, 26:21, 27:7, 28:3, 29:24, 30:4, 31:9, 32:9, 33:1, 34:21, 34:24, 35:2, 35:5, 35:7, 36:11, 36:14, 37:3, 37:7, 37:11, 37:19, 37:20, 38:1, 38:4, 38:9, 38:13, 43:5, 43:12, 43:16, 44:10, 44:21, 47:6, 47:12, 47:17, 47:23, 48:3, 48:12, 48:18, 49:3, 55:1, 55:6, 55:10, 55:14, 61:10, 61:13, 61:19, 61:25, 62:5, 63:25, 65:1, 67:10, 72:18, 72:21, 73:6, 105:24, 106:6, 129:20, 130:21, 154:13, 154:14, 154:16, 154:20, 154:21, 223:24, 224:6

**hypothetically** [1] - 86:25

**I**

**idea** [5] - 34:8, 38:22, 52:18, 93:12, 128:21
**identifiable** [1] - 63:7
**identified** [20] - 53:4, 56:8, 61:22, 62:4, 62:24, 63:9, 63:10, 72:21, 80:5, 82:14, 94:11, 104:7, 128:5, 144:4, 151:6, 158:20, 175:23, 219:13, 224:8, 225:11
**identifies** [4] - 72:14, 73:18, 163:12, 196:19
**identify** [12] - 11:20, 11:23, 22:1, 66:21, 79:6, 104:3, 128:6, 135:3, 139:24, 143:24, 179:4, 186:10
**identifying** [4] - 64:11,

76:19, 108:1, 186:8
**ignore** [1] - 220:18
**II** [14] - 37:12, 37:16, 39:24, 40:10, 154:11, 154:15, 154:17, 154:24, 155:6, 155:15, 156:4, 157:12, 158:21
**III** [5] - 37:11, 37:16, 154:15, 154:22, 169:6
**illegal** [4] - 157:20, 157:24, 217:15, 217:20
**illegally** [2] - 218:12, 218:13
**illegitimate** [1] - 198:14
**illicit** [2] - 180:21, 185:3
**illustrate** [1] - 92:19
**illustrated** [5] - 9:12, 9:14, 93:6, 95:2, 184:22
**illustrates** [2] - 10:8, 10:9
**illustration** [2] - 9:16, 10:19
**illustration's** [1] - 105:19
**illustrative** [4] - 9:2, 56:2, 56:19
**immediate** [4] - 193:21, 193:22, 223:1, 225:21
**Immediate** [10] - 177:12, 190:15, 222:16, 223:9, 224:12, 225:2, 225:5, 226:6, 226:16, 231:24
**immediately** [1] - 82:13
**impact** [6] - 104:11, 120:1, 169:15, 173:20, 174:11, 209:6
**impacted** [1] - 111:16
**impacts** [1] - 174:14
**impeach** [2] - 166:16, 166:22
**imperceptibly** [1] - 111:8
**implement** [2] - 177:8, 231:13
**implementation** [3] - 228:13, 229:10, 229:23
**implied** [1] - 89:7

**import** [1] - 123:23
**important** [1] - 92:2
**importantly** [1] - 92:23
**importation** [2] - 157:20, 157:24
**imposed** [2] - 160:18, 165:1
**imposing** [1] - 163:1
**impossible** [1] - 163:3
**impractical** [1] - 82:17
**improper** [1] - 157:25
**IN** [2] - 1:1, 1:18
**in-depth** [1] - 233:2
**inappropriate** [2] - 11:6, 69:21
**inartful** [1] - 203:25
**inches** [1] - 122:6
**include** [25] - 43:7, 63:16, 76:10, 77:16, 77:17, 78:1, 78:2, 79:5, 80:2, 103:22, 104:15, 105:10, 105:25, 106:2, 109:21, 112:8, 113:23, 131:8, 142:14, 154:9, 154:11, 175:25, 202:17
**included** [20] - 41:25, 42:7, 56:21, 64:5, 70:21, 77:25, 79:3, 81:18, 94:13, 108:22, 109:20, 110:5, 110:7, 120:9, 123:7, 146:4, 157:14, 165:3, 227:17, 227:20
**includes** [8] - 41:7, 71:2, 74:8, 109:17, 123:4, 154:13, 227:9, 227:17
**including** [14] - 10:11, 15:6, 24:4, 29:5, 39:17, 89:16, 111:5, 112:14, 117:18, 118:24, 171:16, 208:9, 210:11, 222:5
**Including** [1] - 210:12
**inclusion** [1] - 13:18
**inconsistent** [3] - 107:9, 165:4, 167:6
**inconsistently** [1] - 166:21
**incorrectly** [1] - 40:19
**increase** [10] - 29:17, 32:4, 32:14, 38:2, 38:9, 46:11, 48:7, 48:23, 49:5, 49:17
**increased** [7] - 30:8, 30:12, 45:24, 47:18,

48:4, 48:20, 51:11
**increases** [2] - 111:3, 116:9
**increasing** [1] - 46:4
**increment** [1] - 131:9
**independent** [1] - 45:22
**indicate** [1] - 128:13
**indicates** [1] - 10:6
**indicator** [1] - 106:25
**individual** [4] - 92:10, 140:11, 148:21, 164:1
**individually** [1] - 43:9
**individuals** [4] - 50:10, 99:11, 132:22, 178:25
**individuals'** [2] - 8:19, 174:14
**industrial** [1] - 218:23
**industry** [3] - 231:4, 231:7, 235:19
**infer** [1] - 200:6
**inference** [1] - 217:3
**inferred** [1] - 233:24
**information** [25] - 28:10, 33:5, 41:24, 42:6, 49:21, 50:13, 54:19, 64:15, 71:2, 74:24, 75:4, 78:19, 80:6, 94:24, 95:23, 123:11, 162:13, 169:13, 178:24, 179:1, 180:11, 181:3, 192:8, 201:17, 231:15
**inherent** [1] - 93:20
**initial** [1] - 100:4
**Initiative** [2] - 194:11, 209:17
**initiative** [1] - 224:22
**inquiry** [1] - 233:3
**inserted** [3] - 145:15, 145:18, 145:19
**inside** [1] - 68:25
**inspect** [2] - 235:11, 235:25
**instance** [4] - 109:16, 114:25, 204:20, 207:1
**instances** [2] - 16:24, 110:3
**Instead** [1] - 176:24
**instead** [4] - 93:15, 100:5, 108:20, 183:20
**instructions** [1] - 101:23
**insufficient** [1] - 221:10

**intend** [1] - 91:13
**intended** [6] - 18:19, 56:6, 56:7, 133:19, 158:11, 213:9
**intent** [1] - 213:12
**intention** [1] - 91:16
**intentional** [1] - 102:11
**interact** [1] - 145:9
**interested** [2] - 199:15, 216:15
**interesting** [1] - 130:2
**internal** [1] - 39:13
**internally** [2] - 159:7, 204:15
**interpret** [1] - 200:17
**interpretation** [12] - 111:19, 114:17, 114:18, 191:5, 191:17, 219:8, 219:22, 219:23, 231:23, 236:6, 236:7, 236:25
**interpreted** [1] - 42:9
**interpreting** [1] - 221:3
**interrupt** [6] - 35:12, 55:18, 64:2, 64:17, 146:8, 184:16
**intertwined** [2] - 148:13, 148:20
**intervene** [1] - 101:3
**intervening** [1] - 115:8
**interview** [1] - 144:10
**introduce** [3] - 77:10, 81:12, 117:13
**introduced** [1] - 210:7
**introducing** [1] - 144:1
**introduction** [3] - 209:22, 210:5, 210:23
**inventory** [2] - 152:25, 153:2
**inversely** [1] - 121:22
**investigate** [3] - 180:3, 180:12, 236:16
**investigated** [2] - 67:3, 234:24
**investigating** [1] - 136:11
**investigation** [1] - 144:24
**Investigations** [2] - 136:9, 144:5
**investigations** [2] - 136:10, 225:10
**Investigations"** [1] - 136:7

investigative [1] - 181:5
Investigator [2] - 136:21, 148:15
investigator [1] - 180:24
investigators [2] - 169:17, 208:8
investigatory [2] - 145:1, 233:3
involve [2] - 112:7, 186:23
involved [6] - 109:23, 136:16, 136:17, 148:2, 223:8, 230:13
involves [4] - 173:22, 173:25, 174:22, 174:24
involving [2] - 107:12, 148:23
Irpino [1] - 3:7
irrelevant [1] - 171:9
ISIA [1] - 5:4
issue [30] - 69:4, 80:11, 83:20, 84:1, 84:3, 84:7, 88:14, 88:18, 88:22, 88:23, 89:8, 89:22, 94:5, 94:21, 95:4, 97:21, 97:22, 97:23, 124:16, 124:21, 126:6, 126:19, 126:20, 126:22, 161:17, 169:20, 179:23, 191:9, 193:21, 231:3
Issues [2] - 197:3, 197:9
issues [14] - 56:16, 67:8, 77:14, 87:3, 89:14, 90:13, 121:16, 142:2, 169:4, 169:16, 170:1, 180:2, 197:17, 236:20
issuing [1] - 217:6
item [2] - 40:5, 110:4
itemized [1] - 40:6
items [4] - 111:4, 158:23, 178:6, 204:19
iteration [2] - 143:21, 192:13
itself [1] - 36:16

## J

Jackson [2] - 6:8, 208:14
Janet [1] - 170:13

January [2] - 224:5
JASIEWICZ [1] - 5:4
Jefferson [4] - 21:8, 21:9, 21:12, 53:23
JEFFREY [1] - 5:13
JENNIFER [1] - 4:12
Jersey [1] - 65:9
job [11] - 78:12, 136:7, 138:23, 168:20, 201:15, 201:16, 201:20, 217:10, 217:11, 217:12
Joe [6] - 138:5, 138:8, 171:16, 212:24, 213:2
Johnson [1] - 208:10
JOSEPH [1] - 6:4
JR [2] - 2:3, 2:15
Juan [2] - 2:5, 2:17
judge [4] - 127:8, 127:21, 132:8, 157:2
Judge [30] - 7:2, 54:4, 76:9, 78:1, 78:5, 78:11, 79:19, 86:24, 92:23, 98:3, 98:25, 166:16, 181:15, 182:19, 185:7, 194:14, 196:3, 209:8, 210:15, 210:20, 211:8, 222:19, 223:13, 225:25, 226:18, 228:17, 229:13, 232:3, 234:18
JUDGE [1] - 1:17
judges [1] - 35:13
judgment [1] - 101:23
judicial [1] - 70:6
July [3] - 92:4, 235:2, 235:21
June [4] - 171:18, 226:11, 235:5, 235:7
jurisdiction [7] - 29:7, 29:8, 29:12, 29:17, 33:10, 33:12, 181:9
jurisdictions [2] - 24:4, 50:22
jury [3] - 80:3, 85:14, 88:13
justification [2] - 204:15, 209:3
justified [1] - 205:11
justifies [1] - 208:1

## K

Kanawha [2] - 149:20, 208:14
KEARSE [1] - 4:2
Keegan [1] - 101:18

keep [9] - 19:21, 20:16, 20:24, 35:17, 35:21, 162:5, 184:17, 192:8, 202:13
Keep [2] - 218:16, 235:5
keeping [3] - 152:18, 202:14, 236:8
Keith [1] - 171:18
Kelly [1] - 6:8
Kentucky [3] - 13:3, 14:7, 208:9
Kermit [3] - 73:9, 73:12
Kessler [1] - 4:17
Kevin [4] - 137:14, 137:15, 137:16, 138:2
key [3] - 216:15, 216:17, 216:20
kilograms [4] - 46:15, 46:21, 46:23, 108:20
kind [4] - 85:4, 86:8, 121:21, 153:15
kinds [2] - 106:22, 196:20
knowing [3] - 12:3, 57:16, 95:18
knowledge [6] - 28:4, 52:17, 131:14, 151:9, 191:6, 203:6
knows [5] - 69:18, 95:24, 160:2, 175:14, 200:10
KOUBA [1] - 3:14
Kreutzer [3] - 137:15, 138:2
Kyle [2] - 8:13, 171:19

## L

LA [1] - 3:8
lab [8] - 107:25, 108:2, 108:3, 108:6, 108:13, 108:14, 108:17, 109:2
labs [2] - 107:17, 107:18
lack [7] - 129:23, 133:1, 175:5, 200:9, 203:1, 203:14, 208:22
laid [2] - 11:4, 76:15, 92:24, 92:25
Lakeland [3] - 63:23, 63:25, 64:23, 64:25
Lakewood [1] - 100:11
Lanier [1] - 3:4

large [5] - 93:9, 98:10, 100:21, 145:1, 207:23
largely [1] - 43:15
larger [8] - 16:20, 18:1, 18:7, 51:20, 71:1, 123:1, 178:19, 192:6
largest [6] - 16:15, 16:24, 27:18, 27:23, 28:11
Larry [4] - 230:2, 230:6, 230:11, 231:8
last [19] - 21:6, 23:18, 62:7, 62:13, 68:24, 77:25, 94:18, 102:1, 104:9, 111:12, 147:6, 148:25, 184:22, 184:25, 198:6, 205:15, 234:18, 234:23, 237:4
lastly [1] - 153:4
late [3] - 34:25, 51:10, 51:16
latter [1] - 187:8
launch [1] - 169:13
launched [2] - 192:20, 192:23
LAURA [1] - 5:10
Laurie [1] - 171:17
law [17] - 45:10, 50:10, 84:8, 89:23, 92:8, 97:16, 158:8, 165:1, 182:15, 183:6, 183:7, 184:1, 184:5, 189:24, 191:17, 231:8, 233:24
LAW [2] - 127:14, 127:17
Law [3] - 3:4, 3:7, 3:12
lawful [1] - 216:25
Lawrence [2] - 208:11, 208:12
laws [2] - 156:24, 184:14
lawsuits [1] - 167:24
lawyers [4] - 44:6, 80:10, 89:17, 204:20
lay [1] - 109:15
layered [1] - 88:24
lead [3] - 75:21, 140:14, 156:5
leadership [1] - 145:15
leading [3] - 75:18, 105:13, 170:13
leads [1] - 85:17
learn [4] - 7:20, 7:21, 12:3, 171:2

learning [1] - 11:19
least [15] - 10:8, 25:18, 27:25, 29:12, 29:17, 33:10, 34:4, 47:3, 59:7, 62:7, 65:2, 65:6, 69:5, 113:10, 197:16
leave [4] - 41:17, 95:5, 162:13, 201:19, 234:7
leaves [1] - 79:25
led [1] - 19:2
Lee [1] - 3:12
left [10] - 9:6, 31:8, 101:14, 103:10, 112:15, 135:8, 138:15, 150:13, 157:8, 231:5
left-hand [3] - 101:14, 150:13, 157:8
legal [1] - 185:5
legally [1] - 159:20
legitimate [8] - 45:11, 157:15, 198:8, 201:1, 216:2, 218:22, 232:12, 233:1
length [2] - 110:6, 131:6
leniency [1] - 234:21
Leon [2] - 2:4, 2:16
less [6] - 46:20, 92:6, 107:7, 112:17, 112:18, 205:21
lethal [1] - 218:8
letter [26] - 211:22, 212:2, 212:13, 212:18, 213:9, 213:25, 214:19, 214:23, 215:18, 219:18, 219:19, 219:25, 220:1, 220:4, 220:6, 221:17, 221:18, 221:19, 221:22, 229:1, 229:3, 229:5, 231:20, 235:4, 235:13
Letter [4] - 212:20, 212:23, 222:12, 224:22
letters [9] - 190:14, 190:16, 211:12, 211:13, 214:3, 214:14, 222:7, 236:18
letting [1] - 87:22
level [9] - 9:16, 10:10, 10:16, 81:8, 119:9, 119:12, 119:14,

187:5, 204:13
**levels** [5] - 15:12, 15:13, 110:23, 147:8
**Levin** [1] - 2:12
**LEYIMU** [1] - 4:8
**license** [19] - 152:22, 152:23, 153:6, 162:10, 176:18, 176:20, 177:14, 181:11, 183:18, 201:12, 217:3, 220:25, 222:2, 222:14, 235:6, 235:12, 235:15, 235:23, 236:2
**licensed** [7] - 65:16, 162:18, 177:21, 179:1, 179:21, 221:10, 236:10
**licenses** [1] - 66:23
**light** [2] - 205:15, 205:16
**likely** [1] - 177:18
**limit** [3] - 9:19, 46:7, 190:8
**limitations** [1] - 95:15
**limited** [2] - 86:6, 210:25
**Lincoln** [1] - 208:14
**LINDA** [1] - 4:5
**Linden** [5] - 229:1, 230:8, 230:11, 231:8, 235:14
**line** [11] - 20:1, 33:16, 33:17, 49:24, 64:10, 92:18, 98:23, 139:1, 171:8
**Line** [1] - 96:6
**lines** [9] - 7:17, 32:20, 32:22, 33:18, 49:20, 64:9, 86:13, 92:10, 150:25
**link** [3] - 21:18, 21:20, 21:21
**links** [1] - 21:23
**Lisa** [2] - 6:18, 238:3
**list** [7] - 40:6, 68:16, 78:19, 100:7, 109:22, 227:19
**listed** [5] - 20:11, 26:10, 26:17, 55:9, 103:16
**listing** [1] - 68:23
**literally** [8] - 14:4, 28:8, 70:23, 74:6, 92:13, 99:6, 150:19, 220:22
**litigation** [2] - 163:19, 164:6
**Litigation** [1] - 230:20

**live** [1] - 174:19
**lived** [1] - 52:18
**LLC** [1] - 2:4
**load** [1] - 129:17
**loaded** [3] - 182:17, 200:9, 211:2
**loading** [1] - 185:10
**local** [6] - 67:4, 176:25, 225:15, 225:19, 232:9, 232:25
**located** [3] - 53:7, 54:25, 57:20
**location** [6] - 18:23, 64:14, 149:14, 197:13, 197:20, 207:25
**locations** [2] - 62:23, 63:3
**Lockbourne** [4] - 150:2, 150:3, 151:7, 227:21
**Logan** [3] - 6:5, 6:12, 208:15
**logically** [1] - 113:19
**logistics** [1] - 62:16
**logo** [5] - 8:9, 150:18, 150:20, 150:24
**look** [54] - 8:23, 9:1, 9:5, 10:19, 12:1, 14:19, 14:20, 15:8, 15:16, 16:14, 16:17, 20:8, 20:24, 20:25, 21:6, 27:1, 29:21, 35:8, 36:9, 42:14, 46:13, 49:9, 53:3, 53:25, 54:7, 54:8, 57:4, 73:1, 92:9, 93:16, 96:4, 114:25, 122:18, 134:22, 167:10, 172:11, 178:3, 178:6, 178:7, 197:19, 204:11, 204:19, 206:6, 206:17, 206:20, 208:3, 208:8, 215:18, 223:21, 224:4, 227:8, 229:20
**looked** [12] - 7:23, 11:18, 42:11, 53:10, 74:9, 77:10, 118:25, 130:11, 167:14, 207:5, 207:6, 222:3
**Looking** [1] - 34:12
**looking** [21] - 15:2, 28:1, 28:2, 40:24, 61:12, 73:5, 76:10, 115:23, 116:3, 119:22, 130:18, 145:19, 172:11,

