```
                 IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                            AT CHARLESTON


_____x
                                :
THE CITY OF HUNTINGTON,         :        Civil Action
                                :
             Plaintiff,         :        No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
             Defendants.        :
_____x
                                :
CABELL COUNTY COMMISSION,       :        Civil Action
                                :
             Plaintiff,         :        No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
             Defendants.        :
_____x
```

BENCH TRIAL - VOLUME 9
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


MAY 13, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:              Ayme Cochran, RMR, CRR
Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1        PROCEEDINGS had before The Honorable David A. Faber,

2    Senior Status Judge, United States District Court, Southern

3    District of West Virginia, in Charleston, West Virginia, on

4    May 13, 2021, at 9:00 a.m., as follows:

5            THE COURT:  Mr. Nicholas?

6            MR. NICHOLAS:  Thank you, Your Honor.  Last night,

7    the plaintiffs served us 50 new exhibits or identified 50

8    new exhibits for us to review.  Unfortunately, that's on top

9    of the 43 that they sent us on the first night for Mr.

10   Zimmerman testifying, that -- started to testify.  So, I let

11   the 43 go even though you mentioned 30 because I'm really

12   not interested in, you know, bickering about every little

13   thing, but now that we have 50 new exhibits that have been

14   identified, I have to ask that they not be used.  I think

15   it's, you know, out of the spirit and the letter of the

16   rules and I don't think they should be permitted to be used.

17           THE COURT:  How many are you going to use, Mr.

18   Farrell?

19           MR. FARRELL:  20.

20           THE COURT:  Well, why didn't you give him 20?

21           MR. FARRELL:  Judge, we're trying to elicit

22   testimony from an adverse party and we are doing our very

23   best to anticipate foundational objections, hearsay

24   objection.  And adapt to the practice of having to disclose

25   what we're going to use to cross examine adverse parties the

1      night before.  I don't believe -- and this is why our

2      initial disclosure was very broad, so that we didn't get

3      caught in a box of having to go in a different direction

4      during adverse cross.

5              THE COURT:  If he -- if he sticks to the 20,

6      designates the 20, will that solve your problem?  It will

7      obviously help, right?

8              MR. NICHOLAS:  I'm going to say it wouldn't solve

9      our problem, but it's better than nothing.  So, I'll --

10             THE COURT:  Okay.  Give him 20 and that's it.

11     We've got to have some rules here and you can't flood your

12     opponent with paper.  They'll do the same to you and the

13     trial will be totally out of control.

14         So, give him 20 and we'll let it go at that.  You said

15     20.  So, give him the 20.

16             MR. FARRELL:  I -- one second, Judge.  Let me --

17         (Pause)

18             MR. FARRELL:  Judge, I've been advised that

19     potentially some of these documents are in anticipation of

20     redirect, but I don't think that anything I'm going to go

21     into today is materially outside of what was disclosed the

22     night before last and I'll stand on those words.  I don't

23     anticipate these to be any surprise or new documents.

24             THE COURT:  Okay.  So, you're not going to give

25     him any today and you're going to stick with the 43 you gave

```
1    him when I told you to give him 30; is that right?

2              MR. FARRELL:  I'll need a few minutes to

3    cross-reference the list on what was disclosed last night.

4    Judge, I'm not trying to play games here.  I'm not trying to

5    surprise anybody.  We're trying to react to a very technical

6    case that has documents that this witness has been

7    cross-examined before on and today what you'll see is my

8    clear intention to stay within the guardrails of presenting

9    to him documents that he will recognize.

10             THE COURT:  Okay.  So, where are we?  You're

11   standing on the 43 you've already given him?

12             MR. FARRELL:  Well, without -- I can outline

13   exactly what it is we intend to go through right now and I

14   don't have in my mind whether those documents fall on the

15   first list, the second list, the third list, or the fourth

16   list.  I believe that all of these documents fall within

17   some type of disclosure that we have made in the last

18   72 hours, but I --

19             THE COURT:  Well, saying they're within the same

20   type of disclosure doesn't get around the problem, Mr.

21   Farrell, because we're dealing with specific documents, not

22   a morphous category of documents.

23             MR. FARRELL:  Respectfully, Judge, the problem

24   that we're having is anticipating what documents we want to

25   use to cross examine the adverse party in a realtime basis.
```

```
 1              THE COURT:  Well, that's a problem you have and
 2   you have to prepare your cross and you've got to let the
 3   other side know what documents you're going to use.  That's
 4   a simple thing, and you've given them 43, and you told me
 5   that you could do 20 more, and then you could get by with
 6   the same original 43.  Now, what are you going to do?
 7              MR. FARRELL:  I'll need a moment to
 8   cross-reference the 43 list to make sure.
 9              THE COURT:  Okay.  All right.  Can you do that
10   right now?
11              MR. FARRELL:  I -- I believe they're doing it as
12   we speak.
13              THE COURT:  All right.  Is Mr. Zimmerman in the
14   courtroom?
15              MR. FARRELL:  Judge, we have two other
16   administrative things to talk about.
17              THE COURT:  Okay, go ahead.
18              MR. FARRELL:  The first is, is that we issued a
19   subpoena for a custodial testimony from the Drug Emporium.
20   During discovery, we issued a subpoena for their dispensing
21   records.
22              THE COURT:  Well, I was told there had been a
23   stipulation entered taking care of that.  Is that not true?
24              MR. FARRELL:  There is not.  So, we served a
25   subpoena for the records custodian to come and to testify
```

1    that these are the documents that we subpoenaed, that they

2    are held in the usual course of business, and that they were

3    produced in response.

4        I anticipate the testimony will take five minutes.  It

5    will not be substantive.  It is laying the foundation.  And

6    we'd ask for five minutes after the lunch break to get the

7    witness up and down.

8            THE COURT:  Any problem with that?

9            MR. NICHOLAS:  Well, my only problem with that, I

10   don't have a problem with them putting the witness on for

11   five minutes to do this.  I would have a problem with doing

12   it in the midst of my examination of Mr. Zimmerman.  So, it

13   may not come to anything because maybe we'll be done with

14   Mr. Zimmerman after the lunch break.  If not, I'd like to be

15   able to complete that, and then they can put this person on.

16           THE COURT:  How about that, Mr. Farrell?

17           MR. FARRELL:  That's fine, as long as we get the

18   opportunity to put them on.

19           THE COURT:  Okay.  I may have authorized the

20   filing of the stipulation and I was told this morning it had

21   been entered into.  Is that -- has that been entered?

22           LAW CLERK:  It may be a different issue, Your

23   Honor.

24           THE COURT:  Oh, okay.  Okay, go ahead.

25           MR. FARRELL:  The final matter is that for the

```
1    purposes of the record, I wanted to identify specifically
2    the plaintiffs' exhibits that we are asking for conditional
3    -- for you to conditionally admit.  Review of the transcript
4    yesterday has several different times and places where we
5    had made the proffer.  You came back after lunch, I believe,
6    and made some rulings and I just wanted to proffer for the
7    record the exact P numbers of that.
8             THE COURT:  Well, I didn't keep a list.  I usually
9    do, but I didn't keep a list as we go along of the documents
10   that came within the Court's conditional rulings.  So, if
11   you can provide a list and both sides can agree that those
12   are the ones that were actually offered, that would be
13   helpful to all of us, I think.
14            MR. FARRELL:  I don't think we're going to agree
15   to that, Judge.
16            MR. MAHADY:  Your Honor, I want to give you a
17   preview of what these documents are.  If -- during the
18   course of Dr. McCann's direct that the plaintiffs did, they
19   showed him, you know, maybe four to five charts for
20   SafeScript.  We cross-examined the witness and, on redirect,
21   Mr. Mougey handed us an 80-page packet of all of the charts
22   for SafeScript Pharmacy.  I objected.  I said it's outside
23   the scope of our cross examination.  They could have used it
24   on direct if they wanted to.  You sustained that objection.
25   What Mr. Farrell is now trying to get under the Court's
```

```
 1    conditional admitted order is the entire 80-page packet.
 2             THE COURT:  Well, no.  The Court's conditional
 3    order was intended to embrace the specific charts and
 4    summaries offered by Mr. Mougey when he questioned Dr.
 5    McCann.
 6             MR. MAHADY:  Thank you, Your Honor.
 7             THE COURT:  That did not include the packets that
 8    he held up yesterday.  So, I think you're exactly right, Mr.
 9    Mahady.
10             MR. MAHADY:  Thank you.
11             MR. FARRELL:  And so, for the record, Judge, and I
12    respect your ruling.  I would like to put on the record that
13    Mr. Mougey made a motion to admit P-44711, P-44758, P --
14             THE COURT:  Okay.  Now, is this the list of the
15    things that I conditionally admitted or is this the packet?
16             MR. FARRELL:  This is -- this is the packet that
17    he had -- Dr. McCann described the methodology --
18             THE COURT:  Okay, and you're making a record of --
19             MR. FARRELL:  Yes, sir.
20             THE COURT:  -- of those that you offered that I
21    have not admitted; is that right?
22             MR. FARRELL:  That is correct.
23             THE COURT:  You are trying to make the record so
24    your objection will be in a form that the Court of Appeals
25    can understand what it's all about, right?
```

```
 1              MR. FARRELL:  Yes, Your Honor.

 2              THE COURT:  Okay.  Go ahead, please.

 3              MR. FARRELL:  P-44711; P-44758, which we are

 4   referencing as the SafeScript packet; P-44754, which is the

 5   McCloud packet; P-44749, which is the Drug Emporium packet.

 6         Mr. Mougey then offered to present the remaining

 7   packets for the pharmacies that are referenced in the matrix

 8   diagram for CT2.

 9         Finally, the matrix itself summary chart is P-43225,

10   which contains the national average, the state average, the

11   Cabell County average, selected pharmacies within Case Track

12   2, City of Huntington and Cabell County, and selected

13   pharmacies throughout the State of West Virginia, for

14   purposes which we have already proffered for the record.

15              MR. MAHADY:  Your Honor, just for the record, at

16   least as it relates to Drug Emporium and McCloud Family

17   Pharmacy, they didn't even attempt to show the witness the

18   packets.  So, they were -- I don't know how they could have

19   possibly been proffered into evidence.

20              THE COURT:  Well, they haven't been authenticated

21   and they're just full of hearsay.

22              MR. MAHADY:  And we haven't even seen -- the Court

23   hasn't even seen them yet.  So, just for the -- I know

24   you've already ruled on this, but just for the record, those

25   weren't even shown to the witness and I'll pass it to Mr.
```

1    Schmidt.

2          THE COURT:  I haven't admitted them, but Mr.

3    Farrell has got a right to make the record clear.

4       Mr. Schmidt?

5          MR. SCHMIDT:  Yes.  Just to add to the record we

6    agree with what Mr. Mahady said.  In addition, they made the

7    election to show limited pages during the direct.  That

8    binds them in terms of the scope of the redirect.  There

9    would be a major issue in the record even trying to track

10   what the new pages are versus what the old pages are.

11      And then, during the redirect, they did not even

12   attempt to question on the new pages other than holding up

13   the document.  There may have been one or two that they

14   questioned on.  I'm not even sure if that happened.  So,

15   those are our additional objections.

16          THE COURT:  Mr. Ruby, we've gone almost two weeks

17   and you haven't said anything yet.

18          MR. RUBY:  I'm going to break my streak, Your

19   Honor.

20          THE COURT:  Okay.

21          MR. RUBY:  Just for the Court's awareness, we did

22   speak -- counsel spoke with Ms. Skinner after court

23   yesterday evening and she asked us to compile our lists of

24   the exhibits that each side believed would be covered by the

25   Court's conditional admission ruling.  So, we expect to have

```
 1    that information to her shortly to assist the Court.
 2                THE COURT:  All right.
 3                MR. FARRELL:  Judge, may I, for the record?
 4                THE COURT:  Yes.
 5                MR. FARRELL:  We take exception to the
 6    characterization that we did not even attempt to proffer the
 7    packets.  We attempted on numerous occasions, we believe the
 8    record will show, to admit the packets and the Court did not
 9    allow it and sustained the objections.
10        So, I just want to make the record clear that it was
11    not our purposeful decision, as counsel recommended, that we
12    did not move to admit.  We attempted to and the Court
13    sustained the objections preventing us from doing so.
14                THE COURT:  Okay.
15        Mr. Mahady?
16                MR. MAHADY:  Your Honor, since these packets fall
17    outside of the Court's conditional approval, we would ask
18    that these packets, to the extent they were not shown to the
19    witness, are not used with witnesses on cross examination.
20                THE COURT:  Well, I think that's right.  You
21    should -- I conditionally admitted the exhibits that we've
22    identified as summary charts and I think you're limited to
23    that.  The packets, I didn't let them in for a number of
24    reasons, and I don't -- I think Mr. Mahady is right.  I
25    don't think you should use those, Mr. Farrell.
```

```
 1                    MR. MAHADY:  Thank you, Your Honor.

 2                    MR. FARRELL:  Yes, Your Honor.

 3                    THE COURT:  All right.  Mr. Zimmerman.

 4                    MR. NICHOLAS:  I had asked him to stay out of the

 5          courtroom while we were doing this argument, so he's right

 6          outside.

 7                    THE COURT:  Well, that's perfectly proper, Mr.

 8          Nicholas.  Thank you.

 9                    THE COURT:  Good morning, Mr. Zimmerman.

10                    THE WITNESS:  Good morning.

11                    THE COURT:  You can take the witness stand and

12          you're still under oath, sir.

13                    THE WITNESS:  Thank you.

14                    MR. FARRELL:  Good morning, Mr. Zimmerman.

15                    THE WITNESS:  Good morning.

16                    MR. FARRELL:  Judge, may I approach the board?

17                    THE COURT:  Yes.

18                    BY MR. FARRELL:

19          Q.   Yesterday, we spoke --

20                    MR. FARRELL:  I'd ask for just 30 seconds of

21          lenience to recap.

22                    BY MR. FARRELL:

23          Q.   Yesterday, we spoke of the 2021 OxyContin hearing that

24          we addressed very briefly yesterday; do you recall that?

25          A.   Yes.
```

1   **Q.**   And then we went to the 2005 distributor initiative

2   meeting between the DEA and AmerisourceBergen.

3   **A.**   Yes.

4   **Q.**   And then we discussed in 2006 the immediate suspension

5   order?

6   **A.**   2007?

7   **Q.**   I'm sorry.   2007 immediate suspension order?

8   **A.**   Yes.

9   **Q.**   And then we discussed the settlement and agreement with

10  the DEA immediately thereafter?

11  **A.**   Yes.

12  **Q.**   And then we discussed the Reed Smith letter following

13  that Settlement Agreement/ and that brings us up to speed,

14  correct?

15  **A.**   That's as I remembered, yes.

16  **Q.**   The next thing that we're going to discuss is the

17  second letter from the DEA dated December 27th, 2007 from

18  Joe Rannazzisi.

19         MR. FARRELL:  And I'll circulate copies.

20       Judge, may I approach?

21         THE COURT:  Yes.

22         MR. FARRELL:

23  **Q.**   For the record, it is P-3 and I'm going to place a

24  black flag the best I can toward the end of December of 2007

25  while you review the document.  When you get finished

1    reviewing it, will you let me know, please, sir?

2    **A.**    Okay.  Okay.

3    **Q.**    Do you recognize this document?

4    **A.**    Yes.  I've seen it before.

5    **Q.**    What is it?

6    **A.**    It's a letter to the registrants.

7    **Q.**    What is the date of it?

8    **A.**    The date?

9    **Q.**    Yes, sir.

10   **A.**    June 12th, 2012.

11   **Q.**    I'm sorry.

12   **A.**    Did you ask me the date?  I'm sorry.

13   **Q.**    I apologize.  This is the compilation.  This is P-3.

14   I'm going to ask you to go to the December 27th, 2007,

15   letter.

16   **A.**    Oh, I'm sorry.

17   **Q.**    It would be Bate stamped 3 at the bottom.

18   **A.**    Okay.

19   **Q.**    What is this document?

20   **A.**    It looks like the other document.  It's a letter from

21   the DEA to the registrants.

22   **Q.**    What is the date of the document?

23   **A.**    This one is December 27th, 2007.

24   **Q.**    And would you look to the bottom right-hand corner and

25   read into the record the Bates stamped numbers starting

1    ABCDMDL?

2    **A.**   00378495.

3    **Q.**   Who is this letter from?

4    **A.**   Joe, Joseph Rannazzisi.

5    **Q.**   And where does Joseph Rannazzisi work?

6    **A.**   He was the Deputy Assistant Administrator of Diversion

7    Control for DEA.

8    **Q.**   Do you recognize this document as being sent from the

9    DEA to AmerisourceBergen amongst other registrants?

10   **A.**   Yeah.  I believe it was sent to our distribution

11   center, the registrant location.

12   **Q.**   And as the Chief of CSRA, did you review this letter

13   when it was sent to AmerisourceBergen?

14   **A.**   I -- I don't specifically recall, but I'm sure I would

15   have looked at it, yes.

16   **Q.**   You have reviewed it since receipt, correct?

17   **A.**   Yes.

18   **Q.**   And you're familiar with what it says?

19   **A.**   Yes.  I've seen it before, yes.

20   **Q.**   You've been deposed and we've talked about this

21   document before, correct?

22   **A.**   Correct.  You said we talked about it?  Maybe in my

23   deposition, is that what you're referring to?

24   **Q.**   Yes.

25   **A.**   Yes.

1   **Q.**   On behalf of -- as a 30(b)(6) designee for

2   AmerisourceBergen, you've acknowledged AmerisourceBergen

3   received this correspondence?

4   **A.**   There's -- there's three -- I think -- I think you

5   mentioned it yesterday.  There's three letters from the DEA,

6   R-1, R-2 and R-3, and we could only substantiate we received

7   two.  I can't remember which was the third one, but we could

8   not find record of receiving a third one.  And I don't know

9   which of the three it was, but since that time period, I've

10  seen the letter, yes.

11  **Q.**   But you acknowledge this is a communication from the

12  DEA to AmerisourceBergen that you received and reviewed and

13  you were on notice of the contents?

14  **A.**   As I stated, one of the three letters I don't recall

15  seeing until years later and we could never find -- we could

16  never substantiate that we actually received the letter.

17  I'm not saying we didn't or we did.  One of the three.  Two,

18  we were able to.

19          MR. FARRELL:  Judge, may I have one moment?

20          THE COURT:  Yes.

21      (Pause)

22          BY MR. FARRELL:

23  **Q.**   I'm going to see if we can identify it in the

24  transcript and refresh your recollection at a later point.

25  **A.**   Okay.

```
 1              MR. FARRELL:  In the meantime, Judge, this is the

 2     last of the Rannazzisi letters that we intend to present

 3     collectively as P-32 and we would move for its admission,

 4     along with the other documents from the DEA contained

 5     therein.

 6              MS. MAINIGI:  Objection, Your Honor.

 7              THE COURT:  Yes, what basis?

 8              MS. MAINIGI:  One of -- both a combination of

 9     foundation and hearsay, Your Honor.  I think that, as Mr.

10     Farrell reflected, this is a compilation packet of several

11     letters.  I don't believe either yesterday or today we've

12     even gone through all of the letters to lay a foundation

13     that Mr. Zimmerman would have seen them.

14         As Mr. Zimmerman just said, there's at least one that

15     he could not identify and I am assuming that whichever

16     letter gets admitted, if they get admitted, that they would

17     not be admissible for truth.

18              THE COURT:  Well, they haven't been authenticated,

19     so I'll sustain the objection at this point.

20              MR. FARRELL:  Judge, we have a stipulation with

21     the parties specifically authenticating these letters.

22              THE COURT:  Is that right, Ms. Mainigi?

23              MS. MAINIGI:  Your Honor, I think there is a

24     stipulation as to certain documents.  I would ask to have

25     the opportunity to check all of these because I'm not sure
```

1    all of these are on the list, but we can certainly check,

2    but I don't think irrespective of whether there's a

3    stipulation or not, it's really --

4            THE COURT:  Well, I'm not going to admit them

5    until you can persuade me they're within the stipulation.

6        Mr. Hester?

7            MR. HESTER:  Yes, Your Honor.  I was going to also

8    add the stipulation does not go to foundation.  It's, at

9    most, a stipulation on authenticity and I did want to make

10   clear our objection on hearsay grounds to the admission of

11   these documents, as well.

12           THE COURT:  All right.  At this point, I'll

13   sustain the objection.

14           BY MR. FARRELL:

15   **Q.**   So, we're going to walk through this correspondence and

16   I'm going to ask you a few questions.

17   **A.**   Okay.

18   **Q.**   The dear registrant letter, will you read the first

19   paragraph, please?

20   **A.**   "This letter is being sent to every entity in the

21   United States registered with the Drug Enforcement

22   Administration to manufacture or distribute controlled

23   substances.  The purpose of this letter is to reiterate the

24   responsibilities of controlled substance manufacturers and

25   distributors to inform DEA of suspicious orders in

1    accordance with 21 CFR 1301.74(b)."

2    **Q.**   Thank you.  Now going to the second paragraph, the

3    sentence that begins, "The regulation clearly indicates",

4    would you please read aloud?

5    **A.**   "The regulation clearly indicates that it is the sole

6    responsibility of the registrant to design and operate such

7    a system."

8    **Q.**   Continue.

9    **A.**   "Accordingly, DEA does not approve or otherwise endorse

10   any specific system for reporting suspicious orders."

11            MR. HESTER:  Your Honor, may I object?  The

12   witness is being asked to read in a document into the record

13   and it's not clear to me what basis there is for it when

14   there's a hearsay objection.

15            THE COURT:  Sustained.

16            MR. FARRELL:  Judge, we're providing this not for

17   the truth of the matter asserted, but for notice of the

18   DEA's position communicated to --

19            THE COURT:  You haven't authenticated it or shown

20   it's admissible and, until you do that, I'm going to sustain

21   the objection and not let it in.  I don't think it's proper

22   for you to question him about a document that's out there

23   unauthenticated and not admitted.

24            MR. FARRELL:  Okay.

25            THE COURT:  Now, if he's a hostile witness, it

```
 1    could give you, I guess, a good faith basis to ask him a

 2    question or two, but not have him read -- read the letter.

 3              MR. FARRELL:  Yes, Your Honor.

 4              THE COURT:  And I haven't found him to be hostile

 5    yet.  Are you saying -- well, I'm raising an issue that --

 6              MR. FARRELL:  Judge, I don't believe that his

 7    testimony has been hostile.  He's been very cooperative.  We

 8    do believe that he is an adverse witness and he has -- in

 9    his testimony, the second question I asked him was which

10    party he identified with and he named AmerisourceBergen.

11    Under Rule 611, that puts it squarely within the grounds for

12    me to ask leading questions and treat him as an adverse

13    party.

14              THE COURT:  Do you agree with that, Mr. Nicholas?

15              MR. NICHOLAS:  I'm sorry.  I was -- my friend Mr.

16    Mahady was --

17              THE COURT:  He says Rule 611 gives him the

18    authority to ask him leading questions even though he hasn't

19    been hostile.

20              MR. NICHOLAS:  I -- honest -- yeah.  I have not

21    been objecting to the leading because I think within --

22    within reason, he can lead him a little bit pursuant to the

23    rule.  That was my understanding of the rule because he's --

24    because he's a party, but that's why I haven't been

25    objecting to the leading.
```

```
1              THE COURT:  Yes.  We need to get through this.

2              MR. NICHOLAS:  Yeah.

3              THE COURT:  So -- so, I'll let you lead him a

4    little bit, Mr. Farrell.

5              MR. FARRELL:  Yes.  I apologize, Your Honor.  I'm

6    --

7              MR. NICHOLAS:  Go ahead, I'm sorry.  I apologize.

8              MR. FARRELL:  I'm going to move off of this

9    particular document until I can get the transcript from his

10   prior deposition.  I would like to sever and separate the

11   two P-32 documents now for the record.  So, the September,

12   2006 Rannazzisi letter which was previously identified as

13   one of the components of P-32, I would like to have

14   designated in the record as P-32A, Alpha.

15             THE COURT:  Which page is that?

16             MR. FARRELL:  It would be Bates stamp Pages 9, 10,

17   11 and 12.

18             THE COURT:  Okay.  So, that -- that is going to be

19   removed from this packet and given a new number, right?

20             MR. FARRELL:  Yes, Your Honor, P-32A, Alpha.

21             THE COURT:  Okay.

22             MR. FARRELL:  And then we'll have designated

23   separately the December 27, 2007 letter, which has Bates

24   stamp P-32_3 and _4.  We'll call that P-32B, as in Bravo,

25   and I will make a proffer to the Court that in the
```

```
1    deposition of Thomas Prevoznik from the DEA's 30(b)(6)

2    designation that we tendered to the Court the foundation and

3    the circulation of this document was asked for and

4    established in that deposition.

5              THE COURT:  Is there still an argument about

6    whether I should consider that deposition?  I know at one

7    point there was a motion made to kick it out.

8              MR. FARRELL:  It's still pending, Your Honor.

9              THE COURT:  Still pending?

10             MR. MAHADY:  It's still pending, Your Honor, and I

11   think there is an issue.

12             THE COURT:  Okay.  Where does that leave you, Mr.

13   Farrell?

14             MR. FARRELL:  In a very difficult position.

15             THE COURT:  Well --

16             MR. FARRELL:  Can I -- can I ask about this

17   document on conditional relevancy and if, in fact --

18             THE COURT:  Well, if he -- if he identified it in

19   his deposition, isn't that sufficient even if I kick out the

20   bulk of his testimony?

21             MR. MAHADY:  You're referring to Tom Prevoznik?

22             THE COURT:  Yes.

23             MR. MAHADY:  So, one of the issues that we have

24   with Tom Prevoznik and that we raised in the motion is that

25   he lacked personal knowledge for a lot of the issues he
```

1   testified about.  As Mr. Farrell has explained, these

2   letters come from Joe Rannazzisi, not Tom Prevoznik.  I do

3   not believe he was within the Office of Diversion Control at

4   the time.

5        So, I do think these -- his testimony as to when the

6   dear registrant letters were sent would probably fall pretty

7   squarely within the confines of the motion that we've teed

8   up.

9             THE COURT:  Well, so your point is if he -- the

10  only thing I'm concerned about now is whether he properly

11  identified and authenticated the document.  If he did that

12  in his deposition, then I can let Mr. Farrell use them even

13  if I kick the deposition, can't I?

14            MR. MAHADY:  I'm not sure if Tom Prevoznik would

15  have been in a position to properly authenticate the

16  documents given his lack of involvement, but I defer to -- I

17  defer to Your Honor.

18            THE COURT:  Well --

19            MS. MAINIGI:  Your Honor, if I may just add, Mr.

20  Prevoznik was not in Diversion Control until 2012, so we do

21  not think he can authenticate the letters prior to 2012.

22            THE COURT:  Okay.  You've got a problem you need

23  to get around here, Mr. Farrell.

24            MR. FARRELL:  I'm working on it, Judge.  I think I

25  have a temporary solution.  I'm going to reference Mr.

1    Zimmerman's deposition on Friday, August 3rd, 2018, Page

2    145.  My colleague, Mr. Pifko, is the one that deposed Mr.

3    Zimmerman.

4              COURT REPORTER:  I'm sorry.  Who was it again?

5    I'm sorry.

6              MR. FARRELL:  Mr. Pifko, P-i-f-k-o.  And on Page

7    145, Mr. Pifko says, "I'm handing you what has been marked

8    as Exhibit 6.  For the record, these are a series of letters

9    from the Department of Justice."  Gives the Bates stamp.

10        "For the record, there's four letters in this packet.

11   You'll see down at the bottom one of them is December 27th,

12   2007."

13        On the next page, the question was asked, "These are

14   what we refer to as dear registrant letters.  Have you heard

15   that term before?"  The witness answered "yes."  The next

16   question is, "Did AmerisourceBergen receive a copy of this

17   letter?"  Answer, "I believe one or more of our distribution

18   centers did."

19        Question, "When you were at the company at that time,

20   did you receive a copy of that letter?"  Answer, "I

21   eventually saw a copy of the letter."

22             MR. NICHOLAS:  Well, Your Honor, it says -- it's

23   referring to one letter.  It doesn't say which one it is.

24   And it looks like -- it looks like this is a reference to

25   the September --

1      Let's go back.  Could you go back to that page just so

2  I can see where I was doing this?

3      Someone just took down the testimony I was looking at.

4  I just want to wait until it comes back.

5          UNIDENTIFIED SPEAKER:  It's up in front of you

6  now.

7          MR. NICHOLAS:  Oh, I'm sorry.  I'm sorry.  Okay.

8      It says, "Let's start with the first one dated

9  September 27th, 2006."  Okay, so it looks like he -- he does

10 -- that's one of the ones that he saw.  It says," I

11 eventually" -- what it says is, "I eventually saw a copy of

12 this -- of the letter.  I never received one from the DEA --

13 from DEA."

14     Actually, that -- so, that calls into question all --

15 that letter, as well, because he says he never received it

16 from the DEA, but be that as it may, we're only talking

17 about one letter at most.

18         MS. MAINIGI:  And, Your Honor, if I may add, also,

19 as I recall the testimony from yesterday, Mr. Zimmerman was

20 not able to identify the 2006 letter and the testimony that

21 was just read out loud incompletely is not inconsistent with

22 that because he, in his deposition testimony, does appear to

23 -- I think the page is gone.

24     He -- he hedges a bit, understandably, and says that it

25 was probably received at the distribution centers and he

```
 1    says he's eventually seen the letters.  So, the testimony is
 2    unclear, but I do think yesterday his testimony was clear on
 3    the 2006 letter, as I heard it that, he could not -- he did
 4    not recall receiving the letter.
 5              THE COURT:  Okay.  Mr. Farrell, I'm not going to
 6    let you question him about the letters at this time.  I'm
 7    sure you'll figure out a way to get another bite at the
 8    apple down the road, but for now, I'm not going to let you
 9    do it on the ground that there hasn't been a proper
10    identification and authentication of the letters or the fact
11    that this witness has familiarity with it.
12              MR. FARRELL:  I'm sorry, Your Honor.  I missed
13    that last part.
14              THE COURT:  There's no showing that this witness
15    has familiarity with the letters.
16              MR. FARRELL:  I'm working on that, Judge.
17              THE COURT:  Okay.
18              BY MR. FARRELL:
19    Q.   Mr. Zimmerman, are you familiar with the OMP Program at
20    AmerisourceBergen?
21    A.   Put a time context to it, but I've been familiar with
22    it since being with the company.  So, depending on what time
23    frame.  I do understand the OMP Program.  I just want to
24    make sure I understand what time frame if we're going to be
25    talking about it.
```

1    **Q.**   You've been at this company since 1990?

2    **A.**   Correct.

3    **Q.**   And you're still there today?

4    **A.**   Yes.

5    **Q.**   You're in charge of CSRA?

6    **A.**   Yes.

7    **Q.**   One of CSRA's obligations or responsibilities is to

8    develop a Suspicious Order Monitoring System?

9    **A.**   Correct.

10   **Q.**   You were -- you were the one involved that were (sic)

11   involved with and implemented the policies and procedures?

12   **A.**   I oversee the process, correct.  My department is

13   responsible.  Ultimately, me, yes.

14   **Q.**   So, in discovery, we were provided a list of the

15   documents from the CSRA under the OMP Program and I have a

16   list of ten of them that I would like to show you and to put

17   into the record.  It's not comprehensive.  The list is

18   enormous.  But these appear to be from our review documents

19   we want to discuss.

20        And I'll go ahead and proffer for the record which ones

21   they are.  They shouldn't be a surprise.

22             MR. MAHADY:  Can we be given the documents while

23   you proffer them?

24             MR. FARRELL:  Yes.

25             MR. MAHADY:  Can we get them before you proffer

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1   them?

 2              MR. FARRELL:  Yes, Your Honor.

 3              MR. MAHADY:  And, Your Honor, we would just like

 4   to know if these were on the list of the 38 or so that were

 5   disclosed two nights ago?

 6              THE COURT:  Were they, Mr. Farrell?

 7              MR. FARRELL:  Yes.  These have been disclosed for

 8   a long time.  This is the compendium of exhibits of their

 9   Suspicious Order Monitoring System.

10              THE COURT:  Well, being disclosed for a long time

11   doesn't tell me that they were on the list that you supplied

12   Mr. Nicholas.

13              MR. FARRELL:  Yes.  This was disclosed last night.

14              THE COURT:  Okay.

15              MR. NICHOLAS:  Okay.  Well, all right.  Last night

16   is the 50 that is being culled down to the 20.  So, this is

17   -- this is ten of the 20.  This is ten of the 20 that are

18   left, I think.

19              THE COURT:  Okay.

20              MR. NICHOLAS:  Right?

21              THE COURT:  All right.  Go ahead, Mr. Farrell.

22              MR. FARRELL:  May I approach the witness?

23              THE COURT:  Yes, you may.

24              BY MR. FARRELL:

25   Q.   This is P-82.
```

1          MR. NICHOLAS:  I think we haven't received the

2     documents, so we'd like to see a copy of them before --

3     before they're shown to the witness.

4          THE COURT:  Yes.  Do you have a copy?

5          MR. FARRELL:  Judge, we did not anticipate that we

6     were going to have to go through this amount of detail and

7     documents that were previously stipulated to.  To save the

8     Court some effort, can I exercise five minutes of recess to

9     get my documents together?

10          THE COURT:  Yes.  Yeah.  We'll be in recess for

11     five minutes.

12        (Recess taken)

13          MR. NICHOLAS:  Your Honor, if I may, over the

14     break, we -- I was reminded that we had entered a prior

15     stipulation with the plaintiffs in which we said that we

16     would not object to the introduction of certain documents

17     through certain witnesses.  The Rannazzisi correspondence

18     falls within those -- falls within the stipulation.

19        So, I hadn't raised the initial objection, but -- but I

20     will say that we do not object to the introduction of these

21     documents through Mr. Zimmerman.  We said we wouldn't object

22     to that and we don't.

23        We maintain all evidentiary, you know, objections on

24     grounds of hearsay and I may get up and down and talk about

25     that, but just so the record is clear, you know, he can --

```
 1    he can use -- he can introduce the documents and ask

 2    questions on them.

 3              THE COURT:  Well, thank you, Mr. Nicholas.

 4         Does that -- do the other defendants agree with that?

 5              MS. MAINIGI:  Yes, Your Honor.  We found the

 6    stipulation over the break.  I think we do maintain all the

 7    other evidentiary objections.

 8              THE COURT:  I understand that.

 9         Mr. Hester?

10              MR. HESTER:  Same position, Your Honor.  We do

11    have a hearsay objection to the letters but, otherwise, we

12    understand the stipulation governs.

13              THE COURT:  All right.  Well --

14              MR. NICHOLAS:  And just one more thing I want to

15    say on the record, if it's okay.  Just so -- just so it's

16    clear that we're not trying to pick at Mr. Farrell for the

17    sake of it when I -- when I ask for the exhibits and the

18    documents the night before.  This kind of thing can be

19    avoided if we have the time -- you know, if we don't get a

20    hundred documents the night before kind of thing.  So, I do

21    apologize to the Court for the time that was taken on this.

22              THE COURT:  Well, we did take an hour to do this.

23              MR. NICHOLAS:  Yeah.

24              THE COURT:  Okay.  Mr. Zimmerman --

25              MR. FARRELL:  Judge, before we proceed --
```

```
1              THE COURT:  I'm sorry?

2              MR. FARRELL:  Before we proceed, I would like to

3    add some color to the purpose and the practice that we are

4    attempting to follow.

5              THE COURT:  Okay.

6              MR. FARRELL:  This is complex litigation involving

7    a lot of witnesses over a long period of time.  There's

8    documents that have been produced in discovery that have

9    hearsay issues.  There are documents that have sponsoring

10   witness issues.  There are documents that have internal

11   e-mails within departments.

12       We had protracted negotiations with the defendants so

13   that we didn't need to proffer for you a hundred 5-minute

14   videotaped testimony laying sponsoring witness

15   authentication testimony.

16       We entered into a stipulation, and it's in the docket,

17   and it is ECF 1306, and we identified each of the documents

18   that we intended to use at trial and we entered into a

19   stipulation that if they would bring four live witnesses, we

20   would agree that we would not take the deposition of their

21   CEO.  We negotiated an actual agreement that we sat down on

22   discovery so that we would have sponsoring witnesses to put

23   on AmerisourceBergen, Cardinal Health and McKesson's own

24   testimony.

25       To our detriment, we took a position so that we could
```

1    put documents that they know are authentic, that they know

2    are within the -- being held within the normal course of

3    business, so that we didn't have to go through all of this.

4    And so, it's frustrating to stand up here now and then to

5    have to go back and build a record that we did not

6    anticipate we would need to build.

7              THE COURT:  I understand.

8              MR. NICHOLAS:  Well, I -- I guess the only thing

9    I'll say is -- to this is, yes, that's why I brought the

10   stipulation to your attention.  I don't agree with

11   necessarily all the characterization of the back and forth.

12   I don't know what's to whose detriment.  You know, it was a

13   negotiated thing.  But, yeah, that's why I brought it up

14   and, you know, I hope we don't have to continue to go

15   through this kind of thing.

16             THE COURT:  Okay.

17        All right.  Mr. Zimmerman, can you resume the witness

18   stand, please?

19             MR. FARRELL:  Thank you.  Judge, at this time, we

20   would ask for P-32 to be admitted into the record.

21             THE COURT:  Any objection?

22             MR. HESTER:  Just preserving our hearsay objection

23   to the document, Your Honor.

24             MR. NICHOLAS:  Same.

25             THE COURT:  All right.  Subject to that, you may

```
 1    -- it's admitted.

 2                    PLAINTIFF EXHIBIT P-32 ADMITTED

 3              MR. FARRELL:  Thank you.

 4         Bring out P-32, please.  I think -- have I circulated a

 5    copy?

 6              MR. HESTER:  Yes, you did.

 7              MR. NICHOLAS:  Of the three letters, yes.

 8              BY MR. FARRELL:

 9    Q.   Mr. Zimmerman --

10              MR. FARRELL:  Judge, may I approach the screen?

11              THE COURT:  Yes.

12              BY MR. FARRELL:

13    Q.   Go to Bates stamp Page 3 and 4.  So, we're not going to

14    get into the first paragraph.  We're going to go to the

15    second paragraph.

16         Mr. Zimmerman, you acknowledge and recognize that this

17    is a communication from the DEA to AmerisourceBergen

18    providing notice that the DEA does not approve or otherwise

19    endorse any specific system of reporting suspicious orders,

20    correct?

21    A.   That's what it states.

22    Q.   And it also states that the DEA -- that any prior

23    implicit or explicit suggestions that they have approved

24    systems in the past are hereby revoked.  Do you see that,

25    sir?
```

```
 1    A.    I do.

 2    Q.    Now, the third paragraph, I'd like for you to read the

 3    first sentence.

 4    A.    "The regulation also requires that the registrant

 5    inform the local DEA Division Office of suspicious orders

 6    when discovered by the registrant."

 7    Q.    Now, again, this is using the when-discovered language

 8    that we've been discussing in the past, correct?

 9    A.    Yes.

10          MR. NICHOLAS:  Objection.  Objection.

11          THE WITNESS:  It's stated in the document the

12    when-discovered, correct.

13          BY MR. FARRELL:

14    Q.    The when-discovered language was referenced in

15    yesterday's testimony.  Do you remember that?

16    A.    I remember discussing it.  I'm not sure what context,

17    but yes.

18    Q.    So, the next sentence says, "Filing a monthly report of

19    completed transactions", and then in parentheses,

20    ("excessive purchase report" or "high unit purchases") does

21    not meet the regulatory requirement to report suspicious

22    orders.'"  Do you see that sentence?  Did I read it

23    correctly?

24    A.    Yes.

25    Q.    And do you acknowledge this is the DEA providing notice
```

1    that it believes in 2007 that simply reporting suspicious

2    orders after the fact, they do not deem it to be compliant

3    with regulatory law?

4    **A.**   That's what it states.

5    **Q.**   This is what the DEA provided notice to you in 2007,

6    correct?

7    **A.**   This is the guidance letter that they provided in 2007.

8    **Q.**   All right.  I'd like to go and focus your attention at

9    the very bottom of the page, the very last sentence.  "The

10   determination of whether", do you see that, sir?

11   **A.**   I do.

12   **Q.**   Will you read that into the record?

13   **A.**   "The determination of whether an order is suspicious

14   (sic) not only on the ordering patterns of the particular

15   customer, but also on the patterns of the registrant's

16   customer base and the patterns throughout the relevant

17   segment of the regulated industry."

18   **Q.**   Sir, do you acknowledge that this is the DEA in 2007

19   providing notice to AmerisourceBergen that it expects you,

20   when reviewing suspicious orders, to look for patterns from

21   the customers' prior purchase history?

22            MS. MAINIGI:  Objection, Your Honor.  This use of

23   notice, this is calling for a legal conclusion.  The last

24   two questions have done that.

25            THE COURT:  Overruled.  You can go ahead, Mr.

1    Farrell.

2          THE WITNESS:  What was the question, sir?

3          BY MR. FARRELL:

4    **Q.**   Do you acknowledge that this 2007 correspondence is the

5    DEA providing notice to AmerisourceBergen that when you are

6    looking to determine whether an order is suspicious that you

7    should look at the ordering pattern of that particular

8    customer?

9    **A.**   In a general sense.  I mean, I think DEA referred to

10   these as guidance letters, so it's providing guidance of

11   things that you could look at.

12   **Q.**   Let me rephrase the question.  Does this 2007 letter

13   provide guidance to AmerisourceBergen that when it was

14   looking for suspicious orders, it should look for ordering

15   patterns from the particular customer?

16   **A.**   It says to look at the customer base and the patterns

17   throughout.

18   **Q.**   And does it also provide guidance that you should look

19   for patterns amongst the customer base of AmerisourceBergen?

20   **A.**   They're recommending you could do that.  I mean, the

21   regulations are very specific about pattern and frequency.

22   It doesn't have any of this in the regulations and, I mean,

23   there's a tool to get that.

24         If this is the -- if they want to create a requirement

25   for the distributors to follow, then just enhance the

1    regulation, put it in a proposed rule, and put it in the

2    act, and then we're clear.  But these guidance letters cause

3    confusion because it was guidance.

4         And, you know, for instance, they say they don't

5    approve a program, but we entered an agreement to mail our

6    suspicious orders to Washington, DC and we -- this says

7    should I ignore our agreement with the DEA to send our

8    orders to DC?  Because this letter says we have to send them

9    to the District Office.  So, what's a registrant to do,

10   follow the legal agreement or the guidance letter?

11   **Q.**   So, two parts to that, sir.  The reason that

12   AmerisourceBergen was sending the Suspicious Order Reports

13   to headquarters was because you entered into a Settlement

14   Agreement with the DEA following an immediate suspension

15   order.

16   **A.**   But this says no -- any prior agreements are null and

17   void, this -- this guidance letter.  So, does that make that

18   agreement null and void?  (Unintelligible).

19        COURT REPORTER:  I'm sorry.  What was that last

20   part?  I got "make that agreement null and void".  I didn't

21   hear the last sentence.

22        THE WITNESS:  Yes.  If I -- if we're supposed to

23   follow the guidance letter, this tells me to ignore my legal

24   agreement with the DEA we entered into in 2007, in June,

25   because it's saying any prior agreements are -- I don't know

1    what's the exact terminology.

2    **Q.**   Mr. Zimmerman, did you ask that question of the DEA?

3          MR. NICHOLAS:  Your Honor, I'm sorry.  I think the

4    witness was still trying to answer the question.

5          THE WITNESS:  Did you want me to look through here

6    and find it?  Let me see if I can find it.  It might have

7    been one of the other ones.  In one of these letters, it

8    says that any past -- DEA will not recognize or approve any

9    program.

10         MR. FARRELL:  Judge, may I continue?

11         THE COURT:  Yes.

12         BY MR. FARRELL:

13   **Q.**   Did you ask the DEA this very question to clear up any

14   ambiguity?

15   **A.**   No, because this was a guidance letter, not a -- not a

16   legal document or a regulation.

17   **Q.**   So, you agree that this is a guidance document from the

18   DEA recommending that AmerisourceBergen, when looking for

19   whether an order is suspicious, for a particular customer to

20   compare it to patterns from your other customers; agreed?

21   **A.**   It would -- it is a suggestion that you could look at

22   patterns throughout the relevant segment of that, like

23   hospitals versus pharmacies.

24   **Q.**   Yes, sir.  That's the third component to this.  I'm

25   asking in particular whether or not the DEA in this 2007

1    letter provided guidance to AmerisourceBergen that when

2    you're looking to see whether an order is suspicious from a

3    particular customer you should compare it to patterns from

4    your other customers?  Is that the guidance provided by the

5    DEA?

6    **A.**   That's the guidance referenced in the letter, yes.

7    **Q.**   And in addition to that, they recommend or provide

8    guidance that you should also compare the ordering patterns

9    of a particular customer throughout the relevant segment of

10   the regulated industry.  Do you see that?

11   **A.**   That's what it says, yes.

12   **Q.**   Now, if you go to Page 2, the very last sentence.  I'm

13   sorry.  Now, the first paragraph of Page 2, the very last

14   sentence, will you please read it aloud?

15   **A.**   Starting with "Also"?  Oh, "Nevertheless, ordering one

16   highly abused controlled substance and little or nothing

17   else deviates from the normal pattern of what pharmacies

18   generally do (sic)."

19   **Q.**   And you would agree with me in 2007 this is the

20   guidance provided by the DEA to AmerisourceBergen?

21   **A.**   This is what's written in the letter, yes.

22   **Q.**   Now, go to the third paragraph that starts with

23   "Lastly".  Would you please read the first sentence, please?

24   **A.**   "Lastly, registrants that routinely report suspicious

25   orders, yet fill these orders without first determining that

1    order is not being diverted into other than legitimate

2    medical, scientific, and industrial channels, may be failing

3    to maintain effective controls against diversion."

4    **Q.**   And, again, this is guidance from the DEA in 2007

5    telling AmerisourceBergen that reporting orders and still

6    shipping them may fail to maintain effective control

7    according to the DEA?

8    **A.**   That's what it states.

9    **Q.**   Now, we're going to take an interlude within the black

10   flag analysis to talk about AmerisourceBergen's Suspicious

11   Order Monitoring System or, as you call it the, OMP, and

12   would you remind me, please, what OMP stands for?

13   **A.**   Order Monitoring Program.  It consists of several

14   different components.

15   **Q.**   Sir, is it fair to say that, prior to 2007, that

16   AmerisourceBergen was reporting suspicious orders, but still

17   shipping them?

18   **A.**   In most instances, that was the process that we had

19   worked with and designed with the DEA up until 2007.

20   **Q.**   And that AmerisourceBergen was not sending individual

21   suspicious orders, but was running end-of-the-month summary

22   reports of all of the orders that were flagged by your

23   system?

24   **A.**   That's not correct.

25   **Q.**   I'm sorry.  Would you please explain the process

1    pre-2007 of how AmerisourceBergen was identifying suspicious

2    orders?

3    **A.**   So, pre-2007, there's three component.  First component

4    is training of the staff at the distribution centers, that

5    if they see anything suspicious, they have an obligation to

6    report it as suspicious, which they would contact the DEA

7    and they complete a DEA contact form.

8        The second component was a daily transaction report

9    that would be sent to the local DEA Office on a daily basis,

10   which I -- which was -- when identified or when discovered,

11   which is in the document, they would receive that the next

12   morning when the orders were processed at night.

13       And then the third component up to -- was the DEA local

14   office wanted a monthly report.  We would submit a monthly

15   report of all orders that had been reported.

16       The flexibility of the program is up to the individual

17   DEA office.  They can receive a report weekly, monthly,

18   quarterly.  They could have it designed for one product.

19   They could have it designed for one customer.  It was

20   completely flexible for however the DEA wanted to best

21   utilize that information to prevent diversion.

22   **Q.**   So, let's take each of those three components and break

23   them down for a second.  The first one, I believe, you've

24   referenced as manual, the people that were in the cage would

25   identify orders that were suspicious?

1  **A.**   If they identified an order that was suspicious,

2  correct.

3  **Q.**   Can you explain to me how you trained the people in the

4  cage to identify suspicious orders?

5  **A.**   So, they pick orders every day and if they're picking

6  one all the time and somebody says we want five cases, they

7  have an obligation to say that's not normal for what we do

8  and then would report that and we would investigate and find

9  out circumstances.  And they're trained annually on that

10  process.

11      You know, that's what initiated our program with the

12  DEA in '96 and '98.  We were making 12,000 phone calls a

13  year and the DEA offices was getting frustrated with the

14  amount of phone contact and pretty much telling us to stop

15  reporting, which we have a regulatory obligation.

16      That's what initiated me working with the DEA is, one,

17  the local offices who we are mandated to report to were

18  extremely upset with the daily phone calls of us reporting

19  suspicious order and were telling us to stop.  So, that was

20  the interaction I had with DEA in working on the two-year

21  process that would work best for the field investigators to

22  act upon suspicious orders, but give them information that

23  wasn't bogging them down throughout the day with phone

24  calls.

25  **Q.**   Were you, as the Head of CSRA, alarmed that your

1    pickers in the cage vaults were calling the DEA thousands of

2    times to report suspicious orders?

3    **A.**    What it did was part of the 12,000 phone calls was the

4    -- was the regulation was so vague, which still remains

5    today.  So, the problem we had in 1990 with a vague

6    requirement that said unusual frequency, quantity and

7    pattern without -- pretty much that's it in the regulation

8    and they've not changed it since caused vagueness.

9        So, it was up to the order filler to determine -- it's

10   just like it is today.  It's up to us to determine.  And I

11   think the letters, it says we won't tell you what's

12   suspicious and what's not, is what DEA says in these

13   letters.

14       So, if they're -- we will not give you any guidance on

15   what to report and what not to report.  You have to figure

16   it out based upon what you know.  And so, we have that same

17   discussion with our order fillers.  So, they put that

18   position -- put that responsibility on them for knowing the

19   orders that they fill and, if they have any suspicion,

20   again, depending upon what they feel, they have an

21   obligation to report it, which resulted in 12,000 phone

22   calls because they were probably being overly conservative.

23       So, that was the purpose of starting to working with

24   DEA in '96, try to come up with some kind of standard

25   understanding that we could somehow -- because, again, what

1    was the DEA going to do with these 12,000 phone calls?  They

2    didn't want any.  They told us to stop.

3         So, we tried to work with them.  It took two years of

4    working back and forth of what the report would look like,

5    what would be the trigger points, what should we do.  There

6    was no discussion about stop shipping.  There never a

7    discussion in those two-year processes.

8         I worked with all the DEA offices.  I worked with all

9    the program managers.  And I worked with Washington, DC.

10   Never a reference to shop shipping.

11        And so, our program wasn't designed to stop shipping

12   because I think, again, as I stated yesterday, the purpose,

13   the main purpose of controlled substance is for patient

14   care, not for abuse.

15        And so, we have these requirements to make sure that

16   patients get these drugs in a responsible, safe manner and

17   anytime we stop an order or effect that supply chain based

18   upon a suspicion, a patient might not got their product and

19   that's me overruling a doctor that knows the patient and

20   overruling a pharmacy who sees the patient and knows the

21   patient background.  I have none of that.

22        So, whenever we stop an order, we're effectively

23   overruling a doctor and a pharmacist and cause -- puts me in

24   a tough position to make that decision.  So, you know, we

25   try to do the best we can with the vague regulations and our

 1    moral responsibility to make sure these medications get to

 2    pharmacies so they can be dispensed to patients.

 3    Q.   That's a lot to unpack there, Mr. Zimmerman.  Let me

 4    see if I can circle back.  Let's go back to the first

 5    aspect.  You said that the people that were in the vault,

 6    we're talking about the pickers and checkers; is that what

 7    they're called?

 8    A.   Order pickers.  Order fillers.  We'd rather call them

 9    order fillers.

10    Q.   So, these are literally the men and women employed in

11    your warehouses who receive an order and go to a shelf?

12    A.   Uh-huh.

13    Q.   Pick up a box of controlled substances and then place

14    it for delivery?

15    A.   These are people that work in the vault.  They get the

16    customer order and if there's a discrepancy on the order,

17    they call the pharmacy and they say you meant -- did you --

18    what manufacturer brand Oxycontin?  So they have ultimate

19    relationships with these pharmacies they do business with.

20         So, those are the people that know every -- they know

21    the customers that are ordering those controlled substances

22    because they have to clarify.  I'm going back to the 90s.

23    They have to clarify when an order comes in on a narcotic

24    order form that they put oxycodone and there's three

25    different types.  What manufacturer did they want?

1          So, sometimes there's a phone call to the doctor or

2     there's a ten.  Did you mean that you wanted one?  They

3     clarify that kind of discussion.  So, there's interaction

4     with that order filler in the vault at that time because of

5     the way the business was structured.

6     **Q.**    Excuse me.

7     **A.**    Sorry.

8     **Q.**    These individuals that are making determinations as to

9     whether an order is suspicious, did AmerisourceBergen have a

10    written policy defining in an objective manner what would be

11    suspicious for the pickers?

12    **A.**    We cited the regulatory -- the Code of Federal

13    Regulations.

14    **Q.**    Other than that, did you provide any guidance to the

15    pickers on how or when they should identify a suspicious

16    order?

17    **A.**    When they identify something that they feel is of

18    unusual frequency, pattern or -- and size and we -- the

19    policy on what to do once you get that.

20    **Q.**    Did you provide them the resources to be able to

21    compare one order to a previous order?

22    **A.**    It's the same person that picked the previous -- I

23    guess I'm not understanding.  I mean, these people work in

24    there every day.  They fill every order.

25    **Q.**    My question is, did you provide them resources so that

1    they could compare a present order to a past order?

2    **A.**   I mean, they have inventory records and reports.  I'm

3    not sure I understand your question.

4    **Q.**   My question very simply is, is did you provide them a

5    computer?  Did you provide them some way to scan?  Or some

6    way to look at trends or patterns?  Or are you expecting

7    them to remember?

8    **A.**   No.  I'm sorry.  They have a computer system where they

9    look in and they see the past history and, usually, that

10   would be the first step and they can see what they've

11   ordered in the past to see if that's the product they

12   wanted.  If there's any discrepancy with that, then they

13   would usually make the phone call.  So, I wasn't hitting

14   every single point but, yes, they would key in the customer

15   number and see what they purchased in the past.

16   **Q.**   So, the daily report, that was the second component of

17   your pre-2007 OMP?

18   **A.**   Yes, correct.

19   **Q.**   The daily report, would this be what you're submitting,

20   all the transactions and ARCOS to the DEA?

21   **A.**   No.

22   **Q.**   This is something different?

23   **A.**   Yeah.  No.  So -- so, every time a customer orders an

24   opioid, it gets reported to the DEA three times.

25   **Q.**   I understand.  My question is, this is part of your

```
 1    SOMS or OMP Program --

 2    A.    That's the --

 3    Q.    Not your reporting requirement to ARCOS, correct?

 4    A.    Completely separate.

 5    Q.    Very good.  So, what is it that you were providing on a

 6    daily basis to the DEA in -- or pre-2007?

 7    A.    Any order -- we -- what we were providing is what we

 8    worked on for two years with the DEA on what -- I mean, I --

 9    Q.    I'm sorry, sir.

10    A.    I'm explaining it to you.

11    Q.    What I'm asking you is --

12              MR. NICHOLAS:  Your Honor --

13              BY MR. FARRELL:

14    Q.    Pre-2007, not -- not the policy that you enacted

15    afterwards?

16              MR. NICHOLAS:  If the witness -- I'm sorry to

17    object.  I would appreciate it if the witness could be

18    permitted to complete his answer and not be interrupted in

19    the middle of it.

20              THE COURT:  Yes.  He has the right to complete his

21    answer, Mr. Farrell.  Go ahead.  Sustained.

22              THE WITNESS:  And maybe this will clarify, Mr.

23    Farrell.  We worked with the DEA in '97 that I think you're

24    referring to; but then, I worked with them in '96, the same

25    process of working with them to design a program that was
```

1    acceptable for DEA.

2        So, in '96, we did work with them for two years.  What

3    did you want to see?  One of the big changes was, instead of

4    -- this is what DEA wanted, not -- was that let's compare

5    the customer to itself where, previous to that in the 90 --

6    early 90s, we would compare all pharmacies together in one

7    category.

8        So, if you had a small pharmacy, they're in the

9    same bucket as a huge pharmacy.  And then, they take an

10   average and anything over the average would be suspicious.

11   And so, the large customers would get reported frequently.

12   Smaller customers would never get reported.  And that was

13   also some of the confusion.

14       And I -- went to DEA and said, look at, you have these

15   huge reports that you're getting on a monthly basis and

16   you're getting 12,000 phone calls.  Let's see if we can

17   somehow develop a program that meets the monthly -- what

18   your expectations are for monthly and what we can do for

19   immediate to see if we can get those phone calls down.

20   And that was the two-year process.

21       So, we came up with the trigger point was we would

22   compare a customer to themselves for a four-month pattern

23   and anything over an average of that individual customer

24   with a multiplier would be coded as suspicious and that's

25   what was reported the next morning to the DEA.

1    **Q.**   So, you would take that particular customer's three --

2    **A.**   I think it's four-month average, but yes.  I think it's

3    four months.

4    **Q.**   You would take the four-month average of that

5    particular customer, correct?

6    **A.**   Correct.

7    **Q.**   And then you would multiply the average by a

8    multiplier?

9    **A.**   Correct.

10    **Q.**   What multiplier were you using?

11    **A.**   The one we've -- after two years of using different

12    multipliers, we settled at three, but that was completely

13    flexible.  Each office could have it zero.  They could have

14    it six.

15        We had some that wanted higher, six.  Some wanted zero.

16    It was completely up to the DEA office what multiplier they

17    wanted.

18    **Q.**   So, if the four-month average was ten, how many pills

19    could a pharmacy order before your system would flag it the

20    next month?

21    **A.**   It depends on what the DEA office wanted.  If they

22    wanted the three multiplier, it would be 30.  If they wanted

23    the zero multiplier, it would be ten.

24    **Q.**   Do you have anything in writing where the DEA has ever

25    said to AmerisourceBergen that it approves using a

```
 1    multiplier for purposes of monitoring suspicious orders of

 2    controlled substances?

 3    A.   We have a letter approving the program that we

 4    developed with the three multiplier.  I also have a letter

 5    -- I think I've seen a letter from the DEA office asking us

 6    to raise the multiplier to six.

 7    Q.   Do you have these letters?

 8    A.   Yes.

 9    Q.   Where?  Did you bring them?

10    A.   I don't have them with me.

11    Q.   Okay.  Because this letter, I believe, was the Burling

12    -- I'm sorry.

13    A.   Bergen Brunswig.

14    Q.   Bergen Brunswig that was discussed in Thomas

15    Prevoznik's deposition, correct?

16    A.   I'm sorry.  I didn't read his deposition.

17    Q.   I apologize.  I thought you said you read portions of

18    it.

19    A.   No.  I've not read any depositions in this trial.

20    Q.   All right.  And so, you say there's another letter

21    somewhere where the DEA actually asked you to raise it to

22    six?

23    A.   From the DEA office.  Again, remember, as I explained,

24    each DEA office have the opportunity to have it zero or ten,

25    whatever they wanted.  Again, the requirement is written in
```

1    these guidance letters is we report directly to the regional

2    DEA office.

3        Again, this is '96 to '98, pre-2007, pre-these letters,

4    but still, the CFR requires you to report suspicious orders

5    to the local DEA office.  So, we would consult with the

6    local DEA office of how they wanted those orders.

7               MR. FARRELL:  Judge, may I have one second to

8    confer?

9               THE COURT:  Yes.

10       (Pause)

11              MR. FARRELL:  Judge, without belaboring the point,

12   I would ask that during the break that counsel provide to

13   the plaintiffs the letter referencing the six times.

14              THE COURT:  Well, if you have it.

15              MR. NICHOLAS:  Well, it's been produced in

16   discovery, Your Honor.

17              MR. FARRELL:  Then we'll look for it.

18              THE COURT:  Okay.

19              BY MR. FARRELL:

20   **Q.**   So, if, in fact, the average is three times and the

21   average is ten, what would the next month -- what would be

22   the maximum amount of pills that could be ordered the next

23   month?

24   **A.**   They could get more.  This is a -- this is a -- this

25   was a --

1    **Q.**   My question is, if the four-month average was ten and

2    the multiplier was three, what would be the maximum amount

3    of pills the customer could order the following month?

4    **A.**   They could order as much as they want.

5    **Q.**   Okay.

6    **A.**   It could be flagged.  What would be flagged as

7    suspicious would be anything over 30.

8    **Q.**   So -- so, there would be 30?

9    **A.**   Yeah.  The program didn't stop, again, because of the

10    patient care, right?  If we put a hard stop on it based upon

11    just some multiplier without any knowledge of what the

12    doctors are doing or what's going on in that area and the

13    responsibility of the pharmacists, then we would be stopping

14    the supply chain of medications and our role sits in the

15    middle, I think, that we talked about yesterday.  We're in

16    the middle of the system.

17    Our system is to make sure we have products available,

18    maintained safely and securely, and ethical, efficacy,

19    ensure that when the pharmacy orders it for a patient, it's

20    available to them.

21    **Q.**   So, to be clear, prior to 2007, a customer or pharmacy

22    could order as many pills as they wanted; that you would

23    ship it and then you would report anything in excess of

24    three times to the DEA?

25    **A.**   They can order, but that doesn't necessarily mean we

1    would ship it.  Again, it depends upon -- you asked what

2    would be categorized as suspicious and identified.  That

3    doesn't mean people just can't order -- they can place an

4    order.  It doesn't mean it's going to be filled.

5        So, if they ordered something, you know, large, one,

6    the order filler would probably say this is crazy.  Our

7    systems have quantities for -- because people put in order

8    entry errors.  So, if they meant to order ten and they

9    ordered a hundred, the system would capture that for all

10    products, not just for controlled substances.

11    **Q.**   I'm going to have P-82.

12           MR. FARRELL:  Judge, may I approach the witness?

13           THE COURT:  Yes.

14           MR. FARRELL:  For the record and for counsel, the

15    documents that were identified as the Suspicious Order

16    Monitoring Programs produced in discovery are referenced in

17    Appendix A of the stipulation and is also Appendix A to

18    AmerisourceBergen's fourth supplemental discovery responses.

19        For the purposes of today, I'm no going to go through

20    all of them, but I have ten of them that I would like to

21    proffer for the Court.

22           BY MR. FARRELL:

23    **Q.**   Mr. Zimmerman, do you recognize this document?

24    **A.**   It looks like a policy document.

25    **Q.**   From where?

1    **A.**    From Regulatory Compliance and Security Services.

2    **Q.**    For which company?

3    **A.**    For -- it would -- I think Bergen Brunswig, but I don't

4    know if it says it on here.

5    **Q.**    This would be 1999?

6    **A.**    Yes.

7    **Q.**    And is this the -- one of the policies within the OMP

8    Program at what is now AmerisourceBergen prior to 2007?

9    **A.**    That's what it appears to be.

10           MR. FARRELL:  Judge, at this time, I would ask for

11    the admission of P-82.

12           THE COURT:  Any objection?

13           MR. NICHOLAS:  No objection.

14           MS. MAINIGI:  No objection, Your Honor.

15           THE COURT:  Hearing no objection --

16           MR. HESTER:  No objection, Your Honor.

17           THE COURT:  It's admitted.

18                    **PLAINTIFF EXHIBIT P-82 ADMITTED**

19           BY MR. FARRELL:

20    **Q.**    On P-82, if you look to Page 2, you'll see the very

21    last sentence of the first paragraph.  Page 2, please.  Is

22    that for suspicious order monitors, you do identify the

23    three-times multiplier, correct?

24    **A.**    Well --

25    **Q.**    Page 2?  Top of the page, bottom line, first paragraph.

1     "The monthly average times factor for ARCOS items is

2     presently set by DEA at three times the monthly average."

3     Do you see that?

4     **A.**   I do.

5     **Q.**   Now, do you have any documentation that the DEA

6     approved this with the three-times multiplier?

7     **A.**   So, one more point of clarification.

8     **Q.**   Yes, sir.

9     **A.**   So, when we designed a new program in '98, we continued

10    with the process, which is this ARCOS Excessive Order Report

11    that a lot of the industry was use -- utilizing and we had

12    to continue to send that report to the DEA monthly in

13    addition to the other newly designed.  This is in addition

14    to.  So, this was another reporting requirement.

15         I got some letters from DEA saying we could stop

16    sending this monthly report but, again, it was up to each

17    district DEA office.

18         So, this report was in place before -- it was like

19    1980.  And so, the descriptions under the reports was a

20    report that was in place in the 80s and continued on until

21    the DEA told us we didn't need to send it anymore.  It's in

22    addition to the one we described just a moment ago.

23    **Q.**   Next is going to be a reference, I believe, a 2001

24    policy and procedure.  It's P-953.

25              MR. FARRELL:  Judge, may I approach?

```
 1                    THE WITNESS:  Thank you.

 2                    BY MR. FARRELL:

 3    Q.    Sir, do you recognize this document?

 4    A.    Yeah.  Let me just -- I'm almost done.  Yes.

 5    Q.    And what is it?

 6    A.    It is a Suspicious Order Reporting Policy and

 7    Procedures.

 8    Q.    For which company?

 9    A.    It appears to be AmerisourceBergen.

10    Q.    Do you recognize this as the Suspicious Order Reporting

11    Policy or a policy at AmerisourceBergen dated January 12,

12    2001?

13    A.    It appears to be.

14                    MR. FARRELL:  Judge, at this time, I would ask for

15    the admission of 953.

16                    THE COURT:  Any objection?

17                    MR. NICHOLAS:  No objection.

18                    MR. HESTER:  No objection, Your Honor.

19                    MS. MAINIGI:  No objection, Your Honor.

20                    THE COURT:  It's admitted.

21                    PLAINTIFF EXHIBIT 953 ADMITTED

22                    BY MR. FARRELL:

23    Q.    The next document is P-26290.

24                    MR. FARRELL:  Judge, may I approach?

25                    THE COURT:  Yes.
```

1          BY MR. FARRELL:

2     **Q.**   Sir, do you recognize this document?

3     **A.**   It appears to be the Security Regulatory Policy and

4     Procedures Manual for AmerisourceBergen for our distribution

5     centers.

6     **Q.**   And I'd like you to turn to Page 31.  I'm sorry.  It's

7     going to be actually Page 31 of the actual policy Bates

8     stamped at the bottom.  There we go.

9          And if you'll highlight (b) all the way through.

10    That's good right there.

11         I'll direct your attention to what's on the screen as

12    Paragraph B, excessive suspicious orders of controlled

13    substances.  Do you see that?

14    **A.**   Yes.

15    **Q.**   Sir, is this the -- is this the CSRA Policy and

16    Procedure Manual for Distribution Centers at

17    AmerisourceBergen Effective 2004?

18    **A.**   Yes.

19    **Q.**   And in it, it references that there are directives that

20    the compliance coordinator is responsible for assuring all

21    associates are thoroughly familiar with procedures for

22    recognizing and reporting suspicious orders; agreed?

23    **A.**   Yes.

24         MR. FARRELL:  And we're going to go through a

25    couple of those policies and procedures, but for now, I'd

1    like to ask for P-26290 to be entered into the record.

2            MR. NICHOLAS:  Your Honor, if he's offering this

3    into evidence, we have no objection.

4            THE COURT:  Are you offering it, Mr. Farrell?

5            MR. FARRELL:  I'm sorry?

6            THE COURT:  Are you offering it?

7            MR. FARRELL:  I'm sorry, yes.  We're moving it

8    into the record, please.

9            THE COURT:  All right.  And I hear no objection;

10   is that right?

11           MR. HESTER:  No objection.

12           MS. MAINIGI:  No objection.

13           THE COURT:  All right.  It's admitted.

14               **PLAINTIFF EXHIBIT P-26290 ADMITTED**

15           MR. FARRELL:  Judge, this might be a good --

16           THE COURT:  Well, we need to switch court

17   reporters here.  So, that's a good suggestion.  Let's be in

18   recess until 10:45.

19       (Recess taken)

20       (Proceedings resumed at 10:47 a.m.)

21           THE COURT:  Mr. Zimmerman, you can resume the

22   witness stand, sir.

23   BY MR. FARRELL:

24   **Q.**  Mr. Zimmerman, when we -- before we took off and

25   took a break, we were referencing the 2004 manual that

```
 1    referenced policies and procedures that

 2    AmerisourceBergen expected to be followed at the

 3    distribution centers.  I'm going to show you a couple of

 4    those policies and procedures and hopefully I have them

 5    correct.

 6         First is going to be P-26293 which is Policy Number

 7    CSRA 2.12, December 1st, 2005.  I'm sorry.  I think I -- did

 8    I misspeak?  26293.

 9              MR. FARRELL:  Judge, may I approach?

10              THE WITNESS:  Thank you.

11    BY MR. FARRELL:

12    Q.   Mr. Zimmerman, do you recognize this document?

13    A.   It appears to be a CSRA policy from December, 2005.

14    Q.   And is this a policy that was adopted and enforced at

15    CSRA under your command?

16    A.   It appears to be.

17    Q.   What is the date of the document?

18    A.   December 1st, 2005.

19    Q.   What is the name of the document?

20    A.   "Possible Excessive/Suspicious Order Review."

21    Q.   What is the policy number?

22    A.   CSRA 2.12.

23              MR. FARRELL:  At this time I'd ask for the

24    admission of P-26293.

25              THE COURT:  Any objection?
```

```
 1              MR. NICHOLAS:  No objection.

 2              MS. MAINIGI:  No objection, Your Honor.

 3              MR. HESTER:  No objection, Your Honor.

 4    BY MR. FARRELL:

 5    Q.   If you would, for the record, please, read in the

 6    Purpose.

 7    A.   "To ensure compliance with applicable state and federal

 8    regulations, AmerisourceBergen Corporation has designed this

 9    program to review the ordering activity of its customers to

10    identify the existence of possible excessive or suspicious

11    orders of controlled substances and listed chemicals."

12    Q.   Now, for purposes of references on our board, this

13    policy was in effect after the DEA distributor initiative

14    meeting; correct?

15              MR. NICHOLAS:  Your Honor, may I interpose an

16    objection?

17         The objection relates to the board, the use of the

18    flags on the board because the board, as I understand it,

19    represents all -- distribution from all distributors.  So

20    we're, we're mixing metaphors or, or -- I don't know how to

21    put it, but the questioning is not matching up with what the

22    display is showing, particularly to the extent that he's

23    putting flags up there that supposedly show notice.  But

24    this is -- what's being depicted isn't particular to

25    AmerisourceBergen.  It's, it's all distribution over this
```

```
 1    period of time from, from everyone.  So I'll object to the

 2    use of the board at this stage.

 3              THE COURT:  Well, what about that, Mr. Farrell?

 4              MR. FARRELL:  Judge, first, it's a demonstrative.

 5        Second of all, as you recall, the defendants made great

 6    hay with pointing out that this chart is publicly available

 7    to the City of Huntington and Cabell County.  And if it was

 8    available to the City of Huntington and Cabell County, it

 9    certainly was available to those that were selling pills to

10    see the volume of pills coming into the geographic region.

11              MR. NICHOLAS:  But, but this chart is, is showing

12    the volume of pills nationwide for -- I'm sorry -- the

13    volume of pills to, to this region from everyone.  So I'm

14    just not sure -- I'm not sure that the, the flags make sense

15    in relation to the chart.  If it was just AmerisourceBergen

16    information, I guess I could understand it, but it's not.

17              THE COURT:  He's saying you're using all three, if

18    I understand him correctly, information relative to all

19    three defendants to elicit the testimony of

20    AmerisourceBergen.

21              MR. NICHOLAS:  And I believe it's more than all

22    three.  I think it's all distributors.

23              MR. FARRELL:  So my point ultimately, Judge, is

24    that I can pull up whatever chart we want.  This is the

25    chart that everybody agrees shows the total volume of pills
```

1    that were being sold into the region that AmerisourceBergen

2    would have had notice of when they continued to sell pills

3    into Huntington/Cabell County.  I'm not even making it

4    from -- I'm sorry.

5          THE COURT:  I'm going to overrule the objection

6    and allow it.  I, I -- if we had a jury, I think there would

7    be a danger of confusing the jury.  And there's always a

8    danger that I'll get confused, but I don't think I am at

9    this point and I think I can draw the distinction.

10         So go ahead, Mr. Farrell.

11         MR. FARRELL:  Thank you, Your Honor.

12   BY MR. FARRELL:

13   Q.   So what we're talking about is from after -- this

14   is the policy, 26293, that is in force by

15   AmerisourceBergen after the first -- this meeting with

16   the DEA in 2005 and before the Immediate Suspension

17   Order that was served on AmerisourceBergen.  Correct?

18   A.   Yeah.  This is the policy we initiated after our

19   meeting with DEA in 2005.  This policy is in addition to our

20   other suspicious -- this is in addition, not that --

21         COURT REPORTER:  I'm sorry?

22         THE WITNESS:  It's not the suspicious order

23   reporting policy.  This is an additional policy to review

24   customers that we put in place after our DEA meeting.

25   BY MR. FARRELL:

```
 1   Q.   I apologize if I hadn't made it clear.  The 2004
 2   manual, this thicker document I handed you, that's the
 3   CSRA manual; correct?
 4   A.   It's the manual, correct.
 5   Q.   And it references additional policies that may be in
 6   force; correct?
 7   A.   I, I'm not understanding the question.
 8   Q.   So we -- I had you read from the manual --
 9   A.   Yes.
10   Q.   -- that the Chief Compliance Officer is responsible for
11   the training and enforcement of policies and procedures
12   promulgated by AmerisourceBergen.  Do you recall that
13   testimony?
14   A.   I remember something -- yes.
15            MR. FARRELL:  Judge, I --
16            THE WITNESS:  You said that -- you, you mentioned
17   a policy review.  You mentioned it said other policies.  And
18   I just want to make sure I understand exactly what we're
19   talking about.
20       I said -- I just -- my comment was just this -- I just
21   want to make sure you understood this wasn't our only
22   suspicious order monitoring policy in 2005.
23   BY MR. FARRELL:
24   Q.   Yes, sir.  Thank you.  What I'm holding is 26293.
25   This is one of the policies AmerisourceBergen had in
```

```
 1    place in 2005 related to suspicious orders?

 2    A.   Yes, 2.12, sorry.

 3    Q.   I got distracted.  Did we move this into evidence?

 4    Yes.

 5         I'm going to show you now the evolution of 2.12 and I

 6    believe that the, the next version can be found at P-253.

 7         May I approach?

 8              THE WITNESS:  Thank you.

 9    BY MR. FARRELL:

10    Q.   Sir, do you recognize this document?

11    A.   It appears to be the CSRA Policy 2.12.

12    Q.   And does this appear to be the amendment of P-26293

13    dated May 8th, 2007?

14    A.   It's revised May 8th, 2007, correct.

15    Q.   It's the same policy, just a revised version on

16    May 8th, 2007?

17    A.   Yes.

18              MR. FARRELL:  Judge, I'd ask for admission of

19    P-253.

20              MR. NICHOLAS:  No objection.

21              MS. MAINIGI:  No objection.

22              THE COURT:  Hearing no objection --

23              MR. HESTER:  No objection, Your Honor.

24              THE COURT:  -- it's admitted.

25    BY MR. FARRELL:
```

1    **Q.**   Sir, again you'll recall, sir, that the Immediate

2    Suspension Order served by the DEA was on April 19th,

3    2007?

4    **A.**   It was actually served on, I think it was April 24th.

5    The letter is dated April 19th.

6    **Q.**   Sorry.  In April of 2007 AmerisourceBergen was served

7    with an Immediate Suspension Order.  And was this policy

8    enacted thereafter?

9    **A.**   The policy was enacted in 2005.  It was revised in

10   2007.  It was always in place.  The policy was in place at

11   the time of the suspension.  It was revised on May 8th.

12   **Q.**   Immediately after the Immediate Suspension Order but

13   prior to entering into the settlement agreement?

14   **A.**   That's what the date would portray.

15   **Q.**   I'm going to have you look at the very bottom of 253.

16   Can you read into the record the last sentence?

17   **A.**   "Orders that are determined to be suspicious will be

18   reported to DEA without being shipped."

19   **Q.**   Sir, on May 8th, 2007, did AmerisourceBergen adopt a

20   policy to block suspicious orders?

21   **A.**   That's what the document indicates.

22   **Q.**   I'm going to show you the next evolution which is

23   October 1st, 2008.  It would be P-26292.

24              MR. FARRELL:  Judge, may I approach?

25              THE COURT:  Yes.

```
 1              THE WITNESS:  Thank you.

 2     BY MR. FARRELL:

 3     Q.   Do you recognize this document, sir?

 4     A.   It appears to be the Order Monitoring Program CSRA

 5     Policy 2.12 revised October 1st, 2008.

 6              MR. FARRELL:  Judge, at this time I'd ask for the

 7     admission of P-26292.

 8              THE COURT:  Objection?

 9              MR. NICHOLAS:  No objection.

10              MR. HESTER:  No objection, Your Honor.

11              THE COURT:  It's admitted.

12     BY MR. FARRELL:

13     Q.   I'll ask you to turn to Page 2 and look at

14     Paragraph 3.  Will you read the first sentence, please?

15     A.   You want me to read the paragraph?

16     Q.   You can, sir.

17     A.   "On a monthly basis CSRA will review a customer product

18     mix-report to help identify customers purchasing more than a

19     pre-determined percentage of controlled substances versus

20     non-controlled substances.  CSRA will investigate and

21     identify customers whose purchasing activity warrants

22     further review."

23     Q.   I'm going to put a pin in this and we're going to flip

24     to a different document.  It will be P-2876.  I'll give you

25     a minute to read it.  This is an email that you're on the
```

```
 1   chain.

 2              MR. FARRELL:  Judge, may I approach?

 3              THE COURT:  Yes.

 4              THE WITNESS:  Thank you.

 5   BY MR. FARRELL:

 6   Q.   We'll keep this document up for a minute on the

 7   screen while you review the other one, please.

 8        (Pause)

 9        Sir, I'm going to be asking you directly about the

10   email that you wrote on the bottom of Page 2.  But, in

11   general, do you recognize this document?

12   A.   I, I -- yeah, I mean, I wrote this email it looks like.

13   Q.   This is an email that you wrote.  What is the date of

14   it?

15   A.   May 21st, 2008.

16   Q.   Who did you send it to?

17   A.   I sent it to the divisional RVPs.

18   Q.   Sir, will you, will you tell the Court what a

19   divisional RVP is?

20   A.   So outside of the CSRA structure we went over

21   yesterday, the business structure itself is the, is the

22   regional structure which has a Regional Vice President in

23   charge of all operations for the distribution centers within

24   their region.  That's sales, operations.

25   Q.   And would this be to all of the Regional Vice
```

1    Presidents including the Lockbourne, Ohio, facility?

2    **A.**   They would have, they would have been included.

3    **Q.**   Okay.  Now, when you look at the email that you sent --

4          Can we bring up 2876, the bottom of Page 2, please.

5          Do you see the email that starts with "From Chris

6    Zimmerman"?

7    **A.**   Are we on the second page?

8    **Q.**   Bottom of Page 2.

9    **A.**   Yes.

10   **Q.**   This is an email from you; correct?

11   **A.**   Correct.

12   **Q.**   This is an email that you sent in your capacity as the

13   Senior Vice President of CSRA at AmerisourceBergen; correct?

14   **A.**   I think I was VP at the time but, yes.

15   **Q.**   And this is a type of email that you would have sent to

16   your subordinates in the course of your job

17   responsibilities; correct?

18   **A.**   Yes.

19   **Q.**   You say there in the first paragraph starting, "One of

20   the reports," will you read that into the record, please?

21   **A.**   "One of the reports that CSRA's diversion control group

22   reviews on a monthly basis is the percentage of controlled

23   substances to all Rx that a customer purchases from ABDC.

24   The average retail pharmacy purchases between 5 and

25   15 percent controlled substances.  In our DEA negotiations,

1   DEA indicated that one sign that a pharmacy may be diverting

2   controlled substances is if a pharmacy purchases a high

3   percentage of controlled substances."

4   **Q.**   Will you go to the bottom of the page with the

5   statement, "Would it not make sense."

6   **A.**   Want me to read it out loud?

7   **Q.**   Please.

8   **A.**   "Would it not make sense that if ABDC is going to

9   assume the risk of supplying these customers with their

10   controlled substances, shouldn't ABDC also receive the

11   benefit of supplying these customers with the low risk

12   product as well?"

13   **Q.**   Now, I'd like to flip back to Policy CSRA 2.12 dated

14   October 1st, 2008.  I'd like to now go to Paragraph 8 which

15   is the top of Page 3.  I'll give you a second to read it.

16        (Pause)

17        Have you read it, sir?

18   **A.**   Just a second.  Just eight; right?

19   **Q.**   Just eight.

20   **A.**   Okay.

21        MR. FARRELL:  Will you pull it up, please?  26292,

22   Page 3, Paragraph 8.  Thank you.  The whole paragraph,

23   please.

24   BY MR. FARRELL:

25   **Q.**   Will you read the first sentence, please.

1    **A.**    "The standard ABC will use is whether it is more likely

2    than not that the customer is permitting controlled

3    substances to be illegally diverted, whether knowingly or

4    due to its negligence in complying with its legal

5    obligations for professional practice".

6    **Q.**    Stop there for a second.  So this is a policy effective

7    October of 2008 that you would be looking at the conduct of

8    the pharmacy when filling prescriptions when enforcing your

9    regulatory responsibilities.  Agreed?

10   **A.**    I mean, you've added prescriptions.  We would be

11   looking at their purchasing patterns and history, not the

12   actual practice.

13   **Q.**    So then when you go to the next sentence, would you

14   please read it?

15   **A.**    "If so, ABC will cut off further sales of controlled

16   substances or listed chemicals that appear are being

17   diverted."

18   **Q.**    This is an acknowledgment that if your OMP system flags

19   an order as suspicious that you will cut off sales to that

20   customer until you've resolved that suspicion.  Agreed?

21   **A.**    Yeah.

22   **Q.**    If you go down and look at the, the first, or the next

23   sentence.

24   **A.**    "Decisions will be made on a case-by-case basis and

25   will depend upon a full consideration of the circumstances

1    including --"  Want me to -- it runs through all the

2    different things to consider.

3    **Q.**   Yeah.  The ones that I guess I would particularly be

4    interested in is the first one is you'd look at the ordering

5    patterns of the customer; correct?

6    **A.**   That's what it says, ordering patterns of the customer.

7    **Q.**   And you'd look at the product mix and the size and

8    frequency of the orders?

9    **A.**   Yes.

10   **Q.**   And you would look at whether or not the customers of

11   the pharmacy are primarily paying in cash?  Whether patients

12   are disproportionately cash customers?

13   **A.**   Okay, I see that.

14   **Q.**   You would be looking at the customers of your customer?

15   **A.**   We would be looking at the, the -- how -- and this is

16   in the due diligence portion of the, of the program, not an

17   ongoing basis, but to get an understanding of the type of

18   business that we're going to be opening up.

19          MR. FARRELL:  Judge, at this point I'd like to

20   move for admission of P-26292 as well as P-2876.

21          THE COURT:  Any objection?

22          MR. NICHOLAS:  No objection.

23          MR. HESTER:  No objection, Your Honor.

24          MS. MAINIGI:  No objection, Your Honor.

25          THE COURT:  It's admitted.

```
 1   BY MR. FARRELL:

 2   Q.   For purposes of completeness, I'm going to look at

 3   P-253.

 4              MR. FARRELL:  Judge, while I'm sorting this out,

 5   I'll proffer for the record that there is one further

 6   amendment to 2.12.  It's dated January 5th, 2010.  It's

 7   P-253 that we'll circle back to.

 8   BY MR. FARRELL:

 9   Q.   Okay.  The next document that I'm going to show

10   you, Mr. Zimmerman, is P-187.

11              MR. FARRELL:  May I approach?

12              THE WITNESS:  Thank you.

13   BY MR. FARRELL:

14   Q.   For reference for the Court, this is a document --

15   a memorandum purportedly written by you dated June 29th,

16   2007.  The subject matter is "Update:  OMP Distribution

17   Center Procedures."  I'll give you a minute to read

18   that.

19        (Pause)

20        Sir, are you ready?

21   A.   Yes.

22   Q.   Do you recognize this document?

23   A.   It is a memorandum I -- appears I wrote on June 29th,

24   2007.

25   Q.   And who did you send it to?
```

1    **A.**    Distribution Center Associates.

2    **Q.**    Now, what, what is the title of the document?

3    **A.**    "OMP Distribution Center Procedures."

4    **Q.**    And is it fair to say this is a memorandum that you

5    drafted and circulated to the distribution center associates

6    regarding the new updates to your OMP policy?

7    **A.**    Correct.

8           MR. FARRELL:  Judge, at this time I'd ask for the

9    admission of P-187.

10          MR. NICHOLAS:  No objection.

11          MR. HESTER:  No objection, Your Honor.

12          MS. MAINIGI:  No objection, Your Honor.

13          THE COURT:  It's admitted.

14   BY MR. FARRELL:

15   **Q.**   This document was circulated a week after your

16   settlement agreement with the DEA?  The DEA settlement

17   agreement is dated June 22nd, 2007.  It's P-9.  And this

18   document would have been written a week later?

19   **A.**   Yes.

20   **Q.**   I'm going to ask you to look on Page 2.

21   **A.**   And just to clarify, it did come from me and also the

22   operations person, Frank Napoli.  I just noticed that.  It

23   wasn't just from me.  It was a joint memo from me and

24   operations.

25   **Q.**   Yes, sir.  Thank you.

1        On Page 2, the first paragraph, the second to last

2   sentence, will you read aloud the second to the last

3   sentence in this memo that you sent to all the distribution

4   centers?

5   **A.**   Orders that -- sorry.  "Orders that are investigated by

6   CSRA will be reported to the Drug Enforcement

7   Administration."

8   **Q.**   I'm sorry.  Continue.

9   **A.**   "CSRA will also review released and cancelled orders to

10  confirm they are being handled consistently and

11  appropriately."

12  **Q.**   This is the sentence I was trying to get to.  Will you

13  read the next sentence, please?

14  **A.**   "All subsequent orders that continue to exceed the

15  monthly threshold will be rejected from processing until the

16  OMP held item is released."

17  **Q.**   This is, again, a memorandum that you sent to the

18  distribution centers that if a customer exceeds the monthly

19  threshold, they're going to reject all other items from the

20  customer until you clear it.  Correct?

21  **A.**   Correct.

22  **Q.**   Now I'm going to have you flip to the second to last

23  page.  And it's hard to see, so maybe we can -- right there.

24  No, back up.  There we go.

25      This is a diagram from your memorandum.  And is this

```
 1    a -- I guess we would call it a flowchart of the order

 2    monitoring process that you were adopting in June of 2007?

 3    A.   Correct.

 4    Q.   And you'll see that there's a decision matrix that

 5    happens once the orders are placed and flagged at

 6    AmerisourceBergen distribution centers.  Agreed?

 7    A.   Agreed.

 8    Q.   And I'm assuming here, since we don't have a color

 9    copy, that where I'm going to point right here with this

10    blacked out, blacked out section, do you see the triangle

11    "Does order pass initial interrogation?"  "Pass."  And what

12    would you guess would be in that black box?  Fail?

13    A.   Hold, yeah.  I'm not sure.

14    Q.   Non-pass?

15    A.   I guess.  I'm not sure what it says.  I can't recall.

16    Q.   That would indicate that your, your electronic

17    monitoring algorithm has flagged something; correct?

18    A.   Correct.

19    Q.   And that it would be subject to your division doing due

20    diligence; correct?

21    A.   There's one quick -- the DC staff is a step before it

22    gets to the -- to my group.

23    Q.   Very good.  And then I would like to highlight on the

24    far right, it says, "Hold current and all future orders from

25    customer of like items."
```

1          This is in your system that if you get a suspicious

2     order from a customer, the account is frozen until you clear

3     it through due diligence.  Agreed?

4     **A.**   Of like items, same product family, correct.

5     **Q.**   That's a great point.  Not all of the items, just the

6     base code; for instance, all oxycodone products?

7     **A.**   I believe so.  I'm not, I mean, --

8     **Q.**   Or hydrocodone products?

9     **A.**   By reading that, that's how I would interpret it.

10    **Q.**   Would you, would you think that it applied to all

11    opioids or would you have divided it out between, say,

12    fentanyl patches, oxycodone pills, hydrocodone pills?

13    **A.**   It would -- again, remember, this is at the beginning

14    of our trial as we're working on the program with DEA.  It

15    was after we signed our agreement but before they released

16    our license.

17         So we had two months that we were working through any

18    kinks that we identified.  This was the initial

19    out-of-the-chute program we put in place.  And over the next

20    couple months, we continued to fine-tune it with DEA until

21    it got to where they liked it.

22              MR. FARRELL:  Judge, cleaning up now, I believe I

23    now have the last iteration that I intend to present to the

24    Court of 2.12.  It's P-44002.  May I approach?

25              THE WITNESS:  Thank you.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    BY MR. FARRELL:

2    **Q.**   Without belaboring the point, sir, what is this

3    document and what did it replace and when was it

4    effective?

5    **A.**   It looks like it's a revised version of CSRA .2 -- 2.12

6    that was revised on January 5th, 2010.

7              MR. FARRELL:  Judge, at this time we would move

8    for admission of the document.

9              THE COURT:  Any objection?

10             MR. HESTER:  No objection.

11             MR. NICHOLAS:  No objection, Your Honor.

12             THE COURT:  Hearing no further objection, it's

13   admitted.

14             MR. FARRELL:  Judge, I'm going to take a small

15   detour now before we get into the two other black flags and

16   talk a little bit about corporate culture.

17        With your indulgence, I'd like to circulate P-212.

18             MR. NICHOLAS:  Your Honor, I will object to the

19   characterization of the evidence to come, whatever he's

20   going to ask.

21             THE COURT:  Yeah, sustained.

22             MR. FARRELL:  Judge, may I approach?

23             THE COURT:  Yes.

24   BY MR. FARRELL:

25   **Q.**   Sir, do you recognize this document?

```
 1    A.    Looks like an email string.

 2    Q.    Involving who?

 3    A.    It starts with Joe Tomkiewicz to Ed Hazewski and then

 4    to Julie Eddy.

 5    Q.    This is an email that you received in the course of

 6    your role as Senior Vice President of CSRA at

 7    AmerisourceBergen?

 8    A.    I received this email, yes.

 9    Q.    And this email came from and involved individuals that

10    report to you and are in charge of CSRA and suspicious order

11    monitoring in places including Huntington/Cabell County,

12    West Virginia?

13    A.    Yes.

14              MR. FARRELL:  Judge, I'd ask for admission of

15    P-212.

16              THE COURT:  Is there any objection to that?

17              MR. NICHOLAS:  No objection.

18    BY MR. FARRELL:

19    Q.    Mr. Zimmerman -- I'm sorry.

20              MR. HESTER:  No objection, Your Honor.

21              THE COURT:  Ms. Mainigi.

22              MS. MAINIGI:  No objection, Your Honor.

23              THE COURT:  Okay.  It's admitted.

24    BY MR. FARRELL:

25    Q.    Mr. Zimmerman, what is this email?
```

1    **A.**   It looks like a parody, a poor excuse of a parody I

2    would think.  I'm not sure.  I don't know if it came from a

3    paper or where it was, where it came from, but it's a parody

4    of the opioid abuse situation at the time.

5    **Q.**   Did you endorse the parody?

6    **A.**   No, I don't endorse it.  I think it's a reflection of

7    the environment, not, none whatsoever.  I forwarded it to

8    our government affairs person.  We are working with the

9    government agencies and the states making, giving them as

10   much information as we can on what we receive.

11       My diversion people said Google alerts, they get things

12   that come in with certain buzz words.  But I'd rather them

13   not forward this on.  If it was a business purpose to alert

14   people to what, what you're seeing in the social media or on

15   the internet is one thing.  But if it was as a, as taking

16   things not seriously, I would definitely not support that.

17   **Q.**   Well, the email that you -- the top of the chain you

18   sent this email to Julie Eddy.  And who is Julie Eddy?

19   **A.**   Julie Eddy is a state government affairs person used to

20   work for the Florida Department of Health.

21   **Q.**   And it says there, "I sent this to you a month or so

22   ago.  Nice to see it recirculated," smiley face.  So I take

23   it you had received this earlier?

24   **A.**   No, I had -- I don't recall ever receiving it earlier.

25   **Q.**   I'm going to next reference P-17046, 17046.  Don't

```
 1    bring it up yet, please.
 2              MR. FARRELL:  Judge, may I approach?
 3    BY MR. FARRELL:
 4    Q.   Sir, do you recognize this document?
 5    A.   Yes.  It's an email from me to government affairs at
 6    had.
 7    Q.   And did you cut and paste the parody and then forward
 8    it to had?
 9    A.   It appears that -- it appears that way.
10    Q.   In fact, you did forward it on?
11    A.   I forwarded -- yes, I forwarded it on to government
12    affairs, correct.  I forwarded it on to Julie Eddy within
13    our government affairs because they are the ones that are
14    lobbying at the state and working on regulations on opioids.
15    And, so, I feel that anything out -- that any information I
16    have I share with them, yes.
17    Q.   Will you bring up P-17046, please.
18         So the title of this is "Saw This And Had To Share It."
19    Do you see that?
20    A.   Yes.
21    Q.   And this is a parody sung to the tune of *The Beverly
22    Hillbillies*.  Do you know what *The Beverly Hillbillies* is?
23    A.   I do.
24    Q.   What is it?
25    A.   It was a TV show.
```

1    **Q.**    There was an opening intro to the song; correct?

2    **A.**    Yes.

3    **Q.**    So somebody has rewritten the lyrics to this song and

4    then turned it into a parody and it circulated amongst your

5    CSRA department.  Agreed?

6    **A.**    It was circulated in my department, through my

7    department, yes.  And I forwarded it on to the government

8    affairs folks, yes.

9            MR. FARRELL:  Judge, I'd ask for both P-212 and

10   P-17046 be admitted into the record.

11           THE COURT:  Any objection?

12           MR. NICHOLAS:  No objection.

13           MR. HESTER:  No objection.

14           MS. MAINIGI:  No objection.

15           THE COURT:  It's admitted.

16   BY MR. FARRELL:

17   **Q.**    All right.  Aside from the parody, I think that I'd

18   like to use it as a vehicle to discuss a couple of

19   topics.

20       The first thing I'd like to identify -- I hope I get

21   this right -- it's to the tune of *The Beverly Hillbillies*,

22   but it says "A poor mountaineer."  Do you see that?

23   **A.**    I see that.

24   **Q.**    Sir, do you acknowledge that here in West Virginia that

25   we sometimes recognize ourself or refer to ourselves as

1    Mountaineers?

2    **A.**    Yes.

3    **Q.**    Do you know what the mascot for West Virginia

4    University is?

5    **A.**    Mountaineers.

6    **Q.**    And it's making a reference to keeping his habit fed.

7    But what, what I'm particularly interested in is this last

8    sentence.  Will you read that aloud, please?

9    **A.**    "About pills that is, Hillbilly heroin"?  That one?

10   **Q.**    Yes.  Then it says "OC."  Do you know what OC means?

11   **A.**    Yeah.  The term early on Oxycontin, what is also

12   referred -- I have seen in several articles as hillbilly

13   heroin, yes.

14   **Q.**    So you'll recognize or acknowledge that at least in

15   2011 hillbilly heroin and pills, prescription pills have

16   some reference point to each other?

17   **A.**    What's the question?  What -- could you repeat the

18   question, please?

19   **Q.**    Do you know what hillbilly heroin is?

20   **A.**    Hillbilly -- I've heard Oxycontin referred to as

21   hillbilly heroin, yes.

22   **Q.**    So in common parlance, you understand that there is a

23   connection between the reference in this parody you

24   circulated between hillbilly heroin and prescription

25   opiates?

**A.**   Right, to the government affairs folks I did.  That's correct.

**Q.**   Now, the next thing it says is it says "Pain clinics, cash and carry."

Again, in 2011 you are acknowledging and recognizing that a source of prescription pills or hillbilly heroin are pain clinics that have cash and carry?

**A.**   I forwarded this parody on to the government affairs, yeah.  I don't even know if I read the whole thing.  Again, it was the context of the environment that we were under.  I forwarded it on to them.

Mainly, it was -- Florida had regulations that we were looking at at the time.  And it was, you know, relevant.  Florida was mentioned in the parody.

**Q.**   And the reason it was mentioned was that the story of this is that Mountaineers are driving down to Florida to get pills; correct?

MR. NICHOLAS:  Your Honor, I'd like to just object only to the extent that the witness is being -- starting to be asked to do a lot of interpreting.  I'm letting him answer questions about the parody without a lot of objecting, but we're getting close to just sort of de-constructing something which is not really what he's testifying about.

THE COURT:  Well, I'll overrule the objection and

1    you can ask him, Mr. Farrell.

2            THE WITNESS:  So what was the question?

3    BY MR. FARRELL:

4    Q.   This is an implicit recognition that there was pill

5    migration from Florida up into Mountaineer land?

6    A.   Somebody wrote a parody that included that, yes.

7    Q.   Now, this is the other thing.  "A bevy of pillbillies."

8    What does a "bevy of pillbillies" mean to you, sir?

9    A.   A lot of pill -- a lot of pillbillies.  I mean, the

10   pillbilly term I've seen, or referenced as individuals that,

11   that -- usually it's the people that go down and pick up the

12   drugs and then resell them.  It's the -- I don't know the

13   words, dealers, not, not the actual unfortunate patients,

14   the victims.

15   Q.   And then the final refrain here is, "Pill mills, that

16   is.  Buy some pills.  Take a load home."

17           Again, this is a recognition.  Have you heard of the

18   Blue Highway?

19   A.   I heard that reference in the deposition, the Blue

20   Highway.  Yeah, I think that's what one of the terms was

21   used for that -- moving it from -- moving it up from

22   Florida.

23   Q.   How about Oxy Express?

24   A.   I'm sure I've heard that -- I mean, over the years I'm

25   sure I've heard that term as well or have seen it before.

1    Q.   Next is P-17051.  Don't bring it up yet, please.

2              MR. FARRELL:  May I approach, Judge?

3              THE WITNESS:  Thank you.

4    BY MR. FARRELL:

5    Q.   Sir, do you recognize this document?

6    A.   It appears to be an email from me to a large group.  It

7    looks like most of them are CSRA it appears to be and some

8    operations as well.

9    Q.   What's the date?

10   A.   It is August, 2007.

11   Q.   What's the subject line?

12   A.   "Article on Rogue Pharmacies."

13   Q.   Sir, is this an email that you forwarded on to those in

14   your CSRA division on August 23rd, 2007?

15   A.   Yes.

16   Q.   This is shortly after the enactment of your reformed

17   OMP program; correct?

18   A.   Correct.

19   Q.   Shortly after you entered into a settlement agreement

20   with the DEA?

21   A.   Correct.

22   Q.   Shortly after you sent the July, 2000 letter by counsel

23   to DEA promising to do better; correct?

24   A.   What was that last question?

25   Q.   You promised the DEA to do better in your July, 2007

```
 1   letter?

 2            MR. NICHOLAS:  I'll object to the, object to the

 3   question.  There's no foundation for that and it's a

 4   mischaracterization.

 5            THE COURT:  I'll sustain the objection, Mr.

 6   Farrell.

 7            MR. FARRELL:  Will you bring up P-17051.

 8   BY MR. FARRELL:

 9   Q.   In this email you'll see down at the bottom that a

10   newspaper article from the Associated Press is reporting

11   from Charleston, West Virginia, in 2007.  Do you see

12   that?

13   A.   Yes.

14   Q.   And you received this and then you forwarded this

15   article to your CSRA diversion.  Agreed?

16   A.   Yes.

17   Q.   So I really don't know the answer to this.  Do you have

18   somebody that is filtering through looking for news

19   articles?

20   A.   Google alerts.  So if you put in a Google alert for

21   hillbilly heroin, pillbilly, opioids, heroin, any article or

22   anything that comes up, pops up in your email to one of

23   these folks.

24        And you'll see and we -- hundreds of thousands of

25   documents and millions of pages you'll see through our
```

1    emails, you'll see a lot of these forwarding processes going

2    on.

3        So when an article pops up -- and, again, part of it is

4    trying to get everyone to understand what the environment we

5    were in.  And, so, these things pop up, this article I

6    received.  And then, again, for educational purposes we

7    forward it to the diversion control group.  To this day, I

8    probably get 10 emails a day from this group forwarding on

9    something that they picked out from the internet.

10   **Q.**   So let's read what you wrote.

11       Scroll up, please.  Other direction.  All the way.

12   There we go.

13       Starting with "not only," will you read what you wrote

14   into the record?

15   **A.**   "Not only is this part of the country purchasing the

16   majority of hydrocodone from legitimate pharmacies, but they

17   also buy a huge quantity from illegal on-line pharmacies.

18   There is a whole lot of pain in the Appalachia area."

19            MR. FARRELL:  Judge, at this point I'd like to put

20   P-17051 in the record.

21            MR. NICHOLAS:  No objection.

22            MR. HESTER:  No objection, Your Honor.

23            MS. MAINIGI:  Your Honor, I'm assuming that the

24   article that's included here is not being offered for the

25   truth because it is hearsay.

1            THE COURT:  What are you offering it for?

2            MR. FARRELL:  Notice that there was a huge

3     quantity of opium pills being sold in the Appalachia region.

4            THE COURT:  Okay.  It's admitted for that purpose.

5            MS. MAINIGI:  Your Honor, I think that is the --

6     that's the truth of the article I guess that he's trying to

7     get it admitted for.  I mean, certainly I don't have any

8     objection to the Chris Zimmerman part of the email but I

9     think the article is hearsay.

10           MR. NICHOLAS:  And I would only add that that

11    description that Mr. Farrell just gave is not really

12    reflective of what Mr. Zimmerman wrote, which is that he

13    said a huge quantity from illegal on-line pharmacies.

14       So if we're going to characterize the document on the

15    record -- characterize what Mr. Zimmerman said, I would at

16    least like it to be accurate in that way.

17           THE COURT:  Well, I'm going to admit it for

18    Mr. Zimmerman's -- showing Mr. Zimmerman's state of mind at

19    the time he distributed this newspaper article.  It doesn't

20    come in for the truth of the matter asserted in the article.

21           MR. FARRELL:  Yes, sir, Your Honor.

22       The next document is P-282.

23       Judge, may I approach?

24           THE WITNESS:  Thank you.

25    BY MR. FARRELL:

1    **Q.**   Sir, do you recognize this document?

2    **A.**   It's an email from me to several different people and

3    different departments it looks like on May 6th, 2011.

4    **Q.**   And, so, you mentioned earlier that there was reference

5    to you forwarding on information to your government affairs

6    person, Julie Eddy.

7    **A.**   Yeah.

8    **Q.**   Do you see down below that there's reference to the

9    Florida reforms?

10   **A.**   Yes.

11   **Q.**   And is this one of the reasons why you would keep your

12   legislative affairs person in the loop as to what's

13   happening on the ground?

14   **A.**   So she -- yes.  She forwarded this to me, what was

15   changing, and then I forwarded it on that we're going to

16   start seeing increases in -- in poorly worded terms, we're

17   going to see -- we could see larger increases in Georgia and

18   Alabama.

19   **Q.**   And, so, when you look at the bottom half of it,

20   without going into great detail, this is a summary by Julie

21   Eddy to you, among others, that is summarizing the reforms

22   in 2011 in Florida to address illicit opioid abuse.  Agreed?

23          MS. MAINIGI:  Objection, Your Honor.  I'm not sure

24   what the relevance is of this line of questioning on this

25   document that relates to Florida.

```
 1              THE COURT:  Well, I'm going to let him continue.
 2    We'll see where it leads.
 3              MR. FARRELL:  Thank you, Your Honor.
 4              THE COURT:  It may not be relevant.
 5              MR. FARRELL:  P-282.  Would you bring it up,
 6    please.
 7    BY MR. FARRELL:
 8    Q.   So following the idea that you're communicating
 9    with legislative affairs, legislative affairs was
10    explaining to you in general some reform action.  It
11    doesn't matter what it is.  Will you read into the
12    record what your response was?
13    A.   "Watch out George and Alabama.  There will be a mass
14    exodus of pillbillies heading north."
15    Q.   Did you take any action as CSRA to watch out for a mass
16    exodus of pillbillies heading north?
17    A.   We -- again, the purpose -- it is poorly written and,
18    you know, I shouldn't have sent the email.  Definitely the
19    term "pillbillies" is not an appropriate term to be using in
20    an email.  And, you know, sorry for that.
21         But I just wanted to again alert, alert the people that
22    they need to be on the watch-out in Alabama and Georgia was
23    the intent.  Poorly executed, poorly stated, and
24    inappropriately said.
25              MR. FARRELL:  Judge, I'd move for P-282 into the
```

```
 1   record.
 2             MS. MAINIGI:  I renew my objection, Your Honor.
 3             THE COURT:  I'll show your objection.
 4             MR. HESTER:  Your Honor, I'd also say it's, it's
 5   hearsay as to the recitation of these elements of the
 6   legislation.
 7             THE COURT:  Well, you're offering it to -- for the
 8   purpose of showing Mr. Zimmerman's attitude at the time this
 9   happened.  Is that right?
10             MR. FARRELL:  Yes, Your Honor.
11             THE COURT:  I'll admit if for the limited purpose
12   and the objections will be shown on the record.
13             MR. FARRELL:  Next document is P-217.  May I
14   approach, Judge?
15             THE COURT:  Yes.
16             THE WITNESS:  Thank you.
17   BY MR. FARRELL:
18   Q.   Sir, do you recognize this document?
19   A.   It looks like -- it doesn't look like.  It's an email
20   from Julie Eddy to me in February, 2011.
21   Q.   What's the subject line?
22   A.   "Oxycontinville."
23   Q.   And what's -- is it -- what's it referencing?  What is
24   this document?
25   A.   It, it looks like a parody.  And my assumption is this
```

1    is the one which she sent me -- one of the other emails you

2    said -- there was an email that she said I think I sent this

3    to you before.  I think she probably was referencing this

4    email.  But it's, again, a parody.

5    **Q.**   Can you bring up 217, please.

6         Are you familiar with Jimmy Buffet's song

7    *Margaritaville*?

8    **A.**   I am.

9    **Q.**   Can you scroll down to beginning with the line, "I

10   drove from Kentucky."

11        There you go.  Thank you.

12        I'm going to -- I'm just going to make a little box

13   here.  I'm just going to reference again and use this as a

14   reference point.

15        This is a 2011 document.  In the first line do you see

16   where it says, "I drove from Kentucky"?

17   **A.**   Yes.

18   **Q.**   Now you understand how far we are now from Kentucky

19   sitting here?

20   **A.**   Yes.

21   **Q.**   And that Huntington/Cabell County is -- it actually

22   abuts Kentucky on the other side of the Big Sandy River.  Do

23   you understand that?

24   **A.**   Yes.  I understand Kentucky is adjacent to West

25   Virginia.

Q.   It's called the Tri-State area.  It says, "I drove from Kentucky, hoped to get lucky, stockpiling meds for me and for you, they're a real measure of drug-dealer treasure, how I'll drive home, I haven't a clue."

That's what it says, isn't it?

A.   That's what it says.

Q.   And this is the exchange between you and Julie Eddy who is the Director of State Government Affairs at AmerisourceBergen?

A.   She forwarded this to me, yes.

MR. FARRELL:  Judge, I'd ask for 217 to be admitted into the record.

THE COURT:  Is there any objection?

MR. NICHOLAS:  No objection.

MR. HESTER:  No objection, Your Honor.

THE COURT:  Ms. Mainigi?

MS. MAINIGI:  No objection.

THE COURT:  All right.  It's admitted.

BY MR. FARRELL:

Q.   Next is going to be 234, P-234.

Sir, do you recognize this document?

A.   I didn't get one.

Q.   Oh.

MR. FARRELL:  Judge, may I approach?

THE COURT:  Yes, you may.

```
1            THE WITNESS:  Thank you.
2    BY MR. FARRELL:
3    Q.   Sir, do you recognize this document?
4    A.   It looks like an email, but let me --
5    Q.   Who is the email from?
6    A.   Looks like an email string that starts from Stacie
7    Heller in our government affairs group.
8    Q.   Okay.  Is it fair to say that it's an email that
9    basically summarizes some media reports as well as responses
10   to some media reports?
11   A.   That's what it appears to be, yes.
12   Q.   That's not of particular interest to me.  What is of
13   interest is that this is a communication dated March 14th,
14   2017, from Steve Mays to you; correct?
15   A.   Yes.
16   Q.   Steve Mays works under you in your chain of command?
17   A.   He does.
18   Q.   And, so, your conduct and your behavior, would you
19   agree with me, has an influence on the corporate culture
20   within CSRA?
21   A.   Yeah.  And, and, you know, I'm sure you're going to
22   probably show me some more emails.  But I can tell you the
23   culture at ABC is of the highest caliber.  And if you pick
24   some emails out of hundreds of thousands of emails and
25   millions of pages of documents and some of them, you know,
```

1    are educational but some of them, unfortunately, I would

2    have rather they didn't circulate some of the information.

3         But by no means does it, does it demonstrate the, the

4    level of work and the amount of time and responsibilities

5    they put forth to their daily functions to make sure they

6    clear those orders so that the, the pharmacies are receiving

7    the products for the patients.

8         And we have to cover from Puerto Rico to Hawaii which

9    is a huge span and we're clearing orders all night long.

10   And these people email back and forth quite a bit.

11        And, you know, I wish they wouldn't send those type of

12   emails.  Unfortunately, they did and, you know, I can

13   apologize for that behavior.  But it was sent in a joking

14   manner and not as a, as a description of the environment

15   they're under.

16        But, I mean, I'll sit here and you can show me more

17   emails and I'll respond to them.  But, you know, I think

18   some of the frustration our team has is that we've been

19   working tirelessly -- I've been doing it for 31 years for

20   the whole reason to keep the supply chain safe and secure.

21        And whether you, whether you -- I take it personally

22   when you attack my credibility that way.  I think I've built

23   that 31 years of work product.  Hopefully I've demonstrated

24   that here today on the stand.

25        But I'll sit here and see some more of these emails and

```
 1    I'll address them the best I can.  And, you know, I do
 2    apologize to the Court for some of the language and some of
 3    the things that are contained in them.  But, unfortunately,
 4    through the, the 15, 20 years we've been in this opioid
 5    crisis, there's been a lot of information change hands.
 6    Q.   Sir, the typed message from Steve Mays to you in P-234
 7    is, "I guess if all the distributors shopped shipping
 8    controlled substances into West Virginia, the problem would
 9    be solved.  Correct?"
10         Did I read that accurately?
11    A.   That's the comment he made sarcastically.
12              MR. FARRELL:  Judge, I'd ask for 234 to be
13    admitted into the record.
14              MR. HESTER:  Your Honor, we object to this
15    document being admitted into evidence.  It has a very
16    extensive set of material underneath the note from Mr. Mays
17    to Mr. Zimmerman that deals with legislative and lobbying
18    activity in Washington.
19         We have a motion pending on this to exclude evidence of
20    petitioning activity, legislative activity, lobbying,
21    litigation activity engaged in by the trade association that
22    is protected by First Amendment petitioning activity and,
23    therefore, is not properly admissible.
24              MS. MAINIGI:  Your Honor, I join in that
25    objection.  Obviously there's an article attached that
```

```
 1    should not be offered.

 2              MR. NICHOLAS:  I join.

 3              THE COURT:  Well, this contains a bunch of stuff

 4    in here that's not relevant and not admissible, doesn't it,

 5    Mr. Farrell?

 6              MR. FARRELL:  Judge, I'd like to put a pin in

 7    this.  My colleague, Mr. Majestro, is in the process of

 8    briefing this.  We, we have a lively dispute, Judge, about

 9    whether or not the lobbying efforts by the trade group and

10    the Big Three are admissible in this trial.  It was -- there

11    was a ruling in CT1.  There's not a ruling yet here.  I'd be

12    glad to stick a pin in this to come back to it.

13              THE COURT:  Well, I'm going to sustain the

14    objection to this document, Mr. Farrell.

15              MR. FARRELL:  Yes, sir.

16    BY MR. FARRELL:

17    Q.   I'd like to bring up P-268.

18         May I approach, Your Honor?

19              THE COURT:  Yes.

20              THE WITNESS:  Thank you.

21    BY MR. FARRELL:

22    Q.   Sir, do you recognize this document as another

23    correspondence amongst those that work under your

24    command at CSRA?

25    A.   I do.
```

1    **Q.**    It's dated September 13th, 2012?

2    **A.**    Yes.

3    **Q.**    Will you please pull up P-268 on the, on the screen.

4         Sir, this is a document, is it not, again where Julie

5    Eddy is summarizing this time the forms in Kentucky?

6    Agreed?

7    **A.**    No, this looks like -- well, there's --

8              MS. MAINIGI:  Your Honor, may I just put in an

9    objection?  We don't see Mr. Zimmerman on this document

10   anywhere.  I don't think a foundation has been laid for it.

11             THE COURT:  Yeah, you need to lay a foundation,

12   Mr. Farrell.

13             MR. FARRELL:  Judge, this is a stipulated document

14   by AmerisourceBergen.  That's the reason why we did not

15   subpoena Cathy Marcum.

16             MR. HESTER:  Your Honor, the stipulation did not

17   stipulate as to foundation.  There was a stipulation on

18   authenticity, not foundation.

19             MR. FARRELL:  Judge, --

20             THE COURT:  I'll sustain the objection unless you

21   can clear it up, Mr. Farrell.

22             MR. FARRELL:  I have the stipulation in my hand.

23   This document is on the stipulation.  And the stipulation

24   includes that we can present this through Chris Zimmerman,

25   Steve Mays, David May and/or Michael Perry.  I'm going to

1    spend about 10 seconds on it.

2              MR. NICHOLAS:  Well, they, they can use the

3    document, but they still have to establish that he knows

4    about it.

5              THE COURT:  Yeah.

6              MR. FARRELL:  We've --

7              THE COURT:  How can you relate this to this

8    witness?

9              MR. FARRELL:  Because he just testified, Your

10   Honor, that he would defend his staff and that there are

11   reasons or other purposes for some of these emails.

12       This is a continuation of the attitude that was

13   reflected in the earlier emails by leadership now being

14   circulated amongst --

15             THE COURT:  Well, it's cumulative to that extent,

16   isn't it?

17             MR. FARRELL:  Well, except this one is a little

18   more pejorative, Your Honor.  This is one I would like for

19   him to take the opportunity to explain.

20             THE COURT:  I'm going to sustain the objection.

21             MR. FARRELL:  Withdraw this document and we

22   will -- we'll -- can I ask for the basis of your sustaining

23   the objection, Judge, for the record?

24             THE COURT:  It's cumulative.  You're, you're

25   showing what you obviously claim to be a cavalier attitude

```
1    on the part of, of this defendant towards the drug problem

2    and -- isn't that why you're offering it?

3              MR. FARRELL:  Yes, Your Honor.

4              THE COURT:  And this is cumulative to the other

5    documents and I'm not -- well, I don't want to comment on

6    the evidence, but I'm not sure how much this proves, you

7    know.  People break the stress of their jobs by humor, and

8    this might be tasteless but I suppose it is relevant to the

9    company's attitude.

10             MR. FARRELL:  That's my point, Judge.

11             THE COURT:  This is cumulative and I'm going to

12   sustain the objection.

13             MR. FARRELL:  Judge, I -- for the record, we're

14   trying to prove that it is more than just stress relief.

15   We're trying to establish that it is a pattern of conduct by

16   those people charged with protecting our community.  And

17   they're circulating emails disparaging hillbillies.

18             THE COURT:  Well, I've ruled on this, Mr. -- I've

19   ruled on this document, Mr. Farrell, and I probably said too

20   much about it.  But go ahead.

21   BY MR. FARRELL:

22   Q.  So the last document, the last document that I --

23             MR. FARRELL:  I'm going to place a pin in this,

24   Judge, that we will attempt to revisit this document through

25   Steve Mays two witnesses from now without drawing your ire I
```

1    hope.

2        The last document before I have it published, I will

3    again reference P-174.  This is the last of the chain of

4    documents, Judge.  May I approach?

5            THE COURT:  Yes.

6            THE WITNESS:  Thank you.

7            MR. FARRELL:  Judge, again this is an email in the

8    same cast as those previously referenced.  And I will wait

9    and defer to the objection and your ruling before moving

10   forward on.

11       Judge, I will note that when we served this document on

12   the defendants, there was no objection placed in the counter

13   sheet.

14           MS. MAINIGI:  Your Honor, I would like to put in

15   an objection if it's appropriate at this time for this

16   document.  I didn't know if we were reserving on that.

17       But it's -- again, I do not see Mr. Zimmerman anywhere

18   on this email chain.  It is now I think well beyond

19   cumulative, and I think we are now getting into the realm of

20   prejudicial.

21           MR. FARRELL:  Judge, if I may, this document was

22   stipulated to in our stipulation and there was no objection

23   placed on the counter by the defendant.

24           THE COURT:  Do you want to say something about it,

25   Mr. Nicholas?

```
 1              MR. NICHOLAS:  I'm torn.  I really am.  I think --
 2    I mean, Mr. Zimmerman is not on the document.  I don't -- to
 3    me, it's not the biggest deal in the world if he tries to
 4    answer about it.  He has said what happened.  You know, he
 5    has expressed himself to the Court I think very well.  And
 6    I'm not sure that there's anything to be gained by
 7    continuing on other than, other than the soundbite prejudice
 8    aspect of it.  So I guess I do object.
 9              THE COURT:  Mr. Hester.
10              MR. HESTER:  Your Honor, I would add the fact that
11    there wasn't a specific objection can't waive the cumulative
12    objection that we've just made.  It is cumulative as to the
13    other documents that have already been presented and there's
14    a lack of foundation.
15              THE COURT:  I'll sustain the objection, Mr.
16    Farrell.
17              MR. FARRELL:  Judge, this might be a good breaking
18    point.
19              THE COURT:  Yeah.  It's high noon.  We'll be in
20    recess until 2:00.
21          You can step down, Mr. Zimmerman, and we'll be back at
22    2:00.
23              THE WITNESS:  Thank you.
24          (Recess taken at 12:01 p.m.)
25              THE COURT:  Mr. Majestro?
```

1          MR. MAJESTRO:  Good morning (sic), Your Honor.

2     Mr. Ruby spoke this morning, so I figured I had to pop up

3     today.

4          THE COURT:  Yes.  We need to get you guys in the

5     game here, as if I don't know you have been in the game

6     already.

7          MR. MAJESTRO:  So, this morning, we had an issue

8     regarding a document that the defendants asserted a First

9     Amendment privilege to.  There was mention of briefing.  The

10    briefing on that issue was complete as of yesterday.

11         I wanted to very quickly go over three points with Your

12    Honor on that issue because the witness -- we're going to

13    get into that issue again with Mr. Zimmerman's testimony.

14         First of all, I'd like to point out in the MDL, Judge

15    Polster twice rejected these defendants' arguments to

16    exclude evidence of lobbying activity based on the First

17    Amendment.  Similarly, you have previously rejected this

18    argument.

19         In *Gillis v. Murphy-Brown*, one of the North Carolina

20    cases where Your Honor sat by designation, you -- you --

21    excuse me.  You ruled as follows:  "Although the

22    *Noerr-Pennington Doctrine* has been extended beyond the

23    antitrust context", which is where it was born, "it has not

24    been applied to bar otherwise admissible evidence in a state

25    law private nuisance lawsuit", which is exactly what we have

1    here.

2         In *Gillis*, Your Honor also ruled that, "The proper

3    remedy for those concerns is care in instructing the jury

4    with respect to what it must find in order to hold a

5    defendant liable and, if the defendant requests it, perhaps

6    also a curative instruction.  The proper remedy is not

7    exclusion of evidence that is otherwise relevant and

8    admissible in connection with plaintiff's claims.  Based on

9    the foregoing, it is clear that the evidence the defendant

10   seeks to exclude is not inadmissible under *Noerr-Pennington*.

11        Now, obviously, that reasoning applies even greater

12   here where there's no danger of having a jury confused.  In

13   this case --

14        THE COURT:  Well, as I understand it, the

15   *Noerr-Pennington Doctrine* holds that liability cannot be

16   imposed based on protected speech, but it doesn't bar its

17   admission for another purpose, such as evidence of intent;

18   is that right?

19        MR. MAJESTRO:  And that's -- and we think it's

20   relevant both for intent and in terms to show concerted

21   action.  We have alleged concerted action and conspiracy in

22   the pleadings in this case and the defendants' activities

23   with had weren't just lobbying.  They were -- they are

24   evidence of that concerted activity.

25        And, finally, I'd say, Your Honor, if you have any

1    doubt, we'd encourage you to carefully look at all the

2    briefing in this case, but for today's purposes, we think

3    it's important for you to at least conditionally admit the

4    evidence.

5              THE COURT:  Well, the briefing hasn't been

6    completed on this issue in this case.

7              MR. MAJESTRO:  Yes, it has, Your Honor, as of last

8    night.  As of last night, the defendants filed -- they filed

9    a reply.

10              THE COURT:  Okay.  Ms. Hardin, do you want to say

11    something?

12              MS. HARDIN:  Well, Your Honor, I didn't appreciate

13    that we were going to have oral argument on this, on this

14    issue right now, but I'll just say we don't disagree, I

15    think, on the two main principles, which is it's not

16    admissible -- evidence of lobbying and other activities of

17    petitioning the government are not admissible to prove

18    liability.  Plaintiffs admit that.

19         It may be in certain circumstances admissible to prove

20    another purpose, such as intent, but plaintiffs have not

21    proven that.  I think, in their brief -- again, I don't have

22    it with me.  I think they listed 12 items to which they said

23    it was related.  Only one of those were actually petitioning

24    activity.

25         And so, they have not met their burden to show that the

1    things that Mr. Farrell specifically talked about in his

2    opening statements, which is filing an amicus brief and

3    other things that had to do with the had are relevant to any

4    purpose.  In order for it to be relevant to concerted

5    action, it has to have been -- there has to have been

6    evidence of an agreement and it has to have been for an

7    unlawful purpose.

8         Plaintiffs haven't proven that here.  They haven't even

9    put any of that in their brief.  So, we agree with Mr.

10   Majestro.  We encourage Your Honor to read the briefs and we

11   think that they make quite clear that the evidence that is

12   the subject of that motion is inadmissible for any purpose

13   that has been alleged in this trial.

14        And Judge Polster made a pretrial ruling about what

15   might be relevant if the plaintiffs could link it up by

16   showing intent.  That case, of course, in Track 1 never

17   actually went to trial.  No evidence was ever actually

18   admitted.  And in the Track 3 case, when he issued an

19   amended ruling, these three defendants are not defendants

20   there and had nothing to do with the briefing that led to

21   that order.

22             THE COURT:  Is this going to come up this

23   afternoon?

24             MR. MAJESTRO:  Yes, sir.  That's why, that's why

25   I'm raising it.  And we just encourage you to hear the

```
 1    evidence.  If you find it's inadmissible later, we're sure

 2    you're capable of forgetting it.

 3              THE COURT:  Okay.  Just a minute.

 4         (Pause)

 5              THE COURT:  Well, rather than -- Mr. Hester, do

 6    you want to say something here, sir?

 7              MR. HESTER:  Well, I'm happy to speak to it, Your

 8    Honor, but if you want -- I obviously want you to go first,

 9    but I'm happy to speak to this.  I -- we -- I did have some

10    substantive remarks in response to what Mr. Majestro said.

11              THE COURT:  Well, my thinking was rather than slow

12    this down, I'd go ahead and allow the testimony subject to

13    me striking it after I read the briefs.

14              MR. HESTER:  Well, Your Honor, our position is

15    this.  First of all, we -- I think we're all in agreement

16    that the Noerr-Pennington Doctrine does not allow the

17    imposition of liability based on First Amendment petitioning

18    activity and I think the plaintiffs agree with us on that.

19         And that would extend to relying on petitioning

20    activities as a basis to establish a conspiracy.  That's

21    substantive liability that they're seeking to establish

22    through conventional petitioning activity, lobbying,

23    legislative activity, filing of amicus briefs.

24         But, in addition, on this point of intent, this is

25    going to take us into a wide detour.  This is -- this is a
```

1    big case already.  This is going to take us into Washington

2    lobbying activity, Washington legislative activity, filing

3    of amicus briefs, participation in litigation, media and

4    press strategies.  It's way afield.

5         And, Your Honor, we would submit that the problem

6    presented here is once we start down this path, we're on

7    another detour.  We're into an area where the plaintiffs --

8    I agree with Ms. Hardin, plaintiffs don't have evidence that

9    connects this to intent except in relation to intent to

10   petition the government.

11        They don't have intent that ties to any activities in

12   Cabell-Huntington.  They don't have any petitioning activity

13   that ties to the issues presented here in relation to public

14   nuisance.

15        And so, we're going to go off on a tangent that

16   requires the defense, of course, to respond.  And so, I

17   think, unlike some of the other decisions the Court has made

18   which I've understood, to admit evidence and then figure it

19   out later, the problem that's presented is it's going to

20   take us into a lot of additional lines of evidence that

21   ultimately we think quite clearly are not going to be

22   relevant.

23              THE COURT:  Mr. Nicholas?

24              MR. NICHOLAS:  Well, I -- I agree with what's been

25   said and just the only thing I'll add is from the worm's eye

1    view, because I've got the witness on the stand, I would --

2    I would hope that -- I hope that, in this case, Your Honor

3    chooses the other path, you know, rather than letting the

4    evidence in conditionally, which I understand that approach,

5    but this is going to take time and it's going to be a detour

6    that is -- I would submit is not going to result in

7    anything.  So, I hope that, at least on this one, we don't

8    take the normal -- the previous approach.

9            MR. MAJESTRO:  I'd just like to say to conclude,

10   Your Honor, we think we can link it up through the

11   collection of all these witnesses.  We have 30 days of trial

12   time.  If we are wasting our time, that's going to be on us.

13       And the evidence that -- of what they did, you know,

14   essentially as we highlighted in the openings in the

15   beginning, the defendant said there isn't -- there was no

16   duty and we don't know what the duties were.

17       And then, there came a turning point where they -- they

18   got together and tried to change what the rules were.  That

19   is -- the fact that they were doing that is not -- we're not

20   showing liability from the petitioning.  Their decision to

21   do that shows their recognition and intent to act in a way

22   that's contrary to what they knew the law was.

23            MR. HESTER:  But, again, Your Honor, we're talking

24   about intent to engage in petitioning activity.  Intent to

25   seek changes in the DEA regulatory scheme.  Intent to seek

1    changes in legislation.  That's not going to be helpful

2    ultimately to the resolution of any issues related to a

3    public nuisance in Cabell-Huntington, but it's going to take

4    a fair amount of extra time, and it's going to take us into

5    a whole new realm of the Washington milieu of Trade

6    Association activity and allegations that somehow intent can

7    be defined from a decision to seek a change in a regulatory

8    structure.  This is way afield from where we've been.

9            MR. MAJESTRO:  We don't believe the evidence is

10   going to be that extensive on that point.  And, again, the

11   intent is -- the intent is shown by their recognition of

12   what the law was and their intent to change it.

13       We're not saying they couldn't do it, but their act of

14   doing it is what shows that they -- that they knew what the

15   law was and they intended -- and they continued to violate.

16       And again, you know, we're happy to link this up as the

17   testimony goes on, but it's unfair, when we have these live

18   witnesses on the stand that are going to go home, we're not

19   going to be able to do it if Your Honor rules three weeks

20   down the road that we're right.

21           THE COURT:  Well, specifically, how is it

22   relevant?

23           MR. MAJESTRO:  So, what this evidence shows is

24   that after the defendant spent several years saying, well,

25   this isn't the law, we don't know what the law is, that they

1    recognized that it was the law and they tried to change it.

2    And so, that recognition shows -- shows their intent.

3        And they also tried to change it.  They worked together

4    to do that.  And that shows the concerted action and

5    conspiracy.

6        And the -- to -- and so, you know, they're -- and they

7    were in this conspiracy and concerted action to continue to

8    violate the Controlled Substances Act and their duties to

9    not cause nuisances in Cabell County.

10            THE COURT:  Well, how much time is it going to

11   take to do it?  I mean, this looks to me like this is going

12   to be a rabbit trail that -- like Mr. Hester said, that's

13   going to waste a whole lot of time.

14            MR. MAJESTRO:  We don't think so, Your Honor, and

15   Your Honor is quite adept at cutting us off when we get --

16   when we get more than enough evidence on a subject.  We're

17   happy to let you be the judge when you've heard enough on

18   it.

19            THE COURT:  Well, and like you said, you'll be

20   using your trial time.

21            MR. MAJESTRO:  Right.

22            THE COURT:  I'm not going to let this trial go

23   beyond what we've set aside.

24        So, Ms. Hardin, do you want another bite at the apple

25   here?

```
 1              MS. HARDIN:  Well, I just wanted to make clear,

 2   Your Honor, that what they have to show is concerted action

 3   for an unlawful purpose and showing that we lobbied the

 4   government, that we wanted to change the law, even if that's

 5   what the evidence were to show, that we didn't like the

 6   current law and tried to change it, there is nothing

 7   unlawful.  That is exactly what is protected by the First

 8   Amendment under the Noerr-Pennington Doctrine.

 9        So, based on what you just heard from Mr. Majestro,

10   they cannot and don't even seem to have a plan to show that

11   this was for any unlawful purpose.  And so, therefore, this

12   evidence shouldn't be admitted because it can't be the basis

13   of any liability, substantive or concerted action, and I

14   won't repeat all the arguments.  And it seems like Your

15   Honor sees --

16              THE COURT:  I'm not --

17              MS. HARDIN:  -- that it's going to be a rabbit

18   hole.  I'm sorry.  You --

19              THE COURT:  I'm sorry.

20        I'm not sure this is an unlawful purpose, Mr. Majestro.

21              MR. MAJESTRO:  The unlawful purpose is, is

22   violating the Controlled Substances Act and continuing to

23   distribute opioids.

24        And, you know, and the last thing I'll say about intent

25   is that intent is an issue the defendants raised.  They're
```

```
 1    the ones that said we have to prove intent.  That's their

 2    motion.

 3            MR. HESTER:  Well, I think -- I think what Mr.

 4    Majestro just said proves up our point, Your Honor.

 5    Violating the law through petitioning activity is

 6    Noerr-Pennington protected.  So, if there's some suggestion

 7    that the petitioning activity was somehow improper, that's

 8    -- that is protected activity.

 9        They also don't have any evidence that it was improper.

10    It was conventional activity to seek adjustments in the

11    regulatory scheme, changes in legislation, filing of amicus

12    briefs.

13        That's conventional activity, First Amendment

14    protected.  The suggestion that somehow that can be held up

15    as a violation of law proves the point this is a

16    Noerr-Pennington protected activity and we are going to have

17    a real detour.  And it's not merely in the plaintiffs' case.

18    It also requires the defense to respond to it, Your Honor.

19        So, we think, unlike some of the other issues that may

20    be around the edge, this is one that seems clearly too far

21    afield to devote valuable trial time to.

22            THE COURT:  How does it relate to intent to flood

23    the market?

24            MR. MAJESTRO:  So, the -- their argument is we

25    didn't know what we were doing is wrong.  You heard a
```

1    witness testifying about the DEA approved this and all of

2    that testimony.  That's their defense in this case, that --

3    that they were acting in a manner consistent with the law.

4         And so, what this shows is a recognition that their

5    conduct was not consistent with the law.  All of these

6    documents show that recognition which -- and that, combined

7    with a continued conduct in violating the law, shows that

8    they intentionally did it.

9              THE COURT:  I think I have to permit this rather

10   than -- hopefully, it won't go too far.

11             MR. MAJESTRO:  We understand that you don't want

12   to hear a lot of it.  We'll act accordingly.

13             THE COURT:  Comes out of your hide on the time,

14   Mr. Majestro.

15             MR. MAJESTRO:  I'm -- we are -- we are acutely

16   aware of the clock ticking.  Thank you, Your Honor.

17             THE COURT:  All right.

18             MR. ACKERMAN:  Your Honor, David Ackerman.  One

19   additional issue after I try to navigate my way through the

20   wires here.

21        Your Honor has heard a lot in the last couple of days

22   about the parties' exhibit stipulation.  And that

23   stipulation has a number of components.  And one of the

24   components certainly is that the plaintiffs need to provide

25   notice to defendants of the documents that we intend to use

1    with a witness we call by 7:00 p.m.

2         The complimentary component to that is that defendants

3    are required to disclose non-authenticity objections to all

4    exhibits that we have disclosed by 10:00 p.m. on the evening

5    prior to the anticipated use at trial.

6         And I raise this, Your Honor, because we have disclosed

7    in the last two nights documents for Mr. Zimmerman and for

8    the witness who will be called next, Mr. May, and received

9    objections from ABDC, but did not receive any objections

10   from McKesson and Cardinal.

11        So, some of us over on this side were a bit confused

12   and surprised to see McKesson and Cardinal objecting to the

13   admission of documents when we had not received any

14   objections from them the evening before.

15        And I -- I point this out, Your Honor, to make clear

16   that this is a court-ordered stipulation and we are doing

17   our best to abide by it and, certainly, defendants would

18   complain if we did not serve a notice of documents and then

19   jumped up and started using documents with a witness, but

20   that same argument holds for defendants' objections.

21        We are entitled to notice of defendants' objections and

22   if defendants don't serve notice of those objections, they

23   should not be required to make them -- or should not be

24   permitted to raise them during the next day at trial.

25             THE COURT:  Well, the stipulation says that they

1    will not object to presentation of the documents while

2    preserving evidentiary objections.

3         MR. ACKERMAN:  This is a different stipulation I'm

4    referencing, Your Honor.  It is Document 1029.  I have

5    copies, if you'd like to see it.

6         THE COURT:  Yes.  I've got --

7         MR. ACKERMAN:  All right.

8         MR. HESTER:  Your Honor, I think there's a very

9    simple answer here, which is an objection for one is an

10   objection for all.  ABDC filed objections.

11        MR. MAHADY:  And, Your Honor, I will note that

12   when we -- sorry.  Your Honor, I will note that when we

13   served our objections, at least in the e-mail last night, we

14   said defendants, plural, reserve all objections.  So --

15        MR. ACKERMAN:  But, Your Honor, it can't be the

16   case that ABDC serves objections for itself because the

17   e-mails that we've received the last two evenings both say,

18   "Attached, please find ABDC's objections to the list of

19   exhibits."  It can't be the case that then every defendant

20   is entitled to make any other objection simply because there

21   is a line afterwards that say defendants reserve the right

22   to raise an objection.  That renders the stipulation

23   meaningless.

24        The reference -- the provision I was referencing in the

25   stipulation, Your Honor, is on Page 7.  There's a box that

1    says "Procedure for exhibit objections."

2           MR. MAHADY:  Your Honor, this is somewhat ironic.

3    I think this would be less of an issue if we were getting

4    real disclosures and were not scrambling to respond to these

5    oversized disclosures.

6        We responded.  We said we reserved the right for all

7    defendants.  I think Cardinal and McKesson have the right to

8    object.

9           MR. ACKERMAN:  Well, we would submit, Your Honor,

10   that the right of Cardinal and McKesson to object is

11   contingent upon their following the procedures set forth in

12   the exhibit stipulation.

13          THE COURT:  Well, and how are they not following

14   the procedure?

15          MR. ACKERMAN:  Well, Your Honor, if you look at

16   Page 7, it says, "Procedure for non-authenticity exhibit

17   objections", and there is a 10:00 p.m. deadline for

18   disclosure of non-authenticity objections to all exhibits

19   and we did not receive any disclosure from Cardinal or

20   McKesson.

21          THE COURT:  Well, they haven't objected to the

22   authenticity of any of these, have they?

23          MR. ACKERMAN:  Well, yes, Your Honor.  This

24   morning, counsel for Cardinal stood up and made relevance

25   and other -- and other types of objections.

1          THE COURT:  Well, a relevance objection is not an

2    objection to authenticity, is it?

3          MR. ACKERMAN:  That's right.  That's why it was

4    required to be disclosed last night.

5          MR. HESTER:  Well, Your Honor, we've been

6    proceeding on the understanding and assumption, as we

7    discussed with the Court at the start of the case, that if

8    one of the defendants lodges an objection, that would

9    suffice as an objection on behalf of all three.  I don't

10   understand the difference whether three or one of the

11   defendants objects.

12     The plaintiffs are on notice of the objection and that

13   was the basis on which we've been proceeding.  Rather than

14   all three defendants spending time at night filing the same

15   objections, one defendant files the objections, and that

16   covers all three of us.

17          MR. ACKERMAN:  There were also, Your Honor, at

18   least one document, and I think more, where defendants did

19   not disclose any objections -- or disclose any objections

20   and then raised them today in court.  So, that is a separate

21   and subsidiary issue.  We just want to make clear that we

22   understand what the rules are going forward.

23          THE COURT:  Well, the stipulation says

24   non-authenticity objections.

25          MR. ACKERMAN:  Yes, Your Honor.  The stipulation

1    says non-authenticity, and that is our concern, is that

2    there were documents -- again, it is a -- it is a two-part

3    concern is, number one, that defendant -- there were

4    defendants here who did not serve objections who then

5    objected.  There were also documents and at least one that

6    Mr. Farrell pointed out where defendants did not raise any

7    objections last night, but then raised objections this

8    morning.

9              THE COURT:  But it has to be an objection to

10   authenticity, doesn't it?

11             MR. ACKERMAN:  No.

12             THE COURT:  For the stipulations?

13             MR. ACKERMAN:  They have to disclose

14   non-authenticity objections.

15             THE COURT:  Okay.  And you're saying there were

16   documents that came in this morning and they didn't do that?

17             MR. ACKERMAN:  There was at least one that I

18   recall, yes, and we just want to make sure.  We're raising

19   it now because we want to make sure we understand the rules

20   of the road going forward, that if don't get a

21   non-authenticity objection the night before, we can assume

22   that we're not going to hear a relevance or some other type

23   of objection the next day in court.  This is the other side

24   of the coin of the same issue that defendants have

25   complained about.

```
 1              THE COURT:  Ms. Wicht wants to say something.
 2              MS. WICHT:  Thank you, Your Honor.  Jennifer Wicht
 3      for Cardinal Health.  I would just point out, in addition to
 4      the fact that an objection for one is an objection for all,
 5      of course, there are objections, as we saw this morning,
 6      that arise only in the context of the particular testimony
 7      that simply can't be known the night before.
 8          We don't know how the documents will be used with a
 9      particular witness.  The cumulative objection that arose
10      this morning, of course, is not something that can be
11      anticipated.  So, I think the idea that we would somehow
12      eliminate any sort of new objections in the courtroom, it's
13      just simply not possible.
14              MR. ACKERMAN:  It's not the cumulative objection,
15      Your Honor.
16              THE COURT:  Well, Mr. Nicholas?
17              MR. NICHOLAS:  I was going to say that and I would
18      only add that if, after all of this -- after all that's
19      happened so far, the plaintiffs have the example of one
20      document that may have slipped through that wasn't objected
21      to, that is not a very big sample size.  I don't think it
22      really justifies this speechifying and this level of
23      attention.
24              THE COURT:  Well, let's press on and you can raise
25      this with -- in the specific context if you think it comes
```

1   up.

2          MR. ACKERMAN:  Understood, Your Honor.

3          THE COURT:  We're wasting a lot of time here.

4      Mr. Farrell?

5          MR. FARRELL:  Ready to proceed, Judge.

6          THE COURT:  Are you ready for the witness?

7          MR. FARRELL:  Yes, Your Honor.

8          THE COURT:  Mr. Zimmerman, where are you?

9          MR. FARRELL:  If all goes well, Judge, I have four

10  documents.

11         THE COURT:  All right.

12         BY MR. FARRELL:

13  Q.   Welcome back, Mr. Zimmerman.

14  A.   Good afternoon.

15  Q.   I'm going to bring up and show you document P-8231, the

16  amicus brief submitted on behalf of HDMA in the *Cardinal*

17  *Health versus Eric Holder* matter.

18       Can you bring it down, please, until --

19       May I approach?

20         BY MR. FARRELL:

21  Q.   Mr. Zimmerman, I only have a couple of reference points

22  to this document, but before we get into it -- I'm sorry.  I

23  will give you a chance to review it.

24  A.   Did you want me to read it first or do you want to ask

25  me?

1    **Q.**  Have you --

2         MR. NICHOLAS:  Your Honor, I don't want to

3    interrupt the examination.  This is a legal brief.  This is

4    an amicus brief.  It's a document that we would -- that, you

5    know, it goes to the *Noerr-Pennington* issue.  I want to at

6    least preserve the objection by making it here before we go

7    forward.

8         THE COURT:  All right.  The objection is shown on

9    the record and you go ahead.

10        MR. FARRELL:  Thank you.

11        BY MR. FARRELL:

12   **Q.**  Mr. Zimmerman, have you seen this document before?

13   **A.**  I don't specifically recall.  I mean, I've heard about

14   it, but I can't remember -- I don't know if I've ever

15   actually read it.

16        MR. FARRELL:  I'm going to -- I'm not going to

17   admit it into the record yet, Judge, but I would like to

18   publish P-2948.

19        MR. FARRELL:

20   **Q.**  We'll have to show it up on the screen and see if that

21   refreshes your recollection.

22        MS. MAINIGI:  Your Honor, the witness has said

23   that he doesn't even know if he's read it, so I don't

24   understand what the basis would be for putting it up on the

25   screen.  There's no foundation.

```
 1            THE COURT:  Well, I agree, at this point, Mr.
 2   Farrell.
 3            MR. FARRELL:  Okay.  May I try another way?
 4            THE COURT:  Yes, you may.
 5            MR. FARRELL:  Judge, we'll be circulating to
 6   counsel and to Your Honor P-2948.
 7       May I approach?
 8            THE COURT:  Yes.
 9            THE WITNESS:  Thank you.
10            BY MR. FARRELL:
11   Q.   Sir, do you recognize P-2948?
12   A.   I do.
13   Q.   And what is it?
14   A.   It's an e-mail string.
15   Q.   And what's the subject matter?
16   A.   Draft amicus brief.
17   Q.   What's the rest of the --
18   A.   Cardinal Health v. Holder.
19   Q.   What is the date?
20   A.   It is February 23rd, 2012.
21   Q.   And who is it from?
22   A.   The first one?
23   Q.   Yes, the top.
24   A.   Oh, the very top is from Steve Mays to me.
25   Q.   Okay.  And what is the -- what does the comment from
```

1     Steve Mays say?

2     **A.**    "I agree with your comments, but don't believe that

3     HDMA is being too aggressive."

4     **Q.**    Now go to the e-mail below that.  Who is that e-mail

5     from?

6     **A.**    It's from me to Steve.

7     **Q.**    And what does it say?

8     **A.**    "Please read and then we can discuss."

9     **Q.**    Okay.  So now, flip to Page 2.  Do you recognize the

10    names on these?

11    **A.**    I do.

12    **Q.**    Does it include the CEO of AmerisourceBergen?

13    **A.**    He's copied, yes.

14    **Q.**    Does it include the President of AmerisourceBergen?

15    **A.**    He is copied, yes.

16    **Q.**    Now, if you will turn to Page 3, and you'll see that

17    it's a bleed-over e-mail, but it's the e-mail that is from

18    John Gray and, at the top of Page 3, it says, "Gentlemen".

19    Do you see that?

20    **A.**    Yes.

21    **Q.**    Okay.  And will you read that into the record, please?

22    **A.**    "Attached is a draft amicus brief that HDMA could file

23    on behalf of our membership in support of the Cardinal case

24    next week."

25    **Q.**    This is an e-mail that you received in the course of

```
 1    your job as the Senior Vice President of CSRA at

 2    AmerisourceBergen, correct?

 3    A.   Yes.  I received this.

 4              MR. FARRELL:  Judge, I'd ask for P-2948 to be

 5    entered into the record.

 6              THE WITNESS:  I forwarded it on to Steve to read.

 7    Again, I'm not sure if I read the entire brief, but --

 8              THE COURT:  Mr. Hester?

 9              MR. HESTER:  I would object, Your Honor, on

10    Noerr-Pennington grounds.  This is -- this is substantive

11    evidence of petitioning activity.  I don't think it's

12    properly admitted.  But I understand the Court's rule, but I

13    wanted to preserve our objection.

14              THE COURT:  All right.

15              MS. MAINIGI:  Your Honor, all I would add is this

16    does not show intent to do anything unlawful, which is what

17    they need to show.

18              THE COURT:  Well, the objections for now are

19    overruled.  Go ahead, Mr. Farrell.  Let's get through this.

20              MR. FARRELL:  So, is the document submitted for

21    the Court as admitted, Judge?

22              THE COURT:  Subject to the objections of all three

23    defendants, it's admitted.

24                  PLAINTIFF EXHIBIT P-2948 ADMITTED

25        MR. FARRELL:  I'd next like to bring up P-214.
```

```
1            May I approach, Judge?

2                 THE COURT:  Yes, you may.

3                 BY MR. FARRELL:

4    Q.   Mr. Zimmerman, do you recognize this document?

5    A.   An e-mail from me to Dave Neu.

6    Q.   Who was Dave Neu?

7    A.   He was, I believe, at this time, the president of the

8    drug company.

9    Q.   And what's the date?

10   A.   February 24th, 2012.

11   Q.   And you will see this is an e-mail that you wrote in

12   the normal course of business as the Senior Vice President

13   of CSRA?

14   A.   Vice President at the time, but yes.

15   Q.   And, again, this is an acknowledgment by you that you

16   were making comments upon the Cardinal Health/Holder amicus

17   brief, correct?

18   A.   Let me read for a second.  It appears to be.

19                 MR. FARRELL:  Judge, I would ask for P-214 to be

20   entered into the record.

21                 MR. HESTER:  We would preserve our objection on

22   Noerr-Pennington grounds, Your Honor.

23                 MS. MAINIGI:  Same, Your Honor.

24                 THE COURT:  All right.  It's admitted over the

25   objections of the defendant.
```

```
 1              PLAINTIFF EXHIBIT P-214 ADMITTED

 2          BY MR. FARRELL:

 3   Q.   Next is P-9156.

 4          MR. FARRELL:  Judge, may I approach?

 5          BY MR. FARRELL:

 6   Q.   Mr. Zimmerman, do you recognize this document?

 7   A.   The first e-mail is from me.

 8   Q.   Who is it to?

 9   A.   It's to my team, some members of my team, and some

10   legal.

11   Q.   Would you identify them, please?

12   A.   Steve Mays, Ed Hazewski, Bruce Gundy, Paul Ross, Mary

13   Fox and John Chou.

14   Q.   And what is the message that you sent?

15   A.   "FYI", for your information.

16   Q.   What's the date of it?

17   A.   March 5th, 2012.

18   Q.   What does "FYI" stand for?

19   A.   For your information.

20   Q.   What is it that you're sending them for their

21   information?

22   A.   It looks like the amicus brief.

23   Q.   And do you see -- do you see on the attachments what it

24   says, top of Page 1?

25   A.   Yeah.  "HDMA amicus brief, *Cardinal v. Holder*,
```

1     March 4th" -- "March" -- yeah --"4th, 2012".

2     **Q.**   Does this document actually contain an attachment of

3     the amicus brief?

4     **A.**   That's what it appears to be.

5            MR. FARRELL:  Judge, I would ask for P-9156 to be

6     admitted into the record.

7            MR. HESTER:  Your Honor, we object on

8     *Noerr-Pennington* grounds.  In addition, there's hearsay in

9     this, in this document at the bottom of the page that we

10    object to.

11           MS. MAINIGI:  Join, Your Honor.

12           MR. NICHOLAS:  Join that objection, Your Honor.

13           THE COURT:  All right.  Go ahead.

14           BY MR. FARRELL:

15    **Q.**   So, let's circle back.  Do you now have a recollection

16    that you had access to, reviewed and commented on the amicus

17    brief submitted on behalf of HDMA in a matter of *Cardinal*

18    *Health v. Holder*?

19    **A.**   It appears that I reviewed, looked at it, yes.

20    **Q.**   Now, circling back to P-8231, the actual amicus brief

21    --

22           MR. FARRELL:  Did I pass out copies already?

23           MR. HESTER:  Yes, she did.

24           BY MR. FARRELL:

25    **Q.**   You have the amicus brief in front of you, do you not,

1    sir?

2    **A.**   Yes.

3    **Q.**   And I'd like you to flip to Page -- Page 2 of the

4    brief.  It's Bate stamped Page 11 at the bottom.

5    **A.**   Okay.

6    **Q.**   And we can bring it up on the monitor now.  And I'm

7    looking at the paragraph -- the second full paragraph that

8    starts, "HDMA's members".  Would you read aloud, please?

9    **A.**   "HDMA's members have not only statutory and regulatory

10   responsibilities to detect and prevent diversion of

11   controlled prescription drugs, but undertake such efforts as

12   responsible members of society.  The public" --

13   **Q.**   Do you agree with that statement?

14   **A.**   Yes.

15   **Q.**   And the next sentence, would you read it aloud, please?

16   **A.**   "The public health dangers associated with the

17   diversion and abuse of controlled prescription drugs have

18   been well-recognized over the years by Congress, DEA, HDMA

19   its members, and public health authorities."

20   **Q.**   Do you agree with that statement, sir?

21   **A.**   Yes.

22   **Q.**   If you turn the page to Page 3, starting with "HDMA" at

23   the very top of the page.

24   **A.**   Okay.

25   **Q.**   This is where HDMA is providing context for the Court.

1    Would you read that into the record, please?

2    **A.**   "HDMA respectfully provides the context in which DEA

3    has taken enforcement actions against distributors while the

4    agency has failed to provide meaningful guidance to assist

5    the regulated industry in complying with DEA's

6    interpretation of its implementing regulations."

7    **Q.**   And the next sentence, please?

8    **A.**   "HDMA respectfully submits that despite the agency's

9    oft-recited refrain that the regulations are clear, the

10   regulated industry doesn't know the rules of the road

11   because they haven't been adequately explained."

12            MR. NICHOLAS:  Your Honor, I'm going to object at

13   this point.  He's reading a brief and that's all he's doing.

14            THE COURT:  Yeah.  And what -- what's the

15   significance of that to this case?  I mean, that doesn't

16   show me anything.

17            MR. FARRELL:  Judge, what I'm attempting to --

18            THE COURT:  Other than what happened and they --

19   okay, go ahead.

20            MR. FARRELL:  What I'm attempting to demonstrate

21   is that the DEA provided notice and warning to all three

22   defendants that they were not following the law and, as a

23   foreseeable risk, it was causing diversion of pills.

24            THE COURT:  Well, and they're saying they were

25   trying to get the regulations changed because they're not

1     clear.

2             MR. FARRELL:  And so, what we have is we have

3     repeated settlement agreements between the defendants and

4     the federal government.  We have their own policies and

5     procedures where they're following what the DEA tells them

6     to do.  And then they show up in federal court and they file

7     a brief and, on Page 4, continue to take the position which

8     is the absolute opposite of what they promised to do to

9     perform with the DEA.  That's the point.

10             THE COURT:  Well, if they're trying to get the

11     rules changed, what's wrong with that?

12             MR. FARRELL:  Well, if they're trying to get the

13     rules changed, then that's an acknowledgment that the rule,

14     they haven't been following.

15             MR. NICHOLAS:  That doesn't follow.

16             THE COURT:  No.  I don't think it follows at all.

17             MR. FARRELL:  Well, maybe I've not used the right

18     combination of words to explain.  What we're trying to

19     establish is that the rules are, say, A, and that the

20     defendants say the rules say B.  Following their attempt

21     with this disagreement, they lost that argument with the --

22             THE COURT:  Yes, but that doesn't mean that they

23     weren't following the rules to begin with, if they wanted to

24     get them changed.

25             MR. FARRELL:  I'm not suggesting that they're

1    trying to change the -- this isn't going to Senate Bill 483

2    or that Marino Bill.  This isn't going to when the law

3    changed later on down the road.  What this is, is state of

4    mind in 2012 that, despite repeated warnings,

5    AmerisourceBergen was stubbornly sticking to their

6    interpretation of the statute having been warned by the DEA,

7    and having been sanctioned by the DEA, and having entered a

8    Settlement Agreement with the DEA, and having promised in

9    written correspondence to the DEA that they would perform

10   these functions.

11         MR. NICHOLAS:  Well, I strongly, strongly disagree

12   with everything he said.  The record doesn't support that.

13   That is not what we've seen.  It's not the truth.  And I --

14   I do not think we should pursue this line of questioning.

15         THE COURT:  I'm going to sustain the objection and

16   cut you off on this.  This is not going anywhere relevant to

17   the case that I can see.

18     I don't see anything wrong with a party trying to get

19   the rules changed if they -- if they do so in the proper

20   format and within the proper method and everything and I

21   don't think it -- well, I've said enough.  Go ahead.

22         MR. FARRELL:  Judge, let me create a record of why

23   we're doing this.  I'm not suggesting there's anything wrong

24   with them taking the position that they're taking in the

25   amicus brief.

```
 1        I'm not suggesting that there's any liability because
 2   they took a position where they disagree with the DEA.
 3        What I'm suggesting is that these documents show, over
 4   a period of 14 years, a consistent stubbornness to perform
 5   the duties that the DEA believes they have.
 6             THE COURT:  But that's not what -- the documents
 7   don't say they stubbornly refused to perform the duties the
 8   DEA put on them.
 9             MR. FARRELL:  Well, I wasn't able to get to that
10   page of the document.  I was trying to lay the foundation.
11             THE COURT:  Well, I -- the objection is sustained.
12   I think we've beaten this horse enough.  Go ahead.
13             MR. FARRELL:  Two more documents, Judge.
14             BY MR. FARRELL:
15   Q.   Mr. Zimmerman, do you recall in 2013 participating in
16   the HDMA's Drug Diversion DEA Strategy Task Force?
17   A.   I may.  I may have.
18             MR. FARRELL:  I'm going to circulate what is
19   P-9486.
20        May I approach, Judge?
21             THE COURT:  Yes.
22             THE WITNESS:  Thank you.
23             BY MR. FARRELL:
24   Q.   Do you recognize this document, sir?
25   A.   It appears to be a cover memo, agenda, and it looks
```

1    like a series of presentations probably from a meeting, it

2    appears to be.

3    **Q.**   Who is it from?

4    **A.**   It's from Pat, Patrick Kelly, from HDMA.

5    **Q.**   Who is it to?

6    **A.**   It's to several members.  Elizabeth Campbell, Gary

7    Cacciatore, Kim Couch, Gilberto Quintero, T. Readling, Tom

8    Twitty, Don Walker, myself, John Gray, Ann Bittman, Pat

9    Kelly, Elizabeth Gallenagh, Perry Fri, Kristen Freitas,

10   Anita Ducca, John Parker, George Koch.  I think it's Peter

11   Vanderveer and Anne Johnson.

12   **Q.**   What's the date?

13   **A.**   It is dated Thursday, December 5th, 2013.

14   **Q.**   Would you read the first sentence after "Dear HDMA Drug

15   Diversion DEA Strategy Task Force Members"?

16   **A.**   "On behalf of John Gray and the HDMA Executive

17   Committee, thank you for agreeing to participate on the HDMA

18   Drug Diversion DEA Strategy Task Force.  We look" -- you

19   know, how long do you want me to read?

20   **Q.**   That's good.  And are there documents attached to this

21   e-mail?

22   **A.**   Yes.

23   **Q.**   Do you recognize the documents attached to the e-mail?

24   **A.**   If I was there, I would have seen them, but I don't,

25   you know, recognize them looking at them.

1    Q.   Before we go further on this document, we're going to

2    talk about P-9160.

3              MR. FARRELL:  May I approach, Judge?

4              THE COURT:  Yes.

5              THE WITNESS:  Thank you.

6              BY MR. FARRELL:

7    Q.   I'll give you a minute to review this document.

8         Sir, do you recognize this document?

9    A.   The first document, the top of it is an e-mail from me

10   to John Chou.

11   Q.   And who is John Chou?

12   A.   He is my boss, General Counsel.

13   Q.   What is the date of the document?

14   A.   Date of document is Friday, November 1st, 2013.

15   Q.   And are there attachments to this document?

16   A.   There is.  There is.

17   Q.   And are these similar to the documents that you

18   received from -- or you received by e-mail from Patrick

19   Kelly?

20   A.   From the -- the other one?

21   Q.   Yes, sir.

22   A.   The first couple are the same.  Maybe they're a

23   different order or something.  I would have to pull it apart

24   and see if they're -- they're not lined up.

25   Q.   You would agree with me that these are two e-mails to

1    and/or from you which include materials that you received as

2    a member of the HDMA Drug Diversion DEA Strategy Task Force?

3    **A.**   Yes.

4    **Q.**   And I'm going to have you look at P-9160 and I'm going

5    to have you flip to Bates stamp ABDC MDL 5787753.  So, it's

6    a little more than 80% through to the back, and the title of

7    this particular slide that's attached to your e-mail says

8    "Industry Messages".  Do you see that, sir?

9    **A.**   7753?

10   **Q.**   I think the slide -- the slide number itself is Slide

11   9.

12   **A.**   Yes.

13   **Q.**   Do you see that documents?

14   **A.**   I believe it's the same one, yes.

15   **Q.**   Can we bring it up on the screen, please?

16        Sir, do you recognize this document?

17        Judge, may I approach the screen?

18           THE COURT:  Yes.

19           THE WITNESS:  I don't recall seeing it but, I

20   mean, I've received it, so I'm sure I saw it before.

21   **Q.**   Do you recall any focus groups performed by HDMA

22   related to your role on the HDMA Task Force?

23   **A.**   We met and discussed but, I mean, I can't recall

24   specific conversations.

25   **Q.**   In particular, "One of the overall assessments in the

1    focus groups is that without access to data, respondents in

2    the focus group question how distributors can be held

3    responsible."  Did I read that accurately?

4    **A.**    Overall assessment?  Yes.

5    **Q.**    All right.  Do you recall that being one of the

6    conclusions --

7                THE COURT:  Just a minute.

8        Ms. Mainigi?

9                MS. MAINIGI:  Your Honor, I object on the basis of

10   foundation.  The witness does not seem to be recalling this.

11   So, Mr. Farrell is essentially testifying.

12       I also renew objections based on *Noerr-Pennington*.  I

13   mean, nothing here shows any intent on anyone's part to do

14   something unlawful.  So, we're going down another line of

15   questioning that seems like a rabbit hole.

16               THE COURT:  Well, I'll ask you the same question I

17   did before.  How is this relevant to the big issue in this

18   case that they flooded the Huntington-Cabell area with

19   drugs?

20               MR. FARRELL:  Without conceding the point, what

21   I'm attempting to show is that when the flood waters

22   receded, rather than do anything else, the defendants,

23   through their trade group, began conducting focus groups to

24   try to contain the message.  And one of the messages is that

25   if they could prevent the data from being exposed, then they

1   might not be held liable, which is ultimately conduct that

2   happens that we're trying to use to establish a state of

3   mind as to their past behavior.

4        So, the point of this is, is that we have two

5   particular Task Forces that Mr. Zimmerman participated in,

6   one in 2013 related to overall strategy that contains a

7   Crisis Play Book that we mentioned earlier and the results

8   of their focus groups that framed their positions.

9        And as I said in opening argument, Judge, many of the

10   arguments being made by counsel and by the defendants today

11   are born out of the results of these focus groups.  That's

12   point one.

13        Point number two is the second group Mr. Zimmerman

14   participated in was a West Virginia Task Force formed by

15   HDMA entitled "Turning the Tide in West Virginia" in 2015.

16   Not turning the tide of the opioid epidemic, but as -- if

17   permitted, I'll lay the foundation for turning the tide on

18   the media's portrayal of their role in the opioid epidemic.

19        So, we're attempting to show that when given the

20   opportunity to do something, what the defendants did was run

21   from liability.  And we believe -- I'm not trying to make

22   the -- I'm giving you the color because this is the basis

23   for that color.

24             MR. NICHOLAS:  Your Honor, I don't think that was

25   in response to a pretty simple question.  I think that was a

1    grandstanding speech which has no place in the courtroom and

2    has no place on the public record, frankly.  I know that

3    media is listening to this thing in an overflow room and

4    perhaps that's why we're hearing such speeches, but there is

5    no basis for this in the record.

6        He is not -- he would not be able to prove it.  There's

7    no foundation for any of this.  I don't believe that -- I

8    disagree strongly with everything he said, every

9    characterization he's made.

10       This is exactly why we -- this is one of the reasons we

11   objected to this material in the first place and I wouldn't

12   want the record to be -- to be lacking for the fact that I

13   strongly -- that, on behalf of my client, I totally disagree

14   with the speech, the closing argument, the

15   mischaracterizations, and the fact that none of that stuff

16   is going to prove out in this case.  I have to say it.

17             THE COURT:  Ms. Mainigi?

18             MS. MAINIGI:  I think Mr. Farrell with his speech

19   proves the point that we've been trying to make, Your Honor,

20   and denying liability is not intent.  He should not be

21   allowed to continue this.

22             THE COURT:  Mr. Hester?

23             MR. HESTER:  Your Honor, just to amplify on this

24   slightly, I think what Mr. Farrell has said really

25   illustrates why the plaintiffs are, in fact, trying to

1    discern or impose liability based on petitioning conduct.

2         These are -- HDMA is a Trade Association.  It's engaged

3    in evaluating legislative strategies, regulatory strategies

4    and media strategies.  The fact that they're engaged in a

5    media strategy along the lines of what's on the board is

6    petitioning activity.

7         It's protected First Amendment activity.  And to draw

8    from that some sinister inference is entirely unfair.  It's

9    entirely at odds with First Amendment principles.  They're

10   not using this in any legitimate way.

11        They're trying to find a basis for liability based on

12   the activities of a Trade Association that was engaged in

13   very conventional activity.  And I think Mr. Farrell's

14   argument really illustrates that, that he is trying to draw

15   from decisions that were being made in petitioning activity,

16   whether they were going to pursue a press strategy, or a

17   regulatory strategy, he's trying to discern from that some

18   sinister intent that then they try to imply here.  Well,

19   that's trying to impose liability based on First Amendment

20   activity.

21             THE COURT:  Well, even if the *Noerr-Pennington*

22   *Doctrine* doesn't keep this out, Mr. Farrell, what's the

23   relevancy?

24             MR. FARRELL:  State of mind.  Notice.

25             THE COURT:  How -- how does this show a state of

```
 1    mind that is probative of liability in this case?

 2              MR. FARRELL:  Well, part of their defense is to

 3    blame the DEA and, if permitted, I would be able to show a

 4    slide that shows the origins of that defense.

 5              THE COURT:  Well, why don't you do that?  Other

 6    than that, I just -- I don't see that this is helpful at

 7    all, but I'll let you go ahead a little bit.

 8              MR. FARRELL:  Judge, will you give me a moment to

 9    confer?

10              THE COURT:  Yes.

11         (Pause)

12              MR. FARRELL:  Judge, we withdraw both amicus

13    briefs, documents supporting it, as well as the HDMA

14    documents.

15          No further questions.

16              THE COURT:  You have no more questions of this

17    witness; is that right?

18              MR. FARRELL:  That's correct.

19              THE COURT:  And withdrawing the exhibits?

20              MR. FARRELL:  Yes, sir.

21              THE COURT:  All right.  You may cross examine, Mr.

22    Nicholas.

23                       CROSS EXAMINATION

24              BY MR. NICHOLAS:

25    Q.   Good afternoon, Mr. Zimmerman.
```

1    **A.**    Good afternoon, Mr. Nicholas.

2    **Q.**    Mr. Zimmerman, how long have you been employed at

3    AmerisourceBergen?

4    **A.**    I've been employed for 31 years.

5    **Q.**    And what is your current position?

6    **A.**    My current position is Senior Vice President of

7    Corporate Security and Regulatory Affairs.

8    **Q.**    That's CSRA?

9    **A.**    That's correct, CSRA.

10   **Q.**    Have you always -- for all the 30 years you've been

11   with the company, have you always worked in the area of

12   security and regulatory affairs at the company?

13   **A.**    My duties have always been with security and

14   regulatory.  At the very beginning, it was referred to as

15   Corporate Security, but always with security and regulatory.

16   **Q.**    Have you ever been on the business side or the sales

17   side of the company?

18   **A.**    No.

19   **Q.**    In your current positioning, have you had any

20   responsibilities in connection with the pandemic?

21   **A.**    Yeah.  I'm also one of the four-member COVID Task Force

22   that we assembled.  I guess it's been, unfortunately, a year

23   and a half and we made -- started the decisions of how to

24   conduct business making sure we continue product flow to

25   hospitals and pharmacies.  And in the pandemic, our

1    warehouses are frontline workers, essential workers, and are

2    critical to the supply channel.

3    Q.   I'm going to go straight to asking you some questions

4    about AmerisourceBergen generally, if I may.  First of all,

5    what is AmerisourceBergen Drug Company?

6    A.   AmerisourceBergen Drug Company is a drug wholesaler.

7    Q.   And what does a wholesale pharmaceutical distributor or

8    a drug wholesaler do?

9    A.   Our part in the supply chain is we buy pharmaceuticals,

10   over-the-counter products.  Pharmaceuticals include

11   controlled substances, health and beauty aids, and we buy

12   from about 2,000 different manufacturers and we bring them

13   into our warehouses and make them available for pharmacies

14   and hospitals.

15   Q.   Where is your company headquartered?

16   A.   We're headquartered in -- well, next month, when we

17   open our new building, it'll be -- well, when the pandemic

18   lifts, we'll be in Conshohocken, Pennsylvania.

19   Q.   How many employees does AmerisourceBergen employ?

20   A.   Close to 23,000.

21   Q.   And how many distribution centers do you have?

22   A.   We have approximately 27.

23   Q.   What products does AmerisourceBergen distribute?

24   A.   So, we distribute controlled substances,

25   pharmaceuticals, over-the-counter drugs, health and beauty

1    aids, anything you would find in a -- from a regular

2    pharmacy to what hospitals would need.

3    **Q.**   Yesterday you were asked how much of a market share

4    does The Big Three hold nationally and you said, "I've heard

5    upwards of 90%."  What products were you referring to when

6    you answered that question?

7    **A.**   I was -- I was -- the 90% was applied to the full

8    complement of products, the health and beauty aids, OTC,

9    pharmaceuticals and controlled substances.  The 90%

10   contained all that.

11   **Q.**   So, you weren't referring to opioids?

12   **A.**   No.  Not -- not opioids.  I've read articles where it's

13   much less, our market share.

14   **Q.**   And just to be clear, does AmerisourceBergen

15   manufacture opioids?

16   **A.**   We do not.

17              MR. NICHOLAS:  Okay.  Richie, could we just show

18   the supply chain as a demonstrative, please?

19              BY MR. NICHOLAS:

20   **Q.**   I just want to ask you a few questions about the

21   healthcare supply chain in the United States and we can use

22   this for reference as needed.  What is AmerisourceBergen's

23   role in the healthcare supply chain in the United States?

24   What does the company do?

25   **A.**   So, as I briefly explained -- a little bit more detail.

So, we have -- there's 2,000 manufacturers that fluctuates
that we buy products from where we purchase -- we carry
anywhere from 60,000 different items within our warehouses
and there's over -- we have over 16,000 pharmacy customers.

So, what we do, without a distributor, each one of
those 2,000 manufacturers have to ship direct to the
pharmacy.  And those pharmacies would have to place 2,000
separate orders.  They'd have to receive 2,000 separate
receipts at the door each day.  And that's the product going
out.

There's also the setup of the customers.  The
manufacturers only have to set up a few distributors and
sell their products to the distributors.  And then, we
handle all the pharmacies, making sure that they have an
appropriate license and collect.

**Q.**   So, just to make the point clear, why is it that
pharmacies and manufacturers don't just deal directly with
each other?  Why not cut out the middleman?

**A.**   It would be too many -- it would be -- one, it would be
too many transactions and the manufacturers couldn't handle
it because they ship like once a week, where we ship every
single day, and the pharmacies need those products the
following day.

And they may need from -- you know, half -- if they
ordered 50 products, it could be 50 different suppliers

1    they're buying from.  So, they could get it in one order.

2    And the timing of it, our customers can order up until 6:00

3    at night and then get the orders the very next day.  And we

4    want to do that daily to keep their inventory levels low.

5    **Q.**   Now, everyone in the supply chain, with the exception

6    of the patient, is licensed and is regulated, correct?

7    **A.**   Yes.  So, I may have explained yesterday.  So, each

8    segment on the -- in the supply chain as DEA refers to as

9    the Closed System must be -- hold a registration by the DEA

10   in order to handle controlled substances and each set of

11   responsibilities, whether your -- your registration is

12   classified as a manufacturer has specific requirements they

13   must follow.

14        There's a distributor classification.  There's a

15   practitioner classification.  And retail pharmacy

16   classification.  Each one has a specific set of guidelines.

17        But there's also general guidelines for having

18   effective controls to prevent diversion that we all must

19   follow when the products are in our possession.

20   **Q.**   And AmerisourceBergen is licensed by the DEA with

21   regard to controlled substances; is that correct?

22   **A.**   That's correct.

23   **Q.**   All right.  Is AmerisourceBergen also licensed by

24   individual Boards of Pharmacies, State Boards?

25   **A.**   Yes.  So, we refer to them as state regulatory

1    authorities.  Some are Boards of Health.  Some are Boards of

2    Pharmacy.  There's sometimes another third, which is State

3    Controlled Substance Authority within the state.

4    **Q.**   Does that include the West Virginia Board of Pharmacy?

5    **A.**   It does, yes.

6    **Q.**   All right.  I want to ask you a few questions about

7    reporting.  We've heard about ARCOS, so I'm not going to ask

8    you to explain what that is again, but so I think we all

9    know what it is, but does AmerisourceBergen report to the

10   ARCOS database?

11   **A.**   Yes.

12   **Q.**   All right.  How often?

13   **A.**   We -- AmerisourceBergen -- you have an option of

14   monthly or quarterly.  AmerisourceBergen reports monthly.

15   **Q.**   Does AmerisourceBergen also report controlled

16   substances -- substance transactions to the DEA daily?

17   **A.**   Yes.  We -- as part of our forwarding agreement, we

18   report every single sale of controlled substances, not just

19   Schedule II, but all schedules, to the DEA on a daily basis.

20   **Q.**   Now, the healthcare supply chain is often referred to

21   as the Closed System of Distribution.

22   **A.**   Yes.

23   **Q.**   Why does that matter?  What does that mean and why does

24   it matter that it's a Closed System of Distribution?

25   **A.**   So, as I mentioned that each registration has a

1    certification, a classification, and then they have specific

2    responsibilities within that closed chain.  And so, it

3    provides the tool for DEA to identify where diversion is

4    occurring in the supply chain.

5        So, when a manufacturer manufactures the product, they

6    have to keep records of where all that product was

7    distributed to, and then the distributor must maintain

8    records of the part they received, and then what customers

9    they shipped it to.

10       So, when the DEA comes into our facilities, which they

11   come in quite often, they'll come in.  They'll do an audit.

12   They'll take -- they'll say let me see your receipts.

13   They'll subtract all of our sales.  And then, they'll look

14   at the end in inventory.  Any discrepancies would be

15   diversion.  The product would be missing from the legitimate

16   source.

17       Pharmacies have the same requirements.  So, once we

18   send out product to the pharmacy, the pharmacy has to keep a

19   record of all the property received from the distributor, or

20   distributors.  And then, DEA can take that total, subtract

21   the number of prescriptions they have.  If they don't have

22   that remaining amount on the shelf, then revert to

23   diversion.

24       And so, it's a complete closed circle.  The closed --

25   the Closed System that illustrates that DEA at any given

1    time can track a product from manufacturing to dispensing to

2    detect diversion.

3    **Q.**   So, under the system, every pill is accounted for?

4    **A.**   Through -- down to prescription because with the

5    inventory -- so, when they -- I'll use distributor as an

6    example.

7         They'll take a -- they'll take all the receipts.

8    They'll subtract the sales.  They'll count the shelf.  Then,

9    we'll have to show them a DEA 106 Form for anything that was

10   theft -- or stolen or a 41 Form for any product loss.  So,

11   every single pill should be accounted for.

12   **Q.**   Okay.  I'd like to ask you a few more questions about

13   AmerisourceBergen's role.  Does AmerisourceBergen ever

14   interact with the patient?

15   **A.**   No.

16   **Q.**   Is AmerisourceBergen ever consulted by a doctor when

17   that doctor is making prescribing decisions?

18   **A.**   No.

19   **Q.**   Does AmerisourceBergen make medical decisions?

20   **A.**   No.

21   **Q.**   Who determines whether a prescription is medically

22   necessary for a patient?

23   **A.**   In that closed system, the DEA is designating the

24   practitioner to ensure -- they have the responsibility to

25   ensure that a prescription is written for a medical -- a

```
 1    legitimate medical purpose.

 2    Q.    And before filling a prescription, does the pharmacist

 3    have an obligation?

 4    A.    So, also written in the Code of Federal Regulations,

 5    the pharmacist has a corresponding responsibility that the

 6    prescription has been written for a legitimate medical

 7    purpose.

 8    Q.    So, under the regulations, it's on both the doctor and

 9    the pharmacist to determine that a prescription opioid is

10    medically necessary for the patient; is that correct?

11    A.    That's correct.

12              MR. FARRELL:  Objection, Your Honor, leading.

13              THE COURT:  Well, it is leading.  I'll sustain the

14    objection, Mr. Nicholas.

15              BY MR. NICHOLAS:

16    Q.    So, under the regulations, who is responsible for

17    making the determination that a prescription opioid is

18    medically necessary for the patient?

19    A.    So, I think it's 21 CFR 130.674 regarding

20    prescriptions.  Clearly designates that the prescribing

21    physician must ensure that a prescription is written for a

22    proper medical use and the corresponding responsibility lies

23    with the pharmacist to ensure that that prescription is for

24    regular -- I think -- I can't remember the exact word -- for

25    proper medical use.
```

1    **Q.**   Is AmerisourceBergen --

2         THE COURT:  We have an unusual situation here.

3    This is cross examination and leading questions are normally

4    permitted on cross, but he's a witness you produced, Mr.

5    Nicholas, and you're basically directing him.  So, that was

6    the basis of me sustaining the objection, even though

7    technically, this is cross examination.

8         MR. NICHOLAS:  I understood.  And I'm mindful of

9    the peculiar situation here and I'm going to try hard not to

10   lead.  If I lead a little tiny bit, maybe I can be given a

11   little latitude, but I will really try not to do that.

12        THE COURT:  Okay.

13        BY MR. NICHOLAS:

14   **Q.**   So, the decision we're talking about as to whether to

15   prescribe, is AmerisourceBergen involved in that decision at

16   all?

17   **A.**   No.

18   **Q.**   Is that decision as to medical necessity ever provided

19   to AmerisourceBergen?

20   **A.**   No.

21   **Q.**   Now, as you know, the plaintiffs in this case are

22   Huntington, the City of Huntington, and Cabell County.  Was

23   AmerisourceBergen involved in the prescribing decisions made

24   to any individuals in Huntington and Cabell?

25   **A.**   No.

1    **Q.**   Was AmerisourceBergen involved in any dispensing

2    decisions made to individuals in Huntington and Cabell

3    County?

4    **A.**   No.

5    **Q.**   Now, when a customer, say like a pharmacy, orders

6    prescription medications, medication from AmerisourceBergen,

7    does the distributor ever see any individual prescription?

8    **A.**   No.

9            MR. FARRELL:  Objection, Your Honor, continuing to

10   lead.

11           MR. NICHOLAS:  I don't think that's leading.

12           THE COURT:  Well, I think that question is proper.

13   It is a bit leading, but overruled.

14           BY MR. NICHOLAS:

15   **Q.**   Can you explain how the ordering process works?

16   **A.**   As I mentioned, the pharmacies throughout the day, they

17   have a system and they go into the system and, as they --

18   the prescriptions come in and products they need, they

19   assemble an order that they send at the end of the day and

20   it includes whatever products they need for the following

21   day.  There's no specific information, not how many

22   prescriptions they have.  It's just a -- the order for the

23   night.

24   **Q.**   How regularly do your customers place orders?

25   **A.**   So, most of our customers place orders every night.

1    Some high volume get two orders a day.

2    **Q.**    In terms of recordkeeping or things of that nature, do

3    you do anything extra when a customer orders opioids?

4    **A.**    So, opioids has a whole -- because it's a Schedule II

5    narcotic, there's a whole other set of regulatory

6    requirements in the CFR we must adhere to and having to deal

7    with narcotic order forms, also a DEA Form 222.

8        So, a customer -- and now, that's being replaced with

9    technology called CSOS.

10            COURT REPORTER:  CSOS?

11            THE WITNESS:  CSOS, C-S-O-S, yeah.

12            COURT REPORTER:  Thank you.

13            THE WITNESS:  And so, if the customer is a CSOS

14   customer, they have to transmit that through the CSOS

15   database that runs it through DEA.  So, DEA sees the order

16   before we even see it.

17       So, the Schedule II opioid order would go through DEA's

18   database before we get it to make sure that the customer's

19   licensed and has the appropriate schedule to order Schedule

20   IIs.

21       If you're not on CSOS, and the older -- the older

22   process was you filled out a three-part form.  The

23   pharmacist had to fill out and handwrite the form.  Send it

24   to the distributor.  The distributor is not allowed to fill

25   that order until they verify the paper form with the amount

1    of product they have.

2         And then, they would pull that form apart.  And then,

3    they would mail those -- one copy to the DEA every month, in

4    addition to the ARCOS reporting, in addition to the daily

5    reporting, and in addition to the -- any other reporting

6    requirements.

7    Q.   I want to ask you a few questions about quotas.  We've

8    heard already about quotas in this case.  Can you tell us

9    how that works, how the quotas work, to the best of your

10   knowledge?

11             MR. FARRELL:  Objection, Your Honor, foundation.

12             BY MR. NICHOLAS:

13   Q.   Do you know anything about how quotas for controlled

14   substances are set each year?

15   A.   The manufacturers submit an application and they're

16   approved --

17             THE COURT:  Overruled.  He can answer.  Go ahead.

18             THE WITNESS:  Oh, I'm sorry.  They're set by the

19   DEA based on an application from the manufacturers for a

20   request to manufacture a certain quantity.

21             BY MR. NICHOLAS:

22   Q.   Okay.  And do you know the purpose of the quota?

23   A.   The -- so, the basis of the quota is to ensure that

24   there's enough medication so that we don't have shortages in

25   the supply channel.  So, they have to -- the manufacturers

1   have to present the amount that, based upon their

2   information in the perceived medical needs for the following

3   year, they need a certain amount of product to be

4   manufactured.

5        And then DEA can approve, they can cut, or they can

6   adjust the quota as they see they -- as DEA feels is the

7   amount they need.

8             MR. FARRELL:  Judge, I'm going to continue my

9   objection to this witness testifying about the purpose and

10  function of the regulatory duties of the DEA with regard to

11  quotas.

12            THE COURT:  Well, it's his understanding of what

13  -- what his company's obligations are with regard to the

14  quotas, as I understand the question, so I'm going to allow

15  it.

16            BY MR. NICHOLAS:

17  **Q.**   Other than the manufacturer, is anyone in the supply

18  chain involved in the setting of quotas?

19  **A.**   The DEA approves them.  I'm not sure that -- that's all

20  I know.

21  **Q.**   Okay.  Is AmerisourceBergen involved in this at all?

22  **A.**   No.

23  **Q.**   Has AmerisourceBergen ever been involved with quotas?

24  **A.**   No.

25  **Q.**   Okay.  Let's transition to regulations, if we might.

```
1    Mr. Zimmerman, as the Senior Vice President of CSRA, are you

2    familiar with the Controlled Substances Act?

3    A.   Familiar with the act, but more so the Code of Federal

4    Regulations, which are promulgated by the act.

5    Q.   Okay.  Is AmerisourceBergen a registrant under the

6    controlled system -- Controlled Substances Act?

7    A.   Yes.  Each one of our distribution centers holds a DEA

8    registration.

9    Q.   Okay.  So, we've heard about the general requirements

10   of the Controlled Substances Act already in this case and

11   I'm going to display that.  I'm going to -- I just want to

12   -- they're expressed in Section 1301.71.  I just want to

13   display the section, if I might.

14        Do you recognize this, this language in this section?

15   A.   Yes.

16   Q.   Okay.  We don't have to -- what I really want to do is

17   go to the question of whether there are more specific

18   requirements than this for distributors under the act?

19   A.   Yeah.  And, as I've mentioned, you see it applies to

20   manufacturers, distributors and dispensers.

21   Q.   Right.

22   A.   So, they all -- that requirement applies to all.

23   Q.   So, this is the broad section, and then there are

24   specific -- all right.  So, is this the broadest of the

25   sections?
```

1    **A.**   Yes.  So, the CFR, they'll take security requirements

2    and then, they'll identify who they belong to.  So, some

3    will be maybe manufacturers, distributors.  Some will be

4    just distributors.  Some may be just pharmacies.  Some might

5    be practitioners.  And they break it in, but some are

6    overarching like security; you know, your responsibility to

7    prevent diversion, those type of overarching --

8    **Q.**   Are there specific requirements for distributors under

9    the act?

10   **A.**   Yes.

11            MR. FARRELL:  Objection, Your Honor.

12            THE COURT:  Basis?

13            MR. FARRELL:  Testimony on the legal duty of the

14   law.  There's rulings Your Honor has made that has

15   prohibited the plaintiffs from proffering such opinions and

16   now the defense is either opening the door or should be

17   precluded from doing the same.

18            THE COURT:  Well, it's his understanding of what

19   his company's obligations are and I'll overrule the

20   objection.

21            BY MR. NICHOLAS:

22   **Q.**   And can you tell us what the categories of the specific

23   requirement for distributors are?

24   **A.**   There's the security section.  There's recordkeeping,

25   which goes to the proper recordkeeping for adequate controls

1   for inventories and such, and then there's a general section

2   for narcotics.  I mentioned the narcotic order forms.

3   **Q.**   Okay.  Is there anything about suspicious orders?

4   **A.**   Suspicious orders falls under the security requirements

5   and, as you see in that section there, it says for a

6   registrant to determine if they have adequate control to

7   prevent diversion, it tells you there to refer to these

8   sections, 130.172-130.176.  The suspicious reporting

9   requirement is 130.174, I believe, would fall in that.

10  **Q.**   Okay.  And with the exception of what we've just --

11  what you just covered, are there any other requirements?

12  **A.**   For the DEA or just for our company?

13  **Q.**   Yeah.

14  **A.**   I think that pretty much sums it up from the DEA.  I

15  mean, yeah.

16  **Q.**   Does the DEA do anything to make sure that you're

17  following these regulations?

18  **A.**   Yeah.  They -- they'll routinely audit the registrants

19  during -- you know, for my 31 career, sometimes we would

20  have 25 audits in a year.  Sometimes we would have eight.

21      They are mandated -- I believe they're mandated to

22  conduct a certain amount like once every two years.  I'm not

23  sure if that changes over time, but they have to come and

24  inspect the distributors on a certain cycle and

25  manufacturers, which they do regularly.

1              MR. FARRELL:  Objection, Your Honor.  Again, it's

2      imposing duties that he believes that the DEA has.  This is

3      not only testimony that you have ruled upon, but it's

4      testimony that defendants have objected to when we tried to

5      elicit similar testimony from Thomas Prevosnik, 30(b)(6) of

6      the DEA.  They should not be allowed to have it both ways.

7              MR. NICHOLAS:  Your Honor, if I might respond.  I

8      don't -- I mean, I don't know what happened in Mr.

9      Prevosnick's 30(b)(6) deposition, but if I'm recalling the

10     direct -- the cross examination of Mr. Zimmerman from this

11     morning and yesterday, we had all kinds of questions and

12     answers pertaining to these kinds of things.

13         I think this is -- I -- you know, I'm really -- when

14     you said before that I'm not allowed to lead, I agree, as

15     long as I'm directing him, but all of this is arguably

16     responsive to the cross examination, as well.  So, I think I

17     need to lead, number one, and I think the subject matter is

18     totally appropriate for this, of all witness, of any witness

19     to --

20             THE COURT:  I'll overrule the objection.  You can

21     -- you can pursue this.

22             MR. NICHOLAS:  Okay.

23             BY MR. NICHOLAS:

24     **A.**   So, the -- I think the audit question.

25     **Q.**   Yes.

1   **A.**   So, they audit our facilities, you know, not just DEA,

2   but all other regulatory agencies.  I think, last year, we

3   had over 230 different inspections, visits, audits, just

4   last year alone.

5       And they come in and they'll have set guidelines to

6   ensure that we have proper -- proper procedures and

7   processes in place to prevent diversion and also meet all

8   the requirements of the CFR.  And so, sometimes, they last a

9   couple days.  Sometimes, they go a few weeks.

10      They do a reconciliation.  They check the alarm

11  systems.  They look at our customer files.  They look at our

12  suspicious orders.  They look at everything that you find in

13  the Code of Federal Regulations and that occurs regularly.

14  **Q.**   All right.  Let's focus on the physical security

15  requirements under the regulations.  This is Section

16  1301.72; is that correct?

17  **A.**   Yes.

18  **Q.**   All right.  And I'm displaying the section -- I think

19  it's actually a two-page -- so, there's two pages, but we

20  can go back to the first of the two pages.  Now, these

21  requirements are extremely detailed; is that correct?

22  **A.**   They're very -- they're very well -- they're extremely

23  detailed for -- in order to ensure you have proper security

24  requirements.

25  **Q.**   Can you give us a sense of the level of detail in this

1    requirement?

2    **A.**    So, when we're talking about controlled substance

3    storage areas, it's so detailed to the fact that they tell

4    you the gauge.  You have to have ten-gauge wire in a cage.

5    The openings can't be more than two and a half inches and

6    diagonal.

7         They have to -- you know, your posts have to be no more

8    than ten feet apart.  They have to be at least one inch in

9    diameter.  The bolts, as I mentioned yesterday, have to be

10   brazed to the floor.

11        Your vaults have to have to have eight-inch

12   poured-in-place concrete with rebars.

13             COURT REPORTER:  I'm sorry.  Slow down for me,

14   please.

15             THE WITNESS:  I'm sorry.  Eight-inch

16   poured-in-place -- and it's all in that -- all in that

17   detail, but eight-inch poured-in-place concrete with rebar

18   every six inches apart.

19        So, when we build a facility, the DEA has to come out

20   and look at the structure before we even pour the cement and

21   sign off on it.  And they test that when they do our -- when

22   they do our audits, as well.

23        It also includes the alarm system.  You have to have

24   certain vibration alarms, heat alarms, motion detections.

25   Doors have to be self-closing and locking.  All of that is

1    contained within the regulation, that level of detail.  So,

2    when you're going to open up a facility, a distributor, then

3    they tell you exactly how to do it.

4        It's also defined on how the pharmacies don't have to

5    have that level of security.  They can disperse the product

6    throughout -- on their shelf.  That's why, for security

7    reasons, we'd rather the opioids stay in the distribution

8    centers in our cages and vaults and not on the shelf.

9    That's why we have the orders every day.

10   **Q.**   Can you explain the process for when the company takes

11   control of a prescription opioid from a manufacturer from --

12   starting at the dock?

13   **A.**   So, because of the type recordkeeping requirements I

14   mentioned, when the DEA comes in and does an accountability

15   review, they want it to be lined up a hundred percent.  So,

16   when narcotics -- well, I guess we'll use Schedule II

17   narcotics.  When it comes in the receiving dock, that

18   product's received in receiving.  It's then immediately

19   taken to the vault area.

20       It's received a second time and then put on the shelf.

21   And then, the very next day, we do a complete inventory of

22   all movement of that drug to ensure what was received in

23   receiving was received at the vault and was put on the shelf

24   in the right location.  And we do that every day because, if

25   we wait a week and do an inventory, it takes too much --

1    takes too much time to try to track it down.

2    **Q.**    Are there any other times when you take an inventory?

3    **A.**    So, in addition to the daily accountability, we do a

4    complete monthly inventory of the cage involved, as well,

5    just in -- just in the event that, heaven forbid, there's

6    any internal theft.  We want to identify that, as well, and

7    we do that on the shipping part, as well.

8    **Q.**    And who gets this information?

9    **A.**    Who gets the --

10    **Q.**    The inventory information?

11    **A.**    Well, our reporting requirements report to the DEA.

12    So, they -- everything we receive in is reported to the DEA.

13    So, if it's Schedule II, as I mentioned, that's transmitted

14    to the DEA.

15    **Q.**    Do you conduct criminal background checks for your

16    employees?

17    **A.**    One of the requirements in the CFR is you have to

18    ensure you don't have anyone working in your facility that

19    has a -- has a past drug charge.  So, we perform criminal

20    background checks on all of our employees upon hire.  And

21    then, any employee we designate as compliance critical,

22    which are those that work with controlled substances,

23    whether it's at the receiving dock, in the cage, or the

24    vault, they have a -- they have a criminal background check

25    every year.

1    **Q.**   Do you take precautions when the product is on the

2    trucks?

3    **A.**   So, as the registrant and the way the Code of Federal

4    Regulations is written is that we're responsible for the

5    product from the time we sign for it until the time the

6    pharmacy signs for it, which there's a whole section that

7    talks about transportation and our responsibility to ensure

8    we hire carriers that have adequate securities.

9        Any losses that happen from when we -- they pick it up

10   on our dock before it gets to the pharmacy is the

11   responsibility of the distributor.

12   **Q.**   Does CSRA have anyone that -- have personnel in the

13   distribution centers around the country?

14   **A.**   So, from the org charts from yesterday, you saw that

15   there's CSRA managers at each of the facilities and they

16   each have a staff.  There's a lead and then there's

17   specialists under that.  And they ensure that the operation

18   is doing the receiving process that I explained.

19       It's the same process on the shipping.  We double check

20   every single controlled substance order.  And then, that

21   also goes on the accountability list.  So, they're ensuring

22   that all the policies are being followed.

23       They also conduct all the -- all the training at the

24   facility, the regulatory training.  We talked about

25   suspicious order monitoring at the location.  They conduct

1    the annual training for all the employees for regulatory

2    requirements.

3    **Q.**   Now, I think we've already -- we've heard testimony

4    already in this case that the Lockbourne Distribution Center

5    is the distribution center that was distributing into West

6    Virginia and including Cabell County and Huntington.  Is the

7    Lockbourne Distribution Center licensed by the DEA?

8    **A.**   Yes, they are.

9    **Q.**   Are all of your distribution centers licensed by the

10   DEA?

11   **A.**   They are.  And because of our process and our program,

12   it has -- it's standardized.  So, that whole process I'm

13   describing, whether security, recordkeeping, how we receive

14   product, how we ship product, that's the same at every

15   distribution center.  It's standardized across the board.

16   So, everything that Lockbourne would have, all our other

17   distribution centers would have, as well.

18   **Q.**   So, is it correct that all of the physical security

19   requirements and things that you do to comply with those

20   requirements are in place in the Lockbourne facility?

21   **A.**   Yes.  And so, when it -- in addition to the government

22   auditing us every two years, that's the internal CSRA Team I

23   mentioned.  They perform two self-assessments of the entire

24   operation every, every year.

25        So, in addition to the DEA, we're auditing ourselves.

1    And then, on top of that, the Office of Compliance also

2    performs an audit to make sure that the distribution centers

3    are operating as designed.

4    **Q.**   Is the securing of these products when they are in your

5    possession a large part of AmerisourceBergen's

6    responsibility in protecting against diversion?

7    **A.**   Yes.  We have to -- as soon as we receive those

8    products, I mean, they're put in a vault and they're counted

9    regularly.  We have -- we have limited access control.  Only

10   certain members of the -- only certain employees can access

11   those systems and everything is card-key.  So, we know every

12   single person that goes into those storage areas and what

13   time they leave.

14        So, rarely, in the event we do have a theft issue, we

15   can usually pinpoint the time because we're counted so often

16   and we pinpoint every single person that had access to it.

17              MR. NICHOLAS:  Your Honor, this is a natural break

18   point for me.

19              THE COURT:  Well, we need to relieve the court

20   reporter, so we'll be in recess for about ten minutes.  Come

21   back at about 20 till 4:00.

22        (Recess taken)

23        (Proceedings resumed at 3:42 p.m.)

24              THE COURT:  All right, Mr. Nicholas, you may

25   go forth.

1           MR. NICHOLAS:  Thank you.

2    BY MR. NICHOLAS:

3    **Q.**   Mr. Zimmerman, has the diversion control program

4    evolved over time?

5    **A.**   Yes, since I've been with the company.

6    **Q.**   Were you personally involved in designing and operating

7    the program starting in 1990 when you joined the company?

8    **A.**   Yes.  I was working -- that was one of the first things

9    I did was -- actually, my very first day at work I came

10   in -- I started on January 2nd and most of the office was

11   out.

12        So I came in and admin said, "We need you to mail these

13   reports to these DEA offices."  And they were the suspicious

14   order reporting at the time.  That was my very first

15   function.

16   **Q.**   I want to ask you about the time period from 1990 to

17   1998.  In the early '90s -- well, what did the program look

18   like -- briefly, what did the early '90s -- what did the

19   program look like in the early '90s?

20           MR. FARRELL:  Objection, Your Honor.

21           THE COURT:  Basis?

22           MR. FARRELL:  This is outside the temporal scope

23   of the discovery that the defendants insisted on dating back

24   to the early days of the MDL.  We were restricted from

25   discovery prior to the -- prior to 2006.

1          THE COURT:  Well, you're asking him the history of

2     his involvement in the diversion program.  Right?

3          MR. NICHOLAS:  That's correct.

4          THE COURT:  Overruled.  I'll allow it.

5     BY MR. NICHOLAS:

6     **Q.**   What did the program look like in the early '90s?

7     **A.**   So in the early '90s, it was a two-step process.  One

8     was we did the training at the distribution centers with the

9     employees to ensure that those who were picking those orders

10    had the responsibility if they saw something suspicious,

11    whether it was pattern, frequency.  They would have the

12    obligation to contact the DEA office and report it.

13         It also consists of a monthly report that compared all

14    pharmacies to one another and then created an average.  And

15    then the average produced was on the report which was mailed

16    to the local DEA office each month.

17    **Q.**   And how was your interaction with the DEA during that

18    time period?

19    **A.**   Good.  I -- we would meet every six months.  The

20    industry would meet with DEA at DEA's office.  And then in

21    six months the DEA would come to had -- at the time, it was

22    called the NWDA -- at their office and we would have just

23    open discussion about the environment, what was occurring,

24    any trends that we were seeing, any trends that they were

25    seeing.  It was a shared, shared correspondence.

1          MR. FARRELL:  Objection, Your Honor.  He's

2    testifying about conversations that happened with the trade

3    organization that we were prevented from going into in other

4    contexts.

5          THE COURT:  I'll sustain that one, Mr. Nicholas.

6    BY MR. NICHOLAS:

7    **Q.**   Please don't make any references to any trade

8    organizations.  With that, you can go on.

9    **A.**   So we would regularly meet.  And when we would have a

10   new business initiative, opening up a distribution center,

11   potential acquisition, there was a lot of interaction with

12   the DEA at that time.  And we had a great -- you know, I had

13   a -- I thought we did have a really good working

14   relationship.

15   **Q.**   Will you give us just -- without describing them in

16   detail just a couple of examples of how the distribution

17   centers worked with DEA specifically on issues?

18   **A.**   So as, as I mentioned on the suspicious order

19   reporting, it wouldn't be uncommon if they had a call with

20   the DEA office, one regarding an issue itself.

21          But, again, on a multitude -- if there was a loss or an

22   inventory discrepancy or an issue with the alarm system,

23   anything that had to do with the Code of Federal

24   Regulations, they would contact the DEA, whether it was to

25   alert them of the issue, inform them of the issue, or seek

1    guidance.

2        And in the same, same note, DEA would call the -- they

3    would contact the local distribution center themselves.  So

4    there was a good working relationship.

5        One of the things I would do when I would audit a

6    facility is I always set up appointments with the local law

7    enforcement, with the local DEA office, and the Board of

8    Pharmacy just to give them a general awareness of what we do

9    and introduce myself so when you're talking to somebody on

10   the phone that there's a little bit of a personal contact.

11   And it just seemed to really help when things would happen.

12       So it was really to have, build that trust with one

13   another.  In the event of an emergency, you really need to

14   rely, then you had somebody to trust and work with.

15   **Q.**   And, and just one more question on this.  How about

16   previous -- other prior epidemics?  Did you work with them

17   on that?

18   **A.**   So we worked with the DEA on a whole multitude of

19   issues that arose.  I think I mentioned, you know, at the

20   very beginning when I first started on the rescheduling of

21   steroids into a Schedule III.  We worked with them on --

22   when pseudoephedrine was being stolen from pharmacies -- or

23   not pharmacies, but really retail stores and they were

24   making methamphetamine.  We worked with DEA on that.  I've

25   also worked with them on suspicious order reporting.

1      But continuously always, you know, hand-in-glove

2   working with them.  CSRA is the DEA internal -- we worked --

3   you know, I heard the term "adversary."  I look at them as

4   more of a partner.  They have the same -- we have the same

5   mission to protect the supply channel.  And, so, we're

6   really -- we're not -- we weren't at odds.

7   **Q.**   In 1996 did you approach the DEA with an idea with

8   regard to your program?

9   **A.**   I did, yeah.  It was, again, borne from, borne from

10  those meetings that I would have with them when I would do

11  my audits.  You know, "How is everything going?  What do you

12  like?  What don't you like?"  They would always complain

13  about the phone calls.

14      And, so, I reached out to Washington, Washington, D.C.

15  to see if there was something that we could do to make the

16  process better for them and --

17          MR. FARRELL:  Objection, Your Honor.  This is

18  lobbying to government to change the rules.

19          MR. NICHOLAS:  I object to the objection.  That's

20  not what he's doing.  I think he's interrupting the witness

21  when he's trying to answer the question.

22          THE COURT:  Overruled.  Go ahead.

23          THE WITNESS:  If I said Washington, I meant the

24  DEA Washington -- I apologize.  I meant the DEA office in

25  Washington, not Washington, D.C. lobbying activity.  This

1    was working with -- and it wasn't to change the regulation.

2    It was how can we -- the regulation is very vague.  Right?

3    Frequency, pattern, and quantity.  That's it.  And report

4    when identified.  That's it.

5        So I was looking to better clarify that vagueness and

6    something that would work because I'm being told from the

7    DEA to stop calling, but our regulatory requirement is you

8    have to report a suspicious order when identified.  We have

9    to keep calling.

10       And, so, that was putting us in a little bit of

11   friction with the DEA office that the person that's auditing

12   you and going to be enforcing is telling you to stop, but

13   you have a, you have an obligation to by the regulations to,

14   to continue.  So that was the basis of the initiation of

15   the, of the program.

16   BY MR. NICHOLAS:

17   **Q.**   And during the next two years from 1996 to 1998,

18   did you work to develop that better program?

19   **A.**   We did.  So we first started -- we looked at the old

20   report, compared all pharmacies together.  We worked with

21   DEA, and they thought it would be more informative if it

22   compared a specific pharmacy to itself so it could identify

23   its own patterns or frequency or quantity.

24       They, they wanted to have full flexibility to, to alter

25   that, that trigger amount we heard three times was the

1    default, but they could change it to one or to 10.

2         Another one was they didn't want -- they wanted it

3    faxed to them so it didn't have to take up the time in

4    answering the phone and we could have that faxed to them so

5    when they came in in the morning, the report would be at the

6    office.  And, so, that would meet the -- would identify the

7    requirement in the regulation.

8    **Q.**   And did you work with the DEA in developing this new

9    program?

10   **A.**   Yeah, we worked on what we wanted to try to accomplish.

11   And then our IT department went and developed, developed the

12   program, put it into production, and then we tested it.  So

13   we were -- and the whole time, we still maintained our daily

14   reporting.  We still maintained that monthly report I

15   described.

16        So we were still maintaining our program as it had been

17   since the '80s.  So we were testing out the new program with

18   the new parameters and we started with one office expanding

19   to another office.  I think it expanded to, you know, a

20   third fairly quickly.  And we utilized it until we got full

21   approval to implement it nationwide.

22   **Q.**   And when you say you started in one office, did the DEA

23   allow you to test your program in their field offices?

24   **A.**   It -- so it was tested in our distribution centers, but

25   the reports went to the field offices which was the

1    requirement.  So those -- we would -- I think L.A. was one,

2    Los Angeles.

3         So the L.A. office when they came in in the morning,

4    they would have a stack of suspicious orders that had been

5    reported from the orders of the night before.

6    **Q.**   Now, did all of this culminate in an approval by the

7    DEA of your program?

8    **A.**   Yes.

9    **Q.**   Was the approval in writing?

10   **A.**   Yes.

11          MR. NICHOLAS:  Can we display, Ritchie,

12   AM-WV-00781.

13   BY MR. NICHOLAS:

14   **Q.**   Do you recognize this letter?

15   **A.**   Yes.

16   **Q.**   Was this letter addressed to you?

17   **A.**   Yes, it was.

18   **Q.**   What is the date on the letter?  Can you see it?

19   **A.**   July 23rd, 1998.

20   **Q.**   And did you read the letter when you received it and do

21   you recall it?

22   **A.**   Yes, we did.

23   **Q.**   Everyone has one except you.

24          MR. NICHOLAS:  May I approach?

25          THE COURT:  Yes.

1          MR. NICHOLAS:  Everyone except you and me have

2     one.

3          Your Honor, at this time I would offer this letter into

4     evidence, into evidence.

5          THE COURT:  What about all the stuff that's

6     attached to it?

7          MR. NICHOLAS:  Actually, thank you for reminding

8     me.  That's very important.

9     BY MR. NICHOLAS:

10    **Q.**  Can you take a look at the attachments to this

11    letter and tell us what they are?

12         I'll try to streamline this.  Are the attachments to

13    the letter prior correspondence between you and the DEA

14    about the development of this program?

15    **A.**  Yes.

16    **Q.**  All right.  And flipping through it, do you recognize

17    all of that correspondence?

18    **A.**  I do.

19    **Q.**  And was it all either to you personally or from you

20    personally?

21    **A.**  Yes.

22    **Q.**  Okay.

23         MR. NICHOLAS:  Your Honor, what I will offer into

24    evidence is the packet, is the group of documents.

25         THE COURT:  Is there any objection?

```
 1              MR. FARRELL:  I'm flipping through it, Judge.

 2         (Pause)

 3              MR. FARRELL:  The only objection I would have,

 4    Your Honor, is whether or not this is the complete set of

 5    communications that were discussed in Thomas Prevoznik's

 6    deposition.  And to that extent, we have no objection.

 7              MR. NICHOLAS:  It is -- I believe it is the

 8    complete set.  But, in any event, I offer it into evidence.

 9              THE COURT:  I think what you've offered is

10    admissible in and of itself and I'll admit it.

11    BY MR. NICHOLAS:

12    Q.   All right.  Can we look at just the first sentence,

13    please, and can you read the first sentence of the

14    letter out loud -- well, read the first sentence out

15    loud for the record, please.

16    A.   "This is to grant approval of your request to implement

17    on a nationwide basis your newly developed system to

18    identify and report suspicious orders for controlled

19    substances and regulated chemicals as required by the

20    federal regulation."

21    Q.   Read the second sentence, please.

22    A.   "DEA managers who have been involved with the testing

23    of the system have relayed their positive opinions regarding

24    its ability to provide information in a fashion which is not

25    only useful overall but is also responsive to the needs of
```

1    the individual DEA offices."

2    **Q.**   And read the first sentence of the second paragraph and

3    then we can stop with the reading.

4    **A.**   "We appreciate the efforts you have undertaken to

5    develop this improved system and apologize for the lengthy

6    approval process."

7    **Q.**   Thank you, Mr. Zimmerman.

8        Now let's just display one more version of this

9    document, please.  And that is AM -- that is 02658.

10       Is this the same -- first of all, take a look at this.

11   Is this the same letter?

12   **A.**   Yes.

13   **Q.**   Okay.  I'm going to direct your attention to the only

14   difference in the letter and that is way at the bottom and

15   that's it.  It says on the bottom "Subject:  Approve

16   suspicious order monitoring system."  Do you see that?

17   **A.**   Yes.

18   **Q.**   Okay.  And that is the only difference in the letter.

19           MR. NICHOLAS:  I offer this letter into evidence

20   as well.

21           THE COURT:  Any objection?

22           MR. FARRELL:  Judge, I don't know that the

23   foundation has been laid.  It's Bates stamped on United

24   States DEA.

25           THE COURT:  Well, he testified that he received

1    it.

2            MR. FARRELL:  Yeah, but I think that the bottom

3    portion they're trying to --

4            THE COURT:  Oh, I see, yeah.

5        Well, what about that, Mr. Nicholas?

6            MR. NICHOLAS:  Hold on one second.  I've got to

7    consult with my smarter friend.  I'll be right back.

8            THE COURT:  Well, obviously I have smarter friends

9    that help me.

10       (Pause)

11           MR. NICHOLAS:  Okay.  What we're checking to see

12   is whether we have a stipulation to the foundation of this

13   with the plaintiffs that would permit its -- to permit -- to

14   permit it to be admitted on foundational grounds.  We'll

15   check and I can move on while we're --

16           THE COURT:  Well, I'm going to, I'm going to admit

17   it.

18           MR. NICHOLAS:  Okay.  Good, great.  Thank you.

19   BY MR. NICHOLAS:

20   **Q.**   Now, did you communicate or send this approval

21   letter to anyone on your team?

22   **A.**   Yes.  So this was -- once we implemented the new

23   program nationwide, we had sent the copy of the letter to

24   each of the distribution centers to keep in their records

25   for the process when the DEA would perform their audits.

1    **Q.**   So it could be shown to the DEA?

2    **A.**    If, if requested.

3    **Q.**   Okay.  And, and just quickly, what were the

4    highlights -- without going into a lot of detail, what were

5    the highlights of the improvements that you made?

6    **A.**   So other than the immediate fax versus a phone call was

7    one.  It made it much more efficient.  And I hate to say the

8    fax was breaking technology at the time, but the advanced

9    technology we implemented was the fax machine.  That was a

10   big change.

11       But really the customer to themselves versus everybody

12   in one bucket, and then the flexibility that it gave the DEA

13   which is referenced in the letter.  They could tailor make

14   it to whatever they want.  They could set the thresholds to

15   zero.  They could focus on one item.

16       So if Houston is having a Promethazine problem, they

17   could set that threshold to zero and get every order for

18   Promethazine sold on a daily basis.  So really the tool --

19   they could report suspicious orders, but they could also use

20   it as an investigative tool as well.

21   **Q.**   Was this pretty advanced for the industry at the time?

22   **A.**    I'd like to think so.  I -- you know, in all, all

23   fairness to our counterparts, I always like to think that my

24   department does a great job and we're always looking for

25   better ways to do things and, you know, which is some of the

1    frustration.  We were always trying to make sure we're

2    following the rules and applying the regulations

3    appropriately.

4    **Q.**   Now, under this new, this new approved program, was

5    AmerisourceBergen required to hold and not ship suspicious

6    orders?

7    **A.**   No.

8    **Q.**   All right.  Did the DEA know that?

9           MR. FARRELL:  Objection, Your Honor, lack of

10   foundation.

11          THE COURT:  Well, if he, if he knows.

12          THE WITNESS:  We tested with the DEA for two

13   months, and we were releasing the orders that were flagged

14   that we were reporting.  So I don't know how they would not

15   know.

16          THE COURT:  Overruled.

17   BY MR. NICHOLAS:

18   **Q.**   So is it correct that the DEA approved the 1998

19   program that included reporting suspicious orders after

20   shipping them?

21   **A.**   Yes.

22   **Q.**   Now, why would you ship orders that were suspicious?

23   **A.**   Again, we, we reported our orders that we felt were

24   suspicious, but we would ship the -- we shipped the order

25   not to impact patient care and the supply channel.

1       Now, that isn't to say that there's not an order that

2   we would, we would just ship anything.  So, I mean, there

3   are instances where we get something that we won't ship

4   because we just don't feel comfortable, you know.  There are

5   unique circumstances.

6       We had an individual show up wanting to buy a pallet

7   full of pseudoephedrine, which was a listed chemical at the

8   time, for cash.  And our person called from the DC saying,

9   "I have somebody here who wants to buy a --" not even a

10  pharmacy, just somebody walking in.  That's a suspicious

11  order when somebody walks in wanting to buy a listed

12  chemical with cash.

13      And we just told the person to come back the next day.

14  And, so, it gave us time to notify DEA so we could arrange

15  for that situation.

16      But that's -- I mean, again, suspicious orders are

17  those to help DEA to alert them that potential -- there

18  could be, you know, something they need to look into, things

19  that they can do that we can't.

20      And, so, when I started with the company, we would ship

21  orders that we identified as suspicious.  They -- and,

22  again, our assumption is that if there was an issue with the

23  pharmacy, that they would either revoke the license or

24  inform us to stop shipping.

25  **Q.**   Did you train your personnel -- I'm sorry.  Did you

```
 1    train DEA personnel on the new program?  Did
 2    AmerisourceBergen do training for DEA people on your new
 3    program?
 4    A.   Yes.  We informed them how, how it worked.  Then, you
 5    know, in addition to other regulatory requirements, we
 6    trained them -- helped train them as well.
 7    Q.   And were these -- were there training sessions?
 8    A.   Yes.  So for the Code of Federal Regulations as a
 9    whole?
10    Q.   On your -- pertaining to your new program.
11    A.   For the new, for the new program we had -- I don't know
12    if we had specific training programs for the DEA.  For our
13    people, we did.  And then part of our training we did with
14    the DEA I think initiated in the late '90s.  It would
15    include that portion as well.
16    Q.   Okay.  Were these early training sessions supervised by
17    you?
18    A.   Me and my team, yeah.
19    Q.   Okay.  In 2005 did the DEA meet with your colleague,
20    Steve Mays?
21    A.   Yes.
22    Q.   Okay.  Do you have a general understanding of what was
23    discussed?
24    A.   Yes.
25    Q.   Okay.  Can you tell us generally what that was?
```

1   **A.**    When Steve came back from the 2005 meeting, it was more

2   in reference to internet pharmacies that they had -- that

3   the DEA was experiencing that required higher levels of

4   opioids that were being filled through this internet

5   mechanism and wanted to bring it to our attention and be

6   aware of that.

7   **Q.**    So were internet pharmacies the focus of that meeting

8   in 2005?

9   **A.**    That's the take I got when Steve came back was the, the

10  impetus of the meeting.

11  **Q.**    Okay.  Mr. Mays will testify, so we'll hear more from

12  him.

13  **A.**    Yes.

14  **Q.**    But after that meeting, did the company make some more

15  improvements in its program?

16  **A.**    Yeah.  Based on the meeting, they wanted us to take --

17  you know, if you're seeing higher levels of opioids to

18  conduct, you know, look into them further.

19       I think we opened up around 100 investigations.  After

20  that point, we modified the policy to include that process

21  and conducted investigations of higher level opioid

22  purchasers.

23  **Q.**    Did the improvements made after 2005 include

24  development of a due diligence questionnaire?

25  **A.**    Yes.

1    **Q.**   Okay.  And that questionnaire was for your customers;

2    correct?

3    **A.**   It was for the customers that we identified that needed

4    additional investigation, let's say, based upon the volume.

5    And if they were conducting internet operations at that

6    time, as long as they met the requirements of having a

7    physical patient/doctor relationship and met all the

8    requirements, it could be legal.  But if they weren't, then,

9    then it would be illegal.

10        So if a pharmacy claimed to us they were conducting

11   internet business, we would have a form that they would have

12   to complete to understand they were doing it within practice

13   or not.

14   **Q.**   All right.  Let's talk about the period beginning in

15   2007.  In 2007, when the year began, were you still

16   operating under the 1998 approved program?

17   **A.**   Yes.

18   **Q.**   Did something happen in the middle -- did something

19   happen sometime in 2007 that changed all that?

20   **A.**   Yes.

21   **Q.**   All right.  Can you tell us what happened?

22   **A.**   We received an order of show cause and immediate

23   suspension of our Orlando distribution center in April,

24   2007.

25   **Q.**   Now, before we go any further, the Orlando distribution

1   center doesn't ship to -- has never supplied to West

2   Virginia; correct?

3   **A.**   That's correct.

4   **Q.**   All right.  Let me ask you some questions about the

5   receipt of the Immediate Suspension Order.

6       First of all, had anything like that ever happened to,

7   to you when you were with the company for all the time you

8   were with the company before that?

9   **A.**   No.  I had never experienced an Immediate Suspension

10  Order to show cause since I started with the company.

11  **Q.**   Have you ever experienced an Immediate Suspension Order

12  to show cause since that one event in 2007?

13  **A.**   No.

14  **Q.**   So that's the only time?

15  **A.**   Yes.

16  **Q.**   Okay.  Given your entire time with the company and all

17  of your experience with the DEA, was this something that you

18  would have ever expected to happen?

19  **A.**   No.

20  **Q.**   Was it a surprise?

21  **A.**   It was, it was a shock.  So, you know, my first -- let

22  me see, 2007.  So my first 17 years has been working, like I

23  said, together as partners with the, with DEA and not

24  adversarial whatsoever.  That's not to say we didn't have

25  issues that they may find on our audit that we'd have to

1    correct from time to time by any means.  But, you know,

2    we -- I thought we worked really well together.

3        And we went to the 2005 meeting.  We implemented a new

4    policy.  We opened up additional investigations.  We had

5    open dialogue with the Orlando DEA office.  In 2006 they

6    submitted us a list of questionable pharmacies.  We

7    investigated them.  We shut some down.  We denied others

8    from opening.  This is in 2006.

9        And then, you know, to get the Immediate Suspension

10   Order as we're working with the local DEA office was a shock

11   without any notice of any issues going on in Florida.

12   **Q.**   Now, the information you received with regard to the

13   suspension order had to do with four specific pharmacies; is

14   that correct?

15   **A.**   Yes.

16   **Q.**   All right.  And at that point in time when you received

17   the suspension order, were you still doing business with all

18   four of those pharmacies that you got, got an order for?

19   **A.**   No.  I believe three of them we had, three of them we

20   had shut -- not shut down.  We had stopped servicing and had

21   communicated that to the DEA office.

22   **Q.**   Okay.  Now, eventually this was worked out in

23   conjunction with the DEA; correct?

24   **A.**   Correct.

25   **Q.**   All right.  Was there -- and there was no fine imposed

1  in connection with this at the end of the day; is that

2  right?

3  **A.**   That's correct.

4  **Q.**   Okay.  Has AmerisourceBergen ever been fined by the

5  DEA?

6  **A.**   Not, not with my company, not with Bergen Brusnwig or

7  since the merger in 2001, so since 1990 for me.

8  **Q.**   So the answer to that question is "no"?

9  **A.**   Yeah.

10  **Q.**   Now, as part of that agreement -- so eventually what

11  happened after -- you know, what happened after that that

12  resulted in a new -- let me start again.  After all was said

13  and done, you came out with a new program in 2007.  Is that

14  correct?

15  **A.**   That's correct.

16  **Q.**   Okay.  And that was in connection with working with the

17  DEA; is that right?

18  **A.**   That's correct.

19  **Q.**   Okay.  And as part of that agreement between

20  AmerisourceBergen and the DEA, did AmerisourceBergen agree

21  to send a report of all sales of controlled substances to

22  the DEA on top of its suspicious order reporting?

23  **A.**   Yes.

24  **Q.**   Okay.  What was -- so I'm going to refer to this new

25  program in 2007 as the enhanced program.  All right?

A.    Okay.

Q.    What was the major change in the enhanced program that you, that you agreed to undertake after this -- after these discussions with the DEA?

A.    So it, it was comprised of a more in-depth due diligence process of on-boarding new pharmacies, which included the verification of a license, but also a pharmacist and information about the owner, size.  Again, because of the internet process, we would do searches and see if they had a website, if they were taking orders on the internet, things like that.  So it was enhanced due diligence portion.

      And then the actual reporting of itself, which you remember pre-'98 all pharmacy customers together from '98 to '07, every customer to themselves.  And then this new enhanced system was back to comparing all pharmacies in a bucket, but we then broke them into groups so you didn't have all these pharmacies and then one multiplier.  We had one -- pharmacies broken into I think four groups.

Q.    What about the shipping requirement?

A.    We also spoke to -- spoke to.  We also -- part of the negotiation was that if an order is identified as an order of interest, then it's blocked and we review that order. It's not shipped.  We review the order.  And if we determine it's not suspicious, we can release it.  And if we do

```
 1    determine that after investigation it's suspicious, we

 2    report it to DEA and it's not shipped.

 3    Q.   So was this the first time -- so from this time forward

 4    did, did AmerisourceBergen ship orders that were suspicious

 5    orders?

 6    A.   They shipped -- they shipped the orders that were

 7    identified as suspicious by the report, yes.

 8    Q.   Going forward from beginning -- under the new program,

 9    did AmerisourceBergen stop shipping suspicious orders?

10    A.   Yes.

11    Q.   Okay.  Before the new program, --

12    A.   Yes.

13    Q.   -- AmerisourceBergen had?

14    A.   Yes.

15    Q.   Run this by us again because it's important.  I just

16    want to make sure we have the sequencing correctly.

17    A.   Yes.  So, again, the shipment requirement -- I'm not

18    really sure what -- so from '90 to '96 we would send the

19    report, find the order and ship it.

20         From '96 to '98 working in conjunction with DEA and

21    their offices and Washington, D.C., we would identify the

22    suspicious order and ship it, which they approved in a

23    letter in writing.

24         From -- so from '98 to '07 we would identify a

25    suspicious order and ship it.
```

```
 1        And then in 2007 after -- the company agreed with DEA

 2    that we would not ship an order that we identified as

 3    suspicious.

 4    Q.    Just one point of clarification from yesterday.  I want

 5    to ask you one, one question.

 6        In your diversion control program, if you, if you

 7    report a suspicious order and block that order, which is the

 8    way it is now, has it ever been your policy that you cancel

 9    all future orders for that product for that customer?

10    A.    No.  I think it -- just to clarify, so when the order

11    gets triggered in the system as potentially suspicious, it

12    won't allow that customer to place another order for that

13    product until the resolution of that one order, whether it's

14    cancelled or shipped.

15    Q.    But it's never been -- but has it ever been your policy

16    that you cancel all future orders if you report a suspicious

17    order?

18    A.    No.

19    Q.    Okay.  Now, prior to 2007 in all of your communications

20    with the DEA, did anyone ever tell you not to ship an order

21    that you had reported as suspicious?

22    A.    I don't -- not that I can recall.

23    Q.    As part of your agreement -- you've already testified,

24    I think, that as part of the 2007 agreement, you agreed that

25    ABDC -- that AmerisourceBergen would send a report of all
```

1  sales of controlled substances to the DEA in addition to its

2  suspicious orders; correct?

3  **A.**   Yes.

4  **Q.**   And that was, that was something that you agreed to do

5  for a period of five years under the agreement; is that

6  correct?

7  **A.**   That's correct.

8  **Q.**   But you continued to do it -- despite the fact that the

9  five years have long come and gone, you've continued to do

10  it to this day; is that correct?

11  **A.**   That's correct.

12  **Q.**   Was, was the DEA satisfied with this new enhanced

13  program that you put into place in 2007?

14  **A.**   Yes.  Part of the, part of the agreement is that they

15  would -- once we had the program up and running, as we

16  mentioned that the, the agreement was entered into in June,

17  and then we had two months where we worked with DEA and

18  operations and making sure the system was working as

19  designed like we did previously.

20      And once we felt we had it in a place where we thought

21  it was what they wanted, DEA would pick five of our

22  facilities that they would come in and do a spot check

23  unannounced.  And then they would finalize that with a visit

24  to corporate where they would review our due diligence files

25  and then give us a report of what their findings were at the

1    distribution centers and the final review.

2         And at that point, if they were satisfied, they would

3    return our DEA license in Florida.

4    **Q.**   Did you feel like -- did you feel like the DEA signed

5    off on your new program?

6    **A.**   Yeah, or they wouldn't have given us our license back.

7    **Q.**   Now, after the new program was put in place in 2007,

8    did you make a presentation about it at any point with the

9    DEA?

10   **A.**   Yes.  The DEA asked me if I would be willing to present

11   at their industry conference.  I believe it was in November,

12   2007.

13        MR. NICHOLAS:  And can we pull up, please,

14   Ritchie, Defendants' WV-002191, please.

15        Looks like we have the wrong one.  No, that's the right

16   one, isn't it?  Oh, that's right.  Sorry.  I gave you the

17   wrong document.  Go back -- yeah.  This is the correct

18   document.  So let me hand this out real quick.

19   BY MR. NICHOLAS:

20   **Q.**   While I do, is this -- this is from the DEA's

21   website pulled today, still on the website.  Is this the

22   conference at which you presented in 2011 -- in 2007?

23   **A.**   Yes.

24   **Q.**   Okay.

25        MR. NICHOLAS:  And if we just turn, Ritchie, to

1    the page I want to display, which is the second page of the

2    document, and cull out just one section of it.  I think we

3    have already.  Yeah.

4    BY MR. NICHOLAS:

5    **Q.**   First of all, do you remember this conference?

6    **A.**   I do.

7    **Q.**   Where was it?  Was it in Houston?

8    **A.**   I believe, I believe it was.

9    **Q.**   And was it a conference that was sponsored by the DEA?

10   **A.**   Yes.  The DEA -- I think it's every two years the DEA

11   handles a -- handles.  The DEA has an industry conference

12   every two years.

13   **Q.**   Okay.  So this was the biannual, I guess, or --

14   biannual DEA conference for the industry; correct?

15   **A.**   It's DEA's presenting to the industry.  All the

16   speakers are usually from DEA from various units.

17   **Q.**   All right.  And let's cull out just the first sentence

18   of this document of what I'm displaying here.

19         Was there a section of the conference devoted to

20   suspicious orders?

21   **A.**   Yes.

22   **Q.**   All right.  And did you and Mr. Mapes of the DEA make a

23   joint presentation or present together about suspicious

24   orders?

25   **A.**   Yes.

1   **Q.**   Okay.  Can you just read the first sentence, please?

2   **A.**   "Michael Mapes, Chief, DEA, Regulatory Section, and

3   Chris Zimmerman, Vice President, Corporate Security and

4   Regulatory Affairs, AmerisourceBergen updated the attendees

5   on when suspicious order reports should be submitted to

6   authorities."

7            MR. NICHOLAS:  Okay.  Do we have anything else

8   culled out on this document, Ritchie?  This is the only

9   other thing I wanted to point out.

10  BY MR. NICHOLAS:

11  **Q.**   Can you just read the first sentence of this

12  paragraph, of this paragraph relating to suspicious

13  orders?

14  **A.**   Sure.  "Mr. Zimmerman stressed the importance of

15  knowing your customers and providing due diligence

16  investigation on all new retail and wholesale accounts with

17  the exception of retain chain pharmacies."

18  **Q.**   Can you keep reading, please?

19  **A.**   "Included in the new account set-up process is a new

20  account questionnaire."

21  **Q.**   Keep going.

22  **A.**   "In addition, on-site visits are conducted which

23  includes the taking of photographs inside and outside the

24  premises."

25  **Q.**   Okay.  So, basically, is it correct that you were

1    describing your new program at this conference to the

2    industry?

3    **A.**    That's correct.

4    **Q.**    And it was side-by-side with the DEA; is that correct?

5    **A.**    Yes.

6    **Q.**    Okay.  Let's just go to -- now we can go to the next

7    document.  We may have already handed this out.  So everyone

8    has this already except me and Mr. Zimmerman.

9         So can I -- just very quickly, Mr. Zimmerman, is -- can

10   you tell us whether this document that -- what is this

11   document that I've just given you?

12   **A.**    This looks like the PowerPoint presentation that I did

13   at the conference.

14   **Q.**    So this is the presentation you made at the conference

15   we just discussed?

16   **A.**    Yes.

17   **Q.**    Okay.  Do you recognize the PowerPoint?

18   **A.**    I do.

19   **Q.**    And you remember you did, you made this presentation?

20   **A.**    Yes.

21   **Q.**    All right.

22              MR. NICHOLAS:  Your Honor, I'll offer this into

23   evidence at this time.

24              THE COURT:  I've got two documents.

25              MR. NICHOLAS:  I don't need the one pager, just

```
 1    the PowerPoint, yeah.

 2              THE COURT:  Is there any objection, Mr. Farrell?

 3              MR. FARRELL:  No objection, Your Honor.

 4              THE COURT:  All right.  It's admitted.

 5    BY MR. NICHOLAS:

 6    Q.   Can you turn to Page 3 of the document?

 7    A.   Yes.

 8    Q.   All right.  And we can display it.  All right.

 9         Now, can you read the first sentence, please?

10         First of all, what does it say at the top of this

11    slide?  Go ahead.

12    A.   "Distributors usually implement policies that mirror

13    the Code of Federal Regulations."

14    Q.   Okay.  And if you go to -- then it ticks off four

15    regulations; correct?

16    A.   Correct.

17    Q.   And the first one is related to physical security

18    controls; correct?

19    A.   Yes.

20    Q.   All right.  And then it describes that.  And what does

21    it say at the end of that?

22    A.   "No problem."

23    Q.   Okay.  The next section is 1304.  What does that

24    pertain to under the rules?

25    A.   It's the recordkeeping requirements we talked about to
```

1    ensure that you have adequate inventory records to prevent

2    diversion.

3    **Q.**   What does it say after that one?

4    **A.**   "No problem."

5    **Q.**   The next one is 1305.  And that's orders for Schedule I

6    and II controlled substances.  What does it say after that?

7    **A.**   "No problem."

8    **Q.**   The final one is other security controls.  And it says,

9    "Make a good faith inquiry, report suspicious orders; report

10   significant losses - gray area."

11       Do you see that?

12   **A.**   Yes.

13   **Q.**   Okay.  And what did you mean by gray area, if you

14   remember?

15   **A.**   Yes.  So the first three -- the physical -- how, how,

16   how specific the requirements were.  When I do records, they

17   tell me I have to do an inventory every two years.  It has

18   to be signed and dated.  It tells you about how to do ARCOS

19   maintenance.  It tells you exactly how to perform each

20   function of the requirement for the regulation.

21       Controlled substance order forms, it tells you how to

22   cancel a line.  And it doesn't mean just cancel a line.  It

23   says how long you have to draw the line, not just through

24   the first part but through the entire line, and how you have

25   to write "cancel" and where you write it and when you have

1    to cancel a line.  And then you have to notify the customer

2    in writing, very specific requirements to fulfill that

3    requirement.

4        When it comes to the other areas that I mentioned,

5    those gray areas are suspicious orders where it says an

6    order of unusual quantity, quantity, pattern and frequency,

7    and that's it.

8        And then on the significant losses, it's just

9    significant losses, if there's 1, 100.  The distributor and

10    these requirements have to make a decision on what they deem

11    to be significant and what is deemed to be suspicious.

12        The tricky part coming -- on a security side is

13    significant.  If we, we sell 100 -- we sell -- I'm sorry --

14    we sell four million pieces of product a night, every night,

15    and we fill 1.5 million lines.

16        So if somebody came to me and said, "Is one piece

17    significant?"  Out of 4 million?  No.  But if it's one

18    bottle of a drug that, that somebody has captured that is

19    caught with, it's significant.  All right?

20        So you have to determine the circumstances of what's

21    significant.  But that's all put upon the registrant.  It's

22    not clearly defined in the C.F.R. like the other areas.

23    Q.  Can you turn to slide 9, please.  I want you to look at

24    the second -- this slide is headed "Order Monitoring

25    Program."  Right?

1    **A.**    Yes.

2    **Q.**    Can you read the second bullet point on your slide?

3    **A.**    "Historically controlled substance/listed chemical

4    order monitoring has been based on a ship and report

5    process."

6    **Q.**    Now, can you read the next line?

7    **A.**    "ABC's OMP process is now based on identify, capture,

8    investigate, and report suspicious orders prior to

9    shipment."

10   **Q.**    Okay.  Go back to the second bullet point, please,

11   where it says, it says, "Historically controlled

12   substance/listed chemical order monitoring has been based on

13   a ship and report process."

14          You were on the dais with DEA; is that right?

15   **A.**    That's correct.

16   **Q.**    All right.  Did your colleague on the dais at DEA

17   interrupt you and say, "That's incorrect"?

18   **A.**    No.

19   **Q.**    Did anyone from the DEA approach you at the conference

20   or after the conference and say, "That thing you said in the

21   presentation was not correct"?

22   **A.**    No.

23   **Q.**    Okay.  Has anyone ever corrected that from the DEA?

24   **A.**    No.

25   **Q.**    Okay.  Did you make essentially the same presentation

1    with further description of your improvements again in 2009?

2    **A.**   So 2009 would have been the very next DEA conference

3    since they're every two years.  And they asked if I would

4    come and speak again just as a progress, how the program was

5    functioning for the company.

6    **Q.**   Okay.

7              MR. NICHOLAS:  May I approach?

8              THE COURT:  Yes.

9              MR. NICHOLAS:  While we're looking at that, in the

10   meantime I will seek to move the website document that you

11   had into evidence, the other one.

12             THE COURT:  Is there any objection, Mr. Farrell?

13             MR. FARRELL:  No, Your Honor.

14             THE COURT:  It's admitted.

15   BY MR. NICHOLAS:

16   **Q.**   Just take -- all I want you to do is look at this

17   and flip through it and tell us whether you recognize

18   this as the presentation you made in 2009, two years

19   later.

20   **A.**   Yes.

21   **Q.**   Okay.  So at this point, is it correct that you were

22   making another presentation in 2009 describing your program

23   as of that date with the, with the DEA beside you in that

24   conference and you made that presentation to the industry?

25   **A.**   Correct.

1    **Q.**   Okay.   Okay, Mr. Zimmerman, in, in 2019 did the Office

2    of Inspector General issue a report about the DEA's handling

3    of diversion control?

4    **A.**   Yes.

5            MR. FARRELL:   Objection, Your Honor.   The

6    defendants have made objections to our reference and

7    inclusion of the House E&C report and now they're attempting

8    to introduce the follow-up from that hearing report which is

9    the OIG report.

10           If this is permitted, it opens the door and allows us

11   to enter into the record the House hearing report.

12   Otherwise, we think that it's objectionable for the same

13   reasons stated by the defendant.

14           MR. NICHOLAS:   I'm not the legal briefer on this,

15   Your Honor, but there are, there are -- you could drive a

16   huge truck through the difference between the House E&C

17   report which was, which was prepared by staffers.   I mean, I

18   can go -- someone can argue the E&C motion if they want, but

19   this is simply a report issued by the Office of the

20   Inspector General with none of the markers of

21   untrustworthiness that the House E&C report has, which is

22   the whole basis for our effort to keep that out of evidence.

23           The House E&C report for a variety of reasons is not

24   trustworthy and that's, that's essentially why we're, we're

25   seeking to exclude it.   There is no, there is no marker of

1   untrustworthy on this document with regard to this document.

2   It's the Office of the Inspector General for goodness sakes.

3   I mean, their, their whole job is to be impartial and look

4   at, you know, make sure that the Government is -- agencies

5   are doing what they're supposed to.  It's a public record

6   and there's no basis for it.  There's no, there's no

7   exception articulated here for why it shouldn't come in.

8           THE COURT:  Well, have you offered it?  You

9   haven't offered it yet, have you?

10          MR. NICHOLAS:  I didn't have a chance.  He was

11  trying to prohibit me from questioning about it.

12          THE COURT:  Well, I'll let you go ahead and

13  question him about it and then we'll decide whether to admit

14  it or not.

15          MR. NICHOLAS:  Okay.

16      Again, Your Honor, with my apologies for the fact that

17  I'm being reminded of something by my younger and smarter

18  friend.  I would like to move the 2009 presentation made by

19  Mr. Zimmerman, the slide presentation into evidence.

20          THE COURT:  Is there any objection to that,

21  Mr. Farrell?

22          MR. FARRELL:  No objection.

23          THE COURT:  Okay.  It's admitted.

24          MR. NICHOLAS:  Thank you, Your Honor.

25  BY MR. NICHOLAS:

1    Q.   All right.  Can we look at the cover page of this

2    document, please.

3         All right.  First of all, do you recognize -- do you --

4    have you seen this before?

5    A.   Yes.

6    Q.   Is this a document that you would have -- that you

7    received in the normal course of your duties with the

8    company?

9    A.   Yes.

10   Q.   All right.  And did you review it in the normal course?

11   A.   I did.

12   Q.   Okay.  And what does it -- what is it called?

13   A.   It's the review of the Drug Enforcement

14   Administration's regulatory and enforcement efforts to

15   control the diversion of opioids.

16   Q.   And what is the heading on it?  In other words, if you

17   look at the top --

18   A.   I'm sorry.

19   Q.   That's okay.  I wanted that.  But also go to the top

20   where it says -- where there's the insignia and all that.

21   A.   "Office of Inspector General, U.S. Department of

22   Justice."

23   Q.   Okay.  And then what does it say under that?

24   A.   "Oversight, Integrity, Guidance," and then "Review of

25   the Drug Enforcement Administration's Regulatory and

1   Enforcement Efforts to Control the Diversion of Opioids."

2   **Q.**   Okay.  Can we turn to Page 13 of the document, please?

3   This is what I want to show from Page 13.  Can you read the

4   heading?

5   **A.**   "DEA was slow to respond to the dramatic increase in

6   opioid abuse and needs to more fully utilize its regulatory

7   authorities and enforcement resources to detect and combat

8   the diversion of controlled substances."

9   **Q.**   Can you read the second, the next section?

10  **A.**   "We found that DEA did not fully utilize its available

11  regulatory authorities as part of its effort to combat the

12  diversion of pharmaceutical opioids, even as the rate of

13  opioid use and abuse in the United States increased

14  dramatically from 1990 to 2017."  Continue?

15  **Q.**   Just read the next sentence.

16  **A.**   "Due mostly to opioid abuse, the rate of opioid

17  overdose deaths in the United States grew on average by

18  eight percent per year from 1999 through 2013 and by

19  71 percent per year from 2013 through 2017."

20  **Q.**   And, finally, the next sentence?

21  **A.**   "Yet, from 2003 to 2013 DEA authorized manufacturers to

22  produce substantial amounts of opioids."

23  **Q.**   All right.  That's fine.  Let's turn to Page 31,

24  please.  Please read the next section out loud.

25  **A.**   "We found that SORS database did not include all

1    suspicious orders provided to DEA, thereby significantly

2    impacting its usefulness.  This was due largely to the fact

3    that most DEA registrants are not required to report

4    suspicious orders to DEA headquarters.  Instead, consistent

5    with federal regulation, nearly all such information is sent

6    to the DEA field offices and DEA has not created a mechanism

7    whereby reports sent to its field divisions are uploaded

8    into the SORS database."  Continue?

9    **Q.**    Yeah.

10   **A.**    "As of August, 2017, approximately 1,400 DEA

11   registrants were manufacturers and distributors of

12   controlled substances and ARCOS contained ordering

13   information from about 1,100 of these registrants.  Yet, we

14   found that the SORS database contained suspicious order

15   reports from only eight registrants."

16   **Q.**    All right.  Go to the next section on this page.  Read

17   the -- read this from -- yeah.  Read what's highlighted.

18   **A.**    "One diversion program manager described the SORS

19   database as a joke, noting that DEA field division staff did

20   not receive access to the SORS database until 2017, nearly

21   10 years after it was created."

22   **Q.**    And one more section on the next page, please, Ritchie.

23        Could you read this section out loud from the Office of

24   Inspector General's report?

25   **A.**    "We also believe that DEA should establish regulations,

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    policies, and procedures that specifically define what

2    constitutes a suspicious order, as well as what information

3    should be included in a suspicious order report."

4    **Q.**   Okay.  Now, the OIG also had a paragraph -- had in its

5    conclusions commented on the setting of quotas.  I'd like

6    you to read the first -- I apologize for making you do all

7    this reading.  I'm going to stop really soon.  Can you just

8    read the first paragraph?

9    **A.**   "As the United States is confronted with one of the

10   worst drug epidemics in its history, the opioid related

11   overdoses accounting for more than 47,600 deaths in 2017, an

12   estimated 35 percent of which involved a prescription

13   opioid, we found that DEA was slow to respond to this crisis

14   in a number of ways.  First, unlike past drug crises, in

15   combating the current opioid epidemic DEA failed to develop

16   a comprehensive national strategy that could have focused

17   and directed its regulatory and enforcement efforts.  For

18   example, as the rate of opioid use and abuse in the United

19   States continued to increase from 1999 to 2016, the amount

20   of opioid manufacturing authorized by DEA also increased

21   dramatically during that same time.  We found that DEA did

22   not reduce the aggregate production quota for most

23   controlled substances until 2016, the year during which

24   opioid production fell by 25 percent."

25   **Q.**   Thank you.

1           MR. NICHOLAS:  I would offer this document into

2    evidence, Your Honor.

3           THE COURT:  Any objection?

4           MR. FARRELL:  No objection.

5           THE COURT:  It's admitted.

6           MR. NICHOLAS:  Your Honor, if I -- all I want is

7    30 seconds to talk to these guys.  And then that's -- then

8    I'm going to wrap up.

9        (Pause)

10   BY MR. NICHOLAS:

11   **Q.**   Mr. Zimmerman, you've been examined on the witness

12   stand for all day today and part of yesterday.  You've

13   been with the company for 30 years.  And you've spent

14   your life working in the -- working on diversion control

15   and security for AmerisourceBergen.

16       Has the company, in your personal experience, always

17   taken its responsibility for diversion control seriously?

18   **A.**   Yes.

19   **Q.**   Have you always taken your responsibilities seriously?

20   **A.**   Yes.

21   **Q.**   You've worked with a lot of people in the company over

22   the years.  Many of them you've been with -- some of them

23   for decades.

24       Have the people you've worked with at Amerisource in

25   your experience always taken their responsibilities

1    seriously?

2    **A.**    They do.  It's a serious job for the industry we're in.

3    **Q.**    On a personal level, since you've been here all day and

4    questioned in this fashion, is there anything else that you

5    would like to say to the Court at this time?

6    **A.**    Thanks for allowing me to testify.  But, you know, I

7    think there's a misnomer that there's -- that we're against

8    DEA in the industry and it's never been that way.  We want

9    to -- we're just looking for information to make the best

10   decisions we can.

11       And we understand there's an opioid crisis.  Our

12   families -- we have loved ones that have been impacted on

13   both sides, whether there's addiction or death in overdose

14   or through parents with cancer or chronic pain that needed

15   those medications before they pass on.

16       So we understand the magnitude of torturing a

17   legitimate patient by not getting their medication and

18   somebody dying of an overdose.  And I just don't want that

19   to get lost.  That's why it's so serious when you're making

20   decisions that we don't take them lightly.

21            MR. NICHOLAS:  I have no further questions.

22            THE COURT:  I have one question, Mr. Zimmerman.

23   I'm probably confused on this.  But I thought you testified

24   earlier that you would report suspicious orders and ship

25   them.  And then you've testified a while ago that you, you

1    didn't ship them.

2              THE WITNESS:  So in 2007 we entered into an

3    agreement with DEA where DEA said we'll enter into an

4    agreement with us to not ship orders.

5              THE COURT:  So from now on you haven't shipped?

6              THE WITNESS:  Correct.

7              THE COURT:  Since 2007?

8              THE WITNESS:  Correct.

9              THE COURT:  I've got a request here from the

10   plaintiffs that they have a person to put on with Drug

11   Emporium, the custodian, and they've been waiting around all

12   day.  And I'd like to accommodate him or her and put them on

13   and get that so they don't have to come back tomorrow.

14             MR. NICHOLAS:  I don't object conceptually.  I

15   will say that it would be very nice if Mr. Zimmerman does

16   not have to be brought back for another day.  So either --

17   if we do this, it's fine.  But can we get -- could we get --

18   I don't want to impose on anyone to stay longer than they

19   have to, but I would really like it if he just --

20             THE COURT:  Mr. Farrell, how much more are you

21   going to have with Mr. Zimmerman?

22             MR. FARRELL:  Hopefully five minutes.

23             THE COURT:  Okay.  Why don't you go ahead and do

24   that and then we'll take the records custodian.

25             THE WITNESS:  Thank you.

```
 1            THE COURT:  I didn't ask the other defendants if
 2    they need to question Mr. Zimmerman.
 3            MR. HESTER:  Your Honor, we have no questions.
 4            MS. MAINIGI:  No questions for us, Your Honor.
 5            THE COURT:  Okay.
 6                       REDIRECT EXAMINATION
 7    BY MR. FARRELL:
 8    Q.   Mr. Zimmerman, you were asked about the Defendants'
 9    Exhibit DEF-WV-2191.  I'm going to try to throw it up
10    and see if I can do this.
11            You read, you read three of the sentences, but not the,
12    the last thing I've highlighted.  Would you please -- this
13    is from your DEA joint presentation.  Would you please read
14    that into the record?
15    A.   Mr. -- starting with "Mr. Mapes"?
16    Q.   Well, you can, you can --
17    A.   There it is.  I'm sorry.
18    Q.   "Which include the taking of --" I'm sorry.
19            "Registrants who routinely report suspicious orders,
20    yet fill these orders, with reason to believe they are
21    destined for the illicit market, are failing --" is it my
22    screen?
23    Q.   How about if I read it?
24    A.   Please.  My screen keeps going in and out.  Sorry.
25    Q.   "Registrants --" oh, man, I need my glasses.
```

1    "Registrants --"

2              THE COURT:  I lost mine too, Mr. Farrell.  I have

3    no idea where they are.

4    BY MR. FARRELL:

5    **Q.**  "Registrants who routinely report suspicious

6    orders, yet fill these orders, with reason to believe

7    they are destined for the illicit market, are failing to

8    maintain effective controls against diversion.".

9         Do you trust that I read that accurately?

10   **A.**  Yes.

11   **Q.**  And the record will reflect it.  I'm also going to

12   have -- I'm going to quickly circulate and pass these

13   around.

14             MR. FARRELL:  This is P-521.  Judge, may I

15   approach?

16             THE COURT:  Yes.

17             THE WITNESS:  Thank you.

18   BY MR. FARRELL:

19   **Q.**  Expediting the matter, you'll recognize this as

20   August 4th, 2007, correspondence from your counsel.

21   It's in follow-up to the July 11th, 2007, letter that

22   was previously admitted.  Have you seen this letter

23   before?

24   **A.**  I'm sure I have.

25   **Q.**  Okay.  The very last sentence of the second paragraph

1    says, "The agreement does not approve or endorse particular

2    system to identify and disclose suspicious orders.  The

3    design and operation of a particular system remains the sole

4    responsibility of ABDC."

5         Did I read that accurately?

6    **A.**   Yes.

7              MR. FARRELL:  This is Plaintiffs' 521.  I'd move

8    for its admission.

9              THE COURT:  Any objection?

10             MR. NICHOLAS:  No objection.

11             THE COURT:  It's admitted.

12   BY MR. FARRELL:

13   **Q.**   You said that you read the OIG report that was

14   published in September of 2019.  You're aware there were

15   Congressional hearings regarding the sale of pills by

16   five distributors, including AmerisourceBergen, into

17   West Virginia before the House Energy and Commerce

18   Committee, are you not?

19             MR. NICHOLAS:  Objection.  This is outside the

20   scope.

21             THE COURT:  Well, overruled.  I'll let him -- I'll

22   let you pursue it, Mr. Farrell.  Go ahead.

23   BY MR. FARRELL:

24   **Q.**   You're aware of congressional hearings?

25   **A.**   I mean, there was congressional hearings, yes.

1  **Q.**   And you're aware that there was a report that was

2  generated that discussed both the DEA as well as the

3  distributors?

4  **A.**   I believe there was a report produced, yes.

5  **Q.**   Have you reviewed the report?

6  **A.**   I'm sure I would have looked at it, but I don't recall

7  it.

8  **Q.**   Did you review the report in the normal course of

9  duties that you performed for --

10            THE COURT:  Ms. Mainigi.

11            MS. MAINIGI:  I was waiting.  Yes, Your Honor.  We

12  have an objection to this entire line of questioning.  It is

13  clearly outside the scope of the cross-examination or direct

14  examination, whatever we're calling it.  But we also have a

15  pending motion on this House E&C issue.

16            THE COURT:  Is this the same matter we got into

17  earlier or not?

18            MR. FARRELL:  No, Your Honor.  To be clear --

19            THE COURT:  This is another --

20            MR. NICHOLAS:  No, this is the same -- he's

21  raising the same issue again, same matter.

22            MS. MAINIGI:  No, no, no, no.  To clarify, there's

23  two separate objections.  This was not raised -- the House

24  E&C was not raised during the course of the examination by

25  Mr. Nicholas.  And that's the primary reason for objection.

1    But I also note and put an objection on the fact that

2  we have a pending motion on the House E&C right now, and the

3  reason for why that should not be admitted into evidence,

4  Your Honor.

5         THE COURT:  I'm going to sustain the objection,

6  Mr. Farrell.

7         MR. FARRELL:  Judge, I was not attempting to admit

8  the E&C report.  I was simply trying to ask the exact same

9  question that I wrote down that Mr. Nicholas asked on the

10  OIG report to lay a foundation that the E&C report would

11  have been reviewed by Mr. Zimmerman.

12         THE COURT:  Okay.  You can ask him that.

13  BY MR. FARRELL:

14  **Q.**   You said that you had reviewed the House Energy and

15  Commerce report.  Correct?

16  **A.**   I probably would have reviewed it, yes.

17  **Q.**   Not probably.

18  **A.**   Well, I don't specifically --

19         MR. NICHOLAS:  He said not -- you're correcting

20  what he's saying.  I think he's entitled to say what he

21  says.

22         THE COURT:  He said, "I probably reviewed it but I

23  don't -- but not -- I don't remember specifically," or

24  something.

25         THE WITNESS:  That's correct.

```
 1              THE COURT:  Go ahead.

 2    BY MR. FARRELL:

 3    Q.   It's a 450-page report that involves the testimony

 4    of your CEO about West Virginia.  Is it your testimony

 5    you have not reviewed the report?

 6    A.   I've probably reviewed portions of it.  I can't say if

 7    I read the whole 450 pages of the report.

 8    Q.   Would you have done so in your role as Senior Vice

 9    President of CSRA at AmerisourceBergen?

10    A.   Yes.

11    Q.   Last item of inquiry.  I'm going to reference

12    Defendants' WV-1.  This is the 2007 presentation that you

13    gave along with the DEA.  Do you recall this document?

14    A.   Yes.

15    Q.   I'm going to point you just to two particular things.

16    This is --

17              MR. FARRELL:  And I believe this has already been

18    admitted in the record, Madam Clerk?

19              THE CLERK:  Yes.

20    BY MR. FARRELL:

21    Q.   This is Page 14.  Oh, it's over here.  If you go to

22    Page 14, do you see the very top item of your -- would

23    you please read it aloud?

24    A.   The first arrow or the --

25    Q.   Yes, sir.
```

1    **A.**    "If the order quantity goes over the item family

2    threshold, the order will be placed into OMP review."

3    **Q.**    And the second one?

4    **A.**    "All subsequent orders within the same item family will

5    be rejected while an item within the same family is under

6    review."

7    **Q.**    Okay.  So let's close the circle on this.  The OMP

8    program you would set a threshold or a cap for a pharmacy.

9    And if the orders exceeded that cap, you would start the OMP

10   review and you would hold all other orders until the OMP

11   review finished its logical conclusion.  Correct?

12   **A.**    For that item, yes.

13   **Q.**    All right.

14          MR. FARRELL:  Judge, I'd like to have the final

15   document identified as P-432.  May I approach?

16          THE WITNESS:  Thank you.

17   BY MR. FARRELL:

18   **Q.**    Sir, do you recognize this document?

19   **A.**    It looks like -- not looks like.  It's a memorandum

20   from Ed Hazewski, Kevin Kreutzer, and Joe Tomkiewicz to

21   Chris Zimmerman.

22   **Q.**    That would be you, sir?

23   **A.**    That's me.

24   **Q.**    And the date of it?

25   **A.**    January 19th, 2009.

```
1                  MR. FARRELL:  Would you please publish it?

2                  MR. NICHOLAS:  Your Honor, this is outside the

3      scope and I'm going to object to this document.  It's not

4      within the scope of my examination at all.

5                  MR. FARRELL:  Judge, it's --

6                  THE COURT:  Well, you could have offered it when

7      you called him first, couldn't you, Mr. Farrell?

8                  MR. FARRELL:  This specifically goes to the

9      program that he just testified to.  It specifically goes to

10     the threshold amounts where they are reporting suspicious

11     orders and what their thresholds are --

12                 THE COURT:  Okay, I'll let you ask him about it.

13     Overruled.  Go ahead.

14     BY MR. FARRELL:

15     Q.   Do you see the, the limits here on this document,

16     the thresholds?

17     A.   Yes.

18     Q.   And you'll see that you've identified three pharmacies,

19     a small, medium, and large.  Correct?

20     A.   Correct.

21     Q.   And the oxycodone threshold for the small is 12,000.

22     The medium is 24,000.  And the large is 37,000.  Do you see

23     that?

24     A.   That's what it says, yes.

25     Q.   And, so, on an annual basis, that comes to 144,000
```

224

```
 1   oxycodone pills a year to small pharmacies; 288,000

 2   oxycodones to medium size pharmacies; and 444,000 pills,

 3   oxycodone pills to a large pharmacy before your thresholds

 4   are even met?

 5          MR. NICHOLAS:  Well, I'll object only because I

 6   don't see any of those numbers on this document.

 7          THE COURT:  Well, they are on the document, aren't

 8   they, Mr. Farrell?

 9          MR. FARRELL:  Yes, sir.  These are, these are

10   pills per month that are on the document.  And, so, by

11   taking an annual estimate --

12          MR. NICHOLAS:  I apologize.  I didn't see them.  I

13   thought he was doing math on the fly.  I apologize.

14          THE COURT:  He's multiplying the numbers by 12,

15   aren't you?

16          MR. FARRELL:  Yes, sir.

17   BY MR. FARRELL:

18   Q.   Is that correct, Mr. Zimmerman?

19   A.   That's what the memo states.

20   Q.   And then over on hydrocodone you'll see that the

21   threshold for small pharmacies is 18,000 pills a month.  The

22   threshold for medium pharmacies is almost 40,000 pills a

23   month.  And the threshold for large pharmacies is 55,000

24   pills a month.  Did I read that accurately?

25   A.   That's what it states.
```

1   **Q.**   So that a small pharmacy customer of AmerisourceBergen

2   could order 350,000 doses of hydrocodone without triggering

3   the thresholds, triggering your OPM process?

4   **A.**   According -- I'm looking at this memo.

5   **Q.**   And 760,000 dosage units for medium size pharmacies per

6   year without triggering the OMP process?

7   **A.**   According to this memo.

8   **Q.**   And one million dosage units per year for large

9   pharmacies without -- of hydrocodone without triggering the

10   OMP process.  I'm sorry.  I made some bad math there.

11   **A.**   That sounds a little high.

12   **Q.**   I apologize.  I'll back up.  It's 216,000 for

13   hydrocodone small pharmacies; 480,000 for medium pharmacies;

14   and 660,000 hydrocodone for large pharmacies per year.

15   Correct?

16   **A.**   That's what the memo indicates.

17   **Q.**   So by adding that all together, a small pharmacy

18   customer of AmerisourceBergen could order 350,000 doses of

19   hydrocodone or oxycodone without ever triggering the OMP

20   process.  Agreed?

21   **A.**   Potentially.

22   **Q.**   And a medium size pharmacy could order 760,000 dosage

23   units of oxycodone and hydrocodone without ever triggering

24   their OMP process.  Agreed?

25   **A.**   That's what the memo states.

1  **Q.**   And --

2  **A.**   These numbers are in the memo, yes.

3  **Q.**   And a large pharmacy could order over a million pills

4  of hydrocodone and oxycodone a year without ever triggering

5  the OMP process.  Agreed?

6  **A.**   That's what the math adds up to.

7        MR. FARRELL:  No further questions, Your Honor.  I

8  move to admit 432.

9        THE COURT:  Any objection to it?

10        MR. NICHOLAS:  No objection.

11        MS. MAINIGI:  No, Your Honor.

12        THE COURT:  All right.  It's admitted.

13     May Mr. Zimmerman be excused?

14        MR. FARRELL:  Yes, Your Honor.

15        THE COURT:  Mr. Zimmerman, thank you very much for

16  being here and your patience with us.  You're free to go,

17  sir.

18     Let's get the records custodian in and get that done

19  and then we'll go home.

20        MR. HESTER:  Your Honor, while we're waiting, I

21  wanted to see if I could raise one housekeeping matter with

22  the Court.

23        THE COURT:  Okay.  Go ahead.

24        MR. HESTER:  This is for our planning purposes.

25  We, obviously, have known that the Court has allocated six

```
 1    weeks of trial time to the defense and six weeks of trial

 2    time to the plaintiffs.  And our understanding as we get to

 3    the end of week two is that still remains the Court's

 4    intention that each side will have 30 days of trial time in

 5    the matter?

 6              THE COURT:  I think that's the plan.

 7              MR. HESTER:  And we also wanted to make sure we

 8    confirmed with the Court that the Memorial Day week, the

 9    week from May 31 through June 4, that's an open week.

10              THE COURT:  Didn't we decide to open that whole

11    week and not come back?  I originally had another trial that

12    week.  That's why I was going to have you come back, but it

13    doesn't make any sense for us to be here one day.

14         How are we going to make up that time?  Okay.  The plan

15    was to make up for that, at least in part, by going a full

16    day on Friday a week from tomorrow.

17              MR. HESTER:  Thank you, Your Honor.  We can do

18    some work that week when we're not in court.  So thank you.

19              THE COURT:  I think we'll all be happy to have a

20    whole week off.

21              MR. HESTER:  Thank you, Your Honor.

22              MR. MAHADY:  No objection, Your Honor.

23              THE COURT:  Okay.

24              MR. FULLER:  Judge, Mike Fuller on behalf of the

25    plaintiffs.  I would like to call Donna Kelley who's a
```

1    records custodian.

2            THE COURT:  All right, you may do so.

3        Ms. Kelley.

4            THE CLERK:  Would you please state your name.

5            THE WITNESS:  Yes.  My name is Donna Kelley.  The

6    last name is spelled K-e-l-l-e-y.

7            THE CLERK:  Thank you.  Please raise your right

8    hand.

9    **DONNA KELLEY, PLAINTIFFS' WITNESS, SWORN**

10           THE CLERK:  Thank you.  Please take a seat.

11           THE WITNESS:  Thank you.

12                       DIRECT EXAMINATION

13   BY MR. FULLER:

14   **Q.**   Ms. Kelley, I want you to know that's bulletproof

15   glass, so no one can shoot you while you're up there.

16   Okay?

17   **A.**   That's good to know.

18           THE COURT:  We're sorry we've kept you waiting all

19   this time.  That's just one of the aggravations --

20           THE WITNESS:  It's perfectly all right.

21           THE COURT:  -- we ask people to put up with.

22   BY MR. FULLER:

23   **Q.**   Now, Ms. Kelley, you are free to remove your mask

24   now so we can all hear you.  And just make sure you

25   speak into the microphone.

```
 1    A.    Yes, sir.

 2              MR. FULLER:  May it please the Court.

 3              THE COURT:  Yes.

 4              MR. FULLER:  Thank you, Your Honor.

 5    BY MR. FULLER:

 6    Q.    Ms. Kelley, state your name for the record.

 7    A.    My name is Donna Kelley.

 8    Q.    Where are you currently emplyed?

 9    A.    I am employed at Discount Emporium, Inc., doing

10    business as Drug Emporium.

11    Q.    And you received a subpoena over there at Drug Emporium

12    for this trial; is that correct?

13    A.    Correct.

14    Q.    It actually requested certain documents to be brought

15    to trial; is that right?

16    A.    That's correct.

17    Q.    And is your role one of the record custodian for Drug

18    Emporium?

19    A.    Yes, sir.

20    Q.    And this pharmacy is over in Cabell County; is that

21    correct?

22    A.    Yes, sir.

23    Q.    And the records that you've pulled, were they

24    dispensing records?

25    A.    They were.
```

1    **Q.**   And did you pull records from I think 2011 through 2018

2    for all the prescriptions that the pharmacy filled during

3    that time frame; is that right?

4    **A.**   That's correct.

5    **Q.**   And did you extract from those records the -- what we

6    would call HIPAA information, anything that would identify

7    the patient --

8    **A.**   We did.

9    **Q.**   -- or customer?

10   **A.**   We did.

11   **Q.**   And were these records something that are kept in the

12   normal course of business?

13   **A.**   They are, yes.

14   **Q.**   Are they inputted by someone with knowledge or

15   conducting the transaction?

16   **A.**   Yes.

17   **Q.**   And are those records maintained by you in the normal

18   course of your business?

19   **A.**   They are, yes, indeed.

20           THE COURT:  Are the entries made by your employees

21   made at or near the time of the events that they're

22   reported?

23           THE WITNESS:  Yes, Your Honor.

24           THE COURT:  Okay.

25   BY MR. FULLER:

1    Q.   Ms. Kelley, can we pop up one of the Excel

2    spreadsheets?

3           MR. FULLER:  Your Honor, this is P-43770 for the

4    record.  There's actually seven Excel spread files,

5    spreadsheets.

6    BY MR. FULLER:

7    Q.   We're just going to go through it real quick,

8    Ms. Kelley.  The first column is the date written.

9    That's the date the prescription was written; is that

10   correct?

11   A.   Yes, that's correct.

12   Q.   The next column is the date.  And that's the date the

13   prescription is filled; is that right?

14   A.   That is correct, yes.

15   Q.   The Rx number is the prescription number; is that

16   right?

17   A.   The prescription number, yes.

18   Q.   Then we have the quantity, and that's the quantity of

19   pills; is that correct?

20   A.   I believe so.

21   Q.   The day supply, how many days the prescription is for;

22   is that right?

23   A.   Yes.

24   Q.   Last insurance paid, how it's paid, either by cash or

25   by third party; is that correct?

1    **A.**    Yes.

2    **Q.**    Then you have the drug, the therapeutic class, the

3    doctor's DEA number, and then the doctor who wrote the

4    prescription; is that correct?

5    **A.**    That is correct.

6    **Q.**    Is that true for all the records that you provided as

7    far as the dispensing records?

8    **A.**    Yes.

9              MR. FULLER:  Judge, because of the size of the

10   spreadsheets, I have them on a thumb drive.  So we would now

11   submit P-43770 for admission.

12             THE COURT:  Is there any objection?

13             MS. WICHT:  No objection, Your Honor.

14             MR. HESTER:  Not from me.

15             MR. NICHOLAS:  No objection.

16             THE COURT:  May the witness be excused?

17             MR. FULLER:  As far as I'm concerned, Your Honor.

18             THE COURT:  Ms. Kelley, thank you very much.

19             MS. WICHT:  Your Honor, I apologize.  I have just

20   two or three questions just to clarify.

21             THE COURT:  Oh, I'm sorry.  Go ahead, Ms. Wicht.

22             MS. WICHT:  I'm sorry.  I don't think I'm going to

23   introduce any complications at this hour of the day, Your

24   Honor.

25                     CROSS EXAMINATION

1    BY MS. WICHT:

2    **Q.**   Good afternoon, Ms. Kelley.  My name is Jennifer

3    Wicht and I'm an attorney for Cardinal Health.  I just

4    have two or three questions.  I just wanted to clarify.

5    **A.**   Okay.

6    **Q.**   The spreadsheets that were produced and what you just

7    talked about with Mr. Fuller, I just wanted to clarify, does

8    that include all medications that were dispensed by Drug

9    Emporium for that time frame or were there particular

10   medications that were selected and pulled?

11   **A.**   All medications for that location for those date

12   ranges.

13   **Q.**   Okay.  For the location in Cabell County?

14   **A.**   In Cabell County.

15   **Q.**   Okay.  And the data was not selected or limited

16   depending on what distributor Drug Emporium received those

17   drugs from; correct?

18   **A.**   The records reflect all prescriptions dispensed for

19   that location for those time frames.

20   **Q.**   Okay.  Thank you, ma'am.  And, and that data was pulled

21   from Drug Emporium's internal recordkeeping system.  Am I

22   correct?

23   **A.**   I'm not sure I quite understand your question.

24   **Q.**   Okay.  The system that you pulled them from, that's an

25   internal system that Drug Emporium uses to run its business;

1    is that right?

2    **A.**   That's correct.

3    **Q.**   It's not a system that other companies or -- have

4    access to.  Is that right?

5    **A.**   That's correct.

6    **Q.**   Okay.  Thank you very much.  That's all I have, ma'am.

7              THE COURT:  Anything else?

8              MR. FULLER:  No, Your Honor.  Just for the record,

9    we've produced copies of the electronic files to the

10   defense.  I don't have extra thumb drives, but I'm going to

11   give this one to the clerk.

12             THE COURT:  All right.

13             MR. FULLER:  Thank you, Judge.

14             THE COURT:  Now you can go, Ms. Kelley.  Thank you

15   very much.

16             THE WITNESS:  Appreciate it.

17             THE COURT:  We'll be in recess until 9:00 tomorrow

18   morning.

19        (Trial recessed at 5:06 p.m.)

20

21

22

23

24

25

1     CERTIFICATION:

2          I, Ayme A. Cochran, Official Court

3     Reporter, and I, Lisa A. Cook, Official Court Reporter,

4     certify that the foregoing is a correct transcript from

5     the record of proceedings in the matter of The City of

6     Huntington, et al., Plaintiffs vs. AmerisourceBergen

7     Drug Corporation, et al., Defendants, Civil Action No.

8     3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9     reported on May 13, 2021.

10

11          S\Ayme A. Cochran          s\Lisa A. Cook

12            Reporter                    Reporter

13        _

14

15          May 13, 2021

16            Date

17

18

19

20

21

22

23

24

25

**'**

**'07** [2] - 194:15, 195:24
**'80s** [1] - 179:17
**'90** [1] - 195:18
**'90s** [6] - 173:17, 173:18, 173:19, 174:6, 174:7, 188:14
**'96** [7] - 47:12, 48:24, 53:24, 54:2, 57:3, 195:18, 195:20
**'97** [1] - 53:23
**'98** [6] - 47:12, 57:3, 61:9, 194:14, 195:20, 195:24

**0**

**00378495** [1] - 20:2
**00907** [2] - 2:5, 2:17
**02658** [1] - 183:9
**0C** [2] - 88:10

**1**

**1** [3] - 112:16, 133:24, 204:9
**1,100** [1] - 211:13
**1,400** [1] - 211:10
**1.5** [1] - 204:15
**10** [5] - 26:16, 93:8, 105:1, 179:1, 211:21
**100** [3] - 189:19, 204:9, 204:13
**1001** [2] - 2:10, 4:6
**1022** [1] - 3:5
**1029** [1] - 122:4
**106** [1] - 155:9
**10:00** [2] - 121:4, 123:17
**10:45** [1] - 64:18
**10:47** [1] - 64:20
**11** [2] - 26:17, 135:4
**11th** [1] - 217:21
**12** [4] - 26:17, 62:11, 111:22, 224:14
**12,000** [6] - 47:12, 48:3, 48:21, 49:1, 54:16, 223:21
**126** [1] - 3:5
**12:01** [1] - 108:24
**12th** [1] - 19:10
**13** [6] - 1:19, 7:4, 210:2, 210:3, 235:9, 235:15
**130.172-130.176** [1] - 164:8
**130.174** [1] - 164:9
**130.674** [1] - 156:19

**1300** [1] - 6:15
**1301.71** [1] - 162:12
**1301.72** [1] - 166:16
**1301.74(b)** [1] - 24:1
**1304** [1] - 202:23
**1305** [1] - 203:5
**1306** [1] - 36:17
**1311** [2] - 2:4, 2:16
**13th** [1] - 104:1
**14** [3] - 139:4, 221:21, 221:22
**144,000** [1] - 223:25
**145** [2] - 29:2, 29:7
**14th** [1] - 100:13
**15** [2] - 74:25, 102:4
**15910** [1] - 3:18
**16,000** [1] - 151:4
**1600** [1] - 3:17
**17** [1] - 191:22
**17046** [1] - 85:25
**1717** [2] - 6:6, 6:13
**18,000** [1] - 224:21
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1980** [1] - 61:19
**1990** [6] - 32:1, 48:5, 173:7, 173:16, 193:7, 210:14
**1996** [2] - 177:7, 178:17
**1998** [5] - 173:17, 178:17, 180:19, 186:18, 190:16
**1999** [3] - 60:5, 210:18, 212:19
**19th** [3] - 71:2, 71:5, 222:25
**1st** [6] - 65:7, 65:18, 71:23, 72:5, 75:14, 141:14

**2**

**2** [15] - 14:12, 44:12, 44:13, 60:20, 60:21, 60:25, 72:13, 73:10, 74:4, 74:8, 79:20, 80:1, 83:5, 130:9, 135:3
**2,000** [5] - 149:12, 151:1, 151:6, 151:7, 151:8
**2.12** [10] - 65:7, 65:22, 70:2, 70:5, 70:11, 72:5, 75:13, 78:6, 82:24, 83:5
**20** [14] - 7:19, 7:20, 8:5, 8:6, 8:10, 8:14, 8:15, 10:5, 33:16, 33:17, 102:4, 172:21

**2000** [1] - 91:22
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2001** [3] - 61:23, 62:12, 193:7
**2003** [1] - 210:21
**2004** [3] - 63:17, 64:25, 69:1
**2005** [14] - 18:1, 65:7, 65:13, 65:18, 68:16, 68:19, 69:22, 70:1, 71:9, 188:19, 189:1, 189:8, 189:23, 192:3
**2006** [8] - 18:4, 26:12, 30:9, 30:20, 31:3, 173:25, 192:5, 192:8
**2007** [57] - 18:6, 18:7, 18:17, 18:24, 19:14, 19:23, 26:23, 29:12, 40:1, 40:5, 40:7, 40:18, 41:4, 41:12, 42:24, 43:25, 44:19, 45:4, 45:15, 45:19, 58:21, 60:8, 70:3, 70:14, 70:16, 71:3, 71:6, 71:10, 71:19, 78:16, 78:24, 79:17, 81:2, 91:10, 91:14, 91:25, 92:11, 190:15, 190:19, 190:24, 191:12, 191:22, 193:13, 193:25, 196:1, 196:19, 196:24, 197:13, 198:7, 198:12, 198:22, 215:2, 215:7, 217:20, 217:21, 221:12
**2008** [5] - 71:23, 72:5, 73:15, 75:14, 76:7
**2009** [6] - 206:1, 206:2, 206:18, 206:22, 208:18, 222:25
**2010** [2] - 78:6, 83:6
**2011** [8] - 88:15, 89:5, 95:3, 95:22, 97:20, 98:15, 198:22, 230:1
**2012** [8] - 19:10, 28:20, 28:21, 104:1, 129:20, 132:10, 133:17, 138:4
**2012"** [1] - 134:1
**2013** [7] - 139:15, 140:13, 141:14, 144:6, 210:18, 210:19, 210:21

**2015** [1] - 144:15
**2016** [2] - 212:19, 212:23
**2017** [6] - 100:14, 210:14, 210:19, 211:10, 211:20, 212:11
**2018** [2] - 29:1, 230:1
**2019** [2] - 207:1, 218:14
**202** [2] - 2:4, 2:16
**2021** [5] - 1:19, 7:4, 17:23, 235:9, 235:15
**21** [2] - 24:1, 156:19
**216,000** [1] - 225:12
**217** [2] - 98:5, 99:11
**21st** [1] - 73:15
**2216** [1] - 3:7
**222** [1] - 159:7
**22nd** [1] - 79:17
**23,000** [1] - 149:20
**230** [1] - 166:3
**234** [2] - 99:20, 102:12
**23rd** [3] - 91:14, 129:20, 180:19
**24,000** [1] - 223:22
**24th** [2] - 71:4, 132:10
**25** [3] - 5:5, 164:20, 212:24
**253** [1] - 71:15
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26292** [1] - 75:21
**26293** [3] - 65:8, 68:14, 69:24
**27** [2] - 26:23, 149:22
**27th** [5] - 18:17, 19:14, 19:23, 29:11, 30:9
**28** [3] - 3:15, 4:3, 4:9
**2876** [1] - 74:4
**288,000** [1] - 224:1
**29464** [3] - 3:15, 4:4, 4:9
**29th** [2] - 78:15, 78:23
**2:00** [2] - 108:20, 108:22
**2nd** [1] - 173:10

**3**

**3** [10] - 19:17, 38:13, 72:14, 75:15, 75:22, 112:18, 130:16, 130:18, 135:22, 202:6
**30** [11] - 7:11, 9:1, 17:20, 55:22, 58:7,

58:8, 115:11, 148:10, 213:7, 213:13, 227:4
**30(b)(6** [4] - 21:1, 27:1, 165:5, 165:9
**31** [8] - 63:6, 63:7, 101:19, 101:23, 148:4, 164:19, 210:23, 227:9
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**32502** [1] - 2:14
**35** [1] - 212:12
**350,000** [2] - 225:2, 225:18
**37,000** [1] - 223:22
**38** [1] - 33:4
**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 235:8
**3:17-cv-01665** [2] - 1:11, 235:8
**3:42** [1] - 172:23
**3rd** [1] - 29:1

**4**

**4** [5] - 26:24, 38:13, 137:7, 204:17, 227:9
**40,000** [2] - 224:22
**401** [2] - 2:10, 4:6
**405** [1] - 2:7
**41** [1] - 155:10
**43** [7] - 7:9, 7:11, 8:25, 9:11, 10:4, 10:6, 10:8
**432** [1] - 226:8
**444,000** [1] - 224:2
**450** [1] - 221:7
**450-page** [1] - 221:3
**47,600** [1] - 212:11
**480,000** [1] - 225:13
**483** [1] - 138:1
**4:00** [1] - 172:21
**4th** [3] - 134:1, 217:20

**5**

**5** [1] - 74:24
**5-minute** [1] - 36:13
**50** [6] - 7:7, 7:13, 33:16, 151:25
**521** [1] - 218:7
**55,000** [1] - 224:23
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**5787753** [1] - 142:5
**5:06** [1] - 234:19
**5th** [4] - 78:6, 83:6,

133:17, 140:13

**6**

**6** [1] - 29:8
**60,000** [1] - 151:3
**600** [1] - 2:13
**611** [2] - 25:11, 25:17
**660,000** [1] - 225:14
**6:00** [1] - 152:2
**6th** [2] - 3:5, 95:3

**7**

**7** [2] - 122:25, 123:16
**70130** [1] - 3:8
**707** [1] - 4:18
**71** [1] - 210:19
**716** [1] - 3:12
**72** [1] - 9:18
**725** [2] - 4:13, 4:15
**760,000** [2] - 225:5, 225:22
**7753** [1] - 142:9
**7:00** [1] - 121:1

**8**

**8** [2] - 75:14, 75:22
**80%** [1] - 142:6
**80-page** [2] - 12:21, 13:1
**801** [1] - 3:10
**80s** [1] - 61:20
**850** [1] - 5:12
**8th** [5] - 70:13, 70:14, 70:16, 71:11, 71:19

**9**

**9** [4] - 1:16, 26:16, 142:11, 204:23
**90** [1] - 54:5
**90%** [3] - 150:5, 150:7, 150:9
**901** [1] - 4:18
**90s** [2] - 50:22, 54:6
**91436** [1] - 3:18
**953** [2] - 62:15, 62:21
**9:00** [2] - 7:4, 234:17
**9th** [1] - 2:10

**A**

**a.m** [2] - 7:4, 64:20
**ABC** [3] - 76:1, 76:15, 100:23
**ABC's** [1] - 205:7
**ABCDMDL** [1] - 20:1
**ABDC** [9] - 74:23,

75:8, 75:10, 121:9, 122:10, 122:16, 142:5, 196:25, 218:4
**ABDC's** [1] - 122:18
**abide** [1] - 121:17
**ability** [1] - 182:24
**able** [8] - 11:15, 21:18, 30:20, 51:20, 116:19, 139:9, 145:6, 147:3
**absolute** [1] - 137:8
**abuse** [8] - 49:14, 85:4, 95:22, 135:17, 210:6, 210:13, 210:16, 212:18
**abused** [1] - 44:16
**abuts** [1] - 98:22
**acceptable** [1] - 54:1
**access** [7] - 134:16, 143:1, 172:9, 172:10, 172:16, 211:20, 234:4
**accommodate** [1] - 215:12
**accomplish** [1] - 179:10
**accordance** [1] - 24:1
**according** [1] - 45:7
**According** [2] - 225:4, 225:7
**accordingly** [2] - 24:9, 120:12
**account** [3] - 82:2, 200:19, 200:20
**accountability** [3] - 168:14, 169:3, 170:21
**accounted** [2] - 155:3, 155:11
**accounting** [1] - 212:11
**accounts** [1] - 200:16
**accurate** [1] - 94:16
**accurately** [5] - 102:10, 143:3, 217:9, 218:5, 224:24
**ACKERMAN** [16] - 2:9, 120:18, 122:3, 122:7, 122:15, 123:9, 123:15, 123:23, 124:3, 124:17, 124:25, 125:11, 125:13, 125:17, 126:14, 127:2
**Ackerman** [1] - 120:18
**acknowledge** [7] - 21:11, 38:16, 39:25, 40:18, 41:4, 87:24, 88:14

**acknowledged** [1] - 21:2
**acknowledging** [1] - 89:5
**acknowledgment** [3] - 76:18, 132:15, 137:13
**acquisition** [1] - 175:11
**Act** [5] - 117:8, 118:22, 162:2, 162:6, 162:10
**act** [9] - 42:2, 47:22, 115:21, 116:13, 120:12, 162:3, 162:4, 162:18, 163:9
**acting** [1] - 120:3
**Action** [4] - 1:4, 1:10, 235:7, 235:8
**action** [9] - 96:10, 96:15, 110:21, 112:5, 117:4, 117:7, 118:2, 118:13
**actions** [1] - 136:3
**activities** [5] - 110:22, 111:16, 113:20, 114:11, 146:12
**activity** [31] - 66:9, 72:21, 102:18, 102:20, 102:21, 102:22, 109:16, 110:24, 111:24, 113:18, 113:22, 113:23, 114:2, 114:12, 115:24, 116:6, 119:5, 119:7, 119:8, 119:10, 119:13, 119:16, 131:11, 146:6, 146:7, 146:13, 146:15, 146:20, 177:25
**actual** [6] - 36:21, 63:7, 76:12, 90:13, 134:20, 194:13
**acutely** [1] - 120:15
**adapt** [1] - 7:24
**add** [10] - 15:5, 23:8, 28:19, 30:18, 36:3, 94:10, 108:10, 114:25, 126:18, 131:15
**added** [1] - 76:10
**addiction** [1] - 214:13
**adding** [1] - 225:17
**addition** [19] - 15:6, 44:7, 61:13, 61:22, 68:19, 68:20, 113:24, 126:3, 134:8, 160:4, 160:5,

169:3, 171:21, 171:25, 188:5, 197:1, 200:22
**additional** [7] - 15:15, 68:23, 69:5, 114:20, 120:19, 190:4, 192:4
**address** [2] - 95:22, 102:1
**addressed** [2] - 17:24, 180:16
**adds** [1] - 226:6
**adept** [1] - 117:15
**adequate** [4] - 163:25, 164:6, 170:8, 203:1
**adequately** [1] - 136:11
**adhere** [1] - 159:6
**adjacent** [1] - 98:24
**adjust** [1] - 161:6
**adjustments** [1] - 119:10
**admin** [1] - 173:12
**Administration** [2] - 23:22, 80:7
**Administration's** [2] - 209:14, 209:25
**administrative** [1] - 10:16
**Administrator** [1] - 20:6
**admissible** [11] - 22:17, 24:20, 102:23, 103:4, 103:10, 109:24, 110:8, 111:16, 111:17, 111:19, 182:10
**admission** [16] - 15:25, 22:3, 23:10, 60:11, 62:15, 65:24, 70:18, 72:7, 77:20, 79:9, 83:8, 84:14, 110:17, 121:13, 218:8, 232:11
**admit** [16] - 12:3, 13:13, 16:8, 16:12, 23:4, 94:17, 97:11, 111:3, 111:18, 114:18, 128:17, 182:10, 184:16, 208:13, 220:7, 226:8
**ADMITTED** [6] - 38:2, 60:18, 62:21, 64:14, 131:24, 133:1
**admitted** [44] - 13:11, 13:15, 13:21, 15:2, 16:21, 22:16, 24:23, 37:20, 38:1, 60:17, 62:20, 64:13, 70:24, 72:11, 77:25, 79:13,

83:13, 84:23, 87:10, 87:15, 94:4, 94:7, 99:12, 99:18, 102:13, 102:15, 112:18, 118:12, 131:12, 131:21, 131:23, 132:24, 134:6, 184:14, 202:4, 206:14, 208:23, 213:5, 217:22, 218:11, 220:3, 221:18, 226:12
**adopt** [1] - 71:19
**adopted** [1] - 65:14
**adopting** [1] - 81:2
**advanced** [2] - 185:8, 185:21
**adversarial** [1] - 191:24
**adversary** [1] - 177:3
**adverse** [6] - 7:22, 7:25, 8:4, 9:25, 25:8, 25:12
**advised** [1] - 8:18
**affairs** [14] - 85:8, 85:19, 86:5, 86:12, 86:13, 87:8, 89:1, 89:8, 95:5, 95:12, 96:9, 100:7, 148:12
**Affairs** [3] - 99:8, 148:7, 200:4
**afield** [3] - 114:4, 116:8, 119:21
**afternoon** [5] - 112:23, 127:14, 147:25, 148:1, 233:2
**afterwards** [2] - 53:15, 122:21
**agencies** [3] - 85:9, 166:2, 208:4
**agency** [1] - 136:4
**agency's** [1] - 136:8
**agenda** [1] - 139:25
**aggravations** [1] - 228:19
**aggregate** [1] - 212:22
**aggressive** [1] - 130:3
**ago** [4] - 33:5, 61:22, 85:22, 214:25
**agree** [21] - 12:11, 12:14, 15:6, 25:14, 35:4, 36:20, 37:10, 43:17, 44:19, 100:19, 112:9, 113:18, 114:8, 114:24, 129:1, 130:2, 135:13, 135:20, 141:25, 165:14, 193:20

**agreed** [6] - 43:20, 63:22, 194:3, 196:1, 196:24, 197:4
**Agreed** [12] - 76:9, 76:20, 81:6, 81:7, 82:3, 87:5, 92:15, 95:22, 104:6, 225:20, 225:24, 226:5
**agreeing** [1] - 140:17
**agreement** [26] - 18:9, 36:21, 42:5, 42:7, 42:10, 42:18, 42:20, 42:24, 71:13, 79:16, 79:17, 82:15, 91:19, 112:6, 113:15, 153:17, 193:10, 193:19, 196:23, 196:24, 197:5, 197:14, 197:16, 215:3, 215:4, 218:1
**Agreement** [3] - 18:13, 42:14, 138:8
**agreements** [3] - 42:16, 42:25, 137:3
**agrees** [1] - 67:25
**ahead** [28] - 10:17, 11:24, 14:2, 26:7, 32:20, 33:21, 40:25, 53:21, 68:10, 106:20, 113:12, 128:9, 131:19, 134:13, 136:19, 138:21, 139:12, 147:7, 160:17, 177:22, 202:11, 208:12, 215:23, 218:22, 221:1, 223:13, 226:23, 232:21
**aids** [3] - 149:11, 150:1, 150:8
**al** [4] - 1:7, 1:13, 235:6, 235:7
**Alabama** [3] - 95:18, 96:13, 96:22
**alarm** [3] - 166:10, 167:23, 175:22
**alarmed** [1] - 47:25
**alarms** [2] - 167:24
**alert** [6] - 85:13, 92:20, 96:21, 175:25, 187:17
**alerts** [2] - 85:11, 92:20
**algorithm** [1] - 81:17
**allegations** [1] - 116:6
**alleged** [2] - 110:21, 112:13
**allocated** [1] - 226:25

**allow** [8] - 16:9, 68:6, 113:12, 113:16, 161:14, 174:4, 179:23, 196:12
**allowed** [4] - 145:21, 159:24, 165:6, 165:14
**allowing** [1] - 214:6
**allows** [1] - 207:10
**almost** [3] - 15:16, 62:4, 224:22
**alone** [1] - 166:4
**aloud** [7] - 24:4, 44:14, 80:2, 88:8, 135:8, 135:15, 221:23
**Alpha** [2] - 26:14, 26:20
**alter** [1] - 178:24
**AM** [1] - 183:9
**AM-WV-00781** [1] - 180:12
**ambiguity** [1] - 43:14
**amended** [1] - 112:19
**Amendment** [9] - 102:22, 109:9, 109:17, 113:17, 118:8, 119:13, 146:7, 146:9, 146:19
**amendment** [2] - 70:12, 78:6
**Amerisource** [1] - 213:24
**AmerisourceBergen** [93] - 6:2, 18:2, 20:9, 20:13, 21:2, 21:12, 25:10, 29:16, 31:20, 36:23, 38:17, 40:19, 41:5, 41:13, 41:19, 42:12, 43:18, 44:1, 44:20, 45:5, 45:16, 45:20, 46:1, 51:9, 55:25, 60:8, 62:9, 62:11, 63:4, 63:17, 65:2, 66:8, 66:25, 67:15, 67:20, 68:1, 68:15, 68:17, 69:12, 69:25, 71:6, 71:19, 74:13, 81:6, 84:7, 99:9, 104:14, 130:12, 130:14, 131:2, 138:5, 148:3, 149:4, 149:5, 149:6, 149:19, 149:23, 150:14, 152:20, 152:23, 153:9, 153:13, 153:14, 153:15, 155:13, 155:16, 155:19, 157:1, 157:15,

157:19, 157:23, 158:1, 158:6, 161:21, 161:23, 162:5, 186:5, 188:2, 193:4, 193:20, 195:4, 195:9, 195:13, 196:25, 200:4, 213:15, 218:16, 221:9, 225:1, 225:18, 235:6
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**AmerisourceBergen's** [5] - 45:10, 59:18, 150:22, 155:13, 172:5
**amicus** [17] - 112:2, 113:23, 114:3, 119:11, 127:16, 128:4, 129:16, 130:22, 132:16, 133:22, 133:25, 134:3, 134:16, 134:20, 134:25, 138:25, 147:12
**amount** [14] - 34:6, 47:14, 57:22, 58:2, 101:4, 116:4, 154:22, 159:25, 161:1, 161:3, 161:7, 164:22, 178:25, 212:19
**amounts** [2] - 210:22, 223:10
**amplify** [1] - 145:23
**analysis** [1] - 45:10
**ANDREW** [1] - 5:10
**Angeles** [1] - 180:2
**Anita** [1] - 140:10
**Ann** [1] - 140:8
**ANNE** [1] - 4:2
**Anne** [1] - 140:11
**ANNIE** [1] - 3:14
**annual** [3] - 171:1, 223:25, 224:11
**annually** [1] - 47:9
**answer** [12] - 29:17, 29:20, 43:4, 53:18, 53:21, 89:21, 92:17, 108:4, 122:9, 160:17, 177:21, 193:8
**answered** [2] - 29:15, 150:6
**answering** [1] - 179:4
**answers** [1] - 165:12
**ANTHONY** [1] - 2:6
**anticipate** [5] - 7:23, 8:23, 11:4, 34:5, 37:6

**anticipated** [2] - 121:5, 126:11
**anticipating** [1] - 9:24
**anticipation** [1] - 8:19
**antitrust** [1] - 109:23
**anytime** [1] - 49:17
**apart** [4] - 141:23, 160:2, 167:8, 167:18
**apologies** [1] - 208:16
**apologize** [15] - 19:13, 26:5, 26:7, 35:21, 56:17, 69:1, 101:13, 102:2, 177:24, 183:5, 212:6, 224:12, 224:13, 225:12, 232:19
**Appalachia** [2] - 93:18, 94:3
**Appeals** [1] - 13:24
**appear** [4] - 30:22, 32:18, 70:12, 76:16
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**Appendix** [2] - 59:17
**apple** [2] - 31:8, 117:24
**applicable** [1] - 66:7
**application** [2] - 160:15, 160:19
**applied** [3] - 82:10, 109:24, 150:7
**applies** [3] - 110:11, 162:19, 162:22
**applying** [1] - 186:2
**appointments** [1] - 176:6
**Appreciate** [1] - 234:16
**appreciate** [3] - 53:17, 111:12, 183:4
**approach** [36] - 17:16, 18:20, 33:22, 38:10, 59:12, 61:25, 62:24, 65:9, 70:7, 71:24, 73:2, 78:11, 82:24, 83:22, 86:2, 91:2, 94:23, 97:14, 99:24, 103:18, 107:4, 115:4, 115:8, 127:19, 129:7, 132:1, 133:4, 139:20, 141:3, 142:17, 177:7, 180:24, 205:19, 206:7, 217:15, 222:15
**appropriate** [5] - 96:19, 107:15, 151:15, 159:19,

165:18
**appropriately** [2] - 80:11, 186:13
**approval** [7] - 16:17, 179:21, 180:6, 180:9, 182:16, 183:6, 184:20
**approve** [6] - 24:9, 38:18, 42:5, 43:8, 161:5, 218:1
**Approve** [1] - 183:15
**approved** [8] - 38:23, 61:6, 120:1, 160:16, 186:4, 186:18, 190:16, 195:22
**approves** [2] - 55:25, 161:19
**approving** [1] - 56:3
**April** [5] - 71:2, 71:4, 71:5, 71:6, 190:23
**Arch** [2] - 6:6, 6:13
**ARCOS** [9] - 52:20, 53:3, 61:1, 61:10, 153:7, 153:10, 160:4, 203:18, 211:12
**area** [9] - 58:12, 93:18, 99:1, 114:7, 143:18, 148:11, 168:19, 203:10, 203:13
**areas** [5] - 167:3, 172:12, 204:4, 204:5, 204:22
**arguably** [1] - 165:15
**argue** [1] - 207:18
**argument** [10] - 17:5, 27:5, 109:18, 111:13, 119:24, 121:20, 137:21, 144:9, 145:14, 146:14
**arguments** [3] - 109:15, 118:14, 144:10
**arise** [1] - 126:6
**arose** [2] - 126:9, 176:19
**arrange** [1] - 187:14
**arrow** [1] - 221:24
**Article** [1] - 91:12
**article** [11] - 92:10, 92:15, 92:21, 93:3, 93:5, 93:24, 94:6, 94:9, 94:19, 94:20, 102:25
**articles** [3] - 88:12, 92:19, 150:12
**articulated** [1] - 208:7
**ASHLEY** [1] - 5:3
**Aside** [1] - 87:17

**aside** [1] - 117:23
**aspect** [2] - 50:5, 108:8
**assemble** [1] - 158:19
**assembled** [1] - 148:22
**asserted** [3] - 24:17, 94:20, 109:8
**assessment** [1] - 143:4
**assessments** [2] - 142:25, 171:23
**assist** [2] - 16:1, 136:4
**Assistant** [1] - 20:6
**associated** [1] - 135:16
**Associated** [1] - 92:10
**Associates** [1] - 79:1
**associates** [2] - 63:21, 79:5
**association** [1] - 102:21
**Association** [3] - 116:6, 146:2, 146:12
**assume** [2] - 75:9, 125:21
**assuming** [3] - 22:15, 81:8, 93:23
**assumption** [3] - 97:25, 124:6, 187:22
**assuring** [1] - 63:20
**AT** [1] - 1:2
**Attached** [1] - 122:18
**attached** [6] - 102:25, 130:22, 140:20, 140:23, 142:7, 181:6
**attachment** [1] - 134:2
**attachments** [4] - 133:23, 141:15, 181:10, 181:12
**attack** [1] - 101:22
**attempt** [5] - 14:17, 15:12, 16:6, 106:24, 137:20
**attempted** [2] - 16:7, 16:12
**attempting** [7] - 36:4, 136:17, 136:20, 143:21, 144:19, 207:7, 220:7
**attendees** [1] - 200:4
**attention** [6] - 37:10, 40:8, 63:11, 126:23, 183:13, 189:5
**attitude** [4] - 97:8, 105:12, 105:25, 106:9
**attorney** [1] - 233:3
**audit** [7] - 154:11, 164:18, 165:24,

166:1, 172:2, 176:5, 191:25
**auditing** [3] - 171:22, 171:25, 178:11
**audits** [5] - 164:20, 166:3, 167:22, 177:11, 184:25
**August** [5] - 29:1, 91:10, 91:14, 211:10, 217:20
**authentic** [1] - 37:1
**authenticate** [2] - 28:15, 28:21
**authenticated** [4] - 14:20, 22:18, 24:19, 28:11
**authenticating** [1] - 22:21
**authentication** [2] - 31:10, 36:15
**authenticity** [12] - 23:9, 104:18, 121:3, 123:16, 123:18, 123:22, 124:2, 124:24, 125:1, 125:10, 125:14, 125:21
**authorities** [5] - 135:19, 153:1, 200:6, 210:7, 210:11
**Authority** [1] - 153:3
**authority** [1] - 25:18
**authorized** [3] - 11:19, 210:21, 212:20
**available** [7] - 58:17, 58:20, 67:6, 67:8, 67:9, 149:13, 210:10
**average** [4] - 14:10, 14:11, 54:10, 54:23, 55:2, 55:4, 55:7, 55:18, 57:20, 57:21, 58:1, 61:1, 61:2, 74:24, 174:14, 174:15, 210:17
**Avin** [1] - 3:7
**avoided** [1] - 35:19
**aware** [5] - 120:16, 189:6, 218:14, 218:24, 219:1
**awareness** [2] - 15:21, 176:8
**Ayme** [2] - 6:17, 235:2

## B

**background** [4] - 49:21, 169:15, 169:20, 169:24
**bad** [1] - 225:10
**bar** [2] - 109:24,

110:16
**Baron** [1] - 3:17
**base** [4] - 40:16, 41:16, 41:19, 82:6
**based** [18] - 48:16, 49:17, 58:10, 109:16, 110:8, 110:16, 113:17, 118:9, 143:12, 146:1, 146:11, 146:19, 160:19, 161:1, 190:4, 205:4, 205:7, 205:12
**Based** [1] - 189:16
**Basis** [1] - 173:21
**basis** [30] - 9:25, 22:7, 24:13, 25:1, 46:9, 53:6, 54:15, 72:17, 74:22, 76:24, 77:17, 105:22, 113:20, 118:12, 124:13, 128:24, 143:9, 144:22, 145:5, 146:11, 153:19, 157:6, 160:23, 163:12, 178:14, 182:17, 185:18, 207:22, 208:6, 223:25
**Bate** [2] - 19:17, 135:4
**Bates** [8] - 19:25, 26:16, 26:23, 29:9, 38:13, 63:7, 142:5, 183:23
**Baylen** [1] - 2:13
**beaten** [1] - 139:12
**beauty** [3] - 149:11, 149:25, 150:8
**BEFORE** [1] - 1:17
**began** [2] - 143:23, 190:15
**begin** [1] - 137:23
**beginning** [7] - 82:13, 98:9, 115:15, 148:14, 176:20, 190:14, 195:8
**begins** [1] - 24:3
**behalf** [2] - 21:1, 124:9, 127:16, 130:23, 134:17, 140:16, 145:13, 227:24
**behavior** [3] - 100:18, 101:13, 144:3
**belaboring** [2] - 57:11, 83:2
**believes** [3] - 40:1, 139:5, 165:2
**belong** [1] - 163:2
**below** [2] - 95:8, 130:4

**BENCH** [1] - 1:16
**benefit** [1] - 75:11
**Bergen** [4] - 53:13, 56:14, 60:3, 193:6
**beside** [1] - 206:23
**best** [9] - 7:23, 18:24, 46:20, 47:21, 49:25, 102:1, 121:17, 160:9, 214:9
**better** [7] - 8:9, 91:23, 91:25, 177:16, 178:5, 178:18, 185:25
**between** [10] - 18:2, 74:24, 82:11, 88:23, 88:24, 99:7, 137:3, 181:13, 193:19, 207:16
**Beverly** [3] - 86:21, 86:22, 87:21
**bevy** [2] - 90:7, 90:8
**beyond** [3] - 107:18, 109:22, 117:23
**biannual** [2] - 199:13, 199:14
**bickering** [1] - 7:12
**Big** [3] - 98:22, 103:10, 150:4
**big** [5] - 54:3, 114:1, 126:21, 143:17, 185:10
**biggest** [1] - 108:3
**Bill** [2] - 138:1, 138:2
**binds** [1] - 15:8
**bit** [12] - 25:22, 26:4, 30:24, 83:16, 101:10, 121:11, 147:7, 150:25, 157:10, 158:13, 176:10, 178:10
**bite** [2] - 31:7, 117:24
**Bittman** [1] - 140:8
**black** [4] - 18:24, 45:9, 81:12, 83:15
**blacked** [2] - 81:10
**blame** [1] - 147:3
**bleed** [1] - 130:17
**bleed-over** [1] - 130:17
**block** [2] - 71:20, 196:7
**blocked** [1] - 194:23
**Blue** [2] - 90:18, 90:19
**Blvd** [2] - 3:15, 4:3, 4:9
**board** [8] - 17:16, 66:12, 66:17, 66:18, 67:2, 146:5, 171:15
**Board** [2] - 153:4, 176:7

**boarding** [1] - 194:6
**Boards** [4] - 152:24, 153:1
**bogging** [1] - 47:23
**bolts** [1] - 167:9
**Bonasso** [1] - 5:14
**Book** [1] - 144:7
**born** [2] - 109:23, 144:11
**borne** [2] - 177:9
**boss** [1] - 141:12
**bottle** [1] - 204:18
**Bottom** [1] - 74:8
**bottom** [17] - 19:17, 19:24, 29:11, 40:9, 60:25, 63:8, 71:15, 73:10, 74:4, 75:4, 92:9, 95:19, 134:9, 135:4, 183:14, 183:15, 184:2
**Boulevard** [1] - 3:18
**box** [5] - 8:3, 50:13, 81:12, 98:12, 122:25
**Box** [2] - 5:14, 6:8
**brand** [1] - 50:18
**Bravo** [1] - 26:24
**brazed** [1] - 167:10
**break** [11] - 11:6, 11:14, 15:18, 34:14, 35:6, 46:22, 57:12, 64:25, 106:7, 163:5, 172:17
**breaking** [2] - 108:17, 185:8
**Bridgeside** [3] - 3:15, 4:3, 4:9
**brief** [20] - 111:21, 112:2, 112:9, 127:16, 128:3, 128:4, 129:16, 130:22, 131:7, 132:17, 133:22, 133:25, 134:3, 134:17, 134:20, 134:25, 135:4, 136:13, 137:7, 138:25
**briefer** [1] - 207:14
**briefing** [6] - 103:8, 109:9, 109:10, 111:2, 111:5, 112:20
**briefly** [3] - 17:24, 150:25, 173:18
**briefs** [6] - 112:10, 113:13, 113:23, 114:3, 119:12, 147:13
**bring** [18] - 36:19, 38:4, 56:9, 74:4, 86:1, 86:17, 91:1,

92:7, 96:5, 98:5,
103:17, 127:15,
127:18, 131:25,
135:6, 142:15,
149:12, 189:5
**brings** [1] - 18:13
**broad** [2] - 8:2, 162:23
**broadest** [1] - 162:24
**broke** [1] - 194:17
**broken** [1] - 194:19
**brought** [4] - 37:9,
37:13, 215:16,
229:14
**Brown** [1] - 109:19
**Bruce** [1] - 133:12
**Brunswig** [3] - 56:13,
56:14, 60:3
**Brusnwig** [1] - 193:6
**bucket** [3] - 54:9,
185:12, 194:17
**Budd** [1] - 3:17
**Buffet's** [1] - 98:6
**build** [4] - 37:5, 37:6,
167:19, 176:12
**building** [1] - 149:17
**built** [1] - 101:22
**bulk** [1] - 27:20
**bullet** [2] - 205:2,
205:10
**bulletproof** [1] -
228:14
**bunch** [1] - 103:3
**burden** [1] - 111:25
**Burling** [2] - 5:11,
56:11
**business** [17] - 11:2,
37:3, 50:19, 51:5,
73:21, 77:18, 85:13,
132:12, 148:16,
148:24, 175:10,
190:11, 192:17,
229:10, 230:12,
230:18, 233:25
**Buy** [1] - 90:16
**buy** [7] - 93:17, 149:9,
149:11, 151:2,
187:6, 187:9, 187:11
**buying** [1] - 152:1
**buzz** [1] - 85:12
**BY** [106] - 17:18,
17:22, 21:22, 23:14,
31:18, 33:24, 38:8,
38:12, 39:13, 41:3,
43:12, 53:13, 57:19,
59:22, 60:19, 62:2,
62:22, 63:1, 64:23,
65:11, 66:4, 68:12,
68:25, 69:23, 70:9,
70:25, 72:2, 72:12,
73:5, 75:24, 78:1,

78:8, 78:13, 79:14,
83:1, 83:24, 84:18,
84:24, 86:3, 87:16,
90:3, 91:4, 92:8,
94:25, 96:7, 97:17,
99:19, 100:2,
103:16, 103:21,
106:21, 127:12,
127:20, 128:11,
129:10, 132:3,
133:2, 133:5,
134:14, 134:24,
139:14, 139:23,
141:6, 147:24,
150:19, 156:15,
157:13, 158:14,
160:12, 160:21,
161:16, 163:21,
165:23, 173:2,
174:5, 175:6,
178:16, 180:13,
181:9, 182:11,
184:19, 186:17,
198:19, 199:4,
200:10, 202:5,
206:15, 208:25,
213:10, 216:7,
217:4, 217:18,
218:12, 218:23,
220:13, 221:2,
221:20, 222:17,
223:14, 224:17,
228:13, 228:22,
229:5, 230:25,
231:6, 233:1

## C

**C.F.R** [1] - 204:22
**CA** [1] - 3:18
**Cabell** [16] - 3:2,
14:11, 14:12, 67:7,
67:8, 114:12, 116:3,
117:9, 143:18,
157:22, 157:24,
158:2, 171:6,
229:20, 233:13,
233:14
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell-Huntington** [2]
- 114:12, 116:3
**Cacciatore** [1] - 140:7
**cage** [6] - 46:24, 47:4,
48:1, 167:4, 169:4,
169:23
**cages** [1] - 168:8
**caliber** [1] - 100:23
**CALLAS** [1] - 6:7
**Campbell** [1] - 140:6

**CAMPBELL** [1] - 6:14
**cancel** [6] - 196:8,
196:16, 203:22,
203:25, 204:1
**cancelled** [2] - 80:9,
196:14
**cancer** [1] - 214:14
**cannot** [2] - 110:15,
118:10
**cap** [2] - 222:8, 222:9
**capable** [1] - 113:2
**capacity** [1] - 74:12
**Capitol** [1] - 2:7
**capture** [2] - 59:9,
205:7
**captured** [1] - 204:18
**card** [1] - 172:11
**card-key** [1] - 172:11
**Cardinal** [17] - 4:11,
5:2, 36:23, 121:10,
121:12, 123:7,
123:10, 123:19,
123:24, 126:3,
127:16, 129:18,
130:23, 132:16,
133:25, 134:17,
233:3
**care** [5] - 10:23, 49:14,
58:10, 110:3, 186:25
**career** [1] - 164:19
**carefully** [1] - 111:1
**Carey** [1] - 4:17
**Carolina** [1] - 109:19
**carriers** [1] - 170:8
**carry** [3] - 89:4, 89:7,
151:2
**Case** [1] - 14:11
**case** [26] - 9:6, 76:24,
110:13, 110:22,
111:2, 111:6,
112:16, 112:18,
114:1, 115:2,
119:17, 120:2,
122:16, 122:19,
124:7, 130:23,
136:15, 138:17,
143:18, 145:16,
147:1, 157:21,
160:8, 162:10, 171:4
**case-by-case** [1] -
76:24
**cases** [2] - 47:6,
109:20
**cash** [7] - 77:11,
77:12, 89:4, 89:7,
187:8, 187:12,
231:24
**cast** [1] - 107:8
**categories** [1] -
163:22

**categorized** [1] - 59:2
**category** [2] - 9:22,
54:7
**Cathy** [1] - 104:15
**caught** [2] - 8:3,
204:19
**caused** [1] - 48:8
**causing** [1] - 136:23
**cavalier** [1] - 105:25
**cement** [1] - 167:20
**Center** [7] - 3:12, 5:11,
78:17, 79:1, 79:3,
171:4, 171:7
**center** [8] - 20:11,
79:5, 171:5, 171:15,
175:10, 176:3,
190:23, 191:1
**centers** [21] - 29:18,
30:25, 46:4, 63:5,
65:3, 73:23, 80:4,
80:18, 81:6, 149:21,
162:7, 168:8,
170:13, 171:9,
171:17, 172:2,
174:8, 175:17,
179:24, 184:24,
198:1
**Centers** [1] - 63:16
**CEO** [3] - 36:21,
130:12, 221:4
**certain** [13] - 22:24,
34:16, 34:17, 85:12,
111:19, 160:20,
161:3, 164:22,
164:24, 167:24,
172:10, 229:14
**certainly** [5] - 23:1,
67:9, 94:7, 120:24,
121:17
**certification** [1] -
154:1
**CERTIFICATION** [1] -
235:1
**certify** [1] - 235:4
**CFR** [7] - 24:1, 57:4,
156:19, 159:6,
163:1, 166:8, 169:17
**chain** [19] - 49:17,
58:14, 73:1, 85:17,
100:16, 101:20,
107:3, 107:18,
149:9, 150:18,
150:21, 150:23,
152:5, 152:8,
153:20, 154:2,
154:4, 161:18,
200:17
**chance** [2] - 127:23,
208:10
**change** [14] - 102:5,

115:18, 116:7,
116:12, 117:1,
117:3, 118:4, 118:6,
138:1, 177:18,
178:1, 179:1,
185:10, 194:2
**changed** [8] - 48:8,
136:25, 137:11,
137:13, 137:24,
138:3, 138:19,
190:19
**changes** [5] - 54:3,
115:25, 116:1,
119:11, 164:23
**changing** [1] - 95:15
**channel** [4] - 149:2,
160:25, 177:5,
186:25
**channels** [1] - 45:2
**characterization** [4] -
16:6, 37:11, 83:19,
145:9
**characterize** [2] -
94:14, 94:15
**charge** [4] - 32:5,
73:23, 84:10, 169:19
**charged** [1] - 106:16
**CHARLES** [1] - 3:11
**CHARLESTON** [2] -
1:2, 1:18
**Charleston** [7] - 2:8,
3:13, 4:19, 5:15, 6:9,
7:3, 92:11
**chart** [6] - 14:9, 67:6,
67:11, 67:15, 67:24,
67:25
**charts** [5] - 12:19,
12:21, 13:3, 16:22,
170:14
**Chase** [1] - 4:18
**check** [7] - 22:25,
23:1, 166:10,
169:24, 170:19,
184:15, 197:22
**checkers** [1] - 50:6
**checking** [1] - 184:11
**checks** [2] - 169:15,
169:20
**chemical** [4] - 187:7,
187:12, 205:3,
205:12
**chemicals** [3] - 66:11,
76:16, 182:19
**Chesterbrook** [1] -
6:15
**Chief** [3] - 20:12,
69:10, 200:2
**chooses** [1] - 115:3
**Chou** [3] - 133:13,
141:10, 141:11

**Chris** [5] - 74:5, 94:8, 104:24, 200:3, 222:21
**chronic** [1] - 214:14
**chute** [1] - 82:19
**circle** [5] - 50:4, 78:7, 134:15, 154:24, 222:7
**circling** [1] - 134:20
**circulate** [5] - 18:19, 83:17, 101:2, 139:18, 217:12
**circulated** [7] - 38:4, 79:5, 79:15, 87:4, 87:6, 88:24, 105:14
**circulating** [2] - 106:17, 129:5
**circulation** [1] - 27:3
**circumstances** [5] - 47:9, 76:25, 111:19, 187:5, 204:20
**cited** [1] - 51:12
**City** [7] - 4:1, 5:11, 14:12, 67:7, 67:8, 157:22, 235:5
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 235:7, 235:8
**civil** [1] - 1:10
**claim** [1] - 105:25
**claimed** [1] - 190:10
**claims** [1] - 110:8
**clarification** [2] - 61:7, 196:4
**clarify** [11] - 50:22, 50:23, 51:3, 53:22, 79:21, 178:5, 196:10, 219:22, 232:20, 233:4, 233:7
**class** [1] - 232:2
**classification** [4] - 152:14, 152:15, 152:16, 154:1
**classified** [1] - 152:12
**cleaning** [1] - 82:22
**clear** [26] - 9:8, 15:3, 16:10, 23:10, 24:13, 31:2, 34:25, 35:16, 42:2, 43:13, 58:21, 69:1, 80:20, 82:2, 101:6, 104:21, 110:9, 112:11, 118:1, 121:15, 124:21, 136:9, 137:1, 150:14, 151:16, 219:18
**clearing** [1] - 101:9
**clearly** [7] - 24:3, 24:5, 114:21, 119:20, 156:20, 204:22,

219:13
**Clerk** [1] - 221:18
**clerk** [1] - 234:11
**CLERK** [5] - 11:22, 221:19, 228:4, 228:7, 228:10
**client** [1] - 145:13
**clinics** [2] - 89:3, 89:7
**clock** [1] - 120:16
**close** [3] - 89:22, 149:20, 222:7
**closed** [4] - 154:2, 154:24, 155:23
**Closed** [4] - 152:9, 153:21, 153:24, 154:25
**closing** [2] - 145:14, 167:25
**clue** [1] - 99:4
**Cochran** [3] - 6:17, 235:2, 235:11
**Code** [8] - 51:12, 156:4, 162:3, 166:13, 170:3, 175:23, 188:8, 202:13
**code** [1] - 82:6
**coded** [1] - 54:24
**coin** [1] - 125:24
**colleague** [4] - 29:2, 103:7, 188:19, 205:16
**collect** [1] - 151:15
**collection** [1] - 115:11
**collectively** [1] - 22:3
**color** [4] - 36:3, 81:8, 144:22, 144:23
**column** [2] - 231:8, 231:12
**combat** [2] - 210:7, 210:11
**combating** [1] - 212:15
**combination** [2] - 22:8, 137:18
**combined** [1] - 120:6
**comfortable** [1] - 187:4
**coming** [2] - 67:10, 204:12
**command** [3] - 65:15, 100:16, 103:24
**comment** [4] - 69:20, 102:11, 106:5, 129:25
**commented** [2] - 134:16, 212:5
**comments** [2] - 130:2, 132:16
**Commerce** [2] -

218:17, 220:15
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2, 3:2
**Committee** [2] - 140:17, 218:18
**common** [1] - 88:22
**communicate** [1] - 184:20
**communicated** [2] - 24:18, 192:21
**communicating** [1] - 96:8
**communication** [3] - 21:11, 38:17, 100:13
**communications** [2] - 182:5, 196:19
**community** [1] - 106:16
**companies** [1] - 234:3
**company** [28] - 29:19, 31:22, 32:1, 60:2, 62:8, 132:8, 148:11, 148:12, 148:17, 149:15, 150:24, 164:12, 168:10, 173:5, 173:7, 187:20, 189:14, 191:7, 191:8, 191:10, 191:16, 193:6, 196:1, 206:5, 209:8, 213:13, 213:16, 213:21
**Company** [2] - 149:5, 149:6
**company's** [3] - 106:9, 161:13, 163:19
**compare** [8] - 43:20, 44:3, 44:8, 51:21, 52:1, 54:4, 54:6, 54:22
**compared** [3] - 174:13, 178:20, 178:22
**comparing** [1] - 194:16
**compendium** [1] - 33:8
**compilation** [2] - 19:13, 22:10
**compile** [1] - 15:23
**complain** [2] - 121:18, 177:12
**complained** [1] - 125:25
**complement** [1] - 150:8
**complete** [11] - 11:15,

46:7, 53:18, 53:20, 109:10, 154:24, 168:21, 169:4, 182:4, 182:8, 190:12
**completed** [2] - 39:19, 111:6
**completely** [4] - 46:20, 53:4, 55:12, 55:16
**completeness** [1] - 78:2
**complex** [1] - 36:6
**Compliance** [3] - 60:1, 69:10, 172:1
**compliance** [3] - 63:20, 66:7, 169:21
**compliant** [1] - 40:2
**complications** [1] - 232:23
**complimentary** [1] - 121:2
**comply** [1] - 171:19
**complying** [2] - 76:4, 136:5
**component** [7] - 43:24, 46:3, 46:8, 46:13, 52:16, 121:2
**components** [5] - 26:13, 45:14, 46:22, 120:23, 120:24
**comprehensive** [2] - 32:17, 212:16
**comprised** [1] - 194:5
**computer** [3] - 6:19, 52:5, 52:8
**conceding** [1] - 143:20
**conceptually** [1] - 215:14
**concern** [2] - 125:1, 125:3
**concerned** [2] - 28:10, 232:17
**concerns** [1] - 110:3
**concerted** [8] - 110:20, 110:21, 110:24, 112:4, 117:4, 117:7, 118:2, 118:13
**conclude** [1] - 115:9
**conclusion** [2] - 40:23, 222:11
**conclusions** [2] - 143:6, 212:5
**concrete** [2] - 167:12, 167:17
**conditional** [7] - 12:2, 12:10, 13:1, 13:2, 13:25, 16:17, 27:17
**conditionally** [5] -

12:3, 13:15, 16:21, 111:3, 115:4
**conduct** [13] - 76:7, 100:18, 106:15, 120:5, 120:7, 144:1, 146:1, 148:24, 164:22, 169:15, 170:23, 170:25, 189:18
**conducted** [2] - 189:21, 200:22
**conducting** [4] - 143:23, 190:5, 190:10, 230:15
**confer** [2] - 57:8, 147:9
**conference** [14] - 198:11, 198:22, 199:5, 199:9, 199:11, 199:14, 199:19, 201:1, 201:13, 201:14, 205:19, 205:20, 206:2, 206:24
**confines** [1] - 28:7
**confirm** [1] - 80:10
**confirmed** [1] - 227:8
**confronted** [1] - 212:9
**confused** [4] - 68:8, 110:12, 121:11, 214:23
**confusing** [1] - 68:7
**confusion** [2] - 42:3, 54:13
**Congress** [1] - 135:18
**Congressional** [1] - 218:15
**congressional** [2] - 218:24, 218:25
**conjunction** [2] - 192:23, 195:20
**connection** [5] - 88:23, 110:8, 148:20, 193:1, 193:16
**connects** [1] - 114:9
**Connolly** [2] - 4:13, 5:4
**CONROY** [1] - 3:3
**conservative** [1] - 48:22
**Conshohocken** [1] - 149:18
**consider** [2] - 27:6, 77:2
**consideration** [1] - 76:25
**consistent** [4] - 120:3, 120:5, 139:4, 211:4
**consistently** [1] -

80:10
**consists** [2] - 45:13, 174:13
**conspiracy** [4] - 110:21, 113:20, 117:5, 117:7
**constitutes** [1] - 212:2
**constructing** [1] - 89:23
**consult** [2] - 57:5, 184:7
**consulted** [1] - 155:16
**contact** [7] - 46:6, 46:7, 47:14, 174:12, 175:24, 176:3, 176:10
**contain** [2] - 134:2, 143:24
**contained** [6] - 22:4, 102:3, 150:10, 168:1, 211:12, 211:14
**contains** [3] - 14:10, 103:3, 144:6
**contents** [1] - 21:13
**context** [8] - 31:21, 39:16, 89:10, 109:23, 126:6, 126:25, 135:25, 136:2
**contexts** [1] - 175:4
**contingent** [1] - 123:11
**continuation** [1] - 105:12
**Continue** [3] - 80:8, 210:14, 211:8
**continue** [12] - 24:8, 37:14, 43:10, 61:12, 80:14, 96:1, 117:7, 137:7, 145:21, 148:24, 161:8, 178:14
**continued** [9] - 61:9, 61:20, 68:2, 82:20, 116:15, 120:7, 197:8, 197:9, 212:19
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continuing** [1] - 108:7, 118:22, 158:9
**continuously** [1] - 177:1
**contrary** [1] - 115:22
**control** [13] - 8:13, 45:6, 74:21, 93:7, 164:6, 168:11, 172:9, 173:3, 196:6, 207:3, 209:15, 213:14, 213:17

**Control** [4] - 20:7, 28:3, 28:20, 210:1
**Controlled** [7] - 117:8, 118:22, 153:3, 162:2, 162:6, 162:10, 203:21
**controlled** [43] - 23:22, 23:24, 44:16, 49:13, 50:13, 50:21, 56:2, 59:10, 63:12, 66:11, 72:19, 72:20, 74:22, 74:25, 75:2, 75:3, 75:10, 76:2, 76:15, 102:8, 135:11, 135:17, 149:11, 149:24, 150:9, 152:10, 152:21, 153:15, 153:18, 160:13, 162:6, 167:2, 169:22, 170:20, 182:18, 193:21, 197:1, 203:6, 205:3, 205:11, 210:8, 211:12, 212:23
**controls** [6] - 45:3, 152:18, 163:25, 202:18, 203:8, 217:8
**conventional** [4] - 113:22, 119:10, 119:13, 146:13
**conversations** [2] - 142:24, 175:2
**Cook** [3] - 6:18, 235:3, 235:11
**cooperative** [1] - 25:7
**coordinator** [1] - 63:20
**copied** [2] - 130:13, 130:15
**copies** [4] - 18:19, 122:5, 134:22, 234:9
**copy** [10] - 29:16, 29:20, 29:21, 30:11, 34:2, 34:4, 38:5, 81:9, 160:3, 184:23
**corner** [1] - 19:24
**corporate** [3] - 83:16, 100:19, 197:24
**Corporate** [2] - 148:7, 148:15, 200:3
**Corporation** [3] - 6:2, 66:8, 235:7
**cORPORATION** [2] - 1:7, 1:13
**Correct** [21] - 68:17, 74:11, 79:7, 80:20, 80:21, 81:3, 81:18, 91:18, 91:21, 102:9, 192:24, 202:16,

206:25, 215:6, 215:8, 220:15, 222:11, 223:19, 223:20, 225:15, 229:13
**correct** [98] - 13:22, 18:14, 20:16, 20:21, 20:22, 32:2, 32:9, 32:12, 38:20, 39:8, 39:12, 40:6, 45:24, 47:2, 52:18, 53:3, 55:5, 55:6, 55:9, 56:15, 60:23, 65:5, 66:14, 69:3, 69:4, 69:6, 70:14, 74:10, 74:13, 74:17, 77:5, 81:17, 81:20, 82:4, 86:12, 87:1, 89:2, 89:17, 91:17, 91:23, 100:14, 131:2, 132:17, 147:18, 148:9, 152:6, 152:21, 152:22, 156:10, 156:11, 166:16, 166:21, 171:18, 174:3, 186:18, 190:2, 191:2, 191:3, 192:1, 192:14, 192:23, 193:3, 193:14, 193:15, 193:18, 197:2, 197:6, 197:7, 197:10, 197:11, 198:17, 199:14, 200:25, 201:3, 201:4, 202:15, 202:18, 205:15, 205:21, 206:21, 220:25, 224:18, 229:12, 229:16, 229:21, 230:4, 231:10, 231:11, 231:14, 231:19, 231:25, 232:4, 232:5, 233:17, 233:22, 234:2, 234:5, 235:4
**corrected** [1] - 205:23
**correcting** [1] - 220:19
**correctly** [3] - 39:23, 67:18, 195:16
**correspondence** [10] - 21:3, 23:15, 34:17, 41:4, 103:23, 138:9, 174:25, 181:13, 181:17, 217:20
**corresponding** [2] - 156:5, 156:22
**Couch** [1] - 140:7
**counsel** [9] - 15:22,

16:11, 57:12, 59:14, 91:22, 123:24, 129:6, 144:10, 217:20
**Counsel** [1] - 141:12
**count** [1] - 155:8
**counted** [2] - 172:8, 172:15
**counter** [4] - 107:12, 107:23, 149:10, 149:25
**counterparts** [1] - 185:23
**country** [2] - 93:15, 170:13
**COUNTY** [1] - 1:10
**County** [16] - 2:2, 3:2, 14:11, 14:12, 67:7, 67:8, 68:3, 84:11, 98:21, 117:9, 157:22, 158:3, 171:6, 229:20, 233:13, 233:14
**couple** [9] - 63:25, 65:3, 82:20, 87:18, 120:21, 127:21, 141:22, 166:9, 175:16
**course** [17] - 11:2, 12:18, 37:2, 74:16, 84:5, 112:16, 114:16, 126:5, 126:10, 130:25, 132:12, 209:7, 209:10, 219:8, 219:24, 230:12, 230:18
**Court** [29] - 6:17, 6:18, 7:2, 13:24, 14:22, 16:1, 16:8, 16:12, 26:25, 27:2, 34:8, 35:21, 59:21, 73:18, 78:14, 82:24, 102:2, 108:5, 114:17, 124:7, 131:21, 135:25, 214:5, 226:22, 226:25, 227:8, 229:2, 235:2, 235:3
**COURT** [325] - 1:1, 1:17, 7:5, 7:17, 7:20, 8:5, 8:10, 8:24, 9:10, 9:19, 10:1, 10:9, 10:13, 10:17, 10:22, 11:8, 11:16, 11:19, 11:24, 12:8, 13:2, 13:7, 13:14, 13:18, 13:20, 13:23, 14:2, 14:20, 15:2, 15:16, 15:20, 16:2, 16:4,

16:14, 16:20, 17:3, 17:7, 17:9, 17:11, 17:17, 18:21, 21:20, 22:7, 22:18, 22:22, 23:4, 23:12, 24:15, 24:19, 24:25, 25:4, 25:14, 25:17, 26:1, 26:3, 26:15, 26:18, 26:21, 27:5, 27:9, 27:12, 27:15, 27:18, 27:22, 28:9, 28:18, 28:22, 29:4, 31:5, 31:14, 31:17, 33:6, 33:10, 33:14, 33:19, 33:21, 33:23, 34:4, 34:10, 35:3, 35:8, 35:13, 35:22, 35:24, 36:1, 36:5, 37:7, 37:16, 37:21, 37:25, 38:11, 40:25, 42:19, 43:11, 53:20, 57:9, 57:14, 57:18, 59:13, 60:12, 60:15, 60:17, 62:16, 62:20, 62:25, 64:4, 64:6, 64:9, 64:13, 64:16, 64:21, 65:25, 67:3, 67:17, 68:5, 68:21, 70:22, 70:24, 71:25, 72:8, 72:11, 73:3, 77:21, 77:25, 79:13, 83:9, 83:12, 83:21, 83:23, 84:16, 84:24, 84:23, 87:11, 87:15, 89:25, 92:5, 94:1, 94:4, 94:17, 96:1, 96:4, 97:3, 97:7, 97:11, 97:15, 99:13, 99:16, 99:18, 99:25, 103:3, 103:13, 103:19, 104:11, 104:20, 105:5, 105:7, 105:15, 105:20, 105:24, 106:4, 106:11, 106:18, 107:5, 107:24, 108:9, 108:15, 108:19, 108:25, 109:4, 110:14, 111:5, 111:10, 112:22, 113:3, 113:5, 113:11, 114:23, 116:21, 117:10, 117:19, 117:22, 118:16, 118:19, 119:22, 120:9, 120:13, 120:17, 121:25, 122:6, 123:13, 123:21, 124:1, 124:23, 125:9,

125:12, 125:15,
126:1, 126:16,
126:24, 127:3,
127:6, 127:8,
127:11, 128:8,
129:1, 129:4, 129:8,
131:8, 131:14,
131:18, 131:22,
132:2, 132:24,
134:13, 136:14,
136:18, 136:24,
137:10, 137:16,
137:22, 138:15,
139:6, 139:11,
139:21, 141:4,
142:18, 143:7,
143:16, 145:17,
145:22, 146:21,
146:25, 147:5,
147:10, 147:16,
147:19, 147:21,
156:13, 157:2,
157:12, 158:12,
159:10, 159:12,
160:17, 161:12,
163:12, 163:18,
165:20, 167:13,
172:19, 172:24,
173:21, 174:1,
174:4, 175:5,
177:22, 180:25,
181:5, 181:25,
182:9, 183:21,
183:25, 184:4,
184:8, 184:16,
186:11, 186:16,
201:24, 202:2,
202:4, 206:8,
206:12, 206:14,
208:8, 208:12,
208:20, 208:23,
213:3, 213:5,
214:22, 215:5,
215:7, 215:9,
215:20, 215:23,
216:1, 216:5, 217:2,
217:16, 218:9,
218:11, 218:21,
219:10, 219:16,
219:19, 220:5,
220:12, 220:22,
221:1, 223:6,
223:12, 224:7,
224:14, 226:9,
226:12, 226:15,
226:23, 227:6,
227:10, 227:19,
227:23, 228:2,
228:18, 228:21,
229:3, 230:20,
230:24, 232:12,

232:16, 232:18,
232:21, 234:7,
234:12, 234:14,
234:17
**court** [8] - 15:22,
64:16, 121:16,
124:20, 125:23,
137:6, 172:19,
227:18
**Court's** [8] - 12:10,
12:25, 13:2, 15:21,
15:25, 16:17,
131:12, 227:3
**court-ordered** [1] -
121:16
**courtroom** [4] - 10:14,
17:5, 126:12, 145:1
**cover** [3] - 101:8,
139:25, 209:1
**covered** [2] - 15:24,
164:11
**covers** [1] - 124:16
**COVID** [1] - 148:21
**Covington** [1] - 5:11
**crazy** [1] - 59:6
**create** [2] - 41:24,
138:22
**created** [3] - 174:14,
211:6, 211:21
**credibility** [1] - 101:22
**criminal** [3] - 169:15,
169:19, 169:24
**crises** [1] - 212:14
**Crisis** [1] - 144:7
**crisis** [3] - 102:5,
212:13, 214:11
**critical** [2] - 149:2,
169:21
**cross** [17] - 7:25, 8:4,
9:3, 9:7, 9:25, 10:2,
10:8, 12:20, 12:23,
16:19, 147:21,
157:3, 157:4, 157:7,
165:10, 165:16,
219:13
**CROSS** [2] - 147:23,
232:25
**cross-examination** [1]
- 219:13
**cross-examined** [2] -
9:7, 12:20
**cross-reference** [2] -
9:3, 10:8
**CRR** [2] - 6:17, 6:18
**CSOS** [6] - 159:9,
159:11, 159:13,
159:14, 159:21
**cSOS** [1] - 159:10
**CSRA** [39] - 20:12,
32:5, 32:15, 47:25,

63:15, 65:7, 65:13,
65:15, 65:22, 69:3,
70:11, 72:4, 72:17,
72:20, 73:20, 74:13,
75:13, 80:6, 80:9,
83:5, 84:6, 84:10,
87:5, 91:7, 91:14,
92:15, 96:15,
100:20, 103:24,
131:1, 132:13,
148:8, 148:9, 162:1,
170:12, 170:15,
171:22, 177:2, 221:9
**CSRA's** [2] - 32:7,
74:21
**CT1** [1] - 103:11
**CT2** [1] - 14:8
**cull** [2] - 199:2, 199:17
**culled** [2] - 33:16,
200:8
**culminate** [1] - 180:6
**culture** [3] - 83:16,
100:19, 100:23
**cumulative** [9] -
105:15, 105:24,
106:4, 106:11,
107:19, 108:11,
108:12, 126:9,
126:14
**curative** [1] - 110:6
**current** [6] - 81:24,
118:6, 148:5, 148:6,
148:19, 212:15
**custodial** [1] - 10:19
**custodian** [6] - 10:25,
215:11, 215:24,
226:18, 228:1,
229:17
**customer** [44] - 40:15,
40:16, 41:8, 41:15,
41:16, 41:19, 43:19,
44:3, 44:9, 46:19,
50:16, 52:14, 52:23,
54:5, 54:22, 54:23,
55:5, 58:3, 58:21,
72:17, 74:23, 76:2,
76:20, 77:5, 77:6,
77:14, 80:18, 80:20,
81:25, 82:2, 158:5,
159:3, 159:8,
159:13, 159:14,
166:11, 185:11,
194:15, 196:9,
196:12, 204:1,
225:1, 225:18, 230:9
**customer's** [2] - 55:1,
159:18
**customers** [24] -
43:20, 44:4, 50:21,
54:11, 54:12, 66:9,

68:24, 72:18, 72:21,
75:9, 75:11, 77:10,
77:12, 77:14, 151:4,
151:11, 152:2,
154:8, 158:24,
158:25, 190:1,
190:3, 194:14,
200:15
**customers'** [1] - 40:21
**cut** [6] - 76:15, 76:19,
86:7, 138:16,
151:18, 161:5
**cutting** [1] - 117:15
**cycle** [1] - 164:24

## D

**D.C** [3] - 177:14,
177:25, 195:21
**daily** [14] - 46:8, 46:9,
47:18, 52:16, 52:19,
53:6, 101:5, 152:4,
153:16, 153:19,
160:4, 169:3,
179:13, 185:18
**dais** [2] - 205:14,
205:16
**danger** [3] - 68:7,
68:8, 110:12
**dangers** [1] - 135:16
**data** [4] - 143:1,
143:25, 233:15,
233:20
**database** [8] - 153:10,
159:15, 159:18,
210:25, 211:8,
211:14, 211:19,
211:20
**Date** [1] - 235:16
**date** [22] - 19:7, 19:8,
19:12, 19:22, 65:17,
71:14, 73:13, 91:9,
129:19, 132:9,
133:16, 140:12,
141:13, 141:14,
180:18, 206:23,
222:24, 231:8,
231:9, 231:12,
233:11
**dated** [13] - 18:17,
30:8, 62:11, 70:13,
71:5, 75:13, 78:6,
78:15, 79:17,
100:13, 104:1,
140:13, 203:18
**dating** [1] - 173:23
**Dave** [2] - 132:5, 132:6
**David** [3] - 7:1,
104:25, 120:18
**DAVID** [2] - 1:17, 2:9

**days** [6] - 115:11,
120:21, 166:9,
173:24, 227:4,
231:21
**DC** [11] - 2:11, 4:7,
4:14, 4:16, 5:5, 5:12,
42:6, 42:8, 49:9,
81:21, 187:8
**de** [1] - 89:23
**De** [2] - 2:4, 2:16
**de-constructing** [1] -
89:23
**DEA** [248] - 18:2,
18:10, 18:17, 19:21,
20:7, 20:9, 21:5,
21:12, 22:4, 23:25,
24:9, 30:12, 30:13,
30:16, 38:17, 38:18,
38:22, 39:5, 39:25,
40:5, 40:18, 41:5,
41:9, 42:7, 42:14,
42:24, 43:2, 43:8,
43:13, 43:18, 43:25,
44:5, 44:20, 45:4,
45:7, 45:19, 46:6,
46:7, 46:9, 46:13,
46:17, 46:20, 47:12,
47:13, 47:16, 47:20,
48:1, 48:12, 48:24,
49:1, 49:8, 52:20,
52:24, 53:6, 53:8,
53:23, 54:1, 54:4,
54:14, 54:25, 55:16,
55:21, 55:24, 56:5,
56:21, 56:23, 56:24,
57:2, 57:5, 57:6,
58:24, 61:2, 61:5,
61:12, 61:15, 61:17,
61:21, 66:13, 68:16,
68:19, 68:24, 71:2,
71:18, 74:25, 75:1,
79:16, 82:14, 82:20,
91:20, 91:23, 91:25,
115:25, 120:1,
135:18, 136:2,
136:21, 137:5,
137:9, 138:6, 138:7,
138:8, 138:9, 139:2,
139:5, 139:8,
139:16, 140:15,
140:18, 142:2,
147:3, 152:8, 152:9,
152:20, 153:16,
153:19, 154:3,
154:10, 154:20,
154:25, 155:9,
155:23, 159:7,
159:15, 160:3,
160:19, 161:5,
161:6, 161:10,

161:19, 162:7,
164:12, 164:14,
164:16, 165:2,
165:6, 166:1,
167:19, 168:14,
169:11, 169:12,
169:14, 171:7,
171:10, 171:25,
173:13, 174:12,
174:16, 174:17,
174:20, 174:21,
175:12, 175:17,
175:20, 175:24,
176:2, 176:7,
176:18, 176:24,
177:2, 177:7,
177:24, 178:7,
178:11, 178:21,
179:8, 179:22,
180:7, 181:13,
182:22, 183:1,
183:24, 184:25,
185:1, 185:12,
186:8, 186:12,
186:18, 187:14,
187:17, 188:1,
188:2, 188:12,
188:14, 188:19,
189:3, 191:17,
191:23, 192:5,
192:10, 192:21,
192:23, 193:5,
193:17, 193:20,
193:22, 194:4,
195:2, 195:20,
196:1, 196:20,
197:1, 197:12,
197:17, 197:21,
198:3, 198:4, 198:9,
198:10, 199:9,
199:10, 199:11,
199:14, 199:16,
199:22, 200:2,
201:4, 205:14,
205:16, 205:19,
205:23, 206:2,
206:23, 210:5,
210:10, 210:21,
211:1, 211:3, 211:4,
211:6, 211:10,
211:19, 211:25,
212:13, 212:15,
212:20, 212:21,
214:8, 215:3,
216:13, 219:2,
221:13, 232:3
**DEA's** [8] - 24:18,
27:1, 136:5, 159:17,
174:20, 198:20,
199:15, 207:2
**deadline** [1] - 123:17

**deal** [3] - 108:3,
151:17, 159:6
**dealer** [1] - 99:3
**dealers** [1] - 90:13
**dealing** [1] - 9:21
**deals** [1] - 102:17
**Dear** [1] - 140:14
**dear** [3] - 23:18, 28:6,
29:14
**death** [1] - 214:13
**deaths** [2] - 210:17,
212:11
**decades** [1] - 213:23
**December** [10] -
18:17, 18:24, 19:14,
19:23, 26:23, 29:11,
65:7, 65:13, 65:18,
140:13
**decide** [2] - 208:13,
227:10
**decision** [9] - 16:11,
49:24, 81:4, 115:20,
116:7, 157:14,
157:15, 157:18,
204:10
**decisions** [9] -
114:17, 146:15,
148:23, 155:17,
155:19, 157:23,
158:2, 214:10,
214:20
**Decisions** [1] - 76:24
**deem** [2] - 40:2,
204:10
**deemed** [1] - 204:11
**DEF-WV-2191** [1] -
216:9
**default** [1] - 179:1
**defend** [1] - 105:10
**Defendant** [4] - 4:10,
5:2, 5:7, 6:2
**defendant** [12] -
106:1, 107:23,
110:5, 110:9,
115:15, 116:24,
122:19, 124:15,
125:3, 132:25,
207:13
**Defendants** [3] - 1:8,
1:14, 235:7
**defendants** [35] -
35:4, 36:12, 67:5,
67:19, 107:12,
109:8, 111:8,
112:19, 118:25,
120:25, 121:2,
121:17, 121:22,
122:14, 122:21,
123:7, 124:8,
124:11, 124:14,

124:18, 125:4,
125:6, 125:24,
131:23, 136:22,
137:3, 137:20,
143:22, 144:10,
144:20, 165:4,
173:23, 207:6, 216:1
**Defendants'** [3] -
198:14, 216:8,
221:12
**defendants'** [4] -
109:15, 110:22,
121:20, 121:21
**defense** [8] - 114:16,
119:18, 120:2,
147:2, 147:4,
163:16, 227:1,
234:10
**defer** [3] - 28:16,
28:17, 107:9
**define** [1] - 212:1
**defined** [3] - 116:7,
168:4, 204:22
**defining** [1] - 51:10
**Definitely** [1] - 96:18
**definitely** [1] - 85:16
**delivery** [1] - 50:14
**demonstrate** [2] -
101:3, 136:20
**demonstrated** [1] -
101:23
**demonstrative** [2] -
67:4, 150:18
**denied** [1] - 192:7
**denying** [1] - 145:20
**Department** [7] - 29:9,
85:20, 209:21
**department** [6] -
32:12, 87:5, 87:6,
87:7, 179:11, 185:24
**departments** [2] -
36:11, 95:3
**depicted** [1] - 66:24
**deposed** [2] - 20:20,
29:2
**deposition** [16] -
20:23, 26:10, 27:1,
27:4, 27:6, 27:19,
28:12, 28:13, 29:1,
30:22, 36:20, 56:15,
56:16, 90:19, 165:9,
182:6
**depositions** [1] -
56:19
**depth** [1] - 194:5
**Deputy** [1] - 20:6
**described** [4] - 13:17,
61:22, 179:15,
211:18
**describes** [1] - 202:20

**describing** [4] -
171:13, 175:15,
201:1, 206:22
**description** [3] -
94:11, 101:14, 206:1
**descriptions** [1] -
61:19
**design** [3] - 24:6,
53:25, 218:3
**designate** [1] - 169:21
**designated** [2] -
26:14, 26:22
**designates** [2] - 8:6,
156:20
**designating** [1] -
155:23
**designation** [2] - 27:2,
109:20
**designed** [9] - 45:19,
46:18, 46:19, 49:11,
61:9, 61:13, 66:8,
172:3, 197:19
**designee** [1] - 21:1
**designing** [1] - 173:6
**despite** [3] - 136:8,
138:4, 197:8
**destined** [2] - 216:21,
217:7
**detail** [8] - 34:6, 95:20,
150:25, 166:25,
167:17, 168:1,
175:16, 185:4
**detailed** [3] - 166:21,
166:23, 167:3
**detect** [3] - 135:10,
155:2, 210:7
**detections** [1] -
167:24
**determination** [3] -
40:10, 40:13, 156:17
**determinations** [1] -
51:8
**determine** [8] - 41:6,
48:9, 48:10, 156:9,
164:6, 194:24,
195:1, 204:20
**determined** [2] -
71:17, 72:19
**determines** [1] -
155:21
**determining** [1] -
44:25
**detour** [5] - 83:15,
113:25, 114:7,
115:5, 119:17
**detriment** [2] - 36:25,
37:12
**develop** [5] - 32:8,
54:17, 178:18,
183:5, 212:15

**developed** [4] - 56:4,
179:11, 182:17
**developing** [1] - 179:8
**development** [2] -
181:14, 189:24
**deviates** [1] - 44:17
**devote** [1] - 119:21
**devoted** [1] - 199:19
**diagonal** [1] - 167:6
**diagram** [2] - 14:8,
80:25
**dialogue** [1] - 192:5
**diameter** [1] - 167:9
**difference** [4] -
124:10, 183:14,
183:18, 207:16
**different** [17] - 8:3,
11:22, 12:4, 45:14,
50:25, 52:22, 55:11,
72:24, 77:2, 95:2,
95:3, 122:3, 141:23,
149:12, 151:3,
151:25, 166:3
**difficult** [1] - 27:14
**diligence** [8] - 77:16,
81:20, 82:3, 189:24,
194:6, 194:12,
197:24, 200:15
**DIRECT** [1] - 228:12
**direct** [8] - 12:18,
12:24, 15:7, 63:11,
151:6, 165:10,
183:13, 219:13
**directed** [1] - 212:17
**directing** [2] - 157:5,
165:15
**direction** [2] - 8:3,
93:11
**directives** [1] - 63:19
**directly** [3] - 57:1,
73:9, 151:17
**Director** [1] - 99:8
**disagree** [5] - 111:14,
138:11, 139:2,
145:8, 145:13
**disagreement** [1] -
137:21
**discern** [2] - 146:1,
146:17
**disclose** [6] - 7:24,
121:3, 124:19,
125:13, 218:2
**disclosed** [9] - 8:21,
9:3, 33:5, 33:7,
33:10, 33:13, 121:4,
121:6, 124:4
**disclosure** [5] - 8:2,
9:17, 9:20, 123:18,
123:19
**disclosures** [2] -

123:4, 123:5
**Discount** [1] - 229:9
**discovered** [5] - 39:6, 39:7, 39:12, 39:14, 46:10
**discovery** [9] - 10:20, 32:14, 36:8, 36:22, 57:16, 59:16, 59:18, 173:23, 173:25
**discrepancies** [1] - 154:14
**discrepancy** [3] - 50:16, 52:12, 175:22
**discuss** [4] - 18:16, 32:19, 87:18, 130:8
**discussed** [10] - 18:4, 18:9, 18:12, 56:14, 124:7, 142:23, 182:5, 188:23, 201:15, 219:2
**discussing** [2] - 39:8, 39:16
**discussion** [5] - 48:17, 49:6, 49:7, 51:3, 174:23
**discussions** [1] - 194:4
**disparaging** [1] - 106:17
**dispensed** [3] - 50:2, 233:8, 233:18
**dispensers** [1] - 162:20
**dispensing** [5] - 10:20, 155:1, 158:1, 229:24, 232:7
**disperse** [1] - 168:5
**display** [7] - 66:22, 162:11, 162:13, 180:11, 183:8, 199:1, 202:8
**displaying** [2] - 166:18, 199:18
**disproportionately** [1] - 77:12
**dispute** [1] - 103:8
**distinction** [1] - 68:9
**distracted** [1] - 70:3
**distribute** [4] - 23:22, 118:23, 149:23, 149:24
**distributed** [2] - 94:19, 154:7
**distributing** [1] - 171:5
**distribution** [31] - 20:10, 29:17, 30:25, 46:4, 63:4, 65:3, 66:19, 66:25, 73:23, 79:5, 80:3, 80:18,

81:6, 149:21, 162:7, 168:7, 170:13, 171:5, 171:9, 171:15, 171:17, 172:2, 174:8, 175:10, 175:16, 176:3, 179:24, 184:24, 190:23, 190:25, 198:1
**Distribution** [8] - 63:16, 78:16, 79:1, 79:3, 153:21, 153:24, 171:4, 171:7
**distributor** [15] - 18:1, 66:13, 149:7, 151:5, 152:14, 154:7, 154:19, 155:5, 158:7, 159:24, 168:2, 170:11, 204:9, 233:16
**distributors** [20] - 23:25, 41:25, 66:19, 67:22, 102:7, 136:3, 143:2, 151:12, 151:13, 154:20, 162:18, 162:20, 163:3, 163:4, 163:8, 163:23, 164:24, 211:11, 218:16, 219:3
**Distributors** [1] - 202:12
**district** [1] - 61:17
**District** [3] - 7:2, 7:3, 42:9
**DISTRICT** [3] - 1:1, 1:1, 1:17
**Diversion** [8] - 20:6, 28:3, 28:20, 139:16, 140:15, 140:18, 142:2, 210:1
**diversion** [29] - 45:3, 46:21, 74:21, 85:11, 92:15, 93:7, 135:10, 135:17, 136:23, 152:18, 154:3, 154:15, 154:23, 155:2, 163:7, 164:7, 166:7, 172:6, 173:3, 174:2, 196:6, 203:2, 207:3, 209:15, 210:8, 210:12, 211:18, 213:14, 213:17
**diversion."** [1] - 217:8
**diverted** [3] - 45:1, 76:3, 76:17
**diverting** [1] - 75:1
**divided** [1] - 82:11
**Division** [1] - 39:5

**division** [3] - 81:19, 91:14, 211:19
**divisional** [2] - 73:17, 73:19
**divisions** [1] - 211:7
**dock** [4] - 168:12, 168:17, 169:23, 170:10
**docket** [1] - 36:16
**doctor** [7] - 49:19, 49:23, 51:1, 155:16, 155:17, 156:8, 232:3
**doctor's** [1] - 232:3
**doctors** [1] - 58:12
**Doctrine** [5] - 109:22, 110:15, 113:16, 118:8, 146:22
**document** [120] - 15:13, 18:25, 19:3, 19:19, 19:20, 19:22, 20:8, 20:21, 24:12, 24:22, 26:9, 27:3, 27:17, 28:11, 37:23, 39:11, 43:16, 43:17, 46:11, 59:23, 59:24, 62:3, 62:23, 63:2, 65:12, 65:17, 65:19, 69:2, 70:10, 71:21, 72:3, 72:24, 73:6, 73:11, 78:9, 78:14, 78:22, 79:2, 79:15, 79:18, 83:3, 83:8, 83:25, 86:4, 91:5, 94:14, 94:22, 95:1, 95:25, 97:13, 97:18, 97:24, 98:15, 99:21, 100:3, 102:15, 103:14, 103:22, 104:4, 104:9, 104:13, 104:23, 105:3, 105:21, 106:19, 106:22, 106:24, 107:2, 107:11, 107:16, 107:21, 108:2, 109:8, 124:18, 126:20, 127:15, 127:22, 128:4, 128:12, 131:20, 132:4, 133:6, 134:2, 134:9, 139:10, 139:24, 141:1, 141:7, 141:8, 141:9, 141:13, 141:14, 141:15, 142:16, 183:9, 198:17, 198:18, 199:2, 199:18, 200:8, 201:7, 201:10, 201:11, 202:6,

206:10, 208:1, 209:2, 209:6, 210:2, 213:1, 221:13, 222:15, 222:18, 223:3, 223:15, 224:6, 224:7, 224:10
**Document** [1] - 122:4
**documentation** [1] - 61:5
**documents** [64] - 8:19, 8:23, 9:6, 9:9, 9:14, 9:16, 9:21, 9:22, 9:24, 10:3, 11:1, 12:9, 12:17, 22:4, 22:24, 23:11, 26:11, 28:16, 32:15, 32:18, 32:22, 34:2, 34:7, 34:9, 34:16, 34:21, 35:1, 35:18, 35:20, 36:8, 36:9, 36:10, 36:17, 37:1, 59:15, 92:25, 100:25, 106:5, 107:4, 108:13, 120:6, 120:25, 121:7, 121:13, 121:18, 121:19, 122:1, 125:2, 125:5, 125:16, 126:8, 127:10, 139:3, 139:6, 139:13, 140:20, 140:23, 141:17, 142:13, 147:13, 147:14, 181:24, 201:24, 229:14
**Don** [1] - 140:8
**done** [6] - 11:13, 40:24, 62:4, 193:13, 221:8, 226:18
**Donna** [3] - 227:25, 228:5, 229:7
**DONNA** [2] - 228:9
**door** [3] - 151:9, 163:16, 207:10
**doors** [1] - 167:25
**dosage** [3] - 225:5, 225:8, 225:22
**doses** [2] - 225:2, 225:18
**double** [1] - 170:19
**doubt** [1] - 111:1
**Douglas** [1] - 4:17
**down** [29] - 11:7, 29:11, 30:3, 31:8, 33:16, 34:24, 36:21, 46:23, 47:23, 54:19, 76:22, 89:16, 90:11, 92:9, 95:8, 98:9, 108:21, 113:12,

114:6, 116:20, 127:18, 138:3, 143:14, 155:4, 167:13, 169:1, 192:7, 192:20, 220:9
**Dr** [2] - 12:18, 13:4, 13:17
**draft** [2] - 129:16, 130:22
**drafted** [1] - 79:5
**dramatic** [1] - 210:5
**dramatically** [2] - 210:14, 212:21
**draw** [4] - 68:9, 146:7, 146:14, 203:23
**drawing** [1] - 106:25
**Drive** [1] - 6:15
**drive** [3] - 99:4, 207:15, 232:10
**drives** [1] - 234:10
**driving** [1] - 89:16
**drove** [3] - 98:10, 98:16, 99:1
**DRUG** [2] - 1:7, 1:13
**Drug** [23] - 6:2, 10:19, 14:5, 14:16, 23:21, 80:6, 139:16, 140:14, 140:18, 142:2, 149:5, 149:6, 209:13, 209:25, 215:10, 229:10, 229:11, 229:17, 233:8, 233:16, 233:21, 233:25, 235:7
**drug** [11] - 99:3, 106:1, 132:8, 149:6, 149:8, 168:22, 169:19, 204:18, 212:10, 212:14, 232:2
**drug-dealer** [1] - 99:3
**drugs** [7] - 49:16, 90:12, 135:11, 135:17, 143:19, 149:25, 233:17
**Ducca** [1] - 140:10
**Due** [1] - 210:16
**due** [10] - 76:4, 77:16, 81:19, 82:3, 189:24, 194:5, 194:11, 197:24, 200:15, 211:2
**during** [14] - 8:4, 10:20, 12:17, 15:7, 15:11, 57:12, 121:24, 164:19, 174:17, 178:17, 212:21, 212:23, 219:24, 230:2
**duties** [9] - 115:16,

117:8, 139:5, 139:7, 148:13, 161:10, 165:2, 209:7, 219:9
**duty** [2] - 115:16, 163:13
**dying** [1] - 214:18

# E

**E&C** [10] - 207:7, 207:16, 207:18, 207:21, 207:23, 219:15, 219:24, 220:2, 220:8, 220:10
**e-mail** [15] - 122:13, 129:14, 130:4, 130:17, 130:25, 132:5, 132:11, 133:7, 140:21, 140:23, 141:9, 141:18, 142:7
**e-mails** [3] - 36:11, 122:17, 141:25
**early** [9] - 54:6, 88:11, 173:17, 173:18, 173:19, 173:24, 174:6, 174:7, 188:16
**East** [3] - 3:5, 3:12, 4:18
**ECF** [1] - 36:17
**Ed** [3] - 84:3, 133:12, 222:20
**Eddy** [10] - 84:4, 85:18, 85:19, 86:12, 95:6, 95:21, 97:20, 99:7, 104:5
**edge** [1] - 119:20
**educational** [2] - 93:6, 101:1
**effect** [2] - 49:17, 66:13
**Effective** [1] - 63:17
**effective** [6] - 45:3, 45:6, 76:6, 83:4, 152:18, 217:8
**effectively** [1] - 49:22
**efficacy** [1] - 58:18
**efficient** [1] - 185:7
**effort** [3] - 34:8, 207:22, 210:11
**efforts** [5] - 103:9, 135:11, 183:4, 209:14, 212:17
**Efforts** [1] - 210:1
**eight** [8] - 75:18, 75:19, 164:20, 167:11, 167:15, 167:17, 210:18, 211:15
**eight-inch** [3] -

167:11, 167:15, 167:17
**Eighth** [1] - 3:10
**either** [6] - 22:11, 163:16, 181:19, 187:23, 215:16, 231:24
**election** [1] - 15:7
**electronic** [2] - 81:16, 234:9
**elements** [1] - 97:5
**elicit** [3] - 7:21, 67:19, 165:5
**eliminate** [1] - 126:12
**Elizabeth** [2] - 140:6, 140:9
**ELIZABETH** [1] - 6:14
**email** [35] - 72:25, 73:10, 73:12, 73:13, 74:3, 74:5, 74:10, 74:12, 74:15, 84:1, 84:5, 84:8, 84:9, 84:25, 85:17, 85:18, 86:5, 91:6, 91:13, 92:9, 92:22, 94:8, 95:2, 96:18, 96:20, 97:19, 98:2, 98:4, 100:4, 100:5, 100:6, 100:8, 101:10, 107:7, 107:18
**emails** [12] - 93:1, 93:8, 98:1, 100:22, 100:24, 101:12, 101:17, 101:25, 105:11, 105:13, 106:17
**embrace** [1] - 13:3
**emergency** [1] - 176:13
**employ** [1] - 149:19
**employed** [4] - 50:10, 148:2, 148:4, 229:9
**employee** [1] - 169:21
**employees** [7] - 149:19, 169:16, 169:20, 171:1, 172:10, 174:9, 230:20
**emplyed** [1] - 229:8
**Emporium** [11] - 10:19, 14:5, 14:16, 215:11, 229:9, 229:10, 229:11, 229:18, 233:9, 233:16, 233:25
**Emporium's** [1] - 233:21
**enacted** [3] - 53:14, 71:8, 71:9
**enactment** [1] - 91:16

**Encino** [1] - 3:18
**encourage** [3] - 111:1, 112:10, 112:25
**end** [7] - 18:24, 45:21, 154:14, 158:19, 193:1, 202:21, 227:3
**end-of-the-month** [1] - 45:21
**endorse** [5] - 24:9, 38:19, 85:5, 85:6, 218:1
**Energy** [2] - 218:17, 220:14
**enforced** [1] - 65:14
**enforcement** [6] - 69:11, 136:3, 176:7, 209:14, 210:7, 212:17
**Enforcement** [5] - 23:21, 80:6, 209:13, 209:25, 210:1
**enforcing** [2] - 76:8, 178:12
**engage** [1] - 115:24
**engaged** [4] - 102:21, 146:2, 146:4, 146:12
**enhance** [1] - 41:25
**enhanced** [5] - 193:25, 194:2, 194:11, 194:16, 197:12
**enormous** [1] - 32:18
**ensure** [15] - 58:19, 66:7, 155:24, 155:25, 156:21, 156:23, 160:23, 166:6, 166:23, 168:22, 169:18, 170:7, 170:17, 174:9, 203:1
**ensuring** [1] - 170:21
**enter** [2] - 207:11, 215:3
**entered** [16] - 10:23, 11:21, 34:14, 36:16, 36:18, 42:5, 42:13, 42:24, 64:1, 91:19, 131:5, 132:20, 138:7, 197:16, 215:2
**entering** [1] - 71:13
**entire** [6] - 13:1, 131:7, 171:23, 191:16, 203:24, 219:12
**entirely** [2] - 146:8, 146:9
**entitled** [4] - 121:21, 122:20, 144:15, 220:20
**entity** [1] - 23:20

**entries** [1] - 230:20
**entry** [1] - 59:8
**ENU** [1] - 4:12
**environment** [5] - 85:7, 89:10, 93:4, 101:14, 174:23
**epidemic** [3] - 144:16, 144:18, 212:15
**epidemics** [2] - 176:16, 212:10
**Eric** [1] - 127:17
**errors** [1] - 59:8
**essential** [1] - 149:1
**essentially** [4] - 115:14, 143:11, 205:25, 207:24
**establish** [7] - 105:3, 106:15, 113:20, 113:21, 137:19, 144:2, 211:25
**established** [1] - 27:4
**estimate** [1] - 224:11
**estimated** [1] - 212:12
**et** [4] - 1:7, 1:13, 235:6, 235:7
**ethical** [1] - 58:18
**evaluating** [1] - 146:3
**evening** [3] - 15:23, 121:4, 121:14
**evenings** [1] - 122:17
**event** [5] - 169:5, 172:14, 176:13, 182:8, 191:12
**events** [1] - 230:21
**eventually** [6] - 29:21, 30:11, 31:1, 192:22, 193:10
**evidence** [42] - 14:19, 64:3, 70:3, 83:19, 102:15, 102:19, 106:6, 109:16, 109:24, 110:7, 110:9, 110:17, 110:24, 111:4, 111:16, 112:6, 112:11, 112:17, 113:1, 114:8, 114:18, 114:20, 115:4, 115:13, 116:9, 116:23, 117:16, 118:5, 118:12, 119:9, 131:11, 181:4, 181:24, 182:8, 183:19, 201:23, 206:11, 207:22, 208:19, 213:2, 220:3
**evidentiary** [3] - 34:23, 35:7, 122:2
**evolution** [2] - 70:5,

71:22
**evolved** [1] - 173:4
**exact** [4] - 12:7, 43:1, 156:24, 220:8
**exactly** [8] - 9:13, 13:8, 69:18, 109:25, 118:7, 145:10, 168:3, 203:19
**EXAMINATION** [4] - 147:23, 216:6, 228:12, 232:25
**examination** [12] - 11:12, 12:23, 16:19, 128:3, 157:3, 157:7, 165:10, 165:16, 219:13, 219:14, 219:24, 223:4
**examine** [3] - 7:25, 9:25, 147:21
**examined** [3] - 9:7, 12:20, 213:11
**example** [3] - 126:19, 155:6, 212:18
**examples** [1] - 175:16
**exceed** [1] - 80:14
**exceeded** [1] - 222:9
**exceeds** [1] - 80:18
**Excel** [2] - 231:1, 231:4
**except** [5] - 105:17, 114:9, 180:23, 181:1, 201:8
**exception** [5] - 16:5, 152:5, 164:10, 200:17, 208:7
**excess** [1] - 58:23
**excessive** [3] - 39:20, 63:12, 66:10
**Excessive** [1] - 61:10
**Excessive/ Suspicious** [1] - 65:20
**exchange** [1] - 99:7
**exclude** [4] - 102:19, 109:16, 110:10, 207:25
**exclusion** [1] - 110:7
**excuse** [3] - 51:6, 85:1, 109:21
**excused** [2] - 226:13, 232:16
**executed** [1] - 96:23
**Executive** [1] - 140:16
**exercise** [1] - 34:8
**EXHIBIT** [6] - 38:2, 60:18, 62:21, 64:14, 131:24, 133:1
**Exhibit** [2] - 29:8, 216:9
**exhibit** [4] - 120:22,

123:1, 123:12, 123:16

**exhibits** [12] - 7:7, 7:8, 7:13, 12:2, 15:24, 16:21, 33:8, 35:17, 121:4, 122:19, 123:18, 147:19

**existence** [1] - 66:10

**exodus** [2] - 96:14, 96:16

**expanded** [1] - 179:19

**expanding** [1] - 179:18

**expect** [1] - 15:25

**expectations** [1] - 54:18

**expected** [2] - 65:2, 191:18

**expecting** [1] - 52:6

**expects** [1] - 40:19

**Expediting** [1] - 217:19

**experience** [3] - 191:17, 213:16, 213:25

**experienced** [2] - 191:9, 191:11

**experiencing** [1] - 189:3

**explain** [7] - 45:25, 47:3, 105:19, 137:18, 153:8, 158:15, 168:10

**explained** [6] - 28:1, 56:23, 136:11, 150:25, 152:7, 170:18

**explaining** [2] - 53:10, 96:10

**explicit** [1] - 38:23

**exposed** [1] - 143:25

**Express** [1] - 90:23

**expressed** [2] - 108:5, 162:12

**extend** [1] - 113:19

**extended** [1] - 109:22

**extensive** [2] - 102:16, 116:10

**extent** [5] - 16:18, 66:22, 89:19, 105:15, 182:6

**extra** [3] - 116:4, 159:3, 234:10

**extract** [1] - 230:5

**extremely** [3] - 47:18, 166:21, 166:22

**eye** [1] - 114:25

# F

**FABER** [1] - 1:17

**Faber** [1] - 7:1

**face** [1] - 85:22

**facilities** [4] - 154:10, 166:1, 170:15, 197:22

**facility** [7] - 74:1, 167:19, 168:2, 169:18, 170:24, 171:20, 176:6

**fact** [17] - 27:17, 31:10, 40:2, 57:20, 86:10, 108:10, 115:19, 126:4, 145:12, 145:15, 145:25, 146:4, 167:3, 197:8, 208:16, 211:2, 220:1

**factor** [1] - 61:1

**fail** [1] - 45:6

**Fail** [1] - 81:12

**failed** [2] - 136:4, 212:15

**failing** [3] - 45:2, 216:21, 217:7

**fair** [4] - 45:15, 79:4, 100:8, 116:4

**fairly** [1] - 179:20

**fairness** [1] - 185:23

**faith** [2] - 25:1, 203:9

**fall** [5] - 9:14, 9:16, 16:16, 28:6, 164:9

**falls** [3] - 34:18, 164:4

**familiar** [7] - 20:18, 31:19, 31:21, 63:21, 98:6, 162:2, 162:3

**familiarity** [2] - 31:11, 31:15

**families** [1] - 214:12

**family** [4] - 82:4, 222:1, 222:4, 222:5

**Family** [1] - 14:16

**far** [7] - 81:24, 98:18, 119:20, 120:10, 126:19, 232:7, 232:17

**FARRELL** [268] - 2:3, 7:19, 7:21, 8:16, 8:18, 9:2, 9:12, 9:23, 10:7, 10:11, 10:15, 10:18, 10:24, 11:17, 11:25, 12:14, 13:11, 13:16, 13:19, 13:22, 14:1, 14:3, 16:3, 16:5, 17:2, 17:14, 17:16, 17:18, 17:20, 17:22, 18:19, 18:22, 21:19, 21:22, 22:1,

22:20, 23:14, 24:16, 24:24, 25:3, 25:6, 26:5, 26:8, 26:16, 26:20, 26:22, 27:8, 27:14, 27:16, 28:24, 29:6, 31:12, 31:16, 31:18, 32:24, 33:2, 33:7, 33:13, 33:22, 33:24, 34:5, 35:25, 36:2, 36:6, 37:19, 38:3, 38:8, 38:10, 38:12, 39:13, 41:3, 43:10, 43:12, 53:13, 57:7, 57:11, 57:17, 57:19, 59:12, 59:14, 59:22, 60:10, 60:19, 61:25, 62:2, 62:14, 62:22, 62:24, 63:1, 63:24, 64:5, 64:7, 64:15, 64:23, 65:9, 65:11, 65:23, 66:4, 67:4, 67:23, 68:11, 68:12, 68:25, 69:15, 69:23, 70:9, 70:18, 70:25, 71:24, 72:2, 72:6, 72:12, 73:2, 73:5, 75:21, 75:24, 77:19, 78:1, 78:4, 78:8, 78:11, 78:13, 79:8, 79:14, 82:22, 83:1, 83:7, 83:14, 83:22, 83:24, 84:14, 84:18, 84:24, 86:2, 86:3, 87:9, 87:16, 90:3, 91:2, 91:4, 92:7, 92:8, 93:19, 94:2, 94:21, 94:25, 96:3, 96:5, 96:7, 96:25, 97:10, 97:13, 97:17, 99:11, 99:19, 99:24, 100:2, 102:12, 103:6, 103:15, 103:16, 103:21, 104:13, 104:19, 104:22, 105:6, 105:9, 105:17, 105:21, 106:3, 106:10, 106:13, 106:21, 106:23, 107:7, 107:21, 108:17, 127:5, 127:7, 127:9, 127:12, 127:20, 128:10, 128:11, 128:16, 128:19, 129:3, 129:5, 129:10, 131:4, 131:20, 131:25, 132:3, 132:19, 133:2, 133:4, 133:5, 134:5, 134:14,

134:22, 134:24, 136:17, 136:20, 137:2, 137:12, 137:17, 137:25, 138:22, 139:9, 139:13, 139:14, 139:18, 139:23, 141:3, 141:6, 143:20, 146:24, 147:2, 147:8, 147:12, 147:18, 147:20, 156:12, 158:9, 160:11, 161:8, 163:11, 163:13, 165:1, 173:20, 173:22, 175:1, 177:17, 182:1, 182:3, 183:22, 184:2, 186:9, 202:3, 206:13, 207:5, 208:22, 213:4, 215:22, 216:7, 217:4, 217:14, 217:18, 218:7, 218:12, 218:23, 219:18, 220:7, 220:13, 221:2, 221:17, 221:20, 222:14, 222:17, 223:1, 223:5, 223:8, 223:14, 224:9, 224:16, 224:17, 226:7, 226:14

**Farrell** [51] - 2:4, 2:15, 7:18, 9:21, 11:16, 12:25, 15:3, 16:25, 22:10, 26:4, 27:13, 28:1, 28:12, 28:23, 31:5, 33:6, 33:21, 35:16, 41:1, 53:21, 53:23, 64:4, 67:3, 68:10, 90:1, 92:6, 94:11, 103:5, 103:14, 104:12, 104:21, 106:19, 108:16, 112:1, 125:6, 127:4, 129:2, 131:19, 143:11, 145:18, 145:24, 146:22, 202:2, 206:12, 208:21, 215:20, 217:2, 218:22, 220:6, 223:7, 224:8

**Farrell's** [1] - 146:13

**fashion** [2] - 182:24, 214:4

**fax** [3] - 185:6, 185:8, 185:9

**faxed** [2] - 179:3, 179:4

**FCRR** [1] - 6:18

**February** [3] - 97:20, 129:20, 132:10

**fed** [1] - 88:6

**federal** [5] - 66:7, 137:4, 137:6, 182:20, 211:5

**Federal** [8] - 51:12, 156:4, 162:3, 166:13, 170:3, 175:23, 188:8, 202:13

**feet** [1] - 167:8

**fell** [1] - 212:24

**felt** [2] - 186:23, 197:20

**fentanyl** [1] - 82:12

**few** [8] - 9:2, 23:16, 150:20, 151:12, 153:6, 155:12, 160:7, 166:9

**field** [6] - 47:21, 179:23, 179:25, 211:6, 211:7, 211:19

**figure** [3] - 31:7, 48:15, 114:18

**figured** [1] - 109:2

**file** [2] - 130:22, 137:6

**filed** [2] - 111:8, 122:10

**files** [5] - 124:15, 166:11, 197:24, 231:4, 234:9

**filing** [6] - 11:20, 112:2, 113:23, 114:2, 119:11, 124:14

**Filing** [1] - 39:18

**fill** [8] - 44:25, 48:19, 51:24, 159:23, 159:24, 204:15, 216:20, 217:6

**filled** [5] - 59:4, 159:22, 189:4, 230:2, 231:13

**filler** [4] - 48:9, 51:4, 59:6

**fillers** [3] - 48:17, 50:8, 50:9

**filling** [2] - 76:8, 156:2

**filtering** [1] - 92:18

**final** [5] - 11:25, 90:15, 198:1, 203:8, 222:14

**finalize** [1] - 197:23

**finally** [3] - 14:9, 110:25, 210:20

**findings** [1] - 197:25

**fine** [5] - 11:17, 82:20,

192:25, 210:23, 215:17
**fine-tune** [1] - 82:20
**fined** [1] - 193:4
**finished** [2] - 18:25, 222:11
**Firm** [2] - 3:4, 3:7
**first** [63] - 7:9, 9:15, 10:18, 23:18, 30:8, 38:14, 39:3, 44:13, 44:23, 44:25, 46:3, 46:23, 50:4, 52:10, 60:21, 60:25, 67:4, 68:15, 72:14, 74:19, 75:25, 76:22, 77:4, 80:1, 87:20, 98:15, 109:14, 113:8, 113:15, 127:24, 129:22, 133:7, 140:14, 141:9, 141:22, 145:11, 149:4, 166:20, 173:8, 173:9, 173:14, 176:20, 178:19, 182:12, 182:13, 182:14, 183:2, 183:10, 191:21, 191:22, 195:3, 199:17, 200:1, 200:11, 202:9, 202:17, 203:15, 203:24, 212:6, 212:8, 221:24, 223:7, 231:8
**First** [15] - 65:6, 102:22, 109:8, 109:16, 113:17, 118:7, 119:13, 146:7, 146:9, 146:19, 191:6, 199:5, 202:10, 209:3, 212:14
**five** [12] - 11:4, 11:6, 11:11, 12:19, 34:8, 34:11, 47:6, 197:5, 197:9, 197:21, 215:22, 218:16
**FL** [1] - 2:14
**flag** [3] - 18:24, 45:10, 55:19
**flagged** [6] - 45:22, 58:6, 81:5, 81:17, 186:13
**flags** [5] - 66:18, 66:23, 67:14, 76:18, 83:15
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flexibility** [3] - 46:16, 178:24, 185:12

**flexible** [2] - 46:20, 55:13
**flip** [7] - 72:23, 75:13, 80:22, 130:9, 135:3, 142:5, 206:17
**flipping** [2] - 181:16, 182:1
**flood** [3] - 8:11, 119:22, 143:21
**flooded** [1] - 143:18
**Floor** [1] - 3:5
**floor** [1] - 167:10
**Florida** [11] - 85:20, 89:12, 89:14, 89:16, 90:5, 90:22, 95:9, 95:22, 95:25, 192:11, 198:3
**flow** [1] - 148:24
**flowchart** [1] - 81:1
**fluctuates** [1] - 151:1
**fly** [1] - 224:13
**focus** [10] - 40:8, 142:21, 143:1, 143:2, 143:23, 144:8, 144:11, 166:14, 185:15, 189:7
**focused** [1] - 212:16
**folks** [3] - 87:8, 89:1, 92:23
**follow** [9] - 36:4, 41:25, 42:10, 42:23, 137:15, 152:13, 152:19, 207:8, 217:21
**follow-up** [2] - 207:8, 217:21
**followed** [2] - 65:2, 170:22
**following** [16] - 18:12, 42:14, 58:3, 96:8, 123:11, 123:13, 136:22, 137:5, 137:14, 137:20, 137:23, 151:23, 158:20, 161:2, 164:17, 186:2
**follows** [3] - 7:4, 109:21, 137:16
**FOR** [1] - 1:1
**forbid** [1] - 169:5
**Force** [7] - 139:16, 140:15, 140:18, 142:2, 142:22, 144:14, 148:21
**force** [2] - 68:14, 69:6
**Forces** [1] - 144:5
**foregoing** [2] - 110:9, 235:4
**foreseeable** [1] -

136:23
**forgetting** [1] - 113:2
**Form** [3] - 155:9, 155:10, 159:7
**form** [8] - 13:24, 46:7, 50:24, 159:22, 159:23, 159:25, 160:2, 190:11
**format** [1] - 138:20
**formed** [1] - 144:14
**forms** [4] - 104:5, 159:7, 164:2, 203:21
**forth** [6] - 37:11, 49:4, 101:5, 101:10, 123:11, 172:25
**forward** [10] - 85:13, 86:7, 86:10, 93:7, 107:10, 124:22, 125:20, 128:7, 195:3, 195:8
**forwarded** [13] - 85:7, 86:11, 86:12, 87:7, 89:8, 89:11, 91:13, 92:14, 95:14, 95:15, 99:10, 131:6
**forwarding** [4] - 93:1, 93:8, 95:5, 153:17
**foundation** [21] - 11:5, 22:9, 22:12, 23:8, 27:2, 92:3, 104:10, 104:11, 104:17, 104:18, 108:14, 128:25, 139:10, 143:10, 144:17, 145:7, 160:11, 183:23, 184:12, 186:10, 220:10
**foundational** [2] - 7:23, 184:14
**four** [16] - 12:19, 29:10, 36:19, 54:22, 55:2, 55:3, 55:4, 55:18, 58:1, 127:9, 148:21, 192:13, 192:18, 194:19, 202:14, 204:14
**four-member** [1] - 148:21
**four-month** [5] - 54:22, 55:2, 55:4, 55:18, 58:1
**fourth** [2] - 9:15, 59:18
**Fox** [1] - 133:13
**frame** [4] - 31:23, 31:24, 230:3, 233:9
**framed** [1] - 144:8
**frames** [1] - 233:19
**Frank** [1] - 79:22
**frankly** [1] - 145:2
**free** [2] - 226:16,

228:23
**Freitas** [1] - 140:9
**frequency** [7] - 41:21, 48:6, 51:18, 77:8, 174:11, 178:23, 204:6
**Frequency** [1] - 178:3
**frequently** [1] - 54:11
**Fri** [1] - 140:9
**friction** [1] - 178:11
**Friday** [3] - 29:1, 141:14, 227:16
**friend** [3] - 25:15, 184:7, 208:18
**friends** [1] - 184:8
**front** [2] - 30:5, 134:25
**frontline** [1] - 149:1
**frozen** [1] - 82:2
**frustrated** [1] - 47:13
**frustrating** [1] - 37:4
**frustration** [2] - 101:18, 186:1
**fulfill** [1] - 204:2
**full** [8] - 14:21, 76:25, 135:7, 150:7, 178:24, 179:20, 187:7, 227:15
**Fuller** [4] - 2:4, 2:15, 227:24, 233:7
**FULLER** [14] - 2:15, 227:24, 228:13, 228:22, 229:2, 229:4, 229:5, 230:25, 231:3, 231:6, 232:9, 232:17, 234:8, 234:13
**fully** [2] - 210:6, 210:10
**function** [3] - 161:10, 173:15, 203:20
**functioning** [1] - 206:5
**functions** [2] - 101:5, 138:10
**future** [3] - 81:24, 196:9, 196:16
**FYI** [2] - 133:15, 133:18

# G

**gained** [1] - 108:6
**Gallenagh** [1] - 140:9
**game** [2] - 109:5
**games** [1] - 9:4
**Gary** [1] - 140:6
**gauge** [2] - 167:4
**general** [8] - 41:9, 73:11, 96:10,

152:17, 162:9, 164:1, 176:8, 188:22
**General** [5] - 141:12, 207:2, 207:20, 208:2, 209:21
**General's** [1] - 211:24
**generally** [3] - 44:18, 149:4, 188:25
**generated** [1] - 219:2
**Gentlemen"** [1] - 130:18
**geographic** [1] - 67:10
**George** [2] - 96:13, 140:10
**Georgia** [2] - 95:17, 96:22
**Gilberto** [1] - 140:7
**Gillis** [2] - 109:19, 110:2
**given** [10] - 9:11, 10:4, 26:19, 28:16, 32:22, 144:19, 154:25, 157:10, 198:6, 201:11
**Given** [1] - 191:16
**glad** [1] - 103:12
**glass** [1] - 228:15
**glasses** [1] - 216:25
**glove** [1] - 177:1
**goodness** [1] - 208:2
**Google** [3] - 85:11, 92:20
**Government** [2] - 99:8, 208:4
**government** [17] - 85:8, 85:9, 85:19, 86:5, 86:11, 86:13, 87:7, 89:1, 89:8, 95:5, 100:7, 111:17, 114:10, 118:4, 137:4, 171:21, 177:18
**governs** [1] - 35:12
**grandstanding** [1] - 145:1
**grant** [1] - 182:16
**Gray** [3] - 130:18, 140:8, 140:16
**gray** [3] - 203:10, 203:13, 204:5
**great** [6] - 67:5, 82:5, 95:20, 175:12, 184:18, 185:24
**greater** [1] - 110:11
**GRETCHEN** [1] - 6:7
**grew** [1] - 210:17
**ground** [2] - 31:9, 95:13
**grounds** [7] - 23:10, 25:11, 34:24,

131:10, 132:22,
134:8, 184:14
**group** [11] - 74:21,
81:22, 91:6, 93:7,
93:8, 100:7, 103:9,
143:2, 143:23,
144:13, 181:24
**groups** [7] - 142:21,
143:1, 143:23,
144:8, 144:11,
194:17, 194:19
**guardrails** [1] - 9:8
**guess** [14] - 25:1,
37:8, 51:23, 67:16,
77:3, 81:1, 81:12,
81:15, 94:6, 102:7,
108:8, 148:22,
168:16, 199:13
**guidance** [23] - 40:7,
41:10, 41:13, 41:18,
42:2, 42:3, 42:10,
42:17, 42:23, 43:15,
43:17, 44:1, 44:4,
44:6, 44:8, 44:20,
45:4, 48:14, 51:14,
57:1, 136:4, 176:1
**Guidance** [1] - 209:24
**guidelines** [3] -
152:16, 152:17,
166:5
**Gundy** [1] - 133:12
**guys** [2] - 109:4, 213:7

**H**

**habit** [1] - 88:6
**half** [4] - 95:19,
148:23, 151:24,
167:5
**hand** [5] - 19:24,
104:22, 177:1,
198:18, 228:8
**hand-in-glove** [1] -
177:1
**handed** [3] - 12:21,
69:2, 201:7
**handing** [1] - 29:7
**handle** [3] - 151:14,
151:20, 152:10
**handled** [1] - 80:10
**handles** [2] - 199:11
**handling** [1] - 207:2
**hands** [1] - 102:5
**handwrite** [1] - 159:23
**happy** [5] - 113:7,
113:9, 116:16,
117:17, 227:19
**hard** [3] - 58:10,
80:23, 157:9
**Hardin** [1] - 114:8

**hardin** [2] - 111:10,
117:24
**HARDIN** [4] - 5:3,
111:12, 118:1,
118:17
**hate** [1] - 185:7
**Hawaii** [1] - 101:8
**Hawkins** [1] - 3:7
**hay** [1] - 67:6
**Hazewski** [3] - 84:3,
133:12, 222:20
**HDMA** [20] - 127:16,
130:3, 130:22,
133:25, 134:17,
135:18, 135:22,
135:25, 136:2,
136:8, 140:4,
140:14, 140:16,
140:17, 142:2,
142:21, 142:22,
144:15, 146:2,
147:13
**HDMA's** [3] - 135:8,
135:9, 139:16
**Head** [1] - 47:25
**headed** [1] - 204:24
**heading** [4] - 96:14,
96:16, 209:16, 210:4
**headquartered** [2] -
149:15, 149:16
**headquarters** [2] -
42:13, 211:4
**Health** [10] - 4:11, 5:2,
36:23, 85:20, 126:3,
127:17, 129:18,
134:18, 153:1, 233:3
**health** [5] - 135:16,
135:19, 149:11,
149:25, 150:8
**Health/Holder** [1] -
132:16
**healthcare** [3] -
150:21, 150:23,
153:20
**hear** [7] - 42:21, 64:9,
112:25, 120:12,
125:22, 189:11,
228:24
**heard** [19] - 29:14,
31:3, 88:20, 90:17,
90:19, 90:24, 90:25,
117:17, 118:9,
119:25, 120:21,
128:13, 150:4,
153:7, 160:8, 162:9,
171:3, 177:3, 178:25
**Hearing** [2] - 70:22,
83:12
**hearing** [5] - 17:23,
60:15, 145:4, 207:8,

207:11
**hearings** [3] - 218:15,
218:24, 218:25
**hearsay** [13] - 7:23,
14:21, 22:9, 23:10,
24:14, 34:24, 35:11,
36:9, 37:22, 93:25,
94:9, 97:5, 134:8
**heat** [1] - 167:24
**heaven** [1] - 169:5
**hedges** [1] - 30:24
**held** [7] - 11:2, 13:8,
37:2, 80:16, 119:14,
143:2, 144:1
**Heller** [1] - 100:7
**help** [5] - 8:7, 72:18,
176:11, 184:9,
187:17
**helped** [1] - 188:6
**helpful** [3] - 12:13,
116:1, 147:6
**hereby** [1] - 38:24
**heroin** [9] - 88:9,
88:13, 88:15, 88:19,
88:21, 88:24, 89:6,
92:21
**HESTER** [41] - 5:9,
23:7, 24:11, 35:10,
37:22, 38:6, 60:16,
62:18, 64:11, 66:3,
70:23, 72:10, 77:23,
79:11, 83:10, 84:20,
87:13, 93:22, 97:4,
99:15, 102:14,
104:16, 108:10,
113:7, 113:14,
115:23, 119:3,
122:8, 124:5, 131:9,
132:21, 134:7,
134:23, 145:23,
216:3, 226:20,
226:24, 227:7,
227:17, 227:21,
232:14
**Hester** [7] - 23:6, 35:9,
108:9, 113:5,
117:12, 131:8,
145:22
**hide** [1] - 120:13
**high** [5] - 39:20, 75:2,
108:19, 159:1,
225:11
**higher** [4] - 55:15,
189:3, 189:17,
189:21
**highest** [1] - 100:23
**highlight** [1] - 63:9,
81:23
**highlighted** [3] -
115:14, 211:17,

216:12
**highlights** [2] - 185:4,
185:5
**highly** [1] - 44:16
**Highway** [2] - 90:18,
90:20
**Hillbillies** [3] - 86:22,
87:21
**hillbillies** [1] - 106:17
**Hillbilly** [2] - 88:9,
88:20
**hillbilly** [7] - 88:12,
88:15, 88:19, 88:21,
88:24, 89:6, 92:21
**himself** [1] - 108:5
**HIPAA** [1] - 230:6
**hire** [2] - 169:20,
170:8
**Historically** [2] -
205:3, 205:11
**history** [5] - 40:21,
52:9, 76:11, 174:1,
212:10
**hitting** [1] - 52:13
**Hold** [3] - 81:13,
81:24, 184:6
**hold** [5] - 110:4,
150:4, 152:9, 186:5,
222:10
**Holder** [4] - 127:17,
129:18, 133:25,
134:18
**holding** [2] - 15:12,
69:24
**holds** [3] - 110:15,
121:20, 162:7
**hole** [2] - 118:18,
143:15
**home** [4] - 90:16,
99:4, 116:18, 226:19
**honest** [1] - 25:20
**Honor** [178] - 7:6,
11:23, 12:16, 13:6,
14:1, 14:15, 15:19,
16:16, 17:1, 17:2,
22:6, 22:9, 22:23,
23:7, 24:11, 25:3,
26:5, 26:20, 27:8,
27:10, 28:17, 28:19,
29:22, 30:18, 31:12,
33:2, 33:3, 34:13,
35:5, 35:10, 37:23,
40:22, 43:3, 53:12,
57:16, 60:14, 60:16,
62:18, 62:19, 64:2,
66:2, 66:3, 66:15,
68:11, 70:23, 72:10,
77:23, 77:24, 79:11,
79:12, 83:11, 83:18,
84:20, 84:22, 89:18,

93:22, 93:23, 94:5,
94:21, 95:23, 96:3,
97:2, 97:4, 97:10,
99:15, 102:14,
102:24, 103:18,
104:8, 104:16,
105:10, 105:18,
106:3, 107:14,
108:10, 109:1,
109:12, 109:20,
110:2, 110:25,
111:7, 111:12,
112:10, 113:8,
113:14, 114:5,
115:2, 115:10,
115:23, 116:19,
117:14, 117:15,
118:2, 118:15,
119:4, 119:18,
120:16, 120:18,
120:21, 121:6,
121:15, 122:4,
122:8, 122:11,
122:12, 122:15,
122:25, 123:2,
123:9, 123:15,
123:23, 124:5,
124:17, 124:25,
126:2, 126:15,
127:2, 127:7, 128:2,
128:22, 129:6,
131:9, 131:15,
132:22, 132:23,
134:7, 134:11,
134:12, 136:12,
143:9, 144:24,
145:19, 145:23,
156:12, 158:9,
160:11, 163:11,
163:14, 165:1,
165:7, 172:17,
173:20, 175:1,
177:17, 181:3,
181:23, 182:4,
186:9, 201:22,
202:3, 206:13,
207:5, 207:15,
208:16, 208:24,
213:2, 213:6, 216:3,
216:4, 219:11,
219:18, 220:4,
223:2, 226:7,
226:11, 226:14,
226:20, 227:17,
227:21, 227:22,
229:4, 230:23,
231:3, 232:13,
232:17, 232:19,
232:24, 234:8
**HONORABLE** [1] -
1:17

31:10
**Honorable** [1] - 7:1
**hope** [6] - 37:14, 87:20, 107:1, 115:2, 115:7
**hoped** [1] - 99:2
**hopefully** [2] - 65:4, 120:10
**Hopefully** [2] - 101:23, 215:22
**horse** [1] - 139:12
**hospitals** [4] - 43:23, 148:25, 149:14, 150:2
**hostile** [4] - 24:25, 25:4, 25:7, 25:19
**hour** [2] - 35:22, 232:23
**hours** [1] - 9:18
**House** [10] - 207:7, 207:11, 207:16, 207:21, 207:23, 218:17, 219:15, 219:23, 220:2, 220:14
**housekeeping** [1] - 226:21
**Houston** [2] - 185:16, 199:7
**huge** [7] - 54:9, 54:15, 93:17, 94:2, 94:13, 101:9, 207:16
**humor** [1] - 106:7
**hundred** [4] - 35:20, 36:13, 59:9, 168:15
**hundreds** [2] - 92:24, 100:24
**HUNTINGTON** [1] - 1:4
**Huntington** [14] - 3:10, 4:1, 14:12, 67:7, 67:8, 114:12, 116:3, 143:18, 157:22, 157:24, 158:2, 171:6, 235:6
**Huntington-Cabell** [1] - 143:18
**Huntington/Cabell** [3] - 68:3, 84:11, 98:21
**hydrocodone** [11] - 82:8, 82:12, 93:16, 224:20, 225:2, 225:9, 225:13, 225:14, 225:19, 225:23, 226:4

**I**

**idea** [4] - 96:8, 126:11, 177:7, 217:3
**identification** [1] -

**identified** [22] - 7:7, 7:14, 16:22, 25:10, 26:12, 27:18, 28:11, 36:17, 46:10, 47:1, 59:2, 59:15, 82:18, 178:4, 178:8, 187:21, 190:3, 194:22, 195:7, 196:2, 222:15, 223:18
**identify** [25] - 12:1, 21:23, 22:15, 30:20, 46:25, 47:4, 51:15, 51:17, 60:22, 66:10, 72:18, 72:21, 87:20, 133:11, 154:3, 163:2, 169:6, 178:22, 179:6, 182:18, 195:21, 195:24, 205:7, 218:2, 230:6
**identifying** [1] - 46:1
**ignore** [2] - 42:7, 42:23
**II** [6] - 153:19, 159:4, 159:17, 168:16, 169:13, 203:6
**III** [1] - 176:21
**IIs** [1] - 159:20
**illegal** [3] - 93:17, 94:13, 190:9
**illegally** [1] - 76:3
**illicit** [3] - 95:22, 216:21, 217:7
**illustrates** [3] - 145:25, 146:14, 154:25
**immediate** [6] - 18:4, 18:7, 42:14, 54:19, 185:6, 190:22
**Immediate** [8] - 68:16, 71:1, 71:7, 71:12, 191:5, 191:9, 191:11, 192:9
**immediately** [2] - 18:10, 168:18
**Immediately** [1] - 71:12
**impact** [1] - 186:25
**impacted** [1] - 214:12
**impacting** [1] - 211:2
**impartial** [1] - 208:3
**impetus** [1] - 189:10
**implement** [3] - 179:21, 182:16, 202:12
**implemented** [4] - 32:11, 184:22, 185:9, 192:3

**implementing** [1] - 136:6
**implicit** [2] - 38:23, 90:4
**imply** [1] - 146:18
**importance** [1] - 200:14
**important** [3] - 111:3, 181:8, 195:15
**impose** [3] - 146:1, 146:19, 215:18
**imposed** [2] - 110:16, 192:25
**imposing** [1] - 165:2
**imposition** [1] - 113:17
**improper** [2] - 119:7, 119:9
**improved** [1] - 183:5
**improvements** [4] - 185:5, 189:15, 189:23, 206:1
**IN** [2] - 1:1, 1:18
**in-depth** [1] - 194:5
**inadmissible** [3] - 110:10, 112:12, 113:1
**inappropriately** [1] - 96:24
**Inc** [1] - 229:9
**inch** [4] - 167:8, 167:11, 167:15, 167:17
**inches** [1] - 167:5, 167:18
**include** [12] - 13:7, 130:12, 130:14, 142:1, 149:10, 153:4, 188:15, 189:20, 189:23, 210:25, 216:18, 233:8
**Included** [1] - 200:19
**included** [6] - 74:2, 90:6, 93:24, 186:19, 194:7, 212:3
**includes** [4] - 104:24, 158:20, 167:23, 200:23
**including** [5] - 74:1, 77:1, 84:11, 171:6, 218:16
**inclusion** [1] - 207:7
**incompletely** [1] - 30:21
**inconsistent** [1] - 30:21
**incorrect** [1] - 205:17
**increase** [2] - 210:5, 212:19

**increased** [2] - 210:13, 212:20
**increases** [2] - 95:16, 95:17
**indeed** [1] - 230:19
**indicate** [1] - 81:16
**indicated** [1] - 75:1
**indicates** [4] - 24:3, 24:5, 71:21, 225:16
**individual** [7] - 45:20, 46:16, 54:23, 152:24, 158:7, 183:1, 187:6
**individuals** [5] - 51:8, 84:9, 90:10, 157:24, 158:2
**indulgence** [1] - 83:17
**industrial** [1] - 45:2
**industry** [15] - 40:17, 44:10, 61:11, 136:5, 136:10, 174:20, 185:21, 198:11, 199:11, 199:14, 199:15, 201:2, 206:24, 214:2, 214:8
**Industry** [1] - 142:8
**inference** [1] - 146:8
**influence** [1] - 100:19
**inform** [4] - 23:25, 39:5, 175:25, 187:24
**information** [25] - 16:1, 46:21, 47:22, 67:16, 67:18, 85:10, 86:15, 95:5, 101:2, 102:5, 133:15, 133:19, 133:21, 158:21, 161:2, 169:8, 169:10, 182:24, 192:12, 194:8, 211:5, 211:13, 212:2, 214:9, 230:6
**informative** [1] - 178:21
**informed** [1] - 188:4
**initial** [4] - 8:2, 34:19, 81:11, 82:18
**initiated** [4] - 47:11, 47:16, 68:18, 188:14
**initiation** [1] - 178:14
**initiative** [3] - 18:1, 66:13, 175:10
**inputted** [1] - 230:14
**inquiry** [2] - 203:9, 221:11
**inside** [1] - 200:23
**insignia** [1] - 209:20
**insisted** [1] - 173:23
**inspect** [1] - 164:24
**inspections** [1] -

166:3
**Inspector** [5] - 207:2, 207:20, 208:2, 209:21, 211:24
**instance** [2] - 42:4, 82:6
**instances** [2] - 45:18, 187:3
**Instead** [1] - 211:4
**instead** [1] - 54:3
**instructing** [1] - 110:3
**instruction** [1] - 110:6
**insurance** [1] - 231:24
**Integrity** [1] - 209:24
**intend** [4] - 9:13, 22:2, 82:23, 120:25
**intended** [3] - 13:3, 36:18, 116:15
**intent** [26] - 96:23, 110:17, 110:20, 111:20, 112:16, 113:24, 114:9, 114:11, 115:21, 115:24, 115:25, 116:6, 116:11, 116:12, 117:2, 118:24, 118:25, 119:1, 119:22, 131:16, 143:13, 145:20, 146:18
**intention** [2] - 9:8, 227:4
**intentionally** [1] - 120:8
**interact** [1] - 155:14
**interaction** [4] - 47:20, 51:3, 174:17, 175:11
**interest** [3] - 100:12, 100:13, 194:23
**interested** [3] - 7:12, 77:4, 88:7
**interlude** [1] - 45:9
**internal** [6] - 36:10, 169:6, 171:22, 177:2, 233:21, 233:25
**internet** [9] - 85:15, 93:9, 189:2, 189:4, 189:7, 190:5, 190:11, 194:9, 194:11
**interpose** [1] - 66:15
**interpret** [1] - 82:9
**interpretation** [2] - 136:6, 138:6
**interpreting** [1] - 89:20
**interrogation** [1] - 81:11
**interrupt** [2] - 128:3,

205:17
**interrupted** [1] - 53:18
**interrupting** [1] - 177:20
**intro** [1] - 87:1
**introduce** [4] - 35:1, 176:9, 207:8, 232:23
**introduction** [2] - 34:16, 34:20
**inventories** [1] - 164:1
**inventory** [12] - 52:2, 152:4, 154:14, 155:5, 168:21, 168:25, 169:2, 169:4, 169:10, 175:22, 203:1, 203:17
**investigate** [3] - 47:8, 72:20, 205:8
**investigated** [2] - 80:5, 192:7
**investigation** [3] - 190:4, 195:1, 200:16
**investigations** [3] - 189:19, 189:21, 192:4
**investigative** [1] - 185:20
**investigators** [1] - 47:21
**involved** [13] - 32:10, 32:11, 84:9, 157:15, 157:23, 158:1, 161:18, 161:21, 161:23, 169:4, 173:6, 182:22, 212:12
**involvement** [2] - 28:16, 174:2
**involves** [1] - 221:3
**Involving** [1] - 84:2
**involving** [1] - 36:6
**ire** [1] - 106:25
**ironic** [1] - 123:2
**Irpino** [1] - 3:7
**irrespective** [1] - 23:2
**ISIA** [1] - 5:4
**issue** [26] - 11:22, 15:9, 25:5, 27:11, 109:7, 109:10, 109:12, 109:13, 111:6, 111:14, 118:25, 120:19, 123:3, 124:21, 125:24, 128:5, 143:17, 172:14, 175:20, 175:22, 175:25, 187:22, 207:2, 219:15, 219:21

**issued** [4] - 10:18, 10:20, 112:18, 207:19
**issues** [11] - 27:23, 27:25, 36:9, 36:10, 114:13, 116:2, 119:19, 175:17, 176:19, 191:25, 192:11
**IT** [1] - 179:11
**it'll** [1] - 149:17
**item** [8] - 80:16, 185:15, 221:11, 221:22, 222:1, 222:4, 222:5, 222:12
**items** [7] - 61:1, 80:19, 81:25, 82:4, 82:5, 111:22, 151:3
**iteration** [1] - 82:23
**itself** [9] - 14:9, 54:5, 73:21, 122:16, 142:10, 175:20, 178:22, 182:10, 194:13

## J

**Jackson** [1] - 6:8
**January** [5] - 62:11, 78:6, 83:6, 173:10, 222:25
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**Jennifer** [2] - 126:2, 233:2
**Jimmy** [1] - 98:6
**job** [19] - 74:16, 131:1, 185:24, 208:3, 214:2
**jobs** [1] - 106:7
**Joe** [5] - 18:18, 20:4, 28:2, 84:3, 222:20
**John** [7] - 130:18, 133:13, 140:8, 140:10, 140:16, 141:10, 141:11
**Johnson** [1] - 140:11
**join** [4] - 102:24, 103:2, 134:11, 134:12
**joined** [1] - 173:7
**joint** [3] - 79:23, 199:23, 216:13
**joke** [1] - 211:19
**joking** [1] - 101:13
**Joseph** [2] - 20:4, 20:5
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:15
**Juan** [2] - 2:5, 2:17

**Judge** [68] - 7:2, 8:16, 9:23, 12:15, 13:11, 22:1, 28:24, 31:16, 65:9, 67:4, 67:23, 69:15, 70:18, 71:24, 72:6, 73:2, 77:19, 78:4, 79:8, 82:22, 83:7, 83:14, 83:22, 84:14, 86:2, 87:9, 91:2, 93:19, 94:23, 96:25, 97:14, 99:11, 99:24, 102:12, 103:6, 103:8, 104:13, 104:19, 105:23, 106:10, 106:13, 106:24, 107:4, 107:7, 107:11, 107:21, 108:17, 109:14, 112:14, 127:5, 127:9, 128:17, 131:21, 132:1, 139:13, 139:20, 141:3, 144:9, 161:8, 182:1, 183:22, 217:14, 220:7, 222:14, 223:5, 227:24, 232:9, 234:13
**judge** [35] - 7:21, 8:18, 9:4, 10:15, 16:3, 17:16, 18:20, 21:19, 22:20, 24:16, 25:6, 34:5, 35:25, 37:19, 38:10, 43:10, 57:7, 57:11, 59:12, 60:10, 61:25, 62:14, 62:24, 64:15, 117:17, 129:5, 131:4, 132:19, 133:4, 134:5, 136:17, 138:22, 142:17, 147:8, 147:12
**JUDGE** [1] - 1:17
**Julie** [10] - 84:4, 85:18, 85:19, 86:12, 95:6, 95:20, 97:20, 99:7, 104:4
**July** [4] - 91:22, 91:25, 180:19, 217:21
**jumped** [1] - 121:19
**June** [8] - 19:10, 42:24, 78:15, 78:23, 79:17, 81:2, 197:16, 227:9
**jury** [4] - 68:6, 68:7, 110:3, 110:12
**Justice** [2] - 29:9, 209:22
**justifies** [1] - 126:22

## K

**K-e-l-l-e-y** [1] - 228:6
**KEARSE** [1] - 4:2
**keep** [13] - 12:8, 12:9, 73:6, 95:11, 101:20, 146:22, 152:4, 154:6, 154:18, 178:9, 184:24, 200:18, 207:22
**Keep** [1] - 200:21
**keeping** [1] - 88:6
**keeps** [1] - 216:24
**Kelley** [12] - 227:25, 228:3, 228:5, 228:14, 228:23, 229:6, 229:7, 231:1, 231:8, 232:18, 233:2, 234:14
**KELLEY** [1] - 228:9
**Kelly** [4] - 6:8, 140:4, 140:9, 141:19
**Kentucky** [7] - 98:10, 98:16, 98:18, 98:22, 98:24, 99:2, 104:5
**kept** [2] - 228:18, 230:11
**Kessler** [1] - 4:17
**Kevin** [1] - 222:20
**key** [2] - 52:14, 172:11
**kick** [3] - 27:7, 27:19, 28:13
**Kim** [1] - 140:7
**kind** [5] - 35:18, 35:20, 37:15, 48:24, 51:3
**kinds** [2] - 165:11, 165:12
**kinks** [1] - 82:18
**knowing** [2] - 48:18, 200:15
**knowingly** [1] - 76:3
**knowledge** [4] - 27:25, 58:11, 160:10, 230:14
**known** [2] - 126:7, 226:25
**knows** [4] - 49:19, 49:20, 105:3, 186:11
**Koch** [1] - 140:10
**KOUBA** [1] - 3:14
**Kreutzer** [1] - 222:20
**Kristen** [1] - 140:9

## L

**L.A** [2] - 180:1, 180:3
**LA** [1] - 3:8
**lack** [3] - 28:16, 108:14, 186:9
**lacked** [1] - 27:25

**lacking** [1] - 145:12
**laid** [2] - 104:10, 183:23
**land** [1] - 90:5
**language** [4] - 39:7, 39:14, 102:2, 162:14
**Lanier** [1] - 3:4
**large** [11] - 54:11, 59:5, 91:6, 172:5, 223:19, 223:22, 224:3, 224:23, 225:8, 225:14, 226:3
**largely** [1] - 211:2
**larger** [1] - 95:17
**Last** [2] - 221:11, 231:24
**last** [41] - 7:6, 8:22, 9:3, 9:17, 22:2, 31:13, 33:13, 33:15, 40:9, 40:23, 42:19, 42:21, 44:12, 44:13, 60:21, 71:16, 80:1, 80:2, 80:22, 82:23, 88:7, 91:24, 106:22, 107:2, 107:3, 111:7, 111:8, 118:24, 120:21, 121:7, 122:13, 122:17, 124:4, 125:7, 166:2, 166:4, 166:8, 216:12, 217:25, 228:6
**lastly** [1] - 44:24
**Lastly"** [1] - 44:23
**late** [1] - 188:14
**latitude** [1] - 157:11
**LAURA** [1] - 5:10
**law** [19] - 40:3, 109:25, 115:22, 116:12, 116:15, 116:25, 117:1, 118:4, 118:6, 119:5, 119:15, 120:3, 120:5, 120:7, 136:22, 138:2, 163:14, 176:6
**LAW** [1] - 11:22
**Law** [3] - 3:4, 3:7, 3:12
**lawsuit** [1] - 109:25
**lay** [5] - 22:12, 104:11, 139:10, 144:17, 220:10
**laying** [2] - 11:5, 36:14
**lead** [8] - 25:22, 26:3, 157:10, 158:10, 165:14, 165:17, 170:16
**leadership** [1] - 105:13
**leading** [9] - 25:12, 25:18, 25:21, 25:25,

156:12, 156:13,
157:3, 158:11,
158:13
**leads** [1] - 96:2
**least** [13] - 14:16,
22:14, 88:14, 94:16,
111:3, 115:7,
122:13, 124:18,
125:5, 125:17,
128:6, 167:8, 227:15
**leave** [2] - 27:12,
172:13
**led** [1] - 112:20
**Lee** [1] - 3:12
**left** [1] - 33:18
**legal** [10] - 40:23,
42:10, 42:23, 43:16,
76:4, 128:3, 133:10,
163:13, 190:8,
207:14
**legislation** [3] - 97:6,
116:1, 119:11
**legislative** [8] - 95:12,
96:9, 102:17,
102:20, 113:23,
114:2, 146:3
**legitimate** [7] - 45:1,
93:16, 146:10,
154:15, 156:1,
156:6, 214:17
**lengthy** [1] - 183:5
**lenience** [1] - 17:21
**Leon** [2] - 2:4, 2:16
**less** [2] - 123:3,
150:13
**letter** [64] - 7:15,
18:12, 18:17, 19:6,
19:15, 19:20, 20:3,
20:12, 21:10, 21:16,
22:16, 23:18, 23:20,
23:23, 25:2, 26:12,
26:23, 29:17, 29:20,
29:21, 29:23, 30:12,
30:15, 30:17, 30:20,
31:3, 31:4, 40:7,
41:12, 42:8, 42:10,
42:17, 42:23, 43:15,
44:1, 44:6, 44:21,
56:3, 56:4, 56:5,
56:11, 56:20, 57:13,
71:5, 91:22, 92:1,
180:14, 180:16,
180:18, 180:20,
181:3, 181:11,
181:13, 182:14,
183:11, 183:14,
183:18, 183:19,
184:21, 184:23,
185:13, 195:23,
217:21, 217:22

**letters** [27] - 21:5,
21:14, 22:2, 22:11,
22:12, 22:21, 28:2,
28:6, 28:21, 29:8,
29:10, 29:14, 31:1,
31:6, 31:10, 31:15,
35:11, 38:7, 41:10,
42:2, 43:7, 48:11,
48:13, 56:7, 57:1,
57:3, 61:15
**letting** [2] - 89:20,
115:3
**level** [7] - 101:4,
126:22, 166:25,
168:1, 168:5,
189:21, 214:3
**levels** [3] - 152:4,
189:3, 189:17
**Levin** [1] - 2:12
**LEYIMU** [1] - 4:8
**liability** [13] - 110:15,
111:18, 113:17,
113:21, 115:20,
118:13, 139:1,
144:21, 145:20,
146:1, 146:11,
146:19, 147:1
**liable** [2] - 110:5,
144:1
**license** [6] - 82:16,
151:15, 187:23,
194:7, 198:3, 198:6
**licensed** [6] - 152:6,
152:20, 152:23,
159:19, 171:7, 171:9
**lies** [1] - 156:22
**life** [1] - 213:14
**lifts** [1] - 149:18
**lightly** [1] - 214:20
**likely** [1] - 76:1
**limited** [5] - 15:7,
16:22, 97:11, 172:9,
233:15
**limits** [1] - 223:15
**LINDA** [1] - 4:5
**line** [18] - 60:25,
91:11, 93:17, 94:13,
95:24, 97:21, 98:9,
98:15, 122:21,
138:14, 143:14,
203:22, 203:23,
203:24, 204:1,
205:6, 219:12
**lined** [2] - 141:24,
168:15
**lines** [3] - 114:20,
146:5, 204:15
**link** [3] - 112:15,
115:10, 116:16
**Lisa** [2] - 6:18, 235:3

**list** [19] - 9:3, 9:15,
9:16, 10:8, 12:8,
12:9, 12:11, 13:14,
23:1, 32:14, 32:16,
32:17, 33:4, 33:11,
122:18, 170:21,
192:6
**listed** [5] - 66:11,
76:16, 111:22,
187:7, 187:11
**listening** [1] - 145:3
**lists** [1] - 15:23
**literally** [1] - 50:10
**litigation** [3] - 36:6,
102:21, 114:3
**live** [2] - 36:19, 116:17
**lively** [1] - 103:8
**LLC** [1] - 2:4
**load** [1] - 90:16
**lobbied** [1] - 118:3
**lobbying** [11] - 86:14,
102:17, 102:20,
103:9, 109:16,
110:23, 111:16,
113:22, 114:2,
177:18, 177:25
**local** [11] - 39:5, 46:9,
46:13, 47:17, 57:5,
57:6, 174:16, 176:3,
176:6, 176:7, 192:10
**location** [6] - 20:11,
168:24, 170:25,
233:11, 233:13,
233:19
**Lockbourne** [5] -
74:1, 171:4, 171:7,
171:16, 171:20
**locking** [1] - 167:25
**lodges** [1] - 124:8
**Logan** [2] - 6:5, 6:12
**logical** [1] - 222:11
**look** [49] - 19:24,
40:20, 41:7, 41:11,
41:14, 41:16, 41:18,
43:5, 43:21, 49:4,
52:6, 52:9, 54:14,
57:17, 60:20, 71:15,
72:13, 74:3, 76:22,
77:4, 77:7, 77:10,
78:2, 79:20, 95:19,
97:19, 111:1,
123:15, 140:18,
142:4, 154:13,
166:11, 166:12,
167:20, 173:17,
173:19, 174:6,
177:3, 181:10,
182:12, 183:10,
187:18, 189:18,
204:23, 206:16,

208:3, 209:1, 209:17
**looked** [4] - 20:15,
134:19, 178:19,
219:6
**looking** [18] - 30:3,
41:6, 41:14, 43:18,
44:2, 76:7, 76:11,
77:14, 77:15, 89:13,
92:18, 135:7,
140:25, 178:5,
185:24, 206:9,
214:9, 225:4
**Looks** [3] - 84:1,
100:6, 198:15
**looks** [20] - 19:20,
29:24, 30:9, 59:24,
73:12, 83:5, 85:1,
91:7, 95:3, 97:19,
97:25, 100:4, 104:7,
117:11, 133:22,
139:25, 201:12,
222:19
**loop** [1] - 95:12
**Los** [1] - 180:2
**loss** [2] - 155:10,
175:21
**losses** [4] - 170:9,
203:10, 204:8, 204:9
**lost** [3] - 137:21,
214:19, 217:2
**loud** [6] - 30:21, 75:6,
182:14, 182:15,
210:24, 211:23
**loved** [1] - 214:12
**low** [2] - 75:11, 152:4
**lucky** [1] - 99:2
**lunch** [3] - 11:6,
11:14, 12:5
**lyrics** [1] - 87:3

---

## M

**ma'am** [2] - 233:20,
234:6
**machine** [1] - 185:9
**Madam** [1] - 221:18
**Magazine** [1] - 3:7
**magnitude** [1] -
214:16
**MAHADY** [18] - 6:4,
12:16, 13:6, 13:10,
14:15, 14:22, 16:16,
17:1, 27:10, 27:21,
27:23, 28:14, 32:22,
32:25, 33:3, 122:11,
123:2, 227:22
**Mahady** [5] - 13:9,
15:6, 16:15, 16:24,
25:16
**mail** [18] - 42:5,

122:13, 129:14,
130:4, 130:17,
130:25, 132:5,
132:11, 133:7,
140:21, 140:23,
141:9, 141:18,
142:7, 160:3, 173:12
**mailed** [1] - 174:15
**mails** [3] - 36:11,
122:17, 141:25
**main** [2] - 49:13,
111:15
**Mainigi** [6] - 22:22,
84:21, 99:16, 143:8,
145:17, 219:10
**MAINIGI** [35] - 4:12,
22:6, 22:8, 22:23,
28:19, 30:18, 35:5,
40:22, 60:14, 62:19,
64:12, 66:2, 70:21,
77:24, 79:12, 84:22,
87:14, 93:23, 94:5,
95:23, 97:2, 99:17,
102:24, 104:8,
107:14, 128:22,
131:15, 132:23,
134:11, 143:9,
145:18, 216:4,
219:11, 219:22,
226:11
**maintain** [6] - 34:23,
35:6, 45:3, 45:6,
154:7, 217:8
**maintained** [4] -
58:18, 179:13,
179:14, 230:17
**maintaining** [1] -
179:16
**maintenance** [1] -
203:19
**MAJESTRO** [15] - 2:6,
109:1, 109:7,
110:19, 111:7,
112:24, 115:9,
116:9, 116:23,
117:14, 117:21,
118:21, 119:24,
120:11, 120:15
**Majestro** [9] - 2:6,
103:7, 108:25,
112:10, 113:10,
118:9, 118:20,
119:4, 120:14
**major** [2] - 15:9, 194:2
**majority** [1] - 93:16
**man** [1] - 216:25
**manager** [1] - 211:18
**managers** [3] - 49:9,
170:15, 182:22
**mandated** [3] - 47:17,

164:21
**manner** [4] - 49:16, 51:10, 101:14, 120:3
**manual** [6] - 46:24, 64:25, 69:2, 69:3, 69:4, 69:8
**Manual** [2] - 63:4, 63:16
**manufacture** [3] - 23:22, 150:15, 160:20
**manufactured** [1] - 161:4
**manufacturer** [6] - 50:18, 50:25, 152:12, 154:5, 161:17, 168:11
**manufacturers** [15] - 23:24, 149:12, 151:1, 151:6, 151:12, 151:17, 151:20, 160:15, 160:19, 160:25, 162:20, 163:3, 164:25, 210:21, 211:11
**manufactures** [1] - 154:5
**manufacturing** [2] - 155:1, 212:20
**Mapes** [3] - 199:22, 200:2, 216:15
**March** [4] - 100:13, 133:17, 134:1
**Marcum** [1] - 104:15
**Margaritaville** [1] - 98:7
**Marino** [1] - 138:2
**MARK** [1] - 3:16
**marked** [1] - 29:7
**marker** [1] - 207:25
**markers** [1] - 207:20
**market** [5] - 119:23, 150:3, 150:13, 216:21, 217:7
**Mary** [1] - 133:12
**mascot** [1] - 88:3
**mask** [1] - 228:23
**mass** [2] - 96:13, 96:15
**matching** [1] - 66:21
**material** [2] - 102:16, 145:11
**materially** [1] - 8:21
**materials** [1] - 142:1
**math** [3] - 224:13, 225:10, 226:6
**matrix** [3] - 14:7, 14:9, 81:4
**matter** [17] - 11:25,

24:17, 78:16, 94:20, 96:11, 127:17, 129:15, 134:17, 153:23, 153:24, 165:17, 217:19, 219:16, 219:21, 226:21, 227:5, 235:5
**maximum** [2] - 57:22, 58:2
**MAY** [1] - 1:19
**Mays** [11] - 100:14, 100:16, 102:6, 102:16, 104:25, 106:25, 129:24, 130:1, 133:12, 188:20, 189:11
**McCann** [2] - 13:5, 13:17
**McCann's** [1] - 12:18
**McCloud** [2] - 14:5, 14:16
**MCCLURE** [1] - 6:3
**MCGINNESS** [1] - 4:2
**McKesson** [6] - 5:8, 121:10, 121:12, 123:7, 123:10, 123:20
**McKesson's** [1] - 36:23
**MDL** [3] - 109:14, 142:5, 173:24
**mean** [37] - 41:9, 41:20, 41:22, 51:2, 51:23, 52:2, 53:8, 58:25, 59:3, 59:4, 73:12, 76:10, 82:7, 90:8, 90:9, 90:24, 94:7, 101:16, 108:2, 117:11, 128:13, 136:15, 137:22, 142:20, 142:23, 143:13, 153:23, 164:15, 165:8, 172:8, 187:2, 187:16, 203:13, 203:22, 207:17, 208:3, 218:25
**meaningful** [1] - 136:4
**meaningless** [1] - 122:23
**means** [3] - 88:10, 101:3, 192:1
**meant** [4] - 50:17, 59:8, 177:23, 177:24
**meantime** [2] - 22:1, 206:10
**measure** [1] - 99:3
**mechanical** [1] - 6:19
**mechanism** [2] - 189:5, 211:6

**media** [7] - 85:14, 100:9, 100:10, 114:3, 145:3, 146:4, 146:5
**media's** [1] - 144:18
**medical** [9] - 45:2, 155:19, 155:25, 156:1, 156:6, 156:22, 156:25, 157:18, 161:2
**medically** [3] - 155:21, 156:10, 156:18
**medication** [3] - 158:6, 160:24, 214:17
**medications** [7] - 50:1, 58:14, 158:6, 214:15, 233:8, 233:10, 233:11
**medium** [7] - 223:19, 223:22, 224:2, 224:22, 225:5, 225:13, 225:22
**meds** [1] - 99:2
**meet** [7] - 39:21, 166:7, 174:19, 174:20, 175:9, 179:6, 188:19
**meeting** [12] - 18:2, 66:14, 68:15, 68:19, 68:24, 140:1, 189:1, 189:7, 189:10, 189:14, 189:16, 192:3
**meetings** [1] - 177:10
**meets** [1] - 54:17
**member** [2] - 142:2, 148:21
**members** [6] - 133:9, 135:9, 135:12, 135:19, 140:6, 172:10
**Members** [1] - 140:15
**members"** [1] - 135:8
**membership** [1] - 130:23
**memo** [9] - 79:23, 80:3, 139:25, 224:19, 225:4, 225:7, 225:16, 225:25, 226:2
**memorandum** [6] - 78:15, 78:23, 79:4, 80:17, 80:25, 222:19
**Memorial** [1] - 227:8
**men** [1] - 50:10
**mention** [1] - 109:9
**mentioned** [20] - 7:11, 21:5, 69:16, 69:17, 89:14, 89:15, 95:4,

144:7, 153:25, 158:16, 162:19, 164:2, 167:9, 168:14, 169:13, 171:23, 175:18, 176:19, 197:16, 204:4
**merely** [1] - 119:17
**merger** [1] - 193:7
**message** [3] - 102:6, 133:14, 143:24
**messages** [1] - 143:24
**Messages"** [1] - 142:8
**met** [5] - 111:25, 142:23, 190:6, 190:7, 224:4
**metaphors** [1] - 66:20
**methamphetamine** [1] - 176:24
**method** [1] - 138:20
**methodology** [1] - 13:17
**Michael** [2] - 104:25, 200:2
**MICHAEL** [2] - 2:15, 3:9
**microphone** [1] - 228:25
**middle** [4] - 53:19, 58:15, 58:16, 190:18
**middleman** [1] - 151:18
**midst** [1] - 11:12
**might** [11] - 43:6, 49:18, 64:15, 106:8, 108:17, 112:15, 144:1, 161:25, 162:13, 163:4, 165:7
**migration** [1] - 90:5
**Mike** [1] - 227:24
**MILDRED** [1] - 3:3
**milieu** [1] - 116:5
**million** [5] - 204:14, 204:15, 204:17, 225:8, 226:3
**millions** [2] - 92:25, 100:25
**mills** [1] - 90:15
**mind** [6] - 9:14, 94:18, 138:4, 144:3, 146:24, 147:1
**mindful** [1] - 157:8
**mine** [1] - 217:2
**minute** [6] - 72:25, 73:6, 78:17, 113:3, 141:7, 143:7
**minutes** [8] - 9:2, 11:4, 11:6, 11:11, 34:8, 34:11, 172:20, 215:22

**mirror** [1] - 202:12
**mischaracterization** [1] - 92:4
**mischaracterizations** [1] - 145:15
**misnomer** [1] - 214:7
**missed** [1] - 31:12
**missing** [1] - 154:15
**mission** [1] - 177:5
**misspeak** [1] - 65:8
**Mitchell** [1] - 2:12
**mix** [2] - 72:18, 77:7
**mix-report** [1] - 72:18
**mixing** [1] - 66:20
**modified** [1] - 189:20
**moment** [4] - 10:7, 21:19, 61:22, 147:8
**monitor** [1] - 135:6
**monitoring** [9] - 56:1, 69:22, 81:2, 81:17, 84:11, 170:25, 183:16, 205:4, 205:12
**Monitoring** [7] - 32:8, 33:9, 45:11, 45:13, 59:16, 72:4, 204:24
**monitors** [1] - 60:22
**month** [18] - 45:21, 54:22, 55:2, 55:4, 55:18, 55:20, 57:21, 57:23, 58:1, 58:3, 85:21, 149:16, 160:3, 174:16, 224:10, 224:21, 224:23, 224:24
**monthly** [20] - 39:18, 46:14, 46:17, 54:15, 54:17, 54:18, 61:1, 61:2, 61:12, 61:16, 72:17, 74:22, 80:15, 80:18, 153:14, 169:4, 174:13, 179:14
**months** [7] - 55:3, 82:17, 82:20, 174:19, 174:21, 186:13, 197:17
**moral** [1] - 50:1
**morning** [19] - 11:20, 17:9, 17:10, 17:14, 17:15, 46:12, 54:25, 109:1, 109:2, 109:7, 123:24, 125:8, 125:16, 126:5, 126:10, 165:11, 179:5, 180:3, 234:18
**morphous** [1] - 9:22
**Morris** [1] - 6:15
**most** [8] - 23:9, 30:17, 45:18, 91:7, 158:25,

173:10, 211:3,
212:22
**mostly** [1] - 210:16
**motion** [11] - 13:13,
27:7, 27:24, 28:7,
102:19, 112:12,
119:2, 167:24,
207:18, 219:15,
220:2
**Motley** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**Mougey** [4] - 12:21,
13:4, 13:13, 14:6
**MOUGEY** [1] - 2:12
**mountaineer** [1] -
87:22
**Mountaineer** [1] - 90:5
**Mountaineers** [3] -
88:1, 88:5, 89:16
**move** [12] - 16:12,
22:3, 26:8, 70:3,
77:20, 83:7, 96:25,
184:15, 206:10,
208:18, 218:7, 226:8
**movement** [1] -
168:22
**moving** [4] - 64:7,
90:21, 107:9
**MR** [504] - 2:3, 2:6,
2:9, 2:12, 2:15, 3:9,
3:11, 3:16, 4:17, 5:9,
5:10, 5:13, 6:4, 7:6,
7:19, 7:21, 8:8, 8:16,
8:18, 9:2, 9:12, 9:23,
10:7, 10:11, 10:15,
10:18, 10:24, 11:9,
11:17, 11:25, 12:14,
12:16, 13:6, 13:11,
13:16, 13:19, 13:22,
14:1, 14:3, 14:15,
14:22, 15:5, 15:18,
15:21, 16:3, 16:5,
16:16, 17:1, 17:2,
17:4, 17:14, 17:16,
17:18, 17:20, 17:22,
18:19, 18:22, 21:19,
21:22, 22:1, 22:20,
23:7, 23:14, 24:11,
24:16, 24:24, 25:3,
25:6, 25:15, 25:20,
26:2, 26:5, 26:7,
26:8, 26:16, 26:20,
26:22, 27:8, 27:10,
27:14, 27:16, 27:21,
27:23, 28:14, 28:24,
29:6, 29:22, 30:7,
31:12, 31:16, 31:18,
32:22, 32:24, 32:25,
33:2, 33:3, 33:7,
33:13, 33:15, 33:20,

33:22, 33:24, 34:1,
34:5, 34:13, 35:10,
35:14, 35:23, 35:25,
36:2, 36:6, 37:8,
37:19, 37:22, 37:24,
38:3, 38:6, 38:7,
38:8, 38:10, 38:12,
39:10, 39:13, 41:3,
43:3, 43:10, 43:12,
53:12, 53:13, 53:16,
57:7, 57:11, 57:15,
57:17, 57:19, 59:12,
59:22, 60:10, 60:13,
60:16, 60:19, 61:25,
62:2, 62:14, 62:17,
62:18, 62:22, 62:24,
63:1, 63:24, 64:2,
64:5, 64:7, 64:11,
64:15, 64:23, 65:9,
65:11, 65:23, 66:1,
66:3, 66:4, 66:15,
67:4, 67:11, 67:21,
67:23, 68:11, 68:12,
68:25, 69:15, 69:23,
70:9, 70:18, 70:20,
70:23, 70:25, 71:24,
72:2, 72:6, 72:9,
72:10, 72:12, 73:2,
73:5, 75:21, 75:24,
77:19, 77:22, 77:23,
78:1, 78:4, 78:8,
78:11, 78:13, 79:8,
79:10, 79:11, 79:14,
82:22, 83:1, 83:7,
83:10, 83:11, 83:14,
83:18, 83:22, 83:24,
84:14, 84:17, 84:18,
84:20, 84:24, 86:2,
86:3, 87:9, 87:12,
87:13, 87:16, 89:18,
90:3, 91:2, 91:4,
92:2, 92:7, 92:8,
93:19, 93:21, 93:22,
94:2, 94:10, 94:21,
94:25, 96:3, 96:5,
96:7, 96:25, 97:4,
97:10, 97:13, 97:17,
99:11, 99:14, 99:15,
99:19, 99:24, 100:2,
102:12, 102:14,
103:2, 103:6,
103:15, 103:16,
103:21, 104:13,
104:16, 104:19,
104:22, 105:2,
105:6, 105:9,
105:17, 105:21,
106:3, 106:10,
106:13, 106:21,
106:23, 107:7,
107:21, 108:1,

108:10, 108:17,
109:1, 109:7,
110:19, 111:7,
112:24, 113:7,
113:14, 114:24,
115:9, 115:23,
116:9, 116:23,
117:14, 117:21,
118:21, 119:3,
119:24, 120:11,
120:15, 120:18,
122:3, 122:7, 122:8,
122:11, 122:15,
123:2, 123:9,
123:15, 123:23,
124:3, 124:5,
124:17, 124:25,
125:11, 125:13,
125:17, 126:14,
126:17, 127:2,
127:5, 127:7, 127:9,
127:12, 127:20,
128:2, 128:10,
128:11, 128:16,
128:19, 129:3,
129:5, 129:10,
131:4, 131:9,
131:20, 131:25,
132:3, 132:19,
132:21, 133:2,
133:4, 133:5, 134:5,
134:7, 134:12,
134:14, 134:22,
134:23, 134:24,
136:12, 136:17,
136:20, 137:2,
137:12, 137:15,
137:17, 137:25,
138:11, 138:22,
139:9, 139:13,
139:14, 139:18,
139:23, 141:3,
141:6, 143:20,
144:24, 145:23,
146:24, 147:2,
147:8, 147:12,
147:18, 147:20,
147:24, 150:17,
150:19, 156:12,
156:15, 157:8,
157:13, 158:9,
158:11, 158:14,
160:11, 160:12,
160:21, 161:8,
161:16, 163:11,
163:13, 163:21,
165:1, 165:7,
165:22, 165:23,
172:17, 173:1,
173:2, 173:20,
173:22, 174:3,

174:5, 175:1, 175:6,
177:17, 177:19,
178:16, 180:11,
180:13, 180:24,
181:1, 181:7, 181:9,
181:23, 182:1,
182:3, 182:7,
182:11, 183:19,
183:22, 184:2,
184:6, 184:11,
184:18, 184:19,
186:9, 186:17,
198:13, 198:19,
198:25, 199:4,
200:7, 200:10,
201:22, 201:25,
202:3, 202:5, 206:7,
206:9, 206:13,
206:15, 207:5,
207:14, 208:10,
208:15, 208:22,
208:24, 208:25,
213:1, 213:4, 213:6,
213:10, 214:21,
215:14, 215:22,
216:3, 216:7, 217:4,
217:14, 217:18,
218:7, 218:10,
218:12, 218:19,
218:23, 219:18,
219:20, 220:7,
220:13, 220:19,
221:2, 221:17,
221:20, 222:14,
222:17, 223:1,
223:2, 223:5, 223:8,
223:14, 224:5,
224:9, 224:12,
224:16, 224:17,
226:7, 226:10,
226:14, 226:20,
226:24, 227:7,
227:17, 227:21,
227:22, 227:24,
228:13, 228:22,
229:2, 229:4, 229:5,
230:25, 231:3,
231:6, 232:9,
232:14, 232:15,
232:17, 234:8,
234:13
**MS** [57] - 3:3, 3:6,
3:14, 4:2, 4:5, 4:8,
4:12, 4:12, 4:15, 5:3,
5:4, 5:10, 6:3, 6:7,
6:14, 22:6, 22:8,
22:23, 28:19, 30:18,
35:5, 40:22, 60:14,
62:19, 64:12, 66:2,
70:21, 77:24, 79:12,
84:22, 87:14, 93:23,

94:5, 95:23, 97:2,
99:17, 102:24,
104:8, 107:14,
111:12, 118:1,
118:17, 126:2,
128:22, 131:15,
132:23, 134:11,
143:9, 145:18,
216:4, 219:11,
219:22, 226:11,
232:13, 232:19,
232:22, 233:1
**Mt** [3] - 3:15, 4:4, 4:9
**multiplier** [14] - 54:24,
55:8, 55:10, 55:16,
55:22, 55:23, 56:1,
56:4, 56:6, 58:2,
58:11, 60:23, 61:6,
194:18
**multipliers** [1] - 55:12
**multiply** [1] - 55:7
**multiplying** [1] -
224:14
**multitude** [2] - 175:21,
176:18
**Murphy** [1] - 109:19
**Murphy-Brown** [1] -
109:19
**must** [7] - 110:4,
152:9, 152:13,
152:18, 154:7,
156:21, 159:6

## N

**name** [7] - 65:19,
228:4, 228:5, 228:6,
229:6, 229:7, 233:2
**named** [1] - 25:10
**names** [1] - 130:10
**Napoli** [1] - 79:22
**narcotic** [4] - 50:23,
159:5, 159:7, 164:2
**narcotics** [3] - 164:2,
168:16, 168:17
**national** [2] - 14:10,
212:16
**nationally** [1] - 150:4
**nationwide** [4] -
67:12, 179:21,
182:17, 184:23
**natural** [1] - 172:17
**nature** [1] - 159:2
**navigate** [1] - 120:19
**near** [1] - 230:21
**nearly** [2] - 211:5,
211:20
**necessarily** [2] -
37:11, 58:25
**necessary** [3] -

155:22, 156:10, 156:18

**necessity** [1] - 157:18

**need** [28] - 9:2, 10:7, 26:1, 28:22, 36:13, 37:6, 61:21, 64:16, 96:22, 104:11, 109:4, 120:24, 131:17, 150:2, 151:22, 151:24, 158:18, 158:20, 161:3, 161:7, 165:17, 172:19, 173:12, 176:13, 187:18, 201:25, 216:2, 216:25

**needed** [3] - 150:22, 190:3, 214:14

**needs** [3] - 161:2, 182:25, 210:6

**negligence** [1] - 76:4

**negotiated** [2] - 36:21, 37:13

**negotiation** [1] - 194:22

**negotiations** [2] - 36:12, 74:25

**Neu** [2] - 132:5, 132:6

**never** [12] - 21:15, 21:16, 30:12, 30:15, 49:6, 49:10, 54:12, 112:16, 191:1, 191:9, 196:15, 214:8

**Nevertheless** [1] - 44:15

**New** [2] - 3:5, 3:8

**new** [39] - 7:7, 7:8, 7:13, 8:23, 15:10, 15:12, 26:19, 61:9, 79:6, 116:5, 126:12, 149:17, 175:10, 179:8, 179:17, 179:18, 184:22, 186:4, 188:1, 188:2, 188:10, 188:11, 192:3, 193:12, 193:13, 193:24, 194:6, 194:15, 195:8, 195:11, 197:12, 198:5, 198:7, 200:16, 200:19, 201:1

**newly** [2] - 61:13, 182:17

**news** [1] - 92:18

**newspaper** [2] - 92:10, 94:19

**next** [46] - 18:16, 29:13, 29:15, 39:18, 46:11, 54:25, 55:20,

57:21, 57:22, 61:23, 62:23, 70:6, 71:22, 76:13, 76:22, 78:9, 80:13, 82:19, 85:25, 89:3, 94:22, 121:8, 121:24, 125:23, 130:24, 131:25, 133:3, 135:15, 136:7, 149:16, 152:3, 168:21, 178:17, 187:13, 201:6, 202:23, 203:5, 205:6, 206:2, 210:9, 210:15, 210:20, 210:24, 211:16, 211:22, 231:12

**Next** [3] - 91:1, 97:13, 99:20

**Nice** [1] - 85:22

**nice** [1] - 215:15

**NICHOLAS** [125] - 6:11, 7:6, 8:8, 11:9, 17:4, 25:15, 25:20, 26:2, 26:7, 29:22, 30:7, 33:15, 33:20, 34:1, 34:13, 35:14, 35:23, 37:8, 37:24, 38:7, 39:10, 43:3, 53:12, 53:16, 57:15, 60:13, 62:17, 64:2, 66:1, 66:15, 67:11, 67:21, 70:20, 72:9, 77:22, 79:10, 83:11, 83:18, 84:17, 87:12, 89:18, 92:2, 93:21, 94:10, 99:14, 103:2, 105:2, 108:1, 114:24, 126:17, 128:2, 134:12, 136:12, 137:15, 138:11, 144:24, 147:24, 150:17, 150:19, 156:15, 157:8, 157:13, 158:11, 158:14, 160:12, 160:21, 161:16, 163:21, 165:7, 165:22, 165:23, 172:17, 173:1, 173:2, 174:3, 174:5, 175:6, 177:19, 178:16, 180:11, 180:13, 180:24, 181:1, 181:7, 181:9, 181:23, 182:7, 182:11, 183:19, 184:6, 184:11, 184:18, 184:19, 186:17, 198:13,

198:19, 198:25, 199:4, 200:7, 200:10, 201:22, 201:25, 202:5, 206:7, 206:9, 206:15, 207:14, 208:10, 208:15, 208:24, 208:25, 213:1, 213:6, 213:10, 214:21, 215:14, 218:10, 218:19, 219:20, 220:19, 223:2, 224:5, 224:12, 226:10, 232:15

**Nicholas** [17] - 7:5, 17:8, 25:14, 33:12, 35:3, 107:25, 114:23, 126:16, 147:22, 148:1, 156:14, 157:5, 172:24, 175:5, 184:5, 219:25, 220:9

**night** [25] - 7:6, 7:9, 8:1, 8:22, 9:3, 33:13, 33:15, 35:18, 35:20, 46:12, 101:9, 111:8, 122:13, 124:4, 124:14, 125:7, 125:21, 126:7, 152:3, 158:23, 158:25, 180:5, 204:14

**nights** [2] - 33:5, 121:7

**Ninth** [1] - 4:6

**Noerr** [13] - 109:22, 110:10, 110:15, 113:16, 118:8, 119:6, 119:16, 128:5, 131:10, 132:22, 134:8, 143:12, 146:21

**Noerr-Pennington** [13] - 109:22, 110:10, 110:15, 113:16, 118:8, 119:6, 119:16, 128:5, 131:10, 132:22, 134:8, 143:12, 146:21

**Non** [1] - 81:14

**non** [8] - 72:20, 121:3, 123:16, 123:18, 124:24, 125:1, 125:14, 125:21

**non-authenticity** [7] - 121:3, 123:16, 123:18, 124:24, 125:1, 125:14,

125:21

**non-controlled** [1] - 72:20

**Non-pass** [1] - 81:14

**none** [4] - 49:21, 85:7, 145:15, 207:20

**noon** [1] - 108:19

**normal** [10] - 37:2, 44:17, 47:7, 115:8, 132:12, 209:7, 209:10, 219:8, 230:12, 230:17

**normally** [1] - 157:3

**north** [2] - 96:14, 96:16

**North** [1] - 109:19

**note** [6] - 102:16, 107:11, 122:11, 122:12, 176:2, 220:1

**nothing** [5] - 8:9, 44:16, 112:20, 118:6, 143:13

**notice** [18] - 21:13, 24:17, 38:18, 39:25, 40:5, 40:19, 40:23, 41:5, 66:23, 68:2, 120:25, 121:18, 121:21, 121:22, 124:12, 136:21, 146:24, 192:11

**Notice** [1] - 94:2

**noticed** [1] - 79:22

**notify** [2] - 187:14, 204:1

**noting** [1] - 211:19

**November** [2] - 141:14, 198:11

**nuisance** [3] - 109:25, 114:14, 116:3

**nuisances** [1] - 117:9

**null** [3] - 42:16, 42:18, 42:20

**number** [15] - 16:23, 26:19, 52:15, 65:21, 120:23, 125:3, 142:10, 144:13, 154:21, 165:17, 212:14, 231:15, 231:17, 232:3

**Number** [1] - 65:6

**numbers** [5] - 12:7, 19:25, 224:6, 224:14, 226:2

**numerous** [1] - 16:7

**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12

**NWDA** [1] - 174:22

**NY** [1] - 3:5

125:21

## O

**oath** [1] - 17:12

**object** [24] - 24:11, 34:16, 34:20, 34:21, 53:17, 67:1, 83:18, 89:18, 92:2, 102:14, 108:8, 122:1, 123:8, 123:10, 131:9, 134:7, 134:10, 136:12, 143:9, 177:19, 215:14, 223:3, 224:5

**objected** [6] - 12:22, 123:21, 125:5, 126:20, 145:11, 165:4

**objecting** [4] - 25:21, 25:25, 89:22, 121:12

**objection** [143] - 7:24, 12:24, 13:24, 22:6, 22:19, 23:10, 23:13, 24:14, 24:21, 34:19, 35:11, 37:21, 37:22, 39:10, 40:22, 60:12, 60:13, 60:14, 60:15, 60:16, 62:16, 62:17, 62:18, 62:19, 64:3, 64:9, 64:11, 64:12, 65:25, 66:1, 66:2, 66:3, 66:16, 66:17, 68:5, 70:20, 70:21, 70:22, 70:23, 72:9, 72:10, 77:21, 77:22, 77:23, 77:24, 79:10, 79:11, 79:12, 83:9, 83:10, 83:11, 83:12, 84:16, 84:17, 84:20, 84:22, 87:11, 87:12, 87:13, 87:14, 89:25, 92:5, 93:21, 93:22, 94:8, 97:2, 97:3, 99:13, 99:14, 99:15, 99:17, 102:25, 103:14, 104:9, 104:20, 105:20, 105:23, 106:12, 107:9, 107:12, 107:15, 107:22, 108:11, 108:12, 108:15, 122:9, 122:10, 122:20, 122:22, 124:1, 124:2, 124:8, 124:9, 124:19, 125:21, 125:23, 126:4, 126:9, 126:14, 128:6, 128:8, 131:13, 132:21, 134:12,

138:15, 139:11,
156:12, 156:14,
157:6, 158:9,
160:11, 161:9,
163:11, 163:20,
165:1, 165:20,
177:19, 181:25,
182:3, 182:6,
183:21, 202:2,
202:3, 206:12,
208:20, 208:22,
213:3, 213:4, 218:9,
218:10, 219:12,
219:25, 220:1,
220:5, 226:9,
226:10, 227:22,
232:12, 232:13,
232:15
**Objection** [8] - 72:8,
95:23, 173:20,
175:1, 177:17,
186:9, 207:5, 218:19
**objectionable** [1] -
207:12
**objections** [41] - 7:23,
15:15, 16:9, 16:13,
34:23, 35:7, 97:12,
121:3, 121:9,
121:14, 121:20,
121:21, 121:22,
122:2, 122:10,
122:13, 122:14,
122:16, 122:18,
123:1, 123:17,
123:18, 123:25,
124:15, 124:19,
124:24, 125:4,
125:7, 125:14,
126:5, 126:12,
131:18, 131:22,
132:25, 143:12,
207:6, 219:23
**objective** [1] - 51:10
**objects** [1] - 124:11
**obligation** [7] - 46:5,
47:7, 47:15, 48:21,
156:3, 174:12,
178:13
**obligations** [4] - 32:7,
76:5, 161:13, 163:19
**Obviously** [1] - 102:25
**obviously** [6] - 8:7,
105:25, 110:11,
113:8, 184:8, 226:25
**occasions** [1] - 16:7
**occurring** [2] - 154:4,
174:23
**occurs** [1] - 166:13
**October** [4] - 71:23,
72:5, 75:14, 76:7

**odds** [2] - 146:9,
177:6
**OF** [2] - 1:1, 1:4
**offer** [6] - 181:3,
181:23, 182:8,
183:19, 201:22,
213:1
**offered** [10] - 12:12,
13:4, 13:20, 14:6,
93:24, 103:1, 182:9,
208:8, 208:9, 223:6
**offering** [6] - 64:2,
64:4, 64:6, 94:1,
97:7, 106:2
**office** [29] - 46:14,
46:17, 55:13, 55:16,
55:21, 56:5, 56:23,
56:24, 57:2, 57:5,
57:6, 61:17, 173:10,
174:12, 174:16,
174:20, 174:22,
175:20, 176:7,
177:24, 178:11,
179:6, 179:18,
179:19, 179:22,
180:3, 192:5,
192:10, 192:21
**Office** [10] - 28:3,
39:5, 42:9, 46:9,
172:1, 207:1,
207:19, 208:2,
209:21, 211:23
**Officer** [1] - 69:10
**offices** [9] - 47:13,
47:17, 49:8, 173:13,
179:23, 179:25,
183:1, 195:21, 211:6
**Official** [2] - 235:2,
235:3
**oft** [1] - 136:9
**oft-recited** [1] - 136:9
**often** [4] - 153:12,
153:20, 154:11,
172:15
**Ohio** [1] - 74:1
**OIG** [4] - 207:9, 212:4,
218:13, 220:10
**old** [2] - 15:10, 178:19
**older** [2] - 159:21
**OMP** [24] - 31:19,
31:23, 32:15, 45:11,
45:12, 52:17, 53:1,
60:7, 76:18, 78:16,
79:3, 79:6, 80:16,
91:17, 205:7, 222:2,
222:7, 222:9,
222:10, 225:6,
225:10, 225:19,
225:24, 226:5
**on-boarding** [1] -

194:6
**on-line** [2] - 93:17,
94:13
**on-site** [1] - 200:22
**once** [9] - 51:19, 81:5,
114:6, 151:21,
154:17, 164:22,
184:22, 197:15,
197:20
**One** [7] - 5:11, 74:19,
74:21, 142:25,
174:7, 176:5, 211:18
**one** [141] - 8:16, 15:13,
19:23, 21:7, 21:8,
21:14, 21:17, 21:19,
22:8, 22:14, 26:13,
27:6, 27:23, 29:2,
29:11, 29:17, 29:23,
30:8, 30:10, 30:12,
30:17, 32:7, 32:10,
35:14, 43:7, 44:15,
46:18, 46:19, 46:23,
47:6, 47:16, 51:2,
51:21, 54:3, 54:6,
55:11, 57:7, 59:5,
60:7, 61:7, 61:22,
69:25, 73:7, 75:1,
77:4, 78:5, 81:21,
85:15, 88:9, 90:20,
92:22, 95:11, 98:1,
99:22, 105:17,
105:18, 109:19,
111:23, 115:7,
119:20, 120:18,
120:23, 122:9,
124:8, 124:10,
124:15, 124:18,
125:3, 125:5,
125:17, 126:4,
126:19, 129:22,
141:20, 142:14,
143:5, 143:24,
144:6, 144:12,
145:10, 148:21,
151:5, 151:19,
152:1, 152:16,
160:3, 162:7,
165:17, 167:8,
169:17, 173:8,
174:14, 175:5,
175:20, 176:12,
176:15, 179:1,
179:2, 179:18,
179:22, 180:1,
180:23, 181:2,
183:8, 184:6, 185:7,
185:12, 185:15,
191:12, 194:18,
194:19, 196:4,
196:5, 196:13,

198:15, 198:16,
199:2, 201:25,
202:17, 203:3,
203:5, 203:8,
204:16, 204:17,
206:11, 211:22,
212:9, 214:22,
222:3, 225:8,
226:21, 227:13,
228:15, 228:19,
229:17, 231:1,
234:11
**ones** [8] - 12:12,
30:10, 32:20, 43:7,
77:3, 86:13, 119:1,
214:12
**ongoing** [1] - 77:17
**open** [6] - 149:17,
168:2, 174:23,
192:5, 227:9, 227:10
**opened** [2] - 189:19,
192:4
**opening** [7] - 77:18,
87:1, 112:2, 144:9,
163:16, 175:10,
192:8
**openings** [2] - 115:14,
167:5
**opens** [1] - 207:10
**operate** [1] - 24:6
**operating** [3] - 172:3,
173:6, 190:16
**operation** [3] - 170:17,
171:24, 218:3
**operations** [7] - 73:23,
73:24, 79:22, 79:24,
91:8, 190:5, 197:18
**opiates** [1] - 88:25
**opinions** [2] - 163:15,
182:23
**opioid** [22] - 52:24,
85:4, 95:22, 102:4,
144:16, 144:18,
156:9, 156:17,
159:17, 168:11,
189:21, 210:6,
210:13, 210:16,
212:10, 212:13,
212:15, 212:18,
212:20, 212:24,
214:11
**opioids** [15] - 82:11,
86:14, 92:21,
118:23, 150:11,
150:12, 150:15,
159:3, 159:4, 168:7,
189:4, 189:17,
209:15, 210:12,
210:22
**Opioids** [1] - 210:1

**opium** [1] - 94:3
**OPM** [1] - 225:3
**opponent** [1] - 8:12
**opportunity** [5] -
11:18, 22:25, 56:24,
105:19, 144:20
**opposite** [1] - 137:8
**option** [1] - 153:13
**oral** [1] - 111:13
**order** [112] - 13:1,
13:3, 18:5, 18:7,
40:13, 41:6, 42:15,
43:19, 44:2, 45:1,
47:1, 47:19, 48:9,
48:17, 49:17, 49:22,
50:8, 50:9, 50:11,
50:16, 50:23, 50:24,
51:4, 51:9, 51:16,
51:21, 51:24, 52:1,
53:7, 55:19, 58:3,
58:4, 58:22, 58:25,
59:3, 59:4, 59:6,
59:7, 59:8, 60:22,
68:22, 69:22, 76:19,
81:1, 81:11, 82:2,
84:10, 110:4, 112:4,
112:21, 141:23,
152:1, 152:2,
152:10, 158:19,
158:22, 159:7,
159:15, 159:17,
159:19, 159:25,
164:2, 166:23,
170:20, 170:25,
173:14, 175:18,
176:25, 178:8,
183:16, 185:17,
186:24, 187:1,
187:11, 190:22,
192:13, 192:17,
192:18, 193:22,
194:22, 194:23,
194:24, 195:19,
195:22, 195:25,
196:2, 196:7,
196:10, 196:12,
196:13, 196:17,
196:20, 200:5,
203:21, 204:6,
205:4, 205:12,
211:14, 212:2,
212:3, 222:1, 222:2,
225:2, 225:18,
225:22, 226:3
**Order** [20] - 32:8, 33:9,
42:12, 45:11, 45:13,
59:15, 61:10, 62:6,
62:10, 65:20, 68:17,
71:2, 71:7, 71:12,
72:4, 191:5, 191:10,

191:11, 192:10, 204:24
**ordered** [6] - 52:11, 57:22, 59:5, 59:9, 121:16, 151:25
**ordering** [11] - 40:14, 41:7, 41:14, 44:8, 44:15, 50:21, 66:9, 77:4, 77:6, 158:15, 211:12
**Orders** [3] - 71:17, 80:5
**orders** [93] - 23:25, 24:10, 38:19, 39:5, 39:22, 40:2, 40:20, 41:14, 42:6, 42:8, 44:25, 45:5, 45:16, 45:21, 45:22, 46:2, 46:12, 46:15, 46:25, 47:4, 47:5, 47:22, 48:2, 48:19, 52:23, 56:1, 57:4, 57:6, 58:19, 63:12, 63:22, 66:11, 70:1, 71:20, 77:8, 80:9, 80:14, 81:5, 81:24, 101:6, 101:9, 151:8, 152:3, 158:5, 158:24, 158:25, 159:1, 159:3, 164:3, 164:4, 166:12, 168:9, 174:9, 180:4, 180:5, 182:18, 185:19, 186:6, 186:13, 186:19, 186:22, 186:23, 187:16, 187:21, 194:10, 195:4, 195:5, 195:6, 195:9, 196:9, 196:16, 197:2, 199:20, 199:24, 200:13, 203:5, 203:9, 204:5, 205:8, 211:1, 211:4, 214:24, 215:4, 216:19, 216:20, 217:6, 218:2, 222:4, 222:9, 222:10, 223:11
**org** [1] - 170:14
**organization** [1] - 175:3
**organizations** [1] - 175:8
**original** [1] - 10:6
**originally** [1] - 227:11
**origins** [1] - 147:4
**Orlando** [3] - 190:23, 190:25, 192:5
**Orleans** [1] - 3:8

**OTC** [1] - 150:8
**Otherwise** [1] - 207:12
**otherwise** [5] - 24:9, 35:11, 38:18, 109:24, 110:7
**ourself** [1] - 87:25
**ourselves** [2] - 87:25, 171:25
**out-of-the-chute** [1] - 82:19
**outline** [1] - 9:12
**outside** [10] - 8:21, 12:22, 16:17, 17:6, 73:20, 173:22, 200:23, 218:19, 219:13, 223:2
**over-the-counter** [2] - 149:10, 149:25
**overall** [4] - 142:25, 143:4, 144:6, 182:25
**overarching** [2] - 163:6, 163:7
**overdose** [3] - 210:17, 214:13, 214:18
**overdoses** [1] - 212:11
**overflow** [1] - 145:3
**overly** [1] - 48:22
**overrule** [4] - 68:5, 89:25, 163:19, 165:20
**Overruled** [4] - 174:4, 177:22, 186:16, 223:13
**overruled** [5] - 40:25, 131:19, 158:13, 160:17, 218:21
**overruling** [3] - 49:19, 49:20, 49:23
**oversee** [1] - 32:12
**Oversight** [1] - 209:24
**oversized** [1] - 123:5
**own** [3] - 36:23, 137:4, 178:23
**owner** [1] - 194:8
**Oxy** [1] - 90:23
**oxycodone** [9] - 50:24, 82:6, 82:12, 223:21, 224:1, 224:3, 225:19, 225:23, 226:4
**oxycodones** [1] - 224:2
**Oxycontin** [4] - 17:23, 50:18, 88:11, 88:20
**Oxycontinville** [1] - 97:22

**P**

**P-1200** [1] - 2:7
**P-17046** [3] - 85:25, 86:17, 87:10
**P-17051** [3] - 91:1, 92:7, 93:20
**P-174** [1] - 107:3
**P-187** [2] - 78:10, 79:9
**P-212** [3] - 83:17, 84:15, 87:9
**P-214** [3] - 131:25, 132:19, 133:1
**P-217** [1] - 97:13
**P-234** [2] - 99:20, 102:6
**P-253** [4] - 70:6, 70:19, 78:3, 78:7
**P-26290** [3] - 62:23, 64:1, 64:14
**P-26292** [3] - 71:23, 72:7, 77:20
**P-26293** [3] - 65:6, 65:24, 70:12
**P-268** [2] - 103:17, 104:3
**P-282** [3] - 94:22, 96:5, 96:25
**P-2876** [2] - 72:24, 77:20
**P-2948** [5] - 128:18, 129:6, 129:11, 131:4, 131:24
**P-3** [2] - 18:23, 19:13
**P-32** [6] - 22:3, 26:11, 26:13, 37:20, 38:2, 38:4
**P-32_3** [1] - 26:24
**P-32A** [2] - 26:14, 26:20
**P-32B** [1] - 26:24
**P-432** [1] - 222:15
**P-43225** [1] - 14:9
**P-43770** [2] - 231:3, 232:11
**P-44002** [1] - 82:24
**P-44711** [2] - 13:13, 14:3
**P-44749** [1] - 14:5
**P-44754** [1] - 14:4
**P-44758** [2] - 13:13, 14:3
**P-521** [1] - 217:14
**P-82** [5] - 33:25, 59:11, 60:11, 60:18, 60:20
**P-8231** [2] - 127:15, 134:20
**P-9** [1] - 79:17
**P-9156** [2] - 133:3,

134:5
**P-9160** [2] - 141:2, 142:4
**P-9486** [1] - 139:19
**P-953** [1] - 61:24
**P-i-f-k-o** [1] - 29:6
**p.m** [6] - 108:24, 121:1, 121:4, 123:17, 172:23, 234:19
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**packet** [5] - 12:21, 13:1, 13:15, 13:16, 14:4, 14:5, 22:10, 26:19, 29:10, 181:24
**packets** [8] - 13:7, 14:7, 14:18, 16:7, 16:8, 16:16, 16:18, 16:23
**page** [19] - 26:15, 29:13, 30:1, 30:23, 40:9, 60:25, 74:7, 75:4, 80:23, 134:9, 135:22, 135:23, 139:10, 166:19, 199:1, 209:1, 211:16, 211:22
**Page** [35] - 29:1, 29:6, 38:13, 44:12, 44:13, 60:20, 60:21, 60:25, 63:6, 63:7, 72:13, 73:10, 74:4, 74:8, 75:15, 75:22, 79:20, 80:1, 122:25, 123:16, 130:9, 130:16, 130:18, 133:24, 135:3, 135:4, 135:22, 137:7, 202:6, 210:2, 210:3, 210:23, 221:21, 221:22
**pager** [1] - 201:25
**pages** [9] - 15:7, 15:10, 15:12, 92:25, 100:25, 166:19, 166:20, 221:7
**Pages** [1] - 26:16
**paid** [2] - 231:24
**Pain** [1] - 89:3
**pain** [3] - 89:7, 93:18, 214:14
**pallet** [1] - 187:6
**pandemic** [3] - 148:20, 148:25, 149:17
**Papantonio** [1] - 2:12
**paper** [3] - 8:12, 85:3, 159:25
**Paragraph** [4] - 63:12,

72:14, 75:14, 75:22
**paragraph** [21] - 23:19, 24:2, 38:14, 38:15, 39:2, 44:13, 44:22, 60:21, 60:25, 72:15, 74:19, 75:22, 80:1, 135:7, 183:2, 200:12, 212:4, 212:8, 217:25
**parameters** [1] - 179:18
**parentheses** [1] - 39:19
**parents** [1] - 214:14
**Parker** [1] - 140:10
**parlance** [1] - 88:22
**parody** [16] - 85:1, 85:3, 85:5, 86:7, 86:21, 87:4, 87:17, 88:23, 89:8, 89:14, 89:21, 90:6, 97:25, 98:4
**Part** [1] - 197:14
**part** [29] - 31:13, 42:20, 48:3, 52:25, 93:3, 93:15, 94:8, 106:1, 125:2, 143:13, 147:2, 149:9, 153:17, 154:8, 159:22, 169:7, 172:5, 188:13, 193:10, 193:19, 194:21, 196:23, 196:24, 197:14, 203:24, 204:12, 210:11, 213:12, 227:15
**participate** [1] - 140:17
**participated** [2] - 144:5, 144:14
**participating** [1] - 139:15
**participation** [1] - 114:3
**particular** [21] - 26:9, 40:14, 41:7, 41:15, 43:19, 43:25, 44:3, 44:9, 55:1, 55:5, 66:24, 100:12, 126:6, 126:9, 142:7, 142:25, 144:5, 218:1, 218:3, 221:15, 233:9
**particularly** [3] - 66:22, 77:3, 88:7
**parties** [2] - 7:25, 22:21
**parties'** [1] - 120:22
**partner** [1] - 177:4

partners [1] - 191:23
parts [1] - 42:11
party [7] - 7:22, 9:25,
25:10, 25:13, 25:24,
138:18, 231:25
pass [6] - 14:25,
81:11, 81:14,
134:22, 214:15,
217:12
Pass [1] - 81:11
past [10] - 38:24, 39:8,
43:8, 52:1, 52:9,
52:11, 52:15, 144:3,
169:19, 212:14
paste [1] - 86:7
Pat [2] - 140:4, 140:8
patches [1] - 82:12
path [2] - 114:6, 115:3
patience [1] - 226:16
patient [15] - 49:13,
49:18, 49:19, 49:20,
49:21, 58:10, 58:19,
152:6, 155:14,
155:22, 156:10,
156:18, 186:25,
214:17, 230:7
patient/doctor [1] -
190:7
patients [5] - 49:16,
50:2, 77:11, 90:13,
101:7
Patrick [2] - 140:4,
141:18
pattern [10] - 41:7,
41:21, 44:17, 48:7,
51:18, 54:22,
106:15, 174:11,
178:3, 204:6
patterns [16] - 40:14,
40:15, 40:16, 40:20,
41:15, 41:16, 41:19,
43:20, 43:22, 44:3,
44:8, 52:6, 76:11,
77:5, 77:6, 178:23
PAUL [2] - 2:3, 5:9
Paul [1] - 133:12
Pause [11] - 8:17,
21:21, 57:10, 73:8,
75:16, 78:19, 113:4,
147:11, 182:2,
184:10, 213:9
paying [1] - 77:11
PEARL [1] - 3:6
peculiar [1] - 157:9
pejorative [1] - 105:18
pending [6] - 27:8,
27:9, 27:10, 102:19,
219:15, 220:2
Pennington [13] -
109:22, 110:10,

110:15, 113:16,
118:8, 119:6,
119:16, 128:5,
131:10, 132:22,
134:8, 143:12,
146:21
Pennsylvania [1] -
149:18
Pensacola [1] - 2:14
people [20] - 46:24,
47:3, 50:5, 50:15,
50:20, 51:23, 59:3,
59:7, 85:11, 85:14,
90:11, 95:2, 96:21,
101:10, 106:16,
188:2, 188:13,
213:21, 213:24,
228:21
People [1] - 106:7
per [6] - 210:18,
210:19, 224:10,
225:5, 225:8, 225:14
perceived [1] - 161:2
percent [6] - 74:25,
168:15, 210:18,
210:19, 212:12,
212:24
percentage [1] -
72:19, 74:22, 75:3
perfectly [2] - 17:7,
228:20
perform [8] - 137:9,
138:9, 139:4, 139:7,
169:19, 171:23,
184:25, 203:19
performed [2] -
142:21, 219:9
performs [1] - 172:2
perhaps [2] - 110:5,
145:4
period [8] - 21:9, 36:7,
67:1, 139:4, 173:16,
174:18, 190:14,
197:5
permit [4] - 120:9,
184:13, 184:14
permitted [7] - 7:16,
53:18, 121:24,
144:17, 147:3,
157:4, 207:10
permitting [1] - 76:2
Perry [2] - 104:25,
140:9
person [13] - 11:15,
51:22, 79:22, 85:8,
85:19, 95:6, 95:12,
172:12, 172:16,
187:11, 187:8,
187:13, 215:10
personal [4] - 27:25,

176:10, 213:16,
214:3
personally [4] -
101:21, 173:6,
181:19, 181:20
personnel [3] -
170:12, 187:25,
188:1
persuade [1] - 23:5
pertain [1] - 202:24
pertaining [2] -
165:12, 188:10
PETER [1] - 2:12
Peter [1] - 140:10
petition [1] - 114:10
petitioning [16] -
102:20, 102:22,
111:17, 111:23,
113:17, 113:19,
113:22, 114:12,
115:20, 115:24,
119:5, 119:7,
131:11, 146:1,
146:6, 146:15
pharmaceutical [2] -
149:7, 210:12
pharmaceuticals [4] -
149:9, 149:10,
149:25, 150:9
Pharmacies [3] -
91:12, 152:24,
154:17
pharmacies [46] -
14:7, 14:11, 14:13,
43:23, 44:17, 50:2,
50:19, 54:6, 93:16,
93:17, 94:13, 101:6,
148:25, 149:13,
151:7, 151:14,
151:17, 151:22,
158:16, 163:4,
168:4, 174:14,
176:22, 176:23,
178:20, 189:2,
189:7, 192:6,
192:13, 192:18,
194:6, 194:16,
194:18, 194:19,
200:17, 223:18,
224:1, 224:2,
224:21, 224:22,
224:23, 225:5,
225:9, 225:13,
225:14
pharmacist [7] -
49:23, 156:2, 156:5,
156:9, 156:23,
159:23, 194:8
pharmacists [1] -
58:13

pharmacy [34] - 49:20,
50:17, 54:8, 54:9,
55:19, 58:19, 58:21,
74:24, 75:1, 75:2,
76:8, 77:11, 150:2,
151:4, 151:7,
152:15, 154:18,
158:5, 170:6,
170:10, 178:22,
187:10, 187:23,
190:10, 194:14,
222:8, 224:3, 225:1,
225:17, 225:22,
226:3, 229:20, 230:2
Pharmacy [5] - 12:22,
14:17, 153:2, 153:4,
176:8
Philadelphia [2] - 6:6,
6:13
phone [15] - 47:12,
47:14, 47:18, 47:23,
48:3, 48:21, 49:1,
51:1, 52:13, 54:16,
54:19, 176:10,
177:13, 179:4, 185:6
photographs [1] -
200:23
physical [5] - 166:14,
171:18, 190:7,
202:17, 203:15
physician [1] - 156:21
pick [7] - 35:16, 47:5,
50:13, 90:11,
100:23, 170:9,
197:21
picked [2] - 51:22,
93:9
pickers [5] - 48:1,
50:6, 50:8, 51:11,
51:15
picking [2] - 47:5,
174:9
piece [1] - 204:16
pieces [1] - 204:14
PIFKO [1] - 3:16
Pifko [3] - 29:2, 29:6,
29:7
Pill [1] - 90:15
pill [4] - 90:4, 90:9,
155:3, 155:11
pillbillies [6] - 90:7,
90:8, 90:9, 96:14,
96:16, 96:19
pillbilly [2] - 90:10,
92:21
pills [30] - 55:18,
57:22, 58:3, 58:22,
67:9, 67:10, 67:12,
67:13, 67:25, 68:2,
82:12, 88:9, 88:15,

89:6, 89:17, 90:16,
94:3, 136:23,
218:15, 224:1,
224:2, 224:3,
224:10, 224:21,
224:22, 224:24,
226:3, 231:19
pin [4] - 72:23, 103:6,
103:12, 106:23
pinpoint [2] - 172:15,
172:16
place [26] - 18:23,
50:13, 59:3, 61:18,
61:20, 68:24, 70:1,
71:10, 82:19,
106:23, 145:1,
145:2, 145:11,
151:7, 158:24,
158:25, 166:7,
167:12, 167:16,
167:17, 171:20,
196:12, 197:13,
197:20, 198:7
placed [4] - 81:5,
107:12, 107:23,
222:2
places [2] - 12:4,
84:11
PLAINTIFF [6] - 38:2,
60:18, 62:21, 64:14,
131:24, 133:1
Plaintiff [5] - 1:5, 1:11,
2:2, 3:2, 4:1
plaintiff's [1] - 110:8
plaintiffs [21] - 7:7,
12:18, 34:15, 57:13,
111:18, 111:20,
112:8, 112:15,
113:18, 114:7,
114:8, 120:24,
124:12, 126:19,
145:25, 157:21,
163:15, 184:13,
215:10, 227:2,
227:25
Plaintiffs [1] - 235:6
PLAINTIFFS' [1] -
228:9
plaintiffs' [2] - 12:2,
119:17
Plaintiffs' [1] - 218:7
plan [3] - 118:10,
227:6, 227:14
planning [1] - 226:24
play [1] - 9:4
Play [1] - 144:7
pleadings [1] - 110:22
Pleasant [3] - 3:15,
4:4, 4:9
plural [1] - 122:14

**point** [48] - 21:24, 22:19, 23:12, 27:7, 28:9, 52:14, 54:21, 57:11, 61:7, 67:23, 68:9, 77:19, 81:9, 82:5, 83:2, 88:16, 93:19, 98:14, 106:10, 108:18, 109:14, 113:24, 115:17, 116:10, 119:4, 119:15, 121:15, 126:3, 129:1, 136:13, 137:9, 143:20, 144:4, 144:12, 144:13, 145:19, 151:16, 172:18, 189:20, 192:16, 196:4, 198:2, 198:8, 200:9, 205:2, 205:10, 206:21, 221:15
**pointed** [1] - 125:6
**pointing** [1] - 67:6
**points** [3] - 49:5, 109:11, 127:21
**policies** [13] - 32:11, 60:7, 63:25, 65:1, 65:4, 69:5, 69:11, 69:17, 69:25, 137:4, 170:22, 202:12, 212:1
**policy** [29] - 51:10, 51:19, 53:14, 59:24, 61:24, 62:11, 63:7, 65:13, 65:14, 65:21, 66:13, 68:14, 68:18, 68:19, 68:23, 69:17, 69:22, 70:15, 71:7, 71:9, 71:10, 71:20, 76:6, 79:6, 189:20, 192:4, 196:8, 196:15
**Policy** [2] - 62:6, 62:11, 63:3, 63:15, 65:6, 70:11, 72:5, 75:13
**Polster** [2] - 109:15, 112:14
**Ponc** [1] - 2:4
**Ponce** [1] - 2:16
**poor** [2] - 85:1, 87:22
**poorly** [3] - 95:16, 96:17, 96:23
**Poorly** [1] - 96:23
**pop** [3] - 93:5, 109:2, 231:1
**pops** [2] - 92:22, 93:3
**portion** [4] - 77:16, 184:3, 188:15, 194:12

**portions** [2] - 56:17, 221:6
**portray** [1] - 71:14
**portrayal** [1] - 144:18
**position** [13] - 24:18, 27:14, 28:15, 35:10, 36:25, 48:18, 49:24, 113:14, 137:7, 138:24, 139:2, 148:5, 148:6
**positioning** [1] - 148:19
**positions** [1] - 144:8
**positive** [1] - 182:23
**possession** [2] - 152:19, 172:5
**Possible** [1] - 65:20
**possible** [2] - 66:10, 126:13
**possibly** [1] - 14:19
**posts** [1] - 167:7
**potential** [2] - 175:11, 187:17
**potentially** [2] - 8:19, 196:11
**Potentially** [1] - 225:21
**pour** [1] - 167:20
**poured** [3] - 167:12, 167:16, 167:17
**poured-in-place** [3] - 167:12, 167:16, 167:17
**Powell** [1] - 2:6
**PowerPoint** [3] - 201:12, 201:17, 202:1
**PR** [2] - 2:5, 2:17
**practice** [4] - 7:24, 36:3, 76:12, 190:12
**practice"** [1] - 76:5
**practitioner** [2] - 152:15, 155:24
**practitioners** [1] - 163:5
**pre** [2] - 57:3, 72:19
**pre-'98** [1] - 194:14
**pre-2007** [6] - 46:1, 46:3, 52:17, 53:6, 53:14, 57:3
**pre-determined** [1] - 72:19
**pre-these** [1] - 57:3
**precautions** [1] - 170:1
**precluded** [1] - 163:17
**prejudice** [1] - 108:7
**prejudicial** [1] - 107:20
**premises** [1] - 200:24

**prepare** [1] - 10:2
**prepared** [1] - 207:17
**prescribe** [1] - 157:15
**prescribing** [3] - 155:17, 156:20, 157:23
**prescription** [24] - 88:15, 88:24, 89:6, 135:11, 135:17, 155:4, 155:21, 155:25, 156:2, 156:6, 156:9, 156:17, 156:21, 156:23, 158:6, 158:7, 168:11, 212:12, 231:9, 231:13, 231:15, 231:17, 231:21, 232:4
**prescriptions** [8] - 76:8, 76:10, 154:21, 156:20, 158:18, 158:22, 230:2, 233:18
**present** [8] - 14:6, 22:2, 52:1, 82:23, 104:24, 161:1, 198:10, 199:23
**presentation** [15] - 122:1, 198:8, 199:23, 201:12, 201:14, 201:19, 205:21, 205:25, 206:18, 206:22, 206:24, 208:18, 208:19, 216:13, 221:12
**presentations** [1] - 140:1
**presented** [5] - 108:13, 114:6, 114:13, 114:19, 198:22
**presenting** [2] - 9:8, 199:15
**presently** [1] - 61:2
**preserve** [3] - 128:6, 131:13, 132:21
**preserving** [2] - 37:22, 122:2
**President** [11] - 73:22, 74:13, 84:6, 130:14, 131:1, 132:12, 132:14, 148:6, 162:1, 200:3, 221:9
**president** [1] - 132:7
**Presidents** [1] - 74:1
**press** [3] - 114:4, 126:24, 146:16
**Press** [1] - 92:10

**pretrial** [1] - 112:14
**pretty** [6] - 28:6, 47:14, 48:7, 144:25, 164:14, 185:21
**prevent** [8] - 46:21, 135:10, 143:25, 152:18, 163:7, 164:7, 166:7, 203:1
**prevented** [1] - 175:3
**preventing** [1] - 16:13
**preview** [1] - 12:17
**previous** [5] - 51:21, 51:22, 54:5, 115:8, 176:16
**previously** [6] - 26:12, 34:7, 107:8, 109:17, 197:19, 217:22
**Prevosnick's** [1] - 165:9
**Prevosnik** [1] - 165:5
**Prevoznik** [6] - 27:1, 27:21, 27:24, 28:2, 28:14, 28:20
**Prevoznik's** [2] - 56:15, 182:5
**primarily** [1] - 77:11
**primary** [1] - 219:25
**principles** [2] - 111:15, 146:9
**private** [1] - 109:25
**privilege** [1] - 109:9
**probative** [1] - 147:1
**problem** [19] - 8:6, 8:9, 9:20, 9:23, 10:1, 11:8, 11:9, 11:10, 11:11, 28:22, 48:5, 102:8, 106:1, 114:5, 114:19, 185:16, 202:22, 203:4, 203:7
**procedure** [2] - 61:24, 123:14
**Procedure** [3] - 63:16, 123:1, 123:16
**procedures** [10] - 32:11, 63:21, 63:25, 65:1, 65:4, 69:11, 123:11, 137:5, 166:6, 212:1
**Procedures** [4] - 62:7, 63:4, 78:17, 79:3
**proceed** [3] - 35:25, 36:2, 127:5
**proceeding** [2] - 124:6, 124:13
**proceedings** [1] - 235:5
**Proceedings** [3] - 6:19, 64:20, 172:23
**PROCEEDINGS** [1] - 7:1

**process** [34] - 32:12, 45:18, 45:25, 47:10, 47:21, 53:25, 54:20, 61:10, 81:2, 103:7, 158:15, 159:22, 168:10, 170:18, 170:19, 171:11, 171:12, 174:7, 177:16, 183:6, 184:25, 189:20, 194:6, 194:9, 200:19, 205:5, 205:7, 205:13, 225:3, 225:6, 225:10, 225:20, 225:24, 226:5
**processed** [1] - 46:12
**processes** [3] - 49:7, 93:1, 166:7
**processing** [1] - 80:15
**Proctor** [1] - 2:12
**produce** [1] - 210:22
**produced** [10] - 6:19, 11:3, 36:8, 57:15, 59:16, 157:4, 174:15, 219:4, 233:6, 234:9
**product** [26] - 46:18, 49:18, 52:11, 72:17, 75:12, 77:7, 82:4, 101:23, 148:24, 151:9, 154:5, 154:6, 154:15, 154:18, 155:1, 155:10, 160:1, 161:3, 168:5, 170:1, 170:5, 171:14, 196:9, 196:13, 204:14
**product's** [1] - 168:18
**production** [3] - 179:12, 212:22, 212:24
**products** [18] - 58:17, 59:10, 82:6, 82:8, 101:7, 149:10, 149:23, 150:5, 150:8, 151:2, 151:13, 151:22, 151:25, 152:19, 158:18, 158:20, 172:4, 172:8
**professional** [1] - 76:5
**proffer** [10] - 12:5, 12:6, 16:6, 26:25, 32:20, 32:23, 32:25, 36:13, 59:21, 78:5
**proffered** [2] - 14:14, 14:19
**proffering** [1] - 163:15
**program** [59] - 42:5,

43:9, 46:16, 47:11, 49:9, 49:11, 53:25, 54:17, 56:3, 58:9, 61:9, 66:9, 77:16, 82:14, 82:19, 91:17, 171:11, 173:3, 173:7, 173:17, 173:19, 174:2, 174:6, 177:8, 178:15, 178:18, 179:9, 179:12, 179:16, 179:17, 179:23, 180:7, 181:14, 184:23, 186:4, 186:19, 188:1, 188:3, 188:10, 188:11, 189:15, 190:16, 193:13, 193:25, 194:2, 195:8, 195:11, 196:6, 197:13, 197:15, 198:5, 198:7, 201:1, 206:4, 206:22, 211:18, 222:8, 223:9
**Program** [8] - 31:19, 31:23, 32:15, 45:13, 53:1, 60:8, 72:4, 204:25
**programs** [1] - 188:12
**Programs** [1] - 59:16
**progress** [1] - 206:4
**prohibit** [1] - 208:11
**prohibited** [1] - 163:15
**Promethazine** [2] - 185:16, 185:18
**promised** [3] - 91:25, 137:8, 138:8
**promising** [1] - 91:23
**promulgated** [2] - 69:12, 162:4
**proper** [14] - 17:7, 24:21, 31:9, 110:2, 110:6, 138:19, 138:20, 156:22, 156:25, 158:12, 163:25, 166:6, 166:23
**properly** [4] - 28:10, 28:15, 102:23, 131:12
**property** [1] - 154:19
**proposed** [1] - 42:1
**protect** [1] - 177:5
**protected** [8] - 102:23, 110:16, 118:7, 119:6, 119:8, 119:14, 119:16, 146:7

**protecting** [2] - 106:16, 172:6
**protracted** [1] - 36:12
**prove** [6] - 106:14, 111:17, 111:19, 119:1, 145:6, 145:16
**proven** [2] - 111:21, 112:8
**proves** [4] - 106:6, 119:4, 119:15, 145:19
**provide** [13] - 12:11, 41:13, 41:18, 44:7, 51:14, 51:20, 51:25, 52:4, 52:5, 57:12, 120:24, 136:4, 182:24
**provided** [10] - 32:14, 40:5, 40:7, 44:1, 44:4, 44:20, 136:21, 157:18, 211:1, 232:6
**provides** [2] - 136:2, 154:3
**providing** [10] - 24:16, 38:18, 39:25, 40:19, 41:5, 41:10, 53:5, 53:7, 135:25, 200:15
**provision** [1] - 122:24
**pseudoephedrine** [2] - 176:22, 187:7
**public** [7] - 114:13, 116:3, 135:12, 135:16, 135:19, 145:2, 208:5
**publicly** [1] - 67:6
**publish** [2] - 128:18, 223:1
**published** [2] - 107:2, 218:14
**Puerto** [1] - 101:8
**pull** [7] - 67:24, 75:21, 104:3, 141:23, 160:2, 198:13, 230:1
**pulled** [5] - 198:21, 229:23, 233:10, 233:20, 233:24
**purchase** [3] - 39:20, 40:21, 151:2
**purchased** [2] - 52:15
**purchasers** [1] - 189:22
**purchases** [4] - 39:20, 74:23, 74:24, 75:2
**purchasing** [4] - 72:18, 72:21, 76:11, 93:15
**purportedly** [1] - 78:15
**purpose** [23] - 23:23, 36:3, 48:23, 49:12,

49:13, 85:13, 94:4, 96:17, 97:8, 97:11, 110:17, 111:20, 112:4, 112:7, 112:12, 118:3, 118:11, 118:20, 118:21, 156:1, 156:7, 160:22, 161:9
**Purpose** [1] - 66:6
**purposeful** [1] - 16:11
**purposes** [10] - 12:1, 14:14, 56:1, 59:19, 66:12, 78:2, 93:6, 105:11, 111:2, 226:24
**pursuant** [1] - 25:22
**pursue** [4] - 138:14, 146:16, 165:21, 218:22
**put** [37] - 11:15, 11:18, 13:12, 31:21, 32:16, 36:22, 37:1, 42:1, 48:17, 48:18, 50:24, 58:10, 59:7, 66:21, 68:24, 72:23, 82:19, 92:20, 93:19, 101:5, 103:6, 104:8, 107:14, 112:9, 139:8, 168:20, 168:23, 172:8, 179:12, 197:13, 198:7, 204:21, 215:10, 215:12, 220:1, 228:21
**puts** [2] - 25:11, 49:23
**putting** [4] - 11:10, 66:23, 128:24, 178:10

## Q

**quantities** [1] - 59:7
**quantity** [12] - 48:6, 93:17, 94:3, 94:13, 160:20, 178:3, 178:23, 204:6, 222:1, 231:18
**quarterly** [2] - 46:18, 153:14
**questionable** [1] - 192:6
**questioned** [3] - 13:4, 15:14, 214:4
**questioning** [6] - 66:21, 95:24, 138:14, 143:15, 208:11, 219:12
**questionnaire** [3] - 189:24, 190:1, 200:20

**questions** [22] - 23:16, 25:12, 25:18, 35:2, 40:24, 89:21, 147:15, 147:16, 149:3, 150:20, 153:6, 155:12, 157:3, 160:7, 165:11, 191:4, 214:21, 216:3, 216:4, 226:7, 232:20, 233:4
**quick** [3] - 81:21, 198:18, 231:7
**quickly** [5] - 109:11, 179:20, 185:3, 201:9, 217:12
**Quintero** [1] - 140:7
**quite** [6] - 101:10, 112:11, 114:21, 117:15, 154:11, 233:23
**quota** [4] - 160:22, 160:23, 161:6, 212:22
**quotas** [9] - 160:7, 160:8, 160:9, 160:13, 161:11, 161:14, 161:18, 161:23, 212:5

## R

**R-1** [1] - 21:6
**R-2** [1] - 21:6
**R-3** [1] - 21:6
**rabbit** [3] - 117:12, 118:17, 143:15
**Rafferty** [1] - 2:12
**raise** [9] - 56:6, 56:21, 121:6, 121:24, 122:22, 125:6, 126:24, 226:21, 228:7
**raised** [7] - 27:24, 34:19, 118:25, 124:20, 125:7, 219:23, 219:24
**raising** [4] - 25:5, 112:25, 125:18, 219:21
**ranges** [1] - 233:12
**Rannazzisi** [7] - 18:18, 20:4, 20:5, 22:2, 26:12, 28:2, 34:17
**rarely** [1] - 172:14
**rate** [3] - 210:12, 210:16, 212:18
**rather** [10] - 50:8, 85:12, 101:2, 113:5,

113:11, 115:3, 120:9, 124:13, 143:22, 168:7
**reached** [1] - 177:14
**react** [1] - 9:5
**read** [80] - 19:25, 23:18, 24:4, 24:12, 25:2, 30:21, 39:2, 39:22, 40:12, 44:14, 44:23, 56:16, 56:17, 56:19, 66:5, 69:8, 71:16, 72:14, 72:15, 72:25, 74:20, 75:6, 75:15, 75:17, 75:25, 76:14, 78:17, 80:2, 80:13, 88:8, 89:9, 93:10, 93:13, 96:11, 102:10, 112:10, 113:13, 127:24, 128:15, 128:23, 130:8, 130:21, 131:6, 131:7, 132:18, 135:8, 135:15, 136:1, 140:14, 140:19, 143:3, 150:12, 180:20, 182:13, 182:14, 183:2, 200:1, 200:11, 202:9, 205:2, 205:6, 210:3, 210:9, 210:15, 210:24, 211:17, 211:23, 212:6, 212:8, 216:11, 216:13, 216:23, 217:9, 218:5, 218:13, 221:7, 221:23, 224:24
**Read** [3] - 182:21, 211:16, 211:17
**reading** [5] - 82:9, 136:13, 183:3, 200:18, 212:7
**Readling** [1] - 140:7
**ready** [3] - 78:20, 127:5, 127:6
**real** [5] - 99:3, 119:17, 123:4, 198:18, 231:7
**really** [24] - 7:11, 23:3, 89:23, 92:17, 94:11, 108:1, 126:22, 145:24, 146:14, 157:11, 162:16, 165:13, 175:13, 176:11, 176:12, 176:13, 176:23, 177:6, 185:11, 185:18, 192:2, 195:18, 212:7,

215:19
**realm** [2] - 107:19, 116:5
**realtime** [1] - 9:25
**reason** [9] - 25:22, 42:11, 89:15, 101:20, 104:14, 216:20, 217:6, 219:25, 220:3
**reasoning** [1] - 110:11
**reasons** [7] - 16:24, 95:11, 105:11, 145:10, 168:7, 207:13, 207:23
**rebar** [1] - 167:17
**rebars** [1] - 167:12
**recalling** [2] - 143:10, 165:9
**recap** [1] - 17:21
**receded** [1] - 143:22
**receipt** [2] - 20:16, 191:5
**receipts** [3] - 151:9, 154:12, 155:7
**receive** [14] - 29:16, 29:20, 46:11, 46:17, 50:11, 75:10, 85:10, 121:9, 123:19, 151:8, 169:12, 171:13, 172:7, 211:20
**received** [36] - 21:3, 21:6, 21:12, 21:16, 30:12, 30:15, 30:25, 34:1, 84:5, 84:8, 85:23, 92:14, 93:6, 121:8, 121:13, 122:17, 130:25, 131:3, 141:18, 142:1, 142:20, 154:8, 154:19, 168:18, 168:20, 168:22, 168:23, 180:20, 183:25, 190:22, 192:12, 192:16, 209:7, 229:11, 233:16
**receiving** [9] - 21:8, 31:4, 85:24, 101:6, 168:17, 168:18, 168:23, 169:23, 170:18
**recess** [6] - 34:8, 34:10, 64:18, 108:20, 172:20, 234:17
**Recess** [4] - 34:12, 64:19, 108:24, 172:22
**recessed** [1] - 234:19

**recirculated** [1] - 85:22
**recitation** [1] - 97:5
**recited** [1] - 136:9
**recognition** [7] - 90:4, 90:17, 115:21, 116:11, 117:2, 120:4, 120:6
**recognize** [41] - 9:9, 19:3, 20:8, 38:16, 43:8, 59:23, 62:3, 62:10, 63:2, 65:12, 70:10, 72:3, 73:11, 78:22, 83:25, 86:4, 87:25, 88:14, 91:5, 95:1, 97:18, 99:21, 100:3, 103:22, 129:11, 130:9, 132:4, 133:6, 139:24, 140:23, 140:25, 141:8, 142:16, 162:14, 180:14, 181:16, 201:17, 206:17, 209:3, 217:19, 222:18
**recognized** [2] - 117:1, 135:18
**recognizing** [2] - 63:22, 89:5
**recollection** [3] - 21:24, 128:21, 134:15
**recommend** [1] - 44:7
**recommended** [1] - 16:11
**recommending** [2] - 41:20, 43:18
**reconciliation** [1] - 166:10
**record** [72] - 12:1, 12:7, 13:11, 13:12, 13:18, 13:23, 14:14, 14:15, 14:24, 15:3, 15:5, 15:9, 16:3, 16:8, 16:10, 18:23, 19:25, 21:8, 24:12, 26:11, 26:14, 29:8, 29:10, 32:17, 32:20, 34:25, 35:15, 37:5, 37:20, 40:12, 59:14, 64:1, 64:8, 66:5, 71:16, 74:20, 78:5, 87:10, 93:14, 93:20, 94:15, 96:12, 97:1, 97:12, 99:12, 102:13, 105:23, 106:13, 128:9, 128:17, 130:21, 131:5, 132:20,

134:6, 136:1, 138:12, 138:22, 145:2, 145:5, 145:12, 154:19, 182:15, 207:11, 208:5, 216:14, 217:11, 221:18, 229:6, 229:17, 231:4, 234:8, 235:5
**recorded** [1] - 6:19
**recordkeeping** [7] - 159:2, 163:24, 163:25, 168:13, 171:13, 202:25, 233:21
**records** [20] - 10:21, 10:25, 52:2, 154:6, 154:8, 184:24, 203:1, 203:16, 215:24, 226:18, 228:1, 229:23, 229:24, 230:1, 230:5, 230:11, 230:17, 232:6, 232:7, 233:18
**REDIRECT** [1] - 216:6
**redirect** [4] - 8:20, 12:20, 15:8, 15:11
**reduce** [1] - 212:22
**Reed** [3] - 6:4, 6:11, 18:12
**refer** [4] - 29:14, 87:25, 152:25, 164:7, 193:24
**reference** [23] - 9:3, 10:8, 28:25, 29:24, 49:10, 61:23, 78:14, 85:25, 88:6, 88:16, 88:23, 90:19, 95:4, 95:8, 98:13, 98:14, 107:3, 122:24, 127:21, 150:22, 189:2, 207:6, 221:11
**referenced** [9] - 14:7, 39:14, 44:6, 46:24, 59:16, 65:1, 90:10, 107:8, 185:13
**references** [4] - 63:19, 66:12, 69:5, 175:7
**referencing** [7] - 14:4, 57:13, 64:25, 97:23, 98:3, 122:4, 122:24
**referred** [5] - 41:9, 88:12, 88:20, 148:14, 153:20
**referring** [6] - 20:23, 27:21, 29:23, 53:24, 150:5, 150:11
**refers** [1] - 152:8
**reflect** [2] - 217:11,

233:18
**reflected** [2] - 22:10, 105:13
**reflection** [1] - 85:6
**reflective** [1] - 94:12
**reform** [1] - 96:10
**reformed** [1] - 91:16
**reforms** [2] - 95:9, 95:21
**refrain** [2] - 90:15, 136:9
**refresh** [1] - 21:24
**refreshes** [1] - 128:21
**refused** [1] - 139:7
**regard** [6] - 152:21, 161:10, 161:13, 177:8, 192:12, 208:1
**regarding** [6] - 79:6, 109:8, 156:19, 175:20, 182:23, 218:15
**region** [5] - 67:10, 67:13, 68:1, 73:24, 94:3
**regional** [2] - 57:1, 73:22
**Regional** [2] - 73:22, 73:25
**registered** [1] - 23:21
**registrant** [12] - 20:11, 23:18, 24:6, 28:6, 29:14, 39:4, 39:6, 42:9, 162:5, 164:6, 170:3, 204:21
**registrant's** [1] - 40:15
**registrants** [9] - 19:6, 19:21, 20:9, 44:24, 164:18, 211:3, 211:11, 211:13, 211:15
**Registrants** [4] - 216:19, 216:25, 217:1, 217:5
**registration** [4] - 152:9, 152:11, 153:25, 162:8
**regular** [2] - 150:1, 156:24
**regularly** [5] - 158:24, 164:25, 166:13, 172:9, 175:9
**regulated** [6] - 40:17, 44:10, 136:5, 136:10, 152:6, 182:19
**regulation** [14] - 24:3, 24:5, 39:4, 42:1, 43:16, 48:4, 48:7, 168:1, 178:1, 178:2, 179:7, 182:20,

203:20, 211:5
**Regulations** [8] - 51:13, 156:4, 162:4, 166:13, 170:4, 175:24, 188:8, 202:13
**regulations** [18] - 41:21, 41:22, 49:25, 66:8, 86:14, 89:12, 136:6, 136:9, 136:25, 156:8, 156:16, 161:25, 164:17, 166:15, 178:13, 186:2, 202:15, 211:25
**regulatory** [26] - 39:21, 40:3, 47:15, 51:12, 76:9, 115:25, 116:7, 119:11, 135:9, 146:3, 146:17, 148:12, 148:14, 148:15, 152:25, 159:5, 161:10, 166:2, 170:24, 171:1, 178:7, 188:5, 209:14, 210:6, 210:11, 212:17
**Regulatory** [6] - 60:1, 63:3, 148:7, 200:2, 200:4, 209:25
**reiterate** [1] - 23:23
**reject** [1] - 80:19
**rejected** [4] - 80:15, 109:15, 109:17, 222:5
**relate** [2] - 105:7, 119:22
**related** [7] - 70:1, 111:23, 116:2, 142:22, 144:6, 202:17, 212:10
**relates** [3] - 14:16, 66:17, 95:25
**relating** [1] - 200:12
**relation** [3] - 67:15, 114:9, 114:13
**relationship** [3] - 175:14, 176:4, 190:7
**relationships** [1] - 50:19
**relative** [1] - 67:18
**relayed** [1] - 182:23
**release** [1] - 194:25
**released** [3] - 80:9, 80:16, 82:15
**releasing** [1] - 186:13
**relevance** [4] - 95:24, 123:24, 124:1, 125:22

**relevancy** [2] - 27:17, 146:23
**relevant** [16] - 40:16, 43:22, 44:9, 89:13, 96:4, 103:4, 106:8, 110:7, 110:20, 112:3, 112:4, 112:15, 114:22, 116:22, 138:16, 143:17
**relief** [1] - 106:14
**relieve** [1] - 172:19
**rely** [1] - 176:14
**relying** [1] - 113:19
**remaining** [2] - 14:6, 154:22
**remains** [3] - 48:4, 218:3, 227:3
**remarks** [1] - 113:10
**remedy** [2] - 110:3, 110:6
**remember** [14] - 21:7, 39:15, 39:16, 52:7, 56:23, 69:14, 82:13, 128:14, 156:24, 194:14, 199:5, 201:19, 203:14, 220:23
**remembered** [1] - 18:15
**remind** [1] - 45:12
**reminded** [2] - 34:14, 208:17
**reminding** [1] - 181:7
**remove** [1] - 228:23
**removed** [1] - 26:19
**renders** [1] - 122:22
**renew** [2] - 97:2, 143:12
**repeat** [2] - 88:17, 118:14
**repeated** [2] - 137:3, 138:4
**rephrase** [1] - 41:12
**replace** [1] - 83:3
**replaced** [1] - 159:8
**reply** [1] - 111:9
**Report** [1] - 61:10
**report** [81] - 39:18, 39:20, 39:21, 44:24, 46:6, 46:8, 46:14, 46:15, 46:17, 47:8, 47:17, 48:2, 48:15, 48:21, 49:4, 52:16, 52:19, 57:1, 57:4, 58:23, 61:12, 61:16, 61:18, 61:20, 72:18, 84:10, 153:9, 153:15, 153:18, 169:11, 174:12,

174:13, 174:15, 178:3, 178:8, 178:20, 179:5, 179:14, 182:18, 185:19, 193:21, 195:2, 195:7, 195:19, 196:7, 196:16, 196:25, 197:25, 203:9, 205:4, 205:8, 205:13, 207:2, 207:7, 207:8, 207:9, 207:11, 207:17, 207:19, 207:21, 207:23, 211:3, 211:24, 212:3, 214:24, 216:19, 217:5, 218:13, 219:1, 219:4, 219:5, 219:8, 220:8, 220:10, 220:15, 221:3, 221:5, 221:7
**reported** [13] - 46:15, 52:24, 54:11, 54:12, 54:25, 71:18, 80:6, 169:12, 180:5, 186:23, 196:21, 230:22, 235:9
**REPORTER** [6] - 29:4, 42:19, 68:21, 159:10, 159:12, 167:13
**reporter** [1] - 172:20
**Reporter** [6] - 6:17, 6:18, 235:3, 235:12
**reporters** [1] - 64:17
**reporting** [27] - 24:10, 38:19, 40:1, 45:5, 45:16, 47:15, 47:18, 53:3, 61:14, 63:22, 68:23, 92:10, 153:7, 160:4, 160:5, 164:8, 169:11, 173:14, 175:19, 176:25, 179:14, 186:14, 186:19, 193:22, 194:13, 223:10
**Reporting** [2] - 62:6, 62:10
**reports** [14] - 45:22, 52:2, 54:15, 61:19, 74:20, 74:21, 100:9, 100:10, 153:14, 173:13, 179:25, 200:5, 211:7, 211:15
**Reports** [1] - 42:12
**represents** [1] - 66:19
**request** [3] - 160:20, 182:16, 215:9
**requested** [2] - 185:2,

229:14
**requests** [1] - 110:5
**required** [7] - 121:3, 121:23, 124:4, 182:19, 186:5, 189:3, 211:3
**requirement** [17] - 39:21, 41:24, 48:6, 53:3, 56:25, 61:14, 162:22, 163:23, 164:9, 167:1, 178:7, 179:7, 180:1, 194:20, 195:17, 203:20, 204:3
**requirements** [28] - 49:15, 152:12, 154:17, 159:6, 160:6, 162:9, 162:18, 163:1, 163:8, 164:4, 164:11, 166:8, 166:15, 166:21, 166:24, 168:13, 169:11, 169:17, 171:2, 171:19, 171:20, 188:5, 190:6, 190:8, 202:25, 203:16, 204:2, 204:10
**requires** [4] - 39:4, 57:4, 114:16, 119:18
**rescheduling** [1] - 176:20
**resell** [1] - 90:12
**reserve** [2] - 122:14, 122:21
**reserved** [1] - 123:6
**reserving** [1] - 107:16
**resolution** [2] - 116:2, 196:13
**resolved** [1] - 76:20
**resources** [3] - 51:20, 51:25, 210:7
**respect** [2] - 13:12, 110:4
**respectfully** [3] - 9:23, 136:2, 136:8
**respond** [7] - 101:17, 114:16, 119:18, 123:4, 165:7, 210:5, 212:13
**responded** [1] - 123:6
**respondents** [1] - 143:1
**response** [4] - 11:3, 96:12, 113:10, 144:25
**responses** [2] - 59:18, 100:9
**responsibilities** [11] -

23:24, 32:7, 74:17, 76:9, 101:4, 135:10, 148:20, 152:11, 154:2, 213:19, 213:25
**responsibility** [14] - 24:6, 48:18, 50:1, 58:13, 155:24, 156:5, 156:22, 163:6, 170:7, 170:11, 172:6, 174:10, 213:17, 218:4
**responsible** [8] - 32:13, 49:16, 63:20, 69:10, 135:12, 143:3, 156:16, 170:4
**responsive** [2] - 165:16, 182:25
**rest** [1] - 129:17
**restricted** [1] - 173:24
**result** [1] - 115:6
**resulted** [2] - 48:21, 193:12
**results** [2] - 144:7, 144:11
**resume** [2] - 37:17, 64:21
**resumed** [2] - 64:20, 172:23
**retail** [4] - 74:24, 152:15, 176:23, 200:16
**retain** [2] - 200:17
**return** [1] - 198:3
**revert** [1] - 154:22
**review** [26] - 7:8, 12:3, 18:25, 20:12, 32:18, 66:9, 68:23, 69:17, 72:17, 72:22, 73:7, 80:9, 127:23, 141:7, 168:15, 194:23, 194:24, 197:24, 198:1, 209:10, 209:13, 219:8, 222:2, 222:6, 222:10, 222:11
**Review** [2] - 65:20, 209:24
**reviewed** [11] - 20:16, 21:12, 134:16, 134:19, 219:5, 220:11, 220:14, 220:16, 220:22, 221:5, 221:6
**reviewing** [2] - 19:1, 40:20
**reviews** [1] - 74:22
**revised** [7] - 70:14, 70:15, 71:9, 71:11,

72:5, 83:5, 83:6
**revisit** [1] - 106:24
**revoke** [1] - 187:23
**revoked** [1] - 38:24
**rewritten** [1] - 87:3
**Rice** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**Richie** [1] - 150:17
**Rico** [1] - 101:8
**right-hand** [1] - 19:24
**risk** [3] - 75:9, 75:11, 136:23
**Ritchie** [5] - 180:11, 198:14, 198:25, 200:8, 211:22
**River** [1] - 98:22
**RMR** [2] - 6:17, 6:18
**road** [5] - 31:8, 116:20, 125:20, 136:10, 138:3
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**Rogue** [1] - 91:12
**role** [8] - 58:14, 84:6, 142:22, 144:18, 150:23, 155:13, 221:8, 229:17
**room** [1] - 145:3
**Ross** [1] - 133:12
**routinely** [4] - 44:24, 164:18, 216:19, 217:5
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**Ruby** [3] - 4:17, 15:16, 109:2
**RUBY** [4] - 4:17, 15:18, 15:21
**Rule** [2] - 25:11, 25:17
**rule** [5] - 25:23, 42:1, 131:12, 137:13
**ruled** [6] - 14:24, 106:18, 106:19, 109:21, 110:2, 165:3
**rules** [16] - 7:16, 8:11, 115:18, 116:19, 124:22, 125:19, 136:10, 137:11, 137:13, 137:19, 137:20, 137:23, 138:19, 177:18, 186:2, 202:24
**ruling** [7] - 13:12, 15:25, 103:11, 107:9, 112:14, 112:19
**rulings** [3] - 12:6, 12:10, 163:14
**Run** [1] - 195:15

**run** [2] - 144:20, 233:25
**running** [2] - 45:21, 197:15
**runs** [2] - 77:1, 159:15
**RVP** [1] - 73:19
**RVPs** [1] - 73:17
**Rx** [2] - 74:23, 231:15

**S**

**s\Ayme** [1] - 235:11
**s\Lisa** [1] - 235:11
**safe** [2] - 49:16, 101:20
**safely** [1] - 58:18
**SafeScript** [3] - 12:20, 12:22, 14:4
**sake** [1] - 35:17
**sakes** [1] - 208:2
**sale** [2] - 153:18, 218:15
**sales** [8] - 73:24, 76:15, 76:19, 148:16, 154:13, 155:8, 193:21, 197:1
**SALGADO** [1] - 4:15
**sample** [1] - 126:21
**San** [2] - 2:5, 2:17
**sanctioned** [1] - 138:7
**Sandy** [1] - 98:22
**sarcastically** [1] - 102:11
**sat** [2] - 36:21, 109:20
**satisfied** [2] - 197:12, 198:2
**save** [1] - 34:7
**saw** [7] - 29:21, 30:10, 30:11, 126:5, 142:20, 170:14, 174:10
**Saw** [1] - 86:18
**SC** [3] - 3:15, 4:4, 4:9
**scan** [1] - 52:5
**Schedule** [8] - 153:19, 159:4, 159:17, 159:19, 168:16, 169:13, 176:21, 203:5
**schedule** [1] - 159:19
**schedules** [1] - 153:19
**scheme** [2] - 115:25, 119:11
**SCHMIDT** [2] - 5:9, 15:5
**Schmidt** [2] - 15:1, 15:4
**scientific** [1] - 45:2
**scope** [7] - 12:23,

15:8, 173:22, 218:20, 219:13, 223:3, 223:4
**scrambling** [1] - 123:4
**screen** [10] - 38:10, 63:11, 73:7, 104:3, 128:20, 128:25, 142:15, 142:17, 216:22, 216:24
**scroll** [1] - 98:9
**Scroll** [1] - 93:11
**searches** [1] - 194:9
**seat** [1] - 228:10
**second** [31] - 8:16, 9:15, 18:17, 24:2, 25:9, 38:15, 46:8, 46:23, 52:16, 57:7, 74:7, 75:15, 75:18, 76:6, 80:1, 80:2, 80:22, 132:18, 135:7, 144:13, 168:20, 182:21, 183:2, 184:6, 199:1, 204:24, 205:2, 205:10, 210:9, 217:25, 222:3
**Second** [1] - 67:5
**seconds** [3] - 17:20, 105:1, 213:7
**Section** [3] - 162:12, 166:15, 200:2
**section** [17] - 81:10, 162:13, 162:14, 162:23, 163:24, 164:1, 164:5, 166:18, 170:6, 199:2, 199:19, 202:23, 210:9, 210:24, 211:16, 211:22, 211:23
**sections** [2] - 162:25, 164:8
**secure** [1] - 101:20
**securely** [1] - 58:18
**securing** [1] - 172:4
**securities** [1] - 170:8
**security** [17] - 148:12, 148:13, 148:15, 163:1, 163:6, 163:24, 164:4, 166:14, 166:23, 168:5, 168:6, 171:13, 171:18, 202:17, 203:8, 204:12, 213:15
**Security** [5] - 60:1, 63:3, 148:7, 148:15, 200:3
**see** [83] - 9:7, 21:23, 29:11, 30:2, 34:2,

38:24, 39:22, 40:10, 43:6, 44:2, 44:10, 46:5, 50:4, 52:9, 52:10, 52:11, 52:15, 54:3, 54:16, 54:19, 60:20, 61:3, 63:13, 67:10, 74:5, 77:13, 80:23, 81:4, 81:10, 85:22, 86:19, 87:22, 87:23, 92:9, 92:11, 92:24, 92:25, 93:1, 95:8, 95:17, 96:2, 98:15, 101:25, 104:9, 107:17, 121:12, 122:5, 128:20, 130:16, 130:19, 132:11, 133:23, 138:17, 138:18, 141:24, 142:8, 142:13, 147:6, 154:12, 158:7, 159:16, 161:6, 162:19, 164:5, 177:15, 180:18, 183:16, 184:4, 184:11, 191:22, 194:10, 203:11, 216:10, 221:22, 223:15, 223:18, 223:22, 224:6, 224:12, 224:20, 226:21
**seeing** [7] - 21:15, 85:14, 95:16, 142:19, 174:24, 174:25, 189:17
**seek** [6] - 115:25, 116:7, 119:10, 175:25, 206:10
**seeking** [2] - 113:21, 207:25
**seeks** [1] - 110:10
**seem** [2] - 118:10, 143:10
**sees** [3] - 49:20, 118:15, 159:15
**segment** [4] - 40:17, 43:22, 44:9, 152:8
**selected** [4] - 14:11, 14:12, 233:10, 233:15
**self** [2] - 167:25, 171:23
**self-assessments** [1] - 171:23
**self-closing** [1] - 167:25
**sell** [5] - 68:2, 151:13, 204:13, 204:14
**selling** [1] - 67:9

**Senate** [1] - 138:1
**send** [14] - 42:7, 42:8, 61:12, 61:21, 73:16, 78:25, 101:11, 154:18, 158:19, 159:23, 184:20, 193:21, 195:18, 196:25
**sending** [4] - 42:12, 45:20, 61:16, 133:20
**SENIOR** [1] - 1:17
**Senior** [8] - 7:2, 74:13, 84:6, 131:1, 132:12, 148:6, 162:1, 221:8
**Sensabaugh** [1] - 5:14
**sense** [6] - 41:9, 67:14, 75:5, 75:8, 166:25, 227:13
**sent** [24] - 7:9, 20:8, 20:10, 20:13, 23:20, 28:6, 46:9, 73:17, 74:3, 74:12, 74:15, 80:3, 80:17, 85:18, 85:21, 91:22, 96:18, 98:1, 98:2, 101:13, 133:14, 184:23, 211:5, 211:7
**sentence** [35] - 24:3, 39:3, 39:18, 39:22, 40:9, 42:21, 44:12, 44:14, 44:23, 60:21, 71:16, 72:14, 75:25, 76:13, 76:23, 80:2, 80:3, 80:12, 80:13, 88:8, 135:15, 136:7, 140:14, 182:12, 182:13, 182:14, 182:21, 183:2, 199:17, 200:1, 200:11, 202:9, 210:15, 210:20, 217:25
**sentences** [1] - 216:11
**separate** [6] - 26:10, 53:4, 124:20, 151:8, 219:23
**separately** [1] - 26:23
**September** [5] - 26:11, 29:25, 30:9, 104:1, 218:14
**sequencing** [1] - 195:16
**series** [2] - 29:8, 140:1
**serious** [2] - 214:2, 214:19
**seriously** [4] - 85:16, 213:17, 213:19, 214:1
**serve** [3] - 121:18, 121:22, 125:4

**served** [8] - 7:7, 10:24, 68:17, 71:2, 71:4, 71:6, 107:11, 122:13
**serves** [1] - 122:16
**Services** [1] - 60:1
**servicing** [1] - 192:20
**sessions** [2] - 188:7, 188:16
**set** [18] - 61:2, 102:16, 117:23, 123:11, 151:12, 152:10, 152:16, 159:5, 160:14, 160:18, 166:5, 176:6, 182:4, 182:8, 185:14, 185:17, 200:19, 222:8
**set-up** [1] - 200:19
**setting** [2] - 161:18, 212:5
**settled** [1] - 55:12
**settlement** [6] - 18:9, 71:13, 79:16, 91:19, 137:3
**Settlement** [3] - 18:13, 42:13, 138:8
**setup** [1] - 151:11
**seven** [1] - 231:4
**sever** [1] - 26:10
**several** [7] - 12:4, 22:10, 45:13, 88:12, 95:2, 116:24, 140:6
**SHANNON** [1] - 6:3
**share** [3] - 86:16, 150:3, 150:13
**Share** [1] - 86:18
**shared** [2] - 174:25
**sheet** [1] - 107:13
**shelf** [7] - 50:11, 154:22, 155:8, 168:6, 168:8, 168:20, 168:23
**ship** [24] - 58:23, 59:1, 151:6, 151:21, 171:14, 186:5, 186:22, 186:24, 187:2, 187:3, 187:20, 191:1, 195:4, 195:19, 195:22, 195:25, 196:2, 196:20, 205:4, 205:13, 214:24, 215:1, 215:4
**shipment** [2] - 195:17, 205:9
**shipped** [9] - 71:18, 154:9, 186:24, 194:24, 195:2, 195:6, 196:14, 215:5
**shipping** [12] - 45:6,

45:17, 49:6, 49:10, 49:11, 102:7, 169:7, 170:19, 186:20, 187:24, 194:20, 195:9

**shock** [2] - 191:21, 192:10

**shoot** [1] - 228:15

**shop** [1] - 49:10

**shopped** [1] - 102:7

**shortages** [1] - 160:24

**shortly** [2] - 16:1, 91:16

**Shortly** [2] - 91:19, 91:22

**show** [37] - 14:17, 15:7, 16:8, 32:16, 65:3, 66:23, 70:5, 71:22, 78:9, 86:25, 97:3, 100:22, 101:16, 110:20, 111:25, 118:2, 118:5, 118:10, 120:6, 127:15, 128:20, 131:16, 131:17, 136:16, 137:6, 139:3, 143:21, 144:19, 146:25, 147:3, 150:17, 155:9, 187:6, 190:22, 191:10, 191:12, 210:3

**showed** [1] - 12:19

**showing** [9] - 31:14, 66:22, 67:11, 94:18, 97:8, 105:25, 112:16, 115:20, 118:3

**shown** [8] - 14:25, 16:18, 24:19, 34:3, 97:12, 116:11, 128:8, 185:1

**shows** [11] - 67:25, 115:21, 116:14, 116:23, 117:2, 117:4, 120:4, 120:7, 143:13, 147:4

**shut** [3] - 192:7, 192:20

**sic** [3] - 32:10, 40:14, 109:1

**sic)** [1] - 44:18

**side** [11] - 10:3, 15:24, 98:22, 121:11, 125:23, 148:16, 148:17, 201:4, 204:12, 227:4

**side-by-side** [1] - 201:4

**sides** [2] - 12:11, 214:13

**sign** [3] - 75:1, 167:21, 170:5

**signed** [3] - 82:15, 198:4, 203:18

**significance** [1] - 136:15

**significant** [8] - 203:10, 204:8, 204:9, 204:11, 204:13, 204:17, 204:19, 204:21

**significantly** [1] - 211:1

**signs** [1] - 170:6

**similar** [2] - 141:17, 165:5

**similarly** [1] - 109:17

**simple** [3] - 10:4, 122:9, 144:25

**simply** [7] - 40:1, 52:4, 122:20, 126:7, 126:13, 207:19, 220:8

**SINGER** [1] - 4:5

**single** [7] - 52:14, 151:22, 153:18, 155:11, 170:20, 172:12, 172:16

**sinister** [2] - 146:8, 146:18

**sit** [2] - 101:16, 101:25

**site** [1] - 200:22

**sits** [1] - 58:14

**sitting** [1] - 98:19

**situation** [4] - 85:4, 157:2, 157:9, 187:15

**six** [10] - 55:14, 55:15, 56:6, 56:22, 57:13, 167:18, 174:19, 174:21, 226:25, 227:1

**size** [8] - 51:18, 77:7, 126:21, 194:8, 224:2, 225:5, 225:22, 232:9

**Skinner** [1] - 15:22

**slide** [9] - 142:7, 142:10, 147:4, 202:11, 204:23, 204:24, 205:2, 208:19

**Slide** [1] - 142:10

**slightly** [1] - 145:24

**slipped** [1] - 126:20

**slow** [3] - 113:11, 210:5, 212:13

**Slow** [1] - 167:13

**small** [9] - 54:8, 83:14,

223:19, 223:21, 224:1, 224:21, 225:1, 225:13, 225:17

**smaller** [1] - 54:12

**smarter** [3] - 184:7, 184:8, 208:17

**smiley** [1] - 85:22

**Smith** [3] - 6:4, 6:11, 18:12

**social** [1] - 85:14

**society** [1] - 135:12

**sold** [3] - 68:1, 94:3, 185:18

**sole** [2] - 24:5, 218:3

**solution** [1] - 28:25

**solve** [2] - 8:6, 8:8

**solved** [1] - 102:9

**someone** [3] - 30:3, 207:18, 230:14

**sometime** [1] - 190:19

**sometimes** [7] - 51:1, 87:25, 153:2, 164:19, 164:20, 166:8, 166:9

**somewhat** [1] - 123:2

**somewhere** [1] - 56:21

**SOMS** [1] - 53:1

**song** [3] - 87:1, 87:3, 98:6

**soon** [2] - 172:7, 212:7

**Sorry** [3] - 71:6, 198:16, 216:24

**sorry** [50] - 18:7, 19:11, 19:12, 19:16, 25:15, 26:7, 29:4, 29:5, 30:7, 31:12, 36:1, 42:19, 43:3, 44:13, 45:25, 51:7, 52:8, 53:9, 53:16, 56:12, 56:16, 63:6, 64:5, 64:7, 65:7, 67:12, 68:4, 68:21, 70:2, 80:5, 80:8, 84:19, 96:20, 118:18, 118:19, 122:12, 127:22, 160:18, 167:13, 167:15, 187:25, 204:13, 209:18, 216:17, 216:18, 225:10, 228:18, 232:21, 232:22

**SORS** [5] - 210:25, 211:8, 211:14, 211:18, 211:20

**sort** [2] - 89:22, 126:12

**sorting** [1] - 78:4

**soundbite** [1] - 108:7

**sounds** [1] - 225:11

**source** [2] - 89:6, 154:16

**South** [1] - 2:13

**Southern** [1] - 7:2

**SOUTHERN** [1] - 1:1

**span** [1] - 101:9

**SPEAKER** [1] - 30:5

**speakers** [1] - 199:16

**specialists** [1] - 170:17

**specific** [21] - 9:21, 13:3, 24:10, 38:19, 41:21, 108:11, 126:25, 142:24, 152:12, 152:16, 154:1, 158:21, 162:17, 162:24, 163:8, 163:22, 178:22, 188:12, 192:13, 203:16, 204:2

**specifically** [12] - 12:1, 20:14, 22:21, 112:1, 116:21, 128:13, 175:17, 212:1, 220:18, 220:23, 223:8, 223:9

**speech** [4] - 110:16, 145:1, 145:14, 145:18

**speeches** [1] - 145:4

**speechifying** [1] - 126:22

**speed** [1] - 18:13

**spelled** [1] - 228:6

**spend** [1] - 105:1

**spending** [1] - 124:14

**spent** [2] - 116:24, 213:13

**spirit** [1] - 7:15

**sponsored** [1] - 199:9

**sponsoring** [3] - 36:9, 36:14, 36:22

**spot** [1] - 197:22

**spread** [1] - 231:4

**spreadsheets** [4] - 231:2, 231:5, 232:10, 233:6

**Square** [2] - 6:5, 6:12

**squarely** [2] - 25:11, 28:7

**Stacie** [1] - 100:6

**stack** [1] - 180:4

**staff** [5] - 46:4, 81:21, 105:10, 170:16, 211:19

**staffers** [1] - 207:17

**stage** [1] - 67:2

**stamp** [5] - 26:16, 26:24, 29:9, 38:13, 142:5

**stamped** [5] - 19:17, 19:25, 63:8, 135:4, 183:23

**stand** [10] - 8:22, 17:11, 37:4, 37:18, 64:22, 101:24, 115:1, 116:18, 133:18, 213:12

**standard** [2] - 48:24, 76:1

**standardized** [2] - 171:12, 171:15

**standing** [1] - 9:11

**stands** [1] - 45:12

**STANNER** [1] - 5:10

**start** [6] - 30:8, 95:16, 114:6, 124:7, 193:12, 222:9

**started** [10] - 7:10, 121:19, 148:23, 173:10, 176:20, 178:19, 179:18, 179:22, 187:20, 191:10

**starting** [9] - 19:25, 44:15, 48:23, 74:19, 89:19, 135:22, 168:12, 173:7, 216:15

**Starting** [1] - 93:13

**starts** [5] - 44:22, 74:5, 84:3, 100:6, 135:8

**state** [14] - 14:10, 66:7, 85:19, 86:14, 94:18, 109:24, 138:3, 144:2, 146:24, 146:25, 152:25, 153:3, 228:4, 229:6

**State** [5] - 14:13, 99:1, 99:8, 152:24, 153:2

**statement** [3] - 75:5, 135:13, 135:20

**statements** [1] - 112:2

**States** [9] - 7:2, 23:21, 150:21, 150:23, 183:24, 210:13, 210:17, 212:9, 212:19

**states** [8] - 38:21, 38:22, 40:4, 45:8, 85:9, 224:19, 224:25, 225:25

**STATES** [2] - 1:1, 1:17

**Status** [1] - 7:2

**STATUS** [1] - 1:17
**statute** [1] - 138:6
**statutory** [1] - 135:9
**stay** [4] - 9:8, 17:4, 168:7, 215:18
**stenography** [1] - 6:19
**step** [4] - 52:10, 81:21, 108:21, 174:7
**steroids** [1] - 176:21
**Steve** [13] - 100:14, 100:16, 102:6, 104:25, 106:25, 129:24, 130:1, 130:6, 131:6, 133:12, 188:20, 189:1, 189:9
**STEVEN** [1] - 4:17
**stick** [2] - 8:25, 103:12
**sticking** [1] - 138:5
**sticks** [1] - 8:5
**still** [19] - 17:12, 27:5, 27:8, 27:9, 27:10, 32:3, 43:4, 45:5, 45:16, 48:4, 57:4, 105:3, 179:13, 179:14, 179:16, 190:15, 192:17, 198:21, 227:3
**stipulate** [1] - 104:17
**stipulated** [3] - 34:7, 104:13, 107:22
**stipulation** [33] - 10:23, 11:20, 22:20, 22:24, 23:3, 23:5, 23:8, 23:9, 34:15, 34:18, 35:6, 35:12, 36:16, 36:19, 37:10, 59:17, 104:16, 104:17, 104:22, 104:23, 107:22, 120:22, 120:23, 121:16, 121:25, 122:3, 122:22, 122:25, 123:12, 124:23, 124:25, 184:12
**stipulations** [1] - 125:12
**stockpiling** [1] - 99:2
**stolen** [2] - 155:10, 176:22
**stood** [1] - 123:24
**stop** [16] - 47:14, 47:19, 49:2, 49:6, 49:11, 49:17, 49:22, 58:9, 58:10, 61:15, 178:7, 178:12, 183:3, 187:24, 195:9, 212:7
**Stop** [1] - 76:6

**stopped** [1] - 192:20
**stopping** [1] - 58:13
**storage** [2] - 167:3, 172:12
**stores** [1] - 176:23
**story** [1] - 89:15
**straight** [1] - 149:3
**strategies** [4] - 114:4, 146:3, 146:4
**strategy** [5] - 144:6, 146:5, 146:16, 146:17, 212:16
**Strategy** [4] - 139:16, 140:15, 140:18, 142:2
**streak** [1] - 15:18
**streamline** [1] - 181:12
**Street** [15] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15, 4:18, 5:5, 5:12, 6:6, 6:13
**stress** [2] - 106:7, 106:14
**stressed** [1] - 200:14
**striking** [1] - 113:13
**string** [3] - 84:1, 100:6, 129:14
**strongly** [4] - 138:11, 145:8, 145:13
**structure** [5] - 73:20, 73:21, 73:22, 116:8, 167:20
**structured** [1] - 51:5
**stubbornly** [2] - 138:5, 139:7
**stubbornness** [1] - 139:4
**stuff** [3] - 103:3, 145:15, 181:5
**subject** [11] - 37:25, 78:16, 81:19, 91:11, 97:21, 112:12, 113:12, 117:16, 129:15, 131:22, 165:17
**Subject** [1] - 183:15
**submit** [6] - 46:14, 114:5, 115:6, 123:9, 160:15, 232:11
**submits** [1] - 136:8
**submitted** [5] - 127:16, 131:20, 134:17, 192:6, 200:5
**submitting** [1] - 52:19
**subordinates** [1] - 74:16
**subpoena** [5] - 10:19, 10:20, 10:25,

104:15, 229:11
**subpoenaed** [1] - 11:1
**subsequent** [2] - 80:14, 222:4
**subsidiary** [1] - 124:21
**Substance** [1] - 153:3
**substance** [7] - 23:24, 44:16, 49:13, 153:16, 167:2, 170:20, 203:21
**substance/listed** [2] - 205:3, 205:12
**Substances** [5] - 117:8, 118:22, 162:2, 162:6, 162:10
**substances** [33] - 23:23, 50:13, 50:21, 56:2, 59:10, 63:13, 66:11, 72:19, 72:20, 74:23, 74:25, 75:2, 75:3, 75:10, 76:3, 76:16, 102:8, 149:11, 149:24, 150:9, 152:10, 152:21, 153:16, 153:18, 160:14, 169:22, 182:19, 193:21, 197:1, 203:6, 210:8, 211:12, 212:23
**substantial** [1] - 210:22
**substantiate** [2] - 21:6, 21:16
**substantive** [5] - 11:5, 113:10, 113:21, 118:13, 131:10
**subtract** [3] - 154:13, 154:20, 155:8
**suffice** [1] - 124:9
**sufficient** [1] - 27:19
**suggesting** [4] - 137:25, 138:23, 139:1, 139:3
**suggestion** [4] - 43:21, 64:17, 119:6, 119:14
**suggestions** [1] - 38:23
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12
**summaries** [1] - 13:4
**summarizes** [1] - 100:9
**summarizing** [2] - 95:21, 104:5
**summary** [4] - 14:9, 16:22, 45:21, 95:20

**sums** [1] - 164:14
**sung** [1] - 86:21
**supervised** [1] - 188:16
**supplemental** [1] - 59:18
**supplied** [2] - 33:11, 191:1
**suppliers** [1] - 151:25
**supply** [17] - 49:17, 58:14, 101:20, 149:2, 149:9, 150:18, 150:21, 150:23, 152:5, 152:8, 153:20, 154:4, 160:25, 161:17, 177:5, 186:25, 231:21
**supplying** [2] - 75:9, 75:11
**support** [3] - 85:16, 130:23, 138:12
**supporting** [1] - 147:13
**suppose** [1] - 106:8
**supposed** [2] - 42:22, 208:5
**supposedly** [1] - 66:23
**surprise** [4] - 8:23, 9:5, 32:21, 191:20
**surprised** [1] - 121:12
**suspension** [7] - 18:4, 18:7, 42:14, 71:11, 190:23, 192:13, 192:17
**Suspension** [8] - 68:16, 71:2, 71:7, 71:12, 191:5, 191:9, 191:11, 192:9
**suspicion** [3] - 48:19, 49:18, 76:20
**suspicious** [101] - 23:25, 24:10, 38:19, 39:5, 39:21, 40:1, 40:13, 40:20, 41:6, 41:14, 42:6, 43:19, 44:2, 44:24, 45:16, 45:21, 46:1, 46:5, 46:6, 46:25, 47:1, 47:4, 47:19, 47:22, 48:2, 48:12, 51:9, 51:11, 51:15, 54:10, 54:24, 56:1, 57:4, 58:7, 59:2, 60:22, 63:12, 63:22, 66:10, 68:20, 68:22, 69:22, 70:1, 71:17, 71:20, 76:19, 82:1, 84:10, 164:3, 164:4, 164:8,

166:12, 170:25, 173:13, 174:10, 175:18, 176:25, 178:8, 180:4, 182:18, 183:16, 185:19, 186:5, 186:19, 186:22, 186:24, 187:10, 187:16, 187:21, 193:22, 194:25, 195:1, 195:4, 195:7, 195:9, 195:22, 195:25, 196:3, 196:7, 196:11, 196:16, 196:21, 197:2, 199:20, 199:23, 200:5, 200:12, 203:9, 204:5, 204:11, 205:8, 211:1, 211:4, 211:14, 212:2, 212:3, 214:24, 216:19, 217:5, 218:2, 223:10
**Suspicious** [7] - 32:8, 33:9, 42:12, 45:10, 59:15, 62:6, 62:10
**sustain** [13] - 22:19, 23:13, 24:20, 92:5, 103:13, 104:20, 105:20, 106:12, 108:15, 138:15, 156:13, 175:5, 220:5
**sustained** [7] - 12:24, 16:9, 16:13, 24:15, 53:21, 83:21, 139:11
**sustaining** [2] - 105:22, 157:6
**SUZANNE** [1] - 4:15
**switch** [1] - 64:16
**SWORN** [1] - 228:9
**system** [31] - 24:7, 24:10, 38:19, 45:23, 52:8, 55:19, 58:16, 58:17, 59:9, 76:18, 82:1, 155:3, 155:23, 158:17, 162:6, 167:23, 175:22, 182:17, 182:23, 183:5, 183:16, 194:16, 196:11, 197:18, 218:2, 218:3, 233:21, 233:24, 233:25, 234:3
**System** [7] - 32:8, 33:9, 45:11, 152:9, 153:21, 153:24, 154:25
**systems** [4] - 38:24,

59:7, 166:11, 172:11

## T

**tailor** [1] - 185:13
**talks** [1] - 170:7
**tangent** [1] - 114:15
**Task** [8] - 139:16, 140:15, 140:18, 142:2, 142:22, 144:5, 144:14, 148:21
**tasteless** [1] - 106:8
**team** [5] - 101:18, 133:9, 184:21, 188:18
**Team** [1] - 171:22
**technical** [1] - 9:5
**technically** [1] - 157:7
**technology** [3] - 159:9, 185:8, 185:9
**teed** [1] - 28:7
**TEMITOPE** [1] - 4:8
**temporal** [1] - 173:22
**temporary** [1] - 28:25
**ten** [14] - 32:16, 33:17, 51:2, 55:18, 55:23, 56:24, 57:21, 58:1, 59:8, 59:20, 167:4, 167:8, 172:20
**ten-gauge** [1] - 167:4
**tendered** [1] - 27:2
**Tenth** [1] - 5:12
**term** [7] - 29:15, 88:11, 90:10, 90:25, 96:19, 177:3
**terminology** [1] - 43:1
**terms** [5] - 15:8, 90:20, 95:16, 110:20, 159:2
**test** [2] - 167:21, 179:23
**tested** [3] - 179:12, 179:24, 186:12
**testified** [7] - 28:1, 105:9, 183:25, 196:23, 214:23, 214:25, 223:9
**testify** [4] - 7:10, 10:25, 189:11, 214:6
**testifying** [6] - 7:10, 89:24, 120:1, 143:11, 161:9, 175:2
**testimony** [31] - 7:22, 10:19, 11:4, 25:7, 25:9, 27:20, 28:5, 30:3, 30:19, 30:20, 30:22, 31:1, 31:2, 36:14, 36:15, 36:24, 39:15, 67:19, 69:13,

109:13, 113:12, 116:17, 120:2, 126:6, 163:13, 165:3, 165:4, 165:5, 171:3, 221:3, 221:4
**testing** [2] - 179:17, 182:22
**THE** [373] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:17, 7:20, 8:5, 8:10, 8:24, 9:10, 9:19, 10:1, 10:9, 10:13, 10:17, 10:22, 11:8, 11:16, 11:19, 11:24, 12:8, 13:2, 13:7, 13:14, 13:18, 13:20, 13:23, 14:2, 14:20, 15:2, 15:16, 15:20, 16:2, 16:4, 16:14, 16:20, 17:3, 17:7, 17:9, 17:10, 17:11, 17:13, 17:15, 17:17, 18:21, 21:20, 22:7, 22:18, 22:22, 23:4, 23:12, 24:15, 24:19, 24:25, 25:4, 25:14, 25:17, 26:1, 26:3, 26:15, 26:18, 26:21, 27:5, 27:9, 27:12, 27:15, 27:18, 27:22, 28:9, 28:18, 28:22, 31:5, 31:14, 31:17, 33:6, 33:10, 33:14, 33:19, 33:21, 33:23, 34:4, 34:10, 35:3, 35:8, 35:13, 35:22, 35:24, 36:1, 36:5, 37:7, 37:16, 37:21, 37:25, 38:11, 39:11, 40:25, 41:2, 42:22, 43:5, 43:11, 53:20, 53:22, 57:9, 57:14, 57:18, 59:13, 60:12, 60:15, 60:17, 62:1, 62:16, 62:20, 62:25, 64:4, 64:6, 64:9, 64:13, 64:16, 64:21, 65:10, 65:25, 67:3, 67:17, 68:5, 68:22, 69:16, 70:8, 70:22, 70:24, 71:25, 72:1, 72:8, 72:11, 73:3, 73:4, 77:21, 77:25, 78:12, 79:13, 82:25, 83:9, 83:12, 83:21, 83:23, 84:16, 84:21, 84:23, 87:11, 87:15, 89:25, 90:2, 91:3, 92:5, 94:1, 94:4, 94:17, 94:24, 96:1, 96:4, 97:3, 97:7, 97:11,

97:15, 97:16, 99:13, 99:16, 99:18, 99:25, 100:1, 103:3, 103:13, 103:19, 103:20, 104:11, 104:20, 105:5, 105:7, 105:15, 105:20, 105:24, 106:4, 106:11, 106:18, 107:5, 107:6, 107:24, 108:9, 108:15, 108:19, 108:23, 108:25, 109:4, 110:14, 111:5, 111:10, 112:22, 113:3, 113:5, 113:11, 114:23, 116:21, 117:10, 117:19, 117:22, 118:16, 118:19, 119:22, 120:9, 120:13, 120:17, 121:25, 122:6, 123:13, 123:21, 124:1, 124:23, 125:9, 125:12, 125:15, 126:1, 126:16, 126:24, 127:3, 127:6, 127:8, 127:11, 128:8, 129:1, 129:4, 129:8, 129:9, 131:6, 131:8, 131:14, 131:18, 131:22, 132:2, 132:24, 134:13, 136:14, 136:18, 136:24, 137:10, 137:16, 137:22, 138:15, 139:6, 139:11, 139:21, 139:22, 141:4, 141:5, 142:18, 142:19, 143:7, 143:16, 145:17, 145:22, 146:21, 146:25, 147:5, 147:10, 147:16, 147:19, 147:21, 156:13, 157:2, 157:12, 158:12, 159:11, 159:13, 160:17, 160:18, 161:12, 163:12, 163:18, 165:20, 167:15, 172:19, 172:24, 173:21, 174:1, 174:4, 175:5, 177:22, 177:23, 180:25, 181:5, 181:25, 182:9,

183:21, 183:25, 184:4, 184:8, 184:16, 186:11, 186:12, 186:16, 201:24, 202:2, 202:4, 206:8, 206:12, 206:14, 208:8, 208:12, 208:20, 208:23, 213:3, 213:5, 214:22, 215:2, 215:5, 215:6, 215:7, 215:8, 215:9, 215:20, 215:23, 215:25, 216:1, 216:5, 217:2, 217:16, 217:17, 218:9, 218:11, 218:21, 219:10, 219:16, 219:19, 220:5, 220:12, 220:22, 220:25, 221:1, 221:19, 222:16, 223:6, 223:12, 224:7, 224:14, 226:9, 226:12, 226:15, 226:23, 227:6, 227:10, 227:19, 227:23, 228:2, 228:4, 228:5, 228:7, 228:10, 228:11, 228:18, 228:20, 228:21, 229:3, 230:20, 230:23, 230:24, 232:12, 232:16, 232:18, 232:21, 234:7, 234:12, 234:14, 234:16, 234:17
**theft** [3] - 155:10, 169:6, 172:14
**themselves** [4] - 54:22, 176:3, 185:11, 194:15
**therapeutic** [1] - 232:2
**thereafter** [2] - 18:10, 71:8
**thereby** [1] - 211:1
**therefore** [2] - 102:23, 118:11
**therein** [1] - 22:5
**they've** [3] - 48:8, 52:10, 215:11
**thicker** [1] - 69:2
**thinking** [1] - 113:11
**third** [10] - 9:15, 21:7, 21:8, 39:2, 43:24, 44:22, 46:13, 153:2, 179:20, 231:25

**Thomas** [5] - 2:12, 27:1, 56:14, 165:5, 182:5
**thoroughly** [1] - 63:21
**thousands** [3] - 48:1, 92:24, 100:24
**Three** [3] - 6:5, 103:10, 150:4
**three** [42] - 6:12, 21:4, 21:5, 21:9, 21:14, 21:17, 38:7, 46:3, 46:22, 50:24, 52:24, 55:1, 55:12, 55:22, 56:4, 57:20, 58:2, 58:24, 60:23, 61:2, 61:6, 67:17, 67:19, 67:22, 109:11, 112:19, 116:19, 124:9, 124:10, 124:14, 124:16, 131:22, 136:21, 159:22, 178:25, 192:19, 203:15, 216:11, 223:18, 232:20, 233:4
**three-part** [1] - 159:22
**three-times** [2] - 60:23, 61:6
**threshold** [10] - 80:15, 80:19, 185:17, 222:2, 222:8, 223:10, 223:21, 224:21, 224:22, 224:23
**thresholds** [5] - 185:14, 223:11, 223:16, 224:3, 225:3
**throughout** [8] - 14:13, 40:16, 41:17, 43:22, 44:9, 47:23, 158:16, 168:6
**throw** [1] - 216:9
**thumb** [2] - 232:10, 234:10
**Thursday** [1] - 140:13
**ticking** [1] - 120:16
**ticks** [1] - 202:14
**Tide** [1] - 144:15
**tide** [2] - 144:16, 144:17
**ties** [2] - 114:11, 114:13
**timing** [1] - 152:2
**TIMOTHY** [1] - 5:9
**tiny** [1] - 157:10
**tirelessly** [1] - 101:19
**title** [3] - 79:2, 86:18, 142:6
**today** [14] - 8:21, 8:25, 9:7, 22:11, 32:3,

48:5, 48:10, 59:19, 101:24, 109:3, 124:20, 144:10, 198:21, 213:12
**today's** [1] - 111:2
**together** [10] - 34:9, 54:6, 115:18, 117:3, 178:20, 191:23, 192:2, 194:14, 199:23, 225:17
**Tom** [5] - 27:21, 27:24, 28:2, 28:14, 140:7
**Tomkiewicz** [2] - 84:3, 222:20
**tomorrow** [3] - 215:13, 227:16, 234:17
**took** [6] - 30:3, 36:25, 49:3, 64:24, 64:25, 139:2
**tool** [4] - 41:23, 154:3, 185:18, 185:20
**top** [16] - 7:8, 60:25, 75:15, 85:17, 129:23, 129:24, 130:18, 133:24, 135:23, 141:9, 172:1, 193:22, 202:10, 209:17, 209:19, 221:22
**topics** [1] - 87:19
**torn** [1] - 108:1
**torturing** [1] - 214:16
**total** [2] - 67:25, 154:20
**totally** [3] - 8:13, 145:13, 165:18
**tough** [1] - 49:24
**toward** [1] - 18:24
**towards** [1] - 106:1
**Tower** [2] - 3:4, 4:18
**track** [3] - 15:9, 155:1, 169:1
**Track** [3] - 14:11, 112:16, 112:18
**Trade** [3] - 116:5, 146:2, 146:12
**trade** [5] - 102:21, 103:9, 143:23, 175:2, 175:7
**trail** [1] - 117:12
**train** [3] - 187:25, 188:1, 188:6
**trained** [3] - 47:3, 47:9, 188:6
**training** [11] - 46:4, 69:11, 170:23, 170:24, 171:1, 174:8, 188:2, 188:7, 188:12, 188:13,

188:16
**transaction** [2] - 46:8, 230:15
**transactions** [4] - 39:19, 52:20, 151:20, 153:16
**transcript** [5] - 6:19, 12:3, 21:24, 26:9, 235:4
**transition** [1] - 161:25
**transmit** [1] - 159:14
**transmitted** [1] - 169:13
**transportation** [1] - 170:7
**treasure** [1] - 99:3
**treat** [1] - 25:12
**trends** [3] - 52:6, 174:24
**Tri** [1] - 99:1
**Tri-State** [1] - 99:1
**TRIAL** [1] - 1:16
**trial** [19] - 8:13, 36:18, 56:19, 82:14, 103:10, 112:13, 112:17, 115:11, 117:20, 117:22, 119:21, 121:5, 121:24, 227:1, 227:4, 227:11, 229:12, 229:15
**Trial** [1] - 234:19
**triangle** [1] - 81:10
**tricky** [1] - 204:12
**tried** [6] - 49:3, 115:18, 117:1, 117:3, 118:6, 165:4
**tries** [1] - 108:3
**trigger** [3] - 49:5, 54:21, 178:25
**triggered** [1] - 196:11
**triggering** [7] - 225:2, 225:3, 225:6, 225:9, 225:19, 225:23, 226:4
**truck** [1] - 207:16
**trucks** [1] - 170:2
**true** [2] - 10:23, 232:6
**trust** [3] - 176:12, 176:14, 217:9
**trustworthy** [1] - 207:24
**truth** [6] - 22:17, 24:17, 93:25, 94:6, 94:20, 138:13
**try** [12] - 48:24, 49:25, 120:19, 129:3, 143:24, 146:18, 157:9, 157:11, 169:1, 179:10,

181:12, 216:9
**trying** [34] - 7:21, 9:4, 9:5, 12:25, 13:23, 15:9, 35:16, 43:4, 80:12, 93:4, 94:6, 106:14, 106:15, 136:25, 137:10, 137:12, 137:18, 138:1, 138:18, 139:10, 144:2, 144:21, 145:19, 145:25, 146:11, 146:14, 146:17, 146:19, 177:21, 184:3, 186:1, 208:11, 220:8
**tune** [3] - 82:20, 86:21, 87:21
**turn** [9] - 63:6, 72:13, 130:16, 135:22, 198:25, 202:6, 204:23, 210:2, 210:23
**turned** [1] - 87:4
**Turning** [1] - 144:15
**turning** [3] - 115:17, 144:16, 144:17
**TV** [1] - 86:25
**Twelfth** [3] - 4:13, 4:15, 5:5
**twice** [1] - 109:15
**Twitty** [1] - 140:8
**two** [51] - 10:15, 15:13, 15:16, 21:7, 21:17, 25:2, 26:11, 33:5, 40:24, 42:11, 47:20, 49:3, 49:7, 53:8, 54:2, 54:20, 55:11, 82:17, 83:15, 106:25, 111:15, 121:7, 122:17, 125:2, 139:13, 141:25, 144:4, 144:13, 159:1, 164:22, 166:19, 166:20, 167:5, 171:22, 171:23, 174:7, 178:17, 186:12, 197:17, 199:10, 199:12, 201:24, 203:17, 206:3, 206:18, 219:23, 221:15, 227:3, 232:20, 233:4
**two-page** [1] - 166:19
**two-part** [1] - 125:2
**two-step** [1] - 174:7
**two-year** [3] - 47:20, 49:7, 54:20
**type** [8] - 9:17, 9:20,

74:15, 77:17, 101:11, 125:22, 163:7, 168:13
**typed** [1] - 102:6
**types** [2] - 50:25, 123:25

**U**

**U.S** [1] - 209:21
**ultimate** [1] - 50:18
**ultimately** [5] - 32:13, 67:23, 114:21, 116:2, 144:1
**unannounced** [1] - 197:23
**unauthenticated** [1] - 24:23
**unclear** [1] - 31:2
**uncommon** [1] - 175:19
**under** [28] - 12:25, 17:12, 25:11, 32:15, 61:19, 65:15, 89:10, 100:16, 101:15, 103:23, 110:10, 118:8, 155:3, 156:8, 156:16, 162:5, 162:18, 163:8, 164:4, 166:15, 170:17, 186:4, 190:16, 195:8, 197:5, 202:24, 209:23, 222:5
**underneath** [1] - 102:16
**understandably** [1] - 30:24
**understood** [4] - 69:21, 114:18, 127:2, 157:8
**undertake** [2] - 135:11, 194:3
**undertaken** [1] - 183:4
**unfair** [2] - 116:17, 146:8
**unfortunate** [1] - 90:13
**unfortunately** [4] - 7:8, 101:1, 102:3, 148:22
**Unfortunately** [1] - 101:12
**UNIDENTIFIED** [1] - 30:5
**unintelligible)** [1] - 42:18
**unique** [1] - 187:5
**unit** [1] - 39:20
**UNITED** [2] - 1:1, 1:17

**United** [9] - 7:2, 23:21, 150:21, 150:23, 183:23, 210:13, 210:17, 212:9, 212:18
**units** [4] - 199:16, 225:5, 225:8, 225:23
**University** [1] - 88:4
**unlawful** [8] - 112:7, 118:3, 118:7, 118:11, 118:20, 118:21, 131:16, 143:14
**unless** [1] - 104:20
**unlike** [3] - 114:17, 119:19, 212:14
**unpack** [1] - 50:3
**untrustworthiness** [1] - 207:21
**untrustworthy** [1] - 208:1
**unusual** [4] - 48:6, 51:18, 157:2, 204:6
**up** [90] - 11:7, 13:8, 15:12, 18:13, 28:8, 30:5, 34:24, 37:4, 37:13, 43:13, 45:19, 46:13, 46:16, 48:9, 48:10, 48:24, 50:13, 54:21, 55:16, 61:16, 66:21, 66:23, 67:24, 73:6, 74:4, 75:21, 77:18, 80:24, 82:22, 86:1, 86:17, 90:5, 90:11, 90:21, 91:1, 92:7, 92:22, 93:3, 93:5, 93:11, 96:5, 98:5, 103:17, 104:3, 104:21, 109:2, 112:15, 112:22, 115:10, 116:16, 119:4, 119:14, 121:19, 123:24, 127:1, 127:15, 128:20, 128:24, 131:25, 135:6, 137:6, 141:24, 142:15, 151:12, 152:2, 164:14, 168:2, 168:15, 170:9, 175:10, 176:6, 179:3, 187:6, 189:19, 192:4, 197:15, 198:13, 200:19, 207:8, 213:8, 216:9, 217:21, 225:12, 226:6, 227:14, 227:15, 228:15, 228:21, 231:1

**Update** [1] - 78:16
**updated** [1] - 200:4
**updates** [1] - 79:6
**uploaded** [1] - 211:7
**upset** [1] - 47:18
**upwards** [1] - 150:5
**useful** [1] - 182:25
**usefulness** [1] - 211:2
**uses** [1] - 233:25
**usual** [1] - 11:2
**utilize** [3] - 46:21, 210:6, 210:10
**utilized** [1] - 179:20
**utilizing** [1] - 61:11

## V

**vague** [4] - 48:4, 48:5, 49:25, 178:2
**vagueness** [2] - 48:8, 178:5
**valuable** [1] - 119:21
**Vanderveer** [1] - 140:11
**variety** [1] - 207:23
**various** [1] - 199:16
**vault** [7] - 50:5, 50:15, 51:4, 168:19, 168:23, 169:24, 172:8
**vaults** [3] - 48:1, 167:11, 168:8
**vehicle** [1] - 87:18
**Ventura** [1] - 3:18
**verification** [1] - 194:7
**verify** [1] - 159:25
**version** [4] - 70:6, 70:15, 83:5, 183:8
**versus** [6] - 15:10, 43:23, 72:19, 127:17, 185:6, 185:11
**vibration** [1] - 167:24
**vice** [1] - 132:14
**Vice** [10] - 73:22, 73:25, 74:13, 84:6, 131:1, 132:12, 148:6, 162:1, 200:3, 221:8
**victims** [1] - 90:14
**videotaped** [1] - 36:14
**view** [1] - 115:1
**violate** [2] - 116:15, 117:8
**violating** [3] - 118:22, 119:5, 120:7
**violation** [1] - 119:15
**Virginia** [17] - 4:18, 7:3, 14:13, 84:12, 87:24, 88:3, 92:11,

98:25, 102:8, 144:14, 144:15, 153:4, 171:6, 191:2, 218:17, 221:4
**VIRGINIA** [2] - 1:1, 1:18
**visit** [1] - 197:23
**visits** [2] - 166:3, 200:22
**void** [2] - 42:17, 42:18
**void"** [1] - 42:20
**VOLUME** [1] - 1:16
**volume** [6] - 67:10, 67:12, 67:13, 67:25, 159:1, 190:4
**VP** [1] - 74:14
**vs** [1] - 235:6

## W

**wait** [3] - 30:4, 107:8, 168:25
**waiting** [4] - 215:11, 219:11, 226:20, 228:18
**waive** [1] - 108:11
**WAKEFIELD** [1] - 5:13
**walk** [1] - 23:15
**Walker** [1] - 140:8
**walking** [1] - 187:10
**walks** [1] - 187:11
**wants** [2] - 126:1, 187:9
**warehouses** [4] - 50:11, 149:1, 149:13, 151:3
**warned** [1] - 138:6
**warning** [1] - 136:21
**warnings** [1] - 138:4
**warrants** [1] - 72:21
**Washington** [19] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 42:6, 49:9, 102:18, 114:1, 114:2, 116:5, 177:14, 177:23, 177:24, 177:25, 195:21
**waste** [1] - 117:13
**wasting** [2] - 115:12, 127:3
**Watch** [1] - 96:13
**watch** [2] - 96:15, 96:22
**watch-out** [1] - 96:22
**waters** [1] - 143:21
**ways** [3] - 165:6, 185:25, 212:14
**WEBB** [1] - 3:11
**Webb** [1] - 3:12

**website** [4] - 194:10, 198:21, 206:10
**week** [14] - 79:15, 79:18, 130:24, 151:21, 168:25, 227:3, 227:8, 227:9, 227:11, 227:12, 227:16, 227:18, 227:20
**weekly** [1] - 46:17
**weeks** [3] - 15:16, 116:19, 166:9, 227:1
**welcome** [1] - 127:13
**well-recognized** [1] - 135:18
**West** [16] - 7:3, 14:13, 84:12, 87:24, 88:3, 92:11, 98:24, 102:8, 144:14, 144:15, 153:4, 171:5, 191:1, 218:17, 221:4
**WEST** [2] - 1:1, 1:18
**whatsoever** [2] - 85:7, 191:24
**when-discovered** [3] - 39:7, 39:12, 39:14
**whereby** [1] - 211:7
**whichever** [1] - 22:15
**whole** [18] - 75:22, 89:9, 93:18, 101:20, 116:5, 117:13, 159:4, 159:5, 170:6, 171:12, 176:18, 179:13, 188:9, 207:22, 208:3, 221:7, 227:10, 227:20
**wholesale** [2] - 149:7, 200:16
**wholesaler** [2] - 149:6, 149:8
**Wicht** [4] - 126:1, 126:2, 232:21, 233:3
**WICHT** [6] - 4:12, 126:2, 232:13, 232:19, 232:22, 233:1
**wide** [1] - 113:25
**Williams** [2] - 4:13, 5:4
**willing** [1] - 198:10
**wire** [1] - 167:4
**wires** [1] - 120:20
**wish** [1] - 101:11
**Withdraw** [1] - 105:21
**withdraw** [1] - 147:12
**withdrawing** [1] - 147:19
**witness** [44] - 9:6, 11:7, 11:10, 12:20,

14:17, 14:25, 16:19, 17:11, 24:12, 24:25, 25:8, 29:15, 31:11, 31:14, 33:22, 34:3, 36:10, 36:14, 37:17, 43:4, 53:16, 53:17, 59:12, 64:22, 89:19, 105:8, 109:12, 115:1, 120:1, 121:1, 121:8, 121:19, 126:9, 127:6, 128:22, 143:10, 147:17, 157:4, 161:9, 165:18, 177:20, 213:11, 232:16
**WITNESS** [49] - 17:10, 17:13, 17:15, 39:11, 41:2, 42:22, 43:5, 53:22, 62:1, 65:10, 68:22, 69:16, 70:8, 72:1, 73:4, 78:12, 82:25, 90:2, 91:3, 94:24, 97:16, 100:1, 103:20, 107:6, 108:23, 129:9, 131:6, 139:22, 141:5, 142:19, 159:11, 159:13, 160:18, 167:15, 177:23, 186:12, 215:2, 215:6, 215:8, 215:25, 217:17, 220:25, 222:16, 228:5, 228:9, 228:11, 228:20, 230:23, 234:16
**witnesses** [8] - 16:19, 34:17, 36:7, 36:19, 36:22, 106:25, 115:11, 116:18
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**women** [1] - 50:10
**word** [1] - 156:24
**worded** [1] - 95:16
**words** [5] - 8:22, 85:12, 90:13, 137:18, 209:16
**workers** [2] - 149:1
**works** [3] - 100:16, 158:15, 160:9
**world** [1] - 108:3
**worm's** [1] - 114:25
**worst** [1] - 212:10
**wrap** [1] - 213:8
**write** [2] - 203:25
**writing** [4] - 55:24, 180:9, 195:23, 204:2
**written** [14] - 44:21,

51:10, 56:25, 78:15, 79:18, 96:17, 138:9, 155:25, 156:4, 156:6, 156:21, 170:4, 231:8, 231:9
**wrote** [11] - 73:10, 73:12, 73:13, 78:23, 90:6, 93:10, 93:13, 94:12, 132:11, 220:9, 232:3
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10, 3:13, 4:19, 5:15, 6:9
**WV-002191** [1] - 198:14
**WV-1** [1] - 221:12

## Y

**year** [21] - 47:13, 47:20, 49:7, 54:20, 148:22, 160:14, 161:3, 164:20, 166:2, 166:4, 169:25, 171:24, 190:15, 210:18, 210:19, 212:23, 224:1, 225:6, 225:8, 225:14, 226:4
**years** [28] - 21:15, 49:3, 53:8, 54:2, 55:11, 90:24, 101:19, 101:23, 102:4, 116:24, 135:18, 139:4, 148:4, 148:10, 164:22, 171:22, 178:17, 191:22, 197:5, 197:9, 199:10, 199:12, 203:17, 206:3, 206:18, 211:21, 213:13, 213:22
**yesterday** [21] - 12:4, 13:8, 15:23, 17:19, 17:23, 17:24, 21:5, 22:11, 30:19, 31:2, 49:12, 58:15, 73:21, 109:10, 150:3, 152:7, 165:11, 167:9, 170:14, 196:4, 213:12
**yesterday's** [1] - 39:15
**York** [1] - 3:5
**younger** [1] - 208:17

## Z

**zero** [6] - 55:13, 55:15, 55:23, 56:24, 185:15, 185:17

**Zimmerman** [69] -
7:10, 10:13, 11:12,
11:14, 17:3, 17:9,
17:14, 22:13, 22:14,
29:3, 30:19, 31:19,
34:21, 35:24, 37:17,
38:9, 38:16, 43:2,
50:3, 59:23, 64:21,
64:24, 65:12, 74:6,
78:10, 84:19, 84:25,
94:8, 94:12, 94:15,
102:17, 104:9,
104:24, 107:17,
108:2, 108:21,
121:7, 127:8,
127:13, 127:21,
128:12, 132:4,
133:6, 139:15,
144:5, 144:13,
147:25, 148:2,
162:1, 165:10,
173:3, 183:7, 200:3,
200:14, 201:8,
201:9, 207:1,
208:19, 213:11,
214:22, 215:15,
215:21, 216:2,
216:8, 220:11,
222:21, 224:18,
226:13, 226:15
**Zimmerman's** [5] -
29:1, 94:18, 97:8,
109:13