IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
             Plaintiff,        :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
             Defendants.  :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
             Plaintiff,        :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
             Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 10
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

MAY 14, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:            Ayme Cochran, RMR, CRR
Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1              PROCEEDINGS had before The Honorable David A. Faber,

 2     Senior Status Judge, United States District Court, Southern

 3     District of West Virginia, in Charleston, West Virginia, on

 4     May 14, 2021, at 9:00 a.m., as follows:

 5              THE COURT:  Good morning, everybody.

 6              SIMULTANEOUS SPEAKERS:  Good morning, Your Honor.

 7              THE COURT:  TGIF.

 8        Mr. Farrell, are you ready to call your next witness?

 9              MR. PIFKO:  Good morning, Your Honor.  Mark Pifko

10     for plaintiffs.

11        Plaintiffs call David May to the stand.

12              THE COURT:  Okay.

13              MS. MCCLURE:  Your Honor, before David May comes

14     up to the stand to testify, I have something preliminary to

15     raise with the Court.

16        Your Honor, Mr. David May is presently the Senior Vice

17     President of Diversion Control at AmerisourceBergen.  He has

18     primary responsibility for overseeing the currently enforced

19     Diversion Control Program.  During Mr. May's examination, we

20     anticipate that we will both present customer-specific

21     information regarding current -- current customers or former

22     customers of AmerisourceBergen and describe with some

23     particularity the way today our Diversion Control Program

24     works.

25        To that end, we note that it is contrary to the
```

1    purposes of that Diversion Control Program to have certain

2    of the pieces of information public.

3         We also recognize the right of the public and the media

4    to have access to trials.  That said, we have some concerns

5    about certain particular documents being broadcast to the

6    overflow room for this portion of the trial and, to be

7    clear, not all of the documents, certain particular

8    documents.

9         So, in light of the sensitive information that will

10   potentially be discussed today, possibly elicited by Mr.

11   Pifko, possibly elicited by myself, and acknowledging the

12   need, of course, for us to present a defense in this case

13   but also trying to have the trial proceed efficiently, we

14   have the following proposal:

15        That David May testify in open court; that the

16   testimony be broadcast to the overflow room; that the visual

17   feed that focuses on the documents in the bottom right

18   corner of the overflow room be halted either for today or

19   for only the specific documents about which there are

20   confidentiality issues.

21        We also request that we be able to, subsequent to

22   today's testimony, either the documents or the testimony

23   itself, review for any particular redactions, which would be

24   accompanied by a motion by AmerisourceBergen.

25        It is possible that none of this would be necessary,

1   but in light of the fact that we are putting our witness --

2   their witness -- I'm sorry -- our witness in their case, we

3   simply don't know the scope and extent to which current

4   information would be discussed.

5        So, we have discussed this proposal with the plaintiffs

6   and my understanding is that they do not agree that we could

7   make specific requests for the documents not to be broadcast

8   to the overflow room or request sealing of specific portions

9   of testimony or specific documents subsequent to today's

10  testimony.

11            THE COURT:  Do we have the ability to do this?  We

12  do?

13       Okay.  Mr. Farrell?

14            MR. FARRELL:  Thank you, Judge.  On behalf of the

15  plaintiffs, we object to -- this is open court and we object

16  to the sealing of any document or any testimony in a public

17  nuisance case brought on behalf of the public to abate this

18  epidemic.  That's point number one.

19       Point number two, we don't know what documents they're

20  referencing because the Court has not required the

21  defendants to disclose what documents they're going to use

22  with these witnesses.

23       Number three, discovery in this case was blocked -- not

24  blocked.  That's the wrong word.  There's a temporal scope

25  to discovery in this case.  On the back end, it was 2006 and

1    I believe on the front end, it was as of time of remand

2    sometime in 2019.  So, for purposes of discovery

3    disclosures, we have not conducted any discovery nor been

4    permitted to conduct any discovery on the current scope of

5    their program.

6          And, finally, on the relevance standpoint, eliciting

7    testimony about current customers or current OMP programs,

8    we fail to see how it has anything to do with the flood of

9    pills that were sold into West Virginia, into this

10   community, giving rise to the opioid epidemic.

11         MS. MCCLURE:  May I respond?  Your Honor, certain

12   of the documents that I'm thinking of today would be

13   documents that have been produced to plaintiffs that are in

14   the record covered by the discovery period, which ends, I

15   honestly don't recall, sometime 2018 or 2019.

16         That said, some of the information within those

17   documents, despite the fact that it may be from 2018, would

18   still today be considered confidential by the company.  And,

19   to be clear, this is confidential because the purpose of the

20   Diversion Control Program is, in fact, to protect the

21   public.

22         The second point that Mr. Farrell was making regarding

23   relevance, the plaintiffs have articulated in this case that

24   they are seeking an abatement-only forward-looking remedy.

25         So, Mr. May's testimony today, Mr. Farrell is free to

```
1    stand up and object to the extent that he believes that the

2    testimony is information that he was -- I believe he used

3    the word prevented from obtaining in the course of

4    discovery, but Mr. May is the present -- the present -- the

5    Vice President of Diversion Control.  The plaintiffs are

6    seeking a forward-only abatement remedy and the current

7    state of the program, regardless of whether the plaintiffs

8    are choosing to focus in their examination on far distant

9    past and the fact that, what they call the number of pills

10   that were submitted long ago, the fact that they're choosing

11   to focus on that does not prevent us from pointing out to

12   Your Honor what is our Diversion Control Program today.

13        They're calling this witness, Mr. May.  He currently

14   operates the Diversion Control Program.  We're entitled to

15   mount a defense to that.

16        But, to be clear, the documents that I'm talking about

17   showing or potentially broadcasting and would have

18   confidentiality concerns are documents that the plaintiffs

19   have.

20             THE COURT:  Let me make sure I understand you.

21   You're saying this is confidential customer information that

22   shouldn't be disclosed?

23             MS. MCCLURE:  So it's not necessarily information

24   of the customer.  It is in the sense that we have -- let me

25   give you an example -- parameters that are set for each
```

1    customer via a computer algorithm.  Certain of the documents

2    that Mr. May may discuss today would contain those

3    customer-specific parameters.  So, it's not necessarily the

4    customers' information.  It's the perimeter and our

5    algorithm that assigns the amount a customer is permitted to

6    purchase prior to an order being flagged or considered an

7    order of interest by our system.  So, it's our own

8    proprietary information regarding what a customer,

9    particular customers, are permitted to order prior to their

10   order being considered an order of interest.

11          THE COURT:  Mr. Farrell?

12          MR. FARRELL:  Judge, we have asked for in

13   discovery for the past three years the algorithm used by the

14   defendants to determine what is flagged under their system

15   and they have yet to produce it.  We would strenuously

16   object to the late-hour introduction of the actual

17   algorithm.  If Your Honor lets the algorithm, the code be

18   entered, then we would ask the opportunity to have Dr.

19   McCann run their algorithm on their own data.

20          MS. MCCLURE:  And, Your Honor, I am not the

21   Diversion Control expert.  I'm the lawyer here.  So, the

22   first point is that to the extent that Mr. Farrell has a

23   complaint about apparently a long-standing concern he has

24   about discovery, this is not the forum in which to raise it

25   and such issues would have and should have been brought to

1    the Court long ago.

2        Second of all, I believe that Mr. May -- we're not

3    talking -- let me just be clear.  I am not talking about the

4    introduction of an algorithm.  What I am talking about is

5    documents which on their face would reveal information about

6    the maximum amount a customer would be permitted to order

7    using various parameters prior to their order being

8    considered an order of interest.

9        It's not in the public's interest in terms of the whole

10   purpose of the Closed System of Distribution to have these

11   particular pieces of information become public.  Again, this

12   is a limited set of documents that have been produced to the

13   plaintiff.

14           THE COURT:  So, you're saying that it's okay to

15   display them here in court, but you don't want them

16   broadcast in the overflow room; is that right?

17           MS. MCCLURE:  Yes, Your Honor.  My understanding

18   is that all of the attorneys who are here today are subject

19   to the Court's confidentiality order in this case and have

20   executed a protective order, et cetera.

21           THE COURT:  Well, if we have the technological

22   ability to do this, I'm going to allow you to do it.  So,

23   you tell me when the documents you're concerned about come

24   up and --

25           MS. MCCLURE:  Thank you, Your Honor.

```
 1              THE COURT:  I'll have them cut off the broadcast
 2     to the outside world.
 3              MS. MCCLURE:  Thank you, Your Honor.
 4              THE COURT:  Okay, Mr. Farrell.
 5              MR. FARRELL:  Just note for the record our
 6     continuing objection to closure.
 7              MR. PIFKO:  Start this again.  Good morning, Your
 8     Honor.  Mark Pifko for plaintiffs.
 9          Plaintiffs call David May to the stand.
10              COURTROOM DEPUTY CLERK:  Would you please state
11     your name?
12              THE WITNESS:  David May.
13              COURTROOM DEPUTY CLERK:  Thank you.  Please raise
14     your right hand.
15                   DAVID MAY, PLAINTIFF WITNESS, SWORN
16              COURTROOM DEPUTY CLERK:  Thank you.  Please take a
17     seat.
18              THE COURT:  Sir, if you don't mind pulling your
19     mask down, that will help me to understand you.
20              THE WITNESS:  Yes, sir.  Good morning, Judge.
21              THE COURT:  Good morning.
22                       DIRECT EXAMINATION
23              BY MR. PIFKO:
24     Q.   Good morning, Mr. May.
25     A.   Good morning, Mr. Pifko.
```

1   **Q.**   Will you please state your name for the Court?

2   **A.**   David P. May.

3   **Q.**   Are you currently identified with AmerisourceBergen?

4   **A.**   I am currently employed with AmerisourceBergen, yes.

5   **Q.**   And what is your title?

6   **A.**   Vice President of Diversion Control and Security.

7   **Q.**   You were previously deposed in the MDL and you sat as a

8   30(b)(6) corporate representative for AmerisourceBergen,

9   correct?

10  **A.**   Yes.

11  **Q.**   What are your responsibilities as Vice President of

12  Diversion Control?

13  **A.**   My responsibilities include oversight of the Order

14  Monitoring Program, which is part of the Diversion Control

15  Program, at ABC.  It also includes oversight of our due

16  diligence activities, again, as part of the diversion

17  control and I would include there new customer due diligence

18  and ongoing customer due diligence.

19       It also includes the security profile.  We have

20  distribution centers across the country where some of my

21  team engages in the work around the security at those

22  facilities, as well as at some of our corporate buildings.

23       I also have investigative staff that work for me and

24  they investigate such things as hotline complaints or they

25  may investigate losses at our distribution center if they

1    occur.

2    **Q.**    You joined the company around 2014, correct?

3    **A.**    March of 2014, yes.

4    **Q.**    You had -- you had another title.  You were Senior

5    Director of Regulatory Affairs at that point?

6    **A.**    The title when I joined the company was Senior Director

7    of Diversion Control and Federal Investigations.

8    **Q.**    Okay.  Were your responsibilities at that time roughly

9    the same as they are now, although you had a different

10   title?

11   **A.**    Generally, yes, around Diversion Control.  What was

12   added to my responsibilities was more of that security and

13   investigations profile.

14   **Q.**    Okay.  So, initially, you weren't responsible for the

15   security investigations portion of it?

16   **A.**    To the extent that investigations of losses would be

17   brought to my attention as part of Diversion Control, but

18   more of those duties in direct oversight of those employees,

19   you know, were added to my function.

20   **Q.**    Prior to joining AmerisourceBergen, you currently (sic)

21   serve with the DEA, correct?

22   **A.**    Yes, prior to joining, I did.

23   **Q.**    Okay.  For approximately how long?

24   **A.**    I joined the Drug Enforcement Administration in 1982 as

25   a student intern.  Worked for them for three years or so,

```
1    graduated from Northeastern University in 1985, and then had

2    about a 30-year career with DEA.

3    Q.   And working for AmerisourceBergen, that was your first

4    job in the public sector; is that correct?

5    A.   That is correct.

6              MS. MCCLURE:  Objection.

7              BY MR. PIFKO:

8    Q.   When you joined --

9              MS. MCCLURE:  Objection to foundation, public

10   sector.

11             BY MR. PIFKO:

12   Q.   When you joined --

13             THE COURT:  Wait a minute.

14             MS. MCCLURE:  Your Honor, it was just he said

15   public sector.  I believe he meant private sector.

16             THE COURT:  Oh, okay.  All right.

17        Did you mean private sector?

18             MR. PIFKO:  I did.  Sorry.

19   Q.   When you joined AmerisourceBergen -- let me back up for

20   a second.  Who do you report to?

21   A.   Chris Zimmerman.

22   Q.   Okay.  And you said you have a team under you, correct?

23   A.   Correct.

24   Q.   About how many people report to you?

25   A.   Well, there are about 30 people on my team.  I have
```

1    five direct reports.

2    **Q.**   Okay.  And since the time that you joined the company,

3    you've always reported to Mr. Zimmerman?

4    **A.**   That's correct.

5    **Q.**   So, when you joined the company, was your position a

6    new position or did you take over someone else's position?

7    **A.**   It was a new position, my understanding.

8    **Q.**   So, when you first met with Mr. Zimmerman either in

9    your interview or when you took over the position, did you

10   attempt to gain an understanding of what would be expected

11   of you in this position?

12   **A.**   Yes.  We had discussions about what the position would

13   entail.

14   **Q.**   Did you gain an understanding of why they were adding

15   this new position?

16   **A.**   My understanding is that they needed an additional

17   resource.

18   **Q.**   Was there something specific they wanted you to focus

19   on?  Did you have an understanding about why they wanted

20   this additional resource?

21            MS. MCCLURE:  Objection, compound.

22            THE COURT:  Sustained.  Break it up, Mr. Pifko.

23            BY MR. PIFKO:

24   **Q.**   Did you have an understanding about why the company

25   wanted to add this additional resource?

A.    The why, not really.

Q.    Prior or around the time you joined the company, did
you undertake any efforts to understand the regulatory
activities that were going on in the distribution industry?

A.    So, prior to joining the company and during this time,
before I was employed, I reviewed the various regulations
that were involved with the pharmaceutical industry as a
whole and supply chain, as well as the closed system.  I did
further research when I was hired by the company into, you
know, how the company actually carried out those
responsibilities.

Q.    Were you aware at the time that some entities in the
distribution entity had had regulatory compliance
enforcement activities brought against them?

A.    So, when I joined the company in 2014, you know, there
were periods of time where I did various presentations and
trainings and I've learned about certain actions that have
been taken by DEA specifically.

Q.    Were you aware at the time that Cardinal Health had had
its registration suspended at its Lakeland facility around
2012?

        MR. RUBY:  Objection, Your Honor.  Foundation as to
Cardinal Health.

        THE COURT:  Sustained.  If you can lay a
foundation, you can ask him.

```
 1          BY MR. PIFKO:

 2    Q.    In taking on this position, did you believe it was

 3    necessary to understand the nature of DEA's prior

 4    enforcement activities against other drug distributors in

 5    the industry?

 6    A.    As I took the position, you know, I think it was

 7    important to understand as much as I could about the

 8    industry, about the regulations, about the participants in

 9    the industry.  I'm not sure I had any particular focus on

10    any particular area.  It was more kind of drinking from the

11    fire hose trying to gather as much information as I could.

12    Q.    And, in gathering that information, did you attempt to

13    make yourself aware of enforcement actions against other

14    major entities in the supply chain?

15    A.    So, among the materials that I reviewed, I seem to

16    recall that I became aware of certain actions that were

17    taken, but I don't have any specific -- sitting here in

18    2021, you know, what I did know specifically in 2014 around

19    what I didn't know.

20    Q.    So, on or around the time that you joined

21    AmerisourceBergen, did Mr. Zimmerman make you aware of any

22    problems that the company was facing that he wanted you to

23    specifically focus on?

24    A.    I don't know that there were any particular problems

25    that he identified.  I think we had a lot of discussion
```

1    about, you know, the state of play, in essence.  You know,

2    what was going on in the industry, what was the relationship

3    with the regulator.  You know, what were some of their

4    challenges and, you know, and then, you know, discussing in

5    general how they were doing things.  And those conversations

6    included more than Mr. Zimmerman.  The people that were

7    doing the work, I would engage with them, as well.

8    Q.   Who else did you speak to about those issues?

9    A.   Other folks at the company, NCSRA, Corporate Security

10   and Regulatory Affairs.  You know, that would have included

11   Steve Mays, who had been there for sometime; Ed Hazewski,

12   who was, at the time, I believe his title was Director of

13   Diversion Control, and he was directly overseeing the

14   day-to-day order monitoring and due diligence efforts.  And

15   then the various team members who were actually engaged in

16   the work, I would speak with them, as well.

17   Q.   I believe you said that Mr. Zimmerman and these other

18   people that you just mentioned, you discussed challenges in

19   the regulatory environment; is that what you said?

20   A.   Yes.  Yes.

21   Q.   Okay.  What do you mean by -- can you elaborate?  What

22   kind of challenges did you discuss with Mr. Zimmerman?

23   A.   I think, just generally speaking, trying to understand

24   the regulators' expectations particularly around suspicious

25   order monitoring and reporting.  That seemed to be an area

```
 1    where it wasn't completely clear to the team, you know, what
 2    specifically was required and some frustrations by the team
 3    in terms of communicating with the regulator on some of
 4    those issues.
 5    Q.   Did you understand that part of why they brought you on
 6    was to add clarity to that issue?
 7              MS. MCCLURE:  Objection, calls for speculation.
 8              THE COURT:  Overruled.  He can answer.
 9              THE WITNESS:  Again, the intent of Mr. Zimmerman
10    and AmerisourceBergen in hiring me, as I sit here today, can
11    I describe precisely what their intent was?  I really can't.
12    I know that, you know, what we discussed and what were some
13    of the expectations and, you know, we talked about some of
14    the things that I thought I could help with.
15              BY MR. PIFKO:
16    Q.   And let's break that out a little bit.  So, you said
17    there were things you could help with and you said there
18    were expectations.  So, what did you understand the
19    expectations were of you when you joined the company?
20    A.   That I would, you know, take oversight responsibility
21    for this particular program and the Diversion Control
22    Program and all that it encompasses and, you know, evaluate
23    the program and, you know, bring my view to what I thought
24    of the program and, you know, any areas where I thought
25    maybe we could make some changes.  So, that's, generally
```

1    speaking, what some of those expectations were.

2    **Q.**   And then you said there were areas where you thought

3    you could help.  What -- how did you think you could help

4    address those expectations?

5    **A.**   So, I think that, you know, if one of the issues is

6    communication with DEA and trying to understand DEA, I think

7    that, you know, as an entity, DEA has, I would say, a

8    personality to it.  And so, I, as, you know, a 30-year

9    employee of the Drug Enforcement Administration, I

10   understand the personality and that can sometimes make

11   things easier when it comes to communication and also kind

12   of anticipating, you know, which way the agency might be

13   thinking on certain topics.  And so, I think, you know, that

14   was one of the things that I could help with.

15        I also -- you know, the company, AmerisourceBergen, has

16   a fairly large international presence and I had spent around

17   ten years in my career with DEA working in Europe, Africa

18   and Belize and I think that they thought that that

19   experience could also be helpful to them with their

20   international footprint, but that was some of the earlier

21   discussions and the fact of the matter, I have not done too

22   much of that work.  I have done some.

23   **Q.**   Did you have relationships with high-ranking DEA

24   officials as a result of your experience that you thought

25   you might be able to call upon to assist the company at

1    times?

2    **A.**    I'm sorry, Mr. Pifko.  I missed the very first part of

3    that question.

4    **Q.**    Sorry.  I said did you have relationships with

5    high-ranking DEA officials from your work at DEA that you

6    thought you could help use to execute your duties in meeting

7    the expectations of Mr. Zimmerman?

8    **A.**    Well, I certainly had relationships with folks at DEA

9    that had senior positions towards the end of my career.  I

10   guess my caution is, as you've asked the question, it almost

11   sounds like, you know, could I leverage some of those

12   relationships in some way and, you know, that would be

13   inappropriate and absolutely never.  I think that having

14   those relationships and having the ability to communicate

15   with DEA is important and I wish we could do more of it.

16   **Q.**    You mentioned some names and people that you spoke to

17   when you initially took on the job.  So, one of them was

18   Steve Mays?

19   **A.**    Yes, sir.

20   **Q.**    Can you tell me who Steve Mays is?

21   **A.**    Steve Mays is -- his title is Vice President of

22   Regulatory Affairs and he also works within the Corporate

23   Security and Regulatory Affairs section.

24   **Q.**    Can you explain how your responsibilities differ from

25   his responsibilities?

1    **A.**    Sure.  So, Steve Mays, I think, spends most of his time

2    overseeing our distribution centers.  We have 27-odd

3    distribution centers for human health across the country and

4    the regulatory requirements at those distribution centers

5    are quite extensive.  And so, it includes extensive

6    recordkeeping and inventory requirements, security

7    requirements.

8        DEA is very specific about what happens at one of our

9    distribution centers right down to the thickness of the

10   vaults that contain our Schedule II products.  And so, it's

11   quite a bit of work.  He manages a team of regional

12   directors and each one of those regional directors oversees

13   the work of Compliance Managers.

14       So, at each and every distribution center we have a

15   Compliance Manager that ultimately reports up through the

16   regional managers to Steve May (sic) -- Steve Mays, I'm

17   sorry, and I think he numbers about a hundred or so

18   employees in his section.

19   **Q.**    So, I don't want to put words in your mouth, but I feel

20   like when I'm understanding your explanation, and I would

21   like you to tell me if I'm correct.  And so, does Mr. Mays

22   kind of work with Diversion Control issues internally;

23   whereas, you're focused on external and customer-facing

24   issues; would that be fair?

25   **A.**    I think I would -- I think I would describe it more

1    that there is some sort of independence there in terms of

2    what our roles are.  Certainly, you know, I do not get

3    involved in those sorts of issues around what the regulatory

4    requirements there, except for there is some back-and-forth

5    and the back-and-forth would involve when we have a theft

6    situation that we investigate, either a last-mile courier

7    situation.

8         At that point, we would work together because I would

9    have the people that would get involved with following up

10   that.  So, I don't want to give the impression that we're,

11   you know, stove-piped and that we don't interact.

12        I think you are correct in that, you know, my role,

13   Diversion Control, most of my team, those are all

14   customer-facing in terms of we're monitoring and evaluating

15   our customers across the country and that includes all of

16   our customer types, pharmacists, pharmacies, hospitals,

17   clinics, practitioners, manufacturers, distributors.

18   **Q.**   Prior to you joining the company, was there someone who

19   was executing Diversion Control functions in this

20   customer-facing role?

21   **A.**   Could you give me a period of time?

22   **Q.**   Well, immediately prior to you joining?

23   **A.**   Ed Hazewski was the principal person responsible for

24   order monitoring and the due diligence efforts Diversion

25   Control Team.

1   **Q.**   And prior to joining, do you know who Ed Hazewski

2   reported to?

3   **A.**   I can't say definitively whether it was Mr. Mays or Mr.

4   Zimmerman.

5   **Q.**   And tell the Court who Mr. Hazewski is.

6   **A.**   Mr. Hazewski is a former employee of AmerisourceBergen.

7   He retired, I guess, about three or four years ago now.  He

8   occupied that position, I would say, for approximately nine

9   years, eight years.

10       Prior to his employment with AmerisourceBergen, he was

11   a police officer, a detective.  He -- I believe he was a

12   polygrapher, as well, in his former career in law

13   enforcement.

14   **Q.**   And so, Mr. Hazewski was handling customer due

15   diligence efforts for the company at that time; is that

16   correct?

17   **A.**   So, when you say "handling", certainly, he had

18   oversight of the diversion aspect of that.  Of course,

19   there's a lot of other parts of the company who touch

20   customers but, yes, for Diversion Control.  So, I'm just

21   trying to marrow on that.

22   **Q.**   Let's move forward a little bit.  Do you believe

23   there's an opioid crisis?

24   **A.**   Yes.

25   **Q.**   Do you believe there's an opioid crisis in West

1    Virginia?

2    **A.**    Yes.

3    **Q.**    Do you believe there's an opioid crisis in Cabell

4    County?

5    **A.**    A couple of things.  I guess I wouldn't say presently.

6    Is your question for present state?

7    **Q.**    I'm sorry.  I didn't understand your answer.

8    **A.**    Is your -- are you asking me present state, do I

9    believe there is an opioid problem in Cabell County?

10   **Q.**    Correct.

11   **A.**    Okay.  So, you know, again, as part of my role and

12   responsibility, I do, of course, try to keep informed on,

13   you know, different abuse of pharmaceuticals and we're

14   discussing opioids here.  So, I track that sort of

15   information.  I think it's important for me to be aware of

16   it so that I can be responsive to the extent that a

17   wholesale distributor can be responsive to it.

18       I think there has been, in looking at prescribing rates

19   during the last -- you know, maybe going back to 2011

20   through the present for opioids, prescribing rates across

21   West Virginia or across the country have gone down year over

22   year.  Just this year, they've gone down double digit and

23   we're at -- if I remember the last news on this that I read,

24   we're at 2003 levels when it comes to opioid prescribing.

25       So, I think there's been a tremendous improvement on

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    the issue.  I still think we have a ways to go in terms of

2    opioid misuse and there's still some work to be done.

3         Specifically narrowing down to Cabell County, I can't

4    -- I can't speak, you know, to a level of do I know the

5    level of folks that are getting treated in Cabell County who

6    suffer Opoid Use Disorder?  I do not.

7    **Q.**   So, you said as part of your role in Diversion Control,

8    you undertake efforts to become familiar with drug abuse

9    issues, correct?

10   **A.**   I do.  I try to gather as much information as I can

11   relative to any of these issues that may be -- you know,

12   could help me with my job.

13   **Q.**   And you also have some familiarity with drug abuse

14   issues from your work with DEA, correct?

15   **A.**   Yes, sir.

16   **Q.**   So, maybe you'll recall we discussed this during your

17   deposition, but do you agree that a person can be prescribed

18   an opioid for a legitimate reason and then transition to a

19   point where they're misusing and abusing that drug?

20        MR. RUBY:  Objection, Your Honor, calls for expert

21   opinion.

22        MS. MCCLURE:  Objection, I join in that and also

23   suggest that to the extent it calls for lay opinion, we also

24   object.

25        MR. PIFKO:  Your Honor, he testified that he makes

1    himself familiar with drug abuse issues as part of his job

2    responsibilities and as a 30-year veteran of the DEA.

3            THE COURT:  Overruled.  I'll let him answer.

4    Overruled.

5            THE WITNESS:  Can you repeat your question, sir.

6            BY MR. PIFKO:

7    **Q.**   Yeah.  I asked if you recall, we discussed this in your

8    deposition, that you believe that someone can be prescribed

9    an opioid for a legitimate medical purpose and then

10   ultimately transition and become -- abuse that drug and

11   become addicted and use it for illegal purposes?

12   **A.**   Sure.  Thank you.

13           So, I think that in the realm of things that are

14   possible, I think that if you have someone, an athlete that

15   gets injured, then goes to his physician and is being

16   treated, at some point, his physician may change his

17   treatment and, again, there's a lot of surmising here, and

18   that person can no longer get those prescriptions filled or

19   doesn't receive the prescription itself.  Can that person

20   then on his own go out into the streets and find a

21   substitute for those drugs that he was taking?  I think, in

22   the realm of possibilities, yes, that can -- that can

23   absolutely happen.

24           I guess I would just add, do I have any empirical data

25   that I have studied that would show me to the extent that

1    something like that has occurred, I do not, and I am not an

2    addiction specialist.  So, to the extent that that -- I can

3    solidify it more than just having -- using my common sense,

4    I cannot.

5    **Q.**   In your work with DEA, you prosecuted illegal drug

6    traffickers -- or you investigated illegal drug trafficking,

7    correct?

8    **A.**   Yes.

9    **Q.**   Do you also believe as a result of your efforts to

10   become familiar with drug abuse and your work with DEA that

11   when some of these people have become addicted or are

12   searching for an alternative source of their need that they

13   can also look for heroin?

14           MS. MCCLURE:  Same objection as previously, Your

15   Honor.

16           THE COURT:  Well, I don't -- Mr. Hester?

17           MR. HESTER:  I was just going to object.  It calls

18   for speculation.

19           THE COURT:  I don't think you've laid a sufficient

20   foundation to extract any knowledge from him on this subject

21   yet, Mr. Pifko.  I'm going to sustain the objection to that

22   question.

23           MR. PIFKO:  I'll see if I can --

24           THE COURT:  You can try it again, if you want to.

25           MR. PIFKO:  All right.  I'll see if I can ask a

