IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 11
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


MAY 17, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:                    Ayme Cochran, RMR, CRR
Court Reporter:                    Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A. Faber,

 2   Senior Status Judge, United States District Court, Southern

 3   District of West Virginia, in Charleston, West Virginia, on

 4   May 17, 2021, at 9:00 a.m., as follows:

 5          THE COURT:  Mr. Nicholas, you have something you

 6   want to bring up with the Court and I understand this -- we

 7   have nobody in the courtroom but people who are associated

 8   with the case and we're not streaming it into the overflow

 9   room for this presentation by you, right?

10          MR. NICHOLAS:  Thank you, Your Honor, and I'll

11   make one more request on that issue and that is I would ask

12   that this very short portion of our discussion, that this

13   portion of the transcript be sealed.

14          THE COURT:  All right.  It will be sealed.

15

16

17

18

19

20

21

22

23

24

25
```



























10        (Recess taken)

11              THE COURT:  Well, we're back on the record

12   unsealed.

13         Mr. May, are you in the courtroom?

14              THE WITNESS:  Yes, sir.

15              THE COURT:  Will you come forward and take the

16   witness stand?  And you're still under oath, sir.

17              THE COURT:  All right.  Ms. McClure?

18              MS. MCCLURE:  Thank you, Your Honor.

19                    **CONTINUED CROSS EXAMINATION**

20              **BY MS. MCCLURE:**

21   **Q.**   Good morning, Mr. May.

22   **A.**   Good morning.

23   **Q.**   So, we covered a good bit of your background on your

24   direct on Friday.  I'd like to circle back and ask you a few

25   questions about your prior experience at the DEA.

1       So, after a 30-year career in DEA, is it fair to say

2   that you understand at a high level the organizational

3   structure of the DEA?

4   **A.**   I think that's fair.

5   **Q.**   Okay.  Could you just briefly describe at a very high

6   level the organizational structure?

7   **A.**   So, DEA is a law enforcement agency that also has a

8   regulatory responsibility, so I think it's kind of unique.

9   The DEA has a headquarters, a central authority, which is in

10  Arlington, Virginia, and that is where the leadership of the

11  agency works.

12      It also has field divisions throughout the United

13  States and, at each field division, there is a special agent

14  in charge who is responsible for that area of

15  responsibility.  And so -- and within each field division,

16  we have agents, Task Force officers, diversion investigators

17  and, depending upon the location of the field division, the

18  numbers of personnel at each field division would differ.

19      Underneath the special agent in charge, you have

20  assistant special agents in charge.  And then, below them,

21  you have group supervisors and then special agent and

22  diversion investigator workforce.

23  **Q.**   So, given that description, is it fair to say that

24  there are two sides of the DEA?

25  **A.**   I think that's fair to say in terms of Diversion

1    Control and in the enforcement side of the agency.

2    **Q.**    So, enforcement side and Diversion Control?

3    **A.**    Correct.

4    **Q.**    And are those two sides funded differently?

5    **A.**    Yes, they are.  The Diversion Control part of the

6    agency is what we call fee funded.  So, it's all about the

7    registrants that pay for their registration.  That's what

8    goes to fund the Diversion Control efforts of DEA.

9    **Q.**    And how about the other side, the enforcement side?

10   **A.**    That's congressionally.  Like every budget and every

11   federal agency, it's a congressionally authorized budget.

12   **Q.**    And in your career did you work on both sides?

13   **A.**    I worked almost my entire career on the enforcement

14   side of the agency in -- actually, I would say my whole

15   career, although my last several months, while in the

16   Atlanta Field Division, I had oversight responsibility for a

17   Tactical Diversion Squad.

18   **Q.**    And, Mr. May, in a few sentences could you describe the

19   various placements in your enforcement career?

20   **A.**    Sure.  I started my career in Boston and was first

21   transferred to New York City.  I spent five years in New

22   York City where I worked as a special agent.

23            Following that time, I transferred overseas for my

24   first overseas assignment.  I worked in Marcet, France for

25   two years, followed by Paris, France.

1      I was then promoted back to DEA headquarters.  I did a

2   stint on DEA Headquarters and then was asked to lead a new

3   program at DEA called the Regional Enforcement Team.  It was

4   a separate funded program.  And I did that for three years.

5   I got the program up and running.

6      I later supervised the Drug Task Force in the City of

7   Charlotte, North Carolina for about five years.  That was

8   followed by another foreign assignment where I was posted in

9   Rome, Italy, but I had oversight responsibility for all of

10  the DEA Offices in Africa and some in Europe.

11  **Q.**   During your time at DEA, did you ever work on cases or

12  -- involving the diversion of prescription opioids?

13  **A.**   I had a couple of occasions to just support Diversion

14  Control in terms of their investigations.  I specifically

15  remember two instances supporting them.  They don't have

16  arrest powers so, if they're going to want somebody

17  arrested, they ask for assistance from the Special Agent

18  Workforce.

19  **Q.**   Did any of your time at DEA involve a Tactical

20  Diversion Squad?

21  **A.**   Yes, the last -- the last about ten months of my career

22  in Atlanta.

23  **Q.**   Can you tell the Court what a Tactical Diversion Squad

24  is?

25  **A.**   A Tactical Diversion Squad is a group that's made up of

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1   special agents, diversion investigators, state and local

2   investigators, and Intelligence Analysts.  And it's a

3   relatively new concept which put together this hybrid group

4   to address the opioid investigations and controlled

5   substance investigations.

6   **Q.**   Was that the last role you had with DEA before you

7   retired?

8   **A.**   It was.

9   **Q.**   Okay.  Switching gears out of your background and now

10   into the Diversion Control Program today at

11   AmerisourceBergen.  So, for the benefit of the Court, we're

12   going to start by describing the modern program; and then,

13   we will go back in time and talk about their various

14   sections and how they developed over time.

15        So, talking about the Diversion Control Program as it

16   is enforced today, could you generally describe the

17   components of that program?

18   **A.**   Sure.  I'm going to go back to our bucket language from

19   last week and essentially having four buckets.  When first

20   on-boarding a customer, we have a new customer due diligence

21   component where we collect certain information from the

22   customer and then we take that information and a member of

23   the team will review the information, verify certain

24   information, relying upon public data sources and could be,

25   as I mentioned on Friday, you know, looking at the

1    backgrounds of both pharmacists and physicians and verifying

2    any adverse actions in looking at such things as the

3    quantities of particular controlled substances the customer

4    intends to order.  So, that -- that is what I refer to as

5    essentially bucket number one.

6              MS. MCCLURE:  And, Richie, could we put up on the

7    screen the demonstrative of this, the first bucket?

8              BY MS. MCCLURE:

9    Q.   Okay, and the second?

10   A.   So, if you look at the life of a customer, the second

11   logical step would be the Order Monitoring Program.  And,

12   you know, in terms of that new customer review, we may or

13   may not authorize that customer to purchase controlled

14   substances.  Assuming that we didn't have any risks that we

15   could not mitigate, we would authorize that customer to

16   purchase controlled substances and listed chemicals.

17        And then, each and every order by that customer would

18   then be subject to our Order Monitoring Program where --

19   which is, as I explained on Friday, the program that

20   AmerisourceBergen has had in place to identify and report

21   suspicious orders.

22   Q.   And the third?

23   A.   The third would be, again, back to due diligence.  It's

24   this notion of ongoing due diligence.  So, when we on-board

25   a customer, our efforts don't end at that time.  And so, as

 1    I mentioned, we will continue to monitor each and every

 2    order of controlled substances and listed chemicals by that

 3    customer and we'll also have these analytics that we've

 4    developed where we look at the customer more wholistically

 5    and we refer to them as "dashboards" so that, you know, not

 6    only are we looking at individual orders that come to our

 7    attention, but we're also looking at the purchasing over

 8    time of all products, controls and non-controls, by that

 9    customer.

10         On occasion, when we're engaged in this process, if we

11    see potential red flags we could engage with a customer and

12    that engagement could be as simple as sending the customer

13    an e-mail inquiring about a specific order or it could be

14    arranging a site visit to the customer with the help of our

15    outside contractor, the Pharma Compliance Group, in order to

16    mitigate those red flags.

17    **Q.**   And the fourth?

18    **A.**   The fourth would be policies and procedures and I would

19    lump in there, as well, some training.

20    **Q.**   Which is on this slide as the fifth.

21    **A.**   I'm sorry.  I can't see the slides.

22    **Q.**   That's okay.

23              MS. MCCLURE:  Richie, could you put up the fifth?

24              THE COURT:  It's on your monitor there, sir.

25              THE WITNESS:  Thank you, sir.  Thank you.

1        Training.  I'm sorry.  Thank you.

2        So, talk about policies and procedures first.  Again,

3    we -- we've always had policies and procedures associated

4    with the program starting in around 2014, when we were

5    contemplating changes to the program.  What we found was,

6    you know, the policies and procedures we had in place didn't

7    match with those changes.

8        And so, as we began to make changes in the program

9    between 2014 and 2016, we realized that, hey, we have to

10   start again with our policies and procedures.  So, we

11   published a new set of policies and procedures specifically

12   for the Diversion Control Program in 2017 and really, I

13   would -- you know, that's the foundation of the program so

14   that we have a bases for everything that we do.

15   **Q.**   And the fifth?

16   **A.**   The fifth would be training.  And we have different

17   types of training that we carry out at AmerisourceBergen.

18   We train our customers to some extent.  We train our

19   internal groups, whether it's the groups at the distribution

20   centers, or even our own team members when they're

21   on-boarded.

22       We train our sales staff.  And I think I mentioned we

23   developed an electronic training program for them.  It would

24   have been around late 2016 to replace some of the training

25   that had occurred previously using power points and things

1    such as that.

2    **Q.**   And, Mr. May, have these been -- in your assessment

3    having joined the company in 2014 and still there today,

4    have these five buckets been the main part of

5    AmerisourceBergen's Diversion Control Program since you

6    started with the company in 2014?

7    **A.**   Yes.

8    **Q.**   And when you joined the company, in looking back, I

9    believe you testified on Friday that you looked back.  Is it

10   your understanding that these components have been -- were

11   indeed part the Diversion Control Program many years before

12   you joined the company?

13          MR. FARRELL:  Objection, Your Honor.

14          THE COURT:  What's the basis?

15          MR. FARRELL:  Foundation.  He arrived with the

16   company in 2014.

17          MS. MCCLURE:  Your Honor, Mr. May testified as to

18   his prior --

19          THE COURT:  Well, if you would, lay a foundation

20   for it.  Go ahead.

21          MS. MCCLURE:  Okay.

22          BY MS. MCCLURE:

23   **Q.**   Mr. May, when you joined the company, did you -- I

24   believe you testified on Friday you looked at what was

25   currently in place at the time; is that correct?

1    **A.**   Yes, I did.  I had conversations with other members of

2    CSRA who I identified to understand what the program was.  I

3    reviewed documentation around the program.  I reviewed

4    existing policies and procedures around the program.

5    **Q.**   So --

6              THE COURT:  Overruled.  I'll let him answer.

7              BY MS. MCCLURE:

8    **Q.**   Mr. May, has this been your understanding of the

9    program for many years before you joined at least from 2007

10   forward based on that review that you've talked about?

11   **A.**   Yes.  So, all of the buckets that you see here, they

12   had, as well, when I joined the company.

13   **Q.**   And is this program a national program or is it

14   regional in any way?

15   **A.**   This is a national program.

16   **Q.**   Briefly, with new customer due diligence, you've

17   described a lot of the checks that you've already done.  Are

18   licensed checks done for DEA and the corresponding state

19   agency, whatever that may be called in that state, for every

20   new customer when they're joined?

21             MR. PIFKO:  Objection, Your Honor.  Just objection

22   to the extent this is cumulative on what was discussed on

23   Friday and repetitive of testimony that we already have.

24             MS. MCCLURE:  Your Honor, we're going to cover two

25   points with new customer due diligence and then move on.

```
 1              THE COURT:  Overruled.  Go ahead.

 2              THE WITNESS:  I'm sorry.  Can you repeat the

 3    question?

 4              BY MS. MCCLURE:

 5    Q.   Are license checks done at the beginning of every

 6    initiation of a new customer with DEA and whatever the

 7    corresponding -- corresponding state agency would be?

 8    A.   Yes.  We do license checks and we would make a copy of

 9    those license checks and include those in the due diligence

10    file and it would be the DEA registration.  You know, a

11    pharmacy license by the State.  And some states also require

12    a controlled substance license, which is separate, but all

13    of those checks would be performed.

14    Q.   Okay.  Moving on to the Order Monitoring Program, I

15    believe you've testified that that is a process where

16    there's a computer flag and then a human review.  Do I have

17    that correct?

18    A.   That is correct.  I'm not sure I completely described

19    the process on Friday, but it is a two-step process and it

20    has been a two-step process going back at least until 2007

21    and essentially what happens with the program is that when a

22    customer places the order, the order is then instantly

23    reviewed electronically.

24         And if certain -- in the former program, if a threshold

25    was surpassed, then that order would be automatically held,
```

1    could not be picked, packed or shipped until it was then

2    reviewed to determine whether the order is suspicious.

3         Going back into 2014-2015 when we enhanced our program,

4    it's the -- in terms of the mechanism and how the program

5    works, it's the same notion that an order is held based upon

6    parameters being exceeded.  When that order is held, it

7    cannot be picked, packed and shipped.  It's then reviewed by

8    a member of the Diversion Control Team, who decides whether

9    the order is, in fact, suspicious.

10   **Q.**   Based on your review of the program when you joined and

11   your knowledge of it through to today, has that two-step

12   process been the case from 2007 to the present?

13   **A.**   It has.

14   **Q.**   Just to be clear, Mr. May, when AmerisourceBergen

15   receives an order from a pharmacy or any customer, does that

16   order include prescription-level information?

17   **A.**   Orders do not include prescription-level information.

18   **Q.**   So, how -- can you explain how an order -- what an

19   order is that we receive from the pharmacy customer or the

20   hospital customer?

21   **A.**   So, we define an order as a unique drug family.  We

22   have identified in our program about 70 drug families.  So,

23   it would be a -- a unique drug family.  The order is placed

24   on -- at one time, at the same time.  So, it would be a

25   particular date and time for a certain quantity of that

 1    controlled substance family.  That would define an order.

 2        So, for example, if I may, it would be a customer who

 3    places an order and ordered oxycodone.  He could have

 4    ordered several different NDC's or different types of

 5    oxycodone products, but they would all be considered one

 6    family, and the total quantity on that particular time would

 7    represent the order.

 8    **Q.**   Mr. May, do orders come in to AmerisourceBergen for

 9    non-opioid products every day?

10    **A.**   Yes.

11    **Q.**   Have you hear heard the phrase "just in time delivery"

12    when it comes to pharmaceutical distribution?

13    **A.**   Yes.

14    **Q.**   What does that mean?

15    **A.**   So, just in time delivery, essentially, it refers to

16    the way that the healthcare delivery system works in terms

17    of pharmaceuticals and, generally speaking, and there are

18    always exceptions, of course, but generally speaking,

19    pharmacies order every single day, controls and

20    non-controls.

21        And, you know, a couple of reasons.  Number one, they

22    are -- our pharmacies are looking to reduce their inventory

23    and the more inventory they keep on hand, the more that

24    costs them in terms of their cash flow.  So, just as a

25    simple business requirement, it's more financially

1    beneficial to the customer to have the ability to order

2    every single day.

3        From a controlled substance point of view, it's also

4    very advantageous for that pharmacy to have the least amount

5    of inventory on hand for controlled substances.  Again, what

6    we're trying to avoid there is a situation where there's

7    either internal theft at the pharmacy and the less product

8    on hand in terms of controls reduces that.  And also,

9    reduces the chances of a robbery, resulting in the

10   significant loss of controlled substances.

11       I would finally add to that probably that it's just the

12   efficiency of the wholesale distributor system which has,

13   you know, permitted this situation to exist.  You know, we

14   deliver almost every day to our customers and, some

15   locations, more than once a day.

16   **Q.**   If an order is not delivered on time to a pharmacy, can

17   that result in harm to patients?

18           MR. PIFKO:  Objection, speculation.

19           BY MS. MCCLURE:

20   **Q.**   Based on your experience in the industry, Mr. May,

21   which now I believe includes --

22           THE COURT:  Overruled.  Go ahead.

23           BY MS. MCCLURE:

24   **Q.**   -- seven years at AmerisourceBergen, if a pharmacy

25   order is not delivered timely by AmerisourceBergen, can that

1    result in harm to patients?

2    **A.**    That's always our balance.  You know, every decision

3    that we make ultimately could affect patient care and, you

4    know, we have the regulation on the one side.  We have

5    patient care issues on the other side.

6          So, if a delivery does not arrive at a pharmacy where a

7    patient was intending to get their medication, it certainly

8    can impact them, yes.

9    **Q.**    And, nevertheless, even though that a delay can cause,

10   as you've testified, have an effect on patients,

11   AmerisourceBergen, nevertheless, still holds orders of

12   controlled substances that hit our parameters, correct?

13   **A.**    We do.  And for our procedure, our guidance is we can

14   hold that order for at least 24 hours and more time, if

15   necessary.  If we have to communicate with the customer, for

16   example, they may not respond back immediately, so we will

17   hold it for a longer period of time in that case.

18   **Q.**    So, let's talk through briefly an order coming in to

19   AmerisourceBergen.  An order comes in from a pharmacy.  What

20   happens next?

21   **A.**    Well, one of two things can happen.  If it's an order

22   for controlled substances, the order can pass through

23   without surpassing any parameters and the order would then

24   be processed as normal.  It would be picked, packed and

25   shipped.

1          If the order, on the other hand, surpasses the

2     established parameters, that order would be instantly held

3     in the queue, a -- what we refer to as a work flow would be

4     created and that work flow would appear in the work function

5     area of the Diversion Control Team members who review all of

6     those orders.

7     **Q.**   And can anyone else at AmerisourceBergen outside of the

8     Diversion Control Team see or release an order that's been

9     held at that point?

10    **A.**   No.

11    **Q.**   What is that order reviewed for?

12    **A.**   Well, the order is reviewed to make a determination

13    whether the order is suspicious or not.

14    **Q.**   And when is an order suspicious under the regulation?

15    **A.**   So, we -- as the -- relying upon the language in the

16    regulation, unusual quantities, orders that deviate

17    substantially from a normal pattern, and orders of unusual

18    frequency, that's how the regulation defines those as

19    including those.  That's the language.  So, anything that

20    fits that criteria.

21    **Q.**   And is that, what you've just described, the only

22    definitional direction you have from DEA about what a

23    suspicious order is?

24    **A.**   Yes.

25    **Q.**   And who reviews orders that are held today?

```
1    A.    It would be a member of the Diversion Control Team.

2    Q.    And, briefly, what type of information do those

3    Diversion Control Team members evaluate to determine what to

4    do with that order?

5    A.    Sure.

6          MR. PIFKO:  Objection, Your Honor, just to the

7    extent we're talking about the policies and procedures and

8    there have been changes over time.  I just ask that the

9    questions clearly define the time period for which we're

10   discussing.

11         BY MS. MCCLURE:

12   Q.   Mr. May --

13         THE COURT:  All right.  Sustained.  Go ahead.

14         BY MS. MCCLURE:

15   Q.   Mr. May, based on your experience in the Diversion

16   Control Program, prior to making changes to the Diversion

17   Control Program, which you've briefly described, did you

18   operate and oversee the existing Diversion Control Program

19   when you joined AmerisourceBergen in 2014?

20   A.    I did.

21   Q.   And then, since that time, have you then overseen the

22   current Diversion Control Program to which you've made some

23   changes?

24   A.    Yes.  And those changes occur regularly, annually.

25   Q.   Okay.  And if I asked you to describe the types of
```

1    information the Diversion Control Team members rely on in

2    evaluating an order, would that actually have changed in any

3    way from 2014, when the program you took over existed at the

4    time you joined, through to today?

5    **A.**   So, I mentioned on Friday we have the totality of the

6    circumstances test where we look at all of the information

7    we can gather around the order and much of that information

8    that was being looked at in 2014 is similar to what we look

9    at today.

10        And so, we would look at the past ordering activity of

11   that particular controlled substance by that customer over a

12   period of time to look at issues like frequency and pattern,

13   but we would also look at the other due diligence

14   information that I referenced here.

15        Right now, during 2014, when I arrived, we had

16   spreadsheets and those spreadsheets had certain data on them

17   that would contribute to the decision making process.  We've

18   now converted those to our dashboards and we have that

19   information in Tableau.

20        It may be that we review the customer due diligence

21   file itself.  There may be information pertinent to the

22   decision in terms of the customer base, the patient customer

23   base, being serviced by a particular location.

24        And so, much of that information has stayed the same

25   over time.  How we get to that information has changed a

1    little bit in terms of what we can access.

2         And I would add, though, we have added some additional

3    information, public source data that we've incorporated into

4    our program that we did not have when I arrived in 2014,

5    just to make that distinction, that there have been some

6    additions of new information.

7    **Q.**   Okay.  And we'll get to that when we talk about the

8    Tableau files, but back to the order that we're evaluating

9    at the Diversion Control Team level, what happens if that

10   order is deemed by that Diversion Control Team member to be

11   suspicious?

12   **A.**   The order would be cancelled, and it would be reported

13   to DEA, and it would also be reported to those states where

14   it's required.

15   **Q.**   And after that order is reported as suspicious, is

16   there any other internal follow-up that happens about an

17   order that has been reported to State BOP, if required, and

18   DEA as suspicious?

19   **A.**   Yes.  We started the process sometime ago back when we

20   were looking at the program and we have weekly meetings, or

21   the Diversion Control Program has a weekly meeting, where

22   they review all of the previous week's Suspicious Order

23   Reports.  And the purpose of that is to essentially say,

24   hey, is there anything further that we need to do relative

25   to this customer, any additional due diligence or follow-up

1    for that particular customer.

2        And, on some occasions, there is additional follow-up

3    that's required.  Some occasions, we report the suspicious

4    order, we don't see any other potential red flags, and

5    that's -- we've carried out our obligation.

6    **Q.**   And you said it was reported to DEA.  Does anything

7    happen to that Suspicious Order Report internally at

8    AmerisourceBergen?

9    **A.**   We document it.  That suspicious order is documented in

10   a couple of different places.  It's documented within the

11   data management platform, SAP, that we -- that the company

12   utilizes in its tracking of all of its transactions.

13       And we also document it in the customer file where we

14   can, you know, add that information from SAP to the customer

15   file.  That way, when we look at a customer, the intent

16   there is to look at the whole life of the customer, which

17   would include, of course, any Suspicious Order Reports.

18   **Q.**   And, Mr. May, you said that you can add it to the

19   customer file.  Does that happen automatically or does that

20   require a human to remember to take that order and note in

21   the customer file that something had been reported as

22   suspicious?

23   **A.**   So, we've developed a recent enhancement where, I

24   mentioned on Friday, our latest version of our document

25   maintenance system is referred to as ARCHER.  And what we've

1    developed is a directed feed from SAP, this platform, where

2    the order is reported directly down into the ARCHER customer

3    file where that report would be saved.

4    **Q.**    Mr. May, does the fact that a customer placed an order

5    that your team has found to be suspicious automatically mean

6    that that customer is suspicious?

7    **A.**    No, it does not.

8    **Q.**    In fact, are you aware of any regulatory guidance that

9    says that if a customer places an order with

10   AmerisourceBergen, that AmerisourceBergen then reports to

11   the DEA as suspicious, that customer should be considered

12   suspicious and we should stop shipping orders to that

13   customer?

14   **A.**    No, that's not in the regulation.

15   **Q.**    Do you have any familiarity with the new proposed rule

16   making that has been issued by DEA in 2020?

17   **A.**    Yes, I do.

18   **Q.**    And does that new proposed rule making address any

19   guidance with respect to the question I've just asked you?

20   **A.**    It does not.

21   **Q.**    Thank you.  And you've said that you have a weekly

22   meeting with your team to discuss suspicious orders.  Does

23   the team -- what does the team do to decide whether to have

24   a customer subject to a deeper examination?

25   **A.**    Just to clarify, I don't participate in those meetings

1    and I have two directors that manage those personnel in

2    those meetings, but they -- they would review the order.

3    There would be certain information about the order.

4          There would be, of course, the customer name,

5    registration number, the drug family that was subject to the

6    order, the quantity that was involved, and some other

7    metrics around that particular customer.  And they would

8    then sit as a group and review that and they may consult

9    with these dashboards, again, to see if there's any other

10   red flags and, if there are, there could be follow-up that

11   comes out of those meetings and that follow-up would be

12   assigned to a team member.

13   Q.   And while you may not attend those meetings, do you

14   have familiarity to be able to testify today here about what

15   you -- what goes on in these meetings?

16   A.   I do.  I review the -- I see the e-mail traffic and I

17   also used to participate in those meetings, but have stopped

18   doing so.

19   Q.   And is this the company's own initiative where these

20   weekly meetings are conducted to evaluate suspicious orders

21   or is there some DEA guidance or regulation that mandates

22   this?

23   A.   This is our own internal procedure.

24   Q.   And today, does the regulation require

25   AmerisourceBergen to cancel and not ship a suspicious order

1    under the regulatory definition?

2            MR. FARRELL:  Objection, Your Honor.

3            THE COURT:  Basis?

4            MR. FARRELL:  The same basis that the defendants

5    filed a motion in limine to prevent us from opining on what

6    the regulation does or does not say.

7            MS. MCCLURE:  Your Honor, Mr. May was asked

8    questions regarding his understanding of the law on Friday.

9            THE COURT:  Yeah.  Overruled.  She asked him what

10   the regulation requires.

11           MS. MCCLURE:  As to his understanding.  I'm -- I'm

12   happy to make the --

13           BY MS. MCCLURE:

14   Q.   As your understanding of the regulation, Mr. May?

15   A.   My understanding of the regulation is that there is no

16   requirement to cancel the order, that the regulation is

17   actually silent on this issue.

18   Q.   Okay.  So, let's go back to that order at issue.  What

19   happens if the order -- I'm sorry.  What happens if the

20   Diversion Control Team determines that that order is not

21   suspicious?

22   A.   They release the order so that it can go back in the

23   queue to be picked, packed and shipped.  And I'm sorry I'm

24   using that language.  I'm willing to explain that a little

25   bit more if that's unfamiliar to anybody.

1    Q.    Sure, Mr. May.  Can you explain what pick, pack and

2    ship means?

3    A.    It's a term that's utilized by our Distribution Center

4    personnel that once that order is added back into the queue,

5    then they are notified electronically and their

6    responsibility is to find that particular order within the

7    Distribution Center, pick it, take it off the shelf, put it

8    into a tote, and then that tote is eventually shipped to the

9    pharmacy.  Picked, packed and shipped.

10   Q.    Okay.  Let's move on to ongoing customer due diligence.

11          MS. MCCLURE:  Your Honor, at this time, I'm going

12   to request to publish an exhibit, which is a dashboard from

13   2018, that has been produced to the plaintiffs.

14          Don't publish it yet, please, Richie.

15          And this is one of those documents I brought to your

16   attention on Friday which contains information that we would

17   request be broadcast in this courtroom, but that the feed to

18   the overflow courtroom for this document be halted.

19          THE COURT:  And this is because it contains

20   sensitive internal information relating to your marketing or

21   something like that?

22          MS. MCCLURE:  So, it's not with respect to

23   marketing, Your Honor.  It's with respect to this is the --

24   it contains some information about the customer.  It also,

25   in portions of the document, contains information about the

1    parameters that Mr. May has testified about that would be

2    particular to this customer; in other words, what the

3    perimeter limits would be for certain definitional

4    parameters that are in place for AmerisourceBergen as to how

5    much product that customer can order before then tripping

6    the parameters to be subject to a suspicious order.

7                    THE COURT:  Mr. Farrell?

8                    MR. FARRELL:  Objection on several grounds, Judge.

9    Number one, relevance.  This dashboard has a temporal limit

10   or scope that is recent and we don't believe it's relevant

11   as to the volume of pills that was sold during -- back to

12   2007.  So, to the extent that it is relevant, it's relevant

13   for a near-term temporal scope.  That's number one.

14        Number two is that, again, the plaintiffs feel

15   aggrieved that the defendants are not required during their

16   direct to present to us the exhibits that they intend to use

17   the night before as we are on cross examination.

18        And, number three is if we are going to go through a

19   didactic explanation of the current OMP process which

20   includes the dashboard, we ask that the full dashboard be

21   shown and not just snippets of it so that we can evaluate

22   not just one page, but multiple pages of what information

23   they have access to.

24                    MS. MCCLURE:  Your Honor, may I respond?

25                    THE COURT:  Yes.

1           MS. MCCLURE:  As to the near-term scope, as Mr.

2    May will testify, the dashboards have been in place since

3    2015 going through to the present.  The information that

4    we're displaying is the information from a 2018 dashboard

5    which was produced to the plaintiffs.

6           The plaintiffs have chosen in this case to seek

7    abatement only as a forward-looking remedy.  Therefore, we

8    believe that regardless of what the plaintiffs are choosing

9    to define as relevant in this case, we believe it is

10   relevant for Your Honor to understand the operation of these

11   dashboards and view them as Mr. May has described from that

12   2015 through to the present time period.  Mr. May will be

13   able to describe the manner in which they may have changed

14   over time.

15          As to the second point Mr. Farrell raised regarding the

16   ruling that he is aggrieved about, I believe that Your Honor

17   has three times ruled on that.  And so, at this point, I

18   don't have anything further to say except to refer to the

19   fact that Your Honor has ruled that the plaintiffs have an

20   obligation to disclose for witnesses they are calling as on

21   cross in their case documents the night before and that the

22   defendants do not.

23          As to the third point, the requesting that the full

24   dashboard be shown, we are, in fact, intending to walk

25   through the full dashboard.  There are actually two.  There

1   is a weekly and a monthly for each customer throughout the

2   entire program.  And so, we would intend to walk through the

3   weekly and the monthly.

4       The weekly has three tabs on it.  We would be viewing

5   each of those three tabs.  And the monthly, I believe -- I'm

6   not looking at it.  I think it has seven and we would

7   briefly walk through those, as well.  So, I have no concern

8   about showing the dashboard as Mr. Farrell has requested.

9           THE COURT:  Well, what -- what do you not want

10  shown here?

11          MS. MCCLURE:  So, in the courtroom, we are fine in

12  light of the fact that this -- the courtroom is full of

13  attorneys who are representing parties in this litigation.

14  We would simply request that the feed for the document not

15  be broadcast to the overflow courtroom.  So, that's the sole

16  --

17      THE COURT:  Is there any objection to that other than

18  what Mr. Farrell said?

19      All right.  Overruled.  I'm going to allow it.  Go

20  ahead.

21      Mr. Ruby?

22          MR. RUBY:  Your Honor, just one point of procedure

23  with regard to objections.  Defendants at least have

24  endeavored to, with each witness, only have one attorney per

25  party making the objections or handling the witness and we

```
 1    would ask that plaintiffs follow the same practice.  I
 2    believe that Mr. Farrell and Mr. Pifko are both counsel for
 3    the County here.
 4             THE COURT:  Well, I'm not confused or misled by
 5    this.  I'm going to allow this for now.  If it gets out of
 6    control, I'll reconsider that ruling, but I think it might
 7    even be helpful for more than one lawyer to be involved
 8    here.
 9        So, I'm going to overrule your objection, Mr. Ruby.
10             MR. RUBY:  Understood, Your Honor.
11             THE COURT:  And the feed will be cut off with
12    regard to the document.
13             MR. FARRELL:  Judge, for the record, we would
14    again place on the record our objection to preventing the
15    public from access, full access, to the evidence being
16    presented in this trial.
17             THE COURT:  Well, I think there's a good reason
18    here to follow this procedure placed on the record by Ms.
19    McClure and I'll allow it.  Your objection will be shown on
20    the record.
21             MS. MCCLURE:  Thank you, Your Honor.
22        Richie, could you go ahead and publish, please,
23    AMWV-993E, which is the weekly dashboard for St. Mary's
24    Medical Center?
25        And, Your Honor, I would request that Mr. May be
```

```
1    permitted to come down off of the stand and walk Your Honor

2    through the various portions of the dashboards.

3              THE COURT:  That will be fine, Mr. May, if that

4    will help with your testimony.

5              THE WITNESS:  Sure.

6              THE COURT:  You may do so.

7              THE WITNESS:  Thank you, Your Honor.

8              MR. FARRELL:  Judge, I have another objection.

9              THE COURT:  Okay.

10             MR. FARRELL:  We object to the use of a non-retail

11   pharmacy, which is the subject of this litigation, and

12   instead, the use of hospitals and, in fact, we're going to

13   -- if this evidence is presented, we would also like to have

14   the very same opportunity to use the dashboard to look at

15   the sales to the pharmacies in Cabell County over the past

16   several years.

17             MS. MCCLURE:  Your Honor, the dashboards are

18   uniform in terms of the manner in which they work, as Mr.

19   May will testify, whether the customer is a hospital, a

20   pharmacy, et cetera.  So, this is our portion of the

21   presentation.  This may not be the only dashboard that we

22   show Your Honor.

23        That said, Mr. Farrell has access to evidence that we

24   have produced to him and his decision as to what he would

25   want to use is up to him.
```

1            THE COURT:  Well, I'm going to allow him to go

2     ahead with this and, if Mr. Farrell wants to offer similar

3     evidence, we'll deal with that when it comes up.

4            So, go ahead, Mr. May.

5            MS. MCCLURE:  Thank you, Your Honor.

6            BY MS. MCCLURE:

7     **Q.**   So, David, I believe that your mic is now working.  It

8     should be green and you can approach the screen.

9            So, Mr. May, what this document?

10    **A.**   So, again, this is a dashboard that's been created and,

11    over time, the dashboard has looked a little differently.

12    This one was published with data through May 25th, 2018 and

13    you see the date on the bottom of the dashboard.  We refer

14    to this as the customer dashboard.

15           And, again, to be clear, we continue to change these

16    dashboards.  So, what the dashboard looks like today, in May

17    of '21, is different than what we're looking at here.  There

18    have been some changes.

19           So, we'll start at the top left and kind of move around

20    the document a little bit.  In looking at the top left, we

21    see DEA license number and then every -- and then, we'll see

22    four different account numbers associated with, in this

23    particular case, it's St. Mary's Hospital in Cabell County.

24           And I think I -- I believe I explained on Friday that

25    our program works to the DEA registration level.  So, an

1    account can have multiple account numbers, but all of that

2    data, that purchasing data, aggregates the DEA registration

3    level.  And so that's why you see four different accounts

4    here, but it all goes back to that one level.

5         Moving over to the right, we look at some summaries

6    sales metrics for a three-month period of time.  You'll see

7    up at the top it says "three months as of 4/30/18".  So,

8    that would have been the three-month ending on April 30th.

9    One of the things that we look at here and one of the

10   changes that we made to our program is we look at dosing

11   units of controlled substances versus non-controlled

12   substances.  And, in this particular case, you see in the

13   very bottom there 1.2% of all purchasing by this customer

14   has -- during that three-month time frame has been

15   controlled substances.

16        Looking now down back to your left, we have product

17   family distribution.  This actually shows us over a period

18   of 12 months all of the controlled substances that have been

19   purchased by this customer.  It gives you the dosing unit

20   quantity.  It ranks them one through however many families

21   they've purchased during this time period.  And it shows you

22   percentages of those controls.

23        So, looking at this hospital, the top controlled

24   substance would be a Fentanyl liquid, which would be a very

25   common substance, of course, for a hospital and using it in

1    procedures.  And so, that wouldn't be surprising to us.

2         You also see the parameters which Ms. McClure mentioned

3    here, the individual order parameter, and TRD perimeter for

4    this particular customer.

5         Moving over to the right, again, you see just the -- we

6    track the amount as a percentage of the dosing units of

7    controlled substances so that we can see the ebb and flow to

8    see if there's any red flag there.

9         Below that, we show the flagged orders for this

10   particular customer.  So, if you hover over one of those

11   green marks, you'll see that there were two released orders.

12   So, in other words, two orders of interest.  And both were

13   released during the month of January.

14        Moving all the way back to your left, customer order

15   history, now what this does is actually shows us for 90 days

16   each and every order that was placed be the customer for a

17   controlled substance.  Again, looking at the date, the DEA

18   registration number.  There's a unique order number.  Then

19   you have the order, the product family that was ordered.

20   You have the quantities and then you have the comp and TRD

21   parameters, as well.  And so, that gives us a complete view

22   of the customer for 90 days.

23        And then, finally, over to your right, order

24   distribution during 90-day period ending 5/25, so if you

25   hover over any of those dots, it will actually tell you what

1    the order was by order line and then the date, the product,

2    the 30-day quantity and the TRD perimeter for that

3    particular order.

4         And this is a way for us to get a sense, thinking back

5    now to the regulation where it talks about quantity, pattern

6    and frequency, this gives us an opportunity by looking at

7    all of that information and it's all in one place.

8         So, we may be looking at one individual order, but

9    we're considering the complete customer when we do so.  So,

10   it's, again, getting back to that notion of totality of the

11   circumstances.

12   **Q.**   And, Mr. May, does every AmerisourceBergen customer who

13   orders controlled substances have a weekly dashboard like

14   this one?

15   **A.**   Yes.  The dashboard is the same for every customer that

16   purchases controlled substances.  Once they make that first

17   purchase, then this is the sort of information that would be

18   tracked.

19   **Q.**   Is that true for independent pharmacies?

20   **A.**   Yes, it is.

21   **Q.**   Chain pharmacies?

22   **A.**   Yes.

23   **Q.**   Hospitals?

24   **A.**   All DEA registrants that --

25   **Q.**   Thank you.

1    **A.**    -- place orders for controlled substances.

2          MS. MCCLURE:  Can you, Richie, move to the second

3    tab on the bottom called "product trend"?

4          BY MS. MCCLURE:

5    **Q.**   Can you explain what this is?

6    **A.**   Sure.  This gives us the opportunity if, say, for

7    instance, we wanted to focus our attention on any one

8    particular product, we could look at that particular

9    product.  So, if there was a concern -- in this particular

10   case, the example that we're showing is we have a product

11   family of hydrocodone up there.  And then, we look at the

12   purchasing by that customer of hydrocodone over a period of

13   time.

14        We not only look at how that looks when it's charted to

15   give us a sense of whether the order appears to be somewhat

16   regular, but we also have the ability under the customer

17   concentration on the bottom to look month over month the

18   ordering of that particular controlled substance.

19        Now, I could take this same chart.  I could insert

20   other drug families.  As many drug families as we have, but

21   as you can imagine, the chart gets busier as you add those

22   drug families.

23        MS. MCCLURE:  And going back, Richie, to the

24   customer tear sheet tab, that first tab.

25        BY MS. MCCLURE:

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   Can you describe briefly how these -- this tab looks

2    different today versus this 2018?

3    **A.**   Sure.   There are actually -- on our new customer tear

4    sheet, there are actually three tabs on the bottom.   And

5    what's missing here that we've incorporated into our program

6    is a customer risk scoring, customer risk matrix.   So, we

7    brought in outside data sources and now, if I were to pull

8    up this customer's current dashboard, there would be a risk

9    ranking, a risk ranking for this particular customer

10   compared to his peer group, and a risk ranking for this

11   particular customer in this county.

12   **Q.**   Thank you.

13          MS. MCCLURE:   Your Honor, I move the admission of

14   a pdf screenshot of these Tableau files.   Just for technical

15   reasons, viewing Tableau files in their native format is

16   somewhat difficult because you need to download protocol,

17   programs, but we would, at this point, move for the

18   admission of pdf copies of this weekly dashboard for St.

19   Mary's Medical Center.

20          THE COURT:   Is there any objection to that?

21          MR. FARRELL:   Judge, aside from procedurally our

22   continued objection, this is a screenshot pdf of an

23   electronic file that was produced in discovery.   I will note

24   that we have attempted to take similar summaries of similar

25   datasets that this Court has rejected.   Nonetheless, we have

1    no objection to the entry of this document into the record.

2              THE COURT:  All right.  It's admitted.

3              MS. MCCLURE:  So, Your Honor, just briefly.

4              COURTROOM DEPUTY CLERK:   Number?

5              MS. MCCLURE:  It's 993E.  So, it's an excerpt from

6    the Tableau files.  993E.

7         (Discussion held off the record)

8              THE COURT:  If I admit this, it's going to be in

9    the record.  You're concerned about publishing it, aren't

10   you?

11             MS. MCCLURE:  Your Honor, so, at the same time I

12   had made that request on Friday, thank you for bringing that

13   to my attention, we had requested that we be able to submit

14   documents with accompanying -- accompanying a brief, Your

15   Honor, to briefly address the sealing of the particular

16   documents that we would not be broadcasting to the overflow

17   room.  So, that -- we would request that we have the ability

18   to submit that brief at the conclusion of the day.

19             THE COURT:  Okay.  So, this -- well, what do you

20   want me to do?  If this is admitted --

21             MS. MCCLURE:  How about we -- could we do this,

22   conditionally admit the document subject to our brief so

23   it's not technically, quote, "in the record" until we submit

24   that brief to requesting under seal treatment?

25             THE COURT:  That's the way we'll handle it.  It

```
 1    will be conditionally admitted subject to reviewing the

 2    submissions on it.

 3        Mr. Farrell?

 4            MS. MCCLURE:  Thank you, Your Honor.

 5            MR. FARRELL:  I have a responsibility to make a

 6    record.

 7            THE COURT:  Mr. Farrell?

 8            COURT REPORTER:  Mr. Farrell, is your mic on?

 9            MR. FARRELL:  Yes, it is.

10            COURT REPORTER:  Okay, sorry.

11            MR. FARRELL:  I'm sorry.

12            COURT REPORTER:  That's okay.

13            MR. FARRELL:  Judge, again, if this is evidence

14    used to -- by the defendants to rebut the claim brought by

15    the public for a public nuisance cause of action that you

16    intend to rely upon, we believe the public has a right to

17    see the evidence in which -- upon which your ruling will be

18    based.

19            MS. MCCLURE:  Your Honor, I'd be happy to address

20    that again, if you'd like.

21            THE COURT:  Well, yeah.  I'm -- I'll overrule that

22    objection for now having conditionally admitted the document

23    and going to deal with this when I see your submissions.

24            MS. MCCLURE:  Thank you, Your Honor.

25        And, Richie, could we pull up the monthly dashboard for
```

1    St. Mary's, which is 942E?

2            BY MS. MCCLURE:

3    **Q.**   And, Mr. May, what is this document?

4    **A.**   So, this is our monthly --

5            MS. MCCLURE:  Sorry.  I just wanted to confirm

6    that this similarly is not being broadcast, correct?  Thank

7    you.

8            THE WITNESS:  This is a monthly dashboard and it

9    has several components.  The last dashboard that we looked

10   at was more customer centered.  This dashboard actually has

11   several tabs and it lets us look at and help us manage our

12   overall program.

13       And so, to the extent that it deals with particular

14   customers, there's one tab, which we'll get to, that says

15   "Customer Detail Report", but I would start with the first

16   tab here where it says "OMP Summary" and, again, as we've

17   discussed earlier today, ours is a national program.  And

18   so, what I'm looking at here is national data.

19       And, again, just to point out on the bottom, it says,

20   "Data through 5/31/18".  And so that's our period of time.

21       And what we look at here, again, is helping us to

22   manage us to manage our OMP -- our OMP Program in and of

23   itself.  So, what we're looking at here in the right-hand

24   column under "Key OMP Metrics", it's giving us metrics for

25   the month of May, but then, it's comparing those metrics

1    against the 12-month average.

2         So, in the month of May, there was 858 million dose

3    units ordered nationally versus the 12-month average, which

4    was 852-plus million dosage units.

5         And so, and then if you go down the column, and I don't

6    have to read for everybody, but it just tells you what that

7    looks like in terms of orders placed, in orders flagged, and

8    percentage of orders flagged, reported orders.

9         The active DEA licenses, remember, I said earlier that

10   the program works to the DEA registration level.  So, and

11   there was a question, I believe, on last Friday around how

12   many customers that we support for controlled substances

13   sales and my answer was about 22,000.

14        You see here in May, 22,400 registrations.  The

15   12-month average is 21,296.  And to be clear,

16   AmerisourceBergen has many customers that never order

17   controlled substances.  So, they would not be reflected in

18   this data at all.

19        And then, finally, "Impact to DEA" probably needs some

20   explanation.  What that means is out of those 22,400 in the

21   month of May, 2,400 of them were impacted by a program; in

22   other words, they had an order of interest that was held.

23        We then track that same information in terms of

24   charting and on the -- on the right top, you see "Orders

25   Flagged".  I believe I mentioned on Friday, if I didn't,

1      I'll mention it here.  Our program, the current version of

2      order monitoring is risk based and we look at all of our

3      drug families in terms of risk, high risk, medium risk and

4      low risk.  And that's a metric that we like to track.

5          And, of course, we're trying -- what we're trying to do

6      there, is we're trying to force our attention electronically

7      at those product families that are at the most risk; of

8      course, without ignoring those ones that are on the lower

9      risk scale.

10         On this particular chart, you see there's a -- an

11     increase in the number of medium risk products and you would

12     say, well, you know, that kind of runs counter to what

13     you're saying then in terms of risk.

14         In fact, you know, I'm familiar with -- business

15     occurrences happen all the time that we have to manage

16     through OMP.  This particular period of time, Walgreens had

17     shifted their purchasing, their direct purchasing of

18     pseudoephedrine products listed chemicals, over to

19     AmerisourceBergen and when you make a change in the business

20     like that with that ordering, that pattern and the

21     quantities, when you make a change like that, now we're

22     going to see those orders hitting our system until the

23     system learns this new business.  So, this is just, you

24     know, one aspect of the thing -- things we try to manage in

25     the order monitoring.

1          On the bottom, you see a heat map that is of the

2     country and it's by distribution center.  And that's just

3     reflecting the number of orders reported.  On the dark end

4     there's more orders reported by the distribution centers

5     servicing those customers and on, of course, the left end,

6     the lighter end, there are less.

7     **Q.**   And, Mr. May, how does this --

8          MS. MCCLURE:  I'm sorry.  Can we go to the second

9     tab, Richie, product trend?

10         THE WITNESS:  Again, looking at our program

11    nationally, one of the things that we like to do is, is

12    there some emerging -- emerging drug of concern in terms of

13    controlled substances?  And so, what we do is we look

14    specifically at any changes over time.  So, we're looking at

15    dosage units distributed.

16         And, again, we see it on the top where we always break

17    it down, high risk, medium risk, low risk.  We look at the

18    orders placed in terms of the raw numbers.  We always try to

19    add a percentage to it, flagged orders and reporting orders.

20         And then we chart those.  We chart those same figures

21    in terms of looking at percentage change.

22         So, if you want to hover over one of those dots, you

23    can see that represents -- so, right there, we're looking at

24    PG, the Pregabalin family, and we're seeing an 8.3% increase

25    during this period of time.

1        Moving to the right, same notion where we're looking

2    now at not the dosing units, but the flagged orders.  And

3    so, if you want to just hover over one of those flagged

4    orders, you can see here the hydrocodone family and the

5    percentage of orders flagged has increased by 4.13% and we

6    actually have a raw number, 209, that represents that 4.3%.

7        Going down to the bottom, product family breakdown,

8    again, we look and we have -- I mentioned 70 -- 70 drug

9    families that we monitor and this just shows you over time

10   what that looked like.

11       So, you see the dosage current and then next to it

12   would be three-month average.  And, again, our goal here is

13   always to understand the trending of that information.

14            BY MS. MCCLURE:

15   **Q.**   And how about the third tab, individual product

16   dashboard?

17   **A.**   Here, the -- again, we focus on a particular product.

18   Again, we've highlighted it for purposes of today's

19   discussion on hydrocodone solid.  I could plug in any of my

20   70 product families here and we look at those same exact

21   figures and we chart them in terms of dosage units by months

22   and percentage of orders flagged.

23       On the bottom, the difference here is we look at our

24   complete customer base in terms of looking at this

25   particular -- at this particular drug family hydrocodone.

1     So, it's a little more detailed, a little more customer

2     centered.

3     **Q.**   Okay.  And the next tab, orders of interest?

4     **A.**   Again, there's a lot of data here, a lot of data

5     points, and I don't want to -- I don't want to get too much

6     into the weeds, but I guess I would point -- you know, for

7     me, what is significant is up in the left-hand order,

8     percent of flagged orders, and this is always something that

9     I go back to.  You know, how is the program working in terms

10    of percent of orders flagged and you see that, in May, 41%

11    of the orders flagged was for high risk.  31% for medium.

12    27 for low.

13     So, for me, that's an appropriate distribution because

14    we're now -- what that means is we're now focusing our

15    review on those orders that are of the most high risk.

16    **Q.**   Mr. May, one quick question.  The tab is called Orders

17    of Interest.  Up on the left, it says "Flagged Orders".  Can

18    you tell is -- are those the same things, those terms?

19    **A.**   They are the same thing.  Prior to 2014, the language

20    of the program was flagged orders.  After we did the

21    enhancements and starting, you know, midway through 2015, we

22    referred flagged orders as orders of interest.

23    **Q.**   Okay.  Anything in particular on this dashboard in

24    addition?

25    **A.**   You know, I'd point to our adjudication reasons.  One

1    of the things that we tried to do with our program is to put

2    more definition around the documentation of the work when it

3    came to suspicious orders so that if we do communicate with

4    DEA, when we file that report, if DEA comes back to us and

5    they want more information by the customer, of course, we

6    have access to everything that we've looked at here today,

7    but it's just another -- it was another effort by us to try

8    to make the documentation a little bit more robust on that

9    point.

10   **Q.**   Okay.  And the --

11           THE COURT:  When you get to a stopping point, we

12   need to --

13           MS. MCCLURE:  Okay.

14           THE COURT:  -- switch out the court reporters and

15   take a break.

16           MS. MCCLURE:  Your Honor, we would be fine to

17   pause at this point, do that, and pick this up after our

18   break.

19           THE COURT:  Okay.  We'll be in recess for about

20   ten minutes.

21       (Recess taken)

22           MS. MCCLURE:  Your Honor, request permission for

23   Mr. May to continue with the examination with the lapel mic,

24   and just wanted to confirm that this would still not be

25   broadcast to the overflow.

```
1              THE COURT:  Yes, you may.
2    BY MS. MCCLURE:
3    Q.   Mr. May, so we were on this Orders of Interest tab.
4    Anything else to address on this before we move to
5    Customer Risk Metrics?
6    A.   I think we can move on to the Customer Risk Metrics
7    tab.  Thank you.
8    Q.   And what is this -- what does this dashboard display?
9    A.   This represents the beginning of our process in terms
10   of assigning risk to our customers.  And, and we have about
11   10 different data points that we look at around our customer
12   in terms of assessing risk.
13            And we would assess the risk of the customer and then
14   we would assign a customer a score.  And that way, we could
15   look at any particular -- I could focus on any particular
16   area on the map.
17            If you just kind of hover over a state, and it would
18   give you -- in this particular matrix what we're looking at
19   here in this data is we've taken one of those risk points,
20   and that is percentage of OY of OX.  And what that means is
21   percentage of oxycodone 30-milligram which we separated into
22   its own family, and we're comparing that against all of the
23   oxycodone sales to that particular customer over a period of
24   time.  And, and then we're looking at that.
25            So in the State of Utah right now, generally speaking,
```

1    that, that rate is about 12.38 percent.  So it gives us an

2    idea of what that percentage looks like on a state by state

3    basis.  And, of course, we've added color coding.  So if you

4    go down to Texas, you see that, that dark of a color, the

5    higher that particular point.  And, and --

6    **Q.**   Mr. May, just on an overall aggregate basis for the

7    state, not as to a particular customer?

8    **A.**   This is looking across the state.  Now, on any one of

9    these states, then, we could click on the state and then

10   drill down into the particular customer right down to the

11   county level for, for this same particular metric.

12        If you look at the bottom of the, of the data points,

13   you see customer, scorecard, metrics.  And, and I mentioned

14   there were about 10 items that we look at when assessing

15   this particular score, and you see some of those there.

16        The first we've already mentioned, and that is

17   percentage of 30-milligram, 30-milligram oxycodone versus

18   all oxycodone.  But you'll see -- I'm going to work from the

19   right to the left, and if you hover over those at the top on

20   the lines.  Okay.  It doesn't give you anything.

21        So CDC overdose rate.  I mentioned earlier that we

22   brought in some public data sources and we overlaid those

23   public data sources over our own data and to get, again, any

24   information that, that we could gather that would be

25   helpful.  And those CDC overdose rates have now been

1   incorporated into our dashboard.

2       Now move right to left, please.  High risk per capita.

3   So what we're looking at here is the high risk dosing units

4   down to the county level.  And we've also incorporated

5   population rates into our data.  So we look at that on a per

6   data, per data basis.

7       Keep moving upward.  You can keep moving.  I'm happy to

8   explain these, but I'm trying to not bury everybody in data

9   if that's okay.

10      Move to the left.  Percentage change orders placed.  So

11  if we now see this customer and the customer is ordering

12  more controlled versus non-controls, that's -- we want to

13  understand why that's happening.  When we see the growth of

14  a customer, we would expect to see balance growth unless, of

15  course, they had a particular patient population that was

16  causing them to grow differently.

17      Move to the left, please.  Again, looking at percentage

18  of flagged orders and -- across the state and that would be

19  a metric that would -- if we had more customers that were

20  getting flagged, that would play into it.

21      Keep moving left.  Percentage of high risk.  Again,

22  remember our program always goes back to the risk bases of

23  drug families, so percentage of high risk that were being

24  flagged.

25      Move to your left, please.  And, again, we're looking

1    at changes.  So if there's -- this would be a change in the

2    percentage of CS versus Rx, again looking at any sort of

3    trending like that.

4         And all of these metrics together, they're all

5    weighted.  So they're not all given a separate weight.  We

6    actually have calculations that we make.  And based upon --

7    so some of these methods may have more weight than others.

8    But we generate a raw score of all of this and then we give

9    the customer a final score.

10        And, again, it's a risk score so that we can look at it

11   instantly and say, well, if this customer X has a risk score

12   that's much higher than customer Y, then we want to

13   understand those things.

14   **Q.**   Okay.  And, Mr. May, has anyone assisted

15   AmerisourceBergen with these dashboards?

16   **A.**   Yes.  We've partnered with FTI I mentioned on Friday

17   has been our outside consultant.  And we have partnered with

18   them since 2014, and we continue that partnership through

19   today.

20   **Q.**   And the next tab, Customer Detail Report, we'll run

21   through these last three quickly.

22   **A.**   So, again, most of what we were seeing before was

23   program information, so across the country we could drill

24   down on any of it and get to the customer level.

25        But what we've done here is we've just taken our St.

1    Mary's and we're looking at St. Mary's on a different

2    dashboard now.  And, again, it has more visuals.  It lets us

3    look at different things, including the scorecard metrics

4    that we just talked about.

5         We also can look at high, medium, low risk products.

6    And, you know, we add color to them to help these reviews to

7    take place more efficiently.

8         So those red product families, those all represent high

9    risk.  So we want that sort of thing to jump out to the

10   investigators.

11   **Q.**   Okay.  How about the next tab, Program Maintenance?

12   **A.**   Again, in terms of working with FTI, in terms of

13   looking at the data, there's certain data requirements that

14   we have.

15        For example, if we have a brand new customer that we do

16   not have ordering data for, we would want to establish a

17   90-day history with that customer.  We have certain

18   requirements for a certain number of orders before we would

19   stop assigning that customer parameters.  And that would be

20   one example of how we manage the program.

21   **Q.**   Okay.  And the next tab, Geographic Metrics.

22   **A.**   Again, you could hover over any one of these states

23   and, and it's going to show you the risk measured for the

24   state.  If you click on the state, it would bring it down to

25   the county level.  If we click on the county level, it's

1   going to give you every customer we're servicing in that

2   county.

3       So it's just another way for us to use the customer

4   risk, customer risk metrics that I talked about.  I talked

5   about the overdose death rates.  The other one that would be

6   included in addition to population would be the prescriber

7   Medicare Part B prescribing rate.

8   **Q.**   Okay.

9           MS. MCCLURE:  Your Honor, at this time, I move the

10  admission of 942-E, the monthly dashboard for St. Mary's

11  conditionally dependent on the submission of the brief that

12  we've previously discussed.

13          THE COURT:  Any objection?

14          MR. FARRELL:  I'm hesitant to say anything, Judge.

15  Obviously, we spent two and a half days laying -- trying to

16  lay a foundation for the admission of similar data metrics

17  that this Court has conditionally admitted.  So we have no

18  objection to this being conditionally admitted as well.

19          THE COURT:  All right, it's admitted.

20          MR. HESTER:  Your Honor, just so the record is

21  clear, these are not similar data metrics to the ones we

22  were discussing with Dr. McCann.  They're quite different.

23  These are, these are screen shots out of a database.  I just

24  wanted the record to be clear on that.

25          MS. MCCLURE:  Your Honor, Mr. Hester stole what I

```
 1    wrote down here which is "not similar."  So I would join in
 2    that response to Mr. Farrell.
 3              THE COURT:  All right.  It's admitted.
 4    BY MS. MCCLURE:
 5    Q.   Mr. May, on the confidentiality of those materials,
 6    does AmerisourceBergen treat those dashboards as
 7    something that is confidential?
 8    A.   Yes, we do.
 9    Q.   And why is that?
10    A.   The dashboards contain certain information,
11    particularly around our parameters, in the order of the
12    behavior.  And we, we've made a significant amount of effort
13    to make sure that we keep that information private.
14         I believe that's probably what the regulator would
15    expect from us is to keep that proprietary information
16    private.  And we certainly don't want to create a situation
17    where if there is some nefarious registrant out there, we
18    don't want to supply them with any information that would
19    allow them to defeat our system.
20    Q.   So is the concern that information on that detailed
21    level about how the program operates as to particular
22    customers could theoretically allow a customer who learns
23    that information to evade the system?
24    A.   It could, uh-huh.
25    Q.   Okay.  Moving on --
```

```
 1        Richie, if we can put back up that Diversion Control
 2   Program demonstrative.
 3        Moving on to Policies and Procedures, you mentioned the
 4   Policies and Procedures needed to be changed when you worked
 5   to update the program.
 6             THE COURT:  Can we put the screen back on at this
 7   point?
 8             MS. MCCLURE:  Oh, yes.  I'm sorry.  Yes, Your
 9   Honor, the screen can be displayed.  Thank you for that
10   reminder.
11        So can we hand out the Policies and Procedures, please?
12        Your Honor, may I approach?
13   BY MS. MCCLURE:
14   Q.   Mr. May, what is this document that I've presented
15   to you?  Or I'm sorry.  Let me rephrase that.  What are
16   these documents that I have presented to you?
17   A.   These documents are Diversion Control Program Policies
18   and Procedures that were effective January 1st, 2017.
19   Q.   And are these Policies and Procedures kept in the
20   ordinary course of business of AmerisourceBergen?
21   A.   Yes, they are.
22   Q.   And do these reflect the current Diversion Control
23   Program Policies and Procedures?
24   A.   The, the process -- we have an annual process where we
25   review and update Policies and Procedures.  And, so, there
```

1    are -- there have been revisions to these particular

2    Policies and Procedures which are dated January 1st, 2017.

3    **Q.**   Are these Policies and Procedures substantially similar

4    to what's in today's Policies and Procedures?

5    **A.**   Yes.

6            MS. MCCLURE:  Your Honor, I move the admission.  I

7    note additionally that these -- this document I will include

8    as well in today's brief with respect to confidentiality of

9    the program and how the program and system works at

10   AmerisourceBergen.

11       So I would move the admission of AM-West Virginia-00064

12   conditionally for confidentiality reasons.  I will include

13   that in the submission with the Tableau files.

14           THE COURT:  So you say the diversion policy is

15   confidential as well?

16           MS. MCCLURE:  Yes, Your Honor.  And to the extent

17   that they address certain elements of the program, we may

18   evaluate this and determine that we would simply redact

19   portions of it as -- instead of having the entire document

20   be confidential.  And we would include the reasons and

21   rationale for that in our submission.

22           THE COURT:  All right.  Is there any objection to

23   me conditionally admitting this at this point?

24           MR. PIFKO:  No, Your Honor.

25           THE COURT:  It's admitted.

```
 1              MS. MCCLURE:  Thank you.
 2    BY MS. MCCLURE:
 3    Q.   David, you can set that aside.
 4         And then turning to training, you've already discussed
 5    some of the current training in direct on Friday.
 6         Mr. May, --
 7         So, Richie, if we could put up the next slide for
 8    Diversion Control Program Over Time.
 9         After you started at AmerisourceBergen, you talked
10    about making some changes.  Why did you decide to revise
11    certain portions of the Diversion Control Program?
12    A.   It's a continuous process.  Overseeing a regulatory
13    program should be a continuous process where we, you know,
14    self-assess, self-evaluate what we're doing year over year.
15    There could be many reasons to do so.
16         There could be changes in drug abuse trends.  A lot of
17    our focus has been on opioids.  But if you look
18    historically, there has been wide, wide changes in drug
19    abuse trends.  And there may be changes in the regulations.
20    We mentioned earlier today that DEA proposed a new wording
21    around the suspicious order regulation.
22         And, so, for these reasons, we should constantly be
23    evaluating our programs and developing them.
24    Q.   And, so, I will ask you about some of the changes that
25    you made.  But, first, can you put yourself back at the time
```

1    when you joined AmerisourceBergen in March of 2014 and tell

2    us your overall impressions of the Diversion Control Program

3    that was in place when you arrived?

4    **A.**    Again, many of the things that they were doing are

5    things that we're doing today.  And, so, I feel that they

6    were operating a good program.  And, you know, where we had

7    opportunities to make changes and improvements, we went

8    ahead and did so.

9    **Q.**    Based on your experience, did you believe that the

10    program that AmerisourceBergen was operating when you

11    arrived in 2014 met AmerisourceBergen's regulatory

12    requirements?

13    **A.**    Yes.

14    **Q.**    Okay.  Looking at New Customer Due Diligence, are there

15    any changes you have not talked about that you've made to

16    New Customer Due Diligence since 2014?

17    **A.**    We instituted one change where if we had a customer

18    that we discontinued servicing, in order for that

19    customer -- that customer could re-apply with

20    AmerisourceBergen over time.

21        Originally, we would have a six-month waiting period in

22    terms of conducting New Customer Due Diligence on that

23    customer.  Now it is a period of 12 months before the

24    customer can re-apply with AmerisourceBergen.

25        And we would treat them as a new customer except for

```
 1    knowing that we had discontinued sales.  And we would
 2    continue that and we would consider that as well in our
 3    review process.
 4    Q.   Mr. May, while we're talking about due diligence files,
 5    does DEA ever ask AmerisourceBergen to provide due diligence
 6    files to the DEA?
 7    A.   Yes.
 8              MS. MCCLURE:  And if we could hand out document
 9    AM-WV-00121.
10         Your Honor, may I approach?
11    BY MS. MCCLURE:
12    Q.   Mr. May, what's the date of this email chain that
13    I've handed to you?
14    A.   The date is Thursday, September 24th, 2015.
15    Q.   And does this relate to DEA's request for certain due
16    diligence files for Cabell County customers in 2015?
17    A.   For Cabell County and other locations, yes.
18    Q.   Thank you for that correction, other locations as well.
19    And one of the locations -- can you read the first location
20    that's a bullet point in that list of locations?
21    A.   Sure.  Pharmacy Associates, 1308 --
22    Q.   Go ahead.
23    A.   1308, 4th Avenue, Huntington, West Virginia.
24    Q.   Okay.  And can you move down to Continuum Care?  Is
25    that also in Huntington?
```

1    **A.**   Yes, it is.

2    **Q.**   And how about McCloud?

3    **A.**   Yes, it is.

4    **Q.**   And Walgreens in Barboursville, do you have an

5    understanding as to whether that's in Huntington, Cabell

6    County?

7    **A.**   I believe Barboursville is in Cabell County, yes.

8    **Q.**   And how about the Drug Emporium?

9    **A.**   That one as well, yes.

10   **Q.**   Okay.  And after requesting these files, did DEA follow

11   up with AmerisourceBergen and instruct you to stop servicing

12   any of these accounts?

13   **A.**   No.

14   **Q.**   Did DEA follow up with AmerisourceBergen and say you

15   should make any changes at all to how these accounts in West

16   Virginia or any of these other accounts should be serviced?

17   **A.**   They did not.

18   **Q.**   Thank you.  You can put that aside.

19          MS. MCCLURE:  Your Honor, I move for the admission

20   of AM-West Virginia-00121.

21          THE COURT:  Any objection?

22          MR. PIFKO:  No objection, Your Honor.

23          THE COURT:  It's admitted.

24   BY MS. MCCLURE:

25   **Q.**   Okay.  Moving on to the program over time, the

1    Order Monitoring Program, briefly, David, we've --

2    Mr. May, we've talked about some of these elements.

3    After you joined the company in 2014, did you take any

4    trips or have any meetings with the regulator shortly

5    after joining?

6    **A.**   I, I had a couple of meetings with DEA shortly after --

7    well, one was shortly after joining AmerisourceBergen.

8    **Q.**   And which -- where was that meeting held?

9    **A.**   Met with DEA in Louisville, Kentucky, at their office

10   per their request.

11   **Q.**   And do you recall the month of that meeting?

12   **A.**   I started in March.  I believe the meeting was in

13   April.

14   **Q.**   Okay.  And who attended that meeting from DEA?

15   **A.**   There was a gentleman named Martin Redd and he worked

16   for the Diversion Control Section at Louisville DEA.  There

17   was another state and local officer who worked with Mr. Redd

18   that Ms. Marcum who accompanied me from AmerisourceBergen

19   recognized.  And there may have been one other gentleman

20   there.

21   **Q.**   What was Ms. Marcum's role when she attended this

22   meeting with you?

23   **A.**   Ms. Marcum is the Regional Director who had oversight

24   responsibility for our Louisville distribution center at

25   that time.

1    **Q.**   Do you know where Ms. Marcum resides?

2    **A.**   She resides in Kentucky.

3    **Q.**   And do you recall Ms. Marcum sending an email

4    summarizing this meeting soon after it concluded?

5    **A.**   I do.

6    **Q.**   Okay.

7            MS. MCCLURE:  If we can hand out that document.

8        Your Honor, may I approach?

9            THE COURT:  Yes.

10   BY MS. MCCLURE:

11   **Q.**   Mr. May, do you recognize that document I've handed

12   you as Ms. Marcum's summary of the meeting that you had

13   with the DEA diversion investigator in Louisville,

14   Kentucky, as well as the state law enforcement

15   personnel?

16   **A.**   Yes.

17   **Q.**   And are you copied on this email?

18   **A.**   Yes, I am.

19   **Q.**   Okay, and if we could display this email, Richie, and

20   if you could pull up those, the two paragraphs beginning

21   with "Mr. Redd" and with "David May."  And -- thank you.

22           MR. PIFKO:  Your Honor, we object on hearsay

23   grounds to the extent that they're relying on the truth of

24   the matter of any of the DEA statements that were made at

25   this meeting.

```
1              THE COURT:  Well, that's right, isn't it,
2    Ms. McClure?
3              MS. MCCLURE:  Your Honor, this is not hearsay.
4    This is offered to show the effect on the listener, provide
5    notice to Mr. May regarding the DEA's expectation and his
6    state of mind as to what was expected.
7              THE COURT:  So it comes in for the limited purpose
8    of showing notice to Mr. May.  And who's Mr. May?  David May
9    is this fellow; right?
10             MS. MCCLURE:  That's correct, Your Honor.
11             THE COURT:  I'll admit it for the limited purpose.
12   BY MS. MCCLURE:
13   Q.   Okay.  Mr. May, if you could read the first
14   sentence there that begins, up on the screen, with "Mr.
15   Redd."
16   A.   "Mr. Redd advised us that the main reason that he
17   wanted the meeting was due to the new process that DEA
18   headquarters has implemented for his office.  He now
19   receives a monthly report from headquarters that contains
20   all the rejected orders by ABC in his region and he is now
21   required to respond to headquarters with an explanation as
22   to why they were reported as suspicious."
23   Q.   Okay.  Was Mr. Redd then asking you why certain orders
24   had been reported as suspicious by AmerisourceBergen?
25   A.   Yes.  Generally, Mr. Redd was trying to understand the
```

```
 1    program that we had in place to identify and report

 2    suspicious orders and was -- and we made a presentation to

 3    him on that -- during that meeting on how the program worked

 4    at that time.

 5    Q.   And do you have -- the paragraph -- I'm sorry.  The

 6    sentence that begins, "He was satisfied with the information

 7    we provided," does that comport with your recollection of

 8    the meeting as well?

 9            MR. PIFKO:  Objection to the extent that they're

10    trying to take testimony on Mr. Redd's state of mind.

11            MS. MCCLURE:  I'm asking for Mr. May's

12    understanding of his impression of whether he believed that

13    Mr. Redd was satisfied with the information provided during

14    that meeting.

15            THE COURT:  Overruled.  I'll let him answer.

16            THE WITNESS:  My understanding that Mr. Redd and

17    the other participants was -- were satisfied with the

18    information that we provided during that meeting.

19    BY MS. MCCLURE:

20    Q.   Okay.  And if you could read the second paragraph

21    in full.

22    A.   Starting with "David May"?

23    Q.   Yes, I'm sorry, starting with, "David May also

24    advised."

25    A.   "David May also advised Mr. Redd that he is currently
```

1    reviewing the overall program to determine if there are

2    revisions that need to take place.  He explained that in

3    many cases he feels we are over-reporting.  He assured them

4    that we are continuing to review the program and are making

5    adjustments to strengthen our program as we see necessary."

6    **Q.**    Mr. May, what did you take away from this meeting with

7    Mr. Redd and the state and local law enforcement officials

8    in Kentucky?

9    **A.**    So putting it in context, this was barely a month after

10   I had arrived at the company and we were trying to again

11   take a close look at what we were doing, what we were doing

12   around order monitoring and how we were doing it.

13        And, so, one of the things that, at least from my

14   perspective, I wanted to be able to sit with the DEA at a

15   meeting like that and provide meaningful information,

16   meaningful action or information.

17        And, so, at that time, part of my review going forward

18   was always going to be with a mind-set, you know, we're,

19   we're satisfying the regulation.  We're reporting orders.

20   But I also want those orders to be something that the

21   regulator can rely on to take whatever action the regulator

22   deems necessary.

23   **Q.**    Did any other field officers contact you around this

24   time asking you also to explain why the orders that

25   AmerisourceBergen had been reporting were, in fact,

1    suspicious?

2    **A.**   Yes.  Shortly after -- maybe a month or so, I received

3    an email from -- actually Jacksonville.  I believe it was

4    Jacksonville DEA had reached out.  And then that mail

5    eventually found its way to me.

6    **Q.**   Okay.

7          MS. MCCLURE:  And if we could hand out

8    AM-WV-00792.

9       Your Honor, may I approach?

10          THE COURT:  Yes.

11   BY MS. MCCLURE:

12   **Q.**   Mr. May, is this the email chain that you were just

13   discussing?

14   **A.**   Yes.

15   **Q.**   Okay.  If you turn to the second page of the email,

16   about halfway down there's an email to you from Angela Lee.

17   Who do you understand Angela Lee to be?

18   **A.**   Angela Lee is a DEA diversion investigator, or was

19   at -- assigned to Jackson [sic] district office at the time

20   of this writing which was June 17th, 2014.

21   **Q.**   Okay.  And, in general, what did you understand her to

22   be asking for?

23   **A.**   Very similar information as to what the Louisville DEA

24   was asking for in terms of trying to understand what the

25   suspicious order reports were that were in her area of

1    responsibility to try to understand AmerisourceBergen's

2    process.  And it's very similar to what was being asked in

3    Louisville.

4    **Q.**   And based on this email chain, do you have an

5    understanding or do you recollect speaking with Ms. -- I'm

6    sorry -- Ms. Lee?

7    **A.**   I, I know that it looks like we set up a call.  I don't

8    have a specific recollection of that conversation.

9    **Q.**   But the email indicates to you that a call did occur?

10   **A.**   Yes.

11   **Q.**   Okay.

12            MS. MCCLURE:  Your Honor, I move the admission of

13   AM-WV-00792.

14            THE COURT:  Any objection to 792?

15            MR. PIFKO:  Only object to the extent that they're

16   relying on the truth of the matter of any DEA statements in

17   the email.  Aside from that, we don't have an objection.

18            THE COURT:  What about that, Ms. McClure?

19            MS. MCCLURE:  Your Honor, I'm -- at this point,

20   it's the same as the last document.  This is intended to

21   offer to show the effect on the listener and information

22   that was conveyed.

23            THE COURT:  All right.  I'll admit it for that

24   limited purpose.  It shows the state of mind of DEA.  Right?

25            MS. MCCLURE:  Yes, Your Honor, state of mind of

1    DEA in requesting these documents and the effect on that --

2    of that, on -- the effect of that on Mr. May.

3         Richie, could we put back up the Diversion Control

4    Program Over Time with OMP highlighted?

5    BY MS. MCCLURE:

6    **Q.**    David, let's talk about peer grouping.  Can you

7    talk briefly about -- I believe you've testified about

8    peer grouping in the Order Monitoring Program.  Can you

9    explain to the Court how that works?

10   **A.**    Sure.  The notion behind peer grouping is when thinking

11   about comparing an order by a customer to another customer's

12   order, which is similar to the way the program operates, we

13   would want to compare like customers.

14        And, so, think of, for instance, a retail pharmacy.

15   Does a retail pharmacy place orders the same as a

16   practitioner?  They do not.  The, the products that are

17   ordered are different and, and the nature of the orders in

18   terms of frequency and volume are different.

19        And, so, what we have as a component of our Order

20   Monitoring Program is this notion that we peer group our

21   customers together.  And for the retail class of trade,

22   pharmacies, that peer grouping has looked differently over

23   time.

24   **Q.**    So how do you -- how many customer types are there

25   today?

```
1    A.    There are approximately I would say seven off the top

2    of my head.

3    Q.    And this peer grouping that you mentioned, do you

4    understand, based on your experience operating the program

5    that was in place from 2014 -- when you joined the company

6    as to whether that program also had peer grouping?

7    A.    They did have peer grouping in 2014.

8    Q.    And are there more or less peer groups today?

9    A.    There are more peer groups today.

10   Q.    How many peer groups are there today?

11   A.    Approximately seven.

12   Q.    I'm sorry.

13   A.    Uh-huh, in terms of registration type, uh-huh.

14   Q.    Okay.  And then how about sizing of customers?

15   A.    So, so there are several ways in which we peer group.

16   And if you look at how we establish a peer group, the first

17   thing we look at is the DEA activity code that is assigned

18   to the registrant by DEA.

19        And, so, for example, is the registrant a pharmacy?  Is

20   that the activity code that's been assigned?  So, so that's

21   one way we group.

22        The next way we group is by the size of the customer.

23   And if you -- when I say the size of the customer, we've

24   looked at that differently over time.  But presently how we

25   determine the size of the customer is we look at the total
```

1    non-controlled dosing units that were purchased by the

2    customer during the most recent 12-month period which we

3    refer to as a baseline.  And that establishes the size.

4         We also have a geographic risk component which is an

5    add-on in the last two years that also determines the -- in

6    terms of the -- one of the parameters, it reduces the

7    parameter of size based upon the distribution center to

8    which the customer is aligned.

9    Q.   So a mid-size retail pharmacy in Cabell County, how

10   would peer grouping work to compare that mid-size customer

11   Cabell County orders to what?

12   A.   So it could be compared within the county, but it can

13   also be -- the peer group works at the distribution center

14   level.  So we would look at the particular servicing

15   distribution center.  In this case, it would be in Ohio.

16        And we would look at -- in terms of retail pharmacies,

17   we have 10 sizes which we refer to as deciles.  And within

18   each decile there's a number of dosing units that determines

19   the size of the customer.

20        So if we looked at a size -- let's say we looked at a

21   size 5 decile retail pharmacy, we would compare -- in terms

22   of the cumulative volume parameter, we would compare that

23   size 5 pharmacy to another size 5 pharmacy being serviced by

24   our distribution center out of Ohio.

25   Q.   So am I correct that if there's 27 distribution centers

1    and 10 sizes today that there are 270 peer groups?

2    **A.**   You would have been correct two years ago.  We changed

3    that particular peer grouping size by adding the risk, the

4    geographic risk component.

5        And, so, we're still considering geography -- you're

6    correct in that -- except the way we're considering it is on

7    a risk bases where every distribution center we assign a

8    risk score and then we adjust the parameters for the highest

9    risk drugs according to that ranking.

10       So to put it in a little more simple terms, I hope, a

11   pharmacy in West Virginia that's serviced by Ohio, the risk

12   ranking we now have -- the geographic risk ranking is a 2 or

13   medium, which means that the, the parameters that are set

14   for pharmacies across the country would actually be reduced

15   by 10 percent for West Virginia pharmacies.

16       And, again, the reason there is, as I've discussed

17   before, is we want to focus the electronic system more

18   closely at where we have perceived increased risk.

19   **Q.**   So I thought I was going to get off easy because

20   there's 27 times 10 which was 270.

21   **A.**   Two years ago that exactly was the case.

22   **Q.**   So how many are there today then?

23   **A.**   We don't even consider a peer group number.

24   **Q.**   Thank you.  And how long did the process take for you

25   to design, test, and roll out this newer version of the

1    Order Monitoring Program after you joined?

2    **A.**    So in March of '14, from that period I believe we

3    started rolling out the new or enhanced Order Monitoring

4    Program around mid 2015.  And it was a rolling schedule

5    where we would roll it out to certain distribution centers

6    on schedule versus rolling it out completely.  We finished

7    that process by the end of 2015, early 2016.

8    **Q.**    Thank you.  And while we're going to go through some --

9    we've gone through some of those changes to the Order

10   Monitoring Program and the Diversion Control Program, is the

11   basing structure of the OMP today the same as it was in 2007

12   in the sense of flagged orders, then reviewed by a human

13   being?

14   **A.**    When it comes to that mechanism that, you know, flagged

15   orders are electronic, then reviewed by humans, that, that

16   has not changed.  That's remained.

17   **Q.**    And you talk about peer grouping.  Are orders that come

18   in from customers also tested against that customer's own

19   prior orders for that same type of product?

20   **A.**    Yes.  There's two tests that are performed without

21   parameters.  There's an individual order test.  And what

22   happens there is the customer's order that's placed by the

23   customer for that particular family is measured against that

24   customer's previous 12-month ordering of that particular

25   product family.

1      And, and if the order exceeds that parameter, that
2   would be, that would be a description of what an individual
3   order parameter looks like.
4   **Q.**   And the other parameter is the peer grouping one?
5   **A.**   The other, the other parameter is peer grouping.  And
6   we refer to that as a cumulative volume parameter where what
7   we're doing there is we're measuring the customer's ordering
8   of a product family over rolling 30 days compared to his
9   peers.
10      So the notion there is we look at customer.  We say,
11   you know, in terms of his ordering, okay, here's how you've
12   ordered in the past, Customer X, and we want to compare
13   those orders.  But we also want to compare your orders to
14   your peer group to see that, that there is alignment or not
15   with those sorts of orders.
16   **Q.**   And did you ever ask DEA to take a look at this revised
17   Order Monitoring Program?
18   **A.**   I made a request to meet with DEA to, among other
19   things, outline our Order Monitoring Program due to all of
20   the changes what we had made to it.
21          MS. MCCLURE:  If you could hand out AM-WV-00640.
22      Your Honor, may I approach?
23          THE COURT:  Yes.
24   BY MS. MCCLURE:
25   **Q.**   Mr. May, do you recognize this document?

1    A.    I do.

2    Q.    And what is it?

3    A.    This is the letter that I composed to Mr. John Martin

4    requesting a meeting with Diversion Control at DEA.

5    Q.    Okay.

6          Ritchie, if we could publish that AM-WV-640 up on the

7    screen.

8          And if you could turn, David, to the third paragraph

9    and read that paragraph aloud.

10   A.    "Since at least the 1980s, ABDC and its predecessors

11   have had systems in place to identify and report suspicious

12   orders of controlled substances to the appropriate

13   governmental agencies in compliance with federal and state

14   law.  ABDC's OMP has continually evolved over the years

15   based on input from various stakeholders, especially DEA."

16   Q.    Okay.  And then the next paragraph, does this generally

17   describe the history of the program as you understood that

18   history based on your review when you joined the company?

19   A.    Yes, it does.

20   Q.    And then turning to Page 2, the paragraph, "It is --

21   sorry -- "It is as part of this legacy," what are you

22   generally asking for here, David?

23   A.    Asking for a meeting.  You know, we had put a lot of

24   work into our program and we wanted to have an opportunity

25   to sit down with DEA and talk about those changes that we

1    made, and also to see if there was any opportunity where we

2    could better, I guess, serve the regulator in terms of what

3    they wanted us to look at.

4         You know, there may be information that we have that,

5    that -- I'm sorry -- that we don't have that the regulator

6    has.  And, and I just thought this would be an opportunity

7    to have that sort of sit-down communication.

8    **Q.**   Okay.

9         And if we could do the next paragraph, Ritchie.

10        So this letter is dated in 2018; right?

11   **A.**   Yes.

12   **Q.**   Why wait until 2018 to ask for this meeting with DEA if

13   the changes were implemented in large part by the end of

14   2015?

15   **A.**   So, so they were rolled out by the end of 2015, and the

16   first full year of operation was 2016.

17        One of the learnings that I have is despite all of the

18   testing that we do with the program, it takes some time.

19   And I explained the situation today how there's a business

20   occurrence when I used the Walgreens examples.

21        I have other examples where things happen and really it

22   was about a two-year learning where we were pretty

23   comfortable in terms of those learnings, making the

24   adjustments that we needed to make.

25        And, and also I believe it was in 2017 DEA first

1    started talking about the notion of addressing the

2    suspicious order regulation in, in proposing a new rule.

3    That was in 2017.  It didn't occur until, as we've talked

4    about already here today, I believe November of '20 is when

5    that proposal came out.

6         So it just seemed that the timing here was appropriate.

7    We had enough time for the program under our belt.  We knew

8    this, this proposed rule was supposed to come out immanently

9    and thought this was the best time to do it.

10   **Q.**   Okay.  So did DEA respond to this letter as you recall?

11   **A.**   I had several email exchanges with DEA after I wrote

12   the letter, yes.

13   **Q.**   So did you have a meeting?

14   **A.**   I did not.  They initially agreed to a meeting, set

15   some, set some potential dates for that meeting, and then

16   they cancelled that meeting.

17   **Q.**   Okay, all right.

18        Ritchie, we can take -- I'm sorry.

19        Your Honor, I move for the admission of AM-WV-000640.

20        THE COURT:  Is there any admission to -- any

21   objection to 640?

22        MR. PIFKO:  No objection on that one.

23        THE COURT:  All right.  It's admitted.

24   BY MS. MCCLURE:

25   **Q.**   So, okay, turning back to our Diversion Control

1    Program Over Time, Mr. May, did the type of data used

2    today that we've displayed in the dashboard differ

3    substantially from the type of data AmerisourceBergen

4    was using in 2014 for on-going customer due diligence?

5    A.    No.  The data is our transactional data.  That's what

6    was being used in 2014, and that's what's being used in

7    2021.

8    Q.    And based on your examination that you talked about

9    when you joined the company and the investigation you did

10   into what had been happening with the Diversion Control

11   Program prior to you joining, is it your understanding that,

12   in fact, this same type of data had been being used for

13   on-going customer due diligence since 2007?

14   A.    The same type, similar data was being used by

15   AmerisourceBergen at that time.  It was just being published

16   in a different format, similar, not exactly the same, but

17   similar data.

18   Q.    Okay.  Mr. May, do you know what an OMP size report is?

19   A.    Yes.

20   Q.    What is that?

21   A.    That is one of these data files or spreadsheets that

22   was produced -- was being produced when I arrived and for

23   years before my arrival at AmerisourceBergen.  And it is a

24   spreadsheet that contains our complete list of customers who

25   are purchasing controlled substances.  And it works, again,

```
 1    for the DEA registration level.
 2         And on the spreadsheet there are certain data points
 3    that we track that are relevant to our review.  We, in fact,
 4    still -- that's the only legacy report we still publish to
 5    this day.
 6    Q.   Okay.
 7              MS. MCCLURE:  If we could pass out AM-WV-406.
 8         Your Honor, this is a fairly lengthy, voluminous
 9    report.  So we've talked with the plaintiffs about doing
10    four copies of the voluminous reports, one going to the
11    witness, two going to the Court, one to opposing counsel.
12         May I approach?
13              THE COURT:  Yes.
14    BY MS. MCCLURE:
15    Q.   Mr. May, what is this document?
16    A.   May I just have one brief moment?
17    Q.   Oh, yes.  I'm sorry.
18         (Pause)
19    A.   So this is an OMP size report.  It's a little hard to
20    see on the very first line, but it looks like it's dated to
21    the 2014 era from October.  It looks like it covers October
22    through, through December sales.
23    Q.   So this would have been a report run during the time
24    that you were at the company?
25    A.   Yes.
```

1    Q.   And how does the Diversion Control Team use this

2    report?

3    A.   Again, there are certain data points in here that are

4    relative to that review.  And, specifically, you know,

5    looking at Number 1, the trending, what the sales looked

6    like over a period of time, and also particular attention

7    here to the controlled substance percentage ordering by that

8    customer.

9         And, again, this is the 2014 version.  There is a 2021

10   version that's quite, quite different.

11   Q.   But it's -- the 2021 version contains some of the same

12   type of information that's on this 2014 one that we have

13   displayed here?

14   A.   Yes.

15   Q.   Okay.  And do you have any understanding as to how long

16   prior to you joining the company in 2014 these OMP size

17   reports have been being generated and relied upon by the

18   Diversion Control Team?

19   A.   I believe I've seen reports -- this particular report

20   going back certainly before 2014.  But was it as far back as

21   2009, 2010?  I just -- I'm not precisely sure.  But it's

22   about that time period.

23   Q.   So approximately 2009-2010 from your recollection?

24   A.   From my recollection.

25   Q.   Okay.

```
1              MS. MCCLURE:  Your Honor, I move for the admission

2       of AM-WV-00406.

3              MR. PIFKO:  Your Honor, we don't object to the

4       extent that this format of data was something that they

5       looked at and analyzed.  But to the extent they're trying to

6       rely on the exact numbers, this witness doesn't have

7       foundation to authenticate the accuracy of every single menu

8       in that chart.

9              MS. MCCLURE:  Your Honor, we are simply submitting

10      this document as evidence of how the program has evolved and

11      the types of data and information the Diversion Control Team

12      was relying on prior to Mr. May's arrival and during the

13      first year and a half when he was at AmerisourceBergen

14      during which the 2007 program was being operated.

15          I'm not asking Mr. May to validate any of the internal

16      documents or numbers in here.  It's being offered for

17      purposes of explaining to the Court what that prior time

18      period's on-going customer due diligence looked like.

19             THE COURT:  Well, I'm not sure I understand your

20      objection, Mr. Pifko.

21             MR. PIFKO:  With Ms. McClure's clarification about

22      the purpose of why they're seeking to admit it, we don't

23      have an objection to that purpose.

24             THE COURT:  Well, can you get around the hearsay

25      rule here?
```

```
 1              MS. MCCLURE:  Well, Your Honor, this is actually
 2    also a business record in the sense that -- let me lay the
 3    foundation for that.
 4    BY MS. MCCLURE:
 5    Q.   Mr. May, are these documents kept and maintained in
 6    the course of AmerisourceBergen's doing business on a
 7    routine regular basis?
 8    A.   Yes.  So, so this -- the data contained in this report
 9    is based upon transactional data by the company that the
10    company keeps as part of its normal operations and business
11    records.
12    Q.   So is this an Excel spreadsheet?
13    A.   This is.
14    Q.   It happens to be in hard copy form as we're looking at
15    it today.  But you understand it's maintained in Excel;
16    correct?
17    A.   Correct.
18    Q.   And the source of that Excel, to your understanding, is
19    the SAP data?
20    A.   It would have been an SAP output, yes.
21    Q.   And SAP is what?
22    A.   SAP is the platform that we utilized at that period of
23    time in 2014 and up to this date.  It's essentially the
24    platform through which we manage all of our transactions.  I
25    believe they call it an ERP, an Enterprise Risk Platform.
```

1    That's the technical term for it.

2            MS. MCCLURE:  So, Your Honor, with that

3    clarification, I believe that this document can come into

4    evidence for the purpose of explaining what the

5    AmerisourceBergen Diversion Control System on-going order --

6    I'm sorry -- on-going customer due diligence was at that

7    time.

8            THE COURT:  Are the entries in this made at or

9    near the time the events purport to portray?

10           THE WITNESS:  Yes, they are.

11           THE COURT:  Are they made by a person with the

12    duty to accurately make the entries?

13           THE WITNESS:  They are.

14           THE COURT:  It's admitted.

15           MS. MCCLURE:  Thank you, Your Honor.

16    BY MS. MCCLURE:

17    **Q.**   When you joined AmerisourceBergen in 2014, was it

18    also using reports for specific types of controlled

19    substances like hydrocodone or oxycodone called trend

20    reports?

21    **A.**   Yes.

22           MS. MCCLURE:  If we could hand out document

23    AM-WV-00398.

24        And this is similar, Your Honor, a voluminous document.

25    So we have one for the witness, two for the Court, and one

1    for opposing counsel.

2         This is offered for the same purpose as the last report

3    was, both as a business record and not as evidence of what

4    the company was doing when Mr. May joined.

5         May I approach?

6              THE COURT:  Yes.

7    BY MS. MCCLURE:

8    **Q.**   I did make them two-sided, but they're still

9    voluminous.

10        Mr. May, what is this document?

11   **A.**   May I have one minute?

12   **Q.**   Yes.  I'm sorry.  I keep doing that.  Apologies.

13        (Pause)

14   **A.**   So this would be an example of a sample report of a, of

15   a drug trending report.  The period of time here outlined on

16   the report is from June of 2014 through November of 2014.

17   And it shows month over monthly purchasing per registrant of

18   select controlled substances.  It also gives you the average

19   month, and then the total for that -- I guess it would be a

20   five-month period.

21   **Q.**   And is this document a trend report -- this is for

22   hydrocodone; correct?

23   **A.**   So this is not -- appears to be -- at least on my copy

24   I don't see the column for hydrocodone.  It's definitely a

25   drug trending report.  I just don't see the entry for which

1    drug.

2    **Q.**   Okay.  We'll come back to that.  Have the Tableau files

3    that we've walked through today replaced that report?

4    **A.**   Yes.

5    **Q.**   Meaning the product trend report?

6    **A.**   Yes, they have.

7    **Q.**   And based on your review when you joined the company in

8    2014, did you have an understanding that these product trend

9    reports were already being run at the time that you joined?

10   **A.**   They were being run at the time -- had already being

11   run at the time that I joined, yes.

12   **Q.**   And was that for a similar period, as you understood it

13   for the OMP size report dating from the 2009-2010 time

14   period?

15   **A.**   That's the approximate time period based on my

16   recollection of seeing these reports historically.

17   **Q.**   Okay.

18          MS. MCCLURE:  Your Honor, I move for the admission

19   of AM-WV-00398.

20          THE COURT:  Any objection to 398, Mr. Pifko?

21          MR. PIFKO:  No objection.

22          THE COURT:  It's admitted.

23   BY MS. MCCLURE:

24   **Q.**   Now, we're still in on-going customer due

25   diligence.  We're in the time period when you joined the

```
 1    company in 2014.  We heard a little bit earlier last

 2    week about McCloud Family Pharmacy.  Do you recognize

 3    McCloud Family Pharmacy as being an AmerisourceBergen

 4    customer?

 5    A.   I do.

 6    Q.   Do you know if AmerisourceBergen had stopped servicing

 7    McCloud at some point prior to today?

 8    A.   Yes.

 9    Q.   Do you know when that was?

10    A.   I believe it was sometime ago.

11    Q.   Okay.  Did AmerisourceBergen also have OMP weekly

12    dashboards for McCloud in 2015 once the dashboards started

13    being rolled out?

14    A.   We would have had dashboards at that time period.

15    That's when we started producing the dashboards as we

16    developed the program.

17    Q.   Okay.  If we could hand out AM-WV-0104-E.  This is an

18    excerpt for the McCloud and Drug Emporium dashboards.

19         Your Honor, may I approach?

20             THE COURT:  Yes.

21    BY MS. MCCLURE:

22    Q.   Mr. May, the first page of this document is Drug

23    Emporium; correct?

24    A.   It's reflected the customer name is Drug Emporium, yes,

25    with a DEA registration.
```

**Q.**   Okay.  And then if we go to the fourth page in, that is
reflected as McCloud; correct?  And apologies for this being
two-sided.

**A.**   Yes, that is McCloud Family Pharmacy.

**Q.**   Okay.  So are these weekly customer dashboards for both
McCloud and Drug Emporium contained within the same
document?

**A.**   Yes.

**Q.**   And, so, we've earlier walked through the 2018 St.
Mary's Medical Center Hospital pharmacy dashboard.  But
these are independent retail pharmacy customers at this time
in 2015; right?

**A.**   That's correct.

**Q.**   And does this contain the similar -- even though this
is dated in 2015, similar to the dashboards that we
previously reviewed for the weeklies for St. Mary's Medical
Center?

**A.**   Yes.  The dashboards are produced and do not consider
DEA registration type.  So it's always the same except for
the fact, as you've pointed out, these were the earliest
iteration of the dashboard.  So they might not be precisely
aligned if you compare the '18 to the '15.

**Q.**   Okay.

**A.**   But, generally, the content is the same.

         MS. MCCLURE:  Your Honor, I move for the admission

```
1    of AM-WV-1040-E which are the customer dashboards for
2    McCloud and Drug Emporium.  And I do so requesting
3    conditional admission similar to the dashboards that we
4    previously discussed with respect to St. Mary's Medical
5    Center that would be included in a brief that we would
6    submit.
7                THE COURT:  You don't want this one displayed
8    outside the courtroom.  Correct?
9                MS. MCCLURE:  Correct.  So I'm not calling it up
10   on the screen and I'm just moving the admission
11   conditionally.
12               THE COURT:  All right.  Mr. Pifko.
13               MR. PIFKO:  No objection to the admission.
14               THE COURT:  All right.  It's admitted.
15   BY MS. MCCLURE:
16   Q.   Okay.  Mr. May, I believe that you've already
17   touched on these two areas over time.  But you -- do you
18   have an understanding that AmerisourceBergen had -- the
19   Diversion Control Team had policies and procedures in
20   place when you joined the company in 2014?
21   A.   Yes, they did.
22   Q.   And had that been the case, based on your review of the
23   documents and evidence when you joined, for a substantial
24   period of time prior to your joinder?
25   A.   Yes, it was.
```

1    Q.   Okay.  And training -- you've talked about some

2    training that you have already -- you have conducted.  Did

3    you have an understanding that training was something taking

4    place at AmerisourceBergen at the time you joined?

5    A.   Yes.

6    Q.   Did you have an understanding that the training was

7    something that was happening for a substantial period of

8    time prior to your joining the company?

9    A.   That was my understanding.

10   Q.   Okay.  Let's talk about diversion team resources.  When

11   you joined the company out of DEA after 30 years of

12   experience as a special agent, what was your impression of

13   the Diversion Control Team that you joined in 2014 at

14   AmerisourceBergen?

15   A.   Could you be a little more precise in "impression"?

16   Q.   Of the people, the individuals who were operating this

17   program and running it when you joined.

18   A.   Sure.  Thank you.  So, generally speaking, the members

19   of CSRA and the members of the Diversion Control Team I

20   thought were experienced.  I think that they cared deeply

21   about what they were doing.

22        You know, looking back and whether it's, you know,

23   Mr. Zimmerman who's running the program or Mr. Hazewski who

24   was serving as the Director, they were very committed to

25   carrying out the program.

1        The investigators that worked for Mr. Hazewski at that

2    time and later I had personally met with.  And, and

3    Elizabeth Garcia was a former DEA diversion investigator who

4    was very conscientious about her work.  Eric Martin also was

5    a lifetime employee of AB who, who came over to Diversion

6    Control and was very conscientious.  Kevin Kreutzer same

7    situation.  So I thought good people, good background.

8        I think I explained on Friday Mr. Hazewski was a career

9    police officer who's a detective.  He was a polygrapher.

10   And, so, you know, he had a great reputation.

11       And just generally speaking, I thought good people

12   doing a good job.

13   **Q.**   And what Human Resources did the Diversion Control Team

14   have when you started?  What, what kinds of resources and

15   where?

16   **A.**   So, of course, we had the nucleus of the Diversion

17   Control Team which was Mr. Hazewski and the investigators

18   that worked directly for him.  But we also had other groups

19   that we coordinated closely with in terms of carrying out

20   the Diversion Control efforts.

21       So I think I spoke on Friday about Mr. Gundy who was at

22   the company when we started.  He had investigators and he

23   would assist with the loss investigations.  And, of course,

24   you know, that's an area where we have to make sure that

25   we're not incurring losses at our distribution centers of

1    controlled substances.

2        We also had compliance teams at each and every

3    distribution center that reported up through Mr. Mays.  And,

4    however, some of those folks carried out Diversion Control

5    activities.

6        We had a particular personnel designation of RPIC,

7    which was Responsible Person In Charge, who for a period of

8    time assisted and they were located in every distribution

9    center.  They assisted with the Order Monitoring Program and

10   execution of the Order Monitoring Program at the

11   distribution center level.

12   **Q.**   When you joined in 2014 did you feel the Diversion

13   Control Team had sufficient resources?

14   **A.**   I did.

15   **Q.**   Today do you feel like the Diversion Control Team has

16   sufficient resources?

17   **A.**   I do.

18   **Q.**   Are there more or less than seven years ago when you

19   joined?

20   **A.**   There are more.

21   **Q.**   Today Diversion Control Team, you mentioned that Liz

22   Garcia had been a former DEA diversion.  Are there any other

23   former DEA personnel other than yourself who are currently

24   working on the Diversion Control Team today?

25   **A.**   Yes.  We have several DEA folks that work with me

1    today.

2    **Q.**   Mr. May, can you list who they are?

3    **A.**   Jeff Kallal, Duane Stickles, Jim Mara (phonetic).  And

4    we just hired a former diversion investigator, Cynthia

5    Chiles (phonetic), who is brand new in the past couple of

6    weeks.

7         We also have two pharmacists, one of whom was a former

8    State of Connecticut investigator for several years before

9    she joined H.D. Smith and now AmerisourceBergen.

10        So we have four or five that are former law enforcement

11   on the staff now.

12   **Q.**   Does anyone other than you have oversight and

13   responsibility for that Diversion Control Team?

14   **A.**   So I share my responsibility now with the directors.

15   So I have different directors over different functional

16   areas that help me manage the program.

17   **Q.**   Mr. May, we've heard a lot about the term CSRA.  Is

18   CSRA -- would it be fair to say that CSRA is an umbrella

19   that includes the Diversion Control Program but is a broader

20   organization than just Diversion Control?

21   **A.**   That would be an accurate description.

22   **Q.**   Other than the internal Diversion Control resources,

23   does AmerisourceBergen also have outside consultants that

24   assist with Diversion Control efforts?

25   **A.**   Yeah, we have three major consulting services or

1    partners, outside contractors.  Of course, I've mentioned

2    several times FTI who have been with us since 2014.

3        We also utilize the Pharma Compliance Group made up of

4    primarily DEA diversion investigators and agents and have

5    been engaged with them -- or that engagement has been

6    precedently at AmerisourceBergen.  And we also utilize a

7    company called Pro Compliance who helps us when we're

8    collecting specific data from the pharmacy.

9    **Q.**   Do you use any former DEA outside consultants to

10   conduct audits of AmerisourceBergen's Diversion Control

11   Program?

12   **A.**   We have used outside former DEA folks.  When I joined

13   the company, the company had already engaged with Mike

14   Mapes, and he had been performing those audits for a couple

15   of years.

16       After Mike Mapes left the company to pursue another

17   opportunity -- I believe that was in the year after I

18   arrived, 2015 -- we then hired Mr. Brian Reise who is also

19   former DEA diversion to do some of that work.  He also has

20   moved on to another opportunity.

21   **Q.**   Could we hand out AM-WV-02763.

22       Your Honor, may I approach?

23           THE COURT:  Yes.

24   BY MS. MCCLURE:

25   **Q.**   Let me know when you've had a minute to look at

1    that, Mr. May.

2        (Pause)

3    **A.**    Okay.  I've reviewed that.

4    **Q.**    What is this document?

5    **A.**    This is a memorandum prepared by Mike Mapes and

6    delivered to Amerisource -- several different members of

7    AmerisourceBergen.

8    **Q.**    And what does this document reflect?

9    **A.**    It reflects a review of the ABC Order Monitoring

10   Program.  And I believe there were some areas that were

11   reviewed in terms of due diligence as well.

12   **Q.**    Okay.  If you could blow up the part on Page 1 that

13   starts after "Background," if you could display this

14   document, the part after "Background," after "Background,"

15   the next section, Ritchie.  Thank you.

16       Can you read the sentence that begins, "The ABC OMP."

17   It's the second sentence in that section.

18   **A.**    "The ABC OMP is well managed and appears to be very

19   effective at mitigating the risks associated with the

20   distribution of controlled substances by ABC."

21   **Q.**    And is that your understanding of what Mr. Mapes'

22   finding was in this letter?

23   **A.**    Yes.

24   **Q.**    Okay.

25           MS. MCCLURE:  Your Honor, I move the admission of

```
 1    AM-WV-2763.

 2              THE COURT:  Any objection to 2763?

 3              MR. PIFKO:  No objection, Your Honor.

 4              THE COURT:  It's admitted.

 5    BY MS. MCCLURE:

 6    Q.   Okay.  David -- you can set that aside, Mr. May.

 7         On Friday you discussed sometimes that we --

 8              THE COURT:  Is this a good place to stop?  I've

 9    got a sentencing at noon and we'll have to give counsel time

10    to get set up at the table.

11         We'll come back at 2:00, Mr. May.

12              THE WITNESS:  Yes, sir.

13         (Recess taken at 11:55 a.m.)

14              THE COURT:  Ms. McClure.

15              MS. MCCLURE:  Your Honor, during the morning, I

16    marked a document and I asked Mr. May if it contained a

17    report for hydrocodone.  It was document number AMWV-00398.

18              THE COURT:  Okay.

19              MS. MCCLURE:  I pulled the metadata associated

20    with the document and confirmed with Mr. Pifko that the file

21    name for the document is hydrocodoneJune2014_November2014.

22    So, I just wanted to note for the record what the title of

23    that document was.

24              THE COURT:  Okay.

25              MR. PIFKO:  We don't dispute that either.
```

```
 1              BY MS. MCCLURE:

 2    Q.    Okay.  Good afternoon, Mr. May.

 3    A.    Good afternoon.

 4    Q.    FTI, let's talk about FTI for a minute.  You were shown

 5    the FTI CSRA Process Report on direct on Friday; do you

 6    recall that?

 7    A.    I do recall, yes.

 8    Q.    Now, I don't believe you were asked any questions about

 9    the findings in that report, but I want to ask you a few

10    things about that report.  Can you pull out Plaintiffs'

11    Exhibit 93, which was shown to you on Friday, which you

12    should still have in the set of documents before you?

13    A.    Yes.

14    Q.    Do you have that document?

15    A.    I have that in front of me, yes.

16    Q.    Okay.  Did you review that report when you received in

17    2014?

18    A.    I did.

19    Q.    Do you agree with all of the findings in that report?

20    A.    No.

21    Q.    So, you disagree with some of them?

22    A.    Yes.

23    Q.    Was there a finding about Diversion Control resources

24    on Page 9 of that document?

25    A.    So, if you want to point me to a particular -- that
```

1    might save us some time in particular.

2    **Q.**    I believe it's on Page 9 and it begins with the phrase,

3    "CSRA is very reactive to situations."  Do you see that?

4    **A.**    Yes, I see it.  Thank you.

5    **Q.**    Okay.  Can you generally, for the record, summarize

6    what you believe that finding to be and advise whether you

7    agree with it or not?

8    **A.**    In terms of constantly putting out fires, that that

9    description would mean to me that there was not a lot of

10   planning with our work, that we were more reactionary to our

11   work, and in terms of that, identifying CSRA as the entity,

12   I will tell you from my perspective in Diversion Control

13   everything that we were doing was pro-active.  I mean, we

14   managed our work day to day, but this was during a period of

15   time when we were completely reviewing how we were doing

16   things.  So, I would not -- I would not agree with that

17   description of the work.

18   **Q.**    Were you involved with responding to FTI's findings in

19   a written document?

20   **A.**    I was.

21   **Q.**    Okay.

22           MS. MCCLURE:can we hand out W -- no, I'm sorry.

23   Can we hand out P-00472?

24       May I approach, Your Honor?

25           THE COURT:  Yes.

```
1              THE WITNESS:  Thank you.

2              BY MS. MCCLURE:

3    Q.   And let me know when you've taken a moment to look

4    through that document.

5    A.   Thank you.

6    Q.   And is this a copy of the company, including your own

7    responses, to FDI's recommendations from the report that the

8    plaintiffs had entered at Exhibit 93?

9    A.   Yes.

10   Q.   And you were not shown this document on Friday,

11   correct?

12   A.   That is correct.

13   Q.   And if you could turn to Page 2 of the matrix itself,

14   and if you could read the finding on Page 2, which begins,

15   "There is currently"?

16   A.   "There is currently a lack of visibility to the process

17   and rationale for adjudicating orders held for review.

18   While both the corporate and distribution center personnel

19   reviewing orders provide comments, there is no standard or

20   defined reasons -- no standard set of defined reasons to

21   support those decisions."

22   Q.   And do you agree with that finding?

23   A.   I think at the time when I walked through the doors, as

24   I have explained, and with my meetings with DEA Louisville,

25   I was interested at least in terms of providing
```

1    documentation around the decisionmaking process.  I thought

2    that there was -- there was room for improvement on that

3    area.

4        I don't -- I did not agree with the lack of -- the lack

5    of visibility conclusion that was made in terms of -- in

6    terms of the process when adjudicating orders.  So, a little

7    bit of both there.

8    **Q.**   Okay.  Did you take the FTI Process Report and

9    responding to it seriously?

10   **A.**   I did.

11   **Q.**   But you don't agree with each and every conclusion that

12   they reached; is that fair?

13   **A.**   That's fair.  This is -- this report was generated

14   after what FTI has actually described in their own document

15   as somewhat of a brief review and I believe they interviewed

16   possibly 20 associates during the time of the review.  We

17   had already been engaged at this time and had a

18   several-month review of our processes, so I felt like our

19   process was much more comprehensive in terms of our -- our

20   assessment of our own programs.

21   **Q.**   So, when you say "our" in that sentence, is that the

22   Diversion Control Team and FTI's separate process about

23   revising the program?

24   **A.**   Correct.  And there's reference in the first document

25   where FTI also indicates that they were engaged with us

```
 1    separately and so, therefore, did not -- did not expend a

 2    lot of their time in our area.

 3    Q.   Okay, thank you.

 4    A.   Versus other CSRA areas.

 5    Q.   Okay, thank you.

 6              MS. MCCLURE:  Your Honor, I seek admission of

 7    P-00472.

 8              THE COURT:  Is there any objection?

 9              MR. PIFKO:  No objection.

10              THE COURT:  Admitted.

11                DEFENSE EXHIBIT P-00472 ADMITTED

12              MS. MCCLURE:  Okay.  You can set that aside, Mr.

13    May.

14              BY MS. MCCLURE:

15    Q.   Turning to ARCOS data, what entity houses ARCOS data?

16    A.   DEA.

17    Q.   Historically, say when you joined the company in 2014,

18    did AmerisourceBergen or any other distributor, to your

19    knowledge, have access to ARCOS data at all?

20    A.   In terms of understanding our customers and the ability

21    to understand whether a customer had more than one supplier,

22    the answer would be no.  There have been six-month ARCOS

23    reports produced publicly by DEA for sometime, but they are

24    not customer-specific, nor are they distributor-specific, so

25    they don't really offer any information for us that's of any
```

1    utility.

2    **Q.**   So, those six-month reports are aggregated data?

3    **A.**   Aggregated nationwide data that reflects just total

4    distribution across the country.

5    **Q.**   Okay.  On direct on Friday, you testified about

6    sometimes thinking that AmerisourceBergen could know if

7    other distributors were servicing a customer who is applying

8    to us to become one of our customers.  If we didn't have

9    access to ARCOS data, how would we have known that?

10   **A.**   The only way to know -- well, I'm not sure that you

11   could absolutely know it.  You can ask the question of the

12   customer and then you would be -- you know, assume the

13   customer tells the truth.  That's the only way to know that.

14   **Q.**   And is that a portion that's on AmerisourceBergen's 590

15   Form, the questionnaire where customers sign up to become a

16   customer of AmerisourceBergen?

17   **A.**   Yes.

18   **Q.**   Whether you're being serviced by another distributor

19   currently?

20   **A.**   Whether you have another distributor.  Not precisely

21   sure of the language, but it's to that effect.

22   **Q.**   Okay.  Did there come a time where you did have access

23   to more ARCOS data than you had when you joined the company

24   in 2014?

25   **A.**   Yes.  DEA has developed a tool for wholesale

1    distributors to utilize and which gives us the ability to --

2    for ARCOS reportable drugs.  So, Schedule II and Schedule

3    III narcotics for distributors and manufacturers gives us

4    the ability to investigate a customer by registration number

5    and query the system to see if that registrant, customer,

6    pharmacy had more than one distributor.  And it would query

7    the most previous six-month period.  And through that tool,

8    you could then see if there was more than one distributor

9    and the total dosing units for whatever ARCOS reportable

10   drug you had a query for.

11   **Q.**   And when was the first time that that tool was made

12   available to you?

13   **A.**   I believe that the tool was developed, at least in

14   part, out of the Support Act, which I -- I believe the

15   requirement was that DEA develop that capability by 2018, at

16   some point in 2018, if my recollection serves me.

17        So, they develop the tool and then they've made a

18   couple of improvements on it since developing it.

19   **Q.**   Did the tool first tell you how many other wholesalers

20   a customer would have and then later, it eventually added

21   the amount of certain controlled substances that were being

22   supplied by the other distributor?

23   **A.**   My understanding is, when it first came out, it would

24   let us query.  It would list how many distributors there

25   were for a particular reportable drug and it would list the

1    dosing units under that, each distributor.  I think the

2    improvement that was made is that it gave us the ability to

3    perform a multi-drug family query.  At least, that was one

4    of the improvements.

5        And, again, so instead of putting in hydrocodone for a

6    particular customer, you could list ten different reportable

7    drugs and have all of those listed in the response.  I

8    believe that was the improvement.

9    **Q.**   Okay.  And despite the fact that we did not have --

10   AmerisourceBergen did not have access to that tool prior to

11   2018, we have reported transactional DEA to the ARCOS system

12   if it's an ARCOS reportable drug since when?

13   **A.**   Since their requirement has been established.

14   **Q.**   Okay.  And are you also aware of whether we report any

15   other data to DEA about our transactions?

16   **A.**   We report each and every controlled substance sale that

17   we make to our customer base and have been doing so since

18   2007 to DEA.  It's a separate reporting not required by the

19   regulation, but it was required by the agreement that we

20   entered into with DEA in 2007.

21   **Q.**   Is it fair to say that DEA has known every single

22   controlled substance AmerisourceBergen has shipped to any of

23   its customers within two days after the shipment was made

24   since 2007?

25   **A.**   That is the reporting that's occurred since 2007.

1    **Q.**   Okay.  Mr. May, moving on to a newer area, what is a Do

2    Not Ship List?

3    **A.**   Do Not Ship List is a tool that we've utilized in the

4    Diversion Control Program.  I referred to it as a tool.

5    It's essentially a list of customers that we have maintained

6    over the years, pre-dated me in 2014, and I believe it goes

7    back as far as 2007, 2006, if I recall correctly, and

8    essentially it is a list of DEA registrants that we have

9    either terminated the sale of controlled substances and

10   listed chemicals or completely terminated the relationship

11   with those customers.  And I have been maintaining that

12   tool, like I said, for sometime, up to and including the

13   present.

14            MS. MCCLURE:  Okay.  Can we hand out AMWV-00601?

15        Your Honor, may I approach?

16            THE COURT:  Yes.

17            BY MS. MCCLURE:

18   **Q.**   Have you had a minute to look at that document?

19   **A.**   I have, thank you.

20   **Q.**   Mr. May, are there actually two separate sections of

21   this document?  Unfortunately, because it's an Excel, the

22   pages are not numbered, but I would direct you to the last

23   three pages of the document, which have a different title

24   than the first several.

25   **A.**   Yes.  Included in the rear of the attachment is a list

1     of -- removed list currently approved for CS purchases,

2     which would indicate to me that this represented those

3     customers that were once on the Do Not Ship List that were

4     subsequently re-evaluated and approved for purchasing of

5     controlled and listed chemicals.

6     **Q.**   Okay.  Mr. May, is the list that I sent you, which I

7     believe is the Do Not Ship List and then the customers who

8     were previously on it who are now permitted to ship, is this

9     list a nationwide list?

10    **A.**   It is nationwide.

11    **Q.**   Okay.  When a customer is added to this Do Not Ship

12    List, do you know for a fact that diversion is happening?

13    **A.**   No.  This is -- again, and I talked about this a little

14    bit on Friday.  This is pursuant to our risk assessment

15    where we identify potential red flags.  We investigate those

16    red flags and, for one reason or another, we're not able to

17    mitigate those red flags to a satisfactory degree.  And so,

18    this is one option that we have, is to add the customer to

19    the Do Not Ship List and stop shipping controls to them.

20          MS. MCCLURE:  Okay.  Your Honor, I move for the

21    admission of AMWV-00601.

22          THE COURT:  Any objection to -- any objection to

23    601?

24          MR. PIFKO:  No, Your Honor.

25          THE COURT:  It's admitted.

**DEFENSE EXHIBIT AMWV-00601**

1

2          BY MS. MCCLURE:

3     Q.   And, Mr. May, do you and the Diversion Control Team

4     tell DEA when we place a customer on the Do Not Ship List?

5     A.   So, beginning in January of 2018, we changed our

6     procedure to include written notification to the local Field

7     Division where the pharmacy was located, as well as the

8     State Board of Pharmacy for every pharmacy that we add to

9     the Do Not Ship List.

10         And essentially how the program works is, it's May --

11    whatever customers would be added in May, in June, we would

12    then write letters to the DEA and Board of Pharmacy where

13    the pharmacies were located informing them of our decision

14    to terminate the sale of controlled substances and listed

15    chemicals.

16    Q.   Okay.  Mr. May, after AmerisourceBergen has terminated

17    a customer's ability to purchase controlled substances, have

18    any of those customers raised concerns about the fact that

19    they believe termination will affect patient access to

20    medication?

21    A.   Yes.

22    Q.   And can you describe one of those situations?

23    A.   We had a pharmacy in Alaska named Bernie's Pharmacy

24    and, again, the scenario was we saw some potential red flags

25    at Bernie's Pharmacy.  We conducted a pretty comprehensive

123

1    review, made the determination that we could not mitigate

2    those red flags, and made the decision to terminate the sale

3    of controlled substances and listed chemicals.

4         Following that decision, we informed the pharmacy as we

5    do not only of our initial concerns, and we give them an

6    opportunity to respond to our initial concerns, which they

7    did, and then we subsequently reviewed that, made our final

8    decision that their response did not fully mitigate our

9    concerns.  We made the final decision to terminate the sale

10   of controlled substances and the listed chemicals.

11        They then hired an attorney and we were brought to

12   federal court in Alaska and where ultimately the judge found

13   for the pharmacy and ordered us to continue our shipment of

14   controlled substances and listed chemicals to the pharmacy.

15   One of the main concerns from the pharmacy, their

16   perspective, was that they were concerned with patient

17   access issues.

18   **Q.**   And in connection with that case, did any other entity

19   or person raise concerns about patient access to medication?

20   **A.**   There was an official, a Health Department official in

21   Alaska, who communicated with me on the evening that we

22   finished our court date and he communicated to me directly

23   about that very issue saying he was concerned about patient

24   access and patients not being able to get controls and would

25   I be willing to work with him and his office to make sure

1    that it didn't -- didn't cause any, you know, harm to

2    patients and I -- I agreed that I would but, subsequently,

3    it was out of my hands because the Court ordered us to

4    continue servicing the pharmacy.

5    **Q.**   Okay.  So, to be clear, the state official, I think you

6    said it was?

7    **A.**   Yes.

8    **Q.**   The state official who wrote you was asking you to

9    continue servicing that pharmacy or not?

10            MR. PIFKO:  Objection, hearsay on the state

11   official's comments.

12            MS. MCCLURE:  Your Honor, Mr. May has already

13   testified to the official's comments and the request without

14   objection.  Moreover, it goes to effect on the listener and

15   I'm asking Mr. May to clarify his prior testimony.

16            THE COURT:  Well, I think this is necessary to

17   complete his story here, so I'm going to allow it.

18            THE WITNESS:  My sense was and my understanding

19   was that that health official actually thought that the

20   Court was going to rule in another way and, in fact, the

21   Court ruled against us.  His message to me was sent before

22   the Court ruling that I received, the court ruling, and

23   essentially he was trying to prepare for a situation where

24   customers, patients that were being serviced by that

25   pharmacy, would no longer have those medication available to

1    them.

2    **Q.**    So, he was asking you to work with them and continue to

3    service Bernie's?

4    **A.**    It wasn't that specific.  And, again, folks that maybe

5    are utilizing or misusing opioids, having have them not

6    receive their medication could -- could cause danger to

7    their lives and so, I think he was trying to manage through

8    that.

9    **Q.**    When AmerisourceBergen makes the decision to terminate

10   a customer's ability to order controlled substances, are you

11   overriding the decision of the DEA, who currently has that

12   pharmacy licensed?

13   **A.**    So, to the extent that we're saying to a pharmacy and a

14   pharmacist that even though you're registered with DEA, duly

15   registered, and you're licensed by the State, we're

16   essentially saying to them it doesn't matter.  We see this

17   risk and we can't mitigate it.  So, even though you possess

18   the necessary licensure, we're not going to supply you.  So,

19   to the extent that we're overruling the State and the DEA, I

20   guess I would describe it like that, as opposed to

21   overruling.  We're just saying we're not going to do it even

22   though they're licensed appropriately.

23   **Q.**    And that would apply also to the trained pharmacist who

24   has a license at that pharmacy?

25   **A.**    Correct.

1    **Q.**   That would apply also to the trained physician who is

2    the one prescribing the medications where patients are then

3    bringing that prescription to the pharmacy?

4    **A.**   Correct.  That -- the entire chain is -- I guess I

5    would refer to it as the clinician chain.  We're

6    essentially, you know, overriding their -- in some extent --

7    some extent their educational training and background.

8    **Q.**   And of those entities in that chain, are we -- does

9    AmerisourceBergen have information about the specific

10   patient for whom those medications may be intended?

11   **A.**   No.  We don't see -- of course, we don't see the

12   patient/doctor relationship.  We don't understand the

13   treatment, the diagnosis that the prescriber puts forth.  We

14   don't see the interaction between the pharmacist and the

15   patient in the evaluation that the pharmacist performs in

16   terms of his corresponding responsibility at, you know,

17   adjudicating that prescription in terms of its medical

18   necessity.  All of that is beyond our view.  We don't see

19   any of those interactions.

20   **Q.**   Okay, thank you.

21        Switching to a different topic, you've talked about

22   orders of interest and flagged orders.  Those are not

23   suspicious orders; is that correct?

24   **A.**   That's correct.

25   **Q.**   If a customer goes over their allotted perimeter in the

1    AmerisourceBergen system, is that an order that is required

2    to be reported to DEA?

3    **A.**    No.

4    **Q.**    Has DEA ever provided definitional guidance in the

5    regulation as to what the word unusual means?

6    **A.**    No.

7    **Q.**    How about deviating substantially from a normal

8    pattern?

9    **A.**    No.

10            MS. MCCLURE:  Okay.  If we can pass out

11   AMWV-00896.

12         Your Honor, may I approach?

13            THE COURT:  Yes.

14            THE WITNESS:  Thank you.

15            BY MS. MCCLURE:

16   **Q.**    Have you had a moment to look through that document?

17   **A.**    Yes, I have.  Thank you.

18   **Q.**    Okay.  What is this document?

19   **A.**    This is an e-mail exchange between had and myself.

20   There's others included, but you can't see the complete

21   distribution list.  You can see the -- my response at the

22   end where I just thank -- thank had and Ruth Miller for

23   sharing the information.

24   **Q.**    And your e-mail is --

25            MR. FARRELL:  Objection, Your Honor.

```
 1              THE COURT:  Just a minute.  What's the basis for
 2     the objection?
 3              MR. FARRELL:  It's me, Mr. Farrell.  The basis is
 4     that you have precluded me from asking very similar
 5     questions on Friday of Mr. Zimmerman regarding had and
 6     excluded the evidence.
 7              MS. MCCLURE:  Your Honor, may I respond?
 8              THE COURT:  Yes.
 9              MS. MCCLURE:  Your Honor, this is a -- if you look
10     at the e-mail, it is a summary of a meeting where DEA was
11     present at a meeting and gave DEA -- provided commentary.
12     It is not an had-related meeting.  It is not in the vein of
13     the Noerr-Pennington objections that the defendants have
14     raised to some of the evidence Mr. Farrell is discussing
15     presenting with Mr. Zimmerman.
16        This document is a summary of DEA's statements.  It is
17     being offered for effect on the listener and notice.  The
18     fact that it happens to be at a -- at a meeting with had is
19     not the point of the document.  It is being offered for the
20     comments recorded in here, which are from DEA at this
21     meeting.
22              THE COURT:  Well, it's hearsay, isn't it?
23              MS. MCCLURE:  Yes, but it's being offered for
24     notice and the effect on the listener, as well as the state
25     of mind of the speaker.  It's not being offered for the
```

```
 1    truth.  It's a summary of a meeting and plaintiffs are free
 2    to question Mr. May on the document itself, but it's
 3    unrelated to the reasons that the Court declined to permit
 4    the admission of various documents Mr. Farrell is
 5    referencing regarding had and the Noerr-Pennington and First
 6    Amendment issues.
 7              THE COURT:  Mr. Farrell?
 8              MR. FARRELL:  On Friday, you asked me what does
 9    this have to do with flooding pills into West Virginia, and
10    you struck it, and I wasn't even permitted to lay a
11    foundation because of the timing of it.  This document is
12    dated August 31, 2017.
13              MS. MCCLURE:  Your Honor --
14              THE COURT:  Well, I don't remember the document
15    you were offering.  What -- what was it?
16              MR. FARRELL:  I was -- we had an entire series of
17    had documents, including The Crisis Playbook, the Turning
18    the Tide in West Virginia, discussions of meetings with the
19    DEA.  In fact, The Crisis Playbook contained a section on
20    how to deal with the DEA.  You -- you struck all of the had
21    stuff, not only on Noerr-Pennington, but on relevance
22    because you said what does this have to do with your case.
23        So, all I'm suggesting is, is that if they're allowed
24    to get into their meetings in 2017, their understanding of
25    the law, their dealings with their trade group, then we
```

1    should be allowed to show that there's another side to this

2    coin.

3         MS. MCCLURE:  May I respond, Your Honor?  Mr.

4    Farrell -- the evidence that Mr. Farrell is talking about

5    had to do with evidence that he believed was demonstrating

6    concerted action of the companies joining together, having

7    this Trade Association, for the purpose of all of the

8    various arguments Mr. Farrell made on Friday.

9         This document is being offered -- the had part of it

10   has literally no bearing on the point.  It just happens that

11   the document was summarized by someone who attended the

12   meeting who is from had.  The statement that I'm going to

13   particularly be directing Mr. May to is at the bottom of

14   Page 1.  It relates to the statement "gray is good" and the

15   suspicious order reporting requirement.

16        It's -- the had involvement here is, at best,

17   incidental.  It has no bearing on the document itself, which

18   is being offered for the purpose of a summary of the DEA's

19   statements that are made within it.

20        THE COURT:  I've got the transcript here, Mr.

21   Farrell, and I hadn't ruled on that and you withdrew the

22   documents before I ruled on them; correct?

23        MR. FARRELL:  That was not my understanding --

24   well, I did withdraw after you -- I did withdraw the

25   documents after you said that you didn't find them

1    compelling at all.

2            THE COURT:  Yes, but I didn't rule on it, and I

3    didn't rule them out.  I was just telling you -- I guess

4    inviting you to straighten me out if I was wrong.  I, mean

5    you withdrew the document.  I didn't rule on it.

6            MR. FARRELL:  Judge, I did not interpret our

7    colloquy on Friday as an invitation to straighten you out.

8            THE COURT:  Well --

9            MR. FARRELL:  I took it as a clear indication that

10   you were not interested in hearing any of that evidence.

11   So, with that being said, you know, I'll let the record

12   stand on the entire --

13           THE COURT:  Okay.  Well, you withdrew the

14   document, so your argument is not making much progress with

15   me here.

16           MR. FARRELL:  Yes, Your Honor.

17           THE COURT:  Do you agree that it's a -- putting

18   that aside, your unfairness argument, do you agree that it's

19   admissible not -- the hearsay is not admissible, but it's

20   admissible for another purpose?

21           MR. FARRELL:  Yes, Your Honor.  We believe all of

22   the communications with the had are admissible.

23           THE COURT:  Okay, it's admitted.  Are you

24   objecting to it?

25           MR. FARRELL:  No, we are not.

```
 1              THE COURT:  Okay.  It's admitted.
 2           DEFENSE EXHIBIT AMWV-00896 ADMITTED
 3           BY MS. MCCLURE:
 4    Q.   Mr. May, what is this e-mail from Ms. Miller about?
 5    A.   It summarized a meeting between members of had and DEA
 6    in August of 2017.
 7           MS. MCCLURE:  If you could go to the bottom,
 8    Richie, of the document and blow up the section that's "gray
 9    is good".
10           BY MS. MCCLURE:
11    Q.   Can you read that paragraph into the record, Mr. May?
12    A.   The entire paragraph?
13    Q.   Yes, please.
14    A.   "Gray is good/accountability.  We gained a little
15    insight into Mr. Lewis's perspectives about how regulations
16    should be written.  While he expressed concern that some of
17    the DEA regulations have remained unchanged since 1971, he
18    also expressed that, based on his experience in the field
19    for DEA, gray is good, meaning that overly defining
20    requirements can create its own problems.  Had pointed out
21    that while flexibility is necessary, it also is essential
22    that the agency establish parameters so that registrants can
23    understand when they have strayed outside.  Mr. Lewis also
24    expressed his view that the agency should clearly convey
25    each registrant's accountability so that registrants
```

133

1    understand and can accept their responsibilities."

2    **Q.**   Mr. May, who is Mr. Lewis?

3    **A.**   A DEA headquarters personnel that was responsible for

4    the -- at least in part for drafting proposed rules and

5    regulations on behalf of DEA.

6    **Q.**   Okay.  So, did you view the statement, quote, "gray is

7    good", to be a statement that is helpful as applied to the

8    definition of what is a suspicious order or not?

9    **A.**   Not when it comes to suspicious order identification

10   and reporting.  It's a -- it's an area of the regulation

11   that DEA has used in the past to take certain action

12   relative to industries -- I guess issues associated with the

13   way industry has reported suspicious orders, whether that

14   action was some sort of administrative, or civil action, or

15   otherwise.

16        And so, in an area where DEA has used this particular

17   -- this particular part of the regulation to consistently --

18   consistently carry out enforcement to the industry, that is

19   one that we would want as much clarity around that portion

20   of the regulation as is possible to make sure that we don't

21   run afoul of what the expectation is by -- by the regulator.

22        I think, to his point, I think there are areas where,

23   you know, with regulations, you don't maybe want a lot of

24   specificity, but when it comes specifically to suspicious

25   order reporting and the consequences of not -- of not doing

```
 1    it to the level that the regulator experts, I think you need
 2    all the clarity that you can get.
 3    Q.   Is it your understanding based on your experience in
 4    the industry that the determination of whether an order is
 5    suspicious or not is subjective?
 6    A.   Yes, it is subjective.
 7    Q.   And is a suspicious order the same thing as an order
 8    that is going to be diverted?
 9    A.   I don't know what an order that's going to be diverted
10    -- we don't know if an order is going to be diverted.  I
11    know a suspicious order is -- what is -- it is defined as.
12         And, again, we report suspicious orders based upon our
13    understanding of the regulation and how the regulation
14    defines them.  In terms of whether an order that we declare
15    suspicious, somehow a portion of that order gets diverted,
16    we have no -- we have no visibility.  Once we -- the
17    medications leave our -- leave our possession, we just don't
18    have the visibility.
19         Contrary, there could be an order that we release
20    that's not suspicious and then a portion of that order could
21    ultimately be diverted.  We just don't have that level of --
22    level of views to the downstream end use of the product.
23    Q.   And I just want to confirm one thing based on what
24    you've just said.  Does AmerisourceBergen ship any
25    suspicious orders?
```

1   **A.**   We do not.

2   **Q.**   Okay.  Let's turn to the GAO.

3          MS. MCCLURE:  If you could hand out DEFWV-2181.

4   Thank you.

5       And, Your Honor, may I approach?

6          THE COURT:  Yes.

7          BY MS. MCCLURE:

8   **Q.**   Now, Mr. May, this is a lengthy document.  I'm not

9   going to direct your attention to the entire thing, but let

10  me know when you have taken a look at it.

11  **A.**   Thank you.

12  **Q.**   Okay.

13         MS. MCCLURE:  Richie, could you pull that document

14  up on the screen, please?

15         MR. FARRELL:  Judge, excuse me.

16         MS. MCCLURE:  Yes.

17         MR. FARRELL:  Objection.

18         THE COURT:  What's the basis of your objection?

19         MR. FARRELL:  So, there's a motion in limine filed

20  by the defendants to prevent us from submitting and talking

21  about the House ENC Report and, if I'm not mistaken, this

22  GOA Report is a report to the same panel that published the

23  ENC Report.

24      So, this goes to the same thing with the OIG.  You let

25  the OIG Report in.  They're now asking for the GOA Report to

```
 1    come in.  And we're -- still have pending whether or not the
 2    plaintiffs are permitted to introduce and reference the ENC
 3    Report.
 4              MS. MCCLURE:  May I respond?
 5              THE COURT:  Go ahead, please.
 6              MS. MCCLURE:  Your Honor, the Energy and Commerce
 7    Report is a staff report.  It is not a Congressional Report.
 8    It is a staff-level report issued, in fact, not by a
 9    bipartisan portion of the staff, but only by the majority
10    staff.  It is not an official congressional record.  That, I
11    believe, has been made clear by our briefing.
12        The reliability concerns, the extent of bias and
13    potential issues that come from a report that is as
14    political as that lower-level staff report, that is not
15    present with respect to GAO, which is the government --
16    United States Government Accountability Office, who is
17    charged with evaluating the efficiency and effectiveness of
18    government programs.
19        It is simply an entirely different analysis from the
20    ENC Report.  It is more akin to the OIG Report, the Office
21    of Inspector General, in the sense that it is an audit
22    conducted and none of the reliability concerns that
23    accompany and are the reason for the defendant's motion on
24    the ENC Report are equally applicable here.
25        So, this report is just entirely different in character
```

1    and understand that, to an outsider, it may appear that

2    these government reports are all the same.  They simply are

3    not and that is the reason that we've offered you the case

4    law with respect to the ENC Report not being admissible.

5              THE COURT:  Okay.  How does this -- how does this

6    come into evidence?  Why --

7              MS. MCCLURE:  So, this -- additionally, there are

8    several hearsay exceptions that would apply to this

9    document.  So, it is, I believe, considered a public record.

10   I'm not looking at my rule book, but I think that's 803(8).

11        Additionally, it is -- it comes in for the purpose of

12   notice.  You're going to -- what I intend to elicit from Mr.

13   May is to have portions of the document in which DEA is

14   instructed by OIG to create more --

15             THE COURT:  Let me interrupt you.  It is a report

16   by a government agency under a duty to investigate and

17   report accurately subject to the report; correct?

18             MS. MCCLURE:  Yes, Your Honor, it is.  It is an

19   official audit of the GAO.

20             THE COURT:  And, Mr. Farrell, doesn't that make it

21   a lot different from the report you wanted to get in, which

22   was a report of the majority of a Committee in Congress

23   without any input even from the minority?

24             MR. FARRELL:  I will withhold comment on the

25   majority and minority.  I think that would bolster our

```
 1    argument, if anything, but that being said --

 2              THE COURT:  How does this bolster your argument

 3    for one side to be cut out of the process?

 4              MR. FARRELL:  Well --

 5              THE COURT:  If it was?

 6              MR. FARRELL:  Well, because the hearing -- well,

 7    I'll let our briefing on ENC stand for itself.  The ENC

 8    Report is half of what we're talking about here.  Half of

 9    that report talks about the DEA's role and their missed

10    opportunities with the opioid epidemic.

11              THE COURT:  Well, I know, but you're not answering

12    my question.  Why -- how is it reliable if it's produced by

13    half of a Congressional Committee after a -- after a

14    hearing?  And we've all seen those hearings on TV and how

15    they go.

16              MR. FARRELL:  I understand.  I think that all of

17    these agencies particularly sometime have agendas and I

18    don't see any distinction between one arm of the federal

19    government publishing a report and the other.  You have the

20    opportunity to provide the weight that's appropriate to

21    either one of them.

22         What we take exception to is the admission of one and

23    the exclusion of the other when you can provide whatever

24    weight it is that you want.  We think we should be allowed

25    to make hay with whatever that ENC Report says favorable to
```

```
 1    us, just like we think we should be able to make hay with
 2    the favorable aspects of the OIG and GOA Report.
 3         It just seems as if the defendants are cherry-picking
 4    the documents they want to go in and then cherry-picking the
 5    portions to have read aloud within those reports.
 6              THE COURT:  Well --
 7              MS. MCCLURE:  Your Honor --
 8              THE COURT:  I see a big difference between these
 9    two documents and I have a big problem with the Majority
10    Committee Report you're referring to and I've got that on my
11    plate to rule on.
12              MR. FARRELL:  Judge, we believe it was a
13    bipartisan investigation, but I'll rely --
14              THE COURT:  It was a bipartisan investigation that
15    produced a report by one side of the -- of the aisle.
16              MR. FARRELL:  Yes, sir.  I'll let the smarter
17    lawyers on my team -- rely on their briefing on the matter.
18              MS. MCCLURE:  And, Your Honor, I just -- at this
19    point, I don't believe it's the time or the place to argue
20    for the ENC Report.  I do defer to my smarter colleagues, as
21    well, in the sense that I'm not the drafter of that or the
22    arguer.
23         Nevertheless, I do think that there is already
24    sufficient evidence and proffer in the record as to why this
25    document is materially different in character than that of
```

```
1    the ENC and that whatever the Court immediately does with

2    the ENC Report, this does not affect or control this

3    independent separate report by the Government Accountability

4    Office.

5               THE COURT:  And you're saying it comes in under

6    803(8), as a public record?

7               MS. MCCLURE:  If I got the number right, Your

8    Honor, then I'm even more impressed with myself, but --

9               THE COURT:  (a)(2), a matter observed while under

10   a legal duty to report.

11              MS. MCCLURE:  Yes, Your Honor.

12              THE COURT:  That's what it is?

13              MS. MCCLURE:  Yes, Your Honor.

14              THE COURT:  I'm going to admit it.  It's admitted.

15            DEFENSE EXHIBIT DEFWV-2181 ADMITTED

16              MS. MCCLURE:  Thank you.

17              BY MS. MCCLURE:

18   Q.   Mr. May, have you seen this document before?

19   A.   I have.

20   Q.   And what's the title of the document?

21   A.   "Report to Congressional Requesters.  Prescription

22   Drugs.  More DEA Information About Registrants' Controlled

23   Substances Roles Could Improve Their Understanding and Help

24   Ensure Access."

25   Q.   And who is the author of this document?
```

```
1    A.    It's the GAO.

2    Q.    And what is the GAO?

3    A.    Government Accountability Office for the Federal

4    Government.

5    Q.    Okay.  And if you could turn several pages into the

6    report, it's Page 3 of the report, the bottom right.  Bates

7    number ends in 734.

8          Mr. May, let me ask you, have you reviewed this

9    document before?

10   A.    I have reviewed this document.  I have not read it

11   cover to cover though.

12   Q.    And have you reviewed it in the course and performance

13   of your job duties at AmerisourceBergen in 2015?

14   A.    In 2015?  Actually, I believe I was -- actually spoke

15   with GAO on the phone, GAO Atlanta, as they were doing the

16   study, if I recall correctly, and then I subsequently

17   reviewed parts of their report.

18   Q.    Okay.  And what did you understand on Page 3 the

19   report's purpose to be or what it examines?

20   A.    Again, I think one of the focuses of the report, to my

21   recollection, was around -- and this is more of my

22   recollection than just reading here.

23   Q.    Okay.

24   A.    Was around the whole notion of assessing the level of

25   communication and collaboration between DEA, the agency, and
```

1    the registrant community, and I think that was one of the

2    areas that they were looking at.

3    **Q.**   Okay.  If you could turn to Page 25.  And there's a

4    paragraph that basically suggests that some guidance -- or

5    some distributors believe additional guidance would be

6    helpful from DEA regarding what suspicious order reporting

7    is expected.  Do you agree with that, that statement as --

8    from your role in the industry?

9    **A.**   Yes.  And, as I stated during the last series of

10   questions, any additional guidance we can get from the

11   regulator specifically that goes to how we carry out or

12   fulfill our duties to meet the regulation would be

13   beneficial.

14   **Q.**   Okay.  If you could turn to Page 44 and, in the

15   recommendations section in that -- that middle bullet, could

16   you read that middle bullet out loud that begins, "Solicit"?

17   **A.**   "Solicit input from distributors, or associations

18   representing distributors, and develop additional guidance

19   for distributors regarding their roles and responsibilities

20   for suspicious orders monitoring and reporting."

21   **Q.**   Okay.  Do you agree that DEA providing additional

22   guidance would be beneficial?

23   **A.**   Yes.

24   **Q.**   Okay.

25               MS. MCCLURE:  Your Honor, I'm not sure I actually

```
1    moved for admission of this document.  At this time, I do
2    move for the admission of DEFWV-2181.  I think we did that,
3    but just to make sure --
4              THE COURT:  I think I admitted it, didn't I?
5              MS. MCCLURE:  Yeah, okay.
6              THE COURT:  It's admitted.
7         Do you object to it, Mr. Farrell?
8              MR. FARRELL:  I'm confused on whether I do or not,
9    Judge, but --
10             THE COURT:  Well, that's up to you.
11             MR. FARRELL:  I think you already ruled.  Let our
12   objection be noted for the record.
13             THE COURT:  Well, and the basis of your objection
14   was it's not fair for me to let it in, right?
15             MR. FARRELL:  Yes, Your Honor.
16             THE COURT:  Okay.  Under all the circumstances of
17   the case?
18             MR. FARRELL:  Yes, Your Honor.
19             THE COURT:  Because the document you withdrew, I
20   didn't rule on?
21             MR. FARRELL:  Well, that would be a depiction that
22   reflects poorly on me but, yes, that's the argument I made.
23             THE COURT:  How does that reflect poorly on you?
24             MR. FARRELL:  Well, the -- the matter is of bigger
25   significance to us than simply the plaintiffs withdrew it.
```

1   This, as you can appreciate, has been a three-year-running

2   legal dispute between two very capable teams of lawyers.

3   And so, we have very strong opinions as to the admissibility

4   of some of the documents that have been excluded, but I

5   understand your rulings and respect them.

6             THE COURT:  Well, if you want me to rule on it,

7   you're going to have to offer it again because you withdrew

8   it.

9             MR. FARRELL:  Yes, Your Honor.

10            THE COURT:  Okay.  Well, if that issue comes up,

11   then I'll go back and re-read the briefs and rule on it.

12            MR. FARRELL:  Yes, Your Honor.

13            MS. MCCLURE:  Thank you.

14            BY MS. MCCLURE:

15   **Q.**   Mr. May, did DEA issue formal guidance regarding the

16   distributor -- I'm sorry -- regarding the suspicious order

17   definition in 2015 after this report came out from GAO?

18   **A.**   No.

19   **Q.**   How about 2016?

20   **A.**   No.

21   **Q.**   And is it true that it was not until 2020 that they

22   offered that additional guidance?

23   **A.**   Actually, what was offered in 2020 was a proposed rule

24   for public comment.  And so, DEA was offering to -- through

25   that proposed rule process is looking to change the language

1    in the implementing regulation and that's what was presented

2    in late 2020.

3             MR. FARRELL:  Objection, Your Honor.  We object to

4    the characterization of the DEA's intent.  The document

5    should speak for itself.

6             THE COURT:  Sustained.

7             BY MS. MCCLURE:

8    **Q.**   Mr. May, what was your understanding of the proposed

9    rule that was offered in November of 2020 by DEA?

10   **A.**   As a registrant and anybody in the public under the,

11   you know, proposed rule process can comment on the proposed

12   rule by DEA.  And so, DEA published its proposed rule and

13   looking to seek comments from the public and the focus of

14   the proposed rule was, for the most part, suspicious order

15   reporting.

16   **Q.**   And, Mr. May, do you recall if there was yet another

17   GOA Report that came out before DEA offered that notice of

18   the propose rulemaking in 2020?

19   **A.**   Yes, there was.

20   **Q.**   And do you recall whether that also commented on the

21   fact that the recommendation from 2015 was still outstanding

22   as of 2020?

23   **A.**   That's my recollection.

24   **Q.**   Okay.

25   **A.**   At least in part in the document.  That's one of the

```
 1    items.

 2    Q.    Okay.  And, Mr. May, have you made yourself familiar

 3    with the customers that AmerisourceBergen has had during the

 4    time period that is at issue in this case, which is 2006 to

 5    2018, for the City of Huntington and the County of Cabell?

 6    A.    I have reviewed data and information relative to that

 7    customer base, yes, and familiarized myself with them.

 8              MS. MCCLURE:  Richie, could you pull up that

 9    customers demonstrative, please?

10              BY MS. MCCLURE:

11    Q.    And, Mr. May, based on that familiarization, is this a

12    full representation of every one of the customers that

13    AmerisourceBergen serviced at any point between the years

14    2006 and 2018?

15    A.    Am I looking at the only page in the document?

16    Q.    So, this is 2006 to 2018.

17    A.    Thank you.

18    Q.    And then we will go through each year.

19    A.    Thank you.  So, yes, I mean, again, we have tens of

20    thousands of customers.  I have focused on the customers in

21    preparation of this testimony and I recognize many of the

22    names here as being customers in Cabell County between 2006

23    and 2018.

24    Q.    Okay.

25              MS. MCCLURE:  And then, Richie, could we flip
```

1    through 2006?

2          BY MS. MAY:

3    **Q.**   So, this is the customers as of 2006; is that correct,

4    Mr. May, based on your review?

5    **A.**   Yes.

6    **Q.**   Okay.  2007, a couple went away.  '08.  '9.  2010.

7    '11.  '12.  '13.  '14.  '15.  '16.

8          So, by 2016, there's nine customers listed there,

9    correct?

10   **A.**   Correct.

11   **Q.**   And based on your understanding, are the five on the

12   left hospitals?

13   **A.**   Yes.

14   **Q.**   And the one in the center there, Medical Park, is that

15   an independent pharmacy?  Oh, I'm sorry.  "LTC", what does

16   that mean?

17   **A.**   That's a long-term care pharmacy specializing in caring

18   for end-of-life patients.

19   **Q.**   Okay.  And then from --

20          THE COURT:  Those are all in Cabell County; is

21   that right?

22          MS. MCCLURE:  Or the City of Huntington.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  And the City of Huntington has just a

25   little bit that flips over into Wayne County, I believe; is

1    that right?

2              MS. MCCLURE:  Yes.  Yes.  But the majority of the

3    City of Huntington is encompassed within Cabell County.

4              THE COURT:  All right.

5              BY MS. MCCLURE:

6    **Q.**   And a couple of Walgreens on the bottom right?

7    **A.**   Correct.

8    **Q.**   And that's a chain, correct?

9    **A.**   It is, yes.

10   **Q.**   Okay.  2017, okay, we've lost that long-term care.

11   2018.  So, looks like here we've added -- we still have the

12   hospitals on the left, a couple of independent or long-term

13   care in the center and -- at the top, and then several

14   Walgreens at the bottom.  Do you know where those -- why

15   those were all added in 2018?

16   **A.**   Yes, and Walgreens had acquired numerous Rite Aid

17   Pharmacies during this period of time and they converted

18   those Rite Aid locations to the Walgreens brand.

19   **Q.**   Okay.

20             MS. MCCLURE:  Your Honor, may I have a moment to

21   confer with co-counsel?

22             THE COURT:  Yes.

23        (Pause)

24             MS. MCCLURE:  Your Honor, at this time, I have no

25   further questions subject to Mr. Farrell or --

```
 1            THE COURT:  All right.  Is there any redirect of

 2   Mr. May?

 3            MR. PIFKO:  Your Honor, we do have some questions.

 4   Maybe I'll request a short recess and then we can ask our

 5   questions.  I'll try to keep it very brief.

 6            THE COURT:  Okay.  Let's take about ten minutes.

 7       And you can step down, Mr. May.

 8            THE WITNESS:  Yes, sir.  Thank you.

 9            THE COURT:  And we'll have you come back.

10            THE WITNESS:  Thank you.

11       (Recess taken)

12            MR. PIFKO:  Good afternoon, Your Honor.  Mark

13   Pifko for plaintiffs.

14                   REDIRECT EXAMINATION

15   BY MR. PIFKO:

16   Q.   I just have a few topics.  I'll try to keep this

17   very brief.  I know it's the afternoon.

18       Mr. May, from Friday -- I believe you should have all

19   the exhibits in front of you from your prior testimony.  I'd

20   like you to pull out Number 898 from Friday, and

21   specifically if I can ask you to direct your attention to 5.

22   The slide says 4, but then if you look at the P-0898 it says

23   5 on the bottom.

24   A.   I think we're on the same spot, yes.

25   Q.   We're there?  All right.  Thanks.  Great.  So we talked
```

1    about the baskets of the Diversion Control Program.  And one

2    of them was this idea of knowing your customer.  Right?

3    **A.**   Correct.

4    **Q.**   So here you're talking about in this slide that -- what

5    you say in the notes you don't see specific reference to

6    knowing your customer in the law and regulations.  And you

7    go on to explain that you see a concept in other places.  Do

8    you see that?

9    **A.**   I do.

10   **Q.**   So you agree that something can be part of the

11   Diversion Control requirements without necessarily being

12   expressly in the regulations; correct?

13          MS. MCCLURE:  Objection, Your Honor, calls for a

14   legal conclusion.  I think Mr. Pifko can ask Mr. May about

15   this specific requirement.  But the question was changed to

16   be something and more broad than Mr. May -- than this slide

17   reflects.

18          THE COURT:  Well, overruled.  I think, I think

19   it's a proper question.  Go ahead.  You can answer it.

20          THE WITNESS:  Thank you, sir.

21      I believe that there are certain parts of our program

22   that are administered, the Diversion Control Program.  And I

23   believe they're done for a reason.  Are they expressly

24   stated in the laws or regulations?  I, I don't think you see

25   due diligence anywhere.  But we do perform diligence on our

1    customers.  But it's not because I believe that, that the

2    law requires it.  It's more that I think it's appropriate

3    for our program.

4    BY MR. PIFKO:

5    Q.   Well, you have here on this slide -- you have in

6    red 21, C.F.R., 1301.7(1)(a) where it talks about how

7    applicants and registrants shall provide effective

8    controls and procedures.  Do you see that?

9    A.   I do.

10   Q.   And you have the words "effective controls" in bold

11   there?

12   A.   I do.

13   Q.   You agree that that part of the regulation can

14   encompass other aspects of Diversion Control like the idea

15   of providing effective controls and require things like

16   knowing your customer?  Is that what you're trying to convey

17   in this slide?

18   A.   I have the notations for the regulations written.  I

19   believe this is the NADDI presentation.  I have those

20   regulations up there so that the law enforcement community

21   I'm addressing understands what the regulations are.

22        And then I'm speaking first of the one in red

23   presumably because it's highlighted here under these notes.

24        Again, I, I would, I would say that we have a program.

25   Some of the things that we do in our program are not in the

1    laws or regulations.  You won't find them there.

2        And, so, to the extent that we do these things even

3    though they're not in the law or regulations, that would be

4    my response.

5    **Q.**   Let's go a little further back in the same presentation

6    to Page 18.  You're talking about the closed system here.

7    And partway through the notes -- I'll let you get there.

8    **A.**   I'm sorry.

9    **Q.**   Take your time.

10   **A.**   Yes.

11   **Q.**   Okay.  So about halfway down there you are talking

12   about the closed system here.  And you say, "To that end --"

13   do you see that part?

14   **A.**   I do.

15   **Q.**   Okay.  "To that end, a wholesaler is responsible --"

16   you mean wholesale distributor there?

17   **A.**   I do.

18   **Q.**   "A wholesaler is responsible for knowing the customer

19   and monitoring the controlled substances and listed

20   chemicals shipped to that customer and rejecting and

21   reporting suspicious orders."

22   **A.**   I see that, yes.

23   **Q.**   Okay.  Do you agree that those are the three components

24   that a wholesale distributor is responsible for?

25   **A.**   I think that from our program at AmerisourceBergen

1    these are things that we do include in our program; knowing

2    the customer, monitoring the controlled substance and listed

3    chemicals shipped to the customer, and rejecting suspicious

4    orders.  Those are all things that we've spoken about here

5    that we do at AmerisourceBergen.

6    **Q.**   And you believe that through the closed system that a

7    distributor is responsible for handling those attributes;

8    correct?

9    **A.**   I believe as -- in the, in the closed system which

10   requires certain registrants to perform certain actions,

11   certainly reporting suspicious orders and having effective

12   controls in place is part of the wholesale distributor's

13   requirements.

14   **Q.**   And that includes knowing your customers and also

15   rejecting suspicious orders as well?

16          MR. RUBY:  Objection, Your Honor, vague as to

17   time.

18          THE COURT:  Overruled.

19          THE WITNESS:  Again, going back to the notion

20   knowing our customer, something that we, we do in the

21   current program, something we've done in the past program,

22   something that I think we should do.  So absolutely no

23   debate there.

24       I guess where we're getting hung up is in the

25   regulations somewhere which we don't find it there.  And

1   reporting suspicious orders, that clearly falls upon the

2   manufacturer and distributor within this closed system of

3   distribution.

4   BY MR. PIFKO:

5   **Q.**   I want to -- I know you talked for quite a few

6   hours, so you may not remember everything you said over

7   the course of today.  But one of the comments you made

8   before the lunch break was that the regulation is silent

9   on the issue of canceling orders.  Do you recall saying

10  something to that effect?

11  **A.**   Yes.  So specifically when it came to our discussion

12  about suspicious order reporting, once the order is reported

13  as suspicious, my statement was that the, the regulation is

14  silent on whether or not that suspicious order may be

15  shipped by the practice -- by practice at AmerisourceBergen.

16      Since I've been there and prior to my arrival at

17  AmerisourceBergen, we do not ship suspicious orders because

18  it's my understanding that that is the regulator expectation

19  going back and -- but, again, the, the regulation is silent

20  on the issue.

21  **Q.**   Do you recall -- I believe I asked you on Friday that

22  you were deposed in this matter by me in 2018?

23  **A.**   Yes.

24  **Q.**   I believe on August 4th.  Does that sound right?

25  **A.**   Sounds right.

1    Q.    Okay.   I wanted to try to clarify your statement that

2    you made today with the statement that you made then.

3         Do you recall saying that in terms of suspicious

4    orders, your understanding of the law and regulation

5    requires us to reject them, cancel them, and report them to

6    the DEA?

7              MS. MCCLURE:   Your Honor, objection.   I don't

8    believe this is proper impeachment for Mr. Pifko to

9    apparently be reading from a transcript without establishing

10   any inconsistency.   I believe he's just quoted Mr. May's

11   prior testimony back to him, but there's no support for

12   permitting it.

13             THE COURT:   Where's the inconsistency Mr. Pifko?

14             MR. PIFKO:   I wasn't trying to -- I was trying to

15   clarify.   I wasn't saying it was necessarily inconsistent.

16   If you'll allow me a little leeway, I can flush that out

17   further.

18             THE COURT:   Well, I'll sustain the objection.   I

19   don't think that's a right way to get at it.

20   BY MR. PIFKO:

21   Q.    Okay.   Where I'm going, Mr. May, is that even

22   though the -- you testified that the regulation is

23   silent on the issue of canceling, it can still be the

24   case that the, even though it might be -- the face of

25   the regulation might not say that, that the law can

```
 1   still require you to cancel and report orders if they're

 2   suspicious.  Agreed?

 3               MS. MCCLURE:  Your Honor, objection.  It calls for

 4   a legal conclusion and --

 5               THE COURT:  Sustained.

 6               MS. MCCLURE:  -- I think this is a back door to

 7   what --

 8               THE COURT:  Sustained.  I think it's a confusing

 9   question too.

10   BY MR. PIFKO:

11   Q.   Do you recall talking about the, the dashboards

12   earlier?

13   A.   Yes.

14   Q.   Okay.  And that was a program that you developed with

15   FTI Consulting?

16   A.   Well, it wasn't a program.  It was taking software and

17   then creating these easily accessible dashboards through the

18   software as opposed to programming.  I'm not very technical,

19   but that's how I would describe it.

20   Q.   And do you recall Ms. McClure showed you -- I mean, we

21   looked at a couple screen shots.  But one of them included a

22   screen shot of some customers from Cabell County from, for

23   Drug Emporium and McCloud?  Do you recall that?

24   A.   Yes, I do.

25   Q.   That was AM-WV-01040-E.  Do you want to put that in
```

1    front of you for a moment?

2        So what's the time period of transactions that's being

3    reflected in this dashboard?

4    **A.**    So on the bottom of the dashboard you can see that it's

5    indicated on the bottom right-hand corner data through 4-17,

6    2015.  Do you see that?

7    **Q.**    Okay.

8    **A.**    And, so, this dashboard contains both essentially three

9    months worth of data for this particular production.  And I

10   guess there could be different data points within that that

11   extends beyond that three months.  I guess it depends on

12   which we're looking at because I do see, for example, on --

13   under Product Family Distribution it says 12 months.  And,

14   so, that's 12 months worth of data.  But most of the other

15   data fields that you see are, are this three-month time

16   period.  It's a little confusing.

17           MS. MCCLURE:  Your Honor, this is one of the

18   dashboards.  I just want to make sure that this dashboard is

19   not being displayed to the overflow room and if we could

20   take that down if it is.

21           THE COURT:  You're right.  Are we sure this is not

22   being displayed?

23           THE CLERK:  It's still on.

24           THE COURT:  It's still on in the display?

25           THE CLERK:  Nobody told me.  It's off now.

```
 1              THE COURT:  This one needs to be deleted, I mean,

 2    from -- not shown to the other room.

 3              MS. MCCLURE:  Thank you, Your Honor.  I was not

 4    aware that they were going to be offering the dashboard from

 5    today.

 6              THE COURT:  Okay.  Go ahead, Mr. Pifko.

 7    BY MR. PIFKO:

 8    Q.   Mr. May, have you ever used the OMP dashboard tool

 9    to study historical or ordering patterns that date prior

10    to 2015?

11    A.   These -- this particular set of tools we developed with

12    FTI were first being produced in 2015.  Prior to that time,

13    and we spoke about this earlier today, we were using a

14    series of spreadsheets which would have included that OMP

15    size report and then the different trending reports.

16    Q.   But these Tableau graphic tiles were not used prior to

17    2015; correct?

18    A.   That's correct.

19    Q.   And the data contained to make the analysis in here

20    doesn't go back further than 2015; is that correct?

21              MS. MCCLURE:  Objection, misstates the witness's

22    testimony.

23              THE COURT:  Well, I don't remember whether it does

24    or not.

25         Can you answer the question?
```

```
1              THE WITNESS:  I think that the majority of the

2    data in that dashboard was limited to three months prior to

3    production of the dashboard which I believe -- it's not up

4    now -- was April of 2015 if I have that correct.

5         But there was one section of the dashboard that

6    reflected historical data that looked like it went back that

7    was more limited in time.

8         So what's happening there is FTI has the production of

9    the dashboard in 2015 but was able to go back and grab

10   transactional data that they could have populated that with

11   just from that previous 12 months.  Certainly it doesn't

12   look like it extended beyond that.

13   BY MR. PIFKO:

14   Q.   Okay.  So it didn't extend -- the data in the

15   dashboard doesn't extend beyond 2014 at the earliest?

16   A.   That's what it bears, yes, correct.

17   Q.   I want you to look back at 898 again, specifically on

18   Page -- using the P-898 number, Page 8.

19   A.   Yes.

20   Q.   About halfway down the page there, you have some notes

21   here.  And, again, you were speaking to diversion

22   investigators at this presentation?

23   A.   Correct.

24   Q.   You say, "If our common goal is to detect, identify,

25   and prevent diversion, I think that a much more effective
```

1    way of doing that is not by identifying a specific order in

2    time by a customer but by analyzing and reviewing the

3    ordering behavior of that customer over a period of time."

4         Do you see that?

5    **A.**    I do.

6    **Q.**    Do you agree with that statement?

7    **A.**    I agree that my assessment of the efficacy of

8    individual order reporting, it's in the regulation.  I

9    believe it serves a purpose.  And I believe that it has a

10   value to it.

11        But in my view, having administered the program, I also

12   believe that it's very helpful to look at historical data in

13   terms of the customer's purchasing of, of controlled and

14   non-controlled substances.  I think there's a value to that.

15   **Q.**    With respect to Drug Emporium and McCloud, the

16   pharmacies that were shown in that prior exhibit, did you at

17   any time undertake any effort to look back at the historical

18   ordering patterns of whose customers?

19   **A.**    So in, in reviewing our customers and some of the data

20   associated with those customers that were in Cabell County,

21   I've reviewed that data.  We had the list of all those

22   customers up there.  It's quite a bit of data over quite a

23   bit of time.  I believe the Drug Emporium was a customer of

24   AB for some 20 odd years.  So I did look at the, the data as

25   part of my review process.

1    **Q.**   Okay.  You looked at going back as far as they were a

2    customer?

3    **A.**   No, I don't have that data that far back.  I looked, I

4    looked at the data that was available to me and, again, not

5    trying to go back further than 2006.

6    **Q.**   Okay.  I want to hand you a document, P-43225.

7         May I approach, Your Honor?

8              THE COURT:  Yes.

9              THE WITNESS:  Thank you.

10             MS. MCCLURE:  Your Honor, I have an objection

11   about this document.  I believe that this may be a document

12   from Mr. McCann who was the expert who testified during the

13   early part of last week.

14        It contains, it looks like, dosage units, summaries for

15   AmerisourceBergen and for McKesson and for Cardinal.  So I

16   would object to the extent that this McCann document is now

17   being used with Mr. May who's --

18             THE COURT:  Well, where are you going --

19             MS. MCCLURE:  -- never seen -- he's never seen

20   this document before and I object to Mr. McCann documents

21   being used with this witness.

22             MR. PIFKO:  This is one of the exhibits that was

23   admitted through Dr. McCann's testimony.  And Mr. May

24   testified that he did familiarize himself with customer data

25   from the customers in Cabell County.  I just wanted to ask

```
 1    him a couple questions about some of the numbers in here.
 2              THE COURT:  Was it admitted through Dr. McCann's
 3    testimony?
 4              MR. PIFKO:  My understanding is that it was.
 5              MR. HESTER:  Well, Your Honor, we understood that
 6    there was only a conditional admission and that the Court
 7    still has to recall on the 1006 issue which is still
 8    pending.
 9              THE COURT:  Well, --
10              MS. MCCLURE:  Your Honor, I agree with that.  I
11    believe that there's not been confirmation that the
12    defendants' 1006 objections have been ruled on.  So I think
13    that these -- to the extent that anything was admitted, I
14    believe it was conditional.  So I don't think it has been
15    admitted yet.  And, regardless, nevertheless, even if it had
16    been admitted, I would object to it being presented to
17    Mr. May.
18              MR. PIFKO:  Your Honor, part of my understanding
19    of the conditional admission of the document was that we
20    could ask witnesses about it.
21              THE COURT:  Well, I'm going to let you use it.  Go
22    ahead.
23              MR. PIFKO:  Thank you, Your Honor.
24    BY MR. PIFKO:
25    Q.   Mr. May, I'm only going to ask you about
```

1    information in the first four pages that concern

2    AmerisourceBergen.  So you don't have to worry about the

3    other parts of it.

4         You see here there's -- the first chart is oxycodone

5    dosage units and it's got data going from 2006 to 2014 for

6    the first three pages.  Do you see that?

7    **A.**   I see that, yes.

8    **Q.**   Okay.  And as you go on the columns, the columns are

9    various customers.  Do you see that?

10   **A.**   I do.

11   **Q.**   It says here that over the time period covered here,

12   2006 to 2014, AmerisourceBergen distributed 1,946,980

13   dosage units of hydrocodone to McCloud.  Is that consistent

14   with what your understanding is from reviewing the data?

15             MR. HESTER:  Objection, lack of foundation, Your

16   Honor.

17             MS. MCCLURE:  Same objection, Your Honor.  I also

18   object to the point that we, I believe, established that

19   Mr. McCann had not included returns in his analysis.

20        So his analysis was by definition going to not include

21   certain, certain -- returns of certain dosage units that

22   have been returned to AmerisourceBergen.  And I believe that

23   that problem infects this document.

24             MR. PIFKO:  Your Honor, my recollection of that

25   testimony was -- I mean, I think Dr. McCann disagreed with

1    defendants' assertion.  But, in any event, that was only

2    15,000 dosage units.  I'm asking about a number that's

3    almost two million here.

4              MS. MCCLURE:  So, Your Honor, we made the point as

5    an example with one shipment for one customer.  That does

6    not mean that the issue was limited to that one example.

7         So I do believe that Mr. McCann did testify that he did

8    not include returns in his analysis and summary.  So that

9    problem could affect the entire chart.

10             THE COURT:  Well, this is -- even though the

11   plaintiff called this witness, this is in the nature of

12   cross-examination.  I'm going to overrule the objection and

13   let you ask him a couple questions here, but don't belabor

14   the point.

15             MR. PIFKO:  Thank you, Your Honor.

16   BY MR. PIFKO:

17   **Q.**   Again, Mr. May, based on your familiarity with

18   reviewing the data, is it consistent with your

19   understanding that AmerisourceBergen shipped

20   approximately 1,946,980 dosage units of oxycodone to

21   McCloud?

22   **A.**   So when I reviewed the data, I was relying upon the

23   data that's available to me through SAP and our own, our own

24   programs and systems.

25        I guess to the extent that I did review data, I, I

```
 1    certainly didn't prepare to the level where I can say I
 2    reviewed X pharmacy and I know during the period of 2006 to
 3    2014 they distributed X amount of dosage units.  I couldn't
 4    do that in any manner for any of the pharmacies that I
 5    reviewed in preparation for here today.
 6    BY MR. PIFKO:
 7    Q.   How about for Drug Emporium?  It's got 1,458,500.
 8              MS. MCCLURE:  Your Honor, at this point, Mr. May
 9    has said, "I cannot do that for any of the pharmacies."
10         Mr. Pifko is testifying by highlighting the document
11    and reading into the record numbers that Mr. May is saying,
12    "I can't do that."
13              THE COURT:  Yeah, I'm going to sustain the
14    objection.  He couldn't answer your last question and this
15    is in the nature of the same type of question.  So I'll
16    sustain the objection.
17    BY MR. PIFKO:
18    Q.   When we were looking at Exhibit 898, you talked
19    about looking at customer's ordering patterns.  Do you
20    recall that?
21    A.   Yes.
22    Q.   And then at some point in your testimony earlier today
23    I believe you talked about the totality of the circumstances
24    test.  Do you recall that?
25    A.   Yes.
```

1    **Q.**   And talking about suspicious orders and documenting it

2    in the customer file.  Do you recall that?

3    **A.**   I do.

4    **Q.**   I want to understand for purposes of the record, the

5    customer file, that's in those databases that we talked

6    about on Friday, right, that was currently Archer and it

7    used to be Lawtrac and I think there was a third one?  Is

8    that correct?

9    **A.**   You're correct.  It's currently Archer which was

10   preceded by Thomson Reuters.  And we referred to that as

11   Matter Management which was preceded by Lawtrac.

12   **Q.**   Okay.  And those files contained your information about

13   the customer including due diligence information?

14   **A.**   That's correct.  Just one point on the suspicious order

15   report being included in the Archer file.  That is a recent

16   development where we set up this automated download from our

17   EIP to Archer.  That did not exist prior.

18       That doesn't mean that we would not include information

19   about suspicious orders maybe in a commentary, but just

20   wanted to clarify that that was a recent development.

21           MR. PIFKO:  Can I get Plaintiffs' Exhibit 17140?

22       Permission to approach?

23           THE COURT:  Yes.

24           THE WITNESS:  Thank you.

25   BY MR. PIFKO:

1    **Q.**   Earlier in your testimony Ms. McClure showed you

2    part of this document which was Defendants' Exhibit

3    AM-VW-00121 [sic].  Take a minute to review Plaintiff's

4    Exhibit 17140 and let me know when you're ready.

5        (Pause)

6    **A.**   Yes, sir.

7    **Q.**   Are you familiar with the discussion that is being

8    reflected in Exhibit 17140?

9    **A.**   Yes.

10   **Q.**   And you agree this is the -- contains additional

11   responses from the Exhibit AM-WV-00121?

12   **A.**   Was that the exhibit from Ms. McClure earlier?

13   **Q.**   Yes.

14   **A.**   It looks like this is -- it's an extension of that

15   original email because at the beginning of this email chain,

16   I see the original request from DEA, so I would say "yes."

17   **Q.**   Can you tell me what's being reflected in Exhibit

18   17140?

19   **A.**   It's -- all of this is relative to our response to a

20   DEA request for information that was generated based upon

21   their cyclical inspection of our Ohio facility.

22   **Q.**   And that's your name at the top as the recipient of

23   this email from Eric Cherveny; correct?

24   **A.**   Yes.

25            MR. PIFKO:  Plaintiffs move for 17140 into the

1    record.

2              THE COURT:  Any objection?

3              MS. MCCLURE:  No, Your Honor.

4              THE COURT:  It's admitted.

5    BY MR. PIFKO:

6    Q.   Do you know who Jesse Freese is?  Am I saying the

7    name right?

8    A.   Just only that he's the Diversion Investigator from DEA

9    Columbus that initiated the request back in September of

10   2015.

11   Q.   Okay.

12   A.   I don't know him beyond the name that's written on the

13   email.

14   Q.   It's got his title here on Page 4 of the exhibit.  Do

15   you see that?

16   A.   I do see "Diversion Investigator."

17   Q.   Do you know what a diversion investigator is?

18   A.   Yes.

19   Q.   Can you tell the Court what a diversion investigator

20   is?

21   A.   Well, it's -- the coding for it is in the Federal

22   Government in 1810 versus an 1811 which is Special Agent.

23   And it's the, it's the title of the position for those folks

24   that work within Diversion Control.

25   Q.   And those are the people dealing with the diversion

1    regulations at DEA?

2    **A.**    They do deal with them, yes.

3    **Q.**    And, so, here this diversion investigator is conducting

4    an audit of AmerisourceBergen's Columbus facility or also

5    known as Lockbourne; is that correct?

6    **A.**    Yes.

7    **Q.**    And, to your knowledge, that's the distribution center

8    that serves customers in Cabell County and Huntington;

9    correct?

10   **A.**    It does, yes.

11   **Q.**    And, so, the diversion investigator here is asking for

12   copies of the due diligence files for several customers.  Do

13   you see that?

14   **A.**    I do, yes.

15   **Q.**    And includes Continuum Care Pharmacy, McCloud, and Drug

16   Emporium; correct?

17   **A.**    Yes.

18   **Q.**    Do you have an understanding as to why DEA was asking

19   for due diligence files for those customers?

20   **A.**    DEA will frequently ask during -- more so as of late --

21   frequently ask for due diligence files associated with

22   certain customers being serviced at the distribution center.

23   That's generally a part of their inspection process.

24   **Q.**    There's some discussion then between Eric Cherveny and

25   others and then he forwards the front page to you.  Who's

1   Eric Cherveny?

2   **A.**   Eric Cherveny was a former Director of Diversion

3   Control and he replaced Ed Hazewski who I think I explained

4   in prior testimony had retired from AmerisourceBergen.

5   **Q.**   So the discussion here is about the various people in

6   the department looking for some of the files that were

7   requested; agreed?

8   **A.**   Yes.

9   **Q.**   If you turn to the first page, Mr. Cherveny provides

10   you an update a few days after the request.  We see bullet

11   points on the various pharmacies that were included in the

12   request.  Agreed?

13   **A.**   Yes.

14   **Q.**   And, so, for McCloud it says, "Lawtrac matter is

15   empty."  Do you see that?

16   **A.**   I do see that.

17   **Q.**   It says "Requesting hard file from Iron Mountain - file

18   not found."  Do you see that?

19   **A.**   I do.

20   **Q.**   For Drug Emporium it says, "Lawtrac matter is empty."

21   Do you see that?

22   **A.**   I do.  I'm a little confused on McCloud because it

23   said, "590 in file is from 2010."  So I'm not sure what

24   they're referring to when they say it's from 2010 when above

25   it says it's empty.  So the context of that I'm a little

1    confused on but, sorry.

2    **Q.**   It also says -- this, this email is written in 2015.

3    So it says "ordering updated one."  Even if there is one in

4    2010, that would be five years old at that point?

5    **A.**   Yes.

6    **Q.**   Going down to Drug Emporium, then, so it says, "Lawtrac

7    matter is empty," there.  Agree?

8    **A.**   Yes.

9    **Q.**   I think I asked you about this on Friday, but I just

10   want to clarify for the record.  When you started your

11   position, it was new; correct?

12   **A.**   I'm sorry, sir?

13   **Q.**   When you started your position, it was a new position?

14   **A.**   It was a new position, yes.

15   **Q.**   And who was performing some of the responsibilities

16   that you now perform before you took over the position, or

17   when you started this position?

18            MS. MCCLURE:  Your Honor, I believe that this was

19   asked and answered last Friday but --

20            THE COURT:  I agree.  Sustained.

21            MR. PIFKO:  I just want to check -- we were trying

22   to print something during the break.  I want to check on

23   that.  And aside from that, I don't have any further

24   questions.

25            THE COURT:  All right.  You may do so.

```
 1        (Pause)
 2              MR. PIFKO:  I don't have any further questions.
 3              THE COURT:  All right.
 4        Do you have anything else, Ms. McClure?
 5              MS. MCCLURE:  Yes, Your Honor, very briefly.
 6                        RECROSS EXAMINATION
 7   BY MS. MCCLURE:
 8   Q.   Mr. May, on this P-17140 --
 9   A.   Yes.
10   Q.   -- for Number 1, Pharmacy Associates, can you read what
11   the bullet says there?
12   A.   "Lawtrac matter contains all required docs."
13   Q.   For Number 6 can you read the bullet, the first bullet
14   under Continuum Care Pharmacy?
15   A.   "Old PharMerica customer."
16   Q.   And then what's the parentheses?
17   A.   "Chain."
18   Q.   What does "chain" mean?
19   A.   Chain -- we consider a chain pharmacy to be any
20   pharmacy numbering ten or more locations with common
21   ownership.
22   Q.   Do you have an understanding as to whether DEA ever
23   advised AmerisourceBergen that chains were exempt from due
24   diligence?
25   A.   My understanding was that when it came to the
```

1    questionnaire that was agreed upon in 2007 that that

2    questionnaire was specifically for independent pharmacies is

3    my understanding.

4    **Q.**   Okay.  Can you just go to Number 7, McCloud?

5    **A.**   Yes.

6    **Q.**   You've noted in the fourth bullet it says, "590 in file

7    is from 2010."  Do you understand that to mean that the

8    McCloud file had a 590 in it?

9    **A.**   That's my understanding.

10   **Q.**   And the note above that is, "Requested all microfiche

11   documentation."  What does that mean?

12   **A.**   I believe Sheri France was in -- assigned to customer

13   maintenance.  And -- but beyond that, I don't know what that

14   means.

15   **Q.**   Okay.

16   **A.**   Sorry.

17   **Q.**   The last bullet there, "Reference is made to a 590

18   completion in Lawtrac matter."  What does that indicate to

19   you?

20   **A.**   So you see a number there beginning with RA.  That

21   stands for Regulatory Affairs which indicates that a, a

22   matter, or a file was open for the customer.  And,

23   otherwise, that number would not have been generated.

24        And, so, the reference to a 590 completion would then

25   make sense in light of the fact that a matter was created.

1    **Q.**   Okay.  Number 8, Walgreens.  The first bullet, "Will

2    pull WAG chain spreadsheet."  What does that mean, a chain

3    spreadsheet?

4    **A.**   So getting back to common ownership, how we handle

5    chains as opposed to giving -- or asking the pharmacy for

6    the completion of an independent questionnaire in order to

7    obviously avoid redundancy around questions concerning

8    ownership, we create a spreadsheet.

9        And that spreadsheet contains, I would say, about

10   80 percent of the information that we glean from the

11   individual pharmacy questionnaire except for those redundant

12   questions.  And that's how we manage the due diligence

13   documentation for our chain customers.

14   **Q.**   Okay.  So is it fair to say that for this chain

15   customer, Walgreens, we had essentially the bulk of the

16   information that would have been in a 590, but it was just

17   in a spreadsheet instead of a questionnaire?

18   **A.**   That's correct.  It would contain all of the

19   information we required for our chain in the spreadsheet.

20   **Q.**   Number 9, Drug Emporium.  The second bullet says,

21   "Requesting hard file from Iron Mountain."  What does that

22   mean?

23   **A.**   There was a period in time where AmerisourceBergen was

24   saving hard copy documents.  And eventually, like most

25   businesses, we went to digital formatting and recording.

```
 1          And between that time, or during that process, there
 2     were documents that were stored at Iron Mountain.  And this
 3     is our request relative to Drug Emporium to see if they had
 4     any, any hard copy documents available to us.
 5     Q.   Okay.  And, Mr. May, have you seen any, any information
 6     or do you recall DEA coming back to you at any point for
 7     this list of pharmacy due diligence files and saying these
 8     due diligence files are inadequate or this is not in
 9     compliance with the regulation?
10               MR. PIFKO:  Objection, hearsay.
11               THE COURT:  Pardon me?
12               MR. PIFKO:  I said objection hearsay to the extent
13     what DEA might have said to him.
14               MS. MCCLURE:  Your Honor, --
15               THE COURT:  Overruled.
16               THE WITNESS:  I, I don't recall getting any
17     additional update from DEA on this request.  And to the
18     extent that we still say that we're waiting for certain
19     things, I just don't have a recollection.  I have no
20     recollection of being contacted further on this matter
21     beyond what is listed here.
22     BY MS. MCCLURE:
23     Q.   Okay.  And this is September of 2015.
24     A.   Uh-huh.
25     Q.   Do you recall looking at the Drug Emporium and McCloud
```

1    family dashboards from earlier, those Tableau files?

2    **A.**    Yes.

3    **Q.**    Do you recall that that information was through April

4    of 2015?

5    **A.**    Correct.

6    **Q.**    And, so, at this point in September of 2015, is it fair

7    to say that those dashboards are available for both order

8    review and on-going customer due diligence to your Diversion

9    Control Team?

10   **A.**    I think that was -- I believe that was part of my

11   testimony on Friday where we talked about what defines due

12   diligence.

13        And, and from my perspective what defines due diligence

14   is not only these sorts of documents, but also the day in

15   and day out ordering by the customer, the Order Monitoring

16   Program, and those continuous due diligence efforts around

17   those analytical reports which I would argue carry the most

18   value because it shows the transactional history of the

19   customer.

20            MS. MCCLURE:  Your Honor, one moment.

21        (Pause)

22            MS. MCCLURE:  Thank you, Mr. May.  I have no

23   further questions.

24            THE WITNESS:  Thank you.

25            THE COURT:  Do you have anything else, Mr. Pifko?

```
 1              MR. PIFKO:  No, Your Honor.

 2              THE COURT:  May Mr. May be excused?

 3         Hearing no objection to that, I'm going to let you go,

 4    Mr. May.  Thanks for your time and being here to help us out

 5    and you're free to go.

 6              THE WITNESS:  Thank you, sir.

 7              THE COURT:  You can call your next witness.

 8              MR. FARRELL:  Plaintiffs call Steve Mays.

 9              THE COURT:  Mr. Mays, just come up here and the

10    clerk will give you the oath, sir.

11              THE CLERK:  Please state your name.

12              THE WITNESS:  Stephen Mays.

13              THE CLERK:  Thank you.  Please raise your right

14    hand.

15    STEPHEN MAYS, PLAINTIFFS' WITNESS, SWORN

16              THE CLERK:  Thank you.  Please take a seat.

17              MR. FARRELL:  A piece of housekeeping, Judge.  May

18    I approach the bench very quickly?

19              THE COURT:  Yes.

20                        DIRECT EXAMINATION

21    BY MR. FARRELL:

22    Q.   Please state your name.

23    A.   Stephen Mays.

24    Q.   And which of the parties here are you identified with?

25    A.   AmerisourceBergen.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1   **Q.**   What is your current title and role?

2   **A.**   Vice President of Regulatory Affairs.

3   **Q.**   How long have you been serving in that capacity?

4   **A.**   About five years I think.

5   **Q.**   What was your title prior to that?

6   **A.**   Senior Director of Corporate Security Regulatory

7   Affairs.

8   **Q.**   Is that the position that Mr. May now holds?

9   **A.**   No.  He's Vice President of Diversion Control.

10  **Q.**   So could you take a moment and explain what your title

11  and responsibilities were prior to 2014 and what your role

12  and responsibilities were after 2014 when Mr. May arrived?

13  **A.**   Okay.  So prior to -- I don't know how far back you

14  want me to go.

15  **Q.**   I'm just trying to get an understanding of the division

16  of responsibilities with respect to you when Mr. May

17  arrived.

18  **A.**   So when Mr. May arrived, I was the Senior Director of

19  Regulatory Affairs and I oversaw all regulatory compliance

20  for the company for drug distribution.

21  **Q.**   Did that include Diversion Control?

22  **A.**   That included Diversion Control for -- from 2007 to

23  about 2010, something like that, yes.

24  **Q.**   And then who was in charge of Diversion Control from

25  2010 on?

1    **A.**    I believe Ed Hazewski ran the program until David came.

2    **Q.**    And then was there any overlap?  Did Mr. May take over

3    Mr. Hazewski's responsibilities?

4    **A.**    Not that I know of, no.  No overlap?

5    **Q.**    I'm sorry.  So Mr. Hazewski was in charge of Diversion

6    Control from 2010 until when?

7    **A.**    I think until David came in about 2012, 2013, something

8    like that.

9    **Q.**    A couple of housekeeping measures.  It's my

10   understanding that on behalf of AmerisourceBergen you were

11   the individual that was present during the August 10, 2005,

12   meeting with the DEA.  Do you recall that?

13   **A.**    Yes, sir, I do.

14   **Q.**    And do you recall that materials were presented to you

15   by the DEA?

16   **A.**    Yes, sir.

17   **Q.**    Did you then take those materials and relay them on to

18   those within Diversion Control?

19   **A.**    That's correct.

20          MR. FARRELL:  Judge, I'm going to reference 8813,

21   P-8813.  May I approach?

22   BY MR. FARRELL:

23   **Q.**    Sir, I'll represent to you that these are materials

24   that came from your custodial file produced by

25   AmerisourceBergen that have already been discussed and

1    referenced.  So I'm not going to go through them in

2    great detail.  But I'd ask you to take a look at this

3    document and tell me if you can identify it.

4    **A.**    Yes, sir.  These are all the materials that were

5    presented to me in a binder at the meeting.

6              MR. FARRELL:  Judge, I'd ask for P-8813 to be

7    admitted.

8              THE COURT:  Any objection?

9              MS. MCCLURE:  No, Your Honor.

10             MR. HESTER:  Your Honor, it has a bit of hearsay

11   in it, so we object on hearsay grounds to the introduction

12   of the document insofar as it's being introduced for the

13   truth.

14             THE COURT:  Does it come in for the truth,

15   Mr. Farrell?

16             MR. FARRELL:  It comes in for truth of what was

17   communicated to Mr. Mays during the meeting.  Whether or

18   not -- whether or not what was communicated was true I'll

19   leave for the finder of fact.

20             THE COURT:  So you're saying it comes in for the

21   limited purpose of showing his state of mind and, thereby,

22   AmerisourceBergen's state of mind at the time and not for

23   the truth of the matter asserted.

24             MR. FARRELL:  Yes, Your Honor.

25             MS. WICHT:  It was the same objection, Your Honor.

```
 1    You've taken care of it.  Thank you.
 2              MS. MCCLURE:  I'll join in that too.
 3              THE COURT:  Well, I'll admit it for that limited
 4    purpose.
 5    BY MR. FARRELL:
 6    Q.   Mr. Mays, do you recall discussing with the DEA the
 7    United States Supreme Court cases that are referenced in
 8    these materials?
 9    A.   Yes.  They didn't go into a lot of detail with them.
10    They just asked me to read those as I had time permitted.
11    Q.   And did you, in fact, eventually read them?
12    A.   Yeah, I believe I read through all of them.
13    Q.   Now, do you recall whether or not you had any follow-up
14    telephone calls with the DEA following this -- regarding
15    this presentation?
16    A.   Yes, we did.
17    Q.   And do you recall the extent of those conversations?
18    A.   Well, I went to the meeting with DEA by myself at their
19    headquarters.  And when I got back, I think about a month
20    later we had a follow-up call with them with our legal
21    counsel and my boss, Chris Zimmerman.
22    Q.   And at that point in time, were you able to ask
23    questions or clarify any issues that you had with the DEA?
24    A.   I don't recall all the details of the follow-up call,
25    but it was basically the same conversation that I had with
```

 1    DEA at their headquarters.

 2    **Q.**   At that point in time, did you inform the DEA that

 3    AmerisourceBergen was in the process of updating its

 4    policies and procedures regarding drug control diversion?

 5    **A.**   I believe that's correct.

 6            MR. FARRELL:  One more clean-up, Your Honor.

 7    BY MR. FARRELL:

 8    **Q.**   Do you recall receiving a correspondence from the

 9    DEA dated December 27th, 2007, the dear -- second "Dear

10    Registrant" letter from Joe Rannazzisi?

11    **A.**   I believe we were in possession of that, yes.

12    **Q.**   I'm asking you if you personally recall receiving a

13    copy of the letter.

14    **A.**   I don't personally remember receiving a copy, no.

15    **Q.**   Okay.

16            MR. FARRELL:  Judge, I'm going to -- may I

17    approach to refresh the witness's recollection?

18            THE COURT:  Yes.

19            MR. FARRELL:  And for reference purposes, I'm

20    referencing P-2726.

21            MS. MCCLURE:  I don't see that this was the

22    document disclosed for use with Mr. May.  So I'm not -- is

23    it -- was it disclosed?  I'm trying to determine if we

24    lodged objections to the document last night, but I just

25    don't see it on the list.

1              MR. FARRELL:  I'm using it to refresh the

2    witness's recollection.  I'm not asking for its admission.

3              MS. MCCLURE:  Okay.

4              THE COURT:  Refresh his recollection.  You haven't

5    shown that it needs to be refreshed yet, have you?

6              MR. FARRELL:  I believe I asked him if he

7    specifically reviewed the document and he said he didn't

8    recall.  I have an email with him receiving the document.  I

9    just wanted --

10             THE COURT:  Show it to him -- okay.  Go ahead.

11             THE WITNESS:  Yes, sir, I recognize the document.

12   BY MR. FARRELL:

13   **Q.**   Sir, having reviewed this document, can you confirm

14   that you, in fact, did receive the December 27th, 2007,

15   correspondence and reviewed it?

16   **A.**   Yes, sir.

17   **Q.**   All right.  I'd like to bring up P-32.  I think it's

18   the composite exhibit with underscore three.  It's going to

19   be the actual letter.  We're going to go --

20             MR. FARRELL:  Judge, may I approach?

21   BY MR. FARRELL:

22   **Q.**   We're going to go to the very bottom of the

23   document, the very last sentence.  Do you see the last

24   sentence here?  Can you read it from there, sir?

25   **A.**   Yes, sir.

1    Q.   I think it's on your screen.  It may be on your screen

2    as well.

3    A.   I can see it there.

4    Q.   It says, "The determination of whether an order is

5    suspicious depends not only on the ordering patterns of the

6    particular customer, but also on the patterns of the

7    registrant's customer base and the patterns throughout the

8    relevant segment of the regulated industry."

9         Did I read that accurately?

10   A.   Yes, sir.

11   Q.   Now, Mr. Mays, if I may, you were in charge of

12   Diversion Control for a period of time.  And were you aware

13   of the policies and procedures at AmerisourceBergen

14   regarding the monitoring of patterns of orders of

15   prescription opioids?

16             MR. HESTER:  Object to form, Your Honor.  It's

17   compound.

18             THE WITNESS:  Can I answer?

19             THE COURT:  I'll sustain it.  Break it up and ask

20   him, Mr. Farrell.  I'll sustain the objection.

21             MR. FARRELL:  Yes, Your Honor.

22   BY MR. FARRELL:

23   Q.   While -- during your tenure at AmerisourceBergen,

24   were you familiar with the policies and procedures for

25   Diversion Control?

1    **A.**   Yes, sir.

2    **Q.**   Okay.  Were you responsible in part for the development

3    of some of those policies and procedures?

4    **A.**   Yes, sir.

5    **Q.**   What time frame of policies and procedures are you

6    familiar with?

7    **A.**   From probably the -- from the time of our merger in

8    2001 until -- for the Diversion Control side through

9    probably about the time David May came on board.

10   **Q.**   So that would be from approximately 2001 through 2014?

11   **A.**   That's correct.

12   **Q.**   Are you familiar with the current iteration of

13   AmerisourceBergen's Order Monitoring Program that's been in

14   force since 2014?

15   **A.**   No.

16   **Q.**   At all?

17   **A.**   Not -- just vaguely familiar with it, right.

18   **Q.**   So I'm going to ask you that in general between the

19   year 2006 and 2014 was AmerisourceBergen monitoring ordering

20   patterns of particular customers?

21   **A.**   Yes, we were.

22   **Q.**   Did you study the patterns of your customer base for

23   suspicious orders?

24   **A.**   I would say "yes."

25   **Q.**   And did you compare the ordering patterns of your

1    customers to the customer base?

2    **A.**    That's how our system was designed.

3    **Q.**    Okay.  So what I would like to do now, Mr. Mays, is try

4    to understand AmerisourceBergen's Order Monitoring Program

5    during your tenure with Diversion Control.

6             MR. FARRELL:  Judge, may I approach the screen?

7             THE COURT:  Yes.

8             MR. FARRELL:  Judge, with your permission, I would

9    like to lead somewhat just to provide some basic elements.

10            THE COURT:  Well, I think the Rule 611 permits to

11   you do that, so go ahead.

12   BY MR. FARRELL:

13   **Q.**    Mr. Mays, it's my understanding through this

14   litigation that AmerisourceBergen basically had three

15   iterations of its Order Monitoring Program.  Does that

16   sound about right?

17   **A.**    I think that sounds right.  We had one that was created

18   in, I believe, '98 and approved by DEA.  And then we had an

19   enhanced program in 2007; and then another enhancement

20   around the time that David came on, about 2013, 2012.

21   **Q.**    I'm going to do my best to kind of capture that on this

22   writing.

23   **A.**    Okay.

24   **Q.**    The first one started in sometime around '98 and it

25   went up to approximately 2007; is that correct?

1    **A.**    That's correct.

2    **Q.**    And that program we basically -- AmerisourceBergen

3    called OMP, Oscar, Mike, Papa, Order Monitoring Program;

4    correct?

5    **A.**    In 2007, yes.

6    **Q.**    And then that program was revamped again when Mr. May

7    arrived.  And in beginning in 2014 and it took some time to

8    implement it.  But from 2014 on, there was a new program,

9    Correct?

10   **A.**    It was enhanced, yes.

11   **Q.**    Enhanced?

12   **A.**    Yes.

13   **Q.**    So I'm going to try to divide this up into three

14   different time frames and ask some general questions.  Okay?

15           MS. MCCLURE:  Your Honor, just a minor note that

16   the 2007 to 2014 time period, which is seven years in that

17   depiction -- and I don't know whether it's a reference on

18   the artist, but probably better than I could draw.  But I

19   just note that the '98 to '07 time period is 10 years long.

20       So these, these lines are not representative of the

21   extent of period of time.  Is that making sense?  In other

22   words, '07 to '14 is seven years.  '98 to '07 is nine years.

23   But it looks like a lot longer in the middle.

24           THE COURT:  Well, --

25           MS. MCCLURE:  Again, to the extent that it's a

 1    reflection on the artist --

 2            THE COURT:  I'm alert to the problem, so I'm going

 3    to overrule the objection.

 4            MR. FARRELL:  Judge, to foreshadow, I left a gap

 5    in the middle because that's where I'm going to be spending

 6    most of my time writing.  I did not intend to distort the

 7    timeline.

 8            THE COURT:  Oh, okay.  Well, I think if there's no

 9    serious chicanery going on here, Mr. Farrell.

10            MR. FARRELL:  I'll reserve comment.

11    BY MR. FARRELL:

12    Q.   Okay.  So let's start with I think the easy one.

13    And that is the '98 to 2007 time frame.  You're familiar

14    with AmerisourceBergen's monitoring of suspicious orders

15    during that time frame; correct?

16    A.   Yes.

17    Q.   And we have the policies and procedures that were --

18    that we had proffered through a prior witness.  I'm going to

19    do my best to fairly summarize them and see if you agree

20    with my interpretation.  Okay?

21    A.   Okay.

22    Q.   During this time frame, what AmerisourceBergen was

23    doing was that it was looking at a 30-day trail of similar

24    customers to create an average.  Does that sound about

25    right?

1    **A.**    Yeah.  I just want to make one point.  So the merger of

2    the two companies was in 2001.  So it was really -- Bergen

3    Brunswig was the creator of that '98 program that was

4    adopted by the combined company in 2001.  But that sounds,

5    that sounds right.

6    **Q.**   Now, --

7           THE COURT:  Who did Bergen Brunswig merge with,

8    Mr. May?

9           THE WITNESS:  Amerisource Corporation.

10          THE COURT:  Okay.

11   BY MR. FARRELL:

12   **Q.**   Now, once the average was taken, then there was a

13   multiplier of three times added; is that correct?

14          MS. MCCLURE:  Your Honor, I'll just note that to

15   the extent Mr. Farrell is examining Mr. Mays on policies,

16   procedures over a period of time that are reflected in

17   documents and essentially now summarizing his own

18   understanding of them and giving what seems to be sort of a

19   pop quiz to Mr. Mays on what is reflected in documents that

20   Mr. Mays could review, I would object to that.

21          THE COURT:  Well, I'm -- this is in the nature of

22   cross-examination of an adverse witness and I think I'll

23   allow him to do it.  Go ahead.

24   BY MR. FARRELL:

25   **Q.**   So, Mr. Mays, in general if we break this down, we

 1   are looking at the past month of customers from a

 2   distribution center; correct?

 3   **A.**   I'm not that intimately familiar with the formula in

 4   that program, but I think that sounds about right.

 5   **Q.**   Yeah.  And, so, I don't want you to guess.  I do

 6   have -- we have admitted it.  Would you like to see a copy

 7   of the actual policy?

 8   **A.**   Sure, I would.

 9   **Q.**   I believe it's P-82.  And I'll direct you to the top of

10   Page 2.  I'll see if I can pull it up on the screen by doing

11   the magic buttons and then get back to where we're at so the

12   Court can see it as well.

13        So the top of Page 2 reads, "The purpose of this report

14   is to list total customer purchases for the current month

15   that exceed pre-determined multiples of the average monthly

16   purchases of the division customers broken down into certain

17   families of drugs."  Does that sound --

18             MS. MCCLURE:  Your Honor, this document is dated

19   2-1-99 at the top of it.  I believe that this is a legacy

20   Bergen Brunswig document.  I note that Mr. May [sic] is a

21   legacy Amerisource employee.  Amerisource and Bergen did not

22   merge until 2001.

23        So my question is why are we using a legacy Bergen

24   document -- Mr. Zimmerman was a legacy Bergen employee, Mr.

25   Mays is a legacy Amerisource employee -- with an Amerisource

```
 1    witness?

 2            THE COURT:  Can you answer that, Mr. Farrell?

 3            MR. FARRELL:  I can.  I believe I very carefully

 4    and technically laid the foundation that this witness was at

 5    Bergen Brunswig and that this policy was taken from the

 6    Bergen Brunswig company into the merger and that it fairly

 7    and accurately depicts the program that he was the Vice

 8    President of.

 9            THE COURT:  Well, that's right, isn't it,

10    Ms. McClure?

11            MS. MCCLURE:  Yes, I understand that, Your Honor.

12    However, Mr. Mays also testified that because -- he

13    testified five minutes ago that because this program was

14    created under Bergen Brunswig, he wasn't intimately familiar

15    with the formulas in the calculation.

16            THE WITNESS:  I've never seen this document

17    before.  I'm sorry.

18            THE COURT:  Well, counsel, where are you going

19    with this?  He hasn't seen it before.

20            MR. FARRELL:  Well, for him not seeing the

21    document before, he testified almost exactly -- I was really

22    just trying to show him the document to confirm that he

23    wasn't guessing, that this was what they were doing.

24            THE COURT:  Well, I'll overrule the objection and

25    let you go ahead.
```

```
 1              MR. FARRELL:  We'll take this document down.
 2    BY MR. FARRELL:
 3    Q.   So getting back to our diagram, in general, from --
 4    as of 2006 immediately before the change,
 5    AmerisourceBergen was looking at the past month of all
 6    similarly situated customers at a distribution center
 7    and calculating an average; correct?
 8    A.   I believe that is correct, yes.
 9    Q.   And then you were multiplying that average number by
10    three to create an ingredient limit; correct?
11    A.   That was what would flag an order to appear on the
12    report.
13    Q.   And you were doing this by dosage unit; correct?
14    A.   I can't -- I don't know.
15    Q.   Okay.  So if a customer ordered more than three times
16    the average amount of customers from that distribution
17    center, AmerisourceBergen was shipping and then reporting it
18    to the DEA in an after-the-fact monthly report.  Agreed?
19    A.   I think there -- it was reported daily if I'm not
20    mistaken.  And there were some options for DEA.
21    Q.   So let's break that down into pieces.
22    A.   Okay.
23    Q.   If a customer ordered more than three times the average
24    of other customers, AmerisourceBergen at this point in time
25    was shipping the order and then reporting it to the DEA.
```

1    Agreed?

2    **A.**    Agreed.

3    **Q.**    So the ship and report.  Now, beginning in 2005, you

4    met with the DEA and had a couple of telephone calls with

5    them.  Agreed?

6    **A.**    Met with DEA and we had one follow-up call that I know

7    of.

8    **Q.**    Okay.  And then in April of 2007 you're aware there was

9    an Immediate Suspension Order served on a distribution

10   center?  Yes?

11   **A.**    Yes, that's correct.

12   **Q.**    And you had personal knowledge when that happened?

13   **A.**    Yes, that's correct.

14   **Q.**    And then by June 22nd of 2007, AmerisourceBergen

15   entered into a settlement agreement with the DEA.  And as a

16   component of that settlement agreement, AmerisourceBergen

17   began developing a new Order Monitoring Program.  Correct?

18   **A.**    An enhanced program, that's correct.

19   **Q.**    And that's how we get to the OMP program which was

20   rolled out and executed by AmerisourceBergen on June 30th,

21   2007.  Agreed?

22   **A.**    Agreed.

23   **Q.**    Very good.  Now, I want to leap frog forward a little

24   bit and look at 2014.  We just spent a considerable amount

25   of time with Mr. May.  Did you have the privilege to hear

1    his testimony?

2    **A.**    No, sir.

3    **Q.**    Are you familiar with what they have been calling the

4    dashboard?

5    **A.**    Somewhat, yes.

6    **Q.**    Okay.  Was the dashboard available at AmerisourceBergen

7    prior to 2014?

8    **A.**    Not the dashboard that David would be referring to.

9    **Q.**    Okay.  Are you aware of anybody at AmerisourceBergen

10   attempting to upload the historical pre-2014 data into the

11   new tool being used by AmerisourceBergen?

12   **A.**    I don't know.

13   **Q.**    Okay.  Between 2007 and 2014 was AmerisourceBergen, in

14   addition to looking at the data it had, was

15   AmerisourceBergen relying upon public data sources?

16   **A.**    I'm not sure I follow you.

17              MS. MCCLURE:  Objection, date.

18              THE COURT:  Yes.  Can you put a date on it, Mr.

19   Farrell?  You already did.  Overruled.

20              MS. MCCLURE:  The objection, Your Honor, was to

21   the public data sources.  I don't know what that means.

22              THE COURT:  Oh, okay.  I see.  Can you identify

23   the time period that you're, you're questioning him about

24   public data?

25              MR. FARRELL:  Yes, Your Honor.

1          THE COURT:  Okay.  Go ahead.

2   BY MR. FARRELL:

3   **Q.**   So I'll represent to you that Mr. May testified

4   earlier that at AmerisourceBergen now that he tries to

5   read and obtain all information he can from the

6   available public sources.  And I wanted to ask -- I'm

7   going to ask you whether or not these sources were

8   available to you or whether or not the Diversion Control

9   Program relied on those sources between 2007 and 2014.

10  Okay?

11  **A.**   Okay.

12  **Q.**   The first is the reports from the Office of the

13  Inspector General, the OIG.  Are you aware as to whether or

14  not ABC's Diversion Control Program was relying upon

15  historical reports from the Office of the Inspector General

16  when executing its duties to monitor suspicious orders?

17          MS. MCCLURE:  Objection, Your Honor.  There's been

18  no foundation laid that there is any relevant OIG report in

19  the time period we're talking about which I believe was just

20  defined as '07 to '14.  I note that Mr. Farrell is holding

21  in his hand a 2019 OIG report.

22      So I, I don't understand what -- how you're examining a

23  witness on whether he did or the company did rely on certain

24  kinds of reports or documents that have not been established

25  to exist in the first place.

```
 1              THE COURT:  Yeah.  Can you clear that up,
 2   Mr. Farrell?
 3              MR. FARRELL:  Yes.  I was trying to.
 4              THE COURT:  I'll sustain the objection and you may
 5   fix it if you can.
 6              MR. FARRELL:  I, I'll be more direct with the, the
 7   foundation.  Let me see if I can get the document camera up.
 8   BY MR. FARRELL:
 9   Q.   Sir, I'm going to -- this is a document that's been
10   admitted into evidence and I'm going to flip to a page
11   in the back.  I'm going to flip to Page 53 and I'm going
12   to put it up on the screen.
13              MS. MCCLURE:  Your Honor, I request information
14   about what document this is that we are referencing.  I
15   don't -- he's saying it's been admitted.  I don't have
16   information about what the document is called, what the date
17   of the document is, the exhibit number.  So I object to this
18   page being brought up on the screen without this preliminary
19   information.
20              THE COURT:  Identify it for the record, Mr.
21   Farrell.
22              MR. FARRELL:  This is DEF-WV-01597 which is the
23   Office of the Inspector General, United States Department of
24   Justice, Review of the Drug Enforcement Administration's
25   Regulatory and Enforcement Efforts to Control Diversion of
```

1    Opioids.  It's dated September, 2019, and it was admitted

2    through the witness David May.

3            MS. MCCLURE:  September -- I'm sorry.  Can I

4    request information about -- did he say September, 2019, or

5    September 19th?

6        I believe this document is dated September, 2019, and

7    the question to the witness is whether, quote, public data

8    sources like OIG reports were considered by

9    AmerisourceBergen in the 2007 to 2014 time period.

10       So I suggest that the proffer of the document from 2019

11   does not get at my original objection, Your Honor.

12           THE COURT:  Okay.  I'll sustain the objection and

13   you can clear it up if you can.

14           MS. MCCLURE:  And, Your Honor, I would request

15   that the document not be displayed in light of the fact that

16   I think that this page from this document is being displayed

17   on the ELMO.

18           THE COURT:  Well, it's not up there now.  Yeah, it

19   is up there.

20           MS. MCCLURE:  Until and unless a foundation is

21   laid, that is.

22           THE COURT:  Right, okay.

23           MR. FARRELL:  Judge, may I respond briefly?

24           THE COURT:  Yeah.  It's on the ELMO here but it's

25   not over here.  Yeah.  Can you take it down until we have it

1    in a position where you can show it to him?

2            MR. FARRELL:  Yes.  If I may, I don't need to lay

3    a foundation for the document.  It's already been admitted

4    in the record by the defendants, and it is a document that

5    David May, serving in his present capacity as Diversion

6    Control, said he relied upon when performing his functions.

7        What I want to ask him is at the back end of this

8    document are a list of other OIG and other GOA [sic] reports

9    that are identified in an appendix.  And I simply want to

10   ask this witness if, like David May currently, he too was

11   reviewing the OIG and GOA [sic] --

12           THE COURT:  Okay, you can ask him.  I'll overrule

13   the objection.  Go ahead.

14   BY MR. FARRELL:

15   Q.   So, Mr. Mays, all of the fun has been taken out of

16   it.  There are documents -- there are other versions,

17   prior reports from OIG, GOA [sic] that are on Page 53

18   and 54.  There's a total of eight of them.  So without

19   belaboring the point, at AmerisourceBergen Diversion

20   Control were you looking at or relying upon reports from

21   the OIG or GAO during the time frame prior to 2014 when

22   performing your duties for AmerisourceBergen?

23   A.   No.

24   Q.   So is it safe to say that during the same time frame

25   between 2007 and 2014 that AmerisourceBergen was not relying

```
 1    upon prescribing rates from the CDC?

 2    A.    Not that I know of.

 3    Q.    How about CDC overdose rates?

 4          MS. MCCLURE:  Your Honor, to the extent that

 5    there's not been a foundation laid as to whether these

 6    documents exist or not that could have been relied on in the

 7    first place, I object to this line of questioning absent a

 8    foundation that such documents were something that would

 9    have been reviewed.

10          THE COURT:  Overruled.  I'm going to let him

11    pursue it.

12       Go ahead, Mr. Farrell.

13    BY MR. FARRELL:

14    Q.    At ABC Diversion Control between 2007 and 2014 were

15    you studying CDC overdose rates?

16    A.    I don't recall that we did.

17          MS. MCCLURE:  Your Honor, I also object.  The

18    question that was just asked was through 2014 and I note

19    that Mr. May [sic] had indicated previously that it was

20    either 2010 or 2012 when he -- I mean Mr. Mays testified

21    that it was 2007 or 2012 when he was no longer running the

22    Diversion Control program and Mr. Hazewski had taken over.

23    2010.  I'm sorry.

24          MR. FARRELL:  I believe he testified that he was

25    familiar with the policies and procedures up and through
```

1    until Mr. May arrived at AmerisourceBergen.

2         THE COURT:  I think he did and I'll overrule the

3    objection.  Go ahead.

4    BY MR. FARRELL:

5    **Q.**   So, again, Mr. Mays, I'm only going to be talking

6    about between 2007 and 2014 for these questions.  This

7    time frame, was AmerisourceBergen called OMP?

8    **A.**   Was called OMP?

9    **Q.**   Yes, sir.

10   **A.**   I think until around 2014, something like that.  But,

11   again, I wasn't in control of it for the last few years of

12   that period.

13   **Q.**   So I guess what I'm trying to do is I'm trying to find

14   some vernacular for us to be able to reference time frames.

15   And I know that the titles of the documents change.

16        When I reference OMP, I'm going to be referencing the

17   policies and procedures between 2007 up until the enhanced

18   in 2014.  Okay?

19        MS. MCCLURE:  Your Honor, I'm sorry to have to

20   object, but we've been through the fact that the Diversion

21   Control Program at AmerisourceBergen Mr. Mays testified

22   about has many components.

23        One component of that program, whether it's in 2007,

24   2014, or today, is the OMP, which is the Order Monitoring

25   Program.  I think it's confusing to now start to refer to a

1    period of time as the Order Monitoring Program.  The Order

2    Monitoring Program is not a period of time.

3         So I object to the extent that this labeling is

4    confusing and contradicts the evidence about how the program

5    worked.  The OMP is a method to identify orders and then

6    determine if they're suspicious or not.  It is not a period

7    of time.

8              THE COURT:  Do you want to respond to that?

9              MR. FARRELL:  I'm trying to elicit testimony from

10   a witness with knowledge.

11             THE COURT:  Why are you using the OMP to identify

12   the time period?

13             MR. FARRELL:  I made a mistake.  I was simply

14   trying to find some combination of words that would limit us

15   to a time frame to prevent the continued objections.

16             MS. MCCLURE:  May we call it the '07 to '14 time

17   period?

18             THE COURT:  I'll sustain the objection.  I think

19   this is confusing and --

20             MR. FARRELL:  Judge, I'm trying to unconfuse the

21   confusing, so let me start over.

22             THE COURT:  All right.

23   BY MR. FARRELL:

24   Q.   Mr. Mays, at AmerisourceBergen you've had a

25   Diversion Control Program at all times; correct?

1   **A.**   At all times during what period?  I'm not sure I

2   understand what you're asking me here.

3   **Q.**   During the entire time that you have been employed at

4   AmerisourceBergen, has there been a Diversion Control

5   Program?

6   **A.**   Well, I've been employed since 1974.  So it wasn't

7   called Diversion Control Program, you know, early on in my

8   career.  It was just Suspicious Order Monitoring.

9        And, so, Diversion Control was adopted probably in 2007

10  when we actually called it a Diversion Control Program.

11  **Q.**   So what did you call your monitoring and suspicious

12  orders prior to 2007?

13  **A.**   It was just -- it was just called Suspicious Order

14  Monitoring.  That was our responsibility.

15  **Q.**   So we'll call this SOM.  Okay?

16  **A.**   Okay.

17  **Q.**   Is that fair?  And then in 2007 did AmerisourceBergen

18  then implement a Diversion Control Program?

19  **A.**   Yes.  That was part of our settlement with DEA.

20  **Q.**   And what was the name of that?

21  **A.**   It was Diversion Control Program.

22  **Q.**   Perfect.  So we'll call this Diversion Control Program.

23  Then in 2014 it was enhanced; correct?

24  **A.**   Yes.

25  **Q.**   So we'll call that the enhanced Diversion Control

1    Program.  Is that fair?

2    **A.**    I think so, yes.

3    **Q.**    Very good.  So between 2007 up to 2014 did the

4    Diversion Control Program rely upon CDC overdose rates?

5    **A.**    Not that I recall.

6    **Q.**    Did it rely upon populations?

7    **A.**    Not for the period that I can recall.

8    **Q.**    Did it look at the individual customer's historic

9    ordering records?

10   **A.**    Yes, I believe so.

11   **Q.**    How far back did it look at the historic ordering

12   records?

13   **A.**    In the Order Monitoring Program?

14   **Q.**    In the Diversion Control Program between 2007 and 2014

15   you testified that AmerisourceBergen would look at the

16   ordering patterns of a customer; correct?

17   **A.**    We -- when we designed the system in 2007, we, we

18   looked back and got data on customer purchases.  I think it

19   was a year to build, develop that database for the, for

20   setting the threshold.

21   **Q.**    And you testified that you compared one customer to

22   another customer; correct?

23   **A.**    Well, we compared customers in peer groups and size.

24   **Q.**    So you would look at customers that had the similar

25   size and make comparisons when performing your duties?

1    **A.**    We would make comparisons of our customers -- if it's a

2    retail pharmacy and it was a small, medium, or large, it

3    would be compared to other retail pharmacies in that same

4    peer group.

5    **Q.**    Very good.  Now, did you also look at the overall

6    volume of controlled substances that was sold into the

7    county when performing your functions for the Diversion

8    Control Program between 2007 and 2014?

9    **A.**    Well, again, I'm not so sure about the last two years,

10   but I know when we designed the program in 2007, we weren't

11   looking at counties for geography.

12   **Q.**    Now, okay.  Were you, were you able to identify

13   patterns from a broad range of customers for each

14   distribution center?

15   **A.**    Can you repeat that?  I'm not really sure what you're

16   looking for.

17   **Q.**    When we just talked a second about the 2007 letter, I

18   thought that you had agreed with me that you studied the

19   patterns of a particular customer; correct?

20   **A.**    It was the purchases of the customer.

21   **Q.**    The pattern of purchases from a particular customer;

22   correct?

23   **A.**    I believe so, yes.

24   **Q.**    And you testified that you also studied the patterns

25   and purchases from the customer base?

1    **A.**   Yes.

2    **Q.**   And then you testified that you also compared the

3    patterns of purchases of a customer to your customer base?

4              MS. MCCLURE:  Your Honor, objection, asked and

5    answered.

6              THE COURT:  It has been asked and answered.

7    You're trying to --

8              MR. FARRELL:  Help him, yes, Your Honor.

9              THE COURT:  Overruled.  Go ahead.

10   BY MR. FARRELL:

11   **Q.**   So you also compared the patterns of purchases from

12   your customer to the patterns and purchases to your

13   customer base.  Agreed?

14   **A.**   In their -- the customers and their peer group.

15   **Q.**   Yeah, within their peer group, yes.

16   **A.**   Right.

17   **Q.**   Now, we heard testimony here this morning that nowadays

18   they're looking at the volume of controlled substances being

19   sold overall in the county.  Is it your testimony that prior

20   to 2014 AmerisourceBergen was not using that factor?

21   **A.**   Again, I can't speak for the last three or four years

22   of that time period, but in the beginning when we enhanced

23   the program in 2007, we were not looking at counties.

24   **Q.**   What about in geographic areas?  Were you considering

25   whether or not there were too many pharmacies within a

1    geographic area?

2            MS. MCCLURE:  Vague, objection, Your Honor, too

3    many pharmacies.

4            THE COURT:  Overruled.  Go ahead.

5            THE WITNESS:  I'm not sure I follow you.  It

6    was -- you know, we basically designed the system to, to

7    compare pharmacies against their peer group without relation

8    to how many pharmacies are in a certain area or what the

9    geographical area was.

10   BY MR. FARRELL:

11   Q.   What about the overall volume of controlled

12   substances sold to a state?  Would you consider that as

13   a factor when performing your functions of Diversion

14   Control?

15   A.   We considered that in performing different areas of

16   Diversion Control, any information that we knew about

17   patterns of abuse in certain states.  There were certain

18   drugs that were abused in certain areas of the country.  But

19   we didn't have that factored into the Order Monitoring

20   Program at that time if that makes sense.

21   Q.   Yes, sir.  So what about whether a particular community

22   was a healthcare hub?  Did you consider that as a factor

23   when exercising and executing your duties of the Diversion

24   Control Program?

25   A.   That would be taken into consideration during due

1    diligence investigations of customers and new as far as

2    what's in the area.

3    Q.   What about from an algorithm standpoint?  Did it --

4    would it make a difference or would you adjust thresholds

5    based upon whether or not a community was serving as a

6    healthcare hub?

7    A.   The thresholds could be adjusted if there was a

8    legitimate reason for the volume.

9    Q.   My question is, aside from due diligence --

10   A.   Uh-huh.

11   Q.   -- was there an automatic policy or procedure to

12   elevate thresholds depending upon whether or not that

13   community was a healthcare hub?

14   A.   Not that I recall, no.

15   Q.   What about quotas?  Were you relying upon quotas from

16   the DEA when you were executing your duties under the

17   Diversion Control Program?

18   A.   No.

19   Q.   Was the Diversion Control Program between 2007 and

20   leading up to 2014, was it a national program?

21   A.   What do you mean by national?  I'm sorry.

22   Q.   How many distribution centers approximately were there

23   in the United States owned by AmerisourceBergen that were

24   selling controlled substances between 2007 leading up to

25   2014?

1    **A.**    Well, that number fluctuated somewhat.  But all of

2    those AmerisourceBergen Drug Company DCs were on the

3    program.

4    **Q.**    And were they all running the same Diversion Control

5    Program?

6    **A.**    Well, we only had one Diversion Control Program, the

7    corporate program.

8    **Q.**    And was it being executed at each of the distribution

9    centers?

10   **A.**    The policies were being followed, that's correct.

11   **Q.**    At the Diversion Control Program were you watching or

12   monitoring administrative actions taken by the DEA against

13   other wholesale distributors?

14   **A.**    Yes.  We would monitor anything that was going on in

15   the industry and we monitored any news on customers.  So our

16   investigators would have like Google alerts and they would

17   put certain keywords in there where we could find out if,

18   you know, a customer had action taken against them for some

19   reason or if something happened with the regulatory

20   agencies.  We were kept abreast of all that.

21   **Q.**    And do you recall ever seeing an alert when the DEA

22   took administrative action against Cardinal Health sometime

23   in 2012?

24   **A.**    I don't know if we got a Google alert, but we heard

25   about it, you know, either in the news or some other way.

1   **Q.**   Were you personally aware of the administrative action

2   taken by the DEA against Cardinal Health?

3   **A.**   Generally I was aware, yes.

4   **Q.**   Are you familiar with the administrative action and the

5   temporary restraining order that was filed by Cardinal

6   Health in that case?

7   **A.**   Not very much, no.

8   **Q.**   How about this?

9   **A.**   What was it about?

10  **Q.**   Were you aware of an amicus brief being filed in that

11  case on behalf of your trade organization?

12          MS. MCCLURE:  Your Honor, I object to the extent

13  that we're now going into Noerr-Pennington covered issues

14  with amicus brief filings.  This harkens back to last week.

15          THE COURT:  Is this a Noerr-Pennington problem?

16          MR. FARRELL:  It is not, Your Honor, in my humble

17  opinion for what it's worth.  This is no different if the

18  HDMA group goes and meets with the DEA versus if the HDMA

19  files a legal pleading in an HDMA only proceeding.

20          THE COURT:  Okay, overruled.  You can go ahead.

21  BY MR. FARRELL:

22  **Q.**   Were you aware of an amicus brief being filed?

23  **A.**   Yeah, I seem to remember that.

24  **Q.**   In fact, did you review the amicus brief before it was

25  filed?

1    **A.**   I think I remember reading it, but I can't say

2    100 percent that I remember it.

3    **Q.**   Are you aware of the holding by the District Court of

4    Columbia following that proceeding?

5    **A.**   No, I don't remember that.

6    **Q.**   So do you know the outcome of that proceeding?

7    **A.**   No, I don't remember exactly what the outcome was.

8    **Q.**   Do you know whether or not there was a published

9    opinion in the case?

10   **A.**   Published opinion by who?

11   **Q.**   By the Federal District Court of Columbia in

12   Washington, D.C.

13   **A.**   I'm not familiar with it, no.

14   **Q.**   Okay.  I'm going to do my best to make sense of this.

15   But your Diversion Control Program had a work flow or a

16   decision tree on how it was supposed to operate.  Agreed?

17          MS. MCCLURE:  Your Honor, objection to the

18   commentary for the record, "I'll do my best to make sense of

19   this."  I don't know what that's referring to, but I would

20   just request that Mr. Farrell keep his commentary to a

21   minimum.

22          MR. FARRELL:  I did not mean anything pejorative.

23          THE COURT:  Well, if he -- you can answer if you

24   know, Mr. Mays.

25          THE WITNESS:  I'm not sure he got to the question.

```
 1                    MR. FARRELL:  I'm not sure I did either.

 2                    THE COURT:  Ask the question again, Mr. Farrell.

 3       BY MR. FARRELL:

 4       Q.   I'm going to make a diagram and I'm going to ask

 5       you questions about whether or not it's an accurate

 6       reflection of your Diversion Control Program between

 7       2007 through 2014.

 8                    MS. MCCLURE:  I'll just continue to object to the

 9       extent that Mr. Mays has previously testified several times

10       now that starting in 2010 he no longer had responsibility

11       for the Diversion Control Program.

12                    MR. FARRELL:  And I'll repeat that this witness --

13       I very carefully laid the foundation that he was aware.

14                    THE COURT:  Yeah, overruled.  Go ahead, Mr.

15       Farrell.

16       BY MR. FARRELL:

17       Q.   So we start up here with -- I'm going to use a

18       different color.  We start up here with a customer, a

19       pharmacy.  Rx places an order with AmerisourceBergen.

20       That's the first step that happens in this transaction.

21       Agreed?

22       A.   Agreed.

23       Q.   Now, the program that was adopted in 2007 starts with a

24       computer that reviews the order.  Agreed?

25       A.   Agreed.
```

1   **Q.**   And that computer makes a determination as to whether

2   or not that order is above or below a threshold.  Is that

3   right?

4   **A.**   We're talking about 2007; correct?

5   **Q.**   Yes, sir.

6   **A.**   Yes.

7   **Q.**   I'm going to put the word "threshold" here and we're

8   going to come back to it in a minute.

9        So once the order goes through the computer, if it's

10  below the threshold, then the next step is that

11  AmerisourceBergen ships the order.  Agreed?

12  **A.**   No.

13  **Q.**   Sorry.  What I did miss?

14  **A.**   No.  You said -- oh, if it's below the threshold?  Yes,

15  they would release and ship.  Yes.  I'm sorry.

16  **Q.**   Then what happens is that you report the transaction to

17  ARCOS, the national database; is that right?

18  **A.**   That's not entirely correct.  It depends on what the

19  drug is.  So only if it's a Schedule II or III narcotic and

20  we report those monthly to ARCOS.  So that's not a daily

21  occurrence.

22  **Q.**   Okay.  There was testimony earlier that all controlled

23  substances were reported within two days.  Was that the

24  practice at AmerisourceBergen between 2007 through 2014?

25  **A.**   Well, all controlled substances were reported to DEA,

1    but that's not -- ARCOS is different.

2    **Q.**   I see.  So with ARCOS what gets reported by

3    AmerisourceBergen during the 2007 through 2014 time frame?

4    **A.**   So it's the -- it's part of the settlement.  We agreed

5    to report all controlled substance sales --

6    **Q.**   But ARCOS --

7    **A.**   -- every 48 hours.

8    **Q.**   ARCOS is Schedule II narcotics; correct?

9    **A.**   And Schedule III narcotics.

10   **Q.**   And Schedule III.  And at this point in time, the

11   report was done to Ameri- -- from AmerisourceBergen to the

12   DEA on a monthly basis?

13   **A.**   For ARCOS.

14   **Q.**   Yes.

15   **A.**   Correct.

16   **Q.**   Now, if, in fact, the order goes to a computer and is

17   above the threshold, something else happens.  Agreed?

18   **A.**   Agreed.

19   **Q.**   If it's above the threshold, the order is held; is that

20   right?

21   **A.**   That's correct.

22   **Q.**   And the order is held until due diligence dispels

23   suspicion?

24   **A.**   It's, it's held at the distribution center level.

25   **Q.**   Right.  It does not get shipped, does it?

1    **A.**   It doesn't get shipped until and unless they have --

2    unless they agree that they have no suspicions and it's okay

3    to ship.  And they can release the order at the distribution

4    center level.

5    **Q.**   And we call that due diligence?

6    **A.**   Based on their knowledge of the customer.

7    **Q.**   And we call that due diligence?

8    **A.**   We call it due diligence when we conduct an

9    investigation or when it's a new customer, yes.

10   **Q.**   Right.

11   **A.**   Yes.

12   **Q.**   Now, once due diligence is performed, there's two

13   things that can happen.  One is that you dispel suspicion

14   and then you go ahead and ship.  Correct?

15   **A.**   That's at the DC level.  I just disagree with the

16   terminology.  It's not what we call due diligence.

17   **Q.**   Okay.  So help me understand.  There's, there's two

18   different components.  There's one at the distribution

19   center level and one at corporate level; correct?

20   **A.**   That's correct.

21   **Q.**   All right.  So when we hold it, the due -- what happens

22   if the distribution center releases it?

23   **A.**   They, they can release it if, if, if they -- based on

24   their knowledge of the customer.  If they're comfortable

25   releasing the orders, they can release it.  And if they're

1    not sure about it, then they can send those to corporate for

2    review.

3    **Q.**   And where does that -- does that get recorded?  Does it

4    get documented?

5    **A.**   Did you say reported or recorded?

6    **Q.**   Recorded.

7    **A.**   Yeah, the system tracks that.

8    **Q.**   All right.  So we're going to clean this up.  All

9    right.  So at the distribution level -- I'm having a devil

10   of a time here.  At the distribution level they can release

11   the, the order or they can send it up to you in corporate

12   level.  Correct?

13   **A.**   That's correct.

14   **Q.**   And, so, the key here is this; is that nothing happens

15   to that order until it's either cleared by the distribution

16   center or cleared by corporate?

17   **A.**   That's correct.

18   **Q.**   Before it gets cleared by either the distribution

19   center or by corporate at AmerisourceBergen, you're not only

20   holding this order, you're holding all other orders of the

21   similar drug class until a decision is made.  Agreed?

22   **A.**   That's correct.

23   **Q.**   And if the decision is made that there's no suspicion,

24   the order can be shipped.  Agreed?

25   **A.**   That's correct.

1    **Q.**   But if suspicion cannot be eliminated, you have a

2    responsibility to block the order and tell the DEA.  Agreed?

3    **A.**   We report it to the DEA and it's cancelled or rejected.

4    **Q.**   Right.  So now let's talk about this, this key point

5    right here for a second.  Let's talk about the computer

6    algorithm.  You'll agree with me that this entire process

7    does not get triggered unless your computer flags it.

8    Agreed?

9    **A.**   That's correct.

10   **Q.**   So the computer -- when the computer is flagging it,

11   the computer has an input that you call a threshold; right?

12   Is that correct?

13   **A.**   I'm not sure it's an input, but the thresholds are

14   loaded in there.

15   **Q.**   So somebody loads into a computer a threshold.  And

16   that's the -- explain for the Court in your words what is a

17   threshold?

18   **A.**   So a threshold is based on what we discussed earlier

19   where we take the history of the customers, separate the

20   customers by DEA business activity, whether it's retail

21   pharmacy, hospital, et cetera.

22        Then we determine the size of the customer.  And I'm

23   talking in 2007 terms when we designed the enhanced system.

24   And then, then split the customers into different groups by

25   size.

1    So you've got small retail, medium retail, large

2  retail, same way for hospitals and other, other business

3  activities.

4    And then that threshold gets determined based on their

5  average purchases for a month, and then the factor of three

6  is added to that.  And that's where you get the threshold

7  for each size for each customer for each -- and that's per

8  drug family.  There's probably 60 something drug families.

9  **Q.**   So are we talking about -- I'm sorry.  Did you say the

10  prior month?

11  **A.**   Yeah.  In the beginning it was -- I think it was --

12  well, the threshold wasn't determined by the prior month.

13  The thresholds were more or less static based on all that

14  history that was loaded in there.

15  **Q.**   The default threshold.

16  **A.**   But the customer's purchases would be what would

17  trigger that threshold if they exceeded.

18  **Q.**   I understand.  I guess my ultimate question at this

19  late hour is who determined what that threshold was

20  initially?

21  **A.**   Well, AmerisourceBergen did.

22  **Q.**   And how did you determine it?

23  **A.**   I just explained it to you.

24  **Q.**   So you took that customer's prior 30 days --

25  **A.**   So it's, it's based on three times their monthly

```
 1    average.

 2    Q.    And how many months do you use for the average?

 3    A.    Well, I guess it would vary from month to month.

 4    Q.    So let's use a fictional pharmacy --

 5    A.    Uh-huh.

 6    Q.    -- of Bob's pharmacy.  If Bob comes to you and says, "I

 7    want to be an ABC customer in 2007, I have a pharmacy in

 8    Huntington, Cabell County, West Virginia," what would

 9    AmerisourceBergen do to calculate the threshold that I could

10    order every month of hydrocodone and oxycodone?

11    A.    Well, if they were a new customer, they would be set at

12    the minimum threshold for that size because we don't have

13    their history.

14    Q.    And what would be those minimum thresholds?

15    A.    Well, it's going to vary per customer size and business

16    activity.

17              MR. FARRELL:  We'll do that as the very last

18    portion of today, Your Honor.

19    BY MR. FARRELL:

20    Q.    So this is a document that was shown earlier.

21              MS. MCCLURE:  Your Honor, I would request that

22    this document not be displayed to the overflow room.

23              THE COURT:  Okay.

24              MR. FARRELL:  My apologies.

25    BY MR. FARRELL:
```

1    **Q.**   This is a document that was shown earlier that is

2    for -- happens to be a pharmacy in Cabell County.  And

3    over here you see where it says "historical threshold"

4    on the right-hand side?

5    **A.**   I'm not familiar with -- I'm not familiar with this

6    document.

7    **Q.**   Okay.  That's fair.  Let me see if I can do it.  What

8    is the historical minimal thresholds for a pharmacy in

9    Huntington, Cabell County, West Virginia?  Do you recall

10   what the base line default threshold was?

11   **A.**   It wasn't based on county.

12   **Q.**   Okay.  It was based on customer type?

13   **A.**   Customer type and size.

14   **Q.**   And, so, what would be -- how would you determine

15   customer size?

16   **A.**   It would be you take all the -- once you divided the

17   customers into segments and retail pharmacies and then we --

18   the size is determined -- was determined in the beginning

19   based on their dollar purchase volume from ABC.

20   **Q.**   And it wasn't just controlled.  It was all purchases of

21   pharmaceuticals; correct?

22   **A.**   I believe it was all purchases of all prescription

23   drugs, yes, controlled and non-controlled.

24   **Q.**   I think I have the actual document.  Can you pull up --

25   it's been admitted already -- P-432?

1          Sir, I'll represent to you that this is a 2009 RVP

2     talking point that has been entered into the record.  Do you

3     recognize this document or this format of this document?

4     **A.**   No, sir, I do not.

5     **Q.**   So if we can blow it up, just the middle box, if

6     there's testimony in this case that the current defaults for

7     oxycodone and hydrocodone in 2009 were for small, medium,

8     and large pharmacies, is that consistent with your

9     understanding of how the program worked?

10    **A.**   I don't know in what context that's stated.  I don't

11    know why those thresholds are listed in that document.

12              MS. MCCLURE:  Your Honor, objection to the extent

13    this witness has said he's not seen this document before.

14              THE COURT:  Sustained.

15    BY MR. FARRELL:

16    **Q.**   Do you know what the thresholds for oxycodone were

17    for small retail pharmacies in AmerisourceBergen in

18    2009?

19    **A.**   No, I don't.  I don't remember what they were.

20    **Q.**   Where would I find where your Diversion Control Program

21    was setting the default thresholds between 2007 and 2014?

22    **A.**   Well, I believe they were recalculated every year if

23    I'll not mistaken, so they weren't just the same all the

24    time.

25    **Q.**   Who recalculated them?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1   **A.**   I think we -- I think our IT group would help us with

2   that and they run reports.  But I don't know exactly who was

3   responsible for reformulating that.

4   **Q.**   Where can I find in the record how your Diversion

5   Control Program was setting default thresholds?

6          MS. MCCLURE:  Your Honor, I object to asking this

7   witness what seems to amount to a discovery inquiry at a

8   trial in this case.

9       Mr. Mays is a witness.  He is not going to be able to

10  point Mr. Farrell to where he can find in the record.  Mr.

11  Farrell is an attorney.  He can either make a request in the

12  discovery period or he can find the documents in the record

13  himself.

14         THE COURT:  Yeah.  I sustain the objection and

15  mercifully it's 5:00, Mr. Farrell, so we'll go at it again

16  in the morning.

17         MR. FARRELL:  Yes, sir.

18         THE COURT:  And, Mr. Mays, I'm going to excuse you

19  until 9:00 in the morning.  We're going to ask you to come

20  back and we'll proceed from this point on.  Thank you, sir.

21         THE WITNESS:  Thank you, Your Honor.

22         THE COURT:  I'll see everybody at 9:00 in the

23  morning.

24         MR. FARRELL:  Judge, before we leave, I do want to

25  begin the triggering process.  We do intend to submit had

1    testimony of Mr. Gray and Mr. Kelley for the Court.  I

2    believe there's a mechanism where we say it on the record

3    and then there's a 24-hour period before you get to see the

4    end result.

5            MR. HESTER:  And, Your Honor, we, we filed a

6    motion on that to exclude that, those, that testimony and

7    more broadly to exclude the evidence relating to the had

8    petition activities.

9            THE COURT:  All right.  I'll see everybody at

10   9:00.

11       (Trial recessed at 5:02 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1          CERTIFICATION:

2                   I, Ayme A. Cochran, Official Court

3     Reporter, and I, Lisa A. Cook, Official Court Reporter,

4     certify that the foregoing is a correct transcript from

5     the record of proceedings in the matter of The City of

6     Huntington, et al., Plaintiffs vs. AmerisourceBergen

7     Drug Corporation, et al., Defendants, Civil Action No.

8     3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9     reported on May 17, 2021.

10

11          S\Ayme A. Cochran          s\Lisa A. Cook

12             Reporter                   Reporter

13          _

14

15          May 17, 2021

16             Date

17

18

19

20

21

22

23

24

25
```

**'**

**'07** [5] - 187:19, 187:22, 195:20, 201:16
**'08** [1] - 147:6
**'11** [1] - 147:7
**'12** [1] - 147:7
**'13** [1] - 147:7
**'14** [5] - 89:2, 147:7, 187:22, 195:20, 201:16
**'15** [2] - 133:22, 147:7
**'16** [1] - 147:7
**'18** [1] - 103:22
**'20** [1] - 93:4
**'21** [1] - 50:17
**'9** [1] - 147:6
**'98** [6] - 186:18, 186:24, 187:19, 187:22, 188:13, 189:3

**0**

**00907** [2] - 2:5, 2:17

**1**

**1** [4] - 96:5, 110:12, 130:14, 172:10
**1,458,500** [1] - 165:7
**1,946,980** [2] - 163:12, 164:20
**1.2%** [1] - 51:13
**10** [8] - 65:11, 66:14, 87:17, 88:1, 88:15, 88:20, 179:11, 187:19
**100** [1] - 210:2
**1001** [2] - 2:10, 4:6
**1006** [2] - 162:7, 162:12
**1022** [1] - 3:5
**11** [1] - 1:16
**11:55** [1] - 111:13
**12** [5] - 51:18, 75:23, 157:13, 157:14, 159:11
**12-month** [5] - 59:1, 59:3, 59:15, 87:2, 89:24
**12.38** [1] - 66:1
**126** [1] - 3:5
**1300** [1] - 6:15
**1301.7(1)(a** [1] - 151:6
**1308** [2] - 76:21, 76:23
**1311** [2] - 2:4, 2:16
**15,000** [1] - 164:2
**15910** [1] - 3:18

**1600** [1] - 3:17
**17** [4] - 1:19, 7:4, 223:9, 223:15
**17140** [5] - 166:21, 167:4, 167:8, 167:18, 167:25
**1717** [2] - 6:6, 6:13
**17th** [1] - 83:20
**18** [1] - 152:6
**1810** [1] - 168:22
**1811** [1] - 168:22
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1971** [1] - 132:17
**1974** [1] - 202:6
**1980s** [1] - 91:10
**19th** [1] - 197:5
**1st** [2] - 72:18, 73:2

**2**

**2** [6] - 88:12, 91:20, 114:13, 114:14, 190:10, 190:13
**2,400** [1] - 59:21
**2-1-99** [1] - 190:19
**20** [2] - 115:16, 160:24
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2001** [5] - 185:8, 185:10, 189:2, 189:4, 190:22
**2005** [2] - 179:11, 193:3
**2006** [13] - 120:7, 146:4, 146:14, 146:16, 146:22, 147:1, 147:3, 161:5, 163:5, 163:12, 165:2, 185:19, 192:4
**2007** [54] - 30:9, 31:20, 32:12, 45:12, 89:11, 94:13, 97:14, 119:18, 119:20, 119:24, 119:25, 120:7, 147:6, 173:1, 178:22, 182:9, 183:14, 186:19, 186:25, 187:5, 187:16, 188:13, 193:8, 193:14, 193:21, 194:13, 195:9, 197:9, 198:25, 199:14, 199:21, 200:6, 200:17, 200:23, 202:9, 202:12, 202:17, 203:3,

203:14, 203:17, 204:8, 204:10, 204:17, 205:23, 207:19, 207:24, 211:7, 211:23, 212:4, 212:24, 213:3, 216:23, 218:7, 220:21
**2009** [4] - 96:21, 220:1, 220:7, 220:18
**2009-2010** [2] - 96:23, 101:13
**2010** [12] - 96:21, 147:6, 170:23, 170:24, 171:4, 173:7, 178:23, 178:25, 179:6, 199:20, 199:23, 211:10
**2012** [5] - 179:7, 186:20, 199:20, 199:21, 208:23
**2013** [2] - 179:7, 186:20
**2014** [76] - 28:4, 28:9, 29:3, 29:6, 29:16, 37:19, 38:3, 38:8, 38:15, 39:4, 63:19, 68:18, 75:1, 75:11, 75:16, 78:3, 83:20, 86:5, 86:7, 94:4, 94:6, 95:21, 96:9, 96:12, 96:16, 96:20, 98:23, 99:17, 100:16, 101:8, 102:1, 104:20, 105:13, 107:12, 109:2, 112:17, 116:17, 117:24, 120:6, 159:15, 163:5, 163:12, 163:3, 178:11, 178:12, 185:10, 185:14, 185:19, 187:7, 187:8, 187:16, 193:24, 194:7, 194:13, 195:9, 197:9, 198:21, 198:25, 199:14, 199:18, 200:6, 200:10, 200:18, 200:24, 202:23, 203:3, 203:14, 204:8, 205:20, 207:20, 207:25, 211:7, 212:24, 213:3, 220:21
**2014-2015** [1] - 32:3
**2015** [29] - 46:3, 46:12,

63:21, 76:14, 76:16, 89:4, 89:7, 92:14, 92:15, 102:12, 103:12, 103:15, 109:18, 141:13, 141:14, 144:17, 145:21, 157:6, 158:10, 158:12, 158:17, 158:20, 159:4, 159:9, 168:10, 171:2, 175:23, 176:4, 176:6
**2016** [6] - 28:9, 28:24, 89:7, 92:16, 144:19, 147:8
**2017** [9] - 28:12, 72:18, 73:2, 92:25, 93:3, 129:12, 129:24, 132:6, 148:10
**2018** [18] - 44:13, 46:4, 50:12, 55:2, 92:10, 92:12, 103:9, 118:15, 118:16, 119:11, 122:5, 146:5, 146:14, 146:16, 146:23, 148:11, 148:15, 154:22
**2019** [5] - 195:21, 197:1, 197:4, 197:6, 197:10
**202** [2] - 2:4, 2:16
**2020** [7] - 41:16, 144:21, 144:23, 145:2, 145:9, 145:18, 145:22
**2021** [7] - 1:19, 7:4, 94:7, 96:9, 96:11, 223:9, 223:15
**209** [1] - 62:6
**21** [1] - 151:6
**21,296** [1] - 59:15
**22,000** [1] - 59:13
**22,400** [2] - 59:14, 59:20
**2216** [1] - 3:7
**22nd** [1] - 193:14
**24** [1] - 35:14
**24-hour** [1] - 222:3
**24th** [1] - 76:14
**25** [2] - 5:5, 142:3
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**25th** [1] - 50:12
**27** [3] - 63:12, 87:25, 88:20

**270** [2] - 88:1, 88:20
**2763** [1] - 111:2
**27th** [2] - 182:9, 183:14
**28** [3] - 3:15, 4:3, 4:9
**29464** [3] - 3:15, 4:4, 4:9
**2:00** [1] - 111:11

**3**

**3** [2] - 141:6, 141:18
**30** [3] - 90:8, 105:11, 217:24
**30-day** [2] - 53:2, 188:23
**30-milligram** [3] - 65:21, 66:17
**30-year** [1] - 22:1
**30th** [2] - 51:8, 193:20
**31** [1] - 129:12
**31%** [1] - 63:11
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**32502** [1] - 2:14
**3843** [1] - 5:14
**398** [1] - 101:20
**3:17-cv-01362** [2] - 1:5, 223:8
**3:17-cv-01665** [2] - 1:11, 223:8

**4**

**4** [2] - 149:22, 168:14
**4-17** [1] - 157:5
**4.13%** [1] - 62:5
**4.3%** [1] - 62:6
**4/30/18"** [1] - 51:7
**401** [2] - 2:10, 4:6
**405** [1] - 2:7
**41%** [1] - 63:10
**44** [1] - 142:14
**48** [1] - 213:7
**4th** [2] - 76:23, 154:24

**5**

**5** [5] - 87:21, 87:23, 149:21, 149:23
**5/25** [1] - 52:24
**5/31/18"** [1] - 58:20
**53** [2] - 196:11, 198:17
**54** [1] - 198:18
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**590** [7] - 117:14, 170:23, 173:6, 173:8, 173:17,

173:24, 174:16
**5:00** [1] - 221:15
**5:02** [1] - 222:11

## 6

**6** [1] - 172:13
**60** [1] - 217:8
**600** [1] - 2:13
**601** [1] - 121:23
**611** [1] - 186:10
**640** [1] - 93:21
**6th** [1] - 3:5

## 7

**7** [1] - 173:4
**70** [4] - 32:22, 62:8, 62:20
**70130** [1] - 3:8
**707** [1] - 4:18
**716** [1] - 3:12
**725** [2] - 4:13, 4:15
**734** [1] - 141:7
**792** [1] - 84:14

## 8

**8** [2] - 159:18, 174:1
**8.3%** [1] - 61:24
**80** [1] - 174:10
**801** [1] - 3:10
**803(8** [1] - 140:6
**803(8)** [1] - 137:10
**850** [1] - 5:12
**852-plus** [1] - 59:4
**858** [1] - 59:2
**8813** [1] - 179:20
**898** [3] - 149:20, 159:17, 165:18

## 9

**9** [3] - 112:24, 113:2, 174:20
**90** [2] - 52:15, 52:22
**90-day** [2] - 52:24, 69:17
**901** [1] - 4:18
**91436** [1] - 3:18
**93** [2] - 112:11, 114:8
**942-E** [1] - 70:10
**942E** [1] - 58:1
**993E** [2] - 56:5, 56:6
**9:00** [4] - 7:4, 221:19, 221:22, 222:10
**9th** [1] - 2:10

## A

**a)(2** [1] - 140:9
**a.m** [2] - 7:4, 111:13
**AB** [2] - 106:5, 160:24
**abatement** [1] - 46:7
**ABC** [8] - 80:20, 110:9, 110:16, 110:18, 110:20, 199:14, 218:7, 219:19
**ABC's** [1] - 195:14
**ABDC** [1] - 91:10
**ABDC's** [1] - 91:14
**ability** [9] - 34:1, 54:16, 56:17, 116:20, 118:1, 118:4, 119:2, 122:17, 125:10
**able** [12] - 42:14, 46:13, 56:13, 82:14, 121:16, 123:24, 139:1, 159:9, 181:22, 200:14, 204:12, 221:9
**abreast** [1] - 208:20
**absent** [1] - 199:7
**absolutely** [2] - 117:11, 153:22
**abuse** [3] - 74:16, 74:19, 206:17
**abused** [1] - 206:18
**accept** [1] - 133:1
**Access** [1] - 140:24
**access** [14] - 39:1, 45:23, 48:15, 49:23, 64:6, 116:19, 117:9, 117:22, 119:10, 122:19, 123:17, 123:19, 123:24
**accessible** [1] - 156:17
**accompanied** [1] - 78:18
**accompany** [1] - 136:23
**accompanying** [2] - 56:14
**according** [1] - 88:9
**account** [3] - 50:22, 51:1
**Accountability** [3] - 136:16, 140:3, 141:3
**accountability** [1] - 132:25
**accounts** [4] - 51:3, 77:12, 77:15, 77:16
**accuracy** [1] - 97:7
**accurate** [2] - 108:21, 211:5

**accurately** [4] - 99:12, 137:17, 184:9, 191:7
**ACKERMAN** [1] - 2:9
**acquired** [1] - 148:16
**Act** [1] - 118:14
**action** [11] - 57:15, 82:16, 82:21, 130:6, 133:11, 133:14, 208:18, 208:22, 209:1, 209:4
**Action** [4] - 1:4, 1:10, 223:7, 223:8
**actions** [2] - 26:2, 153:10, 208:12
**active** [2] - 59:9, 113:13
**activities** [3] - 107:5, 217:3, 222:8
**activity** [5] - 38:10, 86:17, 86:20, 216:20, 218:16
**actual** [3] - 183:19, 190:7, 219:24
**add** [10] - 34:11, 39:2, 40:14, 40:18, 54:21, 61:19, 69:6, 87:5, 121:18, 122:8
**add-on** [1] - 87:5
**added** [10] - 39:2, 44:4, 66:3, 118:20, 121:11, 122:11, 148:11, 148:15, 189:13, 217:6
**adding** [1] - 88:3
**addition** [3] - 63:24, 70:6, 194:14
**additional** [10] - 39:2, 39:25, 40:2, 142:5, 142:10, 142:18, 142:21, 144:22, 167:10, 175:17
**additionally** [3] - 73:7, 137:7, 137:11
**additions** [1] - 39:6
**address** [6] - 25:4, 41:18, 56:15, 57:19, 65:4, 73:17
**addressing** [2] - 93:1, 151:21
**adjudicating** [3] - 114:17, 115:6, 126:17
**adjudication** [1] - 63:25
**adjust** [2] - 88:8, 207:4
**adjusted** [1] - 207:7
**adjustments** [2] - 82:5, 92:24
**administered** [2] -

150:22, 160:11
**Administration's** [1] - 196:24
**administrative** [5] - 133:14, 208:12, 208:22, 209:1, 209:4
**admissibility** [1] - 144:3
**admissible** [5] - 131:19, 131:20, 131:22, 137:4
**admission** [26] - 55:13, 55:18, 70:10, 70:16, 73:6, 73:11, 77:19, 84:12, 93:19, 93:20, 97:1, 101:18, 103:25, 104:3, 104:10, 104:13, 110:25, 116:6, 121:21, 129:4, 138:22, 143:1, 143:2, 162:6, 162:19, 183:2
**admit** [7] - 56:8, 56:22, 80:11, 84:23, 97:22, 140:14, 181:3
**ADMITTED** [3] - 116:11, 132:2, 140:15
**admitted** [35] - 56:2, 56:20, 57:1, 57:22, 70:17, 70:18, 70:19, 71:3, 73:25, 77:23, 93:23, 99:14, 101:22, 104:14, 111:4, 116:10, 121:25, 131:23, 132:1, 140:14, 143:4, 143:6, 161:23, 162:2, 162:13, 162:15, 162:16, 168:4, 180:7, 190:6, 196:10, 196:15, 197:1, 198:3, 219:25
**admitting** [1] - 73:23
**adopted** [3] - 189:4, 202:9, 211:23
**advantageous** [1] - 34:4
**adverse** [2] - 26:2, 189:22
**advise** [1] - 113:6
**advised** [4] - 80:16, 81:24, 81:25, 172:23
**Affairs** [4] - 173:21, 178:2, 178:7, 178:19
**affect** [4] - 35:3, 122:19, 140:2, 164:9
**afoul** [1] - 133:21

**Africa** [1] - 24:10
**after-the-fact** [1] - 192:18
**afternoon** [4] - 112:2, 112:3, 149:12, 149:17
**agencies** [3] - 91:13, 138:17, 208:20
**agency** [12] - 22:7, 22:11, 23:1, 23:6, 23:11, 23:14, 30:19, 31:7, 132:22, 132:24, 137:16, 141:25
**agendas** [1] - 138:17
**Agent** [2] - 24:17, 168:22
**agent** [5] - 22:13, 22:19, 22:21, 23:22, 105:12
**agents** [4] - 22:16, 22:20, 25:1, 109:4
**aggregate** [1] - 66:6
**aggregated** [2] - 117:2, 117:3
**aggregates** [1] - 51:2
**aggrieved** [2] - 45:15, 46:16
**ago** [6] - 39:19, 88:2, 88:21, 102:10, 107:18, 191:13
**Agree** [1] - 171:7
**agree** [21] - 112:19, 113:7, 113:16, 114:22, 115:4, 115:11, 131:17, 131:18, 142:7, 142:21, 150:10, 151:13, 152:23, 160:6, 160:7, 162:10, 167:10, 171:20, 188:19, 214:2, 216:6
**agreed** [6] - 93:14, 124:2, 170:7, 173:1, 204:18, 213:4
**Agreed** [21] - 156:2, 170:12, 192:18, 193:1, 193:2, 193:5, 193:21, 193:22, 205:13, 210:16, 211:21, 211:22, 211:24, 211:25, 212:11, 213:17, 213:18, 215:21, 215:24, 216:2, 216:8
**agreement** [3] - 119:19, 193:15, 193:16
**ahead** [27] - 29:20,

31:1, 34:22, 37:13, 47:20, 48:22, 50:2, 50:4, 75:8, 76:22, 136:5, 150:19, 158:6, 162:22, 183:10, 186:11, 189:23, 191:25, 195:1, 198:13, 199:12, 200:3, 205:9, 206:4, 209:20, 211:14, 214:14
**Aid** [2] - 148:16, 148:18
**aisle** [1] - 139:15
**akin** [1] - 136:20
**al** [4] - 1:7, 1:13, 223:6, 223:7
**Alaska** [3] - 122:23, 123:12, 123:21
**alert** [3] - 188:2, 208:21, 208:24
**alerts** [1] - 208:16
**algorithm** [2] - 207:3, 216:6
**aligned** [2] - 87:8, 103:22
**alignment** [1] - 90:14
**allotted** [1] - 126:25
**allow** [9] - 47:19, 48:5, 48:19, 50:1, 71:19, 71:22, 124:17, 155:16, 189:23
**allowed** [3] - 129:23, 130:1, 138:24
**almost** [4] - 23:13, 34:14, 164:3, 191:21
**aloud** [2] - 91:9, 139:5
**AM** [2] - 73:11, 77:20
**AM-VW-00121** [1] - 167:3
**AM-West** [2] - 73:11, 77:20
**AM-WV-000640** [1] - 93:19
**AM-WV-00121** [2] - 76:9, 167:11
**AM-WV-00398** [2] - 99:23, 101:19
**AM-WV-00406** [1] - 97:2
**AM-WV-00640** [1] - 90:21
**AM-WV-00792** [2] - 83:8, 84:13
**AM-WV-0104-E** [1] - 102:17
**AM-WV-01040-E** [1] - 156:25
**AM-WV-02763** [1] -

109:21
**AM-WV-1040-E** [1] - 104:1
**AM-WV-2763** [1] - 111:1
**AM-WV-406** [1] - 95:7
**AM-WV-640** [1] - 91:6
**Amendment** [1] - 129:6
**Ameri** [1] - 213:11
**Amerisource** [6] - 110:6, 189:9, 190:21, 190:25
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**AmerisourceBergen** [123] - 6:2, 25:11, 26:20, 28:17, 32:14, 33:8, 34:24, 34:25, 35:11, 35:19, 36:7, 37:19, 40:8, 41:10, 42:25, 45:4, 53:12, 59:16, 60:19, 68:15, 71:6, 72:20, 73:10, 74:9, 75:1, 75:10, 75:20, 75:24, 76:5, 77:11, 77:14, 78:7, 78:18, 80:24, 82:25, 94:3, 94:15, 94:23, 97:13, 99:5, 99:17, 102:3, 102:6, 102:11, 104:18, 105:4, 105:14, 108:9, 108:23, 109:6, 110:7, 116:18, 117:6, 117:16, 119:10, 119:22, 122:16, 125:9, 126:9, 127:1, 134:24, 141:13, 146:3, 146:13, 152:25, 153:5, 154:15, 154:17, 161:15, 163:2, 163:12, 163:22, 164:19, 170:4, 172:23, 174:23, 177:25, 179:10, 179:25, 182:3, 184:13, 184:23, 185:19, 186:14, 187:2, 188:22, 192:5, 192:17, 192:24, 193:14, 193:16, 193:20, 194:6, 194:9, 194:11, 194:13, 194:15, 195:4, 197:9, 198:19, 198:22, 198:25,

200:1, 200:7, 200:21, 201:24, 202:4, 202:17, 203:15, 205:20, 207:23, 208:2, 211:19, 212:11, 212:24, 213:3, 213:11, 215:19, 217:21, 218:9, 220:17, 223:6
**AmerisourceBergen' s** [11] - 29:5, 75:11, 84:1, 98:6, 109:10, 117:14, 169:4, 180:22, 185:13, 184:6, 188:14
**amicus** [4] - 209:10, 209:14, 209:22, 209:24
**amount** [8] - 34:4, 52:6, 71:12, 118:21, 165:3, 192:16, 193:24, 221:7
**AMWV-00398** [1] - 111:17
**AMWV-00601** [3] - 120:14, 121:21, 122:1
**AMWV-00896** [2] - 127:11, 132:2
**AMWV-993E** [1] - 48:23
**analysis** [5] - 136:19, 158:19, 163:19, 163:20, 164:8
**Analysts** [1] - 25:2
**analytical** [1] - 176:17
**analytics** [1] - 27:3
**analyzed** [1] - 97:5
**analyzing** [1] - 160:2
**ANDREW** [1] - 5:10
**Angela** [3] - 83:16, 83:17, 83:18
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**annual** [1] - 72:24
**annually** [1] - 37:24
**answer** [10] - 30:6, 59:13, 81:15, 116:22, 150:19, 158:25, 165:14, 184:18, 191:2, 210:23
**answered** [3] - 171:19, 205:5, 205:6
**answering** [1] - 138:11
**ANTHONY** [1] - 2:6
**Apologies** [1] - 100:12
**apologies** [2] - 103:2,

218:24
**appear** [3] - 36:4, 137:1, 192:11
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appendix** [1] - 198:9
**applicable** [1] - 136:24
**applicants** [1] - 151:7
**applied** [1] - 133:7
**apply** [5] - 75:19, 75:24, 125:23, 126:1, 137:8
**applying** [1] - 117:7
**appreciate** [1] - 144:1
**approach** [21] - 50:8, 72:12, 76:10, 79:8, 83:9, 90:22, 95:12, 100:5, 102:19, 109:22, 113:24, 120:15, 127:12, 135:5, 161:7, 166:22, 177:18, 179:21, 182:17, 183:20, 186:6
**appropriate** [5] - 63:13, 91:12, 93:6, 138:20, 151:2
**appropriately** [1] - 125:22
**approved** [3] - 121:1, 121:4, 186:18
**approximate** [1] - 101:15
**April** [5] - 51:8, 78:13, 159:4, 176:3, 193:8
**Arch** [2] - 6:6, 6:13
**Archer** [4] - 166:6, 166:9, 166:15, 167:12
**ARCHER** [2] - 40:25, 41:2
**ARCOS** [17] - 116:15, 116:19, 116:22, 117:9, 117:23, 118:2, 118:9, 119:11, 119:12, 212:17, 212:20, 213:1, 213:2, 213:6, 213:8, 213:13
**area** [14] - 22:14, 36:5, 65:16, 83:25, 106:24, 115:3, 116:2, 120:1, 133:10, 133:16, 206:1, 206:8, 206:9, 207:2
**areas** [9] - 104:17, 108:16, 110:10,

116:4, 133:22, 142:2, 205:24, 206:15, 206:18
**argue** [2] - 139:19, 176:17
**arguer** [1] - 139:22
**argument** [5] - 131:14, 131:18, 138:1, 138:2, 143:22
**arguments** [1] - 130:8
**Arlington** [2] - 22:10
**arm** [1] - 138:18
**arranging** [1] - 27:14
**arrest** [1] - 24:16
**arrested** [1] - 24:17
**arrival** [3] - 94:23, 97:12, 154:16
**arrive** [1] - 35:6
**arrived** [13] - 29:15, 38:15, 39:4, 75:3, 75:11, 82:10, 94:22, 109:18, 178:12, 178:17, 178:18, 187:7, 200:1
**artist** [2] - 187:18, 188:1
**ASHLEY** [1] - 5:3
**Aside** [1] - 84:17
**aside** [8] - 55:21, 74:3, 77:18, 111:6, 116:12, 131:18, 171:23, 207:9
**aspect** [1] - 60:24
**aspects** [2] - 139:2, 151:14
**asserted** [1] - 180:23
**assertion** [1] - 164:1
**assess** [2] - 65:13, 74:14
**assessing** [3] - 65:12, 66:14, 141:24
**assessment** [4] - 29:2, 115:20, 121:14, 160:7
**assign** [2] - 65:14, 88:7
**assigned** [5] - 42:12, 83:19, 86:17, 86:20, 173:12
**assigning** [2] - 65:10, 69:19
**assignment** [2] - 23:24, 24:8
**assist** [2] - 106:23, 108:24
**assistance** [1] - 24:17
**assistant** [1] - 22:20
**assisted** [3] - 68:14, 107:8, 107:9
**associated** [8] - 7:7,

28:3, 50:22, 110:19, 111:19, 133:12, 160:20, 169:21
**Associates** [2] - 76:21, 172:10
**associates** [1] - 115:16
**Association** [1] - 130:7
**associations** [1] - 142:17
**assume** [1] - 117:12
**assuming** [1] - 26:14
**assured** [1] - 82:3
**AT** [1] - 1:2
**Atlanta** [3] - 23:16, 24:22, 141:15
**attachment** [1] - 120:25
**attempted** [1] - 55:24
**attempting** [1] - 194:10
**attend** [1] - 42:13
**attended** [3] - 78:14, 78:21, 130:11
**attention** [8] - 27:7, 44:16, 54:7, 56:13, 60:6, 96:6, 135:9, 149:21
**attorney** [3] - 47:24, 123:11, 221:11
**attorneys** [1] - 47:13
**attributes** [1] - 153:7
**audit** [3] - 136:21, 137:19, 169:4
**audits** [2] - 109:10, 109:14
**August** [4] - 129:12, 132:6, 154:24, 179:11
**authenticate** [1] - 97:7
**author** [1] - 140:25
**authority** [1] - 22:9
**authorize** [2] - 26:13, 26:15
**authorized** [1] - 23:11
**automated** [1] - 166:16
**automatic** [1] - 207:11
**automatically** [3] - 31:25, 40:19, 41:5
**available** [9] - 118:12, 124:25, 161:4, 164:23, 175:4, 176:7, 194:6, 195:6, 195:8
**Avenue** [1] - 76:23
**average** [15] - 59:1, 59:3, 59:15, 62:12, 100:18, 188:24,

189:12, 190:15, 192:7, 192:9, 192:16, 192:23, 217:5, 218:1, 218:2
**Avin** [1] - 3:7
**avoid** [2] - 34:6, 174:7
**aware** [13] - 41:8, 119:14, 158:4, 184:12, 193:8, 194:9, 195:13, 209:1, 209:3, 209:10, 209:22, 210:3, 211:13
**Ayme** [2] - 6:17, 223:2

## B

**Background** [3] - 110:13, 110:14
**background** [4] - 21:23, 25:9, 106:7, 126:7
**backgrounds** [1] - 26:1
**balance** [2] - 35:2, 67:14
**Barboursville** [2] - 77:4, 77:7
**barely** [1] - 82:9
**Baron** [1] - 3:17
**base** [12] - 38:22, 38:23, 62:24, 119:17, 146:7, 184:7, 185:22, 186:1, 204:25, 205:3, 205:13, 219:10
**Based** [2] - 75:9, 214:6
**based** [36] - 30:10, 32:5, 32:10, 34:20, 37:15, 57:18, 60:2, 68:6, 84:4, 86:4, 87:7, 91:15, 91:18, 94:8, 98:9, 101:7, 101:15, 104:22, 132:18, 134:3, 134:12, 134:23, 146:11, 147:4, 147:11, 164:17, 167:20, 207:5, 214:23, 216:18, 217:4, 217:13, 217:25, 219:11, 219:12, 219:19
**baseline** [1] - 87:3
**bases** [3] - 28:14, 67:22, 88:7
**basic** [1] - 186:9
**basing** [1] - 89:11

**basis** [12] - 29:14, 43:3, 43:4, 66:3, 66:6, 67:6, 98:7, 128:1, 128:3, 135:18, 143:13, 213:12
**baskets** [1] - 150:1
**Bates** [1] - 141:6
**Baylen** [1] - 2:13
**bearing** [2] - 130:10, 130:17
**bears** [1] - 159:16
**become** [2] - 117:8, 117:15
**BEFORE** [1] - 1:17
**began** [2] - 28:8, 193:17
**begin** [1] - 221:25
**beginning** [11] - 31:5, 65:9, 79:20, 122:5, 167:15, 173:20, 187:7, 193:3, 205:22, 217:11, 219:18
**begins** [6] - 80:14, 81:6, 110:16, 113:2, 114:14, 142:16
**behalf** [3] - 133:5, 179:10, 209:11
**behavior** [2] - 71:12, 160:3
**behind** [1] - 85:10
**belabor** [1] - 164:13
**belaboring** [1] - 198:19
**below** [5] - 22:20, 52:9, 212:2, 212:10, 212:14
**belt** [1] - 93:7
**BENCH** [1] - 1:16
**bench** [1] - 177:18
**beneficial** [3] - 34:1, 142:13, 142:22
**benefit** [1] - 25:11
**Bergen** [9] - 189:2, 189:7, 190:20, 190:21, 190:23, 190:24, 191:5, 191:6, 191:14
**Bernie's** [1] - 122:23, 122:25, 125:3
**best** [6] - 93:9, 130:16, 186:21, 188:19, 210:14, 210:18
**better** [2] - 92:2, 187:18
**between** [26] - 28:9, 126:14, 127:19, 132:5, 138:18, 139:8, 141:25,

144:2, 146:13, 146:22, 169:24, 175:1, 185:18, 195:9, 198:25, 199:14, 200:6, 200:17, 203:3, 203:14, 204:8, 207:19, 207:24, 211:6, 212:24, 220:21
**Between** [1] - 194:13
**beyond** [7] - 126:18, 157:11, 159:12, 159:15, 168:12, 173:13, 175:21
**bias** [1] - 136:12
**big** [2] - 139:8, 139:9
**bigger** [1] - 143:24
**binder** [1] - 180:5
**bipartisan** [3] - 136:9, 139:13, 139:14
**bit** [13] - 21:23, 39:1, 43:25, 50:20, 64:8, 102:1, 115:7, 121:14, 147:25, 160:22, 160:23, 180:10, 193:24
**block** [1] - 216:2
**blow** [3] - 110:12, 132:8, 220:5
**Blvd** [3] - 3:15, 4:3, 4:9
**board** [2] - 26:24, 185:9
**Board** [2] - 122:8, 122:12
**boarded** [1] - 28:21
**boarding** [1] - 25:20
**Bob** [1] - 218:6
**Bob's** [1] - 218:6
**bold** [1] - 151:10
**bolster** [2] - 137:25, 138:2
**Bonasso** [1] - 5:14
**book** [1] - 137:10
**BOP** [1] - 39:17
**boss** [1] - 181:21
**Boston** [1] - 23:20
**bottom** [19] - 50:13, 51:13, 54:3, 54:17, 55:4, 58:19, 61:1, 62:7, 62:23, 66:12, 130:13, 132:7, 141:6, 148:6, 148:14, 149:23, 157:4, 157:5, 183:22
**Boulevard** [1] - 3:18
**box** [1] - 220:5
**Box** [2] - 5:14, 6:8
**brand** [3] - 69:15,

108:5, 148:18
**Break** [1] - 184:19
**break** [7] - 61:16, 64:15, 64:18, 154:8, 171:22, 189:25, 192:21
**breakdown** [1] - 62:7
**Brian** [1] - 109:18
**Bridgeside** [3] - 3:15, 4:3, 4:9
**brief** [15] - 56:14, 56:18, 56:22, 56:24, 70:11, 73:8, 95:16, 104:5, 115:15, 149:5, 149:17, 209:10, 209:14, 209:22, 209:24
**briefing** [3] - 136:11, 138:7, 139:17
**briefly** [13] - 22:5, 30:16, 35:18, 37:2, 37:17, 47:7, 55:1, 56:3, 56:15, 78:1, 85:7, 172:5, 197:23
**briefs** [1] - 144:11
**bring** [3] - 7:6, 69:24, 183:17
**bringing** [2] - 56:12, 126:3
**broad** [2] - 150:16, 204:13
**broadcast** [4] - 44:17, 47:15, 58:6, 64:25
**broadcasting** [1] - 56:16
**broader** [1] - 108:19
**broadly** [1] - 222:7
**broken** [1] - 190:16
**brought** [6] - 44:15, 55:7, 57:14, 66:22, 123:11, 196:18
**Brunswig** [6] - 189:3, 189:7, 190:20, 191:5, 191:6, 191:14
**bucket** [3] - 25:18, 26:5, 26:7
**buckets** [3] - 25:19, 29:4, 30:11
**Budd** [1] - 3:17
**budget** [2] - 23:10, 23:11
**build** [1] - 203:19
**bulk** [1] - 174:15
**bullet** [11] - 76:20, 142:15, 142:16, 170:10, 172:11, 172:13, 173:6, 173:17, 174:1, 174:20
**Burling** [1] - 5:11

bury [1] - 67:8
busier [1] - 54:21
business [13] - 33:25, 60:14, 60:19, 60:23, 72:20, 92:19, 98:2, 98:6, 98:10, 100:3, 216:20, 217:2, 218:15
businesses [1] - 174:25
buttons [1] - 190:11
BY [93] - 21:20, 26:8, 29:22, 30:7, 31:4, 34:19, 34:23, 37:11, 37:14, 43:13, 50:6, 54:4, 54:25, 58:2, 62:14, 65:2, 71:4, 72:13, 74:2, 76:11, 77:24, 79:10, 80:12, 81:19, 83:11, 85:5, 90:24, 93:24, 95:14, 98:4, 99:16, 100:7, 101:23, 102:21, 104:15, 109:24, 111:5, 112:1, 114:2, 116:14, 120:17, 122:2, 127:15, 132:3, 132:10, 135:7, 140:17, 144:14, 145:7, 146:10, 147:2, 148:5, 149:15, 151:4, 154:4, 155:20, 156:10, 158:7, 159:13, 162:24, 164:16, 165:6, 165:17, 166:25, 168:5, 172:7, 175:22, 177:21, 179:22, 181:5, 182:7, 183:12, 183:21, 184:22, 186:12, 188:11, 189:11, 189:24, 192:2, 195:2, 196:8, 198:14, 199:13, 200:4, 201:23, 205:10, 206:10, 209:21, 211:3, 211:16, 218:19, 218:25, 220:15

## C

C.F.R [1] - 151:6
CA [1] - 3:18
Cabell [20] - 3:2, 49:15, 50:23, 76:16, 76:17, 77:5, 77:7,

87:9, 87:11, 146:5, 146:22, 147:20, 148:3, 156:22, 160:20, 161:25, 169:8, 218:8, 219:2, 219:9
CABELL [1] - 1:10
cabell [1] - 2:2
calculate [1] - 218:9
calculating [1] - 192:7
calculation [1] - 191:15
calculations [1] - 68:6
CALLAS [1] - 6:7
camera [1] - 196:7
CAMPBELL [1] - 6:14
cancel [4] - 42:25, 43:16, 155:5, 156:1
canceling [2] - 154:9, 155:23
cancelled [3] - 39:12, 93:16, 216:3
cannot [2] - 32:7, 165:9, 216:1
capability [1] - 118:15
capable [1] - 144:2
capacity [2] - 178:3, 198:5
capita [1] - 67:2
Capitol [1] - 2:7
capture [1] - 186:21
Cardinal [6] - 4:11, 5:2, 161:15, 208:22, 209:2, 209:5
Care [3] - 76:24, 169:15, 172:14
care [6] - 35:3, 35:5, 147:17, 148:10, 148:13, 181:1
cared [1] - 105:20
career [9] - 22:1, 23:12, 23:13, 23:15, 23:19, 23:20, 24:21, 106:8, 202:8
carefully [2] - 191:3, 211:13
Carey [1] - 4:17
caring [1] - 147:17
Carolina [1] - 24:7
carried [2] - 40:5, 107:4
carry [4] - 28:17, 133:18, 142:11, 176:17
carrying [2] - 105:25, 106:19
case [23] - 7:8, 32:12, 35:17, 46:6, 46:9, 46:21, 50:23, 51:12, 54:10, 87:15, 88:21,

104:22, 123:18, 129:22, 137:3, 143:17, 146:4, 155:24, 209:6, 209:11, 210:9, 220:6, 221:8
cases [3] - 24:11, 82:3, 181:7
cash [1] - 33:24
causing [1] - 67:16
CDC [6] - 66:21, 66:25, 199:1, 199:3, 199:15, 203:4
Center [9] - 3:12, 5:11, 44:3, 44:7, 48:24, 55:19, 103:10, 103:17, 104:5
center [26] - 61:2, 78:24, 87:7, 87:13, 87:15, 87:24, 88:7, 107:3, 107:9, 107:11, 114:18, 147:14, 148:13, 169:7, 169:22, 190:2, 192:6, 192:17, 193:10, 204:14, 213:24, 214:4, 214:19, 214:22, 215:16, 215:19
centered [2] - 58:10, 63:2
centers [7] - 28:20, 61:4, 87:25, 89:5, 106:25, 207:22, 208:9
central [1] - 22:9
certain [35] - 25:21, 25:23, 31:24, 32:25, 38:16, 42:3, 45:3, 69:13, 69:17, 69:18, 71:10, 73:17, 74:11, 76:15, 80:23, 89:5, 95:2, 96:3, 118:21, 133:11, 150:21, 153:10, 163:21, 169:22, 175:18, 190:16, 195:23, 206:8, 206:17, 206:18, 208:17
Certainly [1] - 159:11
certainly [5] - 35:7, 71:16, 96:20, 153:11, 165:1
CERTIFICATION [1] - 223:1
certify [1] - 223:4
cetera [2] - 49:20, 216:21
chain [16] - 53:21,

76:12, 83:12, 84:4, 126:4, 126:5, 126:8, 148:8, 167:15, 172:18, 172:19, 174:2, 174:13, 174:14, 174:19
Chain [2] - 172:17, 172:19
chains [2] - 172:23, 174:5
chances [1] - 34:9
change [10] - 50:15, 60:19, 60:21, 61:21, 67:10, 68:1, 75:17, 144:25, 192:4, 200:15
changed [8] - 38:2, 38:25, 46:13, 72:4, 88:2, 89:16, 122:5, 150:15
changes [23] - 28:5, 28:7, 28:8, 37:8, 37:16, 37:23, 37:24, 50:18, 51:10, 61:14, 68:1, 74:10, 74:16, 74:18, 74:19, 74:24, 75:7, 75:15, 77:15, 89:9, 90:20, 91:25, 92:13
character [2] - 136:25, 139:25
characterization [1] - 145:4
Charge [1] - 107:7
charge [6] - 22:14, 22:19, 22:20, 178:24, 179:5, 184:11
charged [1] - 136:17
CHARLES [1] - 3:11
CHARLESTON [2] - 1:2, 1:18
Charleston [6] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:3
Charlotte [1] - 24:7
chart [9] - 54:19, 54:21, 60:10, 61:20, 62:21, 97:8, 163:4, 164:9
charted [1] - 54:14
charting [1] - 59:24
Chase [1] - 4:18
check [2] - 171:21, 171:22
checks [6] - 30:17, 30:18, 31:5, 31:8, 31:9, 31:13
chemicals [11] - 26:16, 27:2, 60:18,

120:10, 121:5, 122:15, 123:3, 123:10, 123:14, 152:20, 153:3
cherry [2] - 139:3, 139:4
cherry-picking [2] - 139:3, 139:4
Cherveny [5] - 167:23, 169:24, 170:1, 170:2, 170:9
Chesterbrook [1] - 6:15
chicanery [1] - 188:9
Chiles [1] - 108:5
choosing [1] - 46:8
chosen [1] - 46:6
Chris [1] - 181:21
circle [1] - 21:24
circumstances [4] - 38:6, 53:11, 143:16, 165:23
City [10] - 4:1, 5:11, 23:21, 23:22, 24:6, 146:5, 147:22, 147:24, 148:3, 223:5
CITY [1] - 1:4
Civil [3] - 1:4, 223:7, 223:8
civil [2] - 1:10, 133:14
claim [1] - 57:14
clarification [2] - 97:21, 99:3
clarify [7] - 41:25, 124:15, 155:1, 155:15, 166:20, 171:10, 181:23
clarity [2] - 133:19, 134:2
class [2] - 85:21, 215:21
clean [2] - 182:6, 215:8
clean-up [1] - 182:6
clear [10] - 32:14, 50:15, 59:15, 70:21, 70:24, 124:5, 131:9, 136:11, 196:1, 197:13
cleared [3] - 215:15, 215:16, 215:18
clearly [3] - 37:9, 132:24, 154:1
CLERK [6] - 56:4, 157:23, 157:25, 177:11, 177:13, 177:16
clerk [1] - 177:10
click [3] - 66:9, 69:24, 69:25

**clinician** [1] - 126:5
**close** [1] - 82:11
**closed** [5] - 152:6, 152:12, 153:6, 153:9, 154:2
**closely** [2] - 88:18, 106:19
**co** [1] - 148:21
**co-counsel** [1] - 148:21
**Cochran** [3] - 6:17, 223:2, 223:11
**code** [2] - 86:17, 86:20
**coding** [2] - 66:3, 168:21
**coin** [1] - 130:2
**collaboration** [1] - 141:25
**colleagues** [1] - 139:20
**collect** [1] - 25:21
**collecting** [1] - 109:8
**colloquy** [1] - 131:7
**color** [4] - 66:3, 66:4, 69:6, 211:18
**Columbia** [1] - 210:4, 210:11
**Columbus** [1] - 168:9, 169:4
**column** [3] - 58:24, 59:5, 100:24
**columns** [2] - 163:8
**combination** [1] - 201:14
**combined** [1] - 189:4
**comfortable** [2] - 92:23, 214:24
**coming** [2] - 35:18, 175:6
**comment** [4] - 137:24, 144:24, 145:11, 188:10
**commentary** [4] - 128:11, 166:19, 210:18, 210:20
**commented** [1] - 145:20
**comments** [6] - 114:19, 124:11, 124:13, 128:20, 145:13, 154:7
**Commerce** [1] - 136:6
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2, 3:2
**committed** [1] - 105:24
**Committee** [3] - 137:22, 138:13,

139:10
**common** [4] - 51:25, 159:24, 172:20, 174:4
**communicate** [2] - 35:15, 64:3
**communicated** [4] - 123:21, 123:22, 180:17, 180:18
**communication** [2] - 92:7, 141:25
**communications** [1] - 131:22
**community** [5] - 142:1, 151:20, 206:21, 207:5, 207:13
**comp** [1] - 52:20
**companies** [2] - 130:6, 189:2
**company's** [1] - 42:19
**compare** [9] - 85:13, 87:10, 87:21, 87:22, 90:12, 90:13, 103:22, 185:25, 206:7
**compared** [8] - 55:10, 87:12, 90:8, 203:21, 203:23, 204:3, 205:2, 205:11
**comparing** [3] - 58:25, 65:22, 85:11
**comparisons** [2] - 203:25, 204:1
**compelling** [1] - 131:1
**complete** [6] - 52:21, 53:9, 62:24, 94:24, 124:17, 127:20
**completely** [4] - 31:18, 89:6, 113:15, 120:10
**completion** [3] - 173:18, 173:24, 174:6
**compliance** [4] -

91:13, 107:2, 175:9, 178:19
**Compliance** [3] - 27:15, 109:3, 109:7
**component** [6] - 25:21, 85:19, 87:4, 88:4, 193:16, 200:23
**components** [6] - 25:17, 29:10, 58:9, 152:23, 200:22, 214:18
**comport** [1] - 81:7
**composed** [1] - 91:3
**composite** [1] - 183:18
**compound** [1] - 184:17
**comprehensive** [2] - 115:19, 122:25
**computer** [12] - 6:19, 31:16, 211:24, 212:1, 212:9, 213:16, 216:5, 216:7, 216:10, 216:11, 216:15
**concentration** [1] - 54:17
**concept** [2] - 25:3, 150:7
**concern** [6] - 47:7, 54:9, 61:12, 71:20, 132:16, 163:1
**concerned** [2] - 56:9, 123:16, 123:23
**concerning** [1] - 174:7
**concerns** [8] - 122:18, 123:5, 123:6, 123:9, 123:15, 123:19, 136:12, 136:22
**concerted** [1] - 130:6
**concluded** [1] - 79:4
**conclusion** [5] - 56:18, 115:5, 115:11, 150:14, 156:4
**conditional** [4] - 104:3, 162:6, 162:14, 162:19
**conditionally** [9] - 56:22, 57:1, 57:22, 70:11, 70:17, 70:18, 73:12, 73:23, 104:11
**conduct** [2] - 109:10, 214:8
**conducted** [4] - 42:20, 105:2, 122:25, 136:22
**conducting** [2] - 75:22, 169:3
**confer** [1] - 148:21

**confidential** [3] - 71:7, 73:15, 73:20
**confidentiality** [3] - 71:5, 73:8, 73:12
**confirm** [5] - 58:5, 64:24, 134:23, 183:13, 191:22
**confirmation** [1] - 162:11
**confirmed** [1] - 111:20
**confused** [4] - 48:4, 143:8, 170:22, 171:1
**confusing** [6] - 156:8, 157:16, 200:25, 201:4, 201:19, 201:21
**Congress** [1] - 137:22
**Congressional** [3] - 136:7, 138:13, 140:21
**congressional** [1] - 136:10
**congressionally** [2] - 23:10, 23:11
**Connecticut** [1] - 108:8
**connection** [1] - 123:18
**Connolly** [2] - 4:13, 5:4
**CONROY** [1] - 3:3
**conscientious** [2] - 106:4, 106:6
**consequences** [1] - 133:25
**consider** [6] - 76:2, 88:23, 103:18, 172:19, 206:12, 206:22
**considerable** [1] - 193:24
**consideration** [1] - 206:25
**considered** [5] - 33:5, 41:11, 137:9, 197:8, 206:15
**considering** [4] - 53:9, 88:5, 88:6, 205:24
**consistent** [3] - 163:13, 164:18, 220:8
**consistently** [2] - 133:17, 133:18
**constantly** [2] - 74:22, 113:8
**consult** [1] - 42:8
**consultant** [1] - 68:17
**consultants** [2] - 108:23, 109:9
**Consulting** [1] -

156:15
**consulting** [1] - 108:25
**contact** [1] - 82:23
**contacted** [1] - 175:20
**contain** [3] - 71:10, 103:14, 174:18
**contained** [6] - 98:8, 103:6, 111:16, 129:19, 158:19, 166:12
**contains** [12] - 44:16, 44:19, 44:24, 44:25, 80:19, 94:24, 96:11, 157:8, 161:14, 167:10, 172:12, 174:9
**contemplating** [1] - 28:5
**content** [1] - 103:24
**context** [3] - 82:9, 170:25, 220:10
**continually** [1] - 91:14
**continue** [10] - 27:1, 50:15, 64:23, 68:18, 76:2, 123:13, 124:4, 124:9, 125:2, 211:8
**continued** [2] - 55:22, 201:15
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**CONTINUED** [1] - 21:19
**continuing** [1] - 82:4
**continuous** [3] - 74:12, 74:13, 176:16
**Continuum** [3] - 76:24, 169:15, 172:14
**contractor** [1] - 27:15
**contractors** [1] - 109:1
**contradicts** [1] - 201:4
**contrary** [1] - 134:19
**contribute** [1] - 38:17
**Control** [113] - 23:1, 23:2, 23:5, 23:8, 24:14, 25:10, 25:15, 28:12, 29:5, 29:11, 32:8, 36:5, 36:8, 37:1, 37:3, 37:16, 37:17, 37:18, 37:22, 38:1, 39:9, 39:10, 39:21, 43:20, 72:1, 72:17, 72:22, 74:8, 74:11, 75:2, 78:16, 85:3, 89:10, 91:4, 93:25, 94:10, 96:1, 96:18, 97:11, 99:5, 104:19, 105:13,

105:19, 106:6, 106:13, 106:17, 106:20, 107:4, 107:13, 107:15, 107:21, 107:24, 108:13, 108:19, 108:20, 108:22, 108:24, 109:10, 112:23, 113:12, 115:22, 120:4, 122:3, 150:1, 150:11, 150:22, 151:14, 168:24, 170:3, 176:9, 178:9, 178:21, 178:22, 178:24, 179:6, 179:18, 184:12, 184:25, 185:8, 186:5, 195:8, 195:14, 196:25, 198:6, 198:20, 199:14, 199:22, 200:21, 201:25, 202:4, 202:7, 202:9, 202:10, 202:18, 202:21, 202:22, 202:25, 203:4, 203:14, 204:8, 206:14, 206:16, 206:24, 207:17, 207:19, 208:4, 208:6, 208:11, 210:15, 211:6, 211:11, 220:20, 221:5
**control** [4] - 48:6, 140:2, 182:4, 200:11
**controlled** [61] - 25:4, 26:3, 26:13, 26:16, 27:2, 31:12, 33:1, 34:3, 34:5, 34:10, 35:12, 35:22, 38:11, 51:11, 51:15, 51:18, 51:23, 52:7, 52:17, 53:13, 53:16, 54:1, 54:18, 59:12, 59:17, 61:13, 67:12, 87:1, 91:12, 94:25, 96:7, 99:18, 100:18, 107:1, 110:20, 118:21, 119:16, 119:22, 120:9, 121:5, 122:14, 122:17, 123:3, 123:10, 123:14, 125:10, 152:19, 153:2, 160:13, 160:14, 204:6, 205:18, 206:11, 207:24, 212:22, 212:25, 213:5,

219:20, 219:23
**Controlled** [1] - 140:22
**controls** [13] - 27:8, 33:19, 33:20, 34:8, 51:22, 67:12, 121:19, 123:24, 151:8, 151:10, 151:15, 153:12
**conversation** [2] - 84:8, 181:25
**conversations** [2] - 30:1, 181:17
**converted** [2] - 38:18, 148:17
**convey** [2] - 132:24, 151:16
**conveyed** [1] - 84:22
**Cook** [3] - 6:18, 223:3, 223:11
**coordinated** [1] - 106:19
**copied** [1] - 79:17
**copies** [3] - 55:18, 95:10, 169:12
**copy** [9] - 31:8, 98:14, 100:23, 114:6, 174:24, 175:4, 182:13, 182:14, 190:6
**corner** [1] - 157:5
**Corporate** [1] - 178:6
**corporate** [7] - 114:18, 208:7, 214:19, 215:1, 215:11, 215:16, 215:19
**cORPORATION** [2] - 1:7, 1:13
**Corporation** [3] - 6:2, 189:9, 223:7
**Correct** [11] - 98:17, 104:8, 104:9, 150:3, 159:23, 176:5, 187:9, 193:17, 213:15, 214:14, 215:12
**correct** [82] - 23:3, 29:25, 31:17, 31:18, 35:12, 58:6, 80:10, 87:25, 88:2, 88:6, 98:16, 100:22, 102:23, 103:2, 103:13, 114:11, 114:12, 115:24, 125:25, 126:4, 126:23, 126:24, 130:22, 137:17, 147:3, 147:9, 147:10, 148:7, 148:8, 150:12,

153:8, 158:17, 158:18, 158:20, 159:4, 159:16, 166:8, 166:9, 166:14, 167:23, 169:5, 169:9, 169:16, 171:11, 174:18, 179:19, 182:5, 185:11, 186:25, 187:1, 187:4, 188:15, 189:13, 190:2, 192:7, 192:8, 192:10, 192:13, 193:11, 193:13, 193:18, 201:25, 202:23, 203:16, 203:22, 204:19, 204:22, 208:10, 212:4, 212:18, 213:8, 213:21, 214:19, 214:20, 215:13, 215:17, 215:22, 215:25, 216:9, 216:12, 219:21, 223:4
**correction** [1] - 76:18
**correctly** [2] - 120:7, 141:16
**correspondence** [2] - 182:8, 183:15
**corresponding** [4] - 30:18, 31:7, 126:16
**costs** [1] - 33:24
**counsel** [7] - 48:2, 95:11, 100:1, 111:9, 148:21, 181:21, 191:18
**counter** [1] - 60:12
**counties** [2] - 204:11, 205:23
**country** [5] - 61:2, 68:23, 88:14, 117:4, 206:18
**COUNTY** [1] - 1:10
**county** [10] - 55:11, 66:11, 67:4, 69:25, 70:2, 87:12, 204:7, 205:19, 219:11
**County** [23] - 2:2, 3:2, 48:3, 49:15, 50:23, 76:16, 76:17, 77:6, 77:7, 87:9, 87:11, 146:5, 146:22, 147:20, 147:25, 148:3, 156:22, 160:20, 161:25, 169:8, 218:8, 219:2, 219:9
**couple** [15] - 24:13,

33:21, 40:10, 78:6, 108:5, 109:14, 118:18, 147:6, 148:6, 148:12, 156:21, 162:1, 164:13, 179:9, 193:4
**course** [18] - 33:18, 40:17, 42:4, 51:25, 60:5, 60:8, 61:5, 64:5, 66:3, 67:15, 72:20, 98:6, 106:16, 106:23, 109:1, 126:11, 141:12, 154:7
**Court** [28] - 6:17, 6:18, 7:2, 7:6, 24:23, 25:11, 55:25, 70:17, 85:9, 95:11, 97:17, 99:25, 124:3, 124:20, 124:21, 124:22, 129:3, 140:1, 162:6, 168:19, 181:7, 190:12, 210:3, 210:11, 216:16, 222:1, 223:2, 223:3
**COURT** [218] - 1:1, 1:17, 7:5, 7:14, 21:11, 21:15, 21:17, 27:24, 29:14, 29:19, 30:6, 31:1, 34:22, 37:13, 43:3, 43:9, 44:19, 45:7, 45:25, 47:9, 47:17, 48:4, 48:11, 48:17, 49:3, 49:6, 49:9, 50:1, 55:20, 56:2, 56:8, 56:19, 56:25, 57:7, 57:8, 57:10, 57:12, 57:21, 64:11, 64:14, 64:19, 65:1, 70:13, 70:19, 71:3, 72:6, 73:14, 73:22, 73:25, 77:21, 77:23, 79:9, 80:1, 80:7, 80:11, 81:15, 83:10, 84:14, 84:18, 84:23, 90:23, 93:20, 93:23, 95:13, 97:19, 97:24, 99:8, 99:11, 99:14, 100:6, 101:20, 101:22, 102:20, 104:7, 104:12, 104:14, 109:23, 111:2, 111:4, 111:8, 111:14, 111:18, 111:24, 113:25, 116:8, 116:10, 120:16, 121:22, 121:25, 124:16, 127:13, 128:1,

128:8, 128:22, 129:7, 129:14, 130:20, 131:2, 131:8, 131:13, 131:17, 131:23, 132:1, 135:6, 135:18, 136:5, 137:5, 137:15, 137:20, 138:2, 138:5, 138:11, 139:6, 139:8, 139:14, 140:5, 140:9, 140:12, 140:14, 143:4, 143:6, 143:10, 143:13, 143:16, 143:19, 143:23, 144:6, 144:10, 145:6, 147:20, 147:24, 148:4, 148:22, 149:1, 149:6, 149:9, 150:18, 153:18, 155:13, 155:18, 156:5, 156:8, 157:21, 157:24, 158:1, 158:6, 158:23, 161:8, 161:18, 162:2, 162:9, 162:21, 164:10, 165:13, 166:23, 168:2, 168:4, 171:20, 171:25, 172:3, 175:11, 175:15, 176:25, 177:2, 177:7, 177:9, 177:19, 180:8, 180:14, 180:20, 181:3, 182:18, 183:4, 183:10, 184:19, 186:7, 186:10, 187:24, 188:2, 188:8, 189:7, 189:10, 189:21, 191:2, 191:9, 191:18, 191:24, 194:18, 194:22, 195:1, 196:1, 196:4, 196:20, 197:12, 197:18, 197:22, 197:24, 198:12, 199:10, 200:2, 201:8, 201:11, 201:18, 201:22, 205:6, 205:9, 206:4, 209:15, 209:20, 210:23, 211:2, 211:14, 218:23, 220:14, 221:14, 221:18, 221:22,

222:9
**court** [4] - 64:14, 123:12, 123:22, 124:22
**courtroom** [8] - 7:7, 21:13, 44:17, 44:18, 47:11, 47:12, 47:15, 104:8
**COURTROOM** [1] - 56:4
**cover** [3] - 30:24, 141:11
**covered** [3] - 21:23, 163:11, 209:13
**covers** [1] - 95:21
**Covington** [1] - 5:11
**create** [6] - 71:16, 132:20, 137:14, 174:8, 188:24, 192:10
**created** [5] - 36:4, 50:10, 173:25, 186:17, 191:14
**creating** [1] - 156:17
**creator** [1] - 189:3
**Crisis** [2] - 129:17, 129:19
**criteria** [1] - 36:20
**cross** [4] - 45:17, 46:21, 164:12, 189:22
**CROSS** [1] - 21:19
**cross-examination** [2] - 164:12, 189:22
**CRR** [2] - 6:17, 6:18
**CS** [2] - 68:2, 121:1
**CSRA** [9] - 30:2, 105:19, 108:17, 108:18, 112:5, 113:3, 113:11, 116:4
**cumulative** [3] - 30:22, 87:22, 90:6
**current** [12] - 37:22, 45:19, 55:8, 60:1, 62:11, 72:22, 74:5, 153:21, 178:1, 185:12, 190:14, 220:6
**custodial** [1] - 179:24
**customer** [196] - 25:20, 25:22, 26:3, 26:10, 26:12, 26:13, 26:15, 26:17, 26:25, 27:3, 27:4, 27:9, 27:11, 27:12, 27:14, 30:16, 30:20, 30:25, 31:6, 31:22, 32:15, 32:19, 32:20, 33:2, 34:1, 35:15, 38:11, 38:20, 38:22, 39:25,

40:1, 40:13, 40:14, 40:15, 40:16, 40:19, 40:21, 41:2, 41:4, 41:6, 41:9, 41:11, 41:13, 41:24, 42:4, 42:7, 44:10, 44:24, 45:2, 45:5, 47:1, 49:19, 50:14, 51:13, 51:19, 52:4, 52:10, 52:14, 52:16, 52:22, 53:9, 53:12, 53:15, 54:12, 54:16, 54:24, 55:3, 55:6, 55:9, 55:11, 58:10, 62:24, 63:1, 64:5, 65:11, 65:13, 65:14, 65:23, 66:7, 66:10, 66:13, 67:11, 67:14, 68:9, 68:11, 68:12, 68:24, 69:15, 69:17, 69:19, 70:1, 70:3, 70:4, 71:22, 75:17, 75:19, 75:23, 75:24, 75:25, 85:11, 85:24, 86:22, 86:23, 86:25, 87:2, 87:8, 87:10, 87:19, 89:23, 90:10, 94:4, 94:13, 96:8, 97:18, 99:6, 101:24, 102:4, 102:24, 103:5, 104:1, 116:21, 116:24, 117:7, 117:12, 117:13, 117:16, 118:4, 118:5, 118:20, 119:6, 119:17, 121:11, 121:18, 122:4, 126:25, 146:7, 150:2, 150:6, 151:16, 152:18, 152:20, 153:2, 153:3, 153:20, 160:2, 160:3, 160:23, 161:2, 161:24, 164:5, 166:2, 166:5, 166:13, 172:15, 173:12, 173:22, 174:15, 176:8, 176:15, 176:19, 184:6, 184:7, 185:22, 186:1, 190:14, 192:15, 192:23, 203:16, 203:18, 203:21, 203:22, 204:19, 204:20, 204:21, 204:25, 205:3, 205:12, 205:13, 208:18, 211:18, 214:6, 214:9,

214:24, 216:22, 217:7, 218:7, 218:11, 218:15, 219:12, 219:15
**Customer** [9] - 58:15, 65:5, 65:6, 68:20, 75:14, 75:16, 75:22, 90:12, 219:13
**customer's** [13] - 55:8, 85:11, 89:18, 89:22, 89:24, 90:7, 122:17, 125:10, 160:13, 165:19, 203:8, 217:16, 217:24
**customer-specific** [1] - 116:24
**customers** [68] - 28:18, 34:14, 58:14, 59:12, 59:16, 61:5, 65:10, 67:19, 71:22, 76:16, 85:13, 85:21, 86:14, 89:18, 94:24, 103:11, 116:20, 117:8, 117:15, 119:23, 120:5, 120:11, 121:3, 121:7, 122:11, 122:18, 124:24, 146:3, 146:9, 146:12, 146:20, 146:22, 147:3, 147:8, 151:1, 153:14, 156:22, 160:18, 160:19, 160:20, 160:22, 161:25, 163:9, 169:8, 169:12, 169:19, 169:22, 174:13, 185:20, 186:1, 188:24, 190:1, 190:16, 192:6, 192:16, 192:24, 203:23, 203:24, 204:1, 204:13, 205:14, 207:1, 208:15, 216:19, 216:20, 216:24, 219:17
**cut** [2] - 48:11, 138:3
**cyclical** [1] - 167:21
**Cynthia** [1] - 108:4

# D

**D.C** [1] - 210:12
**daily** [2] - 192:19, 212:20
**danger** [1] - 125:6
**dark** [2] - 61:3, 66:4
**dashboard** [47] -

44:12, 45:9, 45:20, 46:4, 46:24, 46:25, 47:8, 48:23, 49:14, 49:21, 50:10, 50:11, 50:13, 50:14, 50:16, 53:13, 53:15, 55:8, 55:18, 57:25, 58:8, 58:9, 58:10, 62:16, 63:23, 65:8, 67:1, 69:2, 70:10, 94:2, 103:10, 103:21, 157:3, 157:4, 157:8, 157:18, 158:4, 158:8, 159:2, 159:3, 159:5, 159:9, 159:15, 194:4, 194:6, 194:8
**dashboards** [26] - 27:5, 38:18, 42:9, 46:2, 46:11, 49:2, 49:17, 50:16, 68:15, 71:6, 71:10, 102:12, 102:14, 102:15, 102:18, 103:5, 103:15, 103:18, 104:1, 104:3, 156:11, 156:17, 163:16, 176:1, 176:7
**data** [83] - 25:24, 38:16, 39:3, 40:11, 50:12, 51:2, 55:7, 58:18, 59:18, 63:4, 65:11, 65:19, 66:12, 66:22, 66:23, 67:5, 67:6, 67:8, 69:13, 69:16, 70:16, 70:21, 94:1, 94:3, 94:5, 94:12, 94:14, 94:17, 94:21, 95:2, 96:3, 97:4, 97:11, 98:8, 98:9, 98:19, 109:8, 116:15, 116:19, 117:2, 117:3, 117:9, 117:23, 119:15, 146:6, 157:5, 157:9, 157:10, 157:14, 157:15, 158:19, 159:2, 159:6, 159:10, 159:14, 160:12, 160:19, 160:21, 160:22, 160:24, 161:3, 161:4, 161:24, 163:5, 163:14, 164:18, 164:22, 164:23, 164:25, 194:10, 194:14, 194:15, 194:21, 194:24, 197:7, 203:18
**Data** [1] - 58:20

**database** [3] - 70:23, 203:19, 212:17
**databases** [1] - 166:5
**datasets** [1] - 55:25
**Date** [1] - 223:16
**date** [12] - 32:25, 50:13, 52:17, 53:1, 76:12, 76:14, 98:23, 123:22, 158:9, 194:17, 194:18, 196:16
**dated** [10] - 73:2, 92:10, 95:20, 103:15, 120:6, 129:12, 182:9, 190:18, 197:1, 197:6
**dates** [1] - 93:15
**dating** [1] - 101:13
**David** [21] - 7:1, 50:7, 74:3, 78:1, 79:21, 80:8, 81:22, 81:23, 81:25, 85:6, 91:8, 91:22, 111:6, 179:1, 179:7, 185:9, 186:20, 194:8, 197:2, 198:5, 198:10
**DAVID** [2] - 1:17, 2:9
**days** [8] - 52:15, 52:22, 70:15, 90:8, 119:23, 170:10, 212:23, 217:24
**DC** [7] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 214:15
**DCs** [1] - 208:2
**De** [2] - 2:4, 2:16
**DEA** [155] - 21:25, 22:1, 22:3, 22:7, 22:9, 22:24, 23:8, 24:1, 24:2, 24:3, 24:10, 24:11, 24:19, 25:6, 30:18, 31:6, 31:10, 36:22, 39:13, 39:18, 40:6, 41:11, 41:16, 42:21, 50:21, 50:25, 51:2, 52:17, 53:24, 59:9, 59:10, 59:19, 64:4, 74:20, 76:5, 76:6, 77:10, 77:14, 78:6, 78:9, 78:14, 78:16, 79:13, 79:24, 80:17, 82:14, 83:4, 83:18, 83:23, 84:16, 84:24, 85:1, 86:17, 86:18, 90:16, 90:18, 91:4, 91:15, 91:25, 92:12, 92:25, 93:10, 93:11, 95:1, 102:25, 103:19, 105:11, 106:3,

107:22, 107:23,
107:25, 109:4,
109:9, 109:12,
109:19, 114:24,
116:16, 116:23,
117:25, 118:15,
119:11, 119:15,
119:18, 119:20,
119:21, 120:8,
122:4, 122:12,
125:11, 125:14,
125:19, 127:2,
127:4, 128:10,
128:11, 128:20,
129:19, 129:20,
132:5, 132:17,
132:19, 133:3,
133:5, 133:11,
133:16, 137:13,
140:22, 141:25,
142:6, 142:21,
144:15, 144:24,
145:9, 145:12,
145:17, 155:6,
167:16, 167:20,
168:8, 169:1,
169:18, 169:20,
172:22, 175:6,
175:13, 175:17,
179:12, 179:15,
181:6, 181:14,
181:18, 181:23,
182:1, 182:2, 182:9,
186:18, 192:18,
192:20, 192:25,
193:4, 193:6,
193:15, 202:19,
207:16, 208:12,
208:21, 209:2,
209:18, 212:25,
213:12, 216:2,
216:3, 216:20
**DEA's** [6] - 76:15,
80:5, 128:16,
130:18, 138:9, 145:4
**deal** [4] - 50:3, 57:23,
129:20, 169:2
**dealing** [1] - 168:25
**dealings** [1] - 129:25
**deals** [1] - 58:13
**dear** [1] - 182:9
**Dear** [1] - 182:9
**death** [1] - 70:5
**debate** [1] - 153:23
**December** [3] - 95:22,
182:9, 183:14
**decide** [2] - 41:23,
74:10
**decides** [1] - 32:8
**decile** [2] - 87:18,

87:21
**deciles** [1] - 87:17
**decision** [14] - 35:2,
38:17, 38:22, 49:24,
122:13, 123:2,
123:4, 123:8, 123:9,
125:9, 125:11,
210:16, 215:21,
215:23
**decisionmaking** [1] -
115:1
**decisions** [1] - 114:21
**declare** [1] - 134:14
**declined** [1] - 129:3
**deemed** [1] - 39:10
**deems** [1] - 82:22
**deeper** [1] - 41:24
**deeply** [1] - 105:20
**DEF-WV-01597** [1] -
196:22
**default** [4] - 217:15,
219:10, 220:21,
221:5
**defaults** [1] - 220:6
**defeat** [1] - 71:19
**Defendant** [4] - 4:10,
5:2, 5:7, 6:2
**defendant's** [1] -
136:23
**Defendants** [3] - 1:8,
1:14, 223:7
**defendants** [9] - 43:4,
45:15, 46:22, 47:23,
57:14, 128:13,
135:20, 139:3, 198:4
**defendants'** [2] -
162:12, 164:1
**Defendants'** [1] -
167:2
**DEFENSE** [4] -
116:11, 122:1,
132:2, 140:15
**defer** [1] - 139:20
**define** [4] - 32:21,
33:1, 37:9, 46:9
**defined** [4] - 114:20,
134:11, 195:20
**defines** [4] - 36:18,
134:14, 176:11,
176:13
**defining** [1] - 132:19
**definitely** [1] - 100:24
**definition** [5] - 43:1,
64:2, 133:8, 144:17,
163:20
**definitional** [1] -
36:22, 45:3, 127:4
**DEFWV-2181** [3] -
135:3, 140:15, 143:2
**degree** [1] - 121:17

**delay** [1] - 35:9
**deleted** [1] - 158:1
**deliver** [1] - 34:14
**delivered** [3] - 34:16,
34:25, 110:6
**delivery** [4] - 33:11,
33:15, 33:16, 35:6
**demonstrating** [1] -
130:5
**demonstrative** [3] -
26:7, 72:2, 146:9
**department** [1] - 170:6
**Department** [2] -
123:20, 196:23
**dependent** [1] - 70:11
**depiction** [2] - 143:21,
187:17
**depicts** [1] - 191:7
**deposed** [1] - 154:22
**DEPUTY** [1] - 56:4
**describe** [10] - 22:5,
23:18, 25:16, 37:25,
46:13, 55:1, 91:17,
122:22, 125:20,
156:19
**described** [6] - 30:17,
31:18, 36:21, 37:17,
46:11, 115:14
**describing** [1] - 25:12
**description** [5] -
22:23, 90:2, 108:21,
113:9, 113:17
**design** [1] - 88:25
**designation** [1] -
107:6
**designed** [5] - 186:2,
203:17, 204:10,
206:6, 216:23
**despite** [2] - 92:17,
119:9
**Detail** [2] - 58:15,
68:20
**detail** [2] - 180:2,
181:9
**detailed** [2] - 63:1,
71:20
**details** [1] - 181:24
**detect** [1] - 159:24
**detective** [1] - 106:9
**determination** [5] -
36:12, 123:1, 134:4,
184:4, 212:1
**determine** [10] - 32:2,
37:3, 73:18, 82:1,
86:25, 182:23,
201:6, 216:22,
217:22, 219:14
**determined** [6] -
190:15, 217:4,
217:12, 217:19,

219:18
**determines** [3] -
43:20, 87:5, 87:18
**develop** [4] - 118:15,
118:17, 142:18,
203:19
**developed** [10] -
25:14, 27:4, 28:23,
40:23, 41:1, 102:16,
117:25, 118:13,
156:14, 158:11
**developing** [3] -
74:23, 118:18,
193:17
**development** [3] -
166:16, 166:20,
185:2
**deviate** [1] - 36:16
**deviating** [1] - 127:7
**devil** [1] - 215:9
**diagnosis** [1] - 126:13
**diagram** [2] - 192:3,
211:4
**didactic** [1] - 45:19
**differ** [2] - 22:18, 94:2
**difference** [3] - 62:23,
139:8, 207:4
**different** [35] - 28:16,
33:4, 40:10, 50:17,
50:22, 51:3, 55:2,
65:11, 69:1, 69:3,
70:22, 85:17, 85:18,
94:16, 96:10,
108:15, 110:6,
119:6, 120:23,
126:21, 136:19,
136:25, 137:21,
139:25, 157:10,
158:15, 187:14,
206:15, 209:17,
211:18, 213:1,
214:18, 216:24
**differently** [5] - 23:4,
50:11, 67:16, 85:22,
86:24
**difficult** [1] - 55:16
**digital** [1] - 174:25
**Diligence** [3] - 75:14,
75:16, 75:22
**diligence** [41] - 25:20,
26:23, 26:24, 30:16,
30:25, 31:9, 38:13,
38:20, 39:25, 44:10,
76:4, 76:5, 76:16,
94:4, 94:13, 97:18,
99:6, 101:25,
110:11, 150:25,
166:13, 169:12,
169:19, 169:21,
172:24, 174:12,

175:7, 175:8, 176:8,
176:12, 176:13,
176:16, 207:1,
207:9, 213:22,
214:5, 214:7, 214:8,
214:12, 214:16
**DIRECT** [1] - 177:20
**direct** [11] - 21:24,
45:16, 60:17, 74:5,
112:5, 117:5,
120:22, 135:9,
149:21, 190:9, 196:6
**directed** [1] - 41:1
**directing** [1] - 130:13
**direction** [1] - 36:22
**directly** [4] - 41:2,
106:18, 123:22
**Director** [5] - 78:23,
105:24, 170:2,
178:6, 178:18
**directors** [3] - 42:1,
108:14, 108:15
**disagree** [2] - 112:21,
214:15
**disagreed** [1] - 163:25
**disclose** [1] - 46:20
**disclosed** [2] -
182:22, 182:23
**discontinued** [2] -
75:18, 76:1
**discovery** [3] - 55:23,
221:7, 221:12
**discuss** [1] - 41:22
**discussed** [9] - 30:22,
58:17, 70:12, 74:4,
88:16, 104:4, 111:7,
179:25, 216:18
**discussing** [5] -
37:10, 70:22, 83:13,
128:14, 181:6
**discussion** [7] - 7:12,
56:7, 62:19, 154:11,
167:7, 169:24, 170:5
**discussions** [1] -
129:18
**dispel** [1] - 214:13
**dispels** [1] - 213:22
**display** [4] - 65:8,
79:19, 110:13,
157:24
**displayed** [9] - 72:9,
94:2, 96:13, 104:7,
157:19, 157:22,
197:15, 197:16,
218:22
**displaying** [1] - 46:4
**dispute** [2] - 111:25,
144:2
**distinction** [2] - 39:5,
138:18

**distort** [1] - 188:6
**distributed** [3] -
61:15, 163:12, 165:3
**Distribution** [3] - 44:3,
44:7, 157:13
**distribution** [42] -
28:19, 33:12, 51:17,
52:24, 61:2, 61:4,
63:13, 78:24, 87:7,
87:13, 87:15, 87:24,
87:25, 88:7, 89:5,
106:25, 107:3,
107:8, 107:11,
110:20, 114:18,
117:4, 127:21,
154:3, 169:7,
169:22, 178:20,
190:2, 192:6,
192:16, 193:9,
204:14, 207:22,
208:8, 213:24,
214:3, 214:18,
214:22, 215:9,
215:10, 215:15,
215:18
**distributor** [14] -
34:12, 116:18,
116:24, 117:18,
117:20, 118:6,
118:8, 118:22,
119:1, 144:16,
152:16, 152:24,
153:7, 154:2
**distributor's** [1] -
153:12
**distributor-specific**
[1] - 116:24
**distributors** [9] -
117:7, 118:1, 118:3,
118:24, 142:5,
142:17, 142:18,
142:19, 208:13
**DISTRICT** [3] - 1:1,
1:1, 1:17
**district** [1] - 83:19
**District** [4] - 7:2, 7:3,
210:3, 210:11
**Diversion** [119] -
22:25, 23:2, 23:5,
23:8, 23:17, 24:13,
24:20, 24:23, 24:25,
25:10, 25:15, 28:12,
29:5, 29:11, 32:8,
36:5, 36:8, 37:1,
37:3, 37:15, 37:16,
37:18, 37:22, 38:1,
39:9, 39:10, 39:21,
43:20, 72:1, 72:17,
72:22, 74:8, 74:11,
75:2, 78:16, 85:3,

89:10, 91:4, 93:25,
94:10, 96:1, 96:18,
97:11, 99:5, 104:19,
105:13, 105:19,
106:5, 106:13,
106:16, 106:20,
107:4, 107:12,
107:15, 107:21,
107:24, 108:13,
108:19, 108:20,
108:22, 108:24,
109:10, 112:23,
113:12, 115:22,
120:4, 122:3, 150:1,
150:11, 150:22,
151:14, 168:8,
168:16, 168:24,
170:2, 176:8, 178:9,
178:21, 178:22,
178:24, 179:5,
179:18, 184:12,
184:25, 185:8,
186:5, 195:8,
195:14, 196:25,
198:5, 198:19,
199:14, 199:22,
200:20, 201:25,
202:4, 202:7, 202:9,
202:10, 202:18,
202:21, 202:22,
202:25, 203:4,
203:14, 204:7,
206:13, 206:16,
206:23, 207:17,
207:19, 208:4,
208:6, 208:11,
210:15, 211:6,
211:11, 220:20,
221:4
**diversion** [22] - 22:16,
22:22, 24:12, 25:1,
73:14, 79:13, 83:18,
105:10, 106:3,
107:22, 108:4,
109:4, 109:19,
121:12, 159:21,
159:25, 168:17,
168:19, 168:25,
169:3, 169:11, 182:4
**diverted** [5] - 134:8,
134:9, 134:10,
134:15, 134:21
**divide** [1] - 187:13
**divided** [1] - 219:16
**Division** [2] - 23:16,
122:7
**division** [6] - 22:13,
22:15, 22:17, 22:18,
178:15, 190:16
**divisions** [1] - 22:12

**docs** [1] - 172:12
**document** [122] - 40:9,
40:13, 40:24, 44:18,
44:25, 47:14, 48:12,
50:9, 50:20, 56:1,
56:22, 57:22, 58:3,
72:14, 73:7, 73:19,
76:8, 79:7, 79:11,
84:20, 90:25, 95:15,
97:10, 99:3, 99:22,
99:24, 100:10,
100:21, 102:22,
103:7, 110:4, 110:8,
110:14, 111:16,
111:17, 111:20,
111:21, 111:23,
112:14, 112:24,
113:19, 114:4,
114:10, 115:14,
115:24, 120:18,
120:21, 120:23,
127:16, 127:18,
128:16, 128:19,
129:2, 129:11,
129:14, 130:9,
130:11, 130:17,
131:5, 131:14,
132:8, 135:8,
135:13, 137:9,
137:13, 139:25,
140:18, 140:20,
140:25, 141:9,
141:10, 143:1,
143:19, 145:4,
145:25, 146:15,
161:6, 161:11,
161:16, 161:20,
162:19, 163:23,
165:10, 167:2,
180:3, 180:12,
182:22, 182:24,
183:7, 183:8,
183:11, 183:13,
183:23, 190:18,
190:20, 190:24,
191:16, 191:21,
191:22, 192:1,
196:7, 196:9,
196:14, 196:16,
196:17, 197:6,
197:10, 197:15,
197:16, 198:3,
198:4, 198:8,
218:20, 218:22,
219:1, 219:6,
219:24, 220:3,
220:11, 220:13
**documentation** [6] -
30:3, 64:2, 64:8,
115:1, 173:11,
174:13

**documented** [3] -
40:9, 40:10, 215:4
**documenting** [1] -
166:1
**documents** [31] -
44:15, 46:21, 56:14,
56:16, 72:16, 72:17,
85:1, 97:16, 98:5,
104:23, 112:12,
129:4, 129:17,
130:22, 130:25,
139:4, 139:9, 144:4,
161:20, 174:24,
175:2, 175:4,
176:14, 189:17,
189:19, 195:24,
198:16, 199:6,
199:8, 200:15,
221:12
**dollar** [1] - 219:19
**done** [7] - 30:17,
30:18, 31:5, 68:25,
150:23, 153:21,
213:11
**door** [1] - 156:6
**doors** [1] - 114:23
**dosage** [12] - 59:4,
61:15, 62:11, 62:21,
161:14, 163:5,
163:13, 163:21,
164:2, 164:20,
165:3, 192:13
**dose** [1] - 59:2
**dosing** [9] - 51:10,
51:19, 52:6, 62:2,
67:3, 87:1, 87:18,
118:9, 119:1
**dots** [2] - 52:25, 61:22
**Douglas** [1] - 4:17
**down** [27] - 41:2, 49:1,
51:16, 59:5, 61:17,
62:7, 66:4, 66:10,
67:4, 68:24, 69:24,
71:1, 76:24, 83:16,
91:25, 92:7, 149:7,
152:11, 157:20,
159:20, 171:6,
189:25, 190:16,
192:1, 192:21,
197:25
**download** [2] - 55:16,
166:16
**downstream** [1] -
134:22
**Dr** [4] - 70:22, 161:23,
162:2, 163:25
**drafter** [1] - 139:21
**drafting** [1] - 133:4
**draw** [1] - 187:18
**drill** [2] - 66:10, 68:23

**Drive** [1] - 6:15
**DRUG** [2] - 1:7, 1:13
**drug** [27] - 32:21,
32:22, 32:23, 42:5,
54:20, 54:22, 60:3,
61:12, 62:8, 62:25,
67:23, 74:16, 74:18,
100:15, 100:25,
101:1, 118:10,
118:25, 119:3,
119:12, 178:20,
182:4, 212:19,
215:21, 217:8
**Drug** [21] - 6:2, 24:6,
77:8, 102:18,
102:22, 102:24,
103:6, 104:2,
156:23, 160:15,
160:23, 165:7,
169:15, 170:20,
171:6, 174:20,
175:3, 175:25,
196:24, 208:2, 223:7
**Drugs** [1] - 140:22
**drugs** [6] - 88:9,
118:2, 119:7,
190:17, 206:18,
219:23
**Duane** [1] - 108:3
**due** [43] - 25:20,
26:23, 26:24, 30:16,
30:25, 31:9, 38:13,
38:20, 39:25, 44:10,
76:4, 76:5, 76:15,
80:17, 90:19, 94:4,
94:13, 97:18, 99:6,
101:24, 110:11,
150:25, 166:13,
169:12, 169:19,
169:21, 172:23,
174:12, 175:7,
175:8, 176:8,
176:11, 176:13,
176:16, 206:25,
207:9, 213:22,
214:5, 214:7, 214:8,
214:12, 214:16,
214:21
**Due** [3] - 75:14, 75:16,
75:22
**duly** [1] - 125:14
**During** [2] - 188:22,
202:3
**during** [37] - 24:11,
38:15, 45:11, 45:15,
51:14, 51:21, 52:13,
52:24, 61:25, 81:3,
81:13, 81:18, 87:2,
95:23, 97:12, 97:14,
111:15, 113:14,

115:16, 142:9,
146:3, 148:17,
161:12, 165:2,
169:20, 171:22,
175:1, 179:11,
180:17, 184:23,
186:5, 188:15,
198:21, 198:24,
202:1, 206:25, 213:3
**duties** [7] - 141:13,
142:12, 195:16,
198:22, 203:25,
206:23, 207:16
**duty** [3] - 99:12,
137:16, 140:10

# E

**e-mail** [6] - 27:13,
42:16, 127:19,
127:24, 128:10,
132:4
**earliest** [2] - 103:20,
159:15
**early** [3] - 89:7,
161:13, 202:7
**easily** [1] - 156:17
**East** [3] - 3:5, 3:12,
4:18
**easy** [2] - 88:19,
188:12
**ebb** [1] - 52:7
**Ed** [2] - 170:3, 179:1
**educational** [1] -
126:7
**effect** [10] - 35:10,
80:4, 84:21, 85:1,
85:2, 117:21,
124:14, 128:17,
128:24, 154:10
**effective** [7] - 72:18,
110:19, 151:7,
151:10, 151:15,
153:11, 159:25
**effectiveness** [1] -
136:17
**efficacy** [1] - 160:7
**efficiency** [2] - 34:12,
136:17
**efficiently** [1] - 69:7
**effort** [3] - 64:7, 71:12,
160:17
**Efforts** [1] - 196:25
**efforts** [5] - 23:8,
26:25, 106:20,
108:24, 176:16
**eight** [1] - 198:18
**Eighth** [1] - 3:10
**EIP** [1] - 166:17
**either** [10] - 34:7,

111:25, 120:9,
138:21, 199:20,
208:25, 211:1,
215:15, 215:18,
221:11
**electronic** [4] - 28:23,
55:23, 88:17, 89:15
**electronically** [3] -
31:23, 44:5, 60:6
**elements** [3] - 73:17,
78:2, 186:9
**elevate** [1] - 207:12
**elicit** [2] - 137:12,
201:9
**eliminated** [1] - 216:1
**ELIZABETH** [1] - 6:14
**Elizabeth** [1] - 106:3
**ELMO** [2] - 197:17,
197:24
**email** [18] - 76:12,
79:3, 79:17, 79:19,
83:3, 83:12, 83:15,
83:16, 84:4, 84:9,
84:17, 93:11,
167:15, 167:23,
168:13, 171:2, 183:8
**emerging** [2] - 61:12
**employed** [2] - 202:3,
202:6
**employee** [4] - 106:5,
190:21, 190:24,
190:25
**Emporium** [16] - 77:8,
102:18, 102:23,
102:24, 103:6,
104:2, 156:23,
160:15, 160:23,
165:7, 169:16,
170:20, 171:6,
174:20, 175:3,
175:25
**empty** [4] - 170:15,
170:20, 170:25,
171:7
**ENC** [12] - 135:21,
135:23, 136:2,
136:20, 136:24,
137:4, 138:7,
138:25, 139:20,
140:1, 140:2
**Encino** [1] - 3:18
**encompass** [1] -
151:14
**encompassed** [1] -
148:3
**end** [14] - 26:25, 61:3,
61:5, 61:6, 89:7,
92:13, 92:15,
127:22, 134:22,
147:18, 152:12,

152:15, 198:7, 222:4
**end-of-life** [1] - 147:18
**endeavored** [1] -
47:24
**ending** [2] - 51:8,
52:24
**ends** [1] - 141:7
**Energy** [1] - 136:6
**enforced** [1] - 25:16
**enforcement** [11] -
22:7, 23:1, 23:2,
23:9, 23:13, 23:19,
79:14, 82:7, 108:10,
133:18, 151:20
**Enforcement** [3] -
24:3, 196:24, 196:25
**engage** [1] - 27:11
**engaged** [5] - 27:10,
109:5, 109:13,
115:17, 115:25
**engagement** [2] -
27:12, 109:5
**enhanced** [10] - 32:3,
89:3, 186:19,
187:10, 193:18,
200:17, 202:23,
202:25, 205:22,
216:23
**Enhanced** [1] - 187:11
**enhancement** [2] -
40:23, 186:19
**enhancements** [1] -
63:21
**Ensure** [1] - 140:24
**entered** [4] - 114:8,
119:20, 193:15,
220:2
**Enterprise** [1] - 98:25
**entire** [11] - 23:13,
47:2, 73:19, 126:4,
129:16, 131:12,
132:12, 135:9,
164:9, 202:3, 216:6
**entirely** [3] - 136:19,
136:25, 212:18
**entities** [1] - 126:8
**entity** [3] - 113:11,
116:15, 123:18
**entries** [2] - 99:8,
99:12
**entry** [2] - 56:1,
100:25
**ENU** [1] - 4:12
**epidemic** [1] - 138:10
**equally** [1] - 136:24
**era** [1] - 95:21
**Eric** [5] - 106:4,
167:23, 169:24,
170:1, 170:2
**ERP** [1] - 98:25

**especially** [1] - 91:15
**essential** [1] - 132:21
**essentially** [15] -
25:19, 26:5, 31:21,
33:15, 39:23, 98:23,
120:5, 120:8,
122:10, 124:23,
125:16, 126:6,
157:8, 174:15,
189:17
**establish** [3] - 69:16,
86:16, 132:22
**established** [4] - 36:2,
119:13, 163:18,
195:24
**establishes** [1] - 87:3
**establishing** [1] -
155:9
**et** [6] - 1:7, 1:13,
49:20, 216:21,
223:6, 223:7
**Europe** [1] - 24:10
**evade** [1] - 71:23
**evaluate** [5] - 37:3,
42:20, 45:21, 73:18,
74:14
**evaluated** [1] - 121:4
**evaluating** [4] - 38:2,
39:8, 74:23, 136:17
**evaluation** [1] -
126:15
**evening** [1] - 123:21
**event** [1] - 164:1
**events** [1] - 99:9
**eventually** [5] - 44:8,
83:5, 118:20,
174:24, 181:11
**evidence** [20] - 48:15,
49:13, 49:23, 50:3,
57:13, 57:17, 97:10,
99:4, 100:3, 104:23,
128:6, 128:14,
130:4, 130:5,
131:10, 137:6,
139:24, 196:10,
201:4, 222:7
**evolved** [2] - 91:14,
97:10
**exact** [2] - 62:20, 97:6
**exactly** [5] - 88:21,
94:16, 191:21,
210:7, 221:2
**examination** [6] -
41:24, 45:17, 64:23,
94:8, 164:12, 189:22
**EXAMINATION** [4] -
21:19, 149:14,
172:6, 177:20
**examines** [1] - 141:19
**examining** [2] -

189:15, 195:22
**example** [10] - 33:2,
35:16, 54:10, 69:15,
69:20, 86:19,
100:14, 157:12,
164:5, 164:6
**examples** [2] - 92:20,
92:21
**exceed** [1] - 190:15
**exceeded** [2] - 32:6,
217:17
**exceeds** [1] - 90:1
**Excel** [4] - 98:12,
98:15, 98:18, 120:21
**except** [5] - 46:18,
75:25, 88:6, 103:19,
174:11
**exception** [1] - 138:22
**exceptions** [2] -
33:18, 137:8
**excerpt** [2] - 56:5,
102:18
**exchange** [1] - 127:19
**exchanges** [1] - 93:11
**exclude** [2] - 222:6,
222:7
**excluded** [2] - 128:6,
144:4
**exclusion** [1] - 138:23
**excuse** [2] - 135:15,
221:18
**excused** [1] - 177:2
**executed** [2] - 193:20,
208:8
**executing** [3] -
195:16, 206:23,
207:16
**execution** [1] - 107:10
**exempt** [1] - 172:23
**exercising** [1] -
206:23
**EXHIBIT** [4] - 116:11,
122:1, 132:2, 140:15
**exhibit** [6] - 44:12,
160:16, 167:12,
168:14, 183:18,
196:17
**Exhibit** [9] - 112:11,
114:8, 165:18,
166:21, 167:2,
167:4, 167:8,
167:11, 167:17
**exhibits** [3] - 45:16,
149:19, 161:22
**exist** [4] - 34:13,
166:17, 195:25,
199:6
**existed** [1] - 38:3
**existing** [2] - 30:4,
37:18

**expect** [2] - 67:14, 71:15
**expectation** [3] - 80:5, 133:21, 154:18
**expected** [2] - 80:6, 142:7
**expend** [1] - 116:1
**experience** [8] - 21:25, 34:20, 37:15, 75:9, 86:4, 105:12, 132:18, 134:3
**experienced** [1] - 105:20
**expert** [1] - 161:12
**experts** [1] - 134:1
**explain** [10] - 32:18, 43:24, 44:1, 54:5, 67:8, 82:24, 85:9, 150:7, 178:10, 216:16
**explained** [8] - 26:19, 50:24, 82:2, 92:19, 106:8, 114:24, 170:3, 217:23
**explaining** [2] - 97:17, 99:4
**explanation** [3] - 45:19, 59:20, 80:21
**expressed** [3] - 132:16, 132:18, 132:24
**expressly** [2] - 150:12, 150:23
**extend** [2] - 159:14, 159:15
**extended** [1] - 159:12
**extends** [1] - 157:11
**extension** [1] - 167:14
**extent** [31] - 28:18, 30:22, 37:7, 45:12, 58:13, 73:16, 79:23, 81:9, 84:15, 97:4, 97:5, 125:13, 125:19, 126:6, 126:7, 136:12, 152:2, 161:16, 162:13, 164:25, 175:12, 175:18, 181:17, 187:21, 187:25, 189:15, 199:4, 201:3, 209:12, 211:9, 220:12

---

**F**

---

**FABER** [1] - 1:17
**Faber** [1] - 7:1
**face** [1] - 155:24
**facility** [2] - 167:21,

169:4
**fact** [29] - 32:9, 41:4, 41:8, 46:19, 46:24, 47:12, 49:12, 60:14, 82:25, 94:12, 95:3, 103:20, 119:9, 121:12, 122:18, 124:20, 128:18, 129:19, 136:8, 145:21, 173:25, 180:19, 181:11, 183:14, 192:18, 197:15, 200:20, 209:24, 213:16
**factor** [4] - 205:20, 206:13, 206:22, 217:5
**factored** [1] - 206:19
**fair** [14] - 22:1, 22:4, 22:23, 22:25, 108:18, 115:12, 115:13, 119:21, 143:14, 174:14, 176:6, 202:17, 203:1, 219:7
**fairly** [3] - 95:8, 188:19, 191:6
**falls** [1] - 154:1
**familiar** [16] - 60:14, 146:2, 167:7, 184:24, 185:6, 185:12, 185:17, 188:13, 190:3, 191:14, 194:3, 199:25, 209:4, 210:13, 219:5
**familiarity** [3] - 41:15, 42:14, 164:17
**familiarization** [1] - 146:11
**familiarize** [1] - 161:24
**familiarized** [1] - 146:7
**families** [13] - 32:22, 51:20, 54:20, 54:22, 60:3, 60:7, 62:9, 62:20, 67:23, 69:8, 190:17, 217:8
**Family** [4] - 102:2, 102:3, 103:4, 157:13
**family** [19] - 32:21, 32:23, 33:1, 33:6, 42:5, 51:17, 52:19, 54:11, 61:24, 62:4, 62:7, 62:25, 65:22, 89:23, 89:25, 90:8, 119:3, 176:1, 217:8
**far** [7] - 96:20, 120:7, 161:1, 161:3,

178:13, 203:11, 207:1
**FARRELL** [108] - 2:3, 29:13, 29:15, 43:2, 43:4, 45:8, 48:13, 49:8, 49:10, 55:21, 57:5, 57:9, 57:11, 57:13, 70:14, 127:25, 128:3, 129:8, 129:16, 130:23, 131:6, 131:9, 131:16, 131:21, 131:25, 135:15, 135:17, 135:19, 137:24, 138:4, 138:6, 138:16, 139:12, 139:16, 143:8, 143:11, 143:15, 143:18, 143:21, 143:24, 144:9, 144:12, 145:3, 177:8, 177:17, 177:21, 179:20, 179:22, 180:6, 180:16, 180:24, 181:5, 182:6, 182:7, 182:16, 182:19, 183:1, 183:6, 183:12, 183:20, 183:21, 184:21, 184:22, 186:6, 186:8, 186:12, 188:4, 188:10, 188:11, 189:11, 189:24, 191:3, 191:20, 192:1, 192:2, 194:25, 195:2, 196:3, 196:6, 196:8, 196:22, 197:23, 198:2, 198:14, 199:13, 199:24, 200:4, 201:9, 201:13, 201:20, 201:23, 205:8, 205:10, 206:10, 209:16, 209:21, 210:22, 211:1, 211:3, 211:12, 211:16, 218:17, 218:19, 218:24, 218:25, 220:15, 221:17, 221:24
**Farrell** [40] - 2:4, 2:15, 45:7, 46:15, 47:8, 47:18, 48:2, 49:23, 50:2, 57:3, 57:7, 57:8, 71:2, 128:3, 128:14, 129:4, 129:7, 130:4, 130:8,

130:21, 137:20, 143:7, 148:25, 180:15, 184:20, 188:9, 189:15, 191:2, 194:19, 195:20, 196:2, 196:21, 199:12, 210:20, 211:2, 211:15, 221:10, 221:11, 221:15
**favorable** [2] - 138:25, 139:2
**FCRR** [1] - 6:18
**FDI's** [1] - 114:7
**federal** [4] - 23:11, 91:13, 123:12, 138:18
**Federal** [3] - 141:3, 168:21, 210:11
**fee** [1] - 23:6
**feed** [4] - 41:1, 44:17, 47:14, 48:11
**fellow** [1] - 80:9
**felt** [1] - 115:18
**Fentanyl** [1] - 51:24
**few** [7] - 21:24, 23:18, 112:9, 149:16, 154:5, 170:10, 200:11
**fictional** [1] - 218:4
**Field** [2] - 23:16, 122:6
**field** [7] - 22:12, 22:13, 22:15, 22:17, 22:18, 82:23, 132:18
**fields** [1] - 157:15
**fifth** [4] - 27:20, 27:23, 28:15, 28:16
**figures** [2] - 61:20, 62:21
**file** [21] - 31:10, 38:21, 40:13, 40:15, 40:19, 40:21, 41:3, 55:23, 64:4, 111:20, 166:2, 166:5, 166:15, 170:17, 170:23, 173:6, 173:8, 173:22, 174:21, 179:24
**filed** [7] - 43:5, 135:19, 209:5, 209:10, 209:22, 209:25, 222:5
**files** [20] - 39:8, 55:14, 55:15, 56:6, 73:13, 76:4, 76:6, 76:16, 77:10, 94:21, 101:2, 166:12, 169:12, 169:19, 169:21, 170:6, 175:7, 175:8, 176:1, 209:19

**filings** [1] - 209:14
**final** [3] - 68:9, 123:7, 123:9
**finally** [3] - 34:11, 52:23, 59:19
**financially** [1] - 33:25
**finder** [1] - 180:19
**findings** [3] - 112:9, 112:19, 113:18
**fine** [3] - 47:11, 49:3, 64:16
**finished** [2] - 89:6, 123:22
**fires** [1] - 113:8
**Firm** [2] - 3:4, 3:7
**First** [1] - 129:5
**first** [36] - 23:20, 23:24, 25:19, 26:7, 28:2, 53:16, 54:24, 58:15, 66:16, 74:25, 76:19, 80:13, 86:16, 92:16, 92:25, 95:20, 97:13, 102:22, 115:24, 118:11, 118:19, 118:23, 120:24, 151:22, 158:12, 163:1, 163:4, 163:6, 170:9, 172:13, 174:1, 186:24, 195:12, 195:25, 199:7, 211:20
**fits** [1] - 36:20
**five** [9] - 23:21, 24:7, 29:4, 100:20, 108:10, 147:11, 171:4, 178:4, 191:13
**five-month** [1] - 100:20
**fix** [1] - 196:5
**FL** [1] - 2:14
**flag** [3] - 31:16, 52:8, 192:11
**Flagged** [1] - 63:17
**flagged** [19] - 52:9, 59:7, 59:8, 61:19, 62:2, 62:3, 62:5, 62:22, 63:8, 63:10, 63:11, 63:20, 63:22, 67:18, 67:20, 67:24, 89:12, 89:14, 126:22
**Flagged"** [1] - 59:25
**flagging** [1] - 216:10
**flags** [10] - 27:11, 27:16, 40:4, 42:10, 121:15, 121:16, 121:17, 122:24, 123:2, 216:7
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10

**flexibility** [1] - 132:21
**flip** [3] - 146:25, 196:10, 196:11
**flips** [1] - 147:25
**flooding** [1] - 129:9
**Floor** [1] - 3:5
**flow** [5] - 33:24, 36:3, 36:4, 52:7, 210:15
**fluctuated** [1] - 208:1
**flush** [1] - 155:16
**focus** [6] - 54:7, 62:17, 65:15, 74:17, 88:17, 145:13
**focused** [1] - 146:20
**focuses** [1] - 141:20
**focusing** [1] - 63:14
**folks** [5] - 107:4, 107:25, 109:12, 125:4, 168:23
**follow** [15] - 39:16, 39:25, 40:2, 42:10, 42:11, 48:1, 48:18, 77:10, 77:14, 181:13, 181:20, 181:24, 193:6, 194:16, 206:5
**follow-up** [9] - 39:16, 39:25, 40:2, 42:10, 42:11, 181:13, 181:20, 181:24, 193:6
**followed** [3] - 23:25, 24:8, 208:10
**following** [4] - 23:3, 123:4, 181:14, 210:4
**follows** [1] - 7:4
**FOR** [1] - 1:1
**Force** [2] - 124:6, 124:6
**force** [2] - 60:6, 185:14
**foregoing** [1] - 223:4
**foreign** [1] - 24:8
**foreshadow** [1] - 188:4
**Form** [1] - 117:15
**form** [2] - 98:14, 184:16
**formal** [1] - 144:15
**format** [4] - 55:15, 94:16, 97:4, 220:3
**formatting** [1] - 174:25
**former** [11] - 31:24, 106:3, 107:22, 107:23, 108:4, 108:7, 108:10, 109:9, 109:12, 109:19, 170:2
**formula** [1] - 190:3
**formulas** [1] - 191:15

**forth** [1] - 126:13
**forward** [5] - 21:15, 30:10, 46:7, 82:17, 193:23
**forward-looking** [1] - 46:7
**forwards** [1] - 169:25
**foundation** [16] - 28:13, 29:15, 29:19, 70:16, 97:7, 98:3, 129:11, 163:15, 191:4, 195:18, 196:7, 197:20, 198:3, 199:5, 199:8, 211:13
**four** [7] - 25:19, 50:22, 51:3, 95:10, 108:10, 163:1, 205:21
**fourth** [4] - 27:17, 27:18, 103:1, 173:6
**frame** [10] - 51:14, 185:5, 188:13, 188:15, 188:22, 198:21, 198:24, 200:7, 201:15, 213:3
**frames** [2] - 187:14, 200:14
**France** [3] - 23:24, 23:25, 173:12
**free** [2] - 129:1, 177:5
**Freese** [1] - 168:6
**frequency** [4] - 36:18, 38:12, 53:6, 85:18
**frequently** [2] - 169:20, 169:21
**Friday** [36] - 21:24, 25:25, 26:19, 29:9, 29:24, 30:23, 31:19, 38:5, 40:24, 43:8, 44:16, 50:24, 56:12, 59:11, 59:25, 68:16, 74:5, 106:8, 106:21, 111:7, 112:5, 112:11, 114:10, 117:5, 121:14, 128:5, 129:8, 130:8, 131:7, 149:18, 149:20, 154:21, 166:6, 171:9, 171:19, 176:11
**frog** [1] - 193:23
**front** [4] - 112:15, 149:19, 157:1, 169:25
**FTI** [12] - 68:16, 69:12, 109:2, 112:4, 112:5, 115:8, 115:14, 115:25, 156:15, 158:12, 159:8
**FTI's** [2] - 113:18,

115:22
**fulfill** [1] - 142:12
**full** [8] - 45:20, 46:23, 46:25, 47:12, 48:15, 81:21, 92:16, 146:12
**Fuller** [2] - 2:4, 2:15
**FULLER** [1] - 2:15
**fully** [1] - 123:8
**fun** [1] - 198:15
**function** [1] - 36:4
**functional** [1] - 108:15
**functions** [3] - 198:6, 204:7, 206:13
**fund** [1] - 23:8
**funded** [3] - 23:4, 23:6, 24:4

## G

**gained** [1] - 132:14
**GAO** [9] - 135:2, 136:15, 137:19, 141:1, 141:2, 141:15, 144:17, 198:21
**gap** [1] - 188:4
**Garcia** [2] - 106:3, 107:22
**gather** [2] - 38:7, 66:24
**gears** [1] - 25:9
**general** [5] - 83:21, 185:18, 187:14, 189:25, 192:3
**General** [4] - 136:21, 195:13, 195:15, 196:23
**generally** [11] - 25:16, 33:17, 33:18, 65:25, 91:16, 91:22, 103:24, 105:18, 106:11, 113:5, 169:23
**Generally** [2] - 80:25, 209:3
**generate** [1] - 68:8
**generated** [4] - 96:17, 115:13, 167:20, 173:23
**gentleman** [2] - 78:15, 78:19
**geographic** [5] - 87:4, 88:4, 88:12, 205:24, 206:1
**Geographic** [1] - 69:21
**geographical** [1] - 206:9
**geography** [2] - 88:5, 204:11

**given** [2] - 22:23, 68:5
**glean** [1] - 174:10
**GOA** [7] - 135:22, 135:25, 139:2, 145:17, 198:8, 198:11, 198:17
**goal** [2] - 62:12, 159:24
**good"** [1] - 132:9
**good/accountability** [1] - 132:14
**Google** [2] - 208:16, 208:24
**Government** [5] - 136:16, 140:3, 141:3, 141:4, 168:22
**government** [5] - 136:15, 136:18, 137:2, 137:16, 138:19
**governmental** [1] - 91:13
**grab** [1] - 159:9
**graphic** [1] - 158:16
**Gray** [1] - 222:1
**gray** [5] - 130:14, 132:8, 132:14, 132:19, 133:6
**Great** [1] - 149:25
**great** [2] - 106:10, 180:2
**green** [2] - 50:8, 52:11
**GRETCHEN** [1] - 6:7
**grounds** [5] - 45:8, 79:23, 180:11
**group** [20] - 22:21, 24:25, 25:3, 42:8, 55:10, 85:20, 86:15, 86:16, 86:21, 86:22, 87:13, 88:23, 90:14, 129:25, 204:4, 205:14, 205:15, 206:7, 209:18, 221:1
**Group** [2] - 27:15, 109:3
**grouping** [12] - 85:6, 85:8, 85:10, 85:22, 86:3, 86:6, 86:7, 87:10, 88:3, 89:17, 90:4, 90:5
**groups** [9] - 28:19, 86:8, 86:9, 86:10, 88:1, 106:18, 203:23, 216:24
**grow** [1] - 67:16
**growth** [2] - 67:13, 67:14
**guess** [15] - 63:6, 92:2, 100:19, 125:20, 126:4,

131:3, 133:12, 153:24, 157:10, 157:11, 164:25, 190:5, 200:13, 217:18, 218:3
**guessing** [1] - 191:23
**guidance** [12] - 35:13, 41:8, 41:19, 42:21, 127:4, 142:4, 142:5, 142:10, 142:18, 142:22, 144:15, 144:22
**Gundy** [1] - 106:21

## H

**H.D** [1] - 108:9
**had-related** [1] - 128:12
**half** [5] - 70:15, 97:13, 138:8, 138:13
**halfway** [3] - 83:16, 152:11, 159:20
**halted** [1] - 44:18
**hand** [23] - 33:23, 34:5, 34:8, 36:1, 58:23, 63:7, 72:11, 76:8, 79:7, 83:7, 90:21, 99:22, 102:17, 109:21, 113:22, 113:23, 120:14, 135:3, 157:5, 161:6, 177:14, 195:21, 219:4
**handed** [2] - 76:13, 79:11
**handle** [2] - 56:25, 174:4
**handling** [2] - 47:25, 153:7
**hands** [1] - 124:3
**happy** [3] - 43:12, 57:19, 67:7
**hard** [6] - 95:19, 98:14, 170:17, 174:21, 174:24, 175:4
**HARDIN** [1] - 5:3
**harkens** [1] - 209:14
**harm** [3] - 34:17, 35:1, 124:1
**Hawkins** [1] - 3:7
**hay** [2] - 138:25, 139:1
**Hazewski** [8] - 105:23, 106:1, 106:8, 106:17, 170:3, 179:1, 179:5, 199:22
**Hazewski's** [1] - 179:3
**HDMA** [3] - 209:18,

209:19
**head** [1] - 86:2
**headquarters** [8] - 22:9, 24:1, 80:18, 80:19, 80:21, 133:3, 181:19, 182:1
**Headquarters** [1] - 24:2
**health** [1] - 124:19
**Health** [6] - 4:11, 5:2, 123:20, 208:22, 209:2, 209:6
**healthcare** [4] - 33:16, 206:22, 207:6, 207:13
**hear** [2] - 33:11, 193:25
**heard** [5] - 33:11, 102:1, 108:17, 205:17, 208:24
**hearing** [3] - 131:10, 138:6, 138:14
**Hearing** [1] - 177:3
**hearings** [1] - 138:14
**hearsay** [11] - 79:22, 80:3, 97:24, 124:10, 128:22, 131:19, 137:8, 175:10, 175:12, 180:10, 180:11
**heat** [1] - 61:1
**held** [13] - 31:25, 32:5, 32:6, 36:2, 36:9, 36:25, 56:7, 59:22, 78:8, 114:17, 213:19, 213:22, 213:24
**Help** [2] - 140:23, 205:8
**help** [8] - 27:14, 49:4, 58:11, 69:6, 108:16, 177:4, 214:17, 221:1
**helpful** [5] - 48:7, 66:25, 133:7, 142:6, 160:12
**helping** [1] - 58:21
**helps** [1] - 109:7
**hesitant** [1] - 70:14
**HESTER** [7] - 5:9, 70:20, 162:5, 163:15, 180:10, 184:16, 222:5
**Hester** [1] - 70:25
**High** [1] - 67:2
**high** [11] - 22:2, 22:5, 60:3, 61:17, 63:11, 63:15, 67:3, 67:21, 67:23, 69:5, 69:8
**higher** [2] - 66:5, 68:12

highest [1] - 88:8
**highlighted** [3] - 62:18, 85:4, 151:23
**highlighting** [1] - 165:10
**himself** [2] - 161:24, 221:13
**hired** [3] - 108:4, 109:18, 123:11
**historic** [2] - 203:8, 203:11
**historical** [8] - 158:9, 159:6, 160:12, 160:17, 194:10, 195:15, 219:3, 219:8
**historically** [3] - 74:18, 101:16, 116:17
**history** [8] - 52:15, 69:17, 91:17, 91:18, 176:18, 216:19, 217:14, 218:13
**hit** [1] - 35:12
**hitting** [1] - 60:22
**hold** [3] - 35:14, 35:17, 214:21
**holding** [4] - 195:20, 210:3, 215:20
**holds** [2] - 35:11, 178:8
**Honor** [157] - 7:10, 21:18, 29:13, 29:17, 30:21, 30:24, 37:6, 43:2, 43:7, 44:11, 44:23, 45:24, 46:10, 46:16, 46:19, 47:22, 48:10, 48:21, 48:25, 49:1, 49:7, 49:17, 49:22, 50:5, 55:13, 56:3, 56:11, 56:15, 57:4, 57:19, 57:24, 64:16, 64:22, 70:9, 70:20, 70:25, 72:9, 72:12, 73:6, 73:16, 73:24, 76:10, 77:19, 77:22, 79:8, 79:22, 80:3, 80:10, 83:9, 84:12, 84:19, 84:25, 90:22, 93:19, 95:8, 97:1, 97:3, 97:9, 98:1, 99:2, 99:15, 99:24, 101:18, 102:19, 103:25, 109:22, 110:25, 111:3, 111:15, 113:24, 116:6, 120:15, 121:20, 121:24, 124:12, 127:12, 127:25, 128:7, 128:9,

129:13, 130:3, 131:16, 131:21, 135:5, 136:6, 137:18, 139:7, 139:18, 140:8, 140:11, 140:13, 142:25, 143:15, 143:18, 144:9, 144:12, 145:3, 148:20, 148:24, 149:3, 149:12, 150:13, 153:16, 155:7, 156:3, 157:17, 158:3, 161:7, 161:10, 162:5, 162:10, 162:18, 162:23, 163:16, 163:17, 163:24, 164:4, 164:15, 165:8, 168:3, 171:18, 172:5, 175:14, 176:20, 177:1, 180:9, 180:10, 180:24, 180:25, 182:6, 184:16, 184:21, 187:15, 189:14, 190:18, 191:11, 194:20, 194:25, 195:17, 196:13, 197:11, 197:14, 199:4, 199:17, 200:19, 205:4, 205:8, 206:2, 209:12, 209:16, 210:17, 218:18, 218:21, 220:12, 221:6, 221:21, 222:5
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**hope** [1] - 88:10
**hospital** [5] - 32:20, 49:19, 51:23, 51:25, 216:21
**Hospital** [2] - 50:23, 103:10
**hospitals** [5] - 49:12, 53:23, 147:12, 148:12, 217:2
**hour** [1] - 217:19
**hours** [3] - 35:14, 154:6, 213:7
**House** [1] - 135:21
**housekeeping** [2] - 177:17, 179:9
**houses** [1] - 116:15
**hover** [7] - 52:10, 52:25, 61:22, 62:3, 65:17, 66:19, 69:22

**hub** [3] - 206:22, 207:6, 207:13
**Human** [1] - 106:13
**human** [3] - 31:16, 40:20, 89:12
**humans** [1] - 89:15
**humble** [1] - 209:16
**hung** [1] - 153:24
**Huntington** [13] - 3:10, 4:1, 76:23, 76:25, 77:5, 146:5, 147:22, 147:24, 148:3, 169:8, 218:8, 219:9, 223:6
**HUNTINGTON** [1] - 1:4
**hybrid** [1] - 25:3
**hydrocodone** [13] - 54:11, 54:12, 62:4, 62:19, 62:25, 99:19, 100:22, 100:24, 111:17, 119:5, 163:13, 218:10, 220:7
**hydrocodoneJune 2014_November 2014** [1] - 111:21

I

**idea** [3] - 66:2, 150:2, 151:14
**identification** [1] - 133:9
**identified** [4] - 30:2, 32:22, 177:24, 198:9
**Identify** [1] - 196:20
**identify** [10] - 26:20, 81:1, 91:11, 121:15, 159:24, 180:3, 194:22, 201:5, 201:11, 204:12
**identifying** [2] - 113:11, 160:1
**ignoring** [1] - 60:8
**II** [3] - 118:2, 212:19, 213:8
**III** [4] - 118:3, 212:19, 213:9, 213:10
**imagine** [1] - 54:21
**immanently** [1] - 93:8
**Immediate** [1] - 193:9
**immediately** [3] - 35:16, 140:1, 192:4
**Impact** [1] - 59:19
**impact** [1] - 35:8
**impacted** [1] - 59:21
**impeachment** [1] - 155:8
**implement** [2] - 187:8,

202:18
**implemented** [2] - 80:18, 92:13
**implementing** [1] - 145:1
**impressed** [1] - 140:8
**impression** [3] - 81:12, 105:12, 105:15
**impressions** [1] - 75:2
**Improve** [1] - 140:23
**improvement** [3] - 115:2, 119:2, 119:8
**improvements** [3] - 75:7, 118:18, 119:4
**IN** [2] - 1:1, 1:18
**inadequate** [1] - 175:8
**incidental** [1] - 130:17
**include** [13] - 31:9, 32:16, 32:17, 40:17, 73:7, 73:12, 73:20, 122:6, 153:1, 163:20, 164:8, 166:18, 178:21
**included** [10] - 70:6, 104:5, 120:25, 127:20, 156:21, 158:14, 163:19, 166:15, 170:11, 178:22
**includes** [5] - 34:21, 45:20, 108:19, 153:14, 169:15
**including** [6] - 36:19, 69:3, 114:6, 120:12, 129:17, 166:13
**inconsistency** [2] - 155:10, 155:13
**inconsistent** [1] - 155:15
**incorporated** [4] - 39:3, 55:5, 67:1, 67:4
**increase** [2] - 60:11, 61:24
**increased** [2] - 62:5, 88:18
**incurring** [1] - 106:25
**indeed** [1] - 29:11
**independent** [7] - 53:19, 103:11, 140:3, 147:15, 148:12, 173:2, 174:6
**indicate** [2] - 121:2, 173:18
**indicated** [2] - 157:5, 199:19
**indicates** [3] - 84:9, 115:25, 173:21
**indication** [1] - 131:9

**individual** [10] - 27:6, 52:3, 53:8, 62:15, 89:21, 90:2, 160:8, 174:11, 179:11, 203:8
**individuals** [1] - 105:16
**industries** [1] - 133:12
**industry** [7] - 34:20, 133:13, 133:18, 134:4, 142:8, 184:8, 208:15
**infects** [1] - 163:23
**inform** [1] - 182:2
**information** [69] - 25:21, 25:22, 25:23, 25:24, 32:16, 32:17, 37:2, 38:1, 38:6, 38:7, 38:14, 38:19, 38:21, 38:24, 38:25, 39:3, 39:6, 40:14, 42:3, 44:16, 44:20, 44:24, 44:25, 45:22, 46:3, 46:4, 53:7, 53:17, 59:23, 62:13, 64:5, 66:24, 68:23, 71:10, 71:13, 71:15, 71:18, 71:20, 71:23, 81:6, 81:13, 81:18, 82:15, 82:16, 83:23, 84:21, 92:4, 96:12, 97:11, 116:25, 126:9, 127:23, 146:6, 163:1, 166:12, 166:13, 166:18, 167:20, 174:10, 174:16, 174:19, 175:5, 176:3, 195:5, 196:13, 196:16, 196:19, 197:4, 206:16
**Information** [1] - 140:22
**informed** [1] - 123:4
**informing** [1] - 122:13
**ingredient** [1] - 192:10
**initial** [2] - 123:5, 123:6
**initiated** [1] - 168:9
**initiation** [1] - 31:6
**initiative** [1] - 42:19
**input** [5] - 91:15, 137:23, 142:17, 216:11, 216:13
**inquiring** [1] - 27:13
**inquiry** [1] - 221:7
**insert** [1] - 54:19
**insight** [1] - 132:15
**insofar** [1] - 180:12

**inspection** [2] - 167:21, 169:23
**Inspector** [4] - 136:21, 195:13, 195:15, 196:23
**instance** [2] - 54:7, 85:14
**instances** [1] - 24:15
**instantly** [3] - 31:22, 36:2, 68:11
**instead** [4] - 49:12, 73:19, 119:5, 174:17
**instituted** [1] - 75:17
**instruct** [1] - 77:11
**instructed** [1] - 137:14
**Intelligence** [1] - 25:2
**intend** [6] - 45:16, 47:2, 57:16, 137:12, 188:6, 221:25
**intended** [2] - 84:20, 126:10
**intending** [2] - 35:7, 46:24
**intends** [1] - 26:4
**intent** [2] - 40:15, 145:4
**interaction** [1] - 126:14
**interactions** [1] - 126:19
**interest** [5] - 52:12, 59:22, 63:3, 63:22, 126:22
**Interest** [2] - 63:17, 65:3
**interested** [2] - 114:25, 131:10
**internal** [7] - 28:19, 34:7, 39:16, 42:23, 44:20, 97:15, 108:22
**internally** [1] - 40:7
**interpret** [1] - 131:6
**interpretation** [1] - 188:20
**interrupt** [1] - 137:15
**interviewed** [1] - 115:15
**intimately** [2] - 190:3, 191:14
**introduce** [1] - 136:2
**introduced** [1] - 180:12
**introduction** [1] - 180:11
**inventory** [3] - 33:22, 33:23, 34:5
**investigate** [3] - 118:4, 121:15, 137:16
**investigation** [4] -

94:9, 139:13, 139:14, 214:9
**investigations** [5] - 24:14, 25:4, 25:5, 106:23, 207:1
**investigator** [10] - 22:22, 79:13, 83:18, 106:3, 108:4, 108:8, 168:17, 168:19, 169:3, 169:11
**Investigator** [2] - 168:8, 168:16
**investigators** [10] - 22:16, 25:1, 25:2, 69:10, 106:1, 106:17, 106:22, 109:4, 159:22, 208:16
**invitation** [1] - 131:7
**inviting** [1] - 131:4
**involve** [1] - 24:19
**involved** [3] - 42:6, 48:7, 113:18
**involvement** [1] - 130:16
**involving** [1] - 24:12
**Iron** [3] - 170:17, 174:21, 175:2
**Irpino** [1] - 3:7
**ISIA** [1] - 5:4
**issue** [12] - 7:11, 43:17, 43:18, 123:23, 144:10, 144:15, 146:4, 154:9, 154:20, 155:23, 162:7, 164:6
**issued** [2] - 41:16, 136:8
**issues** [8] - 35:5, 38:12, 123:17, 129:6, 133:12, 136:13, 181:23, 209:13
**IT** [1] - 221:1
**Italy** [1] - 24:9
**items** [2] - 66:14, 146:1
**iteration** [2] - 103:21, 185:12
**iterations** [1] - 186:15
**itself** [7] - 38:21, 58:23, 114:13, 129:2, 130:17, 138:7, 145:5

### J

**Jackson** [2] - 6:8, 83:19
**Jacksonville** [2] -

83:3, 83:4
**January** [4] - 52:13, 72:18, 73:2, 122:5
**JASIEWICZ** [1] - 5:4
**Jeff** [1] - 108:3
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**Jesse** [1] - 168:6
**Jim** [1] - 108:3
**job** [2] - 106:12, 141:13
**Joe** [1] - 182:10
**John** [1] - 91:3
**join** [2] - 71:1, 181:2
**joinder** [1] - 104:24
**joined** [34] - 29:3, 29:8, 29:12, 29:23, 30:9, 30:12, 30:20, 32:10, 37:19, 38:4, 75:1, 78:3, 86:5, 89:1, 91:18, 94:9, 99:17, 100:4, 101:7, 101:9, 101:11, 101:25, 104:20, 104:23, 105:4, 105:11, 105:13, 105:17, 107:12, 107:19, 108:9, 109:12, 116:17, 117:23
**joining** [6] - 78:5, 78:7, 94:11, 96:16, 105:8, 130:6
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:15
**Juan** [2] - 2:5, 2:17
**Judge** [15] - 7:2, 45:8, 70:14, 143:9, 177:17, 179:20, 180:6, 182:16, 183:20, 186:6, 186:8, 188:4, 197:23, 201:20, 221:24
**judge** [4] - 48:13, 49:8, 55:21, 57:13, 123:12, 131:6, 135:15, 139:12
**JUDGE** [1] - 1:17
**jump** [1] - 69:9
**June** [5] - 83:20, 100:16, 122:11, 193:14, 193:20
**Justice** [1] - 196:24

### K

**Kallal** [1] - 108:3
**KEARSE** [1] - 4:2
**keep** [8] - 33:23, 67:7,

71:13, 71:15, 100:12, 149:5, 149:16, 210:20
**Keep** [2] - 67:7, 67:21
**keeps** [1] - 98:10
**Kelley** [1] - 222:1
**Kelly** [1] - 6:8
**Kentucky** [4] - 78:9, 79:2, 79:14, 82:8
**kept** [3] - 72:19, 98:5, 208:20
**Kessler** [1] - 4:17
**Kevin** [1] - 106:6
**key** [2] - 215:14, 216:4
**Key** [1] - 58:24
**keywords** [1] - 208:17
**kind** [5] - 22:8, 50:19, 60:12, 65:17, 186:21
**kinds** [2] - 106:14, 195:24
**knowing** [4] - 76:1, 150:2, 150:6, 151:16, 152:18, 153:1, 153:14, 153:20
**knowledge** [7] - 32:11, 116:19, 169:7, 193:12, 201:10, 214:6, 214:24
**known** [3] - 117:9, 119:21, 169:5
**KOUBA** [1] - 3:14
**Kreutzer** [1] - 106:6

### L

**LA** [1] - 3:8
**labeling** [1] - 201:3
**lack** [4] - 114:16, 115:4, 163:15
**laid** [5] - 191:4, 195:18, 197:21, 199:5, 211:13
**language** [7] - 25:18, 36:15, 36:19, 43:24, 63:19, 117:21, 144:25
**Lanier** [1] - 3:4
**lapel** [1] - 64:23
**large** [4] - 92:13, 204:2, 217:1, 220:8
**last** [26] - 23:15, 24:21, 25:6, 25:19, 58:9, 59:11, 68:21, 84:20, 87:5, 100:2, 102:1, 120:22, 142:9, 161:13, 165:14, 171:19, 173:17, 182:24,

183:23, 200:11, 204:9, 205:21, 209:14, 218:17
**late** [4] - 28:24, 145:2, 169:20, 217:19
**latest** [1] - 40:24
**LAURA** [1] - 5:10
**Law** [3] - 3:4, 3:7, 3:12
**law** [14] - 22:7, 43:8, 79:14, 82:7, 91:14, 108:10, 129:25, 137:4, 150:6, 151:2, 151:20, 152:3, 155:4, 155:25
**laws** [2] - 150:24, 152:1
**Lawtrac** [7] - 166:7, 166:11, 170:14, 170:20, 171:6, 172:12, 173:18
**lawyer** [1] - 48:7
**lawyers** [2] - 139:17, 144:2
**lay** [5] - 29:19, 70:16, 98:2, 129:10, 198:2
**laying** [1] - 70:15
**lead** [2] - 24:2, 186:9
**leadership** [1] - 22:10
**leading** [2] - 207:20, 207:24
**leap** [1] - 193:23
**learning** [1] - 92:22
**learnings** [2] - 92:17, 92:23
**learns** [2] - 60:23, 71:22
**least** [13] - 30:9, 31:20, 34:4, 35:14, 47:23, 82:13, 91:10, 100:23, 114:25, 118:13, 119:3, 133:4, 145:25
**leave** [4] - 134:17, 180:19, 221:24
**Lee** [5] - 3:12, 83:16, 83:17, 83:18, 84:6
**leeway** [1] - 155:16
**left** [17] - 50:19, 50:20, 51:16, 52:14, 61:5, 63:7, 63:17, 66:19, 67:2, 67:10, 67:17, 67:21, 67:25, 109:16, 147:12, 148:12, 188:4
**left-hand** [1] - 63:7
**legacy** [7] - 91:21, 95:4, 190:19, 190:21, 190:23, 190:24, 190:25
**legal** [6] - 140:10,

144:2, 150:14, 156:4, 181:20, 209:19
**legitimate** [1] - 207:8
**lengthy** [2] - 95:8, 135:8
**Leon** [2] - 2:4, 2:16
**less** [5] - 34:7, 61:6, 86:8, 107:18, 217:13
**letter** [9] - 91:3, 92:10, 93:10, 93:12, 110:22, 182:10, 182:13, 183:19, 204:17
**letters** [1] - 122:12
**level** [33] - 22:2, 22:6, 32:16, 32:17, 39:9, 50:25, 51:3, 51:4, 59:10, 66:11, 67:4, 68:24, 69:25, 71:21, 87:14, 95:1, 107:11, 134:1, 134:21, 134:22, 136:8, 136:14, 141:24, 165:1, 213:24, 214:4, 214:15, 214:19, 215:9, 215:10, 215:12
**Levin** [1] - 2:12
**Lewis** [2] - 132:23, 133:2
**Lewis's** [1] - 132:15
**LEYIMU** [1] - 4:8
**license** [7] - 31:5, 31:8, 31:9, 31:11, 31:12, 50:21, 125:24
**licensed** [4] - 30:18, 125:12, 125:15, 125:22
**licenses** [1] - 59:9
**licensure** [1] - 125:18
**life** [3] - 26:10, 40:16, 147:18
**lifetime** [1] - 106:5
**light** [3] - 47:12, 173:25, 197:15
**lighter** [1] - 61:6
**limine** [2] - 43:5, 135:19
**limit** [3] - 45:9, 192:10, 201:14
**limited** [8] - 80:7, 80:11, 84:24, 159:2, 159:7, 164:6, 180:21, 181:3
**limits** [1] - 45:3
**LINDA** [1] - 4:5
**line** [4] - 53:1, 95:20, 199:7, 219:10
**lines** [2] - 66:20,

187:20
**liquid** [1] - 51:24
**Lisa** [2] - 6:18, 223:3
**List** [8] - 120:2, 120:3, 121:3, 121:7, 121:12, 121:19, 122:4, 122:9
**list** [19] - 76:20, 94:24, 108:2, 118:24, 118:25, 119:6, 120:5, 120:8, 120:25, 121:1, 121:6, 121:9, 127:21, 160:21, 175:7, 182:25, 190:14, 198:8
**listed** [15] - 26:16, 27:2, 60:18, 119:7, 120:10, 121:5, 122:14, 123:3, 123:10, 123:14, 147:8, 152:19, 153:2, 175:21, 220:11
**listener** [5] - 80:4, 84:21, 124:14, 128:17, 128:24
**literally** [1] - 130:10
**litigation** [3] - 47:13, 49:11, 186:14
**lives** [1] - 125:7
**Liz** [1] - 107:21
**LLC** [1] - 2:4
**loaded** [2] - 216:14, 217:14
**loads** [1] - 216:15
**local** [4] - 25:1, 78:17, 82:7, 122:6
**located** [3] - 107:8, 122:7, 122:13
**location** [3] - 22:17, 38:23, 76:19
**locations** [7] - 34:15, 76:17, 76:18, 76:19, 76:20, 148:18, 172:20
**Lockbourne** [1] - 169:5
**lodged** [1] - 182:24
**Logan** [2] - 6:5, 6:12
**logical** [1] - 26:11
**long-term** [3] - 147:17, 148:10, 148:12
**look** [62] - 26:10, 27:4, 38:6, 38:8, 38:10, 38:12, 38:13, 40:15, 40:16, 49:14, 51:5, 51:9, 51:10, 54:8, 54:11, 54:14, 54:17,

58:11, 58:21, 60:2, 61:13, 61:17, 62:8, 62:20, 62:23, 65:11, 65:15, 66:12, 66:14, 67:5, 68:10, 69:3, 69:5, 74:17, 82:11, 86:16, 86:17, 86:25, 87:14, 87:16, 90:10, 90:16, 92:3, 109:25, 114:3, 120:18, 127:16, 128:9, 135:10, 149:22, 159:12, 159:17, 160:12, 160:17, 160:24, 180:2, 193:24, 203:8, 203:11, 203:15, 203:24, 204:5
**looked** [20] - 29:9, 29:24, 38:8, 50:11, 58:9, 62:10, 64:6, 85:22, 86:24, 87:20, 96:5, 97:5, 97:18, 156:21, 159:6, 161:1, 161:3, 161:4, 203:18
**looking** [55] - 25:25, 26:2, 27:6, 27:7, 29:8, 33:22, 39:20, 46:7, 47:6, 50:17, 50:20, 51:16, 51:23, 52:17, 53:6, 53:8, 58:18, 58:23, 61:10, 61:14, 61:21, 61:23, 62:1, 62:24, 65:18, 65:24, 66:8, 67:3, 67:17, 67:25, 68:2, 69:1, 69:13, 96:5, 98:14, 105:22, 137:10, 142:2, 144:25, 145:13, 146:15, 157:12, 165:18, 165:19, 170:6, 175:25, 188:23, 190:1, 192:5, 194:14, 198:20, 204:11, 204:16, 205:18, 205:23
**Looking** [1] - 75:14
**looks** [13] - 50:16, 54:14, 55:1, 59:7, 66:2, 84:7, 90:3, 95:20, 95:21, 148:11, 161:14, 167:14, 187:23
**loss** [2] - 34:10, 106:23
**losses** [1] - 106:25
**lost** [1] - 148:10

**loud** [1] - 142:16
**Louisville** [7] - 78:9, 78:16, 78:24, 79:13, 83:23, 84:3, 114:24
**low** [4] - 60:4, 61:17, 63:12, 69:5
**lower** [2] - 60:8, 136:14
**lower-level** [1] - 136:14
**LTC** [1] - 147:15
**lump** [1] - 27:19
**lunch** [1] - 154:8

## M

**Magazine** [1] - 3:7
**magic** [1] - 190:11
**MAHADY** [1] - 6:4
**mail** [7] - 27:13, 42:16, 83:4, 127:19, 127:24, 128:10, 132:4
**main** [3] - 29:4, 80:16, 123:15
**MAINIGI** [1] - 4:12
**maintained** [3] - 98:5, 98:15, 120:5
**maintaining** [1] - 120:11
**Maintenance** [1] - 69:11
**maintenance** [2] - 40:25, 173:13
**MAJESTRO** [1] - 2:6
**Majestro** [1] - 2:6
**major** [1] - 108:25
**Majority** [1] - 139:9
**majority** [5] - 136:9, 137:22, 137:25, 148:2, 159:1
**manage** [11] - 42:1, 58:11, 58:22, 60:15, 60:24, 69:20, 98:24, 108:16, 125:7, 174:12
**managed** [2] - 110:18, 113:14
**Management** [1] - 166:11
**management** [1] - 40:11
**mandates** [1] - 42:21
**manner** [3] - 46:13, 49:18, 165:4
**manufacturer** [1] - 154:2
**manufacturers** [1] - 118:3
**map** [2] - 61:1, 65:16

**Mapes** [3] - 109:14, 109:16, 110:5
**Mapes'** [1] - 110:21
**Mara** [1] - 108:3
**Marcet** [1] - 23:24
**March** [3] - 75:1, 78:12, 89:2
**Marcum** [4] - 78:18, 78:23, 79:1, 79:3
**Marcum's** [2] - 78:21, 79:12
**Mark** [1] - 149:12
**MARK** [1] - 3:16
**marked** [1] - 111:16
**marketing** [2] - 44:20, 44:23
**marks** [1] - 52:11
**Martin** [3] - 78:15, 91:3, 106:4
**Mary's** [10] - 48:23, 50:23, 55:19, 58:17, 69:1, 70:10, 103:10, 103:16, 104:4
**match** [1] - 28:7
**materially** [1] - 139:25
**materials** [6] - 71:5, 179:14, 179:17, 179:23, 180:4, 181:8
**matrix** [3] - 55:6, 65:18, 114:13
**matter** [17] - 79:24, 84:16, 125:16, 139:17, 140:9, 143:24, 154:22, 170:14, 170:20, 171:7, 172:12, 173:18, 173:22, 173:25, 175:20, 180:23, 223:5
**Matter** [1] - 166:11
**MAY** [2] - 1:19, 147:2
**May's** [3] - 81:11, 97:12, 155:10
**MAYS** [1] - 177:15
**Mays** [25] - 107:3, 177:8, 177:9, 177:12, 177:23, 180:17, 181:6, 184:11, 186:3, 186:13, 189:15, 189:19, 189:20, 189:25, 190:25, 191:12, 198:15, 199:20, 200:5, 200:21, 201:24, 210:24, 211:9, 221:9, 221:18
**McCann** [7] - 70:22, 161:12, 161:16, 161:20, 163:19,

163:25, 164:7
**McCann's** [2] - 161:23, 162:2
**McCloud** [20] - 77:2, 102:2, 102:3, 102:7, 102:12, 102:18, 103:2, 103:4, 103:6, 104:2, 156:23, 160:15, 163:13, 164:21, 169:15, 170:14, 170:22, 173:4, 173:8, 175:25
**MCCLURE** [196] - 6:3, 21:18, 21:20, 26:6, 26:8, 27:23, 29:17, 29:21, 29:22, 30:7, 30:24, 31:4, 34:19, 34:23, 37:11, 37:14, 43:7, 43:11, 43:13, 44:11, 44:22, 45:24, 46:1, 47:11, 48:21, 49:17, 50:5, 50:6, 54:2, 54:4, 54:23, 54:25, 55:13, 56:3, 56:5, 56:11, 56:21, 57:4, 57:19, 57:24, 58:2, 58:5, 61:8, 62:14, 64:13, 64:16, 64:22, 65:2, 70:9, 70:25, 71:4, 72:8, 72:13, 73:6, 73:16, 74:1, 74:2, 76:8, 76:11, 77:19, 77:24, 79:7, 79:10, 80:3, 80:10, 80:12, 81:11, 81:19, 83:7, 83:11, 84:12, 84:19, 84:25, 85:5, 90:21, 90:24, 93:24, 95:7, 95:14, 97:1, 97:9, 98:1, 98:4, 99:2, 99:15, 99:16, 99:22, 100:7, 101:18, 101:23, 102:21, 103:25, 104:9, 104:15, 109:24, 110:25, 111:5, 111:15, 111:19, 112:1, 114:2, 116:6, 116:12, 116:14, 120:14, 120:17, 121:20, 122:2, 124:12, 127:10, 127:15, 128:7, 128:9, 128:23, 129:13, 130:3, 132:3, 132:7, 132:10, 135:3, 135:7, 135:13, 135:16, 136:4, 136:6, 137:7,

137:18, 139:7, 139:18, 140:7, 140:11, 140:13, 140:16, 140:17, 142:25, 143:5, 144:13, 144:14, 145:7, 146:8, 146:10, 146:25, 147:22, 148:2, 148:5, 148:20, 148:24, 150:13, 155:7, 156:3, 156:6, 157:17, 158:3, 158:21, 161:10, 161:19, 162:10, 163:17, 164:4, 165:8, 168:3, 171:18, 172:5, 172:7, 175:14, 175:22, 176:20, 176:22, 180:9, 181:2, 182:21, 183:3, 187:15, 187:25, 189:14, 190:18, 191:11, 194:17, 194:20, 195:17, 196:13, 197:3, 197:14, 197:20, 199:4, 199:17, 200:19, 201:16, 205:4, 206:2, 209:12, 210:17, 211:8, 218:21, 220:12, 221:6
**McClure** [11] - 21:17, 48:19, 52:2, 80:2, 84:18, 111:14, 156:20, 167:1, 167:12, 172:4, 191:10
**McClure's** [1] - 97:21
**MCCLURE:can** [1] - 113:22
**MCGINNESS** [1] - 4:2
**McKesson** [2] - 5:8, 161:15
**mean** [21] - 33:14, 41:5, 113:9, 113:13, 131:4, 146:19, 147:16, 152:16, 156:20, 158:1, 163:25, 164:6, 166:18, 172:18, 173:7, 173:11, 174:2, 174:22, 199:20, 207:21, 210:22
**Meaning** [1] - 101:5
**meaning** [1] - 132:19

**meaningful** [2] - 82:15, 82:16
**means** [8] - 44:2, 59:20, 63:14, 65:20, 88:13, 127:5, 173:14, 194:21
**measured** [2] - 69:23, 89:23
**measures** [1] - 179:9
**measuring** [1] - 90:7
**mechanical** [1] - 6:19
**mechanism** [3] - 32:4, 89:14, 222:2
**medical** [1] - 126:17
**Medical** [6] - 48:24, 55:19, 103:10, 103:16, 104:4, 147:14
**Medicare** [1] - 70:7
**medication** [5] - 35:7, 122:20, 123:19, 124:25, 125:6
**medications** [3] - 126:2, 126:10, 134:17
**medium** [9] - 60:3, 60:11, 61:17, 63:11, 69:5, 88:13, 204:2, 217:1, 220:7
**meet** [2] - 90:18, 142:12
**meeting** [36] - 39:21, 41:22, 78:8, 78:11, 78:12, 78:14, 78:22, 79:4, 79:12, 79:25, 80:17, 81:3, 81:8, 81:14, 81:18, 82:6, 82:15, 91:4, 91:23, 92:12, 93:13, 93:14, 93:15, 93:16, 128:10, 128:11, 128:12, 128:18, 128:21, 129:1, 130:12, 132:5, 179:12, 180:5, 180:17, 181:18
**meetings** [13] - 39:20, 41:25, 42:2, 42:11, 42:13, 42:15, 42:17, 42:20, 78:4, 78:6, 114:24, 129:18, 129:24
**meets** [1] - 209:18
**member** [5] - 25:22, 32:8, 37:1, 39:10, 42:12
**members** [9] - 28:20, 30:1, 36:5, 37:3, 38:1, 105:18, 105:19, 110:6, 132:5

**memorandum** [1] - 110:5
**mention** [1] - 60:1
**mentioned** [17] - 25:25, 27:1, 28:22, 38:5, 40:24, 52:2, 59:25, 62:8, 66:13, 66:16, 66:21, 68:16, 72:3, 74:20, 86:3, 107:21, 109:1
**menu** [1] - 97:7
**mercifully** [1] - 221:15
**merge** [2] - 189:7, 190:22
**merger** [3] - 185:7, 189:1, 191:6
**message** [1] - 124:21
**met** [3] - 75:11, 106:2, 193:4
**Met** [2] - 78:9, 193:6
**metadata** [1] - 111:19
**method** [1] - 201:5
**methods** [1] - 68:7
**metric** [3] - 60:4, 66:11, 67:19
**metrics** [10] - 42:7, 51:6, 58:24, 58:25, 66:13, 68:4, 69:3, 70:4, 70:16, 70:21
**Metrics** [4] - 58:24, 65:5, 65:6, 69:21
**mic** [3] - 50:7, 57:8, 64:23
**MICHAEL** [2] - 2:15, 3:9
**microfiche** [1] - 173:10
**mid** [3] - 87:9, 87:10, 89:4
**mid-size** [2] - 87:9, 87:10
**middle** [5] - 142:15, 142:16, 187:23, 188:5, 220:5
**midway** [1] - 63:21
**might** [6] - 48:6, 103:21, 113:1, 155:24, 155:25, 175:13
**Mike** [4] - 109:13, 109:16, 110:5, 187:3
**MILDRED** [1] - 3:3
**Miller** [2] - 127:22, 132:4
**million** [3] - 59:2, 59:4, 164:3
**mind** [8] - 80:6, 81:10, 82:18, 84:24, 84:25, 128:25, 180:21, 180:22

mind-set [1] - 82:18
minimal [1] - 219:8
minimum [3] - 210:21, 218:12, 218:14
minor [1] - 187:15
minority [2] - 137:23, 137:25
minute [7] - 100:11, 109:25, 112:4, 120:18, 128:1, 167:3, 212:8
minutes [3] - 64:20, 149:6, 191:13
misled [1] - 48:4
miss [1] - 212:13
missed [1] - 138:9
missing [1] - 55:5
misstates [1] - 158:21
mistake [1] - 201:13
mistaken [3] - 135:21, 192:20, 220:23
misusing [1] - 125:5
Mitchell [1] - 2:12
mitigate [6] - 26:15, 27:16, 121:17, 123:1, 123:8, 125:17
mitigating [1] - 110:19
modern [1] - 25:12
moment [7] - 95:16, 114:3, 127:16, 148:20, 157:1, 176:20, 178:10
monitor [5] - 27:1, 27:24, 62:9, 195:16, 208:14
monitored [1] - 208:15
monitoring [11] - 60:2, 60:25, 82:12, 142:20, 152:19, 153:2, 184:14, 185:19, 188:14, 202:11, 208:12
Monitoring [27] - 26:11, 26:18, 31:14, 78:1, 85:8, 85:20, 89:1, 89:3, 89:10, 90:17, 90:19, 107:9, 107:10, 110:9, 176:15, 185:13, 186:4, 186:15, 187:3, 193:17, 200:24, 201:1, 201:2, 202:8, 202:14, 203:13, 206:19
month [32] - 51:6, 51:8, 51:14, 52:13, 54:17, 58:25, 59:2, 59:21, 62:12, 75:21,

78:11, 82:9, 83:2, 100:17, 100:19, 100:20, 115:18, 116:22, 117:2, 118:7, 157:15, 181:19, 190:1, 190:14, 192:5, 217:5, 217:10, 217:12, 218:3, 218:10
monthly [14] - 47:1, 47:3, 47:5, 57:25, 58:4, 58:8, 70:10, 80:19, 100:17, 190:15, 192:18, 212:20, 213:12, 217:25
months [13] - 23:15, 24:21, 51:7, 51:18, 62:21, 75:23, 157:9, 157:11, 157:13, 157:14, 159:2, 159:11, 218:2
moreover [1] - 124:14
morning [7] - 21:21, 21:22, 111:15, 205:17, 221:16, 221:19, 221:23
Morris [1] - 6:15
most [10] - 60:7, 63:15, 68:22, 87:2, 118:7, 145:14, 157:14, 174:24, 176:17, 188:6
motion [4] - 43:5, 135:19, 136:23, 222:6
Motley [5] - 2:9, 3:14, 4:3, 4:5, 4:8
MOUGEY [1] - 2:12
Mountain [3] - 170:17, 174:21, 175:2
move [23] - 30:25, 44:10, 50:19, 54:2, 55:13, 55:17, 65:4, 65:6, 67:2, 70:9, 73:6, 73:11, 76:24, 77:19, 84:12, 93:19, 97:1, 101:18, 103:25, 110:25, 121:20, 143:2, 167:25
Move [3] - 67:10, 67:17, 67:25
moved [2] - 109:20, 143:1
moving [10] - 31:14, 51:5, 52:5, 52:14, 62:1, 67:7, 67:21, 104:10, 120:1

Moving [3] - 71:25, 72:3, 77:25
MR [177] - 2:3, 2:6, 2:9, 2:12, 2:15, 3:9, 3:11, 3:16, 4:17, 5:9, 5:10, 5:13, 6:4, 7:10, 29:13, 29:15, 30:21, 34:18, 37:6, 43:2, 43:4, 45:8, 47:22, 48:10, 48:13, 49:8, 49:10, 55:21, 57:5, 57:9, 57:11, 57:13, 70:14, 70:20, 73:24, 77:22, 79:22, 81:9, 84:15, 93:22, 97:3, 97:21, 101:21, 104:13, 111:3, 111:25, 116:9, 121:24, 124:10, 127:25, 128:3, 129:8, 129:16, 130:23, 131:6, 131:9, 131:16, 131:21, 131:25, 135:15, 135:17, 135:19, 137:24, 138:4, 138:6, 138:16, 139:12, 139:16, 143:8, 143:11, 143:15, 143:18, 143:21, 143:24, 144:9, 144:12, 145:3, 149:3, 149:12, 149:15, 151:4, 153:16, 154:4, 155:14, 155:20, 156:10, 158:7, 159:13, 161:22, 162:4, 162:5, 162:18, 162:23, 162:24, 163:15, 163:24, 164:15, 164:16, 165:6, 165:17, 166:21, 166:25, 167:25, 168:5, 171:21, 172:2, 175:10, 175:12, 177:1, 177:8, 177:17, 177:21, 179:20, 179:22, 180:6, 180:10, 180:16, 180:24, 181:5, 182:6, 182:7, 182:16, 182:19, 183:1, 183:6, 183:12, 183:20, 183:21, 184:16, 184:21, 184:22, 186:6, 186:8,

186:12, 188:4, 188:10, 188:11, 189:11, 189:24, 191:3, 191:20, 192:1, 192:2, 194:25, 195:2, 196:3, 196:6, 196:8, 196:22, 197:23, 198:2, 198:14, 199:13, 199:24, 200:4, 201:9, 201:13, 201:20, 201:23, 205:8, 205:10, 206:10, 209:16, 209:21, 210:22, 211:1, 211:3, 211:12, 211:16, 218:17, 218:19, 218:24, 218:25, 220:15, 221:17, 221:24, 222:5
MS [213] - 3:3, 3:6, 3:14, 4:2, 4:5, 4:8, 4:12, 4:12, 4:15, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 21:18, 21:20, 26:6, 26:8, 27:23, 29:17, 29:21, 29:22, 30:7, 30:24, 31:4, 34:19, 34:23, 37:11, 37:14, 43:7, 43:11, 43:13, 44:11, 44:22, 45:24, 46:1, 47:11, 48:21, 49:17, 50:5, 50:6, 54:2, 54:4, 54:23, 54:25, 55:13, 56:3, 56:5, 56:11, 56:21, 57:4, 57:19, 57:24, 58:2, 58:5, 61:8, 62:14, 64:13, 64:16, 64:22, 65:2, 70:9, 70:25, 71:4, 72:8, 72:13, 73:6, 73:16, 74:1, 74:2, 76:8, 76:11, 77:19, 77:24, 79:7, 79:10, 80:3, 80:10, 80:12, 81:11, 81:19, 83:7, 83:11, 84:12, 84:19, 84:25, 85:5, 90:21, 90:24, 93:24, 95:7, 95:14, 97:1, 97:9, 98:1, 98:4, 99:2, 99:15, 99:16, 99:22, 100:7, 101:18, 101:23, 102:21, 103:25, 104:9, 104:15, 109:24, 110:25, 111:5, 111:15, 111:19,

112:1, 113:22, 114:2, 116:6, 116:12, 116:14, 120:14, 120:17, 121:20, 122:2, 124:12, 127:10, 127:15, 128:7, 128:9, 128:23, 129:13, 130:3, 132:3, 132:7, 132:10, 135:3, 135:7, 135:13, 135:16, 136:4, 136:6, 137:7, 137:18, 139:7, 139:18, 140:7, 140:11, 140:13, 140:16, 140:17, 142:25, 143:5, 144:13, 144:14, 145:7, 146:8, 146:10, 146:25, 147:2, 147:22, 148:2, 148:5, 148:20, 148:24, 150:13, 155:7, 156:3, 156:6, 157:17, 158:3, 158:21, 161:10, 161:19, 162:10, 163:17, 164:4, 165:8, 168:3, 171:18, 172:5, 172:7, 175:14, 175:22, 176:20, 176:22, 180:9, 180:25, 181:2, 182:21, 183:3, 187:15, 187:25, 189:14, 190:18, 191:11, 194:17, 194:20, 195:17, 196:13, 197:3, 197:14, 197:20, 199:4, 199:17, 200:19, 201:16, 205:4, 206:2, 209:12, 210:17, 211:8, 218:21, 220:12, 221:6
Mt [3] - 3:15, 4:4, 4:9
multi [1] - 119:3
multi-drug [1] - 119:3
multiple [2] - 45:22, 51:1
multiples [1] - 190:15
multiplier [1] - 189:13
multiplying [1] - 192:9

# N

**NADDI** [1] - 151:19
**name** [9] - 42:4, 102:24, 111:21, 167:22, 168:7, 168:12, 177:11, 177:22, 202:20
**named** [2] - 78:15, 122:23
**names** [1] - 146:22
**narcotic** [1] - 212:19
**narcotics** [3] - 118:3, 213:8, 213:9
**national** [7] - 30:13, 30:15, 58:17, 58:18, 207:20, 207:21, 212:17
**nationally** [2] - 59:3, 61:11
**nationwide** [3] - 117:3, 121:9, 121:10
**native** [1] - 55:15
**nature** [4] - 85:17, 164:11, 165:15, 189:21
**NDC's** [1] - 33:4
**near** [3] - 45:13, 46:1, 99:9
**near-term** [2] - 45:13, 46:1
**necessarily** [2] - 150:11, 155:15
**necessary** [6] - 35:15, 82:5, 82:22, 124:16, 125:18, 132:21
**necessity** [1] - 126:18
**need** [6] - 39:24, 55:16, 64:12, 82:2, 134:1, 198:2
**needed** [2] - 72:4, 92:24
**needs** [3] - 59:19, 158:1, 183:5
**nefarious** [1] - 71:17
**never** [4] - 59:16, 161:19, 191:16
**nevertheless** [4] - 35:9, 35:11, 139:23, 162:15
**new** [30] - 24:2, 25:3, 25:20, 26:12, 28:11, 30:16, 30:20, 30:25, 31:6, 39:6, 41:15, 41:18, 55:3, 60:23, 69:15, 74:20, 75:25, 80:17, 89:3, 93:2, 108:5, 171:11, 171:13, 171:14, 187:8, 193:17,

194:11, 207:1, 214:9, 218:11
**New** [7] - 3:5, 3:8, 23:21, 75:14, 75:16, 75:22
**newer** [2] - 88:25, 120:1
**news** [2] - 208:15, 208:25
**next** [13] - 35:20, 62:11, 63:3, 68:20, 69:11, 69:21, 74:7, 86:22, 91:16, 92:9, 110:15, 177:7, 212:10
**Nicholas** [1] - 7:5
**NICHOLAS** [2] - 6:11, 7:10
**night** [3] - 45:17, 46:21, 182:24
**nine** [2] - 147:8, 187:22
**Ninth** [1] - 4:6
**Nobody** [1] - 157:25
**nobody** [1] - 7:7
**Noerr** [5] - 128:13, 129:5, 129:21, 209:13, 209:15
**Noerr-Pennington** [5] - 128:13, 129:5, 129:21, 209:13, 209:15
**non** [9] - 27:8, 33:9, 33:20, 49:10, 51:11, 67:12, 87:1, 160:14, 219:23
**non-controlled** [4] - 51:11, 87:1, 160:14, 219:23
**non-controls** [3] - 27:8, 33:20, 67:12
**non-opioid** [1] - 33:9
**non-retail** [1] - 49:10
**none** [1] - 136:22
**nonetheless** [1] - 55:25
**noon** [1] - 111:9
**normal** [4] - 35:24, 36:17, 98:10, 127:7
**North** [1] - 24:7
**notations** [1] - 151:18
**note** [11] - 40:20, 55:23, 73:7, 111:22, 173:10, 187:15, 187:19, 189:14, 190:20, 195:20, 199:18
**noted** [2] - 143:12, 173:6
**notes** [4] - 150:5,

151:23, 152:7, 159:20
**nothing** [1] - 215:14
**notice** [6] - 80:5, 80:8, 128:17, 128:24, 137:12, 145:17
**notification** [1] - 122:6
**notified** [1] - 44:5
**notion** [10] - 26:24, 32:5, 53:10, 62:1, 85:10, 85:20, 90:10, 93:1, 141:24, 153:19
**November** [3] - 93:4, 100:16, 145:9
**nowadays** [1] - 205:17
**nucleus** [1] - 106:16
**nuisance** [1] - 57:15
**number** [28] - 26:5, 33:21, 42:5, 45:9, 45:13, 45:14, 45:18, 50:21, 52:18, 56:4, 60:11, 61:3, 62:6, 69:18, 87:18, 88:23, 111:17, 118:4, 140:7, 141:7, 159:18, 164:2, 173:20, 173:23, 192:9, 196:17, 208:1
**Number** [7] - 96:5, 149:20, 172:10, 172:13, 173:4, 174:1, 174:20
**numbered** [1] - 120:22
**numbering** [1] - 172:20
**numbers** [8] - 22:18, 50:22, 51:1, 61:18, 97:6, 97:16, 162:1, 165:11
**numerous** [1] - 148:16
**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

# O

**oath** [2] - 21:16, 177:10
**object** [20] - 49:10, 79:22, 84:15, 97:3, 143:7, 145:3, 161:16, 161:20, 162:16, 163:18, 180:11, 189:20, 196:17, 199:7, 199:17, 200:20, 201:3, 209:12, 211:8, 221:6
**Object** [1] - 184:16
**objecting** [1] - 131:24

**objection** [73] - 29:13, 30:21, 34:18, 37:6, 43:2, 45:8, 47:17, 48:9, 48:14, 48:19, 49:8, 55:20, 55:22, 56:1, 57:22, 70:13, 70:18, 73:22, 77:21, 77:22, 84:14, 84:17, 93:21, 93:22, 97:20, 97:23, 101:20, 101:21, 104:13, 111:2, 111:3, 116:8, 116:9, 121:22, 124:10, 124:14, 127:25, 128:2, 135:17, 135:18, 143:12, 143:13, 145:3, 155:7, 155:18, 156:3, 161:10, 163:17, 164:12, 165:14, 165:16, 168:2, 175:12, 177:3, 180:8, 180:25, 184:20, 188:3, 191:24, 194:20, 196:4, 197:11, 197:12, 198:13, 200:3, 201:18, 205:4, 206:2, 210:17, 220:12, 221:14
**Objection** [8] - 81:9, 150:13, 153:16, 158:21, 163:15, 175:10, 194:17, 195:17
**objections** [6] - 47:23, 47:25, 128:13, 162:12, 182:24, 201:15
**obligation** [2] - 40:5, 46:20
**observed** [1] - 140:9
**obtain** [1] - 195:5
**Obviously** [1] - 70:15
**obviously** [1] - 174:7
**occasion** [1] - 27:10
**occasions** [3] - 24:13, 40:2, 40:3
**occur** [3] - 37:24, 84:9, 93:3
**occurred** [2] - 28:25, 119:25
**occurrence** [2] - 92:20, 212:21
**occurrences** [1] - 60:15
**October** [2] - 95:21
**odd** [1] - 160:24

**OF** [2] - 1:1, 1:4
**offer** [4] - 50:2, 84:21, 116:25, 144:7
**offered** [14] - 80:4, 97:16, 100:2, 128:17, 128:19, 128:23, 128:25, 130:9, 130:18, 137:3, 144:22, 144:23, 145:9, 145:17
**offering** [3] - 129:15, 144:24, 158:4
**Office** [7] - 136:16, 136:20, 140:4, 141:3, 195:12, 195:15, 196:23
**office** [4] - 78:9, 80:18, 83:19, 123:25
**officer** [2] - 78:17, 106:9
**officers** [2] - 22:16, 82:23
**Offices** [1] - 24:10
**official** [7] - 123:20, 124:5, 124:8, 124:19, 136:10, 137:19
**Official** [2] - 223:2, 223:3
**official's** [2] - 124:11, 124:13
**officials** [1] - 82:7
**Ohio** [4] - 87:15, 87:24, 88:11, 167:21
**OIG** [13] - 135:24, 135:25, 136:20, 137:14, 139:2, 195:13, 195:18, 195:21, 197:8, 198:8, 198:11, 198:17, 198:21
**old** [1] - 171:4
**Old** [1] - 172:15
**OMP** [26] - 45:19, 58:16, 58:22, 58:24, 60:16, 85:4, 89:11, 91:14, 94:18, 95:19, 96:16, 101:13, 102:11, 110:16, 110:18, 158:8, 158:14, 187:3, 193:19, 200:7, 200:8, 200:16, 200:24, 201:5, 201:11
**on-board** [1] - 26:24
**on-boarded** [1] - 28:21
**on-boarding** [1] -

25:20
**on-going** [7] - 94:4, 94:13, 97:18, 99:5, 99:6, 101:24, 176:8
**once** [11] - 34:15, 44:4, 53:16, 102:12, 121:3, 134:16, 154:12, 189:12, 212:9, 214:12, 219:16
**One** [5] - 5:11, 92:17, 182:6, 200:23, 214:13
**one** [103] - 7:11, 26:5, 32:24, 33:5, 33:21, 35:4, 35:21, 44:15, 45:9, 45:13, 45:22, 47:22, 47:24, 48:7, 50:12, 51:4, 51:9, 51:20, 52:10, 53:7, 53:8, 53:14, 54:7, 58:14, 60:24, 61:11, 61:22, 62:3, 63:16, 63:25, 65:19, 66:8, 69:20, 69:22, 70:5, 75:17, 76:19, 77:9, 78:7, 78:19, 82:13, 86:21, 87:6, 90:4, 93:22, 94:21, 95:10, 95:11, 95:16, 96:12, 99:25, 100:11, 104:7, 108:7, 116:21, 117:8, 118:6, 118:8, 119:3, 121:16, 121:18, 122:22, 123:15, 126:2, 133:19, 134:23, 138:3, 138:18, 138:21, 138:22, 139:15, 141:20, 142:1, 145:25, 146:12, 147:14, 150:1, 151:22, 154:7, 156:21, 157:17, 158:1, 159:5, 161:22, 164:5, 164:6, 166:7, 166:14, 171:3, 176:20, 186:17, 186:24, 188:12, 189:1, 193:6, 203:21, 208:6, 214:18, 214:19
**ones** [2] - 60:8, 70:21
**ongoing** [2] - 26:24, 44:10
**open** [1] - 173:22
**operate** [2] - 37:18, 210:16

**operated** [1] - 97:14
**operates** [2] - 71:21, 85:12
**operating** [4] - 75:6, 75:10, 86:4, 105:16
**operation** [2] - 46:10, 92:16
**operations** [1] - 98:10
**opining** [1] - 43:5
**opinion** [3] - 209:17, 210:9, 210:10
**opinions** [1] - 144:3
**opioid** [3] - 25:4, 33:9, 138:10
**Opioids** [1] - 197:1
**opioids** [4] - 24:12, 74:17, 125:5, 184:15
**opportunities** [2] - 75:7, 138:10
**opportunity** [10] - 49:14, 53:6, 54:6, 91:24, 92:1, 92:6, 109:17, 109:20, 123:6, 138:20
**opposed** [3] - 125:20, 156:18, 174:5
**opposing** [2] - 95:11, 100:1
**option** [1] - 121:18
**options** [1] - 192:20
**order** [141] - 26:4, 26:17, 27:2, 27:13, 27:15, 31:22, 31:25, 32:2, 32:5, 32:6, 32:9, 32:15, 32:16, 32:18, 32:19, 32:21, 32:23, 33:1, 33:3, 33:7, 33:19, 34:1, 34:16, 34:25, 35:14, 35:18, 35:19, 35:21, 35:22, 35:23, 36:1, 36:2, 36:8, 36:11, 36:12, 36:13, 36:14, 36:23, 37:4, 38:2, 38:7, 39:8, 39:10, 39:12, 39:15, 39:17, 40:4, 40:9, 40:20, 41:2, 41:4, 41:9, 42:2, 42:3, 42:6, 42:25, 43:16, 43:18, 43:19, 43:20, 43:22, 44:4, 44:6, 45:5, 45:6, 52:3, 52:14, 52:16, 52:18, 52:19, 52:23, 53:1, 53:3, 53:8, 54:15, 59:16, 59:22, 60:2, 60:25, 63:7, 71:11, 74:21, 75:18, 82:12, 83:25, 85:11, 85:12, 89:21,

89:22, 90:1, 90:3, 93:2, 99:5, 125:10, 127:1, 130:15, 133:8, 133:9, 133:25, 134:4, 134:7, 134:9, 134:10, 134:11, 134:14, 134:15, 134:19, 134:20, 142:6, 144:16, 145:14, 154:12, 154:14, 160:1, 160:8, 166:14, 174:6, 176:7, 184:4, 192:11, 192:25, 209:5, 211:19, 211:24, 212:2, 212:9, 212:11, 213:16, 213:19, 213:22, 214:3, 215:11, 215:15, 215:20, 215:24, 216:2, 218:10
**Order** [31] - 26:11, 26:18, 31:14, 39:22, 40:7, 40:17, 78:1, 85:8, 85:19, 89:1, 89:3, 89:9, 90:17, 90:19, 107:9, 107:10, 110:9, 176:15, 185:13, 186:4, 186:15, 187:3, 193:9, 193:17, 200:24, 201:1, 202:8, 202:13, 203:13, 206:19
**ordered** [10] - 33:3, 33:4, 52:19, 59:3, 85:17, 90:12, 123:13, 124:3, 192:15, 192:23
**ordering** [21] - 38:10, 54:18, 60:20, 67:11, 69:16, 89:24, 90:7, 90:11, 96:7, 158:9, 160:3, 160:18, 165:19, 171:3, 176:15, 184:5, 185:19, 185:25, 203:9, 203:11, 203:16
**orders** [89] - 26:21, 27:6, 32:17, 33:8, 35:11, 36:6, 36:16, 36:17, 36:25, 41:12, 41:22, 42:20, 52:9, 52:11, 52:12, 53:13, 54:1, 59:7, 59:8, 60:22, 61:3, 61:4, 61:18, 61:19, 62:2,

62:4, 62:5, 62:22, 63:3, 63:8, 63:10, 63:11, 63:15, 63:20, 63:22, 64:3, 67:10, 67:18, 69:18, 80:20, 80:23, 81:2, 82:19, 82:20, 82:24, 85:15, 85:17, 87:11, 89:12, 89:15, 89:17, 89:19, 90:13, 90:15, 91:12, 114:17, 114:19, 115:6, 126:22, 126:23, 133:13, 134:12, 134:25, 142:20, 152:21, 153:4, 153:11, 153:15, 154:1, 154:9, 154:17, 155:4, 156:1, 166:1, 166:19, 184:14, 185:23, 188:14, 195:16, 201:5, 202:12, 214:25, 215:20
**Orders** [3] - 59:24, 63:16, 65:3
**Orders"** [1] - 63:17
**ordinary** [1] - 72:20
**organization** [2] - 108:20, 209:11
**organizational** [2] - 22:2, 22:6
**original** [3] - 167:15, 167:16, 197:11
**Originally** [1] - 75:21
**Orleans** [1] - 3:8
**Oscar** [1] - 187:3
**otherwise** [2] - 133:15, 173:23
**outcome** [2] - 210:6, 210:7
**outline** [1] - 90:19
**outlined** [1] - 100:15
**output** [1] - 98:20
**outside** [10] - 27:15, 36:7, 55:7, 68:17, 104:8, 108:23, 109:1, 109:9, 109:12, 132:23
**outsider** [1] - 137:1
**outstanding** [1] - 145:21
**over-reporting** [1] - 82:3
**overall** [7] - 58:12, 66:6, 75:2, 82:1, 204:5, 205:19, 206:11
**overdose** [6] - 66:21, 66:25, 70:5, 199:3,

199:15, 203:4
**overflow** [7] - 7:8, 44:18, 47:15, 56:16, 64:25, 157:19, 218:22
**overlaid** [1] - 66:22
**overlap** [2] - 179:2, 179:4
**overly** [1] - 132:19
**overriding** [2] - 125:11, 126:6
**overrule** [7] - 48:9, 57:21, 164:12, 188:3, 191:24, 198:12, 200:2
**overruled** [8] - 30:6, 31:1, 34:22, 43:9, 47:19, 150:18, 209:20, 211:14
**Overruled** [7] - 81:15, 153:18, 175:15, 194:19, 199:10, 205:9, 206:4
**overruling** [2] - 125:19, 125:21
**oversaw** [1] - 178:19
**overseas** [2] - 23:23, 23:24
**oversee** [1] - 37:18
**Overseeing** [1] - 74:12
**overseen** [1] - 37:21
**oversight** [4] - 23:16, 24:9, 78:23, 108:12
**own** [13] - 28:20, 42:19, 42:23, 65:22, 66:23, 89:18, 114:6, 115:14, 115:20, 132:20, 164:23, 189:17
**owned** [1] - 207:23
**ownership** [3] - 172:21, 174:4, 174:8
**OX** [1] - 65:20
**oxycodone** [12] - 33:3, 33:5, 65:21, 65:23, 66:17, 66:18, 99:19, 163:4, 164:20, 218:10, 220:7, 220:16
**OY** [1] - 65:20

---

**P**

---

**P-00472** [3] - 113:23, 116:7, 116:11
**P-0898** [1] - 149:22
**P-1200** [1] - 2:7
**P-17140** [1] - 172:8
**P-2726** [1] - 182:20
**P-32** [1] - 183:17

**P-432** [1] - 219:25
**P-43225** [1] - 161:6
**P-82** [1] - 190:9
**P-8813** [2] - 179:21, 180:6
**P-898** [1] - 159:18
**p.m** [1] - 222:11
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**pack** [1] - 44:1
**packed** [5] - 32:1, 32:7, 35:24, 43:23, 44:9
**Page** [19] - 91:20, 110:12, 112:24, 113:2, 114:13, 114:14, 130:14, 141:6, 141:18, 142:3, 142:14, 152:6, 159:18, 168:14, 190:10, 190:13, 196:11, 198:17
**page** [11] - 45:22, 83:15, 102:22, 103:1, 146:15, 159:20, 169:25, 170:9, 196:10, 196:18, 197:16
**pages** [6] - 45:22, 120:22, 120:23, 141:5, 163:1, 163:6
**panel** [1] - 135:22
**Papa** [1] - 187:3
**Papantonio** [1] - 2:12
**paragraph** [10] - 81:5, 81:20, 91:8, 91:9, 91:16, 91:20, 92:9, 132:11, 132:12, 142:4
**paragraphs** [1] - 79:20
**parameter** [8] - 52:3, 87:7, 87:22, 90:1, 90:3, 90:4, 90:5, 90:6
**parameters** [16] - 32:6, 35:12, 35:23, 36:2, 45:1, 45:4, 45:6, 52:2, 52:21, 69:19, 71:11, 87:6, 88:8, 88:13, 89:21, 132:22
**Pardon** [1] - 175:11
**parentheses** [1] - 172:16
**Paris** [1] - 23:25
**Park** [1] - 147:14
**Part** [1] - 70:7
**part** [28] - 23:5, 29:4, 29:11, 82:17, 91:21,

92:13, 98:10, 110:12, 110:14, 118:14, 130:9, 133:4, 133:17, 145:14, 145:25, 150:10, 151:13, 152:13, 153:12, 160:25, 161:13, 162:18, 167:2, 169:23, 176:10, 185:2, 202:19, 213:4
**participants** [1] - 81:17
**participate** [2] - 41:25, 42:17
**particular** [60] - 26:3, 32:25, 33:6, 38:11, 38:23, 40:1, 42:7, 44:6, 45:2, 50:23, 51:12, 52:4, 52:10, 53:3, 54:8, 54:9, 54:18, 55:9, 55:11, 56:15, 58:13, 60:10, 60:16, 62:17, 62:25, 63:23, 65:15, 65:18, 65:23, 66:5, 66:7, 66:10, 66:11, 66:15, 67:15, 71:21, 73:1, 87:14, 88:3, 89:23, 89:24, 96:6, 96:19, 107:6, 112:25, 113:1, 118:25, 119:6, 133:16, 133:17, 157:9, 158:11, 184:6, 185:20, 204:19, 204:21, 206:21
**particularly** [3] - 71:11, 130:13, 138:17
**parties** [2] - 47:13, 177:24
**partnered** [2] - 68:16, 68:17
**partners** [1] - 109:1
**partnership** [1] - 68:18
**parts** [3] - 141:17, 150:21, 163:3
**partway** [1] - 152:7
**party** [1] - 47:25
**pass** [3] - 35:22, 95:7, 127:10
**past** [8] - 38:10, 49:15, 90:12, 108:5, 133:11, 153:21, 190:1, 192:5
**patient** [11] - 35:3, 35:5, 35:7, 38:22, 67:15, 122:19,

123:16, 123:19, 123:23, 126:10, 126:15
**patient/doctor** [1] - 126:12
**patients** [8] - 34:17, 35:1, 35:10, 123:24, 124:2, 124:24, 126:2, 147:18
**pattern** [6] - 36:17, 38:12, 53:5, 60:20, 127:8, 204:21
**patterns** [18] - 158:9, 160:18, 165:19, 184:5, 184:6, 184:7, 184:14, 185:20, 185:22, 185:25, 203:16, 204:13, 204:19, 204:24, 205:3, 205:11, 205:12, 206:17
**PAUL** [2] - 2:3, 5:9
**pause** [1] - 64:17
**Pause** [7] - 95:18, 100:13, 110:2, 148:23, 167:5, 172:1, 176:21
**pay** [1] - 23:7
**pdf** [3] - 55:14, 55:18, 55:22
**PEARL** [1] - 3:6
**peer** [28] - 55:10, 85:6, 85:8, 85:10, 85:20, 85:22, 86:3, 86:6, 86:7, 86:8, 86:9, 86:10, 86:15, 86:16, 87:10, 87:13, 88:1, 88:3, 88:23, 89:17, 90:4, 90:5, 90:14, 203:23, 204:4, 205:14, 205:15, 206:7
**peers** [1] - 90:9
**pejorative** [1] - 210:22
**pending** [2] - 136:1, 162:8
**Pennington** [5] - 128:13, 129:5, 129:21, 209:13, 209:15
**Pensacola** [1] - 2:14
**people** [6] - 7:7, 105:16, 106:7, 106:11, 168:25, 170:5
**per** [8] - 47:24, 67:2, 67:5, 67:6, 78:10, 100:17, 217:7, 218:15
**perceived** [1] - 88:18

**percent** [6] - 63:8, 63:10, 66:1, 88:15, 174:10, 210:2
**percentage** [14] - 52:6, 59:8, 61:19, 61:21, 62:5, 62:22, 65:20, 65:21, 66:2, 66:17, 67:17, 67:23, 68:2, 96:7
**Percentage** [2] - 67:10, 67:21
**percentages** [1] - 51:22
**Perfect** [1] - 202:22
**perform** [4] - 119:3, 150:25, 153:10, 171:16
**performance** [1] - 141:12
**performed** [3] - 31:13, 89:20, 214:12
**performing** [8] - 109:14, 171:15, 198:6, 198:22, 203:25, 204:7, 206:13, 206:15
**performs** [1] - 126:15
**perimeter** [4] - 45:3, 52:3, 53:2, 126:25
**period** [59] - 35:17, 37:9, 38:12, 46:12, 51:6, 51:17, 51:21, 52:24, 54:12, 58:20, 60:16, 61:25, 65:23, 75:21, 75:23, 87:2, 89:2, 96:6, 96:22, 98:22, 100:15, 100:20, 101:12, 101:14, 101:15, 101:25, 102:14, 104:24, 105:7, 107:7, 113:14, 118:7, 146:4, 148:17, 157:2, 157:16, 160:3, 163:11, 165:2, 174:23, 184:12, 187:16, 187:19, 187:21, 189:16, 194:23, 195:19, 197:9, 200:12, 201:1, 201:2, 201:6, 201:12, 201:17, 202:1, 203:7, 205:22, 221:12, 222:3
**period's** [1] - 97:18
**permission** [2] - 64:22, 186:8
**Permission** [1] -

166:22
**permit** [1] - 129:3
**permits** [1] - 186:10
**permitted** [6] - 34:13, 49:1, 121:8, 129:10, 136:2, 181:10
**permitting** [1] - 155:12
**person** [2] - 99:11, 123:19
**Person** [1] - 107:7
**personal** [1] - 193:12
**personally** [4] - 106:2, 182:12, 182:14, 209:1
**personnel** [8] - 22:18, 42:1, 44:4, 79:15, 107:6, 107:23, 114:18, 133:3
**perspective** [4] - 82:14, 113:12, 123:16, 176:13
**perspectives** [1] - 132:15
**pertinent** [1] - 38:21
**PETER** [1] - 2:12
**petition** [1] - 222:8
**PG** [1] - 61:24
**Pharma** [2] - 27:15, 109:3
**pharmaceutical** [1] - 33:12
**pharmaceuticals** [2] - 33:17, 219:21
**Pharmacies** [1] - 148:17
**pharmacies** [23] - 33:19, 33:22, 49:15, 53:19, 53:21, 85:22, 87:16, 88:14, 88:15, 122:13, 160:16, 165:4, 165:9, 170:11, 173:2, 204:3, 205:25, 206:3, 206:7, 206:8, 219:17, 220:8, 220:17
**pharmacist** [4] - 125:14, 125:23, 126:14, 126:15
**pharmacists** [2] - 26:1, 108:7
**Pharmacy** [11] - 76:21, 102:2, 102:3, 103:4, 122:8, 122:12, 122:23, 122:25, 169:15, 172:10, 172:14
**pharmacy** [54] - 31:11, 32:15, 32:19, 34:4,

34:7, 34:16, 34:24, 35:6, 35:19, 44:9, 49:11, 49:20, 85:14, 85:15, 86:19, 87:9, 87:21, 87:23, 88:11, 103:10, 103:11, 109:8, 118:6, 122:7, 122:8, 122:23, 123:4, 123:13, 123:14, 123:15, 124:4, 124:9, 124:25, 125:12, 125:13, 125:24, 126:3, 147:15, 147:17, 165:2, 172:19, 172:20, 174:5, 174:11, 175:7, 204:2, 211:19, 216:21, 218:4, 218:6, 218:7, 219:2, 219:8

**PharMerica** [1] - 172:15

**Philadelphia** [2] - 6:6, 6:13

**phone** [1] - 141:15

**phonetic** [1] - 108:5

**phonetic)** [1] - 108:3

**phrase** [2] - 33:11, 113:2

**physician** [1] - 126:1

**physicians** [1] - 26:1

**pick** [3] - 44:1, 44:7, 64:17

**picked** [5] - 32:1, 32:7, 35:24, 43:23, 44:9

**picking** [2] - 139:3, 139:4

**piece** [1] - 177:17

**pieces** [1] - 192:21

**Pifko** [12] - 48:2, 97:20, 101:20, 104:12, 111:20, 149:13, 150:14, 155:8, 155:13, 158:6, 165:10, 176:25

**PIFKO** [48] - 3:16, 30:21, 34:18, 37:6, 73:24, 77:22, 79:22, 81:9, 84:15, 93:22, 97:3, 97:21, 101:21, 104:13, 111:3, 111:25, 116:9, 121:24, 124:10, 149:3, 149:12, 149:15, 151:4, 154:4, 155:14, 155:20, 156:10, 158:7, 159:13,

161:22, 162:4, 162:18, 162:23, 162:24, 163:24, 164:15, 164:16, 165:6, 165:17, 166:21, 166:25, 167:25, 168:5, 171:21, 172:2, 175:10, 175:12, 177:1

**pills** [2] - 45:11, 129:9

**place** [23] - 26:20, 28:6, 29:25, 45:4, 46:2, 48:14, 53:7, 54:1, 69:7, 75:3, 81:1, 82:2, 85:15, 86:5, 91:11, 104:20, 105:4, 111:8, 122:4, 139:19, 153:12, 195:25, 199:7

**placed** [8] - 32:23, 41:4, 48:18, 52:16, 59:7, 61:18, 67:10, 89:22

**placements** [1] - 23:19

**places** [6] - 31:22, 33:3, 40:10, 41:9, 150:7, 211:19

**plaintiff** [1] - 164:11

**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1

**Plaintiff's** [1] - 167:3

**plaintiffs** [13] - 44:13, 45:14, 46:5, 46:6, 46:8, 46:19, 48:1, 95:9, 114:8, 129:1, 136:2, 143:25, 149:13

**Plaintiffs** [3] - 167:25, 177:8, 223:6

**Plaintiffs'** [2] - 112:10, 166:21

**PLAINTIFFS'** [1] - 177:15

**planning** [1] - 113:10

**plate** [1] - 139:11

**platform** [4] - 40:11, 41:1, 98:22, 98:24

**Platform** [1] - 98:25

**play** [1] - 67:20

**Playbook** [2] - 129:17, 129:19

**pleading** [1] - 209:19

**Pleasant** [3] - 3:15, 4:4, 4:9

**plug** [1] - 62:19

**point** [45] - 34:3, 36:9, 46:15, 46:17, 46:23, 47:22, 55:17, 58:19,

63:6, 63:25, 64:9, 64:11, 64:17, 66:5, 72:7, 73:23, 76:20, 84:19, 102:7, 112:25, 118:16, 128:19, 130:10, 133:22, 139:19, 146:13, 163:18, 164:4, 164:14, 165:8, 165:22, 166:14, 171:4, 175:6, 176:6, 181:22, 182:2, 189:1, 192:24, 198:19, 213:10, 216:4, 220:2, 221:10, 221:20

**pointed** [2] - 103:20, 132:20

**points** [10] - 28:25, 30:25, 63:5, 65:11, 65:19, 66:12, 95:2, 96:3, 157:10, 170:11

**police** [1] - 106:9

**policies** [19] - 27:18, 28:2, 28:3, 28:6, 28:10, 28:11, 30:4, 37:7, 104:19, 182:4, 184:13, 184:24, 185:3, 185:5, 188:17, 189:15, 199:25, 200:17, 208:10

**Policies** [10] - 72:3, 72:4, 72:11, 72:17, 72:19, 72:23, 72:25, 73:2, 73:3, 73:4

**policy** [4] - 73:14, 190:7, 191:5, 207:11

**political** [1] - 136:14

**polygrapher** [1] - 106:9

**Ponc** [1] - 2:4

**Ponce** [1] - 2:16

**poorly** [2] - 143:22, 143:23

**pop** [1] - 189:19

**populated** [1] - 159:10

**population** [3] - 67:5, 67:15, 70:6

**populations** [1] - 203:6

**portion** [9] - 7:12, 7:13, 49:20, 117:14, 133:19, 134:15, 134:20, 136:9, 218:18

**portions** [6] - 44:25, 49:2, 73:19, 74:11, 137:13, 139:5

**portray** [1] - 99:9

**position** [9] - 168:23, 171:11, 171:13, 171:14, 171:16, 171:17, 178:8, 198:1

**possess** [1] - 125:17

**possession** [2] - 134:17, 182:11

**possible** [1] - 133:20

**possibly** [1] - 115:16

**posted** [1] - 24:8

**potential** [8] - 27:11, 40:4, 93:15, 121:15, 122:24, 136:13

**Powell** [1] - 2:6

**power** [1] - 28:25

**powers** [1] - 24:16

**PR** [2] - 2:5, 2:17

**practice** [4] - 48:1, 154:15, 212:24

**practitioner** [1] - 85:16

**pre** [2] - 120:6, 190:15

**pre-2014** [1] - 194:10

**pre-dated** [1] - 120:6

**pre-determined** [1] - 190:15

**preceded** [2] - 166:10, 166:11

**precedently** [1] - 109:6

**precise** [1] - 105:15

**precisely** [3] - 96:21, 103:21, 117:20

**precluded** [1] - 128:4

**predecessors** [1] - 91:10

**Pregabalin** [1] - 61:24

**preliminary** [1] - 196:18

**preparation** [2] - 146:21, 165:5

**prepare** [2] - 124:23, 165:1

**prepared** [1] - 110:5

**prescriber** [2] - 70:6, 126:13

**prescribing** [3] - 70:7, 126:2, 199:1

**prescription** [8] - 24:12, 32:16, 32:17, 126:3, 126:17, 140:21, 184:15, 219:22

**prescription-level** [2] - 32:16, 32:17

**present** [9] - 32:12, 45:16, 46:3, 46:12, 120:13, 128:11, 136:15, 179:11,

198:5

**presentation** [7] - 7:9, 49:21, 81:2, 151:19, 152:5, 159:22, 181:15

**presented** [8] - 48:16, 49:13, 72:14, 72:16, 145:1, 162:16, 179:14, 180:5

**presenting** [1] - 128:15

**presently** [1] - 86:24

**President** [2] - 178:2, 178:9, 191:8

**presumably** [1] - 151:23

**pretty** [2] - 92:22, 122:25

**prevent** [4] - 43:5, 135:20, 159:25, 201:15

**preventing** [1] - 48:14

**previous** [4] - 39:22, 89:24, 118:7, 159:11

**previously** [7] - 28:25, 70:12, 103:16, 104:4, 121:8, 199:19, 211:9

**primarily** [1] - 109:4

**print** [1] - 171:22

**private** [2] - 71:13, 71:16

**privilege** [1] - 193:25

**pro** [1] - 113:13

**Pro** [1] - 109:7

**pro-active** [1] - 113:13

**problem** [5] - 139:9, 163:23, 164:9, 188:2, 209:15

**problems** [1] - 132:20

**procedurally** [1] - 55:21

**procedure** [6] - 35:13, 42:23, 47:22, 48:18, 122:6, 207:11

**procedures** [20] - 27:18, 28:2, 28:3, 28:6, 28:10, 28:11, 30:4, 37:7, 52:1, 104:19, 151:8, 182:4, 184:13, 184:24, 185:3, 185:5, 188:17, 189:16, 199:25, 200:17

**Procedures** [10] - 72:3, 72:4, 72:11, 72:18, 72:19, 72:23, 72:25, 73:2, 73:3, 73:4

**proceed** [1] - 221:20
**proceeding** [3] - 209:19, 210:4, 210:6
**Proceedings** [1] - 6:19
**proceedings** [1] - 223:5
**PROCEEDINGS** [1] - 7:1
**process** [33] - 27:10, 31:15, 31:19, 31:20, 32:12, 38:17, 39:19, 45:19, 65:9, 72:24, 74:12, 74:13, 76:3, 80:17, 84:2, 88:24, 89:7, 114:16, 115:1, 115:6, 115:19, 115:22, 138:3, 144:25, 145:11, 160:25, 169:23, 175:1, 182:3, 216:6, 221:25
**Process** [2] - 112:5, 115:8
**processed** [1] - 35:24
**processes** [1] - 115:18
**Proctor** [1] - 2:12
**produced** [13] - 6:19, 44:13, 46:5, 49:24, 55:23, 94:22, 103:18, 116:23, 138:12, 139:15, 158:12, 179:24
**producing** [1] - 102:15
**product** [22] - 34:7, 45:5, 51:16, 52:19, 53:1, 54:3, 54:8, 54:9, 54:10, 60:7, 61:9, 62:7, 62:15, 62:17, 62:20, 69:8, 89:19, 89:25, 90:8, 101:5, 101:8, 134:22
**Product** [1] - 157:13
**production** [3] - 157:9, 159:3, 159:8
**products** [7] - 27:8, 33:5, 33:9, 60:11, 60:18, 69:5, 85:16
**proffer** [2] - 139:24, 197:10
**proffered** [1] - 188:18
**Program** [77] - 25:10, 25:15, 26:11, 26:18, 28:12, 29:5, 29:11, 31:14, 37:16, 37:17, 37:18, 37:22, 39:21, 58:22, 69:11, 72:2, 72:17, 72:23, 74:8,

74:11, 75:2, 78:1, 85:4, 85:8, 85:20, 89:1, 89:4, 89:10, 90:17, 90:19, 94:1, 94:11, 107:9, 107:10, 108:19, 109:11, 110:10, 120:4, 150:1, 150:22, 176:16, 185:13, 186:4, 186:15, 187:3, 193:17, 195:9, 195:14, 200:21, 200:25, 201:1, 201:2, 201:25, 202:5, 202:7, 202:10, 202:18, 202:21, 202:22, 203:1, 203:4, 203:13, 203:14, 204:8, 206:20, 206:24, 207:17, 207:19, 208:5, 208:6, 208:11, 210:15, 211:6, 211:11, 220:20, 221:5
**program** [105] - 24:3, 24:4, 24:5, 25:12, 25:17, 26:19, 28:4, 28:5, 28:8, 28:13, 28:23, 30:2, 30:3, 30:4, 30:9, 30:13, 30:15, 31:21, 31:24, 32:3, 32:4, 32:10, 32:22, 38:3, 39:4, 39:20, 47:2, 50:25, 51:10, 55:5, 58:12, 58:17, 59:10, 59:21, 60:1, 61:10, 63:9, 63:20, 64:1, 67:22, 68:23, 69:20, 71:21, 72:5, 73:9, 73:17, 74:13, 75:6, 75:10, 77:25, 81:1, 81:3, 82:1, 82:4, 82:5, 85:12, 86:4, 86:6, 91:17, 91:24, 92:18, 93:7, 97:10, 97:14, 102:16, 105:17, 105:23, 105:25, 108:16, 115:23, 122:10, 150:21, 151:3, 151:24, 151:25, 152:25, 153:1, 153:21, 156:14, 156:16, 160:11, 179:1, 186:19, 187:2, 187:6, 187:8, 189:3, 190:4, 191:7,

191:13, 193:18, 193:19, 199:22, 200:23, 201:4, 204:10, 205:23, 207:20, 208:3, 208:7, 211:23, 220:9
**programming** [1] - 156:18
**programs** [5] - 55:17, 74:23, 115:20, 136:18, 164:24
**progress** [1] - 131:14
**promoted** [1] - 24:1
**proper** [2] - 150:19, 155:8
**proposal** [1] - 93:5
**propose** [1] - 145:18
**proposed** [12] - 41:15, 41:18, 74:20, 93:8, 133:4, 144:23, 144:25, 145:8, 145:11, 145:12, 145:14
**proposing** [1] - 93:2
**proprietary** [1] - 71:15
**protocol** [1] - 55:16
**provide** [8] - 76:5, 80:4, 82:15, 114:19, 138:20, 138:23, 151:7, 186:9
**provided** [5] - 81:7, 81:13, 81:18, 127:4, 128:11
**provides** [1] - 170:9
**providing** [3] - 114:25, 142:21, 151:15
**pseudoephedrine** [1] - 60:18
**public** [18] - 25:24, 39:3, 48:15, 57:15, 57:16, 66:22, 66:23, 137:9, 140:6, 144:24, 145:10, 145:13, 194:15, 194:21, 194:24, 195:6, 197:7
**publicly** [1] - 116:23
**publish** [5] - 44:12, 44:14, 48:22, 91:6, 95:4
**published** [6] - 28:11, 50:12, 94:15, 135:22, 145:12, 210:8
**Published** [1] - 210:10
**publishing** [2] - 56:9, 138:19
**pull** [10] - 55:7, 57:25, 79:20, 112:10, 135:13, 146:8,

149:20, 174:2, 190:10, 219:24
**pulled** [1] - 111:19
**purchase** [5] - 26:13, 26:16, 53:17, 122:17, 219:19
**purchased** [3] - 51:19, 51:21, 87:1
**purchases** [15] - 53:16, 121:1, 190:14, 190:16, 203:18, 204:20, 204:21, 204:25, 205:3, 205:11, 205:12, 217:5, 217:16, 219:20, 219:22
**purchasing** [10] - 27:7, 51:2, 51:13, 54:12, 60:17, 94:25, 100:17, 121:4, 160:13
**purport** [1] - 99:9
**purpose** [17] - 39:23, 80:7, 80:11, 84:24, 97:22, 97:23, 99:4, 100:2, 130:7, 130:18, 130:20, 137:11, 141:19, 160:9, 180:21, 181:4, 190:13
**purposes** [4] - 62:18, 97:17, 166:4, 182:19
**pursuant** [1] - 121:14
**pursue** [2] - 109:16, 199:11
**put** [18] - 25:3, 26:6, 27:23, 44:7, 64:1, 72:1, 72:6, 74:7, 74:25, 77:18, 85:3, 88:10, 91:23, 156:25, 194:18, 196:12, 208:17, 212:7
**puts** [1] - 126:13
**putting** [4] - 82:9, 113:8, 119:5, 131:17

## Q

**quantities** [4] - 26:3, 36:16, 52:20, 60:21
**quantity** [6] - 32:25, 33:6, 42:6, 51:20, 53:2, 53:5
**query** [5] - 118:5, 118:6, 118:10, 118:24, 119:3
**questioning** [2] - 194:23, 199:7

**questionnaire** [6] - 117:15, 173:1, 173:2, 174:6, 174:11, 174:17
**questions** [20] - 21:25, 37:9, 43:8, 112:8, 128:5, 142:10, 148:25, 149:3, 149:5, 162:1, 164:13, 171:24, 172:2, 174:7, 174:12, 176:23, 181:23, 187:14, 200:6, 211:5
**queue** [3] - 36:3, 43:23, 44:4
**quick** [1] - 63:16
**quickly** [2] - 68:21, 177:18
**quite** [6] - 70:22, 96:10, 154:5, 160:22
**quiz** [1] - 189:19
**quotas** [2] - 207:15
**quote** [3] - 56:23, 133:6, 197:7
**quoted** [1] - 155:10

## R

**RA** [1] - 173:20
**Rafferty** [1] - 2:12
**raise** [2] - 123:19, 177:13
**raised** [3] - 46:15, 122:18, 128:14
**ran** [1] - 179:1
**range** [1] - 204:13
**ranking** [6] - 55:9, 55:10, 88:9, 88:12
**ranks** [1] - 51:20
**Rannazzisi** [1] - 182:10
**rate** [3] - 66:1, 66:21, 70:7
**rates** [7] - 66:25, 67:5, 70:5, 199:1, 199:3, 199:15, 203:4
**rationale** [2] - 73:21, 114:17
**raw** [3] - 61:18, 62:6, 68:8
**re** [4] - 75:19, 75:24, 121:4, 144:11
**re-apply** [2] - 75:19, 75:24
**re-evaluated** [1] - 121:4
**re-read** [1] - 144:11
**reached** [2] - 83:4, 115:12

reactionary [1] - 113:10
reactive [1] - 113:3
read [20] - 59:6, 76:19, 80:13, 81:20, 91:9, 110:16, 114:14, 132:11, 139:5, 141:10, 142:16, 144:11, 172:10, 172:13, 181:10, 181:11, 181:12, 183:24, 184:9, 195:5
reading [4] - 141:22, 155:9, 165:11, 210:1
reads [1] - 190:13
ready [1] - 167:4
realized [1] - 28:9
really [6] - 28:12, 92:21, 116:25, 189:2, 191:21, 204:15
rear [1] - 120:25
reason [9] - 48:17, 80:16, 88:16, 121:16, 136:23, 137:3, 150:23, 207:8, 208:19
reasons [10] - 33:21, 55:15, 63:25, 73:12, 73:20, 74:15, 74:22, 114:20, 129:3
rebut [1] - 57:14
recalculated [2] - 220:22, 220:25
receive [3] - 32:19, 125:6, 183:14
received [3] - 83:2, 112:16, 124:22
receives [2] - 32:15, 80:19
receiving [4] - 182:8, 182:12, 182:14, 183:8
recent [5] - 40:23, 45:10, 87:2, 166:15, 166:20
recess [4] - 64:19, 64:21, 149:4, 149:11
Recess [2] - 21:10, 111:13
recessed [1] - 222:11
recipient [1] - 167:22
recognize [6] - 79:11, 90:25, 102:2, 146:21, 183:11, 220:3
recognized [1] - 78:19
recollect [1] - 84:5
recollection [15] - 81:7, 84:8, 96:23,

96:24, 101:16, 118:16, 141:21, 141:22, 145:23, 163:24, 175:19, 175:20, 182:17, 183:2, 183:4
recommendation [1] - 145:21
recommendations [2] - 114:7, 142:15
reconsider [1] - 48:6
record [36] - 21:11, 48:13, 48:14, 48:18, 48:20, 56:1, 56:7, 56:9, 56:23, 57:6, 70:20, 70:24, 98:2, 100:3, 111:22, 113:5, 131:11, 132:11, 136:10, 137:9, 139:24, 140:6, 143:12, 165:11, 166:4, 168:1, 171:10, 196:20, 198:4, 210:18, 220:2, 221:4, 221:10, 221:12, 222:2, 223:5
Recorded [1] - 215:6
recorded [4] - 6:19, 128:20, 215:3, 215:5
recording [1] - 174:25
records [3] - 98:11, 203:9, 203:12
RECROSS [1] - 172:6
red [13] - 27:11, 27:16, 40:4, 42:10, 52:8, 69:8, 121:15, 121:16, 121:17, 122:24, 123:2, 151:6, 151:22
redact [1] - 73:18
Redd [11] - 78:15, 78:17, 79:21, 80:15, 80:16, 80:23, 80:25, 81:13, 81:16, 81:25, 82:7
Redd's [1] - 81:10
redirect [1] - 149:1
REDIRECT [1] - 149:14
reduce [1] - 33:22
reduced [1] - 88:14
reduces [3] - 34:8, 34:9, 87:6
redundancy [1] - 174:7
redundant [1] - 174:11
Reed [2] - 6:4, 6:11
refer [10] - 26:4, 27:5,

36:3, 46:18, 50:13, 87:3, 87:17, 90:6, 126:5, 200:25
Reference [1] - 173:17
reference [9] - 115:24, 136:2, 150:5, 173:24, 179:20, 182:19, 187:17, 200:14, 200:16
referenced [3] - 38:14, 180:1, 181:7
referencing [4] - 129:5, 182:20, 196:14, 200:16
referred [4] - 40:25, 63:22, 120:4, 166:10
referring [4] - 139:10, 170:24, 194:8, 210:19
refers [1] - 33:15
reflect [3] - 72:22, 110:8, 143:23
reflected [9] - 59:17, 102:24, 103:2, 157:3, 159:6, 167:8, 167:17, 189:16, 189:19
reflecting [1] - 61:3
reflection [2] - 188:1, 211:6
reflects [4] - 110:9, 117:3, 143:22, 150:17
reformulating [1] - 221:3
refresh [2] - 182:17, 183:1
Refresh [1] - 183:4
refreshed [1] - 183:5
regard [2] - 47:23, 48:12
regarding [12] - 43:8, 46:15, 80:5, 128:5, 129:5, 142:6, 142:19, 144:15, 144:16, 181:14, 182:4, 184:14
regardless [2] - 46:8, 162:15
region [1] - 80:20
Regional [2] - 24:3, 78:23
regional [1] - 30:14
registered [2] - 125:14, 125:15
Registrant [1] - 182:10
registrant [7] - 71:17, 86:18, 86:19, 100:17, 118:5,

142:1, 145:10
registrant's [2] - 132:25, 184:7
registrants [7] - 23:7, 53:24, 120:8, 132:22, 132:25, 151:7, 153:10
Registrants' [1] - 140:22
registration [12] - 23:7, 31:10, 42:5, 50:25, 51:2, 52:18, 59:10, 86:13, 95:1, 102:25, 103:19, 118:4
registrations [1] - 59:14
regular [2] - 54:16, 98:7
regularly [1] - 37:24
regulated [1] - 184:8
regulation [34] - 35:4, 36:14, 36:16, 36:18, 41:14, 42:21, 42:24, 43:6, 43:10, 43:14, 43:15, 43:16, 53:5, 74:21, 82:19, 93:2, 119:19, 127:5, 133:10, 133:17, 133:20, 134:13, 142:12, 145:1, 151:13, 154:8, 154:13, 154:19, 155:4, 155:22, 155:25, 160:8, 175:9
regulations [15] - 74:19, 132:15, 132:17, 133:5, 133:23, 150:6, 150:12, 150:24, 151:18, 151:20, 151:21, 152:1, 152:3, 153:25, 169:1
regulator [10] - 71:14, 78:4, 82:21, 92:2, 92:5, 133:21, 134:1, 142:11, 154:18
regulatory [7] - 22:8, 41:8, 43:1, 74:12, 75:11, 178:19, 208:19
Regulatory [5] - 173:21, 178:2, 178:6, 178:19, 196:25
Reise [1] - 109:18
reject [1] - 155:5
rejected [3] - 55:25, 80:20, 216:3
rejecting [3] - 152:20,

153:3, 153:15
relate [1] - 76:15
related [1] - 128:12
relates [1] - 130:14
relating [2] - 44:20, 222:7
relation [1] - 206:7
relationship [2] - 120:10, 126:12
relative [6] - 39:24, 96:4, 133:12, 146:6, 167:19, 175:3
relatively [1] - 25:3
relay [1] - 179:17
release [8] - 36:8, 43:22, 134:19, 212:15, 214:3, 214:23, 214:25, 215:10
released [2] - 52:11, 52:13
releases [1] - 214:22
releasing [1] - 214:25
relevance [2] - 45:9, 129:21
relevant [8] - 45:10, 45:12, 46:9, 46:10, 95:3, 184:8, 195:18
reliability [2] - 136:12, 136:22
reliable [1] - 138:12
relied [4] - 96:17, 195:9, 196:9, 199:6
rely [9] - 38:1, 57:16, 82:21, 97:6, 139:13, 139:17, 195:23, 203:4, 203:6
relying [11] - 25:24, 36:15, 79:23, 84:16, 97:12, 164:22, 194:15, 195:14, 198:20, 198:25, 207:15
remained [2] - 89:16, 132:17
remedy [1] - 46:7
remember [14] - 24:15, 40:20, 59:9, 67:22, 129:14, 154:6, 158:23, 182:14, 209:23, 210:1, 210:2, 210:5, 210:7, 220:19
reminder [1] - 72:10
removed [1] - 121:1
repeat [3] - 31:2, 204:15, 211:12
repetitive [1] - 30:23
rephrase [1] - 72:15
replace [1] - 28:24

**replaced** [2] - 101:3, 170:3
**Report** [24] - 40:7, 58:15, 68:20, 112:5, 115:8, 135:21, 135:22, 135:23, 135:25, 136:3, 136:7, 136:20, 136:24, 137:4, 138:8, 138:25, 139:2, 139:10, 139:20, 140:2, 145:17
**report** [71] - 26:20, 40:3, 41:3, 64:4, 80:19, 81:1, 91:11, 94:18, 95:4, 95:9, 95:19, 95:23, 96:2, 96:19, 98:8, 100:2, 100:14, 100:15, 100:16, 100:21, 100:25, 101:3, 101:5, 101:13, 111:17, 112:9, 112:10, 112:16, 112:19, 114:7, 115:13, 119:14, 119:16, 134:12, 135:22, 136:7, 136:8, 136:13, 136:14, 136:25, 137:15, 137:17, 137:21, 137:22, 138:9, 138:19, 139:15, 140:3, 140:10, 140:21, 141:6, 141:17, 141:20, 144:17, 155:5, 156:1, 158:15, 166:15, 190:13, 192:12, 192:18, 193:3, 195:18, 195:21, 212:16, 212:20, 213:5, 213:11, 216:3
**report's** [1] - 141:19
**reportable** [5] - 118:2, 118:9, 118:25, 119:6, 119:12
**reported** [23] - 39:12, 39:13, 39:15, 39:17, 40:6, 40:21, 41:2, 59:8, 61:3, 61:4, 80:22, 80:24, 107:3, 119:11, 127:2, 133:13, 154:12, 192:19, 212:23, 212:25, 213:2, 215:5, 223:9
**Reporter** [6] - 6:17,

6:18, 223:3, 223:12
**REPORTER** [3] - 57:8, 57:10, 57:12
**reporters** [1] - 64:14
**reporting** [19] - 61:19, 82:3, 82:19, 82:25, 119:18, 119:25, 130:15, 133:10, 133:25, 142:6, 142:20, 145:15, 152:21, 153:11, 154:1, 154:12, 160:8, 192:17, 192:25
**Reports** [2] - 39:23, 40:17
**reports** [23] - 41:10, 83:25, 95:10, 96:17, 96:19, 99:18, 99:20, 101:9, 101:16, 116:23, 117:2, 137:2, 139:5, 158:15, 176:17, 195:12, 195:15, 195:24, 197:8, 198:8, 198:17, 198:20, 221:2
**represent** [5] - 33:7, 69:8, 179:23, 195:3, 220:1
**representation** [1] - 146:12
**representative** [1] - 187:20
**represented** [1] - 121:2
**representing** [2] - 47:13, 142:18
**represents** [3] - 61:23, 62:6, 65:9
**reputation** [1] - 106:10
**request** [26] - 7:11, 44:12, 44:17, 47:14, 48:25, 56:12, 56:17, 64:22, 76:15, 78:10, 90:18, 124:13, 149:4, 167:16, 167:20, 168:9, 170:10, 170:12, 175:3, 175:17, 196:13, 197:4, 197:14, 210:20, 218:21, 221:11
**Requested** [1] - 173:10
**requested** [3] - 47:8, 56:13, 170:7
**Requesters** [1] - 140:21

**requesting** [6] - 46:23, 56:24, 77:10, 85:1, 91:4, 104:2
**Requesting** [2] - 170:17, 174:21
**require** [5] - 31:11, 40:20, 42:24, 151:15, 156:1
**required** [10] - 39:14, 39:17, 40:3, 45:15, 80:21, 119:18, 119:19, 127:1, 172:12, 174:19
**requirement** [6] - 33:25, 43:16, 118:15, 119:13, 130:15, 150:15
**requirements** [6] - 69:13, 69:18, 75:12, 132:20, 150:11, 153:13
**requires** [4] - 43:10, 151:2, 153:10, 155:5
**reserve** [1] - 188:10
**resides** [2] - 79:1, 79:2
**Resources** [1] - 106:13
**resources** [6] - 105:10, 106:14, 107:13, 107:16, 108:22, 112:23
**respect** [10] - 41:19, 44:22, 44:23, 73:8, 104:4, 136:15, 137:4, 144:5, 160:15, 178:16
**respond** [7] - 35:16, 45:24, 80:21, 93:10, 123:6, 128:7, 130:3, 136:4, 197:23, 201:8
**responding** [2] - 113:18, 115:9
**response** [6] - 71:2, 119:7, 123:8, 127:21, 152:4, 167:19
**responses** [2] - 114:7, 167:11
**responsibilities** [7] - 133:1, 142:19, 171:15, 178:11, 178:12, 178:16, 179:3
**responsibility** [14] - 22:8, 22:15, 23:16, 24:9, 44:6, 57:5, 78:24, 84:1, 108:13, 108:14, 126:16, 202:14, 211:10,

216:2
**Responsible** [1] - 107:7
**responsible** [8] - 22:14, 133:3, 152:15, 152:18, 152:24, 153:7, 185:2, 221:3
**restraining** [1] - 209:5
**result** [3] - 34:17, 35:1, 222:4
**resulting** [1] - 34:9
**retail** [16] - 49:10, 85:14, 85:15, 85:21, 87:9, 87:16, 87:21, 103:11, 204:2, 204:3, 216:20, 217:1, 217:2, 219:17, 220:17
**retired** [2] - 25:7, 170:4
**returned** [1] - 163:22
**returns** [3] - 163:19, 163:21, 164:8
**Reuters** [1] - 166:10
**revamped** [1] - 187:6
**review** [36] - 25:23, 26:12, 30:10, 31:16, 32:10, 36:5, 38:20, 39:22, 42:2, 42:8, 42:16, 63:15, 72:25, 76:3, 82:4, 82:17, 91:18, 95:3, 96:4, 101:7, 104:22, 110:9, 112:16, 114:17, 115:15, 115:16, 115:18, 123:1, 147:4, 160:25, 164:25, 167:3, 176:8, 189:20, 209:24, 215:2
**Review** [1] - 196:24
**reviewed** [26] - 30:3, 31:23, 32:2, 32:7, 36:11, 36:12, 89:12, 89:15, 103:16, 110:3, 110:11, 123:7, 141:8, 141:10, 141:12, 141:17, 146:6, 160:21, 164:22, 165:2, 165:5, 183:7, 183:13, 183:15, 199:9
**reviewing** [9] - 57:1, 82:1, 113:15, 114:19, 160:2, 160:19, 163:14, 164:18, 198:11

**reviews** [3] - 36:25, 69:6, 211:24
**revise** [1] - 74:10
**revised** [1] - 90:16
**revising** [1] - 115:23
**revisions** [2] - 73:1, 82:2
**Rice** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**richie** [2] - 48:22, 135:13
**Richie** [14] - 26:6, 27:23, 44:14, 54:2, 54:23, 57:25, 61:9, 72:1, 74:7, 79:19, 85:3, 132:8, 146:8, 146:25
**right-hand** [3] - 58:23, 157:5, 219:4
**Risk** [3] - 65:5, 65:6, 98:25
**risk** [46] - 55:6, 55:8, 55:9, 55:10, 60:2, 60:3, 60:4, 60:7, 60:9, 60:11, 60:13, 61:17, 63:11, 63:15, 65:10, 65:12, 65:13, 65:19, 67:2, 67:3, 67:21, 67:22, 67:23, 68:10, 68:11, 69:5, 69:9, 69:23, 70:4, 87:4, 88:3, 88:4, 88:7, 88:8, 88:9, 88:11, 88:12, 88:18, 121:14, 125:17
**risks** [2] - 26:14, 110:19
**Ritchie** [4] - 91:6, 92:9, 93:18, 110:15
**Rite** [2] - 148:16, 148:18
**RMR** [2] - 6:17, 6:18
**robbery** [1] - 34:9
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**robust** [1] - 64:8
**role** [6] - 25:6, 78:21, 138:9, 142:8, 178:1, 178:11
**Roles** [1] - 140:23
**roles** [1] - 142:19
**roll** [2] - 88:25, 89:5
**rolled** [3] - 92:15, 102:13, 193:20
**rolling** [4] - 89:3, 89:4, 89:6, 90:8
**Rome** [1] - 24:9
**room** [6] - 7:9, 56:17, 115:2, 157:19, 158:2, 218:22

**routine** [1] - 98:7
**RPIC** [1] - 107:6
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**Ruby** [3] - 4:17, 47:21, 48:9
**RUBY** [4] - 4:17, 47:22, 48:10, 153:16
**Rule** [1] - 186:10
**rule** [21] - 41:15, 41:18, 93:2, 93:8, 97:25, 124:20, 131:2, 131:3, 131:5, 137:10, 139:11, 143:20, 144:6, 144:11, 144:23, 144:25, 145:9, 145:11, 145:12, 145:14
**ruled** [7] - 46:17, 46:19, 124:21, 130:21, 130:22, 143:11, 162:12
**rulemaking** [1] - 145:18
**rules** [1] - 133:4
**ruling** [5] - 46:16, 48:6, 57:17, 124:22
**rulings** [1] - 144:5
**run** [7] - 68:20, 95:23, 101:9, 101:10, 101:11, 133:21, 221:2
**running** [6] - 24:5, 105:17, 105:23, 144:1, 199:21, 208:4
**runs** [1] - 60:12
**Ruth** [1] - 127:22
**RVP** [1] - 220:1
**Rx** [2] - 68:2, 211:19

**S**

**s\Ayme** [1] - 223:11
**s\Lisa** [1] - 223:11
**safe** [1] - 198:24
**sale** [5] - 119:16, 120:9, 122:14, 123:2, 123:9
**sales** [9] - 28:22, 49:15, 51:6, 59:13, 65:23, 76:1, 95:22, 96:5, 213:5
**SALGADO** [1] - 4:15
**sample** [1] - 100:14
**San** [2] - 2:5, 2:17
**SAP** [8] - 40:11, 40:14, 41:1, 98:19, 98:20, 98:21, 98:22, 164:23

**satisfactory** [1] - 121:17
**satisfied** [3] - 81:6, 81:13, 81:17
**satisfying** [1] - 82:19
**save** [1] - 113:1
**saved** [1] - 41:3
**saving** [1] - 174:24
**saw** [1] - 122:24
**SC** [3] - 3:15, 4:4, 4:9
**scale** [1] - 60:9
**scenario** [1] - 122:24
**schedule** [2] - 89:4, 89:6
**Schedule** [6] - 118:2, 212:19, 213:8, 213:9, 213:10
**SCHMIDT** [1] - 5:9
**scope** [3] - 45:10, 45:13, 46:1
**score** [7] - 65:14, 66:15, 68:8, 68:9, 68:10, 68:11, 68:8
**scorecard** [2] - 66:13, 69:3
**scoring** [1] - 55:6
**screen** [17] - 26:7, 50:8, 70:23, 72:6, 72:9, 80:14, 91:7, 104:10, 135:14, 156:21, 156:22, 184:1, 186:6, 190:10, 196:12, 196:18
**screenshot** [2] - 55:14, 55:22
**seal** [1] - 56:24
**sealed** [2] - 7:13, 7:14
**sealing** [1] - 56:15
**seat** [1] - 177:16
**second** [12] - 26:9, 26:10, 46:15, 54:2, 61:8, 81:20, 83:15, 110:17, 174:20, 182:9, 204:17, 216:5
**section** [6] - 110:15, 110:17, 129:19, 132:8, 142:15, 159:5
**Section** [1] - 78:16
**sections** [2] - 25:14, 120:20
**Security** [1] - 178:6
**see** [99] - 27:11, 27:21, 30:11, 36:8, 40:4, 42:9, 42:16, 50:13, 50:21, 51:3, 51:6, 51:12, 52:2, 52:5, 52:7, 52:8, 52:11, 57:17, 57:23, 59:14, 59:24, 60:10, 60:22,

61:1, 61:16, 61:23, 62:4, 62:11, 63:10, 66:4, 66:13, 66:15, 66:18, 67:11, 67:13, 67:14, 82:5, 90:14, 92:1, 95:20, 100:24, 100:25, 113:3, 113:4, 118:5, 118:8, 125:16, 126:11, 126:14, 126:18, 127:20, 127:21, 138:18, 139:8, 150:5, 150:7, 150:8, 150:24, 151:8, 152:13, 152:22, 157:4, 157:6, 157:12, 157:15, 160:4, 163:4, 163:6, 163:7, 163:9, 167:16, 168:15, 168:16, 169:13, 170:10, 170:15, 170:16, 170:18, 170:21, 173:20, 175:3, 182:21, 182:25, 183:23, 184:3, 188:19, 190:6, 190:10, 190:12, 194:22, 196:7, 213:2, 219:3, 219:7, 221:22, 222:3, 222:9
**seeing** [5] - 61:24, 68:22, 101:16, 191:20, 208:21
**seek** [3] - 46:6, 116:6, 145:13
**seeking** [1] - 97:22
**seem** [1] - 209:23
**segment** [1] - 184:8
**segments** [1] - 219:17
**select** [1] - 100:18
**self** [2] - 74:14
**self-assess** [1] - 74:14
**self-evaluate** [1] - 74:14
**selling** [1] - 207:24
**send** [2] - 215:1, 215:11
**sending** [2] - 27:12, 79:3
**Senior** [3] - 7:2, 178:6, 178:18
**SENIOR** [1] - 1:17
**Sensabaugh** [1] - 5:14
**sense** [2] - 53:4, 54:15, 89:12, 98:2, 124:18, 136:21, 139:21, 173:25, 187:21, 206:20,

210:14, 210:18
**sensitive** [1] - 44:20
**sent** [2] - 121:6, 124:21
**sentence** [7] - 80:14, 81:6, 110:16, 110:17, 115:21, 183:23, 183:24
**sentences** [1] - 23:18
**sentencing** [1] - 111:9
**separate** [8] - 24:4, 31:12, 68:5, 115:22, 119:18, 120:20, 140:3, 216:19
**separated** [1] - 65:21
**separately** [1] - 116:1
**September** [9] - 76:14, 168:9, 175:23, 176:6, 197:1, 197:3, 197:4, 197:5, 197:6
**series** [3] - 129:16, 142:9, 158:14
**serious** [1] - 188:9
**seriously** [1] - 115:9
**serve** [1] - 92:2
**served** [1] - 193:9
**serves** [3] - 118:16, 160:9, 169:8
**service** [1] - 125:3
**serviced** [8] - 38:23, 77:16, 87:23, 88:11, 117:18, 124:24, 146:13, 169:22
**services** [1] - 108:25
**servicing** [9] - 61:5, 70:1, 75:18, 77:11, 87:14, 102:6, 117:7, 124:4, 124:9
**serving** [4] - 105:24, 178:3, 198:5, 207:5
**set** [15] - 28:11, 74:3, 82:18, 84:7, 88:13, 93:14, 93:15, 111:6, 111:10, 112:12, 114:20, 116:12, 158:11, 166:16, 218:11
**setting** [1] - 203:20, 220:21, 221:5
**settlement** [4] - 193:15, 193:16, 202:19, 213:4
**seven** [7] - 34:24, 47:6, 86:1, 86:11, 107:18, 187:16, 187:22
**several** [19] - 23:15, 33:4, 45:8, 49:16, 58:9, 58:11, 86:15, 93:11, 107:25,

108:8, 109:2, 110:6, 115:18, 120:24, 137:8, 141:5, 148:13, 169:12, 211:9
**several-month** [1] - 115:18
**shall** [1] - 151:7
**SHANNON** [1] - 6:3
**share** [1] - 108:14
**sharing** [1] - 127:23
**sheet** [2] - 54:24, 55:4
**shelf** [1] - 44:7
**Sheri** [1] - 173:12
**shifted** [1] - 60:17
**Ship** [8] - 120:2, 120:3, 121:3, 121:7, 121:11, 121:19, 122:4, 122:9
**ship** [9] - 42:25, 44:2, 121:8, 134:24, 154:17, 193:3, 212:15, 214:3, 214:14
**shipment** [3] - 119:23, 123:13, 164:5
**shipped** [14] - 32:1, 32:7, 35:25, 43:23, 44:8, 44:9, 119:22, 152:20, 153:3, 154:15, 164:19, 213:25, 214:1, 215:24
**shipping** [4] - 41:12, 121:19, 192:17, 192:25
**ships** [1] - 212:11
**short** [2] - 7:12, 149:4
**Shortly** [1] - 83:2
**shortly** [3] - 78:4, 78:6, 78:7
**shot** [1] - 156:22
**shots** [2] - 70:23, 156:21
**show** [8] - 49:22, 52:9, 69:23, 80:4, 84:21, 130:1, 191:22, 198:1
**Show** [1] - 183:10
**showed** [2] - 156:20, 167:1
**showing** [4] - 47:8, 54:10, 80:8, 180:21
**shown** [6] - 45:21, 46:24, 47:10, 48:19, 112:4, 112:11, 114:10, 158:2, 160:16, 183:5, 218:20, 219:1
**shows** [7] - 51:17, 51:21, 52:15, 62:9,

84:24, 100:17, 176:18

**sic** [6] - 83:19, 190:20, 198:8, 198:11, 198:17, 199:19

**sic]** [1] - 167:3

**side** [12] - 23:1, 23:2, 23:9, 23:14, 35:4, 35:5, 130:1, 138:3, 139:15, 185:8, 219:4

**sided** [2] - 100:8, 103:3

**sides** [3] - 22:24, 23:4, 23:12

**sign** [1] - 117:15

**significance** [1] - 143:25

**significant** [3] - 34:10, 63:7, 71:12

**silent** [5] - 43:17, 154:8, 154:14, 154:19, 155:23

**similar** [23] - 38:8, 50:2, 55:24, 70:16, 70:21, 71:1, 73:3, 83:23, 84:2, 85:12, 94:14, 94:16, 94:17, 99:24, 101:12, 103:14, 103:15, 104:3, 128:4, 188:23, 203:24, 215:21

**similarly** [2] - 58:6, 192:6

**simple** [3] - 27:12, 33:25, 88:10

**simply** [8] - 47:14, 73:18, 97:9, 136:19, 137:2, 143:25, 198:9, 201:13

**SINGER** [1] - 4:5

**single** [4] - 33:19, 34:2, 97:7, 119:21

**sit** [4] - 42:8, 82:14, 91:25, 92:7

**sit-down** [1] - 92:7

**site** [1] - 27:14

**situated** [1] - 192:6

**situation** [6] - 34:6, 34:13, 71:16, 92:19, 106:7, 124:23

**situations** [2] - 113:3, 122:22

**six** [4] - 75:21, 116:22, 117:2, 118:7

**six-month** [4] - 75:21, 116:22, 117:2, 118:7

**size** [28] - 86:22, 86:23, 86:25, 87:3, 87:7, 87:9, 87:10,

87:19, 87:20, 87:21, 87:23, 88:3, 94:18, 95:19, 96:16, 101:13, 158:15, 203:23, 203:25, 216:22, 216:25, 217:7, 218:12, 218:15, 219:13, 219:15, 219:18

**sizes** [2] - 87:17, 88:1

**sizing** [1] - 86:14

**slide** [7] - 27:20, 74:7, 149:22, 150:4, 150:16, 151:5, 151:17

**slides** [1] - 27:21

**small** [4] - 204:2, 217:1, 220:7, 220:17

**smarter** [2] - 139:16, 139:20

**Smith** [3] - 6:4, 6:11, 108:9

**snippets** [1] - 45:21

**software** [2] - 156:16, 156:18

**sold** [4] - 45:11, 204:6, 205:19, 206:12

**sole** [1] - 47:15

**Solicit** [1] - 142:16

**solicit** [1] - 142:17

**solid** [1] - 62:19

**SOM** [1] - 202:15

**someone** [1] - 130:11

**sometime** [7] - 39:19, 102:10, 116:23, 120:12, 138:17, 186:24, 208:22

**sometimes** [2] - 111:7, 117:6

**somewhat** [5] - 54:15, 55:16, 115:15, 186:9, 208:1

**Somewhat** [1] - 194:5

**somewhere** [1] - 153:25

**soon** [1] - 79:4

**Sorry** [3] - 58:5, 173:16, 212:13

**sorry** [34] - 27:21, 28:1, 31:2, 43:19, 43:23, 57:10, 57:11, 61:8, 72:8, 72:15, 81:5, 81:23, 84:6, 86:12, 91:21, 92:5, 93:18, 95:17, 99:6, 100:12, 113:22, 144:16, 147:15, 152:8, 171:1, 171:12, 179:5, 191:17, 197:3,

199:23, 200:19, 207:21, 212:15, 217:9

**sort** [6] - 53:17, 68:2, 69:9, 92:7, 133:14, 189:18

**sorts** [2] - 90:15, 176:14

**sound** [4] - 154:24, 186:16, 188:24, 190:17

**sounds** [4] - 186:17, 189:4, 189:5, 190:4

**Sounds** [1] - 154:25

**source** [2] - 39:3, 98:18

**sources** [10] - 25:24, 55:7, 66:22, 66:23, 194:15, 194:21, 195:6, 195:7, 195:9, 197:8

**South** [1] - 2:13

**Southern** [1] - 7:2

**SOUTHERN** [1] - 1:1

**speaker** [1] - 128:25

**speaking** [8] - 33:17, 33:18, 65:25, 84:5, 105:18, 106:11, 151:22, 159:21

**Special** [2] - 24:17, 168:22

**special** [7] - 22:13, 22:19, 22:20, 22:21, 23:22, 25:1, 105:12

**specializing** [1] - 147:17

**specific** [11] - 27:13, 84:8, 99:18, 109:8, 116:24, 125:4, 126:9, 150:5, 150:15, 160:1

**specifically** [11] - 24:14, 28:11, 61:14, 96:4, 133:24, 142:11, 149:21, 154:11, 159:17, 173:2, 183:7

**specificity** [1] - 133:24

**speculation** [1] - 34:18

**spending** [1] - 188:5

**spent** [3] - 23:21, 70:15, 193:24

**split** [1] - 216:24

**spoken** [1] - 153:4

**spot** [1] - 149:24

**spreadsheet** [9] - 94:24, 95:2, 98:12, 174:2, 174:3, 174:8, 174:9, 174:17,

174:19

**spreadsheets** [4] - 38:16, 94:21, 158:14

**Squad** [4] - 23:17, 24:20, 24:23, 24:25

**Square** [2] - 6:5, 6:12

**St** [10] - 48:23, 50:23, 55:18, 58:1, 68:25, 69:1, 70:10, 103:9, 103:16, 104:4

**staff** [7] - 28:22, 108:11, 136:7, 136:8, 136:9, 136:10, 136:14

**staff-level** [1] - 136:8

**stakeholders** [1] - 91:15

**stand** [4] - 21:16, 49:1, 131:12, 138:7

**standard** [2] - 114:19, 114:20

**standpoint** [1] - 207:3

**stands** [1] - 173:21

**STANNER** [1] - 5:10

**start** [9] - 25:12, 28:10, 50:19, 58:15, 188:12, 200:25, 201:21, 211:17, 211:18

**started** [15] - 23:20, 29:6, 39:19, 74:9, 78:12, 89:3, 93:1, 102:12, 102:15, 106:14, 106:22, 171:10, 171:13, 171:17, 186:24

**starting** [4] - 28:4, 63:21, 81:23, 211:10

**Starting** [1] - 81:22

**starts** [2] - 110:13, 211:23

**State** [7] - 31:11, 39:17, 65:25, 108:8, 122:8, 125:15, 125:19

**state** [30] - 25:1, 30:18, 30:19, 31:7, 65:17, 66:2, 66:7, 66:8, 66:9, 67:18, 69:24, 78:17, 79:14, 80:6, 81:10, 82:7, 84:24, 84:25, 91:13, 124:5, 124:8, 124:10, 128:24, 177:11, 177:22, 180:21, 180:22, 206:12

**statement** [9] - 130:12, 130:14, 133:6, 133:7, 142:7,

154:13, 155:1, 155:2, 160:6

**statements** [4] - 79:24, 84:16, 128:16, 130:19

**STATES** [2] - 1:1, 1:17

**States** [6] - 7:2, 22:13, 136:16, 181:7, 196:23, 207:23

**states** [5] - 31:11, 39:13, 66:9, 69:22, 206:17

**static** [1] - 217:13

**STATUS** [1] - 1:17

**Status** [1] - 7:2

**stayed** [1] - 38:24

**stenography** [1] - 6:19

**step** [7] - 26:11, 31:19, 31:20, 32:11, 149:7, 211:20, 212:10

**Stephen** [2] - 177:12, 177:23

**STEPHEN** [1] - 177:15

**Steve** [1] - 177:8

**STEVEN** [1] - 4:17

**Stickles** [1] - 108:3

**still** [20] - 21:16, 29:3, 35:11, 64:24, 88:5, 95:4, 100:8, 101:24, 112:12, 136:1, 145:21, 148:11, 155:23, 156:1, 157:23, 157:24, 162:7, 175:18

**stint** [1] - 24:2

**stole** [1] - 70:25

**stop** [5] - 41:12, 69:19, 77:11, 111:8, 121:19

**stopped** [2] - 42:17, 102:6

**stopping** [1] - 64:11

**stored** [1] - 175:2

**story** [1] - 124:17

**straighten** [2] - 131:4, 131:7

**strayed** [1] - 132:23

**streaming** [1] - 7:8

**Street** [15] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15, 4:18, 5:5, 5:12, 6:6, 6:13

**strengthen** [1] - 82:5

**strong** [1] - 144:3

**struck** [2] - 129:10, 129:20

**structure** [3] - 22:3, 22:6, 89:11

**studied** [2] - 204:18,

204:24
**study** [3] - 141:16, 158:9, 185:22
**studying** [1] - 199:15
**stuff** [1] - 129:21
**subject** [9] - 26:18, 41:24, 42:5, 45:6, 49:11, 56:22, 57:1, 137:17, 148:25
**subjective** [2] - 134:5, 134:6
**submission** [3] - 70:11, 73:13, 73:21
**submissions** [2] - 57:2, 57:23
**submit** [5] - 56:13, 56:18, 56:23, 104:6, 221:25
**submitting** [1] - 97:9, 135:20
**subsequently** [4] - 121:4, 123:7, 124:2, 141:16
**substance** [14] - 25:5, 31:12, 33:1, 34:3, 38:11, 51:24, 51:25, 52:17, 54:18, 96:7, 119:16, 119:22, 153:2, 213:5
**substances** [41] - 26:3, 26:14, 26:16, 27:2, 34:5, 34:10, 35:12, 35:22, 51:11, 51:12, 51:15, 51:18, 52:7, 53:13, 53:16, 54:1, 59:12, 59:17, 61:13, 91:12, 94:25, 99:19, 100:18, 107:1, 110:20, 118:21, 120:9, 122:14, 122:17, 123:3, 123:10, 123:14, 125:10, 152:19, 160:14, 204:6, 205:18, 206:12, 207:24, 212:23, 212:25
**Substances** [1] - 140:23
**substantial** [2] - 104:23, 105:7
**substantially** [4] - 36:17, 73:3, 94:3, 127:7
**sufficient** [3] - 107:13, 107:16, 139:24
**suggest** [1] - 197:10
**suggesting** [1] - 129:23
**suggests** [1] - 142:4

**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12
**summaries** [3] - 51:5, 55:24, 161:14
**summarize** [2] - 113:5, 188:19
**summarized** [2] - 130:11, 132:5
**summarizing** [2] - 79:4, 189:17
**Summary** [1] - 58:16
**summary** [6] - 79:12, 128:10, 128:16, 129:1, 130:18, 164:8
**supervised** [1] - 24:6
**supervisors** [1] - 22:21
**supplied** [1] - 118:22
**supplier** [1] - 116:21
**supply** [2] - 71:18, 125:18
**support** [4] - 24:13, 59:12, 114:21, 155:11
**Support** [1] - 118:14
**supporting** [1] - 24:15
**supposed** [2] - 93:8, 210:16
**Supreme** [1] - 181:7
**surpassed** [1] - 31:25
**surpasses** [1] - 36:1
**surpassing** [1] - 35:23
**surprising** [1] - 52:1
**Suspension** [1] - 193:9
**suspicion** [4] - 213:23, 214:13, 215:23, 216:1
**suspicions** [1] - 214:2
**Suspicious** [5] - 39:22, 40:7, 40:17, 202:8, 202:13
**suspicious** [67] - 26:21, 32:2, 32:9, 36:13, 36:14, 36:23, 39:11, 39:15, 39:18, 40:3, 40:9, 40:22, 41:5, 41:6, 41:11, 41:12, 41:22, 42:20, 42:25, 43:21, 45:6, 64:3, 74:21, 80:22, 80:24, 81:2, 83:1, 83:25, 91:11, 93:2, 126:23, 130:15, 133:8, 133:9, 133:13, 133:24, 134:5, 134:7, 134:11, 134:12, 134:15, 134:20,

134:25, 142:6, 142:20, 144:16, 145:14, 152:21, 153:3, 153:11, 153:15, 154:1, 154:12, 154:13, 154:14, 154:17, 155:3, 156:2, 166:1, 166:14, 166:19, 184:5, 185:23, 188:14, 195:16, 201:6, 202:11
**sustain** [9] - 155:18, 165:13, 165:16, 184:19, 184:20, 196:4, 197:12, 201:18, 221:14
**sustained** [2] - 37:13, 145:6
**Sustained** [4] - 156:5, 156:8, 171:20, 220:14
**SUZANNE** [1] - 4:15
**switch** [1] - 64:14
**switching** [2] - 25:9, 126:21
**SWORN** [1] - 177:15
**System** [1] - 99:5
**system** [22] - 33:16, 34:12, 40:25, 60:22, 60:23, 71:19, 71:23, 73:9, 88:17, 118:5, 119:11, 127:1, 152:6, 152:12, 153:6, 153:9, 154:2, 186:2, 203:17, 206:6, 215:7, 216:23
**systems** [2] - 91:11, 164:24

---

# T

**tab** [15] - 54:3, 54:24, 55:1, 58:14, 58:16, 61:9, 62:15, 63:3, 63:16, 65:3, 65:7, 68:20, 69:11, 69:21
**table** [1] - 111:10
**Tableau** [9] - 38:19, 39:8, 55:14, 55:15, 56:6, 73:13, 101:2, 158:16, 176:1
**tabs** [4] - 47:4, 47:5, 55:4, 58:11
**Tactical** [4] - 23:17, 24:19, 24:23, 24:25
**talks** [3] - 53:5, 138:9, 151:6
**Task** [2] - 22:16, 24:6
**Team** [26] - 24:3, 32:8,

36:5, 36:8, 37:1, 37:3, 38:1, 39:9, 39:10, 43:20, 96:1, 96:18, 97:11, 104:19, 105:13, 105:19, 106:13, 106:17, 107:13, 107:15, 107:21, 107:24, 108:13, 115:22, 122:3, 176:9
**team** [9] - 25:23, 28:20, 41:5, 41:22, 41:23, 42:12, 105:10, 139:17
**teams** [2] - 107:2, 144:2
**tear** [2] - 54:24, 55:3
**technical** [3] - 55:14, 99:1, 156:18
**technically** [2] - 56:23, 191:4
**telephone** [2] - 181:14, 193:4
**TEMITOPE** [1] - 4:8
**temporal** [2] - 45:9, 45:13
**temporary** [1] - 209:5
**ten** [5] - 24:21, 64:20, 119:6, 149:6, 172:20
**tens** [1] - 146:19
**Tenth** [1] - 5:12
**tenure** [2] - 184:23, 186:5
**term** [8] - 44:3, 45:13, 46:1, 99:1, 108:17, 147:17, 148:10, 148:12
**terminate** [4] - 122:14, 123:2, 123:9, 125:9
**terminated** [3] - 120:9, 120:10, 122:16
**termination** [1] - 122:19
**terminology** [1] - 214:16
**terms** [51] - 22:25, 24:14, 26:12, 32:4, 33:16, 33:24, 34:8, 38:22, 39:1, 49:18, 59:7, 59:23, 60:3, 60:13, 61:12, 61:18, 61:21, 62:21, 62:24, 63:9, 63:18, 65:9, 65:12, 69:12, 75:22, 83:24, 85:18, 86:13, 87:6, 87:16, 87:21, 88:10, 90:11, 92:2, 92:23, 106:19, 110:11, 113:8, 113:11, 114:25,

115:5, 115:6, 115:19, 116:20, 126:16, 126:17, 134:14, 155:3, 160:13, 216:23
**test** [4] - 38:6, 88:25, 89:21, 165:24
**tested** [1] - 89:18
**testified** [24] - 29:9, 29:17, 29:24, 31:15, 35:10, 45:1, 85:7, 117:5, 124:13, 155:22, 161:12, 161:24, 191:12, 191:13, 191:21, 195:3, 199:20, 199:24, 200:21, 203:15, 203:21, 204:24, 205:2, 211:9
**testify** [4] - 42:14, 46:2, 49:19, 164:7
**testifying** [1] - 165:10
**testimony** [23] - 30:23, 49:4, 81:10, 124:15, 146:21, 149:19, 155:11, 158:22, 161:23, 162:3, 163:25, 165:22, 167:1, 170:4, 176:11, 194:1, 201:9, 205:17, 205:19, 212:22, 220:6, 222:1, 222:6
**testing** [1] - 92:18
**tests** [1] - 89:20
**Texas** [1] - 66:4
**THE** [255] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:14, 21:11, 21:14, 21:15, 21:17, 27:24, 27:25, 29:14, 29:19, 30:6, 31:1, 31:2, 34:22, 37:13, 43:3, 43:9, 44:19, 45:7, 45:25, 47:9, 47:17, 48:4, 48:11, 48:17, 49:3, 49:5, 49:6, 49:7, 49:9, 50:1, 55:20, 56:2, 56:8, 56:19, 56:25, 57:7, 57:21, 58:8, 61:10, 64:11, 64:14, 64:19, 65:1, 70:13, 70:19, 71:3, 72:6, 73:14, 73:22, 73:25, 77:21, 77:23, 79:9, 80:1, 80:7, 80:11, 81:15, 81:16, 83:10, 84:14, 84:18, 84:23, 90:23, 93:20, 93:23, 95:13, 97:19,

97:24, 99:8, 99:10,
99:11, 99:13, 99:14,
100:6, 101:20,
101:22, 102:20,
104:7, 104:12,
104:14, 109:23,
111:2, 111:4, 111:8,
111:12, 111:14,
111:18, 111:24,
113:25, 114:1,
116:8, 116:10,
120:16, 121:22,
121:25, 124:16,
124:18, 127:13,
127:14, 128:1,
128:8, 128:22,
129:7, 129:14,
130:20, 131:2,
131:8, 131:13,
131:17, 131:23,
132:1, 135:6,
135:18, 136:5,
137:5, 137:15,
137:20, 138:2,
138:5, 138:11,
139:6, 139:8,
139:14, 140:5,
140:9, 140:12,
140:14, 143:4,
143:6, 143:10,
143:13, 143:16,
143:19, 143:23,
144:6, 144:10,
145:6, 147:20,
147:23, 147:24,
148:4, 148:22,
149:1, 149:6, 149:8,
149:9, 149:10,
150:18, 150:20,
153:18, 153:19,
155:13, 155:18,
156:5, 156:8,
157:21, 157:23,
157:24, 157:25,
158:1, 158:6,
158:23, 159:1,
161:8, 161:9,
161:18, 162:2,
162:9, 162:21,
164:10, 165:13,
166:23, 166:24,
168:2, 168:4,
171:20, 171:25,
172:3, 175:11,
175:15, 175:16,
176:24, 176:25,
177:2, 177:6, 177:7,
177:9, 177:11,
177:12, 177:13,
177:16, 177:19,
180:8, 180:14,

180:20, 181:3,
182:18, 183:4,
183:10, 183:11,
184:18, 184:19,
186:7, 186:10,
187:24, 188:2,
188:8, 189:7, 189:9,
189:10, 189:21,
191:2, 191:9,
191:16, 191:18,
191:24, 194:18,
194:22, 195:1,
196:1, 196:4,
196:20, 197:12,
197:18, 197:22,
197:24, 198:12,
199:10, 200:2,
201:8, 201:11,
201:18, 201:22,
205:6, 205:9, 206:4,
206:5, 209:15,
209:20, 210:23,
210:25, 211:2,
211:14, 218:23,
220:14, 221:14,
221:18, 221:21,
221:22, 222:9
**theft** [1] - 34:7
**theoretically** [1] -
71:22
**thereby** [1] - 180:21
**therefore** [2] - 46:7,
116:1
**they've** [2] - 51:21,
118:17
**thinking** [3] - 53:4,
85:10, 117:6
**third** [6] - 26:22,
26:23, 46:23, 62:15,
91:8, 166:7
**Thomas** [1] - 2:12
**Thomson** [1] - 166:10
**thousands** [1] -
146:20
**Three** [1] - 6:5
**three** [32] - 6:12, 24:4,
45:18, 46:17, 47:4,
47:5, 51:6, 51:7,
51:8, 51:14, 55:4,
62:12, 68:21,
108:25, 120:23,
144:1, 152:23,
157:8, 157:11,
157:15, 159:2,
163:6, 183:18,
186:14, 187:13,
189:13, 192:10,
192:15, 192:23,
205:21, 217:5,
217:25

**three-month** [5] -
51:6, 51:8, 51:14,
62:12, 157:15
**three-year-running**
[1] - 144:1
**threshold** [22] - 31:24,
203:20, 212:2,
212:7, 212:10,
212:14, 213:17,
213:19, 216:11,
216:15, 216:17,
216:18, 217:4,
217:6, 217:12,
217:15, 217:17,
217:19, 218:9,
218:12, 219:3,
219:10
**thresholds** [11] -
207:4, 207:7,
207:12, 216:13,
217:13, 218:14,
219:8, 220:11,
220:16, 220:21,
221:5
**throughout** [3] -
22:12, 47:1, 184:7
**Thursday** [1] - 76:14
**Tide** [1] - 129:18
**tiles** [1] - 158:16
**timeline** [1] - 188:7
**timely** [1] - 34:25
**timing** [2] - 93:6,
129:11
**TIMOTHY** [1] - 5:9
**title** [8] - 111:22,
120:23, 140:20,
168:14, 168:23,
178:1, 178:5, 178:10
**titles** [1] - 200:15
**Today** [2] - 107:15,
107:21
**today** [39] - 25:10,
25:16, 29:3, 32:11,
36:25, 38:4, 38:9,
42:14, 42:24, 50:16,
55:2, 58:17, 64:6,
68:19, 74:20, 75:5,
85:25, 86:8, 86:9,
86:10, 88:1, 88:22,
89:11, 92:19, 93:4,
94:2, 98:15, 101:3,
102:7, 107:24,
108:1, 154:7, 155:2,
158:5, 158:13,
165:5, 165:22,
200:24, 218:18
**today's** [3] - 62:18,
73:4, 73:8
**together** [4] - 25:3,
68:4, 85:21, 130:6

**took** [6] - 38:3, 131:9,
171:16, 187:7,
208:22, 217:24
**tool** [12] - 117:25,
118:7, 118:11,
118:13, 118:17,
118:19, 119:10,
120:3, 120:4,
120:12, 158:8,
194:11
**tools** [1] - 158:11
**top** [13] - 50:19, 50:20,
51:7, 51:23, 59:24,
61:16, 66:19, 86:1,
148:13, 167:22,
190:9, 190:13,
190:19
**topic** [1] - 126:21
**topics** [1] - 149:16
**total** [7] - 33:6, 86:25,
100:19, 117:3,
118:9, 190:14,
198:18
**totality** [3] - 38:5,
53:10, 165:23
**tote** [2] - 44:8
**touched** [1] - 104:17
**Tower** [2] - 3:4, 4:18
**track** [4] - 52:6, 59:23,
60:4, 95:3
**tracked** [1] - 53:18
**tracking** [1] - 40:12
**tracks** [1] - 215:7
**Trade** [1] - 130:7
**trade** [3] - 85:21,
129:25, 209:11
**traffic** [1] - 42:16
**trail** [1] - 188:23
**train** [3] - 28:18, 28:22
**trained** [2] - 125:23,
126:1
**training** [13] - 27:19,
28:1, 28:16, 28:17,
28:23, 28:24, 74:4,
74:5, 105:1, 105:2,
105:3, 105:6, 126:7
**transaction** [2] -
211:20, 212:16
**transactional** [5] -
94:5, 98:9, 119:11,
159:10, 176:18
**transactions** [4] -
40:12, 98:24,
119:15, 157:2
**transcript** [5] - 6:19,
7:13, 130:20, 155:9,
223:4
**transferred** [2] -
23:21, 23:23
**TRD** [3] - 52:3, 52:20,

53:2
**treat** [2] - 71:6, 75:25
**treatment** [2] - 56:24,
126:13
**tree** [1] - 210:16
**trend** [6] - 54:3, 61:9,
99:19, 100:21,
101:5, 101:8
**trending** [6] - 62:13,
68:3, 96:5, 100:15,
100:25, 158:15
**trends** [2] - 74:16,
74:19
**Trial** [1] - 222:11
**trial** [2] - 48:16, 221:8
**TRIAL** [1] - 1:16
**tried** [1] - 64:1
**tries** [1] - 195:4
**trigger** [1] - 217:17
**triggered** [1] - 216:7
**triggering** [1] - 221:25
**tripping** [1] - 45:5
**trips** [1] - 78:4
**true** [3] - 53:19,
144:21, 180:18
**truth** [8] - 79:23,
84:16, 117:13,
129:1, 180:13,
180:14, 180:16,
180:23
**try** [9] - 60:24, 61:18,
64:7, 84:1, 149:5,
149:16, 155:1,
186:3, 187:13
**trying** [28] - 34:6, 60:5,
60:6, 67:8, 70:15,
80:25, 81:10, 82:10,
83:24, 97:5, 124:23,
125:7, 151:16,
155:14, 161:5,
171:21, 178:15,
182:23, 191:22,
196:3, 200:13,
201:9, 201:14,
201:20, 205:7
**turn** [8] - 83:15, 91:8,
114:13, 135:2,
141:5, 142:3,
142:14, 170:9
**turning** [4] - 74:4,
91:20, 93:25, 116:15
**Turning** [1] - 129:17
**TV** [1] - 138:14
**Twelfth** [2] - 4:13,
4:15, 5:5
**Two** [1] - 88:21
**two** [36] - 22:24, 23:4,
23:25, 24:15, 30:24,
31:19, 31:20, 32:11,
35:21, 42:1, 45:14,

46:25, 52:11, 52:12,
70:15, 79:20, 87:5,
88:2, 89:20, 92:22,
95:11, 99:25, 100:8,
103:3, 104:17,
108:7, 119:23,
120:20, 139:9,
144:2, 164:3, 189:2,
204:9, 212:23,
214:12, 214:17
**two-sided** [2] - 100:8,
103:3
**two-step** [3] - 31:19,
31:20, 32:11
**two-year** [1] - 92:22
**type** [12] - 37:2, 86:13,
89:19, 94:1, 94:3,
94:12, 94:14, 96:12,
103:19, 165:15,
219:12, 219:13
**types** [6] - 28:17, 33:4,
37:25, 85:24, 97:11,
99:18

## U

**ultimate** [1] - 217:18
**ultimately** [3] - 35:3,
123:12, 134:21
**umbrella** [1] - 108:18
**unchanged** [1] -
132:17
**unconfuse** [1] -
201:20
**under** [18] - 21:16,
36:14, 43:1, 54:16,
56:24, 58:24, 93:7,
119:1, 137:16,
140:5, 140:9,
143:16, 145:10,
151:23, 157:13,
172:14, 191:14,
207:16
**underneath** [1] -
22:19
**underscore** [1] -
183:18
**understood** [4] -
48:10, 91:17,
101:12, 162:5
**undertake** [1] - 160:17
**unfairness** [1] -
131:18
**unfamiliar** [1] - 43:25
**unfortunately** [1] -
120:21
**uniform** [1] - 49:18
**unique** [4] - 22:8,
32:21, 32:23, 52:18
**unit** [2] - 51:19,

192:13
**United** [6] - 7:2, 22:12,
136:16, 181:7,
196:23, 207:23
**UNITED** [2] - 1:1, 1:17
**units** [19] - 51:11,
52:6, 59:3, 59:4,
61:15, 62:2, 62:21,
67:3, 87:1, 87:18,
118:9, 119:1,
161:14, 163:5,
163:13, 163:21,
164:2, 164:20, 165:3
**unless** [5] - 67:14,
197:20, 214:1,
214:2, 216:7
**unrelated** [1] - 129:3
**unsealed** [1] - 21:12
**unusual** [3] - 36:16,
36:17, 127:5
**up** [75] - 7:6, 24:5,
24:25, 26:6, 27:23,
39:16, 39:25, 40:2,
42:10, 42:11, 49:25,
50:3, 51:7, 54:11,
55:8, 57:25, 63:7,
63:17, 64:17, 72:1,
74:7, 77:11, 77:14,
79:20, 80:14, 84:7,
85:3, 91:6, 98:23,
104:9, 107:3, 109:3,
110:12, 111:10,
117:15, 120:12,
132:8, 135:14,
143:10, 144:10,
146:8, 151:20,
153:24, 159:3,
160:22, 166:16,
177:9, 181:13,
181:20, 181:24,
182:6, 183:17,
184:19, 186:25,
187:13, 190:10,
193:6, 196:1, 196:7,
196:12, 196:18,
197:13, 197:18,
197:19, 199:25,
200:17, 203:3,
207:20, 207:24,
211:17, 211:18,
215:8, 215:11,
219:24, 220:5
**update** [4] - 72:5,
72:25, 170:10,
175:17
**updated** [1] - 171:3
**updating** [1] - 182:3
**upload** [1] - 194:10
**upward** [1] - 67:7
**Utah** [1] - 65:25

**utility** [1] - 117:1
**utilize** [3] - 109:3,
109:6, 118:1
**utilized** [3] - 44:3,
98:22, 120:3
**utilizes** [1] - 40:12
**utilizing** [1] - 125:5

## V

**vague** [1] - 153:16
**Vague** [1] - 206:2
**vaguely** [1] - 185:17
**validate** [1] - 97:15
**value** [3] - 160:10,
160:14, 176:18
**various** [9] - 23:19,
25:13, 49:2, 91:15,
129:4, 130:8, 163:9,
170:5, 170:11
**vary** [2] - 218:3,
218:15
**vein** [1] - 128:12
**Ventura** [1] - 3:18
**verify** [1] - 25:23
**verifying** [1] - 26:1
**vernacular** [1] -
200:14
**version** [6] - 40:24,
60:1, 88:25, 96:9,
96:10, 96:11
**versions** [1] - 198:16
**versus** [10] - 51:11,
55:2, 59:3, 66:17,
67:12, 68:2, 89:6,
116:4, 168:22,
209:18
**Vice** [3] - 178:2, 178:9,
191:7
**view** [7] - 34:3, 46:11,
52:21, 126:18,
132:24, 133:6,
160:11
**viewing** [2] - 47:4,
55:15
**views** [1] - 134:22
**VIRGINIA** [2] - 1:1,
1:18
**Virginia** [12] - 4:18,
7:3, 22:10, 76:23,
77:16, 88:11, 88:15,
129:9, 129:18,
218:8, 219:9
**Virginia-00064** [1] -
73:11
**Virginia-00121** [1] -
77:20
**visibility** [4] - 114:16,
115:5, 134:16,
134:18

**visit** [1] - 27:14
**visuals** [1] - 69:2
**volume** [9] - 45:11,
85:18, 87:22, 90:6,
204:6, 205:18,
206:11, 207:8,
219:19
**VOLUME** [1] - 1:16
**voluminous** [4] - 95:8,
95:10, 99:24, 100:9
**vs** [1] - 223:6

## W

**WAG** [1] - 174:2
**wait** [1] - 92:12
**waiting** [2] - 75:21,
175:18
**WAKEFIELD** [1] - 5:13
**Walgreens** [9] - 60:16,
77:4, 92:20, 148:6,
148:14, 148:16,
148:18, 174:1,
174:15
**walk** [4] - 46:24, 47:2,
47:7, 49:1
**walked** [3] - 101:3,
103:9, 114:23
**wants** [1] - 50:2
**Washington** [7] -
2:11, 4:7, 4:14, 4:16,
5:5, 5:12, 210:12
**watching** [1] - 208:11
**Wayne** [1] - 147:25
**ways** [1] - 86:15
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**weeds** [1] - 63:6
**week** [4] - 25:19,
102:2, 161:13,
209:14
**week's** [1] - 39:22
**weeklies** [1] - 103:16
**weekly** [12] - 39:20,
39:21, 41:21, 42:20,
47:1, 47:3, 47:4,
48:23, 53:13, 55:18,
102:11, 103:5
**weeks** [1] - 108:6
**weight** [4] - 68:5, 68:7,
138:20, 138:24
**weighted** [1] - 68:5
**WEST** [2] - 1:1, 1:18
**West** [12] - 7:3, 73:11,
76:23, 77:15, 77:20,
88:11, 88:15, 129:9,
129:18, 218:8, 219:9
**whole** [3] - 23:14,
40:16, 141:24
**wholesale** [6] - 34:12,

117:25, 152:16,
152:24, 153:12,
208:13
**wholesaler** [2] -
152:15, 152:18
**wholesalers** [1] -
118:19
**wholistically** [1] - 27:4
**WICHT** [2] - 4:12,
180:25
**wide** [2] - 74:18
**Williams** [2] - 4:13,
5:4
**willing** [2] - 43:24,
123:25
**withdraw** [2] - 130:24
**withdrew** [6] - 130:21,
131:5, 131:13,
143:19, 143:25,
144:7
**withhold** [1] - 137:24
**WITNESS** [34] - 21:14,
27:25, 31:2, 49:5,
49:7, 58:8, 61:10,
81:16, 99:10, 99:13,
111:12, 114:1,
124:18, 127:14,
147:23, 149:8,
149:10, 150:20,
153:19, 159:1,
161:9, 166:24,
175:16, 176:24,
177:6, 177:12,
177:15, 183:11,
184:18, 189:9,
191:16, 206:5,
210:25, 221:21
**witness** [22] - 21:16,
47:24, 47:25, 95:11,
97:6, 99:25, 161:21,
164:11, 177:7,
188:18, 189:22,
191:1, 191:4,
195:23, 197:2,
197:7, 198:10,
201:10, 211:12,
220:13, 221:7, 221:9
**witness's** [3] - 158:21,
182:17, 183:2
**witnesses** [2] - 46:20,
162:20
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**word** [2] - 127:5,
212:7
**wording** [1] - 74:20
**words** [7] - 45:2,
52:12, 59:22,
151:10, 187:22,
201:14, 216:16

**workforce** [1] - 22:22
**Workforce** [1] - 24:18
**works** [10] - 22:11,
  32:5, 33:16, 50:25,
  59:10, 73:9, 85:9,
  87:13, 94:25, 122:10
**worry** [1] - 163:2
**worth** [3] - 157:9,
  157:14, 209:17
**write** [1] - 122:12
**writing** [3] - 83:20,
  186:22, 188:6
**written** [6] - 113:19,
  122:6, 132:16,
  151:18, 168:12,
  171:2
**wrote** [3] - 71:1,
  93:11, 124:8
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10,
  3:13, 4:19, 5:15, 6:9

## Y

**year** [11] - 74:14,
  92:16, 92:22, 97:13,
  109:17, 144:1,
  146:18, 185:19,
  203:19, 220:22
**years** [29] - 23:21,
  23:25, 24:4, 24:7,
  29:11, 30:9, 34:24,
  49:16, 87:5, 88:2,
  88:21, 91:14, 94:23,
  105:11, 107:18,
  108:8, 109:15,
  120:6, 146:13,
  160:24, 171:4,
  178:4, 187:16,
  187:19, 187:22,
  200:11, 204:9,
  205:21
**York** [3] - 3:5, 23:21,
  23:22
**yourself** [3] - 74:25,
  107:23, 146:2

## Z

**Zimmerman** [5] -
  105:23, 128:5,
  128:15, 181:21,
  190:24