IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 12
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


MAY 18, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:                Ayme Cochran, RMR, CRR
Court Reporter:                Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

1          PROCEEDINGS had before The Honorable David A. Faber,

2     Senior Status Judge, United States District Court, Southern

3     District of West Virginia, in Charleston, West Virginia, on

4     May 18, 2021, at 9:00 a.m., as follows:

5               THE COURT:  I want to put a couple of things on

6     the record before we get going here.

7          Do you have something, Ms. McClure?

8               MS. MCCLURE:  I do, Your Honor, but I'm happy to

9     have you put your things on the record and then I can

10    address it.

11              THE COURT:  Okay.  I wanted to rule on some of the

12    things that are pending before the Court.  On the

13    *Noerr-Pennington* issue, we filed a written opinion this

14    morning ruling in plaintiffs' favor on this issue.  I'm

15    basically following Judge Polster on this point.

16         However, the Majority Congressional Report was offered.

17    I am not going to admit it.  I believe that it lacks

18    sufficient reliability and objectivity to be admissible and

19    it is out.

20         Now, the 1006 summaries, I'm going to let these in.

21    District Courts have broad discretion in determining whether

22    to admit summaries under Rule 1006.  The Fourth Circuit has

23    two main guideposts to guide this discretion, the *Janati*

24    case at 374 F.3d 263, Fourth Circuit 2004, and *United States*

25    *v. Oloyede*, 933 F.3d 302, a 2019 Fourth Circuit case.

1          *Janati* explains that a District Court may abuse its

2     discretion by cutting off both the summary path and "the

3     long way"; that is, the underlying documents, especially in

4     complex cases.  On the other hand, *Oloyede* disallows

5     "skewed" summaries.  There, the government presented

6     summaries of accounts that purported to be comprehensive but

7     misleadingly excluded innocuous transactions to make the

8     criminal defendants look more culpable.  Essentially there,

9     the summaries are not what the government held them out to

10    be.

11         District Courts in this circuit have to navigate

12    between *Janati* and *Oloyede* by being cognizant of the need

13    for summary evidence in complex cases, but on guard against

14    skewed summaries.

15         I believe the argument that the summaries here are

16    skewed stretches *Oloyede* too far.  Each summary here is an

17    accurate picture what it purports to be.  In no chart or

18    table does Dr. McCann hold a summary out to be something it

19    is not.  And the summaries do not fall outside the scope of

20    Rule 1006 when Dr. McCann makes simple, accurate

21    calculations with the summary, such as when he uses U. S.

22    Census data, of which the Court may take judicial notice, to

23    add a per capita category.  I don't think there was any

24    argument that the underlying materials here Dr. McCann used

25    were admissible in their own right.

1      I am concerned about the pharmacy records here from

2  outside of the Huntington-Cabell area.  These are selected

3  by plaintiffs' attorneys, which gives me a concern, and

4  suggests that this case might be similar to the *Janati* case.

5  I'm sorry.  It suggested similar to the *Oloyede* case because

6  the input of the lawyers here may skew the summaries.  I

7  don't think this is a sufficient concern to keep the

8  summaries out at this point, although it does give me a

9  concern.

10      Plaintiffs say they can show that these are proper and

11  I'm going to give them an opportunity to do so and I believe

12  that these can be expunged from the exhibits if the Court

13  ultimately determines that it's not proper to admit them.

14      Okay, Ms. McClure.

15      MS. MCCLURE:  Thank you, Your Honor.  Mr. Mays is

16  waiting outside of the courtroom just to -- I thought it was

17  appropriate to raise this in front of Your Honor outside of

18  his presence.

19      The plaintiffs, over the course of several nights, have

20  identified 82 exhibits that they have purportedly planned to

21  use with Mr. Mays.  Separately, they've identified 38

22  demonstratives that they purport to be intending to use with

23  Mr. Mays, some as late as around 11:00 p.m. last night.

24      I'm raising this to the Court in light of prior

25  discussions we've had on this same topic when it related to

1    Mr. Zimmerman.  We believe that the parties need to proceed

2    in good faith with respect to the number of exhibits that

3    they are purporting to use with witnesses.  It just doesn't

4    seem in the realm of remote possibility that we would be

5    using somewhere around 140 documents, combining

6    demonstratives plus exhibits.

7         I -- we have an obligation, of course, to then object

8    to these documents by 10:00 p.m.  Some of them, if they're

9    coming in later, we just simply don't have the opportunity

10   to be able to do that.

11        So, we raise the concern because we do think it throws

12   the process and could potentially affect the Court's ability

13   to manage this case.  So, we raise this issue again.

14             THE COURT:  How many of these do you really plan

15   to use, Mr. Farrell?

16             MR. FARRELL:  This many (indicating).

17             THE COURT:  Well, I don't know how many this many

18   is.  That's obviously not --

19             MR. FARRELL:  I'm not trying to be --

20             THE COURT:  180.

21             MR. FARRELL:  Let me, for the record, state again

22   we are attempting to avoid getting placed in a straitjacket

23   and trying to anticipate every which way that a witness will

24   go to impeach him or to talk about things.

25        So, by way of example, testimony has been hinted at but

```
 1    has not come out yet that the three-times multiplier
 2    originates from a certain governmental source.  So, we would
 3    have to anticipate that's maybe five, six, seven documents.
 4              THE COURT:  What's the three-times multiplier?
 5              MR. FARRELL:  The threshold that ABC was
 6    identifying took the average sale to a pharmacy and then
 7    multiplied it by three.
 8              THE COURT:  Okay, I remember that.
 9              MR. FARRELL:  So, we have some zigging and some
10    zagging.  And, in addition to that, we have been endeavoring
11    to identify the data sources and figuring out how we can
12    talk about the data in the absence of the 1006 ruling.  So,
13    the 38 demonstratives --
14              THE COURT:  Well, you got a 1006 ruling about
15    30 seconds ago.
16              MR. FARRELL:  Yes, sir.
17              THE COURT:  You won two and lost one, Mr. Farrell.
18              MR. FARRELL:  It's not -- it's not a bad average.
19    So, the 38 demonstratives are actually subsets of the 1006s
20    that if we couldn't use them as evidence, we were going to
21    use them as demonstratives today.  So, there's no surprises
22    here.
23        And, again, this is an adverse witness.  I don't think,
24    as of the third week of trial, that there has been any
25    document that has been a surprise.
```

```
 1              THE COURT:  Well, I think it's fair for you to
 2     tell your opponents the ones that you specifically plan to
 3     use and then, if some others come up, we'll deal with those
 4     in the context.  I don't want to completely cut you off, but
 5     if you flood your opponent with a whole bunch of documents,
 6     then you're obviously placing them at a disadvantage, and I
 7     think they're entitled to notice under the Court's previous
 8     ruling and the agreements of the parties that they're
 9     entitled to a reasonable notice of what you really expect to
10     use.
11              MR. FARRELL:  And, Your Honor, for the record, the
12     plaintiffs never agreed that we would show the defense the
13     documents that we would show their adverse parties.  That
14     being said, I do want to emphasize that the foundation
15     objections that have been placed on the record --
16              THE COURT:  Well, you had an agreement, didn't
17     you, about producing -- about identifying the documents you
18     planned to use with the witnesses before the -- the day
19     before they were offered, didn't you?
20              MR. FARRELL:  No.
21              THE COURT:  You didn't?  Okay.  Well --
22              MS. MCCLURE:  Your Honor, we disagree with Mr.
23     Farrell's characterization of this.  You've had this issue
24     raised before you more than one time.  I don't think that
25     there's any question that the parties' stipulation and the
```

```
 1    Court's order does require that.
 2             MR. FARRELL:  Judge, I wasn't finished yet.
 3             COURT REPORTER:  I'm sorry?
 4             THE COURT:  Oh, we've got -- Mr. Hester, you stood
 5    up first.
 6             MR. HESTER:  Well, Your Honor, I just wanted to
 7    point out that the stipulation has a footnote that
 8    specifically says that the provision for providing exhibits
 9    the night before a witness is to testify, quote, "applies
10    where a party calls a witness adversely in their case in
11    chief."  So, I don't think Mr. Farrell has a right in terms
12    of what the stipulation says.
13             MR. FARRELL:  Judge, may I --
14             THE COURT:  That's what I thought the stipulation
15    said.
16             MR. FARRELL:  May I finish, please?
17             THE COURT:  Yes.
18             MR. FARRELL:  The joint trial exhibit that they're
19    talking about, the plaintiffs and the defendants --
20             THE COURT:  Let me hear from Ms. Mainigi first and
21    then you can finish.
22             MS. MAINIGI:  Your Honor, I was just going to say
23    first, because we each have separate stipulations, we also
24    have such a footnote that if they call an adverse party and
25    this is an issue that Cardinal is obviously extremely
```

1    concerned about, as well, because as soon as we finish with

2    the ABDC witnesses, plaintiffs are going to begin with

3    Cardinal witnesses.

4        And to get over the course of whether it's one night or

5    two nights to get, you know, more than a hundred or

6    somewhere between 100 and 200 exhibits at 7:00 and needing

7    to object by 10:00, when what we have seen is a consistent

8    pattern of using five, six, seven at most exhibits during

9    each examination, I really think suggests that they're

10   trying to bury the real exhibits in the context of the

11   larger list.

12       So, we would just ask as we now continue to move

13   through these company witnesses, which is what they wanted

14   to do, and they agreed to provide these exhibits in advance.

15   This is how they wanted to present their case.  We do think

16   we're entitled to real notice, not -- not what's been

17   happening so far.

18            THE COURT:  Okay.  Mr. Farrell?

19            MR. FARRELL:  So, I don't have the exact pleading

20   number in front of me, but I know that Mr. Wakefield is the

21   one that submitted the pleading to the Court submitting the

22   joint trial exhibit stipulation and in the motion filed by

23   Mr. Wakefield the plaintiffs joined in, it specifically

24   brought to the Court's attention that we disagreed with the

25   Footnote Number 6.

1       The plaintiffs submitted a version of this that said

2    that we do not agree that the night before we have to

3    disclose exhibits for adverse parties.  The defendants had

4    their version of the order that says that the party that has

5    to be adversely called gets the exhibits the night before

6    and you entered the defendants' version.

7       So, I just wanted to be clear.  We never agreed, nor in

8    my legal career have I ever agreed, to show to the adverse

9    party the documents that we intended to use to examine the

10   adverse party.  That was not a stipulation that the

11   plaintiffs voluntarily agreed to.

12      You entered the order, so we've been abiding by it to

13   the best of our ability and the defendants have every right

14   to make these objections but, again, you see the catch-22

15   that the plaintiffs are in.

16      The defendants have made literally scores of objections

17   on foundation, many of which this Court has sustained

18   properly.  And so, we are now having to go back and

19   re-examine our foundational agreements, the stipulations

20   that we entered into, to make sure we can get their

21   documents into evidence.  So, we're into a straight -- we're

22   into a catch-22.  We're attempting to anticipate all of the

23   foundational requirements.

24      If you recall, several witnesses ago, we asked a

25   particular party witness if he recalled a document and he

1    said no and then we showed him five, six, seven e-mails to

2    demonstrate that he had access to that document.

3         So, when you look at the algorithm, the logic tree of

4    the supporting documents that go to each exhibit, yes, we're

5    attempting to disclose documents that we know we may need.

6    This underscores the importance.

7         If this were direct where it was my client sitting on

8    the stand, of course, we would know what questions we're

9    going to ask.  We probably would know the order of the

10   documents we intended to go through.  I was -- I would

11   suggest to the Court we probably have written outlines for

12   the lawyers to make sure we stay on task.  We do not have

13   that ability when we call an adverse party and that's why we

14   objected to the footnote in the joint stipulation.

15             MS. MCCLURE:  May I respond briefly, Your Honor?

16             THE COURT:  Yes.

17             MS. MCCLURE:  Not responding to the question of

18   whether when you call an adverse witness you can be

19   organized and have an outline.  I don't think that those two

20   things are mutually exclusive.

21        Nevertheless, at the end of the day, I'm not going to

22   comment either on Mr. Farrell's recitation of the history.

23        At the end of the day, this was what was entered by the

24   Court and it's signed by Your Honor and we simply are

25   requesting that the parties proceed in good faith and we

1    have some reasonable understanding of what exhibits are

2    truly intended to be used.

3         Your Honor has previously said that you believe that we

4    are entitled to some reasonable notice of that and that

5    there would be some outer edge where there might be a

6    reason, if it wasn't on the list, to nevertheless permit the

7    party -- the party who didn't identify it to use it.  That's

8    really all we're asking for and this volume is just not

9    sustainable.

10             THE COURT:  Well, I think that -- Ms. Mainigi?

11             MS. MAINIGI:  Your Honor, the only thing I was

12    going to add in response to Mr. Farrell is this is a direct

13    exam.  They chose to -- it might be an adverse witness, but

14    they chose to bring these individuals in.

15         They asked months ago.  We entered stipulations to

16    bring these witnesses in, I want to say at least for

17    Cardinal, last August.  These are individuals that they have

18    deposed, in some cases, multiple times in various

19    jurisdictions around the country.

20         There is no element of surprise left here as to what

21    these individuals know and the contours of what they know.

22    The surprise that exists is to get a list of -- of upwards

23    of 100 exhibits, most of which are substantive, Your Honor.

24    I respectfully disagree with Mr. Farrell that a bunch of the

25    exhibits on the list, as we've observed it coming through,

1    are foundational.  They are separate self-standing

2    documents.  It's just a matter of which ones they're

3    intending to use.

4        I can't imagine that attorneys as good as we have on

5    the other side don't have very concrete outlines of where

6    they're going.  Of course, they do.  And I think that the

7    long lists are for no reason other than ensuring that the

8    exhibits that they truly are intending to use are -- are

9    kind of buried in the larger group and that, I think, does

10   get around the spirit of the order Your Honor signed.

11           THE COURT:  Well, I think, to be fair, the parties

12   are entitled to notice of -- to a reasonable number of

13   documents so they can prepare and I think you need to abide

14   by that, Mr. Farrell.

15       Now, I understand that there may be situations that

16   come up where you want to use others and we'll take those up

17   when they come up, but flooding the other side with a whole

18   bunch of documents that makes it impossible for them to

19   prepare is not fair, in my opinion, and I think you

20   shouldn't do it.

21           MR. FARRELL:  Judge, one final point is the

22   documents that we are continuing to re-disclose include

23   documents that we have not been able to admit into the

24   record or lay a foundation yet.  And so, the documents are

25   backloading, as well.

1        I'll give you an example.  There are 20 or 30

2   media-related HDMA documents that we attempted to get in

3   through Mr. Zimmerman that had Mr. Zimmerman's name on it

4   and the objection was made under *Noerr-Pennington*.  And so,

5   we abandoned that route.  That accounted for 20 or 30

6   documents that we would have gotten in had we been able to

7   pursue that line.

8        So, I disagree with any assessment that we are flooding

9   them with documents --

10           THE COURT:  Well, I'm not going to argue with you,

11   Mr. Farrell.  You heard what I said and -- and that's it.

12           MS. MCCLURE:  Your Honor, just as briefly as I can

13   be on this.  We would request that we have some list as you

14   previously instructed with Mr. Zimmerman of -- of a subset

15   of documents that would be planned to use today with Mr. May

16   [sic] -- I mean, sorry.  I'm sorry -- with Mr. Steve Mays

17   today.

18        I do note that previously when we received a list from

19   the plaintiffs of the 43 documents that were identified that

20   morning in court, that actually included documents that had

21   not ever been on a list previously for Mr. Zimmerman.  So,

22   what I -- I just want to be clear about what my ask would

23   be, that there be some subset of the 82 exhibits and 38

24   demonstratives that have been identified that we be provided

25   for Mr. Mays this morning and that that subset be of a

1    reasonable number.

2              THE COURT:  Well, can you do that, Mr. Farrell?

3              MR. FARRELL:  Yes, Your Honor.

4              THE COURT:  Okay.  All right.  Let's get the

5    witness in here and get rolling.

6              MS. MCCLURE:  Your Honor, prior to bringing the

7    witness in, may we have that subset of documents from Mr.

8    Farrell?  So, I don't know if that requires a brief recess.

9    I defer to the Court.

10             MR. FARRELL:  I can make a proffer for the record

11   now the documents we intend to use and then give them a

12   chance to review them.

13             THE COURT:  Okay.

14             MR. FARRELL:  The first document we intend to use

15   was previously admitted as P-187.  It's the second to last

16   page and it is the order monitoring process flow chart to

17   follow up on what we were discussing yesterday.

18        For purposes of allowing Mr. Mays to be able to

19   understand or refer back, we were going to show him P-877,

20   which was previously admitted and stipulated to.  That will

21   be July 11th, 2007.

22        We intend to show him again P-432, which is the

23   January 19th, 2009 memorandum which identifies current

24   default thresholds of oxycodone and hydrocodone.

25        We intend to show him the P-44002 and have it admitted

1    into the record.  It is the CSRA Policy 2.12.  I think we

2    previously admitted four different versions of CSRA 2.12

3    beginning in 2005.  This is the 2010 version.  It's

4    stipulated, as well.

5        We intend to ask him questions about whether or not his

6    sales team was the group that was performing due diligence

7    and show him P-2756, which is an e-mail dated December 13th,

8    2013 from Steve Mays to his team that talks about

9    eliminating sales personnel from involvement in the due

10   diligence process.

11       We intend to show him a new exhibit, P-629, which is an

12   e-mail chain to and from Steve Mays that includes the HDMA

13   industry compliance guidelines and the letters submitted by

14   HDMA to the DEA and the DEA's acknowledgment of receipt of

15   these guidelines.  It's dated 2008 and the series of

16   correspondence from Mr. Zimmerman is in P-629.

17       We intend to go through a couple of the due diligence

18   files with Mr. Zimmerman and, in particular, it's P-2796,

19   which is a June 20th, 2007 SafeScript SOM investigation,

20   S-O-M, and P-1273, which is a July 12, 2007 SOM

21   investigation.

22       We intend to impeach Mr. Zimmerman with an e-mail dated

23   P-2748, which is an e-mail, April 20th, 2012, from Steve

24   Mays to, among others, Chris Zimmerman where he expresses

25   the -- his concern about sharing ARCOS data with the other

1    distributors.

2         We intend to -- we disclosed last night and intend to

3    introduce -- in discovery, we've asked for the defendants to

4    disclose to us the orders that were flagged by their

5    algorithm and it is thousands and thousands and thousands of

6    lines of data.

7              MS. MCCLURE:  Your Honor, I do hate to interrupt

8    and we did ask for a recitation of the exhibit numbers, but

9    to the extent that there's narrative accompanying it that is

10   intended for -- whether it's intended or not, the narrative

11   that accompanies it colors the evidence itself prior to it

12   being offered.  I do object to that.

13             THE COURT:  Can you give her the exhibit numbers,

14   Mr. Farrell?

15             MR. FARRELL:  Yes, Your Honor.

16        P-16639 is a composite exhibit that is voluminous in a

17   data file.  We extracted the exact lines of data that we

18   intend to use and submitted to them last night.

19        P-2819 is another data file.

20        We then intend to show him the document introduced by

21   defendants.  I don't have their sticker number, but it is

22   AM-WV-00601.

23        And then, finally, P-16643 and P-2574.

24        And then, finally, we have the demonstratives, which of

25   this, 1006s that were entered, I have selected 39 of those

1    slides and identified them with my own handwriting and

2    showed them the ones that I intended to go through.

3           THE COURT:  Okay.  Well, let's get Mr. Mays in

4    here and get going.

5        Good morning, Mr. Mays.

6           THE WITNESS:  Good morning.

7           THE COURT:  You're still under oath, sir, and you

8    can take the stand.

9           THE WITNESS:  Thank you, sir.

10                  **FURTHER DIRECT EXAMINATION**

11           **BY MR. FARRELL:**

12   **Q.**   Good morning, Mr. Mays.

13   **A.**   Good morning, sir.

14   **Q.**   Previously admitted into the record is P-187 and I'm

15   going to address your attention to the second to last page.

16   I have pulled a demonstrative from that that includes the

17   Bates stamp in the bottom right-hand corner, as well as the

18   dialogue box from the front page that identifies your name.

19   It's already been admitted, but I'm just going to show you

20   this page so that we can walk through it.

21       Judge, may I approach?

22           THE COURT:  Yes, you may.

23           MR. FARRELL:  I have copies for the Court, as

24   well.

25           BY MR. FARRELL:

1    Q.    Mr. Mays, do you recognize this as an algorithm of

2    AmerisourceBergen's Diversion Control Program process

3    between 2007 through 2014?

4    A.    Well, I'm not sure it's an algorithm, but it's like a

5    process flow of orders that go through the order monitoring

6    system, the OMP.  The Diversion Control Program is the

7    overall program.

8    Q.    So, I'm going to try to walk through the flow process

9    with you and we're going to start with the top left-hand

10   corner where it says "customer submits the order".  Do you

11   see that?

12   A.    Yes, sir.

13   Q.    And then it says "DC receives the order".  What does

14   "DC" stand for?

15   A.    Distribution Center.

16   Q.    And once the Distribution Center receives the order,

17   then it says "system interrogates order via process rules".

18   Do you see that?

19   A.    Yes, I do.

20   Q.    Okay.  What does that mean?

21   A.    So, there's -- there's a lot of rules built into the

22   system to check licenses of customers and all these things

23   before an order gets processed through the system and that

24   would also be where it checks for the thresholds.

25   Q.    Yes, sir.  And is that -- is that -- I don't know what

1    the shape of this is.  Is that where -- I'm making a

2    highlight here in blue where the system asks, "Does this

3    particular order pass initial interrogation?"

4    **A.**   Correct.

5    **Q.**   Okay.  So, if the answer is yes on the flow chart and

6    it passes, then that's when the order is then processed as

7    normal and then reported as a transaction via ARCOS.  Do you

8    see that, sir?

9    **A.**   Yes, I see that.

10   **Q.**   Is that an accurate depiction of the process at

11   AmerisourceBergen between 2007 through 2014?

12   **A.**   I'm looking at this a little further.

13   **Q.**   Sir, I have the entire exhibit if you would like to see

14   the entire exhibit.

15   **A.**   No.  No.  That's fine.  Okay.  I'm just -- I can't -- I

16   don't remember what was in that dark box, so I guess you're

17   getting to that.

18   **Q.**   So, if the order does not pass, it goes into a

19   different route, correct?

20   **A.**   That's correct.

21   **Q.**   And that's the route that we're talking about, the

22   flagging; is that -- is that a fair -- fair way to depict

23   it, a flag?

24   **A.**   Yeah.  I can't remember exactly what the terminology

25   was, but it went into a hold file.

1    **Q.**   A hold?  So, I believe you've used the word "trigger"

2    before on the threshold amount.  Is that a fair way to

3    describe what happens at the interrogation stage, whether or

4    not the system is triggered to flag it?

5    **A.**   I don't remember if it's called trigger, but once -- if

6    it's above -- if you see that box to the right, it's --

7    that's those business rules that it's -- that it's

8    interrogating, you know, the business type, account size,

9    and that's what it interrogates.  So, if it goes above -- it

10   goes above the threshold, it goes into that hold file.  I

11   don't remember using the word "trigger", but --

12   **Q.**   Okay.  So, if the system interrogates the purchase

13   order and it doesn't pass, does that mean it fails?

14   **A.**   I don't think it's called fail.  That's -- like I say,

15   I don't know what is in that dark box, do you?

16   **Q.**   I do not.

17   **A.**   Okay.

18   **Q.**   I'm just trying to find the right word.  It would be a

19   hold?

20   **A.**   Yeah, it's a hold.

21   **Q.**   So then, based on this flow, it says "transfer order to

22   hold file"?

23   **A.**   Uh-huh.

24   **Q.**   Correct?

25   **A.**   Yes.  So, that's the hold, actually.

1   **Q.**   Okay.  And then, as you said yesterday, it's

2   transferred to the DC staff.  Would that be Distribution

3   Center staff?

4   **A.**   Yes.

5   **Q.**   And that's a human being that is at the Distribution

6   Center and he then has a work process flow to go through,

7   correct?

8   **A.**   Right.  They are specifically trained for that task.

9   **Q.**   Yes, sir.  So, if no action is taken, then the box here

10  that I'm highlighting says "hold current and all future

11  orders from customer of like items."  Did I read that

12  accurately?

13  **A.**   Yes.

14  **Q.**   So, if the DC staff doesn't take any action, the entire

15  drug class for that customer is placed on hold?

16  **A.**   Yeah.  That -- that drug family, yes.

17  **Q.**   Now, below that, the DC staff then interrogates the

18  order manually or personally, correct?

19  **A.**   That's correct.

20  **Q.**   And there's three decisions that they can make.  They

21  can make the decision to accept and approve the order,

22  correct, far right?

23  **A.**   Correct.

24  **Q.**   They can delete the entire order, correct?

25  **A.**   That is correct.

1    **Q.**   Or they can hold the order for further review by

2    corporate; is that right?

3    **A.**   That's correct.

4    **Q.**   And that's what we were discussing at the end of

5    yesterday, is that if you hold the order for review, then it

6    gets elevated to CSRA Corporate, correct?

7    **A.**   That is correct.

8    **Q.**   And CSRA Corporate reports the suspicious orders to the

9    DEA regardless of the outcome?

10   **A.**   Can you clarify that?

11   **Q.**   If CSRA determines that the order is good and ships it,

12   they still report it to the DEA?

13   **A.**   No.

14   **Q.**   They do not?

15   **A.**   No.

16   **Q.**   So, if Corporate clears it and it goes through, there's

17   no report?

18   **A.**   They can clear it and release it and it can still be

19   shipped.

20   **Q.**   And is that because the DEA doesn't want to receive

21   notice of orders that your CSRA has determined is not

22   suspicious?

23           MR. HESTER:  Your Honor, objection based on time

24   frame.  I think it should be clarified what the time frame

25   is that's being discussed.

```
 1              THE COURT:  Yes.

 2              MS. MCCLURE:  Additional objection on "DEA

 3      wanted".  He can ask him whether Mr. Mays understood what

 4      DEA's intent was.

 5              THE COURT:  All right.  I'll sustain the

 6      objections and you can clean them up there, Mr. Farrell.

 7              MR. FARRELL:  Thank you, Judge.

 8              BY MR. FARRELL:

 9      Q.   This order monitoring process, OMP, this was the

10      process that was in place between 2007 up to 2014 when it

11      was enhanced by Mr. May, correct?

12      A.   That's approximately correct, yes.

13      Q.   So, I'm going to put your name up here in the top left

14      just so we understand Mr. Mays is talking about this process

15      for the limited time frame of 2007 through 2014, correct?

16      A.   That's the way it was designed in 2007.

17      Q.   So, what was your understanding of why you would not

18      report to the DEA your decisions at the CSRA level if you

19      shipped?

20      A.   Well, because DEA was involved and assisted us with the

21      design of this and the implementation of it and explained

22      very thoroughly how they wanted us to handle orders that got

23      sent up from the DCs.

24      Q.   So, was it --

25      A.   And if we were able to clear the order, it was okay to
```

1    release it based on -- based on the information we had at

2    hand.  And then, if we needed to further investigate that

3    order, we would -- we would cancel it and report it as

4    suspicious.  So, we had that option.  Otherwise, there would

5    be no need for the order to be sent to Corporate if

6    everything was going to get reported as suspicious.

7    **Q.**   So, was it your understanding that the DEA only wanted

8    you to report to them orders that you actually blocked as

9    suspicious?

10   **A.**   That we deemed as suspicious, yes.

11   **Q.**   Now, let's go back up to the DC staff stage.  If the DC

12   staff interrogates the order and decided to delete the

13   entire order, would that be documented somewhere?

14   **A.**   I believe it is.  It's documented in an Activity

15   Report.

16   **Q.**   And do you have policies and procedures that require

17   the documentation of any order that gets deleted because

18   it's suspicious?

19   **A.**   I don't remember specifically that part of it, but we

20   -- I know it's covered in policy that anything that they do

21   when they interrogate or review that order at the DC level

22   gets reported to us.  And so, we review everything the next

23   day and there's -- there's many reasons they could delete an

24   order and it may not be that it's suspicious.

25   **Q.**   And then, over on the accepted/approved order, if the

1   DC staff interrogates an order that has been held by the

2   computer system, would the DC staff be required under your

3   policies and procedures to document that the order's been

4   accepted and approved?

5   **A.**   Yes.

6           MR. FARRELL:  Judge, it would be my intention to

7   use the technology and to save this document and have it

8   admitted as P-187, Alpha, A.

9           THE COURT:  With your annotations on it?

10          MR. FARRELL:  Yes, sir.

11          THE COURT:  Okay.  Is there any objection to that?

12          MS. MCCLURE:  May I have a moment, Your Honor?

13      (Pause)

14          MS. MCCLURE:  No, Your Honor.

15          THE COURT:  It's admitted.

16          **PLAINTIFF EXHIBIT P-187A ADMITTED**

17          MR. FARRELL:  Judge, if I may have 60 seconds for

18  my technology person to push the button to save it.

19          THE COURT:  Okay.

20          BY MR. FARRELL:

21  **Q.**   Now, I want to talk briefly and try to get to this

22  point here again.  Well, it's not going to let me do it now.

23  This part here about the interrogation, the thresholds that

24  were set, we started talking about them a little bit

25  yesterday.  Are you aware of default thresholds that were

```
 1    set for each of the different peer groups of retailers at

 2    AmerisourceBergen during this time frame?

 3    A.   What was -- did you say Lee Taylor's?  What did you

 4    say?

 5    Q.   I don't remember what I said.

 6    A.   Can you repeat the question?  Sorry.

 7    Q.   Yes, sir.  During this time frame when your -- there

 8    was the initial interrogation by your computer system, was

 9    there a default that was set for thresholds for each of the

10    different classes of the peer groups?

11    A.   Yes.  Yes.

12    Q.   And who determined those defaults?

13    A.   Well, the company determined those defaults based on

14    the data that we talked about yesterday.

15              MR. FARRELL:  So, can we bring up P-432, please?

16    There we go.

17              BY MR. FARRELL:

18    Q.   So, this is a document that was previously entered into

19    the record.  It's P-432.

20              MR. FARRELL:  Can you take down the highlight,

21    please, for a second?

22              BY MR. FARRELL:

23    Q.   Do you recognize the format of this document?

24    A.   No, sir, I do not.

25    Q.   Do you recognize or do you recall whether or not
```

1    default thresholds for oxycodone and hydrocodone were

2    recorded in some written format at AmerisourceBergen?

3    **A.**   Well, there were originally thresholds set up for those

4    two families, oxycodone and hydrocodone.  I'm just not

5    familiar with this document and this time frame.  That's --

6    I wasn't copied on it and it wasn't -- I wasn't on that

7    memo.  So, I wasn't actively running the day-to-day

8    Diversion Control Program at that point.

9    **Q.**   So, who was it that would have been setting the default

10   thresholds for oxycodone and hydrocodone at

11   AmerisourceBergen during this time frame?

12   **A.**   That would -- that would be the order monitoring or the

13   Diversion Control Team that that memo was from.  I believe

14   that's who would have been -- probably Ed.  He was running

15   the program at that point.

16   **Q.**   And so, this is Chris Zimmerman, correct?

17   **A.**   Right.

18   **Q.**   And so, would this be a fair and accurate depiction of

19   what the default thresholds would have been at this point in

20   time based on your understanding of the policies and

21   procedures at AmerisourceBergen?

22   **A.**   That's what it appears to be.  He's stating that in the

23   memo.

24   **Q.**   Now, prior to this, are you aware of any other defaults

25   that were confirmed in writing at the Diversion Control

1   Program?

2   **A.**   Well, there was a default set in the beginning when we

3   assigned the program and they would be updated on a regular

4   basis.

5   **Q.**   So, my question to you, sir, is on the default, meaning

6   in the absence of any manual adjustments up or down --

7   **A.**   Uh-huh.

8   **Q.**   Is there a baseline number that all new pharmacies

9   start with?

10   **A.**   That would be the default.

11   **Q.**   Okay.  So, do you know what the default would have been

12   during your tenure at AmerisourceBergen's Diversion Control

13   Program?

14   **A.**   No, I do not.

15   **Q.**   Can you estimate what you think it may have been?

16   **A.**   No, I can't.

17   **Q.**   Would it have been based upon some national average?

18   **A.**   No.  I've told you before it was based on our own data.

19   **Q.**   So, would it have been a national average from your own

20   data?

21   **A.**   Of our customers, yes.

22   **Q.**   Yes?

23   **A.**   Right, that's correct.

24   **Q.**   I'm sorry.  Okay.  So, would you have taken the average

25   of your customers by Distribution Center or would you have

```
 1    taken the average of your customers nationwide?
 2    A.    It wasn't by Distribution Center at that time in the
 3    beginning.  It was -- it was nationwide by customers.
 4    Q.    So, if there is a default threshold set at
 5    AmerisourceBergen during this time frame, that default would
 6    have uniformly applied across all of your retail customers
 7    in the same category?
 8    A.    That's correct.
 9    Q.    So, if this is the default in January, 2009, all
10    pharmacies, retail pharmacies in the United States, would
11    have started with a default threshold of 12,366 oxycodone
12    and 18,480 hydrocodone?
13    A.    That's what it appears to say, yes.  Yeah.
14    Q.    And if it was a medium pharmacy, the default threshold
15    would have been 24,732 oxycodone and 39,960 hydrocodone?
16                THE COURT:  Mr. Hester?
17                MR. HESTER:  Your Honor, lack of foundation.  I
18    think the witness is just reading the document, but he's
19    indicated he has no knowledge of it.
20                THE COURT:  Sustained.
21                BY MR. FARRELL:
22    Q.    Let's see if I can lay the foundation.  If this, in
23    fact, is a document entered into the record from your boss,
24    Chris Zimmerman, is this consistent with your understanding
25    of the process by which AmerisourceBergen was establishing
```

1    default thresholds?

2             MS. MCCLURE:  Your Honor, the memo, to be clear,

3    was just characterized as being from Chris Zimmerman.  The

4    document is from -- Chris Zimmerman, I'm sorry, is on the

5    "to" line.

6             THE COURT:  It's to Chris Zimmerman.  I will

7    sustain the objection.

8             MR. FARRELL:  I will ask it again.

9             BY MR. FARRELL:

10   **Q.**   If this document to Chris Zimmerman from Ed Hazewski,

11   Kevin Kreutzer and Joseph Tomkiewicz, which is P-432, is

12   identifying the current default threshold for oxycodone and

13   hydrocodone as of January 19th, 2009, is this the policy and

14   procedure, based on your understanding at AmerisourceBergen,

15   of how default thresholds were set?

16   **A.**   I'm -- not being familiar with the document, and I

17   can't really read all of that in there, I just don't know

18   what context all this is in.  You know, it could be for a

19   specific area or a specific time frame.  And, so, I'm just

20   -- like I said, I'm just not familiar with the document.

21   **Q.**   So, tell me.  What is your familiarity with how -- who

22   and -- and when default thresholds were set while you were

23   in charge of the Diversion Control Program.

24   **A.**   Well, it was sometime ago, but I believe we would --

25   the default thresholds were set in the beginning of the

1    program once we had it implemented and it was based on all

2    the previous data of sales to our customers.  And then it

3    would get -- those defaults would get updated on an annual

4    -- I think annual or a regular basis just based on the

5    updated data.

6    **Q.**    And where would one expect to find, if anywhere,

7    documentation of the updates on thresholds?

8    **A.**    I just would assume they would be in our archive files

9    somewhere.

10   **Q.**    Okay.  And would it take the shape or form of a

11   memorandum like we're seeing on P-432?

12   **A.**    No.  They wouldn't do a memo every time.

13   **Q.**    What would they do then?

14   **A.**    They would just update the thresholds.

15   **Q.**    Do you know what factors they would use when they

16   updated the defaults?

17   **A.**    The same factors they did when they created them to

18   start with.

19   **Q.**    And that would be looking at the national average of

20   all retail pharmacies in the same or similar class?

21   **A.**    They would look at the same -- the same process that

22   they did to set it up originally, the customer's business

23   activity, the account size, and then by family, by dose, and

24   by peer group.  And then they would set them in peer groups

25   and they -- we were constantly, you know, enhancing the

1    program, finding better ways to do things.  So, but it was

2    all set the same way.

3    **Q.**   Well --

4    **A.**   So, again, he did this memo and I'm not sure exactly.

5    It was some -- it is not a routine memo that would have been

6    sent.

7    **Q.**   Now, during the time frame that you were in charge of

8    the Diversion Control Program, were the sales agents, the

9    sales team, the individuals performing on-site

10   investigations for due diligence?

11   **A.**   Yes, they would do site visits.

12   **Q.**   And so, when it comes down to flagging an order and

13   performing due diligence, it was the sales agent that was

14   performing that on-site investigation?

15   **A.**   Typically, it was.

16            MR. FARRELL:  You can take that down.  Thank you.

17            BY MR. FARRELL:

18   **Q.**   Mr. Mays, are you familiar with the HDMA industry

19   compliance guidelines?

20   **A.**   Familiar with it, yes.

21   **Q.**   Are these -- are these things that you saw and relied

22   upon during your tenure as -- when you were in charge of the

23   Diversion Control Program?

24   **A.**   No, sir.

25   **Q.**   Okay.  Is it a document or is the guideline something

1    that you read?

2    **A.**    I've read it before, yes.

3    **Q.**    Okay.  And was it a collaborative effort by the HDMA

4    members to come up with the guidelines?

5    **A.**    I believe so, yes.

6    **Q.**    And did you participate in that collaborative effort?

7    **A.**    We did.

8    **Q.**    Did you personally?

9    **A.**    Yes.  I personally attended a meeting.

10               MR. FARRELL:  Pull up P-629.

11          Judge, may I approach?

12               BY MR. FARRELL:

13   **Q.**    I'll give you a minute to see the document.  Sir, do

14   you recognize this document?

15   **A.**    Give me just a second, please.  Okay.

16   **Q.**    Sir, do you recognize this document?

17   **A.**    Yes, sir, I do.

18   **Q.**    What is it?

19   **A.**    The -- well, there's an e-mail string attached to it

20   and it's the HDMA industry compliance guidelines for

21   reporting suspicious orders and preventing diversion of

22   controlled substances.

23   **Q.**    Now, is this a document that you received and passed on

24   in an e-mail exchange?

25   **A.**    I don't recall.

1    **Q.**   Having reviewed this document, does it -- is this an

2    e-mail to or from you?

3    **A.**   Looks like the original e-mail in this string is to me

4    from Chris Zimmerman.

5    **Q.**   And then, directly above that, in the middle of the

6    first page, do you see your name anywhere?

7    **A.**   Yes, where I responded to Chris' questions.

8    **Q.**   Yes.  Is -- is this -- if you look at the middle of the

9    page, is it true that HDMA put together these guidelines in

10   October, 2008, shortly after the original suspension of

11   Cardinal Health's distribution license?

12   **A.**   That's what it says, yes, sir.

13   **Q.**   I'd like you to turn to the -- if you flip the page,

14   it's actually Page 3.  It's a letter from the DEA.  Do you

15   see that, sir?

16   **A.**   Yes, sir, I do.

17   **Q.**   And I'd like to bring up P-629 on the screen, please.

18   Now, you see up top the date that says October 17, 2008?

19   **A.**   Yes, sir.

20   **Q.**   And this is a letter from Chief Counsel Wendy Goggin at

21   the DEA to John Gray, President and CEO of the Healthcare

22   Distribution Management Association.  Do you see that?

23   **A.**   Yes, I do.

24   **Q.**   Now, the middle paragraph is the paragraph that I want

25   to direct your attention to and it says -- would you please

1   read the middle paragraph?

2   **A.**   Sure.   "HDMA's industry compliance guidelines represent

3   a concerted effort by HDMA and its primary distributor

4   members to identify and articulate the responsibilities and

5   obligations of controlled substance distributor registrants

6   to design and operate a system to disclose and report

7   suspicious orders as required by the Controlled Substances

8   Act.   All distributors must implement processes and

9   procedures to effectively ensure that controlled substances

10   are not diverted to illicit use."

11              THE COURT:   Just a minute.

12         Mr. Hester?

13              MR. HESTER:   Your Honor, I object to reading the

14   hearsay into the record unless it's being admitted for some

15   purpose other than the truth.

16              THE COURT:   Is it, Mr. Farrell?

17              MR. FARRELL:   Yes.

18              THE COURT:   What's the purpose other than

19   admitting it for the truth of the matter asserted?

20              MR. FARRELL:   This is attempting to show that

21   AmerisourceBergen and others through HDMA worked with the

22   DEA in October of 2008 to come up with industry compliance

23   guidelines and it's directly intended to refute the idea

24   that the DEA was not communicating or working with the

25   defendants during this time frame which has been repeatedly

```
 1    argued.

 2              MR. HESTER:  I think what Mr. Farrell just said

 3    reflects that it's being offered for the truth.

 4              MS. MCCLURE:  Your Honor, I join in that.  The

 5    explanation just seeks to have the hearsay admitted as

 6    truth.

 7              THE COURT:  Ms. Wicht, do you want to get your oar

 8    in the water here?

 9              MS. WICHT:  No, Your Honor.  I think it was ably

10    covered.

11              MR. ACKERMAN:  Your Honor, may I have a minute to

12    confer with Mr. Farrell?

13              THE COURT:  Yes.

14       (Pause)

15              MR. FARRELL:  Judge, we believe this document

16    serves as notice from the DEA to the defendants, as well as

17    the defendant's state of mind as to the appropriateness of

18    the HDMA guidelines for its regulatory responsibilities to

19    the DEA.

20              THE COURT:  Can it come in for that limited

21    purpose, Mr. Hester?

22              MR. HESTER:  Well, I think even the fact that Mr.

23    Farrell is seeking to establish proof of the HDMA guidelines

24    and the fact that HDMA developed the guidelines, that's

25    being offered for the truth.
```

1           MR. ACKERMAN:  Your Honor, with respect -- and

2      this is David Ackerman.  I don't speak a lot.

3           THE COURT:  Yeah, I'll hear from you.  Go ahead.

4           MR. ACKERMAN:  With respect to the HDMA

5      guidelines, I would suggest that those statements are not

6      hearsay pursuant to 801(d)(2)(B) and (C).  801(d)(2)(B) is a

7      statement the party manifested that it adopted or believed

8      to be true.  The fact that this was passed along within ABDC

9      internally suggests that they adopted the statement of their

10     Trade Association, the HDMA.  801(d)(2)(C) is a statement

11     made by a person whom the party authorized to make a

12     statement on the subject.  What the DEA letter here

13     establishes is that the defendants authorized the HDMA and

14     worked with the HDMA to put together these industry

15     guidelines and, therefore, this -- the industry guidelines

16     are properly not hearsay pursuant to 801(d).

17           MS. MCCLURE:  Your Honor, I'm sure co-counsel will

18     offer some legal arguments in addition to what I'm going to

19     say, but at the end of the day, what they're seeking to say

20     is that Mr. Mays, by passing this document along, the mere

21     fact that he passed it along as an e-mail to others is

22     evidence of adoption or evidence of treating HDMA as an

23     agent.  So, I would suggest that those two suggestions that

24     Mr. Ackerman just read do not, in fact, render this document

25     non-hearsay.

1          The DEA -- I'm not -- are they attempting to say that

2     the DEA is our agent?  Because I think that there's not

3     really a question that that's not the case, but I'll allow

4     Mr. Hester and Ms. Wicht to --

5               THE COURT:  Before we go on here --

6               MR. ACKERMAN:  Yeah.

7               THE COURT:  Cite the -- cite the provisions of the

8     rule to me.

9               MR. ACKERMAN:  I will again, Your Honor.  It is

10    801(d)(2)(B) and (d)(2)(C).  It also could be (d)(2)(D) to

11    the extent HDMA is ABDC's agent and I would direct Your

12    Honor to the passage on Page 2 where someone, Mr. Zimmerman,

13    wrote, "I remember we spent some time in DC with Cardinal,

14    McKesson, et cetera, and discussed the process and developed

15    best practices that HDMA ultimately sent to DEA."

16         That statement reflects the fact that ABDC not only

17    worked with HDMA and authorized HDMA to make the statement,

18    but that they adopted it and accepted it as their own.

19              MR. HESTER:  Well, Your Honor, right now, we're on

20    a letter from the U. S. Department of Justice Drug

21    Enforcement Administration.  That can't be our agent.  So,

22    that -- this provision Mr. Ackerman is citing can't apply

23    here and there's no basis to say we manifested a belief in

24    the truth of the statement.  It's -- it's -- there's

25    multiple documents here.

```
 1              THE COURT:  Let me hear from Cardinal.

 2              MS. WICHT:  Well, I certainly agree with Mr.

 3    Hester and Ms. McClure, particularly to the extent that

 4    we're talking about a statement of the DEA.  To the extent

 5    that we are talking about a statement that was made by HDMA,

 6    we would dispute, Your Honor, that HDMA is acting here as an

 7    agent of the three defendants in this courtroom.

 8        Certainly, we are members of that organization, as are

 9    hundreds of other entities.  It was not acting as our agent.

10              MS. MCCLURE:  Ms. Wicht covered what I was going

11    to say.

12              THE COURT:  I'll sustain the objection.  I think

13    it's hearsay and it's out.  And I don't -- it doesn't come

14    within the exception and I don't -- I don't agree with Mr.

15    Ackerman's argument that it's not hearsay under Rule 801.

16    So, I'll sustain the objection.

17              MR. FARRELL:  I'll circle back and try something

18    different, Your Honor.

19              THE COURT:  Okay, Mr. Farrell.

20        (Pause)

21              MR. FARRELL:  So will you pull down this

22    paragraph, please?  Take out the highlight of the second

23    middle box.

24              BY MR. FARRELL:

25    Q.   Now, do you see the top paragraph where it says, "The
```

1    DEA commends the efforts of the Healthcare Distribution

2    Management Association to assist its membership to fulfill

3    their obligations under the Controlled Substances Act and

4    implementing regulations"?  My question to you, Mr. Mays,

5    is, is did you have an understanding that the DEA was

6    commending your trade group for adopting best practices?

7    **A.**    That's how I read that, yes.

8    **Q.**    Okay.  So, if you looked at Page 2 of the e-mail that

9    was sent from Mr. Zimmerman to you that initiated this

10   e-mail chain, it's your boss, Mr. Zimmerman, asking you, "Do

11   you know when HDMA published its guidelines", and he says,

12   "I remember we spent some time in DC with Cardinal,

13   McKesson, et cetera, and discussed the process and developed

14   best practices that HDMA ultimately sent to DEA."  Do you

15   see that sentence?

16   **A.**    Yes, sir, I do.

17   **Q.**    Now, flip through to Page 1 and let's look at what your

18   response was to Mr. Zimmerman by e-mail.  Would you please

19   read that?

20   **A.**    Yes.  "HDMA put the guideline -- put together the

21   guidelines in October, 2008, shortly after the original

22   Cardinal DEA suspension.  I can't find anything on the

23   Cardinal suspension, but it was late 2007, early 2008.  They

24   had another one in 2012 related to WAG."

25   **Q.**    Now, just to be fair, is it your understanding that

1    these guidelines are simply best practices or

2    recommendations?

3    **A.**    That was my understanding, yes.

4        Ms WICHT:  Your Honor, we have the same objection

5    with respect to the guidelines that I --  I think Your Honor

6    has already ruled on.  I'm not sure why.  Your Honor has

7    ruled that this is hearsay and it's not admissible and so

8    I'm not --

9        THE COURT:  Well, what are you offering it for?

10   Are you offering it for the truth of the matter asserted

11   that HDMA put together guidelines and he can't find

12   anything, blah, blah, blah?  Isn't that the truth of --

13   aren't you offering it for the truth of the matter asserted

14   here?

15       MR. FARRELL:  Well, in part, yes.  And in the

16   second part, I'm offering it to show that the DEA was

17   working with industry to adopt best practices.  That's

18   number one.

19       That number two is that the defendant's state of mind

20   was that the DEA was commending them for adopting best

21   practices.

22       And, number three is Mr. Mays just testified that while

23   this wasn't -- he testified that this, in fact, was their

24   attempt to adopt best practices or recommendations.

25       This is dated 2008 and I think it's evidence that

1    directly conflicts with the story -- or, I'm sorry --

2    without color.  It directly conflicts with the prior

3    representations that there was very little to no

4    communication between industry and the DEA.

5              THE COURT:  Has he testified that there was very

6    little to no communication with the DEA?

7              MR. FARRELL:  His predecessor did.  His

8    predecessor did.  And his predecessor did.

9              MS. MCCLURE:  Your Honor, we just simply want the

10   correct foundation to be laid for documents with the witness

11   that is on the stand at the moment.

12      As for the evidence that DEA was, quote, "working with

13   the distributors", that is, in fact, the truth.  He is

14   attempting to offer the document for the truth of the

15   matter.

16      As for the fact that ABDC intended to adopt best

17   practices, which is what we're really doing here, right?  At

18   the end of the day, we're trying to essentially say that by

19   the fact of HDMA sending industry guidelines to DEA, that is

20   an adoption by ABDC and ABDC was somehow bound.  That is

21   what he is trying to offer this for and we believe that is

22   hearsay.

23             MR. FARRELL:  Judge, I'm not trying to bind them

24   that these are the rules they have to follow.  I'm simply

25   offering it for the purpose of establishing that there were

1    ongoing discussions of best practices between industry and

2    the DEA and that this document outlines best practice

3    recommendations.

4        This isn't a statute.  It's not a regulation.  It's

5    simply guidelines from the industry regarding the very

6    subject matter that we are debating in this courtroom.

7        (Pause)

8            THE COURT:  Mr. Farrell, if you could give me a

9    specific limited purpose that this comes in other than the

10   hearsay, I'll consider admitting it, but I don't think

11   you've satisfied me on that point yet.

12           MR. FARRELL:  I think that we would be offering it

13   for the state of mind of the industry as of 2008 with

14   relation to their -- in regard to their relations with the

15   DEA.

16           MS. MCCLURE:  Your Honor, I don't know how a

17   statement by one person could be state of mind of, quote,

18   "the industry".

19           THE COURT:  I'm going to sustain the objection.

20   I'm sure you have other ways to make that point, Mr.

21   Farrell, and I'm -- I'm just -- there's just too much

22   hearsay here for me to permit you to let this document in.

23           MR. FARRELL:  Judge, if I were to remove the DEA

24   letter and just put in the industry compliance guidelines,

25   does that change --

```
 1              THE COURT:  You're asking me for an advisory

 2    opinion, Mr. Farrell.

 3              MR. FARRELL:  Yes, I am, Judge.

 4              THE COURT:  Well, what about that, Ms. McClure?

 5              MS. MCCLURE:  Well, if Mr. Farrell wants to seek

 6    to attempt to introduce the industry guidelines without the

 7    DEA letter and without the e-mail, I think he is free to try

 8    to do that with Mr. Mays.  I can't predict whether I'm going

 9    to object to the manner of the questions he then asks in

10    order to lay that foundation.

11              THE COURT:  Go ahead and question him along those

12    lines, Mr. Farrell.

13              MR. FARRELL:  Very good.

14              THE COURT:  Let's see where we go with that.

15              MR. FARRELL:  I'll try my best, Judge.

16              BY MR. FARRELL:

17    Q.   So, Mr. Mays --

18    A.   Yes, sir.

19    Q.   When you look at Mr. Zimmerman's e-mail to you on Page

20    2 where he says that there was a process to develop best

21    practices, I'm going to point you to Page 4.  Do you see

22    here where it says "industry compliance guidelines"?

23    A.   Yes, sir.

24    Q.   Is this document from this page forward the best

25    practices recommendations from the trade group that you're
```

1    referencing in your e-mail?

2               MS. WICHT:  Object --

3               MS. MCCLURE:  Your Honor, I'm sorry.  I thought we

4    were going to try to divorce the industry guidelines from

5    the cover letter from DEA and from the e-mail itself in

6    order to attempt to --

7               THE COURT:  That's what I thought, too.

8         Ms. Wicht, do you want to say something?

9               MS. WICHT:  Your Honor, the industry guidelines

10   themselves that are attached to this e-mail, which I think

11   is what Mr. Farrell is questioning about now, still remain

12   hearsay.

13              MR. FARRELL:  Judge, if I may, the cover e-mail is

14   a party admission.  It's a -- it's a statement from the

15   party.  It can't be hearsay.

16              THE COURT:  Well, if he can say he's familiar with

17   the guidelines and these are the guidelines, it seems to me

18   that I can -- I can just let the guidelines in.

19              BY MR. FARRELL:

20   **Q.**   Mr. Mays, are you familiar with the guidelines?

21   **A.**   I've seen them.  Yeah, I'm familiar with them.  We

22   already had a program in place, so they weren't really

23   written for us.

24   **Q.**   Granted --

25   **A.**   Right.

1    **Q.**    Are these the guidelines?

2    **A.**    The HDMA guidelines?

3    **Q.**    Yes.

4    **A.**    Yes.

5              MR. FARRELL:  Judge, we would ask --

6              THE COURT:  How do you know that, Mr. Mays?

7              THE WITNESS:  Well, because I -- because I can --

8    I see it on the cover page and I recognize the document.  I

9    mean, I remember looking at it, but we had our own program

10   in place and they basically based these guidelines a lot on

11   what we were doing because we were the first one to put an

12   enhanced program together.

13             BY MR. FARRELL:

14   **Q.**    And you had input into these guidelines?

15   **A.**    Yes, we did.

16             MS. MCCLURE:  Your Honor, with respect, these

17   guidelines are still hearsay and I would request a statement

18   and proffer as to the purpose for which they are being

19   admitted that is non-hearsay.

20             MR. FARRELL:  Judge, the witness has testified

21   that they had input into industry guidelines.  They

22   participated in the guidelines.  He's identified that these

23   are the guidelines.  I should be able to put at least the

24   guidelines into evidence.

25             MS. MCCLURE:  And, Your Honor, what we're

1    requesting is a statement from Mr. Farrell as to what

2    exception, if any, these fall under that would make the

3    guidelines non-hearsay.  By definition, these guidelines are

4    a written statement that is an out-of-court statement that

5    seems to be being offered for the truth.  And I have to

6    protect the record in stating that we simply need to

7    understand if there is a response from the plaintiffs to our

8    hearsay objection.

9              MR. ACKERMAN:  And, Your Honor, given the

10   testimony that we have heard, I would refer the Court again

11   back to 801(d)(2) in terms of a statement made by a person

12   whom the party authorized to make a statement on the subject

13   given that this witness has now testified and confirmed that

14   ABDC participated in the preparation of the guidelines --

15             MS. MCCLURE:  Your Honor --

16             MR. ACKERMAN:  -- and is familiar with the

17   guidelines.

18             MS. MCCLURE:  Apologies, David.

19        Your Honor, participation in guidelines is not

20   authorization to make a statement on behalf of ABDC.  Those

21   are two different things.  The rule requires X and they are

22   trying to make Y into X.

23             THE COURT:  Mr. Hester?

24             MR. HESTER:  Yeah.  I would say the same thing,

25   Your Honor.  I don't think the fact that there was input

1    into these guidelines satisfies this hearsay exception for a

2    statement authorized by a party.  There's no evidence that

3    HDA was authorized to make these statements on behalf of

4    ABDC, Cardinal or McKesson.

5              THE COURT:  Well -- well, I -- I agree with that,

6    but can I admit just the guidelines based on this witness's

7    testimony just to show what the guidelines were at that

8    point in time?

9              MR. FARRELL:  Yes.

10             MS. MCCLURE:  To admit the evidence in order to

11   show what the guidelines were at that time is the textbook

12   definition of hearsay.  What we are asking for is simply a

13   statement from the plaintiffs as to some hearsay exception

14   that they believe applies.

15       I think we've gone through 801(d)(2), whatever the

16   numbers are, and it's not -- HDMA has not been proven to be

17   our agent.  We -- by our participation, that is not

18   authorization to speak on ABDC's behalf.  And so, at this

19   point, I do not believe the record has been established that

20   there is any exception the plaintiffs have proffered that

21   would permit the admission of this document.

22             THE COURT:  What's -- what's the truth of the

23   matter asserted in these guidelines that makes it hearsay?

24             MS. MCCLURE:  Your Honor, this was a -- the

25   guidelines themselves are a statement by a party that is not

1    a party to this case, HDA.  What they are trying to do is

2    make the guidelines a statement of ABC -- ABDC, who is the

3    party and a defendant in this case.  So, the truth is what

4    they're -- they're attempting to essentially apply these

5    guidelines, which Mr. Mays has not said that ABDC adopted.

6         And so, this statement of what the guidelines were in

7    2008 is an out-of-court statement that is offered to show

8    what the guidelines were from HDA.  The question is whether

9    this has any application to ABDC, who is the party in this

10   case.

11        MR. FARRELL:  I don't think we've elicited

12   testimony that ABC has adopted this and perhaps I'm being

13   too simple about it.  I'm thinking about it in terms of

14   medical malpractice cases.  We often introduce evidence of a

15   standard of care by guidelines from the different trade

16   groups or from the governing bodies.  This is a very clear

17   foundational -- in the e-mail that this was just simply an

18   attempt by industry to adopt best practices.

19        And so, when we're introducing the evidence, we're

20   trying -- this witness has testified that there was, in

21   fact, industry best practices, that this is what it was, and

22   it should be entered and you give it the appropriate weight.

23   That being said, we've also called and intend to present

24   HDMA itself where this document was discussed at length.

25        So, while defense have every right to use the Rules of

```
 1    Federal Evidence to make us jump through the hoops, I think
 2    we've jumped through the hoops on this and it comes in.
 3              THE COURT:  I'm going to sustain the objection on
 4    the hearsay ground.  I think it's just full of hearsay and
 5    you haven't given me a limited purpose that gets around the
 6    hearsay rule and -- and I'm going to keep it out.
 7         Go ahead, Mr. Farrell.
 8              MR. FARRELL:  Take P-2478.
 9         Judge, may I approach?
10              THE COURT:  Yes.
11              BY MR. FARRELL:
12    Q.   Mr. Mays, I'm going to direct your attention to the
13    middle of this page and to the second full bullet point.
14    A.   Okay.
15    Q.   Is this an e-mail from you to Mr. Zimmerman and others
16    dated April 20th, 2012?
17    A.   Okay.
18    Q.   Yes?
19    A.   You asked was it an e-mail to Chris Zimmerman?
20    Q.   From you, yes, sir.
21    A.   Yes.
22    Q.   Is it dated April 20th, 2012?
23    A.   That's correct.
24    Q.   And is this an e-mail you would have sent in the normal
25    course of business while exercising your duties at
```

```
 1   AmerisourceBergen?
 2   A.    I'm going to need to read it.
 3   Q.    Yes, sir.
 4   A.    So I can understand the context of it.
 5   Q.    Yes.
 6   A.    Can you give me a minute to read it?
 7   Q.    Sure.  And I can even ask you a question so that you --
 8   and you can hold your answer until you read the document, if
 9   you'd prefer?
10   A.    Sure.
11   Q.    Did you personally have concerns about getting access
12   to ARCOS data from other defendants because you were
13   concerned that it may impose a duty upon AmerisourceBergen
14   to act?
15   A.    Okay.
16              THE COURT:  Mr. Hester?
17              MR. HESTER:  Your Honor, I know the Court has
18   ruled broadly on the *Noerr-Pennington* issues and we're
19   digesting the Court's opinion.  We understand it.
20       But I did want to make clear that this particular
21   question is going right to the *Noerr-Pennington* issue
22   because it's asking about the substantive position being
23   considered by ABDC in relation to a potential legislative
24   change.  It's not going to intent or other non-protected
25   issues.
```

1       It's going right to the heart of the question what was

2   ABDC's position on whether the legislation should be altered

3   in this manner.  And that's the *Noerr* problem that's

4   presented by putting in evidence and then asking about the

5   substantive positions of the companies on what they thought

6   should be the outcome of the legislative proposal.

7               MR. FARRELL:  Judge, I may be --

8               MS. MCCLURE:  I join in that.  I join in that

9   objection.

10              MR. FARRELL:  I may be able to short-circuit this.

11  It's my --

12              THE COURT:  Well, it seems to me, Mr. Farrell, you

13  should have asked him the question before you showed him the

14  document.  I can't remember what the question was, but --

15              MS. MCCLURE:  In fairness, Your Honor, Mr. Mays

16  did request some time to review the document and so, if we

17  could allow the witness to review the document, I do believe

18  Mr. Farrell asked a question and then he could re-state his

19  question once Mr. Mays can read the document.

20      That said, we do join in the *Noerr-Pennington* point.

21              THE COURT:  Okay.  I'm going to overrule Mr.

22  Hester's objection and allow you to read the document, Mr.

23  Mays.

24              MR. FARRELL:  Judge, I did not intend to introduce

25  this document into evidence so perhaps we can start over and

1    I can do a better job.

2              THE COURT:  Well, in my view, you should have

3    asked him the question and then see whether he could answer

4    it or not, and if he couldn't, then you could show him the

5    document.

6              MR. FARRELL:  Yes, Your Honor.

7              THE WITNESS:  Sir, I have a question.  Was there

8    an attachment to this?  It looks like I'm giving thoughts on

9    options provided, but I don't see those options.

10             BY MR. FARRELL:

11   **Q.**   So, we're going to -- we're going to start over.

12   **A.**   Okay.

13   **Q.**   And I'm going to ask you a very general question.  Was

14   it your position that if AmerisourceBergen had access to

15   what other suppliers were selling to a customer, it may

16   create an expectation for AmerisourceBergen to act on the

17   information or be held responsible by DEA?

18             MR. HESTER:  And, Your Honor, just so the record

19   is clear, I would renew our objection.  This is asking the

20   witness about a position being taken on potential

21   legislation.

22             THE COURT:  Overruled.  Go ahead.

23             BY MR. FARRELL:

24   **Q.**   You can answer it.

25   **A.**   I -- I don't remember.  Typically, we want all the

1     information we could get on a customer.

2     **Q.**   But if you received information from the DEA regarding

3     the other distributors' selling patterns, did you believe

4     that it might be a double-edged sword?

5     **A.**   I don't know.  I -- it's -- you know, typically, the

6     more information that you have, the better you can do your

7     job, but you could be held more responsible for having that

8     additional information if you don't act on it.

9     **Q.**   Okay.  And do you recall having the opinion that having

10    access to greater information may be a double-edged sword?

11    Do you recall?

12    **A.**   I don't recall it, no.

13              MR. FARRELL:  Judge, I would like to refresh the

14    witness's recollection.  So --

15              THE COURT:  Well, yeah.  Show him the document and

16    see.  Let him re --

17              THE WITNESS:  Now, can I finish reading it?

18              BY MR. FARRELL:

19    **Q.**   Yes, sir.  I'm going to be pointing to right there.

20    **A.**   Okay.  That appears to be what I said but, again, I

21    don't see the options, so I don't really know what I'm --

22    it's kind of out of context.  I don't know what I'm

23    commenting on.  Thank you.

24              MR. FARRELL:  Judge, this might be a great --

25              THE COURT:  Yes.  We'll be in recess until about

1    20 till 11:00.

2         (Recess taken)

3              MR. FARRELL:  One more shot, Judge.

4              MR. ACKERMAN:  Your Honor, we're going to take

5    one more argument at the industry guidelines with the

6    Court's indulgence.

7              THE COURT:  Okay.

8              MR. ACKERMAN:  Okay.  Your Honor, we offer the

9    industry guidelines for two separate non-hearsay purposes.

10        The first would be to establish ABDC's then existing

11   state of mind pursuant to Rule 803(3).  That would identify

12   that ABDC had awareness of the guidelines which stated what

13   the rules required.

14        This, Your Honor, is very similar to the argument that

15   Ms. McClure made yesterday on the record with respect to

16   statements made by the DEA.  And that was at Page 84 of the

17   transcript where Ms. McClure offered statements of the DEA

18   and stated it -- offering it -- state of mind and the effect

19   of that, the effect of that on Mr. May.  This is the effect

20   of the document on ABDC.

21        It goes directly to the fact, Your Honor, as you noted

22   in your Noerr-Pennington ruling earlier this morning, the

23   question of defendants' knowledge of their duties under the

24   CSA and/or what the DEA required.

25        The guidelines in and of themselves are notice of what,

1   of what that -- of what those regulations required.  And,

2   therefore, that would be the second purpose, Your Honor.  We

3   would offer them to issue that the guidelines issued and

4   that ABDC had notice of them.

5        Now, we still contend, and we believe the evidence

6   shows, that ABDC participated in the preparation of the

7   guidelines.  But we believe for these two reasons, because

8   they establish ABDC's state of mind and, and with respect to

9   what the regulations require and because they are issued

10  simply for notice to establish that the guidelines issued

11  render them admissible.

12            MS. MCCLURE:  Your Honor, Mr. Ackerman started out

13  by characterizing those two exceptions, state of mind and

14  notice, as exceptions that make the document not hearsay.

15       I think under 803, the rule is those -- these --

16  hearsay is inadmissible.  The exceptions, nevertheless, make

17  the document admissible for those limited purposes of

18  notice, state of mind.

19       So I think what the plaintiffs are suggesting is that

20  notice and state of mind would be limited purpose exceptions

21  to the normal hearsay rule.

22       I cannot speak on behalf of my co-counsel, so I would

23  request a moment and the opportunity for them to speak on

24  this as well.

25            THE COURT:  Ms. Wicht.

1          MS. WICHT:  Your Honor, on behalf of Cardinal

2     Health, I think we would simply point out that to the extent

3     the Court were to conclude that the hearsay exceptions of

4     state of mind or notice are applicable here, that would be

5     only to the party who's currently being examined.  It

6     wouldn't be to the, to the, to all defendants.

7          MR. HESTER:  Well, Your Honor, my, my evidence

8     professor would be constrained to point out that 803(3) only

9     applies to a statement by the declarant.  So it clearly

10    doesn't apply to this statement by had.

11              THE COURT:  Well, that's what I thought.

12              MR. HESTER:  But, but I was going to say if, if

13    the point is they're not being admitted for the truth,

14    that's a different thing.  Then it's a non-hearsay purpose.

15              MR. ACKERMAN:  Your Honor, the declarant isn't the

16    witness.  The declarant is the had.  I don't think there's

17    any dispute about that.  There is a difference between

18    the -- it's not the witness's own statement.  The had is

19    out-of-court.  It's an out-of-court declarant.  So I

20    don't -- I understand -- I suspect Mr. Hester's evidence

21    professor might disagree with it but --

22              MR. HESTER:  But the point is if, if the

23    plaintiffs are saying they're not offering if for the truth,

24    they're not offering -- for a non-hearsay purpose, then at

25    least for McKesson we have no objection to that.

```
 1              MS. MCCLURE:  Your Honor, we also have no
 2    objection to the extent that the document is being offered
 3    for the limited purpose of notice or state of mind to the
 4    plaintiffs being able to inquire as to this document
 5    provided that, of course, the document is not being offered
 6    for the truth.
 7              THE COURT:  Ms. Wicht.
 8              MS. WICHT:  We agree with that, Your Honor, just
 9    with the additional exception that as to state of mind as to
10    ABDC that the witness is being questioned about.
11              THE COURT:  All right.  I'm going to admit it for
12    that limited purpose.  The -- we're still excising the first
13    two pages; right?
14              MR. FARRELL:  Yes, Judge.
15              THE COURT:  Okay.  It's admitted for the limited
16    purpose stated, but not for the truth of the matter
17    asserted.  And I'm not admitting the first two pages.
18    You'll have to pull those off.
19              MS. MCCLURE:  Your Honor, I think the first four
20    pages are letters actually.  I'm not sure -- I think it was
21    one letter from DEA that was one page and then a two-page
22    email, so it's three --
23              THE COURT:  Two pieces of paper, four pages.
24              MS. MCCLURE:  Correct.  Thank you.
25              MR. FARRELL:  I printed on front and back, so on
```

1    P-629 it starts with Bates stamp ABDC-MDL-00295006.  That

2    will be redacted.  5007 will be redacted.  5008 will be

3    redacted.  If the Court pleases, we will then begin on 5009.

4    We'll reprint, place a new exhibit sticker on it, and

5    present it to the Court after lunch if that's okay.

6              MS. MCCLURE:  Yes, Your Honor.  Thank you.

7              THE COURT:  All right.

8    BY MR. FARRELL:

9    **Q.**   Welcome back, Mr. Mays.

10   **A.**   Thank you, sir.

11   **Q.**   Are you familiar with the OMP History Report?

12   **A.**   OMP History Report?

13   **Q.**   Yes.

14   **A.**   I would have to see it.  I'm not really sure.

15             MR. FARRELL:  Judge, may I approach?

16             THE COURT:  Yes.

17             THE WITNESS:  I don't remember seeing this before.

18   I'm familiar with some of information on it, but I don't

19   remember the report itself.

20   BY MR. FARRELL:

21   **Q.**   Do you recognize the format of the datasets?

22   **A.**   Yes, sir.

23   **Q.**   Okay.  I'll represent to you that in the -- that this

24   document is stipulated to by the parties, and this is a

25   subset of data from P-16639.  And it's referenced in the

1    discovery responses as the purchase orders from Case Track 2

2    Huntington/Cabell County that were flagged or held by your

3    OMP computer.

4         I'll further represent to you that the entire

5    spreadsheet --

6              MR. FARRELL:  We have the thumb drive, Judge.

7    BY MR. FARRELL:

8    **Q.**   The entire spreadsheet has 35 columns and 17,656

9    rows.  And what we have done here is I have pulled out

10   the particular entries for SafeScript Pharmacy #6 in

11   Huntington/Cabell County, West Virginia, in this subset,

12   as well as McCloud Pharmacy and Drug Emporium.  So I'll

13   give you a second to orient yourself to it.

14             MR. FARRELL:  And in the meantime, Judge, we would

15   ask for the admission of P-16639.

16             THE COURT:  Is there any objection?

17             MS. MCCLURE:  Your Honor, I would request

18   clarification as to whether what we're seeking to admit was

19   the original 16639 which I believe was a much, much, much

20   larger document that included many more columns across and

21   rows; or if they're asking for this excerpt itself which

22   appears to have been modified to eliminate certain columns

23   given the fact that it begins with Column C and then skips

24   to Column I in this report.  So I request that clarification

25   before I can respond.

1          MR. FARRELL:  Yes.  We are asking for the entire

2     dataset to be submitted on this thumb drive.  I have copies

3     for counsel and a copy for the clerk.

4          MS. MCCLURE:  And that entire dataset is the

5     nationwide exhibit set or the Huntington/Cabell exhibit set?

6          MR. FARRELL:  It is ABDC-MDL-01911481.

7          MS. MCCLURE:  Your Honor, I think it's not a

8     surprise that I don't have the database of the documents

9     that we've produced memorized, so I would need to just

10    confirm whether that is -- that Bates number that was read

11    out is intended to be offering an entire nationwide dataset

12    or is it a dataset on a thumb drive that has been limited to

13    pharmacies in Huntington and Cabell.

14         THE COURT:  Simple question, Mr. Farrell.  Can you

15    answer it?

16         MR. FARRELL:  Not without help.

17       (Pause)

18         MR. FARRELL:  It is the -- identified as the OMP

19    History Report for West Virginia 2008 through 2012 in

20    spreadsheet format.

21       So the way, the way this worked is a lot of the

22    information in discovery is in electronic format, so that

23    when we asked for the defendants to produce the orders that

24    were flagged by their system, we got an enormous dataset.

25    And then what we did was we extracted from that the data

1    points specifically referencing SafeScript.

2         So to be prepared to lay the foundation and to ask

3    questions about this, we're prepared to pull up the actual

4    data and then have our staff go through and pull out of the

5    15,000 lines the only lines that matter, or we have a subset

6    of that where we printed off the lines that we intend to ask

7    him about.  But ultimately the purpose of this is to ask him

8    about the thresholds for SafeScript Pharmacy.

9              MS. MCCLURE:  So, Your Honor, the, the issue I see

10   here is that the thumb drive, which is -- I do believe that

11   I agree with plaintiffs what is on that thumb drive is the

12   OMP History Report, meaning a report that was pulled from

13   our system that has the Order Monitoring Program's history

14   for the entire State of West Virginia.

15        So to the extent we're offering out extra

16   jurisdictional data here, I would have a geographic scope

17   concern.

18        Additionally, I believe -- is this being offered as a

19   demonstrative given the fact that it does seem that the

20   evidence has been -- certain columns or rows have -- certain

21   columns and rows have been eliminated.  If so, that may

22   relieve my, my concern and I would just need to confer with

23   co-counsel.

24              THE COURT:  Well, the problem is, if I understand

25   it, is that this contains information that's not really

1    relevant to Cabell-Huntington.  Is that right?

2              MR. FARRELL:  We would disagree, but that's their

3    argument.

4        So, Judge, we would like to ask questions about a

5    particular pharmacy that has a series of data points that

6    are reflected on the spreadsheets that we hand-selected from

7    the larger database.  The defendant --

8              THE COURT:  Why can't you use, use the data as a

9    basis to ask the questions without admitting it into

10   evidence?  That way, you just -- you can just go to the part

11   that's relevant.  Right?

12             MS. MCCLURE:  Yes, Your Honor.  I think that we

13   would agree to the admission of, of the material that's

14   related to Cabell and Huntington.  My, my concern with the

15   thumb drive is that it's overbroad in the sense it includes

16   West Virginia.

17       My concern with this document is that it's possible

18   that a witness would, would want to see fields that appear

19   to have been eliminated from this document.

20       So it's sort of an overbroad concern with the thumb

21   drive and an under-inclusive concern with the hard copy

22   document that's been handed out.

23       So if, if, in fact, the relevant ones for Huntington

24   and Cabell were picked out, which I would then, of course,

25   request an opportunity to be able to verify and come back to

1    the Court later if there were some sort of discrepancy in

2    which ones were selected by plaintiffs' counsel -- I did not

3    have the opportunity due to the timing of this production to

4    do that overnight last night.

5        But if this document were all of the fields instead of

6    just being C, I, L, M, N, et cetera, and limited to

7    Huntington/Cabell, we could agree to the conditional

8    admission of that document provided, again, that I would be

9    able to check the work that was done.

10           THE COURT:  Well, I think the thing to do is

11   conditionally admit it and then have you clean this up after

12   the fact.  It seems to me it provides a basis to ask the

13   questions of the witness whether you admit it or not,

14   doesn't it?

15           MR. FARRELL:  Yes.

16           THE COURT:  Well, --

17           MR. HESTER:  Could we have clarification on what's

18   being conditionally admitted?  Mr. Farrell has proffered a

19   thumb drive which I believe includes a lot of data outside

20   of Cabell-Huntington and we would object on geographic scope

21   to that.

22           THE COURT:  Well, I'm not going to admit any of it

23   and I'm going to let you use it as a basis to question him.

24   How's that?

25           MR. FARRELL:  Not great, but better than nothing.

```
 1              MS. MCCLURE:  That's acceptable.  Thank you, Your
 2    Honor.
 3              THE COURT:  Okay.  Have at it, Mr. Farrell.
 4              MR. FARRELL:  So just to be clear --
 5              THE COURT:  That way, it seems to me that what,
 6    what we're going to hear in court is going to be limited to
 7    what's relevant to Cabell and Huntington.
 8              MR. FARRELL:  Yes.  I -- yes.
 9              THE COURT:  Okay.
10              MR. FARRELL:  Can I have one second to confer?
11              THE COURT:  Yes.
12         (Pause)
13              MR. FARRELL:  Judge, what we're going to -- what
14    we're attempting to do to bypass all concerns is to have the
15    actual thumb drive opened.  And then it's going to be sorted
16    like we did for the spreadsheet, but include all of the
17    columns so that counsel can cross-examine and go back and
18    forth.  And the only thing that will be shown will be the
19    SafeScript Pharmacy.
20              THE COURT:  Do you have any objection to that?
21    That's okay, isn't it?
22              MS. MCCLURE:  Yes, Your Honor.
23              MR. HESTER:  And that's the SafeScript based in
24    Cabell-Huntington; is that right?
25              MR. FARRELL:  Yes, sir.
```

```
 1                  MR. HESTER:  Thank you.

 2                  THE COURT:  Okay.  That's what we'll do.

 3                  MR. FARRELL:  Could we have five minutes to make

 4       it work?

 5                  MS. MCCLURE:  Your Honor, may I make a request

 6       that we receive a hard copy of that as well given the, the

 7       timing of the examination?  We want to be able to promptly

 8       examine Mr. Mays as well.

 9                  MR. FARRELL:  We've already done so.

10                  MS. MCCLURE:  Well, this hard copy does not

11       include all of the columns.

12                  MR. FARRELL:  We will make a copy, a digital copy

13       of what we have.  And then we'll have that digital copy

14       printed as well for you as soon as we possibly can.

15                  MS. MCCLURE:  Thank you.

16                  THE COURT:  You need five minutes to get ready to

17       go forward; right?

18                  MR. FARRELL:  Unless you're offering more.  Judge,

19       I don't mean to be coy about it.  We --

20                  THE COURT:  Well, I'll give you what you need

21       within reason.

22                  MR. FARRELL:  Yes, sir.  So, you know, we started

23       with having an expert try to process it and --

24                  THE COURT:  Okay.  We'll be in recess and let us

25       know when you're ready to go.
```

```
 1              (Recess taken from 10:58 a.m. until 11:10 a.m.)
 2                   THE COURT:  All right, Mr. Farrell, you may
 3      proceed.
 4      BY MR. FARRELL:
 5      Q.   Thank you, Mr. Mays.
 6           I'm going to have put up on the screen the extracted
 7      lines of data regarding SafeScript #6 in Huntington/Cabell
 8      County, West Virginia.  Are you familiar with this
 9      particular pharmacy?
10      A.   Somewhat other than it being part of this case.
11      Q.   Okay.  Aside from what you've learned as a part of this
12      case, did you have independent knowledge about SafeScript
13      Pharmacy as a customer of AmerisourceBergen?
14      A.   Not that I remember, no.
15      Q.   So --
16                   MR. FARRELL:  Judge, may I approach?
17                   THE COURT:  Yes.
18      BY MR. FARRELL:
19      Q.   I'm going to represent to you that this is a subset
20      of data that was provided to us that we've attempted
21      to -- it's been identified as OMP History Report for
22      West Virginia.  Is this the, the dataset recorded by
23      AmerisourceBergen for purchase orders that are flagged
24      by your computer system for further review between 2007
25      through 2014?
```

1    **A.**   I can't really say that because I don't recall this

2    report.  I recognize some of the data fields, but I

3    didn't -- that wasn't my role to review these reports.

4    **Q.**   That's fair.  This is simply data that is inside some

5    machine somewhere.  How would somebody at AmerisourceBergen

6    see a held order in real-time back in 2007?

7    **A.**   So they would go into the system -- so an order would

8    be held at the distribution center level and they put some

9    code in that sends the information to corporate to review

10   the order.

11   **Q.**   So --

12   **A.**   Correct?

13   **Q.**   Let's back up for a second.

14   **A.**   Okay.

15   **Q.**   We went through that flow process.

16   **A.**   Right.

17   **Q.**   And the first thing that happened is that a pharmacy

18   would place an order to AmerisourceBergen.

19   **A.**   Right.

20   **Q.**   The second thing that would happen is that your

21   computer would then run its algorithm and look for, among

22   other things, thresholds; correct?

23   **A.**   That's correct.

24   **Q.**   And if the order was above the threshold, it would then

25   be sent to the distribution center manager to make one of

1    three decisions; correct?

2    **A.**    No, it wouldn't necessarily be sent to the distribution

3    center manager.  We'd call the, the people that would review

4    the orders and the DC responsible -- it's the RPIC,

5    responsible person in charge, and they were specifically

6    trained to review orders.  But it didn't necessarily have to

7    be the division manager.

8    **Q.**    Okay.  Now, I misspoke.  I used a poor word choice.  So

9    it does go to the distribution center, but it goes to a

10   specified person, not necessarily a manager?

11   **A.**    It goes to -- I think it went into a queue.  So it

12   doesn't like -- I don't think it specifically goes to a

13   person to review.  I think it goes into a queue and then

14   they go in and review the held orders.  I'm just not exactly

15   sure I remember the process that, that detail of the

16   process.

17   **Q.**    But the distribution center itself would make one of

18   three decisions:  Accept it and ship, reject it and report,

19   or hold it and send it to corporate?

20   **A.**    That's incorrect.  The distribution center didn't

21   report those orders.  So they could cancel one based on

22   various reasons.  The customer may have called.  It's a

23   duplicate.  We used to call it fat finger where they meant

24   to order one and they ordered 111.  And then they can send

25   it to corporate to review or they could release it based on

1    their knowledge of the customer.

2    **Q.**   Okay.  So the person that is looking at why the system

3    flagged it, what's the interface with it?  Is it a memo?  Is

4    it a piece of paper?

5    **A.**   It's -- I'm sorry.  It's a messaging system.

6    **Q.**   What's the name of that messaging system?

7    **A.**   It was called Metastorm.  And the messaging system

8    would send that message to corporate and say, "This order is

9    being sent to you for review," in some sort of language.

10   There was some canned language in there.

11   **Q.**   Okay.

12   **A.**   Then that would tell them to review that order.

13   **Q.**   So what I'm going to show you is I'm going to show you

14   the data points produced by AmerisourceBergen for that

15   flagging system for SafeScript Pharmacy.  Okay?

16   **A.**   Okay.

17   **Q.**   Now, there are several different columns --

18          MS. MCCLURE:  Your Honor, I do object to the fact

19   that Mr. Mays has testified about the process and his

20   understanding of the process.  However, he has indicated

21   that he's not familiar with this document and that he's

22   familiar with several of the pieces of information within

23   it, but he's not familiar with this document per his own

24   testimony.

25          THE COURT:  What about that, Mr. Farrell?

1           MR. FARRELL:  My hope, Judge, was to take the

2     processes that Mr. Mays has been discussing all morning and

3     have him walk how that process should have worked for

4     SafeScript Pharmacy #6 in Huntington, Cabell County, West

5     Virginia.

6           MS. MCCLURE:  So, Your Honor, the issue is really

7     with the characterization of Mr. Farrell in suggesting that

8     this Excel spreadsheet, which is a download of information

9     from a different database, is the same thing that would be

10    shown to a reviewer, an order reviewer in the distribution

11    center.

12       So I don't object to Mr. Farrell being able to ask

13    questions of Mr. Mays, but we can't represent -- Mr. Mays

14    has said he's never seen this document.  And the way that

15    this works is that this document is not what is viewed in

16    the distribution center.  It's a database and this is a

17    download of information from the database.

18           THE COURT:  Well, that's right, isn't it

19    Mr. Farrell?

20           MR. FARRELL:  Yes.  I'm not suggesting that this

21    is what the interface was.

22           THE COURT:  Okay.  I'll overrule the objection and

23    you can get on with it here.

24    BY MR. FARRELL:

25    Q.   Mr. Mays, you'll notice in Column C it says

1   SafeScript Pharmacy #6.  Do you see that?

2   **A.**   Yes, sir, I do.

3   **Q.**   And I think you can see it on your screen right in

4   front of you if that's a better way to do it.

5   **A.**   Okay.

6   **Q.**   And you'll see that the next line, Columns D, E, F and

7   G are address related; correct?

8   **A.**   Yes.

9   **Q.**   And then I want you to -- let's slide over to Column L.

10          Can you slide the screen over, please?

11          Column L and then Column N is the order date.  Do you

12   see that?

13   **A.**   Yes, sir, I do.

14   **Q.**   So this, this OMP begins in -- this particular dataset

15   appears to begin for SafeScript on July 10th, 2007.  Do you

16   see that?

17   **A.**   Yes, sir.

18   **Q.**   And if you look in Column P it says "threshold."  Do

19   you see that?

20   **A.**   Yes, sir.

21   **Q.**   The threshold in July of 2007 is 10,600; correct?

22   **A.**   That's correct.

23   **Q.**   And it's 10,600 for oxycodone solids in Column U.  Do

24   you see that?

25   **A.**   Yes, sir, I do.

1    **Q.**   So is it fair to say that what we're looking at in

2    Column P with threshold is the monthly threshold for this

3    particular pharmacy to order oxycodone solid dosage units?

4    **A.**   Yes.  That's all oxycodone solid dosage units combined.

5    **Q.**   And, so, it appears from this document that between

6    July 10th and July 12th, 2007, your system was kicking out

7    or was flagging orders in excess of 10,600 dosage units?

8            MS. MCCLURE:  Your Honor, Mr. Farrell has just

9    made a representation about a date range that is not

10   available and visible to the witness.

11           THE COURT:  Is that right, Mr. Farrell?

12           MR. FARRELL:  No, sir, it is not.

13   BY MR. FARRELL:

14   **Q.**   If you'll look in Column M, line 356, will you read

15   the date?

16   **A.**   It says 20070710.

17   **Q.**   What do you interpret that to mean?

18   **A.**   That that's the order date.

19   **Q.**   Which is what?

20   **A.**   Excuse me?

21   **Q.**   What would these digits equate to on the calendar?

22   **A.**   It appears to be July 10th, 2007.

23   **Q.**   Now, I want you to scroll all the way down to line, or

24   line 413, which is highlighted by my capable staff, and read

25   those digits into the record.

1    **A.**    20070712.

2    **Q.**    And what do you think those digits equate to on the

3    calendar?

4    **A.**    It appears to be July 12th, 2007.

5    **Q.**    So from your review of the entries between line 356 and

6    line 413, does it appear that there are a number of orders

7    that have been identified by the AmerisourceBergen computer

8    that exceed the threshold of 10,600?

9    **A.**    Yes.  I'm just not sure every line is an order.  I'm

10   not sure how many lines are attributed to a single order.

11   Again, not being that familiar with this document, I'm not

12   really sure how that data comes together.

13   **Q.**    That's fair.  And that's because sometimes when a

14   pharmacy makes an order, they'll make on -- it's like when

15   you go -- I was going to make a silly analogy.  When you

16   make an order sometimes you have multiple items you're

17   ordering on the same invoice.  Would you agree with that?

18   **A.**    Yes.

19   **Q.**    So it's not like they're putting in on the same day an

20   order at 10:00 a.m., an order at 1:00 p.m., an order at 3:00

21   p.m., or they could.  But, in general, this is business

22   activity being recorded on that day?

23   **A.**    In general.  It just, it just appears that some of the

24   rows seem to be duplicates and I just don't know if that --

25   you know, because if you look at the 356, 357, and 358, it's

```
 1    the same NDC number, same ABC item number, same quantity.
 2         So I don't know if that means there's three orders of
 3    400 or is it one order of 400 and it's duplicated somehow.
 4    So I'm not sure how this data is presented here, --
 5    Q.   Right.
 6    A.   -- how many orders this really is.
 7    Q.   This is just data coming out.  So without any context,
 8    my real question is this:  Do you see the threshold changes
 9    around line 1562?
10    A.   Yes, that's what it appears to be.
11    Q.   So it appears that on July 12th -- or July 12th, 2007,
12    that the threshold was 10,600, and on September 26th, 2007,
13    the threshold has more than doubled to 25,000.  Do you see
14    that, sir?
15    A.   Yeah.  It looks like the data skips a couple of months
16    from July to September, over, over two months.  But, yeah,
17    it looks like the threshold has changed during that period.
18    Q.   My question to you, sir, is who is authorized to make
19    such a threshold change?
20    A.   I believe the investigator can make a threshold change,
21    but it has to be approved by the manager, --
22    Q.   Okay.
23    A.   -- if I recall correctly.
24    Q.   By the distribution center manager?
25    A.   No, the manager in corporate.
```

1  **Q.**   Okay.  Now, for there to be a threshold change of any

2  type, does it need to be documented?

3  **A.**   Yes, it should be, yes.

4  **Q.**   And what are the factors that would go into an approval

5  by corporate to raise thresholds?

6  **A.**   Well, they would typically do additional due diligence

7  on the customer.  In a lot of cases, the threshold increase

8  would be requested by either the business or the sales team.

9       And then they would conduct additional due diligence to

10  see that, that it was warranted to increase the threshold

11  based on that customer's, you know, factors about the

12  customer, whether it was some increase in the business or

13  change in their activity.

14  **Q.**   And who would perform that due diligence?

15  **A.**   That would typically be one of the OMP investigators.

16  Sometimes we used a third party to do inspections of

17  pharmacies --

18  **Q.**   And you --

19  **A.**   -- and the salesperson also.

20  **Q.**   Sales personnel as well; correct?

21  **A.**   Could also be sent out to the pharmacy, yes.

22  **Q.**   All right.  So would you -- one would assume that if

23  there is a threshold increase between 10,625 that you would

24  find documentation somewhere of the justification for that

25  threshold increase.  Agreed?

1    **A.**    I would think so, yes.

2    **Q.**    Now, it also appears that the threshold was bumped from

3    25,000 the very next day to 30,000.  Do you see that?

4    **A.**    Yes, sir, I do.

5    **Q.**    So on September 26th, 2007, the threshold was 25,000,

6    and the very next day on September 27th, 2007, the threshold

7    was 30,000.  Agreed?

8    **A.**    That's what it appears, yes.

9    **Q.**    Now, this is, this is the point I think I have failed

10   to make so far.  AmerisourceBergen's Diversion Control

11   Program only begins the investigative stage once the

12   threshold has been exceeded.  Agreed?

13   **A.**    Not entirely.  We do new customer due diligence and we

14   do additional due diligence of customers.  So it's not only

15   when a threshold is exceeded.

16   **Q.**    For purposes of monitoring suspicious orders --

17   **A.**    Uh-huh.

18   **Q.**    -- the algorithm does not get triggered until the order

19   for that month exceeds the threshold.  Agreed?

20   **A.**    That's agreed.  I agree.

21   **Q.**    So if theoretically you set the threshold at a million

22   pills a month, how many pharmacies in America would the

23   system have flagged?

24   **A.**    I couldn't tell you.

25   **Q.**    Let's talk about SafeScript Pharmacy.  SafeScript

1    Pharmacy in September of 2007 would have to order more than

2    30,000 pills in a month for your system to flag it; correct?

3    **A.**   That's correct.

4    **Q.**   30,000 pills a month for 12 months is how much?

5    **A.**   36,000?  Is that correct?  My math is not too good.

6    **Q.**   It's 360,000 pills a year --

7    **A.**   Oh, 360,000.

8    **Q.**   -- from one pharmacy.  Agreed?

9    **A.**   Agreed.

10   **Q.**   Do you know how many people live in Huntington/Cabell

11   County, West Virginia?

12   **A.**   No, I do not.

13   **Q.**   This threshold set by AmerisourceBergen for SafeScript

14   #6 would permit the company to provide three pills for every

15   man, woman, and child every year without ever flagging the

16   system.

17           MR. HESTER:  Objection, lack of foundation.

18           THE COURT:  Yeah.  He said he didn't know how many

19   people lived in Huntington or Cabell County, Mr. Farrell.

20           MR. FARRELL:  Yes, Your Honor.  I believe you

21   earlier took judicial notice of population.  So I would like

22   to --

23           MS. MCCLURE:  Your Honor, that doesn't mean that

24   Mr. Mays, who is not a judge, is somehow now impugned with

25   knowledge about population that he's just said he doesn't

```
 1    have.
 2              THE COURT:  Well, if I took judicial notice and
 3    you have the number, give him the number.
 4    BY MR. FARRELL:
 5    Q.   Mr. Mays, the population of Huntington/Cabell
 6    County is 100,000 people.
 7    A.   Okay.
 8    Q.   Based upon this threshold for this single pharmacy, it
 9    could provide oxycodone pills to every man, woman, and child
10    in the community.  Agreed?
11    A.   Can you repeat that statement again?  I'm sorry.
12    Q.   If the, if the threshold is 30,000 pills a month, that
13    means that you could deliver or sell 360,000 oxycodone pills
14    to a pharmacy in one year without it ever being flagged.
15    Agreed?
16    A.   Agreed.
17    Q.   We'll go past the population.  How would
18    AmerisourceBergen deliver 360,000 pills to a pharmacy in
19    Huntington, West Virginia?
20    A.   We use a common carrier to make the deliveries.
21    Q.   Which common carrier?
22    A.   We use various common carriers to make our deliveries
23    for us to the pharmacies.
24    Q.   So delivery trucks?
25    A.   Yes.
```

1  **Q.**   And those pills are in safe boxes?

2  **A.**   They're in -- yes, they're in plastic totes.

3  **Q.**   All right.  Let's, let's now scroll down to 30,000

4  until you get to the next page.  Keep going.  Stop right

5  there.

6       It appears that the threshold of 30,000 was increased

7  in April of 2009 from 30,000 to 45,000 pills.  Do you see

8  that?

9  **A.**   Yes, sir, I do.

10  **Q.**   Should there be documentation in the file somewhere

11  that justifies why AmerisourceBergen increased the threshold

12  for this pharmacy from 30,000 pills a month to 45,000 pills

13  a month?

14  **A.**   Yes, there should be documentation of that.

15  **Q.**   Let's continue to scroll down.

16       Here we have a downward trend of thresholds and it's

17  dated January 30th of 2010.  Do you see that?

18  **A.**   Yes, I do.

19  **Q.**   And the number is -- it's not a normal number.  It's --

20  the number is not a round number.  It's a specific number.

21  Do you see that?

22  **A.**   I see that.

23  **Q.**   If there's a downward turn in the threshold, should

24  there be some explanation for that in the due diligence

25  file?

1    **A.**    There should be an explanation for the lowering of the

2    threshold, yes.

3    **Q.**    Do you have any personal knowledge or understanding of

4    whether or not there was some systemic process in place that

5    was more carefully or more specifically calculating

6    thresholds at this time frame to go from a rounded number to

7    a specific number?

8    **A.**    No, I do not.

9    **Q.**    Okay.  Continue to scroll down.

10        And, again, the number bumps back up, apparently, in

11   July of 2011 to 40,200.  And, again, if, in fact, this

12   adjustment was made, would you expect there to be written

13   justification for it somewhere in the record?

14   **A.**    I believe that was August, not July.  Is that correct?

15   **Q.**    So --

16   **A.**    What you highlighted is August.

17   **Q.**    Yes, sir.

18   **A.**    Okay.  There should be documentation any time a

19   threshold is changed.  There should be a narrative or a note

20   in the file or something.  There should be documentation of

21   that.

22   **Q.**    All right.  So let's scroll all the way to the top

23   again, please.  And then scroll to the right to the column

24   on Action.  Right there.

25        Do you see Column AC where it says --

```
 1          Will you click on that whole word, please.  Click on

 2     the box to the right.  Right there.

 3          Release Code.  Do you see that?

 4     A.   Yes, I do.

 5     Q.   What, what does -- do you know what the Release Codes

 6     mean?

 7     A.   Vaguely.  I have a vague recollection of them.

 8     Q.   Do you know how many of these flagged orders were

 9     actually blocked by AmerisourceBergen?

10     A.   I couldn't tell you.

11     Q.   But the data would show it?

12     A.   I would think so.

13     Q.   Do you know how many orders were reported by

14     AmerisourceBergen?

15     A.   Not exactly, no.

16          MR. FARRELL:  Judge, I have what I'm going to

17     circulate as P-2819 which is the suspicious orders that were

18     reported by the -- by AmerisourceBergen to the DEA on behalf

19     of SafeScript Pharmacy.

20          It's -- again, it's a subset of -- I'll represent to

21     you that these are the suspicious orders disclosed by

22     AmerisourceBergen for SafeScript Pharmacy #6.  It's Bates

23     stamped ABDC-MDL-01911482.  And it is Plaintiffs' Trial

24     Exhibit P-2819 we would submit for the record.

25          May I approach?
```

```
 1              THE COURT:  Yes.

 2   BY MR. FARRELL:

 3   Q.   It's multiple pages.  And if you will flip, you'll

 4   see there's one for hydrocodone and oxycodone for

 5   SafeScript.  I think it's the back page I'll be

 6   directing you to.

 7              MS. MCCLURE:  Your Honor, this document appears to

 8   have been modified in the same way as that prior document

 9   was in that certain columns have been extracted from the

10   document, as well as certain rows have been taken out of the

11   document.

12       So we would request that the same process happen here

13   whereby I -- I would not know whether Mr. Mays' answers may

14   change if the information that's been extracted is the only

15   information presented to him.

16       And, so, we would request that to the extent this is an

17   excerpt, I also expect that it's also subject to the same

18   problem as before in that the thumb drive is likely

19   over-inclusive because it's going to include all reported

20   orders for the State of West Virginia.

21       The document appears to be under-inclusive in that it's

22   selected Huntington and Cabell orders selected by

23   plaintiffs' counsel, but only with certain columns.

24       And, so, we would request that we do the same thing

25   with information so to make sure that Mr. Mays has the full
```

```
 1    document available to him, not just the subset.
 2              THE COURT:  Well, you don't have any problem with
 3    that, do you, Mr. Farrell?
 4              MR. FARRELL:  I don't think so, Your Honor.  I'll
 5    make this quick and short.
 6    BY MR. FARRELL:
 7    Q.   Mr. Mays, the documents produced by
 8    AmerisourceBergen and stipulated to in this litigation
 9    indicate that AmerisourceBergen reported three
10    suspicious orders on behalf of SafeScript.  Do you have
11    any reason to dispute that?
12    A.   Yes, sir, I do.  I don't know if it's covered in the
13    same time period, but as, as I recall, these release codes
14    wherever you see an IN, that means -- I believe that means
15    that it was reported to DEA as suspicious.  And there seems
16    to be a lot more on this first spreadsheet than what's on
17    the second one.
18         So I don't know if we're talking about the same date
19    range or not.  This doesn't look like all of the orders that
20    would have been reported as suspicious.
21    Q.   Why not?
22    A.   Well, because of what I just told you.  If you'll go
23    back to the other spreadsheet, there's several lines on here
24    with the release code of IN in them.  And that would
25    indicate that it was -- that would indicate to me -- as I
```

1  recall the IN code means it goes into a queue and gets

2  reported to DEA as suspicious.

3  **Q.**   If there is transactional data that establishes that

4  that order was shipped, that would be a violation of your

5  regulatory duties, would it not?

6         MS. MCCLURE:  Objection, Your Honor, calls for a

7  legal conclusion.  Moreover, Mr. Mays previously testified

8  that he had some familiarity with the codes but wasn't

9  certain as to what each of them meant.

10         THE COURT:  Well, overruled.  He can answer it if

11  he knows.

12         THE WITNESS:  We didn't -- I don't believe we ever

13  shipped an order that we reported as suspicious.

14  BY MR. FARRELL:

15  **Q.**   And if your data shows that the shipments that are

16  on that sheet that you were shipping in that month to

17  that, to that particular pharmacy, that would be in

18  violation of your own policies and procedures, would it

19  not?

20         MS. MCCLURE:  I maintain that same objection, Your

21  Honor.

22         THE COURT:  Well, hasn't he already answered that?

23         MR. FARRELL:  This was different.  I asked him

24  initially whether or not it was violative of his regulatory

25  duties.  And now I'm asking whether it's violative of his --

1          THE COURT:  Okay, overruled.

2      You can answer it if you can, Mr. Mays.

3          THE WITNESS:  I don't remember where it's

4  specifically culled out in our policies and procedures.  And

5  I don't think there's a regulation that states whether --

6  that you can't ship.

7  BY MR. FARRELL:

8  **Q.**   We'll let the record stand.  I'm simply asking

9  you -- I'm holding in one hand a list of the orders

10  flagged by your system, and in my right hand I'm holding

11  the orders that your counsel has disclosed as the

12  suspicious orders.

13  **A.**   Okay.  Again, I may be mistaken.  I was thinking that

14  IN code meant that it was reported as suspicious.  So I

15  could be mistaken.

16  **Q.**   Okay.  Fair enough.

17          MR. FARRELL:  Judge, for purposes of the record --

18  let me see if I can do this the right way.

19      For the purposes of the record, we would submit P-2819

20  and P-16639 for admission into the record only to the extent

21  of pharmacies in Huntington/Cabell County, West Virginia.

22          THE COURT:  Any objection to that?

23          MS. MCCLURE:  Your Honor, I do not.  However, I

24  would request the opportunity to view that.  I don't have a

25  hard copy of the document that has all of the fields.

1          So I think that the way to deal with this is to

2     conditionally admit it subject to us being able to raise any

3     concerns we have with the Court after we've had the

4     opportunity to confer with Mr. Farrell.

5               THE COURT:  Okay.  I'm going to conditionally

6     admit it subject to you clearing up that difficulty, Mr.

7     Farrell.

8     BY MR. FARRELL:

9     Q.   Okay.  So next we're going to go to --

10              THE COURT:  I said "it" but I meant both of them.

11              MR. FARRELL:  Yes, Your Honor.  I will point out

12    this is data that the defendants produced to us, so they

13    have these actual spreadsheets.

14    BY MR. FARRELL:

15    Q.   All right.  The next thing we're going to do, Mr.

16    Mays, winding down toward the end, is the

17    demonstratives.  I call them demonstratives.  They've

18    now been conditionally -- they've actually been admitted

19    by the Court under the 1006.

20         So I've given copies to counsel before, but I have a

21    copy for the Court and I'll be putting it up on the screen.

22              MS. MCCLURE:  Your Honor, I note -- I'm not

23    entirely sure which demonstratives Mr. Farrell is going to

24    begin with.

25         However, some documents were conditionally admitted

```
1    provided that they were used with Dr. McCann.  If you

2    recall, there were some other documents that were not used

3    with Mr. McCann.  I do not believe that those have been

4    conditionally admitted.

5         That said, the list that they gave us of demonstratives

6    includes both types of McCann documents, those that were

7    used with him, which I believe Your Honor previously

8    said could not be -- I'm sorry -- those that were used with

9    him and then those that were not ever used with Mr. McCann.

10        So, for example, Mays 1 -- I'm sorry -- Mays 2 was used

11   with McCann.  Mays 4 was not used with McCann.

12        So to the extent we're going to be talking about

13   documents that were never used with Mr. McCann, then I don't

14   believe that Your Honor's 1006 ruling would cover those.

15            THE COURT:  Well, I admitted the ones that we had

16   the -- that I conditionally admitted.  I admitted them this

17   morning.  Does that embrace all of these documents or just

18   the ones that were used with Mr. McCann?

19            MR. FARRELL:  I believe they were all.  If we can

20   pull up Mays 4, I can show you how and where if you'll

21   recall.

22        Can we pull up Mays 4?

23            THE COURT:  I think I admitted all of them, didn't

24   I?  I didn't?

25            MR. FARRELL:  Pull up Mays 4, please.
```

```
 1              THE COURT:  Just a minute.
 2         (Pause)
 3              THE COURT:  Mr. Farrell, are any of these
 4    documents the packets that I, I wouldn't let in?
 5              MR. FARRELL:  No, Your Honor.
 6              THE COURT:  They were, they were the documents
 7    that were identified during Mr. McCann's testimony that I
 8    conditionally admitted?
 9              MR. FARRELL:  That's my belief and understanding.
10              THE COURT:  I conditionally admitted all of them,
11    didn't I?
12         Mr. Mahady, you'll remember.
13              MR. MAHADY:  I hope so.  Your Honor, you have now
14    admitted the 1006 summaries that Dr. McCann testified to
15    during his direct.
16         There were other charts that were included in those
17    broader packets that Dr. McCann did not testify to.  And I
18    believe your ruling was that I am conditionally admitting
19    the charts that he used and testified about but the other
20    ones are out.
21         Based off of your 1006 ruling this morning, those ones
22    that were conditionally admitted are now in --
23              THE COURT:  They were just -- they were limited to
24    the ones that he testified about.
25              MR. MAHADY:  Exactly.  So we went through the
```

1    demonstratives that Mr. Farrell intends to use and it's a

2    mix of ones that have now been admitted because they were

3    used with Dr. McCann and ones that were not used with Dr.

4    McCann.

5         Our objection only relates to those that were not used

6    with Dr. McCann and are not part of the evidentiary record.

7              MR. FARRELL:  Judge, for instance, this Mays 4, I

8    believe Dr. McCann specifically referenced the time frame of

9    the ARCOS data, the time frame supplied by

10   AmerisourceBergen, and simply put together this summary of

11   what they sold into Huntington/Cabell County and said that

12   the ARCOS data was a 99 percent fit with --

13             THE COURT:  Isn't that right, Mr. Mahady?

14             MR. MAHADY:  He certainly testified about the

15   ARCOS data.  He did not testify specifically about this

16   chart or his visualization of this chart, nor did I

17   cross-examine him on this chart because the plaintiffs chose

18   not to use it with Dr. McCann.

19        The plaintiffs seem to now be trying to use the Court's

20   ruling on the 1006 to bring in all of the other thousands of

21   charts that they did or did not use with Dr. McCann.

22             THE COURT:  Well, I saw a lot of charts that

23   looked like that, but I don't know whether this is one

24   that --

25             MR. FARRELL:  I'll make it easy.  Which ones do

```
 1    you want me to pull out?
 2            MR. MAHADY:  4, 5, 6 --
 3            THE COURT:  If Dr. McCann used it, you can, you
 4    can ask him about it, Mr. Farrell.  But if he didn't, I
 5    think Mr. Mahady is right.
 6            MR. FARRELL:  He's, he's almost always right, so
 7    I'll believe him.
 8         Anything else?
 9            MR. MAHADY:  Not according to our people.
10         4, 5, 6, 9, 11, 12, 15.
11            MR. FARRELL:  9 is the matrix.
12            MR. MAHADY:  Do you mind if I come up there?
13            THE COURT:  When we get to a stopping point, I'm
14    going to have to inconvenience counsel and clear the tables
15    because I've got a matter I have to deal with at -- over the
16    lunch break.  So is this a good place to stop?
17            MR. FARRELL:  Yes.
18            THE COURT:  All right.  We'll come back at 2:00
19    and I'm sorry to have to make you do this over and over
20    but --
21            MS. WICHT:  No problem, Your Honor.
22            THE COURT:  -- that's the way it goes.
23         (Recess taken at 11:49 a.m.)
24            THE COURT:  Okay, Mr. Majestro.
25            MR. MAJESTRO:  Thank you, Your Honor.  Sometimes I
```

1    feel like King George in Hamilton just popping up to give

2    commentary as we go on, but in particular, in all

3    seriousness, the testimony --

4            THE COURT:  You have a more pleasing personality

5    than he did.

6            MR. MAJESTRO:  Well, I take that as a compliment.

7    I thought he was the best character in the whole play.

8            THE COURT:  I did, too.

9            MR. MAJESTRO:  So, Mr. Farrell is going to go

10   through some of Dr. McCann's charts, some of which have

11   information from pharmacies outside Cabell-Huntington.

12       In your ruling this morning, Your Honor noted that you

13   had -- you were troubled some and so the plaintiffs thought

14   it might be beneficial for us to give you a very brief

15   explanation of why we think these out-of-county pharmacies

16   are relevant generally.

17           THE COURT:  Okay.

18           MR. MAJESTRO:  So, first of all, I would go back

19   --  I want to start with your order from April 29th where

20   you said, "Any extraterritorial evidence offered by the

21   plaintiffs must have a demonstrable nexus to Cabell County

22   or the City of Huntington and/or tend to show nationwide

23   trends and shipments, national policies and procedures, or

24   systemic failures that are national in scale."

25       With respect to these ABDC witnesses, we've heard the

```
1    past two days about ABDC's methods and programs for

2    monitoring suspicious orders and the one thing that's clear

3    is that these programs are anything but limited to Cabell

4    County.

5         The witness -- Mr. May testified yesterday, for example

6    --

7              THE COURT:  Well, how do you get around the point

8    that these were cherry-picked by the plaintiffs' lawyers, if

9    I understand what happened?

10             MR. MAJESTRO:  Well, let's --

11             THE COURT:  You probably had something to do with

12   that.

13             MR. MAJESTRO:  I did not.  I wish I did.  Mr.

14   Mougey's team did an excellent job.  But if you look at

15   those pharmacies, there are two categories of those

16   pharmacies.  A lot of them are Southern West Virginia,

17   around the area of Cabell-Huntington, which Mr. Zimmerman

18   testified -- remember all the testimony about how the

19   hospital was a magnet for people?  Well, if that's the case,

20   we shouldn't have these large volumes of pills in all those

21   surrounding counties.  So, that -- that in and of itself

22   makes -- makes that testimony.

23        The other thing that's important to note, Your Honor,

24   is that all the orders in West Virginia came from the same

25   Distribution Center.  So, if there was something peculiar
```

1    about Cabell County, one would not expect to have those same

2    failings in the Eastern Panhandle, or in the Northern

3    Panhandle, or all those other places.  So, what we believe

4    -- that is what the evidence of systemic failure goes to

5    show.

6         In addition, the -- and, you know, I can quote for Your

7    Honor like the -- probably the best place is the last --

8    last testimony he gave.  He said, well, we -- and the

9    question was, "And were they all running the same Diversion

10   Control Program?"  The answer is 'Well, we only had one

11   Diversion Control Program, the corporate program, and it was

12   being executed in each of the distribution centers."

13        Answer, "The policies were being followed, that's

14   correct."  So -- so they have one program.  So the evidence

15   that that program failed in Nevada or wherever is evidence

16   as Your Honor ruled in denying the motion in limine.  It's

17   evidence of the failure -- systemic failure of the system.

18        Finally, Your Honor, they have introduced

19   extraterritorial evidence themselves.  The past couple days,

20   we've heard about -- testimony about things happening in

21   Nevada.  The example from Bernie's Pharmacy in Alaska.

22        So, the impact of these policies and procedures which

23   are truly national in scope is relevant.  So, when they show

24   the harms from these programs, like their example, Bernie's

25   in Alaska, which further testimony is going to show you that

1    that -- that was not as they presented it.  But even if --

2    even so, if Alaska is relevant, certainly, Mingo County or

3    McDowell County is relevant.

4         So, for all of those reasons, Your Honor, we believe

5    that we have shown a significant nexus to Cabell County with

6    these other counties or evidence of one single national

7    program and its systemic failure to control diversion.

8              THE COURT:  Okay.  Do you want to respond to that,

9    Ms. McClure, or somebody else?

10             MS. MCCLURE:  Sure, Your Honor.  So, first, I had

11   understood that this was an argument about geographic scope

12   as it related to the McCann charts.  Now I'm understanding

13   it's actually an argument about geographic scope.

14        So, first and foremost, disagree with Mr. Majestro's

15   characterization of the evidence that has come in.  I do

16   note and I need to respond on the record to the, quote,

17   "evidence of all of the systemic failures."  I would respond

18   that that has, in fact, not been proven at all by the

19   evidence that we've heard in court to date.

20        As to the fact that Mr. May testified that this program

21   is national in scope and the fact that we did introduce

22   evidence in terms of pharmacy terminations, for example, and

23   the fact that something that happens in a jurisdiction that

24   is not Huntington and Cabell can have an effect on how the

25   national program is run, the mentality of the individuals

 1   who are running the Diversion Control Program who then need

 2   to be, as Mr. May noted, on guard to assure that we have

 3   documented our evidence in the right way prior to entering

 4   into a pharmacy termination.

 5        Separate and apart from anything Mr. Majestro said,

 6   however, we return to the fact that we are facing lawsuits

 7   currently today in 54 of the 55 counties in West Virginia,

 8   not to mention hospital cases, not to mention city cases,

 9   some of which are in state court, some of which are in

10   federal court, and those jurisdictions will have the ability

11   to raise whatever it is that they want should those cases go

12   to trial.

13        Huntington and Cabell are the parties here who are

14   seeking a remedy, a future-looking abatement-only remedy as

15   they have chosen to seek and they have chosen to limit their

16   remedy in this case.

17        I do expect that counsel for Cardinal and McKesson

18   will also want to weigh in on this and so I would defer some

19   of the time to them to address -- address these points, as

20   well.

21             THE COURT:  All right.

22             MR. HESTER:  Your Honor --

23             MS. MAINIGI:  Your Honor --

24             MR. HESTER:  Oh, sorry.  Sorry, Enu.  Sorry.

25   Please go ahead.  Please go ahead.

```
 1              MS. MAINIGI:  I'll make a -- I'll pick up where
 2    Ms. McClure left off.  Your Honor, your order says
 3    demonstrable nexus and there is just no demonstrable nexus
 4    to these cherry-picked pharmacies.
 5         It is clear from the McCann testimony and the lack of
 6    additional proffer from the plaintiffs that these pharmacies
 7    were cherry-picked as, in plaintiffs' view, some of the
 8    worst pharmacies, bad behavior, whatever they want to call
 9    them.
10         There's no question.  We've never heard otherwise from
11    these plaintiffs.  They've been noticeably silent when that
12    question has been asked and Dr. McCann was noticeably silent
13    when that question was asked by Your Honor.
14         There is no issue with discussing national programs.
15    Your existing orders allow for the discussion of national
16    programs, but the discussion of national programs does not
17    follow then to the discussion of pharmacies literally
18    anywhere in the United States, including other places in
19    West Virginia.
20         One of the key things, one of the key points of
21    fundamental fairness here, Your Honor, is where did we start
22    from with these plaintiffs?  These extraterritorial, these
23    non-Cabell-Huntington pharmacies, are not in plaintiffs'
24    complaint and I think that's critical.  They're not in their
25    responses to our discovery requests and I think that that is
```

1    critical.

2         They didn't ask for the due diligence files for these

3    pharmacies, Your Honor.  And so, we didn't produce or look

4    for due diligence files for these pharmacies.  So, there's

5    no effective way for us at this point to mount a defense if

6    Your Honor lets those pharmacies in.

7         I mean, how can it be that in their complaint of

8    hundreds and hundreds and hundreds of pages that they fail

9    to mention these pharmacies, they fail to solicit any

10   discovery on them, and then, at trial, they want to play

11   gotcha because they're not satisfied with the numbers that

12   exist in the pharmacies in Cabell and Huntington?

13        Each one of these counties will have the ability to

14   have their day in court.  West Virginia has already settled.

15   So, looking at West Virginia data is not what we should be

16   doing here.  The State of West Virginia has settled their

17   case with these three defendants.

18        Moreover, with respect to what Mr. Majestro is saying,

19   Your Honor, this issue of healthcare hub, none of these

20   extraterritorial pharmacies would be in a place where we

21   would see folks from those jurisdictions coming into our

22   county.  You've got to think about which way the people and

23   the pills flow.

24        So, if they were able to show a nexus, Your Honor, and

25   demonstrate that people from Cabell and Huntington were

 1   driving 200 miles to go to X, Y, or Z pharmacy out of Cabell

 2   and Huntington, then perhaps they come close to meeting your

 3   demonstrable nexus.

 4        But for them to say there are counties around this

 5   county and this city where people might come in for

 6   healthcare, that doesn't satisfy the test here ultimately.

 7        So, for those reasons, Your Honor -- I think what Your

 8   Honor said is you're still willing to let the evidence play

 9   out.  You're still willing to let them come up with a

10   demonstrable nexus, but they haven't so far.

11        We don't think they can and we think there are some

12   fundamental unfairness issues which I've already mentioned

13   with respect to discovery and so forth, so they should never

14   be allowed to do it, but I think that's where the state of

15   play is.

16             THE COURT:  Mr. Hester?

17             MR. HESTER:  Your Honor, I just have a few

18   additional points.  I will try not to repeat.  On this

19   discovery point, I did want to emphasize that the DEA

20   blocked the defendants from discovery into investigations

21   outside Cabell-Huntington.  Those would be the kinds of

22   investigations that would allow us to respond to the kind of

23   evidence that the plaintiffs are now being put in and we

24   were barred from pursuing that.

25        But in addition to the points that have already been

1    made about the lack of demonstrable nexus when we're talking

2    about pharmacies hundreds of miles away from

3    Cabell-Huntington, I would also go to the second clause of

4    the Court's test.  It's either a demonstrable nexus to

5    Cabell-Huntington and/or evidence that, quote, "tends to

6    show nationwide trends and shipments".

7         When the plaintiffs have cherry-picked 10-12

8    pharmacies, hand selected, that's not tending to show

9    evidence of a nationwide trend.  They're just picking out

10   pieces that they think support their theory and it's not a

11   fair showing in any realistic sense of evidence that could

12   be held up as tending to show any sort of nationwide trend

13   within the language of the Court's order.  That would be our

14   view.

15            THE COURT:  Am I going to hear more evidence

16   related to these extra geographical pharmacies, Mr.

17   Majestro?

18            MR. MAJESTRO:  I think so, Your Honor.  That's why

19   we're having -- and, you know, I -- the -- the rest of your

20   order was national policies and procedures or systemic

21   failures that are national in scope.

22        It is pretty clear that this program is one program

23   and, if it didn't work in Ohio County, or in Berkeley

24   County, in Cabell County, that evidence is relevant that it

25   failed other places and that we picked -- we did pick places

```
1    where it failed.  It's evidence that it failed in Cabell.

2    It makes it more likely that it did.

3        With respect to the hospitals, they're the ones that

4    raised that issue, ABDC is, and if their evidence that

5    they're trying to convince Your Honor is that these people

6    from 29 counties are streaming into Cabell County to buy

7    opioids, well, if that was the case, the counties

8    surrounding Cabell ought to have below average consumption

9    of opioids.  Instead, they are above the national and state

10   average, too.  That's what the evidence shows.

11       With respect to what's in our complaint, you know, I

12   don't remember what's in all 400 pages of the complaint, but

13   I do remember all the discovery we did since then, including

14   Dr. McCann's report with all of the expert charts that are

15   in there.  These aren't -- this isn't new evidence.  This is

16   evidence that they've had as of when we -- we presented as

17   -- at least as of when we presented Dr. McCann's testimony.

18       And, finally, Your Honor, you know, the defendants --

19   if we just admitted evidence, the had guidelines,

20   Exhibit 629, if you look on Page 8 of those guidelines, they

21   talk -- it talks about how you decide how to develop these

22   thresholds and one of the ways to do that, according to the

23   had, are patterns of ordering, such as companies -- because

24   it's comparing the present order to geographic areas of the

25   country they serve, e.g., orders from other establishments
```

```
 1    of the same type in this -- in the locale or region.

 2         It's not -- they're not supposed to just look at the --

 3    the particular store.  They're supposed to look in the same

 4    locale or region and, certainly, that is bigger than just

 5    Cabell County.

 6         And so, for all of these reasons, we believe this

 7    evidence is relevant and ought to come in.  Now, what weight

 8    you ultimately give it, and we'll link it, link it up and

 9    show you additional nexuses, but the point of me making this

10    argument today is, is we need not have a debate over

11    geographic scope every time we get into one of these

12    pharmacies and so, we wanted to present to Your Honor why we

13    think this evidence is relevant for the -- at least for the

14    purposes of today's testimony.

15              THE COURT:  Well, let's press on for the moment

16    and see where we go and I think this is a problem I'm going

17    to have to deal with, obviously, but --

18              MR. MAJESTRO:  All right.  Thank you, Your Honor.

19              THE COURT:  Do we have a witness here?

20              MS. MCCLURE:  Your Honor, he's in the waiting room

21    pending that argument.

22              THE COURT:  Okay.

23         Good afternoon, Mr. Mays.

24              THE WITNESS:  Good afternoon, Your Honor.

25              THE COURT:  Okay, Mr. Farrell.
```

```
 1              MR. FARRELL:  Thank you.  So, very briefly,
 2     housecleaning.
 3          Good afternoon.  Good afternoon, Mr. Mays.
 4              THE WITNESS:  Good afternoon, sir.
 5              MR. FARRELL:  This afternoon -- or before the
 6     break, we were referencing the OMP history, which was a
 7     compilation of data extract, of data, from P-16639 and it
 8     purports to be the data that was produced where the computer
 9     system flagged or triggered.
10          The Court's order was that we were not to submit the
11     entire State of West Virginia, but we were to submit Cabell
12     County only.  So what, in conference with the defendants
13     we've agreed to do is, I'll withdraw P-16639 pending your
14     graphic scope ruling and we will re-label P-16639A, Alpha,
15     and it will be Huntington and Cabell County only.  And, at
16     the request of the defendants, it will be for all drug
17     classes and not just hydrocodone and oxycodone.
18              THE COURT:  Is that -- everybody on board with
19     that?
20              MS. MCCLURE:  Yes.  So, it's going to be all
21     flagged orders for Huntington and Cabell for all drug codes?
22              MR. FARRELL:  Yes.
23              MS. MCCLURE:  Yeah.
24              MR. SCHMIDT:  I think on our end, we just need to
25     confer before we can agree to that.  That's the first time
```

1   we're hearing about it.  But we don't object to that being

2   the rule for ABDC.

3            MS. MCCLURE:  And just to be clear, my

4   understanding is, Your Honor, that Mr. Farrell is going to

5   then present us with that actual document filtered in that

6   way, we would confer with him, and then it would be

7   submitted to the Court.  So, it's not ready to be literally

8   handed over at this moment because of the changes that we

9   were going to make to include all of the columns.

10           MR. FARRELL:  I'm stalling in anticipation.

11           MS. WICHT:  Oh, Your Honor, we would take the same

12   position as McKesson.  Certainly, we don't -- we don't

13   object to this for ABDC, but we would need to consider it

14   with respect to Cardinal Health if it comes up.

15           THE COURT:  All right.  Go ahead, Mr. Farrell.

16           MR. FARRELL:  And, secondarily, we were

17   referencing the Suspicious Order Reports AmerisourceBergen

18   has disclosed and it was P-2819 and it was West Virginia, as

19   well.  And so, after conferring with the lawyers, we're

20   going to redact it down to just Huntington-Cabell County and

21   it will be P-2819A, Alpha.  And, again, the defendants have

22   requested it to include not just oxycodone and hydrocodone,

23   but to include all suspicious orders reported to the DEA.

24           MS. MCCLURE:  Just to respond, Your Honor, I did

25   speak with Mr. Farrell about this so that that would be,

1    again, one that we would have the opportunity to review

2    subsequent to today's testimony, confer on it, and then it

3    would be submitted to the Court.

4        Huntington-Cabell only, all suspicious orders, all drug

5    families.  When Mr. Farrell says "all defendants have

6    agreed", however, I'm only speaking on behalf of ABDC.

7            MR. SCHMIDT:  Yeah.  We would just need to confer

8    before we come to that agreement, but we're happy to confer

9    with Mr. Farrell on that.

10           MS. WICHT:  Same for Cardinal.

11           THE COURT:  Should we go ahead with testimony then

12   or should I pull the plug for a few minutes?

13           MR. SCHMIDT:  Oh, no.  I think if -- if ABDC is

14   good with it, we can go ahead as to that.  And I think it's

15   just -- it might come out differently as to us or we may

16   come out at the same place as McKesson.

17           THE COURT:  Ms. Wicht, you're nodding your head.

18           MS. WICHT:  Agreed, Your Honor.  Thank you.

19           THE COURT:  All right.  Go ahead, Mr. Farrell.

20           MR. FARRELL:  I'm sorry.  One --

21           THE COURT:  You've managed to use 20 minutes of

22   your time here.

23           MR. FARRELL:  I'm trying, Judge.  So, the third

24   item is that we are going to confer with defendants and

25   identify and submit the transactional data produced by

```
 1    AmerisourceBergen and that would be, again, agreed to and

 2    stipulated and presented between ourselves.

 3         Judge, we'll be tendering to the Court what's been

 4    marked now as P-23655, which we would ask the Court to

 5    accept.  These are the discovery responses, the most recent

 6    version of discovery responses, filed and served by

 7    AmerisourceBergen and we tender it to the Court for the

 8    record.

 9              THE COURT:  Is there any objection to this?

10         Do you want that admitted, Mr. Farrell?

11              MR. FARRELL:  Yes, Your Honor.

12              THE COURT:  Is there any objection?

13              MS. MCCLURE:  No, Your Honor.

14              THE COURT:  All right.  It's admitted.

15              PLAINTIFF EXHIBIT P-23655 ADMITTED

16              MR. FARRELL:  Now to the witness, Your Honor.

17         I'd ask for P-187 to be brought back up on the screen.

18              BY MR. FARRELL:

19    Q.   Mr. Mays, this is a document that we've previously

20    discussed and has been previously admitted and do you recall

21    earlier today when we were talking about the codes, the

22    action codes that were on the spreadsheet with IN and -- and

23    that discussion right before the break?

24    A.   Yes, sir.

25    Q.   Do you have 187 in front of you?
```

1    **A.**   I don't think so.  This doesn't have a number on it.

2            MR. FARRELL:  Judge, may I approach?  I have an

3    additional copy.

4            BY MR. FARRELL:

5    **Q.**   Sir, I'll direct your attention to Page 4.  Do you

6    recognize that Page 4 contains the deciphering code for the

7    different actions taken by CSRA?

8    **A.**   Give me just a minute.  Okay.  I believe these are

9    codes for the Distribution Center to use.

10   **Q.**   Thank you.

11   **A.**   Okay.

12           MR. FARRELL:  Now, can we bring up the McCann

13   slides that we predetermined to discuss, please, including

14   Mays Page 2?

15           BY MR. FARRELL:

16   **Q.**   Mr. Mays, I'm just going to simply ask you some

17   questions about --

18           MR. MAHADY:  Your Honor, if I may, the request we

19   made to the plaintiffs before the break and during the break

20   is that they used the actual exhibits that Your Honor has

21   now admitted.  I did not think that was an issue, but now we

22   do seem to be going back to the pre-marked demonstratives.

23   So, I'm not trying to be unnecessarily difficult here, but

24   we would prefer for everyone's clarity to use the exhibits

25   that Your Honor has admitted.

```
 1              THE COURT:  Well, did I admit that?

 2              MR. FARRELL:  Yes, Judge.  We have conferred with

 3    the defendants.  Each of the slides that I intend to go

 4    through are included in the packet that you admitted.

 5         And without belaboring the point, before the 1006

 6    ruling, I had identified it by Mays_ and a page.  We've also

 7    included the P number and the page, as well.  So, we've

 8    attempted to take care of both problems of identifying which

 9    of the slides we're going to go through today, as well as

10    identify the exact number, page number, from the exhibit, P.

11         Now, it might make sense that the collection or

12    compendium that was actually presented is now a unique set

13    of documents.  It might make best sense for us to re-Bates

14    stamp this so that there's a clear record of which ones are

15    in and which ones are not.

16              MR. MAHADY:  Your Honor, I think we're just simply

17    asking for the plaintiffs to use the exhibit number with

18    these documents so we can keep track.  Not all the -- and as

19    identified as Mays_2.  So, if this is P-44711, if I can see,

20    we can just simply use that.  And if they're going to use

21    other ones, if we can use the exhibit number.  That's all

22    I'm asking for.

23              THE COURT:  Well, you can do that, can't you, Mr.

24    Farrell?

25              MR. FARRELL:  Yes, sir.
```

```
 1                    THE COURT:  Okay.

 2                    MR. MAHADY:  Thank you.

 3                    BY MR. FARRELL:

 4      Q.    So, Mr. Mays, I'm going to direct your attention to

 5      P-44711_00021 and represent to you that this document was

 6      previously entered into the record.

 7            I'll give you a chance to take a look at it.

 8      A.    I've never seen this document.

 9      Q.    Correct, sir.

10      A.    Okay.

11      Q.    You'll notice that it says on the right-hand side

12      Cabell County and the City of Huntington and I'll represent

13      to you, sir, that the evidence that we've presented is that

14      a total of 36 million dosage units of hydrocodone and

15      oxycodone were sold by AmerisourceBergen to pharmacies in

16      Cabell County-Huntington, between June, 2002 and December of

17      2018.

18            I'm asking you, sir, on behalf of -- in your capacity

19      of the Diversion Control Program, do you see anything

20      facially suspicious about shipping 36 million pills of

21      oxycodone and hydrocodone to a community with a population

22      of a hundred thousand?

23                    MS. MCCLURE:  Objection, Your Honor.  He's not

24      established that these numbers are numbers that Mr. Mays

25      knows about and the question is ordering --
```

```
 1              THE COURT:  Well, that's right.

 2              MR. FARRELL:  I'm representing to the witness,

 3    Your Honor, that we have put into evidence this volume of

 4    pills.  I'm not asking him to validate whether or not that's

 5    true or not.  Another witness has done so.  I'm asking him

 6    whether or not, if this evidence is presented, whether it is

 7    facially suspicious.

 8              MS. MCCLURE:  Your Honor -- I'm sorry, Your Honor.

 9    May I briefly respond?

10              THE COURT:  He could answer that question in the

11    abstract, couldn't he, anything suspicious about shipping 36

12    million pills to the community with a population of a

13    hundred thousand?

14        You don't need the exhibit to ask him that question, do

15    you?

16              MR. FARRELL:  No, sir.

17              MS. MCCLURE:  Moreover, Your Honor, I object to

18    the extent that we're suggesting that facially suspicious is

19    a standard that applies to an overall volume of pills or

20    appears in any regulatory guidance.  So, to the extent that

21    that's being suggested to the Court, I object.

22              THE COURT:  I'm going to overrule it and let him

23    -- let him ask the question.

24        Go ahead, Mr. Farrell.

25              BY MR. FARRELL:
```

1    **Q.**   Sir, in your opinion, is there anything suspicious

2    about selling and shipping 36 million pills of oxycodone and

3    hydrocodone to a community of 100,000 people?

4    **A.**   You know, it looks like that's over a fairly -- what is

5    that, 16 years, a little more than 16 years.  I -- no, I

6    really don't.

7                MR. FARRELL:  All right.  So, if you'll please

8    bring up P-43225, Page 1, the matrix.  For your purposes --

9    yeah.  And so, can we -- can we highlight or make this

10   larger and exclude the non-jurisdictional pharmacies and

11   just have in the first several columns?  Perfect.

12               BY MR. FARRELL:

13   **Q.**   Mr. Mays, I'm going to represent to you that evidence

14   has been submitted in this court of the monthly shipments by

15   AmerisourceBergen into Cabell County from 2006 to 2014.  And

16   so, my first question is this:  Do you recall that -- the

17   testimony that we had earlier regarding the calculation of

18   the thresholds?

19   **A.**   Yes, sir.

20   **Q.**   So, I believe this is oxycodone, is it not?  I can't

21   see it on the screen.  This is hydrocodone.

22               So, the hydrocodone -- the testimony that was elicited

23   from earlier was that, by our calculations, if you take the

24   national average to retail pharmacies across the United

25   States in Column 1, you'll see the national average was

1      6,091.  Do you see that?

2      **A.**   For January, '06?

3      **Q.**   Yes, sir.

4      **A.**   Yes, sir, I see that.

5      **Q.**   And then, in West Virginia, it was 12,655.  Do you see

6      that?

7      **A.**   Yes, sir.

8      **Q.**   So, you would agree with me that facially the average

9      in January of '06 in West Virginia for hydrocodone is twice

10     what it was in the country?  Do you see that?

11              MR. HESTER:  Object, lack of foundation, Your

12     Honor.

13              THE WITNESS:  I see it, sir, yes.

14              THE COURT:  Overruled.  I'm going to let him

15     pursue that.

16         We need to get through this.  Go ahead.

17              BY MR. FARRELL:

18     **Q.**   So, could you walk me through?  Would the threshold set

19     by the AmerisourceBergen system be 6,000 or some permutation

20     of 6,000?

21     **A.**   Well, I think we've gone over multiple times how

22     thresholds are set, so I'm not sure it serves any purpose to

23     go back through it again.

24     **Q.**   My understanding was that your testimony was -- is that

25     you would set thresholds by looking at the average pharmacy,

```
 1    retail pharmacy, in the country?

 2    A.    Oh, yes.  Yes.

 3    Q.    And, in this case, the average for the country is

 4    6,000, the evidence was submitted?

 5    A.    And this is for AmerisourceBergen customers only,

 6    right?

 7    Q.    Yes, sir.

 8    A.    Okay.

 9    Q.    And then you'll see in the City of Huntington that

10    McCloud, if you go across, and Drug Emporium, Fruth

11    Pharmacy, do you see the line that we've highlighted here?

12    A.    Yes, sir.

13    Q.    There are several of these numbers that are in clear

14    excess of January, 2006, are they not?

15    A.    Yes.

16    Q.    So, would you expect in your AmerisourceBergen files

17    since these are the numbers that have been reported as

18    shipped that there has been some due diligence because these

19    numbers are in excess of the threshold?

20    A.    Yes, sir.

21    Q.    And in the -- okay.  So now, let's go over to -- let's

22    take -- let's take in particular Fruth Pharmacy #12.  You'll

23    see here that the numbers indicate the average is 46,000

24    hydrocodone a month.  Do you see that?

25    A.    Yes, sir.
```

**Q.**   And that is approximately six times the national average, correct?

**A.**   Sounds about right, yes.

**Q.**   Including one particular month in June of 2006 where AmerisourceBergen sold 124,000 hydrocodone pills to Fruth #12.  Do you see that?

**A.**   Yes, I do.

**Q.**   So, for -- if the average in June of 2006 is 7,800 pills and, in that month 124,000 were sold to Fruth, would you expect the AmerisourceBergen due diligence file and Corporate Office to have reviewed and cleared this order?

**A.**   I would expect to see that, sir, yes.

**Q.**   Very good.  Now, you'll notice that there -- on this hydrocodone list there are two Fruth Pharmacies in Huntington-Cabell County, West Virginia.  Fruth #12 has an average of 46,000 hydrocodone and Fruth #5 has 35,000 hydrocodone.  Did AmerisourceBergen consider multiple pharmacies within the same family when they were calculating thresholds?

**A.**   No, sir.  It's all based on the -- the single DEA registrant.

          MR. FARRELL:  Now, let's move over to the oxycodone matrix, please.  The next page.  I'm looking for the January, '06, oxycodone.  That's hydrocodone.  There we go.  Again, if you'll just highlight the left-hand side and

1    we'll leave out the national -- the rest of the state.

2              BY MR. FARRELL:

3    Q.   Again, what I'm showing you is what has been entered

4    into evidence as oxycodone distribution to Huntington and

5    Cabell County by AmerisourceBergen and I'd ask you to look

6    at January of 2006.  Can you tell me what the number says

7    for under the national average for January, 2006 according

8    to the calculations we've made of the AmerisourceBergen

9    transactional data?

10   A.   You're saying what that number is?

11   Q.   Yes, sir.

12   A.   It's 3,424.

13   Q.   And in that same month, how many dosage units of

14   oxycodone was shipped to SafeScript #6?

15   A.   38,100.

16   Q.   Now, let's go down a little bit to December of 2006 or

17   November of 2006.  Can you see what the number is there?

18   A.   For national?

19   Q.   Yeah.  We can start with national.  What was the

20   average in November of 2006?

21   A.   3,649.  3,649.

22   Q.   And what was actually shipped to SafeScript that month?

23   A.   56,700.

24   Q.   Now, you would agree with me that in both months,

25   between January, '06 and November, '06, both of those

1    transactions, the 38,100 is clearly in excess of the

2    national average in January of 2006, correct?

3    **A.**    Yes.

4    **Q.**    And you would agree with me that in November of 2006

5    that 56,700 pills is clearly in excess of 3,600 of the

6    national average?

7    **A.**    Yes.

8    **Q.**    And you would expect that since these dosage units were

9    actually shipped by AmerisourceBergen to SafeScript Pharmacy

10   your due diligence files will indicate that these months,

11   the orders were flagged, investigated and cleared as

12   documented in the due diligence files?

13   **A.**    I can't tell you what's in the due diligence files, but

14   the -- the quantities would have been justified by the due

15   diligence.

16   **Q.**    And the same thing here --

17   **A.**    The totality of the circumstances for the customer did

18   not indicate diversion.

19   **Q.**    Now, and that should be in the due diligence file?

20   **A.**    It should be.

21   **Q.**    Based on the way your program is set up?

22   **A.**    Yes, sir.

23   **Q.**    Now, the same thing, if you look at the average across

24   pharmacies in Cabell County, we haven't identified them all.

25   We've just identified a couple of them, but you'll see that

1    over time, the average oxycodone monthly purchase for

2    SafeScript is 35,551.  Do you see that, sir?

3    **A.**    Yes, sir.

4    **Q.**    And if you add up across the line for just McCloud

5    Family Pharmacy, Drug Emporium, Medical Park Pharmacy, the

6    four Fruth Pharmacies and Walgreens, this is an average of

7    in excess of a hundred thousand oxycodone pills every month

8    to pharmacies in Huntington-Cabell County, West Virginia, is

9    it not?

10   **A.**    I'll trust your math, yes, sir.

11           MR. FARRELL:  Now, if we'll keep this file up, you

12   can take off the highlight, but keep a -- keep a finger on

13   this one.

14           BY MR. FARRELL:

15   **Q.**    Sir, I'm going to show you -- are you familiar with the

16   suspicious -- or the SOM investigation document?

17   **A.**    Generally, yes, sir.

18   **Q.**    I think the -- it's -- it has a -- a document, generic

19   document type, RA07-1051.

20           MR. FARRELL:  Judge, may I approach?

21           THE COURT:  Yes.

22           BY MR. FARRELL:

23   **Q.**    I'll give you a minute to look at that.

24   **A.**    Okay.  Okay.

25   **Q.**    Do you recognize the form of this document?

1    **A.**    Yes.

2    **Q.**    What is it?

3    **A.**    It's a summary page of a LawTrac matter with which we

4    use to track our investigations.

5    **Q.**    So, walk me through.  Tell me -- tell me what this

6    document is in your system.

7    **A.**    So, each time an investigator opens an investigation on

8    a customer, they open a matter in LawTrac.  So, that matter

9    number gets automatically assigned to it, that RA07-1051,

10   and then they would enter all the information about their

11   investigation in the text.  And then, if they had any

12   documents to link to it or if it's linked to other matters,

13   they can indicate that.

14   **Q.**    And what -- this particular document, what is this an

15   investigation of?

16   **A.**    It's -- it's an SOM investigation of SafeScript

17   Pharmacy, I'm assuming #6, of June of 2007.

18            MR. FARRELL:  Judge, at this time, I would ask for

19   the admission of 2796 and ask to publish it up on the

20   screen.

21            THE COURT:  Any objection to 2796?

22            MS. MCCLURE:  No, Your Honor.

23            THE COURT:  It's admitted.

24                  **PLAINTIFF EXHIBIT 2796 ADMITTED**

25            BY MR. FARRELL:

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   All right.  So, I'm going to have you orient.  You'll

2    look up here and you'll see in the top corner, date open,

3    June 20, 2007?

4    **A.**   Yes, sir.

5    **Q.**   And date closed, June 26, 2007?

6    **A.**   Yes, sir.

7    **Q.**   And it's last updated on March 26, 2008.  Did you see

8    that?

9    **A.**   Yes, I do.

10   **Q.**   Okay.  And then, I want you to scroll to the right

11   here.  Do you see the manager in charge, Scott Kersch?  Do

12   you know who that is?

13   **A.**   Yes.

14   **Q.**   Who was that?

15   **A.**   He was the investigator.

16   **Q.**   What about Mr. Eric Cherveny, who was that?

17   **A.**   He was also investigating and it looks like he was

18   added as a team member.

19          MR. FARRELL:  All right.  Will you scroll down a

20   little bit?

21          BY MR. FARRELL:

22   **Q.**   Let me ask you a question.  Do you see where it says

23   finance considerations?

24   **A.**   Yes.  We didn't really use those fields.

25   **Q.**   I understand, but we're --

```
 1              THE COURT:  I'm a little confused.  Who was doing
 2     this investigation?
 3              MR. FARRELL:  This is their system.  This is the
 4     --
 5              THE COURT:  And this was an internal
 6     investigation?
 7              THE WITNESS:  Yes, sir.
 8              THE COURT:  Okay.
 9              MR. FARRELL:  Sorry.
10              THE WITNESS:  Well, when I say internal, it's our
11     investigation of one of our customers.
12              THE COURT:  Right.  Okay.
13              THE WITNESS:  Okay.
14              BY MR. FARRELL:
15     Q.   So, and I hope -- let's go to the next page and maybe
16     we can expedite this.  I'm going to have you blow up the
17     description and we'll take a look at it.  In the
18     description, it says, "CSRA opened an inquiry into
19     SafeScript Pharmacy, account number", and then it says, "for
20     excessive hydrocodone purchases in April of 2007."  Do you
21     see that?
22     A.   Yes.
23     Q.   And during April, 2007, the customer purchased 21,000
24     dosage units of hydrocodone with a 12-month average of
25     25,000.  Can you explain to me what this means?
```

1    **A.**    It's just the -- it's just the matter text that the

2    investigator puts in there, as far as the biographical data

3    of the customer, and what prompted the investigation.

4    **Q.**    And so, your system flagged the order?  That's why it

5    says CSRA, correct?

6    **A.**    Yes, but they -- they don't -- every investigation was

7    not based on because a customer was flagged in the system.

8    They have other reports that they would generally run on a

9    monthly basis that might prompt an investigation.

10   **Q.**    And so, can you tell how this order got flagged of

11   21,000?

12            MS. MCCLURE:  Your Honor, objection to the extent

13   that he's characterizing the -- he's using the word "order",

14   which does not appear in any of the text in that

15   description.  So, it's a misleading question to this

16   witness.

17       Mr. Mays has just testified that not every

18   investigation is initiated by an order.  Mr. Farrell's

19   question suggests that the order in and of itself was a

20   21,000 -- an order for 21,000.  That is not reflected in the

21   text of the description and so I object to the question

22   being misleading to the witness.

23            THE COURT:  Do you understand the question?

24            THE WITNESS:  Well, I remember during that time we

25   were opening a lot of investigations just on a purchase

1    report of all purchases of hydrocodone because we had just

2    had --

3                THE COURT:  Well, I'm going to overrule the

4    objection.  Go ahead.

5                MR. FARRELL:  Okay.

6                BY MR. FARRELL:

7    Q.   So, there were 21,000 dosage units in -- during April

8    of 2007.  For whatever reason, CSRA opened an investigation;

9    agreed?

10   A.   That's agreed, yes.

11   Q.   Okay.  So now, somebody was assigned to look into it.

12   Can you go to the next paragraph below?  And it says, "Below

13   response received from ACM."  Do you see that?

14   A.   Yes.

15   Q.   And then there is a message and it's dated March 26,

16   2008.  Do you see that?

17   A.   Yes, sir, I do.

18   Q.   And at the very bottom, you'll see that this message

19   was typed in by Michael G. Perry.  Do you know who Mike

20   Perry is?

21   A.   I believe he was the sales associate.

22   Q.   And I'll represent to you he'll be testifying here

23   shortly this afternoon.

24   A.   Okay.

25   Q.   Will you read into the record what Mike Perry said in

1   response to the CSRA inquiry?

2   **A.**   "Scott, this account does a lot of this style of

3   medication.  Several pain clinics in the area.  They did

4   start buying from Miami-Luken for a few months because we

5   kept holding orders.  They again started buying everything

6   from us because the volume was going down and it was

7   affecting their cost of goods.  They always have done a lot

8   with oxy and Methadone and most likely always will.  Thanks,

9   Michael G. Perry", and then it has his e-mail address and

10   phone number.

11   **Q.**   Okay.  Now, let's remember those dates, June 20th of

12   2007 and March 26, 2008.

13         MR. FARRELL:  Can we pull up the matrix

14   hydrocodone, please?  That would be P-43225.  And let's --

15   this is oxycodone.  Let's go to hydrocodone.  Very good.

16   Now let's blow up just the left -- the left-hand column.

17   There we go.  All the way down, please.

18         BY MR. FARRELL:

19   **Q.**   Now, sir, in June of 2007, do you see where I'm

20   pointing down here?  21,100 dosage units -- I'm sorry.

21   That's McCloud.  Let's go over to SafeScript.  SafeScript on

22   here?  Oh, here it is.  I'm sorry.

23       So, in June of '07, the number is actually 33,000.  Do

24   you see that?

25   **A.**   Yes, sir.

1    Q.   So, in June of 2007, AmerisourceBergen flags SafeScript

2    Pharmacy and can -- for an order on April 7th of 21,000.

3    Can you tell me how many prescription opioids were actually

4    sold in June of 2007?

5              THE COURT:  We've got an objection here.

6              MS. MCCLURE:  Just continue to object to the

7    characterization that this was a single order.

8              THE COURT:  Okay.  Overruled.  Go ahead.

9              BY MR. FARRELL:

10   Q.   So, you can see that in June of 2007?

11   A.   Uh-huh.

12   Q.   The date of --

13   A.   Yes, sir.

14   Q.   CSRA investigation, 33,000 hydrocodone pills were sold

15   to SafeScript; agreed?

16   A.   That's what the data says, yes.

17   Q.   And the national average was 6,500.  Do you see that?

18   A.   Yes, sir.

19   Q.   So, you sold almost five times the national average and

20   your system caught it.  Do you see that?

21   A.   Yes, sir.

22   Q.   Would you expect that there would be a similar such

23   investigation and flag for all of the other previous months

24   that exceeded the threshold?

25   A.   Yeah.  There should be something in the file if they

1    exceeded the threshold.

2    **Q.**   And you would expect, as you look here between January

3    of '06 and June of '07, every single month exceeds the

4    threshold, does it not?

5    **A.**   Does this show what their threshold was?

6    **Q.**   Well, you said that it was based on the national

7    average.

8    **A.**   Well, that's the national average.  That wouldn't be

9    the threshold for national average.

10                MS. MCCLURE:  Your Honor, this relates to my

11   continuing objection about the fact that a threshold in the

12   system has been described numerous times by Mr. May [sic] as

13   being for a single order.  So, we're now -- we're now mixing

14   up orders, which we've heard testimony orders come in every

15   day, sometimes multiple days.  So, we're mixing up

16   suspicious orders and a due diligence investigation that has

17   not prompted -- that is a customer focus.  So, it's --

18                THE COURT:  So, your argument is that his numbers

19   are cumulative orders and there might be suspicious orders

20   inside the number -- I don't understand exactly the

21   objection.

22                MS. MCCLURE:  So, Your Honor, when we're using the

23   term "threshold" as it's been applied to the -- it's an

24   order threshold for every day or every order a customer

25   places.  When we're using the term "threshold" and it's now

1    being used to apply to, say, a monthly average, those are

2    two different concepts.  And so, we're -- we're mixing up

3    suspicious order concepts into aggregate data that's grouped

4    together by definition in this document by month.

5         So, I -- I object to what seems to be either purposeful

6    or unintentional.  It's confusing and it's not accurate.

7              THE COURT:  Well, she's right, isn't she, Mr.

8    Farrell?

9              MR. FARRELL:  Well, I hope so, but I don't think

10   so.  Can I try to clear it up?

11             THE COURT:  Yes.

12             BY MR. FARRELL:

13   **Q.**   I've got a couple quick questions.  Thresholds, Mr.

14   Mays, do you recall when we went through the threshold

15   document and we identified in early 2006 SafeScript's

16   threshold was 10,000 dosage units a month?  Do you remember

17   that?

18   **A.**   Yeah.  I just don't remember what period it was, but

19   yeah.

20   **Q.**   We didn't pick any period.  When you set a threshold,

21   is it for a particular order is the threshold for a month?

22   **A.**   The threshold is for a month.

23   **Q.**   Right.  So, when we're looking at threshold numbers,

24   we're looking at for the month, not a particular order.

25   Otherwise, they'd be able to order 10,000 dosage units every

1    day?

2    **A.**   But you're comparing their monthly purchases to a

3    national average.  So, if that national average, depending

4    on the size of the customer, could be -- the threshold could

5    be three times that average, right?

6    **Q.**   So, and that's because at AmerisourceBergen you were

7    taking the -- an average number and then multiplying it by

8    three?

9    **A.**   Depending on the size of the customers.  That's just

10   the national average for all pharmacies, right?

11   **Q.**   For all --

12   **A.**   So, I don't know how that compares.

13   **Q.**   So, is it your testimony that whatever the national

14   average is for retail pharmacies, the baseline threshold

15   would be three times that number?

16   **A.**   I believe so.

17   **Q.**   So, let's just take, for example, Fruth Pharmacy #12 in

18   March of 2006.  The national average is 6,800 pills of

19   hydrocodone.  Do you see that?

20   **A.**   But my point is that national average may be -- that's

21   for all sizes.  So, I don't know what size Fruth was.  So,

22   that average for their size pharmacy could be different.

23          THE COURT:  Well, how would you identify a

24   suspicious order if you're using cumulative numbers for

25   multiple orders?  Or am I confused?

1           BY MR. FARRELL:

2    **Q.**   How would you determine a suspicious order when you're

3    looking for cumulative orders in a month?

4    **A.**   Well, when -- well, that was -- the system was designed

5    to accumulate those numbers over a month and if a customer

6    exceeded that, because it was based on what their average

7    purchases were, the threshold plus that factor of three

8    would flag something that was -- that was above that to be

9    reviewed.

10          THE COURT:  Once you got to that point, right?

11          THE WITNESS:  Once you got to that point, yes.

12   Now, keep in mind, that report, that program, the OMP, is

13   not the only way we recorded suspicious orders.

14          BY MR. FARRELL:

15   **Q.**   I understand.

16   **A.**   Okay?

17   **Q.**   I'm not disputing that.  I'm just trying to figure out

18   a couple of basic tenets.  Let's take it -- in theory, let's

19   take January of 2006, some month.

20   **A.**   Okay.

21   **Q.**   Okay?  So, starting on January 1st all the way through

22   January 30th, pills are ordered of various lengths, of

23   various sizes.  Let's just presume that on four or five

24   occasions orders were made in January and

25   AmerisourceBergen's program was, if we take January 1st and

1    what it would do is it would keep track of all the

2    individuals orders and stack them.  And if you reached a

3    certain cap, it cut you off, correct?

4    **A.**   Well, it didn't cut you off.  It flagged you.  Any

5    order above that threshold, yes, would be flagged to review

6    -- for review, yes.

7                THE COURT:  And that would be true even if the

8    order that put you over the threshold was a little tiny

9    order, right?

10               THE WITNESS:  Yes.

11               BY MR. FARRELL:

12   **Q.**   So, we've agreed that the thresholds that were set by

13   AmerisourceBergen are in the OMP history that we reviewed;

14   agreed?

15   **A.**   I believe so, yes.

16   **Q.**   And that for periods of time that this cap or threshold

17   for each month for SafeScript was sometimes 10,000, yes?

18   **A.**   I believe so, yes.

19   **Q.**   Sometimes 30,000, yes?

20   **A.**   I believe so, yes.

21   **Q.**   And got as high has 40,000 a month, correct?

22   **A.**   I think so.

23   **Q.**   So, as the threshold was raised, the OMP investigation

24   would only be triggered if it was above that monthly

25   threshold, correct?

1    **A.**    If the accumulated purchases for that monthly period

2    exceeded that, yes.

3    **Q.**    And at the end of the month we start over?

4    **A.**    Yeah.  That's how it was designed in the beginning.

5    **Q.**    Now, but we also have that if the system didn't trigger

6    a suspicious order, you were supposed to block until that

7    suspicion is resolved?

8    **A.**    The system blocked it automatically while that order is

9    being reviewed.

10   **Q.**    So, we're going to go back now to the matrix.  So, for

11   SafeScript Pharmacy #6 in June of 2007 there was an

12   investigation that was entered, right?

13   **A.**    Yes.

14   **Q.**    And as we saw on the previous document, it was not

15   resolved until March 26th of 2008; agreed?

16   **A.**    Well, this is when we got a response from the account

17   manager.

18   **Q.**    Right.

19   **A.**    So, looking at the dates on this, this does look like

20   an investigation that was prompted from a report review

21   because if we had a suspicious -- if it was a suspicious

22   order in April, they wouldn't wait until June to open an

23   investigation.  So, they were going through purchase

24   reports.

25   **Q.**    Yes, sir.

1   **A.**    And starting these investigations.

2   **Q.**    My ultimate point is that, during the investigation,

3   you were still shipping to SafeScript, were you not?

4   **A.**    I would say so, yes, because he didn't indicate that

5   they were cut off or anything changed.

6   **Q.**    So, the process that we went through with all of the

7   changes and thresholds for SafeScript, the same analysis

8   would have been applied for all of the pharmacies, would it

9   not?

10  **A.**    I would assume so.

11  **Q.**    What that means is that if there's a threshold change,

12  then you -- for any of these pharmacies in Huntington-Cabell

13  County, you would expect there to be documentation

14  justifying it?

15  **A.**    I would expect so, yes.

16  **Q.**    And for any of the purchases for a particular month

17  that exceeds the threshold you would expect your OMP Program

18  to have been triggered and the process followed, correct?

19  **A.**    I would -- I would expect so, yes.

20  **Q.**    And that's how you maintain effective control, is

21  following your policies and procedures, agreed?

22  **A.**    That's correct.

23  **Q.**    Sir, are you -- are you aware of the Do Not Ship List?

24  **A.**    Yes, I am.

25  **Q.**    And you're aware that SafeScript was placed on the Do

```
 1    Not Ship List?
 2    A.   No, I'm not.  I wasn't aware of that.
 3    Q.   You're aware that SafeScript was shut down by the DEA?
 4    A.   I don't recall that, no.
 5              MR. FARRELL:  Could I have 16643?
 6         I'm going to start by refreshing his recollection, Your
 7    Honor.  May I approach?
 8              THE COURT:  Well, he hasn't said he couldn't
 9    remember, has he?
10              BY MR. FARRELL:
11    Q.   Do you remember whether or not SafeScript Pharmacy #6
12    was shut down?
13    A.   No, I don't.
14              THE COURT:  Now, you've got to ask him -- you
15    can't just show him a document now.
16              MR. FARRELL:  Yes.
17              THE COURT:  You have to ask him if it would
18    refresh his recollection and then you're stuck with whether
19    he says yes or no.  If he says no, then you're stuck with
20    that.
21              MR. FARRELL:  Yes, Your Honor.
22              THE COURT:  Okay.
23              BY MR. FARRELL:
24    Q.   If I showed you a document with your name on it on
25    SafeScript and the DEA, would that refresh your recollection
```

 1   as to what happened with SafeScript #6?

 2   **A.**   I don't know if it would refresh my memory, but if my

 3   name is on it, if it's an e-mail or something like that,

 4   then I would probably -- would have known about it.

 5             THE COURT:  Okay.  You can show it to him, have

 6   him read it, and then take it back and then ask him the

 7   question if he says it refreshes his recollection.

 8             MR. FARRELL:  This is my last document and my last

 9   question, Judge.

10             THE WITNESS:  Yeah.  I don't really remember this

11   specifically, but -- because we had, you know -- we had

12   customers from time to time that would get, you know, either

13   shut down or raided by DEA and this looks like I'm asking

14   about licensing and things like that.

15             BY MR. FARRELL:

16   **Q.**   So, do you recognize what this document is?

17   **A.**   Yes.  It's an e-mail string, yes, an internal e-mail

18   string.

19   **Q.**   And are you on the e-mail string?

20   **A.**   Yes, sir, I am.

21   **Q.**   And in this e-mail string, are you sending messages to

22   your Diversion Control Team?

23   **A.**   Yes.  It looks like there's a lot of back and forth

24   here, yeah.

25   **Q.**   And are you receiving information from your Diversion

```
 1    Control Team?
 2    A.    Yes.  It looks like I'm getting responses for the
 3    questions I'm asking.
 4    Q.    And what is the date of the document?
 5    A.    Well, the string starts in -- February 14th of 2012 and
 6    it ends on February 15th of 2012.
 7              MR. FARRELL:  Judge, may I present and I'd
 8    circulate and I would move for 16643 to be entered into the
 9    record.
10              MS. MCCLURE:  Your Honor, having not seen the
11    document yet, I can't articulate whether I have an objection
12    to it or not, so I would request a moment.
13              THE COURT:  Okay.
14              MR. FARRELL:  I butchered this one, Judge.  That's
15    on me.
16              BY MR. FARRELL:
17    Q.    Are you ready, sir?
18    A.    I thought we were waiting on her.
19              MS. MCCLURE:  We were.  We were waiting on me.
20    Thank you for your patience.
21         Your Honor, I have no objection to the document except
22    for the obvious purpose -- obvious point that it is hearsay
23    and so I would request for what -- what purpose Mr. Farrell
24    would be offering it.  I'm assuming he has some non-hearsay
25    exception that he intends to offer it for.
```

```
 1              MR. ACKERMAN:  Your Honor, I must admit I'm a bit
 2     confused.  Is there an objection or is there not?  And what
 3     portion of the document do you contend is hearsay?
 4              MS. MCCLURE:  Well, what portion of the document
 5     do you intend to use?  Because ultimately --
 6              MR. ACKERMAN:  All of it.
 7              MS. MCCLURE:  So, it's an entire e-mail string
 8     over a period of time.  Mr. May [sic] has -- Mr. Mays has
 9     testified that he now sees that there are exchanges back and
10     forth, but he has not indicated that this document actually
11     refreshes his recollection.  If that was what we were using
12     it for, then he would have had to take it back.
13          Now, if we're offering it as an exhibit, there's a
14     whole string here.  I understand Mr. Ackerman to say that
15     they intend to offer, quote, "all of it."
16          So, in order for me to articulate the objection, my
17     objection is hearsay.  My -- my response to their potential
18     identification of some non-hearsay purpose depends on the
19     manner in which they intend to use it.  I don't have any
20     information about that yet.
21              THE COURT:  Well, as long as the objection is
22     hearsay, I'm going to sustain it unless you can get around
23     it.
24              MR. ACKERMAN:  Well, Your Honor, I think it's --
25     first of all, I think it's an opposing party's statement.
```

1    It's an e-mail to and from employees from AmerisourceBergen.

2    It is a statement made by a party's -- 801(d)(2)(D), a

3    statement made by the party's agent or employee on a matter

4    within the scope of that relationship and while it existed.

5    These are all ABDC employees on the e-mail.

6            THE COURT:  Well, there's stuff in here by Eric

7    Martin and it goes beyond the statement by just this

8    witness.

9            MR. ACKERMAN:  So, Mr. Martin is an -- is an

10   AmerisourceBergen Drug Corporation employee.  His -- his

11   e-mail signature says that he is Manager, Regulatory

12   Compliance.

13           MR. FARRELL:  And, Judge, we have a stipulation

14   that we need no response from the witness.  This is one of

15   the documents that's included.

16           MS. MCCLURE:  Your Honor, that's for authenticity

17   purposes.  If we're saying declare a witness's prior

18   statement -- I'm sorry, which rule did you say, because it's

19   not inconsistent with any testimony?

20           MR. ACKERMAN:  I'm not saying -- 801(d)(2) and

21   then (D), as in dog.  The statement is offered against an

22   opposing party and was made by the party's agent or employee

23   on a matter within the scope of that relationship and while

24   it existed.  These are all statements of ABDC employees

25   during their employment with ABDC and within the scope of

```
 1   their employment responsibilities.

 2            THE COURT:  I'll overrule the objection and admit

 3   it.

 4               PLAINTIFF EXHIBIT 16643 ADMITTED

 5            MS. MCCLURE:  Thank you.

 6            MR. FARRELL:  Will you bring up 16643, please?

 7            BY MR. FARRELL:

 8   Q.   Sir, this is a document by your CSRA Team discussing

 9   what happened following the raid by the DEA on SafeScript

10   #6, agreed?

11   A.   Yes, sir.

12   Q.   And --

13   A.   Yes, sir.

14   Q.   And this message on the front page was sent by Eric

15   Martin to you, yes?

16   A.   So, at the end of the e-mail string, is that what

17   you're saying, the first page?  Yes.

18   Q.   Yes.  And who is Eric Martin?

19   A.   He was one of our investigators.

20   Q.   And was he an investigator that was in charge of the

21   Lockbourne, Ohio facility that distributed prescription

22   opioids to Huntington-Cabell County, West Virginia?

23   A.   I'm not sure what he was assigned to at that point.

24   Q.   All right.  You'll see that on his signature block, he

25   includes the tag, "See everything, overlook a great deal,
```

1    and correct a little", attributing this quote to Pope John

2    XXIII.  Is this reflective of the policies and procedures of

3    AmerisourceBergen's Diversion Control Program?

4    **A.**   Absolutely not.

5              MS. MCCLURE:  Your Honor, I object and there is an

6    e-mail signature here that has just been highlighted from a

7    witness who is not on the stand.  It is Eric Martin's e-mail

8    signature.  This is Steven Mays.

9         Mr. Mays, who is on the stand, is being asked about

10   what Eric Martin meant, I guess, by this e-mail signature,

11   which is apparently attributed, I don't know if that's true

12   or not, to Pope John Paul the -- or Pope John XXIII.

13        I don't know what Pope John XXIII meant by that

14   statement, let alone know what Eric Martin meant by

15   including that statement from Pope John XXIII in this e-mail

16   signature.  So, this line of questioning is just simply

17   inappropriate and irrelevant.

18              THE COURT:  Well --

19              MR. FARRELL:  No further questions, Your Honor.

20              MS. MCCLURE:  And to the extent the witness

21   answered the question, I would object and move to strike any

22   questioning about this, which is completely speculation.

23              THE COURT:  Well, he hasn't questioned him about

24   this.

25              MS. MCCLURE:  Okay.

1              MR. FARRELL:  Yes, Judge.  I asked him whether or

2      not this statement was reflective of the policies and

3      procedures of AmerisourceBergen and Mr. Mays said no.

4              THE COURT:  Okay.  I'll overrule the objection.

5              MR. FARRELL:  Just to make sure, 16643 was entered

6      in the record?

7              COURTROOM DEPUTY CLERK:  Yes, sir.

8              MR. FARRELL:  I'm sorry?

9              COURTROOM DEPUTY CLERK:  Yes.

10             MR. FARRELL:  No further questions, Judge.  Thank

11     you.

12             THE COURT:  All right.  Okay.

13             MS. MCCLURE:  Okay.

14                        **CROSS EXAMINATION**

15             **BY MS. MCCLURE:**

16     **Q.**   Good afternoon, Mr. Mays.

17     **A.**   Good afternoon.

18     **Q.**   How long have you worked in this industry?

19     **A.**   It will be 47 years in July.

20     **Q.**   And how did you begin working in this industry?  What

21     year was that?

22     **A.**   What -- what year?

23     **Q.**   Yes.

24     **A.**   1974.

25     **Q.**   And where was that?

1    **A.**   That was at an independent drug wholesaler in

2    Chattanooga, Tennessee called Duff Brothers.

3            COURT REPORTER:  I'm sorry.  What was that?

4            THE WITNESS:  Duff, D-u-f-f, Brothers and it was a

5    predecessor company for Amerisource.

6            BY MS. MCCLURE:

7    **Q.**   I'm sorry.  Was that also wholesale drug distribution?

8    **A.**   Yes.  Yes.

9    **Q.**   Okay.  What was your job at Duff Brothers in 1974?

10   **A.**   I started out as an order filler in the warehouse.

11   **Q.**   Okay.  Is that an entry-level position?

12   **A.**   Yes.

13   **Q.**   And what does an order filler do briefly?

14   **A.**   Well, when -- you've got to think back in 1974 terms,

15   so --

16   **Q.**   I appreciate that correction.  It's important that we

17   all think about what time frame we're in.

18   **A.**   So, customers would typically call in orders and we had

19   -- what would now be called Customer Service, they were just

20   called Telephone Sales Department and they would type the

21   orders up on typewriters on picking documents and those

22   would be sent to the warehouse.  And then, the order fillers

23   would fill the orders.

24   **Q.**   And how long were you at that Chattanooga, Tennessee

25   Distribution Center?

1    **A.**    Approximately -- let's see.  From '74 to '94.  So,
2    approximately 20 years.
3    **Q.**    What was your last position at this Chattanooga,
4    Tennessee Distribution Center?
5    **A.**    I was the Operations Manager when I left there.
6    **Q.**    And were you -- had you been Operations Manager for a
7    number of years?
8    **A.**    Yes.  I believe since 1980, if I'm not mistaken.
9    **Q.**    And who owned the -- or who was the company -- what was
10   the company called in 1994, your last year at this
11   Distribution Center?
12   **A.**    That would have been Alco Health Services.
13   **Q.**    Had they acquired Duff Brothers?
14   **A.**    Yes.
15   **Q.**    Okay.  And very generally, briefly, what is the role of
16   an Operations Manager at a warehouse?
17   **A.**    Well, in those days, the Operations Manager pretty much
18   wore all the hats.  He took care of everything in the
19   operation all the way to, you know, making sure that all the
20   facility -- you know, the air-conditioning was working and
21   all the physical security for the facility, all the hiring,
22   making sure all of the employees were hired and maintained.
23   **Q.**    Would -- is it fair to say you had some regulatory
24   obligations, but that was not your primary job?
25   **A.**    Yes.

1    **Q.**   And did this Distribution Center distribute all types

2    of controlled substances from Schedule II to V?

3    **A.**   Yes.

4    **Q.**   And what happened in 1994?

5    **A.**   Okay.  In '94, the company decided to -- the company

6    acquired -- first of all, acquired another independent drug

7    wholesaler in Valdosta, Georgia and it was called Valdosta

8    Drug Company and I believe simultaneously decided to close

9    that facility and move the operations to Orlando, Florida.

10   **Q.**   And did you have responsibilities in the Orlando,

11   Florida Distribution Center then?

12   **A.**   Yes.

13   **Q.**   And was that also an Operations Manager position or was

14   --

15   **A.**   Yes.  I -- I had asked for an opportunity to transfer

16   to Orlando.

17   **Q.**   And is it fair to say that the job description you

18   previously described for Chattanooga, Tennessee is the same

19   as this Orlando facility?

20   **A.**   Yes, ma'am.

21   **Q.**   How long were you in this Operations Manager role in

22   Orlando?

23   **A.**   From '94 to around 2000, I believe.

24   **Q.**   And --

25   **A.**   No, wait a minute.  Let me -- let me back up.

```
1    Q.    Sure.

2    A.    '94 -- it may have been '94 to '98, yes.

3    Q.    Okay.  And what was your next position?

4    A.    I took a position as Director of Corporate -- well,

5    Corporate Security and Regulatory Affairs for the

6    Distribution Center in Orlando.

7    Q.    Okay.  And was that a compliance-related position?

8    A.    Yes.

9    Q.    And is regulatory compliance limited to just

10   regulations about controlled substances or were the duties

11   of a Compliance Manager in Orlando broader than that?

12   A.    Yes.  Much broader, yes.

13   Q.    Okay.  What -- what kinds of other regulations fall

14   under CSRA or regulatory compliance?

15   A.    So, in addition to all the DEA requirements, we had to

16   comply with all the state requirements for the state

17   licensing agency, which at that time in Orlando, it was the

18   Florida Department of Health.  So, they were -- they were

19   tasked with enforcing the PDMA requirements which are in the

20   21 CFR.

21   Q.    And did that also -- did that position also include

22   enforcing company policies?

23   A.    Yes.

24   Q.    And how about local ordinances to the extent they

25   applied?
```

1   **A.**   Local ordinances to a lesser extent.  You know, and

2   then you had, you know, OSHA safety requirements, EPA

3   requirements for waste handling, DOT transportation

4   requirements.  So, it was a lot of regulatory -- we had a

5   lot of different regulatory agencies that regulated us,

6   yeah.

7   **Q.**   And did regulatory compliance include physical

8   security?

9   **A.**   Yes, because there's a lot of physical security

10   requirements in DEA's regulations and also in State Board of

11   Pharmacy regulations.

12   **Q.**   Are you familiar with the DEA regulations for physical

13   security, cage/vault requirements?

14   **A.**   Yes.  I probably couldn't cite all of them, but I'm

15   very familiar with them.

16   **Q.**   We won't.  We will spare the Court that.

17   **A.**   Okay.

18   **Q.**   And how about reporting of suspicious orders, is this

19   something that fell within your regulatory compliance role

20   beginning in 1998?

21   **A.**   Yes.  I was responsible for overseeing that.

22   **Q.**   How long did you remain in this role of Local Director

23   of Regulatory Compliance in Orlando?

24   **A.**   Until about sometime in 2000.

25   **Q.**   And what was your next position?

**A.**   I was hired as a regulatory -- a regulatory supervisor

for corporate.

**Q.**   And what were your job duties in that position?

**A.**   Primarily auditing all of the company's distribution

centers for compliance with the regulations and corporate

policies and procedures.

**Q.**   So, that's all of the various regulations you've

previously laid out, whether they're federal, state?  Does

that include auditing for company policies and compliance?

**A.**   Yes.  Yes.

**Q.**   Okay.  How many people were assigned to audit

facilities at this time for regulatory compliance purposes?

**A.**   If my memory severance me right, I think there were

about four or five of us, but I'm not positive.

**Q.**   And what's -- what does an audit entail?

**A.**   So, it entails -- and these were also like no notice

audits, so we would just show up at the Distribution Center

unannounced on -- usually on a Monday afternoon, announced

ourselves, and then we would let them know that we're there

to conduct a regulatory and security audit of the facility.

        And then we had a checklist that had been put together

for -- for the purpose of conducting the audit.  So, each

checklist, you know, the checklist had, I think for security

and regulatory, it was probably 200 questions and we had to

mark it either -- each question either compliant or not

1  compliant based on the -- based on the documents provided

2  and the answers provided to us on the questions.

3  **Q.**   And how long would the audit generally take?

4  **A.**   It takes about most of the week, yeah.

5  **Q.**   Okay.

6  **A.**   We would typically go home on Friday afternoon.

7  **Q.**   Did the audit include whether the Distribution Center

8  in question was reporting suspicious orders?

9  **A.**   I believe so, yes.

10  **Q.**   Did you have any training on how to conduct these

11  Distribution Center audits?

12  **A.**   Typically, it was on-the-job training.  So, when an

13  auditor would start, they would go out on team audits with

14  one of the more experienced auditors.

15  **Q.**   Okay.  And are these meant to mimic any particular kind

16  of government audit?

17  **A.**   Yes.  They were -- they were designed to mimic a DEA

18  inspection, which is also unannounced.

19  **Q.**   So this is essentially an internal self audit meant to

20  mimic an unannounced DEA audit; is that right?

21            MR. ACKERMAN:  Object to the leading, Your Honor.

22            MS. MCCLURE:  Yes, Your Honor.  I'm trying to move

23  quickly through, so I would request a slight --

24            THE COURT:  I'll overrule the objection.  We need

25  to get through this.

1          BY MS. MCCLURE:

2     **Q.**   And what kind of findings are made in those audit

3     reports you talked about?

4     **A.**   I'm sorry.  What do you mean by findings?

5     **Q.**   Did you make -- did you make decisions or conclusions

6     about whether a facility was compliant, was not compliant?

7     **A.**   Yes.  I mean, we would have -- it was all based on the

8     facts and the documents provided.  So, if we could not

9     determine that they were fully compliant, then it was marked

10    as noncompliant and that would be a finding on the report.

11    **Q.**   Okay.  Is there any corrective action required if you

12    found that a facility was not compliant?

13    **A.**   Yes, ma'am.  At the end of the audit, the auditor would

14    typically -- again, as DEA normally would, we would sit down

15    and have an exit meeting with the DC manager and the staff

16    and go over our findings verbally with them.  And then, we

17    would -- our policy was that we would get them a written

18    report within ten days.  I can't remember if that was

19    calendar days or business days with all of our findings.

20    And then, they were given an additional ten days to respond

21    to those findings with -- with their corrective action plans

22    for each finding.

23    **Q.**   Mr. Mays, are these same type of internal self auditing

24    regulatory compliance audits that you've described, are

25    these the same kinds of regulatory compliance self audits

1  that take place today at the company's Distribution Center?

2  **A.**    They are very similar, yes.

3  **Q.**    Okay.  How do you know that, that these are the same

4  kinds of audits today?

5  **A.**    Well, because we use the same -- we use the same

6  process, the same audit checklist.  Of course, it's

7  constantly modified with new regulations or new -- our

8  changes in policies.

9  **Q.**    Okay.  And I believe you said that you started that

10  position in 2000?

11  **A.**    2000, yes.

12  **Q.**    When did you leave that position?

13  **A.**    In 2002.

14  **Q.**    And were you still in Orlando at this point or --

15  **A.**    Yeah.  I was -- I worked from home from 2000 to 2002

16  because I was traveling probably every other week.  And so,

17  in 2002, I was offered a manager position at corporate, but

18  I had to relocate.

19  **Q.**    And that is now the company we call AmerisourceBergen;

20  is that right?

21  **A.**    Yes, that's correct.

22  **Q.**    And what are your new responsibilities as now the

23  Manager of CSRA?

24  **A.**    Well, the new responsibility, it was a promotion and my

25  responsibility was to supervise the auditors that were in my

1    previous position, the regulatory affairs supervisors.

2    **Q.**    Okay.  And would those audits also include ensuring

3    that distribution centers were complying with policies and

4    procedures around suspicious order reporting?

5    **A.**    Yes, ma'am.

6    **Q.**    Okay.  Let's move to a new area here.  Did the DEA

7    conduct inspections of AmerisourceBergen Distribution

8    Centers?

9    **A.**    Yes, they do.

10   **Q.**    Has that always been the case during your entire time

11   when it was -- let me back that up.  At the time you moved

12   to Valley Forge, we determined that that was the company

13   called AmerisourceBergen.  Had you been with Amerisource

14   prior to that?

15   **A.**    Yeah.

16   **Q.**    All those positions that you described in regulatory

17   affairs?

18   **A.**    Yes, ma'am.

19   **Q.**    Okay.  During your time at Amerisource and then

20   AmerisourceBergen, has the DEA conducted inspections of

21   Amerisource Distribution Centers?

22   **A.**    Yes, cyclical in nature.

23   **Q.**    And is that one of your job responsibilities, to have

24   any responsibility over the DEA inspections when they're

25   on-site?

1    **A.**   Yes.  I would provide support to the Distribution

2    Center if DEA came in and conducted an inspection.  So,

3    typically me or my team would sit in on the initial meetings

4    and be available to them if any questions came up that the

5    DC couldn't answer for some reason and we would typically

6    sit and participate in the exit meeting, also.

7    **Q.**   And do some State Board of Pharmacies, which may be

8    called Board of Health, or Department of Controlled

9    Substances in various states, also conduct inspections?

10   **A.**   Yes, they did.

11   **Q.**   Of AmerisourceBergen and Amerisource Distribution

12   Centers?

13   **A.**   Yes, they did.

14   **Q.**   What is your -- can you describe what happens during a

15   DEA inspection of an AmerisourceBergen Distribution Center?

16   **A.**   Yes.  They -- they -- they were very consistent as far

17   as the types of things they would ask for.

18   **Q.**   I'm sorry.  Did you say they were or were not?

19   **A.**   Well, they were on the inspections.  They were

20   typically consistent in the things they would look at and

21   they would typically do an accountability audit.  They would

22   take a sampling of around 12 or more controlled substances,

23   take a -- take an inventory of those items while they were

24   there, and then they would go back to one of the DEA

25   required inventories and do an accountability using all the

1    transactions during that time period.

2        They would typically look at all of our executed DEA 222

3    Forms.  They would test the alarm system.  They would ask

4    for corporate documents, too, like articles on the

5    corporation and things like that, get the names of the

6    people on the access list to the cage or vault.

7        Am I going too fast?

8                COURT REPORTER:  No.

9                THE WITNESS:  Okay.  The names of the people on

10   the access list to the cage and the vault.  And then they

11   would do their own background checks on those people to make

12   sure they didn't have any criminal history that should not

13   have allowed them to work in there.

14       That was pretty much it.  It was fairly standard, as

15   far as the things that they would -- they would do on their

16   inspections.

17   **Q.**   And how long would these DEA inspections take if

18   there's a -- if there's a --

19   **A.**   Well, that's where the inconsistency comes in.  I've

20   seen DEA inspections take an hour and I've seen them take

21   six months and, typically, in some cases they would come in

22   and start the inspection and ask -- ask for the documents

23   and then they may come back a couple of weeks later and

24   maybe they were working on something else.

25   **Q.**   Are these inspections conducted, as your understanding,

1   by DEA Headquarters staff or by DEA Field Office staff?

2   **A.**   It's almost always Field Office staff.

3   **Q.**   So is it the Field Office that's located near the

4   Distribution Center in question or do the DEA people fly

5   around the country for these?

6   **A.**   No.  Again, it's typically the diversion investigators

7   from the Field Office that has jurisdiction over that

8   Distribution Center.

9   **Q.**   Does DEA inspect the cage and vault at distribution

10  centers in your experience?

11  **A.**   Yes, they do.

12  **Q.**   And I believe you said that they reviewed documents?

13  **A.**   Yes.

14  **Q.**   Can they ask for any kind of document in these

15  inspections?

16  **A.**   Well, they're not really allowed to ask for anything

17  about pricing because they're all -- they're -- I think

18  their requirements are to regulate the actual movement of

19  the controlled substances.  So, they may ask for invoices,

20  printouts, distribution printouts, 222 Forms and things like

21  that.

22  **Q.**   Let me ask a better question.  Can they ask for any

23  document that relates in any way to AmerisourceBergen's

24  regulatory compliance?

25  **A.**   I believe so, yes.

1    **Q.**   Do you generally give the DEA the documents they ask

2    for when they come in to inspect your facility?

3    **A.**   Yes.  I can't think of a time when we didn't.

4    **Q.**   Does DEA make findings after one of these inspections

5    and issue a report to you?

6    **A.**   They -- sometimes they did and sometimes they didn't.

7    They -- we would always ask them for an exit meeting so we

8    had an idea of what their findings are.  Sometimes they were

9    very close to the vest with their findings and we wouldn't

10   know what they were if they had any.  Most of the time,

11   there were no findings.

12   **Q.**   Okay.  And most of the time when there are no findings,

13   do you receive a written letter from DEA or some other

14   written piece of paper that says there are no findings and

15   that you're in compliance?

16   **A.**   No, we typically don't.

17   **Q.**   Okay.  So, no findings --

18            THE COURT:  We need to take a break and change

19   court reporters.

20            MS. MCCLURE:  Okay.

21            THE COURT:  When you get to a stopping point.

22            MS. MCCLURE:  No.  This -- let me just finish this

23   one out.

24            BY MS. MCCLURE:

25   **Q.**   So, no findings by DEA means there won't be any

```
 1    documentation from the DEA in the file; is that correct?
 2    A.   That's correct.
 3    Q.   Okay.  And what happens if the DEA determines that
 4    there is some sort of violation?
 5    A.   Sometimes they would just tell us about it and we would
 6    not even get anything in writing sometimes.  And then
 7    sometimes we would get what we would refer to as a Letter of
 8    Admonition which would list the findings and give us an
 9    opportunity to respond to them with our corrective actions.
10    Q.   Can you remember a time where you did not respond to a
11    DEA finding with corrective action?
12    A.   I can't think of a time where we wouldn't have.
13              MS. MCCLURE:  Okay.  Your Honor, this is a good
14    time for a break.
15              THE COURT:  Okay.  We'll take about ten minutes.
16         You can step down, Mr. Mays.
17              THE WITNESS:  Thank you, sir.
18         (Recess taken)
19         (Proceedings resumed at 3:40 p.m.)
20              THE COURT:  Okay.  When you're ready, Ms.
21    McClure.
22              MS. MCCLURE:  I'm ready.
23    BY MS. MCCLURE:
24    Q.   Mr. Mays, so I believe in time we're now in the
25    2003 time period.  Did you work with DEA in any
```

```
1    capacity -- any new capacity in this time frame as CSRA

2    Manager of Regulatory Affairs?

3    A.   In 2003?  Let me think.

4    Q.   How about this.  Did you conduct any training beginning

5    in 2003 involving the DEA?

6    A.   Oh, yes.  So when the company merged in 2001, Chris

7    Zimmerman had worked with DEA on an agreement to have us

8    come in to our Richmond, Virginia, distribution center and

9    do a training program for the diversion investigator

10   trainees that were in Quantico.  And he started that and

11   then I took that over in 2003.  And I believe I trained

12   about five different classes over the years.

13   Q.   So are these DEA students, people learning how to

14   become a DEA diversion investigator?

15   A.   That was my understanding.  They were DEA investigator

16   trainees or students.

17   Q.   And where did you -- where did these trainings take

18   place?

19   A.   At our Richmond, Virginia, distribution center.

20   Q.   Okay.

21          MS. MCCLURE:  Your Honor, I'm going to present a

22   set of documents.  There's five in total.  So we'll hand

23   them out as quickly as we can.

24          May I approach?

25          THE COURT:  Yes, you may.
```

```
1    BY MS. MCCLURE:
2    Q.    So for purposes of the record, AM-WV is the prefix
3    for each of these 782, 783, 784, 786, 787.
4              MR. ACKERMAN:  Your Honor, I don't have 782, 787
5    and 784.
6              MS. MCCLURE:  I believe Mr. Farrell has copies as
7    well.
8    BY MS. MCCLURE:
9    Q.    Okay.  So, Mr. Mays, what do these letters
10   generally reflect broadly?
11   A.    Yeah.  They are confirmation letters where DEA had
12   previously scheduled a visit to the distribution center, and
13   they're confirming by this letter and letting us know how
14   many students will be participating in the tour and what
15   time they'll arrive at the facility.
16   Q.    And, so, you recognize each of these letters; correct?
17   A.    Yes, ma'am.
18   Q.    And are these fair and accurate representations --
19             THE COURT:  Just a minute, Ms. McClure.
20             MR. FARRELL:  Objection.  The letters from the DEA
21   are hearsay.
22             THE COURT:  Well, that's right, isn't it,
23   Ms. McClure?
24             MS. MCCLURE:  Your Honor, they are hearsay.
25   Mr. Mays has testified as to the fact that these trainings
```

1    took place.  And, so, these confirmatory documents also

2    include information regarding the number of DEA trainees who

3    were trained at the facility.

4        If Your Honor would provide some leeway, what we're to

5    go into is some of the trainings which are appended to

6    certain of the letters that Mr. Mays has given during these,

7    during these various trainings.  And we would like to go

8    through the training for purposes of establishing that the

9    DEA had notice, of course, of what our program was that was

10   being run at the time.  And, so -- yes.

11            THE COURT:  Well, I'll let you go ahead and ask

12   him about the subject.  You haven't offered them yet.  So if

13   you do, we'll deal with the problem at that point.  But you

14   can certainly use them as a basis to question him.

15            MS. MCCLURE:  Thank you, Your Honor.

16   BY MS. MCCLURE:

17   **Q.**   So, Mr. Mays, I've handed you five letters over a

18   2003, 2004, 2005 time frame.  Does that match up with

19   your recollection as to when these trainings took place?

20   **A.**   Yeah.  I just don't have all the letters, but -- there

21   were five different times.  For some reason, I didn't get

22   copies of all of them.

23   **Q.**   You should have 782.

24   **A.**   Yes, ma'am.

25   **Q.**   783.

1   **A.**   Yes.

2   **Q.**   784.

3   **A.**   I don't have that one.

4   **Q.**   786.

5   **A.**   I do have that one.

6   **Q.**   And 787.

7   **A.**   I don't have that one.  I'm missing 784 and 787.

8           MS. MCCLURE:  Apologies, Your Honor.

9           THE COURT:  You can have my copy.

10          THE WITNESS:  Thank you, Your Honor.

11  BY MS. MCCLURE:

12  **Q.**   Okay.  We've got it now.  You can hand that one

13  back to the Judge.  I have now given you 4 and 7.

14  Somehow we missed the witness.

15      Thank you for advising me that I failed you there, Mr.

16  Mays.

17      So this is five trainings in the '03 to '05 time period

18  that you personally had responsibility for?

19  **A.**   Yes, ma'am.

20  **Q.**   And are these letters fair and accurate representations

21  of the letters you received from DEA requesting that you,

22  AmerisourceBergen, give tours and trainings to these DEA

23  recruits?

24  **A.**   Yes, ma'am.

25  **Q.**   Okay.  Can you tell me, looking at these letters which

1   summarize and include reference to the number of DEA

2   trainees who will be attending, approximately how many

3   trainees you trained during this time period?

4   **A.**   Approximately 200 total.

5   **Q.**   Now, you've said that students from Quantico who were

6   in DEA's training to become diversion investigators would

7   attend.  Would they attend alone or was there anyone else

8   from DEA who was actually already a DEA diversion

9   investigator or personnel who would attend?

10  **A.**   Yes.  There would always be someone with them.  Someone

11  assigned to that office of training would come with them.

12  **Q.**   Do you recall the names of any supervisory staff from

13  DEA who attended these trainings that you gave to these

14  students?

15  **A.**   Yes, ma'am.

16  **Q.**   Who, who do you recall?

17  **A.**   I remember Dorothy Corsie (phonetic).  And I think she

18  came along on the first couple.  And then Tom Prevoznik came

19  on at least two of them himself.

20  **Q.**   And did DEA actually provide -- express any

21  appreciation to you for providing this training to its

22  recruits?

23            MR. ACKERMAN:  Objection, hearsay, relevance.

24            MS. MCCLURE:  Your Honor, I thought we had gone

25  over this.  To the extent that there's a relevance

1    objection, I do note that the relevance would be that ABDC

2    was asked to train DEA students.  And we're going to discuss

3    and get into the training itself in a moment.

4              THE COURT:  The question was:  Did DEA actually

5    provide -- express an appreciation to you for providing this

6    training to its recruits?

7         He can answer that question.  I'll overrule the

8    objection.  See if he can answer.

9              THE WITNESS:  Do you want me to answer that?

10   BY MS. MCCLURE:

11   **Q.**   Can you answer that, Mr. Mays?

12   **A.**   Yes, yes, they did.  They did each time verbally.  And

13   then they did provide us with a, a Certificate of

14   Appreciation in I believe it was 2004 --

15   **Q.**   Okay.

16   **A.**   -- from DEA.

17   **Q.**   Let's turn to the presentation that you gave to the DEA

18   diversion investigator recruits.  What was -- were you asked

19   by DEA to put together a presentation to give?

20   **A.**   I don't recall if they asked us to do that, but they

21   did want us to, you know, train the investigators on what --

22   my understanding is none of the investigators had ever been

23   into a wholesale distribution facility.

24        And, so, Chris put together the original -- Chris

25   Zimmerman put together the original presentation.  And then,

```
 1    then I used that on all of my training.

 2    Q.    Okay.  What was the purpose of this training?

 3    A.    To help them to understand, you know, initially how the

 4    wholesale drug distribution industry worked and also, more

 5    importantly, to, to go through some of the DEA regulations

 6    and explain to them how we complied.

 7    Q.    Okay.

 8          MS. MCCLURE:  Your Honor, we have one more

 9    document to hand out that will be the presentation that

10    we're going to be discussing with Mr. Mays if we could

11    approach.

12          THE WITNESS:  Thank you.

13          MS. MCCLURE:  For the record, this is AM-WV-00785.

14    BY MS. MCCLURE:

15    Q.    Mr. Mays, do you recognize this document that I've

16    just handed you?

17    A.    Yes, ma'am.

18    Q.    Okay.  And is this a true and accurate copy of the

19    document you wrote on the cover and then the training

20    presentation itself attached?

21    A.    Yes, ma'am.

22    Q.    Now, I'm not going to review every slide of this

23    training with you, but I'd like to discuss several of them.

24          Ritchie, if we could put up AM-WV-785, please.  And

25    we'll start with Bates 832.
```

1      Mr. Mays, is this an accurate statement of Goals for

2  the Training?

3  **A.**   Yes, ma'am.

4  **Q.**   And can you read the last, the last sentence there?  It

5  begins "in addition."

6  **A.**   "In addition, we will provide examples and methods of

7  standard operating procedures of a full-line pharmaceutical

8  wholesaler in an attempt to educate and, thus, enhance and

9  build on the good working relationship between the industry

10  and DEA."

11  **Q.**   Is this an accurate statement of goals?

12  **A.**   Yes, ma'am.

13  **Q.**   Okay.  If you could turn to the next slide, Bates

14  number 833.

15  **A.**   Okay.

16  **Q.**   Generally, what are the objectives listed on this slide

17  for this presentation?

18  **A.**   Well, generally, just to make sure that they understood

19  the basic function of the wholesale drug distributor and how

20  we -- in regard to controlled substance distribution; make

21  sure that they were familiar with the basic structure and

22  departments of the wholesaler; and also to make sure they

23  understand the industry, basic operations and procedures on

24  how we relate to 21, C.F.R., 1300 to end, which is all the

25  DEA requirements; and then, importantly, to make sure that

1    they understand what types of reports and documents are

2    available to be provided to them during an inspection or an

3    audit.

4    **Q.**   Okay.  So you made sure that DEA knew all of the

5    various kinds of documents they could ask you for when

6    they're doing audits with distribution centers?

7    **A.**   That's correct.

8    **Q.**   Okay.  If we could turn to Bates 844.

9    **A.**   You said 844?

10   **Q.**   Yes.  Mr. Mays, what's the purpose of this slide and

11   giving this information in the training to the DEA diversion

12   investigators or the students?

13   **A.**   Let me look at it just a second.

14        (Pause)

15        It was to, to give them an idea of, you know, typically

16   how many inspections we have every year, how many times and

17   how often that those inspections occur, and also an

18   opportunity to explain to them that we conduct our own

19   audits.  And each, each distribution center was audited

20   periodically between, between six and eight -- every six to

21   eight -- six to 18 months.  I'm sorry.

22   **Q.**   Okay.

23   **A.**   And then gave them some examples of all the different

24   regulatory agencies that impact distribution or oversee

25   distribution.

1    **Q.**    Okay.  If you could turn to 845 which is just the very

2    next page.

3    **A.**    Okay.

4    **Q.**    And if you could blow that up.  Okay.

5         And what is it that you're conveying here in this, in

6    this interpretation slide, Mr. Mays, to these DEA Quantico

7    students?

8    **A.**    The biggest point that we wanted to make to them is

9    that there's, there's some DEA regulations that are very

10   specific, you know, when it comes to this wire gauge of the

11   cage and certain security requirements.  And then there are

12   other regulations that are kind of vague.

13        And there's a lot of different interpretations, you

14   know, in between the industry.  I'm sure that the three

15   distributors in the room probably had different

16   interpretations of different regulations from time to time,

17   and then between industry and DEA, and also between DEA

18   field office in Washington.

19        So this is kind of one of my things is, you know,

20   dealing with all of our distribution centers, each one of

21   them is under jurisdiction of a field office.  And

22   there's -- it's very common for those field offices to

23   either be totally wrong about how they interpret the

24   regulation, and they could be very inconsistent even between

25   field offices and even between the field offices and

 1    headquarters.

 2    **Q.**   Now, Mr. Mays, this is the slide.  You would give the

 3    presentation yourself orally.  Do I have that right?

 4    **A.**   That's correct.

 5    **Q.**   Now, what you've just described here when you've talked

 6    about the different interpretations and the divisions and

 7    interpretations between industry members, field offices, and

 8    headquarters, industry and the DEA, was that something you

 9    would cover in the training?

10    **A.**   Yes, yes.

11    **Q.**   Even though there's DEA diversion supervisors present

12    for this?

13    **A.**   Yeah, because we felt like that was important for them

14    to understand because that's always a challenge for us when

15    one office says you have to do it this way and/or a national

16    distributor and we have 25 other offices say you've got to

17    do it a different way.

18        So, you know, it's trying to help them understand that

19    there are inconsistencies in how the regulations are

20    interpreted.

21    **Q.**   And did any of those supervisors, to your recollection

22    in these five trainings you conducted, stand up and say,

23    "This isn't true, you can't say this," or ask you to change

24    your slides going forward?

25            MR. FARRELL:  Objection, hearsay.

1          MS. MCCLURE:  Your Honor, this has to do with

2    DEA -- with Mr. Mays providing notice to DEA as to what ABDC

3    believes in terms of the inconsistent interpretation of the

4    regulations.

5          So DEA was given notice during this presentation as to

6    what ABDC believed.  And we've already asked him what it was

7    that he said to DEA.  There was no objection there.

8          Now I'm asking whether anyone from DEA, having been

9    given that notice, stood up and said anything or asked the

10   slides to be changed because they didn't like this or

11   thought it was inaccurate.

12         MR. ACKERMAN:  Your Honor, the DEA is not in

13   court.  That's why it's hearsay.

14         THE COURT:  I sustain the objection.

15   BY MS. MCCLURE:

16   Q.   Okay.  Moving on to 846, can you take a look at

17   that slide?

18   A.   Yes, ma'am.

19   Q.   And 846 and actually 847, there are two slides back to

20   back.  What are these two slides discussing?

21   A.   They're discussing the security requirements as, as

22   they are spelled out in the Code of Federal Regulations,

23   1301.71 and .72.

24   Q.   Are these sort of the, the more extensive physical

25   security requirements that you testified previously that

1    you're familiar with?

2    **A.**    Yes.

3    **Q.**    And moving on to Bates 848, which is the next slide,

4    can you read that fourth bullet down that starts "wholesale

5    distributors"?

6    **A.**    Yes.   "Wholesale distributors have an express duty to

7    verify licensure and registration status of its customers."

8    **Q.**    Now, why are you calling this out to DEA?

9    **A.**    Well, because that's very important.   One of the most

10   important things we do is, is make sure that we never

11   distribute controlled substances to an entity that's not

12   properly licensed by the state and registered with DEA.

13   **Q.**    849.   Can you read the second to last bullet and the

14   last bullet?

15   **A.**    Where it starts with "computer system"?

16   **Q.**    Yes.   They each start with "computer system."

17   **A.**    Okay.

18        "Computer system automatically blocks orders of

19   controlled substances from customers with expired

20   registrations."

21        "Computer system automatically blocks schedules of

22   controlled substances from customers not authorized."

23   **Q.**    And is this all information that you reviewed with DEA

24   during those trainings?

25   **A.**    Yes.

1   **Q.**   And why is it important to tell DEA about the way that

2   the system works in terms of automatic blocking?

3   **A.**   To help them understand that, you know, it's, it's not

4   a manual process; that we have to worry about every single

5   customer and checking the registration every time we get an

6   order.  It's all loaded in our system, the DEA number, the

7   expiration date, and the schedules that they're authorized

8   for on the registration.  And the system will automatically

9   block orders if that expiration date hits and it has not

10  been renewed.

11  **Q.**   Okay.  Last one.  Let me ask you about 850.

12  **A.**   Yes, ma'am.

13  **Q.**   And what is this slide about?

14  **A.**   It's, it's the regulation in 1301.74 entitled "Security

15  Controls" and it talks about suspicious orders, the

16  suspicious order system.

17  **Q.**   And if you could read the two bullets that have been

18  highlighted.

19  **A.**   Okay.

20       "Automated reporting system (daily fax to DEA)."

21       "Flexible reporting time frames (daily, weekly,

22  monthly)."

23  **Q.**   Is this an accurate representation of

24  AmerisourceBergen's program at the time?

25  **A.**   Yes, it was.

1    **Q.**   And what program was being run and in place in 2004

2    when this presentation was given to DEA recruits?

3    **A.**   That was the program that was developed by Bergen prior

4    to the merger and it was adopted by the merged company in

5    2001.  And it was the program that was approved in writing

6    by DEA.

7    **Q.**   Okay.

8          MS. MCCLURE:  Your Honor, I do intend to move for

9    the admission of these documents from 782, I believe it is,

10   to 787.  I note that each of the letters -- ultimately, this

11   goes to defendants' state of mind.  It's AmerisourceBergen's

12   state of mind for this time period.

13       Plaintiffs' position is that -- in this case is that

14   prior -- is that during this time period, which is covering

15   from 2003 to 2005, AmerisourceBergen was violating the

16   Controlled Substances Act.  Their public nuisance claim here

17   is based on an assertion that we were violating the

18   Controlled Substances Act.

19       Here the DEA has asked AmerisourceBergen to present at

20   least five times to diversion investigators and train these

21   diversion investigator students, including a review of the

22   program that was in place at AmerisourceBergen at the time,

23   giving notice to DEA investigators, including Mr. Tom

24   Prevoznik who we've heard various arguments about throughout

25   time.

1          So to the extent that the plaintiffs' objection remains

2     that these are hearsay documents, these are directly

3     relevant to the defendants' state of mind and their belief

4     and their understanding of the relationship with DEA and

5     their on-going compliance with what the Controlled

6     Substances Act required based on the fact that the DEA asked

7     for them to give these trainings.  The DEA asked for them to

8     train investigators, including on our program.

9          And, Your Honor, I would circle back to the question

10    that -- the objection you sustained previously and request

11    not only admission of these documents, but permission to ask

12    Mr. Mays if anyone from DEA ever gave notice to

13    AmerisourceBergen after hearing these trainings that

14    anything in this PowerPoint presentation was incorrect,

15    needed to be changed.

16         These are all directly relevant to our state of mind of

17    the company at the time that is part of the time period

18    being challenged and -- by the plaintiffs in this case.

19              THE COURT:  Mr. Farrell, do you want to respond?

20              MR. FARRELL:  Yes, Your Honor.  We have no

21    objection to the testimony of what Mr. Mays said during the

22    presentations nor to the PowerPoint slides.

23         What we have objections to is the letter from the DEA

24    to them just like it was excluded with the HDMA industry

25    compliance guidelines.

```
1            THE COURT:  Yeah.  I have a concern about the
2     hearsay in the cover letters such as -- particularly the one
3     that talks about DEA presenting ABC with a Certificate of
4     Appreciation and so forth.
5         I think the, the training slides come in to show the,
6     the content of the training that was provided DEA by
7     AmerisourceBergen.  And I think at least one of the cover
8     letters is objectionable and they might all be.
9         How much are we -- are you willing to agree to let in,
10    Mr. Ackerman, Mr. Farrell?
11            MS. MCCLURE:  Well, Your Honor, may I respond as
12    well on the 785 point after Mr. Ackerman responds?
13            MR. ACKERMAN:  I was going to raise a different
14    point.  But I think what Mr. Farrell said is correct.  We're
15    willing to allow in the testimony regarding the
16    presentations.  We have concerns about the cover letters.
17        The only point I was going to raise, which I think Mr.
18    Majestro would give me a hard time if I didn't raise, is to
19    note the fact that Quantico, Virginia, is a whole lot
20    further away from Huntington than Mingo County.
21            MS. MCCLURE:  Your Honor, if I may respond.
22        One of the few areas prior to 2012 that Mr. Prevoznik
23    did testify about in his deposition in this case was, in
24    fact, these trainings that AmerisourceBergen was asked by
25    DEA to give to diversion investigators who were all located
```

1     in Quantico, which I'm sure Your Honor is aware is the

2     headquarters for where these types of trainings take place

3     and students were going to be sent out across to the various

4     field offices.

5          Nevertheless, one of the things that Mr. Prevoznik

6     testified about was that he did attend these -- at least one

7     training, and that he believed that AmerisourceBergen was

8     entitled to and deserved this award that is referenced at

9     785.

10         So the point is the plaintiffs' position here is that

11    we are actively at this time apparently violating the CSA,

12    despite the fact that we are running an approved program

13    that DEA explicitly approved in 1998.

14         So the fact that we are not only presenting the

15    training, presenting the training to supervisory staff who

16    don't ask for it to be modified or changed, and they

17    award -- give AmerisourceBergen an award for conducting

18    these trainings is directly relevant to AmerisourceBergen's

19    belief that it was, in fact, operating in compliance with

20    the CSA at the time.

21         So to the extent that this is a hearsay document, I

22    also suggest that the memorandum attached and is the cover

23    of 785 is directly relevant to the defendants' state of mind

24    and is admissible for that limited purpose.

25              MR. ACKERMAN:  Your Honor, just to respond

1    briefly, I, I want to make sure that -- I think Ms. McClure

2    is overstating what this presentation actually is in order

3    to try to get it in under the state of mind exception.

4        We've heard a lot of testimony about cage and vault and

5    other things, like one cage on suspicious order reporting.

6    We understand from the last, what, three, four days of

7    testimony that their system involves a whole lot more than

8    these four bullet points.

9        I think Mr. Farrell has made our points.  We believe

10   the cover letters are hearsay.  And I don't think that there

11   has been any exception identified that would bring them in.

12               MS. MCCLURE:  Your Honor, these are clearly --

13               THE COURT:  I've probably heard enough here.  I

14   think the cover letter on 785 is clearly hearsay and needs

15   to come out.  But that doesn't mean this witness can't

16   testify that they received a Certificate of Appreciation

17   from DEA if that's within his personal knowledge.

18       I think the PowerPoint slides can come in to show the

19   content of the training that, that AmerisourceBergen gave to

20   DEA.

21       Now, what about the other -- so I'm going to let in the

22   PowerPoint presentations and keep out one of the cover

23   letters.

24       Now, there are a bunch of other cover letters that all

25   say the same thing.  Are they objectionable?  They just talk

1    about scheduling meetings and so forth.

2              MR. FARRELL:  Judge, we would object on the same

3    grounds where we made the same arguments that counsel is

4    making for the cover letters of the HDMA guidelines for

5    purposes of notice.

6         That being said, we think that the, the timing of this,

7    which is all prior to 2005, so we'll stand by your ruling

8    and move on.

9              MS. MCCLURE:  Your Honor, provided the slides come

10   in, I am fine to have the cover letters not come in and can

11   withdraw --

12             THE COURT:  Okay.  I'm going to admit the slides

13   and the PowerPoint presentation and, and have you remove all

14   of the cover letters.  I think one of them is clearly

15   impermissible hearsay and the others, giving the plaintiffs

16   the benefit of the doubt, I'll order those out too.

17        But you get the slides in and they show the content of

18   the training that AmerisourceBergen gave to DEA.  And you

19   can ask him about the awards.  If he remembers, he can

20   testify about that.

21             MS. MCCLURE:  I will.  Thank you.

22   BY MS. MCCLURE:

23   **Q.**   Mr. Mays, --

24   **A.**   Yes, ma'am.

25   **Q.**   -- do you remember whether you were ever given an award

1    in connection with these trainings that you conducted?

2    **A.**    Yes.

3    **Q.**    Who gave you that award?

4    **A.**    I believe it may have been Mr. Prevoznik.  I'm not

5    sure.  But it was whoever the super was on that visit.

6    **Q.**    Let me ask more clearly.  Was it the DEA or someone

7    from DEA who gave you that award?

8    **A.**    Yes, yes.

9    **Q.**    Okay.  And what was your understanding as to why they

10   gave you an award?

11   **A.**    It was just to -- it was in -- you know, it was

12   appreciation for all of the training that we had been doing

13   over the years and during that specific time frame for the

14   diversion investigators.

15   **Q.**    Mr. Mays, the PowerPoint presentation that we went

16   through -- we didn't go through every slide.  Did you do

17   every slide, however, when you presented it to your -- to

18   the students?

19   **A.**    Oh, yes, I covered every slide.

20   **Q.**    Okay.  And was there ever a time where anyone from DEA

21   told you that those slides were inaccurate, not a reflection

22   of the law, needed to be changed, or gave you any kind of

23   notice like that?

24            MR. FARRELL:  Objection, hearsay.

25            MS. MCCLURE:  And, Your Honor, I would suggest

1    that given the foundation that's been laid for these slides,

2    the fact that these were given to DEA and they were attended

3    by DEA supervisory staff, including Mr. Prevoznik, that,

4    that the fact that Mr. Mays did or did not hear that

5    anything needed to be changed in his PowerPoint slides about

6    the CSA and about our program is relevant, again, to the

7    defendant's state of mind.

8        So this testimony would be being offered for this

9    limited purpose of exception for state of mind.

10           THE COURT:  I'm going to sustain the objection.  I

11   think that's hearsay and I think it needs to stay out.

12   BY MS. MCCLURE:

13   **Q.**   Okay.  We'll move on to -- Mr. Mays, were you

14   familiar with the suspicious order reporting that

15   AmerisourceBergen was doing in the time period prior to

16   the 2007 Immediate Suspension Order?

17   **A.**   Yes, ma'am.

18   **Q.**   And if I showed you a copy of a Possible Excessive

19   Purchases Report, is that something you would recognize or

20   be familiar with in the course of your job duties?

21   **A.**   I believe so, yes.

22           MS. MCCLURE:  If we could have AM-WV-790.

23       May I approach, Your Honor?

24           THE COURT:  Yes.

25           THE WITNESS:  Thank you.

```
1              THE COURT:  I think I'm going to go back and let
2    him answer that question that I sustained the objection to
3    because unless he talks about the -- testifies to the
4    content of the statement DEA made, I don't think there's any
5    hearsay there.  So I'm going to reverse my ruling and let
6    you go back and ask the question again.
7              MS. MCCLURE:  Okay.
8    BY MS. MCCLURE:
9    Q.   Mr. Mays, circling back to the PowerPoint slides
10   that you gave to these diversion investigator students
11   five times in that time period, --
12   A.   Yes.
13   Q.   -- did any supervisory staff from DEA who attended with
14   those students ever tell you that there was anything wrong
15   with your presentation, slides needed to be changed, or
16   express any objections to the, to the material that you laid
17   out either on the slides or orally in that presentation?
18   A.   No, I don't recall any of -- in any of the sessions
19   ever even being offered a recommendation or told to change
20   anything or that anything was wrong.
21   Q.   Thank you.
22             THE COURT:  Okay.  The record will show your
23   objection to me reversing myself on that.  But he didn't
24   testify to anything they said and, so, I don't think there's
25   any hearsay there.
```

1           MS. MCCLURE:  Thank you, Your Honor.

2   BY MS. MCCLURE:

3   **Q.**   Okay.  AM-WV-790.

4        Mr. Mays, can you identify what this document is for

5   the record?

6   **A.**   Yes.  It's a Possible Excessive Purchases Report.

7   **Q.**   And what is the date on the top right of this document?

8        Ritchie, if you could put this up on the screen,

9   please.

10          MR. FARRELL:  Your Honor -- objection, Your Honor.

11   I've got this one.  Geographic scope.

12          MS. MCCLURE:  Your Honor, we've previously heard

13   testimony about the fact that this is a nationwide program.

14          THE COURT:  Yes, overruled.  I'm going to let him

15   answer it.

16   BY MS. MCCLURE:

17   **Q.**   So in the top right, what is the date there?

18   **A.**   April 24th, 2007.

19   **Q.**   Mr. Mays, would these Possible Excessive Purchase

20   Reports look the same across the country in terms of the

21   type of information and the format that this document is in

22   here that we're looking at?

23   **A.**   Yes, they would.

24   **Q.**   And what is this -- I'm sorry.  I may have asked this.

25   This is a Possible Excessive Purchase Report.  Are these

1    orders that are suspicious that have been reported to DEA?

2    **A.**    Yes, these orders would have been reported to DEA.

3    **Q.**    Okay.  On the very first page there is some

4    handwriting.  There's also some handwriting throughout the

5    document.  Do you know whose handwriting that is?

6    **A.**    I believe that is the Compliance Manager in Orlando's

7    handwriting.  Her name is Marisol Olmo, O-l-m-o.

8    **Q.**    Okay.  And that's her current title is Compliance

9    Manager?

10   **A.**    Yes.  She's the CSRA manager.

11   **Q.**    Okay.  And was that her same title -- did she have CSRA

12   type responsibilities in 2007?

13   **A.**    Yes, she would have had the same responsibilities.

14   **Q.**    Okay.

15   **A.**    Her title would have been a little different.  They

16   were called Compliance Managers for a time and then we

17   changed their title to CSRA Manager.

18   **Q.**    And do you have an understanding as to what Ms. Olmo

19   was doing with this report?

20   **A.**    Yes.  She's required to review it on a daily basis and

21   sign off on it that she has reviewed it.

22   **Q.**    And is Ms. Olmo within your supervisory line of --

23   chain of command, --

24   **A.**    Yes.

25   **Q.**    -- for lack of a better word, at this time?

**A.**   Yes.  She's a manager and she reports to one of my

directors who report -- the directors report directly to me.

**Q.**   And who would she have reported to at this time?

**A.**   Let's see.  2007.  I think that would have been Tony

Droves (phonetic).  But I'm not sure because the directors

have changed over time.

**Q.**   Let's turn to Bates 6059.  It's about, I don't know,

halfway through.

**A.**   059.

**Q.**   The note on the right there in the handwriting, do you

have an understanding as to what that says?

**A.**   I'm not there yet.

          MR. ACKERMAN:  Your Honor, I understand that it's

a national program.  But if we're talking about notes about

specific customers in Jacksonville, Florida, I think we

would reassert our geographic scope objection.

          MS. MCCLURE:  Your Honor, this is not offered for

the purpose of anything having to do with the specific

customer.  It's being offered to demonstrate the fact that

our compliance managers not only reported these orders to

DEA.  They actually then reviewed their own reports for

purposes of compliance with the Controlled Substances Act.

          THE COURT:  Overruled.

BY MS. MCCLURE:

**Q.**   What does that note say on the right?

1    **A.**   It says "okay per Eric Cherveny."  It looks like it

2    says -- I don't know if it says "see this report from

3    4-18-07."

4    **Q.**   Okay.  Were compliance managers like Marisol required

5    to review reports of suspicious orders that had been already

6    sent into the DEA?

7    **A.**   Yes.

8    **Q.**   What was the purpose of that?

9    **A.**   To review those to, you know, make sure that they are

10   being reported as required and to, you know, point out

11   anything that really stood out to them.

12        They may call the corporate office to express any

13   concerns.  They may take extra action at the DC level to

14   monitor the customer a little closer.  They also had the

15   ability to stop an order at the distribution center level

16   manually using the base levels that we had.

17   **Q.**   Okay.

18             MS. MCCLURE:  Your Honor, I move for the admission

19   of AM-WV-790.  I'm not sure I did that, but just in case I

20   didn't.

21             THE COURT:  Do you have any objection to 790?

22             MR. FARRELL:  Yes, objection, Your Honor.

23             THE COURT:  What's your objection?

24             MR. FARRELL:  It's the Jackson- -- it's the

25   Orlando, Florida, diversion so there's relevance with

```
 1    geographic scope, and for the same reasons that you excluded

 2    the OMP history and suspicious orders, we would make the

 3    same argument that if we can't get in non-jurisdictional

 4    pharmacies, neither should they.

 5              MS. MCCLURE:  Your Honor, non-jurisdictional

 6    pharmacies about which discovery was never conducted in this

 7    case have no bearing on the question of whether this

 8    national program and documents that date from 2007

 9    confirming the manner in which --

10              THE COURT:  I agree.  It's admitted.  The

11    objection is overruled.

12              MS. MCCLURE:  Thank you, Your Honor.

13    BY MS. MCCLURE:

14    Q.   Okay.  You can set that aside, Mr. Mays.

15    A.   Step outside did you say?

16    Q.   You can set that aside.  Oh, no, I didn't say step

17    outside.

18    A.   I was ready to run.

19         (Laughter)

20    BY MS. MCCLURE:

21    Q.   Mr. Mays, several times I believe you've testified

22    that in addition to the automated process that corporate

23    CSRA had to report suspicious orders, there was another

24    process that existed for AmerisourceBergen's

25    distribution center employees who identify and report
```

1    suspicious orders.  Is that right?

2    **A.**   That's correct.

3    **Q.**   Okay.

4         Lou, if we could hand out AM-WV-00006.  Oh, wait.  I'm

5    sorry.  Hold on one moment.  Okay.  This is it.

6         May I approach?

7              THE COURT:  Yes.

8    BY MS. MCCLURE:

9    **Q.**   Mr. Mays, do you recognize this document?

10   **A.**   Yes, ma'am.

11   **Q.**   Would you put that up on the screen, please.

12        Mr. Mays, what is this document?

13   **A.**   So it's, it's a, it's a form that we require to be

14   posted inside the cage and the vault that has base levels

15   that can be considered when the order fillers are filling

16   orders; that they should closely inspect the order to see if

17   it exceeds these base levels.  And if they do, they are to

18   bring it to their supervisor's attention.

19        They're also trained on this, on the distribution

20   center that they, that they can't rely on automated systems;

21   that we rely on them to do their jobs to order -- to manage

22   or monitor orders that they're filling on a daily basis.

23   **Q.**   And, so, if the -- if you could read the first sentence

24   of the third paragraph that begins with "every."

25   **A.**   Okay.

1      "Every controlled substance order received in the vault

2  or cage will be closely inspected by the order clerks prior

3  to filling to determine if quantities ordered may be

4  excessive."

5  **Q.**   Okay.  And then there's a list of various quantities.

6  Can you read under the quantities the bullet the word that

7  begins "in addition"?

8  **A.**   In the bold print?

9  **Q.**   Yeah.  "In addition, any irregular."

10  **A.**   Yeah.

11      "In addition, any irregular orders, orders of unusual

12  size or quantities, or orders deviating from the customer's

13  normal pattern must also be brought to the supervisor's

14  attention."

15  **Q.**   What's the purpose of that?

16  **A.**   It's explaining to them again what their

17  responsibilities are when they're reviewing the orders that

18  they're filling, the different, the different types of

19  characteristics of those orders that they need to bring to

20  their supervisor's attention.

21  **Q.**   And, so, is the order filler the person who decides

22  whether the order that they are concerned about is

23  suspicious or not, or is that the supervisor?

24  **A.**   The -- it's, it's the supervisor.  They're just

25  bringing it to the supervisor's attention if it, if it meets

1    any of these characteristics or exceeds these base levels.

2    **Q.**   And then what is the supervisor supposed to do?

3    **A.**   Let me look at this again.

4         It says the supervisor is -- if the order quantities

5    are deemed excessive by the supervisor, even if the order

6    had been filled or is cancelled or reduced, it must be

7    reported to DEA by the supervisor within 24 hours.

8    **Q.**   Okay.  Now, what is the date on this document,

9    Suspicious Order Monitoring Base Levels?

10   **A.**   February, 2007.

11   **Q.**   Okay.  So while it's dated February, 2007, does this

12   form look similar to forms you have previously seen in cage

13   and vault in the '90s and 2000s when you had roles both in

14   operations and regulatory affairs?

15   **A.**   Yes.  I can remember this form being used all the way

16   back to probably my time when I was in Chattanooga.

17   **Q.**   Okay.  You can put that aside.

18        MS. MCCLURE:  Your Honor, can I check something on

19   my table for a minute?

20        (Pause)

21        MS. MCCLURE:  Your Honor, slight issue, but I have

22   a solution.

23        The internet pharmacy 2005 binder has already been

24   admitted under a P number.  We additionally have copies to

25   hand out which have a different number assigned to them.

```
 1        I'm not sure -- instead of having everybody dig through

 2   what's already been admitted under the P number, I just

 3   propose we hand out the copies even though it's a different

 4   exhibit number.

 5        Is there any issue with that?

 6             MR. FARRELL:  No objection.

 7             THE COURT:  All right.  That's fine.

 8             MS. MCCLURE:  Thank you.  May I approach?

 9   BY MS. MCCLURE:

10   Q.   So, Mr. Mays, going back to the internet pharmacy

11   presentation you were asked about during your meeting

12   with DEA, how did it come about that you attended this

13   meeting with DEA?

14   A.   Well, I was initially notified -- I was initially

15   approached by Kyle Wright at a had distributor conference --

16   I think it was in the spring of 2005 -- and asked would I be

17   willing to meet with DEA.  I can't remember his exact words,

18   so -- but he asked -- approached me at that point.

19        And then Mike Mapes contacted me sometime before the

20   meeting to confirm the meeting and invite me to come to the

21   meeting.

22   Q.   And did you already know Mr. Mapes when you attended

23   this internet pharmacy meeting or was he new to you?

24   A.   He was new to me.  I originally met him in the lobby at

25   DEA headquarters.  That was the first time I met him.
```

1    **Q.**   Okay.  And, broadly speaking, what did you understand

2    DEA's concerns to be that they raised to you during this

3    meeting?

4    **A.**   It was exclusively about internet pharmacy and the

5    problem that they were having with internet pharmacies.

6    **Q.**   And what did they want you to do?

7    **A.**   Well, they asked for our help and, and just, you know,

8    went through how big a problem that they thought it was and

9    they asked for our help as a distributor to take a look at

10   our customers and to see if they met any characteristics of

11   an internet pharmacy.

12   **Q.**   Okay.  If we could take a quick look at certain of the

13   slides --

14   **A.**   Okay.

15   **Q.**   -- in this presentation.  How many of these describe

16   suspicious orders?

17   **A.**   I think there was three slides related to suspicious

18   orders.

19   **Q.**   Okay.  And those are on 893 and 894?

20   **A.**   That's correct.

21   **Q.**   Now, do any of these three slides say that distributors

22   should not ship an order that they deem to be suspicious?

23   **A.**   No, they do not.

24   **Q.**   Now, separate from the slides, Mr. Mays, did anyone at

25   this meeting tell you from DEA that AmerisourceBergen and

```
 1   distributors should not ship a suspicious order?
 2   A.    No.
 3   Q.    If we could go to 898.
 4   A.    Okay.
 5   Q.    And that's one of the top -- popular internet drugs.
 6   What, what -- did they say anything to you about this slide?
 7   A.    They were just pointing out the most common drugs that
 8   were prescribed and, and filled over the internet.
 9   Q.    Okay.  If you could turn to the very last two pages of
10   this document.  What is the title of these two pages?
11   A.    "Internet Pharmacy Decision Questions."
12   Q.    Okay.  There's some handwriting on this second page
13   here.  Whose handwriting is that?
14   A.    That is mine.  That's my chicken scratch.
15   Q.    Now, did you understand that DEA was requiring
16   AmerisourceBergen to implement this questionnaire?
17   A.    I did not take it that we were required to implement
18   it.  It was recommended.
19   Q.    Do you recall what DEA told you that some of the
20   characteristics of internet pharmacies were?
21   A.    Yeah, I can recall some of the conversation, yes.
22   Q.    Can you recount any of that?
23   A.    Yeah.  I think they wanted to -- wanted us to be sure
24   that we saw when we opened a new customer that we made sure
25   that it was a brick and mortar pharmacy.  And I think they
```

1    had some photographs in there where they had -- somebody was

2    operating an internet pharmacy out of their living room.

3    And then another one was -- had a picture of two agents in

4    front of a storage facility.

5         So they were making the point that we should make sure

6    that it's a brick and mortar pharmacy.  I think they like to

7    use that term, brick and mortar pharmacy.

8         And, also if -- you know, we should look for like FedEx

9    or UPS boxes stacked up in a pharmacy in one of our

10   customers.  That would be another sign that they could be

11   conducting internet pharmacy operations.

12   **Q.**   Now, Mr. Mays, during this meeting with DEA --

13   **A.**   Uh-huh.

14   **Q.**   -- were you told that AmerisourceBergen was doing

15   anything wrong, improper, or not in compliance with the CSA?

16   **A.**   No, absolutely not.

17   **Q.**   Would that be something you might remember?

18   **A.**   Oh, yeah, I would remember.

19   **Q.**   Why would you say that?

20   **A.**   I mean, I would have gone back and like, you know, rung

21   the alarm bells if they brought me to DC and told -- to

22   their offices and told me we were doing something wrong,

23   yes, I would have -- we would have made immediate changes to

24   correct it.

25   **Q.**   How would you describe this meeting generally with DEA?

1    **A.**   Very cordial, cooperative.  I didn't take it as

2    adversarial at all.

3    **Q.**   And, now, I believe you testified about a follow-up

4    phone call you had with DEA after this meeting in September;

5    right?

6    **A.**   Yes.

7    **Q.**   Okay.  If we could hand out -- oh, no, that's already

8    been admitted.  If we could hand out AM-WV-01079.

9         May I approach, Your Honor?

10        Your Honor, also a matter of housekeeping, I apparently

11   have failed to move into evidence AM-WV-00006 which was that

12   one-page base level suspicious order monitoring document.

13   So I would seek to do that now.

14             MR. FARRELL:  No objection, Your Honor.

15             THE COURT:  Did you offer 79?

16             MS. MCCLURE:  Your Honor, at this time I

17   remembered that I forgot -- I was reminded by my friendly

18   colleagues that I forgot to move in this one page.

19             THE COURT:  I didn't hear you.  I was reading.

20             MS. MCCLURE:  No worries.

21             THE COURT:  So you're moving 6 in?

22             MS. MCCLURE:  00006.

23             THE COURT:  There's no objection to 6?

24             MS. MCCLURE:  That's correct.

25             THE COURT:  It's admitted.

1              MS. MCCLURE:  I will eventually get to move 1079

2    in, but I figure I should do a little more with it first.

3              THE COURT:  Okay.

4    BY MS. MCCLURE:

5    **Q.**   Mr. Mays, do you recognize AM-WV-1079?

6    **A.**   Yes, ma'am, I do.

7    **Q.**   What is this document?

8    **A.**   This is the Lawtrac matter that I opened to document

9    the meeting and the initiative that we started based on that

10   meeting with DEA.

11   **Q.**   Okay.

12        And, Ritchie, if you could put that up on the screen

13   and then if we could go to the very bottom first, the

14   7/21/05.

15        Is that the first entry in this Lawtrac matter?  In

16   other words, does it go from the bottom up?

17   **A.**   Yes, it goes from the bottom up.  The most recent text

18   is at the top.

19   **Q.**   Okay.  Thank you.

20        And then if you could go to the entry above that,

21   Ritchie, the one that starts -- yep.  Thank you.

22        And, so, this one, I believe, starts at the top, is

23   that correct, Mr. Mays, where it says "Mays attended"?

24   **A.**   Yes, that would have been -- when you say the last

25   entry --

1   **Q.**   Yeah, okay.

2   **A.**   There was an additional one above that.

3   **Q.**   Okay.  And then the paragraph that begins 9/19/05, is

4   that the date of the follow-up call you had with DEA

5   regarding internet pharmacy?

6   **A.**   That's correct.

7   **Q.**   And who was on that call from DEA?

8   **A.**   It doesn't mention names, but I'm almost positive it

9   was Mike Mapes.

10  **Q.**   Okay.  And do you recall that because he was the one

11  who attended the prior meeting you had?

12  **A.**   Yes.

13  **Q.**   Okay.  And from AmerisourceBergen it was yourself,

14  Chris Zimmerman, and counsel; is that correct?

15  **A.**   Yes, our internal counsel and outside counsel.

16  **Q.**   Okay.  Following up, then, on this conference call

17  about the internet pharmacy issue, were you told that

18  AmerisourceBergen was doing anything wrong or not in

19  compliance with the CSA?

20  **A.**   No, we weren't.

21  **Q.**   Did Mr. Mapes or anyone else from the DEA during this

22  call tell you that AmerisourceBergen needed to stop shipping

23  suspicious orders?

24  **A.**   No, they did not.

25  **Q.**   What did AmerisourceBergen do to address and respond to

1    the concerns DEA had raised about internet pharmacy?

2    **A.**   Well, we put, we put together a, an investigation

3    program from utilizing the report, the Excessive Purchases

4    Report.

5        I assigned one of my team to start investigating

6    customers that had purchased those three drugs that had,

7    that had been reported as suspicious, and conduct additional

8    due diligence of those customers, specifically to look for

9    the indications of internet pharmacy.

10       So we adopted the checklist of questions that Mike

11   Mapes provided me.  And that's where we created our Form 590

12   which is our form for a site visit of a pharmacy.

13   **Q.**   Now, after this meeting, either of these meetings, the

14   meeting or the call, did DEA mandate that you start these

15   investigations or was that something the company chose to do

16   in response to the DEA's concerns?

17   **A.**   They didn't mandate us to do anything.  It was all

18   recommended.  But we've always worked very cooperatively

19   with DEA.  When they ask us to do something, we have

20   typically always done it.

21   **Q.**   Okay.  And who -- you said you assigned an investigator

22   to oversee some new investigations.  Who was that?

23   **A.**   That was Eric Cherveny.

24   **Q.**   And then if you look through the remainder of this

25   document, Mr. Mays, did you also update company policies and

1    procedures subsequent to this meeting with -- the meeting

2    and the phone call with DEA?

3    **A.**   Yes, yes, I did.

4    **Q.**   And is that reflected in the rest of this Lawtrac

5    document, those updated policies and procedures?

6    **A.**   I believe it is.

7    **Q.**   I'll give you a moment.

8         (Pause)

9    **A.**   Yes.  It states that we were currently developing the

10   procedures for investigating possible excessive and

11   suspicious purchasing activity of customers and identifying

12   those that may involve -- may be involved in illegal

13   activity.

14   **Q.**   And, so, are these policies and procedures -- there's

15   two.  One is called S&RC 5.1 and one is called CSRA 2.12.

16   Are these true and correct copies of the policies and

17   procedures that were updated by you after this meeting with

18   DEA and the phone call?

19   **A.**   That is correct.

20        MS. MCCLURE:  Your Honor, I move for the admission

21   of AM-WV-1079.

22        THE COURT:  Any objection?

23        MR. FARRELL:  I believe that I just have a point

24   of clarification.  The policy that we're referencing here

25   has already been entered in the record or no?

```
 1              MS. MCCLURE:  Your Honor, it's possible that that
 2    policy was already entered.  However, for purposes of
 3    AmerisourceBergen's recordkeeping, Lawtrac entries like this
 4    one -- this is presented in its full document original
 5    format.  So it contains the entries, the new policies, and
 6    then some Form 590s that Mr. Mays has previously testified
 7    about.  So I'm seeking the admission of this document as its
 8    own separate document.
 9              MR. FARRELL:  No objection.
10              THE COURT:  All right, 1079 is admitted.
11              MS. MCCLURE:  Thank you.
12    BY MS. MCCLURE:
13    Q.   And, so, Mr. Mays, --
14              THE COURT:  That includes the Lawtrac; right?
15              MS. MCCLURE:  Yes, Your Honor.  It's the entire
16    document from Bates ending 8249 to Bates ending 8259.
17              THE COURT:  All right.  There being no objection,
18    it's admitted.
19              MS. MCCLURE:  Thank you.
20    BY MS. MCCLURE:
21    Q.   Mr. Mays, can you briefly describe this new
22    investigation program that you initiated for -- in
23    response to DEA's internet pharmacy initiative?
24    A.   Yes.  It was, again, based on the discussions that I
25    had with DEA in the August meeting.  We put together a
```

1    policy and a procedure on how these investigations would be

2    conducted; identified the sources that would prompt one of

3    these investigations, mainly the review of the possible

4    excessive suspicious order report.

5         Also, if we got notification from DEA that they were

6    concerned about a customer or if they took action against a

7    customer, that would prompt one of these investigations.

8         And, also, if we were notified by a distribution center

9    of concerns or someone from the sales team, any of those

10   three areas would prompt one of these investigations.

11        And, and I even put in, you know, specific procedures

12   that had to be followed on each one to make sure that we

13   were consistent in how we conducted them.  And it would

14   include --

15   **Q.**   Mr. Mays, are you reading from 2.12 or are you --

16   **A.**   Well, I'm just -- I'm looking at it while I'm

17   describing it.  Is that okay?

18   **Q.**   Okay.  I appreciate that.  My apologies for

19   interrupting.  Yes, that's perfectly fine.

20   **A.**   There's quite a few steps in there and I just didn't

21   want to miss anything.

22        The -- Eric, who was assigned to do these, would

23   identify the customers based on those products that DEA had

24   told us were most commonly used on the internet.  We had to

25   do a one-year purchase history to see what, what that

1    customer's purchase history was of those drugs, if it was

2    all of a sudden large purchases or whether it was steady or

3    there were any spikes in purchases over that one-year

4    period.

5         And then, you know, once he did that, he would have one

6    of the sales, the sales rep go out to the pharmacy because

7    that was a really important part of it because there was a

8    lot of visual things to determine, help us determine whether

9    they were engaged in that activity, you know, the physical

10   pharmacy itself.  We required them to take pictures inside

11   and out of the pharmacy; and then also complete the 590 form

12   along with the customer to make sure that they agreed on all

13   the information that's being indicated and all the answers

14   that are being put on the form.

15        And then once Eric completed his investigation, he

16   would bring everything to me and then we would review it and

17   decide what course of action that we would take.

18   **Q.**   You talked about sales.  I just want to clarify

19   something.

20   **A.**   Uh-huh.

21   **Q.**   Did anyone from sales -- other than completing the 590

22   with the customer and taking photographs, did anyone from

23   sales play any investigatory role with respect to any of

24   these customers?

25   **A.**   Not other than conducting a site visit.

1    **Q.**   Okay.  So when -- if you had other investigators

2    working with Eric Cherveny, would those investigators have

3    been CSRA employees or would they have been sales employees?

4    **A.**   They wouldn't have been sales employees.  They would

5    have been CSRA employees.

6    **Q.**   Okay.  Thank you.  And is the new 590 form that you've

7    referenced attached to these new policies, or these updated

8    policies that you discussed here today?

9    **A.**   Yes, it is.

10   **Q.**   And are there actually different forms depending on

11   whether the pharmacy is a mail-order pharmacy, is not a

12   mail-order pharmacy, and is just a regular retail pharmacy?

13   **A.**   Yes.  We put together a couple of acknowledgments that

14   we would ask them to sign depending on what we, what we

15   discovered in the investigation.

16        So if they -- we had what we would call a non-internet

17   pharmacy agreement that we would have them sign if we didn't

18   see any indications that they were engaged in illegal

19   internet pharmacy.

20   **Q.**   Uh-huh.

21   **A.**   If they were engaged in internet pharmacy, there are

22   legal ways to do it.  And, so, there was another form that

23   we would have if it was -- if they were engaged in internet

24   activity --

25   **Q.**   Is that the 590b at Bates 56 and 57?

1   **A.**   That would be the 590b, yes.  That's the -- that

2   basically is titled "Internet/Mail-Order Pharmacy Compliance

3   Agreement" and has several bullet points of things that they

4   would -- they're acknowledging that they comply with if we

5   are going to continue to service them.

6   **Q.**   So, Mr. Mays, are you saying that it, it was -- not

7   every internet pharmacy was by definition illegal?

8   **A.**   Correct.

9   **Q.**   Okay.  So there's a legal --

10   **A.**   There is a legal way to do it.

11   **Q.**   Thank you.  And then the 590 that is the general retail

12   pharmacy 590, is that what's reflected at Bates 58 and 59?

13   That's the very last two pages.

14   **A.**   Yeah, that's the, that's the pharmacy questionnaire

15   that has to be completed during the site visit.

16   **Q.**   Okay.  And what would happen if your investigation

17   reveals that a customer was engaged in illegal internet

18   pharmacy sales?

19   **A.**   Well, then we would -- then, you know, if we determined

20   that, then we would work with legal and make a determination

21   about what type of action it would take.  And it often would

22   include ceasing sales of controlled substances to the

23   customer.

24   **Q.**   And what would -- okay.

25           MS. MCCLURE:  Your Honor, I'm about to start a new

```
 1    area that's going to involve some substantial new sets of
 2    documents to be handed out.  I defer to Your Honor as to
 3    whether to begin or hold that.  Unfortunately, I don't
 4    believe that we can complete Mr. Mays today.
 5              THE COURT:  Well, if you're at a stopping place,
 6    this might be a good time to close for the day.  What do you
 7    think?
 8              MS. MCCLURE:  Well, Your Honor, it is going to be
 9    a new area that's going to involve a lot of document handing
10    out.
11              THE COURT:  Okay.  I'm going to pull the plug on
12    this until tomorrow morning at 9:00.  I'll see everybody --
13              MR. ACKERMAN:  Your Honor, I would just request
14    that counsel let us know how much more questioning they
15    think they have so that we can do some witness planning for
16    tomorrow and the rest of the week.
17              THE COURT:  I think that's a fair request, Ms.
18    McClure.
19              MS. MCCLURE:  I'm happy to do that.  I can either
20    make that statement now or I could have an hour and advise
21    the plaintiffs as to what looks like is left given what
22    we've gotten through today.  I'm happy to do both.
23              THE COURT:  Mr. Farrell.
24              MR. FARRELL:  Risking your ire, we would ask that
25    if these are new areas of testimony that we get copies of
```

1    the exhibits they intend to use by 7:00 tonight.  And

2    then --

3              MS. MCCLURE:  Your Honor, I believe that it may

4    be, may be four, may be five times, I think I have lost

5    count, as to the number of times we've addressed this issue.

6         The stipulation does not require us to provide copies

7    to the plaintiffs when they have chosen to call an adverse

8    witness in their case in chief.  I would request that Your

9    Honor simply stand by its prior orders.

10             THE COURT:  All right.  I'm going to stand by my

11   prior orders and deny your request, Mr. Farrell.

12             MR. FARRELL:  Yes, sir.  And then before we

13   adjourn, I'd like to tender 187-A which is the document that

14   we -- should I wait?

15             THE COURT:  What is 187-A?

16             MR. FARRELL:  It's the thing we put up that I told

17   the Court that we would print off from the, from the

18   computer screen.

19             THE COURT:  Yeah.

20             MS. MCCLURE:  So the one with his handwritten

21   notes, I think we already said that that could come in, but

22   I'd appreciate the opportunity to look at the hard copy

23   myself.

24             THE COURT:  It's already been admitted apparently.

25             MR. FARRELL:  The hard copy?

1          MS. MCCLURE:  But I would take a hard copy if I

2     could have one.  Thank you very much.

3        Thank you, Your Honor.

4          THE COURT:  Okay.  Anything else before we adjourn

5     until in the morning?

6        (No Response)

7          THE COURT:  I'm going to have to ask you to come

8     back, Mr. Mays.

9          THE WITNESS:  That's quite all right, sir.

10          THE COURT:  We'll see you in the morning as well.

11          THE WITNESS:  Thank you, Your Honor.

12          THE COURT:  Okay.

13        (Trial recessed at 4:55 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1        CERTIFICATION:

2                 I, Ayme A. Cochran, Official Court

3    Reporter, and I, Lisa A. Cook, Official Court Reporter,

4    certify that the foregoing is a correct transcript from

5    the record of proceedings in the matter of The City of

6    Huntington, et al., Plaintiffs vs. AmerisourceBergen

7    Drug Corporation, et al., Defendants, Civil Action No.

8    3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9    reported on May 18, 2021.

10

11        S\Ayme A. Cochran            s\Lisa A. Cook

12          Reporter                     Reporter

13      _

14

15        May 18, 2021

16          Date

17

18

19

20

21

22

23

24

25
```

## #

**#12** [4] - 119:22, 120:6, 120:15, 133:17
**#6** [2] - 78:1, 88:22

## '

**'03** [1] - 164:17
**'05** [1] - 164:17
**'06** [6] - 118:2, 118:9, 120:24, 121:25, 131:3
**'07** [2] - 129:23, 131:3
**'74** [1] - 147:1
**'90s** [1] - 191:13
**'94** [5] - 147:1, 148:5, 148:23, 149:2
**'98** [1] - 149:2
**'Well** [1] - 100:10

## 0

**00006** [1] - 196:22
**00907** [2] - 2:5, 2:17
**059** [1] - 186:9

## 1

**1** [4] - 46:17, 94:10, 117:8, 117:25
**10,000** [3] - 132:16, 132:25, 135:17
**10,600** [5] - 78:21, 78:23, 79:7, 80:8, 81:12
**10,625** [1] - 82:23
**10-12** [1] - 106:7
**100** [2] - 14:6, 17:23
**100,000** [2] - 85:6, 117:3
**1001** [2] - 2:10, 4:6
**1006** [11] - 7:20, 7:22, 8:20, 11:12, 11:14, 93:19, 94:14, 95:14, 95:21, 96:20, 114:5
**1006s** [2] - 11:19, 22:25
**1022** [1] - 3:5
**1079** [2] - 197:1, 201:10
**10:00** [3] - 10:8, 14:7, 80:20
**10:58** [1] - 73:1
**10th** [3] - 78:15, 79:6, 79:22
**11** [1] - 97:10
**111** [1] - 75:24
**11:00** [2] - 9:23, 61:1

**11:10** [1] - 73:1
**11:49** [1] - 97:23
**11th** [1] - 20:21
**12** [5] - 1:16, 21:20, 84:4, 97:10, 156:22
**12,366** [1] - 35:11
**12,655** [1] - 118:5
**12-month** [1] - 126:24
**124,000** [2] - 120:5, 120:9
**126** [1] - 3:5
**12th** [4] - 79:6, 80:4, 81:11
**1300** [2] - 6:15, 168:24
**1301.71** [1] - 172:23
**1301.74** [1] - 174:14
**1311** [2] - 2:4, 2:16
**13th** [1] - 21:7
**140** [1] - 10:5
**14th** [1] - 140:5
**15** [1] - 97:10
**15,000** [1] - 68:5
**1562** [1] - 81:9
**15910** [1] - 3:18
**15th** [1] - 140:6
**16** [2] - 117:5
**1600** [1] - 3:17
**16639** [1] - 66:19
**16643** [5] - 138:5, 140:8, 143:4, 143:6, 145:5
**17** [1] - 40:18
**17,656** [1] - 66:8
**1717** [2] - 6:6, 6:13
**18** [5] - 1:19, 7:4, 169:21, 209:9, 209:15
**18,480** [1] - 35:12
**180** [1] - 10:20
**187** [1] - 112:25
**187-A** [2] - 207:13, 207:15
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1974** [3] - 145:24, 146:9, 146:14
**1980** [1] - 147:8
**1994** [2] - 147:10, 148:4
**1998** [2] - 150:20, 178:13
**19th** [2] - 20:23, 36:13
**1:00** [1] - 80:20
**1st** [2] - 134:21, 134:25

## 2

**2** [6] - 44:12, 46:8, 50:20, 66:1, 94:10,

113:14
**2.12** [4] - 21:1, 21:2, 200:15, 202:15
**20** [6] - 19:1, 19:5, 61:1, 111:21, 125:3, 147:2
**200** [4] - 14:6, 105:1, 151:24, 165:4
**2000** [5] - 148:23, 150:24, 154:10, 154:11, 154:15
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2000s** [1] - 191:13
**2001** [2] - 161:6, 175:5
**2002** [4] - 115:16, 154:13, 154:15, 154:17
**2003** [6] - 160:25, 161:3, 161:5, 161:11, 163:18, 175:15
**2004** [4] - 7:24, 163:18, 166:14, 175:1
**2005** [6] - 21:3, 163:18, 175:15, 180:7, 191:23, 192:16
**2006** [14] - 117:15, 119:14, 120:4, 120:8, 121:6, 121:7, 121:16, 121:17, 121:20, 122:2, 122:4, 132:15, 133:18, 134:19
**2007** [40] - 20:21, 21:19, 21:20, 24:3, 25:11, 29:10, 29:15, 29:16, 46:23, 73:24, 74:6, 78:15, 78:21, 79:6, 79:22, 80:4, 81:11, 81:12, 83:5, 83:6, 84:1, 124:17, 125:3, 125:5, 126:20, 126:23, 128:8, 129:12, 129:19, 130:1, 130:4, 130:10, 136:11, 182:16, 184:18, 185:12, 186:4, 188:8, 191:10, 191:11
**20070710** [1] - 79:16
**20070712** [1] - 80:1
**2008** [14] - 21:15, 40:10, 40:18, 41:22, 46:21, 46:23, 47:25,

49:13, 55:7, 67:19, 125:7, 128:16, 129:12, 136:15
**2009** [4] - 20:23, 35:9, 36:13, 86:7
**2010** [2] - 21:3, 86:17
**2011** [1] - 87:11
**2012** [8] - 21:23, 46:24, 56:16, 56:22, 67:19, 140:5, 140:6, 177:22
**2013** [1] - 21:8
**2014** [6] - 24:3, 25:11, 29:10, 29:15, 73:25, 117:15
**2018** [1] - 115:17
**2019** [1] - 7:25
**202** [2] - 2:4, 2:16
**2021** [4] - 1:19, 7:4, 209:9, 209:15
**20th** [5] - 21:19, 21:23, 56:16, 56:22, 129:11
**21** [2] - 149:20, 168:24
**21,000** [6] - 126:23, 127:11, 127:20, 128:7, 130:2
**21,100** [1] - 129:20
**2216** [1] - 3:7
**222** [2] - 157:2, 158:20
**24** [1] - 191:7
**24,732** [1] - 35:15
**24th** [1] - 184:18
**25** [2] - 5:5, 171:16
**25,000** [4] - 81:13, 83:3, 83:5, 126:25
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26** [4] - 125:5, 125:7, 128:15, 129:12
**263** [1] - 7:24
**26th** [3] - 81:12, 83:5, 136:15
**2796** [3] - 124:19, 124:21, 124:24
**27th** [1] - 83:6
**28** [3] - 3:15, 4:3, 4:9
**29** [1] - 107:6
**29464** [3] - 3:15, 4:4, 4:9
**29th** [1] - 98:19
**2:00** [1] - 97:18

## 3

**3** [1] - 40:14
**3,424** [1] - 121:12
**3,600** [1] - 122:5

**3,649** [2] - 121:21
**30** [3] - 11:15, 19:1, 19:5
**30,000** [10] - 83:3, 83:7, 84:2, 84:4, 85:12, 86:3, 86:6, 86:7, 86:12, 135:19
**302** [1] - 7:25
**30th** [2] - 86:17, 134:22
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**32502** [1] - 2:14
**33,000** [2] - 129:23, 130:14
**35** [1] - 66:8
**35,000** [1] - 120:16
**35,551** [1] - 123:2
**356** [3] - 79:14, 80:5, 80:25
**357** [1] - 80:25
**358** [1] - 80:25
**36** [4] - 115:14, 115:20, 116:11, 117:2
**36,000** [1] - 84:5
**360,000** [4] - 84:6, 84:7, 85:13, 85:18
**374** [1] - 7:24
**38** [4] - 9:21, 11:13, 11:19, 19:23
**38,100** [2] - 121:15, 122:1
**3843** [1] - 5:14
**39** [1] - 22:25
**39,960** [1] - 35:15
**3:00** [1] - 80:20
**3:17-cv-01362** [2] - 1:5, 209:8
**3:17-cv-01665** [2] - 1:11, 209:8
**3:40** [1] - 160:19

## 4

**4** [11] - 50:21, 94:11, 94:20, 94:22, 94:25, 96:7, 97:2, 97:10, 113:5, 113:6, 164:13
**4-18-07** [1] - 187:3
**40,000** [1] - 135:21
**40,200** [1] - 87:11
**400** [3] - 81:3, 107:12
**401** [2] - 2:10, 4:6
**405** [1] - 2:7
**413** [2] - 79:24, 80:6
**43** [1] - 19:19
**45,000** [2] - 86:7, 86:12
**46,000** [2] - 119:23,

120:16
**47** [1] - 145:19
**4:55** [1] - 208:13

## 5

**5** [3] - 97:2, 97:10, 120:16
**5.1** [1] - 200:15
**5007** [1] - 65:2
**5008** [1] - 65:2
**5009** [1] - 65:3
**54** [1] - 102:7
**55** [1] - 102:7
**553** [1] - 6:8
**56** [2] - 3:4, 204:25
**56,700** [2] - 121:23, 122:5
**56th** [1] - 3:5
**57** [1] - 204:25
**58** [1] - 205:12
**59** [1] - 205:12
**590** [6] - 199:11, 203:11, 203:21, 204:6, 205:11, 205:12
**590b** [2] - 204:25, 205:1
**590s** [1] - 201:6

## 6

**6** [15] - 14:25, 66:10, 73:7, 77:4, 84:14, 97:2, 97:10, 121:14, 124:17, 136:11, 138:11, 139:1, 143:10, 196:21, 196:23
**6,000** [3] - 118:19, 118:20, 119:4
**6,091** [1] - 118:1
**6,500** [1] - 130:17
**6,800** [1] - 133:18
**60** [1] - 31:17
**600** [1] - 2:13
**6059** [1] - 186:7
**629** [1] - 107:20
**6th** [1] - 3:5

## 7

**7** [1] - 164:13
**7,800** [1] - 120:8
**7/21/05** [1] - 197:14
**70130** [1] - 3:8
**707** [1] - 4:18
**716** [1] - 3:12
**72** [1] - 172:23
**725** [2] - 4:13, 4:15

**782** [4] - 162:3, 162:4, 163:23, 175:9
**783** [2] - 162:3, 163:25
**784** [4] - 162:3, 162:5, 164:2, 164:7
**785** [4] - 177:12, 178:9, 178:23, 179:14
**786** [2] - 162:3, 164:4
**787** [5] - 162:3, 162:4, 164:6, 164:7, 175:10
**79** [1] - 196:15
**790** [1] - 187:21
**7:00** [2] - 14:6, 207:1
**7th** [1] - 130:2

## 8

**8** [1] - 107:20
**801** [2] - 3:10, 45:15
**801(d)** [1] - 43:16
**801(d)(2** [3] - 53:11, 54:15, 142:20
**801(d)(2)(B** [3] - 43:6, 44:10
**801(d)(2)(C** [1] - 43:10
**801(d)(2)(D** [1] - 142:2
**803** [1] - 62:15
**803(3** [1] - 63:8
**803(3)** [1] - 61:11
**82** [2] - 9:20, 19:23
**8249** [1] - 201:16
**8259** [1] - 201:16
**832** [1] - 167:25
**833** [1] - 168:14
**84** [1] - 61:16
**844** [2] - 169:8, 169:9
**845** [1] - 170:1
**846** [2] - 172:16, 172:19
**847** [1] - 172:19
**848** [1] - 173:3
**849** [1] - 173:13
**850** [2] - 5:12, 174:11
**893** [1] - 193:19
**894** [1] - 193:19
**898** [1] - 194:3

## 9

**9** [2] - 97:10, 97:11
**9/19/05** [1] - 198:3
**901** [1] - 4:18
**91436** [1] - 3:18
**933** [1] - 7:25
**99** [1] - 96:12
**9:00** [2] - 7:4, 206:12
**9th** [1] - 2:10

## A

**a.m** [5] - 7:4, 73:1, 80:20, 97:23
**abandoned** [1] - 19:5
**abatement** [1] - 102:14
**abatement-only** [1] - 102:14
**ABC** [5] - 11:5, 55:2, 55:12, 81:1, 177:3
**ABDC** [30] - 14:2, 43:8, 44:16, 48:16, 48:20, 53:14, 53:20, 54:4, 55:2, 55:5, 55:9, 57:23, 61:12, 61:20, 62:4, 62:6, 64:10, 98:25, 107:4, 110:2, 110:13, 111:6, 111:13, 142:5, 142:24, 142:25, 166:1, 172:2, 172:6
**ABDC's** [6] - 44:11, 54:18, 58:2, 61:10, 62:8, 99:1
**ABDC-MDL-00295006** [1] - 65:1
**ABDC-MDL-01911481** [1] - 67:6
**ABDC-MDL-01911482** [1] - 88:23
**abide** [1] - 18:13
**abiding** [1] - 15:12
**ability** [6] - 10:12, 15:13, 16:13, 102:10, 104:13, 187:15
**able** [15] - 10:10, 18:23, 19:6, 20:18, 29:25, 52:23, 58:10, 64:4, 69:25, 70:9, 72:7, 77:12, 93:2, 104:24, 132:25
**ably** [1] - 42:9
**absence** [2] - 11:12, 34:6
**absolutely** [2] - 144:4, 195:16
**abstract** [1] - 116:11
**abuse** [1] - 8:1
**AC** [1] - 87:25
**accept** [2] - 27:21, 112:5
**Accept** [1] - 75:18
**acceptable** [1] - 71:1
**accepted** [2] - 31:4, 44:18
**accepted/approved** [1] - 30:25

**access** [6] - 16:2, 57:11, 59:14, 60:10, 157:6, 157:10
**accompanies** [1] - 22:11
**accompanying** [1] - 22:9
**according** [3] - 97:9, 107:22, 121:7
**account** [5] - 26:8, 37:23, 126:19, 129:2, 136:16
**accountability** [2] - 156:21, 156:25
**accounted** [1] - 19:5
**accounts** [1] - 8:6
**accumulate** [1] - 134:5
**accumulated** [1] - 136:1
**accurate** [11] - 8:17, 8:20, 25:10, 33:18, 132:6, 162:18, 164:20, 167:18, 168:1, 168:11, 174:23
**accurately** [1] - 27:12
**ACKERMAN** [24] - 2:9, 42:11, 43:1, 43:4, 44:6, 44:9, 53:9, 53:16, 61:4, 61:8, 63:15, 141:1, 141:6, 141:24, 142:9, 142:20, 152:21, 162:4, 165:23, 172:12, 177:13, 178:25, 186:13, 206:13
**Ackerman** [7] - 43:2, 43:24, 44:22, 62:12, 141:14, 177:10, 177:12
**Ackerman's** [1] - 45:15
**acknowledging** [1] - 205:4
**acknowledgment** [1] - 21:14
**acknowledgments** [1] - 204:13
**ACM** [1] - 128:13
**acquired** [3] - 147:13, 148:6
**Act** [6] - 41:8, 46:3, 175:16, 175:18, 176:6, 186:22
**act** [3] - 57:14, 59:16, 60:8
**acting** [2] - 45:6, 45:9
**action** [10] - 27:9,

27:14, 112:22, 153:11, 153:21, 160:11, 187:13, 202:6, 203:17, 205:21
**Action** [5] - 1:4, 1:10, 87:24, 209:7, 209:8
**actions** [2] - 113:7, 160:9
**actively** [2] - 33:7, 178:11
**Activity** [1] - 30:14
**activity** [7] - 37:23, 80:22, 82:13, 200:11, 200:13, 203:9, 204:24
**actual** [6] - 68:3, 71:15, 93:13, 110:5, 113:20, 158:18
**add** [3] - 8:23, 17:12, 123:4
**added** [1] - 125:18
**addition** [11] - 11:10, 43:18, 100:6, 105:25, 149:15, 168:5, 168:6, 188:22, 190:7, 190:9, 190:11
**additional** [13] - 29:2, 60:8, 64:9, 82:6, 82:9, 83:14, 103:6, 105:18, 108:9, 113:3, 153:20, 198:2, 199:7
**additionally** [1] - 191:24
**Additionally** [1] - 68:18
**address** [7] - 7:10, 23:15, 78:7, 102:19, 129:9, 198:25
**addressed** [1] - 207:5
**adjourn** [2] - 207:13, 208:4
**adjustment** [1] - 87:12
**adjustments** [1] - 34:6
**Administration** [1] - 44:21
**admissible** [6] - 7:18, 8:25, 47:7, 62:11, 62:17, 178:24
**admission** [12] - 51:14, 54:21, 66:15, 69:13, 70:8, 92:20, 124:19, 175:9, 176:11, 187:18, 200:20, 201:7
**admit** [17] - 7:17, 7:22, 9:13, 18:23, 54:6, 54:10, 64:11, 66:18,

70:11, 70:13, 70:22, 93:2, 93:6, 114:1, 141:1, 143:2, 180:12
**admitted** [42] - 20:15, 20:20, 20:25, 21:2, 23:14, 23:19, 31:8, 31:15, 41:14, 42:5, 52:19, 63:13, 64:15, 70:18, 93:18, 93:25, 94:4, 94:15, 94:16, 94:23, 95:8, 95:10, 95:14, 95:22, 96:2, 107:19, 112:10, 112:14, 112:20, 113:21, 113:25, 114:4, 124:23, 188:10, 191:24, 192:2, 196:8, 196:25, 201:10, 201:18, 207:24
**ADMITTED** [4] - 31:16, 112:15, 124:24, 143:4
**admitting** [5] - 41:19, 49:10, 64:17, 69:9, 95:18
**Admonition** [1] - 160:8
**adopt** [4] - 47:17, 47:24, 48:16, 55:18
**adopted** [7] - 43:7, 43:9, 44:18, 55:5, 55:12, 175:4, 199:10
**adopting** [2] - 46:6, 47:20
**adoption** [2] - 43:22, 48:20
**advance** [1] - 14:14
**adversarial** [1] - 196:2
**adverse** [10] - 11:23, 12:13, 13:24, 15:3, 15:8, 15:10, 16:13, 16:18, 17:13, 207:7
**adversely** [2] - 13:10, 15:5
**advise** [1] - 206:20
**advising** [1] - 164:15
**advisory** [1] - 50:1
**affairs** [1] - 155:1, 155:17, 191:14
**Affairs** [2] - 149:5, 161:2
**affect** [1] - 10:12
**affecting** [1] - 129:7
**afternoon** [11] - 108:23, 108:24, 109:3, 109:4, 109:5, 128:23, 145:16, 145:17, 151:18, 152:6

**agencies** [2] - 150:5, 169:24
**agency** [1] - 149:17
**agent** [10] - 38:13, 43:23, 44:2, 44:11, 44:21, 45:7, 45:9, 54:17, 142:3, 142:22
**agents** [2] - 38:8, 195:3
**aggregate** [1] - 132:3
**ago** [4] - 11:15, 15:24, 17:15, 36:24
**agree** [16] - 15:2, 45:2, 45:14, 54:5, 64:8, 68:11, 69:13, 70:7, 80:17, 83:20, 109:25, 118:8, 121:24, 122:4, 177:9, 188:10
**agreed** [19] - 12:12, 14:14, 15:7, 15:8, 15:11, 83:20, 109:13, 111:6, 111:18, 112:1, 128:9, 128:10, 130:15, 135:12, 135:14, 136:15, 137:21, 143:10, 203:12
**Agreed** [9] - 82:25, 83:7, 83:12, 83:19, 84:8, 84:9, 85:10, 85:15, 85:16
**Agreement** [1] - 205:3
**agreement** [4] - 12:16, 111:8, 161:7, 204:17
**agreements** [2] - 12:8, 15:19
**ahead** [15] - 43:3, 50:11, 56:7, 59:22, 102:25, 110:15, 111:11, 111:14, 111:19, 116:24, 118:16, 128:4, 130:8, 163:11
**air** [1] - 147:20
**air-conditioning** [1] - 147:20
**al** [4] - 1:7, 1:13, 209:6, 209:7
**alarm** [2] - 157:3, 195:21
**Alaska** [3] - 100:21, 100:25, 101:2
**Alco** [1] - 147:12
**algorithm** [6] - 16:3, 22:5, 24:1, 24:4, 74:21, 83:18
**allow** [6] - 44:3, 58:17, 58:22, 103:15,

105:22, 177:15
**allowed** [3] - 105:14, 157:13, 158:16
**allowing** [1] - 20:18
**almost** [4] - 97:6, 130:19, 158:2, 198:8
**alone** [2] - 144:14, 165:7
**Alpha** [3] - 31:8, 109:14, 110:21
**altered** [1] - 58:2
**AM** [1] - 162:2
**AM-WV** [1] - 162:2
**AM-WV-00006** [1] - 189:4, 196:11
**AM-WV-00601** [1] - 22:22
**AM-WV-00785** [1] - 167:13
**AM-WV-01079** [1] - 196:8
**AM-WV-1079** [2] - 197:5, 200:21
**AM-WV-785** [1] - 167:24
**AM-WV-790** [3] - 182:22, 184:3, 187:19
**America** [1] - 83:22
**Amerisource** [5] - 146:5, 155:13, 155:19, 155:21, 156:11
**AMERISOURCEBERGEN** [2] - 1:7, 1:13
**AmerisourceBergen** [76] - 6:2, 25:11, 32:2, 33:2, 33:11, 33:21, 35:5, 35:25, 36:14, 41:21, 57:1, 57:13, 59:14, 59:16, 73:13, 73:23, 74:5, 74:18, 76:14, 80:7, 84:13, 85:18, 86:11, 88:9, 88:14, 88:18, 88:22, 90:8, 90:9, 96:10, 110:17, 112:1, 112:7, 115:15, 117:15, 118:19, 119:5, 119:16, 120:5, 120:10, 120:17, 121:5, 121:8, 122:9, 130:1, 133:6, 135:13, 142:1, 142:10, 145:3, 154:19, 155:7, 155:13, 155:20, 156:11, 156:15, 164:22, 175:15,

175:19, 175:22, 176:13, 177:7, 177:24, 178:7, 178:17, 179:19, 180:18, 182:15, 193:25, 194:16, 195:14, 198:13, 198:18, 198:22, 198:25, 209:6
**AmerisourceBergen's** [11] - 24:2, 34:12, 83:10, 134:25, 144:3, 158:23, 174:24, 175:11, 178:18, 188:24, 201:3
**amount** [1] - 26:2
**analogy** [1] - 80:15
**analysis** [1] - 137:7
**ANDREW** [1] - 5:10
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**annotations** [1] - 31:9
**announced** [1] - 151:18
**annual** [2] - 37:3, 37:4
**answer** [17] - 25:5, 57:8, 59:3, 59:24, 67:15, 91:10, 92:2, 100:10, 100:13, 116:10, 156:5, 166:7, 166:8, 166:9, 166:11, 183:2, 184:15
**answered** [2] - 91:22, 144:21
**answers** [3] - 89:13, 152:2, 203:13
**ANTHONY** [1] - 2:6
**anticipate** [3] - 10:23, 11:3, 15:22
**anticipation** [1] - 110:10
**apart** [1] - 102:5
**Apologies** [1] - 164:8
**apologies** [2] - 53:18, 202:18
**appear** [3] - 69:18, 80:6, 127:14
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appended** [1] - 163:5
**applicable** [1] - 63:4
**application** [1] - 55:9
**applied** [4] - 35:6, 131:23, 137:8, 149:25
**applies** [4] - 13:9, 54:14, 63:9, 116:19

**apply** [4] - 44:22, 55:4, 63:10, 132:1
**appreciate** [3] - 146:16, 202:18, 207:22
**appreciation** [3] - 165:21, 166:5, 181:12
**Appreciation** [3] - 166:14, 177:4, 179:16
**approach** [15] - 23:21, 39:11, 56:9, 65:15, 73:16, 88:25, 113:2, 123:20, 138:7, 161:24, 167:11, 182:23, 189:6, 192:8, 196:9
**approached** [2] - 192:15, 192:18
**appropriate** [2] - 9:17, 55:22
**appropriateness** [1] - 42:17
**approval** [1] - 82:4
**approve** [1] - 27:21
**approved** [2] - 31:4, 81:21, 175:5, 178:12, 178:13
**April** [11] - 21:23, 56:16, 56:22, 86:7, 98:19, 126:20, 126:23, 128:7, 130:2, 136:22, 184:18
**Arch** [2] - 6:6, 6:13
**archive** [1] - 37:8
**ARCOS** [5] - 21:25, 25:7, 57:12, 96:9, 96:12, 96:15
**area** [7] - 9:2, 36:19, 99:17, 129:3, 155:6, 206:1, 206:9
**areas** [4] - 107:24, 177:22, 202:10, 206:25
**argue** [1] - 19:10
**argued** [1] - 42:1
**argument** [12] - 8:15, 8:24, 45:15, 61:5, 61:14, 69:3, 101:11, 101:13, 108:10, 108:21, 131:18, 188:3
**arguments** [2] - 43:18, 175:24, 180:3
**arrive** [1] - 162:15
**articles** [1] - 157:4
**articulate** [2] - 41:4, 140:11, 141:16

4

**ASHLEY** [1] - 5:3
**aside** [3] - 188:14, 188:16, 191:17
**Aside** - 73:11
**asserted** [5] - 41:19, 47:10, 47:13, 54:23, 64:17
**assertion** [1] - 175:17
**assessment** [1] - 19:8
**assigned** [10] - 34:3, 124:9, 128:11, 143:23, 151:11, 165:11, 191:25, 199:5, 199:21, 202:22
**assist** [1] - 46:2
**assisted** [1] - 29:20
**associate** [1] - 128:21
**Association** [3] - 40:22, 43:10, 46:2
**assume** [3] - 37:8, 82:22, 137:10
**assuming** [2] - 124:17, 140:24
**assure** [1] - 102:2
**AT** [1] - 1:2
**attached** [5] - 39:19, 51:10, 167:20, 178:22, 204:7
**attachment** [1] - 59:8
**attempt** [5] - 47:24, 50:6, 51:6, 55:18, 168:8
**attempted** [3] - 19:2, 73:20, 114:8
**attempting** [8] - 10:22, 15:22, 16:5, 41:20, 44:1, 48:14, 55:4, 71:14
**attend** [4] - 165:7, 165:9, 178:6
**attended** [8] - 39:9, 165:13, 182:2, 183:13, 192:12, 192:22, 197:23, 198:11
**attending** [1] - 165:2
**attention** [10] - 14:24, 23:15, 40:25, 56:12, 113:5, 115:4, 189:18, 190:14, 190:20, 190:25
**attorneys** [2] - 9:3, 18:4
**attributed** [2] - 80:10, 144:11
**attributing** [1] - 144:1
**audit** [14] - 151:11, 151:15, 151:20, 151:22, 152:3,

152:7, 152:16, 152:19, 152:20, 153:2, 153:13, 154:6, 156:21, 169:3
**audited** [1] - 169:19
**auditing** [3] - 151:4, 151:9, 153:23
**auditor** [2] - 152:13, 153:13
**auditors** [2] - 152:14, 154:25
**audits** [9] - 151:17, 152:11, 152:13, 153:24, 153:25, 154:4, 155:2, 169:6, 169:19
**August** [4] - 17:17, 87:14, 87:16, 201:25
**authenticity** [1] - 142:16
**authorization** [2] - 53:20, 54:18
**authorized** [9] - 43:11, 43:13, 44:17, 53:12, 54:2, 54:3, 81:18, 173:22, 174:7
**Automated** [1] - 174:20
**automated** [2] - 188:22, 189:20
**automatic** [1] - 174:2
**automatically** [5] - 124:9, 136:8, 173:18, 173:21, 174:8
**available** [4] - 79:10, 90:1, 156:4, 169:2
**average** [42] - 11:6, 11:18, 34:17, 34:19, 34:24, 35:1, 37:19, 107:8, 107:10, 117:24, 117:25, 118:8, 118:25, 119:3, 119:23, 120:2, 120:8, 120:16, 121:7, 121:20, 122:2, 122:6, 122:23, 123:1, 123:6, 126:24, 130:17, 130:19, 131:7, 131:8, 131:9, 132:1, 133:3, 133:5, 133:7, 133:10, 133:14, 133:18, 133:20, 133:22, 134:6
**Avin** [1] - 3:7
**avoid** [1] - 10:22
**award** [7] - 178:8, 178:17, 180:25,

181:3, 181:7, 181:10
**awards** [1] - 180:19
**aware** [7] - 31:25, 33:24, 137:23, 137:25, 138:2, 138:3, 178:1
**awareness** [1] - 61:12
**Ayme** [2] - 6:17, 209:2

**B**

**background** [1] - 157:11
**backloading** [1] - 18:25
**bad** [2] - 11:18, 103:8
**Baron** [1] - 3:17
**barred** [1] - 105:24
**base** [5] - 187:16, 189:14, 189:17, 191:1, 196:12
**Base** [1] - 191:9
**Based** [2] - 85:8, 95:21
**based** [30] - 26:21, 28:23, 30:1, 32:13, 33:20, 34:17, 34:18, 36:14, 37:1, 37:4, 52:10, 54:6, 71:23, 75:21, 75:25, 82:11, 120:20, 122:21, 127:7, 131:6, 134:6, 152:1, 153:7, 175:17, 176:6, 197:9, 201:24, 202:23
**baseline** [2] - 34:8, 133:14
**basic** [4] - 134:18, 168:19, 168:21, 168:23
**basis** [10] - 34:4, 37:4, 44:23, 69:9, 70:12, 70:23, 127:9, 163:14, 185:20, 189:22
**Bates** [14] - 23:17, 65:1, 67:10, 88:22, 114:13, 167:25, 168:13, 169:8, 173:3, 186:7, 201:16, 204:25, 205:12
**Baylen** [1] - 2:13
**bearing** [1] - 188:7
**become** [2] - 161:14, 165:6
**BEFORE** [1] - 1:17
**begin** [6] - 14:2, 65:3, 78:15, 93:24,

145:20, 206:3
**beginning** [7] - 21:3, 34:2, 35:3, 36:25, 136:4, 150:20, 161:4
**begins** [7] - 66:23, 78:14, 83:11, 168:5, 189:24, 190:7, 198:3
**behalf** [9] - 53:20, 54:3, 54:18, 62:22, 63:1, 88:18, 90:10, 111:6, 115:18
**behavior** [1] - 103:8
**belaboring** [1] - 114:5
**belief** [4] - 44:23, 95:9, 176:3, 178:19
**believes** [1] - 172:3
**bells** [1] - 195:21
**Below** [1] - 128:12
**below** [3] - 27:17, 107:8, 128:12
**BENCH** [1] - 1:16
**beneficial** [1] - 98:14
**benefit** [1] - 180:16
**Bergen** [1] - 175:3
**Berkeley** [1] - 106:23
**Bernie's** [2] - 100:21, 100:24
**best** [19] - 15:13, 44:15, 46:6, 46:14, 47:1, 47:17, 47:20, 47:24, 48:16, 49:1, 49:2, 50:15, 50:20, 50:24, 55:18, 55:21, 98:7, 100:7, 114:13
**better** [7] - 38:1, 59:1, 60:6, 70:25, 78:4, 158:22, 185:25
**between** [25] - 8:12, 14:6, 24:3, 25:11, 29:10, 48:4, 49:1, 63:17, 73:24, 79:5, 80:5, 82:23, 112:2, 115:16, 121:25, 131:2, 168:9, 169:20, 170:14, 170:17, 170:24, 170:25, 171:7
**beyond** [1] - 142:7
**big** [1] - 193:8
**bigger** [1] - 108:4
**biggest** [1] - 170:8
**bind** [1] - 48:23
**binder** [1] - 191:23
**biographical** [1] - 127:2
**bit** [4] - 31:24, 121:16, 125:20, 141:1
**blah** [1] - 47:12
**block** [3] - 136:6, 143:24, 174:9

**blocked** [4] - 30:8, 88:9, 105:20, 136:8
**blocking** [1] - 174:2
**blocks** [2] - 173:18, 173:21
**blow** [3] - 126:16, 129:16, 170:4
**blue** [1] - 25:2
**Blvd** [3] - 3:15, 4:3, 4:9
**Board** [3] - 150:10, 156:7, 156:8
**board** [1] - 109:18
**bodies** [1] - 55:16
**bold** [1] - 190:8
**Bonasso** [1] - 5:14
**boss** [2] - 35:23, 46:10
**bottom** [5] - 23:17, 128:18, 197:13, 197:16, 197:17
**Boulevard** [1] - 3:18
**bound** [1] - 48:20
**Box** [2] - 5:14, 6:8
**box** [7] - 23:18, 25:16, 26:6, 26:15, 27:9, 45:23, 88:2
**boxes** [2] - 86:1, 195:9
**break** [7] - 97:16, 109:6, 112:23, 113:19, 159:18, 160:14
**brick** [3] - 194:25, 195:6, 195:7
**Bridgeside** [3] - 3:15, 4:3, 4:9
**brief** [2] - 20:8, 98:14
**briefly** [9] - 16:15, 19:12, 31:21, 109:1, 116:9, 146:13, 147:15, 179:1, 201:21
**bring** [12] - 17:14, 17:16, 32:15, 40:17, 96:20, 113:12, 117:8, 143:6, 179:11, 189:18, 190:19, 203:16
**bringing** [2] - 20:6, 190:25
**broad** [1] - 7:21
**broader** [3] - 95:17, 149:11, 149:12
**broadly** [3] - 57:18, 162:10, 193:1
**Brothers** [4] - 146:2, 146:4, 146:9, 147:13
**brought** [4] - 14:24, 112:17, 190:13, 195:21
**Budd** [1] - 3:17

**build** [1] - 168:9
**built** [1] - 24:21
**bullet** [7] - 56:13, 173:4, 173:13, 173:14, 179:8, 190:6, 205:3
**bullets** [1] - 174:17
**bumped** [1] - 83:2
**bumps** [1] - 87:10
**bunch** [4] - 12:5, 17:24, 18:18, 179:24
**buried** [1] - 18:9
**Burling** [1] - 5:11
**bury** [1] - 14:10
**business** [8] - 26:7, 26:8, 37:22, 56:25, 80:21, 82:8, 82:12, 153:19
**butchered** [1] - 140:14
**button** [1] - 31:18
**buy** [1] - 107:6
**buying** [2] - 129:4, 129:5
**BY** [80] - 23:11, 23:25, 29:8, 31:20, 32:17, 32:22, 35:21, 36:9, 38:17, 39:12, 45:24, 50:16, 51:19, 52:13, 56:11, 59:10, 60:18, 65:8, 65:20, 66:7, 73:4, 73:18, 77:24, 79:13, 85:4, 89:2, 90:6, 91:14, 92:7, 93:8, 93:14, 112:18, 113:4, 113:15, 115:3, 116:25, 117:12, 118:17, 121:2, 123:14, 123:22, 124:25, 125:21, 126:14, 128:6, 129:18, 130:9, 132:12, 134:14, 135:11, 138:10, 138:23, 139:15, 140:16, 143:7, 145:15, 146:6, 153:1, 159:24, 160:23, 162:1, 162:8, 163:16, 164:11, 166:10, 167:14, 172:15, 180:22, 182:12, 183:8, 184:2, 184:16, 186:24, 188:13, 188:20, 189:8, 192:9, 197:4, 201:12, 201:20
**bypass** [1] - 71:14

# C

**C)** [1] - 43:6
**C.F.R** [1] - 168:24
**CA** [1] - 3:18
**Cabell** [46] - 3:2, 9:2, 67:13, 69:1, 69:14, 69:24, 70:20, 71:7, 71:24, 77:4, 84:19, 89:22, 98:11, 98:21, 99:3, 99:17, 100:1, 101:5, 101:24, 102:13, 103:23, 104:12, 104:25, 105:1, 105:21, 106:3, 106:5, 106:24, 107:1, 107:6, 107:8, 108:5, 109:11, 109:15, 109:21, 110:20, 111:4, 115:12, 115:16, 117:15, 120:15, 121:5, 122:24, 123:8, 137:12, 143:22
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell-Huntington** [8] - 69:1, 70:20, 71:24, 98:11, 99:17, 105:21, 106:3, 106:5
**cage** [9] - 157:6, 157:10, 158:9, 170:11, 179:4, 179:5, 189:14, 190:2, 191:12
**cage/vault** [1] - 150:13
**calculating** [2] - 87:5, 120:18
**calculation** [1] - 117:17
**calculations** [3] - 8:21, 117:23, 121:8
**calendar** [3] - 79:21, 80:3, 153:19
**CALLAS** [1] - 6:7
**CAMPBELL** [1] - 6:14
**cancel** [2] - 30:3, 75:21
**cancelled** [1] - 191:6
**canned** [1] - 76:10
**cannot** [1] - 62:22
**cap** [2] - 135:3, 135:16
**capable** [1] - 79:24
**capacity** [3] - 115:18, 161:1
**capita** [1] - 8:23
**Capitol** [1] - 2:7
**Cardinal** [16] - 4:11, 5:2, 13:25, 14:3,
17:17, 40:11, 44:13, 45:1, 46:12, 46:22, 46:23, 54:4, 63:1, 102:17, 110:14, 111:10
**care** [3] - 55:15, 114:8, 147:18
**career** [1] - 15:8
**carefully** [1] - 87:5
**Carey** [1] - 4:17
**carrier** [2] - 85:20, 85:21
**carriers** [1] - 85:22
**Case** [1] - 66:1
**case** [26] - 7:24, 7:25, 9:4, 9:5, 10:13, 13:10, 14:15, 44:3, 55:1, 55:3, 55:10, 73:10, 73:12, 99:19, 102:16, 104:17, 107:7, 119:3, 155:10, 175:13, 176:18, 177:23, 187:19, 188:7, 207:8
**cases** [9] - 8:4, 8:13, 17:18, 55:14, 82:7, 102:8, 102:11, 157:21
**catch-22** [2] - 15:14, 15:22
**categories** [1] - 99:15
**category** [2] - 8:23, 35:7
**caught** [1] - 130:20
**ceasing** [1] - 205:22
**Census** [1] - 8:22
**center** [17] - 74:8, 74:25, 75:3, 75:9, 75:17, 75:20, 77:11, 77:16, 81:24, 161:8, 161:19, 162:12, 169:19, 187:15, 188:25, 189:20, 202:8
**Center** [24] - 3:12, 5:11, 24:15, 24:16, 27:3, 27:6, 34:25, 35:2, 99:25, 113:9, 146:25, 147:4, 147:11, 148:1, 148:11, 149:6, 151:17, 152:7, 152:11, 154:1, 156:2, 156:15, 158:4, 158:9
**centers** [6] - 100:12, 151:5, 155:3, 158:10, 169:6, 170:20
**Centers** [3] - 155:8,
155:21, 156:12
**CEO** [1] - 40:21
**certain** [12] - 11:2, 66:22, 68:20, 89:9, 89:10, 89:23, 91:9, 135:3, 163:6, 170:11, 193:12
**certainly** [7] - 45:2, 45:8, 96:14, 101:2, 108:4, 110:12, 163:14
**Certificate** [3] - 166:13, 177:3, 179:16
**CERTIFICATION** [1] - 209:1
**certify** [1] - 209:4
**cetera** [3] - 44:14, 46:13, 70:6
**CFR** [1] - 149:20
**chain** [3] - 21:12, 46:10, 185:23
**challenge** [1] - 171:14
**challenged** [1] - 176:18
**chance** [2] - 20:12, 115:7
**change** [11] - 49:25, 57:24, 81:19, 81:20, 82:1, 82:13, 89:14, 137:11, 159:18, 171:23, 183:19
**changed** [1] - 81:17, 87:19, 137:5, 172:10, 176:15, 178:16, 181:22, 182:5, 183:15, 185:17, 186:6
**changes** [5] - 81:8, 110:8, 137:7, 154:8, 195:23
**character** [1] - 98:7
**characteristics** [4] - 190:19, 191:1, 193:10, 194:20
**characterization** [4] - 12:23, 77:7, 101:15, 130:7
**characterized** [1] - 36:3
**characterizing** [2] - 62:13, 127:13
**charge** [6] - 36:23, 38:7, 38:22, 75:5, 125:11, 143:20
**CHARLES** [1] - 3:11
**Charleston** [6] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:3
**CHARLESTON** [2] -
1:2, 1:18
**chart** [6] - 8:17, 20:16, 25:5, 96:16, 96:17
**charts** [7] - 95:16, 95:19, 96:21, 96:22, 98:10, 101:12, 107:14
**Chase** [1] - 4:18
**Chattanooga** [5] - 146:2, 146:24, 147:3, 148:18, 191:16
**check** [3] - 24:22, 70:9, 191:18
**checking** [1] - 174:5
**checklist** [5] - 151:21, 151:23, 154:6, 199:10
**checks** [2] - 24:24, 157:11
**cherry** [4] - 99:8, 103:4, 103:7, 106:7
**cherry-picked** [4] - 99:8, 103:4, 103:7, 106:7
**Cherveny** [4] - 125:16, 187:1, 199:23, 204:2
**Chesterbrook** [1] - 6:15
**chicken** [1] - 194:14
**chief** [2] - 13:11, 207:8
**Chief** [1] - 40:20
**child** [2] - 84:15, 85:9
**choice** [1] - 75:8
**chose** [4] - 17:13, 17:14, 96:17, 199:15
**chosen** [3] - 102:15, 207:7
**Chris** [13] - 21:24, 33:16, 35:24, 36:3, 36:4, 36:6, 36:10, 40:4, 56:19, 161:6, 166:24, 198:14
**Chris'** [1] - 40:7
**circle** [2] - 45:17, 176:9
**circling** [1] - 183:9
**Circuit** [3] - 7:22, 7:24, 7:25
**circuit** [2] - 8:11, 58:10
**circulate** [2] - 88:17, 140:8
**circumstances** [1] - 122:17
**cite** [3] - 44:7, 150:14
**citing** [1] - 44:22
**City** [6] - 4:1, 5:11, 98:22, 115:12, 119:9, 209:5

**city** [2] - 102:8, 105:5
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 209:7, 209:8
**civil** [1] - 1:10
**claim** [1] - 175:16
**clarification** [4] - 66:18, 66:24, 70:17, 200:24
**clarified** [1] - 28:24
**clarify** [2] - 28:10, 203:18
**clarity** [1] - 113:24
**class** [2] - 27:15, 37:20
**classes** [3] - 32:10, 109:17, 161:12
**clause** [1] - 106:3
**clean** [2] - 29:6, 70:11
**clear** [17] - 15:7, 19:22, 28:18, 29:25, 36:2, 55:16, 57:20, 59:19, 71:4, 97:14, 99:2, 103:5, 106:22, 110:3, 114:14, 119:13, 132:10
**cleared** [2] - 120:11, 122:11
**clearing** [1] - 93:6
**clearly** [7] - 63:9, 122:1, 122:5, 179:12, 179:14, 180:14, 181:6
**clears** [1] - 28:16
**CLERK** [2] - 145:7, 145:9
**clerk** [1] - 67:3
**clerks** [1] - 190:2
**click** [1] - 88:1
**Click** [1] - 88:1
**client** [1] - 16:7
**clinics** [1] - 129:3
**close** [4] - 105:2, 148:8, 159:9, 206:6
**closed** [1] - 125:5
**closely** [2] - 189:16, 190:2
**closer** [1] - 187:14
**co** [3] - 43:17, 62:22, 68:23
**co-counsel** [3] - 43:17, 62:22, 68:23
**Cochran** [3] - 6:17, 209:2, 209:11
**code** [5] - 74:9, 90:24, 91:1, 92:14, 113:6
**Code** [2] - 88:3, 172:22
**Codes** [1] - 88:5
**codes** [6] - 90:13,

91:8, 109:21, 112:21, 112:22, 113:9
**cognizant** [1] - 8:12
**collaborative** [2] - 39:3, 39:6
**colleagues** [1] - 196:18
**collection** [1] - 114:11
**color** [1] - 48:2
**colors** [1] - 22:11
**Column** [12] - 66:23, 66:24, 77:25, 78:9, 78:11, 78:18, 78:23, 79:2, 79:14, 87:25, 117:25
**column** [2] - 87:23, 129:16
**Columns** [1] - 78:6
**columns** [12] - 66:8, 66:20, 66:22, 68:20, 68:21, 71:17, 72:11, 76:17, 89:9, 89:23, 110:9, 117:11
**combined** [1] - 79:4
**combining** [1] - 10:5
**coming** [4] - 10:9, 17:25, 81:7, 104:21
**command** [1] - 185:23
**commending** [2] - 46:6, 47:20
**commends** [1] - 46:1
**comment** [1] - 16:22
**commentary** [1] - 98:2
**commenting** [1] - 60:23
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2, 3:2
**common** [5] - 85:20, 85:21, 85:22, 170:22, 194:7
**commonly** [1] - 202:24
**communicating** [1] - 41:24
**communication** [2] - 48:4, 48:6
**community** [4] - 85:10, 115:21, 116:12, 117:3
**companies** [2] - 58:5, 107:23
**Company** [1] - 148:8
**company** [17] - 14:13, 32:13, 84:14, 146:5, 147:9, 147:10, 148:5, 149:22, 151:9, 154:19,

155:12, 161:6, 175:4, 176:17, 199:15, 199:25
**company's** [2] - 151:4, 154:1
**compares** [1] - 133:12
**comparing** [2] - 107:24, 133:2
**compendium** [1] - 114:12
**compilation** [1] - 109:7
**complaint** [4] - 103:24, 104:7, 107:11, 107:12
**complete** [2] - 203:11, 206:4
**completed** [2] - 203:15, 205:15
**completely** [2] - 12:4, 144:22
**completing** [1] - 203:21
**complex** [2] - 8:4, 8:13
**Compliance** [7] - 142:12, 149:11, 150:23, 185:6, 185:8, 185:16, 205:2
**compliance** [27] - 21:13, 38:19, 39:20, 41:2, 41:22, 49:24, 50:22, 149:7, 149:9, 149:14, 150:7, 150:19, 151:5, 151:9, 151:12, 153:24, 153:25, 158:24, 159:15, 176:5, 176:25, 178:19, 186:20, 186:22, 187:4, 195:15, 198:19
**compliance-related** [1] - 149:7
**compliant** [6] - 151:25, 152:1, 153:6, 153:9, 153:12
**complied** [1] - 167:6
**compliment** [1] - 98:6
**comply** [2] - 149:16, 205:4
**complying** [1] - 155:3
**composite** [1] - 22:16
**comprehensive** [1] - 8:6
**Computer** [2] - 173:18, 173:21
**computer** [6] - 6:19, 31:2, 32:8, 66:3, 73:24, 74:21, 80:7,

109:8, 173:15, 173:16, 207:18
**concepts** [2] - 132:2, 132:3
**concern** [12] - 9:3, 9:7, 9:9, 10:11, 21:25, 68:17, 68:22, 69:14, 69:17, 69:20, 69:21, 177:1
**concerned** [5] - 9:1, 14:1, 57:13, 190:22, 202:6
**concerns** [9] - 57:11, 71:14, 93:3, 177:16, 187:13, 193:2, 199:1, 199:16, 202:9
**concerted** [1] - 41:3
**conclude** [1] - 63:3
**conclusion** [1] - 91:7
**conclusions** [1] - 153:5
**concrete** [1] - 18:5
**conditional** [1] - 70:7
**conditionally** [12] - 70:11, 70:18, 93:2, 93:5, 93:18, 93:25, 94:4, 94:16, 95:8, 95:10, 95:18, 95:22
**conditioning** [1] - 147:20
**conduct** [8] - 82:9, 151:20, 152:10, 155:7, 156:9, 161:4, 169:18, 199:7
**conducted** [8] - 155:20, 156:2, 157:25, 171:22, 181:1, 188:6, 202:2, 202:13
**conducting** [4] - 151:22, 178:17, 195:11, 203:25
**confer** [10] - 42:12, 68:22, 71:10, 93:4, 109:25, 110:6, 111:2, 111:7, 111:8, 111:24
**conference** [3] - 109:12, 192:15, 198:16
**conferred** [1] - 114:2
**conferring** [1] - 110:19
**confirm** [2] - 67:10, 192:20
**confirmation** [1] - 162:11
**confirmatory** [1] - 163:1
**confirmed** [2] - 33:25,

53:13
**confirming** [2] - 162:13, 188:9
**conflicts** [2] - 48:1, 48:2
**confused** [3] - 126:1, 133:25, 141:2
**confusing** [1] - 132:6
**Congressional** [1] - 7:16
**connection** [1] - 181:1
**Connolly** [2] - 4:13, 5:4
**CONROY** [1] - 3:3
**consider** [3] - 49:10, 110:13, 120:17
**considerations** [1] - 125:23
**considered** [2] - 57:23, 189:15
**consistent** [4] - 14:7, 35:24, 156:16, 156:20, 202:13
**constantly** [2] - 37:25, 154:7
**constrained** [1] - 63:8
**consumption** [1] - 107:8
**contacted** [1] - 192:19
**contains** [3] - 68:25, 113:6, 201:5
**contend** [2] - 62:5, 141:3
**content** [4] - 177:6, 179:19, 180:17, 183:4
**context** [6] - 12:4, 14:10, 36:18, 57:4, 60:22, 81:7
**Continue** [1] - 87:9
**continue** [4] - 14:12, 86:15, 130:6, 205:5
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continuing** [2] - 18:22, 131:11
**contours** [1] - 17:21
**Control** [17] - 24:2, 24:6, 33:8, 33:13, 33:25, 34:12, 36:23, 38:8, 38:23, 83:10, 100:10, 100:11, 102:1, 115:19, 139:22, 140:1, 144:3
**control** [2] - 101:7, 137:20
**controlled** [13] - 39:22, 41:5, 41:9, 148:2, 149:10, 156:22, 158:19,

168:20, 173:11,
173:19, 173:22,
190:1, 205:22
**Controlled** [7] - 41:7,
46:3, 156:8, 175:16,
175:18, 176:5,
186:22
**Controls** [1] - 174:15
**conversation** [1] -
194:21
**conveying** [1] - 170:5
**convince** [1] - 107:5
**Cook** [3] - 6:18, 209:3,
209:11
**cooperative** [1] -
196:1
**cooperatively** [1] -
199:18
**copied** [1] - 33:6
**copies** [10] - 23:23,
67:2, 93:20, 162:6,
163:22, 191:24,
192:3, 200:16,
206:25, 207:6
**copy** [16] - 67:3,
69:21, 72:6, 72:10,
72:12, 72:13, 92:25,
93:21, 113:3, 164:9,
167:18, 182:18,
207:22, 207:25,
208:1
**cordial** [1] - 196:1
**corner** [3] - 23:17,
24:10, 125:2
**corporate** [14] - 28:2,
74:9, 75:19, 75:25,
76:8, 81:25, 82:5,
100:11, 151:2,
151:5, 154:17,
157:4, 187:12,
188:22
**Corporate** [7] - 28:6,
28:8, 28:16, 30:5,
120:11, 149:4, 149:5
**Corporation** [3] - 6:2,
142:10, 209:7
**corporation** [3] - 1:7,
1:13, 157:5
**Correct** [3] - 64:24,
74:12, 205:8
**correct** [61] - 25:4,
25:19, 25:20, 26:24,
27:7, 27:18, 27:19,
27:22, 27:23, 27:24,
27:25, 28:3, 28:6,
28:7, 29:11, 29:12,
29:15, 33:16, 34:23,
35:8, 48:10, 56:23,
74:22, 74:23, 75:1,
78:7, 78:21, 78:22,

82:20, 84:2, 84:3,
84:5, 87:14, 100:14,
115:9, 120:2, 122:2,
127:5, 135:3,
135:21, 135:25,
137:18, 137:22,
144:1, 154:21,
160:1, 160:2,
162:16, 169:7,
171:4, 177:14,
189:2, 193:20,
195:24, 196:24,
197:23, 198:6,
198:14, 200:16,
200:19, 209:4
**correction** [1] - 146:16
**corrective** [4] -
153:11, 153:21,
160:9, 160:11
**correctly** [1] - 81:23
**correspondence** [1] -
21:16
**Corsie** [1] - 165:17
**cost** [1] - 129:7
**counsel** [16] - 43:17,
62:22, 67:3, 68:23,
70:2, 71:17, 89:23,
92:11, 93:20, 97:14,
102:17, 180:3,
198:14, 198:15,
206:14
**Counsel** [1] - 40:20
**count** [1] - 207:5
**counties** [7] - 99:21,
101:6, 102:7,
104:13, 105:4,
107:6, 107:7
**country** [7] - 17:19,
107:25, 118:10,
119:1, 119:3, 158:5,
184:20
**COUNTY** [1] - 1:10
**county** [3] - 98:15,
104:22, 105:5
**County** [35] - 2:2, 3:2,
66:2, 66:11, 73:8,
77:4, 84:11, 84:19,
85:6, 92:21, 96:11,
98:21, 99:4, 100:1,
101:2, 101:3, 101:5,
106:23, 106:24,
107:6, 108:5,
109:12, 109:15,
110:20, 115:12,
115:16, 117:15,
120:15, 121:5,
122:24, 123:8,
137:13, 143:22,
177:20
**County-Huntington**

[1] - 115:16
**couple** [10] - 7:5,
21:17, 81:15,
100:19, 122:25,
132:13, 134:18,
157:23, 165:18,
204:13
**course** [12] - 9:19,
10:7, 14:4, 16:8,
18:6, 56:25, 64:5,
69:24, 154:6, 163:9,
182:20, 203:17
**court** [13] - 19:20,
53:4, 55:7, 63:19,
71:6, 101:19, 102:9,
102:10, 104:14,
117:14, 159:19,
172:13
**Court** [33] - 6:17, 6:18,
7:2, 7:12, 8:1, 8:22,
9:12, 9:24, 14:21,
15:17, 16:11, 16:24,
20:9, 23:23, 53:10,
57:17, 63:3, 65:3,
65:5, 70:1, 93:3,
93:19, 93:21, 110:7,
111:3, 112:3, 112:4,
112:7, 116:21,
150:16, 207:17,
209:2, 209:3
**COURT** [240] - 1:1,
1:17, 7:5, 7:11,
10:14, 10:17, 10:20,
11:4, 11:8, 11:14,
11:17, 12:1, 12:16,
12:21, 13:3, 13:4,
13:14, 13:17, 13:20,
14:18, 16:16, 17:10,
18:11, 19:10, 20:2,
20:4, 20:13, 22:13,
23:3, 23:7, 23:22,
29:1, 29:5, 31:9,
31:11, 31:15, 31:19,
35:16, 35:20, 36:6,
41:11, 41:16, 41:18,
42:7, 42:13, 42:20,
43:3, 44:5, 44:7,
45:1, 45:12, 45:19,
47:9, 48:5, 49:8,
49:19, 50:1, 50:4,
50:11, 50:14, 51:7,
51:16, 52:6, 53:23,
54:5, 54:22, 56:3,
56:10, 57:16, 58:12,
58:21, 59:2, 59:22,
60:15, 60:25, 61:7,
62:25, 63:11, 64:7,
64:11, 64:15, 64:23,
65:7, 65:16, 66:16,
67:14, 68:24, 69:8,

70:10, 70:16, 70:22,
71:3, 71:5, 71:9,
71:11, 71:20, 72:2,
72:16, 72:20, 72:24,
73:2, 73:17, 76:25,
77:18, 77:22, 79:11,
84:18, 85:2, 89:1,
90:2, 91:10, 91:22,
92:1, 92:22, 93:5,
93:10, 94:15, 94:23,
95:1, 95:3, 95:6,
95:10, 95:23, 96:13,
96:22, 97:3, 97:13,
97:18, 97:22, 97:24,
98:4, 98:8, 98:17,
99:7, 99:11, 101:8,
102:21, 105:16,
106:15, 108:15,
108:19, 108:22,
108:25, 109:18,
110:15, 111:11,
111:17, 111:19,
111:21, 112:9,
112:12, 112:14,
114:1, 114:23,
115:1, 116:1,
116:10, 116:22,
118:14, 123:21,
124:21, 124:23,
126:1, 126:5, 126:8,
126:12, 127:23,
128:3, 130:5, 130:8,
131:18, 132:7,
132:11, 133:23,
134:10, 135:7,
138:8, 138:14,
138:17, 138:22,
139:5, 140:13,
141:21, 142:6,
143:2, 144:18,
144:23, 145:4,
145:12, 146:3,
152:24, 157:8,
159:18, 159:21,
160:15, 160:20,
161:25, 162:19,
162:22, 163:11,
164:9, 166:4,
172:14, 176:19,
177:1, 179:13,
180:12, 182:10,
182:24, 183:1,
183:22, 184:14,
186:23, 187:21,
187:23, 188:10,
189:7, 192:7,
196:15, 196:19,
196:21, 196:23,
196:25, 197:3,
200:22, 201:10,
201:14, 201:17,

206:5, 206:11,
206:17, 206:23,
207:10, 207:15,
207:19, 207:24,
208:4, 208:7,
208:10, 208:12
**Court's** [10] - 10:12,
12:7, 13:1, 14:24,
57:19, 61:6, 96:19,
106:4, 106:13,
109:10
**COURTROOM** [2] -
145:7, 145:9
**courtroom** [3] - 9:16,
45:7, 49:6
**Courts** [2] - 7:21, 8:11
**cover** [17] - 51:5,
51:13, 52:8, 94:14,
167:19, 171:9,
177:2, 177:7,
177:16, 178:22,
179:10, 179:14,
179:22, 179:24,
180:4, 180:10,
180:14
**covered** [5] - 30:20,
42:10, 45:10, 90:12,
181:19
**covering** [1] - 175:14
**Covington** [1] - 5:11
**coy** [1] - 72:19
**create** [1] - 59:16
**created** [2] - 37:17,
199:11
**criminal** [2] - 8:8,
157:12
**critical** [2] - 103:24,
104:1
**CROSS** [1] - 145:14
**cross** [2] - 71:17,
96:17
**cross-examine** [2] -
71:17, 96:17
**CRR** [2] - 6:17, 6:18
**CSA** [6] - 61:24,
178:11, 178:20,
182:6, 195:15,
198:19
**CSRA** [24] - 21:1,
21:2, 28:6, 28:8,
28:11, 28:21, 29:18,
113:7, 126:18,
127:5, 128:8, 129:1,
130:14, 143:8,
149:14, 154:23,
161:1, 185:10,
185:11, 185:17,
188:23, 200:15,
204:3, 204:5
**culled** [1] - 92:4

culpable [1] - 8:8
cumulative [3] -
131:19, 133:24,
134:3
current [4] - 20:23,
27:10, 36:12, 185:8
customer [30] - 24:10,
27:11, 27:15, 59:15,
60:1, 73:13, 75:22,
76:1, 82:7, 82:12,
83:13, 122:17,
124:8, 126:23,
127:3, 127:7,
131:17, 131:24,
133:4, 134:5, 174:5,
186:19, 187:14,
194:24, 202:6,
202:7, 203:12,
203:22, 205:17,
205:23
Customer [1] - 146:19
customer's [4] -
37:22, 82:11,
190:12, 203:1
customers [24] -
24:22, 34:21, 34:25,
35:1, 35:3, 35:6,
37:2, 83:14, 119:5,
126:11, 133:9,
139:12, 146:18,
173:7, 173:19,
173:22, 186:15,
193:10, 195:10,
199:6, 199:8,
200:11, 202:23,
203:24
cut [4] - 12:4, 135:3,
135:4, 137:5
cutting [1] - 8:2
cyclical [1] - 155:22

**D**

d)(2)(C) [1] - 44:10
d)(2)(D [1] - 44:10
daily [4] - 174:20,
174:21, 185:20,
189:22
dark [2] - 25:16, 26:15
data [46] - 8:22, 11:11,
11:12, 21:25, 22:6,
22:17, 22:19, 32:14,
34:18, 34:20, 37:2,
37:5, 57:12, 65:25,
67:25, 68:4, 68:16,
69:5, 69:8, 70:19,
73:7, 73:20, 74:2,
74:4, 76:14, 80:12,
81:4, 81:7, 81:15,
88:11, 91:3, 91:15,

93:12, 96:9, 96:12,
96:15, 104:15,
109:7, 109:8,
111:25, 121:9,
127:2, 130:16, 132:3
database [5] - 67:8,
69:7, 77:9, 77:16,
77:17
dataset [7] - 67:2,
67:4, 67:11, 67:12,
67:24, 73:22, 78:14
datasets [1] - 65:21
date [18] - 40:18,
78:11, 79:9, 79:15,
79:18, 90:18,
101:19, 125:2,
125:5, 130:12,
140:4, 174:7, 174:9,
184:7, 184:17,
188:8, 191:8, 198:4
Date [1] - 209:16
dated [9] - 21:7,
21:15, 21:22, 47:25,
56:16, 56:22, 86:17,
128:15, 191:11
dates [2] - 129:11,
136:19
DAVID [2] - 1:17, 2:9
David [3] - 7:1, 43:2,
53:18
day-to-day [1] - 33:7
days [9] - 99:1,
100:19, 131:15,
147:17, 153:18,
153:19, 153:20,
179:6
DC [23] - 2:11, 4:7,
4:14, 4:16, 5:5, 5:12,
24:13, 24:14, 27:2,
27:14, 27:17, 30:11,
30:21, 31:1, 31:2,
44:13, 46:12, 75:4,
153:15, 156:5,
187:13, 195:21
DCs [1] - 29:23
De [2] - 2:4, 2:16
DEA [169] - 21:14,
28:9, 28:12, 28:20,
29:2, 29:18, 29:20,
30:7, 40:14, 40:21,
41:22, 41:24, 42:16,
42:19, 43:12, 44:1,
44:2, 44:15, 45:4,
46:1, 46:5, 46:14,
46:22, 47:16, 47:20,
48:4, 48:6, 48:12,
48:19, 49:2, 49:15,
49:23, 50:7, 51:5,
59:17, 60:2, 61:16,
61:17, 61:24, 64:21,

88:18, 90:15, 91:2,
105:19, 110:23,
120:20, 138:3,
138:25, 139:13,
143:9, 149:15,
150:12, 152:17,
152:20, 153:14,
155:6, 155:20,
155:24, 156:2,
156:15, 156:24,
157:2, 157:17,
157:20, 158:1,
158:4, 158:9, 159:1,
159:4, 159:13,
159:25, 160:1,
160:3, 160:11,
160:25, 161:5,
161:7, 161:13,
161:14, 161:15,
162:11, 162:20,
163:2, 163:9,
164:21, 164:22,
165:1, 165:8,
165:13, 165:20,
166:2, 166:4,
166:16, 166:17,
166:19, 167:5,
168:10, 168:25,
169:4, 169:11,
170:6, 170:9,
170:17, 171:8,
171:11, 172:2,
172:5, 172:7, 172:8,
172:12, 173:8,
173:12, 173:23,
174:1, 174:6, 175:2,
175:6, 175:19,
175:23, 176:4,
176:6, 176:7,
176:12, 176:23,
177:3, 177:6,
177:25, 178:13,
179:17, 179:20,
180:18, 181:6,
181:7, 181:20,
182:2, 182:3, 183:4,
183:13, 185:1,
185:2, 186:21,
187:6, 191:7,
192:12, 192:13,
192:17, 192:25,
193:25, 194:15,
194:19, 195:12,
195:25, 196:4,
197:10, 198:4,
198:7, 198:21,
199:1, 199:14,
199:19, 200:2,
200:18, 201:25,
202:5, 202:23
DEA's [7] - 21:14,

29:4, 150:10, 165:6,
193:2, 199:16,
201:23
DEA [1] - 174:20
deal [6] - 12:3, 93:1,
97:15, 108:17,
143:25, 163:13
dealing [1] - 170:20
debate [1] - 108:10
debating [1] - 49:6
December [3] - 21:7,
115:16, 121:16
decide [2] - 107:21,
203:17
decided [3] - 30:12,
148:5, 148:8
decides [1] - 190:21
deciphering [1] -
113:6
Decision [1] - 194:11
decision [1] - 27:21
decisions [5] - 27:20,
29:18, 75:1, 75:18,
153:5
declarant [4] - 63:9,
63:15, 63:16, 63:19
declare [1] - 142:17
deem [1] - 193:22
deemed [2] - 30:10,
191:5
default [20] - 20:24,
31:25, 32:9, 33:1,
33:9, 33:19, 34:2,
34:5, 34:10, 34:11,
35:4, 35:5, 35:9,
35:11, 35:14, 36:1,
36:12, 36:15, 36:22,
36:25
defaults [5] - 32:12,
32:13, 33:24, 37:3,
37:16
defendant [2] - 55:3,
69:7
Defendant [4] - 4:10,
5:2, 5:7, 6:2
defendant's [3] -
42:17, 47:19, 182:7
Defendants [3] - 1:8,
1:14, 209:7
defendants [24] - 8:8,
13:19, 15:3, 15:13,
15:16, 22:3, 22:21,
41:25, 42:16, 43:13,
45:7, 57:12, 63:6,
67:23, 93:12,
104:17, 105:20,
107:18, 109:12,
109:16, 110:21,
111:5, 111:24, 114:3
defendants' [5] - 15:6,

61:23, 175:11,
176:3, 178:23
defense [3] - 12:12,
55:25, 104:5
defer [3] - 20:9,
102:18, 206:2
definition [1] - 53:3,
54:12, 132:4, 205:7
delete [3] - 27:24,
30:12, 30:23
deleted [1] - 30:17
deliver [2] - 85:13,
85:18
deliveries [2] - 85:20,
85:22
delivery [1] - 85:24
demonstrable [7] -
98:21, 103:3, 105:3,
105:10, 106:1, 106:4
demonstrate [3] -
16:2, 104:25, 186:19
demonstrative [2] -
23:16, 68:19
demonstratives [13] -
9:22, 10:6, 11:13,
11:19, 11:21, 19:24,
22:24, 93:17, 93:23,
94:5, 96:1, 113:22
deny [1] - 207:11
denying [1] - 100:16
Department [4] -
44:20, 146:20,
149:18, 156:8
departments [1] -
168:22
depict [1] - 25:22
depiction [2] - 25:10,
33:18
deposed [1] - 17:18
deposition [1] -
177:23
DEPUTY [2] - 145:7,
145:9
describe [5] - 26:3,
156:14, 193:15,
195:25, 201:21
described [5] -
131:12, 148:18,
153:24, 155:16,
171:5
describing [1] -
202:17
description [5] -
126:17, 126:18,
127:15, 127:21,
148:17
deserved [1] - 178:8
design [2] - 29:21,
41:6
designed [4] - 29:16,

134:4, 136:4, 152:17
**despite** [1] - 178:12
**detail** [1] - 75:15
**determination** [1] -
205:20
**determine** [5] - 134:2,
153:9, 190:3, 203:8
**determined** [5] -
28:21, 32:12, 32:13,
155:12, 205:19
**determines** [3] - 9:13,
28:11, 160:3
**determining** [1] - 7:21
**develop** [2] - 50:20,
107:21
**developed** [4] - 42:24,
44:14, 46:13, 175:3
**developing** [1] - 200:9
**deviating** [1] - 190:12
**dialogue** [1] - 23:18
**difference** [1] - 63:17
**different** [30] - 21:2,
25:19, 32:1, 32:10,
45:18, 53:21, 55:15,
63:14, 76:17, 77:9,
91:23, 113:7, 132:2,
133:22, 150:5,
161:12, 163:21,
169:23, 170:13,
170:15, 170:16,
171:6, 171:17,
177:13, 185:15,
190:18, 191:25,
192:3, 204:10
**differently** [1] - 111:15
**difficult** [1] - 113:23
**difficulty** [1] - 93:6
**dig** [1] - 192:1
**digesting** [1] - 57:19
**digital** [2] - 72:12,
72:13
**digits** [3] - 79:21,
79:25, 80:2
**diligence** [22] - 21:6,
21:10, 21:17, 38:10,
38:13, 82:6, 82:9,
82:14, 83:13, 83:14,
86:24, 104:2, 104:4,
119:18, 120:10,
122:10, 122:12,
122:13, 122:15,
122:19, 131:16,
199:8
**DIRECT** [1] - 23:10
**direct** [8] - 16:7,
17:12, 40:25, 44:11,
56:12, 95:15, 113:5,
115:4
**directing** [1] - 89:6
**directly** [10] - 40:5,

41:23, 48:1, 48:2,
61:21, 176:2,
176:16, 178:18,
178:23, 186:2
**Director** [2] - 149:4,
150:22
**directors** [3] - 186:2,
186:5
**disadvantage** [1] -
12:6
**disagree** [6] - 12:22,
17:24, 19:8, 63:21,
69:2, 101:14
**disagreed** [1] - 14:24
**disallows** [1] - 8:4
**disclose** [5] - 15:3,
16:5, 18:22, 22:4,
41:6
**disclosed** [4] - 22:2,
88:21, 92:11, 110:18
**discovered** [1] -
204:15
**discovery** [22] - 22:3,
66:1, 67:22, 103:25,
104:10, 105:13,
105:19, 105:20,
107:13, 112:5,
112:6, 188:6
**discrepancy** [1] - 70:1
**discretion** [3] - 7:21,
7:23, 8:2
**discuss** [3] - 113:13,
166:2, 167:23
**discussed** [6] - 28:25,
44:14, 46:13, 55:24,
112:20, 204:8
**discussing** [8] -
20:17, 28:4, 77:2,
103:14, 143:8,
167:10, 172:20,
172:21
**discussion** [4] -
103:15, 103:16,
103:17, 112:23
**discussions** [3] -
9:25, 49:1, 201:24
**dispute** [3] - 45:6,
63:17, 90:11
**disputing** [1] - 134:17
**distribute** [2] - 148:1,
173:11
**distributed** [1] -
143:21
**distribution** [32] -
40:11, 74:8, 74:25,
75:2, 75:9, 75:17,
75:20, 77:10, 77:16,
81:24, 100:12,
121:4, 146:7, 151:4,
155:3, 158:9,

158:20, 161:8,
161:19, 162:12,
166:23, 167:4,
168:20, 169:6,
169:19, 169:24,
169:25, 170:20,
187:15, 188:25,
189:19, 202:8
**Distribution** [27] -
24:15, 24:16, 27:2,
27:5, 34:25, 35:2,
40:22, 46:1, 99:25,
113:9, 146:25,
147:4, 147:11,
148:1, 148:11,
149:6, 151:17,
152:7, 152:11,
154:1, 155:7,
155:21, 156:1,
156:11, 156:15,
158:4, 158:8
**distributor** [6] - 41:3,
41:5, 168:19,
171:16, 192:15,
193:9
**distributors** [8] - 22:1,
41:8, 48:13, 170:15,
173:5, 173:6,
193:21, 194:1
**distributors'** [1] - 60:3
**DISTRICT** [3] - 1:1,
1:1, 1:17
**District** [5] - 7:2, 7:3,
7:21, 8:1, 8:11
**diversion** [17] - 39:21,
101:7, 122:18,
158:6, 161:9,
161:14, 165:6,
165:8, 166:18,
169:11, 171:11,
175:20, 175:21,
177:25, 181:14,
183:10, 187:25
**Diversion** [17] - 24:2,
24:6, 33:8, 33:13,
33:25, 34:12, 36:23,
38:8, 38:23, 83:10,
100:9, 100:11,
102:1, 115:19,
139:22, 139:25,
144:3
**diverted** [1] - 41:10
**division** [1] - 75:7
**divisions** [1] - 171:6
**divorce** [1] - 51:4
**document** [116] -
11:25, 15:25, 16:2,
20:14, 22:20, 31:3,
31:7, 32:18, 32:23,
33:5, 35:18, 35:23,

36:4, 36:10, 36:16,
36:20, 38:25, 39:13,
39:14, 39:16, 39:23,
40:1, 42:15, 43:20,
43:24, 48:14, 49:2,
49:22, 50:24, 52:8,
54:21, 55:24, 57:8,
58:14, 58:16, 58:17,
58:19, 58:22, 58:25,
59:5, 60:15, 61:20,
62:14, 62:17, 64:2,
64:4, 64:5, 65:24,
66:20, 69:17, 69:19,
69:22, 70:5, 70:8,
76:21, 76:23, 77:14,
77:15, 79:5, 80:11,
89:7, 89:8, 89:10,
89:11, 89:21, 90:1,
92:25, 110:5,
112:19, 115:5,
115:8, 123:16,
123:18, 123:19,
123:25, 124:6,
124:14, 132:4,
132:15, 136:14,
138:15, 138:24,
139:8, 139:16,
140:4, 140:11,
140:21, 141:3,
141:4, 141:10,
143:8, 158:14,
158:23, 167:9,
167:15, 167:19,
178:21, 184:4,
184:7, 184:21,
185:5, 189:9,
189:12, 191:8,
194:10, 196:12,
197:7, 197:8,
199:25, 200:5,
201:4, 201:7, 201:8,
201:16, 206:9,
207:13
**documentation** [9] -
30:17, 37:7, 82:24,
86:10, 86:14, 87:18,
87:20, 137:13, 160:1
**documented** [5] -
30:13, 30:14, 82:2,
102:3, 122:12
**documents** [57] - 8:3,
10:5, 10:8, 11:3,
12:5, 12:13, 12:17,
15:9, 15:21, 16:4,
16:5, 16:10, 18:2,
18:13, 18:18, 18:22,
18:23, 18:24, 19:2,
19:6, 19:9, 19:15,
19:19, 19:20, 20:7,
20:11, 44:25, 48:10,
67:8, 90:7, 93:25,

94:2, 94:6, 94:13,
94:17, 95:4, 95:6,
114:13, 114:18,
124:12, 142:15,
146:21, 152:1,
153:8, 157:4,
157:22, 158:12,
159:1, 161:22,
163:1, 169:1, 169:5,
175:9, 176:2,
176:11, 188:8, 206:2
**dog** [1] - 142:21
**done** [6] - 66:9, 70:9,
72:9, 116:5, 129:7,
199:20
**Dorothy** [1] - 165:17
**dosage** [11] - 79:3,
79:4, 79:7, 115:14,
121:13, 122:8,
126:24, 128:7,
129:20, 132:16,
132:25
**dose** [1] - 37:23
**DOT** [1] - 150:3
**double** [2] - 60:4,
60:10
**double-edged** [2] -
60:4, 60:10
**doubled** [1] - 81:13
**doubt** [1] - 180:16
**Douglas** [1] - 4:17
**down** [22] - 32:20,
34:6, 38:12, 38:16,
45:21, 79:23, 86:3,
86:15, 87:9, 93:16,
110:20, 121:16,
125:19, 129:6,
129:17, 129:20,
138:3, 138:12,
139:13, 153:14,
160:16, 173:4
**download** [2] - 77:8,
77:17
**downward** [2] - 86:16,
86:23
**Dr** [17] - 8:18, 8:20,
8:24, 94:1, 95:14,
95:17, 96:3, 96:6,
96:8, 96:18, 96:21,
97:3, 98:10, 103:12,
107:14, 107:17
**drive** [10] - 66:6, 67:2,
67:12, 68:10, 68:11,
69:15, 69:21, 70:19,
71:15, 89:18
**Drive** [1] - 6:15
**driving** [1] - 105:1
**Droves** [1] - 186:5
**drug** [10] - 27:15,
27:16, 109:16,

109:21, 111:4,
146:1, 146:7, 148:6,
167:4, 168:19
**Drug** [8] - 6:2, 44:20,
66:12, 119:10,
123:5, 142:10,
148:8, 209:7
**DRUG** [2] - 1:7, 1:13
**drugs** [4] - 194:5,
194:7, 199:6, 203:1
**due** [23] - 21:6, 21:9,
21:17, 38:10, 38:13,
70:3, 82:6, 82:9,
82:14, 83:13, 83:14,
86:24, 104:2, 104:4,
119:18, 120:10,
122:10, 122:12,
122:13, 122:14,
122:19, 131:16,
199:8
**Duff** [4] - 146:2, 146:4,
146:9, 147:13
**DUFF** [1] - 146:4
**duplicate** [1] - 75:23
**duplicated** [1] - 81:3
**duplicates** [1] - 80:24
**during** [36] - 14:8,
32:2, 32:7, 33:11,
34:12, 35:5, 38:7,
38:22, 41:25, 81:17,
95:7, 95:15, 113:19,
126:23, 127:24,
128:7, 137:2,
142:25, 155:10,
155:19, 156:14,
157:1, 163:6, 163:7,
165:3, 169:2, 172:5,
173:24, 175:14,
176:21, 181:13,
192:11, 193:2,
195:12, 198:21,
205:15
**duties** [7] - 56:25,
61:23, 91:5, 91:25,
149:10, 151:3,
182:20
**duty** [2] - 57:13, 173:6

**E**

**e-mail** [37] - 21:7,
21:12, 21:22, 21:23,
39:19, 39:24, 40:2,
40:3, 43:21, 46:8,
46:10, 46:18, 50:7,
50:19, 51:1, 51:5,
51:10, 51:13, 55:17,
56:15, 56:19, 56:24,
129:9, 139:3,
139:17, 139:19,

139:21, 141:7,
142:1, 142:5,
142:11, 143:16,
144:6, 144:7,
144:10, 144:15
**e-mails** [1] - 16:1
**e.g** [1] - 107:25
**early** [2] - 46:23,
132:15
**East** [3] - 3:5, 3:12,
4:18
**Eastern** [1] - 100:2
**easy** [1] - 96:25
**Ed** [2] - 33:14, 36:10
**edge** [1] - 17:5
**edged** [2] - 60:4,
60:10
**educate** [1] - 168:8
**effect** [4] - 61:18,
61:19, 101:24
**effective** [2] - 104:5,
137:20
**effectively** [1] - 41:9
**effort** [3] - 39:3, 39:6,
41:3
**efforts** [1] - 46:1
**eight** [2] - 169:20,
169:21
**Eighth** [1] - 3:10
**either** [11] - 16:22,
82:8, 106:4, 132:5,
139:12, 151:25,
170:23, 183:17,
199:13, 206:19
**electronic** [1] - 67:22
**element** [1] - 17:20
**elevated** [1] - 28:6
**elicited** [2] - 55:11,
117:22
**eliminate** [1] - 66:22
**eliminated** [2] - 68:21,
69:19
**eliminating** [1] - 21:9
**ELIZABETH** [1] - 6:14
**email** [1] - 64:22
**embrace** [1] - 94:17
**emphasize** [2] - 12:14,
105:19
**employee** [3] - 142:3,
142:10, 142:22
**employees** [9] - 142:1,
142:5, 142:24,
147:22, 188:25,
204:3, 204:4, 204:5
**employment** [2] -
142:25, 143:1
**Emporium** [3] - 66:12,
119:10, 123:5
**Encino** [1] - 3:18
**end** [11] - 16:21,

16:23, 28:4, 43:19,
48:18, 93:16,
109:24, 136:3,
143:16, 153:13,
168:24
**endeavoring** [1] -
11:10
**ending** [2] - 201:16
**ends** [1] - 140:6
**Enforcement** [1] -
44:21
**enforcing** [2] - 149:19,
149:22
**engaged** [5] - 203:9,
204:18, 204:21,
204:23, 205:17
**enhance** [1] - 168:8
**enhanced** [2] - 29:11,
52:12
**enhancing** [1] - 37:25
**enormous** [1] - 67:24
**ensure** [1] - 41:9
**ensuring** [2] - 18:7,
155:2
**entail** [2] - 151:15
**entails** [1] - 151:16
**enter** [1] - 124:10
**entered** [16] - 15:6,
15:12, 15:20, 16:23,
17:15, 22:25, 32:18,
35:23, 55:22, 115:6,
121:3, 136:12,
140:8, 145:5,
200:25, 201:2
**entering** [1] - 102:3
**entire** [15] - 25:13,
25:14, 27:14, 27:24,
30:13, 66:4, 66:8,
67:1, 67:4, 67:11,
68:14, 109:11,
141:7, 155:10,
201:15
**entirely** [2] - 83:13,
93:23
**entities** [1] - 45:9
**entitled** [7] - 12:7,
12:9, 14:16, 17:4,
18:12, 174:14, 178:8
**entity** [1] - 173:11
**entries** [4] - 66:10,
80:5, 201:3, 201:5
**entry** [4] - 146:11,
197:15, 197:20,
197:25
**entry-level** [1] -
146:11
**ENU** [1] - 4:12
**Enu** [1] - 102:24
**EPA** [1] - 150:2
**equate** [2] - 79:21,

80:2
**Eric** [12] - 125:16,
142:6, 143:14,
143:18, 144:7,
144:10, 144:14,
187:1, 199:23,
202:22, 203:15,
204:2
**especially** [1] - 8:3
**essentially** [4] - 8:8,
48:18, 55:4, 152:19
**establish** [4] - 42:23,
61:10, 62:8, 62:10
**established** [2] -
54:19, 115:24
**establishes** [2] -
43:13, 91:3
**establishing** [3] -
35:25, 48:25, 163:8
**establishments** [1] -
107:25
**estimate** [1] - 34:15
**et** [7] - 1:7, 1:13,
44:14, 46:13, 70:6,
209:6, 209:7
**eventually** [1] - 197:1
**evidence** [54] - 8:13,
11:20, 15:21, 22:11,
43:22, 47:25, 48:12,
52:24, 54:2, 54:10,
55:14, 55:19, 58:4,
58:25, 62:5, 63:7,
63:20, 68:20, 69:10,
98:20, 100:4,
100:14, 100:15,
100:17, 100:19,
101:6, 101:15,
101:17, 101:19,
101:22, 102:3,
105:8, 105:23,
106:5, 106:9,
106:11, 106:15,
106:24, 107:1,
107:4, 107:10,
107:15, 107:16,
107:19, 108:7,
108:13, 115:13,
116:3, 116:6,
117:13, 119:4,
121:4, 196:11
**Evidence** [1] - 56:1
**evidentiary** [1] - 96:6
**exact** [4] - 14:19,
22:17, 114:10,
192:17
**exactly** [5] - 25:24,
38:4, 75:14, 88:15,
131:20
**Exactly** [1] - 95:25
**exam** [1] - 17:13

**EXAMINATION** [2] -
23:10, 145:14
**examination** [2] -
14:9, 72:7
**examine** [5] - 15:9,
15:19, 71:17, 72:8,
96:17
**examined** [1] - 63:5
**example** [8] - 10:25,
19:1, 94:10, 99:5,
100:21, 100:24,
101:22, 133:17
**examples** [2] - 168:6,
169:23
**exceed** [1] - 80:8
**exceeded** [6] - 83:12,
83:15, 130:24,
131:1, 134:6, 136:2
**exceeds** [5] - 83:19,
131:3, 137:17,
189:17, 191:1
**Excel** [1] - 77:8
**excellent** [1] - 99:14
**except** [1] - 140:21
**exception** [10] - 45:14,
53:2, 54:1, 54:13,
54:20, 64:9, 140:25,
179:3, 179:11, 182:9
**exceptions** [5] -
62:13, 62:14, 62:16,
62:20, 63:3
**excerpt** [2] - 66:21,
89:17
**excess** [6] - 79:7,
119:14, 119:19,
122:1, 122:5, 123:7
**Excessive** [5] -
182:18, 184:6,
184:19, 184:25,
199:3
**excessive** [5] -
126:20, 190:4,
191:5, 200:10, 202:4
**exchange** [1] - 39:24
**exchanges** [1] - 141:9
**excising** [1] - 64:12
**exclude** [1] - 117:10
**excluded** [3] - 8:7,
176:24, 188:1
**exclusive** [1] - 16:20
**exclusively** [1] - 193:4
**Excuse** [1] - 79:20
**executed** [2] - 100:12,
157:2
**exercising** [1] - 56:25
**Exhibit** [2] - 88:24,
107:20
**EXHIBIT** [4] - 31:16,
112:15, 124:24,
143:4

**exhibit** [18] - 13:18, 14:22, 16:4, 21:11, 22:8, 22:13, 22:16, 25:13, 25:14, 65:4, 67:5, 114:10, 114:17, 114:21, 116:14, 141:13, 192:4

**exhibits** [19] - 9:12, 9:20, 10:2, 10:6, 13:8, 14:6, 14:8, 14:10, 14:14, 15:3, 15:5, 17:1, 17:23, 17:25, 18:8, 19:23, 113:20, 113:24, 207:1

**exist** [1] - 104:12

**existed** [3] - 142:4, 142:24, 188:24

**existing** [2] - 61:10, 103:15

**exists** [1] - 17:22

**exit** [3] - 153:15, 156:6, 159:7

**expect** [16] - 12:9, 37:6, 87:12, 89:17, 100:1, 102:17, 119:16, 120:10, 120:12, 122:8, 130:22, 131:2, 137:13, 137:15, 137:17, 137:19

**expectation** [1] - 59:16

**expedite** [1] - 126:16

**experience** [1] - 158:10

**experienced** [1] - 152:14

**expert** [2] - 72:23, 107:14

**expiration** [2] - 174:7, 174:9

**expired** [1] - 173:19

**explain** [3] - 126:25, 167:6, 169:18

**explained** [1] - 29:21

**explaining** [1] - 190:16

**explains** [1] - 8:1

**explanation** [4] - 42:5, 86:24, 87:1, 98:15

**explicitly** [1] - 178:13

**express** [5] - 165:20, 166:5, 173:6, 183:16, 187:12

**expresses** [1] - 21:24

**expunged** [1] - 9:12

**extensive** [1] - 172:24

**extent** [19] - 22:9,

44:11, 45:3, 45:4, 63:2, 64:2, 68:15, 89:16, 92:20, 94:12, 116:18, 116:20, 127:12, 144:20, 149:24, 150:1, 165:25, 176:1, 178:21

**extra** [3] - 68:15, 106:16, 187:13

**extract** [1] - 109:7

**extracted** [5] - 22:17, 67:25, 73:6, 89:9, 89:14

**extraterritorial** [4] - 98:20, 100:19, 103:22, 104:20

**extremely** [1] - 13:25

---

# F

**F.3d** [2] - 7:24, 7:25

**FABER** [1] - 1:17

**Faber** [1] - 7:1

**facially** [4] - 115:20, 116:7, 116:18, 118:8

**facilities** [1] - 151:12

**facility** [13] - 143:21, 147:20, 147:21, 148:9, 148:19, 151:20, 153:6, 153:12, 159:2, 162:15, 163:3, 166:23, 195:4

**facing** [1] - 102:6

**fact** [37] - 35:23, 42:22, 42:24, 43:8, 43:21, 43:24, 44:16, 47:23, 48:13, 48:16, 48:19, 53:25, 55:21, 61:21, 66:23, 68:19, 69:23, 70:12, 76:18, 87:11, 101:18, 101:20, 101:21, 101:23, 102:6, 131:11, 162:25, 176:6, 177:19, 177:24, 178:12, 178:14, 178:19, 182:2, 182:4, 184:13, 186:19

**factor** [1] - 134:7

**factors** [4] - 37:15, 37:17, 82:4, 82:11

**facts** [1] - 153:8

**fail** [3] - 26:14, 104:8, 104:9

**failed** [7] - 83:9, 100:15, 106:25, 107:1, 164:15,

196:11

**failings** [1] - 100:2

**fails** [1] - 26:13

**failure** [4] - 100:4, 100:17, 101:7

**failures** [3] - 98:24, 101:17, 106:21

**fair** [17] - 12:1, 18:11, 18:19, 25:22, 26:2, 33:18, 46:25, 74:4, 79:1, 80:13, 106:11, 147:23, 148:17, 162:18, 164:20, 206:17

**Fair** [1] - 92:16

**fairly** [2] - 117:4, 157:14

**fairness** [2] - 58:15, 103:21

**faith** [2] - 10:2, 16:25

**fall** [3] - 8:19, 53:2, 149:13

**familiar** [23] - 33:5, 36:16, 36:20, 38:18, 38:20, 51:16, 51:20, 51:21, 53:16, 65:11, 65:18, 73:8, 76:21, 76:22, 76:23, 80:11, 123:15, 150:12, 150:15, 168:21, 173:1, 182:14, 182:20

**familiarity** [2] - 36:21, 91:8

**families** [2] - 33:4, 111:5

**family** [3] - 27:16, 37:23, 120:18

**Family** [1] - 123:5

**far** [8] - 8:16, 14:17, 27:22, 83:10, 105:10, 127:2, 156:16, 157:15

**FARRELL** [209] - 2:3, 10:16, 10:19, 10:21, 11:5, 11:9, 11:16, 11:18, 12:11, 12:20, 13:2, 13:13, 13:16, 13:18, 14:19, 18:21, 20:3, 20:10, 20:14, 22:15, 23:11, 23:23, 23:25, 29:7, 29:8, 31:6, 31:10, 31:17, 31:20, 32:15, 32:17, 32:20, 32:22, 35:21, 36:8, 36:9, 38:16, 38:17, 39:10, 39:12, 41:17, 41:20, 42:15, 45:17, 45:21, 45:24, 47:15, 48:7, 48:23,

49:12, 49:23, 50:3, 50:13, 50:15, 50:16, 51:13, 51:19, 52:5, 52:13, 52:20, 54:9, 55:11, 56:8, 56:11, 58:7, 58:10, 58:24, 59:6, 59:10, 59:23, 60:13, 60:18, 60:24, 61:3, 64:14, 64:25, 65:8, 65:15, 65:20, 66:6, 66:7, 66:14, 67:1, 67:6, 67:16, 67:18, 69:2, 70:15, 70:25, 71:4, 71:8, 71:10, 71:13, 71:25, 72:3, 72:9, 72:12, 72:18, 72:22, 73:4, 73:16, 73:18, 77:1, 77:20, 77:24, 79:12, 79:13, 84:20, 85:4, 88:16, 89:2, 90:4, 90:6, 91:14, 91:23, 92:7, 92:17, 93:8, 93:11, 93:14, 94:19, 94:25, 95:5, 95:9, 96:7, 96:25, 97:6, 97:11, 97:17, 109:1, 109:5, 109:22, 110:10, 110:16, 111:20, 111:23, 112:11, 112:16, 112:18, 113:2, 113:4, 113:12, 113:15, 114:2, 114:25, 115:3, 116:2, 116:16, 116:25, 117:7, 117:12, 118:17, 120:22, 121:2, 123:11, 123:14, 123:20, 123:22, 124:18, 124:25, 125:19, 125:21, 126:3, 126:9, 126:14, 128:5, 128:6, 129:13, 129:18, 130:9, 132:9, 132:12, 134:1, 134:14, 135:11, 138:5, 138:10, 138:16, 138:21, 138:23, 139:8, 139:15, 140:7, 140:14, 140:16, 142:13, 143:6, 143:7, 144:19, 145:1, 145:5, 145:8, 145:10, 162:20, 171:25, 176:20, 180:2, 181:24,

184:10, 187:22, 187:24, 192:6, 196:14, 200:23, 201:9, 206:24, 207:12, 207:16, 207:25

**Farrell** [67] - 2:4, 2:15, 10:15, 11:17, 13:11, 14:18, 17:12, 17:24, 18:14, 19:11, 20:2, 20:8, 22:14, 29:6, 41:16, 42:2, 42:12, 42:23, 45:19, 49:8, 49:21, 50:2, 50:5, 50:12, 51:11, 53:1, 56:7, 58:12, 58:18, 67:14, 70:18, 71:3, 73:2, 76:25, 77:7, 77:12, 77:19, 79:8, 79:11, 84:19, 90:3, 93:4, 93:7, 93:23, 95:3, 96:1, 97:4, 98:9, 108:25, 110:4, 110:15, 110:25, 111:5, 111:9, 111:19, 112:10, 114:24, 116:24, 132:8, 140:23, 162:6, 176:19, 177:10, 177:14, 179:9, 206:23, 207:11

**Farrell's** [3] - 12:23, 16:22, 127:18

**fast** [1] - 157:7

**fat** [1] - 75:23

**favor** [1] - 7:14

**fax** [1] - 174:20

**FCRR** [1] - 6:18

**February** [4] - 140:5, 140:6, 191:10, 191:11

**federal** [2] - 102:10, 151:8

**Federal** [2] - 56:1, 172:22

**FedEx** [1] - 195:8

**fell** [1] - 150:19

**felt** [1] - 171:13

**few** [5] - 105:17, 111:12, 129:4, 177:22, 202:20

**field** [7] - 170:18, 170:21, 170:22, 170:25, 171:7, 178:4

**Field** [4] - 158:1, 158:2, 158:3, 158:7

**fields** [5] - 69:18, 70:5, 74:2, 92:25, 125:24

**figure** [2] - 134:17,

197:2
**figuring** [1] - 11:11
**file** [13] - 22:17, 22:19, 25:25, 26:10, 26:22, 86:10, 86:25, 87:20, 120:10, 122:19, 123:11, 130:25, 160:1
**filed** [3] - 7:13, 14:22, 112:6
**files** [8] - 21:18, 37:8, 104:2, 104:4, 119:16, 122:10, 122:12, 122:13
**fill** [1] - 146:23
**filled** [2] - 191:6, 194:8
**filler** [3] - 146:10, 146:13, 190:21
**fillers** [2] - 146:22, 189:15
**filling** [4] - 189:15, 189:22, 190:3, 190:18
**filtered** [1] - 110:5
**final** [1] - 18:21
**finally** [4] - 22:23, 22:24, 100:18, 107:18
**finance** [1] - 125:23
**findings** [14] - 153:2, 153:4, 153:16, 153:19, 153:21, 159:4, 159:8, 159:9, 159:11, 159:12, 159:14, 159:17, 159:25, 160:8
**fine** [4] - 25:15, 180:10, 192:7, 202:19
**finger** [2] - 75:23, 123:12
**finish** [5] - 13:16, 13:21, 14:1, 60:17, 159:22
**finished** [1] - 13:2
**Firm** [2] - 3:4, 3:7
**first** [28] - 13:5, 13:20, 13:23, 20:14, 40:6, 52:11, 61:10, 64:12, 64:17, 64:19, 74:17, 90:16, 98:18, 101:10, 101:14, 109:25, 117:11, 117:16, 141:25, 143:17, 148:6, 165:18, 185:3, 189:23, 192:25, 197:2, 197:13, 197:15
**fit** [1] - 96:12

**five** [17] - 11:3, 14:8, 16:1, 72:3, 72:16, 130:19, 134:23, 151:14, 161:12, 161:22, 163:17, 163:21, 164:17, 171:22, 175:20, 183:11, 207:4
**FL** [1] - 2:14
**flag** [5] - 25:23, 26:4, 84:2, 130:23, 134:8
**flagged** [17] - 22:4, 66:2, 67:24, 73:23, 76:3, 83:23, 85:14, 88:8, 92:10, 109:9, 109:21, 122:11, 127:4, 127:7, 127:10, 135:4, 135:5
**flagging** [5] - 25:22, 38:12, 76:15, 79:7, 84:15
**flags** [1] - 130:1
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**Flexible** [1] - 174:21
**flip** [3] - 40:13, 46:17, 89:3
**flood** [1] - 12:5
**flooding** [2] - 18:17, 19:8
**Floor** [1] - 3:5
**Florida** [5] - 148:9, 148:11, 149:18, 186:15, 187:25
**flow** [8] - 20:16, 24:5, 24:8, 25:5, 26:21, 27:6, 74:15, 104:23
**fly** [1] - 158:4
**focus** [1] - 131:17
**folks** [1] - 104:21
**follow** [5] - 20:17, 48:24, 103:17, 196:3, 198:4
**follow-up** [2] - 196:3, 198:4
**followed** [3] - 100:13, 137:18, 202:12
**following** [3] - 7:15, 137:21, 143:9
**Following** [1] - 198:16
**follows** [1] - 7:4
**Footnote** [1] - 14:25
**footnote** [3] - 13:7, 13:24, 16:14
**FOR** [1] - 1:1
**foregoing** [1] - 209:4
**foremost** [1] - 101:14
**Forge** [1] - 155:12
**forgot** [2] - 196:17, 196:18

**form** [10] - 37:10, 123:25, 189:13, 191:12, 191:15, 199:12, 203:11, 203:14, 204:6, 204:22
**Form** [2] - 199:11, 201:6
**format** [7] - 32:23, 33:2, 65:21, 67:20, 67:22, 184:21, 201:5
**Forms** [2] - 157:3, 158:20
**forms** [2] - 191:12, 204:10
**forth** [6] - 71:18, 105:13, 139:23, 141:10, 177:4, 180:1
**forward** [3] - 50:24, 72:17, 171:24
**foundation** [11] - 12:14, 15:17, 18:24, 35:17, 35:22, 48:10, 50:10, 68:2, 84:17, 118:11, 182:1
**foundational** [4] - 15:19, 15:23, 18:1, 15:17
**four** [9] - 21:2, 64:19, 64:23, 123:6, 134:23, 151:14, 179:6, 179:8, 207:4
**fourth** [1] - 173:4
**Fourth** [3] - 7:22, 7:24, 7:25
**frame** [18] - 28:24, 29:15, 32:2, 32:7, 33:5, 33:11, 35:5, 36:19, 38:7, 41:25, 87:6, 96:8, 96:9, 146:17, 161:1, 163:18, 181:13
**frames** [1] - 174:21
**free** [1] - 50:7
**Friday** [1] - 152:6
**friendly** [1] - 196:17
**front** [8] - 9:17, 14:20, 23:18, 64:25, 78:4, 112:25, 143:14, 195:4
**Fruth** [10] - 119:10, 119:22, 120:5, 120:9, 120:14, 120:15, 120:16, 123:6, 133:17, 133:21
**fulfill** [1] - 46:2
**full** [5] - 56:4, 56:13, 89:25, 168:7, 201:4
**full-line** [1] - 168:7

**FULLER** [1] - 2:15
**Fuller** [2] - 2:4, 2:15
**fully** [1] - 153:9
**function** [1] - 168:19
**fundamental** [2] - 103:21, 105:12
**FURTHER** [1] - 23:10
**future** [2] - 27:10, 102:14
**future-looking** [1] - 102:14

---

## G

**gauge** [1] - 170:10
**general** [4] - 59:13, 80:21, 80:23, 205:11
**generally** [9] - 98:16, 123:17, 127:8, 147:15, 152:3, 159:1, 162:10, 168:18, 195:25
**Generally** [1] - 168:16
**generic** [1] - 123:18
**geographic** [8] - 68:16, 70:20, 101:11, 101:13, 107:24, 108:11, 186:16, 188:1
**Geographic** [1] - 184:11
**geographical** [1] - 106:16
**George** [1] - 98:1
**Georgia** [1] - 148:7
**given** [17] - 53:9, 53:13, 56:5, 66:23, 68:19, 72:6, 93:20, 153:20, 163:6, 164:13, 172:5, 172:9, 175:2, 180:25, 182:1, 182:2, 206:21
**Goals** [1] - 168:1
**goals** [1] - 168:11
**Goggin** [1] - 40:20
**goods** [1] - 129:7
**gotcha** [1] - 104:11
**governing** [1] - 55:16
**government** [3] - 8:5, 8:9, 152:16
**governmental** [1] - 11:2
**granted** [1] - 51:24
**graphic** [1] - 109:14
**Gray** [1] - 40:21
**great** [3] - 60:24, 70:25, 143:25
**greater** [1] - 60:10
**GRETCHEN** [1] - 6:7

**ground** [1] - 56:4
**grounds** [1] - 180:3
**group** [5] - 18:9, 21:6, 37:24, 46:6, 50:25
**grouped** [1] - 132:3
**groups** [4] - 32:1, 32:10, 37:24, 55:16
**guard** [2] - 8:13, 102:2
**guess** [2] - 25:16, 144:10
**guidance** [1] - 116:20
**guide** [1] - 7:23
**guideline** [2] - 38:25, 46:20
**guidelines** [66] - 21:13, 21:15, 38:19, 39:4, 39:20, 40:9, 41:2, 41:23, 42:18, 42:23, 42:24, 43:5, 43:15, 46:11, 46:21, 47:1, 47:5, 47:11, 48:19, 49:5, 49:24, 50:6, 50:22, 51:4, 51:9, 51:17, 51:18, 51:20, 52:1, 52:2, 52:10, 52:14, 52:17, 52:21, 52:22, 52:23, 52:24, 53:3, 53:14, 53:17, 53:19, 54:1, 54:6, 54:7, 54:11, 54:23, 54:25, 55:2, 55:5, 55:6, 55:8, 55:15, 61:5, 61:9, 61:12, 61:25, 62:3, 62:7, 62:10, 107:19, 107:20, 176:25, 180:4
**guideposts** [1] - 7:23

---

## H

**halfway** [1] - 186:8
**Hamilton** [1] - 98:1
**hand** [19] - 8:4, 23:17, 24:9, 30:2, 69:6, 92:9, 92:10, 106:8, 115:11, 120:25, 129:16, 161:22, 164:12, 167:9, 189:4, 191:25, 192:3, 196:7, 196:8
**hand-selected** [1] - 69:6
**handed** [5] - 69:22, 110:8, 163:17, 167:16, 206:2
**handing** [1] - 206:9
**handle** [1] - 29:22
**handling** [1] - 150:3
**handwriting** [8] - 23:1,

185:4, 185:5, 185:7, 186:10, 194:12, 194:13
**handwritten** [1] - 207:20
**happy** [4] - 7:8, 111:8, 206:19, 206:22
**hard** [8] - 69:21, 72:6, 72:10, 92:25, 177:18, 207:22, 207:25, 208:1
**HARDIN** [1] - 5:3
**harms** [1] - 100:24
**hate** [1] - 22:7
**hats** [1] - 147:18
**Hawkins** [1] - 3:7
**Hazewski** [1] - 36:10
**HDA** [3] - 54:3, 55:1, 55:8
**HDMA** [33] - 19:2, 21:12, 21:14, 38:18, 39:3, 39:20, 40:9, 41:3, 41:21, 42:18, 42:23, 42:24, 43:4, 43:10, 43:13, 43:14, 43:22, 44:11, 44:15, 44:17, 45:5, 45:6, 46:11, 46:14, 46:20, 47:11, 48:19, 52:2, 54:16, 55:24, 176:24, 180:4
**HDMA's** [1] - 41:2
**head** [1] - 111:17
**headquarters** [4] - 171:1, 171:8, 178:2, 192:25
**Headquarters** [1] - 158:1
**Health** [7] - 4:11, 5:2, 63:2, 110:14, 147:12, 149:18, 156:8
**Health's** [1] - 40:11
**healthcare** [2] - 104:19, 105:6
**Healthcare** [2] - 40:21, 46:1
**hear** [7] - 13:20, 43:3, 45:1, 71:6, 106:15, 182:4, 196:19
**heard** [11] - 19:11, 53:10, 98:25, 100:20, 101:19, 103:10, 131:14, 175:24, 179:4, 179:13, 184:12
**hearing** [2] - 110:1, 176:13
**hearsay** [52] - 41:14, 42:5, 43:6, 43:16,

43:25, 45:13, 45:15, 47:7, 48:22, 49:10, 49:22, 51:12, 51:15, 52:17, 52:19, 53:3, 53:8, 54:1, 54:12, 54:13, 54:23, 56:4, 56:6, 61:9, 62:14, 62:16, 62:21, 63:3, 63:14, 63:24, 140:22, 140:24, 141:3, 141:17, 141:18, 141:22, 162:21, 162:24, 165:23, 171:25, 172:13, 176:2, 177:2, 178:21, 179:10, 179:14, 180:15, 181:24, 182:11, 183:5, 183:25
**heart** [1] - 58:1
**held** [9] - 8:9, 31:1, 59:17, 60:7, 66:2, 74:6, 74:8, 75:14, 106:12
**help** [7] - 67:16, 167:3, 171:18, 174:3, 193:7, 193:9, 203:8
**Hester** [9] - 13:4, 35:16, 41:12, 42:21, 44:4, 45:3, 53:23, 57:16, 105:16
**HESTER** [22] - 5:9, 13:6, 28:23, 35:17, 41:13, 42:2, 42:22, 44:19, 53:24, 57:17, 59:18, 63:7, 63:12, 63:22, 70:17, 71:23, 72:1, 84:17, 102:22, 102:24, 105:17, 118:11
**Hester's** [2] - 58:22, 63:20
**high** [1] - 135:21
**highlight** [6] - 25:2, 32:20, 45:22, 117:9, 120:25, 123:12
**highlighted** [5] - 79:24, 87:16, 119:11, 144:6, 174:18
**highlighting** [1] - 27:10
**himself** [1] - 165:19
**hinted** [1] - 10:25
**hired** [2] - 147:22, 151:1
**hiring** [1] - 147:21
**History** [5] - 65:11, 65:12, 67:19, 68:12,

73:21
**history** [8] - 16:22, 68:13, 109:6, 135:13, 157:12, 188:2, 202:25, 203:1
**hits** [1] - 174:9
**Hold** [1] - 189:5
**hold** [15] - 8:18, 25:25, 26:1, 26:10, 26:19, 26:20, 26:22, 26:25, 27:10, 27:15, 28:1, 28:5, 57:8, 75:19, 206:3
**holding** [3] - 92:9, 92:10, 129:5
**home** [2] - 152:6, 154:15
**Honor** [197] - 7:8, 9:15, 9:17, 12:11, 12:22, 13:6, 13:22, 16:15, 16:24, 17:3, 17:11, 17:23, 18:10, 19:12, 20:3, 20:6, 22:7, 22:15, 28:23, 31:12, 31:14, 35:17, 36:2, 41:13, 42:4, 42:9, 42:11, 43:1, 43:17, 44:9, 44:12, 44:19, 45:6, 45:18, 47:4, 47:5, 47:6, 48:9, 49:16, 51:3, 51:9, 52:16, 52:25, 53:9, 53:15, 53:19, 53:25, 54:24, 57:17, 58:15, 59:6, 59:18, 61:4, 61:8, 61:14, 61:21, 62:2, 62:12, 63:1, 63:7, 63:15, 64:1, 64:8, 64:19, 65:6, 66:17, 67:7, 68:9, 69:12, 71:2, 71:22, 72:5, 76:18, 77:6, 79:8, 84:20, 84:23, 89:7, 90:4, 91:6, 91:21, 92:23, 93:11, 93:22, 94:7, 95:5, 95:13, 97:21, 97:25, 98:12, 99:23, 100:7, 100:16, 100:18, 101:4, 101:10, 102:22, 102:23, 103:2, 103:13, 103:21, 104:3, 104:6, 104:19, 104:24, 105:7, 105:8, 105:17, 106:18, 107:5, 107:18, 108:12, 108:18, 108:20, 108:24,

110:4, 110:11, 110:24, 111:18, 112:11, 112:13, 112:16, 113:18, 113:20, 113:25, 114:16, 115:23, 116:3, 116:8, 116:17, 118:12, 124:22, 127:12, 131:10, 131:22, 138:7, 138:21, 140:10, 140:21, 141:1, 141:24, 142:16, 144:5, 144:19, 152:21, 152:22, 160:13, 161:21, 162:4, 162:24, 163:4, 163:15, 164:8, 164:10, 165:24, 167:8, 172:1, 172:12, 175:8, 176:9, 176:20, 177:11, 177:21, 178:1, 178:25, 179:12, 180:9, 181:25, 182:23, 184:1, 184:10, 184:12, 186:13, 186:17, 187:18, 187:22, 188:5, 188:12, 191:18, 191:21, 196:9, 196:10, 196:14, 196:16, 200:20, 201:1, 201:15, 205:25, 206:2, 206:8, 206:13, 207:3, 207:9, 208:3, 208:11
**Honor's** [1] - 94:14
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**hoops** [2] - 56:1, 56:2
**hope** [4] - 77:1, 95:13, 126:15, 132:9
**hospital** [2] - 99:19, 102:8
**hospitals** [1] - 107:3
**hour** [2] - 157:20, 206:20
**hours** [1] - 191:7
**housecleaning** [1] - 109:2
**housekeeping** [1] - 196:10
**hub** [1] - 104:19
**human** [1] - 27:5
**hundred** [4] - 14:5,

115:22, 116:13, 123:7
**hundreds** [5] - 45:9, 104:8, 106:2
**HUNTINGTON** [1] - 1:4
**Huntington** [40] - 3:10, 4:1, 9:2, 67:13, 69:1, 69:14, 69:23, 70:20, 71:7, 71:24, 77:4, 84:19, 85:19, 89:22, 98:11, 98:22, 99:17, 101:24, 102:13, 103:23, 104:12, 104:25, 105:2, 105:21, 106:3, 106:5, 109:15, 109:21, 110:20, 111:4, 115:12, 115:16, 119:9, 120:15, 121:4, 123:8, 137:12, 143:22, 177:20, 209:6
**Huntington-Cabell** [7] - 9:2, 110:20, 111:4, 120:15, 123:8, 137:12, 143:22
**Huntington/Cabell** [9] - 66:2, 66:11, 67:5, 70:7, 73:7, 84:10, 85:5, 92:21, 96:11
**hydrocodone** [29] - 20:24, 33:1, 33:4, 33:10, 35:12, 35:15, 36:13, 89:4, 109:17, 110:22, 115:14, 115:21, 117:3, 117:21, 117:22, 118:9, 119:24, 120:5, 120:14, 120:16, 120:17, 120:24, 126:20, 126:24, 128:1, 129:14, 129:15, 130:14, 133:19

## I

**idea** [3] - 41:23, 159:8, 169:15
**identification** [1] - 141:18
**identified** [17] - 9:20, 9:21, 19:19, 19:24, 23:1, 52:22, 67:18, 73:21, 80:7, 95:7, 114:6, 114:19, 122:24, 122:25, 132:15, 179:11,

202:2
**identifies** [2] - 20:23, 23:18
**identify** [10] - 11:11, 17:7, 41:4, 61:11, 111:25, 114:10, 133:23, 184:4, 188:25, 202:23
**identifying** [5] - 11:6, 12:17, 36:12, 114:8, 200:11
**II** [1] - 148:2
**illegal** [4] - 200:12, 204:18, 205:7, 205:17
**illicit** [1] - 41:10
**imagine** [1] - 18:4
**Immediate** [1] - 182:16
**immediate** [1] - 195:23
**impact** [2] - 100:22, 169:24
**impeach** [2] - 10:24, 21:22
**impermissible** [1] - 180:15
**implement** [3] - 41:8, 194:16, 194:17
**implementation** [1] - 29:21
**implemented** [1] - 37:1
**implementing** [1] - 46:4
**importance** [1] - 16:6
**important** [7] - 99:23, 146:16, 171:13, 173:9, 173:10, 174:1, 203:7
**importantly** [2] - 167:5, 168:25
**impose** [1] - 57:13
**impossible** [1] - 18:18
**improper** [1] - 195:15
**impugned** [1] - 84:24
**IN** [7] - 1:1, 1:18, 90:14, 90:24, 91:1, 92:14, 112:22
**inaccurate** [2] - 172:11, 181:21
**inadmissible** [1] - 62:16
**inappropriate** [1] - 144:17
**include** [16] - 18:22, 71:16, 72:11, 89:19, 110:9, 110:22, 110:23, 149:21, 150:7, 151:9, 152:7,

155:2, 163:2, 165:1, 202:14, 205:22
**included** [6] - 19:20, 66:20, 95:16, 114:4, 114:7, 142:15
**includes** [7] - 21:12, 23:16, 69:15, 70:19, 94:6, 143:25, 201:14
**including** [9] - 103:18, 107:13, 113:13, 120:4, 144:15, 175:21, 175:23, 176:8, 182:3
**inclusive** [3] - 69:21, 89:19, 89:21
**inconsistencies** [1] - 171:19
**inconsistency** [1] - 157:19
**inconsistent** [3] - 142:19, 170:24, 172:3
**inconvenience** [1] - 97:14
**incorrect** [2] - 75:20, 176:14
**increase** [5] - 82:7, 82:10, 82:12, 82:23, 82:25
**increased** [2] - 86:6, 86:11
**independent** [3] - 73:12, 146:1, 148:6
**indicate** [8] - 90:9, 90:25, 119:23, 122:10, 122:18, 124:13, 137:4
**indicated** [4] - 35:19, 76:20, 141:10, 203:13
**indicating)** [1] - 10:16
**indications** [2] - 199:9, 204:18
**individuals** [6] - 17:14, 17:17, 17:21, 38:9, 101:25, 135:2
**indulgence** [1] - 61:6
**industry** [33] - 21:13, 38:18, 39:20, 41:2, 41:22, 43:14, 43:15, 47:17, 48:4, 48:19, 49:1, 49:5, 49:13, 49:24, 50:6, 50:22, 51:4, 51:9, 52:21, 55:18, 55:21, 61:5, 61:9, 145:18, 145:20, 167:4, 168:9, 168:23, 170:14, 170:17, 171:7, 171:8, 176:24

industry" [1] - 49:18
**information** [26] - 30:1, 59:17, 60:1, 60:2, 60:6, 60:8, 60:10, 65:18, 67:22, 68:25, 74:9, 76:22, 77:8, 77:17, 89:14, 89:15, 89:25, 98:11, 124:10, 139:25, 141:20, 163:2, 169:11, 173:23, 184:21, 203:13
**initial** [3] - 25:3, 32:8, 156:3
**initiated** [3] - 46:9, 127:18, 201:22
**initiative** [2] - 197:9, 201:23
**innocuous** [1] - 8:7
**input** [4] - 9:6, 52:14, 52:21, 53:25
**inquire** [1] - 64:4
**inquiry** [2] - 126:18, 129:1
**inside** [4] - 74:4, 131:20, 189:14, 203:10
**inspect** [3] - 158:9, 159:2, 189:16
**inspected** [1] - 190:2
**inspection** [5] - 152:18, 156:2, 156:15, 157:22, 169:2
**inspections** [14] - 82:16, 155:7, 155:20, 155:24, 156:9, 156:19, 157:16, 157:17, 157:20, 157:25, 158:15, 159:4, 169:16, 169:17
**instance** [1] - 96:7
**instead** [3] - 70:5, 107:9, 192:1
**instructed** [1] - 19:14
**intend** [21] - 20:11, 20:14, 20:22, 20:25, 21:5, 21:11, 21:17, 21:22, 22:2, 22:18, 22:20, 55:23, 58:24, 68:6, 114:3, 141:5, 141:15, 141:19, 175:8, 207:1
**intended** [9] - 15:9, 16:10, 17:2, 22:10, 23:2, 41:23, 48:16, 67:11
**intending** [3] - 9:22, 18:3, 18:8

**intends** [2] - 96:1, 140:25
**intent** [2] - 29:4, 57:24
**intention** [1] - 31:6
**interface** [2] - 76:3, 77:21
**internal** [6] - 126:5, 126:10, 139:17, 152:19, 153:23, 198:15
**internally** [1] - 43:9
**internet** [23] - 191:23, 192:10, 192:23, 193:4, 193:5, 193:11, 194:5, 194:8, 194:20, 195:2, 195:11, 198:5, 198:17, 199:1, 199:9, 201:23, 202:24, 204:16, 204:19, 204:21, 204:23, 205:7, 205:17
**Internet** [1] - 194:11
**Internet/Mail** [1] - 205:2
**Internet/Mail-Order** [1] - 205:2
**interpret** [2] - 79:17, 170:23
**interpretation** [2] - 170:6, 172:3
**interpretations** [4] - 170:13, 170:16, 171:6, 171:7
**interpreted** [1] - 171:20
**interrogate** [1] - 30:21
**interrogates** [6] - 24:17, 26:9, 26:12, 27:17, 30:12, 31:1
**interrogating** [1] - 26:8
**interrogation** [4] - 25:3, 26:3, 31:23, 32:8
**interrupt** [1] - 22:7
**interrupting** [1] - 202:19
**introduce** [5] - 22:3, 50:6, 55:14, 58:24, 101:21
**introduced** [2] - 22:20, 100:18
**introducing** [1] - 55:19
**inventories** [1] - 156:25
**inventory** [1] - 156:23
**investigate** [1] - 30:2

**investigated** [1] - 122:11
**investigating** [3] - 125:17, 199:5, 200:10
**investigation** [29] - 21:19, 21:21, 38:14, 123:16, 124:7, 124:11, 124:15, 124:16, 126:2, 126:6, 126:11, 127:3, 127:6, 127:9, 127:18, 128:8, 130:14, 130:23, 131:16, 135:23, 136:12, 136:20, 136:23, 137:2, 199:2, 201:22, 203:15, 204:15, 205:16
**investigations** [12] - 38:10, 105:20, 105:22, 124:4, 127:25, 137:1, 199:15, 199:22, 202:1, 202:3, 202:7, 202:10
**investigative** [1] - 83:11
**investigator** [13] - 81:20, 124:7, 125:15, 127:2, 143:20, 161:9, 161:14, 161:15, 165:9, 166:18, 175:21, 183:10, 199:21
**investigators** [14] - 82:15, 143:19, 158:6, 165:6, 166:21, 166:22, 169:12, 175:20, 175:23, 176:8, 177:25, 181:14, 204:1, 204:2
**investigatory** [1] - 203:23
**invite** [1] - 192:20
**invoice** [1] - 80:17
**invoices** [1] - 158:19
**involve** [3] - 200:12, 206:1, 206:9
**involved** [2] - 29:20, 200:12
**involvement** [1] - 21:9
**involves** [1] - 179:7
**involving** [1] - 161:5
**ire** [1] - 206:24
**Irpino** [1] - 3:7
**irregular** [2] - 190:9,

190:11
**irrelevant** [1] - 144:17
**ISIA** [1] - 5:4
**issue** [18] - 7:13, 7:14, 10:13, 12:23, 13:25, 57:21, 62:3, 68:9, 77:6, 103:14, 104:19, 107:4, 113:21, 159:5, 191:21, 192:5, 198:17, 207:5
**issued** [3] - 62:3, 62:9, 62:10
**issues** [3] - 57:18, 57:25, 105:12
**item** [2] - 81:1, 111:24
**items** [3] - 27:11, 80:16, 156:23
**itself** [11] - 22:11, 51:5, 55:24, 65:19, 66:21, 75:17, 99:21, 127:19, 166:3, 167:20, 203:10

## J

**Jackson** [2] - 6:8, 187:24
**Jacksonville** [1] - 186:15
**Janati** [4] - 7:23, 8:1, 8:12, 9:4
**January** [18] - 20:23, 35:9, 36:13, 86:17, 118:2, 118:9, 119:14, 120:24, 121:6, 121:7, 121:25, 122:2, 131:2, 134:19, 134:21, 134:22, 134:24, 134:25
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**job** [10] - 59:1, 60:7, 99:14, 146:9, 147:24, 148:17, 151:3, 152:12, 155:23, 182:20
**jobs** [1] - 189:21
**John** [6] - 40:21, 144:1, 144:12, 144:13, 144:15
**join** [4] - 42:4, 58:8, 58:20
**joined** [1] - 14:23
**joint** [3] - 13:18, 14:22, 16:14
**JOSEPH** [1] - 6:4
**Joseph** [1] - 36:11

**JR** [2] - 2:3, 2:15
**Juan** [2] - 2:5, 2:17
**Judge** [28] - 7:2, 7:15, 29:7, 49:23, 50:3, 50:15, 61:3, 64:14, 65:15, 66:6, 66:14, 69:4, 71:13, 72:18, 73:16, 77:1, 88:16, 92:17, 96:7, 111:23, 114:2, 139:9, 140:14, 142:13, 145:1, 145:10, 164:13, 180:2
**judge** [23] - 13:2, 13:13, 18:21, 23:21, 31:6, 31:17, 39:11, 42:15, 48:23, 51:13, 52:5, 52:20, 56:9, 58:7, 58:24, 60:13, 60:24, 84:24, 112:3, 113:2, 123:20, 124:18, 140:7
**JUDGE** [1] - 1:17
**judicial** [3] - 8:22, 84:21, 85:2
**July** [14] - 20:21, 21:20, 78:15, 78:21, 79:6, 79:22, 80:4, 81:11, 81:16, 87:11, 87:14, 145:19
**jump** [1] - 56:1
**jumped** [1] - 56:2
**June** [12] - 21:19, 115:16, 120:4, 120:8, 124:17, 125:3, 125:5, 129:11, 129:19, 129:23, 130:1, 130:4, 130:10, 131:3, 136:11, 136:22
**jurisdiction** [3] - 101:23, 158:7, 170:21
**jurisdictional** [4] - 68:16, 117:10, 188:3, 188:5
**jurisdictions** [3] - 17:19, 102:10, 104:21
**Justice** [1] - 44:20
**justification** [2] - 82:24, 87:13
**justified** [1] - 122:14
**justifies** [1] - 86:11
**justifying** [1] - 137:14

## K

**KEARSE** [1] - 4:2

**keep** [9] - 9:7, 56:6, 114:18, 123:11, 123:12, 134:12, 135:1, 179:22
**Keep** [1] - 86:4
**Kelly** [1] - 6:8
**kept** [1] - 129:5
**Kersch** [1] - 125:11
**Kessler** [1] - 4:17
**Kevin** [1] - 36:11
**key** [2] - 103:20
**kicking** [1] - 79:6
**kind** [18] - 8:9, 60:22, 105:22, 152:15, 153:2, 158:14, 170:12, 170:19, 181:22
**kinds** [5] - 105:21, 149:13, 153:25, 154:4, 169:5
**King** [1] - 98:1
**knowledge** [7] - 35:19, 61:23, 73:12, 76:1, 84:25, 87:3, 179:17
**known** [1] - 139:4
**knows** [2] - 91:11, 115:25
**KOUBA** [1] - 3:14
**Kreutzer** [1] - 36:11
**Kyle** [1] - 192:15

## L

**LA** [1] - 3:8
**label** [1] - 109:14
**lack** [6] - 35:17, 84:17, 103:5, 106:1, 118:11, 185:25
**lacks** [1] - 7:17
**laid** [4] - 48:10, 151:8, 182:1, 183:16
**language** [3] - 76:9, 76:10, 106:13
**Lanier** [1] - 3:4
**large** [2] - 99:20, 203:2
**larger** [5] - 14:11, 18:9, 66:20, 69:7, 117:10
**last** [22] - 9:23, 17:17, 20:15, 22:2, 22:18, 23:15, 70:4, 100:7, 100:8, 125:7, 139:8, 147:3, 147:10, 168:4, 173:13, 173:14, 179:6, 194:9, 197:24, 205:13
**Last** [1] - 174:11

**late** [2] - 9:23, 46:23
**Laughter** [1] - 188:19
**LAURA** [1] - 5:10
**Law** [3] - 3:4, 3:7, 3:12
**law** [1] - 181:22
**lawsuits** [1] - 102:6
**Lawtrac** [7] - 124:3, 124:8, 197:8, 197:15, 200:4, 201:3, 201:14
**lawyers** [4] - 9:6, 16:12, 99:8, 110:19
**lay** [4] - 18:24, 35:22, 50:10, 68:2
**leading** [1] - 152:21
**learned** [1] - 73:11
**learning** [1] - 161:13
**least** [9] - 17:16, 52:23, 63:25, 107:17, 108:13, 165:19, 175:20, 177:7, 178:6
**leave** [2] - 121:1, 154:12
**Lee** [2] - 3:12, 32:3
**leeway** [1] - 163:4
**left** [9] - 17:20, 24:9, 29:13, 103:2, 120:25, 129:16, 147:5, 206:21
**left-hand** [3] - 24:9, 120:25, 129:16
**legal** [7] - 15:8, 43:18, 91:7, 204:22, 205:9, 205:10, 205:20
**legislation** [2] - 58:2, 59:21
**legislative** [2] - 57:23, 58:6
**length** [1] - 55:24
**lengths** [1] - 134:22
**Leon** [2] - 2:4, 2:16
**lesser** [1] - 134:12
**letter** [12] - 40:14, 40:20, 43:12, 44:20, 49:24, 50:7, 51:5, 64:21, 159:13, 162:13, 176:23, 179:14
**Letter** [1] - 160:7
**letters** [22] - 21:13, 64:20, 162:9, 162:11, 162:16, 162:20, 163:6, 163:17, 163:20, 164:20, 164:21, 164:25, 175:10, 177:2, 177:8, 177:16, 179:10, 179:23, 179:24,

**late** [2] ...

180:4, 180:10, 180:14
**letting** [1] - 162:13
**level** [7] - 29:18, 30:21, 74:8, 146:11, 187:13, 187:15, 196:12
**levels** [4] - 187:16, 189:14, 189:17, 191:1
**Levels** [1] - 191:9
**Levin** [1] - 2:12
**LEYIMU** [1] - 4:8
**license** [1] - 40:11
**licensed** [1] - 173:12
**licenses** [1] - 24:22
**licensing** [2] - 139:14, 149:17
**licensure** [1] - 173:7
**light** [1] - 9:24
**likely** [3] - 89:18, 107:2, 129:8
**limine** [1] - 100:16
**limit** [1] - 102:15
**limited** [17] - 29:15, 42:20, 49:9, 56:5, 62:17, 62:20, 64:3, 64:12, 64:15, 67:12, 70:6, 71:6, 95:23, 99:3, 149:9, 178:24, 182:9
**LINDA** [1] - 4:5
**line** [16] - 19:7, 36:5, 78:6, 79:14, 79:23, 79:24, 80:5, 80:6, 80:9, 81:9, 119:11, 123:4, 144:16, 168:7, 185:22
**lines** [9] - 22:6, 22:17, 50:12, 68:5, 68:6, 73:7, 80:10, 90:23
**link** [3] - 108:8, 124:12
**linked** [1] - 124:12
**Lisa** [2] - 6:18, 209:3
**list** [14] - 14:11, 17:6, 17:22, 17:25, 19:13, 19:18, 19:21, 92:9, 94:5, 120:14, 157:6, 157:10, 160:8, 190:5
**List** [2] - 137:23, 138:1
**listed** [1] - 168:16
**lists** [1] - 18:7
**literally** [3] - 15:16, 103:17, 110:7
**litigation** [1] - 90:8
**live** [1] - 84:10
**lived** [1] - 84:19
**living** [1] - 195:2
**LLC** [1] - 2:4
**loaded** [1] - 174:6

**lobby** [1] - 192:24
**local** [2] - 149:24, 150:1
**Local** [1] - 150:22
**locale** [2] - 108:1, 108:4
**located** [2] - 158:3, 177:25
**Lockbourne** [1] - 143:21
**Logan** [2] - 6:5, 6:12
**logic** [1] - 16:3
**look** [38] - 8:8, 16:13, 37:21, 40:8, 46:17, 50:19, 74:21, 78:18, 79:14, 80:25, 90:19, 99:14, 104:3, 107:20, 108:2, 108:3, 115:7, 121:5, 122:23, 123:23, 125:2, 126:17, 128:11, 131:2, 136:19, 156:20, 157:2, 169:13, 172:16, 184:20, 191:3, 191:12, 193:9, 193:12, 195:8, 199:8, 199:24, 207:22
**looked** [2] - 46:8, 96:23
**looking** [16] - 25:12, 37:19, 52:9, 76:2, 79:1, 102:14, 104:15, 118:25, 120:23, 132:23, 132:24, 134:3, 136:19, 164:25, 184:22, 202:16
**looks** [11] - 40:3, 59:8, 81:15, 81:17, 117:4, 125:17, 139:13, 139:23, 140:2, 187:1, 206:21
**lost** [2] - 11:17, 207:4
**Lou** [1] - 189:4
**lowering** [1] - 87:1
**Luken** [1] - 129:4
**lunch** [2] - 65:5, 97:16

## M

**ma'am** [19] - 148:20, 153:13, 155:5, 155:18, 162:17, 163:24, 164:19, 164:24, 165:15, 167:17, 167:21, 168:3, 168:12, 172:18, 174:12,

180:24, 182:17, 189:10, 197:6
**machine** [1] - 74:5
**Magazine** [1] - 3:7
**magnet** [1] - 99:19
**MAHADY** [10] - 6:4, 95:13, 95:25, 96:14, 97:2, 97:9, 97:12, 113:18, 114:16, 115:2
**Mahady** [3] - 95:12, 96:13, 97:5
**mail** [39] - 21:7, 21:12, 21:22, 21:23, 39:19, 39:24, 40:2, 40:3, 43:21, 46:8, 46:10, 46:18, 50:7, 50:19, 51:1, 51:5, 51:10, 51:13, 55:17, 56:15, 56:19, 56:24, 129:9, 139:3, 139:17, 139:19, 139:21, 141:7, 142:1, 142:5, 142:11, 143:16, 144:6, 144:7, 144:10, 144:15, 204:11, 204:12
**mail-order** [2] - 204:11, 204:12
**mails** [1] - 16:1
**main** [1] - 7:23
**MAINIGI** [5] - 4:12, 13:22, 17:11, 102:23, 103:1
**Mainigi** [2] - 13:20, 17:10
**maintain** [2] - 91:20, 137:20
**maintained** [1] - 147:22
**MAJESTRO** [9] - 2:6, 97:25, 98:6, 98:9, 98:18, 99:10, 99:13, 106:18, 108:18
**Majestro** [6] - 2:6, 97:24, 102:5, 104:18, 106:17, 177:18
**Majestro's** [1] - 101:14
**Majority** [1] - 7:16
**malpractice** [1] - 55:14
**man** [2] - 84:15, 85:9
**manage** [2] - 10:13, 189:21
**managed** [1] - 111:21
**Management** [2] - 40:22, 46:2
**Manager** [13] - 142:11, 147:5, 147:6,

147:16, 147:17, 148:13, 148:21, 149:11, 154:23, 161:2, 185:6, 185:9, 185:17
**manager** [13] - 74:25, 75:3, 75:7, 75:10, 81:21, 81:24, 81:25, 125:11, 136:17, 153:15, 154:17, 185:10, 186:1
**Managers** [1] - 185:16
**managers** [2] - 186:20, 187:4
**mandate** [2] - 199:14, 199:17
**manifested** [2] - 43:7, 44:23
**manner** [4] - 50:9, 58:3, 141:19, 188:9
**manual** [2] - 34:6, 174:4
**manually** [2] - 27:18, 187:16
**Mapes** [5] - 192:19, 192:22, 198:9, 198:21, 199:11
**March** [5] - 125:7, 128:15, 129:12, 133:18, 136:15
**Marisol** [2] - 185:7, 187:4
**mark** [1] - 151:25
**MARK** [1] - 3:16
**marked** [3] - 112:4, 113:22, 153:9
**Martin** [6] - 142:7, 142:9, 143:15, 143:18, 144:10, 144:14
**Martin's** [1] - 144:7
**match** [1] - 163:18
**material** [2] - 69:13, 183:16
**materials** [1] - 8:24
**math** [2] - 84:5, 123:10
**matrix** [5] - 97:11, 117:8, 120:23, 129:13, 136:10
**matter** [20] - 18:2, 41:19, 47:10, 47:13, 48:15, 49:6, 54:23, 64:16, 68:5, 97:15, 124:3, 124:8, 127:1, 142:3, 142:23, 196:10, 197:8, 197:15, 209:5
**matters** [1] - 124:12
**MAY** [1] - 1:19

**Mays** [109] - 9:15, 9:21, 9:23, 19:16, 19:25, 20:18, 21:8, 21:12, 21:24, 23:3, 23:5, 23:12, 24:1, 29:3, 29:14, 38:18, 43:20, 46:4, 47:22, 50:8, 50:17, 51:20, 52:6, 55:5, 56:12, 58:15, 58:19, 58:23, 65:9, 72:8, 73:5, 76:19, 77:2, 77:13, 77:25, 84:24, 85:5, 89:25, 90:7, 91:7, 92:2, 93:16, 94:10, 94:11, 94:20, 94:22, 94:25, 96:7, 108:23, 109:3, 112:19, 113:14, 113:16, 114:6, 115:4, 115:24, 117:13, 127:17, 132:14, 141:8, 144:8, 144:9, 145:3, 145:16, 153:23, 160:16, 160:24, 162:9, 162:25, 163:6, 163:17, 164:16, 166:11, 167:10, 167:15, 168:1, 169:10, 170:6, 171:2, 172:2, 176:12, 176:21, 180:23, 181:15, 182:4, 182:13, 183:9, 184:4, 184:19, 188:14, 188:21, 189:9, 189:12, 192:10, 193:24, 195:12, 197:5, 197:23, 199:25, 201:6, 201:13, 201:21, 202:15, 205:6, 206:4, 208:8
**Mays'** [1] - 89:13
**Mays_2** [1] - 114:19
**McCann** [24] - 8:18, 8:20, 8:24, 94:1, 94:3, 94:6, 94:9, 94:11, 94:13, 94:18, 95:14, 95:17, 96:3, 96:4, 96:6, 96:8, 96:18, 96:21, 97:3, 101:12, 103:5, 103:12, 113:12
**McCann's** [4] - 95:7, 98:10, 107:14, 107:17
**McCloud** [4] - 66:12,

119:10, 123:4, 129:21
**McClure** [13] - 7:7, 9:14, 45:3, 50:4, 61:15, 61:17, 101:9, 103:2, 160:21, 162:19, 162:23, 179:1, 206:18
**MCCLURE** [150] - 6:3, 7:8, 9:15, 12:22, 16:15, 16:17, 19:12, 20:6, 22:7, 29:2, 31:12, 31:14, 36:2, 42:4, 43:17, 45:10, 48:9, 49:16, 50:5, 51:3, 52:16, 52:25, 53:15, 53:18, 54:10, 54:24, 58:8, 58:15, 62:12, 64:1, 64:19, 64:24, 65:6, 66:17, 67:4, 67:7, 68:9, 69:12, 71:1, 71:22, 72:5, 72:10, 72:15, 76:18, 77:6, 79:8, 84:23, 89:7, 91:6, 91:20, 92:23, 93:22, 101:10, 108:20, 109:20, 109:23, 110:3, 110:24, 112:13, 115:23, 116:8, 116:17, 124:22, 127:12, 130:6, 131:10, 131:22, 140:10, 140:19, 141:4, 141:7, 142:16, 143:5, 144:5, 144:20, 144:25, 145:13, 145:15, 146:6, 152:22, 153:1, 159:20, 159:22, 159:24, 160:13, 160:22, 160:23, 161:21, 162:1, 162:6, 162:8, 162:24, 163:15, 163:16, 164:8, 164:11, 165:24, 166:10, 167:8, 167:13, 167:14, 172:1, 172:15, 175:8, 177:11, 177:21, 179:12, 180:9, 180:21, 180:22, 181:25, 182:12, 182:22, 183:7, 183:8, 184:1, 184:2, 184:12, 184:16, 186:17, 186:24, 187:18, 188:5, 188:12,

188:13, 188:20, 189:8, 191:18, 191:21, 192:8, 192:9, 196:16, 196:20, 196:22, 196:24, 197:1, 197:4, 200:20, 201:1, 201:11, 201:12, 201:15, 201:19, 201:20, 205:25, 206:8, 206:19, 207:3, 207:20, 208:1
**McDowell** [1] - 101:3
**MCGINNESS** [1] - 4:2
**McKesson** [8] - 5:8, 44:14, 46:13, 54:4, 63:25, 102:17, 110:12, 111:16
**mean** [13] - 19:16, 24:20, 26:13, 52:9, 72:19, 79:17, 84:23, 88:6, 104:7, 153:4, 153:7, 179:15, 195:20
**meaning** [2] - 34:5, 68:12
**means** [8] - 81:2, 85:13, 90:14, 91:1, 126:25, 137:11, 159:25
**meant** [9] - 75:23, 91:9, 92:14, 93:10, 144:10, 144:13, 144:14, 152:15, 152:19
**meantime** [1] - 66:14
**mechanical** [1] - 6:19
**media** [1] - 19:2
**media-related** [1] - 19:2
**Medical** [1] - 123:5
**medical** [1] - 55:14
**medication** [1] - 129:3
**medium** [1] - 35:14
**meet** [1] - 192:17
**meeting** [25] - 39:9, 105:2, 153:15, 156:6, 159:7, 192:11, 192:13, 192:20, 192:21, 192:23, 193:3, 193:25, 195:12, 195:25, 196:4, 197:9, 197:10, 198:11, 199:13, 199:14, 200:1, 200:17, 201:25
**meetings** [3] - 156:3, 180:1, 199:13

**meets** [1] - 190:25
**member** [1] - 125:18
**members** [4] - 39:4, 41:4, 45:8, 171:7
**membership** [1] - 46:2
**memo** [8] - 33:7, 33:13, 33:23, 36:2, 37:12, 38:4, 38:5, 76:3
**memorandum** [3] - 20:23, 37:11, 178:22
**memorized** [1] - 67:9
**memory** [2] - 139:2, 151:13
**mentality** [1] - 101:25
**mention** [4] - 102:8, 104:9, 198:8
**mentioned** [1] - 105:12
**mere** [1] - 43:20
**merged** [2] - 161:6, 175:4
**merger** [1] - 175:4
**message** [4] - 76:8, 128:15, 128:18, 143:14
**messages** [1] - 139:21
**messaging** [3] - 76:5, 76:6, 76:7
**met** [3] - 192:24, 192:25, 193:10
**Metastorm** [1] - 76:7
**Methadone** [1] - 129:8
**methods** [2] - 99:1, 168:6
**Miami** [1] - 129:4
**Miami-Luken** [1] - 129:4
**MICHAEL** [2] - 2:15, 3:9
**Michael** [2] - 128:19, 129:9
**middle** [8] - 40:5, 40:8, 40:24, 41:1, 45:23, 56:13
**might** [16] - 9:4, 17:5, 17:13, 60:4, 60:24, 63:21, 98:14, 105:5, 111:15, 114:11, 114:13, 127:9, 131:19, 177:8, 195:17, 206:6
**Mike** [5] - 128:19, 128:25, 192:19, 198:9, 199:10
**MILDRED** [1] - 3:3
**miles** [2] - 105:1, 106:2
**million** [5] - 83:21, 115:14, 115:20,

116:12, 117:2
**mimic** [3] - 152:15, 152:17, 152:20
**mind** [23] - 42:17, 47:19, 49:13, 49:17, 61:11, 61:18, 62:8, 62:13, 62:18, 62:20, 63:4, 64:3, 64:9, 97:12, 134:12, 175:11, 175:12, 176:3, 176:16, 178:23, 179:3, 182:7, 182:9
**mine** [1] - 194:14
**Mingo** [2] - 101:2, 177:20
**minute** [10] - 39:13, 41:11, 42:11, 57:6, 95:1, 113:8, 123:23, 148:25, 162:19, 191:19
**minutes** [5] - 72:3, 72:16, 111:12, 111:21, 160:15
**misleading** [2] - 127:15, 127:22
**misleadingly** [1] - 8:7
**miss** [1] - 202:21
**missed** [1] - 164:14
**missing** [1] - 164:7
**misspoke** [1] - 75:8
**mistaken** [3] - 92:13, 92:15, 147:8
**Mitchell** [1] - 2:12
**mix** [1] - 96:2
**mixing** [3] - 131:13, 131:15, 132:2
**modified** [4] - 66:22, 89:8, 154:7, 178:16
**moment** [9] - 31:12, 48:11, 62:23, 108:15, 110:8, 140:12, 166:3, 189:5, 200:7
**Monday** [1] - 151:18
**monitor** [2] - 187:14, 189:22
**Monitoring** [1] - 68:13, 191:9
**monitoring** [7] - 20:16, 24:5, 29:9, 33:12, 83:16, 99:2, 196:12
**month** [27] - 83:19, 83:22, 84:2, 84:4, 85:12, 86:12, 86:13, 91:16, 119:24, 120:4, 120:9, 121:13, 121:22, 123:7, 131:3, 132:4,

132:16, 132:21, 132:22, 132:24, 134:3, 134:5, 134:19, 135:17, 135:21, 136:3, 137:16
**monthly** [8] - 79:2, 117:14, 123:1, 127:9, 132:1, 133:2, 135:24, 136:1
**monthly)** [1] - 174:22
**months** [10] - 17:15, 81:15, 81:16, 84:4, 121:24, 122:10, 129:4, 130:23, 157:21, 169:21
**Moreover** [1] - 91:7
**moreover** [2] - 104:18, 116:17
**morning** [15] - 7:14, 19:20, 19:25, 23:5, 23:6, 23:12, 23:13, 61:22, 77:2, 94:17, 95:21, 98:12, 206:12, 208:5, 208:10
**Morris** [1] - 6:15
**mortar** [3] - 194:25, 195:6, 195:7
**most** [11] - 14:8, 17:23, 112:5, 129:8, 152:4, 159:10, 159:12, 173:9, 194:7, 197:17, 202:24
**motion** [2] - 14:22, 100:16
**Motley** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**MOUGEY** [1] - 2:12
**Mougey's** [1] - 99:14
**mount** [1] - 104:5
**move** [15] - 14:12, 120:22, 140:8, 144:21, 148:9, 152:22, 155:6, 175:8, 180:8, 182:13, 187:18, 196:11, 196:18, 197:1, 200:20
**moved** [1] - 155:11
**movement** [1] - 158:18
**Moving** [1] - 172:16
**moving** [2] - 173:3, 196:21
**MR** [285] - 2:3, 2:6, 2:9, 2:12, 2:15, 3:9, 3:11, 3:16, 4:17, 5:9, 5:10, 5:13, 6:4,

10:16, 10:19, 10:21, 11:5, 11:9, 11:16, 11:18, 12:11, 12:20, 13:2, 13:6, 13:13, 13:16, 13:18, 14:19, 18:21, 20:3, 20:10, 20:14, 22:15, 23:11, 23:23, 23:25, 28:23, 29:7, 29:8, 31:6, 31:10, 31:17, 31:20, 32:15, 32:17, 32:20, 32:22, 35:17, 35:21, 36:8, 36:9, 38:16, 38:17, 39:10, 39:12, 41:13, 41:17, 41:20, 42:2, 42:11, 42:15, 42:22, 43:1, 43:4, 44:6, 44:9, 44:19, 45:17, 45:21, 45:24, 47:15, 48:7, 48:23, 49:12, 49:23, 50:3, 50:13, 50:15, 50:16, 51:13, 51:19, 52:5, 52:13, 52:20, 53:9, 53:16, 53:24, 54:9, 55:11, 56:8, 56:11, 57:17, 58:7, 58:10, 58:24, 59:6, 59:10, 59:18, 59:23, 60:13, 60:18, 60:24, 61:3, 61:4, 61:8, 63:7, 63:12, 63:15, 63:22, 64:14, 64:25, 65:8, 65:15, 65:20, 66:6, 66:7, 66:14, 67:1, 67:6, 67:16, 67:18, 69:2, 70:15, 70:17, 70:25, 71:4, 71:8, 71:10, 71:13, 71:23, 71:25, 72:1, 72:3, 72:9, 72:12, 72:18, 72:22, 73:4, 73:16, 73:18, 77:1, 77:20, 77:24, 79:12, 79:13, 84:17, 84:20, 85:4, 88:16, 89:2, 90:4, 90:6, 91:14, 91:23, 92:7, 92:17, 93:8, 93:11, 93:14, 94:19, 94:25, 95:5, 95:9, 95:13, 95:25, 96:7, 96:14, 96:25, 97:2, 97:6, 97:9, 97:11, 97:12, 97:17, 97:25, 98:6, 98:9, 98:18, 99:10, 99:13, 102:22, 102:24, 105:17, 106:18, 108:18, 109:1, 109:5, 109:22, 109:24, 110:10,

110:16, 111:7,
111:13, 111:20,
111:23, 112:11,
112:16, 112:18,
113:2, 113:4,
113:12, 113:15,
113:18, 114:2,
114:16, 114:25,
115:2, 115:3, 116:2,
116:16, 116:25,
117:7, 117:12,
118:11, 118:17,
120:22, 121:2,
123:11, 123:14,
123:20, 123:22,
124:18, 124:25,
125:19, 125:21,
126:3, 126:9,
126:14, 128:5,
128:6, 129:13,
129:18, 130:9,
132:9, 132:12,
134:1, 134:14,
135:11, 138:5,
138:10, 138:16,
138:21, 138:23,
139:8, 139:15,
140:7, 140:14,
140:16, 141:1,
141:6, 141:24,
142:9, 142:13,
142:20, 143:6,
143:7, 144:19,
145:1, 145:5, 145:8,
145:10, 152:21,
162:4, 162:20,
165:23, 171:25,
172:12, 176:20,
177:13, 178:25,
180:2, 181:24,
184:10, 186:13,
187:22, 187:24,
192:6, 196:14,
200:23, 201:9,
206:13, 206:24,
207:12, 207:16,
207:25
**MS** [178] - 3:3, 3:6,
3:14, 4:2, 4:5, 4:8,
4:12, 4:12, 4:15, 5:3,
5:4, 5:10, 6:3, 6:7,
6:14, 7:8, 9:15,
12:22, 13:22, 16:15,
16:17, 17:11, 19:12,
20:6, 22:7, 29:2,
31:12, 31:14, 36:2,
42:4, 42:9, 43:17,
45:2, 45:10, 48:9,
49:16, 50:5, 51:2,
51:3, 51:9, 52:16,
52:25, 53:15, 53:18,

54:10, 54:24, 58:8,
58:15, 62:12, 63:1,
64:1, 64:8, 64:19,
64:24, 65:6, 66:17,
67:4, 67:7, 68:9,
69:12, 71:1, 71:22,
72:5, 72:10, 72:15,
76:18, 77:6, 79:8,
84:23, 89:7, 91:6,
91:20, 92:23, 93:22,
97:21, 101:10,
102:23, 103:1,
108:20, 109:20,
109:23, 110:3,
110:11, 110:24,
111:10, 111:18,
112:13, 115:23,
116:8, 116:17,
124:22, 127:12,
130:6, 131:10,
131:22, 140:10,
140:19, 141:4,
141:7, 142:16,
143:5, 144:5,
144:20, 144:25,
145:13, 145:15,
146:6, 152:22,
153:1, 159:20,
159:22, 159:24,
160:13, 160:22,
160:23, 161:21,
162:1, 162:6, 162:8,
162:24, 163:15,
163:16, 164:8,
164:11, 165:24,
166:10, 167:8,
167:13, 167:14,
172:1, 172:15,
175:8, 177:11,
177:21, 179:12,
180:9, 180:21,
180:22, 181:25,
182:12, 182:22,
183:7, 183:8, 184:1,
184:2, 184:12,
184:16, 186:17,
186:24, 187:18,
188:5, 188:12,
188:13, 188:20,
189:8, 191:18,
191:21, 192:8,
192:9, 196:16,
196:20, 196:22,
196:24, 197:1,
197:4, 200:20,
201:1, 201:11,
201:12, 201:15,
201:19, 201:20,
205:25, 206:8,
206:19, 207:3,
207:20, 208:1

**Mt** [3] - 3:15, 4:4, 4:9
**multiple** [8] - 17:18,
44:25, 80:16, 89:3,
118:21, 120:17,
131:15, 133:25
**multiplied** [1] - 11:7
**multiplier** [2] - 11:1,
11:4
**multiplying** [1] - 133:7
**must** [5] - 41:8, 98:21,
141:1, 190:13, 191:6
**mutually** [1] - 16:20

# N

**name** [8] - 19:3, 23:18,
29:13, 40:6, 76:6,
138:24, 139:3, 185:7
**names** [4] - 157:5,
157:9, 165:12, 198:8
**narrative** [3] - 22:9,
22:10, 87:19
**national** [38] - 34:17,
34:19, 37:19, 98:23,
98:24, 100:23,
101:6, 101:21,
101:25, 103:14,
103:15, 103:16,
106:20, 106:21,
107:9, 117:24,
117:25, 120:1,
121:1, 121:7,
121:18, 121:19,
122:2, 122:6,
130:17, 130:19,
131:6, 131:8, 131:9,
133:3, 133:10,
133:13, 133:18,
133:20, 171:15,
186:14, 188:8
**nationwide** [9] - 35:1,
35:3, 67:5, 67:11,
98:22, 106:6, 106:9,
106:12, 184:13
**nature** [1] - 155:22
**navigate** [1] - 8:11
**NDC** [1] - 81:1
**near** [1] - 158:3
**necessarily** [3] - 75:2,
75:6, 75:10
**need** [24] - 8:12, 10:1,
16:5, 18:13, 30:5,
53:6, 57:2, 67:9,
68:22, 72:16, 72:20,
82:2, 101:16, 102:1,
108:10, 109:24,
110:13, 111:7,
116:14, 118:16,
142:14, 152:24,
159:18, 190:19

**needed** [6] - 30:2,
176:15, 181:22,
182:5, 183:15,
198:22
**needing** [1] - 14:6
**needs** [2] - 179:14,
182:11
**Nevada** [2] - 100:15,
100:21
**never** [9] - 12:12, 15:7,
77:14, 94:13,
103:10, 105:13,
115:8, 173:10, 188:6
**Nevertheless** [1] -
178:5
**nevertheless** [3] -
16:21, 17:6, 62:16
**New** [2] - 3:5, 3:8
**new** [23] - 21:11, 34:8,
65:4, 83:13, 107:15,
154:7, 154:22,
154:24, 155:6,
161:1, 192:23,
192:24, 194:24,
199:22, 201:5,
201:21, 204:6,
204:7, 205:25,
206:1, 206:9, 206:25
**next** [15] - 30:22, 78:6,
83:3, 83:6, 86:4,
93:9, 93:15, 120:23,
126:15, 128:12,
149:3, 150:25,
168:13, 170:2, 173:3
**nexus** [9] - 98:21,
101:5, 103:3,
104:24, 105:3,
105:10, 106:1, 106:4
**nexuses** [1] - 108:9
**NICHOLAS** [1] - 6:11
**night** [8] - 9:23, 13:9,
14:4, 15:2, 15:5,
22:2, 22:18, 70:4
**nights** [2] - 9:19, 14:5
**Ninth** [1] - 4:6
**Noerr** [7] - 7:13, 19:4,
57:18, 57:21, 58:3,
58:20, 61:22
**Noerr-Pennington**
[6] - 7:13, 19:4, 57:18,
57:21, 58:20, 61:22
**non** [14] - 43:25,
52:19, 53:3, 57:24,
61:9, 63:14, 63:24,
103:23, 117:10,
140:24, 141:18,
188:3, 188:5, 204:16
**non-Cabell-
Huntington** [1] -
103:23

**non-hearsay** [8] -
43:25, 52:19, 53:3,
61:9, 63:14, 63:24,
140:24, 141:18
**non-internet** [1] -
204:16
**non-jurisdictional** [3]
- 117:10, 188:3,
188:5
**non-protected** [1] -
57:24
**noncompliant** [1] -
153:10
**none** [2] - 104:19,
166:22
**normal** [5] - 25:7,
56:24, 62:21, 86:19,
190:13
**normally** [1] - 153:14
**Northern** [1] - 100:2
**note** [10] - 19:18,
87:19, 93:22, 99:23,
101:16, 166:1,
175:10, 177:19,
186:10, 186:25
**noted** [3] - 61:21,
98:12, 102:2
**notes** [2] - 186:14,
207:21
**nothing** [1] - 70:25
**notice** [30] - 8:22,
12:7, 12:9, 14:16,
17:4, 18:12, 28:21,
42:16, 61:25, 62:4,
62:10, 62:14, 62:18,
62:20, 63:4, 64:3,
77:25, 84:21, 85:2,
115:11, 120:13,
151:16, 163:9,
172:2, 172:5, 172:9,
175:23, 176:12,
180:5, 181:23
**noticeably** [2] -
103:11, 103:12
**notification** [1] - 202:5
**notified** [2] - 192:14,
202:8
**November** [4] -
121:17, 121:20,
121:25, 122:4
**nuisance** [1] - 175:16
**Number** [1] - 14:25
**number** [49] - 10:2,
14:20, 18:12, 20:1,
22:21, 34:8, 47:18,
47:19, 47:22, 67:10,
80:6, 81:1, 85:3,
86:19, 86:20, 87:6,
87:7, 87:10, 113:1,
114:7, 114:10,

114:17, 114:21, 121:6, 121:10, 121:17, 124:9, 126:19, 129:10, 129:23, 131:20, 133:7, 133:15, 147:7, 163:2, 165:1, 168:14, 174:6, 191:24, 191:25, 192:2, 192:4, 207:5
**numbers** [14] - 22:8, 22:13, 54:16, 104:11, 115:24, 119:13, 119:17, 119:19, 119:23, 131:18, 132:23, 133:24, 134:5
**numerous** [1] - 131:12
**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

**O**

**O-l-m-o** [1] - 185:7
**oar** [1] - 42:7
**oath** [1] - 23:7
**object** [21] - 10:7, 14:7, 22:12, 41:13, 50:9, 51:2, 70:20, 76:18, 77:12, 110:1, 110:13, 116:17, 116:21, 118:11, 127:21, 130:6, 132:5, 144:5, 144:21, 152:21, 180:2
**objected** [1] - 16:14
**Objection** [6] - 84:17, 91:6, 162:20, 165:23, 171:25, 181:24
**objection** [62] - 19:4, 28:23, 29:2, 31:11, 36:7, 45:12, 45:16, 47:4, 49:19, 53:8, 56:3, 58:9, 58:22, 59:19, 63:25, 64:2, 66:16, 71:20, 77:22, 91:20, 92:22, 96:5, 112:9, 112:12, 115:23, 124:21, 127:12, 128:4, 130:5, 131:11, 131:21, 140:11, 140:21, 141:2, 141:16, 141:17, 141:21, 143:2, 145:4, 152:24, 166:1, 166:8, 172:7,

172:14, 176:1, 176:10, 176:21, 182:10, 183:2, 183:23, 184:10, 186:16, 187:21, 187:22, 187:23, 188:11, 192:6, 196:14, 196:23, 200:22, 201:9, 201:17
**objectionable** [2] - 177:8, 179:25
**objections** [6] - 12:15, 15:14, 15:16, 29:6, 176:23, 183:16
**objectives** [1] - 168:16
**objectivity** [1] - 7:18
**obligation** [1] - 10:7
**obligations** [3] - 41:5, 46:3, 147:24
**observed** [1] - 17:25
**obvious** [2] - 140:22
**obviously** [4] - 10:18, 12:6, 13:25, 108:17
**occasions** [1] - 134:24
**occur** [1] - 169:17
**October** [4] - 40:10, 40:18, 41:22, 46:21
**OF** [2] - 1:1, 1:4
**offer** [8] - 43:18, 48:14, 48:21, 61:8, 62:3, 140:25, 141:15, 196:15
**offered** [19] - 7:16, 12:19, 22:12, 42:3, 42:25, 53:5, 55:7, 61:17, 64:2, 64:5, 68:18, 98:20, 142:21, 154:17, 163:12, 182:8, 183:19, 186:17, 186:19
**offering** [14] - 47:9, 47:10, 47:13, 47:16, 48:25, 49:12, 61:18, 63:23, 63:24, 67:11, 68:15, 72:18, 140:24, 141:13
**office** [5] - 165:11, 170:18, 170:21, 171:15, 187:12
**Office** [5] - 120:11, 158:1, 158:2, 158:3, 158:7
**offices** [7] - 170:22, 170:25, 171:7, 171:16, 178:4, 195:22
**Official** [2] - 209:2,

209:3
**often** [3] - 55:14, 169:17, 205:21
**Ohio** [2] - 106:23, 143:21
**Olmo** [3] - 185:7, 185:18, 185:22
**Oloyede** [5] - 7:25, 8:4, 8:12, 8:16, 9:5
**OMP** [16] - 24:6, 29:9, 65:11, 65:12, 66:3, 67:18, 68:12, 73:21, 78:14, 82:15, 109:6, 134:12, 135:13, 135:23, 137:17, 188:2
**on-going** [1] - 176:5
**on-site** [3] - 38:9, 38:14, 155:25
**on-the-job** [1] - 152:12
**once** [9] - 24:16, 26:5, 37:1, 58:19, 83:11, 134:10, 134:11, 203:5, 203:15
**one** [91] - 11:17, 12:24, 14:4, 14:21, 18:21, 37:6, 46:24, 47:18, 49:17, 52:11, 61:5, 64:21, 71:10, 74:25, 75:17, 75:21, 75:24, 81:3, 82:15, 82:22, 84:8, 85:14, 89:4, 90:17, 92:9, 96:23, 99:2, 100:1, 100:10, 100:14, 101:6, 103:20, 104:13, 106:22, 107:22, 108:11, 111:1, 111:20, 120:4, 123:13, 126:11, 140:14, 142:14, 143:19, 152:14, 155:23, 156:24, 159:4, 159:23, 164:3, 164:5, 164:7, 164:12, 167:8, 170:19, 170:20, 171:15, 174:11, 177:2, 177:7, 178:5, 178:6, 179:5, 179:22, 180:14, 184:11, 186:1, 189:5, 194:5, 195:3, 195:9, 196:12, 196:18, 197:21, 197:22, 198:2, 198:10, 199:5, 200:15, 201:4,

202:2, 202:7, 202:10, 202:12, 202:25, 203:3, 203:5, 207:20, 208:2
**One** [5] - 5:11, 61:3, 173:9, 177:22, 200:15
**one-page** [1] - 196:12
**one-year** [2] - 202:25, 203:3
**ones** [11] - 12:2, 18:2, 23:2, 69:23, 70:2, 94:15, 94:18, 95:20, 95:21, 95:24, 96:2, 96:3, 96:25, 107:3, 114:14, 114:15, 114:21
**ongoing** [1] - 49:1
**open** [3] - 124:8, 125:2, 136:22
**opened** [5] - 71:15, 126:18, 128:8, 194:24, 197:8
**opening** [1] - 127:25
**opens** [1] - 124:7
**operate** [1] - 41:6
**operating** [3] - 168:7, 178:19, 195:2
**operation** [1] - 147:19
**Operations** [6] - 147:5, 147:6, 147:16, 147:17, 148:13, 148:21
**operations** [4] - 148:9, 168:23, 191:14, 195:11
**opinion** [6] - 7:13, 18:19, 50:2, 57:19, 60:9, 117:1
**opioids** [4] - 107:7, 107:9, 130:3, 143:22
**opponent** [1] - 12:5
**opponents** [1] - 12:2
**opportunity** [12] - 9:11, 10:9, 62:23, 69:25, 70:3, 92:24, 93:4, 111:1, 148:15, 160:9, 169:18, 207:22
**opposing** [2] - 141:25, 142:22
**option** [1] - 30:4
**options** [3] - 59:9, 60:21
**orally** [2] - 171:3, 183:17
**Order** [5] - 68:13, 110:17, 182:16, 191:9, 205:2
**order** [118] - 13:1,

15:4, 15:12, 16:9, 18:10, 20:16, 24:5, 24:16, 24:17, 24:23, 25:3, 25:6, 25:18, 26:13, 26:21, 27:18, 27:21, 27:24, 28:1, 28:5, 28:11, 29:9, 29:25, 30:3, 30:5, 30:12, 30:13, 30:17, 30:21, 30:24, 30:25, 31:1, 33:12, 38:12, 50:10, 51:6, 54:10, 74:6, 74:7, 74:10, 74:18, 74:24, 75:24, 76:8, 76:12, 77:10, 78:11, 79:3, 79:18, 80:9, 80:10, 80:14, 80:16, 80:20, 81:3, 83:18, 84:1, 91:4, 91:13, 98:19, 103:2, 106:13, 106:20, 107:24, 109:10, 120:11, 127:4, 127:10, 127:13, 127:18, 127:19, 127:20, 130:2, 130:7, 131:13, 131:24, 132:3, 132:21, 132:24, 132:25, 133:24, 134:2, 135:5, 135:8, 135:9, 136:6, 136:8, 136:22, 141:16, 146:10, 146:13, 146:22, 155:4, 174:6, 174:16, 179:2, 179:5, 180:16, 182:14, 187:15, 189:15, 189:16, 189:21, 190:1, 190:2, 190:21, 190:22, 191:4, 191:5, 193:22, 194:1, 196:12, 202:4, 204:11, 204:12
**order"** [2] - 24:10, 24:13
**order's** [1] - 31:3
**ordered** [3] - 75:24, 134:22, 190:3
**ordering** [3] - 80:17, 107:23, 115:25
**orders** [78] - 22:4, 24:5, 27:11, 28:8, 28:21, 29:22, 30:8, 39:21, 41:7, 66:1, 67:23, 73:23, 75:4, 75:6, 75:14, 75:21, 79:7, 80:6, 81:2,

81:6, 83:16, 88:8,
88:13, 88:17, 88:21,
89:20, 89:22, 90:10,
90:19, 92:9, 92:11,
92:12, 99:2, 99:24,
103:15, 107:25,
109:21, 110:23,
111:4, 122:11,
129:5, 131:14,
131:16, 131:19,
133:25, 134:3,
134:13, 134:24,
135:2, 146:18,
146:21, 146:23,
150:18, 152:8,
173:18, 174:9,
174:15, 185:1,
185:2, 186:20,
187:5, 188:2,
188:23, 189:1,
189:16, 189:22,
190:11, 190:12,
190:17, 190:19,
193:16, 193:18,
198:23, 207:9,
207:11
**ordinances** [2] -
149:24, 150:1
**organization** [1] - 45:8
**organized** [1] - 16:19
**orient** [2] - 66:13,
125:1
**original** [7] - 40:3,
40:10, 46:21, 66:19,
166:24, 166:25,
201:4
**originally** [3] - 33:3,
37:22, 192:24
**originates** [1] - 11:2
**Orlando** [11] - 148:9,
148:10, 148:16,
148:19, 148:22,
149:6, 149:11,
149:17, 150:23,
154:14, 187:25
**Orlando's** [1] - 185:6
**Orleans** [1] - 3:8
**OSHA** [1] - 150:2
**otherwise** [3] - 30:4,
103:10, 132:25
**ought** [2] - 107:8,
108:7
**ourselves** [2] - 112:2,
151:19
**out-of-county** [1] -
98:15
**out-of-court** [4] - 53:4,
55:7, 63:19
**outcome** [2] - 28:9,
58:6

**outer** [1] - 17:5
**outline** [1] - 16:19
**outlines** [3] - 16:11,
18:5, 49:2
**outside** [10] - 8:19,
9:2, 9:16, 9:17,
70:19, 98:11,
105:21, 188:15,
188:17, 198:15
**over-inclusive** [1] -
89:19
**overall** [2] - 24:7,
116:19
**overbroad** [2] - 69:15,
69:20
**overlook** [1] - 143:25
**overnight** [1] - 70:4
**overrule** [8] - 58:21,
77:22, 116:22,
128:3, 143:2, 145:4,
152:24, 166:7
**Overruled** [1] - 186:23
**overruled** [7] - 59:22,
91:10, 92:1, 118:14,
130:8, 184:14,
188:11
**oversee** [2] - 169:24,
199:22
**overseeing** [1] -
150:21
**overstating** [1] - 179:2
**own** [13] - 8:25, 23:1,
34:18, 34:19, 44:18,
52:9, 63:18, 76:23,
91:18, 157:11,
169:18, 186:21,
201:8
**owned** [1] - 147:9
**oxy** [1] - 129:8
**oxycodone** [26] -
20:24, 33:1, 33:4,
33:10, 35:11, 35:15,
36:12, 78:23, 79:3,
79:4, 85:9, 85:13,
89:4, 109:17,
110:22, 115:15,
115:21, 117:2,
117:20, 120:23,
120:24, 121:4,
121:14, 123:1,
123:7, 129:15

**P**

**P-1200** [1] - 2:7
**P-1273** [1] - 21:20
**P-16639** [6] - 22:16,
65:25, 66:15, 92:20,
109:7, 109:13
**P-16639A** [1] - 109:14

**P-16643** [1] - 22:23
**P-187** [4] - 20:15,
23:14, 31:8, 112:17
**P-187A** [1] - 31:16
**P-23655** [2] - 112:4,
112:15
**P-2478** [1] - 56:8
**P-2574** [1] - 22:23
**P-2748** [1] - 21:23
**P-2756** [1] - 21:7
**P-2796** [1] - 21:18
**P-2819** [5] - 22:19,
88:17, 88:24, 92:19,
110:18
**P-2819A** [1] - 110:21
**P-432** [5] - 20:22,
32:15, 32:19, 36:11,
37:11
**P-43225** [2] - 117:8,
129:14
**P-44002** [1] - 20:25
**P-44711** [1] - 114:19
**P-44711_00021** [1] -
115:5
**P-629** [5] - 21:11,
21:16, 39:10, 40:17,
65:1
**P-877** [1] - 20:19
**p.m** [6] - 9:23, 10:8,
80:20, 80:21,
160:19, 208:13
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**packet** [1] - 114:4
**packets** [2] - 95:4,
95:17
**Page** [12] - 40:14,
44:12, 46:8, 46:17,
50:19, 50:21, 61:16,
107:20, 113:5,
113:6, 113:14, 117:8
**page** [27] - 20:16,
23:15, 23:18, 23:20,
40:6, 40:9, 40:13,
50:24, 52:8, 56:13,
64:21, 86:4, 89:5,
114:6, 114:7,
114:10, 120:23,
124:3, 126:15,
143:14, 143:17,
170:2, 185:3,
194:12, 196:12,
196:18
**pages** [10] - 64:13,
64:17, 64:20, 64:23,
89:3, 104:8, 107:12,
194:9, 194:10,
205:13
**pain** [1] - 129:3
**Panhandle** [2] - 100:2,

100:3
**Papantonio** [1] - 2:12
**paper** [2] - 64:23,
76:4, 159:14
**paragraph** [8] - 40:24,
41:1, 45:22, 45:25,
128:12, 189:24,
198:3
**Park** [1] - 123:5
**part** [10] - 30:19,
31:23, 47:15, 47:16,
69:10, 73:10, 73:11,
96:6, 176:17, 203:7
**participate** [2] - 39:6,
156:6
**participated** [3] -
52:22, 53:14, 62:6
**participating** [1] -
162:14
**participation** [2] -
53:19, 54:17
**particular** [19] - 15:25,
21:18, 25:3, 57:20,
66:10, 69:5, 73:9,
78:14, 79:3, 91:17,
98:2, 108:3, 119:22,
120:4, 124:14,
132:21, 132:24,
137:16, 152:15
**particularly** [2] - 45:3,
177:2
**parties** [8] - 10:1,
12:8, 12:13, 15:3,
16:25, 18:11, 65:24,
102:13
**parties'** [1] - 12:25
**party** [22] - 13:10,
13:24, 15:4, 15:9,
15:10, 15:25, 16:13,
17:7, 43:7, 43:11,
51:14, 51:15, 53:12,
54:2, 54:25, 55:1,
55:3, 55:9, 63:5,
82:16, 142:22
**party's** [4] - 141:25,
142:2, 142:3, 142:22
**pass** [3] - 25:3, 25:18,
26:13
**passage** [1] - 44:12
**passed** [3] - 39:23,
43:8, 43:21
**passes** [1] - 25:6
**passing** [1] - 43:20
**past** [3] - 85:17, 99:1,
100:19
**path** [1] - 8:2
**patience** [1] - 140:20
**pattern** [2] - 14:8,
190:13
**patterns** [2] - 60:3,

107:23
**PAUL** [2] - 2:3, 5:9
**Paul** [1] - 144:12
**Pause** [10] - 31:13,
42:14, 45:20, 49:7,
67:17, 71:12, 95:2,
169:14, 191:20,
200:8
**PDMA** [1] - 149:19
**PEARL** [1] - 3:6
**peculiar** [1] - 99:25
**peer** [4] - 32:1, 32:10,
37:24
**pending** [3] - 7:12,
108:21, 109:13
**Pennington** [6] - 7:13,
19:4, 57:18, 57:21,
58:20, 61:22
**Pensacola** [1] - 2:14
**people** [17] - 75:3,
84:10, 84:19, 85:6,
97:9, 99:19, 104:22,
104:25, 105:5,
107:5, 117:3,
151:11, 157:6,
157:9, 157:11,
158:4, 161:13
**per** [3] - 8:23, 76:23,
187:1
**percent** [1] - 96:12
**perfect** [1] - 117:11
**perfectly** [1] - 202:19
**perform** [1] - 82:14
**performing** [4] - 21:6,
38:9, 38:13, 38:14
**perhaps** [3] - 55:12,
58:25, 105:2
**period** [16] - 81:17,
90:13, 132:18,
132:20, 136:1,
141:8, 157:1,
160:25, 164:17,
165:3, 175:12,
175:14, 176:17,
182:15, 183:11,
203:4
**periodically** [1] -
169:20
**periods** [1] - 135:16
**permission** [1] -
176:11
**permit** [4] - 17:6,
49:22, 54:21, 84:14
**permutation** [1] -
118:19
**Perry** [4] - 128:19,
128:20, 128:25,
129:9
**person** [6] - 31:18,
43:11, 49:17, 53:11,

75:5, 75:10, 75:13, 76:2, 190:21

**personal** [2] - 87:3, 179:17

**personality** [1] - 98:4

**personally** [5] - 27:18, 39:8, 39:9, 57:11, 164:18

**personnel** [3] - 21:9, 82:20, 165:9

**PETER** [1] - 2:12

**pharmaceutical** [1] - 168:7

**Pharmacies** [3] - 120:14, 123:6, 156:7

**pharmacies** [42] - 34:8, 35:10, 37:20, 67:13, 82:17, 83:22, 85:23, 92:21, 98:11, 98:15, 99:15, 99:16, 103:4, 103:6, 103:8, 103:17, 103:23, 104:3, 104:4, 104:6, 104:9, 104:12, 104:20, 106:2, 106:8, 106:16, 108:12, 115:15, 117:10, 117:24, 120:18, 122:24, 123:8, 133:10, 133:14, 137:8, 137:12, 188:4, 188:6, 193:5, 194:20

**pharmacy** [52] - 9:1, 11:6, 35:14, 69:5, 73:9, 74:17, 79:3, 80:14, 82:21, 84:8, 85:8, 85:14, 85:18, 86:12, 91:17, 101:22, 102:4, 105:1, 118:25, 119:1, 133:22, 191:23, 192:10, 192:23, 193:4, 193:11, 194:25, 195:2, 195:6, 195:7, 195:9, 195:11, 198:5, 198:17, 199:1, 199:9, 199:12, 201:23, 203:6, 203:10, 203:11, 204:11, 204:12, 204:17, 204:19, 204:21, 205:7, 205:12, 205:14, 205:18

**Pharmacy** [27] - 66:10, 66:12, 68:8, 71:19, 73:13, 76:15, 77:4, 78:1, 83:25, 84:1,

88:19, 88:22, 100:21, 119:11, 119:22, 122:9, 123:5, 124:17, 126:19, 130:2, 133:17, 136:11, 138:11, 150:11, 194:11, 205:2

**Philadelphia** [2] - 6:6, 6:13

**phone** [4] - 129:10, 196:4, 200:2, 200:18

**phonetic)** [2] - 165:17, 186:5

**photographs** [2] - 195:1, 203:22

**physical** [4] - 147:21, 150:7, 150:9, 150:12, 172:24, 203:9

**pick** [3] - 103:1, 106:25, 132:20

**picked** [6] - 69:24, 99:8, 103:4, 103:7, 106:7, 106:25

**picking** [2] - 106:9, 146:21

**picture** [2] - 8:17, 195:3

**pictures** [1] - 203:10

**piece** [2] - 76:4, 159:14

**pieces** [3] - 64:23, 76:22, 106:10

**PIFKO** [1] - 3:16

**pills** [27] - 83:22, 84:2, 84:4, 84:6, 84:14, 85:9, 85:12, 85:13, 85:18, 86:1, 86:7, 86:12, 99:20, 104:23, 115:20, 116:4, 116:12, 116:19, 117:2, 120:5, 120:9, 122:5, 123:7, 130:14, 133:18, 134:22

**place** [18] - 29:10, 51:22, 52:10, 65:4, 74:18, 87:4, 97:16, 100:7, 104:20, 111:16, 154:1, 161:18, 163:1, 163:19, 175:1, 175:22, 178:2, 206:5

**placed** [4] - 10:22, 12:15, 27:15, 137:25

**places** [5] - 100:3, 103:18, 106:25, 131:25

**placing** [1] - 12:6

**PLAINTIFF** [4] - 31:16, 112:15, 124:24, 143:4

**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1

**plaintiffs** [32] - 9:10, 9:19, 12:12, 13:19, 14:2, 14:23, 15:1, 15:11, 15:15, 19:19, 53:7, 54:13, 54:20, 62:19, 63:23, 64:4, 68:11, 96:17, 96:19, 98:13, 98:21, 103:6, 103:11, 103:22, 105:23, 106:7, 113:19, 114:17, 176:18, 180:15, 206:21, 207:7

**Plaintiffs** [1] - 209:6

**plaintiffs'** [9] - 7:14, 9:3, 70:2, 89:23, 99:8, 103:7, 103:23, 176:1, 178:10

**Plaintiffs'** [1] - 88:23, 175:13

**plan** [2] - 10:14, 12:2

**planned** [3] - 9:20, 12:18, 19:15

**planning** [1] - 206:15

**plans** [1] - 153:21

**plastic** [1] - 86:2

**play** [5] - 98:7, 104:10, 105:8, 105:15, 203:23

**pleading** [2] - 14:19, 14:21

**Pleasant** [3] - 3:15, 4:4, 4:9

**pleases** [1] - 65:3

**pleasing** [1] - 98:4

**plug** [2] - 111:12, 206:11

**plus** [2] - 10:6, 134:7

**point** [45] - 7:15, 9:8, 13:7, 18:21, 31:22, 33:8, 33:15, 33:19, 49:11, 49:20, 50:21, 54:8, 54:19, 56:13, 58:20, 63:2, 63:8, 63:13, 63:22, 83:9, 93:11, 97:13, 99:7, 104:5, 105:19, 108:9, 114:5, 133:20, 134:10, 134:11, 137:2, 140:22, 143:23, 154:14, 159:21, 163:13, 170:8, 177:12, 177:14, 177:17, 178:10,

187:10, 192:18, 195:5, 200:23

**pointing** [2] - 60:19, 129:20, 194:7

**points** [10] - 68:1, 69:5, 76:14, 102:19, 103:20, 105:18, 105:25, 179:8, 179:9, 205:3

**policies** [24] - 30:16, 31:3, 33:20, 91:18, 92:4, 98:23, 100:13, 100:22, 106:20, 137:21, 144:2, 145:2, 149:22, 151:6, 151:9, 154:8, 155:3, 199:25, 200:5, 200:14, 200:16, 201:5, 204:7, 204:8

**Policy** [1] - 21:1

**policy** [6] - 30:20, 36:13, 153:17, 200:24, 201:2, 202:1

**Polster** [1] - 7:15

**Ponc** [1] - 2:4

**Ponce** [1] - 2:16

**poor** [1] - 75:8

**Pope** [5] - 144:1, 144:12, 144:13, 144:15

**popping** [1] - 98:1

**popular** [1] - 194:5

**population** [6] - 84:21, 84:25, 85:5, 85:17, 115:21, 116:12

**portion** [2] - 141:3, 141:4

**position** [20] - 57:22, 58:2, 59:14, 59:20, 110:12, 146:11, 147:3, 148:13, 149:3, 149:4, 149:7, 149:21, 150:25, 151:3, 154:10, 154:12, 154:17, 155:1, 175:13, 178:10

**positions** [2] - 58:5, 155:16

**positive** [2] - 151:14, 198:8

**possibility** [1] - 10:4

**possible** [4] - 69:17, 200:10, 201:1, 202:3

**Possible** [4] - 182:18, 184:6, 184:19, 184:25

**possibly** [1] - 72:14

**posted** [1] - 189:14

**potential** [3] - 57:23, 59:20, 141:17

**potentially** [1] - 10:12

**Powell** [1] - 2:6

**PowerPoint** [8] - 176:14, 176:22, 179:18, 179:22, 180:13, 181:15, 182:5, 183:9

**PR** [2] - 2:5, 2:17

**practice** [1] - 49:2

**practices** [13] - 44:15, 46:6, 46:14, 47:1, 47:17, 47:21, 47:24, 48:17, 49:1, 50:21, 50:25, 55:18, 55:21

**pre** [1] - 113:22

**pre-marked** [1] - 113:22

**predecessor** [4] - 48:7, 48:8, 146:5

**predetermined** [1] - 113:13

**predict** [1] - 50:8

**prefer** [2] - 57:9, 113:24

**prefix** [1] - 162:2

**preparation** [2] - 53:14, 62:6

**prepare** [2] - 18:13, 18:19

**prepared** [2] - 68:2, 68:3

**prescribed** [1] - 194:8

**prescription** [2] - 130:3, 143:21

**presence** [1] - 9:18

**present** [10] - 14:15, 55:23, 65:5, 107:24, 108:12, 110:5, 140:7, 161:21, 171:11, 175:19

**presentation** [17] - 166:17, 166:19, 166:25, 167:9, 167:20, 168:17, 171:3, 172:5, 175:2, 176:14, 179:2, 180:13, 181:15, 183:15, 183:17, 192:11, 193:15

**presentations** [3] - 176:22, 177:16, 179:22

**presented** [13] - 8:5, 58:4, 81:4, 89:15, 101:1, 107:16, 107:17, 112:2, 114:12, 115:13, 116:6, 181:17, 201:4

**presenting** [3] - 177:3, 178:14, 178:15
**President** [1] - 40:21
**press** [1] - 108:15
**presume** [1] - 134:23
**pretty** [3] - 106:22, 147:17, 157:14
**preventing** [1] - 39:21
**previous** [5] - 12:7, 37:2, 130:23, 136:14, 155:1
**previously** [22] - 17:3, 19:14, 19:18, 19:21, 20:15, 20:20, 21:2, 23:14, 32:18, 91:7, 94:7, 112:19, 112:20, 115:6, 148:18, 151:8, 162:12, 172:25, 176:10, 184:12, 191:12, 201:6
**Prevoznik** [6] - 165:18, 175:24, 177:22, 178:5, 181:4, 182:3
**pricing** [1] - 158:17
**primarily** [1] - 151:4
**primary** [2] - 41:3, 147:24
**print** [2] - 190:8, 207:17
**printed** [3] - 64:25, 68:6, 72:14
**printouts** [2] - 158:20
**problem** [9] - 58:3, 68:24, 89:18, 90:2, 97:21, 108:16, 163:13, 193:5, 193:8
**problems** [1] - 114:8
**procedure** [2] - 36:14, 202:1
**procedures** [22] - 30:16, 31:3, 33:21, 41:9, 91:18, 92:4, 98:23, 100:22, 106:20, 137:21, 144:2, 145:3, 151:6, 155:4, 168:7, 168:23, 200:1, 200:5, 200:10, 200:14, 200:17, 202:11
**proceed** [3] - 10:1, 16:25, 73:3
**Proceedings** [2] - 6:19, 160:19
**proceedings** [1] - 209:5
**PROCEEDINGS** [1] - 7:1

**process** [32] - 10:12, 20:16, 21:10, 24:2, 24:5, 24:8, 24:17, 25:10, 27:6, 29:9, 29:10, 29:14, 35:25, 37:21, 44:14, 46:13, 50:20, 72:23, 74:15, 75:15, 75:16, 76:19, 76:20, 77:3, 87:4, 89:12, 137:6, 137:18, 154:6, 174:4, 188:22, 188:24
**processed** [2] - 24:23, 25:6
**processes** [2] - 41:8, 77:2
**Proctor** [1] - 2:12
**produce** [2] - 67:23, 104:3
**produced** [7] - 6:19, 67:9, 76:14, 90:7, 93:12, 109:8, 111:25
**producing** [1] - 12:17
**production** [1] - 70:3
**products** [1] - 202:23
**professor** [2] - 63:8, 63:21
**proffer** [3] - 20:10, 52:18, 103:6
**proffered** [2] - 54:20, 70:18
**Program** [15] - 24:2, 24:6, 33:8, 34:1, 34:13, 36:23, 38:8, 38:23, 83:11, 100:10, 100:11, 102:1, 115:19, 137:17, 144:3
**program** [24] - 24:7, 33:15, 34:3, 37:1, 38:1, 51:22, 52:9, 52:12, 100:11, 100:14, 100:15, 101:7, 101:20, 101:25, 106:22, 122:21, 134:12, 134:25, 161:9, 163:9, 174:24, 175:1, 175:3, 175:5, 175:22, 176:8, 178:12, 182:6, 184:13, 186:14, 188:8, 199:3, 201:22
**Program's** [1] - 68:13
**programs** [6] - 99:1, 99:3, 100:24, 103:14, 103:16
**promotion** [1] - 154:24

**prompt** [4] - 127:9, 202:2, 202:7, 202:10
**prompted** [2] - 127:3, 131:17, 136:20
**promptly** [1] - 72:7
**proof** [1] - 42:23
**proper** [2] - 9:10, 9:13
**properly** [3] - 15:18, 43:16, 173:12
**proposal** [1] - 58:6
**propose** [1] - 192:3
**protect** [1] - 53:6
**protected** [1] - 57:24
**proven** [2] - 54:16, 101:18
**provide** [10] - 14:14, 84:14, 85:9, 156:1, 163:4, 165:20, 166:5, 166:13, 168:6, 207:6
**provided** [13] - 19:24, 59:9, 64:5, 70:8, 73:20, 94:1, 152:1, 152:2, 153:8, 169:2, 177:6, 180:9, 199:11
**provides** [1] - 70:12
**providing** [4] - 13:8, 165:21, 166:5, 172:2
**provision** [2] - 13:8, 44:22
**provisions** [1] - 44:7
**public** [1] - 175:16
**publish** [1] - 124:19
**published** [1] - 46:11
**pull** [1] - 39:10, 45:21, 64:18, 68:3, 68:4, 94:20, 94:22, 97:1, 111:12, 129:13, 206:11
**Pull** [1] - 94:25
**pulled** [3] - 23:16, 66:9, 68:12
**purchase** [8] - 26:12, 66:1, 73:23, 123:1, 127:25, 136:23, 202:25, 203:1
**Purchase** [2] - 184:19, 184:25
**purchased** [2] - 126:23, 199:6
**Purchases** [3] - 182:19, 184:6, 199:3
**purchases** [8] - 126:20, 128:1, 133:2, 134:7, 136:1, 137:16, 203:2, 203:3
**purchasing** [1] - 200:11
**purport** [1] - 9:22
**purported** [1] - 8:6

**purportedly** [1] - 9:20
**purporting** [1] - 10:3
**purports** [2] - 8:17, 109:8
**purpose** [27] - 41:15, 41:18, 42:21, 48:25, 49:9, 52:18, 56:5, 62:2, 62:20, 63:14, 63:24, 64:3, 64:12, 64:16, 68:7, 118:22, 140:22, 140:23, 141:18, 151:22, 167:2, 169:10, 178:24, 182:9, 186:18, 187:8, 190:15
**purposeful** [1] - 132:5
**purposes** [15] - 20:18, 61:9, 62:17, 83:16, 92:17, 92:19, 108:14, 117:8, 142:17, 151:12, 162:2, 163:8, 180:5, 186:22, 201:2
**pursuant** [2] - 43:6, 43:16, 61:11
**pursue** [2] - 19:7, 118:15
**pursuing** [1] - 105:24
**push** [1] - 31:18
**put** [33] - 7:5, 7:9, 29:13, 40:9, 43:14, 46:20, 47:11, 49:24, 52:11, 52:23, 73:6, 74:8, 96:10, 105:23, 116:3, 135:8, 151:21, 166:19, 166:24, 166:25, 167:24, 184:8, 189:11, 191:17, 197:12, 199:2, 201:25, 202:11, 203:14, 204:13, 207:16
**puts** [1] - 127:2
**putting** [3] - 58:4, 80:19, 93:21

### Q

**Quantico** [5] - 161:10, 165:5, 170:6, 177:19, 178:1
**quantities** [6] - 122:14, 190:3, 190:5, 190:6, 190:12, 191:4
**quantity** [1] - 81:1
**questioned** [2] - 64:10, 144:23

**questioning** [4] - 51:11, 144:16, 144:22, 206:14
**questionnaire** [2] - 194:16, 205:14
**questions** [18] - 16:8, 21:5, 40:7, 50:9, 68:3, 69:4, 69:9, 70:13, 77:13, 113:17, 132:13, 140:3, 144:19, 145:10, 151:24, 152:2, 156:4, 199:10
**Questions** [1] - 194:11
**queue** [3] - 75:11, 75:13, 91:1
**quick** [3] - 90:5, 132:13, 193:12
**quickly** [2] - 152:23, 161:23
**quite** [2] - 202:20, 208:9
**quote** [8] - 13:9, 48:12, 49:17, 100:6, 101:16, 106:5, 141:15, 144:1

### R

**RA07-1051** [2] - 123:19, 124:9
**Rafferty** [1] - 2:12
**raid** [1] - 143:9
**raided** [1] - 139:13
**raise** [9] - 9:17, 10:11, 10:13, 82:5, 93:2, 102:11, 177:13, 177:17, 177:18
**raised** [5] - 12:24, 107:4, 135:23, 193:2, 199:1
**raising** [1] - 9:24
**range** [2] - 79:9, 90:19
**re** [6] - 15:19, 18:22, 58:18, 60:16, 109:14, 114:13
**re-Bates** [1] - 114:13
**re-disclose** [1] - 18:22
**re-examine** [1] - 15:19
**re-label** [1] - 109:14
**re-state** [1] - 58:18
**reached** [1] - 135:2
**read** [24] - 27:11, 36:17, 39:1, 39:2, 41:1, 43:24, 46:7, 46:19, 57:2, 57:6, 57:8, 58:19, 58:22, 67:10, 79:14, 79:24, 128:25, 139:6,

168:4, 173:4,
173:13, 174:17,
189:23, 190:6
**reading** [5] - 35:18,
41:13, 60:17,
196:19, 202:15
**ready** [7] - 72:16,
72:25, 110:7,
140:17, 160:20,
160:22, 188:18
**real** [4] - 14:10, 14:16,
74:6, 81:8
**real-time** [1] - 74:6
**realistic** [1] - 106:11
**really** [21] - 10:14,
12:9, 14:9, 17:8,
36:17, 44:3, 48:17,
51:22, 60:21, 65:14,
68:25, 74:1, 77:6,
80:12, 81:6, 117:6,
125:24, 139:10,
158:16, 187:11,
203:7
**realm** [1] - 10:4
**reason** [7] - 17:6,
18:7, 72:21, 90:11,
128:8, 156:5, 163:21
**reasonable** [5] - 12:9,
17:1, 17:4, 18:12,
20:1
**reasons** [7] - 30:23,
62:7, 75:22, 101:4,
105:7, 108:6, 188:1
**reassert** [1] - 186:16
**recalled** [1] - 15:25
**receipt** [1] - 21:14
**receive** [3] - 28:20,
72:6, 159:13
**received** [7] - 19:18,
39:23, 60:2, 128:13,
164:21, 179:16,
190:1
**receives** [2] - 24:13,
24:16
**receiving** [1] - 139:25
**recent** [2] - 112:5,
197:17
**recess** [3] - 20:8,
60:25, 72:24
**Recess** [4] - 61:2,
73:1, 97:23, 160:18
**recessed** [1] - 208:13
**recitation** [2] - 16:22,
22:8
**recognize** [16] - 24:11,
32:23, 32:25, 39:14,
39:16, 52:8, 65:21,
74:2, 113:6, 123:25,
139:16, 162:16,
167:15, 182:19,

189:9, 197:5
**recollection** [9] -
60:14, 88:7, 138:6,
138:18, 138:25,
139:7, 141:11,
163:19, 171:21
**recommendation** [1] -
183:19
**recommendations** [4]
- 47:2, 47:24, 49:3,
50:25
**recommended** [2] -
194:18, 199:18
**record** [37] - 7:6, 7:9,
10:21, 12:11, 12:15,
18:24, 20:10, 21:1,
23:14, 32:19, 35:23,
41:14, 53:6, 54:19,
59:18, 61:15, 79:25,
87:13, 88:24, 92:8,
92:17, 92:19, 92:20,
96:6, 101:16, 112:8,
114:14, 115:6,
128:25, 140:9,
145:6, 162:2,
167:13, 183:22,
184:5, 200:25, 209:5
**recorded** [6] - 6:19,
33:2, 73:22, 80:22,
134:13
**recordkeeping** [1] -
201:3
**records** [1] - 9:1
**recount** [1] - 194:22
**recruits** [5] - 164:23,
165:22, 166:6,
166:18, 175:2
**redact** [1] - 110:20
**redacted** [3] - 65:2,
65:3
**reduced** [1] - 191:6
**Reed** [2] - 6:4, 6:11
**refer** [3] - 20:19,
53:10, 160:7
**reference** [1] - 165:1
**referenced** [4] - 65:25,
96:8, 178:8, 204:7
**referencing** [5] - 51:1,
68:1, 109:6, 110:17,
200:24
**reflect** [1] - 162:10
**reflected** [4] - 69:6,
127:20, 200:4,
205:12
**reflection** [1] - 181:21
**reflective** [1] - 144:2,
145:2
**reflects** [2] - 42:3,
44:16
**refresh** [4] - 60:13,

138:18, 138:25,
139:2
**refreshes** [2] - 139:7,
141:11
**refreshing** [1] - 138:6
**refute** [1] - 41:23
**regard** [2] - 49:14,
168:20
**regarding** [7] - 49:5,
60:2, 73:7, 117:17,
163:2, 177:15, 198:5
**regardless** [1] - 28:9
**region** [2] - 108:1,
108:4
**registered** [1] - 173:12
**registrant** [1] - 120:21
**registrants** [1] - 41:5
**registration** [3] -
173:7, 174:5, 174:8
**registrations** [1] -
173:20
**regular** [3] - 34:3,
37:4, 204:12
**regulate** [1] - 158:18
**regulated** [1] - 150:5
**regulation** [4] - 49:4,
92:5, 170:24, 174:14
**Regulations** [1] -
172:22
**regulations** [17] -
46:4, 62:1, 62:9,
149:10, 149:13,
150:10, 150:11,
150:12, 151:5,
151:7, 154:7, 167:5,
170:9, 170:12,
170:16, 171:19,
172:4
**Regulatory** [4] -
142:11, 149:5,
150:23, 161:2
**regulatory** [23] -
42:18, 91:5, 91:24,
116:20, 147:23,
149:9, 149:14,
150:4, 150:5, 150:7,
150:19, 151:1,
151:12, 151:20,
151:24, 153:24,
153:25, 155:1,
155:16, 158:24,
169:24, 191:14
**reject** [1] - 75:18
**relate** [1] - 168:24
**related** [9] - 9:25,
19:2, 46:24, 69:14,
78:7, 101:12,
106:16, 149:7,
193:17
**relates** [3] - 96:5,

131:10, 158:23
**relation** [2] - 49:14,
57:23
**relations** [1] - 49:14
**relationship** [4] -
142:4, 142:23,
168:9, 176:4
**Release** [2] - 88:3,
88:5
**release** [5] - 28:18,
30:1, 75:25, 90:13,
90:24
**relevance** [4] - 165:23,
165:25, 166:1,
187:25
**relevant** [16] - 69:1,
69:11, 69:23, 71:7,
98:16, 100:23,
101:2, 101:3,
106:24, 108:7,
108:13, 176:3,
176:16, 178:18,
178:23, 182:6
**reliability** [1] - 7:18
**relied** [1] - 38:21
**relieve** [1] - 68:22
**relocate** [1] - 154:18
**rely** [2] - 189:20,
189:21
**remain** [2] - 51:11,
150:22
**remainder** [1] - 199:24
**remains** [1] - 179:24
**remedy** [3] - 102:14,
102:16
**remember** [36] - 11:8,
25:16, 25:24, 26:5,
26:11, 30:19, 32:5,
44:13, 46:12, 52:9,
58:14, 59:25, 65:17,
65:19, 73:14, 75:15,
92:3, 95:12, 99:18,
107:12, 107:13,
127:24, 129:11,
132:16, 132:18,
138:9, 138:11,
139:10, 153:18,
160:10, 165:17,
180:25, 191:15,
192:17, 195:17,
195:18
**remembered** [1] -
196:17
**remembers** [1] -
180:19
**reminded** [1] - 196:17
**remote** [1] - 10:4
**remove** [2] - 49:23,
180:13
**render** [2] - 43:24,

62:11
**renew** [1] - 59:19
**renewed** [1] - 174:10
**rep** [1] - 203:6
**repeat** [3] - 32:6,
85:11, 105:18
**repeatedly** [1] - 41:25
**Report** [11] - 7:16,
30:15, 65:11, 65:12,
67:19, 68:12, 73:21,
182:19, 184:6,
184:25, 199:4
**report** [27] - 28:12,
28:17, 29:18, 30:3,
30:8, 41:6, 65:19,
66:24, 68:12, 74:2,
75:18, 75:21,
107:14, 128:1,
134:12, 136:20,
153:10, 153:18,
159:5, 185:19,
186:2, 187:2,
188:23, 188:25,
199:3, 202:4
**reported** [22] - 25:7,
30:6, 30:22, 88:13,
88:18, 89:19, 90:9,
90:15, 90:20, 91:2,
91:13, 92:14,
110:23, 119:17,
185:1, 185:2, 186:3,
186:20, 187:10,
191:7, 199:7, 209:9
**Reporter** [6] - 6:17,
6:18, 209:3, 209:12
**REPORTER** [1] - 13:3,
146:3, 157:8
**reporters** [1] - 159:19
**reporting** [8] - 39:21,
150:18, 152:8,
155:4, 174:20,
174:21, 179:5,
182:14
**Reports** [2] - 110:17,
184:20
**reports** [9] - 28:8,
74:3, 127:8, 136:24,
153:3, 169:1, 186:1,
186:21, 187:5
**represent** [10] - 41:2,
65:23, 66:4, 73:19,
77:13, 88:20, 115:5,
115:12, 117:13,
128:22
**representation** [2] -
79:9, 174:23
**representations** [3] -
48:3, 162:18, 164:20
**representing** [1] -
116:2

**reprint** [1] - 65:4
**request** [22] - 19:13,
52:17, 58:16, 62:23,
66:17, 66:24, 69:25,
72:5, 89:12, 89:16,
89:24, 92:24,
109:16, 113:18,
140:12, 140:23,
152:23, 176:10,
206:13, 206:17,
207:8, 207:11
**requested** [2] - 82:8,
110:22
**requesting** [3] - 16:25,
53:1, 164:21
**requests** [1] - 103:25
**require** [5] - 13:1,
30:16, 62:9, 189:13,
207:6
**required** [13] - 31:2,
41:7, 61:13, 61:24,
62:1, 153:11,
156:25, 176:6,
185:20, 187:4,
187:10, 194:17,
203:10
**requirements** [14] -
15:23, 149:15,
149:16, 149:19,
150:2, 150:3, 150:4,
150:10, 150:13,
158:18, 168:25,
170:11, 172:21,
172:25
**requires** [2] - 20:8,
53:21
**requiring** [1] - 194:15
**resolved** [2] - 136:7,
136:15
**respect** [14] - 10:2,
43:1, 43:4, 47:5,
52:16, 61:15, 62:8,
98:25, 104:18,
105:13, 107:3,
107:11, 110:14,
203:23
**respectfully** [1] -
17:24
**respond** [16] - 16:15,
66:25, 101:8,
101:16, 101:17,
105:22, 110:24,
116:9, 153:20,
160:9, 160:10,
176:19, 177:11,
177:21, 178:25,
198:25
**responded** [1] - 40:7
**responding** [1] -
16:17

**responds** [1] - 177:12
**Response** [1] - 208:6
**response** [10] - 17:12,
46:18, 53:7, 128:13,
129:1, 136:16,
141:17, 142:14,
199:16, 201:23
**responses** [5] - 66:1,
103:25, 112:5,
112:6, 140:2
**responsibilities** [9] -
41:4, 42:18, 143:1,
148:10, 154:22,
155:23, 185:12,
185:13, 190:17
**responsibility** [4] -
154:24, 154:25,
155:24, 164:18
**responsible** [5] -
59:17, 60:7, 75:4,
75:5, 150:21
**rest** [4] - 106:19,
121:1, 200:4, 206:16
**resumed** [1] - 160:19
**retail** [8] - 35:6, 35:10,
37:20, 117:24,
119:1, 133:14,
204:12, 205:11
**retailers** [1] - 32:1
**return** [1] - 102:6
**reveals** [1] - 205:17
**reverse** [1] - 183:5
**reversing** [1] - 183:23
**review** [29] - 20:12,
28:1, 28:5, 30:21,
30:22, 58:16, 58:17,
73:24, 74:3, 74:9,
75:3, 75:6, 75:13,
75:14, 75:25, 76:9,
76:12, 80:5, 111:1,
135:5, 135:6,
136:20, 167:22,
175:21, 185:20,
187:5, 187:9, 202:3,
203:16
**reviewed** [9] - 40:1,
120:11, 134:9,
135:13, 136:9,
158:12, 173:23,
185:21, 186:21
**reviewer** [2] - 77:10
**reviewing** [1] - 190:17
**Rice** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**Richmond** [2] - 161:8,
161:19
**right-hand** [2] - 23:17,
115:11
**Risking** [1] - 206:24
**Ritchie** [4] - 167:24,

184:8, 197:12,
197:21
**RMR** [2] - 6:17, 6:18
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**role** [6] - 74:3, 147:15,
148:21, 150:19,
150:22, 203:23
**roles** [1] - 191:13
**rolling** [1] - 20:5
**room** [3] - 108:20,
170:15, 195:2
**round** [1] - 86:20
**rounded** [1] - 87:6
**route** [3] - 19:5, 25:19,
25:21
**routine** [1] - 38:5
**rows** [6] - 66:9, 66:21,
68:20, 68:21, 80:24,
89:10
**RPIC** [1] - 75:4
**RPR** [1] - 6:18
**RPR-RMR-CRR-**
**FCRR** [1] - 6:18
**Ruby** [1] - 4:17
**RUBY** [1] - 4:17
**Rule** [4] - 7:22, 8:20,
45:15, 61:11
**rule** [8] - 7:11, 44:8,
53:21, 56:6, 62:15,
62:21, 110:2, 142:18
**ruled** [4] - 47:6, 47:7,
57:18, 100:16
**rules** [4] - 24:21, 26:7,
48:24, 61:13
**Rules** [1] - 55:25
**rules"** [1] - 24:17
**ruling** [14] - 7:14,
11:12, 11:14, 12:8,
61:22, 94:14, 95:18,
95:21, 96:20, 98:12,
109:14, 114:6,
180:7, 183:5
**run** [6] - 74:21,
101:25, 127:8,
163:10, 175:1,
188:18
**rung** [1] - 195:20
**running** [5] - 33:7,
33:14, 100:9, 102:1,
178:12

**S**

**S&RC** [1] - 200:15
**s\Ayme** [1] - 209:11
**s\Lisa** [1] - 209:11
**safe** [1] - 86:1
**SafeScript** [39] -
21:19, 66:10, 68:1,

68:8, 71:19, 71:23,
73:7, 73:12, 76:15,
77:4, 78:1, 78:15,
83:25, 84:13, 88:19,
88:22, 89:5, 90:10,
121:14, 121:22,
122:9, 123:2,
124:16, 126:19,
129:21, 130:1,
130:15, 135:17,
136:11, 137:3,
137:7, 137:25,
138:3, 138:11,
138:25, 139:1, 143:9
**SafeScript's** [1] -
132:15
**safety** [1] - 150:2
**sale** [1] - 11:6
**sales** [18] - 21:6, 21:9,
37:2, 38:8, 38:9,
38:13, 82:8, 128:21,
202:9, 203:6,
203:18, 203:21,
203:23, 204:3,
204:4, 205:18,
205:22
**Sales** [2] - 82:20,
146:20
**salesperson** [1] -
82:19
**SALGADO** [1] - 4:15
**sampling** [1] - 156:22
**San** [2] - 2:5, 2:17
**satisfied** [2] - 49:11,
104:11
**satisfies** [1] - 54:1
**satisfy** [1] - 105:6
**save** [2] - 31:7, 31:18
**saw** [4] - 38:21, 96:22,
136:14, 194:24
**SC** [3] - 3:15, 4:4, 4:9
**scale** [1] - 98:24
**Schedule** [1] - 148:2
**scheduled** [1] -
162:12
**schedules** [2] -
173:21, 174:7
**scheduling** [1] - 180:1
**SCHMIDT** [4] - 5:9,
109:24, 111:7,
111:13
**scope** [16] - 8:19,
68:16, 70:20,
100:23, 101:11,
101:13, 101:21,
106:21, 108:11,
109:14, 142:4,
142:23, 142:25,
184:11, 186:16,
188:1

**scores** [1] - 15:16
**Scott** [2] - 125:11,
129:2
**scratch** [1] - 194:14
**screen** [12] - 40:17,
73:6, 78:3, 78:10,
93:21, 112:17,
117:21, 124:20,
184:8, 189:11,
197:12, 207:18
**scroll** [8] - 79:23,
86:3, 86:15, 87:9,
87:22, 87:23,
125:10, 125:19
**second** [17] - 20:15,
23:15, 32:21, 39:15,
45:22, 47:16, 56:13,
62:2, 66:13, 71:10,
74:13, 74:20, 90:17,
106:3, 169:13,
173:13, 194:12
**secondarily** [1] -
110:16
**seconds** [2] - 11:15,
31:17
**security** [9] - 147:21,
150:8, 150:9,
150:13, 151:20,
151:23, 170:11,
172:21, 172:25
**Security** [2] - 149:5,
174:14
**See** [2] - 143:25, 166:8
**see** [90] - 15:14, 24:11,
24:18, 25:8, 25:9,
25:13, 26:6, 35:22,
39:13, 40:6, 40:15,
40:18, 40:22, 45:25,
46:15, 50:14, 50:21,
52:8, 59:3, 59:9,
60:16, 60:21, 65:14,
68:9, 69:18, 74:6,
78:1, 78:3, 78:6,
78:12, 78:16, 78:19,
78:24, 81:8, 81:13,
82:10, 83:3, 86:7,
86:17, 86:21, 86:22,
87:25, 88:3, 89:4,
90:14, 92:18,
104:21, 108:16,
114:19, 115:19,
117:21, 117:25,
118:1, 118:4, 118:5,
118:10, 118:13,
119:9, 119:11,
119:23, 119:24,
120:6, 120:12,
121:17, 122:25,
123:2, 125:2, 125:7,
125:11, 125:22,

126:21, 128:13, 128:16, 128:18, 129:19, 129:24, 130:10, 130:17, 130:20, 133:19, 143:24, 147:1, 186:4, 187:2, 189:16, 193:10, 202:25, 204:18, 206:12, 208:10
**seeing** [2] - 37:11, 65:17
**seek** [3] - 50:5, 102:15, 196:13
**seeking** [5] - 42:23, 43:19, 66:18, 102:14, 201:7
**seeks** [1] - 42:5
**seem** [5] - 10:4, 68:19, 80:24, 96:19, 113:22
**sees** [1] - 141:9
**selected** [7] - 9:2, 22:25, 69:6, 70:2, 89:22, 106:8
**self** [4] - 18:1, 152:19, 153:23, 153:25
**self-standing** [1] - 18:1
**sell** [1] - 85:13
**selling** [3] - 59:15, 60:3, 117:2
**send** [3] - 75:19, 75:24, 76:8
**sending** [2] - 48:19, 139:21
**sends** [1] - 74:9
**SENIOR** [1] - 1:17
**Senior** [1] - 7:2
**Sensabaugh** [1] - 5:14
**sense** [4] - 69:15, 106:11, 114:11, 114:13
**sent** [15] - 29:23, 30:5, 38:6, 44:15, 46:9, 46:14, 56:24, 74:25, 75:2, 76:9, 82:21, 143:14, 146:22, 178:3, 187:6
**sentence** [3] - 46:15, 168:4, 189:23
**separate** [6] - 13:23, 18:1, 61:9, 102:5, 193:24, 201:8
**separately** [1] - 9:21
**September** [8] - 81:12, 81:16, 83:5, 83:6, 84:1, 196:4
**series** [2] - 21:15, 69:5
**seriousness** [1] - 98:3
**serve** [1] - 107:25

**served** [1] - 112:6
**serves** [2] - 42:16, 118:22
**Service** [1] - 146:19
**service** [1] - 205:5
**Services** [1] - 147:12
**sessions** [1] - 183:18
**set** [26] - 31:24, 32:1, 32:9, 33:3, 34:2, 35:4, 36:15, 36:22, 36:25, 37:22, 37:24, 38:2, 67:5, 83:21, 84:13, 114:12, 118:18, 118:22, 118:25, 122:21, 132:20, 135:12, 161:22, 188:14, 188:16
**sets** [1] - 206:1
**setting** [1] - 33:9
**settled** [2] - 104:14, 104:16
**seven** [3] - 11:3, 14:8, 16:1
**several** [11] - 9:19, 15:24, 76:17, 76:22, 90:23, 117:11, 119:13, 129:3, 167:23, 188:21, 205:3
**severance** [1] - 151:13
**SHANNON** [1] - 6:3
**shape** [2] - 25:1, 37:10
**sharing** [1] - 21:25
**sheet** [1] - 91:16
**ship** [4] - 75:18, 92:6, 193:22, 194:1
**Ship** [2] - 137:23, 138:1
**shipments** [3] - 91:15, 98:23, 117:14
**shipments"** [1] - 106:6
**shipped** [8] - 28:19, 29:19, 91:4, 91:13, 119:18, 121:14, 121:22, 122:9
**shipping** [6] - 91:16, 115:20, 116:11, 117:2, 137:3, 198:22
**ships** [1] - 28:11
**short** [2] - 58:10, 90:5
**short-circuit** [1] - 58:10
**shortly** [3] - 40:10, 46:21, 128:23
**shot** [1] - 61:3
**show** [40] - 9:10, 12:12, 12:13, 15:8, 20:19, 20:22, 20:25,

21:7, 21:11, 22:20, 23:19, 41:20, 47:16, 54:7, 54:11, 55:7, 59:4, 60:15, 76:13, 88:11, 94:20, 98:22, 100:5, 100:23, 100:25, 104:24, 106:6, 106:8, 106:12, 108:9, 123:15, 131:5, 138:15, 139:5, 151:17, 177:5, 179:18, 180:17, 183:22
**showed** [5] - 16:1, 23:2, 58:13, 138:24, 182:18
**showing** [2] - 106:11, 121:3
**shown** [3] - 71:18, 77:10, 101:5
**shows** [3] - 62:6, 91:15, 107:10
**shut** [3] - 138:3, 138:12, 139:13
**sic** [3] - 19:16, 131:12, 141:8
**side** [4] - 18:5, 18:17, 115:11, 120:25
**sign** [4] - 185:21, 195:10, 204:14, 204:17
**signature** [6] - 142:11, 143:24, 144:6, 144:8, 144:10, 144:16
**signed** [2] - 16:24, 18:10
**significant** [1] - 101:5
**silent** [2] - 103:11, 103:12
**silly** [1] - 80:15
**similar** [7] - 9:4, 9:5, 37:20, 61:14, 130:22, 154:2, 191:12
**Simple** [1] - 67:14
**simple** [2] - 8:20, 55:13
**simply** [19] - 10:9, 16:24, 47:1, 48:9, 48:24, 49:5, 53:6, 54:12, 55:17, 62:10, 63:2, 74:4, 92:8, 96:10, 113:16, 114:16, 114:20, 144:16, 207:9
**simultaneously** [1] - 148:8
**SINGER** [1] - 4:5

**single** [8] - 80:10, 85:8, 101:6, 120:20, 130:7, 131:3, 131:13, 174:4
**sit** [3] - 153:14, 156:3, 156:6
**site** [7] - 38:9, 38:11, 38:14, 155:25, 199:12, 203:25, 205:15
**sitting** [1] - 16:7
**situations** [1] - 18:15
**six** [8] - 11:3, 14:8, 16:1, 120:1, 157:21, 169:20, 169:21
**size** [7] - 26:8, 37:23, 133:4, 133:9, 133:21, 133:22, 190:12
**sizes** [2] - 133:21, 134:23
**skew** [1] - 9:6
**skewed** [3] - 8:5, 8:14, 8:16
**skips** [2] - 66:23, 81:15
**slide** [15] - 78:9, 78:10, 167:22, 168:13, 168:16, 169:10, 170:6, 171:2, 172:17, 173:3, 174:13, 181:16, 181:17, 181:19, 194:6
**slides** [24] - 23:1, 113:13, 114:3, 114:9, 171:24, 172:10, 172:19, 172:20, 176:22, 177:5, 179:18, 180:9, 180:12, 180:17, 181:21, 182:1, 182:5, 183:9, 183:15, 183:17, 193:13, 193:17, 193:21, 193:24
**slight** [2] - 152:23, 191:21
**Smith** [2] - 6:4, 6:11
**sold** [7] - 96:11, 115:15, 120:5, 120:9, 130:4, 130:14, 130:19
**solicit** [1] - 104:9
**solid** [2] - 79:3, 79:4
**solids** [1] - 78:23
**solution** [1] - 191:22
**SOM** [5] - 21:19, 21:20, 123:16, 124:16

**someone** [4] - 44:12, 165:10, 181:6, 202:9
**Someone** [1] - 165:10
**sometime** [3] - 36:24, 150:24, 192:19
**Sometimes** [1] - 82:16
**sometimes** [12] - 80:13, 80:16, 97:25, 131:15, 135:17, 135:19, 159:6, 159:8, 160:5, 160:6, 160:7
**Somewhat** [1] - 73:10
**somewhere** [8] - 10:5, 14:6, 30:13, 37:9, 74:5, 82:24, 86:10, 87:13
**soon** [2] - 14:1, 72:14
**sorry** [30] - 9:5, 13:3, 19:16, 32:6, 34:24, 36:4, 48:1, 51:3, 76:5, 85:11, 94:8, 94:10, 97:19, 102:24, 111:20, 116:8, 126:9, 129:20, 129:22, 142:18, 145:8, 146:3, 146:7, 153:4, 156:18, 169:21, 184:24, 189:5
**Sorry** [1] - 102:24
**sort** [6] - 69:20, 70:1, 76:9, 106:12, 160:4, 172:24
**sorted** [1] - 71:15
**sounds** [1] - 120:3
**source** [1] - 11:2
**sources** [2] - 11:11, 202:2
**South** [1] - 2:13
**Southern** [2] - 7:2, 99:16
**SOUTHERN** [1] - 1:1
**spare** [1] - 150:16
**speaking** [2] - 111:6, 193:1
**specific** [10] - 36:19, 49:9, 86:20, 87:7, 170:10, 181:13, 186:15, 186:18, 202:11
**specifically** [14] - 12:2, 13:8, 14:23, 27:8, 30:19, 68:1, 75:5, 75:12, 87:5, 92:4, 96:8, 96:15, 139:11, 199:8
**specified** [1] - 75:10
**speculation** [1] - 144:22

**spelled** [1] - 172:22
**spent** [2] - 44:13, 46:12
**spikes** [1] - 203:3
**spirit** [1] - 18:10
**spreadsheet** [8] - 66:5, 66:8, 67:20, 71:16, 77:8, 90:16, 90:23, 112:22
**spreadsheets** [2] - 69:6, 93:13
**spring** [1] - 192:16
**Square** [2] - 6:5, 6:12
**stack** [1] - 135:2
**stacked** [1] - 195:9
**staff** [18] - 27:2, 27:3, 27:14, 27:17, 30:11, 30:12, 31:1, 31:2, 68:4, 79:24, 153:15, 158:1, 158:2, 165:12, 178:15, 182:3, 183:13
**stage** [3] - 26:3, 30:11, 83:11
**stalling** [1] - 110:10
**stamp** [3] - 23:17, 65:1, 114:14
**stamped** [1] - 88:23
**stand** [11] - 16:8, 23:8, 24:14, 48:11, 92:8, 144:7, 144:9, 171:22, 180:7, 207:9, 207:10
**standard** [4] - 55:15, 116:19, 157:14, 168:7
**standing** [1] - 18:1
**STANNER** [1] - 5:10
**start** [18] - 24:9, 34:9, 37:18, 58:25, 59:11, 98:19, 103:21, 121:19, 129:4, 136:3, 138:6, 152:13, 157:22, 167:25, 173:16, 199:5, 199:14, 205:25
**started** [9] - 31:24, 35:11, 62:12, 72:22, 129:5, 146:10, 154:9, 161:10, 197:9
**starting** [2] - 134:21, 137:1
**starts** [6] - 65:1, 140:5, 173:4, 173:15, 197:21, 197:22
**state** [31] - 10:21, 42:17, 47:19, 49:13, 49:17, 58:18, 61:11,

61:18, 62:8, 62:13, 62:18, 62:20, 63:4, 64:3, 64:9, 102:9, 105:14, 107:9, 121:1, 149:16, 151:8, 173:12, 175:11, 175:12, 176:3, 176:16, 178:23, 179:3, 182:7, 182:9
**State** [6] - 68:14, 89:20, 104:16, 109:11, 150:10, 156:7
**statement** [41] - 43:7, 43:9, 43:10, 43:12, 44:16, 44:17, 44:24, 45:4, 45:5, 49:17, 51:14, 52:17, 53:1, 53:4, 53:11, 53:12, 53:20, 54:2, 54:13, 54:25, 55:2, 55:6, 55:7, 63:9, 63:10, 63:18, 85:11, 141:25, 142:2, 142:3, 142:7, 142:18, 142:21, 144:14, 144:15, 145:2, 168:1, 168:11, 183:4, 206:20
**statements** [5] - 43:5, 54:3, 61:16, 61:17, 142:24
**STATES** [2] - 1:1, 1:17
**States** [5] - 7:2, 7:24, 35:10, 103:18, 117:25
**states** [3] - 92:5, 156:9, 200:9
**stating** [2] - 33:22, 53:6
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**status** [1] - 173:7
**statute** [1] - 49:4
**stay** [2] - 16:12, 182:11
**steady** [1] - 203:2
**stenography** [1] - 6:19
**step** [2] - 160:16, 188:16
**Step** [1] - 188:15
**steps** [1] - 202:20
**Steve** [4] - 19:16, 21:8, 21:12, 21:23
**STEVEN** [1] - 4:17
**Steven** [1] - 144:8
**sticker** [2] - 22:21, 65:4

**still** [11] - 23:7, 28:12, 28:18, 51:11, 52:17, 62:5, 64:12, 105:8, 105:9, 137:3, 154:14
**stipulated** [5] - 20:20, 21:4, 65:24, 90:8, 112:2
**stipulation** [9] - 12:25, 13:7, 13:12, 13:14, 14:22, 15:10, 16:14, 142:13, 207:6
**stipulations** [3] - 13:23, 15:19, 17:15
**stood** [3] - 13:4, 172:9, 187:11
**Stop** [1] - 86:4
**stop** [3] - 97:16, 187:15, 198:22
**stopping** [3] - 97:13, 159:21, 206:5
**storage** [1] - 195:4
**store** [1] - 108:3
**story** [1] - 48:1
**straight** [1] - 15:21
**straitjacket** [1] - 10:22
**streaming** [1] - 107:6
**Street** [15] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15, 4:18, 5:5, 5:12, 6:6, 6:13
**stretches** [1] - 8:16
**strike** [1] - 144:21
**string** [10] - 39:19, 40:3, 139:17, 139:18, 139:19, 139:21, 140:5, 141:7, 141:14, 143:16
**structure** [1] - 168:21
**stuck** [2] - 138:18, 138:19
**students** [13] - 161:13, 161:16, 162:14, 165:5, 165:14, 166:2, 169:12, 170:7, 175:21, 178:3, 181:18, 183:10, 183:14
**stuff** [1] - 142:6
**style** [1] - 129:2
**subject** [7] - 43:12, 49:6, 53:12, 89:17, 93:2, 93:6, 163:12
**submit** [5] - 88:24, 92:19, 109:10, 109:11, 111:25
**submits** [1] - 24:10
**submitted** [9] - 14:21, 15:1, 21:13, 22:18,

67:2, 110:7, 111:3, 117:14, 119:4
**submitting** [1] - 14:21
**subsequent** [2] - 111:2, 200:1
**subset** [10] - 19:14, 19:23, 19:25, 20:7, 65:25, 66:11, 68:5, 73:19, 88:20, 90:1
**subsets** [1] - 11:19
**substance** [3] - 41:5, 168:20, 190:1
**substances** [10] - 39:22, 41:9, 148:2, 149:10, 156:22, 158:19, 173:11, 173:19, 173:22, 205:22
**Substances** [7] - 41:7, 46:3, 156:9, 175:16, 175:18, 176:6, 186:22
**substantial** [1] - 206:1
**substantive** [3] - 17:23, 57:22, 58:5
**sudden** [1] - 203:2
**sufficient** [2] - 7:18, 9:7
**suggest** [5] - 16:11, 43:5, 43:23, 178:22, 181:25
**suggested** [2] - 9:5, 116:21
**suggesting** [4] - 62:19, 77:7, 77:20, 116:18
**suggestions** [1] - 43:23
**suggests** [4] - 9:4, 14:9, 43:9, 127:19
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12
**summaries** [11] - 7:20, 7:22, 8:5, 8:6, 8:9, 8:14, 8:15, 8:19, 9:6, 9:8, 95:14
**summarize** [1] - 165:1
**summary** [7] - 8:2, 8:13, 8:16, 8:18, 8:21, 96:10, 124:3
**super** [1] - 181:5
**supervise** [1] - 154:25
**supervisor** [7] - 151:1, 190:23, 190:24, 191:2, 191:4, 191:5, 191:7
**supervisor's** [4] - 189:18, 190:13, 190:20, 190:25

**supervisors** [3] - 155:1, 171:11, 171:21
**supervisory** [5] - 165:12, 178:15, 182:3, 183:13, 185:22
**supplied** [1] - 96:9
**suppliers** [1] - 59:15
**support** [2] - 106:10, 156:1
**supporting** [1] - 16:4
**supposed** [4] - 108:2, 108:3, 136:6, 191:2
**surprise** [4] - 11:25, 17:20, 17:22, 67:8
**surprises** [1] - 11:21
**surrounding** [2] - 99:21, 107:8
**suspect** [1] - 63:20
**suspension** [3] - 40:10, 46:22, 46:23
**Suspension** [1] - 182:16
**suspicion** [1] - 136:7
**Suspicious** [2] - 110:17, 191:9
**suspicious** [60] - 28:8, 28:22, 30:4, 30:6, 30:9, 30:10, 30:18, 30:24, 39:21, 41:7, 83:16, 88:17, 88:21, 90:10, 90:15, 90:20, 91:2, 91:13, 92:12, 92:14, 99:2, 110:23, 111:4, 115:20, 116:7, 116:11, 116:18, 117:1, 123:16, 131:16, 131:19, 132:3, 133:24, 134:2, 134:13, 136:6, 136:21, 150:18, 152:8, 155:4, 174:15, 174:16, 179:5, 182:14, 185:1, 187:5, 188:2, 188:23, 189:1, 190:23, 193:16, 193:17, 193:22, 194:1, 196:12, 198:23, 199:7, 200:11, 202:4
**sustain** [9] - 29:5, 36:7, 45:12, 45:16, 49:19, 56:3, 141:22, 172:14, 182:10
**sustainable** [1] - 17:9
**sustained** [4] - 15:17, 35:20, 176:10, 183:2

**SUZANNE** [1] - 4:15
**sword** [2] - 60:4, 60:10
**system** [47] - 24:6, 24:17, 24:22, 24:23, 25:2, 26:4, 26:12, 31:2, 32:8, 41:6, 67:24, 68:13, 73:24, 74:7, 76:2, 76:5, 76:6, 76:7, 76:15, 79:6, 83:23, 84:2, 84:16, 92:10, 100:17, 109:9, 118:19, 124:6, 126:3, 127:4, 127:7, 130:20, 131:12, 134:4, 136:5, 136:8, 157:3, 173:15, 173:16, 173:18, 173:21, 174:2, 174:6, 174:8, 174:16, 174:20, 179:7
**systemic** [7] - 87:4, 98:24, 100:4, 100:17, 101:7, 101:17, 106:20
**systems** [1] - 189:20

### T

**table** [2] - 8:18, 191:19
**tables** [1] - 97:14
**tag** [1] - 143:25
**talks** [5] - 21:8, 107:21, 174:15, 177:3, 183:3
**task** [2] - 16:12, 27:8
**tasked** [1] - 149:19
**Taylor's** [1] - 32:3
**team** [10] - 21:6, 21:8, 38:9, 82:8, 99:14, 125:18, 152:13, 156:3, 199:5, 202:9
**Team** [4] - 33:13, 139:22, 140:1, 143:8
**technology** [2] - 31:7, 31:18
**Telephone** [1] - 146:20
**TEMITOPE** [1] - 4:8
**ten** [3] - 153:18, 153:20, 160:15
**tend** [1] - 98:22
**tender** [2] - 112:7, 207:13
**tendering** [1] - 112:3
**tending** [2] - 106:8, 106:12
**tends** [1] - 106:5

**tenets** [1] - 134:18
**Tennessee** [4] - 146:2, 146:24, 147:4, 148:18
**Tenth** [1] - 5:12
**tenure** [2] - 34:12, 38:22
**term** [3] - 131:23, 131:25, 195:7
**termination** [1] - 102:4
**terminations** [1] - 101:22
**terminology** [1] - 25:24
**terms** [8] - 13:11, 53:11, 55:13, 101:22, 146:14, 172:3, 174:2, 184:20
**test** [3] - 105:6, 106:4, 157:3
**testified** [23] - 47:22, 47:23, 48:5, 52:20, 53:13, 55:20, 76:19, 91:7, 95:14, 95:19, 95:24, 96:14, 99:5, 99:18, 101:20, 127:17, 141:9, 162:25, 172:25, 178:6, 188:21, 196:3, 201:6
**testifies** [1] - 183:3
**testify** [7] - 13:9, 95:17, 96:15, 177:23, 179:16, 180:20, 183:24
**testifying** [1] - 128:22
**testimony** [30] - 10:25, 53:10, 54:7, 55:12, 76:24, 95:7, 98:3, 99:18, 99:22, 100:8, 100:20, 100:25, 103:5, 107:17, 108:14, 111:2, 111:11, 117:17, 117:22, 118:24, 131:14, 133:13, 142:19, 176:21, 177:15, 179:4, 179:7, 182:8, 184:13, 206:25
**text** [5] - 124:11, 127:1, 127:14, 127:21, 197:17
**textbook** [1] - 54:11
**THE** [266] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:11, 10:14, 10:17, 10:20, 11:4, 11:8, 11:14, 11:17, 12:1, 12:16,

12:21, 13:4, 13:14, 13:17, 13:20, 14:18, 16:16, 17:10, 18:11, 19:10, 20:2, 20:4, 20:13, 22:13, 23:3, 23:6, 23:7, 23:9, 23:22, 29:1, 29:5, 31:9, 31:11, 31:15, 31:19, 35:16, 35:20, 36:6, 41:11, 41:16, 41:18, 42:7, 42:13, 42:20, 43:3, 44:5, 44:7, 45:1, 45:12, 45:19, 47:9, 48:5, 49:8, 49:19, 50:1, 50:4, 50:11, 50:14, 51:7, 51:16, 52:6, 52:7, 53:23, 54:5, 54:22, 56:3, 56:10, 57:16, 58:12, 58:21, 59:2, 59:7, 59:22, 60:15, 60:17, 60:25, 61:7, 62:25, 63:11, 64:7, 64:11, 64:15, 64:23, 65:7, 65:16, 65:17, 66:16, 67:14, 68:24, 69:8, 70:10, 70:16, 70:22, 71:3, 71:5, 71:9, 71:11, 71:20, 72:2, 72:16, 72:20, 72:24, 73:2, 73:17, 76:25, 77:18, 77:22, 79:11, 84:18, 85:2, 89:1, 90:2, 91:10, 91:12, 91:22, 92:1, 92:3, 92:22, 93:5, 93:10, 94:15, 94:23, 95:1, 95:3, 95:6, 95:10, 95:23, 96:13, 96:22, 97:3, 97:13, 97:18, 97:22, 97:24, 98:4, 98:8, 98:17, 99:7, 99:11, 101:8, 102:21, 105:16, 106:15, 108:15, 108:19, 108:22, 108:24, 108:25, 109:4, 109:18, 110:15, 111:11, 111:17, 111:19, 111:21, 112:9, 112:12, 112:14, 114:1, 114:23, 115:1, 116:1, 116:10, 116:22, 118:13, 118:14, 123:21, 124:21, 124:23, 126:1, 126:5, 126:7, 126:8, 126:10, 126:12, 126:13,

127:23, 127:24, 128:3, 130:5, 130:8, 131:18, 132:7, 132:11, 133:23, 134:10, 134:11, 135:7, 135:10, 138:8, 138:14, 138:17, 138:22, 139:5, 139:10, 140:13, 141:21, 142:6, 143:2, 144:18, 144:23, 145:4, 145:12, 146:4, 152:24, 157:9, 159:18, 159:21, 160:15, 160:17, 160:20, 161:25, 162:19, 162:22, 163:11, 164:9, 164:10, 166:4, 166:9, 167:12, 172:14, 176:19, 177:1, 179:13, 180:12, 182:10, 182:24, 182:25, 183:1, 183:22, 184:14, 186:23, 187:21, 187:23, 188:10, 189:7, 192:7, 196:15, 196:19, 196:21, 196:23, 196:25, 197:3, 200:22, 201:10, 201:14, 201:17, 206:5, 206:11, 206:17, 206:23, 207:10, 207:15, 207:19, 207:24, 208:4, 208:7, 208:9, 208:10, 208:11, 208:12
**themselves** [4] - 51:10, 54:25, 61:25, 100:19
**theoretically** [1] - 83:21
**theory** [2] - 106:10, 134:18
**therefore** [2] - 43:15, 62:2
**they've** [4] - 9:21, 93:18, 103:11, 107:16
**They've** [1] - 93:17
**thinking** [2] - 55:13, 92:13
**third** [4] - 11:24, 82:16, 111:23, 189:24

**Thomas** [1] - 2:12
**thoroughly** [1] - 29:22
**thoughts** [1] - 59:8
**thousand** [3] - 115:22, 116:13, 123:7
**thousands** [4] - 22:5, 96:20
**Three** [1] - 6:5
**three** [24] - 6:12, 11:1, 11:4, 11:7, 27:20, 45:7, 47:22, 64:22, 75:1, 75:18, 81:2, 84:14, 90:9, 104:17, 133:5, 133:8, 133:15, 134:7, 170:14, 179:6, 193:17, 193:21, 199:6, 202:10
**three-times** [2] - 11:1, 11:4
**threshold** [66] - 11:5, 26:2, 26:10, 35:4, 35:11, 35:14, 36:12, 74:24, 78:18, 78:21, 79:2, 80:8, 81:8, 81:12, 81:13, 81:17, 81:19, 81:20, 82:1, 82:7, 82:10, 82:23, 82:25, 83:2, 83:5, 83:6, 83:12, 83:15, 83:19, 83:21, 84:13, 85:8, 85:12, 86:6, 86:11, 86:23, 87:2, 87:19, 118:18, 119:19, 130:24, 131:1, 131:4, 131:5, 131:9, 131:11, 131:23, 131:24, 131:25, 132:14, 132:16, 132:20, 132:21, 132:22, 132:23, 133:4, 133:14, 134:7, 135:5, 135:8, 135:16, 135:23, 135:25, 137:11, 137:17
**thresholds** [28] - 20:24, 24:24, 31:23, 31:25, 32:9, 33:1, 33:3, 33:10, 33:19, 36:1, 36:15, 36:22, 36:25, 37:7, 37:14, 68:8, 74:22, 82:5, 86:16, 87:6, 107:22, 117:18, 118:22, 118:25, 120:19, 132:13, 135:12, 137:7
**throughout** [2] -

175:24, 185:4
**throws** [1] - 10:11
**thumb** [10] - 66:6,
  67:2, 67:12, 68:10,
  68:11, 69:15, 69:20,
  70:19, 71:15, 89:18
**timing** [3] - 70:3, 72:7,
  180:6
**TIMOTHY** [1] - 5:9
**tiny** [1] - 135:8
**title** [5] - 185:8,
  185:11, 185:15,
  185:17, 194:10
**titled** [1] - 205:2
**today** [12] - 11:21,
  19:15, 19:17, 102:7,
  108:10, 112:21,
  114:9, 154:1, 154:4,
  204:8, 206:4, 206:22
**today's** [2] - 108:14,
  111:2
**together** [15] - 40:9,
  43:14, 46:20, 47:11,
  52:12, 80:12, 96:10,
  132:4, 151:21,
  166:19, 166:24,
  166:25, 199:2,
  201:25, 204:13
**Tom** [2] - 165:18,
  175:23
**Tomkiewicz** [1] -
  36:11
**tomorrow** [2] -
  206:12, 206:16
**tonight** [1] - 207:1
**Tony** [1] - 186:4
**took** [9] - 11:6, 84:21,
  85:2, 147:18, 149:4,
  161:11, 163:1,
  163:19, 202:6
**top** [11] - 24:9, 29:13,
  40:18, 45:25, 87:22,
  125:2, 184:7,
  184:17, 194:5,
  197:18, 197:22
**topic** [1] - 9:25
**total** [3] - 115:14,
  161:22, 165:4
**totality** [1] - 122:17
**totally** [1] - 170:23
**totes** [1] - 86:2
**tour** [1] - 162:14
**tours** [1] - 164:22
**toward** [1] - 93:16
**Tower** [2] - 3:4, 4:18
**track** [3] - 114:18,
  124:4, 135:1
**Track** [1] - 66:1
**trade** [3] - 46:6, 50:25,
  55:15

**Trade** [1] - 43:10
**train** [4] - 166:2,
  166:21, 175:20,
  176:8
**trained** [6] - 27:8,
  75:6, 161:11, 163:3,
  165:3, 189:19
**trainees** [5] - 161:10,
  161:16, 163:2,
  165:2, 165:3
**Training** [1] - 168:2
**training** [24] - 152:10,
  152:12, 161:4,
  161:9, 163:8, 165:6,
  165:11, 165:21,
  166:3, 166:6, 167:1,
  167:2, 167:19,
  167:23, 169:11,
  171:9, 177:5, 177:6,
  178:7, 178:15,
  179:19, 180:18,
  181:12
**trainings** [16] -
  161:17, 162:25,
  163:5, 163:7,
  163:19, 164:17,
  164:22, 165:13,
  171:22, 173:24,
  176:7, 176:13,
  177:24, 178:2,
  178:18, 181:1
**transaction** [1] - 25:7
**transactional** [3] -
  91:3, 111:25, 121:9
**transactions** [3] - 8:7,
  122:1, 157:1
**transcript** [3] - 6:19,
  61:17, 209:4
**transfer** [2] - 26:21,
  148:15
**transferred** [1] - 27:2
**transportation** [1] -
  150:3
**traveling** [1] - 154:16
**treating** [1] - 43:22
**tree** [1] - 16:3
**trend** [3] - 86:16,
  106:9, 106:12
**trends** [2] - 98:23,
  106:6
**Trial** [2] - 88:23,
  208:13
**TRIAL** [1] - 1:16
**trial** [5] - 11:24, 13:18,
  14:22, 102:12,
  104:10
**trigger** [4] - 26:1, 26:5,
  26:11, 136:5
**triggered** [5] - 26:4,
  83:18, 109:9,

135:24, 137:18
**troubled** [1] - 98:13
**trucks** [1] - 85:24
**true** [8] - 40:9, 43:8,
  116:5, 135:7,
  144:11, 167:18,
  171:23, 200:16
**truly** [3] - 17:2, 18:8,
  100:23
**trust** [1] - 123:10
**truth** [18] - 41:15,
  41:19, 42:3, 42:6,
  42:25, 44:24, 47:10,
  47:12, 47:13, 48:13,
  48:14, 53:5, 54:22,
  55:3, 63:13, 63:23,
  64:6, 64:16
**try** [10] - 24:8, 31:21,
  45:17, 50:7, 50:15,
  51:4, 72:23, 105:18,
  132:10, 179:3
**trying** [17] - 10:19,
  10:23, 14:10, 26:18,
  48:18, 48:21, 48:23,
  53:22, 55:1, 55:20,
  96:19, 107:5,
  111:23, 113:23,
  134:17, 152:22,
  171:18
**turn** [8] - 40:13, 86:23,
  166:17, 168:13,
  169:8, 170:1, 186:7,
  194:9
**Twelfth** [3] - 4:13,
  4:15, 5:5
**twice** [1] - 118:9
**two** [28] - 7:23, 11:17,
  14:5, 16:19, 33:4,
  43:23, 47:19, 53:21,
  61:9, 62:7, 62:13,
  64:13, 64:17, 64:21,
  81:16, 99:1, 99:15,
  120:14, 132:2,
  165:19, 172:19,
  172:20, 174:17,
  194:9, 194:10,
  195:3, 200:15,
  205:13
**Two** [1] - 64:23
**two-page** [1] - 64:21
**type** [9] - 26:8, 82:2,
  108:1, 123:19,
  146:20, 153:23,
  184:21, 185:12,
  205:21
**typed** [1] - 128:19
**types** [6] - 94:6, 148:1,
  156:17, 169:1,
  178:2, 190:18
**typewriters** [1] -

146:21
**typically** [19] - 38:15,
  59:25, 60:5, 82:6,
  82:15, 146:18,
  152:6, 152:12,
  153:14, 156:3,
  156:5, 156:20,
  156:21, 157:2,
  157:21, 158:6,
  159:16, 169:15,
  199:20

## U

**ultimate** [1] - 137:2
**ultimately** [8] - 9:13,
  44:15, 46:14, 68:7,
  105:6, 108:8, 141:5,
  175:10
**unannounced** [3] -
  151:18, 152:18,
  152:20
**under** [20] - 7:22, 12:7,
  19:4, 23:7, 31:2,
  45:15, 46:3, 53:2,
  61:23, 62:15, 69:21,
  89:21, 93:19, 121:7,
  149:14, 170:21,
  179:3, 190:6,
  191:24, 192:2
**under-inclusive** [2] -
  69:21, 89:21
**underlying** [2] - 8:3,
  8:24
**underscores** [1] - 16:6
**understood** [3] - 29:3,
  101:11, 168:18
**unfairness** [1] -
  105:12
**Unfortunately** [1] -
  206:3
**uniformly** [1] - 35:6
**unintentional** [1] -
  132:6
**unique** [1] - 114:12
**United** [5] - 7:2, 7:24,
  35:10, 103:18,
  117:24
**UNITED** [2] - 1:1, 1:17
**units** [11] - 79:3, 79:4,
  79:7, 115:14,
  121:13, 122:8,
  126:24, 128:7,
  129:20, 132:16,
  132:25
**Unless** [1] - 72:18
**unless** [3] - 41:14,
  141:22, 183:3
**unnecessarily** [1] -
  113:23

**unusual** [1] - 190:11
**up** [73] - 12:3, 13:5,
  18:16, 18:17, 20:17,
  29:6, 29:10, 29:13,
  29:23, 30:11, 32:15,
  33:3, 34:6, 37:22,
  39:4, 39:10, 40:17,
  40:18, 41:22, 68:3,
  70:11, 73:6, 74:13,
  87:10, 93:6, 93:21,
  94:20, 94:22, 94:25,
  97:12, 98:1, 103:1,
  105:9, 106:12,
  108:8, 110:14,
  112:17, 113:12,
  117:8, 122:21,
  123:4, 123:11,
  124:19, 125:2,
  126:16, 129:13,
  129:16, 131:14,
  131:15, 132:2,
  132:10, 143:6,
  146:21, 148:25,
  151:17, 155:11,
  156:4, 163:18,
  167:24, 170:4,
  171:22, 172:9,
  184:8, 189:11,
  195:9, 196:3,
  197:12, 197:16,
  197:17, 198:4,
  198:16, 207:16
**update** [2] - 37:14,
  199:25
**updated** [8] - 34:3,
  37:3, 37:5, 37:16,
  125:7, 200:5,
  200:17, 204:7
**updates** [1] - 37:7
**UPS** [1] - 195:9
**upwards** [1] - 17:22
**uses** [1] - 8:21
**utilizing** [1] - 199:3

## V

**vague** [2] - 88:7,
  170:12
**Vaguely** [1] - 88:7
**Valdosta** [2] - 148:7
**validate** [1] - 116:4
**Valley** [1] - 155:12
**various** [12] - 17:18,
  75:22, 85:22,
  134:22, 134:23,
  151:7, 156:9, 163:7,
  169:5, 175:24,
  178:3, 190:5
**vault** [7] - 157:6,
  157:10, 158:9,

179:4, 189:14, 190:1, 191:13
**Ventura** [1] - 3:18
**verbally** [2] - 153:16, 166:12
**verify** [2] - 69:25, 173:7
**version** [5] - 15:1, 15:4, 15:6, 21:3, 112:6
**versions** [1] - 21:2
**vest** [1] - 159:9
**via** [2] - 24:17, 25:7
**view** [4] - 59:2, 92:24, 103:7, 106:14
**viewed** [1] - 77:15
**violating** [3] - 175:15, 175:17, 178:11
**violation** [3] - 91:4, 91:18, 160:4
**violative** [2] - 91:24, 91:25
**VIRGINIA** [2] - 1:1, 1:18
**Virginia** [31] - 4:18, 7:3, 66:11, 67:19, 68:14, 69:16, 73:8, 73:22, 77:5, 84:11, 85:19, 89:20, 92:21, 99:16, 99:24, 102:7, 103:19, 104:14, 104:15, 104:16, 109:11, 110:18, 118:5, 118:9, 120:15, 123:8, 143:22, 161:8, 161:19, 177:19
**visible** [1] - 79:10
**visit** [5] - 162:12, 181:5, 199:12, 203:25, 205:15
**visits** [1] - 38:11
**visual** [1] - 203:8
**visualization** [1] - 96:16
**VOLUME** [1] - 1:16
**volume** [4] - 17:8, 116:3, 116:19, 129:6
**volumes** [1] - 99:20
**voluminous** [1] - 22:16
**voluntarily** [1] - 15:11
**vs** [1] - 209:6

**W**

**WAG** [1] - 46:24
**wait** [4] - 136:22, 148:25, 189:4, 207:14

**waiting** [4] - 9:16, 108:20, 140:18, 140:19
**WAKEFIELD** [1] - 5:13
**Wakefield** [2] - 14:20, 14:23
**Walgreens** [1] - 123:6
**walk** [5] - 23:20, 24:8, 77:3, 118:18, 124:5
**wanted"** [1] - 29:3
**wants** [1] - 50:5
**warehouse** [3] - 146:10, 146:22, 147:16
**warranted** [1] - 82:10
**Washington** [7] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 170:18
**waste** [1] - 150:3
**water** [1] - 42:8
**ways** [4] - 38:1, 49:20, 107:22, 204:22
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**week** [4] - 11:24, 152:4, 154:16, 206:16
**weekly** [1] - 174:21
**weeks** [1] - 157:23
**weigh** [1] - 102:18
**weight** [2] - 55:22, 108:7
**Welcome** [1] - 65:9
**Wendy** [1] - 40:20
**WEST** [2] - 1:1, 1:18
**West** [27] - 7:3, 66:11, 67:19, 68:14, 69:16, 73:8, 73:22, 77:4, 84:11, 85:19, 89:20, 92:21, 99:16, 99:24, 102:7, 103:19, 104:14, 104:15, 104:16, 109:11, 110:18, 118:5, 118:9, 120:15, 123:8, 143:22
**whereby** [1] - 89:13
**whole** [7] - 12:5, 18:17, 88:1, 98:7, 141:14, 177:19, 179:7
**wholesale** [5] - 146:7, 166:23, 167:4, 168:19, 173:4
**Wholesale** [1] - 173:6
**wholesaler** [4] - 146:1, 148:7, 168:8, 168:22
**WICHT** [12] - 4:12, 42:9, 45:2, 47:4,

51:2, 51:9, 63:1, 64:8, 97:21, 110:11, 111:10, 111:18
**Wicht** [7] - 42:7, 44:4, 45:10, 51:8, 62:25, 64:7, 111:17
**Williams** [2] - 4:13, 5:4
**willing** [5] - 105:8, 105:9, 177:9, 177:15, 192:17
**winding** [1] - 93:16
**wire** [1] - 170:10
**wish** [1] - 99:13
**withdraw** [2] - 109:13, 180:11
**WITNESS** [27] - 23:6, 23:9, 52:7, 59:7, 60:17, 65:17, 91:12, 92:3, 108:24, 109:4, 118:13, 126:7, 126:10, 126:13, 127:24, 134:11, 135:10, 139:10, 146:4, 157:9, 160:17, 164:10, 166:9, 167:12, 182:25, 208:9, 208:11
**witness** [36] - 10:23, 11:23, 13:9, 13:10, 15:25, 16:18, 17:13, 20:5, 20:7, 35:18, 48:10, 52:20, 53:13, 55:20, 58:17, 59:20, 63:16, 64:10, 69:18, 70:13, 79:10, 99:5, 108:19, 112:16, 116:2, 116:5, 127:16, 127:22, 142:8, 142:14, 144:7, 144:20, 164:14, 179:15, 206:15, 207:8
**witness's** [4] - 54:6, 60:14, 63:18, 142:17
**witnesses** [8] - 10:3, 12:18, 14:2, 14:3, 14:13, 15:24, 17:16, 98:25
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**woman** [2] - 84:15, 85:9
**won** [1] - 11:17
**word** [8] - 26:1, 26:11, 26:18, 75:8, 88:1, 127:13, 185:25, 190:6
**words** [2] - 192:17,

197:16
**wore** [1] - 147:18
**works** [2] - 77:15, 174:2
**worries** [1] - 196:20
**worry** [1] - 174:4
**worst** [1] - 103:8
**Wright** [1] - 192:15
**writing** [3] - 33:25, 160:6, 175:5
**written** [9] - 7:13, 16:11, 33:2, 51:23, 53:4, 87:12, 153:17, 159:13, 159:14
**wrote** [2] - 44:13, 167:19
**WU** [1] - 5:10
**WV** [7] - 2:8, 3:10, 3:13, 4:19, 5:15, 6:9, 162:2

**X**

**XXIII** [4] - 144:2, 144:12, 144:13, 144:15

**Y**

**year** [9] - 84:6, 84:15, 85:14, 145:21, 145:22, 147:10, 169:16, 202:25, 203:3
**years** [7] - 117:5, 145:19, 147:2, 147:7, 161:12, 181:13
**yesterday** [7] - 20:17, 27:1, 28:5, 31:25, 32:14, 61:15, 99:5
**York** [1] - 3:5
**yourself** [3] - 66:13, 171:3, 198:13

**Z**

**zagging** [1] - 11:10
**zigging** [1] - 11:9
**Zimmerman** [25] - 10:1, 19:3, 19:14, 19:21, 21:16, 21:18, 21:22, 21:24, 33:16, 35:24, 36:3, 36:4, 36:6, 36:10, 40:4, 44:12, 46:9, 46:10, 46:18, 56:15, 56:19, 99:17, 161:7, 166:25, 198:14
**Zimmerman's** [2] -

19:3, 50:19