IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                                :
THE CITY OF HUNTINGTON,         :      Civil Action
                                :
            Plaintiff,          :      No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
            Defendants.  :
_____x
                                :
CABELL COUNTY COMMISSION,       :      Civil Action
                                :
            Plaintiff,          :      No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
            Defendants.  :
_____x
```

BENCH TRIAL - VOLUME 13
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

MAY 19, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,
Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:                Ayme Cochran, RMR, CRR
Court Reporter:                Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

25

```
 1              PROCEEDINGS had before The Honorable David A.

 2    Faber, Senior Status Judge, United States District

 3    Court, Southern District of West Virginia, in

 4    Charleston, West Virginia, on May 19, 2021, at 9:00

 5    a.m., as follows:

 6              THE COURT:  Are we ready to go with Mr. Mays?

 7              MS. MCCLURE:  He's just waiting outside to make

 8    sure we didn't have any preliminary issues.

 9              THE COURT:  Okay.

10         Good morning, Mr. Mays.

11         All right, Ms. McClure.

12                   CONTINUED CROSS EXAMINATION

13    BY MS. MCCLURE:

14    Q.   Good morning, Mr. Mays.

15    A.   Good morning.

16    Q.   To orient you back to where we're going to start today,

17    you had mentioned beginning some investigations after the

18    internet pharmacy meeting with DEA in 2005.  Do you recall

19    that?

20    A.   Yes, I do.

21    Q.   Okay.  And it was Eric Cherveny who was responsible for

22    running those and reporting to you?

23    A.   Yes, ma'am.

24    Q.   And did he provide updates to you in the investigation?

25    A.   Yes, he did.
```

1    **Q.**   Approximately how many investigations do you recall

2    conducting after the 2005 meeting with DEA?

3    **A.**   Probably hundreds.

4    **Q.**   Hundreds did you say?

5    **A.**   I'd say hundreds I think.

6    **Q.**   Over what time period?

7    **A.**   I would say over a year or so.

8    **Q.**   And were those documents -- were those investigations

9    documented?

10   **A.**   Yes, they were.

11           MS. MCCLURE:  Your Honor, we're going to introduce

12   a spreadsheet that is limited to the investigations from

13   this time period that were conducted on pharmacies located

14   in the Huntington/Cabell area.

15       For the ease of the Court, we intend to hand out the

16   spreadsheet with those nine investigations, as well as

17   accompanying documents that reference each investigation as

18   a single packet.  And I will read the exhibit numbers into

19   the record.  But to avoid handing out 10 times, we have

20   compiled it as a packet.

21       May I approach, Your Honor?

22           THE COURT:  Yes.

23   BY MS. MCCLURE:

24   **Q.**   And, Mr. Mays, if you could let me know when you

25   have a minute to look through those.

```
 1        (Pause)

 2             MS. MCCLURE:  For purposes of the record, the

 3   documents I've handed out all begin with AM-WV-, the first

 4   is 000714A, the A being because it's an excerpt of just the

 5   Huntington/Cabell pharmacy, 1410, 1418, 1444, which is a

 6   two-page document, 1413, 1417, 1406, 1415, 1999, 1409, 1416.

 7   BY MS. MCCLURE:

 8   Q.   Mr. Mays, have you had a chance to review this?

 9   A.   Yes, ma'am.

10   Q.   Mr. Mays, when you look up the DEA number of a customer

11   in your database or in the DEA's database, does that tell

12   you the address of the customer?

13   A.   Yes, it does.

14   Q.   Okay.  The first document, 714-A, can you describe what

15   this is?

16   A.   Yes.  It's, it's a spreadsheet listing investigation

17   summary of the Huntington/Cabell customers.

18   Q.   And in Column K is the text roughly the same for each

19   of those entries?

20   A.   Yes, it is.

21   Q.   And what does that text say?

22   A.   It says "account opened, no suspicious, no suspicious

23   found."

24   Q.   Okay.  If we could turn to the document, the first one

25   behind the spreadsheet, 1410 --
```

```
 1        Ritchie, if you could put that up on the screen,

 2   please.

 3   A.    Okay.

 4   Q.    In the top left what customer is this for?

 5   A.    Drug Emporium 1, Columbus 7/2007.

 6   Q.    Okay.  And what year was this investigation done?

 7   A.    Yeah, 2007.

 8   Q.    Okay.  If you turn to the second page on the back of

 9   that page, it's a double-sided document.

10   A.    Okay.

11   Q.    One moment.  And does this indicate that CSRA initiated

12   an investigation?

13   A.    Yes, it does.

14   Q.    And in the second line, what is that investigation for?

15   It says for elevated purchase numbers?

16   A.    Yes, for elevated purchase numbers during April of 2007

17   of hydrocodone and Alprazolam.

18   Q.    Now, is that an -- is this an investigation resulting

19   from a single order or is this a different kind of

20   investigation?

21        Let me withdraw that and ask that question again.

22        Is this a customer level due diligence investigation?

23   A.    I believe it is because it's talking about elevated

24   purchase numbers and not like a single order.

25   Q.    Okay.  And was that the nature of the investigations
```

1    that Eric Cherveny was generally conducting in this time

2    period, customer level?

3    **A.**   Yes, it was.

4    **Q.**   Okay.  And if you review the summary on the second

5    page, does it indicate that the license of the customer was

6    checked?

7             MR. ACKERMAN:  Objection to the leading, Your

8    Honor.

9             THE COURT:  Overruled.

10            THE WITNESS:  Can you repeat the question?

11   BY MS. MCCLURE:

12   **Q.**   Sure.  Does the second page, the description,

13   include the fact that the -- a license was checked for

14   this customer?  And it's also highlighted on your

15   screen.

16   **A.**   Yes.  It says all the registrations are valid.  I think

17   that's for the -- well, that's for the physician.  They

18   indicate the DEA registration.

19   **Q.**   In the fifth line does it say -- can you read what the

20   sentence says that begins "The pharmacy"?

21   **A.**   Yes.  It says, "The pharmacy is licensed by the State

22   of West Virginia."

23   **Q.**   Okay.

24            THE COURT:  You are leading him, Ms. McClure, if

25   you can rephrase your questions.

```
 1              MS. MCCLURE:  Okay.  Your Honor, --

 2              THE COURT:  The first one, I think, was a

 3    preliminary question to introduce him to the area of

 4    inquiry, but --

 5              MS. MCCLURE:  Understood, Your Honor.

 6              THE COURT:  And I realize this is

 7    cross-examination, but he's basically your witness.

 8              MS. MCCLURE:  I understand, Your Honor.  I've been

 9    attempting to be diligent about not leading the witness.

10    BY MS. MCCLURE:

11    Q.   Mr. Mays, what is the conclusion of the concluding

12    statement in this investigation?

13    A.   Well, after he completed his investigation, checked,

14    you know, the licensing, gathered all the facts, had the,

15    had the account manager complete a 590, and after all the

16    internet searches just to see if there's any sort of

17    internet pharmacy, and the -- there was no indication of

18    diversion was the final determination.

19    Q.   Okay.  Thank you.  Can we turn to the next document

20    which is 1418.  What pharmacy is this for on the first page?

21    A.   This is for SafeScript Pharmacy #6.

22    Q.   Okay.  What does it indicate the date in the top left

23    of when this was opened?

24    A.   June of 2007.

25    Q.   If you turn to the following page, the back page, does
```

1    this generally reflect a portion of the investigation that

2    was conducted for SafeScript?

3    **A.**   Yes, it does.

4    **Q.**   Okay.  Now, Mr. Mays, if you turn to the next document

5    in this package, which is the two-page document that begins

6    1444, it's a blank page and it says "document produced

7    natively."  And then you turn to the second page.

8         Does this text, based on your experience, also go with

9    the SafeScript investigation that is at 1418?

10   **A.**   Yes, it does because it's, it's the same matter number.

11   **Q.**   Okay.  So in the left on this page it says RA07-1051.

12   Is that the matter number?

13   **A.**   Yes, it is.

14   **Q.**   Okay.  And is a unique matter assigned each time an

15   investigation like this was opened by the Lawtrac system?

16   **A.**   Yes, it is.

17   **Q.**   And if you turn back to the first SafeScript document,

18   1418, in the top right what is that matter number?

19   **A.**   RAO7-1051.

20   **Q.**   And that's the same as the second document at 1444;

21   correct?

22   **A.**   That's correct.

23   **Q.**   So if you turn to the second page of 1418, the text

24   matches some of the text in 1444.  But does 1444 have more

25   text?

1    **A.**   Yes, it does.

2    **Q.**   Okay.  Can you briefly describe a summary of this

3    investigation and the conclusions drawn from it?

4    **A.**   Let me read through it real quick.

5        (Pause)

6        Yeah.  It goes through what, what I would expect to see

7    in this other one.  I'm not sure why the text is missing

8    from the other one.

9    **Q.**   Okay.

10   **A.**   But this describes all of the information that, that

11   the account manager, Michael Perry, had, had found upon his

12   visit to the, to the pharmacy.

13   **Q.**   And, in fact, Mr. Mays, on the longer document, 1444,

14   in the very first entry at the top, the concluding line of

15   it, 6/20/07, what is the conclusion there that begins with

16   the word "investigation does not"?

17   **A.**   Oh, it says, "The investigation does not indicate any

18   type of diversion."

19   **Q.**   And does that indicate to you that the investigation

20   that CSRA was conducting of SafeScript in June of '07 was

21   concluded in June of '07?

22   **A.**   Yes, that's correct.

23   **Q.**   And the update that is later in this page, do you have

24   any information as to why that update may have been added

25   later?

1    **A.**   No, I'm not really sure.  It looks to be several months

2    later that it was added.  So I'm not sure exactly what that

3    would be.

4    **Q.**   Okay, the next document, 1413, top left.  What pharmacy

5    is this and what year was this investigation?

6    **A.**   This, this is Medical Arts Pharmacy.

7    **Q.**   And when you turn to the second page of 1413, does that

8    also reach a conclusion as to whether there was any

9    information justifying stopping controlled substances

10   service?

11   **A.**   No, it doesn't.  It says the customer will continue to

12   receive controlled substances until such time additional

13   information becomes available requiring further

14   investigation.  And they requested to close the file and

15   submit a copy to me.

16   **Q.**   Okay.  Next document, 1417, what pharmacy is this?

17   **A.**   This is S & F Pharmacy doing business as Fruths

18   Pharmacy, May, 2007.

19   **Q.**   Okay.  And if you turn to the second page --

20   **A.**   Yes.

21   **Q.**   -- does the investigator find or not find any evidence

22   of diversion occurring after the investigation?

23   **A.**   No.  After he completed the investigation, he says that

24   the investigation does not indicate any diversion.

25   **Q.**   Okay.  And the next document, 1406, what pharmacy is

1   this?

2   **A.**   This is S & F Pharmacy #2, June of '07.

3   **Q.**   Thank you.  And if you turn to the back page where it

4   describes the investigation, does this investigator find or

5   not find any indication of diversion?

6   **A.**   They did not.  This investigation does not indicate any

7   type of diversion.

8   **Q.**   And the next document, 1415, top left, what is this

9   document -- pharmacy, I'm sorry.

10   **A.**   Medical Park Pharmacy, May of '07.

11   **Q.**   And if you turn to the back, does this investigation --

12   after the activities that are described in that paragraph,

13   does this investigation determine -- does this investigator

14   determine that there was or was not any indication of

15   diversion?

16   **A.**   There was not any indication of any type of diversion.

17   **Q.**   1999.  Do you know why this one looks a little bit

18   different?

19   **A.**   Not really sure.  I don't know.  Maybe it was -- it may

20   have been a different version or an upgrade, a different

21   version of Lawtrac.

22   **Q.**   Okay.  The top, in the center top, which pharmacy is

23   this investigation for?

24   **A.**   This is McCloud Pharmacy.

25   **Q.**   And what month and year was this?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **A.**    June of 2007.

2    **Q.**    Okay.  And in the middle entry, does it indicate

3    whether the investigator found or not -- did not find any

4    evidence of diversion?

5    **A.**    He states the investigation does not indicate any type

6    of diversion.

7    **Q.**    And then in the entry above that on 6/28/12, is that a

8    different, a different type of inquiry received?

9    **A.**    Yes.  It looks like there was a threshold review

10   request.

11   **Q.**    Okay.  And was that denied or granted?

12   **A.**    Let's see.  It was denied.

13   **Q.**    Thank you.  And then the next document, 1409, what

14   pharmacy is this?

15   **A.**    This is Budget Discount Pharmacy, Columbus.

16   **Q.**    And when we, when we look up the DEA number which is

17   indicated in the description there, would that DEA number --

18   I think you've testified would give us the address for this

19   customer?

20   **A.**    Yes.

21   **Q.**    Okay.  So it says Columbus.  Do you know whether that's

22   because the pharmacy is in Columbus or this was serviced out

23   of Columbus?

24   **A.**    No.  I think -- I believe it indicates it's a Columbus

25   customer.  So if you look down halfway through the page

1    where it says "location hierarchy," --

2    **Q.**   Uh-huh.

3    **A.**   -- it shows the ABDC Northeast Region and the Columbus

4    distribution center.

5    **Q.**   Okay.  If you turn to the description on the back page

6    in the first line does it, however, indicate that this

7    customer is in Huntington, West Virginia?

8    **A.**   Yes, it does.

9    **Q.**   Okay.  And the description there indicates an

10   investigation was conducted.  Did this investigator find or

11   not find any evidence of diversion?

12   **A.**   It says there was no indication of diversion.

13   **Q.**   Okay.  And then 1416, what is this pharmacy?

14   **A.**   This is Medicap Pharmacy 317.  I guess that's -- I'm

15   not sure what the 317 is.  June of '07.

16   **Q.**   And then in the back page after the description of the

17   investigation, does it indicate that the investigator here

18   did or did not find any evidence of diversion?

19   **A.**   The investigation does not indicate any type of

20   diversion.

21   **Q.**   Okay.  Thank you.  If we could go back to this

22   spreadsheet which is 714A, if we could put that up on the

23   screen.  The initials in Column J where it says INV, who is

24   EH to your knowledge?

25   **A.**   That would be Ed Hazewski.

```
 1    Q.   SK?

 2    A.   Scott Kirsch.

 3    Q.   TW?

 4    A.   I can't think of that one.  Ted Will.  He was one of

 5    the investigators, yes.

 6    Q.   JJ?

 7    A.   I'm not sure about that one.  It could be John Jessie

 8    but I'm not positive.

 9    Q.   And are these individuals, the ones that you

10    identified, all members of the CSRA team?

11    A.   Yes.

12    Q.   Are any of them salespeople?

13    A.   No, they are not.

14    Q.   Did sales play any role in this investigation other

15    than collection of the 590 and taking photographs?

16    A.   That's it.  That's all they do.

17    Q.   So the investigations were conducted entirely by CSRA

18    personnel?

19    A.   That's correct.

20    Q.   Mr. Mays, did DEA ever indicate to you that they were

21    not pleased with your efforts to address the illegal

22    pharmacy -- illegal internet pharmacy problem after the

23    meeting you had with them in August of 2005?

24    A.   No, they did not.

25    Q.   Okay.  Mr. Mays, you can set those documents aside.  I
```

```
 1    want to turn your attention to the time frame of April of

 2    2007.

 3    A.    Okay.

 4    Q.    What happened with the DEA in April of 2007?

 5    A.    In April of 2007 they suspended the DEA registration of

 6    our Orlando distribution center in Florida.

 7    Q.    How do you know that?

 8    A.    I got a call from the facility manager letting me know

 9    that DEA was there to suspend the registration and put a

10    lock on the cage and vault.

11    Q.    Was this serious --

12    A.    Yes.

13    Q.    -- from your perspective?

14    A.    Yes, very serious, yes.

15    Q.    What did you do?

16    A.    Well, I immediately told my boss.  And then I ran into

17    the CEO in the hallway and I had to be the one to tell him.

18    And then we went to the general counsel's office and called

19    the -- I'm sorry?

20    Q.    I'll just instruct you not to divulge any conversations

21    you had directly with general counsel.  It's privileged.

22    A.    Oh, okay, sorry.

23    Q.    When you said -- you were going to say something,

24    "called the," was that going to be an outside person or

25    another legal counsel?
```

```
 1    A.    No, we were calling the DEA, --

 2    Q.    Okay.  You can continue.

 3    A.    -- people in Orlando to find out what's going on.

 4    Q.    And you said you notified your boss.  Who was your boss

 5    at this time?

 6    A.    Chris Zimmerman.

 7    Q.    Did you call anyone else other than the DEA in Orlando?

 8    A.    I called Mike Mapes.

 9    Q.    Why?

10    A.    Because we had been working together for a couple of

11    years on this issue and it was a shock to us because I had

12    been working with him all along on the issues and --

13    Q.    You said -- I'm sorry.  I did not mean to interrupt.

14    A.    No.  I had just -- I'm like, "What's going on?"  And he

15    didn't know.

16    Q.    So when you said it was a shock to us, did you mean it

17    was a shock to you or Mapes or both?

18    A.    It was a surprise to both of us.

19    Q.    Why was this a surprise to you?

20    A.    Because we had been working closely with, with DEA,

21    with Mike Mapes and the team on, you know, our, our program

22    and the things that they wanted us to do to detect diversion

23    and investigate these pharmacies.  And we didn't feel like

24    we were doing -- we thought we were doing everything we were

25    supposed to be doing.
```

1    **Q.**   Did you believe you would have received some sort of

2    outreach if you had not been doing what you were supposed to

3    be doing?

4    **A.**   Yes.  I expected to, yes.

5    **Q.**   Why would you expect that?

6    **A.**   Because we had always had that kind of relationship

7    with DEA.

8    **Q.**   And do you recall if any of the pharmacies mentioned in

9    the immediate -- I'm sorry.  What documents did DEA serve in

10   order to effectuate that closure of the Orlando facility?

11   **A.**   I think it was like a -- I think it's called an

12   Immediate Suspension Order or something like that.

13   **Q.**   And did they reference any specific pharmacies in that

14   Immediate Suspension Order?

15   **A.**   Yes, they did.

16   **Q.**   And do you recall whether any investigations had

17   already been conducted by AmerisourceBergen into those

18   pharmacies?

19   **A.**   I believe all of them were.

20   **Q.**   And do you know if -- at the time DEA served the

21   Immediate Suspension Order, were we servicing at that time

22   all of those pharmacies mentioned in it or had some of them

23   already been terminated in terms of controlled substances?

24   **A.**   We weren't servicing all of them.  I know at least -- I

25   think half of them we had already -- we had cut off for

```
1    quite some time.

2    Q.   Okay.  Did Orlando -- did DEA move to shut down any

3    other AmerisourceBergen distribution centers?

4    A.   No, they did not.

5    Q.   So was this limited to Orlando only?

6    A.   Yes.

7              MR. ACKERMAN:  Object to form.  Objection --

8    sorry.

9              MS. MCCLURE:  I'll rephrase.

10   BY MS. MCCLURE:

11   Q.   Was Orlando the only distribution center affected?

12   A.   Yes, it was.

13   Q.   And was Orlando shipping products at this time,

14   controls or non-controls or anything into the Huntington,

15   West Virginia, area?

16   A.   No, they were not.

17   Q.   And did DEA limit Orlando's ability to distribute any

18   non-controlled products?

19   A.   No, they did not.

20   Q.   So the facility in Orlando was open for non-controlled

21   products; correct?

22   A.   Yes, yes.

23   Q.   And was there any -- was there any change to

24   AmerisourceBergen's ability to ship controlled substances

25   out of the Orlando facility in the few days after the
```

1    suspension?

2    **A.**    Yes.  The -- we got a -- I think it's called special

3    dispensation with DEA to allow us to continue servicing the

4    Department of Defense accounts and hospitals I believe.

5    **Q.**    And that continuation of service that you got a special

6    dispensation for from DEA, was that for both controlled and

7    non-controlled products?

8    **A.**    It was for controls because we could already ship

9    non-controlled.

10   **Q.**    Okay.  And, in fact, why would you need that special

11   dispensation?

12   **A.**    Well, because our registration was suspended, so we

13   couldn't legally distribute any controlled substances.  So

14   that meant that the DOD accounts and these other key

15   accounts that they didn't have any concerns about diversion

16   were not able to get their controls.  And we were -- they

17   were our customers.

18   **Q.**    Was AmerisourceBergen at this time able to ship

19   controlled substances into Florida from any other

20   distribution center?

21   **A.**    Yes.

22   **Q.**    And how was that -- how would that come to be?

23   **A.**    So we had to work with the Florida Department of Health

24   and expedite a license for our Columbus, Ohio, distribution

25   center so they could ship controls to Florida.  And, so, we

```
 1    got that license and then they started servicing the Florida

 2    customers with controlled substances out of Columbus.

 3    Q.    And was DEA aware of the fact that you were obtaining a

 4    license from Florida and then shipping controlled substances

 5    into Florida from Columbus?

 6              MR. ACKERMAN:  Objection.

 7              MS. MCCLURE:  Okay.

 8              THE COURT:  What's the basis?

 9              MR. ACKERMAN:  Speculation, foundation.

10              MS. MCCLURE:  Well, --

11    BY MS. MCCLURE:

12    Q.    Mr. Mays, do you know whether DEA was --

13              THE COURT:  I'll sustain the objection.  You can

14    go ahead.

15    BY MS. MCCLURE:

16    Q.    Do you know whether DEA was aware of the fact that

17    AmerisourceBergen was shipping products -- controlled

18    substances into Florida from the Columbus distribution

19    center?

20    A.    Oh, yes, they were aware.

21    Q.    How do you know that?

22    A.    I -- they brought it up during the initial discussions,

23    you know, something to the effect of, "We know you can

24    service the customers from another DC."

25    Q.    Was the program that was being run for our Diversion
```

1    Control Program the same for Columbus and for Orlando or

2    were there differences?

3    **A.**   No, they would be the same.

4    **Q.**   Thank you.  What happened after this was -- this

5    Immediate Suspension -- I believe you said it was at the end

6    of April?

7    **A.**   It was sometime around the 24th, I believe, something

8    like that, of April.

9    **Q.**   Okay.  What happened next?

10   **A.**   Well, as soon as we had the conversation with the, the

11   DEA agents that were serving the suspension, they had

12   already scheduled a meeting with us for the next day at

13   their headquarters.

14   **Q.**   Did you attend that meeting?

15   **A.**   Yes, I did.

16   **Q.**   And was that in Washington, D.C., or the area?

17   **A.**   Yes, at DEA's headquarters.  I believe it's Arlington.

18   **Q.**   And what do you recall about that meeting?

19   **A.**   There were several of us there, so I didn't do a lot of

20   talking.  They were pretty much telling us in general what

21   they expected us to do.  And then there were further

22   negotiations and meetings that I wasn't a part of.

23   **Q.**   And what did you understand that they expected you to

24   do?

25   **A.**   They wanted us to put a program together where we would

1    stop an order before it is shipped and find a way to

2    determine whether that order is suspicious and report it

3    before shipping.

4    **Q.**   Let me break that down a little bit.

5    **A.**   Okay.

6    **Q.**   Prior to this time, had you always -- has the company

7    and, to your understanding, the industry always shipped

8    orders that had been reported to the DEA as suspicious?

9    **A.**   Yeah, for the most part, you know, other than the

10   manual cage and vault where we had the base levels,

11   sometimes those orders may have been stopped.  But, in

12   general, the orders were always shipped.

13   **Q.**   And after this meeting with DEA, you understood that

14   orders were -- could continue to be shipped or could no

15   longer be shipped if they were deemed suspicious by the

16   company?

17   **A.**   They did not tell us we could not ship a suspicious

18   order, but they wanted us to determine whether it was

19   suspicious prior to shipping.

20   **Q.**   Okay.  After this meeting, what happened -- after this

21   meeting, what happened?

22   **A.**   Okay.  So I was put in charge of going back to the

23   office and working with the team to, you know, build this

24   enhanced program based on information that, that my boss and

25   legal counsel were getting with -- from their meetings with

1    DEA.

2         So they were continuing their -- excuse me -- their

3    meetings and negotiations.  And then they would tell me,

4    "Okay, here's what you need to do."  So we would start

5    putting things in place to get that accomplished.

6    **Q.**    Okay.  And was this -- was the changes limited to just

7    the Order Monitoring Program or was DEA's involvement with

8    our Diversion Control Program broader than just the OMP?

9    **A.**    Yes.  They, they wanted us to expand on our due

10   diligence that we had started after the 2005 meeting to

11   implement that for new customers that were coming on board.

12   So we would do new customer due diligence and build this

13   Order Monitoring Program.

14   **Q.**    Okay.  Let's start to focus first on the changes to the

15   Order Monitoring Program.

16   **A.**    Okay.

17   **Q.**    Did you do this by yourself at AmerisourceBergen?

18   **A.**    No, no.

19   **Q.**    With whom did you primarily work?

20   **A.**    Very closely with Jim Jackson.  I think he was in sales

21   operations.

22   **Q.**    And why Jim Jackson?

23   **A.**    He, he was, he was kind of one of those people that you

24   can kind of ask to do anything and they can do anything.  So

25   he had a lot of knowledge of the industry and he had a lot

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    of knowledge of the technical side of the business.  And,

2    so, he worked with us to help us build this program.

3    **Q.**   Did DEA have any involvement in helping to design the

4    new program?

5    **A.**   Yes.

6    **Q.**   How do you know that?

7    **A.**   So -- well, Mike Mapes and -- Mike Mapes was assigned

8    to work with us basically every step of the way.  So he came

9    to the corporate office just about every week.  So he was

10   there the whole time and assisted us in developing the

11   program.  He was there for us to ask questions while we were

12   in the process of building the program.

13        So Kyle Wright was with him most of the time.  And also

14   Scott Davis from the Philadelphia office was there for quite

15   some time also.

16   **Q.**   Do you mean they were physically in AmerisourceBergen's

17   offices?

18   **A.**   Physically there, yes.

19   **Q.**   So if -- the Immediate Suspension Order is at the end

20   of April.  Which month was it that Mike Mapes and Kyle

21   Wright were physically on-site working with

22   AmerisourceBergen to design the program?

23   **A.**   Basically, most of the month of April, May, and June,

24   part of June I think.

25   **Q.**   It would have been the end of April; right?

1   **A.**   Yeah, the end of April, yeah, I'm sorry, yeah, after

2   the suspension.

3   **Q.**   And I believe you said they also, in addition to the

4   OMP, asked you to do what with due diligence?

5   **A.**   To, to put a process in place to do new customer due

6   diligence.  So, so what we were doing for existing customers

7   that were being flagged on the reports for suspicious

8   orders, they wanted us to do that same due diligence for new

9   customers, all new customers, retail pharmacies.  They

10   excluded -- they exempted hospitals and chains.

11   **Q.**   And did they review any customer due diligence files

12   that AmerisourceBergen had?

13   **A.**   Yes.

14   **Q.**   How do you know that?

15   **A.**   Because they asked to see some.  But, for the most

16   part, we were taking our due diligence files to them and our

17   investigation files to say, you know, "Look through this and

18   let us know what you think, you know, we should do," because

19   some of them were, some of them were really kind of

20   head-scratchers just because of the high volume that they

21   were doing.  But we could not find any diversion.  We

22   visited some of them several times and could not find any

23   diversion, but we just knew the volume was high.

24   **Q.**   And did you raise the volume issue to the DEA personnel

25   who were on-site at your headquarters in this time frame?

1    **A.**    Yes, we did.

2    **Q.**    And what was your understanding of their response?

3    **A.**    Well, they looked at one in particular and for some

4    reason I can't think of the name of the pharmacy, but it was

5    in West Virginia.  And they said it looks -- you know, after

6    they reviewed the file, which was probably six inches thick

7    of all the different due diligence visits and all the

8    reports and everything we had done, they said, "It looks

9    like you've done all you can do."

10   **Q.**    For all of the customers whose due diligence files you

11   presented to DEA, did DEA advise you to make any changes or

12   stop servicing any of those customers?

13   **A.**    No.

14   **Q.**    And do you, do you recall approximately how many due

15   diligence files DEA reviewed on-site?

16   **A.**    No.  I wish -- they looked at several.  I would say

17   probably a couple of dozen, but I'm not positive about that.

18   **Q.**    And, so, did AmerisourceBergen successfully develop a

19   revised Order Monitoring Program to be implemented at

20   distribution centers?

21   **A.**    Yes, we did.

22   **Q.**    And was that just limited to the Orlando distribution

23   center or was it implemented more broadly?

24   **A.**    Oh, it was, it was implemented across all of ABDC.

25   **Q.**    Did that result in a change to how AmerisourceBergen

1 was handling orders that are flagged?

2 **A.** Yes.

3 **Q.** What was the change?

4 **A.** Well, we had to stop an order that, that we had --

5 after we had built the thresholds in the system, anything

6 that exceeded that threshold was stopped and reviewed by

7 the, by the distribution center.  If they weren't sure they

8 could clear it, you know, if they weren't 100 percent

9 comfortable with it, they would send it up to CSRA to

10 review.  This would be before the order is shipped.  So it

11 could not be shipped until it was reviewed.

12 **Q.** And what would CSRA do with those orders?

13 **A.** So if they sent an order up to CSRA to be reviewed, we

14 would -- our investigators would look at the customer, look

15 at the file and all the information we had.  And in most --

16 in many cases, they could go ahead and release the order.

17 And in other cases, they would determine it was suspicious

18 and report it to DEA.

19 **Q.** Now, this whole process that you've described, was this

20 implemented -- was this known to DEA that this was the

21 process that AmerisourceBergen would be implementing?

22 **A.** Yes, they were there every step of the way.

23 **Q.** Did DEA do any testing of the implementation of this

24 Order Monitoring Program at distribution centers?

25 **A.** Yes, they did.

1    **Q.**    How do you know that?

2    **A.**    They told us that they were going to go to -- after

3    we -- when we -- once we implemented the program, they were

4    going to go to five distribution centers and test it to see

5    how it worked at the distribution center level.

6        I believe some of those five were -- they told us where

7    they were, and then there were one or two where they didn't

8    tell us they were going until like the last minute.

9    **Q.**    And, so, what did those site visits and reviews entail?

10                   MR. ACKERMAN:  Objection.

11                   THE COURT:  What's the basis?

12                   MR. ACKERMAN:  So I -- it seems that the basis for

13   the witness's knowledge on the subject is hearsay.

14                   MS. MCCLURE:  Oh.

15                   MR. ACKERMAN:  He's testifying as to what the DEA

16   told him.

17                   MS. MCCLURE:  I asked what --

18                   MR. ACKERMAN:  I just don't have a foundation for

19   what the DEA did at various --

20                   THE COURT:  Well, if he knows what the visits and

21   reviews entailed from his personal knowledge, he can answer.

22   Overruled.

23   BY MS. MCCLURE:

24   **Q.**    Mr. Mays, do you have any knowledge personally as

25   to what those DEA site visits entailed?

1    **A.**    Yes, because I went on three of them personally.  And I

2    think the first one was in Williamston, Michigan.  They --

3    basically, we walked them through the whole process of how

4    an order hits their system, if it exceeds threshold, what

5    the DC does with it, then how it gets sent to corporate, and

6    then they could see that whole process about whether the

7    order, you know, whether -- they saw the whole process of an

8    order being released or an order being rejected and reported

9    as suspicious.  That was basically it.  They didn't do like

10   a full, a full cyclical inspection that DEA would do, but

11   they were mainly there to test our Order Monitoring Program.

12   **Q.**    Those three that you attended, do you recall how long

13   those reviews took?

14   **A.**    I think a couple of days each one.

15   **Q.**    Now, you've also said that they reviewed the process

16   from start to finish of an order coming in, including how

17   corporate handled it.  Did they review the process at the

18   corporate level as well, meaning --

19   **A.**    Oh, yes.

20   **Q.**    -- AmerisourceBergen's headquarters?

21   **A.**    I didn't mean to interrupt you.  Yes, they did.

22   **Q.**    And how do you know that?

23   **A.**    They would look -- they could look on the screen to see

24   how the investigator was handling the orders.  They knew the

25   options the investigator had.  They would see what they

 1   would look at, the type of documents and records and history

 2   that they would look at.

 3   **Q.**   Do you have personal knowledge of the corporate piece

 4   of this when they viewed the system at corporate

 5   headquarters?

 6   **A.**   Yes.

 7   **Q.**   And was this revised Order Monitoring Program

 8   implemented nationwide after this time?

 9   **A.**   Yes, it was.

10   **Q.**   And did the company get its license restored to the

11   Orlando facility?

12   **A.**   Yes, it did.

13   **Q.**   And do you know when that was?

14   **A.**   I believe it was -- there was a settlement agreement in

15   June, and then I think the license was restored in August,

16   if I'm not mistaken, or lifted the suspension.

17   **Q.**   And were those reviews that DEA did on-site, did those

18   occur after the settlement agreement?

19   **A.**   Yes, they did.

20   **Q.**   And is it your understanding that your license could

21   only be restored if the DEA had approved the system and

22   those five audits you mentioned?

23   **A.**   Right.  That was my understanding that was the

24   stipulation that they, they had to successfully complete

25   those five inspections.  And then if everything was going

1    well, then they would lift the suspension.

2    **Q.**   And as a result of that settlement, do you have an

3    understanding as to whether AmerisourceBergen paid any fines

4    to DEA?

5    **A.**   We paid no fine.

6    **Q.**   Do you have an understanding as to whether

7    AmerisourceBergen admitted any liability or violation?

8    **A.**   No, we did not.

9    **Q.**   To your knowledge, did DEA ever shut down any other

10   distribution center of AmerisourceBergen?

11   **A.**   No, they did not.

12   **Q.**   And how would you know that?

13   **A.**   I would know.

14   **Q.**   Is that within your job duties from the time that, say,

15   1990 forward?

16   **A.**   Yes.

17   **Q.**   I'm sorry, 1998 forward.

18   **A.**   Yes, yes.

19   **Q.**   Thank you.

20   **A.**   Sorry.

21           THE COURT:  We have to change court reporters

22   early today to accommodate my sister Judge Berger.  And, so,

23   we'll be in recess for 10 minutes.

24           MS. MCCLURE:  Thank you.

25           (Recess taken at 9:46 a.m.)

```
 1              THE COURT:  Okay, Ms. McClure.

 2              MS. MCCLURE:  Your Honor, I neglected to move the

 3    admission of some documents, so I will go ahead and do that

 4    now, which is the spreadsheet that I handed out, 714, as

 5    well as 1410, 1418, 1444, 1413, 1417, 1406, 1415, 1999,

 6    1416, 1409.

 7              THE COURT:  Is there any objection to any of

 8    these?

 9              MR. FARRELL:  No, Your Honor.

10              THE COURT:  All right.  They're all admitted.

11        I'm a little confused about what the purpose of these

12    are.  Are you just showing the examples of the procedure

13    they used to review the pharmacies?

14              MS. MCCLURE:  Yes, Your Honor.  So, this is

15    intended to demonstrate to Your Honor that in this 2007,

16    early 2007 time frame, that nine pharmacies in Huntington

17    and Cabell were subject to a customer-level due diligence

18    investigation by CSRA.

19              THE COURT:  I thought that's what you were up to.

20    Thank you.

21              MS. MCCLURE:  I'm sorry if I didn't make that

22    clear.

23              THE COURT:  Thank you.  Okay.  They're all

24    admitted.

25        DEFENSE EXHIBITS 714, 1410, 1418, 1444, 1413, 1417, 1406,
```

```
 1                    1415, 1999, 1416, 1409 ADMITTED

 2              MS. MCCLURE:  Thank you.

 3              BY MS. MCCLURE:

 4    Q.   Now, Mr. May [sic] --

 5    A.   Yes, ma'am.

 6    Q.   As a result -- Mr. Mays, I'm sorry.  I -- I still

 7    sometimes do that.  As a result of this new program that was

 8    implemented in the Summer of 2007 at all AmerisourceBergen

 9    distribution centers, if an order was deemed suspicious by

10    AmerisourceBergen after this new program was launched, was

11    it shipped or not shipped?

12    A.   It was not shipped.

13    Q.   You've also talked about a Form 590 due diligence that

14    was begun around this time.  Did the DEA require Form 590s

15    to be done on chain pharmacies?

16    A.   No.  They were exempted.

17    Q.   Exempted by whom?

18    A.   DEA.  As part of the settlement, they were exempted.

19    Q.   And you oversaw the rollout of this new Order

20    Monitoring Program at AmerisourceBergen?

21    A.   Yes, I did.

22    Q.   Based on your entire experience from this time frame,

23    did you believe that DEA had knowledge of all of the

24    elements of the new Order Monitoring Program?

25    A.   Yes.  They -- they assisted us and supervised the whole
```

1    process.

2    **Q.**   Including not just the Order Monitoring Program, but

3    does that include the due diligence process, as well?

4    **A.**   Yes, absolutely.

5    **Q.**   Based on your understanding, do you believe that DEA

6    had approved this program?

7    **A.**   Yes.

8    **Q.**   Mr. Mays, what is a DEA Pharmaceutical Industry

9    Conference?

10   **A.**   That is a conference that DEA typically puts on every

11   two years and it is for distributors and manufacturers and

12   it's -- it's put on by DEA and it's typically just to update

13   the -- update the industry on any new regulations or

14   anything the DEA wants to update the industry on.

15   **Q.**   And did you attend that conference in September of

16   2007?

17   **A.**   Yes, I did.

18   **Q.**   And did anyone else from AmerisourceBergen attend that

19   conference in September, 2007?

20   **A.**   Yes.  Chris Zimmerman did.

21   **Q.**   Did Mr. Zimmerman have a role at that conference?

22   **A.**   Yes, he did.  The DEA had asked him to come and present

23   our new program to the rest of the industry.

24   **Q.**   And so, the attendees at this conference include both

25   DEA personnel and industry people; is that correct?

1    **A.**    That is correct.

2    **Q.**    Did anyone else speak along with Chris Zimmerman at

3    this presentation?

4    **A.**    I believe, yes, Mike Mapes did.

5    **Q.**    And was Mike Mapes employed by DEA at the time?

6    **A.**    Yes, he was.

7    **Q.**    Do you have any knowledge as to why Mr. Zimmerman

8    presented in 2007?

9    **A.**    Well, my understanding was the DEA wanted us to present

10   our program to the rest of the industry because they wanted

11   the rest of the industry to put the same or a similar

12   program in place.

13           MS. MCCLURE:  Okay.  We're going to go ahead and

14   hand out DEF-WV-00001, which has already been admitted into

15   evidence but in light of -- we just don't want people to

16   have to dig around.

17       May I approach, Your Honor?

18           THE COURT:  Yes.

19           BY MS. MCCLURE:

20   **Q.**   Mr. Mays, if you could take a look at that and let me

21   know when you have had a chance to do so.

22   **A.**   Yes, I'm familiar with it.

23   **Q.**   Okay.

24           MS. MCCLURE:  Richie, if you could put that up on

25   the screen, please.

1          MS. MCCLURE:

2    **Q.**   On this cover page, who does this indicate that this

3    presentation was given by?

4    **A.**   Who it was given by?

5    **Q.**   Correct.

6    **A.**   Yes, Chris Zimmerman.

7    **Q.**   Did you -- did you attend this presentation yourself?

8    **A.**   Yes, I did.

9    **Q.**   Okay.  If we could turn to the page that is

10   ABDC-001824, which is about six pages in.  Mr. Mays, what is

11   this slide?

12   **A.**   This is a slide describing the components of our

13   Diversion Control Program.

14   **Q.**   Based on your knowledge of DEA's on-site activities at

15   AmerisourceBergen in 2007, did they review our entire

16   Diversion Control Program?

17   **A.**   Yes, they did.

18   **Q.**   The next page at the top, what does the second bullet

19   say?  I'm sorry, the one that begins "retail"?

20   **A.**   "Retail chain pharmacies are exempted."

21   **Q.**   And that's that process you just talked about in terms

22   of new customer due diligence?

23   **A.**   That's correct.

24   **Q.**   Okay.  If you could turn to 1827, a couple pages down,

25   and the bottom two bullets, could you read those aloud?

1    **A.**   Yes.  "Historically controlled substance/listed

2    chemical order monitoring has been based on a ship and

3    report process.  ABC's OMP process is now based on identify,

4    capture, investigate, and report suspicious orders, all

5    prior to shipment."

6    **Q.**   Thank you.

7         MR. ACKERMAN:  Your Honor, I'm happy to let

8    counsel spend a little time on this, but we already had Mr.

9    Zimmerman here to testify about the presentation that he

10   provided, so I'm a bit confused as to why this isn't

11   cumulative.

12        MS. MCCLURE:  Your Honor, Mr. Mays was the

13   individual who was personally responsible for implementing

14   this new Order Monitoring Program at AmerisourceBergen and,

15   therefore, his knowledge is of a slightly different nature.

16        THE COURT:  Yeah.  I'll overrule the objection.

17   Overruled.  Go ahead.

18        MS. MCCLURE:  I did not review this document with

19   Mr. Zimmerman.

20        BY MS. MCCLURE:

21   **Q.**   The next page, 1828 --

22   **A.**   Yes, ma'am.

23   **Q.**   Customer account type and size, are these things that

24   based on your understanding and knowledge of the process the

25   DEA reviewed in terms of AmerisourceBergen's new Order

1   Monitoring Program?

2   **A.**   Yes, they did.

3   **Q.**   And two more pages in, 1830, OMP item family and

4   threshold, are these also elements of the program that DEA

5   based on your understanding and understanding had -- had

6   involvement in and had -- was knowledgeable about at

7   AmerisourceBergen?

8   **A.**   Yes.  They -- they were in knowledge of the whole

9   process.

10   **Q.**   Okay, 1832.

11   **A.**   Okay.

12   **Q.**   The bottom, OMP review.  I want to go back to one

13   thing.  When Mr. Farrell was asking you some questions, he

14   was using the phrase "due diligence" when it comes to

15   reviewing a single order that has come in.  Is that

16   terminology correct as it is applied to AmerisourceBergen's

17   Order Monitoring Program?

18   **A.**   Well, for a single order, it would be more of an

19   investigation than due diligence.

20   **Q.**   So, is an investigation something that is limited to

21   that order then?

22   **A.**   It's typically that order and that customer.

23   **Q.**   Okay.  And is that called order review at

24   AmerisourceBergen?

25   **A.**   We have order review at the Distribution Center level

1    and then initially at CSRA, unless they determine it's

2    suspicious, and then they do a further investigation.

3    **Q.**    Okay.  And order review at AmerisourceBergen, does

4    Sales do order review or investigation?

5    **A.**    No, they do not.

6    **Q.**    Okay.  When it comes to a threshold increase, does

7    Sales play any role in a decision about whether to increase

8    a customer's threshold?

9    **A.**    No, they do not.

10   **Q.**    Circling back to P-187, which is that chart that you

11   described as showing the process flow for orders at

12   AmerisourceBergen, do you recall this chart?

13   **A.**    Yes, I do.

14   **Q.**    Based on your experience and knowledge having been

15   present with the DEA during their on-site time in May and

16   June of 2007, as well as the functionality reviews after the

17   Settlement Agreement, okay, did DEA have knowledge of the

18   following:  The use of customer type, sizing, drug product

19   family, peer groups, averages, use of multipliers and the

20   order monitoring process generally at AmerisourceBergen?

21             MR. FARRELL:  Objection, foundation and compound.

22             MS. MCCLURE:  I'm happy to break them up into

23   individual increments, Your Honor, but this is --

24             THE COURT:  Okay.  Do that, if you will, please.

25   Otherwise, the objection is sustained.

1          MS. MCCLURE:  Your Honor --

2          BY MS. MCCLURE:

3    **Q.**   I'm sorry.  Mr. Mays, based on your knowledge of DEA's

4    on-site activities at the time of the implementation of this

5    new program, did DEA have knowledge of our use of customer

6    type in the Order Monitoring Program?

7    **A.**   Yes, they did.

8    **Q.**   And how about sizing?

9    **A.**   Yes, they did.

10   **Q.**   Drug product families?

11   **A.**   Yes, they did.

12   **Q.**   Peer groups?

13   **A.**   Yes, they did.

14   **Q.**   Use of averages?

15   **A.**   Yes, they did.

16   **Q.**   Use of multipliers?

17          MR. FARRELL:  Objection, Your Honor, foundation.

18          THE COURT:  Well, overruled.  He's testified at

19   length about his familiarity with this program, hasn't he?

20          MR. FARRELL:  I believe what he's testifying to

21   now, Your Honor, is the question put to him does the DEA

22   have knowledge of the multiplier and no foundation has been

23   laid by this witness as to how he knows the DEA knows about

24   the multiplier.

25          MS. MCCLURE:  I'm happy to ask the question, Your

```
 1   Honor.

 2              BY MS. MCCLURE:

 3   Q.   Do you know, Mr. Mays, whether DEA is aware of that?

 4   A.   Yes, they were.

 5   Q.   How do you know that?

 6   A.   They were there when we were building that and

 7   determining what that multiplier should be and they

 8   understood what it was.

 9              THE COURT:  Okay, the objection is overruled.  Go

10   ahead.

11              BY MS. MCCLURE:

12   Q.   And the order monitoring process generally?

13   A.   Yes.

14   Q.   I'm sorry.

15   A.   Yes.  I'm sorry.

16   Q.   Thank you.  And beyond the Order Monitoring process,

17   did DEA have knowledge of our due diligence process?

18   A.   Yes, they did.

19   Q.   Review due diligence files?

20   A.   Yes, they did.

21   Q.   Review our documentation?

22   A.   Yes, they did.

23   Q.   Review the Diversion Control Program generally?

24   A.   Yes, they did.

25   Q.   Did AmerisourceBergen retain any consultants to audit
```

1     the OMP at any time?

2     **A.**    Yes, we did.

3     **Q.**    And was that retention limited to the Order Monitoring

4     Program or was it broader to include the Diversion Control

5     Program?

6     **A.**    It was broader.  It included the Diversion Control

7     Program.

8     **Q.**    Who was the consultant or consultants that

9     AmerisourceBergen retained?

10    **A.**    We retained Mike Mapes after he retired from DEA.

11    **Q.**    What was the first year that you recall Mike Mapes

12    performing an audit of our Diversion Control Program?

13    **A.**    I believe it was 2008.

14    **Q.**    Okay.  And he was no longer with DEA at this time?

15    **A.**    That's correct.

16    **Q.**    And why did you retain a consultant to audit the

17    Diversion Control Program?

18    **A.**    Well, because we wanted to make sure that it was

19    continually compliant and that any -- that any changes or

20    enhancements we were making would be acceptable to DEA and

21    that would be -- that would keep us compliant with what our

22    -- with our settlement.

23    **Q.**    And are you familiar with those audits?

24    **A.**    Yes, I am.

25    **Q.**    At the time that they were conducted?

1    **A.**   Yes.

2    **Q.**   Do you know whether Mr. Mapes met with individuals who

3    were in AmerisourceBergen's Diversion Control Program?

4    **A.**   Yes, he did.

5    **Q.**   Does that include the order reviewers who would be

6    reviewing orders?

7    **A.**   Yes.  He -- he met with the people, the person that was

8    running the program and also the investigators.

9    **Q.**   And who is the person who was running the program?

10   **A.**   Through most of that period, it was Ed Hazewski.

11   **Q.**   Do you recall the names of any other individuals that

12   Mr. Mapes would have met with?

13   **A.**   Let's see.  Joe Tomkiewicz, Kevin Kreutzer, David

14   Breitmayer.  I can't think of any others right now.

15   **Q.**   Would he have met with Liz Garcia?

16   **A.**   Yes.  Yes.

17   **Q.**   What -- who was Liz Garcia?

18   **A.**   She was one of our investigators.  She was a former DEA

19   Diversion Investigator.

20   **Q.**   And do you recall whether Mr. Mapes reviewed new

21   customer due diligence files during these audits?

22   **A.**   Yes, he did.

23   **Q.**   Did he review sales limits and threshold limits for our

24   Order Monitoring Program?

25   **A.**   I believe he did, yes.

1    **Q.**    Did he review the Do Not Ship List?

2    **A.**    Yes, he did.

3    **Q.**    Did he review our suspicious orders that had been sent

4    to the DEA?

5    **A.**    Yes, he did.

6    **Q.**    Did he review customer investigation files?

7    **A.**    Yes, he did.

8    **Q.**    Did he review threshold change requests?

9    **A.**    Yes, he did.

10   **Q.**    Do you recall approximately how long each of these

11   audits were?

12   **A.**    They were multiple days, several days.

13   **Q.**    Okay.  You've said that he -- he did an audit in 2008.

14   Do you remember how many times overall Mr. Mapes did audits

15   of the AmerisourceBergen Diversion Control Program?

16   **A.**    I believe there were about five.  Four or five.  Maybe

17   five.

18   **Q.**    Do you remember what Mr. Mapes' general conclusions

19   were about the audits of the Diversion Control Program?

20   **A.**    Yes.  Each time, I think in every case, he said that it

21   was fully compliant and working as designed.

22   **Q.**    Did Mr. Mapes ever conclude that the Diversion Control

23   Program was not operating as designed?

24   **A.**    No, he did not.

25   **Q.**    Did Mr. Mapes ever conclude that the Diversion Control

1    Program was not operating in compliance with

2    AmerisourceBergen's policies and procedures?

3    **A.**   No, he did not.

4    **Q.**   Did Mr. Mapes ever conclude that AmerisourceBergen's

5    Diversion Control Program was not operating consistent with

6    the statute or the governing regulations?

7    **A.**   No, he did not.

8    **Q.**   Mr. Mays, during the 2000-2010 time period, do you have

9    general awareness as to what was happening with DEA quotas?

10   **A.**   Yes.

11   **Q.**   What is your general awareness?

12   **A.**   My general awareness is -- was that I think pretty much

13   on an annual basis they kept raising the quotas.

14          MR. FARRELL:  Objection, Your Honor.  During

15   examination, the testimony was elicited that the Diversion

16   Control Program did not rely upon quotas when performing its

17   function.

18          MS. MCCLURE:  Your Honor, Mr. Farrell asked Mr.

19   Mays whether the quotas were relied upon.  I'm asking a

20   different question as to whether Mr. Mays had general

21   awareness as to the quotas.

22          THE COURT:  Yes, overruled.  He's talking about

23   his own awareness and knowledge.  Overruled.

24          BY MS. MCCLURE:

25   **Q.**   Mr. Mays, have you ever visited the Lockbourne

1    Distribution Center?

2    **A.**   Yes, I have.

3    **Q.**   And is that the Distribution Center that services the

4    Huntington-Cabell, West Virginia area?

5    **A.**   I believe it is, yes.

6    **Q.**   If I showed you photographs of that Distribution

7    Center, would you recognize them?

8    **A.**   Yes, ma'am.

9    **Q.**   Okay.

10          MS. MCCLURE:  AMWV-2644E, which is an excerpt of

11   several photographs --

12        May I approach, Your Honor?

13          THE COURT:  Yes.

14          MS. MCCLURE:  Richie, if you could put these up on

15   the screen, please.

16          BY MS. MCCLURE:

17   **Q.**   Mr. Mays, based on your knowledge, does this reflect

18   photographs of the Lockbourne Distribution Center?

19   **A.**   Yes, it does.

20   **Q.**   Okay.  If we could flip through the photos, Richie.

21   Sorry.  Go back one.  Okay, next.  And next.  And next.

22          BY MS. MCCLURE:

23   **Q.**   And, Mr. Mays, what does this photograph depict based

24   on your knowledge?

25   **A.**   It -- it depicts our Schedule II controlled substance

```
 1    vault.

 2    Q.   So, is that a door that is open to the vault at this

 3    time?

 4    A.   Yeah.  That is the actual vault door that's opened and

 5    then there's a day gate inside the vault door that has to

 6    stay closed and locked at all times.

 7    Q.   Okay.  So, this door is open right now.  When that door

 8    closes, you're saying it has to remain closed and locked?

 9    A.   Yes.  Whenever that vault door is open, the day gate

10    has to be self-closing, self-locking.

11    Q.   Oh, I understand.  Thank you.

12              MS. MCCLURE:  May I have a moment to confer with

13    counsel, co-counsel, Your Honor?

14              THE COURT:  Yes.

15         (Pause)

16              MS. MCCLURE:  Your Honor, I move for the admission

17    of AM-WV-2644E, the four photographs that Mr. Mays has

18    testified about.

19              THE COURT:  Is there any objection?

20              MR. ACKERMAN:  I'm just curious as to when these

21    photographs were taken.  That's all.

22              BY MS. MCCLURE:

23    Q.   Mr. Mays, do these photographs, to your knowledge,

24    depict the current state of the Lockbourne Distribution

25    Center generally?
```

1  **A.**   I believe they do.

2          THE COURT:  They're admitted.

3              **DEFENSE EXHIBIT AM-WV-2644E ADMITTED**

4          MS. MCCLURE:  Your Honor, I have no further

5  questions at this time subject to recross.

6          THE COURT:  Mr. Farrell, do you have any redirect?

7          MR. FARRELL:  Yes, Your Honor.

8                  **REDIRECT EXAMINATION**

9          **MR. FARRELL:**

10  **Q.**   Good morning, Mr. Mays.

11  **A.**   Good morning, sir.

12  **Q.**   Just a couple of follow-up questions.  Do you recall

13  the Excessive Purchase Order Report you were shown yesterday

14  from the Orlando distribution facility?

15  **A.**   Yes, sir, I am.

16  **Q.**   Okay.  Have you seen any of -- evidence of similar

17  reports like this, but pertaining to the Lockbourne/Columbus

18  facility.

19          MS. MCCLURE:  Your Honor, I request clarification

20  as to the time frame.  Have you seen ever or --

21          THE COURT:  Sustained.

22          BY MR. FARRELL:

23  **Q.**   Is there any evidence today of any of these Excessive

24  Order Reports that you've seen regarding the Lockbourne,

25  Ohio facility?

1    **A.**   I don't remember seeing them, but they're the same for

2    every DC.

3    **Q.**   And have you been shown these same things, but for the

4    Lockbourne facility?

5    **A.**   I don't remember seeing them, no.

6          MR. FARRELL:  Can we pull up AM-WV-0006 if we have

7    it?

8          BY MR. FARRELL:

9    **Q.**   Sir, do you recall the base level document that you

10   reviewed yesterday?

11   **A.**   Yes, sir, I do.

12   **Q.**   And if you look at it, this is what I believe you said

13   was posted on the vault cages and that would be the vault

14   that we just saw the picture of, correct?

15   **A.**   It's posted inside the vault and the cage and, in most

16   cases, they're two separate storage facilities.

17   **Q.**   And so, this is the process, the OMP process?  This is

18   the rules for the pickers and packers to follow when

19   exercising the duty to maintain effective control; agreed?

20   **A.**   That's the base levels that they use when they're

21   filling the orders for controlled substances, yes.

22   **Q.**   And the third full paragraph says, "Every controlled

23   substance order received in the vault or cage will be

24   closely inspected by the order clerks prior to filling to

25   determine if quantities ordered may be excessive."  Do you

1    see that, sir?

2    **A.**   Yes, I do.

3    **Q.**   And the next sentence is in bold and it says, "Any

4    ordered quantities above the following basic parameters must

5    be brought to your supervisor's attention."  Do you see

6    that, sir?

7    **A.**   Yes, I do.

8    **Q.**   Now, if there is an order that is brought to the

9    supervisor's attention, would you expect there to be

10   documentation of that?

11   **A.**   I would expect that supervisor to do what they're

12   required to do.  I couldn't tell you whether they documented

13   it every time.

14   **Q.**   Now, you'll see here the first line says, "Bottle of

15   100 above ten."  Do you see that?

16   **A.**   Yes, sir.

17   **Q.**   So, is it fair to say that that is an order in excess

18   of a thousand pills must be brought to the supervisor's

19   attention inside the cage?

20   **A.**   That's what it says, yes.

21   **Q.**   And, sir, have you gone back to look at how many orders

22   placed by SafeScript Pharmacy #6 with the Lockbourne, Ohio

23   distribution facility exceeded a thousand pills?

24   **A.**   I couldn't tell you what the number is, no.

25   **Q.**   Would you be surprised if there are 743 orders totaling

```
1    2.9 million dosage units of hydrocodone and oxycodone that

2    exceed 1,000?

3              MS. MCCLURE:  Your Honor, again, request time

4    frame.  He's aggregating orders and I request that -- the

5    witness can't respond to that question absent a time frame.

6              THE COURT:  What's the time frame, Mr. Farrell?

7              BY MR. FARRELL:

8    Q.  Would you be surprised that after enactment of this

9    February, 2007 policy there are 743 orders placed by

10   SafeScript Pharmacy to AmerisourceBergen that exceed a

11   thousand pills?

12             MS. MCCLURE:  Your Honor, same objection.

13             THE COURT:  You have to -- from 2000 when?  From

14   when to when?

15             BY MR. FARRELL:

16   Q.  Well, the SafeScript Pharmacy, as we discussed

17   yesterday, was shut down in February of 2012.  So, between

18   February of 2007 and February of 2012, would you be

19   surprised that there are 743 orders placed and filled by

20   SafeScript Pharmacy to AmerisourceBergen that exceeded a

21   thousand pills?

22   A.  That's a fairly long time frame.  I don't know if I

23   would be surprised if that was -- if that's their normal

24   volume and there's no indications of diversion, then there

25   must be some heavy subscribing -- prescribing by doctors in
```

1    that area.

2    **Q.**    In fact, it wouldn't be heavy by your own policy; it

3    would be excessive, would it not?

4                MS. MCCLURE:  Objection, Your Honor.

5                THE COURT:  Basis?

6                MS. MCCLURE:  That Mr. Mays has asked the question

7    and Mr. Farrell is just continuing to harass Mr. Mays.

8                THE COURT:  Well, this is in the nature of cross

9    examination since the witness represents an adverse party,

10   so I'm going to overrule the objection.

11               THE WITNESS:  Could you repeat the question?  I'm

12   sorry.

13               BY MR. FARRELL:

14   **Q.**    I'll try.  The pills by definition in AM-WV-0006, the

15   volume of pills or orders in excess of a thousand by

16   definition are excessive; agreed?

17               MS. MCCLURE:  Objection, Your Honor.

18   Misrepresents the document which indicates on its face what

19   it says, which is may be excessive.

20               THE COURT:  Well, haven't you already basically

21   asked him that?

22               MR. FARRELL:  Yeah.  I'm trying to be a little

23   more direct and create a clean record.

24               THE COURT:  Okay, I'll -- go ahead.  Overruled,

25   but let's get -- let's get this done.

1               THE WITNESS:  Okay.  So, the document says, "The

2     quantities may be excessive" and then that just -- those

3     numbers are a guideline.  It says, "Order quantities above

4     following basic patterns must be brought to the supervisor's

5     attention."  They're not deeming those excessive.  They're

6     saying they may be.

7               BY MR. FARRELL:

8     **Q.**   And you were handed a stack of documents of nine

9     investigations that took place in the year 2007 in Cabell

10    County, correct?

11    **A.**   That's correct.

12    **Q.**   Have you seen any other documentation of those

13    investigations for those nine investigations?

14    **A.**   Those are the only ones I have seen.

15    **Q.**   And are those the types of documents you would expect

16    to see in a due diligence file?

17    **A.**   No.  There's a lot more.  You've got the questionnaire.

18    There's a lot that's done in the due diligence

19    investigation.  All that is, is a summary.

20    **Q.**   All right.  So, where would we find all of those

21    documents in the files at AmerisourceBergen?  Would they be

22    in a -- would they be in a central location or would they be

23    in several locations?

24               MS. MCCLURE:  Your Honor, two objections.  One is

25    that's a compound question.  The second is there's no

 1    question that these materials were provided to the

 2    plaintiffs.  So, I'm not understanding how the witness

 3    should be able to direct him to information that plaintiffs

 4    already have.

 5              THE COURT:  Well, what's the purpose of the

 6    question?

 7              MR. FARRELL:  Judge, the purpose of the question

 8    is to identify the source of the document so that I can

 9    identify whether or not this is the complete set of

10    documents and so I'm trying to ask --

11              THE COURT:  Okay, overruled.  I'll let you -- I'll

12    let him answer.  Go ahead.

13              BY MR. FARRELL:

14    Q.   So, for purposes of this specific investigation, are

15    you aware of any other documents in AmerisourceBergen's

16    possession related to those nine investigations?

17    A.   There would be additional documentation in the file.

18    That's a -- let me finish.  That's a LawTrac matter and,

19    depending on the age of it, there could be hard copy files

20    stored at Iron Mountain.  There could be hard copy files

21    stored at Corporate.  I just couldn't tell you where they

22    are, but there's documentation on all due diligence

23    investigations.

24    Q.   Yes, sir.  My question to you is, have you seen any

25    other documentation for those nine investigations?

1    **A.**   I don't recall seeing it over the years, no.

2    **Q.**   Okay.  Aside from those nine investigations, are you

3    aware of any other investigations in Huntington-Cabell

4    County, West Virginia after June of 2007?

5    **A.**   I'm sure there were, but I'm not aware of them.  I'm

6    not familiar with them.

7    **Q.**   And those June, 2000 investigations coincide with the

8    DEA's immediate suspension order and the settlement that was

9    effectuated in June of 2007; agreed?

10   **A.**   It was during that same time frame as the settlement,

11   yes.

12   **Q.**   Now, we talked about briefly the September, 2007 Chris

13   Zimmerman presentation, along with the DEA.  You would agree

14   with me, sir, that the imposition of the new Order

15   Monitoring Program by AmerisourceBergen was costing

16   AmerisourceBergen business and customers; agreed?

17   **A.**   I'm not sure about that.

18          MR. FARRELL:  Judge, I'm going to have marked and

19   present P-17118.

20       May I approach, Your Honor?

21          THE COURT:  Yes.

22          BY MR. FARRELL:

23   **Q.**   I'll give you a minute to review this, sir.  Sir, do

24   you recognize this document?

25   **A.**   Well, it's -- I'm copied on it.  I just -- I don't

```
 1    remember it, but I'm copied on it, so --

 2    Q.   So, what is this document?

 3    A.   It's an e-mail string from Sales, between Sales.  I

 4    think it's the -- the VP of Retail Sales and Chris

 5    Zimmerman.

 6              COURT REPORTER:  I'm sorry.  What did you -- the

 7    VP --

 8              THE WITNESS:  The VP of Retail Sales.  I'm sorry.

 9              BY MR. FARRELL:

10    Q.   Is this an e-mail chain to and from you that is dated

11    around September 7th, 2007 that was a document that you

12    would expect to be retained in the usual course of business?

13    A.   Can you repeat that?

14    Q.   Yeah.  That was a bad question.

15         This is an e-mail chain that you're included on?

16    A.   Yes.

17    Q.   And it involves other people in the Control Diversion

18    Program, agreed?

19    A.   I don't believe so.  I think it's -- these are -- these

20    are all sales and management people.  So, Chris and I are

21    the only people from CSRA on this string, from what I can

22    tell.

23    Q.   Who is John Chou?

24    A.   He's a General Counsel for the corporation.

25    Q.   And who is James Frary?
```

1   **A.**   He is -- he was like -- I think, at that time, he was a

2   Regional Vice President of Sales or something like that.

3   **Q.**   Do you see the subject line says RE, and a colon, and

4   what does it say?

5   **A.**   Which -- on which entry are you talking about, the top?

6   **Q.**   The subject line on all of the e-mails in this chain

7   says what?

8   **A.**   "OMP".

9   **Q.**   And what does that stand for?

10   **A.**   Order Monitoring Program.

11   **Q.**   This is a conversation about the presentation Mr.

12   Zimmerman was about to make; agreed?

13   **A.**   It's a part of it, yes.

14   **Q.**   And in this e-mail chain, those that are involved in it

15   are commenting upon the fact that the DEA is requiring

16   AmerisourceBergen to implement a new procedure, which is

17   costing it money and customers; agreed?

18   **A.**   Seems to be one of the sales guy's opinions, yes.

19   **Q.**   And one of the other opinions is, is that there was

20   speculation that the DEA was going to do the same for the

21   other distributors, thereby leveling the playing field;

22   agreed?

23   **A.**   Yeah.  I think that's what's being alluded to, yes.

24          MR. FARRELL:  Judge, I would ask P-17118 to be

25   admitted for the record.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1              MS. MCCLURE:  You Honor, we do object to the
 2    extent this is hearsay, but would want to know if there's a
 3    limited purpose for which it's offered.
 4              MR. ACKERMAN:  Your Honor, 801 -- or 801(d)(2)(D).
 5    It's not hearsay because they are statements made by the
 6    party's employee on a matter within the scope of that
 7    relationship and while it existed.
 8              THE COURT:  Okay.  Cite the rule to me again
 9    slowly.
10              MR. ACKERMAN:  Sure.  We should probably flag this
11    one, Your Honor.  801(d)(2)(D).
12              THE COURT:  "Statements offered against an
13    opposing party is one the party manifested that is adopted
14    and believed to be true"?
15              MR. ACKERMAN:  I'm sorry.  "D", as in dog.
16              THE COURT:  "D", as in dog?
17              MR. ACKERMAN:  Yes.  My apologies.
18              THE COURT:  "On a matter within the scope of that
19    relationship and while it existed."
20         I'm going to -- I'm going to admit it.  It's admitted.
21              PLAINTIFF EXHIBIT P-17118 ADMITTED
22              BY MR. FARRELL:
23    Q.   One final question.  You talked about in October of
24    2004 that the DEA provided a Certificate of Appreciation to
25    AmerisourceBergen and to you for your efforts.
```

**A.**    Yes, sir.

**Q.**    Are you -- are you aware of any similar commendations from the DEA to AmerisourceBergen following the Distributor Initiative Program that was launched in 2005?

**A.**    Not that I recall, sir.

MR. FARRELL:  That's all the questions I have, Judge.  Thank you.

MS. MCCLURE:  Your Honor, one brief -- and, Your Honor, this is not a question for the witness.  However, plaintiffs have admitted P-23655, which is AmerisourceBergen Drug Corporation's fourth supplemental objections and responses to plaintiffs' first combined discovery requests to distributors.  In doing so, they entered the responses themselves.

However, there are appendices referenced within these responses, which are Appendix A, ABDC policies and procedures produced in the MDL, and then Appendix B, which is referenced in here, is described as additional documents reflecting due diligence materials relating to its customers located in the City of Huntington and Cabell County.

And so, this is the Appendix B and we would -- unfortunately, I don't have copies of this.  So, what I would request is that for completeness Appendix A and B be added into P-23655 and that I be afforded an opportunity to present to the Court the documents once we have a chance to

```
 1    photocopy them.

 2              THE COURT:  Mr. Farrell?

 3              MR. FARRELL:  No objection.

 4              THE COURT:  All right.  They're all admitted.

 5          PLAINTIFF EXHIBIT P-23655 ADMITTED

 6              MS. MCCLURE:  Thank you, Your Honor.  I have no

 7    more -- further questions for Mr. Mays.

 8              THE COURT:  Is there anything else of Mr. Mays?

 9              MR. FARRELL:  No, Your Honor.  He may be

10    dismissed.

11              THE COURT:  Mr. Mays, you have a big smile on your

12    face and --

13              THE WITNESS:  I'm going to get out of here.

14              THE COURT:  Thank you, sir, very much and you're

15    free to go.

16              THE WITNESS:  Thank you.  Thank you, Your Honor.

17              THE COURT:  And we appreciate your being here.

18         And let's take a short break.  We have to have a little

19    bit of mercy on our court reporters here and we'll be in

20    recess for about ten minutes.

21         (Recess taken)

22              THE COURT:  Are you ready to call your next

23    witness?

24              MR. FARRELL:  Yes, Your Honor.

25              MR. KENNEDY:  Your Honor, we are calling Michael
```

1    Perry.

2            THE COURT:  Okay.  We'll need your name for the

3    court reporter.

4            MR. KENNEDY:  Yes, Your Honor.  I was coming up to

5    do that.  Yes, my name is Eric Kennedy, for the plaintiffs.

6            COURTROOM DEPUTY CLERK:  Sir, would you please

7    state your full name?

8            THE WITNESS:  My full name is Michael Gerard

9    Perry.

10           COURTROOM DEPUTY CLERK:  Thank you.  Please raise

11   your right hand.

12           **MICHAEL G. PERRY, PLAINTIFF, SWORN**

13           COURTROOM DEPUTY CLERK:  Thank you.  Please take a

14   seat.

15           THE COURT:  Good morning, Mr. Perry.

16           THE WITNESS:  Good morning, Judge.

17           THE COURT:  Okay, Mr. Kennedy, you may proceed.

18           MR. KENNEDY:  Thank you, Your Honor.

19                       **DIRECT EXAMINATION**

20           **BY MR. KENNEDY:**

21   **Q.**  Mr. Perry, my name is Eric Kennedy.  How are you today,

22   sir?

23   **A.**  Very good, sir.

24   **Q.**  And, for the record, could you please state your full

25   name?

1   **A.**   My full is Michael Gerard Perry.

2   **Q.**   Where do you live, sir?

3   **A.**   I live in Huntington, West Virginia.

4   **Q.**   And I have been told that you are retired from

5   AmerisourceBergen; is that correct?

6   **A.**   Yes, sir.

7   **Q.**   And when did you retire?

8   **A.**   I retired January 6th of 2020.

9   **Q.**   And did you retire and leave there on good terms, sir?

10   **A.**   Yes, sir.

11   **Q.**   And what do you -- what are you currently doing with

12   your time?

13   **A.**   Well, for the past year or so, I've been dealing with

14   this, which is -- I still feel is a responsibility not only

15   for me, but for the community.  I have -- I've lived in

16   Huntington for 40-some years and one of my passions is

17   gardening.  I love the outdoors.  And I've been spending a

18   lot of time not only in the garden, but on the golf course

19   and trying to, you know, enjoy my retirement.

20   **Q.**   Very good.  When did you begin employment with

21   AmerisourceBergen?

22   **A.**   Roughly, it was around 1996.  I believe it was May the

23   1st of 1996.

24   **Q.**   And what was your position when you started?

25   **A.**   Sales Executive.

```
 1    Q.    And how long did you remain in that position?

 2    A.    I remained in that position until I retired and that

 3    would have been 24 years.

 4    Q.    That position involve direct sales to pharmacies?

 5    A.    Yes.

 6    Q.    And when I say "direct sales", you would make sales

 7    calls?

 8    A.    That's correct.

 9    Q.    Your title, you said, Sales Executive.  Has that been

10    known by a different title at times?

11    A.    It -- at one time or another, you may have been called

12    a sales manager, you may have been called, you know, a

13    salesman, but when I retired, I was a sales executive.

14    Q.    I'm going use the term sales executive, sales manager.

15    Sometimes I may even say sales rep.  So, you understand that

16    I'm trying to say the same thing all the time?

17    A.    Yes, sir.

18    Q.    Okay.  Now, did you have a territory?  Did you have a

19    territory that you were responsible for at

20    AmerisourceBergen, a sales territory?

21    A.    Yes.

22    Q.    And can you describe that for us?

23    A.    When -- when you say describe it, I could describe it

24    in several different ways because I had numerous

25    territories.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    Q.   All right.  Geographically?
 2    A.   Yes.
 3    Q.   Tell us geographically, if you could describe that.
 4    A.   I had a territory in Eastern Kentucky for a period of
 5    time.  I had a territory in West Virginia for a period of
 6    time.  I had a territory in West Virginia and Pittsburgh for
 7    a period of time.
 8    Q.   Was there a period of time when -- when Cabell County
 9    was a part of your sales territory?
10    A.   Yes.
11    Q.   Can you tell me for what period of time?
12    A.   The exact period of time?  I would say 90% of the time
13    that I was a sales executive with AmerisourceBergen, I had
14    Cabell County.
15    Q.   So, most of the 24 years?
16    A.   Yes, sir.
17    Q.   How many customers?  I mean, I know it can vary at
18    times, but -- but approximately how many customers would you
19    serve at any one time?
20    A.   In the entire territory?
21    Q.   Yes, sir.
22    A.   That would vary, also, but for most of the time, it
23    would have been anywhere between 65 to maybe 80 customers.
24    Q.   How often would you see them?
25    A.   Quite often.
```

```
1    Q.   Once a month, every two months?

2    A.   At least once a month.

3    Q.   How many customers in Cabell County on the average if

4    we look over the 24 years?

5    A.   That's going to vary, also.  You know, customers come

6    and go.  Stores open and close.  I would say probably no

7    more than ten.  That might be a little low.  10-12 possibly.

8    Q.   Basically, you sold goods and services to pharmacies;

9    true?

10   A.   That's correct.

11   Q.   And would that include the sale of controlled

12   substances?

13   A.   That included all pharmaceuticals and OTCs.

14   Q.   Would that include the sale of controlled substances?

15   A.   That is a pharmaceutical.

16   Q.   So, that would include opioids?

17   A.   That is a pharmaceutical.

18   Q.   Oxycodone?

19   A.   That is a pharmaceutical.

20   Q.   Hydrocodone?

21   A.   That also is a pharmaceutical.

22   Q.   Fentanyl?

23   A.   That is a pharmaceutical.

24   Q.   Methadone?

25   A.   That is a pharmaceutical.
```

```
 1   Q.   Schedule III along with Schedule II?

 2   A.   Yes, sir.

 3   Q.   Let's talk about how you were compensated, if we could.

 4   A.   Okay.

 5   Q.   You received a base salary; would that be true?

 6   A.   That's correct.

 7   Q.   And then, in addition to the base salary, would I be

 8   correct that you could make a significant amount of money in

 9   addition to your base salary based upon a bonus system that

10   was set up by AmerisourceBergen?

11   A.   That's correct.

12   Q.   And that -- that bonus system basically had sales goals

13   or targets and, if you could hit the sales goal or target,

14   you could make additional money?

15   A.   Yes, sir.

16   Q.   And, sir, if you exceeded your sales target, could you

17   make even more money?

18   A.   Yes.

19   Q.   And annually, would I be correct, annually you would

20   get a compensation package from AmerisourceBergen each year;

21   true?

22   A.   That's correct.

23   Q.   Pretty detailed package that would outline your targets

24   or your goals for the year and how much you could make in

25   bonus money if you were to hit those targets?
```

1    **A.**   That's correct.

2    **Q.**   The first line -- and you may not remember this.  The

3    first line of each of those annual contracts would indicate

4    that this has been established and set up to motivate you to

5    sell; do you recall that, sir, the very first line in each

6    of those annual compensation packages?

7    **A.**   Well, as a salesperson, I'm always motivated to sell.

8    Any salesperson would be motivated to sell.

9    **Q.**   Mr. Elkins was your immediate boss for a period of

10   time?

11   **A.**   Yes.

12   **Q.**   And would I be correct in saying he told us that the

13   more you would sell, because you were a part of his

14   territory, the more you would sell, that would make it

15   easier for him to make more money in the bonus system?

16            MR. NICHOLAS:  Objection, hearsay, lack of

17   foundation.

18            THE COURT:  Overruled.  I'll let him answer.  Go

19   ahead.

20            BY MR. KENNEDY:

21   **Q.**   Sir, you're familiar with that's how the system worked?

22   **A.**   Could you re-state your --

23   **Q.**   You were a part of Mr. Elkins' territory, correct?

24   **A.**   Yes.

25   **Q.**   And did you understand that the more you would sell,

1    the more sales there would be in his larger territory; so,

2    therefore, he could do better?

3    **A.**    That's correct.

4    **Q.**    And above Mr. Elkins was Lisa Mash.  She was the VP of

5    Sales, do you -- you know that?

6    **A.**    Yes.

7    **Q.**    You know her?

8    **A.**    Yes.

9    **Q.**    And she had an even larger territory than Mr. Elkins,

10   correct, a larger geographic region; is that true?

11   **A.**    Yes.

12   **Q.**    And so, the better Mr. Elkins' territory did as a part

13   of her territory, the more money she could make via the

14   bonus system?

15         MR. NICHOLAS:  Objection, Your Honor.  At this

16   point, I think I would like to object to the leading nature

17   of the questions.  I do recognize that this witness is a

18   former AmerisourceBergen employee, but I think the case law

19   is pretty clear in the Fourth Circuit and generally that

20   until the witness is established as actually adverse or

21   hostile that the questions should not be leading in nature

22   in this fashion.

23         THE COURT:  Yes.  I will sustain the objection.

24      Try not to lead him, Mr. Kennedy.

25         MR. KENNEDY:  Your Honor, if you look to Rule 611

1    in the case law, Your Honor, there seem to be two factors

2    with respect to ex-employees.  Number one, did they leave

3    the company on good terms and a good relationship; and,

4    number two, did their job in any way relate to the subject

5    matter of the lawsuit.  He was the salesperson with respect

6    to this lawsuit.  Based upon those two factors, Your Honor,

7    we believe that we should be allowed to lead.

8              THE COURT:  Well, Mr. Nicholas?

9              MR. NICHOLAS:  Well, I don't have much more to say

10   except that I did go to the trouble of having -- looking at

11   the law myself and having a little memo done on it and it

12   looks to me as if the bottom line test here is whether -- is

13   the demeanor -- is the demeanor of the witness during --

14   during the -- during the examination.

15      I think it's in the Court's discretion to decide

16   whether this witness is a hostile witness.  I don't think

17   any -- we've heard anything yet to suggest that in the

18   slightest.

19             THE COURT:  Well, I think that's right.  Rule

20   611(c)(2) allows you to lead if the witness is hostile, an

21   adverse party, or a witness identified with an adverse

22   party.  I don't think that you've identified him

23   sufficiently as an adverse party because he's retired and

24   he's not working for them anymore.  So, I'm going to sustain

25   the objection.

1              BY MR. KENNEDY:

2     **Q.**   Sir, did -- I don't know anything that was said or

3     transpired.  Did you meet with counsel, the attorneys

4     representing AmerisourceBergen, to prepare for your

5     testimony today, sir?

6     **A.**   Yes.

7     **Q.**   On how many occasions?

8     **A.**   I believe that was -- are you talking in person or are

9     you talking as Zoom meetings plus in person?

10    **Q.**   Yes, sir, Zoom meetings plus in person?

11    **A.**   Six, seven times maybe.

12             MR. KENNEDY:  Your Honor, I think that that alone

13    should -- should satisfy the requirements as a --

14             THE COURT:  I've sustained the objection, Mr.

15    Kennedy.  You may proceed with your direct and if he becomes

16    hostile, then I'll re-visit it.

17             MR. KENNEDY:  Thank you.

18             THE COURT:  But for now, get on with it.

19             BY MR. KENNEDY:

20    **Q.**   Sir, how long of a period of time were opioids a part

21    of your bonus calculation?

22    **A.**   I can't say that, what the period of time was.

23    **Q.**   Was there a period of time that opioids were a part of

24    your bonus calculation?

25    **A.**   I don't know if they were or they weren't in a period

```
 1    of time.

 2    Q.    You did not know?

 3    A.    No, sir.

 4    Q.    Sir, controlled substances, the larger category, for

 5    what period of time were controlled substances, if you know,

 6    part of your bonus calculation?

 7    A.    I don't know that either, sir.

 8    Q.    As you sit here today, you don't know?

 9    A.    No, sir.

10    Q.    Controlled substances could be -- could controlled

11    substances be a significant portion of your sales to an

12    individual pharmacy?

13    A.    Could you say that again?

14    Q.    Could controlled substance sales be a significant

15    portion of your sales, total sales, to a pharmacy?

16    A.    I mean, every pharmacy varies.

17    Q.    So, could they be a significant part?  I know that they

18    clearly vary, but could they be a significant portion of

19    your total sales?

20    A.    I can't say if they would be a significant part or not.

21    Q.    Sir, do you -- do you recall that at one point that

22    86% percent of your sales to SafeScript were controlled

23    substances?

24    A.    I was not privy to that information.

25                MR. KENNEDY:  Could we bring up P-16642, please?
```

```
 1          Your Honor, may I approach the witness?

 2               THE COURT:  Yes.

 3               BY MR. KENNEDY:

 4   Q.   Mr. Perry, have you had a chance to take a look?

 5   A.   Yes, sir.

 6   Q.   And do you know who Ed Hazewski is?

 7   A.   Yes.

 8   Q.   And did he send you an e-mail?  And if you take a look

 9   here, it appears he sent you an e-mail on August 12th of

10   2011, do you see that, to Michael Perry?

11   A.   Yes.

12   Q.   And does he say "The customer", and he's talking about

13   SafeScript.  That's the subject, correct?

14   A.   That's correct.

15   Q.   And does he state, "The customer has been adjusted and

16   is now set at the maximum they can receive of this product.

17   Their controlled substance ratio is 86% of their overall

18   purchases"?  Do you see that?

19   A.   Yes.

20   Q.   So, sir, at one point in time, you knew that there was

21   an 86% controlled substance ratio with respect to

22   SafeScript, true?

23   A.   At this point in time, yes.

24   Q.   All right.  And controlled substance ratio, that's the

25   total sales amount for controlled substances over the total
```

1  sales amount; true?

2  **A.**   Yes.

3  **Q.**   Sir, I think you indicated that you were always

4  motivated to sell.  Would that include always having

5  motivation to keep the customer happy and satisfied?

6  **A.**   Yes.  My goal as a salesman was always to make sure

7  that I did and followed through with a request from the

8  customer in the best interest for the customer and for the

9  company.

10  **Q.**   And, sir, did you interact at all with Regulatory

11  Affairs throughout your 24 years?

12  **A.**   On different occasions, yes.

13  **Q.**   And you understood that a part of their responsibility

14  was to monitor and control the shipments of controlled

15  substances, the pharmacy?

16  **A.**   That's correct.

17  **Q.**   And, sir, given the sales force and the motivation to

18  keep the customer happy and the responsibility of the

19  Regulatory Affairs folks to control and, at times, limit the

20  sale of opioids, was there a conflict that existed between

21  those two departments at AmerisourceBergen?

22          MR. HESTER:  Object as compound, Your Honor.

23          THE COURT:  Break it up, Mr. Kennedy, and you can

24  ask him.

25          MR. KENNEDY:  Yes, Your Honor.

1          BY MR. KENNEDY:

2     **Q.**   Sir, given the role that you had to keep the customer

3     happy, given the role of Regulatory Affairs to limit the

4     sale of opioids, was there, at times, a conflict that

5     existed between those two departments at AmerisourceBergen?

6     **A.**   I wouldn't call it a conflict.  There may be

7     conversation back and forth with regards to what we needed

8     to do and how we needed to proceed.

9     **Q.**   And can you be more specific?

10    **A.**   Let's say, for instance, a customer wanted to have a

11    threshold review on a particular item that we said we will

12    not ship.  Of course, I would take that, we would do a

13    threshold review, and bring back the answer to the customer

14    with regards to if we would ship or not.

15         MR. KENNEDY:  Can I bring up P-02504, please?

16       May I approach, Your Honor?

17           THE COURT:  Yes.

18         MR. KENNEDY:  Thank you.

19         MR. NICHOLAS:  Your Honor, before we have

20    questioning on this document, I will interpose at least one

21    and possibly two objections.  One is this appears to be a

22    discussion -- discussion or an e-mail chain involving a

23    Tennessee customer.  So, that's -- that's number one.  It's

24    a geographic scope issue.

25       And, number two, Mr. Perry is not on this document.

1    So, I'm going to ask that some foundation be laid or -- and

2    the document not otherwise be used at this time.

3              THE COURT:  Can you lay a foundation, Mr. Kennedy?

4              MR. KENNEDY:  We believe so, Your Honor.

5              THE COURT:  Okay, go ahead.

6              BY MR. KENNEDY:

7    **Q.**   Sir, your compensation system, was that a national

8    system at AmerisourceBergen?

9    **A.**   Yes.

10   **Q.**   And the Regulatory Affairs, sir, with respect to

11   Regulatory Affairs, beginning in '07, did you receive

12   training with respect to the responsibilities and

13   obligations of Regulatory Affairs?

14   **A.**   Yes.

15   **Q.**   And did that continue each year up until the time of

16   your retirement?

17   **A.**   Yes.

18   **Q.**   And, later on, it actually became a part of, I think, a

19   website that you could go on and get your training at a

20   website and then take a test; true?

21   **A.**   Yes.  We would do it by website and we would also have

22   sales meetings where we would have our Regulatory Affairs

23   Team come in and, you know, do different things with us with

24   regards to our CSRA site.

25             MR. NICHOLAS:  Your Honor, I don't want to

```
1    interrupt.  Could we have the document taken down and -- you

2    know, until --

3              THE COURT:  Yes, please.

4              MR. NICHOLAS:  Thank you.

5              MR. KENNEDY:  I'm sorry.

6              BY MR. KENNEDY:

7    Q.   And so, did you understand that also to be a national

8    program?

9    A.   Yes.

10             MR. KENNEDY:  Your Honor, we would like to proceed

11   with questioning.  We believe this --

12             THE COURT:  Go ahead.

13             MR. NICHOLAS:  Your Honor, the -- if I just -- I

14   don't want to prolong this, but this does pertain to a

15   Tennessee customer and I'm not sure that it's appropriate

16   for questioning because of the geographic nature of it and

17   the fact that he has no involvement in this.

18             MR. RUBY:  And, Your Honor, we would join in that,

19   as well.  If the suggestion is that simply because there was

20   some sort of national policy that any instance that happened

21   anywhere in the country, therefore, becomes relevant in this

22   case about Cabell County and Huntington, we don't think

23   that's consistent with the Court's ruling on geographic

24   scope.

25             THE COURT:  Well, I think it might be relevant to
```

```
 1    show the general attitude and state of mind of the company

 2    overall, including the geographical area at issue here, and

 3    I'm going to overrule that objection.

 4         Go ahead, Mr. Kennedy.

 5              MR. KENNEDY:  Thank you, Your Honor.

 6              MR. RUBY:  Your Honor, if we could, there's a

 7    separate foundation issue.  I still don't think there's been

 8    foundation laid with this witness.  His name, as far as -- I

 9    just glanced at this, but I don't see his name anywhere on

10    it.

11              THE COURT:  Yes.  You will have to lay a

12    foundation that shows this witness has some knowledge, Mr.

13    Kennedy, but you can go ahead and try to do that.

14              MR. KENNEDY:  Your Honor, my -- this witness is

15    not on this e-mail and my intention was to go through this

16    and ask him if he has had similar experiences as to what is

17    being outlined here given that it's a national program.

18              MR. NICHOLAS:  I don't know about that.  I mean, I

19    think he can ask -- he can ask questions about his

20    experiences, but using this document as an outline to do so

21    seems -- strikes me as out, out of bounds.

22              THE COURT:  Mr. Farrell, do you want to say

23    something?

24              MR. FARRELL:  Yes, Your Honor.  We have an

25    agreement with a stipulation that rather than call various
```

1    witnesses that would need to lay the basic foundation of a

2    sponsoring witness, that we were allowed to put in the

3    testimony through the four live witnesses.

4         In the alternative, Judge, we're provided the right to

5    cure.  And so, what we would ask is the opportunity to call

6    one of the people on this e-mail to bring them in.  So,

7    we're not trying to play games here on this, Judge.  We are

8    attempting to limit the number of sponsoring witnesses that

9    are required to get into documents.

10        MR. NICHOLAS:  The right to cure that he's

11   referring to had to do with the time period leading up to

12   trial.  That's number one.

13        Number two, the stipulation that he's referring to only

14   discusses authenticity.  We're not talking about

15   authenticity.  We're talking about the admissibility of this

16   document on evidentiary grounds now and that is the basis of

17   the -- of these objections.

18        MR. ACKERMAN:  Your Honor -- Your Honor, if I may,

19   the stipulation is at Docket 828 and it reads, "Plaintiffs

20   will be provided an opportunity to cure all unresolved

21   issues relating to authenticity and foundation, including

22   the ability to depose and/or call a custodial witness at

23   trial."

24        And I don't understand how we would have the ability to

25   cure before the Court made a ruling on any authenticity or

```
 1    foundation issues.  So, the argument that somehow the

 2    stipulation only applied before trial, we would obviously

 3    disagree with that.

 4              MR. MAHADY:  Your Honor, there's a separate

 5    stipulation that gave rise to the stipulation that Mr.

 6    Ackerman is referring to which said that this was an issue

 7    leading up to trial.

 8        Even if AmerisourceBergen does not object to the

 9    authenticity of this document per a stipulation, that does

10    not negate the fact that this witness, Mr. Perry, is not on

11    this document and cannot testify to this document that

12    specifically relates to two customers in Tennessee.  So,

13    there's no foundation for this document with this witness.

14              THE COURT:  Mr. Ruby?

15              MR. RUBY:  Your Honor, I was going to make a point

16    that I think is similar to what Mr. Mahady said, which is

17    that whether there is a stipulation that might lead to the

18    admission of the document without a sponsoring witness is a

19    separate question from whether there -- whether this witness

20    has foundation to then testify about the document.  And so,

21    we certainly would maintain our objection to questioning

22    this witness about a document on which he doesn't appear at

23    all without establishing that he knows something about it.

24              THE COURT:  How -- how does -- how does this

25    document come in through this witness?
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1          MR. FARRELL:  Your Honor, without belaboring the

2     point, I would like to have the Court read the stipulation

3     at Document 82 --

4          THE COURT:  Well, aside from the stipulation, what

5     about the foundation to let this in?

6          MR. FARRELL:  We have a stipulation that we can

7     put these documents in through this named witness without

8     that.  That's -- that's literally written in the

9     stipulation.

10          MR. MAHADY:  Your Honor, the stipulation -- we

11     also reserve all objections.  The stipulation does not say

12     that they can just use any document they want with any

13     witness.

14      Also, to the extent that this document relates to

15     Diversion Control, they could have attempted to use this

16     with the three witnesses that have already testified for

17     Diversion Control.

18      Mr. Perry did not service these customers.  He's not on

19     the e-mail.  There's just -- they haven't established the

20     foundation.  They could have tried.  I don't think they were

21     successful.

22          THE COURT:  Mr. Hester?

23          MR. HESTER:  Your Honor, yes.  I would just

24     distinguish between the foundation related to the

25     admissibility of the document and the question of foundation

1    in relation to questioning a given witness about the

2    document.  And that's a different issue from the

3    stipulation.

4        The stipulation goes to whether sponsoring witnesses

5    would be required to establish the admissibility of a given

6    document, but that's different from whether there's a

7    foundation for questioning this witness about the document.

8            THE COURT:  Mr. Hester just made my point much

9    more articulately than I did.  Can you -- can you respond to

10   that?

11           MR. FARRELL:  I think so.  I think he also made a

12   very -- I think -- I think he's made a very strong point.

13   So, aside from the introduction of the document, we would

14   like to enter it into evidence and if you exclude us from

15   asking this witness about a document that he doesn't know

16   anything about, I think that's a separate issue.

17       My primary focus is the vehicle for us to enter

18   documents into the record for purposes --

19           THE COURT:  Go ahead.  Finish.

20           MR. FARRELL:  My primary purpose is the vehicle to

21   enter documents into the record and the stipulation

22   specifically says that through these witnesses, we can

23   introduce documents with -- without having to lay the

24   foundation or authentication.

25           THE COURT:  Well, I understand all that, but how

1    is this -- how is this admissible above and beyond the

2    stipulation?  Seems to me it's not admissible through this

3    witness because he -- you haven't established any kind of a

4    foundation for it through this witness.

5             MR. FARRELL:  So, and I'm trying to find the right

6    framework to say this.  If this document is relevant and not

7    subject to some other exclusion, we're not required by the

8    stipulation to lay its authenticity or have a sponsoring

9    witness with knowledge of the document to enter it into the

10   record.

11        If it's in the record, then I think we have a separate

12   chain of discussions on whether or not it's proper to have

13   this witness testify regarding its contents, but we're

14   offering this document for the record and we've specifically

15   stipulated so that we don't have to call in 500 different

16   sponsoring witnesses.

17            THE COURT:  Well, that's all true, but you still

18   have to show that it's admissible, don't you?

19            MR. FARRELL:  And so, for admissibility, if we

20   presume it's an authentic document produced in the usual

21   course of business, if we presume that we do not need a

22   sponsoring witness with knowledge, the only other question

23   is whether it's relevant.  And, if it's relevant, then it's

24   a 403 analysis.

25            THE COURT:  Well, it's hearsay, isn't it?

1          MR. FARRELL:  It's a document kept in the normal

2    course of business.  It's not hearsay because it's

3    801(d)(2).  It's the -- it's written words of the party and

4    any danger of hearsay can be refuted by the party.

5       So, all of the procedural safeguards on hearsay that

6    prevent hearsay from being admitted are not present in this

7    case because it's the words of the party.  So, if they want

8    to dispute the validity of truth of the matter, they have

9    that opportunity.

10          THE COURT:  Well, if I admit it, what are you

11   going to do with it?  You're not going to take him through

12   it and -- and make him basically read it into the record.

13          MR. FARRELL:  Correct.

14          THE COURT:  You are?

15          MR. FARRELL:  No.  We are --

16          MR. NICHOLAS:  Maybe I can cut through this.  I

17   just don't want this witness questioned about this document.

18          THE COURT:  I understand that and I think that's a

19   perfectly valid point and that's the point I was trying to

20   get to.

21          MR. ACKERMAN:  So, Your Honor, if I may, the

22   second stipulation with ABDC, which is the one that Mr.

23   Farrell is referencing, is at Docket 1306 and what it says

24   is, "AmerisourceBergen stipulates that they will not object

25   to the presentation of these documents through", and then it

 1    lists "Chris Zimmerman, Steve Mays, David May and/or Michael

 2    Perry at trial while preserving all other evidentiary

 3    objections."

 4         Now, I understand that -- and, as Mr. Farrell has said,

 5    we're not going to take the witness through each and every

 6    point of the document, but we are allowed by stipulation to

 7    present the document through Mr. Perry and ask him questions

 8    about the content.  And I think that is what Mr. Kennedy

 9    wants to do.  He is not planning to -- to walk Mr. Perry

10    through this document line by line.

11         MR. NICHOLAS:  I'm not -- I don't object to the --

12    to the document being admitted into the record, which is

13    what Mr. Farrell said he wants.  I'm objecting to its use

14    with this witness.  The thing -- the stipulation says we

15    preserve all evidentiary objections.  This is the objection.

16    He shouldn't be questioned on it, but if he wants to

17    introduce the document into the record, fine.

18         MR. RUBY:  And, Judge, I'll say one more thing on

19    this.  And I don't mean to argue Mr. Nicholas's stipulation

20    for him, but I happen to have it up on my screen, and Docket

21    1306 expressly says that AmerisourceBergen reserves the

22    right to object to the admissibility of any witness's

23    testimony about documents that might be admissible under the

24    stipulation.  So, it preserves that separation between

25    admissibility and testimony.

```
1              THE COURT:  Okay.  Here's what I'm going to do.
2     I'm going to admit it, but I'm not going to let you question
3     him about it.
4              MR. FARRELL:  Thank you, Judge.
5              THE COURT:  0001 is admitted.  There's been no
6     showing that this witness had any participation in or
7     knowledge of the chain of e-mails here and the discussion
8     contained therein.  So, I'm going to admit the document, but
9     not allow you to question him about it.
10                  PLAINTIFF EXHIBIT 0001 ADMITTED
11             THE COURT:  Go ahead, Mr. Kennedy.
12             MR. KENNEDY:  Thank you, Your Honor.
13             BY MR. KENNEDY:
14    Q.   Sir, just to -- just to back up, just to summarize, the
15    more you would sell and hit your goals, the more money you
16    could make, sir, yes?
17    A.   The more money you can make, but that money was capped.
18    Q.   Okay.  And your motivation was -- as a good salesman,
19    your motivation was to keep the customer happy; true?
20    A.   Not only keep the customer happy, but do the right
21    things with regards to how ABC operated.
22    Q.   And, sir, given the framework then in the compensation
23    structure that we have talked about, AmerisourceBergen made
24    you, as the sales rep, the eyes and the ears of regulatory
25    control; is that true?
```

```
 1                MR. NICHOLAS:  Objection to the leading, Your
 2    Honor.
 3                THE COURT:  Well, let's get through this.  I think
 4    technically this comes within the 6 -- what is it, 611, Mr.
 5    Kennedy?
 6                MR. KENNEDY:  Yes, sir.
 7                THE COURT:  611(c).  And I'm going to let you lead
 8    him just to -- just to get this done.  Go ahead.
 9                MR. KENNEDY:  Thank you.
10                THE COURT:  I'm assuming that he -- well, he
11    obviously was associated with AmerisourceBergen even though
12    he isn't right now and -- and I think it comes within the
13    rule and I will let you lead him.  Go to it.
14                MR. KENNEDY:  Thank you, Your Honor.
15                BY MR. KENNEDY:
16    Q.   Sir, do you remember my question?  AmerisourceBergen
17    set up a program and structure whereby the sales folks were
18    the eyes and ears of Regulatory Affairs; is that true?
19    A.   That's correct.
20    Q.   You've been described as the first line of defense
21    against diversion in the marketplace with respect to your
22    pharmacies.  Would you agree with that?
23    A.   I would have to disagree with that.  I can't say I was
24    the first line of defense.
25    Q.   You've been described as the boots on the ground.
```

```
 1    Would you agree with that, sir?
 2    A.   I was the salesman.
 3    Q.   And the eyes and ears, correct?
 4    A.   As much as I could be, yes.
 5    Q.   And, more specifically, sir, you're familiar with the
 6    590 Questionnaire?
 7    A.   Yes.
 8    Q.   And the 590 Questionnaire, I think it's about 5-6
 9    pages, 46 questions.  Familiar with that?
10    A.   Yes.
11    Q.   And you had training from Regulatory Affairs with
12    respect to the 590 Questionnaire and its purpose, its
13    function, and your role?
14    A.   That's correct.
15    Q.   And probably filled out over 100 of those or 200 in
16    your career?
17    A.   I personally do not fill those out or never have filled
18    them out.
19    Q.   You work with the customer and sit with the customer as
20    the customer completes the questionnaire?
21    A.   That's correct.
22    Q.   And, more specifically, before a customer would be
23    sold, a new customer would be sold with controlled
24    substances, it was required that the customer complete the
25    590 Questionnaire; true?
```

**A.**   Yes.

**Q.**   And then, during the course and the life of the relationship with the customer, you would meet with the customer at times and you would update the questionnaire with them, correct?

**A.**   If we were asked to update, we would update.

**Q.**   And, sir, the -- again, required before a customer is sold controlled substances; true?

**A.**   Could you reframe that again?  Say that again.

**Q.**   The required questionnaire must be answered by the customer prior to AmerisourceBergen selling them controlled substances?

MR. NICHOLAS:  Objection, Your Honor.  Could we have a time frame put on these questions, please?

THE COURT:  Yes, please.

BY MR. KENNEDY:

**Q.**   Your entire career, sir, beginning in -- well, not entire career, but beginning in '07 until you retired, would that be true?

**A.**   I can't say if it started in '07 or not.

**Q.**   '08?

**A.**   Possibly.

**Q.**   For sure by '09?

**A.**   Most likely.

**Q.**   And, again, the purpose was to collect information so

```
1    that Regulatory Affairs could decide whether or not you

2    folks would sell controlled substances to the new pharmacy,

3    correct?

4    A.    That's correct.

5    Q.    So, in other words, you were collecting information to

6    see if there were any concerns, maybe potential red flags

7    that might lead Regulatory Affairs to conclude that maybe

8    this is a pharmacy we should not sell controlled substances

9    to, correct?

10   A.    That is the purpose of a 590, yes.

11   Q.    And the 590 is a site visit by the sales rep to the

12   customer, correct?

13   A.    That's correct.

14   Q.    You sit and you go through the questions with them.

15   You collect the information, correct?

16   A.    That's correct.

17   Q.    You make observations, correct?

18   A.    When you say observations --

19   Q.    You take photographs?

20   A.    That's correct.

21   Q.    Inside of the pharmacy and outside of the pharmacy?

22   A.    That's correct.

23   Q.    That's done by the sales executive, true?

24   A.    Yes.

25              MR. KENNEDY:  And if we can pull up 41625.  Don't
```

```
1    pull it up yet.  I'll get permission hopefully.
2         May I approach, Your Honor?
3              THE COURT:  Yes.
4              MR. KENNEDY:  Thank you.
5              MR. KENNEDY:  Counsel and Mr. Perry, attached to
6    this --
7              BY MR. KENNEDY:
8    Q.   Well, sir, first of all, is that your name on the front
9    page of this e-mail, Mr. Perry, Ed Hazewski, a 590
10   Questionnaire, sir?
11   A.   Yes.
12   Q.   And if we go to Page 3, is that a 590 Questionnaire?
13             MR. NICHOLAS:  Your Honor, before we go further,
14   this -- I will object to the use of this particular document
15   because it is a display of a Form 590 for a customer that is
16   not in Cabell -- or not in Cabell County or the City of
17   Huntington.  It's in the State of West Virginia, but it's
18   not in Cabell County or Huntington.
19             MR. KENNEDY:  And, Your Honor, we are simply using
20   this as an exemplifier.  I'm not going to ask any questions.
21   We can later black out any of the answers by the customer,
22   but we chose a questionnaire as an exemplifier that Mr.
23   Perry was involved in the creation --
24             THE COURT:  Why didn't you pick one in the
25   geographical area at issue here?
```

```
 1              MR. KENNEDY:  It's -- this is the same
 2    questionnaire nationally, Your Honor, and I'm not sure we
 3    have one within the geographic area that Mr. Perry filled
 4    out.  I just want to use it as an example.
 5              MR. NICHOLAS:  That's okay.  Let it go.
 6              MR. KENNEDY:  Just an example.
 7              THE COURT:  All right.  Go ahead.
 8              MR. KENNEDY:  Thank you.
 9         And if we can display Page 3, please.
10              BY MR. KENNEDY:
11    Q.   Sir, up at the top, Form 590 is identified; true?  On
12    Page 3, sir?
13    A.   Yes.
14              MR. NICHOLAS:  Your Honor, I will permit -- it's
15    okay to permit the question, but I'm uncomfortable having
16    the display -- having the customer information displayed,
17    particularly when we're not talking about a -- I am just
18    asking that it be taken off the screen really.
19              THE COURT:  Yeah.  Do that, Mr. Kennedy, and then
20    you can go ahead.
21              MR. KENNEDY:  That's fine.  Thank you, Your Honor.
22              BY MR. KENNEDY:
23    Q.   Retail pharmacy questionnaire up at the top, sir?
24    A.   Yes.
25    Q.   And then, number one, the pharmacy name, that would be
```

1    the first question where the pharmacy is identified, true?

2    **A.**    Correct.

3    **Q.**    And then, two says if existing ABC customer.  This

4    indicates, like you said, sometimes you go back after the

5    customer has been accepted and you update the questionnaire,

6    correct?

7    **A.**    That's correct.

8    **Q.**    And you see down at the bottom it says, "Revised

9    January 8, 2008."  Do you see that, sir?

10   **A.**    Yes.

11   **Q.**    And so, it probably existed prior to '08, then was

12   revised in '08.  Do we agree with that?

13   **A.**    It says it's revised.

14   **Q.**    And it's attached to an e-mail from 2014, so this

15   questionnaire would have existed at least until 2014 that

16   you were utilizing, true?

17   **A.**    I assume.

18   **Q.**    And if you will go to Page 5 of the questionnaire -- or

19   of the exhibit, sir, do you see Question 32?  Do you see

20   that?

21   **A.**    Yes.

22   **Q.**    32 says, "Check the following types of products and

23   provide the approximate percentage of products you expect to

24   purchase from AmerisourceBergen."  Do you see that question?

25   **A.**    Yes.

1    **Q.**   So, that is something that AmerisourceBergen wants to

2    know before they will agree to even start selling controlled

3    substances, correct?

4    **A.**   That's correct.

5    **Q.**   And you go down and there's a line three down that says

6    "controlled substances" and if you check yes, then

7    AmerisourceBergen wants to know the percentage of total

8    purchases.  Do you see that?

9    **A.**   Yes.

10   **Q.**   And that takes us back to the controlled substance

11   percentage that we talked about a little bit ago, true?

12   **A.**   Yes.

13   **Q.**   As a part of your training and education about this

14   590, you understood, sir, that if you have a high controlled

15   substance ratio, then that can be a concern, correct?

16   **A.**   It could be.

17   **Q.**   Now, go down further.  See 34?  34 says, "Please

18   provide a list of names of all suppliers you intend to

19   continue to use."  Did I read that right?

20   **A.**   Yes.

21   **Q.**   Suppliers means distributors?

22   **A.**   I don't know if it means distributors or not.  It says

23   "suppliers".

24   **Q.**   Okay.  Sir, as part of your education and training, did

25   you understand that AmerisourceBergen wanted to know that

1    because if a pharmacy splits their purchases among two or

2    more different suppliers, it allows them to order under

3    thresholds?  Did you understand that to be the reason for

4    that question?

5    **A.**    The reason I have different suppliers, first of all, is

6    not to buy -- you know, to cherry-pick from one customer to

7    another, as far as a wholesaler.  The reason behind having

8    multiple suppliers for independent pharmacies is to have

9    access for all product.

10   **Q.**    Is this a question that Regulatory Affairs wanted an

11   answer to before they would agree to sell controlled

12   substances?

13   **A.**    We ask every customer if they're using another

14   supplier.

15   **Q.**    35, "Why are you changing wholesalers?"  Do you see

16   that?

17   **A.**    Yes.

18   **Q.**    And AmerisourceBergen wanted an answer to this and the

19   Regulatory Department, sir, because there could be different

20   reasons why someone is changing their supplier or

21   distributor, true?

22   **A.**    That's correct.

23   **Q.**    Sometimes they can change because price, true?

24   **A.**    That's correct.

25   **Q.**    Other times, they can change because the distributor is

1    limiting or cutting off their purchase of controlled

2    substances, true?

3    **A.**   That could be true.

4    **Q.**   And that would be a concern?

5    **A.**   Yes.

6    **Q.**   And that is something Regulatory Affairs wants to know

7    about prior, right, prior to beginning the sale of

8    controlled substances?

9              MR. NICHOLAS:  Your Honor, I -- I will object to

10   the questions about what Regulatory Affairs wants to know

11   about only because the plaintiffs have had three -- they

12   have summoned three witnesses from Regulatory Affairs into

13   this courtroom and cross-examined them for hours on end.

14   They could have -- they could ask all of that stuff of those

15   -- of those people.  To the extent they have, great.  To the

16   extent they haven't, this is not the witness for whom to ask

17   those kinds of questions.  So, I will object to this -- to

18   the questions to the extent they're asking what Regulatory

19   Affairs thought or didn't think when the Regulatory Affairs

20   people were in the courtroom for the last three, four days.

21             THE COURT:  Well, this is cumulative and plowing

22   ground we've been over and over, so I'm going to sustain the

23   objection.

24             BY MR. KENNEDY:

25   **Q.**   All right.  Sir, if you go to Page 38 -- or, excuse me,

1    Question 38 on the next page.  Do you see the question,

2    "Does the pharmacy expect to order more than 5,000 dosages

3    of hydrocodone combination products a month?"  Do you see

4    that question?

5    **A.**   Yes.

6    **Q.**   And if that is the intention of the pharmacy, then the

7    590 Questionnaire, sir, that you were helping them fill out,

8    it requires an explanation, true?

9    **A.**   Yes.

10   **Q.**   And that's something that AmerisourceBergen chose to

11   put on this form before they even agree to sell, true?

12   **A.**   Yes.

13   **Q.**   And if the explanation being provided is not sufficient

14   or appropriate, that can be a concern, true?

15           MR. NICHOLAS:  Same objection, Your Honor.

16           THE COURT:  Sustained.

17           BY MR. KENNEDY:

18   **Q.**   Go to Question 40, sir.  Does 40 state, "Does the

19   pharmacy expect to order more than 6,000 dosage units of

20   oxycodone", and if they say yes, they're required to provide

21   an explanation for why they want to buy that level of

22   oxycodone; is that true?

23   **A.**   Yes.

24   **Q.**   And then 42, "If reason for yes to answers 38 to 41 is

25   pain management clinics physicians, please list each

1   prescriber with their DEA registration number."  Is that

2   required information?

3   **A.**   If the answer is yes for 31 through -- or 38 through

4   41, yes.

5   **Q.**   AmerisourceBergen, at least from the questionnaire that

6   you have filled out countless occasions, they want to know

7   then the identity of those pain clinics, true?

8           MR. NICHOLAS:  Same, same objection.

9           MR. KENNEDY:  I have no further questions on this

10  questionnaire, Your Honor.  That might help us.

11          THE COURT:  Well, I'll sustain the objection and

12  you can move on to your next subject, Mr. Kennedy.

13          BY MR. KENNEDY:

14  **Q.**   Sir, to -- to sum up then, your responsibilities prior

15  to the customer, the new customer becoming a customer that

16  you'll sell controlled substances to, is you fill out the

17  590 information, correct?

18  **A.**   Yes.

19  **Q.**   You do a site visit?

20  **A.**   Yes.

21  **Q.**   You take photographs?

22  **A.**   Correct.

23  **Q.**   After they become a customer, you -- periodically, when

24  asked, you will update the 590, true?

25  **A.**   Correct.

1    **Q.**   You will continue as the eyes and the ears, correct?

2    **A.**   Correct.

3    **Q.**   But you had additional responsibility other than just

4    the routine collection of materials, did you not, sir?

5    **A.**   Could you be more specific?

6          MR. KENNEDY:  If you can give us 205, please,

7    which is not an exhibit?

8          BY MR. KENNEDY:

9    **Q.**   Sir, would I be correct that beyond just the routine

10   collection of information, sales executives were responsible

11   for investigating their customer even after it was

12   determined that the customer was a concern for diversion?

13         THE COURT:  Mr. Nicholas?

14         MR. NICHOLAS:  Yeah.  I'll object to this

15   demonstrative.  I don't know where it comes from, what it's

16   foundation is.  I would ask that it be taken down for the

17   time being unless -- again, I mean, it's just something

18   that's written down on a piece of paper with no -- no

19   foundation at all.  So, I'll object and, you know, questions

20   can be asked and answered, but I don't think the

21   demonstrative should be used in this fashion.

22         THE COURT:  Well, I agree, until you lay a

23   foundation for it, Mr. Kennedy.  Go ahead.

24         BY MR. KENNEDY:

25   **Q.**   Well, sir, you were -- you were trained with respect to

1    responsibilities, were you not?

2    **A.**    You would have to be a little more specific with

3    regards to my responsibilities.

4    **Q.**    Were you trained in -- beginning in '07 and then every

5    year thereafter with respect to your responsibilities as it

6    related to Diversion Control?

7    **A.**    Yes.

8    **Q.**    Okay.  And as part of those responsibilities and as

9    things actually worked, the Sales Executive was responsible

10    for doing investigations even after one of your customers

11    was determined to be a concern for diversion?  That is what

12    happened in reality, true?

13              MR. NICHOLAS:  I'll object for lack of foundation.

14    It's a compound question and, at this point, although I

15    understand the Court's ruling on leading, I will object to

16    leading in this fashion.

17              THE COURT:  Just a minute.

18         (Pause)

19              MR. NICHOLAS:  And I'll only add that our CSRA

20    people have all already been on the stand and been asked

21    about this.  So, it's cumulative, as well.

22              THE COURT:  Well, he's asked him about the sales

23    representatives' responsibilities and --

24              MR. NICHOLAS:  The -- I don't want to interrupt.

25              THE COURT:  Well, that was -- I'll hear you.

```
 1              MR. NICHOLAS:  I was just going to say, our CSRA
 2   people have already been asked about the sales, the
 3   responsibilities of the salespeople.  I can -- I can recall
 4   it for at least Mr. May and Mr. Mays.
 5              THE COURT:  Well, that's true, but Mr. Perry is a
 6   salesman and he is on the front line in sales and I think it
 7   is appropriate for this to be pursued, but you're going to
 8   have to lay a foundation for that document.
 9              MR. KENNEDY:  Your Honor, I just -- I just was
10   saving time.  I could have written that on the board.
11   That's all that that was.  And I'm just asking this witness
12   according to his training and what he was actually asked to
13   do.
14              THE COURT:  Well, you can ask him about his
15   understanding.
16              MR. KENNEDY:  Yes, sir.
17              THE COURT:  What his responsibilities as a sales
18   representative were and, beyond that, I'm probably not going
19   to let you go.
20              BY MR. KENNEDY:
21   Q.   My specific question is, sir, is it true through your
22   career at times you were asked to do investigations of your
23   customers even after it was determined that they were a
24   concern for diversion?
25   A.   I was never asked to do an investigation.  I would be
```

```
1    asked to retrieve information with regards to the 590s and

2    that be it.

3    Q.   And, sir, so we can communicate, when I say

4    investigation, that's exactly what I mean, retrieving

5    information, right?

6    A.   That's correct.

7    Q.   Okay.  Retrieving that information involved talking to

8    and asking questions to the pharmacist on the 590, correct?

9    A.   Yes.

10   Q.   That investigation and retrieving information required

11   talking to owners and getting the information on the 590s?

12   A.   Yes.

13   Q.   Including explanations as to why they needed to buy so

14   much hydrocodone above 5,000, correct?

15   A.   That's correct.

16   Q.   Asking their explanations why they needed to buy

17   oxycodone above 6,000, correct?

18   A.   That's correct.

19   Q.   And it also included taking photographs of the

20   surrounding areas?

21   A.   That's correct.

22   Q.   Okay.  So, that's what we mean by investigation?

23        MR. NICHOLAS:  Your Honor, I will -- my objection

24   is, that was all fine, but I don't want to conflate the --

25   use the word investigation, which is Mr. Kennedy -- I don't
```

1    want the record to make it appear that Mr. Kennedy's use of

2    the word investigation is conferred on this witness.  I

3    think it's important to keep the language clean on a point

4    like this.

5                 THE COURT:  Well --

6                 MR. KENNEDY:  Just trying to communicate, Your

7    Honor.  That's -- I don't want to have to --

8                 THE COURT:  He said he didn't believe there were

9    investigations, but then you asked him what he actually does

10   and referred to it as an investigation.  So, try to keep the

11   language clean and go ahead.

12                MR. KENNEDY:  Thank you.

13                BY MR. KENNEDY:

14   **Q.**   When I say investigation, you'll understand that that's

15   what I mean, the information gathering that you did.  All

16   right?

17                MR. NICHOLAS:  Same objection.  I'm worried about

18   the record.  I'm not worried about -- you know, the

19   communication may seem fine, but I'm worried about the

20   record.

21                THE COURT:  Yeah.  You don't want the record to

22   show that this guy was an investigator who had a

23   responsibility to do things that -- beyond what he's

24   testifying to?  And that was very inarticulate, but --

25                MR. NICHOLAS:  I don't want the record to

1    misconstrue that on that point exactly.  He said he doesn't

2    do investigations.  And then, the next thing we hear are a

3    series of questions that refer to what he does as to an

4    investigation.

5               THE COURT:  Right.  Just ask him what he does, Mr.

6    Kennedy, and don't call it an investigation because he said

7    it isn't.

8               BY MR. KENNEDY:

9    Q.   Let's talk about SafeScript.  All right?  Is SafeScript

10   one of your customers, sir?

11   A.   They were.

12   Q.   Located in Huntington?

13   A.   That's correct.

14   Q.   Fourth Avenue, if you recall?

15   A.   I don't recall the exact -- if it was Fourth Avenue,

16   Third Avenue.  It was on one of the lower streets there in

17   Huntington.

18   Q.   And do you recollect they were a customer from 2004 to

19   2012?

20   A.   Yes.

21   Q.   And you were the sales rep the entire time?

22   A.   That's correct.

23   Q.   Were your responsibilities relating to diversion and

24   collecting information any different for SafeScript than

25   your other pharmacies?

1   **A.**   No.

2   **Q.**   And, sir, if I told you to assume that

3   AmerisourceBergen sold 3.8 million dosages of oxycodone and

4   hydrocodone products to SafeScript from '04 to '12, would

5   that surprise you?

6   **A.**   Could you say that again?

7   **Q.**   If I told you and asked to you assume that

8   AmerisourceBergen shipped 3.8 million doses of oxycodone and

9   hydrocodone to SafeScript between '04 and '12, would that

10   amount surprise you?

11   **A.**   I don't know if it would surprise me or not.  There's a

12   lot of things that could come into play there with regards

13   to the product that they actually purchased, their

14   clientele, the doctors.

15   **Q.**   Sir, again, you started in '04 with them as your

16   customer, correct?  Yes, sir?

17   **A.**   Yes.

18   **Q.**   You sold them oxycodone, true?

19   **A.**   Yes.

20   **Q.**   And do you remember that they were the highest volume

21   oxycodone customer in Cabell County?

22   **A.**   That, I did not have information.

23   **Q.**   And, sir, would I be correct, though, that early in

24   your relationship with SafeScript, you concluded, you

25   concluded, that you were selling them a lot of oxycodone?

```
 1    A.   I concluded?

 2    Q.   Yes, sir.

 3    A.   I don't -- I don't ever recall saying that I sold them

 4    a lot of oxycodone.

 5              MR. KENNEDY:  And if we could look at P-02796,

 6    please.

 7         And if I can approach, Your Honor.  And, Your Honor,

 8    I'm thinking we may not have an objection because this has

 9    been admitted into evidence.  It was yesterday with Mr. --

10    Mr. Farrell's questioning.

11         Can we display this on the screen, Your Honor?

12              THE COURT:  I'm sorry?

13              MR. KENNEDY:  Can we put this on the screen?  It

14    was admitted yesterday.

15              THE COURT:  Yes.  Put it on the screen.

16              BY MR. KENNEDY:

17    Q.   And, Mr. Perry, if you'll look at the first page, if

18    you would, please.  Does the first page up at the top say

19    "SOM investigation, SafeScript Pharmacy"?

20    A.   Yes.

21              MR. KENNEDY:  If you'll go to Page 2 and if you

22    can go to the paragraph that corresponds to 3/26/08, if you

23    could pull that out, please.

24              BY MR. KENNEDY:

25    Q.   And does it state, "Below response received from ACM"?
```

1    ACM would be -- would be you, would it not, sir?

2    **A.**    That's correct.

3    **Q.**    And did you state in an e-mail, "Scott", and is Scott

4    Regulatory Affairs?

5    **A.**    Yes.

6    **Q.**    "This document [sic] does a lot of this style of

7    medication.  Several pain clinics in the area."  All right.

8    Pain clinics, pain clinics is -- is one of the things that

9    AmerisourceBergen wants to know about even before they'll

10   agree to sell you controlled substances, correct?

11   **A.**    That's something we like to know about, yes.

12   **Q.**    And so, now in '08, we know that SafeScript has a lot

13   of pain clinics in the area, true?

14   **A.**    Yes.

15            MR. NICHOLAS:  I'll object to the use of the word

16   -- to the use of the words a lot.  This has several pain

17   clinics in the area.

18            MR. KENNEDY:  I apologize.  It says several.

19            THE COURT:  Well, I'll sustain the objection

20   unless he explains what he means by a lot.

21            MR. KENNEDY:  Yes, sir.

22            BY MR. KENNEDY:

23   **Q.**    Does this say "several"?

24   **A.**    It says "several pain clinics".

25   **Q.**    Those are your words, correct?

1    **A.**    Yes.

2    **Q.**    The second sentence, does it state, "They did start

3    buying from Miami-Luken"?  Miami-Luken is another

4    distributor, correct?

5    **A.**    That's correct.

6    **Q.**    And, again, that's information AmerisourceBergen wants

7    to know about before they'll agree to even sell you

8    controlled substances, true?

9    **A.**    We want to know that regardless if it's controlled

10   substance or if it's just a regular pharmaceutical.

11   **Q.**    Okay.  They state, "They did start buying from

12   Miami-Luken for a few month because we kept holding orders."

13   And now you know the reason why they went over to

14   Miami-Luken, correct?

15   **A.**    Yes.

16   **Q.**    And the reason is you folks were holding orders of

17   oxycodone so they went elsewhere so they could purchase

18   additional oxycodone, true?  Is that what it states?

19   **A.**    It states that we were holding orders.

20   **Q.**    And that's why they went to Miami-Luken, is what it

21   states, true?

22   **A.**    Yes.

23   **Q.**    Sir, it states that next, "They again started buying

24   everything from us because the volume was going down and it

25   was affecting their cost of goods."  Is that the way the

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    system worked, sir, that the more you buy, the better your

2    price for AmerisourceBergen?

3    **A.**   It would depend.

4    **Q.**   Well, we're talking about oxycodone.

5    **A.**   Could you be more specific with regards to that

6    oxycodone?

7    **Q.**   Is there a specific type of oxycodone, sir, that the

8    more you buy, the less the price?

9    **A.**   No.

10   **Q.**   There is not?

11   **A.**   To my knowledge, no.

12   **Q.**   And what are you referencing there in that statement,

13   sir, that "because the volume got low, it was affecting

14   their price and cost of goods"?

15   **A.**   Well, if a specific account was buying, they would have

16   a specific sale-buy program regardless if they were buying

17   controlled substance or if they were buying regular

18   pharmaceuticals.  If they fell outside of those parameters,

19   their cost of goods would go down.

20   **Q.**   And, sir, you finally state, "They always have done a

21   lot with oxy and Methadone."  Do you see that?

22   **A.**   Yes.

23   **Q.**   And you mean they had always purchased a lot of

24   oxycodone; is that correct, sir?

25   **A.**   That's correct.

```
 1              MR. KENNEDY:  And if I can have P-44758.

 2         Your Honor, this was admitted into evidence by you, I

 3    think, the day before yesterday.  This is a -- a graph from

 4    Dr. McCann related to SafeScript.

 5         And if we could put that up on the screen.

 6         May I approach, Your Honor?

 7              THE COURT:  Yes.

 8              MR. KENNEDY:  It may be just easiest --

 9              MR. MAHADY:  Do you mind if we see what the

10    exhibit is because there's been some --

11              MR. KENNEDY:  We're using Page 30, Your Honor.

12    Page 30 was expressly referenced by Dr. McCann at Page 162

13    of his transcript from May 11th.  This, I believe, was --

14    was admitted.

15              MR. MAHADY:  No objection to the use of this, Your

16    Honor.

17              THE COURT:  When you get to a stopping point, Mr.

18    Kennedy, I'm going to have to pull the plug here because

19    I've got another matter to deal with.

20              MR. KENNEDY:  All right.  After I do this, then

21    we're all good.

22              THE COURT:  You go ahead.  That's fine.

23              MR. KENNEDY:  And if we can go to, I believe, Page

24    30 of this.

25                   BY MR. KENNEDY:
```

1    **Q.**   And, Mr. Perry, if we go up from '08 and if you stated

2    in '08 that they were buying a lot of oxy, can we agree they

3    were buying a lot of oxy in '07?

4         MR. NICHOLAS:  Your Honor, I'll object to the use

5    of the document with this witness.  There's no foundation

6    laid at all as to whether the witness has any knowledge of

7    what's being displayed here or anything else.

8         THE COURT:  I'll sustain the objection, Mr.

9    Kennedy.

10        BY MR. KENNEDY:

11   **Q.**   Sir, when you said in the e-mail they had always used,

12   purchased a lot of oxy, tell me the time frame you meant.

13   Did you mean all the way back to the beginning to '04?

14   **A.**   I can't say what time frame that would have been.

15   **Q.**   And, sir, when you stated that "they probably always

16   would", if we assume these numbers to be true, your

17   prediction that they would always buy a lot of oxy was true?

18        MR. NICHOLAS:  Same objection.  And as to the use

19   of this document and to the extreme leading nature of the

20   question at this point.

21        THE COURT:  Sustained.

22        MR. KENNEDY:  I have nothing further at this

23   point, Your Honor.  It's a good time to break.

24        THE COURT:  Yes.  We'll be in recess until 2:00.

25     Mr. Perry, you can step down and we'll expect you back

```
 1    here a little before 2:00.
 2              THE WITNESS:  Thank you.
 3              THE COURT:  Thank you very much.
 4         (Recess taken)
 5              THE COURT:  Mr. Perry, you can resume the witness
 6    stand, sir.  And the Court will remind you you're still
 7    under oath, Mr. Perry.
 8         Mr. Kennedy, do you want to resume your direct?
 9              MR. KENNEDY:  Thank you, Your Honor.
10         All set?
11              THE COURT:  Yes.
12              BY MR. KENNEDY:
13    Q.   Good afternoon, Mr. Perry.
14    A.   Good afternoon.
15    Q.   In your training, did you have an understanding of what
16    a suspicious order was?
17    A.   Yes.
18    Q.   And did you understand that if Regulatory concluded
19    that a customer had placed a suspicious order, they would
20    report that to the DEA?  Did you know that?
21    A.   I did not know that it would be reported to the DEA.  I
22    would report that to the CSRA side and let them do what they
23    needed to do from that time forward.
24    Q.   And did you know that -- you can assume in 2007-2008
25    that AmerisourceBergen reported some suspicious orders to
```

1    the DEA with regard to SafeScript.  You can assume that.

2    So, I want to ask you, did you understand through your

3    training that just because AmerisourceBergen reported

4    suspicious orders to the DEA, that did not relieve

5    AmerisourceBergen from its responsibility to continue to

6    maintain effective controls against diversion?  Is that

7    consistent with your training, sir?

8              MR. NICHOLAS:  Your Honor, I'm going to object as

9    we embark on this road of asking what the -- what CSRA'S

10   requirements were.  This is -- this is not the witness for

11   these kinds of questions.  We all understand the nature and

12   the purpose of the questions, but we had CSRA people here

13   for three days or more.

14             THE COURT:  Yeah.

15             MR. KENNEDY:  Your Honor, if I might respond?

16             THE COURT:  Of course, pretty badly, but he did

17   ask him if it was consistent with his training.

18             MR. KENNEDY:  Yes, sir.

19             THE COURT:  So, I'll let him answer, but you're

20   going to have to get through this, Mr. Kennedy.

21             THE WITNESS:  I'm going to need you to re-frame

22   that question again.

23             BY MR. KENNEDY:

24   **Q.**   Did you understand from your training, sir, that just

25   because AmerisourceBergen reported a suspicious order to the

```
 1    DEA, that did not relieve AmerisourceBergen from its

 2    responsibility to continue to maintain effective controls to

 3    prevent diversion?

 4            MR. NICHOLAS:  Same objection.  Calls for a legal

 5    conclusion, as well.

 6            THE COURT:  Sustained.

 7            MR. KENNEDY:  If we can have P-00193, please.

 8        If I can approach, Your Honor?

 9            THE COURT:  Yes.

10            MR. KENNEDY:  Thank you.

11            BY MR. KENNEDY:

12    Q.   And, Mr. Perry, is the title of this document "ABC

13    Diversion Control Program The Sales Associate Role in

14    Diversion Control"?

15    A.   Yes.

16    Q.   And would you be included in that category of sales

17    associate?

18    A.   Yes.

19    Q.   Was it your practice as a responsible employee to

20    attend the training sessions that were provided by

21    AmerisourceBergen with respect to your role in Diversion

22    Control?

23    A.   Yes, either by in person meetings or by video meetings.

24    Q.   If you can go to Page 3, please.  Let me read bullet

25    point 2.  Well, let's start with bullet point 1.  "21 CFR
```

1    1301.74 requires that registrants design and operate systems

2    to identify suspicious orders and report suspicious orders

3    to the DEA when discovered."  Consistent with your training,

4    sir?

5    **A.**    I mean, it's there.  I'm not responsible for

6    identifying those and sending them to the DEA.

7    **Q.**    I understand.  Bullet point number two, "Reporting

8    suspicious orders to DEA does not relieve the distributor of

9    the responsibility to maintain effective controls to prevent

10   diversion."  Consistent with your training, sir, that

11   statement?

12   **A.**    Again, I'm not responsible for sending that information

13   to the DEA.

14   **Q.**    I understand that, but is that statement with respect

15   to the continued responsibility after the report of a

16   suspicious order consistent with your training?

17   **A.**    Yes.  I am saying yes.

18   **Q.**    Okay, thank you.  The next bullet, "DEA cannot tell a

19   distributor if an order is or not and usually will not tell

20   the distributor whether or not to ship."  Is that

21   consistent, sir, with your training?

22   **A.**    Yes.

23   **Q.**    And, finally, "Distributor must make a business

24   decision whether or not to ship the order".  Is that

25   consistent with your training?

1    **A.**    Yes.

2    **Q.**    So, sir, you understood the DEA was not going to tell

3    AmerisourceBergen whether or not to continue to ship to

4    SafeScript; AmerisourceBergen had to make that decision?

5    You understood that from your training?

6              MR. RUBY:  Your Honor -- Your Honor, objection as

7    to time frame.  There's no -- I don't see any date on this

8    document that would orient the witness.

9              THE COURT:  Yes.  I was wondering about that

10   myself, Mr. Kennedy.

11             MR. KENNEDY:  Your Honor, the -- Page 2, I'm

12   sorry, it has a copyright of 2007.

13             BY MR. KENNEDY:

14   **Q.**    And, sir, we've read through the statements.  Was this

15   a consistent message, what we have talked about and what we

16   have read, from 2007 forward?

17   **A.**    Again, it's in writing here, but as far as the sales

18   making those calls, the sales did not make those calls.

19   **Q.**    I'm not asking who made the call.  I'm just talking

20   about the existence of the responsibility that's consistent

21   with your training, true?

22             MR. NICHOLAS:  I'll object.  I think the witness

23   is -- is expressing the fact that he's limited in his

24   ability to answer such questions.

25             THE COURT:  Sustained.

```
 1            BY MR. KENNEDY:
 2    Q.   So, let's go back to SafeScript.  We left off before
 3    the break with SafeScript in 2008 and, at that point in
 4    time, we looked at your e-mail where you had informed
 5    Regulatory Affairs about the pain clinics and about
 6    purchases from Miami-Luken; do you recall that, in 2008,
 7    before lunch?
 8    A.   Yes.
 9    Q.   So, moving to 2009.  Were you folks still selling
10    oxycodone to SafeScript?
11    A.   I don't recall if we were at that time or not.
12    Q.   Were you still the sales representative?
13    A.   Yes.
14    Q.   In September of 2009, do you remember Regulatory
15    deciding that they needed to take a closer look at
16    SafeScript?
17    A.   I don't recall that.
18            MR. KENNEDY:  If we can have P-17150, please.
19        May I approach, Your Honor?
20            BY MR. KENNEDY:
21    Q.   Mr. Perry, I'm going to start at the bottom of this and
22    move up to your involvement in the top e-mail, if we could.
23            MR. KENNEDY:  If you can bring up -- or excuse me.
24    Don't bring it up.
25            BY MR. KENNEDY:
```

**Q.**   An e-mail from Eric Martin, he's in Regulatory,

correct?

**A.**   He's part of CSRA, yes.

**Q.**   And its subject is OMP Reports.  Do you know what OMP

is, Order Monitoring Program?

**A.**   Yes.

**Q.**   And it says, "John, based on the last two reports and

recommendation of Joe Tomkiewicz, we at the Division should

focus on independent retail accounts that show repeatedly

and have OMP threshold issues."  Do you understand that to

mean that they show repeatedly; that means they are

exceeding their threshold repeatedly?  Would you understand

that, sir?

         MR. NICHOLAS:  I have to object.  I object.  He's

not on this document.

   You know, I thought he was going to be shown the

document.  I didn't think it was going to be read.  I

thought he was going to be asked if it refreshed his

recollection.  He can't read this stuff into the record

without -- on the -- in this fashion.

         THE COURT:  Mr. Ruby, do you want to --

         MR. RUBY:  Same objection, Your Honor.

         MR. ACKERMAN:  Your Honor, I would just note for

the record that this is another one of the documents that is

included in the stipulation at Docket 1306.

```
 1              MR. KENNEDY:  And we can take it in parts, Your

 2    Honor.  We would offer this into evidence under 801(d)(2)(D)

 3    as a statement offered against AmerisourceBergen and if we

 4    can get it into evidence through there, this is referencing

 5    SafeScript and his responsibility.  His name is at the top

 6    of the document.  If we can admit it into evidence and then

 7    question about SafeScript, his customer, and then his

 8    involvement, that's what we intend to do.

 9              THE COURT:  Well, if its authenticity is not

10    disputed and it fits within 801(d)(2)(D), it can come in,

11    but he doesn't know anything about it, Mr. Kennedy.  You

12    haven't laid a foundation for it or anything.  I'm not going

13    to just let you pull a piece of paper out of the sky and fry

14    this witness with it.

15              MR. KENNEDY:  All right.

16              BY MR. KENNEDY:

17    Q.   Sir, SafeScript is your customer?

18    A.   Yes.

19    Q.   And is your name at the top of the e-mail referencing

20    you as the Account Manager or Sales Rep for SafeScript?

21    A.   It's in the e-mail.  It's not the top of the e-mail.

22              MR. KENNEDY:  Well, Your Honor, may I question the

23    document?  Or I can move on.

24              MR. RUBY:  Your Honor, we would object, and just

25    to clarify --
```

1              THE COURT:  I'm going to sustain the objection.

2       You need to -- you need to move on.

3              MR. KENNEDY:  And, Your Honor, we would like to --

4              THE COURT:  If you want to offer it, we'll decide

5       whether it's admissible or not, but I'm not going to let you

6       question Mr. Perry about it.

7              MR. KENNEDY:  We would offer P-17150 into

8       evidence.

9              MR. NICHOLAS:  Per the stipulation, Your Honor, we

10      have no objection to the admission of the document.

11             THE COURT:  All right.  It's admitted.

12              **PLAINTIFF EXHIBIT P-17150 ADMITTED**

13             MR. KENNEDY:  Could you give us P-16655, please?

14          May I approach, Your Honor?

15             THE COURT:  Yes.

16          BY MR. KENNEDY:

17      **Q.**   Sir, if you could go to -- oh.

18          (Pause)

19             THE COURT:  All right.  Mr. Kennedy.

20             MR. KENNEDY:  Thank you, Your Honor.  We would

21      like to offer into evidence P-16655 under 801(d)(2)(D).

22             THE COURT:  Is there any objection?

23             MR. NICHOLAS:  No objection.

24             THE COURT:  It's admitted.

25              **PLAINTIFF EXHIBIT P-16655 ADMITTED**

             BY MR. KENNEDY:

Q.    Sir, would you go to the second page, please, of the

e-mail at the bottom from Eric Martin to you?  Did Mr.

Martin, sir, write to you on September 9, 2009, "Michael,

your account", gives the number, "SafeScript has, for the

last two months, purchased a high ratio of controlled

substances to control -- to total sales."  And so, that's --

we talked about that earlier, correct?  And high controlled

substance ratio, I think you told us, sir, it can be of

concern, correct?

A.    That's correct.

Q.    He continues, "Please visit this account and ask them

if there has been a significant change in their business

that may account for this.  Please compare the current Form

590 to the current purchase history, as the percentage of

sales they declared would be controlled substances.  Please

complete an amended Form 590, if necessary, and a Request to

Review Threshold and forward copies to myself and Ed

Hazewski, Manager Diversion Control.  Please respond by

e-mail when this visit has been scheduled.  Thank you for

your help in keeping us compliant."  All right?

      Let's look at the last statement.  "Thank you for your

help in keeping us compliant."  At this point in time, sir,

you understand, at least from your impression, you were

selling them a lot of oxycodone, correct?  Correct?

1    **A.**   It doesn't specifically say oxycodone.

2    **Q.**   I'm asking you, sir, at this point in time, do you

3    understand that you were selling them a lot of oxycodone?

4    **A.**   I can't answer that.

5    **Q.**   Pardon me?

6    **A.**   I cannot answer that.

7    **Q.**   At this point in time, you know their controlled

8    substance ratio is high, do you not?

9    **A.**   That, we know.

10   **Q.**   At this point in time, you know that they have been

11   purchasing from a second distributor, Miami-Luken, correct?

12   **A.**   Correct.

13   **Q.**   You know the reason that they left you folks was

14   because you were stopping some of their orders and they

15   wanted to be able to buy as much Oxycodone as they wanted.

16   You knew that, did you not?

17          MR. NICHOLAS:  Object to that, Your Honor.  That's

18   -- he can't know that and that's an improper question.

19          THE COURT:  Just a minute.

20      Sustained.

21          BY MR. KENNEDY:

22   **Q.**   Sir, at this point in time, from your prior note that

23   we went through, you knew that they were buying from pain

24   clinics, correct, or they were servicing pain clinics

25   filling those prescriptions, correct?

1    **A.**   Yes.

2    **Q.**   And, sir, I will ask you to assume that they were

3    purchasing beyond the 5,000 hydrocodones.  I'll ask you to

4    assume that they were purchasing far in excess, eight to ten

5    times in excess of the 6,000.  So, assuming that, they would

6    have been required to explain why they wanted to buy at

7    these levels, correct?

8    **A.**   Assuming if those were the numbers.

9    **Q.**   Sir, given all of this, did you take this to mean that

10   Mr. Martin believed that sending you to collect information

11   kept AmerisourceBergen compliant?

12           MR. HESTER:  Objection, calls for speculation.

13           THE COURT:  Sustained.

14           BY MR. KENNEDY:

15   **Q.**   Sir, on this -- go up to number 2, e-mail above, if you

16   would.  You e-mailed Mr. Martin back.  Do you see that?

17   **A.**   Yes.

18   **Q.**   E-mailed him back the same day and you state to Mr.

19   Martin, "This account has always purchased a high volume of

20   controls to total sales."  Can you give us a time frame?

21   How long had you known that SafeScript was buying a high

22   volume of controls to total sales?

23   **A.**   I don't know the time frame.

24   **Q.**   And down below, Mr. Martin said "two months".  You

25   corrected him and said that they always had purchased a high

1    volume, true?

2    **A.**   They purchased a high volume, yes.

3    **Q.**   Sir, on this -- this e-mail chain is Mr. Hazewski.  Do

4    you see that?  Mr. Hazewski's on the first e-mail?

5    **A.**   Which e-mail are you referring to?

6    **Q.**   The first one that we read.

7    **A.**   The one dated September 9th?

8    **Q.**   Yes, sir.

9    **A.**   At what time?

10   **Q.**   Yes, sir.

11   **A.**   The 3:52 one?  The --

12   **Q.**   Mr. Hazewski is in the 3:52, yes.

13   **A.**   Okay.

14   **Q.**   Do you see that?

15   **A.**   Yep.

16   **Q.**   You knew Mr. Hazewski?

17   **A.**   Yes.

18   **Q.**   Did you know that he was a 25-year police officer

19   before coming to AmerisourceBergen?

20   **A.**   I did not know that.

21   **Q.**   I think on the next page, Scott Kirsch is on one of

22   those e-mails.  Did you know Scott Kirsch?

23   **A.**   I knew of Scott.

24   **Q.**   Did you know he was a five-year police officer in

25   Pennsylvania before coming to AmerisourceBergen?

1    **A.**    I did not know that.

2    **Q.**    What about Bruce Gundy, did you know him?

3    **A.**    I don't know Bruce.

4    **Q.**    Is there any indication here that, at this point in

5    time, sir, Mr. Hazewski with his police background, Mr.

6    Kirsch, that either of them were going to go to SafeScript?

7    **A.**    I have no idea.

8    **Q.**    Did Mr. Hazewski ever visit SafeScript, sir, to your

9    knowledge?

10                MR. NICHOLAS:  Objection.

11                THE COURT:  Well, if he knows.

12        Do you know?

13                THE WITNESS:  I do not know.

14                BY MR. KENNEDY:

15   **Q.**    Sir, when somebody from Regulatory Affairs would go to

16   one of your pharmacy customers, you would make arrangements

17   for that meeting, would you not?

18   **A.**    I don't believe I ever had Regulatory Affairs go to one

19   of my pharmacies.  We always had an outsourced agency do

20   that.

21   **Q.**    And that started in 2015, did it not?

22   **A.**    I'm not sure when that started.

23   **Q.**    From 2004 to 2012, an eight-year period of SafeScript,

24   do you have any recollection of anybody from Regulatory

25   Affairs ever going to SafeScript to talk to the owner?

```
 1   A.   To my knowledge, no.

 2   Q.   Did you ever have anybody from Regulatory Affairs ever

 3   go to SafeScript during this eight-year period and talk to

 4   the pharmacist?

 5   A.   To my knowledge, no.

 6   Q.   Let's go to 2011.  Do you remember in 2011 sending

 7   Regulatory Affairs the names of three prescribing physicians

 8   that they were filling scripts for at SafeScript?

 9   A.   I don't recall that.  Maybe if I saw it.

10   Q.   Well, I'll try to help you out.

11            MR. KENNEDY:  16651, please.

12        May I approach, Your Honor?  Thank you.

13        Your Honor, we would like to offer into evidence

14   P-16651, again, under 801(d)(2)(D).

15            THE COURT:  Is there any objection to this one?

16            MR. NICHOLAS:  No objection to it being admitted

17   pursuant to the stipulation.

18            THE COURT:  All right.  It's admitted.

19            PLAINTIFF EXHIBIT P-16651 ADMITTED

20            BY MR. KENNEDY:

21   Q.   Now, sir, could you look at the e-mail up at the top?

22            MR. KENNEDY:  Do you want to pull that up, please?

23            BY MR. KENNEDY:

24   Q.   You sent an e-mail, did you not, it looks like here

25   July 29, 2011 to Ed Hazewski, correct?
```

1    **A.**    That's correct.

2    **Q.**    He's in Regulatory Affairs, true?

3    **A.**    That's correct.

4    **Q.**    Copied Eric Martin, also Regulatory Affairs, correct?

5    **A.**    That's correct.

6    **Q.**    And the subject is "Threshold Limits SafeScript" and

7    you attach some information and what you're attaching is an

8    e-mail from SafeScript to you, true, that appears below?

9    **A.**    That's correct.

10   **Q.**    And it provides the names of three prescribers that

11   SafeScript is filling scripts for, correct?

12   **A.**    It has three prescribers on there.

13   **Q.**    One is Deleno Webb and a second one of the three is

14   Phillip Fisher, true?

15   **A.**    That's correct.

16   **Q.**    Let's talk about Dr. Webb.  As you sit here today, do

17   you know Dr. Webb's name?

18   **A.**    I know his name.

19   **Q.**    And do you know the issues and the problems he's had as

20   we sit here today, sir?

21   **A.**    No.

22   **Q.**    Did anyone from AmerisourceBergen ever bring to your

23   attention issues or problems that Dr. Webb had with the West

24   Virginia Board of Worker's Compensation?

25   **A.**    No.

1    **Q.**   And so, why did you provide these names to Regulatory

2    Affairs?

3    **A.**   I did not provide those names.  Those names were given

4    to me to provide to our Regulatory Affairs Team.

5    **Q.**   Second in the chain then, why did you send to

6    Regulatory Affairs these names of these prescribers?

7    **A.**   Because that's what we were in the process of doing.

8    **Q.**   Did you understand that when you provide these names to

9    Regulatory Affairs that they investigate or they review and

10   look into the background of these physicians?  That's the

11   purpose for sending them?

12   **A.**   I don't know what their protocol is.

13   **Q.**   Short of the protocol, do you understand that they

14   review these names, which is why you send them, the names of

15   these doctors?

16            MR. NICHOLAS:  Objection, asked and answered.  He

17   just said he doesn't know the protocol.

18            THE COURT:  I believe he said he didn't know,

19   didn't he, Mr. Kennedy?

20            MR. KENNEDY:  I'm just -- I -- the word protocol

21   threw me off, Your Honor.  I didn't know.  I'm not asking

22   the protocol in detail.

23            BY MR. KENNEDY:

24   **Q.**   You know that the reason you're sending this is they

25   can research --

```
 1              THE COURT:  Well, overruled.  You can answer if
 2   you can, Mr. Perry.
 3              THE WITNESS:  When I send information to them,
 4   what they do with it never comes back to me, as far as why
 5   they want the information or the type of investigation that
 6   they're doing.
 7              BY MR. KENNEDY:
 8   Q.  So, your 24 years since '07, you never understood why
 9   you were providing these names; is that your testimony?
10   A.  I understand why I'm providing it.
11   Q.  Okay.
12   A.  But what they do with it, I have no idea.
13   Q.  Tell us why you provided it.
14   A.  Because they asked for it.
15              MR. KENNEDY:  If we can have P-26160, please.
16        If we can approach.  Thank you, Your Honor.
17        Your Honor, we would move to enter into evidence
18   P-26160.
19              THE COURT:  Any objection?
20              MR. NICHOLAS:  Yes.  I object to this on the
21   grounds of hearsay and relevance.  The witness has already
22   indicated he doesn't know anything about any of this and so
23   I certainly do object.
24              MR. ACKERMAN:  Your Honor, it's offered for
25   notice.  I'd also note that Rule 902(6) provides that
```

```
 1     newspapers and periodicals are self-authenticating.

 2               MR. NICHOLAS:  Well, as far as notice is

 3     concerned, let me just say for -- again that Mr. Mays was

 4     here this morning, Mr. May was here, you know, in the last

 5     couple of days, and Mr. Zimmerman was here before that.  If

 6     they want to talk about -- if they want to talk about what

 7     CSRA knew or didn't do [sic], did or didn't do, or did do,

 8     they could have asked those -- those individuals these

 9     questions.

10          This witness has already said he knows nothing about

11     this.  So, there is absolutely no reason that I can think of

12     why they should be permitted to ask questions of this

13     witness.

14               MR. KENNEDY:  And, Your Honor, may I respond?

15               THE COURT:  Just a minute.

16          (Pause)

17               THE COURT:  Now, go ahead, please.

18               MR. KENNEDY:  Your Honor, 902(6) provides with

19     respect to authentication that newspapers can

20     self-authenticate.  101(b) was amended in 2011 to indicate

21     that electronic versions of newspapers can be admitted.

22          The courts have split on this.  Some have said it's

23     required that you have an affidavit in addition to the

24     electronic version.  However, the majority of the

25     jurisdictions have looked back to 101(b) and said we can
```

1    look at the electronic version of a newspaper and if it has

2    the indicia of reliability, the indicia of authentication,

3    it can be admitted.

4        They look to four things.  One, is there a logo?  We

5    have a logo.  Is there a website stated?  We have a website.

6    Is there a date?  We have a date.  And is there a page

7    number?  And we don't.  We have three of four of the indicia

8    of authentication, Your Honor.

9        Pursuant to that, 801 --

10              THE COURT:  Well, it gets you around the

11   authentication problem, but what about the hearsay and --

12              MR. KENNEDY:  Hearsay, 801 --

13              COURT REPORTER:  I'm sorry.

14              MR. KENNEDY:  Oh, I'm sorry.

15       Well, hearsay on two points, Your Honor.  Basically,

16   the 801(d)(2)(D), we are offering against the adversary in

17   the case.  We think we have authentication, Your Honor, plus

18   an exception to the hearsay rule.

19              MR. NICHOLAS:  Well --

20              THE COURT:  Well, the fact that you're offering it

21   against an adversary in the case doesn't make a newspaper

22   article admissible, does it?

23              MR. KENNEDY:  Under these circumstances, Your

24   Honor, it is -- it is certainly notice that one of the folks

25   that they're filling scripts for in 2011 -- in 2005, his

```
1    privileges with the Worker's Compensation Board had been

2    terminated for writing opioids prescriptions without --

3            THE COURT:  If showing he had notice of this.

4        Mr. Nicholas?

5            MR. NICHOLAS:  He doesn't have notice of this.  As

6    an aside, we're not filling scripts for anyone, so I want to

7    correct that misstatement on the record.

8        But, more fundamentally, he was asked if he knew

9    anything about Mr. Webb.  He said no.  He knows nothing

10   about him.  So, this is just -- I don't know what -- I don't

11   know what to call this, but this should not come in.

12           THE COURT:  I'm going to sustain the objection,

13   Mr. Kennedy.  You can move on.

14           MR. KENNEDY:  Your Honor, we would like to offer

15   this into evidence and then we wouldn't question this

16   witness, but we would like to proffer then P-26160 into

17   evidence, Your Honor.

18           MR. NICHOLAS:  We object.

19           MR. HESTER:  Objection on hearsay grounds, Your

20   Honor.

21           MR. RUBY:  Us, as well, Your Honor.

22           MR. ACKERMAN:  You know, I would only note that

23   the witness has already testified and agreed with the

24   characterization that he was ABDC's eyes and ears on the

25   ground.  So, to the extent there was a report in a West
```

```
 1    Virginia periodical, it is indicia of whether ABDC's eyes

 2    and ears on the ground could have had notice.

 3              THE COURT:  Mr. Hester?

 4              MR. HESTER:  Well, Your Honor, I don't think that

 5    overcomes the hearsay problem with the newspaper article.

 6              THE COURT:  Yeah.  I've ruled on this.  It's out.

 7    The objection is sustained.

 8              MR. KENNEDY:  And, Your Honor, we have a -- Dr.

 9    Fisher also at this point in time had issues and problems

10    with the Osteopathic Board with respect to opioids and I'm

11    assuming -- and it's a newspaper article, also.  So, if you

12    have an objection to that, we can get a ruling.  I would

13    like to make a proffer.

14              MR. NICHOLAS:  Yes.  I'm going to object to that,

15    of course.  Same -- same objection.

16              THE COURT:  Well, you can ask him about Dr. Fisher

17    and see if he knows anything, Mr. Kennedy.

18              MR. KENNEDY:  You're right.  I'm sorry.

19              BY MR. KENNEDY:

20    Q.   Sir, do you know anything about Dr. Fisher and his

21    issues and problems with the Osteopathic Board in West

22    Virginia?

23    A.   I did not.

24              MR. KENNEDY:  And, Your Honor, we would offer

25    P-26161 into evidence.  One, we already argued why we
```

```
 1    believe that it's self-authenticating and, number two --

 2              THE COURT:  I haven't seen it.  Is it another

 3    newspaper article?

 4              MR. KENNEDY:  Yes, sir.

 5              THE COURT:  The objection is sustained.

 6              MR. KENNEDY:  We would proffer into evidence

 7    P-26161, Your Honor.

 8              THE COURT:  Okay.  You want to -- you want to put

 9    it into evidence, but proffer what it is?

10              MR. KENNEDY:  Yeah.

11              THE COURT:  I mean, it's not admitted into

12    evidence, but you want it in the record as a proffer; is

13    that --

14              MR. KENNEDY:  Yes, Your Honor.

15              THE COURT:  That's okay, isn't it, Mr. Nicholas?

16              MR. NICHOLAS:  He can proffer it as long as it's

17    not in evidence.

18              THE COURT:  That's right.  Well, he's making a

19    record in case I made the wrong ruling here and he's

20    entitled to do that.

21              MR. KENNEDY:  Your Honor, it should be -- give

22    exhibits to everybody?

23              THE COURT:  Yeah.  Just -- just have it identified

24    some way.  Is it marked as an exhibit?

25              MR. KENNEDY:  Yes.  It's marked as an exhibit,
```

```
 1    yes.

 2              THE COURT:  Okay.

 3              MR. KENNEDY:  And we are proffering P-26161.

 4              THE COURT:  All right.  And that vouches the

 5    record, but I have sustained the objection and its admission

 6    into the record.

 7              MR. HESTER:  Could we have a copy of it, please?

 8              MR. KENNEDY:  We are still on Exhibit 16651.

 9              BY MR. KENNEDY:

10    Q.   Sir, the reason you were providing the names of these

11    physicians was because of a request for a threshold review

12    and an increase, true, if you want to look at that full

13    exhibit?

14    A.   That is correct.

15    Q.   And if you look to Page 3 of the exhibit, that is the

16    Request For Threshold Review, true?

17    A.   That is correct.

18    Q.   And you are the account manager that's stated, Michael

19    G. Perry?

20    A.   That's correct.

21    Q.   And the drug family being reviewed and the request is

22    for oxycodone?

23    A.   That's correct.

24    Q.   And go down to Reason For Threshold Review.  Do you see

25    that?
```

1    **A.**    Yes.

2    **Q.**    Does it state in bold, "Note:  Exceeding the

3    established threshold does not in itself justify a threshold

4    increase in all cases?"  That's printed right on the form,

5    correct?

6    **A.**    That's what it says.

7    **Q.**    And go down where you say, "Ed", and you stated, "This

8    customer has had issues with exceeding the thresholds on

9    these items."  And, sir, is that the same as they stated

10   right above in bold with "not in and of itself justify a

11   threshold increase"?

12   **A.**    One more time.  I'm sorry.

13   **Q.**    Do you see, sir, where it says, "Note:  Exceeding the

14   threshold -- exceeding the established threshold does not in

15   itself justify a threshold increase."  That's printed on the

16   form, correct?

17   **A.**    That's correct.

18   **Q.**    And then below, you give the reason for this increase.

19   "The customer has had issues with them exceeding the

20   thresholds."  Do you see that?  Was that your statement for

21   the reason?

22   **A.**    I let them know that, yes, the customer has had issues

23   before.

24   **Q.**    Did you provide any reason for the increase in the

25   threshold in 2011 to SafeScript?

1    **A.**   I can't remember if I did or did not.

2    **Q.**   Is there any reason stated on this Threshold Increase

3    Form?

4    **A.**   I don't see one.

5    **Q.**   Sir, you understand that with that one sentence,

6    "SafeScript's threshold for oxycodone in 2011 was

7    increased"?

8              MR. NICHOLAS:  Objection, lack of foundation, and

9    if we're going to keep referring to the one sentence, I

10   would like to -- I would like to ask the Court to ask Mr.

11   Kennedy to read the second sentence --

12             BY MR. KENNEDY:

13   **Q.**   "Please" --

14             MR. NICHOLAS:  And the third sentence.

15             BY MR. KENNEDY:

16   **Q.**   "Please review and see if we can up the threshold on

17   these items.  Please see the additional information in this

18   e-mail."  And the additional information was the name of

19   three doctors, two of which were Dr. Webb and Dr. Fisher,

20   correct?

21   **A.**   That's correct.

22   **Q.**   And did you anticipate that they were going to look

23   into Dr. Fisher and Dr. Webb before they increased the

24   threshold, sir?

25             MR. NICHOLAS:  Objection.  Go ahead.  Sorry.  I

1    withdraw it.

2              THE WITNESS:  I don't know what they would do with

3    that information.

4              BY MR. KENNEDY:

5    **Q.**   But you asked them to see it before they ruled on the

6    threshold, correct?

7    **A.**   I asked them to see my e-mail.

8    **Q.**   Which contained the three physicians, true?

9    **A.**   That's correct.

10   **Q.**   Did you know that Dr. Webb was a psychiatrist?

11   **A.**   I did not.

12             MR. NICHOLAS:  We're -- objection.  We're at the

13   stage here now where he's being asked about something which

14   he's already said he knows nothing about.

15             THE COURT:  Sustained.

16             MR. KENNEDY:  16642, we passed around.  It was the

17   first thing we passed around already.  We're going to go

18   back to that.

19             BY MR. KENNEDY:

20   **Q.**   Mr. Perry, I think you already have this.  This is the

21   first thing that we looked at.

22   **A.**   16642?

23   **Q.**   Yes, sir, 16642.  If I had another copy, I would give

24   it to you.  It's the first one we looked at of all the

25   exhibits.

```
 1              Here's another copy.

 2                   MR. KENNEDY:  May I approach, Your Honor?

 3                   THE COURT:  Yes.

 4                   BY MR. KENNEDY:

 5    Q.   Sir, I have another copy.  Here's the first one.

 6    A.   Thank you.

 7    Q.   And, sir, we looked at this in the beginning.  This is

 8    Ed Hazewski's response with respect to the threshold

 9    increase.  Do you see that August 12th e-mail to you?

10    A.   Yes.

11    Q.   And does he state, "The customer has been adjusted and

12    is now set at the maximum they can receive of this product.

13    Their CS ratio is 86% of their overall purchases"?  That

14    means that SafeScript, as late as 2011, can now purchase

15    even more oxycodone, correct?  That's what that decision

16    means, correct?

17    A.    It doesn't specifically say they can order more of that

18    specific item.

19    Q.   So, you asked for an increase and they say it's been

20    adjusted.  Does that mean the threshold has been adjusted up

21    as you requested?

22    A.   Yes.

23    Q.   And, sir, at the time in 2011 that this decision was

24    made by Regulatory Affairs, we know the controlled substance

25    ratio is high, correct?
```

1    **A.**   Correct.

2    **Q.**   They know that more than one distributor is being used,

3    correct?

4    **A.**   I'm assuming.

5    **Q.**   They know the reason the change from you folks over to

6    Miami-Luken for a period, correct?

7            MR. NICHOLAS:  Your Honor, I'll object at this

8    point.  I'm not sure that, with regard to the time period,

9    that this is accurate and we've gone through this chart

10   three times.  So, I'm not sure what the purpose is either.

11           BY MR. KENNEDY:  And, Your Honor, if I might

12   respond.  I've spent two hours documenting every one of

13   these items from Mr. Perry to Regulatory Affairs.  It

14   started with the 2008 e-mail by Mr. Perry --

15           THE COURT:  Well, I will overrule the objection

16   and let you do it.  Go ahead.

17           BY MR. KENNEDY:

18   **Q.**   Sir, at this point in time, you can assume that the

19   hydro was over 5,000, so an explanation is required,

20   correct, if it's over 5,000?

21   **A.**   If it's over, I guess, yes.

22   **Q.**   And if the oxycodone is over 6,000, an explanation as

23   to why they want to buy that level is required, correct?

24   **A.**   Correct.

25   **Q.**   And we know that they are filling prescriptions for

1    pain clinics, true?

2    **A.**    Yes.

3    **Q.**    And the threshold of this information known is

4    increased so they can buy even more oxycodone, true?

5    **A.**    I'm assuming so.

6    **Q.**    Sir, SafeScript was closed in February of 2012.  You

7    are aware of that?

8    **A.**    Yes.

9    **Q.**    I think you actually reported to AmerisourceBergen that

10   the owner of SafeScript had been pulled over and detained by

11   the police, true?

12   **A.**    That's correct.

13   **Q.**    You called that in?

14   **A.**    That's correct.

15   **Q.**    And the DEA raided SafeScript, did they not?

16   **A.**    That's what I understand.

17   **Q.**    And at that point in time, AmerisourceBergen decided

18   they weren't going to sell anymore to SafeScript?

19   **A.**    I believe we did cut them off.

20   **Q.**    The day before you cut them off, you were still selling

21   them a lot of oxycodone, correct?

22   **A.**    How much we were selling them at that time, I have no

23   idea.

24   **Q.**    Let's switch gears for a second.  You interacted with

25   sales folks around your district, sales folks at national

1    meetings?

2    **A.**    Yes.

3    **Q.**    And you interacted with your boss and the VP of Sales,

4    Lisa Mash?

5    **A.**    Yes.

6    **Q.**    And, sir, was it your impression or your belief that

7    AmerisourceBergen applied the Diversion Control Program

8    equally across all of your customers, big and small?

9    **A.**    Yes.

10   **Q.**    Sir, what is the -- tell me, what was the monthly

11   volume of some of your bigger customers?

12   **A.**    I mean, it would vary.  When you say big customer --

13   **Q.**    What was a big customer, $100,000.00 a month,

14   $200,000.00?  Do you have customers like that?

15   **A.**    I mean, personally?

16   **Q.**    Yes, sir.

17   **A.**    Every customer is a big customer.

18   **Q.**    Okay.  And just a plain dollar amount, sir, would a

19   customer under $50,000.00 be one of your smaller customers

20   if we just look at it as monthly dollar value?

21   **A.**    Again, I mean, I can't judge who was a big customer,

22   who was a -- who was a small customer.  Your sales are going

23   to vary depending upon a lot of things in the industry.

24   **Q.**    If I told you that your monthly with SafeScript was

25   $190,000.00, would that fit into your memory?

**A.**   Yes.

**Q.**   If I told you that Safe Cloud [sic] was a $3.7 million

dollar annual customer, would that be consistent with your

memory, sir?

**A.**   Who?

**Q.**   Or, excuse me, McCloud?

**A.**   Okay.  You're going to have to come back and say that

all again because --

**Q.**   If I told you that McCloud was a $3.7 million dollar

annual customer at one point, would that be consistent with

your memory of McCloud?

          MR. NICHOLAS:  Your Honor, could we -- may I

object to ask that the question be clarified as to whether

we're talking about all products?

          MR. KENNEDY:  Yes, sir.

          BY MR. KENNEDY:

**Q.**   I'm talking about your total sales.

**A.**   Yeah.  That's -- that's a large account.

          MR. KENNEDY:  If I can have P-00193, please.

P-14622.

     May I approach, Your Honor?

          THE COURT:  Yes.

          MR. KENNEDY:  Thank you.

     And, Your Honor, this is a series of e-mails amongst

employees at AmerisourceBergen.  We would like to offer

```
 1    Exhibit 41622 into evidence pursuant to 801(B)(2)(D),

 2    statements of a party employee offered against the adverse

 3    party.

 4                 THE COURT:  Is there any objection to 41622?

 5                 MR. NICHOLAS:  No objection.

 6                 THE COURT:  Admitted.

 7                PLAINTIFF EXHIBIT 41622 ADMITTED

 8                 MR. KENNEDY:  I'm sorry.

 9                 BY MR. KENNEDY:

10    Q.   And, Mr. Elkins [sic], if you could start it at the top

11    e-mail, if you would, please.  Do you see your name there,

12    Mr. Elkins [sic]?  Your boss is sending an e-mail to you.

13    Do you see that?

14    A.   My name is not Mr. Elkins.

15    Q.   I'm sorry.  Mr. Elkins is sending an e-mail to you,

16    Michael Perry, do you see that, the top e-mail?

17    A.   He sent that e-mail to me along with several other

18    people, yes.

19    Q.   And what he is doing, he is attaching the e-mail below

20    when he sends you the e-mail, true?

21    A.   Yes.

22    Q.   And if we can go to the e-mail below, the e-mail below

23    says, "Team:  Since the end of summer, our sales team

24    undertook an endeavor to review all accounts with less than

25    $50,000.00 a month in volume.  In addition, and
```

1    independently, for any such accounts that were purchasing a

2    high percentage of controlled substances in relation to

3    their overall TRV", which would be total sales, correct,

4    sir?

5    A.   Yes.

6    Q.   "With respect to those $50,000.00 a month customers,

7    you were directed to have frank conversations reiterating

8    the importance of Diversion Control and that any red flags

9    caused by their purchasing patterns put them at risk of

10   having controlled substance purchases suspended or limited

11   by AmerisourceBergen."  Do you see that, sir?

12   A.   Yes.

13   Q.   So, sir, you were told to have frank conversations with

14   all of your accounts under $50,000.00, true?

15   A.   That's correct.

16   Q.   Frank conversations about red flags and a warning that

17   you would reduce the controlled substance shipments or cut

18   them off, true?

19   A.   That's correct.

20   Q.   You didn't have these conversations, at least under

21   this program, with any customer over $50,000.00, true?

22   A.   Correct.

23   Q.   Now, sir, over the years, I think you told us you --

24   you interacted with Regulatory Affairs, correct?

25   A.   That's correct.

```
 1    Q.   You certainly interacted with sales folks up to the

 2    Vice President, Lisa Mash, true?

 3    A.   That's correct.

 4    Q.   My question is, from your observations 24 years at the

 5    company, sir, do you believe that AmerisourceBergen had the

 6    same commitment to Diversion Control as they did to selling

 7    products?

 8    A.   I do.

 9         MR. KENNEDY:  If you can give me P-17140.

10         If I can approach, Your Honor?

11         THE COURT:  Yes.

12         MR. KENNEDY:  Your Honor, this has already been

13    admitted into evidence, P-17140.

14         BY MR. KENNEDY:

15    Q.   Sir, if you go down to number seven, do you see McCloud

16    Family Pharmacy that was your customer?

17    A.   That's correct.

18    Q.   And Drug Emporium was your customer?

19    A.   That's correct.

20    Q.   And, sir, do you see that in looking for the due

21    diligence files, they looked to Iron Mountain.  That's an

22    off-source facility, storage facility, correct?

23         MR. NICHOLAS:  Your Honor, I will interpose an

24    objection at this time.  The document that's been placed in

25    front of the -- with regard to the document placed in front
```

```
 1    of Mr. Perry, there's no -- there's nothing on it to -- that
 2    -- to suggest that Mr. Perry has ever seen the document.
 3              MR. KENNEDY:  And, Your Honor, it's about two of
 4    his clients and about the 580 Form that he was responsible
 5    --
 6              THE COURT:  Well, you can ask him if he -- if he
 7    has any familiarity with it.  Otherwise, I'll sustain the
 8    objection.
 9              MR. KENNEDY:  Your Honor, we would like to offer
10    into evidence P-17140 as -- under 801(d)(2)(D).
11              MR. NICHOLAS:  I think it's already admitted into
12    evidence.  That's not the issue.
13              BY MR. KENNEDY:
14    Q.   Sir, let me just back away.  I'm going to ask you to
15    assume some facts.  I want you to assume, sir, that the DEA
16    did an inspection of a Columbus facility in 2015 and they
17    asked for the due diligence documents on two of your
18    customers, McCloud and Drug Emporium.
19         And I want you to assume, sir, that Regulatory Affairs,
20    in looking for those due diligence files in those two
21    pharmacies, looked to Iron Mountain, an off-site storage
22    facility, then looked through Microfiche to find those
23    documents.  I want you to assume that.  All right?
24              MR. NICHOLAS:  I'll object before we go on.
25    That's a lot to assume and these are -- and they're all
```

```
 1    assumptions and I'm not sure that this has any value.  So,

 2    I'm going to -- I'm going to object.

 3              THE COURT:  Well, I'll let him ask the question

 4    and --

 5              MR. KENNEDY:  And you can -- I assume that -- and

 6    my assumption --

 7         (Unintelligible cross-talk)

 8              COURT REPORTER:  I'm sorry.  I --

 9              MR. KENNEDY:  I'm sorry.

10              COURT REPORTER:  I didn't hear the end of that,

11    Judge.

12              THE COURT:  I said overruled at this point.

13              COURT REPORTER:  Thank you.

14              MR. KENNEDY:  And I -- you can assume, sir, that

15    my assumptions are based upon P-17140 that's been admitted

16    into evidence.  And I will move on.

17              MR. NICHOLAS:  I will object to that comment, but

18    go on.

19              THE COURT:  Well, I'll sustain the objection to

20    the editorial comment.

21              BY MR. KENNEDY:

22    Q.  Sir, let's look at the tools you had available to you

23    to sell products.  All right?  First of all, do you have a

24    website available to you called The Hub?

25    A.  Yes.
```

1    **Q.**    And tell us what's in The Hub.

2    **A.**    It's going to take all day.

3    **Q.**    There's a lot of information about --

4    **A.**    There is a lot of information in The Hub.

5    **Q.**    About each individual customer, true?

6    **A.**    That's correct.

7    **Q.**    You can look into The Hub and find basically up to the

8    date what you have sold or what that customer has purchased,

9    true?

10   **A.**    That's correct.

11   **Q.**    And you can actually even look historically back and

12   see where they were with respect to these different product

13   categories a year before?

14   **A.**    Not product-specific.

15   **Q.**    No, category-specific?

16   **A.**    I don't believe it's category-specific either.

17   **Q.**    Tell us what else is in there.

18   **A.**    I mean, there is information in there on all our

19   programs and services, our reporting tools, communications

20   with interior sections of our corporation, just -- I mean,

21   just a plethora of information on ABC and who we are, what

22   we have to offer.

23   **Q.**    And some of the information is customer-specific, true?

24   **A.**    That's correct.

25   **Q.**    So, you could look up SafeScript and get a whole ton of

1    information that helps you sell to SafeScript, true?

2    **A.**    Not necessarily.

3    **Q.**    What about McCloud, specific information about McCloud?

4              MR. NICHOLAS:  Your Honor, could I object and ask

5    for some time period here?

6              THE COURT:  Yeah.

7              BY MR. KENNEDY:

8    **Q.**    The Hub was in existence for what period of time, sir?

9    **A.**    I don't recall when we started using The Hub.

10   **Q.**    Prior to The Hub, what was this -- this database

11   called; do you remember?

12   **A.**    I don't remember that either.

13   **Q.**    The information in The Hub, sir, updated every other

14   day; is that true?

15   **A.**    If it refreshed, yes.

16   **Q.**    You also had available to you a website called Xactly,

17   true?

18   **A.**    Yes.

19   **Q.**    And for what period of time did you have the website

20   Xactly?

21   **A.**    That, I don't recall.

22   **Q.**    At least five years?

23   **A.**    Maybe.

24   **Q.**    And let me -- with respect to The Hub, did you even

25   have a Hub coach?  You had somebody that actually would

1    coach you on how to use Hub and how to navigate through it

2    to get information?

3    **A.**    There was -- there was other people that, you know, if

4    we were having issues that we could go to and they might be

5    able to help us through something.

6    **Q.**    And what information then does this other website

7    provide to you, Xactly?

8    **A.**    What other website are you talking about?

9    **Q.**    Xactly, X-a-c-t-l-y, are you familiar with that?

10   **A.**    Yeah.  I can't remember, no pun here, exactly what.

11   Exactly.  Yeah.  I really can't recall.  I mean, you would

12   have to refresh my mind, someone would, what Xactly did.

13   **Q.**    Xactly would give you information about your sales and

14   how close you were to meeting some of your targets, correct?

15   **A.**    Okay.  Okay.

16   **Q.**    You also -- and that was just on-line.  You get that on

17   your computer, true?

18   **A.**    That's correct.

19   **Q.**    And you would get The Hub right on your computer, too,

20   correct?

21   **A.**    That's correct.

22   **Q.**    So, you could get onto The Hub from your house, when

23   you were on a sales call, on vacation, correct?

24   **A.**    That's correct.

25   **Q.**    And the same with this website, Xactly, which provided

1   you additional information on sales to date, correct?

2   **A.**   Correct.

3   **Q.**   You also got a Leakage Report.  Can you tell us what

4   the Leakage Report is, sir?

5   **A.**   The Leakage Report you use for a lot of things.  You

6   know, if -- if we're a vendor for an account and they're

7   having issues with regards to ordering product, we want to

8   know what that product is.  And we'd like to know why it's

9   being leaked, why we're not capturing that as one of our

10  sales.

11  **Q.**   And you get that with respect to each individual

12  customer, also, do you not?

13  **A.**   Yes.

14  **Q.**   And I looked at the report, sir.  There's PRX Sales,

15  CMRX Sales, total RX sales.  There's a lot of information in

16  the Leakage Report, also, true?

17  **A.**   There's a lot of -- yes.

18  **Q.**   And you pull that right up on your computer, also?

19  **A.**   From time to time, yes.

20  **Q.**   You can get that in minutes, true?

21  **A.**   From time to time, yes.

22  **Q.**   So, sir, let me ask you, for you to access information

23  to help you sell products, did you ever have to go to an

24  off-site storage facility?

25  **A.**   No.

1    **Q.**   Did you ever have to leaf through Microfiche to get

2    information to sell your products?

3    **A.**   No.

4    **Q.**   Did you ever have to wait five days to get the

5    information or is it updated every few days?

6    **A.**   I don't recall how often it's updated.

7    **Q.**   And when you looked for information, sir, was your

8    information with respect to the sales to a particular

9    customer every -- over five years old?

10   **A.**   Can you say that again?

11   **Q.**   Was the information on the sales to your customer over

12   five years old?

13   **A.**   I certainly would hope not.

14   **Q.**   You wouldn't want to do that with respect to selling

15   products, would you, sir?

16   **A.**   No.

17   **Q.**   Sir, the 590 we've talked so much about, there was a

18   problem, was there not, as late as 2017 with your customers

19   having updated, or having any 590 at all, was there not?

20   **A.**   With my -- all my customers?

21   **Q.**   No, sir.  There was a problem with AmerisourceBergen,

22   including your customers, with respect to having 590 Forms

23   in their files, was there not?

24   **A.**   There was an initiative that the company took around

25   that time for 590s.

1    **Q.**   You understand, sir, that over 90% of the customers

2    being sold controlled substances had no 590 or had an

3    outdated 590?  Were you aware of that, sir?

4              MR. NICHOLAS:  Objection, lack of foundation.

5              THE COURT:  Well, if he knows.

6         Do you know?

7              THE WITNESS:  I do not know that.

8              BY MR. KENNEDY:

9    **Q.**   Sir, were you a part of the project to collect 590s?

10   **A.**   Every salesperson most likely would have had that

11   responsibility.

12   **Q.**   And that was started in 2017, correct?

13   **A.**   I'm not sure what year that was.

14   **Q.**   Assume it started in 2017.  That would be ten years

15   after the program to have 590s for every customer came into

16   place, would it not, ten years later?

17             MR. NICHOLAS:  Objection, lack of foundation.

18             THE COURT:  Well, if he knows.

19        Do you know?

20             THE WITNESS:  I do not.

21             THE COURT:  Doesn't know.

22             BY MR. KENNEDY:

23   **Q.**   Well, sir, the 590 was required.  We did that this

24   morning, correct?

25             COURT REPORTER:  I'm sorry.  Can you repeat that,

1     please?

2               BY MR. KENNEDY:

3     **Q.**   The 590 was required for every customer.  We

4     established that this morning, did we not?

5     **A.**   That's correct.

6               MR. NICHOLAS:  I'll object to that question

7     belatedly as lacking foundation and inaccurate.

8               THE COURT:  I'll sustain that objection.

9               MR. KENNEDY:  If you can give me 41623, please.

10        If I can approach, Your Honor?

11              THE COURT:  Yes.

12              MR. KENNEDY:  Sometimes I can't see you nod.

13    Without my glasses, I can read, but I can't see.

14              THE COURT:  I have the same problem, Mr. Kennedy,

15    sometimes.

16              MR. KENNEDY:  Your Honor, we would offer P-41623

17    into evidence pursuant to 801(d)(2)(D).  This is the

18    statements by employees against an adverse party.

19              THE COURT:  Is there any objection?

20              MR. NICHOLAS:  Yes.  I certainly object to the use

21    of this document with Mr. Perry.

22              MR. KENNEDY:  Mr. Perry is on the e-mail, Your

23    Honor.  He received this document.

24              MR. HESTER:  Your Honor, it's not clear what is

25    being introduced.  Is it simply the e-mail or there's also

1       -- we've been handed a printout that includes pharmacies

2       from all over the country.  It's not clear whether the --

3       counsel is moving to --

4               MR. KENNEDY:  Just the e-mail.  Just the e-mail,

5       Your Honor.

6               THE COURT:  So, all you're offering is an e-mail;

7       is that right?

8               MR. KENNEDY:  Yes, Your Honor.  Mr. Perry is on

9       the e-mail.

10              MR. MAHADY:  Your Honor, if we're just doing the

11      e-mail at this time, I think that's okay to the extent Mr.

12      Perry knows about it.  To the extent we move beyond this

13      e-mail, we would like the opportunity to stand back up and

14      object because --

15              THE COURT:  Okay.

16              MR. MAHADY:  -- this issue generally raises a

17      number of objections, including geographic scope.

18              THE COURT:  All right.  I'll admit it and you can

19      renew, I guess, but it is admitted at this point.

20          And you're offering it under what rule, Mr. Ackerman?

21              MR. ACKERMAN:  Mr. Kennedy offered it, Your Honor,

22      but it is that one that we've been talking about for awhile,

23      801(d), as in Delta, 2(d), as in Delta.

24              THE COURT:  801(d) --

25              MR. KENNEDY:  2(d), (d)(2)(D).

```
 1              THE COURT:  Okay.  And I'm so used to hearing from
 2    you, Mr. Ackerman, I just assumed that was you.
 3         All right.  It's admitted.
 4              PLAINTIFF EXHIBIT P-41623 ADMITTED
 5              THE COURT:  Go ahead.
 6              MR. KENNEDY:  Thank you, Your Honor.
 7              BY MR. KENNEDY:
 8    Q.   So, Mr. Perry, you see there's an e-mail up at the top
 9    from Doug Ernsberger and you are included in his
10    transmission.  Do you see that?
11    A.   Yes.
12    Q.   And you see the attachment CSR Form 590, December 2016
13    document.  Do you see that?
14    A.   Yes.
15    Q.   And then, he is forwarding you an e-mail that had been
16    sent to him, true?
17    A.   That's correct.
18    Q.   If you go down to that lower e-mail and the subject is
19    the 590 Validation Project.  Do you remember that, too, sir?
20    A.   Yes.
21    Q.   It states, "Hi, all.  Please cascade this down to all
22    Sales Executives.  We have been asked by CSRA Diversion
23    Control Team to assist them with the collection of updated
24    documentation for a substantial number of customers."
25              MR. KENNEDY:  And underline "substantial number of
```

1    customers", please.

2              BY MR. KENNEDY:

3    **Q.**   The next sentence, "The collection of information will

4    include filling out a new CSRA Form 590, attached, and

5    pictures of the location.  This project will span over the

6    next six months with a goal of completing by June 30, 2017.

7              Background for project.  Over the past several months,

8    the CSRA Diversion Control Team, DCT, has been working on

9    the CSRA 590 Validation Project.  This project was initiated

10   to validate that all current ABDC customers authorized to

11   purchase controlled substances have the required due

12   diligence in file."  It says "required due diligence".

13             Next sentence, "The first phase of this project was to

14   conduct a full review of every ABDC customer authorized to

15   purchase controlled substances and identify any with

16   deficiencies.  This initial phase has been completed and a

17   substantial number of customers have been identified who

18   will require [sic] to have their 590 documentation updated."

19             Do you see that, sir?

20   **A.**   Yes.

21             MR. MAHADY:  Your Honor, I am going to object at

22   this time.  This is well beyond Cabell County and the City

23   of Huntington and the customers that Mr. Perry serviced at

24   that time in 2017.  So, we object on relevancy grounds.

25             We think that to, the extent they have questions about

1    this project, it should be limited to whether or not any of

2    Mr. Perry's customers in Cabell County or the City of

3    Huntington were implicated in 2017.  Anything beyond that is

4    outside the geographic scope of this case.

5                THE COURT:  Well, can you limit it to Cabell

6    County, Mr. Kennedy?

7                MR. KENNEDY:  No, Your Honor.  Look, Your Honor,

8    we -- first, I believe this has already been admitted,

9    number one.

10        Number two, Your Honor, this -- we heard testimony from

11   Mr. May, Mr. Mays, and Mr. Zimmerman.  This goes to state of

12   mind.

13        Number one, Your Honor, they testified that they

14   believed that they were compliant with the law at all times.

15   That's based upon conversations with the DEA.

16        They -- all three of AmerisourceBergen witnesses to

17   date have testified that they were dedicated to compliance

18   and dedicated to their Diversion Control Program.

19        We have evidence here, Your Honor, that a substantial

20   number of pharmacies outside of Cabell County, Your Honor,

21   would not -- did not have the required due diligence in

22   their files.  We believe this goes to state of mind under

23   801 as an exception to the hearsay rule.  On (d)(2)(D), it's

24   an exception to the hearsay rule.  In fact, it's not even

25   hearsay under those two rules.

1          It goes to state of mind, Your Honor.  The very fact

2     Mr. Perry had 14 customers included here.  The fact that

3     they're not Cabell County customers, Your Honor, we believe

4     does not keep this from coming in.  This goes to defendants'

5     state of mind and their repeated statements of how dedicated

6     they were to due diligence and it's missing in a substantial

7     number of pharmacies who they are selling controlled

8     substances to.

9               MR. MAHADY:  Your Honor, if I may --

10              MR. KENNEDY:  It goes to state of mind, Your

11    Honor.  This is not a pharmacy outside of Cabell County,

12    Your Honor.  This is a national program and they --

13              THE COURT:  I understand the point.  Let me --

14              MR. MAHADY:  Well, first, I disagree with the

15    characterization that this contradicts any of the testimony

16    of Mr. May, Zimmerman or Mays.

17          I also note that, as Mr. Kennedy just testified [sic],

18    they were just here testifying.  This very clearly states

19    that this was an initiative by the CSRA Diversion Control

20    Team.  Those were the witnesses where this should have been

21    raised.

22          As it relates to Mr. Perry, Mr. Kennedy also stated

23    that this relates to customers outside of Cabell County.

24    That's because it does not relate to customers in Cabell

25    County.

1          So, again, for the reasons that we've said about how

2     this is not the right witness, along with the fact that

3     there is a geographic scope issue, we object.

4          Mr. Nicholas may have something to add.

5          THE COURT:  Well, I'm going to overrule the

6     objection and let him pursue it.  I think it does go to the

7     -- the state of mind and whether they were sincere about

8     their Diversion Control and so forth and -- but if Mr. Perry

9     doesn't know anything about it, then you've got a problem.

10         MR. KENNEDY:  Yes, sir.  Thank you, Your Honor.

11         THE COURT:  Go ahead for now.

12         BY MR. KENNEDY:

13    **Q.**   Let me finish, Mr. Perry.  Just going to read two

14    sentences.  "Next steps, due to the high number of customers

15    that will need validation, we have broken the list into two

16    groups of CPA customers and non-CPA.  The first group we

17    will address is the CPA group.

18         Beginning January 11, Sales Executives" -- and that is

19    you, correct?

20    **A.**   That's correct.

21    **Q.**   And you remember this program, correct?

22    **A.**   Yes.

23    **Q.**   "Beginning January 11, Sales Executives will complete

24    the validation paperwork, CSRA Form 590 and pictures, for

25    the CPA accounts in their assignments."

```
 1              MR. KENNEDY:  Go down to the note, please, and I'm

 2    finished.

 3              BY MR. KENNEDY:

 4    Q.   Do you see the note?  Did they tell you, Mr. Perry,

 5    with respect to this project and you going out and

 6    collecting required due diligence, did they tell you in this

 7    note, "This documentation project should be done within the

 8    normal scope of your routing"?  That's sales calls, correct?

 9    A.   That's correct.

10    Q.   Do they tell you, sir, "The priority is still the

11    financial performance of your assignment"?  And that would

12    be your territory, sir, correct?

13    A.   That's correct.

14    Q.   So, sir, they are missing the required due diligence in

15    a substantial number of customers that they are selling

16    controlled substances to and they tell you that the priority

17    is your financial performance in collecting these documents,

18    correct?

19    A.   That's correct.

20    Q.   And, sir, can you tell the Court, how long did this

21    project last?  How long were you out there collecting the

22    required due diligence for the customers that you were

23    already selling controlled substances to?

24    A.   I have no idea how long it actually lasted.

25    Q.   It lasted over a year, didn't it?
```

```
 1              MR. NICHOLAS:  Objection.  He just said he didn't
 2    know how long it lasted.
 3              THE COURT:  Sustained.
 4              BY MR. KENNEDY:
 5    Q.   Sir, let me ask you, during this period of time, did
 6    anyone from AmerisourceBergen come to you -- and you can
 7    assume you had 14 customers on this list.  Did anybody from
 8    AmerisourceBergen ever come to you and say, "Until we
 9    collect the required due diligence, we're not going to sell
10    controlled substances to your customers"?
11              MR. NICHOLAS:  Objection to -- object to the lack
12    of foundation.  I don't think it's been established that --
13    whether or not this witness had 14 customers in 2017, 14
14    independent pharmacies in 2017.  I object.
15              MR. KENNEDY:  Your Honor, if I may, I asked him to
16    assume that and that is the next document where he has 14
17    customers, Your Honor.
18              THE COURT:  Overruled.
19         Answer it if you can, Mr. Perry.
20              BY MR. KENNEDY:
21    Q.   Did anybody come to you, sir, and say, "We're going to
22    stop selling until we get due diligence"?
23    A.   No.
24    Q.   Did anybody come to you during this period where you
25    were attempting to collect this due diligence and say,
```

1        "We're going to change the priority from financial

2     performance to actually getting the required due diligence?"

3     Did anybody come to you and make that statement?

4     **A.**    No.

5                    THE COURT:  Let's take a break here.  I think

6     we've got -- the court reporter needs a break, Mr. Kennedy.

7                    MR. KENNEDY:  Thank you, Your Honor.

8                    THE COURT:  So, we'll be in recess for a few

9     minutes.

10        (Recess taken)

11        (Proceedings resumed at 3:25 p.m. as follows:)

12                   THE COURT:  Mr. Perry, you can resume the

13     witness stand, sir.

14                   MR. KENNEDY:  Your Honor, I have no further

15     questions of Mr. Perry.  If you want me to wait, I can --

16                   THE COURT:  Thank you, Mr. Kennedy.

17        Are you ready to cross-examine?

18                   MR. NICHOLAS:  He wanted to do something.  He

19     wanted to introduce -- I'm giving him the opportunity to do

20     something he wants to do first.

21                   THE COURT:  All right.

22                   MR. KENNEDY:  Yes, Your Honor.

23        We would like to offer a few exhibits that I did not

24     offer.  I questioned on them and I missed it in focusing on

25     other things.

1             We would like to offer 16642.

2                  MR. NICHOLAS:  No objection to this one.

3                  THE COURT:  All right.  It's admitted.

4                  MR. KENNEDY:  And then 41625.  And that was the,

5        that was the exemplar of the 590 that we utilized.

6                  MR. NICHOLAS:  Well, I don't object except I think

7        since it refers to a specific customer and it has specific

8        customer information and that customer is in Tennessee, I

9        would ask that the information be blocked -- the name of the

10       customer be blocked out and the information be blocked out.

11       If I recall correctly, it was being used to show what the

12       questions were.

13                 MR. KENNEDY:  Yes.

14                 THE COURT:  Can you do it that way, Mr. Kennedy,

15       and still have it to do what you want it to do?

16                 MR. KENNEDY:  I think we would like -- if there's

17       a way we can white-out the answers, but we would like to

18       have a 590 in evidence somewhere, Your Honor.

19                 MR. NICHOLAS:  That's fine.  As long as the

20       answers and the name of the customer are whited-out, that's

21       fine.

22                 MR. KENNEDY:  We'll do that tonight.

23                 THE COURT:  All right.  I'll admit it subject to

24       making those inundations.

25                 MR. KENNEDY:  And then 00193 which is on the

```
 1    stipulation, and that is the PowerPoint presentation of the

 2    sales associate that we questioned on.

 3              MR. NICHOLAS:  No objection to that.

 4              THE COURT:  All right.  That's admitted.

 5              MR. KENNEDY:  We are finished.  Thank you, Your

 6    Honor.

 7              THE COURT:  Thank you, Mr. Kennedy.

 8         All right, Mr. Nicholas.

 9                         CROSS EXAMINATION

10    BY MR. NICHOLAS:

11    Q.   Good afternoon, Mr. Perry.

12    A.   Good afternoon.

13    Q.   I'm going to start with a few background or cleanup,

14    cleanup questions I guess.  One has to do with the products

15    that you sold to the pharmacies that were part of your, you

16    know, customer base.

17         You didn't just sell opioids to these, to these

18    pharmacies; is that right?

19    A.   I mean, as a sales executive, our primary goal was to

20    go out and bring to the company customers.  And we did that

21    in a number of ways.

22         Probably the most strengths that we had as a company

23    was our programs and services that we had to offer

24    customers.  We had a very, very robust programs and services

25    program that kept customers and also kept our phones ringing
```

 1   with regards to what we brought to the industry.

 2        It wasn't just selling pharmaceuticals.  It was all

 3   about who we were as a company and what we had to offer in

 4   order for our independents to actually keep their doors

 5   open.

 6        Our programs and services were number one with regards

 7   to our sales force.  Our Good Neighbor Pharmacy Program,

 8   top-notch.  I think everybody in this room probably has seen

 9   or heard of Good Neighbor Pharmacy.

10        Today probably one of the biggest spotlights with

11   regards to Good Neighbor Pharmacy was the fact that Good

12   Neighbor Pharmacies led the way with regards to giving COVID

13   shots in the State of West Virginia.  Good Neighbor Pharmacy

14   did a lot of things for a lot of customers.  It wasn't just

15   about selling pharmaceuticals.

16        One of the other programs that we had was our Elevate

17   Program.  And through our Elevate Program, it kept our

18   customers tied to us because we were able to actually go out

19   and negotiate better pricing for them with regards to their

20   reimbursements.

21        We were able to go out, show the customers that we had

22   something that every pharmacy -- no matter if you were with

23   AmerisourceBergen or if you were with Cardinal or if you

24   were with McKesson, you needed a third-party provider, and

25   our Elevate Program did that.

1    **Q.**   In terms of the actual products that you were selling,

2    in addition to controlled substances or narcotics, is it --

3    isn't it correct or is it correct that you sold the full

4    range of products that a pharmacy would, would carry, both

5    over-the-counter and behind-the-counter?

6    **A.**   That's correct.

7    **Q.**   And, so, that would include products that include the

8    likes of blood pressure medication, chemotherapy,

9    chemotherapy medication, as well as things like Advil,

10   Tylenol, you know, things of that nature, the full range?

11   **A.**   That's correct.

12   **Q.**   Okay.  A couple more background questions and then I'll

13   ask you about your background.

14        From time to time, CSRA would ask you to obtain

15   additional information from your customers; is that correct?

16   **A.**   Yes.

17   **Q.**   And they would ask you to send the information along to

18   CSRA; is that correct?

19   **A.**   That's correct.

20   **Q.**   Did you always obtain the information that CSRA asked

21   you to obtain in a timely fashion and send it along?

22   **A.**   Yes.

23   **Q.**   Okay.  And, finally, with regard to the Form 590, the

24   Form 590 is not the full range of due diligence that the

25   company does; isn't that correct?

**A.**    That's correct.

**Q.**    And as far as the actual Form 590 is concerned, did you

ever coach customers in filling out the Form 590 to try to

evade or get around any due diligence obligations?

**A.**    Never.

**Q.**    Okay, all right.  Let's, let's -- I'd like to have the

opportunity for you to tell the Court a little bit more

about yourself.

Can you tell the Court your educational background,

please, up through college?

**A.**    Sure.  So, you know, 1 through 8 I attended

Transfiguration Catholic School in Pittsburgh, Pennsylvania.

After leaving Transfiguration, going into high school,

I attended Mon Valley Catholic High School in Monongahela,

PA.

After leaving and graduating from Mon Valley Catholic,

I attended Cal State University.  At that time, it was

California College.  Now it is California State University

of Pennsylvania.  I attended that school for two years.  And

my ambition was to go into social work.

After two years at California State University, they

started losing accreditation in social work.  My ambition

through social work was to work with juvenile delinquents.

Through some channels that I had in Huntington, West

Virginia, I had an uncle that lived in Huntington.  And I

1    talked to him on various occasions and we talked about a lot

2    of different things, what Huntington had to offer along with

3    Marshall University.

4         With sticking with him -- and just to reference his

5    name, his name was Francis Degidio.

6              COURT REPORTER:  Could you spell that?

7              THE WITNESS:  D-e-g-i-d-i-o.

8         And he not only was a citizen of West Virginia, a

9    resident, Fran also -- I refer to him as Fran -- he owned

10   four drug stores in the Huntington area by the name of

11   Budget Discount Pharmacy.

12        So attending Marshall University, I decided to go to

13   Marshall, come to Huntington, and pursue a career in State

14   Police.  I went into criminal justice law enforcement.

15   That's what I studied in school.

16        And, matter of fact, Paul, your father was actually one

17   of my professors.

18        So through, through my schooling at Marshall and living

19   in Huntington, talking with my uncle, we decided that it

20   would probably be a good thing for me to make some money

21   while going to school.

22        So I started working at Budget Discount Pharmacy.  So

23   working at Budget, going to school at Marshall, you know, I

24   met a lot of people.  I started to get very familiar with

25   how a pharmacy operated, the ins and outs of a pharmacy, the

1    different things that need to take place in a pharmacy and

2    so on.

3         And it started to, you know, started to make me think

4    about do I really want to go into State Police and have the

5    opportunity to be shot at or something, you know.  So I, I

6    started, you know, working there.

7         I got to know a lot of people that came into the

8    drugstore as far as salespeople and I got to be friends with

9    one.  And I was approached my last semester at Marshall to

10   take a position with a small company called Chapman Drug.

11   So the last semester, I did go to work for Chapman Drug

12   Company as a salesperson.

13            THE COURT:  What year did you graduate from

14   Marshall?

15            THE WITNESS:  1984.  I graduated in '84, was going

16   to school full-time, and working for Chapman Drug my last

17   semester.

18        I fell in love with what I did.  I fell in love with

19   the people I worked with.  And I fell in love with the

20   independent pharmacies that I called on.

21        For 35 years I called on independent pharmacies.  I

22   loved what I did.  And to this day I, I just think

23   independent pharmacy is awesome.

24   BY MR. NICHOLAS:

25   Q.   Have you lived in Huntington, the City of

1  Huntington since you transferred there from Cal- -- from

2  California State in --

3  **A.**    From -- so when, when I left PA, I was living, of

4  course, with my parents in Monongahela, PA, and I moved to

5  Huntington in 1980.  And I reside in Huntington.  I've been

6  there now for 41 years.

7       But one thing I want to say is I am not just a resident

8  of Huntington, West Virginia.  I'm a son of Marshall.  I

9  love Marshall University.  I love what Huntington had to

10  offer with regards to families, what was being offered on

11  the, the side of, you know, the arts and so on in

12  Huntington.

13       I was an active member and still am an active member as

14  a citizen in Huntington.  I sit on the parish council of my

15  Catholic church.  I sit on the finance council of my

16  Catholic church.  I was a little league coach for several

17  years in Huntington.  And I was a vice president of that

18  little league for several years in Huntington.

19       I also was a business owner in Huntington.  I owned a

20  Giovanni's Pizza in Huntington for several years with two

21  other couples, Terry Houck and Sherry Houck, along with Jeff

22  Rowe and Terry Rowe.

23       That in itself was a great experience because that

24  really opened our eyes to who people really were in

25  Huntington.  We got to meet and know so many people.  I

1    loved what I did, you know, as a salesperson, but we had a

2    great opportunity to pursue other things and that's what we

3    did.

4         We were fortunate one day that someone walked in our

5    store and offered to buy it without it even being for sale.

6    That store is still in existence today in Westmoreland.

7    **Q.**   So the pizza store, pizza shop; right?

8    **A.**   That's correct.

9    **Q.**   The pizza must have been pretty good.

10   **A.**   I'd have to say it was the best.

11   **Q.**   All right.  Let's, let's fast forward you just a little

12   bit to when you started working for AmerisourceBergen.

13        Do you recall when that was and how long have you been

14   with AmerisourceBergen -- were you with AmerisourceBergen?

15   **A.**   Yeah.  So, you know, I started with Chapman Drug

16   Company.  I was with Chapman Drug for basically -- I can't

17   remember if it was six years, eight years, whatever it was.

18   And Chapman was actually bought by Cardinal Health.

19        I worked out of the Ironton distribution center for

20   Chapman Drug Company.  And when they were purchased by

21   Cardinal, of course, that warehouse was closed.

22        After, I believe it was four years with Cardinal

23   Health, I was pursued to go to work for Bergen Brunswig

24   Company.  In '96, I believe it was, 1996 is when I started

25   my career with Bergen Brunswig who then was purchased by

```
 1    AmerisourceBergen.

 2    Q.   And you were with that --

 3    A.   Amerisource.

 4    Q.   And you were with that company until last year; is that

 5    right?

 6    A.   I was with that company and retired January 6th of

 7    2020.

 8    Q.   Okay.  I'd like to ask you some questions about what

 9    you did as a sales executive for Amerisource,

10    AmerisourceBergen.  Let me start with this.  As a sales --

11    in that job, how frequently did you visit your customers?

12    A.   I tried to visit my customers on a very strict call

13    basis.  I respected my customers.  They were my customers.

14    And I always made sure that I tried to stay close to my

15    customers.

16         So I had a pretty good call schedule.  I would say

17    anywhere between -- at least once a month.  Some customers

18    were more than that because of geographics.  There probably

19    wasn't a store that I would drive by and not stop.

20         I always liked to stop in and see my customers, see if

21    there was anything I could do for them, you know.  And it

22    wasn't a sales call that was set up.  I was in the industry

23    for a long time.  People knew who I was.  They knew how I

24    operated.  And people didn't expect me to call them for an

25    appointment.  If I wanted to go to a store, I went to a
```

1    store and they were open arms.

2    **Q.**    So is it correct that you made visits that were

3    unannounced?

4    **A.**    Yes.

5    **Q.**    Okay.  Just generally, what were your responsibilities

6    as a sales executive?

7    **A.**    Well, as a sales executive, I mean, we carried a pretty

8    big bag.  Our primary source -- you know, our primary

9    business practice was to maintain our current customer base

10   and cold call other pharmacies to see if we might be able to

11   bring them to AmerisourceBergen.

12   **Q.**    Was part of your role to collect due diligence

13   information on new and existing customers?

14   **A.**    Yes.

15   **Q.**    And who -- we've already discussed the fact that you

16   would collect the information and send it on to CSRA;

17   correct?

18   **A.**    That's correct.

19   **Q.**    Who made the decision as to whether the customer's due

20   diligence information checked out?

21   **A.**    That was done by the CSRA team.

22   **Q.**    Did CSRA train you on diversion?

23   **A.**    Yes.

24   **Q.**    All right.  Were you trained every year?

25   **A.**    Yes.

```
1    Q.   Did you have to take a test every year?

2    A.   Yes.

3    Q.   Were you trained on red flags?

4    A.   Occasionally we were.  I mean, you know, we always

5    wanted to know what red flags were.  Part of the training

6    was watching the video.  It would tell us what, you know,

7    type of things to look for, things such as, you know,

8    strange cars in the parking lot, a lot of people gathering

9    at the door, you know, things of that nature.

10   Q.   As far as red flags are concerned, was a red flag the

11   kind of thing where one size fits all or do you have to look

12   at the circumstances to determine whether something is a red

13   flag or it's not a red flag?

14   A.   I think you really need to look at the whole ball of

15   wax.  What might be a red flag for one store may not be a

16   red flag for another store.

17        And I'll give you a pretty good, you know, example of

18   that.  You know, there were several accounts that I would

19   call on that if you were to go in the store, you might see a

20   security guard there.  But that security guard there was

21   there for a purpose with regards to making sure that they

22   kept the store secure.

23        Other stores you would walk into you would not see a

24   security guard.  I mean, there was just different, different

25   things.
```

1    **Q.**   Having worked in the industry basically since the time

2    you were in college, having been in and around drug stores,

3    pharmacies since those days, do you believe that you were

4    able to recognize red flags when you saw them?

5    **A.**   Absolutely.

6    **Q.**   How did you look for red flags?

7    **A.**   Well, my common practice was every drugstore that I

8    pulled up to, whether it was an existing customer or if it

9    was a cold call, I got into a pretty good habit to pull up

10   to that store and look around, look at my circumference, see

11   who's available, you know, where they're standing, what

12   they're doing, what activity is taking place, how many cars

13   might be sitting in the drive-through, how many cars might

14   be sitting in the parking lot.  And then that's when I would

15   get out of my car.

16       You know, I never, I never felt unsafe at any of my

17   stores, but it was just, it was just a practice that I did.

18   **Q.**   Would you make it a practice of meeting the pharmacist

19   in charge at your, you know, at your stores?

20   **A.**   Occasionally, yes.

21           THE COURT:  Did you call directly on doctors at

22   all?

23           THE WITNESS:  No doctors, sir.

24   BY MR. NICHOLAS:

25   **Q.**   Now, it's correct -- am I correct that the Order

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    Monitoring System had thresholds identifying the amount

2    of product a customer could order of controlled

3    substances?

4    **A.**   When you say thresholds --

5    **Q.**   Thresholds.

6    **A.**   I mean, every account -- you know, every account didn't

7    have the same threshold.  It depended upon the mix of

8    product.  It depended upon their buy side.  So thresholds --

9    if someone was to hit a threshold, that would be a red flag

10   for us to go back and say we need more information from this

11   customer because our system is saying that you're purchasing

12   too much of this or too much of that and we need to do a

13   review on your account.

14   **Q.**   Now, you yourself didn't know the threshold amounts,

15   did you?

16   **A.**   No.

17   **Q.**   Okay.  Could customers ask to have their threshold

18   amounts increased?

19   **A.**   They could ask.

20   **Q.**   And who made the decision as to whether to increase a

21   threshold or not?

22   **A.**   That would have been done by our CSRA side.

23   **Q.**   Now, we've, we've heard about SafeScript and we've

24   heard about a couple of other pharmacies.  So I'm going to

25   actually ask you to -- I'm going to ask you about a couple

1    of the pharmacies that are located in Cabell County and the

2    City of Huntington, just a few.

3         And I'd like to start with SafeScript Pharmacy #6.

4    Could you please describe for the Court what SafeScript

5    Pharmacy #6 looked like?  Describe it physically for us,

6    please.

7    **A.**    Yeah.  I mean, back in the day when SafeScript was

8    open, it was a free-standing store.  It had windows on the

9    front of the store, one on each side of the door, large

10   windows.  They had about four or five different parking

11   spots to directly pull up to, to the actual store itself.

12   And then they had curb parking there also.  They did not

13   have a drive-through.

14        You would walk into the store and -- you know, in

15   pharmacy we, we have stores that are large with front ends,

16   big retail accounts, and we have stores that we call

17   apothecary stores.

18        An apothecary store -- if you call on an apothecary

19   store, they don't do front end business, OTC brand products

20   and so on.  They're strictly pharmaceuticals.  And

21   SafeScript was basically an apothecary.

22        You know, when SafeScript first opened, they opened and

23   they had no front end.  You would walk in.  You would give

24   your script, and the script would come back to you after the

25   process of filling the, the script and so on.

1          Further on down a couple of years they remodeled the

2     store.  They still did not have a front end.  But they put

3     in some bulletproof glass and they also put in like a

4     turnstile type hand-through prescription label -- not label

5     but prescription.

6          You know, there was a door on the right-hand side from

7     the lobby into the pharmacy.  I could recall every time that

8     I was at the store -- and whether it was that store or any

9     other store, my business practice was never to walk behind

10    someone's pharmacy into their, into their pharmacy behind

11    the counter.

12    **Q.**   Why was that?

13    **A.**   Out of respect for what was taking place in the

14    pharmacy and out of respect for the information that is in

15    that pharmacy for particular patients and so on.  I would

16    never walk behind someone's pharmacy.  If, if asked to come

17    in, that's when I would walk behind the counter and into the

18    pharmacy.

19         So when I would go to SafeScript, you know, the girl at

20    the window would always see me.  She knew who I was.  And I

21    would wait and finally someone would come to the door and

22    let me in the pharmacy.

23         The pharmacy was like any other, you know.  They had a

24    full line of pharmaceuticals on their shelves.  They had

25    techs.  They had a pharmacist.  They had their fax machine,

```
1    their computers, you know.  To me, it was normal practice.

2    Q.   Was SafeScript #6 located in a nice area of Huntington

3    or a not so nice area?

4    A.   I can't say it was a nice area or not a nice -- it, it,

5    it was in an okay area.  I'll just say that.  There was --

6    it wasn't, you know, in the area of the courthouse or the

7    police station or, you know, that type of proximity, but

8    there were other businesses in that area.

9    Q.   Was SafeScript licensed by the West Virginia Board of

10   Pharmacy?

11   A.   Yes.

12   Q.   Were they licensed by the DEA?

13   A.   Yes.

14   Q.   Does the fact that they were licensed mean anything to

15   you?

16   A.   If they were licensed, that means that they could

17   distribute -- not distribute but they could dispense

18   pharmaceuticals.

19   Q.   How long did AmerisourceBergen service SafeScript #6?

20   A.   The exact number of years I can't recall, but it was

21   probably more than five.

22   Q.   Now, you said that you called on your customers about

23   once a month, is that correct, give or take?

24   A.   Yes.

25   Q.   So how frequently did you visit SafeScript #6 over the
```

1    years?

2    **A.**    SafeScript was a little different.  I mean, being that

3    I lived in Huntington and SafeScript was in Huntington, you

4    know, I would frequent that store quite often, maybe not

5    every week, but at least every other week.  And these were

6    calls that -- you know, I would not call the store and say,

7    "Hey, I'm stopping by."  I would stop most of the time

8    unannounced.

9    **Q.**    You mentioned that SafeScript had a drive-up style

10   bank-style window.  Was that a red flag in your view?

11   **A.**    No.

12   **Q.**    Did you think it was a red flag that SafeScript took,

13   took security precautions?

14   **A.**    Yes.

15   **Q.**    It was a red flag?

16   **A.**    Oh, it wasn't a red flag that they took it for -- no,

17   no, I want to retract that.  It wasn't a red flag that they

18   had a security, you know, drive, turnstile type window, no.

19   **Q.**    Did you see lines of people waiting at SafeScript at

20   any time?

21   **A.**    Never.

22   **Q.**    Did you see people loitering outside ever?

23   **A.**    Never.

24   **Q.**    Did you see empty bottle pills in the parking lot ever?

25   **A.**    Never.

1   **Q.**   Did you see needles in the parking lot ever?

2   **A.**   Never.

3   **Q.**   Did you witness customers paying in cash?

4   **A.**   How a customer paid I have no idea.

5   **Q.**   Did you see cars with out-of-state license plates?

6   **A.**   Well, if you say out-of-state, we're going to start

7   talking about the Tri-State area.

8   **Q.**   Yeah.  No, I'd like you to address that.

9   **A.**   Huntington, of course, as most of the people in the

10   courtroom know, is in the Tri-State area of West Virginia,

11   Kentucky, and Ohio.  So, obviously, you're going to have

12   out-of-state license plates.

13       If I was to pull up to that store and see a license

14   plate from Tennessee, a license plate from, let's say,

15   Michigan, a license plate from Pennsylvania, that would

16   start throwing up red flags to me.

17   **Q.**   But did you ever see that at SafeScript?

18   **A.**   I never did.

19   **Q.**   All right.  Now, I asked you about sometimes meeting

20   with -- or knowing the pharmacist in charge.  Do you recall

21   that Troy Whaley was the pharmacist in charge at SafeScript?

22   **A.**   Yes.

23   **Q.**   Did you know him a little bit?

24   **A.**   I didn't personally know Troy.  I knew Troy through

25   other people that knew Troy.  I would hear people, you know,

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    talk with regards to them calling on Troy from previous, you

2    know, pharmacies that he worked at and so on.

3    **Q.**   Was he a licensed pharmacist?

4    **A.**   Yes.

5    **Q.**   Did you think he was a legitimate pharmacist?

6    **A.**   Yes.

7    **Q.**   In your visits to SafeScript, SafeScript #6, did you

8    ever see Mr. Whaley taking pills out of the pharmacy?

9    **A.**   Never.

10   **Q.**   Did you ever have any concern during the time that you

11   serviced -- that you worked with SafeScript that Mr. Whaley,

12   the pharmacist in charge, was diverting drugs?

13   **A.**   No.

14   **Q.**   Now, was SafeScript -- was the situation at SafeScript

15   that the owner was different than the pharmacist in charge?

16   **A.**   Yes.  So the, the owner of SafeScript Pharmacy, Kent

17   Freeman, he was not a licensed pharmacist.  I believe Kent

18   owned a construction company.  And that's not unusual that,

19   you know, you have an owner of a pharmacy that's not an

20   actual pharmacist.  I know several stores that operate or

21   that have owners of those stores that are not pharmacists.

22   **Q.**   Did you ever meet Mr. Freeman?

23   **A.**   Yes.

24   **Q.**   Okay.  Did you ever see him behind the counter --

25   behind the pharmacy counter in the store?

**A.**    Occasionally, you know, when I was there Kent may come

in.  It's his store.  He would be in the pharmacy.

**Q.**    Did you ever witness Mr. Freeman taking pills out of

the store?

**A.**    No.

**Q.**    Now, we've already heard in this case that there came a

point in time when -- in 2012 when Mr. Freeman was arrested.

How did you find out about that?

**A.**    I can't remember if it was a phone call or if it was an

email or if it was something that someone, you know, brought

to my attention.  But when it was brought to my attention,

one of the first things that I did and one of the

responsibilities that I have is to report that back to our

controlled substance side.

**Q.**    And is that what you did?

**A.**    Yes.

**Q.**    And you did it right away?

**A.**    Yes.

**Q.**    Do you remember whether you did it by phone or email or

what?

**A.**    I can't remember if it was by phone or by email.  I'm

sure it's documented somewhere.  But it was done, yes.

**Q.**    Okay.  I want to ask you about McCloud Family Pharmacy.

We've heard McCloud referenced in this case as well.  What

did that pharmacy look like in Cabell, Cabell County?

1    **A.**   Well, first of all, McCloud doesn't sit in Cabell

2    County.

3    **Q.**   All right.  I stand corrected.  Tell me exactly where

4    it sits.

5    **A.**   It sits in Wayne County.

6    **Q.**   Okay.  And is that the part of Huntington that's in

7    Wayne County?  Is that where it is?

8    **A.**   I don't know if it's considered part of Huntington or

9    not.

10   **Q.**   Okay.

11   **A.**   It is actually in a little town called Lavalette, West

12   Virginia.

13   **Q.**   You're revealing me to be an out-of-towner, Mr. Perry.

14   Okay.  Can you describe the -- that pharmacy, please?

15   **A.**   Yes.  So McCloud Family Pharmacy sat in like a little

16   strip mall.  There's a large grocery store there.  There's

17   Goodwill in that strip mall.  There's several insurance

18   agents in that strip mall with various other small

19   businesses.

20        The store sat on one of the ends of that strip mall.

21   They had a drive-through.  The store was very well

22   organized.  They had a really nice front end.  They sold a

23   lot of OTC brand products.  They had a large Hallmark card

24   section, sold a lot of knickknacks and so on.  But they

25   still sold a large amount of OTC items in that store also.

```
 1    Q.    And who owned, who owned McCloud?

 2    A.    The owners were two brothers, Kevin McCloud and Jeff

 3    McCloud.

 4    Q.    Did you know them?  Did you have interactions with them

 5    at all?

 6    A.    Yes.

 7    Q.    Okay.  Can you describe those very briefly for us,

 8    please?

 9    A.    So depending upon what day it was that I would see

10    them, they pretty much had their routine with regards to

11    their schedules.  I would see either Jeff or Kevin.  And

12    both were licensed pharmacists, you know, great people.  I

13    always enjoyed calling on Jeff and Kevin.  You know, they

14    always gave me time.  I would wait for my time.  And when

15    they asked me to come back and discuss things with them,

16    they gave me ample time, good, good people.

17    Q.    How often would you visit that pharmacy?

18    A.    Again, that pharmacy was located within five miles of

19    my residence.  So that pharmacy was visited by me quite

20    often.

21    Q.    Okay.  And same set of questions and I'll shorten them

22    this time.  Did you -- in all the visits, all the times you

23    visited the McCloud Pharmacy, did you ever see long lines of

24    people waiting at the pharmacy?

25    A.    No.
```

**Q.**   Or people loitering outside?

**A.**   No.

**Q.**   Or needles or empty bottles in the parking lot?
Anything of that nature?

**A.**   No.

**Q.**   All right.  And same questions about cars with
out-of-state plates.  Other than the Tri-State license
plates, did you see license plates beyond that?

**A.**   No.

**Q.**   Did you think at any time that you visited McCloud
Pharmacy ever that the McClouds were diverting drugs out of
their pharmacy?

**A.**   No.

**Q.**   Is McCloud still in operation today?

**A.**   The brothers no longer own that store.  They sold that
store to Fruth several years ago.  And that store is still
there.  It's called Fruth Family Pharmacy currently.

**Q.**   I'm only going to ask you about one more pharmacy and
that's Drug Emporium because that too has been referenced in
this, in this case.  Describe Drug Emporium for the Court,
please.

**A.**   Well, I'll give you a really good example.  My wife
stopped there not too long ago and she called me and she
said, "Honey, I'm not going to be home for quite a while."
She said, "I cannot believe what this store has to offer."

1          I mean, Drug Emporium is huge.  They have everything

2     from beers, wines, OTCs.  My wife said she spent a half hour

3     in the Skecher section.  Collegiate apparel, home

4     healthcare, you name it, they have it.  Plus, they have

5     their pharmacy.

6     **Q.**   Do you know who the pharmacist in charge is that you

7     dealt with at -- we're talking about the Barboursville

8     location; right?

9     **A.**   Yes.

10    **Q.**   So the question is do you know who the pharmacist in

11    charge was?

12    **A.**   I would see different pharmacy -- pharmacists at that

13    location.  You know, Brock -- I don't know what Brock's last

14    name was, but I remember Brock.  I would see Brock there

15    occasionally.

16         I would see one of the owners there, or partner I

17    should say, Jerry Leonard.  I would see Jerry Leonard there

18    because he was a licensed pharmacist also.

19    **Q.**   Okay.  Is Drug Emporium a licensed pharmacy?

20    **A.**   Yes.

21    **Q.**   Is it licensed by the West Virginia Board of Pharmacy?

22    **A.**   Yes.

23    **Q.**   Is it licensed by the DEA?

24    **A.**   Yes.

25    **Q.**   Do you recall how long AmerisourceBergen serviced Drug

```
 1    Emporium?

 2    A.    It depended upon the contract.  We had contracts with

 3    Drug Emporium.  You know, from time to time we would win a

 4    contract or lose a contract.  So we may have the business

 5    for, you know, maybe five years, and then we would lose it

 6    to a competitor.  And then when that contract would be up,

 7    we would bid for that contract again and we may win it back.

 8    So from time to time, they were customers of

 9    AmerisourceBergen.

10    Q.    How often would you visit Drug Emporium in

11    Barboursville?

12    A.    At least once a month.

13    Q.    For all the years that you worked with them, that you

14    serviced them?

15    A.    Yes.

16    Q.    Okay.  In all of the times and all the years that you

17    worked with -- you serviced Drug Emporium, did you ever see

18    what you would consider to be a red flag of the -- and, you

19    know, we've gone through them.  I don't need to list them

20    all again.

21    A.    No.

22    Q.    Is Drug Emporium still in operation today?

23    A.    Yes.

24    Q.    Just a few very final questions for you, Mr. Perry.

25          At any time in your 24 years with AmerisourceBergen did
```

```
1    you ever think that AmerisourceBergen was doing anything

2    other than a good job?

3    A.    No.

4    Q.    Did you always think they were a good company?

5    A.    I did.

6    Q.    How about yourself personally?  At any time did you

7    ever think you were not doing a good job in Cabell County

8    and the City of Huntington?

9    A.    No.

10   Q.    Do you think you dropped any balls while you were

11   working in Cabell and Huntington?

12   A.    No.

13   Q.    Did you ever turn a blind eye to compliance or to

14   diversion issues?

15   A.    No.

16   Q.    Did you ever prioritize sales over your

17   responsibilities to report issues to Diversion Control?

18   A.    No.

19   Q.    Did you ever push the sale of opioids to a particular

20   pharmacy?

21   A.    Never.

22   Q.    Did you ever push controlled substances in the

23   direction of a pharmacy because you thought you would get

24   paid more if you did that?

25   A.    Never.
```

```
 1    Q.   Did the company ever pressure you to do that?

 2    A.   Never.

 3    Q.   Sitting here today looking back at your 24 years, even

 4    using 2020 hindsight, even using 2021 hindsight, do you

 5    think you should have done anything differently?

 6    A.   My wife tells me I should work longer.  No.

 7    Q.   Okay.  Mr. Perry, thank you very much.  I appreciate

 8    your time.

 9              MR. NICHOLAS:  I have no further questions, Your

10    Honor.

11              THE COURT:  Mr. Kennedy, do you have anything else

12    of this witness?

13         Mr. Farrell.

14                         REDIRECT EXAMINATION

15    BY MR. FARRELL:

16    Q.   Good afternoon.  I'm Paul Farrell, Jr.  We haven't

17    had a chance to meet.

18    A.   Hi, Paul.

19    Q.   So do you remember what class my father taught?

20    A.   It was a criminal justice class.  That was 40 some

21    years ago.  The specific class I can't remember, but I loved

22    him as a professor.

23    Q.   That's right.  And you've been to Fran Degidio's house?

24    A.   Yes.

25    Q.   I grew up on South Queens Court.
```

1    **A.**   I know exactly where you lived, Paul, yes.

2    **Q.**   My grandfather used to take me to Sacred Heart Church

3    at 7:00 a.m. on weekdays.  I don't know if that's where

4    you're at.

5    **A.**   Yes.

6    **Q.**   I know your family as well.  That's one of the reasons

7    why Eric is the one who took the beginning.  I've got a

8    couple questions for you.

9    **A.**   Sure.

10   **Q.**   Without belaboring the point, you performed the sales

11   function for AmerisourceBergen; correct?

12   **A.**   That's correct.

13   **Q.**   And the Suspicious Order Monitoring and the Regulatory

14   Compliance was a separate component of AmerisourceBergen?

15   **A.**   I wouldn't say it was a separate, separate component.

16   It was part of AmerisourceBergen.

17   **Q.**   So were you watching or tracking the volume of pills

18   that were going into your pharmacies?

19   **A.**   That's something that I would not or did not do.

20   **Q.**   At any point in time were you advised or shown

21   statistics or trends of purchasers from the pharmacies that

22   you serviced?

23   **A.**   I don't recall that.

24   **Q.**   I noticed in some of the communications that you were

25   assigned Kentucky, or there was a -- your division or

1    territory included Kentucky?

2    **A.**    Yeah.  From time to time -- you know, we had different

3    initiatives in the company.  We would have different

4    positions, territory changes because the company wanted to

5    have a different initiative to go to market and so on.

6         So from time to time, our, our sales territories did

7    change.  And, of course, my territories changed, you know,

8    maybe every six, seven, eight years, whatever it might be.

9         But I still had a good base of customers in that

10   Huntington area because that was my home.  Not only that,

11   but a lot of my customers did business with

12   AmerisourceBergen because of who I am, the relationships

13   that we had, the personal relationships that we had.  I was

14   very, very well received and very well-liked in my

15   territory, and you could ask my competition if that's true

16   or not true.

17   **Q.**   So your territory also included across the Big Sandy

18   over into Kentucky; correct?

19   **A.**   That's correct.

20   **Q.**   That would be Boyd County and Greenup County?

21   **A.**   That is correct.

22   **Q.**   And then if you cross the Ohio River, that's Lawrence

23   County and Scioto County.  Is that in your territory as

24   well?

25   **A.**   Yes.

**Q.**    Just north of Huntington and Cabell County, if you can
swim up river, is Mason County?

**A.**    Yes.

**Q.**    And if you continue to go down south, you've got Wayne
County, Boone County, and Logan County?

**A.**    Okay.  So we need some clarification there.  So Boone
County and, you know, those deep counties down there, that
was not part of my territory.

**Q.**    Okay.

**A.**    Yeah.

**Q.**    So what about, what about Lincoln County?

         MR. NICHOLAS:  Your Honor, at this point, I don't
want to unnecessarily interrupt, but I think this is beyond
the scope.

         THE COURT:  Well, I don't know where he's going.
Overruled.

    I'm going to let you go ahead with this, Paul.

BY MR. FARRELL:

**Q.**    Did you have Lincoln County as well?

**A.**    Yes.

**Q.**    Okay.  So those pharmacies that you called on, were you
ever provided any information or data on the purchasing
trends of your customers in the surrounding counties of
Cabell County?

**A.**    I don't recall that.

1    **Q.**   So you spent 41 years in Huntington.  It's where you

2    grew up.  You coached little league.  Which league did you

3    coach?

4    **A.**   The Buffalo league out in Wayne County.

5    **Q.**   I was League 6.

6    **A.**   We did not like you at all.

7    **Q.**   On a more serious note --

8    **A.**   Yes.

9    **Q.**   -- have you seen a change in our community over the

10   last 40 years?

11   **A.**   I have, yes.

12   **Q.**   I know you have.  We have an opioid epidemic problem in

13   our community, don't we?

14   **A.**   I am well aware of that.

15   **Q.**   It's affected just about every family in our community,

16   hasn't it?

17   **A.**   Just for the record --

18   **Q.**   I know.

19   **A.**   You know.

20   **Q.**   It's affected us all?

21   **A.**   Yeah.

22           MR. FARRELL:  That's all the questions I have.

23   Thank you.

24           THE COURT:  Do you have anything else, Mr.

25   Nicholas?

```
 1                  MR. NICHOLAS:  No, Your Honor.  Thank you.

 2                  THE COURT:  May Mr. Perry be excused?

 3                  MR. NICHOLAS:  He may.

 4                  THE COURT:  You're free to go, Mr. Perry.  Thank

 5       you, sir, very much.  We appreciate it.

 6                  THE WITNESS:  Thank you, Your Honor.

 7                  MR. FARRELL:  Judge, can we have five minutes?

 8                  THE COURT:  Yes.  Let's break for five minutes.

 9           (Recess taken from 4:17 p.m. until 4:25 p.m.)

10                  THE COURT:  All right.  Do you have a witness you

11       can call?

12                  MR. FULLER:  Your Honor, the plaintiffs would next

13       call Michael Mone.

14                  THE COURT:  Okay.

15                  THE CLERK:  Sir, would you please state your name.

16                  THE WITNESS:  Michael A. Mone.

17                  THE CLERK:  Spell your last name, please.

18                  THE WITNESS:  M-o-n-e.

19                  THE CLERK:  Please raise your right hand.

20       MICHAEL MONE, PLAINTIFFS' WITNESS, SWORN

21                  THE CLERK:  Thank you.  Please take a seat.

22                  MR. FULLER:  May it please the Court.

23                  THE COURT:  Yes.

24                  MR. FULLER:  Mike Fuller for the record.  I was

25       told I had to do that so the court reporter made sure she
```

```
 1    knew who she was taking down.

 2                        DIRECT EXAMINATION

 3    BY MR. FULLER:

 4    Q.   Mr. Mone, please state your name.

 5    A.   My name is Michael, middle initial is A, last name is

 6    Mone, M-o-n-e.

 7    Q.   Mr. Mone, what party here are you associated with?

 8    A.   At the -- for the relevant periods of time, Cardinal

 9    Health.

10    Q.   Okay.  And you haven't actually been deposed for this

11    case; is that correct?

12    A.   To the best of my knowledge, no.

13    Q.   I was hoping you would know if you were.  But you have

14    been deposed for, related to this litigation; is that right?

15    A.   I have.

16    Q.   And you have counsel in the courtroom?

17    A.   Not in the courtroom, but available.

18    Q.   Who is that?

19    A.   Zach Swisher.

20    Q.   And has Williams & Connolly also represented you in

21    this matter?

22    A.   They have.

23    Q.   And did they represent you at your depositions?

24    A.   They did.

25    Q.   And did Cardinal pay for their services for you?
```

1    **A.**   To the best of my --

2               MS. MAINIGI:  Objection, Your Honor, relevance.

3               THE COURT:  What's the basis?

4               MR. FULLER:  Your Honor, I'm establishing that

5    they are tied as a party.

6               THE COURT:  Okay, overruled.

7    BY MR. FULLER:

8    **Q.**   You can answer.

9    **A.**   Cardinal Health is paying the attorneys, yes.

10   **Q.**   And, Mr. Mone, when were you employed with Cardinal?

11   **A.**   I was employed with Cardinal Health from 1996 to

12   2012 -- 2006 to 2012.

13   **Q.**   I was going to say you went back a lot further than I

14   thought.

15   **A.**   Sorry.  I apologize.

16   **Q.**   Sure.  And when you started with Cardinal, you weren't

17   actually working for Cardinal.  You were working for

18   Medicine Shoppe; is that right?

19   **A.**   Medicine Shoppe is a subdivision of Cardinal.  So

20   ultimately I was working for Cardinal Health.

21   **Q.**   What did you do at Medicine Shoppe -- well, explain to

22   the Judge what Medicine Shoppe is.

23   **A.**   Medicine Shoppe is a franchise, a, a company that

24   provides franchisees, independent community pharmacy owners

25   with the franchise name of Medicine Shoppe, and support

```
 1    services for them.

 2    Q.    And are you aware of whether there's a Medicine Shoppe

 3    in Cabell County or Huntington, West Virginia?

 4    A.    I, I don't recall whether there is or there isn't.

 5    Q.    Okay.  Fair enough.  And what did you do for Medicine

 6    Shoppe?  Explain that to the Court.

 7    A.    I was hired at Medicine Shoppe to assist the

 8    franchisees in adapting to regulatory changes or to provide

 9    tools, education tools for regulatory compliance.

10    Q.    And just a little more background on yourself, you are

11    a registered pharmacist, or at least you were at one time;

12    is that correct?

13    A.    I still am.

14    Q.    Okay.  And you are also a lawyer, are you not?

15    A.    I, I am.

16    Q.    And you went to the University of Florida?

17    A.    I did.

18    Q.    Go Gators.  I'm a Gator grad as well.

19    A.    Go Gators.

20    Q.    So about 18 months after you joined Cardinal, you moved

21    over to corporate headquarters; is that right?

22    A.    I did.

23    Q.    I'm sorry, I didn't hear you.

24    A.    I did.

25    Q.    And that is located where?
```

1    **A.**    In Dublin, Ohio.

2    **Q.**    And what role did you take on at that -- well, first of

3    all, tell the Court when that was.

4    **A.**    In December of 2007.

5    **Q.**    And what role did you take on at that point in time?

6    **A.**    I took on the role of Vice President of Anti-Diversion.

7    **Q.**    Okay.  Now, how do I --

8              MR. FULLER:  I'm sorry, Judge.  I'm new to the big

9    screen.  So I was told to push where the tags are, and if I

10   want to use ELMO, I just push ELMO?

11   BY MR. FULLER:

12   **Q.**    All right.  And you're aware that Cardinal

13   distributed controlled substances across the country; is

14   that right?

15   **A.**    Yes.

16   **Q.**    You're also aware that they distributed other products

17   as well.  Is that fair?

18   **A.**    That is correct.

19   **Q.**    Did they have any geographical area where they were

20   more heavily distributed, to the best of your recollection?

21   **A.**    I, I, I wouldn't, I wouldn't necessarily know where

22   their geographic concentration was.

23   **Q.**    And when you came in in 2007, December, you took over

24   their Anti-Diversion section; is that right?

25   **A.**    I took over from Steve Reardon.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   Mr. Reardon had been there for a good period of time;

2    is that correct?

3    **A.**   Yes.

4    **Q.**   And you continued on, just in a different role?

5    **A.**   That is correct.

6    **Q.**   Okay.  And you reported directly to -- was it Mark

7    Hartman?

8    **A.**   That is correct.

9    **Q.**   And that changed at some point in your employment;

10   right?

11   **A.**   It did.

12   **Q.**   And who did it change to?

13   **A.**   Gilberto Quintero.

14   **Q.**   Okay.  And then in 2012 -- tell me when in 2012 your

15   job title or position changed.

16   **A.**   September of 2012.

17   **Q.**   Okay.  Now, your relevant time frame for Anti-Diversion

18   was really from end of 2007, December, through September of

19   2012; is that right?

20   **A.**   That is correct.

21   **Q.**   Okay.  So what I want to try to do next with you is to

22   establish a, a context, if we can, for the Judge.  Okay?

23       So when you arrived, you changed the system, what we've

24   referred to as SOMS, or Suspicious Order Monitoring System,

25   at Cardinal; is that right?

```
 1              MS. MAINIGI:  Objection, Your Honor, leading.  We

 2     have not -- I know we've jumped around on this, but we've

 3     not established that this is an adverse or hostile witness.

 4     Mr. Mone no longer is employed by Cardinal Health.

 5              THE COURT:  Well, --

 6              MR. FULLER:  Judge, --

 7              THE COURT:  Go ahead, Mr. Fuller.

 8              MR. FULLER:  He worked for them for an extended

 9     period of time.  He is no longer employed by them.  He has

10     been, since leaving them, been represented by the same

11     counsel that represents him with Cardinal paying for --

12              THE COURT:  I'll let you lead him.  Go ahead.  I

13     think it's proper under 611.

14              MR. FULLER:  Thank you, Your Honor.

15     BY MR. FULLER:

16     Q.   And I forgot what the question was, but we'll keep

17     going.  Okay?

18     A.   Fair enough.

19     Q.   When you came in in December of 2007, one of your main

20     tasks was implementing the SOMS program -- for the Court,

21     SOMS is Suspicious Order Monitoring System; right?

22     A.   I would say that the answer to that is "no."

23     Q.   So your job wasn't to create and implement a SOMS

24     system?

25     A.   Not to create and implement.  There already was a
```

1    system there.

2    **Q.**    What was your role when you came on?  Do you know?

3    **A.**    To improve the system and make changes to the system.

4    **Q.**    Fair enough.  And then -- let's talk about what was

5    going on during that time frame.  So December of 2007 you

6    were brought up from Medicine Shoppe to the home office.

7    Did you already -- were you already living in the Columbus

8    area?

9    **A.**    I was not.

10   **Q.**    Where were you living before that?

11   **A.**    St. Louis.

12   **Q.**    So you moved from St. Louis to Columbus.  I'm sorry.

13   What town are they actually located in?

14   **A.**    They're located in Dublin.

15   **Q.**    Dublin, which is a suburb of Columbus; right?

16   **A.**    It is.

17   **Q.**    So you moved to Columbus to take on this new role;

18   right?

19   **A.**    Not initially.

20   **Q.**    Okay.  Why did you move to Dublin?  Or did you later

21   move to Dublin?

22   **A.**    I did later move to Dublin.

23   **Q.**    Okay.  When did you move to Dublin?

24   **A.**    Maybe a year after I started, sometime in there.

25   **Q.**    So in the meantime, you're commuting?

1    **A.**   I was.

2    **Q.**   Okay.  And when you were brought in in December of

3    2007, you're aware that two of Cardinal's distribution

4    centers have had their license suspended; is that correct?

5    **A.**   There were two Immediate Suspension Orders for

6    distribution centers at the time that I arrived, yes.

7    **Q.**   And do you remember which two distribution centers?

8    **A.**   Auburn in Washington State and Lakeland in Florida.

9    **Q.**   And then after you arrived, another distribution center

10   had its license suspended; correct?

11   **A.**   It did.

12   **Q.**   And that was Swedesboro, New Jersey?

13   **A.**   It was.

14   **Q.**   And then there was an order to show cause issued for

15   the Texas distribution center, which I believe is Stafford;

16   right?

17   **A.**   To the best of my recollection, that is correct.

18   **Q.**   And Stafford didn't get an Immediate Suspension Order,

19   but they gave up their license as part of that

20   administrative -- or excuse me -- order to show cause;

21   correct?

22   **A.**   I don't recall what happened with, with the Stafford

23   facility.

24   **Q.**   Are you aware that it eventually gave up its license

25   for a period of time?

1    **A.**   I, I don't -- I honestly do not recall whether, whether

2    that was what happened with Stafford.

3    **Q.**   Okay.  And you are aware and were involved in the MOU,

4    or Memorandum of Agreement or Understanding, that was

5    entered between Cardinal and the DOJ -- excuse me -- in

6    2008; right?

7    **A.**   No, I was not involved in the MOU.

8    **Q.**   You were at least aware?

9    **A.**   I was aware.

10   **Q.**   And that MOU affected your job duties and

11   responsibilities; correct?

12   **A.**   The MOU obligations on the DEA and on Cardinal Health

13   with regard to the settlement of that action -- of those

14   actions.

15   **Q.**   And then in 2012 there was another administrative

16   action taken by DOJ; is that correct?

17   **A.**   That is correct.

18   **Q.**   And that also ended up in an Immediate Suspension Order

19   of the Lakeland facility down in Florida; correct?

20   **A.**   That is correct.

21   **Q.**   That was, I think, approximately February 2nd of 2012?

22   **A.**   I'm, I'm okay with -- if you tell me it's February 2nd,

23   it's February 2nd.  I don't recall the date.

24   **Q.**   Fair enough.  You do recall it was 2012; right?

25   **A.**   I do recall it was in 2012, yes.

1    **Q.**   All right.  And then later in 2012 there was another

2    Memorandum Agreement entered between Cardinal and the DOJ;

3    right?

4    **A.**   That is -- yes.

5    **Q.**   And then you changed positions around that point in

6    time as well; right?

7    **A.**   I, I don't recall when the MOA was signed, but I

8    changed, I changed into the role that I had for a while in

9    September.

10   **Q.**   And what role was that?  What was your new role just so

11   the Court has the context?

12   **A.**   My new role was to move to the legal department as a

13   regulatory attorney.

14   **Q.**   All right, perfect.

15            MR. FULLER:  And, Judge, for demonstrative

16   purposes, I'm going to put up -- I'm sorry.  I'm

17   inexperienced.  How do I zoom out?

18            MS. MAINIGI:  Your Honor, before we publish

19   anything, can we get an identification of what this is and

20   take it down until --

21            THE COURT:  Yes.

22            MR. FULLER:  Sure.  This is demonstrative Exhibit

23   218.2.

24            MS. MAINIGI:  Give me a second.

25            MR. FULLER:  Sure.

 1          Your Honor, while she's looking at it, I'm happy to

 2     explain to the Court what it is.  It's the distribution of

 3     oxycodone by Cardinal into CT2 for the entirety of the time

 4     frame.  So it goes all the way back to 1996 through 2018.

 5          What I'm doing with that is marking certain things

 6     along the time line so the Court will have a context of what

 7     was going on during these different time periods.

 8              MS. MAINIGI:  Your Honor, we have provided

 9     objections to this demonstrative.

10          First, I think we've got to lay a foundation with the

11     witness.  And then the -- I guess it's purporting to be a

12     1006 summary, and there's no basis for where the numbers

13     are -- what the numbers are related to.

14              THE COURT:  Well, you can try to lay a basis for

15     it, Mr. Fuller.

16              MR. FULLER:  Well, Judge, there's no way to lay a

17     basis with this particular witness.  That's why I'm offering

18     the demonstrative to give the Court a context of what was

19     transactioning [sic], what was going on during this relevant

20     time period.

21              MS. MAINIGI:  Your Honor, Mr. Fuller has a witness

22     on the stand.  This witness, I do not think, would have any

23     knowledge of what he has put up as a demonstrative.  He

24     should ask questions of this witness.

25              THE COURT:  I'm not going to let you use a

```
1   demonstrative unless it's demonstrative of this witness's

2   testimony, Mr. Fuller.

3               MR. FULLER:  Your Honor, can I, can I put up --

4   show the Court what I'm doing?

5               MS. MAINIGI:  Your Honor, why would we publish a

6   demonstrative when he hasn't established a foundation?

7               MR. FULLER:  Judge, with all due respect, I don't

8   think I'm worried about prejudicing a jury.  I'm sure if you

9   don't allow it, you can ignore it.  So the concern with

10  posting it at the moment just to explain it to the Court --

11              THE COURT:  Well, who's going to explain it?  I

12  mean, you put it up and you're the witness and you're

13  testifying.  Right?

14              MR. FULLER:  It's just a demonstrative, Your

15  Honor.  It's one of Mr. McCann's slides --

16              THE COURT:  It's not a proper demonstrative unless

17  it's illustrative of the witness's testimony.

18       Isn't that right, Ms. Mainigi?

19              MS. MAINIGI:  That's correct, Your Honor.

20              THE COURT:  Okay.  I'm not going to let you use

21  it --

22              MR. FULLER:  Fair enough, Judge.

23              THE COURT:  -- unless you can lay a proper

24  foundation for it.

25              MR. FULLER:  Yes, Your Honor.
```

1    BY MR. FULLER:

2    **Q.**    Mr. Mone, have you looked at or ever seen any of

3    the distribution data from Cardinal into Cabell or

4    Huntington County?

5              MS. MAINIGI:  Time frame.  Objection.

6              MR. FULLER:  Any of it.

7              THE WITNESS:  To the best of my recollection, I

8    would have seen individual pharmacy distribution.

9    BY MR. FULLER:

10   **Q.**    So you wouldn't have compared or looked at the

11   total pills going into Cabell County or West Virginia or

12   any other part of the country, would you?

13   **A.**    Not in my particular role, no, sir.

14   **Q.**    Let's continue on with the time frame issues and sort

15   of laying this context.

16        You know when you came in 2007 there was a pending

17   action with the government, the DOJ?

18             MS. MAINIGI:  Objection, Your Honor.  I understand

19   Mr. Fuller can lead, but Mr. Fuller is testifying at this

20   point and recapping and summarizing.

21             THE COURT:  Yeah.  You can ask him leading

22   questions, but you can't testify, Mr. Fuller.

23             MR. FULLER:  Yes, Your Honor.  I'll rephrase it.

24   BY MR. FULLER:

25   **Q.**    Was there a pending action when you arrived in 2007

1    to Columbus, Ohio?

2    **A.**    When I arrived in Columbus, there were two pending

3    actions.

4    **Q.**    All right.  And are you aware of any administrative

5    briefings -- or excuse me -- distributor briefings that were

6    done at a prior time related to the distribution of

7    controlled substances?

8                   MS. MAINIGI:  Objection, vague.

9                   MR. FULLER:  I'll rephrase, Your Honor.

10                  THE COURT:  Wait just a minute.

11          Yeah, you can re-ask the question, Mr. Fuller.

12                  MR. FULLER:  Thank you, Judge.

13   BY MR. FULLER:

14   **Q.**    Mr. Mone, are you aware that back in 2005 Cardinal

15   met with the DEA with what's referred to as a

16   distributor briefing or distributor initiative?

17   **A.**    I am generally aware that during the periods of time,

18   pharmaceutical wholesale distributors met with the DEA.  I

19   do not know whether specifically Cardinal Health did in

20   2005-2006.

21   **Q.**    Are you also aware of -- what we refer to as Rannazzisi

22   letters, or letters from Joe Rannazzisi with the DEA to the

23   distributors, and particularly Cardinal, one back in

24   September of '06?  Let's start with that one.

25   **A.**    I am not aware of the '06 letter.

```
 1    Q.   So you never saw it?

 2    A.   To the best of my recollection, I never saw the '06

 3    letter.

 4    Q.   And then how about the December, 2012, letter that came

 5    in about the time you were there.  I'm sorry.  December

 6    of -- December of 2007 letter.

 7    A.   I am aware of the Joe Rannazzisi letter from December

 8    of 2007.

 9    Q.   And did you review that letter?

10    A.   I did.

11    Q.   Okay.  Now, one of the additional issues that has been

12    brought up is communication with the DEA.  Did you have

13    regular communication with the DEA?

14    A.   I did.

15    Q.   And would that include communication about the

16    distribution of controlled substances, particularly oxy

17    and -- Oxycontin -- excuse me -- oxycodone and hydrocodone?

18    A.   My communications with the DEA included all controlled

19    substance distributions.

20    Q.   And did some of those concerns focus around those two

21    particular substances?

22              MS. MAINIGI:  Objection.  It misstates his

23    testimony.

24              THE COURT:  Sustained.

25    BY MR. FULLER:
```

1    **Q.**   Did you have any communications with the DEA

2    particularly related to oxycodone or hydrocodone?

3    **A.**   No.

4    **Q.**   Okay.  Did you have conversations in -- starting with

5    2009 with -- I'm going to try to get his name right --

6    Araholt (phonetic)?  In 2009 did you speak with -- I

7    apologize, Your Honor -- the DEA related to the treatment of

8    chains, chain pharmacies?

9    **A.**   2009.  In the absence of some other information, I

10   can't know what we're referring to.

11   **Q.**   Sure, fair enough.  Let's bring up 9401.

12           MS. MAINIGI:  Can we refrain from publishing until

13   it's been distributed and the foundation has been laid?

14           MR. FULLER:  Your Honor, may I approach the

15   witness?

16           THE COURT:  Yes.

17           MS. MAINIGI:  Your Honor, I have an objection to

18   this.  This is a declaration of Mr. Mone, and I don't think

19   this is a proper exhibit for questioning.

20       If there is an occasion to ask Mr. Mone a question and

21   then use the declaration for impeachment purposes, then I

22   think that would be a proper use of a declaration.  But I

23   don't think that Mr. Fuller can take a declaration of Mr.

24   Mone and just throw it on the screen.

25       Moreover, this particular declaration, Your Honor, is

```
 1   irrelevant because of geographic scope.  It has no

 2   relationship or correlation to Cabell/Huntington.  It

 3   relates to matters outside of Cabell/Huntington.

 4            THE COURT:  What are you going to use it for, Mr.

 5   Fuller?

 6            MR. FULLER:  To refresh his -- well, one is --

 7            MS. MAINIGI:  It hasn't -- go ahead.

 8            MR. FULLER:  Your Honor, it's an admission by a

 9   party opponent.  I want to use it for the truth of the

10   matter asserted as to what Mr. Mone did.  It was filed in

11   the Holder vs. DEA action -- excuse me -- Holder vs.

12   Cardinal action as admissions by the defendant.

13            MS. MAINIGI:  Your Honor, he can ask him questions

14   or background that may be in the declaration.  And if Mr.

15   Mone gives an answer different than Mr. Fuller is expecting,

16   he can impeach him with it.  But there's no basis to use

17   this as a roadmap for his questioning.

18            THE COURT:  I agree with that.  You can use it to

19   refresh his recollection.  You can use it as a good faith

20   basis to ask him questions.  But I think Ms. Mainigi is

21   right.  You can't just start in on it and basically read it

22   to him.

23            MS. MAINIGI:  And, Your Honor, one other thing.

24   With respect to refreshing his recollection, there's been

25   no -- there's been no establishment that there's a need to
```

 1    refresh his recollection.

 2              THE COURT:  That's true.

 3              MR. FULLER:  Well, Your Honor, he just testified

 4    that he didn't remember a conversation with the DEA that

 5    happened back in 2009.

 6              THE COURT:  Well, you can ask him if there's

 7    anything that would refresh his recollection with regard to

 8    a conversation with DEA in 2009.  But if he says "no,"

 9    you're stuck with that.

10              MR. FULLER:  Well, Judge, I would think I would be

11    able to impeach him with the inconsistent statement that he

12    placed in his declaration.

13              MS. MAINIGI:  Your Honor, he has not -- just for

14    the record, this witness has not made any sort of

15    inconsistent statement.  I don't know where Mr. Fuller is

16    coming up with that.

17              THE COURT:  Well, that's true too.

18              MR. FULLER:  Judge, I believe I've laid the

19    foundation that I've asked him to --

20              THE COURT:  Well, you can ask him questions based

21    upon what, based upon what -- the knowledge you glean from

22    this, but I don't think you can show him the document and

23    take him through it.

24              MR. FULLER:  Your Honor, can I ask if he can

25    refresh his recollection from the document?

```
 1              MS. MAINIGI:  Your Honor, I do not think there's

 2      even a question pending right now.  Refresh his recollection

 3      about what?  And we need to establish a foundation about --

 4              THE COURT:  I agree.  You can back up and try

 5      again, Mr. Fuller, but --

 6          Mr. Ackerman, do you want to say something here?

 7              MR. ACKERMAN:  I apologize.  I don't think my mic

 8      is on.  It is on.  I apologize, Your Honor.  My head is

 9      spinning a little bit.  And maybe I am -- I got confused in

10      the back and forth.

11          But what is the basis on which we are not allowed to

12      ask this document -- or question the witness regarding this

13      document?  Is it hearsay or relevance or --

14              THE COURT:  I didn't say you couldn't question him

15      based on the document, but you can't show him the document

16      and take him through it.  Mr. Fuller can use information in

17      the document as a basis for his questions.  Okay?

18              MS. MAINIGI:  Your Honor, I --

19              THE COURT:  Isn't that right, Ms. Mainigi?

20              MS. MAINIGI:  Yes, Your Honor.  If, if there's a

21      basis to impeach him or there's a need to refresh his

22      recollection after we've established some sort of foundation

23      and some relevance here, none of which has been done.

24          And, Your Honor, I just object to the double-teaming

25      which I think we have allowed to have happen.  But Mr.
```

 1    Fuller's conducting the examination here.  Mr. Fuller ought

 2    to be able to answer his own -- any questions posed by the

 3    Court or respond to any objections raised.

 4            THE COURT:  Well, I've been real lax about, about

 5    that and Mr. Farrell is standing up which makes me even

 6    less -- even more lax about it.  Normally it's one lawyer

 7    for each party for a witness.  And I've violated that rule

 8    because nobody has objected to it.

 9            MS. MAINIGI:  I am objecting, Your Honor.

10            THE COURT:  All right.  Sit down, Mr. Farrell.

11            MR. ACKERMAN:  Your Honor, I would note that I

12    represent the City of Huntington.  Mr. Fuller is

13    representing the Cabell County.  They are two separate

14    plaintiffs.

15            THE COURT:  All right.

16        Well, Mr. Farrell, you and Mr. Fuller represent the

17    same party.  Right?

18            MR. FARRELL:  I sat down, Judge.

19            THE COURT:  Okay.  Go ahead, Mr. Fuller.

20            MR. FULLER:  Your Honor, he has a copy of the

21    document.  Do you want me to retrieve it at this time?

22            THE COURT:  Well, --

23            MR. FULLER:  Judge, I -- I'll do whatever Your

24    Honor wants.

25            THE COURT:  Well, you can use the information in

1    the document to ask him questions and we'll take it from

2    there.  But I'm not going to let him use the document until

3    we get to a point where it's relevant for him to use it, if

4    we ever get there.

5              MR. FULLER:  Yes, Your Honor.

6    BY MR. FULLER:

7    **Q.**   Mr. Mone, turn that document upside-down on your

8    desk.  And do you recall a conversation in 2009 with the

9    DEA related to the treatment of chain pharmacies?

10             MS. MAINIGI:  Objection, relevance, foundation.

11             THE COURT:  Overruled.  He can answer.

12             THE WITNESS:  I had many conversations with the

13   DEA during periods of time.  I'm not certain what

14   conversation you're specifically referring to.

15   BY MR. FULLER:

16   **Q.**   Sure.  Might it refresh your recollection if I

17   showed you an affidavit that you did that references a

18   specific conversation that you had with the DEA in 2009?

19             MS. MAINIGI:  Your Honor, I have to object again,

20   and I apologize for continuing to get up, but we're right

21   back where we were 10 minutes ago.  He needs to give him

22   some more guideposts about the conversation with the DEA.

23             THE COURT:  You need to at least give him a

24   specific date and ask him if he remembers that.

25             MR. FULLER:  Yes, Your Honor.

```
 1    BY MR. FULLER:

 2    Q.    Mr. Mone, do you remember in July of 2009 having a

 3    conversation with Mr. Arpaio related to the treatment of

 4    chain pharmacies?

 5    A.    I do.

 6    Q.    Okay.  Now, in that conversation did Mr. Arpaio

 7    indicate to you that chain pharmacies should be treated the

 8    same as other retail independent chains?

 9    A.    Mr. Arpaio was discussing with me his expectation that

10    the due diligence with regard to chain pharmacies should be

11    the same as retail independents.  To the best of my

12    recollection, that's what our conversation was about.

13    Q.    And did you consider that to be guidance from the DEA?

14    A.    I did not consider that to be guidance.

15    Q.    And did you have a differing opinion as to the

16    treatment of chains compared to retail independent

17    pharmacies?

18    A.    I had a difference of opinion with regard to how we

19    managed the due diligence with chains based upon my

20    conversations with Barbara Boockholdt.

21    Q.    And did you later in the month of November of 2009 have

22    a conversation with Barbara Boockholdt related to the

23    treatment of chain pharmacies?

24    A.    I do not recall the specific timeline when I spoke with

25    Barbara.  But to the best of my recollection, immediately
```

```
 1    after Mr. Arpaio called me, I called Barbara.  If you're
 2    referring to a different time, I need some framework.
 3    Q.   Well, now, I specified the time frame that I was
 4    talking about because Mr. Arpaio's conversation was in July,
 5    at least based on my question.
 6         Now I'm asking about a conversation in November, which
 7    is approximately six, five, four months later.  Are you --
 8    the conversation or the call you're referring to to
 9    Ms. Boockholdt, was that right after your conversation?
10    A.   There was a -- there was a call to Ms. Boockholdt
11    immediately after Mr. Arpaio communicated with me.  There
12    may have been other conversations with Barbara.
13    Q.   Do you remember a conversation with Ms. Boockholdt,
14    Barbara as you referenced her, in November of 2009 related
15    to the same issue of treating chains differently and they
16    should be treated the same as retail independents?
17    A.   I do not have any recollection of that conversation.
18              MR. FULLER:  Can I get 9928?
19         Judge, this is another declaration filed in the same
20    matter and deals with that particular conversation.
21              MS. MAINIGI:  Your Honor, I do not think he has
22    established any basis to refresh recollection if that's what
23    he's anticipating doing.  Why doesn't he ask the witness
24    what was said in the conversation?
25              MR. FULLER:  Judge, I believe --
```

```
 1                    THE COURT:  Do you remember the conversation, Mr.

 2      Mone?

 3                    THE WITNESS:  With Barbara?

 4                    THE COURT:  Yes.

 5                    THE WITNESS:  I, I remember the conversation

 6      immediately after Mike called in July.

 7                    THE COURT:  Do you remember the content of the

 8      conversation?

 9                    THE WITNESS:  It was a discussion about how

10      Barbara had visited the Cardinal Health -- Cardinal Health

11      and we had had our conversation when she did the assessment

12      of the SOM system earlier in the year.

13                    THE COURT:  Is that what you're driving at, Mr.

14      Fuller?

15                    MR. FULLER:  No, Your Honor.  I asked him

16      specifically about November and he testified he had no

17      recollection.  That's when I culled up the next document.

18                    THE COURT:  Well, if -- what's the document?  His

19      own declaration?

20                    MR. FULLER:  Yes, Your Honor.

21                    MS. MAINIGI:  Your Honor, he still cannot do this.

22      I mean, if Mr. Mone has a recollection of a -- he can ask

23      him about all the conversations he recalls with Ms.

24      Boockholdt.  But there's a number of different ways he can

25      establish some guideposts and ask some questions.  This is
```

1    not -- he really just wants to put this document on the

2    screen and walk through it.  It's not that easy.

3            THE COURT:  Well, I'm not going to let him do

4    that.  But if, if, if he can establish that his recollection

5    is refreshed by the document, then you can show him that

6    part of the document that refreshes his recollection with

7    regard to this particular conversation.

8            MR. FULLER:  Thank you, Judge.

9    BY MR. FULLER:

10   Q.   Mr. Mone, if I showed you a declaration that you

11   did back in 2012 that addressed this specific

12   conversation in November with Ms. Boockholdt, might that

13   refresh your recollection?

14   A.   It may or may not.

15           MR. FULLER:  Your Honor, may I approach the

16   witness?

17           THE COURT:  Yeah, you can, you can show him that

18   part of the document and ask him if it refreshes his

19   recollection.  And if he says "yes," you can retrieve the

20   document and ask him the question.  But he's got to testify

21   from memory, not read the document.

22           MR. FULLER:  Fair enough, Judge.  May I approach?

23           THE COURT:  Yes.

24   BY MR. FULLER:

25   Q.   If you'll look at the review, Paragraph 11, Mr.

```
 1    Mone.

 2              MS. MAINIGI:  I'm sorry, Mr. Fuller.  P-9928,

 3    Paragraph 11?

 4              MR. FULLER:  Yes.

 5              THE COURT:  Does that refresh your recollection

 6    about what happened in --

 7              MS. MAINIGI:  I don't think this is the correct

 8    document.

 9    BY MR. FULLER:

10    Q.   Can I see your copy, Mr. Mone, for a second?  I

11    apologize.

12              MR. FULLER:  Yeah, it is.  I'm sorry, Judge.

13    BY MR. FULLER:

14    Q.   Mr. Mone, have you had a chance to look at

15    Paragraph 11?

16    A.   I have.

17              THE COURT:  Does that refresh your recollection

18    about this conversation you had with Ms. Boockholdt?

19              THE WITNESS:  It does not.  It references an

20    email.

21              MR. FULLER:  Hold on.  I apologize, Judge.  I was

22    looking at my wrong highlight.  Let's look at Paragraph 7.

23    It's on the page prior.

24              THE COURT:  Where are we?  Are we in the

25    declaration or are we in the --
```

```
 1                 MR. FULLER:  Yes, Your Honor.

 2                 THE COURT:  Paragraph 7?  This doesn't say

 3     anything about a November meeting.

 4                 MR. FULLER:  Judge, if you start about halfway

 5     down that paragraph on February 24th, 2012, --

 6                 THE COURT:  Okay.  I see it.

 7         Have you read that --

 8         We need to get through this.

 9         Have you read that, Mr. Mone?

10                 THE WITNESS:  I'm almost finished, Your Honor.

11         Yes, I've read it.

12                 THE COURT:  Does that refresh your recollection

13     about this November, 2009, meeting?

14                 THE WITNESS:  It does not.

15                 THE COURT:  You're stuck with his answer, Mr.

16     Fuller.

17                 MR. FULLER:  May I obtain the declaration back,

18     Your Honor?

19                 THE COURT:  Yes.

20                 MR. FULLER:  Your Honor, it's 5:00.  Are we --

21                 THE COURT:  It's exactly 5:00.  That's the

22     bewitching hour.

23                 MR. FULLER:  When you said we've got to get

24     through this, I looked at my watch.

25                 THE COURT:  Mr. Mone, I'm going to have to ask you
```

```
 1    to come back tomorrow, sir.  And you're excused for tonight

 2    and we'll see you at 9:00 in the morning.

 3             THE WITNESS:  Yes, Your Honor.

 4             THE COURT:  And I think Mr. Schmidt had a matter

 5    he wanted to bring up with the Court.

 6             MR. SCHMIDT:  Yes, Your Honor.

 7        Your Honor, the issue we wanted to raise is something I

 8    raised with Mr. Farrell.  It's a timing issue.

 9        Several of their expert witnesses are sequenced in that

10    they -- later witnesses rely on the testimony of earlier

11    witnesses to give their opinions.  They rely on the expert

12    report and the testimony of someone else.

13        This comes up most immediately next week in the context

14    of Mr. Rafalski, the DEA witness that plaintiffs are

15    producing who relies on testimony from Dr. McCann that has

16    not yet come into evidence.  And that presents two

17    questions.

18        One is the case law, we believe, is pretty clear that

19    Dr. McCann has to give that testimony as a predicate to Mr.

20    Rafalski.  And I don't think the plaintiffs disagree with

21    that.  They told us they do intend to call Dr. McCann.

22        So the second question is the sequencing.  In our view,

23    Dr. McCann should come in, give the testimony, lay the

24    predicate, and then Mr. Rafalski should testify.  I think

25    the plaintiffs have taken the opposite view.
```

```
 1          Just as a matter of good order, we think it should be

 2    sequenced that way, including the cross-examination of Mr.

 3    Rafalski could be a mess if we're testifying about a

 4    methodology that hasn't actually come in before the Court.

 5          So our request is just that proper sequencing be

 6    observed.

 7                THE COURT:  When do you expect to call these

 8    witnesses, Mr. Farrell?

 9                MR. FARRELL:  Optimistically, next week.

10                THE COURT:  Optimistically, next week?

11                MR. FARRELL:  Yes, sir.

12                THE COURT:  Will both of them be available next

13    week?

14                MR. FARRELL:  Yes.

15                THE COURT:  Well, why can't you put Dr. McCann on

16    first?

17                MR. FARRELL:  Because that wasn't our plan.  And I

18    think that -- to be blunt, Judge, I think that there's

19    tactical reasons for us to put it on in this order and

20    tactical reasons for the defense to want it the other way

21    around.

22          So to be clear, the sequence of this looks something

23    like this.  Each of the three defendants have, as you've

24    seen, some type of algorithm or metric to identify orders

25    which are, using different language, suspicious, red flags,
```

```
 1    excessive, orders of interest.  What -- it's based upon data

 2    that was transactional data that was produced in discovery.

 3        So Dr. McCann has been split so that he can present the

 4    transactional data, and then we put on the three defendants

 5    where we put on the record the types of tests they were

 6    using.

 7        Mr. Rafalski is a former DEA agent who did this type of

 8    analysis and led the investigation into the Masters

 9    Pharmaceutical case.  He's going to then take the tests that

10    are in the record from the three companies.  He's going to

11    then reference due diligence files that were -- that had

12    been produced in discovery.  And he's going to state, as in

13    his expert witness report, to apply these tests.

14        Mr. McCann -- Dr. McCann, as the mathematician, is not

15    laying any factual predicate for those tests.  He's simply

16    going to be running the data analysis that Mr. Rafalski is

17    going to testify to.

18        We think the good order is the one that we've proposed

19    and we would suggest that under 104(b), conditional

20    relevancy, that the sequence is appropriate for us to put on

21    both of them in that order.  That would be --

22            THE COURT:  Well, how -- if he's relying on Dr.

23    McCann and Dr. McCann's testimony is relying on him not in

24    the record, how are you going to get around that problem?

25            MR. FARRELL:  I think it's conditional relevancy.
```

1    I think what he can say is he's going to say that -- these

2    are all reports that have been disclosed in discovery.  It's

3    not an unknown entity.

4         So I think Mr. Rafalski is going to say these are the

5    results of the tests the next witness is going to put on.

6              MR. SCHMIDT:  Your Honor, on our end it's not a

7    tactical decision.  It's just a basic point that Mr.

8    Rafalski doesn't run these analyses.  He doesn't know how to

9    run these analyses.  He doesn't know the aspects of how

10   these analyses were run in terms of the decisions that were

11   made in the analyses.  He can't self-authenticate these

12   analyses.  Only Dr. McCann can do that.

13        And as a matter of good practice, we're going to be put

14   in a position where we're essentially cross-examining Mr.

15   Rafalski about Dr. McCann's deposition testimony about these

16   methodologies when it seems to us the self-evidently more

17   appropriate way to do it would be to hear from Dr. McCann

18   about the methodologies, cross-examine Dr. McCann, and then

19   have Mr. Rafalski say why he's okay with the methodologies.

20             THE COURT:  Why can't you do that, Mr. Farrell?

21             MR. FARRELL:  Well, I can.  And what will happen

22   then is that there will be objections the other way around.

23        So I'm perfectly willing to play it out exactly as Mr.

24   Schmidt says, but I will tell you that we will be sitting

25   here for that, for that testimony with the same exact --

1    there's no predicate.

2              THE COURT:  Well, if, if you're willing -- if

3    you're telling me you can solve the problem by calling Dr.

4    McCann first, and if you can do that, I think that's the

5    right way to do it.

6              MR. FARRELL:  May I have one second, Judge?

7         (Pause)

8              MR. FARRELL:  Judge, the problem that we have is

9    that both Dr. McCann and Jim Rafalski are experts in the

10   MDL.  And their deposition -- or their testimony has been

11   secured and their surrounding dates have been impacted with

12   other litigation with Judge Polster.

13        That being said, I take with great respect the advice

14   of my learned counsel on the order of witnesses that we

15   should call.  I, I just met with the smarter lawyers on my

16   team -- and I don't mean that in any sarcastic way --

17   literally the lawyers that have designed this.  And the

18   ordering of the two witnesses is not as important as it is

19   with the scheduling.

20        I personally believe that this is the right order of

21   things to go, but I will defer as long as we understand that

22   there will not be any gamesmanship about staging.

23              THE COURT:  You mean they might not be available

24   because they have an obligation in the MDL litigation to be

25   somewhere else?

1           MR. FARRELL:  Yes.  We have, we have been working

2     with the MDL lawyers to try to -- because they want to take

3     the depositions of these witnesses.

4           MR. SCHMIDT:  Actually, Your Honor, I think what's

5     happened is my understanding is -- and we raised this

6     earlier.  Mr. Rafalski was supposed to be deposed in a

7     Georgia case three weeks ago.  They cancelled that, so we

8     would not have a deposition of him before here.

9        Dr. McCann was supposed to -- and then Mr. Rafalski was

10    also supposed to be deposed by pharmacies I think last week.

11    They cancelled that so there wouldn't be a deposition before

12    herein.  I don't know if the same thing has happened with

13    Dr. McCann.

14       But that's -- those cancellations, as I understand it,

15    certainly as to the McKesson case in Georgia, were over our

16    objection.

17          THE COURT:  Well, I'm going to ask you to call Dr.

18    McCann first, Mr. Farrell.

19          MR. FARRELL:  Yes, Your Honor.

20          THE COURT:  Now, does everybody know we plan to go

21    until 5:00 on Friday this week?

22          ALL COUNSEL:  Yes, Your Honor.

23          THE COURT:  Unfortunately, I have somewhere I've

24    got to be Monday morning and I can get here by 10:00.  So

25    we'll start at 10:00 on Monday and I'll give you that hour

```
 1    back.  I'll work out a way to give you that hour back.  So I
 2    just want to make sure everybody is aware of that.
 3                MR. SCHMIDT:  Thank you, Your Honor.
 4                THE COURT:  I'll see everybody at --
 5        Ms. McClure.
 6                MS. MCCLURE:  Your Honor, I just need to complete
 7    the record that I had previously offered in terms of the
 8    documents I didn't have copies of.  So I'll provide those --
 9                THE COURT:  Okay.
10                MS. MCCLURE:  -- which is 23655 with Appendices A
11    and B.
12                THE COURT:  All right.  We'll be in recess until
13    9:00 in the morning.
14        (Trial recessed at 5:11 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

```
 1        CERTIFICATION:

 2               I, Ayme A. Cochran, Official Court

 3     Reporter, and I, Lisa A. Cook, Official Court Reporter,

 4     certify that the foregoing is a correct transcript from

 5     the record of proceedings in the matter of The City of

 6     Huntington, et al., Plaintiffs vs. AmerisourceBergen

 7     Drug Corporation, et al., Defendants, Civil Action No.

 8     3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

 9     reported on May 19, 2021.

10

11            S\Ayme A. Cochran          s\Lisa A. Cook

12              Reporter                   Reporter

13        _

14

15        May 19, 2021

16           Date

17

18

19

20

21

22

23

24

25
```

## #

**#6** [2] - 12:21, 183:3

## $

**$100,000.00** [1] - 146:13
**$190,000.00** [1] - 146:25
**$200,000.00** [1] - 146:14
**$50,000.00** [5] - 146:19, 148:25, 149:6, 149:14, 149:21

## '

**'04** [4] - 109:4, 109:9, 109:15, 115:13
**'06** [3] - 215:24, 215:25, 216:2
**'07** [11] - 14:20, 14:21, 16:2, 16:10, 18:15, 80:11, 93:18, 93:20, 104:4, 115:3, 133:8
**'08** [6] - 93:21, 97:11, 97:12, 111:12, 115:1, 115:2
**'09** [1] - 93:23
**'12** [2] - 109:4, 109:9
**'84** [1] - 175:15
**'96** [1] - 177:24

## 0

**0001** [2] - 90:5, 90:10
**000714A** [1] - 9:4
**00193** [1] - 169:25
**00907** [2] - 2:5, 2:17

## 1

**1** [3] - 10:5, 118:25, 173:11
**1,000** [1] - 56:2
**10** [3] - 8:19, 36:23, 222:21
**10-12** [1] - 70:7
**100** [3] - 32:8, 55:15, 92:15
**1001** [2] - 2:10, 4:6
**1006** [1] - 212:12
**101(b** [2] - 134:20, 134:25
**1022** [1] - 3:5
**104(b** [1] - 231:19
**10:00** [2] - 234:24, 234:25

**11** [5] - 165:18, 165:23, 226:25, 227:3, 227:15
**11th** [1] - 114:13
**126** [1] - 3:5
**12th** [2] - 77:9, 143:9
**13** [1] - 1:16
**1300** [1] - 6:15
**1301.74** [1] - 119:1
**1306** [3] - 88:23, 89:21, 122:25
**1311** [2] - 2:4, 2:16
**14** [5] - 164:2, 167:7, 167:13, 167:16
**1406** [4] - 9:6, 15:25, 37:5, 37:25
**1409** [4] - 9:6, 17:13, 37:6, 38:1
**1410** [4] - 9:5, 9:25, 37:5, 37:25
**1413** [5] - 9:6, 15:4, 15:7, 37:5, 37:25
**1415** [4] - 9:6, 16:8, 37:5, 38:1
**1416** [4] - 9:6, 18:13, 37:6, 38:1
**1417** [4] - 9:6, 15:16, 37:5, 37:25
**1418** [7] - 9:5, 12:20, 13:9, 13:18, 13:23, 37:5, 37:25
**1444** [8] - 9:5, 13:6, 13:20, 13:24, 14:13, 37:5, 37:25
**15910** [1] - 3:18
**1600** [1] - 3:17
**162** [1] - 114:12
**16642** [4] - 142:16, 142:22, 142:23, 169:1
**16651** [2] - 130:11, 139:8
**1717** [2] - 6:6, 6:13
**18** [1] - 204:20
**1827** [1] - 41:24
**1828** [1] - 42:21
**1830** [1] - 43:3
**1832** [1] - 43:10
**19** [4] - 1:19, 7:4, 236:9, 236:15
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1980** [1] - 176:5
**1984** [1] - 175:15
**1990** [1] - 36:15
**1996** [5] - 67:22, 67:23, 177:24, 203:11, 212:4
**1998** [1] - 36:17
**1999** [4] - 9:6, 16:17,

37:5, 38:1
**1st** [1] - 67:23

## 2

**2** [5] - 16:2, 110:21, 118:25, 120:11, 127:15
**2(d** [2] - 160:23, 160:25
**2.9** [1] - 56:1
**200** [1] - 92:15
**2000** [2] - 56:13, 60:7
**2000-2010** [1] - 50:8
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2004** [3] - 63:24, 108:18, 129:23
**2005** [7] - 7:18, 8:2, 19:23, 28:10, 64:4, 135:25, 215:14
**2005-2006** [1] - 215:20
**2006** [1] - 203:12
**2007** [35] - 10:7, 10:16, 12:24, 15:18, 17:1, 20:2, 20:4, 20:5, 37:15, 37:16, 38:8, 39:16, 39:19, 40:8, 41:15, 44:16, 56:9, 56:18, 58:9, 60:4, 60:9, 60:12, 61:11, 120:12, 120:16, 205:4, 205:23, 206:18, 207:19, 208:5, 209:3, 214:16, 214:25, 216:6, 216:8
**2007-2008** [1] - 116:24
**2008** [7] - 47:13, 49:13, 97:9, 121:3, 121:6, 144:14, 210:6
**2009** [14] - 121:9, 121:14, 125:4, 217:5, 217:6, 217:9, 219:5, 219:8, 222:8, 222:18, 223:2, 223:21, 224:14, 228:13
**2011** [10] - 77:10, 130:6, 130:25, 134:20, 135:25, 140:25, 141:6, 143:14, 143:23
**2012** [20] - 56:17, 56:18, 108:19, 129:23, 145:6, 189:7, 203:12, 206:14, 206:16,

206:19, 210:15, 210:21, 210:24, 210:25, 211:1, 216:4, 226:11, 228:5
**2014** [2] - 97:14, 97:15
**2015** [2] - 129:21, 151:16
**2016** [1] - 161:12
**2017** [8] - 157:18, 158:12, 158:14, 162:6, 162:24, 163:3, 167:13, 167:14
**2018** [1] - 212:4
**202** [2] - 2:4, 2:16
**2020** [3] - 67:8, 178:7, 196:4
**2021** [5] - 1:19, 7:4, 196:4, 236:9, 236:15
**205** [1] - 103:6
**21** [1] - 118:25
**218.2** [1] - 211:23
**2216** [1] - 3:7
**23655** [1] - 235:10
**24** [8] - 68:3, 69:15, 70:4, 78:11, 133:8, 150:4, 194:25, 196:3
**24th** [2] - 26:7, 228:5
**25** [1] - 5:5
**25-year** [1] - 128:18
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**28** [3] - 3:15, 4:3, 4:9
**29** [1] - 130:25
**29464** [3] - 3:15, 4:4, 4:9
**2:00** [2] - 115:24, 116:1
**2nd** [3] - 210:21, 210:22, 210:23

## 3

**3** [5] - 95:12, 96:9, 96:12, 118:24, 139:15
**3.7** [2] - 147:2, 147:9
**3.8** [2] - 109:3, 109:8
**3/26/08** [1] - 110:22
**30** [4] - 114:11, 114:12, 114:24, 162:6
**31** [1] - 102:3
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**317** [2] - 18:14, 18:15
**32** [2] - 97:19, 97:22

**32502** [1] - 2:14
**34** [2] - 98:17
**35** [2] - 99:15, 175:21
**38** [4] - 100:25, 101:1, 101:24, 102:3
**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 236:8
**3:17-cv-01665** [2] - 1:11, 236:8
**3:25** [1] - 168:11
**3:52** [2] - 128:11, 128:12

## 4

**40** [4] - 101:18, 196:20, 200:10
**40-some** [1] - 67:16
**401** [2] - 2:10, 4:6
**403** [1] - 87:24
**405** [1] - 2:7
**41** [4] - 101:24, 102:4, 176:6, 200:1
**41622** [3] - 148:1, 148:4, 148:7
**41623** [1] - 159:9
**41625** [2] - 94:25, 169:4
**42** [1] - 101:24
**46** [1] - 92:9
**4:17** [1] - 201:9
**4:25** [1] - 201:9

## 5

**5** [1] - 97:18
**5,000** [5] - 101:2, 106:14, 127:3, 144:19, 144:20
**5-6** [1] - 92:8
**500** [1] - 87:15
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**580** [1] - 151:4
**590** [39] - 12:15, 19:15, 38:13, 92:6, 92:8, 92:12, 92:25, 94:10, 94:11, 95:9, 95:12, 95:15, 96:11, 98:14, 101:7, 102:17, 102:24, 106:8, 125:15, 125:17, 157:17, 157:19, 157:22, 158:2, 158:3, 158:23, 159:3, 161:12, 161:19, 162:4, 162:9, 162:18,

165:24, 169:5,
169:18, 172:23,
172:24, 173:2, 173:3
**590s** [6] - 38:14,
106:1, 106:11,
157:25, 158:9,
158:15
**5:00** [3] - 228:20,
228:21, 234:21
**5:11** [1] - 235:14

## 6

**6** [8] - 55:22, 91:4,
183:5, 185:2,
185:19, 185:25,
188:7, 200:5
**6,000** [4] - 101:19,
106:17, 127:5,
144:22
**6/20/07** [1] - 14:15
**6/28/12** [1] - 17:7
**600** [1] - 2:13
**611** [3] - 73:25, 91:4,
207:13
**611(c)** [1] - 91:7
**611(c)(2** [1] - 74:20
**65** [1] - 69:23
**6th** [3] - 3:5, 67:8,
178:6

## 7

**7** [2] - 227:22, 228:2
**7/2007** [1] - 10:5
**70130** [1] - 3:8
**707** [1] - 4:18
**714** [2] - 37:4, 37:25
**714-A** [1] - 9:14
**714A** [1] - 18:22
**716** [1] - 3:12
**725** [2] - 4:13, 4:15
**743** [3] - 55:25, 56:9,
56:19
**7:00** [1] - 197:3
**7th** [1] - 61:11

## 8

**8** [2] - 97:9, 173:11
**80** [1] - 69:23
**801** [5] - 3:10, 63:4,
135:9, 135:12,
163:23
**801(B)(2)(D** [1] - 148:1
**801(d** [2] - 160:23,
160:24
**801(d)(2)** [1] - 88:3
**801(d)(2)(D** [3] -
123:2, 123:10,

135:16
**801(d)(2)(D)** [6] - 63:4,
63:11, 124:21,
130:14, 151:10,
159:17
**82** [1] - 85:3
**828** [1] - 83:19
**850** [1] - 5:12
**86%** [4] - 76:22, 77:17,
77:21, 143:13

## 9

**9** [1] - 125:4
**90%** [2] - 69:12, 158:1
**901** [1] - 4:18
**902(6** [2] - 133:25,
134:18
**91436** [1] - 3:18
**9401** [1] - 217:11
**9928** [1] - 224:18
**9:00** [3] - 7:4, 229:2,
235:13
**9:46** [1] - 36:25
**9th** [2] - 2:10, 128:7

## A

**a.m** [3] - 7:5, 36:25,
197:3
**ABC** [4] - 90:21, 97:3,
118:12, 153:21
**ABC's** [1] - 42:3
**ABDC** [6] - 18:3,
31:24, 64:16, 88:22,
162:10, 162:14
**ABDC's** [2] - 136:24,
137:1
**ABDC-001824** [1] -
41:10
**ability** [5] - 23:17,
23:24, 83:22, 83:24,
120:24
**able** [11] - 24:16,
24:18, 59:3, 126:15,
155:5, 171:18,
171:21, 179:10,
181:4, 219:11, 221:2
**absence** [1] - 217:9
**absent** [1] - 56:5
**Absolutely** [1] - 181:5
**absolutely** [2] - 39:4,
134:11
**acceptable** [1] - 47:20
**accepted** [1] - 97:5
**access** [2] - 99:9,
156:22
**accommodate** [1] -
36:22
**accompanying** [1] -

8:17
**accomplished** [1] -
28:5
**according** [1] - 105:12
**Account** [1] - 123:20
**account** [15] - 9:22,
12:15, 14:11, 42:23,
113:15, 125:5,
125:12, 125:14,
127:19, 139:18,
147:18, 156:6,
182:6, 182:13
**accounts** [10] - 24:4,
24:14, 24:15, 122:9,
148:24, 149:1,
149:14, 165:25,
180:18, 183:16
**accreditation** [1] -
173:22
**accurate** [1] - 144:9
**Ackerman** [4] - 84:6,
160:20, 161:2, 220:6
**ACKERMAN** [2] - 2:9,
11:7, 23:7, 25:6,
25:9, 33:10, 33:12,
33:15, 33:18, 42:7,
52:20, 63:4, 63:10,
63:15, 63:17, 83:18,
88:21, 122:23,
133:24, 136:22,
160:21, 220:7,
221:11
**ACM** [2] - 110:25,
111:1
**Action** [4] - 1:4, 1:10,
236:7, 236:8
**action** [6] - 210:13,
210:16, 214:17,
214:25, 218:11,
218:12
**actions** [2] - 210:14,
215:3
**active** [2] - 176:13
**activities** [3] - 16:12,
41:14, 45:4
**activity** [1] - 181:12
**actual** [5] - 52:4,
172:1, 173:2,
183:11, 188:20
**adapting** [1] - 204:8
**add** [2] - 104:19, 165:4
**added** [3] - 14:24,
15:2, 64:24
**addition** [6] - 30:3,
71:7, 71:9, 134:23,
148:25, 172:2
**additional** [11] -
15:12, 59:17, 64:18,
71:14, 103:3,
112:18, 141:17,

141:18, 156:1,
172:15, 216:11
**address** [5] - 9:12,
17:18, 19:21,
165:17, 187:8
**addressed** [1] -
226:11
**adjusted** [4] - 77:15,
143:11, 143:20
**administrative** [3] -
209:20, 210:15,
215:4
**admissibility** [6] -
83:15, 85:25, 86:5,
87:19, 89:22, 89:25
**admissible** [6] - 87:1,
87:2, 87:18, 89:23,
124:5, 135:22
**admission** [6] - 37:3,
52:16, 84:18,
124:10, 139:5, 218:8
**admissions** [1] -
218:12
**admit** [7] - 63:20,
88:10, 90:2, 90:8,
123:6, 160:18,
169:23
**ADMITTED** [10] - 38:1,
53:3, 63:21, 65:5,
90:10, 124:12,
124:25, 130:19,
148:7, 161:4
**admitted** [32] - 36:7,
37:10, 37:24, 40:14,
53:2, 62:25, 63:20,
64:10, 65:4, 88:6,
89:12, 90:5, 110:9,
110:14, 114:2,
114:14, 114:11,
124:24, 130:16,
130:18, 134:21,
135:3, 138:11,
148:6, 150:13,
151:11, 152:15,
160:19, 161:3,
163:8, 169:3, 170:4
**adopted** [1] - 63:13
**adversary** [2] -
135:16, 135:21
**adverse** [8] - 57:9,
73:20, 74:21, 74:23,
148:2, 159:18, 207:3
**advice** [1] - 233:13
**Advil** [1] - 172:9
**advise** [1] - 31:11
**advised** [1] - 197:20
**Affairs** [34] - 78:11,
78:19, 79:3, 80:10,
80:11, 80:13, 80:22,
91:18, 92:11, 94:1,

94:7, 99:10, 100:6,
100:10, 100:12,
100:19, 111:4,
121:5, 129:15,
129:18, 129:25,
130:2, 130:7, 131:2,
131:4, 132:2, 132:4,
132:6, 132:9,
143:24, 144:13,
149:24, 151:19
**affected** [4] - 23:11,
200:15, 200:20,
210:10
**affecting** [2] - 112:25,
113:13
**affidavit** [2] - 134:23,
222:17
**afforded** [1] - 64:24
**afternoon** [5] -
116:13, 116:14,
170:11, 170:12,
196:16
**age** [1] - 59:19
**agency** [1] - 129:19
**agent** [1] - 231:7
**agents** [2] - 26:11,
190:18
**aggregating** [1] - 56:4
**ago** [6] - 98:11,
192:16, 192:23,
196:21, 222:21,
234:7
**agree** [6] - 60:13,
91:22, 92:1, 97:12,
98:2, 99:11, 101:11,
103:22, 111:10,
112:7, 115:2,
218:18, 220:4
**agreed** [9] - 54:19,
57:16, 60:9, 60:16,
61:18, 62:12, 62:17,
62:22, 136:23
**agreement** [3] - 35:14,
35:18, 82:25
**Agreement** [3] -
44:17, 210:4, 211:2
**ahead** [31] - 25:14,
32:16, 37:3, 40:13,
42:17, 46:10, 57:24,
59:12, 72:19, 80:5,
81:12, 82:4, 82:13,
86:19, 90:11, 91:8,
96:7, 96:20, 103:23,
107:11, 114:22,
134:17, 141:25,
144:16, 161:5,
165:11, 199:17,
207:7, 207:12,
218:7, 221:19
**al** [4] - 1:7, 1:13,

236:6, 236:7
**algorithm** [1] - 230:24
**ALL** [1] - 234:22
**allow** [3] - 24:3, 90:9, 213:9
**allowed** [5] - 74:7, 83:2, 89:6, 220:11, 220:25
**allows** [2] - 74:20, 99:2
**alluded** [1] - 62:23
**almost** [1] - 228:10
**alone** [1] - 75:12
**aloud** [1] - 41:25
**Alprazolam** [1] - 10:17
**alternative** [1] - 83:4
**AM** [1] - 9:3
**AM-WV** [1] - 9:3
**AM-WV-0006** [2] - 54:6, 57:14
**AM-WV-2644E** [2] - 52:17, 53:3
**ambition** [2] - 173:20, 173:22
**amended** [2] - 125:17, 134:20
**Amerisource** [2] - 178:3, 178:9
**AmerisourceBergen** [107] - 6:2, 22:17, 23:3, 24:18, 25:17, 28:17, 29:22, 30:12, 31:18, 31:25, 32:21, 36:3, 36:7, 36:10, 38:8, 38:10, 38:20, 39:18, 41:15, 42:14, 43:7, 43:24, 44:3, 44:12, 44:20, 46:25, 47:9, 49:15, 56:10, 56:20, 58:21, 60:15, 60:16, 62:16, 63:25, 64:3, 64:10, 67:5, 67:21, 68:20, 69:13, 71:10, 71:20, 73:18, 75:4, 78:21, 79:5, 80:8, 84:8, 88:24, 89:21, 90:23, 91:11, 91:16, 93:11, 97:24, 98:1, 98:7, 98:25, 99:18, 101:10, 102:5, 109:3, 109:8, 111:9, 112:6, 113:2, 116:25, 117:3, 117:5, 117:25, 118:1, 118:21, 120:3, 120:4, 123:3, 127:11, 128:19, 128:25, 131:22, 145:9, 145:17, 146:7, 147:25,

149:11, 150:5, 157:21, 163:16, 167:6, 167:8, 171:23, 177:12, 177:14, 178:1, 178:10, 179:11, 185:19, 193:25, 194:9, 194:25, 195:1, 197:11, 197:14, 197:16, 198:12, 236:6
**AMERISOURCEBERGEN** [2] - 1:7, 1:13
**AmerisourceBergen's** [9] - 23:24, 29:16, 34:20, 42:25, 43:16, 48:3, 50:2, 50:4, 59:15
**amount** [7] - 71:8, 77:25, 78:1, 109:10, 146:18, 182:1, 190:25
**amounts** [2] - 182:14, 182:18
**ample** [1] - 191:16
**AMWV-2644E** [1] - 51:10
**analyses** [5] - 232:8, 232:9, 232:10, 232:11, 232:12
**analysis** [3] - 87:24, 231:8, 231:16
**ANDREW** [1] - 5:10
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**annual** [5] - 50:13, 72:3, 72:6, 147:3, 147:10
**annually** [2] - 71:19
**answer** [19] - 33:21, 59:12, 72:18, 79:13, 99:11, 99:18, 102:3, 117:19, 120:24, 126:4, 126:6, 133:1, 167:19, 203:8, 207:22, 218:15, 221:2, 222:11, 228:15
**answered** [3] - 93:10, 103:20, 132:16
**answers** [4] - 95:21, 101:24, 169:17, 169:20
**ANTHONY** [1] - 2:6
**Anti** [3] - 205:6, 205:24, 206:17
**Anti-Diversion** [3] - 205:6, 205:24, 206:17
**anticipate** [1] - 141:22

**anticipating** [1] - 224:23
**apologies** [1] - 63:17
**apologize** [8] - 111:18, 203:15, 217:7, 220:7, 220:8, 222:20, 227:11, 227:21
**apothecary** [4] - 183:17, 183:18, 183:21
**apparel** [1] - 193:3
**appear** [2] - 84:22, 107:1
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**Appendices** [1] - 235:10
**appendices** [1] - 64:15
**Appendix** [4] - 64:16, 64:17, 64:21, 64:23
**applied** [3] - 43:16, 84:2, 146:7
**apply** [1] - 231:13
**appointment** [1] - 178:25
**appreciate** [3] - 65:17, 196:7, 201:5
**Appreciation** [1] - 63:24
**approach** [21] - 8:21, 40:17, 51:12, 60:20, 77:1, 79:16, 95:2, 110:7, 114:6, 118:8, 121:19, 124:14, 130:12, 133:16, 143:2, 147:21, 150:10, 159:10, 217:14, 226:15, 226:22
**approached** [1] - 175:9
**appropriate** [5] - 81:15, 101:14, 105:7, 231:20, 232:17
**approved** [2] - 35:21, 39:6
**approximate** [1] - 97:23
**April** [10] - 10:16, 20:1, 20:4, 20:5, 26:6, 26:8, 29:20, 29:23, 29:25, 30:1
**Araholt** [1] - 217:6
**Arch** [2] - 6:6, 6:13
**area** [24] - 8:14, 12:3, 23:15, 26:16, 51:4,

57:1, 82:2, 95:25, 96:3, 111:7, 111:13, 111:17, 174:10, 185:2, 185:3, 185:4, 185:5, 185:6, 185:8, 187:7, 187:10, 198:10, 205:19, 208:8
**areas** [1] - 106:20
**argue** [1] - 89:19
**argued** [1] - 137:25
**argument** [1] - 84:1
**Arlington** [1] - 26:17
**arms** [1] - 179:1
**Arpaio** [5] - 223:3, 223:6, 223:9, 224:1, 224:11
**Arpaio's** [1] - 224:4
**arrangements** [1] - 129:16
**arrested** [1] - 189:7
**arrived** [5] - 206:23, 209:6, 209:9, 214:25, 215:2
**article** [4] - 135:22, 137:5, 137:11, 138:3
**articulately** [1] - 86:9
**arts** [1] - 176:11
**Arts** [1] - 15:6
**ASHLEY** [1] - 5:3
**aside** [5] - 19:25, 60:2, 85:4, 86:13, 136:6
**aspects** [1] - 232:9
**asserted** [1] - 218:10
**assessment** [1] - 225:11
**assigned** [3] - 13:14, 29:7, 197:25
**assignment** [1] - 166:11
**assignments** [1] - 165:25
**assist** [2] - 161:23, 204:7
**assisted** [2] - 29:10, 38:25
**Associate** [1] - 118:13
**associate** [2] - 118:17, 170:2
**associated** [2] - 91:11, 202:7
**assume** [19] - 97:17, 109:2, 109:7, 115:16, 116:24, 117:1, 127:2, 127:4, 144:18, 151:15, 151:19, 151:23, 151:25, 152:5, 152:14, 158:14, 167:7, 167:16

**assumed** [1] - 161:2
**assuming** [6] - 91:10, 127:5, 127:8, 137:11, 144:4, 145:5
**assumption** [1] - 152:6
**assumptions** [2] - 152:1, 152:15
**AT** [1] - 1:2
**attach** [1] - 131:7
**attached** [3] - 95:5, 97:14, 162:4
**attaching** [2] - 131:7, 148:19
**attachment** [1] - 161:12
**attempted** [1] - 85:15
**attempting** [2] - 12:9, 83:8, 167:25
**attend** [5] - 26:14, 39:15, 39:18, 41:7, 118:20
**attended** [5] - 34:12, 173:11, 173:14, 173:17, 173:19
**attendees** [1] - 39:24
**attending** [1] - 174:12
**attention** [8] - 20:1, 55:5, 55:9, 55:19, 58:5, 131:23, 189:11
**attitude** [1] - 82:1
**attorney** [1] - 211:13
**attorneys** [2] - 75:3, 203:9
**Auburn** [1] - 209:8
**audit** [4] - 46:25, 47:12, 47:16, 49:13
**audits** [6] - 35:22, 47:23, 48:21, 49:11, 49:14, 49:19
**August** [4] - 19:23, 35:15, 77:9, 143:9
**authentic** [1] - 87:20
**authenticate** [2] - 134:20, 232:11
**authenticating** [2] - 134:1, 138:1
**authentication** [6] - 86:24, 134:19, 135:2, 135:8, 135:11, 135:17
**authenticity** [7] - 83:14, 83:15, 83:21, 83:25, 84:9, 87:8, 123:9
**authorized** [2] - 162:10, 162:14
**available** [4] - 15:13, 152:22, 152:24, 154:16, 181:11,

202:17, 230:12, 233:23
**Avenue** [3] - 108:14, 108:15, 108:16
**average** [1] - 70:3
**averages** [2] - 44:19, 45:14
**Avin** [1] - 3:7
**avoid** [1] - 8:19
**aware** [26] - 25:3, 25:16, 25:20, 46:3, 59:15, 60:3, 60:5, 64:2, 145:7, 158:3, 200:14, 204:2, 205:12, 205:16, 209:3, 209:24, 210:3, 210:8, 210:9, 215:4, 215:14, 215:17, 215:21, 215:25, 216:7, 235:2
**awareness** [5] - 50:9, 50:11, 50:12, 50:21, 50:23
**awesome** [1] - 175:23
**awhile** [1] - 160:22
**Ayme** [2] - 6:17, 236:2

**B**

**background** [9] - 129:5, 132:10, 162:7, 170:13, 172:12, 172:13, 173:9, 204:10, 218:14
**bad** [1] - 61:14
**badly** [1] - 117:16
**bag** [1] - 179:8
**ball** [1] - 180:14
**balls** [1] - 195:10
**bank** [1] - 186:10
**bank-style** [1] - 186:10
**Barbara** [8] - 223:20, 223:22, 223:25, 224:1, 224:12, 224:14, 225:3, 225:10
**Barboursville** [2] - 193:7, 194:11
**Baron** [1] - 3:17
**base** [9] - 27:10, 54:9, 54:20, 71:5, 71:7, 71:9, 170:16, 179:9, 198:9
**based** [24] - 13:8, 27:24, 38:22, 39:5, 41:14, 42:2, 42:3, 42:24, 43:5, 44:14, 45:3, 51:17, 51:23,

71:9, 74:6, 122:7, 152:15, 163:15, 219:20, 219:21, 220:15, 223:19, 224:5, 231:1
**basic** [4] - 55:4, 58:4, 83:1, 232:7
**basis** [17] - 25:8, 33:11, 33:12, 50:13, 57:5, 83:16, 178:13, 203:3, 212:12, 212:14, 212:17, 218:16, 218:20, 220:11, 220:17, 220:21, 224:22
**Baylen** [1] - 2:13
**became** [1] - 80:18
**become** [1] - 102:23
**becomes** [3] - 15:13, 75:15, 81:21
**becoming** [1] - 102:15
**beers** [1] - 193:2
**BEFORE** [1] - 1:17
**begin** [2] - 9:3, 67:20
**beginning** [11] - 7:17, 80:11, 93:17, 93:18, 100:7, 104:4, 115:13, 143:7, 165:18, 165:23, 197:7
**begins** [4] - 11:20, 13:5, 14:15, 41:19
**begun** [1] - 38:14
**behind** [9] - 9:25, 99:7, 172:5, 184:9, 184:10, 184:16, 184:17, 188:24, 188:25
**behind-the-counter** [1] - 172:5
**belaboring** [2] - 85:1, 197:10
**belatedly** [1] - 159:7
**belief** [1] - 146:6
**below** [6] - 127:24, 131:8, 140:18, 148:19, 148:22
**Below** [1] - 110:25
**BENCH** [1] - 1:16
**Bergen** [2] - 177:23, 177:25
**Berger** [1] - 36:22
**best** [10] - 78:8, 177:10, 202:12, 203:1, 205:20, 209:17, 214:7, 216:2, 223:11, 223:25
**better** [4] - 73:2, 73:12, 113:1, 171:19

**between** [11] - 56:17, 61:3, 69:23, 78:20, 79:5, 85:24, 89:24, 109:9, 178:17, 210:5, 211:2
**bewitching** [1] - 228:22
**beyond** [11] - 46:16, 87:1, 103:9, 105:18, 107:23, 127:3, 160:12, 162:22, 163:3, 192:8, 199:13
**bid** [1] - 194:7
**big** [9] - 65:11, 146:8, 146:12, 146:13, 146:17, 146:21, 179:8, 183:16, 205:8
**Big** [1] - 198:17
**bigger** [1] - 146:11
**biggest** [1] - 171:10
**bit** [9] - 16:17, 27:4, 42:10, 65:19, 98:11, 173:7, 177:12, 187:23, 220:9
**black** [1] - 95:21
**blank** [1] - 13:6
**blind** [1] - 195:13
**blocked** [3] - 169:9, 169:10
**blood** [1] - 172:8
**blunt** [1] - 230:18
**Blvd** [3] - 3:15, 4:3, 4:9
**board** [2] - 28:11, 105:10
**Board** [6] - 131:24, 136:1, 137:10, 137:21, 185:9, 193:21
**bold** [3] - 55:3, 140:2, 140:10
**Bonasso** [1] - 5:14
**bonus** [8] - 71:9, 71:12, 71:25, 72:15, 73:14, 75:21, 75:24, 76:6
**Boockholdt** [8] - 223:20, 223:22, 224:9, 224:10, 224:13, 225:24, 226:12, 227:18
**Boone** [2] - 199:5, 199:6
**boots** [1] - 91:25
**boss** [7] - 20:16, 21:4, 27:24, 72:9, 146:3, 148:12
**Bottle** [1] - 55:14
**bottle** [1] - 186:24
**bottles** [1] - 192:3

**bottom** [6] - 41:25, 43:12, 74:12, 97:8, 121:21, 125:3
**bought** [1] - 177:18
**Boulevard** [1] - 3:18
**bounds** [1] - 82:21
**Box** [2] - 5:14, 6:8
**Boyd** [1] - 198:20
**brand** [2] - 183:19, 190:23
**break** [9] - 27:4, 44:22, 65:18, 78:23, 115:23, 121:3, 168:5, 168:6, 201:8
**Breitmayer** [1] - 48:14
**Bridgeside** [3] - 3:15, 4:3, 4:9
**brief** [1] - 64:8
**briefing** [1] - 215:16
**briefings** [2] - 215:5
**briefly** [3] - 14:2, 60:12, 191:7
**bring** [11] - 76:25, 79:13, 79:15, 83:6, 121:23, 121:24, 131:22, 170:20, 179:11, 217:11, 229:5
**broader** [3] - 28:8, 47:4, 47:6
**broadly** [1] - 31:23
**Brock** [3] - 193:13, 193:14
**Brock's** [1] - 193:13
**broken** [1] - 165:15
**brothers** [2] - 191:2, 192:15
**brought** [11] - 25:22, 55:5, 55:8, 55:18, 58:4, 171:1, 189:10, 189:11, 208:6, 209:2, 216:12
**Bruce** [2] - 129:2, 129:3
**Brunswig** [2] - 177:23, 177:25
**Budd** [1] - 3:17
**Budget** [4] - 17:15, 174:11, 174:22, 174:23
**Buffalo** [1] - 200:4
**build** [3] - 27:23, 28:12, 29:2
**building** [2] - 29:12, 46:6
**built** [1] - 32:5
**bullet** [5] - 41:18, 118:24, 118:25, 119:7, 119:18
**bulletproof** [1] - 184:3

**bullets** [1] - 41:25
**Burling** [1] - 5:11
**business** [14] - 15:17, 29:1, 60:16, 61:12, 87:21, 88:2, 119:23, 125:13, 176:19, 179:9, 183:19, 184:9, 194:4, 198:11
**businesses** [2] - 185:8, 190:19
**buy** [14] - 99:6, 101:21, 106:13, 106:16, 113:1, 113:8, 113:16, 115:17, 126:15, 127:6, 144:23, 145:4, 177:5, 182:8
**buying** [10] - 112:3, 112:11, 112:23, 113:15, 113:16, 113:17, 115:2, 115:3, 126:23, 127:21
**BY** [117] - 7:13, 8:23, 9:7, 11:11, 12:10, 23:10, 25:11, 25:15, 33:23, 38:3, 40:19, 42:20, 45:2, 46:2, 46:11, 50:24, 51:16, 51:22, 52:22, 53:22, 54:8, 56:7, 57:13, 58:7, 59:13, 60:22, 61:9, 63:22, 66:20, 72:20, 75:1, 75:19, 77:3, 79:1, 80:6, 81:6, 90:13, 91:15, 93:16, 95:7, 96:10, 96:22, 100:24, 101:17, 102:13, 103:8, 103:24, 105:20, 107:13, 108:8, 110:16, 110:24, 111:22, 114:25, 115:10, 116:12, 117:23, 118:11, 120:13, 121:1, 121:20, 121:25, 123:16, 124:16, 125:1, 126:21, 127:14, 129:14, 130:20, 130:23, 132:23, 133:7, 137:19, 139:9, 141:12, 141:15, 142:4, 142:19, 143:4, 144:11, 144:17, 147:16, 148:9, 150:14, 151:13, 152:21, 154:7,

158:8, 158:22, 159:2, 161:7, 162:2, 165:12, 166:3, 167:4, 167:20, 170:10, 175:24, 181:24, 196:15, 199:18, 202:3, 203:7, 205:11, 207:15, 214:1, 214:9, 214:24, 215:13, 216:25, 222:6, 222:15, 223:1, 226:9, 226:24, 227:9, 227:13

## C

**CA** [1] - 3:18
**Cabell** [34] - 3:2, 37:17, 51:4, 58:9, 60:3, 64:20, 69:8, 69:14, 70:3, 81:22, 95:16, 95:18, 109:21, 162:22, 163:2, 163:5, 163:20, 164:3, 164:11, 164:23, 164:24, 183:1, 189:25, 190:1, 195:7, 195:11, 199:1, 199:24, 204:3, 214:3, 214:11, 221:13
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell/Huntington** [2] - 218:2, 218:3
**cage** [5] - 20:10, 27:10, 54:15, 54:23, 55:19
**cages** [1] - 54:13
**Cal** [2] - 173:17, 176:1
**calculation** [3] - 75:21, 75:24, 76:6
**California** [4] - 173:18, 173:21, 176:2
**CALLAS** [1] - 6:7
**CAMPBELL** [1] - 6:14
**cancellations** [1] - 234:14
**cancelled** [2] - 234:7, 234:11
**cannot** [5] - 84:11, 119:18, 126:6, 192:25, 225:21
**Capitol** [1] - 2:7
**capped** [1] - 90:17
**capture** [1] - 42:4

**capturing** [1] - 156:9
**car** [1] - 181:15
**card** [1] - 190:23
**Cardinal** [31] - 4:11, 5:2, 171:23, 177:18, 177:21, 177:22, 202:8, 202:25, 203:9, 203:10, 203:11, 203:16, 203:17, 203:19, 203:20, 204:20, 205:12, 206:25, 207:4, 207:11, 210:5, 210:12, 211:2, 212:3, 214:3, 215:14, 215:19, 215:23, 218:12, 225:10
**Cardinal's** [1] - 209:3
**career** [6] - 92:16, 93:17, 93:18, 105:22, 174:13, 177:25
**Carey** [1] - 4:17
**carried** [1] - 179:7
**carry** [1] - 172:4
**cars** [5] - 180:8, 181:12, 181:13, 187:5, 192:6
**cascade** [1] - 161:21
**case** [17] - 49:20, 73:18, 74:1, 81:22, 88:7, 135:17, 135:21, 138:19, 163:4, 189:6, 189:24, 192:20, 202:11, 229:18, 231:9, 234:7, 234:15
**cases** [4] - 32:16, 32:17, 54:16, 140:4
**cash** [1] - 187:3
**categories** [1] - 153:13
**category** [4] - 76:4, 118:16, 153:15, 153:16
**category-specific** [2] - 153:15, 153:16
**Catholic** [5] - 173:12, 173:14, 173:16, 176:15, 176:16
**caused** [1] - 149:9
**Center** [8] - 3:12, 5:11, 43:25, 51:1, 51:3, 51:7, 51:18, 52:25
**center** [14] - 16:22, 18:4, 20:6, 23:11, 24:20, 24:25, 25:19, 31:23, 32:7, 33:5, 36:10, 177:19,

209:9, 209:15
**centers** [8] - 23:3, 31:20, 32:24, 33:4, 38:9, 209:4, 209:6, 209:7
**central** [1] - 58:22
**CEO** [1] - 20:17
**certain** [2] - 212:5, 222:13
**certainly** [7] - 84:21, 133:23, 135:24, 150:1, 157:13, 159:20, 234:15
**Certificate** [1] - 63:24
**CERTIFICATION** [1] - 236:1
**certify** [1] - 236:4
**CFR** [1] - 118:25
**chain** [17] - 38:15, 41:20, 61:10, 61:15, 62:6, 62:14, 79:22, 87:12, 90:7, 128:3, 132:5, 217:8, 222:9, 223:4, 223:7, 223:10, 223:23
**chains** [6] - 30:10, 217:8, 223:8, 223:16, 223:19, 224:15
**chance** [6] - 9:8, 40:21, 64:25, 77:4, 196:17, 227:14
**change** [13] - 23:23, 31:25, 32:3, 36:21, 49:8, 99:23, 99:25, 125:13, 144:5, 168:1, 198:7, 200:9, 206:12
**changed** [7] - 198:7, 206:9, 206:15, 206:23, 211:5, 211:8
**changes** [7] - 28:6, 28:14, 31:11, 47:19, 198:4, 204:8, 208:3
**changing** [2] - 99:15, 99:20
**channels** [1] - 173:24
**Chapman** [7] - 175:10, 175:11, 175:16, 177:15, 177:16, 177:18, 177:20
**characterization** [2] - 136:24, 164:15
**charge** [8] - 27:22, 181:19, 187:20, 187:21, 188:12, 188:15, 193:6, 193:11
**CHARLES** [1] - 3:11
**CHARLESTON** [2] -

1:2, 1:18
**Charleston** [6] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:4
**chart** [3] - 44:10, 44:12, 144:9
**Chase** [1] - 4:18
**Check** [1] - 97:22
**check** [1] - 98:6
**checked** [4] - 11:6, 11:13, 12:13, 179:20
**chemical** [1] - 42:2
**chemotherapy** [2] - 172:8, 172:9
**cherry** [1] - 99:6
**cherry-pick** [1] - 99:6
**Cherveny** [2] - 7:21, 11:1
**Chesterbrook** [1] - 6:15
**chose** [2] - 95:22, 101:10
**Chou** [1] - 61:23
**Chris** [8] - 21:6, 39:20, 40:2, 41:6, 60:12, 61:4, 61:20, 89:1
**church** [2] - 176:15, 176:16
**Church** [1] - 197:2
**circling** [1] - 44:10
**Circuit** [1] - 73:19
**circumference** [1] - 181:10
**circumstances** [2] - 135:23, 180:12
**cite** [1] - 63:8
**citizen** [2] - 174:8, 176:14
**City** [11] - 4:1, 5:11, 64:20, 95:16, 162:22, 163:2, 175:25, 183:2, 195:8, 221:12, 236:5
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 236:7, 236:8
**civil** [1] - 1:10
**clarification** [2] - 53:19, 199:6
**clarified** [1] - 147:13
**clarify** [1] - 123:25
**class** [3] - 196:19, 196:20, 196:21
**clean** [3] - 57:23, 107:3, 107:11
**cleanup** [2] - 170:13, 170:14
**clear** [7] - 32:8, 37:22, 73:19, 159:24, 160:2, 229:18,

230:22
**clearly** [2] - 76:18, 164:18
**CLERK** [7] - 66:6, 66:10, 66:13, 201:15, 201:17, 201:19, 201:21
**clerks** [1] - 54:24
**clientele** [1] - 109:14
**clients** [1] - 151:4
**clinics** [11] - 101:25, 102:7, 111:7, 111:8, 111:13, 111:17, 121:5, 126:24, 145:1
**clinics"** [1] - 111:24
**close** [4] - 15:14, 70:6, 155:14, 178:14
**closed** [4] - 52:6, 52:8, 145:6, 177:21
**closely** [3] - 21:20, 28:20, 54:24
**closer** [1] - 121:15
**closes** [1] - 52:8
**closing** [1] - 52:10
**closure** [1] - 22:10
**Cloud** [1] - 147:2
**CMRX** [1] - 156:15
**co** [1] - 52:13
**co-counsel** [1] - 52:13
**coach** [5] - 154:25, 155:1, 173:3, 176:16, 200:3
**coached** [1] - 200:2
**Cochran** [3] - 6:17, 236:2, 236:11
**coincide** [1] - 60:7
**cold** [2] - 179:10, 181:9
**collect** [8] - 93:25, 94:15, 127:10, 158:9, 167:9, 167:25, 179:12, 179:16
**collecting** [5] - 94:5, 108:24, 166:6, 166:17, 166:21
**collection** [5] - 19:15, 103:4, 103:10, 161:23, 162:3
**college** [2] - 173:10, 181:2
**College** [1] - 173:18
**Collegiate** [1] - 193:3
**colon** [1] - 62:3
**Columbus** [19] - 10:5, 17:15, 17:21, 17:22, 17:23, 17:24, 18:3, 24:24, 25:2, 25:5, 25:18, 26:1, 151:16, 208:7, 208:12,

208:15, 208:17, 215:1, 215:2
**Column** [2] - 9:18, 18:23
**combination** [1] - 101:3
**combined** [1] - 64:12
**comfortable** [1] - 32:9
**coming** [7] - 28:11, 34:16, 66:4, 128:19, 128:25, 164:4, 219:16
**commendations** [1] - 64:2
**comment** [2] - 152:17, 152:20
**commenting** [1] - 62:15
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2, 3:2
**commitment** [1] - 150:6
**common** [1] - 181:7
**communicate** [2] - 106:3, 107:6
**communicated** [1] - 224:11
**communication** [4] - 107:19, 216:12, 216:13, 216:15
**communications** [4] - 153:19, 197:24, 216:18, 217:1
**community** [5] - 67:15, 200:9, 200:13, 200:15, 203:24
**commuting** [1] - 208:25
**companies** [1] - 231:10
**company** [21] - 27:6, 27:16, 35:10, 74:3, 78:9, 82:1, 150:5, 157:24, 170:20, 170:22, 171:3, 172:25, 175:10, 178:4, 178:6, 188:18, 195:4, 196:1, 198:3, 198:4, 203:23
**Company** [4] - 175:12, 177:16, 177:20, 177:24
**compare** [1] - 125:14
**compared** [2] - 214:10, 223:16
**compensated** [1] -

71:3
**Compensation** [2] - 131:24, 136:1
**compensation** [4] - 71:20, 72:6, 80:7, 90:22
**competition** [1] - 198:15
**competitor** [1] - 194:6
**compiled** [1] - 8:20
**complete** [7] - 12:15, 35:24, 59:9, 92:24, 125:17, 165:23, 235:6
**completed** [3] - 12:13, 15:23, 162:16
**completeness** [1] - 64:23
**completes** [1] - 92:20
**completing** [1] - 162:6
**compliance** [4] - 50:1, 163:17, 195:13, 204:9
**Compliance** [1] - 197:14
**compliant** [7] - 47:19, 47:21, 49:21, 125:21, 125:23, 127:11, 163:14
**component** [2] - 197:14, 197:15
**components** [1] - 41:12
**compound** [4] - 44:21, 58:25, 78:22, 104:14
**computer** [4] - 6:19, 155:17, 155:19, 156:18
**computers** [1] - 185:1
**concentration** [1] - 205:22
**concern** [9] - 98:15, 100:4, 101:14, 103:12, 104:11, 105:24, 125:10, 188:10, 213:9
**concerned** [3] - 134:3, 173:2, 180:10
**concerns** [3] - 24:15, 94:6, 216:20
**conclude** [4] - 49:22, 49:25, 50:4, 94:7
**concluded** [5] - 14:21, 109:24, 109:25, 110:1, 116:18
**concluding** [2] - 12:11, 14:14
**conclusion** [4] - 12:11, 14:15, 15:8, 118:5

**conclusions** [2] - 14:3, 49:18
**conditional** [2] - 231:19, 231:25
**conduct** [1] - 162:14
**conducted** [6] - 8:13, 13:2, 18:10, 19:17, 22:17, 47:25
**conducting** [4] - 8:2, 11:1, 14:20, 221:1
**confer** [1] - 52:12
**Conference** [1] - 39:9
**conference** [5] - 39:10, 39:15, 39:19, 39:21, 39:24
**conferred** [1] - 107:2
**conflate** [1] - 106:24
**conflict** [3] - 78:20, 79:4, 79:6
**confused** [3] - 37:11, 42:10, 220:9
**Connolly** [3] - 4:13, 5:4, 202:20
**CONROY** [1] - 3:3
**consider** [3] - 194:18, 223:13, 223:14
**considered** [1] - 190:8
**consistent** [13] - 50:5, 81:23, 117:7, 117:17, 119:3, 119:10, 119:16, 119:21, 119:25, 120:15, 120:20, 147:3, 147:10
**construction** [1] - 188:18
**consultant** [2] - 47:8, 47:16
**consultants** [2] - 46:25, 47:8
**contained** [2] - 90:8, 142:8
**content** [2] - 89:8, 225:7
**contents** [1] - 87:13
**context** [6] - 206:22, 211:11, 212:6, 212:18, 214:15, 229:13
**continually** [1] - 47:19
**continuation** [1] - 24:5
**continue** [12] - 15:11, 21:2, 24:3, 27:14, 80:15, 98:19, 103:1, 117:5, 118:2, 120:3, 199:4, 214:14
**CONTINUED** [1] - 7:12
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10

**continued** [2] - 119:15, 206:4
**continues** [1] - 125:12
**continuing** [3] - 28:2, 57:7, 222:20
**contract** [5] - 194:2, 194:4, 194:6, 194:7
**contracts** [2] - 72:3, 194:2
**contradicts** [1] - 164:15
**control** [5] - 54:19, 78:14, 78:19, 90:25, 125:7
**Control** [33] - 26:1, 28:8, 41:13, 41:16, 46:23, 47:4, 47:6, 47:12, 47:17, 48:3, 49:15, 49:19, 49:22, 49:25, 50:5, 50:16, 61:17, 85:15, 85:17, 104:6, 118:13, 118:14, 118:22, 125:19, 146:7, 149:8, 150:6, 161:23, 162:8, 163:18, 164:19, 165:8, 195:17
**controlled** [71] - 15:9, 15:12, 22:23, 23:18, 23:20, 23:24, 24:6, 24:7, 24:9, 24:13, 24:19, 25:2, 25:4, 25:17, 42:1, 51:25, 54:21, 54:22, 70:11, 70:14, 76:4, 76:5, 76:10, 76:14, 76:22, 77:17, 77:21, 77:24, 77:25, 78:14, 92:23, 93:8, 93:11, 94:2, 94:8, 98:2, 98:6, 98:10, 98:14, 99:11, 100:1, 100:8, 102:16, 111:10, 112:8, 112:9, 113:17, 125:6, 125:8, 125:16, 126:7, 143:24, 149:2, 149:10, 149:17, 158:2, 162:11, 162:15, 164:7, 166:16, 166:23, 167:10, 172:2, 182:2, 189:14, 195:22, 205:13, 215:7, 216:16, 216:18
**controls** [10] - 23:14, 24:8, 24:16, 24:25, 117:6, 118:2, 119:9,

127:20, 127:22
**conversation** [28] - 26:10, 62:11, 79:7, 219:4, 219:8, 222:8, 222:14, 222:18, 222:22, 223:3, 223:6, 223:12, 223:22, 224:4, 224:6, 224:8, 224:9, 224:13, 224:17, 224:20, 224:24, 225:1, 225:5, 225:8, 225:11, 226:7, 226:12, 227:18
**conversations** [11] - 20:20, 149:7, 149:13, 149:16, 149:20, 163:15, 217:4, 222:12, 223:20, 224:12, 225:23
**Cook** [3] - 6:18, 236:3, 236:11
**copied** [3] - 60:25, 61:1, 131:4
**copies** [3] - 64:22, 125:18, 235:8
**copy** [9] - 15:15, 59:19, 59:20, 139:7, 142:23, 143:1, 143:5, 221:20, 227:10
**copyright** [1] - 120:12
**corporate** [7] - 29:9, 34:5, 34:17, 34:18, 35:3, 35:4, 204:21
**Corporate** [1] - 59:21
**Corporation** [2] - 6:2, 236:7
**corporation** [4] - 1:7, 1:13, 61:24, 153:20
**Corporation's** [1] - 64:11
**correct** [196] - 13:21, 13:22, 14:22, 19:19, 23:21, 39:25, 40:1, 41:5, 41:23, 43:16, 47:15, 54:14, 58:10, 58:11, 67:5, 68:8, 70:10, 71:6, 71:8, 71:11, 71:19, 71:22, 72:1, 72:12, 72:23, 73:3, 73:10, 77:13, 77:14, 78:16, 88:13, 91:19, 92:3, 92:14, 92:21, 93:5, 94:3, 94:4, 94:9, 94:12, 94:13, 94:15, 94:16, 94:17, 94:20, 94:22, 97:2, 97:6, 97:7,

98:3, 98:4, 98:15,
99:22, 99:24,
102:17, 102:22,
102:25, 103:1,
103:2, 103:9, 106:6,
106:8, 106:14,
106:15, 106:17,
106:18, 106:21,
108:13, 108:22,
109:16, 109:23,
111:2, 111:10,
111:25, 112:4,
112:5, 112:14,
113:24, 113:25,
122:2, 125:8,
125:10, 125:11,
125:25, 126:11,
126:12, 126:24,
126:25, 127:7,
130:25, 131:1,
131:3, 131:4, 131:5,
131:9, 131:11,
131:15, 136:7,
139:14, 139:17,
139:20, 139:23,
140:5, 140:16,
140:17, 141:20,
141:21, 142:6,
142:9, 143:15,
143:16, 143:25,
144:1, 144:3, 144:6,
144:20, 144:23,
144:24, 145:12,
145:14, 145:21,
149:3, 149:15,
149:19, 149:22,
149:24, 149:25,
150:3, 150:17,
150:19, 150:22,
153:6, 153:10,
153:24, 155:14,
155:18, 155:20,
155:21, 155:23,
155:24, 156:1,
156:2, 158:12,
158:24, 159:5,
161:17, 165:19,
165:20, 165:21,
166:8, 166:9,
166:12, 166:13,
166:18, 166:19,
172:3, 172:6,
172:11, 172:15,
172:18, 172:19,
172:25, 173:1,
177:8, 179:2,
179:17, 179:18,
181:25, 185:23,
197:11, 197:12,
198:18, 198:19,
198:21, 202:11,

204:12, 205:18,
206:2, 206:5, 206:8,
206:20, 209:4,
209:10, 209:17,
209:21, 210:11,
210:16, 210:17,
210:19, 210:20,
213:19, 227:7, 236:4
**corrected** [2] - 127:25,
190:3
**correctly** [1] - 169:11
**correlation** [1] - 218:2
**corresponds** [1] -
110:22
**cost** [3] - 112:25,
113:14, 113:19
**costing** [2] - 60:15,
62:17
**council** [2] - 176:14,
176:15
**COUNSEL** [1] -
234:22
**counsel** [12] - 20:21,
20:25, 27:25, 42:8,
52:13, 75:3, 95:5,
160:3, 202:16,
207:11, 233:14
**Counsel** [1] - 61:24
**counsel's** [1] - 20:18
**counter** [6] - 172:5,
184:11, 184:17,
188:24, 188:25
**counties** [2] - 199:7,
199:23
**countless** [1] - 102:6
**country** [4] - 81:21,
160:2, 205:13,
214:12
**COUNTY** [1] - 1:10
**County** [44] - 2:2, 3:2,
58:10, 60:4, 64:20,
69:8, 69:14, 70:3,
81:22, 95:16, 95:18,
109:21, 162:22,
163:2, 163:6,
163:20, 164:3,
164:11, 164:23,
164:25, 183:1,
189:25, 190:2,
190:5, 190:7, 195:7,
198:20, 198:23,
199:1, 199:2, 199:5,
199:7, 199:11,
199:19, 199:24,
200:4, 204:3, 214:4,
214:11, 221:13
**couple** [11] - 21:10,
31:17, 34:14, 41:24,
53:12, 134:5,
172:12, 182:24,

182:25, 184:1, 197:8
**couples** [1] - 176:21
**course** [12] - 61:12,
67:18, 79:12, 87:21,
88:2, 93:2, 117:16,
137:15, 176:4,
177:21, 187:9, 198:7
**court** [5] - 36:21,
65:19, 66:3, 168:6,
201:25
**Court** [30] - 6:17, 6:18,
7:3, 8:15, 64:25,
83:25, 85:2, 116:6,
141:10, 166:20,
173:7, 173:9, 183:4,
192:20, 196:25,
201:22, 204:6,
205:3, 207:20,
211:11, 212:2,
212:6, 212:18,
213:4, 213:10,
221:3, 229:5, 230:4,
236:2, 236:3
**COURT** [287] - 1:1,
1:17, 7:6, 7:9, 8:22,
11:9, 11:24, 12:2,
12:6, 25:8, 25:13,
33:11, 33:20, 36:21,
37:1, 37:7, 37:10,
37:19, 37:23, 40:18,
42:16, 44:24, 45:18,
46:9, 50:22, 51:13,
52:14, 52:19, 53:2,
53:6, 53:21, 56:6,
56:13, 57:5, 57:8,
57:20, 57:24, 59:5,
59:11, 60:21, 61:6,
63:8, 63:12, 63:16,
63:18, 65:2, 65:4,
65:8, 65:11, 65:14,
65:17, 65:22, 66:2,
66:15, 66:17, 72:18,
73:23, 74:8, 74:19,
75:14, 75:18, 77:2,
78:23, 79:17, 80:3,
80:5, 81:3, 81:12,
81:25, 82:11, 82:22,
84:14, 84:24, 85:4,
85:22, 86:8, 86:19,
86:25, 87:17, 87:25,
88:10, 88:14, 88:18,
90:1, 90:5, 90:11,
91:3, 91:7, 91:10,
93:15, 95:3, 95:24,
96:7, 96:19, 100:21,
101:16, 102:11,
103:13, 103:22,
104:17, 104:22,
104:25, 105:5,
105:14, 105:17,

107:5, 107:8,
107:21, 108:5,
110:12, 110:15,
111:19, 114:7,
114:17, 114:22,
115:8, 115:21,
115:24, 116:3,
116:5, 116:11,
117:14, 117:16,
117:19, 118:6,
118:9, 120:9,
120:25, 122:21,
123:9, 124:1, 124:4,
124:11, 124:15,
124:19, 124:22,
124:24, 126:19,
127:13, 129:11,
130:15, 130:18,
132:18, 133:1,
133:19, 134:15,
134:17, 135:10,
135:13, 135:20,
136:3, 136:12,
137:3, 137:6,
137:16, 138:2,
138:5, 138:8,
138:11, 138:15,
138:18, 138:23,
139:2, 139:4,
142:15, 143:3,
144:15, 147:22,
148:4, 148:6,
150:11, 151:6,
152:3, 152:8,
152:10, 152:12,
152:13, 152:19,
154:6, 158:5,
158:18, 158:21,
158:25, 159:8,
159:11, 159:14,
159:19, 160:6,
160:15, 160:18,
160:24, 161:1,
161:5, 163:5,
164:13, 165:5,
165:11, 167:3,
167:18, 168:5,
168:8, 168:12,
168:16, 168:21,
169:3, 169:14,
169:23, 170:4,
170:7, 174:6,
175:13, 181:21,
196:11, 199:15,
200:24, 201:2,
201:4, 201:8,
201:10, 201:14,
201:23, 203:3,
203:6, 207:5, 207:7,
207:12, 211:21,
212:14, 212:25,

213:11, 213:16,
213:20, 213:23,
214:21, 215:10,
216:24, 217:16,
218:4, 218:18,
219:2, 219:6,
219:17, 219:20,
220:4, 220:14,
220:19, 221:4,
221:10, 221:15,
221:19, 221:22,
221:25, 222:11,
222:23, 225:1,
225:4, 225:7,
225:13, 225:18,
226:3, 226:17,
226:23, 227:5,
227:17, 227:24,
228:2, 228:6,
228:12, 228:15,
228:19, 228:21,
228:25, 229:4,
230:7, 230:10,
230:12, 230:15,
231:22, 232:20,
233:2, 233:23,
234:17, 234:20,
234:23, 235:4,
235:9, 235:12
**Court's** [3] - 74:15,
81:23, 104:15
**courthouse** [1] -
185:6
**courtroom** [5] -
100:13, 100:20,
187:10, 202:16,
202:17
**COURTROOM** [3] -
66:6, 66:10, 66:13
**courts** [1] - 134:22
**cover** [1] - 41:2
**COVID** [1] - 171:12
**Covington** [1] - 5:11
**CPA** [4] - 165:16,
165:17, 165:25
**create** [3] - 57:23,
207:23, 207:25
**creation** [1] - 95:23
**criminal** [2] - 174:14,
196:20
**CROSS** [2] - 7:12,
170:9
**cross** [9] - 12:7, 57:8,
100:13, 152:7,
168:17, 198:22,
230:2, 232:14,
232:18
**cross-examination** [2]
- 12:7, 230:2
**cross-examine** [2] -

168:17, 232:18
**cross-examined** [1] - 100:13
**cross-examining** [1] - 232:14
**cross-talk** [1] - 152:7
**CRR** [2] - 6:17, 6:18
**CS** [1] - 143:13
**CSR** [1] - 161:12
**CSRA** [30] - 10:11, 14:20, 19:10, 19:17, 32:9, 32:12, 32:13, 37:18, 44:1, 61:21, 80:24, 104:19, 105:1, 116:22, 117:12, 122:3, 134:7, 161:22, 162:4, 162:8, 162:9, 164:19, 165:24, 172:14, 172:18, 172:20, 179:16, 179:21, 179:22, 182:22
**CSRA'S** [1] - 117:9
**CT2** [1] - 212:3
**culled** [1] - 225:17
**cumulative** [3] - 42:11, 100:21, 104:21
**curb** [1] - 183:12
**cure** [4] - 83:5, 83:10, 83:20, 83:25
**curious** [1] - 52:20
**current** [5] - 52:24, 125:14, 125:15, 162:10, 179:9
**custodial** [1] - 83:22
**customer** [102] - 9:10, 9:12, 10:4, 10:22, 11:2, 11:5, 11:14, 15:11, 17:19, 17:25, 18:7, 28:12, 30:5, 30:11, 32:14, 37:17, 41:22, 42:23, 43:22, 44:18, 45:5, 48:21, 49:6, 77:12, 77:15, 78:5, 78:8, 78:18, 79:2, 79:10, 79:13, 79:23, 81:15, 90:19, 90:20, 92:19, 92:20, 92:22, 92:23, 92:24, 93:3, 93:4, 93:7, 93:11, 94:12, 95:15, 95:21, 96:16, 97:3, 97:5, 99:6, 99:13, 102:15, 102:23, 103:11, 103:12, 108:18, 109:16, 109:21, 116:19, 123:7, 123:17,

140:8, 140:19, 140:22, 143:11, 146:12, 146:13, 146:17, 146:19, 146:21, 146:22, 147:3, 147:10, 149:21, 150:16, 150:18, 153:5, 153:8, 153:23, 156:12, 157:9, 157:11, 158:15, 159:3, 162:14, 169:7, 169:8, 169:10, 169:20, 170:16, 179:9, 181:8, 182:2, 182:11, 187:4
**customer's** [2] - 44:8, 179:19
**customer-level** [1] - 37:17
**customer-specific** [1] - 153:23
**customers** [75] - 9:17, 24:17, 25:2, 25:24, 28:11, 30:6, 30:9, 31:10, 31:12, 60:16, 62:17, 64:19, 69:17, 69:18, 69:23, 70:3, 70:5, 84:12, 85:18, 104:10, 105:23, 108:10, 129:16, 146:8, 146:11, 146:14, 146:19, 149:6, 151:18, 157:18, 157:20, 157:22, 158:1, 161:24, 162:1, 162:10, 162:17, 162:23, 163:2, 164:2, 164:3, 164:23, 164:24, 165:14, 165:16, 166:15, 166:22, 167:7, 167:10, 167:13, 167:17, 170:20, 170:24, 170:25, 171:14, 171:18, 171:21, 172:15, 173:3, 178:11, 178:12, 178:13, 178:15, 178:17, 178:20, 179:13, 182:17, 185:22, 187:3, 194:8, 198:9, 198:11, 199:23
**cut** [5] - 22:25, 88:16, 145:19, 145:20, 149:17

**cutting** [1] - 100:1
**cyclical** [1] - 34:10

# D

**d)(2)(D** [1] - 163:23
**d)(2)(D)** [1] - 160:25
**D-e-g-i-d-i-o** [1] - 174:7
**D.C** [1] - 26:16
**danger** [1] - 88:4
**data** [6] - 199:22, 214:3, 231:1, 231:2, 231:4, 231:16
**database** [3] - 9:11, 154:10
**date** [9] - 12:22, 120:7, 135:6, 153:8, 156:1, 163:17, 210:23, 222:24
**Date** [1] - 236:16
**dated** [2] - 61:10, 128:7
**dates** [1] - 233:11
**David** [3] - 7:1, 48:13, 89:1
**DAVID** [2] - 1:17, 2:9
**Davis** [1] - 29:14
**days** [10] - 23:25, 34:14, 49:12, 100:20, 117:13, 134:5, 157:4, 157:5, 181:3
**DC** [9] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 25:24, 34:5, 54:2
**DCT** [1] - 162:8
**De** [2] - 2:4, 2:16
**DEA** [111] - 7:18, 8:2, 9:10, 11:18, 17:16, 17:17, 19:20, 20:4, 20:5, 20:9, 21:1, 21:7, 21:20, 22:7, 22:9, 22:20, 23:2, 23:17, 24:3, 24:6, 25:3, 25:12, 25:16, 26:11, 27:8, 27:13, 28:1, 29:3, 30:24, 31:11, 31:15, 32:18, 32:20, 32:23, 33:15, 33:19, 33:25, 34:10, 35:17, 35:21, 36:4, 36:9, 38:14, 38:18, 38:23, 39:5, 39:8, 39:10, 39:12, 39:14, 39:22, 39:25, 40:5, 40:9, 42:25, 43:4, 44:15, 44:17, 45:5, 45:21, 45:23, 46:3, 46:17, 47:10, 47:14,

47:20, 48:18, 49:4, 50:9, 60:13, 62:15, 62:20, 63:24, 64:3, 102:1, 116:20, 116:21, 117:1, 117:4, 118:1, 119:3, 119:6, 119:8, 119:13, 119:18, 120:2, 145:15, 151:15, 163:15, 185:12, 193:23, 210:12, 215:15, 215:18, 215:22, 216:12, 216:13, 216:18, 217:1, 217:7, 218:11, 219:4, 219:8, 222:9, 222:13, 222:18, 222:22, 223:13, 229:14, 231:7
**DEA's** [6] - 9:11, 26:17, 28:7, 41:14, 45:3, 60:8
**deal** [1] - 114:19
**dealing** [1] - 67:13
**deals** [1] - 224:20
**dealt** [1] - 193:7
**December** [11] - 161:12, 205:4, 205:23, 206:18, 207:19, 208:5, 209:2, 216:4, 216:5, 216:6, 216:7
**decide** [3] - 74:15, 94:1, 124:4
**decided** [3] - 145:17, 174:12, 174:19
**deciding** [1] - 121:15
**decision** [8] - 44:7, 119:24, 120:4, 143:15, 143:23, 179:19, 182:20, 232:7
**decisions** [1] - 232:10
**declaration** [12] - 217:18, 217:21, 217:22, 217:23, 217:25, 218:14, 219:12, 224:19, 225:19, 226:10, 227:25, 228:17
**declared** [1] - 125:16
**dedicated** [3] - 163:17, 163:18, 164:5
**deemed** [2] - 27:15, 38:9
**deeming** [1] - 58:5
**deep** [1] - 199:7
**DEF-WV-00001** [1] -

40:14
**Defendant** [4] - 4:10, 5:2, 5:7, 6:2
**defendant** [1] - 218:12
**defendants** [2] - 230:23, 231:4
**Defendants** [3] - 1:8, 1:14, 236:7
**defendants'** [1] - 164:4
**defense** [3] - 91:20, 91:24, 230:20
**Defense** [1] - 24:4
**DEFENSE** [2] - 37:25, 53:3
**defer** [1] - 233:21
**deficiencies** [1] - 162:16
**definition** [2] - 57:14, 57:16
**Degidio** [1] - 174:5
**Degidio's** [1] - 196:23
**Deleno** [1] - 131:13
**delinquents** [1] - 173:23
**Delta** [2] - 160:23
**demeanor** [2] - 74:13
**demonstrate** [1] - 37:15
**demonstrative** [12] - 103:15, 103:21, 211:15, 211:22, 212:9, 212:18, 212:23, 213:1, 213:6, 213:14, 213:16
**denied** [2] - 17:11, 17:12
**department** [1] - 211:12
**Department** [3] - 24:4, 24:23, 99:19
**departments** [2] - 78:21, 79:5
**depended** [3] - 182:7, 182:8, 194:2
**depict** [2] - 51:23, 52:24
**depicts** [1] - 51:25
**depose** [1] - 83:22
**deposed** [4] - 202:10, 202:14, 234:6, 234:10
**deposition** [4] - 232:15, 233:10, 234:8, 234:11
**depositions** [2] - 202:23, 234:3
**DEPUTY** [3] - 66:6, 66:10, 66:13

describe [9] - 9:14, 14:2, 68:22, 68:23, 69:3, 183:4, 190:14, 191:7
Describe [2] - 183:5, 192:20
described [6] - 16:12, 32:19, 44:11, 64:18, 91:20, 91:25
describes [2] - 14:10, 16:4
describing [1] - 41:12
description [5] - 11:12, 17:17, 18:5, 18:9, 18:16
design [3] - 29:3, 29:22, 119:1
designed [3] - 49:21, 49:23, 233:17
desk [1] - 222:8
detail [1] - 132:22
detailed [1] - 71:23
detained [1] - 145:10
detect [1] - 21:22
determination [1] - 12:18
determine [8] - 16:13, 16:14, 27:2, 27:18, 32:17, 44:1, 54:25, 180:12
determined [3] - 103:12, 104:11, 105:23
determining [1] - 46:7
develop [1] - 31:18
developing [1] - 29:10
difference [1] - 223:18
differences [1] - 26:2
different [38] - 10:19, 16:18, 16:20, 17:8, 31:7, 42:15, 50:20, 68:10, 68:24, 78:12, 80:23, 86:2, 86:6, 87:15, 99:2, 99:5, 99:19, 108:24, 153:12, 174:2, 175:1, 180:24, 183:10, 186:2, 188:15, 193:12, 198:2, 198:3, 198:5, 206:4, 212:7, 218:15, 224:2, 225:24, 230:25
differently [2] - 196:5, 224:15
differing [1] - 223:15
dig [1] - 40:16
diligence [44] - 10:22, 28:10, 28:12, 30:4, 30:6, 30:8, 30:11,

30:16, 31:7, 31:10, 31:15, 37:17, 38:13, 39:3, 41:22, 43:14, 43:19, 46:17, 46:19, 48:21, 58:16, 58:18, 59:22, 64:19, 150:21, 151:17, 151:20, 162:12, 163:21, 164:6, 166:6, 166:14, 166:22, 167:9, 167:22, 167:25, 168:2, 172:24, 173:4, 179:12, 179:20, 223:10, 223:19, 231:11
diligence" [1] - 162:12
diligent [1] - 12:9
direct [6] - 57:23, 59:3, 68:4, 68:6, 75:15, 116:8
DIRECT [2] - 66:19, 202:2
directed [1] - 149:7
direction [1] - 195:23
directly [4] - 20:21, 181:21, 183:11, 206:6
disagree [4] - 84:3, 91:23, 164:14, 229:20
disclosed [1] - 232:2
Discount [3] - 17:15, 174:11, 174:22
discovered [1] - 119:3
discovery [4] - 64:12, 231:2, 231:12, 232:2
discretion [1] - 74:15
discuss [1] - 191:15
discussed [2] - 56:16, 179:15
discusses [1] - 83:14
discussing [1] - 223:9
discussion [4] - 79:22, 90:7, 225:9
discussions [2] - 25:22, 87:12
dismissed [1] - 65:10
dispensation [3] - 24:3, 24:6, 24:11
dispense [1] - 185:17
display [4] - 95:15, 96:9, 96:16, 110:11
displayed [2] - 96:16, 115:7
dispute [1] - 88:8
disputed [1] - 123:10
distinguish [1] - 85:24
distribute [4] - 23:17, 24:13, 185:17

distributed [4] - 205:13, 205:16, 205:20, 217:13
Distribution [6] - 43:25, 51:1, 51:3, 51:6, 51:18, 52:24
distribution [28] - 18:4, 20:6, 23:3, 23:11, 24:20, 24:24, 25:18, 31:20, 31:22, 32:7, 32:24, 33:4, 33:5, 36:10, 38:9, 53:14, 55:23, 177:19, 209:3, 209:6, 209:7, 209:9, 209:15, 212:2, 214:3, 214:8, 215:6, 216:16
distributions [1] - 216:19
Distributor [2] - 64:3, 119:23
distributor [11] - 99:21, 99:25, 112:4, 119:8, 119:19, 119:20, 126:11, 144:2, 215:5, 215:16
distributors [7] - 39:11, 62:21, 64:13, 98:21, 98:22, 215:18, 215:23
District [2] - 7:2, 7:3
DISTRICT [3] - 1:1, 1:1, 1:17
district [1] - 145:25
diversion [29] - 12:18, 14:18, 15:22, 15:24, 16:5, 16:7, 16:15, 16:16, 17:4, 17:6, 18:11, 18:12, 18:18, 18:20, 21:22, 24:15, 30:21, 30:23, 56:24, 91:21, 103:12, 104:11, 105:24, 108:23, 117:6, 118:3, 119:10, 179:22, 195:14
Diversion [37] - 25:25, 28:8, 41:13, 41:16, 46:23, 47:4, 47:6, 47:12, 47:17, 48:3, 48:19, 49:15, 49:19, 49:22, 49:25, 50:5, 50:15, 61:17, 85:15, 85:17, 104:6, 118:13, 118:14, 118:21, 125:19, 146:7, 149:8, 150:6, 161:22, 162:8, 163:18, 164:19,

165:8, 195:17, 205:6, 205:24, 206:17
diverting [2] - 188:12, 192:11
division [1] - 197:25
Division [1] - 122:8
divulge [1] - 20:20
Docket [4] - 83:19, 88:23, 89:20, 122:25
doctors [6] - 56:25, 109:14, 132:15, 141:19, 181:21, 181:23
Document [1] - 85:3
document [98] - 9:6, 9:14, 9:24, 10:9, 12:19, 13:4, 13:5, 13:6, 13:17, 13:20, 14:13, 15:4, 15:16, 15:25, 16:8, 16:9, 17:13, 42:18, 54:9, 57:18, 58:1, 59:8, 60:24, 61:2, 61:11, 79:20, 79:25, 80:2, 81:1, 82:20, 83:16, 84:9, 84:11, 84:13, 84:18, 84:20, 84:22, 84:25, 85:12, 85:14, 85:25, 86:2, 86:6, 86:7, 86:13, 86:15, 87:6, 87:9, 87:14, 87:20, 88:1, 88:17, 89:6, 89:7, 89:10, 89:12, 89:17, 90:8, 95:14, 105:8, 111:6, 115:5, 115:19, 118:12, 120:8, 122:15, 122:17, 123:6, 123:23, 124:10, 150:24, 150:25, 151:2, 159:21, 159:23, 161:13, 167:16, 219:22, 219:25, 220:12, 220:13, 220:15, 220:17, 221:21, 222:1, 222:2, 222:7, 225:17, 225:18, 226:1, 226:5, 226:6, 226:18, 226:20, 226:21, 227:8
documentation [9] - 46:21, 55:10, 58:12, 59:17, 59:22, 59:25, 161:24, 162:18, 166:7
documented [3] - 8:9, 55:12, 189:22

documenting [1] - 144:12
documents [26] - 8:8, 8:17, 9:3, 19:25, 22:9, 35:1, 37:3, 58:8, 58:15, 58:21, 59:10, 59:15, 64:18, 64:25, 83:9, 85:7, 86:18, 86:21, 86:23, 88:25, 89:23, 122:24, 151:17, 151:23, 166:17, 235:8
DOD [1] - 24:14
dog [2] - 63:15, 63:16
DOJ [4] - 210:5, 210:16, 211:2, 214:17
dollar [4] - 146:18, 146:20, 147:3, 147:9
done [17] - 10:6, 31:8, 31:9, 38:15, 57:25, 58:18, 74:11, 91:8, 94:23, 113:20, 166:7, 179:21, 182:22, 189:22, 196:5, 215:6, 220:23
door [10] - 52:2, 52:4, 52:5, 52:7, 52:9, 180:9, 183:9, 184:6, 184:21
doors [1] - 171:4
dosage [2] - 56:1, 101:19
dosages [2] - 101:2, 109:3
doses [1] - 109:8
double [2] - 10:9, 220:24
double-sided [1] - 10:9
double-teaming [1] - 220:24
Doug [1] - 161:9
Douglas [1] - 4:17
down [33] - 17:25, 23:2, 27:4, 36:9, 41:24, 56:17, 81:1, 97:8, 98:5, 98:17, 103:16, 103:18, 112:24, 113:19, 115:25, 127:24, 139:24, 140:7, 150:15, 161:18, 161:21, 166:1, 184:1, 199:4, 199:7, 202:1, 210:19, 211:20, 221:10, 221:18, 222:7, 228:5
dozen [1] - 31:17

**Dr** [31] - 114:4, 114:12,
131:16, 131:17,
131:23, 137:8,
137:16, 137:20,
141:19, 141:23,
142:10, 229:15,
229:19, 229:21,
229:23, 230:15,
231:3, 231:14,
231:22, 231:23,
232:12, 232:15,
232:17, 232:18,
233:3, 233:9, 234:9,
234:13, 234:17
**drawn** [1] - 14:3
**drive** [6] - 178:19,
181:13, 183:13,
186:9, 186:18,
190:21
**Drive** [1] - 6:15
**drive-through** [3] -
181:13, 183:13,
190:21
**drive-up** [1] - 186:9
**driving** [1] - 225:13
**dropped** [1] - 195:10
**Drug** [21] - 6:2, 10:5,
64:11, 150:18,
151:18, 175:10,
175:11, 175:16,
177:15, 177:16,
177:20, 192:19,
192:20, 193:1,
193:19, 193:25,
194:3, 194:10,
194:17, 194:22,
236:7
**DRUG** [2] - 1:7, 1:13
**drug** [5] - 44:18,
45:10, 139:21,
174:10, 181:2
**drugs** [2] - 188:12,
192:11
**drugstore** [2] - 175:8,
181:7
**Dublin** [7] - 205:1,
208:14, 208:15,
208:20, 208:21,
208:22, 208:23
**due** [47] - 10:22, 28:9,
28:12, 30:4, 30:5,
30:8, 30:11, 30:16,
31:7, 31:10, 31:14,
37:17, 38:13, 39:3,
41:22, 43:14, 43:19,
46:17, 46:19, 48:21,
58:16, 58:18, 59:22,
64:19, 150:20,
151:17, 151:20,
162:11, 162:12,

163:21, 164:6,
165:14, 166:6,
166:14, 166:22,
167:9, 167:22,
167:25, 168:2,
172:24, 173:4,
179:12, 179:19,
213:7, 223:10,
223:19, 231:11
**during** [20] - 10:16,
25:22, 44:15, 48:21,
50:8, 50:14, 60:10,
74:13, 74:14, 93:2,
130:3, 167:5,
167:24, 188:10,
208:5, 212:7,
212:19, 215:17,
222:13
**duties** [2] - 36:14,
210:10
**duty** [1] - 54:19

**E**

**e-mail** [53] - 61:3,
61:10, 61:15, 62:14,
77:8, 77:9, 79:22,
82:15, 83:6, 85:19,
95:9, 97:14, 111:3,
115:11, 121:4,
121:22, 122:1,
123:19, 123:21,
125:3, 125:20,
127:15, 128:3,
128:4, 128:5,
130:21, 130:24,
131:8, 141:18,
142:7, 143:9,
144:14, 148:11,
148:12, 148:15,
148:16, 148:17,
148:19, 148:20,
148:22, 159:22,
159:25, 160:4,
160:6, 160:9,
160:11, 160:13,
161:8, 161:15,
161:18
**e-mailed** [2] - 127:16,
127:18
**e-mails** [4] - 62:6,
90:7, 128:22, 147:24
**early** [3] - 36:22,
37:16, 109:23
**ears** [6] - 90:24, 91:18,
92:3, 103:1, 136:24,
137:2
**ease** [1] - 8:15
**easier** [1] - 72:15
**easiest** [1] - 114:8

**East** [3] - 3:5, 3:12,
4:18
**Eastern** [1] - 69:4
**easy** [1] - 226:2
**Ed** [8] - 18:25, 48:10,
77:6, 95:9, 125:18,
130:25, 140:7, 143:8
**editorial** [1] - 152:20
**education** [3] - 98:13,
98:24, 204:9
**educational** [1] -
173:9
**effect** [1] - 25:23
**effective** [4] - 54:19,
117:6, 118:2, 119:9
**effectuate** [1] - 22:10
**effectuated** [1] - 60:9
**efforts** [2] - 19:21,
63:25
**EH** [1] - 18:24
**eight** [5] - 127:4,
129:23, 130:3,
177:17, 198:8
**eight-year** [2] -
129:23, 130:3
**Eighth** [1] - 3:10
**either** [7] - 76:7,
118:23, 129:6,
144:10, 153:16,
154:12, 191:11
**electronic** [3] -
134:21, 134:24,
135:1
**elements** [2] - 38:24,
43:4
**Elevate** [3] - 171:16,
171:17, 171:25
**elevated** [3] - 10:15,
10:16, 10:23
**elicited** [1] - 50:15
**ELIZABETH** [1] - 6:14
**Elkins** [7] - 72:9, 73:4,
73:9, 148:10,
148:12, 148:14,
148:15
**Elkins'** [2] - 72:23,
73:12
**ELMO** [2] - 205:10
**elsewhere** [1] - 112:17
**email** [4] - 189:10,
189:19, 189:21,
227:20
**embark** [1] - 117:9
**employed** [5] - 40:5,
203:10, 203:11,
207:4, 207:9
**employee** [4] - 63:6,
73:18, 118:19, 148:2
**employees** [3] - 74:2,
147:25, 159:18

**employment** [2] -
67:20, 206:9
**Emporium** [12] - 10:5,
150:18, 151:18,
192:19, 192:20,
193:1, 193:19,
194:1, 194:3,
194:10, 194:17,
194:22
**empty** [2] - 186:24,
192:3
**enactment** [1] - 56:8
**Encino** [1] - 3:18
**end** [13] - 26:5, 29:19,
29:25, 30:1, 100:13,
148:23, 152:10,
183:19, 183:23,
184:2, 190:22,
206:18, 232:6
**endeavor** [1] - 148:24
**ended** [1] - 210:18
**ends** [2] - 183:15,
190:20
**enforcement** [1] -
174:14
**enhanced** [1] - 27:24
**enhancements** [1] -
47:20
**enjoy** [1] - 67:19
**enjoyed** [1] - 191:13
**entail** [1] - 33:9
**entailed** [2] - 33:21,
33:25
**enter** [5] - 86:14,
86:17, 86:21, 87:9,
133:17
**entered** [3] - 64:13,
210:5, 211:2
**entire** [6] - 38:22,
41:15, 69:20, 93:17,
93:18, 108:21
**entirely** [1] - 19:17
**entirety** [1] - 212:3
**entitled** [1] - 138:20
**entity** [1] - 232:3
**entries** [1] - 9:19
**entry** [4] - 14:14, 17:2,
17:7, 62:5
**ENU** [1] - 4:12
**epidemic** [1] - 200:12
**equally** [1] - 146:8
**Eric** [8] - 7:21, 11:1,
66:5, 66:21, 122:1,
125:3, 131:4, 197:7
**Ernsberger** [1] - 161:9
**essentially** [1] -
232:14
**establish** [5] - 86:5,
206:22, 220:3,
225:25, 226:4

**established** [12] -
72:4, 73:20, 85:19,
87:3, 140:3, 140:14,
159:4, 167:12,
207:3, 213:6,
220:22, 224:22
**establishing** [2] -
84:23, 203:4
**establishment** [1] -
218:25
**et** [4] - 1:7, 1:13,
236:6, 236:7
**evade** [1] - 173:4
**eventually** [1] - 209:24
**evidence** [33] - 15:21,
17:4, 18:11, 18:18,
40:15, 53:16, 53:23,
86:14, 110:9, 114:2,
123:2, 123:4, 123:6,
124:8, 124:21,
130:13, 133:17,
136:15, 136:17,
137:25, 138:6,
138:9, 138:12,
138:17, 148:1,
150:13, 151:10,
151:12, 152:16,
159:17, 163:19,
169:18, 229:16
**evidentiary** [3] -
83:16, 89:2, 89:15
**evidently** [1] - 232:16
**ex** [1] - 74:2
**ex-employees** [1] -
74:2
**exact** [4] - 69:12,
108:15, 185:20,
232:25
**exactly** [9] - 15:2,
106:4, 108:1,
155:10, 155:11,
190:3, 197:1,
228:21, 232:23
**examination** [6] -
12:7, 50:15, 57:9,
74:14, 221:1, 230:2
**EXAMINATION** [6] -
7:12, 53:8, 66:19,
170:9, 196:14, 202:2
**examine** [2] - 168:17,
232:18
**examined** [1] - 100:13
**examining** [1] -
232:14
**example** [4] - 96:4,
96:6, 180:17, 192:22
**examples** [1] - 37:12
**exceed** [2] - 56:2,
56:10
**exceeded** [4] - 32:6,

55:23, 56:20, 71:16
**exceeding** [6] - 122:12, 140:2, 140:8, 140:13, 140:14, 140:19
**exceeds** [1] - 34:4
**except** [2] - 74:10, 169:6
**exception** [3] - 135:18, 163:23, 163:24
**excerpt** [2] - 9:4, 51:10
**excess** [4] - 55:17, 57:15, 127:4, 127:5
**Excessive** [2] - 53:13, 53:23
**excessive** [7] - 54:25, 57:3, 57:16, 57:19, 58:2, 58:5, 231:1
**exclude** [1] - 86:14
**excluded** [1] - 30:10
**exclusion** [1] - 87:7
**excuse** [9] - 28:2, 100:25, 121:23, 147:6, 209:20, 210:5, 215:5, 216:17, 218:11
**excused** [2] - 201:2, 229:1
**Executive** [3] - 67:25, 68:9, 104:9
**executive** [8] - 68:13, 68:14, 69:13, 94:23, 170:19, 178:9, 179:6, 179:7
**executives** [1] - 103:10
**Executives** [3] - 161:22, 165:18, 165:23
**exemplar** [1] - 169:5
**exemplifier** [2] - 95:20, 95:22
**exempted** [5] - 30:10, 38:16, 38:17, 38:18, 41:20
**exercising** [1] - 54:19
**exhibit** [9] - 8:18, 97:19, 103:7, 114:10, 138:24, 138:25, 139:13, 139:15, 217:19
**EXHIBIT** [9] - 53:3, 63:21, 65:5, 90:10, 124:12, 124:25, 130:19, 148:7, 161:4
**Exhibit** [3] - 139:8, 148:1, 211:22
**EXHIBITS** [1] - 37:25

**exhibits** [3] - 138:22, 142:25, 168:23
**existed** [6] - 63:7, 63:19, 78:20, 79:5, 97:11, 97:15
**existence** [3] - 120:20, 154:8, 177:6
**existing** [4] - 30:6, 97:3, 179:13, 181:8
**expand** [1] - 28:9
**expect** [12] - 14:6, 22:5, 55:9, 55:11, 58:15, 61:12, 97:23, 101:2, 101:19, 115:25, 178:24, 230:7
**expectation** [1] - 223:9
**expected** [3] - 22:4, 26:21, 26:23
**expecting** [1] - 218:15
**expedite** [1] - 24:24
**experience** [4] - 13:8, 38:22, 44:14, 176:23
**experiences** [2] - 82:16, 82:20
**expert** [3] - 229:9, 229:11, 231:13
**experts** [1] - 233:9
**Explain** [1] - 204:6
**explain** [5] - 127:6, 203:21, 212:2, 213:10, 213:11
**explains** [1] - 111:20
**explanation** [5] - 101:8, 101:13, 101:21, 144:19, 144:22
**explanations** [2] - 106:13, 106:16
**expressing** [1] - 120:23
**expressly** [2] - 89:21, 114:12
**extended** [1] - 207:8
**extent** [9] - 63:2, 85:14, 100:15, 100:16, 100:18, 136:25, 160:11, 160:12, 162:25
**extreme** [1] - 115:19
**eye** [1] - 195:13
**eyes** [7] - 90:24, 91:18, 92:3, 103:1, 136:24, 137:1, 176:24

### F

**Faber** [1] - 7:2

**FABER** [1] - 1:17
**face** [2] - 57:18, 65:12
**facilities** [1] - 54:16
**facility** [17] - 20:8, 22:10, 23:20, 23:25, 35:11, 53:14, 53:18, 53:25, 54:4, 55:23, 150:22, 151:16, 151:22, 156:24, 209:23, 210:19
**fact** [19] - 11:13, 14:13, 24:10, 25:3, 25:16, 57:2, 62:15, 81:17, 84:10, 120:23, 135:20, 163:24, 164:1, 164:2, 165:2, 171:11, 174:16, 179:15, 185:14
**factors** [2] - 74:1, 74:6
**facts** [2] - 12:14, 151:15
**factual** [1] - 231:15
**Fair** [6] - 204:5, 207:18, 208:4, 210:24, 213:22, 226:22
**fair** [3] - 55:17, 205:17, 217:11
**fairly** [1] - 56:22
**faith** [1] - 218:19
**familiar** [8] - 40:22, 47:23, 60:6, 72:21, 92:5, 92:9, 155:9, 174:24
**familiarity** [2] - 45:19, 151:7
**families** [2] - 45:10, 176:10
**Family** [4] - 150:16, 189:23, 190:15, 192:17
**family** [5] - 43:3, 44:19, 139:21, 197:6, 200:15
**far** [9] - 82:8, 99:7, 120:17, 127:4, 133:4, 134:2, 173:2, 175:8, 180:10
**FARRELL** [53] - 2:3, 37:9, 44:21, 45:17, 45:20, 50:14, 53:7, 53:9, 53:22, 54:6, 54:8, 56:7, 56:15, 57:13, 57:22, 58:7, 59:7, 59:13, 60:18, 60:22, 61:9, 62:24, 63:22, 64:6, 65:3, 65:9, 65:24, 82:24, 85:1, 85:6, 86:11,

86:20, 87:5, 87:19, 88:1, 88:13, 88:15, 90:4, 196:15, 199:18, 200:22, 201:7, 221:18, 230:9, 230:11, 230:14, 230:17, 231:25, 232:21, 233:6, 233:8, 234:1, 234:19
**Farrell** [21] - 2:4, 2:15, 43:13, 50:18, 53:6, 56:6, 57:7, 65:2, 82:22, 88:23, 89:4, 89:13, 196:13, 196:16, 221:5, 221:10, 221:16, 228:8, 230:8, 232:20, 234:18
**Farrell's** [1] - 110:10
**fashion** [5] - 73:22, 103:21, 104:16, 122:20, 172:21
**fast** [1] - 177:11
**father** [2] - 174:16, 196:19
**fax** [1] - 184:25
**FCRR** [1] - 6:18
**February** [16] - 56:9, 56:17, 56:18, 145:6, 210:21, 210:22, 210:23, 228:5
**fell** [4] - 113:18, 175:18, 175:19
**felt** [1] - 181:16
**Fentanyl** [1] - 70:22
**few** [8] - 23:25, 112:12, 157:5, 168:8, 168:23, 170:13, 183:2, 194:24
**field** [1] - 62:21
**fifth** [1] - 11:19
**file** [6] - 15:14, 31:6, 32:15, 58:16, 59:17, 162:12
**filed** [2] - 218:10, 224:19
**files** [16] - 30:11, 30:16, 30:17, 31:10, 31:15, 46:19, 48:21, 49:6, 58:21, 59:19, 59:20, 150:21, 151:20, 157:23, 163:22, 231:11
**fill** [3] - 92:17, 101:7, 102:16
**filled** [5] - 56:19, 92:15, 92:17, 96:3, 102:6

**filling** [11] - 54:21, 54:24, 126:25, 130:8, 131:11, 135:25, 136:6, 144:25, 162:4, 173:3, 183:25
**final** [3] - 12:18, 63:23, 194:24
**finally** [4] - 113:20, 119:23, 172:23, 184:21
**finance** [1] - 176:15
**financial** [3] - 166:11, 166:17, 168:1
**fine** [8] - 36:5, 89:17, 96:21, 106:24, 107:19, 114:22, 169:19, 169:21
**fines** [1] - 36:3
**finish** [4] - 34:16, 59:18, 86:19, 165:13
**finished** [3] - 166:2, 170:5, 228:10
**Firm** [2] - 3:4, 3:7
**first** [42] - 9:3, 9:14, 9:24, 12:2, 12:20, 13:17, 14:14, 18:6, 28:14, 34:2, 47:11, 55:14, 64:12, 72:2, 72:3, 72:5, 91:20, 91:24, 95:8, 97:1, 99:5, 110:17, 110:18, 128:4, 128:6, 142:17, 142:21, 142:24, 143:5, 152:23, 162:13, 163:8, 164:14, 165:16, 168:20, 183:22, 189:12, 190:1, 205:2, 230:16, 233:4, 234:18
**First** [1] - 212:10
**Fisher** [6] - 131:14, 137:9, 137:16, 137:20, 141:19, 141:23
**fit** [1] - 146:25
**fits** [2] - 123:10, 180:11
**five** [19] - 33:4, 33:6, 35:22, 35:25, 49:16, 49:17, 128:24, 154:22, 157:4, 157:9, 157:12, 183:10, 185:21, 191:18, 194:5, 201:7, 201:8, 224:7
**five-year** [1] - 128:24
**FL** [1] - 2:14

**flag** [13] - 63:10, 180:10, 180:13, 180:15, 180:16, 182:9, 186:10, 186:12, 186:15, 186:16, 186:17, 194:18

**flagged** [2] - 30:7, 32:1

**flags** [10] - 94:6, 149:8, 149:16, 180:3, 180:5, 180:10, 181:4, 181:6, 187:16, 230:25

**Flaherty** [1] - 5:14

**FLAHIVE** [1] - 5:10

**flip** [1] - 51:20

**Floor** [1] - 3:5

**Florida** [11] - 20:6, 24:19, 24:23, 24:25, 25:1, 25:4, 25:5, 25:18, 204:16, 209:8, 210:19

**flow** [1] - 44:11

**focus** [4] - 28:14, 86:17, 122:9, 216:20

**focusing** [1] - 168:24

**folks** [11] - 78:19, 91:17, 94:2, 112:16, 121:9, 126:13, 135:24, 144:5, 145:25, 150:1

**follow** [2] - 53:12, 54:18

**follow-up** [1] - 53:12

**followed** [1] - 78:7

**following** [6] - 12:25, 44:18, 55:4, 58:4, 64:3, 97:22

**follows** [2] - 7:5, 168:11

**FOR** [1] - 1:1

**force** [2] - 78:17, 171:7

**foregoing** [1] - 236:4

**forgot** [1] - 207:16

**form** [4] - 23:7, 101:11, 140:4, 140:16

**Form** [15] - 38:13, 38:14, 95:15, 96:11, 125:14, 125:17, 141:3, 151:4, 161:12, 162:4, 165:24, 172:23, 172:24, 173:2, 173:3

**former** [3] - 48:18, 73:18, 231:7

**Forms** [1] - 157:22

**forth** [3] - 79:7, 165:8, 220:10

**fortunate** [1] - 177:4

**forward** [6] - 36:15, 36:17, 116:23, 120:16, 125:18, 177:11

**forwarding** [1] - 161:15

**foundation** [43] - 25:9, 33:18, 44:21, 45:17, 45:22, 72:17, 80:1, 80:3, 82:7, 82:8, 82:12, 83:1, 83:21, 84:1, 84:13, 84:20, 85:5, 85:20, 85:24, 85:25, 86:7, 86:24, 87:4, 103:16, 103:19, 103:23, 104:13, 105:8, 115:5, 123:12, 141:8, 158:4, 158:17, 159:7, 167:12, 212:10, 213:6, 213:24, 217:13, 219:19, 220:3, 220:22, 222:10

**four** [10] - 49:16, 52:17, 83:3, 100:20, 135:4, 135:7, 174:10, 177:22, 183:10, 224:7

**fourth** [1] - 64:11

**Fourth** [3] - 73:19, 108:14, 108:15

**frame** [23] - 20:1, 30:25, 37:16, 38:22, 53:20, 56:4, 56:5, 56:6, 56:22, 60:10, 93:14, 115:12, 115:14, 117:21, 120:7, 127:20, 127:23, 206:17, 208:5, 212:4, 214:5, 214:14, 224:3

**framework** [3] - 87:6, 90:22, 224:2

**Fran** [3] - 174:9, 196:23

**franchise** [2] - 203:23, 203:25

**franchisees** [2] - 203:24, 204:8

**Francis** [1] - 174:5

**frank** [3] - 149:7, 149:13, 149:16

**Frary** [1] - 61:25

**free** [3] - 65:15, 183:8, 201:4

**free-standing** [1] - 183:8

**Freeman** [4] - 188:17, 188:22, 189:3, 189:7

**frequent** [1] - 186:4

**frequently** [2] - 178:11, 185:25

**Friday** [1] - 234:21

**friends** [1] - 175:8

**front** [10] - 95:8, 105:6, 150:25, 183:9, 183:15, 183:19, 183:23, 184:2, 190:22

**Fruth** [2] - 192:16, 192:17

**Fruths** [1] - 15:17

**fry** [1] - 123:13

**full** [14] - 34:10, 54:22, 66:7, 66:8, 66:24, 67:1, 139:12, 162:14, 172:3, 172:10, 172:24, 175:16, 184:24

**full-time** [1] - 175:16

**FULLER** [64] - 2:15, 201:12, 201:22, 201:24, 202:3, 203:4, 203:7, 205:8, 205:11, 207:6, 207:8, 207:14, 207:15, 211:15, 211:22, 211:25, 212:16, 213:3, 213:7, 213:14, 213:22, 213:25, 214:1, 214:6, 214:9, 214:23, 214:24, 215:9, 215:12, 215:13, 216:25, 217:14, 218:6, 218:8, 219:3, 219:10, 219:18, 219:24, 221:20, 221:23, 222:5, 222:6, 222:15, 222:25, 223:1, 224:18, 224:25, 225:15, 225:20, 226:8, 226:9, 226:15, 226:22, 226:24, 227:4, 227:9, 227:12, 227:13, 227:21, 228:1, 228:4, 228:17, 228:20, 228:23

**Fuller** [24] - 2:4, 2:15, 201:24, 207:7, 212:15, 212:21,
213:2, 214:19, 214:22, 215:11, 217:23, 218:5, 218:15, 219:15, 220:5, 220:16, 221:1, 221:12, 221:16, 221:19, 225:14, 227:2, 228:16

**Fuller's** [1] - 221:1

**fully** [1] - 49:21

**function** [2] - 50:17, 92:13, 197:11

**functionality** [1] - 44:16

**fundamentally** [1] - 136:8

---

## G

**games** [1] - 83:7

**gamesmanship** [1] - 233:22

**Garcia** [2] - 48:15, 48:17

**garden** [1] - 67:18

**gardening** [1] - 67:17

**gate** [2] - 52:5, 52:9

**gathered** [1] - 12:14

**gathering** [2] - 107:15, 180:8

**Gator** [1] - 204:18

**Gators** [2] - 204:18, 204:19

**gears** [1] - 145:24

**general** [10] - 20:18, 20:21, 26:20, 27:12, 49:18, 50:9, 50:11, 50:12, 50:20, 82:1

**General** [1] - 61:24

**generally** [10] - 11:1, 13:1, 44:20, 46:12, 46:23, 52:25, 73:19, 160:16, 179:5, 215:17

**geographic** [10] - 73:10, 79:24, 81:16, 81:23, 96:3, 160:17, 163:4, 165:3, 205:22, 218:1

**geographical** [3] - 82:2, 95:25, 205:19

**geographically** [2] - 69:1, 69:3

**geographics** [1] - 178:18

**Georgia** [2] - 234:7, 234:15

**Gerard** [2] - 66:8, 67:1

**Gilberto** [1] - 206:13

**Giovanni's** [1] - 176:20

**girl** [1] - 184:19

**given** [11] - 41:3, 41:4, 78:17, 79:2, 79:3, 82:17, 86:1, 86:5, 90:22, 127:9, 132:3

**glanced** [1] - 82:9

**glass** [1] - 184:3

**glasses** [1] - 159:13

**glean** [1] - 219:21

**goal** [4] - 71:13, 78:6, 162:6, 170:19

**goals** [3] - 71:12, 71:24, 90:15

**golf** [1] - 67:18

**goods** [4] - 70:8, 112:25, 113:14, 113:19

**Goodwill** [1] - 190:17

**governing** [1] - 50:6

**government** [1] - 214:17

**grad** [1] - 204:18

**graduate** [1] - 175:13

**graduated** [1] - 175:15

**graduating** [1] - 173:16

**grandfather** [1] - 197:2

**granted** [1] - 17:11

**graph** [1] - 114:3

**great** [5] - 100:15, 176:23, 177:2, 191:12, 233:13

**Greenup** [1] - 198:20

**GRETCHEN** [1] - 6:7

**grew** [2] - 196:25, 200:2

**grocery** [1] - 190:16

**ground** [4] - 91:25, 100:22, 136:25, 137:2

**grounds** [4] - 83:16, 133:21, 136:19, 162:24

**group** [2] - 165:16, 165:17

**groups** [3] - 44:19, 45:12, 165:16

**guard** [3] - 180:20, 180:24

**guess** [5] - 18:14, 144:21, 160:19, 170:14, 212:11

**guidance** [2] - 223:13, 223:14

**guideline** [1] - 58:3

**guideposts** [1] - 222:22, 225:25

**Gundy** [1] - 129:2
**guy** [1] - 107:22

## H

**habit** [1] - 181:9
**half** [2] - 22:25, 193:2
**halfway** [2] - 17:25, 228:4
**Hallmark** [1] - 190:23
**hallway** [1] - 20:17
**hand** [6] - 8:15, 40:14, 66:11, 184:4, 184:6, 201:19
**hand-through** [1] - 184:4
**handed** [4] - 9:3, 37:4, 58:8, 160:1
**handing** [1] - 8:19
**handled** [1] - 34:17
**handling** [2] - 32:1, 34:24
**happy** [9] - 42:7, 44:22, 45:25, 78:5, 78:18, 79:3, 90:19, 90:20, 212:1
**harass** [1] - 57:7
**hard** [2] - 59:19, 59:20
**HARDIN** [1] - 5:3
**Hartman** [1] - 206:7
**Hawkins** [1] - 3:7
**Hazewski** [11] - 18:25, 48:10, 77:6, 95:9, 125:19, 128:3, 128:12, 128:16, 129:5, 129:8, 130:25
**Hazewski's** [2] - 128:4, 143:8
**head** [2] - 30:20, 220:8
**head-scratchers** [1] - 30:20
**headquarters** [6] - 26:13, 26:17, 30:25, 34:20, 35:5, 204:21
**Health** [14] - 4:11, 5:2, 24:23, 177:18, 177:23, 202:9, 203:9, 203:11, 203:20, 207:4, 210:12, 215:19, 225:10
**healthcare** [1] - 193:4
**hear** [6] - 104:25, 108:2, 152:10, 187:25, 204:23, 232:17
**heard** [7] - 74:17, 163:10, 171:9, 182:23, 182:24, 189:6, 189:24

**hearing** [1] - 161:1
**hearsay** [20] - 33:13, 63:2, 63:5, 72:16, 87:25, 88:2, 88:4, 88:5, 88:6, 133:21, 135:11, 135:12, 135:15, 135:18, 136:19, 137:5, 163:23, 163:24, 163:25, 220:13
**Heart** [1] - 197:2
**heavily** [1] - 205:20
**heavy** [2] - 56:25, 57:2
**help** [7] - 29:2, 102:10, 125:21, 125:23, 130:10, 155:5, 156:23
**helping** [1] - 29:3, 101:7
**helps** [1] - 154:1
**herein** [1] - 234:12
**Hester** [3] - 85:22, 86:8, 137:3
**HESTER** [8] - 5:9, 78:22, 85:23, 127:12, 136:19, 137:4, 139:7, 159:24
**Hi** [2] - 161:21, 196:18
**hierarchy** [1] - 18:1
**High** [1] - 173:14
**high** [14] - 30:20, 30:23, 98:14, 125:6, 125:8, 126:8, 127:19, 127:21, 127:25, 128:2, 143:25, 149:2, 165:14, 173:13
**highest** [1] - 109:20
**highlight** [1] - 227:22
**highlighted** [1] - 11:14
**hindsight** [2] - 196:4
**hired** [1] - 204:7
**historically** [2] - 42:1, 153:11
**history** [2] - 35:1, 125:15
**hit** [4] - 71:13, 71:25, 90:15, 182:9
**hits** [1] - 34:4
**Hold** [1] - 227:21
**Holder** [2] - 218:11
**holding** [3] - 112:12, 112:16, 112:19
**home** [4] - 192:24, 193:3, 198:10, 208:6
**honestly** [1] - 210:1
**Honey** [1] - 192:24
**Honor** [238] - 8:11, 8:21, 11:8, 12:1, 12:5, 12:8, 37:2,

37:9, 37:14, 37:15, 40:17, 42:7, 42:12, 44:23, 45:1, 45:17, 45:21, 46:1, 50:14, 50:18, 51:12, 52:13, 52:16, 53:4, 53:7, 53:19, 56:3, 56:12, 57:4, 57:17, 58:24, 60:20, 63:1, 63:4, 63:11, 64:8, 64:9, 65:6, 65:9, 65:16, 65:24, 65:25, 66:4, 66:18, 73:15, 73:25, 74:1, 74:6, 75:12, 77:1, 78:22, 78:25, 79:16, 79:19, 80:4, 80:25, 81:10, 81:13, 81:18, 82:5, 82:6, 82:14, 82:24, 83:18, 84:4, 84:15, 85:1, 85:10, 85:23, 88:21, 90:12, 91:2, 91:14, 93:13, 95:2, 95:13, 95:19, 96:2, 96:14, 96:21, 100:9, 101:15, 102:10, 105:9, 106:23, 107:7, 110:7, 110:11, 114:2, 114:6, 114:11, 114:16, 115:4, 115:23, 116:9, 117:8, 117:15, 118:8, 120:6, 120:11, 121:19, 122:22, 122:23, 123:2, 123:22, 123:24, 124:3, 124:9, 124:14, 124:20, 126:17, 130:12, 130:13, 132:21, 133:16, 133:17, 133:24, 134:14, 134:18, 135:8, 135:15, 135:17, 135:24, 136:14, 136:17, 136:20, 136:21, 137:4, 137:8, 137:24, 138:7, 138:14, 138:21, 143:2, 144:7, 144:11, 147:12, 147:21, 147:24, 150:10, 150:12, 150:23, 151:3, 151:9, 154:4, 159:10, 159:16, 159:23, 159:24, 160:5, 160:8, 160:10, 160:21,

161:6, 162:21, 163:7, 163:10, 163:13, 163:19, 163:20, 164:1, 164:3, 164:9, 164:11, 164:12, 165:10, 167:15, 167:17, 168:7, 168:14, 168:22, 169:18, 170:6, 196:10, 199:12, 201:1, 201:6, 201:12, 203:2, 203:4, 207:1, 207:14, 211:18, 212:1, 212:8, 212:21, 213:3, 213:5, 213:15, 213:19, 213:25, 214:18, 214:23, 215:9, 217:7, 217:14, 217:17, 217:25, 218:8, 218:13, 218:23, 219:3, 219:13, 219:24, 220:1, 220:8, 220:18, 220:20, 220:24, 221:9, 221:11, 221:20, 221:24, 222:5, 222:19, 222:25, 224:21, 225:15, 225:20, 225:21, 226:15, 228:1, 228:10, 228:18, 228:20, 229:3, 229:6, 229:7, 232:6, 234:4, 234:19, 234:22, 235:3, 235:6
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**hope** [1] - 157:13
**hopefully** [1] - 95:1
**hoping** [1] - 202:13
**hospitals** [2] - 24:4, 30:10
**hostile** [5] - 73:21, 74:16, 74:20, 75:16, 207:3
**Houck** [2] - 176:21
**hour** [4] - 193:2, 228:22, 234:25, 235:1
**hours** [2] - 100:13, 144:12
**house** [2] - 155:22, 196:23
**Hub** [13] - 152:24,

153:1, 153:4, 153:7, 154:8, 154:9, 154:10, 154:13, 154:24, 154:25, 155:1, 155:19, 155:22
**huge** [1] - 193:1
**hundreds** [2] - 8:3, 8:5
**Hundreds** [1] - 8:4
**Huntington** [52] - 3:10, 4:1, 18:7, 23:14, 37:16, 51:4, 60:3, 64:20, 67:3, 67:16, 81:22, 95:17, 95:18, 108:12, 108:17, 162:23, 163:3, 173:24, 173:25, 174:2, 174:10, 174:13, 174:19, 175:25, 176:1, 176:5, 176:8, 176:9, 176:12, 176:14, 176:17, 176:18, 176:19, 176:20, 176:25, 183:2, 185:2, 186:3, 187:9, 190:6, 190:8, 195:8, 195:11, 198:10, 199:1, 200:1, 204:3, 214:4, 221:12, 236:6
**HUNTINGTON** [1] - 1:4
**Huntington-Cabell** [2] - 51:4, 60:3
**Huntington/Cabell** [3] - 8:14, 9:5, 9:17
**hydro** [1] - 144:19
**hydrocodone** [9] - 10:17, 56:1, 70:20, 101:3, 106:14, 109:4, 109:9, 216:17, 217:2
**hydrocodones** [1] - 127:3

## I

**idea** [5] - 129:7, 133:12, 145:23, 166:24, 187:4
**identification** [1] - 211:19
**identified** [7] - 19:10, 74:21, 74:22, 96:11, 97:1, 138:23, 162:17
**identify** [6] - 42:3, 59:8, 59:9, 119:2, 162:15, 230:24
**identifying** [2] - 119:6,

182:1
**identity** [1] - 102:7
**ignore** [1] - 213:9
**II** [2] - 51:25, 71:1
**III** [1] - 71:1
**illegal** [2] - 19:21, 19:22
**illustrative** [1] - 213:17
**immediate** [3] - 22:9, 60:8, 72:9
**Immediate** [8] - 22:12, 22:14, 22:21, 26:5, 29:19, 209:5, 209:18, 210:18
**immediately** [5] - 20:16, 223:25, 224:11, 225:6, 229:13
**impacted** [1] - 233:11
**impeach** [3] - 218:16, 219:11, 220:21
**impeachment** [1] - 217:21
**implement** [4] - 28:11, 62:16, 207:23, 207:25
**implementation** [2] - 32:23, 45:4
**implemented** [7] - 31:19, 31:23, 31:24, 32:20, 33:3, 35:8, 38:8
**implementing** [3] - 32:21, 42:13, 207:20
**implicated** [1] - 163:3
**importance** [1] - 149:8
**important** [2] - 107:3, 233:18
**imposition** [1] - 60:14
**impression** [2] - 125:24, 146:6
**improper** [1] - 126:18
**improve** [1] - 208:3
**IN** [2] - 1:1, 1:18
**inaccurate** [1] - 159:7
**inarticulate** [1] - 107:24
**inches** [1] - 31:6
**include** [13] - 11:13, 39:3, 39:24, 47:4, 48:5, 70:11, 70:14, 70:16, 78:4, 162:4, 172:7, 216:15
**included** [11] - 47:6, 61:15, 70:13, 106:19, 118:16, 122:25, 161:9, 164:2, 198:1, 198:17, 216:18

**includes** [1] - 160:1
**including** [8] - 34:16, 39:2, 82:2, 83:21, 106:13, 157:22, 160:17, 230:2
**inconsistent** [2] - 219:11, 219:15
**increase** [11] - 44:6, 44:7, 139:12, 140:4, 140:11, 140:15, 140:18, 140:24, 143:9, 143:19, 182:20
**Increase** [1] - 141:2
**increased** [4] - 141:7, 141:23, 145:4, 182:18
**increments** [1] - 44:23
**independent** [9] - 99:8, 122:9, 167:14, 175:20, 175:21, 175:23, 203:24, 223:8, 223:16
**independently** [1] - 149:1
**independents** [3] - 171:4, 223:11, 224:16
**indicate** [18] - 10:11, 11:5, 11:18, 12:22, 14:17, 14:19, 15:24, 16:6, 17:2, 17:5, 18:6, 18:17, 18:19, 19:20, 41:2, 72:3, 134:20, 223:7
**indicated** [3] - 17:17, 78:3, 133:22
**indicates** [4] - 17:24, 18:9, 57:18, 97:4
**indication** [6] - 12:17, 16:5, 16:14, 16:16, 18:12, 129:4
**indications** [1] - 56:24
**indicia** [4] - 135:2, 135:7, 137:1
**individual** [6] - 42:13, 44:23, 76:12, 153:5, 156:11, 214:8
**individuals** [4] - 19:9, 48:2, 48:11, 134:8
**industry** [12] - 27:7, 28:25, 39:13, 39:14, 39:23, 39:25, 40:10, 40:11, 146:23, 171:1, 178:22, 181:1
**Industry** [1] - 39:8
**inexperienced** [1] - 211:17
**information** [68] - 14:10, 14:24, 15:9,

15:13, 27:24, 32:15, 59:3, 76:24, 93:25, 94:5, 94:15, 96:16, 102:2, 102:17, 103:10, 106:1, 106:5, 106:7, 106:10, 106:11, 107:15, 108:24, 109:22, 112:6, 119:12, 127:10, 131:7, 133:3, 133:5, 141:17, 141:18, 142:3, 145:3, 153:3, 153:4, 153:18, 153:21, 153:23, 154:1, 154:3, 154:13, 155:2, 155:6, 155:13, 156:1, 156:15, 156:22, 157:2, 157:5, 157:7, 157:8, 157:11, 162:3, 169:8, 169:9, 169:10, 172:15, 172:17, 172:20, 179:13, 179:16, 179:20, 182:10, 184:14, 199:22, 217:9, 220:16, 221:25
**informed** [1] - 121:4
**initial** [3] - 25:22, 162:16, 202:5
**initials** [1] - 18:23
**initiated** [2] - 10:11, 162:9
**Initiative** [1] - 64:4
**initiative** [4] - 157:24, 164:19, 198:5, 215:16
**initiatives** [1] - 198:3
**inquiry** [2] - 12:4, 17:8
**inside** [4] - 52:5, 54:15, 55:19, 94:21
**inspected** [1] - 54:24
**inspection** [2] - 34:10, 151:16
**inspections** [1] - 35:25
**instance** [2] - 79:10, 81:20
**instruct** [1] - 20:20
**insurance** [1] - 190:17
**intend** [4] - 8:15, 98:18, 123:8, 229:21
**intended** [1] - 37:15
**intention** [2] - 82:15, 101:6
**interact** [1] - 78:10
**interacted** [4] -

145:24, 146:3, 149:24, 150:1
**interactions** [1] - 191:4
**interest** [2] - 78:8, 231:1
**interior** [1] - 153:20
**internet** [4] - 7:18, 12:16, 12:17, 19:22
**interpose** [2] - 79:20, 150:23
**interrupt** [5] - 21:13, 34:21, 81:1, 104:24, 199:13
**introduce** [5] - 8:11, 12:3, 86:23, 89:17, 168:19
**introduced** [1] - 159:25
**introduction** [1] - 86:13
**inundations** [1] - 169:24
**INV** [1] - 18:23
**investigate** [3] - 21:23, 42:4, 132:9
**investigating** [1] - 103:11
**investigation** [55] - 7:24, 8:17, 9:16, 10:6, 10:12, 10:14, 10:18, 10:20, 10:22, 12:12, 12:13, 13:1, 13:9, 13:15, 14:3, 14:16, 14:17, 14:19, 15:5, 15:14, 15:22, 15:23, 15:24, 16:4, 16:6, 16:11, 16:13, 16:23, 17:5, 18:10, 18:17, 18:19, 19:14, 30:17, 37:18, 43:19, 43:20, 44:2, 44:4, 49:6, 58:19, 59:14, 105:25, 106:4, 106:10, 106:22, 106:25, 107:2, 107:10, 107:14, 108:4, 108:6, 110:19, 133:5, 231:8
**investigations** [21] - 7:17, 8:1, 8:8, 8:12, 8:16, 10:25, 19:17, 22:16, 58:9, 58:13, 59:16, 59:23, 59:25, 60:2, 60:3, 60:7, 104:10, 105:22, 107:9, 108:2
**Investigator** [1] - 48:19
**investigator** [9] -

15:21, 16:4, 16:13, 17:3, 18:10, 18:17, 34:24, 34:25, 107:22
**investigators** [4] - 19:5, 32:14, 48:8, 48:18
**involve** [1] - 68:4
**involved** [5] - 62:14, 95:23, 106:7, 210:3, 210:7
**involvement** [6] - 28:7, 29:3, 43:6, 81:17, 121:22, 123:8
**involves** [1] - 61:17
**involving** [1] - 79:22
**Iron** [3] - 59:20, 150:21, 151:21
**Ironton** [1] - 177:19
**Irpino** [1] - 3:7
**irrelevant** [1] - 218:1
**ISIA** [1] - 5:4
**issue** [15] - 21:11, 30:24, 79:24, 82:2, 82:7, 84:6, 86:2, 86:16, 95:25, 151:12, 160:16, 165:3, 224:15, 229:7, 229:8
**issued** [1] - 209:14
**issues** [18] - 7:8, 21:12, 83:21, 84:1, 122:10, 131:19, 131:23, 137:9, 137:21, 140:8, 140:19, 140:22, 155:4, 156:7, 195:14, 195:17, 214:14, 216:11
**item** [3] - 43:3, 79:11, 143:18
**items** [4] - 140:9, 141:17, 144:13, 190:25
**itself** [5] - 140:3, 140:10, 140:15, 176:23, 183:11

**J**

**Jackson** [3] - 6:8, 28:20, 28:22
**James** [1] - 61:25
**January** [5] - 67:8, 97:9, 165:18, 165:23, 178:6
**JASIEWICZ** [1] - 5:4
**Jeff** [4] - 176:21, 191:2, 191:11, 191:13
**JEFFREY** [1] - 5:13

**JENNIFER** [1] - 4:12
**Jerry** [2] - 193:17
**Jersey** [1] - 209:12
**Jessie** [1] - 19:7
**Jim** [3] - 28:20, 28:22, 233:9
**JJ** [1] - 19:6
**job** [8] - 36:14, 74:4, 178:11, 195:2, 195:7, 206:15, 207:23, 210:10
**Joe** [4] - 48:13, 122:8, 215:22, 216:7
**John** [3] - 19:7, 61:23, 122:7
**join** [1] - 81:18
**joined** [1] - 204:20
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:15
**Jr** [1] - 196:16
**Juan** [2] - 2:5, 2:17
**Judge** [34] - 7:2, 36:22, 64:7, 66:16, 83:4, 83:7, 89:18, 90:4, 152:11, 201:7, 203:22, 205:8, 206:22, 207:6, 211:15, 212:16, 213:7, 213:22, 215:12, 219:10, 219:18, 221:18, 221:23, 224:19, 224:25, 226:8, 226:22, 227:12, 227:21, 228:4, 230:18, 233:6, 233:8, 233:12
**JUDGE** [1] - 1:17
**judge** [4] - 59:7, 60:18, 62:24, 146:21
**July** [4] - 130:25, 223:2, 224:4, 225:6
**jumped** [1] - 207:2
**June** [14] - 12:24, 14:20, 14:21, 16:2, 17:1, 18:15, 29:23, 29:24, 35:15, 44:16, 60:4, 60:7, 60:9, 162:6
**jurisdictions** [1] - 134:25
**jury** [1] - 213:8
**justice** [2] - 174:14, 196:20
**justify** [3] - 140:3, 140:10, 140:15
**justifying** [1] - 15:9
**juvenile** [1] - 173:23

## K

**KEARSE** [1] - 4:2
**keep** [12] - 47:21, 78:5, 78:18, 79:2, 90:19, 90:20, 107:3, 107:10, 141:9, 164:4, 171:4, 207:16
**keeping** [2] - 125:21, 125:23
**Kelly** [1] - 6:8
**KENNEDY** [184] - 65:25, 66:4, 66:18, 66:20, 72:20, 73:25, 75:1, 75:12, 75:17, 75:19, 76:25, 77:3, 78:25, 79:1, 79:15, 79:18, 80:4, 80:6, 81:5, 81:6, 81:10, 82:5, 82:14, 90:12, 90:13, 91:6, 91:9, 91:14, 91:15, 93:16, 94:25, 95:4, 95:5, 95:7, 95:19, 96:1, 96:6, 96:8, 96:10, 96:21, 96:22, 100:24, 101:17, 102:9, 102:13, 103:6, 103:8, 103:24, 105:9, 105:16, 105:20, 107:6, 107:12, 107:13, 108:8, 110:5, 110:13, 110:16, 110:21, 110:24, 111:18, 111:21, 111:22, 114:1, 114:8, 114:11, 114:20, 114:23, 114:25, 115:10, 115:22, 116:9, 116:12, 117:15, 117:18, 117:23, 118:7, 118:10, 118:11, 120:11, 120:13, 121:1, 121:18, 121:20, 121:23, 121:25, 123:1, 123:15, 123:16, 123:22, 124:3, 124:7, 124:13, 124:16, 124:20, 125:1, 126:21, 127:14, 129:14, 130:11, 130:20, 130:22, 130:23, 132:20, 132:23, 133:7, 133:15, 134:14, 134:18,
135:12, 135:14, 135:23, 136:14, 137:8, 137:18, 137:19, 137:24, 138:4, 138:6, 138:10, 138:14, 138:21, 138:25, 139:3, 139:8, 139:9, 141:12, 141:15, 142:4, 142:16, 142:19, 143:2, 143:4, 144:11, 144:17, 147:15, 147:16, 147:19, 147:23, 148:8, 148:9, 150:9, 150:12, 150:14, 151:3, 151:9, 151:13, 152:5, 152:9, 152:14, 152:21, 154:7, 158:8, 158:22, 159:2, 159:9, 159:12, 159:16, 159:22, 160:4, 160:8, 160:25, 161:6, 161:7, 161:25, 162:2, 163:7, 164:10, 165:10, 165:12, 166:1, 166:3, 167:4, 167:15, 167:20, 168:7, 168:14, 168:22, 169:4, 169:13, 169:16, 169:22, 169:25, 170:5
**Kennedy** [38] - 66:5, 66:17, 66:21, 73:24, 75:15, 78:23, 80:3, 82:4, 82:13, 89:8, 90:11, 91:5, 96:19, 102:12, 103:23, 106:25, 108:6, 114:18, 115:9, 116:8, 117:20, 120:10, 123:11, 124:19, 132:19, 136:13, 137:17, 141:11, 159:14, 160:21, 163:6, 164:17, 164:22, 168:6, 168:16, 169:14, 170:7, 196:11
**Kennedy's** [1] - 107:1
**Kent** [3] - 188:16, 188:17, 189:1
**Kentucky** [5] - 69:4, 187:11, 197:25, 198:1, 198:18

**kept** [8] - 50:13, 88:1, 112:12, 127:11, 170:25, 171:17, 180:22
**Kessler** [1] - 4:17
**Kevin** [4] - 48:13, 191:2, 191:11, 191:13
**key** [1] - 24:14
**kind** [7] - 10:19, 22:6, 28:23, 28:24, 30:19, 87:3, 180:11
**kinds** [2] - 100:17, 117:11
**Kirsch** [4] - 19:2, 128:21, 128:22, 129:6
**knickknacks** [1] - 190:24
**knowing** [1] - 187:20
**knowledge** [36] - 18:24, 28:25, 29:1, 33:13, 33:21, 33:24, 35:3, 36:9, 38:23, 40:7, 41:14, 42:15, 42:24, 43:8, 44:14, 44:17, 45:3, 45:5, 45:22, 46:17, 50:23, 51:17, 51:24, 52:23, 82:12, 87:9, 87:22, 90:7, 113:11, 115:6, 129:9, 130:1, 130:5, 202:12, 212:23, 219:21
**knowledgeable** [1] - 43:6
**known** [4] - 32:20, 68:10, 127:21, 145:3
**knows** [12] - 33:20, 45:23, 84:23, 129:11, 134:10, 136:9, 137:17, 142:14, 158:5, 158:18, 160:12
**KOUBA** [1] - 3:14
**Kreutzer** [1] - 48:13
**Kyle** [2] - 29:13, 29:20

## L

**LA** [1] - 3:8
**label** [2] - 184:4
**lack** [6] - 72:16, 104:13, 141:8, 158:4, 158:17, 167:11
**lacking** [1] - 159:7
**laid** [7] - 45:23, 80:1, 82:8, 115:6, 123:12, 217:13, 219:18

**Lakeland** [2] - 209:8, 210:19
**language** [3] - 107:3, 107:11, 230:25
**Lanier** [1] - 3:4
**large** [6] - 147:18, 183:9, 183:15, 190:16, 190:23, 190:25
**larger** [4] - 73:1, 73:9, 73:10, 76:4
**last** [16] - 33:8, 100:20, 122:7, 125:6, 125:22, 134:4, 166:21, 175:9, 175:11, 175:16, 178:4, 193:13, 200:10, 201:17, 202:5, 234:10
**lasted** [3] - 166:24, 166:25, 167:2
**late** [2] - 143:14, 157:18
**launched** [2] - 38:10, 64:4
**LAURA** [1] - 5:10
**Lavalette** [1] - 190:11
**law** [6] - 73:18, 74:1, 74:11, 163:14, 174:14, 229:18
**Law** [3] - 3:4, 3:7, 3:12
**Lawrence** [1] - 198:22
**lawsuit** [2] - 74:5, 74:6
**Lawtrac** [3] - 13:15, 16:21, 59:18
**lawyer** [2] - 204:14, 221:6
**lawyers** [3] - 233:15, 233:17, 234:2
**lax** [2] - 221:4, 221:6
**lay** [12] - 80:3, 82:11, 83:1, 86:23, 87:8, 103:22, 105:8, 212:10, 212:14, 212:16, 213:23, 229:23
**laying** [2] - 214:15, 231:15
**lead** [9] - 73:24, 74:7, 74:20, 84:17, 91:7, 91:13, 94:7, 207:12, 214:19
**leading** [13] - 11:7, 11:24, 12:9, 73:16, 73:21, 83:11, 84:7, 91:1, 104:15, 104:16, 115:19, 207:1, 214:21
**leaf** [1] - 157:1

**league** [5] - 176:16, 176:18, 200:2, 200:4
**League** [1] - 200:5
**Leakage** [4] - 156:3, 156:4, 156:5, 156:16
**leaked** [1] - 156:9
**learned** [1] - 233:14
**least** [16] - 22:24, 70:2, 79:20, 97:15, 102:5, 105:4, 125:24, 149:20, 154:22, 178:17, 186:5, 194:12, 204:11, 210:8, 222:23, 224:5
**leave** [2] - 67:9, 74:2
**leaving** [3] - 173:13, 173:16, 207:10
**led** [2] - 171:12, 231:8
**Lee** [1] - 3:12
**left** [8] - 10:4, 12:22, 13:11, 15:4, 16:8, 121:2, 126:13, 176:3
**legal** [4] - 20:25, 27:25, 118:4, 211:12
**legally** [1] - 24:13
**legitimate** [1] - 188:5
**length** [1] - 45:19
**Leon** [2] - 2:4, 2:16
**Leonard** [2] - 193:17
**less** [3] - 113:8, 148:24, 221:6
**letter** [6] - 215:25, 216:3, 216:4, 216:6, 216:7, 216:9
**letters** [2] - 215:22
**letting** [1] - 20:8
**level** [9] - 10:22, 11:2, 33:5, 34:18, 37:17, 43:25, 54:9, 101:21, 144:23
**leveling** [1] - 62:21
**levels** [3] - 27:10, 54:20, 127:7
**Levin** [1] - 2:12
**LEYIMU** [1] - 4:8
**liability** [1] - 36:7
**license** [19] - 11:5, 11:13, 24:24, 25:1, 25:4, 35:10, 35:15, 35:20, 187:5, 187:12, 187:13, 187:14, 187:15, 192:7, 192:8, 209:4, 209:10, 209:19, 209:24
**licensed** [12] - 11:21, 185:9, 185:12, 185:14, 185:16, 188:3, 188:17,

191:12, 193:18, 193:19, 193:21, 193:23
**licensing** [1] - 12:14
**life** [1] - 93:2
**lift** [1] - 36:1
**lifted** [1] - 35:16
**light** [1] - 40:15
**likely** [2] - 93:24, 158:10
**limit** [5] - 23:17, 78:19, 79:3, 83:8, 163:5
**limited** [10] - 8:12, 23:5, 28:6, 31:22, 43:20, 47:3, 63:3, 120:23, 149:10, 163:1
**limiting** [1] - 100:1
**Limits** [1] - 131:6
**limits** [2] - 48:23
**Lincoln** [2] - 199:11, 199:19
**LINDA** [1] - 4:5
**line** [20] - 10:14, 11:19, 14:14, 18:6, 55:14, 62:3, 62:6, 72:2, 72:3, 72:5, 74:12, 89:10, 91:20, 91:24, 98:5, 105:6, 155:16, 184:24, 212:6
**lines** [2] - 186:19, 191:23
**Lisa** [5] - 6:18, 73:4, 146:4, 150:2, 236:3
**list** [5] - 98:18, 101:25, 165:15, 167:7, 194:19
**List** [1] - 49:1
**listing** [1] - 9:16
**lists** [1] - 89:1
**literally** [2] - 85:8, 233:17
**litigation** [3] - 202:14, 233:12, 233:24
**live** [3] - 67:2, 67:3, 83:3
**lived** [5] - 67:15, 173:25, 175:25, 186:3, 197:1
**living** [4] - 174:18, 176:3, 208:7, 208:10
**Liz** [2] - 48:15, 48:17
**LLC** [1] - 2:4
**lobby** [1] - 184:7
**located** [9] - 8:13, 64:20, 108:12, 183:1, 185:2, 191:18, 204:25, 208:13, 208:14

**location** [5] - 18:1, 58:22, 162:5, 193:8, 193:13
**locations** [1] - 58:23
**lock** [1] - 20:10
**Lockbourne** [6] - 50:25, 51:18, 52:24, 53:24, 54:4, 55:22
**Lockbourne/ Columbus** [1] - 53:17
**locked** [2] - 52:6, 52:8
**locking** [1] - 52:10
**Logan** [2] - 6:5, 6:12, 199:5
**logo** [2] - 135:4, 135:5
**loitering** [2] - 186:22, 192:1
**Look** [1] - 30:17
**look** [44] - 8:25, 9:10, 17:16, 17:25, 32:14, 34:23, 35:1, 35:2, 40:20, 54:12, 55:21, 70:4, 73:25, 77:4, 77:8, 110:5, 110:17, 121:15, 125:22, 130:21, 132:10, 135:1, 135:4, 139:12, 139:15, 141:22, 146:20, 152:22, 153:7, 153:11, 153:25, 163:7, 180:7, 180:11, 180:14, 181:6, 181:10, 189:25, 226:25, 227:14, 227:22
**looked** [16] - 31:3, 31:16, 121:4, 134:25, 142:21, 142:24, 143:7, 150:21, 151:21, 151:22, 156:14, 157:7, 183:5, 214:2, 214:10, 228:24
**looking** [6] - 74:10, 150:20, 151:20, 196:3, 212:1, 227:22
**looks** [6] - 15:1, 16:17, 17:9, 31:5, 31:8, 74:12, 130:24, 230:22
**lose** [2] - 194:4, 194:5
**losing** [1] - 173:22
**Louis** [2] - 208:11, 208:12
**love** [6] - 67:17, 175:18, 175:19, 176:9
**loved** [3] - 175:22,

177:1, 196:21
**low** [2] - 70:7, 113:13
**lower** [2] - 108:16, 161:18
**Luken** [8] - 112:3, 112:12, 112:14, 112:20, 121:6, 126:11, 144:6
**lunch** [1] - 121:7

**M**

**M-o-n-e** [2] - 201:18, 202:6
**ma'am** [5] - 7:23, 9:9, 38:5, 42:22, 51:8
**machine** [1] - 184:25
**Magazine** [1] - 3:7
**MAHADY** [10] - 6:4, 84:4, 85:10, 114:9, 114:15, 160:10, 160:16, 162:21, 164:9, 164:14
**Mahady** [1] - 84:16
**mail** [53] - 61:3, 61:10, 61:15, 62:14, 77:8, 77:9, 79:22, 82:15, 83:6, 85:19, 95:9, 97:14, 111:3, 115:11, 121:4, 121:22, 122:1, 123:19, 123:21, 125:3, 125:20, 127:15, 128:3, 128:4, 128:5, 130:21, 130:24, 131:8, 141:18, 142:7, 143:9, 144:14, 148:11, 148:12, 148:15, 148:16, 148:17, 148:19, 148:20, 148:22, 159:22, 159:25, 160:4, 160:6, 160:9, 160:11, 160:13, 161:8, 161:15, 161:18
**mailed** [2] - 127:16, 127:18
**mails** [4] - 62:6, 90:7, 128:22, 147:24
**main** [1] - 207:19
**Mainigi** [3] - 213:18, 218:20, 220:19
**MAINIGI** [29] - 4:12, 203:2, 207:1, 211:18, 211:24, 212:8, 212:21, 213:5, 213:19,

214:5, 214:18, 215:8, 216:22, 217:12, 217:17, 218:7, 218:13, 218:23, 219:13, 220:1, 220:18, 220:20, 221:9, 222:10, 222:19, 224:21, 225:21, 227:2, 227:7
**maintain** [6] - 54:19, 84:21, 117:6, 118:2, 119:9, 179:9
**MAJESTRO** [1] - 2:6
**Majestro** [1] - 2:6
**majority** [1] - 134:24
**mall** [4] - 190:16, 190:17, 190:18, 190:20
**managed** [1] - 223:19
**management** [2] - 61:20, 101:25
**Manager** [2] - 123:20, 125:19
**manager** [6] - 12:15, 14:11, 20:8, 68:12, 68:14, 139:18
**manifested** [1] - 63:13
**manual** [1] - 27:10
**manufacturers** [1] - 39:11
**Mapes** [17] - 21:8, 21:17, 21:21, 29:7, 29:20, 40:4, 40:5, 47:10, 47:11, 48:2, 48:12, 48:20, 49:14, 49:22, 49:25, 50:4
**Mapes'** [1] - 49:18
**MARK** [1] - 3:16
**Mark** [1] - 206:6
**marked** [3] - 60:18, 138:24, 138:25
**market** [1] - 198:5
**marketplace** [1] - 91:21
**marking** [1] - 212:5
**Marshall** [9] - 174:3, 174:12, 174:13, 174:18, 174:23, 175:9, 175:14, 176:8, 176:9
**Martin** [8] - 122:1, 125:3, 125:4, 127:10, 127:16, 127:19, 127:24, 131:4
**Mash** [3] - 73:4, 146:4, 150:2
**Mason** [1] - 199:2
**Masters** [1] - 231:8

**matches** [1] - 13:24
**materials** [3] - 59:1, 64:19, 103:4
**mathematician** [1] - 231:14
**matter** [19] - 13:10, 13:12, 13:14, 13:18, 59:18, 63:6, 63:18, 74:5, 88:8, 114:19, 171:22, 174:16, 202:21, 218:10, 224:20, 229:4, 230:1, 232:13, 236:5
**matters** [1] - 218:3
**maximum** [2] - 77:16, 143:12
**MAY** [1] - 1:19
**Mays** [39] - 7:6, 7:10, 7:14, 8:24, 9:8, 9:10, 12:11, 13:4, 14:13, 19:20, 19:25, 25:12, 33:24, 38:6, 39:8, 40:20, 41:10, 42:12, 45:3, 46:3, 50:8, 50:19, 50:20, 50:25, 51:17, 51:23, 52:17, 52:23, 53:10, 57:6, 57:7, 65:7, 65:8, 65:11, 89:1, 105:4, 134:3, 163:11, 164:16
**McCann** [19] - 114:4, 114:12, 229:15, 229:19, 229:21, 229:23, 230:15, 231:3, 231:14, 231:23, 232:12, 232:17, 232:18, 233:4, 233:9, 234:9, 234:13, 234:18
**McCann's** [3] - 213:15, 231:23, 232:15
**McCloud** [18] - 16:24, 147:6, 147:9, 147:11, 150:15, 151:18, 154:3, 189:23, 189:24, 190:1, 190:15, 191:1, 191:2, 191:3, 191:23, 192:10, 192:14
**McClouds** [1] - 192:11
**McClure** [4] - 7:11, 11:24, 37:1, 235:5
**MCCLURE** [62] - 6:3, 7:7, 7:13, 8:11, 8:23, 9:2, 9:7, 11:11, 12:1, 12:5, 12:8, 12:10, 23:9, 23:10, 25:7,

208:6
**meet** [5] - 75:3, 93:3, 176:25, 188:22, 196:17
**meeting** [16] - 7:18, 8:2, 19:23, 26:12, 26:14, 26:18, 27:13, 27:20, 27:21, 28:10, 129:17, 155:14, 181:18, 187:19, 228:3, 228:13
**meetings** [9] - 26:22, 27:25, 28:3, 75:9, 75:10, 80:22, 118:23, 146:1
**member** [2] - 176:13
**members** [1] - 19:10
**memo** [1] - 74:11
**Memorandum** [2] - 210:4, 211:2
**memory** [4] - 146:25, 147:4, 147:11, 226:21
**mentioned** [5] - 7:17, 22:8, 22:22, 35:22, 186:9
**mercy** [1] - 65:19
**mess** [1] - 230:3
**message** [1] - 120:15
**met** [8] - 48:2, 48:7, 48:12, 48:15, 174:24, 215:15, 215:18, 233:15
**Methadone** [2] - 70:24, 113:21
**methodologies** [3] - 232:16, 232:18, 232:19
**methodology** [1] - 230:4
**metric** [1] - 230:24
**Miami** [8] - 112:3, 112:12, 112:14, 112:20, 121:6, 126:11, 144:6
**Miami-Luken** [8] - 112:3, 112:12, 112:14, 112:20, 121:6, 126:11, 144:6
**mic** [1] - 220:7
**MICHAEL** [4] - 2:15, 3:9, 66:12, 201:20
**Michael** [12] - 14:11, 65:25, 66:8, 67:1, 77:10, 89:1, 125:4, 139:18, 148:16, 201:13, 201:16, 202:5
**Michigan** [2] - 34:2, 187:15

**Microfiche** [2] - 151:22, 157:1
**middle** [2] - 17:2, 202:5
**Might** [1] - 222:16
**might** [17] - 70:7, 81:25, 84:17, 89:23, 94:7, 102:10, 117:15, 144:11, 155:4, 179:10, 180:15, 180:19, 181:13, 198:8, 226:12, 233:23
**Mike** [11] - 21:8, 21:21, 29:7, 29:20, 40:4, 40:5, 47:10, 47:11, 201:24, 225:6
**MILDRED** [1] - 3:3
**miles** [1] - 191:18
**million** [5] - 56:1, 109:3, 109:8, 147:2, 147:9
**mind** [9] - 82:1, 114:9, 155:12, 163:12, 163:22, 164:1, 164:5, 164:10, 165:7
**minute** [7] - 8:25, 33:8, 60:23, 104:17, 126:19, 134:15, 215:10
**minutes** [7] - 36:23, 65:20, 156:20, 168:9, 201:7, 201:8, 222:21
**misconstrue** [1] - 108:1
**misrepresents** [1] - 57:18
**missed** [1] - 168:24
**missing** [3] - 14:7, 164:6, 166:14
**misstatement** [1] - 136:7
**misstates** [1] - 216:22
**mistaken** [1] - 35:16
**Mitchell** [1] - 2:12
**mix** [1] - 182:7
**MOA** [1] - 211:7
**moment** [3] - 10:11, 52:12, 213:10
**Mon** [2] - 173:14, 173:16
**Monday** [2] - 234:24, 234:25
**Mone** [24] - 201:13, 201:16, 202:4, 202:6, 202:7, 203:10, 207:4, 214:2, 215:14, 217:18, 217:20,

217:24, 218:10, 218:15, 222:7, 223:2, 225:2, 225:22, 226:10, 227:1, 227:10, 227:14, 228:9, 228:25
**MONE** [1] - 201:20
**money** [11] - 62:17, 71:8, 71:14, 71:17, 71:25, 72:15, 73:13, 90:15, 90:17, 174:20
**monitor** [1] - 78:14
**monitoring** [3] - 42:2, 44:20, 46:12
**Monitoring** [24] - 28:7, 28:13, 28:15, 31:19, 32:24, 34:11, 35:7, 38:20, 38:24, 39:2, 42:14, 43:1, 43:17, 45:6, 46:16, 47:3, 48:24, 60:15, 62:10, 122:5, 182:1, 197:13, 206:24, 207:21
**Monongahela** [2] - 173:14, 176:4
**month** [14] - 16:25, 29:20, 29:23, 70:1, 70:2, 101:3, 112:12, 146:13, 148:25, 149:6, 178:17, 185:23, 194:12, 223:21
**monthly** [3] - 146:10, 146:20, 146:24
**months** [7] - 15:1, 70:1, 125:6, 162:6, 162:7, 204:20, 224:7
**months"** [1] - 127:24
**Moreover** [1] - 217:25
**morning** [13] - 7:10, 7:14, 7:15, 53:10, 53:11, 66:15, 66:16, 134:4, 158:24, 159:4, 229:2, 234:24, 235:13
**Morris** [1] - 6:15
**most** [15] - 27:9, 29:13, 29:23, 30:15, 32:15, 48:10, 54:15, 69:15, 69:22, 93:24, 158:10, 170:22, 186:7, 187:9, 229:13
**motivate** [1] - 72:4
**motivated** [3] - 72:7, 72:8, 78:4
**motivation** [4] - 78:5, 78:17, 90:18, 90:19
**Motley** [5] - 2:9, 3:14,

25:10, 25:11, 25:15, 33:14, 33:17, 33:23, 36:24, 37:2, 37:14, 37:21, 38:2, 38:3, 40:13, 40:19, 40:24, 41:1, 42:12, 42:18, 42:20, 44:22, 45:1, 45:2, 45:25, 46:2, 46:11, 50:18, 50:24, 51:10, 51:14, 51:16, 51:22, 52:12, 52:16, 52:22, 53:4, 53:19, 56:3, 56:12, 57:4, 57:6, 57:17, 58:24, 63:1, 64:8, 65:6, 235:6, 235:10
**MCGINNESS** [1] - 4:2
**McKesson** [3] - 5:8, 171:24, 234:15
**MDL** [4] - 64:17, 233:10, 233:24, 234:2
**mean** [38] - 21:13, 21:16, 29:16, 34:21, 69:17, 76:16, 82:18, 89:19, 103:17, 106:4, 106:22, 107:15, 113:23, 115:13, 119:5, 122:11, 127:9, 138:11, 143:20, 146:12, 146:15, 146:21, 153:18, 153:20, 155:11, 170:19, 179:7, 180:4, 180:24, 182:6, 183:7, 185:14, 186:2, 193:1, 213:12, 225:22, 233:16, 233:23
**meaning** [1] - 34:18
**means** [7] - 98:21, 98:22, 111:20, 122:11, 143:14, 143:16, 185:16
**meant** [2] - 24:14, 115:12
**meantime** [1] - 208:25
**mechanical** [1] - 6:19
**Medical** [2] - 15:6, 16:10
**Medicap** [1] - 18:14
**medication** [3] - 111:7, 172:8, 172:9
**Medicine** [10] - 203:18, 203:19, 203:21, 203:22, 203:23, 203:25, 204:2, 204:5, 204:7,

4:3, 4:5, 4:8
**MOU** [4] - 210:3,
210:7, 210:10,
210:12
**MOUGEY** [1] - 2:12
**Mountain** [3] - 59:20,
150:21, 151:21
**move** [16] - 23:2, 37:2,
52:16, 102:12,
121:22, 123:23,
124:2, 133:17,
136:13, 152:16,
160:12, 208:20,
208:21, 208:22,
208:23, 211:12
**moved** [4] - 176:4,
204:20, 208:12,
208:17
**moving** [2] - 121:9,
160:3
**MR** [439] - 2:3, 2:6,
2:9, 2:12, 2:15, 3:9,
3:11, 3:16, 4:17, 5:9,
5:10, 5:13, 6:4, 11:7,
23:7, 25:6, 25:9,
33:10, 33:12, 33:15,
33:18, 37:9, 42:7,
44:21, 45:17, 45:20,
50:14, 52:20, 53:7,
53:9, 53:22, 54:6,
54:8, 56:7, 56:15,
57:13, 57:22, 58:7,
59:7, 59:13, 60:18,
60:22, 61:9, 62:24,
63:4, 63:10, 63:15,
63:17, 63:22, 64:6,
65:3, 65:9, 65:24,
65:25, 66:4, 66:18,
66:20, 72:16, 72:20,
73:15, 73:25, 74:9,
75:1, 75:12, 75:17,
75:19, 76:25, 77:3,
78:22, 78:25, 79:1,
79:15, 79:18, 79:19,
80:4, 80:6, 80:25,
81:4, 81:5, 81:6,
81:10, 81:13, 81:18,
82:5, 82:6, 82:14,
82:18, 82:24, 83:10,
83:18, 84:4, 84:15,
85:1, 85:6, 85:10,
85:23, 86:11, 86:20,
87:5, 87:19, 88:1,
88:13, 88:15, 88:16,
88:21, 89:11, 89:18,
90:4, 90:12, 90:13,
91:1, 91:6, 91:9,
91:14, 91:15, 93:13,
93:16, 94:25, 95:4,
95:5, 95:7, 95:13,

95:19, 96:1, 96:5,
96:6, 96:8, 96:10,
96:14, 96:21, 96:22,
100:9, 100:24,
101:15, 101:17,
102:8, 102:9,
102:13, 103:6,
103:8, 103:14,
103:24, 104:13,
104:19, 104:24,
105:1, 105:9,
105:16, 105:20,
106:23, 107:6,
107:12, 107:13,
107:17, 107:25,
108:8, 110:5,
110:13, 110:16,
110:21, 110:24,
111:15, 111:18,
111:21, 111:22,
114:1, 114:8, 114:9,
114:11, 114:15,
114:20, 114:23,
114:25, 115:4,
115:10, 115:18,
115:22, 116:9,
116:12, 117:8,
117:15, 117:18,
117:23, 118:4,
118:7, 118:10,
118:11, 120:6,
120:11, 120:13,
120:22, 121:1,
121:18, 121:20,
121:23, 121:25,
122:14, 122:22,
122:23, 123:1,
123:15, 123:16,
123:22, 123:24,
124:3, 124:7, 124:9,
124:13, 124:16,
124:20, 124:23,
125:1, 126:17,
126:21, 127:12,
127:14, 129:10,
129:14, 130:11,
130:16, 130:20,
130:22, 130:23,
132:16, 132:20,
132:23, 133:7,
133:15, 133:20,
133:24, 134:2,
134:14, 134:18,
135:12, 135:14,
135:19, 135:23,
136:5, 136:14,
136:18, 136:19,
136:21, 136:22,
137:4, 137:8,
137:14, 137:18,
137:19, 137:24,

138:4, 138:6,
138:10, 138:14,
138:16, 138:21,
138:25, 139:3,
139:7, 139:8, 139:9,
141:8, 141:12,
141:14, 141:15,
141:25, 142:4,
142:12, 142:16,
142:19, 143:2,
143:4, 144:7,
144:11, 144:17,
147:12, 147:15,
147:16, 147:19,
147:23, 148:5,
148:8, 148:9, 150:9,
150:12, 150:14,
150:23, 151:3,
151:9, 151:11,
151:13, 151:24,
152:5, 152:9,
152:14, 152:17,
152:21, 154:4,
154:7, 158:4, 158:8,
158:17, 158:22,
159:2, 159:6, 159:9,
159:12, 159:16,
159:20, 159:22,
159:24, 160:4,
160:8, 160:10,
160:16, 160:21,
160:25, 161:6,
161:7, 161:25,
162:2, 162:21,
163:7, 164:9,
164:10, 164:14,
165:10, 165:12,
166:1, 166:3, 167:1,
167:4, 167:11,
167:15, 167:20,
168:7, 168:14,
168:18, 168:22,
169:2, 169:4, 169:6,
169:13, 169:16,
169:19, 169:22,
169:25, 170:3,
170:5, 170:10,
175:24, 181:24,
196:9, 196:15,
199:12, 199:18,
200:22, 201:1,
201:3, 201:7,
201:12, 201:22,
201:24, 202:3,
203:4, 203:7, 205:8,
205:11, 207:6,
207:8, 207:14,
207:15, 211:15,
211:22, 211:25,
212:16, 213:3,
213:7, 213:14,

213:22, 213:25,
214:1, 214:6, 214:9,
214:23, 214:24,
215:9, 215:12,
215:13, 216:25,
217:14, 218:6,
218:8, 219:3,
219:10, 219:18,
219:24, 220:7,
221:11, 221:18,
221:20, 221:23,
222:5, 222:6,
222:15, 222:25,
223:1, 224:18,
224:25, 225:15,
225:20, 226:8,
226:9, 226:15,
226:22, 226:24,
227:4, 227:9,
227:12, 227:13,
227:21, 228:1,
228:4, 228:17,
228:20, 228:23,
229:6, 230:9,
230:11, 230:14,
230:17, 231:25,
232:6, 232:21,
233:6, 233:8, 234:1,
234:4, 234:19, 235:3
**MS** [104] - 3:3, 3:6,
3:14, 4:2, 4:5, 4:8,
4:12, 4:12, 4:15, 5:3,
5:4, 5:10, 6:3, 6:7,
6:14, 7:7, 7:13, 8:11,
8:23, 9:2, 9:7, 11:11,
12:1, 12:5, 12:8,
12:10, 23:9, 23:10,
25:7, 25:10, 25:11,
25:15, 33:14, 33:17,
33:23, 36:24, 37:2,
37:14, 37:21, 38:2,
38:3, 40:13, 40:19,
40:24, 41:1, 42:12,
42:18, 42:20, 44:22,
45:1, 45:2, 45:25,
46:2, 46:11, 50:18,
50:24, 51:10, 51:14,
51:16, 51:22, 52:12,
52:16, 52:22, 53:4,
53:19, 56:3, 56:12,
57:4, 57:6, 57:17,
58:24, 63:1, 64:8,
65:6, 203:2, 207:1,
211:18, 211:24,
212:8, 212:21,
213:5, 213:19,
214:5, 214:18,
215:8, 216:22,
217:12, 217:17,
218:7, 218:13,
218:23, 219:13,

220:1, 220:18,
220:20, 221:9,
222:10, 222:19,
224:21, 225:21,
227:2, 227:7, 235:6,
235:10
**Mt** [3] - 3:15, 4:4, 4:9
**multiple** [2] - 49:12,
99:8
**multiplier** [3] - 45:22,
45:24, 46:7
**multipliers** [2] - 44:19,
45:16
**must** [7] - 55:4, 55:18,
56:25, 58:4, 93:10,
119:23, 177:9

---

## N

**name** [32] - 31:4, 66:2,
66:5, 66:7, 66:8,
66:21, 66:25, 82:8,
82:9, 95:8, 96:25,
123:5, 123:19,
131:17, 131:18,
141:18, 148:11,
148:14, 169:9,
169:20, 174:5,
174:10, 193:4,
193:14, 201:15,
201:17, 202:4,
202:5, 203:25, 217:5
**named** [1] - 85:7
**names** [13] - 48:11,
98:18, 130:7,
131:10, 132:1,
132:3, 132:6, 132:8,
132:14, 133:9,
139:10
**narcotics** [1] - 172:2
**national** [6] - 80:7,
81:7, 81:20, 82:17,
145:25, 164:12
**nationally** [1] - 96:2
**nationwide** [1] - 35:8
**natively** [1] - 13:7
**nature** [11] - 10:25,
42:15, 57:8, 73:16,
73:21, 81:16,
115:19, 117:11,
172:10, 180:9, 192:4
**navigate** [1] - 155:1
**necessarily** [2] -
154:2, 205:21
**necessary** [1] - 125:17
**need** [22] - 24:10,
28:4, 66:2, 83:1,
87:21, 117:21,
124:2, 165:15,
175:1, 180:14,

182:10, 182:12,
194:19, 199:6,
218:25, 220:3,
220:21, 222:23,
224:2, 228:8, 235:6
**needed** [7] - 79:7,
79:8, 106:13,
106:16, 116:23,
121:15, 171:24
**needles** [2] - 187:1,
192:3
**needs** [2] - 168:6,
222:21
**negate** [1] - 84:10
**neglected** [1] - 37:2
**negotiate** [1] - 171:19
**negotiations** [2] -
26:22, 28:3
**Neighbor** [5] - 171:7,
171:9, 171:11,
171:12, 171:13
**never** [11] - 92:17,
105:25, 133:4,
133:8, 181:16,
184:9, 184:16,
187:18, 216:1, 216:2
**Never** [9] - 173:5,
186:21, 186:23,
186:25, 187:2,
188:9, 195:21,
195:25, 196:2
**New** [3] - 3:5, 3:8,
209:12
**new** [28] - 28:11,
28:12, 29:4, 30:5,
30:8, 30:9, 38:7,
38:10, 38:19, 38:24,
39:13, 39:23, 41:22,
42:14, 42:25, 45:5,
48:20, 60:14, 62:16,
92:23, 94:2, 102:15,
162:4, 179:13,
205:8, 208:17,
211:10, 211:12
**newspaper** [5] -
135:1, 135:21,
137:5, 137:11, 138:3
**newspapers** [3] -
134:1, 134:19,
134:21
**Next** [1] - 15:16
**next** [34] - 12:19, 13:4,
15:4, 15:25, 16:8,
17:13, 26:9, 26:12,
41:18, 42:21, 51:21,
55:3, 65:22, 101:1,
102:12, 108:2,
112:23, 119:18,
128:21, 162:3,
162:6, 162:13,

165:14, 167:16,
201:12, 206:21,
225:17, 229:13,
230:9, 230:10,
230:12, 232:5
**nice** [5] - 185:2, 185:3,
185:4, 190:22
**NICHOLAS** [78] - 6:11,
72:16, 73:15, 74:9,
79:19, 80:25, 81:4,
81:13, 82:18, 83:10,
88:16, 89:11, 91:1,
93:13, 95:13, 96:5,
96:14, 100:9,
101:15, 102:8,
103:14, 104:13,
104:19, 104:24,
105:1, 106:23,
107:17, 107:25,
111:15, 115:4,
115:18, 117:8,
118:4, 120:22,
122:14, 124:9,
124:23, 126:17,
129:10, 130:16,
132:16, 133:20,
134:2, 135:19,
136:5, 136:18,
137:14, 138:16,
141:8, 141:14,
141:25, 142:12,
144:7, 147:12,
148:5, 150:23,
151:11, 151:24,
152:17, 154:4,
158:4, 158:17,
159:6, 159:20,
167:1, 167:11,
168:18, 169:2,
169:6, 169:19,
170:3, 170:10,
175:24, 181:24,
196:9, 199:12,
201:1, 201:3
**Nicholas** [7] - 74:8,
103:13, 136:4,
138:15, 165:4,
170:8, 200:25
**Nicholas's** [1] - 89:19
**nine** [7] - 8:16, 37:16,
58:8, 58:13, 59:16,
59:25, 60:2
**Ninth** [1] - 4:6
**nobody** [1] - 221:8
**non** [6] - 23:14, 23:18,
23:20, 24:7, 24:9,
165:16
**non-controlled** [4] -
23:18, 23:20, 24:7,
24:9

**non-controls** [1] -
23:14
**non-CPA** [1] - 165:16
**none** [1] - 220:23
**normal** [4] - 56:23,
88:1, 166:8, 185:1
**Normally** [1] - 221:6
**north** [1] - 199:1
**Northeast** [1] - 18:3
**notch** [1] - 171:8
**note** [10] - 122:23,
126:22, 133:25,
136:22, 164:17,
166:1, 166:4, 166:7,
200:7, 221:11
**Note** [2] - 140:2,
140:13
**nothing** [5] - 115:22,
134:10, 136:9,
142:14, 151:1
**notice** [6] - 133:25,
134:2, 135:24,
136:3, 136:5, 137:2
**noticed** [1] - 197:24
**notified** [1] - 21:4
**November** [7] -
223:21, 224:6,
224:14, 225:16,
226:12, 228:3,
228:13
**number** [37] - 9:10,
13:10, 13:12, 13:18,
17:16, 17:17, 55:24,
74:2, 74:4, 79:23,
79:25, 83:8, 83:12,
83:13, 96:25, 102:1,
119:7, 125:5,
127:15, 135:7,
138:1, 150:15,
160:17, 161:24,
161:25, 162:17,
163:9, 163:10,
163:13, 163:20,
164:7, 165:14,
166:15, 170:21,
171:6, 185:20,
225:24
**numbers** [9] - 8:18,
10:15, 10:16, 10:24,
58:3, 115:16, 127:8,
212:12, 212:13
**numerous** [1] - 68:24
**NW** [6] - 2:10, 4:6,
4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

---

## O

**oath** [1] - 116:7
**object** [43] - 63:1,

73:16, 78:22, 84:8,
88:24, 89:11, 89:22,
95:14, 100:9,
100:17, 103:14,
103:19, 104:13,
104:15, 111:15,
115:4, 117:8,
120:22, 122:14,
123:24, 126:17,
133:20, 133:23,
136:18, 137:14,
144:7, 147:13,
151:24, 152:2,
152:17, 154:4,
159:6, 159:20,
160:14, 162:21,
162:24, 165:3,
167:11, 167:14,
169:6, 220:24,
222:19
**Object** [1] - 23:7
**objected** [1] - 221:8
**objecting** [2] - 89:13,
221:9
**objection** [75] - 25:13,
37:7, 42:16, 44:21,
44:25, 45:17, 46:9,
50:14, 52:19, 56:12,
57:4, 57:10, 57:17,
65:3, 72:16, 73:15,
73:23, 74:25, 75:14,
82:3, 84:21, 89:15,
91:1, 93:13, 100:23,
101:15, 102:8,
102:11, 106:23,
107:17, 110:8,
111:19, 114:15,
115:8, 115:18,
118:4, 120:6,
122:22, 124:1,
124:10, 124:22,
124:23, 127:12,
129:10, 130:15,
130:16, 132:16,
133:19, 136:12,
136:19, 137:7,
137:12, 137:15,
138:5, 139:5, 141:8,
141:25, 142:12,
144:15, 148:4,
148:5, 150:24,
151:8, 152:19,
158:4, 158:17,
159:8, 159:19,
165:6, 167:1,
167:11, 169:2,
170:3, 217:17,
234:16
**Objection** [11] - 11:7,
23:7, 25:6, 33:10,

203:2, 207:1, 214:5,
214:18, 215:8,
216:22, 222:10
**objections** [11] -
58:24, 64:11, 79:21,
83:17, 85:11, 89:3,
89:15, 160:17,
212:9, 221:3, 232:22
**obligation** [1] - 233:24
**obligations** [3] -
80:13, 173:4, 210:12
**observations** [3] -
94:17, 94:18, 150:4
**observed** [1] - 230:6
**obtain** [4] - 172:14,
172:20, 172:21,
228:17
**obtaining** [1] - 25:3
**obviously** [3] - 84:2,
91:11, 187:11
**occasion** [1] - 217:20
**occasionally** [1] -
193:15
**Occasionally** [3] -
180:4, 181:20, 189:1
**occasions** [4] - 75:7,
78:12, 102:6, 174:1
**occur** [1] - 35:18
**occurring** [1] - 15:22
**October** [1] - 63:23
**OF** [2] - 1:1, 1:4
**off-site** [2] - 151:21,
156:24
**off-source** [1] - 150:22
**offer** [19] - 123:2,
124:4, 124:7,
124:21, 130:13,
136:14, 137:24,
147:25, 151:9,
153:22, 159:16,
168:23, 168:24,
169:1, 170:23,
171:3, 174:2,
176:10, 192:25
**offered** [9] - 63:3,
63:12, 123:3,
133:24, 148:2,
160:21, 176:10,
177:5, 235:7
**offering** [6] - 87:14,
135:16, 135:20,
160:6, 160:20,
212:17
**office** [5] - 20:18,
27:23, 29:9, 29:14,
208:6
**officer** [2] - 128:18,
128:24
**offices** [1] - 29:17
**Official** [2] - 236:2,

236:3
**often** [7] - 69:24,
69:25, 157:6, 186:4,
191:17, 191:20,
194:10
**Ohio** [7] - 24:24,
53:25, 55:22,
187:11, 198:22,
205:1, 215:1
**old** [2] - 157:9, 157:12
**OMP** [10] - 28:8, 30:4,
42:3, 43:3, 43:12,
47:1, 54:17, 122:4,
122:10
**OMP"** [1] - 62:8
**on-line** [1] - 155:16
**on-site** [7] - 29:21,
30:25, 31:15, 35:17,
41:14, 44:15, 45:4
**once** [7] - 33:3, 64:25,
70:1, 70:2, 178:17,
185:23, 194:12
**one** [101] - 9:24, 12:2,
14:7, 14:8, 16:17,
19:4, 19:7, 20:17,
28:23, 31:3, 33:7,
34:2, 34:14, 41:19,
43:12, 48:18, 51:21,
58:24, 62:18, 62:19,
63:11, 63:13, 63:23,
64:8, 67:16, 68:11,
69:19, 74:2, 76:21,
77:20, 79:20, 79:21,
79:23, 83:6, 83:12,
88:22, 89:18, 95:24,
96:3, 96:25, 99:6,
104:10, 108:10,
108:16, 111:8,
122:24, 128:6,
128:7, 128:11,
128:21, 129:16,
129:18, 130:15,
131:13, 135:4,
135:24, 137:25,
140:12, 141:4,
141:5, 141:9,
142:24, 143:5,
144:2, 144:12,
146:19, 147:10,
156:9, 160:22,
163:9, 163:13,
169:2, 171:6,
171:10, 174:16,
175:9, 176:7, 177:4,
180:11, 180:15,
183:9, 189:12,
190:20, 192:18,
193:16, 197:6,
197:7, 204:11,
207:19, 213:15,

215:23, 215:24,
216:11, 218:6,
218:23, 221:6,
231:18, 233:6
**One** [5] - 5:11, 10:11,
170:14, 171:16,
229:18
**ones** [2] - 19:9, 58:14
**open** [8] - 23:20, 52:2,
52:7, 52:9, 70:6,
171:5, 179:1, 183:8
**opened** [2] - 9:22,
12:23, 13:15, 52:4,
176:24, 183:22
**operate** [2] - 119:1,
188:20
**operated** [3] - 90:21,
174:25, 178:24
**operating** [3] - 49:23,
50:1, 50:5
**operation** [2] - 192:14,
194:22
**operations** [1] - 28:21
**opinion** [2] - 223:15,
223:18
**opinions** [3] - 62:18,
62:19, 229:11
**opioid** [1] - 200:12
**opioids** [9] - 70:16,
75:20, 75:23, 78:20,
79:4, 136:2, 137:10,
170:17, 195:19
**opponent** [1] - 218:9
**opportunity** [9] -
64:24, 83:5, 83:20,
88:9, 160:13,
168:19, 173:7,
175:5, 177:2
**opposing** [1] - 63:13
**opposite** [1] - 229:25
**Optimistically** [2] -
230:9, 230:10
**options** [1] - 34:25
**order** [52] - 10:19,
10:24, 22:10, 27:1,
27:2, 27:18, 32:4,
32:10, 32:13, 32:16,
34:4, 34:7, 34:8,
34:16, 38:9, 42:2,
43:15, 43:18, 43:21,
43:22, 43:23, 43:25,
44:3, 44:4, 44:20,
46:12, 48:5, 54:23,
54:24, 55:8, 55:17,
60:8, 99:2, 101:2,
101:19, 116:16,
116:19, 117:25,
119:16, 119:19,
143:17, 171:4,
182:2, 209:14,

209:20, 230:1,
230:19, 231:18,
231:21, 233:14,
233:20
**Order** [33] - 22:12,
22:14, 22:21, 28:7,
28:13, 28:15, 29:19,
31:19, 32:24, 34:11,
35:7, 38:19, 38:24,
39:2, 42:14, 42:25,
43:17, 45:6, 46:16,
47:3, 48:24, 53:13,
53:24, 58:3, 60:14,
62:10, 122:5,
181:25, 197:13,
206:24, 207:21,
209:18, 210:18
**order"** [1] - 119:24
**ordered** [2] - 54:25,
55:4
**ordering** [2] - 156:7,
233:18
**orders** [30] - 27:8,
27:11, 27:12, 27:14,
30:8, 32:1, 32:12,
34:24, 42:4, 44:11,
48:6, 49:3, 54:21,
55:21, 55:25, 56:4,
56:9, 56:19, 57:15,
112:12, 112:16,
112:19, 116:25,
117:4, 119:2, 119:8,
126:14, 230:24,
231:1
**Orders** [1] - 209:5
**organized** [1] - 190:22
**orient** [2] - 7:16, 120:8
**Orlando** [14] - 20:6,
21:3, 21:7, 22:10,
23:2, 23:5, 23:11,
23:13, 23:20, 23:25,
26:1, 31:22, 35:11,
53:14
**Orlando's** [1] - 23:17
**Orleans** [1] - 3:8
**Osteopathic** [2] -
137:10, 137:21
**OTC** [3] - 183:19,
190:23, 190:25
**OTCs** [2] - 70:13,
193:2
**otherwise** [3] - 44:25,
80:2, 151:7
**ought** [1] - 221:1
**out-of-state** [4] -
187:5, 187:6,
187:12, 192:7
**out-of-towner** [1] -
190:13
**outdated** [1] - 158:3

**outdoors** [1] - 67:17
**outline** [2] - 71:23,
82:20
**outlined** [1] - 82:17
**outreach** [1] - 22:2
**outs** [1] - 174:25
**outside** [11] - 7:7,
20:24, 94:21,
113:18, 163:4,
163:20, 164:11,
164:23, 186:22,
192:1, 218:3
**outsourced** [1] -
129:19
**over-the-counter** [1] -
172:5
**overall** [5] - 49:14,
77:17, 82:2, 143:13,
149:3
**overcomes** [1] - 137:5
**overrule** [5] - 42:16,
57:10, 82:3, 144:15,
165:5
**Overruled** [4] - 11:9,
33:22, 199:16,
222:11
**overruled** [12] - 42:17,
45:18, 46:9, 50:22,
50:23, 57:24, 59:11,
72:18, 133:1,
152:12, 167:18,
203:6
**oversaw** [1] - 38:19
**own** [5] - 50:23, 57:2,
192:15, 221:2,
225:19
**owned** [5] - 174:9,
176:19, 188:18,
191:1
**owner** [6] - 129:25,
145:10, 176:19,
188:15, 188:16,
188:19
**owners** [5] - 106:11,
188:21, 191:2,
193:16, 203:24
**oxy** [6] - 113:21,
115:2, 115:3,
115:12, 115:17,
216:16
**Oxycodone** [1] -
126:15
**oxycodone** [30] - 56:1,
70:18, 101:20,
101:22, 106:17,
109:3, 109:8,
109:18, 109:21,
109:25, 110:4,
112:17, 112:18,
113:4, 113:6, 113:7,

113:24, 121:10,
125:25, 126:1,
126:3, 139:22,
141:6, 143:15,
144:22, 145:4,
145:21, 212:3,
216:17, 217:2
**Oxycontin** [1] - 216:17

## P

**P-00193** [2] - 118:7,
147:19
**P-02504** [1] - 79:15
**P-02796** [1] - 110:5
**P-1200** [1] - 2:7
**P-14622** [1] - 147:20
**P-16642** [1] - 76:25
**P-16651** [2] - 130:14,
130:19
**P-16655** [3] - 124:13,
124:21, 124:25
**P-17118** [3] - 60:19,
62:24, 63:21
**P-17140** [4] - 150:9,
150:13, 151:10,
152:15
**P-17150** [3] - 121:18,
124:7, 124:12
**P-187** [1] - 44:10
**P-23655** [3] - 64:10,
64:24, 65:5
**P-26160** [3] - 133:15,
133:18, 136:16
**P-26161** [3] - 137:25,
138:7, 139:3
**P-41623** [2] - 159:16,
161:4
**P-44758** [1] - 114:1
**P-9928** [1] - 227:2
**p.m** [4] - 168:11,
201:9, 235:14
**P.O** [2] - 5:14, 6:8
**PA** [6] - 6:6, 6:13,
6:15, 173:15, 176:3,
176:4
**package** [3] - 13:5,
71:20, 71:23
**packages** [1] - 72:6
**packers** [1] - 54:18
**packet** [2] - 8:18, 8:20
**Page** [13] - 95:12,
96:9, 96:12, 97:18,
100:25, 110:21,
114:11, 114:12,
114:23, 118:24,
120:11, 139:15
**page** [32] - 9:6, 10:8,
10:9, 11:5, 11:12,
12:20, 12:25, 13:5,

13:6, 13:7, 13:11, 13:23, 14:23, 15:7, 15:19, 16:3, 17:25, 18:5, 18:16, 41:2, 41:9, 41:18, 42:21, 95:9, 101:1, 110:17, 110:18, 125:2, 128:21, 135:6, 227:23

**pages** [4] - 41:10, 41:24, 43:3, 92:9

**paid** [4] - 36:3, 36:5, 187:4, 195:24

**pain** [12] - 101:25, 102:7, 111:7, 111:8, 111:13, 111:16, 111:24, 121:5, 126:23, 126:24, 145:1

**Papantonio** [1] - 2:12

**paper** [2] - 103:18, 123:13

**paperwork** [1] - 165:24

**paragraph** [4] - 16:12, 54:22, 110:22, 228:5

**Paragraph** [5] - 226:25, 227:3, 227:15, 227:22, 228:2

**parameters** [2] - 55:4, 113:18

**pardon** [1] - 126:5

**parents** [1] - 176:4

**parish** [1] - 176:14

**Park** [1] - 16:10

**parking** [7] - 180:8, 181:14, 183:10, 183:12, 186:24, 187:1, 192:3

**Part** [1] - 180:5

**part** [32] - 26:22, 27:9, 29:24, 30:16, 38:18, 62:13, 69:9, 72:13, 72:23, 73:12, 75:20, 75:23, 76:6, 76:17, 76:20, 78:13, 80:18, 98:13, 98:24, 104:8, 122:3, 158:9, 170:15, 179:12, 190:6, 190:8, 197:16, 199:8, 209:19, 214:12, 226:6, 226:18

**participation** [1] - 90:6

**particular** [12] - 31:3, 79:11, 95:14, 157:8, 184:15, 195:19, 212:17, 214:13,

216:21, 217:25, 224:20, 226:7

**particularly** [4] - 96:17, 215:23, 216:16, 217:2

**partner** [1] - 193:16

**parts** [1] - 123:1

**party** [18] - 57:9, 63:13, 74:21, 74:22, 74:23, 88:3, 88:4, 88:7, 148:2, 148:3, 159:18, 171:24, 202:7, 203:5, 218:9, 221:7, 221:17

**party's** [1] - 63:6

**passed** [2] - 142:16, 142:17

**passions** [1] - 67:16

**past** [2] - 67:13, 162:7

**patients** [1] - 184:15

**patterns** [2] - 58:4, 149:9

**Paul** [5] - 174:16, 196:16, 196:18, 197:1, 199:17

**PAUL** [2] - 2:3, 5:9

**Pause** [7] - 9:1, 14:5, 52:15, 104:18, 124:18, 134:16, 233:7

**pay** [1] - 202:25

**paying** [3] - 187:3, 203:9, 207:11

**PEARL** [1] - 3:6

**peer** [2] - 44:19, 45:12

**pending** [4] - 214:16, 214:25, 215:2, 220:2

**Pennsylvania** [4] - 128:25, 173:12, 173:19, 187:15

**Pensacola** [1] - 2:14

**People** [1] - 178:23

**people** [32] - 21:3, 28:23, 39:25, 40:15, 48:7, 61:17, 61:20, 61:21, 83:6, 100:15, 100:20, 104:20, 105:2, 117:12, 148:18, 155:3, 174:24, 175:7, 175:19, 176:24, 176:25, 178:24, 180:8, 186:19, 186:22, 187:9, 187:25, 191:12, 191:16, 191:24, 192:1

**per** [2] - 84:9, 124:9

**percent** [2] - 32:8, 76:22

**percentage** [5] - 97:23, 98:7, 98:11, 125:15, 149:2

**perfect** [1] - 211:14

**perfectly** [2] - 88:19, 232:23

**performance** [3] - 166:11, 166:17, 168:2

**performed** [1] - 197:10

**performing** [2] - 47:12, 50:16

**period** [31] - 8:6, 8:13, 11:2, 48:10, 50:8, 69:4, 69:5, 69:7, 69:8, 69:11, 69:12, 72:9, 75:20, 75:22, 75:23, 75:25, 76:5, 83:11, 129:23, 130:3, 144:6, 144:8, 154:5, 154:8, 154:19, 167:5, 167:24, 206:1, 207:9, 209:25, 212:20

**periodical** [1] - 137:1

**periodically** [1] - 102:23

**periodicals** [1] - 134:1

**periods** [4] - 202:8, 212:7, 215:17, 222:13

**permission** [1] - 95:1

**permit** [2] - 96:14, 96:15

**permitted** [1] - 134:12

**PERRY** [1] - 66:12

**Perry** [54] - 14:11, 66:1, 66:9, 66:21, 67:1, 77:4, 77:10, 79:25, 84:10, 85:18, 89:2, 89:7, 89:9, 95:5, 95:9, 95:23, 96:3, 105:5, 110:17, 115:1, 115:25, 116:5, 116:7, 116:13, 118:12, 121:21, 124:6, 133:2, 142:20, 144:13, 144:14, 148:16, 151:1, 151:2, 159:21, 159:22, 160:8, 160:12, 161:8, 162:23, 164:2, 164:22, 165:8, 165:13, 166:4, 167:19, 168:12, 168:15, 170:11,

190:13, 194:24, 196:7, 201:2, 201:4

**perry** [2] - 66:15, 139:19

**Perry's** [1] - 163:2

**person** [7] - 20:24, 48:7, 48:9, 75:8, 75:9, 75:10, 118:23

**personal** [3] - 33:21, 35:3, 198:13

**personally** [6] - 33:24, 34:1, 42:13, 92:17, 146:15, 187:24, 195:6, 233:20

**personnel** [3] - 19:18, 30:24, 39:25

**perspective** [1] - 20:13

**pertain** [1] - 81:14

**pertaining** [1] - 53:17

**PETER** [1] - 2:12

**pharmaceutical** [8] - 70:15, 70:17, 70:19, 70:21, 70:23, 70:25, 112:10, 215:18

**Pharmaceutical** [2] - 39:8, 231:9

**pharmaceuticals** [7] - 70:13, 113:18, 171:2, 171:15, 183:20, 184:24, 185:18

**pharmacies** [42] - 8:13, 21:23, 22:8, 22:13, 22:18, 22:22, 30:9, 37:13, 37:16, 38:15, 41:20, 68:4, 70:8, 91:22, 99:8, 108:25, 129:19, 151:21, 160:1, 163:20, 164:7, 167:14, 170:15, 170:18, 175:20, 175:21, 179:10, 181:3, 182:24, 183:1, 188:2, 197:18, 197:21, 199:21, 217:8, 222:9, 223:4, 223:7, 223:10, 223:17, 223:23, 234:10

**Pharmacies** [1] - 171:12

**pharmacist** [16] - 106:8, 130:4, 181:18, 184:25, 187:20, 187:21, 188:3, 188:5, 188:12, 188:15, 188:17, 188:20,

193:6, 193:10, 193:18, 204:11

**pharmacists** [3] - 188:21, 191:12, 193:12

**Pharmacy** [31] - 12:21, 15:6, 15:17, 15:18, 16:2, 16:10, 16:24, 17:15, 18:14, 55:22, 56:10, 56:16, 56:20, 110:19, 150:16, 171:7, 171:9, 171:11, 171:13, 174:11, 174:22, 183:3, 183:5, 185:10, 188:16, 189:23, 190:15, 191:23, 192:11, 192:17, 193:21

**pharmacy** [70] - 7:18, 9:5, 11:20, 11:21, 12:17, 12:20, 14:12, 15:4, 15:16, 15:25, 16:9, 16:22, 17:14, 17:22, 18:13, 19:22, 31:4, 76:12, 76:15, 76:16, 78:15, 94:2, 94:8, 94:21, 96:23, 96:25, 97:1, 99:1, 101:2, 101:6, 101:19, 129:16, 164:11, 171:22, 172:4, 174:25, 175:1, 175:23, 183:15, 184:7, 184:10, 184:14, 184:15, 184:16, 184:18, 184:22, 184:23, 188:8, 188:19, 188:25, 189:2, 189:25, 190:14, 191:17, 191:18, 191:19, 191:24, 192:12, 192:18, 193:5, 193:12, 193:19, 195:20, 195:23, 203:24, 214:8

**phase** [2] - 162:13, 162:16

**Philadelphia** [3] - 6:6, 6:13, 29:14

**Phillip** [1] - 131:14

**phone** [3] - 189:9, 189:19, 189:21

**phones** [1] - 170:25

**phonetic** [1] - 217:6

**photocopy** [1] - 65:1

**photograph** [1] - 51:23

**photographs** [10] - 19:15, 51:6, 51:11, 51:18, 52:17, 52:21, 52:23, 94:19, 102:21, 106:19

**photos** [1] - 51:20

**phrase** [1] - 43:14

**physically** [3] - 29:16, 29:21, 183:5

**Physically** [1] - 29:18

**physician** [1] - 11:17

**physicians** [5] - 101:25, 130:7, 132:10, 139:11, 142:8

**pick** [2] - 95:24, 99:6

**pickers** [1] - 54:18

**picture** [1] - 54:14

**pictures** [2] - 162:5, 165:24

**piece** [3] - 35:3, 103:18, 123:13

**PIFKO** [1] - 3:16

**pills** [11] - 55:18, 55:23, 56:11, 56:21, 57:14, 57:15, 186:24, 188:8, 189:3, 197:17, 214:11

**Pittsburgh** [2] - 69:6, 173:12

**Pizza** [1] - 176:20

**pizza** [3] - 177:7, 177:9

**place** [8] - 28:5, 30:5, 40:12, 58:9, 158:16, 175:1, 181:12, 184:13

**placed** [7] - 55:22, 56:9, 56:19, 116:19, 150:24, 150:25, 219:12

**plain** [1] - 146:18

**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1

**PLAINTIFF** [9] - 63:21, 65:5, 66:12, 90:10, 124:12, 124:25, 130:19, 148:7, 161:4

**plaintiffs** [10] - 59:2, 59:3, 64:10, 66:5, 100:11, 201:12, 221:14, 229:14, 229:20, 229:25

**Plaintiffs** [2] - 83:19, 236:6

**plaintiffs'** [1] - 64:12

**PLAINTIFFS'** [1] - 201:20

**plan** [2] - 230:17,

234:20

**planning** [1] - 89:9

**plate** [3] - 187:14, 187:15

**plates** [5] - 187:5, 187:12, 192:7, 192:8

**play** [5] - 19:14, 44:7, 83:7, 109:12, 232:23

**playing** [1] - 62:21

**Pleasant** [3] - 3:15, 4:4, 4:9

**pleased** [1] - 19:21

**plethora** [1] - 153:21

**plowing** [1] - 100:21

**plug** [1] - 114:18

**Plus** [1] - 193:4

**plus** [3] - 75:9, 75:10, 135:17

**point** [45] - 73:16, 76:21, 77:20, 77:23, 84:15, 85:2, 86:8, 86:12, 88:19, 89:6, 104:14, 107:3, 108:1, 114:17, 115:20, 115:23, 118:25, 119:7, 121:3, 125:23, 126:2, 126:7, 126:10, 126:22, 129:4, 137:9, 144:8, 144:18, 145:17, 147:10, 152:12, 160:19, 164:13, 189:7, 197:10, 197:20, 199:12, 205:5, 206:9, 211:5, 214:20, 222:3, 232:7

**points** [1] - 135:15

**police** [5] - 128:18, 128:24, 129:5, 145:11, 185:7

**Police** [2] - 174:14, 175:4

**policies** [2] - 50:2, 64:16

**policy** [3] - 56:9, 57:2, 81:20

**Polster** [1] - 233:12

**Ponc** [1] - 2:4

**Ponce** [1] - 2:16

**portion** [4] - 13:1, 76:11, 76:15, 76:18

**posed** [1] - 221:2

**position** [7] - 67:24, 68:1, 68:2, 68:4, 175:10, 206:15, 232:14

**positions** [2] - 198:4, 211:5

**positive** [2] - 19:8,

31:17

**possession** [1] - 59:16

**possibly** [3] - 70:7, 79:21, 93:22

**posted** [2] - 54:13, 54:15

**posting** [1] - 213:10

**potential** [1] - 94:6

**Powell** [1] - 2:6

**PowerPoint** [1] - 170:1

**PR** [2] - 2:5, 2:17

**practice** [8] - 118:19, 179:9, 181:7, 181:17, 181:18, 184:9, 185:1, 232:13

**precautions** [1] - 186:13

**predicate** [4] - 229:19, 229:24, 231:15, 233:1

**prediction** [1] - 115:17

**prejudicing** [1] - 213:8

**preliminary** [2] - 7:8, 12:3

**prepare** [1] - 75:4

**prescriber** [1] - 102:1

**prescribers** [3] - 131:10, 131:12, 132:6

**prescribing** [2] - 56:25, 130:7

**prescription** [2] - 184:4, 184:5

**prescriptions** [3] - 126:25, 136:2, 144:25

**present** [8] - 39:22, 40:9, 44:15, 60:19, 64:25, 88:6, 89:7, 231:3

**presentation** [8] - 40:3, 41:3, 41:7, 42:9, 60:13, 62:11, 88:25, 170:1

**presented** [2] - 31:11, 40:8

**presents** [1] - 229:16

**preserve** [1] - 89:15

**preserves** [1] - 89:24

**preserving** [1] - 89:2

**president** [1] - 176:17

**President** [3] - 62:2, 150:2, 205:6

**pressure** [2] - 172:8, 196:1

**presume** [2] - 87:20, 87:21

**pretty** [12] - 26:20,

50:12, 71:23, 73:19, 117:16, 177:9, 178:16, 179:7, 180:17, 181:9, 191:10, 229:18

**prevent** [3] - 88:6, 118:3, 119:9

**previous** [1] - 188:1

**previously** [1] - 235:7

**price** [4] - 99:23, 113:2, 113:8, 113:14

**pricing** [1] - 171:19

**primarily** [1] - 28:19

**primary** [5] - 86:17, 86:20, 170:19, 179:8

**printed** [2] - 140:4, 140:15

**printout** [1] - 160:1

**prioritize** [1] - 195:16

**priority** [3] - 166:10, 166:16, 168:1

**privileged** [1] - 20:21

**privileges** [1] - 136:1

**privy** [1] - 76:24

**problem** [11] - 19:22, 135:11, 137:5, 157:18, 157:21, 159:14, 165:9, 200:12, 231:24, 233:3, 233:8

**problems** [4] - 131:19, 131:23, 137:9, 137:21

**procedural** [1] - 88:5

**procedure** [2] - 37:12, 62:16

**procedures** [2] - 50:2, 64:17

**proceed** [4] - 66:17, 75:15, 79:8, 81:10

**Proceedings** [2] - 6:19, 168:11

**proceedings** [1] - 236:5

**PROCEEDINGS** [1] - 7:1

**process** [25] - 29:12, 30:5, 32:19, 32:21, 34:3, 34:6, 34:7, 34:15, 34:17, 39:1, 39:3, 41:21, 42:3, 42:24, 43:9, 44:11, 44:20, 46:12, 46:16, 46:17, 54:17, 132:7, 183:25

**Proctor** [1] - 2:12

**produced** [6] - 6:19, 13:6, 64:17, 87:20, 231:2, 231:12

**producing** [1] -

229:15

**product** [12] - 44:18, 45:10, 77:16, 99:9, 109:13, 143:12, 153:12, 153:14, 156:7, 156:8, 182:2, 182:8

**product-specific** [1] - 153:14

**products** [22] - 23:13, 23:18, 23:21, 24:7, 25:17, 97:22, 97:23, 101:3, 109:4, 147:14, 150:7, 152:23, 156:23, 157:2, 157:15, 170:14, 172:1, 172:4, 172:7, 183:19, 190:23, 205:16

**professor** [1] - 196:22

**professors** [1] - 174:17

**proffer** [6] - 136:16, 137:13, 138:6, 138:9, 138:12, 138:16

**proffering** [1] - 139:3

**program** [31] - 21:21, 25:25, 26:25, 27:24, 29:2, 29:4, 29:11, 29:12, 29:22, 33:3, 38:7, 38:10, 39:6, 39:23, 40:10, 40:12, 43:4, 45:5, 45:19, 48:8, 48:9, 81:8, 82:17, 91:17, 113:16, 149:21, 158:15, 164:12, 165:21, 170:25, 207:20

**Program** [44] - 26:1, 28:7, 28:8, 28:13, 28:15, 31:19, 32:24, 34:11, 35:7, 38:20, 38:24, 39:2, 41:13, 41:16, 42:14, 43:1, 43:17, 45:6, 46:23, 47:4, 47:5, 47:7, 47:12, 47:17, 48:3, 48:24, 49:15, 49:19, 49:23, 50:1, 50:5, 50:16, 60:15, 61:18, 62:10, 64:4, 118:13, 122:5, 146:7, 163:18, 171:7, 171:17, 171:25

**programs** [5] - 153:19, 170:23, 170:24, 171:6, 171:16

**project** [9] - 158:9,
162:5, 162:7, 162:9,
162:13, 163:1,
166:5, 166:7, 166:21
**Project** [2] - 161:19,
162:9
**prolong** [1] - 81:14
**proper** [7] - 87:12,
207:13, 213:16,
213:23, 217:19,
217:22, 230:5
**proposed** [1] - 231:18
**protocol** [5] - 132:12,
132:13, 132:17,
132:20, 132:22
**provide** [12] - 7:24,
97:23, 98:18,
101:20, 132:1,
132:3, 132:4, 132:8,
140:24, 155:7,
204:8, 235:8
**provided** [11] - 42:10,
59:1, 63:24, 83:4,
83:20, 101:13,
118:20, 133:13,
155:25, 199:22,
212:8
**provider** [1] - 171:24
**provides** [4] - 131:10,
133:25, 134:18,
203:24
**providing** [3] - 133:9,
133:10, 139:10
**proximity** [1] - 185:7
**PRX** [1] - 156:14
**psychiatrist** [1] -
142:10
**publish** [2] - 211:18,
213:5
**publishing** [1] -
217:12
**pull** [11] - 54:6, 94:25,
95:1, 110:23,
114:18, 123:13,
130:22, 156:18,
181:9, 183:11,
187:13
**pulled** [2] - 145:10,
181:8
**pun** [1] - 155:10
**purchase** [10] - 10:15,
10:16, 10:24, 97:24,
100:1, 112:17,
125:15, 143:14,
162:11, 162:15
**Purchase** [1] - 53:13
**purchased** [10] -
109:13, 113:23,
115:12, 125:6,
127:19, 127:25,

128:2, 153:8,
177:20, 177:25
**purchasers** [1] -
197:21
**purchases** [6] - 77:18,
98:8, 99:1, 121:6,
143:13, 149:10
**purchasing** [7] -
126:11, 127:3,
127:4, 149:1, 149:9,
182:11, 199:22
**purporting** [1] -
212:11
**purpose** [12] - 37:11,
59:5, 59:7, 63:3,
86:20, 92:12, 93:25,
94:10, 117:12,
132:11, 144:10,
180:21
**purposes** [5] - 9:2,
59:14, 86:18,
211:16, 217:21
**pursuant** [4] - 130:17,
135:9, 148:1, 159:17
**pursue** [3] - 165:6,
174:13, 177:2
**pursued** [2] - 105:7,
177:23
**push** [4] - 195:19,
195:22, 205:9,
205:10
**put** [34] - 10:1, 18:22,
20:9, 26:25, 27:22,
30:5, 39:12, 40:11,
40:24, 45:21, 51:14,
83:2, 85:7, 93:14,
101:11, 110:13,
110:15, 114:5,
138:8, 149:9, 184:2,
184:3, 211:16,
212:23, 213:3,
213:12, 226:1,
230:15, 230:19,
231:4, 231:5,
231:20, 232:5,
232:13
**puts** [1] - 39:10
**putting** [1] - 28:5

## Q

**quantities** [4] - 54:25,
55:4, 58:2, 58:3
**Queens** [1] - 196:25
**questioned** [4] -
88:17, 89:16,
168:24, 170:2
**questioning** [9] -
79:20, 81:11, 81:16,
84:21, 86:1, 86:7,

110:10, 217:19,
218:17
**Questionnaire** [7] -
92:6, 92:8, 92:12,
92:25, 95:10, 95:12,
101:7
**questionnaire** [12] -
58:17, 92:20, 93:4,
93:10, 95:22, 96:2,
96:23, 97:5, 97:15,
97:18, 102:5, 102:10
**questions** [49] - 11:25,
29:11, 43:13, 53:5,
53:12, 64:6, 65:7,
73:17, 73:21, 82:19,
89:7, 92:9, 93:14,
94:14, 95:20,
100:10, 100:17,
100:18, 102:9,
103:19, 106:8,
108:3, 117:11,
117:12, 120:24,
134:9, 134:12,
162:25, 168:15,
169:12, 170:14,
172:12, 178:8,
191:21, 192:6,
194:24, 196:9,
197:8, 200:22,
212:24, 214:22,
218:13, 218:20,
219:20, 220:17,
221:2, 222:1,
225:25, 229:17
**quick** [1] - 14:4
**Quintero** [1] - 206:13
**quite** [6] - 23:1, 29:14,
69:25, 186:4,
191:19, 192:24
**quotas** [5] - 50:9,
50:13, 50:16, 50:19,
50:21

## R

**RA07-1051** [1] - 13:11
**Rafalski** [13] - 229:14,
229:20, 229:24,
230:3, 231:7,
231:16, 232:4,
232:8, 232:15,
232:19, 233:9,
234:6, 234:9
**Rafferty** [1] - 2:12
**raided** [1] - 145:15
**raise** [4] - 30:24,
66:10, 201:19, 229:7
**raised** [4] - 164:21,
221:3, 229:8, 234:5
**raises** [1] - 160:16

**raising** [1] - 50:13
**ran** [1] - 20:16
**range** [3] - 172:4,
172:10, 172:24
**Rannazzisi** [3] -
215:21, 215:22,
216:7
**RA07-1051** [1] - 13:19
**rather** [1] - 82:25
**ratio** [9] - 77:17,
77:21, 77:24, 98:15,
125:6, 125:9, 126:8,
143:13, 143:25
**RE** [1] - 62:3
**re** [4] - 72:22, 75:16,
117:21, 215:11
**re-ask** [1] - 215:11
**re-frame** [1] - 117:21
**re-state** [1] - 72:22
**re-visit** [1] - 75:16
**reach** [1] - 15:8
**read** [21] - 8:18, 11:19,
14:4, 41:25, 85:2,
88:12, 98:19,
118:24, 120:14,
120:16, 122:17,
122:19, 128:6,
141:11, 159:13,
165:13, 218:21,
226:21, 228:7,
228:9, 228:11
**reads** [1] - 83:19
**ready** [3] - 7:6, 65:22,
168:17
**real** [2] - 14:4, 221:4
**reality** [1] - 104:12
**realize** [1] - 12:6
**really** [13] - 15:1,
16:19, 30:19, 96:18,
155:11, 175:4,
176:24, 180:14,
190:22, 192:22,
206:18, 226:1
**Reardon** [2] - 205:25,
206:1
**Reason** [1] - 139:24
**reason** [16] - 31:4,
99:3, 99:5, 99:7,
101:24, 112:13,
112:16, 126:13,
132:24, 134:11,
139:10, 140:18,
140:21, 140:24,
141:2, 144:5
**reasons** [5] - 99:20,
165:1, 197:6,
230:19, 230:20
**recapping** [1] - 214:20
**receive** [4] - 15:12,
77:16, 80:11, 143:12

**received** [7] - 17:8,
22:1, 54:23, 71:5,
110:25, 159:23,
198:14
**recess** [5] - 36:23,
65:20, 115:24,
168:8, 235:12
**Recess** [5] - 36:25,
65:21, 116:4,
168:10, 201:9
**recessed** [1] - 235:14
**recognize** [4] - 51:7,
60:24, 73:17, 181:4
**recollect** [1] - 108:18
**recollection** [27] -
122:19, 129:24,
205:20, 209:17,
214:7, 216:2,
218:19, 218:24,
219:1, 219:7,
219:25, 220:2,
220:22, 222:16,
223:12, 223:25,
224:17, 224:22,
225:17, 225:22,
226:4, 226:6,
226:13, 226:19,
227:5, 227:17,
228:12
**recommendation** [1] -
122:8
**record** [33] - 8:19, 9:2,
57:23, 62:25, 66:24,
86:18, 86:21, 87:10,
87:11, 87:14, 88:12,
89:12, 89:17, 107:1,
107:18, 107:20,
107:21, 107:25,
122:19, 122:24,
136:7, 138:12,
138:19, 139:5,
139:6, 200:17,
201:24, 219:14,
231:5, 231:10,
231:24, 235:7, 236:5
**recorded** [1] - 6:19
**records** [1] - 35:1
**recross** [1] - 53:5
**red** [22] - 94:6, 149:8,
149:16, 180:3,
180:5, 180:10,
180:12, 180:13,
180:15, 180:16,
181:4, 181:6, 182:9,
186:10, 186:12,
186:15, 186:16,
186:17, 187:16,
194:18, 230:25
**redirect** [1] - 53:6
**REDIRECT** [2] - 53:8,

196:14
**reduce** [1] - 149:17
**Reed** [2] - 6:4, 6:11
**refer** [3] - 108:3,
174:9, 215:21
**reference** [4] - 8:17,
22:13, 174:4, 231:11
**referenced** [6] - 64:15,
64:18, 114:12,
189:24, 192:19,
224:14
**references** [2] -
222:17, 227:19
**referencing** [4] -
88:23, 113:12,
123:4, 123:19
**referred** [3] - 107:10,
206:24, 215:15
**referring** [9] - 83:11,
83:13, 84:6, 128:5,
141:9, 217:10,
222:14, 224:2, 224:8
**refers** [1] - 169:7
**reflect** [2] - 13:1,
51:17
**reflecting** [1] - 64:19
**refrain** [1] - 217:12
**reframe** [1] - 93:9
**refresh** [13] - 155:12,
218:6, 218:19,
219:1, 219:7,
219:25, 220:21,
222:16, 224:22,
226:13, 227:5,
227:17, 228:12
**Refresh** [1] - 220:2
**refreshed** [3] - 122:18,
154:15, 226:5
**refreshes** [2] - 226:6,
226:18
**refreshing** [1] - 218:24
**refuted** [1] - 88:4
**regard** [9] - 117:1,
144:8, 150:25,
172:23, 210:13,
219:7, 223:10,
223:18, 226:7
**regarding** [3] - 53:24,
87:13, 220:12
**regardless** [2] - 112:9,
113:16
**regards** [18] - 79:7,
79:14, 80:24, 90:21,
104:3, 106:1,
109:12, 113:5,
156:7, 171:1, 171:6,
171:11, 171:12,
171:19, 176:10,
180:21, 188:1,
191:10

**region** [1] - 73:10
**Region** [1] - 18:3
**Regional** [1] - 62:2
**registered** [1] - 204:11
**registrants** [1] - 119:1
**registrations** [1] -
11:16
**regular** [3] - 112:10,
113:17, 216:13
**regulations** [2] -
39:13, 50:6
**Regulatory** [39] -
78:10, 78:19, 79:3,
80:10, 80:11, 80:13,
80:22, 91:18, 92:11,
94:1, 94:7, 99:10,
99:19, 100:6,
100:10, 100:12,
100:18, 100:19,
111:4, 116:18,
121:5, 121:14,
122:1, 129:15,
129:18, 129:24,
130:2, 130:7, 131:2,
131:4, 132:1, 132:4,
132:6, 132:9,
143:24, 144:13,
149:24, 151:19,
197:13
**regulatory** [4] - 90:24,
204:8, 204:9, 211:13
**reimbursements** [1] -
171:20
**reiterating** [1] - 149:7
**rejected** [1] - 34:8
**relate** [2] - 74:4,
164:24
**related** [13] - 59:16,
85:24, 104:6, 114:4,
202:14, 212:13,
215:6, 217:2, 217:7,
222:9, 223:3,
223:22, 224:14
**relates** [5] - 84:12,
85:14, 164:22,
164:23, 218:3
**relating** [3] - 64:19,
83:21, 108:23
**relation** [2] - 86:1,
149:2
**relationship** [7] - 22:6,
63:7, 63:19, 74:3,
93:3, 109:24, 218:2
**relationships** [2] -
198:12, 198:13
**release** [1] - 32:16
**released** [1] - 34:8

**relevance** [5] - 133:21,
203:2, 220:13,
220:23, 222:10
**relevancy** [3] - 162:24,
231:20, 231:25
**relevant** [9] - 81:21,
81:25, 87:6, 87:23,
202:8, 206:17,
212:19, 222:3
**reliability** [1] - 135:2
**relied** [1] - 50:19
**relies** [1] - 229:15
**relieve** [3] - 117:4,
118:1, 119:8
**rely** [3] - 50:16,
229:10, 229:11
**relying** [2] - 231:22,
231:23
**remain** [2] - 52:8, 68:1
**remained** [1] - 68:2
**remember** [30] -
49:14, 49:18, 54:1,
54:5, 61:1, 72:2,
91:16, 109:20,
121:14, 130:6,
141:1, 154:11,
154:12, 155:10,
161:19, 165:21,
177:17, 189:9,
189:19, 189:21,
193:14, 196:19,
196:21, 209:7,
219:4, 223:2,
224:13, 225:1,
225:5, 225:7
**remembers** [1] -
222:24
**remind** [1] - 116:6
**remodeled** [1] - 184:1
**renew** [1] - 160:19
**Rep** [1] - 123:20
**rep** [4] - 68:15, 90:24,
94:11, 108:21
**repeat** [4] - 11:10,
57:11, 61:13, 158:25
**repeated** [1] - 164:5
**repeatedly** [3] - 122:9,
122:11, 122:12
**rephrase** [4] - 11:25,
23:9, 214:23, 215:9
**report** [14] - 27:2,
32:18, 42:3, 42:4,
116:20, 116:22,
119:2, 119:15,
136:25, 156:14,
189:13, 195:17,
229:12, 231:13
**Report** [5] - 53:13,
156:3, 156:4, 156:5,
156:16

**reported** [9] - 27:8,
34:8, 116:21,
116:25, 117:3,
117:25, 145:9,
206:6, 236:9
**Reporter** [6] - 6:17,
6:18, 236:3, 236:12
**reporter** [2] - 66:3,
168:6, 201:25
**REPORTER** [7] - 61:6,
135:13, 152:8,
152:10, 152:13,
158:25, 174:6
**reporters** [2] - 36:21,
65:19
**reporting** [2] - 7:22,
153:19
**Reporting** [1] - 119:7
**reports** [5] - 30:7,
31:8, 53:17, 122:7,
232:2
**Reports** [2] - 53:24,
122:4
**represent** [3] - 202:23,
221:12, 221:16
**representative** [2] -
105:18, 121:12
**representatives'** [1] -
104:23
**represented** [2] -
202:20, 207:10
**representing** [2] -
75:4, 221:13
**represents** [2] - 57:9,
207:11
**request** [9] - 17:10,
53:19, 56:3, 56:4,
64:23, 78:7, 139:11,
139:21, 230:5
**Request** [2] - 125:17,
139:16
**requested** [2] - 15:14,
143:21
**requests** [2] - 49:8,
64:12
**require** [2] - 38:14,
162:18
**required** [24] - 55:12,
83:9, 86:5, 87:7,
92:24, 93:7, 93:10,
101:20, 102:2,
106:10, 127:6,
134:23, 144:19,
144:23, 158:23,
159:3, 162:11,
162:12, 163:21,
166:6, 166:14,
166:22, 167:9, 168:2
**requirements** [2] -
75:13, 117:10

**requires** [2] - 101:8,
119:1
**requiring** [2] - 15:13,
62:15
**research** [1] - 132:25
**reserve** [1] - 85:11
**reserves** [1] - 89:21
**reside** [1] - 176:5
**residence** [1] - 191:19
**resident** [2] - 174:9,
176:7
**respect** [27] - 74:2,
74:5, 77:21, 80:10,
80:12, 91:21, 92:12,
103:25, 104:5,
118:21, 119:14,
134:19, 137:10,
143:8, 149:6,
153:12, 154:24,
156:11, 157:8,
157:14, 157:22,
166:5, 184:13,
184:14, 213:7,
218:24, 233:13
**respected** [1] - 178:13
**respond** [7] - 56:5,
86:9, 117:15,
125:19, 134:14,
144:12, 221:3
**response** [3] - 31:2,
110:25, 143:8
**responses** [3] - 64:12,
64:13, 64:16
**responsibilities** [14] -
80:12, 102:14,
104:1, 104:3, 104:5,
104:8, 104:23,
105:3, 105:17,
108:23, 179:5,
189:13, 195:17,
210:11
**responsibility** [12] -
67:14, 78:13, 78:18,
103:3, 107:23,
117:5, 118:2, 119:9,
119:15, 120:20,
123:5, 158:11
**responsible** [9] - 7:21,
42:13, 68:19,
103:10, 104:9,
118:19, 119:5,
119:12, 151:4
**rest** [3] - 39:23, 40:10,
40:11
**restored** [3] - 35:10,
35:15, 35:21
**result** [4] - 31:25,
36:2, 38:6, 38:7
**resulting** [1] - 10:18
**results** [1] - 232:5

**resume** [3] - 116:5, 116:8, 168:12
**resumed** [1] - 168:11
**Retail** [2] - 61:4, 61:8
**retail** [10] - 30:9, 41:19, 41:20, 96:23, 122:9, 183:16, 223:8, 223:11, 223:16, 224:16
**retain** [2] - 46:25, 47:16
**retained** [3] - 47:9, 47:10, 61:12
**retention** [1] - 47:3
**retire** [2] - 67:7, 67:9
**retired** [8] - 47:10, 67:4, 67:8, 68:2, 68:13, 74:23, 93:18, 178:6
**retirement** [2] - 67:19, 80:16
**retract** [1] - 186:17
**retrieve** [3] - 106:1, 221:21, 226:19
**retrieving** [3] - 106:4, 106:7, 106:10
**revealing** [1] - 190:13
**Review** [3] - 125:18, 139:16, 139:24
**review** [34] - 9:8, 11:4, 17:9, 30:11, 32:10, 34:17, 37:13, 41:15, 42:18, 43:12, 43:23, 43:25, 44:3, 44:4, 46:19, 46:21, 46:23, 48:23, 49:1, 49:3, 49:6, 49:8, 60:23, 79:11, 79:13, 132:9, 132:14, 139:11, 141:16, 148:24, 162:14, 182:13, 216:9, 226:25
**reviewed** [10] - 31:6, 31:15, 32:6, 32:11, 32:13, 34:15, 42:25, 48:20, 54:10, 139:21
**reviewers** [1] - 48:5
**reviewing** [2] - 43:15, 48:6
**reviews** [5] - 33:9, 33:21, 34:13, 35:17, 44:16
**Revised** [1] - 97:8
**revised** [4] - 31:19, 35:7, 97:12, 97:13
**Rice** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**richie** [2] - 40:24, 51:14
**Richie** [1] - 51:20

**right-hand** [1] - 184:6
**ringing** [1] - 170:25
**rise** [1] - 84:5
**risk** [1] - 149:9
**Ritchie** [1] - 10:1
**River** [1] - 198:22
**river** [1] - 199:2
**RMR** [2] - 6:17, 6:18
**road** [1] - 117:9
**roadmap** [1] - 218:17
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**robust** [1] - 170:24
**role** [19] - 19:14, 39:21, 44:7, 79:2, 79:3, 92:13, 118:21, 179:12, 205:2, 205:5, 205:6, 206:4, 208:2, 208:17, 211:8, 211:10, 211:12, 214:13
**Role** [1] - 118:13
**rollout** [1] - 38:19
**room** [1] - 171:8
**roughly** [2] - 9:18, 67:22
**routine** [3] - 103:4, 103:9, 191:10
**routing** [1] - 166:8
**Rowe** [2] - 176:22
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**Ruby** [3] - 4:17, 84:14, 122:21
**RUBY** [9] - 4:17, 81:18, 82:6, 84:15, 89:18, 120:6, 122:22, 123:24, 136:21
**rule** [7] - 63:8, 91:13, 135:18, 160:20, 163:23, 163:24, 221:7
**Rule** [3] - 73:25, 74:19, 133:25
**ruled** [2] - 137:6, 142:5
**rules** [2] - 54:18, 163:25
**ruling** [5] - 81:23, 83:25, 104:15, 137:12, 138:19
**run** [4] - 25:25, 232:8, 232:9, 232:10
**running** [4] - 7:22, 48:8, 48:9, 231:16
**RX** [1] - 156:15

## S

**s\Ayme** [1] - 236:11
**s\Lisa** [1] - 236:11
**Sacred** [1] - 197:2
**Safe** [1] - 147:2
**safeguards** [1] - 88:5
**SafeScript** [75] - 12:21, 13:2, 13:9, 13:17, 14:20, 55:22, 56:10, 56:16, 56:20, 76:22, 77:13, 77:22, 108:9, 108:24, 109:4, 109:9, 109:24, 110:19, 111:12, 114:4, 117:1, 120:4, 121:2, 121:3, 121:10, 121:16, 123:5, 123:7, 123:17, 123:20, 125:5, 127:21, 129:6, 129:8, 129:23, 129:25, 130:3, 130:8, 131:6, 131:8, 131:11, 140:25, 143:14, 145:6, 145:10, 145:15, 145:18, 146:24, 153:25, 154:1, 182:23, 183:3, 183:4, 183:7, 183:21, 183:22, 184:19, 185:2, 185:9, 185:19, 185:25, 186:2, 186:3, 186:9, 186:12, 186:19, 187:17, 187:21, 187:7, 188:11, 188:14, 188:16
**SafeScript's** [1] - 141:6
**salary** [3] - 71:5, 71:7, 71:9
**sale** [8] - 70:11, 70:14, 78:20, 79:4, 100:7, 113:16, 177:5, 195:19
**sale-buy** [1] - 113:16
**sales** [75] - 19:14, 28:20, 48:23, 61:20, 62:18, 67:25, 68:4, 68:6, 68:12, 68:13, 68:14, 68:15, 68:20, 69:9, 69:13, 71:12, 71:13, 71:16, 73:1, 76:11, 76:14, 76:15, 76:19, 76:22, 77:25, 78:1, 78:17, 80:22,

90:24, 91:17, 94:11, 94:23, 103:10, 104:22, 105:2, 105:6, 105:17, 108:21, 118:16, 120:17, 120:18, 121:12, 125:7, 125:16, 127:20, 127:22, 145:25, 146:22, 147:17, 148:23, 149:3, 150:1, 155:13, 155:23, 156:1, 156:10, 156:15, 157:8, 157:11, 166:8, 170:2, 170:19, 171:7, 178:9, 178:10, 178:22, 179:6, 179:7, 195:16, 197:10, 198:6
**Sales** [18] - 44:4, 44:7, 61:3, 61:4, 61:8, 62:2, 68:9, 73:5, 104:9, 118:13, 123:20, 146:3, 156:14, 156:15, 161:22, 165:18, 165:23
**salesman** [5] - 68:13, 78:6, 90:18, 92:2, 105:6
**salespeople** [3] - 19:12, 105:3, 175:8
**salesperson** [6] - 72:7, 72:8, 74:5, 158:10, 175:12, 177:1
**SALGADO** [1] - 4:15
**San** [2] - 2:5, 2:17
**Sandy** [1] - 198:17
**sarcastic** [1] - 233:16
**sat** [3] - 190:15, 190:20, 221:18
**satisfied** [1] - 78:5
**satisfy** [1] - 75:13
**saving** [1] - 105:10
**saw** [6] - 34:7, 54:14, 130:9, 181:4, 216:1, 216:2
**SC** [3] - 3:15, 4:4, 4:9
**Schedule** [3] - 51:25, 71:1
**schedule** [1] - 178:16
**scheduled** [2] - 26:12, 125:20
**schedules** [1] - 191:11
**scheduling** [1] - 233:19

**SCHMIDT** [5] - 5:9, 229:6, 232:6, 234:4, 235:3
**Schmidt** [2] - 229:4, 232:24
**School** [2] - 173:12, 173:14
**school** [6] - 173:13, 173:19, 174:15, 174:21, 174:23, 175:16
**schooling** [1] - 174:18
**Scioto** [1] - 198:23
**scope** [10] - 63:6, 63:18, 79:24, 81:24, 160:17, 163:4, 165:3, 166:8, 199:14, 218:1
**Scott** [7] - 19:2, 29:14, 111:3, 128:21, 128:22, 128:23
**scratchers** [1] - 30:20
**screen** [15] - 10:1, 11:15, 18:23, 34:23, 40:25, 51:15, 89:20, 96:18, 110:11, 110:13, 110:15, 114:5, 205:9, 217:24, 226:2
**script** [3] - 183:24, 183:25
**scripts** [4] - 130:8, 131:11, 135:25, 136:6
**searches** [1] - 12:16
**seat** [2] - 66:14, 201:21
**second** [23] - 10:8, 10:14, 11:4, 11:12, 13:7, 13:20, 13:23, 15:7, 15:19, 41:18, 58:25, 88:22, 112:2, 125:2, 126:11, 131:13, 132:5, 141:11, 145:24, 211:24, 227:10, 229:22, 233:6
**section** [3] - 190:24, 193:3, 205:24
**sections** [1] - 153:20
**secure** [1] - 180:22
**secured** [1] - 233:11
**security** [5] - 180:20, 180:24, 186:13, 186:18
**see** [90] - 12:16, 14:6, 17:12, 30:15, 33:4, 34:6, 34:23, 34:25, 48:13, 55:1, 55:5, 55:14, 55:15, 58:16,

62:3, 69:24, 77:10, 77:18, 82:9, 94:6, 97:8, 97:9, 97:19, 97:24, 98:8, 98:17, 99:15, 101:1, 101:3, 113:21, 114:9, 120:7, 127:16, 128:4, 128:14, 137:17, 139:24, 140:13, 140:20, 141:4, 141:16, 141:17, 142:5, 142:7, 143:9, 148:11, 148:13, 148:16, 149:11, 150:15, 150:20, 153:12, 159:12, 159:13, 161:8, 161:10, 161:12, 161:13, 162:19, 166:4, 178:20, 179:10, 180:19, 180:23, 181:10, 184:20, 186:19, 186:22, 186:24, 187:1, 187:5, 187:13, 187:17, 188:8, 188:24, 191:9, 191:11, 191:23, 192:8, 193:12, 193:14, 193:16, 193:17, 194:17, 227:10, 228:6, 229:2, 235:4

**seeing** [3] - 54:1, 54:5, 60:1

**seem** [2] - 74:1, 107:19

**self** [7] - 52:10, 134:1, 134:20, 138:1, 232:11, 232:16

**self-authenticate** [2] - 134:20, 232:11

**self-authenticating** [2] - 134:1, 138:1

**self-closing** [1] - 52:10

**self-evidently** [1] - 232:16

**self-locking** [1] - 52:10

**sell** [22] - 72:5, 72:7, 72:8, 72:13, 72:14, 72:25, 78:4, 90:15, 94:2, 94:8, 99:11, 101:11, 102:16, 111:10, 112:7, 145:18, 152:23, 154:1, 156:23, 157:2, 167:9, 170:17

**selling** [17] - 93:11, 98:2, 109:25, 121:9, 125:25, 126:3, 145:20, 145:22, 150:6, 157:14, 164:7, 166:15, 166:23, 167:22, 171:2, 171:15, 172:1

**semester** [3] - 175:9, 175:11, 175:17

**send** [8] - 32:9, 77:8, 132:5, 132:14, 133:3, 172:17, 172:21, 179:16

**sending** [8] - 119:6, 119:12, 127:10, 130:6, 132:11, 132:24, 148:12, 148:15

**sends** [1] - 148:20

**SENIOR** [1] - 1:17

**Senior** [1] - 7:2

**Sensabaugh** [1] - 5:14

**sent** [7] - 32:13, 34:5, 49:3, 77:9, 130:24, 148:17, 161:16

**sentence** [9] - 11:20, 55:3, 112:2, 141:5, 141:9, 141:11, 141:14, 162:3, 162:13

**sentences** [1] - 165:14

**separate** [10] - 54:16, 82:7, 84:4, 84:19, 86:16, 87:11, 197:14, 197:15, 221:13

**separation** [1] - 89:24

**September** [11] - 39:15, 39:19, 60:12, 61:11, 121:14, 125:4, 128:7, 206:16, 206:18, 211:9, 215:24

**sequence** [2] - 230:22, 231:20

**sequenced** [2] - 229:9, 230:2

**sequencing** [2] - 229:22, 230:5

**series** [2] - 108:3, 147:24

**serious** [3] - 20:11, 20:14, 200:7

**serve** [2] - 22:9, 69:19

**served** [1] - 22:20

**service** [5] - 15:10, 24:5, 25:24, 85:18, 185:19

**serviced** [7] - 17:22,

162:23, 188:11, 193:25, 194:14, 194:17, 197:22

**services** [8] - 51:3, 70:8, 153:19, 170:23, 170:24, 171:6, 202:25, 204:1

**servicing** [6] - 22:21, 22:24, 24:3, 25:1, 31:12, 126:24

**serving** [1] - 26:11

**sessions** [1] - 118:20

**set** [10] - 19:25, 59:9, 71:10, 72:4, 77:16, 91:17, 116:10, 143:12, 178:22, 191:21

**Settlement** [1] - 44:17

**settlement** [8] - 35:14, 35:18, 36:2, 38:18, 47:22, 60:8, 60:10, 210:13

**seven** [3] - 75:11, 150:15, 198:8

**several** [22] - 15:1, 26:19, 30:22, 31:16, 49:12, 51:11, 58:23, 68:24, 111:7, 111:16, 111:18, 111:23, 111:24, 148:17, 162:7, 176:16, 176:18, 176:20, 180:18, 188:20, 190:17, 192:16

**Several** [1] - 229:9

**SHANNON** [1] - 6:3

**shelves** [1] - 184:24

**Sherry** [1] - 176:21

**ship** [11] - 23:24, 24:8, 24:18, 24:25, 27:17, 42:2, 79:12, 79:14, 119:20, 119:24, 120:3

**Ship** [1] - 49:1

**shipment** [1] - 42:5

**shipments** [2] - 78:14, 149:17

**shipped** [11] - 27:1, 27:7, 27:12, 27:14, 27:15, 32:10, 32:11, 38:11, 38:12, 109:8

**shipping** [5] - 23:13, 25:4, 25:17, 27:3, 27:19

**shock** [3] - 21:11, 21:16, 21:17

**shop** [1] - 177:7

**Shoppe** [10] - 203:18, 203:19, 203:21,

203:22, 203:23, 203:25, 204:2, 204:6, 204:7, 208:6

**short** [2] - 65:18, 132:13

**shorten** [1] - 191:21

**shot** [1] - 175:5

**shots** [1] - 171:13

**show** [14] - 82:1, 87:18, 107:22, 122:9, 122:11, 169:11, 171:21, 209:14, 209:20, 213:4, 219:22, 220:15, 226:5, 226:17

**showed** [3] - 51:6, 222:17, 226:10

**showing** [4] - 37:12, 44:11, 90:6, 136:3

**shown** [4] - 53:13, 54:3, 122:16, 197:20

**shows** [2] - 18:3, 82:12

**shut** [3] - 23:2, 36:9, 56:17

**sic** [9] - 38:4, 111:6, 134:7, 147:2, 148:10, 148:12, 162:18, 164:17, 212:19

**side** [8] - 29:1, 116:22, 176:11, 182:8, 182:22, 183:9, 184:6, 189:14

**sided** [1] - 10:9

**signed** [1] - 211:7

**significant** [7] - 71:8, 76:11, 76:14, 76:17, 76:18, 76:20, 125:13

**similar** [5] - 40:11, 53:16, 64:2, 82:16, 84:16

**simply** [4] - 81:19, 95:19, 159:25, 231:15

**sincere** [1] - 165:7

**SINGER** [1] - 4:5

**single** [5] - 8:18, 10:19, 10:24, 43:15, 43:18

**sister** [1] - 36:22

**Sit** [1] - 221:10

**sit** [8] - 76:8, 92:19, 94:14, 131:16, 131:20, 176:14, 176:15, 190:1

**site** [14] - 29:21, 30:25, 31:15, 33:9, 33:25, 35:17, 41:14,

44:15, 45:4, 80:24, 94:11, 102:19, 151:21, 156:24

**sits** [2] - 190:4, 190:5

**sitting** [3] - 181:13, 181:14, 232:24

**Sitting** [1] - 196:3

**situation** [1] - 188:14

**six** [7] - 31:6, 41:10, 75:11, 162:6, 177:17, 198:8, 224:7

**size** [2] - 42:23, 180:11

**sizing** [2] - 44:18, 45:8

**SK** [1] - 19:1

**Skecher** [1] - 193:3

**sky** [1] - 123:13

**slide** [5] - 41:11, 41:12

**slides** [1] - 213:15

**slightest** [1] - 74:18

**slightly** [1] - 42:15

**slowly** [1] - 63:9

**small** [4] - 146:8, 146:22, 175:10, 190:18

**smaller** [1] - 146:19

**smarter** [1] - 233:15

**smile** [1] - 65:11

**Smith** [2] - 6:4, 6:11

**social** [3] - 173:20, 173:22, 173:23

**sold** [15] - 70:8, 92:23, 93:8, 109:3, 109:18, 110:3, 153:8, 158:2, 170:15, 172:3, 190:22, 190:24, 190:25, 192:15

**solve** [1] - 233:3

**SOM** [2] - 110:19, 225:12

**someone** [7] - 99:20, 155:12, 177:4, 182:9, 184:21, 189:10, 229:12

**sometime** [2] - 26:7, 208:24

**sometimes** [8] - 27:11, 38:7, 68:15, 97:4, 99:23, 159:12, 159:15, 187:19

**somewhere** [4] - 169:18, 189:22, 233:25, 234:23

**SOMS** [4] - 206:24, 207:20, 207:21, 207:23

**son** [1] - 176:8

**soon** [1] - 26:10

**Sorry** [2] - 36:20, 203:15

**sorry** [39] - 16:9, 20:19, 20:22, 21:13, 22:9, 23:8, 30:1, 36:17, 37:21, 38:6, 41:19, 45:3, 46:14, 46:15, 51:21, 57:12, 61:6, 61:8, 63:15, 81:5, 110:12, 120:12, 135:13, 135:14, 137:18, 140:12, 141:25, 148:8, 148:15, 152:8, 152:9, 158:25, 204:23, 205:8, 208:12, 211:16, 216:5, 227:2, 227:12

**sort** [6] - 12:16, 22:1, 81:20, 214:14, 219:14, 220:22

**source** [3] - 59:8, 150:22, 179:8

**south** [1] - 199:4

**South** [2] - 2:13, 196:25

**SOUTHERN** [1] - 1:1

**Southern** [1] - 7:3

**span** [1] - 162:5

**special** [3] - 24:2, 24:5, 24:10

**specific** [23] - 22:13, 59:14, 79:9, 103:5, 104:2, 105:21, 113:5, 113:7, 113:15, 113:16, 143:18, 153:14, 153:15, 153:16, 153:23, 154:3, 169:7, 196:21, 222:18, 222:24, 223:24, 226:11

**specifically** [10] - 84:12, 86:22, 87:14, 92:5, 92:22, 126:1, 143:17, 215:19, 222:14, 225:16

**specified** [1] - 224:3

**speculation** [2] - 62:20, 127:12

**Speculation** [1] - 25:9

**spell** [1] - 174:6

**Spell** [1] - 201:17

**spend** [1] - 42:8

**spending** [1] - 67:17

**spent** [3] - 144:12, 193:2, 200:1

**spinning** [1] - 220:9

**split** [2] - 134:22, 231:3

**splits** [1] - 99:1

**sponsoring** [7] - 83:2, 83:8, 84:18, 86:4, 87:8, 87:16, 87:22

**spotlights** [1] - 171:10

**spots** [1] - 183:11

**spreadsheet** [6] - 8:12, 8:16, 9:16, 9:25, 18:22, 37:4

**Square** [2] - 6:5, 6:12

**St** [2] - 208:11, 208:12

**stack** [1] - 58:8

**Stafford** [4] - 209:15, 209:18, 209:22, 210:2

**stage** [1] - 142:13

**staging** [1] - 233:22

**stand** [7] - 62:9, 104:20, 116:6, 160:13, 168:13, 190:3, 212:22

**standing** [3] - 181:11, 183:8, 221:5

**STANNER** [1] - 5:10

**start** [19] - 7:16, 28:4, 28:14, 34:16, 98:2, 112:2, 112:11, 118:25, 121:21, 148:10, 170:13, 178:10, 183:3, 187:6, 187:16, 215:24, 218:21, 228:4, 234:25

**started** [23] - 25:1, 28:10, 67:24, 93:20, 109:15, 112:23, 129:21, 129:22, 144:14, 154:9, 158:12, 158:14, 173:22, 174:22, 174:24, 175:3, 175:6, 177:12, 177:15, 177:24, 203:16, 208:24

**starting** [1] - 217:4

**State** [13] - 11:21, 95:17, 171:13, 173:17, 173:18, 173:21, 174:13, 175:4, 176:2, 187:7, 187:10, 192:7, 209:8

**state** [28] - 52:24, 66:7, 66:24, 72:22, 77:15, 82:1, 101:18, 110:25, 111:3, 112:2, 112:11, 113:20, 127:18, 140:2, 143:11, 163:11, 163:22, 164:1, 164:5, 164:10, 165:7,

187:5, 187:6, 187:12, 192:7, 201:15, 202:4, 231:12

**statement** [10] - 12:12, 113:12, 119:11, 119:14, 123:3, 125:22, 140:20, 168:3, 219:11, 219:15

**statements** [6] - 63:5, 63:12, 120:14, 148:2, 159:18, 164:5

**states** [7] - 17:5, 112:18, 112:19, 112:21, 112:23, 161:21, 164:18

**States** [1] - 7:2

**STATES** [2] - 1:1, 1:17

**station** [1] - 185:7

**statistics** [1] - 197:21

**STATUS** [1] - 1:17

**Status** [1] - 7:2

**statute** [1] - 50:6

**stay** [2] - 52:6, 178:14

**stenography** [1] - 6:19

**step** [3] - 29:8, 32:22, 115:25

**steps** [1] - 165:14

**Steve** [2] - 89:1, 205:25

**STEVEN** [1] - 4:17

**sticking** [1] - 174:4

**still** [21] - 38:6, 67:14, 82:7, 87:17, 116:6, 121:9, 121:12, 139:8, 145:20, 166:10, 169:15, 176:13, 177:6, 184:2, 190:25, 192:14, 192:16, 194:22, 198:9, 204:13, 225:21

**stipulated** [1] - 87:15

**stipulates** [1] - 88:24

**stipulation** [29] - 35:24, 82:25, 83:13, 83:19, 84:2, 84:5, 84:9, 84:17, 85:2, 85:4, 85:6, 85:9, 85:10, 85:11, 86:3, 86:4, 86:21, 87:2, 87:8, 88:22, 89:6, 89:14, 89:19, 89:24, 122:25, 124:9, 130:17, 170:1

**stop** [7] - 27:1, 31:12, 32:4, 167:22, 178:19, 178:20, 186:7

**stopped** [3] - 27:11, 32:6, 192:23

**stopping** [4] - 15:9, 114:17, 126:14, 186:7

**storage** [4] - 54:16, 150:22, 151:21, 156:24

**store** [35] - 177:5, 177:6, 177:7, 178:19, 178:25, 179:1, 180:15, 180:16, 180:19, 180:22, 181:10, 183:8, 183:9, 183:11, 183:14, 183:18, 183:19, 184:2, 184:8, 184:9, 186:4, 186:6, 187:13, 188:25, 189:2, 189:4, 190:16, 190:20, 190:21, 190:25, 192:15, 192:16, 192:25

**stored** [2] - 59:20, 59:21

**stores** [11] - 70:6, 174:10, 180:23, 181:2, 181:17, 181:19, 183:15, 183:16, 183:17, 188:20, 188:21

**strange** [1] - 180:8

**Street** [15] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15, 4:18, 5:5, 5:12, 6:6, 6:13

**streets** [1] - 108:16

**strengths** [1] - 170:22

**strict** [1] - 178:12

**strictly** [1] - 183:20

**strikes** [1] - 82:21

**string** [2] - 61:3, 61:21

**strip** [4] - 190:16, 190:17, 190:18, 190:20

**strong** [1] - 86:12

**structure** [2] - 90:23, 91:17

**stuck** [2] - 219:9, 228:15

**studied** [1] - 174:15

**stuff** [2] - 100:14, 122:19

**style** [3] - 111:6, 186:9, 186:10

**subdivision** [1] - 203:19

**subject** [13] - 33:13, 37:17, 53:5, 62:3, 62:6, 74:4, 77:13, 87:7, 102:12, 122:4, 131:6, 161:18, 169:23

**submit** [1] - 15:15

**subscribing** [1] - 56:25

**substance** [17] - 51:25, 54:23, 76:14, 77:17, 77:21, 77:24, 98:10, 98:15, 112:10, 113:17, 125:9, 126:8, 143:24, 149:10, 149:17, 189:14, 216:19

**substance/listed** [1] - 42:1

**substances** [49] - 15:9, 15:12, 22:23, 23:24, 24:13, 24:19, 25:2, 25:4, 25:18, 54:21, 70:12, 70:14, 76:4, 76:5, 76:10, 76:11, 76:23, 77:25, 78:15, 92:24, 93:8, 93:12, 94:2, 94:8, 98:3, 98:6, 99:12, 100:2, 100:8, 102:16, 111:10, 112:8, 125:7, 125:16, 149:2, 158:2, 162:11, 162:15, 164:8, 166:16, 166:23, 167:10, 172:2, 182:3, 195:22, 205:13, 215:7, 216:16, 216:21

**substantial** [6] - 161:24, 161:25, 162:17, 163:19, 164:6, 166:15

**suburb** [1] - 208:15

**successful** [1] - 85:21

**successfully** [2] - 31:18, 35:24

**sufficient** [1] - 101:13

**sufficiently** [1] - 74:23

**suggest** [3] - 74:17, 151:2, 231:19

**suggestion** [1] - 81:19

**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12

**sum** [1] - 102:14

**summarize** [1] - 90:14

**summarizing** [1] -

214:20
**summary** [5] - 9:17, 11:4, 14:2, 58:19, 212:12
**summer** [1] - 148:23
**Summer** [1] - 38:8
**summoned** [1] - 100:12
**supervised** - 38:25
**supervisor** [1] - 55:11
**supervisor's** [4] - 55:5, 55:9, 55:18, 58:4
**supplemental** [1] - 64:11
**supplier** [2] - 99:14, 99:20
**suppliers** [5] - 98:18, 98:21, 99:2, 99:5, 99:8
**suppliers"** [1] - 98:23
**support** [1] - 203:25
**supposed** [5] - 21:25, 22:2, 234:6, 234:9, 234:10
**surprise** [5] - 21:18, 21:19, 109:5, 109:10, 109:11
**surprised** [4] - 55:25, 56:8, 56:19, 56:23
**surrounding** [3] - 106:20, 199:23, 233:11
**suspend** [1] - 20:9
**suspended** [5] - 20:5, 24:12, 149:10, 209:4, 209:10
**suspension** [6] - 24:1, 26:11, 30:2, 35:16, 36:1, 60:8
**Suspension** [8] - 22:12, 22:14, 22:21, 26:5, 29:19, 209:5, 209:18, 210:18
**Suspicious** [3] - 197:13, 206:24, 207:21
**suspicious** [24] - 9:22, 27:2, 27:8, 27:15, 27:17, 27:19, 30:7, 32:17, 34:9, 38:9, 42:4, 44:2, 49:3, 116:16, 116:19, 116:25, 117:4, 117:25, 119:2, 119:8, 119:16, 230:25
**sustain** [12] - 25:13, 73:23, 74:24, 100:22, 102:11,

111:19, 115:8, 124:1, 136:12, 151:7, 152:19, 159:8
**sustained** [14] - 44:25, 53:21, 75:14, 101:16, 115:21, 118:6, 120:25, 126:20, 127:13, 137:7, 138:5, 139:5, 142:15, 167:3
**Sustained** [1] - 216:24
**SUZANNE** [1] - 4:15
**Swedesboro** [1] - 209:12
**swim** [1] - 199:2
**Swisher** [1] - 202:19
**switch** [1] - 145:24
**SWORN** [2] - 66:12, 201:20
**System** [3] - 182:1, 206:24, 207:21
**system** [20] - 13:15, 32:5, 34:4, 35:4, 35:21, 71:9, 71:12, 72:15, 72:21, 73:14, 80:7, 80:8, 113:1, 182:11, 206:23, 207:24, 208:1, 208:3, 225:12
**systems** [1] - 119:1

---

# T

**tactical** [3] - 230:19, 230:20, 232:7
**tags** [1] - 205:9
**target** [2] - 71:13, 71:16
**targets** [4] - 71:13, 71:23, 71:25, 155:14
**tasks** [1] - 207:20
**taught** [1] - 196:19
**team** [6] - 19:10, 21:21, 27:23, 148:23, 179:21, 233:16
**Team** [6] - 80:23, 132:4, 148:23, 161:23, 162:8, 164:20
**teaming** [1] - 220:24
**technical** [1] - 29:1
**technically** [1] - 91:4
**techs** [1] - 184:25
**Ted** [1] - 19:4
**TEMITOPE** [1] - 4:8
**ten** [6] - 55:15, 65:20, 70:7, 127:4, 158:14, 158:16
**Tennessee** [5] - 79:23,

81:15, 84:12, 169:8, 187:14
**Tenth** [1] - 5:12
**term** [1] - 68:14
**terminated** [2] - 22:23, 136:2
**terminology** [1] - 43:16
**terms** [8] - 22:23, 41:21, 42:25, 67:9, 74:3, 172:1, 232:10, 235:7
**territories** [3] - 68:25, 198:6, 198:7
**territory** [21] - 68:18, 68:19, 68:20, 69:4, 69:5, 69:6, 69:9, 69:20, 72:14, 72:23, 73:1, 73:9, 73:12, 73:13, 166:12, 198:1, 198:4, 198:15, 198:17, 198:23, 199:8
**Terry** [2] - 176:21, 176:22
**test** [5] - 33:4, 34:11, 74:12, 80:20, 180:1
**testified** [10] - 17:18, 45:18, 52:18, 85:16, 136:23, 163:13, 163:17, 164:17, 219:3, 225:16
**testify** [8] - 42:9, 84:11, 84:20, 87:13, 214:22, 226:20, 229:24, 231:17
**testifying** [7] - 33:15, 45:20, 107:24, 164:18, 213:13, 214:19, 230:3
**testimony** [20] - 50:15, 75:5, 83:3, 89:23, 89:25, 133:9, 163:10, 164:15, 213:2, 213:17, 216:23, 229:10, 229:12, 229:15, 229:19, 229:23, 231:23, 232:15, 232:25, 233:10
**testing** [1] - 32:23
**tests** [5] - 231:5, 231:9, 231:13, 231:15, 232:5
**Texas** [1] - 209:15
**text** [7] - 9:18, 9:21, 13:8, 13:23, 13:24, 13:25, 14:7
**THE** [316] - 1:1, 1:1, 1:4, 1:17, 7:6, 7:9,

8:22, 11:9, 11:10, 11:24, 12:2, 12:6, 25:8, 25:13, 33:11, 33:20, 36:21, 37:1, 37:7, 37:10, 37:19, 37:23, 40:18, 42:16, 44:24, 45:18, 46:9, 50:22, 51:13, 52:14, 52:19, 53:2, 53:6, 53:21, 56:6, 56:13, 57:5, 57:8, 57:11, 57:20, 57:24, 58:1, 59:5, 59:11, 60:21, 61:8, 63:8, 63:12, 63:16, 63:18, 65:2, 65:4, 65:8, 65:11, 65:13, 65:14, 65:16, 65:17, 65:22, 66:2, 66:8, 66:15, 66:16, 66:17, 72:18, 73:23, 74:8, 74:19, 75:14, 75:18, 77:2, 78:23, 79:17, 80:3, 80:5, 81:3, 81:12, 81:25, 82:11, 82:22, 84:14, 84:24, 85:4, 85:22, 86:8, 86:19, 86:25, 87:17, 87:25, 88:10, 88:14, 88:18, 90:1, 90:5, 90:11, 91:3, 91:7, 91:10, 93:15, 95:3, 95:24, 96:7, 96:19, 100:21, 101:16, 102:11, 103:13, 103:22, 104:17, 104:22, 104:25, 105:5, 105:14, 105:17, 107:5, 107:8, 107:21, 108:5, 110:12, 110:15, 111:19, 114:7, 114:17, 114:22, 115:8, 115:21, 115:24, 116:2, 116:3, 116:5, 116:11, 117:14, 117:16, 117:19, 117:21, 118:6, 118:9, 120:9, 120:25, 122:21, 123:9, 124:1, 124:4, 124:11, 124:15, 124:19, 124:22, 124:24, 126:19, 127:13, 129:11, 129:13, 130:15, 130:18, 132:18, 133:1, 133:3, 133:19, 134:15, 134:17, 135:10,

135:20, 136:3, 136:12, 137:3, 137:6, 137:16, 138:2, 138:5, 138:8, 138:11, 138:15, 138:18, 138:23, 139:2, 139:4, 142:2, 142:15, 143:3, 144:15, 147:22, 148:4, 148:6, 150:11, 151:6, 152:3, 152:12, 152:19, 154:6, 158:5, 158:7, 158:18, 158:20, 158:21, 159:8, 159:11, 159:14, 159:19, 160:6, 160:15, 160:18, 160:24, 161:1, 161:5, 163:5, 164:13, 165:5, 165:11, 167:3, 167:18, 168:5, 168:8, 168:12, 168:16, 168:21, 169:3, 169:14, 169:23, 170:4, 170:7, 174:7, 175:13, 175:15, 181:21, 181:23, 196:11, 199:15, 200:24, 201:2, 201:4, 201:6, 201:8, 201:10, 201:14, 201:15, 201:16, 201:17, 201:18, 201:19, 201:21, 201:23, 203:3, 203:6, 207:5, 207:7, 207:12, 211:21, 212:14, 212:25, 213:11, 213:16, 213:20, 213:23, 214:7, 214:21, 215:10, 216:24, 217:16, 218:4, 218:18, 219:2, 219:6, 219:17, 219:20, 220:4, 220:14, 220:19, 221:4, 221:10, 221:15, 221:19, 221:22, 221:25, 222:11, 222:12, 222:23, 225:1, 225:3, 225:4, 225:5, 225:7, 225:9, 225:13, 225:18, 226:3, 226:17, 226:23, 227:5,

227:17, 227:19,
227:24, 228:2,
228:6, 228:10,
228:12, 228:14,
228:15, 228:19,
228:21, 228:25,
229:3, 229:4, 230:7,
230:10, 230:12,
230:15, 231:22,
232:20, 233:2,
233:23, 234:17,
234:20, 234:23,
235:4, 235:9, 235:12
**themselves** [1] - 64:14
**thereafter** [1] - 104:5
**thereby** [1] - 62:21
**therefore** [3] - 42:15,
73:2, 81:21
**therein** [1] - 90:8
**thick** [1] - 31:6
**thinking** [1] - 110:8
**third** [3] - 54:22,
141:14, 171:24
**Third** [1] - 108:16
**third-party** [1] -
171:24
**Thomas** [1] - 2:12
**thousand** [5] - 55:18,
55:23, 56:11, 56:21,
57:15
**Three** [1] - 6:5
**three** [22] - 6:12, 34:1,
34:12, 85:16, 98:5,
100:11, 100:12,
100:20, 117:13,
130:7, 131:10,
131:12, 131:13,
135:7, 141:19,
142:8, 144:10,
163:16, 230:23,
231:4, 231:10, 234:7
**Threshold** [5] -
125:18, 131:6,
139:16, 139:24,
141:2
**threshold** [32] - 17:9,
32:6, 34:4, 43:4,
44:6, 44:8, 48:23,
49:8, 79:11, 79:13,
122:10, 122:12,
139:11, 140:3,
140:11, 140:14,
140:15, 140:25,
141:6, 141:16,
141:24, 142:6,
143:8, 143:20,
145:3, 182:7, 182:9,
182:14, 182:17,
182:21
**thresholds** [7] - 32:5,

99:3, 140:8, 140:20,
182:1, 182:4, 182:8
**Thresholds** [1] - 182:5
**threw** [1] - 132:21
**throughout** [1] - 78:11
**throw** [1] - 217:24
**throwing** [1] - 187:16
**tied** [2] - 171:18, 203:5
**timeline** [1] - 223:24
**timely** [1] - 172:21
**timing** [1] - 229:8
**TIMOTHY** [1] - 5:9
**title** [4] - 68:9, 68:10,
118:12, 206:15
**today** [12] - 7:16,
36:22, 53:23, 66:21,
75:5, 76:8, 131:16,
131:20, 177:6,
192:14, 194:22,
196:3
**Today** [1] - 171:10
**together** [2] - 21:10,
26:25
**Tomkiewicz** [2] -
48:13, 122:8
**tomorrow** [1] - 229:1
**ton** [1] - 153:25
**tonight** [2] - 169:22,
229:1
**took** [10] - 34:13, 58:9,
157:24, 186:12,
186:13, 186:16,
197:7, 205:6,
205:23, 205:25
**tools** [4] - 152:22,
153:19, 204:9
**top** [22] - 10:4, 12:22,
13:18, 14:14, 15:4,
16:8, 16:22, 41:18,
62:5, 96:11, 96:23,
110:18, 121:22,
123:5, 123:19,
123:21, 130:21,
148:10, 148:16,
161:8, 171:8
**top-notch** [1] - 171:8
**total** [12] - 76:15,
76:19, 77:25, 98:7,
125:7, 127:20,
127:22, 147:17,
149:3, 156:15,
214:11
**totaling** [1] - 55:25
**Tower** [2] - 3:4, 4:18
**town** [2] - 190:11,
208:13
**towner** [1] - 190:13
**tracking** [1] - 197:17
**train** [1] - 179:22
**trained** [4] - 103:25,

104:4, 179:24, 180:3
**training** [20] - 80:12,
80:19, 92:11, 98:13,
98:24, 105:12,
116:15, 117:3,
117:7, 117:17,
117:24, 118:20,
119:3, 119:10,
119:16, 119:21,
119:25, 120:5,
120:21, 180:5
**transactional** [2] -
231:2, 231:4
**transactioning** [1] -
212:19
**transcript** [3] - 6:19,
114:13, 236:4
**transferred** [1] - 176:1
**Transfiguration** [2] -
173:12, 173:13
**transmission** [1] -
161:10
**transpired** [1] - 75:3
**treated** [2] - 223:7,
224:16
**treating** [1] - 224:15
**treatment** [5] - 217:7,
222:9, 223:3,
223:16, 223:23
**trends** [2] - 197:21,
199:23
**Tri** [3] - 187:7, 187:10,
192:7
**Tri-State** [3] - 187:7,
187:10, 192:7
**TRIAL** [1] - 1:16
**Trial** [1] - 235:14
**trial** [5] - 83:12, 83:23,
84:2, 84:7, 89:2
**tried** [3] - 85:20,
178:12, 178:14
**trouble** [1] - 74:10
**Troy** [5] - 187:21,
187:24, 187:25,
188:1
**true** [70] - 63:14, 70:9,
71:5, 71:21, 73:10,
77:22, 78:1, 80:20,
87:17, 90:19, 90:25,
91:18, 92:25, 93:8,
93:19, 94:23, 96:11,
97:1, 97:16, 98:11,
99:21, 99:23, 100:2,
100:3, 101:8,
101:11, 101:14,
101:22, 102:7,
102:24, 104:12,
105:5, 105:21,
109:18, 111:13,
112:8, 112:18,

112:21, 115:16,
115:17, 120:21,
128:1, 131:2, 131:8,
131:14, 139:12,
139:16, 142:8,
145:1, 145:4,
145:11, 148:20,
149:14, 149:18,
149:21, 150:2,
153:5, 153:9,
153:23, 154:1,
154:14, 154:17,
155:17, 156:16,
156:20, 161:16,
198:15, 198:16,
219:2, 219:17
**truth** [2] - 88:8, 218:9
**TRV** [1] - 149:3
**try** [11] - 57:14, 73:24,
82:13, 107:10,
130:10, 173:3,
206:21, 212:14,
217:5, 220:4, 234:2
**trying** [8] - 57:22,
59:10, 67:19, 68:16,
83:7, 87:5, 88:19,
107:6
**turn** [18] - 9:24, 10:8,
12:19, 12:25, 13:4,
13:7, 13:17, 13:23,
15:7, 15:19, 16:3,
16:11, 18:5, 20:1,
41:9, 41:24, 195:13,
222:7
**turnstile** [2] - 184:4,
186:18
**TW** [1] - 19:3
**Twelfth** [3] - 4:13,
4:15, 5:5
**two** [47] - 9:6, 13:5,
33:7, 39:11, 41:25,
43:3, 54:16, 58:24,
70:1, 74:1, 74:4,
74:6, 78:21, 79:5,
79:21, 79:25, 83:13,
84:12, 97:3, 99:1,
119:7, 122:7, 125:6,
127:24, 135:15,
138:1, 141:19,
144:12, 151:3,
151:17, 151:20,
163:10, 163:25,
165:13, 165:15,
173:19, 173:21,
176:20, 191:2,
209:3, 209:5, 209:7,
215:2, 216:20,
221:13, 229:16,
233:18
**two-page** [2] - 9:6,

13:5
**Tylenol** [1] - 172:10
**type** [18] - 14:18, 16:7,
16:16, 17:5, 17:8,
18:19, 35:1, 42:23,
44:18, 45:6, 113:7,
133:5, 180:7, 184:4,
185:7, 186:18,
230:24, 231:7
**types** [3] - 58:15,
97:22, 231:5
**typically** [3] - 39:10,
39:12, 43:22

## U

**ultimately** [1] - 203:20
**unannounced** [2] -
179:3, 186:8
**uncle** [2] - 173:25,
174:19
**uncomfortable** [1] -
96:15
**under** [16] - 89:23,
99:2, 116:7, 123:2,
124:21, 130:14,
135:23, 146:19,
149:14, 149:20,
151:10, 160:20,
163:22, 163:25,
207:13, 231:19
**underline** [1] - 161:25
**Understood** [1] - 12:5
**understood** [7] -
27:13, 46:8, 78:13,
98:14, 120:2, 120:5,
133:8
**undertook** [1] -
148:24
**unfortunately** [1] -
64:22
**Unfortunately** [1] -
234:23
**Unintelligible** [1] -
152:7
**unique** [1] - 13:14
**UNITED** [2] - 1:1, 1:17
**United** [1] - 7:2
**units** [2] - 56:1,
101:19
**University** [7] -
173:17, 173:18,
173:21, 174:3,
174:12, 176:9,
204:16
**unknown** [1] - 232:3
**unless** [6] - 44:1,
103:17, 111:20,
213:1, 213:16,
213:23

**unnecessarily** [1] - 199:13
**unresolved** [1] - 83:20
**unsafe** [1] - 181:16
**unusual** [1] - 188:18
**up** [76] - 9:10, 10:1, 17:16, 18:22, 25:22, 32:9, 32:13, 37:19, 40:24, 44:22, 51:14, 53:12, 54:6, 66:4, 71:10, 72:4, 76:25, 78:23, 79:15, 80:15, 83:11, 84:7, 89:20, 90:14, 91:17, 94:25, 95:1, 96:11, 96:23, 102:14, 110:18, 114:5, 115:1, 121:22, 121:23, 121:24, 127:15, 130:21, 130:22, 141:16, 143:20, 150:1, 153:7, 153:25, 156:18, 160:13, 161:8, 173:10, 178:22, 181:8, 181:9, 183:11, 186:9, 187:13, 187:16, 194:6, 196:25, 199:2, 200:2, 208:6, 209:19, 209:24, 210:18, 211:16, 212:23, 213:3, 213:12, 216:12, 217:11, 219:16, 220:4, 221:5, 222:20, 225:17, 229:5, 229:13
**update** [10] - 14:23, 14:24, 39:12, 39:13, 39:14, 93:4, 93:6, 97:5, 102:24
**updated** [6] - 154:13, 157:5, 157:6, 157:19, 161:23, 162:18
**updates** [1] - 7:24
**upgrade** [1] - 16:20
**upside** [1] - 222:7
**upside-down** [1] - 222:7
**usual** [2] - 61:12, 87:20
**utilized** [1] - 169:5
**utilizing** [1] - 97:16

**V**

**vacation** [1] - 155:23
**vague** [1] - 215:8

**valid** [2] - 11:16, 88:19
**validate** [1] - 162:10
**validation** [2] - 165:15, 165:24
**Validation** [2] - 161:19, 162:9
**validity** [1] - 88:8
**Valley** [2] - 173:14, 173:16
**value** [2] - 146:20, 152:1
**varies** [1] - 76:16
**various** [4] - 33:19, 82:25, 174:1, 190:18
**vary** [6] - 69:17, 69:22, 70:5, 76:18, 146:12, 146:23
**vault** [11] - 20:10, 27:10, 52:1, 52:2, 52:4, 52:5, 52:9, 54:13, 54:15, 54:23, 56:23
**vehicle** [2] - 86:17, 86:20
**vendor** [1] - 156:6
**Ventura** [1] - 3:18
**version** [4] - 16:20, 16:21, 134:24, 135:1
**versions** [1] - 134:21
**via** [1] - 73:13
**vice** [1] - 176:17
**Vice** [3] - 62:2, 150:2, 205:6
**video** [2] - 118:23, 180:6
**view** [3] - 186:10, 229:22, 229:25
**viewed** [1] - 35:4
**violated** [1] - 221:7
**violation** [1] - 36:7
**Virginia** [26] - 4:18, 7:3, 7:4, 11:22, 18:7, 23:15, 31:5, 51:4, 60:4, 67:3, 69:5, 69:6, 95:17, 131:24, 137:1, 137:22, 171:13, 173:25, 174:8, 176:8, 185:9, 187:10, 190:12, 193:21, 204:3, 214:11
**VIRGINIA** [2] - 1:1, 1:18
**visit** [12] - 14:12, 75:16, 94:11, 102:19, 125:12, 125:20, 129:8, 178:11, 178:12, 185:25, 191:17, 194:10
**visited** [6] - 30:22,

50:25, 191:19, 191:23, 192:10, 225:10
**visits** [7] - 31:7, 33:9, 33:20, 33:25, 179:2, 188:7, 191:22
**VOLUME** [1] - 1:16
**volume** [15] - 30:20, 30:23, 30:24, 56:24, 57:15, 109:20, 112:24, 113:13, 127:19, 127:22, 128:1, 128:2, 146:11, 148:25, 197:17
**vouches** [1] - 139:4
**VP** [5] - 61:4, 61:7, 61:8, 73:4, 146:3
**vs** [3] - 218:11, 236:6

**W**

**wait** [4] - 157:4, 168:15, 184:21, 191:14
**Wait** [1] - 215:10
**waiting** [3] - 7:7, 186:19, 191:24
**WAKEFIELD** [1] - 5:13
**walk** [8] - 89:9, 180:23, 183:14, 183:23, 184:9, 184:16, 184:17, 226:2
**walked** [2] - 34:3, 177:4
**wants** [13] - 39:14, 89:9, 89:13, 89:16, 98:1, 98:7, 100:6, 100:10, 111:9, 112:6, 168:20, 221:24, 226:1
**warehouse** [1] - 177:21
**warning** [1] - 149:16
**Washington** [8] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 26:16, 209:8
**watch** [1] - 228:24
**watching** [2] - 180:6, 197:17
**wax** [1] - 180:15
**Wayne** [4] - 190:5, 190:7, 199:4, 200:4
**ways** [3] - 68:24, 170:21, 225:24
**WEBB** [1] - 3:11
**Webb** [8] - 3:12, 131:13, 131:16,

131:23, 136:9, 141:19, 141:23, 142:10
**Webb's** [1] - 131:17
**website** [11] - 80:19, 80:20, 80:21, 135:5, 152:24, 154:16, 154:19, 155:6, 155:8, 155:25
**week** [9] - 29:9, 186:5, 229:13, 230:9, 230:10, 230:13, 234:10, 234:21
**weekdays** [1] - 197:3
**weeks** [1] - 234:7
**well-liked** [1] - 198:14
**WEST** [2] - 1:1, 1:18
**West** [25] - 7:3, 7:4, 11:22, 18:7, 23:15, 31:5, 51:4, 60:4, 67:3, 69:5, 69:6, 95:17, 131:23, 136:25, 137:21, 171:13, 173:24, 174:8, 176:8, 185:9, 187:10, 190:11, 193:21, 204:3, 214:11
**Westmoreland** [1] - 177:6
**Whaley** [3] - 187:21, 188:8, 188:11
**whereby** [1] - 91:17
**white** [1] - 169:17
**white-out** [1] - 169:17
**whited** [1] - 169:20
**whited-out** [1] - 169:20
**whole** [9] - 29:10, 32:19, 34:3, 34:6, 34:7, 38:25, 43:8, 153:25, 180:14
**wholesale** [2] - 215:18
**wholesaler** [1] - 99:7
**wholesalers** [1] - 99:15
**WICHT** [1] - 4:12
**wife** [3] - 192:22, 193:2, 196:6
**Williams** [3] - 4:13, 5:4, 202:20
**Williamston** [1] - 34:2
**willing** [2] - 232:23, 233:2
**win** [2] - 194:3, 194:17
**window** [3] - 184:20, 186:10, 186:18
**windows** [2] - 183:8, 183:10
**wines** [1] - 193:2

**wish** [1] - 31:16
**withdraw** [2] - 10:21, 142:1
**WITNESS** [31] - 11:10, 57:11, 58:1, 61:8, 65:13, 65:16, 66:8, 66:16, 116:2, 117:21, 129:13, 133:3, 142:2, 158:7, 158:20, 174:7, 175:15, 181:23, 201:6, 201:16, 201:18, 201:20, 214:7, 222:12, 225:3, 225:5, 225:9, 227:19, 228:10, 228:14, 229:3
**witness** [79] - 12:7, 12:9, 45:23, 56:5, 57:9, 59:2, 64:9, 65:23, 73:17, 73:20, 74:13, 74:16, 74:20, 74:21, 77:1, 82:8, 82:12, 82:14, 83:2, 83:22, 84:10, 84:13, 84:18, 84:19, 84:22, 84:25, 85:7, 85:13, 86:1, 86:7, 86:15, 87:3, 87:4, 87:9, 87:13, 87:22, 88:17, 89:5, 89:14, 90:6, 100:16, 105:11, 107:2, 115:5, 115:6, 116:5, 117:10, 120:8, 120:22, 123:14, 133:21, 134:10, 134:13, 136:16, 136:23, 165:2, 167:13, 168:13, 187:3, 189:3, 196:12, 201:10, 207:3, 212:11, 212:17, 212:21, 212:22, 212:24, 213:12, 217:15, 219:14, 220:12, 221:7, 224:23, 226:16, 229:14, 231:13, 232:5
**witness's** [4] - 33:13, 89:22, 213:1, 213:17
**witnesses** [17] - 83:1, 83:3, 83:8, 85:16, 86:4, 86:22, 87:16, 100:12, 163:16, 164:20, 229:9, 229:10, 229:11, 230:8, 233:14, 233:18, 234:3

**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**wondering** [1] - 120:9
**word** [5] - 14:16,
106:25, 107:2,
111:15, 132:20
**words** [5] - 88:3, 88:7,
94:5, 111:16, 111:25
**Worker's** [2] - 131:24,
136:1
**worried** [4] - 107:17,
107:18, 107:19,
213:8
**Wright** [2] - 29:13,
29:21
**write** [1] - 125:4
**writing** [2] - 120:17,
136:2
**written** [4] - 85:8,
88:3, 103:18, 105:10
**WU** [1] - 5:10
**WV** [7] - 2:8, 3:10,
3:13, 4:19, 5:15, 6:9,
9:3

## X

**Xactly** [5] - 154:16,
154:20, 155:7,
155:12, 155:25
**xactly** [2] - 155:9,
155:13
**XACTLY** [1] - 155:9

## Y

**year** [23] - 8:7, 10:6,
15:5, 16:25, 47:11,
58:9, 67:13, 71:20,
71:24, 80:15, 104:5,
128:24, 129:23,
130:3, 153:13,
158:13, 166:25,
175:13, 178:4,
179:24, 180:1,
208:24, 225:12
**years** [39] - 21:11,
39:11, 60:1, 67:16,
68:3, 69:15, 70:4,
78:11, 133:8,
149:23, 150:4,
154:22, 157:9,
157:12, 158:14,
158:16, 173:19,
173:21, 175:21,
176:6, 176:17,
176:18, 176:20,
177:17, 177:22,
184:1, 185:20,
186:1, 192:16,

194:5, 194:13,
194:16, 194:25,
196:3, 196:21,
198:8, 200:1, 200:10
**yesterday** [6] - 53:13,
54:10, 56:17, 110:9,
110:14, 114:3
**York** [1] - 3:5
**yourself** [6] - 28:17,
41:7, 173:8, 182:14,
195:6, 204:10

## Z

**Zach** [1] - 202:19
**Zimmerman** [15] -
21:6, 39:20, 39:21,
40:2, 40:7, 41:6,
42:9, 42:19, 60:13,
61:5, 62:12, 89:1,
134:5, 163:11,
164:16
**Zoom** [2] - 75:9, 75:10
**zoom** [1] - 211:17