IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
```

BENCH TRIAL - VOLUME 14
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

MAY 20, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087

Court Reporter:                    Ayme Cochran, RMR, CRR
Court Reporter:                    Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

25

```
 1              PROCEEDINGS had before The Honorable David A.

 2    Faber, Senior Status Judge, United States District

 3    Court, Southern District of West Virginia, in

 4    Charleston, West Virginia, on May 20, 2021, at 9:00

 5    a.m., as follows:

 6              THE COURT:  All right, Mr. Majestro.

 7              MR. MAJESTRO:  I get the job of trying to change

 8    your mind, Your Honor.

 9              THE COURT:  Well --

10              MR. MAJESTRO:  Let me just --

11              THE COURT:  Have at it.

12              MR. MAJESTRO:  Let me just get right to it.  The

13    ruling -- your ruling yesterday, which plaintiffs really

14    didn't have much time to prepare for consideration, we think

15    ou should revisit for several reasons.

16         First, and I've got a couple of cases that I want to

17    put up for you.  The general rule is that a party has

18    discretion to determine the order of presentation -- more

19    rights.  Thus, the fundamental rule universally accepted is

20    that with reference to facts whose relevancy depends on

21    others, the order of presentation is left to the discretion

22    of the party himself subject, of course, to the general

23    discretion of the Court.

24         First -- First Circuit stated, certainly, the general

25    rule is that a party should be able to present his case and
```

1    order that case as he sees fit.

2        Second, Your Honor, this is especially true when we're

3    dealing with issues of conditional relevancy.  As the Fourth

4    Circuit noted, Rule 104(b) continues the practice

5    specifically authorizing the judge to admit the evidence

6    subject to proof of the preliminary fact.  And that's what

7    we're intending to do here.

8        Third, Rule 703 governing experts states that experts

9    can rely on inadmissible data.  So, what we're proposing

10   here is that -- is that the expert rely on data that is not

11   only admissible, but that will be admitted later in the

12   trial.  Certainly, there's no prejudice for that.

13       Fourth, Your Honor, the plaintiffs are prejudiced by

14   the ruling and this is the -- I think this is the most

15   important point I'm making.  Plaintiffs plan to prevent --

16   present Mr. Rafalski first.  He has been here for more than

17   a week preparing and reviewing the defendants' testimony

18   which will -- which will underlie his opinions.  He is ready

19   to go once the defendants' witnesses finish testifying.

20       Dr. McCann, on the other hand, went home.  The

21   attorneys that are responsible for presenting his testimony

22   went home and they had not planned to have him prepared and

23   ready next week.

24       The defendants' stipulation stipulated to splitting Dr.

25   McCann's testimony up and that gave us a reasonable belief

1    that we would be able to present the order -- these

2    witnesses in the order we wanted to.

3        In addition, this has a cascade effect on our other

4    witnesses.  By upending the schedule, we have a lot of

5    experts who have other obligations.  They're professionals,

6    a lot of other witnesses that have other obligations, and it

7    just totally completely causes problems with our scheduling

8    of witnesses because it's not just scheduling the witnesses.

9    Because of the way this case has worked, we have different

10   lawyers responsible for different witnesses.  We've got a

11   schedule of lawyers.

12       In addition, this is what we believe -- the order we

13   have presented we believe is the way that is the most

14   persuasive to Your Honor.  We ought to have a right to make

15   that choice since it's our case to prove.

16       Next, Mr. Rafalski has issues.  He is giving a

17   deposition in Georgia on the 2nd and Judge Polster has just

18   ordered him to give a deposition in the MDL on June -- on

19   June 10th or June 11th.  So, that's a -- those are more

20   issues that we have to -- we have to work around.

21       Finally, the defendants' grounds don't have any merit.

22   This is really a chicken and the egg problem.  Mr.

23   Rafalski's methods for determining suspicious orders were

24   provided to Dr. McCann, who applied them to DEA's ARCOS data

25   and the defendants' transactional data to determine the

1    number of orders that each method would have flagged.

2         Rafalski the used McCann's calculations to provide for

3    each method a table showing the number of dosage units of

4    the oxycodone and hydrocodone the distributor shipped and

5    the percentage of orders that would have been flagged based

6    on the total units.

7         So, the testimony is interrelated.  So, Dr. McCann is

8    relying on Mr. Rafalski's methods.  Mr. Rafalski is relying

9    on Dr. McCann's calculations.  For us to get that testimony

10   in, both -- we have to have both of the testimonies.  And

11   so, which order it comes in, you're always going to have a

12   situation where one expert is going to be conditionally

13   relying on the other.

14        Finally, Your Honor, defendants' proposal is -- we

15   think it gives the defendants a tactical advantage.

16   McKesson and ABDC are parties in the Georgia case and

17   they'll have the opportunity to depose Mr. Rafalski before

18   he testifies in giving them a second shot at deposing him.

19        And the -- and for the same reasons we think it's best

20   to present Mr. Rafalski first, the defendants would like to

21   present Mr. McCann first.  We would submit they don't get to

22   make that choice.  We've been very accommodating with them

23   letting them do direct so their witness is in the middle of

24   our case and we think we ought to have the discretion of how

25   we call our experts.

1              THE COURT:  He's right, isn't he, Mr. Schmidt?

2              MR. SCHMIDT:  I think he's right, Your Honor, as

3     to the general rule.  The reason we raise this in this

4     unique circumstance is because I think this circumstance is

5     distinct.  The general rule is, of course, that he gets to

6     choose the sequencing.

7         Here, we're talking about something very specific,

8     though.  We're talking about an expert who completely relies

9     on the work of another expert where there's substantial risk

10    of confusion in the record and just an unwieldy cross

11    examination if we have to examine Mr. Rafalski on a

12    methodology that Dr. McCann has employed without the Court

13    having heard from Dr. McCann where we may be examining Mr.

14    Rafalski on deposition transcripts from Dr. McCann.

15        We're absolutely entitled to do that.  That's what

16    they're forcing.

17        And I would point the Court to Rule 611.  Rule 611

18    regarding the mode and order of examining witnesses and

19    presenting evidence leaves that to the control of the Court

20    with the factors being avoiding waste of time, protecting

21    witnesses from harassment or undue embarrassment, and make

22    these procedures effective for determining the truth.

23        In those circumstances we think it makes sense for Dr.

24    McCann to come first so we don't have, first, an indirect

25    examination through Dr. Rafalski, and then the same

1      examination through Dr. McCann himself where there's a

2      potential for unwieldiness or confusion, but also

3      contradiction.

4           As to the stipulation that we agreed to, we view that

5      exactly the opposite way.  We agreed with the plaintiffs

6      that they could do something unusual with Dr. McCann, which

7      is call him twice to try to facilitate this with the

8      understanding that he would still be laying the predicate

9      for Mr. Rafalski before Mr. Rafalski testified.

10          Now we're getting this very unusual out-of-sequence

11     that we would never have agreed to where they can present

12     Dr. McCann on the things they want, protect them on the

13     things they don't want, and you'll recall, they actually

14     objected when I started asking him about these methodologies

15     and I made clear I wasn't going to get into them because I

16     thought he was coming back before Dr. Rafalski would

17     testify.  They're presenting him in a way they they never

18     could.

19          The guiding principle should be what's useful to the

20     Court and what's useful to the record.  That's what Rule 611

21     says and, in these circumstances, we do think that calls for

22     departure from the norm where we've already had that

23     departure from the norm through the manner in which Dr.

24     McCann has otherwise been presented.

25          The only other thing I will say as to the scheduling

1   conflict that they cite, it's very clear that, number one,

2   that's of their own making.  Dr. -- Mr. Rafalski was

3   supposed to be deposed weeks ago.  They told us a couple

4   days before they didn't want us having a deposition of him

5   before he testified, so they cancelled that in another case.

6   That's not a legitimate ground for delaying here.

7        And, number two, the tactics there is naked in what

8   they're saying.  They want to avoid a second deposition

9   before he testifies.  That's a function of another case.  We

10  couldn't present to the Court their decision to cancel his

11  deposition in another case when they did that.  We're

12  litigating that before the other court.

13       In the same way, they can't use that as a justification

14  for this unusual procedure where they split up Dr. McCann's

15  testimony and then have him actually come after the witness

16  who is relying on him.  Thank you, Your Honor.

17            THE COURT:  I've given this a good bit of thought

18  last night and I think the plaintiffs do have a right to

19  control their case.  It's obvious under the rules that they

20  do, except under obvious circumstances, and I think the fair

21  thing to do is reverse my ruling and allow the plaintiffs to

22  proceed in the order they wish to proceed.

23            MR. SCHMIDT:  We would simply ask then, Your

24  Honor, for some leeway on cross examination to be able to

25  explore what I think will end up being duplicative with

14

```
 1    apologies, but necessitated by the sequencing that the
 2    plaintiffs have chosen.
 3              THE COURT:  Well, we'll cross that bridge when we
 4    get to it, Mr. Schmidt, but I will keep that in mind.
 5              MR. SCHMIDT:  Thank you, Your Honor.
 6              MR. MAJESTRO:  Thank you, Your Honor.  I'm off to
 7    prepare a witness.  Excuse me.
 8              THE COURT:  Mr. Mone.
 9              MR. FULLER:  Your Honor, while he's coming up,
10    Mike Fuller on behalf plaintiff.  I would like to put on --
11    excuses me, Judge -- put on the record an agreement that we
12    worked out with the defendants as far as admission of some
13    documents.
14              THE COURT:  Okay.
15              MR. FULLER:  And what we'll do is, they're going
16    to review the entirety of the documents and then we'll
17    provide the hard copies to the Court this afternoon, but by
18    agreement, P-14290 --
19              COURT REPORTER:  I'm sorry.  14 --
20              MR. FULLER:  -- 290, 42071, 42100, 42102, 42103,
21    42107, 42113, 42114, 42115, 42116, 42117, 42118, 42123,
22    14288, 42432, and 14296 will be admitted by agreement after
23    they've had a chance to review them, Judge, and we'll do
24    that and get them on the record this afternoon.
25              THE COURT:  Ms. Mainigi?
```

```
 1              MS. MAINIGI:  That's fine, Your Honor, after a
 2    conditional -- conditionally fine with that and we will
 3    review the thumb drive when we receive it, confirm, and
 4    we'll let the Court know by the afternoon.
 5              THE COURT:  Okay.  Well, I'm drowning in paper up
 6    here and I know it's going to get a lot worse before it's
 7    over.
 8              MR. FULLER:  Well, Judge, most of those we'll put
 9    on a thumb drive to make it easier.
10              THE COURT:  Okay.  Well, I'm technologically
11    illiterate, Mr. Fuller.  I don't know if I'll be able to
12    handle that or not.
13         Mr. Mone, you can resume the witness stand, sir, and
14    you're still under oath, the oath you took yesterday to tell
15    the truth.
16              THE WITNESS:  Yes, Your Honor.
17              THE COURT:  All right.  Mr. Fuller, you may
18    proceed.
19              MR. FULLER:  May it please the Court.  I'm Mike
20    Fuller on behalf of the plaintiffs.
21                    CONTINUED DIRECT EXAMINATION
22              BY MR. FULLER:
23    Q.   Mr. Mone, yesterday, we were talking a little bit about
24    your time and employment at Cardinal.  Can you see this
25    white board over here?  Can you see that okay, Mr. Mone?
```

```
 1    A.    Now it's white, yeah.

 2    Q.    What we established is that you were at Cardinal over

 3    the Anti-Diversion Department between the end of 2007

 4    through 2012, right?

 5    A.    Through September of 2012, yes.

 6    Q.    All right.  And around those same times, there are two

 7    DEA actions against Cardinal, right?

 8    A.    Prior to my arrival, there were two DEA actions.

 9    Q.    Well, and just prior to your arrival in December, there

10    were two administrative inspection warrants and ISOs,

11    correct?

12    A.    I do not know about the administrative inspection

13    warrants.  I'm aware that there were two, prior to my

14    arrival, ISOs.

15    Q.    Very good.  And, in 2012, right before you left, was

16    another Immediate Suspension Order for the Lakeland

17    Distribution Center, right?

18    A.    That is correct.

19    Q.    And prior to your arrival, it was a Mr. Reardon that

20    was over Anti-Diversion, correct?

21    A.    Yes.

22    Q.    And are you aware who was there after your departure in

23    September of 2012?  And when I say your departure, let's

24    make it clear.  Your departure from that department, okay?

25    A.    Mr. Todd Cameron.
```

```
 1    Q.   And so, you're in this middle section, right?

 2    A.   I am.

 3    Q.   And for ease, I'll refer to this as Chapter 1, which is

 4    prior to your arrival in that department, okay?

 5    A.   All right.

 6    Q.   Chapter 2, which is your time frame, right?

 7    A.   Right.

 8    Q.   And then Chapter 3 will be after your departure and Mr.

 9    Todd Cameron's arrival, correct?

10    A.   Fair enough.

11    Q.   Okay.  Now, I believe you testified yesterday --

12              MR. FULLER:  Can I get 8861 and don't put it on

13    the screen yet.

14         May I approach the witness, Your Honor?

15              THE COURT:  Yes.

16              BY MR. FULLER:

17    Q.   I believe you testified yesterday related to -- what we

18    refer to as the Rannazzisi letters; do you recall that?

19    A.   That's the December of 2007 Joe letter, yes.

20    Q.   And you're aware that there was an earlier letter in

21    2006, correct?

22    A.   I have no personal knowledge of a prior 2006 letter.

23    Q.   Okay.  I've handed you a document which is marked 8861,

24    correct?

25    A.   It is.
```

1    **Q.**   And do you recognize that document?  Well, actually,

2    let me start.  What is it?

3    **A.**   It's an e-mail from Bob Giacalone to other members of

4    both the -- our team, as well as outside legal counsel.

5    **Q.**   And who is -- you say Bob Giacalone.  It actually says

6    Robert Giacalone, right?

7    **A.**   Yes.

8    **Q.**   But you call him Bob; is that fair?

9    **A.**   I do.

10   **Q.**   And who is Mr. Giacalone?

11   **A.**   Mr. Giacalone was the Senior Vice President of Cardinal

12   Health's Legal Regulatory Group.

13   **Q.**   Is he someone that you worked with on a regular basis

14   when you were in that -- that position, what we call Chapter

15   2?

16   **A.**   I did work with Bob, yes.

17   **Q.**   Okay.  And are you a recipient of this e-mail?

18   **A.**   I am.

19   **Q.**   And does it appear that there are attachments to this

20   e-mail?

21   **A.**   It does.

22   **Q.**   And is there any reason to believe that you wouldn't

23   have received these in your regular course of employment

24   there at Cardinal because the e-mail was sent to you?

25   **A.**   I see no reason why I wouldn't have received it.

1    **Q.**   And can you take a look at the attachments?  Does the

2    first attachment appear to be a letter from the DEA to

3    Cardinal Health, Zanesville, Ohio from February 7th of 2007?

4    **A.**   Yes.

5    **Q.**   Does the second letter appear to be to Cardinal Health

6    on December 27th, 2007?

7    **A.**   To the Syracuse Distribution Center, yes.

8    **Q.**   Sir, and is it your understanding that each of the

9    distribution centers received a Rannazzisi letter or do you

10   know?

11   **A.**   I have -- I have no independent knowledge of whether

12   each of the distribution centers received it, but it is more

13   than likely that they did.

14   **Q.**   Fair enough.  The next document attached there is

15   Diversion Investigators Manual, correct?

16   **A.**   It is.  It appears -- it's a letter to Cardinal Health

17   to Bob, the subject of which is the Diversion Investigators

18   Manual.

19   **Q.**   And it has an excerpt from the Diversion Investigators

20   Manual; is that right?

21   **A.**   It does.

22   **Q.**   And if you turn to the next document, it's a memorandum

23   that has DEA letterhead prepared by Linden Barber?

24   **A.**   Correct, from March 1st of 2007.

25   **Q.**   Yes, sir.  And then you have -- the last document is

1    September 27th, 2006, a letter from Joe Rannazzisi, correct?

2    **A.**    And that is in this packet, that is correct.

3    **Q.**    And, Mr. Mone, you would have received this in the

4    regular course of your employment with Cardinal?

5    **A.**    To the best of my knowledge, since I am on this as a

6    cc, I would have received it.

7           MR. FULLER:  Your Honor, I would submit and move

8    Plaintiffs' Exhibit 8861 into evidence.

9           MS. MAINIGI:  Your Honor, objection for several

10   reasons to this compilation.  First, this was not identified

11   to us in the proper course.  It was identified after our

12   7:00 p.m. deadline.

13       But leaving that aside, it includes several documents

14   that are hearsay and there's several Joe Rannazzisi letters

15   in here.  I think Mr. Mone several times has been approached

16   by Mr. Fuller yesterday and today now about earlier versions

17   of a Rannazzisi letter.  Mr. Mone testified he did not begin

18   in his role until December, 2007 and that he did not see

19   earlier versions of the letter.

20       I believe Your Honor admitted the Rannazzisi letters in

21   the ABDC witness case for the limited purpose that it bears

22   upon notice, but subject to the existing hearsay objections.

23   Mr. Mone was not actually in his role at Cardinal either for

24   receipt of the December, 2006 letter, nor for receipt of the

25   February, 2007 letter.

```
 1          So, the documents right now, a foundation has not been

 2     laid for them and they are not documents that ought to be

 3     coming in through Mr. Mone.  Mr. Fuller can use another

 4     witness to do that.

 5          MR. ACKERMAN:  Your Honor, with respect to each of

 6     those in turn, I'll start with the foundation first.

 7          MS. MAINIGI:  Your Honor, I'm sorry to interrupt,

 8     but I do not think it is proper for Mr. Ackerman -- we have

 9     someone who is taking testimony in the form of Mr. Fuller.

10     It is not proper for Mr. Ackerman to handle all of these

11     objections.

12          THE COURT:  Well --

13          MR. ACKERMAN:  Your Honor, we're --

14          THE COURT:  I agree with that.  I let this go on

15     because there wasn't any objection to it, but the rule is

16     one lawyer per witness per party and if there's an objection

17     to me allowing otherwise, then I'm going to sustain the

18     objection.

19          Mr. Fuller, you can talk to Mr. Ackerman if, you want

20     to.

21          MR. ACKERMAN:  Your Honor, we've done it this way

22     to try to expedite the trial so that we don't have to have

23     conversations for each objection.  If we have to do it that

24     way, we will --

25          MS. MAINIGI:  Your Honor --
```

```
1              MR. ACKERMAN:  But it is certainly within your
2     discretion.
3              MS. MAINIGI:  Your Honor, Mr. Fuller has been
4     preparing for this testimony for days and days and days.
5     None of this is a surprise in terms of the issues that are
6     going to arise.
7              THE COURT:  Okay.  From now on, unless there's
8     some exceptional reason not to do that, it's one lawyer per
9     witness per party and that's the rule and if any party in
10    the case insists upon me applying it that way, that's what
11    I'm going to do unless there's a specific reason in the
12    context of not doing it that way.
13             MR. ACKERMAN:  Your Honor, isn't that what we're
14    doing?  We have two plaintiffs.  We have two separate
15    parties.
16             MS. MAINIGI:  There is one -- yes, there are two
17    plaintiffs, but there is one attorney taking testimony right
18    now.  That is the attorney who is trying to get in documents
19    to which I've objected.  That's the attorney who should
20    respond.
21             MR. ACKERMAN:  Well, give me a minute to confer
22    with Mr. Fuller, Your Honor.
23        (Pause)
24             MR. FULLER:  So, Your Honor, just as they were
25    admitted with ABDC, this shows notice and knowledge.  Mr.
```

```
1    Mone testified that he didn't have any recollection or
2    didn't remember.  This clearly -- this document shows he got
3    these documents.  He was on the e-mail.  He received them.
4    I'm fine not questioning him about them.
5              THE COURT:  Okay.  Can I receive them for the
6    limited purpose of showing notice and knowledge of the
7    corporation, Ms. Mainigi, and not admit them for the truth
8    of the matter asserted?
9              MS. MAINIGI:  Your Honor, not as it relates to the
10   December, 2006 and the February, 2007 letter.  The idea that
11   Mr. Mone got them in 2012 is no notice at all for receipt in
12   2006 and February of 2007, which is what I believe Mr.
13   Fuller hopes to establish.
14      He can do it through another witness.  He has other
15   witnesses that -- that he can establish that through, but
16   Mr. Mone has made clear that he didn't arrive in this role
17   until December, 2007.
18              MR. FULLER:  Judge --
19              THE COURT:  How much of this do you object to, the
20   whole packet?
21              MS. MAINIGI:  We're fine with the December, 2007
22   letter, Your Honor.  We're fine with the same -- we're fine
23   for admission for notice purposes with the December, 2007
24   letter.
25              THE COURT:  And the rest of it you object to; is
```

```
1    that right?

2              MS. MAINIGI:  Correct, Your Honor.

3              THE COURT:  I'm going to admit the December, 2007

4    letter, Mr. Fuller, and sustain the objection with regard to

5    the rest of it.

6                   PLAINTIFF EXHIBIT 8861 ADMITTED

7              THE COURT:  Mr. Hester?

8              MR. HESTER:  Your Honor, may I just have

9    clarification it's not being admitted for the truth of the

10   matter asserted; it's being admitted for the fact that the

11   statement was made?

12             THE COURT:  That's right.  It's admitted for the

13   limited purpose stated.

14             MR. FULLER:  Judge, these documents are also on a

15   stipulation with the defendants and so I think they should

16   be admitted.  Maybe I can't use them with Mr. Mone.

17             THE COURT:  If I understand the stipulation, that

18   gets around the authentication rule, but it doesn't get

19   around any other objections; is that correct?

20             MS. MAINIGI:  That's correct, Your Honor.

21             THE COURT:  And so, you've authenticated them

22   through the stipulation, but that doesn't get you around the

23   hearsay problem and any other evidentiary problem.

24             MR. FULLER:  Sure, Judge.

25             MS. MAINIGI:  And just for the record, I think as
```

```
1    it relates to these particular letters, we did stipulate as

2    to authenticity, but -- but the foundation has -- we made

3    clear that the foundation needs to be laid.

4              THE COURT:  All right.  Well, I made my ruling on

5    this.

6         Go ahead, Mr. Fuller.

7         And this doesn't mean they're out absolutely forever.

8    If you have another witness that can do it right --

9              MR. FULLER:  Well, Judge --

10             THE COURT:  You can feel free to go forward with

11   that.

12             MR. FULLER:  Sure.  Here's the problem, Judge.

13   These -- and I'll go back to the board of setting out the

14   time frames.

15             MR. FARRELL:  Excuse me, Judge.  Can I confer with

16   Mr. Fuller?

17             THE COURT:  Yes.

18        (Pause)

19             MR. FULLER:  Hey, Judge, can we take a brief

20   recess?

21             MS. MAINIGI:  Your Honor -- that's fine.

22             THE COURT:  Well, yes.  I think Mr. Fuller has

23   been surprised by all of this and we'll be in recess.

24        Can you do it in five minutes, Mr. Fuller?

25             MR. FULLER:  Sure, Judge.
```

```
 1              THE COURT:  Okay.  Ms. Mainigi wanted to say
 2     something and I'm going to let you say it.  Go ahead.
 3              MS. MAINIGI:  Sorry, Your Honor.  These -- I don't
 4     -- with all due respect, I do not think Mr. Fuller was
 5     surprised.  He has known this is coming.  He sent these at
 6     10:00 last night.  This has been an ongoing back and forth.
 7     There's no surprise here.
 8              THE COURT:  Okay.  Well, I'll indulge him this
 9     time.
10              MR. FULLER:  Thank you, Your Honor.
11              THE COURT:  Five minutes.
12         (Recess taken)
13              MS. MAINIGI:  Your Honor, the one thing that I
14     would say --
15              LAW CLERK:  Please be seated and come to order.
16              MS. MAINIGI:  I'm sorry.  The one thing I would
17     add is to the extent they want to use the letters as notice
18     in 2012 to Mr. Mone, I'm fine with that, and I apologize if
19     I was not clear on that.
20         My understanding is the whole purpose of trying to get
21     them in right now is to establish notice to the company or
22     to Mr. Mone in 2006 and I just don't think they can overcome
23     what they need to overcome with this particular witness for
24     2006.  But to the extent they would like to establish notice
25     as of 2012, we're fine with that.
```

```
1              THE COURT:  Mr. Farrell?

2              MR. FARRELL:  Judge, may I make a proffer for the

3    Court in the absence of the witness?

4              THE COURT:  Yes.

5              MR. FARRELL:  During discovery we served a

6    subpoena for the Apex deposition of each of the defendants.

7    It was --

8              THE COURT:  What's an Apex deposition?

9              MR. FARRELL:  Their boss.  The three people that

10   testified at Congress in the ENC Report, we served subpoenas

11   on or, through the discovery process, if they were still

12   employed, we asked for their deposition.  The Apex Doctrine

13   means there's certain elements you have to fulfill before

14   you take a CEO.

15        It was appealed to a special master.  Special master

16   ruled in our favor and, if I recall, it was appealed to you

17   and the appeal, we prevailed.

18        We also served a 30(b)(6) notice on each of the three

19   defendants for this trial and that 30(b)(6) notice, the

20   contents included laying the foundation for documents.  Sir,

21   I know because I wrote it.

22        We then engaged in discussions, me personally, Paul

23   Farrell, as an officer of the court, and I spoke with each

24   of my learned counsel and we reached an accommodation and a

25   stipulation that is set forth in Document 835 with Cardinal
```

1    Health.  The document is virtually identical with each of

2    the three defendants.

3        ECF 835 with Cardinal Health starts with Paragraph

4    number 1 where, on behalf of the City of Huntington and

5    Cabell County, we agreed not to call George Barrett, the

6    CEO, or Linden Barber, their counsel, to testify at trial.

7    Cardinal Health reserved the right to do so in their case in

8    chief, but we forfeited that right with the stipulation.

9        Paragraph 2, we even went to the state court litigants

10   and got the state court litigants to agree to stand down on

11   the CEO deposition of George Barrett.

12       Number three, and I'd like to read this into the

13   record.  "The CT2 plaintiffs will not take any further fact

14   depositions of Cardinal Health witnesses in connection with

15   CT2.  The CT2 plaintiffs will withdraw their Rule 30(b)(6)

16   notice to Cardinal Health and inform the Court the motion to

17   enforce that notice is moot as to Cardinal Health.

18       So, let me be as crystal clear and blunt as I can.  We

19   stood down on discovery on August 6th, 2020 in exchange for

20   this stipulation.  This stipulation goes on to say that --

21   this stipulation goes on to say that they will not object on

22   authentication grounds, but that's not where they rested.

23       They also said they will not object to sponsoring

24   witness.  And, to be clear, in the -- in Page 3 of ECF 835,

25   it says that if there is -- let me read it.  "The plaintiffs

1    have expressed a desire to, as much as possible, negate the

2    need for plaintiffs to bring multiple Cardinal Health

3    witnesses to trial for the sole purpose of authenticating

4    and establishing the proper foundation for use of the

5    identified documents at trial."  That's number one.

6        "The parties will work in good faith to address

7    specific issues relating to authenticity and foundation

8    between now and trial."  That's the only thing that's said

9    about before trial.  We didn't agree to work this out.  We

10   said we'd negotiate in good faith.

11       And then this is the sentence that I'd like to bring

12   emphasis to.  "Plaintiffs will be provided an opportunity to

13   cure all unresolved issues relating to authenticity and

14   foundation, including the ability to depose and/or call a

15   custodial witness at trial."

16       Judge, the document that they just objected to is set

17   forth specifically in Appendix A as an identified document

18   for us to present at trial and if they're going to be -- if

19   they're going to insist on the breach of this, then we'll

20   declare it breached and we will begin calling custodial

21   witnesses, and we will issue a trial subpoena for their CEO.

22       So, this is -- I understand the point about not asking

23   a witness about a document.  We're not asking for that.

24   We're trying to admit the core elements of our case with

25   documents that inculpate the defendants, in our humble

1    opinion, and they're -- the defendants reached an agreement

2    with us of the entry of these documents in the record and

3    now they're objecting.

4            THE COURT:  Okay.  Let me hear from Ms. Mainigi.

5            MS. MAINIGI:  Your Honor, I don't think we should

6    distract from getting this witness back on the stand, but we

7    did agree to authenticity, but as I got up and said just

8    now, Your Honor, the notice -- and we've agreed to notice,

9    but the notice is as of 2012.  The e-mail as of 2012.  So,

10   if there's any notice to be established, it is notice as of

11   2012.

12        Ultimately, they chose which witnesses they wanted to

13   bring.  They twice cancelled Mr. Mone's deposition in the

14   MDL.  They had an opportunity to depose him.  We had him

15   ready to go.  They decided for strategic reasons to cancel

16   his deposition.

17        They also, as you see from the chart that Mr. Fuller

18   has put up there, Steve Reardon, they have depo designations

19   on Steve Reardon.  And I think the depo designations -- I

20   can go back and check, but I think they include testimony

21   related to a December, 2006 letter.

22        So, there is no reason to get off track here with Mr.

23   Mone, who has clearly specified when he's there.  If they

24   want to take this up with us later, we're happy to continue

25   having a conversation to see what we can work out, but this

1      is not the witness or the vehicle to -- to ask questions

2      about December, 2006.

3          So, we're happy to continue chatting with them and

4      figuring out if we're disagreeing about the stipulation or

5      whether there's something we can work out vis-a-vis the

6      stipulation, but this is not the witness to ask questions

7      about a December, 2006 letter.

8              THE COURT:  Well, are you going to question this

9      witness about the time period that he wasn't there?

10             MR. FARRELL:  No, Judge.  What we -- what we would

11     expect is for your rulings to be consistent.  If the witness

12     has no personal knowledge, then that's one thing.  This is

13     about the admission of documents, evidence, into the record

14     for purposes of findings of fact and conclusions of law.

15         This isn't -- if the witness has no knowledge, you've

16     made it clear you can't specify to it, but we have the -- we

17     have agreed to live witnesses and we need to use those live

18     witnesses as a vehicle to enter documents into the record.

19     That's it.

20             MS. MAINIGI:  Your Honor, he still has to get over

21     the other objections.  He has to get over hearsay.  And so,

22     to get over hearsay, all he has is notice as of 2012.  This

23     document, which is the one they're relying on, is a 2012

24     document with attachments.

25         So, if they want to use this 2012 document and get it

1    admitted for a limited purpose as an exception to the

2    hearsay rule, it is notice as of 2012.  That is why I

3    amended my statements earlier.  So, this notice as of 2012,

4    but that is the proper application of the stipulation.

5              THE COURT:  The cover memo says -- or e-mail says,

6    "Per your request, please see the attached DEA guidelines.

7    In going through my files, I've included an excerpt", and

8    then he goes on to talk about the documents.

9         I'm going to let it in.  Objection is overruled.  It's

10   in.

11             MR. HESTER:  But, Your Honor, may I have

12   clarification?  I believe the prior ruling was that you had

13   admitted it for the purpose of the fact the statement was

14   made, not for the truth, and there was no -- there was no

15   waiver of the hearsay objection in these stipulations.  So,

16   I just wanted to be clear on the basis for the Court's

17   admission.

18             THE COURT:  I'm, at this point, admitting it for

19   the limited purpose of showing notice and knowledge of the

20   corporation for the whole time period covered by the

21   documents, but I'm not admitting it for the truth of the

22   matter asserted insofar as there's hearsay that the

23   plaintiffs have not gotten around by showing that there's an

24   exception.

25             MS. MAINIGI:  Thank you, Your Honor.

```
 1        And just so I don't interrupt later, I assume Mr.

 2   Fuller still has to establish foundation if he wants to

 3   question on it.

 4              THE COURT:  All right.  Go ahead, Mr. -- can we

 5   get Mr. Mone back here?

 6              MR. FULLER:  I'll ask the questions, but I don't

 7   know that I'll get answers until he's back, Judge.

 8              THE COURT:  Please resume the witness stand, Mr.

 9   Mone.

10        Go ahead, Mr. Fuller.

11              MR. FULLER:  Thank you, Your Honor.

12              BY MR. FULLER:

13   Q.   Mr. Mone.

14   A.   Yes, sir.

15              MR. FULLER:  1983.

16              BY MR. FULLER:

17   Q.   I think when we were talking yesterday, you recollect

18   that there were distributor initiatives, distributor

19   briefings.

20              MR. FULLER:  May I approach the witness, Your

21   Honor?

22              THE COURT:  Yes.

23              BY MR. FULLER:

24   Q.   Mr. Mone, I've provided you with a document -- well,

25   let me ask you before you look at it -- provided you -- the
```

```
 1    distributor initiative, were you ever provided a copy of
 2    what Cardinal got in these distributor briefings?
 3    A.   To the best of my recollection, I was not.
 4    Q.   So, you were brought in and asked to revamp the SOM
 5    system, but you weren't provided the briefing information
 6    that the DEA left Cardinal back in 2005 or 2006?
 7    A.   When I was brought in, I was asked to continue --
 8            THE COURT:  Just a minute, Mr. Fuller.
 9            MR. FULLER:  Yes, Your Honor.
10        (Pause)
11            THE COURT:  All right, Mr. Fuller.
12            BY MR. FULLER:
13    Q.   All right.  Go ahead, Mr. Mone.
14    A.   When I was brought in, I was asked to continue the
15    enhancements and -- of the existing system that was in
16    place.
17    Q.   And I'm assuming then that you didn't review any of the
18    guidance provided by the DEA to Cardinal; is that right,
19    related to the distributor briefings?
20    A.   What I testified to is I don't recall seeing any of the
21    documents that were part of the prior -- before my time, the
22    2005-2006 distributor initiative.
23    Q.   And you have a document in front of you.  Do you
24    recognize it?
25    A.   I do not.
```

1    **Q.**   Does it -- the first page is an e-mail; is that

2    correct?

3    **A.**   It is.

4    **Q.**   And who is on the e-mail?

5    **A.**   It is from Robert Giacalone on 6/1 of 2007 to Steve

6    Reardon.

7    **Q.**   And Mr. Reardon, as we discussed, prior to your

8    arrival, was in charge of Anti-Diversion?

9    **A.**   He was.

10   **Q.**   And Robert Giacalone, what was his position?

11   **A.**   He was the Senior Vice President of Regulatory.

12   **Q.**   And, if you will, flip through the document.  Do you

13   recognize what the document is?

14   **A.**   I do not recognize the PowerPoint slides.

15          THE COURT:  You've already asked him that and he's

16   answered it.  He said he didn't recognize it and you asked

17   him again and he said he didn't recognize it again, Mr.

18   Fuller.

19          MR. FULLER:  Yes, Your Honor.  Now I'm going to

20   move in Plaintiffs' Exhibit 1983.  It has been stipulated,

21   like the last document, between the parties.  I'm not going

22   to question the witness about it, but I just want it in for

23   purposes of the record.

24          MR. HESTER:  Your Honor, we would object on

25   hearsay grounds to the document that's appended to the

```
 1   e-mail.  It's full of hearsay and I think the Court has
 2   previously admitted a prior -- another version of this same
 3   packet only for the fact that the statement was made not for
 4   the truth of the matter asserted.
 5               THE COURT:  Ms. Mainigi?
 6               MS. MAINIGI:  Your Honor, I would also object on
 7   -- on hearsay grounds.  We're certainly okay with notice if
 8   they would like to admit it for the purpose of notice and I
 9   will note, once again, for the record, that Mr. Reardon has
10   designations.  Mr. Reardon, who came before Mr. Mone, has
11   depo designations that may cover what they would like.
12               THE COURT:  Mr. Hester, may I admit it for the
13   limited purposes?
14               MR. HESTER:  Yes, Your Honor.  We have no
15   objection as long as it's admitted for that limited purpose.
16               THE COURT:  Mr. Nicholas?
17               MR. NICHOLAS:  No objection.
18               THE COURT:  All right.  It's admitted for the
19   limited purpose of showing knowledge of the defendant
20   Cardinal; is that right?  Did that get it?
21               MS. MAINIGI:  Yes, Your Honor.
22               MR. FULLER:  Thank you, Your Honor.
23                   PLAINTIFF EXHIBIT 1983 ADMITTED
24               MR. FULLER:
25   Q.   Next, Mr. Mone, we talked about the MOUs and MOAs.  You
```

```
 1    have a recollection of those, correct?
 2    A.   I do.
 3              MR. FULLER:  8873.
 4              BY MR. FULLER:
 5    Q.   Mr. Mone, do you recognize this document?
 6    A.   I do not.
 7    Q.   Do you recognize individuals on the document?
 8    A.   I'm sorry?
 9    Q.   Do you recognize the individuals on the document?
10    A.   I do.
11    Q.   Is that Mr. Giacalone again?
12    A.   It is from Mr. Robert Giacalone on January 25th of
13    2016.
14    Q.   And there are some attachments to this document; is
15    that correct?
16    A.   It's a rather large packet, so yes, there are
17    attachments.
18    Q.   And if you look, there are some of the Rannazzisi
19    letters.  If you will turn to Page 15, and if you look at
20    the bottom, there's page numbers down there?
21    A.   Yeah.
22    Q.   See if you recognize that document.
23    A.   The -- the Page 15 is a cover page for a 2012 DEA MOA.
24    Q.   And are you familiar with that document?
25              MS. MAINIGI:  Objection, Your Honor.  Yesterday
```

```
 1    there were some questions that I did not object to at all

 2    related to the 2008 action and the 2012 action, but it seems

 3    that Mr. Fuller is looking for admission of these documents,

 4    as well as to gain testimony related to those two actions,

 5    and we've got a number of objections.

 6         We've got a hearsay objection, but we have also a

 7    personal knowledge objection with respect to Mr. Mone, and

 8    then we've got a geographic scope objection.  Both of these

 9    actions have nothing to do with West Virginia.

10         The 2008 action relates to four distribution centers

11    outside of West Virginia.  The 2012 action relates to one

12    Distribution Center in Florida, as well as four pharmacies

13    in Florida.  So, there is absolutely no demonstrable nexus

14    to Cabell-Huntington and no other aspects of the tests that

15    you have laid out for geographic scope is met either, Your

16    Honor.

17         And just for the purpose of the record, we also reserve

18    our objections on motion in limine to the Court.

19              THE COURT:  Mr. Fuller?

20              MR. FULLER:  Yes, Your Honor, if I might, let me

21    lay a little more of a predicate, if it's okay with the

22    Court.

23              THE COURT:  All right.  Go ahead.

24              BY MR. FULLER:

25    Q.   Mr. Mone --
```

```
 1              THE COURT:  I'll reserve ruling on the objection.

 2    Go ahead.

 3              MR. FULLER:  Thank you, Judge.

 4              BY MR. FULLER:

 5    Q.   Mr. Mone, the system that you put in place, was it

 6    limited to any geographical area within the United States?

 7    A.   The system that was put in place was a system that was

 8    designed to identify and report suspicious orders for any

 9    customer of Cardinal Health.

10    Q.   Any customer in the country, right?

11    A.   That is correct.

12    Q.   Shipping out of any Distribution Center, correct?

13    A.   That is correct.

14    Q.   So, it was a centralized system run out of Dublin,

15    Ohio, correct?

16    A.   It was a centralized system that involved the

17    individual orders for individual pharmacies by individual

18    distribution centers.

19    Q.   Operated out of Dublin, Ohio, correct?

20    A.   The operation of the assessment was done in Dublin,

21    Ohio.

22    Q.   You had an electronic system that was maintained in

23    Dublin, correct?

24    A.   I'm going to assume that the computers were in Dublin.

25    I don't know where the computers were, but the technology --
```

1      the team was in Dublin.

2      **Q.**    The team?

3      **A.**    The immediate team.  It expanded into the distribution

4      centers, as well, but with the office.

5      **Q.**    And then, when you arrived in December of 2012, the

6      system that you were revamping was also a nationally based

7      system based on what's called Ingredient Limit Reports,

8      correct?

9      **A.**    Well, I have to correct you when I arrived.  I arrived

10     in 2007, not 2012.

11     **Q.**    I'm sorry.  In December of 2007.

12     **A.**    It was a system that was -- the system that was in

13     place when I arrived was a -- a migration from the ILR

14     system into -- we had already begun the process of

15     integrating into a new electronic system.

16     **Q.**    And the ILR system was a nationally based system,

17     correct?

18     **A.**    The ILR system -- the ILR system occurred at the

19     distribution centers.

20     **Q.**    But it was the same system across the country, right?

21     Each Distribution Center ran an ILR and submitted those on a

22     monthly basis; is that correct?

23     **A.**    My understanding is that each individual Distribution

24     Center ran their own reports and submitted those to the Drug

25     Enforcement Administration.  I do not know whether anything

```
 1    occurred centrally.

 2    Q.   And Mr. Reardon ran that program; is that right?

 3    A.   Mr. Reardon was in charge of that program.

 4    Q.   Mr. Reardon and his team was based in Dublin, Ohio,

 5    correct?

 6    A.   Mr. Reardon's office was in Dublin, Ohio.

 7              MR. FULLER:  Your Honor, I think I've now laid the

 8    predicate that these are national systems.

 9              THE COURT:  Ms. Mainigi?

10              MS. MAINIGI:  I disagree, Your Honor.  I think we

11    just heard testimony -- as it relates to the 2008, I think

12    we just heard testimony from Mr. Mone that they were run out

13    of the distribution centers.  The 2008 action related to

14    Auburn, Washington; Lakeland, Florida; Swedesboro, New

15    Jersey; and Stafford, Texas.  There was nothing that related

16    to Cabell-Huntington.  There is a Distribution Center in

17    Wheeling, West Virginia that was not part of the 2008

18    action.

19         If I go back, Your Honor, to -- to the test you laid

20    out that the plaintiffs have to meet in order to get in

21    evidence beyond Cabell-Huntington, they first need to show a

22    demonstrable nexus to Cabell-Huntington.  These two MOUs

23    have no demonstrable nexus to Cabell-Huntington.  I don't

24    think they would dispute that.

25         Second, they could show national trends in shipment.
```

1    MOUs would not show any national trends in shipment.  Third,

2    systemic failure.  If they are trying to say that these

3    isolated MOUs that occurred in first four, and then one

4    Distribution Center well far away from Cabell-Huntington,

5    when there are 27 distribution centers that Cardinal has all

6    over the country, that somehow that's evidence of some

7    failure in Cabell-Huntington, that's absolutely wrong.

8         There's no way that distribution centers that don't

9    service Cabell and Huntington in any way, shape or form that

10   were implicated in those MOUs could somehow demonstrate some

11   systemic failure that affected Cabell-Huntington.

12        If they want to show that the system was faulty, then

13   we ought to see some evidence of that in Cabell-Huntington

14   and we welcome them putting on some evidence of that in

15   Cabell-Huntington, but bringing in settlement agreements

16   that have nothing to do with Cabell-Huntington is just a

17   complete waste of time and contrary to what Your Honor has

18   ruled.

19             THE COURT:  It looks to me like, I mean, the -- it

20   is arguably relevant to whether or not there is a systemic

21   failure.  I think it is a -- this goes to the weight rather

22   than the admissibility on that issue and -- and I am going

23   to let it in as it relates to the issue of the systemic

24   failure.

25        The system was designed to cover all of the operations

1    here and it broke down in a couple of instances that were

2    far removed apparently from Cabell-Huntington, but it does

3    relate to the overarching issue of the systemic failure to a

4    certain extent and I'll consider it insofar as it's relevant

5    to that.

6         Mr. Hester?

7              MR. HESTER:  Your Honor, again, we have a hearsay

8    objection to this.  We understand that the statement was

9    made, and -- but we would object to its introduction for the

10   truth of the matter asserted.

11             MS. KEARSE:  And, Your Honor, I think -- I know

12   I've been sitting quietly, but I think we have an objection

13   --

14             COURT REPORTER:  I'm sorry.  I'm having a hard

15   time hearing you.

16             MS. KEARSE:  I'm sorry.  I'm used to having my

17   mask on.

18        Anne Kearse, Your Honor.  I've been sitting here

19   quietly, but I would like to invoke the same rule.  We have

20   one witness, one person who is objecting, and one person who

21   is defending this witness.  This is a Cardinal discussion

22   right now.  We have McKesson raising objections, as well.

23        So, I would like to object and say we have the same

24   rule we have now, one lawyer, one witness defending --

25             THE COURT:  Well, I think one lawyer for each

```
 1    party with regard to each witness.

 2              MR. KEARSE:  Yeah.  It's not being offered against

 3    McKesson, Your Honor.

 4              MR. HESTER:  Well, Your Honor, Your Honor, I would

 5    say once the document comes in for the truth, it's a

 6    document that would be relevant evidence against McKesson.

 7    So, it seems to me we're entitled to object.

 8              THE COURT:  Mr. Nicholas, you want to say

 9    something?

10              MR. NICHOLAS:  Not really.

11              THE COURT:  Well, you're supposed to stand up when

12    you address the Court, too.

13              MR. NICHOLAS:  I apologize, Your Honor.

14              THE COURT:  Okay.

15              MS. MAINIGI:  Your Honor, just for the purpose of

16    the record, I also maintain our hearsay objection.  Thank

17    you.

18              THE COURT:  All right.  I'm not going to consider

19    it for the hearsay, but I will admit it, for what it's

20    worth, on the issue of the systemic failure, although --

21    well, if we cut out all the hearsay of this, there's not

22    much left, is there, Mr. Fuller?

23              MR. FULLER:  Well, Judge, I've been told to cite

24    the rules on my piece of paper.

25              THE COURT:  Okay.
```

1          MR. FULLER:  So, under 801(d)(2)(A), a statement

2    made by the party and in the individual purpose of their

3    capacity, Cardinal signed the MOAs.  So, they are admissions

4    by Cardinal.

5          And 801(d)(2)(B), statements of one of the parties

6    manifested, or adopted, or believed to be true, they signed

7    off on these MOAs, Your Honor.

8          MS. MAINIGI:  Your Honor, we disagree with that.

9    We don't think that there are admissions and we think it's

10   barred by 408.

11         THE COURT:  All right.  I'm going to -- I'm going

12   to admit it without -- and try to keep -- not consider the

13   hearsay at this point.

14         Go ahead, Mr. Fuller.

15         MR. FULLER:  Yes, Your Honor.

16         BY MR. FULLER:

17   **Q.**   And, Mr. Mone, in 2012, the next action began with an

18   administrative inspection warrant.  Were you aware of that

19   being served at the Cardinal Distribution Center?

20   **A.**   I was.

21   **Q.**   And were you involved in that process?

22   **A.**   I was not.

23         MS. MAINIGI:  Your Honor, I just want a continuing

24   objection to this line of questioning.

25         THE COURT:  All right.  The record will so show.

```
 1            MR. FULLER:  44562.

 2            BY MR. FULLER:

 3   Q.   I've passed you Plaintiffs' Exhibit 44562, Mr. Mone.

 4   Do you recognize that document?

 5   A.   I do not.

 6            MR. FULLER:  Judge, I would, for non-hearsay

 7   purposes of notice and knowledge, I would move in 44562.

 8            MS. MAINIGI:  Your Honor, I object again on

 9   hearsay grounds, as well as geographic scope.  I mean, you

10   can look at the face of the document.  A warrant is

11   allegations.  It proves absolutely nothing and you can see

12   that this went to the Cardinal facility in Lakeland,

13   Florida.

14       And I submit, Your Honor, that if we're going to --

15   again, I did not object yesterday for some basic background

16   information on these MOUs, but if they're going to present

17   evidence of actions outside of Cabell and Huntington and

18   spend significant amounts of their time doing that, I think

19   we also have an unfairness issue because we didn't do

20   discovery in this case related to those actions.

21            THE COURT:  What's the purpose of this?

22            MR. FULLER:  Judge, it again provides notice and

23   knowledge.  It's the basis of the MOU that you've just

24   admitted into the record.

25            THE COURT:  I think we're getting pretty far
```

```
 1    afield here, Mr. Fuller.  I'm going to sustain the objection

 2    to that.

 3               MR. FULLER:  Your Honor, one last one.

 4               THE COURT:  I'm encouraged by your referring to

 5    this as one last one.

 6               BY MR. FULLER:

 7    Q.   Mr. Mone, do you recognize this document?

 8    A.   I do not.

 9    Q.   Were you aware that Cardinal entered into a Settlement

10    Agreement with the DOJ and DEA in 2016 based on the 2012 MOU

11    action?

12               MS. MAINIGI:  Your Honor, this relates to --

13    objection, I'm sorry.  This relates to the same action that

14    we were just talking about, the Lakeland.  This is the

15    Lakeland settlement.

16               THE COURT:  What's the purpose of this, Mr.

17    Fuller?

18               MR. FULLER:  Your Honor, this is the Settlement

19    Agreement that's related to the second MOU.  If you turn to

20    Page 3, Cardinal specifically signed off on and admits to

21    violations of the Controlled Substance Act based on its

22    system that was in place.  I agree that these violations

23    relate to the Lakeland Distribution Center, but it is a

24    nationally operated system, particularly under Mr. Mone.

25               THE COURT:  Well, I think this relates to the
```

```
 1    issue of the systemic failure and I'm going to admit it, Ms.

 2    Mainigi.

 3              MS. MAINIGI:  Your Honor, thank you.  I just want

 4    to respond to Mr. Fuller's allegation that the --

 5              THE COURT:  Okay.

 6              MS. MAINIGI:  Any admissions related to Lakeland.

 7    Thank you, Your Honor.

 8              MR. FULLER:

 9    Q.   Mr. Mone, when you came in in December of 2007, you

10    took on to review the system that was in existence, correct?

11    A.   I did.

12    Q.   And did you review how that system operated?

13    A.   I did not review the specifics of how the system

14    operated.

15    Q.   And then you started building your own system, correct?

16    A.   I did not.  I continued the already established -- the

17    already in-process changes that were being made to the

18    system.

19    Q.   I'm sorry.  You did tell me that before.  You mentioned

20    that there was -- you mentioned that there was a Phase 1 in

21    place, I believe?

22    A.   I -- I don't believe I used the term Phase 1.  There --

23    the -- the system was migrating from the ILR system into the

24    new electronic reporting system and it had already begun

25    when I got there.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1   **Q.**   And you developed some -- you developed some portions

2   of that new system, correct?

3   **A.**   I did.

4   **Q.**   Something known as Know Your Customer?  Was that

5   something that you implemented there at Cardinal?

6   **A.**   The Know Your Customer component of the SOM system was

7   something that was developed and expanded during my time.

8   **Q.**   How about due diligence, is that something that you

9   created there at Cardinal?

10  **A.**   I would not say that we created due diligence.  We had

11  always done due diligence.  The manner by which we expanded

12  the due diligence was done when I came into the role.

13  **Q.**   And that expansion had to do with centralizing the due

14  diligence; is that correct, and electronically storing, I

15  believe?

16  **A.**   I'm going to disagree with you because the electronic

17  storage -- the due diligence piece is a different piece than

18  the electronic component.  When -- there are two different

19  components of the SOM system.

20          MR. FULLER:  May I approach the witness, Your

21  Honor?

22          THE COURT:  Yes.

23          MR. FULLER:  It's going to be 9734.

24          BY MR. FULLER:

25  **Q.**   Mr. Mone, do you recognize this document?

1    **A.**    I do.

2    **Q.**    What is it?

3    **A.**    Well, the first page is an e-mail from me to Bob

4    Giacalone on 6/30 of 2008 with the attachment being a

5    PowerPoint, a series of slides on anti-diversion progress

6    update.

7    **Q.**    And that PowerPoint presentation has a date of

8    February 18th, 2008?

9    **A.**    It does.

10   **Q.**    Were you involved in the creation of that PowerPoint

11   presentation?

12   **A.**    I was.

13   **Q.**    And did you forward it to Mr. Giacalone?

14   **A.**    I did.

15   **Q.**    Now, let me ask you, your first slide on Page 3 of that

16   document, you talk about corporate investigations and key

17   observations and recommendations, right?

18   **A.**    It -- if that is the title of the slide, yes.

19   **Q.**    And you make some comments related to the

20   organizational structure, don't you?

21   **A.**    I do.

22   **Q.**    And these were based on your personal knowledge at the

23   time, right?

24   **A.**    It was.

25   **Q.**    The investigation that you had done into the existing

1    system, correct?

2    **A.**    I guess that's fair to say, the investigation that was

3    done, yeah.

4    **Q.**    And the finding that you made is inconsistent oversight

5    of field QRA, right?

6    **A.**    That is the statement that is made.

7    **Q.**    And for the Court's benefit, field QRA is Quality

8    Regulatory Affairs, correct?

9    **A.**    That is correct.

10   **Q.**    And did you -- Cardinal operated with compliance

11   officers at the different distribution centers it had across

12   the country; is that correct?

13   **A.**    That is correct.

14   **Q.**    Next, you find that inconsistent QRA participation and

15   direction both in selection of personnel and training of

16   personnel.  So, some other of your concerns about the system

17   that was being operated, correct?

18   **A.**    I wouldn't call them concerns.  They were

19   identifications of areas for continuous improvement.

20   **Q.**    Okay.  And then skipping down a little bit, you find

21   that there are communication gaps between QRA, Quality

22   Regulatory Affairs, and the sales force, unclear decision

23   rights, right?

24   **A.**    That is stated on the form.

25   **Q.**    You also noticed over the time there at Cardinal that

1    there was some contention or conflict between Sales and QRA

2    at times, correct?

3    **A.**    I did not notice any conflict between Sales and QRA.

4    **Q.**    Never any issues between Sales and QRA in your mind?

5    **A.**    Not with regard to what we were doing.

6    **Q.**    Then in the resource section, the last bullet point

7    that you have under resources is budgetary constraints and

8    limited resources.  That was another finding that you made,

9    right?

10   **A.**    It was another observation.

11   **Q.**    And when you came to Cardinal and you met with Mr.

12   Reardon, you had three staff members, didn't you?

13   **A.**    I did.

14   **Q.**    And that's excluding Mr. Reardon, correct?

15   **A.**    That is correct.

16   **Q.**    And it was Eric Brantley, Tim Dunham and Nick Rausch;

17   is that right?

18   **A.**    That is correct.

19   **Q.**    Okay.  And you felt that to properly operate the

20   Anti-Diversion System at Cardinal you needed more help than

21   just those three individuals, didn't you?

22   **A.**    I did.

23   **Q.**    If we turn the next page, Page 4 of the document, you

24   talk about key action and people.  Do you see that?

25   **A.**    I do.

1   **Q.**   And you added a Senior VP Supply Chain Integrity of

2   Operations, right?

3   **A.**   That is correct.

4   **Q.**   You tried to add or added another VP, two directors and

5   six investigators?

6   **A.**   That is correct.

7   **Q.**   I'm sorry.

8   **A.**   That's -- that's what's written on the slide.

9   **Q.**   Forming Anti-Diversion Team located in Dublin, Chicago,

10  Lakeland, Swedesboro and Sacramento, right?

11  **A.**   That is correct on the slide.

12  **Q.**   Again, that's because your system was a national system

13  operating everywhere, wasn't it?

14  **A.**   It was --

15          MS. MAINIGI:  Objection.  Asked and answered, Your

16  Honor.

17          THE COURT:  Overruled.

18          THE WITNESS:  It was a centralized system.

19          BY MR. FULLER:

20  **Q.**   It says you aligned or added 24 field QRA Compliance

21  Managers and that would be at the different distribution

22  centers around the country, wasn't it?

23  **A.**   That is correct.

24  **Q.**   And prior to you making that addition or change, while

25  the distribution centers may have had compliance officers,

1    they were given other duties and not necessarily full-time

2    positions, right?

3    **A.**    That is correct.

4    **Q.**    And that's a change that you felt needed to happen to

5    properly monitor anti-diversion?

6    **A.**    That is a change that I felt was necessary to meet our

7    regulatory obligations.

8    **Q.**    And another change was the reporting requirement of

9    those individuals.  And I think that's in your next bullet

10   point, realign regulatory operations and Anti-Diversion

11   Reports of the Senior VP supply chain integrity, right?

12   **A.**    Yes.

13   **Q.**    And that would have been you, correct?

14   **A.**    Actually, no, it was not.

15   **Q.**    Who was the Senior Vice President?

16   **A.**    That would be Mark Hartman.

17   **Q.**    Your boss?

18   **A.**    My boss.

19   **Q.**    Fair enough.  If you turn to Page 6 of the document,

20   one of the goals that you were trying to accomplish and that

21   you felt needed to be improved on was communication between

22   Sales, Operations and QRA; is that right?

23   **A.**    I did.

24   **Q.**    And if we look down there, and we mentioned just a

25   moment ago, when you came into the QRA Division they had

```
 1    four people, Mr. Reardon, Mr. Brantley, Mr. Dunham and Mr.

 2    Rausch, correct?

 3    A.    And the Distribution Compliance Officers.

 4    Q.    Fair enough.  While here you mark or indicate that

 5    you're going to try to re-educate the 40,000 domestic

 6    employees of Cardinal Health, correct?

 7    A.    Yes.

 8    Q.    If you'll turn to Page 10.

 9          MR. FULLER:  Your Honor, at this time, I would

10    move in Plaintiffs' Exhibit 9734.

11          MS. MAINIGI:  No objection, Your Honor.

12          MR. FULLER:  Could we pop that up?

13          THE COURT:  It's admitted.

14          PLAINTIFF EXHIBIT 9734 ADMITTED

15          MR. FULLER:  Could we pop that up on the screen,

16    please?

17          BY MR. FULLER:

18    Q.    Mr. Hartman -- excuse me.  Mr. Mone, this sets out the

19    process -- well, for lack of a better term, Suspicious Order

20    Monitoring System, right?

21    A.    It sets out a thought process of how to operate a

22    system.

23          MR. FULLER:  And, Gina, if you could blow up the

24    right side of the slide.

25          BY MR. FULLER:
```

```
 1   Q.   And so, it starts with an order?

 2   A.   Correct.

 3   Q.   Is that right?

 4   A.   It does.

 5   Q.   And an order is an order that comes in generally at

 6   this time electronically from the customer; is that correct?

 7   A.   Generally electronically, yes, that is correct.

 8   Q.   And then that order goes into your -- during your time

 9   of your system, your automated system; is that correct?

10   A.   Into the electronic order monitoring system, yes, the

11   electronic component.

12   Q.   And you had built what is called thresholds and we'll

13   talk more about those in a minute.

14   A.   Okay.

15   Q.   Right?

16   A.   That is correct.

17   Q.   And a threshold, for the Court's benefit, is basically

18   a number or a limit which a customer can order up to; is

19   that fair?

20   A.   No, it is not.

21   Q.   What is a threshold?

22   A.   A threshold, I agree with you, is a number.  It is not,

23   however, a limit.

24   Q.   During the time of your system, was the threshold fixed

25   so that a customer could not order above that number?
```

1    **A.**   A threshold was a fixed number that if an order came

2    through the system that was above that number, that order

3    would be held for evaluation.

4    **Q.**   And then you have two sections or two split-offs here.

5    You have a report, and I'm assuming that means report to the

6    DEA, correct?

7    **A.**   It does not.

8    **Q.**   Who would that be reported to then?

9    **A.**   That -- the system that you have here is the system

10   that we ultimately did not implement.  It's the thought

11   process of a system that we initially thought about.

12   **Q.**   Okay.

13   **A.**   The reports are the threshold reports that are being

14   evaluated by the team.

15   **Q.**   And then the questionnaire, fax and/or call, is that

16   what we referred to earlier as sort of the due diligence

17   process?

18   **A.**   No.  The due diligence process is beyond just this

19   piece, but it is the analysis that the team would conduct

20   with regard to an assessment of that held order.

21   **Q.**   Okay.  And then that breaks off into either release or

22   report; is that right?

23   **A.**   That is correct.

24   **Q.**   And when we say release, that means release to whom?

25   **A.**   Release the order to the DEA registrant that ordered

1    it.

2    **Q.**   And then the report is to report to the DEA?

3    **A.**   That is correct.

4    **Q.**   And then terminate means terminate the customer,

5    correct?

6    **A.**   That is a decision that may have been made with regard

7    to a particular customer.

8                   MR. FULLER:  So, if we could bring up

9    demonstrative or start with the animated version of 217.

10                  MS. MAINIGI:  Before you publish the

11   demonstrative, Mr. Fuller, is -- if I could, is this your

12   demonstrative?

13                  MR. FULLER:  I'm sorry.  2172.

14                  MS. MAINIGI:  Oh, 2172?  Thank you.

15                  BY MR. FULLER:

16   **Q.**   All right.  So, generally, in any sort of automated

17   system, you have to have a triggering mechanism; is that

18   right?

19   **A.**   I would agree with that, yes.

20   **Q.**   Now, Cardinal during your time used thresholds; is that

21   fair?

22   **A.**   Cardinal used thresholds as the initial inquiry into

23   the evaluation, that is correct.

24   **Q.**   And that's only one part of a Suspicious Order

25   Monitoring System, correct?

```
 1    A.    Yes.  There were other components.

 2    Q.    Okay.  And the triggering system Cardinal used was to

 3    devise an average of the distributions nationwide, correct?

 4    A.    No, that is not correct.

 5    Q.    So, what is your understanding of how they devised the

 6    thresholds when you initially created the system?

 7    A.    To the best of my recollection, the manner by which we

 8    established those thresholds was to take a -- to take a

 9    dataset and to analyze that dataset based on unique

10    characteristics of particular segmented customers.

11    Q.    So, you divided the customers in different segments

12    based on hospital, or pharmacies, or long-term care

13    providers, whatever it may be, correct?

14    A.    Correct.

15    Q.    Okay.  And then, did you subcategorize the customers by

16    size?

17    A.    We did.

18    Q.    And then how did you determine size?

19    A.    We determined size by characteristics such as total --

20    total purchase price of controlled and non-controlled

21    substances, by number of prescriptions, by a series of

22    analyses based upon the questionnaires and knowing our

23    customers' needs, the types of patients they were seeing,

24    how close they were to hospitals, a number of factors.

25    Q.    And so, once you determine what the customer's size is
```

```
 1    in the different small, medium and large, I'm assuming,

 2    correct?

 3    A.   We used those characteristics.  We grouped them in that

 4    way, yes.

 5    Q.   And then you would take an average for each of those

 6    categories, right?

 7    A.   I believe that we took an average of those categories,

 8    yes.

 9    Q.   And then you tripled the average, right?

10    A.   For some controlled substances, yes.

11    Q.   For oxycodone and hydrocodone, did you triple the

12    averages?

13    A.   For -- for Schedule II controlled substances, we took a

14    multiplier of three.

15    Q.   So, for each of the different categories, you then had

16    an average -- and that was nationwide average, right?

17    A.   Well, no.  It was a -- the statistics were designed on

18    the manner by which we -- well, they were designed about how

19    we segmented customers.

20    Q.   Sure.  I'm sorry.  Let me ask the question better.

21    Based on segmentation and then size, then you took the

22    average for that segment and that size of a customer for the

23    entire nation?

24    A.   We applied it to all of the customers across the

25    country.
```

```
 1    Q.    Okay.  And then you multiplied that number by three?

 2    A.    The root number times three, yes.

 3    Q.    Okay.  So, that's your initial triggering system?

 4    That's step one in your SOMS process, correct?

 5    A.    The threshold is the triggering, yes.

 6    Q.    So, Step 2, if you have a triggering event, you have to

 7    do something, right?

 8    A.    Yes.

 9    Q.    Yes, I'm sorry.  It's next to you, too.  I apologize.

10    A.    It's over here.

11    Q.    Does it matter --

12          MS. MAINIGI:  Excuse me, Mr. Fuller.  May I -- I

13    think this is a different demo.  Which demo number is this?

14          MR. FULLER:  I'm sorry.

15          MS. MAINIGI:  You're going to go back to Demo 02?

16    Thank you.

17          MR. FULLER:  Yes, ma'am.

18          BY MR. FULLER:

19    Q.    All right.  So, we have to do something if there's a

20    triggering effect, correct?

21    A.    Yes.

22    Q.    And based on the way your system was designed, did it

23    matter whether you were triggered just by a little bit or

24    triggered by a lot?

25    A.    Once there was a trigger, there was an analysis.
```

1    **Q.**   So, let's -- for example, if we had a threshold that's

2    10,000 pills of oxycodone and someone goes over it by a

3    hundred pills, it still triggers in your system, correct?

4    **A.**   Yes.

5    **Q.**   And you would still have to take action, right?

6    **A.**   Correct.

7    **Q.**   Same example, but let's change the numbers.  10,000

8    pill threshold, but they go over by 5,000 pills.  It doesn't

9    change at least this part of how the process works?  You

10   still have the triggering event and you still have to take

11   action, correct?

12   **A.**   Yes.

13   **Q.**   Okay.  Now, if you choose not to take action, can you

14   cancel and report the order to the DEA?

15   **A.**   We -- I don't know what you mean by if you choose not

16   to take action.  We always took an action to do an

17   evaluation.

18   **Q.**   Okay.  So, your suggestion to the Court is that every

19   order that triggers is going to have some sort of due

20   diligence?

21   **A.**   Yes.

22   **Q.**   And that due diligence is going to be documented,

23   correct?

24   **A.**   That due diligence would be documented in the system.

25   **Q.**   And when we're doing the due diligence, what we're

1    trying to do is to determine whether we can clear this order

2    or whether we have to report the order to the DEA, correct?

3    **A.**   Yes.

4    **Q.**   So, let's go to Step 3.  So, Step 3, if we have

5    adequate due diligence that clears the order, whatever

6    amount it is, it's your understanding that under your system

7    you would then be cleared to ship the order?

8    **A.**   Yes.

9    **Q.**   If you conduct the due diligence and you cannot clear

10   it, meaning you cannot validate the order, it's not likely

11   to be diverted, then you have to -- you have a suspicious

12   order that's not cleared and you have to block it and report

13   it, correct?

14   **A.**   Yes.

15   **Q.**   Okay.  Do you know how many suspicious orders you

16   reported into Cabell or Huntington?

17   **A.**   I do not.

18   **Q.**   Do you know how many suspicious orders you reported

19   into the State of West Virginia during your time?  And I

20   want to limit the questions.  Let me go back for a second.

21        During your tenure, what we described as Chapter 2,

22   from the end of -- December of '07 to September of '08 -- or

23   to September of '12, do you know how many suspicious orders

24   you reported into Huntington and Cabell County?

25   **A.**   I do not.

1    **Q.**   Do you know how many suspicious orders you reported to

2    the State of West Virginia?

3    **A.**   I do not.

4    **Q.**   Now, your system, this electronic system, you had

5    access to threshold and threshold breaches, correct?

6    **A.**   I did, yes.

7    **Q.**   And would you review thresholds and threshold breaches?

8    **A.**   Not ordinarily.

9    **Q.**   But did you have access to the system?

10   **A.**   As I said before, I did have access to them.

11   **Q.**   Could you have reviewed them?

12   **A.**   I could have, yes.

13   **Q.**   And if you were looking at a particular pharmacy, is

14   that something that you might do?

15   **A.**   I might, yes.

16   **Q.**   And when we say thresholds, thresholds may change over

17   time.  It didn't stick to the three time multiplier,

18   correct?

19   **A.**   That is correct.

20   **Q.**   And if we're going to change a threshold, we have to go

21   through certain steps to do that, don't we?

22   **A.**   The team would do an evaluation and to whether or not

23   to make a change in a threshold.

24   **Q.**   And there are certain justified reasons for changing a

25   threshold, correct?

1    **A.**   There would be.

2    **Q.**   And there are certain reasons we wouldn't want to

3    change a threshold, correct?

4    **A.**   There would be.

5    **Q.**   And those reasons need to be documented in that

6    customer's due diligence file, correct?

7    **A.**   The rationale would have to be up to the pharmacist.  I

8    don't recall a specific requirement, and I could be

9    incorrect, but I don't recall a specific requirement that

10   the reasons themselves be documented.  All of -- well, when

11   I say reasons, I mean the totality of all the reasons.

12   **Q.**   But there has to be some basis documented, correct?

13   **A.**   There's going to be a basis for the pharmacist, member

14   of the team, to make a decision.

15   **Q.**   And when you say pharmacist, so the Court is clear,

16   we're not talking about the pharmacists at the pharmacy.

17   We're talking about the pharmacist at Cardinal that's job is

18   to evaluate thresholds and whether one needs to be changed?

19   **A.**   Our team of pharmacists and staff on the QRA Team, yes,

20   Your Honor, not the pharmacy piece, just our little piece of

21   the pie.

22   **Q.**   And if we are going to make a choice based on a trigger

23   and clear an order to be shipped, the basis of that

24   clearance needs to be documented, as well, correct?

25   **A.**   Like I said, I don't recall that.  The base -- all of

1    the reasons why a pharmacist made a -- pharmacist/pharmacist

2    team made a decision, but there had to be a rational basis

3    for doing so.

4    **Q.**   And we need to be able to know what that rational basis

5    is; is that fair?

6    **A.**   The -- because those pharmacists were continually

7    working in the same area, they had to be satisfied with the

8    decisions that they made and they would record what they

9    felt was necessary to refresh their recollection, I would

10   assume, as to why they made a prior decision to go up or to

11   go down.

12            MR. FULLER:  Judge, it's right at 10:30.  I'm

13   going to switch topics.

14            THE COURT:  Good time for a break, Mr. Fuller.

15       We'll be in recess for ten minutes.

16       (Recess taken)

17       (Proceedings resumed at 10:42 a.m.)

18            THE COURT:  Mr. Mone, you can resume the

19   witness stand, sir.

20            THE WITNESS:  It's a lot longer walk than you

21   think it is.

22   BY MR. FULLER:

23   **Q.**   Mr. Mone, we're talking about the implementation of

24   your system.  And at the time, there's several

25   distribution centers that have their license suspended;

```
 1    correct?
 2    A.    Yes, they were.
 3    Q.    At that, that point in time -- at that point in time,
 4    there was an issue with compliance of Valencia distribution
 5    center; is that right?
 6    A.    Not at that time.
 7    Q.    Was it shortly thereafter?
 8    A.    The concern associated with Valencia was a concern
 9    expressed by the Drug Enforcement Administration after --
10    way after the, the period of time of the Immediate
11    Suspension Orders.
12    Q.    When you say way after, would it have been early '09?
13    A.    I believe it was sometime in the spring of '09, that's
14    correct.
15    Q.    And were there meetings with DEA related to that issue?
16    A.    There were.
17    Q.    Did Cardinal -- based on the meetings with DEA, did
18    Cardinal make certain additional changes to its system to
19    continuously improve that system?
20    A.    I do not recall whether we made changes to our system
21    as a result of the Valencia concern.  We were always engaged
22    in taking the available information and continuously making
23    improvements to the system.  So I don't know that I can say
24    point to serial that they were directly related.
25    Q.    During that same time frame, and I mean early 2008,
```

```
1    were you aware of Dendrite being hired to do an evaluation
2    of the system, Mr. Ron Buzzeo?
3    A.   The, the work that Ron Buzzeo's group did with my team
4    was that they provided additional resources for
5    investigations.
6    Q.   Do you remember being interviewed by Mr. Buzzeo related
7    to the functioning of that system?
8    A.   I don't remember -- I don't remember an interview by
9    Ron.  I know that Ron and I had talked, but I don't have any
10   specific recollection of an interview.
11             MR. FULLER:  May I approach, Judge?
12             THE COURT:  Yes.
13   BY MR. FULLER:
14   Q.   Mr. Mone, do you recognize this document?
15   A.   I do not.
16             MS. MAINIGI:  Your Honor, I have an objection to
17   the use of this document which is P-45.  There are multiple
18   objections.
19        I think the witness has indicated he doesn't recognize
20   the document.  The document is hearsay.  And there was a
21   privilege objection in the MDL court related to this
22   document.  That privilege objection was ultimately overruled
23   by Special Master Cohen.
24        But just for the purpose of the record, we continue to
25   assert our privilege objection to this -- for the purpose of
```

```
 1     the record here.  But foundationally I don't think that they
 2     can cover this document with this witness.
 3              THE COURT:  Well, he said he didn't recognize it.
 4          Go ahead, Mr. Fuller.
 5              MR. FULLER:  Thank you, Judge.
 6     BY MR. FULLER:
 7     Q.   Mr. Mone, if you'll turn to the second page of this
 8     document --
 9              MS. MAINIGI:  Objection, foundation.
10              THE COURT:  Well, yeah.  How -- just address her
11     objection and --
12              MR. FULLER:  Sure, Your Honor.  Quite frankly,
13     I'll just move it into evidence, Your Honor.  This is one of
14     the stipulated documents.  I don't necessarily need to ask
15     the witness about it.  He's referenced in it and there's
16     emails from him attached to it.
17              THE COURT:  Can I admit it as one of the
18     stipulated documents if he's not questioned about it?
19              MR. FULLER:  We would submit it only for notice
20     and knowledge, Judge.
21              MS. MAINIGI:  Your Honor, we have stipulated to
22     authenticity and no sponsoring witness, but we still have a
23     hearsay objection related to it, as well as lack of
24     knowledge and the previously stated 403.  But we maintain a
25     hearsay objection in addition to the others.
```

1          THE COURT:  Well, he's saying he's not admitting

2     it for the hearsay, only to knowledge and notice.  Can I

3     admit it for that limited purpose?

4          MS. MAINIGI:  I don't think so, Your Honor,

5     because this particular witness did not get this document.

6     So if he's the head of the Anti-Diversion and he did not get

7     this document, I don't know what kind of notice it serves

8     as, and it is otherwise hearsay.

9          THE COURT:  Okay.  I'll sustain the objection for

10     now.  Maybe you can get it in some other way.

11     BY MR. FULLER:

12     **Q.**  All right.  9809.  Mr. Mone, do you recognize this

13     document which is Plaintiffs' 9809?

14     **A.**  I do not.

15          MR. FULLER:  Judge, I would move this one in for

16     the record.  This is, again, another stipulated document.

17     It's by Cardinal's counsel to DOJ and it revolves around the

18     Valencia distribution center and promises made by Cardinal.

19          MS. MAINIGI:  Your Honor, I object.  I disagree

20     that this is a stipulated document.  I do not believe it is.

21     Perhaps I'm wrong and Mr. Fuller can show me that.  But our

22     records do not indicate this is a stipulated document.

23          We've already established there's no personal knowledge

24     related to this document.  And, more significant than that,

25     Your Honor, is that it's completely irrelevant to

```
1    Cabell/Huntington.
2         The Valencia distribution center is in California.
3    This document is a letter from outside counsel for Cardinal
4    to the DEA related to this facility in Valencia, California.
5    It has nothing to do with anything here, Your Honor.
6              THE COURT:  I'll sustain the objection, Mr.
7    Fuller.
8              MR. FULLER:  Yes, Your Honor.
9    BY MR. FULLER:
10   Q.   14122.  Mr. Mone, do you recognize this document?
11   A.   The first page of the document is an email from Tony
12   Romano on 5/6 of 2008.
13             MS. MAINIGI:  Mr. Fuller, could I get a copy of
14   the document, please?
15             THE WITNESS:  It reflects -- it's a series of
16   PowerPoint slides.
17   BY MR. FULLER:
18   Q.   And who is Mr. Romano?  Do you know?
19   A.   Mr. Romano -- I don't recall what his title was, but he
20   worked in the sales operations area.  And I'd like to think
21   that he was the, the training expert.
22   Q.   Well, it says "Director of Sales Training" there on his
23   signature line; right?
24   A.   It would help -- I apologize.  I didn't read the whole
25   document.
```

1   **Q.**   This was sent on or about May 6th of 2008; is that

2   right?

3   **A.**   That is correct.

4   **Q.**   And he's providing you with these PowerPoints as well

5   as, apparently, two video presentations that were given as

6   part of the training at Cardinal; correct?

7   **A.**   Correct.

8   **Q.**   And that was something that you would be somewhat

9   involved in, particularly as to the training related to QRA;

10   is that right?

11   **A.**   Yes, that is correct.

12   **Q.**   And you've seen some of these slides in the past;

13   correct?

14   **A.**   I have.

15           MR. FULLER:  Your Honor, at this point I would

16   move in Plaintiffs' 14122 into evidence.

17           THE COURT:  Any objection to 14122?

18           MS. MAINIGI:  No, Your Honor.

19           THE COURT:  It's admitted.

20   BY MR. FULLER:

21   **Q.**   Now we have it up on the screen.

22   **A.**   Okay.

23   **Q.**   And this packet includes several different

24   presentations; is that correct?

25   **A.**   It, it does.

**Q.** If you could turn to Page 3 of the document.  It's talking about the kick-off.  Do you see George Barrett there?  Who's George Barrett?  Do you know?

**A.** At the time, George Barrett was the vice chairman of the supply chain division of Cardinal Health as well as the CEO.

**Q.** And Jeff Henderson, do you know who he is?

**A.** He was the chief financial officer of the organization.

**Q.** And Mark Hartman, he's your boss; is that correct?

**A.** That is correct.

**Q.** Turn to -- go back to Page 8.  Actually -- I'm sorry. Let's go to Page 10.

**A.** Page 10?

**Q.** Yes.

**A.** Yes, sir.

**Q.** All right.  Can you blow that up.  Thank you.

It's talking about DEA guidance.  Do you see that?

**A.** That is the title of the slide.

**Q.** And are you aware of what Cardinal needs to do to ensure compliance with both the Controlled Substances Act as well as implementing regulations?

**A.** I have a general knowledge of what was expected, yes.

**Q.** And is that sort of a two-step process, meaning that you have to maintain effective controls to prevent diversion?

1    **A.**    The, the statutory requirement of the Controlled

2    Substances Act says to maintain effective controls against

3    diversion.

4    **Q.**    Okay.  And then there's a separate reporting

5    requirement, isn't there?

6    **A.**    There is a reporting requirement.

7    **Q.**    And that required you to report suspicious orders when

8    discovered.  Those would be orders of unusual size, pattern,

9    and frequency.  Correct?

10   **A.**    They would be orders of unusual size, orders deviating

11   substantially from a normal pattern, and orders of unusual

12   frequency.

13   **Q.**    In your triggering system, the way it was designed only

14   measured orders of unusual size; correct?

15   **A.**    It did not.

16   **Q.**    Okay.  So let me ask it differently.  Your threshold

17   system only measured orders of unusual size; correct?

18   **A.**    No, it did not.

19   **Q.**    How did -- explain to the Court how your threshold

20   system monitored orders of unusual pattern or frequency.

21   **A.**    The threshold system, while it used a reference number

22   of the threshold, we produced additional reports below the

23   threshold number that the pharmacist would analyze, and

24   reports that would look at pattern and frequency, as well as

25   the fact that the threshold system itself in looking at that

1    order that broke a particular size, that -- in the analysis

2    you could look at all of the orders below that to assess a

3    pattern, assess a frequency.

4         And in doing so on a 30-day rotational basis, you were

5    able as a pharmacist, member of the team, to analyze all of

6    the additional characteristics; its size, unusual size,

7    deviating substantially from a normal pattern, and unusual

8    frequency.

9         So the system itself is a very broad, comprehensive

10   system.

11   **Q.**   And let me back up and maybe my question was a little

12   unfair, so let's go back.

13        As to the triggering mechanism, being the threshold,

14   that's based on volume in and of itself; correct?

15   **A.**   The threshold -- the threshold is based upon the -- the

16   threshold is based upon a number, a size.

17   **Q.**   Okay.  So my question pertains just to the threshold

18   and the triggering event.  That only measures volume; right?

19   **A.**   The threshold itself in the way it's constructed

20   assesses a volume analysis.  But inside that volume

21   analysis, because you are looking at specific orders for

22   specific -- specific orders for specific customers, you are

23   able to do in that analysis the deviating from an unusual

24   frequency, unusual frequency, and the rest of --

25             THE COURT:  I'm going to have to interrupt you.

1    I've got a technological breakdown here.

2         (Pause)

3         It's working.  Yeah, that's fine.

4    BY MR. FULLER:

5    **Q.**   So that additional analysis is what your pharmacist

6    would do; correct?

7    **A.**   The pharmacist team, yes, that is correct.

8    **Q.**   And here if we go back to the PowerPoint, it says,

9    "Reporting suspicious orders to the DEA does not relieve the

10   distributor of the responsibility to maintain effective

11   controls to prevent diversion."

12        And you agree with that; correct?

13   **A.**   First of all, this is not my slide.  I believe if you

14   are looking to the correspondence that that statement does

15   appear in DEA correspondences.

16   **Q.**   My question is, as the one running the Anti-Diversion

17   Control Program at Cardinal for the Chapter 2 time frame, do

18   you agree with that statement?

19   **A.**   Yes.  The reporting of suspicious orders is not the

20   totality of the obligation.

21   **Q.**   And a registrant, such as Cardinal, has an obligation

22   beyond just reporting suspicious orders; correct?

23   **A.**   It does.  The, the obligation is to maintain effective

24   controls against diversion.  And amongst, amongst others,

25   you've got the security requirements that are associated

1    with the distribution centers.  So, yeah, there are things

2    beyond just that one particular regulation.

3    **Q.**   So do you agree that shipping suspicious orders is not

4    maintaining effective controls against diversion?

5    **A.**   I would not agree.  The, the obligation is to report

6    suspicious orders.  The, the regulation says develop a

7    system, implement that system to report suspicious orders of

8    controlled substances.  That's the obligation.

9    **Q.**   But you also have an obligation to maintain effective

10   controls to prevent diversion; right?

11   **A.**   In, in the CSA there is that requirement to maintain

12   effective controls against diversion.

13   **Q.**   And, and according to Mr. Mone, effective controls

14   still means we can still ship out onto the streets, into

15   pharmacies suspicious orders?

16   **A.**   No, it does not.

17   **Q.**   So we must not ship suspicious orders to prevent

18   diversion?

19   **A.**   Suspicious -- once a suspicious order is identified,

20   that suspicious order is reported, is reported to DEA and

21   not shipped to the customer.

22   **Q.**   And, so, do you -- I'm a little confused now because

23   what I'm trying to figure out, since it's obviously an issue

24   in the case, is whether maintaining effective controls

25   requires us to not ship suspicious orders.

1        If we're going to maintain effective controls to

2   prevent diversion, how can we ship an order that's

3   determined to be suspicious?

4            MS. MAINIGI:  Objection, Your Honor.  I think this

5   has been asked and answered and I'd also like a

6   specification as to the time frame.

7            THE COURT:  It's certainly been asked and

8   answered.  So I'll sustain the objection.

9   BY MR. FULLER:

10  **Q.**   Mr. Mone, let's turn to Page 17.  Did you utilize

11  the sales force to assist with your Anti-Diversion

12  system?

13  **A.**   The sales force was a component of the SOM system.

14  They did participate.

15  **Q.**   And here it mentions that they're the boots on the

16  ground and the front line defense.  Do you agree with that?

17  **A.**   I believe that the sales force were the first line of

18  the front line -- I wouldn't necessarily call it the front

19  line of defense.  My analysis on it is they're the front

20  line of visibility for the company.

21  **Q.**   And they have the most, probably, interactive contact

22  with the customer; is that right?

23  **A.**   They do.

24  **Q.**   We'll keep working our way through this.  Let's go back

25  to Page 86.

1       During this time when you arrived at Cardinal's

2   headquarters in November -- excuse me -- December of 2007,

3   do you believe that this country was facing an opioid

4   epidemic?

5   **A.**   I believe that since the first person chewed on a leaf

6   and found a berry that they liked and it caused a reaction

7   in the brain that society has had a substance use disorder.

8       I -- I'm not -- I can't tell you whether it's an

9   epidemic or not.  I'm not an epidemiologist.  But I can tell

10  you with certainty that we have a public health crisis with

11  the use of medicines.

12  **Q.**   And was that -- did we have a public health crisis

13  related to the use of medicines related to opioids back in

14  2006 and 2007?

15  **A.**   We did.

16  **Q.**   Do you know if we have that public health crisis in

17  Cabell County?

18  **A.**   I have no specific knowledge about the county's public

19  health crisis.  But what I can tell you is systemically

20  across the United States --

21  **Q.**   It's everywhere?

22  **A.**   -- we have an issue with regard to the substance use

23  disorder that originates with the prescribing of controlled

24  substances.  And, and, of course, obviously, controlled

25  substances includes opioids.

1    **Q.**   So let's keep going.  Let's turn to Page 100.

2         Here we're going to talk a little bit about your

3    on-boarding process.  Is there a process that you go through

4    under your system at Cardinal when you're bringing on a new

5    pharmacy?

6    **A.**   We did have a process to, to bring on a, a new

7    customer.

8    **Q.**   And that process requires a site visit; correct?

9    **A.**   It did.

10   **Q.**   That process also required a new customer

11   questionnaire; is that correct?

12   **A.**   It did.

13   **Q.**   That's a questionnaire that you had devised and

14   implemented at Cardinal; correct?

15   **A.**   We -- the team, you know, it was a team effort.  It's

16   not one person.  It was a team effort to develop the

17   questionnaire to ascertain facts that we felt were relevant.

18   **Q.**   Your department?

19   **A.**   Oh, yeah.

20   **Q.**   You also came up with other information that you had

21   gathered related to these new customers; correct?

22   **A.**   Yes, we would gather additional information.

23   **Q.**   What would that include?

24   **A.**   Well, to the extent, you know -- obviously, the first

25   two requirements is to recognize that the entity had a state

1    license and, where required, a state controlled substance

2    license and a DEA registration.

3        And we would have folks collect demographic data,

4    information such as how close they were to a hospital,

5    information about the types of patients, you know, whether

6    they had, whether they took care of senior citizen centers,

7    you know, trying to get -- again, the questionnaire was

8    about know your customer, know the characteristics of the

9    customer to be able to understand their business needs.

10   **Q.**   Would you tend to validate the information provided by

11   the customer?

12   **A.**   Where the information was subject to objective

13   validation like, like the DEA license and the Board of

14   Pharmacy license, yes, we would, we would attempt to do so

15   where we could obtain objective information.

16   **Q.**   It also lists here on the PowerPoint existing stores

17   that have a 12-month total dollar purchase from prior

18   wholesaler and if computer can provide a breakdown of the

19   monthly purchases of controlled substances.  That's

20   important.  Correct?

21   **A.**   Yes.  If they were transitioning from a different

22   wholesaler to us, so they were -- you know, a new store to

23   us, we would look at in terms of understanding and look for

24   the consistency between the representations they made on the

25   customer questionnaire to the data that they provided.

1    Q.   And all this is part of being vigilant as a

2    distributor, as a registrant to ensure we're not

3    over-supplying somebody; correct?

4    A.   It is all part of the due diligence process to make a

5    decision as to whether or not an individual customer would

6    become a Cardinal Health customer.

7    Q.   Now, could a customer refuse to provide some of this

8    information?

9    A.   If a customer -- could they?  Yeah, a customer could

10   refuse to provide some of that information.  Then we would

11   take that under consideration as to whether or not to open

12   them up or not.

13   Q.   Meaning that might be a red flag; right?

14   A.   We would consider that a, a -- we would consider it

15   amongst the totality of the circumstances as to whether or

16   not we would open a customer and allow them to purchase

17   medicines from us.

18   Q.   And what about top prescribers?  Would you obtain that

19   information from them?

20   A.   Initially because -- in the initial stages of where we

21   were in the development of the program and because much of

22   the, much of -- not the totality of, but much of the

23   emphasis was on internet pharmacies, the top prescribers

24   were an element of analysis.

25   Q.   And then a determination is made as to whether to sign

1    on that customer?

2    **A.**    That is correct.

3    **Q.**    And who determines what the threshold is going to be

4    initially for the customer?

5    **A.**    It was -- the initial thresholds were determined based

6    upon an analysis by the analytics team and the pharmacist

7    team after they have made a determination that the

8    information on the customer was sufficient to open up a

9    customer.

10    **Q.**    Now, let's still deal with new customers, but let's

11    switch over to chains.  Did chains go through a different

12    process in on-boarding?

13    **A.**    Chains did go through a different process in

14    on-boarding.

15    **Q.**    And was that controlled by your department or some

16    other department?

17    **A.**    It was still controlled by our department.

18    **Q.**    And who had control of whether a chain was on-boarded?

19    **A.**    Still our -- still our team had a -- had the decision

20    as to whether or not a new chain would be added to, as a

21    customer.

22    **Q.**    And this important information that we've been talking

23    about, would you get the same information from the chain

24    customer?

25    **A.**    Sometimes we did, sometimes we did not.

**Q.**   Why would there be occasions where you would not?

**A.**   The occasions where we would not were situations where the, the, the, the data either was not available because it was a, it was a brand new store, there was nothing there, you know, they put a new building in, and sometimes we would use the analysis of the characteristics of the chain in terms of whether it's a 24-hour store, where it was located to place them in the segmented categories that we may have had for that particular chain.

**Q.**   Were there certain chains that wouldn't provide you information when requested; for example, CVS?

**A.**   To the best of my recollection, whenever we requested information, we received the information from the chain in order to enable the, the, the pharmacist team to make a decision.

**Q.**   And then on top of that, I think you stated in the past that you would determine what their SOMS system was; is that correct?

**A.**   We would determine based upon the factors that we knew about, the new location, where they fit in terms of characteristics, recognizing that the, the chain itself had some fairly unique, you know, standard characteristics; 24-hour stores, you know, where they were located, et cetera, put those into the segmentation.  And we would segment them and start their initial thresholds at that

1    segmented area, you know, whatever we -- wherever we

2    categorized them, you know.

3    **Q.**   My question was a little different than that.  Do you

4    know what type of SOMS system that the chains had?

5    **A.**   Oh, that the chains themselves have?

6    **Q.**   Yes.

7    **A.**   I do not know what -- I do not know the specifics of

8    the systems that the chains themselves used.

9    **Q.**   So were you during this time frame relying on the

10   chains to conduct their own due diligence?

11   **A.**   No, we were not relying on the chains to do their own

12   due diligence.  We were in a collaborative and cooperative

13   relationship with the chains to communicate information back

14   and forth.  We didn't rely on them.  We did our own analysis

15   based upon what we would discern.

16   **Q.**   Now let's go to Page 114.

17   **A.**   Yes.

18   **Q.**   Here we're dealing with thresholds; right?

19   **A.**   Yes, sir.

20   **Q.**   And under your time frame, thresholds were

21   non-disclosable to sales as well as to customers; is that

22   right?

23   **A.**   This is correct.

24   **Q.**   And that's because you believed that it would be -- or

25   raise the eye of someone if you were telling them what their

1    thresholds were; correct?

2    **A.**    My belief in not disclosing the threshold was that I

3    didn't want customers to know specifically what their

4    threshold was in case they wanted to attempt to manipulate

5    the threshold system, recognizing that once they had a DEA

6    registration, they could purchase from any wholesaler.

7    **Q.**    And a lot of pharmacies had a secondary purchaser as

8    relates to a distributor; correct?

9    **A.**    I, I believe that it's probably fair to say that every

10   pharmacy had at least a secondary wholesaler.

11   **Q.**    And if someone knew what their threshold was, they

12   could order up to a threshold and then turn around and go to

13   their secondary for the same drug class or drug family to

14   order additional product; correct?

15   **A.**    And that was the reason why we initially decided not to

16   disclose the threshold.

17   **Q.**    And, and let's walk through a little more on these

18   thresholds in detail.

19        So the Court understands, each drug family or base code

20   has its own individual threshold; is that correct?

21   **A.**    That is correct, in the system that we implemented.

22   **Q.**    Of particular relevance to us in this case is that

23   oxycodone and hydrocodone would each have their own

24   independent threshold.  Is that true?

25   **A.**    That is correct.

**Q.**   Now, at some point, you guys began to use sub base
thresholds; correct?

**A.**   Yes, we did.

**Q.**   And --

**A.**   I don't recall when that occurred.

**Q.**   And that was a system where we looked at the more
abused substances and set a separate threshold for those;
for example, maybe oxy 30.  Correct?

**A.**   The, the sub segmentation of a particular family was
designed to gather information about the, the prescribing
because it all starts with prescribing, the prescribing and
dispensing at that particular location.  It gives a better
analysis than just a single number which is, in fact,
continuous quality improvement.

**Q.**   And another reason we don't disclose the threshold is
because we want to capture the intent of the customer; is
that right?

**A.**   That, that's the analysis that I used in terms of
capturing intent.

**Q.**   Explain to the Court what we mean by capture the
intent.

**A.**   Well, I wanted to capture -- I didn't want the
customer -- first of all, I didn't want the customer to
manipulate the system by knowing the threshold and doing
other things.  But capturing their intent was to see that

1    they would hit the threshold and then move to a secondary

2    supplier.

3         Why I wanted that particular information, recognizing,

4    of course, that the first time we hit the threshold, they

5    could just figure out what the threshold was.  I wanted it

6    to be able to set-off for our team that initial inquiry into

7    that particular customer.

8         So I captured their intent, their growth, what was

9    happening with the customer so that we could make

10   appropriate investigation of what was happening with the

11   customer.

12   **Q.**   Let's go next to Page 120.

13        All right, QRA evaluation.  Now, at this point in the

14   process, we went from having a threshold.  Now this is the

15   discussion related to evaluating that threshold event.

16   Correct?

17   **A.**   Yes, sir.

18   **Q.**   All right.  And then it says here that one of the

19   things that you're going to do is you're going to review

20   12-month historical purchases; is that right?

21   **A.**   Yes, sir.

22   **Q.**   And that means the sales of that customer -- sales of

23   Cardinal to that particular pharmacy?

24   **A.**   That is correct, assuming, of course, we had 12 months

25   of data.

**Q.**   Sure.  Assuming they have been a customer for 12
months?

**A.**   Right.

**Q.**   Now, you could also obtain what's called -- I think
it's called a Drug Utilization Report from the pharmacy
itself; correct?

**A.**   We would, we would often -- the pharmacist would often
request the Utilization, yes.

**Q.**   When you say "the pharmacist," again we're talking
about Cardinal's pharmacist?

**A.**   Yes.

**Q.**   And explain to the Court what a Drug Utilization Report
is from one of your customers.

**A.**   So a Drug Utilization Report is a, is a
computer-generated summary of -- without patient data, so
there's no -- because of HIPAA laws, there's no patient
data.  It's a summary description of the drug and, depending
upon the system, you know, the number of prescriptions, the
quantity of those, the quantity dispensed for that
particular drug family.

So a Drug Use Report would be the dispensing
information that was, was performed by the pharmacy pursuant
to prescriptions presented to it.

**Q.**   So, basically, from the Drug Utilization Report you
could see what that pharmacy is dispensing; correct?

1   **A.**   We could see the total quantity of the drugs.

2   Depending upon the, the nature of the report, yes, we should

3   be able to see in the Drug History Report the total quantity

4   dispensed.

5   **Q.**   That would also give rise to determining whether

6   they're ordering from someone else; correct?

7   **A.**   You could infer that, you know.  Because the delta

8   between those two numbers may, in fact, depending upon the

9   number, be the, the drug quantity that's on the shelf at the

10  pharmacy.  So it requires a little bit of analysis, but

11  you're teasing out information as best you can.

12  **Q.**   The second point here is the questionnaire sent by

13  sales operations to customers to inquire about the order.

14  "Why" basically?  Correct?

15  **A.**   The "why."  Why did you need this?  What's going on?

16  What's changed?

17  **Q.**   And that questionnaire -- during your time, was it

18  electronically completed?

19  **A.**   It varied, you know.  At the beginning of the system,

20  we were paper-based.  At the beginning of the system, we

21  were paper-based and fax-based and what have you.  As we

22  designed and continued to improve the system, it became

23  electronic.

24  **Q.**   Now, just so we're clear, you said the beginning of the

25  system.  You're talking about when you arrived in 2007,

1    2008?

2    **A.**   Oh, yeah.  At the beginning -- at the beginning of the

3    implementation of the changes to migrate to this type of

4    system, we were paper-based.

5    **Q.**   Next Power -- next point says "Questionnaire sent to

6    QRA by customer, the plausibility evaluation."

7    **A.**   Yes.

8    **Q.**   Is that where you're evaluating the basis of their

9    explanation?

10   **A.**   That is where the pharmacist team would take the

11   information based upon their knowledge and experience, the

12   pharmacist and analytics, to look at the data that was

13   coming back and to make a decision what to do with that

14   order.

15   **Q.**   And this is verified by a site visit?

16   **A.**   There, there were opportunities whereby the pharmacist

17   team, in their evaluation, would say this is plausible,

18   plausibility evaluation.  If the order is not suspicious,

19   let's go look at the pharmacy to see the rest of the story,

20   the totality of the story, you know.  And we would set up

21   our investigatory team to go do a site visit.

22   **Q.**   And this is all a process that has to be gone through

23   when we have a triggering event to clear an order; correct?

24   **A.**   Not necessarily.  This process -- the, the verification

25   by a site visit was not an absolute default.  As I said

1    earlier in the last response, the pharmacist may determine

2    that the order was okay, the plausibility piece.  But in, in

3    their professional decision, they wanted a site visit.

4        And, so, they would set up a site visit with the

5    investigatory team.  It didn't change the nature of their

6    assessment of the order.  It just said let's go to the

7    customer for the rest of the story.

8    **Q.**   This process that's gone through, we would see some of

9    that documented in the due diligence file for that

10   particular customer; correct?

11   **A.**   In the early stages of the system, those -- the

12   documentation would be on paper in a file.  Later on, that

13   information was retained in an electronic system.

14       The documentation was not the totality of the -- what

15   was going on in the heads of the professionals that we were

16   using.  It may simply have been a summary analysis, a

17   shorthand version of, say, yes, I've done my diligence and

18   I've done the totality of the circumstances review and I've

19   made a decision.

20   **Q.**   But we're going to have the questionnaire -- we're

21   going to have the response to the questionnaire.  Any of

22   that additional information is going to be compiled in that;

23   correct?

24   **A.**   Some of that information -- you know, the questionnaire

25   more than likely would be there.  Some of that information

1    would be retained.

2          However, depending upon the time frame and the

3    circumstances, not every document is going to be in

4    existence today 12 years later -- well, 11, however many

5    years later we are -- on a paper system.  Some of those

6    paper systems were -- the records retention policy was two

7    years and some of those paper documents don't exist any

8    more.

9    **Q.**   Let's go to Page 122.

10         THE COURT:  Let me ask you a question that just

11   occurred to me.  And I'm sorry to interrupt the flow here

12   and I may have missed it.  But did DEA provide any guidance

13   or have any input into how you determined your threshold

14   requirements?

15         THE WITNESS:  Absolutely none.  The DEA -- the DEA

16   said, "You built the system.  It's your system and your

17   responsibility," essentially.  So they didn't, they didn't

18   provide any of the substantive guidance on how to --

19         THE COURT:  So you determined the way you

20   established the threshold requirements completely on your

21   own?

22         THE WITNESS:  There -- so when counsel asked me

23   the question about the multiplication times three, to the

24   best of my recollection, there was a DEA public -- I forget

25   what it's called -- Advisory Committee, Public Advisory

1   Committee whereby they came together and made some

2   recommendations.  We used that same kind of -- because it

3   was on the DEA site, we sort of used it as a framework

4   within which to make our decisions about thresholds.

5           THE COURT:  I completely interrupted your flow

6   there, Mr. Fuller.

7           MR. FULLER:  You can interrupt any time, Judge.

8           THE WITNESS:  You get to do that.

9   BY MR. FULLER:

10  **Q.**   And the Court had a great question.  The, the

11  involvement of the DEA -- you referred to, I think,

12  what's referred to as the chemical handlers; right?

13  **A.**   Yes.

14  **Q.**   And chemical handlers is designed based, I think you

15  stated, on the Meth Act?

16  **A.**   To the best of my recollection, yes.

17  **Q.**   And it's designed to identify extraordinary orders of

18  List I chemicals; is that right?

19  **A.**   Yes, I believe that's accurate.

20  **Q.**   So it's not necessarily applicable to controlled

21  substances unless they contain List I chemicals.

22  **A.**   It's not necessarily -- you're right.  It is not

23  necessarily applicable, but it does provide a reasonable,

24  rational framework within which to begin a discussion or a

25  thought process about how to develop such a system.

1    **Q.**   And that system is designed, or the chemical handlers

2    is identifying extraordinary sizes of List I chemicals;

3    correct?

4    **A.**   That is correct.

5    **Q.**   Okay.  Let's change to -- so the QRA evaluation --

6    **A.**   Yes, sir.

7    **Q.**   -- determination has to be made at Cardinal as to

8    whether an order is plausible and suspicious or not

9    plausible and suspicious; correct?

10   **A.**   Yes.

11   **Q.**   And it, it's determined -- if the order is not

12   plausible and suspicious, you set out the process that's

13   going to occur; correct?

14   **A.**   Yes.  And the only point that I would make note of is

15   that the order was already blocked because it -- you know,

16   in most instances because it had a threshold.

17   **Q.**   It blocked at the triggering mechanization we looked at

18   earlier; correct?

19   **A.**   Yes, correct.

20   **Q.**   And then the suspicious order has to be reported to the

21   DEA; is that right?

22   **A.**   Once you determine that it is suspicious, the order is

23   reported to the Drug Enforcement Administration.

24   **Q.**   Sales is notified as well; right?

25   **A.**   That is correct.

1   **Q.**   And then the customer's terminated from purchasing

2   controlled substances or in totality; right?

3   **A.**   In, in, in, in the operation of the system, we either

4   did not let them purchase controlled substances or, you

5   know, that controlled substance or other related controlled

6   substances or in totality.

7        And in many instances, there were circumstances where

8   we even cut off their non-controlled substance ability, the

9   ability to order non-controlled substances.

10  **Q.**   Now, during your tenure, were you more focused on

11  reporting suspicious customers as compared to reporting

12  suspicious orders?

13  **A.**   No, we reported -- the regulatory requirement is to

14  report suspicious orders, and we reported suspicious orders.

15  **Q.**   So you never -- strike that.  So every customer that

16  you reported during your time frame, you either terminated

17  them from purchasing controlled substances or in totality;

18  correct?

19  **A.**   I do not --

20            MS. MAINIGI:  Objection.  I think that misstates

21  his testimony.

22            THE COURT:  Can you rephrase the question, Mr.

23  Fuller?

24            MR. FULLER:  Sure.

25            THE COURT:  I'll sustain the objection.

```
 1   BY MR. FULLER:

 2   Q.   The process laid out here has the customer being

 3   terminated from purchasing controlled substances or in

 4   totality; correct?

 5   A.   That is the statement on the slide, yes.

 6   Q.   Let's turn to Page 126.

 7        Now, this talks about proactive threshold analysis.  Do

 8   you see that?

 9   A.   I do.

10   Q.   And it gives us some of the reasons for increasing a

11   threshold, does it not?

12   A.   These, these characteristics could be characteristics

13   associated with increasing the threshold.

14   Q.   Okay.  It says "Things You Do."  It says "Our People."

15   What does that mean?

16   A.   The, the basic parameters around where we built the

17   corporate-wide effort was Anti-Diversion is everyone's

18   responsibility.  So we built a team effort so our people --

19   all of our people would be engaged in the process because it

20   comes back to -- any system is three things, you know.  A

21   first semester MBA student knows it's people, process, and

22   technology.

23   Q.   Then it's "Know Your Customer."  That's part of the

24   process; correct?

25   A.   Yes.
```

1    **Q.**    Gather information and provide to QRA, significant

2    change in business.   If there is a significant change, that

3    would be a legitimate reason for changing the threshold?

4    **A.**    These are characteristics that would demonstrate a, a

5    justification for a change in threshold.

6    **Q.**    First one being a new Hospice contract?

7    **A.**    Yes.

8    **Q.**    What that's referring to is if they gain a massive

9    customer of some sort, that may be a legitimate reason to

10   increase or change a threshold?

11   **A.**    It doesn't have to be a massive customer.  It just has

12   to be a change -- it's a change in their business that would

13   be reflected in the prescriptions that doctors were

14   prescribing that the pharmacy would be dispensing for

15   patients which would obviously change the need to order

16   controlled substances to meet and care for the patients that

17   were in Hospice.

18   **Q.**    The next one is file purchase of another pharmacy;

19   basically, where one pharmacy buys out another.  Is that

20   right?

21   **A.**    Yes.

22   **Q.**    Location change into the medical center, another reason

23   to change or increase a threshold?

24   **A.**    They would be -- not necessarily reasons to increase a

25   threshold, but they would be reasons to be looked at as to

1  why a threshold change might be necessary.  In some

2  instances, you might wait for the threshold to hit.  Other

3  instances, you may do a proactive analysis.

4  **Q.**   And the final one listed is addition of a new cancer

5  center; correct?

6  **A.**   Yes, sir.  It changes the dynamics of, you know, as I

7  said earlier, the relationship of the pharmacy let's say to

8  the hospital, and then the hospital builds a brand new

9  cancer center and it acquires a different number of

10  patients, and the patients are going to be treated

11  differently.

12  **Q.**   And in the validation process of QRA and keeping the

13  due diligence file, you would want to see this type of

14  documentation to support this kind of change?

15  **A.**   Depending upon the circumstances and the time, you

16  know, the timing of where we were in the process.  The

17  documentation would ordinarily be there for the pharmacist,

18  and the team would use that, you know, evaluation, make the

19  evaluation and make a change.

20  **Q.**   Now let's go to Page 128.  This is the decision impact,

21  the impact of whatever decision is made by QRA?

22  **A.**   Yes.

23  **Q.**   If the order is justified, additional products from the

24  original order may be released up to the new threshold

25  amount.  That's assuming there was a change in threshold or

1    an increase in threshold; right?

2    **A.**    It does make that assumption, yes.

3    **Q.**    And if that due diligence has been done, it would

4    justify a basis for increasing the threshold, then they can

5    order up to that order amount; is that right?

6    **A.**    Yes, sir.

7    **Q.**    Next point:  If the threshold is not increased, the

8    remaining of the product is cut from the original order --

9    excuse me -- if the threshold is not increased, the

10   remaining product from the original order will be cut.  It

11   means we keep the blocked order blocked.

12   **A.**    Correct.  The order is blocked.

13   **Q.**    If the size of the original order is not justified, QRA

14   will send the report to the DEA, or Drug Enforcement

15   Administration, and a block will be applied to all families

16   of controlled substances.  Correct?

17   **A.**    That is what's stated there, yes.

18   **Q.**    Okay.

19            MR. FULLER:  Judge, I'm sorry.  I moved that one

20   into evidence already.

21   BY MR. FULLER:

22   **Q.**    P-1930.  Mr. Mone, do you recognize -- let me ask

23   you, do you recognize this document?

24   **A.**    The first page is an email from me on 10/1 of 2008 to

25   Chris Anderson.

```
1    Q.   And who is Chris Anderson?  Do you know?

2    A.   Okay.  I learned from the last time I'm going to read

3    what it says down below.  He is the Director of Operational

4    Excellence and Quality Systems.

5    Q.   There's always a good way to cheat a little bit, huh?

6    A.   Yeah.

7    Q.   All right.  It says here -- you write to Chris, and

8    this is October 1st of 2008, that, "I made a few changes to

9    the slides and some information has changed a bit."  Right?

10   A.   Yes, sir.

11   Q.   And you attached several documents -- well, actually, I

12   think it's one PowerPoint presentation.  Correct?

13   A.   The documents, I believe, originated with Chris.

14   Q.   Right.  You're sending them back to him after you made

15   some changes?

16   A.   Yes, yes.

17   Q.   And have you seen these slides before as well?

18   A.   I undoubtedly have seen these slides before, but I

19   don't recall them currently, you know.  It's 12 years ago.

20            MR. FULLER:  Your Honor, I would move into

21   evidence Plaintiffs' 1930.

22            THE COURT:  Any objection to 1930?

23            MS. MAINIGI:  No objection, Your Honor, provided

24   that the witness can corroborate a foundation.  I note that

25   there are some notes on the page in addition to the slides.
```

```
 1    And the witness has testified that he's flipped through the
 2    slides.  I don't know if he can corroborate the notes that
 3    are on the slides.
 4    BY MR. FULLER:
 5    Q.   Mr. Mone, let me ask a question.  Mr. Mone, when
 6    you went through this, were you reviewing the totality
 7    of the PowerPoint?
 8    A.   To the best of my recollection, I was reviewing my
 9    components of the slides.
10    Q.   And you made edits to those?
11    A.   Apparently, I did.  What those edits were, I don't
12    recall what they were.
13    Q.   Sure.  You don't have an independent recollection today
14    of what edits you made?
15    A.   Right.
16    Q.   But according to your statement in the email, you made
17    edits and then you sent it back?
18    A.   Yes.
19           MR. FULLER:  Judge, I would move for the
20    admission.
21           MS. MAINIGI:  Your Honor, I still don't think a
22    foundation has been laid for the notes portion of the
23    slides.
24           THE COURT:  Did you make the notes, Mr. Mone?
25           THE WITNESS:  I did not.
```

```
1              THE COURT:  Do you know who did?

2              THE WITNESS:  I do not.

3              MS. MAINIGI:  I'm fine with admitting it without

4    the notes.

5              THE COURT:  Let's excise the notes and admit it

6    without the notes.  How about that, Mr. Fuller?  Are you

7    happy with that?

8              MR. FULLER:  Judge, I think he would have reviewed

9    it, but that's fine.  I don't have any objection.

10             THE COURT:  Okay.  1930 is admitted, but the Court

11   will not consider the notes.  They're not -- the notes are

12   not admitted.  The rest of the exhibit is admitted.

13             MR. ACKERMAN:  Your Honor, --

14   BY MR. FULLER:

15   Q.   Mr. Mone, turn to Page 18 of the document.

16   A.   Yes, sir.

17   Q.   This is the idea of the mentality behind your system,

18   isn't it?  First we identify; correct?

19   A.   Correct.

20   Q.   That's through our triggering system?

21   A.   Right.

22   Q.   Then we block, meaning we can't ship the order; right?

23   A.   That is a component of the triggering system.

24   Q.   Then we have to conduct due diligence.  And if we don't

25   surpass the due diligence threshold, meaning clear the
```

1    order, then it has to be reported to the DEA?

2    **A.**    If we determine that it is suspicious, it is reported

3    to the DEA.

4    **Q.**    If you turn to the next page.  The methods of diversion

5    that you were concerned about at Cardinal included several;

6    correct?

7    **A.**    Yes, sir.  That's on the slide.

8    **Q.**    Including indiscriminate prescribing; right?

9    **A.**    That is a method of diversion, yes.

10    **Q.**    Doctor shopping?

11    **A.**    That is a method of diversion.

12    **Q.**    Pain clinics?

13    **A.**    Depending upon how you define pain clinics.  I actually

14    call them prescription clinics.  But go ahead, yeah.

15    **Q.**    Excessive orders and distribution.

16    **A.**    Yes, sir.

17              THE COURT:  What do you mean by financiers there

18    as a method of diversion?

19              THE WITNESS:  I have no idea because that wasn't

20    my slide.  My slides are --

21              THE COURT:  Okay.

22              THE WITNESS:  -- from 31, and not all of the ones

23    after 31 are, are mine.

24              THE COURT:  Okay.

25    BY MR. FULLER:

```
 1    Q.    So your slides are up to --
 2    A.    My slide starts on 31.  And not all of the ones that
 3    follow 31 are my slides.
 4    Q.    Okay.
 5    A.    It's the one where my history and background is
 6    identified.
 7    Q.    28038.  Mr. Mone, do you recognize this document
 8    identified as Plaintiffs' 28038?
 9    A.    I recognize -- do I recognize it?
10    Q.    Yes, sir.
11    A.    No.
12    Q.    Are you identified on it?
13    A.    I am identified on it.
14    Q.    And is this an email from Douglas Emma to multiple
15    people, including yourself?
16    A.    I am a cc on the document, yes.
17    Q.    Do you have any reason to -- well, let me ask you this.
18    Who is Douglas Emma?
19    A.    Doug Emma was one of the pharmacists on the QRA team,
20    our, our Cardinal Health pharmacist QRA team.
21    Q.    And what was his role on the QRA team?
22    A.    He was a pharmacist that was part of the evaluation of
23    the -- in the QRA team just like the other pharmacists who
24    performed their evaluation on assessment of orders.
25    Q.    And is Mr. Emma sending this email to Mr. Linden Barber
```

```
 1    and Mr. Gilberto?

 2    A.    He, he -- the two individuals were Linden Barber and

 3    Gilberto Quintero.

 4    Q.    And who are they, or what was their role?

 5    A.    Gilberto was the new -- well, at this time, not new

 6    anymore, but he's the new Mark Hartman.  And Linden Barber I

 7    believe at this time was outside counsel.

 8    Q.    So, basically, Gilberto becomes your boss?

 9    A.    Gilberto was my boss, yes, sir.

10    Q.    Okay.

11              MR. FULLER:  Your Honor, at this time I would move

12    in Plaintiffs' 28038.

13              THE COURT:  Any objection to 28038?

14              MS. MAINIGI:  Your Honor, just a hearsay

15    objection.  We're fine with this as long as it's not

16    admitted for the truth.

17              THE COURT:  Do you want to admit it for the truth?

18              MR. FULLER:  Absolutely, Judge.  It's an email

19    from an investigator inside QRA reporting on what he does in

20    QRA.

21              THE COURT:  Okay.  How do you get around the

22    hearsay?

23              MR. FULLER:  It's an admission, Judge.  It would

24    be 801(d)(2)(D), a statement made by the party's agent or

25    employee on a matter within the scope of that relationship
```

1   while it existed.

2           THE COURT:  It's admitted.

3   BY MR. FULLER:

4   **Q.**   This email is on June 12th of 2012; is that right?

5   **A.**   It is.

6   **Q.**   Now, based on our timeline from the other documents

7   admitted into evidence, we know that the Immediate

8   Suspension Order was issued down in Lakeland in February of

9   2012; correct?

10  **A.**   That is correct.

11  **Q.**   So this is while that issue is pending.  Is that fair?

12  **A.**   I don't recall when the issue was resolved.  It may or

13  may not be.

14  **Q.**   Let me ask it differently.  The issue with the second

15  MOU had at least started when this email has occurred.  It

16  may have concluded.  We just don't recollect?

17  **A.**   I, I think that's a fair representation of what I

18  remember.

19  **Q.**   Okay.  Let's walk through this.  It says, "This is

20  follow-up to a discussion we had on our conference call

21  regarding the suspected hot spots, black hole cases, and

22  cases that probably need to be revisited by LV-TAC."  Right?

23  **A.**   You read that correctly.

24  **Q.**   And explain to the Court -- well, let me help you.

25  LV-TAC is a special committee within Cardinal; is that

1    right?

2    **A.**   It is a special committee that was created within

3    QRA -- within Cardinal, yes, yes.

4    **Q.**   And it was members of the QRA department; right?

5    **A.**   Yes.

6    **Q.**   And it would look at special instances or particular

7    concerns; is that correct?

8    **A.**   It would look at particular customers that were

9    identified to be looked at because of their volume of

10   controlled substances purchased.

11   **Q.**   And LV stands for large volume, doesn't it?

12   **A.**   It did, yes.

13   **Q.**   Do you recollect who the members of that committee

14   were?

15   **A.**   I know that the, that the SVP, the SVP of QRA, the VP

16   of QRA, and a bunch of folks.  I apologize.  I don't.

17   **Q.**   Sure.  Were you a member of that committee?

18   **A.**   I was initially, yes.

19   **Q.**   And was your boss a member, whether Mr. Quintero or Mr.

20   Hartman?

21   **A.**   Mr. Hartman has been retired, so it would be

22   Mr. Quintero.

23   **Q.**   Okay.  And you're right.  Let me back up.  This

24   committee was started somewhere around the beginning of

25   2012; is that right?

1    **A.**    Sometime in 2012, yes, sir.

2    **Q.**    Okay.  So back when you originated or came into this

3    position at QRA in Chapter 2, there was no LV-TAC?

4    **A.**    That is correct.

5    **Q.**    This came as a growth of the enforcement action down in

6    Lakeland; correct?

7    **A.**    This came as an improvement in -- as I cite, we're

8    continuously improving the program.  This came in as an

9    improvement to the program.

10   **Q.**    Fair enough.  It says next that, "I've taken the time

11   to illustrate a few examples.  Please contact me if you need

12   anything further."

13        Now, is Mr. Emma one that would have access to a host

14   of information related to all your pharmacies?

15   **A.**    Mr. Emma would have access to information that would --

16   in the ordinary course of what he did come in contact with.

17   How far broader than that may very well have been a function

18   of -- and I do not know -- participation in the LV-TAC.

19   **Q.**    Now, the LV-TAC and as well as all of QRA, they weren't

20   again limited in any particular geographic area that they

21   were looking at; is that correct?

22   **A.**    That is correct.  It was the entire enterprise.

23   **Q.**    When you say the entire enterprise, you mean the entire

24   country?

25   **A.**    Correct.

1    **Q.**   Okay.  And they point out several issues here; correct?

2    **A.**   He, he raises several.

3    **Q.**   First are possible hot spots.  Do you see that?

4    **A.**   I do.

5    **Q.**   That's dealing with hot spots out in Fresno,

6    California, is one of them; right?

7    **A.**   Yes, sir.

8    **Q.**   Then he's talking about a Medicine Shoppe.  Do you see

9    that?

10    **A.**   Uh-huh.

11    **Q.**   Medicine Shoppe BT3743300?

12    **A.**   I do.

13    **Q.**   And Medicine Shoppe has a particular relationship with

14    Cardinal; is that right?  I believe you testified to that

15    earlier.

16    **A.**   Medicine Shoppe is the brand name of a franchise

17    operation for Cardinal Health.

18    **Q.**   And I'll represent to you that the evidence will show

19    that there is a Medicine Shoppe in Cabell County -- well,

20    actually in the City of Huntington that skirts out into

21    Wayne County.

22          MS. MAINIGI:  Objection, Your Honor.  I think Mr.

23    Fuller is just testifying.

24          THE COURT:  Well, I'll overrule it.  He's just

25    laying the basis for the line of questions he's going to

1    pursue, so overruled.

2    BY MR. FULLER:

3    **Q.**   Mr. Mone, the relationship that Cardinal has with

4    Medicine Shoppe and the franchisees --

5    **A.**   Uh-huh.

6    **Q.**   -- Medicine Shoppe pays Cardinal a franchise tag, if

7    you will, for becoming part of their system; correct?

8    **A.**   My understanding of how franchises work, and I'm not a

9    franchise expert, is that the franchisees pay the franchisor

10   a fee for the ability to use the mark.

11   **Q.**   And on top of that, Medicine Shoppe also pays for the

12   pills that they order from Cardinal; correct?

13   **A.**   If that Medicine Shoppe is a customer of Cardinal

14   Health, they would obviously have an obligation to pay for

15   the medicines that they order.

16   **Q.**   And are you aware whether there's licensing -- I'm

17   sorry.

18   **A.**   I'm done.

19   **Q.**   Are you aware whether there are licensing agreements

20   between Medicine Shoppe and the different franchisees?

21   **A.**   I, I am not aware of what the licensing agreements are.

22   **Q.**   My question is very simply were you aware if they

23   exist?

24   **A.**   I have no independent knowledge that they exist, but

25   logic tells you that in order to be a franchisee, there has

1    to be a licensing agreement.

2    **Q.**    And I would assume, then, that you don't have any

3    knowledge as to what control Medicine Shoppe has over the

4    franchisees and where they order controlled substances or

5    anything else from, or do you?

6    **A.**    My only knowledge of the relationship is that Medicine

7    Shoppe franchisees are treated as independent retail

8    pharmacies.

9    **Q.**    And that means treated differently than the national

10   chains; is that correct?

11   **A.**    Treated differently than chains, that is correct.

12   They're treated just like every other retail independent

13   pharmacy.

14   **Q.**    All right.  Then we get down to -- well, Midwest

15   Benefit Pharmacy.  That's another one listed here, correct,

16   under the hot spot section?

17   **A.**    Yes, sir.

18   **Q.**    Then we get down to the black hole section.  Do you see

19   that?

20   **A.**    I do.

21   **Q.**    And there we list I believe it's just two pharmacies;

22   right?

23   **A.**    There are two pharmacies identified.

24   **Q.**    Van Pharmacy in Van, West Virginia.  Do you know where

25   Van, West Virginia, is, Mr. Mone?

1    **A.**    I have no idea, none whatsoever.

2    **Q.**    Okay.  And it says here, "QRA first discovered in

3    January of 2012 that the pharmacy was filling out-of-state

4    prescriptions from a pain clinic in Georgia."

5         Did I read that correctly?

6    **A.**    You did read that correctly.

7    **Q.**    Was that a known issue or concern at Cardinal that

8    there may be migration of pills?

9              MS. MAINIGI:  Objection, Your Honor, outside of

10    geographic scope.  The pharmacy is not in Cabell County.

11             THE COURT:  Well, I'll overrule it.  Go ahead.

12             THE WITNESS:  Whenever a pharmacy was dispensing

13    pursuant to prescriptions received from practitioners

14    outside of their area, we would normally almost always make

15    an inquiry into that.

16    BY MR. FULLER:

17    **Q.**    And not just in this particular instance, but that

18    was a known concern for Cardinal.  That was a potential

19    red flag.  Right?

20    **A.**    It was a, it was a consideration based upon the

21    totality of the circumstances that we would look into.

22    **Q.**    And at least here in June we've known it's been going

23    on at least as far back as January of 2012; correct?  At

24    least that's what the email says.

25             MS. MAINIGI:  Objection, foundation.  I don't

1    think that there -- it's been established that Mr. Mone has

2    any knowledge of this besides Mr. Fuller just asking him to

3    read the email.

4              THE COURT:  I agree.  Sustained.

5    BY MR. FULLER:

6    Q.   Let's go down to T & J Enterprise doing business as

7    Medicine Shoppe in Huntington, West Virginia.  As I told

8    you, the evidence would show there is a Medicine Shoppe

9    in Huntington, West Virginia.  Is that correct, Mr.

10   Mone?

11   A.   It appears based upon this email that there is a

12   Medicine Shoppe in Huntington, West Virginia.

13   Q.   And, again, keep in mind this is January of 2012.

14   "This pharmacy has experienced significant growth from the

15   stimulant drug families and new pain clinic business."

16        Do you see that there?

17   A.   I see the statement.

18   Q.   And one would presume that if we're seeing significant

19   growth, we're going to see some sort of documentation of

20   that in the due diligence files for Medicine Shoppe; right?

21   A.   One would anticipate that there would be.  And given

22   that it's 2012, it's likely to be in the system.

23   Q.   And then on top of that, we're talking about growth

24   from pain clinics, which is another potential red flag, is

25   it not?

1    **A.**   Only to the extent that we would make an inquiry

2    because not all pain clinics are -- not all pain clinic

3    physicians fail to meet their obligation to prescribe in

4    good faith in the course of professional practice for a

5    legitimate medical purpose.

6    **Q.**   And that's why we have to do due diligence to be able

7    to make that determination; correct?

8    **A.**   We have to do due diligence to satisfy ourselves that

9    the pharmacist in the dispensing of that medication is

10   meeting their corresponding responsibility in assessing the

11   prescriptions that the doctor is writing for the pain

12   clinics.

13   **Q.**   And you would want to know what pain clinics they're

14   servicing; right?

15   **A.**   We would want to, we would want to inquire who the new

16   pain clinic was prescribing.

17   **Q.**   And you'd want to inquire as to the top prescribers,

18   and particularly if they're coming from that particular pain

19   clinic; right?

20   **A.**   We would look at the prescribers of the pain clinics.

21   We -- I'm sorry.  To the extent that the pharmacist who's

22   making this analysis feels that it's relevant, which I would

23   presume that they would, then, yes, the answer is they would

24   look into that.

25   **Q.**   And just so we're clear, when we say the pharmacist,

```
1    we're talking about Cardinal's pharmacist, not the

2    pharmacist in the pharmacy.

3    A.    Yeah.  They have their own corresponding responsibility

4    in the pharmacy, but our pharmacists would make inquiry.

5    Q.    And it says, "QRA vetted the new pediatrician

6    prescribing stimulants and nothing significant appeared from

7    a DEA and license search."

8         Did I read that right?

9    A.    You did.

10   Q.    It says, "A competitor in town was raided by the DEA

11   which resulted in the arrest of the non-pharmacist owner."

12        Are you aware that there was a pharmacy in Huntington

13   that was shut down by the DEA?

14   A.    To the best of my recollection, I, I do not have any

15   specific knowledge that that occurred.

16   Q.    Okay.  Now, is that an issue that Cardinal would want

17   to be aware of?

18   A.    The easy answer for you is "yes" because, obviously, it

19   was a concern for our pharmacist.  Therefore, it is a

20   concern about what to do with the prescriptions from that --

21   patients who had been going to that pharmacy would naturally

22   be going to other pharmacies in the area.  So, yes, it's a

23   relevant inquiry.

24   Q.    And if some of those patients were illegitimate

25   patients, the pharmacy would get shut down, at least
```

1    according to this, by the DEA.  We wouldn't necessarily want

2    illegitimate patients coming to our customers.  Correct?

3              MS. MAINIGI:  Objection, Your Honor.  This calls

4    for speculation.  We're not talking about this particular

5    circumstance.  I don't know what Mr. Fuller is talking about

6    here.

7              THE COURT:  Okay.  Sustained.

8              MR. FULLER:  I'll ask it a different way.

9    BY MR. FULLER:

10   **Q.**   Is one of the concerns that you have related to a

11   DEA shutdown of a pharmacy is where are those

12   prescriptions now going to get filled?

13   **A.**   Can you say the question again?

14   **Q.**   Sure.  I'll ask it again.  When a DEA pharmacy or the

15   DEA comes in and shuts down, raids a pharmacy --

16   **A.**   Yes.

17   **Q.**   -- in a small town, you're going to want to be mindful

18   of that if you can be; correct?

19   **A.**   When, when the DEA closes a pharmacy in any town, it

20   doesn't have to be a small town, just a town, it is a

21   relevant inquiry to, for the pharmacist to look at the post

22   shutdown changes to our customers in that area.

23   **Q.**   And, so, when you're evaluating such things as

24   threshold breaches or even threshold adjustments, that's

25   part of the totality of the circumstances that Cardinal

1    wants to use in trying to make those type of decisions?

2    **A.**    Cardinal would use those factors in the totality of

3    the -- the pharmacists would use that in the totality of the

4    circumstances in their evaluation.

5                  THE COURT:  Mr. Fuller, I'm going to pull the plug

6    on this and attend to another matter.  So when you get to a

7    stopping point, we'll --

8                  MR. FULLER:  Judge, we can break right now.

9                  THE COURT:  Okay.  That's fine.  Let's come back

10    at 2:00.

11                  MR. FARRELL:  Judge, may I make a quick proffer

12    before we leave?

13                  THE COURT:  Yes.

14                  MR. FARRELL:  You previously, you previously ruled

15    that P-45, lack of foundation, and provided the opportunity

16    for the plaintiffs to find another avenue to introduce it.

17        Therefore, under Document 835, the stipulation in this

18    case, it reads, "Plaintiffs will be provided an opportunity

19    to cure all unresolved issues relating to authenticity and

20    foundation, including the ability to depose and/or call a

21    custodial witness at trial."

22        The custodial witness for P-45 is Steve Falk, F-a-l-k.

23    We hereby place Cardinal on notice we intend to call him as

24    a custodial witness for P-45.

25                  THE COURT:  Okay, all right.  See you at 2:00.

```
 1            (Recess taken at 12:02 p.m.)

 2            THE COURT:  All right, Ms. Hardin.

 3            MS. HARDIN:  Good afternoon, Your Honor.  Ashley

 4     Hardin on behalf of Cardinal Health.

 5        And I would just like to address the several

 6     accusations from this morning, including the comment by Mr.

 7     Farrell right before the lunch break that Cardinal Health is

 8     in breach of any of the evidentiary objections to which we

 9     have agreed.  And I think this issue has come up this

10     morning with regard to Document P-45.

11        We are not in breach of any stipulation, Your Honor.  I

12     would like to clarify what those stipulations --

13            THE COURT:  Did he say you were?  I don't remember

14     that he said that.

15            MS. HARDIN:  That is certainly the impression I

16     have been left with, Your Honor, and I think Mr. Majestro

17     was also planning to address the Court.

18            THE COURT:  Okay.

19            MS. HARDIN:  And if that's incorrect, he'll

20     clarify.

21        First of all, the first stipulation that Cardinal

22     entered into with regard to this issue is Docket 835.  That

23     was entered on August the 6th.  And what we agreed to do in

24     that stipulation, which didn't address any specific

25     documents, that was to be worked out later.  What we agreed
```

1    to do was for a certain set of documents to be agreed on

2    later, not to object on authenticity and lack of sponsoring

3    witness.

4         We also agreed that between the time the stipulation

5    was entered on August the 6th of 2020 and start of the trial

6    to work with the plaintiffs in good faith to address issues

7    of authenticity and foundation.

8         We're now into the third and -- or fourth week of the

9    trial and so, that time has passed.  So, we do not agree

10   that we have agreed to put up any -- any witness to cure any

11   custodial issues.

12        And I think the statement was made this morning that

13   they would like to send a subpoena to Steve Falk, who is the

14   former General Counsel of Cardinal Health.  We don't control

15   him in any event, but even if we did, we wouldn't agree that

16   it's proper to send a custodial deposition notice to him

17   now.

18        But more fundamentally, Your Honor, the issues that

19   were raised, the objections that were raised this morning do

20   -- as to P-45 do not implicate the stipulation.  We did not

21   object to the admissibility of that document because it

22   lacks authenticity or because they didn't have a proper

23   sponsoring witness.

24        We objected to the admissibility of that document

25   because it is hearsay and it is privileged.  And in both --

```
 1                THE COURT:  Well, I read all of these stipulations
 2      and you did reserve your right to --
 3                MS. HARDIN:  Exactly, Your Honor.
 4                THE COURT:  -- object on hearsay and a whole bunch
 5      of other stuff, too.
 6                MS. HARDIN:  That's right.  So, 835, as I said,
 7      was the original stipulation that didn't deal with any
 8      specific documents.  Then there are three separate
 9      stipulations that got entered that actually do deal with
10      particular documents on which we made that agreement on --
11      on authenticity and lack of sponsoring witness.
12          The one that concerns Document P-45 is Docket 1305 and
13      the listing of exhibits is 1305.1.  And it -- as Your Honor
14      rightly notes, it couldn't be more clear.  We said we
15      preserve all evidentiary objections, including hearsay.
16          We made a hearsay objection to the admissibility of
17      that document and Your Honor sustained the objection.  So,
18      we're outside of the realm of the stipulation and we're
19      outside of the realm of where any custodial witness, even if
20      they could get a deposition, even if we agreed they could do
21      that, would help them cure their issue.
22          So, we're not in breach and we just wanted to make that
23      abundantly clear to the Court, Your Honor.  So, thank you
24      very much.
25                THE COURT:  Okay.  Thank you.
```

1            Mr. Majestro, do you want to say something?

2                MR. MAJESTRO:  Yes, sir.

3            So, Your Honor, I missed much of this morning's

4    proceedings, but we had a discussion over lunch and I came

5    up with what I think is a good -- a better way to handle

6    this than we've been doing it in this case.

7            With respect to the documents where the parties have

8    stipulated to authenticity, where the parties have

9    stipulated that there isn't a need to present the documents

10   through a sponsoring witness, and that would include, I

11   believe, the McKesson documents, and the Cardinal documents,

12   and some third-party documents like the documents from the

13   DEA, we would propose that the night before -- instead of

14   what we've been doing is listing the documents to be used

15   with witnesses and that -- I think that's what we're getting

16   all bollixed up about, that we would just list those

17   documents as documents we are going to tender to the Court

18   and move for admission in the record.

19           Now, the parties can list their objections like we've

20   been doing.  We can list our responses.  We can submit our

21   responses.  We can submit them to the Court and if there are

22   any hearsay objections or other issues that need to be dealt

23   with, we can deal with them.  Either the Court can rule or

24   the Court -- if the Court wants to hear argument on them,

25   but -- but this -- you know, we've gotten a lot of argument

1    over documents that we don't think we need to be doing that.

2         I don't -- I think I went to sleep dreaming of

3    802(1)(D) last night and there's no need to do that in

4    court.  And so, so we propose that that be the case.  That's

5    what we are going to do tonight.  We wanted to provide the

6    defendants with notice.

7         Now, I understand ABDC is objecting to that because

8    their witnesses are gone and the stipulation was limited to

9    production through the witnesses that showed up.  That, I --

10   I haven't looked at that stipulation.  If that's the case,

11   we won't identify ABDC documents.

12        But these other documents are documents that the

13   stipulations either through third parties where all the

14   defendants agreed to or the remaining two defendants with

15   live witnesses where they have agreed that we don't need a

16   sponsoring witness, we don't need to be arguing about those

17   documents with witnesses on the stand.

18             THE COURT:  Your stipulations were just with

19   Cardinal, weren't they?

20             MR. MAJESTRO:  There is a separate stipulation

21   with McKesson and then -- for their documents and there is a

22   stipulation with all the defendants for docs -- for other

23   third-party documents, such as DEA documents, and those

24   kinds of documents.  And those are the -- those are the

25   documents that I am proposing we follow this procedure on.

```
1              THE COURT:  Mr. Mahady?

2              MR. MAHADY:  Your Honor, Mr. Majestro

3    distinguished, I believe, between the stipulations of the

4    other defendants and the ABDC stipulation.  I just want to

5    make note for the record that there is a distinction as far

6    as we're concerned.  I can deal with that with Mr. Majestro.

7    If he feels like he needs to raise it later, he can.

8              MR. MAJESTRO:  Yeah, and I haven't looked at -- I

9    pulled up the McKesson stipulation and I'm assuming they all

10   three had the same language.  He raised that same issue

11   immediately before.  We'll work that out.

12       We won't -- if there is not a -- if there's not an

13   agreement that the document can be produced without a

14   sponsoring witness or if there's some other agreed -- you

15   know, some other way to get it in without a sponsoring

16   witness, we're not going to put them on the list that way.

17   We'll put them on the list of witnesses, but as he pointed

18   out, his witnesses are gone, so they're not going to be his

19   witnesses.

20             MR. MAHADY:  Right.  And, Your Honor, I'll just

21   note that what the stipulation says is that

22   AmerisourceBergen stipulates that they will not object to

23   the presentation of these documents through Chris Zimmerman,

24   Steve Mays, David May and/or Michael Perry at trial while

25   preserving all other evidentiary objections.
```

1       That was a negotiated term.  I believe the plaintiffs

2   sought to have no sponsoring witness.  We negotiated that it

3   has to be through those witnesses.  Those witnesses have now

4   come and gone.

5       So, our position is, is that the plaintiffs cannot now

6   seek to move in additional documents, whether stipulated or

7   not, without these witnesses per the stipulation.

8           THE COURT:  Well, let's wait until the documents

9   are offered and then -- then deal with that at that point,

10  Mr. Mahady.

11          MR. MAHADY:  Thank you, Your Honor.

12          THE COURT:  Mr. Hester?

13          MR. HESTER:  Your Honor, I'm just not sure how the

14  procedure that Mr. Majestro is proposing would, in fact,

15  work.  If it's all going to be by paper, there's no

16  opportunity for us to present our views to the Court in any

17  realistic methodology and, furthermore, I'm not sure how we

18  would determine what the Court has admitted into evidence

19  and what it's not.  It feels like it's shifting some work to

20  the Court here; whereas, the way we've been doing it, I

21  understand there's been a little bit of back and forth, but

22  in the aggregate, it's useful for us to know what's in

23  evidence as we're going through the testimony on particular

24  days.

25          THE COURT:  Well, some of the problem was probably

```
1    my fault because I didn't perfectly understand the

2    stipulations.  I've read them now and I think that I do.

3        So, Mr. Majestro, I think we can just deal with it as

4    it comes up.

5            MR. MAJESTRO:  Okay.  So, we'll put them on the

6    list and we'll see what happens.

7            THE COURT:  Mr. Farrell?

8            MR. FARRELL:  I think that cures everything except

9    for P-45.  P-45 is the audit and, this morning, there was an

10   objection on foundation, which you sustained.

11       So, we're perfectly willing and able and encourage a

12   discussion on hearsay grounds, but the objection that was

13   sustained -- that was made and sustained, according to my

14   learned co-counsel, was on foundation.  So, the problem that

15   we have is that if, in fact, we're going to have foundation

16   arguments, then we only have a finite number of Cardinal

17   Health witnesses in order to present it through.

18           THE COURT:  Well, doesn't the stipulations take

19   care of the foundation argument?  And that may -- I don't

20   remember that specific document.

21           MR. FARRELL:  Yes, Your Honor.

22           THE COURT:  But --

23           MS. HARDIN:  Your Honor, I think we are perhaps

24   confusing -- can you hear me -- confusing two issues.

25       We objected to the admissibility of P-45 on hearsay
```

1    grounds and it's certain we don't have access to the

2    transcript at this point in time, but we understood that

3    that was the objection that Your Honor sustained and why

4    that document is not admissible.

5         We made a foundation objection to whether or not Mr.

6    Mone is capable of testifying about that document, whether

7    or not it comes in.  The answer to that is lack of

8    foundation because he testified that he -- I believe he

9    testified that he had never seen it.  So, that was the

10   foundation objection.  No custodial deposition could cure

11   that.

12             THE COURT:  So, you're saying that the stipulation

13   makes it admissible, but there's no foundation for Mr. Mone

14   to testify?

15             MS. HARDIN:  No, sir.  We don't believe the

16   stipulation makes P-45 admissible.  We -- the stipulation

17   says we're not going to object to P-45 on the ground of

18   authenticity, so we don't contend that it's not authentic,

19   and we don't contend that they have to put up a sponsoring

20   witness.

21        So, if P-45 were independently admissible, then it

22   could come in theoretically through Mr. Mone, but Mr. Mone

23   cannot testify about it because he has no foundation from

24   which to do so.  And here, in this particular instance, the

25   document is not independently admissible because it is

1    hearsay and the plaintiffs have not overcome the hearsay

2    objection.  Your Honor sustained that objection.

3            MR. ACKERMAN:  Your Honor, may we make a record on

4    the hearsay objection because I don't believe a record has

5    been made on that objection.

6            MR. FARRELL:  That's my point, Judge.  The

7    stipulation isn't limited to a sponsoring witness.  The

8    stipulation says foundation.  We were prevented from asking

9    any questions on foundation and that was the objection.

10           So, to be clear, what we're suggesting is that Mr. Mone

11   says he's never seen this document before.  We agree that

12   precludes us from asking him questions on a document he has

13   no knowledge of.  It does not preclude us from tendering

14   that document to the Court for admission.

15           What we're suggesting is that this process could be

16   expedited and the witness testimony truncated if we come up

17   with a procedure where we can take documents that we believe

18   are subject to stipulation and tender them to the Court as

19   if this were an appellate case submitted on the briefs.

20           There are documents we can submit on their face that

21   will save us a tremendous amount of time and argument having

22   to present it during an individual witness's testimony.

23           That being said, we have a pretty good argument of why

24   this document, which was prepared at the request of, in the

25   custodial file of, argued and briefed and even subject to

1    deposition testimony is not hearsay.

2        Now, one real quick side-bar.  The defendants have also

3    gone and made the argument that this document is subject to

4    attorney-client privilege and I would like to proffer for

5    the record that in the MDL 2804, ECF 1498, discovery ruling

6    14.5, it specifically rejects attorney-client privilege and

7    that it was affirmed by Judge Polster at ECF 1553.

8        So, to the extent that the defendants are trying to

9    preserve for the record that this document is covered by

10   attorney-client privilege, we believe there's been an

11   insufficient showing to invoke the privilege.

12            THE COURT:  Okay.  Which one is it?  What's the

13   number on it?  I will try and find it here.

14            MR. ACKERMAN:  P-45.

15            THE COURT:  P-45?

16            MR. ACKERMAN:  Yes, sir.

17            MS. HARDIN:  Your Honor --

18            THE COURT:  Let me --

19            MS. HARDIN:  Sure.  Certainly.

20            THE COURT:  Okay, I've got it now.

21            MR. ACKERMAN:  So, Your Honor, with respect to the

22   hearsay objection, this is a document that states on it --

23   the first line of the letter says, "I have attached for your

24   information and review our initial findings and

25   recommendations on Cardinal Healthcare's Suspicious Order

1    Monitoring System."  It is similar, if not identical, at

2    least in analysis, to the FTI report that Your Honor ruled

3    was not hearsay with regard to ABDC.

4         The reason that it is not hearsay, Your Honor, is

5    because it falls within an opposing party's prior statement

6    within Rule 801(d)(2) and, specifically, it is 801(d)(2)(C),

7    a statement made by a person whom the party authorized to

8    make a statement on the subject.  Cardinal Health hired

9    Cegedim Dendrite and authorized them to investigate and

10   report their findings on its Suspicious Order Monitoring

11   System.

12        It also is not hearsay pursuant to Rule 801(d)(2)(D),

13   as in Delta, because it is a statement made by the party's

14   agent on a matter within the scope of that relationship and

15   while it existed.  And I do believe that you stated with

16   respect to ABDC that FTI was their consultant and their

17   agent for purposes of this review.  The same analysis

18   applies with respect to this document.

19             THE COURT:  Ms. Hardin?

20             MS. HARDIN:  Your Honor, we disagree on both

21   counts.  One, Ms. Mainigi was clear this morning that this

22   document was subject to an adverse privilege ruling against

23   us in the MDL.  We fought tooth and nail to have to produce

24   this document.  We lost that battle.

25        But now, here we are at the moment of truth.  This is

1    the trial.  And it's now wanting to be offered against us

2    and admitted against us.  And so, we do not waive our

3    privilege objection.  We have never waived that objection.

4    And we assert it here again to the extent that this is the

5    first time this document is ever being utilized against us

6    in a court.  So, that's point one.

7        Point two, this document does not fall within the

8    hearsay exception.  801(2)(d)(C) -- I don't know if I'm

9    getting all the letters confused -- is a statement of an

10   agent.

11       In the -- the Fourth Circuit has addressed two times

12   whether or not a party's lawyer's statement can be admitted

13   against them under this exception and both times both

14   statements involved a statement that the lawyer made to

15   someone else in the outside world.

16       This report is legal advice.  It is Cardinal Health's

17   lawyer talking to it in a privileged attorney-client

18   communication.  They are not acting as our agent in that

19   situation in terms of making statements on our behalf, nor

20   did we authorize them to make any statements on our behalf

21   to anyone else.

22       And so, if the exception is going to be that legal

23   advice given within the confines of the attorney-client

24   communication can then be entered against that party at

25   trial, then I submit that is beyond anything that we have

1    seen in the case law in the Fourth Circuit and it's not what

2    is contemplated by that exception, nor is this our own

3    statement that we have adopted in any sense.

4        I mean, again, this is legal advice.  And the legal

5    advice was given to us just the same as if I call my client

6    this afternoon and I give them my opinion about how this

7    trial is going.  That is not an admission of my -- that will

8    not be an admission of my client.  That will not be my

9    client's statement.  That would be my statement to my

10   client.

11       So, it is hearsay.  It's an out-of-court statement that

12   they want to offer for the truth and they haven't yet given

13   a proper hearsay objection, anything to override the hearsay

14   objection, in our opinion, Your Honor.

15           MR. ACKERMAN:  So, Your Honor, let me address that

16   briefly.  First of all --

17           THE COURT:  I've heard enough of this.  I'm going

18   to stick with my original ruling, but I will take another

19   look at it and see if it ought to be reversed, but I know

20   what the arguments are here.

21       And I will consider your arguments, Mr. Ackerman.

22           MR. ACKERMAN:  Okay.

23           THE COURT:  And we've spent a half-hour almost on

24   this and we need to get rolling.

25       Mr. Mone, are you here?

```
 1              MS. MAINIGI:  We're going to get him, Your Honor.
 2              MR. ACKERMAN:  While he is walking in, Your Honor,
 3     this -- and Cegedim Dendrite is not a law firm.  I just want
 4     to make that clear for the record.
 5              THE COURT:  Well, he's a lawyer, isn't he, isn't
 6     he or she, or whoever it is?
 7              MR. ACKERMAN:  No, Your Honor.
 8              MS. HARDIN:  Your Honor, I believe --
 9              MR. ACKERMAN:  This is -- this is a third party
10     that was hired by Cardinal Health.
11              THE COURT:  Well --
12              MR. ACKERMAN:  I understand and perhaps we should
13     brief this or discuss it later.
14              THE COURT:  Mr. Mone, you may resume the witness
15     stand and you're under oath, of course, still under oath.
16              MR. FULLER:  May I approach the witness?
17              THE COURT:  You may, Mr. Fuller.  Yes, you may.
18              BY MR. FULLER:
19     Q.  I'm handing the witness what has been marked Plaintiffs
20     7509.  Mr. Mone, do you recognize this document?  Let's
21     start with the first page.
22     A.  The first page -- sorry.  The first page is an e-mail
23     from Nick Rausch to me and others.
24     Q.  And does it -- what does it pertain to?
25     A.  It is a visual description of last month's SOM Report
```

1    with relevant metrics.

2    **Q.**   This e-mail was sent on June 5th of 2009?

3    **A.**   Yes, sir.

4    **Q.**   And it mentions it was relating to the prior month.  Is

5    this something that you would get on a semi-regular basis?

6    **A.**   Yes, sir.

7    **Q.**   And is this something that was done in the normal

8    course of your employment as the one in charge of running

9    the QRA Division at Cardinal?

10   **A.**   Yes, it would.

11   **Q.**   And was it Mr. Rausch's duty as -- or his position to

12   send these e-mails to your group on a regular basis, as

13   well?

14   **A.**   Yes.  He was in charge of the Analytics Group.

15             MR. FULLER:  Your Honor, we would move in P-7509.

16             MS. MAINIGI:  No objection, Your Honor.

17             THE COURT:  It's admitted.

18                 **PLAINTIFF EXHIBIT P-7509 ADMITTED**

19             BY MR. FULLER:

20   **Q.**   And if we turn to the second page, this provides sort

21   of a summary of the prior month, as well as a lookback,

22   correct, Mr. Mone?

23   **A.**   It does.

24   **Q.**   And so, if we look at the upper left-hand box, it says,

25   "SOMS events per month".  Do you see that?

**A.**   I do.

**Q.**   And that means suspicious order monitoring events for the month; is that correct?

**A.**   It refers to the threshold events per month.

**Q.**   And as we established earlier, that's particularly based off of volume, right?  It has to hit that threshold trigger, correct?

**A.**   Those are the events that hit the threshold.  Those are the events of the orders that hit the threshold.

**Q.**   And that, again, would only be considering volume; is that right?

**A.**   It's predominantly volume, yes.

**Q.**   Then there may be an analysis done related to frequency and pattern, but that's done by your pharmacist after the triggering event occurs?

**A.**   Both before and after.

**Q.**   And it looks back, what, about 12 months?

**A.**   It does.

**Q.**   And it provides numbers.  So, 421 for June of '08, do you see that?

**A.**   I do.

**Q.**   Would that mean that Cardinal nationwide had 421 triggering events across the country?

**A.**   Yes, it does.

**Q.**   And if we go to the next month, July, 390 -- excuse me.

1    793, do you see that?

2    **A.**    That is correct.

3    **Q.**    And that would mean we have 793 threshold triggering

4    events under your system across the country?

5    **A.**    That is what that number means to me, yes.

6    **Q.**    If you turn to the last page, the third page, I'm

7    sorry, there's another box there that refers to suspicious

8    orders per month.  Do you see that box?

9    **A.**    I do.

10   **Q.**    And is that the number of orders that Cardinal actually

11   determined to be suspicious across the country?

12   **A.**    Yes.

13   **Q.**    So, if we look at that and we compare June of '08, we

14   know we have 421 triggering events, right?

15   **A.**    Yes.

16   **Q.**    And we reported 12 suspicious orders; is that correct?

17   **A.**    That is correct.

18   **Q.**    So, for example, on July of '08, we had 793 triggering

19   events, but only reported two orders nationwide.

20   **A.**    That is correct.

21   **Q.**    And carries on throughout the rest of the 12-month span

22   there; is that right?

23   **A.**    It does.

24   **Q.**    Okay.  And, again, this was the system that was housed

25   in Dublin, Ohio; is that correct?

1   **A.**   Yes, sir.

2   **Q.**   So, Mr. Mone, I passed you two more documents.  One is

3   marked Plaintiffs' Exhibit 77 for the record.  The other one

4   is marked Plaintiffs' Exhibit 44267.  Do you have them in

5   front of you?

6   **A.**   I do.

7   **Q.**   Are they the similar type of monthly summaries?

8   **A.**   They are.

9   **Q.**   And if you look at P-77, does it appear that in the

10  upper right-hand corner that it's for a February, 2009

11  summary?

12  **A.**   It does.

13  **Q.**   And if you look at 44267, upper left-hand corner, it

14  looks like it's for an August of 2009 summary, correct?

15  **A.**   Right.

16  **Q.**   And these, again, were documents that were produced in

17  the regular course of business in the Anti-Diversion

18  Department?

19  **A.**   They were.

20          MR. FULLER:  Your Honor, I would move in

21  Plaintiffs' 77 and Plaintiffs' 44267.

22          MS. MAINIGI:  No objection, Your Honor.

23          THE COURT:  Admitted.

24              **PLAINTIFF EXHIBIT 77 & 44267 ADMITTED**

25          BY MR. FULLER:

1    **Q.**   Mr. Mone, did you use these to monitor how the system

2    was functioning?

3    **A.**   These were tools that were used by the team to make

4    assessments of the program.

5    **Q.**   And then, these are all based off the thresholds,

6    correct?

7    **A.**   These reports are based off of threshold, that is

8    correct.

9    **Q.**   Now, we talked about setting the thresholds earlier and

10   you're setting them, at least initially, end of 2007,

11   beginning of 2008, correct?

12   **A.**   That was the initial thresholds setting process, yes.

13   **Q.**   Before your arrival, Cardinal didn't use these type of

14   thresholds, right?  They used Ingredient Limit Reports?

15   **A.**   Before I got there, Ingredient Limit Reports were being

16   -- were done and when I got there, they were already -- the

17   system was already in the beginning stages of making

18   adjustments to an electronic system.

19        I don't recall how -- I don't recall how those initial

20   orders, you know, that they were establishing in the

21   immediate term before I got there were done.

22   **Q.**   But you implemented this threshold system we've been

23   talking about today?

24   **A.**   I improved -- I improved the entire -- I would like to

25   think I improved the entire system that was there.

1   **Q.**   And so, when you devised how these thresholds were

2   going to be set using the system we talked about earlier,

3   subcategorizing the customers, then subcategorizing them on

4   size, then determining an average and tripling it, what did

5   you do to take into consideration that the company was in

6   the throes of an opioid epidemic?

7   **A.**   The considerations that we made were to take our

8   assumptions that we were making in terms of where to place

9   those thresholds and bounce those up against external

10  experts to make certain that the assumptions that we were

11  making were -- were appropriate.

12  **Q.**   And then that led you to the conclusion that it was

13  still a good idea to multiply the average by three?

14  **A.**   Yes.  When we sent -- when we sent it out and had

15  external folks look at the process, they came back with an

16  assessment with the assumptions that we were making were

17  appropriate.

18  **Q.**   Now, we've talked about the thresholds.  We've talked

19  about that they're tracked.  You guys had a -- and I said

20  you guys.  I'm sorry.  Cardinal had an electronic system for

21  tracking these thresholds and I think you testified earlier

22  these were kept in the normal course, correct?

23  **A.**   That is correct.

24  **Q.**   You also tracked threshold changes in the normal

25  course; is that right?

1    **A.**   Through system track changes, we did.

2    **Q.**   You had access to these systems?

3    **A.**   I did have access to the systems, yes.

4    **Q.**   As well as the rest of your team; is that right?

5    **A.**   Absolutely.

6    **Q.**   Now, not only with threshold changes, but threshold

7    events.  We see here that on certain months, for example,

8    May of '08, we have the 421 threshold events.  Those are

9    tracked, as well, correct?

10   **A.**   Which document are you referring to?

11   **Q.**   I'm sorry.  I'm on 7509, the one that has your e-mail

12   attached to it.

13   **A.**   Okay, thank you.  7509?  And what was your statement --

14   question?

15   **Q.**   Yes, sir.  I'll ask the question again.  Where we have

16   June of '08 the 421 threshold events --

17   **A.**   Yes.

18   **Q.**   Those are also tracked within Cardinal's system; is

19   that right?

20   **A.**   Yes, they were.

21   **Q.**   Those were also accessible by you?

22   **A.**   Pardon?

23   **Q.**   You also have access to those?

24   **A.**   I did.

25   **Q.**   No longer?

```
1    A.    Correct.

2    Q.    You did at the time?

3    A.    Correct.

4    Q.    Your team had access to those?

5    A.    They did.

6    Q.    It's something that your department would use on a

7    regular basis in maintaining the anti-diversion system,

8    correct?

9    A.    Yes, they would.

10   Q.    You also tracked all the suspicious orders that were

11   reported, correct?

12   A.    Yes, we did.

13   Q.    You could look up and see how many suspicious orders

14   were reported in certain geographic areas, as well as

15   particular pharmacies; is that right?

16   A.    Yes, we could.

17   Q.    You had access to that system?

18   A.    Undoubtedly, I had access to the system.  I'm not sure

19   I knew the ability to extract that information out of the

20   system.

21   Q.    That may be something that you asked one of your other

22   team members --

23   A.    Yes.

24   Q.    -- to pull for you; is that fair?

25   A.    Yes.
```

```
1    Q.   Okay.

2              MR. FULLER:  Your Honor, at this time, I would

3    like to move in P-14294.  We disclosed this last night and

4    there was no objection.

5              MS. MAINIGI:  We have no objection, Your Honor, to

6    its admission.  Obviously, we can -- if it's something he's

7    going to question the witness on, we can take that piece of

8    it up as it goes, but we have no objection to its admission.

9              THE COURT:  Okay, it's admitted.

10             PLAINTIFF EXHIBIT P-14294 ADMITTED

11             MR. FULLER:  Your Honor, I'm going to test my

12   luck.  I'm going to move for admission of P-44275.

13             MS. MAINIGI:  Same position, Your Honor.

14             THE COURT:  Admitted.

15             PLAINTIFF EXHIBIT P-44275 ADMITTED

16             MR. FULLER:  And I would move for admission of

17   P-42071.

18             MS. MAINIGI:  One moment, Your Honor.

19             THE COURT:  Yes.

20       (Pause)

21             MS. MAINIGI:  Same position, Your Honor.

22             THE COURT:  All right.  It's admitted.

23             PLAINTIFF EXHIBIT 42071 ADMITTED

24             BY MR. FULLER:

25   Q.   Mr. Mone, a moment ago when we were talking about the
```

1   design of the thresholds and taking into consideration the

2   epidemic, you mentioned relying on third-party experts.

3   What third-party experts would that be?

4   **A.**   Well, we subjected our SOM program to Deloitte.  We

5   subjected elements of it to IBM Watson.  There were

6   improvements that we looked at and we submitted to a Ph.D.

7   at Ohio State.  There may, in fact, be more, but those are

8   the three I can think of right now.

9   **Q.**   Now, let me try to inquire on those.  The submission to

10   Ohio State came further on in the system, correct?

11   **A.**   It did.

12   **Q.**   The submission to Cegedim Dendrite was earlier on in

13   the system, correct?

14           MS. MAINIGI:  Objection.  I don't think that is

15   the testimony.  I don't think Mr. Mone said Cegedim

16   Dendrite.  He said IBM Watson, he said Deloitte, and he said

17   Ohio State.

18           THE COURT:  Sustained.

19           BY MR. FULLER:

20   **Q.**   Mr. Mone, I'm handing you what's marked for

21   identification purposes as Plaintiffs' Exhibit 80.  Have you

22   seen this document before?

23   **A.**   I have not.

24   **Q.**   You had -- do you have any understanding of what this

25   Investigative Demand Committee Report would be?

1    **A.**    No.

2    **Q.**    Sure.

3    **A.**    May I -- may I make a correction?

4    **Q.**    Sure.

5    **A.**    Because I'm just not certain.  I may actually have seen

6    parts of this document in a prior deposition, but I haven't

7    seen the document, the whole thing.

8    **Q.**    Fair enough.  So, you may have recollection of this

9    document from a prior deposition; you don't remember seeing

10   it during the course of your employment?

11   **A.**    I do not.  Do not.

12   **Q.**    Do you remember whether in the beginning of -- end of

13   2012, beginning 2013, whether there was an investigation

14   conducted related to the SOMS systems at Cardinal?

15   **A.**    I recall a -- for lack of a better term, I recall an

16   internal -- an internal inquiry into the Suspicious Order

17   Monitoring Program.

18   **Q.**    And were you interviewed related to that process?

19   **A.**    To the best of my recollection, I was.

20   **Q.**    Do you believe some of your team members may have been

21   interviewed in that process?

22   **A.**    Undoubtedly, they were, more than likely.

23   **Q.**    And was that looking at and reviewing the SOMS system

24   in place and any potential changes that may need to be made?

25   **A.**    I would assume that's what they were looking at.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1              MR. FULLER:  Your Honor, at this pint, I would
 2    move into evidence -- not to show the witness -- but just
 3    submission into evidence, Plaintiffs' Exhibit 80.
 4              MS. MAINIGI:  Your Honor, objection.  I understand
 5    it's not being submitted to show the witness, so I will
 6    reserve on a foundational objection.
 7         My main objection to admission is geographic scope
 8    because this report relates to Florida-Lakeland.  It does
 9    not report -- it doesn't have anything to do with
10    Cabell-Huntington.
11              THE COURT:  Mr. Mone, what's the Special Demand
12    Committee?
13              THE WITNESS:  I have no idea what that is.
14              THE COURT:  Oh, you don't know?  Okay.
15              MS. MAINIGI:  I don't think -- I think, as he
16    testified, Your Honor, he had not seen this.  So, he -- he
17    certainly may have been interviewed, but he doesn't know
18    what the report actually says or what it covers.  And our
19    objection relates to the fact that this has nothing to do
20    with Cabell and Huntington.  It has to do with Lakeland,
21    Florida.
22              THE COURT:  Well, I'm still not clear on exactly
23    what this is, Mr. Fuller.
24              MR. FULLER:  Your Honor, and the Court can feel
25    free to review the document.  It is an investigation and a
```

```
1    report about the SOMS systems of Cardinal Health up and to
2    the beginning or -- beginning of 2013, end of 2012, that was
3    requested by the Board of Directors of Cardinal Health.  It
4    sets out not only Lakeland, Florida.  It talks about their
5    systems in general, and the national scope of those systems,
6    and how they function, and what problems they had with those
7    systems.
8         As Mr. Mone testified, he believes there was an
9    internal investigation.  All of this would throw it into
10   801(d)(2)(A), (d)(2)(B), or (d)(2)(C).
11             MS. MAINIGI:  Your Honor, we're not objecting on
12   the basis of hearsay.  We're objecting on the basis of
13   geographic scope.
14             THE COURT:  Well, I think it might be -- for the
15   reason that I admitted the documents this morning that you
16   objected to on geographic scope, I think it may relate to
17   the -- to the overall program and whether it was working
18   properly and so forth.  I can't remember the term that was
19   used this morning, can you, Mr. --
20             MR. FULLER:  I'm sorry.  I couldn't hear you, Your
21   Honor.
22             THE COURT:  The term that was used this morning --
23             MR. FULLER:  The systemic failures?
24             THE COURT:  Right.  I think it relates to that and
25   I'm going to admit it.
```

**PLAINTIFF EXHIBIT 80 ADMITTED**

2      BY MR. FULLER:

3  **Q.**   Mr. Mone, as of the time of the 2008 memorandum

4  agreement, was Cardinal required to centrally report all of

5  its suspicious orders?

6  **A.**   It was required to report to the DEA Office, as opposed

7  to the obligation that individual distribution centers were

8  required to report to their local -- you know, the

9  regulations report locally and our MOA says report

10  centrally.

11  **Q.**   When we say report centrally, you guys -- I'm sorry.

12  When we say report to the office, you at Cardinal had to

13  report to Washington and the DEA Office, correct?

14  **A.**   That is correct.

15  **Q.**   And that's something that you helped to put in place

16  and your team developed to put into place that this

17  automated or electronic reporting would be done, correct?

18  **A.**   Yes.  The IT individuals at Cardinal Health were

19  designing the reporting component of the obligation imposed

20  by the MOI.

21      MR. FULLER:  So, if we might, because it's been

22  admitted, put up P-42071.  It's an Excel spreadsheet.

23      BY MR. FULLER:

24  **Q.**   Mr. Mone, I'll represent to you that this has been

25  produced -- and it should be on the screen in front of you.

1    You don't have to look way over here.

2    **A.**    Okay.

3    **Q.**    As suspicious orders into what we call CT2, but into

4    Huntington-Cabell County, West Virginia, okay?

5    **A.**    All right.

6    **Q.**    And it has certain columns and I want to run through

7    with you what these are.  A SOR ID, which is Column A, that

8    would be Suspicious Order ID?

9    **A.**    I have no idea what that is.

10   **Q.**    Let's keep going.  Registrant, DEA, what do you suspect

11   that is?

12   **A.**    That one's fairly obvious.  That's the registrant's DEA

13   number.

14   **Q.**    Fair enough.  NDC, can you explain to the Court what an

15   NDC code is?

16   **A.**    Yes.  The National Drug Code is the code that is

17   assigned to particular products by the manufacturer that

18   identify the product and the package size.  So, the National

19   Drug Code.

20   **Q.**    So, if you have the NDC code for something you can

21   identify who made it, the strength, the type of drug it is

22   and how many come in a package, right?

23   **A.**    Yes, sir.

24   **Q.**    Then you have the order quantity, which that's pretty

25   self-explanatory.  And then you have the limit order

```
 1    quantity.  And you have the number of records.  Customer DEA
 2    number, is that the same as the registrant DEA number?
 3    A.    Actually, no.  Now that we're -- now that I'm looking
 4    at this, the first registrant DEA number would be our
 5    registration number.
 6    Q.    So, potentially, if Wheeling was distributing to
 7    Cabell-Huntington, that would be the DEA registrant number
 8    for the Wheeling Distribution Center; is that correct?
 9    A.    That is a -- that is a distribution registration
10    number.  I don't know to whom it applies.  More than likely,
11    it applies to Wheeling, but that's -- I apologize for my
12    error before.
13    Q.    No, that's all right.
14          MR. FULLER:  If we could slide over Gina.
15          BY MR. FULLER:
16    Q.    And we have the customer name, T and J Enterprises.
17    Customer address, doing business as Medicine Shoppe.  We
18    continue over.  It's in Huntington, West Virginia.  Drug
19    family?
20    A.    Yes.
21    Q.    We've talked about that a little bit earlier and that's
22    significant, correct?
23    A.    It is the drug family, yes.
24    Q.    And these thresholds are set per drug family, right?
25    A.    They are.
```

1    **Q.**   And where are we at?  9143, do you know what that is

2    for?

3    **A.**   Since the next column says oxycodone, I know that 9143

4    is going to be oxycodone.

5    **Q.**   Yes, sir.  Let's see.  Then we have the date and month

6    and the overwrite date.  What's the date of this first entry

7    here?

8    **A.**   8/14/2012.

9    **Q.**   And do you have any knowledge as to whether Cardinal

10   reported any suspicious orders for Cabell-Huntington prior

11   to 8/14/2012?

12   **A.**   I have no independent knowledge.

13   **Q.**   If they did, they would be saved in the Cardinal

14   system, correct?

15   **A.**   Not necessarily.

16   **Q.**   Did Cardinal erase its orders?

17   **A.**   Not that I'm aware of.

18   **Q.**   Okay.  So, if they reported them and it was saved in

19   their system, then we would have them, right?

20   **A.**   I would think so, but I don't know what the record

21   retention policy of this document would be.  You know, I --

22   I don't know -- I'm not the IT guy, so I don't know what the

23   IT folks do, how long they keep things, or what have you.

24          MR. FULLER:  Your Honor, if I could have one

25   second, I think I'm --

```
 1              THE COURT:  Yeah.
 2         (Pause)
 3              MR. FULLER:  Your Honor, I'll pass the witness.
 4              THE COURT:  All right.  Thank you, Mr. Fuller.
 5         Ms. Mainigi?
 6              MS. MAINIGI:  Yes, Your Honor.
 7         Mr. Simmons, are we ready to go or do you need a couple
 8    of minutes?
 9         We probably just need a couple of minutes of
10    transition, Your Honor, if that's okay.
11              THE COURT:  Okay.  Let's just -- I'll stay on the
12    bench.
13              MS. MAINIGI:  Sure.
14              THE COURT:  And you can go ahead and do it that
15    way.
16              MS. MAINIGI:  Thank you, Your Honor.
17              MS. MAINIGI:  Mr. Simmons, are we ready?
18         Good afternoon, Mr. Mone.
19              THE WITNESS:  Good afternoon.
20         Mr. Simmons, let's go ahead and put Demonstrative 2 up.
21                        CROSS EXAMINATION
22              BY MS. MAINIGI:
23    Q.   I just want to take a few minutes and review your
24    background before you came to Cardinal, Mr. Mone.
25    A.   Okay.
```

```
1    Q.   Does this demonstrative accurately reflect your

2    qualifications and background before you came to Cardinal

3    Health?

4    A.   It is a summary of my background, yes.

5    Q.   And can you describe for us your educational

6    background, please?

7    A.   So, educationally, I attended the University of

8    Florida.  I graduated from there twice, once from the

9    College of Pharmacy and once from the College of Law.

10   Q.   Could you pull the microphone a little bit closer?  I'm

11   having a little bit of a hard time.

12   A.   Okay.  Is that -- is that better?

13   Q.   Yes.  That's wonderful.

14   A.   Sorry.

15   Q.   Have you worked as a practicing pharmacist?

16   A.   I have.

17   Q.   And did you also work for the Florida Board of

18   Pharmacy?

19   A.   I did.

20   Q.   Can you tell us at high level what you did for the

21   Florida Board of Pharmacy?

22   A.   When I went to work for the Board of Pharmacy, I was a

23   prosecutor for the Florida Board.

24   Q.   And are there particular types of actions you

25   prosecuted?
```

```
1    A.    The -- the actions that were found to have probable
2    cause.  So, I would prosecute at the administrative law
3    level pharmacists and pharmacies over allegations of
4    deviations from the standard and statutes for the practice
5    of pharmacy and pharmacists.
6    Q.    And did that work give you experience in pharmacy
7    regulation?
8    A.    It did.
9    Q.    And then, did you later work for the Florida Attorney
10   General's Office?
11   A.    I did.
12   Q.    And describe for us what you did there.
13   A.    I served as the General Counsel for Administrative
14   Regulatory Boards, the Board of Osteopathic Medicine,
15   Veterinary Medicine, Podiatric Medicine, and I also served
16   as an Assistant on the Board of Medicine's Probable Cause
17   Panel.
18   Q.    And did you have occasion in that role to address
19   issues related to opioids and other controlled substances?
20   A.    I did as it related to those practitioners who were
21   licensed in those particular fields.
22   Q.    After the Florida AG's office, what was your next role?
23   A.    I was -- I was voted, I was elected, I'm not sure what
24   the right term is.  The Kentucky Board of Pharmacy decided
25   to hire me as their Executive Director.
```

1   **Q.**   Tell us about that role.  What did you do there?

2   **A.**   For -- I was the Chief Administrative, Chief Executive,

3   Chief Operating Officer of the state body that is known as

4   the Board of Pharmacy.

5   **Q.**   Now, in that Executive Director role, did you take any

6   steps related to the prevention of the misuse of

7   prescription medications?

8   **A.**   Yes.

9   **Q.**   Can you describe that for us, please?

10   **A.**   Sure.  While I was the Executive Director of the Board,

11   in conjunction with the Cabinet for Health -- the Cabinet

12   for Drug Services, the title I may have messed up, but at

13   the instance of the Attorney General, Drug Control and the

14   Board of Pharmacy worked on the establishment of the

15   Prescription Monitoring Program in Kentucky.

16   **Q.**   And what was the Prescription Monitoring Program that

17   you worked on?

18   **A.**   It's called KASPER and it was an all-schedule

19   electronic reporting system that was implemented in

20   Kentucky.

21   **Q.**   And what was the goal of that Prescription Monitoring

22   Program?

23   **A.**   The goal of the -- at least as far as I could

24   determine, the goal of the Prescription Monitoring Program

25   was to provide a tool so -- to the practitioners, those who

1    wrote prescriptions, as well as those who dispensed

2    prescriptions, to obtain a more full picture of the

3    patient's use of controlled substances.

4    **Q.**   And when you say practitioner, are you referring to

5    prescribers?

6    **A.**   Yes.  Practitioners who have the authority to

7    prescribe, yes.

8    **Q.**   And who had access to this system that you helped with?

9    **A.**   The practitioners, the prescribers, the dispensers,

10   Drug Control themselves and I'm --

11   **Q.**   Did wholesale -- I'm sorry.

12   **A.**   And I'm sure whoever else was in the statute that said

13   that they could have it.  I just don't recall all the rest

14   of the folks.

15   **Q.**   Do you recall whether wholesale distributors had access

16   to this program?

17   **A.**   They did not.  The program contains protected health

18   information and wholesalers do not have access to the

19   information.

20   **Q.**   Besides the Kentucky Board of Pharmacy, can you

21   describe other positions that you've held related to

22   pharmacy?

23   **A.**   Yeah.  On the slide, it reflects that I was a member of

24   the Ohio Board of Pharmacy.  I served two terms there as

25   President of the Board.  I suspect you can look at my career

1    and say I tried to spend most of my career in public

2    service.

3         And then the last bullet there is the National

4    Association of Boards of Pharmacy where I -- as a -- as the

5    Executive Director of the Kentucky Board of Pharmacy, I was

6    elected to the Executive Committee of NEVP, but probably

7    more significantly for me, is that for more than 20 years, I

8    have served on the multi -- the Multi-State Pharmacy

9    Jurisprudence Exam Review Committee.

10   **Q.**   And what does that committee do?

11   **A.**   It's the committee that puts together the law exam that

12   every pharmacist in the country takes in order to get a

13   license to be a pharmacist or to reciprocate from state to

14   state.

15   **Q.**   Thank you, Mr. Mone.

16         MS. MAINIGI:  Now, we can go ahead and take that

17   down, Mr. Simmons.

18         BY MS. MAINIGI:

19   **Q.**   You spent some time with Mr. Fuller just setting the

20   stage in terms of the timetable that you were -- the time

21   period that you were at Cardinal Health running the

22   Anti-Diversion System; do you recall that?

23   **A.**   I do.

24   **Q.**   And I think you told us that Mr. Steve Reardon came

25   before you in terms of running the Anti-Diversion Program;

1    is that right?

2    **A.**   It is.

3    **Q.**   And then Mr. Todd Cameron came after you in terms of

4    running the Anti-Diversion Program at Cardinal, correct?

5    **A.**   He did.

6    **Q.**   So, when you arrived in December, 2007, you said that

7    the Cardinal Health Anti-Diversion Program was in the

8    process of changing; do you recall that?

9    **A.**   I do.

10   **Q.**   What was your understanding of why the Cardinal program

11   was changing in that time period?

12   **A.**   My understanding of the basis for the change was that

13   Mr. Reardon had attended a DEA Industry Conference a few

14   months earlier and came back and began the development of

15   the electronic -- the electronic component of the Suspicious

16   Order Monitoring System.

17   **Q.**   Now, what is your understanding of what happened at the

18   conference?

19   **A.**   My understanding of what happened at the conference was

20   that a competitor had presented in conjunction with the DEA

21   and explained their new electronic system for reporting

22   suspicious orders and that the expectation of the DEA had

23   changed relative to when Suspicious Order Reports would be

24   sent to DEA.

25   **Q.**   Was that competitor AmerisourceBergen?

1    **A.**   It was.

2    **Q.**   And do you recall whether that conference was in that

3    September, 2007 time period right before you arrived?

4    **A.**   Yeah.  It was -- it was shortly before, so September is

5    probably right.

6    **Q.**   And with respect to the DEA expectations that you

7    understood as you came in and took over the Anti-Diversion

8    System, you mentioned the electronic system.  Were there any

9    other components that you're recalling got -- that Mr.

10   Reardon brought back for implementation?

11   **A.**   I call it the three prongs of what we did, which was

12   Know Your Customer, electronic monitoring and

13   investigations.

14   **Q.**   Those were the three prongs that Mr. Reardon brought

15   back?

16   **A.**   To the best of my recollection, that's what were

17   brought back.

18   **Q.**   And if I could ask you to bring that a little bit

19   closer to you.  Still having a little bit of difficulty.

20   **A.**   I'm sorry.

21   **Q.**   That's better.  Thank you.

22          Now, when you arrived in December, 2007, Cardinal

23   Health was in the process of building out a system

24   consistent with the new expectations of DEA?

25   **A.**   I would say that's a fair statement.

**Q.**   And you were charged with assisting an implementation of those changes?

**A.**   Yes, I was.

**Q.**   Now, did you come to understand whether there was any discussion at the conference about whether suspicious orders should be shipped?

**A.**   I did.

**Q.**   And what was your understanding?

**A.**   That suspicious orders were not to be shipped to customers.

**Q.**   Did you understand that that expectation was the same or different than it had been before?

**A.**   That it was different.

**Q.**   In your understanding, was there a statutory or regulatory requirement to not ship suspicious orders?

**A.**   Given that the statutory reference to suspicious orders hasn't changed since, from what I could tell back then and what I understand to be the current language, since the language itself hasn't changed, it had to be a change in expectations.

**Q.**   A change in expectations by the DEA?

**A.**   Correct.

**Q.**   Now, after you became the Head of Cardinal Health's Anti-Diversion Team, did Cardinal Health receive any letters from the DEA about their new expectations?

1   **A.**   The letter that I recall is the -- and I don't recall

2   the specifics of the letter, you know, what -- what is

3   essentially in it, but there was a December, 2007 letter

4   from Joe Rannazzisi.

5   **Q.**   And so, when you arrived, Cardinal Health began the

6   process or continued the process of implementing changes as

7   a result of the September, 2007 conference, as well as the

8   December Rannazzisi letters?

9   **A.**   Yes.

10   **Q.**   Now, when you arrived, did you also have an opportunity

11   to assess the system that existed before Cardinal began

12   making changes post-September, 2007?

13   **A.**   If you're referring the ILR System, yes, I had an

14   opportunity to assess ILR System.

15   **Q.**   I am.  And could you describe for us what an ILR is and

16   an ILR System?

17   **A.**   My understanding of the ILR System is the Ingredient

18   Limit Reports, which was an end of the month report to the

19   DEA of orders.

20   **Q.**   And do you know what Cardinal did with the ILR Reports?

21   **A.**   I do not.

22   **Q.**   Do you know what contact Cardinal had with the DEA or

23   the Cardinal Health Distribution Centers, what contact they

24   had with the DEA?

25   **A.**   Well, in that assessment that was done, not only did

1    the distribution centers produce the ILRs and submit them to

2    DEA, but then, according to the regulation, which went to

3    the local DEA folks, the -- it was my understanding that the

4    cage and vault folks and the compliance officers would,

5    based upon their relationships, pick up the phone, call DEA

6    and say, hey, here's a suspicious order.

7    **Q.**   So, as you're -- as you understood it, the distribution

8    centers made calls to the DEA reporting suspicious orders?

9              MR. FULLER:  Your Honor, I'm going to object.

10   One, now counsel is now testifying.  And, two, when I asked

11   Mr. Mone about the earlier system, he had no recollection.

12             MS. MAINIGI:  Your Honor, if I may, I don't recall

13   the specifics, but I believe that he did reference ILRs to

14   Mr. Fuller in relation to that questioning and I don't

15   believe Mr. Fuller asked him about distribution centers

16   making calls to report suspicious orders.

17             MR. ACKERMAN:  I also -- I don't think my

18   microphone is on.

19             THE COURT:  Overruled.  Go ahead.

20             MS. MAINIGI:  Let me just rephrase the question.

21             BY MS. MAINIGI:

22   **Q.**   Mr. Mone, to your understanding as you were assessing

23   the prior system, did you understand whether Distribution

24   Centers of Cardinal were making calls to the DEA reporting

25   suspicious orders?

1    **A.**    Yes.

2    **Q.**    As part of your assessment of the old system, did you

3    come to believe that Cardinal Health, that the system it was

4    running under Mr. Reardon, complied with the Controlled

5    Substances Act?

6              MR. FULLER:  Object to form, Your Honor.  I'm

7    sorry.  Not object to form.  There's no foundation, Judge.

8              MS. MAINIGI:  He assessed the prior system, Your

9    Honor.

10             MR. ACKERMAN:  Also calls for a legal conclusion.

11             THE COURT:  Well, I'll sustain the objection.

12        You can rephrase the question, Ms. Mainigi.

13             MS. MAINIGI:  Okay.  I believe Mr. Fuller did ask

14   Mr. Mone about his understanding of the Controlled

15   Substances Act.

16             BY MS. MAINIGI:

17   **Q.**    So, Mr. Mone, do you recall talking to Mr. Fuller about

18   your understanding of the Controlled Substances Act?

19   **A.**    I do.

20   **Q.**    And the Controlled Substances Act is an act that you

21   became quite familiar with in your role as Head of

22   Anti-Diversion; is that right?

23   **A.**    I did.

24   **Q.**    And did you review with us, I think earlier, the

25   different components of what was required of Cardinal under

```
 1    the Controlled Substances Act?
 2    A.    To the best of my recollection, we were earlier talking
 3    about the statutory component of maintaining effective
 4    controls against diversion and the regulatory component,
 5    which was to develop a system to identify and report
 6    suspicious orders.
 7    Q.    In your assessment of the prior system did you come to
 8    believe that Cardinal Health's prior system operated
 9    consistent with the Controlled Substances Act?
10             MR. FULLER:  Same objection, Judge.  This witness
11    had no knowledge of the prior system when I asked him.
12             MS. MAINIGI:  I don't think that's correct, Your
13    Honor.
14             THE COURT:  Well, overruled.  I think he -- he did
15    testify about that, at least that he had knowledge of it.
16             BY MS. MAINIGI:
17    Q.    Do you need the question again, Mr. Mone?
18    A.    Yes, please.
19    Q.    When you assessed the prior Cardinal Health system, did
20    you form an understanding as to whether the prior system
21    that Cardinal Health had, whether that was operating
22    consistent with the Controlled Substances Act?
23    A.    It would seem to -- the answer is yes.  It would seem
24    to me that if a distributor were providing an ILR to the DEA
25    for all the years that they were doing it and the regulation
```

1      never changed, it had to be in compliance.

2              MR. ACKERMAN:  Your Honor, I object on the ground

3      that I --

4              THE COURT:  One lawyer.

5              MR. ACKERMAN:  I'm objecting for the City of

6      Huntington, Your Honor.

7              THE COURT:  Oh, okay.  I'm sorry, Mr. Ackerman.

8              MR. ACKERMAN:  Yes.  We've switched now, so my

9      microphone is back on.  Object to that -- I think the

10     witness's answer stated a legal conclusion.  The question

11     was a yes or no question, but the -- but in explaining the

12     answer, the witness stated a legal conclusion.  So, I'd

13     object on that ground and move to strike.

14             THE COURT:  Well, it's his understanding of what

15     the situation requires.  I'm going to overrule that and let

16     him answer.

17             BY MS. MAINIGI:

18     **Q.**   Now, let me -- we'll cover some changes, Mr. Mone,

19     specific changes that you made going forward, but let me ask

20     you, besides the changes that got made at the end of 2007,

21     beginning of 2008, while you were Head of Anti-Diversion,

22     was this the only time that Cardinal Health made changes to

23     its system?

24     **A.**   No.  We were engaged in a continuous improvement

25     process the entire time I was there.

1    **Q.**   Now, do you recall Mr. Fuller asking you some questions

2    about this 2008 settlement with the DEA?

3    **A.**   I -- I vaguely recall them, yes.

4          MS. MAINIGI:  Your Honor, as you know, we have

5    objected to a discussion of that based on geographic scope

6    and we retain our objection to that, but I am going to ask a

7    few questions since Mr. Fuller was allowed to ask questions

8    and we don't waive --

9          THE COURT:  You may ask questions without waiving

10   the objection.

11         MS. MAINIGI:  Yes, Your Honor.  Thank you.

12         THE COURT:  That's fine.  The objection will be

13   preserved.

14         BY MS. MAINIGI:

15   **Q.**   Around the same time that you took your position at

16   Anti-Diversion at the end of 2007, did the DEA begin

17   enforcement actions related to certain Cardinal Health

18   Distribution Centers?

19   **A.**   Yes.

20   **Q.**   Now, in terms of timeline, if I represent to you that

21   the ABDC Conference was September 2007, do you recall when

22   the first immediate suspension order against a Cardinal

23   Health Distribution Center occurred?

24         MR. FULLER:  Objection, foundation, Judge.

25         THE COURT:  Overruled.  If he remembers, he can

1    answer.

2            THE WITNESS:  To the best of my recollection, it

3    was -- it was towards the end of November of 2007.

4            BY MS. MAINIGI:

5    Q.   And was that the Auburn-Washington State facility?

6    A.   Auburn was the first one, yes.

7    Q.   And then were there two more in December, the month

8    that you arrived?

9    A.   Yes.

10   Q.   And were those Lakeland, Florida and Swedesboro, New

11   Jersey?

12   A.   Yes.  Swedesboro on my 50th birthday.

13   Q.   Happy birthday.

14   A.   Thank you.

15   Q.   Was there also an Order to Show Cause in January, 2008?

16   A.   I do not recall whether it was December or January, but

17   I do recall an Order to Show Cause.

18   Q.   And do you recall that was Stafford, Texas?

19   A.   It was Texas.

20   Q.   And each of those four distribution centers, Mr. Mone,

21   had a separate registration with the DEA; is that correct?

22   A.   They did, yes.

23   Q.   And do you recall generally what type of pharmacies

24   were involved in the 2008 DEA action?

25   A.   They were predominantly what in the literature and the

1    DEA language were called internet pharmacies.

2    **Q.**   To your recollection by this point in time, had

3    Cardinal Health taken measures to ensure that none of its

4    customers were acting as internet pharmacies?

5    **A.**   Yes.

6    **Q.**   Now, do you recall around that time how many

7    distribution centers Cardinal Health had approximately?

8    **A.**   I know that there were more than 20.  I don't recall

9    the specific number.

10   **Q.**   And do you recall any allegation in this point in time,

11   the end of 2007, beginning of 2008, against the Wheeling,

12   West Virginia Cardinal Health Distribution Center?

13   **A.**   No.  I don't believe there was anything ever about

14   Wheeling.

15   **Q.**   And, to your knowledge, did any of the distribution

16   centers at issue in the 2008 enforcement actions ship

17   controlled substances to West Virginia?

18   **A.**   To pharmacies in West Virginia?

19   **Q.**   Correct.

20   **A.**   No.

21   **Q.**   And I think you've already testified that by the time

22   you got some of these enforcement actions, Cardinal Health

23   had already begun to make changes to its Suspicious Order

24   Monitoring System?

25   **A.**   Yes, it had.

1    **Q.**   Did Cardinal Health ultimately reach a settlement with
2    the DEA?
3    **A.**   It did.
4    **Q.**   And was that in the 2008 time period?
5    **A.**   To the best of my recollection, yes.
6    **Q.**   And did the four distribution centers at issue regain
7    their DEA registrations as part of that process?
8    **A.**   They did.
9    **Q.**   To your knowledge, in the 2008 DEA settlement, was
10   there any admission of liability or finding of wrongdoing by
11   Cardinal Health?
12   **A.**   To the best of my knowledge, there was none.
13   **Q.**   And as part of the settlement with the DEA did Cardinal
14   Health agree that its Suspicious Order Monitoring Program
15   would not ship suspicious orders and would report those
16   orders to the DEA?
17   **A.**   And -- yes, and it would report those orders to the DEA
18   in Washington.
19   **Q.**   As opposed to the Field Offices?
20   **A.**   Correct.
21   **Q.**   And was this agreement that was in the 2008 settlement,
22   was that consistent with the updated DEA guidance that had
23   been provided in the September, 2007 conference, as well as
24   the December 2007 Rannazzisi letter?
25   **A.**   I believe the answer to that is yes.

1    **Q.**   To your knowledge, did Cardinal Health meet all the

2    terms and conditions of the Settlement Agreement?

3    **A.**   Oh, yes.

4    **Q.**   Now, we've walked through your qualifications.  Let's

5    put up an organizational chart so we can talk about

6    anti-diversion at Cardinal Health.

7                MS. MAINIGI:  Demonstrative 3, please, Mr.

8    Simmons.

9                MR. ACKERMAN:  Could I get a copy of this, please?

10               MR. FULLER:  Can I be shown a copy before?

11               MS. MAINIGI:  Sure.  Let's take it down.

12               MR. ACKERMAN:  And, Your Honor, I just want to --

13   I just want to make this point more globally.  I think there

14   was discussion earlier about not showing demonstratives

15   until the other party has had an opportunity to review it

16   and object.  We haven't received any copies of

17   demonstratives, so we, I think, should have that same

18   opportunity.

19               THE COURT:  Okay.

20               MS. MAINIGI:  Your Honor, I believe we addressed

21   this issue when it came up with the corporate witnesses for

22   ABDC, but there was not an agreement to share demonstratives

23   in advance in -- as it relates to our demonstratives.

24               MR. ACKERMAN:  Well, Your Honor, the defendants

25   certainly made that request of us.  I can't imagine it would

1    be the case that we would be required to show them and not

2    the defendants.

3                THE COURT:  Well, I don't see any harm in putting

4    it up since there's no jury here before -- I remember the

5    discussion this morning and everything, but --

6                MR. ACKERMAN:  I just want to make sure, Your

7    Honor, that the same rules apply to us apply to the

8    defendants when they present their case through a witness.

9    That's our concern.

10               THE COURT:  Okay.

11               MS. MAINIGI:  Your Honor, we're happy to discuss.

12               THE COURT:  Yes.  Don't put it up until Mr.

13   Ackerman has had a chance to look at it.

14               MS. MAINIGI:  Okay.  That's fine, Your Honor.

15               MR. ACKERMAN:  Mr. Fuller says it's fine.  I will

16   -- I will go along with him on this one.

17               MS. MAINIGI:  Mr. Fuller?

18               MR. FULLER:  Sure, Judge.  It's fine.

19               MS. MAINIGI:  Thank you, Mr. Fuller.

20               BY MS. MAINIGI:

21   Q.   This is an organizational chart related to Cardinal

22   Health.  Mr. Mone, in the 2008 to 2012 time period, does

23   this org chart accurately reflect the folks that were above

24   you and below you?

25   A.   The positions do.  The names are not necessarily a

1    correct reflection.

2    **Q.**   I think you told us earlier that, at some point, Mark

3    Hartman became Gilberto Quintero?

4    **A.**   That is correct, yes.

5    **Q.**   Okay.  And that role, the Mark Hartman/Gilberto

6    Quintero role, can you tell us about that role?

7    **A.**   That's my boss -- or shouldn't make it present tense.

8    That was my boss.

9    **Q.**   And that role over -- can you describe what that role,

10   the Mark Hartman role, oversaw?

11   **A.**   Yeah.  That role was responsible for QRA Operations and

12   involved the RPs, the Anti-Diversion piece, and then Steve

13   Reardon's pierce, which was the Quality and Regulatory

14   Affairs piece that related to the rest of the obligations

15   with regard to the distribution centers.

16   **Q.**   Now, when you -- so, Mr. Reardon had your role before

17   you came in, correct?

18   **A.**   Correct.  It was combined, one role under Steve.

19   **Q.**   And then the role got split off into two; is that

20   right?

21   **A.**   Yes.  I came along and I picked up the anti-diversion

22   piece.

23   **Q.**   And so, the piece that Mr. Reardon held onto, can you

24   just give us a little bit more description of what that role

25   entailed?

1    **A.**    Sure.  He held onto the compliance officers, which is

2    why you see only a dotted line to me.  They actually are --

3    they're actually a solid line in to Steve.

4    **Q.**    And you meant -- I'm sorry.  Go ahead.

5    **A.**    And Steve handled the Distribution Center licensing and

6    security and the other components of the Distribution

7    Center.

8    **Q.**    So, what do the compliance officers do at the

9    distribution centers?

10   **A.**    Well, they're -- a lot of things.  They're responsible

11   for the cage and vault.  They're responsible for licensing.

12   They're responsible for maintaining the on-site records.

13   They're responsible for communicating to -- to

14   anti-diversion.  And they're responsible to communicate up

15   to Steve.

16   **Q.**    Now, I see underneath you is Know Your Customer and I

17   know that's a component of the system going forward, but can

18   you describe why it's on the org chart?

19   **A.**    Yeah.  We -- what we did was, you know, as I indicated

20   before, any good system is a PPT, people, process, and

21   technology.  And so, we took the components of the system,

22   grouped individuals into areas of excellence, and placed

23   them in the system so that the Know Your Customer folks or

24   the intake folks, the Know Your Customer analyst folks that

25   worked with the pharmacists.

1    **Q.**   So did -- did the Know Your Customer folks evaluate and

2    conduct diligence on new customers?

3    **A.**   They did.

4    **Q.**   And also existing customers?

5    **A.**   They did.

6    **Q.**   And were there -- there were questionnaires associated

7    with that process?  Did they fill those questionnaires out?

8    **A.**   They did not fill the questionnaires out.

9         MR. ACKERMAN:  Your Honor, a leading objection to

10   the last question.

11        MS. MAINIGI:  I'm just trying to move this along,

12   Your Honor.

13        THE COURT:  Yeah, overruled.  We need to get

14   through this and I don't see any harm to the question and

15   then the answer.

16        THE WITNESS:  The answer is they didn't fill it

17   out.  The customers filled it out.

18        BY MS. MAINIGI:

19   **Q.**   What did the Know Your Customer folks do with the

20   questionnaires?

21   **A.**   They took it and where there -- as I indicated to

22   counsel this morning, where there were objective ways of

23   assessing what the customer provided, they would look those

24   up, you know, licensure, and make sure that the licensure

25   was right, and the objective data that they could find, and

1    then they would pass that on to the pharmacist.

2    **Q.**   Then there is electronic order monitoring and

3    pharmacists.  And I know you referred several time to

4    pharmacists with Mr. Fuller.  Can you describe the role of

5    those individuals?

6    **A.**   These pharmacists were, as Mr. Fuller and I had the

7    unfortunate discussion about pharmacists being -- these are

8    our pharmacists who were assessing -- were doing the

9    assessment of both the data that was provided through the

10   Know Your Customer piece, as well as doing the evaluation of

11   the threshold events.

12   **Q.**   And then there's an Investigations Team.  What did they

13   do?

14   **A.**   When the pharmacist made a request for additional

15   information, the pharmacist would send it over to the

16   Investigatory Team, who would then do a site visit -- to do

17   a site visit of the pharmacy and those -- the boxes are our

18   folks and we had additional -- and we talked about it

19   earlier.  We had the additional consultants that would go

20   out and do those inspections.

21   **Q.**   And then the Analytics Team, what did the Analytics

22   Team do?

23   **A.**   The Analytics Team was the team that produced the data

24   that Mr. Fuller provided to me earlier and would work with

25   the IT Team to -- to build the analytics capability.

```
1    Q.   Now, as a wholesale distributor, is it fair to say
2    Cardinal Health supplies a lot of products beyond opioids to
3    its customers?
4    A.   Yes.  We're a full -- full line -- Cardinal Health is a
5    full line pharmaceutical wholesale distributor.
6    Q.   What are the other types of products at a very high
7    level that Cardinal Health provides?
8    A.   Very high level, your asthma inhalers.  You know, your
9    hospital supplies we provide from -- oh, from Band-Aids to
10   specialty medications in the distribution channel.
11   Q.   As a wholesale distributor, does Cardinal Health
12   develop opioids?
13   A.   It does not.  It is not a manufacturer.
14   Q.   Does it seek approval from the FDA to market opioids?
15   A.   It does not.
16   Q.   Does Cardinal Health develop or conduct clinical tests
17   on the risks and benefits of opioids?
18           MR. FULLER:  Object to form.  Foundation.
19           THE COURT:  Overruled.
20           THE WITNESS:  To the best of my knowledge, we
21   don't have any clinical folks that do that.
22           BY MS. MAINIGI:
23   Q.   We've talked about the Closed System of Distribution.
24   Can you describe what the Closed System of Distribution
25   means?
```

```
1    A.   The Closed System of Distribution is the process by

2    which everyone in the supply chain --

3    Q.   Actually, hold that thought.  Let me get another

4    demonstrative and let me show Mr. Fuller.

5         Mr. Simmons, if you could put up Demonstrative 4,

6    please.

7              THE WITNESS:  That's the -- that.

8              BY MS. MAINIGI:

9    Q.   Is this a picture of the Closed System of Distribution?

10   A.   Yeah.  It represents the individuals who are registered

11   by -- the closest in the distribution is everybody that's

12   registered by the Drug Enforcement Administration.  So, when

13   product moves between all of these entities or that the --

14   every one of those folks is -- has a DEA registration, the

15   folks that are outside of the patients.

16   Q.   So, to prescribe opioids, do prescribers have to be

17   registered with the DEA?

18   A.   Yes, they do.  And any -- you know, any controlled

19   substance that they wish to prescribe, they have to be

20   registered with the DEA.

21   Q.   And the pharmacy, if it's going to dispense opioids,

22   has to be registered with the DEA?

23   A.   In order to possess and dispense them, they, too, have

24   to be registered with the DEA.

25   Q.   Now, you described something earlier, you mentioned it
```

1    a few times with Mr. Fuller, corresponding responsibility.

2    Define that for me.

3    **A.**   Well, the corresponding responsibility is a term in the

4    regulations of the -- of the DEA, the CFR, that relates to

5    the --

6             COURT REPORTER:  Can you keep your voice up just a

7    little bit for me, please?

8             THE WITNESS:  Sure.

9             COURT REPORTER:  Thank you.

10            THE WITNESS:  Hold on a second.  Let's --

11            MS. MAINIGI:  Maybe -- I don't know if that

12   microphone pulls a little bit closer.

13            THE WITNESS:  I'm almost off the desk, but --

14            MS. MAINIGI:  Okay, sorry.

15            THE WITNESS:  And the chair doesn't move.  The

16   chair doesn't move, so I'm -- so, the only thing I can do

17   for you is to raise my voice and I'll do that.

18            MS. MAINIGI:  Thank you.

19            THE WITNESS:  The corresponding responsibility is

20   the -- is a component of the regulations for DEA as it

21   relates to pharmacists that reflects that the pharmacists,

22   in their determination to dispense a controlled substance,

23   must undertake a corresponding responsibility to essentially

24   assess whether the doctor who has that primary obligation,

25   when they make the decision to prescribe, has written the

1    prescription in good faith in the course of professional

2    practice for a legitimate medical purpose.

3              BY MS. MAINIGI:

4    **Q.**   And that's the pharmacist's responsibility?

5    **A.**   That's a corresponding responsibility, yeah.

6    **Q.**   Now, what is the Cardinal role at a high level in this

7    Closed System?

8    **A.**   In this Closed System, the high level is we buy -- only

9    to the extent that we're talking about controlled

10   substances.

11   **Q.**   Yes.  Let's go through some of that.

12   **A.**   It purchases controlled substances from a DEA

13   registered manufacturer, has a DEA registration to hold it,

14   to possess it, and enables it to sell that controlled

15   substance to another DEA registered entity.

16   **Q.**   In the closed system, does a Cardinal Health ship

17   directly to patients?

18   **A.**   No.  There's no relationship to the patient.

19   **Q.**   When Cardinal ships medication to a pharmacy, how does

20   the medication go from the pharmacy's shelves to the

21   patients?

22   **A.**   Presumptively, the pharmacist receives a prescription

23   that they make an assessment of that, the physician wrote it

24   in good faith in the course of professional practice and for

25   a legitimate medical purpose, thereby assuring themselves,

```
 1    meeting their corresponding responsibility, and then

 2    prepares it and dispenses it to the patient.

 3    Q.   So, if no patient comes in with a prescription to a

 4    pharmacy, what happens to the medication that the pharmacy

 5    ordered from Cardinal Health?

 6    A.   It sits on the shelf.

 7    Q.   And does that apply to all medications or just

 8    controlled substances?

 9    A.   Everything.  You know, any legend drug, any -- let me

10    -- I don't want to have definitions of legend drugs.  Any

11    prescription item first requires the patient to present a

12    valid prescription to the pharmacist.

13    Q.   Now, within this Closed System were quotas set by DEA

14    as to the nationwide amount of opioids that could be

15    produced?

16    A.   Yes.  And that applies to the manufacturer of the

17    product, the quotas.

18    Q.   And, to your knowledge, did Cardinal Health ever ship

19    in excess of the DEA quotas?

20    A.   It would be impossible for Cardinal Health to ship in

21    excess of the quota.

22    Q.   Why is that?

23    A.   Well, because Cardinal Health is not -- first of all,

24    the easy answer is Cardinal Health is not the only

25    distributor.  And there are no dosage -- there are no
```

1    amounts above what the DEA quota is that can be

2    manufactured, so no one could distribute more than what the

3    quota was.

4    **Q.**   To your knowledge, did Cardinal Health ever ship to a

5    pharmacy in Cabell or Huntington that was not registered

6    with the DEA and licensed by the State of West Virginia?

7    **A.**   To the best of my knowledge, we would not ship to any

8    customer that was not registered by the State or the -- in

9    the jurisdictions where the state required controlled

10   substance registration and a DEA registration.

11   **Q.**   And, to your knowledge, did Cardinal Health ever ship

12   prescription opioids to a pharmacy in Cabell or Huntington

13   that Cardinal Health knew or should have known was

14   dispensing for a purpose other than to fill legitimate

15   prescriptions written by doctors?

16   **A.**   No.

17   **Q.**   Now, when it comes to some of the reporting that

18   Cardinal Health does to the DEA, is there reporting called

19   ARCOS that you're familiar with?

20   **A.**   Yes.

21   **Q.**   Can you describe what that is?

22   **A.**   Well, firstly, that -- the ARCOS reporting vault fell

23   under Steve.

24   **Q.**   Steve Reardon?

25   **A.**   Steve Reardon, yeah.  He's not there anymore, but Steve

1    Reardon.  That's the component of that security and what

2    have you that Steve did on the QRA side.

3         But the ARCOS Report is a report that is required to be

4    submitted by -- I think it's manufacturers and distributors

5    for all schedule Is, all Schedule IIs, and narcotic IIIs.

6    **Q.**   So, for every single pill, Mr. Mone, the controlled

7    substance that Cardinal Health shipped, did the DEA know who

8    it shipped to?

9    **A.**   Ultimately, DEA would know -- be able to know that

10   information.  It directly gets every month the ARCOS Reports

11   which would -- now, mind you, we don't have any Schedule Is,

12   but it's all Schedule IIs and Narcotic IIIs.

13   **Q.**   And would the DEA know when that shipment occurred?

14   **A.**   Yes.

15   **Q.**   At any point during your time with Cardinal Health's

16   Anti-Diversion Team from 2008 to 2012 did DEA inform

17   Cardinal Health that it believed its shipments to Cabell

18   County or Huntington were excessive?

19   **A.**   No.  There was no communication from DEA with regard to

20   that.

21   **Q.**   At any point during your time with Cardinal Health's

22   Anti-Diversion Team from 2008 to 2012 did DEA inform

23   Cardinal Health that its shipments to any particular

24   pharmacy in Cabell County or Huntington were excessive?

25   **A.**   No, they did not.

1            MS. MAINIGI:  Your Honor, I'm about to change

2   sections.  Would now be a good time for our break?

3            THE COURT:  Yes.  Let's take about a ten-minute

4   break here.

5        (Recess taken)

6        (Proceedings resumed at 3:40 p.m.)

7            THE COURT:  Mr. Mone, you can come on back up,

8   sir.

9   BY MS. MAINIGI:

10  **Q.**   Welcome back, Mr. Mone.

11  **A.**   Thank you.

12  **Q.**   During the time that you worked at Cardinal, were you

13  provided the resources necessary for the Anti-Diversion work

14  that you led?

15  **A.**   Yes.

16  **Q.**   And during your tenure did the Anti-Diversion staff

17  grow?

18  **A.**   It did.

19  **Q.**   Let's walk through the main components of the

20  Suspicious Order Monitoring System that you helped to design

21  and lead.

22       Demonstrative 5, Mr. Simmons, which counsel has no

23  objection to, Your Honor.

24  BY MS. MAINIGI:

25  **Q.**   So let's start with the Know Your Customer

1    component.  I think you've talked about that a bit with

2    Mr. Fuller, but did that part of the system involve

3    gathering information about new customers?

4    **A.**   It did.

5    **Q.**   And, and how did that work?  Describe it to us at a

6    high level.

7    **A.**   Well, the customer process was a holistic process that

8    involved all of the Cardinal Health team members.  It

9    involved the sales folks that were at the, that were at the

10   customer.  It involved merchandisers.  It involved the, the

11   questionnaire.  It involved the assessment of the answers on

12   the questionnaire.  The compliance officers could on

13   occasion, and would on occasion, go to do ride-alongs with

14   the, the folks.  So we built a program that was, you know,

15   holistic.

16   **Q.**   And what did you do with the information that got

17   gathered as part of Know Your Customer?

18   **A.**   Well, in the initial stages, it was paper and we kept

19   that paper and it was used by the pharmacists in their

20   evaluations.

21   **Q.**   Now, after a new customer was on-boarded, did the Know

22   Your Customer process continue?

23   **A.**   It did.  It was a continuous -- you know, customers

24   changed.  Things changed with regard to the business.  So it

25   was a continuous process.

1    **Q.**   The second component of the system, Electronic Order

2    Monitoring, can you describe that part of the system,

3    please?

4    **A.**   Well, that was the technology component of the system

5    whereby the, the system -- there's a warehouse management

6    system which -- there's a warehouse management system

7    that -- in which the orders are placed.  And as a module on

8    top of and alongside it, there was the Electronic Order

9    Monitoring component that reviewed those orders that came

10   in.

11   **Q.**   And this is where the thresholds are that you spoke to

12   Mr. Fuller about?

13   **A.**   Yes.

14   **Q.**   And can you describe -- I know it's a very elaborate

15   process in terms of setting the thresholds, but at a high

16   level can you describe the threshold process?

17   **A.**   Yeah.  The threshold process was a process whereby we

18   took the totality of the circumstances that we knew and the

19   characteristics of the pharmacy and the description of the

20   patients that they treated, put, put that into a -- put that

21   into the thought, put that into the thought process and made

22   an evaluation of the type of customer that they were,

23   segmenting the classification that they were, whether they

24   were a retail pharmacy or a hospital or a chain pharmacy,

25   and then sub sub-setting them into sizes.

1   **Q.**   So were there individualized thresholds for each

2   pharmacy customer?

3   **A.**   There were individual thresholds for each pharmacy

4   customer over -- well, even the initial one was

5   individualized for that pharmacy, but it was individualized

6   in a, in a bucket.  And then over time, it became even more

7   customized.

8   **Q.**   And what would the categories of information that went

9   into or were considered in setting a threshold?

10   **A.**   Well, we looked at their prior, prior history if it was

11   available.  We looked at the characteristics of the pharmacy

12   because like a Hospice pharmacy is going to look totally

13   different than a psych pharmacy which is going to look

14   totally different than a compounding pharmacy.

15       And they all may be retail independents, but their

16   individual characteristics are going to differ in terms of

17   how they are likely to order controlled substances, as well

18   as every other drug.

19   **Q.**   And over the years that you were there, did you modify

20   or enhance your threshold setting methodology?

21   **A.**   Yes.  Over time we consistently looked at and built

22   models to run the data against to adjust to be as precise as

23   we could be given the limited information that we had.

24   **Q.**   So if an order went above the threshold that was set

25   for that particular pharmacy, what would happen next?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **A.**   Well, the, the order would be held and the pharmacist

2    would conduct an evaluation.

3    **Q.**   Mr. Simmons, could we go back to the chart for a

4    moment.

5         So the pharmacist in the Electronic Order Monitoring,

6    those pharmacists would review the order then?

7    **A.**   That is correct.

8    **Q.**   And what -- to your knowledge, what are some of the

9    things that that pharmacist or pharmacist team would do at

10   that stage when an order had kicked to them?

11   **A.**   Well, among other things -- and I can't tell you

12   exactly what each pharmacist would do because there's a,

13   there's a professional analysis that goes along with it.

14        But they would look at the Know Your Customer

15   information that they had available to them.  They'd look at

16   the data that they had available to them in the system.

17   They would look at the order.  They would look at where the

18   pharmacy is located.

19        They would look at -- they would look at, you know,

20   things like their relationship to a hospital, the customer,

21   where they were.  It's the totality of the circumstances

22   for, for that pharmacy.

23        Whatever we had and whatever they thought we needed, if

24   they needed something else, they'd go to the Know Your

25   Customer folks or they'd pick up the phone and call the

1    pharmacy, or they would try and get the information that was

2    necessary to, to make an appropriate assessment.

3    **Q.**   Mr. Simmons, could you put the other back up.

4         Now, when the pharmacist had, had an order that had

5    kicked over to them, could their evaluation sometimes

6    involve a visit to the pharmacy?

7    **A.**   Yes.

8    **Q.**   And could you describe that to me?

9    **A.**   Well, a visit to the pharmacy would be a, a -- the

10   investigative -- it's interesting.  I'm going to say this.

11   The investigative folks were the primary folks that were

12   responsible for doing the investigations, plus the

13   consultants that were investigators.  And most of those were

14   former DEA diversion investigators that we used.

15        Those folks would go in and they would use the

16   framework of the Know Your Customer questionnaire as a basis

17   for their inquiry when they got to the pharmacy.

18        So they did this like -- they, they did a pre-review of

19   the data.  And they would look at everything that we had.

20   They would fill out a pre-review.  And then the investigator

21   would go in and get information to support or to support and

22   affirm the information that they had, or if something had

23   changed like, for example, they bought the files and -- you

24   know, a chain pharmacy bought a file of a pharmacy that a

25   pharmacy had closed, oh, there's, there's a change, and the

1   independent pharmacy bought the files of the pharmacy that

2   closed, there's a change.  How many prescriptions did you

3   buy, what type of patients, all of that would go into it and

4   then they would write a report.

5   **Q.**   And, so, site visits may kick out of the electronic

6   order monitoring process, but they might also be part of the

7   investigations process?

8   **A.**   Yeah, yeah.  They, they weren't required to be done

9   that way, you know.  But both ways could result in, in, in

10  an investigation.

11  **Q.**   Now, who were the people who would conduct the site

12  visit?

13  **A.**   Well, when, when I got there, I'm a firm believer in

14  cross functionality of folks.  So the investigators that we

15  hired -- we hired former police.  We hired former -- we

16  hired former Board of Pharmacy inspectors.  We hired former

17  Medicaid fraud unit inspectors.  And that was the type of

18  individual that I wanted, but I wanted a broad swath of them

19  so that they could cross-train each other.

20  **Q.**   And, so, those were some of the types of folks you

21  hired as investigators who visited the pharmacy?

22  **A.**   Yes.

23  **Q.**   And the site visit process, was there a checklist or

24  something that they worked off of?

25  **A.**   Like I said, they used the Know Your Customer

1    questionnaire as -- used the Know Your Customer

2    questionnaire as a framework.  They did have their own

3    document, but that's the framework that they used.

4    **Q.**    Now, did you personally ever conduct site visits?

5    **A.**    I did on occasion, rare occasions, but I did.

6    **Q.**    Now, we've talked a lot about suspicious orders.  At

7    what point does a pharmacist in the Anti-Diversion group

8    decide whether an order is suspicious?

9    **A.**    They would decide that at the end of the evaluation

10   that they made about the totality of the circumstances for

11   that pharmacy and that order.

12   **Q.**    And when a pharmacist made a determination that an

13   order was suspicious, what did Cardinal Health do next?

14   **A.**    The order was reported to DEA.

15   **Q.**    Was it shipped?

16   **A.**    No.

17   **Q.**    To your knowledge, during your time at Cardinal Health,

18   did the company ever ship a suspicious order?

19   **A.**    No, it did not.

20   **Q.**    I'm going to show you briefly a document that was

21   previously admitted, Mr. Mone, and I don't think you've

22   necessarily seen it, but I just want to ask you a couple of

23   questions off of it.

24        Defendants' 1.

25             MR. FULLER:  Judge, I would object to the

```
 1    broadcasting until the witness has laid a foundation for it.

 2              THE COURT:  Okay.

 3              MS. MAINIGI:  It's an admitted document, Your

 4    Honor.

 5              THE COURT:  It's already been admitted, Mr.

 6    Fuller.  Put it back up.

 7    BY MS. MAINIGI:

 8    Q.   Now, Mr. Mone, what I'm putting in front of you is

 9    Defendants' Exhibit 1 which I will submit to you is the

10    presentation that was provided at the September 11th,

11    2007, DEA conference by AmerisourceBergen.  And I know

12    you did not see this presentation at the time.  I know

13    you didn't attend the conference.  I know Mr. Reardon

14    did.

15         There are just a couple of components of the program

16    that were put forward in this conference that I just want

17    you to look at and comment as to whether they compare to the

18    Cardinal system that you helped put together.

19              MR. FULLER:  Judge, I'm going to object.  She's

20    going to question a witness who hasn't seen a document that

21    you've prevented me from doing repeatedly about whatever is

22    in the document?

23              MR. ACKERMAN:  At a conference where the witness

24    did not attend.

25              MS. MAINIGI:  Your Honor, he, he's testified that
```

1     Cardinal modeled their system from this conference.  Others

2     did attend it and he's the primary architect of the new

3     system at Cardinal.

4         I've represented that he has not seen the document

5     before.  I just want to walk through some of the generic

6     components in the document.

7              MR. ACKERMAN:  We maintain our foundation

8     objection, Your Honor.

9              THE COURT:  I'll sustain the objection.

10              MS. MAINIGI:  We can take that down, Your Honor.

11     Is it all right if I just run through a few of the

12     components orally?

13              THE COURT:  You can ask the questions and see

14     where we go.

15              MS. MAINIGI:  Okay.  That's fine, Your Honor.

16     BY MS. MAINIGI:

17     **Q.**   You can set aside, Mr. Mone, the document.  I'm

18     looking at Page 6 of the document.  You described to us

19     a Know Your Customer component just now to the Cardinal

20     system; correct?

21     **A.**   I did.

22     **Q.**   And you also described an Order Monitoring Program type

23     component and Electronic Monitoring Program component?

24     **A.**   Yes.

25     **Q.**   And did you describe to me an investigations component?

**A.**   I did.

**Q.**   And was there training also done at Cardinal Health related to Anti-Diversion?

**A.**   Yes.

**Q.**   Can you describe that for me at a high level?

**A.**   At a high level we built modules, training modules that were a component of performance metrics for employees that involved reviewing the presentation and taking a test and requiring you to get 100 percent on the test before you could -- otherwise, you would be in this constant loop of watching the slides again until you got 100 percent of the answers correct.

**Q.**   Who -- let me back up.  Who received training on Anti-Diversion at Cardinal Health?

**A.**   Well, to the best of my knowledge, I'm going to say just about everybody.  What we did was -- Anti-Diversion was everybody's -- was everyone's responsibility.  And the folks that I know that did were the, the sales folks, the sales op folks, my folks, and the distribution center employees.  I know those folks did.

**Q.**   And you were describing this 100 percent -- everybody had to take a test and get 100 percent on the test; is that right?

**A.**   You got the question wrong, you went back through the slides again.  And I think the testing folks were even mean

1    because when you got to the questions, they rearranged the

2    answers so that you couldn't memorize that the answer was,

3    the one you put was C and, you know, they were just sneaky.

4    **Q.**   Okay.   Now, your Know Your Customer due diligence, did

5    Cardinal Health's program for Know Your Customer also

6    include a new account set-up process, the new account

7    questionnaires?

8    **A.**   It did.

9    **Q.**   And you discussed already the on-site visit.   Is that

10   fair?

11   **A.**   Yes.

12   **Q.**   Monthly sales limits.   Did Cardinal Health have monthly

13   sales limits for its customers?

14   **A.**   I don't know what you mean by sales limits.

15   **Q.**   Did Cardinal's system segment customers by size

16   initially?

17   **A.**   Yes, it did.

18   **Q.**   And Cardinal Health called those thresholds?

19   **A.**   Yes.

20   **Q.**   During the time you were head of Anti-Diversion at

21   Cardinal Health, did the Wheeling distribution center have a

22   DEA registration that entire time?

23   **A.**   It did.

24   **Q.**   And in that time period, 2007 to 2012, did distribution

25   centers have to periodically renew their DEA registration?

1    **A.**   They -- they're required to periodically renew.  I

2    think it's a three-year license.

3    **Q.**   So, to your knowledge, did DEA renew the Wheeling, West

4    Virginia, distribution center license each time it applied?

5    **A.**   I would submit to you that it did.

6    **Q.**   Is it your understanding that if the DEA had ever had a

7    problem with the Wheeling facility that they would have let

8    you know about it?

9    **A.**   I would like to believe that they would have.

10   **Q.**   Is it fair to say that if the DEA had an issue with

11   Cabell/Huntington pharmacies, they would have done something

12   about it to your understanding?

13          MR. ACKERMAN:  Objection, speculating.

14          THE COURT:  Well, if he knows.

15          THE WITNESS:  I, I would like to believe they

16   would inform me.

17   BY MS. MAINIGI:

18   **Q.**   To receive and maintain a DEA registration, did DEA

19   have to determine that Cardinal Health had to provide

20   effective controls to guard against diversion?

21   **A.**   Yes.

22   **Q.**   And did that involve physical security measures?

23   **A.**   Yes.

24   **Q.**   Did it involve suspicious order reporting?

25   **A.**   Yes.

1    **Q.**   Now, the physical security measures we haven't talked

2    about much.  But at a high level, what did the regulations

3    require?

4    **A.**   The regulations on physical security are rather

5    extensive I think is a good word there.  There's, there's

6    the amount of rebar that has to be in the concrete and how

7    wide the, the cage has to be -- it has to be set -- and who

8    can have access to the cage and vault.

9         Those, those physical security requirements -- the

10   cameras that you have to have.  You know, there's a lot of

11   extensive regulations on physical security.

12   **Q.**   So there's a lot of details built into those

13   regulations?

14   **A.**   Oh, yeah.

15   **Q.**   Now, as to the suspicious order reporting requirement,

16   what did the regulations require?

17   **A.**   The suspicious order -- it's a fairly small section

18   that says that, that upon discovery, the, the -- you must,

19   you must -- and I'm probably going to get this wrong --

20   design and implement the system to identify to the

21   registrants suspicious orders of controlled substances.  It

22   was maybe 60 words and that's it.

23   **Q.**   Now, did Cardinal Health report suspicious orders not

24   just to the DEA but any other state regulatory body in West

25   Virginia?

1    **A.**    Yes, to the Board of Pharmacy.

2    **Q.**    And do you have any understanding of what the DEA did

3    with the suspicious order report?

4    **A.**    I do not.

5    **Q.**    Did the regulations specify what must be included in a

6    Suspicious Order Monitoring System?

7    **A.**    No, it doesn't.

8    **Q.**    Your SOM system that you helped put together, Mr. Mone,

9    did you come up with SOPs, Standard Operating Procedures,

10   related to various parts of the system?

11   **A.**    Yes, SOPs were created.

12   **Q.**    And why did you create SOPs?

13   **A.**    The, the rationale for creating an SOP is to both

14   create a framework within which all the employees know what

15   to expect and it forms the basis for, if you will, training

16   new employees in the areas that they're going to be engaged.

17   **Q.**    I'm going to try to run through -- get a couple of SOPs

18   in here quickly.  Cardinal 1.  Mr. Mone, could you tell us

19   what Cardinal 1 is?

20   **A.**    It is the SOP for a new retail independent customer

21   survey process.

22   **Q.**    And if you could continue to keep your voice up, sir.

23   **A.**    Okay.  I'm sorry.

24   **Q.**    If you turn to the last page, you're listed as the

25   owner of the document.  What does that mean?

1    **A.**   It means that I was the last person to review the

2    document before it went over to be approved and entered into

3    the, for lack of a better term, the SOP system.

4    **Q.**   And, to the best of your knowledge, were these

5    procedures followed at Cardinal Health?

6    **A.**   Yes, they were.

7    **Q.**   Let me put in front of you --

8          MS. MAINIGI:  Your Honor, actually could I go

9    ahead and move into evidence Cardinal Exhibit 1?

10         MR. FULLER:  No objection, Judge.

11         THE COURT:  It's admitted.

12         MS. MAINIGI:  Thank you, Your Honor.

13    Could I get Cardinal 30, please.

14    BY MS. MAINIGI:

15    **Q.**   Could you identify Cardinal 30 for the record,

16    please, Mr. Mone?

17    **A.**   It is the SOP for the new account approval process.

18    **Q.**   And did you assist with putting this SOP together?

19    **A.**   I was an approver of this.

20    **Q.**   And what was the purpose of this SOP?

21    **A.**   In a similar way, it sets the framework for how folks

22    are supposed to operate.

23    **Q.**   And who implemented the procedures in this SOP?

24    **A.**   That would have been the KYC individuals.

25         MS. MAINIGI:  Could I get Cardinal 745, please.

```
 1        And, Your Honor, I'd like to move into evidence while

 2   we're waiting Cardinal 30.

 3            THE COURT:  Is there any -- you're moving into

 4   evidence 30?

 5            MS. MAINIGI:  Yes, Your Honor.

 6            THE COURT:  Is there any objection to 30?

 7            MR. FULLER:  No, Your Honor.

 8            THE COURT:  It's admitted.

 9            THE WITNESS:  May I amend my last statement?

10   BY MS. MAINIGI:

11   Q.   Yes, please.

12   A.   Not only was it our SOM people, but because this had to

13   do with the, the database, this also applied to the

14   individuals that maintained the database of customers.

15   Q.   Thank you, Mr. Mone.

16        Please take a look at Cardinal 745.  And could you

17   identify this SOP for us, please?

18   A.   This is the process to establish SOM threshold limits.

19   Q.   And did you help put this together as well?

20   A.   To the best of my recollection, I participated.

21   Q.   And do you know who else assisted in putting this

22   together?

23   A.   It would have been the analytics people.

24   Q.   And this is the process followed by who to set

25   thresholds?
```

1    **A.**   It is the framework and methodology when formulating

2    thresholds by the analytics people and, of course, the

3    pharmacists.

4    **Q.**   And, to the best of your knowledge, were these

5    procedures followed at Cardinal Health to set thresholds?

6    **A.**   To the best of my knowledge, they were.

7              MS. MAINIGI:  Your Honor, I'd like to move in

8    Cardinal 745, please.

9              THE COURT:  Any objection to 745?

10             MR. FULLER:  No, Your Honor.

11             MS. MAINIGI:  Could I have Cardinal --

12             THE COURT:  It's admitted.

13             MS. MAINIGI:  Thank you, Your Honor.

14   BY MS. MAINIGI:

15   **Q.**   Cardinal 743.  Could you identify that, please, Mr.

16   Mone?

17   **A.**   It is the SOP for threshold event review,

18   self-verification; decision making and threshold outcome

19   communication.

20   **Q.**   So the last SOP related to setting the threshold.  What

21   related to the threshold does this SOP cover?

22   **A.**   This covers the rest of the story with regard to what

23   is done with reports.

24   **Q.**   And, so, does this cover what happens if something

25   kicks out of a threshold analysis or review?

```
 1    A.   Yes, it does.

 2    Q.   Does it -- is it one of the tools that gets used to

 3    help determine whether an order is reported as suspicious or

 4    not?

 5    A.   Yes, it does.

 6    Q.   And, to your knowledge, were these -- was this SOP

 7    followed at Cardinal?

 8    A.   To the best of my knowledge, yes.

 9             MS. MAINIGI:  Your Honor, I'd like to move for the

10    admission of 743.

11             THE COURT:  Any objection to 743?

12             MR. FULLER:  No objection.

13             MR. ACKERMAN:  No objection.

14             THE COURT:  It's admitted.

15    BY MS. MAINIGI:

16    Q.   Now, Mr. Mone, was there any involvement by the

17    sales department in the threshold event review process?

18    A.   No.

19             MS. MAINIGI:  May I ask for Cardinal 740, please.

20    BY MS. MAINIGI:

21    Q.   Coming back on sales for a moment while we hand

22    this out, so sales, the sales staff did not participate

23    in setting customer thresholds?

24    A.   They did not.

25    Q.   Did sales staff participate in raising or lowering
```

1    thresholds?

2    **A.**   No, they did not.

3    **Q.**   Did sales staff participate in evaluating individual

4    pharmacy orders?

5    **A.**   No, they did not.

6    **Q.**   Were sales staff part of any decision about whether an

7    order would be reported to DEA as suspicious?

8    **A.**   No, they were not.

9    **Q.**   Can you identify Cardinal 740, please?

10   **A.**   It is the SOP for detecting and reporting suspicious

11   orders and responding to threshold events.

12   **Q.**   Is this an updated SOP?

13   **A.**   It is.

14          MS. MAINIGI:  Your Honor, I'd like to move for the

15   admission of Cardinal 740.

16          THE COURT:  Any objection to 740?

17          MR. FULLER:  No, Your Honor.

18          MR. ACKERMAN:  No.

19          THE COURT:  It's admitted.

20   BY MS. MAINIGI:

21   **Q.**   I'm going to put, Mr. Mone, Cardinal 26 in front of

22   you in a moment.  Can you identify Cardinal 26 for us,

23   please?

24   **A.**   It is the on-site investigations SOP.

25   **Q.**   And what does this SOP cover generally?

1    **A.**    The guidance on -- in outlining the steps involved in

2    conducting on-site investigations.

3    **Q.**    So investigators would know to follow this SOP in terms

4    of what to look for when they were on-site?

5    **A.**    Yes, they would.

6    **Q.**    And, to your knowledge, was, was this SOP followed at

7    Cardinal?

8    **A.**    To the best of my knowledge, it was.

9              MS. MAINIGI:  I'd like to move for the admission

10   of Cardinal 26, please.

11             THE COURT:  Any objection to 26?

12             MR. FULLER:  No, objection.

13             MR. ACKERMAN:  No, Your Honor.

14             THE COURT:  It's admitted.

15   BY MS. MAINIGI:

16   **Q.**    Mr. Mone, I've put Cardinal 747 in front of you.

17   Can you identify this SOP, please?

18   **A.**    It is an on-site investigations SOP.

19   **Q.**    And how does it relate to the last SOP we just looked

20   at?

21   **A.**    This is an update.

22   **Q.**    And, so, these SOPs were updated periodically?

23   **A.**    Yes, they were.

24   **Q.**    And did you participate in this updating process?

25   **A.**    To the best of my recollection, I did.  No, it's in

1    October -- this is '12 -- I don't remember this one.

2    **Q.**   Are you listed as the approver on Page 21?

3    **A.**   Page 21.  Oh, sure enough.  I must have done it.

4    **Q.**   What's the difference between the approver and the

5    owner on these SOPs?

6    **A.**   The system -- and, and I don't know the accounting

7    terms for this.  But you're not supposed to have the same

8    person who does something be the approver of it.  And, so,

9    it's a system whereby one person writes it and prepares it

10   and another person approves it.

11   **Q.**   So it's a checks and balances?

12   **A.**   Yeah.  And then the, the approver -- once the approver

13   approves it, it gets entered into the system.

14   **Q.**   To your knowledge, was this SOP followed at Cardinal?

15          MR. FULLER:  Your Honor, objection.  There hasn't

16   been a proper foundation.  This witness has testified he

17   doesn't even recall this SOP.

18          THE COURT:  I think he changed his mind and said

19   he did.

20          THE WITNESS:  I did, yeah.  I'm sorry.  I

21   apologize.

22          MR. FULLER:  He said he didn't remember it.  His

23   name's on it.

24          THE COURT:  Well, and then he --

25       Do you remember it?

1          THE WITNESS:  Do I, do I remember this with the

2     specificity that I do other things?  No, I don't.  But,

3     undoubtedly, in order for this to have gotten in, I would

4     have at the time had to have been able to do it.

5          THE COURT:  Okay.  Objection is overruled.

6          MR. ACKERMAN:  Your Honor, apologies.  I'd also

7     offer an objection on the grounds that the time frame -- the

8     question was, was this standard operating procedure

9     followed.  And the witness has testified that during the

10     time frame following the standard operating procedure he

11     wasn't responsible for QRA I thought unless I'm

12     misremembering the testimony.

13     BY MS. MAINIGI:

14     **Q.**   When did you stop heading up Anti-Diversion in

15     2012?

16     **A.**   September.

17     **Q.**   This is dated April?

18     **A.**   I apologize for creating the confusion.  It was -- it's

19     a long day.

20     **Q.**   Until at least you left Anti-Diversion, do you have any

21     reason to believe that this SOP was not followed?

22     **A.**   No.

23          MS. MAINIGI:  Your Honor, I'd like to move for the

24     admission of Cardinal 747, please.

25          THE COURT:  Is there any objection to it now?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1                MR. ACKERMAN:  No objection.

 2                THE COURT:  Mr. Fuller?

 3                MR. FULLER:  No, Your Honor.

 4                THE COURT:  Admitted.

 5  BY MS. MAINIGI:

 6  Q.   Mercifully we're done with the SOPs.

 7       If I could shift your attention to chain pharmacies

 8  because I think you got a few questions about chain

 9  pharmacies from Mr. Fuller.  Do you recall that?

10  A.   Yes, I do.

11  Q.   What chain pharmacies do you recall Cardinal Health

12  supplying?

13  A.   We had chain pharmacies like Kroger and, and mostly,

14  and most -- to the best of my recollection, most all of

15  their banners.  There's Kroger and then there's like 20

16  different kind of grocery stores underneath them.  We had

17  CVS.  We had -- and some regional, some smaller regional

18  chains.

19  Q.   Did you ever have Walgreens?

20  A.   For a period of time we did.

21  Q.   Safeway?  K-Mart?

22  A.   Safeway we did.  K-Mart, yes, K-Mart we did as well.

23  Q.   And did -- we looked at the three components of the

24  Cardinal Health system -- do you recall that?

25  A.   I do.
```

1    **Q.**    -- on the screen.  Did Cardinal Health's Electronic

2    Monitoring System apply in the same way to chains and retail

3    independents?

4    **A.**    It did.

5    **Q.**    Were there any differences in the way that the SOM

6    process dealt with chain pharmacies as compared to

7    independent retail pharmacies?

8    **A.**    Only to the extent of where we obtained our

9    information.

10   **Q.**    Can you describe that to me, please?

11   **A.**    Well, given, given the chain structure, instead of --

12   in a, in a retail pharmacy we would go to that independent

13   retail pharmacy to get the information.  In the chain

14   structure, we went to the chain folks to get information.

15   **Q.**    Why would you do it that way for the chain?

16   **A.**    Well, that's where the information is.  That's where

17   the information can be collected.  And that was the most

18   efficient way of getting that information, as well as

19   providing a circumstantial guarantee that the information

20   was accurate because the data that we were looking for would

21   be housed centrally as opposed to trying to get it at a

22   chain, at an individual store level.  They were able to get

23   it to us easier.

24   **Q.**    The chain pharmacies generally maintained the type of

25   information you were looking for at their corporate

1   location?

2   **A.**   Yes.

3   **Q.**   Now, do you recall, Mr. Mone, whether there was any

4   guidance from DEA as to whether chain pharmacies should be

5   treated the same or different than retail independents?

6   **A.**   No, I don't recall that.

7   **Q.**   Were chains assigned customized thresholds for all

8   controlled substances like other customers were?

9   **A.**   Yes, they were.

10  **Q.**   Did the Cardinal Anti-Diversion team apply the same

11  standard in their review of threshold events for chain

12  pharmacies in the same way that they did for other

13  customers?

14  **A.**   Yes, they did.

15  **Q.**   Did your team, to your knowledge, ever lower the

16  thresholds for chain stores?

17  **A.**   Yes.  In fact, we raised and lowered thresholds for all

18  of our customers based upon the totality of the

19  circumstances and the analysis that we made.

20  **Q.**   And the manner in which you did that, was that

21  consistent with how it was done for independents?

22  **A.**   Yes.

23  **Q.**   In addition to training your employees on

24  Anti-Diversion, did Cardinal Health talk to its customers

25  about Anti-Diversion?

1    **A.**    Yes.

2    **Q.**    I'm going to ask for Cardinal 458, please.

3          After you've had a chance to look at it, Mr. Mone,

4    could you identify Cardinal 458, describe what it is?

5    **A.**    It is a, it is a correspondence between Cardinal Health

6    and our customers that included a, an article that was

7    commissioned by two pharmacists -- written by two pharmacist

8    attorneys as an education piece about understanding the

9    pharmacist corresponding -- well, in this instance,

10   corresponding responsibility, yeah.

11   **Q.**    And you described corresponding responsibility before?

12   **A.**    I did.

13   **Q.**    What was the purpose, to your understanding, of sending

14   this communication to customers?

15   **A.**    Just as we would provide continuing education for

16   pharmacists at state, local, and national meetings, we

17   wanted to deliver, we wanted to deliver information to

18   customers to remind them of their obligations with regard to

19   the dispensing of controlled substances pursuant to

20   prescriptions that were written.

21   **Q.**    You mentioned continuing pharmacy education at various

22   meetings.  Can you give me a little bit more flavor of that?

23   **A.**    Well, often times we would be either invited -- almost

24   always it's invited.  I don't recall ever asking to speak.

25   But we would have invitations to speak and provide -- just

1    like we have CLE, there's continuing pharmacy education for

2    pharmacist programs.  And we would, we would present those

3    at state and national pharmacy meetings.

4    **Q.**   And why was correspondence like this, or attending

5    those pharmacy events so important?

6    **A.**   Again, it goes back to my philosophy that

7    Anti-Diversion is everyone's responsibility.  And because

8    they are our customers, we want to educate our customers in

9    the best manner that we can so that they're doing the right

10   things; that they're aware of doing the right things.

11          MS. MAINIGI:  Your Honor, I'd like to move for the

12   admission of Cardinal 458, please.

13          THE COURT:  Any objection to 458?

14          MR. FULLER:  No objection, Judge.

15          MR. ACKERMAN:  No objection.

16          THE COURT:  458 is admitted.

17          MS. MAINIGI:  Can I get Cardinal 765, please?

18   BY MS. MAINIGI:

19   **Q.**   Now, plaintiffs' counsel asked you, Mr. Mone, a few

20   questions about Medicine Shoppe.  Do you remember that?

21   **A.**   I do.

22   **Q.**   Specifically, a Medicine Shoppe pharmacy I think called

23   T & J Enterprises located in Huntington.  And what I've put

24   in front of you, Cardinal 765, is a document related to that

25   pharmacy.  Could you identify what it is for us, please?

1    **A.**   It is a Retail Pharmacy Self-Questionnaire.

2    **Q.**   And this was submitted by the Medicine Shoppe in

3    February of 2008?

4    **A.**   Yes, it was.

5    **Q.**   And this is the type of questionnaire that you walked

6    through with us earlier; is that right?

7    **A.**   Yes.

8           MS. MAINIGI:  Your Honor, I'd like to move into

9    evidence Cardinal 765.

10          THE COURT:  Any objection to 765?

11          MR. FULLER:  No objection, Your Honor.

12          MR. ACKERMAN:  No objection.

13          THE COURT:  All right, it's admitted.

14   BY MS. MAINIGI:

15   **Q.**   Let's take a look at Question 22 of the document,

16   Mr. Mone.

17   **A.**   Okay.

18   **Q.**   Did the pharmacy sign a compliance agreement requiring

19   it to adhere to all rules and regulations regarding

20   diversion?

21   **A.**   Yes.

22   **Q.**   And let's look at 23 and 24.  Does Cardinal ask about

23   the history with the DEA in these questionnaires?

24   **A.**   It did.

25   **Q.**   And it asks whether there's been a suspension or

```
 1   revocation?

 2   A.    It did.

 3   Q.    And how about 39?  What does 39 show?

 4   A.    Question 39 asks about the pain management clinics and

 5   nursing homes and long-term care facilities or hospices that

 6   the pharmacy may supply, provide prescriptions for.

 7   Q.    And why is this type of question important to ask?

 8   A.    It's an important question to ask to know your customer

 9   and to know and understand the scope of what their likely

10   controlled substance use would be.

11         THE COURT:  How often did you have these filled

12   out by the pharmacies?

13         THE WITNESS:  These were filled out by the

14   pharmacy on paper initially, then electronically after

15   threshold events.

16         THE COURT:  And how often were they done?

17         THE WITNESS:  They were done periodically.  There

18   was no set schedule to it.

19         THE COURT:  Okay.

20   BY MS. MAINIGI:

21   Q.    And then there was a questionnaire that was done at

22   the beginning before a pharmacy was on board; correct?

23   A.    Correct.

24   Q.    But this is one that just came up periodically, so you

25   had two different types of questionnaires?
```

1    **A.**    Yeah.  They had -- essentially, the same questions were

2    being asked because you would be able to then look at the

3    changes that were made from questionnaire to questionnaire.

4    **Q.**    Now, after the pharmacy provides this type of

5    information, does Cardinal Health verify it?

6    **A.**    To the extent that we were able to verify the

7    information from objective sources, yes.  And when a site

8    visit was conducted, the investigator would continue to

9    question to determine as best he or she could the validity

10   of the answers.

11   **Q.**    Okay.  Let's take a look at Cardinal 763, please.  I'm

12   going to hand to you an example of the threshold event

13   review process, Mr. Mone.  Can you describe what this is a

14   snapshot of, please?

15   **A.**    This is a snapshot of the Anti-Diversion Customer

16   Profile that formed the basis of the, the review by the

17   pharmacist of an order that did a threshold for a specific

18   customer.

19   **Q.**    So this is one of the screens that the pharmacist might

20   look at when something is kicked out for threshold review?

21   **A.**    Yes, it would be.

22   **Q.**    And this particular one that's in front of you, is this

23   for T & J Enterprises that we were just talking about?

24   **A.**    It is.

25   **Q.**    And is this, is this called the ADC profile?

1    **A.**    It is.

2    **Q.**    And explain that profile to us, please.

3    **A.**    So in, in a -- in the process of continuous

4    improvement, we started out with a paper system and files.

5    And my vision was to have ADC, Anti-Diversion

6    Centralization.  I wanted to have the disparate systems that

7    existed that the pharmacist had to go to to collect and

8    collate all of the information into one spot so that it was

9    easier for them to consume and would drive efficiency.

10          And this is one iteration of that continuous

11   improvement of driving toward, having the pharmacist and the

12   team be able to consume information and make decisions and

13   record those decisions.

14   **Q.**    What sort of type of information is available here?

15   **A.**    On the form you have the DEA license information.

16   You've got the customer information.  You've got a purchase

17   profile which gives you a broader sense of the pharmacy, not

18   just the controlled substances.  You have the SOM event

19   specific information.  And for that drug family you have the

20   historical purchase data.

21          MS. MAINIGI:  Your Honor, I'd like to move for the

22   admission of Cardinal 763, please.

23          THE COURT:  Any objection to 763?

24          MR. FULLER:  No, Your Honor.

25          MR. ACKERMAN:  No objection.

```
1              THE COURT:  It's admitted.

2              MS. MAINIGI:  May I have Plaintiffs' 2020, please.

3         Any objection to admitting Plaintiffs' 2020?

4              MR. ACKERMAN:  I'm still reviewing it, but it

5    looks like hearsay.

6              MS. MAINIGI:  Let's go through it.  I don't want

7    to put it up on the screen.

8    BY MS. MAINIGI:

9    Q.   Mr. Mone, if you could turn to the second page,

10   it's an email.  Does this look like the email that was

11   shown to you earlier by Mr. Fuller specifically as it

12   relates to T & J Enterprises, Medicine Shoppe in

13   Huntington, West Virginia? Remember there was a black

14   hole email --

15   A.   Yes.

16   Q.   -- and you talked about this earlier?

17   A.   Page 2 does appear to be that, the content of that

18   prior document.

19   Q.   And I think what he didn't show you is the follow-on

20   email from Mr. Quintero.  If you could take a look here and

21   then let me know what you understood the response was from

22   Mr. Quintero.

23   A.   So what I, what I note from the email is that Gilberto

24   was responding to Doug Linden and cc'd Chris and myself on

25   his phone that as the, as the SVP of the organization that
```

1    he will revisit the pharmacies mentioned and respond to

2    Doug's concern.

3    **Q.**   So some pharmacies were identified and Mr. Quintero

4    said that there would be follow-up done at these pharmacies.

5    Is that fair?

6    **A.**   That's correct.  We'll revisit the pharmacies mentioned

7    in the email.

8    **Q.**   Now, was it your understanding that, in fact, the store

9    was visited after this email?

10   **A.**   I have no recollection as to whether or not the

11   pharmacy was visited after this email.

12   **Q.**   Do you have any reason to believe that it was not

13   visited?

14   **A.**   I have no reason to believe either way that it was or

15   it was not.

16            MS. MAINIGI:  Your Honor, at this time I would

17   like to move for the admission of P-2020.

18            THE COURT:  Any objection to 2020?

19            MR. ACKERMAN:  No objection, Your Honor.

20            MR. FULLER:  No, Your Honor.

21            THE COURT:  It's admitted.

22   BY MS. MAINIGI:

23   **Q.**   Now, with respect to 2020, the timing of this email

24   chain is approximately June, 2012; is that right?

25   **A.**   That is correct.

```
1    Q.   All right.  Let's take a look at Cardinal 770.

2         Can you identify Cardinal 770, Mr. Mone, after you've

3    had a chance to review it?

4    A.   It is the, the -- it is the, the representation of the

5    computer investigator site visit report.

6    Q.   And the investigator site visit report for where?

7    A.   T & J Enterprises.

8    Q.   And is that the T & J Enterprises in Huntington, West

9    Virginia?

10   A.   Yes, it is.  It's the same, it's the same address that

11   we've been talking about.

12   Q.   And what was the date of the visit?

13   A.   The 20th of August of 2012.

14   Q.   And when were -- when was that discussion internally at

15   Cardinal about T & J?

16   A.   June 12th.

17   Q.   2012?

18   A.   2012, yes.

19   Q.   So within two months, the visit had been made?

20   A.   Yes.

21   Q.   Okay.

22        MS. MAINIGI:  Your Honor, at this point I'd like

23   to move for the admission of Cardinal 770.

24        THE COURT:  Any objection to 770?

25        MR. FULLER:  No, Your Honor.
```

```
 1              MR. ACKERMAN:  No, Your Honor.

 2              THE COURT:  It's admitted.

 3    BY MS. MAINIGI:

 4    Q.   Mr. Mone, does Cardinal Health see individual

 5    prescriptions?

 6    A.   It does not.

 7    Q.   Does Cardinal Health assess patient health information

 8    with doctors?

 9    A.   No, it does not.  It doesn't have any PHI to, to

10    communicate with them.

11    Q.   And does Cardinal Health receive information about

12    patients from pharmacies?

13    A.   No, unless -- if they did, it would be a big -- it

14    would be a HIPAA violation.

15    Q.   Does Cardinal Health have access to the complete

16    ordering history of pharmacies if they order from multiple

17    distributors?

18    A.   No, it would not.

19    Q.   Who has that information?

20    A.   The DEA would have that information.

21    Q.   During your time at Cardinal from 2008 to 2012 did you

22    regularly interact with the DEA?

23    A.   I did.

24    Q.   Did Cardinal Health request information about its

25    customers from the DEA?
```

**A.**   We did.

**Q.**   Did Cardinal Health request ARCOS information from the DEA?

**A.**   Yes, we did.

**Q.**   Why?

**A.**   Well, if you go back to the question you asked about who can see all of the data when there are multiple suppliers, there is a point in time when we requested the ARCOS data so that we would know not, not the "who" of the other suppliers, just the "what" and the volume of the "what" so that we could add that into our evaluation about the customer.

**Q.**   Cardinal Health wanted to integrate into its evaluation process how much other distributors were sending to a particular pharmacy.  Is that fair?

**A.**   Yeah, the rest of the story.

**Q.**   Did the DEA provide that information?

**A.**   They did not.

**Q.**   Why not?

**A.**   To the best of my recollection, they claimed it was proprietary information.

**Q.**   Did Cardinal just ask for that information once or multiple times?

**A.**   Multiple times.

**Q.**   Did Cardinal Health also ask the DEA to provide it with

1   any information that the DEA possessed indicating that any

2   Cardinal Health customer was engaged in diversion so that

3   Cardinal could cease distributing controlled substances to

4   that customer?

5   **A.**   To the best of my recollection, that was in a request

6   to DEA.

7   **Q.**   And did the DEA agree to let you know if it was aware

8   of Cardinal Health's customers engaged in diversion?

9   **A.**   I -- to the best of my recollection, I don't recall

10   that there ever was a response to that request.

11   **Q.**   We've talked a lot today about Cardinal Health SOM

12   system and its components.  Did Cardinal Health share the

13   details about its Anti-Diversion system with the DEA?

14   **A.**   Yes, it did.

15   **Q.**   On more than one occasion?

16   **A.**   More than one occasion.

17   **Q.**   As part of that effort did you meet in early 2009 with

18   Barbara Boockholdt of the DEA?

19   **A.**   I did.

20   **Q.**   And remind us, who is Barbara Boockholdt?

21   **A.**   Barbara Boockholdt was -- maybe she was Chief of

22   Regulatory, or she was Chief of the Policy Section at DEA

23   and was our contact at DEA, at DEA headquarters.

24   **Q.**   So this early 2009 meeting, describe that to me.

25   **A.**   The early 2009 meeting was about -- I'd say it was

1    almost a week.

2    **Q.**   The meeting was a week?

3    **A.**   Pardon?

4    **Q.**   The meeting was a week?

5    **A.**   Yeah, more than, you know, I think approximately a

6    week.  Barbara and several other DEA diversion investigators

7    came in to review our system.

8    **Q.**   What do you mean by came in to review your system?

9    **A.**   They came into Dublin and we sat downstairs in a, in a,

10   in a room, in a meeting room and we went through our SOM

11   system.

12   **Q.**   And did that involve reviewing the SOPs and other

13   policies related to the SOM system?

14   **A.**   Yes, it did.

15   **Q.**   Like the policies we looked at earlier today?

16   **A.**   Yes.

17   **Q.**   Did it involve reviewing how Cardinal Health set

18   thresholds for its customers?

19   **A.**   Yes, it did.

20   **Q.**   Did you describe to Ms. Boockholdt and her colleagues

21   how Cardinal Health was identifying and reporting suspicious

22   orders at that point in time in 2009?

23   **A.**   Yes.

24   **Q.**   Did Ms. Boockholdt and her colleagues request

25   particular policies to review as you described the system?

```
1    A.   Yes, she did.

2    Q.   And did you provide those to her?

3    A.   Yes.

4    Q.   Were copies provided or she just reviewed them?

5    A.   She reviewed them.  And where, where she requested

6    information, we prepared them.  And the ones that were not

7    readily available, to the best of my recollection, were put

8    on a thumb drive and mailed to her.

9    Q.   Did you show her the reports that the SOM system

10   generated?

11   A.   I did.

12   Q.   Mr. Mone, were you transparent with the DEA about the

13   way Cardinal's SOM system worked?

14   A.   Yes, very.

15   Q.   Did you hold anything back?

16   A.   No.

17   Q.   In that early 2009 meeting with Ms. Boockholdt and her

18   colleagues, did the DEA identify any fault in the way that

19   Cardinal reported suspicious orders?

20   A.   No. Barbara nor the team identified or told us -- if

21   they, if they identified them, they didn't tell us about

22   them.  To the best of my knowledge, they didn't identify

23   any.

24   Q.   During your time at Cardinal, were there customers that

25   Cardinal refused to on-board because of a diversion concern?
```

1    **A.**    Oh, yes.

2    **Q.**    During your time at Cardinal, did Cardinal ever

3    terminate customers?

4    **A.**    Oh, yes.

5    **Q.**    And when you terminated a customer, did you also notify

6    the DEA?

7    **A.**    Yes, we did.

8    **Q.**    Was the DEA aware of the number of suspicious orders

9    reported by Cardinal in the time frame that you were at

10   Cardinal Health?

11            MR. ACKERMAN:  Objection, speculation as to the

12   awareness of the DEA.

13            THE COURT:  Well, do you know the answer to that?

14            THE WITNESS:  Well, what I -- Your Honor, what I

15   can say is that we submitted them to them.  What they did

16   with them after we submitted them to them, I don't know.

17            THE COURT:  Okay.  Overruled.

18   BY MS. MAINIGI:

19   **Q.**    We've talked a bit about the Cardinal policies.  As

20   to the implementation of those policies, was the DEA

21   able to see individual customer files?

22   **A.**    Yes, they were.

23   **Q.**    Did the DEA visit distribution centers after this early

24   2009 meeting that you had?

25   **A.**    Yes, they did, approximately I'd say two months later,

```
 1    within two months.
 2    Q.   Within two months of this early 2009 meeting they
 3    visited distribution centers?
 4    A.   They did.
 5    Q.   Did they tell you they were going to visit?
 6    A.   Yes.  It was part of the MOA that they were going to
 7    conduct on-site visits.
 8    Q.   Do you know how many visits they conducted?
 9    A.   They, they conducted, to the best of my recollection,
10    all of the ones in the MOA except Swedesboro.
11    Q.   And were there more than the four in the MOA --
12    A.   Yes.
13    Q.   -- that they visited?
14    A.   Correct.
15    Q.   Were they done on different days or all on the same
16    day?
17    A.   All on the same day.
18    Q.   Were you at any of the distribution centers that they
19    conducted a visit to?
20    A.   Yes, I was.
21    Q.   And, to your recollection, what happened at that visit?
22    A.   Well, the, the DEA diversion investigators did a deep
23    dive into the SOM system and wanted it explained as to how
24    the system operated, and wanted to know how the compliance
25    officers and the cage and vault employees were integrated
```

1    into the system.  And they wanted to see SOM reports and

2    customer due diligence files.

3    **Q.**   Was it your impression that they were looking to verify

4    the system worked as you had indicated it did?

5    **A.**   Yes.  I think it was a verification visit based upon

6    what Barbara had done for a week to see that it actually did

7    what we said it did.

8    **Q.**   And in the visits did the DEA request information about

9    particular customers?

10   **A.**   They did.

11   **Q.**   Did they review due diligence files for those

12   customers?

13   **A.**   They did.

14   **Q.**   To your recollection, did they offer any criticism of

15   the due diligence files during those visits?

16   **A.**   To the best of my recollection, during the visit I

17   participated in, they made no concerns about the due

18   diligence files that they looked at.

19   **Q.**   To the best of your recollection, did they offer any

20   comments about how long documentation needed to be held in

21   due diligence files?

22   **A.**   No, they did not.

23   **Q.**   To your knowledge, has the DEA ever instructed

24   distributors to maintain information in due diligence files

25   indefinitely?

1    **A.**    No.

2    **Q.**    What are DEA cyclical inspections?

3    **A.**    So as I testified earlier, and I believe that it's a

4    three-year registration, the cyclical inspections are the

5    inspections by DEA within that three-year license window

6    whereby the DEA diversion investigators come in and go

7    through the distribution center.

8          They go through their records.  They go through the

9    cage and vault.  They request an audit.  You know, they

10   usually have an open inventory that they want to look at and

11   they want to make sure that all of the, you know -- if the

12   computer says that you have 5,000 of X, they want to be able

13   to go onto the shelf and count, and they count up 5,000 of

14   X.  So that's what that cyclical inspection looks like.

15   **Q.**    And during these cyclical inspections by the DEA, did

16   they have full access to Cardinal's policies and procedures?

17   **A.**    They did.

18   **Q.**    Full access to files about customers including due

19   diligence?

20   **A.**    Yes.  To the extent that they would ask for them, the

21   team would prepare them and ship them to either the

22   distribution center or directly to the DEA diversion

23   investigator.

24   **Q.**    Now, as you updated the SOM system over the course of

25   your time in the Anti-Diversion at Cardinal, did you keep

1    the DEA updated as to any changes or improvements you were

2    making?

3    **A.**   Yes, I did.

4    **Q.**   How did you do that?

5    **A.**   I -- sometimes I would just call Barbara and sometimes

6    I would fly up and show Barbara -- have a meeting with

7    Barbara, you know, schedule a meeting with Barbara, sit

8    down, bring my laptop, open up the laptop, show what we were

9    doing, and have a conversation with Barbara and her team

10   about the improvements.  You know, quite frankly, it was a

11   continuous policy improvement process I was proud of.

12   **Q.**   Did it matter to you what the DEA thought about what

13   you were doing?

14   **A.**   Yeah, it did, a lot.

15   **Q.**   Why?

16   **A.**   Well, you saw my career.  I'm a public service guy.

17   This is about a, a -- you know, as I told Mr. Fuller

18   earlier, you know, what you have is a, is a public health

19   crisis.  And I firmly believe that it's, it's a process

20   whereby everybody has to participate, you know, within their

21   lane, what they can do to help do the right thing in their

22   lane.  And I wanted her to know what we were doing.

23       And I -- you know, quite frankly, I'd known Barbara for

24   many years and I expected her to tell me -- I expected her

25   to tell me, you know, "Hey, we don't like what you're doing,

1    change it."  And, quite frankly, I would have.

2    **Q.**   And did you also communicate with various Boards of

3    Pharmacy about what you were doing?

4    **A.**   Oh, yes.

5    **Q.**   Did you communicate with the West Virginia Board of

6    Pharmacy about suspicious order monitoring?

7    **A.**   Yes.  I, I -- you went back through my career.  As a

8    former Executive Director of the Board, there's kind of a

9    relationship between the Executive Directors.  And, so, yes,

10   I communicated not only with the Executive Directors, but

11   when we talked about the MPJE, when the West Virginia Board

12   would send inspectors to the MPJE meeting, I would

13   communicate with them as well there, not just about the

14   MPJE.

15   **Q.**   To your recollection, did you explain the Cardinal

16   Health Suspicious Order Monitoring System to the West

17   Virginia Board of Pharmacy?

18   **A.**   To the best of my recollection, I did.  They knew the

19   essential parameters of it.

20   **Q.**   Did they express any concerns to you?

21   **A.**   No, neither -- none of them did.

22   **Q.**   And did you tell me earlier that you did -- Cardinal

23   Health did report suspicious orders to the West Virginia

24   Board of Pharmacy as well?

25   **A.**   Yes, we did.

```
1              MS. MAINIGI:  Your Honor, I, I continue to reserve

2    my objection on the 2012 settlement.  But because Mr. Fuller

3    asked questions about it, I'll ask a couple as well.

4              THE COURT:  All right.

5    BY MS. MAINIGI:

6    Q.   Describe for me what the 2012 action by DEA against

7    Cardinal Health involved.  What facility?

8    A.   It involved the Lakeland facility, Lakeland, Florida

9    facility.

10   Q.   And did it concern specific pharmacies in Florida?

11   A.   It did.

12   Q.   How many?

13   A.   Four.

14   Q.   Now, had Barbara Boockholdt made a recommendation to

15   you for additional due diligence for Cardinal Health

16   customers in Florida?

17   A.   She did.

18   Q.   What was that time period approximately?

19   A.   I don't recall when she, when she asked me to do that.

20   Q.   Did she identify any particular customers?

21   A.   No, she did not.

22   Q.   Now, the pharmacies that dispense controlled

23   substances, they're obviously licensed by the DEA; right?

24   A.   Yes.

25   Q.   And the DEA can certainly take action against
```

1    pharmacies; correct?

2    **A.**    Yes, they can.

3    **Q.**    When Ms. Boockholdt voiced this concern to you, what

4    did you do?

5    **A.**    Well, we were in the process -- you know, obviously the

6    investigators would have their, their investigative

7    schedule.  And they were scheduled to go down to Florida

8    anyway, and Vince is from Florida.

9        What we did was we got a team together and we looked at

10   the data.  To the best of my recollection, we took like the

11   top 50 customers and sent the whole, the whole team down to

12   Florida to do site visits on, on those Florida customers.

13   She asked me to do it.  I did it.

14   **Q.**    Did you continue doing business with all the customers

15   that you did site inspections on down there?

16   **A.**    No, we did not.

17   **Q.**    What was the result of the process?

18   **A.**    The result of the process was that we determined that

19   there were -- and I don't remember how many.  There were

20   pharmacies that based upon the site visit reflected a --

21   reflected a concern about their corresponding meeting and

22   corresponding responsibility.  And, therefore, we made the

23   decision no longer to conduct business with them.

24   **Q.**    And did the Lakeland action involve some pharmacies

25   that you had already cut off?

1    **A.**    Yes, they did.

2    **Q.**    During the time period that you were head of Cardinal's

3    Anti-Diversion system, did you believe that it was

4    effective?

5    **A.**    Yes, I, I believe it was -- I don't know that you could

6    have very effective, but, yes, it was effective.

7    **Q.**    Did you believe Cardinal Health complied with DEA

8    regulations and the Controlled Substances Act?

9    **A.**    Yes, I did.

10    **Q.**    Now, during your time as the head of Cardinal Health

11    Anti-Diversion Program, did you ever allow an order to be

12    shipped that you believed was going to be used for anything

13    other than a legitimate medical purpose?

14    **A.**    No.

15            MS. MAINIGI:  I have no further questions.

16            THE COURT:  Is there going to be any cross of Mr.

17    Mone by the other defendants?

18            MR. HESTER:  None from us, Your Honor.

19            MR. NICHOLAS:  No, Your Honor.

20            THE COURT:  How much redirect are you going to

21    have, Mr. Fuller?

22            MR. FULLER:  I hope not much, Judge.

23            THE COURT:  Can you do it in seven minutes?

24            MR. FULLER:  We're sure going to try.

25            THE COURT:  Okay.  Let's go.

REDIRECT EXAMINATION

BY MR. FULLER:

**Q.**   Mr. Mone, you said just a moment ago that
Ms. Boockholdt under your system pointed out issues in
Florida and you went on down there and you found some
problems and you cut off pharmacies; right?

**A.**   When -- I missed some of the beginning part of your
question.

**Q.**   I'm sorry.  When Ms. Mainigi was asking you about Ms.
Boockholdt and her telling you about the Florida issue and
you said that you guys went down to Florida and you cut off
a bunch of pharmacies; right?

**A.**   There, there wasn't a Florida issue per se.  What
Barbara said was you should -- she was recommending that you
go down and look at your Florida customers because of
Florida being Florida.

**Q.**   Sure.  And your system is the same nationwide, which
we've already established, and you cut off a bunch of
Florida customers; correct?

**A.**   We cut off customers based upon our site visit review,
yes.

**Q.**   It was hundreds of customers, wasn't it?

**A.**   No.  We visited, we visited a little more than 50 and
we cut off -- I don't remember how many, but we -- as a
result of that visit -- as a result of that effort, I

1   couldn't cut off 100 because we only visited like 53

2   pharmacies, 53, 54.

3   Q.   And, so, the national system, did you then go look

4   everywhere else to see if you were having the same

5   deficiencies?

6   A.   It wasn't a question of deficiencies in my mind.  It

7   was a question of Barbara telling us to pay particular

8   attention and focus on Florida.

9        And the rest of the system, we began to look at the

10  same types of analyses.  But that was a building process

11  with regard to take those top 50 customers and begin to look

12  at those as well.  But we didn't go into another

13  jurisdiction and do a deep dive.  We relied on the strength

14  of the system.

15  Q.   It's the same system that got the second MOU in 2012;

16  right?

17  A.   The same system that, that the Lakeland ISO occurred

18  with.

19  Q.   And you're aware that Cardinal admitted fault in the

20  second MOU; correct?

21            MS. MAINIGI:  Objection.  The document speaks for

22  itself.

23            MR. FULLER:  I'm asking if he's aware, Judge.

24            THE COURT:  Overruled.  You can answer it.

25            THE WITNESS:  I'm aware that the settlement of the

1    2012 acknowledged that there were some -- it, it was some

2    orders of -- it was like some orders of some pharmacies was

3    the best of my recollection of what that MOU said -- MOA

4    said.

5    BY MR. FULLER:

6    **Q.**   And, now, counsel showed you 770.  Do you have that

7    document?

8    **A.**   Yeah.

9    **Q.**   And if you look at the last page, the increases in

10   total controlled substances Rx were attributed to the

11   closing of a local independent pharmacy SafeScript.  Right?

12   **A.**   Yes.

13   **Q.**   This Court's heard about SafeScript.  It was one that

14   was raided and shut down by the DEA.  And then it goes on to

15   explain that the customers at Medicine Shoppe grew from

16   about 1,100 scripts per month to 1,500 because of these

17   individuals; right?

18   **A.**   It does.

19   **Q.**   It also references that the growth is because of a pain

20   clinic.  Do you see anywhere in this document that it tells

21   which pain clinic?

22   **A.**   The text is, is blocked out after the second line on

23   that page, so I can only read the first two lines of it.

24   **Q.**   I agree.  I agree.  And there's no listing that you saw

25   in here of the particular prescribers; correct?

1    **A.**   Let me look.

2         (Pause)

3         I do not see the -- in this review that I did fairly

4    quickly, I don't see the name of a prescriber.

5    **Q.**   Now, last issue, Mr. Mone.  Let's talk about the

6    meeting in 2009 with the DEA and the follow-up where you

7    explained your system.  You were talking with Ms. Mainigi

8    about that; right?

9    **A.**   The, the January or February meeting in 2009, yeah.

10   **Q.**   Yes.  And are you -- who was at the meeting again?

11   Help me out.

12   **A.**   So it was my team, all of the team that was there, --

13   **Q.**   Yes, sir.

14   **A.**   -- Barbara Boockholdt and, to the best of my

15   recollection, three DEA diversion investigators.

16   **Q.**   Do you know Jodi Avergun?

17   **A.**   I do know Jodi Avergun.

18   **Q.**   Was she also involved at that time, maybe not that

19   meeting, but related to this issue of compliance?

20   **A.**   Was she what?

21   **Q.**   Involved related to this issue of compliance?

22   **A.**   Jodi was a -- is an attorney for Cardinal Health.  I

23   don't know that she was, was involved in the relationship of

24   the meeting that we had with Barbara.  I don't recall her

25   participating.

1                    MR. FULLER:  Judge, I would re-move into evidence

2        Plaintiffs' 9809 which is a document and a letter from

3        Ms. Avergun that I've shown before.  This witness testified

4        he had no knowledge, but it's a follow-up to the meetings in

5        early 2009 with the DEA in which Cardinal through their

6        lawyer --

7                    THE COURT:  I don't remember specifically the

8        exhibit.  It's probably up here buried in all this

9        somewhere.

10                   MR. FULLER:  It is, Judge, and that was my last

11       issue.

12                   THE COURT:  I'm not going to be able to see out

13       here.

14                   MS. MAINIGI:  Your Honor, I have a strong

15       objection to that.  As we discussed earlier -- I know it's

16       been a long day -- 9809 was a letter from Cardinal's outside

17       counsel, Jodi Avergun, to the DEA related to Valencia,

18       California.  There's nothing that establishes that somehow

19       this meeting, this general meeting that Mr. --

20                   THE COURT:  Well, and I sustained the objection

21       but said I'd take a look at it and review it, but I'm not

22       going to admit it now, Mr. Fuller.

23                   MR. FULLER:  Fair enough, Judge.  We'll put that

24       on the table for later follow-up.

25           I don't have any further questions.

```
1              THE COURT:  Well, you hit the nail on the head,

2     Mr. Fuller, and you have the Court's appreciation for that.

3              MR. FULLER:  Thank you, Judge.

4              THE COURT:  Now, is there anything else of this

5     witness?

6              MS. MAINIGI:  No, Your Honor.

7              THE COURT:  May Mr. Mone be excused?

8              MR. FULLER:  Yes, Your Honor.

9              MS. MAINIGI:  Yes, Your Honor.

10        I think we do have one scheduling issue for after Mr.

11    Mone's departure.

12             THE COURT:  Mr. Mone, thank you very much.  You're

13    free to go, sir, --

14             THE WITNESS:  Thank you, Your Honor.

15             THE COURT:  -- with our appreciation.

16        All right, Ms. Mainigi.

17             MS. MAINIGI:  Your Honor, we just wanted to

18    confirm, so there's no confusion with witnesses tomorrow

19    morning, the next witness that has been requested and is

20    scheduled is Mr. Jesse Kave, also a Cardinal Health witness.

21        We are planning to present him at 9:00 tomorrow morning

22    at this point given the time that we have here.  I just want

23    to confirm with the plaintiffs where they stand on that

24    because there's been some talk of Dr. Werthammer, and we've

25    got Mr. Kave.  He's been teed up and on the runway for a few
```

```
 1    days ready to go, so we'd like to get him up and out.
 2              THE COURT:  Who are you going to call, Mr.
 3    Farrell?
 4              MR. FARRELL:  Our intention is to call
 5    Dr. Werthammer at 9:00 and get him on and then call Mr. Kave
 6    afterwards.
 7              THE COURT:  Is he the one you're trying to get out
 8    of town?
 9              MS. MAINIGI:  Mr. Kave, yes.
10              THE COURT:  You want to call him first?
11              MS. MAINIGI:  That's what we were told was going
12    to happen.  I've tried having a conversation with Mr.
13    Farrell about this to see if we can try to accommodate him,
14    but I think Mr. Kave will be very short so we ought to be
15    able to get him on and off I would assume.
16              MR. FARRELL:  Mr. Kave lives in Hurricane, so he's
17    nearby.  Dr. Werthammer is in Huntington.
18         And, so, based upon the way the schedule has been
19    going, when we do our directs there is extensive redirect.
20    And I want to make sure Dr. Werthammer gets on and off
21    tomorrow morning first and then we'll call Mr. Kave.
22              THE COURT:  Well, it's your case and I think you
23    have the right to call them in the order you want to call
24    them.
25         Does that answer your question, Ms. Mainigi?
```

```
 1              MS. MAINIGI:  Not quite, Your Honor.  I do think
 2   that Mr. Farrell has an obligation to at least call the
 3   witnesses in the order that he represented he was going to.
 4       We are willing to accommodate a later start for Mr.
 5   Kave, but we insist that he not be carried over the weekend.
 6   That, that is just a bridge too far.
 7       So if Mr. Farrell can represent that they can be done
 8   with Mr. Kave tomorrow, then that's fine.  But, otherwise,
 9   we want Mr. Farrell to live up to the representations he's
10   been making to us all week about when Mr. Kave would be
11   called, which is right after Mr. Mone.
12              THE COURT:  What's the problem with holding him
13   over if we don't get him finished tomorrow?
14              MS. MAINIGI:  Your Honor, he is a former employee.
15   He is not someone who is really under the company's control
16   as a former employee.  And it's been represented to us --
17   originally he was supposed to go on Wednesday, then
18   Thursday.  And now we have been assuming this entire time
19   that he would be up and out on Friday.
20       So Mr. Werthammer is the plaintiffs' witness.  Again,
21   we're willing to work with Mr. Farrell but, but he's got to
22   then either put Mr. Kave up first and whatever happens
23   happens on time, but you can't ask a former employee who's
24   been waiting to testify for days to, to then sit patiently
25   by while they put up another witness when they have
```

```
 1    previously requested him to appear right after Mr. Mone.

 2              THE COURT:  Mr. Farrell.

 3              MR. FARRELL:  I don't have anything pleasant in

 4    response, Judge.

 5              THE COURT:  Well, Mr. Kave is under subpoena,

 6    isn't he?

 7              MR. FULLER:  Yes, Your Honor.

 8              MS. MAINIGI:  I will accept that representation,

 9    Your Honor.

10              THE COURT:  Well, I'm going to let the plaintiffs

11    put their case on in the order they want to put it on.  And

12    I'm sorry if we inconvenience this fellow, but that's just

13    part of the game, making people wait.

14              MS. MAINIGI:  Your Honor, I, I don't -- I

15    understand and I understand your ruling and, of course,

16    we'll abide by it.  But he's a former employee.  They have

17    said they were going to work with us on scheduling.  They've

18    given us representations on scheduling.  So I ask that at

19    the very least that they make every effort to get him on and

20    off tomorrow.

21              THE COURT:  How long is Mr. Werthammer going to

22    take?

23              MR. FARRELL:  I plan on being less than an hour.

24              THE COURT:  Well, let's leave the order the way

25    the plaintiffs want to do it and we'll see where we go
```

```
 1    tomorrow.  I don't think it's my province to interfere

 2    unduly with the order of evidence the plaintiffs choose to

 3    present.  Now, I know there's special circumstances where I

 4    might have an obligation to change that, but that's the way

 5    we'll leave it for tonight.

 6              MS. MAINIGI:  Thank you, Your Honor.

 7              THE COURT:  Okay.  Is there anything else today?

 8         (No Response)

 9              THE COURT:  Everybody looks tired and ready to go.

10    Okay.  I'll see everybody at 9:00 in the morning.

11         (Trial recessed at 5:07 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        CERTIFICATION:

 2                    I, Ayme A. Cochran, Official Court

 3     Reporter, and I, Lisa A. Cook, Official Court Reporter,

 4     certify that the foregoing is a correct transcript from

 5     the record of proceedings in the matter of The City of

 6     Huntington, et al., Plaintiffs vs. AmerisourceBergen

 7     Drug Corporation, et al., Defendants, Civil Action No.

 8     3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

 9     reported on May 20, 2021.

10

11              S\Ayme A. Cochran              s\Lisa A. Cook

12                 Reporter                      Reporter

13          _

14

15              May 20, 2021

16                 Date

17

18

19

20

21

22

23

24

25
```

**'**

**'07** [1] - 63:22
**'08** [6] - 63:22, 135:21, 136:15, 136:20, 140:10, 140:18
**'09** [2] - 67:12, 67:13
**'12** [2] - 63:23, 203:3

# 0

**00907** [2] - 2:5, 2:17
**02** [1] - 61:15

# 1

**1** [9] - 17:3, 28:4, 48:20, 48:22, 190:1, 190:11, 196:20, 196:21, 197:11
**1,100** [1] - 233:18
**1,500** [1] - 233:18
**10** [3] - 55:8, 73:12, 73:13
**10,000** [2] - 62:2, 62:7
**10/1** [1] - 100:24
**100** [6] - 80:1, 192:11, 192:13, 192:23, 192:24, 232:3
**1001** [2] - 2:10, 4:6
**1022** [1] - 3:5
**104(b** [1] - 8:4
**10:00** [1] - 26:6
**10:30** [1] - 66:12
**10:42** [1] - 66:17
**10th** [1] - 9:19
**11** [1] - 93:4
**114** [1] - 85:16
**11th** [2] - 9:19, 190:12
**12** [6] - 88:24, 89:1, 93:4, 101:19, 135:19, 136:18
**12-month** [3] - 81:17, 88:20, 136:23
**120** [1] - 88:12
**122** [1] - 93:9
**126** [2] - 3:5, 97:6
**128** [1] - 99:20
**12:02** [1] - 119:1
**12th** [2] - 107:4, 216:18
**1300** [1] - 6:15
**1305** [1] - 121:14
**1305.1** [1] - 121:15
**1311** [2] - 2:4, 2:16
**14** [2] - 1:16, 14:19
**14.5** [1] - 129:8
**14122** [3] - 71:10, 72:16, 72:17
**14288** [1] - 14:22

**14296** [1] - 14:22
**1498** [1] - 129:7
**15** [2] - 37:19, 37:23
**1553** [1] - 129:9
**15910** [1] - 3:18
**1600** [1] - 3:17
**17** [1] - 78:10
**1717** [2] - 6:6, 6:13
**18** [1] - 103:15
**18th** [1] - 50:8
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1930** [3] - 101:21, 101:22, 103:10
**1983** [3] - 33:15, 35:20, 36:23
**1st** [2] - 19:24, 101:8

# 2

**2** [9] - 17:6, 18:15, 28:9, 61:6, 63:21, 76:17, 109:3, 151:22, 214:19
**20** [7] - 1:19, 7:4, 156:9, 167:10, 205:17, 241:9, 241:15
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2005** [1] - 34:6
**2005-2006** [1] - 34:22
**2006** [13] - 17:21, 17:22, 20:1, 20:24, 23:10, 23:12, 26:22, 26:24, 30:21, 31:2, 31:7, 34:6, 79:14
**2007** [36] - 16:3, 17:19, 19:3, 19:6, 19:24, 20:18, 20:25, 23:10, 23:12, 23:17, 23:21, 23:23, 24:3, 35:5, 40:10, 40:11, 48:9, 79:2, 79:14, 90:25, 138:12, 157:8, 158:5, 158:24, 160:5, 160:9, 160:14, 164:22, 165:18, 165:23, 166:5, 167:13, 168:25, 169:1, 190:13, 194:1
**2008** [29] - 38:2, 38:10, 41:11, 41:13, 41:17, 50:4, 50:8, 67:25, 71:12, 72:1, 91:1, 100:24, 101:8, 138:13, 147:5,

164:23, 165:4, 166:17, 167:1, 167:13, 167:18, 168:6, 168:11, 168:23, 170:24, 181:18, 181:24, 210:5, 217:23
**2009** [13] - 134:4, 137:12, 137:16, 219:19, 220:1, 220:2, 220:24, 221:19, 223:1, 223:4, 234:8, 234:11, 235:7
**2012** [46] - 16:4, 16:5, 16:15, 16:23, 23:11, 26:18, 26:25, 30:9, 30:11, 31:22, 31:23, 31:25, 32:2, 32:3, 37:23, 38:2, 38:11, 40:5, 40:10, 45:17, 47:10, 107:4, 107:9, 108:25, 109:1, 113:3, 113:23, 114:13, 114:22, 144:15, 146:4, 170:24, 181:18, 181:24, 194:1, 204:17, 216:1, 216:15, 216:19, 216:20, 217:23, 228:4, 228:8, 232:17, 233:3
**2013** [2] - 144:15, 146:4
**2016** [2] - 37:13, 47:10
**202** [2] - 2:4, 2:16
**2020** [6] - 28:19, 120:7, 214:4, 214:5, 215:20, 215:25
**2021** [4] - 1:19, 7:4, 241:9, 241:15
**20th** [1] - 216:15
**21** [2] - 203:4, 203:5
**217** [1] - 58:9
**2172** [2] - 58:13, 58:14
**22** [1] - 210:17
**2216** [1] - 3:7
**23** [1] - 210:24
**24** [2] - 53:20, 210:24
**24-hour** [2] - 84:7, 84:23
**25** [1] - 5:5
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**25th** [1] - 37:12
**26** [4] - 201:23,

201:24, 202:12, 202:13
**27** [1] - 42:5
**27th** [2] - 19:6, 20:1
**28** [3] - 3:15, 4:3, 4:9
**28038** [4] - 105:7, 105:8, 106:12, 106:13
**2804** [1] - 129:7
**290** [1] - 14:20
**29464** [3] - 3:15, 4:4, 4:9
**2:00** [2] - 118:10, 118:25
**2nd** [1] - 9:17

# 3

**3** [8] - 17:8, 28:24, 47:20, 50:15, 63:4, 73:1, 169:9
**30** [6] - 87:8, 197:15, 197:17, 198:4, 198:6, 198:8
**30(b)(6** [3] - 27:18, 27:19, 28:15
**30-day** [1] - 75:4
**31** [4] - 104:22, 104:23, 105:2, 105:3
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**32502** [1] - 2:14
**3843** [1] - 5:14
**39** [3] - 211:5, 211:6
**390** [1] - 136:2
**3:17-cv-01362** [2] - 1:5, 241:8
**3:17-cv-01665** [2] - 1:11, 241:8
**3:40** [1] - 182:8

# 4

**4** [2] - 52:23, 176:7
**40,000** [1] - 55:5
**401** [2] - 2:10, 4:6
**403** [1] - 69:24
**405** [1] - 2:7
**408** [1] - 45:10
**42071** [2] - 14:20, 142:25
**421** [5] - 135:21, 135:24, 136:16, 140:10, 140:18
**42100** [1] - 14:20
**42102** [1] - 14:20
**42103** [1] - 14:20
**42107** [1] - 14:21
**42113** [1] - 14:21
**42114** [1] - 14:21

**42115** [1] - 14:21
**42116** [1] - 14:21
**42117** [1] - 14:21
**42118** [1] - 14:21
**42123** [1] - 14:21
**42432** [1] - 14:22
**44267** [4] - 137:6, 137:15, 137:23, 138:1
**44562** [3] - 46:1, 46:3, 46:7
**458** [5] - 208:4, 208:6, 209:14, 209:15, 209:18

# 5

**5** [1] - 182:24
**5,000** [3] - 62:8, 225:14, 225:15
**5/6** [1] - 71:12
**50** [3] - 229:13, 231:25, 232:13
**50th** [1] - 166:14
**53** [2] - 232:3, 232:4
**54** [1] - 232:4
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**5:07** [1] - 240:13
**5th** [1] - 134:4

# 6

**6** [2] - 54:19, 191:20
**6/1** [1] - 35:5
**6/30** [1] - 50:4
**60** [1] - 195:24
**600** [1] - 2:13
**611** [3] - 11:17, 12:20
**6th** [5] - 3:5, 28:19, 72:1, 119:25, 120:7

# 7

**70130** [1] - 3:8
**703** [1] - 8:8
**707** [1] - 4:18
**716** [1] - 3:12
**725** [2] - 4:13, 4:15
**740** [4] - 200:21, 201:11, 201:17, 201:18
**743** [3] - 199:17, 200:12, 200:13
**745** [4] - 198:2, 198:18, 199:10, 199:11
**747** [2] - 202:18, 205:1
**7509** [3] - 133:22,

140:13, 140:15
**763** [3] - 212:13,
213:24, 213:25
**765** [4] - 209:19,
210:1, 210:11,
210:12
**77** [3] - 137:5, 137:23,
138:1
**770** [5] - 216:3, 216:4,
216:25, 217:1, 233:8
**793** [3] - 136:3, 136:5,
136:20
**7:00** [1] - 20:12
**7th** [1] - 19:3

## 8

**8** [1] - 73:11
**8/14/2012** [2] - 150:10,
150:13
**80** [3] - 143:23, 145:5,
147:3
**801** [1] - 3:10
**801(2)(d)(C** [1] -
131:10
**801(d)(2** [1] - 130:8
**801(d)(2)(A** [2] - 45:1,
146:12
**801(d)(2)(B** [1] - 45:5
**801(d)(2)(C** [1] - 130:8
**801(d)(2)(D** [2] -
106:24, 130:14
**802(1)(D** [1] - 123:5
**835** [6] - 27:25, 28:3,
28:24, 118:17,
119:24, 121:8
**850** [1] - 5:12
**86** [1] - 78:25
**8861** [4] - 17:12,
17:23, 20:8, 24:6
**8873** [1] - 37:3

## 9

**901** [1] - 4:18
**9143** [2] - 150:3, 150:5
**91436** [1] - 3:18
**9734** [3] - 49:23,
55:10, 55:14
**9809** [4] - 70:12,
70:13, 235:4, 235:18
**9:00** [4] - 7:4, 236:23,
237:7, 240:12
**9th** [1] - 2:10

## A

**a.m** [2] - 7:5, 66:17
**ABDC** [10] - 10:16,
20:21, 22:25, 123:9,

123:13, 124:6,
130:5, 130:18,
165:23, 169:24
**abide** [1] - 239:18
**ability** [6] - 29:14,
96:8, 96:9, 111:10,
118:20, 141:21
**able** [22] - 7:25, 9:1,
13:24, 15:11, 66:4,
75:5, 75:23, 81:9,
88:6, 90:3, 115:6,
126:13, 181:11,
204:6, 206:24,
212:4, 212:8,
213:14, 222:23,
225:14, 235:14,
237:17
**absence** [1] - 27:3
**absolute** [1] - 91:25
**absolutely** [6] - 11:15,
25:7, 38:13, 42:7,
46:11, 140:7
**Absolutely** [2] - 93:15,
106:18
**abundantly** [1] -
121:25
**abused** [1] - 87:7
**accept** [1] - 239:10
**accepted** [1] - 7:19
**access** [19] - 64:5,
64:9, 64:10, 109:13,
109:15, 127:3,
140:4, 140:5,
140:25, 141:6,
141:19, 141:20,
155:10, 155:17,
155:20, 195:10,
217:17, 225:18,
225:20
**accessible** [1] -
140:23
**accommodate** [2] -
237:15, 238:6
**accommodating** [1] -
10:22
**accommodation** [1] -
27:24
**accomplish** [1] -
54:20
**according** [5] - 77:13,
102:16, 117:1,
126:15, 161:4
**account** [2] - 193:8,
197:19
**accounting** [1] - 203:8
**accurate** [2] - 94:19,
206:22
**accurately** [2] - 152:3,
170:25
**accusations** [1] -

119:8
**ACKERMAN** [44] - 2:9,
21:5, 21:13, 21:21,
22:1, 22:13, 22:21,
103:13, 128:5,
129:16, 129:18,
129:23, 132:17,
132:24, 133:4,
133:9, 133:11,
133:14, 161:19,
162:12, 164:4,
164:7, 164:10,
169:11, 169:14,
170:1, 170:8,
170:17, 173:11,
190:25, 191:9,
194:15, 200:15,
201:20, 202:15,
204:8, 205:3,
209:17, 210:14,
214:2, 214:6,
215:21, 217:3,
222:13
**Ackerman** [6] - 21:8,
21:10, 21:19,
132:23, 164:9,
170:15
**acknowledged** [1] -
233:3
**acquires** [1] - 99:9
**Act** [12] - 47:21, 73:20,
74:2, 94:15, 162:7,
162:17, 162:20,
162:22, 163:3,
163:11, 163:24,
230:10
**act** [1] - 162:22
**acting** [2] - 131:20,
167:6
**Action** [2] - 1:4, 1:10,
241:7, 241:8
**action** [20] - 38:2,
38:10, 38:11, 41:13,
41:18, 45:17, 47:11,
47:13, 52:24, 62:5,
62:11, 62:13, 62:16,
109:5, 167:1, 228:8,
229:2, 230:1
**actions** [11] - 16:7,
16:8, 38:4, 38:9,
46:17, 46:20, 153:1,
153:3, 165:19,
167:18, 167:24
**ADC** [2] - 213:2, 213:7
**add** [3] - 26:17, 53:4,
218:13
**added** [4] - 53:1, 53:4,
53:20, 83:20
**addition** [7] - 9:3,
9:12, 53:24, 69:25,

99:4, 101:25, 207:25
**additional** [14] -
67:18, 68:4, 74:22,
75:6, 76:5, 80:22,
86:14, 92:22, 99:23,
125:8, 174:16,
174:20, 174:21,
228:17
**address** [11] - 29:6,
44:12, 69:10, 119:7,
119:19, 120:1,
120:8, 132:17,
149:19, 153:20,
216:12
**addressed** [2] -
131:13, 169:22
**adequate** [1] - 63:5
**adhere** [1] - 210:21
**adjust** [1] - 185:24
**adjustments** [2] -
117:24, 138:20
**Administration** [5] -
40:25, 67:9, 95:23,
100:15, 176:14
**Administrative** [2] -
153:15, 154:4
**administrative** [4] -
16:10, 16:12, 45:18,
153:4
**admissibility** [5] -
42:22, 120:23,
121:1, 121:18, 127:2
**admissible** [6] - 8:11,
127:6, 127:15,
127:18, 127:23,
128:2
**admission** [25] -
14:12, 23:23, 31:13,
32:17, 38:3, 102:20,
106:23, 122:20,
128:16, 132:9,
132:10, 142:8,
142:10, 142:14,
142:18, 145:9,
168:12, 200:12,
201:17, 202:11,
205:1, 209:14,
213:24, 215:19,
216:25
**admissions** [3] - 45:3,
45:9, 48:6
**admit** [15] - 8:5, 23:7,
24:3, 29:24, 36:8,
36:12, 44:19, 45:12,
48:1, 69:17, 70:3,
103:5, 106:17,
147:2, 235:24
**admits** [1] - 47:20
**ADMITTED** [9] - 24:6,
36:23, 55:14,

134:20, 138:1,
142:12, 142:17,
142:25, 147:3
**admitted** [47] - 8:11,
14:22, 20:20, 22:25,
24:9, 24:10, 24:12,
24:16, 32:1, 32:13,
36:2, 36:15, 36:18,
46:24, 55:13, 72:19,
103:10, 103:12,
106:16, 107:2,
107:7, 125:20,
131:4, 131:14,
134:19, 137:25,
142:11, 142:16,
142:24, 146:17,
147:24, 189:23,
190:5, 190:7,
197:13, 198:10,
199:14, 200:16,
201:21, 202:16,
209:18, 210:15,
214:3, 215:23,
217:4, 232:21
**Admitted** [1] - 205:6
**admitting** [5] - 32:18,
32:21, 70:1, 103:3,
214:5
**adopted** [2] - 45:6,
132:5
**advance** [1] - 169:25
**advantage** [1] - 10:15
**adverse** [1] - 130:24
**advice** [4] - 131:18,
131:25, 132:6, 132:7
**Advisory** [2] - 93:25
**Affairs** [3] - 51:8,
51:22, 171:16
**affected** [1] - 42:11
**affirm** [1] - 187:24
**affirmed** [1] - 129:9
**afield** [1] - 47:1
**afternoon** [7] - 14:17,
14:24, 15:4, 119:5,
132:8, 151:20,
151:21
**afterwards** [1] - 237:8
**AG's** [1] - 153:24
**agent** [5] - 106:24,
130:16, 130:19,
131:12, 131:20
**aggregate** [1] - 125:24
**ago** [5] - 13:3, 54:25,
101:19, 143:2, 231:5
**agree** [26] - 21:14,
28:10, 29:9, 30:7,
47:22, 56:22, 58:19,
76:12, 76:18, 77:3,
77:5, 78:16, 114:4,
120:11, 120:17,

128:13, 168:16, 219:9, 234:1
**agreed** [6] - 12:4, 12:5, 12:11, 28:5, 30:8, 31:17, 119:11, 119:25, 120:2, 120:3, 120:6, 120:12, 121:22, 123:16, 123:17, 124:16
**Agreement** [3] - 47:10, 47:19, 169:4
**agreement** [11] - 14:11, 14:18, 14:22, 30:1, 112:1, 121:12, 124:15, 147:6, 168:23, 169:24, 210:20
**agreements** [3] - 42:15, 111:19, 111:21
**ahead** [17] - 25:6, 26:2, 33:4, 33:10, 34:13, 38:23, 39:2, 45:14, 69:4, 104:14, 113:11, 151:16, 151:22, 156:18, 161:21, 172:6, 197:11
**Aids** [1] - 175:11
**al** [4] - 1:7, 1:13, 241:6, 241:7
**aligned** [1] - 53:20
**all-schedule** [1] - 154:20
**allegation** [2] - 48:4, 167:12
**allegations** [2] - 46:11, 153:5
**allow** [3] - 13:21, 82:16, 230:13
**allowed** [1] - 165:9
**allowing** [1] - 21:17
**almost** [5] - 113:14, 132:25, 177:15, 208:25, 220:3
**alongs** [1] - 183:15
**alongside** [1] - 184:10
**amend** [1] - 198:11
**amended** [1] - 32:3
**AmerisourceBergen** [5] - 6:2, 124:24, 158:2, 190:13, 241:6
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**amount** [6] - 63:6, 99:25, 100:5, 128:23, 179:16, 195:8
**amounts** [2] - 46:18,

180:3
**analyses** [2] - 59:22, 232:12
**analysis** [25] - 57:19, 61:25, 75:1, 75:20, 75:21, 75:23, 76:5, 78:19, 82:24, 83:6, 84:6, 85:14, 87:13, 87:18, 90:10, 92:16, 97:7, 99:3, 115:22, 130:4, 130:19, 135:15, 186:15, 200:2, 207:21
**analyst** [1] - 173:1
**analytics** [5] - 83:6, 91:12, 175:2, 198:25, 199:4
**Analytics** [4] - 134:16, 174:23, 174:25
**analyze** [3] - 59:9, 74:23, 75:5
**Anderson** [2] - 100:25, 101:1
**ANDREW** [1] - 5:10
**animated** [1] - 58:9
**ANNE** [1] - 4:2
**Anne** [1] - 43:18
**ANNIE** [1] - 3:14
**answer** [16] - 115:23, 116:18, 127:9, 163:25, 164:12, 164:14, 164:18, 166:3, 169:2, 173:17, 173:18, 180:1, 193:4, 222:15, 233:1, 238:2
**answered** [4] - 35:16, 53:15, 78:5, 78:8
**answers** [5] - 33:7, 183:13, 192:14, 193:4, 212:12
**ANTHONY** [1] - 2:6
**anti** [6] - 50:5, 54:5, 141:9, 169:8, 171:23, 172:16
**Anti** [42] - 16:3, 16:20, 35:8, 52:20, 53:9, 54:10, 70:6, 76:16, 78:11, 97:17, 137:19, 156:24, 157:2, 157:6, 157:9, 158:9, 160:1, 162:24, 164:23, 165:18, 171:14, 181:18, 181:24, 182:15, 182:18, 189:9, 192:5, 192:16, 192:18, 193:22, 204:16, 204:22, 207:12,

208:1, 208:2, 209:9, 212:17, 213:7, 219:15, 226:2, 230:5, 230:13
**anti-diversion** [6] - 50:5, 54:5, 141:9, 169:8, 171:23, 172:16
**Anti-Diversion** [42] - 16:3, 16:20, 35:8, 52:20, 53:9, 54:10, 70:6, 76:16, 78:11, 97:17, 137:19, 156:24, 157:2, 157:6, 157:9, 158:9, 160:1, 162:24, 164:23, 165:18, 171:14, 181:18, 181:24, 182:15, 182:18, 189:9, 192:5, 192:16, 192:18, 193:22, 204:16, 204:22, 207:12, 208:1, 208:2, 209:9, 212:17, 213:7, 219:15, 226:2, 230:5, 230:13
**anticipate** [1] - 114:21
**anyway** [1] - 229:10
**Apex** [3] - 27:6, 27:8, 27:12
**apologies** [2] - 14:1, 204:8
**apologize** [8] - 26:18, 44:13, 61:9, 71:24, 108:16, 149:13, 203:23, 204:20
**appeal** [1] - 27:17
**appealed** [2] - 27:15, 27:16
**appear** [7] - 18:19, 19:2, 19:5, 76:15, 137:11, 214:19, 239:3
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appeared** [1] - 116:6
**appellate** [1] - 128:21
**appended** [1] - 35:25
**Appendix** [1] - 29:17
**applicable** [2] - 94:20, 94:23
**application** [1] - 32:4
**applied** [5] - 9:24, 60:24, 100:15, 194:6, 198:15
**applies** [4] - 130:20, 149:12, 149:13,

179:18
**apply** [5] - 170:9, 179:9, 206:4, 207:12
**applying** [1] - 22:10
**appreciation** [2] - 236:4, 236:17
**approach** [5] - 17:14, 33:20, 49:20, 68:11, 133:18
**approached** [1] - 20:15
**appropriate** [4] - 88:10, 139:13, 139:19, 187:4
**approval** [2] - 175:16, 197:19
**approved** [1] - 197:4
**approver** [6] - 197:21, 203:4, 203:6, 203:10, 203:14
**approves** [2] - 203:12, 203:15
**April** [1] - 204:19
**Arch** [2] - 6:6, 6:13
**architect** [1] - 191:4
**ARCOS** [7] - 9:24, 180:21, 180:24, 181:5, 181:12, 218:4, 218:11
**area** [8] - 39:6, 66:7, 71:20, 85:1, 109:20, 113:14, 116:22, 117:22
**areas** [4] - 51:19, 141:16, 172:24, 196:18
**arguably** [1] - 42:20
**argued** [1] - 129:2
**arguing** [1] - 123:18
**argument** [6] - 123:1, 123:2, 126:21, 128:23, 128:25, 129:5
**arguments** [3] - 126:18, 132:22, 132:23
**arise** [1] - 22:6
**arrest** [1] - 116:11
**arrival** [8] - 16:8, 16:9, 16:14, 16:19, 17:4, 17:9, 35:8, 138:15
**arrive** [1] - 23:16
**arrived** [12] - 40:5, 40:9, 40:13, 79:1, 90:25, 157:8, 158:5, 158:24, 160:7, 160:12, 166:10
**article** [1] - 208:8
**ascertain** [1] - 80:17
**Ashley** [1] - 119:5

**ASHLEY** [1] - 5:3
**aside** [2] - 20:13, 191:19
**aspects** [1] - 38:14
**assert** [2] - 68:25, 131:6
**asserted** [5] - 23:8, 24:10, 32:22, 36:4, 43:10
**assess** [6] - 75:2, 75:3, 160:13, 160:16, 178:1, 217:9
**assessed** [2] - 162:10, 163:21
**assesses** [1] - 75:20
**assessing** [4] - 115:10, 161:24, 173:25, 174:10
**assessment** [12] - 39:20, 57:20, 92:6, 105:24, 139:18, 161:2, 162:4, 163:9, 174:11, 178:25, 183:13, 187:4
**assessments** [1] - 138:6
**assigned** [2] - 148:19, 207:9
**assist** [2] - 78:11, 197:20
**Assistant** [1] - 153:18
**assisted** [1] - 198:23
**assisting** [1] - 159:3
**associated** [4] - 67:8, 76:25, 97:13, 173:8
**Association** [1] - 156:6
**assume** [6] - 33:1, 39:24, 66:10, 112:2, 145:2, 237:17
**Assuming** [1] - 89:1
**assuming** [7] - 34:17, 57:5, 60:1, 88:24, 99:25, 124:11, 238:20
**assumption** [1] - 100:2
**assumptions** [3] - 139:10, 139:12, 139:18
**assuring** [1] - 179:2
**asthma** [1] - 175:10
**AT** [1] - 1:2
**attached** [4] - 19:14, 32:6, 69:16, 101:11, 129:25, 140:14
**attachment** [1] - 19:2, 50:4
**attachments** [5] - 18:19, 19:1, 31:24,

37:14, 37:17
**attempt** [2] - 81:14, 86:4
**attend** [4] - 118:6, 190:15, 191:1, 191:4
**attended** [2] - 152:9, 157:15
**attending** [1] - 209:6
**attention** [2] - 205:9, 232:10
**attorney** [9] - 22:17, 22:18, 22:19, 129:6, 129:8, 129:12, 131:19, 131:25, 234:24
**Attorney** [2] - 153:11, 154:15
**attorney-client** [5] - 129:6, 129:8, 129:12, 131:19, 131:25
**attorneys** [2] - 8:21, 208:10
**attributed** [1] - 233:12
**Auburn** [3] - 41:14, 166:7, 166:8
**Auburn-Washington** [1] - 166:7
**audit** [2] - 126:11, 225:11
**August** [5] - 28:19, 119:25, 120:7, 137:16, 216:15
**authentic** [1] - 127:20
**authenticated** [1] - 24:21
**authenticating** [1] - 29:3
**authentication** [2] - 24:18, 28:22
**authenticity** [12] - 25:2, 29:7, 29:13, 30:7, 69:22, 118:19, 120:4, 120:9, 120:24, 121:13, 122:10, 127:20
**authority** [1] - 155:8
**authorize** [1] - 131:22
**authorized** [2] - 130:9, 130:11
**authorizing** [1] - 8:5
**automated** [3] - 56:9, 58:16, 147:19
**available** [7] - 67:22, 84:3, 185:13, 186:17, 186:18, 213:16, 221:9
**avenue** [1] - 118:16
**average** [9] - 59:3, 60:5, 60:7, 60:9,

60:16, 60:22, 139:6, 139:15
**averages** [1] - 60:12
**Avergun** [4] - 234:18, 234:19, 235:5, 235:19
**Avin** [1] - 3:7
**avoid** [1] - 13:8
**avoiding** [1] - 11:20
**aware** [20] - 16:13, 16:22, 17:20, 45:18, 47:9, 68:1, 73:19, 111:16, 111:19, 111:21, 111:22, 116:12, 116:17, 150:19, 209:12, 219:9, 222:10, 232:21, 232:25, 233:2
**awareness** [1] - 222:14
**Ayme** [2] - 6:17, 241:2

## B

**background** [6] - 46:15, 105:5, 152:1, 152:4, 152:6, 152:8
**balances** [1] - 203:13
**Band** [1] - 175:11
**Band-Aids** [1] - 175:11
**banners** [1] - 205:17
**bar** [1] - 129:4
**Barbara** [17] - 219:20, 219:22, 219:23, 220:8, 221:22, 224:8, 226:7, 226:8, 226:9, 226:11, 226:25, 228:16, 231:16, 232:9, 234:16, 235:1
**Barber** [5] - 19:23, 28:6, 105:25, 106:2, 106:6
**Baron** [1] - 3:17
**barred** [1] - 45:10
**Barrett** [5] - 28:5, 28:11, 73:2, 73:3, 73:4
**base** [3] - 65:25, 86:19, 87:1
**based** [40] - 10:5, 40:6, 40:7, 40:16, 41:4, 47:10, 47:21, 50:22, 59:9, 59:12, 59:22, 60:21, 61:22, 65:22, 67:17, 75:14, 75:15, 75:16, 83:5, 84:19, 85:15, 90:20,

90:21, 91:4, 91:11, 94:14, 107:6, 113:20, 114:11, 135:8, 138:7, 138:9, 161:7, 165:7, 207:20, 224:7, 229:22, 231:22, 237:20
**basic** [2] - 46:15, 97:16
**basis** [22] - 18:13, 32:16, 40:22, 46:23, 65:12, 65:13, 65:23, 66:2, 66:4, 75:4, 91:8, 100:4, 110:25, 134:7, 134:14, 141:9, 146:14, 157:14, 187:18, 196:17, 212:18
**battle** [1] - 131:1
**Baylen** [1] - 2:13
**bears** [1] - 20:21
**became** [5] - 90:22, 159:25, 162:23, 171:5, 185:8
**become** [1] - 82:6
**becomes** [1] - 106:8
**becoming** [1] - 111:7
**BEFORE** [1] - 1:17
**began** [6] - 45:17, 87:1, 157:16, 160:7, 160:13, 232:11
**begin** [5] - 20:17, 29:20, 94:24, 165:18, 232:13
**beginning** [16] - 90:19, 90:20, 90:24, 91:2, 108:24, 138:13, 138:19, 144:14, 144:15, 146:4, 164:23, 167:13, 211:24, 231:9
**begun** [3] - 40:14, 48:24, 167:25
**behalf** [6] - 14:10, 15:20, 28:4, 119:6, 131:21, 131:22
**behind** [1] - 103:17
**belief** [2] - 8:25, 86:2
**believer** [1] - 188:15
**believes** [1] - 146:10
**below** [4] - 74:22, 75:2, 101:3, 171:1
**bench** [1] - 151:14
**BENCH** [1] - 1:16
**benefit** [2] - 51:7, 56:17
**Benefit** [1] - 112:15
**benefits** [1] - 175:19

**berry** [1] - 79:6
**best** [41] - 10:19, 20:5, 34:3, 59:7, 84:12, 90:11, 93:24, 94:16, 102:8, 116:14, 144:21, 158:18, 163:4, 166:4, 168:7, 168:14, 175:22, 180:9, 192:17, 197:6, 198:22, 199:6, 199:8, 200:10, 202:10, 203:2, 205:16, 209:11, 212:11, 218:22, 219:7, 219:11, 221:9, 221:24, 223:11, 224:18, 224:21, 227:20, 229:12, 233:5, 234:16
**better** [8] - 55:19, 60:20, 87:12, 122:7, 144:17, 152:14, 158:23, 197:5
**between** [17] - 16:3, 29:8, 35:21, 51:21, 52:1, 52:3, 52:4, 54:21, 81:24, 90:8, 111:20, 120:6, 124:5, 176:15, 203:6, 208:7, 227:11
**beyond** [6] - 41:21, 57:18, 76:22, 77:2, 132:2, 175:4
**big** [1] - 217:15
**birthday** [2] - 166:14, 166:15
**bit** [20] - 13:17, 15:23, 51:20, 61:23, 80:2, 90:10, 101:5, 101:9, 125:23, 149:23, 152:12, 152:13, 158:20, 158:21, 172:1, 177:9, 177:14, 183:3, 208:24, 222:21
**black** [3] - 107:21, 112:18, 214:15
**block** [3] - 63:12, 100:15, 103:22
**blocked** [6] - 95:15, 95:17, 100:11, 100:12, 233:24
**blow** [2] - 55:23, 73:16
**blunt** [1] - 28:18
**Blvd** [3] - 3:15, 4:3, 4:9
**board** [4] - 15:25, 25:13, 211:24, 222:2
**Board** [23] - 81:13,

146:5, 152:19, 152:23, 152:24, 152:25, 153:16, 153:18, 154:1, 154:6, 154:12, 154:16, 155:22, 156:1, 156:2, 156:7, 188:18, 196:3, 227:7, 227:10, 227:13, 227:19, 228:1
**boarded** [2] - 83:18, 183:23
**boarding** [3] - 80:3, 83:12, 83:14
**Boards** [3] - 153:16, 156:6, 227:4
**Bob** [6] - 18:3, 18:5, 18:8, 18:16, 19:17, 50:3
**body** [2] - 154:5, 196:1
**bollixed** [1] - 122:18
**Bonasso** [1] - 5:14
**Boockholdt** [11] - 219:20, 219:22, 219:23, 220:22, 221:1, 221:19, 228:16, 229:5, 231:6, 231:12, 234:16
**boots** [1] - 78:15
**boss** [9] - 27:9, 54:17, 54:18, 73:9, 106:8, 106:9, 108:19, 171:9, 171:10
**bottom** [1] - 37:20
**bought** [3] - 187:25, 188:1, 188:3
**Boulevard** [1] - 3:18
**bounce** [1] - 139:11
**Box** [2] - 5:14, 6:8
**box** [3] - 135:1, 136:9, 136:10
**boxes** [1] - 174:19
**brain** [1] - 79:7
**brand** [3] - 84:4, 99:8, 110:16
**Brantley** [2] - 52:16, 55:1
**breach** [4] - 29:19, 119:10, 119:13, 121:24
**breached** [1] - 29:20
**breaches** [3] - 64:5, 64:7, 117:24
**break** [5] - 66:14, 118:8, 119:9, 182:4, 182:6
**breakdown** [2] - 76:1, 81:18

**breaks** [1] - 57:21
**bridge** [2] - 14:3, 238:8
**Bridgeside** [3] - 3:15, 4:3, 4:9
**brief** [2] - 25:19, 133:15
**briefed** [1] - 129:2
**briefing** [1] - 34:5
**briefings** [3] - 33:19, 34:2, 34:19
**briefly** [2] - 132:18, 189:22
**briefs** [1] - 128:21
**bring** [7] - 29:2, 29:11, 30:13, 58:8, 80:6, 158:20, 226:10
**bringing** [2] - 42:15, 80:4
**broad** [2] - 75:9, 188:20
**broadcasting** [1] - 190:3
**broader** [2] - 109:17, 213:19
**broke** [2] - 43:1, 75:1
**brought** [6] - 34:4, 34:7, 34:14, 158:12, 158:16, 158:19
**BT3743300** [1] - 110:11
**bucket** [1] - 185:8
**Budd** [1] - 3:17
**budgetary** [1] - 52:7
**build** [1] - 175:2
**building** [4] - 48:15, 84:5, 158:25, 232:12
**builds** [1] - 99:8
**built** [8] - 56:12, 93:16, 97:16, 97:18, 183:16, 185:23, 192:8, 195:14
**bullet** [3] - 52:6, 54:9, 156:5
**bunch** [4] - 108:16, 121:6, 231:14, 231:20
**buried** [1] - 235:10
**Burling** [1] - 5:11
**business** [10] - 81:9, 98:2, 98:12, 114:6, 114:15, 137:19, 149:19, 184:1, 229:16, 229:25
**buy** [2] - 178:10, 188:5
**buys** [1] - 98:19
**Buzzeo** [2] - 68:2, 68:6
**Buzzeo's** [1] - 68:3
**BY** [83] - 15:22, 17:16,

33:12, 33:16, 33:23, 34:12, 37:4, 38:24, 39:4, 45:16, 46:2, 47:6, 49:24, 53:19, 55:17, 55:25, 58:15, 61:18, 66:22, 68:13, 69:6, 70:11, 71:9, 71:17, 72:20, 76:4, 78:9, 94:9, 97:1, 100:21, 102:4, 103:14, 104:25, 107:3, 111:2, 113:16, 114:5, 117:9, 133:20, 134:21, 138:2, 143:1, 143:21, 147:4, 147:25, 149:17, 151:24, 156:20, 161:23, 162:18, 163:18, 164:19, 165:16, 166:6, 170:22, 173:20, 175:24, 176:10, 178:5, 182:11, 183:1, 190:9, 191:18, 194:19, 197:16, 198:12, 199:16, 200:17, 200:22, 201:22, 202:17, 204:15, 205:7, 209:20, 210:16, 211:22, 214:10, 215:24, 217:5, 222:20, 228:7, 231:4, 233:7

# C

**CA** [1] - 3:18
**CABELL** [1] - 1:10
**Cabell** [30] - 3:2, 28:5, 38:14, 41:16, 41:21, 41:22, 41:23, 42:4, 42:7, 42:9, 42:11, 42:13, 42:15, 42:16, 43:2, 46:17, 63:16, 63:24, 79:17, 110:19, 113:10, 145:12, 145:22, 148:6, 149:9, 150:12, 180:7, 180:14, 181:19, 182:1
**cabell** [1] - 2:2
**Cabell-Huntington** [15] - 38:14, 41:16, 41:21, 41:22, 41:23, 42:4, 42:7, 42:11, 42:13, 42:15, 42:16, 43:2, 145:12, 149:9,

150:12
**Cabell/Huntington** [2] - 71:1, 194:13
**Cabinet** [1] - 154:13
**cage** [6] - 161:6, 172:13, 195:9, 195:10, 224:2, 225:11
**calculations** [2] - 10:2, 10:9
**California** [4] - 71:2, 71:4, 110:6, 235:20
**CALLAS** [1] - 6:7
**cameras** [1] - 195:12
**Cameron** [2] - 16:25, 157:5
**Cameron's** [1] - 17:9
**CAMPBELL** [1] - 6:14
**cancel** [3] - 13:10, 30:15, 62:14
**cancelled** [2] - 13:5, 30:13
**cancer** [2] - 99:4, 99:9
**cannot** [4] - 63:9, 63:10, 125:7, 127:25
**capability** [1] - 175:2
**capable** [1] - 127:8
**capacity** [1] - 45:3
**Capitol** [1] - 2:7
**capture** [3] - 87:16, 87:20, 87:22
**captured** [1] - 88:8
**capturing** [2] - 87:19, 87:25
**Cardinal** [249] - 4:11, 5:2, 15:24, 16:2, 16:7, 18:11, 18:24, 19:3, 19:5, 19:16, 20:4, 20:23, 27:25, 28:3, 28:7, 28:14, 28:16, 28:17, 29:2, 34:2, 34:6, 34:18, 36:20, 39:9, 42:5, 43:21, 45:3, 45:4, 45:19, 46:12, 47:9, 47:20, 49:5, 49:9, 51:10, 51:25, 52:11, 52:20, 55:6, 58:20, 58:22, 59:2, 65:17, 67:17, 67:18, 70:18, 71:3, 72:6, 73:5, 73:19, 76:17, 76:21, 80:4, 80:14, 82:6, 88:23, 95:7, 104:5, 105:20, 107:25, 108:3, 110:14, 110:17, 111:3, 111:6, 111:12, 111:13, 113:7, 113:18, 116:16,

117:25, 118:2, 118:23, 119:6, 119:9, 119:23, 120:16, 122:13, 123:21, 126:18, 130:2, 130:10, 131:18, 133:12, 134:11, 135:24, 136:12, 138:15, 139:22, 144:16, 146:3, 146:5, 147:6, 147:14, 147:20, 150:11, 150:15, 150:18, 152:1, 152:4, 156:23, 157:6, 157:9, 157:12, 158:24, 159:25, 160:1, 160:7, 160:13, 160:22, 160:24, 160:25, 162:1, 162:5, 163:2, 163:10, 163:21, 163:23, 164:24, 165:19, 165:24, 167:5, 167:9, 167:14, 167:24, 168:3, 168:13, 168:15, 169:3, 169:8, 170:23, 175:4, 175:6, 175:9, 175:13, 175:18, 178:8, 178:18, 178:21, 179:7, 179:20, 179:22, 179:25, 180:1, 180:6, 180:13, 180:15, 180:20, 181:9, 181:17, 181:19, 181:23, 181:25, 182:14, 183:10, 189:15, 189:19, 190:20, 191:3, 191:5, 191:21, 192:4, 192:16, 193:7, 193:14, 193:20, 193:23, 194:21, 195:25, 196:20, 196:21, 197:7, 197:11, 197:15, 197:17, 198:2, 198:4, 198:18, 199:7, 199:10, 199:13, 199:17, 200:9, 200:21, 201:11, 201:17, 201:23, 201:24, 202:9, 202:12, 202:18, 203:16, 205:1, 205:13,

206:1, 206:3, 207:12, 208:1, 208:4, 208:6, 208:7, 209:14, 209:19, 210:1, 210:11, 210:24, 212:7, 212:13, 213:24, 216:3, 216:4, 216:17, 216:25, 217:6, 217:9, 217:13, 217:17, 217:23, 218:1, 218:4, 218:15, 218:24, 219:2, 219:4, 219:5, 219:10, 219:13, 219:14, 220:19, 220:23, 221:21, 222:1, 222:2, 222:4, 222:11, 222:12, 222:21, 226:2, 227:17, 227:24, 228:9, 228:17, 230:9, 230:12, 232:21, 234:24, 235:7, 236:22
**Cardinal's** [10] - 70:17, 79:1, 89:10, 116:1, 140:20, 193:17, 221:15, 225:18, 230:4, 235:18
**care** [5] - 59:12, 81:6, 98:16, 126:21, 211:7
**career** [4] - 156:2, 156:3, 226:18, 227:9
**Carey** [1] - 4:17
**carried** [1] - 238:7
**carries** [1] - 136:23
**cascade** [1] - 9:3
**case** [28] - 7:25, 8:1, 9:9, 9:15, 10:16, 10:24, 13:5, 13:9, 13:11, 13:19, 20:21, 22:10, 28:7, 29:24, 46:20, 77:24, 86:4, 86:22, 118:18, 122:8, 123:6, 123:12, 128:21, 132:3, 170:3, 170:10, 237:24, 239:13
**cases** [3] - 7:16, 107:21, 107:22
**categories** [5] - 60:6, 60:7, 60:15, 84:8, 185:10
**categorized** [1] - 85:2
**caused** [1] - 79:6
**causes** [1] - 9:7

**cc** [2] - 20:6, 105:16
**cc'd** [1] - 215:1
**cease** [1] - 219:5
**Cegedim** [4] - 130:11, 133:5, 143:14, 143:17
**Center** [17] - 3:12, 5:11, 16:17, 19:7, 38:12, 39:12, 40:21, 40:24, 41:16, 42:4, 45:19, 47:23, 149:10, 165:25, 167:14, 172:7, 172:9
**center** [11] - 67:5, 70:18, 71:2, 98:22, 99:5, 99:9, 192:21, 193:23, 194:6, 225:9, 225:24
**Centers** [3] - 160:25, 162:1, 165:20
**centers** [29] - 19:9, 19:12, 38:10, 39:18, 40:4, 40:19, 41:13, 42:5, 42:8, 51:11, 53:22, 53:25, 66:25, 77:1, 81:6, 147:9, 161:3, 161:10, 161:17, 166:22, 167:9, 167:18, 168:8, 171:17, 172:11, 194:2, 222:25, 223:5, 223:20
**Centralization** [1] - 213:8
**centralized** [3] - 39:14, 39:16, 53:18
**centralizing** [1] - 49:13
**centrally** [5] - 41:1, 147:6, 147:12, 147:13, 206:23
**CEO** [5] - 27:14, 28:6, 28:11, 29:21, 73:6
**certain** [15] - 27:13, 43:4, 64:21, 64:24, 65:2, 67:18, 84:10, 120:3, 127:3, 139:12, 140:9, 141:16, 144:7, 148:8, 165:19
**certainly** [10] - 7:24, 8:12, 22:1, 36:7, 78:7, 119:17, 129:21, 145:19, 170:2, 229:2
**certainty** [1] - 79:10
**CERTIFICATION** [1] - 241:1
**certify** [1] - 241:4

**cetera** [1] - 84:24
**CFR** [1] - 177:6
**Chain** [1] - 53:1
**chain** [27] - 54:11, 73:5, 83:18, 83:20, 83:23, 84:6, 84:9, 84:13, 84:21, 176:4, 185:1, 188:1, 205:9, 205:10, 205:13, 205:15, 206:8, 206:13, 206:15, 206:16, 206:17, 206:24, 207:1, 207:6, 207:13, 207:18, 216:1
**chains** [14] - 83:11, 84:10, 85:4, 85:5, 85:8, 85:10, 85:11, 85:13, 112:10, 112:11, 205:20, 206:4, 207:9
**Chains** [1] - 83:13
**chair** [2] - 177:17, 177:18
**chairman** [1] - 73:4
**chance** [4] - 14:23, 170:15, 208:5, 216:5
**change** [34] - 7:7, 53:24, 54:4, 54:6, 54:8, 62:7, 62:9, 64:16, 64:20, 64:23, 65:3, 92:5, 95:5, 98:2, 98:5, 98:10, 98:12, 98:15, 98:22, 98:23, 99:1, 99:14, 99:19, 99:25, 157:14, 159:21, 159:23, 182:3, 188:2, 188:4, 227:3, 240:6
**changed** [11] - 65:18, 90:16, 101:9, 157:25, 159:19, 159:21, 164:3, 184:1, 187:25, 203:20
**changes** [22] - 48:17, 67:18, 67:20, 91:3, 99:6, 101:8, 101:15, 117:22, 140:1, 140:3, 140:8, 145:1, 159:4, 160:8, 160:14, 164:20, 164:21, 164:22, 164:24, 167:25, 212:5, 226:3
**changing** [4] - 64:24, 98:3, 157:10, 157:13
**channel** [1] - 175:12
**Chapter** [7] - 17:3,

17:6, 17:8, 18:14, 63:21, 76:17, 109:3
**characteristics** [14] - 59:10, 59:19, 60:3, 75:6, 81:8, 84:6, 84:21, 84:22, 97:12, 98:4, 184:21, 185:13, 185:18
**charge** [4] - 35:8, 41:3, 134:10, 134:16
**charged** [1] - 159:3
**CHARLES** [1] - 3:11
**CHARLESTON** [2] - 1:2, 1:18
**Charleston** [6] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:4
**chart** [6] - 30:17, 169:7, 170:23, 170:25, 172:20, 186:5
**Chase** [1] - 4:18
**chatting** [1] - 31:3
**cheat** [1] - 101:5
**check** [1] - 30:20
**checklist** [1] - 188:25
**checks** [1] - 203:13
**chemical** [3] - 94:12, 94:14, 95:1
**chemicals** [3] - 94:18, 94:21, 95:2
**Chesterbrook** [1] - 6:15
**chewed** [1] - 79:5
**Chicago** [1] - 53:9
**chicken** [1] - 9:22
**chief** [2] - 28:8, 73:8
**Chief** [5] - 154:4, 154:5, 219:23, 219:24
**choice** [3] - 9:15, 10:22, 65:22
**choose** [4] - 11:6, 62:13, 62:15, 240:4
**chose** [1] - 30:12
**chosen** [1] - 14:2
**Chris** [6] - 100:25, 101:1, 101:7, 101:13, 124:25, 215:1
**Circuit** [4] - 7:24, 8:4, 131:13, 132:3
**circumstance** [3] - 11:4, 117:5
**circumstances** [16] - 11:23, 12:21, 13:20, 82:15, 92:18, 93:3, 96:7, 99:15, 113:21, 117:25, 118:4, 184:20, 186:23,

189:12, 207:21, 240:5
**circumstantial** [1] - 206:21
**cite** [3] - 13:1, 44:23, 109:7
**citizen** [1] - 81:6
**City** [6] - 4:1, 5:11, 28:4, 110:20, 164:7, 241:5
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 241:7, 241:8
**civil** [1] - 1:10
**claimed** [1] - 218:22
**clarification** [2] - 24:9, 32:12
**clarify** [2] - 119:14, 119:22
**class** [1] - 86:13
**classification** [1] - 184:25
**CLE** [1] - 209:3
**clear** [24] - 12:15, 13:1, 16:24, 23:16, 25:3, 26:19, 28:18, 28:24, 31:16, 32:16, 63:1, 63:9, 65:15, 65:23, 90:24, 91:23, 103:25, 115:25, 121:16, 121:25, 128:12, 130:23, 133:6, 145:24
**clearance** [1] - 65:24
**cleared** [2] - 63:7, 63:12
**clearly** [2] - 23:2, 30:23
**clears** [1] - 63:5
**CLERK** [1] - 26:15
**client** [8] - 129:6, 129:8, 129:12, 131:19, 131:25, 132:7, 132:10, 132:12
**client's** [1] - 132:11
**clinic** [7] - 113:4, 114:15, 115:2, 115:16, 115:19, 233:22, 233:23
**clinical** [2] - 175:18, 175:23
**clinics** [9] - 104:12, 104:13, 104:14, 114:24, 115:2, 115:12, 115:13, 115:20, 211:6
**close** [2] - 59:24, 81:4
**Closed** [7] - 175:25, 176:1, 176:3,

176:11, 178:9, 178:10, 179:15
**closed** [3] - 178:18, 188:2, 188:4
**closer** [3] - 152:12, 158:21, 177:14
**closes** [1] - 117:19
**closest** [1] - 176:13
**closing** [1] - 233:13
**co** [1] - 126:16
**co-counsel** [1] - 126:16
**Cochran** [3] - 6:17, 241:2, 241:11
**Code** [2] - 148:18, 148:21
**code** [4] - 86:19, 148:17, 148:18, 148:22
**Cohen** [1] - 68:23
**collaborative** [1] - 85:12
**collate** [1] - 213:10
**colleagues** [3] - 220:22, 221:1, 221:20
**collect** [2] - 81:3, 213:9
**collected** [1] - 206:19
**College** [2] - 152:11
**Column** [1] - 148:9
**column** [1] - 150:5
**columns** [1] - 148:8
**combined** [1] - 171:20
**coming** [7] - 12:16, 14:9, 21:3, 26:5, 91:13, 115:18, 117:2
**Coming** [1] - 200:23
**comment** [2] - 119:8, 190:19
**comments** [2] - 50:19, 224:22
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2, 3:2
**commissioned** [1] - 208:9
**Committee** [6] - 93:25, 94:1, 144:2, 145:14, 156:8, 156:11
**committee** [7] - 107:25, 108:2, 108:13, 108:17, 108:24, 156:12, 156:13
**communicate** [1] - 85:13, 172:16, 217:12, 227:4,

227:7, 227:15
**communicated** [1] - 227:12
**communicating** [1] - 172:15
**communication** [7] - 51:21, 54:21, 131:20, 132:1, 181:21, 199:21, 208:16
**company** [4] - 26:21, 78:20, 139:7, 189:20
**company's** [1] - 238:17
**compare** [2] - 136:15, 190:19
**compared** [2] - 96:11, 206:8
**competitor** [3] - 116:10, 157:22, 158:2
**compilation** [1] - 20:10
**compiled** [1] - 92:22
**complete** [2] - 42:17, 217:17
**completed** [1] - 90:18
**completely** [5] - 9:7, 11:8, 70:25, 93:20, 94:5
**compliance** [13] - 51:10, 53:25, 67:4, 73:20, 161:6, 164:3, 172:3, 172:10, 183:14, 210:20, 224:1, 234:21, 234:23
**Compliance** [2] - 53:20, 55:3
**complied** [2] - 162:6, 230:9
**component** [21] - 49:6, 49:18, 56:11, 78:13, 103:23, 147:21, 157:17, 163:5, 163:6, 172:19, 177:22, 181:3, 183:3, 184:3, 184:6, 184:11, 191:21, 191:25, 192:2, 192:9
**components** [13] - 49:19, 59:1, 102:9, 158:11, 163:2, 172:8, 172:23, 182:21, 190:17, 191:8, 191:14, 205:25, 219:14
**compounding** [1] - 185:16

**comprehensive** [1] - 75:9
**computer** [5] - 6:19, 81:18, 89:15, 216:7, 225:14
**computer-generated** [1] - 89:15
**computers** [2] - 39:24, 39:25
**concern** [13] - 67:8, 67:21, 113:7, 113:18, 116:19, 116:20, 170:11, 215:4, 222:2, 228:12, 229:5, 229:23
**concerned** [2] - 104:5, 124:8
**concerns** [7] - 51:16, 51:18, 108:7, 117:10, 121:14, 224:19, 227:22
**concluded** [1] - 107:16
**conclusion** [4] - 139:14, 162:12, 164:12, 164:14
**conclusions** [1] - 31:14
**concrete** [1] - 195:8
**conditional** [2] - 8:3, 15:2
**conditionally** [2] - 10:12, 15:2
**conditions** [1] - 169:4
**conduct** [11] - 57:19, 63:9, 85:10, 103:24, 173:4, 175:18, 186:4, 188:13, 189:6, 223:9, 229:25
**conducted** [5] - 144:16, 212:10, 223:10, 223:11, 223:21
**conducting** [1] - 202:4
**confer** [2] - 22:21, 25:15
**conference** [12] - 107:20, 157:20, 157:21, 158:4, 159:7, 160:9, 168:25, 190:13, 190:15, 190:18, 190:25, 191:3
**Conference** [2] - 157:15, 165:23
**confines** [1] - 131:25
**confirm** [3] - 15:3, 236:20, 236:25
**conflict** [3] - 13:1,

52:1, 52:3
**confused** [2] - 77:22, 131:11
**confusing** [2] - 127:1
**confusion** [4] - 11:10, 12:2, 204:20, 236:20
**Congress** [1] - 27:10
**conjunction** [2] - 154:13, 157:22
**connection** [1] - 28:14
**Connolly** [2] - 4:13, 5:4
**CONROY** [1] - 3:3
**consider** [7] - 43:4, 44:18, 45:12, 82:14, 103:11, 132:23
**consideration** [5] - 7:14, 82:11, 113:20, 139:7, 143:3
**considerations** [1] - 139:9
**considered** [1] - 185:11
**considering** [1] - 135:12
**consistency** [1] - 81:24
**consistent** [6] - 31:11, 159:1, 163:11, 163:24, 168:24, 207:23
**consistently** [1] - 185:23
**constant** [1] - 192:12
**constraints** [1] - 52:7
**constructed** [1] - 75:19
**consultant** [1] - 130:18
**consultants** [2] - 174:21, 187:15
**consume** [2] - 213:11, 213:14
**contact** [6] - 78:21, 109:11, 109:16, 160:24, 160:25, 219:25
**contain** [1] - 94:21
**contains** [1] - 155:19
**contemplated** [1] - 132:4
**contend** [2] - 127:20, 127:21
**content** [1] - 214:19
**contention** [1] - 52:1
**contents** [1] - 27:20
**context** [1] - 22:12
**continually** [1] - 66:6
**continue** [11] - 30:24, 31:3, 34:7, 34:14,

68:24, 149:20, 183:24, 196:24, 212:10, 228:3, 229:16
**CONTINUED** [1] - 15:21
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continued** [3] - 48:16, 90:22, 160:8
**continues** [1] - 8:4
**continuing** [4] - 45:23, 208:17, 208:23, 209:3
**continuous** [8] - 51:19, 87:14, 165:1, 183:25, 184:2, 213:5, 213:12, 226:13
**continuously** [3] - 67:19, 67:22, 109:8
**contract** [1] - 98:6
**contradiction** [1] - 12:3
**contrary** [1] - 42:17
**Control** [3] - 76:17, 154:15, 155:12
**control** [6] - 11:19, 13:19, 83:18, 112:3, 120:16, 238:17
**controlled** [44] - 59:20, 60:10, 60:13, 77:8, 79:23, 79:24, 81:1, 81:19, 83:15, 83:17, 94:20, 96:2, 96:4, 96:5, 96:8, 96:9, 96:17, 97:3, 98:16, 100:16, 108:10, 112:4, 153:21, 155:5, 167:19, 176:20, 177:24, 178:11, 178:14, 178:16, 179:10, 180:11, 181:8, 185:19, 195:23, 207:10, 208:21, 211:12, 213:20, 219:5, 228:24, 233:12
**Controlled** [11] - 47:21, 73:20, 74:1, 162:6, 162:16, 162:20, 162:22, 163:3, 163:11, 163:24, 230:10
**controls** [12] - 73:24, 74:2, 76:11, 76:24, 77:4, 77:10, 77:12, 77:13, 77:24, 78:1, 163:6, 194:22

**conversation** [3] - 30:25, 226:11, 237:14
**conversations** [1] - 21:23
**Cook** [3] - 6:18, 241:3, 241:11
**cooperative** [1] - 85:12
**copies** [3] - 14:17, 169:18, 221:6
**copy** [4] - 34:1, 71:13, 169:11, 169:12
**core** [1] - 29:24
**corner** [2] - 137:12, 137:15
**corporate** [4] - 50:16, 97:17, 169:23, 207:2
**corporate-wide** [1] - 97:17
**Corporation** [2] - 6:2, 241:7
**corporation** [4] - 1:7, 1:13, 23:7, 32:20
**Correct** [14] - 72:7, 74:9, 81:20, 87:8, 88:16, 90:14, 100:12, 100:16, 101:12, 103:19, 109:25, 117:2, 211:25, 223:16
**correct** [197] - 16:11, 16:18, 16:20, 17:9, 17:21, 17:24, 19:15, 19:24, 20:1, 20:2, 24:2, 24:19, 24:20, 35:2, 37:1, 37:15, 39:11, 39:12, 39:13, 39:15, 39:19, 39:23, 40:8, 40:9, 40:17, 40:22, 41:5, 48:10, 48:15, 49:2, 49:14, 51:1, 51:8, 51:9, 51:12, 51:13, 51:17, 52:2, 52:14, 52:15, 52:18, 53:3, 53:6, 53:11, 53:23, 54:3, 54:13, 55:2, 55:6, 56:2, 56:6, 56:7, 56:9, 56:16, 57:6, 57:23, 58:3, 58:5, 58:23, 58:25, 59:3, 59:4, 59:13, 59:14, 60:2, 61:4, 61:20, 62:3, 62:6, 62:11, 62:23, 63:2, 63:13, 64:5, 64:18, 64:19, 64:25, 65:3, 65:6, 65:12, 65:24, 67:1, 67:14, 72:3, 72:6,

72:11, 72:13, 72:24, 73:9, 73:10, 74:14, 74:17, 75:14, 76:6, 76:7, 76:12, 76:22, 80:8, 80:11, 80:14, 80:21, 82:3, 83:2, 84:18, 85:23, 86:1, 86:8, 86:14, 86:20, 86:21, 86:25, 87:2, 88:24, 89:6, 89:25, 90:6, 91:23, 92:10, 92:23, 95:3, 95:4, 95:9, 95:13, 95:18, 95:19, 95:25, 96:18, 97:4, 97:24, 99:5, 103:18, 104:6, 107:9, 107:10, 108:7, 109:4, 109:6, 109:21, 109:22, 110:1, 111:7, 111:12, 112:10, 112:11, 112:15, 113:23, 114:9, 115:7, 117:18, 134:24, 135:5, 135:9, 136:4, 136:18, 136:19, 136:22, 137:2, 137:16, 138:8, 138:10, 138:13, 139:24, 139:25, 140:11, 141:3, 141:5, 141:10, 141:13, 143:12, 143:15, 147:15, 147:16, 147:19, 149:10, 149:24, 150:16, 157:6, 159:24, 163:14, 166:23, 167:21, 168:22, 171:3, 171:6, 171:19, 171:20, 186:9, 191:22, 192:14, 211:24, 215:8, 216:2, 229:3, 231:21, 232:22, 234:2, 241:4
**correction** [1] - 144:5
**correctly** [3] - 107:23, 113:5, 113:6
**correspondence** [3] - 76:14, 208:7, 209:6
**correspondences** [1] - 76:15
**corresponding** [13] - 115:10, 116:3, 177:3, 177:5, 177:21, 177:25, 178:7, 179:3,

208:11, 208:12, 208:13, 229:23, 229:24
**corroborate** [2] - 101:24, 102:2
**Counsel** [2] - 120:16, 153:15
**counsel** [14] - 18:4, 27:24, 28:6, 70:17, 71:3, 93:22, 106:7, 126:16, 161:12, 173:24, 182:24, 209:21, 233:8, 235:19
**count** [2] - 225:15
**country** [12] - 39:10, 40:20, 42:6, 51:12, 53:22, 60:25, 79:3, 109:24, 135:25, 136:6, 136:13, 156:14
**counts** [1] - 130:23
**COUNTY** [1] - 1:10
**County** [11] - 2:2, 3:2, 28:5, 63:24, 79:17, 110:19, 110:21, 113:10, 148:6, 181:20, 182:1
**county's** [1] - 79:18
**couple** [9] - 7:16, 13:3, 43:1, 151:9, 151:11, 189:24, 190:17, 196:19, 228:5
**course** [21] - 7:22, 11:5, 18:23, 20:4, 20:11, 79:24, 88:4, 88:24, 109:16, 115:4, 133:17, 134:10, 137:19, 139:24, 140:2, 144:12, 178:3, 179:1, 199:4, 226:1, 239:17
**COURT** [238] - 1:1, 1:17, 7:6, 7:9, 7:11, 11:1, 13:17, 14:3, 14:8, 14:14, 14:19, 14:25, 15:5, 15:10, 15:17, 17:15, 21:12, 21:14, 22:7, 23:5, 23:19, 23:25, 24:3, 24:7, 24:12, 24:17, 24:21, 25:4, 25:10, 25:17, 25:22, 26:1, 26:8, 26:11, 27:1, 27:4, 27:8, 30:4, 31:8, 32:5, 32:18, 33:4, 33:8, 33:22, 34:8, 34:11, 35:15,

36:5, 36:12, 36:16, 36:18, 38:19, 38:23, 39:1, 41:9, 42:19, 43:14, 43:25, 44:8, 44:11, 44:14, 44:18, 44:25, 45:11, 45:25, 46:21, 46:25, 47:4, 47:16, 47:25, 48:5, 49:22, 53:17, 55:13, 66:14, 66:18, 68:12, 69:3, 69:10, 69:17, 70:1, 70:9, 71:6, 72:17, 72:19, 75:25, 78:7, 93:10, 93:19, 94:5, 96:22, 96:25, 101:22, 102:24, 103:1, 103:5, 103:10, 104:17, 104:21, 104:24, 106:13, 106:17, 106:21, 107:2, 110:24, 113:11, 114:4, 117:7, 118:5, 118:9, 118:13, 118:25, 119:4, 119:15, 119:20, 121:3, 121:6, 122:2, 123:20, 124:3, 125:10, 125:14, 126:2, 126:9, 126:20, 126:24, 127:14, 129:14, 129:17, 129:20, 129:22, 130:21, 132:19, 132:25, 133:7, 133:13, 133:16, 133:19, 134:19, 137:25, 142:11, 142:16, 142:21, 142:24, 143:20, 145:13, 145:16, 145:24, 146:16, 146:24, 147:1, 151:3, 151:6, 151:13, 151:16, 161:21, 162:13, 163:16, 164:6, 164:9, 164:16, 165:11, 165:14, 166:2, 169:21, 170:5, 170:12, 170:14, 173:15, 175:21, 177:8, 177:11, 182:5, 182:9, 190:4, 190:7, 191:11, 191:15, 194:16, 197:13, 198:5, 198:8, 198:10, 199:11, 199:14, 200:13, 200:16, 201:18,

201:21, 202:13, 202:16, 203:20, 204:1, 204:7, 205:2, 205:4, 205:6, 209:15, 209:18, 210:12, 210:15, 211:13, 211:18, 211:21, 213:25, 214:3, 215:20, 215:23, 217:1, 217:4, 222:15, 222:19, 228:6, 230:18, 230:22, 230:25, 231:2, 233:1, 235:9, 235:14, 235:22, 236:3, 236:6, 236:9, 236:14, 236:17, 237:4, 237:9, 237:12, 237:24, 238:14, 239:4, 239:7, 239:12, 239:23, 240:1, 240:9, 240:11
**court** [8] - 13:12, 27:23, 28:9, 28:10, 68:21, 123:6, 131:8, 132:13
**Court** [43] - 6:17, 6:18, 7:3, 7:23, 11:12, 11:17, 11:19, 12:20, 13:10, 14:17, 15:4, 15:19, 27:3, 28:16, 36:1, 38:18, 38:22, 44:12, 62:18, 65:15, 74:19, 86:19, 87:20, 89:12, 94:10, 103:10, 107:24, 119:19, 121:25, 122:19, 122:23, 122:25, 123:1, 125:18, 125:20, 125:22, 128:16, 128:20, 146:1, 148:16, 241:2, 241:3
**Court's** [5] - 32:16, 51:7, 56:17, 233:15, 236:4
**cover** [9] - 32:5, 36:11, 37:23, 42:25, 69:2, 164:20, 199:23, 200:1, 202:2
**covered** [2] - 32:20, 129:11
**covers** [2] - 145:20, 199:24
**Covington** [1] - 5:11
**create** [2] - 196:14, 196:16
**created** [5] - 49:9,

49:10, 59:6, 108:2, 196:13
**creating** [2] - 196:15, 204:20
**creation** [1] - 50:10
**crisis** [5] - 79:10, 79:12, 79:16, 79:19, 226:21
**criticism** [1] - 224:16
**CROSS** [1] - 151:23
**cross** [6] - 11:10, 13:24, 14:3, 188:16, 188:21, 230:18
**cross-train** [1] - 188:21
**CRR** [2] - 6:17, 6:18
**crystal** [1] - 28:18
**CSA** [1] - 77:11
**CT2** [4] - 28:13, 28:15, 148:5
**cure** [5] - 29:13, 118:19, 120:12, 121:23, 127:12
**cures** [1] - 126:10
**current** [1] - 159:20
**custodial** [10] - 29:15, 29:20, 118:21, 118:22, 118:24, 120:13, 120:18, 121:21, 127:12, 129:2
**Customer** [22] - 49:4, 49:6, 97:23, 158:14, 172:18, 172:25, 173:1, 173:3, 173:21, 174:12, 183:2, 183:19, 183:24, 186:16, 187:2, 187:18, 189:2, 189:3, 191:21, 193:6, 193:7, 212:17
**customer** [67] - 39:9, 39:10, 56:6, 56:18, 56:25, 58:4, 58:7, 60:22, 77:21, 78:22, 80:7, 80:10, 81:8, 81:9, 81:11, 81:25, 82:5, 82:6, 82:7, 82:9, 82:16, 83:1, 83:4, 83:8, 83:9, 83:21, 83:24, 87:16, 87:23, 88:7, 88:9, 88:11, 88:22, 89:1, 91:6, 92:7, 92:10, 96:15, 97:2, 98:9, 98:11, 111:13, 149:3, 149:18, 149:19, 173:25, 180:10, 183:9,

183:12, 183:23,
184:24, 185:4,
185:6, 186:22,
196:22, 200:25,
211:10, 212:20,
213:18, 218:14,
219:4, 219:6, 222:7,
222:23, 224:4
**customer's** [3] -
59:25, 65:6, 96:1
**customers** [56] -
59:10, 59:11, 59:15,
60:19, 60:24, 75:22,
80:21, 83:10, 85:21,
86:3, 89:13, 90:13,
96:11, 108:8, 117:2,
117:22, 139:5,
159:12, 167:6,
173:4, 173:6,
173:19, 175:5,
183:5, 183:25,
193:15, 193:17,
198:16, 207:10,
207:15, 207:20,
208:1, 208:8,
208:16, 208:20,
209:10, 218:2,
219:10, 220:20,
222:1, 222:5,
224:11, 224:14,
225:20, 228:18,
228:22, 229:13,
229:14, 229:16,
231:17, 231:21,
231:22, 231:24,
232:13, 233:17
**customers'** [1] - 59:23
**customized** [2] -
185:9, 207:9
**cut** [11] - 44:21, 96:8,
100:8, 100:10,
230:2, 231:8,
231:13, 231:20,
231:22, 232:1, 232:3
**CVS** [2] - 84:11,
205:19
**cyclical** [4] - 225:4,
225:6, 225:16,
225:17

### D

**d)(2)(B** [1] - 146:12
**d)(2)(C** [1] - 146:12
**data** [22] - 8:9, 8:10,
9:24, 9:25, 81:3,
81:25, 84:3, 88:25,
89:15, 89:17, 91:12,
174:2, 174:11,
174:25, 185:24,

186:18, 187:21,
206:22, 213:22,
218:9, 218:11,
229:12
**database** [2] - 198:15,
198:16
**dataset** [2] - 59:9
**Date** [1] - 241:16
**date** [5] - 50:7, 150:7,
150:8, 216:14
**dated** [1] - 204:19
**David** [2] - 7:1, 125:1
**DAVID** [2] - 1:17, 2:9
**days** [8] - 13:4, 22:4,
126:1, 223:17,
237:3, 239:1
**DC** [6] - 2:11, 4:7,
4:14, 4:16, 5:5, 5:12
**De** [2] - 2:4, 2:16
**DEA** [160] - 16:7, 16:8,
19:2, 19:23, 32:6,
34:6, 34:18, 37:23,
47:10, 57:6, 57:25,
58:2, 62:14, 63:2,
67:15, 67:17, 71:4,
73:17, 76:9, 76:15,
77:20, 81:2, 81:13,
86:5, 93:12, 93:15,
93:24, 94:3, 94:11,
95:21, 100:14,
104:1, 104:3, 116:7,
116:10, 116:13,
117:1, 117:11,
117:14, 117:15,
117:19, 122:15,
123:25, 147:8,
147:15, 148:12,
148:14, 149:3,
149:4, 149:6, 149:9,
157:15, 157:22,
157:24, 158:1,
158:8, 159:1,
159:23, 160:2,
160:21, 160:24,
161:1, 161:4, 161:5,
161:7, 161:10,
162:1, 164:1, 165:4,
165:18, 166:23,
167:1, 167:3, 168:4,
168:9, 168:11,
168:15, 168:18,
168:19, 168:24,
176:16, 176:19,
176:22, 176:24,
177:1, 177:6,
177:22, 178:14,
178:15, 178:17,
179:15, 179:21,
180:3, 180:8,
180:12, 180:20,

181:9, 181:11,
181:15, 181:18,
181:21, 181:24,
187:16, 189:16,
190:13, 193:24,
194:2, 194:5, 194:8,
194:12, 194:20,
196:1, 196:4, 201:9,
207:6, 210:25,
213:17, 217:22,
217:24, 218:2,
218:5, 218:19,
219:2, 219:3, 219:8,
219:9, 219:15,
219:20, 219:24,
219:25, 220:8,
221:14, 221:20,
222:8, 222:10,
222:14, 222:22,
222:25, 223:24,
224:10, 224:25,
225:4, 225:7, 225:8,
225:17, 225:24,
226:3, 226:14,
228:8, 228:25,
229:2, 230:9,
233:16, 234:8,
234:17, 235:7,
235:19
**DEA's** [1] - 9:24
**deadline** [1] - 20:12
**deal** [7] - 83:10, 121:9,
121:11, 122:25,
124:8, 125:11, 126:5
**dealing** [3] - 8:3,
85:18, 110:5
**dealt** [2] - 122:24,
206:8
**December** [25] - 16:9,
17:19, 19:6, 20:18,
20:24, 23:10, 23:17,
23:21, 23:23, 24:3,
30:21, 31:2, 31:7,
40:5, 40:11, 48:9,
63:22, 79:2, 157:8,
158:24, 160:5,
160:10, 166:9,
166:18, 169:1
**decide** [2] - 189:10,
189:11
**decided** [3] - 30:15,
86:15, 154:1
**decision** [18] - 13:10,
51:22, 58:6, 65:14,
66:2, 66:10, 82:5,
83:19, 84:15, 91:13,
92:3, 92:19, 99:20,
99:21, 178:2,
199:20, 201:8,
229:25

**decisions** [5] - 66:8,
94:4, 118:1, 213:14,
213:15
**declare** [1] - 29:20
**deep** [2] - 223:24,
232:15
**default** [1] - 91:25
**Defendant** [4] - 4:10,
5:2, 5:7, 6:2
**defendant** [1] - 36:19
**Defendants** [3] - 1:8,
1:14, 241:7
**defendants** [20] -
10:15, 10:20, 14:12,
24:15, 27:6, 27:19,
28:2, 29:25, 30:1,
123:8, 123:16,
123:24, 124:6,
129:4, 129:10,
170:1, 170:4,
170:10, 230:19
**Defendants'** [2] -
190:1, 190:11
**defendants'** [6] - 8:17,
8:19, 8:24, 9:21,
9:25, 10:14
**defending** [2] - 43:21,
43:24
**defense** [2] - 78:16,
78:19
**deficiencies** [2] -
232:7, 232:8
**define** [2] - 104:13,
177:4
**definitions** [1] -
179:12
**delaying** [1] - 13:6
**deliver** [2] - 122:19,
145:13
**Deloitte** [2] - 143:6,
143:18
**Delta** [1] - 130:15
**delta** [1] - 90:7
**Demand** [2] - 144:2,
145:13
**demo** [2] - 61:13
**Demo** [1] - 61:15
**demographic** [1] -
81:3
**demonstrable** [3] -
38:13, 41:22, 41:23
**demonstrate** [2] -
42:10, 98:4
**demonstrative** [6] -
58:9, 58:11, 58:12,
152:3, 169:9, 176:6
**Demonstrative** [3] -
151:22, 176:7,
182:24
**demonstratives** [4] -
169:16, 169:19,

169:24, 169:25
**Dendrite** [5] - 68:1,
130:11, 133:5,
143:14, 143:18
**Department** [2] - 16:3,
137:20
**department** [9] -
16:24, 17:4, 80:18,
83:15, 83:16, 83:17,
108:4, 141:8, 200:19
**departure** [7] - 12:22,
12:23, 16:22, 16:23,
16:24, 17:8, 236:13
**depo** [3] - 30:18,
30:19, 36:11
**depose** [4] - 10:17,
29:14, 30:14, 118:20
**deposed** [1] - 13:3
**deposing** [1] - 10:18
**deposition** [18] - 9:17,
9:18, 11:14, 13:4,
13:8, 13:11, 27:6,
27:8, 27:12, 28:11,
30:13, 30:16,
120:18, 121:22,
127:12, 129:3,
144:8, 144:11
**depositions** [1] -
28:14
**describe** [21] - 152:7,
153:14, 154:11,
155:23, 160:17,
171:11, 172:20,
174:6, 176:1,
180:23, 184:4,
184:16, 184:18,
187:10, 192:2,
192:7, 206:12,
208:6, 212:15,
220:1, 220:22
**Describe** [2] - 183:7,
228:8
**described** [6] - 63:21,
177:2, 191:20,
191:24, 208:13,
221:2
**describing** [1] -
192:23
**description** [4] -
89:17, 134:2, 172:1,
184:21
**design** [3] - 143:3,
182:22, 195:22
**designations** [4] -
30:18, 30:19, 36:10,
36:11
**designed** [11] - 39:8,
42:25, 60:17, 60:18,
61:22, 74:13, 87:10,
90:22, 94:14, 94:17,

95:1
**designing** [1] - 147:21
**desire** [1] - 29:1
**desk** [1] - 177:15
**detail** [1] - 86:18
**details** [2] - 195:14, 219:15
**detecting** [1] - 201:12
**determination** [6] - 82:25, 83:7, 95:7, 115:7, 177:24, 189:14
**determine** [15] - 7:18, 9:25, 59:18, 59:25, 63:1, 84:17, 84:19, 92:1, 95:22, 104:2, 125:20, 155:1, 194:21, 200:5, 212:11
**determined** [8] - 59:19, 78:3, 83:5, 93:13, 93:19, 95:11, 136:13, 229:20
**determines** [1] - 83:3
**determining** [4] - 9:23, 11:22, 90:5, 139:6
**develop** [6] - 77:6, 80:16, 94:25, 163:7, 175:14, 175:18
**developed** [4] - 49:1, 49:7, 147:18
**development** [2] - 82:21, 157:16
**deviating** [3] - 74:10, 75:7, 75:23
**deviations** [1] - 153:6
**devise** [1] - 59:3
**devised** [3] - 59:5, 80:13, 139:3
**differ** [1] - 185:18
**difference** [1] - 203:6
**differences** [1] - 206:7
**different** [27] - 9:9, 9:10, 49:17, 49:18, 51:11, 53:21, 59:11, 60:1, 60:15, 61:13, 72:23, 81:21, 83:11, 83:13, 85:3, 99:9, 111:20, 117:8, 159:14, 159:15, 163:2, 185:15, 185:16, 205:18, 207:7, 212:2, 223:17
**differently** [5] - 74:16, 99:11, 107:14, 112:9, 112:11
**difficulty** [1] - 158:21
**diligence** [37] - 49:8, 49:10, 49:11, 49:12,

49:14, 49:17, 57:16, 57:18, 62:20, 62:22, 62:24, 62:25, 63:5, 63:9, 65:6, 82:4, 85:10, 85:12, 92:9, 92:17, 99:13, 100:3, 103:24, 103:25, 114:20, 115:6, 115:8, 173:4, 193:6, 224:4, 224:13, 224:17, 224:20, 224:23, 225:1, 225:21, 228:17
**direct** [1] - 10:23
**DIRECT** [1] - 15:21
**direction** [1] - 51:15
**directly** [4] - 67:24, 178:19, 181:12, 225:24
**Director** [7] - 71:22, 101:3, 154:2, 154:7, 154:12, 156:7, 227:10
**Directors** [3] - 146:5, 227:11, 227:12
**directors** [1] - 53:4
**directs** [1] - 237:21
**disagree** [5] - 41:10, 45:8, 49:16, 70:19, 130:22
**disagreeing** [1] - 31:4
**discern** [1] - 85:15
**disclosable** [1] - 85:21
**disclose** [2] - 86:16, 87:15
**disclosed** [1] - 142:5
**disclosing** [1] - 86:2
**discovered** [2] - 74:8, 113:2
**discovery** [6] - 27:5, 27:11, 28:19, 46:20, 129:7, 195:20
**discretion** [5] - 7:18, 7:21, 7:23, 10:24, 22:2
**discuss** [2] - 133:15, 170:13
**discussed** [3] - 35:7, 193:11, 235:17
**discussion** [12] - 43:21, 88:15, 94:24, 107:20, 122:6, 126:14, 159:7, 165:7, 169:16, 170:7, 174:9, 216:16
**discussions** [1] - 27:22
**disorder** [2] - 79:7, 79:23

**disparate** [1] - 213:8
**dispense** [4] - 176:23, 176:25, 177:24, 228:24
**dispensed** [3] - 89:19, 90:4, 155:3
**dispensers** [1] - 155:11
**dispenses** [1] - 179:4
**dispensing** [8] - 87:12, 89:21, 89:25, 98:14, 113:12, 115:9, 180:16, 208:21
**dispute** [1] - 41:24
**distinct** [1] - 11:5
**distinction** [1] - 124:7
**distinguished** [1] - 124:5
**distract** [1] - 30:6
**distribute** [1] - 180:4
**distributing** [2] - 149:8, 219:5
**Distribution** [23] - 16:17, 19:7, 38:12, 39:12, 40:21, 40:23, 41:16, 42:4, 45:19, 47:23, 55:3, 149:10, 160:25, 161:25, 165:20, 165:25, 167:14, 172:7, 172:8, 175:25, 176:1, 176:3, 176:11
**distribution** [40] - 19:9, 19:12, 38:10, 39:18, 40:3, 40:19, 41:13, 42:5, 42:8, 51:11, 53:21, 53:25, 66:25, 67:4, 70:18, 71:2, 77:1, 104:15, 147:9, 149:11, 161:3, 161:9, 161:17, 166:22, 167:9, 167:17, 168:8, 171:17, 172:11, 175:12, 176:13, 192:21, 193:23, 194:1, 194:6, 222:25, 223:5, 223:20, 225:9, 225:24
**distributions** [1] - 59:3
**distributor** [15] - 10:4, 33:18, 34:1, 34:2, 34:19, 34:22, 76:10, 82:2, 86:8, 164:1, 175:3, 175:7, 175:13, 180:2
**distributors** [5] -

155:17, 181:6, 217:19, 218:16, 225:1
**DISTRICT** [3] - 1:1, 1:1, 1:17
**District** [2] - 7:2, 7:3
**dive** [2] - 223:25, 232:15
**diversion** [31] - 50:5, 54:5, 73:25, 74:3, 76:11, 76:24, 77:4, 77:10, 77:12, 77:18, 78:2, 104:4, 104:9, 104:11, 104:18, 141:9, 163:6, 169:8, 171:23, 172:16, 187:16, 194:22, 210:22, 219:4, 219:10, 220:8, 222:2, 223:24, 225:8, 225:24, 234:17
**Diversion** [45] - 16:3, 16:20, 19:15, 19:17, 19:19, 35:8, 52:20, 53:9, 54:10, 70:6, 76:16, 78:11, 97:17, 137:19, 156:24, 157:2, 157:6, 157:9, 158:9, 160:1, 162:24, 164:23, 165:18, 171:14, 181:18, 181:24, 182:15, 182:18, 189:9, 192:5, 192:16, 192:18, 193:22, 204:16, 204:22, 207:12, 208:1, 208:2, 209:9, 212:17, 213:7, 219:15, 226:2, 230:5, 230:13
**diverted** [1] - 63:11
**divided** [1] - 59:11
**Division** [2] - 54:25, 134:11
**division** [1] - 73:5
**Docket** [2] - 119:24, 121:14
**docs** [1] - 123:24
**doctor** [2] - 115:11, 178:1
**Doctor** [1] - 104:10
**doctors** [3] - 98:13, 180:17, 217:10
**Doctrine** [1] - 27:12
**document** [105] - 17:23, 18:1, 19:14, 19:22, 19:25, 23:2, 28:1, 29:16, 29:17,

29:23, 31:23, 31:24, 31:25, 33:24, 34:23, 35:12, 35:13, 35:21, 35:25, 37:5, 37:7, 37:9, 37:14, 37:22, 37:24, 44:5, 44:6, 46:4, 46:10, 47:7, 49:25, 50:16, 52:23, 54:19, 68:14, 68:17, 68:20, 68:22, 69:2, 69:8, 70:5, 70:7, 70:13, 70:16, 70:20, 70:22, 70:24, 71:3, 71:10, 71:11, 71:14, 71:25, 73:1, 93:3, 100:23, 103:15, 105:7, 105:16, 120:23, 121:1, 121:19, 124:15, 126:22, 127:6, 127:8, 128:2, 128:13, 128:14, 128:16, 129:1, 129:5, 129:11, 129:24, 130:20, 130:24, 131:1, 131:7, 131:9, 133:22, 140:12, 143:24, 144:8, 144:9, 144:11, 146:2, 150:23, 189:5, 189:22, 190:5, 190:22, 190:24, 191:6, 191:8, 191:19, 191:20, 197:2, 197:4, 210:1, 210:17, 214:20, 232:23, 233:9, 233:22, 235:4
**Document** [4] - 27:25, 118:17, 119:12, 121:14
**documentation** [6] - 92:12, 92:14, 99:14, 99:17, 114:19, 224:22
**documented** [7] - 62:22, 62:24, 65:5, 65:10, 65:12, 65:24, 92:9
**documents** [55] - 14:13, 14:16, 20:13, 21:1, 21:2, 22:18, 23:3, 24:14, 27:20, 29:5, 29:25, 30:2, 31:13, 31:18, 32:8, 32:21, 34:21, 38:3, 69:14, 69:18, 93:7, 101:11, 101:13, 107:6, 120:2, 120:3,

121:10, 121:12,
122:9, 122:11,
122:13, 122:14,
122:16, 122:19,
123:3, 123:13,
123:14, 123:19,
123:23, 123:25,
124:1, 124:2,
124:25, 125:8,
125:10, 128:19,
128:22, 137:4,
137:18, 146:17
**DOJ** [2] - 47:10, 70:17
**dollar** [1] - 81:17
**domestic** [1] - 55:5
**done** [31] - 21:21,
39:20, 49:11, 49:12,
50:25, 51:3, 92:17,
92:18, 100:3,
111:18, 134:9,
135:15, 135:16,
138:18, 138:23,
147:19, 161:2,
188:10, 192:4,
194:13, 199:25,
203:5, 205:8,
207:23, 211:18,
211:19, 211:23,
215:6, 223:17,
224:8, 238:9
**dosage** [2] - 10:3,
180:2
**dotted** [1] - 172:4
**Doug** [2] - 105:19,
215:1
**Doug's** [1] - 215:4
**Douglas** [3] - 4:17,
105:14, 105:18
**down** [27] - 28:10,
28:19, 37:20, 43:1,
51:20, 54:24, 66:11,
101:3, 107:8, 109:5,
112:14, 112:18,
114:6, 116:13,
116:25, 117:15,
156:19, 169:13,
191:12, 226:10,
229:9, 229:13,
229:17, 231:7,
231:13, 231:17,
233:16
**downstairs** [1] -
220:11
**Dr** [21] - 8:20, 8:24,
9:24, 10:7, 10:9,
11:12, 11:13, 11:14,
11:23, 11:25, 12:1,
12:6, 12:12, 12:16,
12:23, 13:2, 13:14,
237:1, 237:7,

237:19, 237:22
**dreaming** [1] - 123:4
**drive** [4] - 15:3, 15:9,
213:11, 221:10
**Drive** [1] - 6:15
**driving** [1] - 213:13
**drowning** [1] - 15:5
**DRUG** [2] - 1:7, 1:13
**Drug** [18] - 6:2, 40:24,
67:9, 89:5, 89:12,
89:14, 89:21, 89:24,
90:3, 95:23, 100:14,
148:18, 148:21,
154:14, 154:15,
155:12, 176:14,
241:7
**drug** [14] - 86:13,
86:19, 89:17, 89:20,
90:9, 114:15,
148:23, 149:20,
149:25, 150:1,
179:11, 185:20,
213:21
**drugs** [2] - 90:1,
179:12
**Dublin** [11] - 39:14,
39:19, 39:20, 39:23,
39:24, 40:1, 41:4,
41:6, 53:9, 137:2,
220:11
**due** [36] - 26:4, 49:8,
49:10, 49:11, 49:12,
49:13, 49:17, 57:16,
57:18, 62:19, 62:22,
62:24, 62:25, 63:5,
63:9, 65:6, 82:4,
85:10, 85:12, 92:9,
99:13, 100:3,
103:24, 103:25,
114:20, 115:6,
115:8, 193:6, 224:4,
224:13, 224:17,
224:19, 224:23,
225:1, 225:20,
228:17
**Dunham** [2] - 52:16,
55:1
**duplicative** [1] - 13:25
**During** [8] - 67:25,
79:1, 182:14,
193:22, 217:23,
222:1, 222:4, 230:4
**during** [22] - 27:5,
49:7, 56:8, 56:24,
58:20, 63:19, 63:21,
85:9, 90:17, 96:10,
96:16, 128:24,
144:12, 181:17,
181:23, 182:18,
189:19, 204:11,

224:17, 224:18,
225:17, 230:12
**duties** [1] - 54:1
**duty** [1] - 134:13
**dynamics** [1] - 99:6

## E

**e-mail** [14] - 18:3,
18:17, 18:20, 18:24,
23:3, 30:9, 32:5,
35:1, 35:4, 36:1,
50:3, 133:24, 134:4,
140:13
**e-mails** [1] - 134:14
**early** [10] - 67:12,
67:25, 92:11,
219:19, 220:1,
220:2, 221:19,
222:25, 223:4, 235:7
**ease** [1] - 17:3
**easier** [3] - 15:9,
206:25, 213:11
**East** [3] - 3:5, 3:12,
4:18
**easy** [2] - 116:18,
180:1
**ECF** [4] - 28:3, 28:24,
129:7, 129:9
**edits** [4] - 102:10,
102:11, 102:14,
102:17
**educate** [2] - 55:5,
209:10
**education** [4] -
208:10, 208:17,
208:23, 209:3
**educational** [1] -
152:7
**educationally** [1] -
152:9
**effect** [2] - 9:3, 61:20
**effective** [16] - 11:22,
73:24, 74:2, 76:10,
76:23, 77:4, 77:9,
77:12, 77:13, 77:24,
78:1, 163:5, 194:22,
230:6, 230:8
**efficiency** [1] - 213:11
**efficient** [1] - 206:20
**effort** [7] - 80:15,
80:16, 97:17, 97:18,
219:19, 232:2,
239:21
**egg** [1] - 9:22
**Eighth** [1] - 3:10
**either** [12] - 20:23,
38:15, 57:21, 84:3,
96:3, 96:16, 122:25,
123:15, 208:25,

215:16, 225:23,
238:24
**elaborate** [1] - 184:16
**elected** [2] - 153:25,
156:8
**electronic** [21] - 39:22,
40:15, 48:24, 49:16,
49:18, 56:10, 56:11,
64:4, 90:23, 92:13,
138:20, 139:22,
147:19, 154:21,
157:17, 157:23,
158:10, 158:14,
174:4, 188:7
**Electronic** [5] - 184:3,
184:10, 186:7,
191:25, 206:3
**electronically** [5] -
49:14, 56:6, 56:7,
90:18, 211:16
**element** [1] - 82:24
**elements** [3] - 27:13,
29:24, 143:7
**ELIZABETH** [1] - 6:14
**email** [20] - 71:11,
100:24, 102:16,
105:14, 105:25,
106:18, 107:4,
107:15, 113:24,
114:3, 114:11,
214:12, 214:16,
214:22, 214:25,
215:9, 215:11,
215:13, 215:25
**emails** [1] - 69:16
**embarrassment** [1] -
11:21
**Emma** [6] - 105:14,
105:18, 105:19,
105:25, 109:13,
109:15
**emphasis** [2] - 29:12,
82:23
**employed** [2] - 11:12,
27:12
**employee** [5] - 106:25,
238:16, 238:18,
238:25, 239:18
**employees** [7] - 55:6,
192:9, 192:21,
196:16, 196:18,
207:25, 224:2
**employment** [5] -
15:24, 18:23, 20:4,
134:10, 144:12
**enable** [1] - 84:14
**enables** [1] - 178:16
**ENC** [1] - 27:10
**Encino** [1] - 3:18
**encourage** [1] -

126:13
**encouraged** [1] - 47:4
**end** [12] - 13:25, 16:3,
63:22, 138:12,
144:14, 146:4,
160:20, 164:22,
165:18, 166:5,
167:13, 189:11
**enforce** [1] - 28:17
**Enforcement** [5] -
40:25, 67:9, 95:23,
100:14, 176:14
**enforcement** [4] -
109:5, 165:19,
167:18, 167:24
**engaged** [7] - 27:22,
67:21, 97:19, 165:1,
196:18, 219:4,
219:10
**enhance** [1] - 185:22
**enhancements** [1] -
34:15
**ensure** [3] - 73:20,
82:2, 167:5
**entailed** [1] - 172:2
**enter** [1] - 31:18
**entered** [8] - 47:9,
119:24, 119:25,
120:7, 121:11,
132:1, 197:4, 203:15
**enterprise** [2] -
109:22, 109:23
**Enterprise** [1] - 114:6
**Enterprises** [6] -
149:18, 209:25,
212:25, 214:14,
216:9, 216:10
**entire** [9] - 60:23,
109:22, 109:23,
139:1, 139:2, 165:2,
193:24, 238:20
**entirety** [1] - 14:16
**entities** [1] - 176:15
**entitled** [2] - 11:15,
44:7
**entity** [2] - 80:25,
178:17
**entry** [2] - 30:2, 150:8
**ENU** [1] - 4:12
**epidemic** [4] - 79:4,
79:9, 139:8, 143:4
**epidemiologist** [1] -
79:9
**erase** [1] - 150:18
**Eric** [1] - 52:16
**error** [1] - 149:14
**especially** [1] - 8:2
**essential** [1] - 227:21
**essentially** [4] - 93:17,
160:5, 177:25, 212:3

**establish** [6] - 23:13, 23:15, 26:21, 26:24, 33:2, 198:20
**established** [9] - 16:2, 30:10, 48:16, 59:8, 70:23, 93:20, 114:1, 135:7, 231:20
**establishes** [1] - 235:20
**establishing** [2] - 29:4, 138:22
**establishment** [1] - 154:16
**et** [5] - 1:7, 1:13, 84:23, 241:6, 241:7
**evaluate** [2] - 65:18, 173:3
**evaluated** [1] - 57:14
**evaluating** [4] - 88:15, 91:8, 117:23, 201:5
**evaluation** [22] - 57:3, 58:23, 62:17, 64:22, 68:1, 88:13, 91:6, 91:17, 91:18, 95:5, 99:18, 99:19, 105:22, 105:24, 118:4, 174:12, 184:24, 186:4, 187:7, 189:11, 218:13, 218:15
**evaluations** [1] - 183:22
**event** [11] - 61:6, 62:10, 75:18, 88:15, 91:23, 120:17, 135:17, 199:19, 200:19, 212:14, 213:20
**events** [17] - 135:2, 135:4, 135:6, 135:10, 135:11, 135:25, 136:6, 136:16, 136:21, 140:9, 140:10, 140:18, 174:13, 201:13, 207:13, 209:7, 211:17
**everywhere** [3] - 53:13, 79:21, 232:6
**evidence** [27] - 8:5, 11:19, 20:8, 31:13, 41:21, 42:6, 42:13, 42:14, 44:6, 46:17, 69:13, 72:16, 100:20, 101:21, 107:7, 110:18, 114:8, 125:20, 125:25, 145:4, 145:5, 197:11, 198:3, 198:6,

210:11, 235:3, 240:4
**evidentiary** [4] - 24:23, 119:10, 121:17, 125:2
**exactly** [4] - 12:5, 121:5, 145:24, 186:14
**Exam** [1] - 156:11
**exam** [1] - 156:13
**examination** [4] - 11:11, 11:25, 12:1, 13:24
**EXAMINATION** [3] - 15:21, 151:23, 231:3
**examine** [1] - 11:11
**examining** [2] - 11:13, 11:18
**example** [8] - 62:1, 62:7, 84:11, 87:8, 136:20, 140:9, 187:25, 212:14
**examples** [1] - 109:11
**Excel** [1] - 147:24
**excellence** [1] - 172:24
**Excellence** [1] - 101:4
**except** [3] - 13:20, 126:10, 223:12
**exception** [6] - 32:1, 32:24, 131:10, 131:15, 131:24, 132:4
**exceptional** [1] - 22:8
**excerpt** [2] - 19:19, 32:7
**excess** [2] - 179:21, 179:23
**Excessive** [1] - 104:15
**excessive** [2] - 181:20, 182:1
**exchange** [1] - 28:19
**excise** [1] - 103:5
**excluding** [1] - 52:14
**excuse** [7] - 14:7, 25:15, 55:18, 61:12, 79:2, 100:9, 136:2
**excused** [1] - 236:9
**excuses** [1] - 14:11
**Executive** [9] - 154:2, 154:4, 154:7, 154:12, 156:7, 156:8, 227:10, 227:11, 227:12
**Exhibit** [10] - 20:8, 35:20, 46:3, 55:10, 137:5, 137:6, 143:23, 145:5, 190:11, 197:11
**exhibit** [2] - 103:12, 235:10

**EXHIBIT** [9] - 24:6, 36:23, 55:14, 134:20, 138:1, 142:12, 142:17, 142:25, 147:3
**exhibits** [1] - 121:15
**exist** [3] - 93:7, 111:23, 111:24
**existed** [4] - 107:1, 130:17, 160:13, 213:9
**existence** [2] - 48:10, 93:4
**existing** [5] - 20:22, 34:15, 50:25, 81:16, 173:6
**expanded** [3] - 40:3, 49:7, 49:11
**expansion** [1] - 49:13
**expect** [2] - 31:11, 196:17
**expectation** [2] - 157:24, 159:13
**expectations** [5] - 158:8, 159:1, 159:22, 159:23, 160:2
**expected** [3] - 73:22, 227:1
**expedite** [1] - 21:22
**expedited** [1] - 128:18
**experience** [2] - 91:11, 153:8
**experienced** [1] - 114:14
**expert** [6] - 8:10, 10:12, 11:8, 11:9, 71:21, 111:9
**experts** [7] - 8:8, 9:5, 10:25, 139:12, 143:4, 143:5
**Explain** [1] - 87:20
**explain** [7] - 74:19, 89:12, 107:24, 148:16, 213:4, 227:17, 233:17
**explained** [3] - 157:23, 223:25, 234:9
**explaining** [1] - 164:13
**explanation** [1] - 91:9
**explanatory** [1] - 149:2
**explore** [1] - 13:25
**express** [1] - 227:22
**expressed** [2] - 29:1, 67:9
**extensive** [3] - 195:7, 195:13, 237:21

**extent** [12] - 26:17, 26:24, 43:4, 80:24, 115:1, 115:21, 129:10, 131:6, 178:11, 206:10, 212:8, 225:22
**external** [2] - 139:11, 139:17
**extract** [1] - 141:21
**extraordinary** [2] - 94:17, 95:2
**eye** [1] - 85:25

## F

**F-a-l-k** [2] - 118:22
**FABER** [1] - 1:17
**Faber** [1] - 7:2
**face** [2] - 46:10, 128:22
**facilitate** [1] - 12:7
**facilities** [1] - 211:7
**facility** [7] - 46:12, 71:4, 166:7, 194:9, 228:9, 228:10, 228:11
**facing** [1] - 79:3
**fact** [15] - 8:6, 24:10, 28:13, 31:14, 32:13, 36:3, 74:25, 87:13, 90:8, 125:16, 126:17, 143:9, 145:21, 207:19, 215:10
**factors** [4] - 11:20, 59:24, 84:19, 118:2
**facts** [2] - 7:20, 80:17
**fail** [1] - 115:3
**failure** [8] - 42:2, 42:7, 42:11, 42:21, 42:24, 43:3, 44:20, 48:1
**failures** [1] - 146:25
**Fair** [2] - 109:10, 235:25
**fair** [22] - 13:20, 17:10, 18:8, 19:14, 51:2, 54:19, 55:4, 56:19, 58:21, 66:5, 86:9, 107:11, 107:17, 142:1, 144:10, 148:16, 159:2, 175:3, 193:12, 194:12, 215:7, 218:17
**fairly** [4] - 84:22, 148:14, 195:19, 234:5
**faith** [6] - 29:6, 29:10, 115:4, 120:8, 178:3, 179:1

**Falk** [2] - 118:22, 120:15
**fall** [1] - 131:9
**falls** [1] - 130:7
**familiar** [3] - 37:24, 162:23, 180:21
**families** [2] - 100:15, 114:15
**family** [8] - 86:13, 86:19, 87:9, 89:20, 149:21, 149:25, 150:1, 213:21
**far** [9] - 14:12, 42:4, 43:2, 46:25, 109:17, 113:23, 124:7, 154:25, 238:8
**FARRELL** [15] - 2:3, 25:15, 27:2, 27:5, 27:9, 31:10, 118:11, 118:14, 126:10, 126:23, 128:8, 237:6, 237:18, 239:5, 239:23
**Farrell** [13] - 2:4, 2:15, 27:1, 27:23, 119:9, 126:9, 237:5, 237:15, 238:4, 238:9, 238:11, 238:23, 239:4
**fault** [3] - 126:3, 221:20, 232:21
**faulty** [1] - 42:12
**favor** [1] - 27:16
**fax** [2] - 57:15, 90:21
**fax-based** [1] - 90:21
**FCRR** [1] - 6:18
**FDA** [1] - 175:16
**February** [9] - 19:3, 20:25, 23:10, 23:12, 50:8, 107:8, 137:12, 210:5, 234:11
**fee** [1] - 111:10
**fell** [1] - 180:24
**fellow** [1] - 239:14
**felt** [6] - 52:19, 54:4, 54:6, 54:21, 66:9, 80:17
**few** [10] - 101:8, 109:11, 151:25, 157:15, 165:9, 177:3, 191:13, 205:10, 209:21, 237:2
**Field** [1] - 168:21
**field** [3] - 51:5, 51:7, 53:20
**fields** [1] - 153:23
**figure** [2] - 77:23, 88:5
**figuring** [1] - 31:4
**file** [7] - 65:6, 92:9,

92:12, 98:18, 99:13, 129:2, 188:1
**files** [13] - 32:7, 114:20, 187:25, 188:3, 213:6, 222:23, 224:4, 224:13, 224:17, 224:20, 224:23, 225:1, 225:20
**fill** [5] - 173:9, 173:10, 173:18, 180:16, 187:22
**filled** [4] - 117:12, 173:19, 211:13, 211:15
**filling** [1] - 113:3
**final** [1] - 99:4
**finally** [2] - 9:21, 10:14
**financial** [1] - 73:8
**financiers** [1] - 104:17
**findings** [3] - 31:14, 130:1, 130:12
**fine** [20] - 15:1, 15:2, 23:4, 23:21, 23:22, 25:21, 26:18, 26:25, 76:3, 103:3, 103:9, 106:15, 118:9, 165:14, 170:16, 170:17, 170:20, 191:17, 238:10
**finish** [1] - 8:19
**finished** [1] - 238:15
**finite** [1] - 126:18
**Firm** [2] - 3:4, 3:7
**firm** [2] - 133:5, 188:15
**firmly** [1] - 226:21
**First** [5] - 7:24, 76:13, 98:6, 103:18, 110:3
**first** [42] - 7:16, 7:24, 8:16, 10:20, 10:21, 11:24, 19:2, 20:10, 21:6, 35:1, 41:21, 42:3, 50:3, 50:15, 71:11, 78:17, 79:5, 80:24, 87:23, 88:4, 97:21, 100:24, 113:2, 119:23, 129:25, 131:7, 132:18, 133:23, 133:24, 149:6, 150:8, 165:24, 166:8, 179:13, 179:25, 233:25, 237:12, 237:23, 238:24
**firstly** [1] - 180:24
**fit** [2] - 8:1, 84:20
**five** [2] - 25:24, 26:11
**fixed** [2] - 56:24, 57:1

**FL** [1] - 2:14
**flag** [3] - 82:13, 113:19, 114:24
**flagged** [2] - 10:1, 10:5
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flavor** [1] - 208:24
**flip** [1] - 35:12
**flipped** [1] - 102:1
**Floor** [1] - 3:5
**Florida** [30] - 38:12, 38:13, 41:14, 46:13, 145:10, 145:23, 146:6, 152:10, 152:19, 152:23, 152:25, 153:11, 153:24, 166:12, 228:10, 228:12, 228:18, 229:9, 229:10, 229:14, 231:7, 231:12, 231:13, 231:15, 231:17, 231:18, 231:21, 232:10
**Florida-Lakeland** [1] - 145:10
**flow** [2] - 93:11, 94:5
**fly** [1] - 226:8
**focus** [1] - 232:10
**focused** [1] - 96:10
**folks** [33] - 81:3, 108:16, 139:17, 150:25, 155:16, 161:5, 161:6, 170:25, 172:25, 173:1, 173:3, 173:21, 174:20, 175:23, 176:16, 176:17, 183:11, 183:16, 187:2, 187:13, 187:17, 188:16, 188:22, 192:19, 192:20, 192:21, 192:22, 193:2, 197:23, 206:16
**follow** [9] - 105:3, 107:20, 124:2, 202:5, 214:21, 215:6, 234:8, 235:6, 236:1
**follow-on** [1] - 214:21
**follow-up** [5] - 107:20, 215:6, 234:8, 235:6, 236:1
**followed** [8] - 197:7, 199:1, 199:7, 200:9, 202:8, 203:16, 204:11, 204:23

**following** [1] - 204:12
**follows** [1] - 7:5
**FOR** [1] - 1:1
**force** [4] - 51:22, 78:11, 78:13, 78:17
**forcing** [1] - 11:16
**foregoing** [1] - 241:4
**forever** [1] - 25:7
**forfeited** [1] - 28:8
**forget** [1] - 93:24
**form** [8] - 21:9, 42:9, 51:24, 162:8, 162:9, 163:22, 175:20, 213:17
**formed** [1] - 212:18
**former** [11] - 120:16, 187:16, 188:17, 188:18, 227:10, 238:16, 238:18, 238:25, 239:18
**forming** [1] - 53:9
**forms** [1] - 196:17
**formulating** [1] - 199:3
**forth** [6] - 26:6, 27:25, 29:17, 85:14, 125:23, 146:20
**forward** [5] - 25:10, 50:13, 164:21, 172:19, 190:18
**fought** [1] - 130:25
**foundation** [33] - 21:1, 21:6, 25:2, 25:3, 27:20, 29:4, 29:7, 29:14, 33:2, 69:9, 101:24, 102:22, 113:25, 118:15, 118:20, 120:9, 126:12, 126:16, 126:17, 126:21, 127:7, 127:10, 127:12, 127:15, 127:25, 128:10, 128:11, 162:9, 166:1, 175:20, 190:3, 191:9, 203:18
**foundational** [1] - 145:8
**foundationally** [1] - 69:1
**four** [7] - 38:10, 38:12, 42:3, 55:1, 166:22, 168:8, 223:13
**Four** [1] - 228:15
**Fourth** [3] - 8:3, 131:13, 132:3
**fourth** [2] - 8:13, 120:10
**frame** [11] - 17:6, 67:25, 76:17, 78:6,

85:9, 85:20, 93:2, 96:16, 204:9, 204:12, 222:11
**frames** [1] - 25:14
**framework** [8] - 94:3, 94:24, 187:18, 189:4, 189:5, 196:16, 197:23, 199:3
**franchise** [3] - 110:16, 111:6, 111:9
**franchisee** [1] - 111:25
**franchisees** [5] - 111:4, 111:9, 111:20, 112:4, 112:7
**franchises** [1] - 111:8
**franchisor** [1] - 111:9
**frankly** [4] - 69:12, 226:12, 226:25, 227:3
**fraud** [1] - 188:19
**free** [5] - 25:10, 146:2, 236:15
**frequency** [9] - 74:9, 74:12, 74:20, 74:24, 75:3, 75:8, 75:24, 135:15
**Fresno** [1] - 110:5
**Friday** [1] - 238:21
**front** [13] - 34:23, 78:16, 78:18, 78:19, 137:7, 148:2, 190:10, 197:9, 201:23, 202:18, 210:1, 212:24
**FTI** [2] - 130:4, 130:18
**fulfill** [1] - 27:13
**Full** [1] - 225:20
**full** [7] - 36:1, 54:1, 155:4, 175:6, 175:7, 225:18
**full-time** [1] - 54:1
**Fuller** [74] - 2:4, 2:15, 14:10, 15:11, 15:17, 15:20, 20:16, 21:3, 21:9, 21:19, 22:3, 22:22, 23:13, 24:4, 25:6, 25:16, 25:22, 25:24, 26:4, 30:17, 33:2, 33:10, 34:8, 34:11, 35:18, 38:3, 38:19, 44:22, 45:14, 47:1, 47:17, 58:11, 61:12, 66:14, 69:4, 70:21, 71:7, 71:13, 94:6, 96:23, 103:6, 110:23, 114:2, 117:5, 118:5, 133:19, 145:25,

151:6, 156:21, 161:16, 161:17, 162:15, 162:19, 165:3, 165:9, 170:17, 170:19, 170:21, 174:6, 174:8, 175:1, 176:6, 177:3, 183:4, 184:14, 190:8, 205:4, 205:11, 214:13, 226:19, 228:4, 230:23, 235:24, 236:4
**FULLER** [161] - 2:15, 14:9, 14:15, 14:20, 15:8, 15:19, 15:22, 17:12, 17:16, 20:7, 22:24, 23:18, 24:14, 24:24, 25:9, 25:12, 25:19, 25:25, 26:10, 33:6, 33:11, 33:12, 33:15, 33:16, 33:20, 33:23, 34:9, 34:12, 35:19, 36:22, 36:24, 37:3, 37:4, 38:20, 38:24, 39:3, 39:4, 41:7, 44:23, 45:1, 45:15, 45:16, 46:1, 46:2, 46:6, 46:22, 47:3, 47:6, 47:18, 48:8, 49:20, 49:23, 49:24, 53:19, 55:9, 55:12, 55:15, 55:17, 55:23, 55:25, 58:8, 58:13, 58:15, 61:14, 61:17, 61:18, 66:12, 66:22, 68:11, 68:13, 69:5, 69:6, 69:12, 69:19, 70:11, 70:15, 71:8, 71:9, 71:17, 72:15, 72:20, 76:4, 78:9, 94:7, 94:9, 96:24, 97:1, 100:19, 100:21, 101:20, 102:4, 102:19, 103:8, 103:14, 104:25, 106:11, 106:18, 106:23, 107:3, 111:2, 113:16, 114:5, 117:8, 117:9, 118:8, 133:18, 133:20, 134:17, 134:21, 137:22, 138:2, 142:4, 142:13, 142:18, 143:1, 143:21, 145:3, 146:1, 146:22, 146:25, 147:4, 147:23, 147:25, 149:16, 149:17,

151:1, 151:5,
161:11, 162:8,
163:12, 166:1,
169:12, 170:20,
175:20, 190:2,
190:21, 197:12,
198:9, 199:12,
200:14, 201:19,
202:14, 203:17,
203:24, 205:5,
209:16, 210:13,
214:1, 215:22,
217:2, 230:24,
231:1, 231:4,
232:25, 233:7,
235:3, 235:12,
235:25, 236:5,
236:10, 239:9
**Fuller's** [1] - 48:4
**function** [2] - 13:9,
109:17, 146:8
**functionality** [1] -
188:16
**functioning** [2] - 68:7,
138:4
**fundamental** [1] - 7:19
**fundamentally** [1] -
120:20
**furthermore** [1] -
125:19

# G

**gain** [2] - 38:4, 98:8
**game** [1] - 239:15
**gaps** [1] - 51:21
**Gather** [1] - 98:1
**gather** [2] - 80:22,
87:10
**gathered** [2] - 80:21,
183:19
**gathering** [1] - 183:5
**general** [8] - 7:17,
7:22, 7:24, 11:3,
11:5, 73:22, 146:7,
235:21
**General** [3] - 120:16,
153:15, 154:15
**General's** [1] - 153:12
**generally** [6] - 56:5,
56:7, 58:16, 166:25,
202:2, 207:1
**generated** [2] - 89:15,
221:12
**generic** [1] - 191:7
**geographic** [10] -
38:8, 38:15, 46:9,
109:20, 113:10,
141:16, 145:9,
146:15, 146:18,

165:7
**geographical** [1] -
39:6
**George** [5] - 28:5,
28:11, 73:2, 73:3,
73:4
**Georgia** [3] - 9:17,
10:16, 113:4
**Giacalone** [11] - 18:3,
18:5, 18:6, 18:10,
18:11, 35:5, 35:10,
37:11, 37:12, 50:4,
50:13
**Gilberto** [7] - 106:1,
106:3, 106:5, 106:8,
106:9, 171:5, 214:25
**Gina** [2] - 55:23,
149:16
**given** [13] - 13:17,
54:1, 72:5, 114:21,
131:25, 132:7,
132:14, 159:18,
185:25, 206:13,
236:24, 239:20
**globally** [1] - 169:15
**goal** [3] - 154:23,
154:25, 155:1
**goals** [1] - 54:20
**governing** [1] - 8:8
**graduated** [1] - 152:10
**great** [1] - 94:10
**GRETCHEN** [1] - 6:7
**grew** [1] - 233:17
**grocery** [1] - 205:18
**ground** [5] - 13:6,
78:16, 127:19,
164:4, 164:15
**grounds** [8] - 9:21,
28:22, 35:25, 36:7,
46:9, 126:14, 127:3,
204:9
**group** [3] - 68:3,
134:14, 189:9
**Group** [2] - 18:12,
134:16
**grouped** [2] - 60:3,
172:24
**grow** [1] - 182:19
**growth** [6] - 88:8,
109:5, 114:14,
114:19, 114:23,
233:21
**guarantee** [1] - 206:21
**guard** [1] - 194:22
**guess** [1] - 51:2
**guidance** [7] - 34:18,
73:17, 93:12, 93:18,
168:24, 202:3, 207:6
**guidelines** [1] - 32:6
**guiding** [1] - 12:19

**guy** [2] - 150:24,
226:18
**guys** [5] - 87:1,
139:21, 139:22,
147:13, 231:13

# H

**half** [1] - 132:25
**half-hour** [1] - 132:25
**hand** [6] - 8:20, 135:1,
137:12, 137:15,
200:23, 212:14
**handed** [1] - 17:23
**handing** [2] - 133:21,
143:22
**handle** [3] - 15:12,
21:10, 122:7
**handled** [1] - 172:7
**handlers** [3] - 94:12,
94:14, 95:1
**happy** [5] - 30:24,
31:3, 103:7, 166:15,
170:13
**harassment** [1] -
11:21
**hard** [3] - 14:17,
43:14, 152:13
**Hardin** [2] - 119:4,
119:6
**hardin** [1] - 130:21
**HARDIN** [12] - 5:3,
119:5, 119:17,
119:21, 121:5,
121:8, 126:25,
127:17, 129:19,
129:21, 130:22,
133:10
**harm** [2] - 170:5,
173:16
**Hartman** [8] - 54:16,
55:18, 73:9, 106:6,
108:20, 108:21,
171:5, 171:12
**Hartman/Gilberto** [1] -
171:7
**Hawkins** [1] - 3:7
**head** [5] - 70:6,
193:22, 230:4,
230:12, 236:3
**Head** [3] - 159:25,
162:23, 164:23
**heading** [1] - 204:16
**headquarters** [2] -
79:2, 219:25
**heads** [1] - 92:15
**Health** [109] - 4:11,
5:2, 19:3, 19:5,
19:16, 28:1, 28:3,
28:7, 28:14, 28:16,

28:17, 29:2, 39:9,
55:6, 73:5, 82:6,
105:20, 110:17,
111:14, 119:6,
119:9, 120:16,
126:19, 130:10,
133:12, 146:3,
146:5, 147:20,
152:5, 154:13,
156:23, 157:9,
158:25, 160:1,
160:7, 160:25,
162:5, 163:21,
163:23, 164:24,
165:19, 165:25,
167:5, 167:9,
167:14, 167:24,
168:3, 168:13,
168:16, 169:3,
169:8, 170:24,
175:4, 175:6, 175:9,
175:13, 175:18,
178:18, 179:7,
179:20, 179:22,
179:25, 180:1,
180:6, 180:13,
180:15, 180:20,
181:9, 181:19,
181:25, 183:10,
189:15, 189:19,
192:4, 192:16,
193:14, 193:20,
193:23, 194:21,
195:25, 197:7,
199:7, 205:13,
206:1, 208:1, 208:7,
212:7, 217:6, 217:9,
217:13, 217:17,
218:1, 218:4,
218:15, 219:2,
219:4, 219:13,
219:14, 220:19,
220:23, 222:12,
227:18, 227:25,
228:9, 228:17,
230:9, 230:12,
234:24, 236:22
**health** [7] - 79:10,
79:12, 79:16, 79:19,
155:19, 217:9,
226:20
**Health's** [9] - 18:12,
131:18, 159:25,
163:10, 181:17,
181:23, 193:7,
206:3, 219:10
**Healthcare's** [1] -
130:2
**hear** [4] - 30:4, 123:1,
127:1, 146:22

**heard** [5] - 11:13,
41:11, 41:12,
132:19, 233:15
**hearing** [1] - 43:15
**hearsay** [47] - 20:14,
20:22, 24:23, 31:21,
31:22, 32:2, 32:15,
32:22, 35:25, 36:1,
36:7, 38:6, 43:7,
44:16, 44:19, 44:21,
45:13, 46:6, 46:9,
68:20, 69:23, 69:25,
70:2, 70:8, 106:14,
106:22, 121:2,
121:6, 121:17,
121:18, 122:24,
126:14, 127:2,
128:3, 128:6, 129:3,
129:24, 130:5,
130:6, 130:14,
131:10, 132:13,
132:15, 146:14,
214:7
**held** [7] - 57:3, 57:20,
155:23, 171:25,
172:3, 186:3, 224:22
**Help** [1] - 234:13
**help** [7] - 52:20, 71:24,
107:24, 121:23,
198:21, 200:5,
226:23
**helped** [5] - 147:17,
155:10, 182:22,
190:20, 196:10
**Henderson** [1] - 73:7
**hereby** [1] - 118:23
**HESTER** [9] - 5:9,
24:8, 32:11, 35:24,
36:14, 43:7, 44:4,
125:15, 230:20
**Hester** [4] - 24:7,
36:12, 43:6, 125:14
**high** [10] - 152:22,
175:8, 175:10,
178:8, 178:10,
183:8, 184:17,
192:7, 192:8, 195:4
**himself** [2] - 7:22,
12:1
**HIPAA** [2] - 89:16,
217:16
**hire** [1] - 154:2
**hired** [9] - 68:1,
130:10, 133:12,
188:17, 188:18,
188:23
**historical** [2] - 88:20,
213:22
**history** [4] - 105:5,
185:12, 210:25,

217:18
**History** [1] - 90:3
**hit** [7] - 88:1, 88:4, 99:2, 135:8, 135:10, 135:11, 236:3
**hold** [4] - 176:5, 177:12, 178:15, 221:17
**holding** [1] - 238:14
**hole** [3] - 107:21, 112:18, 214:16
**holistic** [2] - 183:9, 183:17
**home** [2] - 8:20, 8:22
**homes** [1] - 211:7
**Honor** [218] - 7:8, 8:2, 8:13, 9:14, 10:14, 11:2, 13:16, 13:24, 14:5, 14:6, 14:9, 15:1, 15:16, 17:14, 20:7, 20:9, 20:20, 21:5, 21:7, 21:13, 21:21, 21:25, 22:3, 22:13, 22:22, 22:24, 23:9, 23:22, 24:2, 24:8, 24:20, 25:21, 26:3, 26:10, 26:13, 30:5, 30:8, 31:20, 32:11, 32:25, 33:11, 33:21, 34:9, 35:19, 35:24, 36:6, 36:14, 36:21, 36:22, 37:25, 38:16, 38:20, 41:7, 41:10, 41:19, 42:17, 43:7, 43:11, 43:18, 44:3, 44:4, 44:13, 44:15, 45:7, 45:8, 45:15, 45:23, 46:8, 46:14, 47:3, 47:12, 47:18, 48:3, 48:7, 49:21, 53:16, 55:9, 55:11, 65:20, 68:16, 69:12, 69:13, 69:21, 70:4, 70:19, 70:25, 71:5, 71:8, 72:15, 72:18, 78:4, 101:20, 101:23, 102:21, 103:13, 106:11, 106:14, 110:22, 113:9, 117:3, 119:5, 119:13, 119:18, 120:20, 121:5, 121:15, 121:19, 121:25, 122:5, 124:4, 124:22, 125:13, 125:15, 126:23, 126:25, 127:5, 128:4, 128:5, 129:19, 129:23, 130:4, 130:6,

130:22, 132:16, 132:17, 133:3, 133:4, 133:9, 133:10, 134:17, 134:18, 137:22, 137:24, 142:4, 142:7, 142:13, 142:15, 142:20, 142:23, 145:3, 145:6, 145:18, 146:1, 146:13, 146:23, 151:1, 151:5, 151:8, 151:12, 151:18, 161:11, 161:14, 162:8, 162:11, 163:15, 164:4, 164:8, 165:6, 165:13, 169:14, 169:22, 170:1, 170:9, 170:13, 170:16, 173:11, 173:14, 182:3, 182:25, 190:6, 191:2, 191:10, 191:12, 191:17, 197:10, 197:14, 198:3, 198:7, 198:9, 199:9, 199:12, 199:15, 200:11, 201:16, 201:19, 202:15, 203:17, 204:8, 204:25, 205:5, 209:13, 210:10, 210:13, 213:23, 214:1, 215:18, 215:21, 215:22, 216:24, 217:2, 217:3, 222:16, 228:3, 230:20, 230:21, 235:16, 236:8, 236:10, 236:11, 236:16, 236:19, 238:3, 238:16, 239:9, 239:11, 239:16, 240:8
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**hope** [1] - 230:24
**hopes** [1] - 23:13
**Hospice** [3] - 98:6, 98:17, 185:14
**hospices** [1] - 211:7
**hospital** [7] - 59:12, 81:4, 99:8, 175:11, 185:1, 186:22
**hospitals** [1] - 59:24
**host** [1] - 109:13

**hot** [4] - 107:21, 110:3, 110:5, 112:16
**hour** [2] - 132:25, 239:25
**housed** [2] - 137:1, 206:23
**humble** [1] - 29:25
**hundred** [1] - 62:3
**hundreds** [1] - 231:24
**HUNTINGTON** [1] - 1:4
**Huntington** [40] - 3:10, 4:1, 28:4, 38:14, 41:16, 41:21, 41:22, 41:23, 42:4, 42:7, 42:9, 42:11, 42:13, 42:15, 42:16, 43:2, 46:17, 63:16, 63:24, 110:20, 114:7, 114:9, 114:12, 116:12, 145:12, 145:22, 148:6, 149:9, 149:20, 150:12, 164:8, 180:7, 180:14, 181:20, 182:1, 209:25, 214:15, 216:10, 237:19, 241:6
**Huntington-Cabell** [1] - 148:6
**Hurricane** [1] - 237:18
**hydrocodone** [3] - 10:4, 60:11, 86:23

**I**

**IBM** [2] - 143:7, 143:18
**ID** [2] - 148:9, 148:10
**idea** [7] - 23:10, 103:17, 104:19, 113:1, 139:15, 145:15, 148:11
**identical** [2] - 28:1, 130:3
**identification** [1] - 143:23
**identifications** [1] - 51:19
**identified** [14] - 20:10, 20:11, 29:5, 29:17, 77:19, 105:6, 105:8, 105:12, 105:13, 108:9, 112:23, 215:5, 221:22, 221:23
**identify** [20] - 39:8, 94:17, 103:18, 123:13, 148:20, 148:23, 163:7,

195:22, 197:17, 198:19, 199:17, 201:11, 201:24, 202:19, 208:6, 210:2, 216:4, 221:20, 221:24, 228:22
**identifying** [2] - 95:2, 220:23
**II** [1] - 60:13
**IIIs** [2] - 181:7, 181:14
**IIs** [2] - 181:7, 181:14
**illegitimate** [2] - 116:24, 117:2
**illiterate** [1] - 15:11
**illustrate** [1] - 109:11
**ILR** [13] - 40:13, 40:16, 40:18, 40:21, 48:23, 160:15, 160:16, 160:17, 160:18, 160:19, 160:22, 164:1
**ILRs** [2] - 161:3, 161:15
**imagine** [1] - 170:2
**immediate** [3] - 40:3, 138:23, 165:24
**Immediate** [3] - 16:16, 67:10, 107:7
**immediately** [1] - 124:13
**impact** [2] - 99:20, 99:21
**implement** [3] - 57:10, 77:7, 195:22
**implementation** [5] - 66:23, 91:3, 158:12, 159:3, 222:22
**implemented** [6] - 49:5, 80:14, 86:21, 138:24, 154:21, 197:25
**implementing** [2] - 73:21, 160:8
**implicate** [1] - 120:22
**implicated** [1] - 42:10
**important** [6] - 8:15, 81:20, 83:22, 209:7, 211:9, 211:10
**imposed** [1] - 147:21
**impossible** [1] - 179:22
**impression** [2] - 119:17, 224:5
**improve** [2] - 67:19, 90:22
**improved** [4] - 54:21, 139:1, 139:2
**improvement** [8] - 51:19, 87:14, 109:7,

109:9, 165:1, 213:6, 213:13, 226:13
**improvements** [4] - 67:23, 143:8, 226:3, 226:12
**improving** [1] - 109:8
**IN** [2] - 1:1, 1:18
**in-process** [1] - 48:17
**inadmissible** [1] - 8:9
**include** [4] - 30:20, 80:23, 122:12, 193:8
**included** [5] - 27:20, 32:7, 104:5, 196:7, 208:8
**includes** [3] - 20:13, 72:23, 79:25
**including** [5] - 29:14, 105:15, 118:20, 119:8, 121:17, 225:20
**Including** [1] - 104:8
**inconsistent** [2] - 51:4, 51:14
**inconvenience** [1] - 239:14
**incorrect** [2] - 65:9, 119:21
**increase** [4] - 98:10, 98:23, 98:24, 100:1
**increased** [2] - 100:7, 100:9
**increases** [1] - 233:11
**increasing** [3] - 97:10, 97:13, 100:4
**inculpate** [1] - 29:25
**indefinitely** [1] - 225:2
**independent** [12] - 19:11, 86:24, 102:13, 111:24, 112:7, 112:12, 150:14, 188:3, 196:22, 206:9, 206:14, 233:13
**independently** [2] - 127:23, 128:2
**independents** [4] - 185:17, 206:5, 207:7, 207:23
**indicate** [2] - 55:4, 70:22
**indicated** [4] - 68:19, 172:21, 173:23, 224:6
**indicating** [1] - 219:3
**indirect** [1] - 11:24
**indiscriminate** [1] - 104:8
**individual** [16] - 39:17, 40:23, 45:2, 82:5, 86:20, 128:24,

147:9, 185:5,
185:18, 188:20,
201:5, 206:24,
217:6, 222:23
**individualized** [3] -
185:3, 185:7
**individuals** [12] - 37:7,
37:9, 52:21, 54:9,
106:2, 147:20,
172:24, 174:7,
176:12, 198:1,
198:16, 233:19
**indulge** [1] - 26:8
**Industry** [1] - 157:15
**infer** [1] - 90:7
**inform** [4] - 28:16,
181:18, 181:24,
194:18
**information** [77] -
34:5, 46:16, 67:22,
80:20, 80:22, 81:4,
81:5, 81:10, 81:12,
81:15, 82:8, 82:10,
82:19, 83:8, 83:22,
83:23, 84:11, 84:13,
85:13, 87:10, 88:3,
89:22, 90:11, 91:11,
92:13, 92:22, 92:24,
92:25, 98:1, 101:9,
109:14, 109:15,
130:1, 141:21,
155:20, 155:21,
174:17, 181:12,
183:5, 183:18,
185:10, 185:25,
186:17, 187:3,
187:23, 187:24,
206:11, 206:15,
206:16, 206:18,
206:19, 206:20,
206:21, 207:2,
208:19, 212:7,
212:9, 213:10,
213:14, 213:16,
213:17, 213:18,
213:21, 217:9,
217:13, 217:21,
217:22, 218:1,
218:4, 218:19,
218:23, 218:24,
219:3, 221:8,
224:10, 225:1
**Ingredient** [4] - 40:7,
138:16, 138:17,
160:19
**inhalers** [1] - 175:10
**initial** [11] - 58:22,
61:3, 82:20, 83:5,
84:25, 88:6, 130:1,
138:14, 138:21,

183:20, 185:6
**initiative** [2] - 34:1,
34:22
**initiatives** [1] - 33:18
**input** [1] - 93:13
**inquire** [4] - 90:13,
115:15, 115:17,
143:11
**inquiry** [9] - 58:22,
88:6, 113:15, 115:1,
116:4, 116:23,
117:21, 144:18,
187:19
**iNSERT** [1] - 119:2
**inside** [2] - 75:20,
106:19
**insist** [2] - 29:19,
238:7
**insists** [1] - 22:10
**insofar** [2] - 32:22,
43:4
**inspection** [4] - 16:10,
16:12, 45:18, 225:16
**inspections** [6] -
174:22, 225:4,
225:6, 225:7,
225:17, 229:17
**inspectors** [3] -
188:18, 188:19,
227:14
**instance** [4] - 113:17,
128:1, 154:15,
208:11
**instances** [6] - 43:1,
95:16, 96:7, 99:2,
99:3, 108:6
**instead** [2] - 122:15,
206:13
**instructed** [1] - 224:25
**insufficient** [1] -
129:13
**intake** [1] - 173:1
**integrate** [1] - 218:15
**integrated** [1] - 224:2
**integrating** [1] - 40:15
**Integrity** [1] - 53:1
**integrity** [1] - 54:11
**intend** [1] - 118:23
**intending** [1] - 8:7
**intent** [5] - 87:16,
87:19, 87:21, 87:25,
88:8
**intention** [1] - 237:6
**interact** [1] - 217:24
**interactive** [1] - 78:21
**interesting** [1] -
187:12
**interfere** [1] - 240:3
**internal** [3] - 144:18,
146:11

**internally** [1] - 216:16
**internet** [3] - 82:23,
167:3, 167:6
**interrelated** [1] - 10:7
**interrupt** [5] - 21:7,
33:1, 75:25, 93:11,
94:7
**interrupted** [1] - 94:5
**interview** [2] - 68:8,
68:10
**interviewed** [4] - 68:6,
144:20, 144:23,
145:19
**introduce** [1] - 118:16
**introduction** [1] - 43:9
**inventory** [1] - 225:12
**investigate** [1] -
130:11
**investigation** [7] -
50:25, 51:2, 88:10,
144:15, 146:2,
146:11, 188:12
**Investigations** [1] -
174:14
**investigations** [9] -
50:16, 68:5, 158:15,
187:14, 188:9,
192:2, 202:1, 202:4,
202:20
**investigative** [3] -
187:12, 187:13,
229:8
**Investigative** [1] -
144:2
**investigator** [6] -
106:19, 187:22,
212:10, 216:7,
216:8, 225:25
**Investigators** [3] -
19:15, 19:17, 19:19
**investigators** [11] -
53:5, 187:15,
187:16, 188:16,
188:23, 202:5,
220:8, 223:24,
225:8, 229:8, 234:17
**investigatory** [2] -
91:21, 92:5
**Investigatory** [1] -
174:18
**invitations** [1] - 209:2
**invited** [2] - 208:25,
209:1
**invoke** [2] - 43:19,
129:13
**involve** [7] - 183:4,
187:8, 194:24,
195:1, 220:14,
220:19, 230:1
**Involved** [1] - 234:23

**involved** [18] - 39:16,
45:21, 50:10, 72:9,
131:16, 167:1,
171:14, 183:10,
183:11, 183:12,
183:13, 192:10,
202:3, 228:9,
228:10, 234:20,
234:25
**involvement** [2] -
94:11, 200:18
**Irpino** [1] - 3:7
**irrelevant** [1] - 70:25
**ISIA** [1] - 5:4
**ISO** [1] - 232:19
**isolated** [1] - 42:3
**ISOs** [2] - 16:10, 16:14
**issue** [31] - 29:21,
42:22, 42:23, 43:3,
44:20, 46:19, 48:1,
67:4, 67:15, 77:23,
79:22, 107:11,
107:12, 107:14,
113:7, 116:16,
119:11, 119:24,
121:23, 124:12,
167:18, 168:8,
169:23, 194:12,
231:12, 231:15,
234:7, 234:21,
234:23, 235:13,
236:12
**issued** [1] - 107:8
**issues** [16] - 8:3, 9:16,
9:20, 22:5, 29:7,
29:13, 52:4, 110:1,
118:19, 120:8,
120:13, 120:20,
122:24, 127:1,
153:21, 231:6
**IT** [4] - 147:20, 150:24,
150:25, 175:2
**item** [1] - 179:13
**iteration** [1] - 213:12
**itself** [8] - 74:25, 75:9,
75:14, 75:19, 84:21,
89:6, 159:21, 232:24

---

**J**

**Jackson** [1] - 6:8
**January** [7] - 37:12,
113:3, 113:23,
114:13, 166:17,
166:18, 234:11
**JASIEWICZ** [1] - 5:4
**Jeff** [1] - 73:7
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**Jersey** [2] - 41:15,

166:13
**Jesse** [1] - 236:22
**job** [2] - 7:7, 65:17
**Jodi** [4] - 234:18,
234:19, 234:24,
235:19
**Joe** [4] - 17:19, 20:1,
20:14, 160:6
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:15
**Juan** [2] - 2:5, 2:17
**judge** [8] - 8:5, 23:18,
24:14, 27:2, 29:16,
46:6, 46:22, 66:12
**JUDGE** [1] - 1:17
**Judge** [44] - 7:2, 9:17,
14:11, 14:23, 15:8,
24:24, 25:9, 25:12,
25:15, 25:19, 25:25,
31:10, 33:7, 39:3,
44:23, 68:11, 69:5,
69:20, 70:15, 94:7,
100:19, 102:19,
103:8, 106:18,
106:23, 118:8,
118:11, 128:8,
129:9, 162:9,
163:12, 166:1,
170:20, 190:2,
190:21, 197:12,
209:16, 230:24,
232:25, 235:3,
235:12, 235:25,
236:5, 239:6
**July** [2] - 136:2,
136:20
**June** [11] - 9:18, 9:19,
107:4, 113:22,
134:4, 135:21,
136:15, 140:18,
216:1, 216:18
**jurisdiction** [1] -
232:15
**jurisdictions** [1] -
180:11
**Jurisprudence** [1] -
156:11
**jury** [1] - 170:6
**justification** [2] -
13:13, 98:5
**justified** [3] - 64:24,
99:23, 100:13
**justify** [1] - 100:4

---

**K**

**K-Mart** [3] - 205:23,
205:24
**KASPER** [1] - 154:20
**Kave** [12] - 236:22,

237:2, 237:7, 237:11, 237:16, 237:18, 237:23, 238:7, 238:10, 238:12, 238:24, 239:7
**Kearse** [1] - 43:18
**KEARSE** [4] - 4:2, 43:11, 43:16, 44:2
**keep** [11] - 14:4, 45:12, 78:24, 80:1, 100:11, 114:13, 148:12, 150:25, 177:8, 196:24, 226:2
**keeping** [1] - 99:12
**Kelly** [1] - 6:8
**Kentucky** [5] - 154:1, 154:17, 154:22, 155:22, 156:7
**kept** [2] - 139:24, 183:20
**Kessler** [1] - 4:17
**key** [2] - 50:16, 52:24
**kick** [2] - 73:2, 188:7
**kick-off** [1] - 73:2
**kicked** [3] - 186:12, 187:7, 212:22
**kicks** [1] - 200:2
**kind** [5] - 70:7, 94:2, 99:14, 205:18, 227:10
**kinds** [1] - 124:1
**knowing** [2] - 59:22, 87:24
**knowledge** [55] - 17:22, 19:11, 20:5, 22:25, 23:6, 31:12, 31:15, 32:19, 36:19, 38:7, 46:7, 46:23, 50:22, 69:20, 69:24, 70:2, 70:23, 73:22, 79:18, 91:11, 111:24, 112:3, 112:6, 114:2, 116:15, 128:15, 150:11, 150:14, 163:13, 163:17, 167:17, 168:11, 168:14, 169:3, 175:22, 179:20, 180:6, 180:9, 180:13, 186:10, 189:19, 192:17, 194:5, 197:6, 199:6, 199:8, 200:8, 200:10, 202:8, 202:10, 203:16, 207:17, 221:24, 224:25, 235:6
**known** [8] - 26:5, 49:4,

113:7, 113:18, 113:22, 154:5, 180:15, 226:25
**knows** [2] - 97:21, 194:16
**KOUBA** [1] - 3:14
**Kroger** [2] - 205:15, 205:17
**KYC** [1] - 198:1

**L**

**LA** [1] - 3:8
**lack** [8] - 55:19, 69:23, 118:15, 120:4, 121:13, 127:9, 144:17, 197:5
**lacks** [1] - 120:24
**laid** [8] - 21:2, 25:3, 38:15, 41:7, 41:19, 97:2, 102:22, 190:3
**Lakeland** [18] - 16:16, 41:14, 46:12, 47:14, 47:15, 47:23, 48:6, 53:10, 107:8, 109:6, 145:10, 145:22, 146:6, 166:12, 228:10, 230:1, 232:19
**lane** [2] - 226:23, 226:24
**language** [4] - 124:12, 159:20, 159:21, 167:3
**Lanier** [1] - 3:4
**laptop** [2] - 226:10
**large** [3] - 37:16, 60:1, 108:11
**last** [23] - 13:18, 19:25, 26:6, 35:21, 47:3, 47:5, 52:6, 92:1, 101:2, 123:5, 134:2, 136:8, 142:5, 156:5, 173:12, 197:1, 197:3, 198:11, 199:22, 202:21, 233:11, 234:7, 235:12
**LAURA** [1] - 5:10
**law** [5] - 31:14, 132:3, 133:5, 153:4, 156:13
**LAW** [1] - 26:15
**Law** [4] - 3:4, 3:7, 3:12, 152:11
**laws** [1] - 89:16
**lawyer** [9] - 21:16, 22:8, 43:24, 43:25, 131:16, 131:19, 133:7, 164:6, 235:8
**lawyer's** [1] - 131:14

**lawyers** [2] - 9:10, 9:11
**lay** [1] - 38:21
**laying** [3] - 12:8, 27:20, 110:25
**lead** [1] - 182:23
**leading** [1] - 173:11
**leaf** [1] - 79:5
**learned** [3] - 27:24, 101:2, 126:16
**least** [14] - 62:9, 86:10, 107:15, 113:22, 113:23, 113:24, 116:25, 130:4, 138:12, 154:25, 163:17, 204:22, 238:4, 239:21
**leave** [3] - 118:12, 240:1, 240:7
**leaves** [1] - 11:19
**leaving** [1] - 20:13
**led** [2] - 139:14, 182:16
**Lee** [1] - 3:12
**leeway** [1] - 13:24
**left** [8] - 7:21, 16:15, 34:6, 44:22, 119:18, 135:1, 137:15, 204:22
**left-hand** [2] - 135:1, 137:15
**legal** [8] - 18:4, 131:18, 131:24, 132:6, 162:12, 164:12, 164:14
**Legal** [1] - 18:12
**legend** [2] - 179:11, 179:12
**legitimate** [8] - 13:6, 98:3, 98:9, 115:5, 178:4, 179:2, 180:16, 230:15
**Leon** [2] - 2:4, 2:16
**less** [1] - 239:25
**letter** [26] - 17:19, 17:20, 17:22, 19:2, 19:5, 19:9, 19:16, 20:1, 20:17, 20:19, 20:24, 20:25, 23:10, 23:22, 23:24, 24:4, 30:21, 31:7, 71:3, 129:25, 160:3, 160:4, 160:5, 169:1, 235:4, 235:18
**letterhead** [1] - 19:23
**letters** [9] - 17:18, 20:14, 20:20, 25:1, 26:17, 37:19, 131:11, 160:1,

160:10
**letting** [1] - 10:23
**level** [12] - 152:22, 153:5, 175:9, 175:10, 178:8, 178:10, 183:8, 184:18, 192:7, 192:8, 195:4, 206:24
**Levin** [1] - 2:12
**LEYIMU** [1] - 4:8
**liability** [1] - 168:12
**license** [1] - 66:25, 81:1, 81:2, 81:13, 81:14, 116:7, 156:15, 194:4, 194:6, 213:17, 225:7
**licensed** [3] - 153:23, 180:8, 228:25
**licensing** [6] - 111:16, 111:19, 111:21, 112:1, 172:7, 172:13
**licensure** [2] - 174:1
**likely** [8] - 19:13, 63:10, 92:25, 114:22, 144:24, 149:12, 185:19, 211:11
**limine** [1] - 38:18
**Limit** [4] - 40:7, 138:16, 138:17, 160:20
**limit** [4] - 56:18, 56:23, 63:20, 149:2
**limited** [15] - 20:21, 23:6, 24:13, 32:1, 32:19, 36:13, 36:15, 36:19, 39:6, 52:8, 70:3, 109:20, 123:10, 128:9, 185:25
**limits** [4] - 193:14, 193:15, 193:16, 198:20
**LINDA** [1] - 4:5
**Linden** [6] - 19:23, 28:6, 105:25, 106:2, 106:6, 215:1
**line** [14] - 45:24, 71:23, 78:16, 78:17, 78:18, 78:19, 78:20, 110:25, 129:25, 172:4, 172:5, 175:6, 175:7, 233:24
**lines** [1] - 233:25
**Lisa** [2] - 6:18, 241:3
**List** [3] - 94:18, 94:21, 95:2
**list** [7] - 112:21, 122:18, 122:21, 122:22, 124:18,

124:19, 126:8
**listed** [4] - 99:4, 112:15, 197:1, 203:4
**listing** [3] - 121:15, 122:16, 234:1
**lists** [1] - 81:16
**literature** [1] - 167:2
**litigants** [2] - 28:9, 28:10
**litigating** [1] - 13:12
**live** [4] - 31:17, 123:17, 238:11
**lives** [1] - 237:18
**LLC** [1] - 2:4
**local** [4] - 147:10, 161:5, 208:18, 233:13
**locally** [1] - 147:11
**located** [5] - 53:9, 84:7, 84:23, 186:20, 209:25
**Location** [1] - 98:22
**location** [3] - 84:20, 87:12, 207:3
**Logan** [2] - 6:5, 6:12
**logic** [1] - 111:25
**long-term** [2] - 59:12, 211:7
**look** [58] - 19:1, 33:25, 37:18, 37:19, 46:10, 54:24, 74:24, 75:2, 81:23, 91:12, 91:19, 108:6, 108:8, 113:21, 115:20, 115:24, 117:21, 132:21, 135:1, 136:15, 137:11, 137:15, 139:17, 141:15, 148:3, 156:2, 170:15, 173:25, 185:14, 185:15, 186:16, 186:17, 186:19, 186:21, 187:21, 190:19, 198:18, 202:6, 208:5, 210:17, 210:24, 212:4, 212:13, 212:22, 214:12, 214:22, 216:3, 225:12, 231:17, 232:5, 232:11, 232:13, 233:11, 234:3, 235:23
**lookback** [1] - 134:23
**looked** [15] - 87:6, 95:17, 98:25, 108:9, 123:12, 124:10, 143:8, 185:12, 185:13, 185:23,

202:21, 205:25,
220:17, 224:20,
229:11
**looking** [13] - 38:3,
64:13, 74:25, 75:21,
76:14, 109:21,
144:25, 145:2,
149:5, 191:20,
206:22, 207:2, 224:5
**looks** [6] - 42:19,
135:19, 137:16,
214:7, 225:16,
240:11
**loop** [1] - 192:12
**lost** [1] - 131:1
**lower** [1] - 207:17
**lowered** [1] - 207:19
**lowering** [1] - 201:2
**luck** [1] - 142:14
**lunch** [2] - 119:9,
122:6
**LV** [6] - 107:22,
107:25, 108:11,
109:3, 109:18,
109:19
**LV-TAC** [5] - 107:22,
107:25, 109:3,
109:18, 109:19

## M

**ma'am** [1] - 61:17
**Magazine** [1] - 3:7
**MAHADY** [4] - 6:4,
124:4, 124:22,
125:13
**Mahady** [2] - 124:3,
125:12
**mail** [14] - 18:3, 18:17,
18:20, 18:24, 23:3,
30:9, 32:5, 35:1,
35:4, 36:1, 50:3,
133:24, 134:4,
140:13
**mailed** [1] - 221:10
**mails** [1] - 134:14
**main** [2] - 145:9,
182:21
**Mainigi** [14] - 14:25,
23:7, 26:1, 30:4,
36:5, 41:9, 48:2,
130:23, 151:7,
162:14, 231:11,
234:9, 236:18, 238:2
**MAINIGI** [161] - 4:12,
15:1, 20:9, 21:7,
21:25, 22:3, 22:16,
23:9, 23:21, 24:2,
24:20, 24:25, 25:21,
26:3, 26:13, 26:16,

30:5, 31:20, 32:25,
36:6, 36:21, 37:25,
41:10, 44:15, 45:8,
45:23, 46:8, 47:12,
48:3, 48:6, 53:15,
55:11, 58:10, 58:14,
61:12, 61:15, 68:16,
69:9, 69:21, 70:4,
70:19, 71:13, 72:18,
78:4, 96:20, 101:23,
102:21, 103:3,
106:14, 110:22,
113:9, 113:25,
117:3, 133:3,
134:18, 137:24,
142:7, 142:15,
142:20, 142:23,
143:16, 145:6,
145:17, 146:13,
151:8, 151:15,
151:18, 151:19,
151:24, 156:18,
156:20, 161:14,
161:22, 161:23,
162:10, 162:15,
162:18, 163:14,
163:18, 164:19,
165:6, 165:13,
165:16, 166:6,
169:9, 169:13,
169:22, 170:13,
170:16, 170:19,
170:21, 170:22,
173:13, 173:20,
175:24, 176:10,
177:13, 177:16,
177:20, 178:5,
182:3, 182:11,
183:1, 190:5, 190:9,
191:2, 191:12,
191:17, 191:18,
194:19, 197:10,
197:14, 197:16,
198:2, 198:7,
198:12, 199:9,
199:13, 199:15,
199:16, 200:11,
200:17, 200:21,
200:22, 201:16,
201:22, 202:11,
202:17, 204:15,
204:25, 205:7,
209:13, 209:19,
209:20, 210:10,
210:16, 211:22,
213:23, 214:4,
214:8, 214:10,
215:18, 215:24,
216:24, 217:5,
222:20, 228:3,
228:7, 230:17,

232:23, 235:16,
236:8, 236:11,
236:19, 237:11,
237:13, 238:3,
238:16, 239:10,
239:16, 240:8
**maintain** [12] - 44:16,
69:24, 73:24, 74:2,
76:10, 76:23, 77:9,
77:11, 78:1, 191:9,
194:20, 225:1
**maintained** [3] -
39:22, 198:16, 207:1
**maintaining** [5] - 77:4,
77:24, 141:9, 163:5,
172:14
**MAJESTRO** [9] - 2:6,
7:7, 7:10, 7:12, 14:6,
122:4, 123:22,
124:10, 126:7
**Majestro** [8] - 2:6, 7:6,
119:18, 122:3,
124:4, 124:8,
125:16, 126:5
**management** [3] -
184:7, 184:8, 211:6
**Managers** [1] - 53:21
**manifested** [1] - 45:6
**manipulate** [2] - 86:4,
87:24
**manner** [6] - 12:23,
49:11, 59:7, 60:18,
207:22, 209:11
**Manual** [3] - 19:15,
19:18, 19:20
**manufactured** [1] -
180:4
**manufacturer** [4] -
148:19, 175:15,
178:15, 179:18
**manufacturers** [1] -
181:6
**March** [1] - 19:24
**MARK** [1] - 3:16
**Mark** [6] - 54:16, 73:9,
106:6, 171:4, 171:7,
171:12
**mark** [2] - 55:4, 111:10
**marked** [5] - 17:23,
133:21, 137:5,
137:6, 143:22
**market** [1] - 175:16
**Mart** [3] - 205:23,
205:24
**mask** [1] - 43:17
**massive** [2] - 98:8,
98:11
**Master** [1] - 68:23
**master** [2] - 27:15
**matter** [12] - 23:8,

24:10, 32:22, 36:4,
43:10, 61:11, 61:23,
106:25, 118:6,
130:16, 226:14,
241:5
**MAY** [1] - 1:19
**Mays** [1] - 125:1
**MBA** [1] - 97:21
**McCann** [12] - 8:20,
9:24, 10:7, 10:21,
11:12, 11:13, 11:14,
11:24, 12:1, 12:6,
12:12, 12:24
**McCann's** [4] - 8:25,
10:2, 10:9, 13:14
**MCCLURE** [1] - 6:3
**MCGINNESS** [1] - 4:2
**McKesson** [8] - 5:8,
10:16, 43:22, 44:3,
44:6, 122:13,
123:23, 124:11
**MDL** [5] - 9:18, 30:14,
68:21, 129:7, 130:25
**mean** [17] - 25:7,
42:19, 46:9, 62:15,
65:11, 67:25, 87:20,
97:15, 104:17,
109:23, 132:6,
135:24, 136:5,
193:2, 193:16,
197:2, 220:10
**Meaning** [1] - 82:13
**meaning** [4] - 63:10,
73:23, 103:22,
103:25
**means** [12] - 27:13,
57:5, 57:24, 58:4,
77:14, 88:22,
100:11, 112:9,
135:4, 136:7, 176:2,
197:3
**meant** [1] - 172:6
**measured** [2] - 74:14,
74:17
**measures** [4] - 75:18,
167:5, 194:24, 195:3
**mechanical** [1] - 6:19
**mechanism** [2] -
58:17, 75:13
**mechanization** [1] -
95:17
**Medicaid** [1] - 188:19
**medical** [5] - 98:22,
115:5, 178:4, 179:2,
230:15
**medication** [4] -
115:9, 178:21,
178:22, 179:6
**medications** [3] -
154:9, 175:12, 179:9

**Medicine** [25] - 110:8,
110:11, 110:13,
110:16, 110:19,
111:4, 111:6,
111:11, 111:13,
111:20, 112:3,
112:6, 114:7, 114:8,
114:12, 114:20,
149:19, 153:16,
153:17, 209:22,
209:24, 210:4,
214:14, 233:17
**Medicine's** [1] -
153:18
**medicines** [4] - 79:11,
79:13, 82:17, 111:15
**medium** [1] - 60:1
**meet** [4] - 41:20, 54:6,
98:16, 115:3, 169:3,
219:19
**meeting** [21] - 115:10,
179:3, 220:1, 220:2,
220:4, 220:6,
220:12, 221:19,
223:1, 223:4, 226:8,
226:9, 227:14,
229:23, 234:8,
234:11, 234:12,
234:21, 235:1,
235:21
**meetings** [6] - 67:15,
67:17, 208:18,
208:24, 209:5, 235:6
**member** [5] - 65:13,
75:5, 108:17,
108:19, 155:25
**members** [7] - 18:3,
52:12, 108:4,
108:13, 141:24,
144:22, 183:10
**memo** [1] - 32:5
**memorandum** [2] -
19:22, 147:5
**memorize** [1] - 193:4
**mentality** [1] - 103:17
**mentioned** [9] - 48:19,
48:20, 54:24, 143:4,
158:10, 177:2,
208:23, 215:3, 215:8
**mentions** [2] - 78:15,
134:6
**merchandisers** [1] -
183:12
**Mercifully** [1] - 205:8
**merit** [1] - 9:21
**messed** [1] - 154:14
**met** [2] - 38:15, 52:11
**Meth** [1] - 94:15
**method** [5] - 10:1,
10:3, 104:9, 104:11,

104:18
**methodologies** [1] - 12:14
**methodology** [4] - 11:12, 125:19, 185:22, 199:3
**methods** [3] - 9:23, 10:8, 104:4
**metrics** [2] - 134:3, 192:9
**MICHAEL** [2] - 2:15, 3:9
**Michael** [1] - 125:1
**microphone** [4] - 152:12, 161:20, 164:11, 177:14
**middle** [2] - 10:23, 17:1
**Midwest** [1] - 112:14
**might** [11] - 38:20, 64:14, 64:15, 82:13, 99:1, 99:2, 146:16, 147:23, 188:8, 212:21, 240:6
**migrate** [1] - 91:3
**migrating** [1] - 48:23
**migration** [2] - 40:13, 113:8
**Mike** [2] - 14:10, 15:19
**MILDRED** [1] - 3:3
**mind** [7] - 7:8, 14:4, 52:4, 114:13, 181:13, 203:20, 232:8
**mindful** [1] - 117:17
**mine** [1] - 104:23
**minute** [4] - 22:21, 34:8, 56:13, 182:5
**minutes** [7] - 25:24, 26:11, 66:15, 151:10, 151:11, 151:25, 230:25
**misremembering** [1] - 204:14
**missed** [3] - 93:12, 122:5, 231:9
**misstates** [1] - 96:20
**misuse** [1] - 154:8
**Mitchell** [1] - 2:12
**MOA** [6] - 37:23, 147:11, 223:8, 223:12, 223:13, 233:5
**MOAs** [3] - 36:25, 45:3, 45:7
**mode** [1] - 11:18
**modeled** [1] - 191:3
**models** [1] - 185:24
**modify** [1] - 185:21
**module** [1] - 184:9

**modules** [2] - 192:8
**MOI** [1] - 147:22
**moment** [8] - 54:25, 131:2, 142:20, 143:2, 186:6, 200:23, 201:24, 231:5
**Mone** [112] - 14:8, 15:13, 15:23, 15:25, 20:3, 20:15, 20:17, 20:23, 21:3, 23:1, 23:11, 23:16, 24:16, 26:18, 26:22, 30:23, 33:5, 33:9, 33:13, 33:24, 34:13, 36:10, 36:25, 37:5, 38:7, 38:25, 39:5, 41:12, 45:17, 46:3, 47:7, 47:24, 48:9, 49:25, 55:18, 66:18, 66:23, 68:14, 69:7, 70:12, 71:10, 77:13, 78:10, 100:22, 102:5, 102:24, 103:15, 105:7, 111:3, 112:25, 114:1, 114:10, 127:8, 127:15, 127:24, 128:12, 133:2, 133:16, 133:22, 134:24, 137:4, 138:3, 143:2, 143:17, 143:22, 145:13, 146:10, 147:5, 148:1, 151:20, 152:1, 156:17, 161:13, 161:24, 162:16, 162:19, 163:19, 164:20, 166:22, 170:24, 181:8, 182:9, 182:12, 189:23, 190:10, 191:19, 196:10, 196:20, 197:18, 198:17, 199:18, 200:18, 201:23, 202:18, 207:5, 208:5, 209:21, 210:18, 212:15, 214:11, 216:4, 217:6, 221:14, 230:19, 231:5, 234:7, 236:9, 236:14, 238:13, 239:3
**Mone's** [2] - 30:13, 236:13
**monitor** [2] - 54:5, 138:3

**monitored** [1] - 74:20
**Monitoring** [21] - 55:20, 58:25, 130:3, 130:12, 144:19, 154:17, 154:18, 154:23, 155:1, 157:18, 168:1, 168:16, 182:22, 184:4, 184:11, 186:7, 191:24, 191:25, 196:8, 206:4, 227:18
**monitoring** [6] - 56:10, 135:4, 158:14, 174:4, 188:8, 227:8
**month** [11] - 134:6, 134:23, 135:5, 135:6, 136:2, 136:10, 150:7, 160:20, 166:9, 181:12, 233:18
**month"** [1] - 135:2
**month's** [1] - 134:2
**Monthly** [1] - 193:14
**monthly** [4] - 40:22, 81:19, 137:9, 193:14
**months** [9] - 88:24, 89:2, 135:19, 140:9, 157:16, 216:21, 223:2, 223:3, 223:4
**moot** [1] - 28:17
**morning** [15] - 119:8, 119:12, 120:14, 120:21, 126:11, 130:23, 146:17, 146:21, 146:24, 170:7, 173:24, 236:21, 236:23, 237:23, 240:12
**morning's** [1] - 122:5
**Morris** [1] - 6:15
**most** [10] - 8:14, 9:13, 15:8, 78:21, 95:16, 156:3, 187:15, 205:16, 206:19
**mostly** [1] - 205:15
**motion** [2] - 28:16, 38:18
**Motley** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**MOU** [7] - 46:23, 47:10, 47:19, 107:15, 232:17, 232:22, 233:5
**MOUGEY** [1] - 2:12
**MOUs** [6] - 36:25, 41:22, 42:1, 42:3, 42:10, 46:16
**move** [36] - 20:7,

35:20, 46:7, 55:10, 69:13, 70:15, 72:16, 88:1, 101:20, 102:19, 106:11, 122:20, 125:8, 134:17, 137:22, 142:5, 142:14, 142:18, 145:4, 164:15, 173:13, 177:17, 177:18, 197:11, 198:3, 199:9, 200:11, 201:16, 202:11, 204:25, 209:13, 210:10, 213:23, 215:19, 216:25, 235:3
**moved** [1] - 100:19
**moves** [1] - 176:15
**moving** [1] - 198:5
**MPJE** [3] - 227:13, 227:14, 227:16
**MR** [257] - 2:3, 2:6, 2:9, 2:12, 2:15, 3:9, 3:11, 3:16, 4:17, 5:9, 5:10, 5:13, 6:4, 7:7, 7:10, 7:12, 11:2, 13:23, 14:5, 14:6, 14:9, 14:15, 14:20, 15:8, 15:19, 15:22, 17:12, 17:16, 20:7, 21:5, 21:13, 21:21, 22:1, 22:13, 22:21, 22:24, 23:18, 24:8, 24:14, 24:24, 25:9, 25:12, 25:15, 25:19, 25:25, 26:10, 27:2, 27:5, 27:9, 31:10, 32:11, 33:6, 33:11, 33:12, 33:15, 33:16, 33:20, 33:23, 34:9, 34:12, 35:19, 35:24, 36:14, 36:17, 36:22, 36:24, 37:3, 37:4, 38:20, 38:24, 39:3, 39:4, 41:7, 43:7, 44:2, 44:4, 44:10, 44:13, 44:23, 45:1, 45:15, 45:16, 46:1, 46:2, 46:6, 46:22, 47:3, 47:6, 47:18, 48:8, 49:20, 49:23, 49:24, 53:19, 55:9, 55:12, 55:15, 55:17, 55:23, 55:25, 58:8, 58:13, 58:15, 61:14, 61:17, 61:18, 66:12, 66:22, 68:11, 68:13, 69:5, 69:6, 69:12, 69:19, 70:11, 70:15,

71:8, 71:9, 71:17, 72:15, 72:20, 76:4, 78:9, 94:7, 94:9, 96:24, 97:1, 100:19, 100:21, 101:20, 102:4, 102:19, 103:8, 103:13, 103:14, 104:25, 106:11, 106:18, 106:23, 107:3, 111:2, 113:16, 114:5, 117:8, 117:9, 118:8, 118:11, 118:14, 122:4, 123:22, 124:4, 124:10, 124:22, 125:13, 125:15, 126:7, 126:10, 126:23, 128:5, 128:8, 129:16, 129:18, 129:23, 132:17, 132:24, 133:4, 133:9, 133:11, 133:14, 133:18, 133:20, 134:17, 134:21, 137:22, 138:2, 142:4, 142:13, 142:18, 143:1, 143:21, 145:3, 146:1, 146:22, 146:25, 147:4, 147:23, 147:25, 149:16, 149:17, 151:1, 151:5, 161:11, 161:19, 162:8, 162:12, 163:12, 164:4, 164:7, 164:10, 166:1, 169:11, 169:12, 169:14, 170:1, 170:8, 170:17, 170:20, 173:11, 175:20, 190:2, 190:21, 190:25, 191:9, 194:15, 197:12, 198:9, 199:12, 200:14, 200:15, 201:19, 201:20, 202:14, 202:15, 203:17, 203:24, 204:8, 205:3, 205:5, 209:16, 209:17, 210:13, 210:14, 214:1, 214:2, 214:6, 215:21, 215:22, 217:2, 217:3, 222:13, 230:20, 230:21, 230:24, 231:1, 231:4,

232:25, 233:7, 235:3, 235:12, 235:25, 236:5, 236:10, 237:6, 237:18, 239:5, 239:9, 239:25

**MS** [188] - 3:3, 3:6, 3:14, 4:2, 4:5, 4:8, 4:12, 4:12, 4:15, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 15:1, 20:9, 21:7, 21:25, 22:3, 22:16, 23:9, 23:21, 24:2, 24:20, 24:25, 25:21, 26:3, 26:13, 26:16, 30:5, 31:20, 32:25, 36:6, 36:21, 37:25, 41:10, 43:11, 43:16, 44:15, 45:8, 45:23, 46:8, 47:12, 48:3, 48:6, 53:15, 55:11, 58:10, 58:14, 61:12, 61:15, 68:16, 69:9, 69:21, 70:4, 70:19, 71:13, 72:18, 78:4, 96:20, 101:23, 102:21, 103:3, 106:14, 110:22, 113:9, 113:25, 117:3, 119:5, 119:17, 119:21, 121:5, 121:8, 126:25, 127:17, 129:19, 129:21, 130:22, 133:3, 133:10, 134:18, 137:24, 142:7, 142:15, 142:20, 142:23, 143:16, 145:6, 145:17, 146:13, 151:8, 151:15, 151:18, 151:19, 151:24, 156:18, 156:20, 161:14, 161:22, 161:23, 162:10, 162:15, 162:18, 163:14, 163:18, 164:19, 165:6, 165:13, 165:16, 166:6, 169:9, 169:13, 169:22, 170:13, 170:16, 170:19, 170:21, 170:22, 173:13, 173:20, 175:24, 176:10, 177:13, 177:16, 177:20, 178:5, 182:3, 182:11, 183:1, 190:5, 190:9, 191:2,

191:12, 191:17, 191:18, 194:19, 197:10, 197:14, 197:16, 198:2, 198:7, 198:12, 199:9, 199:13, 199:15, 199:16, 200:11, 200:17, 200:21, 200:22, 201:16, 201:22, 202:11, 202:17, 204:15, 204:25, 205:7, 209:13, 209:19, 209:20, 210:10, 210:16, 211:22, 213:23, 214:4, 214:8, 214:10, 215:18, 215:24, 216:24, 217:5, 222:20, 228:3, 228:7, 230:17, 232:23, 235:16, 236:8, 236:11, 236:19, 237:11, 237:13, 238:3, 238:16, 239:10, 239:16, 240:8

**Mt** [3] - 3:15, 4:4, 4:9
**multi** [1] - 156:10
**Multi** [1] - 156:10
**Multi-State** [1] - 156:10
**multiple** [6] - 29:2, 68:17, 105:14, 217:18, 218:9, 218:25
**Multiple** [1] - 219:1
**multiplication** [1] - 93:23
**multiplied** [1] - 61:1
**multiplier** [2] - 60:14, 64:17
**multiply** [1] - 139:15
**must** [6] - 77:17, 177:25, 195:20, 195:21, 196:7, 203:5

## N

**nail** [2] - 130:25, 236:3
**naked** [1] - 13:7
**name** [3] - 110:16, 149:18, 234:6
**name's** [1] - 203:25
**names** [1] - 171:2
**narcotic** [1] - 181:7
**Narcotic** [1] - 181:14
**nation** [1] - 60:23
**national** [9] - 41:8,

41:25, 42:1, 53:12, 112:9, 146:7, 208:18, 209:5, 232:5
**National** [3] - 148:18, 148:20, 156:5
**nationally** [3] - 40:6, 40:16, 47:24
**nationwide** [6] - 59:3, 60:16, 135:24, 136:21, 179:16, 231:19
**naturally** [1] - 116:21
**nature** [2] - 90:2, 92:5
**NDC** [3] - 148:16, 148:17, 148:22
**nearby** [1] - 237:19
**necessarily** [12] - 54:1, 69:14, 78:18, 91:24, 94:20, 94:22, 94:23, 98:24, 117:1, 150:17, 171:2, 189:24
**necessary** [5] - 54:6, 66:9, 99:1, 182:15, 187:4
**necessitated** [1] - 14:1
**need** [23] - 26:23, 29:2, 31:17, 41:21, 65:5, 66:4, 69:14, 90:15, 98:15, 107:22, 109:11, 122:11, 122:24, 123:3, 123:5, 123:17, 123:18, 133:1, 145:1, 151:9, 151:11, 163:19, 173:15
**needed** [6] - 52:20, 54:4, 54:21, 186:25, 187:1, 224:22
**needs** [7] - 25:3, 59:23, 65:18, 65:24, 73:19, 81:9, 124:9
**negate** [1] - 29:1
**negotiate** [1] - 29:10
**negotiated** [2] - 125:3, 125:4
**never** [8] - 12:11, 12:17, 52:4, 96:15, 127:11, 128:13, 131:5, 164:3
**NEVP** [1] - 156:8
**new** [35] - 40:15, 48:24, 49:2, 80:4, 80:6, 80:10, 80:21, 81:22, 83:10, 83:20, 84:4, 84:5, 84:20, 98:6, 99:4, 99:8, 99:24, 106:5, 106:6,

114:15, 115:15, 116:5, 157:23, 159:1, 160:2, 173:4, 183:5, 183:23, 191:4, 193:8, 196:18, 196:22, 197:19
**New** [4] - 3:5, 3:8, 41:14, 166:12
**Next** [2] - 91:5, 100:7
**next** [21] - 8:23, 9:16, 19:14, 19:22, 36:25, 45:17, 51:14, 52:23, 54:9, 61:9, 88:12, 91:5, 98:18, 104:4, 109:10, 136:2, 150:5, 153:24, 186:2, 189:15, 236:21
**nexus** [3] - 38:13, 41:22, 41:23
**NICHOLAS** [5] - 6:11, 36:17, 44:10, 44:13, 230:21
**Nicholas** [2] - 36:16, 44:8
**Nick** [2] - 52:16, 133:25
**night** [5] - 13:18, 26:6, 122:15, 123:5, 142:5
**Ninth** [1] - 4:6
**non** [6] - 46:6, 59:20, 85:21, 96:8, 96:9, 116:11
**non-controlled** [3] - 59:20, 96:8, 96:9
**non-disclosable** [1] - 85:21
**non-hearsay** [1] - 46:6
**non-pharmacist** [1] - 116:11
**none** [6] - 22:5, 93:15, 113:1, 167:5, 168:14, 227:23
**None** [1] - 230:20
**norm** [2] - 12:22, 12:23
**normal** [5] - 74:11, 75:7, 134:9, 139:24, 140:1
**normally** [1] - 113:14
**note** [6] - 36:9, 95:14, 101:24, 124:7, 124:23, 214:25
**noted** [1] - 8:4
**notes** [10] - 101:25, 102:2, 102:22, 102:24, 103:4, 103:5, 103:6, 103:11, 121:16

**nothing** [9] - 38:9, 41:15, 42:16, 46:11, 71:5, 84:4, 116:6, 145:21, 235:20
**notice** [32] - 20:22, 22:25, 23:6, 23:11, 23:23, 26:17, 26:21, 26:24, 27:18, 27:19, 28:16, 28:17, 30:8, 30:9, 30:10, 31:22, 32:2, 32:3, 32:19, 36:7, 36:8, 46:7, 46:22, 52:3, 69:19, 70:2, 70:7, 118:23, 120:18, 123:8
**noticed** [1] - 51:25
**notified** [1] - 95:24
**notify** [1] - 222:7
**November** [2] - 79:2, 166:5
**number** [39] - 10:1, 10:3, 13:1, 13:7, 28:4, 28:12, 29:5, 38:5, 56:18, 56:22, 56:25, 57:1, 57:2, 59:21, 59:24, 61:1, 61:2, 61:13, 74:21, 74:23, 75:16, 87:13, 89:18, 90:9, 99:9, 126:18, 129:15, 136:7, 136:12, 148:15, 149:3, 149:4, 149:6, 149:7, 149:9, 149:12, 167:11, 222:10
**numbers** [4] - 37:20, 62:7, 90:8, 135:21
**nursing** [1] - 211:7
**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

## O

**oath** [4] - 15:14, 133:17
**object** [28] - 23:19, 23:25, 28:21, 28:23, 35:24, 36:6, 38:1, 43:9, 43:23, 44:7, 46:8, 46:15, 70:19, 120:4, 120:23, 121:6, 124:24, 127:19, 161:11, 162:8, 162:9, 164:4, 164:11, 164:15, 169:18, 175:20, 190:2, 190:21
**objected** [7] - 12:14, 22:19, 29:16, 121:1,

127:2, 146:18, 165:7
**objecting** [6] - 30:3,
43:20, 123:9,
146:13, 146:14,
164:7
**objection** [105] - 20:9,
21:15, 21:16, 21:18,
21:23, 24:4, 32:9,
32:15, 36:15, 36:17,
37:25, 38:6, 38:7,
38:8, 39:1, 43:8,
43:12, 44:16, 45:24,
47:1, 47:13, 53:15,
55:11, 68:16, 68:21,
68:22, 68:25, 69:11,
69:23, 69:25, 70:9,
71:6, 72:17, 78:8,
96:25, 101:22,
101:23, 103:9,
106:13, 106:15,
121:18, 121:19,
126:12, 126:14,
127:5, 127:7,
127:12, 128:4,
128:6, 128:7,
128:11, 129:24,
131:5, 132:15,
132:16, 134:18,
137:24, 142:6,
142:7, 142:10,
143:16, 145:6,
145:8, 145:9,
145:21, 162:13,
163:12, 165:8,
165:12, 165:14,
166:1, 173:11,
182:25, 191:10,
191:11, 197:12,
198:8, 199:11,
200:13, 200:14,
200:15, 201:18,
202:13, 202:14,
203:17, 204:9,
205:2, 205:3,
209:15, 209:16,
209:17, 210:12,
210:13, 210:14,
213:25, 214:2,
214:5, 215:20,
215:21, 217:1,
228:4, 235:17,
235:22
**Objection** [11] - 69:9,
78:4, 96:20, 110:22,
113:9, 113:25,
117:3, 194:15,
204:7, 222:13,
232:23
**objections** [14] -
20:22, 21:11, 24:19,
31:21, 38:5, 38:18,

43:22, 68:18,
119:10, 120:21,
121:17, 122:21,
122:24, 125:2
**objective** [5] - 81:12,
81:15, 173:24,
174:2, 212:9
**obligation** [13] -
76:20, 76:21, 76:23,
77:5, 77:8, 77:9,
111:14, 115:3,
147:9, 147:21,
178:1, 238:4, 240:6
**obligations** [5] - 9:5,
9:6, 54:7, 171:16,
208:20
**observation** [1] -
52:10
**observations** [1] -
50:17
**obtain** [4] - 81:15,
82:18, 89:4, 155:4
**obtained** [1] - 206:10
**obvious** [3] - 13:19,
13:20, 148:14
**obviously** [9] - 77:23,
79:24, 80:24, 98:15,
111:14, 116:18,
142:8, 228:25, 229:7
**occasion** [6] - 153:20,
183:15, 189:7,
219:17, 219:18
**occasions** [3] - 84:1,
84:2, 189:7
**occur** [1] - 95:13
**occurred** [10] - 40:18,
41:1, 42:3, 87:5,
93:11, 107:15,
116:15, 165:25,
181:15, 232:19
**occurs** [1] - 135:17
**October** [2] - 101:8,
203:3
**OF** [2] - 1:1, 1:4
**offer** [4] - 132:14,
204:9, 224:16,
224:21
**offered** [3] - 44:2,
125:11, 131:3
**office** [4] - 40:4, 41:6,
147:14, 153:24
**Office** [3] - 147:8,
147:15, 153:12
**Officer** [1] - 154:5
**officer** [2] - 27:23,
73:8
**Officers** [1] - 55:3
**officers** [7] - 51:11,
53:25, 161:6, 172:3,
172:10, 183:14,

224:2
**Offices** [1] - 168:21
**Official** [2] - 241:2,
241:3
**offs** [1] - 57:4
**often** [5] - 89:7,
208:25, 211:13,
211:18
**Ohio** [11] - 19:3,
39:15, 39:19, 39:21,
41:4, 41:6, 137:2,
143:9, 143:12,
143:19, 156:1
**old** [1] - 162:4
**on-board** [1] - 222:2
**on-boarded** [2] -
83:18, 183:23
**on-boarding** [3] -
80:3, 83:12, 83:14
**on-site** [7] - 172:14,
193:11, 202:1,
202:4, 202:6,
202:20, 223:9
**once** [11] - 8:19, 36:9,
44:5, 59:25, 61:25,
77:19, 86:5, 152:10,
152:11, 203:14,
218:24
**Once** [1] - 95:22
**One** [2] - 5:11, 114:21
**one** [83] - 10:12, 13:1,
21:16, 22:8, 22:16,
22:17, 26:13, 26:16,
29:5, 31:12, 31:23,
38:11, 42:3, 43:20,
43:24, 43:25, 45:5,
47:3, 47:5, 54:20,
58:24, 61:4, 65:18,
69:13, 69:17, 70:15,
76:16, 77:2, 80:16,
88:18, 89:13, 98:6,
98:18, 98:19, 99:4,
100:19, 101:12,
105:5, 105:19,
109:13, 110:6,
112:15, 114:18,
117:10, 121:14,
129:4, 129:14,
130:23, 131:8,
134:10, 137:4,
137:5, 140:13,
141:23, 142:20,
151:1, 161:12,
164:6, 166:8,
170:18, 171:20,
176:16, 180:4,
185:6, 193:5, 200:4,
203:3, 203:11,
212:1, 212:21,
212:24, 213:10,

213:12, 219:17,
219:18, 233:15,
236:12, 237:9
**one's** [1] - 148:14
**ones** [4] - 104:22,
105:2, 221:8, 223:12
**ongoing** [1] - 26:6
**op** [1] - 192:20
**open** [5] - 82:11,
82:16, 83:8, 225:12,
226:10
**operate** [3] - 52:19,
55:21, 197:24
**operated** [8] - 39:19,
47:24, 48:12, 48:14,
51:10, 51:17,
163:10, 224:1
**operating** [4] - 53:13,
163:23, 204:10,
204:12
**Operating** [2] - 154:5,
196:11
**operation** [3] - 39:20,
96:3, 110:17
**Operational** [1] -
101:3
**operations** [4] - 42:25,
54:10, 71:20, 90:13
**Operations** [3] - 53:2,
54:22, 171:13
**opinion** [3] - 30:1,
132:8, 132:16
**opinions** [1] - 8:18
**opioid** [2] - 79:3,
139:8
**opioids** [11] - 79:13,
79:25, 153:21,
175:4, 175:14,
175:16, 175:19,
176:18, 176:23,
179:16, 180:14
**opportunities** [1] -
91:16
**opportunity** [10] -
10:17, 29:12, 30:14,
118:15, 118:18,
125:18, 160:12,
160:16, 169:17,
169:20
**opposed** [3] - 147:8,
168:21, 206:23
**opposing** [1] - 130:7
**opposite** [1] - 12:5
**orally** [1] - 191:14
**order** [104] - 7:18,
7:21, 8:1, 9:1, 9:2,
9:12, 10:11, 11:18,
13:22, 26:15, 41:20,
56:1, 56:5, 56:8,
56:10, 56:18, 56:25,

57:1, 57:2, 57:20,
57:25, 62:14, 62:19,
63:1, 63:2, 63:5,
63:7, 63:10, 63:12,
65:23, 75:1, 77:19,
77:20, 78:2, 84:14,
86:12, 86:14, 90:13,
91:14, 91:18, 91:23,
92:2, 92:6, 95:8,
95:11, 95:15, 95:20,
95:22, 96:9, 98:15,
99:23, 99:24, 100:5,
100:8, 100:10,
100:11, 100:12,
100:13, 103:22,
104:1, 111:12,
111:15, 111:25,
112:4, 126:19,
135:4, 149:1, 149:2,
156:14, 161:8,
165:24, 174:4,
176:25, 185:19,
186:1, 186:3, 186:8,
186:12, 186:19,
187:6, 188:8,
189:10, 189:13,
189:15, 189:16,
189:20, 195:1,
195:17, 195:19,
196:5, 200:5, 201:9,
204:5, 212:19,
217:18, 227:8,
230:13, 237:25,
238:5, 239:13,
240:1, 240:4
**Order** [21] - 16:16,
55:19, 58:24, 107:8,
130:2, 130:12,
144:18, 148:10,
157:18, 157:25,
166:17, 166:19,
167:25, 168:16,
182:22, 184:3,
184:10, 186:7,
191:24, 196:8,
227:18
**ordered** [3] - 9:18,
57:25, 179:7
**ordering** [2] - 90:6,
217:18
**orders** [73] - 9:23,
10:1, 10:5, 39:8,
39:17, 63:15, 63:18,
63:23, 64:1, 74:7,
74:8, 74:10, 74:11,
74:14, 74:17, 74:20,
75:2, 75:21, 75:22,
76:9, 76:19, 76:22,
77:3, 77:6, 77:7,
77:15, 77:17, 77:25,
94:17, 96:12, 96:14,

104:15, 105:24, 135:11, 136:10, 136:12, 136:18, 136:21, 138:22, 141:12, 141:15, 147:7, 148:5, 150:12, 150:18, 157:24, 159:7, 159:11, 159:17, 159:18, 160:21, 161:10, 161:18, 162:2, 163:8, 168:17, 168:18, 168:19, 184:9, 184:11, 189:8, 195:23, 195:25, 201:6, 201:13, 220:24, 221:21, 222:10, 227:25, 233:4
**Orders** [1] - 67:11
**ordinarily** [2] - 64:8, 99:17
**ordinary** [1] - 109:16
**org** [2] - 170:25, 172:20
**organization** [2] - 73:8, 215:2
**organizational** [3] - 50:20, 169:7, 170:23
**original** [6] - 99:24, 100:8, 100:10, 100:13, 121:9, 132:20
**originally** [1] - 238:19
**originated** [2] - 101:13, 109:2
**originates** [1] - 79:23
**Orleans** [1] - 3:8
**Osteopathic** [1] - 153:16
**otherwise** [5] - 12:24, 21:17, 70:8, 192:12, 238:10
**ou** [1] - 7:15
**ought** [6] - 9:14, 10:24, 21:2, 42:13, 132:21, 237:16
**ourselves** [1] - 115:8
**out-of-court** [1] - 132:13
**out-of-sequence** [1] - 12:10
**out-of-state** [1] - 113:3
**outcome** [1] - 199:20
**outlining** [1] - 202:3
**outside** [12] - 18:4, 38:11, 46:17, 71:3, 106:7, 113:9,

113:14, 121:20, 121:21, 131:17, 176:17, 235:18
**over-supplying** [1] - 82:3
**overall** [1] - 146:19
**overarching** [1] - 43:3
**overcome** [3] - 26:22, 26:23, 128:3
**override** [1] - 132:15
**overrule** [3] - 110:24, 113:11, 164:17
**overruled** [10] - 32:9, 53:17, 68:22, 111:1, 161:21, 163:16, 166:2, 173:15, 175:21, 204:7
**Overruled** [2] - 222:19, 233:1
**oversaw** [1] - 171:12
**oversight** [1] - 51:4
**overwrite** [1] - 150:8
**own** [12] - 13:2, 40:24, 48:15, 85:10, 85:11, 85:14, 86:20, 86:23, 93:21, 116:3, 132:4, 189:4
**owner** [3] - 116:11, 197:2, 203:7
**oxy** [1] - 87:8
**oxycodone** [6] - 10:4, 60:11, 62:2, 86:23, 150:5, 150:6

**P**

**P-1200** [1] - 2:7
**P-14290** [1] - 14:18
**P-14294** [2] - 142:5, 142:12
**P-1930** [1] - 100:22
**P-2020** [1] - 215:19
**P-42071** [2] - 142:19, 147:24
**P-44275** [2] - 142:14, 142:17
**P-45** [15] - 68:17, 118:15, 118:22, 118:24, 119:12, 120:22, 121:14, 126:11, 127:2, 127:18, 127:19, 127:23, 129:16, 129:17
**P-7509** [2] - 134:17, 134:20
**P-77** [1] - 137:11
**p.m** [4] - 20:12, 119:1, 182:8, 240:13
**P.O** [2] - 5:14, 6:8

**PA** [3] - 6:6, 6:13, 6:15
**package** [2] - 148:20, 148:24
**packet** [5] - 20:2, 23:20, 36:3, 37:16, 72:23
**Page** [25] - 28:24, 37:19, 37:23, 47:20, 50:15, 52:23, 54:19, 55:8, 73:1, 73:11, 73:12, 73:13, 78:10, 78:25, 80:1, 85:16, 88:12, 93:9, 97:6, 99:20, 103:15, 191:20, 203:4, 203:5, 214:19
**page** [20] - 35:1, 37:20, 37:23, 50:3, 52:23, 69:7, 71:11, 100:24, 101:25, 104:4, 133:23, 133:24, 134:22, 136:8, 197:1, 214:11, 233:11, 233:25
**Pain** [1] - 104:12
**pain** [14] - 104:13, 113:4, 114:15, 114:24, 115:2, 115:11, 115:13, 115:16, 115:18, 115:20, 211:6, 233:21, 233:23
**Panel** [1] - 153:19
**Papantonio** [1] - 2:12
**paper** [14] - 15:5, 44:24, 90:20, 90:21, 91:4, 92:12, 93:5, 93:6, 93:7, 125:17, 183:20, 183:21, 211:16, 213:6
**paper-based** [3] - 90:20, 90:21, 91:4
**Paragraph** [2] - 28:3, 28:9
**parameters** [2] - 97:16, 227:21
**pardon** [1] - 140:24
**Pardon** [1] - 220:5
**part** [23] - 34:21, 41:17, 58:24, 62:9, 72:6, 82:1, 82:4, 97:23, 105:22, 111:7, 117:25, 162:4, 168:9, 168:15, 183:4, 183:19, 184:4, 188:8, 201:8, 219:19, 223:8, 231:9, 239:15

**participate** [6] - 78:14, 200:24, 201:2, 201:5, 203:1, 226:22
**participated** [2] - 198:22, 224:19
**participating** [1] - 235:2
**participation** [2] - 51:14, 109:18
**particular** [40] - 25:1, 26:23, 58:7, 59:10, 64:13, 70:5, 75:1, 77:2, 84:9, 86:22, 87:9, 87:12, 88:3, 88:7, 88:23, 89:20, 92:10, 108:6, 108:8, 109:20, 110:13, 113:17, 115:18, 117:4, 121:12, 125:25, 128:1, 141:17, 148:19, 153:1, 153:23, 181:25, 186:2, 212:24, 218:17, 221:2, 224:11, 228:22, 232:9, 234:2
**particularly** [4] - 47:24, 72:9, 115:18, 135:7
**parties** [9] - 10:16, 22:15, 29:6, 35:21, 45:5, 122:9, 122:10, 122:21, 123:15
**parts** [2] - 144:8, 196:12
**party** [16] - 7:17, 7:22, 7:25, 21:16, 22:9, 44:1, 45:2, 122:14, 123:25, 130:9, 132:1, 133:11, 143:4, 143:5, 169:17
**party's** [4] - 106:24, 130:7, 130:15, 131:14
**pass** [2] - 151:5, 174:3
**passed** [3] - 46:3, 120:11, 137:4
**past** [2] - 72:12, 84:16
**patient** [7] - 89:15, 89:16, 178:20, 179:4, 179:5, 179:13, 217:9
**patient's** [1] - 155:5
**patiently** [1] - 239:1
**patients** [16] - 59:23, 81:5, 98:15, 98:16, 99:10, 116:21, 116:24, 116:25, 117:2, 176:17, 178:19, 178:23,

184:22, 188:5, 217:14
**pattern** [7] - 74:8, 74:11, 74:20, 74:24, 75:3, 75:7, 135:16
**PAUL** [2] - 2:3, 5:9
**Paul** [1] - 27:22
**Pause** [7] - 22:23, 25:18, 34:10, 76:2, 142:22, 151:4, 234:4
**pay** [3] - 111:9, 111:14, 232:9
**pays** [2] - 111:6, 111:11
**PEARL** [1] - 3:6
**pediatrician** [1] - 116:5
**pending** [1] - 107:11
**Pensacola** [1] - 2:14
**People** [1] - 97:14
**people** [13] - 27:9, 52:24, 55:1, 97:18, 97:19, 97:21, 105:15, 172:22, 188:13, 198:14, 198:25, 199:4, 239:15
**per** [11] - 21:16, 22:8, 22:9, 125:9, 135:2, 135:6, 136:10, 150:1, 231:15, 233:18
**Per** [1] - 32:6
**percent** [5] - 192:11, 192:13, 192:23, 192:24
**percentage** [1] - 10:5
**perfectly** [2] - 126:3, 126:13
**performance** [1] - 192:9
**performed** [2] - 89:22, 105:24
**Perhaps** [1] - 70:21
**perhaps** [2] - 126:25, 133:14
**period** [12] - 31:9, 32:20, 67:10, 156:23, 157:13, 158:5, 168:6, 170:24, 194:1, 205:22, 228:20, 230:4
**periodically** [5] - 194:2, 194:3, 202:24, 211:19, 212:1
**Perry** [1] - 125:1
**person** [9] - 43:20, 79:5, 80:16, 130:9,

197:3, 203:10, 203:11, 203:12
**personal** [5] - 17:22, 31:12, 38:7, 50:22, 70:23
**personally** [2] - 27:22, 189:6
**personnel** [2] - 51:15, 51:16
**persuasive** [1] - 9:14
**pertain** [1] - 134:1
**pertains** [1] - 75:17
**PETER** [1] - 2:12
**Ph.D** [1] - 143:8
**pharmaceutical** [1] - 175:7
**pharmacies** [43] - 38:12, 39:17, 59:12, 77:15, 82:23, 86:7, 109:14, 112:8, 112:21, 112:23, 116:22, 141:17, 153:5, 166:25, 167:3, 167:6, 167:20, 194:13, 205:9, 205:11, 205:13, 205:15, 206:8, 206:9, 207:1, 207:6, 207:14, 211:14, 215:3, 215:5, 215:6, 215:8, 217:14, 217:18, 228:12, 228:24, 229:3, 229:22, 230:1, 231:8, 231:14, 232:4, 233:4
**pharmacist** [53] - 65:7, 65:13, 65:15, 65:17, 66:1, 74:23, 75:5, 76:5, 76:7, 83:6, 84:14, 89:7, 89:9, 89:10, 91:10, 91:12, 91:16, 92:1, 99:17, 105:20, 105:22, 115:9, 115:21, 115:25, 116:1, 116:2, 116:11, 116:19, 117:21, 135:16, 152:17, 156:14, 156:15, 174:3, 174:16, 174:17, 178:24, 179:14, 186:3, 186:7, 186:11, 186:14, 187:6, 189:9, 189:14, 208:9, 208:11, 209:4, 212:19, 212:21, 213:9, 213:13

**pharmacist's** [1] - 178:6
**pharmacist/ pharmacist** [1] - 66:1
**pharmacists** [22] - 65:16, 65:19, 66:6, 105:19, 105:23, 116:4, 118:3, 153:5, 153:7, 173:2, 174:5, 174:6, 174:8, 174:9, 174:10, 177:23, 183:21, 186:8, 199:5, 208:9, 208:18
**Pharmacy** [22] - 81:14, 112:15, 112:24, 152:11, 152:20, 152:23, 152:24, 154:1, 154:6, 154:16, 155:22, 156:1, 156:6, 156:7, 156:10, 188:18, 196:3, 210:3, 227:5, 227:8, 227:19, 228:1
**pharmacy** [82] - 64:13, 65:16, 65:20, 80:5, 86:10, 88:23, 89:5, 89:22, 89:25, 90:10, 91:19, 98:14, 98:18, 98:19, 99:7, 112:13, 113:3, 113:10, 113:12, 114:14, 116:2, 116:4, 116:12, 116:21, 116:25, 117:11, 117:14, 117:15, 117:19, 153:7, 153:8, 155:24, 174:19, 176:23, 178:21, 179:6, 180:7, 180:14, 182:1, 184:21, 185:1, 185:4, 185:5, 185:7, 185:13, 185:14, 185:15, 185:16, 186:2, 186:20, 186:24, 187:3, 187:8, 187:11, 187:19, 188:1, 188:2, 188:3, 188:23, 189:13, 201:6, 206:14, 206:15, 208:23, 209:3, 209:5, 209:7, 209:24, 210:2, 210:20, 211:8, 211:16, 211:24, 212:6, 213:19, 215:13, 218:17, 233:13
**pharmacy's** [1] -

178:22
**Phase** [2] - 48:20, 48:22
**PHI** [1] - 217:11
**Philadelphia** [2] - 6:6, 6:13
**philosophy** [1] - 209:8
**phone** [3] - 161:7, 187:2, 215:2
**physical** [5] - 194:24, 195:3, 195:6, 195:11, 195:13
**physician** [1] - 178:25
**physicians** [1] - 115:3
**pick** [2] - 161:7, 187:2
**picked** [1] - 171:23
**picture** [2] - 155:4, 176:11
**pie** [1] - 65:21
**piece** [14] - 44:24, 49:17, 57:19, 65:20, 92:2, 142:9, 171:14, 171:16, 171:24, 171:25, 174:12, 208:10
**pierce** [1] - 171:15
**PIFKO** [1] - 3:16
**pill** [2] - 62:8, 181:8
**pills** [5] - 62:2, 62:3, 62:8, 111:12, 113:8
**pint** [1] - 145:3
**place** [12] - 34:16, 39:5, 39:7, 40:13, 47:22, 48:21, 84:8, 118:23, 139:10, 145:1, 147:17, 147:18
**placed** [2] - 172:24, 184:9
**PLAINTIFF** [9] - 24:6, 36:23, 55:14, 134:20, 138:1, 142:12, 142:17, 142:25, 147:3
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**plaintiff** [1] - 14:10
**Plaintiffs** [3] - 118:18, 133:21, 241:6
**plaintiffs** [26] - 7:13, 8:13, 8:15, 12:5, 13:18, 13:21, 14:2, 15:20, 22:14, 22:17, 28:13, 28:15, 28:25, 29:2, 29:12, 32:23, 41:20, 118:16, 120:8, 125:3, 125:7, 128:3, 236:25, 239:12, 240:2, 240:4
**plaintiffs'** [2] - 209:21,

238:22
**Plaintiffs'** [18] - 20:8, 35:20, 46:3, 55:10, 70:13, 72:16, 101:21, 105:8, 106:12, 137:5, 137:6, 137:23, 143:23, 145:5, 214:4, 214:5, 235:4
**plan** [2] - 8:15, 239:25
**planned** [1] - 8:22
**planning** [2] - 119:19, 236:23
**plausibility** [3] - 91:6, 91:18, 92:2
**plausible** [4] - 91:17, 95:8, 95:9, 95:12
**Pleasant** [3] - 3:15, 4:4, 4:9
**pleasant** [1] - 239:5
**plug** [1] - 118:5
**plus** [1] - 187:14
**Podiatric** [1] - 153:17
**point** [35] - 8:15, 11:17, 29:22, 32:18, 45:13, 52:6, 54:10, 67:3, 67:24, 72:15, 87:1, 88:13, 90:12, 91:5, 95:14, 100:7, 110:1, 118:7, 125:11, 127:4, 128:8, 131:8, 131:9, 167:4, 167:12, 169:15, 171:4, 181:17, 181:23, 189:9, 216:24, 218:10, 220:24, 236:24
**pointed** [2] - 124:19, 231:6
**police** [1] - 188:17
**policies** [6] - 220:15, 220:17, 221:2, 222:21, 222:22, 225:18
**policy** [3] - 93:6, 150:23, 226:13
**Policy** [1] - 219:24
**Polster** [2] - 9:17, 129:9
**Ponc** [1] - 2:4
**Ponce** [1] - 2:16
**pop** [2] - 55:12, 55:15
**portion** [1] - 102:22
**portions** [1] - 49:1
**position** [8] - 18:14, 35:10, 109:3, 125:7, 134:13, 142:15, 142:23, 165:17
**positions** [3] - 54:2,

155:23, 171:2
**possess** [2] - 176:25, 178:16
**possessed** [1] - 219:3
**possible** [2] - 29:1, 110:3
**post** [2] - 117:21, 160:14
**post-September** [1] - 160:14
**potential** [4] - 12:2, 113:18, 114:24, 145:1
**potentially** [1] - 149:8
**Powell** [1] - 2:6
**Power** [1] - 91:5
**PowerPoint** [9] - 35:14, 50:5, 50:7, 50:10, 71:16, 76:8, 81:16, 101:12, 102:7
**PowerPoints** [1] - 72:4
**PPT** [1] - 172:22
**PR** [2] - 2:5, 2:17
**practice** [5] - 8:4, 115:4, 153:6, 178:4, 179:1
**practicing** [1] - 152:17
**practitioner** [1] - 155:6
**practitioners** [5] - 113:13, 153:22, 155:2, 155:8, 155:11
**pre** [2] - 187:20, 187:22
**pre-review** [2] - 187:20, 187:22
**precise** [1] - 185:24
**preclude** [1] - 128:15
**precludes** [1] - 128:14
**predicate** [3] - 12:8, 38:21, 41:8
**predominantly** [2] - 135:14, 167:2
**prejudice** [1] - 8:12
**prejudiced** [1] - 8:13
**preliminary** [1] - 8:6
**prepare** [3] - 7:14, 14:7, 225:23
**prepared** [4] - 8:22, 19:23, 129:1, 221:8
**prepares** [1] - 179:4, 203:11
**preparing** [2] - 8:17, 22:4
**prescribe** [5] - 115:3, 155:9, 176:18, 176:21, 178:2
**prescriber** [1] - 234:6
**prescribers** [8] -

82:18, 82:23, 115:17, 115:20, 155:7, 155:11, 176:18, 234:2

**prescribing** [8] - 79:23, 87:10, 87:11, 98:14, 104:8, 115:16, 116:6

**Prescription** [4] - 154:17, 154:18, 154:23, 155:1

**prescription** [8] - 104:14, 154:9, 178:3, 178:24, 179:5, 179:13, 179:14, 180:14

**prescriptions** [16] - 59:21, 89:18, 89:23, 98:13, 113:4, 113:13, 115:11, 116:20, 117:12, 155:3, 155:4, 180:17, 188:4, 208:22, 211:8, 217:7

**present** [19] - 7:25, 8:16, 9:1, 10:20, 10:21, 12:11, 13:10, 29:18, 46:16, 122:11, 125:18, 126:19, 128:24, 170:10, 171:9, 179:13, 209:4, 236:23, 240:5

**presentation** [9] - 7:18, 7:21, 50:7, 50:11, 101:12, 124:25, 190:12, 190:14, 192:10

**presentations** [2] - 72:5, 72:24

**presented** [4] - 9:13, 12:24, 89:23, 157:22

**presenting** [3] - 8:21, 11:19, 12:17

**preserve** [2] - 121:17, 129:11

**preserved** [1] - 165:15

**preserving** [1] - 125:2

**President** [4] - 18:11, 35:11, 54:15, 156:2

**presume** [2] - 114:18, 115:23

**presumptively** [1] - 178:24

**pretty** [3] - 46:25, 128:25, 149:1

**prevailed** [1] - 27:17

**prevent** [6] - 8:15, 73:24, 76:11, 77:10, 77:17, 78:2

**prevented** [2] - 128:10, 190:23

**prevention** [1] - 154:8

**previously** [6] - 36:2, 69:24, 118:14, 189:23, 239:3

**price** [1] - 59:20

**primary** [3] - 178:1, 187:13, 191:4

**principle** [1] - 12:19

**privilege** [9] - 68:21, 68:22, 68:25, 129:6, 129:8, 129:12, 129:13, 130:24, 131:5

**privileged** [2] - 121:2, 131:19

**proactive** [2] - 97:7, 99:3

**Probable** [1] - 153:18

**probable** [1] - 153:3

**problem** [8] - 9:22, 24:23, 25:12, 126:2, 126:16, 194:9, 238:14

**problems** [3] - 9:7, 146:8, 231:8

**procedure** [6] - 13:14, 124:2, 125:16, 128:19, 204:10, 204:12

**Procedures** [1] - 196:11

**procedures** [5] - 11:22, 197:7, 197:25, 199:7, 225:18

**proceed** [3] - 13:22, 15:18

**proceedings** [2] - 122:6, 241:5

**Proceedings** [3] - 6:19, 66:17, 182:8

**PROCEEDINGS** [1] - 7:1

**process** [75] - 27:11, 40:14, 45:21, 48:17, 55:19, 55:21, 57:11, 57:17, 57:18, 61:4, 62:9, 73:23, 80:3, 80:6, 80:8, 80:10, 82:4, 83:12, 83:13, 88:14, 91:22, 91:24, 92:8, 94:25, 95:12, 97:2, 97:19, 97:21, 97:24, 99:12, 99:16, 128:17, 138:14, 139:17, 144:20, 144:23, 157:10, 158:25, 160:8,

165:2, 168:9, 172:22, 173:9, 176:3, 183:9, 183:24, 184:2, 184:17, 184:18, 184:19, 184:23, 188:8, 188:9, 188:25, 193:8, 196:23, 197:19, 198:20, 199:1, 200:19, 203:1, 206:8, 212:15, 213:5, 218:16, 226:13, 226:21, 229:7, 229:19, 229:20, 232:12

**Proctor** [1] - 2:12

**produce** [2] - 130:25, 161:3

**produced** [7] - 6:19, 74:22, 124:15, 137:18, 148:2, 174:25, 179:17

**product** [6] - 86:14, 100:8, 100:10, 148:20, 176:15, 179:19

**production** [1] - 123:11

**products** [4] - 99:23, 148:19, 175:4, 175:8

**professional** [5] - 92:3, 115:4, 178:3, 179:1, 186:15

**professionals** [2] - 9:5, 92:15

**proffer** [3] - 27:2, 118:11, 129:6

**Profile** [1] - 212:18

**profile** [3] - 213:2, 213:4, 213:19

**program** [14] - 41:2, 41:3, 82:21, 109:8, 109:9, 138:6, 143:6, 146:19, 155:18, 155:19, 157:12, 183:16, 190:17, 193:7

**Program** [13] - 76:17, 144:19, 154:17, 154:18, 154:24, 155:1, 157:2, 157:6, 157:9, 168:16, 191:24, 191:25, 230:13

**programs** [1] - 209:4

**progress** [1] - 50:5

**promises** [1] - 70:18

**prongs** [2] - 158:13, 158:16

**proof** [1] - 8:6

**proper** [9] - 20:11, 21:8, 21:10, 29:4, 32:4, 120:18, 120:24, 132:15, 203:18

**properly** [3] - 52:19, 54:5, 146:20

**proposal** [1] - 10:14

**propose** [2] - 122:15, 123:6

**proposing** [3] - 8:9, 124:2, 125:16

**proprietary** [1] - 218:23

**prosecute** [1] - 153:4

**prosecuted** [1] - 153:2

**prosecutor** [1] - 152:25

**protect** [1] - 12:12

**protected** [1] - 155:19

**protecting** [1] - 11:20

**proud** [1] - 226:13

**prove** [1] - 9:15

**proves** [1] - 46:11

**provide** [20] - 10:2, 14:17, 81:18, 82:7, 82:10, 84:10, 93:12, 93:18, 94:23, 98:1, 123:7, 155:2, 175:11, 194:21, 208:17, 209:2, 211:8, 218:19, 219:2, 221:4

**provided** [20] - 9:24, 29:12, 33:24, 33:25, 34:1, 34:5, 34:18, 68:4, 81:10, 81:25, 101:23, 118:15, 118:18, 168:25, 173:25, 174:11, 175:1, 182:15, 190:12, 221:6

**providers** [1] - 59:13

**provides** [5] - 46:22, 134:22, 135:21, 175:9, 212:6

**providing** [3] - 72:4, 164:1, 206:21

**province** [1] - 240:3

**psych** [1] - 185:15

**Public** [1] - 93:25

**public** [8] - 79:10, 79:12, 79:16, 79:18, 93:24, 156:3, 226:18, 226:20

**publish** [1] - 58:10

**pull** [3] - 118:5, 142:1, 152:12

**pulled** [1] - 124:11

**pulls** [1] - 177:14

**purchase** [8] - 59:20, 81:17, 82:16, 86:6, 96:4, 98:18, 213:18, 213:22

**purchased** [1] - 108:10

**purchaser** [1] - 86:7

**purchases** [3] - 81:19, 88:20, 178:14

**purchasing** [3] - 96:1, 96:17, 97:3

**purpose** [26] - 20:21, 23:6, 24:13, 26:20, 29:3, 32:1, 32:13, 32:19, 36:8, 36:15, 36:19, 38:17, 44:15, 45:2, 46:21, 47:16, 68:24, 68:25, 70:3, 115:5, 178:4, 179:2, 180:16, 197:22, 208:15, 230:15

**purposes** [7] - 23:23, 31:14, 35:23, 36:13, 46:7, 130:19, 143:23

**pursuant** [4] - 89:22, 113:13, 130:14, 208:21

**pursue** [1] - 111:1

**Put** [1] - 190:8

**put** [43] - 7:17, 14:10, 14:11, 15:8, 17:12, 30:18, 39:5, 39:7, 84:5, 84:24, 120:12, 124:18, 124:19, 126:7, 127:21, 147:17, 147:18, 147:24, 151:22, 169:7, 170:14, 176:7, 184:22, 184:23, 187:5, 190:18, 190:20, 193:5, 196:10, 197:9, 198:21, 201:23, 202:18, 209:25, 214:9, 221:9, 235:25, 238:24, 239:2, 239:13

**puts** [1] - 156:13

**putting** [5] - 42:14, 170:5, 190:10, 197:20, 198:23

---

# Q

**QRA** [37] - 51:5, 51:7, 51:14, 51:21, 52:1, 52:3, 52:4, 53:20, 54:22, 54:25, 65:19,

72:9, 88:13, 91:6, 95:5, 98:1, 99:12, 99:21, 100:13, 105:19, 105:20, 105:21, 105:23, 106:19, 106:20, 108:3, 108:4, 108:15, 108:16, 109:3, 109:19, 113:2, 116:5, 134:11, 171:13, 181:4, 204:13
**qualifications** [2] - 152:4, 169:6
**quality** [1] - 87:14
**Quality** [4] - 51:7, 51:21, 101:4, 171:15
**quantity** [7] - 89:19, 90:1, 90:3, 90:9, 149:1, 149:3
**questioned** [1] - 69:18
**questioning** [3] - 23:4, 45:24, 161:16
**questionnaire** [20] - 57:15, 80:11, 80:13, 80:17, 81:7, 81:25, 90:12, 90:17, 92:20, 92:21, 92:24, 183:13, 183:14, 187:18, 189:3, 189:4, 210:7, 211:23, 212:5
**Questionnaire** [2] - 91:5, 210:3
**questionnaires** [8] - 59:22, 173:8, 173:9, 173:10, 173:22, 193:9, 210:25, 212:2
**questions** [21] - 31:1, 31:6, 33:6, 38:1, 63:20, 110:25, 128:11, 128:14, 165:3, 165:9, 165:11, 189:25, 191:15, 193:3, 205:10, 209:22, 212:3, 228:5, 230:17, 236:2
**quick** [2] - 118:11, 129:4
**quickly** [2] - 196:20, 234:6
**quietly** [2] - 43:12, 43:19
**Quintero** [5] - 106:3, 108:19, 108:22, 171:5, 171:8, 214:22, 214:24, 215:5
**Quite** [1] - 69:12

**quite** [5] - 162:23, 226:12, 226:25, 227:3, 238:3
**quota** [3] - 179:23, 180:3, 180:5
**quotas** [3] - 179:15, 179:19, 179:21

## R

**Rafalski** [13] - 8:16, 9:16, 10:2, 10:8, 10:17, 10:20, 11:11, 11:14, 11:25, 12:9, 12:16, 13:2
**Rafalski's** [2] - 9:23, 10:8
**Rafferty** [1] - 2:12
**raided** [2] - 116:10, 233:16
**raids** [1] - 117:15
**raise** [4] - 11:3, 85:25, 124:9, 177:19
**raised** [4] - 120:21, 124:12, 207:19
**raises** [1] - 110:2
**raising** [2] - 43:22, 201:2
**ran** [3] - 40:21, 40:24, 41:2
**Rannazzisi** [10] - 17:18, 19:9, 20:1, 20:14, 20:17, 20:20, 37:18, 160:6, 160:10, 169:1
**rare** [1] - 189:7
**rather** [3] - 37:16, 42:21, 195:6
**rational** [1] - 66:2, 66:4, 94:24
**rationale** [2] - 65:7, 196:15
**Rausch** [3] - 52:16, 55:2, 133:25
**Rausch's** [1] - 134:13
**re** [2] - 55:5, 235:3
**re-educate** [1] - 55:5
**re-move** [1] - 235:3
**reach** [1] - 168:3
**reached** [2] - 27:24, 30:1
**reaction** [1] - 79:6
**read** [12] - 28:12, 28:25, 71:24, 101:2, 107:23, 113:5, 113:6, 114:3, 116:8, 121:3, 126:4, 233:25
**readily** [1] - 221:9
**reads** [1] - 118:18
**ready** [7] - 8:18, 8:23,

30:15, 151:9, 151:19, 237:3, 240:11
**real** [1] - 129:4
**realign** [1] - 54:10
**realistic** [1] - 125:19
**really** [4] - 7:13, 9:22, 44:10, 238:17
**realm** [2] - 121:20, 121:21
**Reardon** [24] - 16:19, 30:18, 30:19, 35:6, 35:7, 36:9, 36:10, 41:2, 41:3, 41:4, 52:12, 52:14, 55:1, 157:1, 157:15, 158:12, 158:16, 162:6, 171:18, 171:25, 181:1, 181:2, 181:3, 190:15
**Reardon's** [2] - 41:6, 171:15
**rearranged** [1] - 193:3
**reason** [17] - 11:3, 18:22, 18:25, 22:8, 22:11, 30:22, 86:15, 87:15, 98:3, 98:9, 98:22, 105:17, 130:6, 146:17, 204:23, 215:14, 215:16
**reasonable** [2] - 8:25, 94:23
**reasons** [14] - 7:15, 10:19, 20:10, 30:15, 64:24, 65:2, 65:5, 65:10, 65:11, 66:1, 97:10, 98:24, 98:25
**rebar** [1] - 195:8
**recalling** [1] - 158:11
**receipt** [3] - 20:24, 23:11
**receive** [6] - 15:3, 23:5, 160:1, 194:20, 217:13
**received** [11] - 18:23, 18:25, 19:9, 19:12, 20:3, 20:6, 23:3, 84:13, 113:13, 169:18, 192:15
**receives** [1] - 178:24
**recess** [3] - 25:20, 25:23, 66:15
**Recess** [4] - 26:12, 66:16, 119:1, 182:7
**recessed** [1] - 240:13
**recipient** [1] - 18:17
**reciprocate** [1] - 156:15
**recognize** [25] - 18:1,

34:24, 35:13, 35:14, 35:16, 35:17, 37:5, 37:7, 37:9, 37:22, 46:4, 47:7, 49:25, 68:14, 68:19, 69:3, 70:12, 71:10, 80:25, 100:22, 100:23, 105:7, 105:9, 133:22
**recognizing** [3] - 84:21, 86:5, 88:3
**recollect** [3] - 33:17, 107:16, 108:13
**recollection** [38] - 23:1, 34:3, 37:1, 59:7, 66:9, 68:10, 84:12, 93:24, 94:16, 102:8, 102:13, 116:14, 144:10, 144:21, 158:18, 161:13, 163:4, 166:4, 167:4, 168:7, 198:22, 203:2, 205:16, 215:12, 218:22, 219:7, 219:11, 221:9, 223:11, 223:23, 224:16, 224:18, 224:21, 227:17, 227:20, 229:12, 233:5, 234:17
**recommendation** [1] - 228:16
**recommendations** [3] - 50:17, 94:2, 130:2
**recommending** [1] - 231:16
**record** [31] - 11:10, 12:20, 14:11, 14:24, 24:25, 28:13, 30:2, 31:13, 31:18, 35:23, 36:9, 38:17, 44:16, 45:25, 46:24, 66:8, 68:24, 69:1, 70:16, 122:20, 124:7, 128:5, 128:6, 129:7, 129:11, 133:6, 137:5, 150:22, 197:17, 213:15, 241:5
**recorded** [1] - 6:19
**records** [5] - 70:22, 93:6, 149:3, 172:14, 225:10
**red** [3] - 82:13, 113:19, 114:24
**redirect** [2] - 230:22, 237:21
**REDIRECT** [1] - 231:3
**Reed** [2] - 6:4, 6:11
**refer** [2] - 17:3, 17:18

**reference** [4] - 7:20, 74:21, 159:18, 161:15
**referenced** [1] - 69:15
**references** [1] - 233:21
**referred** [4] - 57:16, 94:11, 94:12, 174:5
**referring** [5] - 47:4, 98:8, 140:12, 155:6, 160:15
**refers** [2] - 135:6, 136:9
**reflect** [2] - 152:3, 170:25
**reflected** [3] - 98:13, 229:22, 229:23
**reflection** [1] - 171:3
**reflects** [3] - 71:15, 155:25, 177:23
**refresh** [1] - 66:9
**refuse** [2] - 82:7, 82:10
**refused** [1] - 222:2
**regain** [1] - 168:8
**regard** [15] - 24:4, 44:1, 52:5, 57:20, 58:6, 79:22, 119:12, 119:24, 130:5, 171:17, 181:21, 184:1, 199:24, 208:20, 232:13
**regarding** [3] - 11:18, 107:21, 210:21
**regional** [2] - 205:19
**registered** [10] - 176:12, 176:14, 176:19, 176:22, 176:24, 177:1, 178:15, 178:17, 180:7, 180:10
**registrant** [7] - 57:25, 76:21, 82:2, 148:12, 149:4, 149:6, 149:9
**registrant's** [1] - 148:14
**registrants** [1] - 195:23
**registration** [13] - 81:2, 86:6, 149:7, 149:11, 166:23, 176:16, 178:15, 180:12, 193:24, 194:2, 194:20, 225:6
**registrations** [1] - 168:9
**regular** [7] - 18:13, 18:23, 20:4, 134:7, 134:14, 137:19, 141:9

**regularly** [1] - 217:24
**regulation** [5] - 77:2, 77:6, 153:9, 161:4, 164:2
**regulations** [12] - 73:21, 147:11, 177:6, 177:22, 195:4, 195:6, 195:13, 195:15, 195:18, 196:7, 210:21, 230:10
**regulatory** [6] - 54:7, 54:10, 96:13, 159:17, 163:6, 196:1
**Regulatory** [7] - 18:12, 35:11, 51:8, 51:22, 153:16, 171:15, 219:24
**rejects** [1] - 129:8
**relate** [4] - 43:3, 47:23, 146:18, 202:21
**related** [45] - 17:17, 30:21, 34:19, 38:2, 38:4, 41:13, 41:15, 46:20, 47:19, 48:6, 50:19, 67:15, 67:24, 68:6, 68:21, 69:23, 70:24, 71:4, 72:9, 79:13, 80:21, 88:15, 96:5, 109:14, 117:10, 135:15, 144:16, 144:20, 153:21, 153:22, 154:8, 155:23, 165:19, 170:23, 171:16, 192:5, 196:12, 199:22, 199:23, 210:1, 220:15, 234:21, 234:23, 235:19
**relates** [17] - 23:9, 25:1, 38:10, 38:11, 41:11, 42:23, 47:12, 47:13, 47:25, 86:8, 145:10, 145:21, 147:1, 169:25, 177:6, 177:23, 214:14
**relating** [4] - 29:7, 29:13, 118:19, 134:6
**relation** [1] - 161:16
**relationship** [11] - 85:13, 99:7, 106:25, 110:13, 111:3, 112:6, 130:16, 178:20, 186:22, 227:11, 234:25
**relationships** [1] - 161:7

**relative** [1] - 157:25
**release** [4] - 57:21, 57:24, 57:25
**released** [1] - 99:24
**relevance** [1] - 86:22
**relevancy** [2] - 7:20, 8:3
**relevant** [8] - 42:20, 43:4, 44:6, 80:17, 115:22, 116:23, 117:21, 134:3
**relied** [1] - 232:15
**relies** [1] - 11:8
**relieve** [1] - 76:9
**rely** [3] - 8:9, 8:10, 85:14
**relying** [8] - 10:8, 10:13, 13:16, 31:23, 85:9, 85:11, 143:4
**remaining** [3] - 100:8, 100:10, 123:16
**Remember** [1] - 214:15
**remember** [19] - 23:2, 68:6, 68:8, 107:18, 119:15, 126:22, 144:11, 144:14, 146:20, 170:6, 203:3, 203:24, 204:2, 204:3, 209:22, 229:21, 232:1, 235:9
**remembers** [1] - 166:2
**remind** [2] - 208:20, 219:22
**removed** [1] - 43:2
**renew** [3] - 194:2, 194:3, 194:5
**repeatedly** [1] - 190:23
**rephrase** [3] - 96:22, 161:22, 162:14
**Report** [10] - 27:10, 89:5, 89:12, 89:14, 89:21, 89:24, 90:3, 134:2, 144:2, 181:5
**report** [42] - 39:8, 57:5, 57:22, 58:2, 62:14, 63:2, 63:12, 74:7, 77:5, 77:7, 90:2, 96:14, 100:14, 130:4, 130:12, 131:18, 145:10, 145:11, 145:20, 146:3, 147:6, 147:8, 147:10, 147:11, 147:13, 147:14, 147:15, 160:20, 161:18, 163:7, 168:17, 168:19,

181:5, 188:6, 195:25, 196:5, 216:7, 216:8, 227:25
**reported** [26] - 57:8, 63:16, 63:18, 63:24, 64:1, 77:20, 95:20, 95:23, 96:13, 96:14, 96:16, 104:1, 104:2, 136:18, 136:21, 141:13, 141:16, 150:12, 150:20, 189:16, 200:5, 201:9, 221:21, 222:11, 241:9
**Reporter** [6] - 6:17, 6:18, 241:3, 241:12
**REPORTER** [4] - 14:19, 43:14, 177:8, 177:11
**reporting** [22] - 48:24, 54:8, 74:4, 74:6, 76:19, 76:22, 96:11, 106:19, 147:19, 147:21, 154:21, 157:23, 161:10, 162:1, 180:19, 180:20, 180:24, 195:1, 195:17, 201:12, 220:23
**Reporting** [1] - 76:9
**Reports** [8] - 40:7, 54:11, 138:16, 138:17, 157:25, 160:20, 160:22, 181:12
**reports** [9] - 40:24, 57:13, 74:22, 74:24, 138:9, 199:25, 221:11, 224:3
**represent** [4] - 110:18, 148:1, 165:22, 238:9
**representation** [3] - 107:17, 216:6, 239:10
**representations** [3] - 81:24, 238:11, 239:20
**represented** [3] - 191:6, 238:5, 238:18
**represents** [1] - 176:12
**request** [12] - 32:6, 89:8, 129:1, 170:2, 174:16, 218:1, 218:4, 219:7, 219:12, 221:1, 224:10, 225:11
**requested** [7] - 84:11, 84:12, 146:5, 218:10, 221:7,

236:21, 239:3
**require** [2] - 195:5, 195:18
**required** [12] - 74:7, 80:10, 81:1, 147:6, 147:8, 147:10, 163:2, 170:3, 180:11, 181:5, 188:10, 194:3
**requirement** [10] - 54:8, 65:8, 65:9, 74:1, 74:5, 74:6, 77:11, 96:13, 159:17, 195:17
**requirements** [5] - 76:25, 80:25, 93:14, 93:20, 195:11
**requires** [5] - 77:25, 80:8, 90:10, 164:17, 179:13
**requiring** [2] - 192:11, 210:20
**reserve** [5] - 38:17, 39:1, 121:4, 145:8, 228:3
**reserved** [1] - 28:7
**resolved** [1] - 107:12
**resource** [1] - 52:6
**resources** [4] - 52:7, 52:8, 68:4, 182:15
**respect** [9] - 21:5, 26:4, 38:7, 122:9, 129:23, 130:18, 130:20, 158:8, 215:25
**respond** [3] - 22:20, 48:4, 215:3
**responding** [2] - 201:13, 215:1
**Response** [1] - 240:10
**response** [5] - 92:1, 92:21, 214:23, 219:12, 239:6
**responses** [2] - 122:22, 122:23
**responsibility** [17] - 76:10, 93:17, 97:18, 115:10, 116:3, 177:3, 177:5, 177:21, 177:25, 178:6, 178:7, 179:3, 192:19, 208:12, 208:13, 209:9, 229:24
**responsible** [10] - 8:21, 9:10, 171:13, 172:12, 172:13, 172:14, 172:15, 172:16, 187:14, 204:13

**rest** [13] - 23:25, 24:5, 75:24, 91:19, 92:7, 103:12, 136:23, 140:6, 155:15, 171:16, 199:24, 218:18, 232:11
**rested** [1] - 28:22
**result** [7] - 67:21, 160:9, 188:11, 229:19, 229:20, 232:2
**resulted** [1] - 116:11
**resume** [4] - 15:13, 33:8, 66:18, 133:16
**resumed** [2] - 66:17, 182:8
**retail** [10] - 112:7, 112:12, 185:1, 185:17, 196:22, 206:4, 206:9, 206:14, 206:15, 207:7
**Retail** [1] - 210:3
**retain** [1] - 165:8
**retained** [2] - 92:13, 93:1
**retention** [2] - 93:6, 150:23
**retired** [1] - 108:21
**revamp** [1] - 34:4
**revamping** [1] - 40:6
**reverse** [1] - 13:21
**reversed** [1] - 132:21
**Review** [1] - 156:11
**review** [35] - 14:16, 14:23, 15:3, 34:17, 48:10, 48:12, 48:13, 64:7, 88:19, 92:18, 130:1, 130:19, 146:2, 151:25, 163:1, 169:17, 186:8, 187:20, 187:22, 197:3, 199:19, 200:2, 200:19, 207:13, 212:15, 212:18, 212:22, 216:5, 220:9, 220:10, 221:2, 224:13, 231:22, 234:5, 235:23
**reviewed** [5] - 64:11, 103:8, 184:11, 221:6, 221:7
**reviewing** [8] - 8:17, 102:6, 102:8, 144:25, 192:10, 214:6, 220:14, 220:19
**revisit** [3] - 7:15,

215:3, 215:8
**revisited** [1] - 107:22
**revocation** [1] - 211:3
**revolves** [1] - 70:17
**Rice** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**ride** [1] - 183:15
**ride-alongs** [1] -
183:15
**right-hand** [1] -
137:12
**rightly** [1] - 121:16
**rights** [2] - 7:19, 51:23
**rise** [1] - 90:5
**risk** [1] - 11:9
**risks** [1] - 175:19
**RMR** [2] - 6:17, 6:18
**ROBERT** [1] - 6:11
**Robert** [4] - 18:6,
35:5, 35:10, 37:12
**ROBERTSON** [1] - 3:6
**role** [24] - 20:18,
20:23, 23:16, 49:12,
105:21, 106:4,
153:20, 153:24,
154:3, 154:7,
162:23, 171:7,
171:8, 171:11,
171:12, 171:13,
171:18, 171:20,
171:21, 172:1,
174:6, 178:8
**rolling** [1] - 133:1
**Romano** [3] - 71:12,
71:18, 71:19
**Ron** [4] - 68:2, 68:3,
68:9
**room** [2] - 220:12
**root** [1] - 61:2
**rotational** [1] - 75:4
**RPR** [1] - 6:18
**RPR-RMR-CRR-**
**FCRR** [1] - 6:18
**RPs** [1] - 171:14
**RUBY** [1] - 4:17
**Ruby** [1] - 4:17
**Rule** [8] - 8:4, 8:8,
11:17, 12:20, 28:15,
130:8, 130:14
**rule** [12] - 7:17, 7:19,
7:25, 11:3, 11:5,
21:15, 22:9, 24:18,
32:2, 43:19, 43:24,
122:25
**ruled** [4] - 27:16,
42:18, 118:14, 130:4
**rules** [4] - 13:19,
44:24, 170:9, 210:21
**ruling** [11] - 7:13,
8:14, 13:21, 25:4,

32:12, 39:1, 129:7,
130:24, 132:20,
239:17
**rulings** [1] - 31:11
**run** [6] - 39:14, 41:12,
148:8, 185:24,
191:13, 196:19
**running** [6] - 76:16,
134:10, 156:23,
157:2, 157:6, 162:6
**runway** [1] - 237:2
**Rx** [1] - 233:12

# S

**s\Ayme** [1] - 241:11
**s\Lisa** [1] - 241:11
**Sacramento** [1] -
53:10
**SafeScript** [2] -
233:13, 233:15
**Safeway** [2] - 205:23,
205:24
**sales** [22] - 51:22,
71:20, 78:11, 78:13,
78:17, 85:21, 88:22,
90:13, 183:11,
192:20, 193:14,
193:15, 193:16,
200:19, 200:23,
200:24, 201:2,
201:5, 201:8
**Sales** [6] - 52:1, 52:3,
52:4, 54:22, 71:22,
95:24
**SALGADO** [1] - 4:15
**San** [2] - 2:5, 2:17
**sat** [1] - 220:11
**satisfied** [1] - 66:7
**satisfy** [1] - 115:8
**save** [1] - 128:23
**saved** [2] - 150:15,
150:20
**saw** [2] - 226:18,
234:1
**SC** [3] - 3:15, 4:4, 4:9
**schedule** [8] - 9:4,
9:11, 154:20, 181:7,
211:20, 226:9,
229:9, 237:20
**Schedule** [4] - 60:13,
181:7, 181:13,
181:14
**scheduled** [2] - 229:9,
236:22
**scheduling** [6] - 9:7,
9:8, 12:25, 236:12,
239:19, 239:20
**Schmidt** [2] - 11:1,
14:4

**SCHMIDT** [4] - 5:9,
11:2, 13:23, 14:5
**scope** [12] - 38:8,
38:15, 46:9, 106:25,
113:10, 130:16,
145:9, 146:7,
146:15, 146:18,
165:7, 211:11
**screen** [6] - 17:13,
55:15, 72:21, 148:2,
206:3, 214:9
**screens** [1] - 212:21
**scripts** [1] - 233:18
**se** [1] - 231:15
**search** [1] - 116:7
**seated** [1] - 26:15
**second** [18] - 8:2,
10:18, 13:8, 19:5,
41:25, 47:19, 63:20,
69:7, 90:12, 107:14,
134:22, 151:2,
177:12, 184:3,
214:11, 232:17,
232:22, 233:24
**secondary** [4] - 86:7,
86:10, 86:13, 88:1
**Section** [1] - 219:24
**section** [5] - 17:1,
52:6, 112:16,
112:18, 195:19
**sections** [2] - 57:4,
182:4
**security** [8] - 76:25,
172:8, 181:3,
194:24, 195:3,
195:6, 195:11,
195:13
**see** [55] - 15:24, 15:25,
18:25, 20:18, 30:17,
30:25, 32:6, 37:22,
42:13, 46:11, 52:24,
73:2, 73:17, 87:25,
89:25, 90:1, 90:3,
91:19, 92:8, 97:8,
99:13, 110:3, 110:8,
112:18, 114:16,
114:17, 114:19,
126:8, 132:21,
135:2, 135:22,
136:3, 136:10,
140:9, 141:15,
150:7, 170:5, 172:4,
172:18, 173:16,
190:14, 191:15,
217:6, 218:9,
222:23, 224:3,
224:8, 232:6,
233:22, 234:5,
234:6, 235:14,
237:15, 240:2,

240:12
**See** [1] - 118:25
**seeing** [4] - 34:20,
59:23, 114:18,
144:11
**seek** [2] - 125:8,
175:16
**seem** [2] - 163:25
**sees** [1] - 8:1
**segment** [3] - 60:22,
84:25, 193:17
**segmentation** [3] -
60:21, 84:24, 87:9
**segmented** [4] -
59:10, 60:19, 84:8,
85:1
**segmenting** [1] -
184:25
**segments** [1] - 59:11
**selection** [1] - 51:15
**self** [2] - 149:2, 199:20
**Self** [1] - 210:3
**self-explanatory** [1] -
149:2
**Self-Questionnaire**
[1] - 210:3
**self-verification** [1] -
199:20
**sell** [1] - 178:16
**semester** [1] - 97:21
**semi** [1] - 134:7
**semi-regular** [1] -
134:7
**send** [6] - 100:14,
120:15, 120:18,
134:14, 174:17,
227:14
**sending** [4] - 101:14,
105:25, 208:15,
218:16
**SENIOR** [1] - 1:17
**senior** [1] - 81:6
**Senior** [6] - 7:2, 18:11,
35:11, 53:1, 54:11,
54:15
**Sensabaugh** [1] - 5:14
**sense** [3] - 11:23,
132:5, 213:19
**sent** [11] - 18:24, 26:5,
72:1, 90:12, 91:5,
102:17, 134:4,
139:16, 158:1,
229:13
**sentence** [1] - 29:11
**separate** [6] - 22:14,
74:4, 87:7, 121:10,
123:22, 166:23
**September** [13] - 16:5,
16:23, 20:1, 63:22,
63:23, 158:5, 158:6,

160:9, 160:14,
165:23, 168:25,
190:12, 204:18
**sequence** [1] - 12:10
**sequencing** [2] - 11:6,
14:1
**serial** [1] - 67:24
**series** [3] - 50:5,
59:21, 71:15
**served** [8] - 27:5,
27:10, 27:18, 45:19,
153:15, 153:17,
156:1, 156:10
**serves** [1] - 70:7
**service** [3] - 42:9,
156:4, 226:18
**Services** [1] - 154:14
**servicing** [1] - 115:14
**set** [19] - 27:25, 29:16,
87:7, 88:6, 91:20,
92:4, 95:12, 120:3,
139:4, 150:1,
179:15, 186:1,
191:19, 193:8,
195:9, 199:1, 199:7,
211:20, 220:19
**set-off** [1] - 88:6
**set-up** [1] - 193:8
**sets** [4] - 55:18, 55:21,
146:6, 197:23
**setting** [11] - 25:13,
138:11, 138:12,
138:14, 156:21,
184:17, 185:2,
185:11, 185:22,
199:22, 200:25
**Settlement** [3] - 47:9,
47:18, 169:4
**settlement** [9] - 42:15,
47:15, 165:4, 168:3,
168:11, 168:15,
168:23, 228:4, 233:2
**seven** [1] - 230:25
**several** [14] - 7:15,
20:9, 20:13, 20:14,
20:15, 66:24, 72:23,
101:11, 104:5,
110:1, 110:2, 119:7,
174:5, 220:8
**SHANNON** [1] - 6:3
**shape** [1] - 42:9
**share** [2] - 169:24,
219:14
**shelf** [3] - 90:9, 179:8,
225:15
**shelves** [1] - 178:22
**shift** [1] - 205:9
**shifting** [1] - 125:21
**ship** [17] - 63:7, 77:14,
77:17, 77:25, 78:2,

103:22, 159:17, 167:18, 168:17, 178:18, 179:20, 179:22, 180:6, 180:9, 180:13, 189:20, 225:23
**shipment** [3] - 41:25, 42:1, 181:15
**shipments** [2] - 181:19, 181:25
**shipped** [9] - 10:4, 65:23, 77:21, 159:8, 159:11, 181:9, 181:10, 189:17, 230:14
**shipping** [2] - 39:12, 77:3
**ships** [1] - 178:21
**Shoppe** [22] - 110:8, 110:11, 110:13, 110:16, 110:19, 111:4, 111:6, 111:11, 111:13, 111:20, 112:3, 112:7, 114:7, 114:8, 114:12, 114:20, 149:19, 209:22, 209:24, 210:4, 214:14, 233:17
**shopping** [1] - 104:10
**short** [1] - 237:16
**shorthand** [1] - 92:17
**shortly** [2] - 67:7, 158:6
**shot** [1] - 10:18
**Show** [2] - 166:17, 166:19
**show** [18] - 41:21, 41:25, 42:1, 42:12, 45:25, 70:21, 110:18, 114:8, 145:4, 145:7, 170:3, 176:6, 189:22, 211:5, 214:21, 221:11, 226:8, 226:10
**showed** [2] - 123:11, 233:8
**showing** [7] - 10:3, 23:6, 32:19, 32:23, 36:19, 129:13, 169:16
**shown** [3] - 169:12, 214:13, 235:5
**shows** [2] - 22:25, 23:2
**shut** [3] - 116:13, 116:25, 233:16
**shutdown** [2] - 117:11, 117:22

**shuts** [1] - 117:15
**side** [3] - 55:24, 129:4, 181:4
**side-bar** [1] - 129:4
**sign** [2] - 82:25, 210:20
**signature** [1] - 71:23
**signed** [3] - 45:3, 45:6, 47:20
**significant** [8] - 46:18, 70:24, 98:1, 98:2, 114:14, 114:18, 116:6, 149:24
**significantly** [1] - 156:9
**similar** [3] - 130:3, 137:9, 197:23
**Simmons** [9] - 151:9, 151:19, 151:22, 156:19, 169:10, 176:7, 182:24, 186:5, 187:5
**simply** [3] - 13:23, 92:16, 111:22
**SINGER** [1] - 4:5
**single** [2] - 87:13, 181:8
**sit** [2] - 226:9, 239:1
**site** [27] - 80:8, 91:15, 91:21, 91:25, 92:3, 92:4, 94:3, 172:14, 174:18, 174:19, 188:7, 188:13, 188:25, 189:6, 193:11, 202:1, 202:4, 202:6, 202:20, 212:9, 216:7, 216:8, 223:9, 229:14, 229:17, 229:22, 231:22
**sits** [1] - 179:8
**sitting** [2] - 43:12, 43:18
**situation** [3] - 10:12, 131:21, 164:17
**situations** [1] - 84:2
**six** [1] - 53:5
**size** [18] - 59:16, 59:18, 59:19, 59:25, 60:21, 60:22, 74:8, 74:10, 74:14, 74:17, 75:1, 75:6, 75:16, 100:13, 139:6, 148:20, 193:17
**sizes** [2] - 95:2, 185:2
**skipping** [1] - 51:20
**skirts** [1] - 110:20
**sleep** [1] - 123:4
**slide** [13] - 50:15, 50:18, 53:8, 53:11,

55:24, 73:18, 76:13, 97:5, 104:7, 104:20, 105:2, 149:16, 155:25
**slides** [17] - 35:14, 50:5, 71:16, 72:12, 101:9, 101:17, 101:18, 101:25, 102:2, 102:3, 102:9, 102:23, 104:20, 105:1, 105:3, 192:13, 193:2
**small** [4] - 60:1, 117:17, 117:20, 195:19
**smaller** [1] - 205:19
**Smith** [2] - 6:4, 6:11
**snapshot** [2] - 212:16, 212:17
**sneaky** [1] - 193:5
**society** [1] - 79:7
**sole** [1] - 29:3
**solid** [1] - 172:5
**SOM** [19] - 34:4, 49:6, 49:19, 78:13, 134:2, 143:6, 196:10, 198:14, 198:20, 206:7, 213:20, 219:13, 220:12, 220:15, 221:11, 221:15, 223:25, 224:3, 226:1
**someone** [8] - 18:13, 21:9, 62:2, 85:25, 86:11, 90:6, 131:17, 238:17
**Sometime** [1] - 109:1
**sometime** [1] - 67:13
**Sometimes** [1] - 83:25
**sometimes** [5] - 83:25, 84:5, 187:7, 226:7
**somewhat** [1] - 72:8
**somewhere** [2] - 108:24, 235:11
**SOMS** [7] - 61:4, 84:17, 85:4, 135:2, 144:16, 144:25, 146:3
**SOP** [24] - 196:15, 196:22, 197:5, 197:19, 197:20, 197:22, 197:25, 198:19, 199:19, 199:22, 199:23, 200:8, 201:12, 201:14, 202:1, 202:2, 202:5, 202:8, 202:19, 202:20, 202:21, 203:16,

203:19, 204:23
**SOPs** [8] - 196:11, 196:13, 196:14, 196:19, 202:24, 203:7, 205:8, 220:14
**SOR** [1] - 148:9
**sorry** [37] - 14:19, 21:7, 26:3, 26:16, 37:8, 40:11, 43:14, 43:16, 47:13, 48:19, 53:7, 58:13, 60:20, 61:9, 61:14, 73:11, 93:11, 100:19, 111:17, 115:21, 133:24, 136:9, 139:22, 140:13, 146:22, 147:13, 152:16, 155:13, 158:22, 162:9, 164:9, 172:6, 177:16, 196:25, 203:22, 231:11, 239:14
**sort** [9] - 57:16, 58:16, 62:19, 73:23, 94:3, 98:9, 114:19, 134:22, 213:16
**sought** [1] - 125:4
**sources** [1] - 212:9
**South** [1] - 2:13
**Southern** [1] - 7:3
**SOUTHERN** [1] - 1:1
**span** [1] - 136:23
**speaks** [1] - 232:23
**special** [6] - 27:15, 107:25, 108:2, 108:6, 240:5
**Special** [2] - 68:23, 145:13
**specialty** [1] - 175:12
**specific** [20] - 11:7, 22:11, 29:7, 65:8, 65:9, 68:10, 75:21, 75:22, 79:18, 116:15, 120:1, 121:10, 126:22, 164:21, 167:11, 212:19, 213:21, 228:12
**specifically** [8] - 8:5, 29:17, 47:20, 86:3, 129:8, 130:8, 214:13, 235:9
**Specifically** [1] - 209:24
**specification** [1] - 78:6
**specificity** [1] - 204:4
**specifics** [4] - 48:13, 85:7, 160:4, 161:15

**specified** [1] - 30:23
**specify** [2] - 31:16, 196:7
**speculating** [1] - 194:15
**speculation** [2] - 117:4, 222:13
**spend** [2] - 46:18, 156:3
**spent** [2] - 132:25, 156:21
**split** [3] - 13:14, 57:4, 171:21
**split-offs** [1] - 57:4
**splitting** [1] - 8:24
**sponsoring** [12] - 28:23, 69:22, 120:4, 120:25, 121:13, 122:12, 123:18, 124:16, 124:17, 125:4, 127:21, 128:9
**spot** [2] - 112:16, 213:10
**spots** [3] - 107:21, 110:3, 110:5
**spreadsheet** [1] - 147:24
**spring** [1] - 67:13
**Square** [2] - 6:5, 6:12
**staff** [7] - 52:12, 65:19, 182:18, 200:24, 201:2, 201:5, 201:8
**Stafford** [2] - 41:15, 166:20
**stage** [2] - 156:22, 186:12
**stages** [4] - 82:20, 92:11, 138:19, 183:20
**stand** [9] - 15:13, 28:10, 30:6, 33:8, 44:11, 66:19, 123:19, 133:17, 236:25
**standard** [5] - 84:22, 153:6, 204:10, 204:12, 207:13
**Standard** [2] - 196:11
**stands** [1] - 108:11
**STANNER** [1] - 5:10
**start** [8] - 18:2, 21:6, 58:9, 84:25, 120:7, 133:23, 183:2, 238:6
**started** [5] - 12:14, 48:15, 107:15, 108:24, 213:6
**starts** [4] - 28:3, 56:1, 87:11, 105:2
**State** [9] - 63:19, 64:2,

143:9, 143:12, 143:19, 156:10, 166:7, 180:8, 180:10
**state** [12] - 28:9, 28:10, 80:25, 81:1, 113:3, 154:5, 156:15, 156:16, 180:11, 196:1, 208:18, 209:5
**statement** [27] - 24:11, 32:13, 36:3, 43:8, 45:1, 51:6, 76:14, 76:18, 97:5, 102:16, 106:24, 114:17, 120:14, 130:7, 130:9, 130:10, 130:15, 131:11, 131:14, 131:16, 132:5, 132:11, 132:13, 140:15, 159:2, 198:11
**statements** [5] - 32:3, 45:5, 131:16, 131:21, 131:22
**STATES** [2] - 1:1, 1:17
**states** [2] - 8:8, 129:24
**States** [3] - 7:2, 39:6, 79:20
**statistics** [1] - 60:17
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**statute** [1] - 155:14
**statutes** [1] - 153:6
**statutory** [4] - 74:1, 159:16, 159:18, 163:5
**stay** [1] - 151:13
**stenography** [1] - 6:19
**step** [2] - 61:4, 73:23
**Step** [3] - 61:6, 63:4
**steps** [3] - 64:21, 154:8, 202:3
**Steve** [17] - 30:18, 30:19, 35:5, 118:22, 120:15, 125:1, 157:1, 171:14, 171:20, 172:5, 172:7, 172:17, 180:25, 181:1, 181:2, 181:4
**STEVEN** [1] - 4:17
**stick** [2] - 64:17, 132:20
**still** [21] - 12:8, 15:14, 27:11, 31:20, 33:2, 62:3, 62:5, 62:10, 69:22, 77:14, 83:10, 83:17, 83:19, 102:21, 133:17, 139:15, 145:24,

158:21, 214:6
**Still** [1] - 83:19
**stimulant** [1] - 114:15
**stimulants** [1] - 116:6
**stipulate** [1] - 25:1
**stipulated** [11] - 8:24, 35:20, 69:14, 69:18, 69:21, 70:16, 70:20, 70:22, 122:10, 122:11, 125:8
**stipulates** [1] - 124:24
**stipulation** [35] - 8:24, 12:4, 24:15, 24:17, 24:22, 27:25, 28:8, 28:20, 28:21, 31:4, 31:6, 32:4, 118:17, 119:13, 119:23, 120:1, 120:6, 120:22, 121:9, 121:20, 123:10, 123:12, 123:22, 123:24, 124:6, 124:11, 124:23, 125:9, 127:14, 127:18, 128:9, 128:10, 128:20
**stipulations** [9] - 32:15, 119:14, 121:3, 121:11, 123:15, 123:20, 124:5, 126:4, 126:20
**stood** [1] - 28:19
**stop** [1] - 204:16
**stopping** [1] - 118:7
**storage** [1] - 49:17
**store** [5] - 81:22, 84:4, 84:7, 206:24, 215:10
**stores** [4] - 81:16, 84:23, 205:18, 207:18
**storing** [1] - 49:14
**story** [5] - 91:19, 91:20, 92:7, 199:24, 218:18
**strategic** [1] - 30:15
**Street** [15] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15, 4:18, 5:5, 5:12, 6:6, 6:13
**streets** [1] - 77:14
**strength** [2] - 148:23, 232:15
**strike** [2] - 96:15, 164:15
**strong** [1] - 235:16
**structure** [3] - 50:20, 206:13, 206:16
**student** [1] - 97:21
**stuff** [1] - 121:7

**sub** [4] - 87:1, 87:9, 185:2
**sub-setting** [1] - 185:2
**subcategorize** [1] - 59:15
**subcategorizing** [1] - 139:5
**subject** [10] - 7:22, 8:6, 19:17, 20:22, 81:12, 128:20, 129:2, 129:5, 130:10, 130:24
**subjected** [2] - 143:6, 143:7
**submission** [3] - 143:11, 143:14, 145:5
**submit** [11] - 10:21, 20:7, 46:14, 69:19, 122:22, 122:23, 128:22, 132:2, 161:3, 190:11, 194:7
**submitted** [9] - 40:21, 40:24, 128:21, 143:8, 145:7, 181:6, 210:4, 222:17, 222:18
**subpoena** [4] - 27:6, 29:21, 120:15, 239:7
**subpoenas** [1] - 27:10
**substance** [11] - 79:7, 79:22, 81:1, 96:5, 96:8, 176:21, 177:24, 178:17, 180:12, 181:9, 211:12
**Substance** [1] - 47:21
**substances** [33] - 59:21, 60:10, 60:13, 77:8, 79:24, 79:25, 81:19, 87:7, 94:21, 96:2, 96:4, 96:6, 96:9, 96:17, 97:3, 98:16, 100:16, 108:10, 112:4, 153:21, 155:5, 167:19, 178:12, 178:14, 179:10, 185:19, 195:23, 207:10, 208:21, 213:20, 219:5, 228:25, 233:12
**Substances** [10] - 73:20, 74:2, 162:7, 162:17, 162:20, 162:22, 163:3, 163:11, 163:24, 230:10
**substantial** [1] - 11:9
**substantially** [2] -

74:11, 75:7
**substantive** [1] - 93:18
**sufficient** [1] - 83:8
**suggesting** [2] - 128:12, 128:17
**suggestion** [1] - 62:18
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12
**summaries** [1] - 137:9
**summary** [7] - 89:15, 89:17, 92:16, 134:23, 137:13, 137:16, 152:6
**supplier** [1] - 88:2
**suppliers** [2] - 218:10, 218:12
**supplies** [2] - 175:4, 175:11
**Supply** [1] - 53:1
**supply** [4] - 54:11, 73:5, 176:4, 211:8
**supplying** [2] - 82:3, 205:14
**support** [2] - 99:14, 187:23
**supposed** [5] - 13:3, 44:11, 197:24, 203:9, 238:19
**surpass** [1] - 103:25
**surprise** [2] - 22:5, 26:7
**surprised** [2] - 25:23, 26:5
**survey** [1] - 196:23
**suspect** [2] - 148:12, 156:2
**suspected** [1] - 107:21
**suspended** [1] - 66:25
**Suspension** [3] - 16:16, 67:11, 107:8
**suspension** [2] - 165:24, 211:2
**Suspicious** [14] - 55:19, 58:24, 77:19, 130:2, 130:12, 144:18, 148:10, 157:17, 157:25, 167:25, 168:16, 182:22, 196:8, 227:18
**suspicious** [69] - 9:23, 39:8, 63:11, 63:15, 63:18, 63:23, 64:1, 74:7, 76:9, 76:19, 76:22, 77:3, 77:6, 77:7, 77:15, 77:17, 77:19, 77:20, 77:25,

78:3, 91:18, 95:8, 95:9, 95:12, 95:20, 95:22, 96:11, 96:12, 96:14, 104:2, 135:4, 136:9, 136:13, 136:18, 141:12, 141:15, 147:7, 148:5, 150:12, 157:24, 159:7, 159:11, 159:17, 159:18, 161:8, 161:10, 161:18, 162:2, 163:8, 168:17, 189:8, 189:10, 189:15, 189:20, 195:1, 195:17, 195:19, 195:23, 195:25, 196:5, 200:5, 201:9, 201:12, 220:23, 221:21, 222:10, 227:8, 227:25
**sustain** [9] - 21:17, 24:4, 47:1, 70:9, 71:6, 78:8, 96:25, 162:13, 191:11
**Sustained** [2] - 114:4, 117:7
**sustained** [8] - 121:19, 126:12, 126:15, 127:5, 128:4, 143:20, 235:22
**SUZANNE** [1] - 4:15
**SVP** [3] - 108:15, 215:2
**swath** [1] - 188:20
**Swedesboro** [5] - 41:14, 53:10, 166:12, 166:14, 223:12
**switch** [2] - 66:13, 83:11
**switched** [1] - 164:10
**Syracuse** [1] - 19:7
**system** [192] - 34:5, 34:15, 39:5, 39:7, 39:14, 39:16, 39:22, 40:6, 40:7, 40:12, 40:14, 40:15, 40:16, 40:18, 40:20, 42:12, 42:25, 47:22, 47:24, 48:10, 48:12, 48:13, 48:15, 48:18, 48:23, 48:24, 49:2, 49:6, 49:19, 51:1, 51:16, 53:12, 53:18, 55:22, 56:9, 56:10, 56:24, 57:2, 57:9, 57:11, 58:17, 59:2, 59:6,

61:3, 61:22, 62:3, 62:24, 63:6, 64:4, 64:9, 66:24, 67:18, 67:19, 67:20, 67:23, 68:2, 68:7, 74:13, 74:17, 74:20, 74:21, 74:25, 75:9, 75:10, 77:7, 78:12, 78:13, 80:4, 84:17, 85:4, 86:5, 86:21, 87:6, 87:24, 89:18, 90:19, 90:20, 90:22, 90:25, 91:4, 92:11, 92:13, 93:5, 93:16, 94:25, 95:1, 96:3, 97:20, 103:17, 103:20, 103:23, 111:7, 114:22, 136:6, 137:1, 138:3, 138:19, 138:20, 138:24, 139:2, 139:4, 139:22, 140:3, 140:20, 141:9, 141:19, 141:20, 141:22, 143:12, 143:15, 144:25, 150:16, 150:21, 154:21, 155:10, 157:23, 158:10, 158:25, 160:13, 161:13, 161:25, 162:4, 162:5, 162:10, 163:7, 163:9, 163:10, 163:13, 163:21, 163:22, 164:25, 172:19, 172:22, 172:23, 172:25, 178:18, 183:4, 184:3, 184:4, 184:6, 184:7, 184:8, 186:18, 190:20, 191:3, 191:5, 191:22, 193:17, 195:22, 196:10, 196:12, 197:5, 203:8, 203:11, 203:15, 206:1, 213:6, 219:14, 219:15, 220:9, 220:10, 220:13, 220:15, 221:2, 221:11, 221:15, 223:25, 224:1, 224:3, 224:6, 226:1, 230:5, 231:6, 231:19, 232:5, 232:11, 232:16, 232:17, 232:19, 234:9
**System** [24] - 52:20,

55:20, 58:25, 130:3, 130:13, 156:24, 157:18, 158:10, 160:15, 160:16, 160:18, 160:19, 168:1, 175:25, 176:1, 176:3, 176:11, 178:9, 178:10, 179:15, 182:22, 196:8, 206:4, 227:18
**systemic** [8] - 42:2, 42:11, 42:20, 42:23, 43:3, 44:20, 48:1, 146:25
**systemically** [1] - 79:19
**systems** [11] - 41:8, 85:8, 93:6, 140:4, 140:5, 144:16, 146:3, 146:7, 146:9, 213:8
**Systems** [1] - 101:4

# T

**table** [2] - 10:3, 236:1
**TAC** [5] - 107:22, 107:25, 109:3, 109:18, 109:19
**tactical** [1] - 10:15
**tactics** [1] - 13:7
**tag** [1] - 111:6
**talks** [2] - 97:7, 146:6
**Team** [11] - 53:9, 65:19, 160:1, 174:14, 174:18, 174:23, 174:24, 174:25, 175:2, 181:18, 181:24
**team** [51] - 18:4, 40:1, 40:2, 40:3, 41:4, 57:14, 57:19, 64:22, 65:14, 65:19, 66:2, 68:3, 75:5, 76:7, 80:15, 80:16, 83:6, 83:7, 83:19, 84:14, 88:6, 91:10, 91:17, 91:21, 92:5, 97:18, 99:18, 105:19, 105:20, 105:21, 105:23, 138:5, 140:6, 141:6, 141:24, 144:22, 147:18, 174:25, 183:10, 186:11, 207:12, 207:17, 213:14, 221:22, 225:23, 226:11, 229:11, 229:13,

234:14
**teasing** [1] - 90:11
**technological** [1] - 76:1
**technologically** [1] - 15:10
**technology** [4] - 39:25, 97:22, 172:23, 184:6
**teed** [1] - 237:2
**TEMITOPE** [1] - 4:8
**ten** [2] - 66:15, 182:5
**ten-minute** [1] - 182:5
**tend** [1] - 81:10
**tender** [2] - 122:19, 128:20
**tendering** [1] - 128:15
**tense** [1] - 171:9
**Tenth** [1] - 5:12
**tenure** [3] - 63:21, 96:10, 182:18
**term** [12] - 48:22, 55:19, 59:12, 125:3, 138:23, 144:17, 146:20, 146:24, 154:1, 177:5, 197:5, 211:7
**terminate** [1] - 58:4, 222:5
**terminated** [4] - 96:1, 96:16, 97:3, 222:7
**terms** [17] - 22:5, 81:23, 84:7, 84:20, 87:18, 131:21, 139:10, 156:1, 156:22, 157:2, 157:5, 165:22, 169:4, 184:17, 185:18, 202:5, 203:9
**test** [6] - 41:19, 142:13, 192:10, 192:11, 192:24
**testified** [21] - 12:9, 13:5, 17:11, 17:17, 20:17, 23:1, 27:10, 34:20, 102:1, 110:14, 127:10, 127:11, 139:23, 145:18, 146:10, 167:23, 191:2, 203:18, 204:11, 225:5, 235:5
**testifies** [2] - 10:18, 13:9
**testify** [6] - 12:17, 28:6, 127:16, 127:25, 163:17, 239:1
**testifying** [4] - 8:19, 110:23, 127:8,

161:12
**testimonies** [1] - 10:10
**testimony** [20] - 8:17, 8:21, 8:25, 10:7, 10:9, 13:15, 21:9, 22:4, 22:17, 30:20, 38:4, 41:11, 41:12, 96:21, 125:25, 128:18, 128:24, 129:3, 143:17, 204:14
**testing** [1] - 193:2
**tests** [2] - 38:14, 175:18
**Texas** [3] - 41:15, 166:20, 166:21
**text** [1] - 233:24
**THE** [268] - 1:1, 1:1, 1:4, 1:17, 7:6, 7:9, 7:11, 11:1, 13:17, 14:3, 14:8, 14:14, 14:25, 15:5, 15:10, 15:16, 15:17, 17:15, 21:12, 21:14, 22:7, 23:5, 23:19, 23:25, 24:3, 24:7, 24:12, 24:17, 24:21, 25:4, 25:10, 25:17, 25:22, 26:1, 26:8, 26:11, 27:1, 27:4, 27:8, 30:4, 31:8, 32:5, 32:18, 33:4, 33:8, 33:22, 34:8, 34:11, 35:15, 36:5, 36:12, 36:16, 36:18, 38:19, 38:23, 39:1, 41:9, 42:19, 43:25, 44:8, 44:11, 44:14, 44:18, 44:25, 45:11, 45:25, 46:21, 46:25, 47:4, 47:16, 47:25, 48:5, 49:22, 53:17, 53:18, 55:13, 66:14, 66:18, 66:20, 68:12, 69:3, 69:10, 69:17, 70:1, 70:9, 71:6, 71:15, 72:17, 72:19, 75:25, 78:7, 93:10, 93:15, 93:19, 93:22, 94:5, 94:8, 96:22, 96:25, 101:22, 102:24, 102:25, 103:1, 103:2, 103:5, 103:10, 104:17, 104:19, 104:21, 104:22, 104:24, 106:13, 106:17, 106:21, 107:2, 110:24, 113:11,

113:12, 114:4, 117:7, 118:5, 118:9, 118:13, 118:25, 119:4, 119:15, 119:20, 121:3, 121:6, 122:2, 123:20, 124:3, 125:10, 125:14, 126:2, 126:9, 126:20, 126:24, 127:14, 129:14, 129:17, 129:20, 129:22, 130:21, 132:19, 132:25, 133:7, 133:13, 133:16, 133:19, 134:19, 137:25, 142:11, 142:16, 142:21, 142:24, 143:20, 145:13, 145:15, 145:16, 145:24, 146:16, 146:24, 147:1, 151:3, 151:6, 151:13, 151:16, 151:21, 161:21, 162:13, 163:16, 164:6, 164:9, 164:16, 165:11, 165:14, 166:2, 166:4, 169:21, 170:5, 170:12, 170:14, 173:15, 173:18, 175:21, 175:22, 176:9, 177:10, 177:12, 177:15, 177:17, 177:21, 182:5, 182:9, 190:4, 190:7, 191:11, 191:15, 194:16, 194:17, 197:13, 198:5, 198:8, 198:10, 198:11, 199:11, 199:14, 200:13, 200:16, 201:18, 201:21, 202:13, 202:16, 203:20, 203:22, 204:1, 204:3, 204:7, 205:2, 205:4, 205:6, 209:15, 209:18, 210:12, 210:15, 211:13, 211:15, 211:18, 211:19, 211:21, 213:25, 214:3, 215:20, 215:23, 217:1, 217:4, 222:15, 222:16, 222:19, 228:6, 230:18,

230:22, 230:25, 231:2, 233:1, 233:2, 235:9, 235:14, 235:22, 236:3, 236:6, 236:9, 236:14, 236:16, 236:17, 237:4, 237:9, 237:12, 237:24, 238:14, 239:4, 239:7, 239:12, 239:23, 240:1, 240:9, 240:11
**themselves** [5] - 65:10, 85:5, 85:8, 155:12, 179:2
**theoretically** [1] - 127:24
**thereafter** [1] - 67:7
**thereby** [1] - 179:2
**therefore** [1] - 229:24
**Therefore** [2] - 116:19, 118:17
**They've** [1] - 239:19
**they've** [1] - 14:23
**third** [10] - 8:8, 42:1, 120:10, 122:14, 123:15, 123:25, 133:11, 136:8, 143:4, 143:5
**third-party** [4] - 122:14, 123:25, 143:4, 143:5
**Thomas** [1] - 2:12
**Three** [1] - 6:5
**three** [24] - 6:12, 27:9, 27:18, 28:2, 28:12, 52:12, 52:21, 60:14, 61:1, 61:2, 64:17, 93:23, 97:20, 121:10, 124:12, 139:15, 143:10, 158:13, 158:16, 194:4, 205:25, 225:6, 225:7, 234:17
**three-year** [3] - 194:4, 225:6, 225:7
**threshold** [98] - 56:17, 56:21, 56:22, 56:24, 57:1, 57:13, 61:5, 62:1, 62:8, 64:5, 64:7, 64:20, 64:23, 64:25, 65:3, 74:16, 74:19, 74:21, 74:22, 74:23, 74:25, 75:13, 75:15, 75:16, 75:17, 75:19, 83:3, 86:2, 86:4, 86:5, 86:11, 86:12, 86:16, 86:20, 86:24, 87:7, 87:15, 87:24, 88:1, 88:4,

88:5, 88:14, 88:15, 93:13, 93:20, 95:16, 97:7, 97:11, 97:13, 98:3, 98:5, 98:10, 98:23, 98:25, 99:1, 99:2, 99:24, 99:25, 100:1, 100:4, 100:7, 100:9, 103:25, 117:24, 135:6, 135:8, 135:10, 135:11, 136:5, 138:9, 138:24, 140:1, 140:8, 140:10, 140:18, 174:13, 184:18, 184:19, 185:11, 185:22, 186:1, 198:20, 199:19, 199:20, 199:22, 199:23, 200:2, 200:19, 201:13, 207:13, 211:17, 212:14, 212:19, 212:22
**thresholds** [41] - 56:12, 58:20, 58:22, 59:6, 59:8, 64:7, 64:16, 65:18, 83:5, 84:25, 85:18, 85:20, 86:1, 86:18, 87:2, 94:4, 138:7, 138:11, 138:14, 138:16, 139:3, 139:11, 139:20, 139:23, 143:3, 150:1, 184:13, 184:17, 185:3, 185:5, 193:20, 199:2, 199:4, 199:7, 200:25, 201:3, 207:9, 207:18, 207:19, 220:20
**throes** [1] - 139:8
**throughout** [1] - 136:23
**throw** [1] - 146:11
**thumb** [3] - 15:3, 15:9, 221:10
**Thursday** [1] - 238:20
**Tim** [1] - 52:16
**timeline** [1] - 107:6, 165:22
**timetable** [1] - 156:22
**timing** [2] - 99:16, 215:25
**TIMOTHY** [1] - 5:9
**tired** [1] - 240:11
**title** [4] - 50:18, 71:19, 73:18, 154:14
**today** [7] - 20:16, 93:4,

102:13, 138:25, 219:13, 220:17, 240:9
**Todd** [3] - 16:25, 17:9, 157:5
**together** [8] - 94:1, 156:13, 190:20, 196:10, 197:20, 198:21, 198:24, 229:11
**tomorrow** [7] - 236:20, 236:23, 237:23, 238:10, 238:15, 239:22, 240:3
**tonight** [2] - 123:7, 240:7
**Tony** [1] - 71:11
**took** [13] - 15:14, 48:10, 60:7, 60:13, 60:21, 62:16, 81:6, 158:9, 165:17, 172:23, 173:23, 184:20, 229:12
**tool** [1] - 155:2
**tools** [2] - 138:5, 200:4
**tooth** [1] - 130:25
**top** [9] - 82:18, 82:23, 84:16, 111:11, 114:23, 115:17, 184:10, 229:13, 232:13
**topics** [1] - 66:13
**total** [7] - 10:6, 59:19, 59:20, 81:17, 90:1, 90:3, 233:12
**totality** [20] - 65:11, 76:20, 82:15, 82:22, 91:20, 92:14, 92:18, 96:2, 96:6, 96:17, 97:4, 102:6, 113:21, 117:25, 118:2, 118:3, 184:20, 186:23, 189:12, 207:20
**totally** [3] - 9:7, 185:14, 185:16
**toward** [1] - 213:13
**towards** [1] - 166:5
**Tower** [2] - 3:4, 4:18
**town** [6] - 116:10, 117:17, 117:19, 117:20, 237:10
**track** [2] - 30:22, 140:3
**tracked** [5] - 139:21, 140:1, 140:11, 140:20, 141:12
**tracking** [1] - 139:23
**train** [1] - 188:21

**Training** [1] - 71:22
**training** [9] - 51:15, 71:21, 72:6, 72:9, 192:4, 192:8, 192:15, 196:17, 207:25
**transactional** [1] - 9:25
**transcript** [3] - 6:19, 127:4, 241:4
**transcripts** [1] - 11:14
**transition** [1] - 151:12
**transitioning** [1] - 81:21
**transparent** [1] - 221:14
**treated** [6] - 99:10, 112:7, 112:9, 112:12, 184:22, 207:7
**Treated** [1] - 112:11
**tremendous** [1] - 128:23
**trends** [2] - 41:25, 42:1
**Trial** [1] - 240:13
**trial** [18] - 8:12, 21:22, 27:19, 28:6, 29:3, 29:5, 29:8, 29:9, 29:15, 29:18, 29:21, 118:21, 120:7, 120:11, 125:1, 131:3, 132:2, 132:9
**TRIAL** [1] - 1:16
**tried** [3] - 53:4, 156:3, 237:14
**trigger** [3] - 61:25, 65:22, 135:9
**triggered** [1] - 61:23, 61:24
**triggering** [19] - 58:17, 59:2, 61:3, 61:5, 61:6, 61:20, 62:10, 74:13, 75:13, 75:18, 91:23, 95:17, 103:20, 103:23, 135:17, 135:25, 136:5, 136:16, 136:20
**triggers** [2] - 62:3, 62:19
**triple** [1] - 60:11
**tripled** [1] - 60:9
**tripling** [1] - 139:6
**true** [3] - 8:2, 45:6, 86:24
**truncated** [1] - 128:18
**truth** [13] - 11:22, 15:15, 23:7, 24:9, 32:14, 32:21, 36:4,

43:10, 44:5, 106:16, 106:17, 131:2, 132:14
**try** [10] - 12:7, 21:22, 45:12, 55:5, 129:15, 143:11, 187:3, 196:19, 231:1, 237:15
**trying** [14] - 7:7, 22:18, 26:20, 29:24, 42:2, 54:20, 63:1, 77:23, 81:7, 118:1, 129:10, 173:13, 206:23, 237:9
**Turn** [1] - 73:11
**turn** [19] - 19:22, 21:6, 37:19, 47:19, 52:23, 54:19, 55:8, 69:7, 73:1, 78:10, 80:1, 86:12, 97:6, 103:15, 104:4, 134:22, 136:8, 197:1, 214:11
**Twelfth** [3] - 4:13, 4:15, 5:5
**twice** [3] - 12:7, 30:13, 152:10
**two** [40] - 13:7, 16:6, 16:8, 16:10, 16:13, 22:14, 22:16, 38:4, 41:22, 49:18, 53:4, 57:4, 72:5, 73:23, 80:25, 90:8, 93:6, 106:2, 112:21, 112:23, 123:16, 127:1, 131:9, 131:13, 136:21, 137:4, 156:1, 161:12, 166:9, 171:21, 208:9, 212:2, 216:21, 223:2, 223:3, 223:4, 233:25
**two-step** [1] - 73:23
**type** [17] - 85:4, 91:3, 99:13, 118:1, 137:9, 138:15, 148:23, 166:25, 184:24, 188:5, 188:19, 191:24, 207:1, 210:7, 211:9, 212:6, 213:16
**types** [7] - 59:23, 81:5, 153:1, 175:8, 188:22, 212:2, 232:12

**U**

**ultimately** [5] - 30:12, 57:10, 68:22, 168:3,

181:11
**unclear** [1] - 51:22
**under** [23] - 13:19,
13:20, 15:14, 45:1,
47:24, 52:7, 63:6,
80:4, 82:11, 85:20,
112:16, 118:17,
131:15, 133:17,
136:6, 162:6, 163:2,
171:20, 180:25,
231:6, 238:17, 239:7
**underlie** [1] - 8:18
**underneath** [2] -
172:18, 205:18
**understood** [4] -
127:4, 158:9, 161:9,
214:23
**undertake** [1] - 177:25
**undoubtedly** [4] -
101:18, 141:20,
144:24, 204:5
**undue** [1] - 11:21
**unduly** [1] - 240:4
**unfair** [1] - 75:12
**unfairness** [1] - 46:19
**unfortunate** [1] -
174:9
**unique** [3] - 11:4,
59:9, 84:22
**unit** [1] - 188:19
**United** [3] - 7:2, 39:6,
79:20
**UNITED** [2] - 1:1, 1:17
**units** [2] - 10:3, 10:6
**universally** [1] - 7:19
**University** [1] - 152:9
**unless** [5] - 22:7,
22:11, 94:21,
204:13, 217:15
**unresolved** [2] -
29:13, 118:19
**unusual** [13] - 12:6,
12:10, 13:14, 74:8,
74:10, 74:11, 74:14,
74:17, 74:20, 75:6,
75:7, 75:23, 75:24
**unwieldiness** [1] -
12:2
**unwieldy** [1] - 11:10
**up** [82] - 7:17, 8:25,
13:14, 13:25, 14:9,
15:5, 30:7, 30:18,
30:24, 44:11, 52:12,
55:15, 55:23, 56:18,
58:8, 65:7, 66:10,
72:21, 73:16, 75:11,
80:20, 82:12, 83:8,
86:12, 91:20, 92:4,
99:24, 100:5, 105:1,
107:20, 108:23,

119:11, 120:12,
122:7, 122:18,
123:11, 124:11,
126:6, 127:21,
128:18, 139:11,
141:15, 142:10,
146:3, 147:24,
151:22, 154:14,
161:7, 169:7,
169:23, 170:6,
170:14, 171:23,
172:16, 174:1,
176:7, 177:8, 182:9,
187:2, 187:5, 190:8,
192:15, 193:8,
196:11, 196:24,
204:16, 212:1,
214:9, 215:6,
225:15, 226:8,
226:10, 234:8,
235:6, 235:10,
236:1, 237:2, 237:3,
238:11, 238:21,
238:24, 239:2
**update** [2] - 50:6,
202:23
**updated** [5] - 168:24,
201:14, 202:24,
226:1, 226:3
**updating** [1] - 203:1
**upending** [1] - 9:4
**upper** [3] - 135:1,
137:12, 137:15
**useful** [3] - 12:19,
12:20, 125:24
**Utilization** [5] - 89:5,
89:8, 89:12, 89:14,
89:24
**utilize** [1] - 78:10
**utilized** [1] - 131:7

**V**

**vaguely** [1] - 165:5
**Valencia** [7] - 67:4,
67:8, 67:21, 70:18,
71:2, 71:4, 235:19
**valid** [1] - 179:14
**validate** [2] - 63:10,
81:10
**validation** [2] - 81:13,
99:12
**validity** [1] - 212:11
**Van** [3] - 112:24,
112:25
**varied** [1] - 90:19
**various** [3] - 196:12,
208:23, 227:4
**vault** [6] - 161:6,
172:13, 180:24,

195:10, 224:2,
225:11
**vehicle** [2] - 31:1,
31:18
**Ventura** [1] - 3:18
**verification** [3] -
91:24, 199:20, 224:7
**verified** [1] - 91:15
**verify** [3] - 212:7,
212:8, 224:5
**version** [3] - 36:2,
58:9, 92:17
**versions** [2] - 20:16,
20:19
**Veterinary** [1] - 153:17
**vetted** [1] - 116:5
**Vice** [3] - 18:11, 35:11,
54:15
**vice** [1] - 73:4
**video** [1] - 72:5
**view** [1] - 12:4
**views** [1] - 125:18
**vigilant** [1] - 8:9
**Vince** [1] - 229:10
**violation** [1] - 217:16
**violations** [2] - 47:21,
47:22
**VIRGINIA** [2] - 1:1,
1:18
**Virginia** [27] - 4:18,
7:3, 7:4, 38:9, 38:11,
41:17, 63:19, 64:2,
112:24, 112:25,
114:7, 114:9,
114:12, 148:6,
149:20, 167:14,
167:19, 167:20,
180:8, 194:6, 196:2,
214:15, 216:11,
227:7, 227:13,
227:19, 227:25
**virtually** [1] - 28:1
**vis** [2] - 31:5
**vis-a-vis** [1] - 31:5
**visibility** [1] - 78:20
**vision** [1] - 213:7
**visit** [27] - 80:8, 91:15,
91:21, 91:25, 92:3,
92:4, 174:18,
174:19, 187:8,
187:11, 188:14,
188:25, 193:11,
212:10, 216:7,
216:8, 216:14,
216:21, 222:25,
223:7, 223:21,
223:23, 224:7,
224:18, 229:2,
231:22, 232:2
**visited** [9] - 188:23,

215:11, 215:13,
215:15, 223:5,
223:15, 231:25,
232:3
**visits** [7] - 188:7,
189:6, 223:9,
223:10, 224:10,
224:17, 229:14
**visual** [1] - 134:2
**voice** [3] - 177:8,
177:19, 196:24
**voiced** [1] - 229:5
**volume** [10] - 75:14,
75:18, 75:20, 108:9,
108:11, 135:8,
135:12, 135:14,
218:12
**VOLUME** [1] - 1:16
**voted** [1] - 153:25
**VP** [4] - 53:1, 53:4,
54:11, 108:15
**vs** [1] - 241:6

**W**

**wait** [3] - 99:2, 125:10,
239:15
**waiting** [2] - 198:4,
239:1
**waive** [2] - 131:4,
165:10
**waived** [1] - 131:5
**waiver** [1] - 32:15
**waiving** [1] - 165:11
**WAKEFIELD** [1] - 5:13
**Walgreens** [1] -
205:21
**walk** [5] - 66:20,
86:17, 107:19,
182:21, 191:7
**walked** [2] - 169:6,
210:7
**walking** [1] - 133:4
**wants** [3] - 33:2,
118:1, 123:1
**warehouse** [2] -
184:7, 184:8
**warrant** [2] - 45:18,
46:10
**warrants** [2] - 16:10,
16:13
**Washington** [10] -
2:11, 4:7, 4:14, 4:16,
5:5, 5:12, 41:14,
147:15, 166:7,
168:20
**waste** [2] - 11:20,
42:17
**watching** [1] - 192:13
**Watson** [2] - 143:7,

143:18
**Wayne** [1] - 110:21
**ways** [2] - 173:24,
188:11
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**Wednesday** [1] -
238:19
**week** [9] - 8:17, 8:23,
120:10, 220:3,
220:4, 220:6, 220:8,
224:8, 238:12
**weekend** [1] - 238:7
**weeks** [1] - 13:3
**weight** [1] - 42:21
**Welcome** [1] - 182:12
**welcome** [1] - 42:14
**Werthammer** [6] -
237:1, 237:7,
237:19, 237:22,
238:22, 239:23
**WEST** [2] - 1:1, 1:18
**West** [26] - 7:3, 7:4,
38:9, 38:11, 41:17,
63:19, 64:2, 112:24,
112:25, 114:7,
114:9, 114:12,
148:6, 149:20,
167:14, 167:19,
167:20, 180:8,
194:5, 196:1,
214:15, 216:10,
227:7, 227:13,
227:18, 227:25
**whatsoever** [1] -
113:1
**Wheeling** [9] - 41:17,
149:8, 149:10,
149:13, 167:13,
167:16, 193:23,
194:5, 194:9
**whereas** [1] - 125:22
**whereby** [7] - 91:16,
94:1, 184:7, 184:19,
203:11, 225:8,
226:22
**white** [2] - 15:25, 16:1
**whole** [8] - 23:20,
26:20, 32:20, 71:24,
121:6, 144:9, 229:13
**wholesale** [5] -
155:13, 155:17,
175:3, 175:7, 175:13
**wholesaler** [4] -
81:18, 81:22, 86:6,
86:10
**wholesalers** [1] -
155:20
**WICHT** [1] - 4:12
**wide** [2] - 97:17, 195:9

**Williams** [2] - 4:13, 5:4
**willing** [3] - 126:13, 238:6, 238:23
**window** [1] - 225:7
**wish** [2] - 13:22, 176:21
**withdraw** [1] - 28:15
**witness** [75] - 10:23, 13:15, 14:7, 15:13, 17:14, 20:21, 21:4, 21:16, 22:9, 23:14, 25:8, 26:23, 27:3, 28:24, 29:15, 29:23, 30:6, 31:1, 31:6, 31:9, 31:11, 31:15, 33:8, 33:20, 35:22, 43:20, 43:21, 43:24, 44:1, 49:20, 66:19, 68:19, 69:2, 69:15, 69:22, 70:5, 101:24, 102:1, 118:21, 118:22, 118:24, 120:5, 120:12, 120:25, 121:13, 121:21, 122:12, 123:18, 124:16, 124:18, 125:4, 127:22, 128:9, 128:18, 133:16, 133:18, 133:21, 142:9, 145:4, 145:7, 151:5, 163:12, 164:14, 170:10, 190:3, 190:22, 190:25, 203:18, 204:11, 235:5, 236:7, 236:21, 236:22, 238:22, 239:2
**WITNESS** [32] - 15:16, 53:18, 66:20, 71:15, 93:15, 93:22, 94:8, 102:25, 103:2, 104:19, 104:22, 113:12, 145:15, 151:21, 166:4, 173:18, 175:22, 176:9, 177:10, 177:12, 177:15, 177:17, 177:21, 194:17, 198:11, 203:22, 204:3, 211:15, 211:19, 222:16, 233:2, 236:16
**witness's** [2] - 128:24, 164:12
**witnesses** [31] - 8:19, 9:2, 9:4, 9:6, 9:8,

9:10, 11:18, 11:21, 23:15, 28:14, 29:3, 29:21, 30:12, 31:17, 31:18, 122:17, 123:10, 123:11, 123:17, 123:19, 124:19, 124:20, 124:21, 125:5, 125:9, 126:19, 169:23, 236:20, 238:5
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**wonderful** [1] - 152:15
**word** [1] - 195:7
**words** [1] - 195:24
**works** [1] - 62:9
**world** [1] - 131:17
**worse** [1] - 15:6
**worth** [1] - 44:20
**write** [2] - 101:7, 188:6
**writes** [1] - 203:11
**writing** [1] - 115:11
**written** [5] - 53:8, 178:2, 180:17, 208:9, 208:22
**wrongdoing** [1] - 168:12
**wrote** [3] - 27:21, 155:3, 178:25
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10, 3:13, 4:19, 5:15, 6:9

## Y

**year** [3] - 194:4, 225:6, 225:7
**years** [8] - 93:4, 93:5, 93:7, 101:19, 156:9, 164:2, 185:21, 227:1
**yesterday** [9] - 7:13, 15:14, 15:23, 17:11, 17:17, 20:16, 33:17, 37:25, 46:15
**York** [1] - 3:5
**yourself** [1] - 105:15

## Z

**Zanesville** [1] - 19:3
**Zimmerman** [1] - 124:25