# Appendix C

Highly Confidential - Subject to Further Confidentiality Review

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE NORTHERN DISTRICT OF OHIO

3     EASTERN DIVISION

4     - - -

5

6  IN RE:  NATIONAL    :  HON. DAN A.
   PRESCRIPTION OPIATE  :  POLSTER
   LITIGATION       :

7                 :
   APPLIES TO ALL CASES :  NO.

8                 :  1:17-MD-2804
                 :

9

     - HIGHLY CONFIDENTIAL -

10

  SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

       VOLUME I

12

13      - - -

14     April 17, 2019

15      - - -

16     Videotaped deposition of

17  THOMAS PREVOZNIK, taken pursuant to
   notice, was held at the law offices of

18  Williams & Connolly, 725 12th Street,
   Washington, D.C., beginning at 9:11 a.m.,

19  on the above date, before Michelle L.
   Gray, a Registered Professional Reporter,

20  Certified Shorthand Reporter, Certified
   Realtime Reporter, and Notary Public.

21      - - -

22

23    GOLKOW LITIGATION SERVICES
   877.370.3377 ph | 917.591.5672 fax
       deps@golkow.com

24

1    Q.    In that time period, you

2  were still in the field offices or

3  training, so you would not have attended

4  any of the distributor briefings

5  personally --

6    A.    Correct.

7    Q.    -- Mr. Prevoznik?

8    A.    Correct.

9    Q.    Why don't we finish out your

10  experience, and then we'll take a short

11  break.  Is that okay?

12    A.    Sure.

13    Q.    With respect to conferences,

14  just to close the loop on those, and we

15  may have further questioning on this,

16  were there -- you mentioned there was a

17  Pharma conference in 2011?

18    A.    I didn't --

19    Q.    Or for the pharmaceutical

20  industry?  I could have that wrong.  Was

21  there a separate conference for

22  pharmaceutical manufacturers?

23    A.    There was -- the distributor

24  conference came later, but there was an

Highly Confidential - Subject to Further Confidentiality Review

1    and the registrant community, get

2    together to talk about putting together a

3    suspicious order system for chemicals.

4    So that's what this was.  This was a

5    requirement by the Act for us to sit down

6    and come up with a monitoring system.

7         Q.    And so DEA officials

8    participated in the task force, correct?

9         A.    Correct.

10        Q.    If you take a look at the

11   bottom there, where there are some

12   numbers, and look at 2283.

13        A.    I'm sorry.  I'm losing you.

14   Okay, I got you.

15        Q.    So at 2283 forward, there is

16   the membership of the suspicious orders

17   task force, correct?

18        A.    Correct.

19        Q.    And the chairman is from the

20   DEA office of diversion control; is that

21   right?

22        A.    Correct.

23        Q.    And then it looks like there

24   are also various DEA employees from

Highly Confidential - Subject to Further Confidentiality Review

1    system in use by wholesale drug

2    distributors for controlled substances,

3    do you see that reference that you just

4    read?

5         A.    Yes.

6         Q.    Is it fair to say then,

7    there was in fact at this point in time,

8    in 1998, a DEA-approved suspicious order

9    monitoring system for controlled

10   substances?

11        A.    I would say no, because

12   there was never a -- DEA never had an

13   approved system.  The system that the

14   statute requires and the regulations

15   require is the registrant is to design

16   and operate that system.

17             They come to us and they

18   say, here's our system, and we may have

19   discussions with them about it.  So you

20   can have a great system in paper, but

21   when you implement it, are you actually

22   implementing what you say.

23             So that's part of our job,

24   when we go out there for schedule

1    investigation, is to look at that program

2    and are they doing what they're saying,

3    is it actually detecting suspicious

4    orders.

5           Q.    So, Mr. Prevoznik, try to

6    listen to my question and answer it.  I

7    realize that you would like to speechify

8    a little bit and get out your talking

9    points, but please restrain --

10               MR. FINKELSTEIN:  Try not to

11          argue with the witness.

