```
                 IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT CHARLESTON


_____x
                              :
THE CITY OF HUNTINGTON,       :      Civil Action
                              :
             Plaintiff,       :      No.  3:17-cv-01362
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
             Defendants.  :
_____x
                              :
CABELL COUNTY COMMISSION,     :      Civil Action
                              :
             Plaintiff,       :      No. 3:17-cv-01665
                              :
v.                            :
                              :
AMERISOURCEBERGEN DRUG        :
CORPORATION, et al.,          :
                              :
             Defendants.  :
_____x



                    BENCH TRIAL - VOLUME 15
       BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
                   UNITED STATES DISTRICT COURT
                   IN CHARLESTON, WEST VIRGINIA


                        MAY 21, 2021
```

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:            Ayme Cochran, RMR, CRR
Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1              PROCEEDINGS had before The Honorable David A.

 2    Faber, Senior Status Judge, United States District

 3    Court, Southern District of West Virginia, in

 4    Charleston, West Virginia, on May 21, 2021, at 9:00

 5    a.m., as follows:

 6              THE COURT:  Good morning.

 7              MR. HESTER:  Good morning, Your Honor.

 8         Before we get started with Dr. Werthammer, I did want

 9    to raise a threshold point.

10         The plaintiffs have provided us with two proposed

11    demonstrative exhibits for Dr. Werthammer's testimony and

12    those exhibits are videos of a baby shortly after delivery

13    twitching uncontrollably as it goes through drug withdrawal.

14         And, Your Honor, our view is this is not a disputed

15    fact that babies go through withdrawal if they're exposed in

16    utero to drugs and it's not something that's relevant to any

17    disputed issue in this case.

18         This is obviously not a personal injury case and we

19    believe it's not relevant to any issue and should be

20    excluded under Rule 401 or, alternatively, should be

21    excluded under Rule 403 as an undue play of emotion.

22              THE COURT:  How in the world are you -- is that

23    relevant here or something this Court in a bench trial can

24    consider, Mr. Farrell?  Explain that to me.

25              MR. FARRELL:  Yes, Your Honor.
```

```
 1        It is a -- one video is six seconds long and one video
 2   is 26 seconds long and this is a teaching modality that
 3   Dr. Werthammer uses not only for teaching residents about
 4   the effects, signs, and symptoms of NAS, but also as a
 5   teaching point for other institutions to come.
 6        This is part of damages.  This is part of the modality
 7   of treatment that the community in Huntington, West
 8   Virginia, is trying to address.
 9        I would --
10             THE COURT:  Well, --
11             MR. FARRELL:  I would --
12             THE COURT:  Go ahead.  Go ahead.
13             MR. FARRELL:  I would venture to say that, that
14   any attempt to invoke or evoke an undue emotional response
15   upon you, the fact finder, would be a poor attempt on our
16   part.
17             THE COURT:  Obviously this -- the danger of unfair
18   prejudice outweighs any relevancy and I'm not going to watch
19   that and it's out.
20             MR. FARRELL:  Yes, sir.
21             THE COURT:  Okay.  Are we ready to go?
22             MR. FARRELL:  Yes, Your Honor.  Plaintiffs call
23   Dr. Joe Werthammer.
24             THE COURT:  Dr. Werthammer, if you'll come up
25   here, the clerk will give you the oath, sir.
```

```
 1                THE CLERK:  Would you please state your name.

 2                THE WITNESS:  Joseph Werthammer.

 3                THE CLERK:  Thank you.  Please raise your right

 4     hand.

 5     JOSEPH WERTHAMMER, PLAINTIFFS' WITNESS, SWORN

 6                THE CLERK:  Thank you.  Please take a seat.

 7                THE COURT:  Go ahead, please.

 8                          DIRECT EXAMINATION

 9     BY MR. FARRELL:

10     Q.   Good morning.  Please state your name for the

11     record.

12     A.   Joseph Werthammer.

13     Q.   What is your profession?

14     A.   I'm a physician.

15     Q.   Do you have a particular specialized practice?

16     A.   I'm a pediatrician who has a subspecialty in

17     neonatology.

18     Q.   Do you hold any board certifications?

19     A.   I do.

20     Q.   What do you hold board certifications in?

21     A.   I'm Board Certified in pediatrics and sub-board --

22     sub-board certified in neonatal perinatal medicine.

23     Q.   Where do you live?

24     A.   Huntington, West Virginia.

25     Q.   How long have you lived there?
```

1    **A.**   With sometimes away, my entire life.

2    **Q.**   Where do you practice medicine?

3    **A.**   In Huntington, West Virginia, Cabell-Huntington

4    Hospital, and the School of Medicine at Marshall University.

5    **Q.**   Can you please describe your current clinical practice?

6    **A.**   I'm a full-time neonatologist at Cabell-Huntington

7    Hospital in the Neonatal Intensive Care Unit.

8    **Q.**   Do you hold any administrative positions currently?

9    **A.**   I'm Senior Associate Dean of Clinical Affairs for the

10   School of Medicine and Special Advisor to the Dean.

11   **Q.**   You're licensed to practice in West Virginia?

12   **A.**   I am.

13   **Q.**   Sir, I'm going to ask you to go into more detail about

14   your direct personal knowledge of opioids in

15   Huntington/Cabell County, but before you do so, I'd like to

16   walk through briefly some of your, your background.  Could

17   you please tell the Court your educational background?

18   **A.**   I did my undergraduate work at Marshall University.  I

19   went to West Virginia University School of Medicine.  I did

20   my pediatric training at the University of California in San

21   Diego.  And I did my neonatology training at Harvard Medical

22   School at Boston Children's Hospital.

23   **Q.**   And, so, parsing that out a little bit, my

24   understanding is after medical school you did residency

25   training.  Where did you do your residency?

1   **A.**   University of California, San Diego University

2   Hospital.

3   **Q.**   And then is it a fellowship or what's it described

4   after the residency?

5   **A.**   Neonatology Fellowship and that was in Boston.

6   **Q.**   At which hospital?

7   **A.**   Boston Children's Hospital.

8   **Q.**   And are you published?

9   **A.**   I am.

10   **Q.**   And will you briefly describe the areas in which you

11   are published relating to opioids?

12   **A.**   The majority of my recent scholarly activity has been

13   on the subject of Neonatal Abstinence Syndrome.

14   **Q.**   What is Neonatal Abstinence Syndrome?

15   **A.**   Neonatal Abstinence Syndrome is newborns withdrawing

16   from drugs that they've been exposed to through the mother

17   in utero, mostly opioids.

18   **Q.**   Have you held teaching positions?

19   **A.**   I have.  I'm Professor of Pediatrics at Marshall

20   University School of Medicine.

21   **Q.**   Within the hospital departments of medicine have you

22   held leadership positions?

23   **A.**   I've sat on the Board of Cabell-Huntington Hospital.

24   **Q.**   What about within the -- I'm going to get this wrong.

25   The physicians at -- whether it's the Department of

1   Pediatrics or Orthopedics, within the actual clinical

2   practice at the hospitals have you served in a leadership

3   position?

4   **A.**   I served in leadership positions as Chairman of the

5   Department of Pediatrics at the School of Medicine and a

6   section of pediatrics at Cabell Huntington Hospital.

7   **Q.**   Have you, have you had any private practice, private

8   clinical practice?

9   **A.**   Only early in my career in a group called Pediatrics,

10   Incorporated in Huntington that we subsequently merged with

11   the School of Medicine Department of Pediatrics.

12   **Q.**   Do you have direct personal knowledge of the healthcare

13   infrastructure in Huntington/Cabell County, West Virginia,

14   as a result of your leadership positions and practice of

15   medicine?

16   **A.**   I do.

17   **Q.**   A couple more preliminary questions.  Dr. Werthammer,

18   do you have direct personal knowledge of opioid use and

19   abuse in Huntington, Cabell County, West Virginia?

20   **A.**   I do.  In addition to my work with Neonatal Abstinence

21   Syndrome --

22           THE COURT:  Hold on just a minute.  We have a --

23       (Pause)

24           THE COURT:  Okay.  Go ahead, Mr. Farrell.  I'm

25   sorry.

1                  THE WITNESS:  In addition to my work with newborns

2      in the Neonatal Abstinence Syndrome, I've also been involved

3      with medication assisted treatment.  I volunteer one

4      afternoon a week at a medication assisted treatment center

5      called PROACT in Huntington, West Virginia, where I follow

6      between 20 and 25 opioid addicted adults.

7      BY MR. FARRELL:

8      **Q.**   Do you have direct personal knowledge of opioid use

9      and abuse of pregnant mothers in and about Huntington,

10     Cabell County, West Virginia?

11     **A.**   Only through my work with the newborns after they've

12     been delivered.

13     **Q.**   Do you have direct personal knowledge of the long-term

14     effects on the children that you have seen exposed to

15     opioids in utero?

16     **A.**   I have.

17     **Q.**   Are you familiar with the modalities of treatment of

18     newborns that have been exposed to opioids in utero?

19     **A.**   I am.

20     **Q.**   So let's back up now and talk very briefly about the

21     NICU, N-I-C-U.  Will you please describe to the Judge what

22     your involvement with the NICU is and what the NICU is at

23     the healthcare facilities in Huntington/Cabell County, West

24     Virginia?

25     **A.**   In our hospital we have a 40-bed Neonatal Intensive

1    Care Unit where we take care of high-risk, critically ill
2    newborns, primarily those who are born prematurely with
3    respiratory related disorders, but also surgical babies,
4    babies with infectious diseases, heart conditions, and that
5    sort of thing.  I'm a full-time neonatologist and the
6    primary doctor in charge of those babies 10 to 12 weeks per
7    year.
8         In addition, we have another overflow unit called
9    Neonatal Therapeutic Unit where -- this was developed in
10   order to be able to treat babies with Neonatal Abstinence
11   Syndrome who became so plentiful we were unable to manage
12   them in the NICU.
13   **Q.**   So we've discussed the origins of the NTU?
14   **A.**   In 2012 about a third of our patients in the NICU were
15   babies withdrawing from opioids.  Because of that number, we
16   were unable to take other babies who really we were designed
17   for, those babies who are critically ill with other neonatal
18   types of conditions.
19        We take babies from lots of Southern West Virginia,
20   Eastern Kentucky, and Southeastern Ohio.  And because we
21   were on diversion because of our -- we had exceeded our
22   capacity, we decided to open the specialized unit that was
23   more able to take care of babies with Neonatal Abstinence
24   Syndrome as opposed to our very busy, loud, full of light
25   Neonatal Intensive Care Unit.

```
 1          This unit was a low-light, low-stimulation unit staffed
 2     by nurses who had expertise in managing Neonatal Abstinence
 3     Syndrome.  And, so, in 2012 we opened this unit with 15 beds
 4     that could be expanded to 20 beds.
 5          In addition to all the medical staff, we had volunteers
 6     who came in as rockers, comforters for these babies because
 7     these babies needed to be held much of the time and, and
 8     parents weren't always available to do that.
 9     Q.   Did you model the NTU after some other hospital or some
10     other practice around the country?
11     A.   We were among the first to have an NTU mainly because
12     the volume of Neonatal Abstinence Syndrome was greater than
13     any other place.  But we've had a number of other
14     institutions and universities who have come to study our NTU
15     and how it operates and how it's able to manage these babies
16     successfully once they're born.
17     Q.   Can you identify some of those other institutions that
18     have come to Huntington to see your NTU?
19     A.   University of Kentucky came.  Ohio State came.  Boston
20     Children's Hospital, my alma mater, came to visit.  And
21     we've had a number of other institutions, including the
22     First Lady of the United States who was very interested.
23     Q.   Why is it important to have an NTU separate from your
24     NICU?
25     A.   We're taking care of a different type of patient with
```

1    different needs than our babies in the NICUs.  These babies

2    were withdrawing.  And some of the things that were going on

3    in the NICU were disturbing the babies and weren't ideal for

4    their management.

5    **Q.**   So why is it important to have low light and low

6    stimulus in an NTU?

7    **A.**   Well, one of the major areas that are disruptive in the

8    neonate withdrawing, just like in the adult is withdrawing,

9    the central nervous system stimulation and these babies are

10   irritable.  They cry almost continuously.  And they have a

11   classic cry that is very high-pitched that our nurses could

12   recognize across the room.

13        They're jittery.  They're tremulousness and it could go

14   and lead to seizures.  And any excess stimulation could

15   exacerbate those symptoms that are neurologic.

16   **Q.**   Have you studied the incidence of Neonatal Abstinence

17   Syndrome in Huntington, Cabell County, West Virginia?

18   **A.**   I have.

19   **Q.**   Have you compared that incidence to regional or

20   national rates?

21   **A.**   Well, as most people know, West Virginia has the

22   highest incidence of Neonatal Abstinence Syndrome in the

23   country.  We're about five percent as a state compared to

24   the next highest state which is Maine which is three percent

25   of their newborns have Neonatal Abstinence Syndrome.  And

1    states like Nebraska have one-tenth of one percent of their

2    babies born who have Neonatal Abstinence Syndrome.

3         So in West Virginia we're almost double the next

4    highest state in the incidence of Neonatal Abstinence

5    Syndrome.  In Huntington, West Virginia, at our hospital the

6    rate is double the rest of West Virginia at 10 percent.

7         One in five babies are born who have been exposed to

8    either an illicit drug in utero or a prescribed management

9    treatment for opioid addiction.  And half of those babies

10   will withdraw and require treatment.  And that treatment can

11   last anywhere from on average 20 to 30 days, but we've had

12   babies who have needed their required treatment for up to

13   100 days after they're born.

14   **Q.**   After discharge from the Neonatal Therapeutic Unit,

15   have you developed a modality of treatment to follow that

16   baby?

17   **A.**   We have.  Every baby who has been exposed to opioids in

18   utero and developed treatment required Neonatal Abstinence

19   Syndrome are followed in our neonatal follow-up clinic by a

20   pediatric neurologist.

21        I might just add that in addition, because of our

22   volume of babies, more than 250 a year who require

23   treatment, we had to further expand to an off-site facility

24   called Lily's Place which is an additional 12- to 15-bed

25   unit that is specifically designed to be able to also take

1    care of Neonatal Abstinence Syndrome with the appropriate

2    staff and support people.  And all those babies as well have

3    been followed.

4         In 2010 we had 50 babies or maybe 60 babies with

5    Neonatal Abstinence Syndrome.  And in 2015 we were up to 250

6    babies a year with this disorder, each of them requiring on

7    average 30 days of, of treatment for their disorder.  And

8    that's been pretty steady since 2015.

9    **Q.**   Have you followed the, the infants that were exposed in

10   utero after -- or through their pediatric level through

11   their pediatric age or development?

12   **A.**   We have.  And once they enter school, they usually are

13   followed by their local pediatricians unless specialized

14   services are, are required for these children.

15   **Q.**   Why is that?

16   **A.**   Well, we just don't have the capacity.  I mean,

17   probably since 2010 there are 2,500 babies now in Cabell

18   County who suffer from Neonatal Abstinence Syndrome as

19   newborns.

20   **Q.**   So are there -- have you been able, or do you have

21   direct first-hand knowledge of the long-term effects of the

22   infants that have been exposed in utero to opioids?

23   **A.**   Well, as I mentioned, they all go through an acute

24   withdrawal period that requires medication in half of those

25   who were exposed.

1     And what we're finding in our neonatal follow-up

2     clinics is that there are long-term neuro-developmental

3     issues and behavioral issues in these kids even as they

4     approach school age.

5     And there's now been a number of studies from around

6     the country that confirm that these babies are not well from

7     a neurologic or psychiatric point of view even after they go

8     through their acute withdrawal phase, but they do have

9     significant neuro-developmental issues that may be

10    persistent.

11    A lot of these babies are just now getting to school

12    age.  And, so, we're just now learning and hearing reports

13    about some of these behavioral issues that are now turning

14    up.  And we're not clear yet what the long-range issues are

15    going to be as these children reach adolescence and

16    adulthood.

17    **Q.**   Is the healthcare infrastructure at Marshall University

18    at the Vanguard treating newborns exposed in utero as well

19    as treating the children as they grow?

20    **A.**   Yes.

21    **Q.**   Dr. Werthammer, do you believe there presently exists

22    an opioid epidemic in Huntington/Cabell County, West

23    Virginia?

24    **A.**   I do.

25    **Q.**   Is the opioid epidemic a hazard to public health?

1    **A.**    Yes.

2    **Q.**    Can you describe the impact of the opioid epidemic on

3    Huntington/Cabell County, West Virginia, from your

4    perspective?

5         MR. HESTER:  Your Honor, I object.  This is beyond

6    the witness's personal knowledge.

7         THE COURT:  Well, overruled.

8       You can answer, Dr. Werthammer.

9         THE WITNESS:  Well, because of my experience at

10   PROACT as managing adults with addiction and what I've seen

11   as far as our newborns with Neonatal Abstinence Syndrome,

12   I'm aware that perhaps 10 percent of our population of

13   100,000 in Cabell County are addicted or have been addicted

14   to opioids.

15      I think that I've heard our police chief say that

16   90 percent of the crime in Cabell County is a result of

17   addiction.  And having been born and raised in Huntington,

18   it's a different community than it was when I was growing up

19   as far as the type of people you see and the issues that

20   revolve around the opioid epidemic.

21         MS. HARDIN:  Objection, Your Honor, to the

22   statement about what he has heard from someone outside of

23   court and we would move to strike that portion of his

24   answer.

25         THE COURT:  I'll sustain the objection to that and

```
 1    disregard the answer.

 2          Go ahead, Mr. Farrell.

 3    BY MR. FARRELL:

 4    Q.    Dr. Werthammer, do you believe with proper

 5    resources the healthcare infrastructure in

 6    Huntington/Cabell County, West Virginia, can make a

 7    dramatic impact upon the opioid epidemic?

 8    A.    Yes.

 9               MR. FARRELL:  No further questions, Your Honor.

10               THE COURT:  All right.  You may cross, Mr. Mahady.

11          Dr. Werthammer, I may have misunderstood you, but did

12    you say that half of the babies exposed to opioids do not

13    develop NAS?

14               THE WITNESS:  Half of them do not require

15    medication treatment.

16               THE COURT:  Okay.

17               THE WITNESS:  They may have symptoms of Neonatal

18    Abstinence Syndrome, but they don't reach the threshold that

19    they require medication management.

20               THE COURT:  And the other half do require

21    medication?

22               THE WITNESS:  Yes, sir.

23               THE COURT:  Okay.  Thank you, sir.

24          Go ahead, Mr. Mahady.

25               MR. MAHADY:  Good morning, Your Honor.
```

```
 1                THE COURT:  Good morning.
 2                     CROSS EXAMINATION
 3   BY MR. MAHADY:
 4   Q.   Dr. Werthammer, my name is Joe Mahady.  Along with
 5   my colleagues here at counsel table, I represent
 6   AmerisourceBergen.  It's nice to meet you.  I'm going to
 7   ask you some questions first and then counsel for
 8   McKesson is going to ask you some questions as well.
 9        Dr. Werthammer, are you aware that the three defendants
10   in this courtroom, AmerisourceBergen, McKesson, and Cardinal
11   Health are wholesale distributors of prescription
12   medication?
13   A.   I am.
14   Q.   Okay.  And as wholesale distributors, these three
15   defendants do not prescribe prescription opioids; correct?
16   A.   Correct.
17   Q.   Doctors prescribe opioids; right?
18   A.   That's correct.
19   Q.   And you agree that the demand and the amount of opioid
20   pills came from the prescriptions that doctors and other
21   healthcare professionals wrote; correct?
22   A.   Well, I'm not sure if that's correct.  I think there's
23   probably -- the majority of prescriptions have come from
24   doctors, but I think there are unscrupulous physicians and
25   pharmacists that have opioids delivered without
```

```
 1    prescriptions, --

 2    Q.   Okay.

 3    A.   -- some of which are in jail, some of whom are in jail

 4    now.

 5    Q.   Okay.  Dr. Werthammer, do you recall giving a

 6    deposition in this case?

 7    A.   I do.

 8    Q.   Okay.  And do you recall that deposition occurring on

 9    September 9th, 2020?

10    A.   I'll take your word.  I don't remember the date

11    exactly.

12    Q.   And that deposition that you gave was under oath;

13    correct?

14    A.   It was.

15    Q.   Okay.  And you testified truthfully at that deposition?

16    A.   Yes.

17    Q.   Okay.  And you had an opportunity to review your

18    deposition transcript in that case; correct?

19    A.   Yes.

20    Q.   Okay.

21          MR. MAHADY:  Your Honor, if we may pull up

22    Dr. Werthammer's deposition transcript.

23          MR. FARRELL:  Objection, Your Honor.

24          THE COURT:  What's the objection?

25          MR. FARRELL:  Improper impeachment for whatever
```

```
 1    purpose it is.  I don't know that he's elicited any

 2    testimony to show him his prior testimony.  We've been

 3    prevented from doing the same.

 4              MR. MAHADY:  Your Honor, --

 5              THE COURT:  When were you prevented from doing the

 6    same?

 7              MR. FARRELL:  Judge, I'll withdraw that.  We have

 8    attempted to use transcripts before asking questions, and

 9    I'm simply asking that the question be shown or asked before

10    we start introducing testimony.

11              THE COURT:  Well, ask him the question first,

12    Mr. Mahady.

13              MR. MAHADY:  And I did, Your Honor.  That was the

14    question I asked before I went down this road.

15         Do I have permission to publish Dr. Werthammer's --

16              THE COURT:  Well, I'm -- yeah, go ahead.  Go

17    ahead.  Overruled.  Go ahead.

18    BY MR. MAHADY:

19    Q.   Dr. Werthammer, this is the cover page of your

20    deposition transcript.

21         If we can pull up page 36, line 13.

22         Dr. Werthammer, do you see here the question at your

23    deposition was, "Do you agree that the demand and the amount

24    of pills came from the prescriptions that doctors and other

25    healthcare professionals wrote?"
```

1          Do you see that?

2    **A.**   I do.

3    **Q.**   And what was your answer at your deposition?

4    **A.**   "I do."

5    **Q.**   Okay.  Thank you.

6          MR. FARRELL:  Objection, Judge.  This is not

7    inconsistent with what he just testified to.

8          THE COURT:  Well, how is it inconsistent with what

9    he just testified to?

10          MR. MAHADY:  Your Honor, at his deposition he was

11    asked a very straightforward question, the same question

12    that he was asked today.

13      "Does the demand for prescription opioids and the

14    amount of pills come from prescriptions written by doctors

15    and healthcare professionals?"

16      He said, "I do."

17      Today he's had a lot of qualifications and tried to

18    implicate that --

19          THE COURT:  Well, if I heard him correctly, he

20    made the same answer but he amplified it and, and I don't

21    think it's inconsistent.

22          MR. MAHADY:  Okay.  Thank you, Your Honor.  I'll

23    move on.

24    BY MR. MAHADY:

25    **Q.**   Dr. Werthammer, you have heard pain as the fifth

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    vital sign; correct?
 2    A.    Yes, sir.
 3    Q.    And pain as the fifth vital sign is a reference to the
 4    change in the standard of care for treating pain; correct?
 5              MR. ACKERMAN:  Objection, Your Honor.
 6              THE COURT:  What's the objection?
 7              MR. ACKERMAN:  Outside the scope of the direct
 8    examination.
 9              THE COURT:  Overruled.  He can answer.
10              THE WITNESS:  I, I don't agree with that.
11    BY MR. MAHADY:
12    Q.    Okay.  What, what is pain as the fifth vital sign
13    to you?
14    A.    It's not a measure of standard of care, that statement.
15    Q.    Okay.  For all the years that you've practiced in
16    Cabell/Huntington, was there a change in the way doctors
17    treated pain?
18    A.    I, I believe that's correct, although being a
19    pediatrician I'm not sure that was applicable to my
20    practice.
21    Q.    I appreciate the distinction.  But you are also on the
22    Board of Cabell-Huntington Hospital; correct?
23    A.    I actually just finished my nine-year term on that
24    Board.
25    Q.    Okay.  And for a period of time, you were the Chief
```

```
 1    Medical Officer of Marshall Health; correct?

 2    A.   I was.

 3    Q.   Okay.  And pain as the fifth vital sign, I believe

 4    you've testified that that came from organizations like the

 5    Joint Commission; correct?

 6    A.   Yes.

 7    Q.   Okay.  And this standard of care changing led to

 8    doctors prescribing opioids more liberally; correct?

 9    A.   I didn't agree that this was the standard of care.

10    Q.   Okay.  Do you recall a period where pain was considered

11    the fifth vital sign?

12    A.   I do.

13    Q.   Okay.  And during that period where pain was considered

14    the fifth vital sign, were opioids prescribed more liberally

15    than they were in the period prior to that?

16    A.   I think that's true.

17    Q.   Okay.  And, Dr. Werthammer, I want to focus on 2016.

18    In 2016 you were the Chief Medical Officer of Marshall

19    Health; correct?

20    A.   Yes.

21    Q.   And Joseph Shapiro, was he the Dean of the Medical

22    School at Marshall at the time period?

23    A.   He was.

24    Q.   Okay.  And around that 2016-2017 time period, you were

25    also communicating with an individual named Jim Johnson; is
```

```
 1   that correct?

 2   A.   Yes.

 3   Q.   Okay.  And Jim Johnson, at least at the time, was I

 4   think the head of Huntington Mayor's Office of Drug Control

 5   Policy; is that right?

 6   A.   Correct.

 7   Q.   And why were you communicating with Jim Johnson at that

 8   time?

 9   A.   I was involved in some of the meetings that surrounded

10   the opioid epidemic in Cabell County and Huntington, West

11   Virginia.

12   Q.   Okay.

13        Ms. Pierce, could you please hand me Defendants' West

14   Virginia 00473?

15        Your Honor, may I approach the witness?

16             THE COURT:  Yes, you may.

17   BY MR. MAHADY:

18   Q.   Dr. Werthammer, I want to direct your attention to

19   the middle of the page first.  Do you see an email from

20   February 5th, 2016, sent by a Werthammer@marshall.edu?

21   A.   I do.

22   Q.   Was that your email address, or is that your email

23   address?

24   A.   Correct.

25   Q.   And the signature block that follows, Joseph W.
```

1    Werthammer, M.D., Chief Medical Officer, Joan C. Edwards

2    School of Medicine at Marshall University, is that your

3    signature block?

4    **A.**   It is.

5    **Q.**   Okay.  And is that email on February 5th, is that an

6    email that you sent?

7    **A.**   It was.

8    **Q.**   Okay.  Jim Johnson forwarded you an email with the

9    subject line "How Big Pharma Got People Hooked On Opioids."

10   Do you see that?

11   **A.**   I do.

12   **Q.**   Did you review the email or the -- I'm sorry -- the

13   document from the link at the bottom of the email?

14   **A.**   I, I don't remember doing that, but I'm sure I probably

15   did.

16   **Q.**   Okay.

17           MR. MAHADY:  Your Honor, may I approach the

18   witness?

19           THE COURT:  Yes.

20   BY MR. MAHADY:

21   **Q.**   Dr. Werthammer, I just have a very few questions on

22   this specific document if you want to take a second to

23   look at it.

24   **A.**   Okay.

25   **Q.**   Dr. Werthammer, this article bears a very similar title

1    to the subject line of the email that we were just looking

2    at; correct?

3    **A.**   Yes.

4    **Q.**   Okay.  This article, "How Big Pharma Got People Hooked

5    On Dangerous Opioids And Made Tons Of Money Off Of It," this

6    article references Purdue Pharma; correct?

7    **A.**   Yes.

8    **Q.**   There's no reference in this article relating to the

9    wholesale distributors; correct?

10   **A.**   Well, I think as I pointed out in my deposition, I

11   agree with this, that the information promulgated by big

12   pharma and that you cannot become addicted to opioids if

13   you're truly in pain certainly contributed in physicians'

14   minds that there's safety in being able to prescribe opioids

15   for pain without fearing the consequence of addiction.  So

16   I, I agree with that as I pointed out in my deposition.

17   **Q.**   Okay.  And I appreciate that.  And as it relates to

18   this article, it's referencing Purdue Pharma as the

19   manufacturer behind that marketing campaign; correct?

20   **A.**   I, I think that's exactly correct.  And I think big

21   pharma did provide that information to doctors and their

22   detail, detail men came to doctors' offices and espoused the

23   same information.  And, yet, -- and the doctors prescribed

24   that, those opioids and the distributors sent those opioids

25   out.

1    **Q.**   Okay.  And as I think we said in the beginning, it was

2    the prescribing that drove the demand; correct?

3    **A.**   Well, I think the prescribing and -- to some degree,

4    and also some of these miscreants that we talked about like

5    pharmaceutical pharmacy representatives and some physicians.

6    **Q.**   Okay.  Thank you, Your Honor [sic].  I'm sorry.  Thank

7    you, Dr. Werthammer.

8        If we can go back to the email, please.

9        Dr. Werthammer, can you please read your reply on

10   February 5th, 2016?

11   **A.**   "Unfortunately, it was not big pharma who wrote the

12   prescriptions.  It was me and my colleagues, Joe."

13   **Q.**   Okay.  And in response to your email, Dr. Shapiro, who

14   is the Dean of the Medical School, wrote, "We had some help.

15   Pain as the fifth vital sign comes to mind." Correct?

16   **A.**   Correct.

17   **Q.**   Okay.  And he's referring to what we've discussed

18   earlier as pain as the fifth vital sign; correct?

19   **A.**   Correct.

20   **Q.**   Okay.  And Kenneth Burner, he replies, "Dr. Shapiro, I

21   couldn't agree with you more.  Kenny."  Is that right?

22   **A.**   That's what it says, correct.

23   **Q.**   Okay.  And Kenny Burner was associated, as the email

24   suggests, with the Appalachian HIDTA; correct?

25   **A.**   That's what it says.  I don't, I do not know that

1    person.

2    **Q.**   Okay.  You can put that document aside.

3         Actually, before you do, this email does not contain

4    any references to wholesale distributors; correct?

5    **A.**   Correct.

6    **Q.**   Okay.  You can put that document aside.  I'd like to

7    show you another document.

8         Ms. Pierce, if you can please hand me --

9         Actually, before we do, Your Honor, we move to admit

10   not the article, simply Defendants' WV 00473.

11             THE COURT:  You want just the email chain in?

12             MR. MAHADY:  Yes, Your Honor.

13             MR. FARRELL:  Objection, hearsay.

14             MR. MAHADY:  Your Honor, we believe this email

15   goes to the state of mind of Dr. Werthammer in around 2016.

16        We also think that beyond this document being admitted

17   for the truth of the matter, there's also kind of a

18   non-hearsay ground to admit this document.  And that is the

19   fact that these communications were happening in 2016,

20   you'll see in 2017, with individuals in the community in the

21   medical profession who have testified that they have direct

22   personal knowledge of use and abuse of opioids in Cabell,

23   Huntington.

24             THE COURT:  Well, I'm not going to admit the

25   document, but it's perfectly proper for you to cross-examine

```
 1    him on it.

 2              MR. MAHADY:  Okay.  Thank you, Your Honor.

 3              THE COURT:  And I can consider his testimony and

 4    his answers, so I'm not going to admit the document.

 5              MR. MAHADY:  Thank you, Your Honor.

 6          Ms. Pierce, would you please hand me WV-00976.

 7          Your Honor, may I approach the witness?

 8              THE COURT:  Yes.

 9    BY MR. MAHADY:

10    Q.   Dr. Werthammer, I want to start with your email on

11    the second page here.  I believe it's March 28th, 2017.

12    Do you see that?

13    A.   I do.

14    Q.   Okay.  Is that an email that you sent?

15    A.   Yes.

16    Q.   Okay.  And in the email you've described an article

17    from MMWR.  What is MMWR?

18    A.   Morbidity and Mortality Weekly Report.

19    Q.   Okay.  And the email -- or the article that you are

20    describing sending along to your colleagues relates to

21    prescribing of opioids; correct?

22    A.   Correct.

23    Q.   Okay.  I want to flip now to Ms. Holley Mathis's email

24    from March 28th, 2017.

25              MR. ACKERMAN:  Objection, Your Honor.
```

```
 1                   THE COURT:  Basis?

 2                   MR. ACKERMAN:  The Holley Mathis email is hearsay.

 3                   THE COURT:  Well, he's using it as a good faith

 4      basis to cross-examine the doctor and I'm going to allow him

 5      to do that.  And that's a different question, in my view,

 6      from whether the document is admissible.

 7                   MR. MAHADY:  Thank you, Your Honor.

 8      BY MR. MAHADY:

 9      Q.   Dr. Werthammer, who's Holley Mathis?

10      A.   Holley Mathis was the head nurse in the Department of

11      Surgery.

12      Q.   Okay.  And I believe you testified at your deposition

13      that Holley Mathis is a very reliable individual; correct?

14      A.   She is.

15      Q.   Okay.  And she is commenting on your email on the risk

16      of long-term opioid use; correct?

17      A.   Well, you really haven't clarified about the article.

18      Maybe I could take a minute to relate to the Court exactly

19      what that article showed.

20           That is that -- and this was new information, at least

21      to me, in that it showed that if a patient is prescribed an

22      opioid, after three days the incidence of those patients

23      still being on that opioid will -- if they're on it for

24      three days or more, the incidence of them still being on an

25      opioid at one year doubles from baseline.  And if they're on
```

1    it for more than eight days, it goes up further and it goes

2    as high as 30 percent if they require more than 30 days of

3    initial opioid.

4        So one-third of patients who have been on an opioid

5    after surgery or for whatever reason will continue on that

6    opioid at a year.  That was new information to me and that's

7    the article I circulated.

8    **Q.**   Thank you, Dr. Werthammer.  Dr. Werthammer, opioids are

9    an FDA approved medication; correct?

10   **A.**   Correct.

11   **Q.**   Okay.  If we turn back to Holley Mathis's email from

12   March 28th, 2017, Ms. Mathis says, "We (Marshall Surgery)

13   have had our hands slapped because we did not willingly

14   refill narcotic prescriptions and this has occurred more

15   than once."

16       Did I read that correctly?

17   **A.**   Correct.

18   **Q.**   Okay.  And you have no reason to dispute the accuracy

19   of that statement from Ms. Mathis; correct?

20   **A.**   Correct.

21   **Q.**   Okay.  And then Ms. Mathis says, "That said, asking the

22   patients their pain scale on every visit sets up to fail.

23   It should not be the fifth vital sign."

24       Did I read that correctly?

25   **A.**   Correct.

1    **Q.**   Okay.  So Ms. Mathis, like Dean Shapiro from the last

2    email, is commenting on pain as the fifth vital sign in an

3    email addressing opioid use and abuse; correct?

4              MR. FARRELL:  Objection, Your Honor.  This is

5    hearsay.  He's simply reading into the record what somebody

6    else said without asking the --

7              THE COURT:  Well, I'll sustain that objection.

8         Unfortunately, we need to take an early break --

9              MR. MAHADY:  Sure.

10             THE COURT:  -- because the court reporter can't be

11   in two places at once.  She's very good, but she's not that

12   good.

13        Let's take about 10 minutes.

14        And you can step down during the break, Dr. Werthammer.

15        (Recess taken at 9:44 a.m.)

16             THE COURT:  Wait a minute.  We don't have

17   everybody.  Yeah, we do.  Okay.

18             LAW CLERK:  Judge --

19             THE COURT:  Okay, okay.

20             MR. FARRELL:  We can go, Judge.

21             THE COURT:  What about Mr. Ackerman?

22        Okay, Mr. Mahady, I think we've got everybody in place.

23             MR. MAHADY:  Thank you, Your Honor.

24        Your Honor, I am going to move for the admission of

25   DEF-WV-00976, which is the e-mail you were just looking at,

```
 1   and I'm also going to re-ask for the admission of
 2   DEF-WV-00473.  I'm not asking to admit these documents for
 3   the truth of the matter.  I'm going to admit these documents
 4   based on notice.
 5        On both e-mails there are individuals from the
 6   plaintiffs, City of Huntington.  On the first e-mail we
 7   looked at, jimjohnson@cityofhuntington.com is on there and
 8   so is the mayor, Steve Williams.
 9        On the second e-mail that we just looked at, Jim
10   Johnson was on that, as well.  And, in fact, both of these
11   documents were produced from the City of Huntington and the
12   City of Huntington Health Department and we think this is
13   relevant and goes to notice because following the
14   transmittal of these e-mails, the City of Huntington went on
15   and sued the Joint Commission, which is largely based on
16   pain as the fifth vital sign.  So, for that reason, we move
17   to admit these two documents for the limited purpose of
18   notice into the record.
19             THE COURT:  Mr. Farrell?
20             MR. FARRELL:  I think notice is stipulated, Judge.
21   Cabell County and the City of Huntington sued the
22   manufacturers.  And so, I'm not quite sure what this is
23   notice of other than our complaints speak very clearly of
24   what the allegations are against a number of different
25   defendants in the chain of distribution.
```

1          THE COURT:  What's this notice of?

2          MR. MAHADY:  It's notice of the fact that

3   respected individuals in the medical community in this very

4   county believe that pain as a fifth vital sign was the

5   originating or cause factor of the opioid epidemic.

6          THE COURT:  I'm going to overrule the objection

7   and admit both of them.  976 and 473 are both admitted.

8              **DEFENSE EXHIBIT 976 & 473 ADMITTED**

9          BY MR. MAHADY:

10  **Q.**   Dr. Werthammer, I want to look at one more document

11  with you.

12         MR. MAHADY:  Ms. Pierce, if we can hand out

13  DEF-WV-00649.

14      Your Honor, may I approach the witness?

15         THE COURT:  Yeah.  976 and 473 are admitted for

16  the limited purpose stated on the record by Mr. Mahady and

17  not for the truth of the matter asserted.

18         BY MR. MAHADY:

19  **Q.**   Dr. Werthammer, let me know when you're ready.

20  **A.**   I am.

21  **Q.**   Okay.  Dr. Werthammer, the e-mail at the bottom of

22  March 28th, 2017, that's the same originating e-mail that we

23  just saw in the chain involving Ms. Mathis, correct?

24  **A.**   Correct.

25  **Q.**   Okay.  Allen Mock, with an e-mail address

1    Allen.R.Mock@wv.gov, he is the Chief Medical Examiner for

2    the State of West Virginia, correct?

3    **A.**   Yes.

4    **Q.**   Okay.  And in reply to your e-mail, can you read the

5    first two sentences of his response?

6    **A.**   "This is fascinating, Joe.  Like you, I'm surprised by

7    the time course following the appropriate -- quote,

8    appropriate pain management.  I try -- I trained under the

9    sixth vital sign regime and now suffer the fallout.  I've

10   also been subjected to countless orthopedic procedures, the

11   most recent of which was earlier this month, and I now

12   decline all narcotics.  Scary stuff."

13   **Q.**   Okay.  Now, this article and Dr. Mock's response, this

14   is talking about what I believe you testified, that this

15   information in 2017 was new or it was different from what

16   you previously understood, correct?

17   **A.**   The time frame was, correct.

18   **Q.**   Okay.

19   **A.**   And how quickly one can become addicted.

20   **Q.**   Okay.  Dr. Werthammer, can you please read your reply

21   from March 28th, 2017?

22   **A.**   "We have created a monster."

23          MR. MAHADY:  Thank you, Dr. Werthammer.  I have no

24   further questions.

25                      **CROSS EXAMINATION**

1          **BY MS. WU:**

2     **Q.**   Good morning, Doctor.  My name is Laura Wu and I

3     represent McKesson.  I'll have just a few more questions for

4     you this morning.

5     **A.**   Good morning.

6     **Q.**   So, you spent a short time awhile ago with Mr. Farrell

7     talking about NAS and I want to go back and clarify the

8     definition of NAS to the medical community.  NAS can occur

9     if a mother abuses any addictive substance while a child is

10    in utero, correct; it's not just opioids?

11    **A.**   85% involve opioids.

12    **Q.**   Now, 85% in what community?

13    **A.**   I think in the national literature and in our own

14    experience.

15    **Q.**   Under the medical definition of NAS, exposure to a

16    myriad of addictive substances can give rise to a diagnosis

17    of NAS in a baby after birth, correct?

18    **A.**   That's correct.

19    **Q.**   And I would like to take a look at that.

20          MS. WU:  Could I please get a copy of MC-WV-2113,

21    please?

22          Your Honor, may I approach?

23               THE COURT:  Yes.

24               BY MS. WU:

25    **Q.**   Doctor, what you have in front of you is a publication

1   of the West Virginia Perinatal Partnership.  Do you see

2   that?

3   **A.**   Correct.

4   **Q.**   And, Doctor, you sit on the Board of the West Virginia

5   Perinatal Partnership, correct?

6   **A.**   I have.

7   **Q.**   Do you currently sit on that board?

8   **A.**   Not to my knowledge.

9   **Q.**   For what period of time did you sit on that board?

10  **A.**   I'm not sure.

11  **Q.**   It is listed on your CV, correct?

12  **A.**   It is.

13  **Q.**   Okay.  And during the period of time that you served on

14  the board, the partnership sought to improve health outcomes

15  for babies and mothers in the State of West Virginia,

16  correct?

17  **A.**   We have.

18  **Q.**   The document identified as MC-WV-2113 is a publication

19  of that partnership, correct?

20  **A.**   I've not seen this, but it looks at least like a

21  handout from that organization.

22  **Q.**   Okay.  And this document sets forth a definition of

23  NAS.  Do you see that, Doctor?

24  **A.**   I do.

25  **Q.**   And on the first page, it says, "West Virginia

```
 1    pediatric providers should use the following criteria to

 2    diagnose and document intrauterine substance exposure and

 3    Neonatal Abstinence Syndrome, NAS."  Do you see that,

 4    Doctor?

 5    A.   I do.

 6    Q.   Then the document continues, "What is NAS?  NAS is

 7    neonatal withdrawal from many substances, not just opiates.

 8    It is exposure with clinical symptoms, and it is not limited

 9    to those cases that require pharmacological treatment."  Do

10    you see that, Doctor?

11    A.   Correct.

12    Q.   You agree with that definition, correct?

13    A.   For most parts.  I think opiates is not a valid

14    description.  There are more opioids than just opiates.

15    Opiates are just a subclass of opioids.

16    Q.   Doctor, just for clarity, when you're referring to the

17    distinction between opioids and opiates, you're referencing

18    naturally occurring substances as opposed to manmade

19    substances; is that correct?

20    A.   Correct.

21    Q.   For example, fentanyl is an analog, which is created by

22    humans, not naturally occurring, correct?

23    A.   That's correct.

24    Q.   That's the distinction that you're drawing?

25    A.   That's correct.
```

1   **Q.**   Okay.  Now, if we can look further down at this first

2   page, it says, "What is exposure?"  Do you see that, Doctor?

3   **A.**   I do.

4   **Q.**   It says, "Exposure is when there is known maternal use

5   of neuroactive substances at any time during pregnancy."  Do

6   you see that?

7   **A.**   I do.

8   **Q.**   So, NAS arises from in utero exposure to an addictive

9   substance, correct?

10  **A.**   That's correct.

11  **Q.**   And it continues.  "The following substances are

12  associated with neonatal withdrawal."  Do you see that,

13  Doctor?

14  **A.**   I do.

15  **Q.**   And the document goes on to list a number of

16  substances, correct?

17  **A.**   Correct.

18  **Q.**   It includes barbiturates.  Do you see that, Doctor?

19  **A.**   I do.

20  **Q.**   Barbiturates are not an opioid class drug, correct?

21  **A.**   Correct.

22  **Q.**   It identifies Chlordiazepoxide.  Do you see that,

23  Doctor?

24  **A.**   I do.

25  **Q.**   Diazepam and lorazepam, do you see those, Doctor?

1    **A.**    I do.

2    **Q.**    And those are Benzodiazepines, not opioid class drugs,

3    correct?

4    **A.**    Correct.

5    **Q.**    It also identifies Phencyclidine.  Do you see that,

6    Doctor?

7    **A.**    I do.

8    **Q.**    That's PCP, correct?

9    **A.**    Correct.

10   **Q.**    And PCP is not an opioid class drug, correct?

11   **A.**    It is not.

12   **Q.**    Then we can skip to the bottom of the list.  Do you see

13   it includes SSRIs?  Do you see that, Doctor?

14   **A.**    I do.

15   **Q.**    And SSRIs are antidepressants, correct?

16   **A.**    Well, they can be used as antidepressants and they're

17   not opioids.

18   **Q.**    Okay.  Thank you, Doctor.  You anticipated my question.

19   And, Doctor, not all NAS cases in Cabell County include

20   opioid exposure, correct?

21   **A.**    Not all, but in our experience, about 85%.  Now,

22   there's a number of our babies, and the reason that our

23   treatment requirements are longer than the national average

24   is because we have a real problem with polypharmacy

25   exposure, that is children are -- these babies are exposed

1    to multiple different drugs, including all that you've

2    listed here or that has been listed here can be associated,

3    but 85% of our experience is with opioids, at least as part

4    of the exposure leading to Neonatal Abstinence Syndrome.

5    **Q.**   So, let me follow up on two pieces of what you just

6    said.  So, first, on opioids, NAS can arise from exposure to

7    illicit opioids, not just prescription opioids, correct?

8    **A.**   Correct.

9    **Q.**   And looking back at this list, two of those would be

10   illicit Fentanyl and heroin, correct?

11   **A.**   That's correct.

12   **Q.**   Those are nonprescription drugs, correct?

13   **A.**   Well, I don't think any of them are generally

14   considered prescription drugs, correct, although fentanyl

15   patches, for instance, are prescribed.

16   **Q.**   And there's also an illicit form of fentanyl which is

17   common in Cabell County, correct?

18   **A.**   It is.

19   **Q.**   And, Doctor, you mentioned polypharmacy or

20   polysubstance abuse a few moments ago, correct?

21   **A.**   I did.

22   **Q.**   And that refers to the use of multiple substances,

23   correct?

24   **A.**   Correct.

25   **Q.**   And it is true that a majority of NAS cases at Cabell

1    Huntington Hospital involve exposure to polypharmacy or more

2    than one substance during a time that a baby is in utero,

3    correct?

4    **A.**   I'm not sure that's correct, but I think that a

5    significant number of our babies are exposed in multiple

6    agents in utero.

7              MS. WU:  Could I please get a copy of

8    MCK-WV-01686, please?

9         May I approach, Your Honor?  Thank you.

10   **Q.**   Doctor, MC-WV-01686 is a publication in the Marshall

11   Journal of Medicine from 2019.  Are you familiar with this

12   article?

13   **A.**   I'm not.

14   **Q.**   Do you know Dr. Loudin?

15   **A.**   I do.

16   **Q.**   He was one of your colleagues at Marshall Health,

17   correct?

18   **A.**   Correct.

19   **Q.**   Now, if I could ask you to look at what is Page 2 of

20   this document in the abstract section, do you see that,

21   Doctor?

22   **A.**   I do.

23   **Q.**   It reads, "Neonatal Abstinence Syndrome, NAS, is seen

24   at a very high rate at our institution in Huntington, West

25   Virginia, and the majority of exposures are polysubstance in

```
1    nature."  Have I read that accurately?
2              MR. FARRELL:  Objection, Your Honor.  It's hearsay
3    and this witness has testified he has not seen this
4    document.
5              THE COURT:  Well, she's not using it for the truth
6    of the matter asserted.  She's using it as a good faith
7    basis to cross examine him about his previous statements, if
8    I understand.
9         Is that right, Ms. Wu?
10             MS. WU:  Yes, Judge.  Thank you.
11             THE COURT:  So, your objection is overruled.
12        You may go ahead.
13             BY MS. WU:
14   Q.   Doctor, have I read that statement correctly?
15   A.   You have.
16   Q.   And is that consistent with your experience at Cabell
17   Huntington Hospital?
18   A.   Well, as I said, a significant number of our babies
19   have been exposed to polysubstances.  I don't know if it's
20   the majority.  I don't know if I could agree with that
21   statement.
22   Q.   But a significant proportion of the babies diagnosed
23   with NAS are exposed to multiple substances in utero?
24   A.   Including 85% to opioids.
25   Q.   And the 85% that you've cited includes exposure to
```

```
 1   illicit opioids such as heroin and illicit fentanyl,
 2   correct?
 3   A.   Well, I think it's all opioids, including prescription
 4   pharmaceuticals.
 5   Q.   And you don't have numbers that track those
 6   proportions, correct, Doctor?
 7   A.   I do not.
 8   Q.   In part, it's difficult to track given the exposure to
 9   multiple substances during the time that a baby is in utero,
10   correct?
11   A.   I don't think I understand that question.
12   Q.   Sure.  Let me try to ask a better question.
13        It may be difficult to identify the various substances
14   to which a baby was exposed in utero, correct?
15   A.   I disagree with that.  I think when these mothers come
16   for their prenatal visits, they frequently have urine drug
17   screens that can identify up to 20 different substances,
18   including individual types of opioids, including Fentanyl,
19   heroin, hydrocodone, oxycodone.  All those can be
20   individually identified, but I'm not familiar with those
21   data.
22   Q.   And it's those types of screenings that have led you
23   and your colleagues to identify the prevalence of
24   polypharmacy in the NAS babies that you diagnose and treat,
25   correct?
```

**A.**   Right.   Every mother who is admitted to our labor and

delivery floor is mandated to have a urine drug screen and

if that drug screen is positive, or if there's a history of

that mother having a positive drug screen during pregnancy,

an umbilical cord toxicology is analyzed, which looks at a

very large number of drugs that have been -- that the

neonate has been exposed to.   The urine drug screen is only

really accurate if an exposure in the previous week, three

days to a week, to maybe a little bit more, while the

umbilical cord toxicology is very helpful even going back

weeks and months in the pregnancy.

**Q.**   Thank you, Doctor.   You spoke with Mr. Farrell about

the incidence rate of NAS in babies delivered at Cabell

Huntington Hospital, correct?

**A.**   Correct.   Actually, more specifically, 20 percent, or

one in five of our babies we deliver at Cabell Huntington

Hospital have drugs in the urine drug screen and in their

cord toxicology and only half of those or about ten percent

of all of our deliveries will require medication treatment.

     There are a number of others, as the judge asked me,

who have NAS but don't reach a threshold that they require

treatment.   So, we have approximately between 2,500 and

3,000 deliveries a year there and more than 250 of those

babies have Neonatal Abstinence Syndrome requiring treatment

with -- to manage their withdrawal.

1    **Q.**    Thank you, Doctor.  I would like to talk about the

2    change in the incidence rate over time and this is a subject

3    on which you've published, correct, Doctor?

4    **A.**    I have.

5    **Q.**    Doctor, so you're aware that between 2012 and 2013, the

6    incidence rate of NAS in babies delivered at

7    Huntington-Cabell Hospital [sic] almost quadrupled, correct?

8    **A.**    I think the dates you might be referring to are 2010 to

9    2015.  Those are the dates that we studied the change in the

10   incidence of Neonatal Abstinence Syndrome.  Approximately,

11   we had 60 babies with Neonatal Abstinence Syndrome in 2010,

12   maybe up to 80.  I can't remember the specific number.  But

13   more than 250 a year in 2015.  So, that would be

14   approximately triple what it was five years earlier.

15   **Q.**    And after 2015, the rate of NAS in babies delivered at

16   Huntington-Cabell Hospital [sic] declined, correct?

17   **A.**    I don't think that's true.  I think we continue to have

18   about 250 babies annually requiring management of Neonatal

19   Abstinence Syndrome.  So, it's remained constant since that

20   time.

21   **Q.**    Okay.  Well, let's just -- let's just take a look so we

22   can make sure that we're looking at the same numbers.

23            MS. WU:  Could I please get a copy of -- let's see

24   -- Plaintiff's Exhibit 41715, please?

25       It might make it a little easier on us, Doctor.

1        May I approach?

2              THE COURT:  Yes.

3              MS. WU:  Thank you.

4              BY MS. WU:

5   **Q.**   Doctor, I'm showing you P-41715, which is an article of

6   which you are a co-author which was published in 2017,

7   correct?

8   **A.**   Correct.

9   **Q.**   And could I call your attention to Page 3 of this

10  document?  Figure 1 on Page 3 is a chart of the incidence

11  rate of NAS for babies delivered at Cabell Huntington

12  Hospital, correct?

13  **A.**   Correct.

14  **Q.**   And the graph shows that the incidence of NAS at Cabell

15  Huntington Hospital nearly quadrupled between 2012 and 2013,

16  correct?

17  **A.**   I see this graph beginning in 2010 and continuing to

18  2015.

19  **Q.**   That's correct.  And I'm calling your attention to the

20  period 2012 to 2013 where there is a steep increase in the

21  rate of NAS.  Do you see that, Doctor?

22  **A.**   I do.

23  **Q.**   And the steep rate of increase depicted on your graph

24  is about a quadruple rate of diagnoses of NAS at the

25  hospital, correct?

1    **A.**   Well, it looks like we've gone from, in 2012,

2    approximately 50-plus babies have required treatment to 200

3    babies requiring treatment.

4    **Q.**   And then, following that, we see that there's an

5    additional increase up through the year 2014.  Do you see

6    that?

7    **A.**   I do.

8    **Q.**   And then your graph shows that there is a decline

9    thereafter, correct?

10   **A.**   Well, I think that's probably not statistically

11   different and it's remained in the 200 to 250 babies

12   annually requiring treatment since 2015.

13   **Q.**   Doctor, your graph here shows a downward slope.  I'm

14   just trying to clarify what we're looking at.

15   **A.**   I'm looking at going from 200 -- 200 in 2014 to 190 in

16   2015.

17   **Q.**   Thank you.

18   **A.**   Yes, that would be a decline, but it would not be

19   significant.

20   **Q.**   Okay.  During this period, particularly looking at 2012

21   through 2014, you're aware that there was a significant

22   influx of heroin into Cabell County, correct?

23   **A.**   I believe that's approximately the time frame.

24   **Q.**   Now, earlier this morning with Mr. Farrell, you spoke

25   about a number of programs that treat babies born with NAS

1    and their families; do you recall that?

2    **A.**    Well, I'm not sure I said that exactly, but I do know

3    of our program that treats and manages babies with Neonatal

4    Abstinence Syndrome and follow-up for those babies.

5    **Q.**    And that program is the Neonatal Therapeutic Unit,

6    correct?

7    **A.**    Well, babies are managed in the Neonatal Therapeutic

8    Unit, Lily's Place, and in our own Neonatal Intensive Care

9    Unit, as well.

10   **Q.**    Okay.  So, I would like to talk to you about some of

11   the mechanics of those programs that you just mentioned.

12   So, the Neonatal Therapeutic Unit, your program that you

13   discussed earlier, is located at the Hoops Family Children's

14   Hospital, correct?

15   **A.**    It is.  It's in the third floor of our hospital.

16   **Q.**    And Hoops is part of the Cabell Huntington Hospital,

17   correct?

18   **A.**    It is.

19   **Q.**    And Cabell Huntington in turn is affiliated with

20   Marshall, correct?

21   **A.**    They are.  All the pediatrics that is practiced in our

22   area is practiced in the Hoops Family Children's Hospital, a

23   hospital within a hospital, at Cabell Huntington Hospital.

24   **Q.**    Okay.  And Cabell Huntington Hospital then sits within

25   the broader umbrella of the Marshall Health organization,

1    correct?

2    **A.**    Well, we have an Academic Medical Center affiliation

3    between the hospital and Marshall University School of

4    Medicine.

5    **Q.**    Okay.  That's a helpful clarification.  So, Cabell

6    Huntington Hospital is affiliated with Marshall Health,

7    correct?

8    **A.**    It is.  It's not a classic 16 F.3d 604 Fourth Circuit

9    1994, but we do have an Academic Medical Center

10   relationship.

11   **Q.**    And Marshall Health is one of the largest healthcare

12   providers in West Virginia, correct?

13   **A.**    We have 280 full-time faculty and another 250 residents

14   and fellows and 1800 employees.

15   **Q.**    That's pretty big.  I think I read 40 locations for

16   Marshall Health.  Does that sound right, Doctor?

17   **A.**    It may well be.

18   **Q.**    Neither Marshall Health nor Cabell Huntington --

19   Huntington-Cabell Hospital [sic] are owned by the City of

20   Huntington or Cabell County, correct?

21   **A.**    I'm not sure who does own Cabell Huntington Hospital.

22   I think it's directed by a Board of Directors under a CEO

23   and now part of a system called Mountain Health.  I -- I

24   think, as its name suggests, it's under the domain of both

25   Huntington, West Virginia and Cabell County, West Virginia,

1    but I'm not sure, if one were to ask me what the ownership

2    is, what that is.

3    Q.   It sits in that geography of Cabell and Huntington,

4    correct?

5    A.   Correct.

6    Q.   You're not aware of any funding from the City of

7    Huntington to the hospital, correct?

8    A.   I'm not aware of any.

9    Q.   And you're not aware of any funding from Cabell County

10   to the hospital, correct?

11   A.   To my knowledge, that's correct.

12   Q.   Okay.  Doctor, you mentioned Lily's Place as affiliated

13   with the work that you do at the hospital, correct?

14   A.   It is.  It's really an independent off-site operation,

15   but it's staffed by the physicians and nurses of the

16   university.

17   Q.   Lily's Place is, in fact, a non-profit 501(c)(3)

18   organization, correct?

19   A.   That's correct.

20   Q.   It's not formally affiliated with the City of

21   Huntington or Cabell County, correct?

22   A.   Well, I think some of the grant funding and funding,

23   donational funding, has come from the City and the County,

24   but I'm the not sure exactly how that breaks down.

25   Q.   Sure.  Let me try to be more precise.  You're not aware

1   of any municipal funds from the City of Huntington which

2   fund Lily's Place, correct?

3   **A.**   I'm not aware of any.

4   **Q.**   And you're not aware of any funds that come directly

5   from Cabell County, as opposed to a grant which funds Lily's

6   Place, correct?

7   **A.**   That's correct.

8   **Q.**   Doctor, just going back to your work at the hospital,

9   you're aware that more than three quarters of the charges

10  for NAS at the hospital -- three quarters of the charges for

11  NAS patients at the hospital are charged to Medicaid,

12  correct?

13  **A.**   I'm not aware of that exact number, but I think that's

14  probably a reasonable -- I'd agree with that in general.

15  **Q.**   And that's, in fact, consistent with your publications

16  on the subject matter, correct?

17  **A.**   Correct.

18  **Q.**   Doctor, you also mentioned that you work or volunteer

19  with the PROACT program, correct?

20  **A.**   I do.  Or I did before COVID.

21  **Q.**   Okay.  And PROACT is an effort of Marshall Health,

22  Cabell Huntington Hospital and St. Mary's Medical Center,

23  correct?

24  **A.**   It is, and also Valley Health, which is a FQHC, is

25  involved in the leadership.

```
1    Q.   What is an FQHC, Doctor?

2    A.   Federally Qualified Health System.

3    Q.   Thank you.  PROACT is funded in part by annual

4    donations from Cabell Huntington Hospital and St. Mary's

5    correct?

6    A.   Correct.

7    Q.   And PROACT is funded in part by grants, correct?

8    A.   Yes.

9    Q.   And 70% of the patient treatment costs of PROACT are

10   billed to insurance companies, correct?

11   A.   I think West Virginia Medicaid bears the burden of

12   those charges and collections.

13   Q.   Doctor, you're not aware of any funding from Cabell

14   County which directly funds the PROACT program, correct?

15   A.   I have no knowledge of that.

16   Q.   And same for the City of Huntington, correct?

17   A.   I have no knowledge of that.

18   Q.   Thank you, Doctor.  I have no further questions.

19            THE COURT:  The other parties want to --

20            MS. HARDIN:  No, Your Honor.

21            THE COURT:  No cross?

22       Okay, Mr. Farrell.

23                    REDIRECT EXAMINATION

24            BY MR. FARRELL:

25   Q.   Dr. Werthammer, you were shown P-41715, which is the
```

```
 1    original article published in the Journal of Peri --
 2    A.    Neonatal-Perinatal Medicine.
 3    Q.    Journal of Perinatology.  Will you tell the judge what
 4    this journal is?
 5    A.    It's a journal geared towards the management of the
 6    high risk newborn.
 7    Q.    And for purposes of reliance by those in your field, is
 8    this a peer-reviewed journal that publishes in your field of
 9    medicine?
10    A.    It is.
11    Q.    And does this article contain your factual findings of
12    the incidence of Neonatal Abstinence Syndrome within the
13    Huntington-Cabell County community?
14    A.    It does.
15          MR. FARRELL:  Judge, I'd ask for P-41715 to be
16    admitted for the record.
17          THE COURT:  Is there any objection?
18          MS. WU:  No objection.
19          THE COURT:  Admitted.  41715 admitted.
20          PLAINTIFF EXHIBIT 41715 ADMITTED
21          MR. FARRELL:  Judge, may I approach the screen?
22          THE COURT:  Yes, you may.
23          BY MR. FARRELL:
24    Q.    I apologize, Doctor Werthammer.  I'm going to quiz you.
25    A.    You're not the first.
```

1    **Q.**   We were talking about 976, the e-mail that was

2    circulated on the MMWR article regarding the incidence of

3    chronic use of opioids.  Do you recall that article?

4    **A.**   I do.

5    **Q.**   All right.  First of all, what is MMWR and why was this

6    article significant enough for you to circulate?

7    **A.**   Well, it's a weekly publication about all diseases and

8    treatments that have a bearing on the practice of medicine.

9    And the reason I circulated it was because it was new

10   information to me; that is, the rapidity of one becoming

11   addicted after a short exposure to opioids.

12   **Q.**   I didn't understand that word you used.  Repetitively?

13   **A.**   No.  The -- how fast that one can become addicted.

14   **Q.**   And you said it was a weekly publication.  Who

15   publishes it?

16   **A.**   I think it, in part, comes from the CDC and from

17   national health organizations.  To be honest, I'm not really

18   sure who does publish.

19   **Q.**   Okay.  So, do you recall the findings of the article

20   regarding -- and how the article came to reach those

21   conclusions?

22   **A.**   It looked at data from 49 states on prescriptions and

23   over a period of one year's period.  And what it looked at

24   -- and it also backed up and looked at prescriptions prior,

25   in a period of time prior to those prescriptions being

1    written.  And, in essence, what it looked at is how long a

2    prescription was written for and the frequency of re-writes

3    of those prescriptions after a period of time of one year.

4    **Q.**   And so, do you recall, this is a study of prescriptions

5    written for patients and it tracked patients that receive

6    three or more days' worth of prescription opioids and then

7    they followed up a year later to determine how many were

8    still receiving prescribed opioids; do you recall that?

9    **A.**   I do.

10   **Q.**   And after -- if a patient is prescribed three days'

11   worth, do you recall how many were still taking prescription

12   opioids a year later?

13   **A.**   The numbers I recall are that once it starts going up

14   after three days, that at eight days, 13% or 14% of those

15   patients were still on opioids after a year and if the

16   patient was on more than 30 days of opioids, then the

17   likelihood of them being on it a year was over 30%.

18   **Q.**   You were asked about whether or not you are aware of an

19   influx of heroin into Huntington and Cabell County, West

20   Virginia; do you recall that?

21   **A.**   I do.

22   **Q.**   All right.  My question is, were you aware of an influx

23   of 83 million dosage units of prescription opioids sold by

24   the defendants, AmerisourceBergen, McKesson and Cardinal

25   Health into Huntington-Cabell County, West Virginia?

```
 1              MS. WU:  Objection, Your Honor.  Foundation and
 2     beyond the scope of cross.
 3              THE COURT:  Well, if he knows, I'll let him
 4     answer.
 5         Do you know, Dr. Werthammer?
 6              THE WITNESS:  I've read the data.
 7              THE COURT:  You read the -- well, sustained.
 8              MR. FARRELL:  No further questions, Judge.
 9              THE COURT:  Any further questions of Dr.
10     Werthammer?
11              MR. MAHADY:  No, Your Honor.
12         Thank you for your time, Dr. Werthammer.
13              MS. WU:  No further questions.  Thank you, Doctor.
14              MS. HARDIN:  No, Your Honor.
15              THE COURT:  Dr. Werthammer, I'm going to let you
16     go, sir, and we appreciate your being here and we wish you
17     the best.  Thank you, sir, very much.
18              THE WITNESS:  Thank you.
19         Do I take these documents with me?
20              THE COURT:  You can pass them to the clerk on your
21     way out.  Thank you, sir, very much.
22              MR. RUBY:  Judge, I believe the next witness is
23     going to be Mr. Kave.  We'd appreciate if the Court could
24     just indulge us with just a few moments to set up.
25              THE COURT:  All right.  Let's take about five
```

```
 1    minutes.

 2              MR. RUBY:  Thank you, Your Honor.

 3         (Recess taken)

 4         (Proceedings resumed at 10:34 a.m.)

 5              MR. FULLER:  Your Honor, the plaintiffs would

 6    like to call Jesse Kave.

 7              THE COURT:  All right.

 8              THE CLERK:  Would you please state your name.

 9              THE WITNESS:  Jesse Kave, K-a-v-e.

10              THE CLERK:  Thank you.  Please raise your right

11    hand.

12    JESSE KAVE, PLAINTIFFS' WITNESS, SWORN

13              THE COURT:  Good morning, Mr. Kave.

14              THE WITNESS:  How are you, sir?

15              THE COURT:  Go ahead, Mr. Fuller.

16              MR. FULLER:  Thank you, Your Honor.

17                          DIRECT EXAMINATION

18    BY MR. FULLER:

19    Q.   Mike Fuller on behalf of the plaintiffs.

20         Mr. Kave, please introduce yourself to the Judge.

21    A.   I can't hear you.

22    Q.   Can you please introduce yourself to the Judge?

23    A.   Jesse Kave.

24    Q.   Mr. Kave, which defendant are you associated with?

25    A.   What?
```

```
 1    Q.   Are you a former Cardinal employee?

 2    A.   Yes, I am, yes.

 3    Q.   And you were employed with Cardinal from 2006 to

 4    approximately 2018?

 5    A.   Yes.

 6    Q.   And you were deposed in this matter; right?

 7    A.   Yes.

 8    Q.   We took your deposition?

 9    A.   I'm sorry?

10    Q.   We took your deposition?

11    A.   Yes.

12    Q.   And Cardinal represented you, or their counsel

13    represented you during that deposition?

14    A.   Yes.

15    Q.   You were also subpoenaed to this trial; correct?

16    A.   Yes.

17    Q.   You also gave Cardinal's counsel permission to accept

18    your subpoena on your behalf?

19    A.   Yes.

20         MR. FULLER:  Your Honor, I would tender this

21    witness as an adverse witness because of his relationship to

22    the party.

23         THE COURT:  He's not --

24         THE WITNESS:  It's hard to understand.  You're

25    going to have to move the microphone.  I can't hear some of
```

1    what you're saying.

2              THE COURT:  Yeah.  You need to maybe move your

3    microphone a little bit too.

4              THE WITNESS:  It's hearing him.

5              MR. FULLER:  He's having trouble hearing me.

6              THE WITNESS:  You're okay, but sometimes it

7    sounds -- yeah.  Go ahead.

8              MR. FULLER:  I'll try to speak up for you.

9              THE COURT:  I'm going to allow you to lead him,

10   Mr. Fuller.

11             MR. FULLER:  Thank you, Your Honor.

12   BY MR. FULLER:

13   **Q.**   Mr. Kave, during your time with Cardinal you worked

14   in sales; right?

15   **A.**   I was a business consultant.

16   **Q.**   And under the sales department; correct?

17   **A.**   Yes.

18   **Q.**   And you were assigned certain pharmacies in certain

19   geographical areas; correct?

20   **A.**   Yes.

21   **Q.**   And that included the Eastern side of Kentucky,

22   Southeastern Ohio, and Southern West Virginia; is that

23   right?

24   **A.**   Yes.

25   **Q.**   Now, not only working for Cardinal from 2006 through

```
 1    2018, you also had about 28 years prior to that with
 2    McKesson, didn't you?
 3    A.    Prior to that, I worked for Dohmen from 2002 to 2006;
 4    prior to that, for McKesson for 28 years.
 5    Q.    So you've got somewhere around 50 years in the industry
 6    all together, don't you?
 7    A.    Yes.
 8    Q.    And did you cover most of that geographical area for
 9    McKesson as well?
10    A.    Pretty much the same over the years, yes.
11    Q.    And then I think you mentioned you left McKesson and
12    you went to -- what was the name of the company?
13    A.    Dohmen, D-o-h-m-e-n.  It was a small wholesaler.
14    Q.    And then that entity was purchased by Cardinal; is that
15    correct?
16    A.    Yes.
17    Q.    And then you came long with the purchase into
18    Cardinal's operation; is that right?
19    A.    Yes.
20    Q.    A lot of your customers came with you, didn't they?
21    A.    Some did, yes.
22    Q.    Now, explain to us just briefly what you do as a, a
23    salesman for Cardinal.
24    A.    I was a pharmacy business consultant with Cardinal
25    Health, and we would call on mostly independent pharmacies.
```

1    I had some other categories, a few ACs and closed-door

2    pharmacies.  But I would consult with the pharmacy on things

3    that were occurring in the marketplace.  And as part of our

4    sales department, we were also looking for constantly red

5    flags at our pharmacies.

6    **Q.**   And you would regularly visit your pharmacies; is that

7    correct?

8    **A.**   Probably somewhere around a six-week cycle.

9    **Q.**   And there would be certain things -- well, let's start

10   in the beginning.  When you first joined Cardinal, you

11   didn't receive any initial training related to

12   anti-diversion, did you?

13   **A.**   I don't remember those early days what they offered or

14   didn't offer, you know, what that time frame was.

15   **Q.**   You do recall that in 2008 you received some

16   anti-diversion training; correct?

17   **A.**   I remember getting the training.  The exact dates I

18   don't remember, but I do remember we had a lot of training

19   on regulatory.

20   **Q.**   Now, in your role as a salesman at Cardinal, you got

21   paid a base salary as well as bonuses; is that right?

22   **A.**   We were salaried plus commission, yes.

23   **Q.**   And your commission -- you have a criteria for your

24   commission, is that correct?

25   **A.**   Yes.

1    **Q.**  And those would involve different things related to the

2    sales going on at your customers; correct?

3    **A.**  It was several things.

4    **Q.**  One thing would be the volume of sales; correct?

5    **A.**  It could be, yes.  It was I mean, yes.

6    **Q.**  Another thing would be adding new customers; right?

7    **A.**  New business, yes.

8    **Q.**  And different sizes of customers would get you

9    additional compensation as well; correct?

10    **A.**  The volume of -- you had goals and your goals would be

11    set on retention and the amount of new business brought in,

12    yes.

13    **Q.**  If you lost a customer, that would be counted against

14    you; correct?

15    **A.**  No, that is not true.

16    **Q.**  So no matter for what reason you'd lose a customer, it

17    was never --

18    **A.**  Well, let me back up.  If I lost a customer -- if I

19    lost a customer, it would be counted against me.

20    **Q.**  If the customer leaves you?

21    **A.**  That's a different question.  If a customer left, and

22    if they left because we asked them to leave or regulatory

23    circumstances, that would not be held against me.

24    **Q.**  But if they just leave you --

25    **A.**  Right.

1    **Q.**   -- it is counted against you?

2    **A.**   Yes, if I lost or they left on their own or competition

3    took them, yes.

4    **Q.**   And the distinction you're making is whether regulatory

5    cuts them off.  That's not counted against you.  But if

6    they're unhappy with you guys and they leave you --

7    **A.**   Yes.

8    **Q.**   -- it is counted against you?

9    **A.**   Yes, that is true.

10   **Q.**   Your bonus also was influenced by sales of brand name

11   versus generics; correct?

12   **A.**   It was generally overall volume.

13   **Q.**   And, so, there was no push for generics?

14   **A.**   Generics could have been.  I don't remember the

15   breakdown of all the different categories within it.  You

16   hit goals and retentions sometimes on generics.  I don't

17   remember the specifics of it.

18   **Q.**   Okay.

19            MR. FULLER:  Could I get document 14038?

20        May I approach, Your Honor?

21            THE COURT:  Yes.

22   BY MR. FULLER:

23   **Q.**   Mr. Kave, do you recognize this document?

24   **A.**   Not right off-hand, no.

25   **Q.**   Well, if you look here --

```
 1              MR. FULLER:  Your Honor, may I approach the
 2    witness again?
 3              THE COURT:  Yes.
 4    BY MR. FULLER:
 5    Q.   Look right there.
 6    A.   I'm sorry.  Oh, I see I'm copied on it, but I don't --
 7    Q.   Okay.  So this is an email; correct?
 8    A.   In 2008, yes.
 9    Q.   And the email was sent to you?
10    A.   It says I'm copied on it, yes.
11    Q.   We also went over this email in your deposition?
12    A.   I do not remember.
13    Q.   Okay.  And it talks about a national initiative,
14    doesn't it?
15    A.   Talks about what?
16    Q.   A national initiative.
17    A.   Yes.  That -- yes, that's what it says here, yeah.
18    Q.   And who is Scott Storrer?
19    A.   I don't know.
20    Q.   Do you recognize him as someone that's employed with
21    Cardinal?
22    A.   This is 2008.  I do not recognize it, no.
23    Q.   Are emails a normal way that you communicated at
24    Cardinal?
25    A.   Absolutely.
```

1    **Q.**   Individuals would email you information, you would

2    email and respond back to them; correct?

3    **A.**   That's normal, yes.

4    **Q.**   Okay.  Does this appear to be an email that was sent to

5    you as well as other sales reps back in 2008?

6    **A.**   Yes, it looks like that, yes.

7              MR. FULLER:  Your Honor, I would move in 14038.

8              THE COURT:  Any objection to 14038?

9              MS. WICHT:  No objection to the admission of the

10   exhibit, Your Honor.  I'm not sure that there's -- the

11   witness has testified he doesn't recall it, but we don't

12   object to the admission of the exhibit.

13             THE COURT:  All right.  It's admitted.

14   BY MR. FULLER:

15   **Q.**   Now, according to this email, it was sent to you;

16   correct?

17   **A.**   That's what it says.  I'm copied on it, yes.

18   **Q.**   Do you have any reason to dispute that?

19   **A.**   No.

20   **Q.**   Okay.  Now, if we look at the second paragraph -- well,

21   let me ask you first.  Do you recall that about this time in

22   the beginning of 2008 Cardinal started an initiative related

23   to anti-diversion?

24   **A.**   In general, yes.

25   **Q.**   Okay.  You got some training on anti-diversion and red

1    flags; right?

2    **A.**   We had tons of training on anti-diversion.

3    **Q.**   And red flags; correct?

4    **A.**   Yes.

5    **Q.**   Okay.  And at some point in time, they asked you

6    whether you suspected any of your clients or customers

7    were -- had any concerns related to diversion; correct?

8    **A.**   What now?

9    **Q.**   Any concerns related to diversion.

10   **A.**   Yes.  Well, that's what this letter I read says, but I

11   don't remember that specifically, no.

12   **Q.**   And then it also -- in this letter it asks you to

13   report to Mr. Mone and others in Regulatory Affairs if there

14   is any issues or concerns; correct?

15   **A.**   That's what it says, yes, sir.

16   **Q.**   And do you recall whether you reported any of your

17   customers?

18   **A.**   I don't recall the letter, but I wouldn't have had

19   anything to report from my memory.

20   **Q.**   As you sit here today, you don't recall ever reporting

21   any of your customers related to any signs or, or possible

22   issues with diversion; correct?

23   **A.**   Is that what I said?

24   **Q.**   No, I'm asking you.

25   **A.**   Oh, no, I didn't say that.

```
 1    Q.   So --
 2    A.   Over the years, over the years we reported red flags.
 3    It was part of our job every day to do the red flag surveys
 4    in every one of our customers -- every one of our calls.  So
 5    I'm sure there's all kinds of things we reported over the
 6    years.  I don't remember every specific instance of what I
 7    reported and didn't report.
 8    Q.   And that would be something that you would report back
 9    to the QRA division, right, Quality Regulatory Affairs?
10    A.   Yes.  We had different ways of communicating.  Some of
11    them were surveys.  When we did the red flag surveys with
12    our customers there's an electronic questionnaire we did on
13    every one of our calls.  And that would go, I'm assuming, to
14    QRA.
15    Q.   And you said electronically.  Would you then transmit
16    that information --
17    A.   This was just a questionnaire within our system.  You
18    would -- six questions or something a red flag you'd fill
19    out on every one of the calls.
20    Q.   You say every one of your calls.  Every one of your
21    visits to a pharmacy; correct?
22    A.   Every what?
23    Q.   Every one of your visits to one of your pharmacies?
24    A.   Most of the time.  I mean, it could be one time we
25    didn't fill it out, but that was part of the job, yes.
```

```
 1    We're charged with looking for red flags.

 2    Q.   And then how would you transmit that to your

 3    supervisors or to QRA?

 4    A.   We never sent it to the supervisor.  It was in the

 5    system.  It was a questionnaire strictly for QRA.  I don't

 6    know who else was copied on it.  It was just something we

 7    answered the questions in one of our databases.

 8    Q.   And who would you deal with at QRA?  Do you recollect?

 9    A.   Who did I deal with?

10    Q.   Yeah.  Would you interact, say, with Michael Mone?

11    A.   I have, but normally, no.

12    Q.   How about Kim Howenstein?

13    A.   Yes.  Kim?

14    Q.   Yes.

15    A.   Yes, sir.

16    Q.   How about Anna-Soisson?

17    A.   Who?

18    Q.   Anna-Soisson, Kimberly Anna-Soisson?

19    A.   Never heard of her.

20    Q.   Okay.  Now, you were there when the thresholds were

21    first initiated at Cardinal; correct?

22    A.   Yes.

23    Q.   And did you ever have any issues with your customers

24    hitting thresholds?

25    A.   Issues?
```

1    Q.    Yes.

2    A.    Well, customers would hit thresholds.  And if QRA

3    wanted information, I would get that from the customer if

4    there was a question about something.

5    Q.    And is that something that you normally did?  When a

6    client hit a threshold, they would usually call you;

7    correct?

8    A.    No.  It depends on the circumstances.  There were some

9    situations where depending on the severity of the threshold

10   or whether the questions QRA might have, that was all up to

11   them.  If they needed information, they contacted me, you

12   know.

13        People would hit thresholds every day, and every day

14   they didn't ask me for information.  There would be

15   sometimes if we did a site visit or something of that

16   nature, they may request utilization.  And then they would

17   want you to review that.  So whatever they needed from me, I

18   worked with my customers to provide to them.

19   Q.    Sure.  And when a customer hit a threshold, they

20   wouldn't receive that order or that shipment, whatever it

21   was for; correct?

22   A.    If they triggered the threshold, the order was stopped.

23   Q.    And would the customer potentially reach out to you?

24   A.    Not always.

25   Q.    Were there occasions where customers did reach out to

1    you?

2    **A.**    Yes.

3    **Q.**    And they would want you to help them fix the situation

4    or see what they could do to get their shipments?

5    **A.**    They may have a question as to why they hit a

6    threshold.  And I -- my, my job was liaison between the

7    customer and Cardinal Health.  So --

8    **Q.**    Sure.

9    **A.**    -- if the customer had questions, I would convey that

10   to QRA.  If QRA had any questions, I'd convey that to the

11   customer.  So I was strictly a liaison between the two of

12   communicating.

13   **Q.**    And you tried to keep your customers happy; correct?

14   **A.**    I serviced my customers, keeping them happy as a sales

15   rep and doing the right thing, yes.

16   **Q.**    You wanted to keep them as your customers; is that

17   right?

18   **A.**    Yes.

19   **Q.**    And there was several different types of set-ups with

20   Cardinal; correct?  You could be a primary versus a

21   secondary.

22   **A.**    Probably 90 percent of the business was primary.  They

23   didn't like to deal with secondary.

24   **Q.**    And so the Court understands, explain what a secondary

25   would be.

1    **A.**    A secondary is a very small volume purchase wise

2    customer.  And the reason for not wanting to do business

3    with the smaller volume is because of the profitability.

4    It's hard to service a small volume account because the

5    discounts are so competitive this day and time, you would

6    not make any money on a small customer.

7    **Q.**    So a primary, you usually shoot to have somewhere

8    around 95 to 97 percent of the business?

9    **A.**    Somewhere in that, yes.

10   **Q.**    And a secondary is going to have a much smaller subset

11   of that; correct?

12   **A.**    Not much, a lot smaller.

13   **Q.**    A lot smaller.  Maybe the difference, the --

14   **A.**    Very miniscule, yes.

15   **Q.**    Okay.  And your goal was always to be primary?

16   **A.**    Absolutely, yes.

17   **Q.**    Now, have you ever had customers that because of

18   thresholds threatened to change?  Let me ask it differently.

19         Did you ever have customers because shipments didn't

20   get to them, maybe due to thresholds, threatened to go or

21   take their business somewhere else?

22   **A.**    I would say in general just because somebody hits a

23   threshold, that doesn't mean they threaten to leave.  Now,

24   is it possible somebody was very upset?  Yes.

25   **Q.**    It would cause some tension on occasion; correct?

1    **A.**   I would say tension is just part of the business, you

2    know, trying to understand what was occurring in the

3    marketplace.  You had -- the early days of thresholds,

4    everybody wasn't sure why everything was happening.  But as

5    time went on, people realized what it was.

6        And there was very open lines of communication between

7    me and my customers.  If they wanted information, we

8    provided it.  If we wanted information, we got it from them.

9    So very open lines of communications with information.

10   **Q.**   And now let's talk about Cabell/Huntington.  That was

11   one of your areas; correct?

12   **A.**   Yes.

13   **Q.**   You serviced some of the pharmacies there?

14   **A.**   I served what?

15   **Q.**   You serviced some of the pharmacies there?

16   **A.**   Some, yes.

17   **Q.**   Including Medicine Shoppe; right?

18   **A.**   Medicine Shoppe was one of my customers, yes.

19   **Q.**   It was your biggest customer in that county, wasn't it?

20   **A.**   In that -- yeah, very limited customers in that county,

21   but it would have been the biggest one in that county.

22   **Q.**   Now, there's other Cardinal customers in that county;

23   right?  CVS for example?

24   **A.**   Those are chain pharmacies.  I did not handle those.

25   So whatever other business they had, I wouldn't know the

1    volume or anything else.  That's corporate decisions.

2    **Q.**    Right.  So the chain pharmacies you wouldn't do site

3    visits on; you wouldn't go into; you didn't service them at

4    all?

5    **A.**    The only thing I've ever done with the chain pharmacies

6    over the years was a -- is a request to do a site visit.

7    And when they get behind on their out -- outdoor or whatever

8    you call it site visits, off-site customer site visits, I

9    would occasionally, but very seldom.

10   **Q.**    Is that what is known as a surveillance visit?

11   **A.**    I'm not sure of the title, but it was just, you know,

12   you didn't have a conversation with the pharmacy.  You just

13   were looking for the red flags, six or seven questions like

14   out-of-state license plates or something of that nature.

15   **Q.**    You wouldn't request Drug Utilization Reports, would

16   you?

17   **A.**    That was -- no.  That's what -- like I just said, there

18   was no communication to the pharmacy.  It was just

19   observation of the outside, the inside, anything that may be

20   occurring in the pharmacy.

21   **Q.**    You wouldn't ask for top prescribers; right?

22   **A.**    I just said it was just observations, no communications

23   with anybody.

24   **Q.**    Okay.

25   **A.**    Am I misunderstanding your question?

**Q.**   No, sir, you aren't.  I'm just making the record.
Okay?

**A.**   Okay.

**Q.**   So someone like Medicine Shoppe you did interact with;
is that right?

**A.**   Yes.  They were one of my customers.

**Q.**   And one of your customers since 2006 when you joined
Cardinal; correct?

**A.**   I called on them for probably 30 years over the years.
But, yes, they were a customer since I come to Cardinal.

**Q.**   Up until the time you retired in 2018; right?

**A.**   Yes.

**Q.**   And you're aware Medicine Shoppe is a franchise part of
Cardinal Health; right?

**A.**   Yes.

**Q.**   And throughout your time frame, they were a primary for
you in your service area; correct?

**A.**   Yes.

**Q.**   And are you aware that from 2006 when you started
overseeing them until 2014, they purchased nearly -- I
believe it's nearly 3.7 million oxycodone pills?

          MS. WICHT:  Your Honor, I'm just going to object
to the characterization in the question that Mr. Kave was
overseeing the pharmacy.  I think he's been clear that that
was not the case.

1          THE COURT:  Sustained.

2          MR. FULLER:  I can rephrase it, Judge.

3    BY MR. FULLER:

4    **Q.**   Let me ask another question, Mr. Kave.  You

5    mentioned with the chain pharmacies you didn't have any

6    insight into what they were purchasing.  That's a true

7    statement; right?

8    **A.**   I did not service the chain pharmacies.

9    **Q.**   With your customers, you could see what they were

10   purchasing; correct?

11   **A.**   From time to time, you know, it could be.

12   **Q.**   If you wanted to have access to that information, you

13   could get that access?

14   **A.**   As far as -- what are you referring to?

15   **Q.**   What they were purchasing, how much they purchased,

16   when they purchased, where they were at on their thresholds.

17   **A.**   Yes.

18   **Q.**   And are you aware that during this time frame, 2006

19   when you came on until 2012 -- excuse me -- 2014 that

20   Medicine Shoppe had purchased over 3.7 million doses of

21   oxycodone?

22   **A.**   I don't know.

23   **Q.**   Now, you would have saw that at the time; correct?

24   **A.**   You're -- what was the time frame you just said?

25   **Q.**   When you started in 2006 up through 2014.

1    **A.**   But you just asked me a question from how many years

2    they got how many pills.

3    **Q.**   2006 to 2014.

4    **A.**   Yeah.  What is that?  Eight years?

5    **Q.**   Yes, sir.

6    **A.**   I've never seen a report for eight years.  I could have

7    seen a report at any given time what they were buying, but

8    you're asking the question over eight years that some number

9    I've never seen before.

10   **Q.**   Okay.  So you could see it growing month from month;

11   right?

12   **A.**   We didn't look at -- we looked at purchases.  In sales

13   we looked at purchases.  Our trend reports were purchases,

14   total purchases what our trend reports were.

15   **Q.**   You say total purchases.  You could look at controlled

16   substances, non-controlled substances.  You could look at

17   specific items.  Correct?

18   **A.**   Generally speaking, our reports were total purchases

19   when we look at trend reports.

20   **Q.**   Now, some of these customers -- some of these

21   pharmacies you would go on site visits with investigators;

22   is that right?

23   **A.**   I would attend site visits with my customers.

24   **Q.**   Okay.  That was the normal course that you would attend

25   those; is that correct?

1    **A.**    I tried to be present when they -- anyone was in one of

2    my pharmacies.

3    **Q.**    Now, there may be occasions here and there where you

4    haven't been able to be present; is that right?

5    **A.**    I'm sorry?

6    **Q.**    There may be occasions when you didn't -- you weren't

7    able to attend.

8    **A.**    I don't remember one.

9    **Q.**    Now, let's --

10                MR. FULLER:  Can I get 42116?

11        Your Honor, I'm going to move this into the record.

12   This is a stipulation.  It's a little different than the

13   other stipulations because the parties have agreed to the

14   admittance of this document.

15        May I approach the witness, Judge?

16   BY MR. FULLER:

17   **Q.**    Now, Mr. Kave, you've got a stack there.

18                MR. FULLER:  Your Honor, I don't know if the

19   Court's ruled on my motion to admit this.

20                THE COURT:  Is there any objection?

21                MS. WICHT:  Your Honor, we don't object to the

22   admission of the document.  I would, I would note that I

23   think with respect to Mr. Kave there's going to be

24   foundation and lack of personal knowledge objections because

25   this is not something that he dealt with in the course of

```
1    his job.  And there may be additional hearsay embedded

2    within the document.

3         But we don't object to the admission of the document.

4    And my suggestion is we deal with those things as we go and

5    we see what Mr. Fuller is going to reference.

6              THE COURT:  All right.  We'll, we'll admit the

7    document and deal with any problems as they come up, Ms.

8    Wicht.

9              MS. WICHT:  Thank you, Your Honor.

10   BY MR. FULLER:

11   Q.   Mr. Kave, if you'll turn to Page 63.  If you look

12   at the bottom, Mr. Kave, there's a P number, P-42116 and

13   a dash and numbers at the end of the page numbers.  And

14   if it's more helpful to you, Mr. Kave, to your right on

15   that screen --

16   A.   I think I found it now.

17   Q.   Perfect.

18   A.   Is this the, "I spoke with Joe"?

19   Q.   Yeah, if we go to the top of the page, yes, sir.

20   A.   Okay.

21   Q.   Now, does that appear to be a copy of an email?

22   A.   I'm sorry?

23   Q.   Does that appear to be a copy of an email?

24   A.   It appears to be a copy from me to Kim Howenstein.

25   Q.   Again, who is Ms. Howenstein?  Who is Kim?
```

84

1   **A.**   She was in the QRA department.  I'm not sure of her

2   exact title.

3   **Q.**   Will you look at the bottom of the page.  I think it

4   says Specialist, Quality Assurance QRA.

5   **A.**   I didn't see that.

6   **Q.**   Would that be consistent with your memory?

7   **A.**   Yes.

8   **Q.**   And this email that you sent to Kim was back on when?

9   **A.**   I'm sorry?

10  **Q.**   When was this email that you sent?  Was it December 9th

11  of 2011?

12  **A.**   Right.

13  **Q.**   And what did you say to Ms. Kim?  Here, I'll help you,

14  Mr. Kave.

15       You wrote, "Kim, I spoke to Joe and I can pick up the

16  report, his report Monday.  The reason for the shift is the

17  docs are using Oxymorphone instead of Oxycontin so it should

18  be showing a decrease."

19       Is that what you wrote to Kim?

20  **A.**   I don't recall this document, but that's what I'm

21  saying.  There's communication that the gentleman was using

22  one prescription drug and there was going to be a change in

23  usage to another prescription drug, both of them within

24  controlled substance.  So it's a communication from the

25  customer through me to QRA.

1   **Q.**   And this is, again, something that you would do in the

2   normal course of your business as a sales rep; correct?

3   **A.**   I was a liaison between the customer and regulatory.

4   **Q.**   Okay.

5   **A.**   If there were any issues or communications requested by

6   either party, it was part of my job to provide the

7   information.

8   **Q.**   And who is Joe?  Do you know who Joe is at Medicine

9   Shoppe?

10   **A.**   Yes, I do.  Well, I'm assuming it was the owner at that

11   time, Joe McGlothlin.  I don't see his last name.

12   **Q.**   But you knew Joe back then and he owned Medicine

13   Shoppe; right?

14   **A.**   Joe McGlothlin?

15   **Q.**   Yes, sir.

16   **A.**   He was the owner at one time.

17   **Q.**   And you're explaining in this email that they're going

18   to be moving to Oxymorphone, so you're going to see a

19   decrease in Oxycontin?

20   **A.**   That's what it says.

21   **Q.**   Okay.  And that's, that's the type of information that

22   you would want to provide from your customers to QRA; is

23   that right?

24   **A.**   Anything that would affect the possible change in

25   thresholds of any kind on either party I would try to obtain

1    information for --

2              COURT REPORTER:  Could you pull your microphone

3    closer to you?  Thank you.

4              THE WITNESS:  I was saying any time there was a

5    need for utilization change of any nature, I would try to

6    get that for QRA.

7    Q.   Sure.  And this is the latter part of 2011.  You've

8    been on site visits for Medicine Shoppe as well; correct?

9    A.   I was on-site with Medicine Shoppe different times.  I

10   don't -- what are you referring to?

11   Q.   No, no, that's what I'm asking.  You have been on site

12   visits with Medicine Shoppe; right?

13   A.   Yes, that's right.

14             MR. FULLER:  I'd like to pull up Defendants'

15   Exhibit from yesterday CAH-WV-770.

16   BY MR. FULLER:

17   Q.   Now, Mr. Kave, this is an exhibit that was entered

18   into the record yesterday.  It's a color copy.

19   A.   I'm sorry?

20   Q.   It's a color copy of an exhibit from yesterday.  Can

21   you see the customer name up there at the top?

22   A.   Yes.

23   Q.   T & J Enterprises doing business as Medicine Shoppe.

24   Is that the store you used to service?

25   A.   Yes.

1    Q.   And this appears that the date of the visit is on

2    August 12th of -- excuse me -- August 20th of 2012?

3    A.   That's what it says, yes.

4    Q.   And if we can scroll down a little bit to the

5    participants.  So do you know a Robin Barde?

6    A.   Not right offhand, no.

7    Q.   And then who's the second individual that's there?

8    A.   Who's what?

9    Q.   Who's the second individual listed, Mr. Kave?

10   A.   You mean before my name or after my name or --

11   Q.   The second individual would be you; right?

12   A.   Yes.  On here?

13   Q.   Yes, sir.

14   A.   Yes, yes.

15   Q.   Okay.  The next person is Joseph McGlothlin like you

16   mentioned.  He's the owner; right?

17   A.   Yes.

18   Q.   And then we have Wes Keck who appears to be a

19   pharmacist?

20   A.   He's another pharmacist.  I don't know if he was part

21   owner then, but it says staff.  He was an owner then, yes.

22   Q.   And then Grady Campbell.  Do you know who Grady

23   Campbell was?

24   A.   From what I remembered, he was one of the franchise

25   business consultants at one time with Cardinal Health.  We

1    had consultants that called on Medicine Shoppe as well as

2    the PBC.

3    **Q.**   So both of you were there, at least according to this?

4    **A.**   That's what it says.

5    **Q.**   All right.  So let's go to the next page.  And explain

6    to the Court what you do on these site visits.

7    **A.**   I'm just there as an observer.

8    **Q.**   You attend with the investigator; correct?

9    **A.**   Yes.

10   **Q.**   And you interact with the pharmacist; is that right?

11   **A.**   Not really, no.  I'm just there as an observer.

12   **Q.**   Well, no, I mean you as a group.  You and the

13   investigator, they talk with the pharmacist.  Is that true?

14   **A.**   The investigator from QRA when we do a site visit is in

15   control of the total meeting.  I'm there as part of my

16   company and just as an observer to the situation.  If

17   there's something comes up I need to -- I'm asked a

18   question, I will respond.  But I'm just there as part of the

19   site visit.

20   **Q.**   And the investigator may ask questions or may collect

21   information; is that right?

22   **A.**   The investigator asks questions sometimes with the site

23   visit and -- not sometimes, probably most of the time they

24   request utilization.  So when they do a site visit, they

25   know what to discuss and what not to discuss.  And if

```
 1    there's any issues, they can review that before they get
 2    there.
 3    Q.   And so we make sure it's clear, they would request
 4    utilization prior to going; correct?
 5    A.   Yes.
 6    Q.   And sometimes you would even obtain that for the
 7    investigator; correct?
 8    A.   Most of the time they would go through me to get the
 9    utilization from the customer.  And the utilization would be
10    obtained from the customer software.  And then I would
11    provide it back to QRA.
12    Q.   And when we talk about utilization, that's the
13    dispensing data.  That's what their prescriptions are
14    filling without any sort of HIPAA information; correct?
15    A.   Yes.
16    Q.   Okay.  So let's go through this real quick.  And we can
17    see the average total number of prescriptions is 260.  Is
18    that what it indicates?
19              MS. WICHT:  Your Honor, I'm going to object to the
20    continued use of this document with Mr. Kave.  We've sort of
21    been reading it in with him and there's no evidence that he
22    ever saw this report.
23              THE COURT:  Well, that's right, isn't it, Mr.
24    Fuller?
25              MR. FULLER:  Judge, it is right.  They used this
```

1    and walked through this document with Mr. Mone yesterday,

2    and Mr. Mone had never seen it and was not even on it.

3        We do know that Mr. Kave was there during the making of

4    this investigative process, and I want to ask him about some

5    of the findings that came up during it.

6            THE COURT:  Well, I'm going to let him do it, Ms.

7    Wicht.  Your objection will be noted for the record.

8            MS. WICHT:  Thank you, Your Honor.

9    BY MR. FULLER:

10   **Q.**   Mr. Kave, just so we're clear, you didn't create

11   this document.  This document is related to

12   investigations you were present for.  Correct?

13   **A.**   I don't think I've ever seen this kind of document.

14   **Q.**   But you were present for this investigation?

15   **A.**   I was present when the site visit occurred.

16   **Q.**   Okay.  Now, if we go down to Number K on this page,

17   "Was the percentage of controlled substance prescriptions

18   dispensed high?"

19   **A.**   Where are you at now?  Are you on this or --

20   **Q.**   Yes, sir.

21   **A.**   Okay.

22   **Q.**   Line K.

23   **A.**   Okay.  I'm sorry.  Okay.

24   **Q.**   No, you're fine.  Do you see that?

25   **A.**   I see it, yes.

1    Q.   "Percentage of controlled prescriptions dispensed

2    high?"  The answer is "yes."  Right?

3    A.   That's what it says, yes.

4    Q.   And then if you read, it says, "According to the PIC,"

5    which is what?  Who's the PIC?

6    A.   Pharmacist in charge.

7    Q.   Okay.

8    A.   It says slash owner.

9    Q.   Right.  So that would be Joe?

10   A.   It would have been both.  It's possible the pharmacist

11   in charge was necessarily the owner.

12   Q.   The bulk of the controlled substance prescriptions

13   filled by the pharmacy involved both ADHD medications and

14   oxycodone for pain management prescriptions in the area --

15   excuse me -- prescribers in the area preferred oxycodone 15

16   and 30 strengths for pain management.

17       Do you see that?

18   A.   I see what's written here, yes.

19   Q.   Now, one of the things you're trained on is that oxy

20   15s and 30s are the more abused type of oxycodone; correct?

21   A.   Those -- that was part of the training.  This all is

22   what QRA does.  This is their document.  This is their

23   writing.  I don't have anything to do with determining

24   anything about this.

25   Q.   Right.  But you were trained --

1    **A.**    We're trained to look for red flags.  And part of that

2    what you're saying is that the combinations of the Oxys,

3    yes, it could be an issue.

4    **Q.**    It could be an indicator that there's an issue; right?

5    **A.**    Yes.

6    **Q.**    Okay.  Then if we go down to N, it says, "In

7    combination, oxycodone 15 and 30 milligram IR dosage units

8    are less than 50 percent of all oxycodone family dosage

9    units shipped."

10            It says, "no."

11            Do you see that?

12   **A.**    That's what this document says, yes.

13   **Q.**    And if you turn to the next page, and let's just go

14   right to the bottom, it says, "For oxycodone 71 percent of

15   all oxycodone dispensed in a three-month period were 15 and

16   30s."

17            Do you see that?

18   **A.**    That's what it says, yes.

19   **Q.**    That would be a red flag; right?

20   **A.**    I -- I'm not -- I don't have all the information.

21   **Q.**    Sure.  But based on your training, that type of

22   percentage of 30s and 15s would be at least a red flag?

23   **A.**    I don't have all the information.

24   **Q.**    Okay.  And then it says, "Based on CAH," which means

25   Cardinal Health, "sales data did any the drug families of

```
 1   interest experience disproportionate growth in the last 12

 2   months?"

 3        The answer is "yes."

 4        Do you see that?

 5   A.   Yes.

 6   Q.   Now, if you remember back in December of 2011, about

 7   eight months ago prior to this investigation, didn't you

 8   send an email to QRA saying that oxycodone was going to

 9   decline?

10   A.   I don't know what you're referring to.

11   Q.   Can we pull up the last email that we looked at?

12   A.   Can you show me that?

13   Q.   Yes, sir.

14   A.   Yes.

15   Q.   It says the reason for the shift is the docs are using

16   oxymorphone instead of Oxycontin so it should be showing a

17   decrease.

18   A.   Yes.

19   Q.   Right?  And this is when?  December of 2011?

20   A.   Yes.

21   Q.   So eight months earlier Joe has told us our oxycodone

22   is going to go down; right?

23   A.   That's what this says, yes.

24   Q.   And then when we do our site investigation in August,

25   our oxycodone is going up, isn't it?
```

1    **A.**   I didn't see the increase.  I don't know what -- this

2    is not my information.  You're expecting me to analyze

3    something you're showing me on the screen right here now.

4    So whatever the inspector is determining from this

5    investigation is the QRA responsibility.

6    **Q.**   And do you know -- in this same form there's an

7    indication that there's an increase of sales to pain clinic.

8    Do you know what pain clinic that would have been?

9    **A.**   I don't remember this document.

10            MS. WICHT:  Objection on grounds of foundation,

11   Your Honor.

12            THE COURT:  Yeah.  He doesn't know, Mr. Fuller.

13            MR. FULLER:  Judge, he -- I'm sorry, Judge.

14            THE COURT:  I'm going to sustain the objection.

15   Unless you can show a proper foundation, you're just asking

16   him to speculate it seems to me.  I'll sustain the

17   objection.

18   BY MR. FULLER:

19   **Q.**   Mr. Kave, do you know any pain clinics that are

20   located in Huntington, West Virginia?

21   **A.**   Please rephrase that.

22   **Q.**   Are you aware of any pain clinics in Huntington, West

23   Virginia, during this time period?

24            MS. WICHT:  I'm sorry.  I was just going to ask

25   for a time frame on the question.

1          Mr. Fuller said during this time frame, so I don't know

2     if that's specific enough or not for you, Mr. Kave.

3               THE WITNESS:  I'm not familiar with any pain

4     clinics in Huntington.

5     BY MR. FULLER:

6     **Q.**   Okay.  Is one of your jobs as the eyes and ears for

7     Anti-Diversion to stay informed of what's going on in

8     your local communities that you service?

9     **A.**   We were to point out red flags with our customers.  If

10    there's something we observed in the community that could

11    affect a customer, that probably would have been something.

12         But our job as a pharmacy business consultant was to

13    call on the customer, service them.  We would point out or

14    obtain any information if there were any red flags on that

15    site visit.  That was all recorded, reported to the company,

16    you know.  So we were on the constant lookout for red flags

17    with our customer, not in the community.

18    **Q.**   Sir, let's go to the last page of this document.  We

19    see there "Investigator Comments."

20              MS. WICHT:  I don't believe Mr. Kave has the full

21    document.  I'm not seeing that on my screen, Mr. Fuller.

22              MR. FULLER:  I'm aware.  I'm waiting.  Sorry.

23    Thank you.

24              MS. WICHT:  I'm sorry.

25    BY MR. FULLER:

1   **Q.**   And it talks about increases in total controlled

2   substance prescriptions.  Do you see where I'm reading

3   at?

4   **A.**   No, I don't.

5   **Q.**   The second paragraph inside that box.

6   **A.**   It starts with "increases"?

7   **Q.**   Yes, sir.

8   **A.**   I see it now, yes.

9   **Q.**   "Increases were attributable to the closing of a local

10  independent pharmacy SafeScript."

11       Do you know where SafeScript was in Huntington, West

12  Virginia, Mr. Kave?

13  **A.**   In general.  I think it was near the hospital I think.

14  **Q.**   And it says, "which was located approximately two miles

15  away.  SafeScript closed in March or April in 2012.  This

16  pharmacy's controlled substance prescriptions in February

17  totaled 1,154.  They have since increased to about an

18  average of 1,500 per month since the other pharmacy closed."

19       Let me ask you, Mr. Kave, based on your training, are

20  you aware if there is a DEA raid or shut-down of a local

21  pharmacy, is that something that you would want to know and

22  report to QRA?

23            MS. WICHT:  I'm going to object on the basis of

24  foundation where Mr. Fuller read a lengthy portion of the

25  document that the witness has never seen before before he

1    asked the question.  As I understand the question, I think

2    it related to training that Mr. Kave received and not to

3    this document at all.

4              MR. FULLER:  Sure, I --

5              THE COURT:  Well, I think that's right.  It didn't

6    relate to the document.  But it seems to me it's a proper

7    question aside from that.

8          So can you answer the question, Mr. Kave?  Do you

9    understand the question?

10             THE WITNESS:  The last one?

11             THE COURT:  Yes.

12             THE WITNESS:  Please repeat it.

13   BY MR. FULLER:

14   **Q.**   Sure.  Mr. Kave, based on your training, is one of

15   the red flags that you're trained to look for is if

16   pharmacies are shut down by the DEA in your local

17   communities where you service customers?

18   **A.**   A red flag is something we report on our customers.

19   It's not what we report on the community.  Now, an

20   observation like that could have been made and passed along

21   to QRA but, you know, in general, it's not something you go

22   out and report to QRA if the pharmacy is closed or something

23   like that or was shut down.  That's not a daily occurrence

24   or anything else.  That's something I would --

25   **Q.**   And would you consider this, this growth and

1    prescriptions from 1,100 to 1,500 to be significant in a

2    short period of time?

3                    MS. WICHT:  Objection, foundation.

4                    THE COURT:  Overruled.

5                    THE WITNESS:  Do I think that's significant?

6    BY MR. FULLER:

7    **Q.**   Would you consider that significant growth based on

8    your experience?

9    **A.**   I don't know.

10   **Q.**   And even knowing this and what the results of this

11   investigation are, you guys continued to service Medicine

12   Shoppe; correct?

13   **A.**   Yeah.  We never, never left Medicine Shoppe if that's

14   your question.

15   **Q.**   When you say never left, you never cut them off;

16   correct?

17   **A.**   Well, yes, yes.

18   **Q.**   And you are aware that you reported Medicine Shoppe

19   repeatedly for suspicious orders for oxycodone; correct?

20   **A.**   I'm not aware of any specifics on where people hit

21   thresholds and those were reported.  Specifics of any given

22   thing, you know, I don't recall.

23   **Q.**   So -- and let me ask you again, Mr. Kave.  You had

24   Medicine Shoppe reported at the time for suspicious orders;

25   right?

```
 1              MS. WICHT:  Objection on foundation, asked and
 2    answered.
 3              THE COURT:  Hasn't he answered that?
 4              MR. FULLER:  No, Your Honor, I don't believe he
 5    has.
 6              MS. WICHT:  I believe he answered, "I don't know,"
 7    Your Honor.
 8              THE COURT:  Sustain the objection.
 9    BY MR. FULLER:
10    Q.   Mr. Kave, do you remember giving a deposition
11    previously in this matter?
12    A.   I remember giving a deposition.  Everything we covered
13    in that deposition I do not remember.
14    Q.   Do you remember this was back in July of 2020?
15    A.   Yes.  The deposition was in -- somewhere around there,
16    yes.
17    Q.   And we talked about these same issues during that time
18    frame?
19    A.   I don't remember everything we covered.
20              MR. FULLER:  If we could bring up the deposition
21    of Mr. Kave.
22              THE WITNESS:  I'm sorry?
23              MR. FULLER:  I'm having somebody bring up a copy
24    of your deposition at Page 209.
25    BY MR. FULLER:
```

1   **Q.**   Do you see there nearly the bottom of the page,

2   Mr. Kave, at line 16 where I said, "You've had Medicine

3   Shoppe reported a ton for suspicious orders; right?"

4        And you answered, "Yes."

5   **A.**   I don't remember that.

6   **Q.**   But that is what it says; correct?

7   **A.**   That's what it says, yes.

8             MR. FULLER:  I don't have any further questions,

9   Your Honor.

10             THE COURT:  All right.

11        Any cross-examination, Ms. Wicht?  Do you want to go

12   first?

13             MS. WICHT:  May I take just a moment to confer,

14   Your Honor?

15             THE COURT:  Yes.

16        (Pause)

17             MS. WICHT:  Thank you for your patience, Your

18   Honor.

19                    CROSS EXAMINATION

20   BY MS. WICHT:

21   **Q.**   Good morning, Mr. Kave.  Jennifer Wicht for

22   Cardinal Health.

23   **A.**   Good morning.

24   **Q.**   I'll try to be brief and I might skip around a little

25   bit because I'm trying not to cover any of the same things

1    that you already talked about with Mr. Fuller.

2         Could you just let us know, Mr. Kave, where you live?

3    **A.**   I live in Hurricane, West Virginia.

4    **Q.**   And how long have you lived in Hurricane?

5    **A.**   About 21 years.

6    **Q.**   And did you live in West Virginia before that, before

7    you moved to Hurricane?

8    **A.**   I've lived in West Virginia since 1960.

9    **Q.**   And what's your current employment status, Mr. Kave?

10   **A.**   Retired.

11   **Q.**   Congratulations.  When did you retire?

12   **A.**   2018.

13   **Q.**   I hope you're enjoying it other than today.

14   **A.**   I was.

15   **Q.**   Okay.  You worked as a pharmacy business consultant at

16   Cardinal Health; correct?

17   **A.**   Yes.

18   **Q.**   And I believe --

19        MS. WICHT:  I hope Your Honor will indulge just a

20   little bit of leading as I try to orient us.

21   BY MS. WICHT:

22   **Q.**   I believe you said that your customers in the

23   Cabell/Huntington area were independent pharmacies;

24   right?

25   **A.**   Some of them were.  I've had closed-door pharmacies and

1    different things, different types, yes.

2    **Q.**    Were chain pharmacies your customers?

3    **A.**    No.  I never serviced chain pharmacies with Cardinal

4    Health.

5    **Q.**    And were doctors your customers?

6    **A.**    I did not call on doctors with Cardinal Health.

7    **Q.**    And as a PBC with Cardinal Health, did your job involve

8    promoting any specific pharmaceutical products or

9    medications?

10   **A.**    In general, our job was promoting programs and

11   services.  So whether it's an inventory management program

12   or generic automatic -- it could be an advertising program,

13   merchandising program, several things.  We usually did not

14   promote specific products.

15   **Q.**    And when customers placed their orders from Cardinal

16   Health, were they calling you up or contacting you to place

17   their orders?  Was that your role?

18   **A.**    No.  This, this day and time everything is electronic.

19   We don't even see the purchasers until probably the

20   following month sometimes what they've actually bought

21   volume wise.

22   **Q.**    Okay.  And you were talking with Mr. Fuller a little

23   bit about your role in Cardinal Health's Anti-Diversion

24   Program.  Do you recall that?

25   **A.**    I was what?

1    **Q.**   You were talking with Mr. Fuller --

2    **A.**   Yes.  I'm sorry.

3    **Q.**   That's okay, no problem.  And I believe you said that

4    you served as a liaison between the customer and Cardinal

5    Health Anti-Diversion personnel.  Is that right?

6    **A.**   Yes.

7    **Q.**   Okay.  Did you play any part in deciding which pharmacy

8    customers would be allowed to purchase controlled substances

9    through Cardinal Health?

10   **A.**   No.  That was totally out of my purview.  That was QRA.

11   They would determine thresholds and so forth.

12   **Q.**   That was going to be my next question.  Did you play

13   any role in setting or adjusting thresholds of what

14   customers could buy for controlled substances from Cardinal

15   Health?

16   **A.**   No.

17   **Q.**   Did you -- when, when a customer placed an order that

18   was above their threshold, did you play any part in

19   evaluating that order?

20   **A.**   I didn't evaluate anything.  If there was a question

21   from QRA based on the threshold and they wanted information

22   from a customer, my role would be to obtain that information

23   from the customer.

24   **Q.**   And do you -- were you involved in deciding whether a

25   customer's order would be reported to DEA or not?

1    A.    No.  That's QRA's department.

2    Q.    You've talked about being trained on red flags.

3    A.    Yes.

4    Q.    You were looking for those at your customers; right?

5    A.    Yes.

6    Q.    If you observed a red flag at one of your customers,

7    what would you do?

8    A.    You would report it right away to QRA.  We were

9    constantly doing QRA surveys every time we visited a

10   customer.  But if something else occurred around that in any

11   way, we would report it to QRA.

12   Q.    If you see a red flag at a customer, does that mean

13   that diversion is happening at that customer in your

14   experience?

15   A.    No.

16   Q.    Now, sometimes Cardinal Health customers would be cut

17   off from purchasing controlled substances through Cardinal

18   Health; correct?

19   A.    Yes.

20   Q.    And did you play any role in making decisions about

21   whether a customer would be cut off from those purchases?

22   A.    No.

23   Q.    Now, you were in -- as you've told Mr. Fuller, you were

24   in the sales department within Cardinal Health; right?

25   A.    Yes.

```
 1    Q.   And we've been talking about your interactions with the
 2    Anti-Diversion group.
 3    A.   Right.
 4    Q.   Would you say that there was conflict or tension
 5    between the sales group and the Anti-Diversion group at
 6    Cardinal Health?
 7    A.   No.
 8    Q.   And who was the final decision maker at Cardinal Health
 9    between yourself and the sales group and the Anti-Diversion
10    personnel?
11    A.   As far as?
12    Q.   As far as the service to the pharmacy customers.
13    A.   To determine the customer?
14    Q.   As far as distribution of controlled substances to
15    customers.  I'm sorry.  Thank you for that clarification.
16    A.   That would be QRA.
17    Q.   Okay.  And did you ever try to change a decision that
18    was made by QRA?
19    A.   No.
20    Q.   Did you have authority to change a decision that was
21    made by request QRA?
22    A.   No.
23    Q.   Mr. Fuller asked you just a couple of questions about
24    your compensation.
25    A.   Yes.
```

1    Q.    I just want to follow up on that a little bit.  You

2    talked about having sales goals or targets; is that right?

3    A.    Yes.

4    Q.    Okay.  Were any of those goals or targets based on

5    selling particular medication?

6    A.    No.

7    Q.    If a company reported a suspicious order from one of

8    your customers, did that affect your compensation in any

9    way?

10   A.    No.

11   Q.    And if you reported a red flag of a customer, did that

12   affect your compensation in any way?

13   A.    No.

14   Q.    And if QRA decided to cut off a customer from

15   controlled substance purchases, how would that affect your

16   compensation?

17   A.    They would remove that from the goals and retention and

18   all that, so it would be taken out of your market.  So you

19   wouldn't be penalized if it was a QRA issue.

20   Q.    Did you ever urge a customer to order more of a

21   particular medication so that you could meet your target or

22   make more money?

23   A.    No.

24   Q.    Did you ever urge a customer to buy more opioids for

25   any reason?

1    **A.**    Never.

2    **Q.**    You were asked a few questions by Mr. Fuller about the

3    Medicine Shoppe in Huntington.

4    **A.**    Yes.

5    **Q.**    And he put up a document that referred to the closing

6    of a SafeScript Pharmacy down the road a little bit.  Do you

7    recall that?

8    **A.**    Yes.

9    **Q.**    Did you personally have any concerns about the fact

10   that Medicine Shoppe was potentially picking up new

11   customers from SafeScript after that pharmacy was closed?

12   **A.**    No.

13   **Q.**    And why is that?

14   **A.**    If I remember correctly, the information was that this

15   was -- I'm not sure.  I get conflicted with the different --

16   there was some pediatric business they were picking up I

17   think for SafeScript, and that wouldn't be normally

18   something that would be diverted.

19   **Q.**    Okay.  In your experience with Safe-  -- I'm sorry --

20   with Medicine Shoppe I believe you said you normally dealt

21   with the PIC or the owner; correct?

22   **A.**    Yes.

23   **Q.**    Did you deal with -- I believe one of them is Angela

24   Ronk; is that right?

25   **A.**    She is the owner now.  There's documents at different

108

```
1    time frames.  Joe was the owner in some of these.  Angie is
2    the owner now.
3    Q.   And with respect to both Joe and Angie, if I might ask
4    about them together, did you know them to be careful,
5    responsible pharmacists?
6    A.   Very professional pharmacists.
7    Q.   Mr. Fuller asked you a question and he referred to the
8    fact that Medicine Shoppe is a franchise.  Do you remember
9    that?
10   A.   Yes.
11   Q.   And does Cardinal Health own the franchise Medicine
12   Shoppe?  Is that your understanding?
13   A.   Yes.  It's the Medicine Shoppe and Medicap franchise.
14   Q.   Does Cardinal Health own the stores, the Medicine
15   Shoppe stores themselves?
16   A.   No, they do not.
17   Q.   Okay.  And does Cardinal Health manage the Medicine
18   Shoppe stores?
19   A.   No.
20   Q.   Was there anything different about your role as the PBC
21   with respect to Medicine Shoppe because it was a franchise?
22   A.   A role as far as what?
23   Q.   That's a good clarification, Mr. Kave.  As far as the,
24   the liaison of anti-diversion services that you provide.
25   A.   No.  The information was communicated with them just as
```

1    all other independent pharmacies, obtained from them.

2    **Q.**   And did Medicine Shoppe, to your knowledge, the entire

3    time that they were your customer, did they have a valid DEA

4    registration?

5    **A.**   Yes.

6    **Q.**   And did they have a valid West Virginia Board of

7    Pharmacy license?

8    **A.**   Yes.

9    **Q.**   Mr. Kave, in the course of your employment as a PBC at

10   Cardinal Health, did you ever ignore tons of diversion?

11   **A.**   Absolutely not.

12   **Q.**   And did Cardinal Health ever encourage or condone you

13   ignoring any signs of diversion in your experience?

14   **A.**   No.

15   **Q.**   Did you ever prioritize making a sale or keeping a

16   customer over your anti-diversion responsibilities?

17   **A.**   Absolutely not.

18   **Q.**   And did Cardinal Health ever urge you to prioritize

19   making a sale or keeping a customer over your anti-diversion

20   responsibilities?

21   **A.**   Absolutely not.

22          MS. WICHT:  If I might just take one moment, Your

23   Honor.

24      (Pause)

25          MS. WICHT:  I don't have any further questions.

1   Thank you very much.

2              THE COURT:  Is there any other cross?

3              MR. HESTER:  None from us, Your Honor.

4              MR. NICHOLAS:  No, Your Honor.

5              THE COURT:  Any redirect, Mr. Fuller?

6              MR. FULLER:  Ever so briefly, Your Honor, if I

7   might.

8                      REDIRECT EXAMINATION

9   BY MR. FULLER:

10  **Q.**   Mr. Kave, you talked about customers being cut off

11  with Ms. Wicht; right?

12  **A.**   I'm sorry?

13  **Q.**   You talked about customers being cut off with Ms.

14  Wicht?

15  **A.**   You're talking -- am I talking about --

16  **Q.**   Ms. Wicht asked you --

17  **A.**   Yes. I'm sorry.  Sorry I misunderstood.

18  **Q.**   That's all right.  Tell the Judge what customers you

19  cut off or were cut off by Cardinal and Cabell and

20  Huntington during your time there.

21  **A.**   You're asking me to do a recall of things that happened

22  over the years and I don't have that on the top of my head.

23  We definitely cut customers off, yes.  And I, I just -- I

24  don't have that information.

25  **Q.**   You certainly didn't cut off Medicine Shoppe; right?

1    **A.**    Medicine Shoppe was not cut off.

2           MR. FULLER:  Nothing further, Judge.

3           THE COURT:  Do you have anything else, Ms. Wicht?

4           MS. WICHT:  Nothing further, Your Honor.  Thank

5    you.

6           THE COURT:  May Mr. Kave be excused?

7           THE WITNESS:  Thank you.

8           MR. FULLER:  Yes, Your Honor.

9           THE COURT:  You're free to go.  Thank you, sir,

10    very much.  I'm sorry you had to wait around so long.

11           THE WITNESS:  That's okay.

12           MS. KEARSE:  Your Honor, we have our next witness

13    ready.  We're going to put up Mr. Scott Lemley if we could

14    just have a couple minutes to transition.

15           THE COURT:  All right.  Let's get him started.

16       I have to get my law clerk back.  I can't do anything

17    without her.  15 years.

18           THE CLERK:  Please state your name.

19           THE WITNESS:  My name is Scott Lemley.

20           THE CLERK:  Please raise your right hand.

21    **SCOTT LEMLEY, PLAINTIFFS' WITNESS, SWORN**

22           THE CLERK:  Thank you.  Please take a seat.

23           THE COURT:  All right.  You can go ahead.

24           MS. LEYIMU:  May it please the Court, my name is

25    Temitoe Leyimu and I'm here representing the plaintiffs.

```
 1    It's L-e-y-i-m-u.  Our next witness is Mr. Scott Lemley.
 2                    DIRECT EXAMINATION
 3    BY MS. LEYIMU:
 4    Q.   Good afternoon, or good morning, Mr. Lemley.  Could
 5    you please state your name for the record?
 6    A.   My name is Scott Lemley.
 7    Q.   And where do you live, Mr. Lemley?
 8    A.   I live in the Huntington area.
 9    Q.   And where do you work?
10    A.   I work in the City of Huntington.
11    Q.   And what is your current job?
12    A.   I'm the Director of Innovation for the City of
13    Huntington.
14    Q.   Could you tell the Court what you do in that role
15    generally?
16    A.   So my general duties are improving city efficiencies,
17    special programs, things like that.
18    Q.   How long have you served in that particular role?
19    A.   Just under one year.
20    Q.   How long have you worked for the City of Huntington?
21    A.   It's been over 10 years now.
22    Q.   And could you walk the Court through your work history?
23    What was your first job with the City of Huntington?
24    A.   Sure.  In 2010 I was hired on at the Huntington Police
25    Department as a Criminal Intelligence Analyst.  And then for
```

1    a short time, I was assigned to the Mayor's Office of Drug

2    Control Policy.

3        And then later, I was -- I believe it was 2017 -- I was

4    made the Director of Development and Planning for the City

5    of Huntington.  And then last July I moved over to the

6    Director of Innovation.

7    **Q.**   And we will get into your role with the Mayor's Office

8    of Drug Control Policy a little bit more fully in a bit.

9    But how long did you hold the position in the Mayor's Office

10   of Drug Control Policy?

11   **A.**   I was there for about two years.

12   **Q.**   Could you walk the Court just briefly through your

13   educational background?

14   **A.**   Sure.  I have a B.A. from Marshall University and I

15   have an M.A. from Old Dominion University.

16   **Q.**   Do you have any prior training in data analysis?

17   **A.**   Basically, just stuff I would learn in school.

18   **Q.**   And have you done any teaching related to law

19   enforcement?

20   **A.**   Yes.  I was an Adjunct Professor at Marshall University

21   in criminal justice at the intro class.  I did that for one

22   semester.

23   **Q.**   Have you received any professional recognition for your

24   work with the Huntington Police Department?

25   **A.**   Sure.  I guess the big one, I was given as part of the

```
1    DMI project U.S. Attorney's award for that, my work on that
2    project.
3    Q.   And can you tell the Court what DMI means?
4    A.   Sure.  DMI is Drug Market Intervention.  It's a program
5    developed out of Highpoint, North Carolina, that we used to
6    address an open-air drug market in Huntington.
7    Q.   Mr. Lemley, when you first came to the police
8    department, what were you first hired to do?
9    A.   So I was hired as part of the DMI project.  And I was
10   doing data, data analytics on crime for that small area of
11   Huntington.
12   Q.   Could you remind us what year that was when you first
13   started?
14   A.   It would have been the end of 2010, September, October.
15   Q.   By way of introduction for the Court, since you are the
16   first Huntington Police Department person on the stand,
17   could you give the Court a brief overview of the
18   organizational structure of the Huntington Police
19   Department?
20   A.   Sure.  So at the top you would have the Chief and the
21   Chief's office.  And then below that you would have each
22   bureau or division.
23       So you would have a patrol bureau.  That would be your
24   black and whites on the street, beat cops.  You would have
25   the detective bureau which they, of course, do the
```

```
 1    investigations.  You would have professional standards.

 2    Most people would know that as internal affairs.  You would

 3    have a drug unit which is made up of task forces and SEU and

 4    other federal partners.

 5    Q.   Let me interrupt you there.  When you, when you give

 6    the acronyms, you're going to have to explain them for the

 7    Court.

 8    A.   I apologize.

 9    Q.   So you just said SEU was a part of a bureau.  Could you

10    explain what SEU is for the Court?

11    A.   So SEU is the Special Emphasis Unit.  It handled kind

12    of street-level drug crimes.

13    Q.   You can go on.  I believe I interrupted you.

14    A.   I apologize for that.

15         And then you would have the administration bureau.  We

16    call it the admin bureau.  They would handle everything from

17    the budget to, you know, ensuring that there was enough soap

18    in the washroom.

19    Q.   So when you came into this role for this special

20    project, the drug market intervention project as you've just

21    explained, was that a new role or a pre-existing role?

22    A.   That was a new role.

23    Q.   Okay.  And you were brought on to the drug market

24    intervention program.  Could you tell the Court why?  What

25    was going on in the city?
```

1   **A.**   So we had an open-air drug market in a very small area

2   of Huntington.  It was about a two-block by four-block area

3   where we had people selling literally on the corner, on the

4   street.

5       And they had developed this program out of Highpoint,

6   North Carolina, as I said.  And, basically, I was brought in

7   to see if crime was increasing, if it was decreasing, if it

8   was being pushed out to another area.  Those were the

9   general duties that I had.

10  **Q.**   And when you came on to the, to this project, did

11  Huntington Police Department have a drug unit?

12  **A.**   They did, yes.

13  **Q.**   Did you form an understanding as to the history of the

14  drug unit prior to you coming on?

15  **A.**   I did.

16  **Q.**   Would you tell the Court what that was briefly?

17  **A.**   Sure.  So we had a drug unit as far back as 2000.  In

18  2002, I believe was the right year, we had some budget cuts,

19  budget issues.  And they eliminated the drug unit for a

20  short time.

21      From my recollection, it came back I want to say in

22  2004.  I know from documentation purposes in 2007 they had a

23  drug unit.  And by the time I came on in 2010, it was a very

24  robust drug unit with an FBI Drug Task Force, DEA Drug Task

25  Force, an ATF Task Force, SEU, Special Emphasis Unit, as I

1    said.  They had a relationship with HIDTA, which is high

2    intensity drug trafficking area.  That's a federal program.

3    **Q.**   You noted that the DMI project was concentrated to a

4    geographical area.  Could you tell the Court what

5    neighborhoods that was?

6    **A.**   That was in the Fairfield West neighborhood.

7    **Q.**   And in response, did the Huntington Police Department

8    develop your role as -- to help with this initiative?

9    **A.**   They did.  So initially, again, my job was to check

10   just the DMI area, look for crime patterns, look for things,

11   some things as simple as is crime going up, is crime going

12   down.  And then eventually I -- they saw the usefulness in

13   that and made me a full-time employee.

14   **Q.**   In this permanent position, what was your role?

15   **A.**   So it was a wide and varied role.  Every day when I'd

16   come into work, I would have no idea what I was actually

17   going to get into that day, as most police work, even though

18   I was just a civilian.

19        I would sometimes do crime stats, which is just what

20   does crime look like now, what did it look like last week, a

21   month, a year later.  I would check the tip line.  That was

22   part of my responsibilities, very time-consuming checking

23   all the information for that.

24        I would work everything -- or support programs, support

25   investigations on everything from car break-ins to Homeland

1    Security issues.

2    **Q.**   And was this, your title in this role a Criminal

3    Intelligence Analyst?

4    **A.**   It was.

5    **Q.**   Okay.  Did you gather data in this role?

6    **A.**   I did.

7    **Q.**   Did you analyze data in this role?

8    **A.**   Yes.

9    **Q.**   Did you share data in this role?

10   **A.**   Absolutely.

11   **Q.**   Who did you share it with?

12   **A.**   So depending upon the information of the data, it could

13   be shared with the public.  It could be shared with

14   decision-makers such as the City Council or the Mayor, of

15   course the command staff at HPD.  It really depended on the

16   information.

17   **Q.**   From a crime standpoint in the City of Huntington as a

18   result of your role as an analyst, did you form an

19   understanding of how things were progressing as it relates

20   to crime in the city?

21   **A.**   I believe I did.

22   **Q.**   Could you tell the Court what the understanding was?

23   **A.**   So, generally speaking, we had increasing violent

24   crime.  As trends go down -- during my time there.  And then

25   we had property crimes were generally going up.  I would say

1    that's around 2013, '14, around in that time frame.  Drug

2    crimes eventually kind of spiked up again in '13, '14.  I

3    have to check the data on that, but just some general

4    information.

5    **Q.**   And did your work include collaborating with different

6    bureaus within the department?

7    **A.**   Yes.

8    **Q.**   Did that include the drug unit?

9    **A.**   Absolutely.

10   **Q.**   Did your analysis of crime include data related to

11   opioids?

12   **A.**   It did.

13   **Q.**   Okay.  And was opioid use and its impact on the

14   community a focus of your work at that time?

15   **A.**   It became a focus more and more as time went on.  As I

16   said, originally it was DMI, but it definitely increased as

17   time progressed at HPD, at Huntington Police Department.

18   **Q.**   As a part of your work as a criminal analyst for the

19   Huntington Police Department, or HPD, were you responsible

20   for the annual reports?

21   **A.**   I was.

22   **Q.**   Okay.  What was your involvement with the annual

23   reports?

24   **A.**   So my responsibilities involved gathering all the

25   information.  I took a lot of -- I took most of the pictures

1    in there, working with each bureau to figure out what

2    information they want to highlight.  It could be anything

3    from crime stats that I would gather to officer of the

4    month.

5    **Q.**   And when did you start preparing these annual reports?

6    **A.**   So I started in 2012 for the 2011 annual report.  We're

7    always one year behind.

8    **Q.**   Did putting together these annual reports require

9    assessing the data?

10   **A.**   It did.

11   **Q.**   And what data are we talking about?

12   **A.**   So what you would see in an annual report is what we

13   call UCR data which is Uniform Crime Reporting.  It's kind

14   of the standard reporting system we would use as required by

15   the FBI.  So the stats you would see in there are the exact

16   ones that we would report up to the FBI.

17   **Q.**   Okay.  And do you have an understanding of whether that

18   comports with how police departments routinely track drug

19   and crime data?

20   **A.**   I'm sorry.  Say that again.

21   **Q.**   Sure.  Do you have an understanding if that comports

22   with how police departments routinely track drug and crime

23   data?

24   **A.**   Yes, yes.

25   **Q.**   You talked about UCR.

**A.**   It's the standard that all police departments send out.

**Q.**   Okay.

          MS. LEYIMU:  Your Honor, may I approach?

          THE COURT:  Yes.

BY MS. LEYIMU:

**Q.**   Now, Mr. Lemley, I have handed you a small stack of annual reports.  Do you see that?

**A.**   I do.

**Q.**   What are these documents?

**A.**   So these are the annual reports for the Huntington Police Department for 2011 until 2015.

**Q.**   And how do you recognize these to be the annual reports?

**A.**   The cover, of course, pictures divided up into the categories.

**Q.**   And did you compile and prepare these reports?

**A.**   I did.

**Q.**   And you told us what you did to compile and prepare these reports.  What type of information is, is involved in this report?

**A.**   So you would have, again, crime stats, organizational charts.  You would have information from each bureau and possibly each division.  You would have special projects that the Huntington Police Department did, grants, partnerships and programs, awards that we had received,

1    various things like that.

2    **Q.**   Did it also include drug and crime statistics and

3    analytics?

4    **A.**   It did.

5    **Q.**   Okay.  And was the data that you reviewed and compiled

6    and prepared in this report used by the Huntington Police

7    Department to carry out its work?

8    **A.**   Sure.  It was a great quick reference for anyone

9    looking for data on what they seized the last year or

10   anything like that.

11   **Q.**   And was this put together in the ordinary course of

12   business?

13   **A.**   It was.

14   **Q.**   Was the preparation of these reports in your official

15   duties as a Criminal Intelligence Analyst for the Huntington

16   Police Department?

17   **A.**   It became so, yes.

18   **Q.**   And were these reports made public?

19   **A.**   Yes.  They were published on our website.  We actually

20   bound and printed these.  We passed them out to members of

21   the public, City Council, Mayor, other police agencies.

22          MS. LEYIMU:  Your Honor, at this time I would ask

23   for these annual reports 2011 to 2015 to be moved into

24   evidence.

25          THE COURT:  Is there any objection?

```
1              MR. RUBY:  No objection to the document at this

2    level, Judge.  I'll just note that depending on where the

3    testimony goes, there is some hearsay within hearsay that's

4    contained in these, but we'll raise that at the time if we

5    need to.

6              THE COURT:  Well, you've certainly gotten over the

7    first hearsay.  But you're saying there's hearsay within

8    hearsay that might be problematic later?

9              MR. RUBY:  Judge, we're not going to object to the

10   admission of the documents, but there may be testimony

11   within that, that raises objections.

12             THE COURT:  All right.  It's admitted.

13             MS. LEYIMU:  Your Honor, for the record, I would

14   just note the P numbers.

15             THE COURT:  Yes.

16             MS. LEYIMU:  The 2011 annual report is P-41342.

17        2012 is P-41229.

18        2011 [sic] is P-41252.

19        2014 is P-41220.

20        And 2015 is P-41221.

21             THE COURT:  Okay, they're all admitted.

22   BY MS. LEYIMU:

23   Q.   And in the interest of time, Mr. Lemley, we're not

24   going to go through every report, but I did want to ask

25   you just a couple of questions off the bat in the 2011
```

```
 1    and 2012 annual report.  There is a trophy, a picture of

 2    somekind.  Could you tell the Court what that is?

 3    A.    So that is the U.S. Attorney's award for Law

 4    Enforcement Agency of the Year for the Southern District of

 5    West Virginia.

 6    Q.    And did Huntington Police Department win that award?

 7    A.    They did in both 2011 and 2012.

 8    Q.    Are there any topics that remained consistent within

 9    these annual reports over the years?

10    A.    Sure.  So you would have each bureau division.  Those

11    would remain constant.  The crime stats.  Of course, you

12    would update them every year, but that section would be

13    consistent, yeah.

14    Q.    And are there -- did you routinely include some of

15    those sections in the same place with these annual reports?

16    A.    Yes.

17    Q.    Did you routinely include sections on emerging threats

18    in the community in these annual reports?

19    A.    Yes.  There was a section in the drug unit on emerging

20    threats.

21    Q.    Okay.  Let's turn to Page 19 in the 2011 annual report.

22    And right there is identified emerging threats that you

23    included in this annual report; is that correct, Mr. Lemley?

24    A.    That is correct.

25    Q.    And were you familiar with those emerging threats by
```

1      way of tracking data for the Huntington Police Department?

2      **A.**    That was one of the ways we tracked emerging threats,

3      yes.

4      **Q.**    What are some other ways?

5      **A.**    So you would have seizures.  You could have arrests.

6      You could have just general crime data on if a certain drug

7      was increasing or decreasing.

8      **Q.**    And it was -- was it your responsibility to track that

9      information?

10     **A.**    That was part of my responsibilities.  A lot of -- and,

11     of course, the information came from the drug unit itself.

12     **Q.**    Okay.  And halfway through the bottom of the emerging

13     threats paragraph it says, "Currently the most prevalent

14     emerging threat to our community is the lethal diversion of

15     powerful pain medications such as oxycodone and Oxymorphone.

16     West Virginia is second in the nation in prescription drug

17     overdose deaths."

18         Did I read that correctly?

19             MR. RUBY:  Objection, Your Honor.  This is one of

20     the areas of the report that is embedded hearsay.  It's not

21     within the knowledge of the Huntington Police Department

22     whether -- or it's not a regularly kept record of the

23     Huntington Police Department where West Virginia may or may

24     not rank in the country in this area.  It's information they

25     got from somewhere else.

1          MR. ACKERMAN:  Your Honor, may I have a moment

2     with Ms. Lemley, please?

3          THE COURT:  Yes.

4        (Pause)

5          MS. LEYIMU:  Your Honor, I first want to note that

6     these documents were first served at least five days ago,

7     and there were no objections to hearsay to any of these

8     documents.  Those objections were waived as to hearsay.

9          THE COURT:  Well, --

10         MR. RUBY:  Judge, may I respond?

11         THE COURT:  I'm sorry.  Go ahead, Mr. Ruby.

12         MR. RUBY:  The process, as I understand it, for

13    these objections that are made beforehand is that plaintiffs

14    have sent up lists of exhibits in the evenings about 7:00

15    p.m.  And then at 10:00 we send back lists of objections.

16    And with the list that we send back, there's a cover email.

17        And in every one of those cover emails, it says that we

18    reserve the right to make objections to hearsay or other,

19    other evidentiary problems within the document even if we're

20    not lodging an objection to the entire document.

21        So that was the reason I framed my earlier comment in

22    the way that I did.  And we certainly have reserved the

23    right in terms of that back and forth process that we do to

24    make an objection to the embedded hearsay.

25         MS. LEYIMU:  Your Honor, if I may.

```
 1                    THE COURT:  Well, I'm going to cut this off.  I
 2       overrule the objection and admit it.
 3            Go ahead, Ms. Leyimu.
 4                    MS. LEYIMU:  Thank you, Your Honor.
 5       BY MS. LEYIMU:
 6       Q.   The only question that I have is whether the
 7       emerging threat as to the illegal diversion of powerful
 8       pain medications such as oxycodone and oxymorphone
 9       comports with what you were seeing in the data at that
10       time in 2011.
11       A.   From my memory, yes.
12       Q.   Do you routinely include sections on drug seizures in
13       these annual reports as well, Mr. Lemley?
14       A.   That would be content that would be included, yes.
15       Q.   And why is that?  Why do you include drug seizure
16       information?
17       A.   Again, to inform the public of how much drugs we were
18       seizing, what kinds of drugs we were seizing.  Again,
19       sometimes we do comparisons; last year we seized this much,
20       this year we seized this much.  We can see increases or
21       decreases in certain types of drugs.
22       Q.   Okay.  For instance, if you could pull out the 2013
23       annual report, Page 12.
24       A.   I'm sorry.  What page?
25       Q.   Page 12, 2013 with the canine on the front?
```

1    **A.**    Yeah.

2    **Q.**    Okay.  Do you see this block at the bottom of the page

3    where it says "Canine Unit Supported Seizures"?

4    **A.**    I do.

5    **Q.**    Is this the type of information that you would track

6    and include in the annual reports, Mr. Lemley?

7    **A.**    I would, yeah.

8    **Q.**    And what is the purpose of this comparison between 2012

9    and 2013?

10   **A.**    Well, number one, it shows increases in, again, certain

11   types of drugs, but also what kind of drugs they're seizing.

12   **Q.**    And based on this block here, what were you seeing in

13   2012 and 2013 as it relates to the drugs in this block?

14   **A.**    So you can see prescription pills went from 3,309

15   dosage units in 2012.  It tripled to 10,955 dosage units in

16   2013.

17          We also saw increases in heroin from 699 grams to

18   1,865 grams in 2013.

19          You can see currency.  That increased as well.  The

20   number of tracks increased.

21          Marijuana went from 41 pounds to 44 pounds; almost 42

22   pounds to 44 pounds.  That's relatively flat.

23   **Q.**    And did you routinely include sections on drug offenses

24   generally in these annual reports as well?

25   **A.**    Yes.

1    **Q.**    Okay.  And why is what?  Why did you include drug

2    offenses?

3    **A.**    So number one is the UCR category basically shows how

4    many drug offenses were occurring in the city.  We think

5    that's good information to get out there to show what HPD is

6    dealing with.

7    **Q.**    From your work with the Huntington Police Department in

8    gathering and analyzing this data, did you form an

9    understanding of whether or not there was a change in drug

10   offenses over the years?

11   **A.**    Yes.

12   **Q.**    Could you tell the Court what that understanding was?

13   **A.**    So we saw a progression.  I would say kind of earlier

14   in my career which was 2011, 2012, increases in prescription

15   opioids, but that was overtaken by heroin again later in

16   2014, '15, around that time.

17   **Q.**    Okay.  We've looked at a couple of excerpts, but just

18   generally over the span of time of 2011 to 2015 that you

19   were creating these annual reports looking at this data in

20   your official capacity as a data analyst for the Huntington

21   Police Department, did you make any observations regarding

22   opioids in particular in the City of Huntington?

23   **A.**    Yes.  They were increasing.

24   **Q.**    And --

25               THE COURT:  When you get to a stopping place, Ms.

1   Leyimu, we need to pull the plug on this.  I've got

2   something else I've got to attend to.

3          MS. LEYIMU:  Absolutely.  I think we can now.

4          THE COURT:  Is this a good place?

5          MS. LEYIMU:  This is a good place, yes, Your

6   Honor.

7          THE COURT:  Mr. Lemley, I'm going to excuse you

8   until 2:00 and ask you to be back at that time, sir.

9          THE WITNESS:  Okay, Your Honor.  Thank you.

10         THE COURT:  You're free to go until that time.

11         THE WITNESS:  Okay.  Thank you.

12     (Recess taken at 11:59 a.m.)

13         THE COURT:  Mr. Lemley, you may resume the witness

14   stand.  You're still under oath.

15         BY MS. LEYIMU:

16   **Q.**  Mr. Lemley, when we took the break, I think we were

17   going through the annual reports.  We were just about done.

18      Could you take out the Annual Report 2015, please?

19   **A.**  (Witness complies).

20   **Q.**  And in these annual reports, do you provide statistics

21   and data to the Chief of Police?

22   **A.**  I do, yeah.

23   **Q.**  And who was the Chief of Police in 2015 of the

24   Huntington Police Department?

25   **A.**  I believe that was Chief Ciccarelli.

1    **Q.**    Could you open to the first page, please?

2    **A.**    (Witness complies).

3    **Q.**    The first page includes a letter from the Office of the

4    Chief of Police; is that correct?

5    **A.**    Yes.  On the inside cover, yes.

6    **Q.**    And, at the time, that was Joe Ciccarelli, as you've

7    just testified; is that right?

8    **A.**    It is.

9    **Q.**    Halfway down, I'm going to be reading from the first

10   paragraph.  It states, "Over 700 drug overdoses and 530 DUI

11   arrests, 65 percent of which were drug impaired drivers are

12   chilling numbers, but behind each of those numbers is a

13   human being and police officers who must deal with the

14   effects of their addiction and who seek to, in many

15   instances, save them from themselves."  Do you see that?

16   **A.**    I do.

17   **Q.**    Okay.  And would that be consistent with the figures

18   you would have provided to Chief Joe Ciccarelli at the time?

19          MR. RUBY:  Your Honor, objection as to the

20   foundation of these figures or where the witness obtained

21   them if he, in fact, did.

22          THE COURT:  Well, I'll sustain the objection.  You

23   can clear that up, if you can.

24          MS. LEYIMU:  Sure.

25          BY MS. LEYIMU:

1    **Q.**    Did you provide -- did you track data on drug

2    overdoses, Mr. Lemley, as a part of your job at Huntington

3    Police Department?

4    **A.**    In 2015, I tracked drug overdoses as part of my role in

5    the Office of Drug Control Policy.

6    **Q.**    So, in 2015, were you in a dual role working for the

7    Huntington Police Department as a Criminal Intelligence

8    Analyst, as well as a Data Analyst for the Mayor's Office of

9    Drug Control Policy?

10    **A.**    I was.

11    **Q.**    Okay.  And in that role, were you tracking drug

12    overdoses?

13    **A.**    I was.

14    **Q.**    Okay.  And in that role, were you tracking drug

15    overdoses and sharing that information?

16    **A.**    Absolutely.

17            THE COURT:  Overruled.  You can answer.

18        Mr. Ruby, do you want to say something?

19            MR. RUBY:  Your Honor, I will press for a bit more

20    foundation and the reason is that the witness's deposition

21    testimony in this case revealed that the drug overdose

22    figures that he's now testified that he tracked were, in

23    fact, obtained from many different sources outside of the

24    Police Department including --

25            THE COURT:  Well, you can cross examine him on

1    that.  For now, I'm going to let her go ahead.

2         Go ahead.

3              MS. LEYIMU:  Thank you, Your Honor.

4    **Q.**   Did you also look at DUIs and drug impaired drivers as

5    a part of your role in the Mayor's Office of Drug Control

6    Policy of the Huntington Police Department?

7    **A.**   Yes.  That was something that the Chief of Police

8    directed me to do.

9    **Q.**   Okay.  Tell us how you did that, please.

10   **A.**   So, I actually went through every DUI arrest and then I

11   went in to see if they had a blood alcohol content or if it

12   was an impaired driver based on another substance.  A vast

13   majority of those were opioid-related and out of the 530 DUI

14   arrests, a majority of them, 65 were drug-impaired rather

15   than alcohol-related.

16   **Q.**   Okay.  Okay.  And I wanted to ask you about this,

17   "Behind every human being is a police officer who must deal

18   with the effects of the addiction who seek to, in many

19   instances, save them from themselves."  What was the

20   environment in 2015 when you were working with the

21   Huntington Police Department as a police officer in your

22   department?

23   **A.**   My experience there, I mean, it was a very difficult

24   time.  First responders, especially police officers, they're

25   problem solvers.  They were dealing with opioids.  It's a

```
 1    problem that they can't solve by themselves.  You can't

 2    arrest your way out of this problem.  It -- it affects a lot

 3    more than just law enforcement.  So, that -- that's very

 4    frustrating for a police officer, yeah.

 5    Q.   Now, we just looked at some segments from previous

 6    annual reports with regard to prescription pill diversion;

 7    do you recall that?

 8    A.   Yes.

 9    Q.   Okay.  During your time working with the Huntington

10    Police Department, did you become familiar with the term

11    diversion?

12    A.   Yes.

13    Q.   What was your understanding of that to mean?

14    A.   So, related to this, it's substance that is diverted,

15    for lack of a better word, from its intended use, intended

16    purpose.

17    Q.   And did you recall drugs that were being diverted while

18    working at the Huntington Police Department from the data

19    and what you observed?

20    A.   I'm sorry.  Can you say that again?

21    Q.   Sure.  Did you -- did you observe drugs being diverted

22    in the Huntington Police -- from your work at the Huntington

23    Police Department?

24    A.   Yes.

25    Q.   And did some of those diverted drugs include opioids?
```

1    **A.**    Oh, yes.

2    **Q.**    What type of opioids?

3    **A.**    Would have OxyContin, Opana, Roxy 30.  Those would be

4    some examples.

5    **Q.**    And was that based on the data that you were reviewing

6    and analyzing for the Huntington Police Department and the

7    Mayor's Office of Drug Control Policy?

8    **A.**    Yes.

9    **Q.**    Based on your work with the Huntington Police

10   Department, was it common for the Huntington Police

11   Department to investigate instances of diversion in the

12   community?

13   **A.**    Sure.  You would have -- the Drug Unit itself would do

14   investigations into diversion.  You would also have the

15   Patrol Bureau.  In the normal course of operations of being

16   a patrol officer, you would have diversion issues show up.

17   **Q.**    Does the Huntington Police Department in any way

18   endeavor to combat the issue of drug diversion, particularly

19   prescription opioid diversion, in the community?

20   **A.**    They do.

21   **Q.**    How do they do that?

22   **A.**    Two examples offhand.  First one, we participated in

23   the drug take-back days, which is a -- kind of a nationwide

24   thing, but it's getting prescription drugs off the market

25   for unused or unwarranted prescription drugs.  We would be a

1    drop-off point and we would collect those and dispose of

2    them properly.

3        The other one, later on, we actually instituted a drop

4    box which is in the lobby of the Police Department.  So,

5    year-round, we could have individuals drop off unused or

6    unwanted prescription medications and we would dispose of

7    them.

8    Q.   Now, you mentioned your part of the Mayor's Office of

9    Drug Control Policy, as we've heard, correct?

10   A.   Yes.

11   Q.   And the Court has gotten an opportunity to hear from

12   Chief Jan Rader, who served with you a little bit, but from

13   your vantage point, Mr. Lemley, could you tell the Court,

14   what is the Mayor's Office of Drug Control Policy?

15   A.   The Mayor's Office of Drug Control Policy was

16   instituted by the mayor to help deal with the addiction

17   issues that we had going on in Huntington to find innovative

18   and creative ideas on how to address these, to determine the

19   scope of the problem.  That was a big part of it, as well.

20   Q.   And when was it started?

21   A.   So, we were talking about it at the very end of '14,

22   November, December, and we really didn't get going until

23   January of '15, I believe is -- yeah, '15.

24   Q.   And we talked about when you started with the Mayor's

25   Office of Drug Control Policy, which I might call MODC or

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1   the Task Force for short, if that's all right.  You were

2   also working with the Huntington Police Department at that

3   time initially, correct?

4   **A.**   Yes.

5   **Q.**   Okay.  And, at that time, did you believe Huntington

6   had an opioid problem?

7   **A.**   I believe we did, yes.

8   **Q.**   At that time, did you have an appreciation for the

9   scope of the opioid problem in Huntington?

10  **A.**   At the time, no.  Not until you get into it.  That's --

11  that's when you realize it kind of affects everything.  It's

12  not just a law enforcement issue.

13       When you -- in the Police Department, you have blinders

14  on.  It's law enforcement, law enforcement, but this was

15  health-related, and economics, and educational.  It was

16  vast.  You really don't have an appreciation for it until

17  you really dive into it.

18  **Q.**   You talked a little bit about the goals of the Mayor's

19  Office of Drug Control Policy.  Did you have any sort of

20  more formalized tendence of the Task Force?

21  **A.**   We had mission statements.  We had -- essentially, we

22  developed kind of three pillars that we focused on.  Those

23  were prevention, treatment and law enforcement.

24       And prevention is stopping people from starting to

25  begin with.  Treatment is, I mean, treating those who

1    currently have an addiction.  And law enforcement working on

2    the supply side.

3    **Q.**   And who served on this Task Force with you?

4    **A.**   So, Jim Johnson was the Director, Jan Rader and myself.

5    **Q.**   Could you tell the Court just a little bit about your

6    respective roles?

7    **A.**   Sure.  Jim being the Director, he knew everybody.  He

8    had been a law enforcement officer beforehand.  He had a

9    vast wealth of connections.  Jan, she was a registered

10   nurse, so she did a lot of the medical things.  That is

11   definitely not my forte, but I did data analytics, inventive

12   ideas, things like that.

13   **Q.**   And was it your responsibility in the Mayor's Office of

14   Drug Control Policy to gather data, as well?

15   **A.**   Absolutely, yeah.

16   **Q.**   Was it your responsibility to analyze the data?

17   **A.**   Yes.

18   **Q.**   And did you share the data?

19   **A.**   Yes.

20   **Q.**   Who did you share the data with?

21   **A.**   We would share it with a wide range of people, decision

22   makers, such as the mayor, state delegates, City Council.

23   We would share it with the public.  There's probably not a

24   church that we did not visit.  Community meetings.  People

25   in recovery services.  Social services.  Education.  Anyone

1    who we wanted to and could share it with.

2    **Q.**   I was going to ask what you hit the ground doing when

3    you joined the Mayor's Office of Drug Control Policy.

4    **A.**   So, initially, I determined kind of the scope of the

5    problem, was our first thing that we wanted to do.  And in

6    our official capacity as the Mayor's Office, we went out and

7    did community outreach.  We tried to build relationships.

8    We gathered information to figure out the size and scope of

9    the problem.

10   **Q.**   And when you say you gathered information to try to

11   figure out the scope of the problem, what did you do to that

12   end?

13   **A.**   So, from my end, I was doing a lot of data gathering,

14   overdoses, general crime statistics.  We also tried to get

15   stories from other individuals and getting these ideas on

16   how to address the issue.  So, we were talking to people in

17   the health side to figure out is there an inventive way or

18   what should we be doing to help on the health side.

19        We were talking to people in recovery to figure out,

20   number one, how they got into recovery, but also, how they

21   started so we could do prevention programs.

22        We did education to see how it was affecting education

23   on an elementary school level to university level.  Those

24   are some examples.

25   **Q.**   And you mentioned that some of these informed some of

```
1    the prevention efforts that you -- that you went about.  So,

2    let me ask you this.  From a community engagement

3    standpoint, did the Mayor's Office of Drug Control Policy

4    use any of that to inform the policies and the programs that

5    you implemented?
```

**A.**   Most, if not all, of the programs came from what I
would call -- I would just call it a six-month listening
tour.  We would go out and talk to individuals and build
these relationships and gather this information, figure out
what programs would work for our area, what are best
practices, these things that we did in the past that we
could try to re-do or modify it.

**Q.**   And what did you learn from these collaborations and
investigations with people in the community?

MR. RUBY:  Objection, Your Honor.  He's just
described a six-month listening tour which inherently
involves a collection of a great deal of hearsay.  He can
describe the tour and what he asked and what he's already
done, but I don't think he can put that hearsay into the
record.

MS. LEYIMU:  Your Honor, in this unique role, he
has described that, as a way of informing the policy and the
programs that the Mayor's Office of Drug Control Policy
engaged in, they were hearing from the community to figure
out what the scope of the problem was, what was going on,

1    and how to get at and address it.

2            THE COURT:  You did this as part of your duty

3    under the direction of the authorities of Huntington; is

4    that right?

5            THE WITNESS:  Yes, sir.

6            THE COURT:  I'm going to let him testify.  I'm

7    going to overrule the objection and let him testify.  These

8    are the conclusions he drew from his investigation pursuant

9    to the direction of the mayor or whoever it was in

10   Huntington.

11           MS. LEYIMU:  That's correct.

12           THE COURT:  Is that right, Mr. Lemley?

13           THE WITNESS:  Yes, sir.

14           MR. RUBY:  And, Your Honor, we don't object to him

15   testifying about conclusions that he drew.  We do object to

16   the extent he's repeating into the record information or

17   facts that were passed on to him by others.  And it may be a

18   fine distinction in.  We'll just see how this plays out.

19           THE COURT:  Well, yeah.  I will let him testify as

20   to his conclusions, but not go into detail about what he was

21   told by people and so forth.

22           BY MS. LEYIMU:

23   Q.   If you understand, Mr. Lemley, could you talk about the

24   conclusions from the community engagement that you were

25   engaged in in your official capacity at the Mayor's Office

1    of Drug Control Policy?

2    **A.**   Well, I think personally, I think we had an opioid

3    problem at the beginning and I think getting all this

4    feedback and this investigation that we did, it really did

5    support that we had a huge opioid problem.  And, eventually,

6    I mean, we talked about, I mean, it -- IV drug use.  That

7    was something that we were very concerned about.

8         We talked about how to get people in recovery.  We used

9    to call it a portal to recovery, trying to find common

10   themes on how we can move people into recovery.  We looked

11   at, as I said before, with individuals that were addicted,

12   how did they get addicted to do prevention programs.

13        We looked at, for a lot of them, it was a progression.

14   Again, they kind of started out on a prescription pill and

15   then they moved over to heroin because that was what they

16   could get, that's what they could find, that's what was

17   affordable to them because eventually they became more

18   scarce.

19             THE COURT:  Just a minute.

20        Mr. Ruby?

21             MR. RUBY:  Judge, I will object to hearsay on this

22   hearsay testimony about what he was told by other people

23   about how they got the heroin addiction and move to strike

24   that testimony on the gateway there.

25             MS. LEYIMU:  Your Honor, this clearly goes

1    straight to the prevention efforts and what the Mayor's

2    Office of Drug Control Policy was finding out in the

3    community and then doing to resolve the conflict.

4              THE COURT:  Yes, what he found out and not

5    specifically reciting specific things that individuals told

6    him.

7         I'm going to overrule the objection and let him answer,

8    Mr. Ruby.  I think he's testifying as to the conclusions he

9    drew from his investigation and not repeating specific

10   things that he was told.  I'm going to let him answer.

11        Go ahead, Mr. Lemley.

12             THE WITNESS:  And that drove, again, policy

13   decisions.  A good example of that would be prevention

14   efforts on a state level.  We wanted educational things for

15   individuals from kindergarten to high school.

16        Kindergartners, I mean, you don't go into great detail,

17   but stuff like Mr. Yuck, things like that, but when you get

18   to middle school and high school, more precise things on the

19   dangers of opioids.

20   **Q.**   Does the Mayor's Office of Drug Control Policy still

21   exist in the same form today as it did when you were on it?

22   **A.**   It does not.

23   **Q.**   And why is that?

24   **A.**   We had made a transition.  A lot of the work that we

25   did, a lot of the programs that we did, were being continued

1    by other entities from the Cabell-Huntington Health

2    Department or Marshall.

3         And then, I had taken a different position.  I was

4    offered the position of Director of Development and

5    Planning.  So, I took that position.  Jan Rader became the

6    Fire Chief.  And then, Jim Johnson ran off to the State to

7    run their State Office of Drug Control Policy.

8    **Q.**   And did the Mayor's Office of Drug Control Policy work

9    with other agencies on a local level even?

10   **A.**   Oh, absolutely, yeah.

11   **Q.**   Tell us about that.

12   **A.**   I mean, we would work with the Health Department, that

13   would be an example, on starting a Harm Reduction Program.

14   We worked with universities to figure out different ways to

15   address the issues.  Worked with education, again, to figure

16   out prevention efforts and things we can do locally.  I

17   mean, some of it is kind of county-by-county issues.

18   **Q.**   What about on a state level, did you work with any

19   state agencies or organizations while in your capacity on

20   the Mayor's Office of Drug Control Policy?

21   **A.**   Absolutely.  So, we had meetings with state officials

22   occasionally, from DHHR.  We talked a lot to our state

23   delegates about things we thought should happen, different

24   laws they should pass, and that absolutely happened.

25   **Q.**   What about on a federal level, any agencies or

1   organizations that you worked with on a federal level?

2   **A.**   Yeah, a lot of them.  Law enforcement.  We also worked

3   with the National Office of Drug Control Policy.  Law

4   enforcement, FBI, DEA, ATF.  A lot of the law enforcement.

5   HIDTA is another one.  HIDTA, HIDTA stands for high

6   intensity drug trafficking areas.

7   **Q.**   You mentioned IV drug use.  I wanted to circle back to

8   that.  In your official capacity at the Mayor's Office of

9   Drug Control Policy, did you look into issues such as IV

10  drug use?

11  **A.**   Yeah.  Yeah, we did.

12  **Q.**   Tell us about that.

13  **A.**   So, as part of this determining the scope of the

14  problem, we realized that a lot of people are now injecting

15  heroin.  And we know with IV drug use is a lot more issues,

16  health issues.  So, we're seeing increases in Hepatitis C,

17  hepatitis B.  And, at the time we feared an HIV outbreak was

18  something that we would see with the increasing use of IV

19  use of heroin.

20  **Q.**   And switching gears a little bit and going back to the

21  data collection, while working on the Mayor's Office of Drug

22  Control Policy, did you continue to collect data on drugs

23  and crime?

24  **A.**   Absolutely.

25  **Q.**   And what were the sources of that data?

1    **A.**    So, for overdoses, we wanted as complete list as

2    possible in realtime.  So, I would use data from 911 calls

3    that would come in.  I'd also use data from EMS reports that

4    would come in.  And I would finally use law enforcement

5    reports.  Now, a lot of them would be sometimes the same

6    report, so my job was to ensure that I didn't count it three

7    times.  Do my best that I can to make sure we didn't miss

8    any.  I guarantee you that we did miss some, but it's really

9    -- I mean, that's an example of what we did just for the

10   overdose, for overdoses.

11   **Q.**   That's overdoses.  What about drug offenses?  Did you

12   ever look at the drug offenses while in your position at the

13   Mayor's Office of Drug Control Policy?

14   **A.**   I did, yeah.

15   **Q.**   And was there ever a time that you took a more

16   wholistic or historical overview of the drug offenses in the

17   area?

18   **A.**   Absolutely.  So, I guess you could say that began more

19   with the Office of Drug Control Policy time.  So, this would

20   have been in 2015, 2016.  We realized, again, we could not

21   arrest our way out of this.

22        So, I mean, looking at this from a health standpoint,

23   an economic standpoint, a law enforcement standpoint, really

24   allowed us to kind of step back and realize how insidious

25   this was.  It was creeping into all of the -- the facets of

1    our community.

2    **Q.**   And you talked about taking a step back and looking at

3    the drug offenses.  What year span did you look at these

4    drug offenses?

5    **A.**   We'd look at them yearly.  I created other products,

6    maps, looking at drug offenses back in 2004 and comparing

7    them to other years.

8    **Q.**   And what did you see?

9    **A.**   The size of the problem had changed in not only number,

10   but in geographic area.  Drug offenses back in 2004 were

11   very concentrated.  I mean, again, kind of a four-block by

12   four-block area, two-block by two-block area.  They were

13   very confined.  So, if you wanted to address this from a

14   geographic standpoint, you could.

15       By 2014, '15, '16, it had permeated throughout the

16   entire community.  It went as far west as Westmoreland,

17   which is the far west neighborhood, to Altizer, which is far

18   east.  It went from Highlawn, which is in the north, to

19   South Side in the south.  It really -- from a geographic

20   standpoint, it exploded.  It really did.

21   **Q.**   And were you still tracking the drug seizures at this

22   time?  I know we talked about the drug seizures that you

23   were tracking in your capacity with the Huntington Police

24   Department, but now in your capacity at the Mayor's Office

25   of Drug Control Policy, were you tracking drug seizures, as

1    well?

2    **A.**   Yes.

3    **Q.**   Were you ever asked to look at drug seizure and the

4    drug offenses and see if there was any correlation?  Were

5    you asked to do that?

6    **A.**   I'm sorry.  Say that again.  Drug offenses and --

7    **Q.**   Sure.  And drug seizures?

8    **A.**   Yeah.  Generally, I would say yes to that.  So, I mean,

9    we were seeing increases in drug offenses and then we were

10   seeing increases in certain drugs that we were seizing.

11   **Q.**   When you say certain drugs that you were seizing, what

12   drugs?

13   **A.**   Prescription pills.  Opioids, prescription pills and

14   heroin.

15   **Q.**   You talked about the overdoses and tracking overdoses

16   and so, I just wanted to briefly go over that.  The sources

17   for the overdose data, could you tell the Court again what

18   that -- what that is?

19   **A.**   So, to make the most complete list as possible, I took

20   them from EMS, from 911, and from police reports.

21   **Q.**   And when did you start collecting this data on

22   overdoses specifically?

23   **A.**   That was at the very beginning of the Office of Drug

24   Control Policy, so January of 2015.

25   **Q.**   And what types of overdoses were you collecting data

1    on?

2    **A.**    All overdoses.

3    **Q.**    Was it confined to fatal overdoses, non-fatal

4    overdoses?

5    **A.**    Yeah.  So, it was fatal and non-fatal overdoses, yes.

6    **Q.**    Did you conduct an analysis on this type of data?

7    **A.**    We did.  So, originally, the list was just to determine

8    a number and location, but eventually --

9            THE COURT:  Did that include overdoses of drugs

10   other than opioids?

11           THE WITNESS:  It could.  It could.  I will say the

12   vast majority of them were opioid-related, but it could

13   include other ones.

14       I'm sorry.  Oh, analysis.  So, an example of an

15   analysis that --

16           THE COURT:  Mr. Ruby?

17           MR. RUBY:  Judge, with regard to the testimony as

18   to his actual tabulations, I'd again make the objection that

19   while he -- his testimony has been that while he was with

20   the Mayor's Office of Drug Control Policy he was obtaining

21   and then tabulating records that he received from other

22   agencies like EMS, 911 and the Police Department.

23       We don't have the custodians of those records here.  We

24   haven't been provided the records on which Mr. Lemley

25   supposedly relied.

1      It's unlike the situation with Ms. Priddy, who

2   testified in the first week about records that she had

3   collected as the EMS Director or Deputy Director, and the

4   records that Mr. Lemley and the Office of Drug Control

5   Policy was getting from other agencies or custodians are

6   hearsay.

7           THE COURT:  Well, I think he's entitled to testify

8   to the investigation he conducted, the sources he consulted

9   and his conclusions.  So, to that extent, I'm going to allow

10  him to testify and overrule your objection, Mr. Ruby, and

11  I'll leave it at that.

12          BY MS. LEYIMU:

13  **Q.**   And so, where were you getting information with regard

14  to fatal overdoses?  I believe we've asked you about

15  non-fatal.

16  **A.**   Sure.  So, again, those same three.  We also had a

17  relationship with the ME's Office, the Medical Examiner.

18  So, if the Medical Examiner had one, they would send that

19  information to us.

20      I would also consult state lists on the back end to

21  ensure that I didn't miss any, to ensure that my list was as

22  complete as possible.  Occasionally, I may miss one but,

23  again, we were trying to do realtime data.

24  **Q.**   Okay.  And this was all a part of your official

25  capacity on the Mayor's Office of Drug Control Policy; is

1    that correct?

2    **A.**    That is correct.

3    **Q.**    Okay.  Was this information made public by the City and

4    shared?

5    **A.**    Yes.  Yes.  Non-fatals and fatals.

6    **Q.**    Was anyone else at the City comprehensively tracking

7    non-fatal overdose -- overdoses in the community?

8    **A.**    No.  It was just me.

9    **Q.**    Okay.  You talked about realtime data.  Why was

10   realtime data important?

11   **A.**    We had a realtime problem.  Realtime data allows us to

12   direct resources as quickly as possible.  A lot of data that

13   we would get from -- medically or sometimes law enforcement

14   can take weeks or months or -- especially with overdose

15   deaths, it can take years before you get that information.

16   So, tracking that at a local level allowed us to be

17   flexible.  It allowed us to address issues immediately if

18   something were to pop up.  And that was the purpose of us

19   trying to do realtime data.

20   **Q.**    Was it possible to collect data on every single

21   overdose that happened in Cabell County?

22   **A.**    No.  I guarantee you I missed some.

23   **Q.**    And why do you say that?

24   **A.**    Well, an example would be we formed a relationship with

25   the hospitals.  So, if a hospital has an individual who is

1  driven to the hospital by personal vehicle and they are --

2  horror stories of them just being pushed out and the car

3  drives away, they never touch a -- there's no call to 911,

4  there's no EMS report, there's no police report.

5      So, working with the hospital, we tried to gather some

6  of those and created a process to get that information, as

7  well, but if they were to get busy and that call never --

8  never occurs, I would never get it.  That would be an

9  example of why I would miss one.

10 **Q.**   And did you collect data on where overdoses occur

11 geographically within the City of Huntington?

12 **A.**   Yes.  That was one of the things we looked at, was the

13 address, and we would actually map it out to show what we

14 call hotspots and we kind of made it like a weather map.

15     If anyone can -- and like you would see on TV.  Where

16 you see no color or light green, there would be less

17 overdoses.  When you get into oranges and reds and yellows,

18 there would be more overdoses in those areas.

19 **Q.**   And what did you find in terms of geographically?

20 Where were overdoses occurring in the City of Huntington?

21         MR. RUBY:  Your Honor, the same objection.  The

22 witness has now added an additional hearsay source to the

23 list of sources that he relied on, which was information

24 that was called in or provided to him on an ad hoc basis by

25 people at hospitals after patients were dropped off who

1    evidently were suspected of having overdosed.

2         And I'm not -- I'm not optimistic that I'm going to

3    persuade the Court on this, but I will note that the mere

4    fact that Mr. Lemley was a government employee doesn't cure

5    the hearsay problem here.

6              THE COURT:  Okay.  Your optimism is justified and

7    your objection is overruled.

8              BY MS. LEYIMU:

9    **Q.**   And this was realtime data, correct?

10   **A.**   It was.

11   **Q.**   And you were the only one tracking this in the City of

12   Huntington; is that right?

13   **A.**   I was.

14   **Q.**   Okay.  What about data on -- you talked about

15   geographically.  I'm not sure if you got to answer that

16   question.  Where were the overdoses occurring geographically

17   in the City of Huntington, Mr. Lemley?

18   **A.**   Again, they were everywhere.  They went from

19   Westmoreland far west to Altizer north and south.  There

20   were individual hotspots, but it was pretty pervasive

21   throughout the entire city.

22   **Q.**   Did you collect data, as well, on demographics of

23   people who had overdosed?

24   **A.**   Some of them, yes.  We were able to capture age, race,

25   sex, things like that.

**Q.**   Was there a specific type of person who was overdosing

on opioids?

**A.**   No.  It varied.  Very young people, very old people.

From a race standpoint, it generally followed the

demographics of Huntington from, you know, White, Black

Asian, and you could do averages on ages but, I mean, it --

it went from teenagers to 70-year-olds.

       And that's what made it very difficult to address.  If

it was just, you know, 35-year-old white males, we could do

something with that, but it was pervasive throughout the

entire community.

**Q.**   Okay.  So, let's take a look at what you did.  Look at

P-41234.

              MS. LEYIMU:  Your Honor, may I approach?

       Now, Your Honor, what we have done is taken the

spreadsheet that Mr. Lemley had and pulled out in pdf

version the tabs that we were going to talk about today.

I understand there was an issue potentially with

completeness, so we've also printed out the entire

spreadsheet, as well.

              THE COURT:  All right.

              MS. LEYIMU:  I will -- I will note for the record,

as well, that the second page which deals with overdose

deaths, just in the interest of privacy and respect, we have

redacted those and blacked them out.  So, if you see a lot

1    of that on the second page, second tab, that's what it is.

2            BY MS. LEYIMU:

3    **Q.**   Now, Mr. Lemley, do you recognize these documents?

4    **A.**   Yes, I do.

5    **Q.**   What do you recognize them to be?

6    **A.**   So, these appear to be the non-fatal and fatal overdose

7    lists for Cabell County and the City of Huntington.

8    **Q.**   All right.  And do you recall what year this was?

9    **A.**   This would have been 2015.

10   **Q.**   Okay.  And how do you know that?

11   **A.**   Because the date is on it and on the overdose -- well,

12   yeah, the date is on it.

13   **Q.**   On the first tab, are these overdose -- are these

14   non-fatal overdoses or are these fatal overdoses?

15   **A.**   I'm sorry, which one?

16   **Q.**   The first tab.  So, at the bottom, you will see Tab 1.

17   Do you have that?

18   **A.**   Tab 1?  Okay.  So -- yes.  So, these would be the

19   non-fatal overdoses.

20   **Q.**   Okay.  And the second tab, what is that?

21   **A.**   That's the fatal overdose list.

22   **Q.**   Okay.  So, fair to say there were more non-fatal

23   overdoses than there were fatal overdoses?

24   **A.**   Absolutely.

25   **Q.**   And is this the work product from the compilation that

1    you've just described to the Court in terms of tracking the

2    overdose data?

3            THE COURT:  Mr. Ruby?

4            MR. RUBY:  Your Honor, the objection here again

5    would be hearsay and there's a different basis for objection

6    here because this -- this document is an out-of-court

7    statement that the witness has testified that he prepared,

8    but it nonetheless is an out-of-court statement that doesn't

9    fall within the public records exception that we've talked

10   about previously in the trial.

11           That exception has three prongs.  One is activities

12   observed by the office.  Sorry, the activities of the

13   office.  And that, according to the Federal Evidence

14   Treatises by Mueller and Kirkpatrick, it makes clear that it

15   is a matter of Hornbook law that that referred to

16   ministerial activities of the office, such as the

17   administration of oaths or the recording of birth

18   certificates.  It does not refer, and there's abundance of

19   this in the case law, to behavior or conditions of citizens

20   or events that happen outside the office.  So, this doesn't

21   come in under that prong.

22           The second prong of the public records exception is for

23   matters observed by someone in the office with a duty to

24   report and, again, the Mueller and Kirkpatrick Evidence

25   treatises and the case law make clear that that -- that the

1    source of the reported information must have personal

2    knowledge of the matter that's observed.

3        The third prong in the public records exception to the

4    hearsay rule is factual findings from a legally authorized

5    investigation.

6        And, again, the case law, including in the Fourth

7    Circuit in the case of *United States v. D'Anjou*, which is 16

8    F.3d 604, Fourth Circuit, 1994, makes clear that it is --

9    it's not enough that -- to fit that prong of the exception

10   that a document has been prepared or typed by a government

11   employee and *D'Anjou*, the example was an ATF Memo of

12   Investigation, and the Fourth Circuit said that it is beyond

13   peradventure that the mere fact that that sort of

14   preliminary or working record had been prepared by a

15   government employee.  Even a sworn law enforcement officer

16   was not sufficient to bring it within the factual findings

17   prong of a public records exception.

18       Instead, what qualified under that prong was some sort

19   of final or official finding that carried with it indicia of

20   reliability, as opposed to a preliminary or working

21   document, which is what the spreadsheet that's being

22   presented here is.

23       So, to sum it up, Judge, a government employee or a

24   government official can't simply take a copy, a spreadsheet,

25   off their computer desktop and bring it into court and offer

1    it as a -- as a public record under the public records

2    hearsay exception.

3              THE COURT:  Do you want to respond to that?

4              MS. LEYIMU:  Sure.  Your Honor, if I may, this

5    does count as a factual finding from a legally authorized

6    investigation.  Mr. Lemley was in his official capacity on

7    the Mayor's Office of Drug Control Policy.

8        These spreadsheets and his work product are a result of

9    the investigations that he took on.  The findings of those

10   investigations that he has explained were relied upon by

11   very reliable sources.  That's why he shares them.  That's

12   why he presents them.  That's why they share them around.

13   That's why they're public.  If you were to FOIA it, you

14   could get this information.

15       He was the only one comprehensively, moreover, putting

16   this together in the community and I believe that it would

17   assist you as the trier of fact, Your Honor, if you agree,

18   to see what was going on at the Mayor's Office of Drug

19   Control Policy, what they were tracking.  And it's certainly

20   reliable.

21             THE COURT:  Okay.  Here's what I'm going to do

22   rather than belabor this.  I'm going to conditionally admit

23   it until I have a chance to read Mr. Ruby's case and then I

24   will decide whether to consider it or not, but that's

25   harmless, if it's a mistake, but this is a bench trial and

```
1    that result will purge any error.  So, I'm going to go ahead

2    and hear it conditionally.

3        And our rules expert is on his feet over here.

4            MR. ACKERMAN:  Your Honor, I am cautious because I

5    know I -- Ms. Leyimu is up here.  I would just like to have

6    the opportunity to submit to you some other cases on this

7    that we believe support the admissibility of this document.

8            THE COURT:  All right.  You may do so.

9            MR. ACKERMAN:  Thank you.

10           MR. RUBY:  And, Judge, just for the record and for

11   the Court's review later, I'll also cite the Court to 4

12   Federal Evidence 8:87, 8:88, 8:89, which sets forth the

13   Hornbook law on those three prongs of the public records.

14           THE COURT:  Whose evidence book is that, Mr. Ruby?

15           MR. RUBY:  Mueller and Kirkpatrick, Your Honor.

16           THE COURT:  Okay, very good.

17       All right.  Go ahead.

18           MS. LEYIMU:  All right.

19           BY MS. LEYIMU:

20   Q.   I think we have talked about that this is the

21   compilation of your efforts as you've just described to the

22   Court; is that correct?

23   A.   Yes.  This is an example of an overdose list, yes.

24   Q.   Okay.  I just wanted to wrap that one up.

25       We'll look at another one.  This is from 2015, as you
```

1    have testified.  We will look at the 2016 work product that

2    you did, as well.  It's 41234 -- or 236.

3              MS. LEYIMU:  And, Your Honor, I would move that we

4    admit this into evidence, as you anticipate, and that is

5    P-41234.

6              THE COURT:  Well, it will be subject to your

7    objection, Mr. Ruby.  I'm going to conditionally admit it

8    until I have a chance to look at the case law.

9              MR. RUBY:  Same objection, Your Honor, and also,

10   just for the clarity of the record, with respect to all of

11   these overdose-related sort of tabulations or compilations

12   that are coming from sources all over the place that the

13   witness didn't have any firsthand knowledge of, we'd

14   maintain that objection, as well, understanding Your Honor's

15   ruling.

16             THE COURT:  All right.

17             MS. LEYIMU:  May I approach, Your Honor?

18             THE COURT:  Yes.

19             BY MS. LEYIMU:

20   **Q.**   Mr. Lemley, do you recognize this document?

21   **A.**   I do.

22   **Q.**   Okay.  And how do you recognize this document?

23   **A.**   This is what I produced as the overdose list and fatal

24   -- non-fatal and fatal overdose list from 2016.

25   **Q.**   I've handed you three tabs and I just want to make

1    clear for the Court, you talked about the non-fatal

2    overdoses in 2016.  Would that be Tab 1?

3    **A.**    Yes.

4    **Q.**    You discussed the fatal overdoses in 2016.  Would that

5    be Tab 2?

6    **A.**    Yes.

7    **Q.**    And so, what is Tab 5 at the bottom here?

8    **A.**    I'm sorry?

9    **Q.**    Do you have a Tab 5?

10    **A.**    I do.

11    **Q.**    Okay.  Could you tell the Court what Tab 5 is?

12    **A.**    So, Tab 5 is -- Tab 5 was something I put together.  I

13    broke down the overdoses by month and did a -- just an

14    average of overdoses per day.  That's kind of totals.  It

15    appears just for non-fatals from the initial look at it.

16    **Q.**    Okay.  Going back to Tab 1 and Tab 2, could you briefly

17    explain to the Court what this is and what you did?

18    **A.**    Sure.  So, again, this is the realtime list that we

19    were keeping of fatal and non-fatal overdoses and Tab 1 and

20    Tab 2.  It has generally the same information on there.  It

21    has date, age, gender, race, address, zip code, time of the

22    occurrence.

23        There's a column for where I got the information from.

24    So, on that column what you would have is if I -- if there

25    was a 911 report, I'd put it on there.  I could have a 911

1   report, an EMS report, and police, but just one source, I

2   knew I could always go back there if I ever had a question

3   about a certain one.  I put a column on there so I can

4   always -- you know, just a reference for me.

5   **Q.**   Did you have a criteria that you routinely went by in

6   what you included into your spreadsheets?

7   **A.**   I did.  So, I was looking -- at a minimum, I was

8   looking at a date, a time and a location.  The location was

9   necessary for us to map that.  Again, the list was created

10   so we can figure out originally just a number and from a

11   geographic standpoint where they were at.

12   **Q.**   When you say originally just a number from a geographic

13   standpoint, did it evolve into something else?

14   **A.**   It did.  So, we were looking at like the age, seeing if

15   there was any common threads, seeing how the race of the

16   individual, did that matter?  Was there an imbalance there?

17        An example of this would be, from a date, I can

18   determine -- or I can determine is there a day of the week?

19   Did that matter?  When I looked at the time, we actually

20   mapped those out to see if there was a certain time of day

21   that mattered.

22        So, originally, it was intended for one purpose, but

23   because we had all this information, we could do an

24   analysis.  Does time of the day matter?  Does day of the

25   week matter?

1   **Q.**   What did you find -- what did you find or did you find

2   a difference between 2015 and 2016 as it relates to the

3   overdoses?

4   **A.**   That they increased.  I think total overdoses in '15

5   was 944 and 2016 it increased to 1,476.  I believe those

6   numbers are right.

7   **Q.**   Is that inclusive of non-fatal and fatal overdoses?

8   **A.**   Yes.

9   **Q.**   That number you just gave?

10   **A.**   Yes.

11          MS. LEYIMU:  Your Honor, at this time, I would

12   move to admit P-41236 into evidence.

13          MR. RUBY:  Same objections, Your Honor, both the

14   underlying hearsay and the hearsay as to the documents.

15          THE COURT:  I'm going to conditionally admit it

16   subject to the previous ruling by the Court.

17          BY MS. LEYIMU:

18   **Q.**   Did the Mayor's Office of Drug Control Policy prepare

19   any written reports, Mr. Lemley?

20   **A.**   We did.

21   **Q.**   And was that in your official capacity?

22   **A.**   Yes, it was.

23   **Q.**   What were they?

24   **A.**   An example of that would be strategic plans.  So, we --

25   after -- during our investigation, we wanted to set some

1    groundwork and some ideas on how we, as an office, wanted to

2    move forward; but also, as a community as a whole, how we

3    wanted to move forward.

4    **Q.**   Did these strategic plans set out the office's

5    activities?

6    **A.**   They did.

7    **Q.**   What strategic plans did you create?

8    **A.**   We created two different ones.  One would have been

9    about six, seven months, maybe eight months after we

10   started, after we went out and tried to figure out the scope

11   of the problem.  Then, we wrote our strategic plan to

12   address that.  And then, two years later, we again tried to

13   set a new path for the next two years on, again, what we

14   should address.

15   **Q.**   Did you have a hand in creating these strategic plans?

16   **A.**   I did.

17   **Q.**   Tell us in what capacity.

18   **A.**   So, the 2015 one, I actually was the one who compiled

19   it.  My data was used in it.  I actually physically wrote

20   it.  Took a lot of the pictures.

21        In the 2017 one, the only thing I didn't do was the

22   actual compiling of it.  Everything else, data outlines, I

23   reviewed it to ensure it was factually accurate as best I

24   could.

25   **Q.**   We will now look at the strategic plans for 2015 and

```
 1    2017.  This will be P-41708 and P-4180 -- 850, excuse me.
 2              COURT REPORTER:  I'm sorry.  What was that last
 3    number?
 4              MS. LEYIMU:  Sure.  P-41850.
 5              COURT REPORTER:  Thank you.
 6              MS. LEYIMU:  Your Honor, may I approach?
 7              THE COURT:  Yes.
 8              BY MS. LEYIMU:
 9    Q.    Do you recognize these documents, Mr. Lemley?
10    A.    I do.
11    Q.    And how do you recognize these documents?
12    A.    By the content within them and, of course, the cover,
13    graphs, pictures, yeah.
14    Q.    Were these created in the ordinary course of business
15    in your role in the Mayor's Office of Drug Control Policy?
16    A.    Yes.  Part of my official capacity was helping create
17    these.
18    Q.    Did you review these documents before they were
19    released?
20    A.    I did.
21    Q.    And were these documents made public?
22    A.    Oh, yes.  Yes.
23              MS. LEYIMU:  Your Honor, at this time, I would
24    move to admit the 2015 and the 2017 Mayor's Office of Drug
25    Control Policy Strategic Plans.  That is P-41708 and
```

1    P-41850.

2              THE COURT:  Mr. Ruby?

3              MR. RUBY:  Your Honor, these are also hearsay to

4    the extent they're being offered for the truth.  These

5    aren't business records.  They're not regularly kept

6    records.

7              THE COURT:  They don't come -- as I understand it,

8    they don't come in for the truth.  They come in just to show

9    what the strategic plans were.

10             MR. RUBY:  And to the extent that -- I think what

11   the Court will find if it reviews them is that they're sort

12   of a combination of editorial commentary.  And I'll start

13   with the 2015 plan of sort of a commentary-type letter from

14   the mayor, Mayor Williams, who starts out, "Simply stated,

15   our families, our neighborhoods, or communities, our cities

16   and our states are under siege", and goes on in that vein

17   for a page.

18        And then a combination of -- or a healthy dose here of

19   hearsay, recitation of facts with no indicated basis.  For

20   example, Page 6, we have the statement, "Recent studies have

21   shown that North Dakota has the lowest rate of overdose

22   deaths in the United States."

23        So, this is a -- this is -- this is a -- it's shot

24   through with hearsay.  It may in certain aspects -- well, it

25   sets forth in some aspects the plan or the intentions of the

1    office, which wouldn't necessarily be offered for the truth.

2    So, to the extent it's being offered for the truth, it's

3    stated by Mayor Williams saying that the City is under siege

4    with a claim that North Dakota has the lowest rate of

5    overdose rates in the United States and similar factual

6    statements like that, that the source of which is not

7    obvious in this document and it would have to be excluded, I

8    think.

9            THE COURT:  They're admitted for the limited

10   purpose of showing what the plans were and the Court is not

11   going to consider any hearsay that might be included.

12           MS. LEYIMU:  Your Honor, I want to --

13           THE COURT:  Such as the statements of the mayor

14   you've just repeated.

15           MS. LEYIMU:  Your Honor, I wanted to state for the

16   record that under 803.8, this does fit under the -- sets out

17   the office's activities.  And the Mayor's Office of Drug

18   Control Policy, these are the strategic reports that they've

19   set out.

20           MR. RUBY:  And, Your Honor, if I may respond?

21           THE COURT:  Yes.

22           MR. RUBY:  I think what the Court will find in

23   reviewing the Mueller and Kirkpatrick Treatise is Section

24   8:87, which concerns the activities of the office prong of

25   the public records exception, is that it is -- as I said

1    earlier, it does not encompass everything that the office

2    does or reads or writes.

3        It -- it is, on the contrary, narrowly limited to

4    ministerial-type actions that concern activities within the

5    office, the recording of deeds, the recording of birth

6    certificates, and it's not the case that it encompasses any

7    external condition of the office, makes a conclusion about

8    and observes that and can come in under the third prong,

9    which is factual findings, but only if -- only if it is as a

10   result of an investigation that has some indicia of

11   formality and takes the form of final conclusions.  And this

12   strategic plan, with the kind of statements that it has in

13   it about the city under siege, North Dakota, et cetera, et

14   cetera, wouldn't qualify under either prong.

15           THE COURT:  All right.  Your objection is on the

16   record loud and clear and they're admitted.

17       Go ahead.

18           MS. LEYIMU:  Your Honor, I just wanted to state

19   for the record that these were not objected to before.

20           BY MS. LEYIMU:

21   **Q.**   I also want to ask, Mr. Lemley, are these strategic

22   plans the result of factual findings that the Mayor's Office

23   of Drug Control Policy made during the course of its

24   investigations?

25   **A.**   It is.

1          MR. RUBY:  Your Honor, I don't want to belabor

2     this, but we did object to these in one of the e-mails that

3     we sent to plaintiffs and we can put that in the record, if

4     we need to.

5          MR. ACKERMAN:  Your Honor, I hate to do this, but

6     you have been very clear with the plaintiffs that we need to

7     disclose what we are doing to the defendants and we have

8     done that.  We have narrowed down documents that we have

9     intended to use.

10         What Mr. Ruby is saying is that they put a line in an

11    e-mail that says, "We reserve the right to object to any

12    document on these grounds."  If you look at the actual

13    document they served us, where the numbers for these two

14    documents are at the bottom are blank, there are no

15    objections.

16         It says "hearsay" on other documents, but they did not

17    object to these documents.  And the purpose of these

18    objections is to allow us to try to deal with this the night

19    before.

20         It's not like we get the objections at 10:00 and ignore

21    them.  When we get their objections, we seek to address

22    them.  We have to be put on notice of what they're going to

23    object to.

24         If we served our notices of documents we intended to

25    use and included something that said, "We reserve the right

1    to use every other document on our exhibit list", Mr.

2    Nicholas would be upset and rightfully so.  It can't be the

3    -- we are allowed to anticipate objections and they have to

4    specify the objections.  That's what the stipulation at

5    Docket 1029 says.

6         MR. RUBY:  Your Honor, I can speak personally to

7    my role in the sending of these particular e-mails with

8    objections and what I can tell the Court is that -- is that

9    I asked for that objection to be noted not in the -- we've

10   had these Lemley -- the documents with Mr. Lemley sent over

11   several times because he had been -- it had been indicated

12   to us previously last week, and then earlier this week, that

13   he would testify on a prior day, and so we had sent over

14   various different objections.

15        On one of the later rounds of those, I had -- had asked

16   for the objection to these documents to be noted and I don't

17   have the -- I don't have the e-mail in front of me to see

18   how that actually transpired, the final version of that

19   e-mail, but to the extent it's of concern to the Court, we

20   can sort it out.

21        I would also note that the -- again, the e-mail that we

22   transmit in every instance with these objections reserves

23   our right to object to specific portions of the document,

24   which is the nature of the objection here.

25             THE COURT:  Okay.  Well, I've admitted them and

1     let's get on with Mr. Lemley's testimony.

2          And your objection is on the record, Mr. Ruby.

3          BY MS. LEYIMU:

4     **Q.**   Turning to the 2017 strategic plan, Page -- actually,

5     II below.  The second to last paragraph is a statement

6     included by Mayor Steve Williams.  I'm only going to ask one

7     question about this.

8          It notes, "The strategic plan is the outcome of

9     hundreds of meetings over thousands of hours of interaction

10    between law enforcement officers, healthcare professionals,

11    social service administrators, educators, elected officials,

12    clergymen, community activists, recovering addicts and

13    neighborhood groups."  Do you see that?

14    **A.**   I do.

15    **Q.**   My only question is, is this correct?

16          MR. RUBY:  Your Honor, we will object to the

17    hearsay statement from the mayor to the extent it's being

18    used for the truth.  The mayor is here and I think, at some

19    point, will be a witness in this case and can testify as to

20    whether this is true or not, but I don't think it's

21    consistent with the Court's ruling about using these for the

22    purpose of showing a plan to introduce a hearsay statement

23    from the mayor.

24          THE COURT:  Okay.  I'll sustain the objection, but

25    you can try to get at it another way, if you want to, ma'am.

1          BY MS. LEYIMU:

2     **Q.**   Mr. Lemley, you've served on the Mayor's Office of Drug

3     Control Policy, correct?

4     **A.**   Yes.

5     **Q.**   And you put in work talking to the community about what

6     was going on in the scope of the opioid epidemic; is that

7     correct?

8     **A.**   Yes.

9     **Q.**   And what did you do to that end over the culmination of

10    the time that you were on the Mayor's Office of Drug Control

11    Policy?

12    **A.**   For two years, we reached out to a number of people to

13    again find out the scope and find out possible solutions,

14    possible ideas to address the addiction issue that we had.

15    On a daily basis, we would have meeting after meeting after

16    meeting.  It seemed like all we were doing was going to

17    meetings.

18         We were going to community meetings in the evening.  It

19    really was an all-encompassing thing going on.  I mean,

20    talking to anyone and everyone about this issue.

21    **Q.**   Turn to Page 3 of the 2017 Strategic Report, Strategic

22    Plan.  I just wanted to -- you spoke about drug offenses

23    before.

24              MS. LEYIMU:  Page 3 at the end.  There we are.  Go

25    back one.  There we are.

1         BY MS. LEYIMU:

2    **Q.**   Do you recognize this map?

3    **A.**   I do.

4    **Q.**   Okay.  Could you describe this map for the Court,

5    please?

6         MR. RUBY:  Your Honor, I hate to keep jumping up,

7    but as I understood it, the Court has admitted this document

8    not for the truth, but for the purpose of showing the plans

9    or intentions of the Mayor's Office of Drug Control Policy.

10        THE COURT:  Overruled.  I'm going to let him

11   answer.

12        Go ahead.

13        BY MS. LEYIMU:

14   **Q.**   Okay.  You testified earlier that you took a wholistic

15   and historical look at the drug offenses in the city over a

16   span of time; is that correct?

17   **A.**   That's correct.

18   **Q.**   Okay.  Could you tell us what this -- this photo is in

19   the Strategic Plan?

20   **A.**   So, what you see here are three different maps showing

21   drug offenses and those records were taken directly from HPD

22   reports.

23        And you're seeing 2004, as I said earlier, drug

24   offenses were in a very small concentrated area, mainly the

25   Fairfield West community.

1       By 2014, again, they had spread out from the west end

2   all the way down to Highlawn.  And then, again, spans even

3   more in 2016.

4       And, again, you have to read it like a weather map.

5   Areas where you don't see any color at all, there are low to

6   no drug offenses.  Where you see darker colors, there are

7   higher numbers of drug offenses.

8       Literally, because we use this for the public, I tried

9   to make it as easy as possible to read and understand.

10          THE COURT:  Yeah.  This is admissible.  It

11  illustrates his earlier testimony based upon his personal

12  knowledge and I have no problem at all with the map.

13          MS. LEYIMU:  Thank you, Your Honor.

14          BY MS. LEYIMU:

15  **Q.**   I wanted to ask you, Mr. Lemley, just about the

16  programs.  So, in the Mayor's Office of Drug Control Policy,

17  were there programs initiated or developed that you worked

18  on to address the impact of opioids in the community?

19  **A.**   Absolutely.

20  **Q.**   Could you give the Court a brief summary of some of

21  those programs?

22  **A.**   They varied greatly.  Again, prevention, treatment, law

23  enforcement.  Examples would be having naloxone,

24  distributing that to individuals who are at risk of

25  overdosing.  Harm reduction was another program that we

1    helped implement.

2    **Q.**    How are you familiar with harm reduction?

3    **A.**    I'm sorry?

4    **Q.**    I said how are you familiar with harm reduction?

5    **A.**    In this case, it had to do with syringe exchange

6    programs.  Other examples would be the WEAR program, which

7    is Women's Empowerment Addiction Recovery.  It was a special

8    tract of drug court for women who are in the sex trade.

9    Those would be some examples.  Give Me a Reason was a great

10   prevention program to try to work with HIDTA.  That would be

11   another one.

12   **Q.**    And you talked about drug court and the WEAR program.

13   Why did you all institute the WEAR program?

14   **A.**    The WEAR program, as I said, was a special tract of

15   drug court and we saw drug court as a unique opportunity to

16   get people out of the criminal justice system and into a

17   program that will actually get them off of their addiction.

18        Drug courts have been used across the state and across

19   the country and having a special tract for individuals in

20   the sex trade was something we saw important.  We had a

21   large number of prostitutes in our area and they had special

22   needs.  So, addressing that would be something we did.

23   **Q.**    Earlier, we spoke about the impact of opioid -- the

24   opioid epidemic on a first responder when we were looking at

25   the 2015 Annual Report; do you recall that?

1    **A.**    I do.

2    **Q.**    Okay.  Did the Mayor's Office of Drug Control Policy

3    set out to initiate or develop any programming to deal with

4    first responders and what they were seeing?

5    **A.**    It's something we talked about quite a bit within the

6    office.  I was seeing it within the Police Department.  We

7    had a lot of compassion fatigue, burnout.  And then, Jan

8    always talked about it and she was seeing the exact same

9    things at the Fire Department.

10         At the time, we didn't have an idea or a way to address

11   it.  But, eventually, an opportunity presented itself with

12   the Bloomberg Mayors Challenge.  This was a competition

13   among cities across the entire nation and we were asked for

14   ideas on what we could do and I was part of that team.  And

15   I brought up compassion fatigue and burnout for our first

16   responders and to find ways to address their mental health

17   needs, their physical health needs, ways to deal with --

18   coping mechanisms for stressful situations.

19         And we submitted that.  We were one of 35 finalists.

20   And then, finally, we were awarded one of the ten winners of

21   that.  And, since then, we've re-named it the Compass

22   program.  And it's a program that's currently ongoing to

23   deal with first responder compassion fatigue, burnout,

24   stress.

25   **Q.**    Is that a grant?

1    **A.**    It was a grant, yes.

2    **Q.**    And does the grant have a term limit?

3    **A.**    I believe it was three years.

4    **Q.**    Did the Mayor's Office of Drug Control Policy look into

5    any initiatives to assist formerly incarcerated individuals

6    in the community?

7    **A.**    We did.  On a state level, I always called it felony

8    forgiveness, but it was the Second Chance Initiative.  We

9    realized that giving people hope and, in this case, a job

10   was important.

11         So, we really pushed on a state level the Second Chance

12   Initiative and it gave a pathway for individuals convicted

13   of drug crimes to get that felony taken off of their record

14   so they could find meaningful employment.

15         If they can't find meaningful employment, I mean,

16   they're going to be on welfare and other social services

17   that we have to pay for.  If we give them the ability to get

18   a job and pay back into society, that was kind of the end

19   goal to this.

20   **Q.**    Were there other resources that were sought out by the

21   Mayor's Office of Drug Control Policy to combat the opioid

22   epidemic in the community?

23   **A.**    Absolutely.

24   **Q.**    Okay.  Could you tell the Court just generally about

25   that?

1    **A.**    Sure.  We went after all kinds of state and federal

2    grants, private grants, everything from -- there was a

3    product grant for naloxone, was one we went after.  We went

4    after QRT.  There were actually two different grants we went

5    after for that, hoping that we would get one.  Luckily, we

6    got both.  The WEAR program was a grant.  I mean, all -- and

7    all of these, sadly, have time limits on them.

8    **Q.**    Based on your experience and knowledge from your work

9    with the Huntington Police Department and the Mayor's Office

10   of Drug Control Policy, did the City of Huntington work to

11   combat the opioid epidemic in your own community?

12   **A.**    I absolutely think we did.  It was a lot of -- there

13   were a lot of good programs that we started.  A lot of them

14   continue to this day.

15        A lot of time and effort in naming the problem.  We

16   explained the problem.  Bring awareness.

17        I wish we could have done more.  I wish we would have

18   had more time, and more money, and more resources, and more

19   people.  But with what we had, I think we absolutely did the

20   best job we could addressing the issue.

21             MS. LEYIMU:  Thank you, Mr. Lemley, for your time.

22             The WITNESS:  Thank you.

23             THE COURT:  You may cross examine.

24             MR. RUBY:  Thank you, Your Honor.

25                     **CROSS EXAMINATION**

```
 1              BY MR. RUBY:
 2     Q.   Mr. Lemley, good afternoon.
 3     A.   Good afternoon.
 4     Q.   My name is Steve Ruby.  I think we met last July in
 5     Huntington for your deposition.
 6     A.   I believe so.  I apologize.  I'm horrible with names.
 7     Q.   That's all right.  It's good to see you again.
 8          I wanted to start, Mr. Lemley, back at the beginning of
 9     your career with the City and the Drug Market Intervention
10     program.  You testified that you began your career with the
11     City of Huntington as an analyst for the DMI program; is
12     that right?
13     A.   That is correct.
14     Q.   And DMI was a special program that was brought to the
15     City of Huntington because the city had such a serious
16     problem with illegal drug dealers, right?
17     A.   So, we had a problem in a very small confined area.  As
18     I said earlier, kind of two-block by four-block area in the
19     Fairfield West neighborhood where there was an open air drug
20     market.
21     Q.   And, in particular, there was a problem with
22     out-of-state drug dealers in the City of Huntington, right?
23     A.   Generally speaking, at that time, in that small area,
24     yes.
25     Q.   They sold a lot of different kinds of drugs?
```

1    **A.**    Yeah.   Anything they can make money on, yeah, I would

2    say that.

3    **Q.**    They sold cocaine?

4    **A.**    They did.

5    **Q.**    Methamphetamines?

6    **A.**    Not so much.  Not -- not from my memory.

7    **Q.**    Heroin?

8    **A.**    Small amounts at that time, yes.

9    **Q.**    Illicit prescription drugs?

10   **A.**    Yes.

11   **Q.**    And --

12   **A.**    I believe so.

13   **Q.**    I didn't mean to interrupt you.

14   **A.**    No, no.  That's okay.

15   **Q.**    And part of the reason that the City set up the DMI

16   program was because those illegal drug dealers were a

17   significant source of crime in the city, right?

18   **A.**    Not so much in the city and, again, in that very small

19   area.  So, we had, as I said, an open air drug market.

20   Drugs were relatively contained to this area.  I'm not

21   saying there wasn't any anywhere else, but the highest

22   concentration was really in this two-block by four-block or

23   so area, in the DMI area.

24   **Q.**    And in that area the out-of-state drug dealers that had

25   set up shop there were a major source of violent crime in

1   particular, right?

2   **A.**   For that area, yes.

3   **Q.**   And the illegal drug problem that was there in

4   Fairfield had gotten so severe that the City of Huntington

5   actually got a special grant to fight that problem?

6   **A.**   Yes.  That was part of the DMI program.  It was a grant

7   funded program.

8   **Q.**   And the grant to deal with illegal drug trafficking,

9   that was the source of funds that allowed you to hire with

10   the City; is that right?

11   **A.**   That is correct, yeah, obviously.

12   **Q.**   As part of your work, you prepared a report on the DMI

13   program, correct?

14   **A.**   Yes.  Yes.

15         MR. RUBY:  Mr. Simmons, could we bring up

16   DEF-WV-916, please?

17         BY MR. RUBY:

18   **Q.**   And we'll hand you a copy, Mr. Lemley.

19      Mr. Lemley, do you recognize what's been marked

20   DEF-WV-916?

21   **A.**   I believe I do.

22   **Q.**   And is this the report that you prepared or -- a report

23   that you prepared as part of your work with the DMI program?

24   **A.**   It was.

25   **Q.**   That's your name on the cover page there, right?

1    **A.**    That is correct.

2    **Q.**    And this was prepared June of 2011 toward the beginning

3    of the DMI program?

4    **A.**    I wouldn't say towards the beginning.  And, again,

5    we're six months in.  So --

6    **Q.**    Part of this report, six months into the Drug Market

7    Intervention Program, was an assessment of what caused the

8    city's drug problem; is that right?

9    **A.**    I believe so.  You'd have to point me to a section.

10   **Q.**    I will.  And just --

11            MR. RUBY:  And before I move on, Your Honor, I

12   would move to admit DEF-WV-916.

13            THE COURT:  Any objection?

14            MS. LEYIMU:  No objection, Your Honor.

15            THE COURT:  It's admitted.  Admitted.

16            **DEFENSE EXHIBIT DEF-WV-916 ADMITTED**

17            BY MR. RUBY:

18   **Q.**    If you look, Mr. Lemley, in the -- I think the original

19   page numbers have been lost here because of the nature of

20   the document, but in the bottom right-hand corner, there's a

21   long number that we call a Bates number that ends in 062 on

22   the page that I'd like to direct your attention to.

23   **A.**    Okay.

24   **Q.**    Are you there?

25   **A.**    I am.

```
 1    Q.   Do you see there near the bottom there's a -- there's a

 2    heading --

 3              MR. RUBY:  I think it's the next page, Mr.

 4    Simmons.  Thank you.

 5              BY MR. RUBY:

 6    Q.   Near the bottom, Mr. Lemley, there is a section that

 7    begins, "The City of Huntington, a Contextual and Historic

 8    View."  Do you see that?

 9    A.   I do.

10    Q.   And -- and if you flip to the next page, still in this

11    section on context and history.

12    A.   Uh-huh.

13    Q.   There's a paragraph about halfway down the page that

14    begins, "The City of Huntington's population".  Do you see

15    that?

16    A.   Yes.

17    Q.   And it says, "The City of Huntington's population

18    peaked at 87,000 during the 1950s fueled by high-paying

19    manufacturing jobs.  During the 1980s, many of the

20    manufacturing plants that once supported the area's economy

21    began to downsize and close."  Do you see that?

22    A.   I do.

23    Q.   And that's a true statement, correct?

24    A.   I believe it is.

25    Q.   The -- just for example, the Houdaille plant, the one
```

1    that made car bumpers, closed in the 1980s, right?

2    **A.**   Which plant?

3    **Q.**   Houdaille, H-o-u-d-a-i-l-l-e.  It was in Huntington and

4    made car bumpers.

5    **A.**   Car bumpers?  I'm not sure about that one, but there

6    were other ones.

7    **Q.**   And Owens-Illinois Bottle Plant closed in the 90s?

8    **A.**   That is correct.

9    **Q.**   And the ACF plant that made train cars was winding down

10   in the 90s; is that right?

11   **A.**   From my memory, yes.

12   **Q.**   Now, the defendants in this case didn't cause those

13   plants to close, did they?

14   **A.**   Not that I'm aware of, no.

15   **Q.**   If you continue reading, in the same paragraph, it says

16   that, "By 2000, most of the high paying manufacturing plants

17   that once provided a strong tax base for the city were

18   gone."  Is that a true statement?

19   **A.**   I'll say that's true.

20   **Q.**   And you wrote this, right?

21   **A.**   Yes.

22   **Q.**   And it goes on to say, "The loss of these high paying

23   jobs pushed the median income to $18,760.00 below the

24   national median household income level.  The population of

25   the city which also supports the tax base has steadily

1  declined to under $50,000.00."  Do you see that?

2  **A.**  I do.

3  **Q.**  True statement?

4  **A.**  True statement.

5  **Q.**  Now, the next paragraph that begins, "The loss in

6  revenue", do you see that, Mr. Lemley?

7  **A.**  Yes.

8  **Q.**  Could you read the first sentence of that paragraph for

9  me?

10  **A.**  Of that paragraph?

11  **Q.**  Yes, sir.

12  **A.**  "The loss in revenue resulted in a cutback of essential

13  services until 2002 when the Police Department was reduced

14  by one quarter and the Drug Unit and Housing Inspection

15  Division were eliminated."

16  **Q.**  And go on to the next sentence, please.

17  **A.**  "The loss of police protection and elimination of the

18  Drug Unit left the city in a vulnerable condition."

19  **Q.**  "Left the city in a vulnerable condition", is that a

20  true statement?

21  **A.**  I believe it was at the time.

22  **Q.**  Now, that reduction of 25% in the Police Department

23  budget in the City of Huntington, that wasn't caused by any

24  of the defendants in this case, was it?

25  **A.**  Not that I'm aware of.

**Q.**   At the -- at the next sentence, if you would just pick up where you left off and continue.

**A.**   "This was soon discovered by drug dealers from large midwestern cities such as Detroit and Columbus."

**Q.**   You agree with that, that the vulnerable condition of the police force after those budget cuts was discovered by drug dealers from Detroit and Columbus?

**A.**   My understanding, it was.

**Q.**   Now, Huntington has always had a problem with drug dealers from Detroit and Columbus; is that right?

MS. LEYIMU:  Object to the form.  The scope. Object to the scope with "Huntington's always had a problem."

THE COURT:  Yes.  You need to give him a time period or something there, Mr. Ruby.

MR. RUBY:  Well, and, Your Honor, I'll just say this is in -- this is with reference to a previous statement by the witness, but I'll try to narrow it.

THE COURT:  Okay.

BY MR. RUBY:

**Q.**   Even prior to 2002, before the police budget cuts, Huntington had had a problem with Detroit and Columbus drug dealers; isn't that right?

**A.**   Again, that was kind of before my time.  I couldn't speak directly to that from my memory.

1    **Q.**   The slashing of the police budget, in any event, Mr.

2    Lemley, made it more apparent to drug dealers from those

3    cities that they could operate freely in Huntington; do you

4    agree with that?

5    **A.**   I do.

6    **Q.**   It made Huntington an easy mark for out-of-state drug

7    dealers; isn't that right?

8    **A.**   That was one of the things I said, yes.

9    **Q.**   Do you agree with that?

10   **A.**   I do.

11          MR. RUBY:  And, Mr. Simmons, if you would pull out

12   the rest of that paragraph, please.

13          BY MR. RUBY:

14   **Q.**   It says here, concluding this statement about causation

15   of the problem in this DMI report, Mr. Lemley, it says, "The

16   tipping point for the city occurred on May 22, 2005, when

17   four teenagers were gunned down near 1410 Charleston Avenue.

18   From this point forward, the City of Huntington could no

19   longer ignore that there was a drug and violent crime

20   problem in the city."  Now, you're of course familiar with

21   the tragedy that's referred to in that paragraph, aren't

22   you, sir?

23   **A.**   I am.

24   **Q.**   And that tragedy, the prom night shooting in 2005, that

25   was the single worst incident of drug-related violence in

1    the history of the city, wasn't it?

2              MS. LEYIMU:  Object to that question and the

3    scope.

4              THE COURT:  Well, if he knows.  This is cross

5    examination.

6         If you can answer that, Mr. Lemley, do so.

7              THE WITNESS:  I don't think -- I mean, from a

8    historical context, I don't know if I could say that was the

9    worst or -- it was bad.  I can't say it was the worst.

10             BY MR. RUBY:

11   **Q.**   Now, according to the DMI report that you wrote that

12   we're looking at now, that was a tipping point in the city's

13   drug crisis; is that right?

14   **A.**   Yes.

15   **Q.**   Now, those murders were never solved, were they?

16   **A.**   I'm sorry.  Say that again.

17   **Q.**   Those murders were never solved?

18   **A.**   As far as I know, they were not.

19   **Q.**   But the Huntington PD, of which you were a part for

20   many years, publicly confirmed that that incident was the

21   result of the Detroit-Huntington illegal drug trade; isn't

22   that right?

23   **A.**   I don't know if I -- can you say the question again?  I

24   want to make sure I'm answering it right.  I --

25   **Q.**   The Huntington Police Department publicly confirmed

1    that the tragedy that's referred to in this paragraph was

2    the result of the illegal drug trade between Detroit and

3    Huntington; isn't that right?

4    **A.**   I don't know that offhand.  They could have, they could

5    not have.  I don't know.

6    **Q.**   And in this entire document, the DMI six-month report

7    that describes the drug problem that existed in Huntington

8    at the time it was written, there's not any reference to

9    wholesale pharmaceutical distributors, is there?

10   **A.**   No.  Not that I remember in here.  No.  It was really

11   kind of a hidden problem at that time.

12   **Q.**   Now, let's turn to 204, Mr. Lemley.  In 2014, you

13   joined the Mayor's Office of Drug Control Policy; is that

14   right?

15   **A.**   Very end of '14, yes.

16   **Q.**   And that was a newly established office at the time?

17   **A.**   It was.

18   **Q.**   It was established to spearhead or coordinate the

19   city's response to the drug problem?

20   **A.**   Yes.  That might be a fair way to present it.

21   **Q.**   And the members of the office included people who were

22   familiar with the drug problem that existed in the city; is

23   that right?

24   **A.**   Generally speaking, yes.

25   **Q.**   There was Chief -- I'm sorry, go ahead.

1    **A.**   As I said earlier, I don't think you appreciate it

2    until you really dive into the entire scope of it, but yes.

3    **Q.**   It was Chief Rader of the Fire Department?

4    **A.**   She was -- I believe -- she wasn't chief at that time,

5    but yes.

6    **Q.**   And former Chief Johnson of the Police Department?

7    **A.**   That's correct.

8    **Q.**   And when the office was formed, the people who were

9    going to be part of it, you and Mr. Johnson and Ms. -- Chief

10   Johnson and Chief Rader, you had discussions about the

11   nature of the drug problem in Huntington; is that right?

12   **A.**   Yeah.  Early on, we did have discussions about it.

13   **Q.**   We're going to hand you, Mr. Lemley, a document that's

14   been marked as Plaintiffs' 41532.  I'll give you a minute to

15   take a look at it, Mr. Lemley.

16   **A.**   Okay.

17   **Q.**   Mr. Lemley, this -- well, I'll direct your attention

18   first to the cover e-mail.  Is this an e-mail that you sent

19   to Jan Rader, Hank Dial, Jim Johnson and Steve Williams?

20   **A.**   It is.

21   **Q.**   And you sent it -- or at least the date that it bears

22   is October 22nd, 2014, right?

23   **A.**   It does state that.

24   **Q.**   And so, this was more than three years after the Drug

25   Market Intervention Program Report that we just looked at?

```
 1    A.   That is correct.

 2              MR. RUBY:  Your Honor, I would move into evidence

 3    Plaintiffs' 41532.

 4              THE COURT:  Any objection?

 5              MS. LEYIMU:  No objection, Your Honor.

 6              THE COURT:  It's admitted.

 7                   PLAINTIFF EXHIBIT 41532 ADMITTED

 8              BY MR. RUBY:

 9    Q.   And, Mr. Lemley, here on the cover page there's a

10    subject line, first of all, "Mayor's Office of Drug Control

11    Policy".  Do you see that?

12    A.   I do.

13    Q.   And then there's a single sentence that sets forth the

14    purpose of the e-mail.  Could you read that?

15    A.   "Attached file contains the background, mission

16    statement, structure and goals/objectives of the new Office

17    of Drug Control Policy."

18    Q.   And you wrote that, correct?

19    A.   Yes.

20    Q.   And there's an attachment to the e-mail, if you turn

21    the page, that says, "Mayor's Office of Drug Control

22    Policy".  Do you see that?

23    A.   I do.

24    Q.   Did you also draft this attachment?

25    A.   I did.
```

1    **Q.**   And was this based on the discussions that you

2    previously testified about between you and the other members

3    of the office?

4    **A.**   No.

5    **Q.**   It was not?

6    **A.**   No.  I believe this was my first stab at -- because we

7    talked about this office and I was doing research on what

8    other state level offices were doing.  This was kind of my

9    first stab at, you know, mission statements, and structures,

10   and goals, and objectives.

11       As I said previously, we really didn't get started

12   until, you know, November, December.  Really got started

13   January, February of 2015.  So, we actually later on talked

14   about this and kind of moved it down a little bit more.

15       I think this was literally my first stab at, you know,

16   goals and objectives and things like that, things we should

17   look at.

18   **Q.**   Take a look, if you would, at the second paragraph of

19   the attachment.  Do you see that?

20   **A.**   I'm sorry.

21   **Q.**   The second paragraph of the document that's attached to

22   the e-mail.

23   **A.**   Okay.

24   **Q.**   It begins, "It has been".  Do you see that paragraph?

25   **A.**   I do.

1    **Q.**   Can you read the first sentence of that, please, sir?

2    **A.**   "It has been more than a decade since resources were

3    cut and our area became an easy mark for individuals

4    distributing drugs."

5    **Q.**   True statement?

6    **A.**   I believe it's a true statement.

7    **Q.**   And if you would go on and read the next sentence,

8    please.

9    **A.**   "Within a few short years, Huntington was a regional

10    distribution hub for various illegal drugs.  Individuals

11    from Michigan, Ohio, Georgia and Florida have infected our

12    area in the early and mid-2000s selling various drugs."

13    **Q.**   Now, the statement that begins that paragraph, "It has

14    been more than a decade since resources were cut and our

15    area became an easy mark for individuals distributing

16    drugs", that refers to the same 25% cut in the police budget

17    that we saw in the earlier document; is that right?

18    **A.**   That is correct.

19    **Q.**   And the elimination of the Police Drug Unit that went

20    along with that, correct?

21    **A.**   Yes.  The Police Drug Unit was eliminated with those

22    budget cuts in 2002 and then it came back by 2004.  I know

23    I've seen documentation for 2007 about that and, as I said,

24    it was really robust by the time I came on at HPD in 2010.

25    **Q.**   But this statement that you wrote in the document about

1    the background for the Mayor's Office of Drug Control Policy

2    was written in 2014, correct?

3    **A.**    That is correct.

4    **Q.**    The statement that you read, "Within a few short years,

5    Huntington was a regional distribution hub for various

6    illegal drugs", is that a true statement?

7    **A.**    That is.

8    **Q.**    And the statement following, "Individuals from

9    Michigan, Ohio, Georgia, and Florida have infected our area

10   in the early and mid-2000s selling various drugs", is that a

11   true statement?

12   **A.**    It is.

13   **Q.**    Mr. Lemley, I'll let you read through this document.

14   It's only a couple of pages.  But in this document setting

15   forth the background, mission statement, structure and goals

16   and objectives of the new Office of Drug Control Policy,

17   there's not a single mention of wholesale drug distributors,

18   is there?

19   **A.**    That is correct.  As I said, this was kind of my first

20   stab at things I was seeing, what other state offices around

21   the country were doing.  It was kind of our -- my initial

22   ideas that I was presenting to everyone in the e-mail, Jan

23   Rader, Hank Dial, Jim Johnson, Steve Williams.

24   **Q.**    In this document, there's not a single mention of

25   Cardinal Health?

1    **A.**    No.

2    **Q.**    There's not a single mention of McKesson Corporation?

3    **A.**    There is not.

4    **Q.**    Not a single mention of AmerisourceBergen Drug

5    Corporation?

6    **A.**    No.

7    **Q.**    Mr. Lemley, you testified, I believe, as to the current

8    status of the Mayor's Office of Drug Control Policy.  I want

9    to explore that a little bit more.  You joined the office in

10   late 2014; is that right?

11   **A.**    That is correct.

12   **Q.**    And by 2017, everyone in the Mayor's Office of Drug

13   Control Policy had moved on to other jobs; is that right?

14   **A.**    I believe that is correct.

15   **Q.**    Now, you left in January --

16   **A.**    I'm sorry.  Say that again.  I want to make sure I'm

17   answering that correctly.

18   **Q.**    Everybody that was in the Mayor's Office of Drug

19   Control Policy had, by 2017, moved on to other jobs?

20   **A.**    Before or during 2017?  I just want to make sure I'm --

21   I'm -- in 2017, by the end of 2017, everyone had moved on.

22   **Q.**    And that was my question.

23   **A.**    I just --

24   **Q.**    At some point during 2017, everybody moved on to

25   another job; is that right?

1    A.    I believe so, yes.

2    Q.    You left in January of 2017; is that right?

3    A.    I believe so.

4    Q.    And you were never replaced --

5    A.    No.  In the Office of Drug Control Policy?

6    Q.    Yes, sir.

7    A.    Yes.

8    Q.    Jan Rader left the Mayor's Office of Drug Control

9    Policy sometime around April of 2017; does that sound right?

10   A.    I'm not sure on the date.

11   Q.    So, when she was promoted to Fire Chief; is that right?

12   A.    That's correct.

13   Q.    And she was never replaced in the Mayor's Office of

14   Drug Control Policy, was she?

15   A.    No.

16   Q.    And Jim Johnson left around offering 2017 to run the

17   State Office of Drug Control Policy; is that right?

18   A.    I'm not sure of the month, but that sounds about right.

19   Q.    And he was never replaced in the Huntington Mayor's

20   Office of Drug Control Policy, was he?

21   A.    No.

22   Q.    And those were all the members of the office, correct?

23   A.    That is correct.

24   Q.    And the City has never replaced any of you, even though

25   it consistently runs multi-million budget surpluses; is that

1    right?

2              MS. LEYIMU:  I'm objecting to that question and

3    the surplus question and it's not within Mr. Lemley's

4    knowledge and the foundation hasn't been laid for that.

5              MR. RUBY:  I'll try to lay a foundation, Your

6    Honor.

7              BY MR. RUBY:

8    **Q.**   Mr. Lemley, are you familiar with whether the City of

9    Huntington has a budget surplus?

10   **A.**   I generally don't deal with anything related to

11   budgets.

12   **Q.**   Mr. Lemley, let's talk a little bit more about

13   out-of-state drug dealers.  Did you, while you were a data

14   analyst with the Police Department, pay attention to rates

15   or incidences of drug crime in the City of Huntington?

16   **A.**   Yes.

17   **Q.**   Did you know that from 2010 through January of 2017

18   when you left the Police Department at least 137

19   out-of-state drug dealers were indicted federally for drug

20   crimes in Cabell County and Huntington?

21   **A.**   I don't know any exact numbers.

22   **Q.**   And out-of-state drug dealers are still a problem in

23   the City of Huntington even today, aren't they?

24   **A.**   As far as I know, they are.

25   **Q.**   Ms. Leyimu asked you about drug seizures; do you recall

```
 1   that?

 2   A.   Yes.

 3   Q.   And she showed you the annual report that listed

 4   seizures of heroin?

 5   A.   Yes.  I believe it's in one of them.

 6   Q.   And marijuana and other drugs, as well, right?

 7   A.   Yes.

 8   Q.   Now, the people who had those drugs that were seized,

 9   they had obtained those criminally; is that right?

10   A.   I believe so, yes.

11   Q.   That was -- I'm sorry.  Go ahead.

12   A.   Yeah.

13   Q.   That was the reason that the opioids were seized by the

14   Police Department, correct?

15   A.   Yes.

16   Q.   And a lot of the criminals who were trafficking in

17   those drugs, based on the data that you saw while you were

18   with the Mayor's Office of Drug Control Policy and with the

19   Police Department, they were among the out-of-state drug

20   dealers that you've talked about from Detroit and Columbus;

21   is that right?

22   A.   I'm sure some of them were.

23   Q.   You also testified about crime statistics that you

24   tabulated in Huntington; do you recall that?

25   A.   I do.
```

Q.   And, in particular, statistics about drug-related

crimes?

A.   Drug offenses, DUIs, as I've mentioned earlier, just

some examples.

Q.   Did those statistics that you were referring to today

include information about where the drug criminals that

committed those crimes were from?

A.   It depends.  Within the actual HPD report, there might

be an address for the person who was arrested or committed

that offense.  That might be a way of determining that.

Q.   And you observed in reviewing that information that

many of the criminals who committed the crimes that you were

tabulating had come from outside of West Virginia; is that

right?

A.   A good number of them.

Q.   You also -- you also testified that there was an

increase in crime related to drugs; is that right?

A.   Yes.

Q.   And that was true of drugs generally, right, not just

opioids?

A.   So, with opioids, what you had was an increase in

property crimes.  Again, ticking up '13, '14.  And then,

from our investigations, what we found was a lot of

individuals were stealing to support their habit.  So,

that's what was -- what we believed caused the increase in

1    property crimes.

2    **Q.**   And it was your testimony, I believe, that there came a

3    point relatively early in your tenure with the Mayor's

4    Office of Drug Control Policy where you observed that heroin

5    had become the chief drug problem in the city; is that

6    right?

7    **A.**   Yes.  We had progressed from prescription opioids to

8    heroin at that point.

9    **Q.**   The statistics that you kept, they didn't calculate any

10   information on whether any of the crimes -- that drug crimes

11   that occurred in the City of Huntington involved a product

12   that was distributed by any of the defendants in this case,

13   did they?

14   **A.**   I'm sorry.  Can you state the question again?

15   **Q.**   The statistics that you kept about drug offenses didn't

16   include any information about whether any of those drug

17   offenses involved a product that was distributed by any of

18   the defendant in this case; is that right?

19   **A.**   I may have.  Again, I don't recall one offhand, but I

20   may have done some type of analysis of drug crimes relating

21   to prescription opioids.  That's possible.  I don't recall

22   one offhand though.

23   **Q.**   My question was specific to the defendants in this

24   case.  Did you ever calculate any statistics about these

25   defendants?

1   **A.**   No.

2   **Q.**   On the subject of illegal drug activity, Mr. Lemley, do

3   you recall a cluster of overdoses that occurred in

4   Huntington in the Summer of 2016?

5   **A.**   I do.

6   **Q.**   26 people approximately overdosed in a day; is that

7   right?

8   **A.**   I believe that number is correct.

9   **Q.**   Now --

10          THE COURT:  When you get to a stopping point, Mr.

11   Ruby, we need to take a break.

12          MR. RUBY:  Yes, Your Honor.  I have just two more

13   questions on this topic.

14          THE COURT:  Go ahead.

15          MR. RUBY:  Thank you, Your Honor.

16          BY MR. RUBY:

17   **Q.**   Now, none of the people who overdosed in that event

18   died; is that right?

19   **A.**   I believe there was two we found later on that did pass

20   away.

21   **Q.**   Were you aware that when the drug dealer who was behind

22   those overdoses was sentenced before Judge Chambers that

23   Judge Chambers made a finding that no fatalities could be

24   connected to that incident?

25   **A.**   I -- I was not in court at that time.

```
 1              COURT REPORTER:  I'm sorry.  What was that answer?
 2              THE WITNESS:  I was not in court at that time, so
 3    I don't know.
 4              BY MR. RUBY:
 5    Q.   And all 26 of those overdoses resulted from a single
 6    bad batch of heroin laced with fentanyl and carfentanil and
 7    brought to Huntington by a drug dealer from Akron, Ohio; is
 8    that right?
 9    A.   I --
10              MR. IRPINO:  Your Honor, I object.  Anthony Irpino
11    on behalf of Cabell County.
12              COURT REPORTER:  I'm sorry.  What was your name
13    again?
14              MR. IRPINO:  Anthony Irpino on behalf of Cabell
15    County.
16         Those facts are not in evidence and there's no
17    foundation for that question.
18              MR. RUBY:  Your Honor, he's testified that he's
19    familiar with the event.  He was with the Mayor's Office of
20    Drug Control Policy at the time.
21              THE COURT:  Overruled.  He can testify.
22              THE WITNESS:  I'm sorry.  Can you state the
23    question again?
24              BY MR. RUBY:
25    Q.   The question was that -- whether all 26 of the
```

1    overdoses in that episode resulted from a single bad batch

2    of heroin contaminated with Fentanyl and carfentanil that

3    was brought to Huntington by a drug dealer from Akron, Ohio?

4    **A.**   I don't know if there's a good batch of heroin, but I

5    believe they did all come from one batch.

6    **Q.**   And that was a batch of heroin that was laced with

7    fentanyl?

8    **A.**   I believe.  I didn't see the actual toxicology, but

9    from my recollection, I believe that's what I was told.

10              MR. RUBY:  This is a good stopping point, Your

11   Honor.

12              THE COURT:  Okay.  Be in recess for ten minutes.

13        (Recess taken)

14              THE COURT:  Thank you, Mr. Lemley.

15        You may proceed, Mr. Ruby.

16              MR. RUBY:  Thank you, Your Honor.

17   BY MR. RUBY:

18   **Q.**   Mr. Lemley, before the break we were talking about

19   the heroin/fentanyl overdose cluster in the summer of

20   2016.  Do you recall that?

21   **A.**   I do.

22   **Q.**   The reason that heroin is so dangerous is because

23   it's -- sorry -- fentanyl is so dangerous is that it is

24   significantly more potent than heroin; is that right?

25   **A.**   That's my understanding.

1    **Q.**    And it's also cheaper than heroin?

2    **A.**    That's my understanding as well.

3    **Q.**    Cheaper even than marijuana; is that right?

4    **A.**    Yes.

5    **Q.**    And that's the reason that it's become so much more

6    prevalent in recent years?

7    **A.**    I don't know -- recent years.  You have to kind of

8    define that for me.  I can only speak to my time there.  It

9    was growing in the end of 2016.

10    **Q.**    But it's, it's your view that the reason for that

11    growth was because of the, the increased potency and the

12    lower price; right?

13    **A.**    That's one of the reasons, yes.

14    **Q.**    And because of those reasons, Huntington saw an influx

15    of fentanyl entering the city through supply chains that

16    began in Mexico; is that right?

17    **A.**    Mexico was one of the places it came from.

18    **Q.**    And it was that increase in the fentanyl, the fentanyl

19    supply from illegal Mexican sources that produced the

20    increase in fentanyl overdoses that you saw while you were

21    with the HPD?

22    **A.**    Again, it wasn't just from Mexico.  Fentanyl could be,

23    it could be diverted on medical grade, but it could come

24    from other places.  But, I mean, it was a cause of concern

25    at the end of '16, yes.

1    **Q.**   The drugs that caused those 26 overdoses in the summer

2    of 2016, those weren't distributed by Cardinal Health, were

3    they?

4    **A.**   Not that I'm aware of.

5    **Q.**   They weren't distributed by McKesson Corporation?

6    **A.**   Not that I'm aware of.

7    **Q.**   And they weren't distributed by AmerisourceBergen, were

8    they?

9    **A.**   Not that I'm aware of.

10   **Q.**   You testified, Mr. Lemley, about the Office of Drug

11   Control Policies, and I'll say the Mayor's Office of Drug

12   Control Policy because there are others of course.

13   **A.**   Uh-huh.

14   **Q.**   You testified about the Mayor's Office of Drug Control

15   Policy 2015 Strategic Plan.  Do you recall that?

16   **A.**   I do.

17   **Q.**   And that is, Mr. Simmons, if you could bring it up,

18   P-41233.

19        And, Your Honor, I'd just note that since it has been

20   admitted, I'd like to question about it without waiving our

21   objection.

22             THE COURT:  Go ahead.

23   BY MR. RUBY:

24   **Q.**   Now, Mr. Lemley, this plan was published August the

25   24th, 2015; is that right?

1    **A.**    I believe that's correct.

2    **Q.**    So when this plan came out, you and the other folks at

3    the Mayor's Office of Drug Control Policy had had close to a

4    year to study the causes of the city's drug problem; is that

5    right?

6    **A.**    I would say we really dove into it the first half of

7    2015.  And then actually writing it, that would be July and

8    August.  That was the time we actually put it on paper and

9    got it out.

10    **Q.**    That's fair.  So you had many months to study the

11    causes of the city's drug problem at the point that this was

12    done; right?

13    **A.**    That was part of the investigation.

14    **Q.**    And this plan was published less than 18 months before

15    the City of Huntington filed this case; is that right?

16    **A.**    I do not know when they filed the case.

17    **Q.**    Let's look at what the city was saying in this plan.

18    If you can turn to Page 17, it's the -- again, there are

19    multiple numbers on these pages.  It's Number 17 in the

20    report itself, 18 if you're looking at the numbers in the

21    bottom right corner.

22    **A.**    Uh-huh.

23    **Q.**    Do you have that page?

24    **A.**    I do.

25    **Q.**    Do you see the first full paragraph there that starts

1    with "the first issue"?

2    **A.**    Yes.

3    **Q.**    It says, "The first issue that needs to be addressed is

4    enhancing conspiracy laws.  A separate crime of drug

5    conspiracy under Article 60A (the controlled substance area

6    of the law) with a greater penalty would be helpful."

7          Now, you, you wrote this particular 2015 plan; is that

8    right?

9    **A.**    I did.

10   **Q.**    And, so, you agree with this statement?

11   **A.**    I do.

12   **Q.**    Now, at the end of this paragraph it says, "This would

13   place more emphasis on the dealer who brings the illegal

14   substance into the area instead of the addict that sells to

15   support their habit."

16         Do you see that sentence, sir?

17   **A.**    I do.

18   **Q.**    Now, this paragraph is calling for tougher sentences

19   for illegal drug dealers; is that right?

20   **A.**    Generally speaking, yes.

21   **Q.**    Now, let's look at the next paragraph.

22         It says, "Secondly, changing specific laws from

23   indeterminate sentencing to determinate sentencing will

24   allow judges to sentence mid- to upper-level drug dealers in

25   a more appropriate manner."

1          Do you see that?

2     **A.**   I do.

3     **Q.**   So that, that part of the strategic plan is also

4     talking about illegal drug dealers; right?

5     **A.**   It is.

6     **Q.**   Later on in that paragraph it says, "Along with this is

7     a need to enhance sentencing for drug dealers based on the

8     quantity of illegal substances they deliver or possess with

9     intent to distribute.  We propose that sentences be tied in

10    some way to weight."

11         Do you see that?

12    **A.**   I apologize.  I've lost it.  Where are we at?

13    **Q.**   If you look over at your screen, I think it's been

14    highlighted for you.

15    **A.**   Yes.

16    **Q.**   Do you see those two sentences?

17    **A.**   Yes.

18    **Q.**   Those also proposals for dealing with illegal drug

19    dealers; right?

20    **A.**   Yes.

21    **Q.**   And then later on in the same paragraph at the end, the

22    last sentence there that begins, "Currently under federal

23    law," it says, "Currently under federal law dealers receive

24    increased sentences in correlation to the volume.  West

25    Virginia law needs to mirror such federal guidelines."

```
 1              Now, you wrote that statement; right?
 2     A.    I did.
 3     Q.    Do you agree with it?
 4     A.    I do.
 5     Q.    And this is also a proposal for tougher sentences on
 6     illegal drug dealers as a solution to the drug problem;
 7     right?
 8     A.    As the one proposed, yes.
 9     Q.    And we can go on to the next paragraph, Mr. Simmons.
10              And this is at the bottom of Page 17, Mr. Lemley.
11              It says -- if you can pull out the sentence that
12     begins, "We propose."  Just highlight that if you would, Mr.
13     Simmons.
14              Mr. Lemley, do you see the sentence three lines down in
15     the paragraph that begins, "We propose"?
16     A.    I do.
17     Q.    And that says, "We propose a statute whereby it is a
18     separate felony to possess a firearm in connection with a
19     drug trafficking crime."  Do you see that?
20     A.    I do.
21     Q.    That also is a proposal to increase sentences or to
22     increase punishment for certain kinds of drug crimes; is
23     that right?
24     A.    That is.
25     Q.    And that pertains to illegal drug dealers; correct?
```

1    **A.**    It does.

2    **Q.**    And then if you flip the page to the last paragraph in

3    this section that begins with, "The Mayor's Office of Drug

4    Control Policy," do you see that?

5    **A.**    Yes.

6    **Q.**    "The Mayor's Office of Drug Control Policy will

7    continue to explore all available avenues for additional

8    State Code revisions for local law enforcement."

9          Do you see that?

10   **A.**    I do.

11   **Q.**    Now, in this list of legislative recommendations, there

12   was no recommendation to cap shipments of prescription

13   opioid medication to Cabell County, was there?

14   **A.**    Not in those recommendations.

15   **Q.**    There was no recommendation to cap the amount of

16   prescription opioid medications that a doctor could

17   prescribe, was there?

18   **A.**    Not in this.

19   **Q.**    Or that a pharmacy could dispense?

20   **A.**    Not in this.

21   **Q.**    Or that a pharmacy could order from a wholesaler?

22   **A.**    Not in this.

23   **Q.**    There was no recommendation to require any new

24   reporting by wholesale distributors, was there?

25   **A.**    No.  These were all state law proposal changes.

1   **Q.**   But there was no proposal to make any change in state

2   law that related in any way whatsoever to wholesale drug

3   distributors, was there?

4   **A.**   No, not in this.

5   **Q.**   In fact, in this document from 2015 after the Office of

6   Drug Control Policy had had an opportunity to study and

7   understand the problem, there wasn't a single mention of

8   wholesale distributors, was there?

9   **A.**   No.  Actually, during our investigation we realized

10   that a progression had taken place from prescription opioids

11   over to heroin.  The addicts had -- I shouldn't say addicts.

12   People suffering from addiction had replaced prescription

13   opioids now with heroin because it was, as you said, cheaper

14   and they can get it more reliably.  So dealing with the

15   issue at hand, which was at that time heroin, was the focus

16   of this.

17   **Q.**   And I think I understand the conclusion that you just

18   testified that you drew in 2015.  But when this report was

19   actually published in 2015, there was no mention of

20   wholesale distributors, was there?

21   **A.**   Not in this, no.

22   **Q.**   You also testified, Mr. Lemley, about the 2017

23   strategic plan of the Mayor's Office of Drug Control Policy;

24   right?

25   **A.**   Yes.

1    **Q.**   And that is P-41244, Mr. Simmons, if you don't mind

2    bringing it up.  And flip to the cover page.

3        So the date on this plan, the 2017 plan, is May of

4    2017; is that right, Mr. Lemley?

5    **A.**   Yes, it is.

6    **Q.**   Now, when this plan came out, you had already been gone

7    from the office for a number of months; is that right?

8    **A.**   Yes, that is correct.  I was still giving generic

9    support for whatever they needed, if they needed a map

10   created, if they needed me to look over something, give some

11   ideas.  But, generally speaking, I had moved over to my new

12   position and that was my main focus.

13   **Q.**   And this, this plan was prepared by somebody who didn't

14   even work for the city; is that right?

15   **A.**   So it was compiled by an individual, Dr. Ruth.  But,

16   again, it was my, my information, my documents.  It had an

17   outline of prevention, treatment, and law enforcement,

18   pictures that were taken, graphs that I had made.  A lot of

19   it was information I provided and she just compiled it

20   together.

21   **Q.**   And do you, do you recall as you sit here right now

22   that you provided all that information for the preparation

23   of this report?

24   **A.**   No.  It was a collaborative effort, but things like

25   stuff on Page 3, the maps, graphs on Page 2, ideas that went

1    into it, graphs on Page 6, graphs on Page 7, goals,

2    objectives.

3        Again, this is all stuff that we had already kind of

4    moved on with, and we wanted to put down a new plan for the

5    office and for the community on how we wanted to move

6    forward.

7    **Q.**   Mr. Lemley, do you recall that you gave a deposition in

8    this case on July 3rd of 2020?

9    **A.**   I do.

10   **Q.**   And when you gave that deposition, you were under oath?

11   **A.**   Yes.

12   **Q.**   And when you gave that deposition, you told the truth;

13   right?

14   **A.**   Yes.

15            MR. RUBY:  Mr. Simmons, could we have the

16   deposition transcript of Mr. Lemley from last year and could

17   you pull up Page 190?  I'm sorry, Mr. Simmons, 290.

18        Judge, I may have to call for an associate.

19   BY MR. RUBY:

20   **Q.**   Mr. Lemley, while we look for that, I'm going to

21   ask you a little bit more about the 2017 plan.

22   **A.**   Sure.

23   **Q.**   You did testify about the plan earlier?

24   **A.**   Yes.

25            MR. RUBY:  And, Mr. Simmons, if you could bring up

1    Page 10 of the plan, please.  This is Bates 17.

2    BY MR. RUBY:

3    **Q.**   Do you have it there, Mr. Lemley?

4    **A.**   I do.

5    **Q.**   Do you see there Objective 1, Reduce Drug Trafficking?

6    **A.**   I do.

7    **Q.**   And it says "Problem.  The Huntington area is an

8    epicenter for drug distribution."  Do you see that?

9    **A.**   I do.

10   **Q.**   That's a true statement; right?

11   **A.**   I believe it is for our area.

12   **Q.**   And that goes all the way back to the, the 25 percent

13   cut to the police budget in 2002; is that right?

14   **A.**   Historically, you could trace it back to some of that,

15   yeah.

16   **Q.**   And for the report strategy on what to do about the,

17   the issue of Huntington being an epicenter for drug

18   distribution, we can look a little bit further down the

19   page.  Do you see the section that begins, "The MODCP's

20   response"?

21   **A.**   I do.

22   **Q.**   And that says, "The MODCP's response, strengthening law

23   enforcement's ability to target and address drug

24   trafficking."  Do you see that?

25   **A.**   I do.

1    **Q.**   Now, that refers to illegal drug trafficking; is that

2    right?

3    **A.**   Yes.

4    **Q.**   And the paragraph that's beneath that heading refers to

5    many of the same measures that we saw in the report from

6    2015.

7         It says, "The MODCP has worked with West Virginia

8    legislators to develop laws to increase penalties for drug

9    traffickers and help protect public safety.  It has

10   specifically advocated for creating a separate felony for

11   possessing a firearm while trafficking drugs or increasing

12   the penalty for a drug trafficking conviction if the Court

13   discovers a firearm was used or possessed at the time the

14   crime was committed."

15        Do you see that?

16   **A.**   Yes.

17   **Q.**   Do you agree with that recommendation?

18   **A.**   Yes.

19   **Q.**   And it goes on to say that, "The MODCP has also

20   supported changing laws to enhance sentencing based on the

21   quantity of substances possessed."

22        Do you see that?

23   **A.**   I do.

24   **Q.**   Do you agree with that recommendation?

25   **A.**   I do.

1    **Q.**    Now, those are essentially the same recommendations

2    that the MODCP made in the 2015 report; is that right?

3    **A.**    That is correct.

4    **Q.**    And those are focused, again, on illegal drug dealers;

5    is that right?

6    **A.**    That is correct.

7    **Q.**    Now, in 2017 the predominant problem had become illegal

8    fentanyl; right?

9    **A.**    Fentanyl was something that we were concerned about in

10   20- -- at the end of 2016 into 2017.

11   **Q.**    I'll direct your attention to Page 2 of the Strategic

12   Plan.  Do you see the sentence -- it's on your screen, but

13   if you want to turn to Page 2 in the paper copy, feel free.

14   **A.**    Uh-huh.

15   **Q.**    Do you see the sentence at the bottom of the page that

16   begins, "Although the number of fatal overdoses"?

17   **A.**    I see that on here.

18   **Q.**    "Although," it says, "the number of fatal overdoses has

19   declined as first responders have increasingly used

20   naloxone, the total number of overdoses has spiked with the

21   emergence of synthetic opioids that are 50 to 10,000 times

22   stronger than morphine or heroin such as fentanyl and

23   carfentanil."

24        Do you see that?

25   **A.**    I do.

1    **Q.**   We've talked about fentanyl.  Carfentanil is another

2    synthetic opioid that drug dealers use to cut heroin; is

3    that right?

4    **A.**   I think it's the other way around, but carfentanil was

5    something we were seeing, yes.

6    **Q.**   And according to this, the reason that the total number

7    of overdoses had spiked -- and you testified about the data

8    aspect of that spike earlier; correct?

9    **A.**   Yes.

10    **Q.**   According to this, the reason that the total number of

11    overdoses had spiked was because of the emergence of

12    synthetic opioids like heroin and fentanyl; right?

13    **A.**   That is correct.  There was an increase at the end of

14    2016 that appeared to be related to fentanyl.

15    **Q.**   And we've already talked about fentanyl as it pertains

16    to the defendants in this case, but let's talk about

17    carfentanil.  None of the defendants in this case distribute

18    carfentanil, do they?

19    **A.**   Not that I'm aware of.  I don't know exactly what all

20    the defendants distribute, but not that I'm aware of.

21    **Q.**   And you've testified earlier that you don't recall the

22    specific date that this case was filed.  Are you aware that

23    this 2017 plan, setting aside the specific date, that this

24    2017 plan came out after the case was filed?

25    **A.**   Again, I don't know when the case was filed, so I can't

1    speak to that.

2    **Q.**   And in this 2017 Strategic Plan there is still no

3    recommendation that the city cap shipments of prescription

4    opioids into Huntington, is there?

5    **A.**   Not in this plan that I remember.

6    **Q.**   There was no recommendation to cap the amount of

7    prescription opioid medications that a doctor could

8    prescribe?

9    **A.**   Not in this plan, no.

10   **Q.**   No recommendation to cap the amount of prescription

11   opioids that a pharmacy could dispense; right?

12   **A.**   No.  We had moved on from that point.  We had

13   progressed to heroin and, as you said, fentanyl and

14   carfentanil.

15   **Q.**   There wasn't any recommendation to require any new

16   reporting by wholesale distributors?

17   **A.**   Not in this report.

18   **Q.**   Wasn't any recommendation of new licensure requirements

19   for wholesale distributors?

20   **A.**   Not in this report.

21   **Q.**   In fact, in this Strategic Plan on the drug issue

22   published in May of 2017, there's not a single mention of

23   wholesale distributors, is there?

24   **A.**   I don't believe so, not from my memory from what I

25   reviewed on it.

```
 1    Q.    There's not a mention of Cardinal Health?

 2    A.    No, not that I remember.

 3    Q.    There's no mention of McKesson Corporation?

 4    A.    No.

 5    Q.    There's no mention of AmerisourceBergen Drug

 6    Corporation?

 7    A.    No, not that I remember.

 8    Q.    And just so we have clarity on your prior testimony

 9    about the information that you contributed to this report,

10    Mr. Lemley -- and I apologize for giving you the wrong page

11    number earlier.  I would direct you -- and Mr. Simmons will

12    put it on the screen -- to Page 296 of the transcript of

13    your deposition from last year.

14    A.    Uh-huh, yes.

15    Q.    Mr. Lemley, do you see the question at line 4?

16    A.    Yes.

17    Q.    And the question was, "And did you help put this

18    together in any way?"

19          Do you see that?

20    A.    Yes.

21    Q.    And your response was, "I may have provided

22    information."  Correct?

23    A.    Yes.

24    Q.    And then, Mr. Simmons, if we could go down to the

25    question at line 17.
```

```
 1        The question was, "But you don't recall specifically
 2   what information you may have provided?"
 3        Do you see that?
 4   A.   I do.
 5             MS. LEYIMU:  Your Honor, objection.  We skipped a
 6   critical part of this for the context.  This is not proper
 7   impeachment.
 8             THE COURT:  Well, you can recross him on it.
 9        Go ahead, Mr. Ruby.
10   BY MR. RUBY:
11   Q.   And the answer that you gave, Mr. Lemley, in your
12   deposition from last summer to that question is at line
13   19; correct?
14   A.   Yes.
15   Q.   And what was that answer?
16   A.   "Not off-hand."
17   Q.   But you testified earlier, just a few minutes ago,
18   that, that you provided a number of specific -- specific
19   information from specific pages of this report that you
20   pointed to right here on the stand; right?
21   A.   Again, not off-hand at that point.  Looking at it right
22   now, I mean, I definitely provided these maps.  As I said
23   earlier, I provided the graphs, the graphs on Page 6, 7, 2.
24   Yeah.  I mean, content that I helped provide or three
25   pillars; treatment, prevention, law enforcement.  They're in
```

 1    there.

 2    **Q.**   And you do recall that in your deposition last year

 3    that same document, the 2017 report, was in front of you

 4    when you were asked these questions; right?

 5    **A.**   I don't recall that off-hand.  But, I mean, looking at

 6    this, I can tell you that some of the content in there

 7    absolutely came from me, especially maps and graphs.

 8    **Q.**   Did anything happen between last summer and your

 9    testimony today to change your recollection on that point?

10    **A.**   Not really.

11    **Q.**   You testified, Mr. Lemley, about overdose statistics

12    that you put together while you were in the Mayor's Office

13    of Drug Control Policy.  Do you recall that?

14    **A.**   Yes.

15    **Q.**   Incidentally, you don't have any, you don't have any

16    degree in statistics, correct?

17    **A.**   I do not.

18    **Q.**   Or data analysis?

19    **A.**   I do not.

20    **Q.**   And you're not an epidemiologist; correct?

21    **A.**   I am not.

22    **Q.**   Your Bachelor's Degree was in history I believe?

23    **A.**   It was.

24    **Q.**   And your Master's Degree was in international

25    relations?

1   **A.**   It was.

2   **Q.**   The official source of information on overdose deaths

3   in West Virginia is compiled by the state; is that correct?

4   **A.**   Overdose deaths.  They have an official list that they

5   keep, yes.

6   **Q.**   That's compiled by the Department of Health and Human

7   Resources?

8   **A.**   I believe that's correct.

9   **Q.**   And your goal in compiling the statistics that you kept

10  was to get a real-time approximation of the number of

11  overdoses in Huntington; is that right?

12  **A.**   As best I could, yes.

13  **Q.**   The state list would have a lot more information than

14  the one that you compiled; correct?

15  **A.**   That is correct.

16  **Q.**   And it would be verified; correct?

17  **A.**   That is correct.

18  **Q.**   Whereas the data that you compiled were not verified;

19  right?

20  **A.**   Not verified --

21          MS. LEYIMU:  I'll object to foundation.

22          THE COURT:  Just a minute.  What was the basis of

23  the objection?

24          MS. LEYIMU:  He said the word "verified."  There's

25  no foundation laid as to what verification Mr. Ruby is

```
 1    talking about.
 2              MR. RUBY:  I'll rephrase, Your Honor.
 3              THE COURT:  All right.
 4    BY MR. RUBY:
 5    Q.   The information -- the list that the state
 6    maintained of overdoses is derived from official
 7    sources; correct?
 8    A.   I believe it is, yeah, as far as I know.
 9    Q.   And the reason that you started compiling your own list
10    was that the official state list took a long time to come
11    out and you wanted to be able to have approximate date in
12    real-time; is that right?
13    A.   That's correct.
14    Q.   You were, with the data that you put together, just
15    trying to do the best that you could; correct?
16    A.   Generally speaking, yes.
17    Q.   You got data from a lot of sources?
18    A.   I won't say a lot.  I had three main sources, and then
19    I would cross-verify and double-check it.  What I had the
20    state list for was to ensure that I did not miss any deaths
21    on the back end.  If I did, I'd figure out why.  It was just
22    a data gathering process.
23    Q.   You had people at hospitals that would call you if a
24    case came in that they thought was an overdose; right?
25    A.   They would actually -- we set up a process.  They were
```

1    worried about HIPAA regulations.  So they -- we developed a

2    process, and Jan actually helped quite a bit on this.

3        They would actually call 911 and report that they had

4    an overdose.  And I would get no demographic information.

5    Thus, I wouldn't have to worry about HIPAA.  That was a huge

6    concern from them.

7        And then from that point, when I pulled the data from

8    911, I could pull out the addresses which would be 2900 1st

9    Avenue in Huntington and then somewhere on 16th, 1324,

10   something like that, 16th Street in, in Huntington.

11       So I knew from that point that was one brought in by

12   personal vehicle rather than one that was treated by EMS.

13   And I could add that to the list as one that was coming.

14   Q.   Another way that you -- or method that you used to put

15   together this list was to read the obituary page and see if

16   anything looked strange to you?

17   A.   Yeah, and to try to be as complete as possible.  I was

18   always checking the obituary page to see if something looked

19   weird.  Sometimes it was an individual with a car accident

20   after I would do more investigation into it.

21       Again, that was kind of a last resort as a way to go

22   out and find more information later.  So if I found one that

23   was not -- I thought was suspicious looking, I would look

24   into it.  Sometimes it was.  Sometimes it wasn't.

25   Q.   But that was a method that you used to prepare this

1    data was to -- one of the methods was to review the obituary

2    page in the newspaper?

3    **A.**    Yeah.  I wouldn't say, I mean, that was enough.  From

4    that point, I mean, if I saw an obituary that I thought was

5    interesting or weird, then I would go out and try to find

6    more sources of information to double-check it and verify

7    it.

8    **Q.**    You yourself didn't prepare the 911 reports that you

9    relied on; right?

10   **A.**    No.  They were ran by 911 and then I received them.

11   **Q.**    And you yourself didn't prepare the EMS reports that

12   you relied on; right?

13   **A.**    No.  Again, I received those.

14   **Q.**    You didn't prepare the police reports that you relied

15   on; correct?

16   **A.**    No.  Those were done by the individual officers.  And

17   then I would actually go into our database and pull out all

18   the overdoses.

19   **Q.**    And you didn't prepare the information that you

20   received from the medical examiner's office; right?

21   **A.**    No.

22   **Q.**    You, of course, didn't prepare the obituaries that you

23   reviewed in the newspaper?

24   **A.**    No.

25   **Q.**    And you didn't prepare the information that came in

1   from, from nurses at hospitals in the area; correct?

2   **A.**   That is correct.

3   **Q.**   And you didn't bring any of those records or reports

4   with you here today, did you?

5   **A.**   I did not, no.

6   **Q.**   You are not qualified yourself to determine whether a

7   death is an overdose; is that right?

8   **A.**   That is correct.  That's a medical determination.  My

9   job was to take their medical determination and add them

10   together.

11   **Q.**   And your, your responsibility in this process was to

12   take those reports that you got from other outside sources

13   and transcribe them into the spreadsheet that you kept; is

14   that right?

15   **A.**   "Transcribe," I don't know if that's the right word,

16   but I would take that information and I would double-check

17   it to make sure I wasn't double-counting anything and make

18   sure I wasn't missing anything.  And then from that point, I

19   would add it to the list.

20           MR. RUBY:  Mr. Simmons, could you pull up Page 110

21   of the depo transcript we were looking at?

22   BY MR. RUBY:

23   **Q.**   And I'll direct you, Mr. Lemley, to line 20 of the

24   transcript on this page.  Do you see that?

25   **A.**   Uh-huh.

1    **Q.**   The sentence begins there, "So my."  Do you see that?

2    **A.**   Yes, "so my," yes.

3    **Q.**   Could you read that, please?

4    **A.**   "So my responsibility was to take all these reports and

5    transcribe them over and compile the list."

6    **Q.**   And, so, when you gave this testimony in July of last

7    year that your responsibility was to take the reports and

8    transcribe them over, were you telling the truth?

9    **A.**   I don't know if "transcribe" is the right word there.

10   "Compile" is probably definitely the more correct word.

11   **Q.**   Now, the overdose records that you kept, you only kept

12   those for two years; is that right?

13   **A.**   Yes.  I compiled them for two years, yes.

14   **Q.**   2015 and 2016; is that right?

15   **A.**   That is correct.

16   **Q.**   And there was nobody doing that before you did it;

17   right?

18   **A.**   That is correct.

19   **Q.**   And at least at the -- at city government, nobody did

20   it after you stopped doing it; is that right?

21   **A.**   At the city government level, that is correct.  I

22   believe that was picked up -- I don't know if Marshall

23   University, someone in that department picked it up or

24   something or maybe at the state office.  I can't recall

25   off-hand.  But no one within city government, that is

1    correct.

2    **Q.**   And you just identified some places that you thought

3    this information might be compiled now; is that right?

4    **A.**   Maybe.  I don't remember off-hand.  We had a lot of

5    partners that were picking up some of our programs and

6    responsibilities.

7    **Q.**   Do you know as you sit here right now if anybody is

8    compiling this overdose information now at all?

9    **A.**   Not off-hand.

10   **Q.**   You came up with the system that you used to put this

11   together on your own; right?

12   **A.**   Yes, generally speaking.

13   **Q.**   This wasn't done according to any recognized system

14   that you got from a standard setting body, for example;

15   right?

16   **A.**   No.  I did look at -- I believe the State of Colorado

17   was tracking these.  Of course, they have more information,

18   death certificate numbers and things like that.  But with

19   the information I had, I had a set of criteria and that's

20   what I went with.

21   **Q.**   Your list of non-fatal overdoses didn't even reflect

22   what substance was involved, did it?

23   **A.**   Not in the 2015 list.  In the 2016 list if there was a

24   notes -- there was a notes category and a police report

25   mentioned the subject stated he was using heroin or they

1    found a needle, I would incorporate that into the

2    spreadsheet.  But it's tough to do toxicology reports on

3    people that are living.

4    **Q.**   So just so I'm clear, the 2015 non-fatal overdose data

5    had no reflection at all on what substance was involved in

6    the alleged overdose; is that right?

7    **A.**   That is correct.  I would say just from my general

8    knowledge, over 95 percent -- 95 percent of them were opioid

9    related.

10   **Q.**   And how do you know that if you weren't tracking the

11   data?

12   **A.**   So, again, just because it wasn't on the spreadsheet

13   doesn't mean that we weren't looking at police reports.  As

14   I said earlier, looking at police reports in 2016 if I found

15   they're using heroin or something like that, that would be

16   kind of the basis for that explanation.

17   **Q.**   And that was in a notes column that you kept on the

18   spreadsheet in 2016?

19   **A.**   That is correct.

20   **Q.**   In 2015 there's nothing about substance; correct?

21   **A.**   No, not on that sheet.  Originally it was intended just

22   to count the number and for the geographic location.

23   **Q.**   And in 2016 if you happened to come across the data in

24   a report about what the substance was, you would put it in a

25   notes field.  But if it wasn't in the report, that

1   information would not be reflected in the spreadsheet;

2   correct?

3   **A.**   Not on that spreadsheet.  I know that EMS has a

4   criteria for doing that.  I don't know what it is.  I know

5   EMS has a criteria for determining, you know, people size

6   and stuff like that.  And then, of course, in the HPD

7   reports if there was any mention of it, I would put it in a

8   notes category.

9   **Q.**   So on your non-fatal list in 2015 and in 2016 if there

10   was no information in the notes field, the overdose could be

11   a cocaine overdose; correct?

12   **A.**   Unlikely, possible.  It's very unlikely that we'd have

13   a cocaine overdose in 2016 that I can remember.

14   **Q.**   It could be a heroin overdose?

15   **A.**   It could, yes.

16   **Q.**   It could be a fentanyl overdose?

17   **A.**   It could.

18   **Q.**   It could be a carfentanil overdose?

19   **A.**   It could.

20   **Q.**   It could be a methamphetamine overdose?

21   **A.**   It could.

22   **Q.**   And then for your fatal overdoses, the most that you

23   could do on these lists is reflect the drugs that were in

24   the person's system when they died; is that right?

25   **A.**   So that information actually came from the state list.

1    **Q.**   Well, let me rephrase my question.  The information

2    that you got reflected the drugs that were in the system --

3    the person's system when they died; right?

4    **A.**   That is correct.

5    **Q.**   And that was usually more than one drug; right?

6    **A.**   Oh, yes, yeah.

7    **Q.**   So if a person had both an opioid and a benzo in their

8    system, your list would classify the death as one involving

9    opioids?

10    **A.**   Yeah.  It would be opioid related or heroin related or

11    fentanyl related, yeah.

12    **Q.**   And if the person had an opioid and a methamphetamine

13    in their system, you'd still classify that as one involving

14    opioids even though there was also methamphetamine; right?

15    **A.**   Yes.  It would be related to that, yes.

16    **Q.**   Same thing for a death where there was an opioid and

17    cocaine in a person's system; right?

18    **A.**   Yes.

19    **Q.**   And there's no way to know from your statistics whether

20    the opioid that might be present in a person's system was

21    the cause of death if there were also other drugs present;

22    right?

23    **A.**   Not on that list, not on my list.

24    **Q.**   There's no way to know from the statistics that you

25    kept whether the person who overdosed, or allegedly

1    overdosed was ever prescribed opioids; right?

2    **A.**   Not on my list.

3    **Q.**   And there's no way to know whether they ever used a

4    medication that was distributed by Cardinal Health; correct?

5    **A.**   Not on my list.

6    **Q.**   And no way to know if they ever used a medication that

7    was distributed by McKesson Corporation; right?

8    **A.**   No, not on my list.

9    **Q.**   And no way to know if they ever used a medication that

10   was distributed by AmerisourceBergen; right?

11   **A.**   Not on my list.

12   **Q.**   Do you recall your testimony, Mr. Lemley, about the map

13   of drug crimes that was in, I think, the 2017 strategic

14   plan?

15   **A.**   Yes, yes, the drug offenses.

16           MR. RUBY:  And that is, Mr. Simmons, P-2144 --

17   sorry -- 41244.

18   BY MR. RUBY:

19   **Q.**   And I'll direct you, Mr. Lemley, to Page 10.  This

20   has the little long form numbers in the bottom

21   right-hand corner.  Do you see that?

22   **A.**   I do.

23   **Q.**   Now, the comparison that's shown here in these maps is

24   between 2004 and 2014 and 2016; right?

25   **A.**   That is correct.

1    **Q.**    You testified earlier that the year the police budget

2    was cut by 25 percent was 2002; is that right?

3    **A.**    That is correct.

4    **Q.**    And that is the event that later in the goals for the

5    Mayor's Office of Drug Control Policy you said led to

6    Huntington becoming a regional distribution hub for illegal

7    drugs; correct?

8    **A.**    Yes.

9    **Q.**    So you, you wrote those words in the goals for the

10   Mayor's Office of Drug Control Policy in 2014; right?

11   **A.**    I believe that's right, my initial stab at it, yes.

12   **Q.**    And that's the same year that's reflected on the map

13   here in the upper right-hand corner?

14   **A.**    Yes.

15           MR. RUBY:  And let's go ahead and pull that up

16   again, Mr. Simmons.  That's P-41532, the statement of goals

17   and background that you gave for the Office of Drug Control

18   Policy.  If you could pull out that paragraph.  Thank you.

19   BY MR. RUBY:

20   **Q.**    This is in 2014.  And it says here, "It has been

21   more than a decade since resources were cut and our area

22   became an easy mark for individuals distributing drugs."

23   Is that right?

24   **A.**    That's correct.

25   **Q.**    And the event that that statement refers to which made

1    the area an easy mark for individuals distributing drugs

2    came two years before the first version of that map that is

3    shown in the 2017 Strategic Plan; correct?

4    **A.**   That is correct?

5    **Q.**   Your --

6             MR. RUBY:  Could you go back to the map,

7    Mr. Simmons, 44586.

8    BY MR. RUBY:

9    **Q.**   Mr. Lemley, the, the map that's shown here in the

10   2017 Strategic Plan, that doesn't show where the people

11   who committed the drug crimes that are reflected here

12   were from, does it?

13   **A.**   It does not.

14   **Q.**   It doesn't show what drugs were involved, does it?

15   **A.**   It does not.

16   **Q.**   And there's no way on this map to tell if any of these

17   crimes involved prescription opioid medications, is there?

18   **A.**   Not on that map.

19   **Q.**   No way to tell if any of the crimes that are depicted

20   on this map involved any product that was distributed by any

21   defendant in this case, is there?

22   **A.**   Not on this map.

23   **Q.**   And you referred earlier in your testimony, Mr. Lemley,

24   to -- and I don't want to put words in your mouth -- but

25   hidden knowledge, hidden information to the effect that in

1    2011 when you wrote the DMI report you weren't aware of any

2    role of wholesale distributors in the drug problem in

3    Huntington.  Do you recall that?

4    **A.**   Can you repeat that again?

5    **Q.**   Was it your testimony that in 2011 when you wrote the

6    DMI report you weren't aware of any role that wholesale

7    distributors played in the drug problem in Huntington?

8    **A.**   If I'm understanding your question -- I apologize.  Say

9    it one more time.  I'm having -- can you put it in a

10   different way?  I apologize.

11   **Q.**   Let me ask a different question.

12   **A.**   Okay.

13   **Q.**   We've looked at documents that you prepared in 2011,

14   2014, 2015 with a strategic plan and then another document

15   that was prepared by the Mayor's Office of Drug Control

16   Policy in 2017; right?

17   **A.**   Yes.

18   **Q.**   And in none of those documents was there any reference

19   to any wholesale pharmaceutical distributor, was there?

20   **A.**   Not in those documents.

21   **Q.**   And in none of those documents was there any reference

22   to Cardinal Health?

23   **A.**   Not that I remember.

24   **Q.**   No reference to AmerisourceBergen?

25   **A.**   Not that I remember.

```
 1    Q.    And no reference to McKesson Corporation?

 2    A.    Not that I remember.

 3              MR. RUBY:  Nothing further subject to recross,

 4    Your Honor.

 5              THE COURT:  Is there any recross -- or any cross

 6    by any of the other defendants?

 7              MS. WU:  Your Honor, I have just a few questions.

 8              THE COURT:  Yes, you may, Ms. Wu.

 9                        CROSS EXAMINATION

10    BY MS. WU:

11    Q.    Good afternoon, Mr. Lemley.  I'm Laura Wu, counsel

12    for McKesson, and I'll try to make this brief.  It's

13    late on a Friday.  Thank you for your patience.

14         So to start, I'd like to circle back to a few pieces of

15    testimony that you gave earlier today.

16         As part of the prevention efforts that you described

17    with plaintiffs' counsel, you identified drop box and take

18    back programs.  Correct?

19    A.    Those were two of many, yeah.

20    Q.    And the purpose of those two programs, the drop box and

21    take back program is to get drugs prescribed by doctors out

22    of medicine cabinets in the local community; correct?

23    A.    Any unwanted or unused prescription medications.  It

24    was an opportunity for them to dispose of them properly.

25    Q.    And that was important as part of your work because a
```

1    majority of criminal diversion of prescription medications

2    happens from a person's home -- from a person who had a

3    prescription from a doctor; correct?

4    **A.**   I don't have enough knowledge to say that a majority of

5    them come that way.  I don't know.

6    **Q.**   It was a concern of the -- of your work to get

7    prescription medications out of the community to reduce the

8    risks of diversion; correct?

9    **A.**   That is correct.

10    **Q.**   You spoke earlier with counsel for plaintiffs about

11    emerging threats to the city which were identified in some

12    of the HPD reports that you got.  Do you recall that?

13    **A.**   Yes.  I believe that was a standard section for the

14    drug unit.

15    **Q.**   Okay.  I'd like to look at a few more of those.

16    Could we pull up P-41252 which is the 2013 annual

17    report?  This is already admitted.  My apologies.  Could we

18    pull it up, Mr. Reynolds?  Thank you.

19    This is a copy of the 2013 HPD report; correct, Mr.

20    Lemley?

21    **A.**   Yes, it is.

22    **Q.**   And could I call your attention to Page 22 of the

23    report.  And this is the Emerging Threats section of the

24    2013 report.  Do you see that?

25    **A.**   I do.

1    **Q.**   And it reads, "Currently the growing use of heroin is

2    the number one threat to the City of Huntington."

3        Do you see that?

4    **A.**   I do.

5    **Q.**   That was a true statement at the time you published

6    this report; correct?

7    **A.**   2013?  I believe it was.  That was the emerging threat

8    at the time.

9    **Q.**   And by 2013 prescription opioids were not the primary

10    issue the City of Huntington was dealing with; correct?

11    **A.**   No, not at that time.  It had already made the

12    progression.  We were -- it's not like there was a cutoff I

13    will say.  It's not like one minute there was lots of

14    prescription opioids and suddenly they're all gone and it's

15    nothing but heroin, and vice versa.  Early on there was a

16    lot of prescription opioids and a little bit of heroin.  But

17    we had made that progression over as people who were

18    addicted made that progression over.

19    **Q.**   And HPD itself did not track individual drug users in

20    terms of their progression from one substance to another or

21    the number of substances they may have used; correct?

22    **A.**   I'm sorry?  Say that one more time.

23    **Q.**   Let me try that again.

24    **A.**   Okay.

25    **Q.**   HPD did not track the progression of any individuals in

1    Huntington in terms of their -- the number of drugs that

2    they used; correct?

3    **A.**   I wouldn't say that's entirely correct.  Like in the

4    DMI program we had individuals that we were tracking.  We

5    wanted to know the drug history.  I won't say it was common

6    practice, but I won't say it never occurred.

7    **Q.**   And that's not something that's reported in the HPD

8    report such as this 2013 report; correct?

9    **A.**   No, it wouldn't be there.

10   **Q.**   So immediately above the Emerging Threats you see on

11   Page 22 of the report you see a chart with seizure totals

12   for 2013; correct?

13   **A.**   I do.

14   **Q.**   And this is a similar chart to the one you looked at

15   with plaintiffs' counsel in the 2011 report; correct?

16   **A.**   Similar, yes.

17   **Q.**   And this table reflects all seizures by the Special

18   Investigations Bureau of HPD; correct?

19   **A.**   I believe it does.

20   **Q.**   And these numbers include seizures by some of the Task

21   Forces that you mentioned earlier today like the FBI Violent

22   Crimes Drug Task Force; correct?

23   **A.**   That's correct.

24   **Q.**   And they also include seizures by the DEA Task Force in

25   which the HPD participates; correct?

1    A.    That's correct.

2    Q.    Now, I'd like to ask you to turn back to Page 7 of this

3    same 2013 report and call your attention to the part that

4    reads, "Much like the rest of the country, the City of

5    Huntington is now facing the resurgence of an old threat,

6    which is the influx of heroin into our community."

7          Do you see that?

8    A.    I do.

9    Q.    And it's true that, that heroin in the community was

10   considered a resurgence.  It had been here before.  Correct?

11   A.    When I'm speaking about this, I think historically.  I

12   believe in the '70s -- again, I wasn't born at that time.

13   But when I say by old threat, that's what I was meaning

14   there.

15   Q.    Heroin was a threat that had been known to the City of

16   Huntington in previous years; correct?

17   A.    Very previous years.  Again, a lot of the officers

18   probably weren't even born the last time we had a heroin

19   issue.

20   Q.    And -- I'm sorry.  Looking at the same aspect of the

21   report, it also says, "Increases in crime over the past year

22   are directly related to the heroin epidemic hitting our

23   region."

24         Do you see that?

25   A.    I do.

1    Q.   And, again, it was true that the epidemic described

2    heroin, not opioids generally; correct?

3    A.   Generally speaking, I will say that because we had made

4    that progression over by that point.  Rather than talking

5    about prescription opioids, that progression had occurred

6    and we were talking mainly about heroin at that time.

7    Q.   And you described a short while ago that illicit

8    fentanyl became a problem in Huntington in 2015, 2016;

9    correct?

10   A.   20 -- at the very end of 2016 we had issues with

11   fentanyl in the area.

12   Q.   And in response to questions from Mr. Ruby, you

13   testified about an overdose cluster which occurred in

14   August, 2016; correct?

15   A.   That's correct.

16   Q.   And after that event in the summer of 2016, fentanyl

17   took off in the local community; correct?

18   A.   I will say there was an increase absolutely in fentanyl

19   in the second -- at the very end of 2016.

20   Q.   Okay.  Could you look at Plaintiffs' Exhibit 41246.

21            MS. WU:  May I approach, Your Honor?

22            THE COURT:  Yes.

23   BY MS. WU:

24   Q.   Mr. Lemley, we've printed out an Excel sheet which

25   is familiar to you.  This is a set of data that you

1    compiled with statistics from 2016; is that correct?

2    **A.**    Yes, this is 2016.  Let me double-check.  Yes.

3    **Q.**    And you prepared the data that we're looking at;

4    correct, Mr. Lemley?

5    **A.**    That is correct.

6             MS. WU:  Your Honor, I'd move to admit P-41246

7    into evidence.

8             THE COURT:  Any objection?

9             MS. LEYIMU:  No objection.

10            THE COURT:  It's admitted.

11   BY MS. WU:

12   **Q.**    Mr. Lemley, according to your chart in September of

13   2016, the month after the overdose cluster you testified

14   about earlier, every overdose in Huntington involved

15   illicit fentanyl; is that correct?

16   **A.**    No.  Every overdose death did.

17   **Q.**    Thank you for that correction.  Every fatal overdose in

18   the city involved fentanyl; correct?

19   **A.**    Yes.

20   **Q.**    And for the balance of 2016, a majority of fatal

21   overdoses involved illicit fentanyl; correct?

22   **A.**    That is correct.

23   **Q.**    Drug cartels have laced illicit fentanyl not only in

24   heroin but also into other illegal drugs used in the City of

25   Huntington; correct?

1   **A.**   I think, in my opinion, it's backwards.  They're not

2   lacing heroin with fentanyl.  They're lacing fentanyl with

3   heroin.

4   **Q.**   Okay.  So drug cartels are mixing fentanyl with other

5   illicit drugs; correct?

6   **A.**   Yes.  It can be done on the cartel side.  It could be

7   done locally, what it's cut with, yes.

8   **Q.**   And as a result, individuals who may not be seeking

9   opioids may come into contact with fentanyl.  For example,

10  an individual seeking cocaine may inject cocaine laced with

11  fentanyl.  Correct?

12  **A.**   That's possible.

13  **Q.**   And that increases the risk of overdose in Huntington;

14  correct?

15  **A.**   Yes.  Any time you have a strong opioid as fentanyl, it

16  would increase the likelihood of overdose.

17          MS. WU:  And could we look at Plaintiffs' Exhibit

18  41240, please?

19      May I approach, Your Honor?

20          THE COURT:  Yes.

21  BY MS. WU:

22  **Q.**   Mr. Lemley, Plaintiffs' Exhibit 41240 is another

23  set of data that you compiled for the period 2013

24  through 2015; is that correct?

25  **A.**   That is correct.

```
1              MS. WU:  Your Honor, I'd move to admit Plaintiffs'

2       Exhibit 41240 into evidence.

3              THE COURT:  Any objection to that?

4              MS. LEYIMU:  No objection.

5              THE COURT:  It's admitted.  41240 is admitted.

6              MS. WU:  Thank you.

7       BY MS. WU:

8       Q.   Mr. Lemley, this chart shows -- it's titled

9       "Additional Drugs in System of Individuals Who Died of

10      an Accidental Overdose When Fentanyl Was Present:  2013

11      through 2015."

12             Correct?

13      A.   That is correct.

14      Q.   In looking at the data that you presented here, between

15      2013 and 2015 nearly one-third of illicit fentanyl overdoses

16      involving other drugs involved heroin.  Do you see that, Mr.

17      Lemley?

18      A.   Can you say that statement again?  I want to make sure

19      that I'm --

20      Q.   Sure.  If we can scroll down -- I'm sorry.  I didn't

21      realize we didn't have it on the screen.

22             Do you see the entry for heroin?

23      A.   I do.

24      Q.   And it shows that, based on the data you've presented

25      here, that nearly one-third of illicit fentanyl overdoses
```

1    for the period 2013 to 2015 involving other drugs, as

2    reported here, specifically involved heroin.  Do you see

3    that?

4    **A.**   I do.

5    **Q.**   And over that same period, if we can go up to fentanyl,

6    do you see that?

7    **A.**   I don't know what you're referring to.  I'm sorry.

8    **Q.**   Oh, I'm sorry.  I've lost my place on the chart, but we

9    can move on.

10        Over this -- I'm sorry, cocaine.  Can you go to

11   cocaine?  There we go.

12        Sorry about that, Mr. Lemley.

13        So over that same period again, 2013 to 2015, nearly

14   one in ten illicit fentanyl overdoses involved cocaine

15   specifically.  Do you see that?

16   **A.**   Yes, a little bit less than one in ten.

17   **Q.**   And cocaine is not an opioid class drug; correct?

18   **A.**   No.

19   **Q.**   And that percentage of cocaine overdoses that also

20   included fentanyl increased year over year during that

21   period?

22   **A.**   It appears from '13 to '15, yes, it did.

23   **Q.**   And then can we go to methamphetamine.  Do you see

24   that?

25   **A.**   I do.

1    **Q.**   For the period 2013 to 2015, 6.3 percent of illicit

2    fentanyl overdoses also involved methamphetamine; correct?

3    **A.**   That is correct.

4    **Q.**   And, so, the data presented here reports on what we

5    would call polypharmacy overdose events; correct?  Those are

6    events with more than one drug in an individual's system.

7    Correct?

8    **A.**   I don't know that term but, yes, this is where fentanyl

9    and another substance of some type was in the individual's

10   system when they passed.

11   **Q.**   Thank you, Mr. Lemley.

12       I'd like to look at another HPD report.  And can we

13   pull up P-41252 which is already in evidence?

14       Could we turn to Page 22 of this report.

15       Do you have that, Mr. Lemley?

16   **A.**   I believe, yes.

17   **Q.**   Now, if we look at the bottom of the first column it

18   reads, "West Virginia is second in the nation in

19   prescription drug overdose deaths.  Huntington is not immune

20   to this epidemic, and concentrated efforts by all our drug

21   investigation units have placed an emphasis on disrupting

22   and dismantling DTOs responsible for trafficking and

23   distributing heroin and prescription drugs in our

24   community."

25       Do you see that, Mr. Lemley?

1    **A.**    I do.

2    **Q.**    It was true at the time of this report that DTOs were

3    distributing heroin into Huntington; correct?

4    **A.**    Yes, one of many drugs, yes.

5    **Q.**    And it was true at the time this report was published

6    that DTOs were also distributing prescription opioids into

7    Huntington?

8    **A.**    Some of them were, yes.

9    **Q.**    And, so, some of the prescription opioids abuse in

10   Huntington were coming from outside the jurisdiction via

11   criminal activity; correct?

12   **A.**    Some of them were, yes.

13   **Q.**    So they weren't coming from local pharmacies; correct?

14   **A.**    I wouldn't say as a complete.  They absolutely could

15   have come from local pharmacies.

16   **Q.**    The prescription, the prescription opioids referenced

17   here in this report were coming from DTOs; correct?

18   **A.**    They were coming -- I'm a little confused.  Are you

19   talking about the graph here on the left or are you talking

20   about just generally?

21   **Q.**    I'm talking about the portion that we've read into the

22   record that DTOs were bringing prescription drug into the

23   community.

24   **A.**    Yes.  So those would be ones that were most likely

25   brought from outside the community, although it's possible

```
 1    some were local that they were trying to get their hands on
 2    and distributing that they were diverted locally.
 3    Q.    Thank you.  But this is referencing the work of DTOs;
 4    correct?
 5    A.    That specific line, yes.
 6    Q.    Thank you.  So I'd like to look at one more HPD report
 7    moving through a number of them.  That's the 2014 annual
 8    report which is Plaintiffs' Exhibit 41220 which is also in
 9    evidence.
10          Mr. Lemley, do you have the 2014 report in front of
11    you?
12    A.    I do.
13    Q.    Okay.  And that is another report that you put together
14    when you were working with HPD; correct?
15    A.    Yes.
16    Q.    And I'd like to ask you to turn to Page 19 of the
17    report.  And I'm going to call your attention to the portion
18    of the page that reads, "The DEA Task Force is also
19    responsible for investigating and dismantling DTOs operating
20    in Huntington and throughout the Southern District of West
21    Virginia.  The DEA Task Force continues to be particularly
22    effective with investigations that have nexus to source of
23    supply cities such as Columbus, Ohio and Detroit, Michigan."
24          Do you see that?
25    A.    I do.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    Q.   And it was true as of 2014 that Columbus and Detroit

2    were source cities for the heroin and prescription opioids

3    brought into the City of Huntington; correct?

4    A.   I would say Detroit more than Columbus, but that would

5    be generally a correct statement.

6    Q.   I'd like to just go through another HPD document.

7         Could we look at Defendants' West Virginia 01323.

8              MS. WU:  May I approach?

9              THE COURT:  Yes.

10   BY MS. WU:

11   Q.   Mr. Lemley, the document identified as Defendants'

12   Exhibit 01323 is a funding proposal for something called

13   the FBI Violent Crime Drug Task Force, Huntington

14   Interdiction Team.  Do you see that?

15   A.   I do.

16   Q.   And it bears the seal of the Huntington Police

17   Department --

18   A.   Yes.

19   Q.   -- on the front?

20   A.   Yes.

21   Q.   And it's dated January 27th, 2015; correct?

22   A.   Yes.

23   Q.   You were still employed by HPD as of that date;

24   correct?

25   A.   I was.

1  **Q.**   Now, I'd like to ask you to look at Page 2 of the

2  report and call your attention to the portion at the top

3  that reads, "Huntington is the largest city in the region

4  located approximately 300 miles south of Detroit, Michigan.

5  It is frequently referred to as Little Detroit due to the

6  large population of former Detroit-based heroin

7  traffickers."

8      Do you see that?

9  **A.**   I do.

10 **Q.**   And that was an accurate statement as of 2015; correct?

11 **A.**   I believe it is.

12 **Q.**   Now, I'd like to ask you to keep reading with me here.

13     And it says, "Huntington is a destination city known

14 and utilized by Detroit violent gang members and narcotics

15 traffickers to establish heroin distribution points in other

16 parts of the Tri-State region."

17     Do you see that?

18 **A.**   I do.

19     MS. LEYIMU:  Your Honor, I'm just going to object

20 to the extent that there has been no foundation that Mr.

21 Lemley is aware of this document.

22     THE COURT:  Well, where are you going with this,

23 Ms. Wu?

24     MS. WU:  Your Honor, Mr. Lemley was employed by

25 HPD and responsible for reports during this time period.

1    He's testified extensively about his knowledge of the work

2    of the department.

3              THE COURT:  Overruled.  Go ahead.

4              MS. WU:  Thank you, Your Honor.

5    BY MS. WU:

6    **Q.**   Mr. Lemley, the portion that I just read, that was

7    a true statement as of 2015; correct?

8    **A.**   I'm sorry.  Are we talking about the highlighted part?

9    **Q.**   Yes.  I'm happy to read it again.

10   **A.**   No.  That is correct.

11   **Q.**   Thank you, Mr. Lemley.

12         One of the reasons, Mr. Lemley, that drug dealers came

13   from Detroit and elsewhere to Huntington was because they

14   could sell their product, including heroin, at a higher

15   price in Huntington than they could in Detroit; correct?

16   **A.**   That's correct.

17   **Q.**   Could we please look at P-41221, Mr. Lemley.  That's

18   the 2015 HPD annual report.

19         Do you have it, Mr. Lemley?

20   **A.**   I know that I do.

21   **Q.**   Okay.  I'm sorry to rush you.

22   **A.**   That's okay.

23   **Q.**   And this document is already in evidence.

24         Mr. Lemley, the 2015 HPD report we're looking at is yet

25   another one of the reports that you put together while

1   employed with HPD; correct?

2   **A.**   That is correct.

3   **Q.**   Now, I'd like to ask you to look at Page 10 of this

4   report, and call your attention to the first full paragraph

5   that reads, "In January of 2015 members of the FBI Task

6   Force began receiving information about a drug trafficking

7   organization from Detroit, Michigan operating in Huntington

8   area."

9   **A.**   Uh-huh.

10  **Q.**   That was a true statement as of 2015; correct?

11  **A.**   I believe it was.

12  **Q.**   And this section goes on, "Numerous arrests and

13  debriefings confirmed information that linked the drug

14  trafficking organization to a major supplier of the Dirty

15  Dog drug trafficking organization."

16       Do you see that?

17  **A.**   I do.

18  **Q.**   And that was a true statement as of 2015; correct?

19  **A.**   To my knowledge, it is a true statement.

20  **Q.**   And it continues, "The organization recruits

21  individuals from Michigan to come to Huntington to

22  distribute illegal narcotics."

23       Do you see that?

24  **A.**   Yes.

25  **Q.**   And that was also a true statement; correct?

1    **A.**   That is correct.

2    **Q.**   Okay.  Now, if we move down one sentence, and skip one,

3    it reads, "Retrieved during these search warrants was

4    321.7 grams of heroin, $12,700, and two firearms."

5         Do you see that?

6    **A.**   I do.

7    **Q.**   And that was also a true statement as of 2015?

8    **A.**   I believe it was.  I wasn't involved directly with that

9    investigation, but I believe that is a true statement from

10   my recollection.

11   **Q.**   And the Dirty Dog organization described in this 2015

12   report is another example of the Detroit-based DTO that was

13   supplying heroin to the Huntington area; correct?

14   **A.**   That's correct.

15   **Q.**   Now, we're going to head back to one last HPD report,

16   last one, Mr. Lemley.

17        Could we please look at P-41220 which is the 2014

18   report.  And could we look at Page 19, please.

19        Do you have that one, Mr. Lemley?

20   **A.**   I do.

21   **Q.**   Okay.  Now, I'd like to call your attention to the end

22   of Page 19 down at the bottom where it reads, "One of the

23   larger investigations for the DEA tactical diversion squad

24   was the A-Plus Pharmacy investigation which was started in

25   2013 by Charleston DEA diversion investigators following a

1    complaint from a Huntington doctor."

2         Do you see that?

3    **A.**   I do.

4    **Q.**   And that was a true statement at the time this was

5    published; correct?

6    **A.**   Again, I believe it was.  I wasn't involved at all with

7    that investigation that I recollect.  But from my knowledge

8    of operations at HPD afterwards, I believe that is a true

9    statement.

10   **Q.**   Thank you.  And then it continues.  "As the case

11   progressed, complaints were also brought to the attention of

12   investigators about ethics concerns based on the business

13   practices of owners, Kofi and Patricia Agyrekum.  The

14   Agyrekums were allegedly filling prescriptions that did not

15   exist and filling them when they were expired."  Do you see

16   that?

17   **A.**   I do.

18   **Q.**   That's another true statement; correct?

19   **A.**   I believe -- again, I believe it was.  I was not

20   involved in this investigation at all, so my knowledge of it

21   is quite limited.

22   **Q.**   Okay.  But you are aware that A-Plus Care Pharmacy is

23   an example of a pharmacy within Cabell County that engaged

24   in wrongdoing related to prescription opioids; correct?

25   **A.**   I believe it was.

1   Q.   And if we could look at Page 20 of the report, the next

2   page, it continues with some more information about A-Plus

3   Pharmacy.  I call your attention to the part that reads,

4   "DEA TDS," that's the Tactical Diversion Squad, "in

5   conjunction with DEA diversion investigators also seized

6   pills as a result of the search warrant and seized even more

7   pills when A-Plus Care Pharmacy was asked to surrender their

8   license totaling 146,858 pills."

9        Do you see that?

10  A.   I do.

11  Q.   And that was an accurate statement in this report?

12  A.   Again, I wasn't -- did not do any work related to this

13  case that I remember, but I believe that is an accurate

14  statement.

15  Q.   Thank you.  Could we look back at Page 17 of this

16  report, please.

17       Now, Mr. Lemley, this is a seizure, drug seizure chart

18  which is similar to some of the ones that you looked at with

19  plaintiffs' counsel earlier; correct?

20  A.   That is correct.

21  Q.   And this one dates from 2014; --

22  A.   Yes.

23  Q.   -- correct?  Now, if we look at this chart, it shows

24  151,053 dosage units of illegally diverted prescription

25  medication.  Do you see that?

1    **A.**   I do.

2    **Q.**   And based on what we just read a few pages ago, or a

3    few moments ago, 146,858 of those pills were taken from

4    A-Plus Care Pharmacy; correct?

5    **A.**   That is correct.

6    **Q.**   So by my math, and you can check me, 97 percent of

7    pills seized by the Huntington Police Department in 2014

8    came from A-Plus Care Pharmacy; correct?

9    **A.**   That is correct.  That's at that time.  Yeah, I want to

10   say that's correct, yeah.

11   **Q.**   Are you aware that A-Plus Care Pharmacy never received

12   a single prescription opioid pill from McKesson?

13   **A.**   Again, I wasn't part of that investigation --

14   **Q.**   So you don't --

15   **A.**   -- so I don't have any knowledge.

16   **Q.**   You don't know?

17   **A.**   I do not know.

18   **Q.**   Or ABDC?

19   **A.**   I'm sorry?

20   **Q.**   Or ABDC, AmerisourceBergen?

21   **A.**   Oh, again, I wasn't part of that investigation.  I do

22   not know.

23   **Q.**   And the same for Cardinal Health?

24   **A.**   Again, I wasn't part of that investigation.  I do not

25   know.

1    **Q.**    Thank you, Mr. Lemley.

2            MS. WU:  I have no further questions, but I do

3    have one housekeeping item, a document.  I would move

4    Defendants' West Virginia 01323, the grant proposal that we

5    looked at earlier, into evidence.

6            THE COURT:  Any objection to that?

7            MS. LEYIMU:  No objection, Your Honor.

8            THE COURT:  All right.  It's admitted.

9            MS. WU:  Thank you, Mr. Lemley.

10           MR. MAHADY:  Mr. Lemley, I have no questions.

11   Thank you for your time today.

12           THE WITNESS:  Thank you.

13           THE COURT:  Is there any redirect?

14           MS. LEYIMU:  Yes, Your Honor, I believe there will

15   be brief redirect.

16           THE COURT:  Okay.  We need to try to get Mr.

17   Lemley out of here today.

18           MS. LEYIMU:  Agreed.

19           THE WITNESS:  Thank you, Your Honor.

20           THE COURT:  And Judge Faber also.

21           MS. LEYIMU:  Okay.  I'll go as fast as possible.

22                        REDIRECT EXAMINATION

23   BY MS. LEYIMU:

24   **Q.**    Okay.  We're going to jump around for just a bit.

25   Bear with me.

1   **A.**   Okay.

2   **Q.**   You were asked a series of questions about the overdose

3   data that you compiled.  Do you remember that?

4   **A.**   Yes, I believe.

5   **Q.**   Do you believe any of those sources that you used were

6   untrustworthy?

7   **A.**   No.  I believe they're all trustworthy.

8   **Q.**   Do you believe any of those sources that you relied

9   upon were unreliable?

10   **A.**   No.  I believe they were all reliable.

11   **Q.**   And have you shared these spreadsheets with others?

12   **A.**   Absolutely.

13   **Q.**   Who have you shared them with?

14   **A.**   The public, I guess you could say work products from

15   them with education, with recovery, with anyone and

16   everyone.  I mean it was a freely given thing.

17   **Q.**   And you testified that you compared your numbers with

18   the state list.  Correct?

19   **A.**   Overdose deaths, that is correct.

20   **Q.**   For overdose deaths, that's right.  And what did you

21   find?  Were they consistent with the state list?

22   **A.**   Generally consistent.  Once in a blue moon, I would

23   miss one and I would do an investigation of that.  I don't

24   recall ever adding one that I later found out was not.

25   **Q.**   Your data relied upon police data that was reported to

1    the FBI; is that correct?

2    **A.**    That's correct.

3    **Q.**    And what about EMS records?  Are those official

4    records?

5    **A.**    They are.

6    **Q.**    And did your data rely upon those?

7    **A.**    They did.

8    **Q.**    Were these contemporaneous records of the county's

9    Emergency Services Department?

10   **A.**    Can you rephrase that question?

11   **Q.**    Sure.  Did the numbers that came from 911, HPD, and the

12   county's EMS Services Department, was that data that you got

13   specifically from them?

14   **A.**    Yes.

15   **Q.**    Contemporaneous with them reporting it?

16   **A.**    Yes.

17   **Q.**    You were asked questions with "approximate" in the

18   question, so I just want to make this clear for the record.

19        Was your data approximate or was it an actual count of

20   what you were finding from these reliable sources?

21   **A.**    So what was on my sheet was a definite number.  Again,

22   it might be approximate as it was under-counted.  And I've

23   always said my number was a minimum number.  It could have

24   been more out there.  But my number was always a minimum

25   number of overdoses in our county and city.

1    **Q.**   Did you ever hear from the FBI or the state concerning

2    there being inaccuracies within your data?

3    **A.**   No.

4    **Q.**   Following up on the annual report that you just looked

5    at from 2014, was the drug unit the only unit in Huntington

6    Police Department that seized prescription pills?

7    **A.**   No.

8    **Q.**   What other units did that?

9    **A.**   The patrol bureau would seize prescription opioids in

10   their normal course of operations.  The detective bureau

11   could as well based on where an investigation would go.  It

12   would not be just the drug unit.

13   **Q.**   Did the city rely on the spreadsheets that we were

14   talking about with the overdose records in formulating

15   policy?

16   **A.**   Absolutely.

17   **Q.**   I want to take a look at your deposition just for a

18   second.  I think you were pointed to Page 295 and 296, or

19   actually just Page 296.  But I want to look at 295 and 296

20   if we could.

21       Do you recall your deposition, Mr. Lemley?

22   **A.**   I do.

23   **Q.**   Were there a lot of documents?

24   **A.**   There were a lot, yes.

25   **Q.**   On Page 295 at the very bottom the question is posed --

1    I'll read it.  "Is this the 2017 strategic plan for the

2    Mayor's Office of Drug Control Policy?"

3         Do you see that?

4    **A.**   I do.

5    **Q.**   And you said -- how you did answer?

6    **A.**   "Doing a quick glance of the document, it appears that

7    it is in total."

8    **Q.**   So you would agree that you were doing a quick glance

9    at the time?

10   **A.**   Yes, that's correct.

11             MR. RUBY:  Judge, --

12             THE COURT:  Just a minute.  Mr. Ruby.

13             MR. RUBY:  Objection.  I'm not sure if this is

14   impeachment or what.  I don't think, I don't think there was

15   any testimony in the, in the prior -- or in the cross that

16   he hadn't looked at the document.

17             THE COURT:  Yeah, what is the purpose of showing

18   him the document?

19             MS. LEYIMU:  Well, Mr. Ruby asked him, "Didn't you

20   have sufficient time to look at this document before you

21   were asked questions about it at your deposition?"

22        And I'm putting that in context for Mr. Lemley since he

23   took a quick glance of the document to confirm that it was

24   the 2017 strategic plan.

25             MR. RUBY:  Just for the record, Your Honor, I

1    never asked him if he had sufficient time to look at the

2    document.

3            THE COURT:  I'll sustain the objection.  This is a

4    little unusual use of a deposition, so I'll sustain the

5    objection.

6    BY MS. LEYIMU:

7    **Q.**   Look at the next page on 296.  We skipped over this

8    part in your cross-examination with Mr. Ruby, but I

9    wanted to bring it out starting on page -- or on line 6.

10   **A.**   Uh-huh.

11   **Q.**   In this deposition did you testify that you may have

12   provided Excel spreadsheets, Excel files?

13   **A.**   I did.

14   **Q.**   And did you talk about supplying information including

15   data, maps, and graphs?

16   **A.**   Yes.

17   **Q.**   And is that consistent with your testimony here today?

18   **A.**   Yes.

19   **Q.**   And have you had more fully time to look at the annual

20   reports, the strategic plan -- excuse me -- now since then

21   at your deposition?

22   **A.**   Sure, yes.

23   **Q.**   I want to turn to the 2013 annual report quickly, Page

24   22 if we could.

25           Counsel pointed out the heroin seizures from the

1    Special Investigations Bureau.  Do you recall that just a

2    minute ago?

3    **A.**   Yes.

4    **Q.**   I want to call your attention to the, to the beginning.

5    I think you were saying that there was never a switch-off

6    from pills to heroin; is that correct?

7    **A.**   That is correct.

8    **Q.**   Okay.  And heroin had been increasing in 2013.  Did you

9    testify to as much?

10   **A.**   Yes, it definitely had.

11   **Q.**   Were pills still a threat in 2013, Mr. Lemley?

12   **A.**   Yes.  I believe compared to the 2012, if I remember

13   correctly, pills seizures had also increased from '12 to

14   '13.

15   **Q.**   And this is in total, the SIB, Special Investigations

16   Bureau, had an exceptional year combating the heroin and

17   pill epidemic affecting our city with a record amount of

18   drug seizures.  Do you see that?

19   **A.**   Yes.

20   **Q.**   And, so, along with heroin, there was still a pill

21   epidemic going on as well?

22   **A.**   There was an opioid epidemic.

23   **Q.**   Turning to what you were questioned, I believe the

24   number is P-41240, additional drugs in system of individual

25   who died of accidental overdose when fentanyl was present.

```
 1   You were just questioned on that.  Do you have that in front

 2   of you?

 3   A.   I do have it.

 4           MR. RUBY:  I'm sorry, Ms. Leyimu, what was the

 5   number?

 6           MS. LEYIMU:  41240.

 7   BY MS. LEYIMU:

 8   Q.   If you look at the first column in 2013, Mr.

 9   Lemley.

10   A.   Yes.

11   Q.   What was the -- what was the highest percentage -- what

12   was the drug associated with the highest percentage of drugs

13   in the system of individuals who died of accidental

14   overdose?

15   A.   With fentanyl in their system, the number one at

16   28.21 percent was oxycodone.

17   Q.   Okay.  And what about the hydrocodone number?  What was

18   the percentage of people who died of accidental overdose

19   with fentanyl in their system with also another drug?

20   A.   25.64 percent.

21   Q.   What was it?

22   A.   I'm sorry?  Are you asking --

23   Q.   What was the drug?

24   A.   Oh, hydrocodone.  I don't know if I answered your

25   question properly.
```

1    Q.   You did.  You did.  We just didn't go over that part.

2         And then for the last one, you were asked first by Mr.

3    Ruby with regard to the six-month evaluation --

4    A.   Uh-huh.

5    Q.   -- that you put together associated with your DMI

6    strategy job.  Do you recall that?

7    A.   I apologize.  I'm not sure.

8    Q.   That's all right.  We'll pull it up.  I think it was

9    Defendants' WV 00916.

10   A.   Are you talking about the DMI report?

11   Q.   Yes, DMI report, six-month evaluation, sir.

12   A.   Yeah.

13   Q.   Okay.  And you weren't shown the Executive Summary,

14   were you?

15   A.   We didn't talk about that before, no.

16   Q.   Okay.  The Executive Summary -- and I just want to make

17   sure this comports with your understanding -- shows that DMI

18   had been extremely successful in the City of Huntington.  Do

19   you see that?

20   A.   Yeah.

21   Q.   Drug offenses have been cut in half and violent

22   offenses have been decreased by at least 80 percent in the

23   DMI target area.  Do you see that?

24   A.   Yes.

25   Q.   What was the DMI target area for this project?

1    **A.**   So that was that two-block by four-block area in

2    Fairfield West.

3    **Q.**   Drug crimes in the DMI area now represent less than

4    10 percent of all drug crimes in the City of Huntington

5    which is considered a key success in other cities that have

6    implemented the DMI strategy.  Do you see that?

7    **A.**   I do.

8    **Q.**   And was the DMI initiative that the City of Huntington

9    put resources towards, including your job, successful in

10   bringing that down?

11   **A.**   I believe it absolutely did.

12   **Q.**   The next sentence says, "The fear that criminal

13   activity would be displaced to surrounding areas instead of

14   eliminated has greatly been unfounded as there has been no

15   increase in offenses in the area surrounding the target area

16   when looking at the last six months as a whole."

17        Do you see that?

18   **A.**   I do.

19   **Q.**   How is that different -- let me ask you this.  What

20   drug -- was there a drug that was primarily of concern with

21   regard to the DMI initiative?

22   **A.**   It was mainly crack cocaine again in an open-air drug

23   market.

24   **Q.**   How is that different than the opioid epidemic, Mr.

25   Lemley?

**A.**   Oh, again, with crack cocaine, again, it's confined to a very small area.  They were selling it on the corner you could say.

With the opioid epidemic it is much greater in, number one, numbers and, number two, geographic area.

MS. LEYIMU:  That's all I have, Your Honor.

Thank you, Mr. Lemley, for your time.

THE COURT:  Thank you.

May we excuse Mr. Lemley?

MR. RUBY:  As far as I'm concerned, we can go home, Your Honor.

THE COURT:  Thank you, Mr. Lemley.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You're free to go and we appreciate you being here and your patience with us and you may leave, sir.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Remember we're going to start at 10:00 on Monday and I'll see everybody then.

(Trial recessed at 4:59 p.m.)

```
 1        CERTIFICATION:

 2                  I, Ayme A. Cochran, Official Court

 3     Reporter, and I, Lisa A. Cook, Official Court Reporter,

 4     certify that the foregoing is a correct transcript from

 5     the record of proceedings in the matter of The City of

 6     Huntington, et al., Plaintiffs vs. AmerisourceBergen

 7     Drug Corporation, et al., Defendants, Civil Action No.

 8     3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

 9     reported on May 21, 2021.

10

11             S\Ayme A. Cochran              s\Lisa A. Cook

12               Reporter                       Reporter

13        _

14

15          May 21, 2021

16             Date

17

18

19

20

21

22

23

24

25
```

## $

**$12,700** [1] - 253:4
**$18,760.00** [1] - 184:23
**$50,000.00** [1] - 185:1

## '

**'12** [1] - 263:13
**'13** [4] - 119:2, 199:22, 245:22, 263:14
**'14** [5] - 119:1, 119:2, 136:21, 189:15, 199:22
**'15** [6] - 129:16, 136:23, 147:15, 163:4, 245:22
**'16** [2] - 147:15, 204:25
**'70s** [1] - 240:12

## 0

**00473** [2] - 28:14, 32:10
**00907** [2] - 2:5, 2:17
**00916** [1] - 265:9
**01323** [3] - 249:7, 249:12, 257:4
**062** [1] - 182:21

## 1

**1** [7] - 51:10, 155:16, 155:18, 161:2, 161:16, 161:19, 214:5
**1,100** [1] - 98:1
**1,154** [1] - 96:17
**1,476** [1] - 163:5
**1,500** [2] - 96:18, 98:1
**1,865** [1] - 128:18
**10** [9] - 14:6, 17:6, 20:12, 36:13, 112:21, 214:1, 232:19, 252:3, 266:4
**10,000** [1] - 216:21
**10,955** [1] - 128:15
**100** [1] - 17:13
**100,000** [1] - 20:13
**1001** [2] - 2:10, 4:6
**1022** [1] - 3:5
**1029** [1] - 170:5
**10:00** [3] - 126:15, 169:20, 267:19
**10:34** [1] - 62:4
**110** [1] - 226:20
**11:59** [1] - 130:12
**12** [5] - 14:6, 17:24,

93:1, 127:23, 127:25
**126** [1] - 3:5
**12th** [1] - 87:2
**13** [1] - 24:21
**13%** [1] - 60:14
**1300** [1] - 6:15
**1301** [2] - 2:4, 2:16
**1324** [1] - 224:9
**137** [1] - 197:18
**14%** [1] - 60:14
**14038** [3] - 68:19, 70:7, 70:8
**1410** [1] - 187:17
**146,858** [2] - 255:8, 256:3
**15** [6] - 1:16, 15:3, 91:15, 92:7, 92:15, 111:17
**15-bed** [1] - 17:24
**151,053** [1] - 255:24
**15910** [1] - 3:18
**15s** [2] - 91:20, 92:22
**16** [3] - 54:8, 100:2, 157:7
**1600** [1] - 3:17
**16th** [2] - 224:9, 224:10
**17** [6] - 206:18, 206:19, 209:10, 214:1, 219:25, 255:15
**1717** [2] - 6:6, 6:13
**18** [2] - 206:14, 206:20
**1800** [1] - 54:14
**19** [5] - 124:21, 220:13, 248:16, 253:18, 253:22
**190** [2] - 52:15, 213:17
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1950s** [1] - 183:18
**1960** [1] - 101:8
**1980s** [2] - 183:19, 184:1
**1994** [2] - 54:9, 157:8
**1st** [1] - 224:8

## 2

**2** [9] - 46:19, 161:5, 161:16, 161:20, 212:25, 216:11, 216:13, 220:23, 250:1
**2,500** [2] - 18:17, 49:22
**20** [9] - 13:6, 15:4, 17:11, 48:17, 49:15, 216:10, 226:23, 241:10, 255:1

**200** [4] - 52:2, 52:11, 52:15
**2000** [2] - 116:17, 184:16
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2002** [7] - 65:3, 116:18, 185:13, 186:21, 193:22, 214:13, 233:2
**2004** [6] - 116:22, 147:6, 147:10, 173:23, 193:22, 232:24
**2005** [2] - 187:16, 187:24
**2006** [8] - 63:3, 64:25, 65:3, 79:7, 79:19, 80:18, 80:25, 81:3
**2007** [2] - 116:22, 193:23
**2008** [5] - 66:15, 69:8, 69:22, 70:5, 70:22
**2010** [10] - 18:4, 18:17, 50:8, 50:11, 51:17, 112:24, 114:14, 116:23, 193:24, 197:17
**2011** [20] - 84:11, 86:7, 93:6, 93:19, 120:6, 121:11, 122:23, 123:16, 123:18, 123:25, 124:7, 124:21, 127:10, 129:14, 129:18, 182:2, 235:1, 235:5, 235:13, 239:15
**2012** [19] - 14:14, 15:3, 50:5, 51:15, 51:20, 52:1, 52:20, 80:19, 87:2, 96:15, 120:6, 123:17, 124:1, 124:7, 128:8, 128:13, 128:15, 129:14, 263:12
**2013** [29] - 50:5, 51:15, 51:20, 119:1, 127:22, 127:25, 128:9, 128:13, 128:16, 128:18, 237:16, 237:19, 237:24, 238:7, 238:9, 239:8, 239:12, 240:3, 243:23, 244:10, 244:15, 245:1, 245:13, 246:1, 253:25, 262:23,

263:8, 263:11, 264:8
**2014** [26] - 52:5, 52:15, 52:21, 79:20, 80:19, 80:25, 81:3, 123:19, 129:16, 147:15, 174:1, 189:12, 190:22, 194:2, 195:10, 232:24, 233:10, 233:20, 235:14, 248:7, 248:10, 249:1, 253:17, 255:21, 256:7, 260:5
**2015** [60] - 18:5, 18:8, 50:9, 50:13, 50:15, 51:18, 52:12, 52:16, 121:11, 122:23, 123:20, 129:18, 130:18, 130:23, 132:4, 132:6, 133:20, 146:20, 148:24, 155:9, 159:25, 163:2, 164:18, 164:25, 165:24, 166:13, 175:25, 192:13, 205:15, 205:25, 206:7, 207:7, 211:5, 211:18, 211:19, 215:6, 216:2, 227:14, 228:23, 229:4, 229:20, 230:9, 235:14, 241:8, 243:24, 244:11, 244:15, 245:1, 245:13, 246:1, 249:21, 250:10, 251:7, 251:18, 251:24, 252:5, 252:10, 252:18, 253:7, 253:11
**2016** [37] - 27:17, 27:18, 28:20, 31:10, 32:15, 32:19, 146:20, 160:1, 160:24, 161:2, 161:4, 163:2, 163:5, 174:3, 201:4, 203:20, 204:9, 205:2, 216:10, 217:14, 227:14, 228:23, 229:14, 229:18, 229:23, 230:9, 230:13, 232:24, 241:8, 241:10, 241:14, 241:16, 241:19, 242:1, 242:2, 242:13, 242:20
**2016-2017** [1] - 27:24

**2017** [41] - 32:20, 33:11, 33:24, 35:12, 38:22, 39:15, 39:21, 51:6, 113:3, 164:21, 165:1, 165:24, 171:4, 172:21, 195:12, 195:19, 195:20, 195:21, 195:24, 196:2, 196:9, 196:16, 197:17, 211:22, 212:3, 212:4, 213:21, 216:7, 216:10, 217:23, 217:24, 218:2, 218:22, 221:3, 232:13, 234:3, 234:10, 235:16, 261:1, 261:24
**2018** [4] - 63:4, 65:1, 79:11, 101:12
**2019** [1] - 46:11
**202** [2] - 2:4, 2:16
**2020** [3] - 23:9, 99:14, 213:8
**2021** [4] - 1:19, 7:4, 268:9, 268:15
**204** [1] - 189:12
**209** [1] - 99:24
**20th** [1] - 87:2
**21** [5] - 1:19, 7:4, 101:5, 268:9, 268:15
**22** [5] - 187:16, 237:22, 239:11, 246:14, 262:24
**2216** [1] - 3:7
**22nd** [1] - 190:22
**236** [1] - 160:2
**24th** [1] - 205:25
**25** [4] - 5:5, 13:6, 214:12, 233:2
**25%** [2] - 185:22, 193:16
**25.64** [1] - 264:20
**250** [7] - 17:22, 18:5, 49:23, 50:13, 50:18, 52:11, 54:13
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26** [5] - 8:2, 201:6, 202:5, 202:25, 205:1
**260** [1] - 89:17
**27th** [1] - 249:21
**28** [5] - 3:15, 4:3, 4:9, 65:1, 65:4
**28.21** [1] - 264:16
**280** [1] - 54:13

**28th** [5] - 33:11, 33:24, 35:12, 38:22, 39:21
**290** [1] - 213:17
**2900** [1] - 224:8
**29464** [3] - 3:15, 4:4, 4:9
**295** [3] - 260:18, 260:19, 260:25
**296** [5] - 219:12, 260:18, 260:19, 262:7
**2:00** [1] - 130:8

### 3

**3** [5] - 51:9, 51:10, 172:21, 172:24, 212:25
**3,000** [1] - 49:23
**3,309** [1] - 128:14
**3.7** [2] - 79:21, 80:20
**30** [9] - 17:11, 18:7, 35:2, 60:16, 79:9, 91:16, 92:7, 135:3
**30%** [1] - 60:17
**300** [1] - 250:4
**30s** [3] - 91:20, 92:16, 92:22
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**321.7** [1] - 253:4
**32502** [1] - 2:14
**35** [1] - 176:19
**35-year-old** [1] - 154:9
**36** [1] - 24:21
**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 268:8
**3:17-cv-01665** [2] - 1:11, 268:8
**3rd** [1] - 213:8

### 4

**4** [2] - 159:11, 219:15
**40** [1] - 54:15
**40-bed** [1] - 13:25
**401** [3] - 2:10, 4:6, 7:20
**403** [1] - 7:21
**405** [1] - 2:7
**41** [1] - 128:21
**41220** [1] - 248:8
**41234** [1] - 160:2
**41240** [5] - 243:18, 243:22, 244:2, 244:5, 264:6
**41244** [1] - 232:17
**41246** [1] - 241:20
**41532** [3] - 190:14,

191:3, 191:7
**41715** [3] - 50:24, 58:19, 58:20
**42** [1] - 128:21
**42116** [1] - 82:10
**44** [2] - 128:21, 128:22
**44586** [1] - 234:7
**473** [3] - 38:7, 38:8, 38:15
**49** [1] - 59:22
**4:59** [1] - 267:20

### 5

**5** [5] - 161:7, 161:9, 161:11, 161:12
**50** [4] - 18:4, 65:5, 92:8, 216:21
**50-plus** [1] - 52:2
**501(c)(3** [1] - 55:17
**530** [2] - 131:10, 133:13
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**5th** [3] - 28:20, 29:5, 31:10

### 6

**6** [4] - 166:20, 213:1, 220:23, 262:9
**6.3** [1] - 246:1
**60** [2] - 18:4, 50:11
**600** [1] - 2:13
**604** [2] - 54:8, 157:8
**60A** [1] - 207:5
**63** [1] - 83:11
**65** [2] - 131:11, 133:14
**699** [1] - 128:17
**6th** [1] - 3:5

### 7

**7** [3] - 213:1, 220:23, 240:2
**70%** [1] - 57:9
**70-year-olds** [1] - 154:7
**700** [1] - 131:10
**70130** [1] - 3:8
**707** [1] - 4:18
**71** [1] - 92:14
**716** [1] - 3:12
**725** [2] - 4:13, 4:15
**7:00** [1] - 126:14

### 8

**80** [1] - 50:12, 265:22

**801** [1] - 3:10
**803.8** [1] - 167:16
**83** [1] - 60:23
**85%** [6] - 40:11, 40:12, 44:21, 45:3, 47:24, 47:25
**850** [2] - 5:12, 165:1
**87,000** [1] - 183:18
**8:87** [2] - 159:12, 167:24
**8:88** [1] - 159:12
**8:89** [1] - 159:12

### 9

**90** [2] - 20:16, 75:22
**901** [1] - 4:18
**90s** [2] - 184:7, 184:10
**911** [11] - 146:2, 148:20, 149:22, 152:3, 161:25, 224:3, 224:8, 225:8, 225:10, 259:11
**91436** [1] - 3:18
**944** [1] - 163:5
**95** [3] - 76:8, 229:8
**97** [2] - 76:8, 256:6
**976** [4] - 38:7, 38:8, 38:15, 59:1
**9:00** [1] - 7:4
**9:44** [1] - 36:15
**9th** [3] - 2:10, 23:9, 84:10

### A

**A-Plus** [7] - 253:24, 254:22, 255:2, 255:7, 256:4, 256:8, 256:11
**a.m** [4] - 7:5, 36:15, 62:4, 130:12
**ABDC** [2] - 256:18, 256:20
**ability** [2] - 177:17, 214:23
**able** [10] - 14:10, 14:23, 15:15, 17:25, 18:20, 30:14, 82:4, 82:7, 153:24, 223:11
**absolutely** [16] - 132:16, 138:15, 144:10, 144:21, 144:24, 145:24, 146:18, 155:24, 174:19, 177:23, 178:12, 178:19, 221:7, 241:18, 247:14, 266:11
**Absolutely** [10] -

69:25, 76:16, 109:11, 109:17, 109:21, 118:10, 119:9, 130:3, 258:12, 260:16
**Abstinence** [29] - 11:13, 11:14, 11:15, 12:20, 13:2, 14:10, 14:23, 15:2, 15:12, 16:16, 16:22, 16:25, 17:2, 17:4, 17:18, 18:1, 18:5, 18:18, 20:11, 21:18, 42:3, 45:4, 46:23, 49:24, 50:10, 50:11, 50:19, 53:4, 58:12
**abstract** [1] - 46:20
**abundance** [1] - 156:18
**abuse** [6] - 12:19, 13:9, 32:22, 36:3, 45:20, 247:9
**abused** [1] - 91:20
**abuses** [1] - 40:9
**Academic** [2] - 54:2, 54:9
**accept** [1] - 63:17
**access** [2] - 80:12, 80:13
**accident** [1] - 224:19
**Accidental** [1] - 244:10
**accidental** [3] - 263:25, 264:13, 264:18
**According** [2] - 91:4, 217:10
**according** [7] - 70:15, 88:3, 156:13, 188:11, 217:6, 228:13, 242:12
**account** [1] - 76:4
**accuracy** [1] - 35:18
**accurate** [5] - 49:8, 164:23, 250:10, 255:11, 255:13
**accurately** [1] - 47:1
**ACF** [1] - 184:9
**ACKERMAN** [9] - 2:9, 26:5, 26:7, 33:25, 34:2, 126:1, 159:4, 159:9, 169:5
**Ackerman** [1] - 36:21
**acronyms** [1] - 115:6
**ACs** [1] - 66:1
**Action** [4] - 1:4, 1:10, 268:7, 268:8
**actions** [1] - 168:4
**activists** [1] - 171:12
**activities** [7] - 156:11,

156:12, 156:16, 164:5, 167:17, 167:24, 168:4
**activity** [4] - 11:12, 201:2, 247:11, 266:13
**actual** [7] - 12:1, 149:18, 164:22, 169:12, 199:8, 203:8, 259:19
**acute** [2] - 18:23, 19:8
**ad** [1] - 152:24
**add** [4] - 17:21, 224:13, 226:9, 226:19
**added** [1] - 152:22
**addict** [1] - 207:14
**addicted** [10] - 13:6, 20:13, 30:12, 39:19, 59:11, 59:13, 142:11, 142:12, 238:18
**Addiction** [1] - 175:7
**addiction** [12] - 17:9, 20:10, 20:17, 30:15, 131:14, 133:18, 136:16, 138:1, 142:23, 172:14, 175:17, 211:12
**addictive** [3] - 40:9, 40:16, 43:8
**addicts** [3] - 171:12, 211:11
**adding** [2] - 67:6, 258:24
**addition** [5] - 12:20, 13:1, 14:8, 15:5, 17:21
**additional** [7] - 17:24, 52:5, 67:9, 83:1, 152:22, 210:7, 263:24
**Additional** [1] - 244:9
**address** [23] - 8:8, 28:22, 28:23, 38:25, 114:6, 136:18, 139:16, 141:1, 144:15, 147:13, 151:17, 152:13, 154:8, 161:21, 164:12, 164:14, 169:21, 172:14, 174:18, 176:10, 176:16, 199:9, 214:23
**addressed** [1] - 207:3
**addresses** [1] - 224:8
**addressing** [3] - 36:3, 175:22, 178:20
**ADHD** [1] - 91:13

**Adjunct** [1] - 113:20
**adjusting** [1] - 103:13
**admin** [1] - 115:16
**administration** [2] - 115:15, 156:17
**administrative** [1] - 10:8
**administrators** [1] - 171:11
**admissibility** [1] - 159:7
**admissible** [2] - 34:6, 174:10
**admission** [7] - 36:24, 37:1, 70:9, 70:12, 82:22, 83:3, 123:10
**admit** [20] - 32:9, 32:18, 32:24, 33:4, 37:2, 37:3, 37:17, 38:7, 82:19, 83:6, 127:2, 158:22, 160:4, 160:7, 163:12, 163:15, 165:24, 182:12, 242:6, 244:1
**admittance** [1] - 82:14
**ADMITTED** [4] - 38:8, 58:20, 182:16, 191:7
**admitted** [23] - 32:16, 38:7, 38:15, 49:1, 58:16, 58:19, 70:13, 123:12, 123:21, 167:9, 168:16, 170:25, 173:7, 182:15, 191:6, 205:20, 237:17, 242:10, 244:5, 257:8
**adolescence** [1] - 19:15
**adult** [1] - 16:8
**adulthood** [1] - 19:16
**adults** [2] - 13:6, 20:10
**adverse** [1] - 63:21
**advertising** [1] - 102:12
**Advisor** [1] - 10:10
**advocated** [1] - 215:10
**Affairs** [3] - 10:9, 71:13, 72:9
**affairs** [1] - 115:2
**affect** [5] - 85:24, 95:11, 106:8, 106:12, 106:15
**affecting** [2] - 139:22, 263:17
**affects** [2] - 134:2, 137:11
**affiliated** [4] - 53:19,

54:6, 55:12, 55:20
**affiliation** [1] - 54:2
**affordable** [1] - 142:17
**afternoon** [5] - 13:4, 112:4, 179:2, 179:3, 236:11
**afterwards** [1] - 254:8
**age** [6] - 18:11, 19:4, 19:12, 153:24, 161:21, 162:14
**agencies** [6] - 122:21, 144:9, 144:19, 144:25, 149:22, 150:5
**Agency** [1] - 124:4
**agents** [1] - 46:6
**ages** [1] - 154:6
**ago** [9] - 40:6, 45:20, 93:7, 126:6, 220:17, 241:7, 256:2, 256:3, 263:2
**agree** [19] - 22:19, 24:23, 26:10, 27:9, 30:11, 30:16, 31:21, 42:12, 47:20, 56:14, 158:17, 186:5, 187:4, 187:9, 207:10, 209:3, 215:17, 215:24, 261:8
**agreed** [1] - 82:13
**Agreed** [1] - 257:18
**Agyrekum** [1] - 254:13
**Agyrekums** [1] - 254:14
**ahead** [29] - 8:12, 9:7, 12:24, 21:2, 21:24, 24:16, 24:17, 47:12, 62:15, 64:7, 111:23, 126:11, 127:3, 133:1, 133:2, 143:11, 159:1, 159:17, 168:17, 173:12, 189:25, 198:11, 201:14, 205:22, 220:9, 233:15, 251:3
**air** [5] - 114:6, 116:1, 179:19, 180:19, 266:22
**Akron** [2] - 202:7, 203:3
**al** [4] - 1:7, 1:13, 268:6, 268:7
**alcohol** [2] - 133:11, 133:15
**alcohol-related** [1] - 133:15
**all-encompassing** [1] - 172:19

allegations [1] - 37:24
alleged [1] - 229:6
allegedly [2] - 231:25, 254:14
Allen [1] - 38:25
Allen.R.Mock@wv.
gov [1] - 39:1
allow [5] - 34:4, 64:9, 150:9, 169:18, 207:24
allowed [6] - 103:8, 146:24, 151:16, 151:17, 170:3, 181:9
allows [1] - 151:11
alma [1] - 15:20
almost [4] - 46:10, 17:3, 50:7, 128:21
alternatively [1] - 7:20
Altizer [2] - 147:17, 153:19
AMERISOURCEBER
GEN [2] - 1:7, 1:13
AmerisourceBergen
[11] - 6:2, 22:6, 22:10, 60:24, 195:4, 205:7, 219:5, 232:10, 235:24, 256:20, 268:6
amount [8] - 22:19, 24:23, 25:14, 67:11, 210:15, 218:6, 218:10, 263:17
amounts [1] - 180:8
amplified [1] - 25:20
analog [1] - 42:21
analysis [8] - 113:16, 119:10, 149:6, 149:14, 149:15, 162:24, 200:20, 221:18
analyst [5] - 118:18, 119:18, 129:20, 179:11, 197:14
Analyst [5] - 112:25, 118:3, 122:15, 132:8
analytics [3] - 114:10, 122:3, 138:11
analyze [3] - 94:2, 118:7, 138:16
analyzed [1] - 49:5
analyzing [2] - 129:8, 135:6
ANDREW [1] - 5:10
Angela [1] - 107:23
Angie [2] - 108:1, 108:3
Anna [3] - 73:16, 73:18
Anna-Soisson [3] - 73:16, 73:18

ANNE [1] - 4:2
ANNIE [1] - 3:14
Annual [2] - 130:18, 175:25
annual [33] - 57:3, 119:20, 119:22, 120:5, 120:6, 120:8, 120:12, 121:7, 121:10, 121:12, 122:23, 123:16, 124:1, 124:9, 124:15, 124:18, 124:21, 124:23, 127:13, 127:23, 128:6, 128:24, 129:19, 130:17, 130:20, 134:6, 198:3, 237:16, 248:7, 251:18, 260:4, 262:19, 262:23
annually [2] - 50:18, 52:12
answer [20] - 20:8, 20:24, 21:1, 25:3, 25:20, 26:9, 61:4, 91:2, 93:3, 97:8, 132:17, 143:7, 143:10, 153:15, 173:11, 188:6, 202:1, 220:11, 220:15, 261:5
answered [6] - 73:7, 99:2, 99:3, 99:6, 100:4, 264:24
answering [2] - 188:24, 195:17
answers [1] - 33:4
ANTHONY [1] - 2:6
Anthony [1] - 202:10
anthony [1] - 202:14
anti [8] - 66:12, 66:16, 70:23, 70:25, 71:2, 108:24, 109:16, 109:19
Anti [6] - 95:7, 102:23, 103:5, 105:2, 105:5, 105:9
anti-diversion [8] - 66:12, 66:16, 70:23, 70:25, 71:2, 108:24, 109:16, 109:19
Anti-Diversion [6] - 95:7, 102:23, 103:5, 105:2, 105:5, 105:9
anticipate [2] - 160:4, 170:3
anticipated [1] - 44:18
antidepressants [2] - 44:15, 44:16

apologies [1] - 237:17
apologize [9] - 58:24, 115:8, 115:14, 179:6, 208:12, 219:10, 235:8, 235:10, 265:7
Appalachian [1] - 31:24
apparent [1] - 187:2
appear [4] - 70:4, 83:21, 83:23, 155:6
APPEARANCES [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
appeared [1] - 217:14
applicable [1] - 26:19
appreciate [6] - 26:21, 30:17, 61:16, 61:23, 190:1, 267:14
appreciation [2] - 137:8, 137:16
approach [19] - 19:4, 28:15, 29:17, 33:7, 38:14, 40:22, 46:9, 51:1, 58:21, 68:20, 69:1, 82:15, 121:3, 154:14, 160:17, 165:6, 241:21, 243:19, 249:8
appropriate [4] - 18:1, 39:7, 39:8, 207:25
approved [1] - 35:9
approximate [4] - 223:11, 259:17, 259:19, 259:22
approximation [1] - 222:10
April [2] - 96:15, 196:9
Arch [2] - 6:6, 6:13
area [53] - 53:22, 65:8, 79:17, 91:14, 91:15, 101:23, 112:8, 114:10, 116:1, 116:2, 116:8, 117:2, 117:4, 117:10, 125:24, 140:10, 146:17, 147:10, 147:12, 173:24, 175:21, 179:17, 179:18, 179:23, 180:19, 180:20, 180:23, 180:24, 181:2, 193:3, 193:12, 193:15, 194:9, 207:5, 207:14, 214:7, 214:11, 226:1, 233:21, 234:1, 241:11, 252:8, 253:13, 265:23,

265:25, 266:1, 266:3, 266:15, 267:2, 267:5

**area's** [1] - 183:20

**areas** [9] - 11:10, 16:7, 64:19, 77:11, 125:20, 145:6, 152:18, 174:5, 266:13

**arise** [1] - 45:6

**arises** [1] - 43:8

**arrest** [3] - 133:10, 134:2, 146:21

**arrested** [1] - 199:9

**arrests** [4] - 125:5, 131:11, 133:14, 252:12

**article** [21] - 29:25, 30:4, 30:6, 30:8, 30:18, 32:10, 33:16, 33:19, 34:17, 34:19, 35:7, 39:13, 46:12, 51:5, 58:1, 58:11, 59:2, 59:3, 59:6, 59:19, 59:20

**Article** [1] - 207:5

**ASHLEY** [1] - 5:3

**Asian** [1] - 154:6

**aside** [4] - 32:2, 32:6, 97:7, 217:23

**aspect** [2] - 217:8, 240:20

**aspects** [2] - 166:24, 166:25

**asserted** [2] - 38:17, 47:6

**assessing** [1] - 120:9

**assessment** [1] - 182:7

**assigned** [2] - 64:18, 113:1

**assist** [2] - 158:17, 177:5

**assisted** [2] - 13:3, 13:4

**Associate** [1] - 10:9

**associate** [1] - 213:18

**associated** [6] - 31:23, 43:12, 45:2, 62:24, 264:12, 265:5

**assuming** [2] - 72:13, 85:10

**Assurance** [1] - 84:4

**AT** [1] - 1:2

**ATF** [3] - 116:25, 145:4, 157:11

**attached** [2] - 191:15, 192:21

**attachment** [3] - 191:20, 191:24,

192:19

**attempt** [2] - 8:14, 8:15

**attempted** [1] - 24:8

**attend** [5] - 81:23, 81:24, 82:7, 88:8, 130:2

**attention** [16] - 28:18, 51:9, 51:19, 182:22, 190:17, 197:14, 216:11, 237:22, 240:3, 248:17, 250:2, 252:4, 253:21, 254:11, 255:3, 263:4

**Attorney's** [2] - 114:1, 124:3

**attributable** [1] - 96:9

**August** [6] - 87:2, 93:24, 205:24, 206:8, 241:14

**author** [1] - 51:6

**authorities** [1] - 141:3

**authority** [1] - 105:20

**authorized** [2] - 157:4, 158:5

**automatic** [1] - 102:12

**available** [2] - 15:8, 210:7

**Avenue** [2] - 187:17, 224:9

**avenues** [1] - 210:7

**average** [6] - 17:11, 18:7, 44:23, 89:17, 96:18, 161:14

**averages** [1] - 154:6

**Avin** [1] - 3:7

**award** [3] - 114:1, 124:3, 124:6

**awarded** [1] - 176:20

**awards** [1] - 121:25

**aware** [37] - 20:12, 22:9, 50:5, 52:21, 55:6, 55:8, 55:9, 55:25, 56:3, 56:4, 56:9, 56:13, 57:13, 60:18, 60:22, 79:13, 79:19, 80:18, 94:22, 95:22, 96:20, 98:18, 98:20, 184:14, 185:25, 201:21, 205:4, 205:6, 205:9, 217:19, 217:20, 217:22, 235:1, 235:6, 250:21, 254:22, 256:11

**awareness** [1] - 178:16

**awhile** [1] - 40:6

**Ayme** [2] - 6:17, 268:2

---

**B**

**B.A** [1] - 113:14

**babies** [52] - 7:15, 14:3, 14:4, 14:6, 14:10, 14:15, 14:16, 14:17, 14:19, 14:23, 15:6, 15:7, 15:15, 16:1, 16:3, 16:9, 17:2, 17:7, 17:9, 17:12, 17:22, 18:2, 18:4, 18:6, 18:17, 19:6, 19:11, 21:12, 41:15, 44:22, 44:25, 46:5, 47:18, 47:22, 48:24, 49:13, 49:16, 49:24, 50:6, 50:11, 50:15, 50:18, 51:11, 52:2, 52:3, 52:11, 52:25, 53:3, 53:4, 53:7

**baby** [7] - 7:12, 17:16, 17:17, 40:17, 46:2, 48:9, 48:14

**Bachelor's** [1] - 221:22

**backed** [1] - 59:24

**background** [7] - 10:16, 10:17, 113:13, 191:15, 194:1, 194:15, 233:17

**backwards** [1] - 243:1

**bad** [3] - 188:9, 202:6, 203:1

**balance** [1] - 242:20

**barbiturates** [2] - 43:18, 43:20

**Barde** [1] - 87:5

**Baron** [1] - 3:17

**base** [3] - 66:21, 184:17, 184:25

**Based** [1] - 92:24

**based** [24] - 37:4, 37:15, 92:21, 96:19, 97:14, 98:7, 103:21, 106:4, 128:12, 133:12, 135:5, 135:9, 174:11, 178:8, 192:1, 198:17, 208:7, 215:20, 244:24, 250:6, 253:12, 254:12, 256:2, 260:11

**baseline** [1] - 34:25

**Basis** [1] - 34:1

**basis** [9] - 34:4, 47:7, 96:23, 152:24, 156:5, 166:19,

172:15, 222:22, 229:16

**bat** [1] - 123:25

**batch** [5] - 202:6, 203:1, 203:4, 203:5, 203:6

**Bates** [2] - 182:21, 214:1

**Baylen** [1] - 2:13

**Bear** [1] - 257:25

**bearing** [1] - 59:8

**bears** [4] - 29:25, 57:11, 190:21, 249:16

**beat** [1] - 114:24

**became** [9] - 14:11, 119:15, 122:17, 142:17, 144:5, 193:3, 193:15, 233:22, 241:8

**become** [7] - 30:12, 39:19, 59:13, 134:10, 200:5, 204:5, 216:7

**becoming** [2] - 59:10, 233:6

**beds** [2] - 15:3, 15:4

**been"** [1] - 192:24

**BEFORE** [1] - 1:17

**beforehand** [2] - 126:13, 138:8

**began** [5] - 146:18, 179:10, 183:21, 204:16, 252:6

**begin** [1] - 137:25

**beginning** [10] - 31:1, 51:17, 66:10, 70:22, 142:3, 148:23, 179:8, 182:2, 182:4, 263:4

**begins** [12] - 183:7, 183:14, 185:5, 192:24, 193:13, 208:22, 209:12, 209:15, 210:3, 214:19, 216:16, 227:1

**behalf** [4] - 62:19, 63:18, 202:11, 202:14

**behavior** [1] - 156:19

**behavioral** [2] - 19:3, 19:13

**Behind** [1] - 133:17

**behind** [5] - 30:19, 78:7, 120:7, 131:12, 201:21

**belabor** [2] - 158:22, 169:1

**below** [3] - 114:21,

171:5, 184:23

**bench** [2] - 7:23, 158:25

**BENCH** [1] - 1:16

**beneath** [1] - 215:4

**benzo** [1] - 231:7

**Benzodiazepines** [1] - 44:2

**best** [7] - 61:17, 140:10, 146:7, 164:23, 178:20, 222:12, 223:15

**better** [2] - 48:12, 134:15

**between** [21] - 13:6, 42:17, 49:22, 50:5, 51:15, 54:3, 75:6, 75:11, 77:6, 85:3, 103:4, 105:5, 105:9, 128:8, 163:2, 171:10, 189:2, 192:2, 221:8, 232:24, 244:14

**beyond** [4] - 20:5, 32:16, 61:2, 157:12

**Big** [2] - 29:9, 30:4

**big** [6] - 30:11, 30:20, 31:11, 54:15, 113:25, 136:19

**biggest** [2] - 77:19, 77:21

**billed** [1] - 57:10

**birth** [3] - 40:17, 156:17, 168:5

**bit** [26] - 10:23, 49:9, 64:3, 87:4, 100:25, 101:20, 102:23, 106:1, 107:6, 113:8, 132:19, 136:12, 137:18, 138:5, 145:20, 176:5, 192:14, 195:9, 197:12, 213:21, 214:18, 224:2, 238:16, 245:16, 257:24

**black** [1] - 114:24

**Black** [1] - 154:5

**blacked** [1] - 154:25

**blank** [1] - 169:14

**blinders** [1] - 137:13

**block** [17] - 28:25, 29:3, 116:2, 128:2, 128:12, 128:13, 147:11, 147:12, 179:18, 180:22, 266:1

**blood** [1] - 133:11

**Bloomberg** [1] - 176:12

blue [1] - 258:22
Blvd [3] - 3:15, 4:3, 4:9
board [7] - 9:18, 9:20, 9:21, 9:22, 41:7, 41:9, 41:14
Board [7] - 9:21, 11:23, 26:22, 26:24, 41:4, 54:22, 109:6
body [1] - 228:14
Bonasso [1] - 5:14
bonus [1] - 68:10
bonuses [1] - 66:21
book [1] - 159:14
born [9] - 14:2, 15:16, 17:2, 17:7, 17:13, 20:17, 52:25, 240:12, 240:18
Boston [4] - 10:22, 11:5, 11:7, 15:19
Bottle [1] - 184:7
bottom [22] - 29:13, 38:21, 44:12, 83:12, 84:3, 92:14, 100:1, 125:12, 128:2, 155:16, 161:7, 169:14, 182:20, 183:1, 183:6, 206:21, 209:10, 216:15, 232:20, 246:17, 253:22, 260:25
bought [1] - 102:20
Boulevard [1] - 3:18
bound [1] - 122:20
Box [2] - 5:14, 6:8
box [4] - 96:5, 136:4, 236:17, 236:20
brand [1] - 68:10
break [6] - 36:8, 36:14, 117:25, 130:16, 201:11, 203:18
break-ins [1] - 117:25
breakdown [1] - 68:15
breaks [1] - 55:24
Bridgeside [3] - 3:15, 4:3, 4:9
brief [5] - 100:24, 114:17, 174:20, 236:12, 257:15
briefly [9] - 10:16, 11:10, 13:20, 65:22, 110:6, 113:12, 116:16, 148:16, 161:16
bring [10] - 99:20, 99:23, 157:16, 157:25, 178:16, 181:15, 205:17,

213:25, 226:3, 262:9
bringing [3] - 212:2, 247:22, 266:10
brings [1] - 207:13
broader [1] - 53:25
broke [1] - 161:13
brought [11] - 67:11, 115:23, 116:6, 176:15, 179:14, 202:7, 203:3, 224:11, 247:25, 249:3, 254:11
Budd [1] - 3:17
budget [13] - 115:17, 116:18, 116:19, 185:23, 186:6, 186:21, 187:1, 193:16, 193:22, 196:25, 197:9, 214:13, 233:1
budgets [1] - 197:11
build [2] - 139:7, 140:8
bulk [1] - 91:12
bumpers [3] - 184:1, 184:4, 184:5
burden [1] - 57:11
bureau [11] - 114:22, 114:23, 114:25, 115:9, 115:15, 115:16, 120:1, 121:22, 124:10, 260:9, 260:10
Bureau [4] - 135:15, 239:18, 263:1, 263:16
bureaus [1] - 119:6
Burling [1] - 5:11
Burner [2] - 31:20, 31:23
burnout [3] - 176:7, 176:15, 176:23
business [20] - 64:15, 65:24, 67:7, 67:11, 75:22, 76:2, 76:8, 76:21, 77:1, 77:25, 85:2, 86:23, 87:25, 95:12, 101:15, 107:16, 122:12, 165:14, 166:5, 254:12
busy [2] - 14:24, 152:7
buy [2] - 103:14, 106:24
buying [1] - 81:7
BY [91] - 9:9, 13:7, 21:3, 22:3, 24:18, 25:24, 26:11, 28:17, 29:20, 33:9, 34:8, 38:9, 38:18, 40:1,

40:24, 47:13, 51:4, 57:24, 58:23, 62:18, 64:12, 68:22, 69:4, 70:14, 80:3, 82:16, 83:10, 86:16, 90:9, 94:18, 95:5, 95:25, 97:13, 98:6, 99:9, 99:25, 100:20, 101:21, 110:9, 112:3, 121:5, 123:22, 127:5, 130:15, 131:25, 141:22, 150:12, 153:8, 155:2, 159:19, 160:19, 163:17, 165:8, 168:20, 171:3, 172:1, 173:1, 173:13, 174:14, 179:1, 181:17, 182:17, 183:5, 186:20, 187:13, 188:10, 191:8, 197:7, 201:16, 202:4, 202:24, 203:17, 205:23, 213:19, 214:2, 220:10, 223:4, 226:22, 232:18, 233:19, 234:8, 236:10, 241:23, 242:11, 243:21, 244:7, 249:10, 251:5, 257:23, 262:6, 264:7

## C

CA [1] - 3:18
Cabell [55] - 3:2, 10:3, 10:6, 11:23, 12:6, 12:19, 13:10, 16:17, 18:17, 20:13, 20:16, 26:22, 28:10, 32:22, 37:21, 44:19, 45:17, 45:25, 47:16, 49:13, 49:16, 50:7, 50:16, 51:11, 51:14, 52:22, 53:16, 53:19, 53:23, 53:24, 54:5, 54:18, 54:19, 54:20, 54:21, 54:25, 55:3, 55:9, 55:21, 56:5, 56:22, 57:4, 57:13, 58:13, 60:19, 60:25, 110:19, 144:1, 151:21, 155:7, 197:20, 202:11, 202:14, 210:13, 254:23
CABELL [1] - 1:10

cabell [1] - 2:2
Cabell-Huntington [5] - 10:3, 10:6, 11:23, 26:22, 144:1
Cabell/Huntington [3] - 26:16, 77:10, 101:23
cabinets [1] - 236:22
CAH [1] - 92:24
CAH-WV-770 [1] - 86:15
calculate [2] - 200:9, 200:24
California [2] - 10:20, 11:1
CALLAS [1] - 6:7
campaign [1] - 30:19
Campbell [2] - 87:22, 87:23
CAMPBELL [1] - 6:14
canine [1] - 127:25
Canine [1] - 128:3
cannot [1] - 30:12
cap [5] - 210:12, 210:15, 218:3, 218:6, 218:10
capacity [14] - 14:22, 18:16, 129:20, 139:6, 141:25, 144:19, 145:8, 147:23, 147:24, 150:25, 158:6, 163:21, 164:17, 165:16
Capitol [1] - 2:7
capture [1] - 153:24
car [6] - 117:25, 152:2, 184:1, 184:4, 184:5, 224:19
Cardinal [54] - 4:11, 5:2, 22:10, 60:24, 63:1, 63:3, 63:12, 64:13, 64:25, 65:14, 65:23, 65:24, 66:10, 66:20, 69:21, 69:24, 70:22, 73:21, 75:7, 75:20, 77:22, 79:8, 79:10, 79:14, 87:25, 92:25, 100:22, 101:16, 102:3, 102:6, 102:7, 102:15, 102:23, 103:4, 103:9, 103:14, 104:16, 104:17, 104:24, 105:6, 105:8, 108:11, 108:14, 108:17, 109:10, 109:12, 109:18, 110:19, 194:25,

205:2, 219:1, 232:4, 235:22, 256:23
Cardinal's [2] - 63:17, 65:18
care [8] - 14:1, 14:23, 15:25, 18:1, 26:4, 26:14, 27:7, 27:9
Care [9] - 10:7, 14:1, 14:25, 53:8, 254:22, 255:7, 256:4, 256:8, 256:11
career [4] - 12:9, 129:14, 179:9, 179:10
careful [1] - 108:4
Carey [1] - 4:17
carfentanil [8] - 202:6, 203:2, 216:23, 217:4, 217:17, 217:18, 218:14, 230:18
Carfentanil [1] - 217:1
Carolina [2] - 114:5, 116:6
carried [1] - 157:19
carry [1] - 122:7
cars [1] - 184:9
cartel [1] - 243:6
cartels [2] - 242:23, 243:4
case [33] - 7:17, 7:18, 23:6, 23:18, 79:25, 132:21, 156:19, 156:25, 157:6, 157:7, 158:23, 160:8, 168:6, 171:19, 175:5, 177:9, 184:12, 185:24, 200:12, 200:18, 200:24, 206:15, 206:16, 213:8, 217:16, 217:17, 217:22, 217:24, 217:25, 223:24, 234:21, 254:10, 255:13
cases [4] - 42:9, 44:19, 45:25, 159:6
categories [3] - 66:1, 68:15, 121:15
category [3] - 129:3, 228:24, 230:8
causation [1] - 187:14
caused [4] - 182:7, 185:23, 199:25, 205:1
causes [2] - 206:4, 206:11
cautious [1] - 159:4
CDC [1] - 59:16

**Center** [5] - 3:12, 5:11, 54:2, 54:9, 56:22
**center** [1] - 13:4
**central** [1] - 16:9
**CEO** [1] - 54:22
**certain** [12] - 64:18, 66:9, 125:6, 127:21, 128:10, 148:10, 148:11, 162:3, 162:20, 166:24, 209:22
**certainly** [5] - 30:13, 110:25, 123:6, 126:22, 158:19
**certificate** [1] - 228:18
**certificates** [2] - 156:18, 168:6
**CERTIFICATION** [1] - 268:1
**certifications** [2] - 9:18, 9:20
**Certified** [1] - 9:21
**certified** [1] - 9:22
**certify** [1] - 268:4
**cetera** [2] - 168:13, 168:14
**chain** [10] - 32:11, 37:25, 38:23, 77:24, 78:2, 78:5, 80:5, 80:8, 102:2, 102:3
**chains** [1] - 204:15
**Chairman** [1] - 12:4
**Challenge** [1] - 176:12
**Chambers** [2] - 201:22, 201:23
**chance** [2] - 158:23, 160:8
**Chance** [2] - 177:8, 177:11
**change** [13] - 26:4, 26:16, 50:2, 50:9, 76:18, 84:22, 85:24, 86:5, 105:17, 105:20, 129:9, 211:1, 221:9
**changed** [1] - 147:9
**changes** [1] - 210:25
**changing** [3] - 27:7, 207:22, 215:20
**characterization** [1] - 79:23
**charge** [3] - 14:6, 91:6, 91:11
**charged** [2] - 56:11, 73:1
**charges** [3] - 56:9, 56:10, 57:12
**CHARLES** [1] - 3:11
**Charleston** [2] - 2:8, 3:13, 4:19, 5:15, 6:9,

7:4, 187:17, 253:25
**CHARLESTON** [2] - 1:2, 1:18
**chart** [8] - 51:10, 239:11, 239:14, 242:12, 244:8, 245:8, 255:17, 255:23
**charts** [1] - 121:22
**Chase** [1] - 4:18
**cheaper** [2] - 204:1, 211:13
**Cheaper** [1] - 204:3
**check** [8] - 117:9, 117:21, 119:3, 223:19, 225:6, 226:16, 242:2, 256:6
**checking** [2] - 117:22, 224:18
**Chesterbrook** [1] - 6:15
**Chief** [19] - 26:25, 27:18, 29:1, 39:1, 114:20, 130:21, 130:23, 130:25, 131:4, 131:18, 133:7, 136:12, 144:6, 189:25, 190:3, 190:6, 190:9, 190:10, 196:11
**chief** [3] - 20:15, 190:4, 200:5
**Chief's** [1] - 114:21
**child** [1] - 40:9
**children** [5] - 13:14, 18:14, 19:15, 19:19, 44:25
**Children's** [5] - 10:22, 11:7, 15:20, 53:13, 53:22
**chilling** [1] - 131:12
**Chlordiazepoxide** [1] - 43:22
**chronic** [1] - 59:3
**church** [1] - 138:24
**Ciccarelli** [3] - 130:25, 131:6, 131:18
**circle** [2] - 145:7, 236:14
**Circuit** [4] - 54:8, 157:7, 157:8, 157:12
**circulate** [1] - 59:6
**circulated** [3] - 35:7, 59:2, 59:9
**circumstances** [2] - 67:23, 74:8
**cite** [1] - 159:11
**cited** [1] - 47:25
**cities** [7] - 166:15, 176:13, 186:4,

187:3, 248:23, 249:2, 266:5
**citizens** [1] - 156:19
**city** [33] - 112:16, 115:25, 118:20, 129:4, 153:21, 168:13, 173:15, 179:15, 180:17, 180:18, 184:17, 184:25, 185:18, 185:19, 187:16, 187:20, 188:1, 189:22, 200:5, 204:15, 206:17, 212:14, 218:3, 227:19, 227:21, 227:25, 237:11, 242:18, 250:3, 250:13, 259:25, 260:13, 263:17
**City** [60] - 4:1, 5:11, 37:6, 37:11, 37:12, 37:14, 37:21, 54:19, 55:6, 55:20, 55:23, 56:1, 57:16, 112:10, 112:12, 112:20, 112:23, 113:4, 118:14, 118:17, 122:21, 129:22, 138:22, 151:3, 151:6, 152:11, 152:20, 153:11, 153:17, 155:7, 167:3, 178:10, 179:9, 179:11, 179:15, 179:22, 180:15, 181:4, 181:10, 183:7, 183:14, 183:17, 185:23, 187:18, 196:24, 197:8, 197:15, 197:23, 200:11, 206:15, 238:2, 238:10, 240:4, 240:15, 242:24, 249:3, 265:18, 266:4, 266:8, 268:5
**CITY** [1] - 1:4
**city's** [5] - 182:8, 188:12, 189:19, 206:4, 206:11
**Civil** [3] - 1:4, 268:7, 268:8
**civil** [1] - 1:10
**civilian** [1] - 117:18
**claim** [1] - 167:4
**clarification** [3] - 54:5, 105:15, 108:23
**clarified** [1] - 34:17

**clarify** [2] - 40:7, 52:14
**clarity** [3] - 42:16, 160:10, 219:8
**class** [5] - 43:20, 44:2, 44:10, 113:21, 245:17
**classic** [2] - 16:11, 54:8
**classify** [2] - 231:8, 231:13
**clear** [3] - 19:14, 79:24, 89:3, 90:10, 131:23, 156:14, 156:25, 157:8, 161:1, 168:16, 169:6, 229:4, 259:18
**clearly** [2] - 37:23, 142:25
**clergymen** [1] - 171:12
**clerk** [3] - 8:25, 61:20, 111:16
**CLERK** [9] - 9:1, 9:3, 9:6, 36:18, 62:8, 62:10, 111:18, 111:20, 111:22
**client** [1] - 74:6
**clients** [1] - 71:6
**clinic** [3] - 17:19, 94:7, 94:8
**clinical** [4] - 10:5, 12:1, 12:8, 42:8
**Clinical** [1] - 10:9
**clinics** [4] - 19:2, 94:19, 94:22, 95:4
**close** [3] - 183:21, 184:13, 206:3
**closed** [8] - 66:1, 96:15, 96:18, 97:22, 101:25, 107:11, 184:1, 184:7
**closed-door** [2] - 66:1, 101:25
**closer** [1] - 86:3
**closing** [2] - 96:9, 107:5
**cluster** [4] - 201:3, 203:19, 241:13, 242:13
**co** [1] - 51:6
**co-author** [1] - 51:6
**cocaine** [13] - 180:3, 230:11, 230:13, 231:17, 243:10, 245:10, 245:11, 245:14, 245:17, 245:19, 266:22, 267:1
**Cochran** [3] - 6:17, 268:2, 268:11

**Code** [1] - 210:8
**code** [1] - 161:21
**collaborating** [1] - 119:5
**collaborations** [1] - 140:13
**collaborative** [1] - 212:24
**colleagues** [5] - 22:5, 31:12, 33:20, 46:16, 48:23
**collect** [6] - 88:20, 136:1, 145:22, 151:20, 152:10, 153:22
**collected** [1] - 150:3
**collecting** [2] - 148:21, 148:25
**collection** [2] - 140:17, 145:21
**collections** [1] - 57:12
**color** [4] - 86:18, 86:20, 152:16, 174:5
**Colorado** [1] - 228:16
**colors** [1] - 174:6
**Columbus** [8] - 186:4, 186:7, 186:10, 186:22, 198:20, 248:23, 249:1, 249:4
**column** [6] - 161:23, 161:24, 162:3, 229:17, 246:17, 264:8
**combat** [3] - 135:18, 177:21, 178:11
**combating** [1] - 263:16
**combination** [3] - 92:7, 166:12, 166:18
**combinations** [1] - 92:2
**comforters** [1] - 15:6
**coming** [7] - 116:14, 160:12, 224:13, 247:10, 247:13, 247:17, 247:18
**command** [1] - 118:15
**comment** [1] - 126:21
**commentary** [2] - 166:12, 166:13
**commentary-type** [1] - 166:13
**commenting** [2] - 34:15, 36:2
**Comments** [1] - 95:19
**COMMISSION** [1] - 1:10
**commission** [3] - 66:22, 66:23, 66:24
**Commission** [4] - 2:2,

3:2, 27:5, 37:15
**committed** [5] - 199:7, 199:9, 199:12, 215:14, 234:11
**common** [5] - 45:17, 135:10, 142:9, 162:15, 239:5
**communicated** [2] - 69:23, 108:25
**communicating** [4] - 27:25, 28:7, 72:10, 75:12
**communication** [4] - 77:6, 78:18, 84:21, 84:24
**communications** [4] - 32:19, 77:9, 78:22, 85:5
**communities** [3] - 95:8, 97:17, 166:15
**community** [45] - 8:7, 20:18, 32:20, 38:3, 40:8, 40:12, 58:13, 95:10, 95:17, 97:19, 119:14, 124:18, 125:14, 135:12, 135:19, 138:24, 139:7, 140:2, 140:14, 140:24, 141:24, 143:3, 147:1, 147:16, 151:7, 154:11, 158:16, 164:2, 171:12, 172:5, 172:18, 173:25, 174:18, 177:6, 177:22, 178:11, 213:5, 236:22, 237:7, 240:6, 240:9, 241:17, 246:24, 247:23, 247:25
**companies** [1] - 57:10
**company** [4] - 65:12, 88:16, 95:15, 106:7
**compared** [4] - 16:19, 16:23, 258:17, 263:12
**comparing** [1] - 147:6
**comparison** [2] - 128:8, 232:23
**comparisons** [1] - 127:19
**Compass** [1] - 176:21
**compassion** [3] - 176:7, 176:15, 176:23
**compensation** [5] - 67:9, 105:24, 106:8, 106:12, 106:16
**competition** [2] - 68:2,

176:12
**competitive** [1] - 76:5
**compilation** [2] - 155:25, 159:21
**compilations** [1] - 160:11
**Compile** [1] - 227:10
**compile** [3] - 121:16, 121:18, 227:5
**compiled** [13] - 122:5, 164:18, 212:15, 212:19, 222:3, 222:6, 222:14, 222:18, 227:13, 228:3, 242:1, 243:23, 258:3
**compiling** [4] - 164:22, 222:9, 223:9, 228:8
**complaint** [1] - 254:1
**complaints** [2] - 37:23, 254:11
**complete** [5] - 146:1, 148:19, 150:22, 224:17, 247:14
**completeness** [1] - 154:19
**complies** [2] - 130:19, 131:2
**comports** [4] - 120:18, 120:21, 127:9, 265:17
**comprehensively** [2] - 151:6, 158:15
**computer** [2] - 6:19, 157:25
**concentrated** [4] - 117:3, 147:11, 173:24, 246:20
**concentration** [1] - 180:22
**concern** [6] - 168:4, 170:19, 204:24, 224:6, 237:6, 266:20
**concerned** [3] - 142:7, 216:9, 267:10
**concerning** [1] - 260:1
**concerns** [6] - 71:7, 71:9, 71:14, 107:9, 167:24, 254:12
**concluding** [1] - 187:14
**conclusion** [2] - 168:7, 211:17
**conclusions** [8] - 59:21, 141:8, 141:15, 141:20, 141:24, 143:8, 150:9, 168:11
**condition** [4] - 168:7,

185:18, 185:19, 186:5
**conditionally** [4] - 158:22, 159:2, 160:7, 163:15
**conditions** [3] - 14:4, 14:18, 156:19
**condone** [1] - 109:12
**conduct** [1] - 149:6
**conducted** [1] - 150:8
**confer** [1] - 100:13
**confined** [4] - 147:13, 149:3, 179:17, 267:1
**confirm** [2] - 19:6, 261:23
**confirmed** [3] - 188:20, 188:25, 252:13
**conflict** [2] - 105:4, 143:3
**conflicted** [1] - 107:15
**confused** [1] - 247:18
**Congratulations** [1] - 101:11
**conjunction** [1] - 255:5
**connected** [1] - 201:24
**connection** [1] - 209:18
**connections** [1] - 138:9
**Connolly** [2] - 4:13, 5:4
**CONROY** [1] - 3:3
**consequence** [1] - 30:15
**consider** [6] - 7:24, 33:3, 97:25, 98:7, 158:24, 167:11
**considered** [5] - 27:10, 27:13, 45:14, 240:10, 266:5
**consistent** [10] - 47:16, 56:15, 84:6, 124:8, 124:13, 131:17, 171:21, 258:21, 258:22, 262:17
**consistently** [1] - 196:25
**conspiracy** [2] - 207:4, 207:5
**constant** [3] - 50:19, 95:16, 124:11
**constantly** [2] - 66:4, 104:9
**consult** [2] - 66:2, 150:20
**consultant** [2] - 64:15,

65:24, 95:12, 101:15
**consultants** [2] - 87:25, 88:1
**consulted** [1] - 150:8
**consuming** [1] - 117:22
**contact** [1] - 243:9
**contacted** [1] - 74:11
**contacting** [1] - 102:16
**contain** [2] - 32:3, 58:11
**contained** [2] - 123:4, 180:20
**contains** [1] - 191:15
**contaminated** [1] - 203:2
**contemporaneous** [1] - 259:8
**Contemporaneous** [1] - 259:15
**content** [5] - 127:14, 133:11, 165:12, 220:24, 221:6
**context** [4] - 183:11, 188:8, 220:6, 261:22
**Contextual** [1] - 183:7
**continue** [7] - 35:5, 50:17, 145:22, 178:14, 184:15, 186:2, 210:7
**continued** [3] - 89:20, 98:11, 143:25
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continues** [6] - 42:6, 43:11, 248:21, 252:20, 254:10, 255:2
**continuing** [1] - 51:17
**continuously** [1] - 16:10
**contrary** [1] - 168:3
**contributed** [2] - 30:13, 219:9
**control** [1] - 88:15
**Control** [79] - 28:4, 113:2, 113:8, 113:10, 132:5, 132:9, 133:5, 135:7, 136:9, 136:14, 136:15, 136:25, 137:19, 138:14, 139:3, 140:3, 140:23, 142:1, 143:2, 143:20, 144:7, 144:8, 144:20, 145:3, 145:9, 145:22, 146:13, 146:19,

147:25, 148:24, 149:20, 150:4, 150:25, 158:7, 158:19, 163:18, 165:15, 165:25, 167:18, 168:23, 172:3, 172:10, 173:9, 174:16, 176:2, 177:4, 177:21, 178:10, 189:13, 191:10, 191:17, 191:21, 194:1, 194:16, 195:8, 195:13, 195:19, 196:5, 196:8, 196:14, 196:17, 196:20, 198:18, 200:4, 202:20, 205:11, 205:12, 205:14, 206:3, 210:4, 210:6, 211:6, 211:23, 221:13, 233:5, 233:10, 233:17, 235:15, 261:2
**controlled** [14] - 81:15, 81:16, 84:24, 90:17, 91:1, 91:12, 96:1, 96:16, 103:8, 103:14, 104:17, 105:14, 106:15, 207:5
**conversation** [1] - 78:12
**convey** [2] - 75:9, 75:10
**convicted** [1] - 177:12
**conviction** [1] - 215:12
**Cook** [3] - 6:18, 268:3, 268:11
**coordinate** [1] - 189:18
**copied** [4] - 69:6, 69:10, 70:17, 73:6
**coping** [1] - 176:18
**cops** [1] - 114:24
**copy** [13] - 40:20, 46:7, 50:23, 83:21, 83:23, 83:24, 86:18, 86:20, 99:23, 157:24, 181:18, 216:13, 237:19
**cord** [3] - 49:5, 49:10, 49:18
**corner** [6] - 116:3, 182:20, 206:21, 232:21, 233:13, 267:2
**corporate** [1] - 78:1

**Corporation** [9] - 6:2, 195:2, 195:5, 205:5, 219:3, 219:6, 232:7, 236:1, 268:7
**cORPORATION** [2] - 1:7, 1:13
**correct** [334] - 22:15, 22:18, 22:21, 22:22, 23:13, 23:18, 26:1, 26:4, 26:18, 26:22, 27:1, 27:5, 27:8, 27:19, 28:1, 30:2, 30:6, 30:9, 30:19, 30:20, 31:2, 31:18, 31:22, 31:24, 32:4, 33:21, 34:13, 34:16, 35:9, 35:19, 36:3, 38:23, 38:24, 39:2, 39:16, 39:17, 40:10, 40:17, 40:18, 41:3, 41:5, 41:11, 41:16, 41:19, 42:11, 42:12, 42:19, 42:20, 42:22, 42:23, 42:25, 43:9, 43:10, 43:16, 43:17, 43:20, 43:21, 44:3, 44:4, 44:8, 44:9, 44:10, 44:15, 44:20, 45:7, 45:8, 45:10, 45:11, 45:12, 45:14, 45:17, 45:20, 45:23, 45:24, 46:3, 46:4, 46:17, 46:18, 48:2, 48:6, 48:10, 48:14, 48:25, 49:14, 49:15, 50:3, 50:7, 50:16, 51:7, 51:8, 51:12, 51:13, 51:16, 51:19, 51:25, 52:9, 52:22, 53:6, 53:14, 53:17, 53:20, 54:1, 54:7, 54:12, 54:20, 55:4, 55:5, 55:7, 55:10, 55:11, 55:13, 55:18, 55:19, 55:21, 56:2, 56:6, 56:7, 56:12, 56:16, 56:17, 56:19, 56:23, 57:5, 57:6, 57:7, 57:10, 57:14, 57:16, 63:15, 64:16, 64:19, 65:15, 66:7, 66:16, 66:24, 67:2, 67:4, 67:9, 67:14, 68:11, 69:7, 70:2, 70:16, 71:3, 71:7, 71:14, 71:22, 72:21, 73:21, 74:7, 74:21, 75:13, 75:20, 76:11, 76:25, 77:11, 79:8, 79:17, 80:10, 80:23, 81:25, 85:2, 86:8,

88:8, 89:4, 89:7, 89:14, 91:20, 98:12, 98:16, 98:19, 100:6, 101:16, 104:18, 107:21, 124:23, 124:24, 131:4, 136:9, 137:3, 141:11, 151:1, 151:2, 153:9, 159:22, 171:15, 172:3, 172:7, 173:16, 173:17, 179:13, 181:11, 181:13, 182:1, 183:23, 184:8, 190:7, 191:1, 191:18, 193:18, 193:20, 194:2, 194:3, 194:19, 195:11, 195:14, 196:12, 196:22, 196:23, 198:14, 201:8, 206:1, 209:25, 212:8, 216:3, 216:6, 217:8, 217:13, 220:13, 221:16, 221:20, 222:3, 222:8, 222:14, 222:15, 222:16, 222:17, 223:7, 223:13, 223:15, 225:15, 226:1, 226:2, 226:8, 227:10, 227:15, 227:18, 227:21, 228:1, 229:7, 229:19, 229:20, 230:2, 230:11, 231:4, 232:4, 232:25, 233:3, 233:7, 233:24, 234:3, 234:4, 236:22, 237:3, 237:8, 237:9, 237:19, 238:6, 238:10, 238:21, 239:2, 239:3, 239:8, 239:12, 239:15, 239:18, 239:22, 239:23, 239:25, 240:1, 240:16, 241:2, 241:9, 241:14, 241:15, 241:17, 242:1, 242:4, 242:5, 242:15, 242:18, 242:21, 242:22, 242:25, 243:5, 243:14, 243:24, 243:25, 244:13, 245:17, 246:2,

246:3, 246:5, 247:3, 247:11, 247:13, 247:17, 248:4, 248:14, 249:3, 249:5, 249:21, 249:24, 250:10, 251:7, 251:10, 251:15, 251:16, 252:1, 252:2, 252:10, 252:18, 252:25, 253:1, 253:13, 253:14, 254:5, 254:18, 254:24, 255:19, 255:20, 255:23, 256:4, 256:5, 256:8, 256:9, 256:10, 258:19, 259:1, 259:2, 261:10, 263:6, 263:7, 268:4
**Correct** [21] - 22:16, 28:6, 28:24, 31:15, 31:16, 31:19, 32:5, 33:22, 35:10, 35:17, 35:20, 35:25, 81:17, 90:12, 219:22, 236:18, 240:10, 243:11, 244:12, 246:7, 258:18
**correction** [1] - 242:17
**correctly** [8] - 25:19, 35:16, 35:24, 47:14, 107:14, 125:18, 195:17, 263:13
**correlation** [2] - 148:4, 208:24
**costs** [1] - 57:9
**Council** [3] - 118:14, 122:21, 138:22
**Counsel** [1] - 262:25
**counsel** [9] - 22:5, 22:7, 63:12, 63:17, 236:11, 236:17, 237:10, 239:15, 255:19
**count** [4] - 146:6, 158:5, 229:22, 259:19
**counted** [6] - 67:13, 67:19, 68:1, 68:5, 68:8, 259:22
**counting** [1] - 226:17
**countless** [1] - 39:10
**country** [7] - 15:10, 16:23, 19:6, 125:24, 175:19, 194:21, 240:4
**COUNTY** [1] - 1:10
**county** [8] - 38:4, 77:19, 77:20, 77:21,

77:22, 144:17, 259:25
**County** [36] - 2:2, 3:2, 10:15, 12:13, 12:19, 13:10, 13:23, 16:17, 18:18, 19:22, 20:3, 20:13, 20:16, 21:6, 28:10, 37:21, 44:19, 45:17, 52:22, 54:20, 54:25, 55:9, 55:21, 55:23, 56:5, 57:14, 58:13, 60:19, 60:25, 151:21, 155:7, 197:20, 202:11, 202:15, 210:13, 254:23
**county's** [2] - 259:8, 259:12
**county-by-county** [1] - 144:17
**couple** [6] - 12:17, 105:23, 111:14, 123:25, 129:17, 194:14
**course** [21] - 39:7, 81:24, 82:25, 85:2, 109:9, 114:25, 118:15, 121:14, 122:11, 124:11, 125:11, 135:15, 165:12, 165:14, 168:23, 187:20, 205:12, 225:22, 228:17, 230:6, 260:10
**Court** [48] - 6:17, 6:18, 7:3, 7:23, 10:17, 34:18, 61:23, 75:24, 88:6, 111:24, 112:14, 112:22, 113:12, 114:3, 114:15, 114:17, 115:7, 115:10, 115:24, 116:16, 117:4, 118:22, 124:2, 129:12, 136:11, 136:13, 138:5, 148:17, 153:3, 156:1, 159:11, 159:22, 161:1, 161:11, 161:17, 163:16, 166:11, 167:10, 167:22, 170:8, 170:19, 173:4, 173:7, 174:20, 177:24, 215:12, 268:2, 268:3
**court** [11] - 20:23, 36:10, 156:6, 156:8,

157:25, 175:8, 175:12, 175:15, 201:25, 202:2
**COURT** [185] - 1:1, 1:17, 7:6, 7:22, 8:10, 8:12, 8:17, 8:21, 8:24, 9:7, 12:22, 12:24, 20:7, 20:25, 21:10, 21:16, 21:20, 21:23, 22:1, 23:24, 24:5, 24:11, 24:16, 25:8, 25:19, 26:6, 26:9, 28:16, 29:19, 32:11, 32:24, 33:3, 33:8, 34:1, 34:3, 36:7, 36:10, 36:16, 36:19, 36:21, 37:19, 38:1, 38:6, 38:15, 40:23, 47:5, 47:11, 51:2, 57:19, 57:21, 58:17, 58:19, 58:22, 61:3, 61:7, 61:9, 61:15, 61:20, 61:25, 62:7, 62:13, 62:15, 63:23, 64:2, 64:9, 68:21, 69:3, 70:8, 70:13, 80:1, 82:20, 83:6, 86:2, 89:23, 90:6, 94:12, 94:14, 97:5, 97:11, 98:4, 99:3, 99:8, 100:10, 100:15, 110:2, 110:5, 111:3, 111:6, 111:9, 111:15, 111:23, 121:4, 122:25, 123:6, 123:12, 123:15, 123:21, 126:3, 126:9, 126:11, 127:1, 129:25, 130:4, 130:7, 130:10, 130:13, 131:22, 132:17, 132:25, 141:2, 141:6, 141:12, 141:19, 142:19, 143:4, 149:9, 149:16, 150:7, 153:6, 154:21, 156:3, 158:3, 158:21, 159:8, 159:14, 159:16, 160:6, 160:16, 160:18, 163:15, 165:2, 165:5, 165:7, 166:2, 166:7, 167:9, 167:13, 167:21, 168:15, 170:25, 171:24, 173:10, 174:10, 178:23, 182:13, 182:15,

186:14, 186:19,
188:4, 191:4, 191:6,
201:10, 201:14,
202:1, 202:12,
202:21, 203:12,
203:14, 205:22,
220:8, 222:22,
223:3, 236:5, 236:8,
241:22, 242:8,
242:10, 243:20,
244:3, 244:5, 249:9,
250:22, 251:3,
257:6, 257:8,
257:13, 257:16,
257:20, 261:12,
261:17, 262:3,
267:8, 267:12,
267:14, 267:18
**Court's** [3] - 82:19,
159:11, 171:21
**courtroom** [1] - 22:10
**courts** [1] - 175:18
**cover** [12] - 24:19,
65:8, 100:25,
121:14, 126:16,
126:17, 131:5,
165:12, 181:25,
190:18, 191:9, 212:2
**covered** [2] - 99:12,
99:19
**COVID** [1] - 56:20
**Covington** [1] - 5:11
**crack** [2] - 266:22,
267:1
**create** [3] - 90:10,
164:7, 165:16
**created** [8] - 39:22,
42:21, 147:5, 152:6,
162:9, 164:8,
165:14, 212:10
**creating** [3] - 129:19,
164:15, 215:10
**creative** [1] - 136:18
**creeping** [1] - 146:25
**crime** [31] - 20:16,
114:10, 116:7,
117:10, 117:11,
117:19, 117:20,
118:17, 118:20,
118:24, 119:10,
120:3, 120:19,
120:22, 121:21,
122:2, 124:11,
125:6, 139:14,
145:23, 180:17,
180:25, 187:19,
197:15, 198:23,
199:17, 207:4,
209:19, 215:14,
240:21

**Crime** [2] - 120:13,
249:13
**Crimes** [1] - 239:22
**crimes** [20] - 115:12,
118:25, 119:2,
177:13, 197:20,
199:2, 199:7,
199:12, 199:22,
200:1, 200:10,
200:20, 209:22,
232:13, 234:11,
234:17, 234:19,
266:3, 266:4
**Criminal** [4] - 112:25,
118:2, 122:15, 132:7
**criminal** [6] - 113:21,
119:18, 175:16,
237:1, 247:11,
266:12
**criminally** [1] - 198:9
**criminals** [3] - 198:16,
199:6, 199:12
**crisis** [1] - 188:13
**criteria** [6] - 42:1,
66:23, 162:5,
228:19, 230:4, 230:5
**critical** [1] - 220:6
**critically** [2] - 14:1,
14:17
**cross** [15] - 21:10,
32:25, 34:4, 47:7,
57:21, 61:2, 100:11,
110:2, 132:25,
178:23, 188:4,
223:19, 236:5,
261:15, 262:8
**CROSS** [5] - 22:2,
39:25, 100:19,
178:25, 236:9
**cross-examination** [2]
- 100:11, 262:8
**cross-examine** [2] -
32:25, 34:4
**cross-verify** [1] -
223:19
**CRR** [2] - 6:17, 6:18
**cry** [2] - 16:10, 16:11
**culmination** [1] -
172:9
**cure** [1] - 153:4
**currency** [1] - 128:19
**current** [4] - 10:5,
101:9, 112:11, 195:7
**custodians** [2] -
149:23, 150:5
**customer** [41] - 67:13,
67:16, 67:18, 67:19,
67:20, 67:21, 74:3,
74:19, 74:23, 75:7,
75:9, 75:11, 76:2,

76:6, 77:19, 78:8,
79:10, 84:25, 85:3,
86:21, 89:9, 89:10,
95:11, 95:13, 95:17,
103:4, 103:17,
103:22, 103:23,
104:10, 104:12,
104:13, 104:21,
105:13, 106:11,
106:14, 106:20,
106:24, 109:3,
109:16, 109:19
**customer's** [1] -
103:25
**customers** [48] -
65:20, 67:2, 67:6,
67:8, 71:6, 71:17,
71:21, 72:4, 72:12,
73:23, 74:2, 74:18,
74:25, 75:13, 75:14,
75:16, 76:17, 76:19,
77:7, 77:18, 77:20,
77:22, 79:6, 79:7,
80:9, 81:20, 81:23,
85:22, 95:9, 97:17,
97:18, 101:22,
102:2, 102:5,
102:15, 103:8,
103:14, 104:4,
104:6, 104:16,
105:12, 105:15,
106:8, 107:11,
110:10, 110:13,
110:18, 110:23
**cut** [21] - 98:15,
104:16, 104:21,
106:14, 110:10,
110:13, 110:19,
110:23, 110:25,
111:1, 127:1, 193:3,
193:14, 193:16,
214:13, 217:2,
233:2, 233:21,
243:7, 265:21
**cutback** [1] - 185:12
**cutoff** [1] - 238:12
**cuts** [5] - 68:5, 116:18,
186:6, 186:21,
193:22
**CV** [1] - 41:11
**CVS** [1] - 77:23
**cycle** [1] - 66:8

### D

**D'Anjou** [2] - 157:7,
157:11
**D-o-h-m-e-n** [1] -
65:13
**daily** [2] - 97:23,

172:15
**Dakota** [3] - 166:21,
167:4, 168:13
**damages** [1] - 8:6
**danger** [1] - 8:17
**dangerous** [2] -
203:22, 203:23
**Dangerous** [1] - 30:5
**dangers** [1] - 143:19
**darker** [1] - 174:6
**dash** [1] - 83:13
**Data** [1] - 132:8
**data** [87] - 48:21,
59:22, 61:6, 89:13,
92:25, 113:16,
114:10, 118:5,
118:7, 118:9,
118:12, 119:3,
119:10, 120:9,
120:11, 120:13,
120:19, 120:23,
122:5, 122:9, 125:1,
125:6, 127:9, 129:8,
129:19, 129:20,
130:21, 132:1,
134:18, 135:5,
138:11, 138:14,
138:16, 138:18,
138:20, 139:13,
145:21, 145:22,
145:25, 146:2,
146:3, 148:17,
148:21, 148:25,
149:6, 150:23,
151:9, 151:10,
151:11, 151:12,
151:19, 151:20,
152:10, 153:9,
153:14, 153:22,
156:2, 164:19,
164:22, 197:13,
198:17, 217:7,
221:18, 222:18,
223:14, 223:17,
223:22, 224:7,
225:1, 229:4,
229:11, 229:23,
241:25, 242:3,
243:23, 244:14,
244:24, 246:4,
258:3, 258:25,
259:6, 259:12,
259:19, 260:2,
262:15
**database** [1] - 225:17
**databases** [1] - 73:7
**date** [14] - 23:10, 87:1,
155:11, 155:12,
161:21, 162:8,
162:17, 190:21,

196:10, 212:3,
217:22, 217:23,
223:11, 249:23
**Date** [1] - 268:16
**dated** [1] - 249:21
**dates** [4] - 50:8, 50:9,
66:17, 255:21
**David** [1] - 7:1
**DAVID** [2] - 1:17, 2:9
**days** [15] - 17:11,
17:13, 18:7, 34:22,
34:24, 35:1, 35:2,
49:9, 60:14, 60:16,
66:13, 77:3, 126:6,
135:23
**days'** [2] - 60:6, 60:10
**DC** [6] - 2:11, 4:7,
4:14, 4:16, 5:5, 5:12
**De** [2] - 2:4, 2:16
**DEA** [13] - 96:20,
97:16, 103:25,
109:3, 116:24,
145:4, 239:24,
248:18, 248:21,
253:23, 253:25,
255:4, 255:5
**deal** [16] - 73:8, 73:9,
75:23, 83:4, 83:7,
107:23, 131:13,
133:17, 136:16,
140:17, 169:18,
176:3, 176:17,
176:23, 181:8,
197:10
**dealer** [4] - 201:21,
202:7, 203:3, 207:13
**dealers** [25] - 179:16,
179:22, 180:16,
180:24, 186:3,
186:7, 186:10,
186:23, 187:2,
187:7, 197:13,
197:19, 197:22,
198:20, 207:19,
207:24, 208:4,
208:7, 208:19,
208:23, 209:6,
209:25, 216:4,
217:2, 251:12
**dealing** [1] - 129:6,
133:25, 208:18,
211:14, 238:10
**deals** [1] - 154:23
**dealt** [2] - 82:25,
107:20
**Dean** [5] - 10:9, 10:10,
27:21, 31:14, 36:1
**death** [6] - 226:7,
228:18, 231:8,
231:16, 231:21,

242:16
**deaths** [10] - 125:17, 151:15, 154:24, 166:22, 222:2, 222:4, 223:20, 246:19, 258:19, 258:20
**debriefings** [1] - 252:13
**decade** [3] - 193:2, 193:14, 233:21
**December** [5] - 84:10, 93:6, 93:19, 136:22, 192:12
**decide** [1] - 158:24
**decided** [2] - 14:22, 106:14
**deciding** [2] - 103:7, 103:24
**decision** [5] - 105:8, 105:17, 105:20, 118:14, 138:21
**decision-makers** [1] - 118:14
**decisions** [3] - 78:1, 104:20, 143:13
**decline** [4] - 39:12, 52:8, 52:18, 93:9
**declined** [3] - 50:16, 185:1, 216:19
**decrease** [3] - 84:18, 85:19, 93:17
**decreased** [1] - 265:22
**decreases** [1] - 127:21
**decreasing** [2] - 116:7, 125:7
**deeds** [1] - 168:5
**DEF-WV-00473** [1] - 37:2
**DEF-WV-00649** [1] - 38:13
**DEF-WV-00976** [1] - 36:25
**Defendant** [4] - 4:10, 5:2, 5:7, 6:2
**defendant** [3] - 62:24, 200:18, 234:21
**defendants** [14] - 22:9, 22:15, 37:25, 60:24, 169:7, 184:12, 185:24, 200:12, 200:23, 200:25, 217:16, 217:17, 217:20, 236:6
**Defendants** [3] - 1:8,

1:14, 268:7
**Defendants'** [7] - 28:13, 32:10, 86:14, 249:7, 249:11, 257:4, 265:9
**DEFENSE** [2] - 38:8, 182:16
**define** [1] - 204:8
**definite** [1] - 259:21
**definitely** [6] - 110:23, 119:16, 138:11, 220:22, 227:10, 263:10
**definition** [4] - 40:8, 40:15, 41:22, 42:12
**Degree** [2] - 221:22, 221:24
**degree** [2] - 31:3, 221:16
**delegates** [1] - 138:22, 144:23
**deliver** [2] - 49:16, 208:8
**delivered** [6] - 13:12, 22:25, 49:13, 50:6, 50:15, 51:11
**deliveries** [2] - 49:19, 49:23
**delivery** [2] - 7:12, 49:2
**demand** [4] - 22:19, 24:23, 25:13, 31:2
**demographic** [1] - 224:4
**demographics** [2] - 153:22, 154:5
**demonstrative** [1] - 7:11
**Department** [61] - 11:25, 12:5, 12:11, 34:10, 37:12, 112:25, 113:24, 114:16, 114:19, 116:11, 117:7, 119:17, 119:19, 121:11, 121:24, 122:7, 122:16, 124:6, 125:1, 125:21, 125:23, 129:7, 129:21, 130:24, 132:3, 132:7, 132:24, 133:6, 133:21, 134:10, 134:18, 134:23, 135:6, 135:10, 135:11, 135:17, 136:4, 137:2, 137:13, 144:2, 144:12, 147:24, 149:22,

176:6, 176:9, 178:9, 185:13, 185:22, 188:25, 190:3, 190:6, 197:14, 197:18, 198:14, 198:19, 222:6, 249:17, 256:7, 259:9, 259:12, 260:6
**department** [10] - 64:16, 66:4, 84:1, 104:1, 104:24, 114:8, 119:6, 133:22, 227:23, 251:2
**departments** [4] - 11:21, 120:18, 120:22, 121:1
**depended** [1] - 118:15
**depicted** [2] - 51:23, 234:19
**depo** [1] - 226:21
**deposed** [1] - 63:6
**deposition** [38] - 23:6, 23:8, 23:12, 23:15, 23:18, 23:22, 24:20, 24:23, 25:3, 25:10, 30:10, 30:16, 34:12, 63:8, 63:10, 63:13, 69:11, 99:10, 99:12, 99:13, 99:15, 99:20, 99:24, 132:20, 179:5, 213:7, 213:10, 213:12, 213:16, 219:13, 220:12, 221:2, 260:17, 260:21, 261:21, 262:4, 262:11, 262:21
**Deputy** [1] - 150:3
**derived** [1] - 223:6
**describe** [6] - 10:5, 11:10, 13:21, 20:2, 140:18, 173:4
**described** [10] - 11:3, 33:16, 140:16, 140:22, 156:1, 159:21, 236:16, 241:1, 241:7, 253:11
**describes** [1] - 189:7
**describing** [1] - 33:20
**description** [1] - 42:14
**designed** [2] - 14:16, 17:25
**desktop** [1] - 157:25
**destination** [1] - 250:13
**detail** [5] - 10:13, 30:22, 141:20, 143:16
**detective** [2] - 114:25,

260:10
**determinate** [1] - 207:23
**determination** [2] - 226:8, 226:9
**determine** [8] - 60:7, 103:11, 105:13, 136:18, 149:7, 162:18, 226:6
**determined** [1] - 139:4
**determining** [5] - 91:23, 94:4, 145:13, 199:10, 230:5
**Detroit** [18] - 186:4, 186:7, 186:10, 186:22, 188:21, 189:2, 198:20, 248:23, 249:1, 249:4, 250:4, 250:5, 250:6, 250:14, 251:13, 251:15, 252:7, 253:12
**Detroit-based** [2] - 250:6, 253:12
**Detroit-Huntington** [1] - 188:21
**develop** [4] - 21:13, 117:8, 176:3, 215:8
**developed** [4] - 14:9, 17:15, 17:18, 114:5, 116:5, 137:22, 174:17, 224:1
**Development** [2] - 113:4, 144:4
**development** [1] - 18:11
**developmental** [2] - 19:2, 19:9
**DHHR** [1] - 144:22
**diagnose** [2] - 42:2, 48:24
**diagnosed** [1] - 47:22
**diagnoses** [1] - 51:24
**diagnosis** [1] - 40:16
**Dial** [2] - 190:19, 194:23
**Diazepam** [1] - 43:25
**Died** [1] - 244:9
**died** [6] - 201:18, 230:24, 231:3, 263:25, 264:13, 264:18
**Diego** [2] - 10:21, 11:1
**difference** [2] - 76:13, 163:2
**different** [37] - 15:25, 16:1, 20:18, 34:5, 37:24, 39:15, 45:1, 48:17, 52:11, 67:1, 67:8, 67:21, 68:15,

72:10, 75:19, 82:12, 86:9, 102:1, 107:15, 107:25, 108:20, 119:5, 132:23, 144:3, 144:14, 144:23, 156:5, 164:8, 170:14, 173:20, 178:4, 179:25, 235:10, 235:11, 266:19, 266:24
**differently** [1] - 76:18
**difficult** [4] - 48:8, 48:13, 133:23, 154:8
**DIRECT** [3] - 9:8, 62:17, 112:2
**direct** [16] - 10:14, 12:12, 12:18, 13:8, 13:13, 18:21, 26:7, 28:18, 32:21, 151:12, 182:22, 190:17, 216:11, 219:11, 226:23, 232:19
**directed** [2] - 54:22, 133:8
**direction** [2] - 141:3, 141:9
**directly** [6] - 56:4, 57:14, 173:21, 186:25, 240:22, 253:8
**Director** [8] - 112:12, 113:4, 113:6, 138:4, 138:7, 144:4, 150:3
**Directors** [1] - 54:22
**Dirty** [2] - 252:14, 253:11
**disagree** [1] - 48:15
**discharge** [1] - 17:14
**disclose** [1] - 169:7
**discounts** [1] - 76:5
**discovered** [2] - 186:3, 186:6
**discovers** [1] - 215:13
**discuss** [2] - 88:25
**discussed** [4] - 14:13, 31:17, 53:13, 161:4
**discussions** [3] - 190:10, 190:12, 192:1
**diseases** [2] - 14:4, 59:7
**dismantling** [2] - 246:22, 248:19
**disorder** [2] - 18:6, 18:7
**disorders** [1] - 14:3
**dispense** [2] - 210:19, 218:11

**dispensed** [3] - 90:18, 91:1, 92:15
**dispensing** [1] - 89:13
**displaced** [1] - 266:13
**dispose** [3] - 136:1, 136:6, 236:24
**disproportionate** [1] - 93:1
**dispute** [2] - 35:18, 70:18
**disputed** [2] - 7:14, 7:17
**disregard** [1] - 21:1
**disrupting** [1] - 246:21
**disruptive** [1] - 16:7
**distinction** [5] - 26:21, 42:17, 42:24, 68:4, 141:18
**distribute** [4] - 208:9, 217:17, 217:20, 252:22
**distributed** [9] - 200:12, 200:17, 205:2, 205:5, 205:7, 232:4, 232:7, 232:10, 234:20
**distributing** [9] - 174:24, 193:4, 193:15, 233:22, 234:1, 246:23, 247:3, 247:6, 248:2
**distribution** [8] - 37:25, 105:14, 193:10, 194:5, 214:8, 214:18, 233:6, 250:15
**distributor** [1] - 235:19
**distributors** [16] - 22:11, 22:14, 30:9, 30:24, 32:4, 189:9, 194:17, 210:24, 211:3, 211:8, 211:20, 218:16, 218:19, 218:23, 235:2, 235:7
**DISTRICT** [3] - 1:1, 1:1, 1:17
**District** [4] - 7:2, 7:3, 124:4, 248:20
**disturbing** [1] - 16:3
**dive** [2] - 137:17, 190:2
**Diversion** [7] - 95:7, 102:23, 103:5, 105:2, 105:5, 105:9, 255:4
**diversion** [29] - 14:21, 66:12, 66:16, 70:23,

70:25, 71:2, 71:7, 71:9, 71:22, 104:13, 108:24, 109:10, 109:13, 109:16, 109:19, 125:14, 127:7, 134:6, 134:11, 135:11, 135:14, 135:16, 135:18, 135:19, 237:1, 237:8, 253:23, 253:25, 255:5
**diverted** [8] - 107:18, 134:14, 134:17, 134:21, 134:25, 204:23, 248:2, 255:24
**divided** [1] - 121:14
**Division** [1] - 185:15
**division** [4] - 72:9, 114:22, 121:23, 124:10
**DMI** [31] - 114:1, 114:3, 114:4, 114:9, 117:3, 117:10, 119:16, 179:11, 179:14, 180:15, 180:23, 181:6, 181:12, 181:23, 182:3, 187:15, 188:11, 189:6, 235:1, 235:6, 239:4, 265:5, 265:10, 265:11, 265:17, 265:23, 265:25, 266:3, 266:6, 266:8, 266:21
**Docket** [1] - 170:5
**docs** [2] - 84:17, 93:15
**doctor** [6] - 14:6, 34:4, 210:16, 218:7, 237:3, 254:1
**Doctor** [38] - 40:2, 40:25, 41:4, 41:23, 42:4, 42:10, 42:16, 43:2, 43:13, 43:18, 43:23, 43:25, 44:6, 44:13, 44:18, 44:19, 45:19, 46:10, 46:21, 47:14, 48:6, 49:12, 50:1, 50:3, 50:5, 50:25, 51:5, 51:21, 52:13, 54:16, 55:12, 56:8, 56:18, 57:1, 57:13, 57:18, 58:24, 61:13
**Doctors** [1] - 22:17
**doctors** [11] - 22:20, 22:24, 24:24, 25:14, 26:16, 27:8, 30:21,

30:23, 102:5, 102:6, 236:21
**doctors'** [1] - 30:22
**document** [79] - 29:13, 29:22, 32:2, 32:6, 32:7, 32:16, 32:18, 32:25, 33:4, 34:6, 38:10, 41:18, 41:22, 42:2, 42:6, 43:15, 46:20, 47:4, 51:10, 68:19, 68:23, 82:14, 82:22, 83:2, 83:3, 83:7, 84:20, 89:20, 90:1, 90:11, 90:13, 91:22, 92:12, 94:9, 95:18, 95:21, 96:25, 97:3, 97:6, 107:5, 123:1, 126:19, 126:20, 156:6, 157:10, 157:21, 159:7, 160:20, 160:22, 167:7, 169:12, 169:13, 170:1, 170:23, 173:7, 182:20, 189:6, 190:13, 192:21, 193:17, 193:25, 194:13, 194:14, 194:24, 211:5, 221:3, 235:14, 249:6, 249:11, 250:21, 251:23, 257:3, 261:6, 261:16, 261:18, 261:20, 261:23, 262:2
**documentation** [2] - 116:22, 193:23
**documents** [29] - 37:2, 37:3, 37:11, 37:17, 61:19, 107:25, 121:9, 123:10, 126:6, 126:8, 155:3, 163:14, 165:9, 165:11, 165:18, 165:21, 169:8, 169:14, 169:16, 169:17, 169:24, 170:10, 170:16, 212:16, 235:13, 235:18, 235:20, 235:21, 260:23
**Dog** [2] - 252:15, 253:11
**Dohmen** [2] - 65:3, 65:13
**domain** [1] - 54:24
**Dominion** [1] - 113:15

**donational** [1] - 55:23
**donations** [1] - 57:4
**done** [13] - 78:5, 113:18, 130:17, 140:19, 154:15, 169:8, 178:17, 200:20, 206:12, 225:16, 228:13, 243:6, 243:7
**door** [2] - 66:1, 101:25
**dosage** [6] - 60:23, 92:7, 92:8, 128:15, 255:24
**dose** [1] - 166:18
**doses** [1] - 80:20
**double** [7] - 17:3, 17:6, 223:19, 225:6, 226:16, 226:17, 242:2
**double-check** [4] - 223:19, 225:6, 226:16, 242:2
**double-counting** [1] - 226:17
**doubles** [1] - 34:25
**Douglas** [1] - 4:17
**dove** [1] - 206:6
**down** [30] - 24:14, 36:14, 43:1, 55:24, 87:4, 90:16, 92:6, 93:22, 96:20, 97:16, 97:23, 107:6, 117:12, 118:24, 131:9, 161:13, 169:8, 174:2, 183:13, 184:9, 187:17, 192:14, 209:14, 213:4, 214:18, 219:24, 244:20, 253:2, 253:22, 266:10
**downsize** [1] - 183:21
**downward** [1] - 52:13
**Dr** [45] - 7:8, 7:11, 8:3, 8:23, 8:24, 12:17, 19:21, 20:8, 21:4, 21:11, 22:4, 22:9, 23:5, 23:22, 24:15, 24:19, 24:22, 25:25, 27:17, 28:18, 29:21, 29:25, 31:7, 31:9, 31:13, 31:20, 32:15, 33:10, 34:9, 35:8, 36:14, 38:10, 38:19, 38:21, 39:13, 39:20, 39:23, 46:14, 57:25, 61:5, 61:9, 61:12, 61:15, 212:15
**draft** [1] - 191:24
**dramatic** [1] - 21:7

**drawing** [1] - 42:24
**drew** [4] - 141:8, 141:15, 143:9, 211:18
**Drive** [1] - 6:15
**driven** [1] - 152:1
**driver** [1] - 133:12
**drivers** [2] - 131:11, 133:4
**drives** [1] - 152:3
**drop** [5] - 136:1, 136:3, 136:5, 236:17, 236:20
**drop-off** [1] - 136:1
**dropped** [1] - 152:25
**drove** [2] - 31:2, 143:12
**drug** [180] - 7:13, 17:8, 43:20, 44:10, 48:16, 49:2, 49:3, 49:4, 49:7, 49:17, 84:22, 84:23, 92:25, 114:6, 115:3, 115:12, 115:20, 115:23, 116:1, 116:11, 116:14, 116:17, 116:19, 116:23, 116:24, 117:2, 119:8, 120:18, 120:22, 122:2, 124:19, 125:6, 125:11, 125:16, 127:12, 127:15, 128:23, 129:1, 129:4, 129:9, 131:10, 131:11, 132:1, 132:4, 132:11, 132:14, 132:21, 133:4, 133:14, 135:18, 135:23, 142:6, 145:6, 145:7, 145:10, 145:15, 146:11, 146:12, 146:16, 147:3, 147:4, 147:6, 147:10, 147:21, 147:22, 147:25, 148:3, 148:4, 148:6, 148:7, 148:9, 172:22, 173:15, 173:21, 173:23, 174:6, 174:7, 175:8, 175:12, 175:15, 175:18, 177:13, 179:16, 179:19, 179:22, 180:16, 180:19, 180:24, 181:3, 181:8, 182:8, 186:3, 186:7, 186:9,

186:22, 187:2,
187:6, 187:19,
187:25, 188:13,
188:21, 189:2,
189:7, 189:19,
189:22, 190:11,
194:17, 197:13,
197:15, 197:19,
197:22, 197:25,
198:19, 199:1,
199:3, 199:6, 200:5,
200:10, 200:15,
200:16, 200:20,
201:2, 201:21,
202:7, 203:3, 206:4,
206:11, 207:4,
207:19, 207:24,
208:4, 208:7,
208:18, 209:6,
209:19, 209:22,
209:25, 211:2,
214:8, 214:17,
214:23, 215:1,
215:8, 215:12,
216:4, 217:2,
218:21, 231:5,
232:13, 232:15,
234:11, 235:2,
235:7, 237:14,
238:19, 239:5,
243:4, 245:17,
246:6, 246:19,
246:20, 247:22,
251:12, 252:6,
252:13, 252:15,
255:17, 260:5,
260:12, 263:18,
264:12, 264:19,
264:23, 266:4,
266:20, 266:22
**Drug** [102] - 6:2, 28:4,
78:15, 113:1, 113:8,
113:10, 114:4,
116:24, 119:1,
132:5, 132:9, 133:5,
135:7, 135:13,
136:9, 136:14,
136:15, 136:25,
137:19, 138:14,
139:3, 140:3,
140:23, 142:1,
143:2, 143:20,
144:7, 144:8,
144:20, 145:3,
145:9, 145:21,
146:13, 146:19,
147:25, 148:23,
149:20, 150:4,
150:25, 158:7,
158:18, 163:18,
165:15, 165:24,

167:17, 168:23,
172:2, 172:10,
173:9, 174:16,
176:2, 177:4,
177:21, 178:10,
179:9, 182:6,
185:14, 185:18,
189:13, 190:24,
191:10, 191:17,
191:21, 193:19,
193:21, 194:1,
194:16, 195:4,
195:8, 195:12,
195:18, 196:5,
196:8, 196:14,
196:17, 196:20,
198:18, 200:4,
202:20, 205:10,
205:11, 205:14,
206:3, 210:3, 210:6,
211:6, 211:23,
214:5, 219:5,
221:13, 233:5,
233:10, 233:17,
235:15, 239:22,
242:23, 249:13,
261:2, 265:21,
266:3, 268:7
**DRUG** [2] - 1:7, 1:13
**drug-impaired** [1] -
133:14
**drug-related** [2] -
187:25, 199:1
**Drugs** [1] - 244:9
**drugs** [57] - 7:16,
11:16, 44:2, 45:1,
45:12, 45:14, 49:6,
49:17, 127:17,
127:18, 127:21,
128:11, 128:13,
134:17, 134:21,
134:25, 135:24,
135:25, 145:22,
148:10, 148:11,
148:12, 149:9,
179:25, 180:9,
180:20, 193:4,
193:10, 193:12,
193:16, 194:6,
194:10, 198:6,
198:8, 198:17,
199:17, 199:19,
205:1, 215:11,
230:23, 231:2,
231:21, 233:7,
233:22, 234:1,
234:14, 236:21,
239:1, 242:24,
243:5, 244:16,
245:1, 246:23,

247:4, 263:24,
264:12
**DTO** [1] - 253:12
**DTOs** [7] - 246:22,
247:2, 247:6,
247:17, 247:22,
248:3, 248:19
**dual** [1] - 132:6
**due** [2] - 76:20, 250:5
**DUI** [3] - 131:10,
133:10, 133:13
**DUIs** [2] - 133:4, 199:3
**during** [29] - 27:13,
36:14, 41:13, 43:5,
46:2, 48:9, 49:4,
52:20, 63:13, 64:13,
80:18, 90:3, 90:5,
94:23, 95:1, 99:17,
110:20, 118:24,
134:9, 163:25,
168:23, 183:18,
183:19, 195:20,
195:24, 211:9,
245:20, 250:25,
253:3
**duties** [3] - 112:16,
116:9, 122:15
**duty** [2] - 141:2,
156:23

# E

**e-mail** [18] - 36:25,
37:6, 37:9, 38:21,
38:22, 38:25, 39:4,
59:1, 169:11,
170:17, 170:19,
170:21, 190:18,
191:14, 191:20,
192:22, 194:22
**e-mails** [4] - 37:5,
37:14, 169:2, 170:7
**Early** [1] - 238:15
**early** [8] - 12:9, 36:8,
66:13, 77:3, 190:12,
193:12, 194:10,
200:3
**ears** [1] - 95:6
**easier** [1] - 50:25
**East** [3] - 3:5, 3:12,
4:18
**east** [1] - 147:18
**Eastern** [2] - 14:20,
64:21
**easy** [6] - 174:9,
187:6, 193:3,
193:15, 233:22,
234:1
**economic** [1] - 146:23
**economics** [1] -

137:15
**economy** [1] - 183:20
**editorial** [1] - 166:12
**education** [5] -
138:25, 139:22,
144:15, 258:15
**educational** [4] -
10:17, 113:13,
137:15, 143:14
**educators** [1] - 171:11
**Edwards** [1] - 29:1
**effect** [1] - 234:25
**effective** [1] - 248:22
**effects** [5] - 8:4,
13:14, 18:21,
131:14, 133:18
**efficiencies** [1] -
112:16
**effort** [3] - 56:21,
178:15, 212:24
**efforts** [7] - 140:1,
143:1, 143:14,
144:16, 159:21,
236:16, 246:20
**Eight** [1] - 81:4
**eight** [7] - 35:1, 60:14,
81:6, 81:8, 93:7,
93:21, 164:9
**Eighth** [1] - 3:10
**either** [4] - 17:8, 85:6,
85:25, 168:14
**elected** [1] - 171:11
**electronic** [2] - 72:12,
102:18
**electronically** [1] -
72:15
**elementary** [1] -
139:23
**elicited** [1] - 24:1
**eliminated** [4] -
116:19, 185:15,
193:21, 266:14
**elimination** [2] -
185:17, 193:19
**ELIZABETH** [1] - 6:14
**elsewhere** [1] - 251:13
**email** [40] - 28:19,
28:22, 29:5, 29:6,
29:8, 29:12, 29:13,
30:1, 31:8, 31:13,
31:23, 32:3, 32:11,
32:14, 33:10, 33:14,
33:16, 33:19, 33:23,
34:2, 34:15, 35:11,
36:2, 36:3, 69:7,
69:9, 69:11, 70:1,
70:2, 70:4, 70:15,
83:21, 83:23, 84:8,
84:10, 85:17, 93:8,
93:11, 126:16

**emails** [2] - 69:23,
126:17
**embedded** [3] - 83:1,
125:20, 126:24
**emergence** [2] -
216:21, 217:11
**Emergency** [1] - 259:9
**emerging** [10] -
124:17, 124:19,
124:22, 124:25,
125:2, 125:12,
125:14, 127:7,
237:11, 238:7
**Emerging** [2] -
237:23, 239:10
**emotion** [1] - 7:21
**emotional** [1] - 8:14
**emphasis** [2] -
207:13, 246:21
**Emphasis** [2] -
115:11, 116:25
**employed** [5] - 63:3,
69:20, 249:23,
250:24, 252:1
**employee** [6] - 63:1,
117:13, 153:4,
157:11, 157:15,
157:23
**employees** [1] - 54:14
**employment** [4] -
101:9, 109:9,
177:14, 177:15
**Empowerment** [1] -
175:7
**EMS** [12] - 146:3,
148:20, 149:22,
150:3, 152:4, 162:1,
224:12, 225:11,
230:3, 230:5, 259:3,
259:12
**Encino** [1] - 3:18
**encompass** [1] -
168:1
**encompasses** [1] -
168:6
**encompassing** [1] -
172:19
**encourage** [1] -
109:12
**end** [22] - 83:13,
114:14, 136:21,
139:12, 139:13,
150:20, 172:9,
172:24, 174:1,
177:18, 189:15,
195:21, 204:9,
204:25, 207:12,
208:21, 216:10,
217:13, 223:21,
241:10, 241:19,

253:21
**endeavor** [1] - 135:18
**ends** [1] - 182:21
**enforcement** [20] -
113:19, 134:3,
137:12, 137:14,
137:23, 138:1,
138:8, 145:2, 145:4,
146:4, 146:23,
151:13, 157:15,
171:10, 174:23,
210:8, 212:17,
220:25
**Enforcement** [1] -
124:4
**enforcement's** [1] -
214:23
**engaged** [3] - 140:24,
141:25, 254:23
**engagement** [2] -
140:2, 141:24
**enhance** [2] - 208:7,
215:20
**enhancing** [1] - 207:4
**enjoying** [1] - 101:13
**ensure** [5] - 146:6,
150:21, 164:23,
223:20
**ensuring** [1] - 115:17
**enter** [1] - 18:12
**entered** [1] - 86:17
**entering** [1] - 204:15
**Enterprises** [1] -
86:23
**entire** [10] - 10:1,
109:2, 126:20,
147:16, 153:21,
154:11, 154:19,
176:13, 189:6, 190:2
**entirely** [1] - 239:3
**entities** [1] - 144:1
**entitled** [1] - 150:7
**entity** [1] - 65:14
**entry** [1] - 244:22
**ENU** [1] - 4:12
**environment** [1] -
133:20
**epicenter** [2] - 214:8,
214:17
**epidemic** [19] - 19:22,
19:25, 20:2, 20:20,
21:7, 28:10, 38:5,
172:6, 175:24,
177:22, 178:11,
240:22, 241:1,
246:20, 263:17,
263:21, 263:22,
266:24, 267:4
**epidemiologist** [1] -
221:20

**episode** [1] - 203:1
**error** [1] - 159:1
**especially** [3] -
133:24, 151:14,
221:7
**espoused** [1] - 30:22
**essence** [1] - 60:1
**essential** [1] - 185:12
**essentially** [2] -
137:21, 216:1
**establish** [1] - 250:15
**established** [2] -
189:16, 189:18
**et** [6] - 1:7, 1:13,
168:13, 268:6, 268:7
**ethics** [1] - 254:12
**evaluate** [1] - 103:20
**evaluating** [1] -
103:19
**evaluation** [2] - 265:3,
265:11
**evening** [1] - 172:18
**evenings** [1] - 126:14
**event** [6] - 187:1,
201:17, 202:19,
233:4, 233:25,
241:16
**events** [3] - 156:20,
246:5, 246:6
**eventually** [6] -
117:12, 119:2,
142:5, 142:17,
149:8, 176:11
**everywhere** [1] -
153:18
**evidence** [13] - 89:21,
122:24, 159:14,
160:4, 163:12,
191:2, 202:16,
242:7, 244:2,
246:13, 248:9,
251:23, 257:5
**Evidence** [3] - 156:13,
156:24, 159:12
**evidentiary** [1] -
126:19
**evidently** [1] - 153:1
**evoke** [1] - 8:14
**evolve** [1] - 162:13
**exacerbate** [1] - 16:15
**exact** [6] - 56:13,
66:17, 84:2, 120:15,
176:8, 197:21
**exactly** [6] - 23:11,
30:20, 34:18, 53:2,
55:24, 217:19
**examination** [4] -
26:8, 100:11, 188:5,
262:8
**EXAMINATION** [11] -

9:8, 22:2, 39:25,
57:23, 62:17,
100:19, 110:8,
112:2, 178:25,
236:9, 257:22
**examine** [1] - 32:25,
34:4, 47:7, 132:25,
178:23
**Examiner** [3] - 39:1,
150:17, 150:18
**examiner's** [1] -
225:20
**example** [18] - 42:21,
77:23, 143:13,
144:13, 146:9,
149:14, 151:24,
152:9, 157:11,
159:23, 162:17,
163:24, 166:20,
183:25, 228:14,
243:9, 253:12,
254:23
**examples** [7] - 135:4,
135:22, 139:24,
174:23, 176:5,
175:9, 199:4
**exceeded** [1] - 14:21
**Excel** [3] - 241:24,
262:12
**exception** [8] - 156:9,
156:11, 156:22,
157:3, 157:9,
157:17, 158:2,
167:25
**exceptional** [1] -
263:16
**excerpts** [1] - 129:17
**excess** [1] - 16:14
**exchange** [1] - 175:5
**excluded** [2] - 7:20,
7:21, 167:7
**excuse** [7] - 80:19,
87:2, 91:15, 130:7,
165:1, 262:20, 267:9
**excused** [1] - 111:6
**Executive** [2] -
265:13, 265:16
**EXHIBIT** [4] - 38:8,
58:20, 182:16, 191:7
**exhibit** [5] - 70:10,
70:12, 86:17, 86:20,
170:1
**Exhibit** [8] - 50:24,
86:15, 241:20,
243:17, 243:22,
244:2, 248:8, 249:12
**exhibits** [3] - 7:11,
7:12, 126:14
**exist** [2] - 143:21,
254:15

**existed** [2] - 189:7,
189:22
**existing** [1] - 115:21
**exists** [1] - 19:21
**expand** [1] - 17:23
**expanded** [1] - 15:4
**expecting** [1] - 94:2
**experience** [12] - 20:9,
40:14, 44:21, 45:3,
47:16, 93:1, 98:8,
104:14, 107:19,
109:13, 133:23,
178:8
**expert** [1] - 159:3
**expertise** [1] - 15:2
**expired** [1] - 254:15
**Explain** [1] - 7:24
**explain** [6] - 65:22,
75:24, 88:5, 115:6,
115:10, 161:17
**explained** [3] -
115:21, 158:10,
178:16
**explaining** [1] - 85:17
**explanation** [1] -
229:16
**exploded** [1] - 147:20
**explore** [2] - 195:9,
210:7
**exposed** [17] - 7:15,
11:16, 13:14, 13:18,
17:7, 17:17, 18:9,
18:22, 18:25, 19:18,
21:12, 44:25, 46:5,
47:19, 47:23, 48:14,
49:7
**exposure** [14] - 40:15,
42:2, 42:8, 43:2,
43:8, 44:20, 44:25,
45:4, 45:6, 46:1,
47:25, 48:8, 49:8,
59:11
**Exposure** [1] - 43:4
**exposures** [1] - 46:25
**extensively** [1] - 251:1
**extent** [8] - 141:16,
150:9, 166:4,
166:10, 167:2,
170:19, 171:17,
250:20
**external** [1] - 168:7
**extremely** [1] - 265:18
**eyes** [1] - 95:6

**F**

**F.3d** [2] - 54:8, 157:8
**Faber** [2] - 7:2, 257:20
**FABER** [1] - 1:17
**facets** [1] - 146:25

**facilities** [1] - 13:23
**facility** [1] - 17:23
**facing** [1] - 240:5
**fact** [16] - 7:15, 8:15,
32:19, 37:10, 38:2,
55:17, 56:15, 107:9,
108:8, 131:21,
132:23, 153:4,
157:13, 158:17,
211:5, 218:21
**factor** [1] - 38:5
**facts** [3] - 141:17,
166:19, 202:16
**factual** [7] - 58:11,
157:4, 157:16,
158:5, 167:5, 168:9,
168:22
**factually** [1] - 164:23
**faculty** [1] - 54:13
**fail** [1] - 35:22
**fair** [3] - 155:22,
189:20, 206:10
**Fairfield** [5] - 117:6,
173:25, 179:19,
181:4, 266:2
**faith** [2] - 34:3, 47:6
**fall** [1] - 156:9
**fallout** [1] - 39:9
**familiar** [13] - 13:17,
46:11, 48:20, 95:3,
124:25, 134:10,
175:2, 175:4,
187:20, 189:22,
197:8, 202:19,
241:25
**families** [3] - 53:1,
92:25, 166:15
**family** [1] - 92:8
**Family** [2] - 53:13,
53:22
**far** [17] - 20:11, 20:19,
80:14, 105:11,
105:12, 105:14,
108:22, 108:23,
116:17, 147:16,
147:17, 153:19,
188:18, 197:24,
223:8, 267:10
**FARRELL** [24] - 2:3,
7:25, 8:11, 8:13,
8:20, 8:22, 9:9, 13:7,
21:3, 21:9, 23:23,
23:25, 24:7, 25:6,
32:13, 36:4, 36:20,
37:20, 47:2, 57:24,
58:15, 58:21, 58:23,
61:8
**Farrell** [10] - 2:4, 2:15,
7:24, 12:24, 21:2,
37:19, 40:6, 49:12,

52:24, 57:22
**fascinating** [1] - 39:6
**fast** [2] - 59:13, 257:21
**fatal** [32] - 149:3, 149:5, 150:14, 150:15, 151:7, 155:6, 155:14, 155:19, 155:21, 155:22, 155:23, 160:23, 160:24, 161:1, 161:4, 161:19, 163:7, 216:16, 216:18, 228:21, 229:4, 230:9, 230:22, 242:17, 242:20
**fatalities** [1] - 201:23
**fatals** [3] - 151:5, 161:15
**fatigue** [3] - 176:7, 176:15, 176:23
**FBI** [9] - 116:24, 120:15, 120:16, 145:4, 239:21, 249:13, 252:5, 259:1, 260:1
**FCRR** [1] - 6:18
**FDA** [1] - 35:9
**fear** [1] - 266:12
**feared** [1] - 145:17
**fearing** [1] - 30:15
**February** [5] - 28:20, 29:5, 31:10, 96:16, 192:13
**Federal** [2] - 156:13, 159:12
**federal** [8] - 115:4, 117:2, 144:25, 145:1, 178:1, 208:22, 208:23, 208:25
**federally** [2] - 57:2, 197:19
**feedback** [1] - 142:4
**feet** [1] - 159:3
**fellows** [1] - 54:14
**fellowship** [1] - 11:3
**Fellowship** [1] - 11:5
**felony** [4] - 177:7, 177:13, 209:18, 215:10
**fentanyl** [44] - 42:21, 45:14, 45:16, 48:1, 202:6, 203:7, 203:23, 204:15, 204:18, 204:20, 216:8, 216:22, 217:1, 217:12, 217:14, 217:15, 218:13, 230:16,

231:11, 241:8, 241:11, 241:16, 241:18, 242:15, 242:18, 242:21, 242:23, 243:2, 243:4, 243:9, 243:11, 243:15, 244:15, 244:25, 245:5, 245:14, 245:20, 246:2, 246:8, 263:25, 264:15, 264:19
**Fentanyl** [6] - 45:10, 48:18, 203:2, 204:22, 216:9, 244:10
**few** [14] - 29:21, 40:3, 45:20, 61:24, 66:1, 107:2, 193:9, 194:4, 220:17, 236:7, 236:14, 237:15, 256:2, 256:3
**field** [4] - 58:7, 58:8, 229:25, 230:10
**fifth** [12] - 25:25, 26:3, 26:12, 27:3, 27:11, 27:14, 31:15, 31:18, 35:23, 36:2, 37:16, 38:4
**fight** [1] - 181:5
**figure** [13] - 51:10, 120:1, 139:8, 139:11, 139:17, 139:19, 140:9, 140:24, 144:14, 144:15, 162:10, 164:10, 223:21
**figures** [3] - 131:17, 131:20, 132:22
**file** [1] - 191:15
**filed** [5] - 206:15, 206:16, 217:22, 217:24, 217:25
**files** [1] - 262:12
**fill** [2] - 72:18, 72:25
**filled** [1] - 91:13
**filling** [3] - 89:14, 254:14, 254:15
**final** [4] - 105:8, 157:19, 168:11, 170:18
**finalists** [1] - 176:19
**finally** [2] - 146:4, 176:20
**finder** [1] - 8:15
**findings** [8] - 58:11, 59:19, 90:5, 157:4, 157:16, 158:9, 168:9, 168:22
**fine** [2] - 90:24, 141:18

**finished** [1] - 26:23
**Fire** [4] - 144:6, 176:9, 190:3, 196:11
**firearm** [3] - 209:18, 215:11, 215:13
**firearms** [1] - 253:4
**Firm** [2] - 3:4, 3:7
**first** [55] - 15:11, 18:21, 22:7, 24:11, 28:19, 37:6, 39:5, 41:25, 43:1, 45:6, 58:25, 59:5, 66:10, 70:21, 73:21, 100:12, 112:23, 114:7, 114:8, 114:12, 114:16, 123:7, 126:5, 126:6, 131:1, 131:3, 131:9, 133:24, 135:22, 139:5, 150:2, 155:13, 155:16, 175:24, 176:4, 176:15, 176:23, 185:8, 190:18, 191:10, 192:6, 192:9, 192:15, 193:1, 194:19, 206:6, 206:25, 207:1, 207:3, 216:19, 234:2, 246:17, 252:4, 264:8, 265:2
**First** [1] - 15:22
**first-hand** [1] - 18:21
**firsthand** [1] - 160:13
**fit** [2] - 157:9, 167:16
**five** [6] - 16:23, 17:7, 49:16, 50:14, 61:25, 126:6
**fix** [1] - 75:3
**FL** [1] - 2:14
**flag** [9] - 72:3, 72:11, 72:18, 92:19, 92:22, 97:18, 104:6, 104:12, 106:11
**flags** [12] - 66:5, 71:1, 71:3, 72:2, 73:1, 78:13, 92:1, 95:9, 95:14, 95:16, 97:15, 104:2
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flat** [1] - 128:22
**flexible** [1] - 151:17
**flip** [4] - 33:23, 183:10, 210:2, 212:2
**floor** [2] - 49:2, 53:15
**Floor** [1] - 3:5
**Florida** [2] - 193:11, 194:9

**focus** [5] - 27:17, 119:14, 119:15, 211:15, 212:12
**focused** [2] - 137:22, 216:4
**FOIA** [1] - 158:13
**folks** [1] - 206:2
**follow** [7] - 13:5, 17:15, 17:19, 19:1, 45:5, 53:4, 106:1
**follow-up** [3] - 17:19, 19:1, 53:4
**followed** [6] - 17:19, 18:3, 18:9, 18:13, 60:7, 154:4
**following** [8] - 37:13, 39:7, 42:1, 43:11, 52:4, 102:20, 194:8, 253:25
**Following** [1] - 260:4
**follows** [2] - 7:5, 28:25
**FOR** [1] - 1:1
**force** [1] - 188:4
**Force** [12] - 116:24, 116:25, 137:1, 137:20, 138:3, 239:22, 239:24, 248:18, 248:21, 249:13, 252:6
**Forces** [1] - 239:21
**forces** [1] - 115:3
**foregoing** [1] - 268:4
**forgiveness** [1] - 177:8
**form** [9] - 45:16, 94:6, 116:13, 118:18, 129:8, 143:21, 168:11, 186:11, 232:20
**formality** [1] - 168:11
**formalized** [1] - 137:20
**formally** [1] - 55:20
**formed** [2] - 151:24, 190:8
**former** [3] - 63:1, 190:6, 250:6
**formerly** [1] - 177:5
**formulating** [1] - 260:14
**forte** [1] - 138:11
**forth** [8] - 41:22, 103:11, 126:23, 141:21, 159:12, 166:25, 191:13, 194:15
**forward** [4] - 164:2, 164:3, 187:18, 213:6
**forwarded** [1] - 29:8
**foundation** [15] - 61:1,

82:24, 94:10, 94:15, 96:24, 98:3, 99:1, 131:20, 132:20, 197:4, 197:5, 202:17, 222:21, 222:25, 250:20
**four** [7] - 116:2, 147:11, 147:12, 179:18, 180:22, 187:17, 266:1
**four-block** [2] - 116:2, 147:11, 147:12, 179:18, 180:22, 266:1
**Fourth** [4] - 54:8, 157:6, 157:8, 157:12
**FQHC** [2] - 56:24, 57:1
**frame** [10] - 39:17, 52:23, 66:14, 79:16, 80:18, 80:24, 94:25, 95:1, 99:18, 119:1
**framed** [1] - 126:21
**frames** [1] - 108:1
**franchise** [5] - 79:13, 87:24, 108:8, 108:11, 108:13, 108:21
**free** [4] - 111:9, 130:10, 216:13, 267:14
**freely** [2] - 187:3, 258:16
**frequency** [1] - 60:2
**frequently** [2] - 48:16, 250:5
**Friday** [1] - 236:13
**front** [7] - 40:25, 127:25, 170:17, 221:3, 248:10, 249:19, 264:1
**frustrating** [1] - 134:4
**fueled** [1] - 183:18
**full** [8] - 10:6, 14:5, 14:24, 54:13, 95:20, 117:13, 206:25, 252:4
**full-time** [4] - 10:6, 14:5, 54:13, 117:13
**Fuller** [19] - 2:4, 2:15, 62:15, 62:16, 62:18, 63:20, 64:5, 64:8, 64:11, 64:12, 68:19,
**FULLER** [43] - 2:15, 62:5, 62:16, 62:18, 63:20, 64:5, 64:8, 64:11, 64:12, 68:19,

68:22, 69:1, 69:4, 70:7, 70:14, 80:2, 80:3, 82:10, 82:16, 82:18, 83:10, 86:14, 86:16, 89:25, 90:9, 94:13, 94:18, 95:5, 95:22, 95:25, 97:4, 97:13, 98:6, 99:4, 99:9, 99:20, 99:23, 99:25, 100:8, 110:6, 110:9, 111:2, 111:8
**fully** [2] - 113:8, 262:19
**fund** [1] - 56:2
**funded** [3] - 57:3, 57:7, 181:7
**funding** [7] - 55:6, 55:9, 55:22, 55:23, 57:13, 249:12
**funds** [5] - 56:1, 56:4, 56:5, 57:14, 181:9

## G

**gang** [1] - 250:14
**gateway** [1] - 142:24
**gather** [5] - 118:5, 120:3, 138:14, 140:9, 152:5
**gathered** [2] - 139:8, 139:10
**gathering** [4] - 119:24, 129:8, 139:13, 223:22
**geared** [1] - 58:5
**gears** [1] - 145:20
**gender** [1] - 161:21
**general** [12] - 56:14, 70:24, 76:22, 96:13, 97:21, 102:10, 112:16, 116:9, 119:3, 125:6, 139:14, 229:7
**Generally** [5] - 81:18, 207:20, 223:16, 241:3, 258:22
**generally** [20] - 45:13, 68:12, 112:15, 118:23, 118:25, 128:24, 129:18, 148:8, 154:4, 161:20, 177:24, 179:23, 189:24, 197:10, 199:19, 212:11, 228:12, 241:2, 247:20, 249:5
**generic** [2] - 102:12, 212:8
**generics** [3] - 68:11, 68:13, 68:16

**Generics** [1] - 68:14
**gentleman** [1] - 84:21
**geographic** [7] - 147:10, 147:14, 147:19, 162:11, 162:12, 229:22, 267:5
**geographical** [3] - 64:19, 65:8, 117:4
**geographically** [4] - 152:11, 152:19, 153:15, 153:16
**geography** [1] - 55:3
**Georgia** [2] - 193:11, 194:9
**given** [4] - 48:8, 81:7, 98:21, 113:25, 258:16
**glance** [3] - 261:6, 261:8, 261:23
**goal** [3] - 76:15, 177:19, 222:9
**goals** [14] - 67:10, 68:16, 106:2, 106:4, 106:17, 137:18, 192:10, 192:16, 194:15, 213:1, 233:4, 233:9, 233:16
**goals/objectives** [1] - 191:16
**government** [8] - 153:4, 157:10, 157:15, 157:23, 157:24, 227:19, 227:21, 227:25
**grade** [1] - 204:23
**Grady** [2] - 87:22
**grams** [3] - 128:17, 128:18, 253:4
**grant** [11] - 55:22, 56:5, 176:25, 177:1, 177:2, 178:3, 178:6, 181:5, 181:6, 181:8, 257:4
**grants** [5] - 57:7, 121:24, 178:2, 178:4
**graph** [6] - 51:14, 51:17, 51:23, 52:8, 52:13, 247:19
**graphs** [9] - 165:13, 212:18, 212:25, 213:1, 220:23, 221:7, 262:15
**great** [4] - 122:8, 140:17, 143:16, 175:9
**greater** [3] - 15:12, 207:6, 267:4
**greatly** [2] - 174:22, 266:14

**green** [1] - 152:16
**GRETCHEN** [1] - 6:7
**ground** [2] - 32:18, 139:2
**grounds** [2] - 94:10, 169:12
**groundwork** [1] - 164:1
**group** [6] - 12:9, 88:12, 105:2, 105:5, 105:9
**groups** [1] - 171:13
**grow** [1] - 19:19
**growing** [4] - 20:18, 81:10, 204:9, 238:1
**growth** [4] - 93:1, 97:25, 98:7, 204:11
**guarantee** [2] - 146:8, 151:22
**guess** [3] - 113:25, 146:18, 258:14
**guidelines** [1] - 208:25
**gunned** [1] - 187:17
**guys** [2] - 68:6, 98:11

## H

**H-o-u-d-a-i-l-l-e** [1] - 184:3
**habit** [2] - 199:24, 207:15
**half** [7] - 17:9, 18:24, 21:12, 21:20, 49:18, 206:6, 265:21
**Half** [1] - 21:14
**halfway** [3] - 125:12, 131:9, 183:13
**hand** [22] - 9:4, 18:21, 28:13, 32:8, 33:6, 38:12, 62:11, 68:24, 111:20, 164:15, 181:18, 182:20, 190:13, 211:15, 220:16, 220:21, 221:5, 227:25, 228:4, 228:9, 232:21, 233:13
**handed** [2] - 121:6, 160:25
**handle** [2] - 77:24, 115:16
**handled** [1] - 115:11
**handout** [1] - 41:21
**hands** [2] - 35:13, 248:1
**Hank** [2] - 190:19, 194:23
**happy** [3] - 75:13, 75:14, 251:9

**hard** [2] - 63:24, 76:4
**HARDIN** [4] - 5:3, 20:21, 57:20, 61:14
**Harm** [1] - 144:13
**harm** [3] - 174:25, 175:2, 175:4
**harmless** [1] - 158:25
**Harvard** [1] - 10:21
**hate** [2] - 169:5, 173:6
**Hawkins** [1] - 3:7
**hazard** [1] - 19:25
**head** [4] - 28:4, 34:10, 110:22, 253:15
**heading** [2] - 183:2, 215:4
**health** [10] - 19:25, 41:14, 59:17, 137:15, 139:17, 139:18, 145:16, 146:22, 176:16, 176:17
**Health** [51] - 4:11, 5:2, 22:11, 27:1, 27:19, 37:12, 46:16, 53:25, 54:6, 54:11, 54:16, 54:18, 54:23, 56:21, 56:24, 57:2, 60:25, 65:25, 75:7, 79:14, 87:25, 92:25, 100:22, 101:16, 102:4, 102:6, 102:7, 102:16, 103:5, 103:9, 103:15, 104:16, 104:18, 104:24, 105:6, 105:8, 108:11, 108:14, 108:17, 109:10, 109:12, 109:18, 144:1, 144:12, 194:25, 205:2, 219:1, 222:6, 232:4, 235:22, 256:23
**Health's** [1] - 102:23
**health-related** [1] - 137:15
**healthcare** [9] - 12:12, 13:23, 19:17, 21:5, 22:21, 24:25, 25:15, 54:11, 171:10
**healthy** [1] - 166:18
**hear** [5] - 62:21, 63:25, 136:11, 159:2, 260:1
**heard** [6] - 20:15, 20:22, 25:19, 25:25, 73:19, 136:9
**hearing** [4] - 19:12, 64:4, 64:5, 140:24
**hearsay** [35] - 32:13,

32:18, 34:2, 36:5, 47:2, 83:1, 123:3, 123:7, 123:8, 125:20, 126:7, 126:8, 126:18, 126:24, 140:17, 140:19, 142:21, 142:22, 150:6, 152:22, 153:5, 156:5, 157:4, 158:2, 163:14, 166:3, 166:19, 166:24, 167:11, 169:16, 171:17, 171:22
**heart** [1] - 14:4
**held** [4] - 11:18, 11:22, 15:7, 67:23
**help** [8] - 31:14, 75:3, 84:13, 117:8, 136:16, 139:18, 215:9, 219:17
**helped** [3] - 175:1, 220:24, 224:2
**helpful** [4] - 49:10, 54:5, 83:14, 207:6
**helping** [1] - 165:16
**Hepatitis** [1] - 145:16
**hepatitis** [1] - 145:17
**heroin** [62] - 45:10, 48:1, 48:19, 52:22, 60:19, 128:17, 129:15, 142:15, 142:23, 145:15, 145:19, 148:14, 180:7, 198:4, 200:4, 200:8, 202:6, 203:2, 203:4, 203:6, 203:22, 203:24, 204:1, 211:11, 211:13, 211:15, 216:22, 217:2, 217:12, 218:13, 228:25, 229:15, 230:14, 231:10, 238:1, 238:15, 238:16, 240:6, 240:9, 240:18, 240:22, 241:2, 241:6, 242:24, 243:2, 243:3, 244:16, 244:22, 245:2, 246:23, 247:3, 249:2, 250:6, 250:15, 251:14, 253:4, 253:13, 262:25, 263:6, 263:8, 263:16, 263:20
**Heroin** [1] - 240:15
**heroin/fentanyl** [1] -

203:19
**HESTER** [4] - 5:9, 7:7, 20:5, 110:3
**hidden** [3] - 189:11, 234:25
**HIDTA** [6] - 31:24, 117:1, 145:5, 175:10
**high** [14] - 14:1, 16:11, 35:2, 46:24, 58:6, 90:18, 91:2, 117:1, 143:15, 143:18, 145:5, 183:18, 184:16, 184:22
**high-paying** [1] - 183:18
**high-pitched** [1] - 16:11
**high-risk** [1] - 14:1
**higher** [2] - 174:7, 251:14
**highest** [6] - 16:22, 16:24, 17:4, 180:21, 264:11, 264:12
**Highlawn** [2] - 147:18, 174:2
**highlight** [2] - 120:2, 209:12
**highlighted** [2] - 208:14, 251:8
**Highpoint** [2] - 114:5, 116:5
**HIPAA** [3] - 89:14, 224:1, 224:5
**hire** [1] - 181:9
**hired** [3] - 112:24, 114:8, 114:9
**Historic** [1] - 183:7
**historical** [3] - 146:16, 173:15, 188:8
**historically** [1] - 240:11
**Historically** [1] - 214:14
**history** [7] - 49:3, 112:22, 116:13, 183:11, 188:1, 221:22, 239:5
**hit** [8] - 68:16, 74:2, 74:6, 74:13, 74:19, 75:5, 98:20, 139:2
**hits** [1] - 76:22
**hitting** [2] - 73:24, 240:22
**HIV** [1] - 145:17
**hoc** [1] - 152:24
**Hold** [1] - 12:22
**hold** [4] - 9:18, 9:20, 10:8, 113:9
**Holley** [6] - 33:23, 34:2, 34:9, 34:10,

34:13, 35:11
**home** [2] - 237:2, 267:11
**Homeland** [1] - 117:25
**honest** [1] - 59:17
**Honor** [142] - 7:7, 7:14, 7:25, 8:22, 20:5, 20:21, 21:9, 21:25, 23:21, 23:23, 24:4, 24:13, 25:10, 25:22, 26:5, 28:15, 29:17, 31:6, 32:9, 32:12, 32:14, 33:2, 33:5, 33:7, 33:25, 34:7, 36:4, 36:23, 36:24, 38:14, 40:22, 46:9, 47:2, 57:20, 61:1, 61:11, 61:14, 62:2, 62:5, 62:16, 63:20, 64:11, 68:20, 69:1, 70:7, 70:10, 79:22, 82:11, 82:18, 82:21, 83:9, 89:19, 90:8, 94:11, 99:4, 99:7, 100:9, 100:14, 100:18, 101:19, 109:23, 110:3, 110:4, 110:6, 111:4, 111:8, 111:12, 121:3, 122:22, 123:13, 125:19, 126:1, 126:5, 126:25, 127:4, 130:6, 130:9, 131:19, 132:19, 133:3, 140:15, 140:21, 141:14, 142:25, 152:21, 154:14, 154:15, 156:4, 158:4, 158:17, 159:4, 159:15, 160:3, 160:9, 160:17, 163:11, 163:13, 165:6, 165:23, 166:3, 167:12, 167:15, 167:20, 168:18, 169:1, 169:5, 170:6, 171:16, 173:6, 174:13, 178:24, 182:11, 182:14, 186:16, 191:2, 191:5, 197:6, 201:12, 201:15, 202:10, 202:18, 203:11, 203:16, 205:19, 220:5, 223:2, 236:4, 236:7, 241:21, 242:6, 243:19, 244:1,

250:19, 250:24, 251:4, 257:7, 257:14, 257:19, 261:25, 267:6, 267:11, 267:13
**Honor's** [1] - 160:14
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**Hooked** [2] - 29:9, 30:4
**Hoops** [3] - 53:13, 53:16, 53:22
**hope** [3] - 101:13, 101:19, 177:9
**hoping** [1] - 178:5
**Hornbook** [2] - 156:15, 159:13
**horrible** [1] - 179:6
**horror** [1] - 152:2
**Hospital** [27] - 10:4, 10:7, 10:22, 11:2, 11:7, 11:23, 12:6, 15:20, 26:22, 46:1, 47:17, 49:14, 49:17, 50:7, 50:16, 51:12, 51:15, 53:14, 53:16, 53:22, 53:23, 53:24, 54:6, 54:19, 54:21, 56:22, 57:4
**hospital** [20] - 11:6, 11:21, 13:25, 15:9, 17:5, 51:25, 53:15, 53:23, 54:3, 55:7, 55:10, 55:13, 56:8, 56:10, 56:11, 96:13, 151:25, 152:1, 152:5
**hospitals** [5] - 12:2, 151:25, 152:25, 223:23, 226:1
**hotspots** [2] - 152:14, 153:20
**Houdaille** [2] - 183:25, 184:3
**hours** [1] - 171:9
**household** [1] - 184:24
**housekeeping** [1] - 257:3
**Housing** [1] - 185:14
**Howenstein** [3] - 73:12, 83:24, 83:25
**HPD** [28] - 118:15, 119:17, 119:19, 129:5, 173:21, 193:24, 199:8, 204:21, 230:6, 237:12, 237:19, 238:19, 238:25, 239:7, 239:18,

239:25, 246:12, 248:6, 248:14, 249:6, 249:23, 250:25, 251:18, 251:24, 252:1, 253:15, 254:8, 259:11
**hub** [3] - 193:10, 194:5, 233:6
**huge** [2] - 142:5, 224:5
**Human** [1] - 222:6
**human** [2] - 131:13, 133:17
**humans** [1] - 42:22
**hundreds** [1] - 171:9
**HUNTINGTON** [1] - 1:4
**Huntington** [192] - 3:10, 4:1, 8:7, 9:24, 10:3, 10:6, 11:23, 12:6, 12:10, 12:19, 13:5, 13:9, 15:18, 16:17, 17:5, 20:17, 26:22, 28:4, 28:10, 32:23, 37:6, 37:11, 37:12, 37:14, 37:21, 46:1, 46:24, 47:17, 49:14, 49:16, 50:7, 50:16, 51:11, 51:15, 53:16, 53:19, 53:23, 53:24, 54:6, 54:18, 54:19, 54:20, 54:21, 54:25, 55:3, 55:7, 55:21, 56:1, 56:22, 57:4, 57:16, 58:13, 60:19, 60:25, 94:20, 94:22, 95:4, 96:11, 107:3, 110:20, 112:8, 112:10, 112:13, 112:20, 112:23, 112:24, 113:5, 113:24, 114:6, 114:11, 114:16, 114:18, 116:2, 116:11, 117:7, 118:17, 119:17, 119:19, 121:10, 121:24, 122:6, 122:15, 124:6, 125:1, 125:21, 125:23, 129:7, 129:20, 129:22, 130:24, 132:2, 132:7, 133:6, 133:21, 134:9, 134:18, 134:22, 135:6, 135:9, 135:10, 135:17, 136:17, 137:2,

137:5, 137:9, 141:3, 141:10, 144:1, 147:23, 152:11, 152:20, 153:12, 153:17, 154:5, 155:7, 178:9, 178:10, 179:5, 179:11, 179:15, 179:22, 181:4, 183:7, 184:3, 185:23, 186:9, 186:22, 187:3, 187:6, 187:18, 188:19, 188:21, 188:25, 189:3, 189:7, 190:11, 193:9, 194:5, 196:19, 197:9, 197:15, 197:20, 197:23, 198:24, 200:11, 201:4, 202:7, 203:3, 204:14, 206:15, 214:7, 214:17, 218:4, 222:11, 224:9, 224:10, 233:6, 235:3, 235:7, 238:2, 238:10, 239:1, 240:5, 240:16, 241:8, 242:14, 242:25, 243:13, 246:19, 247:3, 247:7, 247:10, 248:20, 249:3, 249:13, 249:16, 250:3, 250:13, 251:13, 251:15, 252:7, 252:21, 253:13, 254:1, 256:7, 260:5, 265:18, 266:4, 266:8, 268:6
**Huntington's** [3] - 183:14, 183:17, 186:12
**Huntington-Cabell** [5] - 50:7, 50:16, 54:19, 58:13, 60:25
**Huntington/Cabell** [6] - 10:15, 12:13, 13:23, 19:22, 20:3, 21:6
**Hurricane** [3] - 101:3, 101:4, 101:7
**hydrocodone** [3] - 48:19, 264:17, 264:24

---

**I**

---

**idea** [2] - 117:16,

176:10
**ideal** [1] - 16:3
**ideas** [9] - 136:18,
138:12, 139:15,
164:1, 172:14,
176:14, 194:22,
212:11, 212:25
**identified** [7] - 41:18,
48:20, 124:22,
228:2, 236:17,
237:11, 249:11
**identifies** [2] - 43:22,
44:5
**identify** [4] - 15:17,
48:13, 48:17, 48:23
**ignore** [3] - 109:10,
169:20, 187:19
**ignoring** [1] - 109:13
**II** [1] - 171:5
**ill** [2] - 14:1, 14:17
**illegal** [24] - 127:7,
179:16, 180:16,
181:3, 181:8,
188:21, 189:2,
193:10, 194:6,
201:2, 204:19,
207:13, 207:19,
208:4, 208:8,
208:18, 209:6,
209:25, 215:1,
216:4, 216:7, 233:6,
242:24, 252:22
**illegally** [1] - 255:24
**illicit** [16] - 17:8, 45:7,
45:10, 45:16, 48:1,
180:9, 241:7,
242:15, 242:21,
242:23, 243:5,
244:15, 244:25,
245:14, 246:1
**Illinois** [1] - 184:7
**illustrates** [1] - 174:11
**imbalance** [1] -
162:16
**immediately** [2] -
151:17, 239:10
**immune** [1] - 246:19
**impact** [5] - 20:2,
21:7, 119:13,
174:18, 175:23
**impaired** [4] - 131:11,
133:4, 133:12,
133:14
**impeachment** [3] -
23:25, 220:7, 261:14
**implement** [1] - 175:1
**implemented** [2] -
140:5, 266:6
**implicate** [1] - 25:18
**important** [6] - 15:23,

16:5, 151:10,
175:20, 177:10,
236:25
**Improper** [1] - 23:25
**improve** [1] - 41:14
**improving** [1] - 112:16
**IN** [2] - 1:1, 1:18
**inaccuracies** [1] -
260:2
**incarcerated** [1] -
177:5
**incidence** [14] - 16:16,
16:19, 16:22, 17:4,
34:22, 34:24, 49:13,
50:2, 50:6, 50:10,
51:10, 51:14, 58:12,
59:2
**incidences** [1] -
197:15
**incident** [3] - 187:25,
188:20, 201:24
**Incidentally** [1] -
221:15
**include** [19] - 44:19,
119:5, 119:8,
119:10, 122:2,
124:14, 124:17,
127:12, 127:15,
128:6, 128:23,
129:1, 134:25,
149:9, 149:13,
199:6, 200:16,
239:20, 239:24
**included** [9] - 64:21,
124:23, 127:14,
162:6, 167:11,
169:25, 171:6,
189:21, 245:20
**includes** [4] - 43:18,
44:13, 47:25, 131:3
**Including** [1] - 77:17
**including** [11] - 15:21,
45:1, 47:24, 48:3,
48:18, 132:24,
157:6, 251:14,
262:14, 266:9
**inclusive** [1] - 163:7
**income** [2] - 184:23,
184:24
**inconsistent** [3] -
25:7, 25:8, 25:21
**incorporate** [1] -
229:1
**Incorporated** [1] -
12:10
**increase** [17] - 51:20,
51:23, 52:5, 94:1,
94:7, 199:17,
199:21, 199:25,
204:18, 204:20,

209:21, 209:22,
215:8, 217:13,
241:18, 243:16,
266:15
**increased** [10] - 96:17,
119:16, 128:19,
128:20, 163:4,
163:5, 204:11,
208:24, 245:20,
263:13
**increases** [10] - 96:1,
96:6, 127:20,
128:10, 128:17,
129:14, 145:16,
148:9, 148:10,
243:13
**Increases** [2] - 96:9,
240:21
**increasing** [7] - 116:7,
118:23, 125:7,
129:23, 145:18,
215:11, 263:8
**increasingly** [1] -
216:19
**independent** [5] -
55:14, 65:25, 96:10,
101:23, 109:1
**indeterminate** [1] -
207:23
**indicated** [2] - 166:19,
170:11
**indicates** [1] - 89:18
**indication** [1] - 94:7
**indicator** [1] - 92:4
**indicia** [2] - 157:19,
168:10
**indicted** [1] - 197:19
**individual** [15] - 27:25,
34:13, 48:18, 87:7,
87:9, 87:11, 151:25,
153:20, 162:16,
212:15, 224:19,
225:16, 238:19,
243:10, 263:24
**individual's** [2] -
246:6, 246:9
**individually** [1] -
48:20
**Individuals** [3] - 70:1,
194:8, 244:9
**individuals** [24] -
32:20, 37:5, 38:3,
136:5, 139:15,
140:8, 142:11,
143:5, 143:15,
174:24, 175:19,
177:5, 177:12,
193:3, 193:10,
193:15, 199:24,
233:22, 234:1,

238:25, 239:4,
243:8, 252:21,
264:13
**indulge** [2] - 61:24,
101:19
**industry** [1] - 65:5
**infants** [2] - 18:9,
18:22
**infected** [2] - 193:11,
194:9
**infectious** [1] - 14:4
**influenced** [1] - 68:10
**influx** [5] - 52:22,
60:19, 60:22,
204:14, 240:6
**inform** [2] - 127:17,
140:4
**information** [93] -
30:11, 30:21, 30:23,
34:20, 35:6, 39:15,
59:10, 70:1, 72:16,
74:3, 74:11, 74:14,
77:7, 77:8, 77:9,
80:12, 85:7, 85:21,
86:1, 88:21, 89:14,
92:20, 92:23, 94:2,
95:14, 103:21,
103:22, 107:14,
108:25, 110:24,
117:23, 118:12,
118:16, 119:4,
119:25, 120:2,
121:19, 121:22,
125:9, 125:11,
125:24, 127:16,
128:5, 129:5,
132:15, 139:8,
139:10, 140:9,
141:16, 150:13,
150:19, 151:3,
151:15, 152:6,
152:23, 157:1,
158:14, 161:20,
161:23, 162:23,
199:6, 199:11,
200:10, 200:16,
212:16, 212:19,
212:22, 219:9,
219:22, 220:2,
220:19, 222:2,
222:13, 223:5,
224:4, 224:22,
225:6, 225:19,
225:25, 226:16,
228:3, 228:8,
228:17, 228:19,
230:1, 230:10,
230:25, 231:1,
234:25, 252:6,
252:13, 255:2,

262:14
**informed** [2] - 95:7,
139:25
**informing** [1] - 140:22
**infrastructure** [3] -
12:13, 19:17, 21:5
**inherently** [1] - 140:16
**initial** [5] - 35:3, 66:11,
161:15, 194:21,
233:11
**initiate** [1] - 176:3
**initiated** [2] - 73:21,
174:17
**initiative** [6] - 69:13,
69:16, 70:22, 117:8,
266:8, 266:21
**Initiative** [2] - 177:8,
177:12
**initiatives** [1] - 177:5
**inject** [1] - 243:10
**injecting** [1] - 145:14
**injury** [1] - 7:18
**Innovation** [2] -
112:12, 113:6
**innovative** [1] -
136:17
**inside** [3] - 78:19,
96:5, 131:5
**insidious** [1] - 146:24
**insight** [1] - 80:6
**Inspection** [1] -
185:14
**inspector** [1] - 94:4
**instance** [4] - 45:15,
72:6, 127:22, 170:22
**instances** [3] -
131:15, 133:19,
135:11
**instead** [5] - 84:17,
93:16, 157:18,
207:14, 266:13
**institute** [1] - 175:13
**instituted** [2] - 136:3,
136:16
**institution** [1] - 46:24
**institutions** [4] - 8:5,
15:14, 15:17, 15:21
**insurance** [1] - 57:10
**Intelligence** [4] -
112:25, 118:3,
122:15, 132:7
**intended** [6] - 134:15,
162:22, 169:9,
169:24, 229:21
**intensity** [2] - 117:2,
145:6
**Intensive** [4] - 10:7,
13:25, 14:25, 53:8
**intent** [1] - 208:9
**intentions** [2] -

166:25, 173:9
**interact** [3] - 73:10, 79:4, 88:10
**interaction** [1] - 171:9
**interactions** [1] - 105:1
**Interdiction** [1] - 249:14
**interest** [3] - 93:1, 123:23, 154:24
**interested** [1] - 15:22
**interesting** [1] - 225:5
**internal** [1] - 115:2
**international** [1] - 221:24
**interrupt** [2] - 115:5, 180:13
**interrupted** [1] - 115:13
**Intervention** [4] - 114:4, 179:9, 182:7, 190:25
**intervention** [2] - 115:20, 115:24
**intrauterine** [1] - 42:2
**intro** [1] - 113:21
**introduce** [3] - 62:20, 62:22, 171:22
**introducing** [1] - 24:10
**introduction** [1] - 114:15
**inventive** [2] - 138:11, 139:17
**inventory** [1] - 102:11
**investigate** [1] - 135:11
**investigating** [1] - 248:19
**investigation** [26] - 90:14, 93:7, 93:24, 94:5, 98:11, 141:8, 142:4, 143:9, 150:8, 157:5, 158:6, 163:25, 168:10, 206:13, 211:9, 224:20, 246:21, 253:9, 253:24, 254:7, 254:20, 256:13, 256:21, 256:24, 258:23, 260:11
**Investigation** [1] - 157:12
**Investigations** [3] - 239:18, 263:1, 263:15
**investigations** [11] - 90:12, 115:1, 117:25, 135:14,

140:14, 158:9, 158:10, 168:24, 199:23, 248:22, 253:23
**investigative** [1] - 90:4
**Investigator** [1] - 95:19
**investigator** [6] - 88:8, 88:13, 88:14, 88:20, 88:22, 89:7
**investigators** [4] - 81:21, 253:25, 254:12, 255:5
**invoke** [1] - 8:14
**involve** [4] - 40:11, 46:1, 67:1, 102:7
**involved** [24] - 13:2, 28:9, 56:25, 91:13, 103:24, 119:24, 121:19, 200:11, 200:17, 228:22, 229:5, 234:14, 234:17, 234:20, 242:14, 242:18, 242:21, 244:16, 245:2, 245:14, 246:2, 253:8, 254:6, 254:20
**involvement** [2] - 13:22, 119:22
**involves** [1] - 140:17
**involving** [5] - 38:23, 231:8, 231:13, 244:16, 245:1
**IR** [1] - 92:7
**Irpino** [3] - 3:7, 202:10, 202:14
**IRPINO** [2] - 202:10, 202:14
**irritable** [1] - 16:10
**ISIA** [1] - 5:4
**issue** [19] - 7:17, 7:19, 92:3, 92:4, 106:19, 135:18, 137:12, 139:16, 154:18, 172:14, 172:20, 178:20, 207:1, 207:3, 211:15, 214:17, 218:21, 238:10, 240:19
**Issues** [1] - 73:25
**issues** [23] - 19:3, 19:9, 19:13, 19:14, 20:19, 71:14, 71:22, 73:23, 85:5, 89:1, 99:17, 116:19, 118:1, 135:16, 136:17, 144:15, 144:17, 145:9,

145:15, 145:16, 151:17, 241:10
**item** [1] - 257:3
**items** [1] - 81:17
**itself** [5] - 125:11, 135:13, 176:11, 206:20, 238:19
**IV** [5] - 142:6, 145:7, 145:9, 145:15, 145:18

## J

**Jackson** [1] - 6:8
**jail** [2] - 23:3
**Jan** [9] - 136:12, 138:4, 138:9, 144:5, 176:7, 190:19, 194:22, 196:8, 224:2
**January** [8] - 136:23, 148:24, 192:13, 195:15, 196:2, 197:17, 249:21, 252:5
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**Jennifer** [1] - 100:21
**JENNIFER** [1] - 4:12
**Jesse** [3] - 62:6, 62:9, 62:23
**JESSE** [1] - 62:12
**Jim** [11] - 27:25, 28:3, 28:7, 29:8, 37:9, 138:4, 138:7, 144:6, 190:19, 194:23, 196:16
**jimjohnson@ cityofhuntington. com** [1] - 37:7
**jittery** [1] - 16:13
**Joan** [1] - 29:1
**job** [20] - 72:3, 72:25, 75:6, 83:1, 85:6, 95:12, 102:7, 102:10, 112:11, 112:23, 117:9, 132:2, 146:6, 177:9, 177:18, 178:20, 195:25, 226:9, 265:6, 266:9
**jobs** [5] - 95:6, 183:19, 184:23, 195:13, 195:19
**Joe** [17] - 8:23, 22:4, 31:12, 39:6, 83:18, 84:15, 85:8, 85:11, 85:12, 85:14, 91:9, 93:21, 108:1, 108:3, 131:6, 131:18
**Johnson** [13] - 27:25,

28:3, 28:7, 29:8, 37:10, 138:4, 144:6, 190:6, 190:9, 190:10, 190:19, 194:23, 196:16
**joined** [5] - 66:10, 79:7, 139:3, 189:13, 195:9
**Joint** [2] - 27:5, 37:15
**Joseph** [5] - 9:2, 9:12, 27:21, 28:25, 87:15
**JOSEPH** [2] - 6:4, 9:5
**Journal** [3] - 46:11, 58:1, 58:3
**journal** [3] - 58:4, 58:5, 58:8
**JR** [2] - 2:3, 2:15
**Juan** [2] - 2:5, 2:17
**Judge** [28] - 7:2, 13:21, 24:7, 25:6, 36:20, 37:20, 47:10, 61:8, 62:20, 62:22, 80:2, 82:15, 89:25, 94:13, 110:18, 111:2, 123:2, 123:9, 126:10, 142:21, 157:23, 159:10, 201:22, 201:23, 213:18, 257:20, 261:11
**judge** [7] - 36:18, 49:20, 58:3, 58:15, 58:21, 61:22, 149:17
**JUDGE** [1] - 1:17
**judges** [1] - 207:24
**July** [6] - 99:14, 113:5, 179:4, 206:7, 213:8, 227:6
**jump** [1] - 257:24
**jumping** [1] - 173:6
**June** [1] - 182:2
**jurisdiction** [1] - 247:10
**justice** [2] - 113:21, 175:16
**justified** [1] - 153:6

## K

**K-a-v-e** [1] - 62:9
**Kave** [41] - 61:23, 62:6, 62:9, 62:13, 62:20, 62:23, 62:24, 64:13, 68:23, 79:23, 80:4, 82:17, 82:23, 83:11, 83:12, 83:14, 84:14, 86:17, 87:9, 89:20, 90:3, 90:10, 94:19, 95:2, 95:20, 96:12, 96:19, 97:2,

97:8, 97:14, 98:23, 99:10, 99:21, 100:2, 100:21, 101:2, 101:9, 108:23, 109:9, 110:10, 111:6
**KAVE** [1] - 62:12
**KEARSE** [2] - 4:2, 111:12
**Keck** [1] - 87:18
**keep** [5] - 75:13, 75:16, 173:6, 222:5, 250:12
**keeping** [4] - 75:14, 109:15, 109:19, 161:19
**Kelly** [1] - 6:8
**Kenneth** [1] - 31:20
**Kenny** [2] - 31:21, 31:23
**Kentucky** [3] - 14:20, 15:19, 64:21
**kept** [10] - 125:22, 166:5, 200:9, 200:15, 222:9, 226:13, 227:11, 229:17, 231:25
**Kessler** [1] - 4:17
**key** [1] - 266:5
**kids** [1] - 19:3
**Kim** [8] - 73:12, 73:13, 83:24, 83:25, 84:8, 84:13, 84:15, 84:19
**Kimberly** [1] - 73:18
**kind** [31] - 32:17, 85:25, 90:13, 115:11, 119:2, 120:13, 128:11, 129:13, 135:23, 137:11, 137:22, 139:4, 142:14, 144:17, 146:24, 147:11, 152:14, 161:14, 168:12, 177:18, 179:18, 186:24, 189:11, 192:8, 192:14, 194:19, 194:21, 204:7, 213:3, 224:21, 229:16
**kindergarten** [1] - 143:15
**Kindergartners** [1] - 143:16
**kinds** [5] - 72:5, 127:18, 178:1, 179:25, 209:22
**Kirkpatrick** [4] - 156:14, 156:24, 159:15, 167:23
**knowing** [1] - 98:10

**knowledge** [28] - 10:14, 12:12, 12:18, 13:8, 13:13, 18:21, 20:6, 32:22, 41:8, 55:11, 57:15, 57:17, 82:24, 109:2, 125:21, 157:2, 160:13, 174:12, 178:8, 197:4, 229:8, 234:25, 237:4, 251:1, 252:19, 254:7, 254:20, 256:15
**known** [4] - 43:4, 78:10, 240:15, 250:13
**knows** [2] - 61:3, 188:4
**Kofi** [1] - 254:13
**KOUBA** [1] - 3:14

## L

**L-e-y-i-m-u** [1] - 112:1
**LA** [1] - 3:8
**labor** [1] - 49:1
**laced** [4] - 202:6, 203:6, 242:23, 243:10
**lacing** [2] - 243:2
**lack** [2] - 82:24, 134:15
**Lady** [1] - 15:22
**laid** [2] - 197:4, 222:25
**Lanier** [1] - 3:4
**large** [4] - 49:6, 175:21, 186:3, 250:6
**largely** [1] - 37:15
**larger** [1] - 253:23
**largest** [2] - 54:11, 250:3
**last** [29] - 17:11, 36:1, 85:11, 93:1, 93:11, 95:18, 97:10, 113:5, 117:20, 122:9, 127:19, 165:2, 170:12, 171:5, 179:4, 208:22, 210:2, 213:16, 219:13, 220:12, 221:2, 221:8, 224:21, 227:6, 240:18, 253:15, 253:16, 265:2, 266:16
**late** [2] - 195:10, 236:13
**latter** [1] - 86:7
**LAURA** [1] - 5:10
**Laura** [2] - 40:2,

236:11
**law** [34] - 111:16, 113:18, 134:3, 137:12, 137:14, 137:23, 138:1, 138:8, 145:2, 145:3, 145:4, 146:4, 146:23, 151:13, 156:15, 156:19, 156:25, 157:6, 157:15, 159:13, 160:8, 171:10, 174:22, 207:6, 208:23, 208:25, 210:8, 210:25, 211:2, 212:17, 214:22, 220:25
**LAW** [1] - 36:18
**Law** [4] - 3:4, 3:7, 3:12, 124:3
**laws** [5] - 144:24, 207:4, 207:22, 215:8, 215:20
**lay** [1] - 197:5
**lead** [2] - 16:14, 64:9
**leadership** [5] - 11:22, 12:2, 12:4, 12:14, 56:25
**leading** [2] - 45:4, 101:20
**learn** [2] - 113:17, 140:13
**learning** [1] - 19:12
**least** [11] - 28:3, 34:20, 41:20, 45:3, 88:3, 92:22, 126:6, 190:21, 197:18, 227:19, 265:22
**leave** [6] - 67:22, 67:24, 68:6, 76:23, 150:11, 267:15
**leaves** [1] - 67:20
**led** [3] - 27:7, 48:22, 233:5
**Lee** [1] - 3:12
**left** [15] - 65:11, 67:21, 67:22, 68:2, 98:13, 98:15, 185:18, 185:19, 186:2, 195:15, 196:2, 196:8, 196:16, 197:18, 247:19
**legally** [2] - 157:4, 158:5
**legislative** [1] - 210:11
**legislators** [1] - 215:8
**Lemley** [115] - 111:13, 111:19, 112:1, 112:4, 112:6, 112:7, 114:7, 121:6,

123:23, 124:23, 126:2, 127:13, 128:6, 130:7, 130:13, 130:16, 132:2, 136:13, 141:12, 141:23, 143:11, 149:24, 150:4, 153:4, 153:17, 154:16, 155:3, 158:6, 160:20, 163:19, 165:9, 168:21, 170:10, 172:2, 174:15, 178:21, 179:2, 179:8, 181:18, 181:19, 182:18, 183:6, 185:6, 187:2, 187:15, 188:6, 189:12, 190:13, 190:15, 190:17, 191:9, 194:13, 195:7, 197:8, 197:12, 201:2, 203:14, 203:18, 205:10, 205:24, 209:10, 209:14, 211:22, 212:4, 213:7, 213:16, 213:20, 214:3, 219:10, 219:15, 220:11, 221:11, 226:23, 232:12, 232:19, 234:9, 234:23, 236:11, 237:20, 241:24, 242:4, 242:12, 243:22, 244:8, 244:17, 245:12, 246:11, 246:15, 246:25, 248:10, 249:11, 250:21, 250:24, 251:6, 251:11, 251:12, 251:17, 251:19, 251:24, 253:16, 253:19, 255:17, 257:1, 257:9, 257:10, 257:17, 260:21, 261:22, 263:11, 264:9, 266:25, 267:7, 267:9, 267:12
**LEMLEY** [1] - 111:21
**Lemley's** [2] - 171:1, 197:3
**lengthy** [1] - 96:24
**Leon** [2] - 2:4, 2:16
**less** [5] - 92:8, 152:16, 206:14, 245:16,

266:3
**lethal** [1] - 125:14
**letter** [5] - 71:10, 71:12, 71:18, 131:3, 166:13
**level** [17] - 18:10, 115:12, 123:2, 139:23, 143:14, 144:9, 144:18, 144:25, 145:1, 151:16, 177:7, 177:11, 184:24, 192:8, 207:24, 227:21
**Levin** [1] - 2:12
**Leyimu** [6] - 111:25, 127:3, 130:1, 159:5, 197:25, 264:4
**LEYIMU** [73] - 4:8, 111:24, 112:3, 121:3, 121:5, 122:22, 123:13, 123:16, 123:22, 126:5, 126:25, 127:4, 127:5, 130:3, 130:5, 130:15, 131:24, 131:25, 133:3, 140:21, 141:11, 141:22, 142:25, 150:12, 153:8, 154:14, 154:22, 155:2, 158:4, 159:18, 159:19, 160:3, 160:17, 160:19, 163:11, 163:17, 165:4, 165:6, 165:8, 165:23, 167:12, 167:15, 168:18, 168:20, 171:3, 172:1, 172:24, 173:1, 173:13, 174:13, 174:14, 178:21, 182:14, 186:11, 188:2, 191:5, 197:2, 220:5, 222:21, 222:24, 242:9, 244:4, 250:19, 257:7, 257:14, 257:18, 257:21, 257:23, 261:19, 262:6, 264:6, 264:7, 267:6
**liaison** [5] - 75:6, 75:11, 85:3, 103:4, 108:24
**liberally** [2] - 27:8, 27:14
**license** [3] - 78:14, 109:7, 255:8

**licensed** [1] - 10:11
**licensure** [1] - 218:18
**life** [1] - 10:1
**light** [4] - 14:24, 15:1, 16:5, 152:16
**likelihood** [2] - 60:17, 243:16
**likely** [1] - 247:24
**Lily's** [6] - 17:24, 53:8, 55:12, 55:17, 56:2, 56:5
**limit** [1] - 177:2
**limited** [7] - 37:17, 38:16, 42:8, 77:20, 167:9, 168:3, 254:21
**limits** [1] - 178:7
**LINDA** [1] - 4:5
**Line** [1] - 90:22
**line** [13] - 24:21, 29:9, 30:1, 100:2, 117:21, 169:10, 191:10, 219:15, 219:25, 220:12, 226:23, 248:5, 262:9
**lines** [3] - 77:6, 77:9, 209:14
**link** [1] - 29:13
**linked** [1] - 252:13
**Lisa** [2] - 6:18, 268:3
**list** [41] - 43:15, 44:12, 45:9, 126:16, 146:1, 148:19, 149:7, 150:21, 152:23, 155:21, 159:23, 160:23, 160:24, 161:18, 162:9, 170:1, 210:11, 222:4, 222:13, 223:5, 223:9, 223:10, 223:20, 224:13, 224:15, 226:19, 227:5, 228:21, 228:23, 230:9, 230:25, 231:8, 231:23, 232:2, 232:5, 232:8, 232:11, 258:18, 258:21
**listed** [5] - 41:11, 45:2, 87:9, 198:3
**listening** [2] - 140:7, 140:16
**lists** [5] - 126:14, 126:15, 150:20, 155:7, 230:23
**literally** [3] - 116:3, 174:8, 192:15
**literature** [1] - 40:13
**live** [6] - 9:23, 101:2, 101:3, 101:6, 112:7,

112:8
**lived** [3] - 9:25, 101:4, 101:8
**living** [1] - 229:3
**LLC** [1] - 2:4
**lobby** [1] - 136:4
**local** [13] - 18:13, 95:8, 96:9, 96:20, 97:16, 144:9, 151:16, 210:8, 236:22, 241:17, 247:13, 247:15, 248:1
**locally** [3] - 144:16, 243:7, 248:2
**located** [4] - 53:13, 94:20, 96:14, 250:4
**location** [4] - 149:8, 162:8, 229:22
**locations** [1] - 54:15
**lodging** [1] - 126:20
**Logan** [2] - 6:5, 6:12
**long-range** [1] - 19:14
**long-term** [4] - 13:13, 18:21, 19:2, 34:16
**Look** [2] - 69:5, 262:7
**look** [69] - 29:23, 38:10, 40:19, 43:1, 46:19, 50:21, 68:25, 70:20, 81:12, 81:15, 81:16, 81:19, 83:11, 84:3, 92:1, 97:15, 117:10, 117:20, 133:4, 145:9, 146:12, 147:3, 147:5, 148:3, 154:12, 159:25, 160:1, 160:8, 161:15, 164:25, 169:12, 173:15, 177:4, 182:18, 190:15, 192:17, 192:18, 206:17, 207:21, 208:13, 212:10, 213:20, 214:18, 224:23, 228:16, 237:15, 241:20, 243:17, 246:12, 246:17, 248:6, 249:7, 250:1, 251:17, 252:3, 253:17, 253:18, 255:1, 255:15, 255:23, 260:17, 260:19, 261:20, 262:1, 262:19, 264:8
**looked** [24] - 37:7, 37:9, 59:22, 59:23, 59:24, 60:1, 81:12, 81:13, 93:11,

129:17, 134:5, 142:10, 142:13, 152:12, 162:19, 190:25, 224:16, 224:18, 235:13, 239:14, 255:18, 257:5, 260:4, 261:16
**Looking** [2] - 220:21, 240:20
**looking** [31] - 30:1, 36:25, 45:9, 50:22, 52:14, 52:15, 52:20, 66:4, 73:1, 78:13, 104:4, 122:9, 129:19, 146:22, 147:2, 147:6, 162:7, 162:8, 162:14, 175:24, 188:12, 206:20, 221:5, 224:23, 226:21, 229:13, 229:14, 242:3, 244:14, 251:24, 266:16
**lookout** [1] - 95:16
**looks** [4] - 41:20, 49:5, 52:1, 70:6
**lorazepam** [1] - 43:25
**lose** [1] - 67:16
**loss** [4] - 184:22, 185:5, 185:12, 185:17
**lost** [7] - 67:13, 67:18, 67:19, 68:2, 182:19, 208:12, 245:8
**loud** [2] - 14:24, 168:16
**Loudin** [1] - 46:14
**low** [5] - 15:1, 16:5, 174:5
**low-light** [1] - 15:1
**low-stimulation** [1] - 15:1
**lower** [1] - 204:12
**lowest** [2] - 166:21, 167:4
**luckily** [1] - 178:5

## M

**M.A** [1] - 113:15
**M.D** [1] - 29:1
**ma'am** [1] - 171:25
**Magazine** [1] - 3:7
**Mahady** [6] - 21:10, 21:24, 22:24, 24:12, 36:22, 38:16
**MAHADY** [30] - 6:4, 21:25, 22:3, 23:21, 24:4, 24:13, 24:18, 25:10, 25:22, 25:24,

26:11, 28:17, 29:17, 29:20, 32:12, 32:14, 33:2, 33:5, 33:9, 34:7, 34:8, 36:9, 36:23, 38:2, 38:9, 38:12, 38:18, 39:23, 61:11, 257:10
**mail** [18] - 36:25, 37:6, 37:9, 38:21, 38:22, 38:25, 39:4, 59:1, 169:11, 170:17, 170:19, 170:21, 190:18, 191:14, 191:20, 192:22, 194:22
**mails** [4] - 37:5, 37:14, 169:2, 170:7
**main** [2] - 212:12, 223:18
**Maine** [1] - 16:24
**MAINIGI** [1] - 4:12
**maintain** [1] - 160:14
**maintained** [1] - 223:6
**MAJESTRO** [1] - 2:6
**Majestro** [1] - 2:6
**major** [3] - 16:7, 180:25, 252:14
**majority** [11] - 11:12, 22:23, 45:25, 46:25, 47:20, 133:13, 133:14, 149:12, 237:1, 237:4, 242:20
**maker** [1] - 105:8
**makers** [2] - 118:14, 138:22
**males** [1] - 154:9
**manage** [4] - 14:11, 15:15, 49:25, 108:17
**managed** [1] - 53:7
**management** [9] - 16:4, 17:8, 21:19, 39:8, 50:18, 58:5, 91:14, 91:16, 102:11
**manages** [1] - 53:3
**managing** [2] - 15:2, 20:10
**mandated** [1] - 49:2
**manmade** [1] - 42:18
**manner** [1] - 207:25
**manufacturer** [1] - 30:19
**manufacturers** [1] - 37:22
**manufacturing** [3] - 183:19, 183:20, 184:16
**map** [17] - 152:13, 152:14, 162:9, 173:2, 173:4, 174:4, 174:12, 212:9,

232:12, 233:12, 234:2, 234:6, 234:9, 234:16, 234:18, 234:20, 234:22
**mapped** [1] - 162:20
**maps** [7] - 147:6, 173:20, 212:25, 220:22, 221:7, 232:23, 262:15
**March** [6] - 33:11, 33:24, 35:12, 38:22, 39:21, 96:15
**marijuana** [2] - 198:6, 204:3
**Marijuana** [1] - 128:21
**mark** [5] - 187:6, 193:3, 193:15, 233:22, 234:1
**MARK** [1] - 3:16
**marked** [2] - 181:19, 190:14
**Market** [4] - 114:4, 179:9, 182:6, 190:25
**market** [9] - 106:18, 114:6, 115:20, 115:23, 116:1, 135:24, 179:20, 180:19, 266:23
**marketing** [1] - 30:19
**marketplace** [2] - 66:3, 77:3
**Marshall** [23] - 10:4, 10:18, 11:19, 19:17, 27:1, 27:18, 27:22, 29:2, 35:12, 46:10, 46:16, 53:20, 53:25, 54:3, 54:6, 54:11, 54:16, 54:18, 56:21, 113:14, 113:20, 144:2, 227:22
**Mary's** [2] - 56:22, 57:4
**Master's** [1] - 221:24
**mater** [1] - 15:20
**maternal** [1] - 43:4
**math** [1] - 256:6
**Mathis** [9] - 34:2, 34:9, 34:10, 34:13, 35:12, 35:19, 35:21, 36:1, 38:23
**Mathis's** [2] - 33:23, 35:11
**matter** [15] - 32:17, 37:3, 38:17, 47:6, 56:16, 63:6, 67:16, 99:11, 156:15, 157:2, 162:16, 162:19, 162:24, 162:25, 268:5
**mattered** [1] - 162:21

**matters** [1] - 156:23
**MAY** [1] - 1:19
**mayor** [9] - 37:8, 136:16, 138:22, 141:9, 166:14, 167:13, 171:17, 171:18, 171:23
**Mayor** [5] - 118:14, 122:21, 166:14, 167:3, 171:6
**Mayor's** [67] - 28:4, 113:1, 113:7, 113:9, 132:8, 133:5, 135:7, 136:8, 136:14, 136:15, 136:24, 137:18, 138:13, 139:3, 139:6, 140:3, 140:23, 141:25, 143:1, 143:20, 144:8, 144:20, 145:8, 145:21, 146:13, 147:24, 149:20, 150:25, 158:7, 158:18, 163:18, 165:15, 165:24, 167:17, 168:22, 172:2, 172:10, 173:9, 174:16, 176:2, 177:4, 177:21, 178:9, 189:13, 191:10, 191:21, 194:1, 195:8, 195:12, 195:18, 196:8, 196:13, 196:19, 198:18, 200:3, 202:19, 205:11, 205:14, 206:3, 210:3, 210:6, 211:23, 221:12, 233:5, 233:10, 235:15, 261:2
**Mayors** [1] - 176:12
**MC-WV-01686** [1] - 46:10
**MC-WV-2113** [2] - 40:20, 41:18
**MCCLURE** [1] - 6:3
**MCGINNESS** [1] - 4:2
**McGlothlin** [3] - 85:11, 85:14, 87:15
**MCK-WV-01686** [1] - 46:8
**McKesson** [16] - 5:8, 22:8, 22:10, 40:3, 60:24, 65:2, 65:4, 65:9, 65:11, 195:2, 205:5, 219:3, 232:7, 236:1, 236:12, 256:12

**ME's** [1] - 150:17
**mean** [33] - 18:16, 67:5, 72:24, 76:23, 87:10, 88:12, 104:12, 133:23, 134:13, 137:25, 142:6, 143:16, 144:12, 144:17, 146:9, 146:22, 147:11, 148:8, 154:6, 172:19, 177:15, 178:6, 180:13, 188:7, 204:24, 220:22, 220:24, 221:5, 225:3, 225:4, 229:13, 258:16
**meaning** [1] - 240:13
**meaningful** [2] - 177:14, 177:15
**means** [2] - 92:24, 114:3
**measure** [1] - 26:14
**measures** [1] - 215:5
**mechanical** [1] - 6:19
**mechanics** [1] - 53:11
**mechanisms** [1] - 176:18
**median** [2] - 184:23, 184:24
**Medicaid** [2] - 56:11, 57:11
**Medical** [12] - 10:21, 27:1, 27:18, 27:21, 29:1, 31:14, 39:1, 54:2, 54:9, 56:22, 150:17, 150:18
**medical** [11] - 10:24, 15:5, 32:21, 38:3, 40:8, 40:15, 138:10, 204:23, 225:20, 226:8, 226:9
**medically** [1] - 151:13
**Medicap** [1] - 108:13
**medication** [16] - 13:3, 13:4, 18:24, 21:15, 21:19, 21:21, 22:12, 35:9, 49:19, 106:5, 106:21, 210:13, 232:4, 232:6, 232:9, 255:25
**medications** [11] - 91:13, 102:9, 125:15, 127:8, 136:6, 210:16, 218:7, 234:17, 236:23, 237:1, 237:7
**medicine** [9] - 9:22, 10:2, 11:21, 12:15, 58:9, 59:8, 236:22

**Medicine** [39] - 10:4, 10:10, 10:19, 11:20, 12:5, 12:11, 29:2, 46:11, 54:4, 58:2, 77:17, 77:18, 79:4, 79:13, 80:20, 85:8, 85:12, 86:8, 86:9, 86:12, 86:23, 88:1, 98:11, 98:13, 98:18, 98:24, 100:2, 107:3, 107:10, 107:20, 108:8, 108:11, 108:13, 108:14, 108:17, 108:21, 109:2, 110:25, 111:1
**meet** [2] - 22:6, 106:21
**meeting** [4] - 88:15, 172:15, 172:16
**meetings** [6] - 28:9, 138:24, 144:21, 171:9, 172:17, 172:18
**members** [6] - 122:20, 189:21, 192:2, 196:22, 250:14, 252:5
**Memo** [1] - 157:11
**memory** [7] - 71:19, 84:6, 127:11, 180:6, 184:11, 186:25, 218:24
**men** [1] - 30:22
**mental** [1] - 176:16
**mention** [11] - 194:17, 194:24, 195:2, 195:4, 211:7, 211:19, 218:22, 219:1, 219:3, 219:5, 230:7
**mentioned** [14] - 18:23, 45:19, 53:11, 55:12, 56:18, 65:11, 80:5, 87:16, 136:8, 139:25, 145:7, 199:3, 228:25, 239:21
**merchandising** [1] - 102:13
**mere** [2] - 153:3, 157:13
**merged** [1] - 12:10
**met** [1] - 179:4
**methamphetamine** [5] - 230:20, 231:12, 231:14, 245:23, 246:2
**methamphetamines** [1] - 180:5
**method** [2] - 224:14, 224:25

**methods** [1] - 225:1
**Mexican** [1] - 204:19
**Mexico** [3] - 204:16, 204:17, 204:22
**Michael** [1] - 73:10
**MICHAEL** [2] - 2:15, 3:9
**Michigan** [6] - 193:11, 194:9, 248:23, 250:4, 252:7, 252:21
**microphone** [3] - 63:25, 64:3, 86:2
**mid** [1] - 207:24
**mid-2000s** [2] - 193:12, 194:10
**middle** [2] - 28:19, 143:18
**midwestern** [1] - 186:4
**might** [17] - 17:21, 50:8, 50:25, 74:10, 100:24, 108:3, 109:22, 110:7, 123:8, 136:25, 167:11, 189:20, 199:8, 199:10, 228:3, 231:20, 259:22
**Mike** [1] - 62:19
**MILDRED** [1] - 3:3
**miles** [2] - 96:14, 250:4
**milligram** [1] - 92:7
**million** [4] - 60:23, 79:21, 80:20, 196:25
**mind** [3] - 31:15, 32:15, 212:1
**minds** [1] - 30:14
**minimum** [3] - 162:7, 259:23, 259:24
**miniscule** [1] - 76:14
**ministerial** [2] - 156:16, 168:4
**ministerial-type** [1] - 168:4
**minute** [9] - 12:22, 34:18, 36:16, 142:19, 190:14, 222:22, 238:13, 261:12, 263:2
**minutes** [5] - 36:13, 62:1, 111:14, 203:12, 220:17
**mirror** [1] - 208:25
**miscreants** [1] - 31:4
**miss** [7] - 146:7, 146:8, 150:21, 150:22, 152:9, 223:20, 258:23
**missed** [1] - 151:22

**missing** [1] - 226:18
**mission** [4] - 137:21, 191:15, 192:9, 194:15
**mistake** [1] - 158:25
**misunderstanding** [1] - 78:25
**misunderstood** [2] - 21:11, 110:17
**Mitchell** [1] - 2:12
**mixing** [1] - 243:4
**MMWR** [4] - 33:17, 59:2, 59:5
**Mock** [1] - 38:25
**Mock's** [1] - 39:13
**modalities** [1] - 13:17
**modality** [3] - 8:2, 8:6, 17:15
**MODC** [1] - 136:25
**MODCP** [3] - 215:7, 215:19, 216:2
**MODCP's** [2] - 214:19, 214:22
**model** [1] - 15:9
**modify** [1] - 140:12
**moment** [3] - 100:13, 109:22, 126:1
**moments** [3] - 45:20, 61:24, 256:3
**Monday** [2] - 84:16, 267:19
**Mone** [4] - 71:13, 73:10, 90:1, 90:2
**Money** [1] - 30:5
**money** [4] - 76:6, 106:22, 178:18, 180:1
**monster** [1] - 39:22
**month** [16] - 39:11, 81:10, 92:15, 96:18, 102:20, 117:21, 120:4, 140:7, 140:16, 161:13, 189:6, 196:18, 242:13, 265:3, 265:11
**months** [13] - 49:11, 93:2, 93:7, 93:21, 151:14, 164:9, 182:5, 182:6, 206:10, 206:14, 212:7, 266:16
**moon** [1] - 258:22
**Morbidity** [1] - 33:18
**moreover** [1] - 158:15
**morning** [1] - 7:6, 7:7, 9:10, 21:25, 22:1, 40:2, 40:4, 40:5, 52:24, 62:13, 100:21, 100:23,

112:4
**morphine** [1] - 216:22
**Morris** [1] - 6:15
**Mortality** [1] - 33:18
**Most** [3] - 72:24, 89:8, 115:2
**most** [13] - 16:21, 39:11, 42:13, 65:8, 88:23, 117:17, 119:25, 125:13, 140:6, 148:19, 184:16, 230:22, 247:24
**mostly** [2] - 11:17, 65:25
**mother** [4] - 11:16, 40:9, 49:1, 49:4
**mothers** [3] - 13:9, 41:15, 48:15
**motion** [1] - 82:19
**Motley** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**MOUGEY** [1] - 2:12
**Mountain** [1] - 54:23
**mouth** [1] - 234:24
**move** [25] - 20:23, 25:23, 32:9, 36:24, 37:16, 63:25, 64:2, 70:7, 82:11, 142:10, 142:23, 160:3, 163:12, 164:2, 164:3, 165:24, 182:11, 182:12, 191:2, 213:5, 242:6, 244:1, 245:9, 253:2, 257:3
**moved** [12] - 101:7, 113:5, 122:23, 142:15, 192:14, 195:13, 195:19, 195:21, 195:24, 212:11, 213:4, 218:12
**moving** [2] - 85:18, 248:7
**MR** [196] - 2:3, 2:6, 2:9, 2:12, 2:15, 3:9, 3:11, 3:16, 4:17, 5:9, 5:10, 5:13, 6:4, 7:7, 7:25, 8:11, 8:13, 8:20, 8:22, 9:9, 13:7, 20:5, 21:3, 21:9, 21:25, 22:3, 23:21, 23:23, 23:25, 24:4, 24:7, 24:13, 24:18, 25:6, 25:10, 25:22, 25:24, 26:5, 26:7, 26:11, 28:17, 29:17, 29:20, 32:12, 32:13, 32:14, 33:2, 33:5,

33:9, 33:25, 34:2, 34:7, 34:8, 36:4, 36:9, 36:20, 36:23, 37:20, 38:2, 38:9, 38:12, 38:18, 39:23, 47:2, 57:24, 58:15, 58:21, 58:23, 61:8, 61:11, 61:22, 62:2, 62:5, 62:16, 62:18, 63:20, 64:5, 64:8, 64:11, 64:12, 68:19, 68:22, 69:1, 69:4, 70:7, 70:14, 80:2, 80:3, 82:10, 82:16, 82:18, 83:10, 86:14, 86:16, 89:25, 90:9, 94:13, 94:18, 95:5, 95:22, 95:25, 97:4, 97:13, 98:6, 99:4, 99:9, 99:20, 99:23, 99:25, 100:8, 110:3, 110:4, 110:6, 110:9, 111:2, 111:8, 123:1, 123:9, 125:19, 126:1, 126:10, 126:12, 131:19, 132:19, 140:15, 141:14, 142:21, 149:17, 152:21, 156:4, 159:4, 159:9, 159:10, 159:15, 160:9, 163:13, 166:3, 166:10, 167:20, 167:22, 169:1, 169:5, 170:6, 171:16, 173:6, 178:24, 179:1, 181:15, 181:17, 182:11, 182:17, 183:3, 183:5, 186:16, 186:20, 187:11, 187:13, 188:10, 191:2, 191:8, 197:5, 197:7, 201:12, 201:15, 201:16, 202:4, 202:10, 202:14, 202:18, 202:24, 203:10, 203:16, 203:17, 205:23, 213:15, 213:19, 213:25, 214:2, 220:10, 223:2, 223:4, 226:20, 226:22, 232:16, 232:18, 233:15, 233:19, 234:6, 234:8, 236:3, 257:10, 261:11, 261:13, 261:25, 264:4, 267:10

MS [143] - 3:3, 3:6, 3:14, 4:2, 4:5, 4:8, 4:12, 4:12, 4:15, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 20:21, 40:1, 40:20, 40:24, 46:7, 47:10, 47:13, 50:23, 51:3, 51:4, 57:20, 58:18, 61:1, 61:13, 61:14, 70:9, 79:22, 82:21, 83:9, 89:19, 90:8, 94:10, 94:24, 95:20, 95:24, 96:23, 98:3, 99:1, 99:6, 100:13, 100:17, 100:20, 101:19, 101:21, 109:22, 109:25, 111:4, 111:12, 111:24, 112:3, 121:3, 121:5, 122:22, 123:13, 123:16, 123:22, 126:5, 126:25, 127:4, 127:5, 130:3, 130:5, 130:15, 131:24, 131:25, 133:3, 140:21, 141:11, 141:22, 142:25, 150:12, 153:8, 154:14, 154:22, 155:2, 158:4, 159:18, 159:19, 160:3, 160:17, 160:19, 163:11, 163:17, 165:4, 165:6, 165:8, 165:23, 167:12, 167:15, 168:18, 168:20, 171:3, 172:1, 172:24, 173:1, 173:13, 174:13, 174:14, 178:21, 182:14, 186:11, 188:2, 191:5, 197:2, 220:5, 222:21, 222:24, 236:7, 236:10, 241:21, 241:23, 242:6, 242:9, 242:11, 243:17, 243:21, 244:1, 244:4, 244:6, 244:7, 249:8, 249:10, 250:19, 250:24, 251:4, 251:5, 257:2, 257:7, 257:9, 257:14, 257:18, 257:21, 257:23, 261:19, 262:6, 264:6, 264:7, 267:6
Mt [3] - 3:15, 4:4, 4:9

Mueller [4] - 156:14, 156:24, 159:15, 167:23
multi [1] - 196:25
multi-million [1] - 196:25
multiple [6] - 45:1, 45:22, 46:5, 47:23, 48:9, 206:19
municipal [1] - 56:1
murders [2] - 188:15, 188:17
must [3] - 131:13, 133:17, 157:1
myriad [1] - 40:16

## N

N-I-C-U [1] - 13:21
naloxone [3] - 174:23, 178:3, 216:20
name [20] - 9:1, 9:10, 22:4, 40:2, 54:24, 62:8, 65:12, 68:10, 85:11, 86:21, 87:10, 111:18, 111:19, 111:24, 112:5, 112:6, 179:4, 181:25, 202:12
named [2] - 27:25, 176:21
names [1] - 179:6
naming [1] - 178:15
narcotic [1] - 35:14
narcotics [3] - 39:12, 250:14, 252:22
narrow [1] - 186:18
narrowed [1] - 169:8
narrowly [1] - 168:3
NAS [29] - 8:4, 21:13, 40:7, 40:8, 40:15, 40:17, 41:23, 42:3, 42:6, 43:8, 44:19, 45:6, 45:25, 46:23, 47:23, 48:24, 49:13, 49:21, 50:6, 50:15, 51:11, 51:14, 51:21, 51:24, 52:25, 56:10, 56:11
nation [3] - 125:16, 176:13, 246:18
National [1] - 145:3
national [7] - 16:20, 40:13, 44:23, 59:17, 69:13, 69:16, 184:24
nationwide [1] - 135:23
naturally [2] - 42:18, 42:22
nature [7] - 47:1,

74:16, 78:14, 86:5, 170:24, 182:19, 190:11
near [4] - 96:13, 183:1, 183:6, 187:17
nearly [7] - 51:15, 79:20, 79:21, 100:1, 244:15, 244:25, 245:13
Nebraska [1] - 17:1
necessarily [2] - 91:11, 167:1
necessary [1] - 162:9
need [12] - 36:8, 64:2, 86:5, 88:17, 123:5, 130:1, 169:4, 169:6, 186:14, 201:11, 208:7, 257:16
needed [7] - 15:7, 17:12, 74:11, 74:17, 212:9, 212:10
needle [1] - 229:1
needs [6] - 16:1, 175:22, 176:17, 207:3, 208:25
neighborhood [4] - 117:6, 147:17, 171:13, 179:19
neighborhoods [2] - 117:5, 166:15
neonatal [7] - 9:22, 14:17, 17:19, 19:1, 42:7, 43:12, 58:2
Neonatal [38] - 10:7, 11:13, 11:14, 11:15, 12:20, 13:2, 13:25, 14:9, 14:10, 14:23, 14:25, 15:2, 15:12, 16:16, 16:22, 16:25, 17:2, 17:4, 17:14, 17:18, 18:1, 18:5, 18:18, 20:11, 21:17, 42:3, 45:4, 46:23, 49:24, 50:10, 50:11, 50:18, 53:3, 53:5, 53:7, 53:8, 53:12, 58:12
neonatal-Perinatal [1] - 58:2
neonate [2] - 16:8, 49:7
neonatologist [2] - 10:6, 14:5
Neonatology [1] - 11:5
neonatology [2] - 9:17, 10:21
nervous [1] - 16:9
neuro [2] - 19:2, 19:9
neuro-

developmental [2] - 19:2, 19:9
neuroactive [1] - 43:5
neurologic [2] - 16:15, 19:7
neurologist [1] - 17:20
Never [2] - 73:19, 107:1
never [25] - 67:17, 73:4, 81:6, 81:9, 90:2, 96:25, 98:13, 98:15, 102:3, 152:3, 152:7, 152:8, 188:15, 188:17, 196:4, 196:13, 196:19, 196:24, 239:6, 256:11, 262:1, 263:5
new [17] - 34:20, 35:6, 39:15, 59:9, 67:6, 67:11, 107:10, 115:21, 115:22, 164:13, 191:16, 194:16, 210:23, 212:11, 213:4, 218:15, 218:18
New [3] - 3:5, 3:8, 67:7
newborn [1] - 58:6
newborns [9] - 11:15, 13:1, 13:11, 13:18, 14:2, 16:25, 18:19, 19:18, 20:11
newly [1] - 189:16
newspaper [2] - 225:2, 225:23
next [21] - 16:24, 17:3, 61:22, 87:15, 88:5, 92:13, 103:12, 111:12, 112:1, 164:13, 183:3, 183:10, 185:5, 185:16, 186:1, 193:7, 207:21, 209:9, 255:1, 262:7, 266:12
nexus [1] - 248:22
nice [1] - 22:6
Nicholas [1] - 170:2
NICHOLAS [2] - 6:11, 110:4
NICU [7] - 13:21, 13:22, 14:12, 14:14, 15:24, 16:3
NICUs [1] - 16:1
night [2] - 169:18, 187:24
nine [1] - 26:23
nine-year [1] - 26:23
Ninth [1] - 4:6

**nobody** [2] - 227:16, 227:19
**non** [20] - 32:18, 55:17, 81:16, 149:3, 149:5, 150:15, 151:5, 151:7, 155:6, 155:14, 155:19, 155:22, 160:24, 161:1, 161:15, 161:19, 163:7, 228:21, 229:4, 230:9
**non-controlled** [1] - 81:16
**non-fatal** [15] - 149:3, 149:5, 150:15, 151:7, 155:6, 155:14, 155:19, 155:22, 160:24, 161:1, 161:19, 163:7, 228:21, 229:4, 230:9
**non-fatals** [2] - 151:5, 161:15
**non-hearsay** [1] - 32:18
**non-profit** [1] - 55:17
**none** [3] - 201:17, 235:18, 235:21
**None** [2] - 110:3, 217:17
**nonetheless** [1] - 156:8
**nonprescription** [1] - 45:12
**normal** [6] - 69:23, 70:3, 81:24, 85:2, 135:15, 260:10
**normally** [4] - 73:11, 74:5, 107:17, 107:20
**North** [5] - 114:5, 116:6, 166:21, 167:4, 168:13
**north** [2] - 147:18, 153:19
**note** [8] - 82:22, 123:2, 123:14, 126:5, 153:3, 154:22, 170:21, 205:19
**noted** [4] - 90:7, 117:3, 170:9, 170:16
**notes** [7] - 171:8, 228:24, 229:17, 229:25, 230:8, 230:10
**nothing** [2] - 229:20, 238:15
**Nothing** [3] - 111:2, 111:4, 236:3
**notice** [8] - 37:4,

37:13, 37:18, 37:20, 37:23, 38:1, 38:2, 169:22
**notices** [1] - 169:24
**November** [2] - 136:22, 192:12
**NTU** [7] - 14:13, 15:9, 15:11, 15:14, 15:18, 15:23, 16:6
**Number** [2] - 90:16, 206:19
**number** [58] - 14:15, 15:13, 15:21, 19:5, 37:24, 43:15, 44:22, 46:5, 47:18, 49:6, 49:20, 50:12, 52:25, 56:13, 81:8, 83:12, 89:17, 128:10, 128:20, 129:3, 139:20, 147:9, 149:8, 162:10, 162:12, 163:9, 165:3, 172:12, 175:21, 182:21, 199:15, 201:8, 212:7, 216:16, 216:18, 216:20, 217:6, 217:10, 219:11, 220:18, 222:10, 229:22, 238:2, 238:21, 239:1, 248:7, 259:21, 259:23, 259:24, 259:25, 263:24, 264:5, 264:15, 264:17, 267:4, 267:5
**numbers** [21] - 48:5, 50:22, 60:13, 83:13, 123:14, 131:12, 163:6, 169:13, 174:7, 182:19, 197:21, 206:19, 206:20, 228:18, 232:20, 239:20, 258:17, 259:11, 267:5
**Numerous** [1] - 252:12
**nurse** [2] - 34:10, 138:10
**nurses** [4] - 15:2, 16:11, 55:15, 226:1
**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

**O**

**oath** [4] - 8:25, 23:12,

130:14, 213:10
**oaths** [1] - 156:17
**obituaries** [1] - 225:22
**obituary** [4] - 224:15, 224:18, 225:1, 225:4
**object** [23] - 20:5, 70:12, 79:22, 82:21, 83:3, 89:19, 96:23, 123:9, 141:14, 141:15, 142:21, 169:2, 169:11, 169:17, 169:23, 170:23, 171:16, 186:11, 186:12, 188:2, 202:10, 222:21, 250:19
**objected** [1] - 168:19
**objecting** [1] - 197:2
**Objection** [12] - 20:21, 23:23, 25:6, 26:5, 32:13, 33:25, 36:4, 94:10, 98:3, 99:1, 125:19, 261:13
**objection** [57] - 20:25, 23:24, 26:6, 36:7, 38:6, 47:2, 47:11, 58:17, 58:18, 61:1, 70:8, 70:9, 82:20, 90:7, 94:14, 94:17, 99:8, 122:25, 123:1, 126:20, 126:24, 127:2, 131:19, 131:22, 140:15, 141:7, 143:7, 149:18, 150:10, 152:21, 153:7, 156:4, 156:5, 160:7, 160:9, 160:14, 168:15, 170:9, 170:16, 170:24, 171:2, 171:24, 182:13, 182:14, 191:4, 191:5, 205:21, 220:5, 222:23, 242:8, 242:9, 244:3, 244:4, 257:6, 257:7, 262:3, 262:5
**objections** [17] - 82:24, 123:11, 126:7, 126:8, 126:13, 126:15, 126:18, 163:13, 169:15, 169:18, 169:20, 169:21, 170:3, 170:4, 170:8, 170:14, 170:22
**Objective** [1] - 214:5
**objectives** [4] - 192:10, 192:16,

194:16, 213:2
**observation** [2] - 78:19, 97:20
**observations** [2] - 78:22, 129:21
**observe** [1] - 134:21
**observed** [8] - 95:10, 104:6, 134:19, 156:12, 156:23, 157:2, 199:11, 200:4
**observer** [3] - 88:7, 88:11, 88:16
**observes** [1] - 168:8
**obtain** [4] - 85:25, 89:6, 95:14, 103:22
**obtained** [5] - 89:10, 109:1, 131:20, 132:23, 198:9
**obtaining** [1] - 149:20
**obvious** [1] - 167:7
**obviously** [2] - 7:18, 181:11
**Obviously** [1] - 8:17
**occasion** [1] - 76:25
**occasionally** [3] - 78:9, 144:22, 150:22
**occasions** [3] - 74:25, 82:3, 82:6
**occur** [2] - 40:8, 152:10
**occurred** [9] - 35:14, 90:15, 104:10, 187:16, 200:11, 201:3, 239:6, 241:5, 241:13
**occurrence** [2] - 97:23, 161:22
**occurring** [9] - 23:8, 42:18, 42:22, 66:3, 77:2, 78:20, 129:4, 152:20, 153:16
**occurs** [1] - 152:8
**October** [2] - 114:14, 190:22
**OF** [2] - 1:1, 1:4
**off-hand** [7] - 68:24, 220:16, 220:21, 221:5, 227:25, 228:4, 228:9
**off-site** [3] - 17:23, 55:14, 78:8
**offense** [1] - 199:10
**offenses** [27] - 128:23, 129:2, 129:4, 129:10, 146:11, 146:12, 146:16, 147:3, 147:4, 147:6, 147:10, 148:4, 148:6, 148:9, 172:22, 173:15,

173:21, 173:24, 174:6, 174:7, 199:3, 200:15, 200:17, 232:15, 265:21, 265:22, 266:15
**offer** [2] - 66:14, 157:25
**offered** [5] - 66:13, 144:4, 166:4, 167:1, 167:2
**offering** [1] - 196:16
**offhand** [5] - 87:6, 135:22, 189:4, 200:19, 200:22
**Office** [82] - 28:4, 113:1, 113:7, 113:9, 131:3, 132:5, 132:8, 133:5, 135:7, 136:8, 136:14, 136:15, 136:25, 137:19, 138:13, 139:3, 139:6, 140:3, 140:23, 141:25, 143:2, 143:20, 144:7, 144:8, 144:20, 145:3, 145:8, 145:21, 146:13, 146:19, 147:24, 148:23, 149:20, 150:4, 150:17, 150:25, 158:7, 158:18, 163:18, 165:15, 165:24, 167:17, 168:22, 172:2, 172:10, 173:9, 174:16, 176:2, 177:4, 177:21, 178:9, 189:13, 191:10, 191:16, 191:21, 194:1, 194:16, 195:8, 195:12, 195:18, 196:5, 196:8, 196:13, 196:17, 196:20, 198:18, 200:4, 202:19, 205:10, 205:11, 205:14, 206:3, 210:3, 210:6, 211:5, 211:23, 221:12, 233:5, 233:10, 233:17, 235:15, 261:2
**office** [24] - 114:21, 156:12, 156:13, 156:16, 156:20, 156:23, 164:1, 167:1, 167:24, 168:1, 168:5, 168:7,

176:6, 189:16,
189:21, 190:8,
192:3, 192:7, 195:9,
196:22, 212:7,
213:5, 225:20,
227:24
**office's** [2] - 164:4,
167:17
**officer** [7] - 120:3,
133:17, 133:21,
134:4, 135:16,
138:8, 157:15
**Officer** [3] - 27:1,
27:18, 29:1
**officers** [5] - 131:13,
133:24, 171:10,
225:16, 240:17
**offices** [3] - 30:22,
192:8, 194:20
**official** [16] - 122:14,
129:20, 139:6,
141:25, 145:8,
150:24, 157:19,
157:24, 158:6,
163:21, 165:16,
222:2, 222:4, 223:6,
223:10, 259:3
**Official** [2] - 268:2,
268:3
**officials** [2] - 144:21,
171:11
**Ohio** [8] - 14:20,
15:19, 64:22,
193:11, 194:9,
202:7, 203:3, 248:23
**old** [3] - 154:3, 240:5,
240:13
**Old** [1] - 113:15
**on-site** [1] - 86:9
**Once** [1] - 258:22
**once** [7] - 15:16,
18:12, 35:15, 36:11,
60:13, 183:20,
184:17
**one** [134] - 8:1, 13:3,
16:7, 17:1, 34:25,
35:4, 38:10, 39:19,
46:2, 46:16, 49:16,
54:11, 55:1, 59:10,
59:13, 59:23, 60:3,
72:4, 72:13, 72:19,
72:20, 72:23, 72:24,
73:7, 77:11, 77:18,
77:21, 79:6, 79:7,
82:1, 82:8, 84:22,
85:16, 87:24, 87:25,
91:19, 95:6, 97:10,
97:14, 104:6, 106:7,
107:23, 109:22,
112:19, 113:21,

113:25, 120:7,
125:2, 125:19,
126:17, 128:10,
129:3, 135:22,
136:3, 139:20,
145:5, 150:18,
150:22, 152:9,
152:12, 153:11,
155:15, 156:11,
158:15, 159:24,
159:25, 162:1,
162:3, 162:22,
164:8, 164:18,
164:21, 169:2,
170:15, 171:6,
172:25, 175:11,
176:19, 176:20,
178:3, 178:5,
183:25, 184:5,
185:14, 187:8,
198:5, 200:19,
200:22, 203:5,
204:13, 204:17,
209:8, 222:14,
224:11, 224:12,
224:13, 224:22,
225:1, 227:25,
231:5, 231:8,
231:13, 235:9,
238:2, 238:13,
238:20, 238:22,
239:14, 244:15,
244:25, 245:14,
245:16, 246:6,
247:4, 248:6,
251:25, 253:2,
253:15, 253:16,
253:19, 255:21,
257:3, 258:23,
258:24, 264:15,
265:2, 267:5
**One** [5] - 5:11, 17:7,
67:4, 251:12, 253:22
**one-tenth** [1] - 17:1
**one-third** [3] - 35:4,
244:15, 244:25
**ones** [6] - 120:16,
149:13, 164:8,
184:6, 247:24,
255:18
**ongoing** [1] - 176:22
**Opana** [1] - 135:3
**open** [9] - 14:22, 77:6,
77:9, 114:6, 116:1,
131:1, 179:19,
180:19, 266:22
**open-air** [3] - 114:6,
116:1, 266:22
**opened** [1] - 15:3
**operate** [1] - 187:3

**operates** [1] - 15:15
**operating** [2] - 248:19,
252:7
**operation** [2] - 55:14,
65:18
**operations** [3] -
135:15, 254:8,
260:10
**opiates** [5] - 42:7,
42:13, 42:14, 42:15,
42:17
**opinion** [1] - 243:1
**opioid** [54] - 12:18,
13:6, 13:8, 17:9,
19:22, 19:25, 20:2,
20:20, 21:7, 22:19,
28:10, 34:16, 34:22,
34:23, 34:25, 35:3,
35:4, 35:6, 36:3,
38:5, 43:20, 44:2,
44:10, 44:20,
119:13, 133:13,
135:19, 137:6,
137:9, 142:2, 142:5,
149:12, 172:6,
175:23, 175:24,
177:21, 178:11,
210:13, 210:16,
217:2, 218:7, 229:8,
231:7, 231:10,
231:12, 231:16,
231:20, 234:17,
243:15, 245:17,
256:12, 263:22,
266:24, 267:4
**opioid-related** [2] -
133:13, 149:12
**Opioids** [2] - 29:9,
30:5
**opioids** [83] - 10:14,
11:11, 11:17, 13:15,
13:18, 14:15, 17:17,
18:22, 20:14, 21:12,
22:15, 22:17, 22:25,
25:13, 27:8, 27:14,
30:12, 30:14, 30:24,
32:22, 33:21, 35:8,
40:10, 40:11, 42:14,
42:15, 42:17, 44:17,
45:3, 45:6, 45:7,
47:24, 48:1, 48:3,
48:18, 59:3, 59:11,
60:6, 60:8, 60:12,
60:15, 60:16, 60:23,
106:24, 119:11,
129:15, 129:22,
133:25, 134:25,
135:2, 143:19,
148:13, 149:10,
154:2, 174:18,

198:13, 199:20,
199:21, 200:7,
200:21, 211:10,
211:13, 216:21,
217:12, 218:4,
218:11, 231:9,
231:14, 232:1,
238:9, 238:14,
238:16, 241:2,
241:5, 243:9, 247:6,
247:9, 247:16,
249:2, 254:24, 260:9
**opportunity** [7] -
23:17, 136:11,
159:6, 175:15,
176:11, 211:6,
236:24
**opposed** [4] - 14:24,
42:18, 56:5, 157:20
**optimism** [1] - 153:6
**optimistic** [1] - 153:2
**oranges** [1] - 152:17
**order** [9] - 14:10,
74:20, 74:22,
103:17, 103:19,
103:25, 106:7,
106:20, 210:21
**orders** [5] - 98:19,
98:24, 100:3,
102:15, 102:17
**ordinary** [2] - 122:11,
165:14
**organization** [8] -
41:21, 53:25, 55:18,
252:7, 252:14,
252:15, 252:20,
253:11
**organizational** [2] -
114:18, 121:21
**organizations** [4] -
27:4, 59:17, 144:19,
145:1
**orient** [1] - 101:20
**original** [2] - 58:1,
182:18
**originally** [5] - 119:16,
149:7, 162:10,
162:12, 162:22
**Originally** [1] - 229:21
**originating** [2] - 38:5,
38:22
**origins** [1] - 14:13
**Orleans** [1] - 3:8
**orthopedic** [1] - 39:10
**Orthopedics** [1] - 12:1
**out-of-court** [2] -
156:6, 156:8
**out-of-state** [8] -
78:14, 179:22,
180:24, 187:6,

197:13, 197:19,
197:22, 198:19
**outbreak** [1] - 145:17
**outcome** [1] - 171:8
**outcomes** [1] - 41:14
**outdoor** [1] - 78:7
**outline** [1] - 212:17
**outlines** [1] - 164:22
**outreach** [1] - 139:7
**Outside** [1] - 26:7
**outside** [8] - 20:22,
78:19, 132:23,
156:20, 199:13,
226:12, 247:10,
247:25
**outweighs** [1] - 8:18
**overall** [1] - 68:12
**Overdose** [3] - 222:4,
244:10, 258:19
**overdose** [51] -
125:17, 132:21,
146:10, 148:17,
151:7, 151:14,
151:21, 154:23,
155:6, 155:11,
155:13, 155:21,
156:2, 159:23,
160:11, 160:23,
160:24, 166:21,
167:5, 203:19,
221:11, 222:2,
223:24, 224:4,
226:7, 227:11,
228:8, 229:4, 229:6,
230:10, 230:11,
230:13, 230:14,
230:16, 230:18,
230:20, 241:13,
242:13, 242:14,
242:16, 242:17,
243:13, 243:16,
246:5, 246:19,
258:2, 258:20,
260:14, 263:25,
264:14, 264:18
**overdose-related** [1] -
160:11
**overdosed** [6] - 153:1,
153:23, 201:6,
201:17, 231:25,
232:1
**overdoses** [61] -
131:10, 132:2,
132:4, 132:12,
132:15, 139:14,
146:1, 146:10,
146:11, 148:15,
148:22, 148:25,
149:2, 149:3, 149:4,
149:5, 149:9,

150:14, 151:7,
152:10, 152:17,
152:18, 152:20,
153:16, 155:14,
155:19, 155:23,
161:2, 161:4,
161:13, 161:14,
161:19, 163:3,
163:4, 163:7, 201:3,
201:22, 202:5,
203:1, 204:20,
205:1, 216:16,
216:18, 216:20,
217:7, 217:11,
222:11, 223:6,
225:18, 228:21,
230:22, 242:21,
244:15, 244:25,
245:14, 245:19,
246:2, 259:25
**overdosing** [2] -
154:1, 174:25
**overflow** [1] - 14:8
**overrule** [5] - 38:6,
127:2, 141:7, 143:7,
150:10
**Overruled** [4] - 24:17,
26:9, 98:4, 251:3
**overruled** [6] - 20:7,
47:11, 132:17,
153:7, 173:10,
202:21
**overseeing** [2] -
79:20, 79:24
**overtaken** [1] - 129:15
**overview** [2] - 114:17,
146:16
**Owens** [1] - 184:7
**Owens-Illinois** [1] -
184:7
**own** [9] - 40:13, 53:8,
54:21, 68:2, 108:11,
108:14, 178:11,
223:9, 228:11
**owned** [2] - 54:19,
85:12
**owner** [11] - 85:10,
85:16, 87:16, 87:21,
91:8, 91:11, 107:21,
107:25, 108:1, 108:2
**owners** [1] - 254:13
**ownership** [1] - 55:1
**oxy** [1] - 91:19
**oxycodone** [17] -
48:19, 79:21, 80:21,
91:14, 91:15, 91:20,
92:7, 92:8, 92:14,
92:15, 93:8, 93:21,
93:25, 98:19,
125:15, 127:8,

264:16
**Oxycontin** [4] - 84:17,
85:19, 93:16, 135:3
**oxymorphone** [2] -
93:16, 127:8
**Oxymorphone** [3] -
84:17, 85:18, 125:15
**Oxys** [1] - 92:2

---

## P

**P-1200** [1] - 2:7
**P-2144** [1] - 232:16
**P-41220** [2] - 123:19,
253:17
**P-41221** [2] - 123:20,
251:17
**P-41229** [1] - 123:17
**P-41233** [1] - 205:18
**P-41234** [2] - 154:13,
160:5
**P-41236** [1] - 163:12
**P-41240** [1] - 263:24
**P-41244** [1] - 212:1
**P-41246** [1] - 242:6
**P-41252** [3] - 123:18,
237:16, 246:13
**P-41342** [1] - 123:16
**P-41532** [1] - 233:16
**P-41708** [2] - 165:1,
165:25
**P-41715** [3] - 51:5,
57:25, 58:15
**P-4180** [1] - 165:1
**P-41850** [2] - 165:4,
166:1
**P-42116** [1] - 83:12
**p.m** [2] - 126:15,
267:20
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**Page** [41] - 46:19,
51:9, 51:10, 83:11,
99:24, 124:21,
127:23, 127:25,
166:20, 171:4,
172:21, 172:24,
206:18, 209:10,
212:25, 213:1,
213:17, 214:1,
216:11, 216:13,
219:12, 220:23,
226:20, 232:19,
237:22, 239:11,
240:2, 246:14,
248:16, 250:1,
252:3, 253:18,
253:22, 255:1,
255:15, 260:18,
260:19, 260:25,

262:23
**page** [43] - 24:19,
24:21, 28:19, 33:11,
41:25, 43:2, 83:13,
83:19, 84:3, 88:5,
90:16, 92:13, 95:18,
100:1, 127:24,
128:2, 131:1, 131:3,
154:23, 155:1,
166:17, 181:25,
182:19, 182:22,
183:3, 183:10,
183:13, 191:9,
191:21, 206:23,
210:2, 212:2,
214:19, 216:15,
219:10, 224:15,
224:18, 225:2,
226:24, 248:18,
255:2, 262:7, 262:9
**pages** [4] - 194:14,
206:19, 220:19,
256:2
**paid** [1] - 66:21
**Pain** [1] - 31:15
**pain** [25] - 25:25, 26:3,
26:4, 26:12, 26:17,
27:3, 27:10, 27:13,
30:13, 30:15, 31:18,
35:22, 36:2, 37:16,
38:4, 39:8, 91:14,
91:16, 94:7, 94:8,
94:19, 94:22, 95:3,
125:15, 127:8
**Papantonio** [1] - 2:12
**paper** [2] - 206:8,
216:13
**paragraph** [29] -
70:20, 96:5, 125:13,
131:10, 171:5,
183:13, 184:15,
185:5, 185:8,
185:10, 187:12,
187:21, 189:1,
192:18, 192:21,
192:24, 193:13,
206:25, 207:12,
207:18, 207:21,
208:6, 208:21,
209:9, 209:15,
210:2, 215:4,
233:18, 252:4
**parents** [1] - 15:8
**parsing** [1] - 10:23
**part** [60] - 8:6, 8:16,
45:3, 48:8, 53:16,
54:23, 57:3, 57:7,
59:16, 66:3, 72:3,
72:25, 77:1, 79:13,
85:6, 86:7, 87:20,

88:15, 88:18, 91:21,
92:1, 103:7, 103:18,
113:25, 114:9,
115:9, 117:22,
119:18, 125:10,
132:2, 132:4, 133:5,
136:8, 136:19,
141:2, 145:13,
150:24, 165:16,
176:14, 180:15,
181:6, 181:12,
181:23, 182:6,
188:19, 190:9,
206:13, 208:3,
220:6, 236:16,
236:25, 240:3,
251:8, 255:3,
256:13, 256:21,
256:24, 262:8, 265:1
**participants** [1] - 87:5
**participated** [1] -
135:22
**participates** [1] -
239:25
**particular** [10] - 9:15,
106:5, 106:21,
112:18, 129:22,
170:7, 179:21,
181:1, 199:1, 207:7
**particularly** [3] -
52:20, 135:18,
248:21
**parties** [2] - 57:19,
82:13
**partners** [2] - 115:4,
228:5
**Partnership** [2] - 41:1,
41:5
**partnership** [2] -
41:14, 41:19
**partnerships** [1] -
121:25
**parts** [2] - 42:13,
250:16
**party** [3] - 63:22, 85:6,
85:25
**pass** [3] - 61:20,
144:24, 201:19
**passed** [4] - 97:20,
122:20, 141:17,
246:10
**past** [2] - 140:11,
240:21
**patches** [1] - 45:15
**path** [1] - 164:13
**pathway** [1] - 177:12
**patience** [3] - 100:17,
236:13, 267:15
**patient** [5] - 15:25,
34:21, 57:9, 60:10,

60:16
**patients** [9] - 14:14,
34:22, 35:4, 35:22,
56:11, 60:5, 60:15,
152:25
**Patricia** [1] - 254:13
**Patrol** [1] - 135:15
**patrol** [3] - 114:23,
135:16, 260:9
**patterns** [1] - 117:10
**PAUL** [2] - 2:3, 5:9
**Pause** [4] - 12:23,
100:16, 109:24,
126:4
**pay** [3] - 177:17,
177:18, 197:14
**paying** [3] - 183:18,
184:16, 184:22
**PBC** [4] - 88:2, 102:7,
108:20, 109:9
**PCP** [2] - 44:8, 44:10
**PD** [1] - 188:19
**pdf** [1] - 154:16
**peaked** [1] - 183:18
**PEARL** [1] - 3:6
**pediatric** [6] - 10:20,
17:20, 18:10, 18:11,
42:1, 107:16
**pediatrician** [2] - 9:16,
26:19
**pediatricians** [1] -
18:13
**pediatrics** [3] - 9:21,
12:6, 53:21
**Pediatrics** [5] - 11:19,
12:1, 12:5, 12:9,
12:11
**peer** [1] - 58:8
**peer-reviewed** [1] -
58:8
**penalized** [1] - 106:19
**penalties** [1] - 215:8
**penalty** [2] - 207:6,
215:12
**Pensacola** [1] - 2:14
**People** [4] - 29:9,
30:4, 74:13, 211:12
**people** [37] - 16:21,
18:2, 20:19, 77:5,
98:20, 115:2, 116:3,
137:24, 138:21,
138:24, 139:16,
139:19, 140:14,
141:21, 142:8,
142:10, 142:22,
145:14, 152:25,
153:23, 154:3,
172:12, 175:16,
177:9, 178:19,
189:21, 190:8,

198:8, 201:6, 201:17, 223:23, 229:3, 230:5, 234:10, 238:17, 264:18

**per** [3] - 14:6, 96:18, 161:14

**peradventure** [1] - 157:13

**percent** [24] - 16:23, 16:24, 17:1, 17:6, 20:12, 20:16, 35:2, 49:15, 49:18, 75:22, 76:8, 92:8, 92:14, 131:11, 214:12, 229:8, 233:2, 246:1, 256:6, 264:16, 264:20, 265:22, 266:4

**percentage** [6] - 90:17, 92:22, 245:19, 264:11, 264:12, 264:18

**Percentage** [1] - 91:1

**Perfect** [1] - 83:17

**perfectly** [1] - 32:25

**perhaps** [1] - 20:12

**Peri** [1] - 58:1

**Perinatal** [3] - 41:1, 41:5, 58:2

**perinatal** [1] - 9:22

**Perinatology** [1] - 58:3

**period** [26] - 18:24, 26:25, 27:10, 27:13, 27:15, 27:22, 27:24, 41:9, 41:13, 51:20, 52:20, 59:23, 59:25, 60:3, 92:15, 94:23, 98:2, 186:15, 243:23, 245:1, 245:5, 245:13, 245:21, 246:1, 250:25

**permanent** [1] - 117:14

**permeated** [1] - 147:15

**permission** [2] - 24:15, 63:17

**persistent** [1] - 19:10

**person** [9] - 32:1, 87:15, 114:16, 154:1, 199:9, 231:7, 231:12, 231:25, 237:2

**person's** [5] - 230:24, 231:3, 231:17, 231:20, 237:2

**personal** [13] - 7:18,

---

10:14, 12:12, 12:18, 13:8, 13:13, 20:6, 32:22, 82:24, 152:1, 157:1, 174:11, 224:12

**personally** [3] - 107:9, 142:2, 170:6

**personnel** [2] - 103:5, 105:10

**perspective** [1] - 20:4

**persuade** [1] - 153:3

**pertains** [2] - 209:25, 217:15

**pervasive** [2] - 153:20, 154:10

**PETER** [1] - 2:12

**Pharma** [4] - 29:9, 30:4, 30:6, 30:18

**pharma** [3] - 30:12, 30:21, 31:11

**pharmaceutical** [4] - 31:5, 102:8, 189:9, 235:19

**pharmaceuticals** [1] - 48:4

**pharmacies** [23] - 64:18, 65:25, 66:2, 66:5, 66:6, 72:23, 77:13, 77:15, 77:24, 78:2, 78:5, 80:5, 80:8, 81:21, 82:2, 97:16, 101:23, 101:25, 102:2, 102:3, 109:1, 247:13, 247:15

**Pharmacist** [1] - 91:6

**pharmacist** [5] - 87:19, 87:20, 88:10, 88:13, 91:10

**pharmacists** [3] - 22:25, 108:5, 108:6

**pharmacological** [1] - 42:9

**pharmacy** [22] - 31:5, 65:24, 66:2, 72:21, 78:12, 78:18, 78:20, 79:24, 91:13, 95:12, 96:10, 96:18, 96:21, 97:22, 101:15, 103:7, 105:12, 107:11, 210:19, 210:21, 218:11, 254:23

**Pharmacy** [9] - 107:6, 109:7, 253:24, 254:22, 255:3, 255:7, 256:4, 256:8, 256:11

**pharmacy's** [1] - 96:16

---

**phase** [1] - 19:8

**Phencyclidine** [1] - 44:5

**Philadelphia** [2] - 6:6, 6:13

**photo** [1] - 173:18

**physical** [1] - 176:17

**physically** [1] - 164:19

**physician** [1] - 9:14

**physicians** [4] - 11:25, 22:24, 31:5, 55:15

**physicians'** [1] - 30:13

**PIC** [3] - 91:4, 91:5, 107:21

**pick** [2] - 84:15, 186:1

**picked** [2] - 227:22, 227:23

**picking** [3] - 107:10, 107:16, 228:5

**picture** [1] - 124:1

**pictures** [5] - 119:25, 121:14, 164:20, 165:13, 212:18

**pieces** [2] - 45:5, 236:14

**Pierce** [4] - 28:13, 32:8, 33:6, 38:12

**PIFKO** [1] - 3:16

**pill** [5] - 134:6, 142:14, 256:12, 263:17, 263:20

**pillars** [2] - 137:22, 220:25

**pills** [17] - 22:20, 24:24, 25:14, 79:21, 81:2, 128:14, 148:13, 255:6, 255:7, 255:8, 256:3, 256:7, 260:6, 263:6, 263:11, 263:13

**pitched** [1] - 16:11

**place** [11] - 15:13, 36:22, 102:16, 124:15, 129:25, 130:4, 130:5, 160:12, 207:13, 211:10, 245:8

**Place** [6] - 17:24, 53:8, 55:12, 55:17, 56:2, 56:6

**placed** [3] - 102:15, 103:17, 246:21

**places** [4] - 36:11, 204:17, 204:24, 228:2

**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1

**PLAINTIFF** [2] - 58:20, 191:7

**Plaintiff's** [1] - 50:24

---

**Plaintiffs** [2] - 8:22, 268:6

**plaintiffs** [9] - 7:10, 37:6, 62:5, 62:19, 111:25, 126:13, 169:3, 169:6, 237:10

**PLAINTIFFS'** [3] - 9:5, 62:12, 111:21

**Plaintiffs'** [7] - 190:14, 191:3, 241:20, 243:17, 243:22, 244:1, 248:8

**plaintiffs'** [3] - 236:17, 239:15, 255:19

**Plan** [8] - 172:22, 173:19, 205:15, 216:12, 218:2, 218:21, 234:3, 234:10

**plan** [31] - 164:11, 166:13, 166:25, 168:12, 171:4, 171:8, 171:22, 205:24, 206:2, 206:14, 206:17, 207:7, 208:3, 211:23, 212:3, 212:6, 212:13, 213:4, 213:21, 213:23, 214:1, 217:23, 217:24, 218:5, 218:9, 232:14, 235:14, 261:1, 261:24, 262:20

**Planning** [2] - 113:4, 144:5

**plans** [9] - 163:24, 164:4, 164:7, 164:15, 164:25, 166:9, 167:10, 168:22, 173:8

**Plans** [1] - 165:25

**plant** [3] - 183:25, 184:2, 184:9

**Plant** [1] - 184:7

**plants** [3] - 183:20, 184:13, 184:16

**plates** [1] - 78:14

**play** [5] - 7:21, 103:7, 103:12, 103:18, 104:20

**played** [1] - 235:7

**plays** [1] - 141:18

**Pleasant** [3] - 3:15, 4:4, 4:9

**plentiful** [1] - 14:11

**plug** [1] - 130:1

**Plus** [7] - 253:24, 254:22, 255:2,

---

255:7, 256:4, 256:8, 256:11

**plus** [1] - 66:22

**point** [27] - 7:9, 8:5, 19:7, 71:5, 95:9, 95:13, 136:1, 136:13, 171:19, 182:9, 187:16, 187:18, 188:12, 195:24, 200:3, 200:8, 201:10, 203:10, 206:11, 218:12, 220:21, 221:9, 224:7, 224:11, 225:4, 226:18, 241:4

**pointed** [5] - 30:10, 30:16, 220:20, 260:18, 262:25

**points** [1] - 250:15

**Police** [56] - 112:24, 113:24, 114:16, 114:18, 116:11, 117:7, 119:17, 119:19, 121:11, 121:24, 122:6, 122:16, 124:6, 125:1, 125:21, 125:23, 129:7, 129:21, 130:21, 130:23, 130:24, 131:4, 132:3, 132:7, 132:24, 133:6, 133:7, 133:21, 134:10, 134:18, 134:22, 134:23, 135:6, 135:9, 135:10, 135:17, 136:4, 137:2, 137:13, 147:23, 149:22, 176:6, 178:9, 185:13, 185:22, 188:25, 190:6, 193:19, 193:21, 197:14, 197:18, 198:14, 198:19, 249:16, 256:7, 260:6

**police** [27] - 20:15, 114:7, 117:17, 120:18, 120:22, 121:1, 122:21, 131:13, 133:17, 133:21, 133:24, 134:4, 148:20, 152:4, 162:1, 185:17, 186:6, 186:21, 187:1, 193:16, 214:13, 225:14, 228:24,

229:13, 229:14, 233:1, 258:25
**Policies** [1] - 205:11
**policies** [1] - 140:4
**Policy** [76] - 28:5, 113:2, 113:8, 113:10, 132:5, 132:9, 133:6, 135:7, 136:9, 136:14, 136:15, 136:25, 137:19, 138:14, 139:3, 140:3, 140:23, 142:1, 143:2, 143:20, 144:7, 144:8, 144:20, 145:3, 145:9, 145:22, 146:13, 146:19, 147:25, 148:24, 149:20, 150:5, 150:25, 158:7, 158:19, 163:18, 165:15, 165:25, 167:18, 168:23, 172:3, 172:11, 173:9, 174:16, 176:2, 177:4, 177:21, 178:10, 189:13, 191:17, 194:1, 194:16, 195:8, 195:13, 195:19, 196:5, 196:9, 196:14, 196:17, 196:20, 198:18, 200:4, 202:20, 205:12, 205:15, 206:3, 210:4, 210:6, 211:6, 211:23, 221:13, 233:5, 233:10, 233:18, 235:16, 261:2
**policy** [3] - 140:22, 143:12, 260:15
**Policy"** [2] - 191:11, 191:22
**polypharmacy** [5] - 44:24, 45:19, 46:1, 48:24, 246:5
**polysubstance** [2] - 45:20, 46:25
**polysubstances** [1] - 47:19
**Ponc** [1] - 2:4
**Ponce** [1] - 2:16
**poor** [1] - 8:15
**pop** [1] - 151:18
**population** [4] - 20:12, 183:17, 184:24, 250:6

population" [1] - 183:14
**portal** [1] - 142:9
**portion** [6] - 20:23, 96:24, 247:21, 248:17, 250:2, 251:6
**portions** [1] - 170:23
**posed** [1] - 260:25
**position** [8] - 12:3, 113:9, 117:14, 144:3, 144:4, 144:5, 146:12, 212:12
**positions** [5] - 10:8, 11:18, 11:22, 12:4, 12:14
**positive** [2] - 49:3, 49:4
**possess** [2] - 208:8, 209:18
**possessed** [2] - 215:13, 215:21
**possessing** [1] - 215:11
**possible** [18] - 71:21, 76:24, 85:24, 91:10, 146:2, 148:19, 150:22, 151:12, 151:20, 172:13, 172:14, 174:9, 200:21, 224:17, 230:12, 243:12, 247:25, 257:21
**possibly** [1] - 121:23
**potency** [1] - 204:11
**potent** [1] - 203:24
**potentially** [3] - 74:23, 107:10, 154:18
**pounds** [4] - 128:21, 128:22
**Powell** [1] - 2:6
**powerful** [2] - 125:15, 127:7
**PR** [2] - 2:5, 2:17
**practice** [12] - 9:15, 10:2, 10:5, 10:11, 12:2, 12:7, 12:8, 12:14, 15:10, 26:20, 59:8, 239:6
**practiced** [3] - 26:15, 53:21, 53:22
**practices** [2] - 140:11, 254:13
**pre** [1] - 115:21
**pre-existing** [1] - 115:21
**precise** [2] - 55:25, 143:18
**predominant** [1] - 216:7
**preferred** [1] - 91:15

**pregnancy** [3] - 43:5, 49:4, 49:11
**pregnant** [1] - 13:9
**prejudice** [1] - 8:18
**preliminary** [3] - 12:17, 157:14, 157:20
**prematurely** [1] - 14:2
**prenatal** [1] - 48:16
**preparation** [2] - 122:14, 212:22
**prepare** [10] - 121:16, 121:18, 163:18, 224:25, 225:8, 225:11, 225:14, 225:19, 225:22, 225:25
**prepared** [12] - 122:6, 156:7, 157:10, 157:14, 181:12, 181:22, 181:23, 182:2, 212:13, 235:13, 235:15, 242:3
**preparing** [1] - 120:5
**prescribe** [5] - 22:15, 22:17, 30:14, 210:17, 218:8
**prescribed** [9] - 17:8, 27:14, 30:23, 34:21, 45:15, 60:8, 60:10, 232:1, 236:21
**prescribers** [2] - 78:21, 91:15
**prescribing** [4] - 27:8, 31:2, 31:3, 33:21
**prescription** [55] - 22:11, 22:15, 25:13, 45:7, 45:14, 48:3, 60:2, 60:6, 60:11, 60:23, 84:22, 84:23, 125:16, 128:14, 129:14, 134:6, 135:19, 135:24, 135:25, 136:6, 142:14, 148:13, 180:9, 200:7, 200:21, 210:12, 210:16, 211:10, 211:12, 218:3, 218:7, 218:10, 234:17, 236:23, 237:1, 237:3, 237:7, 238:9, 238:14, 238:16, 241:5, 246:19, 246:23, 247:6, 247:9, 247:16, 247:22, 249:2, 254:24, 255:24, 256:12,

260:6, 260:9
**prescriptions** [22] - 22:20, 22:23, 23:1, 24:24, 25:14, 31:12, 35:14, 59:22, 59:24, 59:25, 60:3, 60:4, 89:13, 89:17, 90:17, 91:1, 91:12, 91:14, 96:2, 96:16, 98:1, 254:14
**Present** [1] - 244:10
**present** [9] - 82:1, 82:4, 90:12, 90:14, 90:15, 189:20, 231:20, 231:21, 263:25
**presented** [5] - 157:22, 176:11, 244:14, 244:24, 246:4
**presenting** [1] - 194:22
**presently** [1] - 19:21
**presents** [1] - 158:12
**press** [1] - 132:19
**Pretty** [1] - 65:10
**pretty** [3] - 18:8, 54:15, 153:20
**prevalence** [1] - 48:23
**prevalent** [2] - 125:13, 204:6
**prevented** [2] - 24:3, 24:5
**prevention** [13] - 137:23, 137:24, 139:21, 140:1, 142:12, 143:1, 143:13, 144:16, 174:22, 175:10, 212:17, 220:25, 236:16
**previous** [7] - 47:7, 49:8, 134:5, 163:16, 186:17, 240:16, 240:17
**previously** [6] - 39:16, 99:11, 156:10, 170:12, 192:2, 192:11
**price** [2] - 204:12, 251:15
**Priddy** [1] - 150:1
**primarily** [2] - 14:2, 266:20
**primary** [7] - 14:6, 75:20, 75:22, 76:7, 76:15, 79:16, 238:9
**printed** [3] - 122:20, 154:19, 241:24
**prioritize** [2] - 109:15,

109:18
**privacy** [1] - 154:24
**private** [3] - 12:7, 178:2
**PROACT** [8] - 13:5, 20:10, 56:19, 56:21, 57:3, 57:7, 57:9, 57:14
**Problem** [1] - 214:7
**problem** [48] - 44:24, 103:3, 133:25, 134:1, 134:2, 136:19, 137:6, 137:9, 139:5, 139:9, 139:11, 140:25, 142:3, 142:5, 145:14, 147:9, 151:11, 153:5, 164:11, 174:12, 178:15, 178:16, 179:16, 179:17, 179:21, 181:3, 181:5, 182:8, 186:9, 186:13, 186:22, 187:15, 187:20, 189:7, 189:11, 189:19, 189:22, 190:11, 197:22, 200:5, 206:4, 206:11, 209:6, 211:7, 216:7, 235:2, 235:7, 241:8
**problematic** [1] - 123:8
**problems** [2] - 83:7, 126:19
**procedures** [1] - 39:10
**proceed** [1] - 203:15
**proceedings** [1] - 268:5
**Proceedings** [2] - 6:19, 62:4
**PROCEEDINGS** [1] - 7:1
**process** [8] - 90:4, 126:12, 126:23, 152:6, 223:22, 223:25, 224:2, 226:11
**Proctor** [1] - 2:12
**produced** [4] - 6:19, 37:11, 160:23, 204:19
**product** [8] - 155:25, 158:8, 160:1, 178:3, 200:11, 200:17, 234:20, 251:14
**products** [4] - 102:8, 102:14, 147:5, 258:14

**profession** [2] - 9:13, 32:21
**professional** [3] - 108:6, 113:23, 115:1
**professionals** [4] - 22:21, 24:25, 25:15, 171:10
**Professor** [2] - 11:19, 113:20
**profit** [1] - 55:17
**profitability** [1] - 76:3
**program** [33] - 53:3, 53:5, 53:12, 56:19, 57:14, 102:11, 102:12, 102:13, 114:4, 115:24, 116:5, 117:2, 174:25, 175:6, 175:10, 175:12, 175:13, 175:14, 175:17, 176:22, 178:6, 179:10, 179:11, 179:14, 180:16, 181:6, 181:7, 181:13, 181:23, 182:3, 236:21, 239:4
**Program** [4] - 102:24, 144:13, 182:7, 190:25
**programming** [1] - 176:3
**programs** [21] - 52:25, 53:11, 102:10, 112:17, 117:24, 121:25, 139:21, 140:4, 140:6, 140:10, 140:23, 142:12, 143:25, 174:16, 174:17, 174:21, 175:6, 178:13, 228:5, 236:18, 236:20
**progressed** [4] - 119:17, 200:7, 218:13, 254:11
**progressing** [1] - 118:19
**progression** [10] - 129:13, 142:13, 211:10, 238:12, 238:17, 238:18, 238:20, 238:25, 241:4, 241:5
**project** [8] - 114:1, 114:2, 114:9, 115:20, 116:10, 117:3, 265:25
**projects** [1] - 121:23
**prom** [1] - 187:24

**promote** [1] - 102:14
**promoted** [1] - 196:11
**promoting** [2] - 102:8, 102:10
**promulgated** [1] - 30:11
**prong** [9] - 156:21, 156:22, 157:3, 157:9, 157:17, 157:18, 167:24, 168:8, 168:14
**prongs** [2] - 156:11, 159:13
**proper** [5] - 21:4, 32:25, 94:15, 97:6, 220:6
**properly** [3] - 136:2, 236:24, 264:25
**property** [3] - 118:25, 199:22, 200:1
**proportion** [1] - 47:22
**proportions** [1] - 48:6
**proposal** [6] - 209:5, 209:21, 210:25, 211:1, 249:12, 257:4
**proposals** [1] - 208:18
**propose** [4] - 208:9, 209:12, 209:15, 209:17
**proposed** [2] - 7:10, 209:8
**prostitutes** [1] - 175:21
**protect** [1] - 215:9
**protection** [1] - 185:17
**provide** [9] - 30:21, 74:18, 85:6, 85:22, 89:11, 108:24, 130:20, 132:1, 220:24
**provided** [14] - 7:10, 77:8, 131:18, 149:24, 152:24, 184:17, 212:19, 212:22, 219:21, 220:2, 220:18, 220:22, 220:23, 262:12
**providers** [2] - 42:1, 54:12
**psychiatric** [1] - 19:7
**public** [20] - 19:25, 118:13, 122:18, 122:21, 127:17, 138:23, 151:3, 156:9, 156:22, 157:3, 157:17, 158:1, 158:13, 159:13, 165:21,

167:25, 174:8, 215:9, 258:14
**publication** [5] - 40:25, 41:18, 46:10, 59:7, 59:14
**publications** [1] - 56:15
**publicly** [2] - 188:20, 188:25
**publish** [2] - 24:15, 59:18
**published** [13] - 11:8, 11:11, 50:3, 51:6, 58:1, 122:19, 205:24, 206:14, 211:19, 218:22, 238:5, 247:5, 254:5
**publishes** [2] - 58:8, 59:15
**pull** [19] - 23:21, 24:21, 86:2, 86:14, 93:11, 127:22, 130:1, 187:11, 209:11, 213:17, 224:8, 225:17, 226:20, 233:15, 233:18, 237:16, 237:18, 246:13, 265:8
**pulled** [2] - 154:16, 224:7
**punishment** [1] - 209:22
**purchase** [3] - 65:17, 76:1, 103:8
**purchased** [5] - 65:14, 79:20, 80:15, 80:16, 80:20
**purchasers** [1] - 102:19
**purchases** [8] - 81:12, 81:13, 81:14, 81:15, 81:18, 104:21, 106:15
**purchasing** [4] - 80:6, 80:10, 80:15, 104:17
**Purdue** [2] - 30:6, 30:18
**purge** [1] - 159:1
**purpose** [14] - 24:1, 37:17, 38:16, 128:8, 134:16, 151:18, 162:22, 167:10, 169:17, 171:22, 173:8, 191:14, 236:20, 261:17
**purposes** [2] - 58:7, 116:22
**pursuant** [1] - 141:8
**purview** [1] - 103:10

**push** [1] - 68:13
**pushed** [4] - 116:8, 152:2, 177:11, 184:23
**put** [29] - 32:2, 32:6, 107:5, 111:13, 122:11, 140:19, 161:12, 161:25, 162:3, 169:3, 169:10, 169:22, 172:5, 206:8, 213:4, 219:12, 219:17, 221:12, 223:14, 224:14, 228:10, 229:24, 230:7, 234:24, 235:9, 248:13, 251:25, 265:5, 266:9
**putting** [3] - 120:8, 158:15, 261:22

**Q**

**QRA** [32] - 72:9, 72:14, 73:3, 73:5, 73:8, 74:2, 74:10, 75:10, 84:1, 84:4, 84:25, 85:22, 86:6, 88:14, 89:11, 91:22, 93:8, 94:5, 96:22, 97:21, 97:22, 103:10, 103:21, 104:8, 104:9, 104:11, 105:16, 105:18, 105:21, 106:14, 106:19
**QRA's** [1] - 104:1
**QRT** [1] - 178:4
**quadruple** [1] - 51:24
**quadrupled** [2] - 50:7, 51:15
**qualifications** [1] - 25:17
**qualified** [2] - 157:18, 226:6
**Qualified** [1] - 57:2
**qualify** [1] - 168:14
**Quality** [2] - 72:9, 84:4
**quantity** [2] - 208:8, 215:21
**quarter** [1] - 185:14
**quarters** [2] - 56:9, 56:10
**questioned** [2] - 263:23, 264:1
**questionnaire** [3] - 72:12, 72:17, 73:5
**questions** [34] - 12:17, 21:9, 22:7, 22:8, 24:8, 29:21, 39:24,

40:3, 57:18, 61:8, 61:9, 61:13, 72:18, 73:7, 74:10, 75:9, 75:10, 78:13, 88:20, 88:22, 100:8, 105:23, 107:2, 109:25, 123:25, 201:13, 221:4, 236:7, 241:12, 257:2, 257:10, 258:2, 259:17, 261:21
**quick** [5] - 89:16, 122:8, 261:6, 261:8, 261:23
**quickly** [3] - 39:19, 151:12, 262:23
**quite** [4] - 37:22, 176:5, 224:2, 254:21
**quiz** [1] - 58:24
**quote** [1] - 39:7

**R**

**race** [4] - 153:24, 154:4, 161:21, 162:15
**Rader** [8] - 136:12, 138:4, 144:5, 190:3, 190:10, 190:19, 194:23, 196:8
**Rafferty** [1] - 2:12
**raid** [1] - 96:20
**raise** [5] - 7:9, 9:3, 62:10, 111:20, 123:4
**raised** [1] - 20:17
**raises** [1] - 123:11
**ran** [2] - 144:6, 225:10
**range** [2] - 19:14, 138:21
**rank** [1] - 125:24
**rapidity** [1] - 59:10
**rate** [12] - 17:6, 46:24, 49:13, 50:2, 50:6, 50:15, 51:11, 51:21, 51:23, 51:24, 166:21, 167:4
**rates** [3] - 16:20, 167:5, 197:14
**rather** [3] - 133:14, 158:22, 224:12
**Rather** [1] - 241:4
**re** [4] - 37:1, 60:2, 140:12, 176:21
**re-ask** [1] - 37:1
**re-do** [1] - 140:12
**re-named** [1] - 176:21
**re-writes** [1] - 60:2
**reach** [6] - 19:15, 21:18, 49:21, 59:20,

74:23, 74:25
**reached** [1] - 172:12
**read** [30] - 31:9, 35:16, 35:24, 39:4, 39:20, 47:1, 47:14, 54:15, 61:6, 61:7, 71:10, 91:4, 96:24, 125:18, 158:23, 174:4, 174:9, 185:8, 191:14, 193:1, 193:7, 194:4, 194:13, 224:15, 227:3, 247:21, 251:6, 251:9, 256:2, 261:1
**reading** [6] - 36:5, 89:21, 96:2, 131:9, 184:15, 250:12
**reads** [11] - 46:23, 168:2, 238:1, 240:4, 246:18, 248:18, 250:3, 252:5, 253:3, 253:22, 255:3
**ready** [3] - 8:21, 38:19, 111:13
**real** [4] - 44:24, 89:16, 222:10, 223:12
**real-time** [2] - 222:10, 223:12
**realize** [3] - 137:11, 146:24, 244:21
**realized** [5] - 77:5, 145:14, 146:20, 177:9, 211:9
**really** [25] - 14:16, 34:17, 49:8, 55:14, 59:17, 88:11, 118:15, 136:22, 137:16, 137:17, 142:4, 146:8, 146:23, 147:19, 147:20, 172:19, 177:11, 180:22, 189:10, 190:2, 192:11, 192:12, 193:24, 206:6, 221:10
**realtime** [9] - 146:2, 150:23, 151:9, 151:10, 151:11, 151:19, 153:9, 161:18
**Reason** [1] - 175:9
**reason** [21] - 35:5, 35:18, 37:16, 44:22, 59:9, 67:16, 70:18, 76:2, 84:16, 93:15, 106:25, 126:21, 132:20, 180:15, 198:13, 203:22,

204:5, 204:10, 217:6, 217:10, 223:9
**reasonable** [1] - 56:14
**reasons** [3] - 204:13, 204:14, 251:12
**receive** [4] - 60:5, 66:11, 74:20, 208:23
**received** [9] - 66:15, 97:2, 113:23, 121:25, 149:21, 225:10, 225:13, 225:20, 256:11
**receiving** [2] - 60:8, 252:6
**recent** [4] - 11:12, 39:11, 204:6, 204:7
**Recent** [1] - 166:20
**recess** [1] - 203:12
**Recess** [4] - 36:15, 62:3, 130:12, 203:13
**recessed** [1] - 267:20
**recitation** [1] - 166:19
**reciting** [1] - 143:5
**recognition** [1] - 113:23
**recognize** [13] - 16:12, 68:23, 69:20, 69:22, 121:12, 155:3, 155:5, 160:20, 160:22, 165:9, 165:11, 173:2, 181:19
**recognized** [1] - 228:13
**recollect** [2] - 73:8, 254:7
**recollection** [4] - 116:21, 203:9, 221:9, 253:10
**recommendation** [10] - 210:12, 210:15, 210:23, 215:17, 215:24, 218:3, 218:6, 218:10, 218:15, 218:18
**recommendations** [3] - 210:11, 210:14, 216:1
**record** [30] - 9:11, 36:5, 37:18, 38:16, 58:16, 79:1, 82:11, 86:18, 90:7, 112:5, 123:13, 125:22, 140:20, 141:16, 154:22, 157:14, 158:1, 159:10, 160:10, 167:16, 168:16, 168:19, 169:3, 171:2, 177:13, 247:22,

259:18, 261:25, 263:17, 268:5
**recorded** [2] - 6:19, 95:15
**recording** [3] - 156:17, 168:5
**records** [21] - 149:21, 149:23, 149:24, 150:2, 150:4, 156:9, 156:22, 157:3, 157:17, 158:1, 159:13, 166:5, 166:6, 167:25, 173:21, 226:3, 227:11, 259:3, 259:4, 259:8, 260:14
**recovering** [1] - 171:12
**recovery** [7] - 138:25, 139:19, 139:20, 142:8, 142:9, 142:10, 258:15
**Recovery** [1] - 175:7
**recross** [3] - 220:8, 236:3, 236:5
**recruits** [1] - 252:20
**red** [21] - 66:4, 70:25, 71:3, 72:2, 72:3, 72:11, 72:18, 73:1, 78:13, 92:1, 92:19, 92:22, 95:9, 95:14, 95:16, 97:15, 97:18, 104:2, 104:6, 104:12, 106:11
**redacted** [1] - 154:25
**redirect** [3] - 110:5, 257:13, 257:15
**REDIRECT** [3] - 57:23, 110:8, 257:22
**reds** [1] - 152:17
**reduce** [1] - 237:7
**Reduce** [1] - 214:5
**reduced** [1] - 185:13
**Reduction** [1] - 144:13
**reduction** [4] - 174:25, 175:2, 175:4, 185:22
**Reed** [2] - 6:4, 6:11
**refer** [1] - 156:18
**reference** [11] - 26:3, 30:8, 83:5, 122:8, 162:4, 186:17, 189:8, 235:18, 235:21, 235:24, 236:1
**referenced** [1] - 247:16
**references** [2] - 30:6, 32:4
**referencing** [3] -

30:18, 42:17, 248:3
**referred** [7] - 107:5, 108:7, 156:15, 187:21, 189:1, 234:23, 250:5
**referring** [8] - 31:17, 42:16, 50:8, 80:14, 86:10, 93:10, 199:5, 245:7
**refers** [5] - 45:22, 193:16, 215:1, 215:4, 233:25
**refill** [1] - 35:14
**reflect** [2] - 228:21, 230:23
**reflected** [4] - 230:1, 231:2, 233:12, 234:11
**reflection** [1] - 229:5
**reflects** [1] - 239:17
**regard** [5] - 134:6, 149:17, 150:13, 265:3, 266:21
**regarding** [3] - 59:2, 59:20, 129:21
**regime** [1] - 39:9
**region** [3] - 240:23, 250:3, 250:16
**regional** [4] - 16:19, 193:9, 194:5, 233:6
**registered** [1] - 138:9
**registration** [1] - 109:4
**regularly** [3] - 66:6, 125:22, 166:5
**regulations** [1] - 224:1
**Regulatory** [2] - 71:13, 72:9
**regulatory** [4] - 66:19, 67:22, 68:4, 85:3
**relate** [2] - 34:18, 97:6
**related** [31] - 14:3, 66:11, 67:1, 70:22, 71:7, 71:9, 71:21, 90:11, 97:2, 113:18, 119:10, 133:13, 133:15, 134:14, 137:15, 149:12, 160:11, 187:25, 197:10, 199:1, 199:17, 211:2, 217:14, 229:9, 231:10, 231:11, 231:15, 240:22, 254:24, 255:12
**relates** [5] - 30:17, 33:20, 118:19, 128:13, 163:2
**relating** [3] - 11:11, 30:8, 200:20

**relations** [1] - 221:25
**relationship** [5] - 54:10, 63:21, 117:1, 150:17, 151:24
**relationships** [2] - 139:7, 140:9
**relatively** [3] - 128:22, 180:20, 200:3
**released** [1] - 165:19
**relevancy** [1] - 8:18
**relevant** [4] - 7:16, 7:19, 7:23, 37:13
**reliability** [1] - 157:20
**reliable** [5] - 34:13, 158:11, 158:20, 258:10, 259:20
**reliably** [1] - 211:14
**reliance** [1] - 58:7
**relied** [8] - 149:25, 152:23, 158:10, 225:9, 225:12, 225:14, 258:8, 258:25
**rely** [2] - 259:6, 260:13
**remain** [1] - 124:11
**remained** [3] - 50:19, 52:11, 124:8
**Remember** [1] - 267:18
**remember** [35] - 23:10, 29:14, 50:12, 66:13, 66:17, 66:18, 68:14, 68:17, 69:12, 71:11, 72:6, 82:8, 93:6, 94:9, 99:10, 99:12, 99:13, 99:14, 99:19, 100:5, 107:14, 108:8, 189:10, 218:5, 219:2, 219:7, 228:4, 230:13, 235:23, 235:25, 236:2, 255:13, 258:3, 263:12
**remembered** [1] - 87:24
**remind** [1] - 114:12
**remove** [1] - 106:17
**rep** [2] - 75:15, 85:2
**repeat** [2] - 97:12, 235:4
**repeated** [1] - 167:14
**repeatedly** [1] - 98:19
**repeating** [2] - 141:16, 143:9
**repetitively** [1] - 59:12
**rephrase** [5] - 80:2, 94:21, 223:2, 231:1, 259:10
**replaced** [5] - 196:4,

196:13, 196:19,
196:24, 211:12
**replies** [1] - 31:20
**reply** [3] - 31:9, 39:4,
39:20
**report** [95] - 71:13,
71:19, 72:7, 72:8,
81:6, 81:7, 84:16,
89:22, 96:22, 97:18,
97:19, 97:22, 104:8,
104:11, 120:6,
120:12, 120:16,
121:20, 122:6,
123:16, 123:24,
124:1, 124:21,
124:23, 125:20,
127:23, 146:6,
152:4, 156:24,
161:25, 162:1,
181:12, 181:22,
182:6, 187:15,
188:11, 189:6,
198:3, 199:8,
206:20, 211:18,
212:23, 214:16,
215:5, 216:2,
218:17, 218:20,
219:9, 220:19,
221:3, 224:3,
228:24, 229:24,
229:25, 235:1,
235:6, 237:17,
237:19, 237:23,
237:24, 238:6,
239:8, 239:11,
239:15, 240:3,
240:21, 246:12,
246:14, 247:2,
247:5, 247:17,
248:6, 248:8,
248:10, 248:13,
248:17, 250:2,
251:18, 251:24,
252:4, 253:12,
253:15, 253:18,
255:1, 255:11,
255:16, 260:4,
262:23, 265:10,
265:11
**Report** [5] - 33:18,
130:18, 172:21,
175:25, 190:25
**reported** [17] - 71:16,
72:2, 72:5, 72:7,
95:15, 98:18, 98:21,
98:24, 100:3,
103:25, 106:7,
106:11, 157:1,
239:7, 245:2,
258:25, 268:9

**reporter** [1] - 36:10
**Reporter** [6] - 6:17,
6:18, 268:3, 268:12
**REPORTER** - 86:2,
165:2, 165:5, 202:1,
202:12
**Reporting** [1] - 120:13
**reporting** [5] - 71:20,
120:14, 210:24,
218:16, 259:15
**Reports** [1] - 78:15
**reports** [49] - 19:12,
81:13, 81:14, 81:18,
81:19, 119:20,
119:23, 120:5,
120:8, 121:7,
121:10, 121:13,
121:16, 121:19,
122:14, 122:18,
122:23, 124:9,
124:15, 124:18,
127:13, 128:6,
128:24, 129:19,
130:17, 130:20,
134:6, 146:3, 146:5,
148:20, 163:19,
167:18, 173:22,
225:8, 225:11,
225:14, 226:3,
226:12, 227:4,
227:7, 229:2,
229:13, 229:14,
230:7, 237:12,
246:4, 250:25,
251:25, 262:20
**represent** [3] - 22:5,
40:3, 266:3
**representatives** [1] -
31:5
**represented** [2] -
63:12, 63:13
**representing** [1] -
111:25
**reps** [1] - 70:5
**request** [6] - 74:16,
78:6, 78:15, 88:24,
89:3, 105:21
**requested** [1] - 85:5
**require** [12] - 17:10,
17:22, 21:14, 21:19,
21:20, 35:2, 42:9,
49:19, 49:21, 120:8,
210:23, 218:15
**required** [5] - 17:12,
17:18, 18:14, 52:2,
120:14
**requirements** [2] -
44:23, 218:18
**requires** [1] - 18:24
**requiring** [5] - 18:6,

49:24, 50:18, 52:3,
52:12
**research** [1] - 192:7
**reserve** [3] - 126:18,
169:11, 169:25
**reserved** [1] - 126:22
**reserves** [1] - 170:22
**residency** [3] - 10:24,
10:25, 11:4
**residents** [2] - 8:3,
54:13
**resolve** [1] - 143:3
**resort** [1] - 224:21
**resources** [8] - 21:5,
151:12, 177:20,
178:18, 193:2,
193:14, 233:21,
266:9
**Resources** [1] - 222:7
**respect** [5] - 82:23,
108:3, 108:21,
154:24, 160:10
**respected** [1] - 38:3
**respective** [1] - 138:6
**respiratory** [1] - 14:3
**respond** [5] - 70:2,
88:18, 126:10,
158:3, 167:20
**responder** [2] -
175:24, 176:23
**responders** [4] -
133:24, 176:4,
176:16, 216:19
**response** [10] - 8:14,
31:13, 39:5, 39:13,
117:7, 189:19,
214:20, 214:22,
219:21, 241:12
**responsibilities** [6] -
109:16, 109:20,
117:22, 119:24,
125:10, 228:6
**responsibility** [7] -
94:5, 125:8, 138:13,
138:16, 226:11,
227:4, 227:7
**responsible** [5] -
108:5, 119:19,
246:22, 248:19,
250:25
**rest** [3] - 17:6, 187:12,
240:4
**result** [11] - 12:14,
20:16, 118:18,
158:8, 159:1,
168:10, 168:22,
188:21, 189:2,
243:8, 255:6
**resulted** [3] - 185:12,
202:5, 203:1

**results** [1] - 98:10
**resume** [1] - 130:13
**resumed** [1] - 62:4
**resurgence** [2] -
240:5, 240:10
**retention** [2] - 67:11,
106:17
**retentions** [1] - 68:16
**retire** [1] - 101:11
**retired** [1] - 79:11
**Retired** [1] - 101:10
**Retrieved** [1] - 253:3
**revealed** [1] - 132:21
**revenue** [2] - 185:6,
185:12
**review** [7] - 23:17,
29:12, 74:17, 89:1,
159:11, 165:18,
225:1
**reviewed** [5] - 58:8,
122:5, 164:23,
218:25, 225:23
**reviewing** [3] - 135:5,
167:23, 199:11
**reviews** [1] - 166:11
**revisions** [1] - 210:8
**revolve** [1] - 20:20
**Reynolds** [1] - 237:18
**Rice** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**right-hand** [3] -
182:20, 232:21,
233:13
**rightfully** [1] - 170:2
**rise** [1] - 40:16
**risk** [5] - 14:1, 34:15,
58:6, 174:24, 243:13
**risks** [1] - 237:8
**RMR** [2] - 6:17, 6:18
**road** [2] - 24:14, 107:6
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**Robin** [1] - 87:5
**robust** [2] - 116:24,
193:24
**rockers** [1] - 15:6
**role** [33] - 66:20,
102:17, 102:23,
103:13, 103:22,
104:20, 108:20,
108:22, 112:14,
112:18, 113:7,
115:19, 115:21,
115:22, 117:8,
117:14, 117:15,
118:2, 118:5, 118:7,
118:9, 118:18,
132:4, 132:6,
132:11, 132:14,
133:5, 140:21,

165:15, 170:7,
235:2, 235:6
**roles** [1] - 136:6
**Ronk** [1] - 107:24
**room** [1] - 16:12
**round** [1] - 136:5
**rounds** [1] - 170:15
**routinely** [7] - 120:18,
120:22, 124:14,
124:17, 127:12,
128:23, 162:5
**Roxy** [1] - 135:3
**RPR** [1] - 6:18
**RPR-RMR-CRR-
FCRR** [1] - 6:18
**Ruby** [24] - 4:17,
126:11, 132:18,
142:20, 143:8,
149:16, 150:10,
156:3, 159:14,
160:7, 166:2,
169:10, 171:2,
179:4, 186:15,
201:11, 203:15,
220:9, 222:25,
241:12, 261:12,
261:19, 262:8, 265:3
**RUBY** [76] - 4:17,
61:22, 62:2, 123:1,
123:9, 125:19,
126:10, 126:12,
131:19, 132:19,
140:15, 141:14,
142:21, 149:17,
152:21, 156:4,
159:10, 159:15,
160:9, 163:13,
166:3, 166:10,
167:20, 167:22,
169:1, 170:6,
171:16, 173:6,
178:24, 179:1,
181:15, 181:17,
182:11, 182:17,
183:3, 183:5,
186:16, 186:20,
187:11, 187:13,
188:10, 191:2,
191:8, 197:5, 197:7,
201:12, 201:15,
201:16, 202:4,
202:18, 202:24,
203:10, 203:16,
203:17, 205:23,
213:15, 213:19,
213:25, 214:2,
220:10, 223:2,
223:4, 226:20,
226:22, 232:16,
232:18, 233:15,

233:19, 234:6,
234:8, 236:3,
261:11, 261:13,
261:25, 264:4,
267:10
**Ruby's** [1] - 158:23
**Rule** [2] - 7:20, 7:21
**rule** [1] - 157:4
**ruled** [1] - 82:19
**rules** [1] - 159:3
**ruling** [3] - 160:15,
163:16, 171:21
**run** [2] - 144:7, 196:16
**runs** [1] - 196:25
**rush** [1] - 251:21
**Ruth** [1] - 212:15

**S**

**s\Ayme** [1] - 268:11
**s\Lisa** [1] - 268:11
**sadly** [1] - 178:7
**Safe** [1] - 107:19
**SafeScript** [6] - 96:10,
96:11, 96:15, 107:6,
107:11, 107:17
**safety** [2] - 30:14,
215:9
**salaried** [1] - 66:22
**salary** [1] - 66:21
**sale** [2] - 109:15,
109:19
**sales** [16] - 64:14,
64:16, 66:4, 67:2,
67:4, 68:10, 70:5,
75:14, 81:12, 85:2,
92:25, 94:7, 104:24,
105:5, 105:9, 106:2
**salesman** [2] - 65:23,
66:20
**SALGADO** [1] - 4:15
**San** [4] - 2:5, 2:17,
10:20, 11:1
**sat** [1] - 11:23
**save** [2] - 131:15,
133:19
**saw** [14] - 38:23,
80:23, 89:22,
117:12, 128:17,
129:13, 175:15,
175:20, 193:17,
198:17, 204:14,
204:20, 215:5, 225:4
**SC** [3] - 3:15, 4:4, 4:9
**scale** [1] - 35:22
**scarce** [1] - 142:18
**scary** [1] - 39:12
**SCHMIDT** [1] - 5:9
**scholarly** [1] - 11:12
**School** [11] - 10:4,

10:10, 10:19, 10:22,
11:20, 12:5, 12:11,
27:22, 29:2, 31:14,
54:3
**school** [9] - 10:24,
18:12, 19:4, 19:11,
113:17, 139:23,
143:15, 143:18
**scope** [16] - 26:7,
61:2, 136:19, 137:9,
139:4, 139:8,
139:11, 140:25,
145:13, 164:10,
172:6, 172:13,
186:11, 186:12,
188:3, 190:2
**Scott** [5] - 69:18,
111:13, 111:19,
112:1, 112:6
**SCOTT** [1] - 111:21
**screen** [13] - 49:2,
49:3, 49:4, 49:7,
49:17, 58:21, 83:15,
94:3, 95:21, 208:13,
216:12, 219:12,
244:21
**screenings** [1] - 48:22
**screens** [1] - 48:17
**scroll** [2] - 87:4,
244:20
**seal** [1] - 249:16
**search** [2] - 253:3,
255:6
**seat** [2] - 9:6, 111:22
**second** [20] - 29:22,
33:11, 37:9, 70:20,
87:7, 87:9, 87:11,
96:5, 125:16,
154:23, 155:1,
155:20, 156:22,
171:5, 192:18,
192:21, 241:19,
246:18, 260:18
**Second** [2] - 177:8,
177:11
**secondary** [5] - 75:21,
75:23, 75:24, 76:1,
76:10
**Secondly** [1] - 207:22
**seconds** [2] - 8:1, 8:2
**section** [12] - 12:6,
46:20, 124:12,
124:19, 182:9,
183:6, 183:11,
210:3, 214:19,
237:13, 237:23,
252:12
**Section** [1] - 167:23
**sections** [4] - 124:15,
124:17, 127:12,

128:23
**Security** [1] - 118:1
**see** [147] - 15:18,
20:19, 24:22, 25:1,
28:19, 29:10, 32:20,
33:12, 41:1, 41:23,
42:3, 42:10, 43:2,
43:6, 43:12, 43:18,
43:22, 43:25, 44:5,
44:12, 44:13, 46:20,
50:23, 51:17, 51:21,
52:4, 52:5, 69:6,
75:4, 80:9, 81:10,
83:5, 84:5, 85:11,
85:18, 86:21, 89:17,
90:24, 90:25, 91:17,
91:18, 92:11, 92:17,
93:4, 94:1, 95:19,
96:2, 96:8, 100:1,
102:19, 104:12,
116:7, 120:12,
120:15, 121:7,
127:20, 128:2,
128:14, 128:19,
131:15, 133:11,
139:22, 141:18,
145:18, 147:8,
148:4, 152:15,
152:16, 154:25,
155:16, 158:18,
162:20, 170:17,
171:13, 173:20,
174:5, 174:6, 179:7,
183:1, 183:8,
183:14, 183:21,
185:1, 185:6,
191:11, 191:22,
192:19, 192:24,
203:8, 206:25,
207:16, 208:1,
208:11, 208:16,
209:14, 209:19,
210:4, 210:9, 214:5,
214:8, 214:19,
214:24, 215:15,
215:22, 216:12,
216:15, 216:17,
216:24, 219:15,
219:19, 220:3,
224:15, 224:18,
226:24, 227:1,
232:21, 237:24,
238:3, 239:10,
239:11, 240:7,
240:24, 244:16,
244:22, 245:2,
245:6, 245:15,
245:23, 246:25,
248:24, 249:14,
250:8, 250:17,
252:16, 252:23,

253:5, 254:2,
254:15, 255:9,
255:25, 261:3,
263:18, 265:19,
265:23, 266:6,
266:17, 267:19
**seeing** [14] - 95:21,
127:9, 128:12,
145:16, 148:9,
148:10, 162:14,
162:15, 173:23,
176:4, 176:6, 176:8,
194:20, 217:5
**seek** [3] - 131:14,
133:18, 169:21
**seeking** [2] - 243:8,
243:10
**segments** [1] - 134:5
**seize** [1] - 260:9
**seized** [9] - 122:9,
127:19, 127:20,
198:8, 198:13,
255:5, 255:6, 256:7,
260:6
**seizing** [5] - 127:18,
128:11, 148:10,
148:11
**seizure** [5] - 127:15,
148:3, 239:11,
255:17
**seizures** [15] - 16:14,
125:5, 127:12,
147:21, 147:22,
147:25, 148:7,
197:25, 198:4,
239:17, 239:20,
239:24, 262:25,
263:13, 263:18
**Seizures** [1] - 128:3
**seldom** [1] - 78:9
**sell** [1] - 251:14
**selling** [5] - 106:5,
116:3, 193:12,
194:10, 267:2
**sells** [1] - 207:14
**semester** [1] - 113:22
**send** [5] - 93:8, 121:1,
126:15, 126:16,
150:18
**sending** [2] - 33:20,
170:7
**Senior** [2] - 7:2, 10:9
**SENIOR** [1] - 1:17
**Sensabaugh** [1] - 5:14
**sent** [16] - 28:20, 29:6,
30:24, 33:14, 69:9,
70:4, 70:15, 73:4,
84:8, 84:10, 126:14,
169:3, 170:10,
170:13, 190:18,

190:21
**sentence** [16] - 185:8,
185:16, 186:1,
191:13, 193:1,
193:7, 207:16,
207:24, 208:22,
209:11, 209:14,
216:12, 216:15,
227:1, 253:2, 266:12
**sentenced** [1] -
201:22
**sentences** [7] - 39:5,
207:18, 208:9,
208:16, 208:24,
209:5, 209:21
**sentencing** [4] -
207:23, 208:7,
215:20
**separate** [4] - 15:23,
207:4, 209:18,
215:10
**September** [3] - 23:9,
114:14, 242:12
**series** [1] - 258:2
**serious** [1] - 179:15
**served** [12] - 12:2,
12:4, 41:13, 77:14,
103:4, 112:18,
126:6, 136:12,
138:3, 169:13,
169:24, 172:2
**service** [11] - 76:4,
78:3, 79:17, 80:8,
86:24, 95:8, 95:13,
97:17, 98:11,
105:12, 171:11
**serviced** [4] - 75:14,
77:13, 77:15, 102:3
**services** [7] - 18:14,
102:11, 108:24,
138:25, 177:16,
185:13
**Services** [2] - 259:9,
259:12
**set** [14] - 61:24, 67:11,
75:19, 163:25,
164:4, 164:13,
167:19, 176:3,
180:15, 180:25,
223:25, 228:19,
241:25, 243:23
**set-ups** [1] - 75:19
**sets** [6] - 35:22, 41:22,
159:12, 166:25,
167:16, 191:13
**setting** [4] - 103:13,
194:14, 217:23,
228:14
**SEU** [5] - 115:3, 115:9,
115:10, 115:11,

116:25
**seven** [2] - 78:13, 164:9
**several** [4] - 67:3, 75:19, 102:13, 170:11
**severe** [1] - 181:4
**severity** [1] - 74:9
**sex** [3] - 153:25, 175:8, 175:20
SHANNON [1] - 6:3
**Shapiro** [4] - 27:21, 31:13, 31:20, 36:1
**share** [8] - 118:9, 118:11, 138:18, 138:20, 138:21, 138:23, 139:1, 158:12
**shared** [5] - 118:13, 151:4, 258:11, 258:13
**shares** [1] - 158:11
**sharing** [1] - 132:15
**sheet** [3] - 229:21, 241:24, 259:21
**shift** [2] - 84:16, 93:15
**shipment** [1] - 74:20
**shipments** [4] - 75:4, 76:19, 210:12, 218:3
**shipped** [1] - 92:9
**shoot** [1] - 76:7
**shooting** [1] - 187:24
**shop** [1] - 180:25
**Shoppe** [29] - 77:17, 77:18, 79:4, 79:13, 80:20, 85:9, 85:13, 86:8, 86:9, 86:12, 86:23, 88:1, 98:12, 98:13, 98:18, 98:24, 100:3, 107:3, 107:10, 107:20, 108:8, 108:12, 108:13, 108:15, 108:18, 108:21, 109:2, 110:25, 111:1
**short** [9] - 40:6, 59:11, 98:2, 113:1, 116:20, 137:1, 193:9, 194:4, 241:7
**shortly** [1] - 7:12
**shot** [1] - 166:23
**show** [10] - 24:2, 32:7, 93:12, 94:15, 129:5, 135:16, 152:13, 166:8, 234:10, 234:14
**showed** [3] - 34:19, 34:21, 198:3
**showing** [9] - 51:5, 84:18, 93:16, 94:3,

167:10, 171:22, 173:8, 173:20, 261:17
**shown** [7] - 24:9, 57:25, 166:21, 232:23, 234:3, 234:9, 265:13
**shows** [9] - 51:14, 52:8, 52:13, 128:10, 129:3, 244:8, 244:24, 255:23, 265:17
**shut** [3] - 96:20, 97:16, 97:23
**shut-down** [1] - 96:20
**SIB** [1] - 263:15
**sic** [4] - 50:7, 50:16, 54:19, 123:18
**sic]** [1] - 31:6
**side** [5] - 64:21, 138:2, 139:17, 139:18, 243:6
**Side** [1] - 147:19
**siege** [3] - 166:16, 167:3, 168:13
**sign** [13] - 26:1, 26:3, 26:12, 27:3, 27:11, 27:14, 31:15, 31:18, 35:23, 36:2, 37:16, 38:4, 39:9
**signature** [2] - 28:25, 29:3
**significant** [11] - 19:9, 46:5, 47:18, 47:22, 52:19, 52:21, 59:6, 98:1, 98:5, 98:7, 180:17
**significantly** [1] - 203:24
**signs** [3] - 8:4, 71:21, 109:13
**Similar** [1] - 239:16
**similar** [4] - 29:25, 167:5, 239:14, 255:18
**Simmons** [16] - 181:15, 183:4, 187:11, 205:17, 209:9, 209:13, 212:1, 213:15, 213:17, 213:25, 219:11, 219:24, 226:20, 232:16, 233:16, 234:7
**simple** [1] - 117:11
**Simply** [1] - 166:14
**simply** [4] - 24:9, 32:10, 36:5, 157:24
**SINGER** [1] - 4:5
**single** [12] - 151:20,

187:25, 191:13, 194:17, 194:24, 195:2, 195:4, 202:5, 203:1, 211:7, 218:22, 256:12
**sit** [6] - 41:4, 41:7, 41:9, 71:20, 212:21, 228:7
**site** [21] - 17:23, 55:14, 74:15, 78:2, 78:6, 78:8, 81:21, 81:23, 86:8, 86:9, 86:11, 88:6, 88:14, 88:19, 88:22, 88:24, 90:15, 93:24, 95:15
**sits** [2] - 53:24, 55:3
**situation** [3] - 75:3, 88:16, 150:1
**situations** [2] - 74:9, 176:18
**six** [13] - 8:1, 66:8, 72:18, 78:13, 140:7, 140:16, 164:9, 182:5, 182:6, 189:6, 265:3, 265:11, 266:16
**six-month** [5] - 140:7, 140:16, 189:6, 265:3, 265:11
**six-week** [1] - 66:8
**sixth** [1] - 39:9
**size** [3] - 139:8, 147:9, 230:5
**sizes** [1] - 67:8
**skip** [3] - 44:12, 100:24, 253:2
**skipped** [2] - 220:5, 262:7
**slapped** [1] - 35:13
**slash** [1] - 91:8
**slashing** [1] - 187:1
**slope** [1] - 52:13
**small** [13] - 65:13, 76:1, 76:4, 76:6, 114:10, 116:1, 121:6, 173:24, 179:17, 179:23, 180:8, 180:18, 267:2
**smaller** [4] - 76:3, 76:10, 76:12, 76:13
**Smith** [2] - 6:4, 6:11
**soap** [1] - 115:17
**social** [3] - 138:25, 171:11, 177:16
**society** [1] - 177:18
**software** [1] - 89:10
**Soisson** [3] - 73:16, 73:18
**sold** [3] - 60:23, 179:25, 180:3

**solution** [1] - 209:6
**solutions** [1] - 172:13
**solve** [1] - 134:1
**solved** [2] - 188:15, 188:17
**solvers** [1] - 133:25
**somekind** [1] - 124:2
**someone** [5] - 20:22, 69:20, 79:4, 156:23, 227:23
**sometime** [1] - 196:9
**sometimes** [13] - 10:1, 64:6, 68:16, 74:15, 88:22, 88:23, 89:6, 102:20, 104:16, 117:19, 127:19, 146:5, 151:13
**Sometimes** [3] - 224:19, 224:24
**somewhere** [7] - 65:5, 66:8, 76:7, 76:21, 99:15, 125:25, 224:9
**Somewhere** [1] - 76:9
**soon** [1] - 186:3
**sorry** [54] - 12:25, 29:12, 31:6, 63:9, 69:6, 82:5, 83:22, 84:9, 86:19, 90:23, 94:13, 94:24, 95:24, 99:22, 103:2, 105:15, 107:19, 110:12, 110:17, 111:10, 120:20, 126:11, 127:24, 134:20, 148:6, 149:14, 155:15, 156:12, 161:8, 165:2, 175:3, 188:16, 189:25, 192:20, 195:16, 198:11, 200:14, 202:1, 202:12, 202:22, 203:23, 213:17, 232:17, 238:22, 240:20, 244:20, 245:7, 245:8, 245:10, 251:8, 251:21, 256:19, 264:4, 264:22
**Sorry** [3] - 95:22, 110:17, 245:12
**sort** [10] - 14:5, 89:14, 89:20, 137:19, 157:13, 157:18, 160:11, 166:11, 166:13, 170:20
**sought** [2] - 41:14, 177:20
**sound** [2] - 54:16,

196:9
**sounds** [2] - 64:7, 196:18
**source** [10] - 152:22, 157:1, 162:1, 167:6, 180:17, 180:25, 181:9, 222:2, 248:22, 249:2
**sources** [16] - 132:23, 145:25, 148:16, 150:8, 152:23, 158:11, 160:12, 204:19, 223:7, 223:17, 223:18, 225:6, 226:12, 258:5, 258:8, 259:20
**South** [2] - 2:13, 147:19
**south** [3] - 147:19, 153:19, 250:4
**Southeastern** [2] - 14:20, 64:22
**Southern** [5] - 7:3, 14:19, 64:22, 124:4, 248:20
**SOUTHERN** [1] - 1:1
**span** [3] - 129:18, 147:3, 173:16
**spans** [1] - 174:2
**speaking** [10] - 81:18, 118:23, 179:23, 189:24, 207:20, 212:11, 223:16, 228:12, 240:11, 241:3
**spearhead** [1] - 189:18
**special** [9] - 112:17, 115:19, 121:23, 175:7, 175:14, 175:19, 175:21, 179:14, 181:5
**Special** [6] - 10:10, 115:11, 116:25, 239:17, 263:1, 263:15
**Specialist** [1] - 84:4
**specialized** [3] - 9:15, 14:22, 18:13
**specific** [19] - 29:22, 50:12, 72:6, 81:17, 95:2, 102:8, 102:14, 143:5, 143:9, 154:1, 170:23, 200:23, 207:22, 217:22, 217:23, 220:18, 220:19, 248:5
**specifically** [10] - 17:25, 49:15, 71:11, 143:5, 148:22,

215:10, 220:1,
245:2, 245:15,
259:13
**specifics** [2] - 68:17,
98:20
**Specifics** [1] - 98:21
**specify** [1] - 170:4
**speculate** [1] - 94:16
**spent** [1] - 40:6
**spike** [1] - 217:8
**spiked** [4] - 119:2,
216:20, 217:7,
217:11
**spread** [1] - 174:1
**spreadsheet** [10] -
154:16, 154:20,
157:21, 157:24,
226:13, 229:2,
229:12, 229:18,
230:1, 230:3
**spreadsheets** [5] -
158:8, 162:6,
258:11, 260:13,
262:12
**squad** [1] - 253:23
**Squad** [1] - 255:4
**Square** [2] - 6:5, 6:12
**SSRIs** [2] - 44:13,
44:15
**St** [2] - 56:22, 57:4
**stab** [5] - 192:6, 192:9,
192:15, 194:20,
233:11
**stack** [2] - 82:17,
121:6
**staff** [4] - 15:5, 18:2,
87:21, 118:15
**staffed** [2] - 15:1,
55:15
**stand** [3] - 114:16,
130:14, 220:20
**standard** [8] - 26:4,
26:14, 27:7, 27:9,
120:14, 121:1,
228:14, 237:13
**standards** [1] - 115:1
**standpoint** [10] -
118:17, 140:3,
146:22, 146:23,
147:14, 147:20,
154:4, 162:11,
162:13
**stands** [1] - 145:5
**STANNER** [1] - 5:10
**start** [9] - 24:10,
33:10, 66:9, 120:5,
148:21, 166:12,
179:8, 236:14,
267:18
**started** [17] - 7:8,

70:22, 79:19, 80:25,
111:15, 114:13,
120:6, 136:20,
136:24, 139:21,
142:14, 164:10,
178:13, 192:11,
192:12, 223:9,
253:24
**starting** [3] - 137:24,
144:13, 262:9
**starts** [4] - 60:13,
96:6, 166:14, 206:25
**State** [9] - 15:19, 39:2,
41:15, 144:6, 144:7,
196:17, 210:8,
228:16, 250:16
**state** [47] - 9:1, 9:10,
16:23, 16:24, 17:4,
32:15, 62:8, 78:14,
111:18, 112:5,
138:22, 143:14,
144:18, 144:19,
144:21, 144:22,
150:20, 167:15,
168:18, 175:18,
177:7, 177:11,
178:1, 179:22,
180:24, 187:6,
190:23, 192:8,
194:20, 197:13,
197:19, 197:22,
198:19, 200:14,
202:22, 210:25,
211:1, 222:3,
222:13, 223:5,
223:10, 223:20,
227:24, 230:25,
258:18, 258:21,
260:1
**statement** [50] - 20:22,
26:14, 35:19, 47:14,
47:21, 80:7, 156:7,
156:8, 166:20,
171:5, 171:17,
171:22, 183:23,
184:18, 185:3,
185:4, 185:20,
186:17, 187:14,
191:16, 193:5,
193:6, 193:13,
193:25, 194:4,
194:6, 194:8,
194:11, 194:15,
207:10, 209:1,
214:10, 233:16,
233:25, 238:5,
244:18, 249:5,
250:10, 251:7,
252:10, 252:18,
252:19, 252:25,

253:7, 253:9, 254:4,
254:9, 254:18,
255:11, 255:14
**statements** [6] - 47:7,
137:21, 167:6,
167:13, 168:12,
192:9
**States** [5] - 7:2, 15:22,
157:7, 166:22, 167:5
**STATES** [2] - 1:1, 1:17
**states** [4] - 17:1,
59:22, 131:10,
166:16
**statistically** [1] - 52:10
**statistics** [15] - 122:2,
130:20, 139:14,
198:23, 199:1,
199:5, 200:9,
200:15, 200:24,
221:11, 221:16,
222:9, 231:19,
231:24, 242:1
**stats** [5] - 117:19,
120:3, 120:15,
121:21, 124:11
**status** [2] - 101:9,
195:8
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**statute** [1] - 209:17
**stay** [1] - 95:7
**steadily** [1] - 184:25
**steady** [1] - 18:8
**stealing** [1] - 199:24
**steep** [2] - 51:20,
51:23
**stenography** [1] - 6:19
**step** [3] - 36:14,
146:24, 147:2
**Steve** [5] - 37:8, 171:6,
179:4, 190:19,
194:23
**STEVEN** [1] - 4:17
**still** [16] - 34:23,
34:24, 60:8, 60:11,
60:15, 130:14,
143:20, 147:21,
183:10, 197:22,
212:8, 218:2,
231:13, 249:23,
263:11, 263:20
**stimulation** [3] - 15:1,
16:9, 16:14
**stimulus** [1] - 16:6
**stipulated** [1] - 37:20
**stipulation** [2] - 82:12,
170:4
**stipulations** [1] -
82:13
**stopped** [2] - 74:22,

227:20
**stopping** [4] - 129:25,
137:24, 201:10,
203:10
**store** [1] - 86:24
**stores** [3] - 108:14,
108:15, 108:18
**stories** [2] - 139:15,
152:2
**Storrer** [1] - 69:18
**straight** [1] - 143:1
**straightforward** [1] -
25:11
**strange** [1] - 224:16
**strategic** [19] - 163:24,
164:4, 164:7,
164:11, 164:15,
164:25, 166:9,
167:18, 168:12,
168:21, 171:4,
171:8, 208:3,
211:23, 232:13,
235:14, 261:1,
261:24, 262:20
**Strategic** [10] -
165:25, 172:21,
173:19, 205:15,
216:11, 218:2,
218:21, 234:3,
234:10
**strategy** [3] - 214:16,
265:6, 266:6
**Street** [16] - 2:7, 2:10,
2:13, 3:5, 3:7, 3:10,
3:12, 4:6, 4:13, 4:15,
4:18, 5:5, 5:12, 6:6,
6:13, 224:10
**street** [3] - 114:24,
115:12, 116:4
**street-level** [1] -
115:12
**strengthening** [1] -
214:22
**strengths** [1] - 91:16
**stress** [1] - 176:24
**stressful** [1] - 176:18
**strictly** [2] - 73:5,
75:11
**strike** [2] - 20:23,
142:23
**strong** [2] - 184:17,
243:15
**stronger** [1] - 216:22
**structure** [3] - 114:18,
191:16, 194:15
**structures** [1] - 192:9
**studied** [2] - 16:16,
50:9
**studies** [2] - 19:5,
166:20

**study** [5] - 15:14, 60:4,
206:4, 206:10, 211:6
**stuff** [6] - 39:12,
113:17, 143:17,
212:25, 213:3, 230:6
**sub** [2] - 9:21, 9:22
**sub-board** [2] - 9:21,
9:22
**subclass** [1] - 42:15
**subject** [11] - 11:13,
29:9, 30:1, 50:2,
56:16, 160:6,
163:16, 191:10,
201:2, 228:25, 236:3
**subjected** [1] - 39:10
**submit** [1] - 159:6
**submitted** [1] - 176:19
**subpoena** [1] - 63:18
**subpoenaed** [1] -
63:15
**subsequently** [1] -
12:10
**subset** [1] - 76:10
**subspecialty** [1] -
9:16
**substance** [20] - 40:9,
42:2, 43:9, 46:2,
84:24, 90:17, 91:12,
96:2, 96:16, 106:15,
133:12, 134:14,
207:5, 207:14,
228:22, 229:5,
229:20, 229:24,
238:20, 246:9
**substances** [21] -
40:16, 42:7, 42:18,
42:19, 43:5, 43:11,
43:16, 45:22, 47:23,
48:9, 48:13, 48:17,
81:16, 103:8,
103:14, 104:17,
105:14, 208:8,
215:21, 238:21
**success** [1] - 266:5
**successful** [2] -
265:18, 266:9
**successfully** [1] -
15:16
**suddenly** [1] - 238:14
**sued** [2] - 37:15, 37:21
**suffer** [2] - 18:18, 39:9
**suffering** [1] - 211:12
**sufficient** [3] - 157:16,
261:20, 262:1
**suggestion** [1] - 83:4
**suggests** [2] - 31:24,
54:24
**Suite** [9] - 2:4, 2:7,
2:10, 2:13, 2:16,
3:17, 4:6, 6:5, 6:12

**sum** [1] - 157:23
**summary** [1] - 174:20
**Summary** [2] - 265:13, 265:16
**Summer** [1] - 201:4
**summer** [5] - 203:19, 205:1, 220:12, 221:8, 241:16
**supervisor** [1] - 73:4
**supervisors** [1] - 73:3
**supplier** [1] - 252:14
**supply** [4] - 138:2, 204:15, 204:19, 248:23
**supplying** [2] - 253:13, 262:14
**support** [8] - 18:2, 117:24, 142:5, 159:7, 199:24, 207:15, 212:9
**Supported** [1] - 128:3
**supported** [2] - 183:20, 215:20
**supports** [1] - 184:25
**supposedly** [1] - 149:25
**surgery** [1] - 35:5
**Surgery** [2] - 34:11, 35:12
**surgical** [1] - 14:3
**surplus** [2] - 197:3, 197:9
**surpluses** [1] - 196:25
**surprised** [1] - 39:6
**surrender** [1] - 255:7
**surrounded** [1] - 28:9
**surrounding** [2] - 266:13, 266:15
**surveillance** [1] - 78:10
**surveys** [4] - 72:3, 72:11, 104:9
**suspected** [2] - 71:6, 153:1
**suspicious** [5] - 98:19, 98:24, 100:3, 106:7, 224:23
**sustain** [8] - 20:25, 36:7, 94:14, 94:16, 131:22, 171:24, 262:3, 262:4
**Sustain** [1] - 99:8
**Sustained** [1] - 80:1
**sustained** [1] - 61:7
**SUZANNE** [1] - 4:15
**switch** [1] - 263:5
**switch-off** [1] - 263:5
**switching** [1] - 145:20
**sworn** [1] - 157:15
**SWORN** [3] - 9:5,

62:12, 111:21
**symptoms** [4] - 8:4, 16:15, 21:17, 42:8
**Syndrome** [29] - 11:13, 11:14, 11:15, 12:21, 13:2, 14:11, 14:24, 15:3, 15:12, 16:17, 16:22, 16:25, 17:2, 17:5, 17:19, 18:1, 18:5, 18:18, 20:11, 21:18, 42:3, 45:4, 46:23, 49:24, 50:10, 50:11, 50:19, 53:4, 58:12
**synthetic** [3] - 216:21, 217:2, 217:12
**syringe** [1] - 175:5
**system** [21] - 16:9, 54:23, 72:17, 73:5, 120:14, 175:16, 228:10, 228:13, 230:24, 231:2, 231:3, 231:8, 231:13, 231:17, 231:20, 246:6, 246:10, 263:24, 264:13, 264:15, 264:19
**System** [2] - 57:2, 244:9

---

### T

**tab** [5] - 155:1, 155:13, 155:16, 155:18, 155:20
**Tab** [12] - 155:16, 161:2, 161:5, 161:7, 161:9, 161:11, 161:12, 161:16, 161:19, 161:20
**table** [2] - 22:5, 239:17
**tabs** [2] - 154:17, 160:25
**tabulated** [1] - 198:24
**tabulating** [2] - 149:21, 199:13
**tabulations** [2] - 149:18, 160:11
**tactical** [1] - 253:23
**Tactical** [1] - 255:4
**take-back** [1] - 135:23
**talks** [2] - 69:13, 96:1
**Talks** [1] - 69:15
**target** [5] - 106:21, 214:23, 265:23, 265:25, 266:15
**targets** [2] - 106:2, 106:4
**Task** [13] - 116:24,

116:25, 137:1, 137:20, 138:3, 239:20, 239:22, 239:24, 248:18, 248:21, 249:13, 252:5
**task** [1] - 115:3
**tax** [2] - 184:17, 184:25
**TDS** [1] - 255:4
**teaching** [5] - 8:2, 8:3, 8:5, 11:18, 113:18
**team** [1] - 176:14
**Team** [1] - 249:14
**teenagers** [2] - 154:7, 187:17
**Temitoe** [1] - 111:25
**TEMITOPE** [1] - 4:8
**ten** [5] - 49:18, 176:20, 203:12, 245:14, 245:16
**tendence** [1] - 137:20
**tender** [1] - 63:20
**tension** [3] - 76:25, 77:1, 105:4
**Tenth** [1] - 5:12
**tenth** [1] - 17:1
**tenure** [1] - 200:3
**term** [8] - 13:13, 18:21, 19:2, 26:23, 34:16, 134:10, 177:2, 246:8
**terms** [5] - 126:23, 152:19, 156:1, 238:20, 239:1
**testified** [34] - 23:15, 25:7, 25:9, 27:4, 32:21, 34:12, 39:14, 47:3, 70:11, 131:7, 132:22, 150:2, 156:7, 160:1, 173:14, 179:10, 192:2, 195:7, 198:23, 199:16, 202:18, 205:10, 205:14, 211:18, 211:22, 217:7, 217:21, 220:17, 221:11, 233:1, 241:13, 242:13, 251:1, 258:17
**testify** [11] - 141:6, 141:7, 141:19, 150:7, 150:10, 170:13, 171:19, 202:21, 213:23, 262:11, 263:9
**testifying** [2] - 141:15, 143:8
**testimony** [24] - 7:11,

24:2, 24:10, 33:3, 123:3, 123:10, 132:21, 142:22, 142:24, 149:17, 149:19, 171:1, 174:11, 200:2, 219:8, 221:9, 227:6, 232:12, 234:23, 235:5, 236:15, 261:15, 262:17
**THE** [226] - 1:1, 1:1, 1:4, 1:17, 7:6, 7:22, 8:10, 8:12, 8:17, 8:21, 8:24, 9:1, 9:2, 9:3, 9:6, 9:7, 12:22, 12:24, 13:1, 20:7, 20:9, 20:25, 21:10, 21:14, 21:16, 21:17, 21:20, 21:22, 21:23, 22:1, 23:24, 24:5, 24:11, 24:16, 25:8, 25:19, 26:6, 26:9, 26:10, 28:16, 29:19, 32:11, 32:24, 33:3, 33:8, 34:1, 34:3, 36:7, 36:10, 36:16, 36:19, 36:21, 37:19, 38:1, 38:6, 38:15, 40:23, 47:5, 47:11, 51:2, 57:19, 57:21, 58:17, 58:19, 58:22, 61:3, 61:6, 61:7, 61:9, 61:15, 61:18, 61:20, 61:25, 62:7, 62:8, 62:9, 62:10, 62:13, 62:14, 62:15, 63:23, 63:24, 64:2, 64:4, 64:6, 64:9, 68:21, 69:3, 70:8, 70:13, 80:1, 82:20, 83:6, 86:4, 89:23, 90:6, 94:12, 94:14, 95:3, 97:5, 97:10, 97:11, 97:12, 98:4, 98:5, 99:3, 99:8, 99:22, 100:10, 100:15, 110:2, 110:5, 111:3, 111:6, 111:7, 111:9, 111:11, 111:15, 111:18, 111:19, 111:20, 111:22, 111:23, 121:4, 122:25, 123:6, 123:12, 123:15, 123:21, 126:3, 126:9, 126:11, 127:1, 129:25, 130:4, 130:7, 130:9, 130:10, 130:11, 130:13, 131:22,

132:17, 132:25, 141:2, 141:5, 141:6, 141:12, 141:13, 141:19, 142:19, 143:4, 143:12, 149:9, 149:11, 149:16, 150:7, 153:6, 154:21, 156:3, 158:3, 158:21, 159:8, 159:14, 159:16, 160:6, 160:16, 160:18, 163:15, 165:7, 166:2, 166:7, 167:9, 167:13, 167:21, 168:15, 170:25, 171:24, 173:10, 174:10, 178:23, 182:13, 182:15, 186:14, 186:19, 188:4, 188:7, 191:4, 191:6, 201:10, 201:14, 202:2, 202:21, 202:22, 203:12, 203:14, 205:22, 220:8, 222:22, 223:3, 236:5, 236:8, 241:22, 242:8, 242:10, 243:20, 244:3, 244:5, 249:9, 250:22, 251:3, 257:6, 257:8, 257:12, 257:13, 257:16, 257:19, 257:20, 261:12, 261:17, 262:3, 267:8, 267:12, 267:13, 267:14, 267:17, 267:18
**themes** [1] - 142:10
**themselves** [4] - 108:15, 131:15, 133:19, 134:1
**Therapeutic** [3] - 14:9, 17:14, 53:5, 53:7, 53:12
**thereafter** [1] - 52:9
**they've** [4] - 11:16, 13:11, 102:20, 167:18
**third** [7] - 14:14, 35:4, 53:15, 157:3, 168:8, 244:15, 244:25
**Thomas** [1] - 2:12
**thousands** [1] - 171:9
**threads** [1] - 162:15
**threat** [8] - 125:14, 127:7, 238:2, 238:7, 240:5, 240:13,

240:15, 263:11
**threaten** [1] - 76:23
**threatened** [2] - 76:18, 76:20
**Threats** [2] - 237:23, 239:10
**threats** [7] - 124:17, 124:20, 124:22, 124:25, 125:2, 125:13, 237:11
**Three** [1] - 6:5
**three** [25] - 6:12, 16:24, 22:9, 22:14, 34:22, 34:24, 49:8, 56:9, 56:10, 60:6, 60:10, 60:14, 92:15, 137:22, 146:6, 150:16, 156:11, 159:13, 160:25, 173:20, 177:3, 190:24, 209:14, 220:24, 223:18
**three-month** [1] - 92:15
**threshold** [11] - 7:9, 21:18, 49:21, 74:6, 74:9, 74:19, 74:22, 75:6, 76:23, 103:18, 103:21
**thresholds** [12] - 73:20, 73:24, 74:2, 74:13, 76:18, 76:20, 77:3, 80:16, 85:25, 98:21, 103:11, 103:13
**throughout** [5] - 79:16, 147:15, 153:21, 154:10, 248:20
**ticking** [1] - 199:22
**tied** [1] - 208:9
**time-consuming** [1] - 117:22
**TIMOTHY** [1] - 5:9
**tip** [1] - 117:21
**tipping** [2] - 187:16, 188:12
**title** [4] - 29:25, 78:11, 84:2, 118:2
**titled** [1] - 244:8
**today** [14] - 25:12, 71:20, 101:13, 143:21, 154:17, 197:23, 199:5, 221:9, 226:4, 236:15, 239:21, 257:11, 257:17, 262:17
**Today** [1] - 25:17
**together** [16] - 65:6,

108:4, 120:8, 122:11, 158:16, 161:12, 212:20, 219:18, 221:12, 223:14, 224:15, 226:10, 228:11, 248:13, 251:25, 265:5
**ton** [1] - 100:3
**Tons** [1] - 30:5
**tons** [2] - 71:2, 109:10
**took** [15] - 63:8, 63:10, 68:3, 119:25, 130:16, 144:5, 146:15, 148:19, 158:9, 164:20, 173:14, 223:10, 241:17, 261:23
**top** [6] - 78:21, 83:19, 86:21, 110:22, 114:20, 250:2
**topic** [1] - 201:13
**topics** [1] - 124:8
**total** [12] - 81:14, 81:15, 81:18, 88:15, 89:17, 96:1, 163:4, 216:20, 217:6, 217:10, 261:7, 263:15
**totaled** [1] - 96:17
**totaling** [1] - 255:8
**totally** [1] - 103:10
**totals** [2] - 161:14, 239:11
**touch** [1] - 152:3
**tough** [1] - 229:2
**tougher** [2] - 207:18, 209:5
**tour** [3] - 140:8, 140:16, 140:18
**toward** [1] - 182:2
**towards** [3] - 58:5, 182:4, 266:9
**Tower** [2] - 3:4, 4:18
**toxicology** [5] - 49:5, 49:10, 49:18, 203:8, 229:2
**trace** [1] - 214:14
**track** [9] - 48:5, 48:8, 120:18, 120:22, 125:8, 128:5, 132:1, 238:19, 238:25
**tracked** [4] - 60:5, 125:2, 132:4, 132:22
**tracking** [15] - 125:1, 132:11, 132:14, 147:21, 147:23, 147:25, 148:15, 151:6, 151:16, 153:11, 156:1,

158:19, 228:17, 229:10, 239:4
**tracks** [1] - 128:20
**tract** [3] - 175:8, 175:14, 175:19
**trade** [4] - 175:8, 175:20, 188:21, 189:2
**traffickers** [3] - 215:9, 250:7, 250:15
**trafficking** [13] - 117:2, 145:6, 181:8, 198:16, 209:19, 214:24, 215:1, 215:11, 215:12, 246:22, 252:6, 252:14, 252:15
**Trafficking** [1] - 214:5
**tragedy** [3] - 187:21, 187:24, 189:1
**train** [1] - 184:9
**trained** [6] - 39:8, 91:19, 91:25, 92:1, 97:15, 104:2
**training** [15] - 10:20, 10:21, 10:25, 66:11, 66:16, 66:17, 66:18, 70:25, 71:2, 91:21, 92:21, 96:19, 97:2, 97:14, 113:16
**transcribe** [4] - 226:13, 227:5, 227:8, 227:9
**Transcribe** [1] - 226:15
**transcript** [9] - 6:19, 23:18, 23:22, 24:20, 213:16, 219:12, 226:21, 226:24, 268:4
**transcripts** [1] - 24:8
**transition** [2] - 111:14, 143:24
**transmit** [3] - 72:15, 73:2, 170:22
**transmittal** [1] - 37:14
**transpired** [1] - 170:18
**treat** [3] - 14:10, 48:24, 52:25
**treated** [2] - 26:17, 224:12
**treating** [4] - 19:18, 19:19, 26:4, 137:25
**Treatise** [1] - 167:23
**Treatises** [1] - 156:14
**treatises** [1] - 156:25
**treatment** [27] - 8:7, 13:3, 13:4, 13:17, 17:9, 17:10, 17:12, 17:15, 17:18, 17:23,

18:7, 21:15, 42:9, 44:23, 49:19, 49:22, 49:24, 52:2, 52:3, 52:12, 57:9, 137:23, 137:25, 174:22, 212:17, 220:25
**treatments** [1] - 59:8
**treats** [1] - 53:3
**tremulousness** [1] - 16:13
**trend** [3] - 81:13, 81:14, 81:19
**trends** [1] - 118:24
**Tri** [1] - 250:16
**Tri-State** [1] - 250:16
**Trial** [1] - 267:20
**TRIAL** [1] - 1:16
**trial** [4] - 7:23, 63:15, 156:10, 158:25
**tried** [9] - 25:17, 75:13, 82:1, 139:7, 139:14, 152:5, 164:10, 164:12, 174:8
**trier** [1] - 158:17
**triggered** [1] - 74:22
**triple** [1] - 50:14
**tripled** [1] - 128:15
**trophy** [1] - 124:1
**trouble** [1] - 64:5
**true** [36] - 27:16, 45:25, 50:17, 67:15, 68:9, 80:6, 88:13, 171:20, 183:23, 184:18, 184:19, 185:3, 185:4, 185:20, 193:5, 193:6, 194:6, 194:11, 199:19, 214:10, 238:5, 240:9, 241:1, 247:2, 247:5, 249:1, 251:7, 252:10, 252:18, 252:19, 252:25, 253:7, 253:9, 254:4, 254:8, 254:18
**truly** [1] - 30:13
**trustworthy** [1] - 258:7
**truth** [12] - 32:17, 37:3, 38:17, 47:5, 166:4, 166:8, 167:1, 167:2, 171:18, 173:8, 213:12, 227:8
**truthfully** [1] - 215:15
**try** [21] - 39:8, 48:12, 55:25, 64:8, 85:25, 86:5, 100:24, 101:20, 105:17, 139:10, 140:12,

169:18, 171:25, 175:10, 186:18, 197:5, 224:17, 225:5, 236:12, 238:23, 257:16
**trying** [9] - 8:8, 52:14, 77:2, 100:25, 142:9, 150:23, 151:19, 223:15, 248:1
**turn** [14] - 35:11, 53:19, 83:11, 92:13, 124:21, 172:21, 189:12, 191:20, 206:18, 216:13, 240:2, 246:14, 248:16, 262:23
**turning** [2] - 19:13, 171:4
**Turning** [1] - 263:23
**TV** [1] - 152:15
**Twelfth** [3] - 4:13, 4:15, 5:5
**twitching** [1] - 7:13
**two** [32] - 7:10, 36:11, 37:17, 39:5, 45:5, 45:9, 75:11, 96:14, 113:11, 116:2, 135:22, 147:12, 164:8, 164:12, 164:13, 169:13, 172:12, 178:4, 179:18, 180:22, 201:12, 201:19, 208:16, 227:12, 227:13, 234:2, 236:19, 236:20, 253:4, 266:1, 267:5
**two-block** [6] - 116:2, 147:12, 179:18, 180:22, 266:1
**type** [14] - 15:25, 20:19, 85:21, 91:20, 92:21, 121:19, 128:5, 135:2, 149:6, 154:1, 166:13, 168:4, 200:20, 246:9
**typed** [1] - 157:10
**types** [8] - 14:18, 48:18, 48:22, 75:19, 102:1, 127:21, 128:11, 148:25

---

## U

---

**U.S** [2] - 114:1, 124:3
**UCR** [3] - 120:13, 120:25, 129:3
**umbilical** [2] - 49:5, 49:10
**umbrella** [1] - 53:25

unable [2] - 14:11, 14:16
uncontrollably [1] - 7:13
under [27] - 7:20, 7:21, 23:12, 39:8, 40:15, 54:22, 54:24, 64:16, 112:19, 130:14, 141:3, 156:21, 157:18, 158:1, 166:16, 167:3, 167:16, 168:8, 168:13, 168:14, 185:1, 207:5, 208:22, 208:23, 213:10, 259:22
under-counted [1] - 259:22
undergraduate [1] - 10:18
underlying [1] - 163:14
understood [2] - 39:16, 173:7
undue [2] - 7:21, 8:14
unfair [1] - 8:17
Unfortunately [2] - 31:11, 36:8
unfounded [1] - 266:14
unhappy [1] - 68:6
Uniform [1] - 120:13
unique [2] - 140:21, 175:15
unit [20] - 14:8, 14:22, 15:1, 15:3, 17:25, 115:3, 116:11, 116:14, 116:17, 116:19, 116:23, 116:24, 119:8, 124:19, 125:11, 237:14, 260:5, 260:12
Unit [17] - 10:7, 14:1, 14:9, 14:25, 17:14, 53:5, 53:8, 53:9, 53:12, 115:11, 116:25, 128:3, 135:13, 185:14, 185:18, 193:19, 193:21
United [5] - 7:2, 15:22, 157:7, 166:22, 167:5
UNITED [2] - 1:1, 1:17
units [8] - 60:23, 92:7, 92:9, 128:15, 246:21, 255:24, 260:8
universities [2] - 15:14, 144:14

University [15] - 10:4, 10:18, 10:19, 10:20, 11:1, 11:20, 15:19, 19:17, 29:2, 54:3, 113:14, 113:15, 113:20, 227:23
university [2] - 55:16, 139:23
unless [1] - 18:13
Unless [1] - 94:15
unlike [1] - 150:1
Unlikely [1] - 230:12
unlikely [1] - 230:12
unreliable [1] - 258:9
unscrupulous [1] - 22:24
untrustworthy [1] - 258:6
unused [1] - 135:25, 136:5, 236:23
unusual [1] - 262:4
unwanted [2] - 136:6, 236:23
unwarranted [1] - 135:25
up [78] - 8:24, 13:20, 17:12, 17:19, 18:5, 19:1, 19:14, 20:18, 23:21, 24:21, 35:1, 35:22, 45:5, 48:17, 50:12, 52:5, 53:4, 59:24, 60:7, 60:13, 61:24, 64:8, 67:18, 74:10, 80:25, 83:7, 84:15, 86:14, 86:21, 88:17, 90:5, 93:11, 93:25, 99:20, 99:23, 102:16, 106:1, 107:5, 107:10, 107:16, 111:13, 115:3, 117:11, 118:25, 119:2, 120:16, 121:14, 126:14, 131:23, 135:16, 151:18, 157:23, 159:5, 159:24, 173:6, 176:15, 180:15, 180:25, 181:15, 186:2, 199:22, 205:17, 212:2, 213:17, 213:25, 223:25, 226:20, 227:22, 227:23, 228:5, 228:10, 233:15, 237:16, 237:18, 245:5, 246:13, 260:4, 265:8
Up [1] - 79:11
update [1] - 124:12

upper [2] - 207:24, 233:13
upper-level [1] - 207:24
ups [1] - 75:19
upset [2] - 76:24, 170:2
urge [3] - 106:20, 106:24, 109:18
urine [4] - 48:16, 49:2, 49:7, 49:17
usage [1] - 84:23
usefulness [1] - 117:12
users [1] - 238:19
uses [1] - 8:3
utero [16] - 7:16, 11:17, 13:15, 13:18, 17:8, 17:18, 18:10, 18:22, 19:18, 40:10, 43:8, 46:2, 46:6, 47:23, 48:9, 48:14
utilization [7] - 74:16, 86:5, 88:24, 89:4, 89:9, 89:12
Utilization [1] - 78:15
utilized [1] - 250:14

**V**

valid [3] - 42:13, 109:3, 109:6
Valley [1] - 56:24
Vanguard [1] - 19:18
vantage [1] - 136:13
varied [3] - 117:15, 154:3, 174:22
various [7] - 48:13, 122:1, 170:14, 193:10, 193:12, 194:5, 194:10
vast [4] - 133:12, 137:16, 138:9, 149:12
vehicle [2] - 152:1, 224:12
vein [1] - 166:16
Ventura [1] - 3:18
venture [1] - 8:13
verification [1] - 222:25
verified [4] - 222:16, 222:18, 222:20, 222:24
verify [2] - 223:19, 225:6
versa [1] - 238:15
version [3] - 154:17, 170:18, 234:2
versus [2] - 68:11,

75:20
via [1] - 247:10
vice [1] - 238:15
video [2] - 8:1
videos [1] - 7:12
View [1] - 183:8
view [4] - 7:14, 19:7, 34:5, 204:10
violence [1] - 187:25
violent [5] - 118:23, 180:25, 187:19, 250:14, 265:21
Violent [2] - 239:21, 249:13
VIRGINIA [2] - 1:1, 1:18
Virginia [55] - 4:18, 7:3, 7:4, 8:8, 9:24, 10:3, 10:11, 10:19, 12:13, 12:19, 13:5, 13:10, 13:24, 14:19, 16:17, 16:21, 17:3, 17:5, 17:6, 19:23, 20:3, 21:6, 28:11, 28:14, 39:2, 41:1, 41:4, 41:15, 41:25, 46:25, 54:12, 54:25, 57:11, 60:20, 60:25, 64:22, 94:20, 94:23, 96:12, 101:3, 101:6, 101:8, 109:6, 124:5, 125:16, 125:23, 199:13, 208:25, 215:7, 222:3, 246:18, 248:21, 249:7, 257:4
visit [14] - 15:20, 35:22, 66:6, 74:15, 78:6, 78:10, 87:1, 88:14, 88:19, 88:23, 88:24, 90:15, 95:15, 138:24
visited [1] - 104:9
visits [11] - 48:16, 72:21, 72:23, 78:3, 78:8, 81:21, 81:23, 86:8, 86:12, 88:6
vital [3] - 26:1, 26:3, 26:12, 27:3, 27:11, 27:14, 31:15, 31:18, 35:23, 36:2, 37:16, 38:4, 39:9
volume [11] - 15:12, 17:22, 67:4, 67:10, 68:12, 76:1, 76:3, 76:4, 78:1, 102:21, 208:24
VOLUME [1] - 1:16
volunteer [2] - 13:3, 56:18

volunteers [1] - 15:5
vs [2] - 268:6
vulnerable [3] - 185:18, 185:19, 186:5

**W**

wait [2] - 36:16, 111:10
waiting [1] - 95:22
waived [1] - 126:8
waiving [1] - 205:20
WAKEFIELD [1] - 5:13
walk [3] - 10:16, 112:22, 113:12
walked [1] - 90:1
warrant [1] - 255:6
warrants [1] - 253:3
Washington [6] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12
washroom [1] - 115:18
watch [1] - 8:18
ways [6] - 72:10, 125:2, 125:4, 144:14, 176:16, 176:17
wealth [1] - 138:9
WEAR [5] - 175:6, 175:12, 175:13, 175:14, 178:6
weather [2] - 152:14, 174:4
WEBB [1] - 3:11
Webb [1] - 3:12
website [1] - 122:19
week [10] - 13:4, 49:8, 49:9, 66:8, 117:20, 150:2, 162:18, 162:25, 170:12
Weekly [1] - 33:18
weekly [2] - 59:7, 59:14
weeks [3] - 14:6, 49:11, 151:14
weight [1] - 208:10
weird [2] - 224:19, 225:5
welfare [1] - 177:16
Werthammer [41] - 7:8, 8:3, 8:23, 8:24, 9:2, 9:12, 12:17, 19:21, 20:8, 21:4, 21:11, 22:4, 22:9, 23:5, 24:19, 24:22, 25:25, 27:17, 28:18, 29:1, 29:21, 29:25, 31:7, 31:9, 32:15,

33:10, 34:9, 35:8, 36:14, 38:10, 38:19, 38:21, 39:20, 39:23, 57:25, 58:24, 61:5, 61:10, 61:12, 61:15
**WERTHAMMER** [1] - 9:5
**Werthammer's** [3] - 7:11, 23:22, 24:15
**Werthammer@ marshall.edu** [1] - 28:20
**Wes** [1] - 87:18
**WEST** [2] - 1:1, 1:18
**West** [58] - 7:3, 7:4, 8:7, 9:24, 10:3, 10:11, 10:19, 12:13, 12:19, 13:5, 13:10, 13:23, 14:19, 16:17, 16:21, 17:3, 17:5, 17:6, 19:22, 20:3, 21:6, 28:10, 28:13, 39:2, 41:1, 41:4, 41:15, 41:25, 46:24, 54:12, 54:25, 57:11, 60:19, 60:25, 64:22, 94:20, 94:22, 96:11, 101:3, 101:6, 101:8, 109:6, 117:6, 124:5, 125:16, 125:23, 173:25, 179:19, 199:13, 208:24, 215:7, 222:3, 246:18, 248:20, 249:7, 257:4, 266:2
**west** [4] - 147:16, 147:17, 153:19, 174:1
**Westmoreland** [2] - 147:16, 153:19
**whatsoever** [1] - 211:2
**Whereas** [1] - 222:18
**whereby** [1] - 209:17
**White** [1] - 154:5
**white** [1] - 154:9
**whites** [1] - 114:24
**whole** [2] - 164:2, 266:16
**wholesale** [16] - 22:11, 22:14, 30:9, 32:4, 189:9, 194:17, 210:24, 211:2, 211:8, 211:20, 218:16, 218:19, 218:23, 235:2, 235:6, 235:19
**wholesaler** [2] - 65:13, 210:21
**wholistic** [2] - 146:16,

173:14
**Wicht** [8] - 83:8, 90:7, 100:11, 100:21, 110:11, 110:14, 110:16, 111:3
**WICHT** [23] - 4:12, 70:9, 79:22, 82:21, 83:9, 89:19, 90:8, 94:10, 94:24, 95:20, 95:24, 96:23, 98:3, 99:1, 99:6, 100:13, 100:17, 100:20, 101:19, 101:21, 109:22, 109:25, 111:4
**wide** [2] - 117:15, 138:21
**Williams** [8] - 4:13, 5:4, 37:8, 166:14, 167:3, 171:6, 190:19, 194:23
**willingly** [1] - 35:13
**win** [1] - 124:6
**winding** [1] - 184:9
**winners** [1] - 176:20
**wise** [2] - 76:1, 102:21
**wish** [3] - 61:16, 178:17
**withdraw** [2] - 17:10, 24:7
**withdrawal** [7] - 7:13, 7:15, 18:24, 19:8, 42:7, 43:12, 49:25
**withdrawing** [5] - 11:15, 14:15, 16:2, 16:8
**WITNESS** [40] - 9:2, 9:5, 13:1, 20:9, 21:14, 21:17, 21:22, 26:10, 61:6, 61:18, 62:9, 62:12, 62:14, 63:24, 64:4, 64:6, 86:4, 95:3, 97:10, 97:12, 98:5, 99:22, 111:7, 111:11, 111:19, 111:21, 130:9, 130:11, 141:5, 141:13, 143:12, 149:11, 178:22, 188:7, 202:2, 202:22, 257:12, 257:19, 267:13, 267:17
**Witness** [2] - 130:19, 131:2
**witness** [21] - 28:15, 29:18, 33:7, 38:14, 47:3, 61:22, 63:21, 69:2, 70:11, 82:15, 96:25, 111:12,

112:1, 130:13, 131:20, 152:22, 156:7, 160:13, 171:19, 186:18
**witness's** [2] - 20:6, 132:20
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**women** [1] - 175:8
**Women's** [1] - 175:7
**word** [7] - 23:10, 59:12, 134:15, 222:24, 226:15, 227:9, 227:10
**words** [2] - 233:9, 234:24
**world** [1] - 7:22
**worried** [1] - 224:1
**worry** [1] - 224:5
**worst** [3] - 187:25, 188:9
**worth** [2] - 60:6, 60:11
**wrap** [1] - 159:24
**writes** [2] - 60:2, 168:2
**writing** [2] - 91:23, 206:7
**written** [8] - 25:14, 60:1, 60:2, 60:5, 91:18, 163:19, 189:8, 194:2
**wrongdoing** [1] - 254:24
**wrote** [17] - 22:21, 24:25, 31:11, 31:14, 84:15, 84:19, 164:11, 164:19, 184:20, 188:11, 191:18, 193:25, 207:7, 209:1, 233:9, 235:1, 235:5
**Wu** [5] - 40:2, 47:9, 236:8, 236:11, 236:22
**WU** [31] - 5:10, 40:1, 40:20, 40:24, 46:7, 47:10, 47:13, 50:23, 51:3, 51:4, 58:18, 61:1, 61:13, 236:7, 236:10, 241:21, 241:23, 242:6, 242:11, 243:17, 243:21, 244:1, 244:6, 244:7, 249:8, 249:10, 250:24, 251:4, 251:5, 257:2, 257:9
**WV** [8] - 2:8, 3:10, 3:13, 4:19, 5:15, 6:9, 32:10, 265:9
**WV-00976** [1] - 33:6

## Y

**Year** [1] - 124:4
**year** [37] - 14:7, 17:22, 18:6, 26:23, 34:25, 35:6, 49:23, 50:13, 52:5, 60:3, 60:7, 60:12, 60:15, 60:17, 112:19, 114:12, 116:18, 117:21, 120:7, 122:9, 124:12, 127:19, 127:20, 136:5, 147:3, 155:8, 206:4, 213:16, 219:13, 221:2, 227:7, 233:1, 233:12, 240:21, 245:20, 263:16
**year's** [1] - 59:23
**year-round** [1] - 136:5
**yearly** [1] - 147:5
**years** [40] - 26:15, 50:14, 65:1, 65:4, 65:5, 65:10, 72:2, 72:6, 78:6, 79:9, 81:1, 81:4, 81:6, 81:8, 101:5, 110:22, 111:17, 112:21, 113:11, 124:9, 129:10, 147:7, 151:15, 164:12, 164:13, 172:12, 177:3, 188:20, 190:24, 193:9, 194:4, 204:6, 204:7, 227:12, 227:13, 234:2, 240:16, 240:17
**yellows** [1] - 152:17
**yesterday** [4] - 86:15, 86:18, 86:20, 90:1
**York** [1] - 3:5
**young** [1] - 154:3
**yourself** [6] - 62:20, 62:22, 105:9, 225:8, 225:11, 226:6
**yuck** [1] - 143:17

## Z

**zip** [1] - 161:21