IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                                :
THE CITY OF HUNTINGTON,         :      Civil Action
                                :
            Plaintiff,          :      No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
            Defendants.         :
_____x
                                :
CABELL COUNTY COMMISSION,       :      Civil Action
                                :
            Plaintiff,          :      No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
            Defendants.         :
_____x
```

BENCH TRIAL - VOLUME 16
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

MAY 24, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

APPEARANCES (Continued):

For the Defendant,
Cardinal Health:

MS. ASHLEY W. HARDIN
MS. ISIA JASIEWICZ
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

APPEARANCES (Continued):

For the Defendant,
McKesson:

MR. TIMOTHY C. HESTER
MR. PAUL W. SCHMIDT
MS. LAURA M. FLAHIVE WU
MR. ANDREW STANNER
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

MR. JEFFREY M. WAKEFIELD
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087

Court Reporter:              Ayme Cochran, RMR, CRR
Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
1              PROCEEDINGS had before The Honorable David A. Faber,

2     Senior Status Judge, United States District Court, Southern

3     District of West Virginia, in Charleston, West Virginia, on

4     May 24, 2021, at 9:00 a.m., as follows:

5              THE COURT:  Good morning, everybody.

6              ALL COUNSEL:  Good morning.

7              THE COURT:  Are we ready to go, Mr. Farrell?

8              MR. FARRELL:  Yes, if I may have a moment, Judge.

9              THE COURT:  Yes, please.

10             MR. FARRELL:  On behalf of the Plaintiffs'

11    Executive Committee for MDL 2804 styled *In Re: National*

12    *Prescription Opioid Litigation* we mark the passing of

13    Mr. Paul Hanly, Jr.

14         Mr. Hanly was one of the founding fathers of this

15    litigation and served as its co-lead.  He was our colleague,

16    our friend, and my mentor.  He was loved and will be missed.

17             Please note my objection to his absence for the record.

18             THE COURT:  Thank you, Mr. Farrell.  Your comments

19    will be included in the records of the court.  I appreciate

20    you.

21         Mr. Majestro.

22             MR. MAJESTRO:  Good morning, Your Honor.

23         At this time, as I highlighted last week, there are

24    categories of exhibits that the parties, various parties

25    have stipulated can be admitted without the need of a
```

1    sponsoring witness.

2         Today we, we want to move into evidence 15 documents

3    that McKesson agreed at Paragraph 2 of the stipulation which

4    says, "Plaintiffs and McKesson stipulate that it will not

5    object to the presentation of these documents without the

6    use of a sponsoring witness at trial while reserving all

7    other evidentiary objections."

8         As will become very evident when I go through the

9    exhibits, Your Honor, these are very non-controversial.

10   Most of them are not hearsay or subject to very obvious

11   hearsay objections.  A lot of them the defendants offered no

12   objection to.

13        We don't believe that we should have to have a witness

14   on the stand and disrupt witness testimony while we enter

15   these documents as exhibits into the record.

16        I understand McKesson is objecting to this, and I'll

17   let them speak from their perspective as to why they think

18   this is improper.  But we believe this will make the trial

19   go quicker and make the witness testimony go smoother.

20             THE COURT:  All right.

21        Mr. Schmidt, do you want to address that?

22             MR. SCHMIDT:  Yes, Your Honor.

23        First of all, it's, it's not our place to comment on

24   Mr. Hanly.  He was not our colleague.  But we did have a lot

25   of exposure to him and it seems proper to say on our side,

1    and probably on all the defense side, we recognize the loss

2    you guys have experienced.  And I hope this trial has

3    illustrated our ability to fiercely disagree and still be

4    civil to each other, and on those terms especially.  We're

5    very sorry for the loss.

6         In terms of the exhibits, Your Honor, this issue has

7    come up before.  It came up I think a few days ago.  We

8    objected to this practice.

9         Mr. Hester pointed out that it's difficult if we try to

10   use this practice to track what's in evidence or not.  It's

11   difficult to address issues that many of these documents

12   present individually in terms of embedded hearsay, in terms

13   of geographic scope issues, in terms of foundation issues.

14        It feels like we're pushing off to the Court to try to

15   sift through what's in evidence where maybe this will come

16   up again during trial, maybe it never will, and we'll be

17   bickering over this in findings.

18        I thought the Court's ruling was deal with it as it

19   comes up with witnesses.  I think what the Court said was,

20   "So, Mr. Majestro, I think we can just deal with it as it

21   comes up."

22        We do think that's the better course.  We have -- some

23   of these -- most of these are covered by our stipulation,

24   not all of them are.  Many of them do have embedded hearsay.

25   I'm looking at the very first document which quotes a CDC

1    document, a government report, things like that.

2         And then many of them present geographic scope issues

3    that we would submit are properly addressed in the context

4    of individual witnesses where they're being used.

5         If there are documents where they really don't think

6    they have a witness and we have agreed to it, we're willing

7    to talk to them about it.  But this format, moving it in

8    without going through them one by one we submit is not the

9    appropriate way to handle these exhibits.

10              THE COURT:  Well, Mr. Majestro.

11              MR. MAJESTRO:  Well, Your Honor, we gave them this

12   list on Friday.  All we got back on Saturday -- we proposed

13   them getting back to us with any objections by Saturday.  We

14   got back, "We object to the procedure."

15        Last night with respect to the routine stipulations on

16   documents for witnesses they gave us some objections, but

17   these are documents that we believe we don't need, you know,

18   for the most part, and at least all the ones I'm going

19   through are on the stipulation.  And we believe they are

20   documents that can be into evidence.

21        Witnesses may or may not discuss them, but the

22   documents are admissible.  And if they've got objections to

23   particular parts of it, let's slog through that now rather

24   than when we have witnesses on the stand and disrupt witness

25   testimony.

1          And I think it confuses the issue when you -- I think

2     the past couple weeks I've noticed we've gotten kind of

3     distracted between whether the witness is familiar with the

4     document that is independently admissible.

5          And, so, this is -- these are all documents that are

6     independently admissible we believe, or if they're not,

7     they're not and, and let's just go through them and get them

8     admitted into the record.

9          We don't believe we need to have a witness talk about

10    evidence in trial.  If it's evidence in trial and admitted,

11    we can cite it in our proposed findings or argue it in

12    closing arguments.  That's the purpose of evidence.  There's

13    different kinds of evidence, and we believe documentary

14    evidence is appropriate for Your Honor to rely on and for us

15    to present.

16          MR. SCHMIDT:  We're happy to talk with them about

17    these documents and about this procedure.  As Mr. Majestro

18    said, we had a bit of a busy weekend having witnesses up

19    this week.  We heard about this Friday night.  We were asked

20    to respond by Saturday.  On those terms, we said we just

21    can't, we can't respond in that time period.

22          But if we're going to go through them now, then we're

23    going to be having lengthy debates about embedded hearsay

24    and geographic scope that keep us from getting witnesses

25    sitting in the room on the stand.

```
 1            THE COURT:  Well, I want you to get together and
 2   resolve as much of this as you can.  I think the way to do
 3   it, Mr. Majestro, is if there are serious objections other
 4   than the authentication, then you need to take them up as
 5   they come up so I think that would help me understand the
 6   issues.
 7            MR. MAJESTRO:  A lot of these, Your Honor, there
 8   are no objections or lack of personal knowledge is the
 9   objection.  And if we're not presenting it through a
10   witness, that's, that's our point.
11            THE COURT:  Let's see where we go.
12            MR. MAJESTRO:  Okay.  Thank you, Your Honor.
13            MR. SCHMIDT:  Your Honor, we do have a separate
14   document issue that we wanted to raise.
15        The Court will, of course, recall that the parties have
16   agreed to a procedure whereby at 7:00 p.m. the night before
17   they provide exhibits.  We received, in addition to these 12
18   exhibits, 70 exhibits last night, 63 of which they said they
19   would definitely use.
20        It's kind of a scenario we've had repeatedly happen
21   where we get a large number of exhibits.  It's very clear
22   both in quantity and quality they can't use all of these.
23   And quantity, we've never had a witness come close to that
24   many exhibits, and quality they cover things like letters
25   between one of our partners and the DEA that the witness
```

1    never saw, 1006 summaries he never would have seen.  They've

2    literately got the performance reviews on the exhibit list

3    which have no conceivable relevance.

4        So we, we did -- I will say, to Mr. Rafferty's credit,

5    we did talk about this.  We tried to work it out.  Mr.

6    Rafferty communicated to us that he does intend to use these

7    all.  We just don't see how that's possible in terms of the

8    volume or the quality of the exhibits given the Court's

9    prior rulings.

10        This morning, again to Mr. Rafferty's credit, we did

11   get a list of his first 25 exhibits.  But our concern is

12   that we're still -- there's fluff in there.  There's no way

13   they're going to be able to get through these 63 or 70

14   something exhibits.

15        And it's just frustrating the purposes of this

16   stipulation and the way we've now talked about on multiple

17   occasions, and I'm concerned that it's going to derail some

18   of the exam in terms of pointless disputes over, over

19   exhibits as they come in.

20        MR. MAJESTRO:  Your Honor, I want to introduce

21   Troy Rafferty who's going to respond.

22        MR. RAFFERTY:  Good morning, Your Honor.

23        THE COURT:  Good morning.  Yet another lawyer

24   enters this trial.

25        MR. RAFFERTY:  We're multiplying.

1    So setting aside my disagreement with Mr. Schmidt in

2    terms of the admissibility of the documents, which I feel

3    everything that's on my list is admissible and admissible

4    either through the stipulation or through this particular

5    witness but, once again, the cross-examination, because it's

6    cross-examination, I don't have the opportunity to sit with

7    the witness and map it out like a direct exam and say, well,

8    he needs this.  I have to have documents that I can use if

9    he takes a -- denies certain facts or denies certain things.

10   And, so, it's not a situation where I can simply say,

11   well, I'm going to ask this question, he's going to give

12   this answer, and then I don't have a document to back it up

13   because I'm limited in some form or fashion.

14   I have tried to streamline it as much as possible.

15   Every document, every document that I gave to Mr. -- in

16   fact, after me and Mr. Schmidt spoke, which we did a couple

17   times yesterday, I even went through and took out as many as

18   I could and I listed the ones that were "may use," that I

19   might use but I probably, you know, if I don't have to if

20   the witness gives the answer that I expect.

21   So, you know, it really depends on the examination and

22   which way it goes and the answers the witness gives.

23           THE COURT:  Well, I don't know what I can add

24   here.  It seems to me that to move the case and have it

25   streamlined, you have to take a reasonable approach to this

1    and not flood the -- your opponent with a whole bunch of

2    paper, including stuff you're not going to use.

3         So, on the other hand, I do appreciate the situation

4    you're in where although these are your witnesses, they're

5    adverse witnesses and you have a -- you don't have an

6    opportunity to prepare them like they would.

7         So I think there's something to be said for both sides

8    here, and the only way to make it work smoothly is for you

9    to get together and work it out, and I hope you'll do that.

10             MR. RAFFERTY:  Yes, Your Honor.  And just --

11             THE COURT:  Otherwise, I'll take things up as I

12   get to them.

13             MR. RAFFERTY:  Sure, Your Honor, absolutely.

14        And just so the Court knows, another reason -- another

15   factor here is we have communicated with Mr. Schmidt that we

16   are only calling -- we're, we're -- we took down one of the

17   McKesson witnesses that we intended to call, a Mr. Mahoney

18   who was on our witness list and who we stopped from coming

19   here to, to accommodate so he didn't end up traveling.  We

20   decided we were only going to call Mr. Oriente and then the

21   sales rep and that would be it.

22        So unlike some of the other cases -- you know, unlike

23   ABDC and Cardinal cases, we only have the one witness which

24   also then requires a few more documents being added in.  So

25   we can streamline it.  We didn't want to take up the Court's

1    time with yet another witness.

2         MR. MAJESTRO:  And, Your Honor, I just want to add

3    that the, the list Mr. Rafferty and Mr. Schmidt are talking

4    about includes the documents I was about ready to move to

5    admit.

6         So I don't think they can have it both ways.  They

7    can't complain how many documents we try to use with a

8    witness and then object when we try to use documents without

9    a witness.

10        MR. SCHMIDT:  No, I think the 63 documents that

11   they told us they will use, the documents that they do plan

12   to use, and our concern is they include things obviously

13   inadmissible; a letter with the government from a lawyer for

14   McKesson that the witness never saw, a performance review

15   for the witness from 2018 where the only purpose if it was

16   used would be to try to embarrass the witness in open court,

17   documents clearly from outside the jurisdiction.

18        We can deal with those, Your Honor, as they come up,

19   but that was, that was what prompted our concern and the

20   recurring nature of this issue.

21        MR. RAFFERTY:  And, Your Honor, the DEA letters,

22   the DOJ letters that Mr. Schmidt keeps saying are clearly

23   inadmissible, Judge Polster had complete briefing on it and

24   ruled them non-hearsay and relevant and admissible.

25        So, obviously, we have some disagreements, and the

```
1    performance evaluations are very relevant I will put in
2    through the witness.  And, obviously, if, if they're not
3    relevant, then they'll be kept out.
4         THE COURT:  Well, I haven't given you much
5    guidance here, but you know how I feel about, about you
6    cooperating with each other and working together if you can.
7    So let's call a witness and get on it with it.
8         MR. RAFFERTY:  Absolutely, Your Honor, happy to.
9         MR. MAJESTRO:  Your Honor, one last thing.
10       We would like to make clear that Mr. Rafferty is here
11   on behalf of Cabell and Mr. Ackerman is here on behalf of
12   Huntington.  And we would like the Court's indulgence with
13   letting Mr. Ackerman help respond to any of the evidentiary
14   objections as they come up.
15       Do you all object to that?
16       MR. SCHMIDT:  As long as it's not burdensome, we
17   don't object.
18       THE COURT:  Okay.
19       MR. SCHMIDT:  We're very frightened by
20   Mr. Ackerman, but we'll live with that.
21       THE COURT:  Okay, Mr. Rafferty.
22       MR. RAFFERTY:  At this time, plaintiffs call
23   Michael Oriente from McKesson.
24       MR. SCHMIDT:  And he's just in our little room
25   outside, Your Honor, so they're just getting him.
```

```
 1                  THE COURT:  Okay.

 2                  THE CLERK:  Mr. Oriente, could you please state

 3      your name for the record?

 4                  THE WITNESS:  Yes.  Michael Oriente.

 5                  THE CLERK:  Could you spell your last name?

 6                  THE WITNESS:  Yes.  O-r-i-e-n-t-e.

 7                  THE CLERK:  Please raise your right hand.

 8      MICHAEL ORIENTE, PLAINTIFFS' WITNESS, SWORN

 9                  THE CLERK:  Please take a seat right there.

10                  MR. RAFFERTY:  May I proceed, Your Honor?

11                  THE COURT:  Yes, you may proceed.

12                            DIRECT EXAMINATION

13      BY MR. RAFFERTY:

14      Q.   Good morning, sir.  Could you state your name for

15      the record, please?

16      A.   Yes.  My name is Michael Oriente.

17      Q.   Where are you currently employed, Mr. Oriente?

18      A.   I'm employed by McKesson.

19      Q.   Okay.  How long have you been employed by McKesson?

20      A.   Since June of 2004.

21      Q.   And what position did you hold when you started with

22      McKesson in 2004?

23      A.   When I started, I was the Director of Operations of one

24      of McKesson's distribution centers.

25      Q.   And which distribution center was that?
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **A.**   The Delran, New Jersey, distribution center.

2    **Q.**   Okay.  How long did you hold that position?

3    **A.**   For three years.

4    **Q.**   Okay.  And then you moved into becoming a Director of

5    Regulatory Affairs; is that correct?

6    **A.**   Yes.

7    **Q.**   And have you remained Director of Regulatory Affairs in

8    some capacity with McKesson since 2007?

9    **A.**   Yes, since late 2007 to present.

10   **Q.**   I want to kind of break up your tenure as, in the

11   position of Director of Regulatory Affairs.  Okay?

12        When you first moved to being the Director of

13   Regulatory Affairs, what was your position?  What were you

14   Director of?

15   **A.**   Yes.  I was responsible for the northeast region.

16   McKesson had the country divided into four regions.

17   **Q.**   Okay.  So you were one of four?

18   **A.**   There were five of us.  Four of us each had a region,

19   and then there was one additional Director.

20   **Q.**   Okay.  Let's talk about the northeast region for just a

21   second.  Tell me -- tell the Court, I'm sorry, what

22   distribution centers you were the Director of Regulatory

23   Affairs over.

24   **A.**   Yes.  I had responsibility for Boston, Massachusetts;

25   Buffalo, New York; New Castle, Pennsylvania; Rocky Hill,

1    Connecticut; Delran, New Jersey; and Landover, Maryland.

2    **Q.**   And at some point did you also take over being Director

3    of Regulatory for Methuen?

4    **A.**   Yes.  That would be Boston.

5    **Q.**   Oh, that's the Boston?

6    **A.**   Yeah, in Massachusetts.

7    **Q.**   Okay.  Thank you.

8    **A.**   Sure.

9    **Q.**   So the Court understands, explain how the distribution

10   center system works and what your duties are as Director of

11   Regulatory Affairs over those.

12   **A.**   Yes.  I would have, as Director of Regulatory Affairs,

13   responsibility to monitor the daily purchases of controlled

14   substances by the customers that were serviced out of those

15   distribution centers.

16   **Q.**   And did Landover distribution center, as well as New

17   Castle distribution center for McKesson, service portions of

18   West Virginia?

19   **A.**   I believe I had Landover servicing the eastern

20   panhandle, yes.  I don't recall if New Castle went down into

21   West Virginia.

22   **Q.**   Okay.  Are you still -- when did you stop with Landover

23   and New Castle?

24   **A.**   Landover and New Castle would have gone over to another

25   Director, Joe Lumpkin, in I believe 2012-2013 time period.

1    **Q.**   I'm going to hand you what's been marked for

2    identification as P-13736A.

3              MR. RAFFERTY:  May I approach the witness, Your

4    Honor?

5              THE COURT:  Yes.

6              THE WITNESS:  Thank you.

7    BY MR. RAFFERTY:

8    **Q.**   And I really want to talk to you for just a second

9    about what -- just the map so we can make sure that we

10   know which distribution centers were serviced in West

11   Virginia.  Okay, sir?

12        Is this an email from Tom MacDonald to several people

13   and in a group called PGRDRC?

14   **A.**   Yes, it is.

15   **Q.**   Okay.  What is PGRDRC, sir?

16   **A.**   Pharmacy Group Regulatory, Department of Regulatory

17   Compliance.

18   **Q.**   Okay.  And you're a part of that list group; correct?

19   **A.**   Yes.

20   **Q.**   Okay.  So this would have went to you on January 4th

21   2008, sir?

22   **A.**   Yes, I would have been copied.

23   **Q.**   Okay.

24             MR. RAFFERTY:  Your Honor, we would move to admit

25   Document 311 -- sorry -- P-13736A.

```
 1              THE COURT:  Any objection?

 2              MR. SCHMIDT:  No objection, Your Honor.

 3              THE COURT:  It's admitted.

 4    BY MR. RAFFERTY:

 5    Q.   If we can pull it up on the screen and go to Page

 6    11.  That's the map of the United States.  Do you see

 7    that, Mr. Oriente?

 8    A.   Yes, I can.

 9    Q.   And I'm going to apologize.  It's a little hard -- it's

10    a little hard to make out because you've got the dotted

11    lines that are the state borders.  Do you see that?

12    A.   Yes, I do.

13    Q.   Okay.

14              MR. RAFFERTY:  I'm sorry, Your Honor.  May I

15    approach the screen?

16              THE COURT:  Yes.

17    BY MR. RAFFERTY:

18    Q.   So you've got Washington Court House which serviced

19    West Virginia and included Cabell County; correct?

20    A.   Yes, Washington Court House.

21    Q.   And then you've also got New Castle.  And you see New

22    Castle is also in that portion of West Virginia.  Do you see

23    that?

24    A.   Yes, I do.

25    Q.   And then Landover, a portion of West Virginia.  Do you
```

1    see that?

2    **A.**   Yes, I do.

3    **Q.**   So fair to say that you would have been the Director of

4    Regulatory Affairs over two of the three service centers --

5    or, I'm sorry -- distribution centers that serviced West

6    Virginia.  True?

7              MR. SCHMIDT:  Objection, vague as to time.

8              MR. RAFFERTY:  Well, in two thousand --

9              THE COURT:  Just a minute.

10             MR. RAFFERTY:  I'm sorry, Your Honor.

11             THE COURT:  I'll sustain the objection.

12   BY MR. RAFFERTY:

13   **Q.**   I'm sorry, Mr. Oriente.  When you took over in

14   2008 -- or, I'm sorry -- when you were moved to becoming

15   Director of Regulatory Affairs in 2008, were you

16   servicing two of the three distribution centers that

17   serviced West Virginia?

18   **A.**   Yes, in the northern part and the eastern panhandle.

19   **Q.**   Okay.  Thank you, sir.  You can set that aside now.

20        Now, did your position change in 2014, sir?

21   **A.**   Yes, it did.

22   **Q.**   Okay.  And how did it change?

23   **A.**   In 2014 I went from having the regional responsibility

24   to moving into what McKesson called its retail national

25   account, known as RNA.  And, so, my responsibility changed

1    to overseeing the purchases made by the national chains.

2    **Q.**    Okay.   Fair to say that there are two types of

3    customers, or pharmacy customers that McKesson services:

4    Retail nationals accounts and then ISMCs?   Is that correct?

5    **A.**    Yes, that is correct.

6    **Q.**    Okay.   So the retail national accounts, those are the

7    big chains; is that right?

8    **A.**    Yes, it is.

9    **Q.**    Okay.   Including Rite-Aid?

10    **A.**    Yes, it would.

11    **Q.**    And, in fact, in your position even going all the way

12    back to 2008, you were the Director of Regulatory Affairs

13    over the Rite-Aid account; correct?

14    **A.**    Yes.   Specifically from 2008 to 2014 I had the

15    responsibility for the Rite-Aid account.

16    **Q.**    Okay.   And then you went to retail national accounts

17    and you still had responsibility from '14 forward in your

18    role as retail account director; correct?

19    **A.**    The way it worked, once the retail national account

20    regulatory group was established, it was spread out across

21    multiple people.   So I didn't have sole responsibility for

22    it but I had some, yes.

23    **Q.**    Okay.   Yeah.   Because as I understand it, and correct

24    me if I'm wrong, in 2014 instead of your retail national

25    accounts being held -- being serviced specifically by the

1    distribution center managers, or it was serviced -- I'm

2    going to get this question out.  In two thousand -- up until

3    2014, the Directors of Regulatory Affairs over the

4    distribution centers also handled the retail national

5    accounts in the area; correct?

6    **A.**   They would have had specific retail national accounts

7    assigned to them, yes.

8    **Q.**   Okay.  Thank you.  And those retail national accounts,

9    those would be McKesson's biggest accounts; correct?

10   **A.**   They would be largest in volume, yes.

11   **Q.**   Okay.  In fact, Rite-Aid, I believe, has approximately

12   4,600 stores nationwide that McKesson serviced; is that

13   accurate?

14   **A.**   At what time?

15   **Q.**   Let's take 2008 when you were servicing them.

16   **A.**   Yes.

17   **Q.**   Okay.  And I want to talk for a few minutes about the

18   role of the Director of Regulatory Affairs, and I want to

19   focus on the time period between 2008 and 2014.  Okay?

20   **A.**   Yes.

21   **Q.**   Make sure we have a time period.  And during that time,

22   is it fair to say as Director of Regulatory Affairs, you

23   were responsible for implementing the Controlled Substance

24   Monitoring Program as a means to prevent diversion into the

25   illicit market for those distribution centers you were in

 1    charge of?

 2    **A.**    Yes.

 3    **Q.**    Is it fair to say from 2008 to 2014 you were

 4    responsible for ensuring compliance by McKesson for those

 5    distribution centers for the -- I'm sorry.  Let me strike

 6    that.

 7          From 2008 to 2014 is it fair to say you were

 8    responsible for ensuring compliance with the requirements of

 9    the Controlled Substances Act for all controlled substance

10    shipments that came out of the distribution centers you were

11    responsible for?

12    **A.**    Yes.

13    **Q.**    Okay.  And from 2014 to present, you have been

14    responsible for ensuring compliance with the requirements of

15    the Controlled Substances Act for controlled substance

16    shipments going to McKesson's retail national accounts that

17    you were assigned to?

18    **A.**    Yes, that is correct.

19    **Q.**    And when you started as Director of Retail -- I'm

20    sorry -- Director of Regulatory Affairs, had you had any

21    experience as, in Regulatory Affairs?

22    **A.**    There would have been some experience from being a

23    Director of Operations.  That, that responsibility partially

24    is under the Director of Operations over distribution

25    centers.  They need to understand what it is that they're

1   distributing, so, yes.

2   **Q.**   Okay.  But as a Director of Operations of a

3   distribution center, you have very different

4   responsibilities than a Director of Regulatory Affairs;

5   correct?

6   **A.**   They would be different.  Part of the Director of

7   Operations responsibility also covered knowing the

8   regulations for shipping controlled substances.

9   **Q.**   Okay.  And, so, since 2004, then, when you started with

10  McKesson, am I correct in assuming, then, that you were

11  familiar with the requirements under the Controlled

12  Substances Act and the corresponding regulations?

13  **A.**   Yes.

14  **Q.**   Okay.  And when you became a specific -- you were

15  specifically transferred or moved into a Director of

16  Regulatory Affairs position, did you take it upon yourself

17  to then try to educate yourself further on those

18  requirements?

19  **A.**   Yes.  I did some self-education as well as received

20  training.

21  **Q.**   Okay.  And what type of -- when you say received

22  training, that would have all been, for lack of a better

23  phrase, on-the-job training?

24  **A.**   No.  There was some formalized training given by the

25  Senior Director, Gary Hilliard.

1   **Q.**   Okay, Gary Hilliard.  Who is Gary Hilliard?

2   **A.**   He was a Senior Regulatory Director.  He was pre-2008

3   when CSMP first came in.  He was a Director for McKesson.

4   **Q.**   And you had testified earlier that there were a total

5   of five DRAs when you started in 2008?

6   **A.**   Yes.

7   **Q.**   Okay.  And those five, how long were there just five

8   DRAs for McKesson nationwide?  Did it ever grow?

9   **A.**   Yes, it did.

10  **Q.**   Okay.  How long do you recall, if you can, how long did

11  it remain just the five of you?

12  **A.**   Up until 2012, I believe, when two additional were

13  added.

14  **Q.**   And as part of your job responsibilities and in

15  implementing the policies and procedures of McKesson, you

16  would communicate pretty regularly with the other four DRAs.

17  Is that fair?

18  **A.**   Yes, that is correct.

19  **Q.**   Okay.  Both by email, by phone, meetings, that type of

20  thing?

21  **A.**   Yes, all of the above.

22  **Q.**   Okay.  I want to talk for just a minute -- shifting

23  gears now, I want to talk about some of the SOMS policies

24  that were in effect at McKesson, the Suspicious Order

25  Monitoring Systems.  Okay?

1    **A.**    Yes.

2    **Q.**    Okay.  If we could, can you pull up the screen for a

3    second?

4        I'm going to have a little timeline up here.  I want to

5    make sure that we're oriented as to what time period I'm

6    talking about so that the Court knows specifically when I

7    ask you a question where we're at.  Okay?

8    **A.**    Yes.

9    **Q.**    Okay.  So, first, when you started in late 2007 as a

10   DRA -- and I hope I can just say DRA instead of Director of

11   Regulatory Affairs.  You know what I'm referring to;

12   correct?

13   **A.**    I do.

14   **Q.**    When you started as a DRA in late 2007, the system that

15   was in place was called the Life-Style Drug Management -- or

16   Monitoring Program; correct?

17   **A.**    The -- no, that, that program was in existence prior to

18   me becoming a Director of Regulatory Affairs.

19   **Q.**    Yes, sir.  I'm sorry.  I guess what I was saying is

20   when you came there, that's the program -- or that's the,

21   the program that was in place at McKesson was the LDMP?

22   **A.**    Yes.  For a short time, that was as the CSMP,

23   Controlled Substance Monitoring Program, was being

24   developed.

25   **Q.**    And before the LDMP, what there was was there was the

```
 1    Section 55 of the operations manual of, of McKesson.  Are
 2    you familiar with that?
 3    A.   Yes, I am.
 4    Q.   Okay.  But that had already been replaced with the LDMP
 5    by the time you started.  Is that fair?
 6    A.   No.  The Section 55 ran concurrent with the LDMP
 7    program.
 8    Q.   Okay.  And let's just kind of orient ourselves here.
 9    So up until --
10              MR. RAFFERTY:  May I approach the screen, Your
11    Honor?
12              THE COURT:  Yes.
13              MR. RAFFERTY:  Do you want me to ask permission
14    every time?
15              THE COURT:  No, you don't have to, Mr. Rafferty.
16              MR. RAFFERTY:  Okay.  Thank you, sir.
17    BY MR. RAFFERTY:
18    Q.   Okay.  So if we start with -- the Section 55 went
19    right up until -- and it looks like it overlaps the LDMP
20    a little bit.  Is that accurate?
21    A.   Yes.
22              MR. SCHMIDT:  Your Honor, I think it actually
23    directly contradicts what he just said about just on the
24    back end of how long it went.
25              MR. RAFFERTY:  Well, those --
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
1              THE COURT:  Well, just a minute.

2         (Pause)

3              THE COURT:  Well, answer the question if you can,

4    Mr. Oriente.

5              THE WITNESS:  Could you repeat the question?

6    BY MR. RAFFERTY:

7    Q.   Yeah.  All I'm trying to do is orient us time-wise.

8    The Section 55 right here pre-dated the LDMP.  And I

9    think you said it overlapped going into 2007?  Is that

10   accurate?

11   A.   Section 55 went until -- no, I believe Section 55, I

12   believe, went until 2009.

13   Q.   Okay.  So it's your understanding that the Section 55

14   which also entailed having excessive reports, excessive

15   order reports generated.  Do you recall that?

16   A.   Yes, I believe that was in Section 55.

17   Q.   Okay.  And then the LDMP when it came into existence

18   actually had a threshold system in place for controlled

19   substances; is that correct?

20   A.   There were thresholds set under the LDMP program.

21   There were limits that if a customer ordered more than that,

22   it would show up on the LDMP report.

23   Q.   Okay.  So the LDMP applied to a monthly threshold of

24   8,000 dosage units per month for both hydrocodone and

25   oxycodone; is that correct?
```

1    **A.**   We didn't refer to it as a threshold at that time under

2    the LDMP program.  It was a limit.  Thresholds were

3    established under the CSMP program.

4    **Q.**   Okay.  If I could, I would like to show you what's been

5    marked for purposes of identification as P-42535, sir.

6              MR. RAFFERTY:  May I approach, Your Honor?

7              THE COURT:  Yes.

8              THE WITNESS:  Thank you.

9    BY MR. RAFFERTY:

10   **Q.**   Thank you.  Sir, is this a copy of the McKesson

11   operations manual for the Life-Style Drug Monitoring

12   Program?

13   **A.**   Yes, it is.

14   **Q.**   And if you look down in the bottom corner, it says it's

15   dated May 16th, 2007.  True?

16   **A.**   Yes.

17   **Q.**   And, so, consistent with what you've said earlier, if

18   you started in late 2007, this would have been the program

19   that was in place -- or this would have been the -- a

20   program that was in place at McKesson?

21   **A.**   I'm sorry.  What -- can you rephrase the question?

22   **Q.**   Yeah, yeah.  I'm sorry.  You said that you started as

23   Director of Regulatory Affairs in late 2007?

24   **A.**   Correct.

25   **Q.**   Okay.  And I'm just directing you now to the bottom

```
 1    right corner for the date that says May 16th, 2007.
 2    A.    Yes.
 3    Q.    Okay.  So we take those two dates, this would have been
 4    in place when you started as Director of Regulatory Affairs?
 5    A.    Yes.
 6    Q.    And if we look down at the --
 7          MR. RAFFERTY:  Oh, well, I'll move in Exhibit
 8    P-42535, Your Honor.
 9          MR. SCHMIDT:  No objection, Your Honor.
10          THE COURT:  It's admitted.
11    BY MR. RAFFERTY:
12    Q.    And if we look at the top, and it's -- it says
13    Life-Style Drug Monitoring Program at the top.
14          And then if you look down at the middle portion, it
15    talks about the reporting process is targeting controlled
16    substances.  Do you see that?
17    A.    Yes, I do.
18    Q.    Okay.  "This reporting process is targeting controlled
19    substances that the DEA considers life-style drugs.  These
20    drugs are highly abused and are commonly found in illegal
21    internet pharmacies."
22          Do you agree with that, sir?
23    A.    That's what's written here identifying them as being
24    found in internet pharmacies, yes.
25    Q.    Okay.  And that they are highly abused?
```

1    **A.**    That's what is written here, yes.

2    **Q.**    Do you have any reason to disagree with that, sir?

3    **A.**    No.

4    **Q.**    Okay.  And then it goes down and says, "Currently the

5    controlled substances being monitored by these reports are,"

6    and it has oxycodone and it's kind of a little crooked, but

7    the next column is base code.  Do you see that?

8    **A.**    Yes.

9    **Q.**    Are you familiar with the usage of base codes at

10   McKesson.

11   **A.**    Yes, I am.

12   **Q.**    And is that -- is 9143 the oxycodone base code?

13   **A.**    Yes, that would be the identification by the DEA of the

14   active ingredient in oxycodone.

15   **Q.**    Okay.  And then it says dosage threshold; right?

16   **A.**    Yes, sir.

17   **Q.**    Okay.  So, in fact, it was referred to as a threshold;

18   true?

19   **A.**    Okay, yes.

20   **Q.**    Okay.  And then hydrocodone and a base code 9193.  To

21   your understanding, is 9193 the base code for hydrocodone?

22   **A.**    Yes, it is.

23   **Q.**    Okay.  And the dosage threshold would be 8,000 for that

24   as well?

25   **A.**    Yes.

1    **Q.**   Okay.  And then the same for the other two drugs after.

2    Do you see that?

3    **A.**   Yes.

4    **Q.**   And are those -- are those the base codes for those two

5    controlled substances?

6    **A.**   Yes, they are.

7    **Q.**   Okay.  Now, the LDMP, when it was in place, did not

8    have an automatic blocking or stopping mechanism if someone

9    exceeded that threshold.  Is that accurate?

10   **A.**   That is correct.  It would have been a manual process.

11   **Q.**   Okay.  So somebody from McKesson such as yourself as

12   Director of Regulatory Affairs would have to go in and block

13   the order manually?

14   **A.**   When the LDMP program started, it was the

15   responsibility of either the distribution center manager or,

16   in my case, the Director of Operations that oversaw that

17   program, and we performed that function that you mentioned.

18   **Q.**   Okay.  And the Director of Regulatory Affairs would

19   play a role in that decision though.  True?

20   **A.**   Yes.

21   **Q.**   Okay.  Now I want to talk about --

22        If we could, let's go back to the timeline, please.

23        All right.  As Mr. Schmidt pointed out, this might be

24   over -- but just for illustration purposes, the LDMP would

25   have been about a year I think you said?

1          MR. SCHMIDT:  Your Honor, we'll object to the

2     demonstrative because I think it's now inconsistent with the

3     witness's testimony in terms of him saying the Section 55

4     program went right through the same period as the LDMP.

5          MR. RAFFERTY:  How about that?

6          MR. SCHMIDT:  Thank you.  Okay.

7          MR. RAFFERTY:  I fixed it.  I just took the

8     Section 55 off.

9          THE COURT:  Does that take care of your objection?

10          MR. SCHMIDT:  I think that does as to what's

11     presently on the screen.

12        Thank you, Mr. Rafferty.

13          MR. RAFFERTY:  Okay.

14     BY MR. RAFFERTY:

15     **Q.**   So there's the LDMP in that general time period.

16     And then it switches to the CSMP.  Is that correct, Mr.

17     Oriente?

18     **A.**   CSMP would have been before 2009?

19     **Q.**   Yeah.  It started in about mid 2008, which is what we

20     tried to show here.

21     **A.**   Okay, yes.

22     **Q.**   Is that correct?

23     **A.**   Yes.

24     **Q.**   Okay, all right.  And when we go -- and the CSMP stands

25     for the Controlled Substance Monitoring Program.  True?

1   **A.**   Yes, it does.

2   **Q.**   Okay.  And going forward in our examination today I'm

3   going to focus primarily on this time period of the CSMP and

4   your involvement in that.  Okay?

5   **A.**   Yes.

6   **Q.**   Okay.  You mentioned Gary Hilliard earlier.  True?

7   **A.**   Yes, I did.

8   **Q.**   Okay.  And his role, he's going to be testifying in

9   this court by way of deposition testimony.  So I'm not, I'm

10  not going to -- he covers these other two sections, so I'm

11  not going to cover those with you.  Okay?

12  **A.**   That's fine.

13  **Q.**   Okay.  So focusing on this time period, we'll go

14  forward.

15       Now, there's also a threshold system created for all

16  Schedule II and III controlled substances under the

17  Controlled Substance Monitoring Program.  True?

18  **A.**   As well as Schedule IVs and Vs.

19  **Q.**   Okay.  And I'm just concentrating on the IIs and IIIs

20  right now, but thank you.  I appreciate that.

21       And, so -- well, they apply to all opioid products.

22  True?

23  **A.**   Yes, they -- yes, it would.

24  **Q.**   Okay.  And they're set by base code.  We just talked

25  about the base code.  So if we look at 9143 base code for

1    oxycodone, the threshold would be set for a customer based

2    upon that base code.  Is that true?

3    **A.**   Yes, it would encompass all strengths under that base

4    code.

5    **Q.**   Okay.  Same for hydrocodone.  True?

6    **A.**   Yes, sir.

7    **Q.**   Okay.  And the threshold -- so when a threshold is

8    set -- and we'll talk about that in a little bit -- but if

9    the threshold is set and a customer exceeds that threshold

10   in a month -- so they're set month by month.  True?

11   **A.**   They are set -- initially at the start of the program

12   they were fixed thresholds and a customer could not exceed

13   it, that threshold.  They would only be permitted to

14   received up to that threshold.  Any order above that

15   threshold would be blocked, so you couldn't exceed your

16   threshold.

17   **Q.**   Okay.  Unless there was a -- what was referred to as a

18   three-level review process; correct?

19   **A.**   This is correct.

20   **Q.**   Okay.  So there would be a Level One review which

21   involved a questionnaire.  True?

22   **A.**   There was a, a questionnaire.  I just want to define --

23   there's a customer questionnaire and then there would be a

24   Level One specific questionnaire to ask why the customer had

25   a blocked order.

1   **Q.**   Yeah.  And that's the one I'm focusing on right now.

2   **A.**   Okay.

3   **Q.**   And that would be filled out generally by the sales

4   representative.  Is that true?

5            MR. SCHMIDT:  Your Honor, I don't mean to

6   interrupt.  It would be helpful if we just had a time frame

7   because the program has evolved up to the present day.

8            THE COURT:  If you could put a time frame on it.

9            MR. RAFFERTY:  Absolutely, Your Honor.

10  BY MR. RAFFERTY:

11  **Q.**   Starting in 2008 -- let's just take 2008 when you

12  started.  The threshold would be set.  And then if a

13  customer exceeded that threshold, then that would

14  trigger the three-level review.  Is that correct?

15  **A.**   If they attempted to exceed it, yes.

16  **Q.**   Right.  Okay.  And the Level One involved that

17  questionnaire we were just talking about.  True?

18  **A.**   Yes, there was Level One questionnaire that would be

19  the first review as to why that customer had a blocked

20  order.

21  **Q.**   And that would be generally filled out by the sales

22  rep.  Is that true?

23  **A.**   No.  The sales rep did not do the Level One review.  It

24  was conducted by someone at the distribution center.

25  **Q.**   Okay.  Are you familiar or aware of any time a sales

1    rep completed the Level One questionnaire in regards to a

2    possible excess of their threshold?

3    A.    I'm not aware that Level Ones were completed by sales

4    reps in my region, no.

5    Q.    Okay.  And then it would progress after that.  If it

6    was not satisfactory, then it would go to Level Two.

7    Correct?

8    A.    Yes, that is correct.

9    Q.    Okay.  And then if it wasn't satisfied after Level Two,

10   then it went to a Level Three review; correct?

11   A.    Yes, that is correct.

12   Q.    Okay.  And in 2013 did the CSMP change in regards to

13   the Level One through Three process?

14   A.    Yes, it did.

15   Q.    Okay.  And, in fact, the Level One through Three

16   process was replaced with a system where a customer's order

17   was reported to the DEA as suspicious any time the customer

18   exceeded the threshold for a given base code.  True?

19   A.    Yes, that is correct.  We reported more.

20   Q.    But prior to that it did not unless it reached a Level

21   Three?

22   A.    Correct.  The Level Three would be the, the

23   identification to report.

24   Q.    And the CSMP, sir, this was a national policy of

25   McKesson's; correct?

1   **A.**   Yes, it was.

2   **Q.**   There weren't different CSMPs for different

3   distribution centers?

4   **A.**   No, there was one operating manual.

5   **Q.**   Right.  And everybody -- each of the DRAs were expected

6   to abide by the rules pertaining to the CSMP.  True?

7   **A.**   Yes, we followed the same operating manual.

8   **Q.**   And as Director of Regulatory Affairs, you were

9   expected to have -- be very intimately familiar with the

10   requirements of the CSMP.  Is that fair?

11   **A.**   Yes.

12   **Q.**   And to follow that?

13   **A.**   Yes.

14   **Q.**   And one of the key things in the CSMP -- one of the big

15   issues that McKesson had in their CSMP was the need for

16   proper and quality documentation.  Is that correct?

17   **A.**   Yes, documentation was part of the program.

18   **Q.**   And you would agree with me -- we talked about the --

19   being familiar with the requirements of the Controlled

20   Substances Act.  Do you recall that?

21   **A.**   I'm sorry.  What was the last part?

22   **Q.**   You testified earlier about your knowledge of the

23   Controlled Substances Act.

24   **A.**   Yes.

25   **Q.**   Okay.  You agree that under the Controlled Substances

```
 1    Act, McKesson had a duty to provide suspicious order reports
 2    to the DEA.  True?
 3    A.   Yes.
 4    Q.   Okay.  And you'll agree when McKesson launched the CSMP
 5    in 2008, it did so understanding that the DEA expected
 6    McKesson to block any orders it deemed suspicious; correct?
 7    A.   The requirement, as I understood it, was to report
 8    suspicious orders, at which we started the blocking and
 9    those orders would be reported after a Level Three was
10    conducted.
11    Q.   Okay.  And let me, let me try to restate my question a
12    little bit.
13         You understood in 2008 when the CSMP was launched that
14    the DEA expected McKesson to block orders that it deemed
15    suspicious; correct?
16    A.   Yes.
17    Q.   And now I'd like to show you what's been marked as
18    P-42638, sir.
19              MR. RAFFERTY:  May I approach, Your Honor?
20              THE COURT:  Yes.
21    BY MR. RAFFERTY:
22    Q.   Do you recognize this document as the Controlled
23    Substance Monitoring Program at McKesson Corporation?
24    A.   Yes.
25    Q.   Okay.  And if you look at the page all the way in the
```

1    back -- if you look in the upper right corner, this will be

2    similar to a lot of documents.  In the upper right-hand

3    corner there's a dot, dot 17-A in the upper -- that is the

4    last --

5    **A.**    The upper right corner is blank.

6    **Q.**    Oh, okay.  Well, I might have given you the wrong -- I

7    had it marked up that way.  So if you go to just the last

8    page, it's the last page of the document.

9    **A.**    Okay.

10   **Q.**    Page 17 I believe.

11   **A.**    Yes, sir.  That's Page 17.

12   **Q.**    And if you look down, it says -- it's got a date,

13   revision number.  It says 1.4.  It's got June 16th, 2008.

14   Do you see that?

15   **A.**    Yes.

16            MR. RAFFERTY:  Your Honor, at this time plaintiffs

17   would move in P-42368.

18            MR. SCHMIDT:  No objection.

19            THE COURT:  It's admitted.

20        And I need to interrupt you, Mr. Rafferty.  We have too

21   many trials going on and not enough court reporters.  So

22   we're going to have to make a change here.  We'll be in

23   recess for about 10 minutes.

24            MR. RAFFERTY:  Okay.  Thank you, Your Honor.

25            THE COURT:  I'm sorry.

```
 1              MR. RAFFERTY:  No problem.
 2         (Recess taken at 10:49 a.m.)
 3         MR. SCHMIDT:  May the witness resume the witness stand,
 4    Your Honor?
 5              THE COURT:  Yes.  Mr. Oriente, you may resume the
 6    witness stand.
 7              MR. RAFFERTY:  Still have a couple of questions.
 8              THE WITNESS:  Do you want me to take this off?
 9              THE COURT:  It helps me to understand you, Mr.
10    Oriente.
11              THE WITNESS:  Absolutely.  I feel better without
12    it.
13              THE COURT:  Don't we all.
14              BY MR. RAFFERTY:
15    Q.   Okay, Mr. Oriente, I think where we left off, we were
16    talking about some responsibilities and duties under the
17    Controlled Substances Act.  I want to go back for just a
18    moment to the CSMP that we just admitted into evidence,
19    42638.  Do you have that in front of you, sir?
20    A.   I do.
21    Q.   Okay.  At the top, it says Controlled Substance
22    Monitoring Program and then it goes down and it says
23    purpose.  Do you see that section, sir?
24    A.   Yes.
25    Q.   Okay.  It says proactively review the customers' orders
```

1    and purchases for all controlled substances in order to

2    detect and prevent diversion.  Would you agree that that's

3    the purpose of the CSMP that was put in place in 2008 by

4    McKesson?

5    **A.**    Yes, sir, it was.

6    **Q.**    Okay.  Second, maintain customer thresholds for all

7    customer -- for all controlled substances.  Do you see that?

8    **A.**    Yes, we did that.

9    **Q.**    Okay.  And the thresholds, we'll get into how the

10   thresholds were set in just a few minutes but, once again,

11   that's the monthly max that a customer would order without

12   triggering a review, correct?

13   **A.**    Yes.  In the level one, yes.

14   **Q.**    Yes, sir.  And then it says make informed decisions

15   based upon established threshold information.  Do you see

16   that?

17   **A.**    Yes.

18   **Q.**    Okay.  And that's important, is to get the information

19   so that you can make an informed decision as to whether or

20   not to allow a customer to exceed that threshold; true?

21   **A.**    It would have been to determine if a threshold was

22   going to be adjusted upward, yes.

23   **Q.**    Okay.  And then it says build a documented business

24   case.  Do you see that?

25   **A.**    Yes.

1    **Q.**   And it says to substantiate the volume of controlled

2    substances purchased by McKesson customers.  And there's the

3    document again.  Once again, McKesson -- the documentation

4    was a very important part of the process, the CSMP process;

5    true?

6    **A.**   Yes.  It was part of it.

7    **Q.**   Okay.  And then it says report to the DEA those

8    orders/purchases/customers designated as suspicious.  Do you

9    see that?

10   **A.**   Yes, I do.

11   **Q.**   And that's the reporting obligation that we talked

12   about under the CSA, correct?

13   **A.**   Yes, that's correct.

14   **Q.**   And then if you got to Page 6, it's -- there's a number

15   two threshold review.  And I'll go very quickly through

16   this, Mr. Oriente, because the Court will have the benefit

17   of this, but I just want to make sure that I'm reading this

18   correctly.  It says down 2.2 threshold excursion.  Do you

19   see that?

20   **A.**   Yes, I do.

21   **Q.**   Once a customer has reached their monthly maximum

22   threshold amount, all subsequent orders for that item will

23   be blocked.  Do you see that?

24   **A.**   Yes, I do.

25   **Q.**   Okay.  And that's the blocking requirement we talked

1    about over the -- under the regulations, correct?

2    **A.**    Yes.  And orders would be blocked once they reach their

3    threshold.

4    **Q.**    This triggers the level -- the level review process as

5    detailed in level review steps below.  Do you see that?

6    **A.**    Yes, I do.

7    **Q.**    Okay.  So, you agree that McKesson had an obligation to

8    monitor for suspicious orders, block suspicious orders, and

9    report suspicious orders; true?

10   **A.**    Yes, we did.

11   **Q.**    Okay.  Thank you, sir.

12          MS. HARDIN:  Your Honor, I'm just going to object.

13   Ashley Hardin for Cardinal.  Lack of a time period as to

14   when that question is referring.

15          MR. SCHMIDT:  I'll join in that objection.

16          THE COURT:  Sustained.  If you can put a specific

17   time period on it, Mr. Rafferty.

18          MR. RAFFERTY:  Yes.  Yes, sir.  Yes, Your Honor.

19          BY MS. RAFFERTY:

20   **Q.**    I'm talking about from 2008 forward when the CSMP was

21   in place.

22          MR. SCHMIDT:  And I'll object just to the issue of

23   blocking and whether that's in the regulation is obviously a

24   contested legal issue.  There was a motion practice on that

25   before trial where Your Honor was asked by the plaintiffs to

1    make a finding that that was a legal obligation and now

2    trying to get the witness to testify as to legal

3    obligations, as opposed to what he wanted the DEA to do, or

4    he understood he the DEA wanted him to do.  I'm sorry.

5                MR. NICHOLAS:  We join in that objection.

6                MS. HARDIN:  Same, Your Honor.

7                MR. RAFFERTY:  Your Honor, I think he testified

8    that that was his understanding earlier.

9                THE COURT:  Well, I'm going to let you question

10   him along this line and this is a proper subject for cross

11   examination, I believe, and I'll let you go ahead, as long

12   as you've got a specific time frame down.

13       And your objections will be shown for the record.

14               MR. SCHMIDT:  Thank you, Your Honor.

15               BY MR. RAFFERTY:

16   **Q.**   And the time frame I was referring to, sir, was 2008

17   forward, you know, when the CSMP was put in place.

18   **A.**   What was the original question?

19   **Q.**   The obligation to monitor, report and block.  I guess

20   it's really monitor, block and report.

21   **A.**   Yes.  With the guidance, change those requirements,

22   McKesson adopted.

23               THE COURT:  He's asking the witness, if I

24   understand it correctly, the witness's understanding of what

25   these requirements were and since he was in a position of

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    authority and responsibility with the -- with McKesson, I

 2    think it's proper to question him and I'll overrule the

 3    objection.

 4         Go ahead, Mr. Rafferty.

 5              MR. RAFFERTY:  Thank you.  Thank you, Your Honor.

 6              BY MR. RAFFERTY:

 7    Q.   Now moving forward, I'd like to show you what's been

 8    marked as Plaintiffs' Exhibit 00034, sir.

 9              MR. RAFFERTY:  May I approach, Your Honor?

10         There you are, Mr. Oriente.

11              THE WITNESS:  Thank you.

12              MR. RAFFERTY:  Thank you.

13              BY MR. RAFFERTY:

14    Q.   Is this a --

15              MR. RAFFERTY:  I'm sorry, sir.  I'll wait until

16    the Court has it.

17         May I proceed, Your Honor?

18              THE COURT:  Yes.

19              BY MR. RAFFERTY:

20    Q.   Is this a letter from the Drug Enforcement

21    Administration dated December 27th, 2007 to McKesson

22    Corporation?

23    A.   Yes, it is.

24              MR. RAFFERTY:  Plaintiffs would move in Exhibit

25    P-00034 here, Your Honor.
```

```
1              THE COURT:  Any objection?

2              MR. SCHMIDT:  Yes, Your Honor.  We object to this

3     as hearsay and foundation with this witness having been

4     established.

5              MR. RAFFERTY:  It's part of the stipulation, sir,

6     in terms of -- Your Honor, in terms of foundation and its

7     notice as to the obligation.

8              MR. SCHMIDT:  There's no stipulation as to notice

9     and it's hearsay.

10             THE COURT:  This came up earlier in connection

11    with one of the other defendants, I think.  Did I let it in

12    or keep it out?

13             MR. SCHMIDT:  Yes, sir.  I think you let it in

14    earlier one, but not this one.

15             MR. RAFFERTY:  Yes.  This is a December 27, 2007

16    one, Your Honor, and yes, it was -- it is -- and I'm sorry

17    if I wasn't clear.  I was -- in terms of foundation with

18    this witness, I was saying it's on the stipulation.  In

19    terms of hearsay, it is notice as to the corporation as to

20    what the requirements and duties are according to the DEA.

21             MS. HARDIN:  Your Honor, we object on behalf of

22    Cardinal.  It's not notice to Cardinal of anything.

23             MS. MAINIGI:  And, Your Honor, I --

24             THE COURT:  Well, that's --

25             MS. MAINIGI:  Your Honor --
```

```
 1              THE COURT:  Yes?

 2              MS. MAINIGI:  May I just add for the record, in

 3    terms -- I think you're referring back to Mr. Monet.  What I

 4    recall happening during Mr. Monet's testimony is you

 5    admitted the December 27th -- December, 2007 letter not for

 6    the truth of the matter, but just as notice.

 7              MR. SCHMIDT:  I don't think he's yet established a

 8    basis to admit this as to notice with McKesson with this

 9    witness.  If he does, then we won't object for that limited

10    purpose.

11              THE COURT:  Well, I think Ms. Hardin is right.

12    It's only -- if it's admissible at all, it's only admissible

13    against McKesson, isn't it?

14              MR. RAFFERTY:  Yes.  That's all I'm offering it

15    for.  I believe the other letters, the other Rannazzisi

16    letters for the other defendants, came in.  That's all I'm

17    referring.

18              THE COURT:  You can ask him if he's familiar with

19    it.  The hearsay objection is well taken, but it could come

20    in for the limited purpose and I'm going to go ahead and let

21    you ask him the questions.

22              MR. RAFFERTY:  Thank you, Your Honor.  And that's

23    all I'm offering for is notice, limited purpose for notice,

24    and it is, once again, it's on the stip in terms of the

25    sponsoring witness, Your Honor, but I'll -- I'll continue.
```

```
1              THE COURT:  Please do.

2              BY MR. RAFFERTY:

3    Q.   Do you see -- have you seen this letter before, Mr.

4    Oriente?

5    A.   Yes, I have.

6    Q.   Okay.  And is this one of the letters that you would

7    have reviewed when you were in your role as Director of

8    Regulatory Affairs during this time period?

9    A.   I believe I received this letter when I was Director of

10   Operations still.

11   Q.   Okay.  So, performing your duties for McKesson Corp.,

12   correct?

13   A.   Yes.  As a registrant, I would have received a copy of

14   this.

15             MR. RAFFERTY:  I would offer it now, Your Honor.

16             THE COURT:  I'm going to admit it for the limited

17   purpose against McKesson only.

18             MR. SCHMIDT:  We don't object to that with that

19   foundation being laid, Your Honor.

20             THE COURT:  All right.  Your objection will be

21   shown for the record.

22             MR. RAFFERTY:  And that does away with the

23   document.

24             THE COURT:  And you said you don't object with the

25   foundation being laid, is that right, for limited purposes?
```

1    Okay.

2            BY MR. RAFFERTY:

3    **Q.**   If we could, let's take a look at this particular

4    letter.  If we could pull it up on the screen.  And it says,

5    Dear Registrant, and then it goes down and says this letter

6    is being sent to every entity in the United States

7    registered with the Drug Enforcement Administration to

8    manufacture or distribute controlled substances.  And then

9    it says the purpose of this letter is to reiterate.  Do you

10   see that word, sir?

11   **A.**   Yes, I do.

12   **Q.**   Reiterate the responsibilities of controlled substance

13   manufacturers and distributors to inform DEA of suspicious

14   orders in accordance with 21 CFR 1301.74(b).

15           Now, the question I have for you is, when you saw that

16   letter and you saw the word reiterate, had you -- did you go

17   back and look for other letters that the DEA had sent?

18   **A.**   I personally did not.

19   **Q.**   Had you seen the other letters that the DEA and Mr.

20   Rannazzisi had sent?

21   **A.**   I believe I did, yes.

22   **Q.**   Okay.  And what he's reiterating here, if we go down,

23   it says the registration -- I'm sorry.  Strike that.  It

24   says the regulation in that third full paragraph, sir, the

25   regulation also requires that the registrant inform the

```
1    local DEA Division Office of suspicious orders when

2    discovered by the registrant.  Did I read that correctly,

3    sir?

4    A.   Yes, you did.

5    Q.   And is that your understanding of what the obligation

6    of McKesson was under the Controlled Substances Act, was to

7    submit the suspicious order when discovered?

8            MR. SCHMIDT:  Same objection, Your Honor.

9            BY MR. RAFFERTY:

10   Q.   A later date --

11           MR. SCHMIDT:  I think it's okay if he wants him to

12   understand, at this point in time, did he have this

13   understanding, but to ask him to state the law, I think, is

14   improper.

15           THE COURT:  Well, I'll sustain that objection, Mr.

16   Rafferty, and you can move on.

17           MR. RAFFERTY:  Thank you, Your Honor.

18           BY MR. RAFFERTY:

19   Q.   When you reviewed this, do you understand that the DEA

20   -- well, strike that.  Do you understand that suspicious

21   orders, according to what your understanding was at the time

22   were to be disclosed, when the suspicious order was

23   disclosed as compared to a later date?

24           MR. SCHMIDT:  Objection, vague.

25           THE COURT:  Sustained.
```

```
 1            BY MR. RAFFERTY:

 2    Q.   When discovered?

 3            MR. RAFFERTY:  Okay, I'm sorry.  All right.  Let's

 4    just go on.

 5            BY MR. RAFFERTY:

 6    Q.   The letter -- you received the letter and you read this

 7    letter, correct, sir?

 8    A.   Not this particular example, no, but I received a

 9    letter similar.

10    Q.   A copy?

11    A.   A different copy, yes.

12    Q.   Okay.  And if we keep going down, you'll also see it

13    says filing a monthly report of completed transactions,

14    e.g., an excessive purchase report, or high unit purchases

15    does not meet regulatory requirement to report suspicious

16    orders.  Do you see that?

17    A.   Just give me a minute to read that.

18    Q.   Yeah.  It's just the sentence right after.

19    A.   Yes.  That's what it stated here.

20    Q.   Okay.  And then the DEA goes on and says registrants

21    must conduct an independent analysis of suspicious orders

22    prior to completing a sale.  Do you see that?

23    A.   Yes, to determine if it's likely to be diverted.

24    Q.   And that's what was supposed to happen through the CSMP

25    process, correct, that independent analysis?
```

1    **A.**    The CSMP process was to identify suspicious orders.

2    **Q.**    And to go through the level -- the three-level process,

3    correct?

4    **A.**    Yes.  Once identified as suspicious, it would go

5    through the three-level process.

6    **Q.**    Right.  And then it says -- the last sentence of that

7    report, reporting an order as suspicious will not absolve

8    the registrant of responsibility if the registrant knew, or

9    should have known, that the controlled substances were being

10   diverted.  Do you see that?

11   **A.**    Yes.  If we identified an order as being diverted, we

12   would have blocked it.  There's a difference between

13   diversion and suspicious orders.

14   **Q.**    I'm sorry.  Say that again, sir.

15   **A.**    I said if we identified an order as potential

16   diversion, we would block that order, and that there's a

17   difference between a diverted order and a suspicious order.

18   **Q.**    Right.  Once you identified it, you had -- once you

19   identified it as suspicious, you had an obligation to report

20   it as such, correct?

21          MR. SCHMIDT:  Object to characterization, Your

22   Honor.  That's not what he testified to.

23          MR. RAFFERTY:  Well, I -- he --

24          THE COURT:  Wait a minute.

25          MR. SCHMIDT:  Your Honor, I might have actually --

```
1    the question in my head, I think I mis-heard what he said.

2    I'll withdraw that.

3              THE COURT:  All right.  Go ahead.

4              BY MR. RAFFERTY:

5    Q.   Once you -- once -- so, I mean -- see if I can re-state

6    it.  Once you identified an order as suspicious, you then

7    have the obligation to report the order, correct?

8    A.   Yes, report the suspicious order.

9    Q.   Okay.  One of the things that was referenced in the

10   CSMP was this policy of Know Your Customer.  Are you

11   familiar with that policy?

12   A.   Ys, I am.

13   Q.   Okay.  And, in fact, that was something that was -- was

14   in the CSMP, was the obligation for McKesson to know your

15   customer and, in fact, your customer's customer; true?

16   A.   We -- would know our customer by doing due diligence

17   and then I know the phrase know your customer's customer did

18   come out during some time.

19   Q.   Okay.  I would like to show you now what is identified

20   as P-12814, sir.

21             MR. RAFFERTY:  May I approach, Your Honor?

22             THE WITNESS:  Thank you.

23             MR. RAFFERTY:  May I proceed, Your Honor?

24             BY MR. RAFFERTY:

25   Q.   This appears to be an e-mail from Donald Walker.  Who
```

```
1    is Donald Walker?

2    A.    Don Walker was the Senior Vice President over

3    Regulatory Affairs.  He was my boss.

4    Q.    Okay.  And during what time period was he your boss?

5    A.    He would have been my boss somewhere in 2008 while one

6    boss took ill.  So, Don took over the team.  So, from like

7    2008 through when Don left the company, and I'm not sure

8    exactly what year he left.

9    Q.    Okay.

10   A.    I'm sorry.

11   Q.    And this is dated May 2nd, 2012.  Do you see that?

12   A.    Yes.

13   Q.    So, this was approximately four years after the CSMP

14   was implemented by McKesson; is that true?

15   A.    Yes.

16   Q.    And in the to-line, it's got Dave Gustin, Tom McDonald,

17   Bill Mahoney, Michael Oriente.  That's you, correct?

18   A.    Yes.

19   Q.    And others.  Are those other Regulatory Affairs

20   personnel?

21   A.    Yes, they all are.

22   Q.    Okay.  And the subject line is Know Your Customer.  Do

23   you see that?

24   A.    Yes, I do.

25   Q.    And it says, on Monday, I will be making a presentation
```

```
1    to the ISMC sales force at NSC around Know Your Customer.

2    This is intended to be an awareness awakening session that

3    we as a regulatory team will follow up on during the

4    upcoming year.  Do you see that?

5    A.   Yes.

6    Q.   Okay.  And is that the type of thing that would

7    typically be sent to you by Mr. Walker or other Regulatory

8    Affairs people, PowerPoints and such, for presentations?

9    A.   At different times, we would communicate, yes.

10   Q.   Okay.

11             MR. RAFFERTY:  At this time, Your Honor, we would

12   move in P-12814.

13             THE COURT:  Any objection to that one?

14             MR. SCHMIDT:  We don't object to the cover e-mail.

15   The PowerPoint with it seems to have at least some embedded

16   hearsay that I haven't had a chance to study.  So, if we can

17   just preserve our ability to object to that.

18             MS. HARDIN:  Your Honor, on behalf of Cardinal, we

19   object as to hearsay and note our exception as to Cardinal.

20             THE COURT:  Mr. Nicholas?

21             MR. NICHOLAS:  We join in the objection as stated

22   by Ms. Hardin.

23             THE COURT:  Are you objecting to the whole thing,

24   Ms. Hardin, or just the PowerPoint presentation?

25             MS. HARDIN:  The entire thing, Your Honor.  It
```

1    appears to be an internal McKesson document that would not

2    be an admission by Cardinal, nor would it be notice to

3    Cardinal.

4           MR. SCHMIDT:  Your Honor, I'm assuming -- there

5    have now been several objections on behalf of Cardinal only.

6    I'm assuming that documents that come into evidence as to

7    one party don't come in for notice as to another party.  How

8    could they possibly do so?

9        Obviously, the Cardinal documents don't come in for

10   notice as to us, don't come in for notice as to ABDC.  I am

11   fine if Cardinal wants to keep making those objections, but

12   I just want it clear that the same principle applies to

13   every single party.  You can't use one party's documents as

14   notice against another.

15          THE COURT:  I think that's right and I can make

16   that as a standing ruling for the whole shebang.

17          MR. SCHMIDT:  Thank you, Your Honor.

18          MS. HARDIN:  That's fine, Your Honor.  Thank you.

19          MR. RAFFERTY:  And we would -- and we agree, Your

20   Honor.  We're just offering these against McKesson.

21          THE COURT:  All right.

22          MR. ACKERMAN:  With respect to the --

23          THE COURT:  You've got a --

24          MR. ACKERMAN:  I'm sorry, Your Honor.  You were

25   looking down, so I wanted to make sure that you saw me.

```
 1              THE COURT:  Well, I will be happy to hear from

 2     you, Mr. Ackerman.

 3              MR. ACKERMAN:  Sure.  So, with respect to the

 4     hearsay, Your Honor, let's look at 801(d), as in dog, 2(B),

 5     as in boy, and d as in dog.

 6              THE COURT:  Run that by me again.  801(d) --

 7              MR. ACKERMAN:  We'll start with d, as in dog.

 8              THE COURT:  801(d)(2)(D)?

 9              MR. ACKERMAN:  Correct, yes.

10              THE COURT:  Was made by the party's agent or

11     employee on a matter within the scope of that relationship

12     and while it existed.

13              MR. ACKERMAN:  So, the presentation was made by a

14     McKesson employee.  To the extent Mr. Schmidt has referenced

15     embedded hearsay, I would refer the Court to 801(d)(2)(B),

16     as in boy, because McKesson has adopted those statements by

17     incorporating them into the presentation.

18              MR. SCHMIDT:  And, Your Honor, it's not -- I don't

19     think it's a correct reading of the rule that anything

20     someone quotes, if they say, hey, I heard this on the

21     street, or I heard this in an article, or I heard this

22     wherever, that that becomes an adopted statement.  That's

23     not the purpose of the rule to say that anything someone

24     repeats overcomes hearsay.  Embedded hearsay always remains

25     an issue.
```

```
 1              MR. ACKERMAN:  Well, Your Honor, this is a
 2   presentation that the cover e-mail states they are providing
 3   to the sales force intended to be an awareness awakening
 4   session.  So, I think it's a little more than just merely an
 5   employee repeating something.  It was an employee
 6   incorporating statements so in order to educate other
 7   members of the ISMC sales force.
 8              THE COURT:  Do you want to say anything else, Mr.
 9   Schmidt?
10              MR. SCHMIDT:  I'm looking for the rule on embedded
11   hearsay, which I think is 805.  805 recognizes that hearsay
12   within hearsay remains an issue notwithstanding that the
13   overall document itself may not be hearsay.  So, 805 trumps
14   the provision that Mr. Ackerman is citing.
15              MR. ACKERMAN:  To be clear, Your Honor, there are
16   two exceptions to the two levels of hearsay.  The first
17   would be 801(d)(2)(D), as in dog.  It would be a statement
18   by an employee.
19        To the extent there is hearsay within hearsay, those
20   statements would not be hearsay pursuant to 801(d)(2)(B), as
21   in boy, because this employee and McKesson itself has
22   adopted the statement or manifested that they believed them
23   to be true.
24              THE COURT:  All right.  I'm going to admit it,
25   overrule the objection and admit it.
```

```
 1          Go ahead, Mr. Rafferty.

 2               MR. RAFFERTY:  Thank you, Your Honor.

 3               MR. RAFFERTY:  Thank you, Mr. Ackerman.

 4               MR. ACKERMAN:  You're welcome.

 5               BY MR. RAFFERTY:

 6     Q.   If we could, let's turn to Tab -- or let's actually

 7     finish the cover letter.  So, do you recall getting this

 8     particular PowerPoint, sir, the Know Your Customer?

 9     A.   Yes.  I remember receiving this e-mail.

10     Q.   Okay.  And did you ever have a conversation with Mr.

11     Walker about why it is four years after the CSMP is in place

12     there needs to be an awakening session?  Did you ever have a

13     conversation with him about that?

14     A.   Not specifically to that.  This would have been

15     training and additional -- additional training given to the

16     sales team to give them the latest directions regarding

17     knowing your customer.

18     Q.   Okay.  And if we turn to Page 5, Mr. Oriente, sir,

19     please, it's got a description that says CDC currently

20     classifies prescription drug abuse as an epidemic.  Do you

21     agree with that, sir, at that time period?

22     A.   That's -- that's the way I understood the CDC is

23     classifying it, yes.

24     Q.   And you understand there is an opioid epidemic in the

25     United States even today?
```

```
 1              MR. SCHMIDT:  Objection.  Vague as to what he's
 2      talking about.  We were just asking about prescription drugs
 3      as opposed to other forms of opioids.
 4              THE COURT:  Sustained.
 5              BY MR. RAFFERTY:
 6      Q.   Do you agree that there's -- I wasn't trying to tie the
 7      two together.  Do you agree that there is an opioid epidemic
 8      in America, setting aside the same document?
 9              MR. SCHMIDT:  I think that's the literal same
10      question that was just asked.
11              MR. RAFFERTY:  I'm setting the document aside for
12      a second, Your Honor, and I'm just asking the question and
13      then I will get back to the document.
14              THE COURT:  Well, you're talking about now?
15              MR. RAFFERTY:  Yes.
16              MR. SCHMIDT:  And our objection is the same.  It's
17      vague as to what he's talking about, whether it's heroin or
18      prescription opioids.
19              MR. RAFFERTY:  I'll rephrase it, Your Honor.
20              THE COURT:  Okay.
21              BY MR. RAFFERTY:
22      Q.   It goes on and says -- well, it says CDC currently
23      classifies prescription drug abuse as an epidemic.  And this
24      is in 2012.  Do you have an understanding as to whether
25      there is still a prescription drug abuse epidemic in the
```

1    United States?

2    **A.**   The -- my understanding is that the prescription drug

3    abuse epidemic has declined significantly in the last few

4    years.

5    **Q.**   So, you do not think that there is a prescription drug

6    epidemic in the United States today; is that your testimony,

7    sir?

8    **A.**   Not as much as a few years ago, no.  Today, it's

9    illicit Fentanyl and heroin.

10    **Q.**   27,000 died from prescription drug overdoses in 2007, a

11    five-fold increase since 1990.  Do you see that?

12    **A.**   Yes, in those time frames.

13    **Q.**   Do you have any reason to disagree with that statement,

14    sir?

15    **A.**   I do not.

16    **Q.**   Okay.  Now, if you'll turn to Page 13, sir.

17    **A.**   (Witness complies).

18    **Q.**   Are you there, sir?

19    **A.**   Yes, I am.

20    **Q.**   Okay.  All right.  Your Role in Knowing Your Customer.

21    Prospective customers understand pharmacy business models.

22    Do you see that?

23    **A.**   Yes.

24    **Q.**   And one of the things in understanding that first

25    bullet point underneath, percentage of business, scripts

```
 1    filled, that are controlled substances.  Do you see that?

 2    A.   Yes, I do.

 3    Q.   And then underneath it, it's got volume of critical

 4    drugs and it lists out oxycodone and hydrocodone and

 5    Alprazolam.  And then -- do you see that?

 6    A.   Yes, I do.

 7    Q.   Okay.  Percent cash sales for controlled drugs.  Do you

 8    see that?

 9    A.   Yes, I do.

10    Q.   Are these somewhat what's referred to sometimes as red

11    flags to look for?

12    A.   Yes, they would be.

13    Q.   Okay.  Pain clinics as a source of prescriptions, is

14    that -- would that be considered a red flag?

15    A.   It could be, yes.

16    Q.   Let's see.  Out of area scripts -- average pharmacy

17    serves 5-7 mile radius.  Do you see that?

18    A.   Yes, I see that.

19    Q.   And that would be a red flag, too, correct?

20    A.   It would depend on the geographic area.  More rural

21    areas would travel greater distances than in the city.

22    Q.   But one of the things that McKesson wants to look for

23    in determining -- in understanding its customers' business

24    model would certainly be whether or not people are traveling

25    from out of the area to fill their prescriptions there,
```

1    correct?

2    **A.**    Yes.  They'd want to know that 5-7 miles is an average.

3    **Q.**    Okay.  And then, Observe, volume of controls relative

4    to demographics.  Do you see that?

5    **A.**    Yes, sir.

6    **Q.**    So, that would be looking to see how many pills were

7    going into a particular pharmacy based upon the demographics

8    of that area, correct?

9    **A.**    Yes, that is correct.

10   **Q.**    And then, it says -- if you turn to the next page, sir,

11   under Current Customers, recognizing changes in pharmacy's

12   business.  Regular increases in purchases of controlled

13   substances.  Do you see that?

14   **A.**    Yes, I could.

15   **Q.**    So, if a pharmacy continually, you know, monthly or

16   every other month continues to go up in the number of

17   controlled substances it's filling in prescriptions, that

18   would be a potential red flag?

19            MR. SCHMIDT:  Objection.  Mischaracterizes the

20   document.

21            MR. RAFFERTY:  I was asking what his understanding

22   was.

23            THE COURT:  Overruled.

24            BY MR. RAFFERTY:

25   **Q.**    Mr. Oriente?

1    **A.**   I'm sorry.  What was the question?

2    **Q.**   Well, I don't want to speak for His Honor.  I thought

3    he overruled.

4              THE COURT:  Do you want to re-state the question?

5              MR. RAFFERTY:  Yes, sir.

6              BY MR. RAFFERTY:

7    **Q.**   So, if a pharmacy customer of McKesson's continues to

8    go up in volume of controlled substances on a regular basis,

9    that is a potential red flag to your understanding; is that

10   correct?

11   **A.**   It could be one.  As prescriptions increased being

12   written, and those prescriptions would go to a pharmacy, so

13   the pharmacy would be receiving additional prescriptions

14   written by a prescriber, their amount that they're

15   purchasing to meet those prescriptions could go up.  So,

16   just regular increases, again, is not always a sign that

17   there's diversion.

18   **Q.**   Okay.  And if we look at Page 7, sir, of this

19   PowerPoint, the left box says -- I'm sorry.  Are you there?

20   **A.**   Not yet.  Sorry.

21   **Q.**   I'll try to wait for you --

22   **A.**   Okay, I'm there.

23   **Q.**   -- before the next question.  It says, know your

24   customer and your customer's customer.  That's what we were

25   talking about earlier, correct?

**A.**    Yes.

**Q.**    And your customer's customer would be, for example, the

doctors that are writing the prescriptions, correct?

**A.**    Not necessarily.  They're not the customer of the

pharmacy.  They would be the prescriber.  Customer of the

customer is the individual that's getting that prescription.

**Q.**    Okay.  But do you also want to know, for example, who

the doctors are that are prescribing the drugs that are

being filled at the pharmacy?

**A.**    Yes.  We would request prescriber information when

necessary.

**Q.**    Okay.  And then it goes on.  And I'm not going to go

through this, but it basically goes on to say monitor, block

and report in the next three boxes; is that correct?  And we

talked about that earlier.

**A.**    Yes, sir.

**Q.**    Okay.  And then, finally on this document, if you would

turn to Page 6, it says, How the DEA Sees It.  The illicit

pain clinics, the pharmacies that fill their scripts, and

the wholesale distributors -- and that would be McKesson,

correct, the wholesale distributors?

        MR. SCHMIDT:  And this is -- this is what we were

objecting to as embedded hearsay.  This might be the same

language from the December letter that you just used.  I

don't know if it is, but we would just ask that it only come

1    in for purposes of notice.

2            MR. RAFFERTY:  Yes.  That's all we're offering it

3    for, Your Honor.

4            THE COURT:  All right.  Well, I'll sustain the

5    objection and it comes in only for the limited purpose.

6            MR. RAFFERTY:  Okay.  Thank you, Your Honor.

7            BY MR. RAFFERTY:

8    **Q.**   So, I'm sorry.  I'm just going to start over just so I

9    orient myself.  The illicit pain clinics, the pharmacies

10   that fill their scripts, and the wholesale distributors who

11   supply pharmacies, that would be McKesson would be one of

12   those, correct?

13   **A.**   McKesson is a wholesale distributor, yes.

14   **Q.**   Wholesale distributors who supply pharmacies without

15   appropriate due diligence have caused, and continue to

16   cause, millions of dosage units of oxycodone and other

17   controlled substances to be diverted and pose an imminent

18   threat to the public health and safety.  Do you see that?

19   **A.**   Yes.

20           MR. SCHMIDT:  Objection here, Your Honor.  I

21   apologize.  Our objection here, Your Honor, is this is a

22   snippet from a letter from Mr. Rannazzisi.  He is going to

23   be here as a witness to testify, we've been told, and

24   there's a suggestion that he's drawing a conclusion as to

25   cause without it being clear as to who it is or --

```
 1              THE COURT:  Yeah.  That's sustained, Mr. Rafferty.
 2              MR. RAFFERTY:  Well, if I could, just for the
 3   record, Your Honor, that I think it was admitted, and it was
 4   admitted for notice, and I think this statement, which as
 5   Mr. Ackerman said --
 6              THE COURT:  Well --
 7              MR. RAFFERTY:  It goes to the notice as to what
 8   the wholesale distributor's responsibilities are and what
 9   can result if they do not engage in those responsibilities
10   according to the DEA.  So, I think, based upon your prior
11   ruling, sir, that it would -- it is admissible for the
12   limited purposes of notice.
13              MR. SCHMIDT:  At best, it is an opinion from
14   someone who will be here as a witness has also stated in an
15   earlier letter, I think, and just about everybody is
16   following along.
17              THE COURT:  Yes.  This goes beyond the -- in my
18   view, the notice situation, and it's -- it's an opinion of
19   Mr. Rannazzisi and I sustain the objection.
20              MR. RAFFERTY:  Your Honor, once again --
21              THE COURT:  Go ahead, Mr. Rafferty.  If you want
22   to put something on the record, you have the right to do
23   that.
24              MR. RAFFERTY:  Yeah.  I'm sorry, Your Honor.  Just
25   for the record, this is from the Senior Vice President
```

1    telling the other employees and putting that statement out

2    there and, therefore, there is an indicia of reliability.

3    They adopted it.  And for simple purposes of notice, I

4    believe it qualifies and is not -- is not following the

5    hearsay --

6            THE COURT:  Your objection is shown for the

7    record.  I think it goes beyond that.  It's a very -- well,

8    it's an opinion of a DEA agent and I'm going to sustain the

9    objection.

10           MR. RAFFERTY:  Thank you, Your Honor.

11           THE COURT:  The exhibit is in, but the Court is

12   not going to consider that one panel for anything at this

13   point.

14           MR. RAFFERTY:  Thank you for the clarification,

15   Your Honor.

16           BY MR. RAFFERTY:

17   Q.   I want to now show what's been marked as 16210.  I

18   don't know why.  These are very slippery.  Thank you very

19   much.

20        Do you have it?

21   A.   Yes, I do.

22           MR. RAFFERTY:  May I proceed, Your Honor?

23           THE COURT:  Yes, please.

24           BY MR. RAFFERTY:

25   Q.   Who is -- this appears at the top to be a document --

1    if you look at the corner, it says McKesson with their logo.

2    Do you see that?

3    **A.**   Yes.

4    **Q.**   And it says McKesson -- down at the bottom, it says

5    McKesson Corporation privileged and confidential.  For

6    internal use only.  Do you see that?

7    **A.**   Yes, I do.

8    **Q.**   Who was Gary Boggs?

9    **A.**   Gary Boggs, at the time of this document -- documents

10   excuse me -- presentation was a consultant to McKesson.

11   **Q.**   Okay.  And do you know what his background is, who he

12   is?

13   **A.**   Yes.  He then became a Vice President of Regulatory

14   Affairs for McKesson and, prior to that, he was with the DEA

15   for many years.

16   **Q.**   Okay.  And do you recall this presentation or

17   PowerPoint?

18   **A.**   Yes, I do.

19           MR. RAFFERTY:  And at this point -- at this time,

20   Your Honor, we would tender P -- I'm sorry -- P-16210.

21           MR. SCHMIDT:  Your Honor, we'll object on -- it's

22   rife with hearsay and it's got geographic scope issues.  And

23   I think I'll do this as it comes in, but the use that's been

24   made previously of this is unduly prejudicial.

25           THE COURT:  Do you want to respond to that?

```
1              MR. RAFFERTY:  Well, I see Mr. Ackerman standing
2    up, so I think he wants to.
3              MR. ACKERMAN:  I'm happy to do it, Your Honor.  We
4    can start with hearsay and it's the same analysis we went
5    through with the other presentation, Your Honor.  This is a
6    statement made by the party's agent or employee on a matter
7    within the scope of that relationship and while it existed.
8    That's 801(d)(2)(D).
9              THE COURT:  Well, what about all the hearsay
10   within the hearsay, like here, the 6.8 million Americans
11   prescription drug abuse in 2012?
12             MR. ACKERMAN:  So, I would -- I would have two
13   responses to that, Your Honor.  First of all, those were
14   statements that were incorporated into a presentation to
15   McKesson by its consultant that indicates a manifestation
16   that they believe the statements to be true.  Even if they
17   did not, they can be admitted for notice to McKesson.  It
18   demonstrates the company's knowledge of the facts contained
19   within the presentation.
20             MR. SCHMIDT:  And, Your Honor, I don't -- I
21   apologize.
22             MR. ACKERMAN:  Let me just finish addressing all
23   of them.  With respect to the geographic scope, Your Honor,
24   I would note that both Page 24 and Page 36 of the
25   presentation have -- say things like a national epidemic and
```

1    fixing a national problem.  So, we believe this document is

2    national in scope and not limited to one geography or

3    another.

4              MR. SCHMIDT:  And, Your Honor, our basic point is

5    that -- let me give an example.  Page 16 of this document.

6    That just because we have a consultant come in to give a

7    presentation doesn't mean that everything he uses is

8    adopted.

9         The left side of Page 16 is a -- looks like a Hollywood

10   movie photo he's using to illustrate a point.

11        The right side, they've used with a number of our

12   witnesses.  It's never been linked to a McKesson pharmacy.

13   There's imagery in here, Page 19, which feature body bags

14   from some crisis to illustrate a point he's making about

15   deaths.  Those -- that image has nothing to do with

16   prescription opioids.  There was never a horrifying pile of

17   those body bags.

18        And then, just continuing through, it's rife with

19   hearsay.  Reports from the DEA about actions in New York.

20   Reports in the DEA -- from the DEA about actions in Tampa.

21   Reports from the DEA about a doctor in Philadelphia.  That's

22   core hearsay.

23              THE COURT:  It's out.

24              MR. ACKERMAN:  Your Honor --

25              THE COURT:  The objection is sustained.

1          MR. ACKERMAN:  May I make a record, please, Your

2     Honor?

3          THE COURT:  Yes, you may.

4          MR. ACKERMAN:  So, with respect to the prejudicial

5     argument, I would note that the Fourth Circuit has

6     determined that the likelihood of prejudice in a bench trial

7     is low because the Court -- because the purpose of that rule

8     is to prevent a jury from being unfairly prejudiced and the

9     Court is confident, as are we, that a judge will be able to

10    balance the factors one way or another.

11         And I would refer the Court to *Schultz v. Butcher* at 24

12    F.3d 626, Page 632, which is a Fourth Circuit opinion from

13    1994.  And I believe I already addressed the hearsay.  Even

14    without the hearsay, it is admissible as notice to McKesson

15    of the facts contained within the presentation.

16         THE COURT:  Can I ask who wrote that opinion in

17    1994?

18         MR. ACKERMAN:  That, I don't have, Your Honor, but

19    I'll look it up and give it to you at the break.

20         THE COURT:  Well, that's okay.  I was just

21    curious.

22         I'm going -- I'm to sustain the objection.  I think

23    there's all kinds of hearsay in here.  I think it is

24    prejudicial.  I think, insofar as it's relevant, the danger

25    of unfair prejudice outweighs its relevancy and I realize

```
1    this is a bench trial and I can probably sort it out, but I
2    -- there's just so much in here that is just rank hearsay
3    and I'm going to keep it out.  The objection is sustained.
4              MR. RAFFERTY:  Your Honor --
5              THE COURT:  Yes, Mr. Rafferty?
6              MR. RAFFERTY:  If I could, I think, I mean,
7    obviously, we stand on our record and we think the whole
8    thing should come in, but there's two pages, quite frankly,
9    that Mr. Boggs wrote in these two PowerPoint slides.  One is
10   on Page 37, sir, and one is on Page 46.
11        And those are not inflammatory.  They're not
12   prejudicial.  They're from Mr. Boggs, the author of the
13   document, and who is a paid consultant.  So, it's not
14   hearsay under 801(d)(2)(D).
15             THE COURT:  37 and 46?
16             MR. RAFFERTY:  37 and 46, yes, sir.
17             THE COURT:  And those are statements by Mr. Boggs?
18             MR. RAFFERTY:  He's the author of the PowerPoint,
19   yes, sir.
20             THE COURT:  Okay.  Mr. Schmidt, what about that?
21             MR. SCHMIDT:  If he wants to use just those
22   statements for the limited purpose of notice that a
23   consultant came in and made those statements, we don't
24   object to that.
25             THE COURT:  All right.  I'll admit -- I'll admit
```

1    those two pages, exempting them from my prior ruling that

2    this is inadmissible, and I will admit those two pages for

3    the limited purpose of notice.

4         You may proceed.

5              MR. RAFFERTY:  I hate to be a stickler, but is it

6    okay if I put the cover page in, too, just so it's clear

7    what it is?

8              MR. SCHMIDT:  No objection to that, Your Honor.

9              THE COURT:  Okay.  I'm looking for some hearsay on

10   it and I don't see any.

11             MR. RAFFERTY:  All right.  So, we will then create

12   an Exhibit, 851-A.  I'm sorry.

13             THE COURT:  Mr. Rafferty, my able law clerk has

14   informed me that Judge Chapman wrote that opinion.

15             MR. RAFFERTY:  Okay.

16             THE COURT:  And many, many years ago, I had the

17   pleasure to sit with him over there a time or two.

18             MR. RAFFERTY:  Well, good.

19        So, I'm sorry.  We'll go ahead and create a new exhibit

20   at the break that will be admitted as P-16210A, with just

21   those three pages, while also stating on the record as to

22   the admissibility of the entire deck.

23             THE COURT:  All right.  So, those are the three

24   pages I admitted?

25             MR. RAFFERTY:  Yes, sir.

```
 1              THE COURT:  And you want to make a new exhibit
 2      just to clean it up the record?
 3              MR. RAFFERTY:  Right.  And that way, we've
 4      proffered the entire as to P-16210 and that's been kept out.
 5              THE COURT:  All right.
 6              MR. RAFFERTY:  And P-16210A will be --
 7              THE COURT:  You new exhibit will be admitted --
 8              MR. RAFFERTY:  Okay, thank you.
 9              THE COURT:  -- for the limited purpose stated.
10              MR. RAFFERTY:  Okay.
11              BY MR. RAFFERTY:
12      Q.   All right.  Mr. Oriente?
13      A.   Yes.
14      Q.   Sorry.  If you could, turn to Page 37, please, in that
15      PowerPoint.
16      A.   Okay.
17      Q.   And it says distributors have great power individually
18      and collectively.  Do you see that?
19      A.   Yes.  That's what's written here.
20      Q.   Your DEA registration; ensure timely distribution to
21      prevent an uninterrupted supply; and you control the supply
22      to downstream customers.  Do you see that?
23      A.   Yes, I do.
24      Q.   Do you agree with that, that the distributors have
25      great power?
```

1    **A.**    I wouldn't phrase it that way.  What I would say is

2    that the distributors play a role in the distribution of the

3    closed supply chain and great power is the way he phrased

4    it.  I wouldn't phrase it that way.

5    **Q.**    So, you disagree with Mr. Boggs?

6    **A.**    Just in the great power.  I wouldn't -- you know, I

7    wouldn't categorize the responsibility and the role we play

8    as great power.

9    **Q.**    Okay.  If you would now please turn to Page 46, sir.

10   Just let me know when you're there.

11   **A.**    Okay.

12   **Q.**    And this particular slide says what else impacts

13   diversion, question mark.  Do you see that?

14   **A.**    Yes, I do.

15   **Q.**    And it says compliance with several exclamation points

16   after that.  Do you see that?

17   **A.**    Yes.

18   **Q.**    And that would be compliance with the Controlled

19   Substances Act?

20   **A.**    That would be my interpretation, yes.

21   **Q.**    To your understanding?  I'm sorry.

22   **A.**    Yes.

23   **Q.**    I should have qualified that.  And then underneath it,

24   it says the checks and balances created by the Controlled

25   Substances Act work.  Registrants are a force-multiplier.

```
 1    And McKesson is a registrant, correct?
 2    A.    Yes.  McKesson is a DEA registrant.
 3    Q.    Okay.  Without sustained sources of supply, major
 4    diversion schemes wither away.  Do you agree with that?
 5    A.    Yes, I would.
 6    Q.    You can set that one aside.
 7    A.    All right.  Thank you.
 8    Q.    You understand when you took your position as Director
 9    of Regulatory Affairs, McKesson was finalizing a Settlement
10    Agreement with the DEA, correct?
11    A.    Yes, it was.
12    Q.    And that settlement related to violations of the CSA by
13    McKesson; true?
14              MR. SCHMIDT:  Object to characterization, Your
15    Honor.
16              THE COURT:  Sustained.
17              BY MR. RAFFERTY:
18    Q.    During this same time period, McKesson was launching
19    the CSMP that we talked about earlier; true, 2008?
20    A.    Yes.  The CSMP was launched in 2008.
21    Q.    And you know that the CSMP was implemented as a result
22    and function of that settlement with DEA and McKesson,
23    correct?
24    A.    I believe it was, yes.
25    Q.    So, making -- creating the CSMP wasn't something that
```

1    you came up with -- McKesson.  When I say you, I mean

2    McKesson came up with on their own?  It was part of the

3    negotiation with the DEA; true?

4    **A.**   I wouldn't know the specific reasons.  You know, I

5    wasn't at that highest level to create the program, so I --

6    I don't know the exact reason of -- and it may have been one

7    of the reasons, yes.

8    **Q.**   Okay.  I want to hand you what's been marked for

9    purposes of identification, sir, as P-23733?

10   **A.**   Thank you.  Yes.

11   **Q.**   Are you there?  Okay.  At the top, it says Settlement

12   and Release Agreement and Administrative Memorandum of

13   Agreement.  Do you see that?

14   **A.**   Yes, I do.

15   **Q.**   And if you'd turn to Page 18, sir, and just let me know

16   when you're there.

17   **A.**   Yes, sir.

18   **Q.**   Okay.  You'll see that this is signed by John

19   Hammergren as President?

20   **A.**   Yes.

21   **Q.**   Okay.  And his signature is dated April 28th, 2008,

22   correct?

23   **A.**   Yes.

24   **Q.**   And then also, Donald Walker, Donald G. Walker, I

25   should say, Senior Vice President, and his signature is

1    dated April 30th, 2008.  Do you see that?

2    **A.**   Yes, I do.

3    **Q.**   So, this is signed by both the President and the Senior

4    Vice President at the time of McKesson, Corp.;  true?

5    **A.**   Yes.

6         MR. RAFFERTY:  At this time, Your Honor, we would

7    move to admit 23733.

8         MR. SCHMIDT:  And, Your Honor, we'll renew the

9    objection we made pretrial and that's been made throughout

10   trial, which is this is inadmissible under 403 and it is

11   simply allegations with no acceptance of responsibility, but

12   also geographic scope because it relates to facilities that

13   did not primarily supply to Huntington-Cabell.

14        THE COURT:  Mr. Rafferty, do you want to respond

15   to that?

16        MR. RAFFERTY:  Yeah.  This is the -- these are the

17   settlements, this one, and then there was a 2017 settlement

18   that was a subject of the motions in limine that Your Honor

19   ruled on pretrial as to their admissibility, agreeing with

20   Judge Polster as to their admissibility and going to notice

21   and is not hearsay.

22        THE COURT:  Mr. Ackerman, we haven't heard from

23   you here.

24        MR. ACKERMAN:  Always happy to jump in, Your

25   Honor.  Well, I would refer you --

```
 1              MR. RAFFERTY:  I didn't convince you?
 2              MR. ACKERMAN:  I would refer the Court to
 3    801(d)(2)(B), as in broccoli.  A statement the party adopted
 4    or believed to be true is our settlement and release
 5    agreements, memorandum of agreements, that are signed by
 6    McKesson.
 7              MR. SCHMIDT:  Yeah.  And under that grounds, I
 8    think it especially stays out.  It says this agreement is
 9    neither an admission by McKesson of liability or of any
10    allegations made by DEA in the orders and investigation.
11              MR. ACKERMAN:  It's evidence that the allegations
12    were made, Your Honor.
13              THE COURT:  I'll overrule the objection and admit
14    it.
15              MR. RAFFERTY:  Thank you, Your Honor.
16              BY MR. RAFFERTY:
17    Q.   And, in fact, you received a copy of this Settlement
18    Agreement?
19    A.   Yes, I did.
20    Q.   Okay.  So, you're familiar with this Settlement
21    Agreement, correct?
22    A.   Somewhat familiar, yes.
23    Q.   In fact, if I'm not mistaken, you had a two-day meeting
24    with you and the other Regulatory Affairs -- Regulatory --
25    Regulatory Affairs folks at McKesson about this particular
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    settlement, correct?

 2    A.    I don't recall that exact meeting, no.

 3    Q.    Okay.  All right.  Before we go there, I would like you

 4    to turn to Page 13, sir.

 5    A.    Okay.

 6    Q.    Oh, I'm sorry.  Before we do that, go back to Page 1.

 7    I'm sorry.  I don't mean to make you flip back and forth.  I

 8    just want to make sure I get this all straight.

 9          So, this was -- this was the Settlement Memorandum of

10    Agreement in May -- on May 2nd, 2008, correct?

11    A.    Yes.  That's what it has here.

12    Q.    And this was a -- this was in a settlement involving

13    conduct that would be applicable -- or strike that.

14    Applicability, let's just read it.  Applicability -- an

15    agreement shall be -- this agreement shall be applicable to

16    McKesson and all McKesson DEA registered facilities as

17    identified in Appendix A.  Do you see that?

18    A.    Yes.  That's what's written here.

19    Q.    Okay.  So, this was a national settlement; true?

20          MR. SCHMIDT:  Object to characterization and

21    inconsistent with the document.

22          THE COURT:  Sustained.

23          BY MR. RAFFERTY:

24    Q.    All right.  Now, we can turn to the Tab -- let's see.

25    Wait one second.  Point 5.  Do you see that?  Are you there?
```

1    **A.**   On what page?

2    **Q.**   I'm sorry.  5.

3    **A.**   Oh, yes.

4    **Q.**   Okay.  And under (h), McKesson had agreed to pay civil

5    penalties under certain statutes in the amount of 13.25

6    million in settlement claims or potential claims made by the

7    United States of America for failing to report suspicious

8    orders of controlled substances and for failing to report

9    thefts or significant losses of controlled substances.

10            THE COURT:  I think I'm confused about the page

11   here, Mr. Rafferty.

12            MR. RAFFERTY:  Oh, I'm sorry, Your Honor.  It's

13   Page 5, (h) at the top right here.  Right here, Your Honor.

14   Page 5.

15        Did I give you a bad copy?

16            THE COURT:  Oh, you're looking at the -- well, go

17   ahead.  Go ahead.

18            MR. RAFFERTY:  Okay.

19            THE COURT:  I don't have it, but it's all right.

20   Go ahead.

21            MR. RAFFERTY:  All right.  I'm sorry, Your Honor.

22            BY MR. RAFFERTY:

23   **Q.**   Do you see that?

24   **A.**   Yes, I do.

25   **Q.**   Okay.  And then, if you go to Page 3 --

1          MR. RAFFERTY:  I feel like I may have given some

2     bad copies.  I see people flipping around trying to find it.

3          Good?  Okay.  All right.  I just wanted to make sure.

4          May I proceed, Your Honor?

5          THE COURT:  Yes.

6          By MR. RAFFERTY:

7     **Q.**   So, if we look at (h) -- or, I mean, I'm sorry, (2),

8     terms and conditions, obligations of McKesson, and it says

9     there McKesson agrees to maintain a compliance program

10    designed to detect and prevent diversion of controlled

11    substances as required under the CSA and applicable DEA

12    regulations.  Do you see that?

13    **A.**   Yes, I do.

14    **Q.**   Okay.  And this program shall include procedures to

15    review orders for controlled substances.  Orders that exceed

16    established thresholds and criteria will be reviewed by a

17    McKesson employee trained to detect suspicious orders for

18    the purpose of determining whether such orders should be not

19    filled and reported to the DEA or, based on a detailed

20    review, the order is for a legitimate purpose and the

21    controlled substances are not likely to be diverted into

22    other than legitimate medical, scientific, or industrial

23    channels.  Did I read that correctly?

24    **A.**   Yes, you did.

25    **Q.**   And that's -- this is the time period when McKesson

1   then was creating the CSMP in order to try and comply with

2   this agreement; is that your understanding?

3   **A.**   That is my understanding.

4   **Q.**   Okay.  And a couple of things I just want to point out

5   here.  And then if you go down, it says, this compliance

6   program shall apply to all current and future McKesson

7   distribution centers registered with the DEA in the United

8   States and its territories and possessions.  Do you see

9   that?

10   **A.**   Yes, I see that.

11   **Q.**   And then it says McKesson acknowledges and agrees that

12   the obligations undertaken in this subparagraph do not

13   fulfill the totality of its obligation to maintain effective

14   controls against the diversion of controlled substances or

15   to detect and report to DEA suspicious orders for controlled

16   substances.  Do you see that?

17   **A.**   Yes, I do.

18   **Q.**   Okay.  And you would have been one of the people when

19   you became a Director of Regulatory Affairs that was

20   supposed to -- was supposed to review thresholds and

21   criteria by McKesson employees trained to detect suspicious

22   orders.  That was part of your role when you became a DRA;

23   true?

24   **A.**   Yes, I did do that responsibility.

25   **Q.**   And if we go now to Document --

```
1              MR. RAFFERTY:  I'm going to start another

2      document, Your Honor, if you want -- would like me to or if

3      you want me to --

4              THE COURT:  Well, I've not another proceeding here

5      at noon I've got to take care of, so it might be a good

6      place to pull the plug on it.

7         And, this afternoon, I understand that we're going to

8      go from 1:30 to 5:30 to make up for the hour this morning by

9      being late.  So, I will see everybody back at 1:30.

10             MR. RAFFERTY:  Thank you, Your Honor.

11        (Recess taken)

12             THE COURT:  Mr. Fuller?

13             MR. FULLER:  Yes, Your Honor.  How are you this

14     afternoon?

15             THE COURT:  I'm good, thank you.

16             MR. FULLER:  Judge, just as cleanup from the other

17     day, we're going to move in -- Cardinal has had a chance to

18     review and we're going to go ahead and move them into

19     evidence.

20        So, by agreement of the parties, 42100, 42102, 42103,

21     42107, 42113, 4214, 4215 --

22             COURT REPORTER:  I'm sorry.  Can you --

23             MR. FULLER:  I'm sorry.

24             COURT REPORTER:  What was after 107 --

25             MR. FULLER:  4213.
```

1              COURT REPORTER:  Okay.

2              MR. FULLER:  -113, 42114, 42115, 42117, 42118,

3    42123, and 14288.

4         Judge, that's already been submitted to the clerk.

5              THE COURT:  Is there any objection to any of

6    these, Ms. Hardin?

7              MS. HARDIN:  No objection, Your Honor.

8              THE COURT:  All right.  They're all admitted.

9              MS. MCCLURE:  Your Honor, for ABDC, just

10   confirming that those are all Cardinal-related documents

11   that you've just read.

12             MR. FULLER:  No.  I worked with Cardinal to put in

13   your documents.  No, I'm kidding.

14             MS. MCCLURE:  Thank you, Mr. Fuller.

15             MR. FULLER: Yes, ma'am.

16             THE COURT:  All right.  They're all admitted.

17        Go ahead, Mr. Rafferty.

18             MR. RAFFERTY:  While the witness is coming back to

19   the stand, just for the record, we modified the Plaintiff

20   16210 to just the three slides and submitted to the clerk as

21   16210A.

22             MR. SCHMIDT:  And we have that.  We appreciate

23   that.

24             THE COURT:  And are you -- Mr. Schmidt, are you

25   retaining an objection to these two pages?

1          MR. SCHMIDT:  No.  I don't think we had an

2    objection to those two pages other than it's -- it's for the

3    purpose of notice.

4          THE COURT:  Okay.  16210A is admitted.  I think I

5    already admitted it, but it won't hurt to readmit it.

6          THE COURT:  All right.  We need the witness,

7    please.

8       Mr. Oriente, you're still under oath, of course.

9          THE WITNESS:  Yes, sir.  Thank you, Your Honor.

10          MR. RAFFERTY:  May I proceed, Your Honor.

11          THE COURT:  Yes, you may.

12      BY MR. RAFFERTY:

13   **Q.**   Good afternoon, Mr. Oriente.

14   **A.**   Good afternoon.

15   **Q.**   When we broke for lunch, we were talking about the 2008

16   settlement and I just want to close the loop on that.  I'm

17   going to show you what's been marked as P-0011.  There you

18   are, sir.

19   **A.**   Thank you.

20   **Q.**   Mr. Oriente, are you there?

21   **A.**   Yes, I'm here.

22   **Q.**   Okay.  This is an e-mail from you dated March 7th, 2008

23   to Don Walker.  And then I see that group that we talked

24   about earlier, that e-mail group, PGRDRC.

25   **A.**   Yes, sir.

1    Q.   Okay.  And it says, Team, here are the notes from our

2    meeting.  And when you turn the page, it's got a cover --

3    it's got a memorandum that says Regulatory Meeting,

4    Carollton 3/5 and 3/6/08.  Do you see that?

5    A.   Yes.

6    Q.   And, in fact, you were one of the attendees of that;

7    true?

8    A.   Yes, I was.

9          MR. RAFFERTY:  At this time, Your Honor, we would

10   move in P-00011.

11         THE COURT:  Any objection?

12         MR. SCHMIDT:  Your Honor, this document has some

13   embedded hearsay, but I think the better course would be to

14   admit the document and I'll just object to the embedded

15   hearsay if it comes up.

16         THE COURT:  Okay.

17         BY MR. RAFFERTY:

18   Q.   First --

19         THE COURT:  It's admitted subject to specific

20   objections about hearsay or other problems.

21      Go ahead, Mr. Rafferty.

22         MR. RAFFERTY:  Thank you, Your Honor.

23         BY MR. RAFFERTY:

24   Q.   First of all, the attendees, Mr. Oriente, we have Mr.

25   Walker, Bruce Russell, Mr. Hilliard that we discussed, Tom

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    McDonald, Tracy Jonas, Bill Mahoney and then yourself.  Are

2    all of those employees of McKesson?

3    **A.**    Yes.  Some are not current but, yes, they were at this

4    time.

5    **Q.**    Yeah, at that time, I'm sorry.  Thank you for the

6    clarification.

7            And it says Wednesday, 3/5/2008.  Items that will be

8    covered during the meeting:  Memorandum of Agreement.  2 to

9    3 weeks expect sign-offs with the DEA.  And then new CSMP

10   Program.  Do you see that?

11   **A.**    Yes.

12   **Q.**    Okay.  And I had asked you earlier if you had had -- if

13   you all had had a two-day meeting about the 2008 Settlement

14   Agreement and the establishment of the CSMP.  Do you recall

15   this meeting in Carollton?

16   **A.**    Yes, I do.

17   **Q.**    Okay.  All right.  And if you go -- there's just a few

18   questions I have for you in this particular document.  If

19   you go down to Memorandum of Agreement, it says three

20   points.  And I want to go down to the one that says

21   agreement will cover.  Do you see that?

22   **A.**    Yes.

23   **Q.**    Okay.  Agreement will cover all 39 McKesson DEA

24   registrants.  Now, McKesson has 39 DEA registrants because

25   each -- each Distribution Center is a DEA registrant; true?

1    **A.**   Yes.  Each Distribution Center would need a

2    registration, yes.

3    **Q.**   Okay.  All right.  And it says covered conduct, three

4    points.  Failure to maintain adequate controls against

5    diversion.  And then, the third one there, failure to detect

6    and report suspicious orders of controlled substances.  Do

7    you recall that being discussed and the subject -- part of

8    the subject of this meeting?

9    **A.**   Yes.  That was some of the information, yes.

10   **Q.**   Okay.  And then if we turn this page and we go to --

11   down at the bottom where it says factors influencing DEA

12   civil penalty, it says it involved multiple DCs.  That's

13   distribution centers; true?

14   **A.**   Yes, DCs stood for distribution centers.

15   **Q.**   Multiple DCs estimated to be over 4,600 violations.  Do

16   you see that?

17              MR. SCHMIDT:  This is -- I apologize.  This is

18   where we would object on embedded hearsay and foundation.  I

19   think this is a report back of what someone was told.

20              THE COURT:  How do we know there were 4,600

21   violations, Mr. Rafferty?

22              MR. RAFFERTY:  I'm sorry?

23              THE COURT:  How do we know that 4,600 is an

24   accurate figure?

25              MR. RAFFERTY:  Well, this is a meeting of the

1    regulatory people, Your Honor, that were active and involved

2    with the 2008 Settlement Agreement, including the Senior

3    Vice President, Mr. Walker, and he was involved in meetings

4    with the DEA.  And this is all employees of McKesson

5    discussing the parameters of the 2008 settlement, including

6    the number of violations.

7         And so, because they're all employees, they'd all be --

8    they'd all be -- all be statements of an adverse party

9    employee, which is 801(d)(2)(D).  And also, it's notice to

10   everybody else of the DRA that these -- of the nature of the

11   violations and the systemic nature of the violations.

12             MR. SCHMIDT:  Your Honor, if they want to use this

13   for notice that someone at DEA made this allegation to them,

14   I don't object to that.  It's the truth of the matter that

15   is objected to and that's nowhere in the settlement and, in

16   fact, the settlement says to the contrary.

17             THE COURT:  All right.  I'm going to admit it for

18   that limited purpose, Mr. Rafferty.

19             MR. RAFFERTY:  Thank you, Your Honor.

20             THE COURT:  And not for the truth.

21             BY MR. RAFFERTY:

22   Q.   Do you see there where it says there are many factors

23   influencing the decision.  It involved multiple DCs,

24   estimated to be over 4,600 violations?

25   A.   Yes.  That's what's written here.

**Q.**   Okay.  And it says DEA looked at multiple time periods,

shipments to pharmacies that turned out to be internet

pharmacies, shipping millions of dosages to a couple of

pharmacies that later were indicted.  Do you see that?

**A.**   Yes.  That's what's written here.

**Q.**   Do you recall that being a discussion at your meeting?

**A.**   One of the things that was covered, yes.

**Q.**   Okay.  And that -- and the reason it was being

discussed is because that was a serious and systemic issue,

true?

          MR. SCHMIDT:  Objection, foundation.

          MR. RAFFERTY:  I'm asking.

          THE COURT:  Sustained.  You can try to get it out

of him, Mr. Rafferty, in other ways.

          BY MR. RAFFERTY:

**Q.**   Well, let's go -- let's do it this way.  Let's go over

to Page 4, Mr. Oriente, and at the top under Termination of

the Suspension, continued right underneath that bullet point

there is a line that says our documentation must be in

order.  Do you see that?

**A.**   Yes.

**Q.**   We cannot have a repeat occurrence.  Do you see that?

**A.**   Yes.

**Q.**   Now, you -- did you author these notes?

**A.**   I believe I took the notes from the meeting.  You know,

1    this would not have been my, you know, writing.  It probably

2    came from other documents and I summarized them.

3    Q.   Okay.  And you have that in bold, if that's you.  Did

4    you -- did you write that in bold and underline?

5    A.   I believe that's the way it was stated from other

6    documents.

7    Q.   Okay.  And is it your understanding the reason that you

8    could not have another repeat occurrence was because this

9    was a serious and systemic issue?

10              MR. SCHMIDT:  Objection, foundation.

11              THE COURT:  Sustained.

12              MR. RAFFERTY:

13   Q.   Going on to the final portion I want to ask you about,

14   Mr. Oriente, is on Page 6, sir.

15   A.   Yes.

16   Q.   Okay.  And here, once again, this is Day 2, it appears,

17   and you've got the attendees listed there again.  Do you see

18   that?

19   A.   Yes.

20   Q.   Except on this one, I think it adds Dave Gustin on the

21   conference call.  Do you see that?

22   A.   Yes, it does.

23   Q.   Okay.  Who is Dave Gustin?

24   A.   Dave Gustin was a DRA for the North Central region for

25   McKesson.

1    **Q.**   Okay.  And if we look at that, it says -- under

2    thresholds, I'm sorry, sir, Mr. Oriente, under thresholds,

3    the sixth bullet -- I'm sorry, fourth bullet point down.

4    When setting the percentage of controls to purchase, are

5    they for legitimate reasons?  Look at large quantities.

6    That's one of the -- that's one of the red flags; true?

7    **A.**   Large quantities would identify us to take an

8    additional review of a customer, yes.

9    **Q.**   And then it says the key -- under thresholds, the key

10   is the appropriate documentation.  Do you agree?  Do you

11   agree with that?

12   **A.**   Yes.  Documentation was part of our due diligence.

13   **Q.**   Do you agree that it is key in regards to thresholds?

14   **A.**   Yes.  It would be one key factor.

15   **Q.**   Okay.  And then, the next bullet point under that says

16   the key secret is getting the thresholds right from the

17   start-up.  Is that accurate?

18   **A.**   Yes.  That was very important.

19   **Q.**   Okay.  So, you agree with that statement?

20   **A.**   Yes.

21   **Q.**   Okay.  And one of the reasons it's important to get the

22   thresholds right from the start is because if you set the

23   thresholds too high, then customers never bump up against

24   that threshold and it never triggers an investigation; is

25   that accurate?

1    **A.**    That could occur, yes.

2    **Q.**    Okay.  And that could result in diversion, correct?

3    **A.**    It could possibly be diversion.

4    **Q.**    Okay.  Thank you.  Okay.  Then it says -- down further,

5    it says find customers to focus on, run the data and perform

6    analytics.  Look at percentage of controls to total

7    purchases.  So, total controls to total purchases, describe

8    what that's referring to, please.

9    **A.**    Yes.  We would take a look in order to set appropriate

10   thresholds because we didn't want them too low where a

11   customer would be prevented from getting some necessary

12   medications and the percent of controls to total purchases,

13   it would define how much business a customer is doing in

14   regular RX product versus their controlled substance

15   business.

16   **Q.**    So, it would be red flag, for example, if a -- if a

17   pharmacy was selling a large percentage of controlled

18   substances compared to the rest of their prescriptions;

19   true?

20   **A.**    We didn't look at just that one factor.  We would take

21   multiple factors.  That would be one that we would use to

22   determine if additional due diligence was required, yes.

23   **Q.**    Sure.  Sure.  But that would be one, correct?

24   **A.**    Yes.

25   **Q.**    Okay.  Now, after this 2008 settlement, you're aware

```
 1    that there were further investigations against McKesson

 2    Corporation in regards to its Controlled Substance

 3    Monitoring Program by the DEA; true?

 4    A.   Yes, there was.

 5    Q.   Okay.  And, in fact, some of those -- some of those

 6    investigations involved distribution centers that you were

 7    the Director of Regulatory Affairs over; true?

 8    A.   Yes.  I believe I had a couple, yes.

 9    Q.   Okay.  I want to hand you what has been marked as

10    P-00122.  There you are, sir.

11    A.   Thank you.

12              MR. SCHMIDT:  Your Honor, if I may just address at

13    the outset, this is what I flagged at the beginning of the

14    day.  This is a letter that was part of the lead-up to the

15    2017 settlement between government attorneys and McKesson's

16    attorneys; in this case, one of my partners, about the

17    allegations that the government was making in an effort to

18    resolve a dispute between the government and McKesson that

19    resulted in the 2017 settlement.  It even says on its cover

20    it's confidential and subject to Federal Rule of Evidence

21    408.

22         Even without that, it's just not a proper document.

23    It's just not an admissible document in this case and it's

24    certainly not proper with this witness.

25              MR. RAFFERTY:  Your Honor, would you like me to
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    wait to respond, sir?

 2              THE COURT:  Just a minute.

 3              MR. RAFFERTY:  Okay.

 4              THE COURT:  Why doesn't it come within 408, Mr.

 5    Rafferty?

 6              MR. RAFFERTY:  Well, it doesn't come in under 408

 7    for a number of reasons.  Number one, it's not being offered

 8    to prove the existence of the deal.  It's being proved --

 9    it's being offered for notice of their systemic and

10    nationwide failures.

11         In fact, this exact issue was briefed in CT1 and Judge

12    Polster issued an order specifically finding -- and 408 was

13    part of that, along with hearsay and relevancy -- and Judge

14    Polster says specifically, the evidence is relevant among

15    other reasons to prove that McKesson engaged in intentional

16    conduct over many years across the country that was a

17    substantial factor in causing the harm to the plaintiffs and

18    they were on notice of the ways in which -- oh, I'm sorry.

19    That's the motion.

20         This is -- it says the Court agrees the letters are --

21    I'm sorry.  So, this is what the Court ordered, Judge

22    Polster.

23         The Court agrees the letters are relevant to show

24    McKesson's knowledge of the investigation and the statements

25    contained therein.  Accordingly, the Court denies McKesson's
```

1     motion to exclude these very letters.

2          MR. SCHMIDT:  And, Your Honor, just so the Court

3     -- oh, I'm sorry, Mr. Rafferty.

4          MR. RAFFERTY:  I was going to say, just so the

5     Court is aware, this also -- the letter in this -- in this

6     particular context specifically finds that the conduct that

7     is discussed in this, which is violations of the Controlled

8     Substances Act and suspicious order reporting, are both

9     serious -- serious systemic and nationwide in terms of

10    failing to report suspicious orders and that even the ones

11    listed in here are simply illustrative, not exhaustive, and

12    they were as systemic as they were serious.  So, this goes

13    to the very issue of the systemic and national nature of the

14    failures by McKesson to comply with the CSA.

15         MR. SCHMIDT:  Two responses, Your Honor.  First,

16    just so the Court understands the context of Judge Polster's

17    ruling.  Before trial in the CT1 case, the judge said they

18    may be admissible.  After we resolved that case, there was a

19    nunc pro tunc order, and that's what they're relying on, an

20    order after the case was resolved when we didn't have a

21    chance to address what the Court was doing and the Court did

22    not issue that ruling in the context of an active dispute.

23     As to the use of these letters, it's clear from what

24    Mr. Rafferty said that they are using them for the

25    allegations in them, which is squarely within 408.  There's

1    no question about notice.  McKesson was on notice from 2013

2    forward that the DEA was looking into them.  That resulted

3    in the 2017 settlement.

4         But to take allegations from lawyers as part of a

5    dispute where the adverse lawyer is even characterizing

6    their letters as for purposes of settlement, where they're

7    making allegations to encourage a settlement, that could not

8    be more heartland 408 and more improper on other grounds.

9              MR. ACKERMAN:  Your Honor, with respect to Judge

10   Polster's order, he wrote in his evidentiary order, which

11   was entered into December of 2019, these rulings will apply

12   to all future cases in this MDL that are tried by this

13   Court.  Additionally, as a general matter, these rulings

14   apply to remanded cases tried by transferor courts.  He then

15   includes a number of citations.

16        In the next paragraph, he stated, in the future, the

17   parties should generally not file in any MDL case a motion,

18   including a motion for reconsideration, addressing an

19   evidentiary issue already addressed below.

20        Judge Polster clearly issued this order in order to

21   provide guidance to future cases and remanded cases.

22             THE COURT:  And he let this in, right?

23             MR. ACKERMAN:  He did, yes.

24             THE COURT:  On what basis did he let it in?

25             MR. ACKERMAN:  So, Your Honor, it is -- well, Mr.

1    Rafferty, it's at Page 21 of the order, and he wrote, the

2    Court agrees that the letters are relevant to show

3    McKesson's knowledge of the investigation and the statements

4    contained therein.  He let it in for notice and knowledge.

5              MR. SCHMIDT:  They're not using it for notice and

6    knowledge.  They're using it for the allegations in it.

7    That's what they're clear about.

8         And the suggestion that after we settled the case Judge

9    Polster entered an order that bound everyone forever when he

10   didn't have this evidence in front of him the way Your Honor

11   does, I don't think that's well taken.

12             MR. ACKERMAN:  We haven't used it at all yet, Your

13   Honor.

14             THE COURT:  Ms. Hardin, do you want to say

15   something?

16             MS. HARDIN:  I just want to note for the record

17   that we do not agree that Judge Polster's nunc pro tunc

18   order is law of the case.  We have briefed that to Your

19   Honor before and you have actually denied their motions

20   asking for you to wholesale enter Judge Polster's order.

21   So, I'll let Mr. Schmidt deal with the document itself, but

22   the representation that Judge Polster's orders govern Your

23   Honor are incorrect in our opinion.

24             THE COURT:  You're next, Mr. Nicholas.

25             MR. NICHOLAS:  That's all I was -- I just want to

1    chime in and say I completely agree with what Ms. Hardin

2    just said.  I don't think you're bound, or I don't think you

3    should be bound, or meant to be bound by Judge Polster's

4    orders in this -- in that fashion.

5              THE COURT:  Did he enter this order in this case,

6    Mr. Rafferty?

7              MR. RAFFERTY:  In the opioid litigation in the

8    MDL.

9              THE COURT:  In the MDL, he entered it?

10             MR. RAFFERTY:  Yes, Your Honor.

11             THE COURT:  I'm going to sustain the objection.

12   In my opinion, this is covered by 408 and should not come in

13   and I'm not going to admit it.

14             MR. RAFFERTY:  Would it -- would it -- okay.  For

15   -- just for the record, Your Honor, I think 408 is clear in

16   terms of if it's not being offered for the existence of the

17   -- of the -- for the existence of the agreement for other

18   purposes the law --

19             THE COURT:  Well, I know.  I've read the rule, Mr.

20   Rafferty, but it seems to me I think Mr. Smith is exactly

21   right.  These statements were made in the context of

22   negotiations and they're the position of the lawyer -- or

23   lawyers on one side and I just -- I think it is embraced by

24   408 and it's a long-standing rule that the Court's rulings

25   should not inhibit the efforts of the parties to settle

1    cases.

2         MR. RAFFERTY:  I understand that, Your Honor.  My

3    concern is that with this -- what I would request then, if

4    we could, is to have an opportunity to brief this.  This is

5    a very important issue in the case.  The notice -- the

6    notice by this company of the nationwide and systemic

7    failures of their CSMP that resulted in, in fact, Washington

8    Court House, which is one of the distribution centers that

9    services West Virginia and, in fact, services Cabell County

10   is specifically referenced with incidents of egregious

11   conduct and that ultimately end up and is systemic --

12        THE COURT:  Can't you prove that some other way

13   than by offering a letter that was -- that was part of an

14   effort to settle a disputed situation?

15        MR. RAFFERTY:  Well, at the end of the day, in

16   2017, Your Honor, they did, in fact, admit to liability and

17   admit to responsibility in the 2017 settlement.  So, they

18   admitted to these failures, the McKesson Corp did.

19        THE COURT:  Well, but --

20        MR. SCHMIDT:  I think he answered your question.

21   Yes, we can prove it some other way.  I don't think they're

22   going to be able to prove it the way he just described.

23        MR. RAFFERTY:  Sorry.  I was consulted -- or I was

24   asked to be consulted.  No.  I think -- and I do think the

25   fact that they ultimately stipulated and accepted

```
 1    responsibility for the violations in here --

 2              THE COURT:  It's out, Mr. Rafferty.  Go on to your

 3    next point.

 4              MR. RAFFERTY:  Okay.  Thank you, Your Honor.

 5         Oh, yes.  Just for the record, Mr. Ackerman reminded

 6    me, that document that has been excluded to be offered is

 7    P-00122.

 8              THE COURT:  All right.  And the Court sustained

 9    the objection thereto by all the defendants in the case.

10              MR. RAFFERTY:  If I could have just one moment,

11    Your Honor?

12              THE COURT:  Yes.

13              MR. RAFFERTY:  I apologize.

14         (Pause)

15              MR. RAFFERTY:  We'll move on to a different topic

16    right now.

17              BY MR. RAFFERTY:

18    Q.   You are aware that, in fact, in 2017, McKesson did

19    enter into an additional Settlement Agreement separate and

20    apart from the one in 2008?

21    A.   Yes.

22    Q.   Okay.  I'd like to show you what's been marked for

23    purposes of identification as P-42554.

24    A.   Thank you.

25    Q.   Let me know when you're ready, sir.
```

1    **A.**   Yes, I'm' ready.

2    **Q.**   Okay.  You see at the top of this particular document

3    it says Administrative Memorandum of Agreement.  Do you see

4    that?

5    **A.**   Yes.

6    **Q.**   And it reads the Administrative Memorandum of Agreement

7    as entered into by and between the United States Department

8    of Justice, Drug Enforcement Administration, and McKesson

9    Corporation, each a party and collectively the parties.  Do

10   you see that?

11   **A.**   Yes.

12   **Q.**   And, in fact, you received a copy of this in your -- in

13   the course and scope of your work with McKesson; true?

14   **A.**   Yes, I did.

15          MR. RAFFERTY:  Your Honor, at this time, I would

16   move to enter into evidence P-42554.

17          THE COURT:  Is there any objection to 42554?

18          MR. SCHMIDT:  Yes.  Two, Your Honor.  First, we

19   object to this for the same reason we objected to the 2008

20   ruling, which is probably covered by Your Honor's ruling,

21   but we want to preserve our objection to that.

22          Second, there's an appendix missing to this.  There's

23   several, but there's one that matters a little bit.  And, so

24   if we can just add that appendix with agreement, then that

25   resolves that issue.

```
 1              THE COURT:  Well, if you -- I'll accept that, Mr.

 2    Rafferty.  I will admit it subject to the same restrictions

 3    that I admitted the 2008.

 4              MR. RAFFERTY:  Yes, sir.

 5              MR. SCHMIDT:  And just with us preserving our

 6    objection.

 7              THE COURT:  Yes.

 8              MR. SCHMIDT:  Thank you, Your Honor.

 9              MR. RAFFERTY:  Thank you, Your Honor.

10              BY MR. RAFFERTY:

11    Q.   Okay.  If we look at this particular document, sir, if

12    you'll look first at Page 2, and Paragraph seven, it says on

13    or about November 14th, 2014, McKesson received a letter

14    dated November 4, 2014 from the DEA Office of Chief Counsel,

15    Diversion Regulatory and Litigation Section, stating that

16    DEA was separately pursuing administrative action against

17    McKesson Arora for the conduct outlined in the August 13,

18    2014 letter.  McKesson Arora, that is a Distribution Center

19    of McKesson, is it not, sir?

20    A.   Yes, it is.

21         Excuse me one minute, Your Honor.  Your Honor?  Your

22    Honor?

23              THE COURT:  Yes?

24              THE WITNESS:  My screen went off.

25              THE COURT:  Okay.  Can we -- can we fix that?
```

1           THE WITNESS:  There it is.

2           THE COURT:  All right.

3           THE WITNESS:  Could you repeat the question,

4    please?  I'm sorry.

5           MR. RAFFERTY:  Yes.

6           BY MR. RAFFERTY:

7    **Q.**   I think I just asked if it was -- if McKesson Aurora --

8    they referred to McKesson Aurora.  That is, in fact, a

9    Distribution Center of McKesson?

10   **A.**   Yes.  This particular one, because there are two

11   Auroras, this particular one was Aurora, Colorado.

12   **Q.**   Okay.  And then it goes on and says DEA stated that the

13   allegations regarding McKesson's failure to maintain

14   effective controls against diversion of particular

15   controlled substances and failure to design and operate a

16   system to disclose to the registrant suspicious orders of

17   controlled substances was national in scope.  Do you see

18   that?

19          MR. SCHMIDT:  And, Your Honor, we're now just

20   reading in DEA allegations that are part of background

21   clauses and that I think are quoted from the letter that was

22   just excluded.

23          MR. RAFFERTY:  It was merely a foundational

24   question to talk about the different -- the different

25   distribution centers that were being discussed, Your Honor.

```
 1              THE COURT:  All right.  I'll allow -- I will allow
 2      you to question him about that.
 3              MR. RAFFERTY:  Okay, thank you.
 4              BY MR. RAFFERTY:
 5      Q.   And the DEA was also pursuing administrative
 6      investigations of such alleged failure at McKesson WCH.  Is
 7      that Washington Court House, sir?
 8      A.   Yes, that would be.
 9      Q.   And you are aware that that services West Virginia?
10      A.   Yes, I am.
11      Q.   And, in particular, Wash -- sorry -- Cabell County?
12      A.   I would believe so.  It wasn't one of my distribution
13      centers, so I didn't really follow it that closely.
14      Q.   And was that David Gustin's Distribution Center back
15      when you were -- or back when he was at the company?
16      A.   Yes, it would have been.
17      Q.   Okay.  And he ultimately left the company in what year;
18      do you recall?
19      A.   It was a couple of years back, yeah.
20      Q.   And then, McKesson Livonia, that's another -- all of
21      these -- just to shortcut, all of these are actual
22      distribution centers of McKesson Corporation; true?
23      A.   Yes, they are.
24      Q.   Okay.  And the McKesson Methuen?
25      A.   Methuen.
```

**Q.**   What is it?

**A.**   Methuen.

**Q.**   Methuen?  That is -- that, at that time, was part of

your -- or the -- I'm sorry.  Let me back up.  The conduct

being discussed from 2013 to 2014, if it was in Methuen,

that would have been at the time that you were Director of

Regulatory Affairs, sir, for -- for Methuen?

**A.**   Yeah.  Just give me a minute.  If I had that

Distribution Center.  There were changes in 2013.  I may not

have had that Distribution Center.  I'm trying to recall.

**Q.**   But if you -- if you did, you would have had it up

until 2013; true?

**A.**   Yes.

**Q.**   So, just to kind of put a time period on it --

**A.**   Yeah.  I believe it was one of mine.

**Q.**   2008 to 2013 would have been -- Methuen would have been

yours?

**A.**   Yes, sir.

**Q.**   Okay.  Thank you, sir.  And then, McKesson Chicagoland,

Delran, from 2008 to 2014, McKesson Delran had been your

Distribution Center, sir?

**A.**   Yes.

**Q.**   And then McKesson LaCrosse, McKesson La Vista, Ruther

Glen and West Sacramento.  So, out of these, you would have

been involved in at least two of those areas, true, two of

1     those distribution centers?

2  **A.**    Yeah, two distribution centers.

3  **Q.**    Okay.  And then, if you turn the page, sir, under

4     acceptance of acceptance of responsibility, were you aware

5     at the time you received this that McKesson actually

6     acknowledged that they had failed to identify or report

7     certain orders placed by pharmacies as a result of this

8     investigation?

9  **A.**    Yes.

10  **Q.**    And right there in the middle it says McKesson

11     acknowledges that at various times during the period

12     January 1, 2009 up through and including the effective date

13     of this -- of this agreement, do you know what the effective

14     date of that agreement is?

15  **A.**    I know it was signed in 2017.  I don't know when it was

16     created.

17  **Q.**    Okay.  So, starting January 9 and up to and through

18     what the effective date is.  And it says, it did not

19     identify or report to DEA certain orders placed by certain

20     pharmacies which would have been detected by McKesson as

21     suspicious.  Do you see that?

22  **A.**    Yes.  That's what's written here.

23  **Q.**    And then, if we go over to the third page, sir, down

24     underneath -- underneath two -- I'm sorry.  This is now Page

25     3.  Where am I?  Oh, yeah.  There it is.

```
 1          Oh, I'm sorry.  There is another section, acceptance of
 2     responsibility, that we went go through.  The Court will
 3     have the benefit of the document.  And -- but under this
 4     covered conduct for purposes --
 5               MR. SCHMIDT:  Your Honor, I believe it's the
 6     identical language.
 7               MR. RAFFERTY:  I wasn't going to read it.
 8               MR. SCHMIDT:  Okay, that's fine.
 9               MR. RAFFERTY:  That's why I was saying I'm not
10     going to waste the Court's time.
11               MR. SCHMIDT:  Yeah.  I just didn't want there to
12     be a suggestion there was a different --
13               MR. RAFFERTY:  Right.  Just a separate -- okay.
14               BY MR. RAFFERTY:
15     Q.  Anyway, covered conduct, for purposes of this
16     agreement, covered conduct shall mean the following conduct
17     alleged by the government for the covered time period.  And
18     I'm going to have you look at that and then read this in and
19     then I'm going to ask you a couple of questions.
20          There's another -- there is another Distribution Center
21     listed here that I would like to talk to you about, but what
22     is the covered conduct that's discussed, sir, here?
23          Here, I can -- I can just do it very quickly.  McKesson
24     failed to maintain effective controls against diversion of
25     particular controlled substances into other than legitimate
```

1    medical, scientific and industrial channels by sales of --

2    to certain of its customers in violation of the CSA.

3              MR. SCHMIDT:  And, again, Your Honor, I'll object.

4    We didn't object to the acceptance of responsibility

5    language, but now we're simply reading allegations into the

6    record.

7              MR. RAFFERTY:  They agreed to it, Your Honor.  And

8    I have agreed to the --

9              MR. SCHMIDT:  It's actually false that we agreed

10   to this.  That's why there's an acceptance of

11   responsibility.

12             MR. RAFFERTY:  Acceptance of responsibility.

13             THE COURT:  Well, I'll sustain the objection to

14   you reading this into the record, Mr. Rafferty.  The

15   document is in and you don't need to read it.

16             MR. RAFFERTY:  Okay.

17             BY MR. KENNEDY:

18   **Q.**   So, if we go down the other -- the one other

19   Distribution Center that I wanted to ask you about, it lists

20   right there Landover, Maryland.  From 2008 until 2014, would

21   you have been the Director of Regulatory Affairs in charge

22   of that distribution center, sir?

23   **A.**   I don't recall if it went as far as 2014, but, yes, I

24   believe in 2008 through about 2013, it would have been mine.

25   **Q.**   Okay.  Thank you, sir.

1        Now, I want to shift topics a little bit and talk to

2   you in particular about thresholds and threshold -- the

3   setting of thresholds and threshold change requests.  Are

4   you familiar with those topics?

5   **A.**    Yes, I am.

6   **Q.**    Okay.  Would you agree with me that thresholds are it

7   core of the McKesson CSMP?

8   **A.**    Thresholds are an intricate part, yes.

9   **Q.**    Okay.  And once a certain threshold is met, then

10   certain obligations are triggered under the CSMP that

11   McKesson has to follow; true?

12   **A.**    Yes.  Our program, if a customer attempted to order

13   above their threshold, it would then go into our three-level

14   review process.

15   **Q.**    Okay.  We talked about that earlier, so I don't need to

16   go through that, but the thresholds over time, we talked --

17   well, strike that.  Over -- we talked about the importance

18   of getting the thresholds right from the start; do you

19   recall that?

20   **A.**    Yes, I do.

21   **Q.**    Okay.  And when we're setting -- when the CSMP was

22   launched in 2008, there were two different ways of setting

23   thresholds for the -- for different pharmacies or for

24   different customers for the RNAs versus the ISMCs; do you

25   recall that?

1    **A.**    Yes.  There were two types of customers.

2    **Q.**    Okay.  And I don't know that we ever identified what

3    ISMC for the Court.  That would be the Inter -- Independent

4    Small Medium Chain Pharmacies; is that correct?

5    **A.**    That is correct.

6    **Q.**    Okay.  And then, the RNAs, I think you did describe

7    earlier, Retail National Accounts, the big chains?

8    **A.**    Yes.  Yes, sir.

9    **Q.**    Okay.  I want to talk for a few minutes about another

10   document regarding setting thresholds, P-00033.

11            MR. SCHMIDT:  Is this a different document?  Did

12   you say P-2 or 33?

13            MR. RAFFERTY:  P-3.  Sorry.

14            BY MR. RAFFERTY:

15   **Q.**    Here you are, sir.

16   **A.**    Oh, thank you.

17   **Q.**    Do you have the document, sir?

18   **A.**    Yes, I do.  Thank you.

19   **Q.**    This is another letter from the Drug Enforcement

20   Administration.  This one is dated September 27th, 2006.  Do

21   you see that?

22   **A.**    Yes, I do.

23   **Q.**    And this is signed by, once again, Joseph Rannazzisi.

24   Do you see that?

25   **A.**    Yes.

1    **Q.**   Okay.  And have you -- and I think you testified

2    earlier you've seen other Rannazzisi letters other than the

3    one we showed earlier this morning; is that true?

4    **A.**   Yes.  There would have been two, the one this morning

5    and this one.

6    **Q.**   Okay.  All right.

7          MR. RAFFERTY:  So, at this time, Your Honor, we'd

8    move in P-00033.

9          MR. SCHMIDT:  We object only insofar as it's

10   coming in for the truth as hearsay, but we don't object to

11   it coming in for the limited purpose of notice.

12         THE COURT:  I will admit for limited purposes, Mr.

13   Rafferty, and it will be admitted.

14         MR. RAFFERTY:  Thank you, Your Honor.

15         BY MR. RAFFERTY:

16   **Q.**   If we look at this particular letter, as I said, it's

17   dated September 27th, 2006, and I want to ask you a very

18   limited question here.  On Page 2, it indicates in this

19   letter that -- in that paragraph right here starting with a

20   distributor in the last -- second to last full paragraph,

21   second line.  It says a distributor may not simply rely on

22   the fact that the person placing the suspicious order is a

23   DEA registrant and turn a blind eye to the suspicious

24   circumstances.  My question is, do you agree with that?

25   **A.**   Yes.  McKesson only shipped to DEA registered

1    pharmacies and hospitals.

2    **Q.**    Right.  But my question is, is just because they are --

3    the person you're shipping to is a DEA registrant, that

4    doesn't relieve you of your obligations under the CSMP,

5    correct?

6    **A.**    Correct.

7             MR. SCHMIDT:  And just so I state a quibble that I

8    don't think affects the question, just so that we have the

9    record clear, I think you referenced the CSMP.  It wasn't in

10   the place at that time, by I think your broader point is as

11   to our relevant policy stance.

12            MR. RAFFERTY:  Yes.  I'll rephrase it.  Thank you.

13            MR. SCHMIDT:  Okay.  Sorry.

14            MR. RAFFERTY:  No, thank you.

15            BY MR. RAFFERTY:

16   **Q.**    It didn't relieve you of your obligations to prevent

17   diversion and maintain effective controls against diversion,

18   correct?

19            MR. SCHMIDT:  Objection to the foundation in terms

20   of legal obligation.

21            THE COURT:  Overruled.  I think -- I think you've

22   laid the foundation for this testimony.  You can ask him,

23   Mr. Rafferty.

24            THE WITNESS:  Could you repeat the question,

25   please?

```
1              BY MR. RAFFERTY:

2   Q.    Yes.  Simply because you are shipping to a pharmacy

3   that is a DEA registrant does not relieve you of your

4   obligations to maybe obtain effective controls against

5   diversion?

6   A.    Yes.  That would be correct.

7   Q.    Okay.  So, we talked a little bit about your role with

8   the RNAs and, in particular, Rite Aid; do you recall that?

9   A.    Yes.

10  Q.    Okay.  Since 2008, since you've been there and you've

11  been -- and Rite Aid has been a customer that you have

12  serviced as a DRA since that time up until you went to the

13  RNA Division --

14  A.    Correct.

15  Q.    Okay.  And that's been -- and they've been one of the

16  biggest customers of McKesson; true?

17  A.    They are a large chain, yes.  They -- they've gotten

18  smaller over the last few years.  They sold off some of

19  their stores.

20  Q.    When the CSMP was launched, Rite Aid actually

21  approached you and wanted to be opted out of the CSMP; is

22  that correct?

23  A.    Thresholds which were created at the start of the CSMP

24  program were something that was brand new.  Rite Aid had

25  their own compliance and regulatory team, as all of the
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    chain stores do, the large chain stores.  And so, Rite Aid

2    was basically wondering, you know, why did they need to have

3    these thresholds set on their stores when they felt that

4    their stores were compliant to the -- in following the rules

5    that they needed to as a -- as a distributor because when

6    CSMP started, Rite Aid was also distributing to their own

7    stores.

8    **Q.**   Okay.  Let's talk about that for a few minutes.  So,

9    you -- when the CSMP came on board, did they opt out or did

10   they want to opt out?

11   **A.**   They requested not to be in the program, yes.

12   **Q.**   Okay.  If I could, I'd like to show you what's been

13   marked as 13288.

14   **A.**   Thank you.

15   **Q.**   Do you have in front of you what appears to be an

16   e-mail?  And when you look at these e-mail strings, if you

17   start at the top, that's the most recent one from Don Walker

18   to you dated June 12th, '08?

19   **A.**   Yes.

20   **Q.**   And that is in response to an e-mail June 11th, '08; do

21   you see that?

22   **A.**   Yes, I do.

23   **Q.**   Okay.  And it says, Don, I received a call from Ed

24   Bissler today.  Who is Ed Bissler?

25   **A.**   Ed Bissler -- excuse me.  Ed Bissler was the Vice

1   President of Sales over that chain for McKesson.

2   **Q.**   Okay.  And, at this point, in June of '08, the CSMP has

3   been implemented; is that true?

4   **A.**   Yes.  It had just been implemented in the month before,

5   in May.

6   **Q.**   Thank you, sir.  And it says here, this is the first I

7   heard of their dissatisfaction.  It appears it may have been

8   brewing for sometime where they are at the point of asking

9   for a suspension of the program.  Do you see that?

10  **A.**   Yes, I do.

11  **Q.**   Okay.  And you're forwarding this e-mail, I should have

12  said you're forwarding -- or, yeah, you're forwarding this

13  e-mail to Mr. Walker, which included the e-mail down at the

14  bottom from Mr. Bissler.  Do you see that?

15  **A.**   Yes.

16  **Q.**   And, in fact, on the second page, this is the official

17  request by Rite Aid to be opted out of the CSMP where it

18  says following our meeting concerning the Controlled

19  Substance Monitoring Program, Rite Aid is officially

20  requesting the CSMP be suspended or modified for Rite Aid in

21  such a way as to prevent them from being cut off from

22  supply.  Do you see that?

23  **A.**   Yes.  That's what's written here.

24  **Q.**   And then, ultimately, you had -- you forwarded this

25  e-mail on to Mr. Walker and, down at the bottom, I'm not

1    going to read the whole e-mail to you, but I'm going to ask

2    you a question about the last two sentences.  I asked Ed

3    what was being presented to Rite Aid daily and he said they

4    are being sent the threshold --

5              COURT REPORTER:  I'm sorry.  You're going to have

6    to slow down.

7              MR. RAFFERTY:  I'm sorry.

8              COURT REPORTER:  Thank you.

9              MR. RAFFERTY:  I'm sorry.  I do do that.  I

10   apologize.

11             BY MR. RAFFERTY:

12   **Q.**   He said, I asked Ed what was being presented to Rite

13   Aid daily and he said they are being sent the threshold

14   report daily.  Do you see that?

15   **A.**   Yes.  That's written here.

16   **Q.**   What is -- what does that mean, the threshold report?

17   **A.**   Early in the program, a Threshold Percentage Report was

18   shared with customers so they -- on the retail national

19   accounts, it was shared with their corporate office, not

20   with the individual pharmacies.  So, the pharmacy never knew

21   what their threshold was or where they were as far as the

22   percentage.  The corporate office -- the corporate

23   regulatory office of Rite Aid would have received a report

24   letting them know where their stores stood in reference to

25   hitting their threshold.

**Q.**   Generally speaking, under the CSMP when it was
implemented, sir, was it the policy of McKesson to not send
out to customers what their threshold limits are?

**A.**   Yes.

**Q.**   Okay.  And why is that?

**A.**   If a customer knew what their threshold was, they could
order up to that threshold and not receive a blocked order.

**Q.**   Therefore, not triggering the three-level review that
we've discussed; true?

**A.**   Yes.  That would be true.

**Q.**   Okay.  Have you heard that referred to as managing
against a number?

**A.**   No, I haven't.

**Q.**   Okay.  So, but, in fact, what you did instead of
letting people -- letting customers know what their levels
were is, you would call them as they got close to their
threshold.  When I say you, I mean McKesson.  I'm sorry.
True?

**A.**   What was your question?

**Q.**   Yes.  You wouldn't give them -- you wouldn't tell them
what their threshold level is for, for example, oxycodone,
but what you would do is you would reach out to the
customer, the pharmacy, and let them know that they are
bumping up against their threshold and ask if they want a
threshold change?

1    **A.**    Not the individual pharmacy.  It would go to their
2    corporate office and then they would be told that, you know,
3    they're approaching their threshold, but the pharmacy did
4    not get that information.  The Rite Aid Corporation would
5    have gotten its threshold report.
6    **Q.**    But Rite Aid, as a corporation, would get that request?
7    **A.**    Yes, as a corporation, not the individual pharmacy.
8    **Q.**    And then they would make a decision on whether or not
9    they want an increase; true?
10    **A.**    They would do their reviews, also, that their
11    Regulatory Department would routinely do, yes.
12    **Q.**    Okay.  And if they indicated that they did want an
13    increase, then you would given them the increase; true?
14    **A.**    No, not always.
15    **Q.**    Not always?
16    **A.**    No, not always.
17    **Q.**    And if there -- and what should be done before you
18    decide to give the increase to a customer like Rite Aid is
19    there should be some due diligence done on the part of
20    McKesson; true?
21    **A.**    Yes.
22    **Q.**    And that should be documented; true?
23    **A.**    That was part of the process, yes.
24    **Q.**    And I'd now like to show you what's been marked as
25    Exhibit P-12967.

1    **A.**    Thank you.

2            MR. RAFFERTY:  Oh, I'm sorry, Your Honor.  I was

3    just reminded I did not move to admit Plaintiffs' 13288.

4            THE COURT:  Any objection to that?

5            MR. SCHMIDT:  No objection, Your Honor.

6            THE COURT:  All right.  13288 is admitted.

7            MR. RAFFERTY:  Thank you, Your Honor.

8            MR. SCHMIDT:  We will object to this document on

9    geographic scope.  It relates to pharmacies outside of

10   Huntington-Cabell.

11           MR. RAFFERTY:  Your Honor, the discussion in this

12   is pertaining to the retail national accounts and, in

13   particular, the Rite Aid retail national account and how the

14   thresholds were set for Rite Aid and it was done not on a

15   company by -- a pharmacy by pharmacy basis, but on a

16   national basis.

17           THE COURT:  Well, if --

18           MR. SCHMIDT:  I'm sorry.

19           THE COURT:  Go ahead, Mr. Schmidt.

20           MR. SCHMIDT:  I was going to say, if you're only

21   asking about the Rite Aid part and it does -- I haven't

22   looked at if there's Rite Aid stuff in here.  The subject of

23   this is CVS, which was not -- the CVS being discussed is not

24   in Huntington-Cabell.  If you've got Rite Aid that's

25   general, then we don't object to that.

```
1              MR. RAFFERTY:  May I approach opposing counsel?

2              MR. SCHMIDT:  No, Your Honor.

3         (Laughter)

4              MR. SCHMIDT:  We don't object to it for that

5    limited purpose.  Thank you for -- for letting me know that,

6    Mr. Rafferty.

7              THE COURT:  Okay.  What is the limited purpose?

8              MR. RAFFERTY:  It's to show how they set the

9    thresholds for Rite Aid nationally.

10             THE COURT:  It comes in for that limited purpose

11   only.

12        You don't object?  It comes in for that limited

13   purpose.

14             MR. RAFFERTY:  Thank you, Your Honor.

15        I did pass this out, didn't I?  Do you have a copy of

16   the document, Your Honor?

17             THE COURT:  Yes.

18             MR. RAFFERTY:  Okay.  I couldn't remember if I

19   handed it out.

20             THE COURT:  Right here.

21             BY MR. RAFFERTY:

22   Q.   All right.  If we go to the back, the second to last

23   page, Mr. Oriente, do you see there's an e-mail from Elaine

24   Thomet down at the bottom which, once again, in a strange

25   way, we have to read e-mail strings and you have to start
```

1    from the back, but this is Elaine Thomet.  Who is Elaine

2    Thomet?

3    **A.**   She worked in the retail national accounts, like

4    Customer Service Department.

5    **Q.**   Did you -- so, you worked with her?

6    **A.**   She was -- yeah.  I guess you would say I worked with

7    her.  I had interactions with her.  She was a part of the --

8    on the customer service side of the business.

9    **Q.**   Okay.  I just want to look at that first sentence and

10   it says I would like to proactively ask to make the buffer

11   on CVS retail location 30 percent, same as you did for Rite

12   Aid.  Do you see that?

13   **A.**   Yes.  That's what she wrote.

14   **Q.**   Okay.  And then if you go up a couple of e-mails up to

15   the top, it says Michael Oriente sent to Elaine on

16   July 22nd, 2008.  I need Don -- I need to have Don -- and

17   would that be Don Walker?

18   **A.**   Yes, it would be.

19   **Q.**   Approve that CVS will be tweaked, in quotes, as Rite

20   Aid was.  Do you see that?

21   **A.**   Yes.  I wrote that.

22   **Q.**   And then in that -- when we talk about the buffer and

23   being tweaked to 30 percent, are you familiar with the

24   concept of a buffer in setting a threshold?

25   **A.**   Yes, I am.

1    Q.   Okay.  And the buffer is the way the thresholds were

2    set for those retail national accounts under the CSMP was

3    McKesson would take the highest of the last 12 months sales

4    for that particular base code, correct?

5    A.   Yes, that is correct.

6    Q.   And then they would put a 30 percent buffer or

7    addition?  They would add 30 percent to that number,

8    correct?

9    A.   No, that's not correct.

10   Q.   How much would they add?

11   A.   The program buffer was ten percent.

12   Q.   Okay.  Does this indicate in this e-mail that the

13   program buffer for Rite Aid was 30 percent?

14   A.   This is indicating that she is requesting that another

15   chain receive the 30 percent.

16   Q.   And, specifically, what she says is just like you did

17   for Rite Aid?

18   A.   Yes.  Not all Rite Aids received the -- the additional

19   buffer.  It was, as requested, we would review the Rite

20   Aids.  It wasn't across the entire chain.

21   Q.   And, in fact, for the ISMCs, for example, the

22   independent small-medium chains, in fact, there was a --

23   also a buffer put on there thresholds when it was initially

24   being set, correct?

25   A.   Yes.  That would be the ten percent buffer.

**Q.**   Okay.  And then, are you aware of how many of the Rite Aid stores received the 30 percent buffer in 2008?

**A.**   I do not recollect the exact count, no.

**Q.**   Okay.  But you were the one -- you were the one that was making that decision to give the buffer, correct?

**A.**   I would have been the one to review them.  The decision would have been, again, Don Walker's decision to permit me to make those adjustments.  I just don't recall back, what, 13 years ago how many adjustments I made.

**Q.**   And in '08, just to put this in context, you're using the highest of the last 12 months in terms of sales for that base code, as we just discussed, right?

**A.**   Yes.  Thresholds were something new.  Customers experienced monthly fluctuations and variations in their monthly ordering.  And so, we went initially with the highest of that 12 months.

**Q.**   And that would have been 12 months dating back into the '07 period, correct?

**A.**   Yes.  I believe it would have gone back into '07.

**Q.**   And that was during the time period that McKesson was entering into an agreement with the -- the Settlement Agreement that we discussed earlier about violations of the Controlled Substances Act; true?

        MR. SCHMIDT:  Object to characterization, Your Honor.

```
 1              THE COURT:  Just a minute.
 2         Overruled.  He can answer it.
 3              BY MR. RAFFERTY:
 4    Q.   You can answer.
 5    A.   I'm sorry.  Okay.  Could you ask the question again?
 6    I'm sorry.  I'm deaf in this one ear.
 7    Q.   Oh, no problem.  No problem.  I'm happy to.
 8         That was during the time period, if you're going 12
 9    months back from the start of the CSMP, that was in the time
10    period that there was the negotiation going on in terms of
11    the 2008 Settlement Agreement that we talked about earlier?
12    A.   Yes.  It would have covered part of that period.
13    Q.   And did you ever have any discussions with some of your
14    --
15              MR. RAFFERTY:  I was just reminded I did not move
16    this one in either, Judge.  I'm sorry.  Plaintiffs move in
17    P-12967.
18              MR. SCHMIDT:  No objection, subject to limited
19    purpose that was covered with the witness.
20              THE COURT:  Admitted for that purpose.
21              BY MR. RAFFERTY:
22    Q.   Did you ever have conversations with other DRAs about
23    the fact that McKesson was setting thresholds too high?
24    A.   I don't recall having conversations that they were too
25    high.
```

1    **Q.**    I'd like to show you P-08309.  Getting a lot of paper

2    today.

3    **A.**    Thank you.

4    **Q.**    If it starts stacking up, I can set some aside for you.

5    **A.**    I'm fine.  Thank you.

6    **Q.**    Does this appear to be an e-mail dated August 31st,

7    2011 to -- from David Gustin and if you see the bcc down

8    below, do you see your name there?

9    **A.**    Yes, I do.

10   **Q.**    And I think we introduced who Dave Gustin was, but he's

11   a colleague of yours with -- a fellow DRA?

12   **A.**    Yes, he was.

13   **Q.**    Okay.  And just to put a time period on it, during

14   2011, correct?

15   **A.**    Yes, he would have been.

16   **Q.**    Okay.  And here, it says -- Dave Gustin is saying I

17   could use your help.  I have thought of an area that needs

18   tightened up in CSMP and it is the number of accounts we

19   have that large gaps between the amount of Oxy or Hydro they

20   are allowed to buy --

21             COURT REPORTER:  I'm sorry.  What was that again?

22   I didn't get that.

23             BY MR. RAFFERTY:

24   **Q.**    It is the number of accounts we have that have large

25   gaps between the amount of Oxy or Hydro they are allowed to

1    buy, their threshold, and the amount they really need for

2    current purchases.  Do you see that?

3              MR. SCHMIDT:  Your Honor, this one I need to

4    object to on geographic scope.  Unless Mr. Rafferty can tell

5    me I'm wrong, I believe the accounts he's referring to which

6    are set forth at the end are all outside of

7    Huntington-Cabell.  I see places in -- a hospital in Iowa,

8    things like that.

9              MR. RAFFERTY:  Yes.  And there are literally

10   hundreds of them, which describes, once again, how the

11   thresholds are being set on a nationwide basis, Your Honor.

12             THE COURT:  I think it's relevant to how they're

13   set.  I'll overrule it.

14             MR. RAFFERTY:  Thank you, Your Honor.

15             MR. SCHMIDT:  And, if I may say for the record,

16   what he's saying here is very clearly I'm focusing on

17   specific accounts.

18             MR. RAFFERTY:  May I continue, Your Honor?

19             THE COURT:  Yes.

20             MR. RAFFERTY:  Thank you

21             BY MR. RAFFERTY:

22   Q.   And then it says -- and this will be the last sentence

23   that I read.  This increases the opportunity for diversion

24   by exposing more product for introduction into the pipeline

25   than may be being used for legitimate purposes.  Do you see

1    that?

2    **A.**    Yes.  That's what Dave wrote.

3    **Q.**    Okay.  And did you have a conversation with Dave about

4    his thoughts in regards to the fact that thresholds were

5    being set too high?

6    **A.**    I don't recall having conversation with him.  I did

7    receive -- I was blind copied on this e-mail.  I did not

8    feel that way in my region, no.  I had the ability to lower

9    them as I saw fit.

10   **Q.**    Okay.  And I believe what you said, though, was that

11   Dave Gustin was actually over the Washington Court House

12   Distribution Center in 2011, correct?

13   **A.**    Yes, he would have been.

14   **Q.**    That serviced Cabell County?

15   **A.**    Yes, it did.

16   **Q.**    Thank you.

17          MR. RAFFERTY:  Move it in.  Move in P-08309, Your

18   Honor.

19          MR. SCHMIDT:  We'll maintain our objection on that

20   document based on geographic scope.

21          THE COURT:  All right.  Subject to that objection,

22   it's admitted.  It's admitted and the objection is shown on

23   the record.

24          MR. RAFFERTY:  Thank you, Your Honor.

25          MR. SCHMIDT:  Thank you, Your Honor.

1          BY MR. RAFFERTY:

2    **Q.**   But, in fact, there wasn't -- thresholds weren't

3    reduced systematically by McKesson until almost four years

4    later in 2015; is that accurate?

5    **A.**   Yes.  On the systematic basis, that is correct.

6    **Q.**   In fact, there was something referred to as the

7    threshold reduction effort; is that correct?

8    **A.**   That was done -- yes.  That would have been done like

9    in 2013, was a manual review of our customers.

10   **Q.**   But the actual reduction initiative started in 2015; is

11   that true?

12   **A.**   I would -- I would say that was when the systematic

13   process was started.

14   **Q.**   Okay.  If we could, let's look at P-08247.

15   **A.**   Thank you.

16   **Q.**   Are you there, sir?

17   **A.**   Yes, I'm there.

18   **Q.**   And this is a document dated February 9, 2015 and it is

19   from a Nate Hartle.  Do you see that?

20   **A.**   I do.  I have not seen this document before this.

21   **Q.**   Okay.  Do you know at that time whether you were a RNA

22   Director of Regulatory Affairs?

23   **A.**   Yes, I would have been.

24   **Q.**   And who is the -- who is the -- what was Nate Hartle's

25   position?

1   **A.**   He would have been my boss as Senior Director of

2   Regulatory Affairs.

3   **Q.**   Okay.  And is it your testimony that he never came to

4   you and showed you the threshold initiative reduction

5   initiative?

6   **A.**   Yes.  That is correct.

7   **Q.**   Okay.

8           MR. RAFFERTY:  Well, at this point, Your Honor, we

9   would still move this document in as P-08247.  It's a

10  stipulated document with a sponsoring witness stipulation.

11          MR. SCHMIDT:  And, Your Honor, pursuant to our

12  stipulation, no objection to moving it in.

13          THE COURT:  It's admitted.

14          BY MR. RAFFERTY:

15  **Q.**   Did you -- were you aware at that time -- setting the

16  document aside, were you aware at that time that, in fact,

17  the RNAs were going through that reduction initiative on

18  thresholds?

19  **A.**   Yes.  It was something Nate Hartle was undertaking

20  himself and doing the work.  He was not letting me know that

21  they were being reduced.

22  **Q.**   Did you know the amount of the threshold reductions

23  that were incurred by Rite Aid as a result of that

24  initiative?

25  **A.**   I would have seen it on an individual basis.  As I've

1    conducted my due diligence and would look at thresholds, I

2    would see like for a specific registrant, specific Rite Aid

3    store, that would have gone from, you know, X to Y.  That's

4    how I would have seen it.

5    **Q.**   Do you know whether it was millions of pills that would

6    have been reduced?

7    **A.**   I don't know if it was that high.

8    **Q.**   Let me now show you what's been marked at P-13211.

9    **A.**   Thank you.

10   **Q.**   And this document is dated just a year later, May 16th,

11   2016, very similar document to the one we just entered.  And

12   do you see it says, once again, Nate Hartle is sending it;

13   is that correct?

14   **A.**   Nate did not send this.  Nate documented the process he

15   did and this would have gotten filed.

16   **Q.**   Okay.

17   **A.**   It's not an e-mail.

18   **Q.**   Yes.  It appears to be some type of memo; is that

19   correct?

20   **A.**   Yes.  It's him conducting documentation.

21   **Q.**   Okay.  And are you familiar then -- you see the chain

22   name Rite Aid, correct?

23   **A.**   Yes.

24   **Q.**   And you were still involved with Rite Aid in this

25   particular -- at this time?

1    **A.**   Yes, I was.

2    **Q.**   Okay.  Are you familiar with this reduction initiative

3    and this reduction process by Mr. Hartle?

4    **A.**   No, I wasn't.  He did a lot of the review work himself

5    and this is another example of that.

6    **Q.**   Okay.

7            MR. RAFFERTY:  Your Honor, at this time, I would

8    move in P-13211 as part of the stipulated documents.

9            MR. SCHMIDT:  No objection under the stipulation

10   under our agreement.

11           THE COURT:  All right.  It's admitted.

12           BY MR. RAFFERTY:

13   **Q.**   Now I'd like to show you what's been marked as P-13212.

14   **A.**   Thank you.

15   **Q.**   Once again, this is -- I'm sorry.  Are you there, sir?

16   **A.**   Go ahead.

17   **Q.**   Okay.  I just wanted to make sure you were ready.

18   **A.**   Thank you.

19   **Q.**   If you were reviewing it, I didn't want to interrupt

20   you.  This is dated again July 5th, 2017, so yet another

21   year later.  Do you see that?

22   **A.**   Yes, I do.

23   **Q.**   Okay.  And here it is -- once again, this -- well, this

24   is labeled Investigative Report.  Do you see that?

25   **A.**   I'm looking for it.

1    **Q.**   Right at the -- right at the top under -- controlled.

2    **A.**   Oh, okay.  I'm sorry.  Yes.

3    **Q.**   That's all right.  And from Nate Hartle again -- or by

4    Nate Hartle, I should say, and it says Report Re:  Rite Aid

5    DD adjustments.  Chain name, Rite Aid.  Do you see that?

6    **A.**   Yes.

7    **Q.**   Okay.  And are you aware that this threshold reduction

8    initiative went on yet again in 2017?

9    **A.**   During this time, in 2017, Nate was doing these reviews

10   and adjustments.  So, I would, again, learn about it after

11   the fact.  So, I've not seen this document either.

12           MR. RAFFERTY:  We will move this document,

13   P-13212, into evidence per the stipulation.

14           MR. SCHMIDT:  No objection on those terms, Your

15   Honor.

16           THE COURT:  It's admitted.

17           BY MR. RAFFERTY:

18   **Q.**   Now, during the time that you were a DRA, Mr. Oriente,

19   there were -- were there discussions between you and other

20   DRAs between 2008 and 2013 pertaining to the fact that you

21   did not feel as though you had adequate resources to perform

22   your duties as a Director of Regulatory Affairs?

23   **A.**   Yes.  At certain times, the workload was heavy.

24   **Q.**   And your fellow DRAs felt the same way, correct?

25   **A.**   A couple of them did, yes.

1    **Q.**   I want to show you what's been marked as P-13068.

2    **A.**   Thank you.

3    **Q.**   Would you like to review it first, sir?

4    **A.**   Yes, please.  Okay.

5    **Q.**   Okay.  This appears to be an e-mail string between you

6    and a couple of other DRAs; is that accurate?

7    **A.**   Yes, it is.

8    **Q.**   Okay.  And this is dated June 30th, 2009, which would

9    be right around a year after the implementation of the CSMP?

10   **A.**   Yes, roughly a year.

11   **Q.**   And is this during the time period that they still had

12   the five DRAs covering the entire country?

13   **A.**   Yes, it would have been.

14   **Q.**   If we look at this, at the first e-mail, it's the first

15   e-mail that starts the string on the second page, sir.

16   **A.**   Yes, sir.

17   **Q.**   Michael Oriente, Tuesday, June 30th, 2009 to Dave

18   Gustin and Tom McDonald.  I don't think we've introduced Tom

19   McDonald.  Who is he?

20   **A.**   Tom McDonald replaced Tracy Jonas as the West DRA.

21   **Q.**   And you were telling them that I did them.  Thanks.

22   Right now, I think I am in the eye of the storm.  It beat me

23   up pretty good yesterday and I expect this afternoon to heat

24   up.  Right now, I'm gathering my wits.  How are you guys

25   doing?  And this is June 30th, so this is the end of the

1    month, correct?

2    **A.**    Yes, sir.

3    **Q.**    So, what are you referring to there?

4    **A.**    Yes.  Towards the end of the month, since there was a

5    monthly threshold, customers would more than likely have

6    blocked orders the last week of the month.  So, the last day

7    of June would have been a busy day for threshold change

8    reviews and that's what I'm referring to, that the 29th and

9    30th, I was, you know, busy for the entire day reviewing

10   customers.

11   **Q.**    And doing TCRs, correct?

12   **A.**    It would have involved reviewing TCRs, yes.

13   **Q.**    Right, which is the threshold change requests from

14   customers?

15   **A.**    Yes.  Making a determination whether or not they should

16   be granted.

17   **Q.**    Okay.  And that's part of the due diligence obligation

18   of McKesson in regards to the CSMP, correct?

19   **A.**    That is correct.

20   **Q.**    Okay.  And if you go up, Dave Gustin says back to you

21   and Mr. McDonald, I needed backup yesterday.  I think I had

22   190 e-mails and did 80 increases, mostly from the south.  Do

23   you see that?

24   **A.**    Yes.  Dave referenced mostly from the south.  He would

25   have been covering from Bill Mahoney.

1    **Q.**    Okay.

2    **A.**    We covered for each other.  Bill must have been out.

3    **Q.**    That's actually what I was going to ask you.  A lot of

4    time, because there were five of you, people had paid time

5    off, or were sick, or something else, and you all would

6    cover for each other on doing TCRs, correct?

7    **A.**    Yes.  We had backup.

8    **Q.**    Okay.  And here it says -- so, 80 increases, so 80

9    threshold increases were done on that day, according to Mr.

10   Gustin telling you, correct?

11   **A.**    That's what Dave put here, yes.

12   **Q.**    It says -- he goes on to say, that is not to whine, but

13   merely to note that it is not possible to be truly diligent

14   and still handle that kind of volume.  Do you see that?

15   **A.**    I see that.

16   **Q.**    Okay.

17   **A.**    That, again, is his opinion.

18   **Q.**    He says I think I have a good system and am pretty

19   adept, but was hard-pressed to be thorough, error free and

20   on my game.  Do you see that?

21   **A.**    That's what he wrote, yes.

22   **Q.**    Okay.  And then you respond and say we need to think of

23   a solution as a group to the tsunami at the end of the

24   month.  And is the tsunami that you're referring to the

25   tsunami of TCRs, threshold change requests?

1      **A.**   Yes.  It would be the amount of reviews that came in at

2      the end of the month.

3            MR. RAFFERTY:  Plaintiffs would move in P-13068,

4      Your Honor.

5            MR. SCHMIDT:  No objection under the terms of our

6      stipulation.  Or no objection period, I'm sorry.

7            THE COURT:  It will be admitted.

8            MR. RAFFERTY:  Okay, thank you.  I'm not used to

9      hearing that.

10            BY MR. RAFFERTY:

11     **Q.**   I'm going to show you what's been marked as 08763.

12     Now, the last document we just looked at was in '09,

13     correct?

14     **A.**   Yes.

15     **Q.**   I want to show you an e-mail from 2011.

16     **A.**   Thank you.

17     **Q.**   And we'll skip the first couple of e-mails in the

18     string on the last page and the bottom of the second page

19     and start with the e-mail from Dave Gustin to you, Bill

20     Mahoney, Tom McDonald.  That's -- that starts on the first

21     page -- I'm sorry.  It starts on the first page down at the

22     bottom.  Do you see that?

23     **A.**   Bottom of the second page?

24     **Q.**   Bottom of the -- I'm sorry.  Let me -- it's bottom of

25     the second page.  I'm sorry.  Do you see it's dated

```
 1    August 8th, 2011 at 12:09?
 2    A.   Yes, sir.
 3    Q.   Okay.  And there, once again, Dave Gustin is talking
 4    about his workload, correct?
 5    A.   Yes.
 6    Q.   He says I don't know about you, but I already am
 7    starting to feel like I need a personal assistant.  Since
 8    that isn't happening anytime soon, I think we need to
 9    cultivate and incorporate SF.  What is SF?
10    A.   SF is McKesson's abbreviation for service first.  It
11    would be a customer service group in our, at that time,
12    Carollton office in Texas.
13    Q.   Okay.  We need to cultivate and incorporate SF, or
14    service first, to do the mundane and time-consuming so we
15    can visit more customers, attend more events that develop
16    our contacts and knowledge and allow us to be more engaged
17    with the regions to increase our level of influence and
18    accountability.  Am I wrong?
19         And then there is a response from Mr. Mahoney.  And
20    then there is a further response from you.  Do you see that
21    in the middle of Page 2?
22    A.   Yes.
23    Q.   Okay.  And there, you describe how you're feeling about
24    your workload, correct?
25    A.   Where I say I second that, I'm seconding what Bill
```

1       Mahoney wrote.

2       **Q.**   Yeah, but I'm focused primarily, yes, really on the

3       next sentence and the one after that where you say often, it

4       has new doctor, new clinic -- well, let's just put it in

5       context because, you're right, you are saying I second that

6       to Mr. Mahoney's e-mail?

7       **A.**   Right.  The service -- what I'm commenting on is that

8       the service first does not always meet the requirements that

9       I need.  So, that's why I'm seconding what Bill's comment

10      is, not Dave's.

11      **Q.**   And Bill is saying using service first doesn't save the

12      DC or Distribution Center time because documentation is

13      insufficient.  This is particularly true with customers who

14      may have high thresholds.  Is that what he -- and then you

15      seconded that, correct?

16      **A.**   Yes.  I'm agreeing with Bill.

17      **Q.**   And that's because, as we've talked about throughout

18      the day, documentation is a key part of the CSMP, correct?

19      **A.**   Yes.  Each of the DCs assisted the regulatory people in

20      gathering that information.

21      **Q.**   Okay.  And as you go on and say, and, yes, Dave, I am

22      overwhelmed.  I feel that I am going down a river without a

23      paddle and fighting the rapids.  Sooner or later, hopefully

24      later, I feel we will be burned by a customer that did not

25      get enough due diligence.  I feel it is more of a when than

1    if we have a problem arise.  Did I read that correctly?

2    **A.**    Yes, you did.

3    **Q.**    And the being burned by a customer without due

4    diligence, that's the main function?  Due diligence is the

5    main function that you serve as a DRA in exercising your

6    responsibility into the CSMP, correct?

7    **A.**    Yes.  My point in writing that was that we could do our

8    diligence and review a customer and they be a fine customer,

9    and then they make a decision in their business, and they

10   end up doing something that they shouldn't be.  And then,

11   they get, you know, caught and it comes back on the

12   wholesaler.

13   **Q.**    Well, the due diligence that you're doing on TCRs, for

14   example, that was being discussed, is you're doing due

15   diligence to determine whether or not to grant that

16   threshold change request, true?

17   **A.**    Yes, but a customer doing something that causes us to

18   terminate them may not have been involved any TCR.

19   **Q.**    Well, but it includes a TCR.  And it could, if you

20   don't do due diligence, or quality, or proper due diligence

21   and you grant a TCR, that can create a diversion, and that

22   can create a public health hazard; true?

23              MR. SCHMIDT:  Objection, speculation and

24   foundation.

25              MR. RAFFERTY:  This is his job.

```
 1                    THE COURT:  Sustained.
 2                    MR. RAFFERTY:  I'm just about to change topics, if
 3        you would like to take a break, Your Honor.
 4                    THE COURT:  Well, we're going until 5:30 today.  I
 5        would like to get in a few more minutes before we -- before
 6        we do.
 7                    MR. RAFFERTY:  Absolutely, Your Honor.
 8                    BY MR. RAFFERTY:
 9        Q.    So, would you agree with me that during your tenure as
10        a DRA and, particularly in the 2013 time period, threshold
11        increases were becoming almost automatic and automatically
12        granted by McKesson?
13        A.    No.  I wouldn't say they were automatic.  The volume
14        increased.  As -- as prescriptions rose, pharmacies saw more
15        prescriptions from prescribers.  Therefore, pharmacies
16        ordered more product from what they previously had been.
17        So, therefore, they were reaching their threshold, needing
18        additional product.  So, the number of threshold reviews
19        increased, but they weren't automatically just approved.
20        Q.    Okay.  Are you aware in 2013 of the enhancement of the
21        CSMP, some changes to the CSMP?
22        A.    I'm not exactly sure what you mean by the enhancements.
23        Q.    Okay.  Well, let me show you what's been marked as
24        P-13737.  Let me know once you have had a moment to review
25        it, sir?
```

```
 1    A.    Okay, thank you.
 2              MR. RAFFERTY:  While he's reviewing that, Your
 3    Honor, I forgot to move in the last document, P-08763.
 4              MR. SCHMIDT:  No objection.
 5              THE COURT:  It's admitted.
 6              THE WITNESS:  Okay, thank you.
 7              BY MR. RAFFERTY:
 8    Q.    Yep.  This is an e-mail attaching a PowerPoint
 9    presentation that appears to be from Mr. Don Walker, but
10    just to set the foundation, this is from Ellie Rio.  Do you
11    know who Ellie Rio is?
12    A.    Yes.  She assisted Don.
13    Q.    And this is to an awful lot of people that we won't
14    read through.  I did highlight your name.  So, about -- if
15    we could --
16              MR. RAFFERTY:  Well, let's go ahead and move it
17    in, P-13737.
18              MR. SCHMIDT:  No objection.
19              THE COURT:  It's admitted.
20              BY MR. RAFFERTY:
21    Q.    And then if you see --
22    A.    Yeah, I found it.
23    Q.    Okay.  Just so you don't have to look for it.  It took
24    me awhile to find it.  And then if you go down, it says
25    subject, Reference Documents Northeast Suspicious Order
```

```
 1    Monitoring Awareness Training.  Do you see that?
 2    A.    Yes, I do.
 3    Q.    Okay.  And then if you go to the next page, which is an
 4    earlier e-mail, it's October 24th, 2013 from Ellie Rio again
 5    and your name is right there, second line towards the end.
 6    A.    Yes.
 7    Q.    Okay.  Suspicious -- and the subject, Suspicious Order
 8    Monitoring Awareness Training.  Do you see that?
 9    A.    Yes.
10    Q.    And here it says it's from -- sent on behalf of Don
11    Walker.  Do you recall this presentation, sir?
12    A.    Do I recall --
13    Q.    Do you recall this presentation?
14    A.    Yes, I do.
15    Q.    And it says, as you are aware, we are in the process of
16    -- I read too fast.  As you are aware, we are in the process
17    of implementing an enhanced suspicious Order Monitoring
18    Program.  Do you see that?
19    A.    Yes, I do.
20    Q.    Okay.  As a pharmaceutical distributor, McKesson has a
21    responsibility to ensure pharmaceutical controlled
22    substances are not diverted for non-medical or other illegal
23    purposes.  To that end, we are further enhancing our
24    controlled substance distribution policies and procedures.
25    Do you see that?
```

1    **A.**    Yes, I do.

2    **Q.**    Okay.  And, really, what I want to ask you about now

3    that we've got that established is about the presentation.

4    And here it says one of the changes, on Page 7, sir --

5              MR. RAFFERTY:  May I approach the screen?

6              BY MR. RAFFERTY:

7    **Q.**    On Page 7, significant enhancements to CSMP.  Do you

8    see that?

9    **A.**    Yes, I do.

10   **Q.**    And one of the things, the key enhancements underway,

11   more rigorous process for threshold change requests.  Do you

12   see that?

13   **A.**    Yes, I do.

14   **Q.**    So, they're trying to -- so, McKesson, in 2013, is

15   trying to make -- make a more rigorous process for those

16   TCRs we talked about earlier; is that correct?

17   **A.**    Yes.

18   **Q.**    Okay.  And it says changes are the exception, not rule.

19   Do you see that?

20   **A.**    Yes.

21   **Q.**    And the reason it had to be enhanced -- to your

22   understanding, the reason it had to be enhanced was because

23   changes, or the threshold changes, had become the rule, not

24   the -- not the exception, correct?

25             MR. SCHMIDT:  Objection, foundation.

```
 1                THE COURT:  Overruled.

 2                THE WITNESS:  That's what's written here.  That

 3     really wasn't my understanding.  I would review all TCRs

 4     that came to me.

 5                BY MR. RAFFERTY:

 6     Q.   This is what Mr. Walker is saying, right?

 7     A.   Yes.

 8                MR. RAFFERTY:  Okay.  And we would move in

 9     P-13737.

10                MR. SCHMIDT:  No objection.

11                THE COURT:  It's admitted.

12                BY MR. RAFFERTY:

13     Q.   If I could see -- I'm now going to show you what's been

14     marked for purposes of identification, sir, as 42 --

15     P-42796.

16     A.   Thank you.

17                MR. SCHMIDT:  And in an effort to move this along,

18     I'll object to this one as not related to Huntington-Cabell.

19     It's stores outside of Huntington-Cabell.

20                MR. RAFFERTY:  Once again, Your Honor, this is

21     discussing how thresholds are being set in retail national

22     accounts.

23                THE COURT:  Yes.  I will overrule the objection.

24                MR. RAFFERTY:  Thank you.

25                MR. SCHMIDT:  Just so I state for the record, it's
```

```
1    thresholds for an account that was not present in

2    Huntington-Cabell at this time.

3               THE COURT:  Okay.

4               MR. RAFFERTY:  I'm sorry, Your Honor.  May I

5    proceed?

6               THE COURT:  Yes, you may.

7               MR. RAFFERTY:  Thank you.

8               BY MR. RAFFERTY:

9    Q.   Mr. Oriente, this is an e-mail dated --

10              MR. RAFFERTY:  Well, I guess I should just go

11   ahead and admit it, P-42796.

12              MR. SCHMIDT:  We'll maintain our objection, Your

13   Honor.

14              THE COURT:  All right.  It's admitted subject to

15   the objection.

16              MR. RAFFERTY:  Thank you, Your Honor.

17              BY MR. RAFFERTY:

18   Q.   This e-mail from you, the top of it, is to Dave Gustin

19   and we've talked a lot about Dave Gustin.  October, 2008.

20   Do you see that?

21   A.   Yes, I do.

22   Q.   Okay.  And if we go back and start from the beginning

23   here, there is a Stephen Schmidt.  Who is Stephen Schmidt?

24   And this is on -- I'm sorry.  This is on Page 3, Mr.

25   Oriente.
```

**A.**   He worked in the RNA group.  I believe he was an

account manager for McKesson.

**Q.**   And it says, Michael, please see attached TCR form for

today's CVS stores over the 80 percent threshold.  Do you

see that?

**A.**   Yes, I do.

**Q.**   And then, if you flip to Page 2, it says, today's --

from you to Tracy Jonas and others, including Dave Gustin,

today's CVS CSMP threshold adjustments for review.  Dave,

can you do Bill's five, as he is on PTO; is that time off?

**A.**   Yes, it is.

**Q.**   And this is when you all cover for each, as we've

discussed?

**A.**   That is correct.

          THE COURT:  Let me say something for the record.

It seems to me that the geographic scope objection isn't

really appropriate here because we're talking about policies

that go across the -- all of McKesson, which would embrace

the Huntington-Cabell area, to some extent.

          MR. RAFFERTY:  Yes, Your Honor.

          THE COURT:  Do you want to respond?

          MR. SCHMIDT:  Yeah.  And that was the reason for

our objection.  I don't think that's accurate.  They do have

Rite Aid documents.  They did use a Rite Aid document.  CVS

is a different account and they were handled on an account

1    by account basis.  And there's no CVS in Huntington-Cabell

2    this point, at least for McKesson.

3               THE COURT:  All right.  Go ahead, Mr. Rafferty.

4               MR. RAFFERTY:  Thank you.  Thank you, Your Honor.

5               BY MR. RAFFERTY:

6    **Q.**    And then it says -- up at the top, there is an e-mail

7    to other people, Jon Cox, and then you're copied on this

8    CSMP threshold report dated -- and it's dated October 16th,

9    '08.  That's the bottom e-mail on the first page, sir; do

10   you see that?

11   **A.**    Yes.  From Dave Gustin, yes.

12   **Q.**    Yes.  It says regulatory team, something needs to be

13   addressed.  All of these, I believe, had already gotten

14   increases in the past week.  One was done yesterday.  We are

15   giving a lot of automatic increases that would not fly for

16   the independent retailers without level twos.  Is he -- is

17   he -- well, is it your understanding that he was referring

18   to the level two review in the CSMP?

19   **A.**    Yes, he was.

20   **Q.**    And at least Mr. Gustin was referring to them as

21   automatic increases, correct?

22   **A.**    Yeah.  He referenced the automatic increase and he

23   wrote we.  I would not classify mine as automatic.

24   **Q.**    Okay.  Okay.  But, once again, just to orient things,

25   Dave Gustin was, at that time, in 2008, over the Washington

1    Court House Distribution Center, which did service Cabell

2    County, correct?

3    **A.**    Yes, for the independence in that county.

4    **Q.**    And then he says can we not make substantial enough

5    increases to prevent daily changes of thresholds?  Do you

6    see that?

7    **A.**    Yes, I see that.

8    **Q.**    So, one way, would you agree with me, sir, in your role

9    as DRA, one way of not having as many TCRs processed at the

10   end of every month is to increase the thresholds so high

11   that the customer never bumps up against them and that's --

12   well, let me leave the question there.

13   **A.**    This is about six months into the program and

14   thresholds were something that was brand new, so they were

15   being adjusted.  Also, as I stated earlier, as the amount of

16   prescriptions being written by prescribers increased,

17   thresholds would follow that and mirror that as pharmacies

18   would require more product.

19            MR. RAFFERTY:  Your Honor, I hate to do it, but I

20   would move to strike that as unresponsive.  I don't think

21   that answered my question.  I was asking about one way to

22   decrease the amount of TCRs at the end of the month was to

23   set the threshold so high that they never bumped up against

24   it.

25            MR. SCHMIDT:  Your Honor, I think he was answering

1    the question and trying to explain.  He's been a remarkably

2    responsive witness.

3            THE COURT:  I'm going to deny the motion to

4    strike.

5            BY MR. RAFFERTY:

6    **Q.**   If you set the threshold too high, as Mr. Gustin was

7    talking about, then you cut down the number of TCRs at the

8    end of the month, true?

9    **A.**   If the threshold was set way above purchasing then,

10   yes, you would not get a threshold change request.

11           MR. RAFFERTY:  At this time, Your Honor, we would

12   move in 42796.

13           MR. SCHMIDT:  You didn't move it in before?  I

14   thought you moved it in right away.  But either way --

15           MR. RAFFERTY:  I can't keep track.

16           MR. SCHMIDT:  We maintain our objection and I

17   suspect it's overruled.

18           THE COURT:  All right.  Did you object to it, Mr.

19   Schmidt?

20           MR. SCHMIDT:  I did.

21           MR. RAFFERTY:  You overruled it.

22           THE COURT:  On the geographic scope ground?

23           MR. SCHMIDT:  Yes, Your Honor.

24           THE COURT:  All right.  That objection is

25   overruled and it's admitted.

1          MR. RAFFERTY:  Thank you, Your Honor.

2          BY MR. RAFFERTY:

3    **Q.**   I'm now handing you what's been marked for purposes of

4    identification, sir, as P-12778.

5    **A.**   Thank you.

6    **Q.**   Have you had a chance to review it, sir?

7    **A.**   Yes, sir.

8    **Q.**   Okay.  This is an e-mail from Dave Gustin to, once

9    again, a number of people, but down -- luckily for us, down

10   at the cc line is where your name appears.  Do you see that?

11   **A.**   Yes, I do.

12   **Q.**   Okay.  And the date is July 26th, 2010, correct?

13   **A.**   Yes.

14   **Q.**   First, let me ask you this.  Is it ever appropriate

15   when processing a TCR to grant more than the customer is

16   asking for?

17   **A.**   I don't believe there was a restriction in setting the

18   threshold for a customer.

19   **Q.**   So, if a customer asked for a thousand threshold change

20   increase, you could just increase it by 7- or 8,000?

21   **A.**   Not necessarily, but if a customer asks asking for a

22   thousand, you know, if we -- in our due diligence of that

23   customer, we felt that, you know, a permissible amount was

24   slightly higher than that, we could put that in.  I know,

25   myself, I put in what the customer asked for only.

1    **Q.**    You believe that's a better practice as a DRA?

2    **A.**    That's the way I interpreted the operating manual, yes.

3    **Q.**    So, you would believe it would be consistent with the

4    CSMP to grant the request of the customer at the level they

5    requested?

6    **A.**    Yes.  The way I understood it.

7    **Q.**    If we could take a look at P-12778.  And down here, an

8    e-mail to you and many others from Mr. Gustin in 2010 says

9    there's an important aspect to this that had been overlooked

10   and that is to always restore the customer's buffer when we

11   put the TCR in.  If service first passes along that the

12   customer wants 3,000 more doses of something, we need to

13   realize that there is a good chance they are seeking what

14   they think they need, not what they need plus ten percent

15   rounded up.  Do you see that?

16   **A.**    That is what Dave wrote here, yes.

17   **Q.**    So, please remember to adjust their request by ten

18   percent rounded up before filling out the SharePoint TCR and

19   include in your comments that the buffer has been added.

20   So, then he gives an example.  I.e., the customer thinks

21   that they will need 11,000 doses of Oxy.  The TCR request

22   would be for 11,000 plus another 1,100 oxycodone, correct?

23   **A.**    Yes, that's what Dave wrote here.

24   **Q.**    Rounded up to the highest thousands or, in this case

25   13,000.  That will help us tremendously to avoid repeated

1    omits in the future and lighten the workload in terms of

2    calls and reports, not to mention reduce the nuisance factor

3    for our customers.  Do you see that?

4    **A.**    Yes.  That was Dave's interpretation.

5    **Q.**    And you disagree that that's the appropriate thing to

6    do under the CSMP?

7    **A.**    I did not do that in my region, continue to add the

8    buffer.  The buffer was assigned a ten-percent buffer when

9    thresholds were first established, but because of the

10    variability in purchasing, I could see, you know, Dave's,

11    you know, doing that in his region, that he wanted it that

12    way.

13    **Q.**    And that's -- and so, what you could end up doing, if

14    you ended up doing that with every customer McKesson had,

15    you're talking about adding ten percent -- for example, just

16    taking oxycodone, if Mr. Gustin was doing that, that would

17    add thresholds, millions of pills of oxycodone to

18    thresholds, correct?

19            MR. SCHMIDT:  Objection, foundation.

20            THE COURT:  I will sustain the objection.

21        You can try it again, Mr. Rafferty.

22            BY MR. RAFFERTY:

23    **Q.**    Do you know how many customers David Gustin was

24    servicing?

25    **A.**    I do not.

1    **Q.**   Once again, do you know how many customers he was

2    servicing in Cabell County?

3    **A.**   I do not.  It wasn't my area of the country.

4            MR. RAFFERTY:  Plaintiffs move in 12778, Your

5    Honor.

6            MR. SCHMIDT:  No objection.

7            THE COURT:  All right.  12778 is admitted.

8        Maybe this would be good time to take a little timeout,

9    Mr. Rafferty.

10           MR. RAFFERTY:  Okay.  Sure, Your Honor.

11           THE COURT:  Let's be in recess until about 3:30.

12       (Recess taken)

13       (Proceedings resumed at 3:31 as follows:)

14           THE COURT:  All right, Mr. Rafferty.

15           MR. RAFFERTY:  Thank you, Your Honor.

16   BY MR. RAFFERTY:

17   **Q.**   Mr. Oriente, I want to focus on the thresholds in

18   particular to Rite-Aid, your customer.  Okay?

19   **A.**   Yes.

20   **Q.**   Okay.  So would you agree that McKesson in terms of

21   thresholds or Threshold Change Requests has been more

22   deferential to the RNA accounts than they are to the smaller

23   ISMC accounts?

24   **A.**   What do you mean by deferential?  Just that they're

25   different?

1   **Q.**   Well, we'll start with that.  You treat them

2   differently under the CSMP; correct?

3   **A.**   Yes, we treat them differently because the retail

4   national accounts have their own regulatory teams that would

5   oversee their stores, whereas on the independent side there

6   is not that regulatory team.

7   **Q.**   And you don't do any review of the individual store in

8   terms of the TCR; correct?

9   **A.**   No, that's not correct.

10   **Q.**   Okay.  If you did do any review of a particular RNA

11   account such as Rite-Aid, that should be documented in

12   writing; correct?

13   **A.**   There would be some documentation done.  Some was

14   electronic captured.  But, yes, there would be documentation

15   through emails and such that a TCR was conducted.

16   **Q.**   Primarily what you would do is communicate specifically

17   with headquarters as compared to the local store?

18   **A.**   It would go from the local store to the chain

19   corporation.  They would review it through their regulatory

20   team.  And they would then send it on to McKesson for review

21   by myself, yes.

22   **Q.**   All right.  I would like to -- at some point did you

23   agree -- or McKesson -- I'm sorry.  Did McKesson agree to

24   grant a 50 percent increase for all CII controlled

25   substances for each Rite-Aid store?

1    **A.**    That agreement was reached with McKesson and Rite-Aid

2    by my boss, Don Walker, that if Rite-Aid would request a CII

3    review at a store, a or TCR, we were permitted to review it

4    and then make our decision.  It didn't -- it wasn't a

5    blanket increase every Rite-Aid.  It was when they requested

6    it, we would review that.

7    **Q.**    Okay.  It's your testimony it was not an automatic

8    increase?

9    **A.**    Not for all 5,000 Rite-Aids, no.

10   **Q.**    I'd like to show you P-22936.  And have you had a

11   chance to --

12   **A.**    Yes, I see the document.

13   **Q.**    I understand it's a big document.  I'm going to point

14   you to just one particular page, but you're free to look at

15   anything you like.  Okay?

16   **A.**    Fine.

17   **Q.**    So this is -- it says on the cover page "Rite-Aid All."

18   Do you see that?

19   **A.**    Yes.  That's what's typed on this, "Rite-Aid All."

20   **Q.**    Okay.  And I'll represent to you this was produced to

21   us as the paper diligence file for Rite-Aid.

22        MR. SCHMIDT:  Your Honor, we object to that

23   representation.  This refers to specific Rite-Aid stores,

24   none of which are in Huntington/Cabell.

25        THE COURT:  All right.  I'll sustain the

```
 1    objection.
 2              MR. RAFFERTY:  Well, if we could, can we move
 3    to -- I think I can lay a foundation that this pertains to
 4    --
 5              THE COURT:  All right.  Go ahead.
 6    BY MR. RAFFERTY:
 7    Q.   If we go to Page 19, Mr. Oriente, --
 8    A.   Yes.
 9    Q.   Okay.  And it says McKesson Corporate at the top.  It
10    says Threshold Change Form.  Do you see that?
11    A.   I do.
12    Q.   And it's August 14th, '08.  Correct?
13    A.   Yes.
14    Q.   And down below on the regulatory signature there's
15    Michael Oriente.  Do you see that?
16    A.   Yes, I do.
17              MR. SCHMIDT:  Your Honor, I'll object to this on
18    the same basis.  The store that's being discussed is in Camp
19    Hill, Pennsylvania.
20    BY MR. RAFFERTY:
21    Q.   If you look at it, it says "Customer --"
22              THE COURT:  How is a store in Pennsylvania --
23              MR. RAFFERTY:  Because if you look at the thing,
24    it says "Customer Account All."
25         This is pertaining to all -- this is the -- this is all
```

```
1    Rite-Aids.  And, in fact, the next document I'm going to
2    show is going to show that --
3              THE COURT:  I'll overrule the objection and see
4    where you're going with this.  Go ahead.
5    BY MR. RAFFERTY:
6    Q.   Is that your signature down at the bottom left?
7    A.   Yes.  This would have been for stores serviced by the
8    New Castle distribution center.  That's where Blaine Snyder
9    was the DC manager at.
10   Q.   And --
11             MR. SCHMIDT:  Your Honor, I'll note that proves
12   the point.  That distribution center did not distribute to
13   Huntington/Cabell.
14             THE COURT:  How is this relevant to --
15             MR. RAFFERTY:  With all due respect to defense
16   counsel, there is -- this is an all -- all across the board.
17   And, in fact, the Cabell County -- and I will go there
18   next -- showing three out of the four Rite-Aids in Cabell
19   County got the 50 percent auto increase.  And this is the
20   TCR that it's relying upon.
21             THE COURT:  Well, how does this relate to Cabell
22   County?
23             MR. RAFFERTY:  Because of the "all," there's no
24   other forms that show the 50 percent increase, but the
25   Cabell County Rite-Aids got the 50 percent increase, three
```

165

1    out of the four.

2         MR. SCHMIDT:  Your Honor, the form they're using

3    is a pre-filled form that says "all" when they enter a

4    Rite-Aid.  It's for specific pharmacies.

5       And I think what's happening here is this was a file

6    produced by one distribution center.  The argument that's

7    being made is if 10, 15 years later we don't have similar

8    files for other distribution centers, they didn't exist and

9    that's just not true.

10        MR. RAFFERTY:  I think that makes the point.  This

11   is a pre-filled form saying "all" with a 50 percent increase

12   of all CIIs.

13        MR. SCHMIDT:  At one Rite-Aid in Pennsylvania.

14        THE COURT:  I'm going to sustain the objection,

15   Mr. Rafferty.

16        MR. RAFFERTY:  For the record, that is, we would

17   proffer, P-22936 which is the Rite-Aid Threshold Change

18   Request form.

19        MR. SCHMIDT:  We object to moving in those

20   Threshold Change Request forms for pharmacies outside of

21   Huntington/Cabell.

22        THE COURT:  Objection sustained.

23        MR. RAFFERTY:  If I could have just one moment.

24        THE COURT:  Yes.

25        MR. RAFFERTY:  Thank you.

1          (Pause)

2                MR. RAFFERTY:  Your Honor, I'm being informed by

3     my learned partner that, in fact, the Camp Hill address is

4     the Rite-Aid corporation headquarters.  And it would --

5     Chain 252 is all of the Rite-Aids.  It's not reflected to

6     one particular Rite-Aid store.  It's talking about the

7     chain.  And there are four Rite-Aids in Cabell County.

8                MR. SCHMIDT:  Which page are you looking at?

9                MR. RAFFERTY:  19.  Do you have the right

10    document?

11               MR. SCHMIDT:  I do.  No, I don't actually.  If

12    you're talking about -- yes.

13               THE COURT:  Are you still in 22936?

14               MR. RAFFERTY:  We are still in --

15               MR. SCHMIDT:  I don't think that changes that this

16    one specific Rite-Aid, not a global change.  And I think

17    that's documented by the fact that there are other

18    individual Rite-Aids covered in here in other locations like

19    Ohio and places like that.

20               MR. RAFFERTY:  May I ask the witness a question?

21               THE COURT:  Yes.

22    BY MR. RAFFERTY:

23    Q.   Do you know where the Rite-Aid headquarters are,

24    Mr. Oriente?

25    A.   Yes.

```
 1    Q.    Where are they?

 2    A.    It's located in Pennsylvania.

 3    Q.    Camp Hill?

 4    A.    Yes.

 5    Q.    Thank you.

 6              THE COURT:  Well, what page --

 7              MR. RAFFERTY:  Page 19 if we could pull it up just

 8    for illustrative purposes so you can orient yourself, Your

 9    Honor.

10              THE COURT:  So your argument is because this is

11    addressed to the Rite-Aid headquarters and it says "all," it

12    covers all Rite-Aids?

13              MR. RAFFERTY:  It does, Your Honor.  It absolutely

14    positively does.

15              THE COURT:  Like 5,000 of them or something?

16              MR. RAFFERTY:  4,600 plus, Your Honor.

17              THE COURT:  And two or three of them are in

18    Huntington?

19              MR. RAFFERTY:  Four of them.  And three of the

20    four got the 50 percent increase, which is a very large

21    increase.

22              THE COURT:  So this is proof that the Rite-Aids in

23    Huntington got 50 percent increase --

24              MR. RAFFERTY:  The document I'm going to show next

25    is going to show that three out of the four got that
```

```
1    50 percent.

2            THE COURT:  In August of 2008?

3            MR. SCHMIDT:  Which actually refutes the point of

4    this document.  If it's only three out of the four, that's

5    not all Rite-Aids.

6            MR. RAFFERTY:  If I can explain what happened,

7    Your Honor.

8            THE COURT:  Yes, sir.  Go ahead.

9            MR. RAFFERTY:  So what happened is they put in the

10   "all" and then only a number of them, several of them,

11   hundreds, whatever, thousands got it.  And then what

12   happened is they went back and said, "Do you want increases

13   on the ones that hadn't gotten it yet?"  And Rite-Aid said,

14   "Yes."

15       And then they looked back at the threshold change to

16   show that the three out of four Cabell County ones got the

17   50 percent increase.

18           THE COURT:  Well, for what it's worth, if you want

19   to make this one page as a separate exhibit, I'll admit it.

20           MR. RAFFERTY:  Okay.  That's fine.

21           THE COURT:  The rest of it I'll sustain the

22   objection to.

23           MR. RAFFERTY:  We will modify this as we did the

24   Boggs PowerPoint and make this P-22936A.

25           THE COURT:  All right.  It's admitted subject to
```

```
1    Mr. Schmidt's objection.

2              MR. SCHMIDT:  Thank you, Your Honor.

3              MR. RAFFERTY:  Thank you, Your Honor.

4    BY MR. RAFFERTY:

5    Q.   And then it goes "Reason for Change."  Do you see

6    that?

7    A.   What -- are you still on Page 19?

8    Q.   Yes, sir.

9    A.   Okay.

10   Q.   Okay, on the TCR.  And it says the reason for the

11   change is that Rite-Aid Corporation has a DEA monitoring

12   program in place at the corporate level that includes their

13   loss prevention department.  As a result, Rite-Aid

14   Corporation and McKesson agreed to increase all CII base

15   codes by 50 percent.

16        Do you see that?

17   A.   Yes, when they were requested.

18   Q.   Okay.  And, in fact, the, the fact that DEA -- or, I'm

19   sorry.  Let me strike that.  The fact that a customer, a

20   pharmacy of McKesson's has its DEA license, and even though

21   they have a DEA monitoring program in place is not a

22   sufficient reason to grant a blanket increase.  Correct?

23   A.   The increase would have been reviewed -- I know on some

24   of the Cabell County ones they were set at base levels, the

25   lowest level before they were increased.
```

1    **Q.**   So you do know that Cabell County Rite-Aids got the

2    50 percent increase; correct?

3    **A.**   I know of one that I recall.

4    **Q.**   So as we sit here today, it's your testimony that you

5    know one Cabell County Rite-Aid got a 50 percent increase

6    for all CIIs.  True?

7    **A.**   No, not for all CIIs, no.

8    **Q.**   For what then?

9    **A.**   For a specific CII that they would have requested.  And

10   this, this document does not cover those stores.  This

11   document is pertaining to Rite-Aid stores serviced out of

12   the New Castle DC.

13   **Q.**   And where does it say that on there?

14   **A.**   I know because the DC manager, Blaine Snyder, was over

15   the New Castle distribution center only.

16   **Q.**   Do you know whether or not the Cabell County Rite-Aids

17   got the 50 percent increase that is discussed here, sir?

18   **A.**   Not on this document, no.

19   **Q.**   Okay.  Let me show you what's been marked for

20   identification purposes as P-42728.

21            MR. SCHMIDT:  Your Honor, we'll move to strike

22   this exhibit given the witness's testimony that took away

23   the predicate under which it was admitted.

24            THE COURT:  Right.  He said it doesn't show an

25   increase in Cabell County or Huntington.

```
 1              MR. RAFFERTY:  This is a different document, Your

 2    Honor.

 3              THE COURT:  Well, what about the one that I let in

 4    and now based on his testimony he's saying that it's not,

 5    not relevant to the point you're trying to make?

 6              MR. RAFFERTY:  But we believe it is.  And we

 7    believe that is what the TCR was used as an automatic

 8    increase across Rite-Aid, and we can show that those

 9    50 percent increases were given --

10              THE COURT:  Well, if I understood his testimony,

11    he said it didn't show a 50 percent increase for Huntington

12    and Cabell County.

13              MR. RAFFERTY:  He said he thought he saw one, but

14    we have three.

15              THE COURT:  Well, let me ask you --

16              THE WITNESS:  Yes, sir.

17              THE COURT:  -- does this document show a

18    50 percent increase for the Rite-Aid stores in Huntington,

19    Cabell County?

20              THE WITNESS:  It does not, sir.

21              THE COURT:  I'm going to grant the motion to

22    strike it and I'll reverse my ruling admitting it and it's

23    out.

24    BY MR. RAFFERTY:

25    Q.   Let me show you now what's been marked as
```

```
1    Plaintiffs' Exhibit --

2            THE COURT:  If you can get it in through another

3    witness or some other way, Mr. Rafferty, I'll consider it.

4    But based on this witness's testimony, it doesn't prove

5    anything --

6            MR. RAFFERTY:  Thank you, Your Honor.

7            THE COURT:  -- related to Huntington and Cabell

8    County.

9            THE WITNESS:  Yes, sir.

10   BY MR. RAFFERTY:

11   Q.   I'm going to show you what's been marked as Exhibit

12   P-42728.

13   A.   Thank you.

14           MR. SCHMIDT:  Your Honor, this is a purported 1006

15   summary that we believe has at least one inaccuracy in it,

16   and then does not fully report the data purportedly being

17   summarized.  And I can give detail if that would help.

18           THE COURT:  Well, that would be a matter for

19   cross-examination, wouldn't it, Mr. Schmidt?

20           MR. SCHMIDT:  No, I don't think a 1006 summary, a

21   lawyer-prepared document, can come into evidence if it

22   doesn't have a foundation with the witness.

23           THE COURT:  All right.  Well, let's see if Mr.

24   Rafferty can clear up your problem.

25   BY MR. RAFFERTY:
```

1   **Q.**   Are you familiar, Mr. --

2           MR. RAFFERTY:  I'm sorry, Your Honor.  I

3   thought -- may I proceed?

4           THE COURT:  Yes.

5   BY MR. RAFFERTY:

6   **Q.**   Okay.  Mr. Oriente, are you familiar with threshold

7   reports?

8   **A.**   Yes, I am.

9   **Q.**   And looking at this particular threshold report, do you

10  recognize this as a threshold report?

11  **A.**   I, I don't recognize this as, as a report I would have

12  run.  The information on here is similar to what our report

13  would show.  This -- I don't recognize this as one we would

14  have run.

15  **Q.**   Okay.  And, in fact, this was a print-out of the

16  Threshold Change Report from McKesson regarding these

17  particular Rite-Aids in Cabell County.  Do you see --

18          MR. SCHMIDT:  I apologize.

19          THE COURT:  Go ahead, Mr. Schmidt.

20          MR. SCHMIDT:  I'll object to that representation.

21  I think what happened is there was a print-out that Mr.

22  Rafferty is referencing and some of the descriptions

23  changed, as I understand it, through that print-out.  But

24  then there were also omissions of some of the data.  So we

25  kind of have cherry-picking of hydrocodone for some,

1    oxycodone for others.

2            THE COURT:  Well, the witness said he didn't

3    recognize it as a report, quote, we would have run.

4            MR. RAFFERTY:  For the record, this is derived

5    from what is Bates number MCK-MDL-01391128 which is the West

6    Virginia Customer Threshold History Reports that were

7    produced to us from McKesson.

8        These reports are comprised of close to 90,000 rows of

9    data.  This exhibit is simply oxycodone and hydrocodone

10   threshold histories for the Rite-Aid stores in Cabell

11   County.

12       Instead of putting in 90,000 lines of entries, we

13   simply, because it was produced in native format, narrowed

14   it down to the specific pharmacies in Cabell County, the

15   Rite-Aid pharmacies in Cabell County.

16       We have to use this, Your Honor, because there have

17   been no TCRs or diligence files related to these threshold

18   increases.  This is the, this is the only information we

19   have showing these increases.  It was produced from an Excel

20   spreadsheet that they produced.

21           MR. SCHMIDT:  We don't take issue with the fact

22   that they attempted to produce this from one of our

23   spreadsheets.  And I tried to say that in my prior answer.

24       The place where we take issue is in doing so, they seem

25   to have corrupted at least some of the descriptions on the

1     first page of the products.  And then they've also

2     selectively picked thresholds for these pharmacies.  It's an

3     incomplete production.  And if it was going to come in, it

4     should be a complete history.

5              THE COURT:  What about that, Mr. Rafferty?

6              MR. RAFFERTY:  Your Honor, if I may indulge the

7     Court's patience for a second, my partner is the one that

8     pulled this.  And I don't want to misrepresent anything to

9     Your Honor about how this was created, so Mr. Brandon Bogle.

10             MR. BOGLE:  Your Honor, Brandon Bogle.

11          I think I can summarize this fairly briefly.  And I'm

12     the one who created it, so I think I can speak to this

13     issue.

14          All I did was take the oxycodone threshold histories

15     produced to us by McKesson and authenticated, I might add,

16     in this case for the Cabell County specific stores, Rite-Aid

17     stores, again trying to make sure we didn't produce

18     thousands and thousands of pages of data here.

19          The first page that indicates the 9143 base code, which

20     is oxycodone, but then has different descriptions was

21     confirmed by separate McKesson counsel not in this courtroom

22     to be an error in the way the data was put together by

23     McKesson, not any change made by us.

24          And if you see every page thereafter, the short

25     descriptions match perfectly to the base codes.  So this is

1    not a manipulation by data from us.  In fact, if McKesson

2    goes back and looks at this data and spreadsheet they

3    produced, this the same way that it looks.

4              MR. SCHMIDT:  That's not my understanding.  I

5    appreciate that representation.  I'm not trying to quibble.

6    It's not my understanding of the description being wrong in

7    the original spreadsheet, but that doesn't address the

8    separate point which is there needs to be a sponsoring

9    witness for this.

10        And that sponsoring witness would have the opportunity

11   to point out that there's data missing from here that for

12   some stores they focused on oxy because that makes a point,

13   for others they've ignored oxy and focused on hydro.

14             MR. BOGLE:  Your Honor, I think we're perfectly

15   willing and able to focus on the Rite-Aid stores in Cabell

16   County since this case involves Cabell County itself.  And

17   the fact that we chose oxycodone and hydrocodone is

18   consistent with our presentation of this case from the

19   outset.

20        And I might note as well that for the majority of these

21   increases, Mr. Oriente's initials actually appear next to

22   them.

23             MR. SCHMIDT:  Whether or not kind of

24   cherry-picking the data presented is consistent with the

25   case presentation from the outset, it's not fair to the

```
 1    witness when the witness, I don't think, can even
 2    authenticate it.
 3              MR. RAFFERTY:  Authentication --
 4              THE COURT:  I'm sorry.  Go ahead.
 5              MR. SCHMIDT:  I used "authentication."  I mean
 6    give a foundation.
 7              MR. RAFFERTY:  I believe, as Mr. Bogle said, his
 8    initials are on these.
 9              MR. BOGLE:  Your Honor, this is actually, I
10    believe, on the stipulation regarding authentication and
11    presenting a witness.
12              MR. SCHMIDT:  I think the underlying document --
13    underlying document, as I understand it, cures the two
14    issues I raised.  It has the complete data.  It's not
15    cherry-picked and I thought had the correct descriptions.
16    But if you have it there in front of you and I'm wrong on
17    that, then I'll just stand on the first point.
18              MR. BOGLE:  If the Court would prefer that we put
19    in thousands and thousands of pages of data instead of
20    trying to cut to the point with the Cabell County
21    pharmacies, then that's something we can try to print out.
22    It's going to take a long time.
23              MR. SCHMIDT:  We're willing to work with you on
24    coming up with a proper 1006 that we can stipulate to.  I
25    don't think this form is proper with this witness.
```

```
 1              THE COURT:  Well, I'm going to sustain the

 2     objection to this one at this point, but I don't want to cut

 3     you off from introducing that data if you can get it in,

 4     figure out a right way to get it in.

 5              MR. RAFFERTY:  Yes, Your Honor.  We'll endeavor to

 6     do so and we'll try to work with Mr. Schmidt and get it into

 7     a form that we can submit to the Court.  Thank you.

 8              THE COURT:  Okay.

 9              MR. RAFFERTY:  One moment, Your Honor.

10     BY MR. RAFFERTY:

11     Q.    Okay.  I'm going to show you now what's been marked

12     as P-12971.

13     A.    Thank you.

14     Q.    Uh-huh.  Do you see this email from Mr. Palmer to you,

15     Mr. Oriente?

16     A.    Yes, I do.

17     Q.    And this is a -- if you go down to the bottom email,

18     the bottom of the first page, it starts the chain off with

19     an email from Melissa Evangelista to Michael Oriente.  Do

20     you see that?

21     A.    Yes.

22     Q.    And I say Michael Oriente.  And to several other people

23     as well?

24     A.    Yes.

25     Q.    And she says, "Andy, please see the attached daily CSMP
```

```
 1    report.  Let me know if we need to make adjustments to the
 2    current thresholds.  Per your request, I've submitted the
 3    request to increase stores 50 percent of their hydrocodone
 4    threshold if they reached 90 percent or higher."
 5         Do you see that?
 6    A.   Yes, I do.
 7    Q.   Okay.  And then she asks you -- and this is now at
 8    11:10 a.m. on that same day -- "Will you input the request
 9    this morning so the stores can place an order this
10    afternoon?"
11         And then at 12:09 you say, "All the stores that were on
12    hydrocodone list at 90 percent and above have been increased
13    and can now place an order."
14         You say that to Andrew Palmer, and Andrew Palmer says,
15    "Thanks."
16         Do you see that?
17    A.   Yes, I do.
18    Q.   So the request was at 10:49 and by 12:09 that same day
19    those increases had been added.  Correct?
20              MR. SCHMIDT:  I think, again, this is referring to
21    stores outside of Huntington/Cabell unless they lay that
22    foundation, Your Honor.
23              MR. RAFFERTY:  The policies as to Rite-Aid, Your
24    Honor, are relevant since they have national CSMP policies
25    and --
```

```
1              THE COURT:  Well, ask him what it applies to.
2    BY MR. RAFFERTY:
3    Q.   Mr. Oriente, what does this -- do you recall this?
4    A.   Not this individual email, no.
5    Q.   Okay.
6              MR. RAFFERTY:  Well, we would ask it be admitted
7    per the stipulation even though he does not recall it since
8    he's on the email.
9              MR. SCHMIDT:  We would object on geographic scope.
10   We object on geographic scope.
11             THE COURT:  Well, Mr. Oriente, by looking at this
12   can you tell what Rite-Aid outlet it covers?
13             THE WITNESS:  No, sir.  It does not list the store
14   numbers on this document, Your Honor.
15             THE COURT:  Is there anything on here that would
16   indicate that it applies to all the Rite-Aid stores
17   throughout the country?
18             THE WITNESS:  No, it would not.  It's those that
19   were on the list, but I don't have that list to tell you,
20   sir.
21             THE COURT:  So without the list, you wouldn't know
22   whether it applied to Huntington/Cabell County or not.  Am I
23   correct?
24             THE WITNESS:  That is absolutely correct, Your
25   Honor.
```

```
 1              THE COURT:  Okay.  Well, I'm not going to admit
 2      it, Mr. Rafferty.
 3              MR. RAFFERTY:  May I ask one other question?
 4      BY MR. RAFFERTY:
 5      Q.   Who is Andrew Palmer?
 6      A.   Andrew Palmer in 2009 was the head of loss prevention
 7      and regulatory at Rite-Aid.
 8      Q.   That was for Rite-Aid headquarters; correct?
 9      A.   Yes.  He worked at Rite-Aid headquarters.
10      Q.   Okay.  Let me ask you, setting the document aside, is
11      that indicative of proper due diligence under the CSMP for
12      that award or that threshold change to be given within a
13      little over an hour?
14              MR. SCHMIDT:  Same objection.
15              THE COURT:  Well, I'll overrule the objection to
16      the question.
17          You can answer the question if you can, Mr. Oriente.
18              THE WITNESS:  Certainly.  There was constant due
19      diligence done.  So it would not have involved just that one
20      hour between the first email and when I responded they were
21      done.  I would have known my customer.
22          So knowing my customer, I would know the history of
23      those Rite-Aids.  I would have the ability on my computer
24      system to look up those Rite-Aids and see where they were
25      previous to being increased.
```

1   **Q.**   And there should be documentation of that then;

2   correct?

3   **A.**   There could be.  I don't know if it exists today.

4   **Q.**   Okay.  But there should be documentation for every

5   threshold change request that comes in per the CSMP;

6   correct?

7   **A.**   Some of the documentation would have involved a list

8   that that is referring to.

9   **Q.**   Well, just having a list of stores that you're granting

10  it to does not -- is not indicative of due diligence, is it,

11  Mr. Oriente?

12        MR. SCHMIDT:  Your Honor, we're now several

13  minutes into questioning about a document that was not

14  admitted.

15        MR. RAFFERTY:  I'm just asking about policies.

16        THE COURT:  Well, you can ask him -- ask him the

17  questions without using the document if you can, Mr.

18  Rafferty.

19        MR. RAFFERTY:  Yes, Your Honor.  My apologies.

20  BY MR. RAFFERTY:

21  **Q.**   Was it your policy at McKesson as a DRA to grant

22  Threshold Change Requests simply with a listing of

23  stores?

24  **A.**   No, that was not my policy.

25  **Q.**   There should be other due diligence done on top of that

1    as well; correct?

2    **A.**    Yes.  I would have conducted additional due diligence.

3    **Q.**    And have you ever heard the phrase if it's not

4    documented, it didn't happen?

5    **A.**    I'm sorry.  You were facing the other way.  Can you

6    repeat the question?

7    **Q.**    I'm sorry.  I was trying to set the document down.

8    Have you ever heard the phrase if it's not documented, it

9    didn't happen?

10   **A.**    I've heard of that phrase, yes.

11   **Q.**    And that was actually one of the mantras that Mr.

12   Hartle had at McKesson, correct, your boss?

13   **A.**    He did say that from time to time.

14   **Q.**    Okay.  And, in fact, Mr. Hartle was critical throughout

15   your tenure of your failure to document and do quality due

16   diligence and document that due diligence while you were a,

17   while you were -- well, during those -- during the years

18   2016 to 2018.

19             MR. SCHMIDT:  Objection, compound.

20             THE COURT:  Sustained.

21   BY MR. RAFFERTY:

22   **Q.**    Was Mr. Hartle critical of your documentation of

23   TCRs and due diligence in the years 2016, '17 and '18?

24   **A.**    As him being my direct boss, he did at times address

25   issues that he thought there could be improvements.

1    **Q.**   I'd like to show you what's been marked for purposes of

2    identification as P-22927.

3             MR. SCHMIDT:  Your Honor, this is one -- again,

4    this is one of the several performance reviews they have on

5    the witness.  I can't imagine how it's relevant to try to

6    cross-examine a witness in open court about a performance

7    review he got in 2016 and try and pick out a sentence or two

8    to make him feel bad or put him in a bad light when that's

9    not even what the performance review says.

10            MR. RAFFERTY:  That's not at all what I'm trying

11   to do, Your Honor.  There's numerous comments in here

12   about -- in terms of documenting and doing the proper due

13   diligence which is exactly at the core of this case.

14            MR. SCHMIDT:  Your Honor, --

15            THE COURT:  Well, I think it goes to the

16   credibility of the witness possibly and -- as it relates to

17   his testimony he's given here.  And I'll let you do it, Mr.

18   Rafferty.

19            MR. RAFFERTY:  Thank you.

20   BY MR. RAFFERTY:

21   **Q.**   If we can turn to the first page, this appears to

22   be a performance document for fiscal year 2016 for

23   Michael Oriente.  Do you see that?

24   **A.**   Yes.

25   **Q.**   And the manager is Nathan Hartle?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    A.    Yes.

 2    Q.    Okay.  And you're aware that this is something that's

 3    done yearly by McKesson of its employees and DRAs; correct?

 4    A.    Yes, it is.

 5    Q.    Okay.  I'm not going to go through much of it.  I want

 6    to direct your attention to Page 8, sir.

 7    A.    Yes.

 8    Q.    And here in 2016, if you look at --

 9          MR. RAFFERTY:  Well, I'll move -- go ahead and

10    move it in so we can put it up on the board, Your Honor,

11    22927.

12          MR. SCHMIDT:  Objection for the reasons stated,

13    Your Honor.

14          THE COURT:  Well, overruled.

15       Go ahead, Mr. Rafferty.

16    BY MR. RAFFERTY:

17    Q.    Thank you.  And I'm putting it up on the board

18    simply to orient you so you can see where I am, Mr.

19    Oriente.

20    A.    Thank you.

21    Q.    I want to go to the word "finally" here in the middle

22    of the first paragraph.  There we go.  This is under the

23    "Manager Comments" section.

24       It says, "Finally, a critical requirement of our

25    program is timely and accurate documentation of all we do.
```

1    As mentioned earlier in the review, if it is not documented,

2    it didn't happen.  And this requirement is nonnegotiable and

3    something I need to see immediate improvement on."

4         Did I read that correctly?

5    **A.**   Yes, that's what Nate wrote.

6    **Q.**   Okay.  And it was, in particular, pertaining to TCRs as

7    well as other issues; correct?  The documentation I mean.

8    **A.**   Yes, that is correct.

9    **Q.**   With that answer, I won't need to read it.

10   **A.**   I'm sorry.  As far as having a TCR?

11   **Q.**   No, the documentation of TCRs.

12   **A.**   It, it didn't apply specifically to that.  No, I would

13   not have made one adjustment without a TCR if that's what

14   you're asking.

15   **Q.**   No, what -- I think we're talking past each other.

16   I'll let the document stand.

17        And, in fact, isn't it true that the continued --

18   the -- you continued to have problems with documenting due

19   diligence and TCRs even after that year?  Correct?

20   **A.**   Sir, every time you turn, I cannot hear you.

21   **Q.**   I'm sorry.  I've -- that's a bad habit of mine.  I

22   apologize.  I said the problems and the criticisms of your

23   ability and willingness to do quality documentation of TCRs

24   and due diligence continued to be a problem in your work as

25   an RNA; correct?

```
 1              MR. SCHMIDT:  Objection.  He's now testifying
 2    about the document which doesn't say what he just said.
 3              THE COURT:  Well, can you answer the question, Mr.
 4    Oriente?  Did you continue to have criticism about your --
 5    the quality of your documentation?
 6              THE WITNESS:  The criticism that I received was
 7    only from Nate Hartle in the time that he was with McKesson,
 8    yes.  You know, previous to Nate working for Don Walker and
 9    since working for Nate working with a gentleman now, Scott
10    Matsumato (phonetic), my -- you know, criticism of my
11    performance and documentation was not noted.
12              THE COURT:  Okay.  Well, and I'll just say in
13    passing, I've looked through here and there are a lot of
14    positive comments in here about you, aren't there?
15              THE WITNESS:  Thank you, sir.  I appreciate that.
16    BY MR. RAFFERTY:
17    Q.   Let me show you one last of these and we'll move
18    on.  Let me show you what's been marked for
19    identification purposes as 22929.
20    A.   Thank you.
21    Q.   I do agree there are some good things in here, Mr.
22    Oriente.  I want to focus just on one particular sentence.
23         And for the record, this is the performance evaluation
24    for Michael Oriente dated for fiscal year 2018.
25         Do you see that at the top, sir?
```

1    **A.**   Yes.

2    **Q.**   And if you would turn to Page 5, and under "Manager

3    Comments" at the top and the last sentence.  Are you there,

4    sir?

5    **A.**   Yes, I am.

6    **Q.**   Okay.  I want to give you a chance.

7         What Mr. Hartle says is, "As we have discussed in

8    previous reviews and statuses, I need to see improvement in

9    your timeliness, quality, and documentation of our standard

10   due diligence processes."

11        Is that what Mr. Hartle told you in 2018?

12   **A.**   Yes, he did.

13             MR. RAFFERTY:  Plaintiffs would move in 22929.

14             MR. SCHMIDT:  Same objection.

15             THE COURT:  I don't see any reason to admit the

16   document.

17             MR. RAFFERTY:  That's fine, Your Honor.

18             THE COURT:  I don't think you moved in 22927, did

19   you?

20             MR. RAFFERTY:  I did not?  I've had a bad habit of

21   that today, Your Honor.  Since we've got the testimony,

22   that's fine, Your Honor.

23             THE COURT:  I agree.  I don't think it's

24   appropriate to put the witness's entire performance report

25   into the record of this trial.  You made a couple of points,

1    and these provided a good faith basis for your questions,

2    but I don't think the documents need to be admitted.  I'll

3    sustain the objection to admission of the documents.

4              MR. RAFFERTY:  Thank you, Your Honor.

5    BY MR. RAFFERTY:

6    **Q.**   I'm going to move on to some audits.  Are you

7    familiar with the fact that audits were done of

8    different distribution centers by McKesson?

9    **A.**   Yes.

10   **Q.**   That was done in the ordinary course of McKesson's

11   business to go through and quality check distribution

12   centers?

13   **A.**   Yes, McKesson performed self-audits on itself.

14   **Q.**   I'm going to show you what's been marked as Plaintiffs'

15   Exhibit 00115.

16   **A.**   Thank you.

17   **Q.**   Let me know when you've had a chance to look at it,

18   sir.

19   **A.**   Okay.

20   **Q.**   Okay.  This is an -- the cover page is an email from

21   Mr. Walker again dated April 20th, 2011.  And it's to

22   several people, including you, down there in the bottom

23   right, second to last line.  Do you see that?

24   **A.**   Yes.

25   **Q.**   Okay.  And it attaches an audit of certain distribution

1    centers.  Do you see that attached?  It would be the second

2    page right after the cover page, audit report.

3    **A.**    Yes.

4    **Q.**    Okay.  And in this Mr. Walker in the email specifically

5    says midway down in the first paragraph, "As you read

6    through it, I think you'll agree we have work to do.  We

7    need to collectively and collaboratively step up our

8    reinforcement filing SOPs and completing various compliance

9    tasks as outlined in MOM."

10        Do you see that?

11   **A.**    Yes.

12   **Q.**    And then it goes down and he says, "I am certain if we

13   picked four different DCs we would find the same issues, so

14   we should assume this is a network wide concern."

15        Do you see that?

16   **A.**    Yes, that's what he wrote.

17   **Q.**    If we go to the second page of this, which is the audit

18   report by McKesson, it says "McKesson Internal Audit."  Do

19   you see that?

20   **A.**    Yes, I do.

21   **Q.**    And it says current audit March 14th, 2011.  So that

22   would be close to three years after the CSMP limitation?

23   **A.**    Yes, a couple months short.

24   **Q.**    And it says "Yellow Needs Improvement."

25   **A.**    Yes, "Yellow Needs Improvement."

```
 1    Q.   And then if we go to Page 5, just to lay the foundation
 2    as to which of the distribution centers were that were being
 3    audited, it says -- I'm sorry.  Under "Scope and
 4    Objectives"?
 5    A.   Yes.
 6    Q.   And the last sentence of that paragraph identifies the
 7    distribution centers that were audited.  Do you see that?
 8    A.   Yes, I do.
 9    Q.   Okay.  And they are Delran, New Jersey.  That would be
10    your audit -- at that time, that was your distribution
11    center?
12    A.   As a regulatory director, yes.
13    Q.   And I'm sorry.  I keep saying that.  You weren't the
14    operations --
15    A.   Yeah, in that same one.
16    Q.   You were in charge of Regulatory Affairs for Delran?
17    A.   Yes, during this time 2011.
18    Q.   New Castle distributed into West Virginia.  We
19    established that earlier this morning?
20    A.   Yes, the northern part of the state.
21    Q.   Washington Court House distributed into West Virginia
22    and into Cabell County; correct?
23    A.   Yes, that distribution center.
24    Q.   And then there's Conroe, Texas.  Do you see that?
25    A.   Yes, sir.
```

1   **Q.**   And if we go to the overall conclusion on Page 6, just

2   the next page, under "Yellow Needs Improvement."

3   **A.**   Yes.

4   **Q.**   And down there it says, "Overall results of the audit

5   indicate that the distribution centers are not consistently

6   completing and maintaining the required documentation

7   associated with certain SOPs."

8        Is that accurate?

9   **A.**   Yes.  I'm sorry.  Pertaining to the SOPs that we had,

10  yes.

11  **Q.**   Standard operating procedures?

12  **A.**   Yes, sir.

13  **Q.**   Sure.  So if we look at some of the findings as to some

14  of the, some of the actual audits --

15          MR. RAFFERTY:  At this point, Your Honor, we would

16  move to admit 00115.

17          MR. SCHMIDT:  No objection.

18          THE COURT:  It's admitted.

19          MR. RAFFERTY:  Thank you.  That will make it

20  easier I think for people to see.  I apologize.

21  BY MR. RAFFERTY:

22  **Q.**   This is overall -- we've already covered that.

23  Let's go to, let's go to Page 13, please.

24        If we look at this particular audit, you have the

25  different columns; Issue/Observation, Risk, Action Plan,

1    Action Owner, and Action Date.  Do you see that?

2    **A.**    Yes, I do.

3    **Q.**    Okay.  And if we look under Level One forms right

4    there -- you got it.  Let's just look at a couple.

5         Let's look at the ones -- first of all, the ones you

6    were in charge of.  That is Delran.  In Delran it says the

7    Level Ones were not completed for 20 of the 56 omits in July

8    of 2010 and all 54 omits for the month of November, 2010.

9         Do you see that?

10   **A.**    Yes, I do see that.

11   **Q.**    Okay.

12            THE COURT:  What page are you on, Mr. Rafferty?

13   I'm lost here.

14            MR. RAFFERTY:  Oh, I'm sorry, sir.  Page 13, sir.

15            THE COURT:  I've got a different Page 13.

16            MR. RAFFERTY:  You know what.  It's Page 12.  I'm

17   looking at an old numbering system that I used.

18            THE COURT:  Okay.

19            MR. RAFFERTY:  Yeah.  I'm sorry.  That's my fault.

20            THE COURT:  All right.

21   BY MR. RAFFERTY:

22   **Q.**    So if we look at Delran, your Level One forms, so

23   for all 54 omits for the month of November, 2010, there

24   were no Level One reviews on file; correct?

25   **A.**    That is what the audit team determined, yes.

1    **Q.**   And consistent with the mantra of McKesson that we read

2    earlier, if it's not documented, it didn't happen.  Correct?

3              MR. SCHMIDT:  Objection to the characterization.

4    That wasn't McKesson's mantra.

5              THE COURT:  Sustained.

6    BY MR. RAFFERTY:

7    **Q.**   And then if we go down to Washington Court House --

8    I'm sorry -- New Castle, it says the omits -- the

9    required Level One forms were not completed for 21 of

10   the 30 omits in July and 20 of the 27 omits in November,

11   2010.

12        And just to be clear, these Level One forms are

13   supposed to be on file and completed for every omit.

14   Correct?

15   **A.**   Yes, for every blocked order.

16   **Q.**   Okay.  And that's an omit.  That's another word for

17   omit.  Correct?

18   **A.**   Yes, sir.

19   **Q.**   Thank you.  And then if we go to Washington Court House

20   which includes Cabell County, it says Level Ones weren't

21   completed for -- it's kind of small.  It's hard to read.  I

22   apologize.

23        The required Level One forms were not completed for all

24   19 omits in July, 2010, and 11 omits in November, 2010.  In

25   addition, the omit report was not signed and dated by the DC

1  management as required by policy.  And that is a requirement

2  of policy; correct?

3  **A.**   Yes.  DC management is to sign them before they get

4  filed.

5  **Q.**   Okay.  And then if we go to the next page -- now it's

6  Page 13.  If we go to the next page and look at the audit

7  findings of Delran and just the Threshold Change Request,

8  that's when a customer is requesting or -- an increase in

9  their threshold level.  Correct?

10  **A.**   Yes, it is.

11  **Q.**   And on Delran it says based on our review of 103

12  Threshold Change Request forms for July and November of

13  2010, we noted 38 out of 66 forms were not on file for the

14  month of November.  Do you see that?

15  **A.**   Yes, I do.

16  **Q.**   And then Washington Court House, skipping down, it says

17  that 7 forms were not on file at the distribution center.

18  Do you see that?

19  **A.**   Yes, I do.

20  **Q.**   All of that is in violation of the policy and procedure

21  of McKesson in terms of its CSMP; correct?

22  **A.**   It was to be documented, yes.

23  **Q.**   Okay.  I want to show you what's been marked for

24  purposes of identification as Plaintiffs' 00116.  This is

25  another audit report, sir.

```
 1          Do you see this is -- I'm sorry.  Let me know when
 2   you've had a chance to review it, sir.
 3          (Pause)
 4   A.   Yes.
 5   Q.   Do you recognize this as another audit report dated
 6   November 2nd, 2010 -- I'm sorry -- 2012?
 7   A.   Yes, 2012.
 8   Q.   Okay.  And if we go over to the fourth page, this one
 9   also pertains to Delran, New Jersey distribution center as
10   well; correct?
11   A.   Yes.
12   Q.   And that in this time period is still your -- for
13   November, 2012, time period, that was still your
14   distribution center for purposes of Regulatory Affairs?
15   A.   Yes, it was.
16   Q.   And here it says "Key Issues" down below.  I'm sorry.
17              MR. RAFFERTY:  I move to admit P-00116, Your
18   Honor.
19              MR. SCHMIDT:  This one we'll object to foundation
20   with this witness.
21              THE COURT:  This is 16?
22              MR. RAFFERTY:  Yes.  We'll discuss it -- I'll wait
23   for Your Honor.
24              MR. SCHMIDT:  I didn't hear what the
25   representation was.
```

```
 1              MR. RAFFERTY:  I started speaking and then I said
 2     I'd wait.
 3              MR. SCHMIDT:  Sorry.
 4              THE COURT:  Well, your objection is he doesn't lay
 5     a proper foundation through this witness for admitting it.
 6     Is that right?
 7              MR. SCHMIDT:  Yes.
 8              THE COURT:  Even though the authenticity is not in
 9     question; right?
10              MR. SCHMIDT:  Correct.
11              MR. RAFFERTY:  And it's part of the stip, Your
12     Honor, and it is one of his -- one of the auditing
13     facilities -- one that he was in charge of at the Delran
14     facility and it's pertaining to retail national accounts of
15     which he was in charge of.
16              THE COURT:  Did you -- you didn't bring all that
17     out through the witness, did you?
18              MR. RAFFERTY:  Not yet.  I thought because it was
19     part of the stip, there wasn't going to be an objection
20     but --
21              MR. SCHMIDT:  Yeah.  This is not a document you
22     received.  We will agree to its admissibility under the
23     stipulation, but I think he needs to lay a foundation with
24     the witness.  I don't think he'll be able to.
25              THE COURT:  Okay.  If you can lay a foundation,
```

```
 1    I'll admit it, Mr. Rafferty.
 2              MR. RAFFERTY:  I think he stipulated to the
 3    admission, Your Honor, just whether I can question him on it
 4    per the stip.
 5              THE COURT:  Is that right, Mr. Schmidt?
 6              MR. SCHMIDT:  That is right, yes.
 7              THE COURT:  All right.  I didn't understand that.
 8    All right, it's admitted.
 9              MR. RAFFERTY:  Okay.  Thank you.
10    BY MR. RAFFERTY:
11    Q.   Were you in two thousand -- November 2nd, 2012, the
12    Director of Regulatory Affairs over Delran, New Jersey?
13    A.   Yes, I was.
14    Q.   And as part of your responsibilities in 2012 did that
15    entail being in charge of the regulatory compliance as it
16    pertains to Rite-Aid as one of the retail national accounts?
17    A.   Yes.
18    Q.   Okay.  And, so, this would be an audit of your facility
19    and it pertains to specifically the documentation as it
20    pertains to retail national accounts.  Correct?
21              MR. SCHMIDT:  Objection.  It's not his facility.
22    He just has responsibilities to include this among other
23    distribution centers.
24              MR. RAFFERTY:  I think that's what I said.  He had
25    regulatory compliance duties over what's being discussed.
```

```
1              THE COURT:  Well, ask him that and see what he
2    says.
3    BY MR. RAFFERTY:
4    Q.   Did you have regulatory compliance authority and
5    duties over the retail national accounts in 2012 --
6    strike that.  It's getting late.  In, in your -- as part
7    of your regulatory authorities and duties, did you have
8    authority and responsibility for regulatory compliance
9    over retail national accounts in 2012?
10   A.   Yes, for certain, certain ones, not all.
11   Q.   And Rite-Aid was one of those; correct?
12   A.   Yes, it was.
13   Q.   Okay.  And you had regulatory authority over the
14   distribution center in Delran, New Jersey also; correct?
15   A.   Not in total.  The way the regulatory responsibility
16   fell, it was the DC management, whether it was the Director
17   of Operations or in a smaller DC, DC managers.  They were
18   responsible for the Level One review to make sure it was
19   completed, to make sure it was signed, to make sure it was
20   filed.
21   Q.   Okay.  But you were the regulatory -- the Director of
22   Regulatory Affairs for the Delran, New Jersey, distribution
23   center; correct?
24   A.   Yes.
25   Q.   Okay.
```

```
1              MR. RAFFERTY:  I think that lays a foundation.

2              THE COURT:  Doesn't that take care of it, Mr.

3    Schmidt?

4              MR. SCHMIDT:  No.  He literally said the

5    distribution center manager was responsible for the

6    documentation.

7              MR. RAFFERTY:  I think that would go to weight.

8              MR. SCHMIDT:  And we have a distribution list on

9    this document that does not include him.  He was, by

10   contrast, included on the last document for an email which

11   is why I didn't make that same objection.

12             THE COURT:  Did you have any responsibility for

13   the documentation at that center?

14             THE WITNESS:  Some of it, but not all of it, sir.

15   And this went from our internal audit department to Krista

16   Peck in legal.  I was not copied on this.

17             THE COURT:  I'm going to admit it.  I'll overrule

18   the objection and admit it.

19             MR. RAFFERTY:  Thank you, Your Honor.

20   BY MR. RAFFERTY:

21   Q.  If we look at the second -- or we're still on Page

22   4, Mr. Oriente.  And --

23             MR. SCHMIDT:  I apologize for interrupting.  As a

24   point of clarification, we had agreed to the admission.  Our

25   objection was to questioning him.
```

```
 1                  THE COURT:  I understand that.

 2                  MR. SCHMIDT:  Okay.

 3                  THE COURT:  I misspoke.  But I'm going to overrule

 4      the objection and let you question him.  If we get too far

 5      afield here, I'm sure you'll let us know.

 6                  MR. SCHMIDT:  Thank you, Your Honor.

 7                  MR. RAFFERTY:  I've only got a couple questions

 8      about it, Your Honor, I promise.

 9      BY MR. RAFFERTY:

10      Q.   "Key Issues," do you see that?  It's Page 4 down

11      toward the bottom, sir.

12      A.   Yes.

13      Q.   And the key issue here, according to this particular

14      audit, was policies and procedures to document threshold

15      reasoning and customer correspondence are not consistently

16      followed for retail national accounts slash chain stores and

17      institutional provider customer segments.  Is that correct?

18      A.   That's what is written here, yes.

19      Q.   And, once again, pursuant to the CSMP, that is required

20      that there be -- that those -- the documentation for the

21      threshold reasoning must be made?

22      A.   I would have had -- again, retail national accounts

23      were treated somewhat differently because of their own

24      regulatory compliance.  I would have had TCRs for them, but

25      they were not handled in the same way that the independent
```

```
 1    customers were.

 2    Q.   Okay.  And then last question on this if we go to Page

 3    7 of 10.  Number one under "Issue/Observation, Retail

 4    National Accounts and Institutional Providers."

 5         It says, "Although thresholds are established for RNA

 6    customers, documentation of customer questionnaires could

 7    not be provided for RNA chain and institutional providers."

 8         Do you see that?

 9              MR. SCHMIDT:  Your Honor, I'll just renew my

10    objection taking the Court's invitation.  This happens to be

11    one where we have an action owner up on the screen for it

12    and it's not Mr. Oriente.  He's -- he doesn't have

13    foundation to answer questions about this other than just

14    reading the witness statements.

15              MR. RAFFERTY:  I don't think that's what it means.

16              THE COURT:  Well, go ahead and ask him.

17    BY MR. RAFFERTY:

18    Q.   Customer questionnaires regarding thresholds are to

19    be kept on file per the CSMP; correct?

20    A.   Retail national accounts, customer questionnaires at

21    this time was handled differently.

22    Q.   Okay.  Well, according to this audit, that was one of

23    the issues; correct?

24    A.   Yeah, because the retail national accounts in Texas

25    that handled the customer service that like Elaine Thomet
```

1    that you mentioned, Melissa Evangelista, they would have

2    dealt with the chain questionnaires and such.

3    **Q.**   If we go down further, it says Level One reviews were

4    not documented for RNA chain and institutional providers

5    when controlled substance orders were omitted due to a

6    threshold being met.

7         That is a requirement of CSMP; correct?

8    **A.**   Not as I understood it with the RNA because the RNA --

9    again, we were dealing with the corporation and not -- we

10   were dealing with the corporation regulatory team and not

11   the individual pharmacy that the Level One conducted was for

12   to call an individual pharmacy.

13   **Q.**   So you disagree with the findings of the audit?

14   **A.**   No, I don't disagree with the audit.  I'm just

15   explaining the way it, it ran.

16   **Q.**   Okay.

17             THE COURT:  I'm going to overrule the objection

18   that's on the table.  If I understood his testimony, I think

19   he did lay a proper foundation for answering the questions

20   you're asking, so I'll overrule that.

21             MR. RAFFERTY:  Thank you, Your Honor.

22   BY MR. RAFFERTY:

23   **Q.**   Here you are, Mr. Oriente.

24   **A.**   Thanks.

25   **Q.**   Uh-huh.  Let me know when you've had a chance to review

1    it, sir.

2         (Pause)

3    **A.**    Yes.

4    **Q.**    This is an email string that you're participating in;

5    correct?

6    **A.**    Yes.

7    **Q.**    Okay.  Do you see the name at the top of the latest or

8    earliest email?  Do you see that?

9    **A.**    Yes.

10   **Q.**    If we start with the earliest email, which is from Dave

11   Gustin, and it's dated April 15th, 2011.

12   **A.**    Yes, it is.

13   **Q.**    And it details tightening up our increase process.  Do

14   you see that?

15   **A.**    Yes.

16   **Q.**    Okay.  And if we go over to the next page, Mr. Gustin

17   expresses that, "What I believe needs tightened up are the

18   follow-up visits to our accounts that have undergone

19   significant changes in their controls purchases in either

20   volume or percentage.  We also need to tighten up the

21   process regarding granting increases.  We have gotten to a

22   point where certain percentage increases are almost

23   automatic and where we are too easily accepting of reasons

24   like business increase for raising thresholds by small

25   amounts.  The SOP says clearly this is not an acceptable

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    reason unless sales data supports it."

2        Do you agree with that that business increase is not a

3    valid or acceptable reason for a threshold increase without

4    additional data?

5    **A.**   During the evolution of the program, business increase

6    was accepted at times; basically, a pharmacy saying that

7    they're seeing more prescriptions and having an increase in

8    business.

9        As our program evolved and we, you know, put other

10   checks in place, we increased the reason as to why we were

11   no longer accepting business increase.

12   **Q.**   Well, generally, though, business increase by itself

13   without some accompanying data such as a new pharmacy

14   opening or a competitor going out of business for another

15   pharmacy, something -- or sales data, as Mr. Gustin says,

16   that has to accompany simply an increase in business as a

17   reason for a TCR; correct?

18   **A.**   Those would be reasons to substantiate the increase,

19   yes.

20   **Q.**   And according to Mr. Gustin, he was saying that certain

21   percentage of increases are getting to be almost automatic,

22   which would mean -- or do you understand what that would

23   mean?

24   **A.**   I can't speak on Dave's commenting on that.  I didn't

25   feel that way, that they were automatic.

1    **Q.**   Okay.  And then he then forwards this to some people in

2    an email above it where he says the DEA is taking a very

3    active and detailed interest in the CSMP.  Do you see that?

4    **A.**   Yes.

5    **Q.**   He goes on two sentences later, "There's no reason to

6    believe it will only be with the DCs and with ISMC accounts

7    and would not find its way into RNAs and other segments."

8         Do you see that?

9    **A.**   Yes.

10   **Q.**   And then he says, "CVS was fined 75 million for being

11   lax and it wasn't even controls.  That was a warning shot

12   across our collective bows."

13        Do you see that?

14   **A.**   I see that, but I'm not familiar with the specifics on

15   that.

16   **Q.**   So -- so do you as -- as a Director of Regulatory

17   Affairs is part of your job to monitor what's going on in

18   terms of other -- in terms of your customers and whether or

19   not they're being fined by the DEA for violations of the

20   Controlled Substances Act?

21             MR. SCHMIDT:  Objection.  CVS wasn't a customer of

22   McKesson's at this time.

23             MR. RAFFERTY:  I'm not --

24             MR. SCHMIDT:  That was the representation in the

25   question.

```
1              MR. RAFFERTY:  I didn't mean for there to be.

2              MR. SCHMIDT:  Thank you.

3    BY MR. RAFFERTY:

4    Q.    Just setting aside CVS and setting aside the

5    document, was it part of your responsibility as a

6    Director of Regulatory Affairs to monitor your customers

7    in terms of whether they are being fined by the DEA for

8    violations of the Controlled Substances Act?

9    A.    Yes.  I performed reviews of our customers on the OIG,

10   did an OIG search, as well as an internet search, additional

11   Google searches on corporations to see if there was any

12   disciplinary action.  We'd also check on state and the

13   federal DEA website to see about that, yes.

14   Q.    Okay.  So would you have monitored whether or not, for

15   example, Rite-Aid was being fined for violations of the

16   Controlled Substances Act?

17   A.    I would look for that.  I may not have seen every fine

18   that they received.  I, I wouldn't know.

19   Q.    Wouldn't that be relevant to your -- or part of your

20   due diligence in determining whether or not you should allow

21   them to get increases in their thresholds?

22             MR. SCHMIDT:  Objection, speculation.

23             THE COURT:  Well, overruled.

24        If you can answer it, you may answer it.

25             THE WITNESS:  I would, I would conduct those
```

```
 1    reviews.  I may not find a specific instance, you know,

 2    where a state may have brought some action against Rite-Aid.

 3    Again, they had close to 5,000 stores.

 4    BY MR. RAFFERTY:

 5    Q.   Okay.  Do you know how many times Rite-Aid has been

 6    fined by the DEA say in the last 12 to 14 years for

 7    violations of the Controlled Substances Act?

 8    A.   No, I do not.

 9    Q.   If I could -- if I could show you now what we're

10    marking for purposes of identification --

11             MR. RAFFERTY:  Oh, yeah, plaintiffs move in 12821.

12             MR. SCHMIDT:  No objection, Your Honor.

13             THE COURT:  It's admitted.

14    BY MR. RAFFERTY:

15    Q.   Now I'd like to show you what's been marked for

16    purposes of identification as P-08761.  Let me know when

17    you've had a chance to review it, sir.

18    A.   Yes.

19    Q.   This is an email from Dave Gustin at the top to several

20    people, including you, Michael Oriente.  Do you see that?

21    A.   Yes.  He's -- well, it started with Tom McDonald.

22    Q.   Yeah, yeah, if we could -- if you want to start down at

23    the bottom, that's fine.

24         So it's Tom McDonald to that group that we talked

25    about, PGRDRC.  Did I get that right?
```

1    **A.**    Yes.

2    **Q.**    And that's the group -- you would have gotten that as

3    part of that group; correct?

4    **A.**    That is correct.

5    **Q.**    Okay.  And this is in 2012, July 27th, 2012?

6    **A.**    Yes.

7    **Q.**    It says, "I have noticed a trend with TCRs that needs

8    to be addressed.  The information submitted on the TCR is

9    extremely important to our documentation process.  When I

10   screen the TCR, I'm assuming some steps have been completed.

11   First and foremost is direct contact with the customer."

12        And that is one of the requirements that the CSMP when

13   you're doing a TCR analysis is to have direct contact with a

14   customer; correct?

15   **A.**    As far as the ISMC customers, yes.

16   **Q.**    And with the RNA you would have contact, direct contact

17   with headquarters; correct?

18   **A.**    Yes, sir.

19   **Q.**    Okay.  "This contact is required."  So you agree with

20   that.

21        "Be sure you are noting who you spoke with when

22   completing the documentation portion.  Ask for a specific

23   reason for the increase in usage.  Business growth should be

24   accompanied by specific examples of what is generating that

25   growth."

1          Do you see that?

2     **A.**    Yes, I do.

3     **Q.**    And that's what we were talking about earlier as to the

4     reasoning for the -- the reason to grant the TCR for

5     business growth should be accompanied by something else.

6     Correct?

7     **A.**    Yes.  I see here now Tom sent this to his region.

8     **Q.**    Uh-huh.

9     **A.**    The regulatory directors were copied.  This would have

10    went to his west region, his distribution centers that would

11    have been submitting TCRs to him.

12    **Q.**    Okay.  But that, but that's a company-wide issue;

13    right?  I mean, the policies that he's referring to there

14    are company-wide issues in terms of proper documentation of

15    TCRs?

16            MR. SCHMIDT:  Objection, compound.

17            THE COURT:  Sustained.  Break it out.

18    BY MR. RAFFERTY:

19    **Q.**    In terms of the -- well, what Mr. McDonald is

20    referring to here in terms of having additional

21    information as to what generated the business growth is

22    something that was a company-wide policy; correct?

23    **A.**    The reason text was required, some of them had business

24    increase and as the program evolved, we got more in-depth as

25    to the reason why and Tom states an example there.

1    **Q.**   And it says general terms like business growth or

2    customer hit their threshold are not acceptable.

3         Would you agree with that, sir?

4    **A.**   Yes.  They would need to support why there's business

5    growth.

6              MR. RAFFERTY:  Move to admit 08761.

7              MR. SCHMIDT:  No objection.

8              THE COURT:  It's admitted.

9    BY MR. RAFFERTY:

10   **Q.**   Now, in terms of thresholds being increased, these

11   TCRs that we've been talking a lot about, there are

12   certain red flags that are identified.  And we've talked

13   about a few of them here today as to what you look for

14   in determining whether or not to grant a TCR.  Correct?

15   **A.**   Yes.

16   **Q.**   Okay.  And, in fact, those were discussed -- we've

17   discussed those all along.  But there was actually a policy

18   put in place identifying those red flags in 2015 by

19   McKesson; correct?

20   **A.**   Yes, I believe we had red flags identified.

21   **Q.**   Okay.  And if we look at -- I'm handing you what's been

22   marked for identification purposes as P-12643, sir.  Let me

23   know when you've had a moment to review.

24        (Pause)

25        Are you ready, sir?

1    **A.**   Yes.  I'm trying to see who authored this document.

2    I'm not sure who created it.  I am familiar with it.

3    **Q.**   I guess that was going to be my question.  You're

4    familiar with this, these red flags; correct?

5    **A.**   Yes, I am.

6    **Q.**   Okay.

7              MR. RAFFERTY:  I believe this is on the

8    stipulation, Your Honor, so we would at this time move in

9    P-12643.

10             MR. SCHMIDT:  No objection.

11             THE COURT:  It's admitted.

12   BY MR. RAFFERTY:

13   **Q.**   So I want to just highlight a couple of these if we

14   could bring it up on the board.

15        Here it says -- of course, this is in 2015 and I want

16   to focus on just a couple areas in this lengthy document.

17   I'm not going to go through very much of it.

18        It says "McKesson CSMP Red Flags."  And it says that

19   red flags are indicators or areas of possible concern

20   regarding shipments of controlled substances.

21        Do you see that?

22   **A.**   Yes, yes.

23   **Q.**   And you would agree with that; right?

24   **A.**   Yes, they could be possible concerns.

25   **Q.**   Okay.  And then it says down here in the next paragraph

1    it is important that when red flags are identified they are

2    reviewed to ensure appropriate due diligence.

3        You would agree with that; correct?  It's the last

4    sentence of the next paragraph.  I'm sorry.

5    **A.**   Yes.

6    **Q.**   Okay.  And then it's broken up into a couple sections.

7    And one of them, if you go down to Apparent Red Flags, and

8    those are red flags that are more readily identifiable.  Do

9    you see that?

10   **A.**   Yes, they are.

11   **Q.**   And those do not require expertise or extensive

12   analysis.  Do you see that?

13   **A.**   That's what's written here, yes.

14   **Q.**   And then if you go over two pages, point three, they've

15   listed out a whole bunch of them starting with -- under

16   Responses in the Customer Questionnaire on Page 2 and then

17   they've got a list all the way down to the letter R on Page

18   3.  Do you see that?

19   **A.**   Yes.

20   **Q.**   Okay.  I just want to look at two of those out of that

21   list.  M at the top, and one of the red flags they identify

22   is the pharmacy's primary business model involves filling

23   prescriptions for or dispensing directly to pain clinics.

24   Do you see that?

25   **A.**   Yes, I do.

1    **Q.**   And you would agree as a Director of Regulatory Affairs

2    that that would be a red flag that would require some due

3    diligence?

4    **A.**   Yes, it would if they were dispensing directly to pain

5    clinics.

6    **Q.**   Okay.  And then if we look at Q, the pharmacy's

7    business model centers on controlled substances or the

8    pharmacy is planning to expand its controlled substance

9    business.  Do you see that?

10   **A.**   Yes, I do.

11   **Q.**   And do you agree that's a red flag?

12   **A.**   Yes.

13   **Q.**   Now, if we go over to the next page, there are some

14   other, what's referred to as detailed red flags.  Do you see

15   that?

16   **A.**   Yes.

17   **Q.**   I want to ask you just about a couple of those.

18   Geographic location.  Are you with me?

19   **A.**   Yes, I am.

20   **Q.**   Oh, okay.  It says the pharmacy is located in a

21   geographic area known or suspected of having higher than

22   normal prescription drug diversion or level of prescribing.

23   This would include areas where diversion schemes are known

24   to be centrally located.

25       Do you see that?

1    **A.**   Yes, sir.

2    **Q.**   And you agree that is a red flag that you as Director

3    of Regulatory Affairs would look out for?

4    **A.**   It would be one of the items taken into account, yes,

5    sir.

6    **Q.**   Okay.  And there are several here.  I'm just

7    identifying a couple of them just to save court time.

8    **A.**   Okay.

9    **Q.**   And here it says -- if you go on further, it says -- on

10   the next page under "Other Distributors," it's on Page 6.

11   There you go, Number 5:  Pharmacy purchases controlled

12   substances from other distributors.

13       That is a red flag the Director of Regulatory Affairs

14   would be looking out for?

15   **A.**   It's not always a red flag, but it is one thing that

16   would, you know, --

17   **Q.**   Because you can't always monitor -- I'm sorry.  I

18   didn't mean to interrupt you.

19   **A.**   I was going to say many pharmacies, especially in my

20   area of the northeast, use two or more wholesalers.

21   **Q.**   Okay.

22   **A.**   It's a common practice.

23   **Q.**   And then if we look under "Statistical Red Flags," here

24   it says under 1(a), "A customer's controls/prescription

25   ratio when compared to similar customers serviced by the

1    same distribution center seems unusually high."

2         Do you see that?

3    **A.**   Yes, I see that.

4    **Q.**   And it lists a controlled -- let me just read it.

5         "As a benchmark, DEA has previously stated that an

6    average retail pharmacy's controls/Rx ratio is approximately

7    20 to 25 percent."

8         Are you familiar with that?

9    **A.**   Yes, I am.

10   **Q.**   Okay.  And you agree to that?

11   **A.**   Yes, I would.

12   **Q.**   Okay.

13              THE COURT:  What's a controls to prescription

14   ratio?

15              THE WITNESS:  It would be the scheduled drugs II

16   through V, the amount of pills, in comparison to the Rx

17   product such as antibacterial medicine, medicine for

18   psoriasis, dementia, Alzheimer's, PTSD, so the Rx.  So what

19   percent of their purchases are controlled substances

20   compared to their total business.

21              THE COURT:  Okay.

22   BY MR. RAFFERTY:

23   **Q.**   So the higher the controlled prescription ratio,

24   the stronger the red flag.  Do you agree with that?

25   **A.**   That would be one indicator for us to conduct

```
 1    additional due diligence, yes.
 2    Q.    So if you had a customer, for example, that was at
 3    90 percent controls to prescription ratio, that would be a
 4    very strong red flag that you would want to investigate;
 5    correct?
 6               MR. SCHMIDT:  Objection, foundation and time
 7    period.
 8               THE COURT:  I'll allow him to answer it.
 9    Overruled.
10               THE WITNESS:  Could you ask the question again,
11    please?
12    BY MR. RAFFERTY:
13    Q.    Yeah.  Say you had a customer that had a controls
14    to prescription ratio of 90 percent.  That would be a
15    very strong red flag that you would want to investigate;
16    correct?
17    A.    More than likely, that customer would have been
18    terminated before they ever got to 90 percent.
19    Q.    So it's that strong red flag and you would terminate
20    the customer?
21    A.    Yes, sir.
22    Q.    Okay.  By terminate, you mean just stop doing business
23    with them at all?
24    A.    Totally cut them off.
25    Q.    Okay.
```

```
 1              MR. RAFFERTY:  Your Honor, I'm going to show the

 2    witness -- make sure I've got the right document.  If I

 3    could have just one moment, Your Honor.

 4         (Pause)

 5              MR. RAFFERTY:  Your Honor, I think at this point

 6    I've got four documents that are on the stip that I would

 7    like to just move into evidence to move things along.

 8              THE COURT:  All right.  You can identify them and

 9    see if there's any objection to them.

10              MR. RAFFERTY:  They are --

11              MR. SCHMIDT:  I need a copy.

12              MR. RAFFERTY:  I'm sorry.

13              MR. SCHMIDT:  No worries.

14              MR. RAFFERTY:  Your Honor, may I make a

15    suggestion?

16              THE COURT:  Yes.

17              MR. RAFFERTY:  I know we've only got 31 minutes

18    left.  While he's reviewing that, I can go over with my team

19    for five minutes and try to narrow this down to the last

20    few.

21              THE COURT:  Okay.  So you want to take a

22    five-minute break right here?

23              MR. RAFFERTY:  Yes, Your Honor.  I know it's

24    unusual because we've only got 30 minutes left.

25              MR. SCHMIDT:  Our only request is if we can get
```

```
1    through at least the direct today.

2              THE COURT:  Can you get through your direct?

3              MR. RAFFERTY:  I hope to, yes, Your Honor.

4              THE COURT:  Well, all right.  Let's keep it to --

5    are you going to need five minutes?

6              MR. RAFFERTY:  At the most, yes.  I will need five

7    minutes because I just want to make sure that I've

8    covered --

9              THE COURT:  Okay.  Go ahead and I'll just stay

10   right here and do it as fast as you can.

11             MR. RAFFERTY:  Yes, sir.

12             THE COURT:  I think it's good to keep everybody in

13   the courtroom.  Everybody wanted to stand up anyway.

14        (Pause in proceedings from 5:00 p.m. until 5:05 p.m.)

15             MR. RAFFERTY:  I'm fine doing this after since

16   we've got the witness on the stand.  I wasn't planning on

17   asking him any questions.  I was just going to see if

18   something needs to be cleaned up.  He's coming back

19   tomorrow.  Is that okay, Your Honor?

20             THE COURT:  Well, we need to get everybody back in

21   the courtroom.  I thought I could speed this up by staying

22   on the bench.

23             MR. RAFFERTY:  I'm hoping to finish, but if

24   there's something that needs to be cleared up with him on

25   redirect, I can do it on redirect.
```

```
 1              THE COURT:  Do you think you can finish with him
 2    in 25 minutes?
 3              MR. RAFFERTY:  That's my goal.
 4              THE COURT:  Okay.  Looks like we've got everybody
 5    back in the courtroom now, so let's go ahead and try to get
 6    it done.
 7         Obviously, you're going to have to come back tomorrow,
 8    Mr. Oriente.
 9              THE WITNESS:  That's fine, Your Honor.
10              MR. RAFFERTY:  In terms of the -- I'm sorry, Your
11    Honor.  May I proceed?
12              THE COURT:  Go ahead, please.
13    BY MR. RAFFERTY:
14    Q.   In terms of the CSMP, are you aware that there was
15    a policy in place that was listed in the CSMP
16    instructing people not to use the word "suspicious"?
17    A.   Yes, I was.
18              MR. RAFFERTY:  If we could pull up P-42836.
19         It's been admitted, Your Honor.
20    BY MR. RAFFERTY:
21    Q.   And if we could go to Page 15 under the Life of the
22    Customer under the line Customer Communications.  And
23    this is actually inside the policy and procedures of
24    McKesson; correct?
25    A.   Yes, sir, it was.
```

1    Q.    Okay.  And it says, "All communications regarding

2    controlled substances are subject to subpoena and

3    discovery."

4         Do you see that?

5    A.    Yes, I do.

6    Q.    And then the company, McKesson, is actually instructing

7    people, including the DRA, to write information as if it

8    were being viewed by the DEA.  Do you see that?

9    A.    Yes.

10   Q.    And then it says refrain from using the word

11   "suspicious" in communications.  Do you see that?

12   A.    Yes.  Once we identified a customer using the word

13   "suspicious" towards an order, we would have to take action

14   against that.  So we had -- as we conducted our reviews, we

15   had what was known as customers of interest.

16   Q.    And once McKesson deems an order and/or customer

17   suspicious, McKesson is required to act.  This means all

18   controlled substances sales to that customer must cease and

19   the DEA must be notified.

20   A.    Yes.

21   Q.    So the company as early as 2008 was telling its people,

22   its employees and its regulatory folks not to put stuff in

23   writing with the word "suspicious" because that would

24   require McKesson to act; correct?

25   A.    No, that's not correct.

1    **Q.**   And then if I could, let's take a look at -- that

2    stayed in the CSMP for several years, didn't it?

3    **A.**   Yes.  The -- in the CSMP when it reached Level Three

4    and was deemed suspicious, it would be -- controls would be

5    shut off.

6    **Q.**   And you don't want somebody saying the word

7    "suspicious" and then triggering the duty to act; correct?

8    **A.**   Well, it wouldn't be suspicious until I conducted my

9    Level Three.  During the review of Level One and Two, it may

10   not be suspicious.

11   **Q.**   Then why do you have to instruct employees not to use

12   that word in quotes, "suspicious"?

13   **A.**   Once you use that word, we need to take action.

14   **Q.**   Right.  And you didn't want to take action?

15   **A.**   No, that's not true.  We took action on suspicious

16   orders and customers.  We just didn't want it labeled to a

17   customer that we deemed was not suspicious.

18   **Q.**   And if you could, let's take a look at P-12627 which is

19   already in evidence.  That's the 2013 CSMP.

20           MR. SCHMIDT:  I don't think it was, but no

21   objection to it going in.

22           MR. RAFFERTY:  Okay.  Do you need a copy?

23           MR. SCHMIDT:  No.  Your colleague gave me one.

24   Thank you.

25   BY MR. RAFFERTY:

223

1    **Q.**   And if we look at Page 23 of the 2013 version of

2    the CSMP, once again it's got a customer communications

3    section.  Do you see that?

4    **A.**   Yes.

5    **Q.**   And it's got that same language in Number 1 and it goes

6    all the way down, and it says the same exact thing.  And it

7    says refrain from using the word "suspicious" in

8    communications.  Do you see that?

9    **A.**   Yes.

10   **Q.**   So for five years, that remained -- at least for five

11   years that remained the policy and procedure of McKesson;

12   correct?

13   **A.**   Yes.  We didn't just throw that word around.  When we

14   named something suspicious, we took action.

15   **Q.**   I'm going to show you what's been marked for purposes

16   of identification as P-42814.

17   **A.**   Thank you.

18   **Q.**   And if we look at Page 2, Report of Government Contact,

19   do you see that?  It's got Michael Oriente in it?

20   **A.**   Yes, I see it.

21   **Q.**   And it attaches a letter from the DEA.  Do you see

22   that?

23   **A.**   I'm looking for the attachment.

24   **Q.**   It should be on Page 4.

25   **A.**   Yes, sorry.

**Q.**   And this is -- it says from the DEA Department of
Justice regarding -- sent to Washington Court House;
correct?

**A.**   Yes.

MR. SCHMIDT:  If we're going to read the letter
in, we'll object to that -- I'll object to that as hearsay.

MR. RAFFERTY:  This is putting them on notice of
the failures at Washington Court House, Your Honor,
according to the DEA which is the distribution center that
feeds Cabell County and he's copied on it.

THE COURT:  Well, are you offering it for the
truth?

MR. RAFFERTY:  I'm offering it for notice.

THE COURT:  Well, I'm not going to consider it for
the truth, but I'll admit it for the limited purpose.

MR. RAFFERTY:  Thank you, Your Honor.

THE COURT:  42814 is admitted.

BY MR. RAFFERTY:

**Q.**   If we look, it says from March 31st to April 21st,
2011, the DEA Columbus District office conducted an
investigation of the McKesson Company.  On August the
30th there was a management discussion between you and
investigators.

It goes on to say failure to report suspicious
controlled substance orders in violation of Title 21, Code

225

```
1   of Federal Regulations, et cetera, which states that the

2   registrant shall inform DEA of suspicious orders.

3        Do you see that?

4   A.   I do.  This was not one of my distribution centers, so

5   I really would not have been involved in the greater details

6   of this.  I would have read it and filed it.

7   Q.   Correct.  But you're on it; correct?

8   A.   Yeah, yeah, I was a recipient of it.  But, again, I had

9   six DCs to take care of myself.  I wasn't going to worry

10  about this one.

11  Q.   Okay.  Now, on Page 1 after Mr. Gustin sends an email

12  to Mr. Walker at the bottom after looking at the failures,

13  he says, "I cannot say this is a surprise."

14       Do you see that?

15  A.   That is what Dave wrote, yeah.

16  Q.   And Mr. Gustin was the DRA of the Regulatory Affairs

17  for the Washington Court House; correct?

18  A.   That would have been -- I don't believe I was copied on

19  Dave's reply to Don that you just mentioned.

20  Q.   And you know that there were -- between the dates of

21  May, 2008 and July, 2013 there was zero suspicious orders

22  reported for West Virginia customers by McKesson?

23  A.   I do not know that number.

24  Q.   And you mentioned earlier in your examination about the

25  fact that you knew that Rite-Aid self-distributed certain
```

1    controlled substances to themselves; correct?

2    **A.**    Yes, sir.

3    **Q.**    Okay.  And, in fact, what they self-distributed to

4    themselves was hydrocodone; correct?

5    **A.**    Yes.  At that time, hydrocodone was a Schedule III drug

6    and McKesson serviced Rite-Aid with Schedule IIs only.

7    **Q.**    Okay.  And at no time that you were the Director of

8    Regulatory Affairs for McKesson did you request from

9    Rite-Aid the self-distribution numbers of hydrocodone,

10   meaning how much were they distributing to themselves to

11   you.  Correct?

12   **A.**    No, we did not.  What we did was we set lower

13   thresholds because we were a secondary supplier of that drug

14   versus us being the primary.  So they would have had a lower

15   threshold on hydrocodone.

16           MR. RAFFERTY:  Sorry, Your Honor.  I'm trying to

17   hurry and get caught up.

18   BY MR. RAFFERTY:

19   **Q.**    I'm going to show you what's been marked for

20   purposes of identification as P-16690.

21   **A.**    Thank you.

22           MR. SCHMIDT:  Your Honor, this relates to the same

23   issue that came up with ABDC.  We don't object to moving it

24   in for the reasons previously stated.  We object to

25   questions on this.

```
 1              MR. RAFFERTY:  He's listed on the email.

 2              MR. SCHMIDT:  He's not the one talking on the

 3     email.  And you weren't there for the Judge's guidance on

 4     this issue, but I think the Judge's guidance on this issue

 5     calls for moving it in and not questioning.

 6              THE COURT:  You want it to come in but you don't

 7     want him to question him on it?

 8              MR. SCHMIDT:  I don't think it's proper.  He

 9     doesn't have knowledge about what they want to use from this

10     email anyway.

11              THE COURT:  Unless you can lay that foundation,

12     Mr. Rafferty, but I'll admit the document there being no

13     objection to its admission.

14              MR. RAFFERTY:  Thank you.

15     BY MR. RAFFERTY:

16     Q.  Mr. Oriente, do you recall being involved in this

17     email conversation?

18              MR. SCHMIDT:  Actually, if I can reverse my

19     position, I do object to its entry if he's going to try to

20     question him about it.  I don't think he can lay a

21     foundation.  I think under what's happened already in this

22     case, it's improper.

23              THE COURT:  I'll sustain the objection.

24              MR. RAFFERTY:  Your Honor, this is part of the

25     stipulation.  So if I'm not -- if I don't question him about
```

```
1    it, then I assume it comes in under the stip.

2              MR. SCHMIDT:  We don't agree to that.

3              MR. RAFFERTY:  How is that possible?

4              MR. SCHMIDT:  Because during the course of this

5    trial, I offered to stipulate to this to come in.  Counsel

6    rejected that offer.  They're trying to use it with a

7    witness that has no proper purpose who didn't say the things

8    they want to use in it.  So we object to it.

9              THE COURT:  Mr. Farrell, you haven't said anything

10   all day, so I'll welcome anything you want to say.

11             MR. FARRELL:  I would suggest, based on the

12   concerns expressed by counsel, we have an approach-the-bench

13   discussion.

14             MR. SCHMIDT:  We don't object to that, Your Honor.

15   We don't object to a side bar if that's what he wants.

16             MR. FARRELL:  Sidebar, Judge.

17             THE COURT:  That's kind of unusual in this kind of

18   a trial, but we'll go over here in the corner.  I'm not sure

19   why we're doing this.

20        (Bench conference on the record)

21             MR. FARRELL:  Mr. Rafferty was not present when we

22   had our in camera or in chambers discussion regarding

23   inflammatory emails.  So to be fair to Mr. Rafferty, I think

24   that's the issue that Mr. Schmidt is trying to raise is that

25   this particular email may have the tendency to go viral like
```

1    other emails have done.

2         And, so, I wanted to make sure that there was an

3    opportunity for us to have a full discussion without having

4    the inflammatory remarks that are of concern to Mr. Schmidt.

5              MR. RAFFERTY:  If I could say something also.

6    Just so the Court knows, I was told about your order and

7    your ruling and I provided this document to Mr. Schmidt that

8    very day.

9              THE COURT:  Okay.

10             MR. SCHMIDT:  If I can point the Court to the

11   language, it's this comment.

12             THE COURT:  Oh, okay.

13             MR. SCHMIDT:  There's no conceivable purpose for

14   it.  I think what they've done is they've gone through our

15   files and found the one inflammatory email they can find and

16   now they're trying to run it in and I think we've seen that

17   is improper.

18             MR. RAFFERTY:  That is not the case at all, Your

19   Honor.  This was produced to us in the files of Michael

20   Oriente who's on the email.  Yes, we do actually review all

21   of the documents.

22             THE COURT:  And you're concerned about "moving to

23   heroin and meth so we don't have to monitor it."

24             MR. SCHMIDT:  Yes, which is not a statement he

25   endorsed and, frankly, not relevant that someone said

230

```
1    something that's not appropriate.
2              MR. RAFFERTY:  It is -- sorry.  It is relevant for
3    a couple purposes.
4         Number one, this is notice that these employees know
5    that people are moving to heroin from opioids.  It says it
6    right down here in the initial one.  And it is relevant
7    because these are statements made by him.
8              MR. SCHMIDT:  So now we're having non-present
9    witnesses be expert witnesses on --
10             THE COURT:  Okay.  I'm going to let the document
11   in.  I'm not going to let you question him about it.
12             MR. RAFFERTY:  Very well, Your Honor.  Thank you.
13             MR. SCHMIDT:  Thank you for letting us have the
14   sidebar.
15        (Bench conference concluded)
16             MR. RAFFERTY:  Your Honor, based on Your Honor's
17   earlier ruling regarding the DOJ letters, we have -- would
18   like to proffer P-00119, P-00118, P-00121, and P-00122.  All
19   of these letters are letters from the DEA or DOJ to McKesson
20   detailing the, detailing the violations of the Controlled
21   Substances Act as it pertains to opioids.  And along with
22   the several other findings within these, we believe these
23   are all admissible.  They're all on the stip.  We had
24   proposed to file them.  I'm not going to -- we propose to
25   move them into evidence.  They're part of the stip.  We
```

```
1    understand your previous ruling and I believe what we would
2    request would be -- well, I'll let Mr. Majestro --
3            MR. MAJESTRO:  Your Honor --
4        I'm assuming that you object to the introduction of
5    these.  You oppose that.
6        What I would propose, Your Honor, is let us -- I think
7    Mr. Rafferty is finished with the witness.  Before we pass
8    the witness, we wanted to move these into admission.  And we
9    would like the opportunity to file a short brief on why we
10   think they're admissible.  We think this is an important
11   witness.  We didn't want to pass the witness without
12   preserving that for the record.
13           MR. SCHMIDT:  We obviously don't object, if it's
14   agreeable with the Court, to them filing a brief.  We've
15   done the same.  Obviously, we would need suitable time to
16   respond.  We will object to them moving them into evidence.
17   They're the same issue the Court's already addressed.
18           THE COURT:  Well, I'll hold in abeyance my ruling
19   on these until I read your papers, Mr. Majestro.
20           MR. MAJESTRO:  Thank you, Your Honor.
21           THE COURT:  And copies to my clerk, please.
22           MR. SCHMIDT:  Could I actually get copies of the
23   ones you just read?
24           MR. RAFFERTY:  Yeah.  It will take us just a
25   minute.  We still have two other outstanding issues.
```

```
 1          Number one, the customer script documents.  Is there
 2    any objection to those?
 3          MR. SCHMIDT:  There's not to 13714.  There is not
 4    to 13712.  The only two that I have questions about that I
 5    need to check on are 13710 and 13284.  And on the 284 what's
 6    throwing me is that it has a Hurricane address.
 7          All right, I'm told no objection to 13284.
 8          MR. RAFFERTY:  Okay.  So I'm sorry, Paul, Mr.
 9    Schmidt.  I want to get those numbers.
10          MR. SCHMIDT:  I'm sorry.
11          THE COURT:  Are you asking me to revisit the prior
12    ruling?
13          MR. RAFFERTY:  No, no, no.  I was -- these are
14    documents separate that I move, just to move in per our
15    stip.  And I gave -- that was right before I took the break,
16    Your Honor, and Mr. Schmidt was reviewing them to see if he
17    had an objection.  So I now understand that he has no
18    objection to three of the four.
19          MR. SCHMIDT:  13712, 13714, 13284.  And the
20    contested one, at least for now that we just need time to
21    review, is 13710.
22          MR. RAFFERTY:  Okay.  Then I think that will take
23    care of that.
24          So I would move into admission, Your Honor, 13712 --
25          THE COURT:  We need to see the documents.
```

```
1              MR. RAFFERTY:  Oh, yes, yes, Your Honor.

2              THE COURT:  So there's four documents here.

3    There's no objection to three of them.  There's an objection

4    to one of them.

5              MR. RAFFERTY:  I don't think there's an objection

6    yet.  I think Mr. Schmidt just wanted some additional time.

7              THE COURT:  All right.  Are these separate from

8    the ones Mr. Majestro is going to submit?

9              MR. RAFFERTY:  Yeah, totally different issue, Your

10   Honor, yeah.  I'm sorry.  Yeah.

11             THE COURT:  That's what I thought but I wanted to

12   make sure.

13             MR. RAFFERTY:  Yeah, the DEA letters are one

14   thing.  These are documents that were on the stip that I

15   just -- in order to save the Court time, I didn't want to

16   try to go through the witness and enter them in.  So we'll

17   get those together for the Court right now.

18             THE CLERK:  Before you leave.

19             MR. RAFFERTY:  Absolutely.

20             THE COURT:  Are you ready to pass the witness, Mr.

21   Rafferty?

22             MR. RAFFERTY:  Yes.  There was one other

23   housekeeping matter and that is getting -- we would like to

24   be able to get together with Mr. Schmidt, as he suggested,

25   on the Rite-Aid prescription data that he thinks there was
```

```
 1    somekind of manipulation.

 2            THE COURT:  Can I excuse Mr. Oriente --

 3            MR. RAFFERTY:  Oh, yes.

 4            THE COURT:  -- and not make him sit here through

 5    all of this?

 6            MR. RAFFERTY:  Absolutely.

 7            THE COURT:  You've probably had enough lawyer ease

 8    for one day.  You're free to go, but we'll need you back

 9    here promptly at 9:00 and we'll --

10            THE WITNESS:  Yes, sir.

11            THE COURT:  -- pick up from there.

12            THE WITNESS:  Okay.  I'll see you tomorrow

13    morning.  Thank you.

14            THE COURT:  I hope you can have a pleasant

15    evening.

16            THE WITNESS:  Thank you.  You too, sir.

17            THE COURT:  All right.

18            MR. RAFFERTY:  And, so, other than that, we will

19    get with Mr. Schmidt on 342728 which is yet a third issue

20    about the issue on the Rite-Aid prescription data.

21            THE COURT:  Okay.

22            MR. RAFFERTY:  Other than that, yes, we're working

23    on getting the documents and we will get them to you in

24    three minutes.

25            THE COURT:  Okay.  Now can we pull the plug on it
```

1    for today?

2              MR. MAJESTRO:  Your Honor, we have one more

3    housekeeping detail.  I'd like to introduce Monique

4    Christenson to the Court.

5              MR. SCHMIDT:  Before we do that, I apologize for

6    interrupting.  I'd just note that the witness is now passed.

7              MR. RAFFERTY:  Yes.

8              MS. CHRISTENSON:  Good afternoon.  I am here

9    representing City of Huntington.  My name is Monique

10   Christenson.

11       I have two deposition designation packets that

12   plaintiffs would move for admission into evidence.  And to

13   be clear for the record, there are outstanding objections by

14   defendants that are identified and included for

15   consideration in the packets.

16             MR. HESTER:  Could you explain what they are?

17             MS. CHRISTENSON:  The parties negotiated and met

18   pursuant to a stipulation to compile deposition designation

19   packets.  All the packets contain a flash drive containing

20   digital copies of all the packet materials.  They have video

21   files for had witnesses John Gray and Patrick Kelley.  It

22   will be video transcripts; the parties' final negotiated

23   designations with objections and responses; parties' final

24   designation exhibit lists; and corresponding objections and

25   replies; and parties' designation exhibits.

```
1              THE COURT:  Well, I'd like to have the video

2    transcripts and written transcripts marked up so I'll know

3    what you're objecting to and what you're not.

4              MS. CHRISTENSON:  We have three boxes for you,

5    Your Honor, and two copies pursuant to the discussions with

6    your clerk.

7              THE COURT:  Three boxes.

8              MS. CHRISTENSON:  One copy for you and one for

9    your clerk.

10             THE COURT:  All right.

11             MS. CHRISTENSON:  May I submit them at this time?

12             THE COURT:  Yes, you may submit them.

13             MR. HESTER:  Your Honor, just as a mechanical

14   matter, the objections that we have made don't appear on the

15   same pages as the designations.  And if you want us to, we

16   could do the work to put them all in one place if that would

17   be easier for the Court.

18             THE COURT:  Well, you need to do everything you

19   can, Mr. Hester, to minimize the possibility I'll get

20   confused.

21             MR. HESTER:  We will do our best.

22             THE COURT:  And I'm very serious about that.  I'm

23   not trying to be funny.

24             MR. HESTER:  We understand.  What we would like to

25   do is submit a document to the Court that has the objections
```

```
1    self-contained.
2         And just for the record, Your Honor, these are the two
3    designations related to these had witnesses, the trade
4    association.  And we maintain our overarching objection.
5         And I think it becomes clear from the designations that
6    have been made that the plaintiffs are relying on the
7    substance of the positions that we're taking in relation to
8    the HDA's petitioning activity, filing of briefs,
9    legislature strategies, and the like.
10        We do not think this falls within the scope of the
11   Court's ruling, recognizing that there could be showings
12   related to intent or the like that might be outside the
13   scope of the Noerr-Pennington immunity.
14        We think these designations go directly to the
15   substance of the positions that were being taken by had and,
16   therefore, should be precluded under the Court's ruling,
17   just to make sure that the record is clear on that.  But we
18   will make a submission to Your Honor.
19             THE COURT:  Okay.  Thank you, Mr. Hester.
20             MR. HESTER:  Thank you.
21             THE COURT:  Thank you, ma'am.
22        Is there anything else to take up before we adjourn
23   until tomorrow morning?
24        Nobody can leave until we get the documents.
25             MR. RAFFERTY:  I've got them right here.
```

1          THE COURT:  Well, Allison just excused me, but the

2     rest of you have to stay.

3          (Trial recessed at 5:32 p.m.)

```
1         CERTIFICATION:

2                   I, Ayme A. Cochran, Official Court

3    Reporter, and I, Lisa A. Cook, Official Court Reporter,

4    certify that the foregoing is a correct transcript from

5    the record of proceedings in the matter of The City of

6    Huntington, et al., Plaintiffs vs. AmerisourceBergen

7    Drug Corporation, et al., Defendants, Civil Action No.

8    3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9    reported on May 24, 2021.

10

11            S\Ayme A. Cochran          s\Lisa A. Cook

12                Reporter                   Reporter

13       _

14

15            May 24, 2021

16                Date

17

18

19

20

21

22

23

24

25
```

**'**

**'07** [2] - 130:18, 130:19
**'08** [6] - 121:18, 121:20, 122:2, 130:10, 154:9, 163:12
**'09** [1] - 143:12
**'14** [1] - 24:17
**'17** [1] - 183:23
**'18** [1] - 183:23

**0**

**00034** [1] - 49:8
**00115** [2] - 189:15, 192:16
**00116** [1] - 195:24
**00907** [2] - 2:5, 2:17
**08761** [1] - 211:6
**08763** [1] - 143:11

**1**

**1** [4] - 85:6, 113:12, 223:5, 225:11
**1(a** [1] - 215:24
**1,100** [1] - 158:22
**1.4** [1] - 43:13
**10** [3] - 43:23, 165:7, 202:3
**1001** [2] - 2:10, 4:6
**1006** [4] - 13:1, 172:14, 172:20, 177:24
**1022** [1] - 3:5
**103** [1] - 195:11
**107** [1] - 89:24
**10:49** [2] - 44:2, 179:18
**11** [2] - 22:6, 194:24
**11,000** [2] - 158:21, 158:22
**113** [1] - 90:2
**11:10** [1] - 179:8
**11th** [1] - 121:20
**12** [8] - 12:17, 129:3, 130:11, 130:16, 130:17, 131:8, 193:16, 208:6
**126** [1] - 3:5
**12778** [2] - 160:4, 160:7
**12821** [1] - 208:11
**12:09** [3] - 144:1, 179:11, 179:18
**12th** [1] - 121:18
**13** [8] - 65:16, 85:4, 109:17, 130:9,

192:23, 193:14, 193:15, 195:6
**13,000** [1] - 158:25
**13.25** [1] - 86:5
**1300** [1] - 6:15
**1301.74(b)** [1] - 53:14
**1311** [2] - 2:4, 2:16
**13284** [3] - 232:5, 232:7, 232:19
**13288** [3] - 121:13, 126:3, 126:6
**13710** [2] - 232:5, 232:21
**13712** [3] - 232:4, 232:19, 232:24
**13714** [2] - 232:3, 232:19
**14** [1] - 208:6
**14288** [1] - 90:3
**14th** [3] - 109:13, 163:12, 190:21
**15** [3] - 8:2, 165:7, 220:21
**15910** [1] - 3:18
**15th** [1] - 204:11
**16** [4] - 1:16, 75:5, 75:9, 196:21
**1600** [1] - 3:17
**16210** [2] - 72:17, 90:20
**16210A** [2] - 90:21, 91:4
**16th** [5] - 32:15, 33:1, 43:13, 137:10, 154:8
**17** [2] - 43:10, 43:11
**17-A** [1] - 43:3
**1717** [2] - 6:6, 6:13
**18** [1] - 82:15
**19** [6] - 75:13, 163:7, 166:9, 167:7, 169:7, 194:24
**190** [1] - 141:22
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1990** [1] - 65:11
**1994** [2] - 76:13, 76:17
**1:30** [2] - 89:8, 89:9

**2**

**2** [10] - 8:3, 87:7, 93:8, 97:16, 109:12, 118:18, 144:21, 153:7, 213:16, 223:18
**2(B** [1] - 61:4
**2.2** [1] - 46:18
**20** [3] - 193:7, 194:10, 216:7
**20001** [1] - 5:12

**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2004** [3] - 18:20, 18:22, 27:9
**2006** [2] - 117:20, 118:17
**2007** [13] - 19:8, 19:9, 29:9, 29:14, 31:9, 32:15, 32:18, 32:23, 33:1, 49:21, 50:15, 51:5, 65:10
**2008** [50] - 21:21, 23:14, 23:15, 24:12, 24:14, 25:15, 25:19, 26:3, 26:7, 28:5, 36:19, 39:11, 42:5, 42:13, 43:13, 45:3, 47:20, 48:16, 58:5, 58:7, 81:19, 81:20, 82:21, 83:1, 85:10, 91:15, 91:22, 93:13, 95:2, 95:5, 99:25, 107:20, 108:19, 109:3, 112:16, 112:20, 115:20, 115:24, 116:22, 120:10, 128:16, 130:2, 131:11, 139:20, 152:19, 154:25, 168:2, 221:21, 225:21
**2009** [6] - 31:12, 36:18, 113:12, 140:8, 140:17, 181:6
**2010** [10] - 157:12, 158:8, 193:8, 193:23, 194:11, 194:24, 195:13, 196:6
**2011** [10] - 132:7, 132:14, 134:12, 143:15, 144:1, 189:21, 190:21, 191:17, 204:11, 224:20
**2012** [13] - 28:12, 58:11, 64:24, 74:11, 196:6, 196:7, 196:13, 198:11, 198:14, 199:5, 199:9, 209:5
**2012-2013** [1] - 20:25
**2013** [16] - 40:12, 103:1, 112:5, 112:9, 112:12, 112:16, 115:24, 135:9, 139:20, 147:10, 147:20, 149:4, 150:14, 222:19,

223:1, 225:21
**2014** [16] - 23:20, 23:23, 24:14, 24:24, 25:3, 25:19, 26:3, 26:7, 26:13, 109:13, 109:14, 109:18, 112:5, 112:20, 115:20, 115:23
**2015** [5] - 135:4, 135:10, 135:18, 211:18, 212:15
**2016** [6] - 137:11, 183:18, 183:23, 184:7, 184:22, 185:8
**2017** [11] - 83:17, 100:15, 100:19, 103:3, 106:16, 106:17, 107:18, 113:15, 138:20, 139:8, 139:9
**2018** [4] - 16:15, 183:18, 187:24, 188:11
**2019** [1] - 103:11
**202** [2] - 2:4, 2:16
**2021** [4] - 1:19, 7:4, 239:9, 239:15
**20th** [1] - 189:21
**21** [4] - 53:14, 104:1, 194:9, 224:25
**21st** [1] - 224:19
**2216** [1] - 3:7
**22927** [2] - 185:11, 188:18
**22929** [2] - 187:19, 188:13
**22936** [1] - 166:13
**22nd** [1] - 128:16
**23** [1] - 223:1
**23733** [1] - 83:7
**24** [6] - 1:19, 7:4, 74:24, 76:11, 239:9, 239:15
**24th** [1] - 149:4
**25** [4] - 5:5, 13:11, 216:7, 220:2
**252** [1] - 166:5
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26th** [1] - 157:12
**27** [2] - 50:15, 194:10
**27,000** [1] - 65:10
**27th** [5] - 49:21, 51:5, 117:20, 118:17, 209:5
**28** [3] - 3:15, 4:3, 4:9
**2804** [1] - 7:11

**284** [1] - 232:5
**28th** [1] - 82:21
**29464** [3] - 3:15, 4:4, 4:9
**29th** [1] - 141:8
**2nd** [4] - 58:11, 85:10, 196:6, 198:11

**3**

**3** [5] - 86:25, 93:9, 113:25, 152:24, 213:18
**3,000** [1] - 158:12
**3/5** [1] - 92:4
**3/5/2008** [1] - 93:7
**3/6/08** [1] - 92:4
**30** [9] - 128:11, 128:23, 129:6, 129:7, 129:13, 129:15, 130:2, 194:10, 218:24
**30th** [6] - 83:1, 140:8, 140:17, 140:25, 141:9, 224:22
**31** [1] - 218:17
**3100** [2] - 6:5, 6:12
**311** [1] - 21:25
**316** [1] - 2:13
**31st** [2] - 132:6, 224:19
**32502** [1] - 2:14
**33** [1] - 117:12
**342728** [1] - 234:19
**36** [1] - 74:24
**37** [4] - 77:10, 77:15, 77:16, 79:14
**38** [1] - 195:13
**3843** [1] - 5:14
**39** [2] - 93:23, 93:24
**3:17-cv-01362** [2] - 1:5, 239:8
**3:17-cv-01665** [2] - 1:11, 239:8
**3:30** [1] - 160:11
**3:31** [1] - 160:13

**4**

**4** [5] - 96:17, 109:14, 200:22, 201:10, 223:24
**4,600** [6] - 25:12, 94:15, 94:20, 94:23, 95:24, 167:16
**401** [2] - 2:10, 4:6
**403** [1] - 83:10
**405** [1] - 2:7
**408** [9] - 100:21, 101:4, 101:6,

101:12, 102:25,
103:8, 105:12,
105:15, 105:24
**42** [1] - 151:14
**42100** [1] - 89:20
**42102** [1] - 89:20
**42103** [1] - 89:20
**42107** [1] - 89:21
**42113** [1] - 89:21
**42114** [1] - 90:2
**42115** [1] - 90:2
**42117** [1] - 90:2
**42118** [1] - 90:2
**42123** [1] - 90:3
**4213** [1] - 89:25
**4214** [1] - 89:21
**4215** [1] - 89:21
**42554** [1] - 108:17
**42638** [1] - 44:19
**42796** [1] - 156:12
**42814** [1] - 224:17
**46** [4] - 77:10, 77:15,
77:16, 80:9
**4th** [1] - 21:20

## 5

**5** [8] - 63:18, 85:25,
86:2, 86:13, 86:14,
188:2, 191:1, 215:11
**5,000** [3] - 162:9,
167:15, 208:3
**5-7** [2] - 66:17, 67:2
**50** [17] - 161:24,
164:19, 164:24,
164:25, 165:11,
167:20, 167:23,
168:1, 168:17,
169:15, 170:2,
170:5, 170:17,
171:9, 171:11,
171:18, 179:3
**54** [2] - 193:8, 193:23
**55** [10] - 30:1, 30:6,
30:18, 31:8, 31:11,
31:13, 31:16, 36:3,
36:8
**553** [1] - 6:8
**56** [2] - 3:4, 193:7
**56th** [1] - 3:5
**5:00** [1] - 219:14
**5:05** [1] - 219:14
**5:30** [2] - 89:8, 147:4
**5:32** [1] - 238:3
**5th** [1] - 138:20

## 6

**6** [5] - 46:14, 69:18,
97:14, 192:1, 215:10

**6.8** [1] - 74:10
**600** [1] - 2:13
**626** [1] - 76:12
**63** [3] - 12:18, 13:13,
16:10
**632** [1] - 76:12
**66** [1] - 195:13
**6th** [1] - 3:5

## 7

**7** [6] - 68:18, 150:4,
150:7, 157:20,
195:17, 202:3
**70** [2] - 12:18, 13:13
**70130** [1] - 3:8
**707** [1] - 4:18
**716** [1] - 3:12
**725** [2] - 4:13, 4:15
**75** [1] - 206:10
**7:00** [1] - 12:10
**7th** [1] - 91:22

## 8

**8** [1] - 185:6
**8,000** [3] - 31:24,
34:23, 157:20
**80** [4] - 141:22, 142:8,
153:4
**801** [1] - 3:10
**801(d** [2] - 61:4, 61:6
**801(d)(2)(B** [3] -
61:15, 62:20, 84:3
**801(d)(2)(D** [2] - 61:8,
62:17
**801(d)(2)(D)** [3] - 74:8,
77:14, 95:9
**805** [2] - 62:11, 62:13
**850** [1] - 5:12
**851-A** [1] - 78:12
**8th** [1] - 144:1

## 9

**9** [2] - 113:17, 135:18
**90** [5] - 179:4, 179:12,
217:3, 217:14,
217:18
**90,000** [2] - 174:8,
174:12
**901** [1] - 4:18
**9143** [3] - 34:12,
37:25, 175:19
**91436** [1] - 3:18
**9193** [2] - 34:20, 34:21
**9:00** [2] - 7:4, 234:9
**9th** [1] - 2:10

## A

**a.m** [3] - 7:4, 44:2,
179:8
**abbreviation** [1] -
144:10
**ABDC** [4] - 15:23,
60:10, 90:9, 226:23
**abeyance** [1] - 231:18
**abide** [1] - 41:6
**ability** [5] - 9:3, 59:17,
134:8, 181:23,
186:23
**able** [7] - 13:13, 76:9,
78:13, 106:22,
176:15, 197:24,
233:24
**absence** [1] - 7:17
**absolutely** [5] - 15:13,
44:11, 147:7,
167:13, 180:24
**Absolutely** [4] - 17:8,
39:9, 233:19, 234:6
**absolve** [1] - 56:7
**abuse** [5] - 63:20,
64:23, 64:25, 65:3,
74:11
**abused** [2] - 33:20,
33:25
**accept** [1] - 109:1
**acceptable** [3] -
204:25, 205:3, 211:2
**acceptance** [7] -
83:11, 113:4, 114:1,
115:4, 115:10,
115:12
**accepted** [2] - 106:25,
205:6
**accepting** [2] -
204:23, 205:11
**accommodate** [1] -
15:19
**accompanied** [2] -
209:24, 210:5
**accompany** [1] -
205:16
**accompanying** [1] -
205:13
**accordance** [1] -
53:14
**according** [8] - 50:20,
54:21, 71:10, 142:9,
201:13, 202:22,
205:20, 224:9
**accordingly** [1] -
101:25
**account** [13] - 23:25,
24:13, 24:15, 24:18,
24:19, 126:13,
152:1, 153:2,

153:25, 154:1,
161:11, 215:4
**Account** [1] - 163:24
**accountability** [1] -
144:18
**accounts** [32] - 24:4,
24:6, 24:16, 24:25,
25:5, 25:6, 25:8,
25:9, 26:16, 123:19,
126:12, 128:3,
129:2, 132:18,
132:24, 133:5,
133:17, 151:22,
160:22, 160:23,
161:4, 197:14,
198:16, 198:20,
199:5, 199:9,
201:16, 201:22,
202:20, 202:24,
204:18, 206:6
**Accounts** [2] - 117:7,
202:4
**accurate** [12] - 25:13,
30:20, 31:10, 35:9,
94:24, 98:17, 98:25,
135:4, 140:6,
153:23, 185:25,
192:8
**Ackerman** [10] -
17:11, 17:13, 17:20,
61:2, 62:14, 63:3,
71:5, 74:1, 83:22,
107:5
**ACKERMAN** [24] - 2:9,
60:22, 60:24, 61:3,
61:7, 61:9, 61:13,
62:1, 62:15, 63:4,
74:3, 74:12, 74:22,
75:24, 76:1, 76:4,
76:18, 83:24, 84:2,
84:11, 103:9,
103:23, 103:25,
104:12
**acknowledged** [1] -
113:6
**acknowledges** [2] -
88:11, 113:11
**Act** [7] - 26:9, 26:15,
27:12, 41:20, 41:23,
42:1, 44:17, 54:6,
80:19, 80:25, 102:8,
130:23, 206:20,
207:8, 207:16,
208:7, 230:21
**act** [3] - 221:17,
221:24, 222:7
**action** [9] - 109:16,
202:11, 207:12,
208:2, 221:13,
222:13, 222:14,

222:15, 223:14
**Action** [7] - 1:4, 1:10,
192:25, 193:1,
239:7, 239:8
**actions** [2] - 75:19,
75:20
**active** [4] - 34:14,
95:1, 102:22, 206:3
**activity** [1] - 237:8
**actual** [3] - 111:21,
135:10, 192:14
**add** [9] - 14:23, 16:2,
51:2, 108:24, 129:7,
129:10, 159:7,
159:17, 175:15
**added** [4] - 15:24,
28:13, 158:19,
179:19
**adding** [1] - 159:15
**addition** [3] - 12:17,
129:7, 194:25
**additional** [16] -
19:19, 28:12, 63:15,
68:13, 98:8, 99:22,
107:19, 129:18,
147:18, 183:2,
205:4, 207:10,
210:20, 217:1, 233:6
**additionally** [1] -
103:13
**address** [8] - 8:21,
9:11, 100:12,
102:21, 166:3,
176:7, 183:24, 232:6
**addressed** [7] - 10:3,
76:13, 103:19,
154:13, 167:11,
209:8, 231:17
**addressing** [2] -
74:22, 103:18
**adds** [1] - 97:20
**adept** [1] - 142:19
**adequate** [2] - 94:4,
139:21
**adjourn** [1] - 237:22
**adjust** [1] - 158:17
**adjusted** [2] - 45:22,
155:15
**adjustment** [1] -
186:13
**adjustments** [6] -
130:8, 130:9, 139:5,
139:10, 153:9, 179:1
**Administration** [4] -
49:21, 53:7, 108:8,
117:20
**Administrative** [3] -
82:12, 108:3, 108:6
**administrative** [2] -
109:16, 111:5

**admissibility** [5] - 14:2, 78:22, 83:19, 83:20, 197:22
**admissible** [14] - 10:22, 11:4, 11:6, 14:3, 16:24, 51:12, 71:11, 76:14, 100:23, 102:18, 230:23, 231:10
**admission** [9] - 60:2, 84:9, 189:3, 198:3, 200:24, 227:13, 231:8, 232:24, 235:12
**admit** [31] - 16:5, 21:24, 51:8, 52:16, 62:24, 62:25, 77:25, 78:2, 83:7, 84:13, 92:14, 95:17, 105:13, 106:16, 106:17, 109:2, 118:12, 126:3, 152:11, 168:19, 181:1, 188:15, 192:16, 196:17, 198:1, 200:17, 200:18, 211:6, 224:15, 227:12
**admitted** [48] - 7:25, 11:8, 11:10, 22:3, 33:10, 43:19, 44:18, 51:5, 71:3, 71:4, 74:17, 78:20, 78:24, 79:7, 90:8, 90:16, 91:4, 91:5, 92:19, 106:18, 109:3, 118:13, 126:6, 131:20, 134:22, 136:13, 138:11, 139:16, 143:7, 148:5, 148:19, 151:11, 152:14, 156:25, 160:7, 168:25, 170:23, 180:6, 182:14, 189:2, 192:18, 198:8, 208:13, 211:8, 212:11, 220:19, 224:17
**admitting** [2] - 171:22, 197:5
**adopted** [7] - 48:22, 61:16, 61:22, 62:22, 72:3, 75:8, 84:3
**adverse** [3] - 15:5, 95:8, 103:5
**Affairs** [50] - 19:5, 19:7, 19:11, 19:13, 19:23, 20:11, 20:12, 23:4, 23:15, 24:12,

25:3, 25:18, 25:22, 26:20, 26:21, 27:4, 27:16, 29:11, 29:18, 32:23, 33:4, 35:12, 35:18, 41:8, 52:8, 58:3, 58:19, 59:8, 73:14, 81:9, 84:24, 84:25, 88:19, 100:7, 112:7, 115:21, 135:22, 136:2, 139:22, 191:16, 196:14, 198:12, 199:22, 206:17, 207:6, 214:1, 215:3, 215:13, 225:16, 226:8
**affects** [1] - 119:8
**afield** [1] - 201:5
**afternoon** [7] - 89:7, 89:14, 91:13, 91:14, 140:23, 179:10, 235:8
**agent** [3] - 61:10, 72:8, 74:6
**ago** [4] - 9:7, 65:8, 78:16, 130:9
**agree** [40] - 33:22, 41:18, 41:25, 42:4, 45:2, 47:7, 60:19, 63:21, 64:6, 64:7, 79:24, 81:4, 98:10, 98:11, 98:13, 98:19, 104:17, 105:1, 116:6, 118:24, 147:9, 155:8, 160:20, 161:23, 187:21, 188:23, 190:6, 197:22, 205:2, 209:19, 211:3, 212:23, 213:3, 214:1, 214:11, 215:2, 216:10, 216:24, 228:2
**agreeable** [1] - 231:14
**agreed** [9] - 8:3, 10:6, 12:16, 86:4, 115:7, 115:8, 115:9, 169:14, 200:24
**agreeing** [2] - 83:19, 145:16
**Agreement** [15] - 81:10, 82:12, 82:13, 84:18, 84:21, 85:10, 93:8, 93:14, 93:19, 95:2, 107:19, 108:3, 108:6, 130:22, 131:11
**agreement** [15] - 84:8, 85:15, 88:2, 89:20,

93:21, 93:23, 105:17, 108:24, 113:13, 113:14, 114:16, 130:21, 138:10, 162:1
**agreements** [2] - 84:5
**agrees** [5] - 87:9, 88:11, 101:20, 101:23, 104:2
**ahead** [29] - 48:11, 49:4, 51:20, 57:3, 63:1, 71:21, 78:19, 86:17, 86:20, 89:18, 90:17, 92:21, 126:19, 138:16, 148:16, 152:11, 154:3, 163:5, 164:4, 168:8, 173:19, 177:4, 185:9, 185:15, 202:16, 219:9, 220:5, 220:12
**Aid** [83] - 24:9, 24:13, 24:15, 25:11, 120:8, 120:11, 120:20, 120:24, 121:1, 121:6, 122:17, 122:19, 122:20, 123:3, 123:13, 123:23, 125:4, 125:6, 125:18, 126:13, 126:14, 126:21, 126:22, 126:24, 127:9, 128:12, 128:20, 129:13, 129:17, 130:2, 136:23, 137:2, 137:22, 137:24, 139:4, 139:5, 153:24, 160:18, 161:11, 161:25, 162:1, 162:2, 162:5, 162:17, 162:19, 162:21, 162:23, 165:4, 165:13, 165:17, 166:4, 166:6, 166:16, 166:23, 167:11, 168:13, 169:11, 169:13, 170:5, 170:11, 171:8, 171:18, 174:10, 174:15, 175:16, 176:15, 179:23, 180:12, 180:16, 181:7, 181:8, 181:9, 198:16, 199:11, 207:15, 208:2, 208:5, 225:25, 226:6, 226:9, 233:25, 234:20

**Aids** [17] - 129:18, 129:20, 162:9, 164:1, 164:18, 164:25, 166:5, 166:7, 166:18, 167:12, 167:22, 168:5, 170:1, 170:16, 173:17, 181:23, 181:24
**al** [4] - 1:7, 1:13, 239:6, 239:7
**ALL** [1] - 7:6
**allegation** [1] - 95:13
**allegations** [11] - 83:11, 84:10, 84:11, 100:17, 102:25, 103:4, 103:7, 104:6, 110:13, 110:20, 115:5
**alleged** [2] - 111:6, 114:17
**Allison** [1] - 238:1
**allow** [6] - 45:20, 111:1, 144:16, 207:20, 217:8
**allowed** [2] - 132:20, 132:25
**almost** [4] - 135:3, 147:11, 204:22, 205:21
**Alprazolam** [1] - 66:5
**Alzheimer's** [1] - 216:18
**America** [2] - 64:8, 86:7
**Americans** [1] - 74:10
**AmerisourceBergen** [2] - 6:2, 239:6
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**amount** [12] - 46:22, 68:14, 86:5, 132:19, 132:25, 133:1, 136:22, 143:1, 155:15, 155:22, 157:23, 216:16
**amounts** [1] - 204:25
**analysis** [5] - 55:21, 55:25, 74:4, 209:13, 213:12
**analytics** [1] - 99:6
**Andrew** [4] - 179:14, 181:5, 181:6
**ANDREW** [1] - 5:10
**Andy** [1] - 178:25
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**answer** [13] - 14:12, 14:20, 31:3, 131:2, 131:4, 174:23,

181:17, 186:9, 187:3, 202:13, 207:24, 217:8
**answered** [2] - 106:20, 155:21
**answering** [2] - 155:25, 203:19
**answers** [1] - 14:22
**ANTHONY** [1] - 2:6
**antibacterial** [1] - 216:17
**anytime** [1] - 144:8
**anyway** [3] - 114:15, 219:13, 227:10
**apart** [1] - 107:20
**apologies** [1] - 182:19
**apologize** [12] - 22:9, 70:21, 74:21, 94:17, 107:13, 123:10, 173:18, 186:22, 192:20, 194:22, 200:23, 235:5
**Apparent** [1] - 213:7
**appear** [3] - 132:6, 176:21, 236:14
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appendix** [2] - 108:22, 108:24
**Appendix** [1] - 85:17
**applicability** [2] - 85:14
**applicable** [3] - 85:13, 85:15, 87:11
**applied** [2] - 31:23, 180:22
**applies** [3] - 60:12, 180:1, 180:16
**apply** [5] - 37:21, 88:6, 103:11, 103:14, 186:12
**appreciate** [6] - 7:19, 15:3, 37:20, 90:22, 176:5, 187:15
**approach** [11] - 14:25, 21:3, 22:15, 30:10, 32:6, 42:19, 49:9, 57:21, 127:1, 150:5, 228:12
**approach-the-bench** [1] - 228:12
**approached** [1] - 120:21
**approaching** [1] - 125:3
**appropriate** [11] - 10:9, 11:14, 70:15, 98:10, 99:9, 153:17, 157:14, 159:5,

188:24, 213:2, 230:1
**approve** [1] - 128:19
**approved** [1] - 147:19
**April** [5] - 82:21, 83:1, 189:21, 204:11, 224:19
**Arch** [2] - 6:6, 6:13
**area** [10] - 25:5, 66:16, 66:20, 66:25, 67:8, 132:17, 153:19, 160:3, 214:21, 215:20
**areas** [5] - 66:21, 112:25, 212:16, 212:19, 214:23
**argue** [1] - 11:11
**argument** [3] - 76:5, 165:6, 167:10
**arguments** [1] - 11:12
**arise** [1] - 146:1
**Arora** [2] - 109:17, 109:18
**article** [1] - 61:21
**ASHLEY** [1] - 5:3
**Ashley** [1] - 47:13
**aside** [10] - 14:1, 23:19, 64:8, 64:11, 81:6, 132:4, 136:16, 181:10, 207:4
**aspect** [1] - 158:9
**assigned** [3] - 25:7, 26:17, 159:8
**assistant** [1] - 144:7
**assisted** [2] - 145:19, 148:12
**associated** [1] - 192:7
**association** [1] - 237:4
**assume** [2] - 190:14, 228:1
**assuming** [5] - 27:10, 60:4, 60:6, 209:10, 231:4
**AT** [1] - 1:2
**attached** [3] - 153:3, 178:25, 190:1
**attaches** [2] - 189:25, 223:21
**attaching** [1] - 148:8
**attachment** [1] - 223:23
**attempted** [3] - 39:15, 116:12, 174:22
**attend** [1] - 144:15
**attendees** [3] - 92:6, 92:24, 97:17
**attention** [1] - 185:6
**attorneys** [2] - 100:15, 100:16
**Audit** [1] - 190:18
**audit** [17] - 189:25, 190:2, 190:17, 190:21, 191:10, 192:4, 192:24, 193:25, 195:6, 195:25, 196:5, 198:18, 200:15, 201:14, 202:22, 203:13, 203:14
**audited** [2] - 191:3, 191:7
**auditing** [1] - 197:12
**audits** [4] - 189:6, 189:7, 189:13, 192:14
**August** [6] - 109:17, 132:6, 144:1, 163:12, 168:2, 224:21
**Aurora** [3] - 110:7, 110:8, 110:11
**Auroras** [1] - 110:11
**authenticate** [1] - 177:2
**authenticated** [1] - 175:15
**authentication** [3] - 12:4, 177:5, 177:10
**Authentication** [1] - 177:3
**authenticity** [1] - 197:8
**author** [3] - 77:12, 77:18, 96:24
**authored** [1] - 212:1
**authorities** [1] - 199:7
**authority** [4] - 49:1, 199:4, 199:8, 199:13
**auto** [1] - 164:19
**automatic** [12] - 35:8, 147:11, 147:13, 154:15, 154:21, 154:22, 154:23, 162:7, 171:7, 204:23, 205:21, 205:25
**automatically** [2] - 147:11, 147:19
**average** [3] - 66:16, 67:2, 216:6
**Avin** [1] - 3:7
**avoid** [1] - 158:25
**awakening** [3] - 59:2, 62:3, 63:12
**award** [1] - 181:12
**aware** [16] - 39:25, 40:3, 99:25, 102:5, 107:18, 111:9, 113:4, 130:1, 136:15, 136:16, 139:7, 147:20, 149:15, 149:16, 185:2, 220:14
**Awareness** [2] - 149:1, 149:8
**awareness** [2] - 59:2, 62:3
**awful** [1] - 148:13
**awhile** [1] - 148:24
**Ayme** [2] - 6:17, 239:2

**B**

**background** [2] - 73:11, 110:20
**backup** [2] - 141:21, 142:7
**bad** [6] - 86:15, 87:2, 184:8, 186:21, 188:20
**bags** [2] - 75:13, 75:17
**balance** [1] - 76:10
**balances** [1] - 80:24
**bar** [1] - 228:15
**Baron** [1] - 3:17
**base** [18] - 34:7, 34:9, 34:12, 34:20, 34:21, 35:4, 37:24, 37:25, 38:2, 38:3, 40:18, 129:4, 130:12, 169:14, 169:24, 175:19, 175:25
**based** [11] - 38:1, 45:15, 67:7, 71:10, 87:19, 134:20, 171:4, 172:4, 195:11, 228:11, 230:16
**basic** [1] - 75:4
**basis** [11] - 51:8, 68:8, 103:24, 126:15, 126:16, 133:11, 135:5, 136:25, 154:1, 163:18, 189:1
**Bates** [1] - 174:5
**Baylen** [1] - 2:13
**bcc** [1] - 132:7
**beat** [1] - 140:22
**became** [4] - 27:14, 73:13, 88:19, 88:22
**become** [2] - 8:8, 150:23
**becomes** [2] - 61:22, 237:5
**becoming** [4] - 19:4, 23:14, 29:18, 147:11
**BEFORE** [1] - 1:17
**beginning** [2] - 100:13, 152:22
**behalf** [7] - 7:10, 17:11, 50:21, 59:18, 60:5, 149:10
**below** [5] - 47:5, 103:19, 132:8, 163:14, 196:16
**Bench** [2] - 228:20, 230:15
**BENCH** [1] - 1:16
**bench** [4] - 76:6, 77:1, 219:22, 228:12
**benchmark** [1] - 216:5
**benefit** [2] - 46:16, 114:3
**best** [2] - 71:13, 236:21
**better** [5] - 9:22, 27:22, 44:11, 92:13, 158:1
**between** [16] - 11:3, 12:25, 25:19, 56:12, 56:17, 100:15, 100:18, 108:7, 132:19, 132:25, 139:19, 139:20, 140:5, 181:20, 224:22, 225:20
**beyond** [2] - 71:17, 72:7
**bickering** [1] - 9:17
**big** [4] - 24:7, 41:14, 117:7, 162:13
**biggest** [2] - 25:9, 120:16
**bill** [1] - 142:2
**Bill** [7] - 58:17, 93:1, 141:25, 143:19, 144:25, 145:11, 145:16
**Bill's** [2] - 145:9, 153:10
**Bissler** [5] - 121:24, 121:25, 122:14
**bit** [7] - 11:18, 30:20, 38:8, 42:12, 108:23, 116:1, 120:7
**Blaine** [2] - 164:8, 170:14
**blank** [1] - 43:5
**blanket** [2] - 162:5, 169:22
**blind** [2] - 118:23, 134:7
**block** [8] - 35:12, 42:6, 42:14, 47:8, 48:19, 48:20, 56:16, 69:13
**blocked** [9] - 38:15, 38:25, 39:19, 46:23, 47:2, 56:12, 124:7, 141:6, 194:15
**blocking** [4] - 35:8, 42:8, 46:25, 47:23
**Blvd** [3] - 3:15, 4:3, 4:9
**board** [5] - 121:9, 164:16, 185:10, 185:17, 212:14
**body** [2] - 75:13, 75:17
**Boggs** [7] - 73:8, 73:9, 77:9, 77:12, 77:17, 80:5, 168:24
**Bogle** [3] - 175:9, 175:10, 177:7
**BOGLE** [4] - 175:10, 176:14, 177:9, 177:18
**bold** [2] - 97:3, 97:4
**Bonasso** [1] - 5:14
**borders** [1] - 22:11
**boss** [8] - 58:3, 58:4, 58:5, 58:6, 136:1, 162:2, 183:12, 183:24
**Boston** [3] - 19:24, 20:4, 20:5
**bottom** [20] - 32:14, 32:25, 73:4, 94:11, 122:14, 122:25, 127:24, 143:18, 143:22, 143:23, 143:24, 154:9, 164:6, 178:17, 178:18, 189:22, 201:11, 208:23, 225:12
**Boulevard** [1] - 3:18
**bound** [4] - 104:9, 105:2, 105:3
**bows** [1] - 206:12
**box** [1] - 68:19
**Box** [2] - 5:14, 6:8
**boxes** [3] - 69:14, 236:4, 236:7
**boy** [3] - 61:5, 61:16, 62:21
**brand** [2] - 120:24, 155:14
**Brandon** [2] - 175:9, 175:10
**break** [6] - 19:10, 76:19, 78:20, 147:3, 218:22, 232:15
**Break** [1] - 210:17
**brewing** [1] - 122:8
**Bridgeside** [3] - 3:15, 4:3, 4:9
**brief** [3] - 106:4, 231:9, 231:14
**briefed** [2] - 101:11, 104:18
**briefing** [1] - 16:23

**briefly** [1] - 175:11
**briefs** [1] - 237:8
**bring** [2] - 197:16, 212:14
**broader** [1] - 119:10
**broccoli** [1] - 84:3
**broke** [1] - 91:15
**broken** [1] - 213:6
**brought** [1] - 208:2
**Bruce** [1] - 92:25
**Budd** [1] - 3:17
**Buffalo** [1] - 19:25
**buffer** [17] - 128:10, 128:22, 128:24, 129:1, 129:6, 129:11, 129:13, 129:19, 129:23, 129:25, 130:2, 130:5, 158:10, 158:19, 159:8
**build** [1] - 45:23
**bullet** [5] - 65:25, 96:18, 98:3, 98:15
**bump** [1] - 98:23
**bumped** [1] - 155:23
**bumping** [1] - 124:24
**bumps** [1] - 155:11
**bunch** [2] - 15:1, 213:15
**burdensome** [1] - 17:16
**Burling** [1] - 5:11
**burned** [2] - 145:24, 146:3
**Business** [1] - 209:23
**business** [28] - 45:23, 65:21, 65:25, 66:23, 67:12, 99:13, 99:15, 128:8, 146:9, 189:11, 204:24, 205:2, 205:5, 205:8, 205:11, 205:12, 205:14, 205:16, 210:5, 210:21, 210:23, 211:1, 211:4, 213:22, 214:7, 214:9, 216:20, 217:22
**busy** [3] - 11:18, 141:7, 141:9
**Butcher** [1] - 76:11
**buy** [2] - 132:20, 133:1
**BY** [118] - 18:13, 21:7, 22:4, 22:17, 23:12, 30:17, 31:6, 32:9, 33:11, 36:14, 39:10, 42:21, 44:14, 47:19, 48:15, 49:6, 49:13, 49:19, 52:2, 53:2, 54:9, 54:18, 55:1,

55:5, 57:4, 57:24, 63:5, 64:21, 67:24, 68:6, 70:7, 72:16, 72:24, 79:11, 81:17, 84:16, 85:23, 86:22, 91:12, 92:17, 92:23, 95:21, 96:15, 107:17, 109:10, 110:6, 111:4, 114:14, 115:17, 117:14, 118:15, 119:15, 120:1, 123:11, 127:21, 131:3, 131:21, 132:23, 133:21, 135:1, 136:14, 138:12, 139:17, 143:10, 147:8, 148:7, 148:20, 150:6, 151:5, 151:12, 152:8, 152:17, 154:5, 156:5, 157:2, 159:22, 160:16, 163:6, 163:20, 164:5, 166:22, 169:4, 171:24, 172:10, 172:25, 173:5, 178:10, 180:2, 181:4, 182:20, 183:21, 184:20, 185:16, 187:16, 189:5, 192:21, 193:21, 194:6, 198:10, 199:3, 200:20, 201:9, 202:17, 203:22, 207:3, 208:4, 208:14, 210:18, 211:9, 212:12, 216:22, 217:12, 220:13, 220:20, 222:25, 224:18, 226:18, 227:15

## C

**CA** [1] - 3:18
**Cabell** [42] - 3:2, 17:11, 22:19, 83:13, 106:9, 111:11, 126:10, 126:24, 133:7, 134:14, 151:18, 151:19, 152:2, 153:19, 154:1, 155:1, 160:2, 164:17, 164:18, 164:21, 164:25, 166:7, 168:16, 169:24, 170:1,

170:5, 170:16, 170:25, 171:12, 171:19, 172:7, 173:17, 174:10, 174:14, 174:15, 175:16, 176:15, 176:16, 177:20, 191:22, 194:20, 224:10
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**CALLAS** [1] - 6:7
**camera** [1] - 228:22
**Camp** [3] - 163:18, 166:3, 167:3
**CAMPBELL** [1] - 6:14
**cannot** [3] - 96:22, 186:20, 225:13
**capacity** [1] - 19:8
**Capitol** [1] - 2:7
**captured** [1] - 161:14
**Cardinal** [16] - 4:11, 5:2, 15:23, 47:13, 50:22, 59:18, 59:19, 60:2, 60:3, 60:5, 60:9, 60:11, 89:17, 90:10, 90:12
**Cardinal-related** [1] - 90:10
**care** [5] - 36:9, 89:5, 200:2, 225:9, 232:23
**Carey** [1] - 4:17
**Carollton** [3] - 92:4, 93:15, 144:12
**case** [22] - 14:24, 35:16, 45:24, 100:16, 100:23, 102:17, 102:18, 102:20, 103:17, 104:8, 104:18, 105:5, 106:5, 107:9, 158:24, 175:16, 176:16, 176:18, 176:25, 184:13, 227:22, 229:18
**cases** [7] - 15:22, 15:23, 103:12, 103:14, 103:21, 106:1
**cash** [1] - 66:7
**Castle** [12] - 19:25, 20:17, 20:20, 20:23, 20:24, 22:21, 22:22, 164:8, 170:12, 170:15, 191:18, 194:8
**categories** [1] - 7:24
**categorize** [1] - 80:7
**caught** [2] - 146:11, 226:17

**caused** [1] - 70:15
**causes** [1] - 146:17
**causing** [1] - 101:17
**cc** [1] - 157:10
**CDC** [4] - 9:25, 63:19, 63:22, 64:22
**cease** [1] - 221:18
**Center** [15] - 3:12, 5:11, 93:25, 94:1, 109:18, 110:9, 111:14, 112:9, 112:10, 112:21, 114:20, 115:19, 134:12, 145:12, 155:1
**center** [25] - 18:25, 19:1, 20:10, 20:16, 20:17, 25:1, 27:3, 35:15, 39:24, 115:22, 164:8, 164:12, 165:6, 170:15, 191:11, 191:23, 195:17, 196:9, 196:14, 199:14, 199:23, 200:5, 200:13, 216:1, 224:9
**centers** [34] - 18:24, 19:22, 20:15, 21:10, 23:4, 23:5, 23:16, 25:4, 25:25, 26:5, 26:10, 26:25, 41:3, 88:7, 94:13, 94:14, 100:6, 106:8, 110:25, 111:13, 111:22, 113:1, 113:2, 165:8, 189:8, 189:12, 190:1, 191:2, 191:7, 192:5, 198:23, 210:10, 214:7, 225:4
**Central** [1] - 97:24
**centrally** [1] - 214:24
**certain** [19] - 14:9, 86:5, 113:7, 113:19, 115:2, 116:9, 116:10, 139:23, 189:25, 190:12, 192:7, 199:10, 204:22, 205:20, 211:12, 225:25
**certainly** [2] - 66:24, 100:24
**Certainly** [1] - 181:18
**CERTIFICATION** [1] - 239:1
**certify** [1] - 239:4
**cetera** [1] - 225:1
**CFR** [1] - 53:14
**chain** [16] - 80:3,

120:17, 121:1, 122:1, 129:15, 129:20, 137:21, 139:5, 161:18, 166:7, 178:18, 201:16, 202:7, 203:2, 203:4
**Chain** [2] - 117:4, 166:5
**chains** [4] - 24:1, 24:7, 117:7, 129:22
**chambers** [1] - 228:22
**chance** [1] - 59:16, 89:17, 102:21, 157:6, 158:13, 162:11, 188:6, 189:17, 196:2, 203:25, 208:17
**Change** [9] - 160:21, 163:10, 165:17, 165:20, 169:5, 173:16, 182:22, 195:7, 195:12
**change** [21] - 23:20, 23:22, 40:12, 43:22, 48:21, 116:3, 124:25, 141:7, 141:13, 142:25, 146:16, 147:2, 150:11, 156:10, 157:19, 166:16, 168:15, 169:11, 175:23, 181:12, 182:5
**changed** [2] - 23:25, 173:23
**changes** [10] - 67:11, 112:9, 147:21, 150:4, 150:18, 150:23, 155:5, 166:15, 204:19
**channels** [2] - 87:23, 115:1
**Chapman** [1] - 78:14
**characterization** [5] - 56:21, 81:14, 85:20, 130:24, 194:3
**characterizing** [1] - 103:5
**charge** [7] - 26:1, 115:21, 191:16, 193:6, 197:13, 197:15, 198:15
**CHARLES** [1] - 3:11
**CHARLESTON** [2] - 1:2, 1:18
**Charleston** [6] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:3
**Chase** [1] - 4:18

**check** [3] - 189:11, 207:12, 232:5
**checks** [2] - 80:24, 205:10
**cherry** - 173:25, 176:24, 177:15
**cherry-picked** [1] - 177:15
**cherry-picking** [2] - 173:25, 176:24
**Chesterbrook** [1] - 6:15
**Chicagoland** [1] - 112:19
**Chief** [1] - 109:14
**chime** [1] - 105:1
**chose** [1] - 176:17
**Christenson** [2] - 235:4, 235:10
**CHRISTENSON** [5] - 235:8, 235:17, 236:4, 236:8, 236:11
**CII** [4] - 161:24, 162:2, 169:14, 170:9
**CIIs** [3] - 165:12, 170:6, 170:7
**Circuit** [2] - 76:5, 76:12
**circumstances** [1] - 118:24
**citations** [1] - 103:15
**cite** [1] - 11:11
**citing** [1] - 62:14
**city** [1] - 66:21
**CITY** [1] - 1:4
**City** [4] - 4:1, 5:11, 235:9, 239:5
**Civil** [3] - 1:4, 239:7, 239:8
**civil** [4] - 1:10, 9:4, 86:4, 94:12
**claims** [2] - 86:6
**clarification** [3] - 72:14, 93:6, 200:24
**classifies** [2] - 63:20, 64:23
**classify** [1] - 154:23
**classifying** [1] - 63:23
**clauses** [1] - 110:21
**clean** [1] - 79:2
**cleaned** [1] - 219:18
**cleanup** [1] - 89:16
**clear** [16] - 12:21, 17:10, 50:17, 60:12, 62:15, 70:25, 78:6, 102:23, 104:7, 105:15, 119:9, 172:24, 194:12, 235:13, 237:5, 237:17

**cleared** [1] - 219:24
**clearly** [5] - 16:17, 16:22, 103:20, 133:16, 204:25
**clerk** [6] - 78:13, 90:4, 90:20, 231:21, 236:6, 236:9
**CLERK** [5] - 18:2, 18:5, 18:7, 18:9, 233:18
**clinic** [1] - 145:4
**clinics** [5] - 66:13, 69:19, 70:9, 213:23, 214:5
**close** [6] - 12:23, 91:16, 124:16, 174:8, 190:22, 208:3
**closed** [1] - 80:3
**closely** [1] - 111:13
**closing** [1] - 11:12
**co** [1] - 7:15
**co-lead** [1] - 7:15
**Cochran** [3] - 6:17, 239:2, 239:11
**code** [13] - 34:7, 34:12, 34:20, 34:21, 37:24, 37:25, 38:2, 38:4, 40:18, 129:4, 130:12, 175:19
**Code** [1] - 224:25
**codes** [4] - 34:9, 35:4, 169:15, 175:25
**collaboratively** [1] - 190:7
**colleague** [4] - 7:15, 8:24, 132:11, 222:23
**collective** [1] - 206:12
**collectively** [3] - 79:18, 108:9, 190:7
**Colorado** [1] - 110:11
**Columbus** [1] - 224:20
**column** [1] - 34:7
**columns** [1] - 192:25
**coming** [6] - 15:18, 90:18, 118:10, 118:11, 177:24, 219:18
**comment** [3] - 8:23, 145:9, 229:11
**commenting** [2] - 145:7, 205:24
**Comments** [2] - 185:23, 188:3
**comments** [4] - 7:18, 158:19, 184:11, 187:14
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2,

3:2
**Committee** [1] - 7:11
**common** [1] - 215:22
**commonly** [1] - 33:20
**communicate** [3] - 28:16, 59:9, 161:16
**communicated** [2] - 13:6, 15:15
**Communications** [1] - 220:22
**communications** [4] - 221:1, 221:11, 223:2, 223:8
**Company** [1] - 224:21
**company** [10] - 58:7, 106:6, 111:15, 111:17, 126:15, 210:12, 210:14, 210:22, 221:6, 221:21
**company's** [1] - 74:18
**company-wide** [3] - 210:12, 210:14, 210:22
**compared** [5] - 54:23, 99:18, 161:17, 215:25, 216:20
**comparison** [1] - 216:16
**competitor** [1] - 205:14
**compile** [1] - 235:18
**complain** [1] - 16:7
**complete** [3] - 16:23, 175:4, 177:14
**completed** [10] - 40:1, 40:3, 55:13, 193:7, 194:9, 194:13, 194:21, 194:23, 199:19, 209:10
**completely** [1] - 105:1
**completing** [4] - 55:22, 190:8, 192:6, 209:22
**Compliance** [1] - 21:17
**compliance** [14] - 26:4, 26:8, 26:14, 80:15, 80:18, 87:9, 88:5, 120:25, 190:8, 198:15, 198:25, 199:4, 199:8, 201:24
**compliant** [1] - 121:4
**complies** [1] - 65:17
**comply** [2] - 88:1, 102:14
**compound** [2] - 183:19, 210:16
**comprised** [1] - 174:8
**computer** [2] - 6:19,

181:23
**conceivable** [2] - 13:3, 229:13
**concentrating** [1] - 37:19
**concept** [1] - 128:24
**concern** [7] - 13:11, 16:12, 16:19, 106:3, 190:14, 212:19, 229:4
**concerned** [2] - 13:17, 229:22
**concerning** [1] - 122:18
**concerns** [2] - 212:24, 228:12
**concluded** [1] - 230:15
**conclusion** [2] - 70:24, 192:1
**concurrent** [1] - 30:6
**conditions** [1] - 87:8
**conduct** [15] - 55:21, 85:13, 94:3, 101:16, 102:6, 106:11, 109:17, 112:4, 114:4, 114:15, 114:16, 114:22, 207:25, 216:25
**conducted** [9] - 39:24, 42:10, 137:1, 161:15, 183:2, 203:11, 221:14, 222:8, 224:20
**conducting** [1] - 137:20
**conference** [3] - 97:21, 228:20, 230:15
**confident** [1] - 76:9
**confidential** [2] - 73:5, 100:20
**confirmed** [1] - 175:21
**confirming** [1] - 90:10
**confused** [2] - 86:10, 236:20
**confuses** [1] - 11:1
**Connecticut** [1] - 20:7
**connection** [1] - 50:10
**Connolly** [2] - 4:13, 5:4
**Conroe** [1] - 191:24
**CONROY** [1] - 3:3
**consider** [3] - 72:12, 172:3, 224:14
**consideration** [1] - 235:15
**considered** [1] - 66:14
**considers** [1] - 33:19
**consistent** [5] - 32:17,

158:3, 176:18, 176:24, 194:1
**consistently** [2] - 192:5, 201:15
**constant** [1] - 181:18
**consultant** [3] - 73:10, 74:15, 75:6, 77:13, 77:23
**consulted** [2] - 106:23, 106:24
**consuming** [1] - 144:14
**Contact** [1] - 223:18
**contact** [5] - 209:11, 209:13, 209:16, 209:19
**contacts** [1] - 144:16
**contain** [1] - 235:19
**contained** [5] - 74:18, 76:15, 101:25, 104:4, 237:1
**containing** [1] - 235:19
**contested** [2] - 47:24, 232:20
**context** [7] - 10:3, 102:6, 102:16, 102:22, 105:21, 130:10, 145:5
**continually** [1] - 67:15
**continue** [5] - 51:25, 70:15, 133:18, 159:7, 187:4
**continued** [4] - 96:18, 186:17, 186:18, 186:24
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continues** [2] - 67:16, 68:7
**continuing** [1] - 75:18
**contradicts** [1] - 30:23
**contrary** [1] - 95:16
**contrast** [1] - 200:10
**control** [1] - 79:21
**Controlled** [25] - 25:23, 26:9, 26:15, 27:11, 29:23, 36:25, 37:17, 41:19, 41:23, 41:25, 42:22, 44:17, 44:21, 54:6, 80:18, 80:24, 100:2, 102:7, 122:18, 130:23, 206:20, 207:8, 207:16, 208:7, 230:20
**controlled** [51] - 20:13, 26:9, 26:15, 27:8, 31:18, 33:15, 33:18, 34:5, 35:5,

37:16, 45:1, 45:7,
46:1, 53:8, 53:12,
56:9, 66:1, 66:7,
67:12, 67:17, 68:8,
70:17, 86:8, 86:9,
87:10, 87:15, 87:21,
88:14, 88:15, 94:6,
99:14, 99:17,
110:15, 110:17,
114:25, 139:1,
149:21, 149:24,
161:24, 203:5,
212:20, 214:7,
214:8, 215:11,
216:4, 216:19,
216:23, 221:2,
221:18, 224:25,
226:1
**controls** [17] - 67:3,
88:14, 94:4, 98:4,
99:6, 99:7, 99:12,
110:14, 114:24,
119:17, 120:4,
204:19, 206:11,
216:13, 217:3,
217:13, 222:4
**controls/**
**prescription** [1] -
215:24
**controls/Rx** [1] -
216:6
**controversial** [1] - 8:9
**conversation** [5] -
63:10, 63:13, 134:3,
134:6, 227:17
**conversations** [2] -
131:22, 131:24
**convince** [1] - 84:1
**Cook** [3] - 6:18, 239:3,
239:11
**cooperating** [1] - 17:6
**copied** [7] - 21:22,
134:7, 154:7,
200:16, 210:9,
224:10, 225:18
**copies** [5] - 87:2,
231:21, 231:22,
235:20, 236:5
**copy** [11] - 32:10,
52:13, 55:10, 55:11,
84:17, 86:15,
108:12, 127:15,
218:11, 222:22,
236:8
**core** [3] - 75:22,
116:7, 184:13
**corner** [7] - 32:14,
33:1, 43:1, 43:3,
43:5, 73:1, 228:18
**Corp** [3] - 52:11, 83:4,

106:18
**corporate** [5] - 123:19,
123:22, 125:2,
169:12
**Corporate** [1] - 163:9
**Corporation** [11] - 6:2,
42:23, 49:22, 73:5,
100:2, 108:9,
111:22, 125:4,
169:11, 169:14,
239:7
**corporation** [9] - 1:7,
1:13, 50:19, 125:6,
125:7, 161:19,
166:4, 203:9, 203:10
**corporations** [1] -
207:11
**Correct** [17] - 32:24,
40:7, 40:22, 163:12,
169:22, 179:19,
186:19, 194:2,
194:14, 194:17,
195:9, 197:10,
198:20, 210:6,
211:14, 225:7,
226:11
**correct** [160] - 19:5,
21:18, 22:19, 24:4,
24:5, 24:13, 24:18,
24:23, 25:5, 25:9,
26:18, 27:5, 27:10,
28:18, 29:12, 29:16,
31:19, 31:25, 35:10,
36:16, 36:22, 38:18,
38:19, 39:14, 40:8,
40:10, 40:11, 40:19,
40:25, 41:16, 42:6,
42:15, 45:12, 46:12,
46:13, 47:1, 52:12,
55:7, 55:25, 56:3,
56:20, 57:7, 58:17,
61:9, 61:19, 66:19,
67:1, 67:8, 67:9,
68:10, 68:25, 69:3,
69:14, 69:21, 70:12,
81:1, 81:10, 81:23,
82:22, 84:21, 85:1,
85:10, 99:2, 99:23,
117:4, 117:5, 119:5,
119:6, 119:18,
120:6, 120:14,
120:22, 129:4,
129:5, 129:8, 129:9,
129:24, 130:5,
130:18, 132:14,
134:12, 135:5,
135:7, 136:6,
137:13, 137:19,
137:22, 139:24,
141:1, 141:11,

141:18, 141:19,
142:6, 142:10,
143:13, 144:4,
144:24, 145:15,
145:18, 146:6,
150:16, 150:24,
153:14, 154:21,
155:2, 157:12,
158:22, 159:18,
161:2, 161:8, 161:9,
161:12, 170:2,
177:15, 180:23,
180:24, 181:8,
182:2, 182:6, 183:1,
183:12, 185:3,
186:7, 186:8,
186:25, 191:22,
193:24, 195:2,
195:21, 196:10,
199:11, 199:14,
199:23, 201:17,
202:19, 202:23,
203:7, 204:5,
205:17, 209:3,
209:4, 209:14,
209:17, 210:22,
211:19, 212:4,
213:3, 217:5,
217:16, 220:24,
221:24, 221:25,
222:7, 223:12,
224:3, 225:7,
225:17, 226:1,
226:4, 239:4
**correctly** [6] - 46:18,
48:24, 54:2, 87:23,
146:1, 186:4
**correspondence** [1] -
201:15
**corresponding** [2] -
27:12, 235:24
**corrupted** [1] - 174:25
**Counsel** [2] - 109:14,
228:5
**counsel** [4] - 127:1,
164:16, 175:21,
228:12
**COUNSEL** [1] - 7:6
**count** [1] - 130:3
**country** [5] - 19:16,
101:16, 140:12,
160:3, 180:17
**COUNTY** [1] - 1:10
**county** [1] - 155:3
**County** [34] - 2:2, 3:2,
22:19, 106:9,
111:11, 134:14,
155:2, 160:2,
164:17, 164:19,
164:22, 164:25,

166:7, 168:16,
169:24, 170:1,
170:5, 170:16,
170:25, 171:12,
171:19, 172:8,
173:17, 174:11,
174:14, 174:15,
175:16, 176:16,
177:20, 180:22,
191:22, 194:20,
224:10
**couple** [22] - 11:2,
14:16, 44:7, 88:4,
96:3, 100:8, 111:19,
114:19, 128:14,
139:25, 140:6,
143:17, 188:25,
190:23, 193:4,
201:7, 212:13,
212:16, 213:6,
214:17, 215:7, 230:3
**course** [8] - 9:22,
12:15, 91:8, 92:13,
108:13, 189:10,
212:15, 228:4
**Court** [57] - 6:17, 6:18,
7:2, 9:14, 9:19,
12:15, 15:14, 19:21,
20:9, 22:18, 22:20,
29:6, 46:16, 49:16,
61:15, 72:11, 76:7,
76:9, 76:11, 84:2,
101:20, 101:21,
101:23, 101:25,
102:2, 102:5,
102:16, 102:21,
103:13, 104:2,
106:8, 107:8, 111:7,
114:2, 117:3,
134:11, 155:1,
177:18, 178:7,
191:21, 194:7,
194:19, 195:16,
224:2, 224:8,
225:17, 229:6,
229:10, 231:14,
233:15, 233:17,
235:4, 236:17,
236:25, 239:2, 239:3
**COURT** [328] - 1:1,
1:17, 7:5, 7:7, 7:9,
7:18, 8:20, 10:10,
12:1, 12:11, 13:23,
14:23, 15:11, 17:4,
17:18, 17:21, 18:1,
18:11, 21:5, 22:1,
22:3, 22:16, 23:9,
23:11, 30:12, 30:15,
31:1, 31:3, 32:7,
33:10, 36:9, 39:8,
42:20, 43:19, 43:25,

44:5, 44:9, 44:13,
47:16, 48:9, 48:23,
49:18, 50:1, 50:10,
50:24, 51:1, 51:11,
51:18, 52:1, 52:16,
52:20, 52:24, 54:15,
54:25, 56:24, 57:3,
59:13, 59:20, 59:23,
60:15, 60:21, 60:23,
61:1, 61:6, 61:8,
61:10, 62:8, 62:24,
64:4, 64:14, 64:20,
67:23, 68:4, 70:4,
71:1, 71:6, 71:17,
71:21, 72:6, 72:11,
72:23, 73:25, 74:9,
75:23, 75:25, 76:3,
76:16, 76:20, 77:5,
77:15, 77:17, 77:20,
77:25, 78:9, 78:13,
78:16, 78:23, 79:1,
79:5, 79:7, 79:9,
81:16, 83:14, 83:22,
84:13, 85:22, 86:10,
86:16, 86:19, 87:5,
89:4, 89:12, 89:15,
89:22, 89:24, 90:1,
90:5, 90:8, 90:16,
90:24, 91:4, 91:6,
91:11, 92:11, 92:16,
92:19, 94:20, 94:23,
95:17, 95:20, 96:13,
97:11, 101:2, 101:4,
103:22, 103:24,
104:14, 104:24,
105:5, 105:9,
105:11, 105:19,
106:12, 106:19,
107:2, 107:8,
107:12, 108:17,
109:1, 109:7,
109:23, 109:25,
110:2, 111:1,
115:13, 118:12,
119:21, 123:5,
123:8, 126:4, 126:6,
126:17, 126:19,
127:7, 127:10,
127:17, 127:20,
131:1, 131:20,
132:21, 133:12,
133:19, 134:21,
136:13, 138:11,
139:16, 143:7,
147:1, 147:4, 148:5,
148:19, 151:1,
151:11, 151:23,
152:3, 152:6,
152:14, 153:15,
153:21, 154:3,
156:3, 156:18,

156:22, 156:24, 159:20, 160:7, 160:11, 160:14, 162:25, 163:5, 163:22, 164:3, 164:14, 164:21, 165:14, 165:22, 165:24, 166:13, 166:21, 167:6, 167:10, 167:15, 167:17, 167:22, 168:2, 168:8, 168:18, 168:21, 168:25, 170:24, 171:3, 171:10, 171:15, 171:17, 171:21, 172:2, 172:7, 172:18, 172:23, 173:4, 173:19, 174:2, 175:5, 177:4, 178:1, 178:8, 180:1, 180:11, 180:15, 180:21, 181:1, 181:15, 182:16, 183:20, 184:15, 185:14, 187:3, 187:12, 188:15, 188:18, 188:23, 192:18, 193:12, 193:15, 193:18, 193:20, 194:5, 196:21, 197:4, 197:8, 197:16, 197:25, 198:5, 198:7, 199:1, 200:2, 200:12, 200:17, 201:1, 201:3, 202:16, 203:17, 207:23, 208:13, 210:17, 211:8, 212:11, 216:13, 216:21, 217:8, 218:8, 218:16, 218:21, 219:2, 219:4, 219:9, 219:12, 219:20, 220:1, 220:4, 220:12, 224:11, 224:14, 224:17, 227:6, 227:11, 227:23, 228:9, 228:17, 229:9, 229:12, 229:22, 230:10, 231:18, 231:21, 232:11, 232:25, 233:2, 233:7, 233:11, 233:20, 234:2, 234:4, 234:7, 234:11, 234:14,

234:17, 234:21, 234:25, 236:1, 236:7, 236:10, 236:12, 236:18, 236:22, 237:19, 237:21, 238:1
**court** [6] - 7:19, 16:16, 37:9, 43:21, 184:6, 215:7
**Court's** [11] - 9:18, 13:8, 15:25, 17:12, 105:24, 114:10, 175:7, 202:10, 231:17, 237:11, 237:16
**courtroom** [4] - 175:21, 219:13, 219:21, 220:5
**courts** [1] - 103:14
**cover** [16] - 12:24, 37:11, 59:14, 62:2, 63:7, 78:6, 92:2, 93:21, 93:23, 100:19, 142:6, 153:12, 162:17, 170:10, 189:20, 190:2
**covered** [18] - 9:23, 27:7, 93:8, 94:3, 96:7, 105:12, 108:20, 114:4, 114:15, 114:16, 114:17, 114:22, 131:12, 131:19, 142:2, 166:18, 192:22, 219:8
**covering** [2] - 140:12, 141:25
**covers** [3] - 37:10, 167:12, 180:12
**Covington** [1] - 5:11
**Cox** [1] - 154:7
**create** [5] - 78:11, 78:19, 82:5, 146:21, 146:22
**created** [7] - 37:15, 80:24, 113:16, 120:23, 175:9, 175:12, 212:2
**creating** [2] - 81:25, 88:1
**credibility** [1] - 184:16
**credit** [2] - 13:4, 13:10
**crisis** [1] - 75:14
**criteria** [2] - 87:16, 88:21
**critical** [4] - 66:3, 183:14, 183:22, 185:24
**criticism** [3] - 187:4,

187:6, 187:10
**criticisms** [1] - 186:22
**crooked** [1] - 34:6
**cross** [5] - 14:5, 14:6, 48:10, 172:19, 184:6
**cross-examination** [3] - 14:5, 14:6, 172:19
**cross-examine** [1] - 184:6
**CRR** [2] - 6:17, 6:18
**CSA** [5] - 46:12, 81:12, 87:11, 102:14, 115:2
**CSMP** [82] - 28:3, 29:22, 32:3, 36:16, 36:18, 36:24, 37:3, 40:12, 40:24, 41:6, 41:10, 41:14, 41:15, 42:4, 42:13, 44:18, 45:3, 46:4, 47:20, 48:17, 55:24, 56:1, 57:10, 57:14, 58:13, 63:11, 81:19, 81:20, 81:21, 81:25, 88:1, 93:9, 93:14, 106:7, 116:7, 116:10, 116:21, 119:4, 119:9, 120:20, 120:21, 120:23, 121:6, 121:9, 122:2, 122:17, 122:20, 124:1, 129:2, 131:9, 132:18, 140:9, 141:18, 145:18, 146:6, 147:21, 150:7, 153:9, 154:8, 154:18, 158:4, 159:6, 161:2, 178:25, 179:24, 181:11, 182:5, 190:22, 195:21, 201:19, 202:19, 203:7, 206:3, 209:12, 212:18, 220:14, 220:15, 222:2, 222:3, 222:19, 223:2
**CSMPs** [1] - 41:2
**CT1** [2] - 101:11, 102:17
**cultivate** [2] - 144:9, 144:13
**cures** [1] - 177:13
**curious** [1] - 76:21
**Current** [1] - 67:11
**current** [5] - 88:6, 93:3, 133:2, 179:2, 190:21
**Customer** [13] - 57:10, 58:22, 59:1, 63:8, 65:20, 128:4,

163:21, 163:24, 174:6, 202:18, 213:16, 220:22
**customer** [76] - 31:21, 38:1, 38:9, 38:12, 38:23, 38:24, 39:13, 39:19, 40:17, 45:6, 45:7, 45:11, 45:20, 46:21, 57:15, 57:16, 57:17, 63:17, 68:7, 68:24, 69:2, 69:4, 69:5, 69:6, 98:8, 99:11, 99:13, 116:12, 120:11, 124:6, 124:23, 125:18, 128:8, 144:11, 145:24, 146:3, 146:8, 146:17, 155:11, 157:15, 157:18, 157:19, 157:21, 157:23, 157:25, 158:4, 158:12, 158:20, 159:14, 160:18, 169:19, 181:21, 181:22, 195:8, 201:15, 201:17, 202:6, 202:20, 202:25, 206:21, 209:11, 209:14, 211:2, 217:2, 217:13, 217:17, 217:20, 221:12, 221:16, 221:18, 222:17, 223:2, 232:1
**customer's** [7] - 40:16, 57:15, 57:17, 68:24, 69:2, 158:10, 215:24
**Customers** [1] - 67:11
**customers** [35] - 20:14, 24:3, 46:2, 65:21, 79:22, 98:23, 99:5, 115:2, 116:24, 117:1, 120:16, 123:18, 124:3, 124:15, 130:13, 135:9, 141:5, 141:10, 141:14, 144:15, 145:13, 159:3, 159:23, 160:1, 202:1, 202:6, 206:18, 207:6, 207:9, 209:15, 215:25, 221:15, 222:16, 225:22
**customers'** [2] - 44:25, 66:23
**cut** [5] - 122:21, 156:7,

177:20, 178:2, 217:24
**CVS** [11] - 126:23, 128:11, 128:19, 153:4, 153:9, 153:24, 154:1, 206:10, 206:21, 207:4

---

**D**

---

**daily** [6] - 20:13, 123:3, 123:13, 123:14, 155:5, 178:25
**danger** [1] - 76:24
**data** [19] - 99:5, 172:16, 173:24, 174:9, 175:18, 175:22, 176:1, 176:2, 176:11, 176:24, 177:14, 177:19, 178:3, 205:1, 205:4, 205:13, 205:15, 233:25, 234:20
**Date** [2] - 193:1, 239:16
**date** [8] - 33:1, 43:12, 54:10, 54:23, 113:12, 113:14, 113:18, 157:12
**dated** [25] - 31:8, 32:15, 49:21, 58:11, 82:21, 83:1, 91:22, 109:14, 117:20, 118:17, 121:18, 132:6, 135:18, 137:10, 138:20, 140:8, 143:25, 152:9, 154:8, 187:24, 189:21, 194:25, 196:5, 204:11
**dates** [2] - 33:3, 225:20
**dating** [1] - 130:17
**Dave** [28] - 58:16, 97:20, 97:23, 97:24, 132:10, 132:16, 134:2, 134:3, 134:11, 140:17, 141:20, 141:24, 142:11, 143:19, 144:3, 145:21, 152:18, 152:19, 153:8, 153:9, 154:11, 154:25, 157:8, 158:16, 158:23, 204:10,

208:19, 225:15
**Dave's** [5] - 145:10, 159:4, 159:10, 205:24, 225:19
**DAVID** [2] - 1:17, 2:9
**David** [4] - 7:1, 111:14, 132:7, 159:23
**days** [1] - 9:7
**DC** [15] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 145:12, 164:9, 170:12, 170:14, 194:25, 195:3, 199:16, 199:17
**DCs** [8] - 94:12, 94:14, 94:15, 95:23, 145:19, 190:13, 206:6, 225:9
**DD** [1] - 139:5
**De** [2] - 2:4, 2:16
**DEA** [76] - 12:25, 16:21, 33:19, 34:13, 40:17, 42:2, 42:5, 42:14, 46:7, 48:3, 48:4, 50:20, 53:13, 53:17, 53:19, 54:1, 54:19, 55:20, 69:18, 71:10, 72:8, 73:14, 75:19, 75:20, 75:21, 79:20, 81:2, 81:10, 81:22, 82:3, 84:10, 85:16, 87:11, 87:19, 88:7, 88:15, 93:9, 93:23, 93:24, 93:25, 94:11, 95:4, 95:13, 96:1, 100:3, 103:2, 109:14, 109:16, 110:12, 110:20, 111:5, 113:19, 118:23, 118:25, 119:3, 120:3, 169:11, 169:18, 169:20, 169:21, 206:2, 206:19, 207:7, 207:13, 208:6, 216:5, 221:8, 221:19, 223:21, 224:1, 224:9, 224:20, 225:2, 230:19, 233:13
**deaf** [1] - 131:6
**deal** [5] - 9:18, 9:20, 16:18, 101:8, 104:21
**dealing** [2] - 203:9, 203:10
**dealt** [1] - 203:2
**Dear** [1] - 53:5
**deaths** [1] - 75:15
**debates** [1] - 11:23

**December** [6] - 49:21, 50:15, 51:5, 69:24, 103:11
**decide** [1] - 125:18
**decided** [1] - 15:20
**decision** [9] - 35:19, 45:19, 95:23, 125:8, 130:5, 130:6, 130:7, 146:9, 162:4
**decisions** [1] - 45:14
**deck** [1] - 78:22
**declined** [1] - 65:3
**decrease** [1] - 155:22
**deemed** [4] - 42:6, 42:14, 222:4, 222:17
**deems** [1] - 221:16
**Defendant** [4] - 4:10, 5:2, 5:7, 6:2
**Defendants** [3] - 1:8, 1:14, 239:7
**defendants** [5] - 8:11, 50:11, 51:16, 107:9, 235:14
**defense** [2] - 9:1, 164:15
**deferential** [2] - 160:22, 160:24
**define** [2] - 38:22, 99:13
**definitely** [1] - 12:19
**Delran** [16] - 19:1, 20:1, 112:20, 191:9, 191:16, 193:6, 193:22, 195:7, 195:11, 196:9, 197:13, 198:12, 199:14, 199:22
**dementia** [1] - 216:18
**demographics** [2] - 67:4, 67:7
**demonstrates** [1] - 74:18
**demonstrative** [1] - 36:2
**denied** [1] - 104:19
**denies** [3] - 14:9, 101:25
**deny** [1] - 156:3
**department** [2] - 169:13, 200:15
**Department** [5] - 21:16, 108:7, 125:11, 128:4, 224:1
**deposition** [3] - 37:9, 235:11, 235:18
**depth** [1] - 210:24
**derail** [1] - 13:17
**derived** [1] - 174:4
**describe** [3] - 99:7, 117:6, 144:23

**described** [1] - 106:22
**describes** [1] - 133:10
**description** [2] - 63:19, 176:6
**descriptions** [5] - 173:22, 174:25, 175:20, 175:25, 177:15
**design** [1] - 110:15
**designated** [1] - 46:8
**designation** [4] - 235:11, 235:18, 235:24, 235:25
**designations** [5] - 235:23, 236:15, 237:3, 237:5, 237:14
**designed** [1] - 87:10
**detail** [2] - 172:17, 235:3
**detailed** [4] - 47:5, 87:19, 206:3, 214:14
**detailing** [2] - 230:20
**details** [2] - 204:13, 225:5
**detect** [6] - 45:2, 87:10, 87:17, 88:15, 88:21, 94:5
**detected** [1] - 113:20
**determination** [1] - 141:15
**determine** [4] - 45:21, 55:23, 99:22, 146:15
**determined** [2] - 76:6, 193:25
**determining** [4] - 66:23, 87:18, 207:20, 211:14
**develop** [1] - 144:15
**developed** [1] - 29:24
**died** [1] - 65:10
**difference** [2] - 56:12, 56:17
**different** [24] - 11:13, 27:3, 27:6, 41:2, 55:11, 59:9, 107:15, 110:24, 114:12, 116:22, 116:23, 116:24, 117:11, 153:25, 160:25, 171:1, 175:20, 189:8, 190:13, 192:25, 193:15, 233:9
**differently** [4] - 161:2, 161:3, 201:23, 202:21
**difficult** [2] - 9:9, 9:11
**digital** [1] - 235:20
**diligence** [34] - 57:16, 70:15, 98:12, 99:22,

125:19, 137:1, 141:17, 145:25, 146:4, 146:8, 146:13, 146:15, 146:20, 157:22, 162:21, 174:17, 181:11, 181:19, 182:10, 182:25, 183:2, 183:16, 183:23, 184:13, 186:19, 186:24, 188:10, 207:20, 213:2, 214:3, 217:1
**diligent** [1] - 142:13
**direct** [8] - 14:7, 183:24, 185:6, 209:11, 209:13, 209:16, 219:1, 219:2
**DIRECT** [1] - 18:12
**directing** [1] - 32:25
**directions** [1] - 63:16
**directly** [4] - 30:23, 213:23, 214:4, 237:14
**Director** [55] - 18:23, 19:4, 19:7, 19:11, 19:12, 19:14, 19:19, 19:22, 20:2, 20:10, 20:12, 20:25, 23:3, 23:15, 24:12, 25:18, 25:22, 26:19, 26:20, 26:23, 26:24, 27:2, 27:4, 27:6, 27:15, 27:25, 28:2, 28:3, 29:10, 29:18, 32:23, 33:4, 35:12, 35:16, 35:18, 41:8, 52:7, 52:9, 81:8, 88:19, 100:7, 112:6, 115:21, 135:22, 136:1, 139:22, 198:12, 199:16, 199:21, 206:16, 207:6, 214:1, 215:2, 215:13, 226:7
**director** [2] - 24:18, 191:12
**directors** [1] - 210:9
**Directors** [1] - 25:3
**disagree** [7] - 9:3, 34:2, 65:13, 80:5, 159:5, 203:13, 203:14
**disagreement** [1] - 14:1
**disagreements** [1] - 16:25
**disciplinary** [1] - 207:12
**disclose** [1] - 110:16

**disclosed** [2] - 54:22, 54:23
**discovered** [3] - 54:2, 54:7, 55:2
**discovery** [1] - 221:3
**discuss** [2] - 10:21, 196:22
**discussed** [19] - 92:25, 94:7, 96:9, 102:7, 110:25, 112:5, 114:22, 124:9, 126:23, 130:12, 130:22, 146:14, 153:13, 163:18, 170:17, 188:7, 198:25, 211:16, 211:17
**discussing** [2] - 95:5, 151:21
**discussion** [6] - 96:6, 126:11, 224:22, 228:13, 228:22, 229:3
**discussions** [3] - 131:13, 139:19, 236:5
**dispensing** [2] - 213:23, 214:4
**dispute** [3] - 100:18, 102:22, 103:5
**disputed** [1] - 106:14
**disputes** [1] - 13:18
**disrupt** [2] - 8:14, 10:24
**dissatisfaction** [1] - 122:7
**distances** [1] - 66:21
**distracted** [1] - 11:3
**distribute** [2] - 53:8, 164:12
**distributed** [4] - 191:18, 191:21, 225:25, 226:3
**distributing** [3] - 27:1, 121:6, 226:10
**Distribution** [13] - 93:25, 94:1, 109:18, 110:9, 111:14, 112:9, 112:10, 112:21, 114:20, 115:19, 134:12, 145:12, 155:1
**distribution** [61] - 18:24, 18:25, 19:1, 19:22, 20:9, 20:15, 20:16, 20:17, 21:10, 23:5, 23:16, 25:1, 25:4, 25:25, 26:5, 26:10, 26:24, 27:3, 35:15, 39:24, 41:3,

79:20, 80:2, 88:7, 94:13, 94:14, 100:6, 106:8, 110:25, 111:12, 111:22, 113:1, 113:2, 115:22, 149:24, 164:8, 164:12, 165:6, 165:8, 170:15, 189:8, 189:11, 189:25, 191:2, 191:7, 191:10, 191:23, 192:5, 195:17, 196:9, 196:14, 198:23, 199:14, 199:22, 200:5, 200:8, 210:10, 216:1, 224:9, 225:4, 226:9
**distributor** [5] - 70:13, 118:20, 118:21, 121:5, 149:20
**distributor's** [1] - 71:8
**Distributors** [1] - 215:10
**distributors** [9] - 53:13, 69:20, 69:21, 70:10, 70:14, 79:17, 79:24, 80:2, 215:12
**District** - 7:2, 7:3, 224:20
**DISTRICT** [3] - 1:1, 1:1, 1:17
**Diversion** [1] - 109:15
**diversion** [21] - 25:24, 45:2, 56:13, 56:16, 68:17, 80:13, 81:4, 87:10, 88:14, 94:5, 99:2, 99:3, 110:14, 114:24, 119:17, 120:5, 133:23, 146:21, 214:22, 214:23
**diverted** [7] - 55:23, 56:10, 56:11, 56:17, 70:17, 87:21, 149:22
**divided** [1] - 19:16
**Division** [2] - 54:1, 120:13
**doctor** [2] - 75:21, 145:4
**doctors** [2] - 69:3, 69:8
**Document** [2] - 21:25, 88:25
**document** [91] - 9:25, 10:1, 11:4, 12:14, 14:12, 14:15, 42:22, 43:8, 46:3, 52:23, 60:1, 62:13, 64:8,

64:11, 64:13, 67:20, 69:17, 72:25, 73:9, 75:1, 75:5, 77:13, 85:21, 89:2, 92:12, 92:14, 93:18, 100:22, 100:23, 104:21, 107:6, 108:2, 109:11, 114:3, 115:15, 117:10, 117:11, 117:17, 126:8, 127:16, 134:20, 135:18, 135:20, 136:9, 136:10, 136:16, 137:10, 137:11, 139:11, 139:12, 143:12, 148:3, 153:24, 162:12, 162:13, 164:1, 166:10, 167:24, 168:4, 170:10, 170:11, 170:18, 171:1, 171:17, 172:21, 177:12, 177:13, 180:14, 181:10, 182:13, 182:17, 183:7, 183:15, 183:16, 184:22, 186:16, 187:2, 188:16, 197:21, 200:9, 200:10, 201:14, 207:5, 212:1, 212:16, 218:2, 227:12, 229:7, 230:10, 236:25
**documentary** [1] - 11:13
**documentation** [31] - 41:16, 41:17, 46:3, 96:19, 98:10, 98:12, 137:20, 145:12, 145:18, 161:13, 161:14, 182:1, 182:7, 183:22, 185:25, 186:7, 186:11, 186:23, 187:5, 187:11, 188:9, 192:6, 198:19, 200:6, 200:13, 201:20, 202:6, 209:9, 209:22, 210:14
**documented** [11] - 45:23, 125:22, 137:14, 161:11, 166:17, 183:4, 183:8, 186:1, 194:2, 195:22, 203:4

**documenting** [2] - 184:12, 186:18
**Documents** [1] - 148:25
**documents** [42] - 8:2, 8:5, 8:15, 9:11, 10:5, 10:16, 10:17, 10:20, 10:22, 11:5, 11:17, 14:2, 14:8, 15:24, 16:4, 16:7, 16:8, 16:10, 16:11, 16:17, 43:2, 60:6, 60:9, 60:13, 73:9, 90:10, 90:13, 97:2, 97:6, 138:8, 153:24, 189:2, 189:3, 218:6, 229:21, 232:1, 232:14, 232:25, 233:2, 233:14, 234:23, 237:24
**dog** [4] - 61:4, 61:5, 61:7, 62:17
**DOJ** [3] - 16:22, 230:17, 230:19
**Don** [16] - 58:2, 58:6, 58:7, 91:23, 121:17, 121:23, 128:16, 128:17, 130:7, 148:9, 148:12, 149:10, 162:2, 187:8, 225:19
**Donald** [4] - 57:25, 58:1, 82:24
**done** [18] - 125:17, 125:19, 126:14, 135:8, 142:9, 154:14, 161:13, 181:19, 181:21, 182:25, 185:3, 189:7, 189:10, 220:6, 229:1, 229:14, 231:15
**dosage** [4] - 31:24, 34:15, 34:23, 70:16
**dosages** [1] - 96:3
**doses** [2] - 158:12, 158:21
**dot** [1] - 43:3
**dotted** [1] - 22:10
**Douglas** [1] - 4:17
**down** [56] - 15:16, 20:20, 32:14, 33:6, 33:14, 34:4, 43:12, 44:22, 46:18, 48:12, 53:5, 53:22, 55:12, 60:25, 73:4, 88:5, 93:19, 93:20, 94:11, 98:3, 99:4, 113:23, 115:18, 122:13, 122:25, 123:6,

127:24, 132:7, 143:21, 145:22, 148:24, 156:7, 157:9, 158:7, 163:14, 164:6, 174:14, 178:17, 183:7, 189:22, 190:5, 190:12, 192:4, 194:7, 195:16, 196:16, 201:10, 203:3, 208:22, 212:25, 213:7, 213:17, 218:19, 223:6, 230:6
**downstream** [1] - 79:22
**DRA** [17] - 29:10, 29:14, 88:22, 95:10, 97:24, 120:12, 132:11, 139:18, 140:20, 146:5, 147:10, 155:9, 158:1, 182:21, 221:7, 225:16
**DRAs** [10] - 28:5, 28:8, 28:16, 41:5, 131:22, 139:20, 139:24, 140:6, 140:12, 185:3
**drawing** [1] - 70:24
**Drive** [1] - 6:15
**drive** [1] - 235:19
**DRUG** [2] - 1:7, 1:13
**Drug** [9] - 6:2, 29:15, 32:11, 33:13, 49:20, 53:7, 108:8, 117:19, 239:7
**drug** [10] - 63:20, 64:23, 64:25, 65:2, 65:5, 65:10, 74:11, 214:22, 226:5, 226:13
**drugs** [8] - 33:19, 33:20, 35:1, 64:2, 66:4, 66:7, 69:8, 216:15
**due** [33] - 57:16, 70:15, 98:12, 99:22, 125:19, 137:1, 141:17, 145:25, 146:3, 146:4, 146:13, 146:14, 146:20, 157:22, 164:15, 181:11, 181:18, 182:10, 182:25, 183:2, 183:15, 183:16, 183:23, 184:12, 186:18, 186:24, 188:10, 203:5, 207:20, 213:2,

214:2, 217:1
**during** [21] - 9:16, 25:21, 51:4, 52:8, 57:18, 58:4, 59:3, 81:18, 93:8, 113:11, 130:20, 131:8, 132:13, 139:9, 139:18, 140:11, 147:9, 183:17, 191:17, 228:4
**During** [2] - 205:5, 222:9
**duties** [8] - 20:10, 44:16, 50:20, 52:11, 139:22, 198:25, 199:5, 199:7
**duty** [2] - 42:1, 222:7

---

### E

**e-mail** [34] - 57:25, 59:14, 62:2, 63:9, 91:22, 91:24, 121:16, 121:20, 122:11, 122:13, 122:25, 123:1, 127:23, 127:25, 129:12, 132:6, 134:7, 137:17, 140:5, 140:14, 140:15, 143:15, 143:19, 145:6, 148:8, 149:4, 152:9, 152:18, 154:6, 154:9, 157:8, 158:8
**e-mails** [3] - 128:14, 141:22, 143:17
**e.g** [1] - 55:14
**ear** [1] - 131:6
**earliest** [2] - 204:8, 204:10
**early** [2] - 123:17, 221:21
**ease** [1] - 234:7
**easier** [2] - 192:20, 236:17
**easily** [1] - 204:23
**East** [3] - 3:5, 3:12, 4:18
**eastern** [2] - 20:19, 23:18
**Ed** [6] - 121:23, 121:24, 121:25, 123:2, 123:12
**educate** [2] - 27:17, 62:6
**education** [1] - 27:19
**effect** [1] - 28:24
**effective** [8] - 88:13, 110:14, 113:12,

113:13, 113:18, 114:24, 119:17, 120:4
**effort** [4] - 100:17, 106:14, 135:7, 151:17
**efforts** [1] - 105:25
**egregious** [1] - 106:10
**Eighth** [1] - 3:10
**either** [6] - 14:4, 35:15, 131:16, 139:11, 156:14, 204:19
**Elaine** [5] - 127:23, 128:1, 128:15, 202:25
**electronic** [1] - 161:14
**ELIZABETH** [1] - 6:14
**Ellie** [3] - 148:10, 148:11, 149:4
**email** [24] - 21:12, 28:19, 178:14, 178:17, 178:19, 180:4, 180:8, 181:20, 189:20, 190:4, 200:10, 204:4, 204:8, 204:10, 206:2, 208:19, 225:11, 227:1, 227:3, 227:10, 227:17, 228:25, 229:15, 229:20
**emails** [1] - 161:15, 228:23, 229:1
**embarrass** [1] - 16:16
**embedded** [11] - 9:12, 9:24, 11:23, 59:15, 61:15, 61:24, 62:10, 69:23, 92:13, 92:14, 94:18
**embrace** [1] - 153:18
**embraced** [1] - 105:23
**employed** [3] - 18:17, 18:18, 18:19
**employee** [9] - 61:11, 61:14, 62:5, 62:18, 62:21, 74:6, 87:17, 95:9
**employees** [9] - 72:1, 88:21, 93:2, 95:4, 95:7, 185:3, 221:22, 222:11, 230:4
**Encino** [1] - 3:18
**encompass** [1] - 38:3
**encourage** [1] - 103:7
**end** [16] - 15:19, 30:24, 106:11, 106:15, 133:6, 140:25, 141:4,

142:23, 143:2, 146:10, 149:5, 149:23, 155:10, 155:22, 156:8, 159:13
**endeavor** [1] - 178:5
**ended** [1] - 159:14
**endorsed** [1] - 229:25
**Enforcement** [4] - 49:20, 53:7, 108:8, 117:19
**engage** [1] - 71:9
**engaged** [2] - 101:15, 144:16
**enhanced** [3] - 149:17, 150:21, 150:22
**enhancement** [1] - 147:20
**enhancements** [3] - 147:22, 150:7, 150:10
**enhancing** [1] - 149:23
**ensure** [3] - 79:20, 149:21, 213:2
**ensuring** [3] - 26:4, 26:8, 26:14
**entail** [1] - 198:15
**entailed** [1] - 31:14
**enter** [7] - 8:14, 104:20, 105:5, 107:19, 108:16, 165:3, 233:16
**entered** [5] - 103:11, 104:9, 105:9, 108:7, 137:11
**entering** [1] - 130:21
**enters** [1] - 13:24
**entire** [1] - 59:25, 78:22, 79:4, 129:20, 140:12, 141:9, 188:24
**entity** [1] - 53:6
**entries** [1] - 174:12
**entry** [1] - 227:19
**ENU** [1] - 4:12
**epidemic** [8] - 63:20, 63:24, 64:7, 64:23, 64:25, 65:3, 65:6, 74:25
**error** [2] - 142:19, 175:22
**especially** [3] - 9:4, 84:8, 215:19
**established** [10] - 24:20, 32:3, 45:15, 50:4, 51:7, 87:16, 150:3, 159:9, 191:19, 202:5

**establishment** [1] - 93:14
**estimated** [2] - 94:15, 95:24
**et** [5] - 1:7, 1:13, 225:1, 239:6, 239:7
**evaluation** [1] - 187:23
**evaluations** [1] - 17:1
**Evangelista** [2] - 178:19, 203:1
**evening** [1] - 234:15
**events** [1] - 144:15
**Evidence** [1] - 100:20
**evidence** [23] - 8:2, 9:10, 9:15, 10:20, 11:10, 11:12, 11:13, 11:14, 44:18, 60:6, 84:11, 89:19, 101:14, 104:10, 108:16, 139:13, 172:21, 218:7, 222:19, 230:25, 231:16, 235:12
**evident** [1] - 8:8
**evidentiary** [4] - 8:7, 17:13, 103:10, 103:19
**evolution** [1] - 205:5
**evolved** [3] - 39:7, 205:9, 210:24
**exact** [5] - 82:6, 85:2, 101:11, 130:3, 223:6
**exactly** [4] - 58:8, 105:20, 147:22, 184:13
**exam** [2] - 13:18, 14:7
**EXAMINATION** [1] - 18:12
**examination** [7] - 14:5, 14:6, 14:21, 37:2, 48:11, 172:19, 225:24
**examine** [1] - 184:6
**example** [14] - 55:8, 69:2, 69:7, 75:5, 99:16, 124:21, 129:21, 138:5, 146:14, 158:20, 159:15, 207:15, 210:25, 217:2
**examples** [1] - 209:24
**exceed** [5] - 38:12, 38:15, 39:15, 45:20, 87:15
**exceeded** [3] - 35:9, 39:13, 40:18
**exceeds** [1] - 38:9
**Excel** [1] - 174:19
**except** [1] - 97:20

**exception** [3] - 59:19, 150:18, 150:24
**exceptions** [1] - 62:16
**excess** [1] - 40:2
**excessive** [3] - 31:14, 55:14
**exclamation** [1] - 80:15
**exclude** [1] - 102:1
**excluded** [2] - 107:6, 110:22
**excursion** [1] - 46:18
**excuse** [4] - 73:10, 109:21, 121:25, 234:2
**excused** [1] - 238:1
**Executive** [1] - 7:11
**exempting** [1] - 78:1
**exercising** [1] - 146:5
**exhaustive** [1] - 102:11
**exhibit** [9] - 13:2, 72:11, 78:19, 79:1, 79:7, 168:19, 170:22, 174:9, 235:24
**Exhibit** [8] - 33:7, 49:8, 49:24, 78:12, 125:25, 172:1, 172:11, 189:15
**exhibits** [15] - 7:24, 8:9, 8:15, 9:6, 10:9, 12:17, 12:18, 12:21, 12:24, 13:8, 13:11, 13:14, 13:19, 235:25
**exist** [1] - 165:8
**existed** [2] - 61:12, 74:7
**existence** [5] - 29:17, 31:17, 101:8, 105:16, 105:17
**exists** [1] - 182:3
**expand** [1] - 214:8
**expect** [3] - 14:20, 93:9, 140:23
**expected** [4] - 41:5, 41:9, 42:5, 42:14
**experience** [2] - 26:21, 26:22
**experienced** [2] - 9:2, 130:14
**expert** [1] - 230:9
**expertise** [1] - 213:11
**explain** [4] - 20:9, 156:1, 168:6, 235:16
**explaining** [1] - 203:15
**exposing** [1] - 133:24
**exposure** [1] - 8:25
**expressed** [1] -

228:12
**expresses** [1] - 204:17
**extensive** [1] - 213:11
**extent** [3] - 61:14, 62:19, 153:19
**extremely** [1] - 209:9
**eye** [2] - 118:23, 140:22

**F**

**F.3d** [1] - 76:12
**FABER** [1] - 1:17
**Faber** [1] - 7:1
**facilities** [3] - 83:12, 85:16, 197:13
**facility** [3] - 197:14, 198:18, 198:21
**facing** [1] - 183:5
**fact** [49] - 14:16, 24:11, 25:11, 34:17, 40:15, 57:13, 57:15, 84:17, 84:23, 92:6, 95:16, 100:5, 101:11, 106:7, 106:9, 106:16, 106:25, 107:18, 108:12, 110:8, 118:22, 122:16, 124:14, 129:21, 129:22, 131:23, 134:4, 135:2, 135:6, 136:16, 139:11, 139:20, 164:1, 164:17, 166:3, 166:17, 169:18, 169:19, 173:15, 174:21, 176:1, 176:17, 183:14, 186:17, 189:7, 211:16, 225:25, 226:3
**factor** [5] - 15:15, 98:14, 99:20, 101:17, 159:2
**factors** [4] - 76:10, 94:11, 95:22, 99:21
**facts** [3] - 14:9, 74:18, 76:15
**failed** [2] - 113:6, 114:24
**failing** [3] - 86:7, 86:8, 102:10
**failure** [7] - 94:4, 94:5, 110:13, 110:15, 111:6, 183:15, 224:24
**failures** [6] - 101:10, 102:14, 106:7, 106:18, 224:8,

225:12
**Fair** [1] - 24:2
**fair** [9] - 23:3, 25:22, 26:3, 26:7, 28:17, 30:5, 41:10, 176:25, 228:23
**fairly** [1] - 175:11
**faith** [1] - 189:1
**falls** [1] - 237:10
**false** [1] - 115:9
**familiar** [22] - 11:3, 27:11, 30:2, 34:9, 39:25, 41:9, 41:19, 51:18, 57:11, 84:20, 84:22, 116:4, 128:23, 137:21, 138:2, 173:1, 173:6, 189:7, 206:14, 212:2, 212:4, 216:8
**far** [5] - 115:23, 123:21, 186:10, 201:4, 209:15
**FARRELL** [6] - 2:3, 7:8, 7:10, 228:11, 228:16, 228:21
**Farrell** [5] - 2:4, 2:15, 7:7, 7:18, 228:9
**fashion** [2] - 14:13, 105:4
**fast** [2] - 149:16, 219:10
**fathers** [1] - 7:14
**fault** [1] - 193:19
**FCRR** [1] - 6:18
**feature** [1] - 75:13
**February** [1] - 135:18
**Federal** [2] - 100:20, 225:1
**federal** [1] - 207:13
**feeds** [1] - 224:10
**fell** [1] - 199:16
**fellow** [2] - 132:11, 139:24
**felt** [3] - 121:3, 139:24, 157:23
**Fentanyl** [1] - 65:9
**few** [13] - 9:7, 15:24, 25:17, 45:10, 65:3, 65:8, 93:17, 117:9, 120:18, 121:8, 147:5, 211:13, 218:20
**fiercely** [1] - 9:3
**fighting** [1] - 145:23
**figure** [2] - 94:24, 178:4
**file** [10] - 103:17, 162:21, 165:5, 193:24, 194:13, 195:13, 195:17,

202:19, 230:24, 231:9
**filed** [4] - 137:15, 195:4, 199:20, 225:6
**files** [5] - 165:8, 174:17, 229:15, 229:19, 235:21
**filing** [4] - 55:13, 190:8, 231:14, 237:8
**fill** [3] - 66:25, 69:19, 70:10
**filled** [7] - 39:3, 39:21, 66:1, 69:9, 87:19, 165:3, 165:11
**filling** [3] - 67:17, 158:18, 213:22
**final** [3] - 97:13, 235:22, 235:23
**finalizing** [1] - 81:9
**Finally** [1] - 185:24
**finally** [2] - 69:17, 185:21
**findings** [6] - 9:17, 11:11, 192:13, 195:7, 203:13, 230:22
**fine** [13] - 37:12, 60:11, 60:18, 114:8, 132:5, 146:8, 168:20, 188:17, 188:22, 207:17, 208:23, 219:15, 220:9
**Fine** [1] - 162:16
**fined** [5] - 206:10, 206:19, 207:7, 207:15, 208:6
**finish** [4] - 63:7, 74:22, 219:23, 220:1
**finished** [1] - 231:7
**Firm** [2] - 3:4, 3:7
**First** [2] - 8:23, 209:11
**first** [39] - 9:25, 13:11, 19:12, 28:3, 29:9, 39:19, 62:16, 65:24, 74:13, 92:18, 92:24, 102:15, 108:18, 109:12, 122:6, 128:9, 140:3, 140:14, 143:17, 143:20, 143:21, 144:10, 144:14, 145:8, 145:11, 154:9, 157:14, 158:11, 159:9, 175:1, 175:19, 177:17, 178:18, 181:20, 184:21, 185:22, 190:5, 193:5
**fiscal** [1] - 184:22,

187:24
**fit** [1] - 134:9
**five** [15] - 19:18, 28:5, 28:7, 28:11, 65:11, 140:12, 142:4, 153:10, 218:19, 218:22, 219:5, 219:6, 223:10
**five-fold** [1] - 65:11
**five-minute** [1] - 218:22
**fix** [1] - 109:25
**fixed** [2] - 36:7, 38:12
**fixing** [1] - 75:1
**FL** [1] - 2:14
**flag** [14] - 66:14, 66:19, 67:18, 68:9, 99:16, 214:2, 214:11, 215:2, 215:13, 215:15, 216:24, 217:4, 217:15, 217:19
**flagged** [1] - 100:13
**Flags** [3] - 212:18, 213:7, 215:23
**flags** [11] - 66:11, 98:6, 211:12, 211:18, 211:20, 212:4, 212:19, 213:1, 213:8, 213:21, 214:14
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flash** [1] - 235:19
**flip** [2] - 85:7, 153:7
**flipping** [1] - 87:2
**flood** [1] - 15:1
**Floor** [1] - 3:5
**fluctuations** [1] - 130:14
**fluff** [1] - 13:12
**fly** [1] - 154:15
**focus** [7] - 25:19, 37:3, 99:5, 160:17, 176:15, 187:22, 212:16
**focused** [3] - 145:2, 176:12, 176:13
**focusing** [3] - 37:13, 39:1, 133:16
**fold** [1] - 65:11
**folks** [2] - 84:25, 221:22
**follow** [6] - 41:12, 59:3, 111:13, 116:11, 155:17, 204:18
**follow-up** [1] - 204:18
**followed** [2] - 41:7, 201:16

**following** [5] - 71:16, 72:4, 114:16, 121:4, 122:18
**follows** [2] - 7:4, 160:13
**FOR** [1] - 1:1
**force** [4] - 59:1, 62:3, 62:7, 80:25
**force-multiplier** [1] - 80:25
**foregoing** [1] - 239:4
**foremost** [1] - 209:11
**forever** [1] - 104:9
**forgot** [1] - 148:3
**Form** [1] - 163:10
**form** [8] - 14:13, 153:3, 165:2, 165:3, 165:11, 165:18, 177:25, 178:7
**formalized** [1] - 27:24
**format** [2] - 10:7, 174:13
**forms** [11] - 64:3, 164:24, 165:20, 193:3, 193:22, 194:9, 194:12, 194:23, 195:12, 195:13, 195:17
**forth** [2] - 85:7, 133:6
**forward** [7] - 24:17, 37:2, 37:14, 47:20, 48:17, 49:7, 103:2
**forwarded** [1] - 122:24
**forwarding** [3] - 122:11, 122:12
**forwards** [1] - 206:1
**foundation** [30] - 9:13, 50:3, 50:6, 50:17, 52:19, 52:25, 94:18, 96:11, 97:10, 119:19, 119:22, 146:24, 148:10, 150:25, 159:19, 163:3, 172:22, 177:6, 179:22, 191:1, 196:19, 197:5, 197:23, 197:25, 200:1, 202:13, 203:19, 217:6, 227:11, 227:21
**foundational** [1] - 110:23
**founding** [1] - 7:14
**four** [17] - 19:16, 19:17, 28:16, 58:13, 63:11, 135:3, 164:18, 165:1, 166:7, 167:20, 167:25, 168:4,

168:16, 190:13, 218:6, 232:18, 233:2
**Four** [2] - 19:18, 167:19
**Fourth** [2] - 76:5, 76:12
**fourth** [2] - 98:3, 196:8
**frame** [4] - 39:6, 39:8, 48:12, 48:16
**frames** [1] - 65:12
**frankly** [2] - 77:8, 229:25
**free** [3] - 142:19, 162:14, 234:8
**Friday** [2] - 10:12, 11:19
**friend** [1] - 7:16
**frightened** [1] - 17:19
**front** [4] - 44:19, 104:10, 121:15, 177:16
**frustrating** [1] - 13:15
**fulfill** [1] - 88:13
**full** [3] - 53:24, 118:20, 229:3
**Fuller** [4] - 2:4, 2:15, 89:12, 90:14
**FULLER** [8] - 2:15, 89:13, 89:16, 89:23, 89:25, 90:2, 90:12, 90:15
**fully** [1] - 172:16
**function** [4] - 35:17, 81:22, 146:4, 146:5
**funny** [1] - 236:23
**future** [5] - 88:6, 103:12, 103:16, 103:21, 159:1

## G

**game** [1] - 142:20
**gaps** [2] - 132:19, 132:25
**Gary** [6] - 27:25, 28:1, 37:6, 73:8, 73:9
**gathering** [2] - 140:24, 145:20
**gears** [1] - 28:23
**general** [4] - 36:15, 103:13, 126:25, 211:1
**generally** [5] - 39:3, 39:21, 103:17, 124:1, 205:12
**generated** [2] - 31:15, 210:21
**generating** [1] - 209:24
**gentleman** [1] - 187:9

**geographic** [15] - 9:13, 10:2, 11:24, 66:20, 73:22, 74:23, 83:12, 126:9, 133:4, 134:20, 153:16, 156:22, 180:9, 180:10, 214:21
**Geographic** [1] - 214:18
**geography** [1] - 75:2
**given** [12] - 13:8, 17:4, 27:24, 40:18, 43:6, 63:15, 87:1, 125:13, 170:22, 171:9, 181:12, 184:17
**Glen** [1] - 112:24
**global** [1] - 166:16
**goal** [1] - 220:3
**Google** [1] - 207:11
**govern** [1] - 104:22
**Government** [1] - 223:18
**government** [6] - 10:1, 16:13, 100:15, 100:17, 100:18, 114:17
**grant** [10] - 146:15, 146:21, 157:15, 158:4, 161:24, 169:22, 171:21, 182:21, 210:4, 211:14
**granted** [2] - 141:16, 147:12
**granting** [2] - 182:9, 204:21
**Gray** [1] - 235:21
**great** [5] - 79:17, 79:25, 80:3, 80:6, 80:8
**greater** [2] - 66:21, 225:5
**GRETCHEN** [1] - 6:7
**ground** [1] - 156:22
**grounds** [2] - 84:7, 103:8
**group** [11] - 21:13, 21:18, 24:20, 91:23, 91:24, 142:23, 144:11, 153:1, 208:24, 209:2, 209:3
**Group** [1] - 21:16
**grow** [1] - 28:8
**growth** [6] - 209:23, 209:25, 210:5, 210:21, 211:1, 211:5
**guess** [5] - 29:19, 48:19, 128:6, 152:10, 212:3
**guidance** [5] - 17:5,

48:21, 103:21, 227:3, 227:4
**Gustin** [31] - 58:16, 97:20, 97:23, 97:24, 132:7, 132:10, 132:16, 134:11, 140:18, 141:20, 142:10, 143:19, 144:3, 152:18, 152:19, 153:8, 154:11, 154:20, 154:25, 156:6, 157:8, 158:8, 159:16, 159:23, 204:11, 204:16, 205:15, 205:20, 208:19, 225:11, 225:16
**Gustin's** [1] - 111:14
**guys** [2] - 9:2, 140:24

## H

**habit** [2] - 186:21, 188:20
**Hammergren** [1] - 82:19
**hand** [6] - 15:3, 18:7, 21:1, 43:2, 82:8, 100:9
**handed** [1] - 127:19
**handing** [2] - 157:3, 211:21
**handle** [2] - 10:9, 142:14
**handled** [5] - 25:4, 153:25, 201:25, 202:21, 202:25
**Hanly** [3] - 7:13, 7:14, 8:24
**happy** [6] - 11:16, 17:8, 61:1, 74:3, 83:24, 131:7
**hard** [4] - 22:9, 22:10, 142:19, 194:21
**hard-pressed** [1] - 142:19
**hardin** [1] - 104:14
**Hardin** [6] - 47:13, 51:11, 59:22, 59:24, 90:6, 105:1
**HARDIN** [9] - 5:3, 47:12, 48:6, 50:21, 59:18, 59:25, 60:18, 90:7, 104:16
**harm** [1] - 101:17
**Hartle** [13] - 135:19, 136:19, 137:12, 138:3, 139:3, 139:4, 183:12, 183:14,

183:22, 184:25, 187:7, 188:7, 188:11
**Hartle's** [1] - 135:24
**hate** [2] - 78:5, 155:19
**Hawkins** [1] - 3:7
**hazard** [1] - 146:22
**HDA's** [1] - 237:8
**head** [2] - 57:1, 181:6
**headquarters** [7] - 161:17, 166:4, 166:23, 167:11, 181:8, 181:9, 209:17
**health** [2] - 70:18, 146:22
**Health** [2] - 4:11, 5:2
**hear** [3] - 61:1, 186:20, 196:24
**heard** [11] - 11:19, 57:1, 61:20, 61:21, 83:22, 122:7, 124:11, 183:3, 183:8, 183:10
**hearing** [1] - 143:9
**hearsay** [46] - 8:10, 8:11, 9:12, 9:24, 11:23, 16:24, 50:3, 50:9, 50:19, 51:19, 59:16, 59:19, 61:4, 61:15, 61:24, 62:11, 62:12, 62:13, 62:16, 62:19, 62:20, 69:23, 72:5, 73:22, 74:4, 74:9, 74:10, 75:19, 75:22, 76:13, 76:14, 76:23, 77:2, 77:14, 78:9, 83:21, 92:13, 92:15, 92:20, 94:18, 101:13, 118:10, 224:6
**heartland** [1] - 103:8
**heat** [1] - 140:23
**heavy** [1] - 139:23
**held** [1] - 24:25
**help** [5] - 12:5, 17:13, 132:17, 158:25, 172:17
**helpful** [1] - 39:6
**helps** [1] - 44:9
**heroin** [4] - 64:17, 65:9, 229:23, 230:5
**Hester** [3] - 9:9, 236:19, 237:19
**HESTER** [6] - 5:9, 235:16, 236:13, 236:21, 236:24, 237:20
**high** [11] - 55:14, 98:23, 131:23, 131:25, 134:5, 137:7, 145:14,

155:10, 155:23, 156:6, 216:1
**higher** [4] - 157:24, 179:4, 214:21, 216:23
**highest** [5] - 82:5, 129:3, 130:11, 130:16, 158:24
**highlight** [2] - 148:14, 212:13
**highlighted** [1] - 7:23
**highly** [2] - 33:20, 33:25
**Hill** [4] - 19:25, 163:19, 166:3, 167:3
**Hilliard** [5] - 27:25, 28:1, 37:6, 92:25
**himself** [2] - 136:20, 138:4
**histories** [2] - 174:10, 175:14
**History** [1] - 174:6
**history** [2] - 175:4, 181:22
**hit** [1] - 211:2
**hitting** [1] - 123:25
**hold** [3] - 18:21, 19:2, 231:18
**Hollywood** [1] - 75:9
**Honor** [275] - 7:22, 8:9, 8:22, 9:6, 10:11, 11:14, 12:7, 12:12, 12:13, 13:20, 13:22, 15:10, 15:13, 16:2, 16:18, 16:21, 17:8, 17:9, 17:25, 18:10, 21:4, 21:24, 22:2, 22:14, 23:10, 30:11, 30:22, 32:6, 33:8, 33:9, 36:1, 39:5, 39:9, 42:19, 43:16, 43:24, 44:4, 47:12, 47:18, 47:25, 48:6, 48:7, 48:14, 49:5, 49:9, 49:17, 49:25, 50:2, 50:6, 50:16, 50:21, 50:23, 50:25, 51:22, 51:25, 52:15, 52:19, 54:8, 54:17, 56:22, 56:25, 57:21, 57:23, 59:11, 59:18, 59:25, 60:4, 60:17, 60:18, 60:20, 60:24, 61:4, 61:18, 62:1, 62:15, 63:2, 64:12, 64:19, 68:2, 70:3, 70:6, 70:20, 70:21, 71:3, 71:20, 71:24, 72:10, 72:15, 72:22, 73:20, 73:21, 74:3,

74:5, 74:13, 74:20, 74:23, 75:4, 75:24, 76:2, 76:18, 77:4, 78:8, 81:15, 83:6, 83:8, 83:18, 83:25, 84:12, 84:15, 86:12, 86:13, 86:21, 87:4, 89:2, 89:10, 89:13, 90:7, 90:9, 91:9, 91:10, 92:9, 92:12, 92:22, 95:1, 95:12, 95:19, 100:12, 100:25, 102:2, 102:15, 103:9, 103:25, 104:10, 104:13, 104:19, 104:23, 105:10, 105:15, 106:2, 106:16, 107:4, 107:11, 108:15, 108:18, 109:8, 109:9, 109:21, 109:22, 110:19, 110:25, 114:5, 115:3, 115:7, 118:7, 118:14, 126:2, 126:5, 126:7, 126:11, 127:2, 127:14, 127:16, 130:25, 133:3, 133:11, 133:14, 133:18, 134:18, 134:24, 134:25, 136:8, 136:11, 138:7, 139:15, 143:4, 147:3, 147:7, 148:3, 151:20, 152:4, 152:13, 152:16, 153:20, 154:4, 155:19, 155:25, 156:11, 156:23, 157:1, 160:5, 160:10, 160:15, 162:22, 163:17, 164:11, 165:2, 166:2, 167:9, 167:13, 167:16, 168:7, 169:2, 169:3, 170:21, 171:2, 172:6, 172:14, 173:2, 174:16, 175:6, 175:9, 175:10, 176:14, 177:9, 178:5, 178:9, 179:22, 179:24, 180:14, 180:25, 182:12, 182:19, 184:3, 184:11, 184:14, 185:10, 185:13, 188:17, 188:21, 188:22,

189:4, 192:15, 196:18, 196:23, 197:12, 198:3, 200:19, 201:6, 201:8, 202:9, 203:21, 208:12, 212:8, 218:1, 218:3, 218:5, 218:14, 218:23, 219:3, 219:19, 220:9, 220:11, 220:19, 224:8, 224:16, 226:16, 226:22, 227:24, 228:14, 229:19, 230:12, 230:16, 231:3, 231:6, 231:20, 232:16, 232:24, 233:1, 233:10, 235:2, 236:5, 236:13, 237:2, 237:18
**Honor's** [2] - 108:20, 230:16
**Honorable** [1] - 7:1
**HONORABLE** [1] - 1:17
**hope** [5] - 9:2, 15:9, 29:10, 219:3, 234:14
**hopefully** [1] - 145:23
**hoping** [1] - 219:23
**horrifying** [1] - 75:16
**hospital** [1] - 133:7
**hospitals** [1] - 119:1
**hour** [3] - 89:8, 181:13, 181:20
**House** [13] - 22:18, 22:20, 106:8, 111:7, 134:11, 155:1, 191:21, 194:7, 194:19, 195:16, 224:2, 224:8, 225:17
**housekeeping** [2] - 233:23, 235:3
**hundreds** [2] - 133:10, 168:11
**HUNTINGTON** [1] - 1:4
**Huntington** [20] - 3:10, 4:1, 17:12, 83:13, 126:10, 126:24, 133:7, 151:18, 151:19, 152:2, 153:19, 154:1, 167:18, 167:23, 170:25, 171:11, 171:18, 172:7, 235:9, 239:6
**Huntington-Cabell** [1] - 83:13, 126:10,

126:24, 133:7, 151:18, 151:19, 152:2, 153:19, 154:1
**Huntington/Cabell** [1] - 162:24, 164:13, 165:21, 179:21, 180:22
**Hurricane** [1] - 232:6
**hurry** [1] - 226:17
**hurt** [1] - 91:5
**hydro** [1] - 176:13
**Hydro** [2] - 132:19, 132:25
**hydrocodone** [14] - 31:24, 34:20, 34:21, 38:5, 66:4, 173:25, 174:9, 176:17, 179:3, 179:12, 226:4, 226:5, 226:9, 226:15

## I

**I'm** [1] - 108:1
**I.e** [1] - 158:20
**identical** [1] - 114:6
**identifiable** [1] - 213:8
**identification** [17] - 21:2, 32:5, 34:13, 40:23, 82:9, 107:23, 151:14, 157:4, 170:20, 184:2, 187:19, 195:24, 208:10, 208:16, 211:22, 223:16, 226:20
**identified** [14] - 56:4, 56:11, 56:15, 56:18, 56:19, 57:6, 57:19, 85:17, 117:2, 211:12, 211:20, 213:1, 221:12, 235:14
**identifies** [1] - 191:6
**identify** [6] - 56:1, 98:7, 113:6, 113:19, 213:21, 218:8
**identifying** [3] - 33:23, 211:18, 215:7
**ignored** [1] - 176:13
**II** [2] - 37:16, 216:15
**III** [2] - 37:16, 226:5
**IIIs** [1] - 37:19
**IIs** [2] - 37:19, 226:6
**ill** [1] - 58:6
**illegal** [2] - 33:20, 149:22
**illicit** [4] - 25:25, 65:9, 69:18, 70:9
**illustrate** [2] - 75:10,

75:14
**illustrated** [1] - 9:3
**illustration** [1] - 35:24
**illustrative** [1] - 102:11, 167:8
**image** [1] - 75:15
**imagery** [1] - 75:13
**imagine** [1] - 184:5
**immediate** [1] - 186:3
**imminent** [1] - 70:17
**immunity** [1] - 237:13
**impacts** [1] - 80:12
**implementation** [1] - 140:9
**implemented** [5] - 58:14, 81:21, 122:3, 122:4, 124:2
**implementing** [3] - 25:23, 28:15, 149:17
**importance** [1] - 116:17
**important** [9] - 45:18, 46:4, 98:18, 98:21, 106:5, 158:9, 209:9, 213:1, 231:10
**improper** [5] - 8:18, 54:14, 103:8, 227:22, 229:17
**improvement** [2] - 186:3, 188:8
**Improvement** [3] - 190:24, 190:25, 192:2
**improvements** [1] - 183:25
**IN** [2] - 1:1, 1:18
**in-depth** [1] - 210:24
**inaccuracy** [1] - 172:15
**inadmissible** [4] - 16:13, 16:23, 78:2, 83:10
**incidents** [1] - 106:10
**include** [6] - 16:12, 87:14, 158:19, 198:22, 200:9, 214:23
**included** [5] - 7:19, 22:19, 122:13, 200:10, 235:14
**includes** [5] - 16:4, 103:15, 146:19, 169:12, 194:20
**Including** [1] - 24:9
**including** [9] - 15:2, 95:2, 95:5, 103:18, 113:12, 153:8, 189:22, 208:20, 221:7
**incomplete** [1] - 175:3

**inconsistent** [2] - 36:2, 85:21
**incorporate** [2] - 144:9, 144:13
**incorporated** [1] - 74:14
**incorporating** [2] - 61:17, 62:6
**incorrect** [1] - 104:23
**increase** [45] - 65:11, 125:9, 125:13, 125:18, 144:17, 154:22, 155:10, 157:20, 161:24, 162:5, 162:8, 164:19, 164:24, 164:25, 165:11, 167:20, 167:21, 167:23, 168:17, 169:14, 169:22, 169:23, 170:2, 170:5, 170:17, 170:25, 171:8, 171:11, 171:18, 179:3, 195:8, 204:13, 204:24, 205:2, 205:3, 205:5, 205:7, 205:11, 205:12, 205:16, 205:18, 209:23, 210:24
**increased** [9] - 68:11, 147:14, 147:19, 155:16, 169:25, 179:12, 181:25, 205:10, 211:10
**increases** [21] - 67:12, 68:16, 133:23, 141:22, 142:8, 142:9, 147:11, 154:14, 154:15, 154:21, 155:5, 168:12, 171:9, 174:18, 174:19, 176:21, 179:19, 204:21, 204:22, 205:21, 207:21
**incurred** [1] - 136:23
**independence** [1] - 155:3
**Independent** [1] - 117:3
**independent** [6] - 55:21, 55:25, 129:22, 154:16, 161:5, 201:25
**independently** [2] - 11:4, 11:6
**indicate** [3] - 129:12, 180:16, 192:5

**indicated** [1] - 125:12
**indicates** [3] - 74:15, 118:18, 175:19
**indicating** [1] - 129:14
**indicative** [2] - 181:11, 182:10
**indicator** [1] - 216:25
**indicators** [1] - 212:19
**indicia** [1] - 72:2
**indicted** [1] - 96:4
**individual** [1] - 10:4, 69:6, 123:20, 125:1, 125:7, 136:25, 161:7, 166:18, 180:4, 203:11, 203:12
**individually** [2] - 9:12, 79:17
**indulge** [1] - 175:6
**indulgence** [1] - 17:12
**industrial** [2] - 87:22, 115:1
**inflammatory** [4] - 77:11, 228:23, 229:4, 229:15
**influence** [1] - 144:17
**influencing** [2] - 94:11, 95:23
**inform** [1] - 53:13, 53:25, 225:2
**information** [11] - 45:15, 45:18, 69:10, 94:9, 125:4, 145:20, 173:12, 174:18, 209:8, 210:21, 221:7
**informed** [4] - 45:14, 45:19, 78:14, 166:2
**ingredient** [1] - 34:14
**inhibit** [1] - 105:25
**initial** [1] - 230:6
**initials** [2] - 176:21, 177:8
**initiative** [1] - 135:10, 136:4, 136:5, 136:17, 136:24, 138:2, 139:8
**input** [1] - 179:8
**inside** [1] - 220:23
**insofar** [2] - 76:24, 118:9
**instance** [1] - 208:1
**Instead** [1] - 174:12
**instead** [4] - 24:24, 29:10, 124:14, 177:19
**institutional** [3] - 201:17, 202:7, 203:4
**Institutional** [1] - 202:4
**instruct** [1] - 222:11

**instructing** [2] - 220:16, 221:6
**insufficient** [1] - 145:13
**intend** [1] - 13:6
**intended** [3] - 15:17, 59:2, 62:3
**intent** [1] - 237:12
**intentional** [1] - 101:15
**Inter** [1] - 117:3
**interactions** [1] - 128:7
**interest** [2] - 206:3, 221:15
**Internal** [1] - 190:18
**internal** [3] - 60:1, 73:6, 200:15
**internet** [4] - 33:21, 33:24, 96:2, 207:10
**interpretation** [2] - 80:20, 159:4
**interpreted** [1] - 158:2
**interrupt** [4] - 39:6, 43:20, 138:19, 215:18
**interrupting** [2] - 200:23, 235:6
**intimately** [1] - 41:9
**intricate** [1] - 116:8
**introduce** [2] - 13:20, 235:3
**introduced** [2] - 132:10, 140:18
**introducing** [1] - 178:3
**introduction** [2] - 133:24, 231:4
**investigate** [2] - 217:4, 217:15
**investigation** [6] - 84:10, 98:24, 101:24, 104:3, 113:8, 224:21
**investigations** [3] - 100:1, 100:6, 111:6
**Investigative** [1] - 138:24
**investigators** [1] - 224:23
**invitation** [1] - 202:10
**involved** [15] - 38:21, 39:16, 94:12, 95:1, 95:3, 95:23, 100:6, 112:25, 137:24, 141:12, 146:18, 181:19, 182:7, 225:5, 227:16
**involvement** [1] - 37:4
**involves** [2] - 176:16,

213:22
**involving** [1] - 85:12
**Iowa** [1] - 133:7
**Irpino** [1] - 3:7
**ISIA** [1] - 5:4
**ISMC** [6] - 59:1, 62:7, 117:3, 160:23, 206:6, 209:15
**ISMCs** [3] - 24:4, 116:24, 129:21
**issue** [29] - 9:6, 11:1, 12:14, 16:20, 47:22, 47:24, 61:25, 62:12, 96:9, 97:9, 101:11, 102:13, 102:22, 103:19, 106:5, 108:25, 174:21, 174:24, 175:13, 201:13, 210:12, 226:23, 227:4, 228:24, 231:17, 233:9, 234:19, 234:20
**Issue/Observation** [2] - 192:25, 202:3
**issued** [2] - 101:12, 103:20
**issues** [14] - 9:11, 9:13, 10:2, 12:6, 41:15, 73:22, 177:14, 183:25, 186:7, 190:13, 202:23, 210:14, 231:25
**Issues** [2] - 196:16, 201:10
**item** [1] - 46:22
**items** [2] - 93:7, 215:4
**itself** [6] - 62:13, 62:21, 104:21, 176:16, 189:13, 205:12
**IVs** [1] - 37:18

## J

**Jackson** [1] - 6:8
**January** [3] - 21:20, 113:12, 113:17
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**Jersey** [7] - 19:1, 20:1, 191:9, 196:9, 198:12, 199:14, 199:22
**job** [4] - 27:23, 28:14, 146:25, 206:17
**Joe** [1] - 20:25
**John** [2] - 82:18,

235:21
**join** [3] - 47:15, 48:5, 59:21
**Jon** [1] - 154:7
**Jonas** [3] - 93:1, 140:20, 153:8
**Joseph** [1] - 117:23
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:15
**Jr** [1] - 7:13
**Juan** [2] - 2:5, 2:17
**judge** [4] - 76:9, 89:16, 90:4, 102:17
**Judge** [18] - 7:2, 7:8, 16:23, 78:14, 83:20, 101:11, 101:13, 101:21, 102:16, 103:9, 103:20, 104:8, 104:17, 104:20, 104:22, 105:3, 131:16, 228:16
**JUDGE** [1] - 1:17
**Judge's** [2] - 227:3, 227:4
**July** [9] - 128:16, 138:20, 157:12, 193:7, 194:10, 194:24, 195:12, 209:5, 225:21
**jump** [1] - 83:24
**June** [9] - 18:20, 43:13, 121:18, 121:20, 122:2, 140:8, 140:17, 140:25, 141:7
**jurisdiction** [1] - 16:17
**jury** [1] - 76:8
**Justice** [2] - 108:8, 224:2

## K

**KEARSE** [1] - 4:2
**keep** [9] - 11:24, 50:12, 55:12, 60:11, 77:3, 156:15, 191:13, 219:4, 219:12
**keeps** [1] - 16:22
**Kelley** [1] - 235:21
**Kelly** [1] - 6:8
**KENNEDY** [1] - 115:17
**kept** [3] - 17:3, 79:4, 202:19
**Kessler** [1] - 4:17
**Key** [2] - 196:16, 201:10
**key** [9] - 41:14, 98:9, 98:13, 98:14, 98:16,

145:18, 150:10, 201:13
**kidding** [1] - 90:13
**kind** [12] - 11:2, 12:20, 19:10, 30:8, 34:6, 112:14, 142:14, 173:25, 176:23, 194:21, 228:17
**kinds** [2] - 11:13, 76:23
**knowing** [3] - 27:7, 63:17, 181:22
**Knowing** [1] - 65:20
**knowledge** [9] - 12:8, 41:22, 74:18, 101:24, 104:3, 104:4, 104:6, 144:16, 227:9
**known** [6] - 23:25, 56:9, 181:21, 214:21, 214:23, 221:15
**knows** [3] - 15:14, 29:6, 229:6
**KOUBA** [1] - 3:14
**Krista** [1] - 200:15

## L

**LA** [1] - 3:8
**labeled** [2] - 138:24, 222:16
**lack** [3] - 12:8, 27:22, 47:13
**LaCrosse** [1] - 112:23
**laid** [3] - 52:19, 52:25, 119:22
**Landover** [7] - 20:1, 20:16, 20:19, 20:22, 20:24, 22:25, 115:20
**language** [5] - 69:24, 114:6, 115:5, 223:5, 229:11
**Lanier** [1] - 3:4
**large** [9] - 12:21, 98:5, 98:7, 99:17, 120:17, 121:1, 132:19, 132:24, 167:20
**largest** [1] - 25:10
**Last** [1] - 10:15
**last** [32] - 7:23, 12:18, 17:9, 18:5, 41:21, 43:4, 43:7, 43:8, 56:6, 65:3, 118:20, 120:18, 123:2, 127:22, 129:3, 130:11, 133:22, 141:6, 143:12, 143:18, 148:3, 187:17, 188:3,

189:23, 191:6, 200:10, 202:2, 208:6, 213:3, 218:19
**late** [7] - 19:9, 29:9, 29:14, 32:18, 32:23, 89:9, 199:6
**latest** [2] - 63:16, 204:7
**Laughter** [1] - 127:3
**launched** [5] - 42:4, 42:13, 81:20, 116:22, 120:20
**launching** [1] - 81:18
**LAURA** [1] - 5:10
**law** [4] - 54:13, 78:13, 104:18, 105:18
**Law** [3] - 3:4, 3:7, 3:12
**lawyer** [6] - 13:23, 16:13, 103:5, 105:22, 172:21, 234:7
**lawyer-prepared** [1] - 172:21
**lawyers** [2] - 103:4, 105:23
**lax** [1] - 206:11
**lay** [9] - 163:3, 179:21, 191:1, 197:4, 197:23, 197:25, 203:19, 227:11, 227:20
**lays** [1] - 200:1
**LDMP** [16] - 29:21, 29:25, 30:4, 30:6, 30:19, 31:8, 31:17, 31:20, 31:22, 31:23, 32:2, 35:7, 35:14, 35:24, 36:4, 36:15
**lead** [2] - 7:15, 100:14
**lead-up** [1] - 100:14
**learn** [1] - 139:10
**learned** [1] - 166:3
**least** [10] - 10:18, 59:15, 112:25, 154:2, 154:20, 172:15, 174:25, 219:1, 223:10, 232:20
**leave** [3] - 155:12, 233:18, 237:24
**Lee** [1] - 3:12
**left** [9] - 44:15, 58:7, 58:8, 68:19, 75:9, 111:17, 164:6, 218:18, 218:24
**legal** [5] - 47:24, 48:1, 48:2, 119:20, 200:16
**legislature** [1] - 237:9
**legitimate** [5] - 87:20, 87:22, 98:5, 114:25,

133:25
**lengthy** [2] - 11:23, 212:16
**Leon** [2] - 2:4, 2:16
**letter** [29] - 16:13, 49:20, 51:5, 52:3, 52:9, 53:4, 53:5, 53:9, 53:16, 55:6, 55:7, 55:9, 63:7, 69:24, 70:22, 71:15, 100:14, 102:5, 106:13, 109:13, 109:18, 110:21, 117:19, 118:16, 118:19, 213:17, 223:21, 224:5
**letters** [19] - 12:24, 16:21, 16:22, 51:15, 51:16, 52:6, 53:17, 53:19, 101:20, 101:23, 102:1, 102:23, 103:6, 104:2, 118:2, 230:17, 230:19, 233:13
**letting** [7] - 17:13, 123:24, 124:15, 127:5, 136:20, 230:13
**level** [21] - 38:18, 39:14, 45:13, 47:4, 47:5, 56:2, 56:5, 82:5, 116:13, 124:8, 124:21, 144:17, 154:16, 154:18, 158:4, 169:12, 169:25, 195:9, 214:22
**Level** [29] - 38:20, 38:24, 39:16, 39:18, 39:23, 40:1, 40:3, 40:6, 40:9, 40:10, 40:13, 40:15, 40:20, 40:22, 42:9, 193:3, 193:7, 193:22, 193:24, 194:9, 194:12, 194:20, 194:23, 199:18, 203:3, 203:11, 222:3, 222:9
**levels** [3] - 62:16, 124:15, 169:24
**Levin** [1] - 2:12
**LEYIMU** [1] - 4:8
**liability** [2] - 84:9, 106:16
**license** [1] - 169:20
**Life** [4] - 29:15, 32:11, 33:13, 220:21
**life** [1] - 33:19

**Life-Style** [3] - 29:15, 32:11, 33:13
**life-style** [1] - 33:19
**light** [1] - 184:8
**lighten** [1] - 159:1
**likelihood** [1] - 76:6
**likely** [4] - 55:23, 87:21, 141:5, 217:17
**limine** [1] - 83:18
**limit** [1] - 32:2
**limitation** [1] - 190:22
**limited** [22] - 14:13, 51:9, 51:20, 51:23, 52:16, 52:25, 70:5, 71:12, 75:2, 77:22, 78:3, 79:9, 95:18, 118:11, 118:12, 118:18, 127:5, 127:7, 127:10, 127:12, 131:18, 224:15
**limits** [2] - 31:21, 124:3
**LINDA** [1] - 4:5
**line** [9] - 48:10, 58:16, 58:22, 96:19, 118:21, 149:5, 157:10, 189:23, 220:22
**lines** [2] - 22:11, 174:12
**linked** [1] - 75:12
**Lisa** [2] - 6:18, 239:3
**list** [17] - 10:12, 13:2, 13:11, 14:3, 15:18, 16:3, 21:18, 179:12, 180:13, 180:19, 180:21, 182:7, 182:9, 200:8, 213:17, 213:21
**listed** [7] - 14:18, 97:17, 102:11, 114:21, 213:15, 220:15, 227:1
**listing** [1] - 182:22
**lists** [4] - 66:4, 115:19, 216:4, 235:24
**literal** [1] - 64:9
**literally** [2] - 133:9, 200:4
**literately** [1] - 13:2
**Litigation** [2] - 7:12, 109:15
**litigation** [2] - 7:15, 105:7
**live** [1] - 17:20
**Livonia** [1] - 111:20
**LLC** [1] - 2:4
**local** [3] - 54:1, 161:17, 161:18

**located** [3] - 167:2, 214:20, 214:24
**location** [2] - 128:11, 214:18
**locations** [1] - 166:18
**Logan** [2] - 6:5, 6:12
**logo** [1] - 73:1
**long-standing** [1] - 105:24
**look** [59] - 32:14, 33:6, 33:12, 33:14, 37:25, 42:25, 43:1, 43:12, 53:3, 53:17, 61:4, 66:11, 66:22, 68:18, 73:1, 76:19, 87:7, 98:1, 98:5, 99:6, 99:9, 99:20, 109:11, 109:12, 114:18, 118:16, 121:16, 128:9, 135:14, 137:1, 140:14, 148:23, 158:7, 162:14, 163:21, 163:23, 181:24, 185:8, 189:17, 192:13, 192:24, 193:3, 193:4, 193:5, 193:22, 195:6, 200:21, 207:17, 211:13, 211:21, 213:20, 214:6, 215:3, 215:23, 222:1, 222:18, 223:1, 223:18, 224:19
**looked** [5] - 96:1, 126:22, 143:12, 168:15, 187:13
**looking** [15] - 9:25, 60:25, 62:10, 67:6, 78:9, 86:16, 103:2, 138:25, 166:8, 173:9, 180:11, 193:17, 215:14, 223:23, 225:12
**looks** [4] - 30:19, 75:9, 176:2, 176:3
**Looks** [1] - 220:4
**loop** [1] - 91:16
**loss** [4] - 9:1, 9:5, 169:13, 181:6
**losses** [1] - 86:9
**lost** [1] - 193:13
**loved** [1] - 7:16
**low** [2] - 76:7, 99:10
**lower** [3] - 134:8, 226:12, 226:14
**lowest** [1] - 169:25
**luckily** [1] - 157:9
**Lumpkin** [1] - 20:25

**lunch** [1] - 91:15

**M**

**ma'am** [2] - 90:15, 237:21
**MacDonald** [1] - 21:12
**Magazine** [1] - 3:7
**MAHADY** [1] - 6:4
**Mahoney** [7] - 15:17, 58:17, 93:1, 141:25, 143:20, 144:19, 145:1
**Mahoney's** [1] - 145:6
**mail** [34] - 57:25, 59:14, 62:2, 63:9, 91:22, 91:24, 121:16, 121:20, 122:11, 122:13, 122:25, 123:1, 127:23, 127:25, 129:12, 132:6, 134:7, 137:17, 140:5, 140:14, 140:15, 143:15, 143:19, 145:6, 148:8, 149:4, 152:9, 152:18, 154:6, 154:9, 157:8, 158:8
**mails** [3] - 128:14, 141:22, 143:17
**main** [2] - 146:4, 146:5
**MAINIGI** [4] - 4:12, 50:23, 50:25, 51:2
**maintain** [11] - 45:6, 87:9, 88:13, 94:4, 110:13, 114:24, 119:17, 134:19, 152:12, 156:16, 237:4
**maintaining** [1] - 192:6
**MAJESTRO** [11] - 2:6, 7:22, 10:11, 12:7, 12:12, 13:20, 16:2, 17:9, 231:3, 231:20, 235:2
**Majestro** [9] - 2:6, 7:21, 9:20, 10:10, 11:17, 12:3, 231:2, 231:19, 233:8
**major** [1] - 81:3
**majority** [1] - 176:20
**Management** [1] - 29:15
**management** [4] - 195:1, 195:3, 199:16, 224:22
**Manager** [2] - 185:23, 188:2

**manager** [6] - 35:15, 153:2, 164:9, 170:14, 184:25, 200:5
**managers** [2] - 25:1, 199:17
**managing** [1] - 124:11
**manifestation** [1] - 74:15
**manifested** [1] - 62:22
**manipulation** [2] - 176:1, 234:1
**mantra** [2] - 194:1, 194:4
**mantras** [1] - 183:11
**manual** [7] - 30:1, 32:11, 35:10, 41:4, 41:7, 135:9, 158:2
**manually** [1] - 35:13
**manufacture** [1] - 53:8
**manufacturers** [1] - 53:13
**map** [3] - 14:7, 21:9, 22:6
**March** [3] - 91:22, 190:21, 224:19
**mark** [2] - 7:12, 80:13
**MARK** [1] - 3:16
**marked** [32] - 21:1, 32:5, 42:17, 43:7, 49:8, 72:17, 82:8, 91:17, 100:9, 107:22, 121:13, 125:24, 137:8, 138:13, 140:1, 143:11, 147:23, 151:14, 157:3, 170:19, 171:25, 172:11, 178:11, 184:1, 187:18, 189:14, 195:23, 208:15, 211:22, 223:15, 226:19, 236:2
**market** [1] - 25:25
**marking** [1] - 208:10
**Maryland** [2] - 20:1, 115:20
**Massachusetts** [2] - 19:24, 20:6
**match** [1] - 175:25
**materials** [1] - 235:20
**Matsumato** [1] - 187:10
**matter** [9] - 51:6, 61:11, 74:6, 95:14, 103:13, 172:18, 233:23, 236:14, 239:5
**matters** [1] - 108:23

max [1] - 45:11
maximum [1] - 46:21
MAY [1] - 1:19
MCCLURE [3] - 6:3,
90:9, 90:14
McDonald [10] -
58:16, 93:1, 140:18,
140:19, 140:20,
141:21, 143:20,
208:21, 208:24,
210:19
MCGINNESS [1] - 4:2
MCK-MDL-01391128
[1] - 174:5
McKesson [177] - 5:8,
8:3, 8:4, 8:16, 15:17,
16:14, 17:23, 18:18,
18:19, 18:22, 19:8,
19:16, 20:17, 23:24,
24:3, 25:12, 26:4,
27:10, 28:3, 28:8,
28:15, 28:24, 29:21,
30:1, 32:10, 32:20,
34:10, 35:11, 41:15,
42:1, 42:4, 42:6,
42:14, 42:23, 45:4,
46:2, 46:3, 47:7,
48:22, 49:1, 49:21,
51:8, 51:13, 52:11,
52:17, 54:6, 57:14,
58:14, 60:1, 60:20,
61:14, 61:16, 62:21,
66:22, 69:20, 70:11,
70:13, 73:1, 73:4,
73:5, 73:10, 73:14,
74:15, 74:17, 75:12,
76:14, 81:1, 81:2,
81:9, 81:13, 81:18,
81:22, 82:1, 82:2,
83:4, 84:6, 84:9,
84:25, 85:16, 86:4,
87:8, 87:9, 87:17,
87:25, 88:6, 88:11,
88:21, 93:2, 93:23,
93:24, 95:4, 97:25,
100:1, 100:18,
101:15, 102:14,
103:1, 106:18,
107:18, 108:8,
108:13, 109:13,
109:17, 109:18,
109:19, 110:7,
110:8, 110:9, 111:6,
111:20, 111:22,
111:24, 112:19,
112:20, 112:23,
113:5, 113:10,
113:20, 114:23,
116:7, 116:11,
118:25, 120:16,

122:1, 124:2,
124:17, 125:20,
129:3, 130:20,
131:23, 135:3,
141:18, 147:12,
149:20, 150:14,
153:2, 153:18,
154:2, 159:14,
160:20, 161:20,
161:23, 162:1,
163:9, 169:14,
173:16, 174:7,
175:15, 175:21,
175:23, 176:1,
182:21, 183:12,
185:3, 187:7, 189:8,
189:13, 190:18,
194:1, 195:21,
211:19, 212:18,
220:24, 221:6,
221:16, 221:17,
221:24, 223:11,
224:21, 225:22,
226:6, 226:8, 230:19
McKesson's [15] -
18:24, 25:9, 26:16,
40:25, 68:7, 100:15,
101:24, 101:25,
104:3, 110:13,
144:10, 169:20,
189:10, 194:4,
206:22
MDL [5] - 7:11,
103:12, 103:17,
105:8, 105:9
mean [20] - 39:5, 57:5,
75:7, 77:6, 82:1,
85:7, 87:7, 114:16,
123:16, 124:17,
147:22, 160:24,
177:5, 186:7,
205:22, 205:23,
207:1, 210:13,
215:18, 217:22
meaning [1] - 226:10
means [3] - 25:24,
202:15, 221:17
meant [1] - 105:3
mechanical [2] - 6:19,
236:13
mechanism [1] - 35:8
medical [3] - 87:22,
115:1, 149:22
medications [1] -
99:12
medicine [2] - 216:17
medium [1] - 129:22
Medium [1] - 117:4
meet [3] - 55:15,
68:15, 145:8

Meeting [1] - 92:3
meeting [11] - 84:23,
85:2, 92:2, 93:8,
93:13, 93:15, 94:8,
94:25, 96:6, 96:25,
122:18
meetings [2] - 28:19,
95:3
Melissa [2] - 178:19,
203:1
members [1] - 62:7
memo [1] - 137:18
memorandum [3] -
84:5, 92:3, 93:8
Memorandum [5] -
82:12, 85:9, 93:19,
108:3, 108:6
mention [1] - 159:2
mentioned [6] - 35:17,
37:6, 186:1, 203:1,
225:19, 225:24
mentor [1] - 7:16
merely [3] - 62:4,
110:23, 142:13
met [3] - 116:9, 203:6,
235:17
meth [1] - 229:23
Methuen [8] - 20:3,
111:24, 111:25,
112:2, 112:3, 112:5,
112:7, 112:16
MICHAEL [3] - 2:15,
3:9, 18:8
Michael [15] - 17:23,
18:4, 18:16, 58:17,
128:15, 140:17,
153:3, 163:15,
178:19, 178:22,
184:23, 187:24,
208:20, 223:19,
229:19
mid [1] - 36:19
middle [4] - 33:14,
113:10, 144:21,
185:21
midway [1] - 190:5
might [9] - 14:19,
35:23, 43:6, 56:25,
69:23, 89:5, 175:15,
176:20, 237:12
MILDRED [1] - 3:3
mile [1] - 66:17
miles [1] - 67:2
million [3] - 74:10,
86:6, 206:10
millions [4] - 70:16,
96:3, 137:5, 159:17
mine [2] - 112:15,
115:24, 154:23,
186:21

minimize [1] - 236:19
minute [11] - 23:9,
28:22, 31:1, 55:17,
56:24, 101:2,
109:21, 112:8,
131:1, 218:22,
231:25
minutes [14] - 25:17,
43:23, 45:10, 117:9,
121:8, 147:5,
182:13, 218:17,
218:19, 218:24,
219:5, 219:7, 220:2,
234:24
mirror [1] - 155:17
mis [1] - 57:1
mis-heard [1] - 57:1
mischaracterizes [1] -
67:19
misrepresent [1] -
175:8
missed [1] - 7:16
missing [2] - 108:22,
176:11
misspoke [1] - 201:3
mistaken [1] - 84:23
Mitchell [1] - 2:12
model [3] - 66:24,
213:22, 214:7
models [1] - 65:21
modified [2] - 90:19,
122:20
modify [1] - 168:23
MOM [1] - 190:9
moment [8] - 7:8,
44:18, 107:10,
147:24, 165:23,
178:9, 211:23, 218:3
Monday [1] - 58:25
Monet [1] - 51:3
Monet's [1] - 51:4
Monique [2] - 235:3,
235:9
monitor [9] - 20:13,
47:8, 48:19, 48:20,
69:13, 206:17,
207:6, 215:17,
229:23
monitored [2] - 34:5,
207:14
monitoring [2] -
169:11, 169:21
Monitoring [15] -
25:24, 28:25, 29:16,
29:23, 32:11, 33:13,
36:25, 37:17, 42:23,
44:22, 100:3,
122:19, 149:1,
149:8, 149:17
month [17] - 31:24,

38:10, 67:16, 122:4,
141:1, 141:4, 141:6,
142:24, 143:2,
155:10, 155:22,
156:8, 193:8,
193:23, 195:14
monthly [8] - 31:23,
45:11, 46:21, 55:13,
67:15, 130:14,
130:15, 141:5
months [7] - 129:3,
130:11, 130:16,
130:17, 131:9,
155:13, 190:23
morning [14] - 7:5,
7:6, 7:22, 13:10,
13:22, 13:23, 18:14,
89:8, 118:3, 118:4,
179:9, 191:19,
234:13, 237:23
Morris [1] - 6:15
most [4] - 9:23, 10:18,
121:17, 219:6
Most [1] - 8:10
mostly [2] - 141:22,
141:24
motion [7] - 47:24,
101:19, 102:1,
103:17, 103:18,
156:3, 171:21
motions [2] - 83:18,
104:19
Motley [5] - 2:9, 3:14,
4:3, 4:5, 4:8
MOUGEY [1] - 2:12
move [52] - 8:2, 14:24,
16:4, 21:24, 33:7,
43:17, 49:24, 54:16,
59:12, 83:7, 89:17,
89:18, 92:10,
107:15, 108:16,
118:8, 126:3,
131:15, 131:16,
134:17, 136:9,
138:8, 139:12,
143:3, 148:3,
148:16, 151:8,
151:17, 155:20,
156:12, 156:13,
160:4, 163:2,
170:21, 185:9,
185:10, 187:17,
188:13, 189:6,
192:16, 196:17,
208:11, 212:8,
218:7, 230:25,
231:8, 232:14,
232:24, 235:12
Move [1] - 211:6
moved [6] - 19:4,

19:12, 23:14, 27:15, 156:14, 188:18
**movie** [1] - 75:10
**moving** [10] - 10:7, 23:24, 49:7, 136:12, 165:19, 226:23, 227:5, 229:22, 230:5, 231:16
**MR** [666] - 2:3, 2:6, 2:9, 2:12, 2:15, 3:9, 3:11, 3:16, 4:17, 5:9, 5:10, 5:13, 6:4, 7:8, 7:10, 7:22, 8:22, 10:11, 11:16, 12:7, 12:12, 12:13, 13:20, 13:22, 13:25, 15:10, 15:13, 16:2, 16:10, 16:21, 17:8, 17:9, 17:16, 17:19, 17:22, 17:24, 18:10, 18:13, 21:3, 21:7, 21:24, 22:2, 22:4, 22:14, 22:17, 23:7, 23:8, 23:10, 23:12, 30:10, 30:13, 30:16, 30:17, 30:22, 30:25, 31:6, 32:6, 32:9, 33:7, 33:9, 33:11, 36:1, 36:5, 36:6, 36:7, 36:10, 36:13, 36:14, 39:5, 39:9, 39:10, 42:19, 42:21, 43:16, 43:18, 43:24, 44:1, 44:3, 44:7, 44:14, 47:15, 47:18, 47:22, 48:5, 48:7, 48:14, 48:15, 49:5, 49:6, 49:9, 49:12, 49:13, 49:15, 49:19, 49:24, 50:2, 50:5, 50:8, 50:13, 50:15, 51:7, 51:14, 51:22, 52:2, 52:15, 52:18, 52:22, 53:2, 54:8, 54:9, 54:11, 54:17, 54:18, 54:24, 55:1, 55:3, 55:5, 56:21, 56:23, 56:25, 57:4, 57:21, 57:23, 57:24, 59:11, 59:14, 59:21, 60:4, 60:17, 60:19, 60:22, 60:24, 61:3, 61:7, 61:9, 61:13, 61:18, 62:1, 62:10, 62:15, 63:2, 63:3, 63:4, 63:5, 64:1, 64:5, 64:9, 64:11, 64:15, 64:16, 64:19, 64:21, 67:19, 67:21, 67:24, 68:5, 68:6, 69:22, 70:2, 70:6, 70:7,

70:20, 71:2, 71:7, 71:13, 71:20, 71:24, 72:10, 72:14, 72:16, 72:22, 72:24, 73:19, 73:21, 74:1, 74:3, 74:12, 74:20, 74:22, 75:4, 75:24, 76:1, 76:4, 76:18, 77:4, 77:6, 77:16, 77:18, 77:21, 78:5, 78:8, 78:11, 78:15, 78:18, 78:25, 79:3, 79:6, 79:8, 79:10, 79:11, 81:14, 81:17, 83:6, 83:8, 83:16, 83:24, 84:1, 84:2, 84:7, 84:11, 84:15, 84:16, 85:20, 85:23, 86:12, 86:18, 86:21, 86:22, 87:1, 87:6, 89:1, 89:10, 89:13, 89:16, 89:23, 89:25, 90:2, 90:12, 90:15, 90:18, 90:22, 91:1, 91:10, 91:12, 92:9, 92:12, 92:17, 92:22, 92:23, 94:17, 94:22, 94:25, 95:12, 95:19, 95:21, 96:11, 96:12, 96:15, 97:10, 97:12, 100:12, 100:25, 101:3, 101:6, 102:2, 102:4, 102:15, 103:9, 103:23, 103:25, 104:5, 104:12, 104:25, 105:7, 105:10, 105:14, 106:2, 106:15, 106:20, 106:23, 107:4, 107:10, 107:13, 107:15, 107:17, 108:15, 108:18, 109:4, 109:5, 109:8, 109:9, 109:10, 110:5, 110:6, 110:19, 110:23, 111:3, 111:4, 114:5, 114:7, 114:8, 114:9, 114:11, 114:13, 114:14, 115:3, 115:7, 115:9, 115:12, 115:16, 115:17, 117:11, 117:13, 117:14, 118:7, 118:9, 118:14, 118:15, 119:7, 119:12, 119:13, 119:14, 119:15, 119:19, 120:1, 123:7, 123:9,

123:11, 126:2, 126:5, 126:7, 126:8, 126:11, 126:18, 126:20, 127:1, 127:2, 127:4, 127:8, 127:14, 127:18, 127:21, 130:24, 131:3, 131:15, 131:18, 131:21, 132:23, 133:3, 133:9, 133:14, 133:15, 133:18, 133:20, 133:21, 134:17, 134:19, 134:24, 134:25, 135:1, 136:8, 136:11, 136:14, 138:7, 138:9, 138:12, 139:12, 139:14, 139:17, 143:3, 143:5, 143:8, 143:10, 146:23, 146:25, 147:2, 147:7, 147:8, 148:2, 148:4, 148:7, 148:16, 148:18, 148:20, 150:5, 150:6, 150:25, 151:5, 151:8, 151:10, 151:12, 151:17, 151:20, 151:24, 151:25, 152:4, 152:7, 152:8, 152:10, 152:12, 152:16, 152:17, 153:20, 153:22, 154:4, 154:5, 155:19, 155:25, 156:5, 156:11, 156:13, 156:15, 156:16, 156:20, 156:21, 156:23, 157:1, 157:2, 159:19, 159:22, 160:4, 160:6, 160:10, 160:15, 160:16, 162:22, 163:2, 163:6, 163:17, 163:20, 163:23, 164:5, 164:11, 164:15, 164:23, 165:2, 165:10, 165:13, 165:16, 165:19, 165:23, 165:25, 166:2, 166:8, 166:9, 166:11, 166:14, 166:15, 166:20, 166:22, 167:7, 167:13, 167:16, 167:19, 167:24,

168:3, 168:6, 168:9, 168:20, 168:23, 169:2, 169:3, 169:4, 170:21, 171:1, 171:6, 171:13, 171:24, 172:6, 172:10, 172:14, 172:20, 172:25, 173:2, 173:5, 173:18, 173:20, 174:4, 174:21, 175:6, 175:10, 176:4, 176:14, 176:23, 177:3, 177:5, 177:7, 177:9, 177:12, 177:18, 177:23, 178:5, 178:9, 178:10, 179:20, 179:23, 180:2, 180:6, 180:9, 181:3, 181:4, 181:14, 182:12, 182:15, 182:19, 182:20, 183:19, 183:21, 184:3, 184:10, 184:14, 184:19, 184:20, 185:9, 185:12, 185:16, 187:1, 187:16, 188:13, 188:14, 188:17, 188:20, 189:4, 189:5, 192:15, 192:17, 192:19, 192:21, 193:14, 193:16, 193:19, 193:21, 194:3, 194:6, 196:17, 196:19, 196:22, 196:24, 197:1, 197:3, 197:7, 197:10, 197:11, 197:18, 197:21, 198:2, 198:6, 198:9, 198:10, 198:21, 198:24, 199:3, 200:1, 200:4, 200:7, 200:8, 200:19, 200:20, 200:23, 201:2, 201:6, 201:7, 201:9, 202:9, 202:15, 202:17, 203:21, 203:22, 206:21, 206:23, 206:24, 207:1, 207:2, 207:3, 207:22, 208:4, 208:11, 208:12, 208:14, 210:16, 210:18, 211:6, 211:7, 211:9, 212:7,

212:10, 212:12, 216:22, 217:6, 217:12, 218:1, 218:5, 218:10, 218:11, 218:12, 218:13, 218:14, 218:17, 218:23, 218:25, 219:3, 219:6, 219:11, 219:15, 219:23, 220:3, 220:10, 220:13, 220:18, 220:20, 222:20, 222:22, 222:23, 222:25, 224:5, 224:7, 224:13, 224:16, 224:18, 226:16, 226:18, 226:22, 227:1, 227:2, 227:8, 227:14, 227:15, 227:18, 227:24, 228:2, 228:3, 228:4, 228:11, 228:14, 228:16, 228:21, 229:5, 229:10, 229:13, 229:18, 229:24, 230:2, 230:8, 230:12, 230:13, 230:16, 231:3, 231:13, 231:20, 231:22, 231:24, 232:3, 232:8, 232:10, 232:13, 232:19, 232:22, 233:1, 233:5, 233:9, 233:13, 233:19, 233:22, 234:3, 234:6, 234:18, 234:22, 235:2, 235:5, 235:7, 235:16, 236:13, 236:21, 236:24, 237:20, 237:25
**MS** [34] - 3:3, 3:6, 3:14, 4:2, 4:5, 4:8, 4:12, 4:12, 4:15, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 47:12, 47:19, 48:6, 50:21, 50:23, 50:25, 51:2, 59:18, 59:25, 60:18, 90:7, 90:9, 90:14, 104:16, 235:8, 235:17, 236:4, 236:8, 236:11
**Mt** [3] - 3:15, 4:4, 4:9
**multiple** [7] - 13:16, 24:21, 94:12, 94:15, 95:23, 96:1, 99:21
**multiplier** [1] - 80:25

**multiplying** [1] - 13:25
**mundane** [1] - 144:14
**must** [6] - 55:21, 96:19, 142:2, 201:21, 221:18, 221:19

## N

**name** [12] - 18:3, 18:5, 18:14, 18:16, 132:8, 137:22, 139:5, 148:14, 149:5, 157:10, 204:7, 235:9
**named** [1] - 223:14
**narrow** [1] - 218:19
**narrowed** [1] - 174:13
**Nate** [13] - 135:19, 135:24, 136:19, 137:12, 137:14, 139:3, 139:4, 139:9, 186:5, 187:7, 187:8, 187:9
**Nathan** [1] - 184:25
**National** [3] - 7:11, 117:7, 202:4
**national** [35] - 23:24, 24:1, 24:6, 24:16, 24:19, 24:24, 25:4, 25:6, 25:8, 26:16, 40:24, 74:25, 75:1, 75:2, 85:19, 102:13, 110:17, 123:18, 126:12, 126:13, 126:16, 128:3, 129:2, 151:21, 161:4, 179:24, 197:14, 198:16, 198:20, 199:5, 199:9, 201:16, 201:22, 202:20, 202:24
**nationally** [1] - 127:9
**nationals** [1] - 24:4
**nationwide** [6] - 25:12, 28:8, 101:10, 102:9, 106:6, 133:11
**native** [1] - 174:13
**nature** [4] - 16:20, 95:10, 95:11, 102:13
**necessarily** [2] - 69:4, 157:21
**necessary** [2] - 69:11, 99:11
**need** [45] - 7:25, 10:17, 11:9, 12:4, 26:25, 41:15, 43:20, 91:6, 94:1, 115:15, 116:15, 121:2, 128:16, 133:1,

133:3, 142:22, 144:7, 144:8, 144:13, 145:9, 158:12, 158:14, 158:21, 179:1, 186:3, 186:9, 188:8, 189:2, 190:7, 204:20, 211:4, 218:11, 219:5, 219:6, 219:20, 222:13, 222:22, 231:15, 232:5, 232:20, 232:25, 234:8, 236:18
**needed** [2] - 121:5, 141:21
**needing** [1] - 147:17
**Needs** [3] - 190:24, 190:25, 192:2
**needs** [10] - 14:8, 63:12, 132:17, 154:12, 176:8, 197:23, 204:17, 209:7, 219:18, 219:24
**negotiated** [2] - 235:17, 235:22
**negotiation** [2] - 82:3, 131:10
**negotiations** [1] - 105:22
**network** [1] - 190:14
**never** [13] - 9:16, 12:23, 13:1, 16:14, 75:12, 75:16, 98:23, 98:24, 123:20, 136:3, 155:11, 155:23
**New** [23] - 3:5, 3:8, 19:1, 19:25, 20:1, 20:16, 20:20, 20:23, 20:24, 22:21, 75:19, 164:8, 170:12, 170:15, 191:9, 191:18, 194:8, 196:9, 198:12, 199:14, 199:22
**new** [10] - 78:19, 79:1, 79:7, 93:9, 120:24, 130:13, 145:4, 155:14, 205:13
**next** [22] - 34:7, 67:10, 68:23, 69:14, 98:15, 103:16, 104:24, 107:3, 145:3, 149:3, 164:1, 164:18, 167:24, 176:21, 192:2, 195:5, 195:6, 204:16, 212:25, 213:4, 214:13,

215:10
**NICHOLAS** [4] - 6:11, 48:5, 59:21, 104:25
**Nicholas** [2] - 59:20, 104:24
**night** [4] - 10:15, 11:19, 12:16, 12:18
**Ninth** [1] - 4:6
**Nobody** [1] - 237:24
**Noerr** [1] - 237:13
**Noerr-Pennington** [1] - 237:13
**non** [4] - 8:9, 16:24, 149:22, 230:8
**non-controversial** [1] - 8:9
**non-hearsay** [1] - 16:24
**non-medical** [1] - 149:22
**non-present** [1] - 230:8
**none** [1] - 162:24
**nonnegotiable** [1] - 186:2
**noon** [1] - 89:5
**normal** [1] - 214:22
**North** [1] - 97:24
**Northeast** [1] - 148:25
**northeast** [3] - 19:15, 19:20, 215:20
**northern** [2] - 23:18, 191:20
**note** [9] - 7:17, 59:19, 74:24, 76:5, 104:16, 142:13, 164:11, 176:20, 235:6
**noted** [2] - 187:11, 195:13
**notes** [3] - 92:1, 96:24, 96:25
**nothing** [1] - 75:15
**notice** [39] - 50:7, 50:8, 50:19, 50:22, 51:6, 51:8, 51:23, 60:2, 60:7, 60:10, 60:14, 70:1, 71:4, 71:7, 71:12, 71:18, 72:3, 74:17, 76:14, 77:22, 78:3, 83:20, 91:3, 95:9, 95:13, 101:9, 101:18, 103:1, 104:4, 104:5, 106:5, 106:6, 118:11, 224:7, 224:13, 230:4
**noticed** [2] - 11:2, 209:7
**notified** [1] - 221:19
**noting** [1] - 209:21

**notwithstanding** [1] - 62:12
**November** [11] - 109:13, 109:14, 193:8, 193:23, 194:10, 194:24, 195:12, 195:14, 196:6, 196:13, 198:11
**nowhere** [1] - 95:15
**NSC** [1] - 59:1
**nuisance** [1] - 159:2
**number** [19] - 12:21, 43:13, 46:14, 67:16, 75:11, 95:6, 101:7, 103:15, 124:12, 129:7, 132:18, 132:24, 147:18, 156:7, 157:9, 168:10, 174:5, 225:23
**Number** [5] - 202:3, 215:11, 223:5, 230:4, 232:1
**numbering** [1] - 193:17
**numbers** [3] - 180:14, 226:9, 232:9
**numerous** [1] - 184:11
**nunc** [2] - 102:19, 104:17
**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

## O

**O-r-i-e-n-t-e** [1] - 18:6
**oath** [1] - 91:8
**object** [55] - 8:5, 10:14, 16:8, 17:15, 17:17, 36:1, 47:12, 47:22, 50:2, 50:21, 51:9, 52:18, 52:24, 56:21, 59:14, 59:17, 59:19, 73:21, 77:24, 81:14, 85:20, 92:14, 94:18, 95:14, 108:19, 115:3, 115:4, 118:9, 118:10, 126:8, 126:25, 127:4, 127:12, 130:24, 133:4, 151:18, 156:18, 162:22, 163:17, 165:19, 173:20, 180:9, 180:10, 196:19, 224:6, 226:23, 226:24, 227:19,

228:8, 228:14, 228:15, 231:4, 231:13, 231:16
**objected** [3] - 9:8, 95:15, 108:19
**objecting** [4] - 8:16, 59:23, 69:23, 236:3
**Objection** [11] - 23:7, 165:22, 183:19, 185:12, 187:1, 194:3, 198:21, 206:21, 207:22, 210:16, 217:6
**objection** [110] - 7:17, 8:12, 12:9, 22:1, 22:2, 23:11, 33:9, 36:9, 43:18, 47:15, 48:5, 49:3, 50:1, 51:19, 52:20, 54:8, 54:15, 54:24, 59:13, 59:21, 62:25, 64:1, 64:16, 67:19, 70:5, 70:20, 70:21, 71:19, 72:6, 72:9, 75:25, 76:22, 77:3, 78:8, 83:9, 84:13, 90:5, 90:7, 90:25, 91:2, 92:11, 96:11, 97:10, 105:11, 107:9, 108:17, 108:21, 109:6, 115:13, 119:19, 126:4, 126:5, 131:18, 134:19, 134:21, 134:22, 136:12, 138:9, 139:14, 143:5, 143:6, 146:23, 148:4, 148:18, 150:25, 151:10, 151:23, 152:12, 152:15, 153:16, 153:23, 156:16, 156:24, 159:19, 159:20, 160:6, 163:1, 164:3, 165:14, 168:22, 169:1, 178:2, 181:14, 181:15, 188:14, 189:3, 192:17, 197:4, 197:19, 200:11, 200:18, 200:25, 201:4, 202:10, 203:17, 208:12, 211:7, 212:10, 218:9, 222:21, 227:13, 227:23, 232:2, 232:7, 232:17, 232:18, 233:3, 233:5, 237:4

objections [17] - 8:7, 8:11, 10:13, 10:16, 10:22, 12:3, 12:8, 17:14, 48:13, 60:5, 60:11, 92:20, 235:13, 235:23, 235:24, 236:14, 236:25
Objectives [1] - 191:4
obligation [12] - 46:11, 47:7, 48:1, 48:19, 50:7, 54:5, 56:19, 57:7, 57:14, 88:13, 119:20, 141:17
obligations [7] - 48:3, 87:8, 88:12, 116:10, 119:4, 119:16, 120:4
Observe [1] - 67:3
obtain [1] - 120:4
obvious [1] - 8:10
obviously [7] - 16:12, 16:25, 17:2, 47:23, 60:9, 77:7, 231:13
Obviously [2] - 220:7, 231:15
occasions [1] - 13:17
occur [1] - 99:1
occurrence [2] - 96:22, 97:8
October [3] - 149:4, 152:19, 154:8
OF [2] - 1:1, 1:4
offer [2] - 52:15, 228:6
offered [6] - 8:11, 101:7, 101:9, 105:16, 107:6, 228:5
offering [7] - 51:14, 51:23, 60:20, 70:2, 106:13, 224:11, 224:13
Office [2] - 54:1, 109:14
office [6] - 123:19, 123:22, 123:23, 125:2, 144:12, 224:20
Official [2] - 239:2, 239:3
official [1] - 122:16
officially [1] - 122:19
offs [1] - 93:9
often [1] - 145:3
Ohio [1] - 166:19
OIG [2] - 207:9, 207:10
old [1] - 193:17
omissions [1] - 173:24
omit [4] - 194:13,

194:16, 194:17, 194:25
omits [9] - 159:1, 193:7, 193:8, 193:23, 194:8, 194:10, 194:24
omitted [1] - 203:5
on-the-job [1] - 27:23
once [31] - 14:5, 24:19, 45:10, 46:3, 46:21, 47:2, 51:24, 56:4, 56:18, 57:5, 57:6, 71:20, 97:16, 116:9, 117:23, 127:24, 133:10, 137:12, 138:15, 138:23, 144:3, 147:24, 151:20, 154:24, 157:8, 160:1, 201:19, 221:16, 223:2
Once [2] - 221:12, 222:13
One [21] - 5:11, 38:20, 38:24, 39:16, 39:18, 39:23, 40:1, 40:13, 40:15, 178:9, 193:3, 193:22, 193:24, 194:9, 194:12, 194:23, 199:18, 203:3, 203:11, 222:9, 236:8
one [144] - 7:14, 10:8, 12:25, 15:16, 15:23, 17:9, 18:23, 19:17, 19:19, 39:1, 41:4, 41:14, 45:13, 50:11, 50:14, 50:16, 52:6, 57:9, 58:5, 59:13, 60:7, 60:13, 65:24, 66:22, 68:11, 70:11, 72:12, 75:2, 76:10, 77:9, 77:10, 81:6, 82:6, 83:17, 85:25, 88:18, 92:6, 93:20, 94:5, 96:7, 97:20, 98:6, 98:14, 98:21, 99:20, 99:21, 99:23, 100:16, 101:7, 105:23, 106:8, 107:10, 107:20, 108:23, 109:21, 110:10, 110:11, 111:12, 112:15, 115:18, 117:20, 118:3, 118:4, 118:5, 120:15, 121:17, 130:4, 130:6, 131:6, 131:16, 133:3, 137:11, 145:3,

150:4, 150:10, 151:18, 154:14, 155:8, 155:9, 155:21, 162:14, 165:6, 165:13, 165:23, 166:6, 166:16, 168:19, 170:3, 170:5, 171:3, 171:13, 172:15, 173:13, 174:22, 175:7, 175:12, 178:2, 181:3, 181:19, 183:11, 184:3, 184:4, 186:13, 187:17, 187:22, 191:15, 196:8, 196:19, 197:12, 197:13, 198:16, 199:11, 202:3, 202:11, 202:22, 209:12, 213:7, 213:21, 215:4, 215:15, 216:25, 218:3, 222:23, 225:4, 225:10, 227:2, 229:15, 230:4, 230:6, 232:1, 232:20, 233:4, 233:13, 233:22, 234:8, 235:2, 236:8, 236:16
Ones [3] - 40:3, 193:7, 194:20
ones [11] - 10:18, 14:18, 102:10, 168:13, 168:16, 169:24, 193:5, 199:10, 231:23, 233:8
open [2] - 16:16, 184:6
opening [1] - 205:14
operate [1] - 110:15
operating [4] - 41:4, 41:7, 158:2, 192:11
operations [3] - 30:1, 32:11, 191:14
Operations [8] - 18:23, 26:23, 26:24, 27:2, 27:7, 35:16, 52:10, 199:17
opinion [9] - 71:13, 71:18, 72:8, 76:12, 76:16, 78:14, 104:23, 105:12, 142:17
Opioid [1] - 7:12
opioid [4] - 37:21, 63:24, 64:7, 105:7

opioids [5] - 64:3, 64:18, 75:16, 230:5, 230:21
opponent [1] - 15:1
opportunity [7] - 14:6, 15:6, 106:4, 133:23, 176:10, 229:3, 231:9
oppose [1] - 231:5
opposed [2] - 48:3, 64:3
opposing [1] - 127:1
opt [2] - 121:9, 121:10
opted [2] - 120:21, 122:17
order [49] - 31:15, 35:13, 38:14, 38:25, 39:20, 40:16, 42:1, 45:1, 45:11, 54:7, 54:22, 56:7, 56:11, 56:15, 56:16, 56:17, 57:6, 57:7, 57:8, 62:6, 87:20, 88:1, 96:20, 99:9, 101:12, 102:8, 102:19, 102:20, 103:10, 103:20, 104:1, 104:9, 104:18, 104:20, 105:5, 116:12, 118:22, 124:7, 179:9, 179:13, 194:15, 221:13, 221:16, 229:6, 233:15
Order [4] - 28:24, 148:25, 149:7, 149:17
ordered [3] - 31:21, 101:21, 147:16
ordering [1] - 130:15
orders [38] - 42:6, 42:8, 42:9, 42:14, 44:25, 46:22, 47:2, 47:8, 47:9, 53:14, 54:1, 54:21, 55:16, 55:21, 56:1, 56:13, 84:10, 86:8, 87:15, 87:17, 87:18, 88:15, 88:22, 94:6, 102:10, 104:22, 105:4, 110:16, 113:7, 113:19, 141:6, 203:5, 222:16, 224:25, 225:2, 225:21
orders/purchases/ customers [1] - 46:8
ordinary [1] - 189:10
orient [6] - 30:8, 31:7, 70:9, 154:24, 167:8, 185:18

Oriente [59] - 15:20, 17:23, 18:2, 18:4, 18:16, 18:17, 22:7, 23:13, 31:4, 36:17, 44:5, 44:10, 44:15, 46:16, 49:10, 52:4, 58:17, 63:18, 67:25, 79:12, 91:8, 91:13, 91:20, 92:24, 96:17, 97:14, 98:2, 127:23, 128:15, 139:18, 140:17, 152:9, 152:25, 160:17, 163:7, 163:15, 166:24, 173:6, 178:15, 178:19, 178:22, 180:3, 180:11, 181:17, 182:11, 184:23, 185:19, 187:4, 187:22, 187:24, 200:22, 202:12, 203:23, 208:20, 220:8, 223:19, 227:16, 229:20, 234:2
ORIENTE [1] - 18:8
Oriente's [1] - 176:21
oriented [1] - 29:5
original [2] - 48:18, 176:7
Orleans [1] - 3:8
Otherwise [1] - 15:11
ourselves [1] - 30:8
outlet [1] - 180:12
outlined [2] - 109:17, 190:9
outset [3] - 100:13, 176:19, 176:25
outside [6] - 16:17, 17:25, 126:9, 133:6, 151:19, 165:20, 179:21, 237:12
outstanding [2] - 231:25, 235:13
outweighs [1] - 76:25
Overall [1] - 192:4
overall [3] - 62:13, 192:1, 192:22
overarching [1] - 237:4
overcomes [1] - 61:24
overdoses [1] - 65:10
overlapped [1] - 31:9
overlaps [1] - 30:19
overlooked [1] - 158:9
overrule [11] - 49:2, 62:25, 84:13, 133:13, 151:23, 164:3, 181:15,

200:17, 201:3,
203:17, 203:20
**overruled** [10] - 67:23,
68:3, 119:21, 131:2,
151:1, 156:17,
156:21, 156:25,
185:14, 207:23
**Overruled** [1] - 217:9
**oversaw** [1] - 35:16
**oversee** [1] - 161:5
**overseeing** [1] - 24:1
**overwhelmed** [1] -
145:22
**own** [5] - 82:2, 120:25,
121:6, 161:4, 201:23
**owner** [1] - 202:11
**Owner** [1] - 193:1
**Oxy** [3] - 132:19,
132:25, 158:21
**oxy** [2] - 176:12,
176:13
**oxycodone** [16] -
31:25, 34:6, 34:12,
34:14, 38:1, 66:4,
70:16, 124:21,
158:22, 159:16,
159:17, 174:1,
174:9, 175:14,
175:20, 176:17

### P

**P-00011** [1] - 92:10
**P-00033** [2] - 117:10,
118:8
**P-00034** [1] - 49:25
**P-0011** [1] - 91:17
**P-00116** [1] - 196:17
**P-00118** [1] - 230:18
**P-00119** [1] - 230:18
**P-00121** [1] - 230:18
**P-00122** [3] - 100:10,
107:7, 230:18
**P-08247** [2] - 135:14,
136:9
**P-08309** [2] - 132:1,
134:17
**P-08761** [1] - 208:16
**P-08763** [1] - 148:3
**P-1200** [1] - 2:7
**P-12627** [1] - 222:18
**P-12643** [2] - 211:22,
212:9
**P-12778** [2] - 157:4,
158:7
**P-12814** [2] - 57:20,
59:12
**P-12967** [2] - 125:25,
131:17
**P-12971** [1] - 178:12

**P-13068** [2] - 140:1,
143:3
**P-13211** [2] - 137:8,
138:8
**P-13212** [2] - 138:13,
139:13
**P-13736A** [2] - 21:2,
21:25
**P-13737** [3] - 147:24,
148:17, 151:9
**P-16210** [2] - 73:20,
79:4
**P-16210A** [2] - 78:20,
79:6
**P-16690** [1] - 226:20
**P-2** [1] - 117:12
**P-22927** [1] - 184:2
**P-22936** [2] - 162:10,
165:17
**P-22936A** [1] - 168:24
**P-23733** [1] - 82:9
**P-3** [1] - 117:13
**P-42368** [1] - 43:17
**P-42535** [2] - 32:5,
33:8
**P-42554** [2] - 107:23,
108:16
**P-42638** [1] - 42:18
**P-42728** [2] - 170:20,
172:12
**P-42796** [2] - 151:15,
152:11
**P-42814** [1] - 223:16
**P-42836** [1] - 220:18
**P.m** [4] - 12:16,
219:14, 238:3
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**packet** [1] - 235:20
**packets** [4] - 235:11,
235:15, 235:19
**paddle** [1] - 145:23
**Page** [58] - 22:5,
43:10, 43:11, 46:14,
63:18, 65:16, 68:18,
69:18, 74:24, 75:5,
75:9, 75:13, 76:12,
77:10, 79:14, 80:9,
82:15, 85:4, 85:6,
86:13, 86:14, 86:25,
96:17, 97:14, 104:1,
109:12, 113:24,
118:18, 144:21,
150:4, 150:7,
152:24, 153:7,
163:7, 167:7, 169:7,
185:6, 188:2, 191:1,
192:1, 192:23,
193:14, 193:15,
193:16, 195:6,

200:21, 201:10,
202:2, 213:16,
213:17, 215:10,
220:21, 223:1,
223:18, 223:24,
225:11
**page** [44] - 42:25,
43:8, 67:10, 78:6,
86:1, 86:10, 92:2,
94:10, 113:3,
113:23, 122:16,
127:23, 140:15,
143:18, 143:21,
143:23, 143:25,
149:3, 154:9,
162:14, 162:17,
166:8, 167:6,
168:19, 175:1,
175:19, 175:24,
178:18, 184:21,
189:20, 190:2,
190:17, 192:2,
193:12, 195:5,
195:6, 196:8,
204:16, 214:13,
215:10
**pages** [11] - 77:8,
78:1, 78:2, 78:21,
78:24, 90:25, 91:2,
175:18, 177:19,
213:14, 236:15
**paid** [2] - 77:13, 142:4
**pain** [5] - 66:13, 69:19,
70:9, 213:23, 214:4
**Palmer** [5] - 178:14,
179:14, 181:5, 181:6
**panel** [1] - 72:12
**panhandle** [2] - 20:20,
23:18
**Papantonio** [1] - 2:12
**paper** [3] - 15:2,
132:1, 162:21
**papers** [1] - 231:19
**paragraph** [9] - 53:24,
103:16, 118:19,
118:20, 185:22,
190:5, 191:6,
212:25, 213:4
**Paragraph** [2] - 8:3,
109:12
**parameters** [1] - 95:5
**Part** [1] - 27:6
**part** [39] - 10:18,
21:18, 23:18, 28:14,
41:17, 41:21, 46:4,
46:6, 50:5, 82:2,
88:22, 94:7, 98:12,
100:14, 101:13,
103:4, 106:13,
110:20, 112:3,

116:8, 125:19,
125:23, 126:21,
128:7, 131:12,
138:8, 141:17,
145:18, 191:20,
197:11, 197:19,
198:14, 199:6,
206:17, 207:5,
207:19, 209:3,
227:24, 230:25
**partially** [1] - 26:23
**participating** [1] -
204:4
**particular** [34] - 10:23,
14:4, 53:3, 55:8,
63:8, 67:7, 80:12,
84:25, 93:18, 102:6,
108:2, 109:11,
110:10, 110:11,
110:14, 111:11,
114:25, 116:2,
118:16, 120:8,
126:13, 129:4,
137:25, 160:18,
161:10, 162:14,
166:6, 173:9,
173:17, 186:6,
187:22, 192:24,
201:13, 228:25
**particularly** [2] -
145:13, 147:10
**parties** [8] - 7:24,
12:15, 89:20,
103:17, 105:25,
108:9, 235:17
**parties'** [3] - 235:22,
235:23, 235:25
**partner** [2] - 166:3,
175:7
**partners** [2] - 12:25,
100:16
**parts** [1] - 10:23
**party** [6] - 60:7, 60:13,
84:3, 95:8, 108:9
**party's** [2] - 60:13,
74:6
**party's** [1] - 61:10
**pass** [4] - 127:15,
231:7, 231:11,
233:20
**passed** [1] - 235:6
**passes** [1] - 158:11
**passing** [2] - 7:12,
187:13
**past** [3] - 11:2, 154:14,
186:15
**patience** [1] - 175:7
**Patrick** [1] - 235:21
**PAUL** [2] - 2:3, 5:9
**Paul** [2] - 7:13, 232:8

**Pause** [7] - 31:2,
166:1, 196:3, 204:2,
211:24, 218:4,
219:14
**pause** [1] - 107:14
**pay** [1] - 86:4
**PEARL** [1] - 3:6
**Peck** [1] - 200:16
**penalties** [1] - 86:5
**penalty** [1] - 94:12
**Pennington** [1] -
237:13
**Pennsylvania** [5] -
19:25, 163:19,
163:22, 165:13,
167:2
**Pensacola** [1] - 2:14
**people** [22] - 21:12,
24:21, 59:8, 66:24,
87:2, 88:18, 95:1,
124:15, 142:4,
145:19, 148:13,
154:7, 157:9,
178:22, 189:22,
192:20, 206:1,
208:20, 220:16,
221:7, 221:21, 230:5
**Per** [1] - 179:2
**per** [7] - 31:24,
139:13, 180:7,
182:5, 198:4,
202:19, 232:14
**percent** [40] - 66:7,
99:12, 128:11,
128:23, 129:6,
129:7, 129:11,
129:13, 129:15,
129:25, 130:2,
153:4, 158:14,
158:18, 159:8,
159:15, 161:24,
164:19, 164:24,
164:25, 165:11,
167:20, 167:23,
168:1, 168:17,
169:15, 170:2,
170:5, 170:17,
171:9, 171:11,
171:18, 179:3,
179:4, 179:12,
216:7, 216:19,
217:3, 217:14,
217:18
**Percentage** [1] -
123:17
**percentage** [8] -
65:25, 98:4, 99:6,
99:17, 123:22,
204:20, 204:22,
205:21

perfectly [2] - 175:25, 176:14
perform [2] - 99:5, 139:21
performance [10] - 13:2, 16:14, 17:1, 184:4, 184:6, 184:9, 184:22, 187:11, 187:23, 188:24
performed [3] - 35:17, 189:13, 207:9
performing [1] - 52:11
period [31] - 11:21, 20:25, 25:19, 25:21, 29:5, 36:4, 36:15, 37:3, 37:13, 47:13, 47:17, 52:8, 58:4, 63:21, 81:18, 87:25, 112:14, 113:11, 114:17, 130:18, 130:20, 131:8, 131:10, 131:12, 132:13, 140:11, 143:6, 147:10, 196:12, 196:13, 217:7
periods [1] - 96:1
permissible [1] - 157:23
permission [1] - 30:13
permit [1] - 130:7
permitted [2] - 38:13, 162:3
person [2] - 118:22, 119:3
personal [2] - 12:8, 144:7
personally [1] - 53:18
personnel [1] - 58:20
perspective [1] - 8:17
Pertaining [1] - 192:9
pertaining [7] - 41:6, 126:12, 139:20, 163:25, 170:11, 186:6, 197:14
pertains [6] - 163:3, 196:9, 198:16, 198:19, 198:20, 230:21
PETER [1] - 2:12
petitioning [1] - 237:8
PGRDRC [4] - 21:13, 21:15, 91:24, 208:25
pharmaceutical [2] - 149:20, 149:21
Pharmacies [1] - 117:4
pharmacies [25] - 33:21, 33:24, 69:19, 70:9, 70:11, 70:14,

96:2, 96:3, 96:4, 113:7, 113:20, 116:23, 119:1, 123:20, 126:9, 147:14, 147:15, 155:17, 165:4, 165:20, 174:14, 174:15, 175:2, 177:21, 215:19
Pharmacy [2] - 21:16, 215:11
pharmacy [28] - 24:3, 65:21, 66:16, 67:7, 67:15, 68:7, 68:12, 68:13, 69:5, 69:9, 75:12, 99:17, 120:2, 123:20, 124:23, 125:1, 125:3, 125:7, 126:15, 169:20, 203:11, 203:12, 205:6, 205:13, 205:15, 214:8, 214:20
pharmacy's [4] - 67:11, 213:22, 214:6, 216:6
Philadelphia [3] - 6:6, 6:13, 75:21
phone [1] - 28:19
phonetic [1] - 187:10
photo [1] - 75:10
phrase [7] - 27:23, 57:17, 80:1, 80:4, 183:3, 183:8, 183:10
phrased [1] - 80:3
pick [2] - 184:7, 234:11
picked [3] - 175:2, 177:15, 190:13
picking [2] - 173:25, 176:24
PIFKO [1] - 3:16
pile [1] - 75:16
pills [4] - 67:6, 137:5, 159:17, 216:16
pipeline [1] - 133:24
place [23] - 8:23, 29:15, 29:21, 31:18, 32:19, 32:20, 33:4, 35:7, 45:3, 47:21, 48:17, 63:11, 89:6, 119:10, 169:12, 169:21, 174:24, 179:9, 179:13, 205:10, 211:18, 220:15, 236:16
placed [2] - 113:7, 113:19
places [2] - 133:7, 166:19

placing [1] - 118:22
Plaintiff [6] - 1:5, 1:11, 2:2, 3:2, 4:1, 90:19
Plaintiffs [4] - 8:4, 131:16, 188:13, 239:6
plaintiffs [17] - 17:22, 43:16, 47:25, 49:24, 101:17, 143:3, 160:4, 208:11, 235:12, 237:6
Plaintiffs' [6] - 7:10, 49:8, 126:3, 172:1, 189:14, 195:24
PLAINTIFFS' [1] - 18:8
Plan [1] - 192:25
plan [1] - 16:11
planning [2] - 214:8, 219:16
play [3] - 35:19, 80:2, 80:7
Pleasant [3] - 3:15, 4:4, 4:9
pleasant [1] - 234:14
pleasure [1] - 78:17
plug [2] - 89:6, 234:25
plus [3] - 158:14, 158:22, 167:16
Point [1] - 85:25
point [38] - 12:10, 20:2, 54:12, 65:25, 72:13, 73:19, 75:4, 75:10, 75:14, 88:4, 96:18, 98:3, 98:15, 107:3, 119:10, 122:2, 122:8, 136:8, 146:7, 154:2, 161:22, 162:13, 164:12, 165:10, 168:3, 171:5, 176:8, 176:11, 176:12, 177:17, 177:20, 178:2, 192:15, 200:24, 204:22, 213:14, 218:5, 229:10
pointed [2] - 9:9, 35:23
pointless [1] - 13:18
points [4] - 80:15, 93:20, 94:4, 188:25
policies [9] - 28:15, 28:23, 149:24, 153:17, 179:23, 179:24, 182:15, 201:14, 210:13
policy [15] - 40:24, 57:10, 57:11, 119:11, 124:2,

182:21, 182:24, 195:1, 195:2, 195:20, 210:22, 211:17, 220:15, 220:23, 223:11
Polster [7] - 16:23, 83:20, 101:12, 101:14, 101:22, 103:20, 104:9
Polster's [6] - 102:16, 103:10, 104:17, 104:20, 104:22, 105:3
Ponc [1] - 2:4
Ponce [1] - 2:16
portion [5] - 22:22, 22:25, 33:14, 97:13, 209:22
portions [1] - 20:17
pose [1] - 70:17
position [12] - 18:21, 19:2, 19:11, 19:13, 23:20, 24:11, 27:16, 48:25, 81:8, 105:22, 135:25, 227:19
positions [2] - 237:7, 237:15
positive [1] - 187:14
positively [1] - 167:14
possessions [1] - 88:8
possibility [1] - 236:19
possible [7] - 13:7, 14:14, 40:2, 142:13, 212:19, 212:24, 228:3
possibly [3] - 60:8, 99:3, 184:16
potential [4] - 56:15, 67:18, 68:9, 86:6
Powell [1] - 2:6
power [5] - 79:17, 79:25, 80:3, 80:6, 80:8
PowerPoint [10] - 59:15, 59:24, 63:8, 68:19, 73:17, 77:9, 77:18, 79:15, 148:8, 168:24
PowerPoints [1] - 59:8
PR [2] - 2:5, 2:17
practice [5] - 9:8, 9:10, 47:24, 158:1, 215:22
pre [3] - 31:8, 165:3, 165:11
pre-2008 [1] - 28:2
pre-dated [1] - 31:8

pre-filled [2] - 165:3, 165:11
precluded [1] - 237:16
predicate [1] - 170:23
prefer [1] - 177:18
prejudice [2] - 76:6, 76:25
prejudiced [1] - 76:8
prejudicial [4] - 73:24, 76:4, 76:24, 77:12
prepare [1] - 15:6
prepared [1] - 172:21
prescriber [3] - 68:14, 69:5, 69:10
prescribers [2] - 147:15, 155:16
prescribing [2] - 69:8, 214:22
Prescription [1] - 7:12
prescription [18] - 63:20, 64:2, 64:18, 64:23, 64:25, 65:2, 65:5, 65:10, 69:6, 74:11, 75:16, 214:22, 216:13, 216:23, 217:3, 217:14, 233:25, 234:20
prescriptions [14] - 66:13, 66:25, 67:17, 68:11, 68:12, 68:13, 68:15, 69:3, 99:18, 147:14, 147:15, 155:16, 205:7, 213:23
present [9] - 9:12, 10:2, 11:15, 19:9, 26:13, 39:7, 152:1, 228:21, 230:8
presentation [20] - 8:5, 58:25, 59:24, 61:13, 61:17, 62:2, 73:10, 73:16, 74:5, 74:14, 74:19, 74:25, 75:7, 76:15, 148:9, 149:11, 149:13, 150:3, 176:18, 176:25
presentations [1] - 59:8
presented [3] - 123:3, 123:12, 176:24
presenting [2] - 12:9, 177:11
presently [1] - 36:11
preserve [2] - 59:17, 108:21
preserving [2] - 109:5, 231:12
President [9] - 58:2,

71:25, 73:13, 82:19, 82:25, 83:3, 83:4, 95:3, 122:1
**pressed** [1] - 142:19
**pretrial** [2] - 83:9, 83:19
**pretty** [3] - 28:16, 140:23, 142:18
**prevent** [8] - 25:24, 45:2, 76:8, 79:21, 87:10, 119:16, 122:21, 155:5
**prevented** [1] - 99:11
**prevention** [2] - 169:13, 181:6
**previous** [4] - 181:25, 187:8, 188:8, 231:1
**previously** [4] - 73:24, 147:16, 216:5, 226:24
**Primarily** [1] - 161:16
**primarily** [3] - 37:3, 83:13, 145:2
**primary** [2] - 213:22, 226:14
**principle** [1] - 60:12
**print** [4] - 173:15, 173:21, 173:23, 177:21
**print-out** [3] - 173:15, 173:21, 173:23
**privileged** [1] - 73:5
**pro** [2] - 102:19, 104:17
**proactively** [2] - 44:25, 128:10
**problem** [7] - 44:1, 75:1, 131:7, 146:1, 172:24, 186:24
**problems** [3] - 92:20, 186:18, 186:22
**procedure** [5] - 10:14, 11:17, 12:16, 195:20, 223:11
**procedures** [6] - 28:15, 87:14, 149:24, 192:11, 201:14, 220:23
**proceed** [11] - 18:10, 18:11, 49:17, 57:23, 72:22, 78:4, 87:4, 91:10, 152:5, 173:3, 220:11
**proceeding** [1] - 89:4
**proceedings** [2] - 219:14, 239:5
**Proceedings** [2] - 6:19, 160:13
**PROCEEDINGS** [1] - 7:1

**process** [25] - 33:15, 33:18, 35:10, 38:18, 40:13, 40:16, 46:4, 47:4, 55:25, 56:1, 56:2, 56:5, 116:14, 125:23, 135:13, 137:14, 138:3, 149:15, 149:16, 150:11, 150:15, 204:13, 204:21, 209:9
**processed** [1] - 155:9
**processes** [1] - 188:10
**processing** [1] - 157:15
**Proctor** [1] - 2:12
**produce** [2] - 174:22, 175:17
**produced** [10] - 6:19, 162:20, 165:6, 174:7, 174:13, 174:19, 174:20, 175:15, 176:3, 229:19
**product** [6] - 99:14, 133:24, 147:16, 147:18, 155:18, 216:17
**production** [1] - 175:3
**products** [2] - 37:21, 175:1
**proffer** [2] - 165:17, 230:18
**proffered** [1] - 79:4
**Program** [13] - 25:24, 29:16, 29:23, 32:12, 33:13, 36:25, 37:17, 42:23, 44:22, 93:10, 100:3, 122:19, 149:18
**program** [33] - 29:17, 29:20, 29:21, 30:7, 31:20, 32:2, 32:3, 32:18, 32:20, 35:14, 35:17, 36:4, 38:11, 39:7, 41:17, 82:5, 87:9, 87:14, 88:6, 116:12, 120:24, 121:11, 122:9, 123:17, 129:11, 129:13, 155:13, 169:12, 169:21, 185:25, 205:5, 205:9, 210:24
**progress** [1] - 40:5
**promise** [1] - 201:8
**prompted** [1] - 16:19
**promptly** [1] - 234:9
**proof** [1] - 167:22

**proper** [16] - 8:25, 41:16, 48:10, 49:2, 100:22, 100:24, 146:20, 177:24, 177:25, 181:11, 184:12, 197:5, 203:19, 210:14, 227:8, 228:7
**properly** [1] - 10:3
**propose** [2] - 230:24, 231:6
**proposed** [3] - 10:12, 11:11, 230:24
**prospective** [1] - 65:21
**prove** [6] - 101:8, 101:15, 106:12, 106:21, 106:22, 172:4
**proved** [1] - 101:8
**proves** [1] - 164:11
**provide** [3] - 12:17, 42:1, 103:21
**provided** [3] - 189:1, 202:7, 229:7
**provider** [1] - 201:17
**Providers** [1] - 202:4
**providers** [2] - 202:7, 203:4
**providing** [1] - 62:2
**provision** [1] - 62:14
**psoriasis** [1] - 216:18
**PTO** [1] - 153:10
**PTSD** [1] - 216:18
**public** [2] - 70:18, 146:22
**pull** [7] - 22:5, 29:2, 53:4, 89:6, 167:7, 220:18, 234:25
**pulled** [1] - 175:8
**purchase** [2] - 55:14, 98:4
**purchased** [1] - 46:2
**purchases** [12] - 20:13, 24:1, 45:1, 55:14, 67:12, 99:7, 99:12, 133:2, 204:19, 215:11, 216:19
**purchasing** [3] - 68:15, 156:9, 159:10
**purported** [1] - 172:14
**purportedly** [1] - 172:16
**purpose** [29] - 11:12, 16:15, 44:23, 45:3, 51:10, 51:20, 51:23, 52:17, 53:9, 61:23, 70:5, 76:7, 77:22, 78:3, 79:9, 87:18,

87:20, 91:3, 95:18, 118:11, 127:5, 127:7, 127:10, 127:13, 131:19, 131:20, 224:15, 228:7, 229:13
**purposes** [30] - 13:15, 32:5, 35:24, 52:25, 70:1, 71:12, 72:3, 82:9, 103:6, 105:18, 107:23, 114:4, 114:15, 118:12, 133:25, 149:23, 151:14, 157:3, 167:8, 170:20, 184:1, 187:19, 195:24, 196:14, 208:10, 208:16, 211:22, 223:15, 226:20, 230:3
**pursuant** [5] - 62:20, 136:11, 201:19, 235:18, 236:5
**pursuing** [2] - 109:16, 111:5
**pushing** [1] - 9:14
**put** [28] - 17:1, 39:8, 45:3, 47:16, 48:17, 71:22, 78:6, 90:12, 112:14, 129:6, 129:23, 130:10, 132:13, 142:11, 145:4, 157:24, 157:25, 158:11, 168:9, 175:22, 177:18, 184:8, 185:10, 188:24, 205:9, 211:18, 221:22, 236:16
**putting** [4] - 72:1, 174:12, 185:17, 224:7

## Q

**qualified** [1] - 80:23
**qualifies** [1] - 72:4
**quality** [10] - 12:22, 12:24, 13:8, 41:16, 146:20, 183:15, 186:23, 187:5, 188:9, 189:11
**quantities** [2] - 98:5, 98:7
**quantity** [2] - 12:22, 12:23
**questioning** [3] - 182:13, 200:25, 227:5
**questionnaire** [7] -

38:21, 38:22, 38:23, 38:24, 39:17, 39:18, 40:1
**Questionnaire** [1] - 213:16
**questionnaires** [4] - 202:6, 202:18, 202:20, 203:2
**questions** [12] - 44:7, 51:21, 93:18, 114:19, 182:17, 189:1, 201:7, 202:13, 203:19, 219:17, 226:25, 232:4
**quibble** [2] - 119:7, 176:5
**quicker** [1] - 8:19
**quickly** [2] - 46:15, 114:23
**quite** [1] - 77:8
**quote** [1] - 174:3
**quoted** [1] - 110:21
**quotes** [4] - 9:25, 61:20, 128:19, 222:12

## R

**radius** [1] - 66:17
**Rafferty** [57] - 2:12, 13:6, 13:21, 16:3, 17:10, 17:21, 30:15, 36:12, 43:20, 47:17, 49:4, 54:16, 63:1, 71:1, 71:21, 77:5, 78:13, 83:14, 86:11, 90:17, 92:21, 94:21, 95:18, 96:14, 101:5, 102:3, 102:24, 104:1, 105:6, 105:20, 107:2, 109:2, 115:14, 118:13, 119:23, 127:6, 133:4, 154:3, 159:21, 160:9, 160:14, 165:15, 172:3, 172:24, 173:22, 175:5, 181:2, 182:18, 184:18, 185:15, 193:12, 198:1, 227:12, 228:21, 228:23, 231:7, 233:21
**rAFFERTY** [1] - 117:14
**RAFFERTY** [405] - 13:22, 13:25, 15:10, 15:13, 16:21, 17:8,

17:22, 18:10, 18:13, 21:3, 21:7, 21:24, 22:4, 22:14, 22:17, 23:8, 23:10, 23:12, 30:10, 30:13, 30:16, 30:17, 30:25, 31:6, 32:6, 32:9, 33:7, 33:11, 36:5, 36:7, 36:13, 36:14, 39:9, 39:10, 42:19, 42:21, 43:16, 43:24, 44:1, 44:7, 44:14, 47:18, 47:19, 48:7, 48:15, 49:5, 49:6, 49:9, 49:12, 49:13, 49:15, 49:19, 49:24, 50:5, 50:15, 51:14, 51:22, 52:2, 52:15, 52:22, 53:2, 54:9, 54:17, 54:18, 55:1, 55:3, 55:5, 56:23, 57:4, 57:21, 57:23, 57:24, 59:11, 60:19, 63:2, 63:3, 63:5, 64:5, 64:11, 64:15, 64:19, 64:21, 67:21, 67:24, 68:5, 68:6, 70:2, 70:6, 70:7, 71:2, 71:7, 71:20, 71:24, 72:10, 72:14, 72:16, 72:22, 72:24, 73:19, 74:1, 77:4, 77:6, 77:16, 77:18, 78:5, 78:11, 78:15, 78:18, 78:25, 79:3, 79:6, 79:8, 79:10, 79:11, 81:17, 83:6, 83:16, 84:1, 84:15, 84:16, 85:23, 86:12, 86:18, 86:21, 86:22, 87:1, 87:6, 89:1, 89:10, 90:18, 91:10, 91:12, 92:9, 92:17, 92:22, 92:23, 94:22, 94:25, 95:19, 95:21, 96:12, 96:15, 97:12, 100:25, 101:3, 101:6, 102:4, 105:7, 105:10, 105:14, 106:2, 106:15, 106:23, 107:4, 107:10, 107:13, 107:15, 107:17, 108:15, 109:4, 109:9, 109:10, 110:5, 110:6, 110:23, 111:3, 111:4, 114:7, 114:9, 114:13, 114:14, 115:7, 115:12, 115:16, 117:13,

118:7, 118:14, 118:15, 119:12, 119:14, 119:15, 120:1, 123:7, 123:9, 123:11, 126:2, 126:7, 126:11, 127:1, 127:8, 127:14, 127:18, 127:21, 131:3, 131:15, 131:21, 132:23, 133:9, 133:14, 133:18, 133:20, 133:21, 134:17, 134:24, 135:1, 136:8, 136:14, 138:7, 138:12, 139:12, 139:17, 143:3, 143:8, 143:10, 146:25, 147:2, 147:7, 147:8, 148:2, 148:7, 148:16, 148:20, 150:5, 150:6, 151:5, 151:8, 151:12, 151:20, 151:24, 152:4, 152:7, 152:8, 152:10, 152:16, 152:17, 153:20, 154:4, 154:5, 155:19, 156:5, 156:11, 156:15, 156:21, 157:1, 157:2, 159:22, 160:4, 160:10, 160:15, 160:16, 163:2, 163:6, 163:20, 163:23, 164:5, 164:15, 164:23, 165:10, 165:16, 165:23, 165:25, 166:2, 166:9, 166:14, 166:20, 166:22, 167:7, 167:13, 167:16, 167:19, 167:24, 168:6, 168:9, 168:20, 168:23, 169:3, 169:4, 171:1, 171:6, 171:13, 171:24, 172:6, 172:10, 172:25, 173:2, 173:5, 174:4, 175:6, 177:3, 177:7, 178:5, 178:9, 178:10, 179:23, 180:2, 180:6, 181:3, 181:4, 182:15, 182:19, 182:20, 183:21, 184:10, 184:19,

184:20, 185:9, 185:16, 187:16, 188:13, 188:17, 188:20, 189:4, 189:5, 192:15, 192:19, 192:21, 193:14, 193:16, 193:19, 193:21, 194:6, 196:17, 196:22, 197:1, 197:11, 197:18, 198:2, 198:9, 198:10, 198:24, 199:3, 200:1, 200:7, 200:19, 200:20, 201:7, 201:9, 202:15, 202:17, 203:21, 203:22, 206:23, 207:1, 207:3, 208:4, 208:11, 208:14, 210:18, 211:6, 211:9, 212:7, 212:12, 216:22, 217:12, 218:1, 218:5, 218:10, 218:12, 218:14, 218:17, 218:23, 219:3, 219:6, 219:11, 219:15, 219:23, 220:3, 220:10, 220:13, 220:18, 220:20, 222:22, 222:25, 224:7, 224:13, 224:16, 224:18, 226:16, 226:18, 227:1, 227:14, 227:15, 227:24, 228:3, 229:5, 229:18, 230:2, 230:12, 230:16, 231:24, 232:8, 232:13, 232:22, 233:1, 233:5, 233:9, 233:13, 233:19, 233:22, 234:3, 234:6, 234:18, 234:22, 235:7, 237:25

**Rafferty's** [2] - 13:4, 13:10

**raise** [3] - 12:14, 18:7, 228:24

**raised** [1] - 177:14

**raising** [1] - 204:24

**ran** [2] - 30:6, 203:15

**rank** [1] - 77:2

**Rannazzisi** [6] - 51:15, 53:20, 70:22,

71:19, 117:23, 118:2

**rapids** [1] - 145:23

**rather** [1] - 10:23

**ratio** [6] - 215:25, 216:6, 216:14, 216:23, 217:3, 217:14

**re** [2] - 57:5, 68:4

**Re** [2] - 7:11, 139:4

**re-state** [2] - 57:5, 68:4

**reach** [2] - 47:2, 124:22

**reached** [5] - 40:20, 46:21, 162:1, 179:4, 222:3

**reaching** [1] - 147:17

**read** [26] - 54:2, 55:6, 55:17, 85:14, 87:23, 90:11, 105:19, 114:7, 114:18, 115:15, 123:1, 127:25, 133:23, 146:1, 148:14, 149:16, 186:4, 186:9, 190:5, 194:1, 194:21, 216:4, 224:5, 225:6, 231:19, 231:23

**readily** [1] - 213:8

**reading** [6] - 46:17, 61:19, 110:20, 115:5, 115:14, 202:14

**readmit** [1] - 91:5

**reads** [1] - 108:6

**ready** [7] - 7:7, 16:4, 107:25, 108:1, 138:17, 211:25, 233:20

**realize** [2] - 76:25, 158:13

**really** [11] - 10:5, 14:21, 21:8, 48:20, 111:13, 133:1, 145:2, 150:2, 151:3, 153:17, 225:5

**Reason** [1] - 169:5

**reason** [22] - 15:14, 34:2, 65:13, 82:6, 96:8, 97:7, 108:19, 150:21, 150:22, 153:22, 169:10, 169:22, 188:15, 205:1, 205:3, 205:10, 205:17, 206:5, 209:23, 210:4, 210:23, 210:25

**reasonable** [1] - 14:25

**reasoning** [3] - 201:15, 201:21, 210:4

**reasons** [10] - 82:4, 82:7, 98:5, 98:21, 101:7, 101:15, 185:12, 204:23, 205:18, 226:24

**receive** [3] - 124:7, 129:15, 134:7

**received** [19] - 12:17, 27:19, 27:21, 38:14, 52:9, 52:13, 55:6, 55:8, 84:17, 108:12, 109:13, 113:5, 121:23, 123:23, 129:18, 130:2, 187:6, 197:22, 207:18

**receiving** [2] - 63:9, 68:13

**recent** [1] - 121:17

**recess** [3] - 43:23, 160:11, 160:12

**Recess** [2] - 44:2, 89:11

**recessed** [1] - 238:3

**recipient** [1] - 225:8

**recognize** [7] - 9:1, 42:22, 173:10, 173:11, 173:13, 174:3, 196:5

**recognizes** [1] - 62:11

**recognizing** [2] - 67:11, 237:11

**recollect** [1] - 130:3

**reconsideration** [1] - 103:18

**record** [37] - 7:17, 8:15, 11:8, 18:3, 18:15, 48:13, 51:2, 52:21, 71:3, 71:22, 71:25, 72:7, 76:1, 77:7, 78:21, 79:2, 90:19, 104:16, 105:15, 107:5, 115:6, 115:14, 119:9, 133:15, 134:23, 151:25, 153:15, 165:16, 174:4, 187:23, 188:25, 228:20, 231:12, 235:13, 237:2, 237:17, 239:5

**recorded** [1] - 6:19

**records** [1] - 7:19

**recurring** [1] - 16:20

**Red** [3] - 212:18, 213:7, 215:23

**red** [25] - 66:10, 66:14,

66:19, 67:18, 68:9, 98:6, 99:16, 211:12, 211:18, 211:20, 212:4, 212:19, 213:1, 213:8, 213:21, 214:2, 214:11, 214:14, 215:2, 215:13, 215:15, 216:24, 217:4, 217:15, 217:19
**redirect** [2] - 219:25
**reduce** [1] - 159:2
**reduced** [3] - 135:3, 136:21, 137:6
**reduction** [7] - 135:7, 135:10, 136:4, 136:17, 138:2, 138:3, 139:7
**reductions** [1] - 136:22
**Reed** [2] - 6:4, 6:11
**refer** [5] - 32:1, 61:15, 76:11, 83:25, 84:2
**Reference** [1] - 148:25
**reference** [1] - 123:24
**referenced** [6] - 57:9, 61:14, 106:10, 119:9, 141:24, 154:22
**referencing** [1] - 173:22
**referred** [7] - 34:17, 38:17, 66:10, 110:8, 124:11, 135:6, 214:14
**referring** [16] - 29:11, 47:14, 48:16, 51:3, 51:17, 99:8, 133:5, 141:3, 141:8, 142:24, 154:17, 154:20, 179:20, 182:8, 210:13, 210:20
**refers** [1] - 162:23
**reflected** [1] - 166:5
**refrain** [2] - 221:10, 223:7
**refutes** [1] - 168:3
**regarding** [2] - 63:16, 110:13, 117:10, 173:16, 177:10, 202:18, 204:21, 212:20, 221:1, 224:2, 228:22, 230:17
**regards** [6] - 40:1, 40:12, 98:13, 100:2, 134:4, 141:18
**region** [10] - 19:15,

19:18, 19:20, 40:4, 97:24, 134:8, 159:7, 159:11, 210:7, 210:10
**regional** [1] - 23:23
**regions** [2] - 19:16, 144:17
**registered** [4] - 53:7, 85:16, 88:7, 118:25
**registrant** [14] - 52:13, 53:25, 54:2, 56:8, 81:1, 81:2, 93:25, 110:16, 118:23, 119:3, 120:3, 137:2, 225:2
**Registrant** [1] - 53:5
**registrants** [4] - 55:20, 80:25, 93:24
**registration** [3] - 53:23, 79:20, 94:2
**regular** [4] - 67:12, 68:8, 68:16, 99:14
**regularly** [1] - 28:16
**regulation** [3] - 47:23, 53:24, 53:25
**Regulations** [1] - 225:1
**regulations** [4] - 27:8, 27:12, 47:1, 87:12
**Regulatory** [58] - 19:5, 19:7, 19:11, 19:13, 19:22, 20:3, 20:11, 20:12, 21:16, 23:4, 23:15, 24:12, 25:3, 25:18, 25:22, 26:20, 26:21, 27:4, 27:16, 28:2, 29:11, 29:18, 32:23, 33:4, 35:12, 35:18, 41:8, 52:8, 58:3, 58:19, 59:7, 73:13, 81:9, 84:24, 84:25, 88:19, 92:3, 100:7, 109:15, 112:7, 115:21, 125:11, 135:22, 136:2, 139:22, 191:16, 196:14, 198:12, 199:22, 206:16, 207:6, 214:1, 215:3, 215:13, 225:16, 226:8
**regulatory** [26] - 24:20, 55:15, 59:3, 95:1, 120:25, 123:23, 145:19, 154:12, 161:4, 161:6, 161:19, 163:14, 181:7, 191:12, 198:15,

198:25, 199:4, 199:7, 199:8, 199:13, 199:15, 199:21, 201:24, 203:10, 210:9, 221:22
**reinforcement** [1] - 190:8
**reiterate** [3] - 53:9, 53:12, 53:16
**reiterating** [1] - 53:22
**rejected** [1] - 228:6
**relate** [1] - 164:21
**related** [7] - 81:12, 90:10, 151:18, 172:7, 174:17, 237:3, 237:12
**relates** [4] - 83:12, 126:9, 184:16, 226:22
**relation** [1] - 237:7
**relationship** [2] - 61:11, 74:7
**relative** [1] - 67:3
**Release** [1] - 82:12
**release** [1] - 84:4
**relevance** [1] - 13:3
**relevancy** [2] - 76:25, 101:13
**relevant** [17] - 16:24, 17:1, 17:3, 76:24, 101:14, 101:23, 104:2, 119:11, 133:12, 164:14, 171:5, 179:24, 184:5, 207:19, 229:25, 230:2, 230:6
**reliability** [1] - 72:2
**relieve** [3] - 119:4, 119:16, 120:3
**rely** [2] - 11:14, 118:21
**relying** [3] - 102:19, 164:20, 237:6
**remain** [1] - 28:11
**remained** [3] - 19:7, 223:10, 223:11
**remains** [2] - 61:24, 62:12
**remanded** [2] - 103:14, 103:21
**remarkably** [1] - 156:1
**remarks** [1] - 229:4
**remember** [3] - 63:9, 127:18, 158:17
**reminded** [3] - 107:5, 126:3, 131:15
**renew** [2] - 83:8, 202:9
**rep** [4] - 15:21, 39:22, 39:23, 40:1
**repeat** [6] - 31:5,

96:22, 97:8, 110:3, 119:24, 183:6
**repeated** [1] - 158:25
**repeatedly** [1] - 12:20
**repeating** [1] - 62:5
**repeats** [1] - 61:24
**rephrase** [3] - 32:21, 64:19, 119:12
**replaced** [3] - 30:4, 40:16, 140:20
**replies** [1] - 235:25
**reply** [1] - 225:19
**Report** [5] - 123:17, 138:24, 139:4, 173:16, 223:18
**report** [43] - 10:1, 31:22, 40:23, 42:7, 46:7, 47:9, 48:19, 48:20, 55:13, 55:14, 55:15, 56:7, 56:19, 57:7, 57:8, 69:14, 86:7, 86:8, 88:15, 94:6, 94:19, 102:10, 113:6, 113:19, 123:14, 123:16, 123:23, 125:5, 154:8, 172:16, 173:9, 173:10, 173:11, 173:12, 174:3, 179:1, 188:24, 190:2, 190:18, 194:25, 195:25, 196:5, 224:24
**reported** [6] - 40:17, 40:19, 42:9, 87:19, 225:22, 239:9
**Reporter** [6] - 6:17, 6:18, 239:3, 239:12
**REPORTER** [6] - 89:22, 89:24, 90:1, 123:5, 123:8, 132:21
**reporters** [1] - 43:21
**reporting** [5] - 33:15, 33:18, 46:11, 56:7, 102:8
**Reports** [1] - 174:6
**reports** [10] - 31:14, 31:15, 34:5, 42:1, 75:19, 75:20, 75:21, 159:2, 173:7, 174:8
**represent** [1] - 162:20
**representation** [6] - 104:22, 162:23, 173:20, 176:5, 196:25, 206:24
**representative** [1] - 39:4
**representing** [1] - 235:9

**reps** [1] - 40:4
**Request** [4] - 165:18, 165:20, 195:7, 195:12
**request** [18] - 69:10, 106:3, 122:17, 125:6, 146:16, 156:10, 158:4, 158:17, 158:21, 162:2, 179:2, 179:3, 179:8, 179:18, 182:5, 218:25, 226:8, 231:2
**requested** [6] - 121:11, 129:19, 158:5, 162:5, 169:17, 170:9
**requesting** [3] - 122:20, 129:14, 195:8
**Requests** [2] - 160:21, 182:22
**requests** [4] - 116:3, 141:13, 142:25, 150:11
**require** [4] - 155:18, 213:11, 214:2, 221:24
**required** [10] - 87:11, 99:22, 192:6, 194:9, 194:23, 195:1, 201:19, 209:19, 210:23, 221:17
**requirement** [7] - 42:7, 46:25, 55:15, 185:24, 186:2, 195:1, 203:7
**requirements** [11] - 26:8, 26:14, 27:11, 27:18, 41:10, 41:19, 48:21, 48:25, 50:20, 145:8, 209:12
**requires** [2] - 15:24, 53:25
**reserving** [1] - 8:6
**resolve** [2] - 12:2, 100:18
**resolved** [2] - 102:18, 102:20
**resolves** [1] - 108:25
**resources** [1] - 139:21
**respect** [7] - 10:15, 60:22, 61:3, 74:23, 76:4, 103:9, 164:15
**respond** [10] - 11:20, 11:21, 13:21, 17:13, 73:25, 83:14, 101:1, 142:22, 153:21, 231:16
**responded** [1] -

181:20
**response** [3] - 121:20, 144:19, 144:20
**Responses** [1] - 213:16
**responses** [3] - 74:13, 102:15, 235:23
**responsibilities** [8] - 27:4, 28:14, 44:16, 53:12, 71:8, 71:9, 198:14, 198:22
**responsibility** [28] - 19:24, 20:13, 23:23, 23:25, 24:15, 24:17, 24:21, 26:23, 27:7, 35:15, 49:1, 56:8, 80:7, 83:11, 88:24, 106:17, 107:1, 113:4, 114:2, 115:4, 115:11, 115:12, 146:6, 149:21, 199:8, 199:15, 200:12, 207:5
**responsible** [8] - 19:15, 25:23, 26:4, 26:8, 26:11, 26:14, 199:18, 200:5
**responsive** [1] - 156:2
**rest** [3] - 99:18, 168:21, 238:2
**restate** [1] - 42:11
**restore** [1] - 158:10
**restriction** [1] - 157:17
**restrictions** [1] - 109:2
**result** [6] - 71:9, 81:21, 99:2, 113:7, 136:23, 169:13
**resulted** [3] - 100:19, 103:2, 106:7
**results** [1] - 192:4
**resume** [2] - 44:3, 44:5
**resumed** [1] - 160:13
**retail** [27] - 23:24, 24:6, 24:16, 24:18, 24:19, 24:24, 25:4, 25:6, 25:8, 26:16, 123:18, 126:12, 126:13, 128:3, 128:11, 129:2, 151:21, 161:3, 197:14, 198:16, 198:20, 199:5, 199:9, 201:16, 201:22, 202:24, 216:6
**Retail** [5] - 24:4, 26:19, 117:7, 202:3, 202:20
**retailers** [1] - 154:16

**retaining** [1] - 90:25
**reverse** [2] - 171:22, 227:18
**review** [49] - 16:14, 38:18, 38:20, 39:14, 39:19, 39:23, 40:10, 44:25, 45:12, 46:15, 47:4, 47:5, 87:15, 87:20, 88:20, 89:18, 98:8, 116:14, 124:8, 129:19, 130:6, 135:9, 138:4, 140:3, 146:8, 147:24, 151:3, 153:9, 154:18, 157:6, 161:7, 161:10, 161:19, 161:20, 162:3, 162:6, 184:7, 184:9, 186:1, 195:11, 196:2, 199:18, 203:25, 208:17, 211:23, 222:9, 229:20, 232:21
**reviewed** [5] - 52:7, 54:19, 87:16, 169:23, 213:2
**reviewing** [6] - 138:19, 141:9, 141:12, 148:2, 218:18, 232:16
**reviews** [13] - 13:2, 125:10, 139:9, 141:8, 143:1, 147:18, 184:4, 188:8, 193:24, 203:3, 207:9, 208:1, 221:14
**revision** [1] - 43:13
**revisit** [1] - 232:11
**Rice** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**rife** [2] - 73:22, 75:18
**right-hand** [1] - 43:2
**rigorous** [2] - 150:11, 150:15
**Rio** [3] - 148:10, 148:11, 149:4
**Risk** [1] - 192:25
**Rite** [100] - 24:9, 24:13, 24:15, 25:11, 120:8, 120:11, 120:20, 120:24, 121:1, 121:6, 122:17, 122:19, 122:20, 123:3, 123:12, 123:23, 125:4, 125:6, 125:18, 126:13, 126:14, 126:21,

126:22, 126:24, 127:9, 128:11, 128:19, 129:13, 129:17, 129:18, 129:19, 130:1, 136:23, 137:2, 137:22, 137:24, 139:4, 139:5, 153:24, 160:18, 161:11, 161:25, 162:1, 162:2, 162:5, 162:9, 162:17, 162:19, 162:21, 162:23, 164:1, 164:18, 164:25, 165:4, 165:13, 165:17, 166:4, 166:5, 166:6, 166:7, 166:16, 166:18, 166:23, 167:11, 167:12, 167:22, 168:5, 168:13, 169:11, 169:13, 170:1, 170:5, 170:11, 170:16, 171:8, 171:18, 173:17, 174:10, 174:15, 175:16, 176:15, 179:23, 180:12, 180:16, 181:7, 181:8, 181:9, 181:23, 181:24, 198:16, 199:11, 207:15, 208:2, 208:5, 225:25, 226:6, 226:9, 233:25, 234:20
**Rite-Aid** [49] - 24:9, 24:13, 24:15, 25:11, 160:18, 161:11, 161:25, 162:1, 162:2, 162:5, 162:17, 162:19, 162:21, 162:23, 165:4, 165:13, 165:17, 166:4, 166:6, 166:16, 166:23, 167:11, 168:13, 169:11, 169:13, 170:5, 170:11, 171:8, 171:18, 174:10, 174:15, 175:16, 176:15, 179:23, 180:12, 180:16, 181:7, 181:8, 181:9, 198:16, 199:11, 207:15, 208:2, 208:5, 225:25, 226:6, 226:9, 233:25, 234:20

**Rite-Aids** [15] - 162:9, 164:1, 164:18, 164:25, 166:5, 166:7, 166:18, 167:12, 167:22, 168:5, 170:1, 170:16, 173:17, 181:23, 181:24
**river** [1] - 145:22
**RMR** [2] - 6:17, 6:18
**RNA** [13] - 23:25, 120:13, 135:21, 153:1, 160:22, 161:10, 186:25, 202:5, 202:7, 203:4, 203:8, 209:16
**RNAs** [5] - 116:24, 117:6, 120:8, 136:17, 206:7
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**Rocky** [1] - 19:25
**Role** [1] - 65:20
**role** [10] - 24:18, 25:18, 35:19, 37:8, 52:7, 80:2, 80:7, 88:22, 120:7, 155:8
**room** [2] - 11:25, 17:24
**rose** [1] - 147:14
**roughly** [1] - 140:10
**rounded** [3] - 158:15, 158:18, 158:24
**routine** [1] - 10:15
**routinely** [1] - 125:11
**rows** [1] - 174:8
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**Ruby** [1] - 4:17
**RUBY** [1] - 4:17
**rule** [8] - 61:19, 61:23, 62:10, 76:7, 105:19, 105:24, 150:18, 150:23
**Rule** [1] - 100:20
**ruled** [2] - 16:24, 83:19
**rules** [2] - 41:6, 121:4
**ruling** [16] - 9:18, 60:16, 71:11, 78:1, 102:17, 102:22, 108:20, 171:22, 229:7, 230:17, 231:1, 231:18, 232:12, 237:11, 237:16
**rulings** [4] - 13:9, 103:11, 103:13, 105:24

**run** [6] - 61:6, 99:5, 173:12, 173:14, 174:3, 229:16
**rural** [1] - 66:20
**Russell** [1] - 92:25
**Ruther** [1] - 112:23
**RX** [1] - 99:14
**Rx** [2] - 216:16, 216:18

**S**

**s\Ayme** [1] - 239:11
**s\Lisa** [1] - 239:11
**Sacramento** [1] - 112:24
**safety** [1] - 70:18
**sale** [1] - 55:22
**sales** [17] - 15:21, 39:3, 39:21, 39:23, 39:25, 40:3, 59:1, 62:3, 62:7, 63:16, 66:7, 115:1, 129:3, 130:11, 205:1, 205:15, 221:18
**Sales** [1] - 122:1
**SALGADO** [1] - 4:15
**San** [2] - 2:5, 2:17
**satisfactory** [1] - 40:6
**satisfied** [1] - 40:9
**Saturday** [3] - 10:12, 10:13, 11:20
**save** [3] - 145:11, 215:7, 233:15
**saw** [8] - 13:1, 16:14, 53:15, 53:16, 60:25, 134:9, 147:14, 171:13
**SC** [3] - 3:15, 4:4, 4:9
**scenario** [1] - 12:20
**Schedule** [4] - 37:16, 37:18, 226:5, 226:6
**scheduled** [1] - 216:15
**schemes** [2] - 81:4, 214:23
**Schmidt** [29] - 8:21, 14:1, 14:16, 15:15, 16:3, 16:22, 35:23, 61:14, 62:9, 77:20, 90:24, 104:21, 126:19, 152:23, 156:19, 172:19, 173:19, 178:6, 198:5, 200:3, 228:24, 229:4, 229:7, 232:9, 232:16, 233:6, 233:24, 234:19
**SCHMIDT** [191] - 5:9, 8:22, 11:16, 12:13,

16:10, 17:16, 17:19, 17:24, 22:2, 23:7, 30:22, 33:9, 36:1, 36:6, 36:10, 39:5, 43:18, 44:3, 47:15, 47:22, 48:14, 50:2, 50:8, 50:13, 51:7, 52:18, 54:8, 54:11, 54:24, 56:21, 56:25, 59:14, 60:4, 60:17, 61:18, 62:10, 64:1, 64:9, 64:16, 67:19, 69:22, 70:20, 71:13, 73:21, 74:20, 75:4, 77:21, 78:8, 81:14, 83:8, 84:7, 85:20, 90:22, 91:1, 92:12, 94:17, 95:12, 96:11, 97:10, 100:12, 102:2, 102:15, 104:5, 106:20, 108:18, 109:5, 109:8, 110:19, 114:5, 114:8, 114:11, 115:3, 115:9, 117:11, 118:9, 119:7, 119:13, 119:19, 126:5, 126:8, 126:18, 126:20, 127:2, 127:4, 130:24, 131:18, 133:3, 133:15, 134:19, 134:25, 136:11, 138:9, 139:14, 143:5, 146:23, 148:4, 148:18, 150:25, 151:10, 151:17, 151:25, 152:12, 153:22, 155:25, 156:13, 156:16, 156:20, 156:23, 159:19, 160:6, 162:22, 163:17, 164:11, 165:2, 165:13, 165:19, 166:8, 166:11, 166:15, 168:3, 169:2, 170:21, 172:14, 172:20, 173:18, 173:20, 174:21, 176:4, 176:23, 177:5, 177:12, 177:23, 179:20, 180:9, 181:14, 182:12, 183:19, 184:3, 184:14, 185:12, 187:1, 188:14, 192:17, 194:3,

196:19, 196:24, 197:3, 197:7, 197:10, 197:21, 198:6, 198:21, 200:4, 200:8, 200:23, 201:2, 201:6, 202:9, 206:21, 206:24, 207:2, 207:22, 208:12, 210:16, 211:7, 212:10, 217:6, 218:11, 218:13, 218:25, 222:20, 222:23, 224:5, 226:22, 227:2, 227:8, 227:18, 228:2, 228:4, 228:14, 229:10, 229:13, 229:24, 230:8, 230:13, 231:13, 231:22, 232:3, 232:10, 232:19, 235:5
**Schmidt's** [1] - 169:1
**Schultz** [1] - 76:11
**scientific** [2] - 87:22, 115:1
**Scope** [1] - 191:3
**scope** [20] - 9:13, 10:2, 11:24, 61:11, 73:22, 74:7, 74:23, 75:2, 83:12, 108:13, 110:17, 126:9, 133:4, 134:20, 153:16, 156:22, 180:9, 180:10, 237:10, 237:13
**Scott** [1] - 187:9
**screen** [10] - 22:5, 22:15, 29:2, 30:10, 36:11, 53:4, 109:24, 150:5, 202:11, 209:10
**script** [1] - 232:1
**scripts** [4] - 65:25, 66:16, 69:19, 70:10
**search** [2] - 207:10
**searches** [1] - 207:11
**seat** [1] - 18:9
**second** [23] - 19:21, 21:8, 29:3, 45:6, 64:12, 85:25, 108:22, 118:20, 118:21, 122:16, 127:22, 140:15, 143:18, 143:23, 143:25, 144:25, 145:5, 149:5, 175:7, 189:23, 190:1,

190:17, 200:21
**secondary** [1] - 226:13
**seconded** [1] - 145:15
**seconding** [2] - 144:25, 145:9
**secret** [1] - 98:16
**section** [4] - 44:23, 114:1, 185:23, 223:3
**Section** [11] - 30:1, 30:6, 30:18, 31:8, 31:11, 31:13, 31:16, 36:3, 36:8, 109:15
**sections** [2] - 37:10, 213:6
**see** [203] - 12:11, 13:7, 22:6, 22:11, 22:21, 22:22, 23:1, 33:16, 34:7, 35:2, 43:14, 44:23, 45:7, 45:15, 45:24, 46:9, 46:19, 46:23, 47:5, 52:3, 53:10, 55:12, 55:16, 55:22, 56:10, 57:5, 58:11, 58:23, 59:4, 65:11, 65:22, 66:1, 66:5, 66:8, 66:16, 66:17, 66:18, 67:4, 67:6, 67:13, 70:18, 73:2, 73:6, 74:1, 78:10, 79:18, 79:22, 80:13, 80:16, 82:13, 82:18, 83:1, 85:17, 85:24, 85:25, 86:23, 87:2, 87:12, 88:8, 88:10, 88:16, 89:9, 91:23, 92:4, 93:10, 93:21, 94:16, 95:22, 96:4, 96:20, 96:22, 97:17, 97:21, 108:2, 108:3, 108:10, 110:17, 113:21, 117:21, 117:24, 121:21, 122:9, 122:14, 122:22, 123:14, 127:23, 128:12, 128:20, 132:7, 132:8, 133:2, 133:7, 133:25, 135:19, 137:2, 137:12, 137:21, 138:21, 138:24, 139:5, 141:23, 142:14, 142:15, 142:20, 143:22, 143:25, 144:20, 148:21, 149:1, 149:8, 149:18, 149:25, 150:8, 150:12, 150:19,

151:13, 152:20, 153:3, 153:5, 154:10, 155:6, 155:7, 157:10, 158:15, 159:3, 159:10, 162:12, 162:18, 163:10, 163:15, 164:3, 169:5, 169:16, 172:23, 173:17, 175:24, 178:14, 178:20, 178:25, 179:5, 179:16, 181:24, 184:23, 185:18, 186:3, 187:25, 188:8, 188:15, 189:23, 190:1, 190:10, 190:15, 190:19, 191:7, 191:24, 192:20, 193:1, 193:9, 193:10, 195:14, 195:18, 196:1, 199:1, 201:10, 202:8, 204:7, 204:8, 204:14, 206:3, 206:8, 206:13, 206:14, 207:11, 207:13, 208:20, 210:1, 210:7, 212:1, 212:21, 213:9, 213:12, 213:18, 213:24, 214:9, 214:14, 214:25, 216:2, 216:3, 218:9, 219:17, 221:4, 221:8, 221:11, 223:3, 223:8, 223:19, 223:20, 223:21, 225:3, 225:14, 232:16, 232:25, 234:12
**seeing** [1] - 205:7
**seeking** [1] - 158:13
**seem** [1] - 174:24
**Sees** [1] - 69:18
**segments** [2] - 201:17, 206:7
**selectively** [1] - 175:2
**self** [6] - 27:19, 189:13, 225:25, 226:3, 226:9, 237:1
**self-audits** [1] - 189:13
**self-contained** [1] - 237:1
**self-distributed** [2] - 225:25, 226:3
**self-distribution** [1] -

226:9
**self-education** [1] - 27:19
**selling** [1] - 99:17
**send** [3] - 124:2, 137:14, 161:20
**sending** [1] - 137:12
**sends** [1] - 225:11
**SENIOR** [1] - 1:17
**Senior** [9] - 7:2, 27:25, 28:2, 58:2, 71:25, 82:25, 83:3, 95:2, 136:1
**Sensabaugh** [1] - 5:14
**sent** [10] - 53:6, 53:17, 53:20, 59:7, 123:4, 123:13, 128:15, 149:10, 210:7, 224:2
**sentence** [10] - 55:18, 56:6, 128:9, 133:22, 145:3, 184:7, 187:22, 188:3, 191:6, 213:4
**sentences** [2] - 123:2, 206:5
**separate** [8] - 12:13, 107:19, 114:13, 168:19, 175:21, 176:8, 232:14, 233:7
**separately** [1] - 109:16
**September** [2] - 117:20, 118:17
**serious** [7] - 12:3, 96:9, 97:9, 102:9, 102:12, 236:22
**serve** [1] - 146:5
**served** [1] - 7:15
**serves** [1] - 66:17
**service** [12] - 20:17, 23:4, 128:8, 144:10, 144:11, 144:14, 145:7, 145:8, 145:11, 155:1, 158:11, 202:25
**Service** [1] - 128:4
**serviced** [14] - 20:14, 21:10, 22:18, 23:5, 23:17, 24:25, 25:1, 25:12, 120:12, 134:14, 164:7, 170:11, 215:25, 226:6
**services** [4] - 24:3, 106:9, 111:9
**servicing** [5] - 20:19, 23:16, 25:15, 159:24, 160:2
**session** [3] - 59:2, 62:4, 63:12

**set** [31] - 23:19, 31:20, 37:24, 38:1, 38:8, 38:9, 38:10, 38:11, 39:12, 45:10, 81:6, 98:22, 99:9, 121:3, 126:14, 127:8, 129:2, 129:24, 132:4, 133:6, 133:11, 133:13, 134:5, 148:10, 151:21, 155:23, 156:6, 156:9, 169:24, 183:7, 226:12
**setting** [15] - 14:1, 64:8, 64:11, 98:4, 116:3, 116:21, 116:22, 117:10, 128:24, 131:23, 136:15, 157:17, 181:10, 207:4
**settle** [2] - 105:25, 106:14
**settled** [1] - 104:8
**Settlement** [10] - 81:9, 82:11, 84:17, 84:20, 85:9, 93:13, 95:2, 107:19, 130:21, 131:11
**settlement** [19] - 81:12, 81:22, 83:17, 84:4, 85:1, 85:12, 85:19, 86:6, 91:16, 95:5, 95:15, 95:16, 99:25, 100:15, 100:19, 103:3, 103:6, 103:7, 106:17
**settlements** [1] - 83:17
**seven** [1] - 109:12
**several** [13] - 21:12, 60:5, 80:15, 108:23, 168:10, 178:22, 182:12, 184:4, 189:22, 208:19, 215:6, 222:2, 230:22
**SF** [4] - 144:9, 144:10, 144:13
**shall** [6] - 85:15, 87:14, 88:6, 114:16, 225:2
**SHANNON** [1] - 6:3
**shared** [2] - 123:18, 123:19
**SharePoint** [1] - 158:18
**shebang** [1] - 60:16
**shift** [1] - 116:1
**shifting** [1] - 28:22
**shipments** [4] - 26:10,

26:16, 96:2, 212:20
**shipped** [1] - 118:25
**shipping** [4] - 27:8, 96:3, 119:3, 120:2
**short** [4] - 29:22, 175:24, 190:23, 231:9
**shortcut** [1] - 111:21
**shot** [1] - 206:11
**show** [48] - 31:22, 32:4, 36:20, 42:17, 49:7, 57:19, 72:17, 91:17, 101:23, 104:2, 107:22, 121:12, 125:24, 127:8, 132:1, 137:8, 138:13, 140:1, 143:11, 143:15, 147:23, 151:13, 162:10, 164:2, 164:24, 167:24, 167:25, 168:16, 170:19, 170:24, 171:8, 171:11, 171:17, 171:25, 172:11, 173:13, 178:11, 184:1, 187:17, 187:18, 189:14, 195:23, 208:9, 208:15, 218:1, 223:15, 226:19
**showed** [2] - 118:3, 136:4
**showing** [2] - 164:18, 174:19
**showings** [1] - 237:11
**shown** [4] - 48:13, 52:21, 72:6, 134:22
**shut** [1] - 222:5
**sick** [1] - 142:5
**side** [8] - 8:25, 9:1, 75:9, 75:11, 105:23, 128:8, 161:5, 228:15
**Sidebar** [1] - 228:16
**sidebar** [1] - 230:14
**sides** [1] - 15:7
**sift** [1] - 9:15
**sign** [3] - 68:16, 93:9, 195:3
**sign-offs** [1] - 93:9
**signature** [4] - 82:21, 82:25, 163:14, 164:6
**signed** [7] - 82:18, 83:3, 84:5, 113:15, 117:23, 194:25, 199:19
**significant** [3] - 86:9, 150:7, 204:19
**significantly** [1] - 65:3

**similar** [6] - 43:2, 55:9, 137:11, 165:7, 173:12, 215:25
**simple** [1] - 72:3
**simply** [11] - 14:10, 83:11, 102:11, 115:5, 118:21, 120:2, 174:9, 174:13, 182:22, 185:18, 205:16
**SINGER** [1] - 4:5
**single** [1] - 60:13
**sit** [4] - 14:6, 78:17, 170:4, 234:4
**sitting** [1] - 11:25
**situation** [4] - 14:10, 15:3, 71:18, 106:14
**six** [2] - 155:13, 225:9
**sixth** [1] - 98:3
**skip** [1] - 143:17
**skipping** [1] - 195:16
**slash** [1] - 201:16
**slide** [1] - 80:12
**slides** [2] - 77:9, 90:20
**slightly** [1] - 157:24
**slippery** [1] - 72:18
**slog** [1] - 10:23
**slow** [1] - 123:6
**Small** [1] - 117:4
**small** [3] - 129:22, 194:21, 204:24
**small-medium** [1] - 129:22
**smaller** [3] - 120:18, 160:22, 199:17
**Smith** [3] - 6:4, 6:11, 105:20
**smoother** [1] - 8:19
**smoothly** [1] - 15:8
**snippet** [1] - 70:22
**Snyder** [2] - 164:8, 170:14
**sold** [1] - 120:18
**sole** [1] - 24:21
**solution** [1] - 142:23
**somekind** [1] - 234:1
**someone** [8] - 35:8, 39:24, 61:20, 61:23, 71:14, 94:19, 95:13, 229:25
**sometime** [1] - 122:8
**sometimes** [1] - 66:10
**somewhat** [3] - 66:10, 84:22, 201:23
**somewhere** [1] - 58:5
**SOMS** [1] - 28:23
**soon** [1] - 144:8
**sooner** [1] - 145:23
**SOP** [1] - 204:25

**SOPs** [3] - 190:8, 192:7, 192:9
**sorry** [100] - 9:5, 19:21, 21:25, 22:14, 23:5, 23:10, 23:13, 23:14, 26:5, 26:20, 29:19, 32:21, 32:22, 41:21, 43:25, 48:4, 49:15, 50:16, 53:23, 55:3, 56:14, 58:10, 60:24, 68:1, 68:19, 68:20, 70:8, 71:24, 73:20, 78:12, 78:19, 79:14, 80:21, 85:6, 85:7, 86:2, 86:12, 86:21, 87:7, 89:22, 89:23, 93:5, 94:22, 98:2, 98:3, 101:18, 101:21, 102:3, 106:23, 110:4, 111:11, 112:4, 113:24, 114:1, 117:13, 119:13, 123:5, 123:7, 123:9, 124:17, 126:2, 126:18, 131:5, 131:6, 131:16, 132:21, 138:15, 139:2, 143:6, 143:21, 143:24, 143:25, 152:4, 152:24, 161:23, 169:19, 173:2, 177:4, 183:5, 183:7, 186:10, 186:21, 191:3, 191:13, 192:9, 193:14, 193:19, 194:8, 196:1, 196:6, 196:16, 213:4, 215:17, 218:12, 220:10, 223:25, 230:2, 232:8, 232:10, 233:10
**Sorry** [2] - 197:3, 226:16
**sort** [1] - 77:1
**source** [1] - 66:13
**sources** [1] - 81:3
**south** [2] - 141:22, 141:24
**South** [1] - 2:13
**SOUTHERN** [1] - 1:1
**Southern** [1] - 7:2
**speaking** [2] - 124:1, 197:1
**specific** [19] - 25:6, 27:14, 38:24, 47:16, 48:12, 82:4, 92:19, 133:17, 137:2,

162:23, 165:4, 166:16, 170:9, 174:14, 175:16, 208:1, 209:22, 209:24
**Specifically** [1] - 24:14
**specifically** [13] - 24:25, 27:15, 29:6, 63:14, 101:12, 101:14, 102:6, 106:10, 129:16, 161:16, 186:12, 190:4, 198:19
**specifics** [1] - 206:14
**speculation** [2] - 146:23, 207:22
**speed** [1] - 219:21
**spell** [1] - 18:5
**sponsoring** [6] - 8:1, 8:6, 51:25, 136:10, 176:8, 176:10
**spread** [1] - 24:20
**spreadsheet** [3] - 174:20, 176:2, 176:7
**spreadsheets** [1] - 174:23
**Square** [2] - 6:5, 6:12
**squarely** [1] - 102:25
**stacking** [1] - 132:4
**stance** [1] - 119:11
**stand** [11] - 8:14, 10:24, 11:25, 44:3, 44:6, 77:7, 90:19, 177:17, 186:16, 219:13, 219:16
**standard** [1] - 188:9
**Standard** [1] - 192:11
**standing** [3] - 60:16, 74:1, 105:24
**stands** [1] - 36:24
**STANNER** [1] - 5:10
**start** [18] - 30:18, 38:11, 61:7, 70:8, 74:4, 89:1, 98:17, 98:22, 116:18, 120:23, 121:17, 127:25, 131:9, 143:19, 152:22, 161:1, 204:10, 208:22
**start-up** [1] - 98:17
**started** [20] - 18:21, 18:23, 26:19, 27:9, 28:5, 29:9, 29:14, 30:5, 32:18, 32:22, 33:4, 35:14, 36:19, 39:12, 42:8, 121:6, 135:10, 135:13, 197:1, 208:21

**Starting** [1] - 39:11
**starting** [4] - 113:17, 118:19, 144:7, 213:15
**starts** [5] - 132:4, 140:15, 143:20, 143:21, 178:18
**state** [11] - 18:2, 18:14, 22:11, 54:13, 57:5, 68:4, 119:7, 151:25, 191:20, 207:12, 208:2
**statement** [10] - 61:22, 62:17, 62:22, 65:13, 71:4, 72:1, 74:6, 84:3, 98:19, 229:24
**statements** [14] - 61:16, 62:6, 62:20, 74:14, 74:16, 77:17, 77:22, 77:23, 95:8, 101:24, 104:3, 105:21, 202:14, 230:7
**States** [9] - 7:2, 22:6, 53:6, 63:25, 65:1, 65:6, 86:7, 88:8, 108:7
**states** [3] - 62:2, 210:25, 225:1
**STATES** [2] - 1:1, 1:17
**stating** [2] - 78:21, 109:15
**Statistical** [1] - 215:23
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**statuses** [1] - 188:8
**statutes** [1] - 86:5
**stay** [2] - 219:9, 238:2
**stayed** [1] - 222:2
**staying** [1] - 219:21
**stays** [1] - 84:8
**stenography** [1] - 6:19
**step** [1] - 190:7
**Stephen** [2] - 152:23
**steps** [2] - 47:5, 209:10
**STEVEN** [1] - 4:17
**stickler** [1] - 78:5
**still** [19] - 9:3, 13:12, 20:22, 24:17, 44:7, 52:10, 64:25, 91:8, 136:9, 137:24, 140:11, 142:14, 166:13, 166:14, 169:7, 196:12, 196:13, 200:21, 231:25
**stip** [10] - 51:24, 197:11, 197:19, 198:4, 218:6, 228:1,

230:23, 230:25, 232:15, 233:14
**stipulate** [3] - 8:4, 177:24, 228:5
**stipulated** [5] - 7:25, 106:25, 136:10, 138:8, 198:2
**stipulation** [19] - 8:3, 9:23, 10:19, 13:16, 14:4, 50:5, 50:8, 50:18, 136:10, 136:12, 138:9, 139:13, 143:6, 177:10, 180:7, 197:23, 212:8, 227:25, 235:18
**stipulations** [1] - 10:15
**stood** [2] - 94:14, 123:24
**stop** [2] - 20:22, 217:22
**stopped** [1] - 15:18
**stopping** [1] - 35:8
**store** [10] - 137:3, 161:7, 161:17, 161:18, 161:25, 162:3, 163:18, 163:22, 166:6, 180:13
**stores** [31] - 25:12, 120:19, 121:1, 121:3, 121:4, 121:7, 123:24, 130:2, 151:19, 153:4, 161:5, 162:23, 164:7, 170:10, 170:11, 171:18, 174:10, 175:16, 175:17, 176:12, 176:15, 179:3, 179:9, 179:11, 179:21, 180:16, 182:9, 182:23, 201:16, 208:3
**storm** [1] - 140:22
**straight** [1] - 85:8
**strange** [1] - 127:24
**strategies** [1] - 237:9
**streamline** [2] - 14:14, 15:25
**streamlined** [1] - 14:25
**Street** [15] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15, 4:18, 5:5, 5:12, 6:6, 6:13
**street** [1] - 61:21
**strengths** [1] - 38:3

**strike** [11] - 26:5, 53:23, 54:20, 85:13, 116:17, 155:20, 156:4, 169:19, 170:21, 171:22, 199:6
**string** [4] - 140:5, 140:15, 143:18, 204:4
**strings** [2] - 121:16, 127:25
**strong** [3] - 217:4, 217:15, 217:19
**stronger** [1] - 216:24
**study** [1] - 59:16
**stuff** [3] - 15:2, 126:22, 221:22
**Style** [3] - 29:15, 32:11, 33:13
**style** [1] - 33:19
**styled** [1] - 7:11
**subject** [17] - 8:10, 48:10, 58:22, 83:18, 92:19, 94:7, 94:8, 100:20, 109:2, 126:22, 131:18, 134:21, 148:25, 149:7, 152:14, 168:25, 221:2
**submission** [1] - 237:18
**submit** [8] - 10:3, 10:8, 54:7, 178:7, 233:8, 236:11, 236:12, 236:25
**submitted** [4] - 90:4, 90:20, 179:2, 209:8
**submitting** [1] - 210:11
**subparagraph** [1] - 88:12
**subpoena** [1] - 221:2
**subsequent** [1] - 46:22
**Substance** [8] - 25:23, 29:23, 36:25, 37:17, 42:23, 44:21, 100:2, 122:19
**substance** [10] - 26:9, 26:15, 53:12, 99:14, 149:24, 203:5, 214:8, 224:25, 237:7, 237:15
**substances** [39] - 20:14, 27:8, 31:19, 33:16, 33:19, 34:5, 35:5, 37:16, 45:1, 45:7, 46:2, 53:8, 56:9, 66:1, 67:13, 67:17, 68:8, 70:17,

86:8, 86:9, 87:11, 87:15, 87:21, 88:14, 88:16, 94:6, 99:18, 110:15, 110:17, 114:25, 149:22, 161:25, 212:20, 214:7, 215:12, 216:19, 221:2, 221:18, 226:1
**Substances** [17] - 26:9, 26:15, 27:12, 41:20, 41:23, 41:25, 44:17, 54:6, 80:19, 80:25, 102:8, 130:23, 206:20, 207:8, 207:16, 208:7, 230:21
**substantial** [2] - 101:17, 155:4
**substantiate** [2] - 46:1, 205:18
**sufficient** [1] - 169:22
**suggest** [1] - 228:11
**suggested** [1] - 233:24
**suggestion** [4] - 70:24, 104:8, 114:12, 218:15
**suitable** [1] - 231:15
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12
**summaries** [1] - 13:1
**summarize** [1] - 175:11
**summarized** [2] - 97:2, 172:17
**summary** [2] - 172:15, 172:20
**supplier** [1] - 226:13
**supply** [8] - 70:11, 70:14, 79:21, 80:3, 81:3, 83:13, 122:22
**support** [1] - 211:4
**supports** [1] - 205:1
**supposed** [4] - 55:24, 88:20, 194:13
**surprise** [1] - 225:13
**suspect** [1] - 156:17
**suspected** [1] - 214:21
**suspended** [1] - 122:20
**Suspension** [1] - 96:18
**suspension** [1] - 122:9
**suspicious** [54] - 40:17, 42:1, 42:6, 42:8, 42:15, 46:8,

47:8, 47:9, 53:13, 54:1, 54:7, 54:20, 54:22, 55:15, 55:21, 56:1, 56:4, 56:7, 56:13, 56:17, 56:19, 57:6, 57:8, 86:7, 87:17, 88:15, 88:21, 94:6, 102:8, 102:10, 110:16, 113:21, 118:22, 118:23, 149:7, 149:17, 220:16, 221:11, 221:13, 221:17, 221:23, 222:4, 222:7, 222:8, 222:10, 222:12, 222:15, 222:17, 223:7, 223:14, 224:24, 225:2, 225:21
**Suspicious** [3] - 28:24, 148:25, 149:7
**sustain** [15] - 23:11, 54:15, 70:4, 71:19, 72:8, 76:22, 105:11, 115:13, 159:20, 162:25, 165:14, 168:21, 178:1, 189:3, 227:23
**sustained** [14] - 47:16, 54:25, 64:4, 71:1, 75:25, 77:3, 81:3, 81:16, 85:22, 96:13, 97:11, 107:8, 147:1, 165:22
**Sustained** [3] - 183:20, 194:5, 210:17
**SUZANNE** [1] - 4:15
**switches** [1] - 36:16
**SWORN** [1] - 18:8
**system** [9] - 20:10, 29:14, 31:18, 37:15, 40:16, 110:16, 142:18, 181:24, 193:17
**systematic** [2] - 135:5, 135:12
**systematically** [1] - 135:3
**systemic** [9] - 95:11, 96:9, 97:9, 101:9, 102:9, 102:12, 102:13, 106:6, 106:11
**Systems** [1] - 28:25

---

**T**

---

**Tab** [2] - 63:6, 85:24

**table** [1] - 203:18
**talks** [1] - 33:15
**Tampa** [1] - 75:20
**targeting** [2] - 33:15, 33:18
**tasks** [1] - 190:9
**TCR** [22] - 146:18, 146:19, 146:21, 153:3, 157:15, 158:11, 158:18, 158:21, 161:8, 161:15, 162:3, 164:20, 169:10, 171:7, 186:10, 186:13, 205:17, 209:8, 209:10, 209:13, 210:4, 211:14
**TCRs** [21] - 141:11, 141:12, 142:6, 142:25, 146:13, 150:16, 151:3, 155:9, 155:22, 156:7, 174:17, 183:23, 186:6, 186:11, 186:19, 186:23, 201:24, 209:7, 210:11, 210:15, 211:11
**Team** [1] - 92:1
**team** [10] - 58:6, 59:3, 63:16, 120:25, 154:12, 161:6, 161:20, 193:25, 203:10, 218:18
**teams** [1] - 161:4
**TEMITOPE** [1] - 4:8
**ten** [6] - 129:11, 129:25, 158:14, 158:17, 159:8, 159:15
**ten-percent** [1] - 159:8
**tendency** [1] - 228:25
**tender** [1] - 73:20
**Tenth** [1] - 5:12
**tenure** [2] - 19:10, 147:9, 183:15
**terminate** [3] - 146:18, 217:19, 217:22
**terminated** [1] - 217:18
**Termination** [1] - 96:17
**terms** [39] - 9:4, 9:6, 9:12, 9:13, 11:20, 13:7, 13:18, 14:2, 36:3, 50:6, 50:17, 50:19, 51:3, 51:24, 87:8, 102:9, 105:16, 119:19, 130:11,

131:10, 139:14, 143:5, 159:1, 160:20, 161:8, 184:12, 195:21, 206:18, 207:7, 210:14, 210:19, 210:20, 211:1, 211:10, 220:10, 220:14
**territories** [1] - 88:8
**testified** [5] - 28:4, 41:22, 48:7, 56:22, 118:1
**testify** [2] - 48:2, 70:23
**testifying** [2] - 37:8, 187:1
**testimony** [18] - 8:14, 8:19, 10:25, 36:3, 37:9, 51:4, 65:6, 119:22, 136:3, 162:7, 170:4, 170:22, 171:4, 171:10, 172:4, 184:17, 188:21, 203:18
**Texas** [3] - 144:12, 191:24, 202:24
**text** [1] - 210:23
**THE** [362] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:7, 7:9, 7:18, 8:20, 10:10, 12:1, 12:11, 13:23, 14:23, 15:11, 17:4, 17:18, 17:21, 18:1, 18:2, 18:4, 18:5, 18:6, 18:7, 18:9, 18:11, 21:5, 21:6, 22:1, 22:3, 22:16, 23:9, 23:11, 30:12, 30:15, 31:1, 31:3, 31:5, 32:7, 32:8, 33:10, 36:9, 39:8, 42:20, 43:19, 43:25, 44:5, 44:8, 44:9, 44:11, 44:13, 47:16, 48:9, 48:23, 49:11, 49:18, 50:1, 50:10, 50:24, 51:1, 51:11, 51:18, 52:1, 52:16, 52:20, 52:24, 54:15, 54:25, 56:24, 57:3, 57:22, 59:13, 59:20, 59:23, 60:15, 60:21, 60:23, 61:1, 61:6, 61:8, 61:10, 62:8, 62:24, 64:4, 64:14, 64:20, 67:23, 68:4, 70:4, 71:1, 71:6, 71:17, 71:21, 72:6, 72:11, 72:23,

73:25, 74:9, 75:23, 75:25, 76:3, 76:16, 76:20, 77:5, 77:15, 77:17, 77:20, 77:25, 78:9, 78:13, 78:16, 78:23, 79:1, 79:5, 79:7, 79:9, 81:16, 83:14, 83:22, 84:13, 85:22, 86:10, 86:16, 86:19, 87:5, 89:4, 89:12, 89:15, 90:5, 90:8, 90:16, 90:24, 91:4, 91:6, 91:9, 91:11, 92:11, 92:16, 92:19, 94:20, 94:23, 95:17, 95:20, 96:13, 97:11, 101:2, 101:4, 103:22, 103:24, 104:14, 104:24, 105:5, 105:9, 105:11, 105:19, 106:12, 106:19, 107:2, 107:8, 107:12, 108:17, 109:1, 109:7, 109:23, 109:24, 109:25, 110:1, 110:2, 110:3, 111:1, 115:13, 118:12, 119:21, 119:24, 126:4, 126:6, 126:17, 126:19, 127:7, 127:10, 127:17, 127:20, 131:1, 131:20, 133:12, 133:19, 134:21, 136:13, 138:11, 139:16, 143:7, 147:1, 147:4, 148:5, 148:6, 148:19, 151:1, 151:2, 151:11, 151:23, 152:3, 152:6, 152:14, 153:15, 153:21, 154:3, 156:3, 156:18, 156:22, 156:24, 159:20, 160:7, 160:11, 160:14, 162:25, 163:5, 163:22, 164:3, 164:14, 164:21, 165:14, 165:22, 165:24, 166:13, 166:21, 167:6, 167:10, 167:15, 167:17, 167:22, 168:2, 168:8, 168:18, 168:21, 168:25, 170:24, 171:3,

171:10, 171:15, 171:16, 171:17, 171:20, 171:21, 172:2, 172:7, 172:9, 172:18, 172:23, 173:4, 173:19, 174:2, 175:5, 177:4, 178:1, 178:8, 180:1, 180:11, 180:13, 180:15, 180:18, 180:21, 180:24, 181:1, 181:15, 181:18, 182:16, 183:20, 184:15, 185:14, 187:3, 187:6, 187:12, 187:15, 188:15, 188:18, 188:23, 192:18, 193:12, 193:15, 193:18, 193:20, 194:5, 196:21, 197:4, 197:8, 197:16, 197:25, 198:5, 198:7, 199:1, 200:2, 200:12, 200:14, 200:17, 201:1, 201:3, 202:16, 203:17, 207:23, 207:25, 208:13, 210:17, 211:8, 212:11, 216:13, 216:15, 216:21, 217:8, 217:10, 218:8, 218:16, 218:21, 219:2, 219:4, 219:9, 219:12, 219:20, 220:1, 220:4, 220:9, 220:12, 224:11, 224:14, 224:17, 227:6, 227:11, 227:23, 228:9, 228:17, 229:9, 229:12, 229:22, 230:10, 231:18, 231:21, 232:11, 232:25, 233:2, 233:7, 233:11, 233:18, 233:20, 234:2, 234:4, 234:7, 234:10, 234:11, 234:12, 234:14, 234:16, 234:17, 234:21, 234:25, 236:1, 236:7, 236:10, 236:12, 236:18, 236:22, 237:19, 237:21, 238:1
**thefts** [1] - 86:9

**themselves** [3] - 226:1, 226:4, 226:10
**thereafter** [1] - 175:24
**therefore** [5] - 72:2, 124:8, 147:15, 147:17, 237:16
**therein** [2] - 101:25, 104:4
**thereto** [1] - 107:9
**they've** [10] - 10:22, 75:11, 120:15, 120:17, 175:1, 176:13, 213:14, 213:17, 229:14
**They've** [1] - 13:1
**thinks** [2] - 158:20, 233:25
**third** [4] - 53:24, 94:5, 113:23, 234:19
**Thomas** [1] - 2:12
**Thomet** [4] - 127:24, 128:1, 128:2, 202:25
**thorough** [1] - 142:19
**thoughts** [1] - 134:4
**thousand** [5] - 23:8, 25:2, 157:19, 157:22, 198:11
**thousands** [6] - 158:24, 168:11, 175:18, 177:19
**threat** [1] - 70:18
**Three** [10] - 6:5, 40:10, 40:13, 40:15, 40:21, 40:22, 42:9, 222:3, 222:9, 236:7
**three** [30] - 6:12, 19:3, 23:4, 23:16, 38:18, 39:14, 56:2, 56:5, 69:14, 78:21, 78:23, 90:20, 93:19, 94:3, 116:13, 124:8, 164:18, 164:25, 167:17, 167:19, 167:25, 168:4, 168:16, 171:14, 190:22, 213:14, 232:18, 233:3, 234:24, 236:4
**three-level** [6] - 38:18, 39:14, 56:2, 56:5, 116:13, 124:8
**threshold** [90] - 31:18, 31:23, 32:1, 34:15, 34:17, 34:23, 35:9, 37:15, 38:1, 38:7, 38:9, 38:13, 38:14, 38:15, 38:16, 39:12, 39:13, 40:2, 40:18, 45:15, 45:20, 45:21, 46:15, 46:18, 46:22,

47:3, 98:24, 116:2,
116:3, 116:9,
116:13, 123:4,
123:13, 123:16,
123:21, 123:25,
124:3, 124:6, 124:7,
124:17, 124:21,
124:24, 124:25,
125:3, 125:5,
128:24, 133:1,
135:7, 136:4,
136:22, 139:7,
141:5, 141:7,
141:13, 142:9,
142:25, 146:16,
147:10, 147:17,
147:18, 150:11,
150:23, 153:4,
153:9, 154:8,
155:23, 156:6,
156:9, 156:10,
157:18, 157:19,
168:15, 173:6,
173:9, 173:10,
174:10, 174:17,
175:14, 179:4,
181:12, 182:5,
195:9, 201:14,
201:21, 203:6,
205:3, 211:2, 226:15
**Threshold** [10] -
123:17, 160:21,
163:10, 165:17,
165:20, 173:16,
174:6, 182:22,
195:7, 195:12
**thresholds** [56] -
31:20, 33:12, 45:6,
45:9, 45:10, 87:16,
88:20, 98:2, 98:9,
98:13, 98:16, 98:22,
98:23, 99:10, 116:2,
116:3, 116:6, 116:8,
116:16, 116:18,
116:23, 117:10,
120:23, 121:3,
126:14, 127:9,
129:1, 129:23,
130:13, 131:23,
133:11, 134:4,
135:2, 136:18,
137:1, 145:14,
151:21, 152:1,
155:5, 155:10,
155:14, 155:17,
159:9, 159:17,
159:18, 160:17,
160:21, 175:2,
179:2, 202:5,
202:18, 204:24,
207:21, 211:10,

226:13
**Thresholds** [1] - 32:2
**throughout** [4] - 83:9,
145:17, 180:17,
183:14
**throw** [1] - 223:13
**throwing** [1] - 232:6
**tie** [1] - 64:6
**tighten** [1] - 204:20
**tightened** [2] - 132:18,
204:17
**tightening** [1] - 204:13
**time-consuming** [1] -
144:14
**time-wise** [1] - 31:7
**timeline** [2] - 29:4,
35:22
**timeliness** [1] - 188:9
**timely** [2] - 79:20,
185:25
**timeout** [1] - 160:8
**TIMOTHY** [1] - 5:9
**Title** [1] - 224:25
**to-line** [1] - 58:16
**today** [13] - 37:2,
63:25, 65:6, 65:8,
121:24, 132:2,
147:4, 170:4, 182:3,
188:21, 211:13,
219:1, 235:1
**Today** [1] - 8:2
**today's** [3] - 153:4,
153:7, 153:9
**together** [7] - 12:1,
15:9, 17:6, 64:7,
175:22, 233:17,
233:24
**tom** [1] - 140:20
**Tom** [10] - 21:12,
58:16, 92:25,
140:18, 143:20,
208:21, 208:24,
210:7, 210:25
**tomorrow** [4] -
219:19, 220:7,
234:12, 237:23
**took** [13] - 14:17,
15:16, 23:13, 36:7,
58:6, 81:8, 96:25,
148:23, 170:22,
222:15, 223:14,
232:15
**top** [20] - 33:12, 33:13,
44:21, 72:25, 82:11,
86:13, 96:17, 108:2,
121:17, 128:15,
139:1, 152:18,
154:6, 163:9,
182:25, 187:25,
188:3, 204:7,

208:19, 213:21
**topic** [1] - 107:15
**topics** [3] - 116:1,
116:4, 147:2
**total** [7] - 28:4, 99:6,
99:7, 99:12, 199:15,
216:20
**totality** [1] - 88:13
**totally** [1] - 233:9
**Totally** [1] - 217:24
**toward** [1] - 201:11
**towards** [3] - 141:4,
149:5, 221:13
**Tower** [2] - 3:4, 4:18
**track** [2] - 9:10, 156:15
**Tracy** [3] - 93:1,
140:20, 153:8
**trade** [1] - 237:3
**trained** [2] - 87:17,
88:21
**Training** [2] - 149:1,
149:8
**training** [6] - 27:20,
27:22, 27:23, 27:24,
63:15
**transactions** [1] -
55:13
**transcript** [2] - 6:19,
239:4
**transcripts** [3] -
235:22, 236:2
**transferor** [1] - 103:14
**transferred** [1] - 27:15
**travel** [1] - 66:21
**traveling** [2] - 15:19,
66:24
**treat** [2] - 161:1, 161:3
**treated** [1] - 201:23
**tremendously** [1] -
158:25
**trend** [1] - 209:7
**Trial** [1] - 238:3
**TRIAL** [1] - 1:16
**trial** [15] - 8:6, 8:18,
9:2, 9:16, 11:10,
13:24, 47:25, 76:6,
77:1, 83:10, 102:17,
188:25, 228:5,
228:18
**trials** [1] - 43:21
**tried** [6] - 13:5, 14:14,
36:20, 103:12,
103:14, 174:23
**trigger** [1] - 39:14
**triggered** [1] - 116:10
**triggering** [3] - 45:12,
124:8, 222:7
**triggers** [2] - 47:4,
98:24
**Troy** [1] - 13:21

**True** [15] - 23:6, 32:15,
35:19, 36:25, 37:6,
37:17, 37:22, 38:5,
38:10, 38:21, 39:17,
40:18, 41:6, 42:2,
170:6
**true** [50] - 34:18, 38:2,
39:4, 39:22, 45:20,
46:5, 47:9, 57:15,
58:14, 62:23, 74:16,
81:13, 81:19, 82:3,
83:4, 84:4, 85:19,
88:23, 92:7, 93:25,
94:13, 96:10, 98:6,
99:19, 100:3, 100:7,
108:13, 111:22,
112:12, 112:25,
116:11, 118:3,
120:16, 122:3,
124:9, 124:10,
124:18, 125:9,
125:13, 125:20,
125:22, 130:23,
135:11, 145:13,
146:16, 146:22,
156:8, 165:9,
186:17, 222:15
**truly** [1] - 142:13
**trumps** [1] - 62:13
**truth** [6] - 51:6, 95:14,
95:20, 118:10,
224:12, 224:15
**try** [19] - 9:9, 9:14,
16:7, 16:8, 16:16,
27:17, 42:11, 68:21,
88:1, 96:13, 159:21,
177:21, 178:6,
184:5, 184:7,
218:19, 220:5,
227:19, 233:16
**trying** [20] - 31:7, 48:2,
64:6, 87:2, 112:10,
150:14, 150:15,
156:1, 171:5,
175:17, 176:5,
177:20, 183:7,
184:10, 212:1,
226:16, 228:6,
228:24, 229:16,
236:23
**tsunami** [3] - 142:23,
142:24, 142:25
**Tuesday** [1] - 140:17
**tunc** [2] - 102:19,
104:17
**turn** [17] - 63:6, 63:18,
65:16, 67:10, 69:18,
79:14, 80:9, 82:15,
85:4, 85:24, 92:2,
94:10, 113:3,

118:23, 184:21,
186:20, 188:2
**turned** [1] - 96:2
**tweaked** [2] - 128:19,
128:23
**Twelfth** [3] - 4:13,
4:15, 5:5
**Two** [3] - 40:6, 40:9,
222:9
**two** [49] - 23:4, 23:8,
23:16, 24:2, 25:2,
28:12, 33:3, 35:1,
35:4, 37:10, 46:15,
62:16, 64:7, 74:12,
77:8, 77:9, 78:1,
78:2, 78:17, 84:23,
90:25, 91:2, 93:13,
102:15, 108:18,
110:10, 112:25,
113:2, 113:24,
116:22, 117:1,
118:4, 123:2,
154:18, 167:17,
177:13, 184:7,
198:11, 206:5,
213:14, 213:20,
215:20, 231:25,
232:4, 235:11,
236:5, 237:2
**two-day** [2] - 84:23,
93:13
**twos** [1] - 154:16
**type** [4] - 27:21, 28:19,
59:6, 137:18
**typed** [1] - 162:19
**types** [2] - 24:2, 117:1
**typically** [1] - 59:7

---

**U**

**ultimately** [4] -
106:11, 106:25,
111:17, 122:24
**Under** [1] - 191:3
**under** [55] - 26:24,
27:11, 31:20, 32:1,
32:3, 37:16, 38:3,
41:25, 44:16, 46:12,
47:1, 54:6, 67:11,
77:14, 83:10, 84:7,
86:4, 86:5, 87:11,
91:8, 96:17, 98:1,
98:2, 98:9, 98:15,
101:6, 113:3, 114:3,
116:10, 119:4,
124:1, 129:2, 138:9,
138:10, 139:1,
143:5, 159:6, 161:2,
170:23, 181:11,
185:22, 188:2,

192:2, 193:3,
197:22, 202:3,
213:15, 215:10,
215:23, 215:24,
220:21, 220:22,
227:21, 228:1,
237:16
**undergone** [1] -
204:18
**underline** [1] - 97:4
**underlying** [2] -
177:12, 177:13
**underneath** [6] -
65:25, 66:3, 80:23,
96:18, 113:24
**understood** [8] - 42:7,
42:13, 48:4, 63:22,
158:6, 171:10,
203:8, 203:18
**undertaken** [1] - 88:12
**undertaking** [1] -
136:19
**underway** [1] - 150:10
**unduly** [1] - 73:24
**unfair** [1] - 76:25
**unfairly** [1] - 76:8
**uninterrupted** [1] -
79:21
**unit** [1] - 55:14
**United** [9] - 7:2, 22:6,
53:6, 63:25, 65:1,
65:6, 86:7, 88:7,
108:7
**UNITED** [2] - 1:1, 1:17
**units** [2] - 31:24,
70:16
**Unless** [1] - 38:17,
227:11
**unless** [4] - 40:20,
133:4, 179:21, 205:1
**unlike** [2] - 15:22
**unresponsive** [1] -
155:20
**unusual** [2] - 218:24,
228:17
**unusually** [1] - 216:1
**up** [89] - 9:7, 9:16,
9:19, 9:21, 11:18,
12:4, 12:5, 14:12,
15:11, 15:19, 15:25,
16:18, 17:14, 19:10,
22:5, 25:2, 29:2,
29:4, 30:9, 30:19,
31:22, 38:14, 39:7,
43:7, 50:10, 53:4,
59:3, 67:16, 68:8,
68:15, 74:2, 76:19,
79:2, 82:1, 82:2,
89:8, 92:15, 98:17,
98:23, 100:14,

106:11, 112:4,
112:11, 113:12,
113:17, 120:12,
124:7, 124:24,
128:14, 132:4,
132:18, 140:23,
140:24, 141:20,
146:10, 154:6,
155:11, 155:23,
158:15, 158:18,
158:24, 159:13,
159:14, 167:7,
172:24, 177:24,
181:24, 185:10,
185:17, 190:7,
202:11, 204:13,
204:17, 204:18,
204:20, 212:14,
213:6, 219:13,
219:18, 219:21,
219:24, 220:18,
226:17, 226:23,
234:11, 236:2,
237:22
**Up** [1] - 28:12
**upcoming** [1] - 59:4
**upper** [4] - 43:1, 43:2,
43:3, 43:5
**upward** [1] - 45:22
**usage** [2] - 34:9,
209:23
**uses** [1] - 75:7

---

**V**

**vague** [4] - 23:7,
54:24, 64:1, 64:17
**valid** [1] - 205:3
**variability** [1] - 159:10
**variations** [1] - 130:14
**various** [3] - 7:24,
113:11, 190:8
**Ventura** [1] - 3:18
**version** [1] - 223:1
**versus** [3] - 99:14,
116:24, 226:14
**Vice** [7] - 58:2, 71:25,
73:13, 82:25, 83:4,
95:3, 121:25
**video** [3] - 235:20,
235:22, 236:1
**view** [1] - 71:18
**viewed** [1] - 221:8
**violation** [3] - 115:2,
195:20, 224:25
**violations** [15] - 81:12,
94:15, 94:21, 95:6,
95:11, 95:24, 102:7,
107:1, 130:22,
206:19, 207:8,

207:15, 208:7,
230:20
**viral** [1] - 228:25
**VIRGINIA** [2] - 1:1,
1:18
**Virginia** [17] - 4:18,
7:3, 20:18, 20:21,
21:11, 22:19, 22:22,
22:25, 23:6, 23:17,
106:9, 111:9, 174:6,
191:18, 191:21,
225:22
**visit** [1] - 144:15
**visits** [1] - 204:18
**Vista** [1] - 112:23
**volume** [9] - 13:8,
25:10, 46:1, 66:3,
67:3, 68:8, 142:14,
147:13, 204:20
**VOLUME** [1] - 1:16
**Vs** [1] - 37:18
**vs** [1] - 239:6

---

**W**

**wait** [7] - 49:15, 56:24,
68:21, 85:25, 101:1,
196:22, 197:2
**WAKEFIELD** [1] - 5:13
**walker** [8] - 59:7,
63:11, 82:24, 92:25,
95:3, 122:13,
122:25, 151:6
**Walker** [14] - 57:25,
58:1, 58:2, 82:24,
91:23, 121:17,
128:17, 148:9,
149:11, 162:2,
187:8, 189:21,
190:4, 225:12
**Walker's** [1] - 130:7
**wants** [7] - 54:11,
60:11, 66:22, 74:2,
77:21, 158:12,
228:15
**warning** [1] - 206:11
**Wash** [1] - 111:11
**Washington** [19] -
2:11, 4:7, 4:14, 4:16,
5:5, 5:12, 22:18,
22:20, 106:7, 111:7,
134:11, 154:25,
191:21, 194:7,
194:19, 195:16,
224:2, 224:8, 225:17
**waste** [1] - 114:10
**ways** [4] - 16:6, 96:14,
101:18, 116:22
**WCH** [1] - 111:6
**WEBB** [1] - 3:11

**Webb** [1] - 3:12
**website** [1] - 207:13
**Wednesday** [1] - 93:7
**week** [4] - 7:23, 11:19,
141:6, 154:14
**weekend** [1] - 11:18
**weeks** [2] - 11:2, 93:9
**weight** [1] - 200:7
**welcome** [2] - 63:4,
228:10
**WEST** [2] - 1:1, 1:18
**west** [1] - 210:10
**West** [18] - 7:3, 20:18,
20:21, 21:10, 22:19,
22:22, 22:25, 23:5,
23:17, 106:9, 111:9,
112:24, 140:20,
174:5, 191:18,
191:21, 225:22
**whereas** [1] - 161:5
**whereby** [1] - 12:16
**whine** [1] - 142:12
**whole** [6] - 15:1,
59:23, 60:16, 77:7,
123:1, 213:15
**wholesale** [7] - 69:20,
69:21, 70:10, 70:13,
70:14, 71:8, 104:20
**wholesaler** [1] -
146:12
**wholesalers** [1] -
215:20
**WICHT** [1] - 4:12
**wide** [4] - 190:14,
210:12, 210:14,
210:22
**Williams** [2] - 4:13,
5:4
**willing** [3] - 10:6,
176:15, 177:23
**willingness** [1] -
186:23
**wise** [1] - 31:7
**withdraw** [1] - 57:2
**wither** [1] - 81:4
**witness** [73] - 8:1, 8:6,
8:13, 8:14, 8:19,
10:6, 10:24, 11:3,
11:9, 12:10, 12:23,
12:25, 14:5, 14:7,
14:20, 14:22, 15:18,
15:23, 16:1, 16:8,
16:9, 16:14, 16:15,
16:16, 17:2, 17:7,
21:3, 44:3, 44:6,
48:2, 48:23, 50:3,
50:18, 51:9, 51:25,
65:17, 70:23, 71:14,
90:18, 91:6, 100:24,
131:19, 136:10,

156:2, 166:20,
172:3, 172:22,
174:2, 176:9,
176:10, 177:1,
177:11, 177:25,
184:5, 184:6,
184:16, 196:20,
197:5, 197:17,
197:24, 202:14,
218:2, 219:16,
228:7, 231:7, 231:8,
231:11, 233:16,
233:20, 235:6
**WITNESS** [34] - 18:4,
18:6, 18:8, 21:6,
31:5, 32:8, 44:8,
44:11, 49:11, 57:22,
91:9, 109:24, 110:1,
110:3, 119:24,
148:6, 151:2,
171:16, 171:20,
172:9, 180:13,
180:18, 180:24,
181:18, 187:6,
187:15, 200:14,
207:25, 216:15,
217:10, 220:9,
234:10, 234:12,
234:16
**witness's** [5] - 36:3,
48:24, 170:22,
172:4, 188:24
**Witnesses** [1] - 10:21
**witnesses** [14] - 9:19,
10:4, 10:16, 10:24,
11:18, 11:24, 15:4,
15:5, 15:17, 75:12,
230:9, 235:21, 237:3
**wits** [1] - 140:24
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**wondering** [1] - 121:2
**word** [13] - 53:10,
53:16, 185:21,
194:16, 220:16,
221:10, 221:12,
221:23, 222:6,
222:12, 222:13,
223:7, 223:13
**workload** [4] - 139:23,
144:4, 144:24, 159:1
**works** [1] - 20:10
**worries** [1] - 218:13
**worry** [1] - 225:9
**worth** [1] - 168:18
**write** [2] - 97:4, 221:7
**writing** [5] - 69:3,
97:1, 146:7, 161:12,
221:23
**written** [16] - 33:23,

34:1, 68:12, 68:14,
79:19, 85:18, 95:25,
96:5, 113:22,
122:23, 123:15,
151:2, 155:16,
201:18, 213:13,
236:2
**wrote** [16] - 76:16,
77:9, 78:14, 103:10,
104:1, 128:13,
128:21, 134:2,
142:21, 145:1,
154:23, 158:16,
158:23, 186:5,
190:16, 225:15
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10,
3:13, 4:19, 5:15, 6:9

## Y

**year** [11] - 35:25, 58:8,
59:4, 111:17,
137:10, 138:21,
140:9, 140:10,
184:22, 186:19,
187:24
**yearly** [1] - 185:3
**years** [20] - 19:3,
58:13, 63:11, 65:4,
65:8, 73:15, 78:16,
101:16, 111:19,
120:18, 130:9,
135:3, 165:7,
183:17, 183:23,
190:22, 208:6,
222:2, 223:10,
223:11
**Yellow** [3] - 190:24,
190:25, 192:2
**yesterday** [4] - 14:17,
140:23, 141:21,
154:14
**York** [3] - 3:5, 19:25,
75:19
**yourself** [5] - 27:16,
27:17, 35:11, 93:1,
167:8
**ys** [1] - 57:12

## Z

**zero** [1] - 225:21