178:4, 178:5, 178:8, 178:13, 184:7, 191:23, 194:20, 204:10
**looks** [14] - 36:20, 133:10, 133:11, 133:17, 133:24, 134:13, 138:15, 138:17, 139:8, 140:6, 141:1, 145:3, 145:6, 151:7
**loose** [1] - 106:20
**lose** [2] - 146:16, 220:25
**loss** [1] - 153:2
**loud** [1] - 197:10
**low** [1] - 119:25
**lower** [3] - 22:11, 101:1, 105:3
**Luken** [3] - 27:8, 27:14, 72:24
**lunch** [1] - 98:9

## M

**macro** [1] - 145:12
**Madsen** [2] - 142:25, 143:2
**Magazine** [1] - 3:7
**magic** [1] - 79:11
**magnitude** [3] - 22:12, 48:7, 48:23
**magnitudes** [1] - 116:10
**Mahady** [13] - 76:21, 82:4, 82:22, 83:15, 84:12, 84:18, 84:25, 88:8, 90:8, 93:25, 100:24, 117:25, 127:1
**MAHADY** [40] - 6:4, 67:18, 69:16, 76:22, 78:7, 80:8, 83:8, 83:12, 83:17, 84:14, 84:20, 85:8, 85:10, 85:20, 87:10, 88:1, 88:21, 90:9, 90:18, 91:8, 93:5, 95:10, 97:24, 105:13, 106:10, 112:23, 113:3, 113:5, 113:7, 116:17, 116:21, 117:20, 124:13, 124:16, 125:8, 125:14, 125:22, 125:24, 127:2, 127:21
**Mahady's** [2] - 77:11, 87:3
**mail** [2] - 59:24,

104:19
**mailed** [2] - 212:3, 212:11
**mails** [1] - 59:22
**main** [2] - 35:1, 76:5
**MAINIGI** [3] - 4:12, 185:4, 227:1
**maintain** [19] - 80:12, 92:19, 157:16, 162:23, 164:25, 166:2, 175:20, 184:1, 190:7, 191:5, 191:8, 202:8, 212:8, 217:7, 220:10, 220:13, 222:9, 228:2, 233:25
**maintained** [1] - 126:17
**maintaining** [5] - 91:19, 151:24, 152:9, 198:12, 216:3
**maintains** [1] - 147:14
**Maintenance** [1] - 198:7
**MAJESTRO** [2] - 2:6, 90:4
**Majestro** [1] - 2:6
**major** [3] - 35:6, 192:17, 192:18
**majority** [4] - 113:11, 113:15, 151:10, 225:20
**managed** [1] - 187:5
**Manager** [6] - 137:1, 139:3, 141:14, 141:20, 141:21, 142:7
**manager** [2] - 140:12, 140:16
**Managers** [1] - 140:13
**managers** [2] - 140:15, 219:14
**manual** [1] - 187:3
**manufactured** [5] - 45:16, 45:20, 45:23, 45:25, 161:5
**manufacturer** [7] - 107:21, 107:22, 154:3, 158:17, 161:4, 162:25
**manufacturers** [10] - 9:20, 39:8, 44:22, 98:19, 98:20, 108:23, 152:19, 153:20, 162:2, 163:5
**manufacturers'** [1] - 108:7
**manufacturing** [3] - 157:20, 157:25, 163:2

**map** [7] - 19:23, 20:2, 20:16, 20:18, 20:24, 21:2, 21:12
**Mapes** [7] - 133:25, 135:8, 135:9, 139:17, 144:22, 171:18, 235:9
**March** [5] - 38:19, 39:1, 123:20, 124:7, 128:20
**Marcum** [2] - 140:23, 140:24
**margin** [1] - 18:8
**MARK** [1] - 3:16
**marked** [4] - 76:13, 157:5, 194:16, 228:20
**marker** [1] - 126:24
**market** [7] - 23:24, 24:2, 98:11, 115:13, 159:9, 180:21, 185:3
**marketing** [1] - 151:2
**markings** [1] - 102:21
**Marshall** [2] - 20:13, 20:18
**Martin** [5] - 141:7, 141:9, 171:18, 208:11
**Mason** [1] - 208:15
**mass** [1] - 212:11
**Masters** [1] - 167:3
**match** [3] - 94:6, 124:1, 161:14
**material** [1] - 119:13
**materials** [1] - 26:25
**math** [2] - 16:25, 54:16
**mathematical** [1] - 121:11
**matrix** [5] - 12:10, 12:11, 20:8, 22:17, 22:20
**Matt** [1] - 171:19
**matter** [9] - 67:25, 97:17, 99:2, 99:4, 109:18, 171:22, 210:1, 211:1, 238:5
**MAY** [1] - 1:19
**Mays** [10] - 133:25, 135:21, 139:15, 145:6, 145:8, 145:13, 145:21, 195:10, 195:23, 198:25
**McCann** [99] - 7:5, 7:10, 7:16, 8:6, 14:19, 21:3, 23:7, 23:16, 23:22, 26:2, 28:17, 29:23, 36:4, 38:17, 41:22, 42:4,

42:21, 44:15, 52:23, 61:2, 61:5, 63:15, 64:20, 65:14, 66:5, 66:10, 66:12, 66:21, 67:2, 67:6, 67:12, 67:23, 68:3, 68:16, 69:25, 70:11, 70:15, 71:18, 72:9, 73:5, 73:15, 74:18, 74:23, 75:13, 75:24, 76:13, 76:14, 77:16, 78:24, 79:11, 79:25, 81:1, 81:7, 81:11, 85:24, 86:6, 89:17, 92:12, 92:23, 93:10, 94:5, 98:2, 98:9, 99:19, 100:24, 101:4, 101:10, 101:25, 102:7, 102:8, 102:11, 102:16, 102:21, 103:5, 103:20, 103:24, 104:10, 104:17, 105:6, 105:22, 106:11, 106:15, 106:18, 106:20, 110:21, 112:25, 113:4, 117:15, 118:5, 119:7, 120:25, 121:21, 122:12, 122:16, 122:25, 124:10, 125:21, 125:25

**McCann's** [1] - 102:13
**McCloud** [12] - 93:7, 94:3, 114:9, 116:22, 116:23, 119:13, 119:17, 119:19, 119:21, 119:23, 120:2, 120:6
**MCCLURE** [1] - 6:3
**MCGINNESS** [1] - 4:2
**McKesson** [26] - 5:8, 12:17, 12:20, 21:1, 22:4, 27:12, 32:22, 33:13, 34:2, 42:19, 42:23, 57:14, 58:6, 67:7, 72:20, 73:5, 73:9, 73:18, 81:3, 81:4, 82:14, 85:23, 103:19, 117:21, 125:1, 158:25
**McKesson's** [2] - 15:5, 103:10
**MDL** [6] - 89:13, 99:22, 99:24, 100:15, 164:6, 214:3
**MDL-00378501** [1] - 214:7
**mean** [53] - 22:21,

42:9, 42:13, 49:12, 55:21, 76:20, 78:9, 91:2, 96:20, 98:22, 111:19, 133:2, 135:25, 137:8, 139:3, 140:8, 141:22, 146:1, 149:16, 152:14, 153:24, 154:14, 155:23, 155:24, 160:1, 160:10, 174:5, 176:3, 177:20, 177:23, 178:7, 180:1, 183:6, 184:8, 187:23, 193:11, 193:20, 195:14, 197:23, 200:18, 202:13, 202:20, 204:24, 205:4, 212:10, 221:17, 221:23, 231:2, 231:3, 231:5, 237:8
**meaning** [2] - 187:15, 199:11
**means** [7] - 16:7, 63:24, 64:24, 137:9, 170:12, 174:8, 186:20
**meant** [4] - 64:6, 85:4, 174:4, 236:13
**measure** [2] - 20:20, 121:5
**measured** [3] - 113:10, 122:4, 122:6
**measuring** [1] - 122:9
**mechanical** [1] - 6:19
**mechanics** [1] - 196:2
**mechanism** [1] - 180:10
**medical** [13] - 10:3, 45:12, 52:15, 66:23, 155:20, 155:21, 157:15, 160:15, 198:9, 198:14, 215:7, 215:10, 218:22
**medication** [3] - 42:5, 44:21, 45:5
**medications** [9] - 41:23, 42:22, 43:1, 43:4, 43:20, 44:12, 44:13, 57:9, 57:17
**meet** [1] - 45:11
**meeting** [17] - 179:24, 195:12, 195:13, 195:18, 196:1, 196:17, 198:3, 198:21, 198:24, 199:1, 199:7,

224:13, 224:17, 224:22, 225:6, 225:10, 225:19
**meetings** [2] - 170:9, 194:12
**Meigs** [1] - 208:12
**member** [2] - 102:13, 170:6
**members** [3] - 50:11, 151:19, 213:22
**memo** [2] - 194:25, 195:4
**memorandum** [1] - 194:24
**memorize** [1] - 131:12
**memorized** [2] - 156:19, 156:22
**memory** [1] - 134:20
**mention** [3] - 81:17, 219:22, 221:23
**mentioned** [2] - 120:25, 204:21
**mentions** [1] - 221:17
**Mercer** [1] - 21:2
**merely** [1] - 113:25
**merger** [4] - 128:18, 128:20, 149:1, 150:22
**merging** [1] - 125:16
**merry** [1] - 210:15
**merry-go-round** [1] - 210:15
**message** [1] - 230:1
**met** [4] - 188:22, 189:3, 213:2, 225:5
**Methadone** [2] - 169:20, 169:22
**Methamphetamine** [3] - 169:8, 169:14, 170:5
**methamphetamine** [1] - 169:15
**method** [2] - 197:13, 197:19
**metrics** [1] - 92:8
**Metro** [1] - 52:14
**Miami** [4] - 27:8, 27:14, 72:24, 109:8
**Miami-Luken** [3] - 27:8, 27:14, 72:24
**MICHAEL** [2] - 2:15, 3:9
**Michael** [1] - 171:18
**micrograms** [1] - 108:20
**might** [11] - 22:10, 22:11, 22:24, 24:20, 62:15, 94:3, 98:5, 123:17, 124:3, 124:4, 218:21

**Mike** [6] - 133:25, 135:8, 135:9, 139:17, 144:22, 235:8
**MILDRED** [1] - 3:3
**miles** [1] - 21:14
**million** [17] - 14:22, 14:25, 41:18, 72:21, 73:6, 73:8, 73:9, 73:12, 86:13, 106:2, 108:10, 108:21, 129:19, 183:25, 223:23, 224:6, 224:15
**millions** [1] - 64:9
**mind** [8] - 22:9, 51:14, 58:15, 83:10, 127:8, 148:9, 235:5, 236:9
**mine** [1] - 168:8
**Mingo** [1] - 208:15
**minimal** [2] - 112:20
**minor** [1] - 134:3
**minus** [2] - 122:1, 161:8
**minute** [5] - 23:10, 55:18, 75:7, 127:13, 226:24
**minutes** [4] - 35:17, 75:19, 77:6, 127:8
**mischaracterizes** [1] - 55:7
**mispronouncing** [1] - 35:22
**misread** [1] - 216:8
**missed** [2] - 139:1, 216:9
**missing** [4] - 38:19, 38:22, 94:3, 123:17
**Mitchell** [1] - 2:12
**mixed** [1] - 85:6
**MME** [6] - 113:11, 118:7, 118:16, 118:18, 118:22
**MMEs** [8] - 26:14, 47:13, 47:24, 48:14, 51:2, 51:6, 51:16, 52:3
**modify** [2] - 131:8, 176:21
**moment** [3] - 22:15, 28:25, 32:19
**Monday** [3] - 29:22, 61:6, 70:25
**monitor** [1] - 42:15
**monitoring** [5] - 137:10, 137:12, 186:8, 212:9, 213:7
**Monitoring** [3] - 145:24, 187:10, 189:16

**month** [13] - 9:11, 37:19, 92:5, 93:9, 114:10, 114:11, 119:24, 120:3, 120:4, 120:14, 128:24
**monthly** [6] - 14:7, 15:9, 16:16, 73:24, 73:25, 131:9
**months** [9] - 84:1, 88:6, 88:20, 88:22, 88:23, 92:3, 92:6, 92:11, 223:23
**moons** [1] - 61:6
**moots** [1] - 75:15
**morbidity** [4] - 174:1, 174:5, 174:8, 174:11
**Morgan** [1] - 101:18
**morning** [12] - 7:10, 7:11, 23:16, 23:17, 53:11, 66:5, 66:6, 66:7, 70:25, 86:8, 90:23, 237:16
**Morris** [1] - 6:15
**mortality** [3] - 174:10, 174:24
**most** [12] - 36:14, 37:23, 67:14, 68:5, 70:19, 74:24, 81:2, 111:22, 111:25, 129:5, 148:19, 216:15
**motion** [2] - 101:2, 101:3
**Motley** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**MOU** [1] - 228:10
**Mougey** [5] - 50:21, 69:2, 69:20, 72:11, 75:21, 81:11, 81:24, 85:25, 89:8, 91:6, 98:6, 98:22, 120:19
**MOUGEY** [57] - 2:12, 11:3, 11:10, 66:4, 66:9, 67:22, 68:10, 68:15, 69:3, 69:23, 70:5, 70:10, 72:3, 72:12, 74:15, 74:17, 74:22, 75:12, 75:22, 75:23, 77:3, 77:5, 78:11, 78:14, 79:13, 79:16, 81:21, 81:25, 83:11, 83:24, 84:9, 84:18, 84:24, 85:13, 85:19, 86:7, 87:25, 88:5, 90:5, 90:12, 90:17, 93:25, 98:3, 98:7, 98:8, 98:24, 101:6, 101:8, 102:19, 102:20,

105:15, 106:8,
120:17, 120:20,
120:23, 123:8,
125:19
**Mougey's** [3] - 26:22,
80:23, 111:2
**Moundsville** [1] -
20:10
**Mountain** [1] - 207:15
**move** [13] - 11:2,
11:13, 11:23, 81:24,
81:25, 82:6, 104:17,
121:5, 121:9,
126:15, 129:4,
165:18, 223:13
**moved** [3] - 11:11,
37:10, 141:18
**movement** [1] - 169:7
**moving** [7] - 38:17,
44:15, 61:2, 82:9,
127:9, 138:15, 166:2
**MR** [302] - 2:3, 2:6,
2:9, 2:12, 2:15, 3:9,
3:11, 3:16, 4:17, 5:9,
5:10, 5:13, 6:4, 7:8,
7:12, 7:14, 7:15, 8:1,
8:4, 8:5, 11:1, 11:3,
11:10, 11:14, 11:17,
11:22, 11:25, 12:7,
12:9, 66:4, 66:9,
67:18, 67:22, 68:10,
68:15, 68:22, 69:3,
69:16, 69:23, 70:5,
70:10, 71:23, 72:3,
72:5, 72:12, 74:15,
74:17, 74:22, 75:12,
75:14, 75:17, 75:22,
75:23, 76:22, 77:3,
77:5, 78:7, 78:11,
78:14, 79:13, 79:16,
80:8, 80:22, 81:21,
81:25, 83:8, 83:11,
83:12, 83:17, 83:24,
84:9, 84:14, 84:18,
84:20, 84:24, 85:8,
85:10, 85:13, 85:19,
85:20, 86:7, 87:10,
87:25, 88:1, 88:5,
88:21, 90:4, 90:5,
90:9, 90:12, 90:17,
90:18, 90:20, 91:8,
91:13, 91:22, 93:5,
93:25, 95:10, 95:11,
96:2, 96:11, 96:15,
96:16, 96:22, 97:20,
97:24, 97:25, 98:3,
98:7, 98:8, 98:24,
101:6, 101:8,
102:19, 102:20,
105:13, 105:15,

106:8, 106:10,
106:14, 112:23,
113:3, 113:5, 113:7,
116:17, 116:21,
117:20, 117:24,
118:3, 118:15,
119:3, 120:17,
120:20, 120:23,
123:8, 124:13,
124:16, 124:25,
125:8, 125:14,
125:15, 125:19,
125:22, 125:24,
126:17, 127:2,
127:6, 127:21,
128:1, 129:23,
130:2, 130:10,
131:23, 131:25,
132:3, 132:10,
133:1, 133:13,
134:2, 134:9,
134:10, 137:23,
146:24, 153:14,
153:17, 153:18,
156:7, 156:11,
156:14, 156:15,
157:2, 157:4, 158:4,
159:22, 159:24,
160:3, 160:5, 160:8,
160:13, 164:23,
165:2, 165:6,
165:12, 165:14,
165:19, 166:6,
166:10, 166:14,
166:16, 166:19,
166:23, 167:1,
167:4, 167:9, 171:4,
171:14, 172:6,
174:3, 174:7, 175:5,
175:9, 175:13,
175:17, 176:1,
176:4, 179:11,
179:14, 180:17,
181:15, 181:17,
182:1, 182:9,
182:16, 182:19,
183:2, 183:8,
183:23, 184:16,
184:24, 185:7,
185:14, 185:16,
185:17, 187:22,
188:2, 189:10,
189:14, 190:13,
190:21, 190:25,
191:3, 193:7,
193:13, 194:14,
194:15, 196:3,
196:12, 196:14,
196:21, 200:8,
200:13, 203:18,
205:14, 205:20,

205:24, 205:25,
207:7, 207:9,
207:13, 208:17,
209:1, 209:8,
209:10, 209:15,
209:18, 209:21,
209:25, 210:5,
210:9, 210:14,
210:19, 211:3,
211:4, 211:7,
211:10, 211:12,
211:16, 216:8,
216:9, 216:13,
221:2, 221:6, 221:7,
222:21, 223:13,
223:15, 223:17,
223:18, 223:20,
225:25, 226:2,
226:18, 226:21,
226:22, 226:25,
227:4, 228:17,
228:19, 229:13,
229:16, 229:17,
229:19, 232:2,
232:4, 234:2, 234:5,
234:17, 234:20,
234:22, 237:12,
237:17
**MS** [47] - 3:3, 3:16,
3:14, 4:2, 4:5, 4:8,
4:12, 4:12, 4:15, 5:3,
5:4, 5:10, 6:3, 6:7,
6:14, 23:10, 23:15,
35:15, 35:19, 35:23,
35:25, 36:2, 54:3,
54:6, 54:10, 54:12,
55:19, 56:17, 57:2,
63:20, 64:3, 64:18,
64:19, 65:24, 74:19,
75:8, 83:15, 106:17,
119:6, 120:16,
125:2, 125:18,
125:23, 126:25,
185:4, 210:22, 227:1
**Mt** [3] - 3:15, 4:4, 4:9
**multiple** [2] - 11:5,
161:7
**multitude** [3] - 144:25,
184:9, 202:17
**must** [6] - 78:11,
150:6, 153:9, 216:2,
216:4, 216:23