```
1    few more questions for you.
2              BY MR. PIFKO:
3    Q.   So, when you worked for DEA, did you investigate
4    illegal heroin trafficking?
5    A.   I did.
6    Q.   I'm not going to ask you about any -- the DEA had sent
7    a Touhy letter.  I'm not going to ask about any -- so
8    everybody here knows, I'm not going to ask about any
9    investigations or any investigative tactics, but in
10   connection with your efforts to investigate illegal heroin
11   trafficking, did you become familiar with the pathway by
12   which people came to use heroin?
13        MS. MCCLURE:  Your Honor, I still feel like that
14   question additionally continues to call for speculation and
15   it is not the appropriate foundation laying method.
16             THE COURT:  Well, overruled.
17        Answer it if you can, Mr. May.
18             THE WITNESS:  Yes, sir.
19        I think that in the course and thinking back in the
20   various times where I've investigated heroin trafficking --
21   and heroin trafficking is cyclical.  There were the early
22   2000s in Charlotte, North Carolina where I saw black tar
23   heroin investigations extensively day in and day out.  We
24   spent a lot of time there.
25        I spent time in the late 90s in Baltimore investigating
```

1    heroin trafficking organizations.

2         In my days in New York City, I investigated

3    Columbian-based heroin traffickers.

4         So, these were all cycles of heroin trafficking, but

5    I'll tell you, sir, that, you know, when we were doing these

6    investigations, we were investigating to the extent that we

7    could the highest levels of the organizations.  And so, we

8    would not by nature of our investigations look -- look to

9    see, you know, who ultimately the user community of those

10   drugs.  That's just not a level that we even operated at, so

11   I couldn't -- couldn't draw any conclusions about what

12   caused, I guess, someone to start using heroin.

13            THE COURT:  I'll sustain the objection.

14            MR. PIFKO:  We'll move on, Your Honor.

15       Can I get plaintiff's Exhibit 898?

16       May I approach?

17            THE COURT:  Yes.

18            THE WITNESS:  Thank you, sir.

19            BY MR. PIFKO:

20   **Q.**   Mr. May, you have in front of you Exhibit 8 --

21   Plaintiffs' Exhibit 898.  Can you take a look at this and

22   tell me if you know what this is?

23   **A.**   This appears to be a PowerPoint presentation that I

24   prepared with others and the intent of the presentation was

25   to provide this information in slides to a group called