12    BY MS. MAINIGI:

13          Q.    -- from doing that.

14               MR. FINKELSTEIN:  You can

15          ask your questions.  And you're

16          not here to abuse him.

17    BY MS. MAINIGI:

18          Q.    So, Mr. Prevoznik, let's

19    back up.  The DEA helped to write this

20    report, right?

21          A.    Correct.

22          Q.    And someone from the office

23    of diversion control at the DEA was in

24    fact the chair of the group that wrote

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. MAINIGI:

2          Q.    So, the -- I'm sorry.

3          A.    Go ahead.

4          Q.    I didn't mean to interrupt

5    you.  Are you --

6          A.    Yeah.

7          Q.    Okay.  So in '05, '06 and

8    '07, as I understand it from Mr. Wright's

9    testimony, he and Mr. Mapes primarily

10   handled the distributor initiative

11   briefings, correct?

12         A.    Correct.

13         Q.    And you have talked to

14   neither Mr. Wright nor Mr. Mapes,

15   correct?

16         A.    Correct.

17         Q.    So you don't know sitting

18   here today what Mr. Mapes or Mr. Wright

19   said or heard in those distributor

20   initiative briefings, correct?

21               MR. FINKELSTEIN:  Objection.

22         Argumentive.

23               THE WITNESS:  No.

24   BY MS. MAINIGI:

1　　　IN THE UNITED STATES DISTRICT COURT
2　　　　FOR THE NORTHERN DISTRICT OF OHIO
3　　　　　　　　EASTERN DIVISION
4　　　　　　　　　-　-　-
5

　　IN RE:　NATIONAL　　　　:　HON. DAN A.
6　　PRESCRIPTION OPIATE　　:　POLSTER
　　LITIGATION　　　　　　　:
7　　　　　　　　　　　　　　:
　　APPLIES TO ALL CASES　　:　NO.
8　　　　　　　　　　　　　　:　1:17-MD-2804
　　　　　　　　　　　　　　:
9

　　　　　　- HIGHLY CONFIDENTIAL -
10
　　SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
　　　　　　　　　　VOLUME II
12

　　　　　　　　　-　-　-
13

　　　　　　　April 18, 2019
14

　　　　　　　　　-　-　-
15
16　　　　　　　Continued videotaped
　　deposition of THOMAS PREVOZNIK, taken
17　　pursuant to notice, was held at the law
　　offices of Williams & Connolly, 725 12th
18　　Street, Washington, D.C., beginning at
　　8:16 a.m., on the above date, before
19　　Michelle L. Gray, a Registered
　　Professional Reporter, Certified
20　　Shorthand Reporter, Certified Realtime
　　Reporter, and Notary Public.
21
　　　　　　　　　-　-　-
22

　　　　　GOLKOW LITIGATION SERVICES
23　　　877.370.3377 ph | 917.591.5672 fax
　　　　　　　deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

1   terminate controlled substance sales to

2   the customer and report the termination

3   to the DEA."

4             Do you understand what I

5   just read to you?

6             MS. MAINIGI:  Objection.

7        Form.  Objection.  Scope.

8             THE WITNESS:  Can I get the

9        first -- the first part of the

10       question?

11  BY MR. FARRELL:

12       Q.    Yes.  So specifically what

13  I'm referencing is Cardinal Health's

14  reply brief, in Cardinal Health versus

15  Eric Holder, which was a preliminary

16  injunction filed by Cardinal Health in a

17  DC District Court.  And in it -- in the

18  reply brief there's a provision in here

19  that I read to you.  And in essence what

20  it says is that if you get a suspicious

21  order, and you block it, that Cardinal

22  Health would terminate that customer and

23  not sell to it anymore.

24             Do you agree that if a

Highly Confidential - Subject to Further Confidentiality Review

1   wholesale distributor gets a flag of a

2   suspicious order, that they've determined

3   to be a suspicious order, and that they

4   block that shipment, that they should

5   terminate all future sales to that same

6   customer until they can rule out that

7   diversion is occurring?