## N

**name** [13] - 8:20,
35:22, 64:14, 128:2,
128:4, 136:4,
136:18, 138:6,
140:3, 141:6,
141:19, 170:22,

214:5
**named** [1] - 8:13
**names** [8] - 8:19,
62:23, 63:3, 135:2,
139:25, 143:15,
143:24, 150:24
**narcotic** [2] - 162:11
**narcotics** [3] - 154:9,
154:11, 154:17
**narrow** [8] - 40:7,
72:1, 72:4, 79:2,
82:3, 112:1, 112:9,
112:10
**narrowed** [1] - 71:21
**narrowing** [2] -
113:11, 113:20
**narrowly** [1] - 42:9
**narrows** [1] - 112:3
**nation** [2] - 111:25,
215:1
**national** [19] - 9:11,
12:20, 13:8, 13:9,
15:18, 16:21, 17:5,
17:8, 17:9, 17:11,
17:13, 17:16, 18:7,
18:12, 18:18, 22:20,
62:16, 189:17, 233:3
**nationally** [3] - 15:14,
115:23, 159:10
**nationwide** [5] -
92:19, 187:13,
188:10, 189:5,
235:18
**NDC** [5] - 109:19,
115:1, 115:5, 115:7,
115:11
**near** [1] - 150:5
**nearby** [1] - 14:6
**necessary** [2] -
123:25, 157:15
**need** [27] - 35:12,
45:12, 84:7, 84:10,
84:13, 84:15, 87:5,
91:20, 92:13, 92:17,
97:15, 97:16,
117:13, 132:1,
132:6, 142:2, 153:4,
160:6, 162:9,
183:12, 199:19,
201:2, 210:19,
232:5, 232:17,
232:21, 232:22
**needed** [5] - 45:11,
79:15, 81:19,
197:19, 236:9
**needs** [5] - 35:7, 78:4,
87:13, 127:15,
171:23
**negative** [2] - 93:18,
181:20

**negatively** [3] - 121:9,
121:24
**negotiated** [6] -
176:14, 177:14,
223:11, 225:22,
227:15, 227:25
**negotiations** [2] -
177:11, 230:13
**net** [1] - 120:12
**network** [1] - 169:18
**Network** [1] - 207:15
**never** [6] - 11:4, 93:13,
148:13, 194:25,
195:2, 219:21
**New** [5] - 3:5, 3:8,
62:25, 65:9, 100:14
**new** [8] - 13:7, 68:23,
68:24, 115:10,
143:24, 177:8,
228:13, 235:17
**newer** [1] - 150:2
**newly** [1] - 194:5
**next** [27] - 54:7, 85:2,
95:21, 101:16,
118:5, 127:5,
134:16, 134:18,
139:2, 139:25,
143:16, 143:21,
144:1, 154:5, 197:2,
198:16, 202:4,
211:5, 215:21,
215:24, 216:14,
216:21, 217:13,
220:8, 232:5, 232:6,
232:25
**Next** [1] - 199:17
**nexus** [1] - 180:16
**Niagra** [1] - 62:24
**Nicholas** [2] - 90:21,
160:4
**NICHOLAS** [50] - 6:11,
90:20, 95:11, 96:11,
96:15, 96:22, 97:25,
129:23, 131:25,
133:1, 134:2,
153:14, 156:7,
159:22, 159:24,
160:5, 160:8, 165:2,
165:12, 166:6,
166:14, 167:4,
171:4, 174:3, 175:5,
175:13, 176:1,
179:11, 179:14,
182:1, 182:16,
183:2, 184:16,
187:22, 189:10,
190:21, 193:7,
196:14, 200:8,
205:14, 207:7,
208:17, 210:9,

216:8, 221:2,
223:15, 223:18,
226:21, 229:16,
237:12
**Nicole** [2] - 139:2,
139:22
**night** [1] - 68:24
**Ninth** [1] - 4:6
**nomenclature** [1] -
137:24
**non** [16] - 18:6, 20:10,
33:8, 43:20, 43:21,
43:25, 57:5, 57:19,
57:22, 58:20,
138:24, 197:14,
197:21, 215:7,
215:10
**non-ARCOS** [1] - 33:8
**non-controlled** [7] -
43:20, 43:21, 43:25,
57:5, 57:19, 197:14,
197:21
**non-distribution** [1] -
138:24
**non-Huntington** [2] -
18:6, 20:10
**non-medical** [2] -
215:7, 215:10
**non-opioid** [1] - 43:21
**non-pharmacy** [2] -
57:22, 58:20
**none** [8] - 63:21,
64:21, 108:22,
111:4, 111:7,
111:10, 111:15
**nonetheless** [1] -
218:3
**Nonetheless** [2] -
218:6, 234:7
**noon** [1] - 97:17
**normal** [2] - 129:6,
130:20
**North** [1] - 140:23
**Northern** [2] - 53:20,
53:23
**notations** [1] - 103:17
**note** [3] - 74:19, 91:8,
102:10
**noted** [2] - 225:20,
230:1
**notes** [2] - 128:13,
143:22
**nothing** [4] - 69:18,
94:7, 94:18, 102:12
**notice** [15] - 67:8,
67:24, 68:4, 69:4,
70:6, 164:7, 199:6,
210:1, 210:2,
210:25, 213:10,
219:8, 221:9,

221:13, 221:24
**noting** [1] - 75:8
**notwithstanding** [1] -
232:12
**NPI** [14] - 103:5, 103:6,
103:24, 104:2,
104:5, 104:11,
104:21, 105:10,
105:16, 105:18,
105:21, 106:2,
118:25, 119:1
**number** [44] - 9:7,
12:23, 14:21, 14:25,
22:7, 22:9, 22:10,
22:11, 22:19, 40:5,
40:20, 41:1, 41:9,
52:3, 52:24, 63:4,
63:13, 64:13, 72:23,
93:19, 94:8, 94:9,
99:21, 100:21,
104:12, 104:14,
104:18, 104:22,
105:8, 107:1, 107:7,
108:16, 112:23,
122:18, 130:7,
130:24, 131:5,
131:21, 148:22,
149:5, 151:12,
167:23
**Number** [4] - 176:21,
181:22, 212:20,
212:23
**numbers** [32] - 9:6,
9:15, 14:18, 14:20,
15:2, 16:17, 17:5,
17:23, 22:8, 63:6,
63:22, 64:22, 81:2,
81:3, 81:18, 85:1,
93:18, 103:11,
103:14, 105:3,
107:19, 116:5,
117:17, 117:18,
131:4, 131:11,
134:12, 207:19,
208:1, 209:6, 214:6,
214:12
**numerical** [1] - 121:22
**numerous** [3] - 57:24,
58:22, 59:2
**NW** [6] - 2:10, 4:6,
4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

**O**

**oar** [1] - 83:13
**oath** [2] - 164:12,
172:2
**obesity** [1] - 204:12
**object** [40] - 11:3,

56:17, 68:22, 71:23,
75:20, 80:18, 84:25,
96:8, 129:23, 133:1,
153:14, 156:7,
165:2, 165:3, 166:6,
167:4, 171:4, 171:5,
174:3, 179:11,
182:1, 184:18,
187:22, 187:23,
189:10, 193:8,
200:8, 205:14,
205:17, 208:17,
209:21, 210:5,
210:9, 210:22,
216:9, 221:2, 237:12
**Object** [4] - 176:1,
182:16, 200:8, 234:2
**objected** [5] - 79:19,
79:22, 80:3, 92:1,
210:16
**objecting** [3] - 75:18,
78:25, 184:17
**objection** [50] - 69:17,
69:22, 70:2, 70:4,
75:15, 77:11, 81:24,
85:3, 86:9, 87:9,
129:23, 130:9,
131:24, 133:12,
134:3, 134:7,
159:22, 160:8,
165:5, 165:12,
166:9, 166:14,
171:13, 175:6,
175:13, 179:16,
182:7, 184:19,
184:23, 185:15,
189:13, 196:10,
196:13, 205:22,
209:11, 209:20,
210:8, 223:15,
223:16, 223:17,
223:18, 226:20,
226:21, 226:25,
227:1, 227:2,
229:15, 229:16,
229:17
**Objection** [5] - 175:5,
185:4, 189:10,
193:7, 207:7
**objection's** [1] - 70:9
**objections** [5] - 82:3,
126:16, 126:18,
126:25, 127:2
**objective** [3] - 109:12,
110:8, 125:10
**obligation** [3] - 179:3,
186:9, 186:24
**obligations** [2] -
195:21, 203:4
**Obligations** [1] -

227:24
**observations** [1] -
121:6
**observed** [1] - 109:16
**obtain** [1] - 216:3
**obvious** [3] - 109:10,
109:11, 110:4
**obviously** [3] - 55:21,
84:15, 211:2
**occasions** [3] -
150:10, 204:21,
205:21
**occurred** [4] - 91:19,
119:15, 161:10,
161:20
**occurring** [2] -
180:13, 183:19
**occurs** [3] - 161:21,
162:7, 162:20
**October** [6] - 36:14,
37:2, 37:12, 37:20,
38:6, 116:24
**OF** [2] - 1:1, 1:4
**offer** [2] - 116:14,
131:10
**offered** [2] - 106:23,
114:3
**Office** [2] - 230:19,
230:22
**office** [6] - 70:20,
99:11, 139:5,
204:17, 225:15,
225:19
**Officer** [2] - 129:10,
129:14
**officers** [1] - 169:17
**offices** [1] - 219:11
**official** [1] - 166:11
**Official** [2] - 238:2,
238:3
**officially** [1] - 164:24
**officials** [1] - 50:11
**offset** [3] - 113:24,
115:14, 115:16
**often** [1] - 171:5
**Ohio** [5] - 13:2, 14:7,
151:8, 208:11,
227:21
**OIG's** [1] - 46:16
**OMP** [20] - 137:11,
146:13, 187:11,
187:13, 187:18,
188:5, 188:20,
188:21, 189:5,
189:6, 189:15,
189:16, 189:22,
192:4, 192:9,
192:13, 192:16,
228:7, 228:13
**on-line** [1] - 49:24

**once** [12] - 18:5,
98:17, 99:1, 99:7,
112:13, 122:20,
153:7, 162:17,
163:6, 201:19,
219:21, 236:1
**one** [147] - 8:17, 9:5,
14:19, 16:20, 17:11,
17:12, 17:16, 17:19,
17:25, 19:12, 19:14,
21:6, 21:8, 22:2,
22:9, 22:25, 23:3,
24:6, 26:6, 28:11,
29:19, 34:20, 35:8,
35:13, 36:6, 40:13,
46:3, 46:13, 47:11,
50:15, 54:11, 60:21,
61:1, 69:13, 69:15,
71:20, 71:21, 72:25,
73:2, 73:17, 73:23,
74:2, 77:14, 78:18,
78:24, 82:6, 83:13,
83:17, 85:21, 86:16,
86:17, 92:8, 92:17,
92:21, 93:8, 93:11,
94:5, 94:8, 95:10,
96:25, 104:17,
106:24, 107:7,
108:4, 108:5,
108:17, 108:18,
110:2, 110:5, 111:3,
112:18, 114:3,
114:9, 114:23,
116:4, 121:7, 122:1,
122:3, 122:4,
122:11, 123:5,
134:18, 136:16,
140:18, 140:20,
141:2, 141:6,
141:14, 141:19,
141:21, 142:16,
142:24, 143:7,
144:1, 147:11,
147:20, 149:12,
151:1, 151:4,
158:21, 158:23,
158:25, 159:3,
164:3, 169:8, 170:6,
170:7, 172:14,
176:21, 177:3,
180:6, 182:13,
183:11, 187:2,
187:5, 187:8,
189:19, 192:9,
195:25, 196:17,
197:3, 202:17,
204:19, 205:9,
206:6, 206:17,
206:18, 208:3,
210:15, 216:14,
216:17, 216:21,

218:8, 221:12, 222:8, 222:13, 227:20, 227:21, 229:25, 234:20, 236:7

**One** [6] - 5:11, 13:2, 13:3, 23:10, 184:8, 237:4

**one-half** [1] - 116:4

**ones** [12] - 13:19, 14:11, 14:12, 14:14, 49:20, 55:23, 85:25, 141:18, 153:22, 168:9, 192:17

**open** [5] - 98:22, 164:22, 166:25, 183:11, 236:24

**open-ended** [1] - 183:11

**opening** [4] - 204:20, 205:7, 205:17

**operate** [3] - 163:11, 178:23, 186:10

**operated** [2] - 148:22, 188:5

**operation** [1] - 142:8

**operational** [2] - 141:25, 147:14

**operations** [2] - 140:11, 142:5

**opiate** [8] - 68:1, 68:7, 69:8, 154:16, 154:17, 155:4, 164:6, 173:11

**opiates** [10] - 66:24, 67:10, 158:17, 158:22, 159:20, 162:1, 165:11, 175:4, 175:12, 180:20

**opinion** [7] - 100:25, 101:1, 101:2, 101:3, 101:10, 236:18, 236:19

**opinions** [4] - 27:16, 27:21, 110:23, 236:21

**opioid** [29] - 10:21, 12:3, 27:3, 41:23, 42:5, 42:22, 43:1, 43:4, 43:21, 44:20, 76:1, 163:19, 170:1, 171:2, 172:23, 172:25, 173:2, 173:5, 173:9, 173:16, 173:19, 173:22, 173:25, 174:13, 174:17, 174:22, 174:24, 177:17

**opioids** [23] - 9:20, 25:8, 25:14, 28:18, 40:7, 45:2, 45:16, 45:20, 45:25, 50:22, 55:11, 107:14, 107:16, 109:19, 110:23, 154:2, 158:23, 160:11, 161:8, 161:12, 175:21, 195:19, 204:13

**opium** [1] - 154:11

**opposed** [2] - 11:11, 29:19

**opposite** [2] - 59:11, 121:9

**orange** [3] - 36:16, 36:19, 49:20

**Orchard** [1] - 16:19

**Order** [14] - 145:24, 168:12, 177:13, 187:10, 189:16, 190:15, 222:17, 223:9, 224:13, 225:2, 225:5, 226:7, 226:16, 231:24

**order** [51] - 11:1, 22:12, 65:21, 104:19, 137:10, 137:12, 153:3, 162:8, 162:11, 178:9, 178:14, 178:19, 179:25, 180:5, 180:8, 180:14, 180:23, 180:25, 181:9, 186:24, 187:1, 187:6, 191:25, 200:18, 200:22, 200:24, 200:25, 201:3, 201:8, 201:10, 201:13, 202:7, 202:14, 202:18, 202:20, 211:15, 213:6, 219:10, 219:12, 219:23, 220:15, 223:1, 224:11, 225:21, 225:21, 232:11, 232:13, 236:13, 236:22

**ordering** [3] - 29:13, 29:14, 29:18

**Orders** [2] - 199:19, 199:21

**orders** [54] - 58:1, 58:23, 67:14, 136:15, 163:10, 163:12, 163:15, 163:16, 166:4,

166:13, 167:12, 172:11, 176:22, 176:24, 177:2, 179:2, 179:3, 179:10, 179:17, 180:3, 180:8, 180:15, 180:16, 186:8, 186:11, 197:12, 197:18, 200:1, 200:15, 201:16, 202:5, 202:13, 205:11, 212:9, 218:19, 218:21, 219:12, 222:5, 232:10, 232:16, 232:25, 233:7, 233:13, 233:21, 234:8, 234:12, 234:14, 234:24, 236:14, 237:7, 237:8

**org** [5] - 133:2, 134:16, 135:23, 145:19, 146:15

**organization** [1] - 134:5

**organizationally** [1] - 148:9

**organized** [1] - 83:1

**orient** [1] - 12:15

**originally** [1] - 192:23

**Orlando** [2] - 225:15, 227:10

**Orleans** [1] - 3:8

**otherwise** [3] - 52:13, 83:5, 167:12

**ought** [3] - 84:6, 114:19, 156:9

**outlined** [2] - 162:6, 231:23

**outside** [35] - 12:23, 13:1, 16:8, 16:12, 17:11, 17:13, 17:16, 17:19, 18:25, 21:18, 21:25, 22:16, 52:19, 52:24, 53:4, 54:8, 54:20, 54:25, 55:4, 56:5, 57:3, 57:20, 58:10, 60:19, 60:24, 67:18, 68:23, 98:3, 110:12, 111:5, 122:25, 126:21, 142:9, 201:21

**over-the-counter** [1] - 169:12

**overall** [3] - 14:15, 40:7, 72:2

**overdose** [1] - 169:21

**overhauls** [1] - 192:18

**overlap** [2] - 123:15,

123:16

**overlapped** [1] - 123:13

**override** [1] - 201:7

**overrule** [6] - 56:20, 67:20, 133:12, 179:16, 182:6, 209:11

**Overruled** [3] - 11:8, 176:2, 193:9

**overruled** [1] - 207:11

**oversee** [3] - 133:18, 133:22, 137:7

**oversees** [1] - 140:11

**oversight** [1] - 137:9

**overstate** [1] - 107:13

**overstated** [1] - 93:9

**own** [8] - 25:20, 34:24, 42:15, 89:5, 152:17, 152:19, 152:20, 152:21

**owned** [1] - 30:20

**oxycodone** [60] - 12:18, 12:20, 13:15, 14:20, 15:17, 17:23, 24:14, 24:25, 25:8, 25:13, 26:4, 26:11, 26:14, 26:21, 27:7, 27:18, 27:23, 28:2, 28:12, 29:24, 30:4, 31:20, 32:10, 33:1, 43:4, 43:12, 43:16, 44:9, 44:21, 46:7, 46:15, 47:2, 47:6, 47:12, 47:17, 47:22, 48:3, 48:12, 48:18, 49:2, 49:3, 53:5, 55:1, 55:6, 55:9, 55:14, 61:9, 61:13, 61:19, 61:24, 62:5, 64:1, 64:25, 67:10, 72:18, 105:24, 106:6, 130:22, 154:13, 154:16