```
 1    NADDI.  And NADDI would be the National Association of Drug
 2    Diversion Investigators.
 3    Q.   And you can see there's the presentation in the back
 4    pages and the front page, there's an e-mail where you're
 5    sending the slides to someone.  Do you see that?
 6    A.   I do, yes.
 7    Q.   It's dated October 6, 2016.  Does that sound about --
 8    around the time that you gave this presentation?
 9    A.   That sounds about right, yes.
10    Q.   And who is Kimberly St. John?
11    A.   Kim St. John is an admin employee of CSRA.
12    Q.   Why were you sending her these slides?
13    A.   I was asking her for some assistance with a formatting
14    of the slides.  My PowerPoint skills are not very good.
15    Q.   I hear you.  So, you authored the substance of these
16    slides; is that correct?
17    A.   I put a -- I put a lot of the work into the slides.
18    There may have been others that I asked for help gathering
19    some of this information.  I see here I have Bruce Gundy.
20    It says "Bruce".  And he is the gentleman that reports to me
21    that oversees security investigations.  And so, I was asking
22    for his input, as well, here.
23    Q.   The notes that are written under the slides, are those
24    your notes?
25    A.   They are my notes.
```

**Q.**    Where did you give this presentation?

**A.**    So, this was at a Naddi conference and it -- I believe

it actually was in Pittsburgh.  I've done a couple of these

presentations.  So, hopefully, I'm not confusing the

location.  At least one of them was in Pittsburgh.  And I

can't recall where the other one was.

**Q.**    Do you recall approximately how many people attended

the conference?

**A.**    I do not.

              MR. PIFKO:  Your Honor, I would move to admit 898

into evidence.

              THE COURT:  Any objection?

              MS. MCCLURE:  No, Your Honor.

              MR. RUBY:  Your Honor, only to the extent that the

PowerPoint itself is an out-of-court statement and we would

object as hearsay to the extent it's offered for the truth.

              MR. ACKERMAN:  Your Honor, David Ackerman.  I

don't think -- I don't know if my microphone is on.  This is

a document that was served last night and did not receive

any objections from any defendants to this document, so it

would be our contention that a hearsay objection, which is a

non-authenticity objection, needed to either be disclosed

last night or it is waived.

              MR. PIFKO:  Or where it's the statement of a party

opponent.

1          THE COURT:  Well, is it offered for the truth?

2     What's it offered for?

3          MR. PIFKO:  Well, it's offered to understand Mr.

4     May's views about Diversion Control and the circumstances of

5     the prescription opioid epidemic.

6          THE COURT:  I'm going to overrule the objection

7     and admit it.  It's admitted.

8              **PLAINTIFF EXHIBIT 898 ADMITTED**

9          BY MR. PIFKO:

10    **Q.**   Let's turn to the first slide here.  There's some notes

11    here.  It says, "There are probably around 800 wholesale

12    distributors in the U. S., but the three largest, McKesson,

13    Cardinal and AmerisourceBergen, have a combined market share

14    in excess of 90%."  Do you see that?

15    **A.**   I do see that.

16    **Q.**   Okay.  You believed that to be true at the time?

17    **A.**   A couple of things on my notes.  First, to be clear,

18    the notes I used as a guideline as I prepared, so I did not

19    read these notes during the presentation.  I just want to

20    point that out.

21         I gathered certain information as I prepared for this

22    presentation and I would have gathered those facts

23    presumably from information that was available to me in my

24    role.  So, to the extent that I mean 800 wholesalers, I

25    would have gathered that information at that time.

1    Unfortunately, sitting here now, I can't tell you what the

2    source is.

3    **Q.**    Okay.  But you believed -- based on the information

4    that you gathered, you believed that statement to be true,

5    correct?

6    **A.**    I believe it is true approximately to those numbers.

7    **Q.**    You have a statement here saying -- kind of deriving

8    from that statement, you say at the end here, talking to

9    people who might be investigating diversion, you say, "So,

10   if you were investigating a pharmacy and you wanted to

11   gather information about sales of certain controlled

12   substances, you have a better than 90% chance of getting

13   that information by issuing a subpoena to all three

14   companies."  Do you see that?

15   **A.**    I do see that, yes.

16   **Q.**    And what did you mean by that?

17   **A.**    So, putting this in context, I'm in a room with

18   investigators from various state, and local, and federal, in

19   this case, in this particular meeting, diversion

20   investigators from across the country.  And the objective,

21   my objective in the briefing, having had my law enforcement

22   career and having to conduct investigations sometimes

23   knowing -- knowing the various industries and the people who

24   to contact can sometimes be a challenge.

25        So, here is my effort to educate folks, law enforcement

1    folks, on how we, the industry, can collaborate and assist

2    them with their investigations.  And so, here, I'm offering

3    to them, if you have an investigation, you don't know who

4    the drug wholesaler is, you can simply serve a subpoena on

5    the three main ones and there is a good chance that you will

6    identify a customer.

7    **Q.**   Going to the next page, you have a discussion about

8    what you say in the notes are four baskets of a Diversion

9    Control Program.  Do you see that?

10   **A.**   I do.

11   **Q.**   So, let's go through these.  These are -- I mean, as

12   your words, baskets of a program.  These are attributes that

13   you believe are necessary to a Diversion Control Program; is

14   that correct?

15   **A.**   Yes.  First, the term "basket" is probably

16   oversimplified, but it seems to work for me.  And, yes, I

17   believe in terms of my program at AmerisourceBergen, these

18   are elements that would be part of a Diversion Control

19   Program.

20   **Q.**   So, let's talk about what these are.

21   **A.**   Okay.

22   **Q.**   "Know your customer due diligence."  That's a

23   statement, the first one you have there, right?

24   **A.**   Yes, sir.

25   **Q.**   What is "Know your customer due diligence"?

1    **A.**    Well, this is a concept that as we're engaging with a

2    potential customer, we would collect certain information

3    from that customer.  And when I say "we", the Diversion

4    Control Team.  The company itself would also collect

5    information, but we would collect our own information and,

6    as part of that process, the information would be collected

7    and evaluated.  And the purpose of that was to -- to make an

8    assessment in terms of the customer and whether we would

9    want to take that customer on in terms of the sale of

10   controlled substances and listed chemicals.  And so, it

11   would be a risk assessment.

12       You know, to be clear, looking at the regulations,

13   there's nowhere in the regulations, the CFR, around the duty

14   to collect due diligence.  You don't see the words "due

15   diligence".  But from my perspective and my understanding of

16   what the regulator would want, he would want us to engage in

17   this, or her, would want us to engage in this process of

18   collecting this sort of information.

19   **Q.**    So, you said that, you know, you would be collecting

20   this information to determine whether -- to make a risk

21   assessment, like you said?

22   **A.**    Yes, sir.

23   **Q.**    What factors -- and you specifically said that in the

24   context of a risk assessment, as far as whether the company

25   should be selling controlled substances to that customer,

1    correct?

2    **A.**    Correct.

3    **Q.**    So, what factors would you be looking at to make such a

4    risk assessment?

5    **A.**    Sure.  There's a variety of information that we

6    collect.  We collect the -- I call it biographical

7    information.  So, we would make sure that the person was --

8    had all -- the entity had all of the appropriate licenses

9    and registrations.  And that would be the first part, that

10   we would collect information, you know, about address and

11   delivery locations.

12       We would collect information about potential other

13   distributors that the customer had used or was using at the

14   time.  We would collect information about any adverse

15   actions that may have been taken.  We would ask those

16   questions and then we would try to verify that information.

17       We would collect information about the various

18   anticipated purchasing levels of certain controlled

19   substances.  And we would also collect information about the

20   prescribers, the top prescribers, for those customers.

21       And I just want to lay a little foundation here in

22   terms of when I'm explaining this, I'm specifically talking

23   about a pharmacy registrant.  We also have registrants that

24   we service that are hospitals, and clinics, and

25   practitioners, and what -- what we collect from them and

1    what we do with that information is going to look a little

2    bit differently depending upon who the registrant is.

3        So, I just want to make sure that when I -- when I'm

4    providing this information, it's in the context of, in this

5    particular case, I have just described what we would do with

6    a retail pharmacy.

7    **Q.**   And that is what we're interested in here, is in your

8    activities with respect to retail pharmacies, so that is a

9    correct assumption and, going forward, if I ask you

10   questions about that, I'm interested in due diligence with

11   respect to those types of customers.

12       So, you provided a bunch of information there.  When

13   you said you look for top prescribers of a potential

14   customer, what do you do with information about potential

15   prescribers or top prescribers of a potential customer?

16   **A.**   We would validate the licenses for those top

17   prescribers and we would check public data sources relative

18   to any information that might be available.  We would --

19   where we're able to, we would check with the Medical Board

20   in the state where that prescriber was operating to see if

21   there had been any adverse actions against a license.

22       And, also, in terms of the number of prescribers, I'm

23   not sure.  It's either five or ten, top five or top ten.

24   Just want to -- so, I just want to make it clear that we're

25   not collecting all of that practitioner information when we

1    do this process.

2    **Q.**    To help put some context and allow the Court to

3    understand your analysis, can you give a profile of the --

4    when you're doing this risk assessment, of the types of

5    attributes of a customer that would be negative that you

6    would not want to do business with them?

7                MS. MCCLURE:  Objection, vague.  Confusing.

8                THE COURT:  Overruled.  I think he -- he just

9    testified that --

10        Answer the question, Mr. Mays.

11               THE WITNESS:  Yes, sir.

12        So, when we evaluate a customer, you know, we have this

13   totality of the circumstances-type evaluation.  Not only --

14   that goes for evaluating an order of controlled substances,

15   as well as a customer.

16        And so, there is a whole spectrum of information that

17   we may gather.  We may gather information on a potential

18   customer and prescribers and, at that one end of the

19   evaluation, there may be absolutely no adverse information

20   and the decision is quite easy that, okay, hey, there's --

21   we've not found anything that causes us concern relative to

22   the risk for this customer.

23        And then we -- let's move all the way across the

24   spectrum and get all the way over to the other side of the

25   spectrum.  And let me suggest that there may be certain --

1    certain things that would cause us concern and we would

2    consider those in on-boarding a customer.

3         So, if I had a customer who -- a potential customer who

4    was being evaluated and indicated to me that they had been

5    terminated by another -- another distributor for concerns

6    about their dispensing, that would be a concern.

7         If I saw, in terms of the data I collected of their

8    anticipated purchasing of controlled substances and I saw

9    that, you know, there were significant quantities that were

10   being requested by the customer for future purchasing, that

11   would be a concern.

12        If I saw that out of the ten prescribers, and I'm just

13   throwing out a number, seven of them had recent adverse

14   action taken against their licenses relative to their

15   prescribing practices, those would all be elements of our

16   review that would cause me concern.

17        Could that concern rise to the level where we would

18   make a decision not to service that customer?  Yes.  Has

19   that happened?  Yes.

20        Has it happened frequently?  I don't know that I could

21   categorize it.  I would say it's a small percentage of the

22   customers that we evaluate that we make that decision, well,

23   we just -- we just don't believe that this is going to be a

24   relationship we want to engage in.

25             BY MR. PIFKO:

1    **Q.**   You mentioned that significant quantities of

2    anticipated purchases would be a concern.  Why is that a

3    concern?

4    **A.**   I think that any one of those things that I mentioned

5    could be a concern and if I have a pharmacy that's stating

6    they want to purchase significant quantities, that may or

7    may not make sense.  If it's a very small pharmacy and they

8    want to purchase significant quantities, that might not make

9    sense.

10        It may be a very large pharmacy.  There's a really big

11   spectrum when it comes to pharmacy operations and

12   communities that are serviced and so, but larger quantities,

13   particularly by a smaller customer, could be an area that we

14   want to investigate.  I -- you know, I don't know

15   specifically if that answers your question or not.

16   **Q.**   Why would the larger quantities purchased by a smaller

17   customer be something that you would want to investigate

18   further?

19   **A.**   It's one of the -- it's one of the many factors that we

20   consider and evaluate.  I'm not sure I can put a why to it.

21   **Q.**   Does AmerisourceBergen write this information down or

22   document it somewhere?

23   **A.**   Could you clarify what information that is?

24   **Q.**   We were just speaking about the know your customer due

25   diligence, and on-boarding, and we talked about some of the

1    information that you collect and the significance of that

2    information.  Does AmerisourceBergen document that

3    information when it collects it?

4    **A.**    Yes.

5    **Q.**    And am I correct that currently AmerisourceBergen has

6    around 40,000 customers?

7    **A.**    I'm sorry, sir, how many?

8    **Q.**    40,000, 4-0?

9    **A.**    So, I'm more familiar with the number of customers that

10   we have that are purchasing controls and listed chemicals.

11   That's what my focus is.  So, customers that are not

12   purchasing controls, I'm not sure what that total number

13   looks like.

14   **Q.**    Okay.  Well, what's your understanding of how many

15   customers that AmerisourceBergen has that are purchasing

16   controls?

17   **A.**    It's in the neighborhood of 22,000.

18   **Q.**    Okay.  So, that's more customers than you can commit

19   that to memory, so you need to write this information down

20   so that you can access it, right, with 22,000 customers?

21   **A.**    So, I guess getting back to your question, we

22   absolutely document the information that we collect from our

23   customers during the evaluation process and, you know, so

24   that form that we collect that contains the responses.  We

25   collect photos.  We search public data sources.  We collect

1    the licensure information.  Any pertinent information that

2    we learn.

3         If we had a Board of Pharmacy Report or a Medical Board

4    Report, we would capture all of that information and put it

5    into the electronic file.

6         Presently, we've developed a file, an electronic filing

7    system, called ARCHER.  Previous to that, it was Matter

8    Management.  And previous to that, it was LawTrac.

9              COURT REPORTER:  I'm sorry, was what?

10             THE WITNESS:  LawTrac, excuse me.  L-a-w-T-r-a-c.

11   That pre-dates me in terms of some of those systems, to make

12   it clear.  In 2014, when I joined, it was LawTrac, but we

13   had transitioned shortly thereafter to Thomson Reuters and

14   now we're on our third system, ARCHER.

15   **Q.**   So, to allow the Court to understand a little bit about

16   how you're tracking this information, is there a name of the

17   form that you use to collect this information from a

18   prospective customer?

19   **A.**   From a retail pharmacy customer, it's called a Form

20   590, 5-9-0.

21   **Q.**   And we were talking about these databases that were

22   used, LawTrac, Matter Management and ARCHER.  Then these are

23   sort of data warehouses where then you can store information

24   about these customers; is that correct?

25   **A.**   Yes, sir.

1    **Q.**   And then, from time to time, you might need to access

2    information if you're doing an investigation and you might

3    want to know about -- something about the customer, so you

4    would use LawTrac, Matter Management or ARCHER to pull up

5    that information, correct?

6    **A.**   Correct.

7    **Q.**   Can you still -- so, I guess I want to understand the

8    ability to access that information.  So, you mentioned the

9    change of these databases.  Is the information that was in

10   LawTrac, was that then put into the Matter Management system

11   so that, if you had a customer whose information was stored

12   in LawTrac, then when the company switched systems, you

13   could still access that information about that customer?

14   **A.**   So, there was an exercise that was performed where the

15   documentation within LawTrac, when the system was closed,

16   for lack of better terms, that information was extracted and

17   put into hard copy or, I'm sorry, put into digital copy and

18   preserved in a system.

19        I can't be more specific with what the name of the

20   system was and how exactly that worked, but there was this

21   exercise where this information was removed and stored so

22   that we would have future access to it.

23   **Q.**   Right.  So, that's really what I'm trying to understand

24   is, if you -- today, if you're investigating a customer, how

25   far back -- let's say it's a customer that has been with a

1    company since 2004, how far back -- if you want to do an

2    investigation of that company, how far back can you look at

3    that information?

4    **A.**   So, a couple of things.  In terms of how we were

5    operating prior to 2007, we were not collecting this sort of

6    form and -- from our customer.  And so, there was a period

7    of time where these forms weren't collected.

8         You know, pursuant to the work we did with DEA in 2007,

9    we agreed to start collecting this sort of information.  So,

10   there are certainly customers that we have to this day

11   where, you know, we didn't collect that information when we

12   on-boarded them.  And we may or may not have collected it

13   since that time.

14        My understanding of the agreement that we had with DEA

15   in 2007 is they did not have the expectation that we would

16   go back and sort of grandfather those customers and get

17   those forms from those customers.  My understanding of the

18   agreement is that, going forward, we would collect that

19   documentation.

20   **Q.**   Okay.  But to the extent there is -- there was

21   information collected about a customer historically, are you

22   still able to access that customer, that information, today?

23   **A.**   So, from 2007 forward and if it was saved to one of

24   those three systems, of course, one is current, but the

25   answer would be yes, you should still be able to do research

1    and retrieve that information.

2    **Q.**    Let's go back, looking at the document they have in

3    front of you, 898.  The next bullet point you have is one of

4    these baskets of the Diversion Control Program System to

5    detect and report suspicious orders.  Do you see that?

6    **A.**    Yes.

7    **Q.**    Can you describe what that means?

8    **A.**    Wholesale distributors and manufacturers have a

9    regulatory requirement to have a system to identify and

10   report suspicious orders.  And so, in order to carry out

11   that obligation at AmerisourceBergen, we have what we refer

12   to as an Order Monitoring Program.  That was a term that was

13   phrased prior to my arrival but that we continue to refer to

14   it as the Order Monitoring Program.

15         And, you know, just for clarity sake, others in the

16   industry, regulators even, may refer to this as a Suspicious

17   Order Reporting System, or SORS.  It's the same thing.  It's

18   one and the same.  Within AmerisourceBergen, that system is

19   our own.

20   **Q.**    We discussed this in your deposition, but am I correct

21   that your understanding of the law and regulation is that if

22   you identify an order as suspicious, you must not ship it;

23   is that correct?

24   **A.**    So --

25              MR. HESTER:  I object, Your Honor.  I think

1    there's no time frame to the question.

2              THE COURT:  Right.  It's, I think, critical that

3    there be a time frame to that question, so you can rephrase

4    it, Mr. Pifko.

5              MR. PIFKO:  Well, I'm just asking him generally if

6    he understands that the law and regulation requires him not

7    to ship an order that's identified as suspicious.

8              MS. MCCLURE:  Your Honor, just for clarity for the

9    record, Mr. Pifko has been indicating that Mr. May was a

10   30(b)(6) deponent.  I just want to be clear that the period

11   of time for which he was a 30(b)(6) deponent was 2015 to

12   2018.  Moreover, I believe this question calls for a legal

13   conclusion.

14             MR. PIFKO:  Your Honor, I don't -- I don't think

15   the time period is relevant to my question.  I'm just asking

16   him what he understands the law and regulations to be and,

17   as far as a legal conclusion, I'm not asking him for the

18   purposes of him instructing the Court what law is.  He's the

19   head of Diversion Control and I would like to have him

20   explain to you what he thinks the law is.

21             THE COURT:  Well, I think -- I'm going to sustain

22   the objection.  I think that the time period is critical

23   here.  The objection is sustained.

24             BY MR. PIFKO:

25   Q.   How about when you joined the company, do you believe

1    that the law and regulation requires you to block an order

2    and not ship it if it's suspicious?

3    **A.**   In 2014, when I joined the company, my understanding

4    from all of the conversations and the work that I did with

5    members of CSRA was that AmerisourceBergen, when they would

6    report a suspicious order, whenever that occurred, that

7    order would be cancelled and never shipped.  That was the

8    understanding that I had when I walked into the door of

9    AmerisourceBergen in 2014.

10       And going forward, the program that I've overseen,

11   whenever we designate an order as suspicious and we report

12   it to DEA, that order is cancelled and rejected.  It's not

13   picked, packed or shipped.

14   **Q.**   Okay.  Your answer was about what the program is.  I'm

15   just asking you, as the head of Diversion Control, what your

16   understanding of the law and regulation is.  As of 2014, did

17   you understand that you were required to block an order that

18   was identified as suspicious?

19            MS. MCCLURE:  Your Honor, calls for a legal

20   conclusion.

21            THE COURT:  Well, Mr. Ruby, did you want to say

22   something?

23            MR. RUBY:  We join in that objection, Your Honor.

24            THE COURT:  Well, I think he's asking him what his

25   understanding was and I'll allow him to answer that.

1          THE WITNESS:  So, when I joined the company -- you

2     want to know what my understanding was or do you want to

3     know what my understanding is today?

4          BY MR. PIFKO:

5     **Q.**   When you joined the company?

6     **A.**   So, when I joined the company, I believed that the

7     regulation required suspicious orders to be cancelled.  That

8     was the belief.  And that belief was based upon my

9     conversations with others at the company, as well as the

10    actual operations at the company, in terms of how they

11    handled suspicious orders.

12    **Q.**   Thank you.  So, let's -- what's your understanding of

13    what a suspicious order is?

14    **A.**   So, do you want what the regulation states?  I mean, a

15    suspicious order is one that AmerisourceBergen has said we

16    believe this order fits within the realm of what the

17    regulation states is a suspicious order.

18    **Q.**   Okay.  And what's your understanding of the realm of

19    what the regulation states is a suspicious order?

20    **A.**   So, the language in the regulation refers to orders

21    that could be -- could be suspicious; in other words,

22    includes orders of an unusual size, unusual size, orders

23    that deviate from a normal pattern, or orders of unusual

24    frequency.

25    **Q.**   Let's move on to the next bullet point in your baskets

1    of Diversion Control.  So, the next one is continuous

2    monitoring or due diligence.  Do you see that?

3    **A.**   I do.

4    **Q.**   What do you mean by that here?

5    **A.**   So, the notion here is when we on-board a customer, we

6    have a process, and it's getting to know the customer, but

7    the sense here is, and the goal here is to continue to

8    monitor that customer.  So, due diligence doesn't end after

9    we've collected the forms.

10        And due diligence means a lot of things to a lot of

11   people in the industry.  And from my perspective, you know,

12   due diligence includes our everyday monitoring of the orders

13   that are placed by our customers.

14        Once we've taken that customer on and they have the

15   authority to purchase controls, it's important for us, of

16   course, in the execution of the Order Monitoring Program to

17   assess each and every order that they place for controlled

18   substances or listed chemicals.

19        But we've also developed some very powerful analytics,

20   I think, very powerful analytics, where we look at the

21   customer purchasing activity wholistically and over a period

22   of time.  And so, you know, I would include that as part of

23   our due diligence process.

24        There are times when looking at those analytics and

25   looking at OMP, that we may decide to gather additional

1    information directly from the customer and when -- when we

2    decide to do that, it may be simple -- a simple e-mail to

3    the customer asking about a particular order or it may be a

4    visit to the customer either by a member of one of our teams

5    or with our outside consultants that assists us with those

6    sorts of visits.

7        So, again, looking at this notion is we continually

8    monitor the customer.  It's done through a variety of ways,

9    order monitoring analytics, and engagement with a customer,

10   and I would include all of those activities under continuous

11   due diligence.

12   **Q.**   I don't want to get everybody over there jumping up and

13   down with objections, so I want to preface this question.

14   I'm not going to ask you about the attributes of this

15   analytic system right now, but I just want to -- you

16   mentioned that you developed an analytics system.  When was

17   that system developed?

18   **A.**   Working with our outside consultants who assisted us

19   with the review and enhancement of our Order Monitoring

20   Program in 2014 and 2015, during that time period, we also

21   looked at the analytics that we were collecting, because the

22   company was collecting analytics at that time, but the

23   analytics were in the form of mostly spreadsheets.  They

24   contained data that was relevant to due diligence reviews

25   and helped inform us.

1    But looking at a spreadsheet versus a dashboard is --
2    certainly, looking at the dashboard is a more efficient way
3    of doing it visualization-wise.  And so, what we decided to
4    do in this period of time is to work with our outside
5    consultants and take a look at those analytics that we had
6    been collecting and say, hey, is there a better way we can
7    do this?  Can we make this more user friendly?
8        And so, that was part of the work.  We took some of
9    what we were collecting up until that period of time and
10   then we built upon that and we developed these dashboards
11   that we -- we utilize in a software program called Tableau.
12   **Q.**   That consultant that you worked with, they were called
13   FTI Consulting, correct?
14   **A.**   Yes.
15   **Q.**   You mentioned as part of this continued monitoring or
16   due diligence doing a site visit; do you recall saying that?
17   **A.**   Yes.
18   **Q.**   What would someone look for in a site visit as part of
19   the continuous monitoring?
20   **A.**   I mean, I can describe what we -- what that involves
21   for AmerisourceBergen.
22   **Q.**   Yeah, that's what I'm asking.
23   **A.**   So, we had engaged, prior to my arrival at
24   AmerisourceBergen, with Pharma Compliance Group.  They are a
25   third-party contracting company.  And most of the employees

1    are either former DEA diversion investigators or special

2    agents.  And the company had engaged with them to do what I

3    would describe as surveillance-type visits where they drive

4    to the location and make certain observations, which were

5    then recorded on a report, and that report would be

6    furnished to the Diversion Control Team and it would be

7    saved to one of those files where we would document that

8    information.

9         After my arrival in 2014, we began to evaluate, you

10   know, some of the things that that outside consultant was

11   doing and, like everything else, you know, things change in

12   terms of drug abuse patents and red flags.  And so, we

13   wanted to make sure that we were keeping up with that.

14        So, we changed, in essence, what that outside

15   consultant was doing.  We developed a pretty extensive

16   questionnaire.  I think it was between 10-12 pages.

17        They would actually go into the pharmacy, meet with the

18   pharmacist, or pharmacist in charge, or owner.  They would

19   review those questions with them.  Ultimately, they would

20   respond -- you know, we would develop our responses to all

21   of those questions and then we would be furnished a report

22   by this group.

23   **Q.**   You mentioned the concept of red flags in connection

24   with these investigations.  What's a red flag?

25   **A.**   So, there are red flags that we have -- potential red

1    flags we have visibility to -- from a distribution -- our

2    distribution analytic.  So, looking at these dashboards, we

3    may see purchasing by the pharmacy of controlled substances

4    at an elevated level.  It may be purchasing of controlled

5    substances, certain controlled substances.  The ones that

6    are more high risk at an elevated level.  And so, those

7    could be potential red flags that may lead to us conducting

8    the due diligence investigation.

9    **Q.**   What kind of controlled substances are more high risk?

10   **A.**   So, in our Order Monitoring Program, it's a risk

11   adjusted program where we have about 70 drug families that

12   we monitor and we break out those 70 drug families into high

13   risk, medium risk, and low risk.  And then, the purpose of

14   doing that is so that we can essentially shine a clearer

15   light on the high risk end of the spectrum versus the lower

16   risk end of the spectrum.

17       And so, within our high risk, you would find oxycodone,

18   hydrocodone, Hydromorphone, codeine with Promethazine, and

19   several others.

20   **Q.**   And those are opioid products generally?

21   **A.**   Most of the ones that I just listed were, yes.

22   **Q.**   Do you have an understanding about why those are

23   categorized as high risk?

24   **A.**   So, I want to just clarify one point.  At

25   AmerisourceBergen, we have our process where we designate

1    risk levels and, of course, the regulated -- DEA has also

2    scheduled controlled substances II through V.  And so, they

3    have a methodology to do so and we have a methodology.  I

4    assume that you want to hear about our methodology.

5    **Q.**   Yes, I do.  Thank you.

6    **A.**   Okay, thank you.  So, in fact, we actually, in

7    determining what's high risk, we actually consult with the

8    scheduling, DEA scheduling, to say, well, what does DEA

9    consider to be high risk based on scheduling?

10        We also, of course, monitor to the extent that we can

11   abuse trends, drug abuse trends.  And that information, you

12   know, can be found in public stories and news articles.  We

13   hear information from regulators, both state and federal,

14   and we'll try to understand that information and any -- in

15   our partnership, in our collaboration with other industry

16   participants, other wholesalers, manufacturers where we

17   maybe exchange information, all of that is considered when

18   we sit down once a year and review that high, medium, low

19   risk ranking within our Order Monitoring Program.

20   **Q.**   Let's talk about the training and education component

21   now.  What do you mean by training and education?

22   **A.**   So, I guess we'll talk about training first because I

23   look at them a little bit different, if that's okay.

24   **Q.**   Yeah.

25   **A.**   So, we -- Diversion Control does some training, and

1    when I say "does some", we put together training materials.

2    We present some of those training materials in person.  We

3    also present them electronically.

4         There are different recipients of the training.  And

5    so, for example, we train our sales force and we developed,

6    subsequent to my arrival, an electronic training course

7    where we would essentially assign that training

8    electronically to our sales force, our customer-facing sales

9    force, and there was a test associated with the training.

10   And that gave us the capability to, you know, deliver it

11   very efficiently, to modify it.  We've probably modified

12   that training now two times and -- and we also can track who

13   we've trained.

14        So, we train our sales associates.  We train our own

15   team members.  We have two meetings at CSRA every year, at

16   least for the Diversion Control Team where we bring them in,

17   and there's an agenda, and we train them on various facets

18   of the program.

19        We have, of course, initial on-boarding training for

20   members of the Diversion Control Team that they go through.

21   We have general awareness training at all of our

22   distribution centers, which is executed by Compliance

23   Managers to inform those folks there.

24        So, we have this -- and I could go on.  I don't want to

25   belabor it, but we have different groups that we focus on,

1    internal and some external.  We do do trainings with our

2    customers, as well.  And when I say "training", maybe we do

3    use that term somewhat loosely, but we do -- we have offered

4    CE courses.  We have two pharmacists that work in my group

5    and we've done that sort of training, as well.

6    Q.   Why is it important to train your sales force on

7    Diversion Control issues?

8    A.   The sales force at AmerisourceBergen represents largely

9    those associates that are out in the field and that are

10   meeting with the customers.  So, they're dispersed

11   throughout the -- throughout the country and they're going

12   into pharmacies, meeting with pharmacists.

13        And so, as that kind of front person for the company,

14   we feel it's important that they're aware of, you know, what

15   is -- what is drug abuse and what is diversion and, you

16   know, what are their responsibilities.

17   Q.   And so, they're out there in the field, and they're

18   seeing what's happening, and you want them to be able to

19   recognize concerns if they see something; is that what

20   you're saying?

21             MR. HESTER:  Object to form.

22             THE COURT:  Sustained.

23             BY MR. PIFKO:

24   Q.   What's the purpose for why you're wanting these sales

25   force people to be aware of these issues?

1    **A.**    Again, it's their -- they represent the workforce at

2    AmerisourceBergen that's interacting with the pharmacist,

3    the pharmacist in charge.  And so, having them have -- have

4    some level of awareness of what diversion is and

5    understanding their obligations is just something that we

6    feel that we should be doing.

7    **Q.**    Do you view the sales force as a component of the

8    Diversion Control Team in a way?

9    **A.**    I don't really consider them as a component of the

10   Diversion Control Team, but that's not to say that they

11   assist us with certain processes.  So, of course, they would

12   collect due diligence information because, once again,

13   they're the boots on the ground, so to speak.

14        But I would also add, you know, we really try to make

15   an effort to make sure that we, the Diversion Control Team,

16   Corporate Security, operate independently of the business,

17   including sales.

18        So, to the extent that we've used them for certain, you

19   know, administrative collection duties, that's one thing,

20   but we also make sure that they in no way influence any of

21   the work that's being done in evaluating orders or

22   customers.

23   **Q.**    I think you mentioned this earlier, but when looking at

24   a customer's behavior as part of your continuous monitoring,

25   that what you really want to be looking at is patterns of

1   the customers' behavior; is that correct?

2   **A.**   So, you mentioned patterns.  That may be one of the

3   things that we look at in the big picture of everything that

4   we look at.

5   **Q.**   Can you explain how a pattern of behavior -- and we're

6   here for opioid issues, so I'm asking this in the context of

7   opioid controlled substances purchasing, how a customer's

8   pattern of opioid purchasing can be a concern?

9   **A.**   So, I guess you're asking about pattern.  So, we look

10  at the customer ordering activity, opioids or any controlled

11  substances.  We look at their overall ordering activity and,

12  based upon that, the nature of that ordering activity, which

13  extends beyond pattern, I think.

14      I mean, I guess I'm a little concerned that we're

15  trying to, you know, kind of fixate on patent, which -- you

16  know, we look at -- we look at the customers and the

17  customers' orders more wholistically.

18  **Q.**   Yeah.  I'm trying to understand what that means like

19  when you're looking at the customers' behavior and they're

20  ordering in the sense of looking for patterns and how that

21  can be a concern.  Can you explain with you're looking for?

22          MR. HESTER:  Objection, Your Honor.  I think that

23  misstates the witness's testimony.

24          THE COURT:  Sustained.

25          BY MR. PIFKO:

1    **Q.**   Is one of the things that you look at, as far as

2    patterns, the customers' ordering patterns?

3             MS. MCCLURE:  Objection, asked and answered.

4             THE COURT:  Sustained.

5             MR. PIFKO:  I'm going to move to another document.

6    I don't know if the Court wants --

7             THE COURT:  This might be a good place to take a

8    break and switch out the court reporters, Mr. Pifko.  So,

9    let's be in recess for about ten minutes.

10        (Recess taken)

11        (Proceedings resumed at 11:08 a.m.)

12            THE COURT:  Mr. May, if you would resume the

13   witness stand, please, sir, and you're still under oath.

14            THE WITNESS:  Yes, sir.

15            THE COURT:  You may proceed, sir.

16            MR. PIFKO:  Thank you, Your Honor.

17   BY MR. PIFKO:

18   **Q.**   Mr. May, earlier in your testimony when you were

19   talking about a consulting -- FTI Consulting, do you

20   remember that?

21   **A.**   Yes.

22   **Q.**   In addition to their providing assistance in developing

23   order monitoring issues, it's true that FTI was also hired

24   to perform a review of CSRA's current state process and

25   related compliance activities; correct?

1    **A.**    Yes.  FTI was engaged to do a, more of a broader view

2    of the CSRA department versus the work they were doing

3    solely for diversion control.

4    **Q.**    And they were asked to identify any critical gaps or

5    areas of improvement to provide recommendations for how the

6    company could realize those improvements; correct?

7    **A.**    That engagement was not my engagement, so the specific

8    focus would have been whoever engaged them.  I think the

9    documents may refer to what the engagement looked like.

10   **Q.**    Do you recall being made aware that FTI was asked to

11   identify any critical gaps of areas for improvement to

12   provide recommendations on how the company could realize

13   those improvements?

14   **A.**    I recall seeing the results of some of their work.

15   **Q.**    Do you, do you recall being made aware that the company

16   paid $250,000 for their work, for that part of their work?

17   **A.**    I was not aware of what was paid for that work.

18   **Q.**    I'd like to hand you a document to refresh your

19   recollection.

20   **A.**    Thank you.

21   **Q.**    P-4 --

22           THE COURT:  Well, you've got to ask -- you've got

23   to do this right, Mr. Pifko.

24           MR. PIFKO:  Sorry, Your Honor.

25           THE COURT:  If you're going to refresh his

1    recollection, you have to establish that there's something

2    that his recollection will be refreshed if he sees

3    something.

4              MR. PIFKO:  Okay.  Thank you, Your Honor.

5    BY MR. PIFKO:

6    Q.   Mr. May, I asked you if you recall being made aware

7    that FTI was asked to identify any critical gaps or

8    areas of improvement and to provide recommendations for

9    how we can -- or the company could realize those

10   improvements.  And you said you didn't necessarily

11   remember that being something you were made aware of.

12   A.   Sorry.  So my testimony is I was aware that FTI was

13   engaged separately from the work that they were doing with

14   me.  I was not responsible for that engagement.  And I

15   recall seeing certain documents relative to that engagement.

16        But what specifically was the tasking, because I didn't

17   engage them, I can't sit here and tell you, you know, off my

18   head what that engagement was intended to be.

19   Q.   But my question is do you remember being told what that

20   engagement was about?

21   A.   I was -- again, information was communicated to me.

22   The reporting relative to that engagement was reported to

23   me.  I don't have, you know, any specific.

24   Q.   Do you remember Mr. Zimmerman writing an email to you

25   telling you about FTI's engagement and the scope of what

1    they would be doing with respect to that part of it?

2    **A.**   So I recall communications with Mr. Zimmerman.  They

3    would most likely be email communications around this issue,

4    yes.

5    **Q.**   Do you recall what he told you about their engagement?

6    **A.**   I, I do not recall specifically.  I believe there

7    was -- I believe there was a request to respond to certain

8    of that document that was relayed to his team, me being one

9    of those on his team.

10         THE COURT:  If you saw that document, would you

11   remember what he told you about the engagement?

12         THE WITNESS:  I may, Your Honor.

13         THE COURT:  Okay, you can show him.

14         MR. PIFKO:  Thank you, Your Honor.  Plaintiffs'

15   943, permission to approach.

16         THE COURT:  Yes.  And let him look at it and then

17   take it back and then ask him the questions.

18         MR. PIFKO:  Okay.  I'll have to look at my notes

19   to tell me.

20   BY MR. PIFKO:

21   **Q.**   Look at Page 8, please.  Do you see on Page 8 that

22   it has P-00943 and then 8 at the bottom?  Do you see

23   that?

24   **A.**   I see -- just one second and I'll try to find the 8.

25   That's the only thing I'm missing.  The 8 would be on the

1    bottom?

2    **Q.**   Yes.  I know there's different numbers on there, but

3    the Bates number --

4               THE COURT:  Are you talking about the very bottom

5    right-hand side?

6               MR. PIFKO:  Yes.

7               THE WITNESS:  I apologize, Your Honor.

8    BY MR. PIFKO:

9    **Q.**   It looks like it was manually printed to Mr.

10   Zimmerman.

11   **A.**   Okay.  I'll look for that email.  Thank you.

12              THE COURT:  Read it and then tell us whether you

13   remember what he told you or not.

14              THE WITNESS:  Okay.  Yes, sir.  I recall this

15   email, sir.

16              THE COURT:  Okay.  You can ask him about it but

17   you can't have him read the document.

18              MR. PIFKO:  Okay.  Thank you, Your Honor.

19   BY MR. PIFKO:

20   **Q.**   Mr. May, does this refresh your recollection that

21   Mr. Zimmerman informed you that FTI had been asked to

22   identify any critical gaps or areas for improvement to

23   provide recommendations for how the company could

24   realize those improvements?

25   **A.**   Yes.

1    **Q.**   And I believe we discussed this in your deposition.  On

2    or around the time that FTI prepared a report, did you

3    receive a copy of that report?

4    **A.**   I did.

5            MR. PIFKO:  Plaintiffs' Exhibit 93, please.

6    Permission to approach?

7            THE COURT:  Yes.

8            THE WITNESS:  Thank you.

9    BY MR. PIFKO:

10   **Q.**   Please take a minute to look at Plaintiffs' Exhibit

11   93.  Let me know when you're ready.

12       (Pause)

13   **A.**   I'm ready, sir.

14   **Q.**   Okay.  Have you seen Plaintiffs' Exhibit 93 before?

15   **A.**   I have.

16   **Q.**   And is this something that you saw around August 28th,

17   2015?  I'll represent to you that the electronic data that

18   accompanied this document had that date on it.

19   **A.**   That, that makes sense in terms of timing, yes.

20   **Q.**   To your recollection, is that on or around the time

21   that FTI provided a report to the company?

22   **A.**   It was around the same time, yes.

23   **Q.**   Can you tell me what Exhibit 93 is?

24   **A.**   So this is a description by FTI of their process, what

25   they intended -- it would be process, summary and the

1    various areas that they reviewed in terms of their

2    assessment.

3    **Q.**   Based on your having seen this before, is this a true

4    and correct copy of FTI's report?

5    **A.**   I would say, yes.

6            MR. PIFKO:  Your Honor, we move to admit

7    Plaintiffs' Exhibit 93 into the record.

8            THE COURT:  Any objection?

9            MS. MCCLURE:  Yes.  We object on the grounds of

10   hearsay.  This is an FTI report.  I understand that Mr. May

11   has testified that he's seen it before.  But to the extent

12   that this is being offered for the truth, we object on

13   hearsay grounds.

14           THE COURT:  Mr. Hester?

15           MR. HESTER:  Join in the objection, Your Honor.

16           MR. RUBY:  Likewise, Your Honor.

17           MR. PIFKO:  Your Honor, this is --

18           THE COURT:  What's the purpose of this?

19           MR. PIFKO:  It's for two purposes.  It can be

20   admitted for notice.  The report describes, as Mr. Zimmerman

21   had stated to Mr. May, gaps in -- issues that -- surrounding

22   the CSRA organization.  And they, they provided this report

23   within the scope of what they were requested as an agent of

24   FTI.

25       So it falls under two exceptions to the hearsay rule;

1    an authorized statement, and it's also made by an agent

2    within the scope of employment.  We've got several cases

3    that support the entry of this document.  We'd be happy to

4    submit a brief to you if the Court would like that.

5            THE COURT:  What about that, Ms. McClure?

6            MS. MCCLURE:  Your Honor, to the extent that the

7    plaintiffs have, have case law on this and would suggest

8    briefing, we would be open to -- I can't speak on behalf of

9    my counterparts, but we would be open to briefing the issue

10   before Your Honor subject to, of course, if the ruling of

11   Your Honor does not find that Mr. Pifko's case law supports

12   the admission of the document, then the corresponding

13   testimony of Mr. May be stricken from the record as well.

14   So that is what we would propose.

15           THE COURT:  Do you agree it comes in for the truth

16   of the matter asserted and not just to show notice or state

17   of mind of the defendant here?

18           MR. PIFKO:  Correct, Your Honor.  There's -- under

19   two exceptions to the hearsay rule, yes.

20           THE COURT:  And what exception does it come under?

21           MR. PIFKO:  That's under 801(d)(2)(C).  It's a

22   statement that was this made by a person whom the party

23   authorized to make a statement on the subject.  It's also

24   under 801(d)(2)(D).  It was made by the party's agent or

25   employee on a matter within the scope of that relationship

```
 1    while it existed.

 2              MS. MCCLURE:  Your Honor, may I have a moment?

 3              THE COURT:  Yes, sure.

 4         (Pause)

 5              MS. MCCLURE:  Your Honor, for the purposes of

 6    today, we, we are okay with Mr. Pifko questioning the

 7    witness on this subject to if we find that later case law we

 8    think disagrees with that, we would submit something to Your

 9    Honor on that.

10              THE COURT:  Well, it looks to me like it's not

11    hearsay because it comes within 801 --

12              MS. MCCLURE:  801, yes.

13              THE COURT:  -- 801(d)(2) as an opposing party's

14    statement -- subsection (C), was made by a person whom the

15    party authorized to make a statement on the subject.

16         Mr. Hester, does that come within that?

17              MR. HESTER:  Sounds right, Your Honor.

18              MS. MCCLURE:  Yes, Your Honor.

19              THE COURT:  Well, I'm going to admit it.

20              MS. MCCLURE:  Thank you, Your Honor.

21              MR. PIFKO:  Thank you, Your Honor.

22              THE COURT:  Appreciate your candor, Mr. Hester.

23    BY MR. PIFKO:

24    Q.   The document admitted, Mr. May, I don't need to ask

25    you any questions about it right now.  I'll shift gears.
```

```
1          Do you have first-hand knowledge that prescription

2     opioids have been historically diverted into the illicit

3     market?

4     A.   So does that cover my lifetime of work with AB and DEA

5     or what's the --

6     Q.   Yes, sir, in any context.

7     A.   So do I have personal knowledge -- could you finish the

8     question?

9     Q.   Yeah.  My question was do you have first-hand knowledge

10    that prescription opioids have been historically diverted

11    into the illicit market?