8           MS. MAINIGI:  Objection.

9       Form.  Objection.  Scope.  Calls

10      for a hypothetical.

11          MR. EPPICH:  Objection to

12      the foundation.  Calls for

13      speculation.

14          THE WITNESS:  Yes, I would

15      agree.

16  BY MR. FARRELL:

17      Q.    The same thing applies to a

18  document involving McKesson.

19          On August 13, 2014, the

20  United States Department of Justice was

21  communicating with the lawyer for

22  McKesson which ended up resulting in a

23  $150 million fine.

24          And in this discussion, the

Highly Confidential - Subject to Further Confidentiality Review

1    attached to this in the Cardinal Health

2    files, is a cover sheet that says letters

3    from DEA approving the format.

4              And if you look, the first

5    letter is dated April 27, 1984.

6              Are you familiar with this

7    correspondence?

8              MS. MAINIGI:  Objection.

9         Outside the scope.  It's 1984.

10        Form and foundation.

11             MR. FARRELL:  Well, the

12        irony of it is, is that Cardinal

13        Health specifically referenced

14        this document in its combined

15        discovery responses.

16             So I'm going to ask you --

17             MS. MAINIGI:  Outside the

18        scope of this deposition.

19             MR. FARRELL:  I'm going to

20        ask the witness again --

21   BY MR. FARRELL:

22        Q.   Are you familiar with this

23   document?

24        A.   No.

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3
      IN RE: NATIONAL         )
 4    PRESCRIPTION            )   MDL No. 2804
      OPIATE LITIGATION       )
 5    _____ )   Case No.
                              )   1:17-MD-2804
 6                            )
      THIS DOCUMENT RELATES   )   Hon. Dan A.
 7    TO ALL CASES            )   Polster
 8
                 FRIDAY, MAY 17, 2019
 9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                      - - -
12         Videotaped deposition of Thomas
13    Prevoznik, Volume III, held at the offices of
14    WILLIAMS & CONNOLLY LLP, 725 Twelfth Street,
15    NW, Washington, DC, commencing at 8:10 a.m.,
16    on the above date, before Carrie A. Campbell,
17    Registered Diplomate Reporter and Certified
18    Realtime Reporter.
19
20
21                      - - -
22
             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
25
```

```
 1                    It's called Summary of DEA HDMA

 2      meeting, December 19, 2011.

 3                    Do you recall a meeting between

 4      the DEA and HDMA in 2011?

 5                    MR. EPPICH:  Objection.

 6           Foundation.

 7                    THE WITNESS:  I don't.

 8      QUESTIONS BY MS. SINGER:

 9           Q.    The DEA did meet with the HDMA

10      periodically, correct?

11                    MR. EPPICH:  Objection.

12           Foundation.

13                    THE WITNESS:  Correct.

14      QUESTIONS BY MS. SINGER:

15           Q.    Okay.  And down at the bottom

16      of the page here, in the last paragraph, it

17      says, "HDMA asked if there was any -- if

18      there were any noncompliance trends

19      throughout the wholesale distribution

20      industry we should inform our members about."