**Oxycodone** [1] - 129:20

**Oxycontin** [10] - 192:20, 192:21, 192:22, 192:24, 193:1, 193:5, 193:16, 193:22, 194:1, 194:8

## P

**P-1200** [1] - 2:7

**P-32** [3] - 211:5, 211:7, 214:12

**P-43225** [3] - 12:15, 19:22, 53:2

**P-44711** [2] - 29:22, 48:11

**P-44748** [1] - 35:10

**P-44752** [2] - 26:7, 31:7

**P-44758** [1] - 92:9

**P-4478** [1] - 36:9

**P-49** [2] - 222:22, 223:13

**P-877** [2] - 228:20, 229:13

**P-9** [2] - 226:3, 226:19

**P-9112** [3] - 194:17, 196:3, 197:7

**P-9112a** [2] - 196:8, 209:19

**p.m** [1] - 237:19

**P.O** [2] - 5:14, 6:8

**PA** [3] - 6:6, 6:13, 6:15

**package** [5] - 64:10, 70:23, 71:5, 72:17, 115:11

**packages** [5] - 70:19, 70:21, 71:4, 71:15, 80:6

**packet** [9] - 70:12, 74:2, 74:5, 74:10, 78:4, 81:11, 86:2, 92:9, 105:20

**packets** [27] - 54:21, 71:21, 72:16, 72:22, 73:16, 73:17, 73:23, 74:20, 74:25, 75:5, 75:9, 77:10, 77:12, 77:21, 78:16, 78:19, 79:21, 80:2, 82:1, 82:6, 82:18, 86:16, 86:17, 86:22, 87:7, 92:20

**page** [25] - 8:7, 8:12, 9:1, 9:6, 26:8, 53:25, 54:7, 58:18, 62:25, 71:19, 72:15, 81:1, 104:17, 131:24, 132:2, 196:6, 197:2, 199:17, 202:23, 209:19, 210:11, 223:21, 227:19, 232:5, 232:6

**Page** [74] - 8:23, 9:5, 9:7, 10:5, 10:9, 10:14, 12:17, 13:5, 13:6, 13:19, 13:20, 14:24, 16:3, 18:6, 18:11, 18:17, 18:21, 18:22, 20:9, 20:25, 21:6, 21:10, 24:8, 27:2, 29:22, 31:7, 32:11, 35:10, 36:9, 41:3, 41:17, 47:10,

47:21, 48:11, 51:15, 53:2, 71:18, 71:19, 72:13, 73:17, 73:21, 96:3, 96:4, 96:5, 101:11, 101:25, 102:8, 102:17, 102:22, 103:13, 103:14, 103:20, 103:25, 105:6, 132:23, 197:1, 197:2, 197:8, 199:18, 202:23, 211:17, 217:21, 217:22, 224:12, 226:23, 227:5, 227:24

**pages** [9] - 13:6, 43:7, 71:1, 71:15, 71:17, 71:25, 81:17, 82:4, 196:8

**Pages** [1] - 214:16

**pain** [2] - 51:22, 204:17

**pair** [2] - 121:25, 122:2

**Panel** [1] - 170:5

**panel** [1] - 101:20

**Panhandle** [4] - 53:12, 53:17, 53:20, 53:23

**panhandles** [2] - 54:1, 54:11

**Papantonio** [1] - 2:12

**paper** [4] - 84:6, 95:1, 95:25, 96:14

**papers** [1] - 127:9

**paragraph** [19] - 101:14, 214:18, 215:2, 215:21, 218:3, 218:5, 218:16, 218:17, 218:18, 220:8, 229:20, 229:25, 231:11, 232:1, 232:7, 232:18, 232:25, 234:14, 234:23

**Paragraph** [8] - 40:10, 40:24, 41:3, 157:19, 223:21, 224:4, 227:8, 228:1

**Pardon** [1] - 211:9

**part** [21] - 9:18, 23:22, 26:24, 29:12, 29:18, 39:11, 51:13, 56:3, 56:10, 59:15, 89:17, 109:12, 112:6, 129:6, 130:20, 147:25, 176:17, 177:11, 181:10, 183:6, 234:9

**participated** [1] - 170:10

**particular** [26] - 13:6, 22:7, 26:9, 27:1, 28:18, 28:19, 29:6, 29:9, 29:12, 30:17, 40:24, 61:4, 96:23, 99:11, 114:10, 119:12, 119:22, 119:24, 120:13, 120:14, 141:6, 198:8, 206:2, 207:25

**particularly** [2] - 119:25, 126:20

**parties** [3] - 77:22, 82:24, 128:5

**parts** [2] - 14:6, 79:14

**party** [3] - 11:5, 110:2, 158:20

**passed** [2] - 158:8, 169:14

**past** [9] - 22:5, 30:23, 75:19, 144:23, 145:2, 148:24, 166:2, 168:19, 179:5

**patience** [2] - 23:18, 78:15

**patient** [7] - 159:16, 178:24, 191:23, 201:1, 201:6, 201:9, 204:5

**patient's** [1] - 201:3

**patients** [7] - 22:1, 52:18, 201:2, 204:22, 208:9, 209:5, 236:9

**pattern** [5] - 67:16, 178:12, 202:24, 203:6, 203:12

**patterns** [1] - 92:9

**PAUL** [2] - 2:3, 5:9

**Paul** [4] - 133:24, 138:21, 139:13

**pause** [1] - 127:11

**Pause** [2] - 23:13, 226:8

**payment** [2] - 197:13, 197:19

**pdf** [1] - 27:2

**PEARL** [1] - 3:6

**pejorative** [2] - 97:10, 195:16

**pending** [2] - 167:18, 233:2

**Pensacola** [1] - 2:14

**people** [17] - 52:14, 107:12, 129:5, 130:18, 133:17, 135:3, 143:5, 147:7, 151:12, 157:16,

158:3, 168:16, 171:7, 186:23, 196:17, 205:1, 217:18

**people's** [2] - 122:6, 168:8

**per** [15] - 10:6, 29:24, 50:22, 50:25, 51:2, 51:6, 51:16, 52:1, 69:10, 94:13, 103:1, 116:7, 117:11, 117:12, 117:17

**percent** [16] - 15:7, 22:25, 23:3, 23:4, 23:6, 24:25, 25:7, 93:10, 105:3, 112:18, 115:24, 119:20, 172:18, 197:13, 197:20

**percentage** [5] - 22:19, 94:2, 111:3, 116:9, 172:12

**perfect** [3] - 84:9, 114:20, 123:16

**perfectly** [6] - 79:17, 121:22, 121:23, 121:24, 122:1, 122:19

**perform** [6] - 66:12, 68:3, 118:16, 121:17, 153:1, 201:17

**performing** [2] - 114:1, 148:17

**perhaps** [9] - 22:9, 46:2, 46:3, 104:1, 114:22, 115:9, 115:10, 153:11, 207:18

**peril** [1] - 126:11

**period** [11] - 34:9, 46:19, 76:8, 123:22, 129:13, 131:7, 141:9, 144:7, 154:20, 170:22, 223:23

**permitted** [1] - 90:24

**person** [4] - 151:2, 170:8, 220:14, 220:23

**person's** [1] - 174:11

**personal** [1] - 52:17

**personally** [7] - 13:22, 60:5, 130:14, 130:15, 167:14, 176:14, 225:22

**personnel** [1] - 59:22

**perspective** [2] - 144:21, 162:16, 215:9

**PETER** [1] - 2:12

**Pharmaceutical** [1] - 167:3

**Pharmacies** [10] - 30:25, 31:9, 32:3, 32:4, 36:7, 36:12, 36:15, 37:4, 37:25, 179:21

**pharmacies** [142] - 12:21, 12:22, 12:23, 13:1, 13:12, 13:14, 13:18, 14:5, 15:6, 15:25, 16:1, 16:2, 16:3, 16:8, 16:11, 16:15, 16:16, 18:6, 18:10, 18:16, 18:20, 18:23, 19:3, 19:8, 19:13, 21:8, 21:17, 21:19, 21:25, 22:2, 22:5, 22:16, 22:20, 26:3, 28:6, 28:19, 29:4, 30:16, 31:20, 34:24, 35:4, 38:2, 38:14, 52:4, 52:24, 53:3, 53:6, 53:7, 53:12, 53:19, 54:9, 54:13, 54:20, 54:25, 55:4, 55:8, 55:12, 55:21, 55:22, 55:24, 56:5, 56:8, 56:13, 56:21, 57:3, 57:6, 57:18, 57:19, 57:22, 58:19, 59:23, 66:14, 66:19, 67:2, 67:9, 67:13, 70:13, 71:2, 71:14, 73:3, 73:24, 74:3, 76:20, 78:4, 78:9, 78:17, 79:7, 79:21, 86:16, 94:11, 103:3, 103:6, 103:7, 103:16, 103:18, 103:25, 104:6, 104:7, 104:19, 104:24, 105:5, 105:25, 110:11, 111:5, 112:4, 112:7, 112:10, 119:1, 122:25, 123:3, 123:5, 123:6, 126:21, 129:20, 130:19, 149:24, 152:20, 158:22, 159:14, 159:21, 160:11, 162:8, 162:9, 163:10, 163:15, 163:17, 169:22, 177:21, 177:22, 198:15, 202:24, 203:7, 203:13, 203:16, 217:7, 217:11,

217:12, 224:15, 225:16, 225:20

**pharmacist** [1] - 201:24

**pharmacy** [104] - 10:22, 20:10, 20:11, 21:1, 21:7, 21:9, 26:23, 28:3, 28:21, 30:21, 34:23, 44:9, 54:21, 57:22, 58:20, 63:17, 64:6, 64:7, 64:12, 64:14, 65:15, 65:21, 70:23, 70:24, 71:4, 71:5, 71:21, 72:16, 72:19, 73:9, 73:16, 73:17, 73:23, 74:6, 74:8, 74:11, 74:20, 74:21, 74:23, 75:6, 75:10, 75:24, 76:4, 76:10, 76:20, 77:9, 77:21, 78:3, 79:7, 80:3, 80:25, 82:1, 86:17, 93:14, 94:10, 99:6, 99:9, 115:1, 115:8, 115:9, 116:23, 118:25, 119:12, 119:15, 120:13, 131:2, 153:9, 159:17, 160:20, 160:24, 161:11, 161:17, 162:3, 162:18, 172:12, 172:18, 178:1, 178:20, 179:1, 179:23, 180:13, 180:14, 181:3, 191:12, 191:24, 197:13, 197:19, 201:3, 201:5, 201:11, 201:24, 201:25, 203:5, 203:23, 204:17, 221:15, 223:23, 224:5

**Pharmacy** [25] - 26:9, 26:12, 26:15, 26:17, 26:21, 27:3, 27:6, 27:10, 27:17, 27:23, 29:1, 30:17, 30:18, 32:12, 76:25, 93:8, 94:3, 114:9, 114:23, 116:22, 130:23, 138:22, 148:18, 179:23, 183:25

**pharmacy's** [2] - 64:13, 161:16

**Pharmacy's** [1] - 35:1

**pharmacy-specific** [1] - 54:21

**phase** [1] - 113:1

**Philadelphia** [2] - 6:6, 6:13
**phone** [1] - 235:8
**phonetic** [1] - 171:17
**phrase** [2] - 87:4, 212:21
**physical** [6] - 37:15, 64:13, 156:5, 174:14, 174:18, 201:19
**physician's** [1] - 204:17
**pick** [4] - 7:19, 71:25, 197:14, 201:4
**pick-up** [1] - 197:14
**picked** [7] - 18:11, 18:14, 18:15, 77:7, 78:8, 78:9, 80:9
**picking** [2] - 97:13, 197:22
**picture** [1] - 101:9
**pie** [4] - 61:4, 62:12, 150:11, 151:6
**piece** [2] - 95:1, 95:24
**PIFKO** [1] - 3:16
**pileup** [1] - 127:21
**pill** [1] - 153:23
**pills** [55] - 69:10, 72:21, 72:24, 78:20, 91:17, 92:5, 92:6, 92:7, 93:12, 94:2, 96:7, 114:10, 115:15, 115:19, 115:20, 116:24, 117:3, 117:7, 129:19, 130:4, 130:8, 130:12, 130:21, 131:4, 131:5, 151:7, 153:22, 154:16, 154:17, 154:20, 155:4, 155:5, 155:9, 158:18, 160:18, 160:23, 161:5, 162:17, 163:6, 175:3, 177:18, 179:8, 183:25, 185:1, 201:19, 203:23, 204:3, 204:7, 206:8, 206:14, 207:5, 208:7, 209:4
**pin** [3] - 87:4, 152:5, 222:6
**pipeline** [1] - 161:3
**place** [13] - 82:7, 153:10, 177:19, 186:13, 213:10, 219:16, 222:4, 234:15, 235:18,

235:25, 236:2, 237:3, 237:15
**placed** [2] - 65:21, 96:10
**places** [4] - 68:6, 201:3, 207:5, 209:6
**placing** [2] - 60:16, 220:15
**PLAINTIFF** [1] - 127:18
**plaintiff** [1] - 89:16
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**Plaintiffs** [1] - 238:6
**plaintiffs** [20] - 43:15, 56:24, 57:23, 58:8, 58:21, 58:25, 59:16, 60:17, 74:4, 76:23, 87:11, 88:25, 90:24, 93:8, 93:15, 93:22, 95:8, 126:9, 127:6, 173:13
**Plaintiffs'** [9] - 47:10, 47:21, 51:15, 61:3, 68:11, 68:16, 70:16, 70:18, 76:13
**plaintiffs'** [5] - 28:14, 80:10, 80:14, 89:5, 110:11
**plan** [1] - 85:19
**play** [2] - 145:9, 166:24
**playbill** [1] - 135:4
**played** [2] - 164:22, 166:25
**playing** [4] - 58:15, 88:18, 88:22, 88:23
**Pleasant** [3] - 3:15, 4:4, 4:9
**Pleasure** [1] - 8:4
**pleasure** [1] - 126:3
**pledges** [1] - 177:8
**plenty** [1] - 76:23
**plug** [2] - 97:15, 97:18
**pluribus** [1] - 151:4
**plus** [3] - 115:25, 122:3
**Plus** [10] - 26:9, 26:11, 26:15, 26:17, 26:21, 27:3, 27:6, 27:10, 27:17, 27:22
**pockets** [1] - 169:10
**podium** [2] - 83:10, 120:18
**Point** [2] - 92:16
**point** [40] - 16:14, 18:17, 31:25, 69:10, 70:7, 76:23, 77:2, 78:10, 79:4, 79:23, 81:13, 81:15, 83:17,

83:24, 87:15, 88:10, 88:12, 90:14, 90:15, 96:2, 96:25, 105:9, 113:22, 129:7, 130:11, 133:2, 136:22, 138:16, 139:10, 147:11, 166:7, 190:24, 198:6, 199:20, 202:6, 206:11, 209:9, 232:7, 235:14
**pointed** [2] - 79:19, 111:2
**pointing** [2] - 86:10, 105:17
**points** [5] - 22:6, 28:23, 86:10, 88:22, 135:18
**police** [2] - 217:11, 217:12
**policies** [13] - 142:22, 143:11, 147:8, 177:8, 185:18, 185:21, 185:25, 186:3, 186:22, 189:15, 189:17, 189:20, 224:24
**Policy** [1] - 168:13
**policy** [4] - 185:23, 185:24, 186:6, 187:13
**Polster** [1] - 76:9
**Ponc** [1] - 2:4
**Ponce** [1] - 2:16
**poor** [1] - 221:6
**population** [3] - 51:21, 52:5, 191:23
**portion** [3] - 38:10, 136:17, 147:2, 148:4, 190:5, 198:4, 217:5
**portray** [1] - 133:19
**Portsmouth** [1] - 208:13
**position** [17] - 90:9, 160:17, 161:24, 164:24, 166:11, 181:23, 182:10, 189:21, 189:23, 200:3, 207:19, 233:13, 233:15, 233:20, 234:3, 234:6, 236:4
**positions** [3] - 182:22, 182:23, 213:10
**positive** [1] - 169:7
**positively** [2] - 121:7, 122:2
**possession** [4] - 153:6, 157:25,

160:19, 190:8
**possibilities** [2] - 184:21, 185:12
**possible** [3] - 63:10, 91:18, 184:21
**possibly** [3] - 14:8, 97:10, 126:7
**posted** [1] - 50:14
**potential** [6] - 155:1, 155:5, 155:7, 155:16, 178:9, 180:11
**potentially** [2] - 50:7, 218:8
**Powell** [1] - 2:6
**PowerPoint** [1] - 12:5
**powers** [1] - 101:21
**PR** [2] - 2:5, 2:17
**practice** [1] - 152:23
**practices** [1] - 189:17
**precise** [5] - 35:3, 40:5, 41:1, 64:4, 122:18
**predicted** [1] - 77:20
**prefer** [1] - 22:24
**premise** [1] - 229:21
**preparation** [1] - 70:11
**prepared** [8] - 23:23, 26:24, 27:3, 71:12, 87:8, 93:8, 99:1, 99:2
**prescriber** [1] - 178:25
**prescribers** [1] - 152:21
**prescribing** [1] - 191:12
**prescription** [27] - 9:20, 10:21, 25:8, 25:14, 45:16, 45:20, 45:25, 50:21, 154:2, 158:17, 158:22, 159:20, 160:14, 162:1, 165:11, 175:4, 175:12, 175:21, 177:17, 180:20, 195:19, 201:5, 201:7, 214:25, 215:7, 215:11, 218:6
**prescriptions** [11] - 51:10, 52:19, 66:23, 68:1, 68:7, 68:8, 68:20, 69:9, 69:12, 161:13, 179:22
**present** [3] - 31:13, 134:3, 192:15
**presentation** [16] - 7:24, 8:9, 8:12, 9:3, 12:6, 81:16, 145:11,

195:1, 195:2, 195:5, 195:6, 195:7, 195:8, 198:2, 198:3, 225:11
**presented** [10] - 28:17, 30:24, 54:19, 54:24, 71:17, 102:12, 114:8, 114:19, 116:6, 117:16
**presently** [3] - 172:24, 173:2, 173:5
**presents** [1] - 24:12
**President** [10] - 91:14, 128:8, 128:14, 129:8, 129:12, 129:18, 130:3, 135:14, 194:4, 231:12
**pressure** [1] - 44:13
**pretty** [3] - 69:3, 89:22, 149:5
**prevent** [27] - 39:2, 142:19, 146:5, 146:25, 147:1, 151:25, 152:10, 153:8, 158:14, 160:23, 162:20, 164:18, 175:20, 181:24, 182:12, 184:11, 191:8, 201:20, 201:21, 202:12, 202:17, 202:21, 221:25, 222:1, 222:4, 228:3
**preventing** [2] - 187:19, 188:24
**preview** [1] - 77:18
**previous** [5] - 115:7, 115:11, 115:14, 166:17, 205:15
**previously** [4] - 38:15, 154:15, 163:19, 165:20
**Prevosnick** [1] - 171:2
**Prevosnik** [1] - 170:23
**Prevoznik** [3] - 171:11, 196:5, 234:6
**primarily** [4] - 107:16, 108:18, 113:8, 124:6
**primary** [2] - 24:21, 110:22
**printed** [2] - 36:19, 86:14
**private** [1] - 199:7
**privilege** [1] - 143:25
**probative** [1] - 182:21
**problem** [17] - 35:19, 56:11, 64:18, 77:20, 87:10, 89:5, 90:7, 93:20, 93:23,