12               MR. HESTER:  Objection.  It's vague, Your Honor,

13    on the term "diverted."

14               THE COURT:  Overruled.  You can answer.

15               THE WITNESS:  Thank you, sir.

16         So when I think of diversion, it's a criminal act

17    because what we're saying is -- in my meaning of -- my

18    understanding of diversion is when there is a criminal act

19    because the pharmaceutical prescription has been taken out

20    of the, the closed system and for purposes that weren't

21    intended.

22         So, so to the extent that, you know, my work with DEA,

23    of course, I investigated criminal activity.  But I think I

24    described that activity before.  The vast majority of that

25    activity -- and when I say vast, greater than 99 percent was
```

1    directed at criminal drug trafficking organizations who were

2    trafficking illegal drugs.  And, so, I can't recall

3    instances during my investigations when I wouldn't become

4    aware of that.

5         And then in, in the work I've done at AmerisourceBergen

6    in, in overseeing the program, I don't recall a specific

7    instance where I had personal knowledge of pharmaceutical

8    opioids being diverted.

9         I think over the course of several years when I've

10   occupied this position, I have learned about certain actions

11   that the regulator has taken against pharmacies.  And that

12   would indicate to me that, you know, there was some activity

13   related to diversion.

14        Have I followed through to see if those actions

15   resulted in arrest and convictions, I just don't have any

16   specific memories of that as I sit here.  Does that, does

17   that mean that there may have been an instance in my

18   seven-plus years where, with AmerisourceBergen that I've

19   learned somehow, either through an action taken by a

20   regulator, I, I can't say that that's the case either.

21        Sorry for the long-winded explanation.  I had to think

22   about it a little bit.

23   BY MR. PIFKO:

24   **Q.**   That's okay.  Thank you.  Do you believe the volume

25   of prescription opioids diverted into the illicit market

```
 1    was a substantial factor giving rise to the opioid

 2    epidemic?

 3             MR. RUBY:  Your Honor, objection, vague as to

 4    time.

 5             THE COURT:  Well, you've got to lay a basis for

 6    that.

 7             MS. MCCLURE:  Your Honor, I'll also object to the

 8    extent it calls for an expert lay opinion.

 9    BY MR. PIFKO:

10    Q.   Mr. May, you've testified that you believe there is

11    an opioid epidemic; right?

12    A.   Yes.

13    Q.   Through your work at AmerisourceBergen and at the DEA,

14    do you have any sense of what caused the opioid epidemic?

15    A.   So I just want to make sure I understand.  You want me

16    to opine on what I think caused the opioid epidemic?

17    Q.   Well, at this point, my question was just based on your

18    work at AmerisourceBergen and with the DEA if you have an

19    understanding of what caused the opioid epidemic.

20             MS. MCCLURE:  Same objections, Your Honor.

21             THE COURT:  Overruled.

22         Can you answer it, Mr. May?

23             THE WITNESS:  I, I think I can.

24             THE COURT:  Go ahead.

25             THE WITNESS:  Okay.  So looking at, you know, the
```

1    rise and fall of the opioid epidemic, because I think that

2    we definitely saw where there were more opioids that were

3    being prescribed, right, across the country which was always

4    a big concern of mine when I started with the work, and this

5    level of prescribing still concerns me.

6         And, so, we've seen that level of prescribing which led

7    to more distribution over the years.  And then we've seen a

8    decline if we go back to around -- and, again, when I'm

9    looking at data, some of it is AmerisourceBergen data.

10   Other is data that I'm seeing whether it's published by CDC

11   in terms of prescribing rates and that sort of thing.

12   Right?  So then we saw -- we've seen and we continue to see

13   a decline in the prescribing of opioids.

14        And, and, so -- which is a good thing in my view.  And,

15   so, when I say that -- let me just stop there for one

16   second.  The prescribing of those opioids and the increase

17   in the distribution and the subsequent decline in the

18   prescribing and the decline in the distribution are, are

19   directly related.  Right?  And it shows us that where the

20   demand came from.

21        And, so, I would say that certainly the

22   over-prescribing of opioids over time has contributed

23   significantly to the epidemic.

24   **Q.**   So in that sense, do you believe that when the

25   prescribing levels are increased, it also puts the, an

1    increase in diversion of pills into the illicit market as

2    well?

3                    MR. HESTER:  Object to form.

4                    THE COURT:  Tell me what your basis is for the

5    objection, Mr. Hester.

6                    MR. HESTER:  I think it's compound, Your Honor.

7                    THE COURT:  Yeah.  I'll sustain the objection.

8    BY MR. PIFKO:

9    **Q.**   Mr. May, you, you just testified that you believed

10   there was an increase in prescribing of opioids over

11   time; correct?

12   **A.**   Correct, and then a subsequent decrease, correct.

13   Thank you.

14   **Q.**   So my question is coming from the framework that

15   there's an increase in prescriptions being written of

16   opioids, that's putting more pills out in the world.  And do

17   you believe that there is a corresponding increase in

18   diversion that accompanies the increase in prescribing?

19                   MR. HESTER:  Objection, Your Honor, compound

20   again.

21                   MS. MCCLURE:  Join.

22                   MR. RUBY:  We join in that, Your Honor.  And we'll

23   continue to object to the attempt to elicit opinion

24   testimony from this witness who was not disclosed as either

25   an expert on a hybrid witness.

```
 1              THE COURT:  Well, it's not an expert -- it's a lay
 2    opinion, isn't it, Mr. Pifko?
 3              MR. PIFKO:  Well, he's the -- yeah.  I'm not
 4    asking him as an expert, but he is the head of diversion
 5    control for AmerisourceBergen and he has a 30-year --
 6              THE COURT:  Well, based on his experience, I'll
 7    let him answer.
 8              THE WITNESS:  I'm sorry to make you ask me that
 9    question one more time.
10    BY MR. PIFKO:
11    Q.   Yeah.  I'm asking if you believe there's a
12    corresponding increase in diversion of prescription
13    opioids that accompanies the increase in prescribing of
14    opioids.
15    A.   So the, the -- I cannot say as I sit here today that
16    the elevated prescribing of opioids in, in the -- that there
17    is a correlation between the pharmaceutical supply of
18    opioids, big or small, how that's contributed to the illegal
19    market.
20         We have no visibility, of course, in terms of -- we
21    have -- we deliver pharmaceuticals, opioids and other
22    controlled every single day to a pharmacy, and then those
23    are dispensed.  We have no, zero visibility from the moment
24    that we actually -- the, the controlled substances leave our
25    distribution center on that last mile vehicle and go to the
```

1    pharmacy.

2       We, we just -- we don't have visibility and we haven't

3    sought to somehow track that.  I haven't, you know, tried to

4    understand that and I don't know that I could if I did.

5    BY MR. PIFKO:

6    **Q.**   Okay.  So based on the context you described, do

7    you believe the volume of prescription opioids diverted

8    into the illicit market was a substantial factor giving

9    rise to the opioid epidemic?

10           MS. MCCLURE:  Same objection, Your Honor.

11           THE COURT:  Well, he said he didn't know anything,

12   if I understood him correctly, about, about the volume of

13   opioids diverted into the illicit market.  He didn't say

14   anything about that, did he?

15           MS. MCCLURE:  Your Honor, I agree.  He said, "I

16   cannot say there's any correlation."

17           THE COURT:  Objection sustained.

18   BY MR. PIFKO:

19   **Q.**   Mr. May, have you reviewed the House Energy and

20   Commerce report called "Red Flags and Warning Signs

21   Ignored:  Opioid Distribution and Enforcement Concerns

22   in West Virginia"?

23           MR. RUBY:  Your Honor, we'll object in that this

24   is the subject of -- House Energy and Commerce report is the

25   subject of a pending motion that the Court has yet to

```
1    decide.

2              MS. MCCLURE:  Join, Your Honor.

3              MR. PIFKO:  I'm just asking if he read it, Your

4    Honor.

5              THE COURT:  I'll let you pursue this for a while.

6    You asked him if he had reviewed the House Energy and

7    Commerce report.

8         Have you?

9              THE WITNESS:  I have not.  I have heard of

10   certainly news and seen news clips about -- if we're talking

11   about the same report.  I'm not even sure because I heard

12   the end of that was for West Virginia.  But if it's all in

13   the same report, I certainly remember seeing news reports,

14   clips.  But beyond that, I don't recall ever reading that

15   report.

16   BY MR. PIFKO:

17   Q.   Have you reviewed the --

18              MS. MCCLURE:  Your Honor, so we would, we would

19   request that Mr. May not be asked questions regarding the

20   report he hasn't read.

21   BY MR. PIFKO:

22   Q.   Have you reviewed the 2019 Office of Inspector

23   General report that was entered into evidence by your

24   counsel?  Are you familiar with that report?

25   A.   I am familiar with excerpts from that report.  I've,
```

1    I've read certain parts of that report.  I can't say as I

2    sit here that I've read it from end to end.

3    **Q.**   Did you have an understanding -- what's your

4    recollection of the portions that you read?

5    **A.**   Of the Inspector General's report?

6    **Q.**   Yes.

7    **A.**   I seem to recall there was some critiquing of the

8    handling of suspicious order reports by DEA.  But beyond

9    that, I really don't have a lot of clear recollection.  I'm

10   not even sure when I looked at the excerpts.

11   **Q.**   Do you recall reading any portions in the report that

12   were about the opioid epidemic in general?

13   **A.**   I may have read sections.  I just don't recall what

14   those may have been.  I, I try to take in a lot of material

15   in my position and, and read as much as I can as I conduct

16   my work, but I just don't have a specific recollection.

17              MR. PIFKO:  Your Honor, I don't have any further

18   questions at this time and pass the witness.

19              THE COURT:  All right.  Is there any cross?

20              MS. MCCLURE:  Yes, Your Honor, there will be

21   cross-examination of Mr. May.

22        That said, I do believe that Mr. Pifko has covered some

23   fairly extensive portions of the examination that we would

24   have with Mr. May.  So if we were going a full day today,

25   this would be the time where I would request that I have,

1    you know, 15 or 20 minutes to evaluate the outline and

2    determine whether we can shorten.  But that said, with the

3    fact that we have a noon deadline, I would request at least

4    a ten-minute break to review that.

5            THE COURT:  How much cross-examination of this

6    witness do you expect to have?

7            MS. MCCLURE:  I expect it to be something around

8    an hour to an hour and a half given that we've covered some

9    of the things that I was going to cover, so I want to

10   shorten --

11           THE COURT:  Well, we're going to have to have him

12   come back it looks to me like.

13       Mr. May, I know you'd probably like to get out of here,

14   but we're going to ask you to come back Monday morning, sir.

15           THE WITNESS:  I'm happy to do so.

16           THE COURT:  All right.  Thank you very much.

17       Let's go ahead and pull the plug on this now then

18   unless one of the other defendants wants to use 20 minutes

19   here.

20           MR. RUBY:  No, Your Honor.

21           MR. HESTER:  No, Your Honor.

22           THE COURT:  Okay.  Let's -- we'll come back at

23   9:00 Monday morning.

24       We'll see you then, Mr. May.

25           THE WITNESS:  Yes, sir.  Thank you.