21                    Do you see where I am?

22           A.    Yes.

23           Q.    Okay.  "Gary Boggs" --

24                    Who we talked about just a

25      minute ago, correct?
```

1    can say DEA policy is that they should not.

2         Q.    Okay.  I appreciate that.

3               And I believe you testified

4    that the DEA has consistently advised

5    registrants that they should not ship an

6    order that they report as suspicious; is that

7    correct?

8         A.    Correct.

9         Q.    And when you say

10   "consistently," you were referring to the

11   time period from 1971 when the Controlled

12   Substances Act was passed until present day;

13   is that right?

14        A.    Yes.

15        Q.    So approximately a 50-year

16   period.  Your testimony is that the DEA

17   guidance on that point has been consistent,

18   correct?

19        A.    Correct.

20        Q.    All right.  You joined the DEA

21   in 1991, correct?

22        A.    Yes.

23        Q.    In my home city of

24   Philadelphia?

25        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      No.

 2        Q.      And you did not speak with Kyle

 3   Wright, correct?

 4        A.      No.

 5        Q.      There was a reference to a Tom

 6   Gitchel earlier today; is that right?

 7        A.      Tom Gitchel, yes.

 8        Q.      And who is Tom Gitchel?

 9        A.      Tom Gitchel was a senior

10   manager within the diversion program at DEA.

11        Q.      Okay.  And did you speak with

12   Tom Gitchel in preparation for providing

13   testimony on behalf of the DEA?

14        A.      No.

15        Q.      Okay.  How about Patricia Good?

16   Did you speak with Patricia Good?

17        A.      No.

18        Q.      How many field offices does the

19   DEA have?

20        A.      Currently we have 23.

21        Q.      Okay.  And do you know how many

22   field offices the DEA had in the 1990s?

23               MR. FINKELSTEIN:  Objection.

24        Scope.

25               THE WITNESS:  I believe it was
```

```
 1           with -- DEA's consistency has been

 2           that, where I think the

 3           inconsistency -- this is me

 4           speaking -- is that those two words

 5           have been interchanged.  Because it's

 6           still referring to after-the-fact

 7           shipments, and suspicious orders are

 8           before shipment.

 9   QUESTIONS BY MR. MAHADY:

10           Q.     Okay.  Mr. Prevoznik, the DEA

11   approved for implementation nationwide a

12   suspicious order monitoring system that

13   reported suspicious orders to the DEA on a

14   daily basis after the report -- after the

15   orders had already been shipped, correct?

16           A.     Yes.

17           Q.     Mr. Prevoznik, are you aware

18   that Bergen Brunswig merged with Amerisource

19   in or around 2001 to become AmerisourceBergen

20   Corporation?

21                  MR. FINKELSTEIN:  Objection.

22           Scope.

23                  THE WITNESS:  I know they

24           merged.  I don't know what year.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         answered.  Incomplete hypothetical.

 2                   And I'd appreciate the break.

 3                   THE WITNESS:  Could you please

 4         repeat it?

 5   QUESTIONS BY MS. MAINIGI:

 6         Q.    Are they required to hold the

 7   other orders that they don't view to be

 8   suspicious, or is it okay for the distributor

 9   in that instance to exercise their business

10   judgment and send those nonsuspicious orders

11   out?

12                   MR. FINKELSTEIN:  Asked and

13         answered.  Incomplete hypothetical.

14                   THE WITNESS:  Yes.

15   QUESTIONS BY MS. MAINIGI:

16         Q.    Yes what?

17         A.    They can.

18         Q.    Okay.  They can ship those

19   other orders out?

20         A.    Yes.

21                   MS. MAINIGI:  Okay.  Let's go

22         ahead and take your break.

23                   VIDEOGRAPHER:  We're going off

24         record.  The time is 4:53.

25          (Off the record at 4:53 p.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    VIDEOGRAPHER:  We're going back

 2           on record, beginning of Media File

 3           Number 12.  The time is 5:03.

 4      QUESTIONS BY MS. MAINIGI:

 5           Q.    So, Mr. Prevoznik, just

 6      following up on our last line of questioning,

 7      is it fair to say that DEA has no internal

 8      policy defining the circumstances under which

 9      a distributor is required to terminate the

10      distribution of controlled substances to a

11      pharmacy?

12                    MR. FINKELSTEIN:  Objection.

13           Mischaracterizes his prior testimony.

14                    THE WITNESS:  Could you please

15           repeat that?

16      QUESTIONS BY MS. MAINIGI:

17           Q.    Sure.

18                    Is it fair to say that DEA has

19      no internal policy defining the circumstances

20      under which a distributor is required to

21      terminate the distribution of controlled

22      substances to a pharmacy?

23           A.    Yes.

24           Q.    Now, do you recall being asked

25      last time a number of questions about the
```