113:13, 169:15,
189:6, 189:7,
193:23, 215:1,
215:8, 215:12
**problematic** [1] -
193:5
**problems** [6] - 56:8,
114:16, 114:17,
114:18, 189:4, 189:5
**procedures** [10] -
142:22, 147:8,
177:8, 177:9,
185:19, 185:21,
185:24, 185:25,
186:4, 186:22
**proceed** [4] - 7:9,
7:12, 98:6, 126:9
**proceeding** [1] - 73:15
**proceedings** [1] -
238:5
**Proceedings** [1] -
6:19
**PROCEEDINGS** [1] -
7:1
**process** [14] - 39:12,
39:24, 88:4, 113:17,
178:23, 187:1,
187:2, 187:3,
187:16, 221:20,
221:21, 223:8,
235:10, 236:22
**processed** [2] - 76:2,
124:13
**processes** [4] -
137:10, 152:25,
153:10, 177:9
**processing** [8] -
66:11, 112:24,
113:1, 113:8,
113:17, 113:21,
113:25, 137:12
**Proctor** [1] - 2:12
**procured** [1] - 101:19
**produce** [2] - 60:23,
99:5
**produced** [25] - 6:19,
33:21, 39:12, 39:13,
40:2, 44:1, 44:3,
45:3, 57:18, 57:21,
57:24, 58:21, 59:7,
59:8, 59:17, 59:24,
60:6, 60:11, 61:24,
96:25, 97:2, 98:12,
109:17, 123:22,
132:15
**product** [16] - 80:15,
111:18, 136:13,
153:6, 153:7,
162:13, 163:2,
172:12, 177:21,

178:21, 190:8,
202:13, 218:12,
218:13, 225:16,
236:9
**production** [5] -
42:12, 45:5, 47:2,
60:7, 109:20
**products** [12] - 34:24,
35:2, 37:11, 37:16,
37:17, 131:19,
152:1, 152:3, 154:1,
154:21, 197:12,
201:22
**program** [23] - 99:17,
137:13, 137:14,
187:17, 187:18,
188:5, 188:13,
188:15, 188:20,
188:21, 189:7,
192:1, 192:5,
219:10, 219:14,
219:16, 224:25,
225:1, 228:2, 228:8,
228:13, 233:9, 237:3
**Program** [10] - 137:7,
145:20, 145:23,
145:24, 146:6,
147:3, 147:13,
147:17, 187:10,
189:16
**programmed** [3] -
99:8, 99:14
**projects** [1] - 145:2
**promise** [7] - 98:25,
146:9, 152:5, 228:1,
234:11, 235:2,
235:20
**promised** [2] - 233:6,
234:7
**promises** [3] - 177:7,
177:15, 229:10
**promulgate** [1] -
158:10
**prong** [1] - 102:4
**pronounce** [2] -
140:3, 230:2
**properly** [1] - 216:22
**proportion** [1] - 51:20
**prosecuting** [1] -
230:15
**prospective** [1] -
216:24
**protect** [3] - 153:10,
225:13, 236:7
**provide** [10] - 24:9,
56:15, 63:3, 71:9,
162:2, 218:24,
221:9, 221:13,
231:15
**provided** [10] - 37:23,

41:22, 42:4, 52:23,
62:23, 69:4, 74:20,
75:9, 81:8, 81:9
**providing** [1] - 216:1
**proximity** [1] - 204:16
**Ps** [1] - 115:25
**Pseudoephedrine** [1]
- 169:9
**pseudoephedrine** [1]
- 169:11
**psychological** [1] -
156:5
**public** [3] - 50:11,
173:20
**publicly** [7] - 46:16,
49:21, 50:6, 50:13,
51:3, 76:8, 76:9
**publish** [1] - 68:10
**published** [1] - 46:17
**publishes** [1] - 45:1
**pull** [16] - 26:7, 31:6,
40:9, 41:3, 46:17,
47:10, 47:21, 48:11,
49:8, 51:15, 53:2,
92:13, 96:18, 97:15,
97:18, 164:21
**pulled** [2] - 79:14,
134:16
**pulling** [2] - 71:8,
191:19
**purchase** [2] - 115:2,
115:5
**purchased** [3] -
158:23, 162:1,
197:13
**purchases** [3] - 42:15,
158:21, 172:18
**purchasing** [1] -
206:23
**purported** [2] - 83:22,
88:24
**purpose** [18] - 56:14,
77:1, 77:3, 99:25,
151:2, 156:17,
156:24, 157:15,
158:13, 179:20,
180:14, 181:23,
182:11, 184:10,
200:21, 210:25,
214:22
**purposes** [6] - 46:14,
116:15, 150:7,
154:5, 212:9, 216:25
**pursuant** [3] - 45:17,
45:20, 235:10
**put** [38] - 8:6, 9:3,
22:22, 36:6, 45:2,
70:15, 76:2, 77:13,
77:21, 78:24, 78:25,
79:10, 79:17, 79:20,

83:1, 85:2, 87:4,
91:25, 92:20, 94:13,
116:15, 126:15,
126:24, 134:7,
152:5, 170:21,
180:9, 186:13,
187:25, 194:18,
195:4, 208:21,
209:16, 210:11,
210:15, 222:6,
235:25, 236:1
**Putnam** [1] - 208:15
**putting** [4] - 49:8,
210:2, 219:8, 235:18
**pyramid** [1] - 133:17

## Q

**qualified** [2] - 144:12,
144:14
**quantities** [1] - 110:25
**quantity** [4] - 107:13,
108:10, 178:12,
202:1
**quarrel** [2] - 125:12,
125:15
**quarter** [4] - 50:3,
124:2, 171:24
**quarterly** [1] - 50:13
**quarters** [1] - 101:13
**questioning** [14] -
7:17, 11:12, 26:22,
28:15, 77:6, 77:16,
78:23, 79:3, 80:1,
86:1, 98:23, 126:10,
165:3, 171:8
**questions** [29] - 16:2,
18:4, 23:20, 53:1,
58:13, 59:11, 68:18,
71:8, 91:1, 91:2,
91:6, 102:23, 103:9,
106:8, 106:11,
106:20, 112:24,
116:18, 117:20,
123:8, 151:22,
172:22, 181:14,
181:18, 182:5,
182:20, 187:25,
191:20, 212:15
**quick** [3] - 120:20,
146:8, 203:20
**quickly** [8] - 12:15,
58:14, 58:24, 69:24,
73:5, 73:15, 86:7,
232:3
**quite** [4] - 17:3, 18:8,
100:21, 129:6
**quota** [15] - 9:19, 9:23,
10:2, 10:4, 45:4,
45:11, 45:17, 45:21,

45:22, 45:24, 46:7,
46:15, 46:20, 47:2,
49:2
**quotas** [6] - 44:24,
45:1, 45:8, 45:14,
46:4, 46:11

## R

**RA** [1] - 148:11
**Rafferty** [1] - 2:12
**rage** [1] - 169:5
**raise** [2] - 127:17,
178:5
**raised** [1] - 121:16
**raising** [1] - 205:10
**Raleigh** [1] - 208:16
**ran** [1] - 59:21
**ranch** [1] - 84:17
**randomly** [1] - 56:6
**range** [2] - 121:22,
197:12
**ranking** [2] - 28:5,
68:24
**Rannazzisi** [11] -
171:16, 212:20,
212:23, 212:24,
212:25, 213:2,
220:2, 222:12,
224:22, 231:20,
236:17
**Rather** [1] - 15:20
**rather** [2] - 59:10,
126:14
**ratio** [1] - 172:8
**raw** [3] - 76:2, 91:23,
113:20
**re** [2] - 58:15, 148:22
**re-playing** [1] - 58:15
**re-visit** [1] - 148:22
**read** [53] - 8:21, 81:1,
96:18, 97:6, 100:25,
101:15, 101:25,
102:8, 132:11,
155:14, 156:2,
156:12, 157:6,
157:7, 157:12,
157:19, 168:6,
168:11, 168:15,
171:1, 171:6,
171:10, 171:15,
171:21, 184:10,
197:8, 197:10,
198:5, 199:13,
202:5, 202:19,
202:22, 205:7,
212:4, 213:14,
213:15, 214:6,
214:18, 215:5,
215:22, 215:23,

216:12, 216:16, 217:24, 218:18, 223:5, 226:4, 231:16, 232:8, 232:14, 233:4, 237:10
**reading** [7] - 81:18, 135:23, 155:24, 156:12, 205:4, 208:21
**ready** [6] - 84:19, 127:4, 190:13, 211:20, 226:9, 228:23
**real** [3] - 35:14, 146:8, 203:19
**real-time** [1] - 35:14
**really** [16] - 24:2, 45:7, 45:22, 53:14, 108:17, 110:9, 111:9, 113:16, 115:10, 117:10, 122:4, 123:16, 124:6, 124:23, 134:25, 216:14
**reason** [16] - 18:15, 38:24, 50:16, 50:17, 52:12, 88:23, 92:2, 110:4, 123:21, 134:25, 143:23, 167:20, 178:4, 180:9, 195:21, 201:24
**reasonable** [1] - 216:4
**reasons** [2] - 117:8, 120:8
**recalling** [1] - 46:6
**receipt** [1] - 107:19
**receive** [5] - 27:11, 126:8, 161:25, 162:5, 177:22
**received** [6] - 26:4, 27:6, 44:12, 59:8, 212:18, 225:17
**receiving** [1] - 107:16
**recently** [1] - 100:10
**recess** [1] - 171:25
**Recess** [3] - 35:20, 98:1, 172:1
**recessed** [1] - 237:19
**recognize** [13] - 19:24, 20:1, 132:16, 132:22, 133:5, 133:7, 136:3, 136:18, 150:15, 182:3, 212:6, 214:8, 222:22
**recognized** [1] - 30:23
**recollection** [1] - 194:7

**recommendations** [1] - 202:14
**record** [18] - 79:1, 81:19, 92:24, 94:14, 96:5, 96:8, 96:18, 102:9, 126:16, 128:3, 129:18, 132:14, 152:18, 157:6, 223:14, 229:14, 238:5
**recorded** [1] - 6:19
**Recording** [2] - 164:22, 166:25
**recordkeeping** [2] - 161:2, 161:16
**records** [3] - 113:15, 128:13, 181:4
**recross** [1] - 106:9, 106:14, 106:17
**red** [2] - 33:16, 36:24
**redirect** [2] - 66:3, 76:25
**REDIRECT** [1] - 66:8
**reduces** [1] - 104:14
**Reed** [3] - 6:4, 6:11, 229:1
**refer** [2] - 36:6, 159:7
**reference** [8] - 59:3, 82:10, 129:7, 172:21, 191:21, 207:1, 214:11, 233:20
**referenced** [4] - 150:9, 159:8, 196:4, 207:16
**references** [1] - 89:8
**referencing** [5] - 164:3, 173:13, 200:12, 204:24, 228:16
**referred** [4] - 54:21, 66:17, 118:12, 212:20
**referring** [12] - 26:2, 44:23, 71:3, 100:2, 155:11, 165:23, 172:10, 174:9, 183:17, 185:24, 186:6, 208:9
**reflect** [18] - 17:5, 18:17, 18:20, 23:23, 32:20, 49:16, 50:1, 50:21, 59:25, 93:22, 99:18, 109:5, 109:6, 109:19, 113:24, 115:25, 117:6, 120:12
**reflected** [7] - 28:13, 39:3, 47:12, 47:23, 48:13, 53:6, 62:21
**reflecting** [7] - 33:16,

42:11, 57:25, 58:22, 59:18, 60:24, 62:12
**reflective** [1] - 33:4
**reflects** [6] - 9:13, 27:3, 29:23, 35:9, 53:5, 120:11
**regard** [1] - 189:22
**regarding** [15] - 24:14, 36:7, 41:23, 42:5, 53:5, 54:19, 57:25, 58:9, 58:23, 60:19, 81:6, 81:8, 168:12, 228:12, 229:9
**Region** [4] - 140:7, 140:20, 140:23, 143:4
**region** [4] - 16:17, 140:10, 140:18, 206:3
**regional** [2] - 62:16, 140:16
**Regional** [2] - 140:6, 143:3
**regions** [1] - 140:10
**registered** [2] - 65:16, 214:20
**registrant** [7] - 162:18, 190:14, 213:18, 219:20, 220:15, 221:10
**registrants** [6] - 109:23, 109:24, 112:15, 182:15, 212:3, 212:12
**registration** [33] - 63:4, 63:22, 64:22, 107:19, 152:11, 152:12, 153:8, 161:11, 161:18, 161:19, 161:20, 161:22, 161:23, 162:4, 162:21, 179:23, 184:3, 191:9, 191:13, 198:11, 202:1, 202:2, 203:5, 216:3, 216:4, 216:5, 217:4, 218:9, 219:1, 220:24, 221:16, 223:2
**registrations** [2] - 198:5, 217:6
**regulate** [1] - 221:19
**regulated** [1] - 154:17
**regulates** [1] - 44:16
**regulation** [5] - 184:8, 201:8, 221:18, 237:6
**Regulations** [12] - 142:23, 146:5, 146:17, 147:2,

155:13, 158:9, 162:7, 178:12, 180:10, 233:16, 236:15, 237:9
**regulations** [6] - 155:12, 168:22, 181:24, 182:12, 221:11, 221:20
**regulator** [1] - 65:16
**regulators** [1] - 67:4
**Regulatory** [12] - 91:15, 128:9, 128:14, 128:25, 129:6, 129:9, 130:3, 145:21, 148:10, 194:4, 230:19, 231:13
**regulatory** [10] - 142:1, 148:16, 148:18, 165:1, 181:7, 181:8, 189:24, 201:18, 222:4, 231:23
**reinstated** [2] - 176:18, 176:20
**reiterate** [1] - 214:24
**relate** [2] - 113:8, 121:6
**related** [3] - 60:15, 164:6, 212:8
**relating** [3] - 37:15, 67:8, 185:25
**relation** [2] - 66:23, 69:19
**relationship** [3] - 169:3, 230:24, 231:5
**relative** [1] - 116:9
**relatively** [2] - 32:17, 99:4
**relaxed** [1] - 89:20
**Release** [1] - 226:5
**release** [8] - 193:21, 193:22, 227:10, 227:15, 227:21, 235:6, 235:11
**released** [3] - 193:24, 232:17, 235:15
**releasing** [1] - 180:25
**relevance** [1] - 189:11
**relevancy** [4] - 88:25, 93:21, 94:9, 94:16
**reliability** [2] - 94:5, 94:7
**reliable** [1] - 39:9
**reliably** [1] - 39:3
**relieve** [1] - 202:7, 202:20
**rely** [3] - 220:14, 220:23, 222:1
**remained** [1] - 148:24

**remaining** [3] - 61:19, 234:14, 234:24
**remand** [1] - 101:22
**remarks** [1] - 160:6
**remember** [5] - 79:9, 94:23, 146:22, 165:25, 196:2
**remove** [2] - 163:5, 196:6
**removed** [1] - 94:12
**removes** [1] - 209:19
**renew** [1] - 209:18
**Reno** [2] - 170:11, 170:13, 170:15
**repeat** [3] - 27:20, 58:18, 118:10
**rephrase** [3] - 17:12, 25:23, 128:22
**rephrasing** [1] - 75:15
**report** [46] - 27:2, 38:23, 39:25, 40:25, 43:7, 46:16, 76:18, 91:10, 99:8, 100:10, 100:16, 104:4, 109:25, 121:20, 122:17, 133:25, 139:9, 139:11, 139:13, 139:15, 139:17, 139:20, 139:22, 145:3, 163:13, 177:1, 179:2, 179:4, 180:2, 180:15, 180:16, 180:24, 181:1, 181:8, 186:24, 200:1, 200:15, 201:8, 201:12, 201:16, 202:12, 219:12, 232:21, 237:7
**Report** [4] - 76:14, 170:11, 170:15, 199:21
**reportable** [1] - 227:12
**reported** [20] - 25:4, 25:22, 40:25, 41:5, 107:1, 107:22, 107:23, 108:13, 109:5, 110:1, 112:15, 139:4, 147:11, 180:5, 195:14, 200:18, 224:8, 232:17, 238:9
**Reporter** [6] - 6:17, 6:18, 238:3, 238:12
**reporter** [4] - 35:12, 146:11, 171:23, 220:21
**REPORTER** [7] - 118:10, 118:14,

137:20, 146:19,
152:2, 157:22, 203:8
**Reporting** [1] - 202:7
**reporting** [21] - 108:1,
108:4, 108:7,
108:15, 108:25,
109:24, 133:20,
133:21, 152:25,
153:2, 153:3,
176:22, 176:24,
179:21, 187:1,
200:22, 202:19,
218:19, 219:10,
222:5
**reports** [22] - 46:3,
49:24, 71:4, 74:23,
75:5, 75:24, 76:3,
76:5, 76:6, 76:10,
97:6, 99:5, 108:10,
108:12, 111:22,
111:25, 138:17,
151:14, 151:16,
194:8, 232:22
**Reports** [10] - 47:13,
47:24, 48:13, 49:22,
50:1, 50:6, 51:3,
122:23, 124:2, 169:9
**represent** [6] - 23:19,
132:13, 132:14,
150:13, 182:19,
193:3
**representing** [1] -
164:10
**represents** [3] - 47:11,
47:22, 48:12
**request** [4] - 58:8,
60:18, 71:22, 85:21
**requested** [5] - 57:23,
58:21, 58:25, 59:4,
59:16, 72:4
**require** [1] - 126:12
**required** [5] - 45:10,
92:8, 153:1, 162:12,
177:1
**requirement** [7] -
153:4, 167:3, 181:8,
220:9, 220:12,
236:23, 237:9
**requirements** [28] -
37:15, 45:13,
145:23, 147:3,
147:6, 148:6,
148:18, 152:18,
152:19, 152:20,
152:21, 153:10,
153:25, 161:2,
161:16, 179:24,
183:11, 184:9,
188:22, 189:3,
191:10, 202:3,

202:21, 219:3,
221:21, 222:4,
231:23
**requires** [1] - 162:11
**requiring** [1] - 221:24
**rescheduled** [2] -
37:20, 154:14
**rescheduling** [3] -
34:20, 34:25, 37:7
**research** [1] - 10:3
**reserve** [1] - 12:7
**residents** [5] - 52:5,
67:24, 68:6, 68:18,
69:8
**resolution** [2] - 170:3,
223:11
**resolve** [3] - 169:24,
169:25, 231:2
**resolved** [1] - 90:7
**respect** [3] - 32:10,
126:21, 227:12
**respectfully** [1] -
92:23
**respond** [4] - 69:23,
80:22, 83:8, 93:5
**responded** [1] - 98:9
**response** [1] - 98:24
**responses** [1] -
168:11
**responsibilities** [6] -
67:13, 146:18,
147:14, 147:16,
214:24, 236:12
**responsibility** [18] -
8:14, 146:5, 152:4,
160:22, 162:5,
162:17, 162:20,
185:22, 191:5,
201:6, 201:12,
201:18, 202:8,
217:2, 217:6, 217:7,
217:14, 218:20
**responsible** [11] -
136:1, 138:24,
143:8, 143:10,
146:17, 151:24,
152:9, 152:16,
161:15, 191:12,
201:22
**rest** [3] - 105:9,
105:19, 232:18
**restrictions** [3] -
155:9, 155:11,
155:22
**result** [2] - 95:16,
184:15
**results** [1] - 185:2
**resume** [1] - 172:3
**retail** [16] - 15:6,
94:11, 103:2, 103:5,