```
 1              THE COURT:  Yes, Mr. Farrell.
 2              MR. FARRELL:  I think this is the time that
 3    plaintiffs are formally proffering and tendering the
 4    deposition transcripts for purposes of trial testimony of
 5    Nate Hartle and Thomas Prevoznik.  I think those are the
 6    magic words that I say to start the argument with the other
 7    side.
 8              THE COURT:  All right.  There is a motion to
 9    strike Mr. Prevoznik's testimony, --
10              MR. FARRELL:  Yes.
11              THE COURT:  -- is there not?
12              MR. HESTER:  And there's a pending motion as to
13    the Hartle deposition as well, Your Honor.
14              THE COURT:  I don't remember that.  Is that to
15    strike the whole thing or just --
16              MR. HESTER:  Yes, Your Honor.  Well, yes,
17    objecting on various grounds to that testimony.  So we've
18    briefed that for you.
19              THE COURT:  All right.  Well, I'll try to look at
20    those issues.
21          And you'll be ready to go on Monday morning, Mr.
22    Farrell?
23              MR. FARRELL:  Yes, Your Honor.
24              THE COURT:  Okay, all right.  I'll see everybody
25    Monday.
```

1          Is there anything else to take up now?

2                MR. MAJESTRO:  Your Honor, with respect to the

3      Prevoznik motion, that is not fully briefed and we will be

4      in a position to file our response tomorrow.

5                THE COURT:  Okay.  I'll be happy to read that.

6                MR. MAJESTRO:  I would expect my friends on the

7      other side have a reply.

8                THE COURT:  Okay, all right.  Very good.  See you

9      on Monday.

10          (Trial recessed at 11:38 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1          CERTIFICATION:

2                    I, Ayme A. Cochran, Official Court

3      Reporter, and I, Lisa A. Cook, Official Court Reporter,

4      certify that the foregoing is a correct transcript from

5      the record of proceedings in the matter of The City of

6      Huntington, et al., Plaintiffs vs. AmerisourceBergen

7      Drug Corporation, et al., Defendants, Civil Action No.

8      3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9      reported on May 14, 2021.

10

11              S\Ayme A. Cochran              s\Lisa A. Cook

12                 Reporter                       Reporter

13          _

14

15              May 14, 2021

16                 Date

17

18

19

20

21

22

23

24

25
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

## $

**$250,000** [1] - 64:16

## 0

**00907** [2] - 2:5, 2:17

## 1

**10** [1] - 1:16
**10-12** [1] - 56:16
**1001** [2] - 2:10, 4:6
**1022** [1] - 3:5
**11:08** [1] - 63:11
**11:38** [1] - 83:10
**126** [1] - 3:5
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:16
**14** [4] - 1:19, 7:4, 84:9, 84:15
**15** [1] - 81:1
**15910** [1] - 3:18
**1600** [1] - 3:17
**1717** [2] - 6:6, 6:13
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1982** [1] - 16:24
**1985** [1] - 17:1

## 2

**20** [2] - 81:1, 81:18
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2000s** [1] - 32:22
**2003** [1] - 28:24
**2004** [1] - 48:1
**2006** [1] - 9:25
**2007** [4] - 48:5, 48:8, 48:15, 48:23
**2011** [1] - 28:19
**2012** [1] - 19:21
**2014** [10] - 16:2, 16:3, 19:15, 20:18, 46:12, 51:3, 51:9, 51:16, 54:20, 56:9
**2015** [3] - 50:11, 54:20, 68:17
**2016** [1] - 34:7
**2018** [3] - 10:15, 10:17, 50:12
**2019** [3] - 10:2, 10:15, 79:22
**202** [2] - 2:4, 2:16
**2021** [5] - 1:19, 7:4, 20:18, 84:9, 84:15
**22,000** [2] - 45:17,

45:20
**2216** [1] - 3:7
**25** [1] - 5:5
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**27-odd** [1] - 25:2
**28** [3] - 3:15, 4:3, 4:9
**28th** [1] - 68:16
**29464** [3] - 3:15, 4:4, 4:9

## 3

**30** [1] - 17:25
**30(b)(6** [3] - 15:8, 50:10, 50:11
**30-year** [4] - 17:2, 23:8, 30:2, 77:5
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**32502** [1] - 2:14
**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 84:8
**3:17-cv-01665** [2] - 1:11, 84:8

## 4

**4-0** [1] - 45:8
**40,000** [2] - 45:6, 45:8
**401** [2] - 2:10, 4:6
**405** [1] - 2:7

## 5

**5-9-0** [1] - 46:20
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:3
**590** [1] - 46:20

## 6

**6** [1] - 34:7
**600** [1] - 2:13
**6th** [1] - 3:5

## 7

**70** [2] - 57:11, 57:12
**70130** [1] - 3:8
**707** [1] - 4:18
**716** [1] - 3:12
**725** [2] - 4:13, 4:15

## 8

**8** [6] - 33:20, 66:21, 66:22, 66:24, 66:25
**800** [2] - 36:11, 36:24
**801** [3] - 3:10, 71:11, 71:12
**801(d)(2** [1] - 71:13
**801(d)(2)(C)** [1] - 70:21
**801(d)(2)(D)** [1] - 70:24
**850** [1] - 5:12
**898** [5] - 33:15, 33:21, 35:10, 36:8, 49:3

## 9

**90%** [2] - 36:14, 37:12
**901** [1] - 4:18
**90s** [1] - 32:22
**91436** [1] - 3:18
**93** [5] - 68:5, 68:11, 68:14, 68:23, 69:7
**943** [1] - 66:15
**99** [1] - 72:25
**9:00** [2] - 7:4, 81:23
**9th** [1] - 2:10

## A

**a.m** [2] - 7:4, 63:11, 83:10
**AB** [1] - 72:4
**abate** [1] - 9:17
**abatement** [2] - 10:24, 11:6
**abatement-only** [1] - 10:24
**ABC** [1] - 15:15
**ability** [4] - 9:11, 13:22, 24:14, 47:8
**able** [6] - 8:21, 23:25, 41:19, 48:22, 48:25, 60:18
**absolutely** [4] - 24:13, 30:23, 42:19, 45:22
**abuse** [10] - 28:13, 29:8, 29:13, 30:1, 30:10, 31:10, 56:12, 58:11, 60:15
**abusing** [1] - 29:19
**access** [7] - 8:4, 45:20, 47:1, 47:8, 47:13, 47:22, 48:22
**accompanied** [2] - 8:24, 68:18
**accompanies** [2] - 76:18, 77:13
**Ackerman** [1] - 35:17

**ACKERMAN** [2] - 2:9, 35:17
**acknowledging** [1] - 8:11
**act** [2] - 72:16, 72:18
**Action** [4] - 1:4, 1:10, 84:7, 84:8
**action** [2] - 43:14, 73:19
**actions** [7] - 19:17, 20:13, 20:16, 40:15, 41:21, 73:10, 73:14
**activities** [7] - 15:16, 19:4, 19:14, 20:4, 41:8, 54:10, 63:25
**activity** [8] - 53:21, 62:10, 62:11, 62:12, 72:23, 72:24, 72:25, 73:12
**actual** [2] - 12:16, 52:10
**add** [4] - 18:25, 22:6, 30:24, 61:14
**added** [2] - 16:12, 16:19
**addicted** [2] - 30:11, 31:11
**addiction** [1] - 31:2
**adding** [1] - 18:14
**addition** [1] - 63:22
**additional** [4] - 18:16, 18:20, 18:25, 53:25
**additionally** [1] - 32:14
**address** [2] - 23:4, 40:10
**adjusted** [1] - 57:11
**admin** [1] - 34:11
**Administration** [2] - 16:24, 23:9
**administrative** [1] - 61:19
**admission** [1] - 70:12
**admit** [4] - 35:10, 36:7, 69:6, 71:19
**admitted** [3] - 36:7, 69:20, 71:24
**ADMITTED** [1] - 69:23
**adverse** [4] - 40:14, 41:21, 42:19, 43:13
**Affairs** [4] - 16:5, 21:10, 24:22, 24:23
**Africa** [1] - 23:17
**agency** [1] - 23:12
**agenda** [1] - 59:17
**agent** [3] - 69:23, 70:1, 70:24
**agents** [1] - 56:2
**ago** [3] - 11:10, 13:1, 27:7

**agree** [4] - 9:6, 29:17, 70:15, 78:15
**agreed** [1] - 48:9
**agreement** [2] - 48:14, 48:18
**ahead** [2] - 74:24, 81:17
**al** [4] - 1:7, 1:13, 84:6, 84:7
**algorithm** [7] - 12:1, 12:5, 12:13, 12:17, 12:19, 13:4
**allow** [4] - 13:22, 42:2, 46:15, 51:25
**almost** [1] - 24:10
**alternative** [1] - 31:12
**AmerisourceBergen** [38] - 6:2, 7:17, 7:22, 8:24, 15:3, 15:4, 15:8, 16:20, 17:3, 17:19, 20:21, 22:10, 23:15, 27:6, 27:10, 36:13, 38:17, 44:21, 45:2, 45:5, 45:15, 49:11, 49:18, 51:5, 51:9, 52:15, 55:24, 57:25, 60:8, 61:2, 73:5, 73:18, 74:13, 74:18, 75:9, 77:5, 84:6
**AMERISOURCEBERGEN** [2] - 1:7, 1:13
**amount** [2] - 12:5, 13:6
**analysis** [1] - 42:3
**analytic** [2] - 54:15, 57:2
**analytics** [9] - 53:19, 53:20, 53:24, 54:9, 54:16, 54:21, 54:22, 54:23, 55:5
**ANDREW** [1] - 5:10
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**answer** [11] - 22:8, 28:7, 30:3, 32:17, 42:10, 48:25, 51:14, 51:25, 72:14, 74:22, 77:7
**answered** [1] - 63:3
**answers** [1] - 44:15
**ANTHONY** [1] - 2:6
**anticipate** [1] - 7:20
**anticipated** [3] - 40:18, 43:8, 44:2
**anticipating** [1] - 23:12
**apologize** [1] - 67:7
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6,

6:1, 6:10
**Appreciate** [1] - 71:22
**approach** [3] - 33:16, 66:15, 68:6
**appropriate** [2] - 32:15, 40:8
**Arch** [2] - 6:6, 6:13
**ARCHER** [4] - 46:7, 46:14, 46:22, 47:4
**area** [3] - 20:10, 21:25, 44:13
**areas** [7] - 22:24, 23:2, 64:5, 64:11, 65:8, 67:22, 69:1
**argument** [1] - 82:6
**arrest** [1] - 73:15
**arrival** [4] - 49:13, 55:23, 56:9, 59:6
**articles** [1] - 58:12
**articulated** [1] - 10:23
**ASHLEY** [1] - 5:3
**aspect** [1] - 27:18
**asserted** [1] - 70:16
**assess** [1] - 53:17
**assessment** [7] - 39:8, 39:11, 39:21, 39:24, 40:4, 42:4, 69:2
**assign** [1] - 59:7
**assigns** [1] - 12:5
**assist** [3] - 23:25, 38:1, 61:11
**assistance** [2] - 34:13, 63:22
**assisted** [1] - 54:18
**assists** [1] - 54:5
**associated** [1] - 59:9
**associates** [2] - 59:14, 60:9
**Association** [1] - 34:1
**assume** [1] - 58:4
**assumption** [1] - 41:9
**AT** [1] - 1:2
**athlete** [1] - 30:14
**attempt** [3] - 18:10, 20:12, 76:23
**attended** [1] - 35:7
**attention** [1] - 16:17
**attorneys** [1] - 13:18
**attributes** [3] - 38:12, 42:5, 54:14
**August** [1] - 68:16
**authenticity** [1] - 35:22
**authored** [1] - 34:15
**authority** [1] - 53:15
**authorized** [3] - 70:1, 70:23, 71:15
**available** [2] - 36:23, 41:18

**Avin** [1] - 3:7
**aware** [15] - 19:12, 19:19, 20:13, 20:16, 20:21, 28:15, 60:14, 60:25, 64:10, 64:15, 64:17, 65:6, 65:11, 65:12, 73:4
**awareness** [2] - 59:21, 61:4
**Ayme** [2] - 6:17, 84:2

**B**

**back-and-forth** [2] - 26:4, 26:5
**Baltimore** [1] - 32:25
**Baron** [1] - 3:17
**Based** [1] - 69:3
**based** [8] - 33:3, 37:3, 52:8, 58:9, 62:12, 74:17, 77:6, 78:6
**basis** [2] - 74:5, 76:4
**basket** [1] - 38:15
**baskets** [4] - 38:8, 38:12, 49:4, 52:25
**Bates** [1] - 67:3
**Baylen** [1] - 2:13
**became** [1] - 20:16
**become** [8] - 13:11, 29:8, 30:10, 30:11, 31:10, 31:11, 32:11, 73:3
**BEFORE** [1] - 1:17
**began** [1] - 56:9
**behalf** [3] - 9:14, 9:17, 70:8
**behavior** [4] - 61:24, 62:1, 62:5, 62:19
**belabor** [1] - 59:25
**belief** [1] - 52:8
**believes** [1] - 11:1
**Belize** [1] - 23:18
**BENCH** [1] - 1:16
**better** [3] - 37:12, 47:16, 55:6
**between** [2] - 56:16, 77:17
**beyond** [3] - 62:13, 79:14, 80:8
**big** [4] - 44:10, 62:3, 75:4, 77:18
**biographical** [1] - 40:6
**bit** [7] - 22:16, 25:11, 27:22, 41:2, 46:15, 58:23, 73:22
**black** [1] - 32:22
**block** [2] - 51:1, 51:17
**blocked** [2] - 9:23, 9:24
**Blvd** [3] - 3:15, 4:3,

4:9
**board** [1] - 53:5
**Board** [3] - 41:19, 46:3
**boarded** [1] - 48:12
**boarding** [3] - 43:2, 44:25, 59:19
**Bonasso** [1] - 5:14
**boots** [1] - 61:13
**bottom** [4] - 8:17, 66:22, 67:1, 67:4
**Boulevard** [1] - 3:18
**Box** [2] - 5:14, 6:8
**break** [5] - 18:22, 22:16, 57:12, 63:8, 81:4
**Bridgeside** [3] - 3:15, 4:3, 4:9
**brief** [1] - 70:4
**briefed** [2] - 82:18, 83:3
**briefing** [3] - 37:21, 70:8, 70:9
**bring** [2] - 22:23, 59:16
**broadcast** [5] - 8:5, 8:16, 9:7, 13:16, 14:1
**broadcasting** [1] - 11:17
**broader** [1] - 64:1
**brought** [5] - 9:17, 12:25, 16:17, 19:14, 22:5
**Bruce** [1] - 34:19
**Bruce"** [1] - 34:20
**Budd** [1] - 39:10
**buildings** [1] - 15:22
**built** [1] - 55:10
**bullet** [2] - 49:3, 52:25
**bunch** [1] - 41:12
**Burling** [1] - 5:11
**business** [2] - 42:6, 42:14
**BY** [30] - 14:23, 17:7, 17:11, 18:23, 20:1, 22:15, 30:6, 32:2, 33:19, 36:9, 43:25, 50:24, 52:4, 60:23, 62:25, 63:17, 65:5, 66:20, 67:8, 67:19, 68:9, 71:23, 73:23, 74:9, 76:8, 77:10, 78:5, 78:18, 79:16, 79:21

**C**

**CA** [1] - 3:18
**Cabell** [5] - 3:2, 28:3, 28:9, 29:3, 29:5

**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**CALLAS** [1] - 6:7
**CAMPBELL** [1] - 6:14
**cancelled** [3] - 51:7, 51:12, 52:7
**candor** [1] - 71:22
**cannot** [3] - 31:4, 77:15, 78:16
**capability** [1] - 59:10
**Capitol** [1] - 2:7
**capture** [1] - 46:4
**Cardinal** [5] - 4:11, 5:2, 19:19, 19:23, 36:13
**career** [5] - 17:2, 23:17, 24:9, 27:12, 37:22
**Carey** [1] - 4:17
**Carolina** [1] - 32:22
**carried** [1] - 19:10
**carry** [1] - 49:10
**case** [13] - 8:12, 9:2, 9:17, 9:23, 9:25, 10:23, 13:19, 37:19, 41:5, 70:7, 70:11, 71:7, 73:20
**cases** [1] - 70:2
**categorize** [1] - 43:21
**categorized** [1] - 57:23
**caused** [4] - 33:12, 74:14, 74:16, 74:19
**causes** [1] - 42:21
**caution** [1] - 24:10
**CDC** [1] - 75:10
**CE** [1] - 60:4
**center** [3] - 15:25, 25:14, 77:25
**Center** [2] - 3:12, 5:11
**centers** [6] - 15:20, 25:2, 25:3, 25:4, 25:9, 59:22
**certain** [2] - 8:1, 8:5, 8:7, 10:11, 12:1, 19:17, 20:16, 23:13, 36:21, 37:11, 39:2, 40:18, 42:25, 43:1, 56:4, 57:5, 61:11, 61:18, 65:15, 66:7, 73:10, 80:1
**certainly** [8] - 24:8, 26:2, 27:17, 48:10, 55:2, 75:21, 79:10, 79:13
**CERTIFICATION** [1] - 84:1
**certify** [1] - 84:4
**cetera** [1] - 13:20
**CFR** [1] - 39:13

**chain** [2] - 19:8, 20:14
**challenge** [1] - 37:24
**challenges** [3] - 21:4, 21:18, 21:22
**chance** [2] - 37:12, 38:5
**change** [3] - 30:16, 47:9, 56:11
**changed** [1] - 56:14
**changes** [1] - 22:25
**charge** [2] - 56:18, 61:3
**CHARLES** [1] - 3:11
**Charleston** [6] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:3
**CHARLESTON** [2] - 1:2, 1:18
**Charlotte** [1] - 32:22
**Chase** [1] - 4:18
**check** [2] - 41:17, 41:19
**chemicals** [2] - 39:10, 45:10, 53:18
**Chesterbrook** [1] - 6:15
**choosing** [2] - 11:8, 11:10
**Chris** [1] - 17:21
**circumstances** [2] - 36:4, 42:13
**circumstances-type** [1] - 42:13
**City** [4] - 4:1, 5:11, 33:2, 84:5
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 84:7, 84:8
**civil** [1] - 1:10
**clarify** [2] - 44:23, 57:24
**clarity** [3] - 22:6, 49:15, 50:8
**clear** [11] - 8:7, 10:19, 11:16, 13:3, 22:1, 36:17, 39:12, 41:24, 46:12, 50:10, 80:9
**clearer** [1] - 57:14
**CLERK** [3] - 14:10, 14:13, 14:16
**clinics** [2] - 26:17, 40:24
**clips** [2] - 79:10, 79:14
**closed** [3] - 19:8, 47:15, 72:20
**Closed** [1] - 13:10
**closure** [1] - 14:6
**Cochran** [3] - 6:17, 84:2, 84:11
**code** [1] - 12:17

**codeine** [1] - 57:18
**collaborate** [1] - 38:1
**collaboration** [1] - 58:15
**collect** [21] - 39:2, 39:4, 39:5, 39:14, 40:6, 40:10, 40:12, 40:14, 40:17, 40:19, 40:25, 45:1, 45:22, 45:24, 45:25, 46:17, 48:11, 48:18, 61:12
**collected** [6] - 39:6, 43:7, 48:7, 48:12, 48:21, 53:9
**collecting** [9] - 39:18, 39:19, 41:25, 48:5, 48:9, 54:21, 54:22, 55:6, 55:9
**collection** [1] - 61:19
**collects** [1] - 45:3
**Columbian** [1] - 33:3
**Columbian-based** - 33:3
**combined** [1] - 36:13
**coming** [1] - 76:14
**Commerce** [3] - 78:20, 78:24, 79:7
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2, 3:2
**commit** [1] - 45:18
**common** [1] - 31:3
**communicate** [1] - 24:14
**communicated** [1] - 65:21
**communicating** [1] - 22:3
**communication** [2] - 23:6, 23:11
**communications** [2] - 66:2, 66:3
**communities** [1] - 44:12
**community** [2] - 10:10, 33:9
**companies** [1] - 37:14
**company** [41] - 10:18, 16:2, 16:6, 18:2, 18:5, 18:24, 19:2, 19:5, 19:9, 19:10, 19:15, 20:22, 21:9, 22:19, 23:15, 23:25, 26:18, 27:15, 27:19, 39:4, 39:24, 47:12, 48:1, 48:2, 50:25, 51:3, 52:1, 52:5, 52:6, 52:9, 52:10, 54:22, 55:25, 56:2,

60:13, 64:6, 64:12, 64:15, 65:9, 67:23, 68:21
**complaint** [1] - 12:23
**complaints** [1] - 15:24
**completely** [1] - 22:1
**Compliance** [4] - 25:13, 25:15, 55:24, 59:22
**compliance** [2] - 19:13, 63:25
**component** [3] - 58:20, 61:7, 61:9
**compound** [3] - 18:21, 76:6, 76:19
**computer** [2] - 6:19, 12:1
**concept** [2] - 39:1, 56:23
**concern** [13] - 12:23, 42:21, 43:1, 43:6, 43:11, 43:16, 43:17, 44:2, 44:3, 44:5, 62:8, 62:21, 75:4
**concerned** [2] - 13:23, 62:14
**concerns** [5] - 8:4, 11:18, 43:5, 60:19, 75:5
**Concerns** [1] - 78:21
**conclusion** [3] - 50:13, 50:17, 51:20
**conclusions** [1] - 33:11
**conduct** [3] - 10:4, 37:22, 80:15
**conducted** [1] - 10:3
**conducting** [1] - 57:7
**conference** [2] - 35:2, 35:8
**confidential** [3] - 10:18, 10:19, 11:21
**confidentiality** [3] - 8:20, 11:18, 13:19
**confusing** [2] - 35:4, 42:7
**connection** [2] - 32:10, 56:23
**Connolly** [2] - 4:13, 5:4
**CONROY** [1] - 3:3
**consider** [4] - 43:2, 44:20, 58:9, 61:9
**considered** [5] - 10:18, 12:6, 12:10, 13:8, 58:17
**consult** [1] - 58:7
**consultant** [3] - 55:12, 56:10, 56:15
**consultants** [3] - 54:5,

54:18, 55:5
**Consulting** [2] - 55:13, 63:19
**consulting** [1] - 63:19
**contact** [1] - 37:24
**contain** [2] - 12:2, 25:10
**contained** [1] - 54:24
**contains** [1] - 45:24
**contention** [1] - 35:21
**context** [7] - 37:17, 39:24, 41:4, 42:2, 62:6, 72:6, 78:6
**continually** [1] - 54:7
**continue** [4] - 49:13, 53:7, 75:12, 76:23
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continued** [1] - 55:15
**continues** [1] - 32:14
**continuing** [1] - 14:6
**continuous** [4] - 53:1, 54:10, 55:19, 61:24
**contracting** [1] - 55:25
**contrary** [1] - 7:25
**contributed** [2] - 75:22, 77:18
**Control** [40] - 7:17, 7:19, 7:23, 8:1, 10:20, 11:5, 11:12, 11:14, 12:21, 15:6, 15:12, 15:14, 16:7, 16:11, 16:17, 21:13, 22:21, 25:22, 26:13, 26:19, 26:25, 27:20, 29:7, 36:4, 38:9, 38:13, 38:18, 39:4, 49:4, 50:19, 51:15, 53:1, 56:6, 58:25, 59:16, 59:20, 60:7, 61:8, 61:10, 61:15
**control** [2] - 15:17, 64:3, 77:5
**controlled** [16] - 37:11, 39:10, 39:25, 40:18, 42:14, 43:8, 53:17, 57:3, 57:4, 57:5, 57:9, 58:2, 62:7, 62:10, 77:22, 77:24
**controls** [4] - 45:10, 45:12, 45:16, 53:15
**conversations** [3] - 21:5, 51:4, 52:9
**convictions** [1] - 73:15
**Cook** [3] - 6:18, 84:3, 84:11
**copy** [4] - 47:17, 68:3,

69:4
**corner** [1] - 8:18
**corporate** [2] - 15:8, 15:22
**Corporate** [3] - 21:9, 24:22, 61:16
**Corporation** [2] - 6:2, 84:7
**cORPORATION** [2] - 1:7, 1:13
**correct** [35] - 15:9, 16:2, 16:21, 17:4, 17:5, 17:22, 17:23, 18:4, 25:21, 26:12, 27:16, 28:10, 29:9, 29:14, 31:7, 34:16, 37:5, 38:14, 40:1, 40:2, 41:9, 45:5, 46:24, 47:5, 47:6, 49:20, 49:23, 55:13, 62:1, 63:25, 64:6, 69:4, 76:11, 76:12, 84:4
**Correct** [2] - 70:18, 76:12
**correctly** [1] - 78:12
**correlation** [2] - 77:17, 78:16
**corresponding** [3] - 70:12, 76:17, 77:12
**counsel** [1] - 79:24
**counterparts** [1] - 70:9
**country** [7] - 15:20, 25:3, 26:15, 28:21, 37:20, 60:11, 75:3
**COUNTY** [1] - 1:10
**County** [6] - 2:2, 3:2, 28:4, 28:9, 29:3, 29:5
**couple** [4] - 28:5, 35:3, 36:17, 48:4
**courier** [1] - 26:6
**course** [16] - 8:12, 11:3, 27:18, 28:12, 32:19, 48:24, 53:16, 58:1, 58:10, 59:6, 59:19, 61:11, 70:10, 72:23, 73:9, 77:20
**courses** [1] - 60:4
**Court** [16] - 6:17, 6:18, 7:2, 7:15, 9:20, 13:1, 15:1, 27:5, 42:2, 46:15, 50:18, 63:6, 70:4, 78:25, 84:2, 84:3
**COURT** [85] - 1:1, 1:17, 7:5, 7:7, 7:12, 9:11, 11:20, 12:11, 13:14, 13:21, 14:1,

14:4, 14:18, 14:21, 17:13, 17:16, 18:22, 19:24, 22:8, 30:3, 31:16, 31:19, 31:24, 32:16, 33:13, 33:17, 35:12, 36:1, 36:6, 42:8, 46:9, 50:2, 50:21, 51:21, 51:24, 60:22, 62:24, 63:4, 63:7, 63:12, 63:15, 64:22, 64:25, 66:10, 66:13, 66:16, 67:4, 67:12, 67:16, 68:7, 69:8, 69:14, 69:18, 70:5, 70:15, 70:20, 71:3, 71:10, 71:13, 71:19, 71:22, 72:14, 74:5, 74:21, 74:24, 76:4, 76:7, 77:1, 77:6, 78:11, 78:17, 79:5, 80:19, 81:5, 81:11, 81:16, 81:22, 82:1, 82:8, 82:11, 82:14, 82:19, 82:24, 83:5, 83:8