103:6, 103:16,
103:17, 103:25,
104:7, 104:11,
104:23, 105:10,
105:11, 105:12,
105:25, 172:17
**Retail** [9] - 47:12,
47:23, 48:13, 49:21,
50:1, 50:5, 51:3,
122:22, 124:1
**return** [5] - 7:22,
115:10, 115:14,
116:1, 117:3
**returned** [3] - 93:13,
114:10, 116:24
**returns** [4] - 115:4,
120:4, 120:6, 120:14
**reveal** [1] - 88:10
**revealed** [1] - 28:21
**reversal** [1] - 102:1
**reverse** [16] - 101:22,
107:12, 107:13,
107:15, 107:18,
107:20, 107:23,
108:1, 108:9,
108:12, 108:14,
108:15, 108:18,
108:25, 109:5,
113:13
**reversing** [1] - 126:8
**review** [6] - 60:4,
66:16, 67:6, 83:3,
179:3, 180:23,
232:10, 232:17
**reviewed** [6] - 29:21,
38:18, 41:24, 42:6,
52:6, 60:15
**reviewing** [3] - 60:14,
103:14, 187:6
**revising** [1] - 126:8
**revocation** [1] -
218:25
**revoke** [4] - 161:19,
181:11, 201:11,
217:8
**Reynolds** [1] - 20:17
**Rice** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**rid** [2] - 113:13,
113:14
**right-hand** [2] - 197:4,
214:2
**ring** [1] - 8:20
**ripe** [1] - 126:19
**ripple** [1] - 89:14
**rise** [1] - 29:7
**rising** [1] - 9:24
**risks** [2] - 175:3,
175:11
**Rite** [7] - 12:22, 15:25,

19:13, 72:15, 72:21,
73:9, 80:25
**Rite-Aid** [3] - 12:22,
15:25, 19:13
**RMR** [2] - 6:17, 6:18
**road** [1] - 131:13
**ROBERT** [1] - 6:11
**Robert** [3] - 136:23,
136:24, 139:8
**ROBERTSON** [1] - 3:6
**roid** [1] - 169:5
**role** [7] - 128:7,
128:14, 129:15,
135:13, 137:6,
137:7, 167:11
**roles** [1] - 145:8
**roll** [2] - 143:7, 234:17
**room** [1] - 80:3
**rose** [1] - 9:23
**Ross** [4] - 133:24,
138:21, 139:13
**rough** [2] - 23:1,
148:25
**roughly** [11] - 15:6,
15:12, 15:13, 15:21,
16:11, 18:2, 22:21,
30:11, 43:7, 43:10,
49:17
**round** [1] - 210:15
**rounding** [1] - 116:8
**route** [1] - 86:20
**routinely** [1] - 121:12
**row** [2] - 16:18, 102:25
**RPR** [1] - 6:18
**RPR-RMR-CRR-
FCRR** [1] - 6:18
**rub** [2] - 124:18,
124:23
**RUBY** [1] - 4:17
**Ruby** [1] - 4:17
**rude** [1] - 146:9
**Rule** [2] - 125:4, 126:7
**rule** [2] - 92:1, 94:23
**ruled** [2] - 11:5, 90:11
**rules** [2] - 87:16,
158:10
**ruling** [5] - 87:2,
87:14, 87:21, 87:22,
126:8
**run** [2] - 99:5, 99:7

---

# S

**S-O-M-S** [1] - 186:16
**s\Ayme** [1] - 238:11
**s\Lisa** [1] - 238:11
**safe** [2] - 18:10,
142:17
**safeguard** [1] - 162:6
**safely** [1] - 163:6

**SafeScript** [8] - 76:14,
76:20, 76:24, 91:18,
92:4, 94:16, 130:22,
183:25
**safety** [2] - 152:18,
173:20
**sail** [1] - 150:25
**sale** [1] - 158:22
**sales** [1] - 227:12
**Sales** [3] - 169:9,
198:17, 198:21
**Salgado** [7] - 23:9,
23:19, 35:11, 35:21,
106:16, 119:4
**SALGADO** [31] - 4:15,
23:10, 23:15, 35:15,
35:19, 35:23, 35:25,
36:2, 54:3, 54:6,
54:10, 54:12, 55:19,
56:17, 57:2, 63:20,
64:3, 64:18, 64:19,
65:24, 74:19, 75:8,
83:15, 106:17,
119:6, 120:16,
125:2, 125:18,
125:23, 126:25,
210:22
**sample** [2] - 8:24,
72:14
**San** [4] - 2:5, 2:17,
100:12, 100:13
**sanction** [3] - 175:25,
176:3, 176:5
**sanctioned** [1] -
175:19
**sat** [1] - 170:9
**satisfied** [1] - 162:14
**Sav** [4] - 72:15, 72:21,
73:9, 80:25
**Sav-Rite** [4] - 72:15,
72:21, 73:9, 80:25
**save** [2] - 143:19,
145:12
**saw** [6] - 52:11, 93:7,
99:15, 107:6, 107:8,
129:7
**SC** [3] - 3:15, 4:4, 4:9
**scale** [5] - 98:10,
99:10, 99:13, 99:16,
187:7
**Schedule** [14] - 37:11,
37:12, 37:16,
154:11, 154:17,
154:22, 154:24,
155:6, 155:15,
156:4, 158:21, 169:6
**schedule** [1] - 88:2
**scheduling** [2] -
155:2, 156:17
**Schmidt** [14] - 7:7,

11:9, 11:10, 68:21, 71:8, 77:5, 77:16, 80:1, 80:20, 82:12, 98:25, 99:10, 103:9, 117:22

**SCHMIDT** [29] - 5:9, 7:8, 7:12, 7:14, 7:15, 8:1, 8:4, 8:5, 11:1, 11:14, 11:17, 11:22, 11:25, 12:7, 12:9, 68:22, 71:23, 72:5, 75:14, 75:17, 80:22, 106:14, 117:24, 118:3, 118:15, 119:3, 124:25, 125:15, 126:17

**Schmidt's** [2] - 77:11, 78:23

**scientific** [2] - 10:3, 218:22

**Scioto** [1] - 208:12

**scope** [9] - 66:10, 67:19, 68:23, 68:25, 112:1, 112:3, 112:9, 126:20, 189:17

**screen** [5] - 8:7, 8:8, 9:7, 92:13, 181:15

**screw** [1] - 143:19

**scroll** [1] - 92:15

**search** [1] - 59:22

**Seasons** [1] - 21:1

**seated** [1] - 127:20

**second** [2] - 8:12, 16:18, 26:7, 98:25, 155:19, 166:19, 199:20, 218:3, 218:5, 226:4, 229:25, 231:11

**secondly** [1] - 69:6

**Section** [7] - 155:14, 157:11, 157:12, 220:9, 220:12, 230:20

**section** [5] - 21:1, 105:18, 137:25, 155:19, 198:5

**sections** [1] - 101:1

**securely** [1] - 163:7

**Security** [15] - 91:14, 128:9, 128:14, 128:25, 129:5, 129:9, 130:3, 136:6, 136:25, 148:9, 148:14, 148:15, 148:19, 194:4, 231:13

**security** [7] - 37:15, 136:14, 142:1, 148:2, 152:17, 152:24, 162:2

**see** [95] - 8:8, 8:9, 8:10, 8:23, 9:2, 9:9, 9:15, 10:6, 10:9, 10:14, 10:20, 12:17, 12:18, 12:20, 14:25, 17:23, 18:22, 18:24, 18:25, 19:13, 21:10, 21:14, 21:24, 22:4, 37:21, 41:16, 49:5, 49:10, 49:14, 61:16, 68:23, 69:12, 73:1, 77:12, 77:13, 78:2, 85:17, 87:7, 92:3, 93:17, 95:23, 97:19, 107:19, 107:21, 107:23, 107:24, 107:25, 108:15, 108:24, 112:5, 114:24, 115:1, 115:4, 115:6, 118:4, 119:23, 132:11, 135:4, 135:5, 138:20, 139:7, 143:18, 147:7, 147:15, 147:22, 150:14, 156:21, 157:11, 169:10, 179:3, 180:13, 181:3, 186:3, 186:23, 189:7, 189:12, 197:4, 198:16, 198:18, 199:20, 199:22, 205:7, 208:18, 214:2, 214:12, 215:3, 215:14, 218:4, 218:16, 221:15, 230:18, 236:21, 237:9, 237:18

**seeing** [4] - 46:2, 95:13, 119:14, 127:22

**seem** [3] - 16:11, 18:14, 196:18

**sees** [1] - 201:5

**segment** [1] - 191:10

**select** [7] - 13:18, 13:22, 14:2, 53:7, 53:11, 55:8, 55:21

**selected** [12] - 13:24, 14:12, 18:6, 55:4, 55:13, 56:6, 56:21, 74:3, 74:9, 76:24, 77:7, 110:11

**selection** [1] - 19:3

**selectively** [2] - 71:25, 78:9

**self** [6] - 35:5, 36:16, 37:21, 38:16, 114:21

**self-distributed** [1] - 36:16

**self-distributing** [4] - 35:5, 37:21, 114:21

**self-distributor** [1] - 38:16

**sell** [12] - 153:5, 155:7, 159:13, 160:10, 160:11, 177:18, 177:20, 193:1, 204:13, 217:5, 225:6

**seller** [2] - 27:18, 27:23

**sellers** [1] - 28:11

**selling** [9] - 155:4, 169:22, 175:3, 175:11, 183:24, 203:12, 203:17, 220:23, 221:9

**sells** [1] - 158:17

**send** [3] - 204:22, 220:4, 220:6

**senior** [3] - 147:7, 170:8, 230:11

**SENIOR** [1] - 1:17

**Senior** [10] - 7:2, 91:14, 128:8, 129:8, 129:12, 129:18, 135:23, 138:22, 144:4, 145:21

**Sensabaugh** [1] - 5:14

**sent** [8] - 72:15, 120:5, 213:9, 213:17, 213:18, 214:19, 236:18

**sentence** [11] - 41:7, 101:13, 101:16, 102:1, 214:18, 215:5, 215:24, 216:14, 217:13, 220:11, 220:22

**sentences** [1] - 101:16

**separate** [9] - 75:14, 93:17, 117:14, 129:15, 129:16, 141:24, 145:25, 161:17, 166:4

**September** [3] - 211:19, 211:22, 214:1

**sequence** [1] - 58:13

**series** [9] - 9:2, 59:10, 68:17, 70:20, 71:12, 85:2, 122:10, 123:2, 211:12

**serious** [2] - 215:8, 215:11

**serve** [2] - 207:3, 225:21

**served** [4] - 164:7,

170:4, 223:3, 223:4

**service** [1] - 223:8

**serviced** [4] - 28:22, 29:8, 57:4, 207:6

**services** [1] - 208:5

**servicing** [1] - 116:23

**set** [11] - 10:4, 18:4, 24:7, 36:3, 45:11, 70:22, 77:1, 99:1, 118:4, 124:14, 235:21

**sets** [4] - 9:19, 10:2, 45:4, 229:21

**setting** [3] - 10:2, 45:13, 204:7

**settlement** [6] - 190:15, 225:23, 226:11, 226:14, 228:12, 229:10

**Settlement** [1] - 226:4

**seven** [5] - 69:12, 104:4, 119:19, 138:19, 141:2

**several** [14] - 16:22, 17:14, 17:17, 17:20, 47:5, 53:11, 99:7, 103:9, 140:10, 141:18, 150:9, 170:19, 204:21, 207:8

**severe** [3] - 155:9, 155:22, 156:5

**shall** [2] - 187:8, 228:4

**SHANNON** [1] - 6:3

**share** [3] - 23:24, 98:11, 159:9

**shares** [2] - 24:2, 115:13

**shelf** [1] - 161:9

**shelves** [1] - 93:13

**shift** [5] - 32:3, 32:12, 38:8, 235:19, 235:20

**ship** [18] - 45:15, 45:19, 45:22, 63:25, 64:25, 149:24, 163:16, 165:7, 165:8, 165:9, 181:12, 200:7, 200:18, 200:23, 201:9, 219:23, 233:10, 236:14

**shipment** [14] - 32:4, 38:9, 64:10, 64:15, 65:14, 65:20, 65:22, 72:20, 110:2, 113:14, 114:13, 163:9, 166:12, 166:20

**shipments** [73] - 15:3, 15:4, 15:7, 15:9,

25:20, 26:4, 27:3, 27:7, 27:11, 28:2, 29:6, 29:11, 29:17, 31:9, 31:20, 32:13, 32:16, 32:21, 34:9, 38:1, 38:5, 38:13, 39:7, 40:7, 42:10, 42:11, 44:10, 47:11, 47:22, 48:12, 50:13, 55:6, 55:14, 63:17, 64:6, 64:7, 65:19, 67:9, 72:15, 82:14, 94:10, 94:12, 98:19, 98:20, 103:19, 108:23, 109:5, 112:4, 112:7, 112:10, 113:12, 113:18, 113:20, 113:24, 114:14, 114:25, 115:17, 116:2, 116:7, 116:10, 119:18, 120:2, 120:11, 120:12, 122:21, 123:23, 123:24, 165:10, 165:22, 178:2, 206:24, 233:13

**shipped** [38] - 24:15, 25:1, 25:9, 25:14, 26:11, 26:15, 28:18, 33:1, 36:15, 37:25, 38:15, 42:22, 43:20, 48:3, 48:18, 50:22, 55:1, 61:9, 61:14, 61:20, 61:24, 62:5, 62:15, 62:17, 65:20, 96:7, 107:14, 109:7, 110:24, 114:11, 115:7, 115:18, 119:24, 219:12, 227:22, 233:2, 234:25

**shipping** [6] - 37:2, 107:16, 167:2, 167:12, 178:21, 183:18

**ships** [1] - 185:2

**short** [1] - 83:2

**shortened** [1] - 129:8

**shorthand** [2] - 129:1, 129:4

**shortly** [1] - 175:18

**show** [27] - 19:23, 20:18, 21:2, 21:12, 24:6, 26:24, 28:17, 43:19, 46:14, 56:7, 64:7, 71:25, 78:5, 85:22, 86:1, 86:4, 90:24, 91:6, 97:3,

120:11, 156:13, 157:5, 161:8, 176:10, 190:22, 194:16, 223:1

**showed** [7] - 47:5, 47:16, 81:3, 81:6, 81:7, 82:13, 93:15

**showing** [12] - 7:23, 26:3, 30:24, 41:12, 46:10, 60:8, 64:10, 73:24, 93:7, 93:18, 93:24, 116:6

**shown** [11] - 36:16, 36:24, 78:18, 81:1, 93:11, 94:15, 94:24, 96:23, 97:8, 156:9, 167:5

**shows** [16] - 9:9, 10:14, 10:20, 31:8, 31:19, 36:10, 47:1, 48:2, 48:17, 61:8, 61:13, 61:18, 72:17, 93:18, 123:21, 123:23

**shrinkage** [1] - 136:12

**shut** [3] - 67:3, 225:15, 225:20

**sic** [3] - 60:10, 67:1, 202:8

**sic)** [1] - 112:5

**side** [14] - 49:9, 101:14, 108:4, 108:5, 108:7, 113:2, 113:8, 138:15, 144:22, 150:14, 195:4, 231:4

**side-by-side** [1] - 49:9

**sides** [1] - 108:1

**sign** [4] - 30:23, 153:7, 201:25

**signed** [4] - 212:24, 219:14, 219:15, 235:5

**significant** [3] - 77:24, 112:6, 192:19

**significantly** [3] - 51:11, 100:3, 111:16

**similar** [11] - 30:11, 49:10, 49:13, 49:14, 55:10, 60:15, 71:5, 76:15, 105:4, 112:3, 153:9

**similar-type** [1] - 153:9

**similarly** [2] - 31:23, 109:9

**simple** [3] - 99:2, 99:4, 147:19

**simply** [8] - 69:9, 77:1, 79:4, 103:2, 150:10,

191:16, 208:21, 220:14

**simultaneously** [2] - 107:5, 107:23

**SINGER** [1] - 4:5

**single** [10] - 16:20, 64:15, 65:20, 71:21, 72:17, 79:6, 82:6, 180:4, 223:23

**sit** [3] - 87:12, 87:13, 99:12

**site** [1] - 163:3

**sitting** [2] - 80:2, 131:3

**situation** [1] - 210:17

**six** [7] - 34:4, 69:12, 104:4, 114:13, 116:1, 140:21, 141:2

**size** [5] - 67:15, 178:1, 197:12, 197:18

**Size** [1] - 178:2

**skills** [1] - 144:25

**skip** [1] - 184:25

**slide** [18] - 15:8, 17:22, 103:21, 105:17, 136:21, 143:17, 197:1, 197:23, 197:24, 198:4, 198:16, 198:23, 199:17, 199:18, 202:4, 202:23, 203:3

**slides** [2] - 105:23, 196:24

**slightly** [2] - 39:5, 104:2

**slope** [2] - 49:10, 49:18

**slow** [4] - 146:9, 146:21, 157:22, 203:10

**Slow** [1] - 203:8

**small** [2] - 37:3, 107:6

**smart** [2] - 82:22, 160:6

**smart-aleck** [1] - 160:6

**Smith** [3] - 6:4, 6:11, 229:1

**snippet** [1] - 165:4

**software** [1] - 99:4

**sold** [22] - 26:20, 91:17, 92:5, 92:6, 92:7, 129:19, 130:4, 130:8, 130:12, 130:22, 131:4, 131:19, 159:20, 160:1, 160:11, 161:5, 161:9, 172:12, 203:23,

223:22, 224:6, 224:15

**solely** [1] - 76:7

**somekind** [1] - 212:2

**someone** [1] - 11:24

**sometime** [8] - 32:9, 128:15, 132:16, 134:17, 134:23, 143:22, 147:3, 193:3

**sometimes** [8] - 29:16, 43:8, 43:9, 110:18, 129:8, 159:6

**somewhat** [2] - 88:3, 192:18

**somewhere** [1] - 100:20

**SOMS** [2] - 186:16, 186:20

**soon** [1] - 222:8

**sorry** [36] - 11:10, 27:20, 34:15, 35:11, 45:18, 49:12, 49:16, 53:14, 54:3, 64:2, 64:17, 67:15, 71:19, 72:10, 78:11, 85:10, 90:18, 96:11, 98:4, 104:18, 118:8, 118:10, 127:16, 131:17, 137:22, 146:10, 146:22, 152:2, 157:22, 162:23, 173:15, 184:16, 189:15, 190:2, 228:15, 230:20