**court** [5] - 8:15, 9:15, 13:15, 35:15, 63:8
**Court's** [1] - 13:19
**COURTROOM** [3] - 14:10, 14:13, 14:16
**cover** [2] - 72:4, 81:9
**covered** [3] - 10:14, 80:22, 81:8
**Covington** [1] - 5:11
**criminal** [4] - 72:16, 72:18, 72:23, 73:1
**crisis** [3] - 27:23, 27:25, 28:3
**critical** [6] - 50:2, 50:22, 64:4, 64:11, 65:7, 67:22
**critiquing** [1] - 80:7
**cross** [3] - 80:19, 80:21, 81:5
**cross-examination** [2] - 80:21, 81:5
**CRR** [2] - 6:17, 6:18
**CSRA** [3] - 34:11, 51:5, 59:15, 64:2, 69:22
**CSRA's** [1] - 63:24
**current** [9] - 7:21, 9:3, 10:4, 10:7, 11:6, 48:24, 63:24
**customer** [61] - 7:20, 11:21, 11:24, 12:1, 12:3, 12:5, 12:8, 13:6, 15:17, 15:18, 25:23, 26:14, 26:16, 26:20, 27:14, 38:6,

38:22, 38:25, 39:2,
39:3, 39:8, 39:9,
39:25, 40:13, 41:14,
41:15, 42:5, 42:12,
42:15, 42:18, 42:22,
43:2, 43:3, 43:10,
43:18, 44:13, 44:17,
44:24, 46:18, 46:19,
47:3, 47:11, 47:13,
47:24, 47:25, 48:6,
48:21, 48:22, 53:5,
53:6, 53:8, 53:14,
53:21, 54:1, 54:3,
54:4, 54:8, 54:9,
59:8, 62:10
**customer's** [2] -
61:24, 62:7
**customer-facing** [4] -
25:23, 26:14, 26:20,
59:8
**customer-specific** [2]
- 7:20, 12:3
**customers** [25] - 7:21,
7:22, 10:7, 12:9,
26:15, 27:20, 40:20,
41:11, 43:22, 45:6,
45:9, 45:11, 45:15,
45:18, 45:20, 45:23,
46:24, 48:10, 48:16,
48:17, 53:13, 60:2,
60:10, 61:22, 62:16
**customers'** [5] - 12:4,
62:1, 62:17, 62:19,
63:2
**cut** [1] - 14:1
**cycles** [1] - 33:4
**cyclical** [1] - 32:21

## D

**dashboard** [2] - 55:1,
55:2
**dashboards** [2] -
55:10, 57:2
**data** [11] - 12:19,
30:24, 41:17, 43:7,
45:25, 46:23, 54:24,
68:17, 75:9, 75:10
**databases** [2] - 46:21,
47:9
**date** [1] - 68:18
**Date** [1] - 84:16
**dated** [1] - 34:7
**dates** [1] - 46:11
**DAVID** [3] - 1:17, 2:9,
14:15
**David** [9] - 7:1, 7:11,
7:13, 7:16, 8:15,
14:9, 14:12, 15:2,
35:17

**day-to-day** [1] - 21:14
**days** [1] - 33:2
**DC** [6] - 2:11, 4:7,
4:14, 4:16, 5:5, 5:12
**De** [2] - 2:4, 2:16
**DEA** [31] - 16:21, 17:2,
19:18, 23:6, 23:7,
23:17, 23:23, 24:5,
24:8, 24:15, 25:8,
29:14, 30:2, 31:5,
31:10, 32:3, 32:6,
48:8, 48:14, 51:12,
56:1, 58:1, 58:8,
72:4, 72:22, 74:13,
74:18, 80:8
**DEA's** [1] - 20:3
**deadline** [1] - 81:3
**decide** [3] - 53:25,
54:2, 79:1
**decided** [1] - 55:3
**decision** [3] - 42:20,
43:18, 43:22
**decline** [4] - 75:8,
75:13, 75:17, 75:18
**decrease** [1] - 76:12
**Defendant** [4] - 4:10,
5:2, 5:7, 6:2
**defendant** [1] - 70:17
**defendants** [4] - 9:21,
12:14, 35:20, 81:18
**Defendants** [3] - 1:8,
1:14, 84:7
**defense** [2] - 8:12,
11:15
**definitely** [1] - 75:2
**definitively** [1] - 27:3
**deliver** [2] - 59:10,
77:21
**delivery** [1] - 40:11
**demand** [1] - 75:20
**department** [1] - 64:2
**deponent** [2] - 50:10,
50:11
**deposed** [1] - 15:7
**deposition** [6] - 29:17,
30:8, 49:20, 68:1,
82:4, 82:13
**DEPUTY** [3] - 14:10,
14:13, 14:16
**deriving** [1] - 37:7
**describe** [6] - 7:22,
22:11, 25:25, 49:7,
55:20, 56:3
**described** [3] - 41:5,
72:24, 78:6
**describes** [1] - 69:20
**description** [1] - 68:24
**designate** [2] - 51:11,
57:25
**despite** [1] - 10:17

**detect** [1] - 49:5
**detective** [1] - 27:11
**determine** [3] - 12:14,
39:20, 81:2
**determining** [1] - 58:7
**develop** [1] - 56:20
**developed** [7] - 46:6,
53:19, 54:16, 54:17,
55:10, 56:15, 59:5
**developing** [1] - 63:22
**deviate** [1] - 52:23
**differ** [1] - 24:24
**different** [6] - 16:9,
28:13, 58:23, 59:4,
59:25, 67:2
**differently** [1] - 41:2
**digit** [1] - 28:22
**digital** [1] - 47:17
**diligence** [21] - 15:16,
15:17, 15:18, 21:14,
26:24, 27:15, 38:22,
38:25, 39:14, 41:10,
44:25, 53:2, 53:8,
53:10, 53:12, 53:23,
54:11, 54:24, 55:16,
57:8, 61:12
**diligence"** [1] - 39:15
**direct** [2] - 16:18, 18:1
**DIRECT** [1] - 14:22
**directed** [1] - 73:1
**directly** [3] - 21:13,
54:1, 75:19
**Director** [3] - 16:5,
16:6, 21:12
**directors** [2] - 25:12
**disagrees** [1] - 71:8
**disclose** [1] - 9:21
**disclosed** [3] - 11:22,
35:22, 76:24
**disclosures** [1] - 10:3
**discovery** [9] - 9:23,
9:25, 10:2, 10:3,
10:4, 10:14, 11:4,
12:13, 12:24
**discuss** [2] - 12:2,
21:22
**discussed** [9] - 8:10,
9:4, 9:5, 21:18,
22:12, 29:16, 30:7,
49:20, 68:1
**discussing** [2] - 21:4,
28:14
**discussion** [2] -
20:25, 38:7
**discussions** [2] -
18:12, 23:21
**Disorder** [1] - 29:6
**dispensed** [1] - 77:23
**dispensing** [1] - 43:6
**dispersed** [1] - 60:10

**display** [1] - 13:15
**distant** [1] - 11:8
**distribution** [16] -
15:20, 15:25, 19:4,
19:13, 25:2, 25:3,
25:4, 25:9, 25:14,
57:1, 57:2, 59:22,
75:7, 75:17, 75:18,
77:25
**Distribution** [2] -
13:10, 78:21
**distributor** [2] - 28:17,
43:5
**distributors** [5] - 20:4,
26:17, 36:12, 40:13,
49:8
**District** [2] - 7:2, 7:3
**DISTRICT** [3] - 1:1,
1:1, 1:17
**diversion** [15] - 15:16,
27:18, 37:9, 37:19,
56:1, 60:15, 61:4,
64:3, 72:16, 72:18,
73:13, 76:1, 76:18,
77:4, 77:12
**Diversion** [41] - 7:17,
7:19, 7:23, 8:1,
10:20, 11:5, 11:12,
11:14, 12:21, 15:6,
15:12, 15:14, 16:7,
16:11, 16:17, 21:13,
22:21, 25:22, 26:13,
26:19, 26:24, 27:20,
29:7, 34:2, 36:4,
38:8, 38:13, 38:18,
39:3, 49:4, 50:19,
51:15, 53:1, 56:6,
58:25, 59:16, 59:20,
60:7, 61:8, 61:10,
61:15
**diverted** [7] - 72:2,
72:10, 72:13, 73:8,
73:25, 78:7, 78:13
**document** [17] - 9:16,
35:19, 35:20, 44:22,
45:2, 45:22, 49:2,
56:7, 63:5, 64:18,
66:8, 66:10, 67:17,
68:18, 70:3, 70:12,
71:24
**documentation** [2] -
47:15, 48:19
**documents** [21] - 8:5,
8:7, 8:8, 8:17, 8:19,
8:22, 9:7, 9:9, 9:19,
9:21, 10:12, 10:13,
10:17, 11:16, 11:18,
12:1, 13:5, 13:12,
13:23, 64:9, 65:15
**done** [8] - 23:21,

23:22, 29:2, 35:3,
54:8, 60:5, 61:21,
73:5
**door** [1] - 51:8
**double** [1] - 28:22
**Douglas** [1] - 4:17
**down** [9] - 14:19, 25:9,
28:21, 28:22, 29:3,
44:21, 45:19, 54:13,
58:18
**Dr** [1] - 12:18
**draw** [1] - 33:11
**drinking** [1] - 20:10
**drive** [1] - 56:3
**Drive** [1] - 6:15
**drug** [16] - 20:4, 29:8,
29:13, 29:19, 30:1,
30:10, 31:5, 31:6,
31:10, 38:4, 56:12,
57:11, 57:12, 58:11,
60:15, 73:1
**DRUG** [1] - 1:7, 1:13
**Drug** [5] - 6:2, 16:24,
23:9, 34:1, 84:7
**drugs** [3] - 30:21,
33:10, 73:2
**due** [22] - 15:15,
15:17, 15:18, 21:14,
26:24, 27:14, 38:22,
38:25, 39:14, 41:10,
44:24, 53:2, 53:8,
53:10, 53:12, 53:23,
54:11, 54:24, 55:16,
57:8, 61:12
**during** [8] - 7:19, 19:5,
28:19, 29:16, 36:19,
45:23, 54:20, 73:3
**duties** [3] - 16:18,
24:6, 61:19
**duty** [1] - 39:13

## E

**e-mail** [2] - 34:4, 54:2
**early** [1] - 32:21
**easier** [1] - 23:11
**East** [3] - 3:5, 3:12,
4:18
**easy** [1] - 42:20
**Ed** [3] - 21:11, 26:23,
27:1
**educate** [1] - 37:25
**education** [2] - 58:20,
58:21
**efficient** [1] - 55:2
**efficiently** [2] - 8:13,
59:11
**effort** [2] - 37:25,
61:15
**efforts** [7] - 19:3,

21:14, 26:24, 27:15, 29:8, 31:9, 32:10
**eight** [1] - 27:9
**Eighth** [1] - 3:10
**either** [11] - 8:18, 8:22, 18:8, 26:6, 35:22, 41:23, 54:4, 56:1, 73:19, 73:20, 76:24
**elaborate** [1] - 21:21
**electronic** [4] - 46:5, 46:6, 59:6, 68:17
**electronically** [2] - 59:3, 59:8
**elements** [2] - 38:18, 43:15
**elevated** [3] - 57:4, 57:6, 77:16
**elicit** [1] - 76:23
**elicited** [2] - 8:10, 8:11
**eliciting** [1] - 10:6
**ELIZABETH** [1] - 6:14
**email** [4] - 65:24, 66:3, 67:11, 67:15
**empirical** [1] - 30:24
**employed** [2] - 15:4, 19:6
**employee** [4] - 23:9, 27:6, 34:11, 70:25
**employees** [3] - 16:18, 25:18, 55:25
**employment** [2] - 27:10, 70:2
**Encino** [1] - 3:18
**encompasses** [1] - 22:22
**end** [12] - 7:25, 9:25, 10:1, 24:9, 37:8, 42:18, 53:8, 57:15, 57:16, 79:12, 80:2
**ends** [1] - 10:14
**Energy** [3] - 78:19, 78:24, 79:6
**enforced** [1] - 7:18
**enforcement** [6] - 19:14, 20:4, 20:13, 27:13, 37:21, 37:25
**Enforcement** [3] - 16:24, 23:9, 78:21
**engage** [5] - 21:7, 39:16, 39:17, 43:24, 65:17
**engaged** [6] - 21:15, 55:23, 56:2, 64:1, 64:8, 65:13
**engagement** [12] - 54:9, 64:7, 64:9, 65:14, 65:15, 65:18, 65:20, 65:22, 65:25, 66:5, 66:11
**engages** [1] - 15:21

**engaging** [1] - 39:1
**enhancement** [1] - 54:19
**entail** [1] - 18:13
**entered** [2] - 12:18, 79:23
**entities** [2] - 19:12, 20:14
**entitled** [1] - 11:14
**entity** [3] - 19:13, 23:7, 40:8
**entry** [1] - 70:3
**ENU** [1] - 4:12
**environment** [1] - 21:19
**epidemic** [12] - 9:18, 10:10, 36:5, 74:2, 74:11, 74:14, 74:16, 74:19, 75:1, 75:23, 78:9, 80:12
**essence** [2] - 21:1, 56:14
**essentially** [2] - 57:14, 59:7
**establish** [1] - 65:1
**et** [5] - 1:7, 1:13, 13:20, 84:6, 84:7
**Europe** [1] - 43:17
**evaluate** [6] - 22:22, 42:12, 43:22, 44:20, 56:9, 81:1
**evaluated** [2] - 39:7, 43:4
**evaluating** [3] - 26:14, 42:14, 61:21
**evaluation** [3] - 42:13, 42:19, 45:23
**everyday** [1] - 53:12
**evidence** [2] - 35:11, 79:23
**exactly** [1] - 47:20
**examination** [5] - 7:19, 11:8, 80:21, 80:23, 81:5
**EXAMINATION** [1] - 14:22
**example** [2] - 11:25, 59:5
**except** [1] - 26:4
**exception** [1] - 70:20
**exceptions** [2] - 69:25, 70:19
**excerpts** [2] - 79:25, 80:10
**excess** [1] - 36:14
**exchange** [1] - 58:17
**excuse** [1] - 46:10
**execute** [1] - 24:6
**executed** [2] - 13:20, 59:22

**executing** [1] - 26:19
**execution** [1] - 53:16
**exercise** [2] - 47:14, 47:21
**Exhibit** [8] - 33:15, 33:20, 33:21, 68:5, 68:10, 68:14, 68:23, 69:7
**EXHIBIT** [1] - 36:8
**existed** [1] - 71:1
**expect** [3] - 81:6, 81:7, 83:6
**expectation** [1] - 48:15
**expectations** [7] - 21:24, 22:13, 22:18, 22:19, 23:1, 23:4, 24:7
**expected** [1] - 18:10
**experience** [3] - 23:19, 23:24, 77:6
**expert** [6] - 12:21, 29:20, 74:8, 76:25, 77:1, 77:4
**explain** [4] - 24:24, 50:20, 62:5, 62:21
**explaining** [1] - 40:22
**explanation** [2] - 25:20, 73:21
**extends** [1] - 62:13
**extensive** [4] - 25:5, 56:15, 80:23
**extensively** [1] - 32:23
**extent** [19] - 9:3, 11:1, 12:22, 16:16, 28:16, 29:23, 30:25, 31:2, 33:6, 35:14, 35:16, 36:24, 48:20, 58:10, 61:18, 69:11, 70:6, 72:22, 74:8
**external** [2] - 25:23, 60:1
**extract** [1] - 31:20
**extracted** [1] - 47:16

# F

**Faber** [1] - 7:1
**FABER** [1] - 1:17
**face** [1] - 13:5
**facets** [1] - 59:17
**facilities** [1] - 15:22
**facility** [1] - 19:20
**facing** [5] - 20:22, 25:23, 26:14, 26:20, 59:8
**fact** [8] - 9:1, 10:17, 10:20, 11:9, 11:10, 23:21, 58:6, 81:3
**factor** [2] - 74:1, 78:8

**factors** [3] - 39:23, 40:3, 44:19
**facts** [1] - 36:22
**fail** [1] - 10:8
**fair** [1] - 25:24
**fairly** [2] - 23:16, 80:23
**fall** [1] - 75:1
**falls** [1] - 69:25
**familiar** [7] - 29:8, 30:1, 31:10, 32:11, 45:9, 79:24, 79:25
**familiarity** [1] - 29:13
**families** [2] - 57:11, 57:12
**far** [7] - 11:8, 39:24, 47:25, 48:1, 48:2, 50:17, 63:1
**FARRELL** [7] - 2:3, 9:14, 12:12, 14:5, 82:2, 82:10, 82:23
**Farrell** [11] - 2:4, 2:15, 7:8, 9:13, 10:22, 10:25, 12:11, 12:22, 14:4, 82:1, 82:22
**FCRR** [1] - 6:18
**Federal** [1] - 16:7
**federal** [2] - 37:18, 58:13
**feed** [1] - 8:17
**few** [1] - 32:1
**field** [2] - 60:9, 60:17
**file** [3] - 46:5, 46:6, 83:4
**files** [1] - 56:7
**filing** [1] - 46:6
**filled** [1] - 30:18
**finally** [1] - 10:6
**finish** [1] - 72:7
**fire** [1] - 20:11
**Firm** [2] - 3:4, 3:7
**first** [12] - 12:22, 17:3, 18:8, 24:2, 36:10, 36:17, 38:15, 38:23, 40:9, 58:22, 72:1, 72:9
**first-hand** [2] - 72:1, 72:9
**fits** [1] - 52:16
**five** [3] - 18:1, 41:23
**fixate** [1] - 62:15
**FL** [1] - 2:14
**flag** [1] - 56:24
**flagged** [2] - 12:6, 12:14
**Flags** [1] - 78:20
**flags** [5] - 56:12, 56:23, 56:25, 57:1, 57:7
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10

**flood** [1] - 10:8
**Floor** [1] - 3:5
**focus** [8] - 11:8, 11:11, 18:18, 20:9, 20:23, 45:11, 59:25, 64:8
**focused** [1] - 25:23
**focuses** [1] - 8:17
**folks** [6] - 21:9, 24:8, 29:5, 37:25, 38:1, 59:23
**followed** [1] - 73:14
**following** [2] - 8:14, 26:9
**follows** [1] - 7:4
**footprint** [1] - 23:20
**FOR** [1] - 1:1
**force** [7] - 59:5, 59:8, 59:9, 60:6, 60:8, 60:25, 61:7
**foregoing** [1] - 84:4
**Form** [1] - 46:19
**form** [6] - 45:24, 46:17, 48:6, 54:23, 60:21, 76:3
**formally** [1] - 82:3
**formatting** [1] - 34:13
**former** [4] - 7:21, 27:6, 27:12, 56:1
**forms** [3] - 48:7, 48:17, 53:9
**forth** [2] - 26:4, 26:5
**forum** [1] - 12:24
**forward** [7] - 10:24, 11:6, 27:22, 41:9, 48:18, 48:23, 51:10
**forward-looking** [1] - 10:24
**forward-only** [1] - 11:6
**foundation** [6] - 17:9, 19:22, 19:25, 31:20, 32:15, 40:21
**four** [2] - 27:7, 38:8
**frame** [2] - 50:1, 50:3
**framework** [1] - 76:14
**free** [1] - 10:25
**frequency** [1] - 52:24
**frequently** [1] - 43:20
**friendly** [1] - 55:7
**friends** [1] - 83:6
**front** [5] - 10:1, 33:20, 34:4, 49:3, 60:13
**frustrations** [1] - 22:2
**FTI** [13] - 55:13, 63:19, 63:23, 64:1, 64:10, 65:7, 65:12, 67:21, 68:2, 68:21, 68:24, 69:10, 69:24
**FTI's** [2] - 65:25, 69:4

full [1] - 80:24
Fuller [2] - 2:4, 2:15
FULLER [1] - 2:15
fully [1] - 83:3
function [1] - 16:19
functions [1] - 26:19
furnished [2] - 56:6, 56:21
future [2] - 43:10, 47:22

## G

gain [2] - 18:10, 18:14
gaps [5] - 64:4, 64:11, 65:7, 67:22, 69:21
gather [2] - 20:11, 29:10, 37:11, 42:17, 53:25
gathered [4] - 36:21, 36:22, 36:25, 37:4
gathering [2] - 20:12, 34:18
gears [1] - 71:25
General [1] - 79:23
general [3] - 21:5, 59:21, 80:12
General's [1] - 80:5
generally [5] - 16:11, 21:23, 22:25, 50:5, 57:20
gentleman [1] - 34:20
given [1] - 81:8
goal [1] - 53:7
graduated [1] - 17:1
grandfather [1] - 48:16
greater [1] - 72:25
GRETCHEN [1] - 6:7
ground [1] - 61:13
grounds [3] - 69:9, 69:13, 82:17
group [3] - 33:25, 56:22, 60:4
Group [1] - 55:24
groups [1] - 59:25
guess [10] - 24:10, 27:7, 28:5, 30:24, 33:12, 45:21, 47:7, 58:22, 62:9, 62:14
guideline [1] - 36:18
Gundy [1] - 34:19

## H

half [1] - 81:8
halted [1] - 8:18
hand [5] - 14:14, 64:18, 67:5, 72:1, 72:9

handled [1] - 52:11
handling [3] - 27:14, 27:17, 80:8
happy [1] - 70:3, 81:15, 83:5
hard [1] - 47:17
HARDIN [1] - 5:3
Hartle [2] - 82:5, 82:13
Hawkins [1] - 3:7
Hazewski [6] - 21:11, 26:23, 27:1, 27:5, 27:6, 27:14
head [4] - 50:19, 51:15, 65:18, 77:4
health [1] - 25:3
Health [4] - 4:11, 5:2, 19:19, 19:23
hear [3] - 34:15, 58:4, 58:13
heard [2] - 79:9, 79:11
hearsay [7] - 35:16, 35:21, 69:10, 69:13, 69:25, 70:19, 71:11
help [4] - 14:19, 22:14, 22:17, 23:3, 23:14, 24:6, 29:12, 34:18, 42:2
helped [1] - 54:25
helpful [1] - 23:19
heroin [11] - 31:13, 32:4, 32:10, 32:12, 32:20, 32:21, 32:23, 33:1, 33:3, 33:4, 33:12
HESTER [14] - 5:9, 31:17, 49:25, 60:21, 62:22, 69:15, 71:17, 72:12, 76:3, 76:6, 76:19, 81:21, 82:12, 82:16
Hester [5] - 31:16, 69:14, 71:16, 71:22, 76:5
high [11] - 23:23, 24:5, 57:6, 57:9, 57:12, 57:15, 57:17, 57:23, 58:7, 58:9, 58:18
high-ranking [2] - 23:23, 24:5
highest [1] - 33:7
himself [1] - 30:1
hired [2] - 19:9, 63:23
hiring [1] - 22:10
historically [3] - 48:21, 72:2, 72:10
honestly [1] - 10:15
Honor [72] - 7:6, 7:9, 7:13, 7:16, 10:11, 11:12, 12:17, 12:20, 13:17, 13:25, 14:3,

14:8, 17:14, 19:22, 29:20, 29:25, 31:15, 32:13, 33:14, 35:10, 35:13, 35:14, 35:17, 49:25, 50:8, 50:14, 51:19, 51:23, 62:22, 63:16, 64:24, 65:4, 66:12, 66:14, 67:7, 67:18, 69:6, 69:15, 69:16, 69:17, 70:6, 70:10, 70:11, 70:18, 71:2, 71:5, 71:9, 71:17, 71:18, 71:20, 71:21, 72:12, 74:3, 74:7, 74:20, 76:6, 76:19, 76:22, 78:10, 78:15, 78:23, 79:2, 79:4, 79:18, 80:17, 80:20, 81:20, 81:21, 82:13, 82:16, 82:23, 83:2
HONORABLE [1] - 1:17
Honorable [1] - 7:1
hopefully [1] - 35:4
hose [1] - 20:11
hospitals [2] - 26:16, 40:24
hotline [1] - 15:24
hour [3] - 12:16, 81:8
House [3] - 78:19, 78:24, 79:6
human [1] - 25:3
hundred [1] - 25:17
HUNTINGTON [1] - 1:4
Huntington [3] - 3:10, 4:1, 84:6
hybrid [1] - 76:25
hydrocodone [1] - 57:18
Hydromorphone [1] - 57:18

## I

identified [4] - 15:3, 20:25, 50:7, 51:18
identify [7] - 38:6, 49:9, 49:22, 64:4, 64:11, 65:7, 67:22
Ignored [1] - 78:21
II [2] - 25:10, 68:2
illegal [7] - 30:11, 31:5, 31:6, 32:4, 32:10, 73:2, 77:18
illicit [6] - 72:2, 72:11, 73:25, 76:1, 78:8, 78:13
immediately [1] -

26:22
important [6] - 20:7, 24:15, 28:15, 53:15, 60:6, 60:14
impression [1] - 26:10
improvement [5] - 28:25, 64:5, 64:11, 65:8, 67:22
improvements [4] - 64:6, 64:13, 65:10, 67:24
IN [2] - 1:1, 1:18
inappropriate [1] - 24:13
include [4] - 15:13, 15:17, 53:22, 54:10
included [2] - 21:6, 21:10
includes [6] - 15:15, 15:19, 25:5, 26:15, 52:22, 53:12
including [1] - 61:17
increase [6] - 75:16, 76:1, 76:10, 76:15, 76:17, 76:18, 77:12, 77:13
increased [1] - 75:25
independence [1] - 26:1
independently [1] - 61:16
indicate [1] - 73:12
indicated [1] - 43:4
indicating [1] - 50:9
industries [1] - 37:23
industry [10] - 19:4, 19:7, 20:5, 20:8, 20:9, 21:2, 38:1, 49:16, 53:11, 58:15
influence [1] - 61:20
inform [2] - 54:25, 59:23
information [82] - 7:21, 8:2, 8:9, 9:4, 10:16, 11:2, 11:21, 11:23, 12:4, 12:8, 13:5, 13:11, 20:11, 20:12, 28:15, 29:10, 33:25, 34:19, 36:21, 36:23, 36:25, 37:3, 37:11, 37:13, 39:2, 39:5, 39:6, 39:18, 39:20, 40:5, 40:7, 40:10, 40:12, 40:14, 40:16, 40:17, 40:19, 41:1, 41:4, 41:12, 41:14, 41:18, 41:25, 42:16, 42:17, 42:19, 44:21, 44:23, 45:1, 45:2, 45:3, 45:19,

45:22, 46:1, 46:4, 46:16, 46:17, 46:23, 47:2, 47:5, 47:8, 47:9, 47:11, 47:13, 47:16, 47:21, 48:3, 48:9, 48:11, 48:21, 48:22, 49:1, 54:1, 56:8, 58:11, 58:13, 58:14, 58:17, 61:12, 65:21
informed [2] - 28:12, 67:21
initial [1] - 59:19
injured [1] - 30:15
input [1] - 34:22
Inspector [2] - 79:22, 80:5
instance [2] - 73:7, 73:17
instances [1] - 73:3
instructing [1] - 50:18
intended [3] - 65:18, 68:25, 72:21
intent [3] - 22:9, 22:11, 33:24
interact [1] - 26:11
interacting [1] - 61:2
interest [4] - 12:7, 12:10, 13:8, 13:9
interested [2] - 41:7, 41:10
intern [1] - 16:25
internal [1] - 60:1
internally [1] - 25:22
international [2] - 23:16, 23:20
interview [1] - 18:9
introduction [2] - 12:16, 13:4
inventory [1] - 25:6
investigate [7] - 15:24, 15:25, 26:6, 32:3, 32:10, 44:14, 44:17
investigated [4] - 31:6, 32:20, 33:2, 72:23
investigating [5] - 32:25, 33:6, 37:9, 37:10, 47:24
investigation [4] - 38:3, 47:2, 48:2, 57:8
Investigations [1] - 16:7
investigations [12] - 16:13, 16:15, 16:16, 32:9, 32:23, 33:6, 33:8, 34:21, 37:22, 38:2, 56:24, 73:3

**investigative** [2] - 15:23, 32:9
**Investigators** [1] - 34:2
**investigators** [3] - 37:18, 37:20, 56:1
**involve** [1] - 26:5
**involved** [3] - 19:7, 26:3, 26:9
**involves** [1] - 55:20
**Irpino** [1] - 3:7
**ISIA** [1] - 5:4
**issue** [4] - 22:6, 29:1, 66:3, 70:9
**issues** [18] - 8:20, 12:25, 21:8, 22:4, 23:5, 25:22, 25:24, 26:3, 29:9, 29:11, 29:14, 30:1, 60:7, 60:25, 62:6, 63:23, 69:21, 82:20
**issuing** [1] - 37:13
**itself** [4] - 8:23, 30:19, 35:15, 39:4

## J

**Jackson** [1] - 6:8
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**job** [4] - 17:4, 24:17, 29:12, 30:1