**Sorry** [2] - 179:6, 216:11

**sort** [9] - 58:13, 85:18, 99:25, 100:3, 100:22, 110:24, 118:25, 122:20, 135:3

**sorts** [1] - 178:7

**sound** [2] - 55:2, 151:8

**sounds** [5] - 16:6, 41:1, 84:9, 85:19, 95:20

**source** [3] - 24:21, 62:1, 216:5

**South** [1] - 2:13

**Southern** [1] - 7:2

**SOUTHERN** [1] - 1:1

**space** [1] - 71:16

**spawning** [1] - 228:7

**speaking** [2] - 42:21, 164:11

**Specialist** [1] - 137:15

**specialists** [2] - 140:14

**Specialty** [1] - 138:22

**specific** [26] - 10:21, 35:9, 43:4, 53:6, 54:21, 59:23, 64:7, 64:10, 64:12, 66:19, 66:21, 67:2, 67:8, 71:9, 82:14, 86:10, 87:1, 126:23, 148:4, 173:7, 178:24, 179:15, 207:14

**specifically** [9] - 11:20, 52:2, 60:14, 67:10, 67:14, 68:5, 70:19, 100:1, 142:1

**speculation** [1] - 234:3

**spent** [4] - 15:24, 76:23, 77:5, 77:24

**spike** [1] - 93:9

**spot** [1] - 22:22

**spreadsheet** [3] - 92:14, 92:21, 123:6

**spreadsheets** [1] - 123:1

**Square** [2] - 6:5, 6:12

**squarely** [1] - 83:4

**Stacy** [1] - 171:17

**staff** [2] - 102:13, 151:18

**Stafford** [1] - 65:11

**stamp** [3] - 197:5, 214:3, 214:8

**stamped** [2] - 196:7, 196:9, 197:1

**stand** [7] - 79:25, 96:3, 96:4, 96:6, 105:7, 127:13, 172:3

**standard** [3] - 70:22, 72:15, 109:12

**stands** [1] - 137:12

**STANNER** [1] - 5:10

**start** [13] - 32:22, 33:24, 91:4, 135:8, 166:11, 174:23, 176:11, 183:9, 190:7, 196:22, 213:24, 214:17, 234:12

**started** [8] - 29:14, 29:18, 82:7, 102:17, 148:13, 169:2, 169:4, 188:21

**Starting** [1] - 215:23

**starting** [5] - 16:18, 31:16, 146:13, 218:16, 220:8

**starts** [1] - 111:25

**State** [15] - 19:4, 19:5, 19:9, 19:16, 19:23, 19:24, 20:2, 47:24,

48:4, 48:8, 48:24, 112:9, 173:3

**state** [16] - 9:10, 9:16, 10:23, 15:23, 18:18, 50:2, 50:3, 63:11, 65:16, 67:4, 76:4, 89:15, 100:15, 123:6, 128:2, 168:23

**statement** [7] - 28:4, 158:5, 159:25, 203:12, 203:15, 205:2, 216:7

**STATES** [2] - 1:1, 1:17

**states** [3] - 51:2, 51:7, 51:18

**States** [15] - 7:2, 47:14, 47:18, 48:9, 48:25, 49:4, 155:21, 172:25, 182:23, 198:17, 212:7, 214:20, 215:12, 218:7, 230:14

**statewide** [1] - 123:4

**STATUS** [1] - 1:17

**Status** [1] - 7:2

**statute** [1] - 158:8

**statutory** [3] - 218:20, 218:24, 219:3

**steal** [1] - 87:3

**stenography** [1] - 6:19

**step** [3] - 110:3, 132:8, 187:1

**steps** [5] - 39:17, 39:20, 39:23, 109:16, 216:4

**steroids** [1] - 169:4

**Steve** [12] - 133:25, 135:21, 139:15, 145:6, 145:8, 145:13, 145:21, 147:12, 147:14, 195:10, 195:23, 198:3

**Steve's** [1] - 147:5

**STEVEN** [1] - 4:17

**stick** [1] - 15:8

**sticking** [1] - 32:19

**still** [19] - 120:2, 120:11, 120:17, 135:16, 137:19, 145:6, 147:14, 159:12, 172:2, 174:12, 200:6, 200:18, 200:23, 224:23, 235:17, 236:4, 237:1, 237:4, 237:11

**Still** [1] - 137:20

**stipulated** [1] - 93:1

**stipulation** [1] - 89:4

**stolen** [1] - 142:15
**stop** [7] - 32:23, 160:7, 169:22, 200:25, 237:7, 237:8, 237:15
**stopped** [4] - 29:13, 34:23, 35:5, 37:21
**stopping** [1] - 234:15
**stores** [1] - 37:22
**story** [3] - 97:2, 101:5, 150:24
**Strait** [1] - 171:19
**streamline** [1] - 18:5
**Street** [15] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15, 4:18, 5:5, 5:12, 6:6, 6:13
**strength** [1] - 111:1
**strictly** [1] - 186:4
**strike** [1] - 174:23
**Strike** [1] - 189:15
**striking** [1] - 126:12
**stripped** [1] - 66:22
**strong** [1] - 89:22
**strongly** [2] - 80:18, 89:24
**Strosnider** [1] - 80:25
**structure** [5] - 132:17, 133:20, 133:21, 135:19, 145:16
**stuck** [1] - 205:23
**study** [2] - 9:18, 9:23
**stuff** [4] - 86:3, 127:23, 139:6, 205:4
**sub** [2] - 99:1, 157:14
**sub-chapter** [1] - 157:14
**sub-set** [1] - 99:1
**subject** [2] - 35:17, 126:7
**subjective** [2] - 109:11, 124:18
**subjectively** [1] - 99:12
**subjectivity** [2] - 109:15, 110:9
**submit** [3] - 82:24, 97:21, 162:10
**submitted** [3] - 83:21, 123:11, 196:5
**Subsequent** [1] - 225:22
**subset** [5] - 110:25, 113:18, 122:20, 140:14, 230:23
**subsidiary** [2] - 126:19, 150:6
**substance** [3] - 27:25, 153:24, 154:3,

155:16, 155:20, 172:8, 214:25
**Substance** [1] - 67:14
**Substances** [13] - 154:18, 154:25, 155:3, 155:10, 155:25, 156:16, 156:23, 158:8, 181:23, 182:11, 183:9, 184:11, 184:14
**substances** [28] - 43:21, 43:22, 43:25, 44:17, 57:6, 57:19, 142:20, 148:23, 152:10, 154:7, 154:9, 154:24, 154:25, 157:10, 158:1, 172:13, 172:19, 198:8, 202:25, 203:11, 203:14, 214:21, 216:2, 216:25, 217:16, 227:13, 228:4
**substantial** [2] - 158:1, 217:16
**substantially** [1] - 17:9
**subtotaled** [1] - 40:8
**subtotals** [3] - 24:3, 24:13, 105:20
**subtract** [1] - 121:8
**suburbs** [1] - 21:14
**successes** [2] - 187:19, 187:21
**successive** [1] - 73:8
**succinctly** [2] - 233:21, 234:1
**suffers** [1] - 51:21
**sufficiently** [1] - 196:18
**suggest** [2] - 18:19, 81:14
**suggested** [1] - 82:22
**suggesting** [2] - 89:20, 96:13
**suggestion** [2] - 89:18, 90:23
**suggests** [1] - 107:1
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12
**summaries** [10] - 42:10, 82:19, 83:22, 87:16, 88:24, 89:2, 110:7, 123:2, 126:7, 126:9
**summarize** [1] - 112:19

**summarized** [1] - 125:9
**summarizes** [1] - 92:11
**summarizing** [1] - 66:11
**Summary** [9] - 47:13, 47:23, 48:13, 49:22, 50:1, 50:5, 51:3, 122:22, 124:2
**summary** [12] - 80:11, 82:16, 94:22, 94:23, 97:11, 98:11, 104:9, 105:23, 106:24, 125:10, 202:23
**Summit** [1] - 100:9
**super** [1] - 193:8
**supervise** [3] - 133:18, 133:21, 151:13
**supervision** [3] - 56:11, 56:16, 135:19
**supplementation** [2] - 24:24, 124:19
**supplemented** [1] - 24:20
**supplied** [2] - 22:5, 73:1
**supplier** [1] - 35:2
**suppliers** [1] - 30:16
**supply** [3] - 44:16, 236:7, 236:11
**supported** [1] - 102:3
**supporting** [1] - 102:11
**supports** [1] - 102:12
**supposed** [1] - 45:2
**Supreme** [1] - 198:17
**surprise** [1] - 225:17
**surprising** [1] - 207:18
**surrounding** [11] - 52:9, 68:19, 69:7, 69:11, 70:7, 205:12, 206:9, 206:15, 206:21, 207:3, 207:4
**susceptible** [1] - 177:23
**suspended** [3] - 222:8, 222:14, 225:8
**suspension** [2] - 218:25, 223:1
**Suspension** [10] - 177:13, 190:15, 222:16, 223:9, 224:13, 225:2, 225:5, 226:6, 226:16, 231:24
**suspicion** [3] - 178:6, 178:8, 180:11

**Suspicious** [6] - 168:12, 178:15, 178:17, 180:8, 199:19, 199:21
**suspicious** [78] - 136:15, 153:3, 163:9, 163:12, 163:15, 163:17, 166:4, 166:13, 167:12, 172:11, 176:22, 176:24, 177:1, 178:9, 178:10, 178:14, 178:17, 178:19, 179:4, 179:7, 179:8, 179:9, 179:17, 179:20, 179:25, 180:1, 180:3, 180:5, 180:8, 180:14, 180:16, 180:19, 180:22, 180:23, 181:8, 186:7, 186:8, 186:10, 186:24, 187:1, 191:24, 200:1, 200:15, 200:22, 200:24, 201:8, 201:10, 201:13, 201:16, 202:5, 202:7, 202:12, 202:18, 202:19, 204:3, 212:9, 213:6, 218:19, 218:21, 219:10, 219:12, 220:15, 220:16, 220:25, 222:5, 233:7, 233:13, 233:21, 234:8, 234:12, 236:13, 236:14, 236:16, 236:22, 237:7
**sustain** [14] - 69:22, 70:1, 70:4, 81:23, 130:9, 134:6, 165:5, 166:9, 171:13, 175:6, 184:19, 184:23, 185:15, 189:13
**sustained** [7] - 70:9, 105:14, 153:16, 165:13, 166:15, 167:7, 205:22
**Sustained** [5] - 185:6, 188:1, 189:12, 205:19, 234:4
**Suzanne** [1] - 23:19
**SUZANNE** [1] - 4:15
**swear** [1] - 127:15
**Swedesboro** [1] - 65:8
**switch** [3] - 23:10,

35:13, 203:19
**switched** [1] - 35:6
**switches** [3] - 31:24, 114:21, 114:22
**SWORN** [1] - 127:18
**system** [21] - 152:15, 155:2, 158:11, 158:13, 158:16, 163:4, 163:11, 181:2, 186:10, 186:13, 187:16, 189:7, 216:1, 216:22, 227:17, 232:13, 235:8, 235:15, 235:17, 235:25, 236:1
**systemic** [3] - 92:19, 187:15, 187:20

---

**T**

**tab** [1] - 76:1
**table** [5] - 24:12, 26:3, 26:24, 41:12, 73:24
**tables** [10] - 23:23, 26:3, 70:22, 98:18, 99:3, 112:8, 114:19, 116:6, 116:15, 120:8
**tablets** [1] - 169:11
**Targeting** [1] - 8:13
**technical** [3] - 23:11, 231:14
**technicality** [1] - 183:16
**technicians** [1] - 35:18
**techniques** [1] - 181:5
**telephone** [3] - 230:1, 231:12, 231:18
**TEMITOPE** [1] - 4:8
**template** [1] - 99:3
**temporarily** [3] - 110:21, 125:21, 222:14
**ten** [8] - 47:3, 47:18, 48:5, 48:20, 49:5, 49:14, 49:17, 105:3
**ten-fold** [3] - 48:20, 49:5, 49:17
**tended** [1] - 38:5
**tens** [2] - 22:12, 22:14
**tense** [1] - 134:3
**tentacles** [1] - 147:18
**Tenth** [1] - 5:12
**tenth** [1] - 112:17
**tenths** [3] - 114:13, 116:1, 119:19
**term** [2] - 133:8, 203:24
**terms** [7] - 10:16,

11:18, 12:2, 15:17, 18:1, 59:22, 120:25
**terrible** [1] - 78:12
**tertiary** [2] - 204:18, 207:25
**testified** [38] - 34:19, 38:18, 39:20, 47:5, 47:16, 48:2, 48:17, 50:5, 50:20, 51:6, 52:8, 61:5, 69:17, 86:6, 87:15, 93:1, 93:10, 94:6, 100:17, 102:15, 105:10, 112:25, 117:9, 119:7, 163:18, 163:21, 164:1, 164:2, 164:12, 165:20, 166:21, 168:1, 170:14, 194:22, 195:2, 207:24, 209:2, 212:13
**testify** [5] - 26:20, 26:25, 28:14, 95:8, 145:7
**testifying** [2] - 166:5, 221:2
**testimony** [27] - 7:22, 8:21, 39:16, 41:22, 42:4, 43:14, 52:23, 53:11, 55:7, 56:15, 70:11, 75:19, 85:11, 85:16, 95:2, 103:10, 111:13, 116:14, 126:13, 126:23, 131:10, 133:6, 165:4, 166:17, 167:5, 167:6, 206:16
**Texas** [2] - 65:12, 100:25
**THE** [244] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:10, 7:11, 7:13, 8:2, 8:3, 11:7, 11:13, 11:15, 11:20, 12:8, 23:9, 23:12, 35:11, 35:17, 35:21, 35:24, 54:1, 54:5, 55:18, 55:20, 55:25, 56:20, 56:23, 56:24, 56:25, 57:1, 63:15, 63:19, 64:2, 64:4, 64:8, 64:17, 66:2, 66:3, 66:6, 66:7, 67:20, 68:13, 68:14, 68:21, 69:1, 69:22, 70:1, 70:9, 72:8, 72:10, 74:2, 74:5, 74:10, 74:12, 74:13, 74:14, 75:7, 75:16, 75:21, 76:21,

77:4, 78:8, 78:13, 79:9, 79:14, 80:20, 81:23, 83:13, 84:3, 84:13, 84:23, 85:9, 85:11, 85:14, 90:2, 90:6, 90:14, 90:19, 91:5, 91:11, 91:20, 94:20, 96:1, 96:13, 97:14, 97:22, 98:2, 98:5, 98:22, 99:1, 101:7, 105:14, 106:9, 106:13, 106:16, 106:19, 107:4, 107:11, 107:15, 109:9, 109:14, 110:10, 110:15, 110:17, 110:18, 110:20, 110:22, 111:13, 111:21, 112:21, 113:6, 114:5, 114:7, 116:19, 117:22, 118:12, 119:4, 120:19, 123:10, 123:12, 123:13, 123:15, 124:8, 124:15, 125:4, 125:11, 125:17, 125:21, 125:25, 126:2, 126:4, 127:1, 127:3, 127:10, 127:12, 127:15, 127:16, 127:24, 129:25, 130:5, 130:7, 130:9, 132:9, 133:5, 133:10, 133:12, 134:6, 137:22, 146:21, 152:3, 153:16, 156:10, 156:13, 157:3, 157:24, 159:23, 160:1, 160:2, 160:6, 160:9, 165:5, 165:13, 165:16, 166:9, 166:15, 166:18, 166:21, 167:7, 171:10, 171:12, 171:13, 171:23, 172:2, 172:4, 172:5, 174:5, 175:6, 175:14, 175:15, 176:2, 176:3, 179:13, 179:16, 179:19, 181:16, 182:6, 182:17, 182:25, 183:3, 183:6, 184:19, 185:6, 185:9, 185:15, 188:1, 189:12, 190:11,

190:18, 191:2, 193:9, 193:11, 196:10, 196:13, 196:16, 200:10, 200:11, 203:10, 205:19, 205:22, 207:11, 207:12, 208:24, 209:5, 209:9, 209:11, 209:13, 209:14, 209:20, 209:23, 210:4, 210:12, 210:17, 210:21, 210:24, 211:9, 211:11, 216:11, 221:4, 222:20, 223:16, 223:19, 226:1, 226:20, 226:24, 227:2, 228:18, 229:15, 229:18, 234:4, 234:15, 234:19, 237:13, 237:18
**theft** [1] - 136:12
**thereafter** [1] - 82:14
**therefore** [1] - 82:18
**therein** [1] - 210:3
**they've** [9] - 70:8, 80:3, 90:15, 94:6, 94:17, 148:20, 151:10, 205:20, 231:5
**third** [6] - 11:5, 20:10, 27:18, 27:23, 192:15, 218:17
**third-party** [1] - 11:5
**Thomas** [5] - 2:12, 170:22, 171:1, 171:11, 196:4
**thousand** [4] - 115:15, 115:19, 161:5
**thousands** [3] - 22:13, 22:14, 74:7
**thousandths** [1] - 22:25
**Three** [5] - 6:5, 103:1, 159:7, 159:8, 159:9
**three** [42] - 6:12, 21:8, 22:25, 35:6, 48:14, 48:19, 50:2, 54:13, 58:13, 59:10, 62:12, 63:12, 63:17, 69:13, 71:16, 81:1, 81:16, 82:1, 84:1, 88:6, 91:16, 92:7, 98:18, 101:13, 103:21, 114:3, 115:22, 123:20, 123:23, 124:7, 140:20, 141:2, 159:6, 166:1,

170:22, 183:20, 192:4, 192:6, 205:15, 225:9, 237:14
**three-day** [1] - 170:22
**three-digit** [2] - 48:14, 48:19
**three-page** [1] - 81:1
**threshold** [2] - 60:9, 60:10
**thresholds** [2] - 203:23, 204:7
**throughout** [2] - 9:24, 139:25
**time-release** [1] - 193:22
**timeline** [1] - 145:25
**timely** [1] - 232:10
**timetable** [1] - 84:11
**TIMOTHY** [1] - 5:9
**tiny** [1] - 40:20
**title** [11] - 128:8, 129:7, 129:16, 135:21, 136:21, 136:24, 148:17, 157:6, 157:8, 210:12
**titled** [1] - 136:9
**titles** [1] - 129:16
**today** [12] - 70:11, 78:3, 84:14, 92:13, 114:20, 131:3, 145:7, 145:10, 149:7, 154:16, 159:12, 229:3
**Today** [1] - 193:11
**together** [12] - 9:3, 36:7, 49:10, 77:13, 121:6, 121:8, 149:1, 151:1, 169:3, 169:25, 208:22, 231:2
**Tom** [1] - 170:25
**Tomkiewicz** [3] - 138:7, 138:8
**tomorrow** [7] - 87:20, 89:25, 90:3, 97:21, 234:16, 237:15
**took** [10] - 39:17, 39:20, 39:23, 105:22, 110:3, 116:4, 128:13, 145:20, 225:14, 225:21
**tools** [7] - 77:21, 78:2, 79:24, 80:5, 80:9, 80:19, 82:5
**top** [9] - 18:22, 20:4, 102:25, 133:14, 135:5, 194:24, 221:23, 224:12,