**John** [2] - 34:10, 34:11
**Join** [3] - 69:15, 76:21, 79:2
**join** [3] - 29:22, 51:23, 76:22
**joined** [18] - 16:2, 16:6, 16:24, 17:8, 17:12, 17:19, 18:2, 18:5, 19:2, 19:15, 20:20, 22:19, 46:12, 50:25, 51:3, 52:1, 52:5, 52:6
**joining** [6] - 16:20, 16:22, 19:5, 26:18, 26:22, 27:1
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:15
**Juan** [2] - 2:5, 2:17
**judge** [1] - 12:12
**JUDGE** [1] - 1:17
**Judge** [3] - 7:2, 9:14, 14:20
**jumping** [1] - 54:12

## K

**KEARSE** [1] - 4:2
**keep** [1] - 28:12
**keeping** [1] - 56:13
**Kelly** [1] - 6:8
**Kessler** [1] - 4:17
**Kim** [1] - 34:11
**Kimberly** [1] - 34:10
**kind** [8] - 20:10, 21:22, 23:11, 25:22, 37:7, 57:9, 60:13, 62:15
**knowing** [2] - 37:23
**knowledge** [5] - 31:20, 72:1, 72:7, 72:9, 73:7
**knows** [1] - 32:8
**KOUBA** [1] - 3:14

## L

**L-a-w-T-r-a-c** [1] - 46:10
**LA** [1] - 3:8
**lack** [1] - 47:16
**laid** [1] - 31:19
**Lakeland** [1] - 19:20
**language** [1] - 52:20
**Lanier** [1] - 3:4
**large** [2] - 23:16, 44:10
**largely** [1] - 60:8
**larger** [2] - 44:12, 44:16
**largest** [1] - 36:12
**last** [6] - 26:6, 28:19, 28:23, 35:19, 35:23, 77:25
**last-mile** [1] - 26:6
**late** [2] - 12:16, 32:25
**late-hour** [1] - 12:16
**LAURA** [1] - 5:10
**law** [13] - 27:12, 37:21, 37:25, 49:21, 50:6, 50:16, 50:18, 50:20, 51:1, 51:16, 70:7, 70:11, 71:7
**Law** [3] - 3:4, 3:7, 3:12
**LawTrac** [7] - 46:8, 46:12, 46:22, 47:4, 47:10, 47:12, 47:15
**lawTrac** [1] - 46:10
**lawyer** [1] - 12:21
**lay** [6] - 19:24, 29:23, 40:21, 74:5, 74:8, 77:1
**laying** [1] - 32:15
**lead** [1] - 57:7
**learn** [1] - 46:2
**learned** [3] - 19:17,

73:10, 73:19
**least** [3] - 35:5, 59:16, 81:3
**leave** [1] - 77:24
**led** [1] - 75:6
**Lee** [1] - 3:12
**legal** [3] - 50:12, 50:17, 51:19
**legitimate** [2] - 29:18, 30:9
**Leon** [2] - 2:4, 2:16
**letter** [1] - 32:7
**level** [9] - 29:4, 29:5, 33:10, 43:17, 57:4, 57:6, 61:4, 75:5, 75:6
**levels** [5] - 28:24, 33:7, 40:18, 58:1, 75:25
**leverage** [1] - 24:11
**Levin** [1] - 2:12
**LEYIMU** [1] - 4:8
**license** [1] - 41:21
**licenses** [3] - 40:8, 41:16, 43:14
**licensure** [1] - 46:1
**lifetime** [1] - 72:4
**light** [3] - 8:9, 9:1, 57:15
**likely** [1] - 66:3
**Likewise** [1] - 69:16
**limited** [1] - 13:12
**LINDA** [1] - 4:5
**Lisa** [2] - 6:18, 84:3
**listed** [4] - 39:10, 45:10, 53:18, 57:21
**LLC** [1] - 2:4
**local** [1] - 37:18
**location** [2] - 35:5, 56:4
**locations** [1] - 40:11
**Logan** [2] - 6:5, 6:12
**long-standing** [1] - 12:23
**long-winded** [1] - 73:21
**Look** [1] - 66:21
**look** [23] - 31:13, 33:8, 33:21, 41:1, 41:13, 48:2, 53:20, 55:5, 55:18, 58:23, 62:3, 62:4, 62:9, 62:11, 62:16, 63:1, 66:16, 66:18, 67:11, 68:10, 82:19
**looked** [4] - 54:21, 64:9, 80:10
**looking** [10] - 10:24, 28:18, 39:12, 40:3, 49:2, 53:24, 53:25,

54:7, 55:1, 55:2, 57:2, 61:23, 61:25, 62:19, 62:20, 62:21, 74:25, 75:9
**looks** [4] - 45:13, 67:9, 71:10, 81:12
**loosely** [1] - 60:3
**losses** [2] - 15:25, 16:16
**low** [2] - 57:13, 58:18
**lower** [1] - 57:15

## M

**Magazine** [1] - 3:7
**magic** [1] - 82:6
**MAHADY** [1] - 6:4
**mail** [2] - 34:4, 54:2
**main** [1] - 38:5
**MAINIGI** [1] - 4:12
**MAJESTRO** [3] - 2:6, 83:2, 83:6
**Majestro** [1] - 2:14
**major** [1] - 20:14
**majority** [1] - 72:24
**Management** [4] - 46:8, 46:22, 47:4, 47:10
**Manager** [1] - 25:15
**Managers** [2] - 25:13, 59:23
**managers** [1] - 25:16
**manages** [1] - 25:11
**manually** [1] - 67:9
**manufacturers** [3] - 26:17, 49:8, 58:16
**March** [1] - 16:3
**mark** [2] - 7:9, 14:8
**MARK** [1] - 3:16
**market** [8] - 36:13, 72:3, 72:11, 73:25, 76:1, 77:19, 78:8, 78:13
**marrow** [1] - 27:21
**mask** [1] - 14:19
**material** [1] - 80:14
**materials** [3] - 20:15, 59:1, 59:2
**Matter** [4] - 46:7, 46:22, 47:4, 47:10
**matter** [4] - 23:21, 70:16, 70:25, 84:5
**maximum** [1] - 13:6
**MAY** [2] - 1:19, 14:15
**May's** [3] - 7:19, 10:25, 36:4
**Mays** [9] - 21:11, 24:18, 24:20, 24:21, 25:1, 25:16, 25:21, 27:3, 42:10

**McCann** [1] - 12:19
**MCCLURE** [37] - 6:3, 7:13, 10:11, 11:23, 12:20, 13:17, 13:25, 14:3, 17:6, 17:9, 17:14, 18:21, 22:7, 29:22, 31:14, 32:13, 35:13, 42:7, 50:8, 51:19, 63:3, 69:9, 70:6, 71:2, 71:5, 71:12, 71:18, 71:20, 74:7, 74:20, 76:21, 78:10, 78:15, 79:2, 79:18, 80:20, 81:7
**McClure** [1] - 70:5
**MCGINNESS** [1] - 4:2
**McKesson** [2] - 5:8, 36:12
**MDL** [1] - 15:7
**mean** [11] - 17:17, 21:21, 36:24, 37:16, 38:11, 52:14, 53:4, 55:20, 58:21, 62:14, 73:17
**meaning** [1] - 72:17
**means** [3] - 49:7, 53:10, 62:18
**meant** [1] - 17:15
**mechanical** [1] - 6:19
**media** [1] - 8:3
**Medical** [2] - 41:19, 46:3
**medical** [1] - 30:9
**medium** [2] - 57:13, 58:18
**meet** [1] - 56:17
**meeting** [4] - 24:6, 37:19, 60:10, 60:12
**meetings** [1] - 59:15
**member** [1] - 54:4
**members** [4] - 21:15, 51:5, 59:15, 59:20
**memories** [1] - 73:16
**memory** [1] - 45:19
**mentioned** [10] - 21:18, 24:16, 44:1, 44:4, 47:8, 54:16, 55:15, 56:23, 61:23, 62:2
**met** [1] - 18:8
**method** [1] - 32:15
**methodology** [3] - 58:3, 58:4
**MICHAEL** [2] - 2:15, 3:9
**microphone** [1] - 35:18
**might** [8] - 23:12, 23:25, 37:9, 41:18, 44:8, 47:1, 47:2,

63:7
**MILDRED** [1] - 3:3
**mile** [2] - 26:6, 77:25
**mind** [2] - 14:18, 70:17
**mine** [1] - 75:4
**minute** [3] - 17:13, 68:10, 81:4
**minutes** [3] - 63:9, 81:1, 81:18
**missed** [1] - 24:2
**missing** [1] - 66:25
**misstates** [1] - 62:23
**misuse** [1] - 29:2
**misusing** [1] - 29:19
**Mitchell** [1] - 2:12
**modified** [1] - 59:11
**modify** [1] - 59:11
**moment** [2] - 71:2, 77:23
**Monday** [5] - 81:14, 81:23, 82:21, 82:25, 83:9
**monitor** [4] - 53:8, 54:8, 57:12, 58:10
**monitoring** [11] - 21:14, 21:25, 26:14, 26:24, 53:2, 53:12, 54:9, 55:15, 55:19, 61:24, 63:23
**Monitoring** [7] - 15:14, 49:12, 49:14, 53:16, 54:19, 57:10, 58:19
**moreover** [1] - 50:12
**morning** [11] - 7:5, 7:6, 7:9, 14:7, 14:20, 14:21, 14:24, 14:25, 81:14, 81:23, 82:21
**Morris** [1] - 6:15
**most** [5] - 25:1, 26:13, 55:25, 57:21, 66:3
**mostly** [1] - 54:23
**motion** [5] - 8:24, 78:25, 82:8, 82:12, 83:3
**Motley** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**MOUGEY** [1] - 2:12
**mount** [1] - 11:15
**mouth** [1] - 25:19
**move** [7] - 27:22, 33:14, 35:10, 42:23, 52:25, 63:5, 69:6
**MR** [104] - 2:3, 2:6, 2:9, 2:12, 2:15, 3:9, 3:11, 3:16, 4:17, 5:9, 5:10, 5:13, 6:4, 7:9, 9:14, 12:12, 14:5, 14:7, 14:23, 17:7,

17:11, 17:18, 18:23, 19:22, 20:1, 22:15, 29:20, 29:25, 30:6, 31:17, 31:23, 31:25, 32:2, 33:14, 33:19, 35:10, 35:14, 35:17, 35:24, 36:3, 36:9, 43:25, 49:25, 50:5, 50:14, 50:24, 51:23, 52:4, 60:21, 60:23, 62:22, 62:25, 63:5, 63:16, 63:17, 64:24, 65:4, 65:5, 66:14, 66:18, 66:20, 67:6, 67:8, 67:18, 67:19, 68:5, 68:9, 69:6, 69:15, 69:16, 69:17, 69:19, 70:18, 70:21, 71:17, 71:21, 71:23, 72:12, 73:23, 74:3, 74:9, 76:3, 76:6, 76:8, 76:19, 76:22, 77:3, 77:10, 78:5, 78:18, 78:23, 79:3, 79:16, 79:21, 80:17, 81:20, 81:21, 82:2, 82:10, 82:12, 82:16, 82:23, 83:2, 83:6
**MS** [51] - 3:3, 3:6, 3:14, 4:2, 4:5, 4:8, 4:12, 4:12, 4:15, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 7:13, 10:11, 11:23, 12:20, 13:17, 13:25, 14:3, 17:6, 17:9, 17:14, 18:21, 22:7, 29:22, 31:14, 32:13, 35:13, 42:7, 50:8, 51:19, 63:3, 69:9, 70:6, 71:2, 71:5, 71:12, 71:18, 71:20, 74:7, 74:20, 76:21, 78:10, 78:15, 79:2, 79:18, 80:20, 81:7
**Mt** [3] - 3:15, 4:4, 4:9
**must** [1] - 49:22

# N

**NADDI** [2] - 34:1
**Naddi** [1] - 35:2
**name** [4] - 14:11, 15:1, 46:16, 47:19
**names** [1] - 24:16
**narrowing** [1] - 29:3
**Nate** [1] - 82:5
**National** [1] - 34:1
**nature** [3] - 20:3, 33:8, 62:12

**NCSRA** [1] - 21:9
**necessarily** [3] - 11:23, 12:3, 65:10
**necessary** [4] - 8:25, 20:3, 38:13
**need** [5] - 8:12, 31:12, 45:19, 47:1, 71:24
**needed** [2] - 18:16, 35:22
**negative** [1] - 42:5
**neighborhood** [1] - 45:17
**never** [2] - 24:13, 51:7
**new** [4] - 15:17, 18:6, 18:7, 18:15
**New** [3] - 3:5, 3:8, 33:2
**news** [5] - 28:23, 58:12, 79:10, 79:13
**next** [5] - 7:8, 38:7, 49:3, 52:25, 53:1
**NICHOLAS** [1] - 6:11
**night** [2] - 35:19, 35:23
**nine** [1] - 27:8
**Ninth** [1] - 4:6
**non** [1] - 35:22
**non-authenticity** [1] - 35:22
**none** [1] - 8:25
**noon** [1] - 81:3
**normal** [1] - 52:23
**North** [1] - 32:22
**Northeastern** [1] - 17:1
**note** [2] - 7:25, 14:5
**notes** [9] - 34:23, 34:24, 34:25, 36:10, 36:17, 36:18, 36:19, 38:8, 66:18
**notice** [2] - 69:20, 70:16
**notion** [2] - 53:5, 54:7
**nowhere** [1] - 39:13
**nuisance** [1] - 9:17
**number** [9] - 9:18, 9:19, 9:23, 11:9, 41:22, 43:13, 45:9, 45:12, 67:3
**numbers** [3] - 25:17, 37:6, 67:2
**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

# O

**oath** [1] - 63:13
**Object** [1] - 76:3
**object** [14] - 9:15, 11:1, 12:16, 29:24,

31:17, 35:16, 49:25, 60:21, 69:9, 69:12, 74:7, 76:23, 78:23
**objecting** [1] - 82:17
**Objection** [3] - 72:12, 76:19, 78:17
**objection** [27] - 14:6, 17:6, 17:9, 18:21, 19:22, 22:7, 29:20, 29:22, 31:14, 31:21, 33:13, 35:12, 35:21, 35:22, 36:6, 42:7, 50:22, 50:23, 51:23, 62:22, 63:3, 69:8, 69:15, 74:3, 76:5, 76:7, 78:10
**objections** [3] - 35:20, 54:13, 74:20
**objective** [2] - 37:20, 37:21
**obligation** [1] - 49:11
**obligations** [1] - 61:5
**observations** [1] - 56:4
**obtaining** [1] - 11:3
**occupied** [2] - 27:8, 73:10
**occur** [1] - 16:1
**occurred** [2] - 31:1, 51:6
**October** [1] - 34:7
**OF** [2] - 1:1, 1:4
**offered** [6] - 35:16, 36:1, 36:2, 36:3, 60:3, 69:12
**offering** [1] - 38:2
**Office** [1] - 79:22
**officer** [1] - 27:11
**Official** [2] - 84:2, 84:3
**officials** [2] - 23:24, 24:5
**OMP** [2] - 10:7, 53:25
**on-board** [1] - 53:5
**on-boarded** [1] - 48:12
**on-boarding** [3] - 43:2, 44:25, 59:19
**once** [3] - 53:14, 58:18, 61:12
**One** [1] - 5:11
**one** [30] - 9:18, 23:5, 23:14, 24:17, 25:8, 25:12, 35:5, 35:6, 38:23, 42:18, 44:4, 44:19, 48:23, 48:24, 49:3, 49:18, 52:15, 53:1, 54:4, 56:7, 57:24, 61:19, 62:2, 63:1, 66:8, 66:24, 75:15, 77:9, 81:18

**ones** [3] - 38:5, 57:5, 57:21
**ongoing** [1] - 15:18
**open** [4] - 8:15, 9:15, 70:8, 70:9
**operate** [1] - 61:16
**operated** [1] - 33:10
**operates** [1] - 11:14
**operating** [2] - 41:20, 48:5
**operations** [2] - 44:11, 52:10
**opine** [1] - 74:16
**opinion** [5] - 29:21, 29:23, 74:8, 76:23, 77:2
**opioid** [22] - 10:10, 27:23, 27:25, 28:3, 28:9, 28:24, 29:2, 29:18, 30:9, 36:5, 57:20, 62:6, 62:7, 62:8, 74:1, 74:11, 74:14, 74:16, 74:19, 75:1, 78:9, 80:12
**Opioid** [1] - 78:21
**opioids** [20] - 28:14, 28:20, 62:10, 72:2, 72:10, 73:8, 73:25, 75:2, 75:13, 75:16, 75:22, 76:10, 76:16, 77:13, 77:14, 77:16, 77:18, 77:21, 78:7, 78:13
**Opoid** [1] - 29:6
**opponent** [1] - 35:25
**opportunity** [1] - 12:18
**opposing** [1] - 71:13
**Order** [8] - 15:13, 49:12, 49:14, 49:17, 53:16, 54:19, 57:10, 58:19
**order** [33] - 12:6, 12:7, 12:9, 12:10, 13:6, 13:7, 13:8, 13:19, 13:20, 21:14, 21:25, 26:24, 42:14, 49:10, 49:22, 50:7, 51:1, 51:6, 51:7, 51:11, 51:12, 51:17, 52:13, 52:15, 52:16, 52:17, 52:19, 53:17, 54:3, 54:9, 63:23, 80:8
**ordering** [5] - 62:10, 62:11, 62:12, 62:20, 63:2
**orders** [11] - 49:5, 49:10, 52:7, 52:11, 52:20, 52:22, 52:23, 53:12, 61:21, 62:17

**organization** [1] - 69:22
**organizations** [3] - 33:1, 33:7, 73:1
**Orleans** [1] - 3:8
**out-of-court** [1] - 35:15
**outline** [1] - 81:1
**outside** [6] - 14:2, 54:5, 54:18, 55:4, 56:10, 56:14
**over-prescribing** [1] - 75:22
**overall** [1] - 62:11
**overflow** [5] - 8:6, 8:16, 8:18, 9:8, 13:16
**overrule** [1] - 36:6
**overruled** [5] - 22:8, 30:3, 30:4, 32:16, 42:8
**Overruled** [2] - 72:14, 74:21
**overseeing** [4] - 7:18, 21:13, 25:2, 73:6
**overseen** [1] - 51:10
**oversees** [2] - 25:12, 34:21
**oversight** [5] - 15:13, 15:15, 16:18, 22:20, 27:18
**oversimplified** [1] - 38:16
**own** [6] - 12:7, 12:19, 30:20, 39:5, 49:19, 59:14
**owner** [1] - 56:18
**oxycodone** [1] - 57:17

**P**

**P-00943** [1] - 66:22
**P-1200** [1] - 2:7
**P-4** [1] - 64:21
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**packed** [1] - 51:13
**page** [2] - 34:4, 38:7
**Page** [1] - 66:21
**pages** [2] - 34:4, 56:16
**paid** [2] - 64:16, 64:17
**Papantonio** [1] - 2:12
**parameters** [3] - 11:25, 12:3, 13:7
**part** [18] - 15:14, 15:16, 16:17, 22:5, 24:2, 28:11, 29:7, 30:1, 38:18, 39:6, 40:9, 53:22, 55:8, 55:15, 55:18, 61:24,

64:16, 66:1
**participants** [2] - 20:8, 58:16
**particular** [12] - 8:5, 8:7, 8:23, 12:9, 13:11, 20:9, 20:10, 20:24, 22:21, 37:19, 41:5, 54:3
**particularity** [1] - 7:23
**particularly** [2] - 21:24, 44:13
**partnership** [1] - 58:15
**parts** [2] - 27:19, 80:1
**party** [4] - 35:24, 55:25, 70:22, 71:15
**party's** [2] - 70:24, 71:13
**pass** [1] - 80:18
**past** [2] - 11:9, 12:13
**patent** [1] - 62:15
**patents** [1] - 56:12
**pathway** [1] - 32:11
**pattern** [5] - 52:23, 62:5, 62:8, 62:9, 62:13
**patterns** [5] - 61:25, 62:2, 62:20, 63:2
**PAUL** [2] - 2:3, 5:9
**Pause** [2] - 68:12, 71:4
**PEARL** [1] - 3:6
**pending** [2] - 78:25, 82:12
**Pensacola** [1] - 2:14
**people** [13] - 17:24, 17:25, 21:6, 21:18, 24:16, 26:9, 31:11, 32:12, 35:7, 37:9, 37:23, 53:11, 60:25
**percent** [1] - 72:25
**percentage** [1] - 43:21
**perform** [1] - 63:24
**performed** [1] - 47:14
**perimeter** [1] - 12:4
**period** [10] - 10:14, 26:21, 48:6, 50:10, 50:15, 50:22, 53:21, 54:20, 55:4, 55:9
**periods** [1] - 19:16
**permission** [1] - 66:15
**Permission** [1] - 68:6
**permitted** [4] - 10:4, 12:5, 12:9, 13:6
**person** [9] - 26:23, 29:17, 30:18, 30:19, 40:7, 59:2, 60:13, 70:22, 71:14
**personal** [2] - 72:7, 73:7

**personality** [2] - 23:8, 23:10
**perspective** [2] - 39:15, 53:11
**pertinent** [1] - 46:1
**PETER** [1] - 2:12
**Pharma** [1] - 55:24
**pharmaceutical** [4] - 19:7, 72:19, 73:7, 77:17
**pharmaceuticals** [2] - 28:13, 77:21
**pharmacies** [4] - 26:16, 41:8, 60:12, 73:11
**pharmacist** [4] - 56:18, 61:2, 61:3
**pharmacists** [3] - 26:16, 60:4, 60:12
**pharmacy** [12] - 37:10, 40:23, 41:6, 44:5, 44:7, 44:10, 44:11, 46:19, 56:17, 57:3, 77:22, 78:1
**Pharmacy** [1] - 46:3
**Philadelphia** [2] - 6:6, 6:13
**photos** [1] - 45:25
**phrased** [1] - 49:13
**physician** [2] - 30:15, 30:16
**picked** [1] - 51:13
**picture** [1] - 62:3
**pieces** [2] - 8:2, 13:11
**Pifko** [14] - 7:9, 8:11, 14:8, 14:25, 18:22, 24:2, 31:21, 50:4, 50:9, 63:8, 64:23, 71:6, 77:2, 80:22
**PIFKO** [61] - 3:16, 7:9, 14:7, 14:23, 17:7, 17:11, 17:18, 18:23, 20:1, 22:15, 29:25, 30:6, 31:23, 31:25, 32:2, 33:14, 33:19, 35:10, 35:24, 36:3, 36:9, 43:25, 50:5, 50:14, 50:24, 52:4, 60:23, 62:25, 63:5, 63:16, 63:17, 64:24, 65:4, 65:5, 66:14, 66:18, 66:20, 67:6, 67:8, 67:18, 67:19, 68:5, 68:9, 69:6, 69:17, 69:19, 70:18, 70:21, 71:21, 71:23, 73:23, 74:9, 76:8, 77:3, 77:10, 78:5, 78:18, 79:3, 79:16, 79:21, 80:17

**Pifko's** [1] - 70:11
**pills** [4] - 10:9, 11:9, 76:1, 76:16
**piped** [1] - 26:11
**Pittsburgh** [2] - 35:3, 35:5
**place** [2] - 53:17, 63:7
**placed** [1] - 53:13
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**plaintiff** [1] - 13:13
**PLAINTIFF** [2] - 14:15, 36:8
**plaintiff's** [1] - 33:15
**Plaintiffs** [1] - 84:6
**plaintiffs** [13] - 7:10, 7:11, 9:5, 9:15, 10:13, 10:23, 11:5, 11:7, 11:18, 14:8, 14:9, 70:7, 82:3
**Plaintiffs'** [3] - 33:21, 66:14, 68:5, 68:10, 68:14, 69:7
**play** [1] - 21:1
**Pleasant** [3] - 3:15, 4:4, 4:9
**plug** [1] - 81:17
**plus** [1] - 73:18
**point** [9] - 9:18, 9:19, 10:22, 12:22, 16:5, 26:8, 29:19, 30:16, 36:20, 49:3, 52:25, 57:24, 74:17
**pointing** [1] - 11:11
**police** [1] - 27:11
**polygrapher** [1] - 27:12
**Ponc** [1] - 2:4
**Ponce** [1] - 2:16
**portion** [2] - 8:6, 16:15
**portions** [4] - 9:8, 80:4, 80:11, 80:23
**position** [14] - 18:5, 18:6, 18:7, 18:9, 18:11, 18:12, 18:15, 20:2, 20:6, 27:8, 73:10, 80:15, 83:4
**positions** [1] - 24:9
**possibilities** [1] - 30:22
**possible** [2] - 8:25, 30:14
**possibly** [2] - 8:10, 8:11
**potential** [9] - 39:2, 40:12, 41:13, 41:14, 41:15, 42:17, 43:3, 56:25, 57:7
**potentially** [2] - 8:10, 11:17

**Powell** [1] - 2:6
**powerful** [2] - 53:19, 53:20
**PowerPoint** [3] - 33:23, 34:14, 35:15
**PR** [2] - 2:5, 2:17
**practices** [1] - 43:15
**practitioner** [1] - 41:25
**practitioners** [2] - 26:17, 40:25
**pre** [1] - 46:11
**pre-dates** [1] - 46:11
**precisely** [1] - 22:11
**preface** [1] - 54:13
**preliminary** [1] - 7:14
**prepared** [4] - 33:24, 36:18, 36:21, 68:2
**prescribed** [3] - 29:17, 30:8, 75:3
**prescriber** [1] - 41:20
**prescribers** [9] - 40:20, 41:13, 41:15, 41:17, 41:22, 42:18, 43:12
**prescribing** [16] - 28:18, 28:20, 28:24, 43:15, 75:5, 75:6, 75:11, 75:13, 75:16, 75:18, 75:22, 75:25, 76:10, 76:18, 77:13, 77:16
**prescription** [8] - 30:19, 36:5, 72:1, 72:10, 72:19, 73:25, 77:12, 78:7
**prescriptions** [2] - 30:18, 76:15
**presence** [1] - 23:16
**present** [9] - 7:20, 8:12, 11:4, 28:6, 28:8, 28:20, 59:2, 59:3
**presentation** [7] - 33:23, 33:24, 34:3, 34:8, 35:1, 36:19, 36:22
**presentations** [2] - 19:16, 35:4
**presently** [3] - 7:16, 28:5, 46:6
**preserved** [1] - 47:18
**President** [5] - 7:17, 11:5, 15:6, 15:11, 24:21
**presumably** [1] - 36:23
**pretty** [1] - 56:15
**prevent** [1] - 11:11
**prevented** [1] - 11:3

**previous** [2] - 46:7, 46:8
**previously** [1] - 15:7, 31:14
**Prevoznik** [2] - 82:5, 83:3
**Prevoznik's** [1] - 82:9
**primary** [1] - 7:18
**principal** [1] - 26:23
**printed** [1] - 67:9
**private** [2] - 17:15, 17:17
**problem** [1] - 28:9
**problems** [2] - 20:22, 20:24
**proceed** [2] - 8:13, 63:15
**proceedings** [1] - 84:5
**Proceedings** [2] - 6:19, 63:11
**PROCEEDINGS** [1] - 7:1
**process** [10] - 39:6, 39:17, 42:1, 45:23, 53:6, 53:23, 57:25, 63:24, 68:24, 68:25
**processes** [1] - 61:11
**Proctor** [1] - 2:12
**produce** [1] - 12:15
**produced** [3] - 6:19, 10:13, 13:12
**products** [2] - 25:10, 57:20
**proffering** [1] - 82:3
**profile** [3] - 15:19, 16:13, 42:3
**program** [13] - 10:5, 11:7, 22:21, 22:23, 22:24, 38:12, 38:17, 51:10, 51:14, 55:11, 57:11, 59:18, 73:6
**Program** [19] - 7:19, 7:23, 8:1, 10:20, 11:12, 11:14, 15:14, 15:15, 22:22, 38:9, 38:13, 38:19, 49:4, 49:12, 49:14, 53:16, 54:20, 57:10, 58:19
**programs** [1] - 10:7
**Promethazine** [1] - 57:18
**proposal** [2] - 8:14, 9:5
**propose** [1] - 70:14
**proprietary** [1] - 12:8
**prosecuted** [1] - 31:5
**prospective** [1] - 46:18
**protect** [1] - 10:20
**protective** [1] - 13:20

**provide** [5] - 33:25, 64:5, 64:12, 65:8, 67:23
**provided** [3] - 41:12, 68:21, 69:22
**providing** [2] - 41:4, 63:22
**public** [12] - 8:2, 8:3, 9:16, 9:17, 10:21, 13:11, 17:4, 17:9, 17:15, 41:17, 45:25, 58:12
**public's** [1] - 13:9
**published** [1] - 75:10
**pull** [2] - 47:4, 81:17
**pulling** [1] - 14:18
**purchase** [4] - 12:6, 44:6, 44:8, 53:15
**purchased** [1] - 44:16
**purchases** [1] - 44:2
**purchasing** [1] - 40:18, 43:8, 43:10, 45:10, 45:12, 45:15, 53:21, 57:3, 57:4, 62:7, 62:8
**purpose** [7] - 10:19, 13:10, 30:9, 39:7, 57:13, 60:24, 69:18
**purposes** [8] - 8:1, 10:2, 30:11, 50:18, 69:19, 71:5, 72:20, 82:4
**pursuant** [1] - 48:8
**pursue** [1] - 79:5
**put** [10] - 25:19, 34:17, 42:2, 44:20, 46:4, 47:10, 47:17, 59:1
**puts** [1] - 75:25
**putting** [3] - 9:1, 37:17, 76:16

**Q**

**quantities** [6] - 43:9, 44:1, 44:6, 44:8, 44:12, 44:16
**questioning** [1] - 71:6
**questionnaire** [1] - 56:16
**questions** [2] - 32:1, 40:16, 41:10, 56:19, 56:21, 66:17, 71:25, 79:19, 80:18
**quite** [3] - 25:5, 25:11, 42:20

**R**

**Rafferty** [1] - 2:12
**raise** [3] - 7:15, 12:24,

14:13