232:7
**topic** [5] - 38:17, 44:15, 61:2, 166:4, 166:19
**topics** [1] - 203:19
**total** [18] - 24:14, 29:11, 29:16, 32:4, 32:13, 37:3, 38:1, 38:8, 41:7, 41:16, 49:3, 52:3, 69:13, 73:12, 79:18, 102:10, 116:6, 119:18
**totality** [3] - 178:6, 178:16, 180:23
**tough** [2] - 87:15, 88:4
**towards** [1] - 128:23
**Tower** [2] - 3:4, 4:18
**track** [1] - 9:10
**tracking** [1] - 94:10
**trade** [1] - 154:2
**train** [2] - 169:17, 186:22
**training** [1] - 143:8
**trainloads** [1] - 109:6
**Transaction** [1] - 115:1
**transaction** [16] - 24:21, 76:11, 92:18, 107:1, 107:6, 107:24, 108:4, 108:9, 108:12, 109:1, 109:18, 109:24, 109:25, 112:14, 113:23, 124:5
**transactional** [8] - 39:13, 93:16, 97:1, 119:14, 121:18, 122:14, 124:17, 124:21
**Transactions** [6] - 111:8, 114:12, 114:24, 115:25, 116:13, 116:16
**transactions** [27] - 25:4, 38:22, 40:14, 40:25, 41:6, 41:8, 41:19, 92:10, 92:14, 93:18, 94:6, 96:17, 106:25, 107:7, 107:10, 107:11, 108:22, 109:9, 110:1, 110:6, 110:7, 112:6, 119:12, 119:22, 123:17, 124:4
**transcript** [5] - 6:19, 171:1, 171:11, 171:15, 238:4

transcripts [4] - 84:15, 168:6, 168:15, 205:4
transfers [2] - 202:1, 202:2
transportation [1] - 201:23
traveled [1] - 205:1
traveling [2] - 67:25, 68:6
treated [1] - 120:7, 182:3
treating [1] - 111:8
treatment [2] - 52:15, 155:20
trend [2] - 49:5, 49:14
trends [2] - 8:24, 9:11
trial [9] - 27:14, 28:15, 88:7, 88:18, 89:9, 89:12, 89:13, 89:19, 205:3
Trial [1] - 237:19
TRIAL [1] - 1:16
trials [4] - 89:15, 89:16
tried [13] - 77:10, 78:1, 79:5, 79:10, 82:1, 86:11, 87:8, 88:17, 109:15, 148:12, 210:15
trier [1] - 95:6
trivial [1] - 112:20
trouble [2] - 84:17, 95:19
true [16] - 14:8, 14:15, 18:5, 18:22, 51:9, 51:25, 57:12, 57:14, 65:4, 65:8, 65:11, 89:2, 89:9, 159:12, 224:2, 224:7
Trumbull [1] - 100:11
trusted [1] - 216:24
truth [4] - 209:22, 210:7, 210:23, 211:1
try [9] - 7:16, 69:20, 85:1, 94:20, 95:23, 129:17, 153:11, 181:13, 232:2
trying [23] - 12:3, 22:22, 76:25, 77:7, 77:9, 78:5, 78:25, 79:4, 79:23, 80:7, 80:23, 81:11, 83:25, 86:7, 87:11, 88:6, 131:13, 171:5, 176:10, 186:21, 187:2, 190:17, 221:19
Turn [1] - 8:12
turn [14] - 10:9, 10:14, 71:18, 73:17, 73:21,

95:17, 96:3, 101:11, 101:25, 102:8, 106:20, 220:15, 220:24, 230:24
turned [1] - 82:18
turning [1] - 94:2
turns [2] - 108:22, 115:22
Tush [1] - 171:19
Twelfth [3] - 4:13, 4:15, 5:5
twelve [1] - 100:20
twice [3] - 112:14, 113:15, 122:4
two [42] - 16:12, 32:2, 36:3, 43:4, 43:9, 63:12, 69:5, 69:13, 73:8, 77:8, 77:12, 77:25, 82:23, 88:21, 94:9, 100:23, 101:16, 104:9, 109:23, 112:15, 117:25, 121:5, 121:6, 122:9, 122:10, 123:5, 140:20, 141:2, 149:1, 149:4, 176:20, 187:1, 194:22, 207:2, 207:17, 207:23, 209:2, 219:11, 219:18, 219:21, 219:24, 236:19
Two [1] - 20:23
two-step [1] - 187:1
type [13] - 10:21, 11:17, 52:21, 58:9, 60:11, 60:18, 60:23, 71:20, 72:25, 80:1, 148:18, 153:9, 153:25
typed [1] - 94:1
types [11] - 40:2, 40:11, 42:25, 57:25, 58:22, 59:2, 59:17, 87:7, 111:15, 118:25, 119:1
typically [1] - 107:20

U

U.S [4] - 9:15, 10:23, 230:17, 230:22
ultimate [2] - 110:13, 111:16
ultimately [2] - 126:11, 143:12
unchanged [1] - 32:17
unclear [1] - 55:20
Under [2] - 189:1,

224:25
under [47] - 67:13, 84:5, 91:17, 92:8, 94:22, 102:1, 104:5, 126:7, 130:17, 135:19, 136:7, 137:17, 137:18, 141:4, 147:1, 152:1, 152:3, 152:11, 152:12, 152:23, 155:14, 156:16, 158:16, 161:10, 161:20, 161:21, 162:20, 164:12, 165:1, 168:21, 172:2, 178:23, 184:3, 188:25, 189:22, 191:12, 191:17, 202:16, 202:21, 220:9, 220:12, 224:23, 231:16, 234:25
underlying [6] - 82:17, 102:2, 112:24, 124:17, 125:9, 125:12
undermine [1] - 94:7
underneath [3] - 137:14, 140:14, 147:15
underscore [1] - 214:12
understood [3] - 52:10, 58:16, 133:6
undo [2] - 87:15, 88:4
undoubtedly [1] - 215:6
unfair [2] - 72:5, 185:11
unfamiliar [2] - 167:2, 173:9
unfortunately [1] - 147:18
unintelligible [1] - 79:11
unique [3] - 16:4, 56:9, 63:4
Unit [1] - 8:13
unit [3] - 104:18, 219:15, 219:19
United [15] - 7:2, 47:14, 47:18, 48:8, 48:25, 49:4, 155:21, 172:25, 182:23, 198:17, 212:7, 214:20, 215:12, 218:7, 230:14
UNITED [2] - 1:1, 1:17
units [17] - 24:14, 26:10, 29:24, 69:10,

73:6, 73:12, 103:1, 104:12, 104:23, 105:23, 106:6, 108:19, 113:10, 122:5, 223:24, 224:7, 224:15
universe [2] - 79:10, 184:20
unlawfully [1] - 185:2
unless [1] - 234:25
unlicensed [1] - 198:14
unnecessary [2] - 77:2, 82:15
unregistered [2] - 219:25, 221:22
unreliable [1] - 97:10
unsatisfied [1] - 102:4
unum [1] - 151:4
up [79] - 7:16, 7:19, 8:7, 9:7, 9:16, 20:4, 20:16, 20:25, 24:8, 26:7, 31:6, 40:9, 41:3, 41:16, 46:18, 47:10, 47:21, 48:11, 49:8, 50:2, 51:15, 52:25, 53:2, 61:3, 76:2, 81:10, 84:2, 87:19, 92:13, 94:1, 96:3, 96:4, 96:6, 96:18, 97:17, 114:4, 114:5, 116:18, 118:4, 120:21, 121:7, 122:18, 124:1, 126:22, 127:22, 132:5, 134:18, 139:4, 143:7, 143:19, 143:23, 150:7, 150:22, 151:22, 164:21, 170:13, 170:21, 181:14, 188:19, 191:19, 192:10, 196:23, 197:3, 197:9, 197:14, 197:22, 198:16, 201:4, 207:6, 207:15, 213:20, 215:16, 215:18, 220:1, 229:21, 232:6, 236:20
upper [1] - 45:2
upward [1] - 49:10
upwards [1] - 159:11
US [1] - 197:4
US-DEA [1] - 197:4
useable [1] - 113:25
useful [1] - 157:15
uses [2] - 42:14, 218:9

utilized [2] - 216:5, 216:11

V

V.A [2] - 15:3, 15:7
VA [5] - 103:10, 103:16, 103:18, 103:22, 105:1
vacate [2] - 101:3, 102:6
vacated [2] - 101:15, 101:17
vacating [1] - 102:5
vague [2] - 179:15, 236:23
valid [2] - 221:15
validate [3] - 39:12, 39:17, 226:14
variable [1] - 121:25
variables [4] - 121:5, 121:6, 121:25, 122:2
variation [6] - 16:24, 17:1, 17:5
various [6] - 22:6, 24:4, 28:22, 42:21, 110:25, 118:16
vast [2] - 113:11, 113:15
vault [1] - 202:14
Ventura [1] - 3:18
verify [1] - 226:14
version [2] - 59:7, 192:9
versions [1] - 55:10
versus [4] - 197:14, 197:20, 219:25
vertical [1] - 99:15
Vice [10] - 91:14, 128:8, 128:14, 129:8, 129:12, 129:18, 130:3, 135:13, 194:3, 231:12
video [2] - 165:23, 166:24
view [5] - 116:13, 145:12, 210:7, 214:25, 219:2
vigilant [1] - 216:23
violence [1] - 136:12
VIRGINIA [2] - 1:1, 1:18
Virginia [78] - 4:18, 7:3, 8:8, 11:2, 12:21, 13:2, 13:8, 13:9, 14:5, 14:6, 15:13, 15:18, 16:17, 16:21, 17:16, 18:7, 18:12, 18:24, 18:25, 19:4,

19:5, 19:9, 19:10, 19:17, 19:23, 19:24, 20:2, 21:22, 21:24, 27:18, 27:24, 28:12, 30:20, 47:25, 48:4, 48:8, 48:15, 48:25, 49:4, 51:1, 51:2, 51:7, 51:17, 53:13, 53:15, 61:15, 62:10, 62:11, 63:18, 66:22, 68:5, 68:6, 68:17, 73:10, 74:8, 103:2, 110:24, 115:23, 116:11, 119:20, 122:13, 123:3, 130:13, 130:23, 149:15, 149:16, 149:18, 149:21, 149:25, 173:3, 173:8, 173:11, 174:15, 174:20, 174:25, 207:3, 208:13

**Virginia's** [1] - 51:21

**visit** [1] - 148:22

**visualized** [1] - 64:9

**visually** [2] - 49:17, 51:13

**voicemail** [1] - 230:1

**volume** [28] - 14:15, 16:15, 25:19, 28:18, 42:22, 44:9, 44:12, 47:17, 48:3, 48:18, 57:9, 57:16, 67:9, 72:1, 78:25, 80:4, 86:9, 86:13, 119:25, 178:2, 203:23, 204:2, 204:6, 206:8, 206:14, 207:5, 208:6, 209:4

**VOLUME** [1] - 1:16

**volumes** [1] - 225:7

**voluminous** [4] - 28:13, 79:22, 82:17, 232:22

**voluntarily** [1] - 169:22

**vs** [2] - 198:17, 238:6

---

## W

**wait** [1] - 127:13

**Wait** [2] - 127:14, 226:24

**WAKEFIELD** [1] - 5:13

**walk** [2] - 28:19, 70:16

**walked** [1] - 43:10

**waned** [1] - 114:12

**wants** [3] - 88:2, 95:23, 114:4

---

**warehouse** [2] - 161:7, 184:4

**warned** [4] - 175:2, 175:10, 224:14, 225:6

**warning** [1] - 126:10

**warrant** [1] - 218:24

**Washington** [9] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 21:13, 65:5, 112:8

**watch** [2] - 91:18, 205:6

**watching** [1] - 205:5

**water** [1] - 83:14

**Wayne** [1] - 208:16

**ways** [6] - 39:6, 42:22, 86:12, 110:25, 112:3, 122:9

**WE** [1] - 146:5

**WEBB** [1] - 3:11

**Webb** [1] - 3:12

**website** [8] - 7:24, 12:6, 52:12, 75:1, 75:2, 75:25, 76:1, 76:6

**Wednesday** [1] - 84:14

**week** [3] - 71:3, 71:6, 116:16

**weeks** [5] - 82:23, 116:14, 123:20, 123:23, 124:7

**weight** [12] - 40:18, 40:23, 41:5, 88:16, 89:11, 93:2, 94:18, 113:11, 118:8, 118:13, 123:2

**welcome** [1] - 36:4

**weld** [4] - 183:13, 183:14, 183:20

**welded** [1] - 183:12

**welfare** [3] - 157:16, 158:2, 217:17

**well-being** [3] - 174:14, 174:19

**West** [79] - 7:3, 8:7, 11:2, 12:20, 13:2, 13:8, 13:9, 14:5, 14:6, 15:13, 15:18, 16:16, 16:21, 17:16, 18:7, 18:12, 18:24, 18:25, 19:4, 19:5, 19:9, 19:10, 19:17, 19:23, 19:24, 20:2, 21:22, 21:24, 27:18, 27:24, 28:12, 30:20, 47:25, 48:4, 48:8, 48:15, 48:24, 49:4, 51:1, 51:2, 51:7,

---

51:17, 51:21, 53:12, 53:15, 61:15, 62:10, 62:11, 63:18, 66:22, 68:4, 68:6, 68:17, 73:10, 74:8, 103:1, 110:24, 115:23, 116:11, 119:20, 122:13, 123:3, 130:13, 130:23, 143:3, 149:15, 149:16, 149:17, 149:20, 149:24, 173:3, 173:7, 173:11, 174:15, 174:20, 174:25, 207:2, 208:13

**WEST** [2] - 1:1, 1:18

**Westlaw** [1] - 101:11

**Wheeling** [3] - 61:15, 62:10, 62:11

**white** [3] - 116:3, 235:14, 236:24

**whole** [8] - 48:9, 48:25, 55:22, 101:4, 109:6, 124:14, 180:14, 222:2

**wholesale** [2] - 23:24, 25:21

**wholesalers** [2] - 114:14, 170:6

**WICHT** [1] - 4:12

**Williams** [2] - 4:13, 5:4

**wish** [2] - 126:16, 227:9

**wished** [1] - 168:24

**wit** [1] - 137:18

**withdraw** [2] - 97:13, 160:5, 160:8

**WITNESS** [51] - 7:11, 8:3, 54:5, 55:25, 56:23, 56:25, 63:19, 64:8, 66:2, 66:7, 68:14, 72:10, 74:5, 74:12, 74:14, 99:1, 106:13, 107:4, 107:15, 109:14, 110:15, 110:18, 110:22, 111:21, 114:7, 118:12, 123:12, 123:15, 126:2, 127:16, 127:18, 130:7, 133:10, 137:22, 146:21, 152:3, 157:24, 160:1, 160:9, 171:12, 172:4, 175:15, 176:3, 179:19, 183:6, 193:11,

---

200:11, 203:10, 207:12, 209:13, 216:11

**witness** [41] - 11:4, 11:6, 11:16, 69:17, 72:6, 72:7, 77:6, 85:22, 85:23, 90:21, 90:23, 90:25, 91:13, 92:15, 93:7, 94:24, 95:9, 95:12, 95:13, 95:16, 95:18, 95:21, 95:24, 118:5, 126:23, 127:5, 127:13, 156:8, 170:22, 172:3, 182:3, 182:4, 182:20, 188:4, 190:16, 190:23, 209:1, 216:9, 221:5

**witness's** [1] - 184:21

**witnesses** [14] - 56:15, 83:22, 84:20, 85:2, 86:4, 86:20, 87:14, 87:23, 90:7, 90:10, 93:11, 127:22, 144:1, 205:21

**WOELFEL** [1] - 3:9

**Woelfel** [2] - 3:9

**word** [4] - 97:13, 165:24, 186:20, 218:3

**words** [1] - 185:20

**workplace** [2] - 136:12, 142:17

**works** [8] - 11:19, 137:18, 138:2, 152:15, 155:2, 181:2, 192:8

**world** [1] - 83:6

**worried** [2] - 78:22, 79:24

**worry** [3] - 54:10, 85:14, 85:15

**worth** [2] - 86:17, 99:25

**wrap** [1] - 7:16

**Wright** [3] - 8:13, 8:15, 171:19

**write** [4] - 134:11, 201:5, 220:6

**writing** [2] - 84:16, 99:4

**written** [8] - 99:17, 161:3, 201:8, 233:15, 233:16, 233:22, 236:17, 237:7

**WU** [1] - 5:10

**WV** [6] - 2:8, 3:10,

---

3:13, 4:19, 5:15, 6:9

**Wyoming** [1] - 208:16

---

## Y

**year** [24] - 9:21, 44:22, 45:16, 46:1, 50:3, 69:5, 72:18, 75:3, 90:13, 90:15, 99:24, 100:4, 110:25, 111:3, 115:8, 134:13, 161:6, 161:7, 193:20, 193:23

**years** [32] - 32:25, 33:4, 33:5, 33:11, 34:4, 50:7, 51:10, 73:8, 91:16, 147:5, 147:6, 147:9, 148:14, 148:16, 148:24, 148:25, 166:1, 167:18, 169:2, 169:10, 170:1, 194:22, 219:11, 219:18, 219:21, 219:24, 236:3, 236:4, 236:19, 237:1, 237:4, 237:11

**yellow** [3] - 36:18, 140:12, 148:6

**yellower** [1] - 36:20

**yes/no** [1] - 182:2

**yesterday** [18] - 7:19, 15:24, 25:17, 26:2, 70:25, 77:15, 80:1, 86:1, 91:9, 93:6, 93:25, 99:19, 100:24, 102:22, 110:5, 112:25, 114:8, 114:22

**York** [3] - 3:5, 62:25, 100:14

**yourself** [2] - 159:7, 202:20

---

## Z

**zeros** [1] - 214:5

**ZIMMERMAN** [1] - 127:18

**Zimmerman** [43] - 91:15, 93:16, 96:3, 127:7, 127:12, 128:4, 128:10, 130:6, 132:11, 133:15, 148:8, 151:21, 158:5, 158:7, 163:18, 167:10, 172:2, 172:7, 172:24,

174:8, 176:9,
177:10, 179:5,
180:18, 181:18,
183:4, 189:21,
191:15, 193:10,
196:24, 197:5,
203:3, 203:8,
211:20, 220:20,
221:13, 222:22,
226:9, 228:22,
228:25, 231:12,
234:23, 237:1
**Zimmerman"** [1] -
135:6
**zip** [6] - 10:10, 10:11,
48:14, 48:19, 50:2,
50:14