**ranking** [3] - 23:23, 24:5, 58:19
**rates** [3] - 28:18, 28:20, 75:11
**Read** [1] - 67:12
**read** [11] - 28:23, 36:19, 67:17, 79:3, 79:20, 80:1, 80:2, 80:4, 80:13, 80:15, 83:5
**reading** [2] - 79:14, 80:11
**ready** [4] - 7:8, 68:11, 68:13, 82:21
**realize** [4] - 64:6, 64:12, 65:9, 67:24
**really** [8] - 19:1, 22:11, 44:10, 47:23, 61:9, 61:14, 61:25, 80:9
**realm** [4] - 30:13, 30:22, 52:16, 52:18
**reason** [1] - 29:18
**receive** [3] - 30:19, 35:19, 68:3
**recent** [1] - 43:13
**recess** [1] - 63:9
**Recess** [1] - 63:10
**recessed** [1] - 83:10
**recipients** [1] - 59:4
**recognize** [2] - 8:3, 60:19
**recollection** [8] - 64:19, 65:1, 65:2, 67:20, 68:20, 80:4, 80:9, 80:16
**recommendations** [4] - 64:5, 64:12, 65:8, 67:23
**record** [6] - 10:14, 14:5, 50:9, 69:7, 70:13, 84:5
**recorded** [2] - 6:19, 56:5
**recordkeeping** [1] - 25:6
**red** [6] - 56:12, 56:23, 56:24, 56:25, 57:7
**Red** [1] - 78:20
**redactions** [1] - 8:23
**Reed** [2] - 6:4, 6:11
**refer** [4] - 49:11, 49:13, 49:16, 64:9
**referencing** [1] - 9:20
**refers** [1] - 52:20
**refresh** [3] - 64:18, 64:25, 67:20
**refreshed** [1] - 65:2
**regarding** [4] - 7:21, 10:22, 12:8, 79:19

**regardless** [1] - 11:7
**regional** [3] - 25:11, 25:12, 25:16
**registrant** [2] - 40:23, 41:2
**registrants** [1] - 40:23
**registration** [1] - 19:20
**registrations** [1] - 40:9
**regulated** [1] - 58:1
**regulation** [9] - 49:21, 50:6, 51:1, 51:16, 52:7, 52:14, 52:17, 52:19, 52:20
**regulations** [5] - 19:6, 20:8, 39:12, 39:13, 50:16
**regulator** [5] - 21:3, 22:3, 39:16, 73:11, 73:20
**regulators** [2] - 49:16, 58:13
**regulators'** [1] - 21:24
**Regulatory** [4] - 16:5, 21:10, 24:22, 24:23
**regulatory** [6] - 19:3, 19:13, 21:19, 25:4, 26:3, 49:9
**rejected** [1] - 51:12
**related** [3] - 63:25, 73:13, 75:19
**relationship** [3] - 21:2, 43:24, 70:25
**relationships** [5] - 23:23, 24:4, 24:8, 24:12, 24:14
**relative** [6] - 29:11, 41:17, 42:21, 43:14, 65:15, 65:22
**relayed** [1] - 66:8
**relevance** [2] - 10:6, 10:23
**relevant** [2] - 50:15, 54:24
**remand** [1] - 10:1
**remedy** [2] - 10:24, 11:6
**remember** [9] - 28:23, 63:20, 65:11, 65:19, 65:24, 66:11, 67:13, 79:13, 82:14
**removed** [1] - 47:21
**repeat** [1] - 30:5
**rephrase** [1] - 50:3
**reply** [1] - 83:7
**Report** [2] - 46:3, 46:4
**report** [29] - 17:20, 17:24, 49:5, 49:10, 51:6, 51:11, 56:5,

56:21, 68:2, 68:3, 68:21, 69:4, 69:10, 69:20, 69:22, 78:20, 78:24, 79:7, 79:11, 79:13, 79:15, 79:20, 79:23, 79:24, 79:25, 80:1, 80:5, 80:11
**reported** [4] - 18:3, 27:2, 65:22, 84:9
**Reporter** [6] - 6:17, 6:18, 84:3, 84:12
**REPORTER** [1] - 46:9
**reporters** [1] - 63:8
**reporting** [2] - 21:25, 65:22
**Reporting** [1] - 49:17
**reports** [5] - 18:1, 25:15, 34:20, 79:13, 80:8
**represent** [2] - 61:1, 68:17
**representative** [1] - 15:8
**represents** [1] - 60:8
**request** [6] - 8:21, 9:8, 66:7, 79:19, 80:25, 81:3
**requested** [2] - 43:10, 69:23
**requests** [1] - 9:7
**required** [4] - 9:20, 22:2, 51:17, 52:7
**requirement** [1] - 49:9
**requirements** [4] - 25:4, 25:6, 25:7, 26:4
**requires** [2] - 50:6, 51:1
**research** [2] - 19:9, 48:25
**resource** [3] - 18:17, 18:20, 18:25
**respect** [4] - 41:8, 41:11, 66:1, 83:2
**respond** [3] - 10:11, 56:20, 66:7
**response** [1] - 83:4
**responses** [2] - 45:24, 56:20
**responsibilities** [9] - 15:11, 15:13, 16:8, 16:12, 19:11, 24:24, 24:25, 30:2, 60:16
**responsibility** [3] - 7:18, 22:20, 28:12
**responsible** [3] - 16:14, 26:23, 65:14
**responsive** [2] - 28:16, 28:17
**result** [2] - 23:24, 31:9

**resulted** [1] - 73:15
**results** [1] - 64:14
**resume** [1] - 63:12
**resumed** [1] - 63:11
**retail** [3] - 41:6, 41:8, 46:19
**retired** [1] - 27:7
**retrieve** [1] - 49:1
**Reuters** [1] - 46:13
**reveal** [1] - 13:5
**review** [7] - 8:23, 43:16, 54:19, 56:19, 58:18, 63:24, 81:4
**reviewed** [7] - 19:6, 20:15, 69:1, 78:19, 79:6, 79:17, 79:22
**reviews** [1] - 54:24
**Rice** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**right-hand** [1] - 67:5
**rise** [5] - 10:10, 43:17, 74:1, 75:1, 78:9
**risk** [20] - 39:11, 39:20, 39:24, 40:4, 42:4, 42:22, 57:6, 57:9, 57:10, 57:13, 57:15, 57:16, 57:17, 57:23, 58:1, 58:7, 58:9, 58:19
**RMR** [2] - 6:17, 6:18
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**role** [5] - 26:12, 26:20, 28:11, 29:7, 36:24
**roles** [1] - 26:2
**room** [6] - 8:6, 8:16, 8:18, 9:8, 13:16, 37:17
**roughly** [1] - 16:8
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**RUBY** [10] - 4:17, 19:22, 29:20, 35:14, 51:23, 69:16, 74:3, 76:22, 78:23, 81:20
**Ruby** [2] - 4:17, 51:21
**rule** [2] - 69:25, 70:19
**ruling** [1] - 70:10
**run** [1] - 12:19

## S

**s\Ayme** [1] - 84:11
**s\Lisa** [1] - 84:11
**sake** [1] - 49:15
**sale** [1] - 39:9
**sales** [12] - 37:11, 59:5, 59:8, 59:14, 60:6, 60:8, 60:24,

61:7, 61:17
**SALGADO** [1] - 4:15
**San** [2] - 2:5, 2:17
**sat** [1] - 15:7
**saved** [2] - 48:23, 56:7
**saw** [8] - 32:22, 43:7, 43:8, 43:12, 66:10, 68:16, 75:2, 75:12
**SC** [3] - 3:15, 4:4, 4:9
**Schedule** [1] - 25:10
**scheduled** [1] - 58:2
**scheduling** [1] - 58:8, 58:9
**SCHMIDT** [1] - 5:9
**scope** [7] - 9:3, 9:24, 10:4, 65:25, 69:23, 70:2, 70:25
**sealing** [2] - 9:8, 9:16
**search** [1] - 45:25
**searching** [1] - 31:12
**seat** [1] - 14:17
**second** [5] - 10:22, 13:2, 17:20, 66:24, 75:16
**section** [2] - 24:23, 25:18
**sections** [1] - 80:13
**sector** [5] - 17:4, 17:10, 17:15, 17:17
**Security** [4] - 15:6, 21:9, 24:23, 61:16
**security** [6] - 15:19, 15:21, 16:12, 16:15, 25:6, 34:21
**See** [1] - 83:8
**see** [25] - 10:8, 31:23, 31:25, 33:9, 34:3, 34:5, 34:19, 36:14, 36:15, 37:14, 37:15, 38:9, 39:14, 41:20, 49:5, 53:2, 57:3, 60:19, 66:21, 66:22, 66:24, 73:14, 75:12, 81:24, 82:24
**seeing** [5] - 60:18, 64:14, 65:15, 75:10, 79:13
**seeking** [2] - 10:24, 11:6
**seem** [2] - 20:15, 80:7
**sees** [1] - 65:2
**selling** [1] - 39:25
**sending** [2] - 34:5, 34:12
**senior** [1] - 24:9
**Senior** [4] - 7:2, 7:16, 16:4, 16:6
**SENIOR** [1] - 1:17
**Sensabaugh** [1] - 5:14
**sense** [9] - 11:24,

31:3, 44:7, 44:9, 53:7, 62:20, 68:19, 74:14, 75:24
**sensitive** [1] - 8:9
**sent** [1] - 32:6
**separately** [1] - 65:13
**serve** [2] - 16:21, 38:4
**served** [1] - 35:19
**service** [2] - 40:24, 43:18
**serviced** [1] - 44:12
**set** [2] - 11:25, 13:12
**seven** [2] - 43:13, 73:18
**seven-plus** [1] - 73:18
**several** [3] - 57:19, 70:2, 73:9
**SHANNON** [1] - 6:3
**share** [1] - 36:13
**shift** [1] - 71:25
**shine** [1] - 57:14
**ship** [3] - 49:22, 50:7, 51:2
**shipped** [2] - 51:7, 51:13
**shorten** [2] - 81:2, 81:10
**shortly** [1] - 46:13
**show** [3] - 30:25, 66:13, 70:16
**showing** [1] - 11:17
**shows** [1] - 75:19
**sic** [2] - 16:20, 25:16
**side** [4] - 42:24, 67:5, 82:7, 83:7
**significance** [1] - 45:1
**significant** [4] - 43:9, 44:1, 44:6, 44:8
**significantly** [1] - 75:23
**Signs** [1] - 78:20
**simple** [2] - 54:2
**simply** [2] - 9:3, 38:4
**SIMULTANEOUS** [1] - 7:6
**SINGER** [1] - 4:5
**single** [1] - 77:22
**sit** [6] - 22:10, 58:18, 65:17, 73:16, 77:15, 80:2
**site** [2] - 55:16, 55:18
**sitting** [2] - 20:17, 37:1
**situation** [2] - 26:6, 26:7
**size** [2] - 52:22
**skills** [1] - 34:14
**slide** [1] - 36:10
**slides** [7] - 33:25,

34:5, 34:12, 34:14, 34:16, 34:17, 34:23
**small** [3] - 43:21, 44:7, 77:18
**smaller** [2] - 44:13, 44:16
**Smith** [2] - 6:4, 6:11
**software** [1] - 55:11
**sold** [1] - 10:9
**solely** [1] - 64:3
**solidify** [1] - 31:3
**someone** [7] - 18:6, 26:18, 30:8, 30:14, 33:12, 34:5, 55:18
**sometime** [3] - 10:2, 10:15, 21:11
**sometimes** [3] - 23:10, 37:22, 37:24
**somewhat** [1] - 60:3
**somewhere** [1] - 44:22
**Sorry** [3] - 64:24, 65:12, 73:21
**sorry** [10] - 9:2, 17:18, 24:2, 24:4, 25:17, 28:7, 45:7, 46:9, 47:17, 77:8
**SORS** [1] - 49:17
**sort** [9] - 26:1, 28:14, 39:18, 46:23, 48:5, 48:9, 48:16, 60:5, 75:11
**sorts** [2] - 26:3, 54:6
**sought** [1] - 78:3
**sound** [1] - 34:7
**sounds** [2] - 24:11, 34:9
**Sounds** [1] - 71:17
**source** [2] - 31:12, 37:2
**sources** [2] - 41:17, 45:25
**South** [1] - 2:13
**SOUTHERN** [1] - 1:1
**Southern** [1] - 7:2
**SPEAKERS** [1] - 7:6
**speaking** [3] - 21:23, 23:1, 44:24
**special** [1] - 56:1
**specialist** [1] - 31:2
**specific** [15] - 7:20, 8:19, 9:7, 9:8, 9:9, 12:3, 18:18, 20:17, 25:8, 47:19, 64:7, 65:23, 73:6, 73:16, 80:16
**specifically** [10] - 19:18, 20:18, 20:23, 22:2, 29:3, 39:23, 40:22, 44:15, 65:16,

66:6
**spectrum** [6] - 42:16, 42:24, 42:25, 44:11, 57:15, 57:16
**speculation** [3] - 22:7, 31:18, 32:14
**spends** [1] - 25:1
**spent** [3] - 23:16, 32:24, 32:25
**spreadsheet** [1] - 55:1
**spreadsheets** [1] - 54:23
**Square** [2] - 6:5, 6:12
**St** [2] - 34:10, 34:11
**staff** [1] - 15:23
**stand** [5] - 7:11, 7:14, 11:1, 14:9, 63:13
**standing** [1] - 12:23
**standpoint** [1] - 10:6
**STANNER** [1] - 5:10
**start** [4] - 14:7, 33:12, 48:9, 82:6
**started** [1] - 75:4
**state** [11] - 11:7, 14:10, 15:1, 21:1, 28:6, 28:8, 37:18, 41:20, 58:13, 63:24, 70:16
**statement** [11] - 35:15, 35:24, 37:4, 37:7, 37:8, 38:23, 70:1, 70:22, 70:23, 71:14, 71:15
**STATES** [2] - 1:1, 1:17
**States** [1] - 7:2
**states** [3] - 52:14, 52:17, 52:19
**stating** [1] - 44:5
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**stenography** [1] - 6:19
**Steve** [7] - 21:11, 24:18, 24:20, 24:21, 25:1, 25:16
**STEVEN** [1] - 4:17
**still** [10] - 10:18, 29:1, 29:2, 32:13, 47:7, 47:13, 48:22, 48:25, 63:13, 75:5
**stop** [1] - 75:15
**store** [1] - 46:23
**stored** [2] - 47:11, 47:21
**stories** [1] - 58:12
**stove** [1] - 26:11
**stove-piped** [1] - 26:11
**Street** [15] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15,

4:18, 5:5, 5:12, 6:6, 6:13
**streets** [1] - 30:20
**strenuously** [1] - 12:15
**stricken** [1] - 70:13
**strike** [2] - 82:9, 82:15
**student** [1] - 16:25
**studied** [1] - 30:25
**subject** [8] - 13:18, 31:20, 70:10, 70:23, 71:7, 71:15, 78:24, 78:25
**submit** [2] - 70:4, 71:8
**submitted** [1] - 11:10
**subpoena** [2] - 37:13, 38:4
**subsection** [1] - 71:14
**subsequent** [5] - 8:21, 9:9, 59:6, 75:17, 76:12
**substance** [1] - 34:15
**substances** [15] - 37:12, 39:10, 39:25, 40:19, 42:14, 43:8, 53:18, 57:3, 57:5, 57:9, 58:2, 62:7, 62:11, 77:24
**substantial** [2] - 74:1, 78:8
**substitute** [1] - 30:21
**suffer** [1] - 29:6
**sufficient** [1] - 31:19
**suggest** [3] - 29:23, 42:25, 70:7
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12
**summary** [1] - 68:25
**supply** [3] - 19:8, 20:14, 77:17
**support** [1] - 70:3
**supports** [1] - 70:11
**surmising** [1] - 30:17
**surrounding** [1] - 69:21
**surveillance** [1] - 56:3
**surveillance-type** [1] - 56:3
**suspended** [1] - 19:20
**suspicious** [17] - 21:24, 49:5, 49:10, 49:22, 50:7, 51:2, 51:6, 51:11, 51:18, 52:7, 52:11, 52:13, 52:15, 52:17, 52:19, 52:21, 80:8
**Suspicious** [1] - 49:16
**sustain** [4] - 31:21, 33:13, 50:21, 76:7

**sustained** [7] - 18:22, 19:24, 50:23, 60:22, 62:24, 63:4, 78:17
**SUZANNE** [1] - 4:15
**switch** [1] - 63:8
**switched** [1] - 47:12
**SWORN** [1] - 14:15
**system** [15] - 12:7, 12:14, 19:8, 46:7, 46:14, 47:10, 47:15, 47:18, 47:20, 49:9, 49:18, 54:15, 54:16, 54:17, 72:20
**System** [1] - 13:10, 49:4, 49:17
**systems** [3] - 46:11, 47:12, 48:24

# T

**Tableau** [1] - 55:11
**tactics** [1] - 32:9
**tar** [1] - 32:22
**tasking** [1] - 65:16
**Team** [8] - 26:25, 39:4, 56:6, 59:16, 59:20, 61:8, 61:10, 61:15
**team** [11] - 15:21, 17:22, 17:25, 21:15, 22:1, 22:2, 25:11, 26:13, 59:15, 66:8, 66:9
**teams** [1] - 54:4
**technological** [1] - 13:21
**TEMITOPE** [1] - 4:8
**temporal** [1] - 9:24
**ten** [6] - 23:17, 41:23, 43:12, 63:9, 81:4
**ten-minute** [1] - 81:4
**tendering** [1] - 82:3
**Tenth** [1] - 5:12
**term** [4] - 38:15, 49:12, 60:3, 72:13
**terminated** [1] - 43:5
**terms** [20] - 13:9, 22:3, 26:1, 26:14, 29:1, 38:17, 39:8, 39:9, 40:22, 41:22, 43:7, 46:11, 47:16, 48:4, 52:10, 56:12, 68:19, 69:1, 75:11, 77:20
**test** [1] - 59:9
**testified** [5] - 29:25, 42:9, 69:11, 74:10, 76:9
**testify** [2] - 7:14, 8:15
**testimony** [17] - 8:16, 8:22, 9:9, 9:10, 9:16, 10:7, 10:25, 11:2,

62:23, 63:18, 65:12, 70:13, 76:24, 82:4, 82:9, 82:17
**TGIF** [1] - 7:7
**THE** [107] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:7, 7:12, 9:11, 11:20, 12:11, 13:14, 13:21, 14:1, 14:4, 14:12, 14:18, 14:20, 14:21, 17:13, 17:16, 18:22, 19:24, 22:8, 22:9, 30:3, 30:5, 31:16, 31:19, 31:24, 32:16, 32:18, 33:13, 33:17, 33:18, 35:12, 36:1, 36:6, 42:8, 42:11, 46:10, 50:2, 50:21, 51:21, 51:24, 52:1, 60:22, 62:24, 63:4, 63:7, 63:12, 63:14, 63:15, 64:22, 64:25, 66:10, 66:12, 66:13, 66:16, 67:4, 67:7, 67:12, 67:14, 67:16, 68:7, 68:8, 69:8, 69:14, 69:18, 70:5, 70:15, 70:20, 71:3, 71:10, 71:13, 71:19, 71:22, 72:14, 72:15, 74:5, 74:21, 74:23, 74:24, 74:25, 76:4, 76:7, 77:1, 77:6, 77:8, 78:11, 78:17, 79:5, 79:9, 80:19, 81:5, 81:11, 81:15, 81:16, 81:22, 81:25, 82:1, 82:8, 82:11, 82:14, 82:19, 82:24, 83:5, 83:8
**theft** [1] - 26:5
**thereafter** [1] - 46:13
**they've** [1] - 28:22
**thickness** [1] - 25:9
**thinking** [3] - 10:12, 23:13, 32:19
**thinks** [1] - 50:20
**third** [2] - 46:14, 55:25
**third-party** [1] - 55:25
**Thomas** [2] - 2:12, 82:5
**Thomson** [1] - 46:13
**Three** [1] - 6:5
**three** [9] - 6:12, 9:23, 12:13, 16:25, 27:7, 36:12, 37:13, 38:5, 48:24
**throughout** [2] - 60:11
**throwing** [1] - 43:13
**timing** [1] - 68:19

**TIMOTHY** [1] - 5:9
**title** [6] - 15:5, 16:4, 16:6, 16:10, 21:12, 24:21
**today** [16] - 7:23, 8:10, 8:18, 10:12, 10:18, 10:25, 11:12, 12:2, 13:18, 22:10, 47:24, 48:22, 52:3, 71:6, 77:15, 80:24
**today's** [2] - 8:22, 9:9
**together** [2] - 26:8, 59:1
**tomorrow** [1] - 83:4
**took** [4] - 18:9, 20:6, 24:17, 55:8
**top** [6] - 40:20, 41:13, 41:15, 41:16, 41:23
**topics** [1] - 23:13
**total** [1] - 45:12
**totality** [1] - 42:13
**touch** [1] - 27:19
**Touhy** [1] - 32:7
**towards** [1] - 24:9
**Tower** [2] - 3:4, 4:18
**track** [3] - 28:14, 59:12, 78:3
**tracking** [1] - 46:16
**traffickers** [2] - 31:6, 33:3
**trafficking** [9] - 31:6, 32:4, 32:11, 32:20, 32:21, 33:1, 33:4, 73:1, 73:2
**train** [5] - 59:5, 59:14, 59:17, 60:6
**trained** [1] - 59:13
**training** [15] - 58:20, 58:21, 58:22, 58:25, 59:1, 59:2, 59:4, 59:6, 59:7, 59:9, 59:12, 59:19, 59:21, 60:2, 60:5
**trainings** [2] - 19:17, 60:1
**transcript** [2] - 6:19, 84:4
**transcripts** [1] - 82:4
**transition** [2] - 29:18, 30:10
**transitioned** [1] - 46:13
**treated** [2] - 29:5, 30:16
**treatment** [1] - 30:17
**tremendous** [1] - 28:25
**trends** [2] - 58:11
**Trial** [1] - 83:10
**TRIAL** [1] - 1:16

**trial** [3] - 8:6, 8:13, 82:4
**trials** [1] - 8:4
**tried** [1] - 78:3
**true** [5] - 36:16, 37:4, 37:6, 63:23, 69:3
**truth** [4] - 35:16, 36:1, 69:12, 70:15
**try** [9] - 28:12, 29:10, 31:24, 40:16, 58:14, 61:14, 66:24, 80:14, 82:19
**trying** [8] - 8:13, 20:11, 21:23, 23:6, 27:21, 47:23, 62:15, 62:18
**turn** [1] - 36:10
**Twelfth** [4] - 4:13, 4:15, 5:5
**two** [7] - 9:19, 59:12, 59:15, 60:4, 69:19, 69:25, 70:19
**type** [2] - 42:13, 56:3
**types** [3] - 26:16, 41:11, 42:4

# U

**ultimately** [4] - 25:15, 30:10, 33:9, 56:19
**under** [10] - 12:14, 17:22, 34:23, 54:10, 63:13, 69:25, 70:18, 70:20, 70:21, 70:24
**understood** [1] - 78:12
**undertake** [2] - 19:3, 29:8
**unfortunately** [1] - 37:1
**United** [1] - 7:2
**UNITED** [2] - 1:1, 1:17
**University** [1] - 17:1
**unless** [1] - 81:18
**unusual** [2] - 52:22, 52:23
**up** [12] - 7:14, 11:1, 13:24, 17:19, 18:22, 25:15, 26:9, 47:4, 54:12, 55:9, 56:13, 83:1
**user** [2] - 33:9, 55:7
**utilize** [1] - 55:11

# V

**vague** [3] - 42:7, 72:12, 74:3
**validate** [1] - 41:16
**variety** [2] - 40:5, 54:8

**various** [11] - 13:7, 19:6, 19:16, 21:15, 32:20, 37:18, 37:23, 40:17, 59:17, 69:1, 82:17
**vast** [2] - 72:24, 72:25
**vaults** [1] - 25:10
**vehicle** [1] - 77:25
**Ventura** [1] - 3:18
**verify** [1] - 40:16
**versus** [3] - 55:1, 57:15, 64:2
**veteran** [1] - 30:2
**via** [1] - 12:1
**Vice** [5] - 7:16, 11:5, 15:6, 15:11, 24:21
**view** [4] - 22:23, 61:7, 64:1, 75:14
**views** [1] - 36:4
**Virginia** [8] - 4:18, 7:3, 10:9, 28:1, 28:21, 78:22, 79:12
**VIRGINIA** [2] - 1:1, 1:18
**visibility** [4] - 57:1, 77:20, 77:23, 78:2
**visit** [3] - 54:4, 55:16, 55:18
**visits** [2] - 54:6, 56:3
**visual** [1] - 8:16
**visualization** [1] - 55:3
**visualization-wise** [1] - 55:3
**volume** [3] - 73:24, 78:7, 78:12
**VOLUME** [1] - 1:16
**vs** [1] - 84:6

## W

**wait** [1] - 17:13
**waived** [1] - 35:23
**WAKEFIELD** [1] - 5:13
**walked** [1] - 51:8
**wants** [2] - 63:6, 81:18
**warehouses** [1] - 46:23
**Warning** [1] - 78:20
**Washington** [6] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12
**ways** [2] - 29:1, 54:8
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**West** [7] - 7:3, 10:9, 27:25, 28:21, 78:22, 79:12
**WEST** [2] - 1:1, 1:18
**whereas** [1] - 25:23

**whole** [4] - 13:9, 19:8, 42:16, 82:15
**wholesale** [3] - 28:17, 36:11, 49:8
**wholesaler** [1] - 38:4
**wholesalers** [2] - 36:24, 58:16
**wholistically** [2] - 53:21, 62:17
**WICHT** [1] - 4:12
**Williams** [2] - 4:13, 5:4
**winded** [1] - 73:21
**wise** [1] - 55:3
**wish** [1] - 24:15
**WITNESS** [22] - 14:12, 14:15, 14:20, 22:9, 30:5, 32:18, 33:18, 42:11, 46:10, 52:1, 63:14, 66:12, 67:7, 67:14, 68:8, 72:15, 74:23, 74:25, 77:8, 79:9, 81:15, 81:25
**witness** [11] - 7:8, 9:1, 9:2, 11:13, 63:13, 71:7, 76:24, 76:25, 80:18, 81:6
**witness's** [1] - 62:23
**witnesses** [1] - 9:22
**WOELFEL** [1] - 3:9
**Woelfel** [1] - 3:9
**word** [2] - 9:24, 11:3
**words** [5] - 25:19, 38:12, 39:14, 52:21, 82:6
**workforce** [1] - 61:1
**works** [2] - 7:24, 24:22
**world** [2] - 14:2, 76:16
**write** [2] - 44:21, 45:19
**writing** [1] - 65:24
**written** [2] - 34:23, 76:15
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10, 3:13, 4:19, 5:15, 6:9

## Y

**year** [5] - 28:21, 28:22, 58:18, 59:15
**years** [9] - 12:13, 16:25, 23:17, 27:7, 27:9, 73:9, 73:18, 75:7
**York** [2] - 3:5, 33:2
**yourself** [1] - 20:13

## Z

**zero** [1] - 77:23

**Zimmerman** [15] - 17:21, 18:3, 18:8, 20:21, 21:6, 21:17, 21:22, 22:9, 24:7, 27:4, 65:24, 66:2, 67:10, 67:21, 69:20