IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

_____x
                                :
THE CITY OF HUNTINGTON,         :      Civil Action
                                :
             Plaintiff,         :      No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
             Defendants.  :
_____x
                                :
CABELL COUNTY COMMISSION,       :      Civil Action
                                :
             Plaintiff,         :      No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
             Defendants.  :
_____x


BENCH TRIAL - VOLUME 17
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA


MAY 25, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:              Ayme Cochran, RMR, CRR
Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A. Faber,

 2   Senior Status Judge, United States District Court, Southern

 3   District of West Virginia, in Charleston, West Virginia, on

 4   May 25, 2021, at 9:00 a.m., as follows:

 5          THE COURT:  I believe Mr. Rafferty passed the

 6   witness at the conclusion of yesterday.  So, we'll move on

 7   to the cross examination of Mr. Oriente.

 8          MR. SCHMIDT:  May I take the podium, Your Honor?

 9          THE COURT:  Yes.

10          MR. SCHMIDT:  Thank you.

11          THE COURT:  Good morning, sir.

12          THE WITNESS:  Good morning, Your Honor.

13          THE COURT:  The Court reminds you you're still

14   under oath and you may take the witness stand.

15          THE WITNESS:  All right.  Thank you.

16          THE COURT:  Thank you.

17          MR. SCHMIDT:  May I proceed, Your Honor?

18       Thank you.

19                      CROSS EXAMINATION

20          BY MR. SCHMIDT:

21   Q.   Mr. Oriente, I'm going to pick up on some of the

22   questions that you were asked yesterday during the

23   examination you had with plaintiffs' counsel with Mr.

24   Rafferty.  I want to start by just touching on some details

25   of your employment and your work at McKesson.  First off,
```

1    can you tell us what is McKesson's mission as a distributor?

2    **A.**    Yes.  McKesson is a distributor of pharmaceuticals.  We

3    receive product in from the manufacturers.  We warehouse it,

4    store it.  Orders come in to us from pharmacies.  We fill

5    those orders and distribute them to the pharmacies.

6    **Q.**    And from your perspective and your experience, is that

7    an important mission?  Is that an important purpose?

8    **A.**    Yes, it is.

9    **Q.**    Tell me what you mean by that.

10   **A.**    We are a distributor of medications for people.  Some

11   are lifesaving drugs.  Others are maintenance drugs that

12   people need in order to live day-to-day.

13   **Q.**    How long is it that you've spent working at McKesson?

14   **A.**    Since June of 2004.

15   **Q.**    And what is it that has made you spend -- is that about

16   17 years?

17   **A.**    Yes, coming up on it.

18   **Q.**    Okay.  What is it that's made you spend such a

19   substantial portion of your career at McKesson?

20   **A.**    I -- when I interviewed with McKesson, many of the

21   people there had been there very long-term, which told me

22   something about the company.  The company has what it calls

23   I CARE principles and its integrity, customer

24   accountability, respect and excellence and those were some

25   of the things that made me realize McKesson was a very good

1   company to go to work for.

2   **Q.**   I want to do a couple of quick hit points and then dive

3   some more into your background and then into the programs at

4   McKesson.  But just by way of general introduction, the

5   Court has heard about this concept of blocking orders.  For

6   how long has McKesson been blocking orders that go above

7   thresholds?

8   **A.**   McKesson has been systematically blocking orders since

9   2008.  Any suspicious order in 2008 on was systematically

10  blocked.  Prior to 2008, it would have been a manual process

11  by people in the distribution center at different levels

12  that could review orders.

13  **Q.**   Separate from suspicious orders, does McKesson monitor

14  its customers for evidence of diversion, evidence that

15  something -- something wrong is going on?

16  **A.**   Yes, we do.

17  **Q.**   Has that monitoring been part of your job throughout

18  your time at McKesson?

19  **A.**   Yes, it has been.

20  **Q.**   In your position as Director of Regulatory Affairs,

21  have you taken action against pharmacies when you see reason

22  to do so?

23  **A.**   Yes, I have.

24  **Q.**   Other than in this case in your work, has anyone, DEA,

25  state government, expressed concern that you know of about

1    specific McKesson customers in Huntington and Cabell County?

2    **A.**   Not that I'm aware of, no.

3    **Q.**   All right.  Let's go back to your experience and I'll

4    ask you a few more questions about your experiences.  As I

5    understand it, there was a period of time when you were

6    Director of Operations at the distribution center; is that

7    correct?

8    **A.**   Yes.

9    **Q.**   What period of time was that?

10   **A.**   That was 2004.  June of 2004 through the end of 2007.

11   **Q.**   So that we have it, what is a distribution center?  Can

12   you explain what that is?

13   **A.**   A distribution center is a large warehouse building

14   about the size of four football fields.  There's conveyor

15   systems running throughout it.  A lot of automation for

16   picking.  There's also what's called pallet racking where

17   product is stored.  And there's a cage and a vault for

18   storage of the controlled substances.

19   **Q.**   Can you give us a sense of the range of products that

20   McKesson deals with that it has at its distribution centers?

21   **A.**   Yes.  It would have Rx products, such as antibacteria

22   drugs.  It would have drugs for mental illness, have drugs

23   for psoriasis, blood pressure medicines, all that type.

24   Everything you'd see in a pharmacy behind the counter would

25   be in our warehouse.

1    **Q.**   You mentioned the term Rx drugs.  Could you just tell

2    us what that is?

3    **A.**   Yes.  They would be drugs that would require a

4    prescription from a prescriber in order to be dispensed.

5    **Q.**   I'm not going to ask you for an exact number, but from

6    your work, do you have a sense of, if we look at all the --

7    all the medications McKesson has at a warehouse, at a

8    distribution center, how much of those are prescription

9    opioids?

10   **A.**   Yes.  I believe it's roughly about four percent only.

11   **Q.**   I'd like to focus on that small percentage of

12   prescription opioids.  In terms of physical storage at a

13   distribution center, are they stored differently than the

14   other prescription medications?

15   **A.**   Yes, they would be.

16   **Q.**   Can you tell us about that?

17   **A.**   Yes.  The Schedule II opioids would be stored in a

18   vault, a cement vault, reinforced with rebar and would have

19   a big safe door on it just like you'd see at a bank vault.

20   **Q.**   You mentioned Schedule II.  Is there a different method

21   for storing Schedule III controlled substances?

22   **A.**   Yes.  Schedule IIIs through Vs would be stored in a

23   cage, a locked cage environment.

24   **Q.**   Does someone set rules for what that vault needs to be

25   like, or what the cage needs to be like, guiding the Section

1    IIs are in the vault and the Section -- the Schedule IIIs

2    are in the cage?

3    **A.**    Yes.

4    **Q.**    Who sets those rules?

5    **A.**    Those rules and requirements are set by the DEA.

6    **Q.**    And do you have an understanding as to whether those

7    rules are very general, very detailed?

8    **A.**    They're very detailed.

9    **Q.**    We talked about storage.  Are there other surveillance

10   tools at a distribution center regarding controlled

11   substances?

12   **A.**    Yes, there are.

13   **Q.**    Could you describe those to us?

14   **A.**    Yes.  There are cameras throughout the cage and vault.

15   There are cameras throughout the facility overall and, for

16   the cage and vault, there is limited access to employees

17   with badge entry only.

18   **Q.**    And what, as you understand it, is the purpose of

19   having all of those protective measures for prescription

20   opioids?

21   **A.**    Yes.  Those measures are in place because of the closed

22   loop distribution.  By that, it goes from the manufacturer,

23   gets handed off to the distributor.  The distributor takes

24   possession and then distributes or -- yeah, distributes that

25   to the pharmacy.

1    **Q.**   Okay.  How many of these distribution centers are there

2    around the United States?

3    **A.**   I believe at this time there's 28.

4    **Q.**   In order for them to have controlled substances, does

5    each individual distribution center need to be registered by

6    the DEA?

7    **A.**   Yes.  Each distribution center would have a

8    registration issued by the DEA.

9    **Q.**   Do you know whether that registration is a lifetime

10   registration or whether it needs to be renewed?

11   **A.**   It would need to be renewed.

12   **Q.**   How often?

13   **A.**   It's a yearly renewal.

14   **Q.**   And from your perspective, do you understand why

15   there's a renewal process?

16   **A.**   Yes, I do.

17   **Q.**   What's that?

18   **A.**   The DEA would review whether a registration should be

19   renewed.  They have the ability to withdraw that renewal.

20   **Q.**   From your experience, do they have the ability to visit

21   your distribution centers in the course of either

22   registering them initially or in the course of

23   re-registering them annually?

24   **A.**   Yes.  They can visit at any time they see fit.

25   **Q.**   Do they always perform cyclical audits of your

1    distribution centers?

2    **A.**    Yes.  They do come in every -- within every two years

3    to do a cyclical audit.

4    **Q.**    Do you have an experience with that that you could

5    describe for us just in terms of how that works?

6    **A.**    Yes, both as the Director of Operations and as a

7    Regulatory Director.  The DEA comes in once every two years

8    to review your processes, your policies and procedures.

9    They review and do inventory counts to make sure that your

10   inventory is accurate.  They'll also look at what's called a

11   222 Form, which is used to fill out by the -- by the

12   pharmacy to order opioids and the DEA would come in and

13   check that you're storing those and filing those accurately.

14   **Q.**    Okay.  In the course of these cyclical audits or in the

15   course of registering or re-registering the facilities, does

16   the DEA have the ability to look at your policies, like --

17   something like the CSMP that we heard about yesterday?

18   **A.**    Yes, they would.

19   **Q.**    Do they have the ability to look at customer files?

20   **A.**    Yes, they could.

21   **Q.**    Do they have the ability to look at sales data or

22   transaction data?

23   **A.**    Yes.  They'd have full visibility.

24   **Q.**    And from your experience, do they raise issues when

25   they see it during these audits or reviews?

1    **A.**    Yes.   They would note those.

2    **Q.**    Is it meaningful to you if they have access during a

3    review and they don't raise issues regarding it?

4    **A.**    Yes.   That would -- that would happen.   It would be a

5    good sign.

6    **Q.**    Why is that?

7    **A.**    During our audits, if they find no instances that they

8    bring to light, it means that we've had a good audit and

9    they agree with our processes.

10    **Q.**    Okay.   I've been talking about the DEA and their

11    registration process.   Are there parallel licensing

12    requirements from individual states for your distribution

13    centers?

14    **A.**    Yes, there are.

15    **Q.**    We had some discussion yesterday about the Washington

16    Court House Distribution Center and the fact that that was

17    the principal distribution center for Huntington and Cabell

18    County.   Can you tell us where it's located?

19    **A.**    Yes.   Washington Court House Distribution Center is in

20    Washington Court House, Ohio.

21    **Q.**    Is it also licensed, to your knowledge, in West

22    Virginia?

23    **A.**    Yes, it would be, to my knowledge.

24    **Q.**    And why is it licensed in West Virginia if it's located

25    in Ohio?

1    **A.**    In order to do business, controlled substances and Rx

2    drugs into the State of West Virginia, distribution centers

3    would need to be licensed in that state that they distribute

4    into.

5    **Q.**    Is it the only McKesson distribution center that's

6    licensed by the State of West Virginia?

7    **A.**    No, it is not.

8    **Q.**    Why is it you have other distribution centers licensed

9    by the State of West Virginia if Washington Court House and

10   one or two other ones are the principal ones distributing

11   into West Virginia?

12   **A.**    McKesson Distribution Centers have multiple state

13   licenses in order to distribute into multiple states if the

14   need arise.

15   **Q.**    And why might the need arise?

16   **A.**    There could be something that affects the operation of

17   one distribution center and, in order to have the ability

18   to, you know, avert that problem, whether it be electrical

19   or something, they would be able to ship from another

20   distribution center to meet that need.

21   **Q.**    If you have more than one distribution center shipping

22   into West Virginia, does every single one need to be

23   licensed by the State of West Virginia?

24   **A.**    Yes.  Each one would need to be licensed.

25   **Q.**    In your work at McKesson, have you had opportunity to

```
 1    see individual distribution center licenses?

 2    A.   Yes, I have.

 3              MR. SCHMIDT:  May I approach, Your Honor?

 4              THE COURT:  Yes.

 5              THE WITNESS:  Thank you.

 6              MR. SCHMIDT:  Absolutely.

 7              BY MR. SCHMIDT:

 8    Q.   Do you recognize this as a State of West Virginia

 9    license for one of your distribution centers?

10    A.   Yes, I do.

11              MR. SCHMIDT:  Your Honor, we move in MCWV-21250.

12              THE COURT:  Any objection?

13              MR. RAFFERTY:  No objection, Your Honor.

14              THE COURT:  It's admitted.

15              MR. SCHMIDT:  Thank you.

16        Let's put that up on the screen if we could, please.

17    And apologies.  Oh, I'm sorry.

18              MR. SCHMIDT:  Thank you.

19              LAW CLERK:  Sorry.

20              MR. SCHMIDT:  No, my fault.

21              BY MR. SCHMIDT:

22    Q.   Do you see the document on your screen?  We're not

23    going to put it up on this big screen because I'm going to

24    use that in a minute, but it should be on the screen to your

25    right.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **A.**    Yes, sir.

2    **Q.**    And on the Court's screen.  Do you see that document

3    that says State of West Virginia Board of Pharmacy

4    Wholesaler -- Wholesale Drug Distributor Permit, Controlled

5    Substances Permit, McKesson Corporation?  Is this one of

6    those West Virginia licenses you were telling us about?

7    **A.**    Yes, it would be.

8    **Q.**    If you look further down, it's for a place in

9    Robbinsville, New Jersey.  Do you know what distribution

10   center that is?

11   **A.**    Yes.  That goes by the name Tristate Distribution

12   Center.

13   **Q.**    Okay.  We picked this one as an illustration for a

14   reason.  Do you have any affiliation with that distribution

15   center?

16   **A.**    Yes.  That was my home DC.  That's where I have an

17   office.

18   **Q.**    And if we look up above, we see some dates.  It looks

19   like it was issued June 22nd, 2020 and it runs through

20   June 30th of 2021.  Is this the current license for the

21   Tristate Distribution Center?

22   **A.**    Yes, it is, and would be valid until the end of June of

23   this year.

24   **Q.**    Okay.

25            MR. SCHMIDT:  May I approach?

```
1              BY MR. SCHMIDT:

2     Q.   And in the interest of time, what I have done is given

3     you a stack of licenses from the State of West Virginia

4     starting in 2014 forward with the exhibit number MCWV-2149.

5     Do you recognize these documents and have you had a chance

6     to review them before?

7     A.   Yes, I have.

8              MR. SCHMIDT:  We'd move this into evidence, Your

9     Honor.

10             MR. RAFFERTY:  No objection, Your Honor.

11             THE COURT:  It's admitted.

12             BY MR. SCHMIDT:

13    Q.   Let's take just one example from this stack.  If you

14    look at Page 149, please, are you able to tell what

15    distribution center this license corresponds to?

16    A.   Yes.  This license would correspond to the Washington

17    Court House Distribution Center in Ohio.

18    Q.   And can you tell from the date above whether this is

19    the current license?

20    A.   Yes.  It would be, again, valid through the end of June

21    of this year.

22    Q.   All right.  I've been asking you so far about your

23    responsibilities when you were directly part of a

24    distribution center as a Director of Operations.  I want to

25    ask about the role you stepped into and that you still hold
```

1   today now as a Director of Regulatory Affairs.  Can you tell

2   us when you became a Director of Regulatory Affairs?

3   **A.**   Yes.  It would have been in early 2008.

4   **Q.**   And, at a high level, can you tell us what that role as

5   a Director of Regulatory Affairs entails?

6   **A.**   Yes.  For the position that I took, it was a regional

7   position for the northeast.  I was responsible to oversee

8   the controlled substance ordering and shipments for six

9   distribution centers on a daily basis.  I would review

10   customer purchases.

11   **Q.**   Okay.  Why did you switch from being a Director of

12   Operations at a distribution center to being a Director of

13   Regulatory Affairs?  What made you decide to make that shift

14   in your career?

15   **A.**   As Director of Operations, part of my responsibility

16   was regulatory-related.  Since I was responsible for the

17   entire building and operations, and I found that to be a

18   very rewarding, and interesting, satisfying part of the job,

19   and I also wanted to progress in my career and do something

20   on a more regional level than one distribution center.

21   **Q.**   In your experience, has that role been an important

22   role, being a Director of Regulatory Affairs?

23   **A.**   Yes, it has been.

24   **Q.**   When you took that role, did you receive training from

25   McKesson?

```
1    A.    Yes, I did.

2    Q.    Have you received training on Regulatory Affairs issues

3    since?

4    A.    Yes.  The training is continuous.

5    Q.    Has that included external training from diversion

6    investigation groups?

7    A.    Yes, it has.

8    Q.    All right.  I want to shift gears now having gone

9    through your background and I would like to talk about

10   McKesson's role in the supply chain.

11         MR. SCHMIDT:  And, if I may, Your Honor, may I

12   approach the board?

13         THE COURT:  You may.

14         MR. SCHMIDT:  Thank you.

15         BY MR. SCHMIDT:

16   Q.    Start off by writing McKesson in apparently the

17   messiest handwriting possible.  Where is it McKesson gets

18   the controlled substances that it distributes?

19   A.    It gets them from manufacturers.

20   Q.    Okay.

21         MR. ACKERMAN:  Your Honor, just for the record,

22   I'm going to move around this way so that I can see the

23   board.  I just didn't want the Court to be alarmed.

24         THE COURT:  That's fine.

25         BY MR. SCHMIDT:
```

1    **Q.**    Between manufacturers and a company like McKesson,

2    which is the entity that studies the drug and obtains

3    approval for the drug?

4    **A.**    That would be under the manufacturer's responsibility.

5    **Q.**    Which is the entity that makes the medication?

6    **A.**    Again, the manufacturer.

7    **Q.**    Which is the entity that provides warnings to doctors,

8    sometimes to patients regarding the medication?

9    **A.**    That would be provided by the manufacturer.

10   **Q.**    Are the products that McKesson obtains, whether

11   prescription opioids or otherwise, from manufacturers FDA

12   approved?

13   **A.**    Yes, they would be.

14   **Q.**    Is that meaningful that for the prescription

15   medications they're FDA approved?

16   **A.**    Yes, it would be.

17   **Q.**    All right.  What about in terms of customers, can you

18   give us a sense of the customers that McKesson has?

19   **A.**    Yes.  McKesson would -- customers would move

20   pharmacies, as well as hospitals.

21   **Q.**    In terms of supplying pharmacies and hospitals with

22   prescription medications, as you understand it, is that an

23   important function?

24   **A.**    Yes, it is.

25   **Q.**    Why is that?

1    **A.**    Again, some of the medications that we deliver both to

2    hospitals and pharmacies are maintenance drugs for people to

3    live their daily lives.  It's also used in hospitals for

4    surgeries and such.  Some -- some of our shipments are life

5    critical.

6    **Q.**    When you talk about -- and I'll ask you some more

7    questions about the diligence that you do into pharmacies

8    and hospitals and let me focus on pharmacies in particular.

9    Do you see a lot of similarity between their ordering

10   patterns?  Do you have a wide range of variability?

11   **A.**    There would be a wide range of variability.

12   **Q.**    And why is that in your experience?

13   **A.**    Pharmacies are different one from another.  I know

14   there are, you know, average numbers, but there's really few

15   that are average.  Some are larger.  Some are smaller.  Some

16   are located in cities.  Others in rural areas.  There's

17   multiple variabilities.

18   **Q.**    Do you see variability even within pharmacies that

19   might be in the same community?

20   **A.**    Yes, there could be.

21   **Q.**    And why might that be?

22   **A.**    Because of their location.  One pharmacy may have a

23   medical building close by across the street that has

24   multiple physicians offices in it.  Another could be located

25   close to a hospital or a medical center.  So, depending on

```
 1    where they're located, there would be that cause for

 2    variability.

 3    Q.   Do you see variability in terms of the types of

 4    products they order from you, the manufacturers that make

 5    those products?

 6    A.   Yes, there would be.

 7    Q.   Do you have an understanding of whether when you ship a

 8    prescription medicine, whether it's an opioid or something

 9    else to a pharmacy, as to whether it ever leaves the

10    pharmacy shelf without there being a doctor writing a

11    prescription for an individual patient?

12    A.   It should not.  It's a requirement that there be a

13    prescription for a pharmacy to dispense.

14    Q.   Do you have experience with whether pharmacies order

15    large quantities of medications just so they can have them

16    sit on their shelf?

17    A.   No.  They would not order product just to sit on the

18    shelf.  It's -- it's space that they have, as well as, you

19    know, it's expirable.  There are dates on the product.  They

20    wouldn't want it just sitting on the shelf.

21    Q.   Does that contribute to variability over time?

22    A.   It would.

23    Q.   For lack of a better term, is McKesson able to adopt a

24    one size fits all approach to every single one of its

25    pharmacy customers in terms of things like setting threshold
```

```
 1    for all pharmacies?
 2    A.   No, not -- not really.
 3    Q.   Are you able to tell when you look at a pharmacy just
 4    by their numbers whether there's potential diversion or not?
 5    A.   In my experience, no.
 6    Q.   Why is that?
 7    A.   Well, just because there is a large volume pharmacy
 8    does not mean that diversion is taking place.  And the
 9    opposite spectrum is just because a pharmacy is ordering a
10    low amount of opioids doesn't mean that they're not doing
11    something with diversion.
12    Q.   Okay.  And is the same true in reverse?
13    A.   Yes.
14    Q.   I would like to ask you about one customer in
15    particular, one of your hospital customers.  Are you aware
16    of whether McKesson provides VA facilities with prescription
17    opioids?
18    A.   Yes.  McKesson has a contract with the Veterans
19    Administration.
20    Q.   And how do you know about that?
21    A.   When I was first hired in Delran, I was responsible for
22    the operation there and I was -- you know, in the case of
23    Delran, we serviced several VA hospitals.  And so, I would
24    have to have the staffing at the distribution center set
25    appropriately to meet that demand.
```

 1    **Q.**    Okay.

 2              MR. SCHMIDT:  If I may approach, Your Honor?

 3              THE COURT:  Yes.

 4              MR. SCHMIDT:  Sorry for these voluminous documents

 5    that I hope to ask just a couple of questions about that are

 6    important for the record.

 7              THE WITNESS:  Thank you.

 8              MR. ACKERMAN:  Your Honor, may I have a minute to

 9    confer with my colleagues --

10              THE COURT:  Yes.

11              MR. ACKERMAN:  -- before we start this questioning

12    on this topic?

13        (Pause)

14              THE COURT:  I feel like an umpire ready to break

15    up a conference at the mound.

16              MR. ACKERMAN:  I feel like an umpire walking to

17    the mound, Your Honor.

18              BY MR. SCHMIDT:

19    **Q.**    Mr. Oriente, do you see I've put in front of you a copy

20    of the VA contract marked MCWV-02074?

21    **A.**    Yes, I do.

22    **Q.**    Have you had the opportunity at a high level to review

23    this document before you came here today?

24    **A.**    Yes, I have.

25              MR. SCHMIDT:  We'd move this into evidence, Your

1    Honor.

2              MR. ACKERMAN:  We have a relevance objection, Your

3    Honor.

4              THE COURT:  Well, what's the relevance, Mr.

5    Schmidt?

6              MR. SCHMIDT:  They're a customer in

7    Cabell-Huntington.  They're our biggest customer.  They're

8    76 percent of our market.  If the plaintiffs --

9              THE COURT:  I will admit it.  Overrule the

10   objection and admit it.

11             MR. SCHMIDT:  Thank you.

12             BY MR. SCHMIDT:

13   **Q.**   Let's look at the top.  Do you see it says Department

14   of Veterans Affairs at the top, December 31st, 2003?

15   **A.**   Yes, it does.

16   **Q.**   And it's sent to a Mr. Paul Julian.  Do you see that?

17   **A.**   Yes.

18   **Q.**   Who is Mr. Julian?

19   **A.**   Mr. Paul Julian was the President of McKesson at the

20   time.

21   **Q.**   First line says congratulations.  The government is an

22   entity of few words.  And then, if we scroll down, they say

23   -- in the second paragraph, they specify the award period.

24   Do you see that in the second paragraph there for the base

25   period of April 1st, 2004 through March 31st, 2006 with

1    three two-year government renewal options.  Do you see that?

2    **A.**    Yes.

3    **Q.**    Okay.  And then, if we flip through to Page 3 of this

4    document, there's one of these government solicitation

5    contract order forms.  Do you see that?

6    **A.**    Yes.

7    **Q.**    And you can see on the left issued by Department of

8    Veterans Affairs issued to McKesson Corporation.  Do you see

9    that?

10   **A.**    Yes, I do.

11   **Q.**    Okay.

12            MR. SCHMIDT:  May I approach, Your Honor?

13            THE COURT:  Yes.

14            BY MR. SCHMIDT:

15   **Q.**    I'm giving you three exhibits together.

16   **A.**    Thank you.

17   **Q.**    And just while these are being passed out, do you see

18   that these are VA contracts labeled MCWV-2062, MCWV-918 and

19   MC-WV-917?

20   **A.**    Yes, I do.

21            MR. SCHMIDT:  We'd move these three documents into

22   evidence, Your Honor.

23            THE COURT:  Any objection?

24            MR. ACKERMAN:  State my objection for the record,

25   Your Honor, but I can guess your response.

```
 1              THE COURT:  Well, what's your objection?
 2              MR. ACKERMAN:  It's the same relevance objection,
 3   Your Honor.
 4              THE COURT:  Your objection is overruled and
 5   they're admitted, Mr. Ackerman.
 6              BY MR. SCHMIDT:
 7   Q.   All right.  And just very quickly, if we start with
 8   2062, do you see that this -- and you go to the second page,
 9   it says contract period at the top and do you see this is a
10   short-term contract, May 10th, 2012 to August 9th, 2012,
11   with an option for an additional 30 days?
12   A.   Yes, I do.
13   Q.   And if you look at the next document, MCWV-918, on the
14   cover, do you see that there's also a contract period?  This
15   runs from August 10th, 2012 through August 9th, 2014 with
16   three two-year options?
17   A.   Yes, I do.
18   Q.   And last one, MCWV-917, go to -- I believe it's Page 7
19   and in that do you see that this contract period is the
20   August 9th, 2020 through August 8th, 2022 with three
21   two-year options?
22   A.   Yes, I do.
23              MR. SCHMIDT:  Your Honor, just to avoid documents
24   piling up, do you mind if I take some of these big stacks
25   that I'm not going to use further?
```

```
 1                  THE COURT:  All right.

 2                  THE WITNESS:  What do you want back?

 3                  MR. SCHMIDT:  Anything you want to give me.  Thank

 4       you.

 5                  THE WITNESS:  You're welcome.

 6                  MR. SCHMIDT:  Thank you.

 7                  BY MR. SCHMIDT:

 8       Q.   All right.  Let's go back to the board.  Who is it in

 9       the supply chain that makes a decision about whether an

10       individual patient can get access to a prescription

11       medicine, including prescription opioids?

12       A.   That would be a prescriber.

13       Q.   And I've drawn an arrow between the prescriber and the

14       pharmacy just in terms of a patient going to a pharmacy to

15       fill a prescription.  When it comes to talking with

16       prescribers, talking with doctors about the medicines

17       they're prescribing, and which ones they should be

18       prescribing, is that something McKesson does?

19       A.   No, we do not.

20       Q.   Does McKesson interact directly with patients in terms

21       of talking with them about what medicines they should use?

22       A.   No, McKesson does not.

23       Q.   I'm going to ask you about -- I'm going to ask you

24       about DEA.  Does DEA oversee every one of these entities?

25       A.   Yes, they would.
```

1    **Q.**   Do you have an understanding as to whether they

2    register every one of those entities?

3    **A.**   Yes, they would.

4    **Q.**   And from McKesson's perspective in this process, does

5    it matter that these other entities are all registered with

6    the DEA that is dealing with DEA registered entities?

7    **A.**   Yes.  It would definitely be a requirement.  McKesson

8    won't ship to a hospital or a pharmacy that is not licensed

9    with a DEA registration.

10   **Q.**   Why does that matter?

11   **A.**   It's part of the requirement in the -- in the way that

12   McKesson operates in order to meet its responsibilities and

13   it also tells us that a pharmacy or a hospital has been

14   issued and is viewed by the DEA as being an acceptable

15   registrant.

16   **Q.**   Do you have an understanding of whether, in addition to

17   registering all of these entities in the closed system, the

18   DEA actually has control over the amount of prescription

19   opioids in a given year that manufacturers can physically

20   make?

21   **A.**   Yes, they would.

22   **Q.**   What's your understanding of that ability?

23   **A.**   The DEA sets what's called the manufacturing quota,

24   which is basically the amount that a manufacturer could

25   manufacture and make.  They set it for each manufacturer.

1    And so, the DEA controls how much product can be made in a

2    year.  It's a yearly quota.

3    **Q.**   From your experience, does McKesson have any role in

4    that quota process?

5    **A.**   No, we do not.

6    **Q.**   I want to focus on when you started at McKesson and

7    then when you switched over to being a DRA up through, say,

8    2010, 2011, 2012.  In that period of time, do you have an

9    awareness when it comes to prescription opioids as to

10   whether physicians were writing more or less prescriptions

11   over that time?

12   **A.**   They were writing more prescriptions during those

13   years.

14   **Q.**   Do you have an awareness as to whether, during that

15   time period, the DEA was keeping the quota flat, reducing

16   the quota, or increasing the quota?

17   **A.**   The DEA was increasing the quota.

18   **Q.**   So, I want to ask you about those two points.  If

19   you're working at McKesson conducting diligence on

20   pharmacies, monitoring pharmacies, and you know that

21   prescribers are writing more prescriptions, you know that

22   the DEA is raising the quota, do you expect that to have an

23   effect on what pharmacies order?

24   **A.**   Yes, I would.

25   **Q.**   And tell us about that.

1    **A.**    Pharmacies would need to order more in order to meet

2    the increase in prescriptions that they're seeing.

3    **Q.**    And did you, in fact, see that in your practice?

4    **A.**    Yes, I did.  And that would affect, again, our workload

5    as TCRs, the threshold change requests, and our thresholds.

6    As prescribers wrote more, pharmacies ordered more, and they

7    would request that their thresholds be reviewed.

8    **Q.**    Do you have an understanding as to whether when

9    pharmacies order more and ask for threshold change requests,

10   whether that is a function, or not, of doctors writing more

11   prescriptions?

12           MR. RAFFERTY:  Objection, Your Honor, leading.

13           THE COURT:  Well, I'm going to allow him to lead

14   him a little bit.  This is technically cross examination, I

15   think.

16       Go ahead, Mr. Schmidt.

17           THE WITNESS:  Could you repeat the question,

18   please?

19           MR. SCHMIDT:  Of course.

20           BY MR. SCHMIDT:

21   **Q.**    Do you know whether if pharmacies order more from

22   McKesson and ask for a threshold change from McKesson, ask

23   for higher thresholds, whether that is a function of

24   prescribers writing more prescriptions or not?

25   **A.**    Yes, there would be.

1    **Q.**   Now, just to round out the DEA, in your time with

2    McKesson, in your roles, have you had occasion to have

3    interactions with the DEA on issues relating to prescription

4    opioids?

5    **A.**   Yes, I have.

6    **Q.**   Has it been important for you to try to meet the DEA's

7    expectations regarding prescription opioids?

8    **A.**   Yes, absolutely.

9    **Q.**   Has it been important for you to try to work

10   cooperatively with the DEA to meet their expectations?

11   **A.**   Yes, it has.

12   **Q.**   Based on your experience, have there been times when

13   the DEA guidance to McKesson has changed in terms of what

14   their expectations are and what you understand they want you

15   to be doing?

16   **A.**   Yes, there was.

17   **Q.**   Has it always been clear what their guidance is?

18   **A.**   Not always.

19   **Q.**   Can you give us a sense of that?

20   **A.**   Yes.  There were, I think, in '6 and '7, those -- they

21   refer to them as the Rannazzisi letters where the guidance

22   changed as to what was expected of the wholesalers.

23   **Q.**   When you say '6 and '7, do you mean 2006 and 2007?

24   **A.**   Yes, sir.

25   **Q.**   As that guidance has changed over time, has McKesson

```
 1    worked to try to meet that guidance, meet that direction?

 2    A.   Yes.  Our program has evolved.

 3    Q.   I'd like to talk now about your programs and that point

 4    you just mentioned, how it's evolved over time.

 5                MR. SCHMIDT:  And, if I could, I'll go back to the

 6    board, Your Honor.

 7                THE COURT:  Yes.

 8                MR. SCHMIDT:  Thank you.

 9                BY MR. SCHMIDT:

10    Q.   I want to divide this, just for sake of ease, into

11    three time periods.  So, I'd like to ask you, if I could,

12    what happened before 2008?  What happened between 2008 and

13    2013?  And what's happened since 2013?  Do you have

14    familiarity of McKesson's policies at all at all three of

15    those time periods?

16    A.   Yes, I do.

17    Q.   All right.  Let's start with before 2008.  And before I

18    get into each of these time periods, I want to ask you about

19    something you've heard a lot about called ARCOS.  Are you

20    familiar, Mr. Oriente, with the DEA's ARCOS database?

21    A.   Yes, I am.

22    Q.   Could you give us your understanding of what the ARCOS

23    database contains at least as it relates to McKesson?

24    A.   Yes.  It would be all shipments of controlled

25    substances, IIs through Vs, to specific registrants on
```

1    specific dates and specific amounts.

2    **Q.**    Did McKesson provide that information to the DEA?

3    **A.**    Yes, it did.

4    **Q.**    Would it include information on the individual

5    pharmacies being shipped to?

6    **A.**    Yes, it would.

7    **Q.**    Would it include the dates of shipments?

8    **A.**    Yes, it would.

9    **Q.**    Would it include the volume of shipments?

10   **A.**    Yes, it would.

11   **Q.**    Would it include all orders shipped?

12   **A.**    All controlled orders shipped, yes.

13   **Q.**    Fair.  And was that ARCOS Report a constant throughout

14   each of these three time periods?

15   **A.**    Yes, it has been.

16   **Q.**    In your role as Director of Regulatory Affairs, I take

17   it you can access information of the type that McKesson was

18   submitting to the ARCOS database, but could you access the

19   ARCOS data that other distributors were submitting?

20   **A.**    No.  That was not available.

21   **Q.**    Do you have an understanding as to who did have access

22   to that information?

23   **A.**    Only the DEA.

24   **Q.**    Were there occasions you're aware of when distributors

25   like McKesson tried to get access to that ARCOS data?

1    **A.**    I believe there were requests made, yes.

2    **Q.**    Until very recently, was that ever granted, to your

3    knowledge?

4    **A.**    Not until recent.

5    **Q.**    And what happened recently?

6    **A.**    I believe that we got availability to ARCOS in 2019, I

7    believe it was.

8    **Q.**    And do you know how that availability came about?

9    **A.**    Yes.  An act of Congress.

10   **Q.**    Has it been helpful to have access to that data since

11   that time?

12   **A.**    Yes.  It's one more tool in the toolbox for us to

13   review customers.

14   **Q.**    Would it have been useful to have that information,

15   that access, before?

16   **A.**    Yes, it would have.

17   **Q.**    Why is that?

18   **A.**    It would have given us a full picture of the purchases

19   by the pharmacy registrant.  Prior to having access to that

20   information, McKesson could only see what McKesson sold to

21   that customer.

22   **Q.**    Would it have been helpful to have that earlier in

23   terms of your role in conducting diligence and trying to

24   spot diversion where you could?

25   **A.**    Yes, it would have.  It's one of the things we use

1    today on a daily basis.

2              MR. SCHMIDT:  May I approach again, Your Honor?

3              THE COURT:  Yes.

4              MR. SCHMIDT:  I have a very helpful note to me on

5    this document that this is the last big document we'll be

6    passing out.

7              THE COURT:  Okay.

8              THE WITNESS:  Thank you.

9              MR. SCHMIDT:  I hope I can live up to that

10   representation.  I trust I'll have the wrath of all

11   concerned if I don't.

12             BY MR. SCHMIDT:

13   **Q.**   Do you recognize this document that I've put in front

14   of you, which says Drug Operations Manual Section 55 DEA

15   Compliance, and has the exhibit number MCWV-451?

16   **A.**   Yes, I do.

17   **Q.**   What is Section 55 of the Drug Operations Manual at

18   McKesson or what was it?

19   **A.**   Yes.  This is McKesson's Operating Manual for the

20   storage and shipments of controlled substances.

21   **Q.**   To orient us, is this a precursor to the CSMP that we

22   were talking about the other day?  Did it come before it?

23   **A.**   Yes, it did.

24             MR. SCHMIDT:  Your Honor, we move Exhibit MCWV-451

25   into evidence.

1           MR. RAFFERTY:  No objection, Your Honor.

2           MR. SCHMIDT:  Thank you.

3           THE COURT:  It's admitted.

4           BY MR. SCHMIDT:

5      Q.   Let's put that up on the screen.  And if we could go to

6      Page 2, do you see that the date of this is January 15th,

7      1997?

8      A.   Yes, I do.

9      Q.   Until this was replaced by the CSMP, was this

10     periodically revised as circumstances warranted?

11     A.   Yes.  It would have been updated as required.

12     Q.   I believe this version covers the relevant time period

13     in terms of the points I'm going to ask you about, so I'm

14     only going to show you this version of the manual from

15     before 2008.

16          Let's start by going to Page 14, if we could.  Do you

17     see at the top of Page 14 it's got a header that says Drug

18     Operations Manual Section 55.  And then it's got the date,

19     January '97, and below that, it says Federal Regulatory

20     Requirements General.  Do you see that?

21     A.   Yes.

22     Q.   And if we look at that first paragraph under General,

23     there's a sentence that's been underlined for emphasis.  I

24     want to focus on that sentence.  It is extremely important

25     that McKesson employees fully comply with the regulations

1    and the following guidelines.  Did I read that correctly?

2    **A.**   Yes, you did.

3    **Q.**   Is that something you have taken seriously in your work

4    at McKesson?

5    **A.**   Yes, I have.

6    **Q.**   Let's go ahead to Page 16, please, and if we look

7    halfway down Page 16, there's a heading, C.  Do you see that

8    heading?

9    **A.**   Yes.

10   **Q.**   And it says Automated Reports and Consolidated Order

11   System, ARCOS.  Do you have an understanding as to whether

12   that's referring to this ARCOS reporting we were just

13   talking about?

14   **A.**   Yes.  That's what it is.

15   **Q.**   And if you just look, it goes on for sometime to talk

16   about the ARCOS reporting obligations.  I want to skip ahead

17   to the next section or to another section.  Could we go to

18   Page 46, please?  Do you see there's a heading --

19          MR. RAFFERTY:  I'm sorry.  I'm sorry, Mr. Schmidt.

20   I didn't mean to interrupt.  Where were you on the last one?

21   I'm a little lost.

22          MR. SCHMIDT:  I was on Page 16.

23      And, just for the Court's reference, too, there's a --

24   in the lower left corner is the pagination that I'm using

25   with the exhibit number and then the page number.  Sorry for

1   any confusion on that.

2            BY MR. SCHMIDT:

3   **Q.**   So, we're on Page 46.  And do you see the heading at

4   the top, Suspicious Orders, Detecting Suspicious Orders, and

5   then Definition and Responsibility?

6   **A.**   Yes.

7   **Q.**   And if you look in the second paragraph, there's a

8   quotation.  Do you know where that quoted definition comes

9   from?

10  **A.**   Yes, the DEA's definition of suspicious order.

11  **Q.**   And does that comport with your understanding of what

12  the DEA tells you constitutes a suspicious order?

13  **A.**   Yes, it is.

14  **Q.**   All right.  I'm going to come back to that in a minute,

15  but I want to ask you a separate question about that.  Is

16  every single order that your company identifies as a

17  suspicious order also reported as part of the dataset that

18  goes in through ARCOS?

19  **A.**   Yes, it would be, if it was shipped.

20  **Q.**   So, whether it's reported separately as suspicious or

21  not, does it get reported as part of the larger ARCOS

22  dataset?

23  **A.**   Yes.  It would be included in the ARCOS numbers.

24  **Q.**   Would I be correct then in understanding that if

25  there's a Suspicious Order Report, that's actually two

1    reports, one through ARCOS, one is the separate suspicious

2    order flagging?

3    **A.**   That is correct.

4    **Q.**   Let's go to Page 47, please, and in the middle of the

5    page -- or, actually, towards the bottom half of the page --

6    there's reference to something called Daily Controlled

7    Substance Suspicious Order Warning Report and then there's a

8    number there I'm going to ask you about in a moment.  Do you

9    see that?

10   **A.**   Yes, I do.

11   **Q.**   Okay.  So, in this pre-2008 time period, was there a

12   Suspicious Order Report?

13   **A.**   Yes, there was.

14   **Q.**   When it says daily, can you comment on whether it was

15   frequent or infrequent?

16   **A.**   Daily would have been frequent.

17   **Q.**   Immediately after that reference to Daily Controlled

18   Suspicious Order Warning Report, it has some letters and

19   some numbers and it says DU45L500.  Do you know what a DU45

20   is?

21   **A.**   Yes, I do.

22   **Q.**   What does that mean?

23   **A.**   It's McKesson's number.  It was referred to as the DU45

24   and that report listed all suspicious orders identified from

25   the customers' purchasing patterns.

1   Q.   And do you know roughly what period of time it was that

2   McKesson used those DU45s and sent those in to DEA as means

3   of reporting suspicious orders?

4   A.   Yes.  I believe it was up to about 2009.

5   Q.   Now, sitting here today, of course, we are 12, 15,

6   20 years after these DU45s would have been reported.  Do you

7   know of any policy at McKesson that DU45s had to be kept

8   over a 10- 15-, 20-year period every time they were

9   reported?

10   A.   No.  The retention period would have been two years.

11   Q.   Do you know where the reports were coming out of for

12   the DU45s?

13   A.   When you say coming out of, do you mean --

14   Q.   Physically?

15   A.   Printed off?

16   Q.   Geographically?

17   A.   At each distribution center.

18   Q.   At each distribution center?  If we look at a

19   distribution center and do or do not see DU45s -- let me

20   rephrase my question.  If we look at a distribution center

21   and don't see DU45s from a certain time period, can you tell

22   from that fact that there were no DU45s reported?

23   A.   No, you could not.

24   Q.   Why is that?

25   A.   The retention period was to keep them for two years

1    only.

2    **Q.**   Okay.  Let's look further down the page.  Could we look

3    further down the page, please?  Do you see at the bottom of

4    the page there's reference to -- and I'm looking in the

5    parenthetical.  Do you see where it's got triggers for

6    suspicious order reporting using these DU45s and it says

7    three times monthly average for Schedules II and III, eight

8    times monthly average for Schedules IIIN through V?  Do you

9    see that?

10   **A.**   Yes, I do.

11   **Q.**   Were those monthly numbers the basis you used for

12   reporting these DU45s?

13   **A.**   Yes.  That would have been the criteria to identify

14   suspicious orders at that time.

15   **Q.**   Now, I want to pick up on a question the Court had

16   earlier.  Do you know why you would look on a monthly basis,

17   as opposed to doing some kind of order-by-order evaluation,

18   in terms of trying to flag suspicious orders?

19   **A.**   Yes.

20   **Q.**   Why is that?

21   **A.**   The pharmacy ordering, there was variability on a daily

22   and even a weekly basis.  So, to measure a pharmacy on a

23   monthly basis was the best way to determine, you know,

24   purchasing variability that would, you know, identify

25   suspicious orders.

1    **Q.**   Given that variability, do you have a better sense of

2    what's suspicious looking at monthly data or looking at each

3    individual order?

4    **A.**   It would have been on a monthly basis.

5    **Q.**   Let's go to Page 48, please, and towards the bottom of

6    the page in the second paragraph under Heading B, there's

7    reference again to these -- at the end of that to these

8    Daily Controlled Substance Suspicious Order Warning Reports

9    and then I want to focus your attention, if I could, on the

10   language that's now highlighted.  This report can be faxed

11   to your local DEA District Office before the order is

12   shipped.  Do you see that language?

13   **A.**   Yes, I do.

14   **Q.**   Now, two questions about that.  One, is that the type

15   of daily reporting that we've been talking about?

16   **A.**   Yes, it is.

17   **Q.**   And two, when it says before the order is shipped, with

18   these orders that you were reporting, were you shipping them

19   or were you blocking them?

20   **A.**   At this time, we were shipping them.

21   **Q.**   Okay.  Is there a reason why you were shipping them as

22   you were reporting them?

23   **A.**   Yes.  The requirement at this time was to report

24   orders.  It was not necessarily to block orders.

25            MR. ACKERMAN:  Objection, Your Honor.  The witness

1    is stating a legal conclusion.

2              MR. SCHMIDT:  I think the witness was repeatedly

3    --

4              THE COURT:  Overruled.

5              MR. SCHMIDT:  Thank you.

6              BY MR. SCHMIDT:

7    **Q.**   Do you have an understanding from your work if there's

8    a potential harm that could arise from not shipping orders

9    that trigger some kind of threshold?

10   **A.**   I'm sorry.  Could you rephrase that question?

11   **Q.**   Sure.  Is there any potential downside if you block

12   orders that go over a threshold?  Is there any kind of harm

13   that can arise because of it?

14   **A.**   Okay, now I understand.  Yes, there is.

15   **Q.**   And tell us what that is.

16   **A.**   Yes.  Necessary medications, again, some lifesaving,

17   you know, necessary medications would have been prevented

18   from going to pharmacies.

19   **Q.**   Okay.  I want to go back to that definition that

20   appears on Page 46 of suspicious orders.

21   **A.**   Yes.

22   **Q.**   And it talks about orders of unusual size, deviating

23   substantially from a normal pattern, orders of unusual

24   frequency.  Is that your understanding of what constitutes a

25   suspicious order?

**A.**   Yes, it is.

**Q.**   You said yesterday that there was a difference between something that might meet this definition, might have unusual size, and something that is likely to be diverted. Did I hear you correctly yesterday?

**A.**   Yes.  I said that.

**Q.**   And why is that different?

**A.**   Again, with the variability and ordering of pharmacies, they may place an order that could be larger than they previously placed, which would come under the size.  Their normal pattern may have changed.  Perhaps they're ordering once a week instead of daily.  And unusual frequency would fall into that daily versus weekly.  So, that would be the definition of a suspicious order.  It doesn't necessarily mean that that suspicious order is going to be diverted.

**Q.**   Can you have orders that are of unusual size, pattern or frequency that are legitimate?

**A.**   Yes.

**Q.**   Can you give us an example of how that might happen?

**A.**   Yes.  At times, the PIC, which is P-I-C, Pharmacist in Charge, perhaps he does the ordering at a pharmacy and he may be going on vacation next week.  So, the order -- the pharmacist is ordering a two-week supply this week to cover the period he won't be at that pharmacy.

**Q.**   Would you, in your experience, see orders of unusual

1    size, pattern or frequency because of developments in the

2    community, a pharmacy closing, a Hospice center opening?

3    **A.**   Yes, that would occur.

4    **Q.**   Now, going back to that distinction between a

5    suspicious order and orders that are likely to be diverted,

6    in this time period -- and I think you touched on this right

7    in your opening comments.  In this time period, if you saw

8    an order that you believed was likely to be diverted, what

9    would you do with that?

10   **A.**   That would be a manual block.

11   **Q.**   All right.  So, with a great deal of effort, I've

12   written blocked if likely diverted.  Is that what you were

13   doing at this point in time?

14   **A.**   Yes, sir.

15   **Q.**   Now, just sticking with the definition of suspicious

16   orders that we have on the board, unusual size, pattern,

17   frequency, I asked you earlier about how specific the

18   regulations were when it came to the physical security.  Do

19   you remember that?

20   **A.**   Yes, sir.

21   **Q.**   Do you have a sense from your experience as to the

22   level of specificity as to this definition?

23   **A.**   It was no further defined than size, pattern and

24   frequency.

25   **Q.**   Was that challenging at times in terms of identifying

```
 1   suspicious orders?

 2   A.   Yes, it was.

 3   Q.   Can you tell us about that?

 4   A.   Yes.  Again, with the purchasing variability of

 5   pharmacies, size, pattern and frequency were experienced on

 6   a daily basis.

 7   Q.   Okay.  I asked you earlier about that period of time

 8   through the beginning of your tenure and into your tenure

 9   where prescribers were writing more prescriptions; do you

10   remember that?

11   A.   Yes, I do.

12   Q.   If prescriber levels, prescribing, is regularly going

13   up, does that make it challenging to figure out if something

14   is an unusual size, an unusual pattern, an unusual

15   frequency?

16   A.   Yes.  That would be a contributing factor in trying to

17   identify why.

18   Q.   And why is that?

19   A.   Again, as prescribers wrote more, the volume at a

20   pharmacy increased.  The pharmacies would purchase more.

21   So, it would constantly be changing on an upward scale and

22   it would constantly be a different size, pattern and

23   frequency.

24   Q.   Okay.  Let's look at the bottom three paragraphs of

25   this page and you'll see that there's a quotation in the
```

1    middle paragraph.  Do you see that quotation?

2    **A.**   Yes, I do.

3    **Q.**   I'm not going to ask you to vouch for the truth of that

4    quotation because it doesn't come from you.  What I am going

5    to ask you about is your understanding of that quotation.

6         So, let me start with the first paragraph.  Do you see

7    it says please note the following extract of a letter from

8    Mr. Gene Haislip, Director, DEA Office of Compliance and

9    Regulatory Affairs dated November 10th, 1980?  Do you see

10   that language?

11   **A.**   Yes.  That's what's written here.

12   **Q.**   And then there's a quotation; do you see that?

13   **A.**   Yes, I do.

14   **Q.**   And do you understand that quotation to come from this

15   Mr. Haislip at the DEA Office of Compliance and Regulatory

16   Affairs?

17   **A.**   I would interpret that off of this document, yes.

18   **Q.**   Quotation states I would like to state that these

19   guidelines as presented appear to be appropriate for

20   implementation and would serve as effective instrument in

21   accomplishing the requirements set forth in Title 21, Code

22   of Federal Regulations, Section 1301.74.  Do you see that

23   language?

24   **A.**   Yes, I do.

25   **Q.**   And do you have an understanding as to whether there's

1    any relationship between 1301.74 and the suspicious order

2    obligation?

3    **A.**    Yes, there is.

4    **Q.**    And, in fact, if we zoom out of this image and just

5    look at the full page, do you see that this appears in the

6    portion of Section 55 that relates to suspicious orders and

7    detecting suspicious orders?

8    **A.**    Yes.  It's noted there.

9    **Q.**    Okay.  Can we go back to that, those three paragraphs,

10   please?  Now, I want to look at the last paragraph which is,

11   again, from McKesson.  It states because these guidelines

12   have been accepted by DEA, compliance with them is mandatory

13   for all McKesson Drug Distribution Centers.  Do you see

14   that?

15   **A.**    Yes, I do.

16   **Q.**    Did you have an understanding at this point in time

17   that your policies were based on DEA approved guidelines?

18   **A.**    Yes.  That's my understanding.

19   **Q.**    And would this manual, this Section 55, be available to

20   DEA agents anytime they came to do their cyclical audits,

21   anytime they came to do a registration or re-registration?

22   **A.**    Yes.  It would have been available.

23   **Q.**    Would they have the chance to comment on the frequency

24   of your suspicious order reporting, the fact that you were

25   shipping orders, you were reporting suspicious, the fact

```
 1    that you were blocking if likely diverted?
 2    A.   Yes.
 3              MR. ACKERMAN:  Your Honor, I just want to note for
 4    the record that the plaintiffs have a motion in limine with
 5    respect to references to DEA endorsing defendant sums,
 6    policies.  I don't think Mr. Schmidt has gone there, but I
 7    want to make sure that -- I would be remiss if I didn't note
 8    that that motion was still pending.  It's Docket 1353.
 9              MR. SCHMIDT:  I think that's well taken because I
10    think I did go there.
11              BY MR. SCHMIDT:
12    Q.   Let's go to Exhibit P-33, which you were shown
13    yesterday.  Do you recognize this as a letter dated
14    September 27th -- I think we lost it.  Do you still have it
15    on your screens?
16    A.   No.
17    Q.   I think we lost our feed for a second.  I don't know if
18    it's on my end or -- oh, it's back.
19         Do you see that this was a letter that you were shown
20    yesterday dated September 27, 2006, U. S. Department of
21    Justice Drug Enforcement Administration, and if we scroll to
22    the last page, it's from Joseph Rannazzisi?
23    A.   Yes, I do.
24    Q.   I want to show you some language from this letter that
25    we didn't have a chance to look at yesterday.  Can we go to
```

1    the first page, please, to the second paragraph?

2           MR. RAFFERTY:  Your Honor, I'm going to object to

3    the commentary.  The entire document was put in.  To imply

4    that we did not show him a portion of it is inappropriate.

5           MR. SCHMIDT:  I think I just said we didn't see it

6    yesterday.

7           THE COURT:  Well, overruled.  I don't see any

8    problem with that.  Go ahead.

9           MR. SCHMIDT:  Thank you, Your Honor.

10          THE COURT:  It's already in.

11          BY MR. SCHMIDT:

12   **Q.**   Let's look at -- I'm sorry.  Let's look at the second

13   page, please.  And in the second paragraph, I want to look

14   at just that first sentence.  DEA recognizes that the

15   overwhelming majority of registered distributors act

16   lawfully and take appropriate measures to prevent diversion.

17   Did I read that correctly?

18   **A.**   Yes, you did.

19   **Q.**   That sentence from the DEA in the middle of 2006, was

20   that consistent or inconsistent with your understanding of

21   the DEA's views on your programs at this point in time?

22   **A.**    It was consistent with my views that we were meeting

23   the requirements.

24   **Q.**   In this time period with this letter and in the year or

25   two leading up to 2008, did the DEA's guidance start to

1    change?

2    **A.**   Yes, it did.

3    **Q.**   Let's look at another example of that.  Could we show

4    P-34, which is the second letter from Mr. Rannazzisi that

5    you were shown?  Now, we're all the way up to the end of

6    December, December 27, 2007.  So, a year and a half -- a

7    little less than a year and a half later.  Do you recall

8    being shown this letter?

9    **A.**   Yes, I am.

10   **Q.**   Let's look at the second paragraph, please, and I want

11   to ask you about the end of that second paragraph.  It says

12   -- actually, I'll go back to the sentence before.

13   Accordingly, DEA does not approve or otherwise endorse any

14   specific system for reporting suspicious orders.

15        Let me then read you the next sentence.  Past

16   communications with DEA, whether implicit or explicit, that

17   could be construed as approval of a particular system for

18   reporting suspicious orders, should no longer be taken to

19   mean that DEA approves a specific system.  Did I read that

20   correctly?

21   **A.**   Yes, you did.

22   **Q.**   So, if we think back to that manual with the language

23   from the DEA and the statement from McKesson these

24   guidelines have to be followed because they've been endorsed

25   by the DEA, did you understand in this sentence that you

1  could no longer rely on those guidelines and that

2  endorsement?

3  **A.**    That was my understanding.

4  **Q.**    Did you understand from this statement that whatever

5  we've said before that could be construed as approval of a

6  particular system, that should no longer be taken to mean

7  that the DEA approves of a specific system?  Did you

8  understand that the DEA was changing its standards?

9  **A.**    Yes.  It was changing its guidance to us, yes.

10  **Q.**    Did McKesson change its processes in response?

11  **A.**    Yes, it did.

12  **Q.**    All right.  Let me ask you about that, if I may.  We

13  talked about McKesson shipping in this pre-2008 period

14  orders it was reporting as suspicious.  Starting in 2008,

15  did McKesson start blocking orders that exceeded thresholds?

16  **A.**    Yes.  It started blocking all -- excuse me -- started

17  blocking all orders that exceeded threshold.

18  **Q.**    And just to be clear, did that involve continuing to

19  block orders if they are likely to be diverted?

20  **A.**    Yes, it did.

21  **Q.**    Did you do that because that regulation we were looking

22  at on suspicious orders changed or did you do that because

23  guidance from DEA changed?

24  **A.**    I believe it was because of the guidance change.

25  **Q.**    Okay.  Let's look at the rest of your program, the

1    suspicious order part of your program.  Did you receive

2    feedback from the DEA about whether you should report more

3    or less in this time period?

4    **A.**   The feedback was to report less.

5    **Q.**   And did you, in fact, report less?

6    **A.**   Yes, we did.

7    **Q.**   Would it be accurate if I said instead of frequent

8    suspicious order reporting in the pre-2008 period,

9    infrequent suspicious order reporting in this period?

10   **A.**   Yes.  Yes.

11   **Q.**   And I want to detail for the Court how that worked, but

12   first, let me just ask you, did you have an understanding as

13   to why the DEA wanted fewer Suspicious Order Reports than

14   these daily DU45s you'd been providing?

15   **A.**   Yes.  They were getting these large monthly reports

16   similar to the stack that you gave me earlier and they did

17   not want to get that much paperwork any longer.

18   **Q.**   Did you receive that feedback directly?

19   **A.**   I didn't catch the last word.

20   **Q.**   I'm sorry.  Was that feedback you directly received?

21   **A.**   Yes, it was.

22            MR. SCHMIDT:  May I approach, Your Honor?

23            THE COURT:  Yes.

24            THE WITNESS:  Thank you.

25            MR. SCHMIDT:  Thank you.

```
 1              BY MR. SCHMIDT:
 2     Q.   I've handed you just for illustrative purposes a
 3     document I've marked as MCWV-592.  Do you recognize this as
 4     an e-mail that you wrote in 2008?
 5     A.   Yes, it is.
 6              MR. SCHMIDT:  We'd move this into evidence.
 7              MR. RAFFERTY:  No objection, Your Honor.
 8              THE COURT:  It's admitted.
 9              MR. SCHMIDT:  Thank you.
10              BY MR. SCHMIDT:
11     Q.   Let's look at the top of the e-mail.  It's from Michael
12     Oriente, you, to Bruce Russell and Don Walker.  Just to
13     refresh all of us, who was Don Walker?  What was your
14     relation to him?
15     A.   Don Walker was the Senior Vice President over
16     Regulatory.
17     Q.   Was he your boss?
18     A.   Yes, he was.
19     Q.   For lack of a better term?
20     A.   Yeah.
21     Q.   You write in October, 2008, the back end of this time,
22     back in the early part of this time period, Buffalo has
23     received a verbal request from the local DEA Office not to
24     receive the monthly reports, just their copy of the 222
25     Forms.  Could you tell us what you were saying there?
```

1    **A.**    Yes.

2    **Q.**    There is a bit of jargon in there, a bit of shorthand.

3    **A.**    Yes.  The -- as I said, the monthly report was a large

4    report because it listed all shipments and, in a month,

5    there would have been quite a few pages to this report.  The

6    DEA no longer wanted to receive that report.  They only

7    wanted what was the 222 Forms, which are the forms a

8    pharmacy fills out, sends to McKesson, McKesson retains one

9    copy.  These forms are issued by the DEA.  They have a

10   serial number on every form.  And then, one copy goes to DEA

11   and the distributor needs to retain a copy.

12   **Q.**    So, let me be sure I understand.  Did you understand

13   from this that they still wanted your overall data?

14   **A.**    Yes.  They wanted the 222 Forms.  They did not want the

15   monthly report of suspicious orders.

16   **Q.**    Got it.  Okay.  I want to turn to how you implemented

17   these practices of less frequent suspicious order reporting

18   and blocking in your policies, but before I do, when you

19   were doing this, did you understand that's what the DEA

20   wanted from you?

21   **A.**    Yes.  That was my understanding, that we had shown them

22   the program, and they accepted it.

23   **Q.**    We heard yesterday about the Controlled Substance

24   Monitoring Program, the CSMP.  Did you start using that

25   program in this time period?

1    **A.**    Yes.  It would have started in early 2008.

2    **Q.**    Do you still have a CSMP in place today?

3    **A.**    Yes.  CSMP, Controlled Substance Monitoring Program, is

4    still in place today.

5    **Q.**    Has it evolved over time?

6    **A.**    Yes, continuously.

7    **Q.**    Why is that?

8    **A.**    As the marketplace changes, as any new patterns of

9    diversion arise, we change our monitoring program to take

10   those into account.

11   **Q.**    We heard yesterday that for a period of time there was

12   a program that overlapped with Section 55 called the LDMP;

13   Do you remember that?

14   **A.**    Yes.

15   **Q.**    Can you tell us what period of time that program was in

16   place for?

17   **A.**    Yes.  LDMP was in place the end of 2007.  I don't

18   remember the exact months.  I believe the program lasted

19   about 11 months overall.  And it was -- LDMP stood for

20   Lifestyle Drug Monitoring Program.

21   **Q.**    Was it an immediate precursor to the CSMP?

22   **A.**    Yes.  It would have been a precursor.

23   **Q.**    And you told us what it stood for.  The first two

24   letters stand for lifestyle drug.  Do you know where that

25   term lifestyle drug came from?

1    **A.**   Yes.  I believe it was identified by the DEA.

2    **Q.**   All right.  I'd like to focus on the CSMP.

3           MR. SCHMIDT:  May I approach, Your Honor?

4           THE COURT:  You may.

5           THE WITNESS:  Thank you.

6           MR. SCHMIDT:  I apologize.  This might be the same

7    version you introduced.  I don't know if it is.  But just

8    because we've been tracking this one, Your Honor, I'll

9    separately move MCWV-381 into evidence.

10          MR. RAFFERTY:  No objection, Your Honor.

11          THE COURT:  It's admitted.

12          BY MR. SCHMIDT:

13   **Q.**   Okay.  Let's go ahead and put that up on the screen,

14   please.  Do you see at the top it says Controlled Substance

15   Monitoring Program?

16   **A.**   Yes, I do.

17   **Q.**   And if we go to the final page, I think it's Page 17,

18   do you see there various -- bottom half of the page, various

19   revision dates from February, 2008 up until June, 2008?  Do

20   you see that?

21   **A.**   Yes, I do.

22   **Q.**   Do you understand this to be the first version of your

23   CSMP that was used at McKesson?

24   **A.**   Yes, it would be.

25   **Q.**   All right.  Let's look for a few minutes at how this

1    policy works and let's go to the first page of the policy,

2    please.  If we look at the left-hand side near the top, it

3    says purpose.

4            MR. SCHMIDT:  Can we just pull up those bullets?

5    Thank you.

6            BY MR. SCHMIDT:

7    **Q.**   It says the purpose of this process is to and it lists

8    a number of bullet points.  Do you see that?

9    **A.**   Yes, I do.

10   **Q.**   The first one is proactively review the customers'

11   orders and purchases for all controlled substances in order

12   to detect and prevent diversion.  Do you see that language?

13   **A.**   Yes, I do.

14   **Q.**   Could you explain to us your understanding what that

15   means?

16   **A.**   Yes.  This program would permit the regulatory people

17   to observe and review customer orders, as well as shipments

18   to them, in order to detect and prevent diversion.

19   **Q.**   And is that part of what you were doing in your work at

20   McKesson, trying to implement that bullet?

21   **A.**   Yes.  That was my daily job.

22   **Q.**   Let's look at the next bullet, set and maintain

23   customers' thresholds for all controlled substances.  Do you

24   see that?

25   **A.**   Yes.

1    **Q.**   We spent a lot of time yesterday talking about

2    thresholds, so I want to ask you some questions about that.

3    Just to re-orient us, can you tell us what a threshold is

4    under this policy?

5    **A.**   Yes.  It would be a monthly maximum amount within a

6    base code that a customer could order.  It would encompass

7    all strengths of that drug.

8    **Q.**   And what happened if a customer went over that amount,

9    if they tried to order more than their threshold?

10   **A.**   Yeah.  They could not go over that amount.  They could

11   go up to that amount.  If they attempted to go above that

12   amount, the order was automatically systematically blocked

13   and would -- would be, you know, not shipped.

14   **Q.**   If it was blocked, could it be released later or was

15   that order blocked for all time and they would have to

16   reorder?

17   **A.**   It was blocked for all time.  There was no further

18   review for releasing.  It ceased to exist.

19   **Q.**   At this point in time, in 2008, when you adopted the

20   CSMP, we saw that there was mention of thresholds in the

21   earlier LDMP.  Do you remember being shown that?

22   **A.**   Yes.

23   **Q.**   Was there blocking under those thresholds?

24   **A.**   No, there were not.

25   **Q.**   Is this the first time McKesson was using thresholds as

1    its mechanism for blocking, as opposed to simply blocking if

2    likely to be diverted?

3    **A.**   Yes.  All systematic blocking started in May, 2008.

4    **Q.**   As you were starting this program and in the first year

5    or so of implementing this program, were there challenges in

6    getting the thresholds right?

7    **A.**   Yes, there were.

8    **Q.**   Tell me about that, please.

9    **A.**   Thresholds were new to the industry.  They had not been

10   put in place previously.  So, reviewing customers'

11   historical purchases to set these thresholds was the way

12   that we went about this.

13       Again, a threshold is a snapshot in time.  So, as

14   prescribing went up and pharmacies ordered more, those

15   thresholds were stagnant and needed to be reviewed.  So, it

16   was something that -- you know, we constantly looked at a

17   customer's thresholds to see if they were appropriate.

18   **Q.**   Were they uniform across all customers?

19   **A.**   No, they were not.

20   **Q.**   Why not just pick one number and have that apply to

21   every pharmacy?

22   **A.**   Because, obviously, there's an average number.

23   However, there are pharmacies that are smaller and you

24   wouldn't want to just give them the average number if they

25   don't need it.  There are also pharmacies that are much

1    larger and would need a specific threshold, you know,

2    calculated to their specific business model.

3    **Q.**   Do you end up seeing different thresholds -- let me

4    re-ask that.  Do you end up seeing different variability in

5    thresholds across customers?

6    **A.**   Yes, I do.

7    **Q.**   And to take an example we talked about earlier, if you

8    look at something like a VA Hospital and you look at

9    something like a small pharmacy that doesn't serve that many

10   patients, will you see a meaningful difference in their

11   thresholds?

12   **A.**   Yes.  There would be vast differences between a VA

13   Hospital and an independent pharmacy.

14   **Q.**   Now, focusing on this time period from 2008 for the

15   next several years as you were bringing these thresholds

16   into place and blocking on these thresholds, is that that

17   time period you were telling us about earlier when

18   prescribing practices were increasing for prescription

19   opioids?

20   **A.**   Yes.  They would have been increasing during that time

21   period.

22   **Q.**   Does the fact that prescribing practices are increasing

23   have any impact on how challenging or how easy it is to set

24   thresholds in that time period?

25   **A.**   Yes, it would have been.  Thresholds are basically a

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    mirror of the request and ordering and that would have been

2    a reflection of the increase in prescribing.

3    **Q.**    Did your thresholds increase when doctor prescribing

4    went up?

5    **A.**    Yes.  There's a correlation there.

6    **Q.**    There was discussion yesterday about a more recent time

7    frame when thresholds have come down.  Do you remember that

8    discussion?

9    **A.**    Yes, I do.

10   **Q.**    Have you been able to reduce thresholds as we've gotten

11   past that time period you were talking about when

12   prescribing increased and we're now at a time period where

13   prescribing has decreased?  Has that led to your ability to

14   reduce thresholds?

15   **A.**    Yes, it has.  As prescribing has gone down, pharmacies

16   have ordered less and, because pharmacies have ordered less,

17   we're able to reduce our thresholds to those pharmacies.

18   **Q.**    Now, just to ask one -- a couple more questions about

19   thresholds, do you conduct diligence in the context of

20   making decisions about whether to increase, or decrease, or

21   keep thresholds the same?

22   **A.**    Yes.  Before each threshold review is done, there would

23   be due diligence conducted by myself.

24   **Q.**    Is that the only setting in which you conduct due

25   diligence on pharmacies?

1    **A.**   No.  Thresholds do not dictate our due diligence

2    reviews as to whether or not we conduct investigative

3    reports on a pharmacy.  They may never ask for a threshold

4    increase and we may still go out and do an Investigative

5    Report on that pharmacy.

6    **Q.**   So, are thresholds the only way that problematic

7    customers get flagged or threshold change requests?

8    **A.**   No.

9            MR. SCHMIDT:  Your Honor, I have one more small

10   topic.  I propose I do it --

11           THE COURT:  I think we ought to take our break

12   now.

13           MR. SCHMIDT:  Okay.

14           THE COURT:  Yeah.  We'll be in recess for ten

15   minutes.

16       (Recess taken)

17           MR. SCHMIDT:  May I proceed, Your Honor?

18           THE COURT:  Yes.

19           MR. SCHMIDT:  Thank you, Your Honor.

20   BY MR. SCHMIDT:

21   **Q.**   When we broke, Mr. Oriente, we were talking about

22   this 2008 to 2013 time period and there were fewer

23   suspicious order reports and blocking when orders went

24   over the threshold.

25       I want to pick back up right where we started -- right

1    where we stopped and ask you about a topic that you were

2    covered -- that you were asked about yesterday.

3        Specifically, you were asked about two emails from this

4    time period, P-13068 and P-8763.  And I can give those to

5    you if you want, but do you recall being asked about two

6    emails where you and your colleagues were talking about your

7    work load and there was reference to a tsunami and the

8    river?  Do you remember that?

9    **A.**   Yes, I recall.

10   **Q.**   Were you venting in those emails?

11   **A.**   Yes, I was.

12   **Q.**   Were there moments in your, in your work where you felt

13   busy and wanted additional help?

14   **A.**   There were at times, yes.

15   **Q.**   Notwithstanding that, did you feel like you were able

16   to conduct the work you needed to do?

17   **A.**   Yes.  Even though we were busy, I continued to do my

18   due diligence.  It just meant longer hour days and sometimes

19   working weekends.

20   **Q.**   If, if you were too busy to do something like a TCR, a

21   Threshold Change Request, how would you handle that?

22   **A.**   Yes.  As was pointed out, the majority of the increase

23   reviews would come in the last week of the month, of course,

24   because customers would bump up against their threshold.

25       If I could not get to them in that last week of the

1  month and perform my level of due diligence, they would

2  still go into the next month.  So the next week or two, the

3  first week, second week of a new month is when I would

4  review those.

5       It would just take longer to get reviewed.  It wasn't

6  that they would be, you know, approved with no review.

7  **Q.**   Okay.  Related question:  You were asked about the fact

8  that for portions of this time period there were five DRAs

9  for the whole country.  Do you remember that?

10 **A.**   Yes, I do.

11 **Q.**   Your work as a DRA conducting diligence or other

12 inquiries regarding your pharmacies and your hospitals, were

13 there others outside of the DRA group that you could draw on

14 in conducting your work?

15 **A.**   Yes, there was.

16 **Q.**   Can you, can you give us an example?

17 **A.**   Yes.  Distribution center management, the head of the

18 distribution center which I was previously, that person in

19 that position at each distribution center that I had would

20 be available to go make site visits, collect dispensing data

21 from a pharmacy.

22      There was also the sales reps would collect the

23 dispensing data for us when we request it.  And there was

24 also one or two people identified in each distribution

25 center that would assist with the CSMP files, customer files

1    at each DC.

2    **Q.**   And remind us again how many distribution centers there

3    were.

4    **A.**   28.

5    **Q.**   So taking just one at every distribution center, that

6    would add 28 to the five DRAs you mentioned to us?

7    **A.**   Yes, at least 28 people.

8    **Q.**   Has McKesson added more to its diligence program over

9    time?  And I'll come to this 2013 period in a bit.  Did the

10   number of DRAs increase?

11   **A.**   Yes, it did.

12   **Q.**   I'll come back to that.  First, I want to just round

13   out these emails.

14        Do you recall that one of your colleagues, Dave Gustin,

15   was on some of those emails where you guys were venting

16   about work load?

17   **A.**   Yes, I do.

18   **Q.**   Did you ever have an understanding that Mr. Gustin was

19   not able to conduct the level of diligence he needed to do?

20   **A.**   No, that was not my understanding.  We took our

21   positions very seriously.  We did vent from time to time.

22   **Q.**   Let's look at an example of that.  Could we put P-8309

23   on the board.  It's in evidence and you were shown this

24   document yesterday.

25        Just to orient us, this document is dated August 31st,

1    2011.  It's from Mr. Gustin.  And it looks like it's written

2    to a number of individuals including on the second line cc

3    line you.  Do you see that?

4    **A.**   Yes.

5    **Q.**   Do you recall being asked questions about this email

6    yesterday?

7    **A.**   Yes, I do.

8    **Q.**   All right.  And if you just take a minute to refresh

9    yourself on the substance of his email, first of all, do you

10   see where he's proposing an idea that could be tightened up

11   in the CSMP?

12   **A.**   Yes, he is proposing an idea.

13   **Q.**   And does he identify that as accounts where there's

14   large gaps, in his words, between the threshold and the

15   purchases?

16   **A.**   Yes, he does.

17   **Q.**   And then in the second paragraph do you see a reference

18   to an attached spreadsheet?

19   **A.**   Yes, there is.

20   **Q.**   And what was your understanding of what he did through

21   that spreadsheet?

22   **A.**   He identified customers where thresholds could be

23   reduced.

24   **Q.**   Was he actually going out and looking at individual

25   customers and comparing purchases to their thresholds?

**A.**   Yes, he did.

**Q.**   If it helps to have the spreadsheet, I can give you a

new copy of the exhibit.  Would it help to actually be able

to look --

**A.**   If you have it, yes.

**Q.**   Yes.

MR. SCHMIDT:  I'll just pass out the copy in case

the Court doesn't want to sift through a lot of documents.

MR. ACKERMAN:  Mr. Schmidt, do you have an extra

copy?

MR. SCHMIDT:  I do.

THE WITNESS:  Thank you.

BY MR. SCHMIDT:

**Q.**   And if you look at this spreadsheet, it's a

spreadsheet doing what you just told us, going through

different pharmacies and identifying places where

thresholds are higher, where there's a gap between

thresholds and the amount they're actually purchasing?

**A.**   Yes, that's what this is.

**Q.**   Is this an example of Mr. Gustin being proactive in

trying to address pharmacies?

**A.**   Yes, he was.  If he was lowering thresholds, he was

looking to basically prevent customers from ordering more

product.

MR. ACKERMAN:  Your Honor, I just want to voice an

1    objection to the leading questions.  I do understand your

2    prior ruling, but this is a witness from McKesson and the

3    last question was rather leading.

4              THE COURT:  Well, it is leading, but do your best

5    not to lead him, Mr. Schmidt.

6              MR. SCHMIDT:  I will, Your Honor.

7    BY MR. SCHMIDT:

8    **Q.**   Let me focus back on the second sentence of this

9    email if I could.  It's still up on the screen where he

10   talks about an area that could be tightened up.

11             THE COURT:  Let me interrupt and say something.

12       I realize this is cross-examination, but this is a

13   friendly witness and, and I think it's fair to be careful

14   about leading questions even though they're normally

15   permitted on cross.

16             MR. SCHMIDT:  I thought I was.  I'll continue

17   trying to do that, Your Honor.

18   BY MR. SCHMIDT:

19   **Q.**   If you look at the second sentence, do you see the

20   reference to the number of accounts we have that have

21   large gaps between the amount of oxy or hydro they're

22   allowed to buy (their threshold) and the amount they

23   really need (their current purchases)?

24   **A.**   Yes.

25   **Q.**   Do you have an understanding of what that, quote, large

1    gap he's referring to is?

2    **A.**    Yes.

3    **Q.**    Tell us what that is.

4    **A.**    Yes.  So, for instance, if a threshold was 10,000 and a

5    customer is only purchasing 5,000, okay, that gap between

6    what they're purchasing and what their threshold and

7    McKesson had permitted that pharmacy after our due diligence

8    to purchase is that gap that he's talking about.  So he

9    wants to, in this case, bring down that 10,000 -- excuse

10   me -- 10,000 threshold maybe to look 7,500.

11   **Q.**    Do you know one way or another whether simply because a

12   customer has a threshold at a certain level they have to

13   order up to that level?

14   **A.**    No.  Most customers order below their threshold.

15   **Q.**    All right.  Let's take this down and get back to the

16   manual, please, the CSMP.

17       I'd like to, if I could, direct your attention to Page

18   6, please.  I believe you were asked about this language

19   yesterday.  There is a section entitled "Threshold Review."

20   And down at the bottom it's entitled "Threshold Excursion."

21       Do you see that?

22   **A.**    Yes, I do.

23   **Q.**    The manual says once a customer has reached their

24   monthly maximum threshold amount, all subsequent orders for

25   that item will be blocked.  Do you see that?

1    **A.**   Yes, I do.

2    **Q.**   What does it mean to block an order?

3    **A.**   It means that that order does not get shipped.  It just

4    doesn't go any further.  It, it doesn't go to the

5    distribution center.  It never comes out of our computer

6    system.

7    **Q.**   It then says -- I want to focus on that language at the

8    end of the sentence.  "All subsequent orders for that item

9    will be blocked."

10       Does that refer to blocking for all time or blocking

11   for that month?

12   **A.**   That would be any additional orders for that item

13   within that month would be blocked.

14   **Q.**   Got it.

15            THE COURT:  Do you notify the pharmacist when you

16   block an order?

17            THE WITNESS:  Yes.  They were notified originally

18   in the program.  A statement would come out that they have

19   exceeded their -- attempted to exceed their threshold.  They

20   were notified.  We no longer notify them.  It's just zeroed

21   out on the invoice.

22            THE COURT:  And does that go back to them to let

23   them know they're not going to get any pills or how do they

24   know that the order is not going to be filled?

25            THE WITNESS:  The, the order is blocked.  I'm not

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    certain what prints on an invoice today, Your Honor.  But I

2    know it did used to say "exceeded monthly maximum."

3            THE COURT:  Okay.

4    BY MR. SCHMIDT:

5    Q.   Under the CSMP, if a customer exceeded their

6    threshold, could they request a change to their

7    threshold?

8    A.   Yes, they could request a change.

9    Q.   What information would you look at in evaluating that

10   change?

11   A.   So the first piece of information would be what we call

12   our TCR, Threshold Change Request.  That form would come in.

13   Along with it would be dispensing data on that particular

14   base code so we could see their dispensing patterns.

15        We would also ask as to why, why do they need the

16   increase, what's changed in their business.  As you noted,

17   one example is a competitor may have closed.

18   Q.   Who, who is responsible for approving threshold

19   changes?

20   A.   It would be one of the four DRAs.

21   Q.   Someone in your position?

22   A.   Yes.

23   Q.   Now, you were asked some questions yesterday about

24   documenting threshold changes and the diligence relating to

25   threshold changes.  Do you recall being asked those

1    questions?

2    **A.**   Yes, I do.

3    **Q.**   Do you know whether that documentation is kept for all

4    time for every pharmacy going back 10 years?

5    **A.**   No, I don't.

6    **Q.**   If we try to find diligence for a given pharmacy today

7    and we can't find a file, does that mean it was never

8    conducted?

9    **A.**   No, it would not.

10   **Q.**   Why is that?

11   **A.**   There were some electronic tracking of documents.

12   There were some paper documents.  There were files the DRA

13   would have.  There were files the distribution center would

14   have.  It's quite possible that not all papers made it to

15   the file.

16   **Q.**   Were those files kept for all time for every pharmacy?

17   **A.**   Yes, those CSMP files, as we call them, are still in

18   existence.

19   **Q.**   If it made it into the file?

20   **A.**   Yes.

21   **Q.**   Okay.  I'd like to go to Page 7, please.  And it talks

22   about levels of review.  Do you see that?

23   **A.**   Yes.

24   **Q.**   And I just want to scroll through these to orient

25   ourselves and then I'm going to ask you about these levels.

1        We see at the top here Level I review.  And if we

2    scroll down, it says "How To Do, Results, Special Warnings."

3        And then we see Level II review.

4        If we scroll down, the next page we see Level III

5    review.

6        Are you familiar with those three levels of review that

7    would happen when an order went over a threshold?

8    **A.**    Yes, I am.  It would have attempted to go over a

9    threshold, yeah.  They never did go over.

10   **Q.**    Because they would be blocked?

11   **A.**    Exactly.

12   **Q.**    Let's go back to the prior page, please, Page 7.  Let's

13   start with Level I review.  Could you just tell us at a high

14   level what Level I review is?

15   **A.**    Yes.  A Level I review would be a list of customers

16   that had orders blocked that would generate for each

17   distribution center.  And then someone at the distribution

18   center would follow up with that customer and ask why did

19   they attempt to order above their threshold.

20   **Q.**    Will you scroll down a little bit.

21       It talks about results.  And do you see the reference

22   to blocking?

23   **A.**    Yes.  That, that item would continue to be blocked for

24   the remainder of the month.

25   **Q.**    Okay.  Could a, could a blocked order be resolved at

1    this stage without going any further?

2    **A.**    Yes, yes, it could be, yes.

3    **Q.**    And is there any reference to whether if you just keep

4    an order at Level I if it doesn't go higher whether it's

5    treated as suspicious and reported to the DEA?  Is there any

6    reference in the Level I review to that happening?

7    **A.**    No, there is not during a Level I.

8    **Q.**    Let's go to Level II.  Can you tell us what Level II

9    is, please?

10   **A.**    Yes.  Level II would be an escalation to the DRA,

11   myself, or one of my colleagues.

12   **Q.**    Let me just point to some language on that.  It says,

13   "If the Level I review is conducted by DC management as

14   being conclusive, a Level II review is required."

15       Do you see that?

16   **A.**    Yes.

17   **Q.**    Is that what you were just telling us about?

18   **A.**    Yes.  It would then be escalated to my level or one of

19   my counterparts for us to do a review of that pharmacy.

20   **Q.**    Let's go to the next page where it describes how to do

21   a Level II review.  Do you see that language for Level II up

22   on the screen?

23   **A.**    Yes, sir.

24   **Q.**    Is there any reference in the Level II process to an

25   order at that stage being viewed by the company as

1    suspicious and reported to the DEA?

2    **A.**    No.   Level II reviews were not reported off of this

3    process.

4    **Q.**    All right.   Could an order be resolved at the Level II

5    stage without going to the Level III stage?

6    **A.**    Yes, it could be.   If the DRA that did the Level II

7    felt that the inquiry was acceptable, it would end at a

8    Level II.

9    **Q.**    What if they did not think the inquiry was acceptable?

10   **A.**    Then it would be escalated to my senior management by

11   myself and also by my colleagues.

12   **Q.**    And if we scroll down to have the full Level III

13   section on the screen, can you tell us what a Level III

14   review entails?

15   **A.**    Yes.   All Level IIIs, all controlled substances for

16   that customer, not just that specific base code that was

17   blocked, would be blocked.   So, basically, the customer

18   would be blocked from all controlled substances.

19        I would escalate it to the senior VP of distribution

20   operations who also was over regulatory.   That would be Don

21   Walker.   My regional SVP was Pete Pasquale.   Then there's a

22   VP of distribution operations would be notified, as well as

23   the vice president general manager over that distribution

24   center would also be notified.

25   **Q.**    So let me pick up on that DEA notification point.

1      Is there specific language in the description of what a

2  Level III review is that indicates whether at that stage the

3  company treats the order as suspicious and reports it to the

4  DEA?

5  **A.**   Yes.  On line 5 with law department's guidance,

6  regulatory affairs, myself, would contact the DEA office to

7  discuss our findings.

8      And on line 7 I would notify DEA about us terminating a

9  customer.

10 **Q.**   Okay.  And just let me point you to two other places.

11     Let's just look at the preamble to Level III.  Do you

12 see it?  It says if after the level I and Level II reviews

13 have been conducted and the transaction, or transactions are

14 deemed, quote, suspicious, a Level III review is necessary.

15     Do you see that?

16 **A.**   Yes, I do.

17 **Q.**   Is, is this providing in your policy the point at which

18 you will treat an order as suspicious, in quotes, under the

19 regulation?

20 **A.**   Yes, after a Level III.

21 **Q.**   And then if we look at item 3, does it say the

22 customer/transaction are reported to DEA headquarters as

23 suspicious?

24 **A.**   Yes.  At this point, the order would be reported as

25 suspicious.

1    **Q.**   Just to orient ourselves and to close this out as to

2    where we are, what level would blocking occur at?

3    **A.**   Prior to Level I.

4    **Q.**   What level would suspicious order designation and

5    reporting occur at?

6    **A.**   At a Level III.

7    **Q.**   Okay.  If you're blocking prior to Level I when there's

8    exceeding of the threshold, but you're reporting at Level

9    III, does that mean by definition there will be more or less

10   suspicious orders reported?

11   **A.**   There would be less suspicious orders reported.

12   **Q.**   Does that mean by definition there would be orders that

13   would be blocked but not reported because they don't reach

14   Level III review?

15   **A.**   Yes.

16   **Q.**   Did you understand that that's what DEA wanted, the

17   blocking but with less suspicious order reporting?

18   **A.**   That was my understanding, yes.

19   **Q.**   Now, did you have occasion to talk with DEA about this

20   being exactly how you were proceeding under the CSMP?

21   **A.**   Yes, McKesson did.

22   **Q.**   All right.  I want to come back to that.  But before I

23   do, I want to round out some other aspects of how your CSMP

24   worked.

25        Did your CSMP include -- we've heard this concept a lot

```
 1    over the last two days, diligence.  Did your CSMP include a

 2    diligence component?

 3    A.   What was the last word?

 4    Q.   A diligence component.

 5    A.   Yes, sir.

 6    Q.   Was that more or less than what you were doing prior to

 7    2008?

 8    A.   It was more.

 9    Q.   Okay if I write "greater diligence" on the board?

10    A.   Yes.

11    Q.   Okay.  I'd like to fill that out a little bit, if I

12    could, in terms of what that involved, Mr. Oriente.

13         First of all, was there specific diligence you

14    undertook before taking on a new customer?

15    A.   Yes, absolutely.

16    Q.   Let's go back to the, the CSMP manual, Page 381.

17              MR. RAFFERTY:  What page?

18              MR. SCHMIDT:  I'm sorry, Exhibit MC-WV-381, Page

19    9.

20    BY MR. SCHMIDT:

21    Q.   Do you see the heading "New Customer On-Boarding

22    Process"?

23    A.   Yes.

24    Q.   Were there specific -- what does "on-boarding" mean?

25    A.   On-boarding means to bring a customer to McKesson and
```

1    start business with them; in this case, for controlled

2    substances, as well as them ordering Rx product.

3    **Q.**   Were there specific on-boarding steps you took during

4    this time period as part of your diligence?

5    **A.**   Yes, there would have been.

6    **Q.**   Can you talk with us about those steps?

7    **A.**   Yes.  If it was a brand new, what we call a start-up

8    pharmacy, --

9    **Q.**   Uh-huh.

10   **A.**   -- we would go visit that pharmacy, see the physical

11   location of it, make sure that they have, that they're

12   licensed by the state and that they also have a DEA

13   registration.  We would need proof of that.

14        We would also have the new customer start-up fill out a

15   questionnaire.  And that's how a brand new start-up pharmacy

16   would be treated.

17        If there was a new customer coming to McKesson that was

18   a pre-existing pharmacy that they were just changing

19   wholesalers, we would do the questionnaire, the site visit,

20   the license verification.  And in addition to that, we would

21   ask for dispensing information in order to review where

22   thresholds should be set and also to identify what it was

23   that they were dispensing.  It would be their full

24   dispensing record.

25   **Q.**   Okay.  You made reference to a questionnaire.

```
 1        If you scroll down just a little bit in this document,
 2   do you see a discussion of customers questionnaire?
 3   A.   Yes, I do.
 4   Q.   Did you regularly work with those -- or have you
 5   regularly worked with those questionnaires in your work at
 6   McKesson?
 7   A.   Yes.  It was a daily type occurrence of us to review
 8   questionnaires.
 9   Q.   Has the questionnaire evolved over time?
10   A.   Yes, it has.
11   Q.   Why is that?
12   A.   As guidance and also the marketplace has changed, we,
13   we adapted our questionnaire to ask different questions to
14   identify points that could potentially be diversion.
15             MR. SCHMIDT:  I'd like to -- may I approach, Your
16   Honor?  Thank you.
17             THE WITNESS:  Thank you.
18   BY MR. SCHMIDT:
19   Q.   Mr. Oriente, I've handed you a document labeled
20   MC-WV-185.  It's the template questionnaire from 2013.
21   Are you familiar with this document?
22   A.   Yes, I am.
23   Q.   Have you regularly used it in the course of your work?
24   A.   Yes, I have.
25             MR. SCHMIDT:  We move MC-WV-185 into evidence,
```

1    Your Honor.

2              MR. RAFFERTY:  No objection, Your Honor.

3              THE COURT:  185 is admitted.

4              MR. SCHMIDT:  Thank you.

5    BY MR. SCHMIDT:

6    **Q.**  Put it up on the screen, please.

7         We see the McKesson logo and at the top there's a space

8    for the customer name.  It asks the question of whether

9    they're primary with McKesson.  Do you see that?

10   **A.**  Yes, I do.

11   **Q.**  And why, why is that question important?

12   **A.**  Again, that's important because if you're primary, that

13   means that we are your main supplier, which would mean you

14   would be purchasing the majority of your products from

15   McKesson.  And that would be taken into account when your

16   threshold is set.

17        If you're not primary, you're known as secondary.  And,

18   so, we would be a, a back-up distributor to that customer.

19   They would get lower thresholds.

20   **Q.**  It then says "McKesson Sales Representative."  Do you

21   see that?

22   **A.**  Yes.  They would put their name there.

23   **Q.**  Did you have your sales representatives help you in

24   having these questionnaires completed?

25   **A.**  Yes.  They would sometimes conduct this questionnaire,

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    not always.  Sometimes it was DC management, as I said

2    earlier, would go out to customers, and sometimes it would

3    be myself.

4    **Q.**   And then below that it says "Operations Review" and

5    "Regulatory Review."

6         Do you know what that refers to?

7    **A.**   Yes.  Operations Review would be the DC management

8    would look at it before passing it on to myself, and then I

9    would review it.

10   **Q.**   Let's go to the next page.  I just want to quickly go

11   through some of the types of information you would gather

12   through this questionnaire.

13        Do you see there's a section called "General

14   Information and Licensing"?  Do you see that?

15   **A.**   Yes, sir.

16   **Q.**   If we just kind of scroll down, it looks like there's

17   information about the pharmacy license.  And if we keep

18   scrolling down, information about the licensure of the

19   pharmacist.  What, what was the purpose of gathering that

20   information?

21   **A.**   Yes.  All of this information is required before we can

22   distribute to a pharmacy, that they're licensed and in good

23   standings with the state, as well as with the DEA, that they

24   have valid licenses and registrations.

25        And, also, we would review and investigate, pick the

1    pharmacist in charge to make sure that they have not had any

2    disciplinary action, most importantly pertaining to any

3    previous diversion issues.

4    **Q.**   Let's go to Page 3, please.  There's various questions

5    here about the ownership history of the pharmacy.

6         If we scroll down, we have additional pharmacies; do

7    they have disciplinary issues.

8         Go to the next page.  Various other questions about the

9    history, do they conduct background checks, that kind of

10   thing.  Do you see that?

11   **A.**   Yes, I do.

12   **Q.**   Why would you gather that type of information?

13   **A.**   We would want to know their business processes such as

14   were they doing background checks on their employees; did

15   they have any issues with thefts in the past; has there been

16   any disciplinary action against them.  It would be on this

17   form.

18        And then besides them checking "yes" or "no," we would

19   do our own search to verify that they were giving us

20   accurate information.

21   **Q.**   Why would you do that?

22   **A.**   I always use the motto trust but verify.  So if I was

23   signing off on something, I wasn't going to just take their

24   word for it.

25   **Q.**   Let's go to Page 5, please.  It says "Business

1    Information" and it looks like it's got questions about what

2    type of business is it, who else have they been supplied by,

3    questions like in (d) where their new prescriptions come

4    from, do they have a website.  And that continues on Page 6

5    which has questions about do they serve pain clinics,

6    nursing homes, et cetera.  Do you see that?

7    **A.**    Yes, I do.

8    **Q.**    Why would you gather that information?

9    **A.**    That would be important for us to understand their

10   makeup; who, who is their customer, the old "know your

11   customer's customer," and to understand any of the

12   differences that a pharmacy might have in order for us to

13   feel comfortable in doing business with them.

14   **Q.**    Okay.  Let's go to the next page, please, Page 7.  And

15   this asks for information about prescription information.

16   Do you see that?

17   **A.**    Yes, I do.

18   **Q.**    And what, what is being gathered here?

19   **A.**    Again, we would ask for three full months of

20   prescription data.  Again, that would give us a nice picture

21   into the pharmacy business.

22          And then (b) would cover, you know, has there been

23   significant growth during this period, are they seeing

24   additional prescriptions coming in.  And then if "yes," we

25   ask them to explain why, why it is, what's causing that.

1        And then we take a look at their payment method that

2    they receive, whether it's insurance, government aid, or

3    cash for the prescription.

4    **Q.**   And then below that, if we scroll down a little bit,

5    there's a place for the McKesson sales rep, if they're the

6    one doing this, to sign.  There's a place for the owner to

7    sign.  Why would you have the owner sign?

8    **A.**   Yes, that they were attesting to that the information

9    in this document is accurate.

10   **Q.**   Let's go to the last page.  After the owner's

11   signature, there's a page that says "Physical Inspection

12   Completed by McKesson Representative."  Do you see that?

13   **A.**   Yes, I do.

14   **Q.**   What is, what is the purpose of this information?

15   **A.**   Again, to observe such things as:  Is there any

16   activity outside the pharmacy that could be deemed

17   suspicious?  Are there long lines?  Do they have a security

18   guard at the pharmacy?  Unusual signage, for instance, and,

19   you know, "cash only" in the window, things like that.  And

20   we also would take pictures of the documenting on our visit

21   there with the pharmacy both inside and out.

22   **Q.**   And this page appears after you have the pharmacist

23   sign.  Why does it appear after you've had the pharmacist

24   sign?  Why is it its own section?

25   **A.**   I'm not aware as to why that is.  I'm sorry.

1   **Q.**   Would the pharmacist help you complete this page?

2   **A.**   No, they would not.

3   **Q.**   Why is that?

4   **A.**   Because, again, they could give you information that

5   may not be accurate.  We wanted to do our own assessment.

6   **Q.**   Was this useful information to have that you received

7   through these pharmacies when you were on-boarding

8   customers?

9   **A.**   Yes, absolutely.

10  **Q.**   Were there customers where, based on this information

11  and the other information you received about the pharmacy,

12  you said, no, we're not going to on-board this pharmacy?

13  **A.**   Yes, there were times where we refused a customer from

14  coming to McKesson.

15  **Q.**   Was this the end of the diligence or did you continue

16  to conduct diligence over time like pharmacy customers?

17  **A.**   No, that would have been the start of the diligence.

18  **Q.**   Can you describe for the Court further diligence that

19  would be conducted on pharmacies after you on-boarded them?

20  **A.**   Yes.  Any time that they would get a blocked order, I

21  would review those blocked orders and take a look at when

22  they occurred in the month, were they early in the month,

23  mid month, late month.  That would aid in my investigation.

24          I would also go out and do site visits myself.  And,

25  again, if they had a blocked order, they'd go through that

1    three-level process.  So that was another part of due

2    diligence.

3        Another part I would do is look up on the OIG website

4    to see if there was any disciplinary action against a

5    customer.

6        I would also do Google searches and such on the name of

7    the pharmacy, the pharmacist itself to get some background

8    information, see if there were ever any articles, public

9    articles available showing any issues that could have been

10   diversion.

11   **Q.**  Let me ask you about a few of, of those points you

12   mentioned.

13       In terms of the OIG website, can you tell the Court, or

14   say for the record what the OIG website is and why you would

15   go there?

16   **A.**  Yes.  It's the Office of Inspector General, and it

17   would list any actions taken against a business or, or the

18   person, the pharmacist or owner.

19   **Q.**  Why would you be separately Googling or searching on

20   the internet for a pharmacist and the pharmacy?

21   **A.**  To see if there was any other disciplinary action that

22   may not have been brought by the Inspector General.

23   **Q.**  And site visits, you talked about doing site visits.

24   Did you personally conduct site visits?

25   **A.**  Yes, I did.

1   **Q.**   Could you give the Court a sense of how regular that

2   was for you?

3   **A.**   It typically was weekly I would go out and visit

4   pharmacies.

5   **Q.**   How did you decide which pharmacies to visit?

6   **A.**   The criteria was initially independent pharmacies.

7   That was like one of the top criteria.  Then we did by size.

8   So we picked those pharmacies that were the highest

9   purchasers of the opioid drugs.

10       And then also if a pharmacy was doing a lot of

11   omitting, that was another criteria I would use to go visit.

12       And then if I was receiving frequent requests for

13   increases, that would be a -- we call it a red flag to go

14   visit because it would be why is this pharmacy going up so

15   quickly.

16   **Q.**   You, you just used a term called "omits."  Can you tell

17   us just for the record what an omit is?

18   **A.**   Yes, any order that's blocked.  It's synonymous.  A

19   blocked order is an omit.

20   **Q.**   Just so, so we all have a sense of it for the record,

21   can you kind of describe what a site visit that you would

22   conduct would entail?  What would be, what would be involved

23   in that?

24   **A.**   Yes.  Most of my site visits I would go unannounced.

25   **Q.**   Why would you do that?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **A.**    I wouldn't want the pharmacist to know I was coming.

2    **Q.**    Uh-huh.

3    **A.**    Again, I'm not distrusting them, but I want to do a

4    surprise visit.  So I would show up unannounced.

5         Before going into the pharmacy, I'd sit outside a while

6    and observe the traffic of the, the clientele that was going

7    in and to observe if there was any, again, red flags that I

8    saw.

9         I would then walk in and say "hello" and introduce

10   myself as the McKesson regulatory person and talk to that

11   pharmacist and see how they felt while I was there to talk

12   to them.  Did they seem nervous?  Did they feel comfortable

13   in talking to me?  Were they forthcoming with information or

14   were they trying to kind of give fast, short answers?

15        And at that time, I would ask them about what due

16   diligence they were performing, how were they reviewing

17   their prescriptions, were there any certain prescribers that

18   were a large part of their pharmacy.

19        So that, that was the type of interaction that I would

20   have during these site visits.  I would also take some

21   photographs.

22   **Q.**    And just to, to ask for a little more detail on those

23   points, what was it when you were showing up first and

24   sitting outside and you described watching, what is it you

25   were watching for?

1    **A.**   I would look for out-of-state plates was one flag.  I'd

2    look for long lines.  I would look for if there was a

3    security guard on site.  And I would also look if there was

4    any drug transactions occurring either on the premises or

5    nearby.

6    **Q.**   Perhaps you covered this already, but just to be sure I

7    have it, what would you be trying to look for when you went

8    inside and talked to the pharmacist?

9    **A.**   I'd look to see is the pharmacy what would be known as

10   a full-service pharmacy, does it have what we call the front

11   end which would be your medical equipment, OTC.  Maybe

12   they'd have a section of cards and different novelties, as

13   well as the Rx part behind the counter.  So that would be

14   one thing I'd look for.

15        While I was there watching them fill prescriptions, I

16   would watch to see are customers paying with cash, which is

17   another possible red flag that we would look for.

18   **Q.**   And just at a high level, thinking of these steps you

19   told us about, taking the pictures, watching outside, going

20   inside looking around and talking to the pharmacist there,

21   why is it you were doing those site visits at a high level?

22   **A.**   Number one, they were part of the program.  And the

23   reason they were part of the program, it was part of our due

24   diligence to understand our customer.

25   **Q.**   Were there instances when you performed this kind of

1    diligence that we've been talking about with existing

2    customers and McKesson made the judgment to not do business

3    with them anymore, cut them off?

4    **A.**   Yes, there would have been where I terminated existing

5    customers.

6    **Q.**   And why would it be that you would take on a customer

7    and then at a later point in time terminate them?

8    **A.**   There would have been changes in their business and

9    purchase patterns that I would have observed.  And also over

10   time, a customer can change what they're doing.  And if

11   there was noted suspicious activity over the years, once I

12   identified it, I would terminate -- go to Level III, alert

13   my superiors and terminate the customer.

14   **Q.**   Would you conduct a Level III review even in the

15   absence of an element just based on what you saw from your

16   reviews?

17   **A.**   Yes.  Level III could be conducted without a Level I or

18   II previously before it got to -- it did not need to go

19   through a I and II in order to get to III.  It could go

20   right to III.

21   **Q.**   Got it.  I want to touch for a moment on a term you've

22   mentioned a couple times today and that you were asked about

23   yesterday, "red flags."  Do you remember using that term

24   today and then getting asked questions about that yesterday?

25   **A.**   Yes, sir.

1   **Q.**   Could you just tell the Court what, what a red flag is?

2   **A.**   Yes.  Red, red flag is basically the terminology used

3   that, you know, you raise a red flag.  It would be something

4   that would cause you to pay attention to it.  There were

5   several red flags that we looked at.

6   **Q.**   Does the presence of a red flag alone mean that

7   something has gone wrong, that diversion has occurred or

8   will occur?

9   **A.**   No, it doesn't.  Initially there are red flags.  And

10  then a determination is made if that is a resolved red flag

11  or an unresolved red flag.

12       If it's resolved, it means that we saw information that

13  we felt comfortable explaining the red flag that occurred.

14  If it's unresolved, then that's still a problem.

15  **Q.**   And that goes to what I wanted to ask you next.  Can

16  red flags be resolved?

17  **A.**   Yes, absolutely.

18  **Q.**   For example, are there questions in the questionnaire

19  we went through that get at this idea of identifying

20  potential red flags?

21  **A.**   Yes, there are.

22  **Q.**   Can those be resolved depending on the entire picture?

23  **A.**   Yes, they could be through additional questioning of

24  the pharmacist.

25  **Q.**   I want to show you a document on that point that you

1    were shown yesterday.

2              MR. SCHMIDT:  May I approach, Your Honor?

3              THE COURT:  Yes.

4              MR. SCHMIDT:  I'll just give a copy to the Court.

5    It's already in evidence.  For the witness.

6              THE WITNESS:  Thank you.

7    BY MR. SCHMIDT:

8    **Q.**   Mr. Oriente, I've put in front of you P-12643.

9    It's in evidence.  And it says "McKesson CSMP Red

10   Flags."  And this statement of red flags is from May,

11   2015.  Do you see that?

12   **A.**   Yes, I do.

13   **Q.**   Do you recall being asked questions about various of

14   the red flags in this document yesterday?

15   **A.**   Yes.

16   **Q.**   Were you -- this is from May, 2015.  My question to you

17   is:  Were you looking at many of these red flags before this

18   time period?

19   **A.**   Yes, I would have been.

20   **Q.**   All right.  Let's take an example.  If we scroll down

21   this page, it says Section 1, Apparent Red Flags.  Do you

22   see that?

23   **A.**   Yes.

24   **Q.**   And there's physical location.  Do you see that?

25   **A.**   Yes, there is.

1    **Q.**    Would you be looking at many of those red flags going

2    back to 2008 in terms of these site visits?

3    **A.**    Yes, all of them.

4    **Q.**    Let's go to Page 2, please.  It says "Responses in the

5    Customer Questionnaire."  Do you see that?

6    **A.**    Yes.

7    **Q.**    If we scroll through to Page 3, it goes on to Page 3.

8    Do you see that?

9    **A.**    Yes.

10   **Q.**    Did you gather information on many of those points in

11   your questionnaire going back to 2008?

12   **A.**    Yes.

13   **Q.**    Okay.  We talked about how your questionnaire changed

14   over time.  Do you recall that?

15   **A.**    Yes, I do.

16   **Q.**    Did you update -- did your understanding of potential

17   red flags update over time?

18   **A.**    Yes, it would have.

19   **Q.**    Why is that?

20   **A.**    As different diversion trends evolved and, and came to

21   light, it would have been identified and added to our red

22   flag list.

23   **Q.**    Okay.  Let's take an example of that.  If we go to Page

24   4, there are some non-statistical red flags.  Do you see

25   that?

```
 1   A.   Yes, I do.

 2   Q.   The first one is geographic location.  Do you see that?

 3   A.   Yes.

 4   Q.   Yesterday you were asked a question about that first --

 5   actually, second sentence.  "The pharmacy located in a

 6   geographic area known or suspected of having higher than

 7   normal prescription drug diversion levels of prescribing."

 8        Do you see that?

 9   A.   Yes.

10   Q.   Do you remember being asked about that yesterday?

11   A.   Yes, I do.

12   Q.   If you look, there's a footnote.  And I want to go down

13   to the footnote if we could, bottom of the page.

14        Does this indicate that the source for that is the 2014

15   Centers for Disease Control?

16   A.   Yes, it does.  Yes, it does.

17   Q.   And, so, is that an illustration of what you were just

18   telling us about that as you learn more, as trends and

19   diversion became more known, you updated the diligence and

20   the red flags?

21   A.   Yes.

22   Q.   All right.  Let's go to Page 6, please.  Do you see

23   that there's a heading on Page 6 about other distributors?

24   A.   Yes.

25   Q.   You were read that first sentence, "Pharmacy purchases
```

1    controlled substances from other distributors."

2        Do you see that?

3    **A.**    Yes.

4    **Q.**    I want to read a little more.

5        Quote:  "It is not uncommon for a pharmacy to have a

6    secondary supplier to assist in meeting legitimate inventory

7    needs."

8        And then it provides a benchmark and it says, "However,

9    customer commitments can vary and should be factored into

10   the evaluations."

11       Is that your understanding of secondary distributors?

12   **A.**    Yes.  In the region that I had, it was quite common for

13   pharmacies to have two suppliers and sometimes even three

14   suppliers.

15   **Q.**    And that's what I wanted to ask you.  Is this

16   consistent with your experience or not and can you

17   characterize that?

18   **A.**    Yes, it is.  And, again, we would look to see who's the

19   primary supplier, who's the secondary, and who's the

20   tertiary supplier.

21   **Q.**    All right.  I'd like to go back in time, if I could,

22   back to the start of this period when you adopted these

23   policies of infrequent suspicious order reporting, blocking,

24   and greater diligence.

25       You mentioned earlier that you had occasion to talk

1    with the DEA about these changes you were making.  Do you

2    recall that?

3    **A.**   Yes.

4            MR. SCHMIDT:  I'd like to show the Court what

5    we're, what we're talking about when we talk about that,

6    please.

7        May I approach, Your Honor?

8            THE COURT:  Yes.

9            THE WITNESS:  Thank you.

10   BY MR. SCHMIDT:

11   **Q.**   You're welcome.  I've marked as Exhibit P-42657 a

12   slide deck with notes.  It says, "Controlled Substance

13   Monitoring Program Delran Facility Overview,

14   November 6th, 2008."

15       And if you look at the third page, it says "McKesson

16   Meeting Attendees."  Do you see your name under those

17   McKesson meeting attendees?

18   **A.**   Yes, I do.

19   **Q.**   Are you familiar with this document?

20   **A.**   Yes, I am.

21   **Q.**   Was this a presentation given to the DEA in November,

22   2008?

23   **A.**   Yes, it was.

24           MR. SCHMIDT:  We move P-42657 into evidence.

25           THE COURT:  Any objection?

```
 1              MR. RAFFERTY:  No objection, Your Honor.

 2              THE COURT:  It's admitted.

 3    BY MR. SCHMIDT:

 4    Q.   So I want to look at what information you were

 5    giving the DEA in this document.  But before I do, can

 6    you just give us an overview of what the context of this

 7    presentation is, what it is you were presenting?

 8    A.   Yes.  Our program at this date was about six months

 9    old, and we were letting the DEA know exactly what our

10    program was, how it was being implemented, and what the

11    expectations of it were.

12    Q.   Was part of the purpose of the meeting to obtain

13    feedback on your program if appropriate?

14    A.   Yes, it was.

15    Q.   All right.  Let's start with Page 7, please.  It says

16    "CSMP Components Objectives."  And it has different

17    elements:  Know your customer, monitor omitted orders,

18    customer review, use tools, record retention, training, and

19    security.  Do you see that?

20    A.   Yes, I do.

21    Q.   And do those points go to the elements we've been

22    discussing about suspicious order reporting, blocking, and

23    greater diligence?

24    A.   Yes, it does.

25    Q.   Let's go to Page 8.  It says "Know Your Customer,
```

1    Thresholds."  Do you see that?

2    **A.**    Yes.

3    **Q.**    And then it says "Threshold Determination.  Initial

4    customer thresholds were established using 12-month purchase

5    history plus margin of 10 percent."

6         Can you tell us what that refers to?

7    **A.**    Yes.  When we first established thresholds, we used

8    12-month purchase history for all customers.  And then we

9    put a small margin of 10 percent on top of that in order to

10   initially set the threshold.

11   **Q.**    And that, that 10 percent margin you described, there

12   was talk yesterday about buffers.  Do you remember that?

13   **A.**    Yes.

14   **Q.**    Is that 10 percent a buffer?

15   **A.**    Yes, it would be.  And it was put in because of the

16   variability in purchasing month over month.

17   **Q.**    That's what I wanted to ask you.  Why have a buffer?

18   **A.**    In order to offset this variability where pharmacies

19   order more or less each month.

20   **Q.**    And in this time period, if you're basing their

21   thresholds on 12-month purchase history and doctors, as you

22   told us earlier, are writing more and more prescriptions,

23   would you expect their purchases to go up over the course of

24   a year or go down?

25   **A.**    I would expect them to go up because purchasing would

1    have increased.

2    **Q.**   So just to be clear, did you tell the DEA that your

3    thresholds would be based on customer history with a buffer?

4    **A.**   Yes.  They were shown right there on that slide.

5    **Q.**   And do you recall any push-back reaction from the DEA

6    to that?

7    **A.**   I don't recall any, no.

8    **Q.**   Let's look down at the notes field.  It says "Michael

9    Slide."  Would this be your slide?

10   **A.**   Yes, it would.

11   **Q.**   And I want to highlight one particular entry here.  It

12   says "Large drug chain Rite-Aids," and then it gives an

13   average oxycodone of 27,000.  Do you see that?

14   **A.**   Yes, I do.

15   **Q.**   Were you giving the DEA notice in this about some of

16   your larger thresholds?

17   **A.**   Yes, we were.

18   **Q.**   Do you recall any reaction they had to that?

19   **A.**   No, I don't recall any reaction to their seeing this.

20   **Q.**   Now, has Alprazolam, is that a prescription opioid?

21   **A.**   Yes, it is.  No, I'm sorry.  I don't believe Alprazolam

22   is an opioid.

23   **Q.**   Okay.  And then it has hydrocodone.  Is this a

24   prescription opioid?

25   **A.**   Yes.

1    **Q.**   It says "hydrocodone zero."  Do you know why

2    hydrocodone was zero for Rite-Aid?

3    **A.**   Yes.  At the time of this, 2011 -- no, 2008 -- excuse

4    me -- hydrocodone -- Rite-Aid was self distributing

5    Schedules III through V.  And at that time, hydrocodone was

6    a Schedule III.  So McKesson only distributed CIIs at this

7    time to Rite-Aid.

8    **Q.**   Okay.  Let me see if I can put that in terms of

9    oxycodone and hydrocodone.  Did they distribute oxycodone?

10   **A.**   McKesson distributed oxycodone to the Rite-Aids, yes.

11   **Q.**   Was that a Schedule II?

12   **A.**   Yes, it was.

13   **Q.**   And at this time, what schedule is hydrocodone?

14   **A.**   It was a Schedule III.

15   **Q.**   Got it.  Let's go to the next page.

16        On the next page if we look at the top half, did you

17   walk the DEA through how you would -- if you look at the

18   heading:  Know your customer, new customer on-boarding, how

19   you would on-board customers including talking about the

20   questionnaire.

21   **A.**   Yes, it was explained to them.

22   **Q.**   All right.  I want to focus specifically on the first

23   sub heading.  Do you see where it says "Partnership

24   Between"?

25   **A.**   Yes.

1    Q.    And it refers to independent small and medium chains,

2    ISMCs.  Do you see that?

3    A.    Yes, I do.

4    Q.    If we then go further down to the third heading, it

5    says "Retail National Accounts."  Do you see that?

6    A.    Yes, I do.

7    Q.    And then there's two bullets under there.  My, my

8    question is, did you make clear to the DEA that you had one

9    approach for the independent chains and another approach for

10   the retail national accounts?

11   A.    Yes, we did.

12   Q.    What, what was that distinction that you told them

13   about?

14   A.    We explained to them that the retail national accounts

15   also have their own regulatory departments and they review

16   what their stores are dispensing at a level that the

17   independent pharmacies did, did not do.

18   Q.    And what does it mean when you say thresholds assigned

19   by corporate template?

20   A.    Basically, we looked at the Rite-Aids and used a

21   corporate approach based off of each of their pharmacies,

22   but would deal with their corporate office on any reviews

23   and not the individual pharmacy.

24   Q.    The next bullet, changes made via dispensing history in

25   HQ TCR.  What was that saying?

1    **A.**   Yes.  So we would still get dispensing history on a, on

2    a pharmacy, and we would work with the regulatory department

3    of the chain at their headquarters.

4        Again, that was because they would have reviewed their

5    own store before submitting it to McKesson for review.

6    **Q.**   When you told the DEA that you're taking a different

7    approach for the retail national chains than you are for the

8    independent pharmacies, did they say that's not proper?

9    **A.**   No, they did not.

10   **Q.**   Do you recall being asked questions yesterday about

11   giving customers notice as they came near to their

12   thresholds?

13   **A.**   Yes.

14   **Q.**   Do you recall that you, in fact, did that for a period

15   of time as you started using thresholds and blocking?

16   **A.**   Yes, for the retail national accounts, yes.

17   **Q.**   All right.  Let's go to Page 15, please.  It says

18   "Blocking Orders."  Do you see that?

19   **A.**   Yes.

20   **Q.**   And just to walk through the main headings, it says

21   "System blocks orders that exceed threshold, no override at

22   local level."

23       I want to focus on the third one, "Customer

24   Notification.  Alert customer approaching threshold."

25       Do you see that?

1    **A.**    Yes, I do.

2    **Q.**    My question to you, sir, is when you were asked those

3    questions yesterday about whether you gave notice to

4    customers as they came near their threshold, did you tell

5    the DEA that you were going to be doing that?

6    **A.**    Yes.  It states it here.

7    **Q.**    Do you recall any reaction they had to that?

8    **A.**    I don't recall any reaction, no.

9    **Q.**    Why were you giving those notifications?

10   **A.**    To a customer?

11   **Q.**    Yes.

12   **A.**    To alert that customer that they were approaching that

13   threshold, to give them time to assess whether they wanted

14   to submit the Threshold Change Request, and also not to

15   cause any unduly blocking of necessary orders that they may

16   need to place in the future.

17   **Q.**    During this period of time, were you still figuring out

18   the right level of thresholds for your customers?

19   **A.**    Yes, we were.  The program was only six months old at

20   this time.

21   **Q.**    As you became more confident in your thresholds over

22   time and had more experience with them, did there come a

23   point in time where you stopped providing that notice to

24   customers that they were nearing their threshold?

25   **A.**    Yes, that is correct.

1    **Q.**   All right.  Last point on this document.  I want to

2    come back to this idea about less suspicious order reporting

3    and whether you had discussions about that with the DEA.

4        Would you mind turning with me to Page 16 of this

5    document, please?

6        If you could just recall the conversation you and I had

7    about the CSMP and, remember, you told us what Level I

8    review was, Level II review was, Level III review was?

9    **A.**   Yes, I do.

10   **Q.**   In this presentation to the DEA in November, 2008, did

11   you present to the DEA this is what Level I is, this is what

12   Level II is, this is what Level III is?

13   **A.**   Yes, we did.

14   **Q.**   Did you make it clear to the DEA the first level at

15   which you would block orders?

16   **A.**   Yes.

17   **Q.**   And where was that?

18   **A.**   The block occurred at Level I.

19   **Q.**   Okay, if we could just highlight that, please.

20       I want to focus on when you treated orders as

21   suspicious and reported to the DEA.  Did you tell the DEA

22   the level at which you would treat orders as suspicious and

23   report them to the DEA?

24   **A.**   Yes.

25   **Q.**   Where was that?

```
1    A.    That was identified in Level III.

2    Q.    Okay.  So from this presentation, did you tell the DEA

3    that there would be orders that would be blocked but not

4    reported as suspicious because they didn't make it to Level

5    III?

6    A.    Yes.

7    Q.    Did the DEA tell you that they disagreed with that?

8    A.    No, they did not.

9    Q.    I'd like to turn to another document.

10             MR. SCHMIDT:  May I approach, Your Honor?

11             THE COURT:  Yes, you may.

12             THE WITNESS:  Thank you.

13   BY MR. SCHMIDT:

14   Q.    This is a document labeled MC-WV-397.  It looks

15   like it's got a similar cover page to the one we just

16   looked at.  It says "DEA Discussion Document."  This

17   time it's dated July 31st, 2008.  Have you seen this

18   document before?

19   A.    Yes, I have.

20             MR. SCHMIDT:  We move this document into evidence,

21   MC-WV-397.

22             THE COURT:  Any objection?

23             MR. RAFFERTY:  No objection Your Honor.

24             THE COURT:  It's admitted.

25   BY MR. SCHMIDT:
```

1   **Q.**   All right.  Do you recognize this as another

2   presentation to the DEA about your CSMP?

3   **A.**   Yes, I do.

4   **Q.**   And this covers many of the same points we've been

5   talking about, so I'm not going to go through them again.

6   I'll touch on them very quickly.

7         Do you see on Page 6, does this explain to the DEA how

8   you would set thresholds?

9   **A.**   Yes, it does.

10  **Q.**   Does it identify that there would be one approach for

11  your independents and another at the end for your retail

12  chains?

13  **A.**   Yes, it does.

14  **Q.**   If we go to Page 9, does that describe how you would

15  block orders?

16  **A.**   Yes, it does.

17  **Q.**   Does it again tell the DEA this point that there would

18  be customer notification, alert customer approaching

19  threshold?

20         MR. ACKERMAN:  Objection, foundation.  Your Honor,

21  he's testified he's seen document.  He hasn't testified that

22  this document was actually presented to the DEA.

23         MR. SCHMIDT:  I think he has.

24         THE COURT:  You can ask him if it was, Mr.

25  Schmidt.

```
1    BY MR. SCHMIDT:

2    Q.   Was this presented to the DEA to your knowledge?

3    A.   Yes.  This presentation was given by Don Walker to DEA

4    at Washington headquarters.  And this is the document that I

5    would have used to create this presentation given four

6    months later at the local Delran distribution center to the

7    DEA field office.

8            THE COURT:  Okay, overruled.

9    BY MR. SCHMIDT:

10   Q.   Thank you, Mr. Oriente.

11        Here's what I want to focus on, if we go to Page 10,

12   Level I review; Page 12 -- Page 11, Level II review; Page

13   12, Level III review.  Do you have those there in front of

14   you?

15   A.   Yes, sir.

16   Q.   Does the Level I description on Page 10 indicate that

17   orders would be blocked at that level?

18   A.   No, it does not.  Oh, I'm sorry, blocked, yes.

19   Q.   Okay.  Is there any reference to treating the orders as

20   suspicious and reporting it to the DEA on Page 10, Level I;

21   Page 2, Level II; Page 11, Level II?

22   A.   I'm sorry.  Could you repeat the question?

23   Q.   Fair request.  I bungled it.

24        Is there any reference on Page 10, Level I review, or

25   Page 11, Level II review, McKesson treating the orders as
```

1    suspicious and reporting them?

2    **A.**   No, there is not.

3    **Q.**   Where does that appear for the first time in terms of

4    these three levels?

5    **A.**   On the third bullet of the Level III review.

6    **Q.**   Is that the stage consistent with your CSMP where the

7    order would be treated as suspicious and reported?

8    **A.**   Yes, it does.

9    **Q.**   Look with me, if you would, at Page 13, please.  It

10    says at the top McKesson is prepared to stop excessive

11    purchases reporting to local field office.  Do you see that?

12    **A.**   Yes.  It's clearly stated.

13    **Q.**   Does that relate in any way to this first item about

14    infrequent suspicious order reporting?

15    **A.**   Yes, it's basically the same thing.

16    **Q.**   Was that something you were telling DEA?

17    **A.**   Yes, they were informed.

18    **Q.**   All right.  I want to do one more document from this

19    time period with you if I could.

20          MR. SCHMIDT:  And, Your Honor, this is the 2008

21    settlement agreement from yesterday.  We obviously objected

22    to its admission.  If I may preserve that objection on a

23    rolling basis, but now that it's in nevertheless examine on

24    that briefly.

25          THE COURT:  All right.  Go ahead.

```
 1            MR. SCHMIDT:  Thank you.  May I approach?
 2            THE WITNESS:  Thank you.
 3    BY MR. SCHMIDT:
 4    Q.   Why don't we put this up on the screen, Exhibit
 5    P-23733.
 6         Do you remember being asked questions about this
 7    document yesterday, the May 2nd, 2008, settlement between
 8    the DEA and McKesson?
 9    A.   Yes, I do.
10    Q.   I want to direct you to two separate provisions in this
11    document.
12         First, can we go to Page 2?
13         Heading 2 down at the bottom of the page states, "This
14    agreement is neither an admission by McKesson of liability
15    or of any allegations made by DEA in the orders and
16    investigations, nor a concession by DEA that its allegations
17    in the orders and investigations are not well founded."
18         Do you see that?
19    A.   Yes, that's written here.
20    Q.   Did you have that understanding that this is how
21    McKesson viewed that agreement as neither an admission of
22    liability or of the allegations made by DEA?
23    A.   That was my understanding.
24    Q.   Let's go to Page 6 of this document.  Well, actually,
25    let's go to Page 3, please.
```

1    If you look on the screen or on the document, do you

2    see where it says "Obligations of McKesson"?

3    **A.**   Yes.

4    **Q.**   And it continues through for a few pages.  Do you see

5    that?

6    **A.**   Yes.

7    **Q.**   And then on Page 5, if we can go back to Page 5, it

8    says "Obligations of DEA."  Do you see that?

9    **A.**   Yes.

10   **Q.**   I want to look at one of the obligations of the DEA on

11   Page 6, please.

12       If we look at the top of Page 6, do you see a

13   Subsection (e)?

14   **A.**   Yes, I do.

15   **Q.**   I want to read you this language and ask you a couple

16   questions about it.

17       "Within 150 days of the effective date of this

18   agreement, but not earlier than 90 days after the effective

19   date of this agreement, DEA shall conduct reviews of the

20   functionality of McKesson's diversion compliance program,"

21   and calls those compliance reviews, "at up to eight

22   distribution centers of McKesson."

23       Do you see that?

24   **A.**   Yes.

25   **Q.**   Are you familiar with whether those compliance reviews

```
 1   under this agreement actually happened?

 2   A.   Yes, I believe they did.

 3   Q.   And if we look at what the DEA is reviewing in these

 4   compliance reviews, do you see that parenthetical quote

 5   about compliance reviews?

 6   A.   Yes.

 7   Q.   Right before that it says, "DEA shall conduct reviews

 8   of the functionality of McKesson's diversion compliance

 9   program."

10        Do you know what McKesson's diversion compliance

11   program was at this point in time?

12   A.   Yes.  It would have been the CSMP.

13   Q.   Is that your understanding of what these diversion --

14   these compliance reviews were doing was reviewing the

15   functionality of McKesson's CSMP?

16   A.   Yes, that was my understanding.

17   Q.   Now, you mentioned that you had an understanding they

18   occurred.  Let's look at the next paragraph, please.  I'll

19   read the first sentence and then ask you some questions

20   about it.

21        It says, "The compliance reviews will be deemed

22   satisfactory unless DEA determines that one or more of the

23   facilities being inspected has," and then it lists three

24   things.  Do you see that?

25   A.   Yes.
```

1    **Q.**    What is your understanding of the facilities that were

2    inspected, focusing on that language?

3    **A.**    That they all passed the inspection.

4    **Q.**    What, what are the facilities?  What is that referring

5    to?  What facilities is it talking about?  If it helps to

6    look back in the prior --

7    **A.**    Yeah, it would.

8    **Q.**    Let's go back to the prior paragraph.

9    **A.**    Which one was listed?

10   **Q.**    It actually list them all.  But do you see it

11   references up to eight distribution centers?

12   **A.**    Yes.

13   **Q.**    Okay.  Is it your understanding, if we go to the next

14   paragraph, that "facilities" is referencing distribution

15   centers?

16   **A.**    Yes, it would be.

17   **Q.**    Okay.  So let's go to (f) again, please.  And the

18   criteria it gives is they will be deemed satisfactory unless

19   DEA determines, one, quote, failed to maintain effective

20   controls against diversion regarding the distribution of any

21   controlled substance; two, quote, failed to detect and

22   report to DEA suspicious orders of controlled substances;

23   or, three, quote, failed to meaningfully investigate new or

24   existing customers regarding the customer's legitimate need

25   to order or purchase controlled substances."

1        Do you see that language?

2   **A.**   Yes, that is written there.

3   **Q.**   Were these compliance reviews being conducted during

4   this window when you were giving these presentations to the

5   DEA, told them about blocking, about greater diligence, and

6   about less frequent suspicious order reporting?

7   **A.**   Yes, that is correct.

8   **Q.**   Do you have an understanding as to whether the

9   distribution centers who were subject to these compliance

10  reviews all passed?

11  **A.**   Yes.  It's my understanding that all eight passed.

12  **Q.**   And to be clear, if we go back to that first paragraph

13  (e) where it references DEA conducting reviews of the

14  functionality of McKesson's diversion compliance program at

15  CSMP, would the CSMP itself have been available to DEA

16  during these compliance review inspections?

17  **A.**   Yes, it would have.

18          THE COURT:  Was Washington Court House facility

19  one of the facilities they selected?

20          THE WITNESS:  I, I don't know.  I know that, as

21  here, it's Lakeland, Landover, and Conroe, and then five

22  others.  I'm not aware that Washington Court House was one

23  of those five, sir.

24          THE COURT:  Okay.  You don't know whether it was

25  or it wasn't?

```
1                THE WITNESS:  That is correct, Your Honor.
2      BY MR. SCHMIDT:
3      Q.   All right.  Let's jump ahead.
4                MR. SCHMIDT:  If I could just have one moment,
5      Your Honor.
6           (Pause)
7                MR. SCHMIDT:  Your Honor, while I'm having a
8      document pulled, I'm next going to show the witness the 2017
9      settlement he was shown yesterday over our objection just
10     with the request that we preserve our objection to its
11     admission --
12               THE COURT:  All right.
13               MR. SCHMIDT:  -- on a running basis.
14          And Your Honor might recall -- counsel will recall that
15     when you introduced this, I said we would ask for a copy to
16     introduce the exhibit with the appendices.  I'm going to go
17     ahead and move that version in now which is a different
18     version from the plaintiffs' list which is P-1320.
19          May I approach and pass that out if I may?
20               THE COURT:  Yes.
21               THE WITNESS:  Thank you.
22               MR. SCHMIDT:  And just with that preservation of,
23     of the objection generally, I move P-13 into evidence which
24     is what was previously marked but just with the agreement we
25     had about attaching the appendices.
```

```
 1              THE COURT:  Any objection to this?

 2              MR. ACKERMAN:  This one looks like it starts with

 3   Appendix B.

 4       So, again, Your Honor, this might be one of those

 5   things that Mr. Schmidt and me and Mr. Rafferty can work out

 6   in the middle of, or at the lunch break just to figure out

 7   whether these pages are in the right order or not.  They may

 8   not be.

 9              MR. SCHMIDT:  I'll represent that they are.  This

10   came from an exhibit that your side marked.

11              MR. ACKERMAN:  Uh-huh.

12              MR. SCHMIDT:  I'll confess I don't know why it has

13   Appendix B.  I think it was probably pulled from

14   attachments.  I'm happy to rip out Appendix B because it's

15   irrelevant to the purpose and we can treat the rest of the

16   document --

17              MR. ACKERMAN:  I see.  I see.  So the first page

18   here can come off.  So I think that's fine.

19              MR. SCHMIDT:  If I may, Your Honor, and we can

20   submit a new copy to the Court after.  We will remove the

21   first page of what I previously requested be marked as

22   Exhibit B -- as Exhibit P-13 and, instead, request that we

23   move in Exhibit P-13 from pages 2 through 67.

24              THE COURT:  So this -- you're substituting a

25   different Appendix B?  Is that what --
```

121

```
 1              MR. SCHMIDT:  No.  What I'm doing is two things:
 2    Ripping off the first page which I think this was just
 3    attached to some other document.  So the first page goes
 4    away.  And then --
 5              THE COURT:  Is that the page that says Appendix B?
 6              MR. SCHMIDT:  Yes.  That can just come off.
 7              THE COURT:  That that just comes off?
 8              MR. SCHMIDT:  Yes, please.
 9              THE COURT:  All right.
10              MR. SCHMIDT:  And then the rest of the document is
11    the same as what was introduced yesterday with the addition
12    of appendices to the actual settlement agreement itself.
13              THE COURT:  Are you -- do you have any objection
14    to that, Mr. Ackerman?
15              MR. ACKERMAN:  No, Your Honor.
16              THE COURT:  Okay.  It's admitted.
17    BY MR. SCHMIDT:
18    Q.   Do you recognize this as the settlement agreement
19    you discussed with plaintiffs yesterday?
20    A.   Yes.
21    Q.   I want to focus on something on the first page.  If we
22    look at the paragraph on the first page, do you see it
23    references an event on March 12, 2013, where DEA executed an
24    administrative inspection warrant at McKesson Aurora?
25    A.   Yes, I see that.
```

122

**Q.**   What is McKesson Aurora?

**A.**   McKesson Aurora is one of the distribution centers that's in Aurora, Colorado.

**Q.**   Do you know if McKesson Aurora regularly serviced West Virginia?

**A.**   No, it would not.

**Q.**   Do you have any understanding of whether this inspection that's referenced on this first page is what ultimately led to this settlement agreement?

**A.**   Yes, that is my understanding.

**Q.**   Okay.  And I want to ask you about changes that were made -- well, let me ask you a question first.  Following that inspection, the guidance McKesson received from that 2013 inspection, did McKesson make further changes to its policies?

**A.**   Yes, it did.

**Q.**   I'll come back to that.  But did that start shortly after the inspection in 2013 or did McKesson wait until this was finalized in 2017 to start those changes?

**A.**   No, they didn't wait until it was settled.  They made the changes as soon as they were identified.

**Q.**   I'll come back to those I suspect after the lunch break, but I just want to quickly see if I can get through this document before we go to the lunch break.

         Let's look at Page 3 of this document.  And you will

1 recall --

2   If we cull out midway down that paragraph, "McKesson

3 acknowledges."

4   You will -- do you recall being asked questions about

5 this language?

6 **A.** Yes, I do.

7 **Q.** All right.  It says, "McKesson acknowledges that at

8 various times during the January 1st, 2009, period up

9 through and including the effective date of this agreement,

10 the covered time period, it did not identify or report to

11 DEA certain orders placed by certain pharmacies which should

12 have been detected as suspicious by McKesson based on the

13 guidance contained in the DEA letters about the requirements

14 set forth in --" then there's two, the regulation and the

15 statute cited.  Do you see that?

16 **A.** Yes.

17 **Q.** So just a few questions about that language.

18   Do you know if -- when it refers to certain orders

19 placed by certain pharmacies which should have been detected

20 by McKesson as suspicious, do you know if that refers to any

21 pharmacies or orders in Huntington/Cabell?

22 **A.** No, it does not.

23 **Q.** Do you understand this language to be focused

24 specifically on suspicious order reporting?

25 **A.** Yes.

1   **Q.**   Would you have been blocking orders even if they

2   weren't reported as suspicious during this time period that

3   exceeded your thresholds?

4   **A.**   Yes, the orders would have been blocked.

5   **Q.**   Does this language say anything about failing to block

6   orders?

7   **A.**   No, it does not.

8   **Q.**   Does this language say anything about McKesson

9   acknowledging that it had pharmacy customers that were

10  engaged in diversion?

11  **A.**   No, diversion is not mentioned.

12  **Q.**   Does that language say anything about McKesson not

13  meeting its ARCOS reporting obligations?

14  **A.**   No, it does not.

15        MR. SCHMIDT:  May I have one moment to confer,

16  Your Honor?

17        THE COURT:  Yes.

18    (Pause)

19        MR. SCHMIDT:  I'll try to keep the conference

20  short, Your Honor.

21      That concludes what I have on, on this document.  I'm

22  about to switch to a new topic.

23        THE COURT:  Well, this might be a good time to

24  quit.  I've got to take a plea and we need to clear out the

25  courtroom and so forth.  So we'll be in recess until 2:00.

```
1              You can come back at 2:00.

2              THE WITNESS:  Okay.  Thank you, Your Honor.

3         (Recess taken at 11:56 a.m.)

4              THE COURT:  Mr. Oriente, you can resume the

5    witness stand, sir, wherever you are.

6              MR. SCHMIDT:  He just stepped out in case there

7    were early matters to deal with.

8              THE COURT:  All right, Mr. Schmidt.

9              MR. SCHMIDT:  Yes, Your Honor.  May I proceed?

10             THE COURT:  Yes, please.

11             MR. SCHMIDT:  Thank you.

12             BY MR. SCHMIDT:

13   Q.   Mr. Oriente, I want to pick up with where we were on

14   the board in terms of changes over time and orient you back

15   to that inspection at the Arora facility we talked about in

16   2013.  And I think you've said before the lunch break, or

17   let me ask you, at that point in time, did McKesson

18   undertake further changes to its processes?

19   A.   Yes, it did.

20   Q.   Specifically, did it make changes in the volume of

21   suspicious orders that it reported?

22   A.   Yes, it did.

23   Q.   And between these two poles of frequent and infrequent,

24   how would you characterize the changes in reporting again in

25   2013?
```

```
 1    A.   It was frequent and involved all suspicious orders.

 2    Q.   Did it cover everything that you were blocking?

 3    A.   Yes, it would have.

 4    Q.   All right.  Did the blocking itself continue?

 5    A.   Yes.  Full blocking continued.

 6    Q.   Did that include blocking orders that appeared likely

 7    to be diverted?

 8    A.   Yes, it would have.

 9    Q.   And we talked about the diligence for some length that

10    you and your colleagues undertook between 2008 and 2013.

11    Yesterday, you were asked about enhancements to your CSMP in

12    this time frame.  Did that include enhancements to the

13    diligence?

14    A.   Yes, it did.

15    Q.   I'd like to illustrate a little bit for the Court what

16    we were talking about.  Before I do, obviously, anytime you

17    improve something you can ask, well, why weren't you doing

18    that earlier.  In this time frame, this 2008 to 2013 time

19    frame, did you have a view one way or the other as to

20    whether you were doing what the DEA wanted you to do?

21    A.   It was McKesson's understanding that we were, yes.

22    Q.   Did that come from things we talked about before lunch

23    like compliance reviews, the presentations to the DEA?

24    A.   Yes.  Compliance reviews, presentations, cyclical

25    audit, things of that nature.
```

1    **Q.**    When you made changes in 2013, were you making changes

2    because you had a new understanding of what the DEA wanted?

3    **A.**    Yes, we did.

4    **Q.**    Was there -- if we think back to that suspicious order

5    regulation that we looked at that was quoted in one of your

6    early manuals, do you remember that, unusual size,

7    frequency?

8    **A.**    Yes, I do.

9    **Q.**    Was there any change to that regulation or any change

10   to the guidance you were receiving?

11   **A.**    There was no change in the regulation.  There was

12   change in the guidance.

13   **Q.**    Let's talk about how you responded, how McKesson

14   responded to that change in guidance in a little more

15   detail, and I would like to go to a document that you were

16   shown yesterday, P-13737, which is in evidence.

17        And while we look for it, because it's in evidence, I

18   will ask that it be put up on the screen.  I guess it

19   already is.

20        Do you remember being shown this e-mail yesterday dated

21   November 1st, 2013 from Ellie Rio to a number of people?

22   And if I recall correctly, you're about seven or eight lines

23   down.

24   **A.**    Yes.  I see my name.

25   **Q.**    And if we scroll to the next page, please, Page 4,

```
 1    actually, do you see that attached to this e-mail is a slide

 2    deck from November 1st, 2013 regarding the Controlled

 3    Substance Compliance Program?  Do you see that?

 4  A.    Yes, I do.

 5  Q.    And to finish orienting us to this document, if we go

 6    to Page 2 of the document, on the bottom half you were shown

 7    this language sent on behalf of Don Walker.  It references

 8    we are in the process of implementing an enhanced suspicious

 9    Order Monitoring Program and then it looks like there's

10    training on that program; is that correct?

11  A.    Yes, that is correct.

12  Q.    And that enhanced Suspicious Order Monitoring Program,

13    does that include undertaking these steps we have in this

14    2014 forward time period?

15  A.    Yes, it would have.

16  Q.    Okay.  So, let me just pass this on to you and to the

17    Court so you have it for reference if you want it.

18  A.    Thank you.

19  Q.    Thank you.  Why don't you go back to Page 4.  Page 5 is

20    background.  Do you see that?

21  A.    Yes.

22  Q.    Page 6 is Controlled Substance Compliance Program.  Do

23    you see that?

24  A.    Yes, I do.

25  Q.    And Page 7 is the page you were asked about,
```

1    significant enhancements to CSMP.  Do you see that?

2    **A.**   Yes.

3    **Q.**   All right.  And this page references more sophisticated

4    data analysis, more rigorous process for threshold change

5    requests, reinforcement of decision making within the

6    Regulatory Affairs Team and corresponding investments to

7    expand the Regulatory Affairs Team.  Can you give us an

8    overview as you understand it of what those changes

9    involved?

10   **A.**   Yes.  The first one was new and enhanced Data Reports

11   were created for McKesson's regulatory use.  The second

12   bullet was we looked at threshold changes differently from

13   this point forward.  And the third one was the decision

14   making was -- it got additional reviews and then there was

15   increase in the Regulatory Affairs Team and head count.

16   **Q.**   And did that increase, in fact, happen?

17   **A.**   Yes, it did.

18   **Q.**   Can you tell a little bit about the background of some

19   of those new people that you brought in?

20   **A.**   Yes.  Primarily, their background was experience as DEA

21   diversion investigators.  That's where the majority came.

22   Some came from State Attorney General Offices.

23   **Q.**   Why did you hire people with those kinds of

24   backgrounds?

25   **A.**   They had the knowledge and experience in diversion.

1   **Q.**   Was part of this program, this step we've talked about,

2   reporting suspicious orders based on which orders you're

3   blocking?

4   **A.**   Yes.  It would have reported every blocked order that

5   attempted to go above a threshold.

6   **Q.**   And was additional training part of this process?

7   **A.**   Yes, it was.

8   **Q.**   In fact, is this document itself part of that training?

9   **A.**   Yes, it would have been.

10  **Q.**   Okay.  I'd like to show you a slightly later version of

11  your CSMP just so we have it after many of these changes

12  have been made.  Are you aware of whether McKesson continued

13  to update its CSMP after 2014?

14  **A.**   Yes.  It would have been updated.

15  **Q.**   Can you tell us what this document is, sir?

16  **A.**   Yes.  This would be the -- what's referred to as the

17  ISMC Controlled Substance Monitoring Program document, their

18  operating manual involving the independent stores.

19  **Q.**   Are you familiar with this manual from your work at

20  McKesson?

21  **A.**   Yes, I am.

22         MR. SCHMIDT:  Your Honor, we'd move this document

23  into evidence, MCWV-199.

24         THE COURT:  Any objection?

25         MR. RAFFERTY:  No objection, Your Honor.

```
1              THE COURT:  It's admitted.  MCWV-199 is admitted.

2              MR. SCHMIDT:  Thank you.

3              MR. SCHMIDT:  Let's put it up on the screen,

4    please, and we can probably go ahead and replace this

5    screen, too, because I'm done with that board now.  I don't

6    know if that's feasible.

7              BY MR. SCHMIDT:

8    Q.   But either way, do you see that this says ISMC

9    Controlled Substance Monitoring Program Operating Manual and

10   it's dated May, 2015 down at the bottom?  Do you see that?

11   A.   Yes, I do.

12   Q.   So, let me just -- we're not going to go through this

13   in the same detail we went through the other policies, but I

14   want to show you just a few features of it.  Can we go to

15   Page 4, please?

16        In the second half of the page, it lists the core

17   elements of CSMP.  It looks like it's reviewing customers,

18   monitoring customers, blocking orders, conducting initial

19   due diligence, determining when a customer is no longer

20   eligible.  Do you see those?

21   A.   Yes, I could.

22   Q.   Are those steps you've been performing all the way back

23   to the 2008 time frame?

24   A.   Yes.  They would have been established in 2008.

25   Q.   Just at a high level, what was changing here?
```

```
 1    A.    It would have been the additional reporting of

 2    suspicious orders.

 3    Q.    Was there additional diligence, as well?

 4    A.    Yes.

 5    Q.    All right.  Let's look at Page 6, please.  And,

 6    unfortunately, this is not a great copy, but if we could

 7    blow up that organizational chart on the bottom half of the

 8    page.

 9          Do you understand this to refer to the changes we

10    talked about a moment ago in terms of the number of

11    Regulatory Affairs -- Regulatory Affairs employees?

12    A.    Yes.

13    Q.    And it's hard to see the numbers on there, but as I go

14    through and count them, it's somewhere in the order of 25 or

15    26.  Does that -- is that consistent with your recollection?

16    A.    At this time that this was printed, yes.

17    Q.    All right.  Let's look ahead to Page 18.  Is this that

18    red flags document we were talking about earlier?  Is that

19    incorporated as part of your CSMP?

20    A.    Yes, it was.

21    Q.    And let's look ahead to Page 41, please.  Do you see

22    the Suspicious Order Monitoring and Reporting heading?

23    A.    Yes.

24    Q.    It says under heading 7.2, orders with a V code omit

25    are compiled in a Suspicious Order Report, which is
```

1    generated at the end of each day.  The report is

2    automatically transmitted to DEA Headquarters at the end of

3    each day through DEA's website.  Do you see that?

4    **A.**   Yes, I do.

5    **Q.**   What is an order with a V code omit?

6    **A.**   The V code omit specifically -- omits were given an

7    Alpha code.  The V code omit was for a threshold excursion.

8    **Q.**   Exceeding the threshold?

9    **A.**   Attempting to, yes.

10   **Q.**   Attempting to?

11   **A.**   Yeah.

12   **Q.**   Okay.  And so, is this the language that implements

13   what we had on the board about reporting all orders that get

14   blocked because they go above a threshold?

15   **A.**   Yes.  This is describing that process.

16   **Q.**   I'm going to show you one more.

17   **A.**   Thank you.

18   **Q.**   You're welcome.

19        Do you recognize this document I've put if front of

20   you, MCWV-243?

21   **A.**   Yes, I do.

22   **Q.**   What is this document?

23   **A.**   This is the document outlining our process for

24   Controlled Substance Monitoring Program for our RNA, or

25   retail national accounts, customers.

1          MR. SCHMIDT:  Your Honor, we move MCWV-243 into

2     evidence.

3          THE COURT:  Any objection to 243?

4          MR. RAFFERTY:  No objection, Your Honor.

5          THE COURT:  Admitted.

6          BY MR. SCHMIDT:

7     **Q.**   So, just to be sure -- can we put that up on the

8     screen, please?  And just to be sure I understand what we're

9     looking at here, can you tell us the date of this document?

10    **A.**   Yes.  It has an effective date of April 17th, 2018.

11    **Q.**   Is this specific to a certain type of customer for

12    McKesson?

13    **A.**   Yes.  This would have applied to the national chains.

14    **Q.**   If we scroll up the page a bit, is that -- a little

15    more, is that what the reference -- where do you see --

16    where does this tell you that this is for the national

17    chains?

18    **A.**   Under the RNA acronym.

19    **Q.**   Why did McKesson put together a program specific for

20    RNA customers?

21    **A.**   Again, RNA customers are different from independent

22    customers.  RNA chains also conduct due diligence and have

23    regulatory departments that they, themselves, oversee their

24    pharmacies.

25    **Q.**   Are you familiar with a company that McKesson has

1    worked with more recently called Analysis Group?

2    **A.**    Yes, I am.

3    **Q.**    What is it that Analysis Group does?  Well, actually,

4    let me ask you first, what is Analysis Group as you

5    understand it?

6    **A.**    Analysis Group is an analytics company.  They take

7    data, run it through statistical models, and generate an

8    outcome so that that data has meaningful information and

9    action can be used to -- once that determination is made.

10   **Q.**    Does McKesson now work with AGI as part of its

11   Controlled Substance Monitoring Program?

12   **A.**    Yes, they currently do.

13   **Q.**    And what, at a general level, does AGI do with

14   McKesson?

15   **A.**    On a monthly basis, AGI will review customer purchases,

16   previous customer purchases, review geographic areas that

17   the customers are in, and will set new thresholds each month

18   relative to the customers' previous purchases.

19   **Q.**    Do you know if those thresholds can go up and can go

20   down?

21   **A.**    Yes.  It's an automatic process so that thresholds can

22   go down, as well as increase.  If a customer's business is

23   increasing, adjustments can go up.  As a customer's business

24   decreases, the model will reduce the thresholds.

25   **Q.**    And you made reference to a model.  Earlier, you talked

1    about statistics.  I'm not going to ask you to get into the

2    details of those, but are you familiar that they use

3    something called the Tukey Box Plot method?

4    **A.**    Yes, I am.

5    **Q.**    Are you the one who runs those numbers?

6    **A.**    No, I do not.

7    **Q.**    Got it.  Do you understand whether the way they set the

8    model is static or dynamic?

9    **A.**    It would be dynamic.

10   **Q.**    And what does that mean to your understanding?

11   **A.**    That it would take into account the specific customer,

12   but also take into account the geographic area, as well as

13   looking at sort of a rating scale of the most abused base

14   codes.  There's a significance to the different base codes

15   assigned.

16   **Q.**    Do you know whether it incorporates comparing customers

17   to similar customers?

18   **A.**    Yes, it would.  That's one of the statistical modelings

19   that they do.

20   **Q.**    Roughly speaking, do you know how long the company has

21   been working with AGI to help set its thresholds?

22   **A.**    I believe it started around 2015, if I -- you know, to

23   my recollection, around 2015.

24   **Q.**    Okay.  Now, I want to shift gears and cover a few of

25   the points you were asked about yesterday and I want to

1    start with retail national accounts and, specifically, Rite

2    Aid.  Has there been a period of time when you have focused

3    largely on retail national accounts in your work?

4    **A.**   Yes.

5    **Q.**   Since when have you done that?

6    **A.**   In 2014, I moved into a group that was specifically

7    assigned to monitor retail national accounts.

8    **Q.**   And is the way you interact with retail national

9    accounts the same or different than how you interact with

10   individual pharmacies?

11   **A.**   Oh, it would be very different.

12   **Q.**   Can you tell me how that's different and why that's

13   different?

14   **A.**   Yes.  When I was in the northeast region, I would

15   interact with specific store owners and Pharmacists in

16   Charge on the Independent -- or the ISMC group of customers.

17   In the retail national account position, I deal with

18   corporate regulatory people at each of the chains would be

19   the main difference.

20   **Q.**   Do you understand that they themselves -- do you have

21   an understanding as to whether the retail chains are

22   themselves registered as distributors in terms of when they

23   distribute to themselves?

24   **A.**   They would be.  If they do some self-distributing, they

25   would have to be registered as a distributor.

1    Q.   Do you know from your discussions with the DEA whether

2    the DEA knew about that difference in the way you dealt with

3    independent pharmacies and chain pharmacies?

4    A.   Yes.  It was my understanding they knew that

5    difference.

6    Q.   Did we see some of that in the presentations we looked

7    at earlier to the DEA in 2008?

8    A.   Yes.  It was -- to my understanding, what I saw, it was

9    spelled out in the presentations.

10   Q.   Did you -- even though you would deal with the national

11   office, did you still conduct diligence regarding individual

12   chain stores?

13   A.   Yes.  When it was required, I would go visit a --

14   excuse me.  I would go visit a retail national account

15   pharmacy, yes.

16   Q.   For example, were there ever occasions where you

17   rejected threshold change requests on individual chain

18   stores?

19             MR. ACKERMAN:  Your Honor, objection.  Could we

20   have a time frame for these questions?

21             THE COURT:  Yes.  Can you put a time frame on it,

22   Mr. Schmidt?

23             BY MR. SCHMIDT:

24   Q.   The time period when you worked with --

25             MR. SCHMIDT:  Of course.

```
1              BY MR. SCHMIDT:

2    Q.   In the time period where you worked with retail chains,

3    were there occasions where you would reject threshold

4    increases for individual retail chain stores?

5    A.   It would have started in 2008.

6    Q.   Okay.

7    A.   Because I had Rite Aid from 2008 to present.

8    Q.   Okay.  And has that been periodic throughout that time?

9    A.   Yes, it has been.

10   Q.   Were the chain stores different from each other in

11   terms of your interactions with them and their programs?

12   A.   Yes, they -- they would be.

13   Q.   Let me show you a document on that.  This is a document

14   that was marked into evidence yesterday, P-42796.

15             MR. SCHMIDT:  May I approach, Your Honor?

16             THE COURT:  Yes.

17             THE WITNESS:  Thank you.

18             BY MR. SCHMIDT:

19   Q.   If you look at the first line, do you -- in the first

20   e-mail, it is an e-mail to you at the end of this chain in

21   October, 2008.  Do you see the reference to CVS?

22   A.   Yes, I do.

23   Q.   And if you look through the document, do you see

24   various references to CVS in this document?

25   A.   Yes.  It's all CVS related.
```

1    Q.   Let me show you something we didn't have a chance to

2    look at yesterday.  If you look at the end of the first

3    paragraph, do you see where it says CVS is really different

4    from the other RNA?  Do you see that?

5    A.   Yes, I do.

6    Q.   What does that mean?

7    A.   CVS was also a self-distributor to their pharmacies

8    besides using McKesson.  That was probably the biggest

9    difference.

10   Q.   Okay.  When you say CVS is really different from the

11   other RNA, was Rite Aid an RNA?

12   A.   Yes.  Rite Aid was considered an RNA customer.

13   Q.   Were there differences in how you interacted with CVS

14   versus Rite Aid?

15   A.   Yes, there were.

16   Q.   Now, how long is it that you've worked with Rite Aid to

17   monitor for diversion?

18   A.   Since 2008.

19   Q.   You were, in fact, asked some questions yesterday about

20   Rite Aid objecting to your CSMP when it first came on-line

21   in 2008; do you recall that?

22   A.   Yes, I do.

23   Q.   Did you subject them to your CSMP?

24   A.   Yeah.  Although they had objections, they were still on

25   the program.

1    **Q.**   Now, in the time since then, how frequently on average

2    would you have contact with Rite Aid?

3    **A.**   I would say a few times a month.

4    **Q.**   Do you know if they had their own internal team, their

5    own analogs doing what you were doing?

6    **A.**   Yes, they did.  They had their own Regulatory

7    Department.

8    **Q.**   Did you work with those individuals personally?

9    **A.**   Yes, I did.

10   **Q.**   Do you know if they had their own set of policies and

11   procedures, some kind of analog McKesson CSMP for doing

12   their own monitoring of their stores?

13   **A.**   Yes.  Rite Aid had documented policies and procedures

14   on the filling of controlled substances.

15   **Q.**   Did you come to a view from your interactions with Rite

16   Aid?  We can take this down.  Did you come to a view from

17   your interactions with Rite Aid as to whether they were

18   committed from what you could see to detecting and

19   preventing diversion?

20   **A.**   Yes.

21   **Q.**   What was that view?

22   **A.**   My view was that Rite Aid was conducting their due

23   diligence and reviewing not only the pharmacy, but the

24   prescribers that were driving the prescriptions.

25   **Q.**   Were there occasions where you raised concerns or

1    points that you had with Rite Aid with their team?

2    **A.**    Yes, there was.

3    **Q.**    From your perspective, how did they respond?

4    **A.**    They would review those stores that McKesson identified

5    and Rite Aid would report back their findings to myself so

6    that, again, if it was a red flag, could it be resolved with

7    the additional information that Rite Aid would provide.

8    **Q.**    Were there times where, on their own, they would come

9    to you with steps they were taking or concerns they might

10   have?

11   **A.**    Yes.  They would communicate with myself about that.

12   **Q.**    Let me ask you about another topic.  At one point near

13   the end of the day you were asked a question about the ratio

14   of controlled substances to other prescription drugs.  Do

15   you remember being asked that question?

16   **A.**    Yes, I do.

17   **Q.**    And you were asked specifically about a ratio of

18   90 percent controlled substances, ten percent other

19   substances; do you remember that?

20   **A.**    Yes, I do.

21   **Q.**    Do you remember talking about, well, maybe we'd cut

22   that customer off?

23   **A.**    Yes.

24   **Q.**    Would you want to know all the facts about that

25   customer before making that decision?

1    **A.**    Yes.  The 90 percent would be one red flag.  You would

2    dig deeper to find out why.

3    **Q.**    Would that include looking at whatever you had in your

4    diligence file and whatever you had learned about how the

5    customer did business?

6    **A.**    That would be one additional aspect.  There would be

7    more than that, yes.

8    **Q.**    Like what kind of things would you look at?

9    **A.**    I would look at their threshold history throughout the

10   program.  I would look at the latest questionnaire to make

11   sure it matched up to their business model.  I may even

12   conduct a site visit, make a phone call to the pharmacy,

13   compare them to other customers to see why are they

14   different.

15   **Q.**    Would it be relevant, for example, if they were a

16   specialty pharmacy that served customers like Hospices?

17   **A.**    Yes.  That would be a factor taken into consideration.

18   **Q.**    Would it be relevant if there were specialty

19   compounding pharmacies that were purchasing a large amount

20   of their product from other sources?

21   **A.**    Yeah.  That would -- that would definitely be a factor.

22   **Q.**    Would you look at what the absolute level per month of

23   their controlled substance purchases are?

24            MR. RAFFERTY:  Your Honor -- oh, I'm sorry, Paul.

25            BY MR. SCHMIDT:

```
 1    Q.   The actual number per month submitted?

 2              MR. RAFFERTY:  Your Honor, this is a lot of

 3    leading questions.  I have to object.  I mean, I understand

 4    he's allowed to lead a little bit, but question after

 5    question after question here has been blatantly leading.

 6              THE COURT:  Well, I'm going to overrule it and let

 7    him get through this.

 8              MR. SCHMIDT:  Thank you, Your Honor.

 9              THE COURT:  This is cross.  I think he can do some

10    leading.

11         Go ahead.

12              THE WITNESS:  Would you repeat the question,

13    please?

14              BY MR. SCHMIDT:

15    Q.   Sure.  Would you look at the total monthly purchases to

16    see what the number of pills per month being purchased was?

17    A.   Yes.  That would be part of the review.

18    Q.   For example --

19              THE COURT:  You may have -- I may have missed

20    this, but if somebody like CVS self-distributed for part of

21    their purchases, would you have access to how many pills

22    they -- they -- for an individual pharmacy?  Would you have

23    access to the number of pills that they shipped directly to

24    their pharmacies that you also sold to?

25              THE WITNESS:  Not prior to 2019 when the ARCOS
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    data was made available to the wholesaler.  From 2019 on to

2    today, yes.  Prior to 2019, no, I would not have that

3    visibility to the amount that --

4              THE COURT:  So, in setting your thresholds and the

5    monitoring for possible diversion, it seems to me that that

6    would be necessary information for you to have and you

7    wouldn't have it; is that right?

8              THE WITNESS:  We could request that from CVS if we

9    were doing an additional review and felt that the controlled

10   percentage was growing.  We could request their total

11   dispensing.  So, we could get it that way, but it wasn't

12   available unless we asked CVS to provide it.

13             THE COURT:  Would they give it to you if you asked

14   for it?

15             THE WITNESS:  Yes, they would.

16             BY MR. SCHMIDT:

17   Q.   And just to drill into the judge's question a little

18   bit more, in terms of the self-distribution, we've talked a

19   lot about oxycodone and hydrocodone.  Did the chains,

20   generally speaking, distribute oxycodone?

21   A.   No, they did not.  That was a Schedule II drug and they

22   would come to McKesson for that.

23   Q.   Until it was made into a Schedule II drug, did they

24   self-distribute hydrocodone?

25   A.   Yes.  They would have self-distributed it because it

1    was a Schedule III before the DEA made it a Schedule II.

2    **Q.**    And did you take into account that they might be

3    self-distributing hydro, but not oxy, in setting your

4    relative thresholds for those two types of products?

5    **A.**    Yes.  For the oxy, they would have primary with

6    McKesson.  And for hydrocodone, McKesson was a secondary

7    supplier or a backup supplier to -- if CVS or Rite Aid had

8    inventory issues where they could not supply their own

9    stores, they would then come to McKesson and ask us to

10   supply it to them.  Their thresholds for hydrocodone would

11   have been set lower because we were the backup secondary

12   supplier for them.

13   **Q.**   Last questions on this topic.  If I told you a pharmacy

14   had 13,300 pills average per month in the year 2011,

15   oxycodone, does that stand out as high or low to you?

16   **A.**    For me, it would stand out as low in the 2011 time

17   frame.

18   **Q.**   If I told you they had 300 pills per month average in

19   2011 of hydrocodone, would that stand out high or low?

20   **A.**    300 pills would be very low.

21   **Q.**    All right.  You were asked some questions yesterday

22   about audits; do you recall that?

23   **A.**    Yes.

24   **Q.**    Do you have an understanding as to why McKesson has an

25   Audit Department that conducts periodic distribution center

```
 1   audits?

 2   A.   Yes, I do.

 3   Q.   Will you share that with us?

 4   A.   Sure.  McKesson obviously takes it very seriously to

 5   the point that they sort of check the checker.  So, the

 6   audit team would come in and make sure that McKesson is

 7   compliant in our responsibilities.

 8   Q.   Are these audits used as a means to enhance and improve

 9   McKesson's programs and ensure compliance with them?

10   A.   Yes, they would be.

11           MR. SCHMIDT:  May I approach, Your Honor?

12           THE COURT:  Yes.

13           THE WITNESS:  Thank you.

14           MR. SCHMIDT:  You're welcome.

15           BY MR. SCHMIDT:

16   Q.   Exhibit 115 is the first of two audit documents that

17   you were shown yesterday that was admitted into evidence.

18   Do you recall being shown this document?

19   A.   Yes, I do.

20   Q.   What I'd like to do is go to Page 13.  And it's Page 13

21   in the little numbering on the extreme bottom right corner.

22   A.   I have it.

23   Q.   Do you see that?  And we also have it up on the screen

24   and can we call up three paragraphs that were shown

25   regarding individual distribution centers, Delran, Newcastle
```

1    and Washington Court House?  Do you see that?

2    **A.**    Yes, I see that.

3    **Q.**    So, let me ask you first about Delran and Newcastle.

4    Did they regularly supply customers in Cabell County or

5    Huntington?

6    **A.**    No, they did not.

7    **Q.**    Am I correct in looking at all three that they refer to

8    forms not being completed?

9    **A.**    Yes.  All three mention forms.

10   **Q.**    Do you see any finding in there that the actual review

11   work was not done, as opposed to the paperwork not being

12   filled out?

13   **A.**    No, I do not.

14   **Q.**    Let's look at an example.  Can we pull up the full

15   Washington Court House finding?  Do you see it says the

16   required Level I forms were not completed for all 19 omits

17   in July, 2010 and all 11 omits in November, 2010?  Do you

18   see that?  In addition, the omit report was not signed and

19   dated.  Do you see that?

20   **A.**    Yes, I do.

21   **Q.**    Can you tell from this whether the omits were occurring

22   or not?

23   **A.**    Yes, they would have been.  They would have been

24   blocked orders.

25   **Q.**    And was the Audit Department able to tell exactly how

1    many omits had occurred?

2    **A.**   Yes, they would have been able to tell, and then look

3    for the paperwork.

4    **Q.**   And so, is it correct that they're saying we can tell

5    the omits were done, we just don't have the paperwork?

6    **A.**   That's what this is referring to, that the blocked

7    orders did occur.  No shipments were made.  It just was not

8    documented.

9    **Q.**   Do you see any findings there about shipping orders

10   that should not have been shipped?

11   **A.**   No, not at all.

12   **Q.**   Do you see any findings there about diligence not being

13   conducted, as opposed to the paperwork not being conducted?

14   **A.**   No.

15   **Q.**   And if we could go back out to a separate part of the

16   page, if we could grab the right side of the screen from

17   action plan through action date.  We see for the findings

18   we've been talking about, I think those are on the bottom

19   half and it looks like there's text in the action plan.

20   There's text in the action owner.  And there's text in the

21   action date.  Can you tell us what those mean?

22   **A.**   Yes.  The action plan would be the corrective action

23   plan to remedy the identified issue.  The action owner,

24   Blaine Snider in the first case, was the Distribution Center

25   Manager of the Newcastle, Pennsylvania Distribution Center.

```
1   And then the action date as to when it would be completed

2   by.

3   Q.   So, am I correct that by the time this report came out

4   there was an action plan to address this owner and an action

5   date for addressing it by?

6   A.   Yes, that is correct.

7   Q.   Let's go to Page 14, please.  You were also asked about

8   this page under threshold change requests.  And I believe

9   you were asked about Delran and Washington Court House.  Do

10  you recall those?  If we could call those up on Page 14.

11  A.   Oops.  My monitor went off.  Oh, there it goes.

12  Q.   Do you see that it references threshold change forms

13  not being on file?

14  A.   For which DCs?

15  Q.   For Delran -- for all three shown here?  It identified

16  specific --

17  A.   Yes.  Yes.  In the first two, I saw TCR but, yes, all

18  three.

19  Q.   Does that mean that the threshold change work wasn't

20  being done?

21  A.   No.  It is no reflection on the review that the

22  regulatory director would have done.

23  Q.   What does it mean?

24  A.   That the TCR forms were not in the file when the audit

25  occurred.
```

1    **Q.**   Okay.  Let's go back in this document to Page 6,

2    please.  I'm sorry.  Yes, Page 6.  And if we pull out that

3    first paragraph under Overall Conclusion, there was

4    discussion yesterday about the language starting at the

5    words Overall Results four lines down.  Do you see where I'm

6    looking, Mr. Oriente?

7    **A.**   Yes.  It's just been highlighted.  Thank you.

8    **Q.**   Overall results of the audit indicate that the

9    distribution centers are not consistently completing and

10   maintaining the required documentation associated with

11   certain SOPs.  Do you see that?

12   **A.**   Yes, I do.

13   **Q.**   Do you understand that to refer to some of the findings

14   we were just looking at?

15   **A.**   Yes, it would reflect that.

16   **Q.**   All right.  Let's look at the rest of the sentence

17   before that, complete sentence, which includes the language,

18   quote, the U. S. Pharma Distribution Network maintains a

19   robust control environment and stringent standard operating

20   procedures.  Do you see that finding?

21   **A.**   Yes, I do.

22   **Q.**   Is -- are those two ideas together consistent with this

23   point you've been telling us about, that their

24   documentations weren't false, but things like the blocking

25   were occurring?

```
 1    A.    Yes, they were.

 2    Q.    Now, let me just ask you one question about -- about

 3    documents.  Do you know under your retention policies at

 4    McKesson whether, if you have a former customer, a former

 5    pharmacy, you keep their CSMP file for all time?

 6    A.    I do not, no.

 7    Q.    Do you know under your retention policies whether, even

 8    if it's a current customer, you keep their CSMP file 10, 15,

 9    20 years ago?

10    A.    No, I do not.

11    Q.    Let's go to Page 1.  I'm sorry.  Let's go to the other

12    audit that you were shown.

13              MR. SCHMIDT:  May I approach?

14              THE COURT:  Yes.

15              THE WITNESS:  Thank you.

16              MR. SCHMIDT:  You're welcome.

17              BY MR. SCHMIDT:

18    Q.    Do you recognize P-116 as the other audit you were

19    shown from November, 2012?

20    A.    Yes.  This was one that I was not copied on.

21    Q.    Okay.  You weren't -- we didn't get to see this

22    yesterday, but can you tell what the rating is in this

23    audit?

24    A.    Rating?  Let's see.  Current was green, satisfactory;

25    and prior was yellow, needs improvement.
```

1    **Q.**   Let's look at Page 4, please.

2    **A.**   Okay.

3    **Q.**   And let's look at the language under green,

4    satisfactory overall conclusion, that first paragraph.  It

5    says based on the testing performed to meet our audit

6    objectives, we conclude that controls to on-board new

7    customers, assign and monitor thresholds, and report

8    suspicious orders to the DEA are effective.  Do you see

9    that?

10   **A.**   Yes, I do.

11   **Q.**   Is that your understanding of where you stood at this

12   point in time?

13   **A.**   Yes.

14   **Q.**   And then it goes on to talk about the policies and

15   procedures could be improved.  Do you see that?

16   **A.**   Yes.

17   **Q.**   And let's look at what you were shown yesterday in that

18   regard.  If we go to Page 7, please, and let's blow up the

19   first two paragraphs under item 1, which you were asked

20   about yesterday.  Am I correct that this, again, refers to

21   specific documents not being in the file they're supposed to

22   be in?

23   **A.**   Yes.  That is what it's referencing.

24   **Q.**   Is there any finding here that the actual diligence was

25   not being conducted?

1    **A.**   No.  That does not say that the diligence was not

2    conducted.

3    **Q.**   Okay.  I want to go back just for a moment to the

4    document we were just looking at, Exhibit 115, Page 13,

5    please, that bullet in the lower left-hand corner, the item

6    on the lower left-hand corner, regarding those three

7    distribution centers.

8        Will you call that out, please, Delran, Newcastle,

9    Washington Court House in the lower left-hand corner,

10   please?  Thank you.

11       And I want to just return to this idea one more time.

12   Do you see where it refers to the fact that there are omits

13   and it gives specific omit numbers?

14   **A.**   Yes, I see that.

15   **Q.**   Does that tell you that that blocking, those omits,

16   were occurring?

17   **A.**   Yes.  They would have been occurring.  The blocking

18   would have taken place.

19   **Q.**   And then, do you see that there are findings about not

20   having a form signed, a form signed, forms not being

21   completed for all of them?  Do you see that?

22   **A.**   Yes.  The blocking of orders.  The systematic blocking

23   would have taken place.  The paperwork to follow appears

24   that some were missing.

25   **Q.**   Do you recall being asked questions yesterday about

1    something Mr. Hartle said that if it wasn't documented, it

2    didn't happen?

3    **A.**   Yes.  I remember that slogan.

4    **Q.**   Does this tell us that, in fact, there are things here

5    not fully documented that did happen in terms of omits and

6    diligence?

7    **A.**   Yes.  Yes.  They would have been blocked, so they did

8    happen.

9    **Q.**   Let's take a look -- let's switch gears and look at

10   Exhibit 42814, which is in evidence.

11            THE WITNESS:  Thank you.

12            MR. SCHMIDT:  Thank you.

13            BY MR. SCHMIDT:

14   **Q.**   And just to orient ourselves, if we go to the second

15   page of this document, it says Report of Government Contact.

16   And if you scroll down, someone named Robert Corso.  And

17   scroll down a little bit more.  From the Columbus, Ohio DEA

18   Office.  Do you see that?

19   **A.**   Yes, I do.

20   **Q.**   And if we go to the last page, do you remember being

21   asked questions yesterday about -- if we go up a little bit

22   -- the October 28th letter he wrote to the Washington Court

23   House office regarding two numbered items here?  Do you

24   remember being asked those questions, the second one of

25   which is failure to report suspicious controlled substance

1    orders?  Do you see that?

2    **A.**   Yes, I do.

3    **Q.**   We didn't look at the McKesson response to that letter

4    yesterday.  Have you seen the McKesson response to that

5    letter?

6    **A.**   No.

7    **Q.**   Let me show it to you.  Let me see if you received it

8    at the time.

9              THE WITNESS:  Thanks.

10             MR. SCHMIDT:  You're welcome.

11             BY MR. SCHMIDT:

12   **Q.**   You see that this is an e-mail dated shortly after the

13   date of this letter, November 28th, 2011 from Kevin -- I'm

14   going to get the name wrong -- Meunier.

15   **A.**   Meunier.

16   **Q.**   Meunier?

17   **A.**   Yes, sir.

18   **Q.**   And it looks like he's the person that the DEA agent

19   was writing to.  Do you see that?

20   **A.**   Yes.  He was the DC manager.

21   **Q.**   And we can take this down.  Is the e-mail dated

22   November 28th, 2011?

23   **A.**   Yes, it is.

24   **Q.**   And if you look at the cc line of this e-mail, there's

25   a -- on the second line, there is an e-mail address I think

```
 1    you were asked about yesterday.  It looks like it's a group
 2    address, PGRDRC@mckesson.com.  Do you see that?
 3    A.   Yes, I do.
 4    Q.   Would you have received this letter?
 5    A.   Yes.  I would have been copied.
 6               MR. SCHMIDT:  We'd move MCWV-2158 into evidence.
 7               THE COURT:  Any objection?
 8               MR. ACKERMAN:  Hearsay, Your Honor.
 9               MR. SCHMIDT:  It's our letter back.  It's a pretty
10    remarkable proposition if they can show a DEA letter for
11    notice and not our letter back to the DEA.
12               THE COURT:  I'm going to admit it and overrule the
13    objection.
14               BY MR. SCHMIDT:
15    Q.   So, let's look at the response back.  Could we go to
16    the second page of this document, please?  And if we just
17    blow up a little bit, I'm going to start at the top and work
18    down, if we could.  Do you see that it's dated November
19    21st, 2011?
20    A.   Yes.
21    Q.   Do you see that it's written to Mr. Corso, Special
22    Agent in Charge, Detroit Field Division, Columbus District
23    Office, Columbus, Ohio?
24    A.   Yes, I do.
25    Q.   Do you recall him as the one who wrote the letter we
```

1      were looking at a moment ago?

2      **A.**   Yes.

3      **Q.**   And do you see this is regarding the letter of

4      October 28th, 2011?

5      **A.**   Yes.  That's what it's referencing.

6      **Q.**   And if you need to look back at his letter, can you

7      tell me whether that's the date of his letter which you were

8      shown yesterday in Exhibit 42814, P-42814?

9      **A.**   Just give me a minute.  Yes, it is.

10     **Q.**   And if you just keep them both beside you, what I'm

11     going to do is ask if we can just scroll down in the exhibit

12     that's on the screen, MCWV-2158, and do you see there are

13     two numbered items here in italics with entries after them?

14     **A.**   Yes, I do.

15     **Q.**   If you look back at the original letter from the DEA,

16     are these two numbered items what the DEA was telling you in

17     that letter?

18     **A.**   Yes, they do reference and match.

19     **Q.**   And what are the paragraphs below?

20     **A.**   There is -- excuse me.  They are McKesson's reply to

21     the issues raised in the first letter.

22     **Q.**   And let's look --

23              THE COURT:  Let me interject here.  I think this

24     exhibit comes in.  I could probably admit it under Rule 106.

25     It seems to me that fairness requires that it be considered

```
 1    in conjunction with the audit report that it responds to.

 2              MR. ACKERMAN:  Well, Your Honor, the only point I

 3    would make is I believe there were DEA letters, and I'll be

 4    honest, I don't remember the specific one this responds to,

 5    that were admitted solely for the purpose of notice to

 6    McKesson.  I think we would have an issue if the DEA letters

 7    to McKesson were admitted only for notice, but for some

 8    reason, McKesson's response was admitted for the truth.

 9    That doesn't --

10              MR. SCHMIDT:  We're fine with that, Your Honor, if

11    this is just notice of what we believe.

12              MR. ACKERMAN:  Okay.

13              THE COURT:  Are you satisfied with that?

14              MR. ACKERMAN:  I think we'd maintain our

15    objection, but I understand their request.

16              THE COURT:  Okay.

17         All right.  Go ahead, Mr. Schmidt

18              MR. SCHMIDT:  Thank you, Your Honor.

19              BY MR. SCHMIDT:

20    Q.   So, let's look at these two items, if you can just read

21    this first point that the DEA has raised to yourself and

22    just -- if you can characterize to us what's -- what's the

23    nature of that point?

24    A.   Do you want me to read it to myself or out loud?

25    Q.   Just read it to yourself.  No need to read it out loud.
```

1    **A.**   Oh, okay.

2    **Q.**   But I want to just ask you to summarize what you

3    understand that to mean in terms of what the DEA is raising.

4    **A.**   Yes.  Number -- number one references an electronic

5    vault alarm monitoring system.

6    **Q.**   Is that that physical security that we were talking

7    about at the very beginning of today?

8    **A.**   Yes, that is correct.

9    **Q.**   And do you see -- does McKesson provide a response to

10   that that it will enact, quote, effective immediately?

11   **A.**   Yes.  Yes.  They're making adjustments and changes to

12   their policies.

13   **Q.**   Let's look at item 2.  Does that say failure to report

14   suspicious controlled substance orders?

15   **A.**   Yes, it does.

16   **Q.**   And I want to look at the McKesson response to that.

17   It states pursuant to the memorandum of agreement signed

18   with the DEA.  Do you understand that to be a reference to

19   that 2008 Settlement Agreement?

20   **A.**   Yes.  That's what it's referencing.

21   **Q.**   McKesson electronically transmits all reports of

22   suspicious orders to DEA Headquarters in Washington; do you

23   see that?

24   **A.**   Yes, I do.

25   **Q.**   Was this -- DEA was raising this concern.  Can you tell

1    from this letter whether he was based in Washington or in a

2    field office?

3    **A.**   He was located in a field office out in Columbus.

4    **Q.**   It goes on to say, to date, McKesson has submitted 22

5    reports of suspicious orders to DEA and has terminated 22

6    customers.  Do you see that?

7    **A.**   Yes, I do.

8    **Q.**   Do you know whether you were, in fact, responsible for

9    some of those Suspicious Order Reports and some of those

10   terminations?

11   **A.**   Yes, I would have been in my region.

12   **Q.**   Does McKesson then talk in the next several sentences

13   about improving its processes and how its processes work?

14   **A.**   Yes, it does.

15   **Q.**   It then says, last sentence, in order to continue to

16   improve communications with your office, the Washington

17   Court House management will also notify the Columbus DEA

18   Office on any suspicious orders that are reported to DEA

19   Headquarters.  Do you see that?

20   **A.**   Yes, I do see that.

21   **Q.**   Is that saying, in addition to them going to

22   headquarters, they'll now go to the office where this agent

23   works?

24   **A.**   Yes, they will.

25   **Q.**   All right.  Just a few more documents and then I'll be

```
 1    done.
 2              MR. SCHMIDT:  May I approach, Your Honor?
 3              THE COURT:  Yes.
 4              THE WITNESS:  Thank you.
 5              MR. SCHMIDT:  You're welcome.
 6              BY MR. SCHMIDT:
 7    Q.   I've handed you a document I've marked as P-12814 that
 8    you were shown yesterday.  It's from Don Walker to various
 9    people and it talks about a presentation to the ISMC Sales
10    Force around Know Your Customer.  Do you see that?
11    A.   Yes, I do.
12    Q.   Do you recall being asked questions about this
13    document?
14    A.   Yes, I do.
15    Q.   Were these types of training sessions regularly
16    provided at McKesson?
17    A.   Yes, they were.
18              MR. SCHMIDT:  May I approach, Your Honor?
19              THE COURT:  Yes.
20              THE WITNESS:  Thank you.
21              MR. SCHMIDT:  You're welcome.
22              BY MR. SCHMIDT:
23    Q.   I've handed you a document you were shown yesterday,
24    P-8761.  Do you see that?
25    A.   Yes.
```

1    **Q.**   And if we look at the bottom, I believe you were asked

2    questions about Mr. McDonald -- from Mr. McDonald where he

3    was sending a note and copying that e-mail chain that we

4    talked about just a moment ago that included you saying I've

5    noticed a trend with TCRs that needs to be addressed.  Do

6    you see that?

7    **A.**   Yes, I do.

8    **Q.**   Do you understand this to be talking about ensuring

9    that you're addressing threshold change requests properly?

10            MR. ACKERMAN:  Objection to the leading here, Your

11   Honor.

12            MR. SCHMIDT:  I'm happy to take it slow, if that's

13   easier.  Let's -- let's do it --

14            BY MR. SCHMIDT:

15   **Q.**   Let me ask you in a different way.  Do you see where he

16   says I have noticed a trend with TCRs that needs to be

17   addressed?

18   **A.**   Yes, I see that.

19   **Q.**   Do you see where he says the information submitted on

20   the TCR is extremely important to our documentation process?

21   **A.**   Yes, I see that.

22   **Q.**   When I screen the TCR, I'm assuming some steps have

23   been completed?

24   **A.**   Yes, I see that.

25   **Q.**   First and foremost is direct contact with the customer.

```
 1    This contact is required.

 2    A.    Yes, I see that.

 3    Q.    Was that part of your policies?

 4    A.    Yes, it is.

 5    Q.    Was that regularly reinforced over the course of your

 6    work?

 7    A.    Yes, it was.

 8    Q.    Be sure you are noting who you spoke with when

 9    completing the documentation portion.  Was that regularly

10    reinforced over the course of your work?

11    A.    Yes, it was.

12    Q.    Ask for a specific reason for the increase in usage.

13    Business growth should be accompanied by specific examples

14    of what is generating that growth.  Do you see that?

15    A.    Yes, I do see that.

16    Q.    Is that a point that was reinforced over the course of

17    your work?

18    A.    Yes, it was.

19    Q.    Skip down to the second to last line.  Please be as

20    specific as you can in that documentation field.  Many of

21    you do this very well.  I appreciate your attention to

22    detail.  Do you see that?

23    A.    Yes, I do.

24    Q.    Is that something that was regularly reinforced in the

25    course of your work?
```

1    **A.**   Yes, it was.

2    **Q.**   Thank you.

3    **A.**   You're welcome.

4           MR. SCHMIDT:  May I approach, Your Honor?

5           THE COURT:  Yes.

6           THE WITNESS:  Thank you.

7           MR. SCHMIDT:  Thank you.

8           BY MR. SCHMIDT:

9    **Q.**   This is another document you were asked about

10   yesterday, P-12821, from 2011.  It is an e-mail chain where

11   you've written the top e-mail.  Do you see that?

12   **A.**   Yes, I do.

13   **Q.**   And just as one more example of this, if we go to the

14   third page, I want to cover a topic that wasn't covered

15   yesterday.  If we look to that first full paragraph, do you

16   see that?  To that end, we have gone to great lengths to vet

17   each of our accounts, ISMC and others, over time and put

18   photos, search engine result screen prints, dispensing data,

19   questionnaires, TCRs, Level I and interview notes on file.

20   Is that consistent with your experience that you had gone to

21   great lengths to vet each of your accounts and put those

22   documents on file?

23   **A.**   Yes, it is.

24   **Q.**   And just -- can you just walk us through what each of

25   those document types is?

A.    Yes.  So, the photographs would be photographs that we would take while doing our site visits or have them taken by other individuals that would have done site visits for our file.  We wanted to document that we were there and we wanted to document what we saw while we were there.

The search engine results, screen prints is what I mentioned going on either the OIG website or any even just internet search via Google.

Dispensing data is we would request that as desired.  That would go in the file.

The customer questionnaire references that document we looked at earlier.

TCRs, the Threshold Change Request Forms.

And then the Level Is, that if a customer had orders blocked would also be there.

And interview notes from our visits with the pharmacist.

Q.    Just a few final questions.  In your role at McKesson, has it been important for to you try to meet the DEA's expectations with respect to handling and shipping prescription opioids?

A.    Yes, it was.

Q.    Why is that?

A.    McKesson took their responsibility very seriously and that was a -- a requirement of the DEA and of the Controlled

1    Substance Act.

2    **Q.**    Have you tried to do that through your career at

3    McKesson?

4    **A.**    Yes, I have, as well as McKesson.

5    **Q.**    And from what you've seen personally and then in terms

6    of McKesson policies, have you seen changes over time,

7    efforts to improve over time, as the nature of DEA guidance

8    and the opioid crisis has changed?

9    **A.**    Yes.  Our program since its inception in 2008 has

10    evolved and improvements are constantly being added.

11    **Q.**    Does McKesson continue to communicate with the DEA

12    about how it runs its Controlled Substance Monitoring

13    Program?

14    **A.**    Yes, it does.

15              MR. SCHMIDT:  Thank you very much, Mr. Oriente.

16         That's all I have for now, Your Honor.

17              THE COURT:  Is there any cross by either of the

18    other defendants?

19              MS. HARDIN:  No, Your Honor.

20              MR. NICHOLAS:  No, Your Honor.

21              THE COURT:  Mr. Rafferty, do you have any

22    redirect?

23              MR. RAFFERTY:  Yes, Your Honor.

24                    **REDIRECT EXAMINATION**

25              **BY MR. RAFFERTY:**

1    **Q.**   Good afternoon, Mr. Oriente.

2    **A.**   Good afternoon.

3    **Q.**   Mr. Oriente, I'm going to try and be as quick and brief

4    as I can.  I just want to follow up on some of the questions

5    that Mr. Schmidt asked you today, okay?

6    **A.**   Certainly.

7    **Q.**   All right.  First, if we could pull up the document

8    that was just shown to you by Mr. Schmidt, it's MCWV-02158,

9    and this is the McKesson response to the DEA's audit of the

10   Washington Court House.  Do you recall being asked questions

11   just a few minutes ago about this?

12   **A.**   Yes, sir.

13   **Q.**   Now, I look at the time frame and it says -- or I'm

14   sorry.  Back up.  When you were asked questions about the

15   response, the response primarily in number 2 dealt with --

16   or the allegation in 2 was that Washington Court House had

17   failed to report suspicious controlled substance orders.  Do

18   you see that?

19   **A.**   Yes.

20   **Q.**   Okay.  And this time frame that was submitted was -- or

21   this e-mail was dated November 28th, 2011, correct?

22   **A.**   Yes.

23   **Q.**   And, in fact, if we go now to P-42554, which is

24   admitted into evidence, which is the 2017 settlement, do you

25   see that on the screen, sir?

1    **A.**    Yes, I do.

2    **Q.**    Okay.  And, in fact, if you look on Page 3, on (3), it

3    says covered conduct.  For purposes of this agreement,

4    covered conduct shall mean the following conduct alleged by

5    the government for the covered time period.  And then it

6    goes -- and we talked about this.  McKesson failed to

7    maintain effective controls against diversion.  Do you see

8    that under A?

9    **A.**    Yes, I do.

10   **Q.**    Okay.  And, in fact, if we go to Page 4, Washington

11   Court House, Ohio was actually one of those distribution

12   centers that is the subject of this particular agreement,

13   correct?

14   **A.**    Yes.  It's included in the allegations.

15   **Q.**    And if you go up to the -- for the -- to establish what

16   the time period of the covered conduct is, so the covered

17   time period, if you go up to Paragraph 2, midway through the

18   paragraph on that same page under acceptance of

19   responsibility, it says McKesson acknowledges that at

20   various times during the period from January 1, 2009 up

21   through and including the effective date of this agreement

22   it did not identify or report to DEA certain orders placed

23   by certain pharmacies which should have been detected as

24   suspicious.  Do you see that?

25   **A.**    Yes, I do.

1  **Q.**   So, January 1, 2009.  And then, if we look at the

2  effective -- it says the effective date of this agreement.

3  So, if we then turn to Page 12, the effective date -- or,

4  I'm sorry, the date of the -- the execution of the

5  agreement, the agreement shall become effective on the date

6  of signing by the last signatory.  Do you see that?

7  **A.**   Yes, sir.

8  **Q.**   So, if we turn now two pages further to Page, I

9  believe, 15, we are now looking at the last date of the

10  signature -- or last date of the signatory -- is

11  January 17th, 2017.  Do you see that?

12  **A.**   Yes, I do.

13  **Q.**   Okay.  So, the covered conduct for the conduct

14  contained inside the 2017 agreement was January 1, 2009 to

15  January 17th, 2017, correct?

16  **A.**   For this agreement, yes.

17  **Q.**   Okay.  And the covered conduct included the failure to

18  report suspicious orders by Washington Court House; true?

19          MR. SCHMIDT:  Objection.  Mischaracterizes the

20  document.

21          MR. RAFFERTY:  You can go back to read it.  Page

22  3.

23          THE COURT:  I'll overrule the objection.  Go

24  ahead.

25          MR. RAFFERTY:  Okay.  Thank you, Your Honor.

```
1           BY MR. RAFFERTY:

2   Q.   The exact conduct that was being discussed in W -- in

3   MCWV-02158.  And if we could, go to Page 1, the e-mail, and

4   that's November 28th, 2011.  So, this conduct, as a result

5   of failed audit, was during the same time period as the

6   allegations and the ultimate acceptance of responsibility by

7   McKesson in the 2017 Settlement Agreement; true?

8           MR. SCHMIDT:  Object to characterization.  That's

9   not an accurate characterization.

10          MR. RAFFERTY:  That is a -- that's --

11          THE COURT:  Well, I will sustain the objection.

12      I've got the point, Mr. Rafferty.

13          MR. RAFFERTY:  That's all that matters.  Okay,

14   thank you.

15          BY MR. RAFFERTY:

16   Q.   If we could, also, you were asked some questions this

17   afternoon about P-00115.  This is the audit, the internal

18   audit that was done by McKesson, and if you go -- you were

19   asked questions about Pages 13 and 14.  And if we look, Page

20   13 dealt with the Level I forms and Page 14, the threshold

21   change requests.  Do you see that, sir?

22   A.   Yes.

23   Q.   Okay.  And you were asked by Mr. Schmidt about the

24   failure to have documentation for those, including at

25   Washington Court House Distribution Center, and you were
```

1    asked because there's no documentation that you can't say

2    that the due diligence or the forms weren't done, correct?

3    **A.**   That is correct.

4    **Q.**   Okay.  But because there's no documentation, you can't

5    say that the due diligence or the forms were ever filled

6    out, can you?

7    **A.**   The forms, no, but the -- the review, as far as the

8    threshold change, would had to have been done in order to

9    make that change.

10   **Q.**   But if the threshold -- you can't say that.  Does it

11   say anywhere in here that the threshold change request was

12   done, but without process, or without documentation?

13   **A.**   It doesn't say it in this report, no.

14   **Q.**   Okay.  And we do know -- and you were asked about

15   document retention policies with McKesson and do you hold

16   onto these forms forever, correct?

17   **A.**   Yes, that's correct.

18   **Q.**   Okay.  Now, nowhere in here does the audit say that

19   that those forms don't exist, but that's okay, because the

20   document retention policy probably destroyed them.  Does it

21   say that anywhere in there?

22   **A.**   It does not reference it in this, no.

23   **Q.**   Okay.  And if it was past the document retention period

24   for these audit forms or, I'm sorry, for these TCRs or Level

25   Is, then there wouldn't be any reason to note it, correct,

1    by the auditor.

2            MR. SCHMIDT:  Objection -- I apologize.

3    Objection.  Speculation.  Vague.

4            THE COURT:  Sustained.

5            BY MR. RAFFERTY:

6    Q.   Well, we do know one thing, that the findings on the

7    audit by Mr. Walker, if we go back to the front page, were

8    documented as three major areas and it says -- he says we

9    have work to do, correct?

10           MR. SCHMIDT:  And, Your Honor, they weren't --

11   just for the record, they weren't findings by Mr. Walker, so

12   I'll object to the foundation.

13           MR. RAFFERTY:  This was the way Mr. Walker

14   described them in his e-mail.

15           THE COURT:  He can clear it up and I think he just

16   did.

17           MR. SCHMIDT:  Okay.

18           BY MR. RAFFERTY:

19   Q.   Mr. Walker characterized the findings in the audit as

20   being three major areas and he said we have work to do,

21   correct?

22   A.   Yes.  The audit was completed by our Internal Audit

23   Team.

24   Q.   Okay.  Now, you were also asked some questions -- going

25   back to the 2017 Settlement Agreement, you were asked some

1    questions about the first page by Mr. Schmidt.  It's

2    P-42554.  And you were asked questions specifically by Mr.

3    Schmidt about Paragraph 4.

4              MR. RAFFERTY:  May I approach the screen?

5              THE COURT:  Yes.

6              BY MR. RAFFERTY:

7    **Q.**    About Paragraph 4, about this particular McKesson Arora

8    administrative inspection warrant, correct?

9    **A.**    Yes, I was.

10   **Q.**    And you were asked about whether or not this involved

11   West Virginia; do you recall that?

12   **A.**    Yes, I recall that.

13   **Q.**    In fact, it did involve West Virginia, didn't it, sir?

14   **A.**    I'm not aware that it did, sir.

15   **Q.**    Okay.  Let's go down to Paragraph 5 because that wasn't

16   the only administrative inspection warrant issued by the DEA

17   that was the basis for the 2017 Settlement Agreement,

18   correct?

19   **A.**    Yes.  It says there were others here.

20   **Q.**    Yes.  And it says between March, 2013 and present, DEA

21   executed one additional AIW and served numerous

22   administrative subpoenas and conducted a number of cyclic

23   inspections at various McKesson U. S. Pharmaceutical

24   Distribution Centers nationwide, including McKesson's

25   Washington Court House, Ohio Distribution Center.  And then

```
 1     it goes on and lists several other distribution centers.  Do

 2     you see that?

 3     A.    I do, but it doesn't say that the inspection warrant

 4     was relative to Washington Court House.  It just includes

 5     that saying that numerous subpoenas and cyclical

 6     inspections.  It doesn't break it out which DCs had the

 7     cyclical inspections versus NAIW.

 8     Q.    Okay.  But we just did read the fact that Washington

 9     Court House was one of the distribution centers under the

10     covered conduct section discussing the failure to report

11     suspicious orders, correct?

12            MR. SCHMIDT:  I've objected to going well beyond

13     the scope and repetitive, but I will object to that as asked

14     and answered.

15            THE COURT:  I'll sustain the objection.

16            MR. RAFFERTY:  Your Honor, if I could, just for

17     the record, he was asked whether or not this -- he was asked

18     specifically only about Arora, Colorado.  There's numerous

19     other ones that show that this is nationwide and, therefore

20     -- and Washington Court House feeds opioid pills into West

21     Virginia.

22            THE COURT:  Well, you brought that out, that

23     Washington Court House is mentioned here.

24            MR. SCHMIDT:  And, Your Honor, for the record, I

25     asked about Arora because the question asked about it was,
```

1   was that what started this process.

2          MR. RAFFERTY:  And, Your Honor, I think based upon

3   the questioning and the answers, I would also renew our --

4   our -- renew our offer of the DEA letters and DOJ letters

5   that were excluded yesterday that detail into specifically

6   the pharmacies and the distribution centers and the conduct

7   that was involved and ultimately led specifically to this

8   agreement because I believe they have opened the door to

9   that.

10          MR. SCHMIDT:  This is nothing more than an

11   argument that because they asked questions and I've followed

12   up, somehow I've opened a door to something that was

13   inadmissible.  That's not correct, Your Honor.

14          MR. RAFFERTY:  He specifically asked whether it

15   involved West Virginia.  It does.  We know it does.  And he

16   -- and now --

17          THE COURT:  Well, your -- I'm going to sustain the

18   objection and cut this off.  You're just -- I think you've

19   come far beyond what the exhibit here shows and --

20          BY MR. RAFFERTY:

21   Q.   Do you recall being shown a stack of DEA certificates

22   for the renewal of the licenses of the different

23   distribution centers?

24   A.   Yes, sir.

25   Q.   Okay.  In fact, in terms of Washington Court House,

1   part of the agreement for the 2017 settlement was for

2   Washington Court House to lose its DEA license for two

3   years, correct?

4   **A.**   Yes.  I believe that was so.

5   **Q.**   So, we would not find a DEA license for those two years

6   of Washington Court House, the distribution center that

7   feeds Cabell County, correct?

8   **A.**   Yes.  During that time, they would not have had a

9   license.

10  **Q.**   You were also asked questions by Mr. Schmidt about the

11  2008 settlement?

12  **A.**   Yes.

13          MR. RAFFERTY:  It is P-23733, Corey.

14          BY MR. RAFFERTY:

15  **Q.**   And if you would, the date of this is May 2nd, 2008,

16  correct?

17  **A.**   Yes.

18  **Q.**   And you were specifically asked questions by Mr.

19  Schmidt about Page 6 under the DEA obligations and the DEA

20  obligations about -- on Paragraph E.  Within 150 days of the

21  effective date of this agreement, but not earlier than

22  90 days after the effective date of this agreement, DEA

23  shall conduct reviews of the functionality of McKesson's

24  Diversion Compliance Program.  Do you see that?

25  **A.**   Yes, I do.

1    **Q.**   Okay.  And then, it went down -- Mr. Schmidt went down

2    to Paragraph F and talked about the three issues, failing to

3    maintain effective controls, et cetera.  Do you see that?

4    **A.**   Yes.

5    **Q.**   Okay.  And you said that your understanding was that

6    you all passed those inspections, correct?

7    **A.**   That was my understanding, yes.

8    **Q.**   Okay.  And you know, though, that the cover date, as we

9    went through in the 2017 date, starts for the conduct

10   involved in the 2017 starts in January of 2009?  We went

11   through that, correct?

12   **A.**   Yes.  I believe we did.

13   **Q.**   Okay.  So, almost immediately after the 150 days passed

14   and you all passed your inspections from the DEA, the

15   conduct that resulted in the 2017 settlement started,

16   correct?

17              MR. SCHMIDT:  Objection, foundation.

18              THE COURT:  Well, overruled.

19              THE WITNESS:  I haven't looked at the exact dates

20   when one started and when one ended.

21              BY MR. RAFFERTY:

22   **Q.**   Okay.  Well, if we just take the date, that's all I'm

23   looking at, May -- May 2nd, 2008, and then the covered

24   conduct for the 2017 starts January, '09.  So, that's right

25   after 150 days approximately, correct?

1          THE COURT:  There has been testimony to the dates

2     the audit covered, it seems to me.  I don't think I've heard

3     any evidence about -- relating to when the conduct started.

4          MR. RAFFERTY:  That's the -- that's the covered

5     conduct, Your Honor.  In the 2017, it says the covered

6     conduct and the effect -- and the covered conduct dates are

7     January, '09 through the effective date of the agreement,

8     which is January 17th.

9          MR. SCHMIDT:  But I think Your Honor's question is

10    well taken.  That's the allegations in the settlement.

11    That's not in the acceptance of conduct, acceptance of

12    responsibility.

13         MR. RAFFERTY:  That is in the -- the effective

14    date is in the effective -- is in the accepted --

15         THE COURT:  Well, I understand what the effective

16    date is, but I think Mr. Schmidt is correct.  I think there

17    is a difference between the effective date, the beginning of

18    the time period and when the conduct actually started, and I

19    don't think there's any evidence as to when it actually

20    started.

21         MR. RAFFERTY:  Well, and in those DEA and DOJ

22    letters, for the record, we can start spelling out when the

23    conduct was.

24         THE COURT:  Barring if I would let them in, right?

25         MR. RAFFERTY:  Right.

1          MR. SCHMIDT:  And, Your Honor, those just contain

2    more allegations, which I think is why Your Honor correctly

3    kept them out.

4          MR. RAFFERTY:  May I continue, Your Honor?

5          THE COURT:  Yes, please.

6          BY MR. RAFFERTY:

7    **Q.**   The next document I want to talk about, you were asked

8    about P-42657.  Do you see the -- do you recall answering

9    some questions from Mr. Schmidt about that document?

10   **A.**   Yes, I do.

11   **Q.**   And, in fact, I think what it was -- one of the

12   particular pages you were asked about is Page 8.  This is

13   the Know Your Customer thresholds.  Do you see that?

14   **A.**   Yes, I do.

15   **Q.**   And I believe this is one of the presentations you said

16   that you prepared, correct?

17   **A.**   Yes.  I would have prepared this off of the one that

18   Don Walker gave to the DEA Headquarters.

19   **Q.**   Okay.  And you were giving this to the DEA, correct?

20   **A.**   Yes.

21   **Q.**   Okay.  And it's important to be honest and forthright

22   with the DEA when you're communicating with them?

23   **A.**   Yes, it would be.

24   **Q.**   Okay.  If we look down at what you -- your notes, it

25   says Michael Slide.  And then, if you go down to the large

1    drug chain, Rite Aid; do you see that?

2    **A.**   Yes, I see that.

3    **Q.**   And then you've got average -- you've got average

4    oxycodone 27, Alprazolam, 0 and hydrocodone, 0.  Do you see

5    that?

6    **A.**   Yes, I do.

7    **Q.**   But, in fact, during that exact time period of this

8    presentation, you were, in fact, providing and distributing

9    hydrocodone to Rite Aids, were you not?

10   **A.**   The average would have been -- worked out to 0.

11   **Q.**   The average -- well, if the average -- if there's any

12   numbers being sold, the average won't work out to 0,

13   correct?

14   **A.**   It may have been so small that it wasn't, you know,

15   calculated.  That's why the average over 5,000 stores worked

16   out to be less than 1.

17             MR. RAFFERTY:  If we could pull up what's already

18   in evidence, P-43225, and if we turn to Page 16 of that.

19             MR. SCHMIDT:  Your Honor, this is a document Dr.

20   McCann prepared that we'll preserve our objection to.

21             THE COURT:  All right.  You objected and I let it

22   in, correct?

23             MR. RAFFERTY:  I'm sorry.  Say that again.

24             THE COURT:  I overruled the objection and let this

25   document in.

```
 1              MR. RAFFERTY:  Yes.  It's been admitted, Your
 2    Honor.
 3              THE COURT:  Go ahead.
 4              MR. RAFFERTY:  It's already in evidence.  Do you
 5    need another copy?
 6              THE COURT:  No.  I don't need another copy.  I'm
 7    drowning in paper.
 8              MR. RAFFERTY:  Trust me, I understand.
 9              BY MR. RAFFERTY:
10    Q.   If you look at the time period -- and this is -- I want
11    to look at just the Rite Aids in Cabell County.  You were --
12    you were referencing the average for Rite Aids throughout
13    the country, correct, in your presentation?
14    A.   Yes, as they're -- as they're chained, yes.
15    Q.   Okay.  And if we look --
16              MR. RAFFERTY:  If you can take that down, Corey,
17    just because -- there we go.
18              BY MR. RAFFERTY:
19    Q.   If you start looking at the 2008 time period you, in
20    fact, are distributing hydrocodone to the Rite Aids in
21    varying amounts dating back to January, '06, correct?
22    A.   Where does it say that this is hydrocodone?
23    Q.   Right up here in the top left corner.
24    A.   Oh, okay.  Thank you.
25    Q.   Yeah.  And I forget sometimes that not everybody is in
```

```
 1   the courtroom every day.  And that's based on the ARCOS data

 2   from 2006 to 2014.  Do you see that in the left corner?

 3   A.   Yes, I do.

 4   Q.   Okay.

 5   A.   Are these shipment made by McKesson or by Rite Aid?

 6   Q.   By McKesson.

 7   A.   Okay.

 8   Q.   By McKesson.  You see throughout this time period --

 9            MR. SCHMIDT:  I'm going to object.  We now have a

10   lawyer testifying about a document the witness says he

11   doesn't understand.

12            THE COURT:  Sustained.

13        Ask him a question, Mr. Rafferty.

14            MR. RAFFERTY:  Okay.

15            BY MR. RAFFERTY:

16   Q.   In fact, based upon this chart and the ARCOS data you

17   were, in fact, distributing hydrocodone to the Rite Aids in

18   Cabell County, correct?

19   A.   If these are McKesson ARCOS records, yes.  Can I ask a

20   question?

21            THE COURT:  You can explain your answer.

22            THE WITNESS:  Yeah.  What date was my presentation

23   to the DEA?

24            MR. RAFFERTY:  It was in 2008 and I believe it was

25   November, but let me pull it up.  November 6, 2008.
```

```
1              THE WITNESS:  Okay, thank you.
2              BY MR. RAFFERTY:
3     Q.   The next document --
4     A.   Can we go back to the previous document?  Yeah.  So,
5     when you look at November, 2008, when I gave that
6     presentation and previous, the quantities averaging are --
7     are a couple hundred pills a months.  And so, therefore, my
8     presentation saying the average was 0 is accurate.
9     Q.   Okay.  This particular month, just in November, you
10    distributed 2,200 dosage units to the Rite Aids just in
11    Cabell County.  That doesn't take into account nationwide,
12    correct?
13    A.   These 2,200 that you referenced would have been
14    included in their national number that calculated out to 0.
15    Q.   Right.  So, it's your testimony that you were actually
16    selling hydrocodone to Rite Aids during the time period that
17    you said -- told the DEA your average was 0?
18    A.   On an average national basis.
19    Q.   Okay.
20    A.   Okay?
21    Q.   So, if you tally up any numbers above 0, the average
22    would be --
23             THE COURT:  You're arguing with him now, Mr.
24    Rafferty.  We've been through this over and over again and
25    you need to move on.
```

```
1              BY MR. RAFFERTY:

2     Q.    You were asked questions about MCWV-00185, the

3     questionnaires, the onboarding questionnaires.  Do you

4     recall that, Mr. Oriente?

5     A.    May I see what you're referencing?  Yes.

6     Q.    And, in fact, you would not have filled out these

7     questionnaires for any of the ISMCs in Cabell County,

8     correct?

9     A.    That is correct.

10    Q.    That would have been Dave Gustin, correct?

11    A.    Yes.  Well, Dave Gustin and the distribution support

12    staff.

13    Q.    Okay.  And these should be, I think you testified,

14    filled out completely and accurately, correct?

15    A.    I don't recall saying that exactly, but they should be

16    filled out, yes.

17    Q.    Okay.  Now, you didn't do these customer questionnaires

18    for Rite Aids, correct?

19    A.    Not one for every Rite Aid store, no.  There would have

20    been more of a corporate questionnaire involving the chain.

21    Q.    You were asked a lot of questions about orders being

22    blocked and reported and when they were blocked and when

23    they were reported throughout the examination by Mr.

24    Schmidt, correct?

25    A.    Yes, that is correct.
```

1    **Q.**   Okay.  And, in fact, there was a time period from

2    May 23rd, 2008 to July 31st, 2013 where there were, in fact,

3    zero orders reported to the DEA for Cabell County, correct?

4    **A.**   I wouldn't know specifically to Cabell County.  It

5    wasn't my area.

6    **Q.**   Do you know if there were any blocked orders reported

7    for the State of West Virginia during that time period?

8    **A.**   I do not know.

9            MR. RAFFERTY:  Your Honor, at this time,

10   plaintiffs would move in P-42089.

11           THE WITNESS:  Thank you.

12           MR. RAFFERTY:  Your Honor, this is the discovery

13   response to Defendant McKesson -- I'm sorry, to Plaintiffs'

14   first combined discovery request to distributors number 3

15   and it is -- was given to us in response to that

16   interrogatory as the block and reported -- order report for

17   Cabell County.

18           MR. SCHMIDT:  Your Honor, we will object.  It's

19   well outside the scope.  This is something they tried to

20   cover yesterday.  They didn't get it in yesterday.  They

21   didn't use it with him yesterday.  I don't think they're

22   going to have any foundation for using it with him and so,

23   we will object to it object those terms.

24           THE COURT:  The objection is sustained.

25           MR. RAFFERTY:  I believe it's independently

```
 1    admissible as a discovery response of McKesson Corp.  I
 2    would ask the Court --
 3              THE COURT:  What's the relevance though?
 4              MR. RAFFERTY:  Because if you go through it
 5    starting all the way back from 2013, if you look at starting
 6    -- the entire almost last half of the section shows no DEA
 7    reported suspicious orders for any of these orders
 8    throughout that time period.
 9         And, as I said, we requested this information in an
10    interrogatory and this was what was given to us.  And the
11    interrogatory specifically requested --
12              MR. SCHMIDT:  I think it's --
13              MR. RAFFERTY:  Please --
14              MR. SCHMIDT:  Sorry.  Go ahead.
15              MR. RAFFERTY:  Please identify each suspicious
16    order you reported to any regulatory body, including DEA
17    and/or the West Virginia Board of Pharmacy arising out of
18    CT2 and produce all documents related thereto.  And this is
19    what we got from the company.  It's authentic.  They've
20    stipulated to the authenticity of it.  And I believe as a
21    discovery response it would be admissible independently of
22    the witness, but this goes directly to his testimony as to
23    the reporting of suspicious orders.
24              MR. SCHMIDT:  Your Honor, it's outside the scope
25    and if it were admissible independently, that would be the
```

```
 1    correct route for admitting it, to admit it independently,

 2    as opposed to going outside the scope with a witness who is

 3    not going to have a foundation to testify about this.

 4              MR. RAFFERTY:  Well, then I move it -- I move it

 5    in independently.  I won't any questions --

 6              THE COURT:  It is -- it is within the scope based

 7    on his testimony about reporting suspicious orders, isn't

 8    it?

 9              MR. RAFFERTY:  Yes, sir, Your Honor.

10              THE COURT:  I'm going to admit it for what it's

11    worth.  It's -- it's admitted.

12              MR. RAFFERTY:  Thank you, Your Honor.

13              THE WITNESS:  This document, if I could comment on

14    it?

15              MR. RAFFERTY:  Well, because you had said you

16    weren't aware of what the reports were, I wasn't going to

17    ask any questions about it.

18              THE WITNESS:  Am I --

19              THE COURT:  Well, you have to answer his

20    questions, Mr. -- Mr. Oriente.

21              THE WITNESS:  So, I can't --

22              THE COURT:  If this is an explanation of one of

23    your prior answers, I will let you.  Go ahead.

24              THE WITNESS:  Okay.  Well, in being handed this

25    report, these are blocked orders and reported orders, as
```

```
 1    should be.  I just wasn't aware of them.
 2              BY MR. RAFFERTY:
 3    Q.   Okay.  And if you look at the fourth column over, sir,
 4    at the top, what does that say, DEA reported date.  Do you
 5    see that?
 6    A.   Yes.
 7    Q.   Okay.
 8              THE COURT:  How much more do you have, Mr.
 9    Rafferty?
10              MR. RAFFERTY:  Maybe 10-15 minutes.
11              THE COURT:  Okay.  We'll take a 15-minute break.
12         (Recess taken)
13         (Proceedings resumed at 3:44 p.m.)
14              THE COURT:  Is the witness in the courtroom?
15              MR. SCHMIDT:  Sorry, Your Honor.
16              MR. RAFFERTY:  I have good news, though, Your
17    Honor.  It will be pretty much done.  I was able to reach
18    some agreements with Mr. Schmidt.
19              THE COURT:  That's good news, Mr. Rafferty.
20              MR. RAFFERTY:  I sensed it would be.
21              THE COURT:  Okay, Mr. Rafferty.
22              MR. RAFFERTY:  Thank you.
23    BY MR. RAFFERTY:
24    Q.   I'd like to hand you, sir, what's been marked for
25    purposes of identification as P-13296.
```

```
1              MR. SCHMIDT:  I thought the agreement was just to

2     mark it in with no questions.

3              MR. RAFFERTY:  Oh, okay.  I thought you wanted me

4     to at least identify it.  Okay.  We move in P-13296.

5              THE COURT:  Any objection?

6              MR. SCHMIDT:  No objections pursuant to our

7     stipulation, Your Honor.

8              THE COURT:  Okay.  It's admitted.

9              MR. RAFFERTY:  We also -- I think I need one extra

10    copy.

11       We also move in at this time P-13710, Your Honor.

12             MR. SCHMIDT:  Your Honor, I believe this is one of

13    the documents we said yesterday we would confer on and

14    check.

15             THE COURT:  I have to refresh myself on what it

16    is.

17             MR. SCHMIDT:  Having had the chance to do that, no

18    objection.

19             THE COURT:  So you're not objecting to it?

20             MR. SCHMIDT:  Correct.

21             THE COURT:  All right.  It's admitted.

22             MR. RAFFERTY:  Finally, Your Honor, we move into

23    evidence P-4247 -- I'm sorry -- P-42728A.

24             MR. SCHMIDT:  Your Honor, this is another one we

25    talked about yesterday.  We've been able to confer.  It's
```

```
 1    been adjusted.  So we have no objection.
 2              THE COURT:  All right.  It's admitted.
 3              MR. RAFFERTY:  And with that, Your Honor, I have
 4    no further questions.
 5              THE COURT:  Thank you, Mr. Rafferty.
 6         Ms. Mainigi, you wanted to -- I'm sorry.  Do you have
 7    more questions?
 8              MR. SCHMIDT:  I had about five or ten minutes.
 9    Following Mr. Rafferty's lead, I'll drop them.  We're
10    concluded.
11              THE COURT:  Okay.  You may proceed.
12              MR. SCHMIDT:  May we excuse the witness, Your
13    Honor?
14              THE COURT:  Yes.  You say you want to recall --
15              MR. SCHMIDT:  Oh, no.  I'm dropping the questions.
16              THE COURT:  Oh, okay.  So we're done with Mr.
17    Oriente?
18              MR. SCHMIDT:  We're done, yes.  I'm sorry for the
19    confusion.
20              THE COURT:  Mr. Oriente, I'm going to give you
21    some good news, sir.  You're free to go.  You're excused.
22              THE WITNESS:  Thank you, Your Honor.
23              THE COURT:  Thank you, sir, very much.
24              THE WITNESS:  Thank you.
25              THE COURT:  You've been very helpful and we
```

1    appreciate you being here.

2              THE WITNESS:  Thank you very much.

3              MR. SCHMIDT:  If Your Honor doesn't mind, we'll

4    bring in our next witness and I'll walk Mr. Oriente out if

5    that's okay.

6              THE COURT:  That will be fine.

7              THE WITNESS:  Thank you, sir.  Have a good day.

8              MS. MAINIGI:  Your Honor, would you like me to

9    proceed right now?

10             THE COURT:  Yes.

11             MS. MAINIGI:  Your Honor, this will be very quick.

12   I just wanted to put something on the record.

13        Cardinal's third and final witness that plaintiffs had

14   planned to call in their case basically right now in terms

15   of the timing of their case, that witness, Todd Cameron, is

16   no longer going to be called and I just wanted the record to

17   so reflect.

18        Mr. Cameron is the SVP of Supply Chain Integrity.  He

19   runs Cardinal's Anti-Diversion program and has run it since

20   2012.  He was expected to talk about that system on both

21   cross and direct.

22        He's been here preparing for a few days, but late last

23   night the plaintiffs let us know that they no longer intend

24   to call him and that they are foregoing his appearance in

25   their case all together.

1          Now, obviously, the plaintiffs are the master of their

2     case.  But because there was an expectation that Mr. Cameron

3     would be testifying, I wanted to put something on the record

4     to just reflect the change status.

5          Thank you, Your Honor.

6               THE COURT:  So he won't be called at all?  Is that

7     right?

8               MS. MAINIGI:  Well, Your Honor, we certainly have

9     the ability to call him in our case, but I'm told by the

10    plaintiffs that they do not intend to call him in their

11    case.

12              MS. KEARSE:  Yes, Your Honor, this is Ann Kearse.

13    That's my understanding that there was an agreement with Mr.

14    Farrell.  Mr. Farrell is not here right now, but we will not

15    be calling him in our case in chief.

16              THE COURT:  All right.  Thank you, Ms. Kearse.

17              MS. MAINIGI:  Thank you, Your Honor.

18              THE COURT:  You can call your next witness.

19              MR. KENNEDY:  Yes, Your Honor.  We would call

20    Mr. Tim Ashworth.

21              THE COURT:  Okay, Mr. Kennedy.

22              MR. STANNER:  For the court reporter, Your Honor,

23    it's been a while since I've had a chance to talk, so just

24    for the record, Andrew Stanner on behalf of McKesson.

25              THE COURT:  All right, Mr. Stanner.

```
 1              THE CLERK:  Mr. Ashworth, could you state your

 2   name for the record?

 3              THE WITNESS:  Timothy Scott Ashworth.

 4              THE CLERK:  Would you raise your right hand.

 5   TIMOTHY SCOTT ASHWORTH, PLAINTIFFS' WITNESS, SWORN

 6              THE CLERK:  Have a seat right there.  Thank you.

 7              MR. KENNEDY:  Your Honor, Eric Kennedy.  I was

 8   here last week.

 9              THE COURT:  Yes.  I remember you, Mr. Kennedy.

10              MR. KENNEDY:  Thank you, Your Honor.

11              THE COURT:  You may proceed.

12              MR. KENNEDY:  Thank you, Your Honor.

13                        DIRECT EXAMINATION

14   BY MR. KENNEDY:

15   Q.   Mr. Ashworth, my name is Eric Kennedy.  We have not

16   met before.  It's good to see you today.  If you could

17   please state your name for the record, sir.

18   A.   Timothy Scott Ashworth.

19   Q.   And are you currently employed?

20   A.   Yes.

21   Q.   And where are you employed, sir?

22   A.   McKesson.

23   Q.   You are a Regional Sales Manager.  Would that be

24   correct?

25   A.   Yes.
```

```
 1    Q.    And can you tell us how long it is that you've been

 2    employed by McKesson?

 3    A.    Since 2005.

 4    Q.    And you sell to the independent retail pharmacies?

 5    Would that be correct?

 6    A.    Yes.

 7    Q.    So you don't call on the large regional chains like CVS

 8    and Rite-Aid, et cetera; correct?

 9    A.    No.

10    Q.    You started as a sales manager?

11    A.    Actually, I'm a sales rep, not really a sales manager.

12    Q.    Okay.  If I use the term sales executive, sales

13    manager, sales rep, I'm trying to just communicate what your

14    job is.  All right?  I might mix those terms up.  So you

15    understand what I'm saying if I go sales rep, sales manager,

16    sales executive.  All right?

17    A.    Yes.

18    Q.    Prior to McKesson -- McKesson in '05.  Prior to that,

19    you were at D&K Healthcare Resources?  True?

20    A.    Yes.

21    Q.    And what was your job there, sir?

22    A.    Sales rep.

23    Q.    And prior to that, could you tell us what you did?

24    A.    I got the job out of college, so it's really the only

25    job I've had.
```

1    **Q.**   So you went to Marshall?  Is that true?

2    **A.**   Yes.

3    **Q.**   All right.  So what year did you graduate then and

4    start as a sales rep?

5    **A.**   It was 1988.

6    **Q.**   So you have at this point over 30 years experience

7    selling to pharmacies; correct?

8    **A.**   Yes.

9    **Q.**   And you would have over 30 years experience selling

10   controlled substances to pharmacies?

11   **A.**   Yes.

12   **Q.**   I know you sell a lot of different products, a lot of

13   different services, but what we're going to focus on today

14   is controlled substances.  All right?

15   **A.**   Okay.

16   **Q.**   Can you tell us, focusing on McKesson, do you have a

17   sales territory?

18   **A.**   Yes.

19   **Q.**   And can you describe that for us, please?

20   **A.**   It goes, it goes -- it's the State of West Virginia.

21   It goes as far north as Clarksburg to Parkersburg.  I go

22   about an hour north of Parkersburg to Sisterville, or

23   Sistersville.  And as far as I go above Clarksburg is

24   Shinnston.

25        And then I come all the way down to the state line and

1    have all the way to the state line of Virginia with the

2    exception of a few counties on the Virginia/West Virginia

3    border.

4    **Q.**   I know you just described a geographic area that must

5    include Cabell County, but I'm not as good at geography, but

6    that includes Cabell County; true?

7    **A.**   Yes.

8    **Q.**   And how long has Cabell County been in your sales rep

9    again since 2005 on?

10   **A.**   It's always been in my territory.

11   **Q.**   And you sell controlled substances then in Cabell

12   County; correct?

13   **A.**   I sell the service -- our distribution services in

14   Cabell County, yes.

15   **Q.**   Now, my specific question, you sell controlled

16   substances to pharmacies within Cabell County.  Would that

17   be true?

18   **A.**   That's part of what they purchase, yes.

19   **Q.**   And that would include opioids?

20   **A.**   Yes.

21   **Q.**   Oxycodone?

22   **A.**   Yes.

23   **Q.**   Hydrocodone?

24   **A.**   Yes.

25   **Q.**   How many customers -- I know it's changed over the

1    years, but approximately how many customers do you have in

2    Cabell County?

3    **A.**   Currently I have three customers.

4    **Q.**   And if I go back to the 2010 period, how many customers

5    in Cabell County?

6    **A.**   Probably a couple, two or three.

7    **Q.**   Custom Script?  Would that have been one?

8    **A.**   Yes.

9    **Q.**   Part of your responsibilities would include getting new

10   customers?

11   **A.**   Yes.

12   **Q.**   Once a pharmacy, then, becomes a new customer, part of

13   your responsibilities would be not just selling the goods

14   and the services, but in keeping them satisfied and a happy

15   customer.  True?

16   **A.**   Yes.  I would go further to say to make sure that we

17   deliver our product expectations of what they are looking

18   for in a distributor.

19   **Q.**   Keeping current customers is an important part of your

20   responsibilities.  True?

21   **A.**   Yes.

22   **Q.**   How much are you on the road over the last 30 years?

23   How much are you on the road?

24   **A.**   At least four days a week.

25   **Q.**   And that involves visiting customers -- basically, when

```
 1    we say on the road, you're actually going to the pharmacies?
 2    A.    Yes.
 3    Q.    I think you said in one of your depositions it's a
 4    people business.  What did you mean by that?
 5    A.    It's, it's a relationship business.  The small
 6    independent pharmacies that we deal with -- that I deal
 7    with, they like relationships -- it's a relationship
 8    business.  And that is what I meant by, by that statement.
 9    Q.    Maintaining good relationships with the pharmacist
10    then?  That's important?
11    A.    With, with everyone in the pharmacy.
12    Q.    Everybody in -- the pharmacist, the owner, and
13    everybody else?
14    A.    Yes.
15    Q.    Did you know and understand that McKesson over the last
16    decade has sold more opioids than any other distributor in
17    the country?  Are you aware of that?
18    A.    No, I'm not.
19    Q.    Does McKesson market the sale of opioids?
20    A.    No.
21    Q.    Does McKesson have rebate programs?
22    A.    Yes.
23    Q.    And can you tell the Court what a rebate program is?
24    A.    A rebate can be on anything, brand or generic products.
25    I mean, we have a tech credit rebate on technology.
```

1    **Q.**   Rebate programs and generic drugs?

2    **A.**   Yes.

3    **Q.**   Is there a focus on the generic drugs because that's a

4    bigger profit margin?

5    **A.**   Yes.

6    **Q.**   And would hydrocodone be a part of the rebate program

7    as it relates to generics?

8    **A.**   Yes.

9    **Q.**   And that's been true since 2005.  True?

10   **A.**   Yes.

11   **Q.**   And, sir, you also have had rebate programs over the

12   years with respect to fentanyl, have you not?

13   **A.**   Yes.

14   **Q.**   And, sir, you also have something known as -- you have

15   price reduction programs, do you not?

16   **A.**   Yes.

17   **Q.**   And oxycodones have been a part as late as 2018 with

18   respect to price reduction programs.  True?

19   **A.**   I think all of the generic items we have is part of our

20   competitive price mix.

21   **Q.**   The answer would be "yes"?

22   **A.**   Yes.  Generic prices are always dropping, so there's

23   always adjustments to generic pricing.

24   **Q.**   Including hydrocodones and oxycodones?

25   **A.**   Yes.

1   **Q.**   And, sir, the purpose of the rebate programs is to

2   induce the customer to purchase more.  Would that be right?

3   **A.**   Yes.

4   **Q.**   And McKesson has those programs because they work.

5   True?

6   **A.**   In some cases, they work.

7   **Q.**   And the purpose of price reduction programs is to

8   induce customers to purchase more.  True?  That's why you

9   lower the prices?

10  **A.**   Yes.

11  **Q.**   And McKesson has those programs, again, because they

12  work.  True?

13          MR. STANNER:  Objection, Judge, speculation as to

14  McKesson.

15          THE COURT:  Well, if he knows.

16  BY MR. KENNEDY:

17  **Q.**   Sir, let's look at how you get paid.  You have a

18  base salary.  True?

19  **A.**   Yes.

20  **Q.**   That's been true since 2005 when you started at

21  McKesson?

22  **A.**   Yes.

23  **Q.**   You were provided a car?

24  **A.**   Yes, correct.

25  **Q.**   In addition to your base salary, you have a bonus

1    structure at McKesson, do you not?

2    **A.**    Yes.

3    **Q.**    And somewhat of a complicated system, you receive a

4    package in the beginning of each year and it outlines

5    different targets, incentives, and how you can get bonuses.

6    True?

7    **A.**    Yes, correct.

8    **Q.**    But, but, basically, sir, the basic premise is the more

9    you sell, the more money you can make.  True?

10   **A.**    Up to a limit.  There's --

11   **Q.**    There's limits, absolutely.

12           MR. STANNER:  I'm sorry, Judge.  I think he's

13   entitled to finish his answer.

14           MR. KENNEDY:  I'm sorry, sir.

15           THE COURT:  Yes, you can finish your answer,

16   Mr. Ashworth.

17           THE WITNESS:  Yeah.  I mean, there's a limit to

18   each component of our bonus program.

19   BY MR. KENNEDY:

20   **Q.**    So you can -- and in a given year with your bonus

21   program, you can double your income, can you not, sir?

22   **A.**    Yes.

23   **Q.**    In fact, one year, I think 2015, you just about tripled

24   your income, did you not?

25   **A.**    I don't remember.

1    **Q.**   Was your base $50,000 in 2015 and you made $140,000

2    that year, sir?

3    **A.**   I don't remember.

4    **Q.**   And then two years later in 2017 you were back down to

5    $62,000.  Do you remember that, sir?

6    **A.**   What year?

7    **Q.**   2017.

8    **A.**   I'm, I'm sorry.  Would you repeat the whole question?

9    **Q.**   Yes.  Sir, in 2015 your base was approximately $50,000.

10   And with bonuses, you made $140,000 in 2015.  Do you

11   remember that?

12   **A.**   I, I don't recall the exact amount of money I made, no.

13   **Q.**   Two years later, 2017, you made $62,000.  Do you recall

14   that?

15   **A.**   No, not that I --

16   **Q.**   Can we agree, sir, that you can, you can double your

17   income with bonuses?

18          MR. STANNER:  Objection, asked and answered.

19          THE COURT:  Overruled.

20       You can answer.

21          THE WITNESS:  Yes.

22   BY MR. KENNEDY:

23   **Q.**   Yes?  Now, new business, that's included in your

24   bonus system, is it not?

25   **A.**   Yes.

1    **Q.**   You -- if you can bring on a new customer, you get a

2    bonus for that also, do you not?

3    **A.**   Yes, correct.

4    **Q.**   Just to sum up, the more you sell, the more money you

5    can make.  True?

6            MR. STANNER:  Your Honor, I think the question

7    suggests --

8            THE COURT:  Sustained.  You've asked him that

9    about three times, Mr. Kennedy.

10           MR. KENNEDY:  All right, Your Honor.  I'm sorry.

11   BY MR. KENNEDY:

12   **Q.**   Sir, knowing and understanding your, your

13   compensation system -- McKesson creates your

14   compensation system; correct?

15   **A.**   Yes.

16   **Q.**   And knowing and understanding your compensation system,

17   can we agree that McKesson put the sales reps basically in

18   the middle of their program to monitor controlled

19   substances?  True?

20   **A.**   It was just another function of our, of our job duties.

21   **Q.**   Well, sir, McKesson established a system where the

22   salespeople played a key role in knowing the customer and

23   preventing diversion.  Is that true, sir?

24           MR. STANNER:  Your Honor, it calls for speculation

25   as to the -- what McKesson was intending to do or what

1    McKesson did.  He can ask Mr. Ashworth what he knows.

2              THE COURT:  Well, if he knows.  He can answer the

3    question if he knows.

4              THE WITNESS:  Would you please ask the question

5    again?

6    BY MR. KENNEDY:

7    Q.   Sir, knowing and understanding the compensation

8    system, McKesson established a monitoring system where

9    the salespeople played a key role in knowing the

10   customer and in preventing diversion.  Do you agree?

11   A.   I don't know what that has to do with the pay, what I

12   get paid.  Is that what you're -- I'm sorry, I don't

13   understand what you're getting at.

14   Q.   Let me ask one more time, sir.  Will you agree that

15   McKesson established a monitoring system where the

16   salespeople played a key role in knowing the customer and in

17   preventing diversion?  Would you agree with that statement?

18   A.   No.  We, we play a role -- we play a role in getting

19   information and collecting information and giving it to

20   regulatory.  They are the ones that, that run the regulatory

21   program and monitor purchases.

22   Q.   All right, sir.  Do you remember having your testimony

23   taken in this case back in July of 2020?  I think the

24   lawyers for McKesson were present.  Lawyers for Cabell

25   County and Huntington were present.  You were asked a series

         1    of questions.

         2    **A.**    Yes.

         3    **Q.**    And you swore to tell the truth; correct?

         4    **A.**    Uh-huh, yes.

         5    **Q.**    And if we can look at Page 55 of the 7-2-20 deposition,

         6    lines, starting at line 21 and going over to 21.

         7         And, sir, were you asked, "Did you ever know that you

         8    were a key -- that you played a key role in knowing your

         9    customer and preventing diversion?"

        10         And, sir, was your answer "yes" at that time?

        11    **A.**    Yeah.  I don't remember this, this particular question,

        12    but I do play a key role in collecting the information and,

        13    and while I'm there doing, you know, looking around on-site.

        14    But I don't have -- you know, I don't make policy for the

        15    regulatory department.  I don't analyze the information that

        16    I have.  I can't explain that.

        17    **Q.**    Sir, was the question to my answer (verbatim) "yes"?

        18    **A.**    What's the question?

        19    **Q.**    My question was, do you agree that you played a key

        20    role in knowing the customer and preventing diversion?

        21    **A.**    Yes, I played a key role in knowing the customer and

        22    getting the information to regulatory which is part of their

        23    role is preventing diversion.

        24    **Q.**    And, sir, let's go through it step by step, then, a

        25    little bit more specific.  The Life-Style Drug Monitoring

1    Program began back in 2007.  Do you recall that?

2    **A.**    2007?

3    **Q.**    Yes, sir.

4    **A.**    Yes.

5    **Q.**    And you understand that that was in existence for a

6    short period of time.  And then in 2008 the Controlled

7    Substance Monitoring Program, CSMP, came into existence in

8    '08.  Do you recall that?

9    **A.**    Yes.

10   **Q.**    And you were trained, were you not, with respect to the

11   CSMP since 2008?

12   **A.**    Yes.

13   **Q.**    Every year, sir?

14   **A.**    Yes.

15   **Q.**    More specifically, McKesson created a CSMP manual and

16   you were trained with respect to the substance of that

17   manual also, were you not?

18   **A.**    Yes.

19   **Q.**    And the emphasis of the Controlled Substance Monitoring

20   Program, as you were trained, was know your customer.  True?

21   **A.**    Yes.

22   **Q.**    And the customer is the pharmacy.  Would I be right?

23   **A.**    Yes.

24   **Q.**    Now, you understood, sir, then from your training that

25   McKesson had the responsibility to maintain effective

1   controls to prevent diversion?  You understood that?

2           MR. STANNER:  Objection, Judge, calls for a legal

3   conclusion.

4           THE COURT:  Overruled.

5   BY MR. KENNEDY:

6   **Q.**   From your training, sir, you understood that?

7   **A.**   Please ask that question again.

8   **Q.**   You understood from your training that McKesson had the

9   responsibility to maintain effective controls to prevent

10  diversion?  You understood that?

11  **A.**   Yes.

12  **Q.**   And as part of that responsibility, sir, you understood

13  that McKesson had the duty to know its customer.  True?

14          MR. STANNER:  Same objection as to duty.

15          THE COURT:  What was your objection?

16          MR. STANNER:  Sorry, Judge.  It calls for a legal

17  conclusion as to duty.

18          THE COURT:  Overruled.

19  BY MR. KENNEDY:

20  **Q.**   Based upon your training, sir, did you understand

21  that McKesson's responsibility extended to having the

22  duty to know its customer?  Did you understand that from

23  your training, sir?

24  **A.**   Yes.

25  **Q.**   And you remember that all the way back to 2007 when the

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1   training began?

2   **A.**   I don't remember training from 2007.

3   **Q.**   2008.  I'm sorry.  Let's start with the CSMP.  You

4   understood that back in 2008 when your training began?

5   **A.**   Yes.

6   **Q.**   Let's start with on-boarding.  You're familiar with the

7   concept of on-boarding, what that is?

8   **A.**   Yes.

9   **Q.**   And you solicit to get new business, do you not?

10  **A.**   Yes.

11  **Q.**   And what does that involve?  Multiple visits?

12  Brochures?  Calls?  Tell me that process.

13  **A.**    It, it differs from, from prospective -- I guess

14  prospective customers is what we're talking about.  A lot of

15  initially what I do is to get to know the prospective

16  customer and build some rapport.

17       And once you get to that, that, through that step, we

18  sell -- what we're trained to sell is our value added

19  programs.  And it's what makes us -- what we believe makes

20  us different than our competitors and would peak interest in

21  a prospective customer to come on board to McKesson.

22  **Q.**   And can that take months of visits and interaction

23  before somebody actually, let's say, would agree to leave a

24  competitor and come to you?

25  **A.**    It varies.

1    **Q.**   But once, once you, you have solicited a customer,

2    let's say you have now convinced them to become a McKesson

3    customer, they have to be approved with respect to the sale

4    of controlled substances before McKesson will ship them

5    controlled substances.  True?

6    **A.**   Yes.

7    **Q.**   And if regulatory does not approve a customer, then

8    your labor in getting the customer to agree to come to

9    McKesson can go to waste?

10   **A.**   Yes.

11   **Q.**   Now, the way that the program is worked with respect to

12   this on-boarding and the approval process, the approval to

13   sell controlled substances, there's a questionnaire

14   involved, is there not?

15   **A.**   Yes.

16   **Q.**   And it's the responsibility of the sales representative

17   to go to a site visit once the person has agreed to become a

18   customer, the pharmacy has agreed, and then you sit with the

19   pharmacy, the pharmacist, or the owner and you go through

20   and get answers to the questionnaire.  Is that how the

21   process works?

22   **A.**   In some cases.

23   **Q.**   Well, sir, can you, can you cite me an example between

24   2008 and 2013 where anybody in Cabell County other than you,

25   the sales rep, got the questionnaire answered by the

1    pharmacy in the on-boarding process?

2    **A.**   I don't remember.

3    **Q.**   Sir, the way the system is set up from your education

4    and training, it is your responsibility to go to the new

5    customer and get the questionnaire answered.  It is your

6    responsibility, is it not?

7    **A.**   Yes, correct.

8    **Q.**   And you've done it 100 times?

9    **A.**   I've done it quite often, yes.

10   **Q.**   The questionnaire has got the name of the prospective

11   pharmacy.  True?

12   **A.**   Yes.

13   **Q.**   DEA number?

14   **A.**   Yes.

15   **Q.**   Location?

16   **A.**   Yes.

17   **Q.**   Asks questions about their quantities of controlled

18   substances including hydrocodone and oxycodone; correct?

19             MR. STANNER:  Objection, vague as to time period.

20   BY MR. KENNEDY:

21   **Q.**   2008, sir.

22   **A.**   I'm trying to remember what the questionnaire looked

23   like.  It looked totally different in 2008 than it does now

24   and that's why it's hard to answer.

25   **Q.**   It asks about controlled substances; correct?  Every

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    version of it from 2008 until today asks about controlled

2    substances, does it not?

3    **A.**    Yes, in some form or fashion, yes.

4    **Q.**    It asks about whether or not they're going to buy from

5    other wholesalers.  True?

6    **A.**    Yes.

7    **Q.**    And many iterations of the questionnaire have always

8    asked about pain clinics; correct?

9    **A.**    Yes.

10   **Q.**    And there's always been a section there for your

11   observations.  True?

12   **A.**    Yes.

13   **Q.**    You take photos.  Your responsibilities when you're

14   doing this site visit and getting the questionnaire

15   answered, you also take photos, do you not?

16   **A.**    Yes, correct.

17   **Q.**    Then that's all provided to Regulatory Affairs and they

18   make the decision as to whether or not they're going to sell

19   controlled substances?

20   **A.**    That's part of the information they get to make that

21   decision.

22   **Q.**    And if they decide they're not going to sell controlled

23   substances and the approval doesn't come through, then you

24   don't get a bonus for a new customer.  True?

25   **A.**    Yes.

1  **Q.**   Now, let's talk about after the pharmacy becomes a

2  customer, if we could.

3     After they've now been approved to be shipped

4  controlled substances, the monitoring program, sir, as you

5  were trained and as it was established, after someone

6  becomes a customer, the program is set up whereby the sales

7  representative is in a position to prevent or protect their

8  customer from being reviewed or investigated by Regulatory

9  Affairs.   True?

10             MR. STANNER:   Objection, argumentative, compound.

11             THE COURT:   Overruled.   You can answer if you can.

12             THE WITNESS:   I don't agree with that statement.

13  BY MR. KENNEDY:

14  **Q.**   Sir, the CSMP, Controlled Substance Monitoring

15  Program, it set up thresholds.   True?   You're familiar

16  with that?

17  **A.**   Yes.

18  **Q.**   And you understand -- the Court's heard a lot about

19  thresholds.   But thresholds are a limitation on different

20  controlled substances as to how much a pharmacy can be

21  shipped per month.   True?

22  **A.**   Yes.

23  **Q.**   So Smith's Pharmacy on Main Street would have a monthly

24  threshold for Oxycontin, or oxycodone, excuse me.   True?

25  **A.**   Yes.

1  **Q.**   That's how it works.  And the thresholds, the

2  thresholds are a limit that is used to monitor the amount of

3  drug being purchased by the pharmacy.  True?

4  **A.**   Yes.

5  **Q.**   And if, if one of your customers is always ordering

6  under the threshold, there's no review; correct?  They're

7  always ordering under the threshold.  That doesn't trigger

8  any review.  True?

9  **A.**   Really the questions -- and I'll back up to the

10  previous question.

11  **Q.**   All right.

12  **A.**   These are really a function of regulatory.  The -- I

13  guess that's all I have to say is that it's a function of

14  regulatory.

15  **Q.**   I understand, sir.  But you knew that there were

16  thresholds, that there were limits, and they were in place

17  to monitor what was being sold to a pharmacy.  You

18  understood that?

19  **A.**   Yes.

20  **Q.**   And you understood that if your customer orders under

21  the threshold, there's no trigger of any review.  True?

22  **A.**   No, I don't know that.  I don't know if there's -- I

23  know we had often our, our Regulatory Affairs rep would call

24  on customers.  They do on-site visits.  And I don't know

25  that any, any threshold, any visit, or every visit that's

1      triggered, that would be triggered by a threshold.

2      **Q.**   Sir, let me ask you this.  Between 2008 and 2013 can

3      you name me a single instance where someone from Regulatory

4      Affairs made a site visit to one of your customers in Cabell

5      County?

6      **A.**   2008 through?

7      **Q.**   2013.

8      **A.**   Yes, Custom Script.  You asked about Custom Script.  A

9      Regulatory Affairs person did visit on-site.

10     **Q.**   In what year, sir?

11     **A.**   I know of 2013.

12     **Q.**   I'm talking about prior to that, sir.  We've had a lot

13     of testimony about changes in 2013.  That's why I'm saying

14     '08 to '13.  Do you remember any single Regulatory Affairs

15     person making an on-site visit to one of your Cabell County

16     pharmacies between '08 and '13, sir?

17     **A.**   I can't remember -- I don't know if they have.  I don't

18     remember them making any, any visits.

19     **Q.**   So we talked about if a customer stays under the

20     threshold.  If the customer orders over their threshold, do

21     you understand that that would trigger a review?  You

22     understood that?

23     **A.**   I don't, I don't, I don't think just because a customer

24     hits their threshold, that triggers it, not to my knowledge.

25     I don't know how the regulatory department handles that.

```
 1              MR. KENNEDY:  If you can bring up P-42638, please.

 2    Don't bring it up.

 3         This has been admitted into evidence already, Your

 4    Honor.

 5         May I approach, Your Honor?

 6              THE COURT:  You may.

 7              MR. KENNEDY:  Thank you.

 8    BY MR. KENNEDY:

 9    Q.   Sir, I'm, I'm -- sir, does the top say "Controlled

10    Substance Monitoring Program"?

11    A.   Yes.

12    Q.   And you told us earlier that you were trained on the

13    manual itself and this is the manual?

14         You can go to Page 6, if you would, the bottom

15    right-hand corner.

16    A.   Okay.

17    Q.   If you go down to the bottom it says "Threshold

18    Excursion."  That is, that is when somebody orders over

19    their threshold.  That's what an excursion is, is it not?

20    A.   I, I think this -- I'm not familiar with this document

21    and it --

22    Q.   Sir, --

23    A.   It looks like a -- it may be operations, for operations

24    because there's, there's a statement of retail national

25    accounts which is not, not something, not an area I would be
```

1    responsible for.

2    **Q.**    Sir, I will represent to you that this has already been

3    admitted into evidence and established that this is the 2008

4    Controlled Substances Monitoring Program manual that you

5    were trained on.  All right?

6    **A.**    I don't remember.

7    **Q.**    See if you remember this.  Go down to the bottom of

8    Page 6.  And does it state, "Once a customer has reached

9    their monthly maximum threshold amount, all subsequent

10    orders for that item will be blocked.  This triggers the

11    level review process as detailed in level review steps

12    below."

13         And if you turn the page, does 221 state, "Level I

14    review.  A Level I review is required for every threshold

15    excursion.  DC management is required to conduct the Level I

16    review."

17         Is that consistent with your training, sir?

18    **A.**    When we first started the program, that's when we did

19    the Level I questionnaire.  And, and in the beginning it had

20    us doing it -- the sales folks doing the Level I.  But

21    eventually I think it, it, it was handled by the

22    distribution center as far as I can remember.

23    **Q.**    Are you part of DC management?

24    **A.**    No.

25    **Q.**    This says DC management is required to conduct the

1    Level I reviews.  Did you just say you were doing it?

2    **A.**    On occasions when the program first started, but we

3    don't even do the Level I review.  In fact, if that's what

4    you're referring to, Level I questionnaire --

5    **Q.**    That's right here.  But let's go back.  So at least

6    based upon this, if a customer of yours orders over their

7    threshold, there's going to be a Level I review, true, based

8    upon what we've seen?

9             MR. STANNER:  Your Honor, I'm going to object to

10    foundation if he's asking about the document.  He said he's

11    not familiar with it.

12             THE COURT:  Well, he said he's not familiar with

13    it, Mr. Kennedy.  You're asking him about it anyway.  I'll

14    sustain the objection.

15    BY MR. KENNEDY:

16    **Q.**    Sir, McKesson set up a -- its program starting in

17    2008 where you could warn the customer if they were

18    approaching their threshold so that they wouldn't order

19    it and lead to a review; correct?  You could warn them

20    as their sales rep.  True?

21    **A.**    It --

22    **Q.**    Is that true?

23    **A.**    When the program started, there was a period that we

24    were, we were given the information to let the customer know

25    they were approaching their, their, their threshold because

1    it was all new and it required some explanation.

2    **Q.**   Sir, that, that ability of the sales rep to warn the

3    customer, that ability of the sales rep existed until 2013,

4    for five years, sir, did it not?

5    **A.**   I don't remember when it ended.

6    **Q.**   Well, five years wouldn't be the beginning of the

7    program.  Can we agree?

8    **A.**   I, I don't remember when it started and it stopped.

9    **Q.**   Sir, you did -- your practice was to do more than just

10   that, though, sir.  You as the sales rep would not only call

11   and warn the customer they were getting close to the

12   threshold, but you would actually ask the customer if they

13   wanted to increase their threshold.  True?  You would ask

14   them if they wanted to increase their threshold after your

15   warning.  Is that accurate?

16   **A.**   I would, I would ask if they, they needed a threshold

17   change.  And if they did, that would start the whole

18   threshold request procedure.

19   **Q.**   Well, sir, when they're coming up and getting close to

20   their threshold, you're not asking them if they want to

21   lower their threshold, sir.  You're asking if they want a

22   threshold increase.  True?  True?

23   **A.**   Yes.

24   **Q.**   Sir, you were even systematically sent threshold

25   warning reports so you knew which customers to call to keep

```
 1    them from ordering over their thresholds and triggering

 2    investigations, a daily report, were you not?

 3            MR. STANNER:  Objection, Your Honor, vague as to

 4    time frame.

 5    BY MR. KENNEDY:

 6    Q.   Up to 2013 is where -- from 2008 to 2013.

 7    A.   I don't remember getting that that often or getting it

 8    that, that -- I guess up to 2013.  To me, it, it was a brief

 9    time that we got that information and I can't remember how

10    long it was.

11    Q.   But you do remember getting that information?

12    A.   Yeah, there was a time that we got it.

13    Q.   And, sir, would I be correct that not only were you --

14    the sales folks were calling to warn the customer, but the,

15    but the customer also got a warning on their statement and

16    they also got a call from the call center in Texas called

17    Service First.  True?  Three warnings?

18            MR. STANNER:  Objection, speculation and compound.

19            THE COURT:  Well, if he knows, he can answer the

20    question.  But --

21            THE WITNESS:  All I know is what my role was at

22    the time and, and if that was the time period you're talking

23    about that we were given the information to, to, what the

24    customer knows, that they were approaching a threshold, I

25    would have only known what I would have gotten.  I wouldn't
```

1    have known what Service First was doing.

2    BY MR. KENNEDY:

3    **Q.**   Fair enough.  Now, sir, beyond this, beyond this

4    warning that you were, you were able to provide, you had

5    a further ability, did you not, sir, to protect or

6    prevent your customer from being investigated by

7    Regulatory Affairs, did you not?

8    **A.**   No.

9    **Q.**   Well, sir, you told us that -- you told us that you

10   conducted Level I reviews.  True?

11   **A.**   At some point.

12   **Q.**   And, sir, will you disagree if I said you were doing

13   Level I reviews from 2005 to 2013?

14   **A.**   I can't remember how long we did them.

15   **Q.**   And, so, sir, if in the Level I review being done by

16   the sales rep, if you find and conclude under Level I review

17   that everything is fine, then there's no elevation to Level

18   II when Regulatory Affairs gets involved; correct?

19   **A.**   No, I don't believe that's correct.

20   **Q.**   Can you tell the Court what was involved with a Level I

21   review, if you remember?

22   **A.**   I'm sorry, I didn't hear that.  Would you please --

23   **Q.**   Can you tell the Court what was involved with the Level

24   I reviews?  Level I reviews were only done when your

25   customer had ordered over their threshold.  That's what we

 1   just read.  Correct?

 2   **A.**   Yes.

 3   **Q.**   And it's being done by a sales rep for a certain period

 4   of time; correct?

 5   **A.**   Yes.

 6   **Q.**   And you personally did them, did you not?

 7   **A.**   Yes.

 8   **Q.**   And, sir, your, your commitment with respect to your

 9   responsibilities under the Controlled Substances Monitoring

10   Program, your commitment to that responsibility wasn't

11   different outside of Cabell County as it was inside of

12   Cabell County, was it?

13   **A.**   Correct.

14   **Q.**   And if we can have 28152, please.

15          MR. KENNEDY:  If I can approach.

16          THE COURT:  Yes.

17          MR. KENNEDY:  Thank you.

18          THE COURT:  Do you have a copy of this, Mr.

19   Stanner?

20          MR. STANNER:  I do.  I have one from yesterday.

21   I'll wait for the Court to have one.

22       Your Honor, I'm going to object to the document, if the

23   Court's had a chance to look at it.  What this appears to be

24   is a collection of various forms, some of which are

25   Mr. Ashworth's, some of which are not, some of which are in

```
 1    West Virginia, some of which are in Kentucky, some in
 2    Colorado, but none of them in Cabell County.
 3              THE COURT:  What are you going to do with this,
 4    Mr. Kennedy?
 5              MR. KENNEDY:  Yes, Your Honor.
 6        Your Honor, this was an exhibit used during
 7    Mr. Gustin's deposition.  So what we did, we took the same
 8    exhibit and we marked it as an exhibit in this proceeding.
 9        This is 26 Level I reviews by Mr. Ashworth.  No
10    question, the first review is not Mr. Ashworth.  The last
11    four are not Mr. Ashworth.  The middle 26 are his.
12        Your Honor, we are offering this simply for state of
13    mind.  I'm going to ask him a few questions.  This is for
14    state of mind of this witness, Your Honor, state of mind.
15    It has no geographic boundaries.  He has already told us
16    that he took his responsibility inside of Cabell County and
17    outside of Cabell County the same.  So we will take off the
18    first piece and the last piece.
19              THE COURT:  Well, you're not going to go through
20    all 22 of them, are you?
21              MR. KENNEDY:  Pardon me?
22              THE COURT:  You're not going to go through all 22
23    of them, are you?
24              MR. KENNEDY:  No, Your Honor.  I plan on stopping
25    at number three.
```

```
1              THE COURT:  I'll overrule the objection and let

2    you do three of them.

3              MR. KENNEDY:  Thank you.  We would offer this into

4    evidence, Your Honor.

5              THE COURT:  Well --

6              MR. KENNEDY:  And it's 28152.

7              MR. STANNER:  Same objection, Your Honor.

8              THE COURT:  I'm not going to -- I'll let you

9    question him about the three that you're going to question

10   him about.

11             MR. KENNEDY:  All right.  Thank you.

12             THE COURT:  We'll see whether those are admissible

13   or not.  But the rest of it --

14   BY MR. KENNEDY:

15   Q.   Sir, if you would go to the second page, please.

16             MR. KENNEDY:  Can we pull it up, Your Honor, or

17   should we keep it off the screen?

18             THE COURT:  I can see it right here.

19             MR. KENNEDY:  All right.

20             MR. STANNER:  I'm sorry, Mr. Kennedy, I didn't

21   hear the page.

22             MR. KENNEDY:  Page 2.

23   BY MR. KENNEDY:

24   Q.   Sir, Page 2 up at the top, does that say "CSMP

25   Observation Level I Documentation Form"?
```

```
 1   A.   Yes.

 2   Q.   And your name, Tim Ashworth, yes.  So you would be the

 3   one doing this Level I observation.  True?

 4   A.   Yes.

 5   Q.   And it identifies you as an RSM, Regional Sales

 6   Manager.  Yes?

 7   A.   Retail Sales Manager.

 8   Q.   I'm sorry.  And the purpose of this is that this

 9   customer exceeded their threshold for oxycodone.  True?  Is

10   that true?  Do you see on the left it says "Purpose" and it

11   says "Exceeded Threshold"?

12   A.   Yeah, but that oxycodone is not my handwriting.  That's

13   why I'm hesitant to --

14   Q.   Is that your name on the form?

15   A.   That's my name on the form, but that's not my

16   handwriting.  So I'm not sure --

17   Q.   Go down and look at the first question.  The first

18   question on this form is:  "Are you aware that you have

19   exceeded your threshold?  If so, can you explain?"

20        And typed under that is the word "yes."

21        Do you see that?

22   A.   Yes.

23   Q.   There's no explanation.  True?

24   A.   Correct.

25   Q.   And I'm not even going to do three.  I'm going to
```

1   represent to you, sir, that in Exhibit 28152 you answered 26

2   Level I questionnaires with a customer, 26 occasions with a

3   customer over the threshold, and not one of the 26 has an

4   explanation as to why the customer ordered over their

5   threshold.  I'm going to make that representation to you.

6   We're not going to go through all 26.

7       If you want to check, counsel, please do.

8       But I'm not going to question you on all of them.  All

9   right?

10  **A.**   But, you know, just so you understand, this, this Level

11  I isn't -- it wasn't the only step in the progress -- or the

12  process back then.  This was just to, to, to trigger the

13  initial conversation.

14      I don't know that any Level I form -- I mean, we quit

15  doing them at some point because I don't know that it was

16  used in the, the information they got to do their due

17  diligence, the regulatory department.  So --

18  **Q.**   Sir, we've read the CSMP.  Level I was required every

19  single time a customer ordered over the threshold, was it

20  not?  Is that correct?

21  **A.**   Yes.

22  **Q.**   And it said that the distribution center management was

23  to do the Level I; correct?

24  **A.**   Well, that said it -- is that the document that I'm not

25  familiar with?

1    **Q.**   Yes, sir.  Is that what it said?

2    **A.**   I'm not familiar with the document that you're getting

3    that from.  That, that's not what I understood when we first

4    started doing this, that the salespeople were to do the

5    Level I observation.  And it was a communication to the

6    store to let them know that, that they hit their threshold.

7    **Q.**   And you did 26 of them that we've been able to find;

8    correct?

9           MR. STANNER:  Judge, I'm going to renew at this

10   point.  We're talking about 26 of them now.  I don't see how

11   it's state of mind.

12          THE COURT:  Well, overruled.

13      Go ahead, Mr. Kennedy, and --

14   BY MR. KENNEDY:

15   **Q.**   Sir, let me ask you this.  We read through.

16   There's a Level I investigation, a Level II, and a Level

17   III.  If you don't get past Level I where you're doing

18   investigation, it never gets to a Level II or III.

19   True?

20   **A.**   No.  That's, that's, that's not my memory of how it

21   worked.  And I, I wouldn't know beyond Level II or III

22   because that's a function of regulatory.  I, I don't think

23   there's anything on this form that would stop further

24   investigation of a pharmacy that, that, that was being

25   looked at for a suspicious order.  To my knowledge, these

1  forms weren't used for that.

2  **Q.**   Sir, let me ask you.  At any time -- these Level Is,

3  these 26 cover a two-year period.  At any point in time

4  after did you these, after they're turned into Regulatory

5  Affairs, did anybody come to you and say, "Mr. Ashworth,

6  you're not doing these correctly.  We need an explanation as

7  to why the customer ordered over their threshold."  Did

8  anybody come to you and tell you that?

9  **A.**   Yeah, there, there was a point that we were asked to

10  get more detail.  And I'm not sure if it was on this one and

11  it could have been.  But what we found often, especially

12  when you're looking at 2008, 2009, the independent -- the

13  pharmacies, the pharmacies' owners weren't really accustomed

14  to the distributor asking these kind of questions.  And

15  often in the beginning, I had quite a push-back in trying to

16  get information from them.

17  **Q.**   It took them two years to come to you and tell you you

18  needed to answer that question?  Is that what you're saying?

19  **A.**   I don't remember when, when they said that.

20  **Q.**   These Level Is cover two years.  So it would have been

21  sometime after two years?

22  **A.**   I can't remember.

23  **Q.**   Sir, let me -- you were doing the site visit, the

24  initial questionnaire for the new customers; correct?

25  **A.**   Yes.

1   **Q.**   And at certain points in time, you were warning

2   customers when they got close to their threshold; correct?

3   **A.**   Yes.

4   **Q.**   A certain period of time -- well, a certain period of

5   time you were doing these Level I reviews; correct?

6   **A.**   Yes.

7   **Q.**   When a client or a customer wanted a threshold

8   increase, you would fill out the TCR request form; correct?

9   **A.**   Yes.

10  **Q.**   And, sir, the truth is that the sales reps were the

11  eyes and ears of Regulatory Affairs because McKesson did not

12  give Regulatory Affairs the resources or the personnel to be

13  their own eyes and ears.  That is true, is it not, sir?

14  **A.**   No, I don't agree with that statement.

15          MR. KENNEDY:  Can you give me 13385, please?

16      May I approach, Your Honor?

17          THE COURT:  Yes.

18  BY MR. KENNEDY:

19  **Q.**   And, sir, going all the way to the bottom, an email

20  from Dave Gustin to a large group of people, do you see

21  that's dated Wednesday, February 10, 2010?

22  **A.**   Yes.

23  **Q.**   And do you see your name, Tim Ashworth?  It's on the

24  second line from the bottom toward the left.

25  **A.**   Yes, I see that.

1  **Q.**   And Mr. Gustin, he was the Director of Regulatory

2  Affairs for the region that Cabell County is in, was he not?

3  **A.**   Yes.

4  **Q.**   And the subject is pill mills, is it not?  Do you see

5  that?

6  **A.**   I'm -- oh, the subject line?

7  **Q.**   Yes.  It's on the first page right there at the bottom,

8  subject.  Sir, is the subject pill mills?

9  **A.**   I'm sorry.  I'm still -- oh, yeah, I see.  Yes.

10          MR. KENNEDY:  And, Your Honor, we would like to

11  offer into evidence P-13385.  It's on the stipulation under

12  801(d)(2)(D), a statement of employee in the course of his

13  employment, Mr. Gustin.

14          THE COURT:  Any objection?

15          MR. STANNER:  Well, Your Honor, I guess it depends

16  on the part -- I know it's discussing a pharmacy that's not

17  in Cabell.  But if it's just for the bottom email, no

18  objection.

19          MR. KENNEDY:  Yes, Your Honor, that's what it's

20  for.

21          THE COURT:  All right.  It's admitted.

22  BY MR. KENNEDY:

23  **Q.**   If you go to the next page, you'll see what

24  Mr. Gustin sent out.  He says, "Team, this is one reason

25  why we do what we do.  It is so easy for any of our

```
 1    customers to be involved with one of these pill mills

 2    either knowingly or unknowingly.  We would be

 3    implicated.  Like it or not our best line of defense

 4    isn't really me since there is one of me for eight DCs

 5    and twice as many states.  It is up to the rep who knows

 6    the customer better than anyone and is more in tune with

 7    their business and the areas in which they function.  We

 8    really count on you to be our eyes and ears in the

 9    field."

10         Is that what he communicated to you, sir?

11    A.   Yes.

12              MR. KENNEDY:  I have no further questions, Your

13    Honor.

14              THE COURT:  Mr. Stanner, do you want to question

15    him?

16              MR. STANNER:  Yes, Your Honor.  Thank you.

17                         CROSS EXAMINATION

18    BY MR. STANNER:

19    Q.   Good afternoon, Mr. Ashworth.

20    A.   Good afternoon.

21    Q.   Before anything else, do you still have that email in

22    front of you?

23    A.   Yes.

24    Q.   Can you read the next couple sentences in that email?

25    I'm going to ask you to lean into the microphone.
```

1    **A.**   The last two sentences?

2    **Q.**   That's right, after the sentences that Mr. Kennedy

3    read.

4    **A.**   One second, please.

5        "It is the DC personnel who fill orders and get to know

6    what is normal and what looks abnormal.  It is the DCM," the

7    distribution center manager, "who sees a trend in the, in

8    the THD increase request for a certain account.  It is, it

9    is all of us doing our part.  Thanks for your diligence."

10   **Q.**   Mr. Ashworth, when you got that email, did you take it

11   to mean that Mr. Gustin was too busy to do his job so he

12   needed you to do it for him?

13   **A.**   No.

14   **Q.**   What did you take it to mean?

15   **A.**   That, that we, we have to all do our part and it is

16   important if we see something to say something.  And I think

17   it was just that simple.  He wanted to emphasize we need to

18   work together as a team to, to prevent, prevent diversion.

19   **Q.**   Do you do that at McKesson?

20   **A.**   Yes.

21   **Q.**   Do you think you do your part?

22   **A.**   Yes.

23   **Q.**   To use your words, if you see something, do you say

24   something?

25   **A.**   Yes, correct.

1   **Q.**   We'll come back to that.  First I want to give you a

2   chance to tell us where you're from.

3   **A.**   I'm -- I live in Charleston, here in Charleston.

4   **Q.**   And how long have you lived in Charleston?

5   **A.**   Since 2008.

6   **Q.**   Where did you live before that?

7   **A.**   I lived in Hamlin.

8   **Q.**   And I think you told us that you went to Marshall.

9   Have you lived in West Virginia your whole life?

10   **A.**   Yes.

11   **Q.**   You described your territory earlier for the Court.  Is

12   Charleston part of your territory?

13   **A.**   Yes, correct.

14   **Q.**   Do you have customers in this area?

15   **A.**   Yes, I, I have, I have one customer.  It's Kines Family

16   Pharmacy in Sissonville.

17   **Q.**   Okay.  And you said you have customers in Huntington

18   and Cabell County; is that right?

19   **A.**   I currently have three customers there.

20   **Q.**   Okay.  We'll come back to that.  In Huntington/Cabell

21   County do you have customers like Rite-Aid?

22   **A.**   No.

23   **Q.**   Okay.  Who handles those stores for McKesson?

24   **A.**   The retail national accounts.

25   **Q.**   Mr. Kennedy mentioned a pharmacy along the way called

1    Custom Script.  Do you remember that?

2    **A.**    Yes.

3    **Q.**    Was Custom Script a customer of yours?

4    **A.**    Yes.

5    **Q.**    And when was that?

6    **A.**    2010 to 2013.

7    **Q.**    Was Custom Script a typical pharmacy like Kines Family

8    Pharmacy?

9    **A.**    No.  It's, it's what's called a compounding pharmacy.

10   **Q.**    Do you know what that is?

11   **A.**    It's, it's a specialty pharmacy that specializes in

12   compounding specific medications that aren't available in

13   the marketplace from a distributor like McKesson.

14   **Q.**    So if you walked into Custom Script in 2010, 2011 are

15   there greeting cards and shampoo and things like that?

16   **A.**    No, no.  It's -- it doesn't -- it's not like your

17   typical retail pharmacy, no.

18   **Q.**    Does a compounding pharmacy buy its compounding

19   materials from McKesson?

20   **A.**    To my knowledge, McKesson doesn't carry that, that kind

21   of product.

22   **Q.**    So if they get those -- do you know where they get the

23   compounding material?

24   **A.**    A large source that I know of, that I've heard of is a

25   company called PCCA.  And all they do is carry the bulk, the

1    bulk ingredients that compounding pharmacies use.

2    **Q.**    So if a compounding pharmacy is getting the bulk

3    ingredients from someone else, what do they get from

4    McKesson?

5    **A.**    They get, they get the normal medications that

6    compounding distributors wouldn't carry.  It's just the

7    normal prescription medications that are manufactured by a

8    manufacturer.

9    **Q.**    Okay.  And would that include controlled substances?

10   **A.**    Yes.

11   **Q.**    And, so, can that explain a difference in the

12   controlled and non-controlled ratio at a place like Custom

13   Script?

14   **A.**    Yes.

15   **Q.**    How does it explain?

16   **A.**    Well, a lot of their non-controls, it's compounded.

17   And, and it, it wouldn't have the normal retail traffic of

18   non-controlled patients getting non-controlled prescriptions

19   filled.  So that, that's how I -- I think it would kind of

20   skew the number.

21   **Q.**    Have you been to Custom Script Pharmacy, Mr. Ashworth?

22   **A.**    Yes.

23   **Q.**    How many times?

24   **A.**    I can't remember.

25   **Q.**    Did you know a little bit about their business back in

```
 1    2010, 2011?
 2    A.    I'm sorry?  Repeat the question.
 3    Q.    Did you know a little bit about their business back in
 4    2010, 2011?
 5    A.    Yes.
 6              MR. STANNER:  Can I have P-13714, please?
 7          Permission to approach.
 8          At this time, if it's not already in evidence, we'll
 9    move it in.
10              THE COURT:  Any objection?
11              MR. KENNEDY:  No objection.
12              THE COURT:  It's admitted.
13              MR. ACKERMAN:  No, no objection, Your Honor.
14              THE COURT:  Okay.  It's admitted.
15    BY MR. STANNER:
16    Q.    Mr. Ashworth, do you recognize this document?
17    A.    Yes.
18    Q.    Is this a TCR, Threshold Change Request form from
19    Custom Script Pharmacy?
20    A.    Yes, correct.
21    Q.    It has a different name at the top.  Do you know why
22    that is?
23    A.    When they initially opened, it was called Medicine
24    Cabinet.  And at some point, they changed their name to
25    Custom Script.
```

1    **Q.**   Okay.  Down below do you see where it says -- threshold

2    change, that's a term that I think Mr. Kennedy mentioned.  A

3    threshold change form gets filled out when a customer

4    requests a change to the threshold; right?

5    **A.**   Yes, correct.

6    **Q.**   Okay.  And when that happens, the customer is asked to

7    give a reason; is that right?

8    **A.**   Yes, correct.

9    **Q.**   And did you do this threshold change with Custom Script

10   back in 2010?

11   **A.**   Yes.

12   **Q.**   Okay.  Did Custom Script give you a reason why they

13   needed an increase in their threshold for oxycodone?

14   **A.**   Yes.

15   **Q.**   Do you see down below where it says "reason for

16   requested change"?

17   **A.**   Yes.

18   **Q.**   Okay.  And it states, "Med Cab Pharmacy is a new

19   pharmacy that has been aggressively marketing their

20   compounding business to Cabell-Huntington Hospital's

21   oncology clinic."  Is that right?

22   **A.**   Yes, correct.

23   **Q.**   And is that true?  Is that your understanding that at

24   the time Custom Script was doing -- taking on new business

25   from an oncology clinic?

1    **A.**   Yes, and Hospice of Huntington.

2    **Q.**   And then if you go on, there's also -- it says

3    Dr. Fisher's Huntington Spine and Rehab Clinic.  Right?

4    **A.**   Yes.

5    **Q.**   And then a pain management clinic?

6    **A.**   Yes, that's correct.

7    **Q.**   And are those the kinds of places that are going to

8    prescribe more opioids than a typical doctor?

9    **A.**   Yes.

10    **Q.**   Are you familiar with Huntington Hospital's oncology

11    clinic?

12    **A.**   I know of it.  It's, it's pretty -- it's a pretty big

13    operation.

14    **Q.**   And, so, my, my question, Mr. Ashworth, is does this

15    tell you anything about the likely ordering habits of a

16    customer like this one versus a typical family pharmacy like

17    Kines?

18    **A.**   Yes, it would.

19    **Q.**   What would it tell you?

20    **A.**   Well, it, it's the -- it shows that the, the patient

21    base that these, this pharmacy was servicing, it's coming

22    from facilities that would -- the physicians would write

23    higher amounts of controlled drugs.

24         THE COURT:  Mr. Stanner, I apparently admitted

25    this yesterday, so I've now admitted it twice.  You can have

1     one or the other.

2               MR. KENNEDY:  I call, Your Honor.

3               MR. STANNER:  Thank you.  I thought it was.  I

4     appreciate that, Your Honor.  Thank you.

5     BY MR. STANNER:

6     **Q.**   The -- just, just to make sure we have it, when a

7     patient is going to an oncology clinic, what's that for?

8     **A.**   That's for cancer, a cancer patient.

9     **Q.**   And when a patient is going to the Hospice of

10    Huntington, what's that for?

11    **A.**   That's end of life, a patient that's end of life.

12    **Q.**   And are those typically patients that require more

13    opioids?

14    **A.**   Yes.

15    **Q.**   Now, you were asked about Level I reviews and, and in

16    this case a threshold.  What happens after you fill out a

17    document like this, or a Level I review?

18    **A.**   It's submitted to regulatory.

19    **Q.**   Okay.  Do you approve the threshold request that you

20    get from a place like Custom Script?

21    **A.**   No.

22    **Q.**   Who does approve it?

23    **A.**   Regulatory.

24    **Q.**   Do they always approve it?

25    **A.**   Do they always approve a Threshold Change Request?  No.

1    **Q.**    So when it goes to regulatory, what do you do next?

2    **A.**    I, I wait for their review and then they -- they'll

3    tell me whether it's approved or not approved.

4    **Q.**    Okay.  Looking just again at that same document, it

5    goes on to say -- it talks about them aggressively marketing

6    to these practices; right?  And then at the bottom it says,

7    "In doing so Chad."  Who's Chad?

8    **A.**    He's the, the pharmacist in charge and the pharmacy

9    manager.

10   **Q.**    And do you know -- what's his last name?

11   **A.**    Chad Wallace.

12   **Q.**    Do you know Mr. Wallace?

13   **A.**    Yes.

14   **Q.**    How long have you known him?

15   **A.**    I've known him for several years.

16   **Q.**    What's his business?

17   **A.**    His, his area, the area of pharmacy that he practices

18   has been compounding and IV therapies, which are -- which

19   he, he both -- both of those items in the past and, and the

20   future he, he works with the healthcare facilities and the

21   physicians because those type, those type of medications, IV

22   therapies and compounds, require a lot of hands-on

23   knowledge.  And it requires direct communication with the

24   physician.  And that's, that's always been his area of

25   expertise.

1   **Q.**   So it says down below that in doing so, Chad

2   anticipates a 25 percent surge in usage of products

3   containing oxycodone.  Do you know if that surge came to

4   pass, Mr. Ashworth?

5   **A.**   I, I don't think it did.  I, I don't recall that it

6   ever worked out that way, no.

7   **Q.**   So in the year after this TCR, just talking about the

8   year after, in 2011 did Custom Script order more opioids

9   from McKesson?

10  **A.**   Yes.  It did go up for that year.

11  **Q.**   Okay.  And then what happened after that?

12  **A.**   It went down.

13  **Q.**   Do you know why it went down?

14  **A.**   No.

15  **Q.**   Did Custom Script go out of business?

16  **A.**   No.

17  **Q.**   Then why --

18  **A.**   They focused on their core business which is

19  compounding and IV therapies.

20  **Q.**   Do you know the number, how many opioids Custom Script

21  did order in 2011?

22  **A.**   Not -- no.

23  **Q.**   Did you -- I'm sorry.  When Custom Script was your

24  customer, did you have a sense that they were a high volume

25  opioid purchaser, a low volume opioid purchaser?

1    **A.**   I didn't -- I thought they were lower amount.  I

2    thought they ordered lower amounts of controlled drugs from

3    us.

4    **Q.**   Okay.  But within the years 2010, 2011 were high?

5    **A.**   I'm sorry.  Repeat the question.

6    **Q.**   Sure.  Within the years that they were your customer, I

7    thought your testimony was that the numbers were higher in

8    2010 and '11?

9    **A.**   2011, yes.

10   **Q.**   Okay.  And then in 2012 and 2013?

11   **A.**   It went down significantly.

12   **Q.**   Okay.  I want to show you that actually.

13        MR. STANNER:  Can we look at P-13284?  This should

14   also be in evidence already.

15        Permission to approach?

16        THE COURT:  How much more are you going to have

17   with him, Mr. Stanner?

18        MR. STANNER:  I can try and go fast if Mr. Kennedy

19   doesn't have too much redirect.  I could try and wrap it up

20   if you prefer, Your Honor, five minutes.

21        THE COURT:  Mr. Kennedy, are you going to have a

22   good bit of redirect here?

23        MR. KENNEDY:  So far, Your Honor, no.

24        THE COURT:  Well, hopefully we can get

25   Mr. Ashworth done today maybe by -- of course, I've slowed

1    you down here.  But if you get going, maybe we can finish

2    with you, Mr. Ashworth.

3            MR. STANNER:  I'll try my very best.  I'm quite

4    sure Mr. Ashworth does not want to have to come back

5    tomorrow.

6        Your Honor, I believe it's already in evidence unless

7    plaintiffs tell me otherwise.  It should already be in

8    evidence.

9    BY MR. STANNER:

10   Q.   So let's take a look if we can quickly,

11   Mr. Ashworth.

12           MR. STANNER:  Can we go to the next page, please?

13   Can you go to Page 2 of the document?  I'm sorry, not Page

14   2, Chris, Page 3.

15   BY MR. STANNER:

16   Q.   Mr. Ashworth, do you recognize this?

17   A.   Yes.

18   Q.   Is this the 2013 questionnaire for the same pharmacy?

19   A.   Yes.  They changed locations at this point.  They

20   changed their name and they changed locations.  They

21   opened -- moved the facility to Putnam County.

22   Q.   Okay.  Let's just jump, if we can, to Page 7.

23       Up at the top there, Mr. Ashworth, do you see where it

24   says "List Wholesale Distributors and Manufacturers"?

25   A.   Yes.

**Q.**   And down below it says "Freedom" and "PCCA."  Do you see that?

**A.**   Yes.

**Q.**   And next to that it says "bulk powders."  Can you tell us what that refers to?

**A.**   That's, that's the com- -- that's the product they use to compound prescription medications.

**Q.**   Okay.  Let's turn to Page 11 really quickly and look at part B.  Do you see Appendix B there?

**A.**   Yes.

**Q.**   What's listed there?

**A.**   Hospice of Huntington.

**Q.**   And we saw that on the earlier questionnaire.  What do you take from this permit appearing here in 2013?

**A.**   They're still servicing Hospice of Huntington.

**Q.**   Okay.  And the last thing I want to look at if we could is Page 9.

     Up at the top there Mr. Kennedy made reference to the questionnaires earlier asking about certain controlled substances.  Do you see this question?

**A.**   Yes.

**Q.**   And it, and it asks to list the estimated dosage units dispensed per month for specific controlled substances.  Do you see that?

**A.**   Yes.

1    **Q.**   And down below it says "hydrocodone"?

2    **A.**   Yes.

3    **Q.**   And what's the number there?

4    **A.**   1,000 doses.

5    **Q.**   And, so, 1,000 hydrocodone doses a month, is that a lot

6    in your experience?

7    **A.**   No.

8    **Q.**   Down below it says "oxycodone."  Do you see that?

9    **A.**   Yes.

10   **Q.**   And that number is 2,000?

11   **A.**   Yes.

12   **Q.**   In your experience, is that a high number or a low

13   number for oxycodone purchases in a month?

14   **A.**   That's a low number.

15   **Q.**   Down below there's a question B.  It says, "If any of

16   the above is greater than 5,000 dose units, please provide

17   information."

18       Were any of those numbers above 5,000 for this

19   particular pharmacy in 2013?

20   **A.**   No.

21   **Q.**   Thank you, Mr. Ashworth.  If you could -- you can put

22   that aside.  I think what you said earlier was that Dave

23   Gustin was the Director of Regulatory Affairs for the

24   region; is that right?

25   **A.**   Yes, correct.

**Q.**   And did he ever visit Custom Script?

**A.**   Yes, he did.

**Q.**   And I think you said that was in 2013?

**A.**   Yes.

**Q.**   Do you know if he did any other visits?

**A.**   I believe he did, yes.  Dave -- he lived on the road.
He was always visiting -- frequently visiting pharmacies.
Sometimes I would call and set up an appointment and be
there with him, and sometimes he would just show up
unannounced.

**Q.**   That's what I wanted to ask you about.  Mr. Kennedy
asked you to try and remember all the visits he may have
taken.  Did Mr. Gustin tell you every time he would visit
one of your customers?

**A.**   No.

**Q.**   Did you ever show up with a customer and find out that
Mr. Gustin was there?

**A.**   Yeah.  I've pulled up in a parking lot and he's in the
parking lot making observations about, you know, what kind
of traffic is coming into the pharmacy and what kind of
patients are coming into the pharmacy.

**Q.**   Okay.

          MR. STANNER:  I just have a couple more questions,
Judge.

          THE COURT:  Okay.

1    BY MR. STANNER:

2    **Q.**   On the first questionnaire that we looked at when

3    we were looking through the customer base, there was a

4    reference to a Dr. Fisher.  Do you know a Dr. Fisher?

5    **A.**   I do now.

6    **Q.**   Okay.  Did Dr. Fisher run into some -- did he get into

7    trouble with the law at any point?

8    **A.**   I only know what I read in the paper and he lost his

9    license.

10   **Q.**   Okay.  When -- do you know about when that was?

11   **A.**   I don't, I don't recall.

12   **Q.**   Do you know if it was before or after his name was on

13   that 2010 questionnaire?

14   **A.**   It was, it was after.  It was well after this.

15   **Q.**   Okay.  Mr. Kennedy asked you a couple of questions

16   about rebate programs and pricing programs for different

17   drugs.  Do you remember those questions?

18   **A.**   Yes.

19   **Q.**   And does McKesson advertise pricing programs just for

20   opioids -- or rebate programs just for opioids or, or

21   something else?

22   **A.**   No.  It's for the full line, the total book of

23   business.  The incentive is to get all the business, not

24   just any particular class of drugs.

25   **Q.**   You were asked some questions about threshold warnings,

1    Mr. Ashworth, and Level Is.  On the Level I forms, after you

2    filled out a Level I, did that mean that a customer would

3    get an increase in their opioids?

4    **A.**    No, it did not.

5    **Q.**    Did you approve them?

6    **A.**    No.

7    **Q.**    If a customer asked for an increase, what would happen

8    next?

9    **A.**    It would trigger the process of getting, number one,

10   updating the questionnaire if it needed to be updated.

11        Number two, requesting a 90-day dispense report for

12   regulatory to review.

13        And then the third piece of information, the actual

14   TCR, that's where I would ask what, what item they want,

15   they're requesting an increase on.  And below that, I would

16   have to document the reason that they're asking for the

17   increase.

18   **Q.**    Okay.  My last question for you, Mr. Ashworth, if you

19   were to advertise price discounts or rebates to a

20   pharmacist, is the pharmacist going to buy more opioids than

21   they need for the prescription?

22   **A.**    No.  They, they buy -- they basically replenish the

23   stock that, from prescriptions they're filling that they get

24   from the physicians.  And, you know, most independents or

25   any pharmacy business wants to keep a low inventory.  So

1    they're only ordering what they're seeing prescriptions for.

2    **Q.**    Thank you so much for your time, Mr. Ashworth.

3           THE COURT:  Mr. Kennedy, do you have anything

4    else?

5           MR. KENNEDY:  Your Honor, I have three minutes.

6           THE COURT:  Okay.  I'm starting the clock right

7    now.

8           MR. KENNEDY:  Four minutes.

9                    REDIRECT EXAMINATION

10   BY MR. KENNEDY:

11   **Q.**    Sir, I just want to talk about Custom Script for a

12   second.  You talked about the controlled substance to

13   non-controlled substance ratio.  Do you remember that?

14   **A.**    Yes.

15   **Q.**    Sir, anything even approaching 50 percent is high in

16   your experience; correct?

17   **A.**    I wouldn't make that, that statement because it depends

18   on other factors; what kind of business -- you know, is it a

19   compounding business.  There's a lot of other variables that

20   regulatory would review.  So I wouldn't be able to make a

21   statement that any percentage is the right percentage or the

22   wrong percentage.

23   **Q.**    Can you give me Page 97 of the 6/26 deposition, please.

24          Question:  "Okay.  Do you have some understanding as to

25   what ratios you want to see per customer?"

1        You said, "70/30 might raise your radar, so to speak."

2        "What's the limit of controls and non-controls that

3    generally seems acceptable when a customer is reporting to

4    you?"

5        "I don't know."

6        Question:  "50/50?"

7        Next question, next page, please.  "I would think that

8    would be high."

9        Was that your testimony, sir?

10   **A.**   I don't remember it, but I see it here.

11   **Q.**   Do you realize that Custom Script controls to

12   non-controls ratio was over 90 percent?  Did you know that?

13   **A.**   That's what I found out in our prep.

14   **Q.**   And, sir, two of the four customers that they listed on

15   the threshold change request, two of the four were pain

16   clinics, were they not?

17   **A.**   Yes.

18   **Q.**   And one of those, one of those doctors was Dr. Fisher.

19   And you know today he got in trouble and he lost his license

20   from the osteopathic board; correct?

21   **A.**   Yes.

22   **Q.**   And on the questionnaire that was brought to your

23   attention, Dr. Deleno Webb was on that questionnaire, was he

24   not, sir?

25   **A.**   Yes.

1   **Q.**   And you understand that Dr. Deleno Webb lost his

2   privileges with the Board of Workers' Compensation because

3   he was prescribing opioids as a psychiatrist.  You

4   understand that, sir?

5   **A.**   Yes.  And, of course, both of those were well after we

6   noted that on the form, I mean years later.

7   **Q.**   So Dr. Deleno Webb, he lost his privileges in 2005.

8   That was well before that form, sir, wasn't it?

9   **A.**   I'm sorry?

10  **Q.**   In 2005, sir, he lost his privileges with Workers'

11  Comp?

12          MR. STANNER:  Just assumes facts not in evidence,

13  Your Honor.

14  BY MR. KENNEDY:

15  **Q.**   Do you understand it was 2005?

16          THE COURT:  Overruled.  Let's get through this and

17  get it done.

18  BY MR. KENNEDY:

19  **Q.**   Sir, you also testified that Custom Script, in your

20  opinion, bought a low amount of oxycodone.  Do you

21  remember that?

22  **A.**   Yes.

23  **Q.**   Would you consider 160,000 units of oxycodone in one

24  year to be a low amount of oxycodone?

25  **A.**   If, if -- if you, if you take that down to the monthly

```
 1   average, no, that's just going to be over 10,000 doses a

 2   month.  That's, that's a high -- it's above average, but I

 3   wouldn't call that a high number.

 4   Q.   And your threshold was set at 30,500, was it not?

 5   A.   I don't, I don't know what the threshold was set at.

 6   That's not something -- that's a function of regulatory.

 7   Q.   Well, you looked at the Threshold Change Request.

 8   There were 23,500 and you asked for 7,000 more and it was

 9   granted, was it not?

10   A.   I don't recall if it was granted.

11   Q.   Do you recall that they breached their threshold two

12   dozen times in three months?

13   A.   I don't -- I'm not notified every time a pharmacy hits

14   a threshold.

15           MR. KENNEDY:  I have no further questions.  Thank

16   you, sir.

17           THE COURT:  All right.  Can Mr. Ashworth be

18   excused?

19           MR. KENNEDY:  He can, Your Honor.  I don't need

20   Mr. Ashworth.  I'm sorry.

21           THE COURT:  Mr. Ashworth, thank you very much.

22   You're free to go.  Thank you, sir.

23           MR. SCHMIDT:  Your Honor, just one recordkeeping

24   matter.  May I mark as McKesson Demonstrative 1, if you

25   could put it back up, the board that I created with Mr.
```

1    Oriente?

2         THE COURT:  Okay.  Oh, there it is.

3      All right.  If there's nothing further, I'll see

4    everybody at 9:00 in the morning.

5         (Trial recessed at 5:10 p.m.)

```
 1        CERTIFICATION:

 2                 I, Ayme A. Cochran, Official Court

 3     Reporter, and I, Lisa A. Cook, Official Court Reporter,

 4     certify that the foregoing is a correct transcript from

 5     the record of proceedings in the matter of The City of

 6     Huntington, et al., Plaintiffs vs. AmerisourceBergen

 7     Drug Corporation, et al., Defendants, Civil Action No.

 8     3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

 9     reported on May 25, 2021.

10

11            S\Ayme A. Cochran              s\Lisa A. Cook

12              Reporter                        Reporter

13        _

14

15            May 25, 2021

16              Date

17

18

19

20

21

22

23

24

25
```

## $

**$140,000** [2] - 203:1, 203:10
**$50,000** [2] - 203:1, 203:9
**$62,000** [2] - 203:5, 203:13

## '

**'05** [1] - 195:18
**'06** [1] - 182:21
**'08** [3] - 207:8, 215:14, 215:16
**'09** [2] - 178:24, 179:7
**'11** [1] - 242:8
**'13** [2] - 215:14, 215:16
**'97** [1] - 39:19

## 0

**0** [8] - 181:4, 181:10, 181:12, 184:8, 184:14, 184:17, 184:21
**00907** [2] - 2:5, 2:17

## 1

**1** [9] - 97:21, 152:14, 153:19, 169:20, 170:1, 170:14, 171:3, 181:16, 252:24
**1,000** [2] - 245:4, 245:5
**10** [12] - 43:8, 76:4, 103:5, 103:9, 103:11, 103:14, 112:11, 112:16, 112:20, 112:24, 152:8, 229:21
**10,000** [4] - 73:4, 73:9, 73:10, 252:1
**10-15** [1] - 189:10
**100** [1] - 211:8
**1001** [2] - 2:10, 4:6
**1022** [1] - 3:5
**106** [1] - 158:24
**10th** [3] - 29:10, 29:15, 50:9
**11** [6] - 59:19, 112:12, 112:21, 112:25, 148:17, 244:8
**115** [2] - 147:16, 154:4
**11:56** [1] - 125:3
**12** [5] - 43:5, 112:12, 112:13, 121:23,

170:3
**12-month** [3] - 103:4, 103:8, 103:21
**126** [1] - 3:5
**13** [6] - 113:9, 147:20, 154:4, 171:19, 171:20
**13,300** [1] - 146:14
**1300** [1] - 6:15
**1301.74** [2] - 50:22, 51:1
**1311** [2] - 2:4, 2:16
**13385** [1] - 229:15
**1353** [1] - 52:8
**14** [6] - 39:16, 39:17, 150:7, 150:10, 171:19, 171:20
**149** [1] - 19:14
**15** [5] - 43:5, 43:8, 107:17, 152:8, 170:9
**15-minute** [1] - 189:11
**150** [4] - 115:17, 177:20, 178:13, 178:25
**15910** [1] - 3:18
**15th** [1] - 39:6
**16** [5] - 40:6, 40:7, 40:22, 109:4, 181:18
**160,000** [1] - 251:23
**1600** [1] - 3:17
**17** [3] - 1:16, 8:16, 60:17
**1717** [2] - 6:6, 6:13
**17th** [4] - 134:10, 170:11, 170:15, 179:8
**18** [1] - 132:17
**185** [1] - 85:3
**19** [1] - 148:16
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1980** [1] - 50:9
**1988** [1] - 196:5
**1997** [1] - 39:7
**1st** [4] - 27:25, 123:8, 127:21, 128:2

## 2

**2** [15] - 39:6, 98:4, 112:21, 114:12, 114:13, 120:23, 128:6, 160:13, 168:15, 168:16, 169:17, 224:22, 224:24, 243:13, 243:14
**2,000** [1] - 245:10
**2,200** [2] - 184:10, 184:13

**20** [2] - 43:6, 152:9
**20-year** [1] - 43:8
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2003** [1] - 27:14
**2004** [4] - 8:14, 10:10, 27:25
**2005** [8] - 195:3, 197:9, 200:9, 201:20, 221:13, 251:7, 251:10, 251:15
**2006** [5] - 27:25, 34:23, 52:20, 53:19, 183:2
**2007** [8] - 10:10, 34:23, 54:6, 59:17, 207:1, 207:2, 208:25, 209:2
**2008** [64] - 9:9, 9:10, 20:3, 35:12, 35:17, 39:15, 53:25, 55:14, 57:4, 57:21, 59:1, 60:19, 62:19, 63:3, 64:14, 66:22, 82:7, 98:2, 98:11, 101:14, 101:22, 105:3, 109:10, 110:17, 113:20, 114:7, 126:10, 126:18, 131:23, 131:24, 138:7, 139:5, 139:7, 139:21, 140:18, 140:21, 160:19, 167:9, 177:11, 177:15, 178:23, 182:19, 183:24, 183:25, 184:5, 186:2, 207:6, 207:11, 209:3, 209:4, 210:24, 211:21, 211:23, 212:1, 215:2, 215:6, 217:3, 218:17, 220:6, 228:12, 233:5
**2009** [7] - 43:4, 123:8, 169:20, 170:1, 170:14, 178:10, 228:12
**2010** [13] - 32:8, 148:17, 198:4, 229:21, 234:6, 234:14, 236:1, 236:4, 237:10, 242:4, 242:8, 247:13
**2011** [20] - 32:8, 70:1, 105:3, 146:14, 146:16, 146:19,

156:13, 156:22, 157:19, 158:4, 165:10, 168:21, 171:4, 234:14, 236:1, 236:4, 241:8, 241:21, 242:4, 242:9
**2012** [7] - 29:10, 29:15, 32:8, 152:19, 192:20, 242:10
**2013** [34] - 35:13, 66:22, 69:9, 84:20, 121:23, 122:14, 122:18, 125:16, 125:25, 126:10, 126:18, 127:1, 127:21, 128:2, 174:20, 186:2, 187:5, 210:24, 215:2, 215:7, 215:11, 215:13, 219:3, 220:6, 220:8, 221:13, 234:6, 242:10, 243:18, 244:14, 245:19, 246:3
**2014** [7] - 19:4, 29:15, 99:14, 128:14, 130:13, 137:6, 183:2
**2015** [9] - 97:11, 97:16, 131:10, 136:22, 136:23, 202:23, 203:1, 203:9, 203:10
**2017** [18] - 119:8, 122:19, 168:24, 170:11, 170:14, 170:15, 171:7, 173:25, 174:17, 177:1, 178:9, 178:10, 178:15, 178:24, 179:5, 203:4, 203:7, 203:13
**2018** [2] - 134:10, 200:17
**2019** [4] - 37:6, 144:25, 145:1, 145:2
**202** [2] - 2:4, 2:16
**2020** [3] - 18:19, 29:20, 205:23
**2021** [5] - 1:19, 7:4, 18:20, 254:9, 254:15
**2022** [1] - 29:20
**2062** [1] - 29:8
**21** [3] - 50:21, 206:6
**21st** [1] - 157:19
**22** [4] - 161:4, 161:5, 223:20, 223:22
**221** [1] - 217:13
**2216** [1] - 3:7
**222** [4] - 14:11, 57:24,

58:7, 58:14
**22nd** [1] - 18:19
**23,500** [1] - 252:8
**23rd** [1] - 186:2
**243** [1] - 134:3
**25** [7] - 1:19, 5:5, 7:4, 132:14, 241:2, 254:9, 254:15
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26** [10] - 132:15, 223:9, 223:11, 226:1, 226:2, 226:3, 226:6, 227:7, 227:10, 228:3
**27** [3] - 52:20, 54:6, 181:4
**27,000** [1] - 104:13
**27th** [1] - 52:14
**28** [7] - 3:15, 4:3, 4:9, 13:3, 69:4, 69:6, 69:7
**28152** [3] - 222:14, 224:6, 226:1
**28th** [6] - 155:22, 156:13, 156:22, 158:4, 168:21, 171:4
**29464** [3] - 3:15, 4:4, 4:9
**2:00** [2] - 124:25, 125:1
**2nd** [2] - 114:7, 177:15, 178:23

## 3

**3** [12] - 28:3, 80:21, 87:4, 98:7, 114:25, 122:25, 169:2, 170:22, 186:14, 243:14
**30** [4] - 29:11, 196:6, 196:9, 198:22
**30,500** [1] - 252:4
**300** [2] - 146:18, 146:20
**30th** [1] - 18:20
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**31st** [5] - 27:14, 27:25, 69:25, 110:17, 186:2
**32502** [1] - 2:14
**381** [1] - 82:16
**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 254:8
**3:17-cv-01665** [2] - 1:11, 254:8

**3:44** [1] - 189:13

## 4

**4** [8] - 98:24, 127:25, 128:19, 131:15, 153:1, 169:10, 174:3, 174:7
**401** [2] - 2:10, 4:6
**405** [1] - 2:7
**41** [1] - 132:21
**42814** [2] - 155:10, 158:8
**46** [3] - 40:18, 41:3, 46:20
**47** [1] - 42:4
**48** [1] - 45:5

## 5

**5** [6] - 80:5, 87:25, 115:7, 128:19, 174:15
**5,000** [4] - 73:5, 181:15, 245:16, 245:18
**50** [1] - 249:15
**50/50** [1] - 250:6
**55** [7] - 38:14, 38:17, 39:18, 51:6, 51:19, 59:12, 206:5
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**5:10** [1] - 253:5

## 6

**6** [18] - 34:20, 34:23, 73:18, 88:4, 99:22, 99:23, 111:7, 114:24, 115:11, 115:12, 128:22, 132:5, 151:1, 151:2, 177:19, 183:25, 216:14, 217:8
**6/26** [1] - 249:23
**600** [1] - 2:13
**67** [1] - 120:23
**6th** [2] - 3:5, 101:14

## 7

**7** [11] - 29:18, 34:20, 34:23, 76:21, 77:12, 80:8, 88:14, 102:15, 128:25, 153:18, 243:22
**7,000** [1] - 252:8
**7,500** [1] - 73:10

**7-2-20** [1] - 206:5
**7.2** [1] - 132:24
**70/30** [1] - 250:1
**70130** [1] - 3:8
**707** [1] - 4:18
**716** [1] - 3:12
**725** [2] - 4:13, 4:15
**76** [1] - 27:8

## 8

**8** [2] - 102:25, 180:12
**801** [1] - 3:10
**801(d)(2)(D** [1] - 230:12
**850** [1] - 5:12
**8th** [1] - 29:20

## 9

**9** [3] - 82:19, 111:14, 244:17
**90** [5] - 115:18, 142:18, 143:1, 177:22, 250:12
**90-day** [1] - 248:11
**901** [1] - 4:18
**91436** [1] - 3:18
**97** [1] - 249:23
**9:00** [2] - 7:4, 253:4
**9th** [4] - 2:10, 29:10, 29:15, 29:20

## A

**a.m** [2] - 7:4, 125:3
**ability** [12] - 13:19, 13:20, 14:16, 14:19, 14:21, 16:17, 31:22, 65:13, 193:9, 219:2, 219:3, 221:5
**able** [16] - 16:19, 19:14, 24:23, 25:3, 65:10, 65:17, 67:15, 69:19, 71:3, 148:25, 149:2, 189:17, 190:25, 221:4, 227:7, 249:20
**abnormal** [1] - 232:6
**absence** [1] - 95:15
**absolute** [1] - 143:22
**absolutely** [6] - 17:6, 34:8, 82:15, 90:9, 96:17, 202:11
**abused** [1] - 136:13
**acceptable** [4] - 31:14, 79:7, 79:9, 250:3
**acceptance** [4] - 169:18, 171:6,

179:11
**accepted** [3] - 51:12, 58:22, 179:14
**access** [12] - 12:16, 15:2, 30:10, 36:17, 36:18, 36:21, 36:25, 37:10, 37:15, 37:19, 144:21, 144:23
**accompanied** [1] - 164:13
**accomplishing** [1] - 50:21
**accordingly** [1] - 54:13
**account** [9] - 59:10, 85:15, 136:11, 136:12, 137:17, 138:14, 146:2, 184:11, 232:8
**accountability** [1] - 8:24
**Accounts** [1] - 106:5
**accounts** [14] - 70:13, 72:20, 106:10, 106:14, 107:16, 133:25, 137:1, 137:3, 137:7, 137:9, 165:17, 165:21, 216:25, 233:24
**accurate** [8] - 14:10, 56:7, 87:20, 89:9, 90:5, 171:9, 184:8, 219:15
**accurately** [2] - 14:13, 185:14
**accustomed** [1] - 228:13
**ACKERMAN** [24] - 2:9, 21:21, 26:8, 26:11, 26:16, 27:2, 28:24, 29:2, 45:25, 52:3, 71:9, 71:25, 111:20, 120:2, 120:11, 120:17, 121:15, 138:19, 157:8, 159:2, 159:12, 159:14, 163:10, 236:13
**Ackerman** [2] - 29:5, 121:14
**acknowledges** [3] - 123:3, 123:7, 169:19
**acknowledging** [1] - 124:9
**acronym** [1] - 134:18
**act** [2] - 37:9, 53:15
**Act** [1] - 167:1
**action** [17] - 9:21, 87:2, 87:16, 91:4, 91:21, 135:9,

149:17, 149:19, 149:20, 149:21, 149:22, 149:23, 150:1, 150:4
**Action** [4] - 1:4, 1:10, 254:7, 254:8
**actions** [1] - 91:17
**activity** [2] - 89:16, 95:11
**actual** [5] - 121:12, 144:1, 148:10, 153:24, 248:13
**adapted** [1] - 84:13
**add** [1] - 69:6
**added** [4] - 69:8, 98:21, 167:10, 209:18
**addition** [6] - 31:16, 83:20, 121:11, 148:18, 161:21, 201:25
**additional** [14] - 29:11, 67:13, 74:12, 87:6, 88:24, 96:23, 129:14, 130:6, 132:1, 132:3, 142:7, 143:6, 145:9, 174:21
**address** [4] - 71:21, 150:4, 156:25, 157:2
**addressed** [2] - 163:5, 163:17
**addressing** [2] - 150:5, 163:9
**adjusted** [1] - 191:1
**adjustments** [3] - 135:23, 160:11, 200:23
**Administration** [2] - 25:19, 52:21
**administrative** [4] - 121:24, 174:8, 174:16, 174:22
**admissible** [4] - 187:1, 187:21, 187:25, 224:12
**admission** [4] - 113:22, 114:14, 114:21, 119:11
**admit** [6] - 27:9, 27:10, 157:12, 158:24, 188:1, 188:10
**admitted** [30] - 17:14, 19:11, 29:5, 39:3, 57:8, 60:11, 85:3, 102:2, 110:24, 121:16, 131:1, 134:5, 147:17, 159:5, 159:7, 159:8, 168:24, 182:1,

188:11, 190:8, 190:21, 191:2, 216:3, 217:3, 230:21, 236:12, 236:14, 238:24, 238:25
**admitting** [1] - 188:1
**adopt** [1] - 24:23
**adopted** [2] - 62:19, 100:22
**advertise** [2] - 247:19, 248:19
**affairs** [1] - 80:6
**Affairs** [30] - 9:20, 20:1, 20:2, 20:5, 20:13, 20:22, 21:2, 27:14, 28:8, 36:16, 50:9, 50:16, 129:6, 129:7, 129:15, 132:11, 212:17, 213:9, 214:23, 215:4, 215:9, 215:14, 221:7, 221:18, 228:5, 229:11, 229:12, 230:2, 245:23
**affect** [1] - 33:4
**affects** [1] - 16:16
**affiliation** [1] - 18:14
**afternoon** [5] - 168:1, 168:2, 171:17, 231:19, 231:20
**agent** [2] - 156:18, 161:22
**Agent** [1] - 157:22
**agents** [1] - 51:20
**aggressively** [2] - 237:19, 240:5
**AGI** [4] - 135:10, 135:13, 135:15, 136:21
**ago** [5] - 132:10, 152:9, 158:1, 163:4, 168:11
**agree** [12] - 15:9, 203:16, 204:17, 205:10, 205:14, 205:17, 206:19, 209:23, 210:8, 213:12, 219:7, 229:14
**agreed** [2] - 210:17, 210:18
**Agreement** [4] - 160:19, 171:7, 173:25, 174:17
**agreement** [27] - 113:21, 114:14, 114:21, 115:18, 115:19, 116:1,

119:24, 121:12, 121:18, 122:9, 123:9, 160:17, 169:3, 169:12, 169:21, 170:2, 170:5, 170:14, 170:16, 176:8, 177:1, 177:21, 177:22, 179:7, 190:1, 193:13
**agreements** [1] - 189:18
**ahead** [18] - 33:16, 40:6, 40:16, 53:8, 60:13, 113:25, 119:3, 119:17, 131:4, 132:17, 132:21, 144:11, 159:17, 170:24, 182:3, 187:14, 188:23, 227:13
**Aid** [24] - 105:2, 105:4, 105:7, 137:2, 139:7, 140:11, 140:12, 140:14, 140:16, 140:20, 141:2, 141:13, 141:16, 141:17, 141:22, 142:1, 142:5, 142:7, 146:7, 181:1, 183:5, 185:19, 195:8, 233:21
**aid** [2] - 89:2, 90:23
**Aids** [11] - 104:12, 105:10, 106:20, 181:9, 182:11, 182:12, 182:20, 183:17, 184:10, 184:16, 185:18
**AIW** [1] - 174:21
**al** [4] - 1:7, 1:13, 254:6, 254:7
**alarm** [1] - 160:5
**alarmed** [1] - 21:23
**alert** [3] - 95:12, 108:12, 111:18
**Alert** [1] - 107:24
**allegation** [1] - 168:16
**allegations** [7] - 114:15, 114:16, 114:22, 169:14, 171:6, 179:10, 180:2
**alleged** [1] - 169:4
**allow** [1] - 33:13
**allowed** [2] - 72:22, 144:4
**almost** [2] - 178:13, 187:6
**alone** [1] - 96:6
**Alpha** [1] - 133:7

**Alprazolam** [3] - 104:20, 104:21, 181:4
**AmerisourceBergen** [2] - 6:2, 254:6
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**amount** [20] - 25:10, 31:18, 31:24, 62:5, 62:8, 62:10, 62:11, 62:12, 71:18, 72:21, 72:22, 73:24, 143:19, 145:3, 203:12, 214:2, 217:9, 242:1, 251:20, 251:24
**amounts** [4] - 36:1, 182:21, 238:23, 242:2
**analog** [1] - 141:11
**analogs** [1] - 141:5
**analysis** [1] - 129:4
**Analysis** [4] - 135:1, 135:3, 135:4, 135:6
**analytics** [1] - 135:6
**analyze** [1] - 206:15
**ANDREW** [1] - 5:10
**Andrew** [1] - 193:24
**Ann** [1] - 193:12
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**annually** [1] - 13:23
**answer** [13] - 183:21, 188:19, 200:21, 202:13, 202:15, 203:20, 205:2, 206:10, 206:17, 211:24, 213:11, 220:19, 228:18
**answered** [6] - 175:14, 203:18, 210:25, 211:5, 212:15, 226:1
**answering** [1] - 180:8
**answers** [4] - 93:14, 176:3, 188:23, 210:20
**ANTHONY** [1] - 2:6
**Anti** [1] - 192:19
**Anti-Diversion** [1] - 192:19
**antibacteria** [1] - 10:21
**anticipates** [1] - 241:2
**anytime** [3] - 51:20, 51:21, 126:16
**anyway** [1] - 218:13
**apologies** [1] - 17:17
**apologize** [2] - 60:6, 173:2

**Apparent** [1] - 97:21
**appear** [3] - 50:19, 89:23, 113:3
**appearance** [1] - 192:24
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appeared** [1] - 126:6
**appearing** [1] - 244:14
**appendices** [3] - 119:16, 119:25, 121:12
**Appendix** [6] - 120:3, 120:13, 120:14, 120:25, 121:5, 244:9
**applied** [1] - 134:13
**apply** [1] - 63:20
**appointment** [1] - 246:8
**appreciate** [3] - 164:21, 192:1, 239:4
**approach** [32] - 17:3, 18:25, 21:12, 24:24, 26:2, 28:12, 38:2, 56:22, 60:3, 84:15, 97:2, 101:7, 106:9, 106:21, 107:7, 110:10, 111:10, 114:1, 119:19, 139:15, 147:11, 152:13, 162:2, 162:18, 165:4, 174:4, 216:5, 222:15, 229:16, 236:7, 242:15
**approaching** [7] - 107:24, 108:12, 111:18, 218:18, 218:25, 220:24, 249:15
**appropriate** [4] - 50:19, 53:16, 63:17, 102:13
**appropriately** [1] - 25:25
**approval** [6] - 22:3, 54:17, 55:5, 210:12, 212:23
**approve** [7] - 54:13, 210:7, 239:19, 239:22, 239:24, 239:25, 248:5
**approved** [8] - 22:12, 22:15, 51:17, 68:6, 210:3, 213:3, 240:3
**approves** [2] - 54:19, 55:7
**approving** [1] - 75:18
**April** [1] - 27:25,

134:10
**Arch** [2] - 6:6, 6:13
**ARCOS** [20] - 35:19, 35:20, 35:22, 36:13, 36:18, 36:19, 36:25, 37:6, 40:11, 40:12, 40:16, 41:18, 41:21, 41:23, 42:1, 124:13, 144:25, 183:1, 183:16, 183:19
**area** [10] - 72:10, 99:6, 136:12, 186:5, 197:4, 216:25, 233:14, 240:17, 240:24
**areas** [5] - 23:16, 135:16, 173:8, 173:20, 231:7
**arguing** [1] - 184:23
**argument** [1] - 176:11
**argumentative** [1] - 213:10
**arise** [5] - 16:14, 16:15, 46:8, 46:13, 59:9
**arising** [1] - 187:17
**Arora** [4] - 125:15, 174:7, 175:18, 175:25
**arrow** [1] - 30:13
**articles** [2] - 91:8, 91:9
**ASHLEY** [1] - 5:3
**Ashworth** [32] - 193:20, 194:1, 194:3, 194:15, 194:18, 202:16, 205:1, 223:9, 223:10, 223:11, 225:2, 228:5, 229:23, 231:19, 232:10, 235:21, 236:16, 238:14, 241:4, 242:25, 243:2, 243:4, 243:11, 243:16, 243:23, 245:21, 248:1, 248:18, 249:2, 252:17, 252:20, 252:21
**ASHWORTH** [1] - 194:5
**Ashworth's** [1] - 222:25
**aside** [1] - 245:22
**aspect** [1] - 143:6
**aspects** [1] - 81:23
**assess** [1] - 108:13
**assessment** [1] - 90:5
**assign** [1] - 153:7

**assigned** [3] - 106:18, 136:15, 137:7
**assist** [2] - 68:25, 100:6
**associated** [1] - 151:10
**assumes** [1] - 251:12
**assuming** [1] - 163:22
**AT** [1] - 1:2
**attached** [3] - 70:18, 121:3, 128:1
**attaching** [1] - 119:25
**attachments** [1] - 120:14
**attempt** [1] - 77:19
**attempted** [4] - 62:11, 74:19, 77:8, 130:5
**attempting** [2] - 133:9, 133:10
**Attendees** [1] - 101:16
**attendees** [1] - 101:17
**attention** [5] - 45:9, 73:17, 96:4, 164:21, 250:23
**attesting** [1] - 89:8
**Attorney** [1] - 129:22
**audit** [22] - 14:3, 15:8, 126:25, 147:6, 147:16, 150:24, 151:8, 152:12, 152:18, 152:23, 153:5, 159:1, 168:9, 171:5, 171:17, 171:18, 172:18, 172:24, 173:7, 173:19, 173:22, 179:2
**Audit** [3] - 146:25, 148:25, 173:22
**auditor** [1] - 173:1
**audits** [8] - 13:25, 14:14, 14:25, 15:7, 51:20, 146:22, 147:1, 147:8
**August** [6] - 29:10, 29:15, 29:20, 69:25, 122:1, 122:2, 122:3, 122:4
**authentic** [1] - 187:19
**authenticity** [1] - 187:20
**Automated** [1] - 40:10
**automatic** [1] - 135:21
**automatically** [2] - 62:12, 133:2
**automation** [1] - 10:15
**availability** [2] - 37:6, 37:8
**available** [9] - 36:20,

51:19, 51:22, 68:20, 91:9, 118:15, 145:1, 145:12, 234:12
**average** [24] - 23:14, 23:15, 44:7, 44:8, 63:22, 63:24, 104:13, 141:1, 146:14, 146:18, 181:3, 181:10, 181:11, 181:12, 181:15, 182:12, 184:8, 184:17, 184:18, 184:21, 252:1, 252:2
**averaging** [1] - 184:6
**avert** [1] - 16:18
**Avin** [1] - 3:7
**avoid** [1] - 29:23
**award** [1] - 27:23
**aware** [11] - 10:2, 25:15, 36:24, 89:25, 118:22, 130:12, 174:14, 188:16, 189:1, 199:17, 225:18
**awareness** [2] - 32:9, 32:14
**Ayme** [2] - 6:17, 254:2

## B

**back-up** [1] - 85:18
**background** [8] - 9:3, 21:9, 87:9, 87:14, 91:7, 128:20, 129:18, 129:20
**backgrounds** [1] - 129:24
**backup** [2] - 146:7, 146:11
**badge** [1] - 12:17
**bank** [1] - 11:19
**Baron** [1] - 3:17
**barring** [1] - 179:24
**base** [12] - 27:24, 62:6, 75:14, 79:16, 136:13, 136:14, 201:18, 201:25, 203:1, 203:9, 238:21, 247:3
**based** [16] - 34:12, 51:17, 90:10, 95:15, 104:3, 106:21, 123:12, 130:2, 153:5, 161:1, 176:2, 183:1, 183:16, 188:6, 218:6, 218:7
**Based** [1] - 208:20
**basic** [1] - 202:8
**basing** [1] - 103:20

**basis** [13] - 20:9, 38:1, 44:11, 44:16, 44:22, 44:23, 45:4, 49:6, 113:23, 119:13, 135:15, 174:17, 184:18
**Baylen** [1] - 2:13
**became** [3] - 20:2, 99:19, 108:21
**become** [3] - 170:5, 210:2, 210:17
**becomes** [3] - 198:12, 213:1, 213:6
**BEFORE** [1] - 1:17
**began** [3] - 207:1, 209:1, 209:4
**beginning** [7] - 49:8, 160:7, 179:17, 202:4, 217:19, 219:6, 228:15
**behalf** [2] - 128:7, 193:24
**behind** [2] - 10:24, 94:13
**below** [14] - 39:19, 73:14, 86:4, 89:4, 158:19, 217:12, 237:1, 237:15, 241:1, 244:1, 245:1, 245:8, 245:15, 248:15
**BENCH** [1] - 1:16
**benchmark** [1] - 100:8
**beside** [1] - 158:10
**best** [4] - 44:23, 72:4, 231:3, 243:3
**better** [4] - 24:23, 45:1, 57:19, 231:6
**Between** [2] - 105:24, 215:2
**between** [19] - 22:1, 23:9, 30:13, 35:12, 47:2, 48:4, 51:1, 64:12, 70:14, 71:17, 72:21, 73:5, 114:7, 125:23, 126:10, 174:20, 179:17, 210:23, 215:16
**beyond** [5] - 175:12, 176:19, 221:3, 227:21
**big** [5] - 11:19, 17:23, 29:24, 38:5, 238:12
**bigger** [1] - 200:4
**biggest** [2] - 27:7, 140:8
**bit** [20] - 33:14, 58:2, 69:9, 77:20, 82:11, 84:1, 89:4, 126:15, 129:18, 134:14,

144:4, 145:18, 155:17, 155:21, 157:17, 206:25, 235:25, 236:3, 242:22
**Blaine** [1] - 149:24
**blatantly** [1] - 144:5
**block** [11] - 45:24, 46:11, 48:10, 55:19, 74:2, 74:16, 109:15, 109:18, 111:15, 124:5, 186:16
**blocked** [38] - 9:10, 48:12, 62:12, 62:14, 62:15, 62:17, 73:25, 74:9, 74:13, 74:25, 77:10, 77:16, 77:23, 77:25, 79:17, 79:18, 81:13, 90:20, 90:21, 90:25, 92:18, 92:19, 110:3, 112:17, 112:18, 124:4, 130:4, 133:14, 148:24, 149:6, 155:7, 166:15, 185:22, 186:6, 188:25, 217:10
**Blocking** [1] - 107:18
**blocking** [38] - 9:5, 9:6, 9:8, 45:19, 52:1, 55:15, 55:16, 55:17, 58:18, 62:23, 63:1, 63:3, 64:16, 66:23, 74:10, 77:22, 81:2, 81:7, 81:17, 100:23, 102:22, 107:15, 108:15, 118:5, 124:1, 126:2, 126:4, 126:5, 126:6, 130:3, 131:18, 151:24, 154:15, 154:17, 154:22
**blocks** [1] - 107:21
**blood** [1] - 10:23
**blow** [3] - 132:7, 153:18, 157:17
**Blvd** [3] - 3:15, 4:3, 4:9
**Board** [3] - 18:3, 187:17, 251:2
**board** [16] - 21:12, 21:23, 30:8, 35:6, 48:16, 69:23, 82:9, 90:12, 105:19, 125:14, 131:5, 133:13, 153:6, 209:21, 250:20, 252:25
**boarded** [1] - 90:19
**Boarding** [1] - 82:21

**boarding** [9] - 82:24, 82:25, 83:3, 90:7, 105:18, 209:6, 209:7, 210:12, 211:1
**body** [1] - 187:16
**Bonasso** [1] - 5:14
**bonus** [6] - 201:25, 202:18, 202:20, 203:24, 204:2, 212:24
**bonuses** [3] - 202:5, 203:10, 203:17
**book** [1] - 247:22
**border** [1] - 197:3
**boss** [1] - 57:17
**bottom** [22] - 42:5, 44:3, 45:5, 49:24, 60:18, 73:20, 99:13, 114:13, 128:6, 131:10, 132:7, 147:21, 149:18, 163:1, 216:14, 216:17, 217:7, 229:19, 229:24, 230:7, 230:17, 240:6
**bought** [1] - 251:20
**Boulevard** [1] - 3:18
**boundaries** [1] - 223:15
**Box** [3] - 5:14, 6:8, 136:3
**brand** [3] - 83:7, 83:15, 199:24
**breached** [1] - 252:11
**break** [8] - 26:14, 66:11, 120:6, 122:23, 122:24, 125:16, 175:6, 189:11
**Bridgeside** [3] - 3:15, 4:3, 4:9
**brief** [2] - 168:3, 220:8
**briefly** [1] - 113:24
**bring** [7] - 15:8, 73:9, 82:25, 192:4, 204:1, 216:1, 216:2
**bringing** [1] - 64:15
**Brochures** [1] - 209:12
**broke** [1] - 66:21
**brought** [4] - 91:22, 129:19, 175:22, 250:22
**Bruce** [1] - 57:12
**Budd** [1] - 3:17
**Buffalo** [1] - 57:22
**buffer** [3] - 103:14, 103:17, 104:3
**buffers** [1] - 103:12
**build** [1] - 209:16

**building** [3] - 10:13, 20:17, 23:23
**bulk** [4] - 234:25, 235:1, 235:2, 244:4
**bullet** [7] - 61:8, 61:20, 61:22, 106:24, 113:5, 129:12, 154:5
**bullets** [2] - 61:4, 106:7
**bump** [1] - 67:24
**bungled** [1] - 112:23
**Burling** [1] - 5:11
**Business** [1] - 87:25
**business** [34] - 16:1, 64:2, 75:16, 83:1, 87:13, 88:2, 88:13, 88:21, 91:17, 95:2, 95:8, 135:22, 135:23, 143:5, 143:11, 164:13, 199:4, 199:5, 199:8, 203:23, 209:9, 231:7, 235:25, 236:3, 237:20, 237:24, 240:16, 241:15, 241:18, 247:23, 248:25, 249:18, 249:19
**busy** [4] - 67:13, 67:17, 67:20, 232:11
**buy** [5] - 72:22, 212:4, 234:18, 248:20, 248:22
**BY** [106] - 7:20, 17:7, 17:21, 19:1, 19:12, 21:15, 21:25, 26:18, 27:12, 28:14, 29:6, 30:7, 33:20, 35:9, 38:12, 39:4, 41:2, 46:6, 52:11, 53:11, 57:1, 57:10, 60:12, 61:6, 66:20, 71:13, 72:7, 72:18, 75:4, 82:20, 84:18, 85:5, 97:7, 101:10, 102:3, 110:13, 110:25, 112:1, 112:9, 114:3, 119:2, 121:17, 125:12, 131:7, 134:6, 138:23, 139:1, 139:18, 143:25, 144:14, 145:16, 147:15, 152:17, 155:13, 156:11, 157:14, 159:19, 162:6, 162:22, 163:14, 165:8, 167:25, 171:1, 171:15,

173:5, 173:18,
174:6, 176:20,
177:14, 178:21,
180:6, 182:9,
182:18, 183:15,
184:2, 185:1, 189:2,
189:23, 194:14,
201:16, 202:19,
203:22, 204:11,
205:6, 208:5,
208:19, 211:20,
213:13, 216:8,
218:15, 220:5,
221:2, 224:14,
224:23, 227:14,
229:18, 230:22,
231:18, 236:15,
239:5, 243:9,
243:15, 247:1,
249:10, 251:14,
251:18

## C

**CA** [1] - 3:18
**Cab** [1] - 237:18
**Cabell** [34] - 3:2, 10:1,
15:17, 27:7, 148:4,
177:7, 182:11,
183:18, 184:11,
185:7, 186:3, 186:4,
186:17, 197:5,
197:6, 197:8,
197:11, 197:14,
197:16, 198:2,
198:5, 205:24,
210:24, 215:4,
215:15, 222:11,
222:12, 223:2,
223:16, 223:17,
230:2, 230:17,
233:18, 237:20
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell-Huntington** [2]
- 27:7, 237:20
**Cabinet** [1] - 236:24
**cage** [7] - 10:17,
11:23, 11:25, 12:2,
12:14, 12:16
**calculated** [3] - 64:2,
181:15, 184:14
**CALLAS** [1] - 6:7
**cameras** [2] - 12:14,
12:15
**Cameron** [3] - 192:15,
192:18, 193:2
**CAMPBELL** [1] - 6:14
**cancer** [2] - 239:8
**Capitol** [1] - 2:7

**car** [1] - 201:23
**Cardinal** [2] - 4:11, 5:2
**Cardinal's** [2] -
192:13, 192:19
**cards** [2] - 94:12,
234:15
**CARE** [1] - 8:23
**career** [4] - 8:19,
20:14, 20:19, 167:2
**careful** [1] - 72:13
**Carey** [1] - 4:17
**carry** [3] - 234:20,
234:25, 235:6
**case** [16] - 9:24, 25:22,
71:7, 73:9, 83:1,
125:6, 149:24,
192:14, 192:15,
192:25, 193:2,
193:9, 193:11,
193:15, 205:23,
239:16
**cases** [2] - 201:6,
210:22
**cash** [3] - 89:3, 89:19,
94:16
**catch** [1] - 56:19
**causing** [1] - 88:25
**cc** [2] - 70:2, 156:24
**ceased** [1] - 62:18
**cement** [1] - 11:18
**Center** [11] - 3:12,
5:11, 15:16, 15:19,
18:12, 18:21, 19:17,
149:24, 149:25,
171:25, 174:25
**center** [45] - 9:11,
10:6, 10:11, 10:13,
11:8, 11:13, 12:10,
13:5, 13:7, 15:17,
16:5, 16:17, 16:20,
16:21, 17:1, 18:10,
18:15, 19:15, 19:24,
20:12, 20:20, 23:25,
25:24, 43:17, 43:18,
43:19, 43:20, 48:2,
68:17, 68:18, 68:19,
68:25, 69:5, 74:5,
76:13, 77:17, 77:18,
79:24, 112:6,
146:25, 177:6,
217:22, 220:16,
226:22, 232:7
**Centers** [4] - 16:12,
51:13, 99:15, 174:24
**centers** [23] - 10:20,
13:1, 13:21, 14:1,
15:13, 16:2, 16:8,
17:9, 20:9, 69:2,
115:22, 117:11,
117:15, 118:9,

122:2, 147:25,
151:9, 154:7,
169:12, 175:1,
175:9, 176:6, 176:23
**certain** [18] - 43:21,
73:12, 75:1, 93:17,
123:11, 123:18,
123:19, 134:11,
151:11, 169:22,
169:23, 222:3,
229:1, 229:4, 232:8,
244:19
**certainly** [2] - 168:6,
193:8
**certificates** [1] -
176:21
**CERTIFICATION** [1] -
254:1
**certify** [1] - 254:4
**cetera** [3] - 88:6,
178:3, 195:8
**Chad** [4] - 240:7,
240:11, 241:1
**Chain** [1] - 192:18
**chain** [14] - 21:10,
30:9, 104:12, 107:3,
138:3, 138:12,
138:17, 139:4,
139:10, 139:20,
163:3, 165:10,
181:1, 185:20
**chained** [1] - 182:14
**chains** [2] - 106:1,
106:9, 107:7,
111:12, 134:13,
134:17, 134:22,
137:18, 137:21,
139:2, 145:19, 195:7
**challenges** [1] - 63:5
**challenging** [3] -
48:25, 49:13, 64:23
**chance** [8] - 19:5,
51:23, 52:25, 140:1,
190:17, 193:23,
222:23, 233:2
**change** [35] - 33:5,
33:9, 33:22, 54:1,
55:10, 55:24, 59:9,
66:7, 75:6, 75:8,
75:10, 95:10, 127:9,
127:11, 127:12,
127:14, 129:4,
138:17, 150:8,
150:12, 150:19,
163:9, 171:21,
172:8, 172:9,
172:11, 193:4,
219:17, 237:2,
237:3, 237:4, 237:9,
237:16, 250:15

**Change** [7] - 67:21,
75:12, 108:14,
166:13, 236:18,
239:25, 252:7
**changed** [15] - 34:13,
34:22, 34:25, 47:11,
55:22, 55:23, 75:16,
84:12, 98:13, 167:8,
197:25, 236:24,
243:19, 243:20
**changes** [24] - 59:8,
75:19, 75:24, 75:25,
95:8, 101:1, 106:24,
122:11, 122:14,
122:19, 122:21,
125:14, 125:18,
125:20, 125:24,
127:1, 129:8,
129:12, 130:11,
132:9, 160:11,
167:6, 215:13
**changing** [5] - 49:21,
55:8, 55:9, 83:18,
131:25
**characterization** [2] -
171:8, 171:9
**characterize** [3] -
100:17, 125:24,
159:22
**characterized** [1] -
173:19
**charge** [2] - 87:1,
240:8
**Charge** [3] - 47:21,
137:16, 157:22
**CHARLES** [1] - 3:11
**CHARLESTON** [2] -
1:2, 1:18
**Charleston** [10] - 2:8,
3:13, 4:19, 5:15, 6:9,
7:3, 233:3, 233:4,
233:12
**chart** [2] - 132:7,
183:16
**Chase** [1] - 4:18
**check** [4] - 14:13,
147:5, 190:14, 226:7
**checker** [1] - 147:5
**checking** [1] - 87:18
**checks** [2] - 87:9,
87:14
**Chesterbrook** [1] -
6:15
**chief** [1] - 193:15
**Chris** [1] - 243:14
**Clls** [1] - 105:6
**circumstances** [1] -
39:10
**cite** [1] - 210:23
**cited** [1] - 123:15

**cities** [1] - 23:16
**City** [3] - 4:1, 5:11,
254:5
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 254:7,
254:8
**civil** [1] - 1:10
**Clarksburg** [2] -
196:21, 196:23
**class** [1] - 247:24
**clear** [8] - 34:17,
55:18, 104:2, 106:8,
109:14, 118:12,
124:24, 173:15
**clearly** [1] - 113:12
**CLERK** [4] - 17:19,
194:1, 194:4, 194:6
**client** [1] - 229:7
**clientele** [1] - 93:6
**clinic** [5] - 237:21,
237:25, 238:5,
238:11, 239:7
**Clinic** [1] - 238:3
**clinics** [3] - 88:5,
212:8, 250:16
**clock** [1] - 249:6
**close** [6] - 23:23,
23:25, 81:1, 219:11,
219:19, 229:2
**closed** [3] - 12:21,
31:17, 75:17
**closing** [1] - 48:2
**Cochran** [3] - 6:17,
254:2, 254:11
**code** [8] - 62:6, 75:14,
79:16, 132:24,
133:5, 133:6, 133:7
**Code** [1] - 50:21
**codes** [1] - 136:14
**colleagues** [6] - 26:9,
67:6, 69:14, 78:11,
79:11, 126:10
**collect** [2] - 68:20,
68:22
**collecting** [2] -
205:19, 206:12
**collection** [1] - 222:24
**college** [1] - 195:24
**Colorado** [3] - 122:3,
175:18, 223:2
**Columbus** [5] -
155:17, 157:22,
157:23, 161:3,
161:17
**column** [1] - 189:3
**com** [1] - 244:6
**combined** [1] - 186:14
**comfortable** [3] -
88:13, 93:12, 96:13
**coming** [11] - 8:17,

43:11, 43:13, 83:17, 88:24, 90:14, 93:1, 219:19, 238:21, 246:20, 246:21
**comment** [3] - 42:14, 51:23, 188:13
**commentary** [1] - 53:3
**comments** [1] - 48:7
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2, 3:2
**commitment** [2] - 222:8, 222:10
**commitments** [1] - 100:9
**committed** [1] - 141:18
**common** [1] - 100:12
**communicate** [3] - 142:11, 167:11, 195:13
**communicated** [1] - 231:10
**communicating** [1] - 180:22
**communication** [2] - 227:5, 240:23
**communications** [2] - 54:16, 161:16
**community** [2] - 23:19, 48:2
**Comp** [1] - 251:11
**company** [12] - 8:22, 9:1, 22:1, 41:16, 78:25, 80:3, 134:25, 135:6, 136:20, 187:19, 234:25
**compare** [1] - 143:13
**comparing** [2] - 70:25, 136:16
**compensation** [4] - 204:13, 204:14, 204:16, 205:7
**Compensation** [1] - 251:2
**competitive** [1] - 200:20
**competitor** [2] - 75:17, 209:24
**competitors** [1] - 209:20
**compiled** [1] - 132:25
**complete** [2] - 90:1, 151:17
**completed** [7] - 85:24, 148:8, 148:16, 150:1, 154:21, 163:23, 173:22
**Completed** [1] - 89:12

**completely** [1] - 185:14
**completing** [2] - 151:9, 164:9
**compliance** [17] - 51:12, 115:20, 115:21, 115:25, 116:4, 116:5, 116:8, 116:10, 116:14, 116:21, 118:3, 118:9, 118:14, 118:16, 126:23, 126:24, 147:9
**Compliance** [6] - 38:15, 50:8, 50:15, 128:3, 128:22, 177:24
**compliant** [1] - 147:7
**complicated** [1] - 202:3
**comply** [1] - 39:25
**component** [3] - 82:2, 82:4, 202:18
**Components** [1] - 102:16
**comport** [1] - 41:11
**compound** [3] - 213:10, 220:18, 244:7
**compounded** [1] - 235:16
**compounding** [13] - 143:19, 234:9, 234:12, 234:18, 234:23, 235:1, 235:2, 235:6, 237:20, 240:18, 241:19, 249:19
**compounds** [1] - 240:22
**computer** [2] - 6:19, 74:5
**concept** [3] - 9:5, 81:25, 209:7
**concern** [2] - 9:25, 160:25
**concerned** [1] - 38:11
**concerns** [2] - 141:25, 142:9
**concession** [1] - 114:16
**conclude** [2] - 153:6, 221:16
**concluded** [1] - 191:10
**concludes** [1] - 124:21
**Conclusion** [1] - 151:3
**conclusion** [5] - 7:6,

46:1, 153:4, 208:3, 208:17
**conclusive** [1] - 78:14
**conduct** [40] - 65:19, 65:24, 66:2, 67:16, 69:19, 85:25, 87:9, 90:16, 91:24, 92:22, 95:14, 115:19, 116:7, 134:22, 138:11, 143:12, 169:3, 169:4, 169:16, 170:13, 170:17, 171:2, 171:4, 175:10, 176:6, 177:23, 178:9, 178:15, 178:24, 179:3, 179:5, 179:6, 179:11, 179:18, 179:23, 217:15, 217:25
**conducted** [13] - 65:23, 76:8, 78:13, 80:13, 90:19, 95:17, 118:3, 149:13, 153:25, 154:2, 174:22, 221:10
**conducting** [7] - 32:19, 37:23, 68:11, 68:14, 118:13, 131:18, 141:22
**conducts** [1] - 146:25
**confer** [4] - 26:9, 124:15, 190:13, 190:25
**conference** [2] - 26:15, 124:19
**confess** [1] - 120:12
**confident** [1] - 108:21
**confusion** [2] - 41:1, 191:19
**congratulations** [1] - 27:21
**Congress** [1] - 37:9
**conjunction** [1] - 159:1
**Connolly** [2] - 4:13, 5:4
**Conroe** [1] - 118:21
**CONROY** [1] - 3:3
**consider** [1] - 251:23
**consideration** [1] - 143:17
**considered** [2] - 140:12, 158:25
**consistent** [8] - 53:20, 53:22, 100:16, 113:6, 132:15, 151:22, 165:20, 217:17

**consistently** [1] - 151:9
**Consolidated** [1] - 40:10
**constant** [1] - 36:13
**constantly** [4] - 49:21, 49:22, 63:16, 167:10
**constitutes** [2] - 41:12, 46:24
**construed** [2] - 54:17, 55:5
**contact** [4] - 80:6, 141:2, 163:25, 164:1
**Contact** [1] - 155:15
**contain** [1] - 180:1
**contained** [2] - 123:13, 170:14
**containing** [1] - 241:3
**contains** [1] - 35:23
**context** [2] - 65:19, 102:6
**continue** [7] - 72:16, 77:23, 90:15, 126:4, 161:15, 167:11, 180:4
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continued** [3] - 67:17, 126:5, 130:12
**continues** [2] - 88:4, 115:4
**continuing** [1] - 55:18
**continuous** [1] - 21:4
**continuously** [1] - 59:6
**contract** [7] - 25:18, 26:20, 28:5, 29:9, 29:10, 29:14, 29:19
**contracts** [1] - 28:18
**contribute** [1] - 24:21
**contributing** [1] - 49:16
**Control** [1] - 99:15
**control** [2] - 31:18, 151:19
**controlled** [53] - 10:18, 11:21, 12:10, 13:4, 16:1, 20:8, 21:18, 35:24, 36:12, 38:20, 61:11, 61:23, 79:15, 79:18, 83:1, 100:1, 117:21, 117:22, 117:25, 141:14, 142:14, 142:18, 143:23, 145:9, 155:25, 160:14, 168:17, 196:10, 196:14, 197:11, 197:15, 204:18, 210:4,

210:5, 210:13, 211:17, 211:25, 212:1, 212:19, 212:22, 213:4, 213:20, 235:9, 235:12, 235:18, 238:23, 242:2, 244:19, 244:23, 249:12, 249:13
**Controlled** [22] - 18:4, 42:6, 42:17, 45:8, 58:23, 59:3, 60:14, 101:12, 128:2, 128:22, 130:17, 131:9, 133:24, 135:11, 166:25, 167:12, 207:6, 207:19, 213:14, 216:9, 217:4, 222:9
**controls** [12] - 32:1, 117:20, 153:6, 169:7, 178:3, 208:1, 208:9, 235:16, 250:2, 250:11, 250:12
**conversation** [2] - 109:6, 226:13
**conveyor** [1] - 10:14
**convinced** [1] - 210:2
**Cook** [3] - 6:18, 254:3, 254:11
**cooperatively** [1] - 34:10
**copied** [2] - 152:20, 157:5
**copy** [16] - 26:19, 57:24, 58:9, 58:10, 58:11, 71:3, 71:7, 71:10, 97:4, 119:15, 120:20, 132:6, 182:5, 182:6, 190:10, 222:18
**copying** [1] - 163:3
**core** [2] - 131:16, 241:18
**Corey** [2] - 177:13, 182:16
**corner** [8] - 40:24, 147:21, 154:5, 154:6, 154:9, 182:23, 183:2, 216:15
**Corp** [1] - 187:1
**corporate** [5] - 106:19, 106:21, 106:22, 137:18, 185:20
**cORPORATION** [2] - 1:7, 1:13
**Corporation** [4] - 6:2, 18:5, 28:8, 254:7

**Correct** [4] - 190:20, 222:1, 222:13, 225:24
**correct** [92] - 10:7, 41:24, 42:3, 108:25, 118:7, 119:1, 128:10, 128:11, 148:7, 149:4, 150:3, 150:6, 153:20, 160:8, 168:21, 169:13, 170:15, 172:2, 172:3, 172:16, 172:17, 172:25, 173:9, 173:21, 174:8, 174:18, 175:11, 176:13, 177:3, 177:7, 177:16, 178:6, 178:11, 178:16, 178:25, 179:16, 180:16, 180:19, 181:13, 181:22, 182:13, 182:21, 183:18, 184:12, 185:8, 185:9, 185:10, 185:14, 185:18, 185:24, 185:25, 186:3, 188:1, 194:24, 195:5, 195:8, 196:7, 197:12, 201:24, 202:7, 204:3, 204:14, 206:3, 211:7, 211:18, 211:25, 212:8, 212:16, 214:6, 218:19, 220:13, 221:18, 221:19, 222:4, 226:20, 226:23, 227:8, 228:24, 229:2, 229:5, 229:8, 232:25, 233:13, 236:20, 237:5, 237:8, 237:22, 238:6, 245:25, 249:16, 250:20, 254:4
**corrective** [1] - 149:22
**correctly** [7] - 40:1, 47:5, 53:17, 54:20, 127:22, 180:2, 228:6
**correlation** [1] - 65:5
**correspond** [1] - 19:16
**corresponding** [1] - 129:6
**corresponds** [1] - 19:15

**Corso** [1] - 155:16
**corso** [1] - 157:21
**counsel** [3] - 7:23, 119:14, 226:7
**count** [3] - 129:15, 132:14, 231:8
**counter** [2] - 10:24, 94:13
**counterparts** [1] - 78:19
**counties** [1] - 197:2
**country** [3] - 68:9, 182:13, 199:17
**counts** [1] - 14:9
**COUNTY** [1] - 1:10
**County** [34] - 2:2, 3:2, 10:1, 15:18, 148:4, 177:7, 182:11, 183:18, 184:11, 185:7, 186:3, 186:4, 186:17, 197:5, 197:6, 197:8, 197:12, 197:14, 197:16, 198:2, 198:5, 205:25, 210:24, 215:5, 215:15, 222:11, 222:12, 223:2, 223:16, 223:17, 230:2, 233:18, 233:21, 243:21
**couple** [10] - 9:2, 26:5, 65:18, 95:22, 115:15, 184:7, 198:6, 231:24, 246:23, 247:15
**course** [17] - 13:21, 13:22, 14:14, 14:15, 33:19, 43:5, 67:23, 84:23, 103:23, 138:25, 164:5, 164:10, 164:16, 164:25, 230:12, 242:25, 251:5
**Court** [52] - 6:17, 6:18, 7:2, 7:13, 9:5, 15:16, 15:19, 15:20, 16:9, 19:17, 21:23, 44:15, 56:11, 71:8, 90:18, 91:13, 92:1, 96:1, 97:4, 101:4, 118:18, 118:22, 120:20, 128:12, 128:17, 148:1, 148:15, 150:9, 154:9, 155:22, 161:17, 168:10, 168:16, 169:11, 170:18, 171:25, 174:25, 175:4, 175:9,

175:20, 175:23, 176:25, 177:2, 177:6, 187:2, 199:23, 221:20, 221:23, 222:21, 233:11, 254:2, 254:3
**COURT** [187] - 1:1, 1:17, 7:5, 7:9, 7:11, 7:13, 7:16, 17:4, 17:12, 17:14, 19:11, 21:13, 21:24, 26:3, 26:10, 26:14, 27:4, 27:9, 28:13, 28:23, 29:1, 29:4, 30:1, 33:13, 35:7, 38:3, 38:7, 39:3, 46:4, 53:7, 53:10, 56:23, 57:8, 60:4, 60:11, 66:11, 66:14, 66:18, 72:4, 72:11, 74:15, 74:22, 75:3, 85:3, 97:3, 101:8, 101:25, 102:2, 110:11, 110:22, 110:24, 111:24, 112:8, 113:25, 118:18, 118:24, 119:12, 119:20, 120:1, 120:24, 121:5, 121:7, 121:9, 121:13, 121:16, 124:17, 124:23, 125:4, 125:8, 125:10, 130:24, 131:1, 134:3, 134:5, 138:21, 139:16, 144:6, 144:9, 144:19, 145:4, 145:13, 147:12, 152:14, 157:7, 157:12, 158:23, 159:13, 159:16, 162:3, 162:19, 165:5, 167:17, 167:21, 170:23, 171:11, 173:4, 173:15, 174:5, 175:15, 175:22, 176:17, 178:18, 179:1, 179:15, 179:24, 180:5, 181:21, 181:24, 182:3, 182:6, 183:12, 183:21, 184:23, 186:24, 187:3, 188:6, 188:10, 188:19, 188:22, 189:8, 189:11, 189:14, 189:19, 189:21, 190:5, 190:8,

190:15, 190:19, 190:21, 191:2, 191:5, 191:11, 191:14, 191:16, 191:20, 191:23, 191:25, 192:6, 192:10, 193:6, 193:16, 193:18, 193:21, 193:25, 194:9, 194:11, 201:15, 202:15, 203:19, 204:8, 205:2, 208:4, 208:15, 208:18, 213:11, 216:6, 218:12, 220:19, 222:16, 222:18, 223:3, 223:19, 223:22, 224:1, 224:5, 224:8, 224:12, 224:18, 227:12, 229:17, 230:14, 230:21, 231:14, 236:10, 236:12, 236:14, 238:24, 242:16, 242:21, 242:24, 246:25, 249:3, 249:6, 251:16, 252:17, 252:21, 253:2
**court** [1] - 193:22
**Court's** [4] - 18:2, 40:23, 213:18, 222:23
**courtroom** [3] - 124:25, 183:1, 189:14
**cover** [11] - 29:14, 47:23, 88:22, 110:15, 126:2, 136:24, 165:14, 178:8, 186:20, 228:3, 228:20
**covered** [4] - 67:2, 94:6, 123:10, 165:14, 169:3, 169:4, 169:5, 169:16, 170:13, 170:17, 175:10, 178:23, 179:2, 179:4, 179:5, 179:6
**covers** [2] - 39:12, 111:4
**Covington** [1] - 5:11
**create** [1] - 112:5
**created** [3] - 129:11, 207:15, 252:25
**creates** [1] - 204:13
**credit** [1] - 199:25

**crisis** [1] - 167:8
**criteria** [5] - 44:13, 92:6, 92:7, 92:11, 117:18
**critical** [1] - 23:5
**cross** [7] - 7:7, 33:14, 72:12, 72:15, 144:9, 167:17, 192:21
**CROSS** [2] - 7:19, 231:17
**cross-examination** [1] - 72:12
**CRR** [2] - 6:17, 6:18
**CSMP** [47] - 14:17, 38:21, 39:9, 58:24, 59:2, 59:3, 59:21, 60:2, 60:23, 62:20, 68:25, 70:11, 73:16, 75:5, 76:17, 81:20, 81:23, 81:25, 82:1, 82:16, 97:9, 102:16, 109:7, 111:2, 113:6, 116:12, 116:15, 118:15, 126:11, 129:1, 130:11, 130:13, 131:17, 132:19, 140:20, 140:23, 141:11, 152:5, 152:8, 207:7, 207:11, 207:15, 209:3, 213:14, 224:24, 226:18
**CT2** [1] - 187:18
**cull** [1] - 123:2
**current** [6] - 18:20, 19:19, 72:23, 152:8, 152:24, 198:19
**Custom** [23] - 198:7, 215:8, 234:1, 234:3, 234:7, 234:14, 235:12, 235:21, 236:19, 236:25, 237:9, 237:12, 237:24, 239:20, 241:8, 241:15, 241:20, 241:23, 246:1, 249:11, 250:11, 251:19
**Customer** [6] - 82:21, 98:5, 102:25, 107:23, 162:10, 180:13
**customer** [123] - 8:23, 14:19, 20:10, 25:14, 27:6, 27:7, 37:21, 61:17, 62:6, 62:8, 68:25, 73:5, 73:12, 73:23, 75:5, 77:18, 79:16, 79:17, 80:9, 82:14, 82:25, 83:14,

83:17, 85:8, 85:18, 88:10, 88:11, 90:13, 91:5, 94:24, 95:6, 95:10, 95:13, 100:9, 102:17, 102:18, 103:4, 104:3, 105:18, 107:24, 108:10, 108:12, 111:18, 131:19, 134:11, 135:15, 135:16, 136:11, 140:12, 142:22, 142:25, 143:5, 152:4, 152:8, 163:25, 166:11, 166:14, 185:17, 198:12, 198:15, 201:2, 204:1, 204:22, 205:10, 205:16, 206:9, 206:20, 206:21, 207:20, 207:22, 208:13, 208:22, 209:16, 209:21, 210:1, 210:3, 210:7, 210:8, 210:18, 211:5, 212:24, 213:2, 213:6, 213:8, 214:20, 215:19, 215:20, 215:23, 217:8, 218:6, 218:17, 218:24, 219:3, 219:11, 219:12, 220:14, 220:15, 220:24, 221:6, 221:25, 225:9, 226:2, 226:3, 226:4, 226:19, 228:7, 229:7, 231:6, 233:15, 234:3, 237:3, 237:6, 238:16, 241:24, 242:6, 246:16, 247:3, 248:2, 248:7, 249:25, 250:14

**customer's** [5] - 63:17, 88:11, 117:24, 135:22, 135:23

**customer/ transaction** [1] - 80:22

**customers** [70] - 9:14, 10:1, 22:17, 22:18, 22:19, 24:25, 25:15, 37:13, 63:18, 64:5, 66:7, 67:24, 70:22, 70:25, 71:23, 73:14, 77:15, 84:2, 86:2, 90:8, 90:10, 90:16, 94:16, 95:2, 95:5,

103:8, 105:19, 107:11, 108:4, 108:18, 108:24, 117:24, 124:9, 131:17, 131:18, 133:25, 134:20, 134:21, 134:22, 135:17, 136:16, 136:17, 137:16, 143:13, 143:16, 148:4, 153:7, 161:6, 197:25, 198:1, 198:3, 198:4, 198:10, 198:19, 198:25, 201:8, 209:14, 214:5, 214:24, 215:4, 219:25, 228:24, 229:2, 231:1, 233:14, 233:17, 233:19, 233:21, 246:14, 250:14

**customers'** [5] - 42:25, 61:10, 61:23, 63:10, 135:18

**cut** [3] - 95:3, 142:21, 176:18

**CVS** [12] - 139:21, 139:24, 139:25, 140:3, 140:7, 140:10, 140:13, 144:20, 145:8, 145:12, 146:7, 195:7

**cyclic** [1] - 174:22

**cyclical** [7] - 13:25, 14:3, 14:14, 51:20, 126:24, 175:5, 175:7

## D

**D&K** [1] - 195:19

**daily** [14] - 20:9, 23:3, 38:1, 42:14, 42:16, 44:21, 45:15, 47:12, 47:13, 49:6, 56:14, 61:21, 84:7, 220:2

**Daily** [3] - 42:6, 42:17, 45:8

**Data** [1] - 129:10

**data** [19] - 14:21, 14:22, 36:19, 36:25, 37:10, 45:2, 58:13, 68:20, 68:23, 75:13, 88:20, 129:4, 135:7, 135:8, 145:1, 165:18, 166:9, 183:1, 183:16

**database** [3] - 35:20, 35:23, 36:18

**dataset** [2] - 41:17,

41:22

**date** [35] - 19:18, 39:6, 39:18, 102:8, 115:17, 115:19, 123:9, 134:9, 134:10, 149:17, 149:21, 150:1, 150:5, 156:13, 158:7, 161:4, 169:21, 170:2, 170:3, 170:4, 170:5, 170:9, 170:10, 177:15, 177:21, 177:22, 178:8, 178:9, 178:22, 179:7, 179:14, 179:16, 179:17, 183:22, 189:4

**Date** [1] - 254:16

**dated** [13] - 50:9, 52:13, 52:20, 69:25, 110:17, 127:20, 131:10, 148:19, 156:12, 156:21, 157:18, 168:21, 229:21

**dates** [8] - 18:18, 24:19, 36:1, 36:7, 60:19, 178:19, 179:1, 179:6

**dating** [1] - 182:21

**Dave** [6] - 69:14, 185:10, 185:11, 229:20, 245:22, 246:2

**David** [1] - 7:1

**DAVID** [2] - 1:17, 2:9

**day-to-day** [1] - 8:12

**days** [11] - 29:11, 67:18, 82:1, 115:17, 115:18, 177:20, 177:22, 178:13, 178:25, 192:22, 198:24

**DC** [16] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 18:16, 69:1, 78:13, 86:1, 86:7, 156:20, 217:15, 217:23, 217:25, 232:5

**DCM** [1] - 232:6

**DCs** [3] - 150:14, 175:6, 231:4

**De** [2] - 2:4, 2:16

**DEA** [165] - 9:24, 12:5, 13:6, 13:8, 13:18, 14:7, 14:12, 14:16, 15:10, 30:24, 31:6, 31:9, 31:14, 31:18, 31:23, 32:1, 32:15,

32:17, 32:22, 34:1, 34:3, 34:10, 34:13, 36:2, 36:23, 38:14, 41:12, 43:2, 45:11, 50:8, 50:15, 51:12, 51:17, 51:20, 52:5, 53:14, 53:19, 54:13, 54:16, 54:19, 54:23, 54:25, 55:7, 55:8, 55:23, 56:2, 56:13, 57:23, 58:6, 58:9, 58:10, 58:19, 60:1, 78:5, 79:1, 79:25, 80:4, 80:6, 80:8, 80:22, 81:16, 81:19, 83:12, 86:23, 101:1, 101:21, 102:5, 102:9, 104:2, 104:5, 104:15, 105:17, 106:8, 107:6, 108:5, 109:3, 109:10, 109:11, 109:14, 109:21, 109:23, 110:2, 110:7, 110:16, 111:2, 111:7, 111:17, 111:22, 112:2, 112:3, 112:7, 112:20, 113:16, 114:8, 114:15, 114:16, 114:22, 115:8, 115:10, 115:19, 116:3, 116:7, 116:22, 117:19, 117:22, 118:5, 118:13, 118:15, 121:23, 123:11, 123:13, 126:20, 126:23, 127:2, 129:20, 133:2, 138:1, 138:2, 138:7, 146:1, 153:8, 155:17, 156:18, 157:10, 157:11, 158:15, 158:16, 159:3, 159:6, 159:21, 160:3, 160:18, 160:22, 160:25, 161:5, 161:17, 161:18, 166:25, 167:7, 167:11, 169:22, 174:16, 174:20, 176:4, 176:21, 177:2, 177:5, 177:19, 177:22, 178:14, 179:21, 180:18, 180:19, 180:22, 183:23, 184:17, 186:3, 187:6, 187:16,

189:4, 211:13

**DEA's** [8] - 34:6, 35:20, 41:10, 53:21, 53:25, 133:3, 166:19, 168:9

**deal** [7] - 48:11, 106:22, 125:7, 137:17, 138:10, 199:6

**dealing** [1] - 31:6

**deals** [1] - 10:20

**dealt** [3] - 138:2, 168:15, 171:20

**decade** [1] - 199:16

**December** [3] - 27:14, 54:6

**decide** [3] - 20:13, 92:5, 212:22

**decision** [6] - 30:9, 129:5, 129:13, 142:25, 212:18, 212:21

**decisions** [1] - 65:20

**deck** [2] - 101:12, 128:2

**decrease** [1] - 65:20

**decreased** [1] - 65:13

**decreases** [1] - 135:24

**deemed** [4] - 80:14, 89:16, 116:21, 117:18

**deeper** [1] - 143:2

**Defendant** [5] - 4:10, 5:2, 5:7, 6:2, 186:13

**defendant** [1] - 52:5

**defendants** [1] - 167:18

**Defendants** [3] - 1:8, 1:14, 254:7

**defense** [1] - 231:3

**defined** [1] - 48:23

**definitely** [2] - 31:7, 143:21

**Definition** [1] - 41:5

**definition** [9] - 41:8, 41:10, 46:19, 47:3, 47:14, 48:15, 48:22, 81:9, 81:12

**Deleno** [3] - 250:23, 251:1, 251:7

**deliver** [2] - 23:1, 198:17

**Delran** [9] - 25:21, 25:23, 101:13, 112:6, 147:25, 148:3, 150:9, 150:15, 154:8

**demand** [1] - 25:25

**Demonstrative** [1] - 252:24

**Department** [6] - 27:13, 28:7, 52:20, 141:7, 146:25, 148:25

**department** [4] - 107:2, 206:15, 215:25, 226:17

**department's** [1] - 80:5

**departments** [2] - 106:15, 134:23

**deposition** [3] - 206:5, 223:7, 249:23

**depositions** [1] - 199:3

**describe** [6] - 12:13, 14:5, 90:18, 92:21, 111:14, 196:19

**described** [5] - 93:24, 103:11, 173:14, 197:4, 233:11

**describes** [1] - 78:20

**describing** [1] - 133:15

**description** [2] - 80:1, 112:16

**designation** [1] - 81:4

**desired** [1] - 166:9

**destroyed** [1] - 172:20

**detail** [7] - 56:11, 93:22, 127:15, 131:13, 164:22, 176:5, 228:10

**detailed** [3] - 12:7, 12:8, 217:11

**details** [2] - 7:24, 136:2

**detect** [3] - 61:12, 61:18, 117:21

**detected** [3] - 123:12, 123:19, 169:23

**detecting** [2] - 51:7, 141:18

**Detecting** [1] - 41:4

**Determination** [1] - 103:3

**determination** [2] - 96:10, 135:9

**determine** [1] - 44:23

**determines** [2] - 116:22, 117:19

**determining** [1] - 131:19

**Detroit** [1] - 157:22

**developments** [1] - 48:1

**deviating** [1] - 46:22

**dictate** [1] - 66:1

**difference** [8] - 47:2, 64:10, 137:19,

138:2, 138:5, 140:9, 179:17, 235:11

**differences** [3] - 64:12, 88:12, 140:13

**different** [36] - 9:11, 11:20, 23:13, 47:7, 49:22, 64:3, 64:4, 71:16, 84:13, 94:12, 98:20, 102:16, 107:6, 119:17, 120:25, 134:21, 136:14, 137:9, 137:11, 137:12, 137:13, 139:10, 140:3, 140:10, 143:14, 163:15, 176:22, 196:12, 196:13, 202:5, 209:20, 211:23, 213:19, 222:11, 236:21, 247:16

**differently** [2] - 11:13, 129:12

**differs** [1] - 209:13

**dig** [1] - 143:2

**diligence** [49] - 23:7, 32:19, 37:23, 65:19, 65:23, 65:25, 66:1, 67:18, 68:1, 68:11, 69:8, 69:19, 73:7, 75:24, 76:6, 82:1, 82:2, 82:4, 82:9, 82:13, 83:4, 90:15, 90:16, 90:17, 90:18, 91:2, 93:16, 94:24, 95:1, 99:19, 100:24, 102:23, 118:5, 126:9, 126:13, 131:19, 132:3, 134:22, 138:11, 141:23, 143:4, 149:12, 153:24, 154:1, 155:6, 172:2, 172:5, 226:17, 232:9

**DIRECT** [1] - 194:13

**direct** [5] - 73:17, 114:10, 163:25, 192:21, 240:23

**direction** [1] - 35:1

**directly** [6] - 19:23, 30:20, 56:18, 56:20, 144:23, 187:22

**director** [1] - 150:22

**Director** [16] - 9:20, 10:6, 14:6, 14:7, 19:24, 20:1, 20:2, 20:5, 20:11, 20:12, 20:15, 20:22, 36:16, 50:8, 230:1, 245:23

**disagree** [1] - 221:12

**disagreed** [1] - 110:7

**disciplinary** [5] - 87:2, 87:7, 87:16, 91:4, 91:21

**discounts** [1] - 248:19

**discovery** [4] - 186:12, 186:14, 187:1, 187:21

**discuss** [1] - 80:7

**discussed** [2] - 121:19, 171:2

**discussing** [3] - 102:22, 175:10, 230:16

**discussion** [5] - 15:15, 65:6, 65:8, 84:2, 151:4

**Discussion** [1] - 110:16

**discussions** [2] - 109:3, 138:1

**Disease** [1] - 99:15

**dispense** [2] - 24:13, 248:11

**dispensed** [2] - 11:4, 244:23

**dispensing** [13] - 68:20, 68:23, 75:13, 75:14, 83:21, 83:23, 83:24, 106:16, 106:24, 107:1, 145:11, 165:18, 166:9

**distinction** [2] - 48:4, 106:12

**distribute** [8] - 8:5, 16:3, 16:13, 86:22, 105:9, 137:23, 145:20, 145:24

**distributed** [5] - 105:6, 105:10, 144:20, 145:25, 184:10

**distributes** [3] - 12:24, 21:18

**distributing** [7] - 16:10, 105:4, 137:24, 146:3, 181:8, 182:20, 183:17

**distribution** [71] - 9:11, 10:6, 10:11, 10:13, 10:20, 11:8, 11:13, 12:10, 12:22, 13:1, 13:5, 13:7, 13:21, 14:1, 15:12, 15:17, 16:2, 16:5, 16:8, 16:17, 16:20, 16:21, 17:1, 17:9, 18:9, 18:14, 19:15,

19:24, 20:9, 20:12, 20:20, 25:24, 43:17, 43:18, 43:19, 43:20, 68:18, 68:19, 68:24, 69:2, 69:5, 74:5, 76:13, 77:17, 79:19, 79:22, 79:23, 112:6, 115:22, 117:11, 117:14, 117:20, 118:9, 122:2, 145:18, 146:25, 147:25, 151:9, 154:7, 169:11, 175:1, 175:9, 176:6, 176:23, 177:6, 185:11, 197:13, 217:22, 226:22, 232:7

**Distribution** [14] - 15:16, 15:19, 16:12, 18:11, 18:21, 19:17, 51:13, 68:17, 149:24, 149:25, 151:18, 171:25, 174:24, 174:25

**Distributor** [1] - 18:4

**distributor** [13] - 8:1, 8:2, 8:10, 12:23, 58:11, 85:18, 137:25, 140:7, 198:18, 199:16, 228:14, 234:13

**Distributors** [1] - 243:24

**distributors** [9] - 36:19, 36:24, 53:15, 99:23, 100:1, 100:11, 137:22, 186:14, 235:6

**DISTRICT** [3] - 1:1, 1:1, 1:17

**District** [4] - 7:2, 7:3, 45:11, 157:22

**distrusting** [1] - 93:3

**dive** [1] - 9:2

**Diversion** [2] - 177:24, 192:19

**diversion** [40] - 9:14, 21:5, 25:4, 25:8, 25:11, 37:24, 53:16, 59:9, 61:12, 61:18, 84:14, 87:3, 91:10, 96:7, 98:20, 99:7, 99:19, 115:20, 116:8, 116:10, 116:13, 117:20, 118:14, 124:10, 124:11, 129:21, 129:25, 140:17, 141:19, 145:5,

169:7, 204:23, 205:10, 205:17, 206:9, 206:20, 206:23, 208:1, 208:10, 232:18

**diverted** [9] - 47:4, 47:15, 48:5, 48:8, 48:12, 52:1, 55:19, 63:2, 126:7

**divide** [1] - 35:10

**Division** [1] - 157:22

**Docket** [1] - 52:8

**doctor** [3] - 24:10, 65:3, 238:8

**doctors** [5] - 22:7, 30:16, 33:10, 103:21, 250:18

**document** [94] - 17:22, 18:2, 26:23, 28:4, 29:13, 38:5, 38:13, 50:17, 53:3, 57:3, 69:24, 69:25, 84:1, 84:19, 84:21, 89:9, 96:25, 97:14, 101:19, 102:5, 109:1, 109:5, 110:9, 110:14, 110:18, 110:20, 111:21, 111:22, 112:4, 113:18, 114:7, 114:11, 114:24, 115:1, 119:8, 120:16, 121:3, 121:10, 122:24, 122:25, 124:21, 127:15, 128:5, 128:6, 130:8, 130:15, 130:17, 130:22, 132:18, 133:19, 133:22, 133:23, 134:9, 139:13, 139:23, 139:24, 147:18, 151:1, 154:4, 155:15, 157:16, 162:7, 162:13, 162:23, 165:9, 165:25, 166:4, 166:5, 166:11, 166:7, 170:20, 172:15, 172:20, 172:23, 180:7, 180:9, 181:19, 181:25, 183:10, 184:3, 184:4, 188:13, 216:20, 218:10, 222:22, 226:24, 227:2, 236:16, 239:17, 240:4, 243:13,

248:16
**Document** [1] -
110:16
**Documentation** [1] -
224:25
**documentation** [9] -
76:3, 151:10,
163:20, 164:9,
164:20, 171:24,
172:1, 172:4, 172:12
**documentations** [1] -
151:24
**documented** [5] -
141:13, 149:8,
155:1, 155:5, 173:8
**documenting** [2] -
75:24, 89:20
**documents** [14] -
19:5, 26:4, 28:21,
29:23, 71:8, 76:11,
76:12, 147:16,
152:3, 153:21,
161:25, 165:22,
187:18, 190:13
**DOJ** [2] - 176:4,
179:21
**Don** [8] - 57:12, 57:13,
57:15, 79:20, 112:3,
128:7, 162:8, 180:18
**done** [24] - 19:2,
65:22, 131:5, 137:5,
148:11, 149:5,
150:20, 150:22,
162:1, 166:3,
171:18, 172:2,
172:8, 172:12,
189:17, 191:16,
191:18, 211:8,
211:9, 221:15,
221:24, 222:3,
242:25, 251:17
**door** [3] - 11:19,
176:8, 176:12
**dosage** [2] - 184:10,
244:22
**dose** [1] - 245:16
**doses** [3] - 245:4,
245:5, 252:1
**double** [2] - 202:21,
203:16
**Douglas** [1] - 4:17
**down** [58] - 18:8,
27:22, 40:7, 44:2,
44:3, 65:7, 65:15,
73:9, 73:15, 73:20,
77:2, 77:4, 77:20,
79:12, 84:1, 86:16,
86:18, 87:6, 89:4,
97:20, 99:12,
103:24, 104:8,

106:4, 114:13,
123:2, 127:23,
131:10, 135:20,
135:22, 141:16,
151:5, 155:16,
155:17, 156:21,
157:18, 158:11,
164:19, 174:15,
178:1, 180:24,
180:25, 182:16,
196:25, 203:4,
216:17, 217:7,
225:17, 237:15,
241:1, 241:12,
241:13, 242:11,
243:1, 244:1, 245:1,
251:25
**Down** [3] - 237:1,
245:8, 245:15
**downside** [1] - 46:11
**dozen** [1] - 252:12
**Dr** [9] - 181:19, 238:3,
247:4, 247:6,
250:18, 250:23,
251:1, 251:7
**DRA** [6] - 32:7, 68:11,
68:13, 76:12, 78:10,
79:6
**DRAs** [4] - 68:8, 69:6,
69:10, 75:20
**draw** [1] - 68:13
**drawn** [1] - 30:13
**drill** [1] - 145:17
**Drive** [1] - 6:15
**driving** [1] - 141:24
**drop** [1] - 191:9
**dropping** [2] - 191:15,
200:22
**drowning** [1] - 182:7
**Drug** [10] - 6:2, 18:4,
38:14, 38:17, 39:17,
51:13, 52:21, 59:20,
206:25, 254:7
**drug** [12] - 22:2, 22:3,
59:24, 59:25, 62:7,
94:4, 99:7, 104:12,
145:21, 145:23,
181:1, 214:3
**DRUG** [2] - 1:7, 1:13
**drugs** [17] - 8:11,
10:22, 11:1, 11:3,
16:2, 23:2, 92:9,
142:14, 200:1,
200:3, 238:23,
242:2, 247:17,
247:24
**DU45** [2] - 42:19,
42:23
**DU45L500** [1] - 42:19
**DU45s** [10] - 43:2,

43:6, 43:7, 43:12,
43:19, 43:21, 43:22,
44:6, 44:12, 56:14
**due** [15] - 65:23,
65:24, 66:1, 67:18,
68:1, 73:7, 91:1,
93:15, 94:23,
131:19, 134:22,
141:22, 172:2,
172:5, 226:16
**During** [1] - 108:17
**during** [22] - 7:22,
14:25, 15:2, 15:7,
32:12, 32:14, 64:20,
78:7, 83:3, 88:23,
93:20, 118:3,
118:16, 123:8,
124:2, 169:20,
171:5, 177:8, 181:7,
184:16, 186:7, 223:6
**duties** [1] - 204:20
**duty** [4] - 208:13,
208:14, 208:17,
208:22
**dynamic** [2] - 136:8,
136:9

# E

**e-mail** [16] - 57:4,
57:11, 127:20,
128:1, 139:20,
156:12, 156:21,
156:24, 156:25,
163:3, 165:10,
165:11, 168:21,
171:3, 173:14
**early** [6] - 20:3, 57:22,
59:1, 90:22, 125:7,
127:6
**ears** [3] - 229:11,
229:13, 231:8
**ease** [1] - 35:10
**easier** [1] - 163:13
**East** [3] - 3:5, 3:12,
4:18
**easy** [2] - 64:23,
230:25
**education** [1] - 211:3
**effect** [2] - 32:23,
179:6
**effective** [24] - 50:20,
115:17, 115:18,
117:19, 123:9,
134:10, 153:8,
160:10, 169:7,
169:21, 170:2,
170:3, 170:5,
177:21, 177:22,
178:3, 179:7,

179:13, 179:14,
179:15, 179:17,
207:25, 208:9
**effort** [1] - 48:11
**efforts** [1] - 167:7
**eight** [6] - 44:7,
115:21, 117:11,
118:11, 127:22,
231:4
**Eighth** [1] - 3:10
**either** [6] - 13:21,
94:4, 131:8, 166:7,
167:17, 231:2
**electrical** [1] - 16:18
**electronic** [2] - 76:11,
160:4
**electronically** [1] -
160:21
**element** [1] - 95:15
**elements** [3] - 102:17,
102:21, 131:17
**elevation** [1] - 221:17
**eligible** [1] - 131:20
**ELIZABETH** [1] - 6:14
**Ellie** [1] - 127:21
**email** [8] - 70:5, 70:9,
72:9, 229:19,
230:17, 231:21,
231:24, 232:10
**emails** [5] - 67:3, 67:6,
67:10, 69:13, 69:15
**emphasis** [2] - 39:23,
207:19
**emphasize** [1] -
232:17
**employed** [3] -
194:19, 194:21,
195:2
**employee** [1] - 230:12
**employees** [4] - 12:16,
39:25, 87:14, 132:11
**employment** [2] -
7:25, 230:13
**enact** [1] - 160:10
**Encino** [1] - 3:18
**encompass** [1] - 62:6
**end** [24] - 10:10,
18:22, 19:20, 45:7,
52:18, 54:5, 54:11,
57:21, 59:17, 64:3,
64:4, 74:8, 79:7,
90:15, 94:11,
111:11, 133:1,
133:2, 139:20,
140:2, 142:13,
165:16, 239:11
**ended** [2] - 178:20,
219:5
**endorse** [1] - 54:13
**endorsed** [1] - 54:24

**endorsement** [1] -
55:2
**endorsing** [1] - 52:5
**Enforcement** [1] -
52:21
**engaged** [1] - 124:10
**engine** [2] - 165:18,
166:6
**enhance** [1] - 147:8
**enhanced** [3] - 128:8,
128:12, 129:10
**enhancements** [3] -
126:11, 126:12,
129:1
**ensure** [1] - 147:9
**ensuring** [1] - 163:8
**entail** [1] - 92:22
**entails** [2] - 20:5,
79:14
**entire** [4] - 20:17,
53:3, 96:22, 187:6
**entities** [5] - 30:24,
31:2, 31:5, 31:6,
31:17
**entitled** [3] - 73:19,
73:20, 202:13
**entity** [4] - 22:2, 22:5,
22:7, 27:22
**entries** [1] - 158:13
**entry** [2] - 12:17,
104:11
**ENU** [1] - 4:12
**environment** [2] -
11:23, 151:19
**equipment** [1] - 94:11
**Eric** [2] - 194:7,
194:15
**escalate** [1] - 79:19
**escalated** [2] - 78:18,
79:10
**escalation** [1] - 78:10
**especially** [1] - 228:11
**establish** [1] - 169:15
**established** [8] -
103:4, 103:7,
131:24, 204:21,
205:8, 205:15,
213:5, 217:3
**estimated** [1] - 244:22
**et** [7] - 1:7, 1:13, 88:6,
178:3, 195:8, 254:6,
254:7
**evaluating** [1] - 75:9
**evaluation** [1] - 44:17
**evaluations** [1] -
100:10
**event** [1] - 121:23
**eventually** [1] - 217:21
**evidence** [38] - 9:14,
19:8, 26:25, 28:22,

38:25, 57:6, 60:9,
69:23, 84:25, 97:5,
97:9, 101:24,
110:20, 119:23,
127:16, 127:17,
130:23, 134:2,
139:14, 147:17,
155:10, 157:6,
168:24, 179:3,
179:19, 181:18,
182:4, 190:23,
216:3, 217:3, 224:4,
230:11, 236:8,
242:14, 243:6,
243:8, 251:12
**evolved** [6] - 35:2,
35:4, 59:5, 84:9,
98:20, 167:10
**exact** [6] - 11:5, 59:18,
171:2, 178:19,
181:7, 203:12
**exactly** [4] - 81:20,
102:9, 148:25,
185:15
**Exactly** [1] - 77:11
**examination** [5] - 7:7,
7:23, 33:14, 72:12,
185:23
**EXAMINATION** [5] -
7:19, 167:24,
194:13, 231:17,
249:9
**examine** [1] - 113:23
**example** [17] - 19:13,
47:19, 54:3, 64:7,
68:16, 69:22, 71:20,
75:17, 96:18, 97:20,
98:23, 138:16,
143:15, 144:18,
148:14, 165:13,
210:23
**examples** [1] - 164:13
**exceed** [2] - 74:19,
107:21
**Exceeded** [1] - 225:11
**exceeded** [8] - 55:15,
55:17, 74:19, 75:2,
75:5, 124:3, 225:9,
225:19
**exceeding** [2] - 81:8,
133:8
**excellence** [1] - 8:24
**exception** [1] - 197:2
**excessive** [1] - 113:10
**excluded** [1] - 176:5
**excursion** [3] - 133:7,
216:19, 217:15
**Excursion** [2] - 73:20,
216:18
**excuse** [7] - 55:16,

73:9, 105:3, 138:14,
158:20, 191:12,
213:24
**excused** [2] - 191:21,
252:18
**executed** [2] - 121:23,
174:21
**execution** [1] - 170:4
**executive** [2] - 195:12,
195:16
**exhibit** [12] - 19:4,
38:15, 40:25, 71:3,
119:16, 120:10,
158:11, 158:24,
176:19, 223:6, 223:8
**Exhibit** [13] - 38:24,
52:12, 82:18,
101:11, 114:4,
120:22, 120:23,
147:16, 154:4,
155:10, 158:8, 226:1
**exhibits** [1] - 28:15
**exist** [2] - 62:18,
172:19
**existed** [1] - 219:3
**existence** [3] - 76:18,
207:5, 207:7
**existing** [4] - 83:18,
95:1, 95:4, 117:24
**expand** [1] - 129:7
**expect** [3] - 32:22,
103:23, 103:25
**expectation** [1] -
193:2
**expectations** [6] -
34:7, 34:10, 34:14,
102:11, 166:20,
198:17
**expected** [2] - 34:22,
192:20
**experience** [23] - 8:6,
10:3, 13:20, 14:4,
14:24, 20:21, 23:12,
24:14, 25:5, 32:3,
34:12, 47:25, 48:21,
100:16, 108:22,
129:20, 129:25,
165:20, 196:6,
196:9, 245:6,
245:12, 249:16
**experienced** [1] - 49:5
**experiences** [1] - 10:4
**expertise** [1] - 240:25
**expirable** [1] - 24:19
**explain** [9] - 10:12,
61:14, 88:25, 111:7,
183:21, 206:16,
225:19, 235:11,
235:15
**explained** [2] -

105:21, 106:14
**explaining** [1] - 96:13
**explanation** [5] -
188:22, 219:1,
225:23, 226:4, 228:6
**explicit** [1] - 54:16
**expressed** [1] - 9:25
**extended** [1] - 208:21
**external** [1] - 21:5
**extra** [2] - 71:9, 190:9
**extract** [1] - 50:7
**extreme** [1] - 147:21
**extremely** [2] - 39:24,
163:20
**eyes** [3] - 229:11,
229:13, 231:8

## F

**Faber** [1] - 7:1
**FABER** [1] - 1:17
**facilities** [10] - 14:15,
25:16, 116:23,
117:1, 117:4, 117:5,
117:14, 118:19,
238:22, 240:20
**Facility** [1] - 101:13
**facility** [4] - 12:15,
118:18, 125:15,
243:21
**fact** [33] - 15:16, 33:3,
43:22, 51:4, 51:24,
51:25, 56:5, 64:22,
68:7, 107:14,
129:16, 130:8,
140:19, 154:12,
155:4, 161:8,
168:23, 169:2,
169:10, 174:13,
175:8, 176:25,
180:11, 181:7,
181:8, 182:20,
183:16, 183:17,
185:6, 186:1, 186:2,
202:23, 218:3
**factor** [3] - 49:16,
143:17, 143:21
**factored** [1] - 100:9
**factors** [1] - 249:18
**facts** [2] - 142:24,
251:12
**failed** [6] - 117:19,
117:21, 117:23,
168:17, 169:6, 171:5
**failing** [2] - 124:5,
178:2
**failure** [5] - 155:25,
160:13, 170:17,
171:24, 175:10
**fair** [2] - 36:13, 72:13

**Fair** [2] - 112:23,
221:3
**fairness** [1] - 158:25
**fall** [1] - 47:13
**false** [1] - 151:24
**familiar** [16] - 35:20,
77:6, 84:21, 101:19,
115:25, 130:19,
134:25, 136:2,
209:6, 213:15,
216:20, 218:11,
218:12, 226:25,
227:2, 238:10
**familiarity** [1] - 35:14
**Family** [2] - 233:15,
234:7
**family** [1] - 238:16
**far** [7] - 19:22, 172:7,
176:19, 196:21,
196:23, 217:22,
242:23
**FARRELL** [1] - 2:3
**Farrell** [4] - 2:4, 2:15,
193:14
**fashion** [1] - 212:3
**fast** [2] - 93:14, 242:18
**fault** [1] - 17:20
**faxed** [1] - 45:10
**FCRR** [1] - 6:18
**FDA** [2] - 22:11, 22:15
**feasible** [1] - 131:6
**features** [1] - 131:14
**February** [1] - 60:19,
229:21
**Federal** [2] - 39:19,
50:22
**feed** [1] - 52:17
**feedback** [5] - 56:2,
56:4, 56:18, 56:20,
102:13
**feeds** [2] - 175:20,
177:7
**felt** [5] - 67:12, 79:7,
93:11, 96:13, 145:9
**fentanyl** [1] - 200:12
**few** [17] - 10:4, 23:14,
27:22, 58:5, 60:25,
91:11, 115:4,
123:17, 131:14,
136:24, 141:3,
161:25, 166:18,
168:11, 192:22,
197:2, 223:13
**fewer** [2] - 56:13,
66:22
**Field** [1] - 157:22
**field** [7] - 104:8, 112:7,
113:11, 161:2,
161:3, 164:20, 231:9
**fields** [1] - 10:14

**figure** [2] - 49:13,
120:6
**figuring** [1] - 108:17
**file** [13] - 76:7, 76:15,
76:19, 143:4,
150:13, 150:24,
152:5, 152:8,
153:21, 165:19,
165:22, 166:4,
166:10
**files** [7] - 14:19, 68:25,
76:12, 76:13, 76:16,
76:17
**filing** [1] - 14:13
**fill** [9] - 8:4, 14:11,
30:15, 82:11, 83:14,
94:15, 229:8, 232:5,
239:16
**filled** [9] - 74:24,
148:12, 172:5,
185:6, 185:14,
185:16, 235:19,
237:3, 248:2
**filling** [2] - 141:14,
248:23
**fills** [1] - 58:8
**final** [3] - 60:17,
166:18, 192:13
**finalized** [1] - 122:19
**Finally** [1] - 190:22
**findings** [10] - 80:7,
142:5, 149:9,
149:12, 149:17,
151:13, 154:19,
173:6, 173:11,
173:19
**fine** [5] - 21:24,
120:18, 159:10,
192:6, 221:17
**finish** [4] - 128:5,
202:13, 202:15,
243:1
**Firm** [2] - 3:4, 3:7
**First** [6] - 69:12,
82:13, 114:12,
220:17, 221:1, 233:1
**first** [65] - 7:25, 25:21,
27:21, 39:22, 50:6,
53:1, 53:14, 56:12,
59:23, 60:22, 61:1,
61:10, 62:25, 63:4,
68:3, 70:9, 75:11,
93:23, 99:2, 99:4,
99:25, 103:7,
105:22, 109:14,
113:3, 113:13,
116:19, 118:12,
120:17, 120:21,
121:2, 121:3,
121:21, 121:22,

122:8, 122:12, 129:10, 135:4, 139:19, 140:2, 140:20, 147:16, 148:3, 149:24, 150:17, 151:3, 153:4, 153:19, 158:21, 159:21, 163:25, 165:15, 168:7, 174:1, 186:14, 217:18, 218:2, 223:10, 223:18, 225:17, 227:3, 230:7, 247:2
**Fisher** [4] - 247:4, 247:6, 250:18
**Fisher's** [1] - 238:3
**fit** [1] - 13:24
**fits** [1] - 24:24
**five** [8] - 68:8, 69:6, 118:21, 118:23, 191:8, 219:4, 219:6, 242:20
**FL** [1] - 2:14
**flag** [14] - 44:18, 92:13, 94:1, 94:17, 96:1, 96:2, 96:3, 96:6, 96:10, 96:11, 96:13, 98:22, 142:6, 143:1
**flagged** [1] - 66:7
**flagging** [1] - 42:2
**Flags** [2] - 97:10, 97:21
**flags** [14] - 93:7, 95:23, 96:5, 96:9, 96:16, 96:20, 97:10, 97:14, 97:17, 98:1, 98:17, 98:24, 99:20, 132:18
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flat** [1] - 32:15
**flip** [1] - 28:3
**Floor** [1] - 3:5
**focus** [15] - 11:11, 23:8, 32:6, 39:24, 45:9, 60:2, 72:8, 74:7, 105:22, 107:23, 109:20, 112:11, 121:21, 196:13, 200:3
**focused** [3] - 123:23, 137:2, 241:18
**focusing** [3] - 64:14, 117:2, 196:16
**folks** [2] - 217:20, 220:14
**follow** [3] - 77:18, 154:23, 168:4

followed [2] - 54:24, 176:11
**following** [3] - 40:1, 50:7, 169:4
**Following** [2] - 122:12, 191:9
**follows** [1] - 7:4
**football** [1] - 10:14
**footnote** [2] - 99:12, 99:13
**FOR** [1] - 1:1
**Force** [1] - 162:10
**foregoing** [2] - 192:24, 254:4
**foremost** [1] - 163:25
**forever** [1] - 17:16
**forget** [1] - 182:25
**form** [16] - 58:10, 75:12, 87:17, 154:20, 212:3, 225:14, 225:15, 225:18, 226:14, 227:23, 229:8, 236:18, 237:3, 251:6, 251:8
**Form** [2] - 14:11, 224:25
**former** [2] - 152:4
**Forms** [4] - 57:25, 58:7, 58:14, 166:13
**forms** [19] - 28:5, 58:7, 58:9, 148:8, 148:9, 148:16, 150:12, 150:24, 154:20, 171:20, 172:2, 172:5, 172:7, 172:16, 172:19, 172:24, 222:24, 228:1, 248:1
**forth** [3] - 50:21, 123:14, 124:25
**forthcoming** [1] - 93:13
**forthright** [1] - 180:21
**forward** [3] - 19:4, 128:14, 129:13
**foundation** [6] - 111:20, 173:12, 178:17, 186:22, 188:3, 218:10
**founded** [1] - 114:17
**Four** [1] - 249:8
**four** [9] - 10:14, 11:10, 75:20, 112:5, 151:5, 198:24, 223:11, 250:14, 250:15
**fourth** [1] - 189:3
**frame** [11] - 65:7, 126:12, 126:18, 126:19, 131:23,

138:20, 138:21, 146:17, 168:13, 168:20, 220:4
**free** [2] - 191:21, 252:22
**Freedom** [1] - 244:1
**frequency** [11] - 46:24, 47:12, 47:17, 48:1, 48:17, 48:24, 49:5, 49:15, 49:23, 51:23, 127:7
**frequent** [8] - 42:15, 42:16, 56:7, 58:17, 92:12, 118:6, 125:23, 126:1
**frequently** [2] - 141:1, 246:7
**friendly** [1] - 72:13
**front** [8] - 26:19, 38:13, 94:10, 97:8, 112:13, 133:19, 173:7, 231:22
**full** [11] - 14:23, 37:18, 51:5, 79:12, 83:23, 88:19, 94:10, 126:5, 148:14, 165:15, 247:22
**full-service** [1] - 94:10
**FULLER** [1] - 2:15
**Fuller** [2] - 2:4, 2:15
**fully** [2] - 39:25, 155:5
**function** [9] - 22:23, 33:10, 33:23, 204:20, 214:12, 214:13, 227:22, 231:7, 252:6
**functionality** [5] - 115:20, 116:8, 116:15, 118:14, 177:23
**future** [2] - 108:16, 240:20

**G**

**gap** [4] - 71:17, 73:1, 73:5, 73:8
**gaps** [2] - 70:14, 72:21
**gather** [4] - 86:11, 87:12, 88:8, 98:10
**gathered** [1] - 88:18
**gathering** [1] - 86:19
**gears** [3] - 21:8, 136:24, 155:9
**Gene** [1] - 50:8
**General** [6] - 39:20, 39:22, 86:13, 91:16, 91:22, 129:22
**general** [4] - 9:4, 12:7, 79:23, 135:13

generally [3] - 119:23, 145:20, 250:3
**generate** [2] - 77:16, 135:7
**generated** [1] - 133:1
**generating** [1] - 164:14
**generic** [5] - 199:24, 200:1, 200:3, 200:19, 200:23
**Generic** [1] - 200:22
**generics** [1] - 200:7
**geographic** [6] - 99:2, 99:6, 135:16, 136:12, 197:4, 223:15
**geographically** [1] - 43:16
**geography** [1] - 197:5
**given** [14] - 19:2, 31:9, 37:18, 45:1, 76:6, 101:21, 112:3, 112:5, 133:6, 186:15, 187:10, 202:20, 218:24, 220:23
**goods** [1] - 198:13
**Google** [2] - 91:6, 166:8
**Googling** [1] - 91:19
**Government** [1] - 155:15
**government** [6] - 9:25, 27:21, 28:1, 28:4, 89:2, 169:5
**grab** [1] - 149:16
**graduate** [1] - 196:3
**granted** [2] - 37:2, 252:9, 252:10
**great** [4] - 48:11, 132:6, 165:16, 165:21
**greater** [5] - 82:9, 100:24, 102:23, 118:5, 245:16
**green** [2] - 152:24, 153:3
**greeting** [1] - 234:15
**GRETCHEN** [1] - 6:7
**Group** [4] - 135:1, 135:3, 135:4, 135:6
**group** [5] - 68:13, 137:6, 137:16, 157:1, 229:20
**groups** [1] - 21:6
**growing** [1] - 145:10
**growth** [3] - 88:23, 164:13, 164:14
**guard** [2] - 89:18, 94:3
**guess** [6] - 28:25,

127:18, 209:13, 214:13, 220:8, 230:15
**guidance** [17] - 34:13, 34:17, 34:21, 34:25, 35:1, 53:25, 55:9, 55:23, 55:24, 80:5, 84:12, 122:13, 123:13, 127:10, 127:12, 127:14, 167:7
**guidelines** [6] - 40:1, 50:19, 51:11, 51:17, 54:24, 55:1
**guiding** [1] - 11:25
**Gustin** [14] - 69:14, 69:18, 70:1, 71:20, 185:10, 185:11, 229:20, 230:1, 230:13, 230:24, 232:11, 245:23, 246:13, 246:17
**Gustin's** [1] - 223:7
**guys** [1] - 69:15

**H**

**habits** [1] - 238:15
**Haislip** [2] - 50:8, 50:15
**half** [10] - 42:5, 54:6, 54:7, 60:18, 105:16, 128:6, 131:16, 132:7, 149:19, 187:6
**halfway** [1] - 40:7
**Hamlin** [1] - 233:7
**hand** [7] - 61:2, 154:5, 154:6, 154:9, 189:24, 194:4, 216:15
**handed** [6] - 12:23, 57:2, 84:19, 162:7, 162:23, 188:24
**handle** [1] - 67:21
**handled** [1] - 217:21
**handles** [2] - 215:25, 233:23
**handling** [1] - 166:20
**hands** [1] - 240:22
**hands-on** [1] - 240:22
**handwriting** [3] - 21:17, 225:12, 225:16
**happy** [3] - 120:14, 163:12, 198:14
**hard** [2] - 132:13, 211:24
**HARDIN** [2] - 5:3, 167:19
**harm** [2] - 46:8, 46:12

**Hartle** [1] - 155:1
**Hawkins** [1] - 3:7
**head** [2] - 68:17, 129:15
**header** [1] - 39:17
**Heading** [2] - 45:6, 114:13
**heading** [11] - 40:7, 40:8, 40:18, 41:3, 82:21, 99:23, 105:18, 105:23, 106:4, 132:22, 132:24
**headings** [1] - 107:20
**headquarters** [4] - 80:22, 107:3, 112:4, 161:22
**Headquarters** [4] - 133:2, 160:22, 161:19, 180:18
**Health** [2] - 4:11, 5:2
**Healthcare** [1] - 195:19
**healthcare** [1] - 240:20
**hear** [3] - 47:5, 221:22, 224:21
**heard** [9] - 9:5, 14:17, 35:19, 58:23, 59:11, 81:25, 179:2, 213:18, 234:24
**hearsay** [1] - 157:8
**hello** [1] - 93:9
**help** [5] - 67:13, 71:3, 85:23, 90:1, 136:21
**helpful** [4] - 37:10, 37:22, 38:4, 191:25
**helps** [2] - 71:2, 117:5
**hesitant** [1] - 225:13
**HESTER** [1] - 5:9
**high** [15] - 20:4, 26:22, 77:13, 94:18, 94:21, 131:25, 146:15, 146:19, 241:24, 242:4, 245:12, 249:15, 250:8, 252:2, 252:3
**higher** [6] - 33:23, 71:17, 78:4, 99:6, 238:23, 242:7
**highest** [1] - 92:8
**highlight** [2] - 104:11, 109:19
**highlighted** [2] - 45:10, 151:7
**hire** [1] - 129:23
**hired** [1] - 25:21
**historical** [1] - 63:11
**history** [9] - 87:5, 87:9, 103:5, 103:8,

103:21, 104:3, 106:24, 107:1, 143:9
**hit** [2] - 9:2, 227:6
**hits** [2] - 215:24, 252:13
**hold** [2] - 19:25, 172:15
**home** [1] - 18:16
**homes** [1] - 88:6
**honest** [2] - 159:4, 180:21
**Honor** [156] - 7:8, 7:12, 7:17, 17:3, 17:11, 17:13, 19:9, 19:10, 21:11, 21:21, 26:2, 26:8, 26:17, 27:1, 27:3, 28:12, 28:22, 28:25, 29:3, 29:23, 33:12, 35:6, 38:2, 38:24, 39:1, 45:25, 52:3, 53:2, 53:9, 56:22, 57:7, 60:3, 60:8, 60:10, 66:9, 66:17, 66:19, 71:25, 72:6, 72:17, 75:1, 84:16, 85:1, 85:2, 97:2, 101:7, 102:1, 110:10, 110:23, 111:20, 113:20, 119:1, 119:5, 119:7, 119:14, 120:4, 120:19, 121:15, 124:16, 124:20, 125:2, 125:9, 130:22, 130:25, 134:1, 134:4, 138:19, 139:15, 143:24, 144:2, 144:8, 147:11, 157:8, 159:2, 159:10, 159:18, 162:2, 162:18, 163:11, 165:4, 167:16, 167:19, 167:20, 167:23, 170:25, 173:10, 175:16, 175:24, 176:2, 176:13, 179:5, 180:1, 180:2, 180:4, 181:19, 182:2, 186:9, 186:12, 186:18, 187:24, 188:9, 188:12, 189:15, 189:17, 190:7, 190:11, 190:12, 190:22, 190:24, 191:3, 191:13, 191:22, 192:3,

192:8, 192:11, 193:5, 193:8, 193:12, 193:17, 193:19, 193:22, 194:7, 194:10, 194:12, 204:6, 204:10, 204:24, 216:4, 216:5, 218:9, 220:3, 222:22, 223:5, 223:6, 223:12, 223:14, 223:24, 224:4, 224:7, 224:16, 229:16, 230:10, 230:15, 230:19, 231:13, 231:16, 236:13, 239:2, 239:4, 242:20, 242:23, 243:6, 249:5, 251:13, 252:19, 252:23
**Honor's** [1] - 179:9
**Honorable** [1] - 7:1
**HONORABLE** [1] - 1:17
**hope** [2] - 26:5, 38:9
**hopefully** [1] - 242:24
**Hospice** [5] - 48:2, 238:1, 239:9, 244:12, 244:15
**Hospices** [1] - 143:16
**hospital** [4] - 23:25, 25:15, 31:8, 31:13
**Hospital** [2] - 64:8, 64:13
**Hospital's** [2] - 237:20, 238:10
**hospitals** [7] - 22:20, 22:21, 23:2, 23:3, 23:8, 25:23, 68:12
**hour** [2] - 67:18, 196:22
**House** [26] - 15:16, 15:19, 15:20, 16:9, 19:17, 118:18, 118:22, 148:1, 148:15, 150:9, 154:9, 155:23, 161:17, 168:10, 168:16, 169:11, 170:18, 171:25, 174:25, 175:4, 175:9, 175:20, 175:23, 176:25, 177:2, 177:6
**HQ** [1] - 106:25
**hundred** [1] - 184:7
**HUNTINGTON** [1] - 1:4
**Huntington** [16] -

3:10, 4:1, 10:1, 15:17, 27:7, 148:5, 205:25, 233:17, 237:20, 238:1, 238:3, 238:10, 239:10, 244:12, 244:15, 254:6
**Huntington/Cabell** [2] - 123:21, 233:20
**hydro** [2] - 72:21, 146:3
**hydrocodone** [22] - 104:23, 105:1, 105:2, 105:4, 105:5, 105:9, 105:13, 145:19, 145:24, 146:6, 146:10, 146:19, 181:4, 181:9, 182:20, 182:22, 183:17, 184:16, 200:6, 211:18, 245:1, 245:5
**Hydrocodone** [1] - 197:23
**hydrocodones** [1] - 200:24

**I**

**idea** [5] - 70:10, 70:12, 96:19, 109:2, 154:11
**ideas** [1] - 151:22
**identification** [1] - 189:25
**identified** [11] - 42:24, 60:1, 68:24, 70:22, 95:12, 98:21, 110:1, 122:21, 142:4, 149:23, 150:15
**identifies** [2] - 41:16, 225:5
**identify** [11] - 44:13, 44:24, 49:17, 70:13, 83:22, 84:14, 111:10, 123:10, 169:22, 187:15, 190:4
**identifying** [3] - 48:25, 71:16, 96:19
**II** [32] - 11:17, 11:20, 44:7, 77:3, 78:8, 78:10, 78:14, 78:21, 78:24, 79:2, 79:4, 79:6, 79:8, 80:12, 95:18, 95:19, 105:11, 109:8, 109:12, 112:12, 112:21, 112:25, 145:21, 145:23, 146:1, 221:18,

227:16, 227:18, 227:21
**III** [31] - 11:21, 44:7, 77:4, 79:5, 79:12, 79:13, 80:2, 80:11, 80:14, 80:20, 81:6, 81:9, 81:14, 95:12, 95:14, 95:17, 95:19, 95:20, 105:5, 105:6, 105:14, 109:8, 109:12, 110:1, 110:5, 112:13, 113:5, 146:1, 227:17, 227:18, 227:21
**IIIN** [1] - 44:8
**IIIs** [3] - 11:22, 12:1, 79:15
**IIs** [2] - 12:1, 35:25
**illness** [1] - 10:22
**illustrate** [1] - 126:15
**illustration** [2] - 18:13, 99:17
**illustrative** [1] - 57:2
**image** [1] - 51:4
**immediate** [1] - 59:21
**immediately** [3] - 42:17, 160:10, 178:13
**impact** [1] - 64:23
**implement** [1] - 61:20
**implementation** [1] - 50:20
**implemented** [2] - 58:16, 102:10
**implementing** [2] - 63:5, 128:8
**implements** [1] - 133:12
**implicated** [1] - 231:3
**implicit** [1] - 54:16
**imply** [1] - 53:3
**important** [17] - 8:7, 20:21, 22:23, 26:6, 34:6, 34:9, 39:24, 85:11, 85:12, 88:9, 163:20, 166:19, 180:21, 198:19, 199:10, 232:16
**importantly** [1] - 87:2
**improve** [4] - 126:17, 147:8, 161:16, 167:7
**improved** [1] - 153:15
**improvement** [1] - 152:25
**improvements** [1] - 167:10
**improving** [1] - 161:13
**IN** [2] - 1:1, 1:18
**inadmissible** [1] -

176:13
**inappropriate** [1] - 53:4
**incentive** [1] - 247:23
**incentives** [1] - 202:5
**inception** [1] - 167:9
**include** [14] - 36:4, 36:7, 36:9, 36:11, 81:25, 82:1, 126:6, 126:12, 128:13, 143:3, 197:5, 197:19, 198:9, 235:9
**included** [7] - 21:5, 41:23, 163:4, 169:14, 170:17, 184:14, 203:23
**includes** [3] - 151:17, 175:4, 197:6
**including** [9] - 30:11, 70:2, 105:19, 123:9, 169:21, 171:24, 174:24, 187:16, 211:18
**Including** [1] - 200:24
**income** [3] - 202:21, 202:24, 203:17
**inconsistent** [1] - 53:20
**incorporated** [1] - 132:19
**incorporates** [1] - 136:16
**increase** [22] - 33:2, 65:2, 65:3, 65:20, 66:4, 67:22, 69:10, 75:16, 129:15, 129:16, 135:22, 164:12, 219:13, 219:14, 219:22, 229:8, 232:8, 237:13, 248:3, 248:7, 248:15, 248:17
**increased** [3] - 49:20, 65:12, 104:1
**increases** [2] - 92:13, 139:4
**increasing** [6] - 32:16, 32:17, 64:18, 64:20, 64:22, 135:23
**independent** [12] - 64:13, 92:6, 106:1, 106:9, 106:17, 107:8, 130:18, 134:21, 138:3, 195:4, 199:6, 228:12
**Independent** [1] - 137:16
**independently** [5] - 186:25, 187:21,

187:25, 188:1, 188:5
**independents** [2] - 111:11, 248:24
**indicate** [3] - 99:14, 112:16, 151:8
**indicates** [1] - 80:2
**individual** [15] - 13:5, 15:12, 17:1, 24:11, 30:10, 36:4, 45:3, 70:24, 106:23, 137:10, 138:11, 138:17, 139:4, 144:22, 147:25
**individuals** [3] - 70:2, 141:8, 166:3
**induce** [2] - 201:2, 201:8
**industry** [1] - 63:9
**Information** [2] - 86:14, 88:1
**information** [49] - 36:2, 36:4, 36:17, 36:22, 37:14, 37:20, 75:9, 75:11, 83:21, 86:11, 86:17, 86:18, 86:20, 86:21, 87:12, 87:20, 88:8, 88:15, 89:8, 89:14, 90:4, 90:6, 90:10, 90:11, 91:8, 93:13, 96:12, 98:10, 102:4, 135:8, 142:7, 145:6, 163:19, 187:9, 205:19, 206:12, 206:15, 206:22, 212:20, 218:24, 220:9, 220:11, 220:23, 226:16, 228:16, 245:17, 248:13
**informed** [1] - 113:17
**infrequent** [5] - 42:15, 56:9, 100:23, 113:14, 125:23
**ingredients** [2] - 235:1, 235:3
**initial** [3] - 131:18, 226:13, 228:24
**Initial** [1] - 103:3
**inquiries** [1] - 68:12
**inquiry** [2] - 79:7, 79:9
**inside** [6] - 89:21, 94:8, 94:20, 170:14, 222:11, 223:16
**inspected** [2] - 116:23, 117:2
**inspection** [10] - 117:3, 121:24, 122:8, 122:13, 122:14, 122:18,

125:15, 174:8, 174:16, 175:3
**Inspection** [1] - 89:11
**inspections** [6] - 118:16, 174:23, 175:6, 175:7, 178:6, 178:14
**Inspector** [2] - 91:16, 91:22
**instance** [3] - 73:4, 89:18, 215:3
**instances** [2] - 15:7, 94:25
**instead** [3] - 47:12, 56:7, 120:22
**instrument** [1] - 50:20
**insurance** [1] - 89:2
**Integrity** [1] - 192:18
**integrity** [1] - 8:23
**intend** [2] - 192:23, 193:10
**intending** [1] - 204:25
**interact** [4] - 30:20, 137:8, 137:9, 137:15
**interacted** [1] - 140:13
**interaction** [2] - 93:19, 209:22
**interactions** [4] - 34:3, 139:11, 141:15, 141:17
**interest** [2] - 19:2, 209:20
**interesting** [1] - 20:18
**interject** [1] - 158:23
**Internal** [1] - 173:22
**internal** [2] - 141:4, 171:17
**internet** [2] - 91:20, 166:8
**interpret** [1] - 50:17
**interrogatory** [3] - 186:16, 187:10, 187:11
**interrupt** [2] - 40:20, 72:11
**interview** [2] - 165:19, 166:16
**interviewed** [1] - 8:20
**introduce** [2] - 93:9, 119:16
**introduced** [3] - 60:7, 119:15, 121:11
**introduction** [1] - 9:4
**inventory** [5] - 14:9, 14:10, 100:6, 146:8, 248:25
**investigate** [2] - 86:25, 117:23
**investigated** [2] - 213:8, 221:6

**investigation** [5] - 21:6, 90:23, 227:16, 227:18, 227:24
**investigations** [3] - 114:16, 114:17, 220:2
**investigative** [1] - 66:2
**Investigative** [1] - 66:4
**investigators** [1] - 129:21
**investments** [1] - 129:6
**invoice** [2] - 74:21, 75:1
**involve** [2] - 55:18, 174:13, 209:11
**involved** [13] - 82:12, 92:22, 126:1, 129:9, 174:10, 176:7, 176:15, 178:10, 210:14, 221:18, 221:20, 221:23, 231:1
**involves** [1] - 198:25
**involving** [2] - 130:18, 185:20
**Irpino** [1] - 3:7
**irrelevant** [1] - 120:15
**ISIA** [1] - 5:4
**ISMC** [5] - 130:17, 131:8, 137:16, 162:9, 165:17
**ISMCs** [2] - 106:2, 185:7
**issue** [2] - 149:23, 159:6
**issued** [7] - 13:8, 18:19, 28:7, 28:8, 31:14, 58:9, 174:16
**issues** [11] - 14:24, 15:3, 21:2, 34:3, 87:3, 87:7, 87:15, 91:9, 146:8, 158:21, 178:2
**italics** [1] - 158:13
**item** [11] - 73:25, 74:8, 74:12, 77:23, 80:21, 113:13, 153:19, 154:5, 160:13, 217:10, 248:14
**items** [6] - 155:23, 158:13, 158:16, 159:20, 200:19, 240:19
**iterations** [1] - 212:7
**itself** [6] - 91:7, 118:15, 121:12, 126:4, 130:8, 216:13

**IV** [3] - 240:18, 240:21, 241:19

**J**

**Jackson** [1] - 6:8
**January** [13] - 39:6, 39:19, 123:8, 169:20, 170:1, 170:11, 170:14, 170:15, 178:10, 178:24, 179:7, 179:8, 182:21
**jargon** [1] - 58:2
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**Jersey** [1] - 18:9
**job** [9] - 9:17, 20:18, 61:21, 195:14, 195:21, 195:24, 195:25, 204:20, 232:11
**Joseph** [1] - 52:22
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:15
**Juan** [2] - 2:5, 2:17
**Judge** [7] - 7:2, 201:13, 202:12, 208:2, 208:16, 227:9, 246:24
**JUDGE** [1] - 1:17
**judge's** [1] - 145:17
**judgment** [1] - 95:2
**Julian** [3] - 27:16, 27:18, 27:19
**July** [4] - 110:17, 148:17, 186:2, 205:23
**jump** [2] - 119:3, 243:22
**June** [7] - 8:14, 10:10, 18:19, 18:20, 18:22, 19:20, 60:19
**Justice** [1] - 52:21

**K**

**KEARSE** [2] - 4:2, 193:12
**Kearse** [2] - 193:12, 193:16
**keep** [11] - 43:25, 65:21, 78:3, 86:17, 124:19, 152:5, 152:8, 158:10, 219:25, 224:17, 248:25
**keeping** [2] - 32:15, 198:14

Keeping [1] - 198:19
Kelly [1] - 6:8
KENNEDY [52] -
193:19, 194:7,
194:10, 194:12,
194:14, 201:16,
202:14, 202:19,
203:22, 204:10,
204:11, 205:6,
208:5, 208:19,
211:20, 213:13,
216:1, 216:7, 216:8,
218:15, 220:5,
221:2, 222:15,
222:17, 223:5,
223:21, 223:24,
224:3, 224:6,
224:11, 224:14,
224:16, 224:19,
224:22, 224:23,
227:14, 229:15,
229:18, 230:10,
230:19, 230:22,
231:12, 236:11,
239:2, 242:23,
249:5, 249:8,
249:10, 251:14,
251:18, 252:15,
252:19
Kennedy [18] -
193:21, 194:7,
194:9, 194:15,
204:9, 218:13,
223:4, 224:20,
227:13, 232:2,
233:25, 237:2,
242:18, 242:21,
244:18, 246:11,
247:15, 249:3
Kentucky [1] - 223:1
kept [4] - 43:7, 76:3,
76:16, 180:3
Kessler [1] - 4:17
Kevin [1] - 156:13
key [8] - 204:22,
205:9, 205:16,
206:8, 206:12,
206:19, 206:21
kind [16] - 44:17, 46:9,
46:12, 86:16, 87:9,
92:21, 93:14, 94:25,
141:11, 143:8,
228:14, 234:20,
235:19, 246:19,
246:20, 249:18
kinds [2] - 129:23,
238:7
Kines [1] - 233:15,
234:7, 238:17
knowing [9] - 204:12,

204:16, 204:22,
205:7, 205:9,
205:16, 206:8,
206:20, 206:21
knowingly [1] - 231:2
knowledge [9] -
15:21, 15:23, 37:3,
112:2, 129:25,
215:24, 227:25,
234:20, 240:23
known [9] - 85:17,
94:9, 99:6, 99:19,
200:14, 220:25,
221:1, 240:14,
240:15
knows [7] - 201:15,
205:1, 205:2, 205:3,
220:19, 220:24,
231:5
KOUBA [1] - 3:14

L

LA [1] - 3:8
labeled [3] - 28:18,
84:19, 110:14
labor [1] - 210:8
lack [2] - 24:23, 57:19
Lakeland [1] - 118:21
Landover [1] - 118:21
language [26] - 45:10,
45:12, 50:10, 50:23,
52:24, 54:22, 61:12,
73:18, 74:7, 78:12,
78:21, 80:1, 115:15,
117:2, 118:1, 123:5,
123:17, 123:23,
124:5, 124:8,
124:12, 128:7,
133:12, 151:4,
151:17, 153:3
Lanier [1] - 3:4
Large [1] - 104:12
large [14] - 10:13,
24:15, 25:7, 56:15,
58:3, 70:14, 72:21,
72:25, 93:18,
143:19, 180:25,
195:7, 229:20,
234:24
largely [1] - 137:3
larger [5] - 23:15,
41:21, 47:9, 64:1,
104:16
last [30] - 29:18, 38:5,
40:20, 51:10, 52:22,
56:19, 67:23, 67:25,
72:3, 82:1, 82:3,
89:10, 146:13,
155:20, 161:15,

164:19, 170:6,
170:9, 170:10,
187:6, 192:22,
194:8, 198:22,
199:15, 223:10,
223:18, 232:1,
240:10, 244:16,
248:18
Last [1] - 109:1
lasted [1] - 59:18
late [3] - 90:23,
192:22, 200:17
latest [1] - 143:10
LAURA [1] - 5:10
LAW [1] - 17:19
Law [3] - 3:4, 3:7, 3:12
law [2] - 80:5, 247:7
lawfully [1] - 53:16
lawyer [1] - 183:10
lawyers [1] - 205:24
Lawyers [1] - 205:24
LDMP [4] - 59:12,
59:17, 59:19, 62:21
lead [5] - 33:13, 72:5,
144:4, 191:9, 218:19
leading [10] - 33:12,
53:25, 72:1, 72:3,
72:4, 72:14, 144:3,
144:5, 144:10,
163:10
lean [1] - 231:25
learn [1] - 99:18
learned [1] - 143:4
least [5] - 35:23, 69:7,
190:4, 198:24, 218:5
leave [1] - 209:23
leaves [1] - 24:9
led [3] - 65:13, 122:9,
176:7
Lee [1] - 3:12
left [10] - 28:7, 40:24,
61:2, 154:5, 154:6,
154:9, 182:23,
183:2, 225:10,
229:24
left-hand [4] - 61:2,
154:5, 154:6, 154:9
legal [3] - 46:1, 208:2,
208:16
legitimate [3] - 47:17,
100:6, 117:24
length [1] - 126:9
lengths [2] - 165:16,
165:21
Leon [2] - 2:4, 2:16
less [16] - 32:10, 54:7,
56:3, 56:4, 56:5,
58:17, 65:16, 81:9,
81:11, 81:17, 82:6,
103:19, 109:2,

118:6, 181:16
letter [23] - 50:7,
52:13, 52:19, 52:24,
53:24, 54:4, 54:8,
155:22, 156:3,
156:5, 156:13,
157:4, 157:9,
157:10, 157:11,
157:25, 158:3,
158:6, 158:7,
158:15, 158:17,
158:21, 161:1
letters [9] - 34:21,
42:18, 59:24,
123:13, 159:3,
159:6, 176:4, 179:22
letting [1] - 102:9
Level [103] - 77:1,
77:3, 77:4, 77:13,
77:14, 77:15, 78:4,
78:6, 78:7, 78:8,
78:10, 78:13, 78:14,
78:21, 78:24, 79:2,
79:4, 79:5, 79:6,
79:8, 79:12, 79:13,
79:15, 80:2, 80:11,
80:12, 80:14, 80:20,
81:3, 81:6, 81:7,
81:8, 81:14, 95:12,
95:14, 95:17, 109:7,
109:8, 109:11,
109:12, 109:18,
110:1, 110:4,
112:12, 112:13,
112:16, 112:20,
112:21, 112:24,
112:25, 113:5,
148:16, 165:19,
166:14, 171:20,
172:24, 217:13,
217:14, 217:15,
217:19, 217:20,
218:1, 218:3, 218:4,
218:7, 221:10,
221:13, 221:15,
221:16, 221:17,
221:20, 221:23,
221:24, 223:9,
224:25, 225:3,
226:2, 226:10,
226:14, 226:18,
226:23, 227:5,
227:16, 227:17,
227:18, 227:21,
228:2, 228:20,
229:5, 239:15,
239:17, 248:1, 248:2
level [27] - 20:4, 20:20,
26:22, 48:22, 68:1,
69:19, 73:12, 73:13,

77:14, 78:18, 80:12,
81:2, 81:4, 91:1,
94:18, 94:21,
106:16, 107:22,
108:18, 109:14,
109:22, 112:17,
131:25, 135:13,
143:22, 217:11
levels [7] - 9:11,
49:12, 76:22, 76:25,
77:6, 99:7, 113:4
Levin [1] - 2:12
LEYIMU [1] - 4:8
liability [2] - 114:14,
114:22
license [12] - 17:9,
18:20, 19:15, 19:16,
19:19, 83:20, 86:17,
177:2, 177:5, 177:9,
247:9, 250:19
licensed [10] - 15:21,
15:24, 16:3, 16:6,
16:8, 16:23, 16:24,
31:8, 83:12, 86:22
licenses [6] - 16:13,
17:1, 18:6, 19:3,
86:24, 176:22
Licensing [1] - 86:14
licensing [1] - 15:11
licensure [1] - 86:18
life [4] - 23:4, 233:9,
239:11
Life [1] - 206:25
Life-Style [1] - 206:25
lifesaving [2] - 8:11,
46:16
Lifestyle [1] - 59:20
lifestyle [2] - 59:24,
59:25
lifetime [1] - 13:9
light [2] - 15:8, 98:21
likely [9] - 47:4, 48:5,
48:8, 48:12, 52:1,
55:19, 63:2, 126:6,
238:15
limine [1] - 52:4
limit [4] - 202:10,
202:17, 214:2, 250:2
limitation [1] - 213:19
limited [1] - 12:16
limits [2] - 202:11,
214:16
LINDA [1] - 4:5
line [17] - 27:21, 70:2,
70:3, 80:5, 80:8,
139:19, 140:20,
156:24, 156:25,
164:19, 196:25,
197:1, 206:6,
229:24, 230:6,

231:3, 247:22
**lines** [5] - 89:17, 94:2,
127:22, 151:5, 206:6
**Lisa** [2] - 6:18, 254:3
**List** [1] - 243:24
**list** [6] - 77:15, 91:17,
98:22, 117:10,
119:18, 244:22
**listed** [5] - 42:24, 58:4,
117:9, 244:11,
250:14
**lists** [4] - 61:7, 116:23,
131:16, 175:1
**live** [5] - 8:12, 23:3,
38:9, 233:3, 233:6
**lived** [4] - 233:4,
233:7, 233:9, 246:6
**lives** [1] - 23:3
**LLC** [1] - 2:4
**load** [2] - 67:7, 69:16
**local** [5] - 45:11,
57:23, 107:22,
112:6, 113:11
**located** [7] - 15:18,
15:24, 23:16, 23:24,
24:1, 99:5, 161:3
**Location** [1] - 211:15
**location** [4] - 23:22,
83:11, 97:24, 99:2
**locations** [2] - 243:19,
243:20
**locked** [1] - 11:23
**Logan** [2] - 6:5, 6:12
**logo** [1] - 85:7
**long-term** [1] - 8:21
**look** [122] - 11:6,
14:10, 14:16, 14:19,
14:21, 18:8, 18:18,
19:14, 25:3, 27:13,
29:13, 39:22, 40:6,
40:15, 41:7, 43:18,
43:20, 44:2, 44:16,
49:24, 51:5, 51:10,
52:25, 53:12, 53:13,
54:3, 54:10, 55:25,
57:11, 60:25, 61:2,
61:22, 64:8, 69:22,
71:4, 71:14, 72:19,
73:10, 75:9, 80:11,
80:21, 86:8, 89:1,
90:21, 91:3, 94:1,
94:2, 94:3, 94:7,
94:9, 94:14, 94:17,
99:12, 100:18,
101:15, 102:4,
104:8, 105:16,
105:17, 115:1,
115:10, 115:12,
116:3, 116:18,
117:6, 121:22,

122:25, 127:17,
132:5, 132:17,
132:21, 139:19,
139:23, 140:2,
143:8, 143:9,
143:10, 143:22,
144:15, 148:14,
149:2, 151:16,
153:1, 153:3,
153:17, 155:9,
156:3, 156:24,
157:15, 158:6,
158:15, 158:22,
159:20, 160:13,
160:16, 163:1,
165:15, 168:13,
169:2, 170:1,
171:19, 180:24,
182:10, 182:11,
182:15, 184:5,
187:5, 189:3,
201:17, 206:5,
222:23, 225:17,
242:13, 243:10,
244:8, 244:16
**Look** [1] - 113:9
**looked** [14] - 63:16,
96:5, 106:20,
110:16, 127:5,
129:12, 138:6,
166:12, 178:19,
211:22, 211:23,
227:25, 247:2, 252:7
**Looking** [1] - 240:4
**looking** [24] - 44:4,
45:2, 55:21, 70:24,
71:23, 94:20, 97:17,
98:1, 134:9, 136:13,
143:3, 148:7, 151:6,
151:14, 154:4,
158:1, 170:9,
178:23, 182:19,
198:17, 206:13,
228:12, 247:3
**looks** [13] - 18:18,
70:1, 86:16, 88:1,
110:14, 120:2,
128:9, 131:17,
149:19, 156:18,
157:1, 216:23, 232:6
**loop** [1] - 12:22
**lose** [1] - 177:2
**lost** [8] - 40:21, 52:14,
52:17, 247:8,
250:19, 251:1,
251:7, 251:10
**loud** [2] - 159:24,
159:25
**low** [11] - 25:10,
146:15, 146:16,

146:19, 146:20,
241:25, 245:12,
245:14, 248:25,
251:20, 251:24
**lower** [10] - 40:24,
85:19, 146:11,
154:5, 154:6, 154:9,
201:9, 219:21,
242:1, 242:2
**lowering** [1] - 71:22
**lunch** [5] - 120:6,
122:22, 122:24,
125:16, 126:22

## M

**Magazine** [1] - 3:7
**MAHADY** [1] - 6:4
**mail** [16] - 57:4, 57:11,
127:20, 128:1,
139:20, 156:12,
156:21, 156:24,
156:25, 163:3,
165:10, 165:11,
168:21, 171:3,
173:14
**Main** [1] - 213:23
**main** [3] - 85:13,
107:20, 137:19
**MAINIGI** [5] - 4:12,
192:8, 192:11,
193:8, 193:17
**Mainigi** [1] - 191:6
**maintain** [7] - 61:22,
117:19, 159:14,
169:7, 178:3,
207:25, 208:9
**Maintaining** [1] -
199:9
**maintaining** [1] -
151:10
**maintains** [1] - 151:18
**maintenance** [2] -
8:11, 23:2
**MAJESTRO** [1] - 2:6
**Majestro** [1] - 2:6
**major** [2] - 173:8,
173:20
**majority** [4] - 53:15,
67:22, 85:14, 129:21
**makeup** [1] - 88:10
**management** [11] -
68:17, 78:13, 79:10,
86:1, 86:7, 161:17,
217:15, 217:23,
217:25, 226:22,
238:5
**manager** [4] - 79:23,
156:20, 195:10,
195:11, 195:13,

195:15, 232:7, 240:9
**Manager** [4] - 149:25,
194:23, 225:6, 225:7
**mandatory** [1] - 51:12
**manual** [15] - 9:10,
39:14, 48:10, 51:19,
54:22, 73:16, 73:23,
82:16, 130:18,
130:19, 207:15,
207:17, 216:13,
217:4
**Manual** [5] - 38:14,
38:17, 38:19, 39:18,
131:9
**manuals** [1] - 127:6
**manufacture** [1] -
31:25
**manufactured** [1] -
235:7
**manufacturer** [6] -
12:22, 22:6, 22:9,
31:24, 31:25, 235:8
**manufacturer's** [1] -
22:4
**Manufacturers** [1] -
243:24
**manufacturers** [6] -
8:3, 21:19, 22:1,
22:11, 24:4, 31:19
**manufacturing** [1] -
31:23
**March** [3] - 27:25,
121:23, 174:20
**margin** [4] - 103:5,
103:9, 103:11, 200:4
**MARK** [1] - 3:16
**mark** [2] - 190:2,
252:24
**marked** [10] - 26:20,
57:3, 101:11,
119:24, 120:10,
120:21, 139:14,
162:7, 189:24, 223:8
**market** [2] - 27:8,
199:19
**marketing** [2] -
237:19, 240:5
**marketplace** [3] -
59:8, 84:12, 234:13
**Marshall** [2] - 196:1,
233:8
**master** [1] - 193:1
**match** [1] - 158:18
**matched** [1] - 143:11
**material** [1] - 234:23
**materials** [1] - 234:19
**matter** [4] - 31:5,
31:10, 252:24, 254:5
**matters** [2] - 125:7,
171:13

**maximum** [4] - 62:5,
73:24, 75:2, 217:9
**MAY** [1] - 1:19
**MC-WV-185** [2] -
84:20, 84:25
**MC-WV-381** [1] -
82:18
**MC-WV-397** [2] -
110:14, 110:21
**MC-WV-917** [1] -
28:19
**McCann** [1] - 181:20
**MCCLURE** [1] - 6:3
**McDonald** [2] - 163:2
**MCGINNESS** [1] - 4:2
**McKesson** [199] - 5:8,
7:25, 8:2, 8:13, 8:19,
8:20, 8:25, 9:4, 9:6,
9:8, 9:13, 9:18, 10:1,
10:20, 11:7, 16:5,
16:12, 16:25, 18:5,
20:25, 21:16, 21:17,
22:1, 22:10, 22:18,
22:19, 24:23, 25:16,
25:18, 27:19, 28:8,
30:18, 30:20, 30:22,
31:7, 31:12, 32:3,
32:6, 32:19, 33:22,
34:2, 34:13, 34:25,
35:23, 36:2, 36:17,
36:25, 37:20, 38:18,
39:25, 40:4, 43:2,
43:7, 51:11, 51:13,
54:23, 55:10, 55:13,
55:15, 58:8, 60:23,
61:20, 62:25, 69:8,
72:2, 73:7, 81:21,
82:25, 83:17, 84:6,
85:7, 85:9, 85:15,
85:20, 89:5, 89:12,
90:14, 93:10, 95:2,
97:9, 101:15,
101:17, 105:6,
105:10, 107:5,
112:25, 113:10,
114:8, 114:14,
114:21, 115:2,
115:22, 121:24,
122:1, 122:2, 122:4,
122:13, 122:14,
122:18, 123:2,
123:7, 123:12,
123:20, 124:8,
124:12, 125:17,
127:13, 130:12,
130:20, 134:12,
134:19, 134:25,
135:10, 135:14,
140:8, 141:11,
142:4, 145:22,

146:6, 146:9,
146:24, 147:4,
147:6, 152:4, 156:3,
156:4, 159:6, 159:7,
160:9, 160:16,
160:21, 161:4,
161:12, 162:16,
166:18, 166:24,
167:3, 167:4, 167:6,
167:11, 168:9,
169:6, 169:19,
171:7, 171:18,
172:15, 174:7,
174:23, 183:5,
183:6, 183:8,
183:19, 186:13,
187:1, 193:24,
194:22, 195:2,
195:18, 196:16,
199:15, 199:19,
199:21, 201:4,
201:11, 201:14,
201:21, 202:1,
204:13, 204:17,
204:21, 204:25,
205:1, 205:8,
205:15, 205:24,
207:15, 207:25,
208:8, 208:13,
209:21, 210:2,
210:4, 210:9,
218:16, 229:11,
232:19, 233:23,
234:13, 234:19,
234:20, 235:4,
241:9, 247:19,
252:24
**McKesson's** [19] - 8:1,
21:10, 31:4, 35:14,
38:19, 42:23,
115:20, 116:8,
116:10, 116:15,
118:14, 126:21,
129:11, 147:9,
158:20, 159:8,
174:24, 177:23,
208:21
**MCWV-00185** [1] -
185:2
**MCWV-02074** [1] -
26:20
**MCWV-02158** [2] -
168:8, 171:3
**MCWV-199** [2] -
130:23, 131:1
**MCWV-2062** [1] -
28:18
**MCWV-21250** [1] -
17:11
**MCWV-2149** [1] - 19:4

**MCWV-2158** [2] -
157:6, 158:12
**MCWV-243** [2] -
133:20, 134:1
**MCWV-381** [1] - 60:9
**MCWV-451** [2] - 38:15,
38:24
**MCWV-592** [1] - 57:3
**MCWV-917** [1] - 29:18
**MCWV-918** [2] - 28:18,
29:13
**mean** [34] - 8:9, 25:8,
25:10, 34:23, 40:20,
42:22, 43:13, 47:15,
54:19, 55:6, 74:2,
76:7, 81:9, 81:12,
82:24, 85:13, 96:6,
106:18, 136:10,
140:6, 144:3,
149:21, 150:19,
150:23, 160:3,
169:4, 199:4,
199:25, 202:17,
226:14, 232:11,
232:14, 248:2, 251:6
**meaningful** [4] - 15:2,
22:14, 64:10, 135:8
**meaningfully** [1] -
117:23
**means** [8] - 15:8, 43:2,
61:15, 74:3, 82:25,
85:13, 96:12, 147:8
**meant** [2] - 67:18,
199:8
**measure** [1] - 44:22
**measures** [3] - 12:19,
12:21, 53:16
**mechanical** [1] - 6:19
**mechanism** [1] - 63:1
**Med** [1] - 237:18
**medical** [3] - 23:23,
23:25, 94:11
**medication** [2] - 22:5,
22:8
**medications** [14] -
8:10, 11:7, 11:14,
22:15, 22:22, 23:1,
24:15, 46:16, 46:17,
234:12, 235:5,
235:7, 240:21, 244:7
**Medicine** [1] - 236:23
**medicine** [2] - 24:8,
30:11
**medicines** [3] - 10:23,
30:16, 30:21
**medium** [1] - 106:1
**meet** [11] - 16:20,
25:25, 31:12, 33:1,
34:6, 34:10, 35:1,
47:3, 153:5, 166:19

**Meeting** [1] - 101:16
**meeting** [5] - 53:22,
100:6, 101:17,
102:12, 124:13
**memorandum** [1] -
160:17
**memory** [1] - 227:20
**mental** [1] - 10:22
**mention** [2] - 62:20,
148:9
**mentioned** [13] - 11:1,
11:20, 35:4, 69:6,
91:12, 95:22,
100:25, 116:17,
124:11, 166:7,
175:23, 233:25,
237:2
**messiest** [1] - 21:17
**met** [1] - 194:16
**method** [3] - 11:20,
89:1, 136:3
**Meunier** [3] - 156:14,
156:15, 156:16
**Michael** [3] - 57:11,
104:8, 180:25
**MICHAEL** [2] - 2:15,
3:9
**microphone** [1] -
231:25
**mid** [1] - 90:23
**middle** [6] - 42:4,
50:1, 53:19, 120:6,
204:18, 223:11
**midway** [2] - 123:2,
169:17
**might** [15] - 16:15,
23:19, 23:21, 47:3,
47:19, 60:6, 88:12,
119:14, 120:4,
124:23, 142:9,
146:2, 195:14, 250:1
**MILDRED** [1] - 3:3
**mills** [3] - 230:4,
230:8, 231:1
**mind** [7] - 29:24,
109:4, 192:3,
223:13, 223:14,
227:11
**minute** [5] - 17:24,
26:8, 41:14, 70:8,
158:9
**minutes** [8] - 60:25,
66:15, 168:11,
189:10, 191:8,
242:20, 249:5, 249:8
**mirror** [1] - 65:1
**mischaracterizes** [1] -
170:19
**missed** [1] - 144:19
**missing** [1] - 154:24

**mission** [2] - 8:1, 8:7
**Mitchell** [1] - 2:12
**mix** [2] - 195:14,
200:20
**model** [5] - 64:2,
135:24, 135:25,
136:8, 143:11
**modelings** [1] -
136:18
**models** [1] - 135:7
**moment** [8] - 42:8,
95:21, 119:4,
124:15, 132:10,
154:3, 158:1, 163:4
**moments** [1] - 67:12
**money** [3] - 202:9,
203:12, 204:4
**monitor** [10] - 9:13,
102:17, 137:7,
140:17, 150:11,
153:7, 204:18,
205:21, 214:2,
214:17
**Monitoring** [20] -
58:24, 59:3, 59:20,
60:15, 101:13,
128:9, 128:12,
130:17, 131:9,
132:22, 133:24,
135:11, 167:12,
206:25, 207:7,
207:19, 213:14,
216:10, 217:4, 222:9
**monitoring** [10] - 9:17,
32:20, 59:9, 131:18,
141:12, 145:5,
160:5, 205:8,
205:15, 213:4
**month** [28] - 58:4,
67:23, 68:1, 68:2,
68:3, 74:11, 74:13,
77:24, 90:22, 90:23,
103:16, 103:19,
135:17, 141:3,
143:22, 144:1,
144:16, 146:14,
146:18, 184:9,
213:21, 244:23,
245:5, 245:13, 252:2
**monthly** [19] - 44:7,
44:8, 44:11, 44:16,
44:23, 45:2, 45:4,
56:15, 57:24, 58:3,
58:15, 62:5, 73:24,
75:2, 135:15,
144:15, 213:23,
217:9, 251:25
**months** [9] - 59:18,
59:19, 88:19, 102:8,
108:19, 112:6,

184:7, 209:22,
252:12
**morning** [3] - 7:11,
7:12, 253:4
**Morris** [1] - 6:15
**Most** [2] - 73:14, 92:24
**most** [3] - 87:2,
136:13, 248:24
**motion** [2] - 52:4, 52:8
**Motley** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**motto** [1] - 87:22
**MOUGEY** [1] - 2:12
**mound** [2] - 26:15,
26:17
**move** [27] - 7:6, 17:11,
19:8, 21:22, 22:19,
26:25, 28:21, 38:24,
57:6, 60:9, 84:25,
101:24, 110:20,
119:17, 119:23,
120:23, 130:22,
134:1, 157:6,
184:25, 186:10,
188:4, 190:4,
190:11, 190:22,
236:9
**moved** [2] - 137:6,
243:21
**MR** [395] - 2:3, 2:6,
2:9, 2:12, 2:15, 3:9,
3:11, 3:16, 4:17, 5:9,
5:10, 5:13, 6:4, 7:8,
7:10, 7:17, 7:20,
17:3, 17:6, 17:7,
17:11, 17:13, 17:15,
17:18, 17:20, 17:21,
18:25, 19:1, 19:8,
19:10, 19:12, 21:11,
21:14, 21:15, 21:21,
21:25, 26:2, 26:4,
26:8, 26:11, 26:16,
26:18, 26:25, 27:2,
27:6, 27:11, 27:12,
28:12, 28:14, 28:21,
28:24, 29:2, 29:6,
29:23, 30:3, 30:6,
30:7, 33:12, 33:19,
33:20, 35:5, 35:8,
35:9, 38:2, 38:4,
38:9, 38:12, 38:24,
39:1, 39:2, 39:4,
40:19, 40:22, 41:2,
45:25, 46:2, 46:5,
46:6, 52:3, 52:9,
52:11, 53:2, 53:5,
53:9, 53:11, 56:22,
56:25, 57:1, 57:6,
57:7, 57:9, 57:10,
60:3, 60:6, 60:10,

60:12, 61:4, 61:6,
66:9, 66:13, 66:17,
66:19, 66:20, 71:7,
71:9, 71:11, 71:13,
71:25, 72:6, 72:7,
72:16, 72:18, 75:4,
82:17, 82:18, 82:20,
84:15, 84:18, 84:25,
85:2, 85:4, 85:5,
97:2, 97:4, 97:7,
101:4, 101:10,
101:24, 102:1,
102:3, 110:10,
110:13, 110:20,
110:23, 110:25,
111:20, 111:23,
112:1, 112:9,
113:20, 114:1,
114:3, 119:2, 119:4,
119:7, 119:13,
119:22, 120:2,
120:9, 120:11,
120:12, 120:17,
120:19, 121:1,
121:6, 121:8,
121:10, 121:15,
121:17, 124:15,
124:19, 125:6,
125:9, 125:11,
125:12, 130:22,
130:25, 131:2,
131:3, 131:7, 134:1,
134:4, 134:6,
138:19, 138:23,
138:25, 139:1,
139:15, 139:18,
143:24, 143:25,
144:2, 144:8,
144:14, 145:16,
147:11, 147:14,
147:15, 152:13,
152:16, 152:17,
155:12, 155:13,
156:10, 156:11,
157:6, 157:8, 157:9,
157:14, 159:2,
159:10, 159:12,
159:14, 159:18,
159:19, 162:2,
162:5, 162:6,
162:18, 162:21,
162:22, 163:10,
163:12, 163:14,
165:4, 165:7, 165:8,
167:15, 167:20,
167:23, 167:25,
170:19, 170:21,
170:25, 171:1,
171:8, 171:10,
171:13, 171:15,
173:2, 173:5,

173:10, 173:13,
173:17, 173:18,
174:4, 174:6,
175:12, 175:16,
175:24, 176:2,
176:10, 176:14,
176:20, 177:13,
177:14, 178:17,
178:21, 179:4,
179:9, 179:13,
179:21, 179:25,
180:1, 180:4, 180:6,
181:17, 181:19,
181:23, 182:1,
182:4, 182:8, 182:9,
182:16, 182:18,
183:9, 183:14,
183:15, 183:24,
184:2, 185:1, 186:9,
186:12, 186:18,
186:25, 187:4,
187:12, 187:13,
187:14, 187:15,
187:24, 188:4,
188:9, 188:12,
188:15, 189:2,
189:10, 189:15,
189:16, 189:20,
189:22, 189:23,
190:1, 190:3, 190:6,
190:9, 190:12,
190:17, 190:20,
190:22, 190:24,
191:3, 191:8,
191:12, 191:15,
191:18, 192:3,
193:19, 193:22,
194:7, 194:10,
194:12, 194:14,
201:13, 201:16,
202:12, 202:14,
202:19, 203:18,
203:22, 204:6,
204:10, 204:11,
204:24, 205:6,
208:2, 208:5,
208:14, 208:16,
208:19, 211:19,
211:20, 213:10,
213:13, 216:1,
216:7, 216:8, 218:9,
218:15, 220:3,
220:5, 220:18,
221:2, 222:15,
222:17, 222:20,
223:5, 223:21,
223:24, 224:3,
224:6, 224:7,
224:11, 224:14,
224:16, 224:19,
224:20, 224:22,

224:23, 227:9,
227:14, 229:15,
229:18, 230:10,
230:15, 230:19,
230:22, 231:12,
231:16, 231:18,
236:6, 236:11,
236:13, 236:15,
239:2, 239:3, 239:5,
242:13, 242:18,
242:23, 243:3,
243:9, 243:12,
243:15, 246:23,
247:1, 249:5, 249:8,
249:10, 251:12,
251:14, 251:18,
252:15, 252:19,
252:23
**MS** [21] - 3:3, 3:6,
3:14, 4:2, 4:5, 4:8,
4:12, 4:12, 4:15, 5:3,
5:4, 5:10, 6:3, 6:7,
6:14, 167:19, 192:8,
192:11, 193:8,
193:12, 193:17
**Mt** [3] - 3:15, 4:4, 4:9
**multiple** [4] - 16:12,
16:13, 23:17, 23:24
**Multiple** [1] - 209:11
**must** [1] - 197:4

# N

**NAIW** [1] - 175:7
**name** [21] - 18:11,
85:8, 85:22, 91:6,
101:16, 127:24,
156:14, 194:2,
194:15, 194:17,
211:10, 215:3,
225:2, 225:14,
225:15, 229:23,
236:21, 236:24,
240:10, 243:20,
247:12
**named** [1] - 155:16
**National** [1] - 106:5
**national** [18] - 106:10,
106:14, 107:7,
107:16, 133:25,
134:13, 134:16,
137:1, 137:3, 137:7,
137:8, 137:17,
138:10, 138:14,
184:14, 184:18,
216:24, 233:24
**nationwide** [3] -
174:24, 175:19,
184:11
**nature** [3] - 126:25,

159:23, 167:7
**near** [4] - 61:2,
107:11, 108:4,
142:12
**nearby** [1] - 94:5
**nearing** [1] - 108:24
**necessarily** [2] -
45:24, 47:14
**necessary** [5] - 46:16,
46:17, 80:14,
108:15, 145:6
**need** [29] - 8:12, 13:5,
13:11, 16:3, 16:14,
16:15, 16:20, 16:22,
16:24, 33:1, 63:25,
64:1, 72:23, 75:15,
83:13, 95:18,
108:16, 117:24,
124:24, 158:6,
159:25, 182:5,
182:6, 184:25,
190:9, 228:6,
232:17, 248:21,
252:19
**needed** [8] - 63:15,
67:16, 69:19,
219:16, 228:18,
232:12, 237:13,
248:10
**needs** [8] - 11:24,
11:25, 13:10, 58:11,
100:7, 152:25,
163:5, 163:16
**nervous** [1] - 93:12
**Network** [1] - 151:18
**never** [5] - 66:3, 74:5,
76:7, 77:9, 227:18
**nevertheless** [1] -
113:23
**New** [4] - 3:5, 3:8,
18:9, 82:21
**new** [30] - 59:8, 63:9,
68:3, 71:3, 82:14,
83:7, 83:14, 83:15,
83:17, 88:3, 105:18,
117:23, 120:20,
124:22, 127:2,
129:10, 129:19,
135:17, 153:6,
198:9, 198:12,
203:23, 204:1,
209:9, 211:4,
212:24, 219:1,
228:24, 237:18,
237:24
**Newcastle** [4] -
147:25, 148:3,
149:25, 154:8
**news** [3] - 189:16,
189:19, 191:21

**next** [33] - 29:13,
40:17, 47:22, 54:15,
61:22, 64:15, 68:2,
77:4, 78:20, 86:10,
87:8, 88:14, 96:15,
105:15, 105:16,
106:24, 116:18,
117:13, 119:8,
127:25, 161:12,
180:7, 184:3, 192:4,
193:18, 230:23,
231:24, 240:1,
243:12, 244:4,
248:8, 250:7
**Next** [1] - 250:7
**nice** [1] - 88:20
**NICHOLAS** [2] - 6:11,
167:20
**night** [1] - 192:23
**Ninth** [1] - 4:6
**non** [8] - 98:24,
235:12, 235:16,
235:18, 249:13,
250:2, 250:12
**non-controlled** [4] -
235:12, 235:18,
249:13
**non-controls** [3] -
235:16, 250:2,
250:12
**non-statistical** [1] -
98:24
**none** [1] - 223:2
**normal** [7] - 46:23,
47:11, 99:7, 232:6,
235:5, 235:7, 235:17
**normally** [1] - 72:14
**north** [2] - 196:21,
196:22
**northeast** [2] - 20:7,
137:14
**note** [7] - 15:1, 38:4,
50:7, 52:3, 52:7,
163:3, 172:25
**noted** [4] - 51:8,
75:16, 95:11, 251:6
**notes** [5] - 101:12,
104:8, 165:19,
166:16, 180:24
**nothing** [2] - 176:10,
253:3
**notice** [8] - 104:15,
107:11, 108:3,
108:23, 157:11,
159:5, 159:7, 159:11
**noticed** [2] - 163:5,
163:16
**notification** [2] -
79:25, 111:18
**Notification** [1] -

107:24
**notifications** [1] -
108:9
**notified** [5] - 74:17,
74:20, 79:22, 79:24,
252:13
**notify** [4] - 74:15,
74:20, 80:8, 161:17
**noting** [1] - 164:8
**Notwithstanding** [1] -
67:15
**novelties** [1] - 94:12
**November** [17] - 50:9,
101:14, 101:21,
109:10, 127:21,
128:2, 148:17,
152:19, 156:13,
156:22, 157:18,
168:21, 171:4,
183:25, 184:5, 184:9
**nowhere** [1] - 172:18
**number** [37] - 11:5,
19:4, 38:15, 40:25,
42:8, 42:23, 58:10,
61:8, 63:20, 63:22,
63:24, 69:10, 70:2,
72:20, 127:21,
132:10, 144:1,
144:16, 144:23,
160:4, 168:15,
174:22, 184:14,
186:14, 211:13,
223:25, 235:20,
241:20, 245:3,
245:10, 245:12,
245:13, 245:14,
248:9, 252:3
**Number** [2] - 94:22,
248:11
**numbered** [3] -
155:23, 158:13,
158:16
**numbering** [1] -
147:21
**numbers** [12] - 23:14,
25:4, 41:23, 42:19,
44:11, 132:13,
136:5, 154:13,
181:12, 184:21,
242:7, 245:18
**numerous** [3] -
174:21, 175:5,
175:18
**nursing** [1] - 88:6
**NW** [6] - 2:10, 4:6,
4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

# O

**oath** [1] - 7:14
**object** [11] - 53:2,
144:3, 171:8,
173:12, 175:13,
183:9, 186:18,
186:23, 218:9,
222:22
**objected** [3] - 113:21,
175:12, 181:21
**objecting** [2] - 140:20,
190:19
**objection** [60] - 17:12,
17:13, 19:10, 27:2,
27:10, 28:23, 28:24,
29:1, 29:2, 29:4,
33:12, 39:1, 45:25,
57:7, 60:10, 72:1,
85:2, 101:25, 102:1,
110:22, 110:23,
113:22, 119:9,
119:10, 119:23,
120:1, 121:13,
130:24, 130:25,
134:3, 134:4,
138:19, 157:7,
157:13, 159:15,
163:10, 170:19,
170:23, 171:11,
173:2, 173:3,
175:15, 176:18,
178:17, 181:20,
181:24, 186:24,
190:5, 190:18,
191:1, 208:14,
208:15, 218:14,
224:1, 224:7,
230:14, 230:18,
236:10, 236:11,
236:13
**Objection** [8] -
111:20, 201:13,
203:18, 208:2,
211:19, 213:10,
220:3, 220:18
**objections** [2] -
140:24, 190:6
**Objectives** [1] -
102:16
**objectives** [1] - 153:6
**obligation** [1] - 51:2
**obligations** [5] -
40:16, 115:10,
124:13, 177:19,
177:20
**Obligations** [2] -
115:2, 115:8
**Observation** [1] -
224:25

**observation** [2] -
225:3, 227:5
**observations** [2] -
212:11, 246:19
**observe** [4] - 61:17,
89:15, 93:6, 93:7
**observed** [1] - 95:9
**obtain** [1] - 102:12
**obtains** [2] - 22:2,
22:10
**obviously** [5] - 63:22,
113:21, 126:16,
147:4, 193:1
**occasion** [3] - 34:2,
81:19, 100:25
**occasions** [6] - 36:24,
138:16, 139:3,
141:25, 218:2, 226:2
**occur** [5] - 48:3, 81:2,
81:5, 96:8, 149:7
**occurred** [7] - 90:22,
96:7, 96:13, 109:18,
116:18, 149:1,
150:25
**occurrence** [1] - 84:7
**occurring** [5] - 94:4,
148:21, 151:25,
154:16, 154:17
**October** [4] - 57:21,
139:21, 155:22,
158:4
**OF** [2] - 1:1, 1:4
**offer** [3] - 176:4,
224:3, 230:11
**offering** [1] - 223:12
**office** [11] - 18:17,
80:6, 106:22, 112:7,
113:11, 138:11,
155:23, 161:2,
161:3, 161:16,
161:22
**Office** [8] - 45:11,
50:8, 50:15, 57:23,
91:16, 155:18,
157:23, 161:18
**Offices** [1] - 129:22
**offices** [1] - 23:24
**Official** [2] - 254:2,
254:3
**offset** [1] - 103:18
**often** [6] - 13:12,
211:9, 214:23,
220:7, 228:11,
228:15
**Ohio** [7] - 15:20,
15:25, 19:17,
155:17, 157:23,
169:11, 174:25
**OIG** [4] - 91:3, 91:13,
91:14, 166:7

**old** [3] - 88:10, 102:9,
108:19
**omit** [8] - 92:17,
92:19, 132:24,
133:5, 133:6, 133:7,
148:18, 154:13
**omits** [10] - 92:16,
133:6, 148:16,
148:17, 148:21,
149:1, 149:5,
154:12, 154:15,
155:5
**omitted** [1] - 102:17
**omitting** [1] - 92:11
**on-board** [3] - 90:12,
105:19, 153:6
**on-boarded** [1] -
90:19
**On-boarding** [2] -
82:21, 82:25
**on-boarding** [8] -
82:24, 83:3, 90:7,
105:18, 209:6,
209:7, 210:12, 211:1
**on-line** [1] - 140:20
**on-site** [4] - 206:13,
214:24, 215:9,
215:15
**onboarding** [1] -
185:3
**Once** [2] - 198:12,
217:8
**once** [9] - 14:7, 47:12,
73:23, 95:11, 135:9,
209:17, 210:1,
210:17
**oncology** [4] - 237:21,
237:25, 238:10,
239:7
**One** [2] - 5:11, 232:4
**one** [120] - 16:10,
16:17, 16:21, 16:22,
16:24, 17:9, 18:5,
18:13, 19:13, 20:20,
23:13, 23:22, 24:24,
25:14, 25:15, 28:4,
29:18, 30:24, 31:2,
37:12, 37:25, 40:20,
42:1, 45:14, 58:8,
58:10, 60:8, 61:10,
63:20, 65:18, 66:9,
68:24, 69:5, 69:14,
73:11, 75:17, 75:20,
78:11, 78:18, 89:6,
92:7, 94:1, 94:14,
94:22, 99:2, 104:11,
106:8, 107:23,
110:15, 111:10,
113:18, 115:10,
116:22, 117:9,

117:19, 118:19,
118:22, 119:4,
120:2, 120:4, 122:2,
124:15, 126:19,
127:5, 129:10,
129:13, 133:16,
136:5, 136:18,
142:12, 143:1,
143:6, 152:2,
152:20, 154:11,
155:24, 157:25,
159:4, 160:4,
165:13, 169:11,
173:6, 174:21,
175:9, 178:20,
180:11, 180:15,
180:17, 185:19,
188:22, 190:9,
190:12, 190:24,
198:7, 199:3,
202:23, 205:14,
214:5, 215:4,
215:15, 222:20,
222:21, 225:3,
226:3, 228:10,
230:24, 231:1,
231:4, 233:15,
238:16, 239:1,
246:14, 248:9,
250:18, 251:23,
252:23
**ones** [5] - 16:10,
30:17, 175:19,
205:20
**oops** [1] - 150:11
**opened** [4] - 176:8,
176:12, 236:23,
243:21
**opening** [2] - 48:2,
48:7
**operates** [1] - 31:12
**Operating** [2] - 38:19,
131:9
**operating** [2] - 130:18,
151:19
**operation** [3] - 16:16,
25:22, 238:13
**operations** [5] - 20:17,
79:20, 79:22, 216:23
**Operations** [10] - 10:6,
14:6, 19:24, 20:12,
20:15, 38:14, 38:17,
39:18, 86:4, 86:7
**opinion** [1] - 251:20
**opioid** [9] - 24:8, 92:9,
104:20, 104:22,
104:24, 167:8,
175:20, 241:25
**opioids** [27] - 11:9,
11:12, 11:17, 12:20,

14:12, 22:11, 25:10, 25:17, 30:11, 31:19, 32:9, 34:4, 34:7, 64:19, 166:21, 197:19, 199:16, 199:19, 238:8, 239:13, 241:8, 241:20, 247:20, 248:3, 248:20, 251:3
**opportunity** [2] - 16:25, 26:22
**opposed** [5] - 44:17, 63:1, 148:11, 149:13, 188:2
**opposite** [1] - 25:9
**option** [1] - 29:11
**options** [3] - 28:1, 29:16, 29:21
**order** [98] - 8:12, 9:9, 11:4, 13:4, 14:12, 16:1, 16:13, 16:17, 24:4, 24:14, 24:17, 28:5, 31:12, 32:23, 33:1, 33:9, 33:21, 41:10, 41:12, 41:16, 41:17, 42:2, 44:6, 44:17, 45:3, 45:11, 45:17, 46:25, 47:9, 47:14, 47:15, 47:22, 48:5, 48:8, 51:1, 51:24, 56:1, 56:8, 56:9, 58:17, 61:11, 61:18, 62:6, 62:9, 62:12, 62:15, 66:23, 73:13, 73:14, 74:2, 74:3, 74:16, 74:24, 74:25, 77:7, 77:19, 77:25, 78:4, 78:25, 79:4, 80:3, 80:18, 80:24, 81:4, 81:17, 83:21, 88:12, 90:20, 90:25, 92:18, 92:19, 95:19, 100:23, 102:22, 103:9, 103:18, 103:19, 109:2, 113:7, 113:14, 117:25, 118:6, 120:7, 123:24, 127:4, 130:4, 132:14, 133:5, 161:15, 172:8, 186:16, 187:16, 218:18, 227:25, 241:8, 241:21
**Order** [12] - 40:10, 41:25, 42:7, 42:12, 42:18, 45:8, 56:13, 128:9, 128:12, 132:22, 132:25,

161:9
**order-by-order** [1] - 44:17
**ordered** [9] - 33:6, 63:14, 65:16, 221:25, 226:4, 226:19, 228:7, 242:2
**ordering** [16] - 20:8, 23:9, 25:9, 44:21, 47:8, 47:11, 47:21, 47:23, 65:1, 71:23, 83:2, 214:5, 214:7, 220:1, 238:15, 249:1
**Orders** [3] - 41:4, 107:18
**orders** [108] - 8:4, 8:5, 9:5, 9:6, 9:8, 9:12, 9:13, 36:11, 36:12, 42:24, 43:3, 44:14, 44:18, 44:25, 45:18, 45:24, 46:8, 46:12, 46:20, 46:22, 46:23, 47:16, 47:25, 48:5, 48:16, 49:1, 51:6, 51:7, 51:25, 54:14, 54:18, 55:14, 55:15, 55:17, 55:19, 55:22, 58:15, 61:11, 61:17, 66:23, 73:24, 74:8, 74:12, 77:16, 81:10, 81:11, 81:12, 90:21, 102:17, 107:21, 108:15, 109:15, 109:20, 109:22, 110:3, 111:15, 112:17, 112:19, 112:25, 114:15, 114:17, 117:22, 123:11, 123:18, 123:21, 124:1, 124:4, 124:6, 125:21, 126:1, 126:6, 130:2, 131:18, 132:2, 132:24, 133:13, 148:24, 149:7, 149:9, 153:8, 154:22, 156:1, 160:14, 160:22, 161:5, 161:18, 166:14, 168:17, 169:22, 170:18, 175:11, 185:21, 186:3, 186:6, 187:7, 187:23, 188:7, 188:25, 214:20, 215:20, 216:18, 217:10, 218:6, 232:5
**organizational** [1] - 132:7

**orient** [7] - 38:21, 62:3, 69:25, 76:24, 81:1, 125:14, 155:14
**Oriente** [22] - 7:7, 7:21, 26:19, 35:20, 57:12, 66:21, 82:12, 84:19, 97:8, 112:10, 125:4, 125:13, 151:6, 167:15, 168:1, 168:3, 185:4, 188:20, 191:17, 191:20, 192:4, 253:1
**orienting** [1] - 128:5
**original** [1] - 158:15
**originally** [1] - 74:17
**Orleans** [1] - 3:8
**osteopathic** [1] - 250:20
**OTC** [1] - 94:11
**otherwise** [3] - 22:11, 54:13, 243:7
**ought** [1] - 66:11
**ourselves** [3] - 76:25, 81:1, 155:14
**out-of-state** [1] - 94:1
**outcome** [1] - 135:8
**outlines** [1] - 202:4
**outlining** [1] - 133:23
**outside** [10] - 68:13, 89:16, 93:5, 93:24, 94:19, 186:19, 187:24, 188:2, 222:11, 223:17
**overall** [5] - 12:15, 58:13, 59:19, 151:8, 153:4
**Overall** [2] - 151:3, 151:5
**overlapped** [1] - 59:12
**override** [1] - 107:21
**overrule** [5] - 27:9, 144:6, 157:12, 170:23, 224:1
**Overruled** [5] - 203:19, 208:4, 208:18, 213:11, 251:16
**overruled** [7] - 29:4, 46:4, 53:7, 112:8, 178:18, 181:24, 227:12
**oversee** [3] - 20:7, 30:24, 134:23
**Overview** [1] - 101:13
**overview** [2] - 102:6, 129:8
**overwhelming** [1] - 153:15
**own** [13] - 87:19, 89:24, 90:5, 106:15,

107:5, 141:4, 141:5, 141:6, 141:10, 141:12, 142:8, 146:8, 229:13
**owner** [8] - 89:6, 89:7, 91:18, 149:20, 149:23, 150:4, 199:12, 210:19
**owner's** [1] - 89:10
**owners** [2] - 137:15, 228:13
**ownership** [1] - 87:5
**oxy** [3] - 72:21, 146:3, 146:5
**oxycodone** [19] - 104:13, 105:9, 105:10, 145:19, 145:20, 146:15, 181:4, 211:18, 213:24, 225:9, 225:12, 237:13, 241:3, 245:8, 245:13, 251:20, 251:23, 251:24
**Oxycodone** [1] - 197:21
**oxycodones** [2] - 200:17, 200:24
**Oxycontin** [1] - 213:24

## P

**P-00115** [1] - 171:17
**P-116** [1] - 152:18
**P-1200** [1] - 2:7
**P-12643** [1] - 97:8
**P-12814** [1] - 162:7
**P-12821** [1] - 165:10
**P-13** [3] - 119:23, 120:22, 120:23
**P-13068** [1] - 67:4
**P-1320** [1] - 119:18
**P-13284** [1] - 242:13
**P-13296** [2] - 189:25, 190:4
**P-13385** [1] - 230:11
**P-13710** [1] - 190:11
**P-13714** [1] - 236:6
**P-13737** [1] - 127:16
**P-23733** [2] - 114:5, 177:13
**P-33** [1] - 52:12
**P-34** [1] - 54:4
**P-42089** [1] - 186:10
**P-4247** [1] - 190:23
**P-42554** [2] - 168:23, 174:2
**P-42638** [1] - 216:1
**P-42657** [3] - 101:11, 101:24, 180:8

**P-42728A** [1] - 190:23
**P-42796** [1] - 139:14
**P-42814** [1] - 158:8
**P-43225** [1] - 181:18
**P-8309** [1] - 69:22
**P-8761** [1] - 162:24
**P-8763** [1] - 67:4
**p.m** [2] - 189:13, 253:5
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**package** [1] - 202:4
**Page** [98] - 19:14, 28:3, 29:18, 39:6, 39:16, 39:17, 40:6, 40:7, 40:18, 40:22, 41:3, 42:4, 45:5, 46:20, 60:17, 73:17, 76:21, 77:12, 82:16, 82:18, 87:4, 87:25, 88:4, 88:14, 98:4, 98:7, 98:23, 99:22, 99:23, 102:15, 102:25, 107:17, 109:4, 111:7, 111:14, 112:11, 112:12, 112:16, 112:20, 112:21, 112:24, 112:25, 113:9, 114:12, 114:24, 114:25, 115:7, 115:11, 115:12, 122:25, 127:25, 128:6, 128:19, 128:22, 128:25, 131:15, 132:5, 132:17, 132:21, 147:20, 150:7, 150:10, 151:1, 151:2, 152:11, 153:1, 153:18, 154:4, 169:2, 169:10, 170:3, 170:8, 170:21, 171:3, 171:19, 171:20, 177:19, 180:12, 181:18, 206:5, 216:14, 217:8, 224:22, 224:24, 243:13, 243:14, 243:22, 244:8, 244:17, 249:23
**page** [64] - 29:8, 40:25, 42:5, 44:2, 44:3, 44:4, 45:6, 49:25, 51:5, 52:22, 53:1, 53:13, 60:17, 60:18, 61:1, 77:4, 77:12, 78:20, 82:17, 86:10, 87:8, 88:14,

89:10, 89:11, 89:22,
90:1, 97:21, 99:13,
101:15, 105:15,
105:16, 110:15,
114:13, 120:17,
120:21, 121:2,
121:3, 121:5,
121:21, 121:22,
122:8, 127:25,
128:25, 129:3,
131:16, 132:8,
134:14, 149:16,
150:8, 155:15,
155:20, 157:16,
165:14, 169:18,
173:7, 174:1,
217:13, 224:15,
224:21, 230:7,
230:23, 243:12,
250:7
**pages** [6] - 58:5,
115:4, 120:7,
120:23, 170:8,
180:12
**Pages** [1] - 171:19
**pagination** [1] - 40:24
**paid** [2] - 201:17,
205:12
**pain** [4] - 88:5, 212:8,
238:5, 250:15
**pallet** [1] - 10:16
**Papantonio** [1] - 2:12
**paper** [3] - 76:12,
182:7, 247:8
**papers** [1] - 76:14
**paperwork** [6] - 56:17,
148:11, 149:3,
149:5, 149:13,
154:23
**paragraph** [24] -
27:23, 27:24, 39:22,
41:7, 45:6, 50:1,
50:6, 51:10, 53:1,
53:13, 54:10, 54:11,
70:17, 116:18,
117:8, 117:14,
118:12, 121:22,
123:2, 140:3, 151:3,
153:4, 165:15,
169:18
**Paragraph** [6] -
169:17, 174:3,
174:7, 174:15,
177:20, 178:2
**paragraphs** [5] -
49:24, 51:9, 147:24,
153:19, 158:19
**parallel** [1] - 15:11
**Pardon** [1] - 223:21
**parenthetical** [2] -

44:5, 116:4
**Parkersburg** [2] -
196:21, 196:22
**parking** [2] - 246:18,
246:19
**part** [45] - 9:17, 19:23,
20:15, 20:18, 31:11,
41:17, 41:21, 56:1,
57:22, 61:19, 83:4,
91:1, 91:3, 93:18,
94:13, 94:22, 94:23,
102:12, 130:1,
130:6, 130:8,
132:19, 135:10,
144:17, 144:20,
149:15, 164:3,
177:1, 197:18,
198:12, 198:19,
200:6, 200:17,
200:19, 206:22,
208:12, 212:20,
217:23, 230:16,
232:9, 232:15,
232:21, 233:12,
244:9
**Part** [1] - 198:9
**particular** [13] - 23:8,
25:15, 54:17, 55:6,
75:13, 104:11,
169:12, 174:7,
180:12, 184:9,
206:11, 245:19,
247:24
**Partnership** [1] -
105:23
**Pasquale** [1] - 79:21
**pass** [4] - 71:7,
119:19, 128:16,
241:4
**passed** [8] - 7:5,
28:17, 117:3,
118:10, 118:11,
178:6, 178:13,
178:14
**passing** [2] - 38:6,
86:8
**past** [6] - 54:15, 65:11,
87:15, 172:23,
227:17, 240:19
**patient** [8] - 24:11,
30:10, 30:14,
238:20, 239:7,
239:8, 239:9, 239:11
**patients** [6] - 22:8,
30:20, 64:10,
235:18, 239:12,
246:21
**pattern** [9] - 46:23,
47:11, 47:16, 48:1,
48:16, 48:23, 49:5,

49:14, 49:22
**patterns** [5] - 23:10,
42:25, 59:8, 75:14,
95:9
**PAUL** [2] - 2:3, 5:9
**Paul** [3] - 27:16,
27:19, 143:24
**Pause** [3] - 26:13,
119:6, 124:18
**pay** [2] - 96:4, 205:11
**paying** [1] - 94:16
**payment** [1] - 89:1
**PCCA** [2] - 234:25,
244:1
**peak** [1] - 209:20
**PEARL** [1] - 3:6
**pending** [1] - 52:8
**Pennsylvania** [1] -
149:25
**Pensacola** [1] - 2:14
**people** [15] - 8:10,
8:12, 8:21, 9:11,
23:2, 61:16, 68:24,
69:7, 127:21,
129:19, 129:23,
137:18, 162:9,
199:4, 229:20
**per** [8] - 143:22,
144:1, 144:16,
146:14, 146:18,
213:21, 244:23,
249:25
**percent** [12] - 11:10,
27:8, 103:5, 103:9,
103:11, 103:14,
142:18, 143:1,
241:2, 249:15,
250:12
**percentage** [5] -
11:11, 145:10,
249:21, 249:22
**perform** [2] - 13:25,
68:1
**performed** [2] - 94:25,
153:5
**performing** [2] -
93:16, 131:22
**perhaps** [2] - 47:11,
47:21
**Perhaps** [1] - 94:6
**period** [78] - 10:5,
10:9, 27:23, 27:25,
29:9, 29:14, 29:19,
32:8, 32:15, 39:12,
42:11, 43:1, 43:8,
43:10, 43:21, 43:25,
47:24, 48:6, 48:7,
49:7, 53:24, 55:13,
56:3, 56:8, 56:9,
57:22, 58:25, 59:11,

59:15, 64:14, 64:17,
64:21, 64:24, 65:11,
65:12, 66:22, 67:4,
68:8, 69:9, 83:4,
88:23, 97:18,
100:22, 103:20,
107:14, 108:17,
113:19, 123:8,
123:10, 124:2,
128:14, 137:2,
138:24, 139:2,
169:5, 169:16,
169:17, 169:20,
171:5, 172:23,
179:18, 181:7,
182:10, 182:19,
183:8, 184:16,
186:1, 186:7, 187:8,
198:4, 207:6,
211:19, 218:23,
220:22, 222:3,
228:3, 229:4
**periodic** [2] - 139:8,
146:25
**periodically** [1] -
39:10
**periods** [4] - 35:11,
35:15, 35:18, 36:14
**Permission** [2] -
236:7, 242:15
**permit** [2] - 61:16,
244:14
**Permit** [2] - 18:4, 18:5
**permitted** [2] - 72:15,
73:7
**person** [7] - 68:18,
91:18, 93:10,
156:18, 210:17,
215:9, 215:15
**personally** [4] - 91:24,
141:8, 167:5, 222:6
**personnel** [2] -
229:12, 232:5
**perspective** [4] - 8:6,
13:14, 31:4, 142:3
**pertaining** [1] - 87:2
**Pete** [1] - 79:21
**PETER** [1] - 2:12
**PGRDRC@
mckesson.com** [1] -
157:2
**Pharma** [1] - 151:18
**Pharmaceutical** [1] -
174:23
**pharmaceuticals** [1] -
8:2
**pharmacies** [68] - 8:4,
8:5, 9:21, 22:20,
22:21, 23:2, 23:7,
23:8, 23:13, 23:18,

24:14, 25:1, 32:20,
32:23, 33:1, 33:6,
33:9, 33:21, 36:5,
46:18, 47:8, 49:5,
49:20, 63:14, 63:23,
63:25, 65:15, 65:16,
65:17, 65:25, 68:12,
71:16, 71:21, 87:6,
90:7, 90:19, 92:4,
92:5, 92:6, 92:8,
100:13, 103:18,
106:17, 106:21,
107:8, 123:11,
123:19, 123:21,
134:24, 137:10,
138:3, 140:7,
143:19, 144:24,
169:23, 176:6,
195:4, 196:7,
196:10, 197:16,
199:1, 199:6,
215:16, 228:13,
235:1, 246:7
**pharmacies'** [1] -
228:13
**Pharmacist** [1] - 47:20
**pharmacist** [22] -
47:23, 74:15, 86:19,
87:1, 89:22, 89:23,
90:1, 91:7, 91:18,
91:20, 93:1, 93:11,
94:8, 94:20, 96:24,
166:17, 199:9,
199:12, 210:19,
240:8, 248:20
**Pharmacists** [1] -
137:15
**pharmacy** [100] -
10:24, 12:25, 14:12,
23:22, 24:9, 24:10,
24:13, 24:25, 25:3,
25:7, 25:9, 30:14,
31:8, 31:13, 37:19,
44:21, 44:22, 47:21,
47:24, 48:2, 49:20,
58:8, 63:21, 64:9,
64:13, 66:3, 66:5,
68:21, 73:7, 76:4,
76:6, 76:16, 78:19,
83:8, 83:10, 83:15,
83:18, 86:17, 86:22,
87:5, 88:12, 88:21,
89:16, 89:18, 89:21,
90:11, 90:12, 90:16,
91:7, 91:20, 92:10,
92:14, 93:5, 93:18,
94:9, 94:10, 99:5,
100:5, 106:23,
107:2, 124:9,
138:15, 141:23,

143:12, 143:16, 144:22, 146:13, 152:5, 198:12, 199:11, 207:22, 210:18, 210:19, 211:1, 211:11, 213:1, 213:20, 214:3, 214:17, 227:24, 230:16, 233:25, 234:7, 234:9, 234:11, 234:17, 234:18, 235:2, 237:19, 238:16, 238:21, 240:8, 240:17, 243:18, 245:19, 246:20, 246:21, 248:25, 252:13
**Pharmacy** [9] - 18:3, 99:25, 187:17, 213:23, 233:16, 234:8, 235:21, 236:19, 237:18
**Philadelphia** [2] - 6:6, 6:13
**phone** [1] - 143:12
**photographs** [3] - 93:21, 166:1
**photos** [3] - 165:18, 212:13, 212:15
**Physical** [1] - 89:11
**physical** [5] - 11:12, 48:18, 83:10, 97:24, 160:6
**physically** [2] - 31:19, 43:14
**physician** [1] - 240:24
**physicians** [5] - 23:24, 32:10, 238:22, 240:21, 248:24
**PIC** [2] - 47:20
**pick** [7] - 7:21, 44:15, 63:20, 66:25, 79:25, 86:25, 125:13
**picked** [2] - 18:13, 92:8
**picking** [1] - 10:16
**picture** [3] - 37:18, 88:20, 96:22
**pictures** [2] - 89:20, 94:19
**piece** [4] - 75:11, 223:18, 248:13
**PIFKO** [1] - 3:16
**piling** [1] - 29:24
**pill** [3] - 230:4, 230:8, 231:1
**pills** [9] - 74:23, 144:16, 144:21, 144:23, 146:14,

146:18, 146:20, 175:20, 184:7
**place** [18] - 12:21, 18:8, 25:8, 47:9, 59:2, 59:4, 59:16, 59:17, 63:10, 64:16, 89:5, 89:6, 108:16, 154:18, 154:23, 214:16, 235:12, 239:20
**placed** [4] - 47:10, 123:11, 123:19, 169:22
**places** [3] - 71:16, 80:10, 238:7
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**Plaintiffs** [1] - 254:6
**plaintiffs** [9] - 27:8, 52:4, 121:19, 186:10, 192:13, 192:23, 193:1, 193:10, 243:7
**Plaintiffs'** [1] - 186:13
**PLAINTIFFS'** [1] - 194:5
**plaintiffs'** [2] - 7:23, 119:18
**plan** [6] - 149:17, 149:19, 149:22, 149:23, 150:4, 223:24
**planned** [1] - 192:14
**plates** [1] - 94:1
**play** [3] - 205:18, 206:12
**played** [6] - 204:22, 205:9, 205:16, 206:8, 206:19, 206:21
**plea** [1] - 124:24
**Pleasant** [3] - 3:15, 4:4, 4:9
**Plot** [1] - 136:3
**plus** [1] - 103:5
**podium** [1] - 7:8
**point** [36] - 35:3, 48:13, 51:16, 53:21, 62:19, 78:12, 79:25, 80:10, 80:17, 80:24, 95:7, 96:25, 108:23, 109:1, 111:17, 116:11, 125:17, 129:13, 142:12, 147:5, 151:23, 153:12, 159:2, 159:21, 159:23, 164:16, 171:12, 196:6, 221:11, 226:15, 227:10,

228:3, 228:9, 236:24, 243:19, 247:7
**pointed** [1] - 67:22
**points** [13] - 9:2, 32:18, 39:13, 61:8, 84:14, 91:11, 93:23, 98:10, 102:21, 111:4, 136:25, 142:1, 229:1
**poles** [1] - 125:23
**policies** [18] - 14:8, 14:16, 35:14, 51:17, 52:6, 58:18, 100:23, 122:15, 131:13, 141:10, 141:13, 152:3, 152:7, 153:14, 160:12, 164:3, 167:6, 172:15
**policy** [7] - 43:7, 61:1, 62:4, 80:17, 172:20, 206:14
**Ponc** [1] - 2:4
**Ponce** [1] - 2:16
**portion** [4] - 8:19, 51:6, 53:4, 164:9
**portions** [1] - 68:8
**position** [7] - 9:20, 20:6, 20:7, 68:19, 75:21, 137:17, 213:7
**positions** [1] - 69:21
**possession** [1] - 12:24
**possible** [4] - 21:17, 76:14, 94:17, 145:5
**potential** [5] - 25:4, 46:8, 46:11, 96:20, 98:16
**potentially** [1] - 84:14
**powders** [1] - 244:4
**Powell** [1] - 2:6
**PR** [2] - 2:5, 2:17
**practice** [2] - 33:3, 219:9
**practices** [5] - 58:17, 64:18, 64:22, 240:6, 240:17
**pre** [1] - 83:18
**pre-2008** [3] - 42:11, 55:13, 56:8
**pre-existing** [1] - 83:18
**preamble** [1] - 80:11
**precursor** [3] - 38:21, 59:21, 59:22
**prefer** [1] - 242:20
**premise** [1] - 202:8
**premises** [1] - 94:4
**prep** [1] - 250:13
**prepared** [4] - 113:10,

180:16, 180:17, 181:20
**preparing** [1] - 192:22
**prescribe** [1] - 238:8
**prescriber** [4] - 11:4, 30:12, 30:13, 49:12
**prescribers** [8] - 30:16, 32:21, 33:6, 33:24, 49:9, 49:19, 93:17, 141:24
**prescribing** [13] - 30:17, 30:18, 49:12, 63:14, 64:18, 64:22, 65:2, 65:3, 65:12, 65:13, 65:15, 99:7, 251:3
**prescription** [31] - 11:4, 11:8, 11:12, 11:14, 12:19, 22:11, 22:14, 22:22, 24:8, 24:11, 24:13, 25:16, 30:10, 30:11, 30:15, 31:18, 32:9, 34:3, 34:7, 64:18, 88:15, 88:20, 89:3, 99:7, 104:20, 104:24, 142:14, 166:21, 235:7, 244:7, 248:21
**prescriptions** [16] - 32:10, 32:12, 32:21, 33:2, 33:11, 33:24, 49:9, 88:3, 88:24, 93:17, 94:15, 103:22, 141:24, 235:18, 248:23, 249:1
**presence** [1] - 96:6
**present** [5] - 109:11, 139:7, 174:20, 205:24, 205:25
**presentation** [13] - 101:21, 102:7, 109:10, 110:2, 111:2, 112:3, 112:5, 162:9, 181:8, 182:13, 183:22, 184:6, 184:8
**presentations** [6] - 118:4, 126:23, 126:24, 138:6, 138:9, 180:15
**presented** [3] - 50:19, 111:22, 112:2
**presenting** [1] - 102:7
**preservation** [1] - 119:22
**preserve** [3] - 113:22, 119:10, 181:20
**President** [2] - 27:19, 57:15

**president** [1] - 79:23
**pressure** [1] - 10:23
**pretty** [4] - 157:9, 189:17, 238:12
**prevent** [10] - 53:16, 61:12, 61:18, 71:23, 208:1, 208:9, 213:7, 221:6, 232:18
**prevented** [1] - 46:17
**preventing** [7] - 141:19, 204:23, 205:10, 205:17, 206:9, 206:20, 206:23
**previous** [6] - 87:3, 135:16, 135:18, 184:4, 184:6, 214:10
**previously** [6] - 47:10, 63:10, 68:18, 95:18, 119:24, 120:21
**price** [5] - 200:15, 200:18, 200:20, 201:7, 248:19
**prices** [2] - 200:22, 201:9
**pricing** [3] - 200:23, 247:16, 247:19
**primarily** [2] - 129:20, 168:15
**primary** [5] - 85:9, 85:12, 85:17, 100:19, 146:5
**principal** [2] - 15:17, 16:10
**principles** [1] - 8:23
**Printed** [1] - 43:15
**printed** [1] - 132:16
**prints** [3] - 75:1, 165:18, 166:6
**privileges** [3] - 251:2, 251:7, 251:10
**proactive** [1] - 71:20
**proactively** [1] - 61:10
**problem** [3] - 16:18, 53:8, 96:14
**problematic** [1] - 66:6
**procedure** [1] - 219:18
**procedures** [5] - 14:8, 141:11, 141:13, 151:20, 153:15
**proceed** [6] - 7:17, 66:17, 125:9, 191:11, 192:9, 194:11
**proceeding** [2] - 81:20, 223:8
**Proceedings** [2] - 6:19, 189:13
**proceedings** [1] - 254:5

**PROCEEDINGS** [1] - 7:1
**Process** [1] - 82:22
**process** [25] - 9:10, 13:15, 15:11, 31:4, 32:4, 61:7, 78:24, 79:3, 91:1, 128:8, 129:4, 130:6, 133:15, 133:23, 135:21, 163:20, 172:12, 176:1, 209:12, 210:12, 210:21, 211:1, 217:11, 226:12, 248:9
**processes** [7] - 14:8, 15:9, 55:10, 87:13, 125:18, 161:13
**Proctor** [1] - 2:12
**produce** [1] - 187:18
**produced** [1] - 6:19
**product** [11] - 8:3, 10:17, 24:17, 24:19, 32:1, 71:24, 83:2, 143:20, 198:17, 234:21, 244:6
**products** [10] - 10:19, 10:21, 22:10, 24:4, 24:5, 85:14, 146:4, 196:12, 199:24, 241:2
**profit** [1] - 200:4
**program** [45] - 35:2, 55:25, 56:1, 58:22, 58:25, 59:9, 59:12, 59:15, 59:18, 61:16, 63:4, 63:5, 69:8, 74:18, 94:22, 94:23, 102:8, 102:10, 102:13, 108:19, 115:20, 116:9, 116:11, 118:14, 128:10, 130:1, 134:19, 140:25, 143:10, 167:9, 192:19, 199:23, 200:6, 202:18, 202:21, 204:18, 205:21, 210:11, 213:4, 213:6, 217:18, 218:2, 218:16, 218:23, 219:7
**Program** [22] - 58:24, 59:3, 59:20, 60:15, 101:13, 128:3, 128:9, 128:12, 128:22, 130:17, 131:9, 133:24, 135:11, 167:13,

177:24, 207:1, 207:7, 207:20, 213:15, 216:10, 217:4, 222:10
**programs** [19] - 9:3, 35:3, 53:21, 139:11, 147:9, 199:21, 200:1, 200:11, 200:15, 200:18, 201:1, 201:4, 201:7, 201:11, 209:19, 247:16, 247:19, 247:20
**progress** [2] - 20:19, 226:11
**proof** [1] - 83:13
**proper** [1] - 107:8
**properly** [1] - 163:9
**propose** [1] - 66:10
**proposing** [2] - 70:10, 70:12
**proposition** [1] - 157:10
**prospective** [5] - 209:13, 209:14, 209:15, 209:21, 211:10
**protect** [2] - 213:7, 221:5
**protective** [1] - 12:19
**provide** [6] - 36:2, 142:7, 145:12, 160:9, 221:4, 245:16
**provided** [4] - 22:9, 162:16, 201:23, 212:17
**provides** [3] - 22:7, 25:16, 100:8
**providing** [4] - 56:14, 80:17, 108:23, 181:8
**provisions** [1] - 114:10
**psoriasis** [1] - 10:23
**psychiatrist** [1] - 251:3
**public** [1] - 91:8
**pull** [7] - 61:4, 148:14, 151:2, 168:7, 181:17, 183:25, 224:16
**pulled** [3] - 119:8, 120:13, 246:18
**purchase** [10] - 49:20, 73:8, 95:9, 103:4, 103:8, 103:21, 117:25, 197:18, 201:2, 201:8
**purchased** [2] - 144:16, 214:3
**purchaser** [2] - 241:25

**purchasers** [1] - 92:9
**purchases** [18] - 20:10, 37:18, 61:11, 63:11, 70:15, 70:25, 72:23, 99:25, 103:23, 113:11, 135:15, 135:16, 135:18, 143:23, 144:15, 144:21, 205:21, 245:13
**purchasing** [10] - 42:25, 44:24, 49:4, 71:18, 73:5, 73:6, 85:14, 103:16, 103:25, 143:19
**purpose** [12] - 8:7, 12:18, 61:3, 61:7, 86:19, 89:14, 102:12, 120:15, 159:5, 201:1, 201:7, 225:8
**Purpose** [1] - 225:10
**purposes** [3] - 57:2, 169:3, 189:25
**pursuant** [2] - 160:17, 190:6
**push** [2] - 104:5, 228:15
**push-back** [2] - 104:5, 228:15
**Put** [1] - 85:6
**put** [28] - 17:16, 17:23, 26:19, 38:13, 39:5, 53:3, 60:13, 63:10, 69:22, 85:22, 97:8, 103:9, 103:15, 105:8, 114:4, 127:18, 131:3, 133:19, 134:7, 134:19, 138:21, 165:17, 165:21, 192:12, 193:3, 204:17, 245:21, 252:25
**Putnam** [1] - 243:21

**Q**

**quantities** [3] - 24:15, 184:6, 211:17
**questioning** [3] - 26:11, 96:23, 176:3
**Questionnaire** [1] - 98:5
**questionnaire** [34] - 83:15, 83:19, 83:25, 84:2, 84:9, 84:13, 84:20, 85:25, 86:12, 96:18, 98:11, 98:13, 105:20, 143:10,

166:11, 185:20, 210:13, 210:20, 210:25, 211:5, 211:10, 211:22, 212:7, 212:14, 217:19, 218:4, 228:24, 243:18, 244:13, 247:2, 247:13, 248:10, 250:22, 250:23
**questionnaires** [10] - 84:5, 84:8, 85:24, 165:19, 185:3, 185:7, 185:17, 226:2, 244:19
**questions** [71] - 7:22, 10:4, 23:7, 26:5, 45:14, 62:2, 65:18, 70:5, 72:1, 72:14, 75:23, 76:1, 84:13, 87:4, 87:8, 88:1, 88:3, 88:5, 95:24, 96:18, 97:13, 107:10, 108:3, 114:6, 115:16, 116:19, 123:4, 123:17, 138:20, 140:19, 144:3, 146:13, 146:21, 154:25, 155:21, 155:24, 162:12, 163:2, 166:18, 168:4, 168:10, 168:14, 171:16, 171:19, 173:24, 174:1, 174:2, 176:11, 177:10, 177:18, 180:9, 185:2, 185:21, 188:5, 188:17, 188:20, 190:2, 191:4, 191:7, 191:15, 206:1, 211:17, 214:9, 223:13, 228:14, 231:12, 246:23, 247:15, 247:17, 247:25, 252:15
**quick** [3] - 9:2, 168:3, 192:11
**quickly** [7] - 29:7, 86:10, 92:15, 111:6, 122:23, 243:10, 244:8
**quit** [2] - 124:24, 226:14
**quite** [6] - 58:5, 76:14, 100:12, 211:9, 228:15, 243:3
**quota** [8] - 31:23,

32:2, 32:4, 32:15, 32:16, 32:17, 32:22
**quotation** [8] - 41:8, 49:25, 50:1, 50:4, 50:5, 50:12, 50:14, 50:18
**quote** [8] - 72:25, 80:14, 116:4, 117:19, 117:21, 117:23, 151:18, 160:10
**Quote** [1] - 100:5
**quoted** [2] - 41:8, 127:5
**quotes** [1] - 80:18

**R**

**racking** [1] - 10:16
**radar** [1] - 250:1
**RAFFERTY** [75] - 17:13, 19:10, 33:12, 39:1, 40:19, 53:2, 57:7, 60:10, 82:17, 85:2, 102:1, 110:23, 130:25, 134:4, 143:24, 144:2, 167:23, 167:25, 170:21, 170:25, 171:1, 171:10, 171:13, 171:15, 173:5, 173:13, 173:18, 174:4, 174:6, 175:16, 176:2, 176:14, 176:20, 177:13, 177:14, 178:21, 179:4, 179:13, 179:21, 179:25, 180:4, 180:6, 181:17, 181:23, 182:1, 182:4, 182:8, 182:9, 182:16, 182:18, 183:14, 183:15, 183:24, 184:2, 185:1, 186:9, 186:12, 186:25, 187:4, 187:13, 187:15, 188:4, 188:9, 188:12, 188:15, 189:2, 189:10, 189:16, 189:20, 189:22, 189:23, 190:3, 190:9, 190:22, 191:3
**Rafferty** [12] - 2:12, 7:5, 7:24, 120:5, 167:21, 171:12, 183:13, 184:24, 189:9, 189:19,

189:21, 191:5
**Rafferty's** [1] - 191:9
**raise** [5] - 14:24, 15:3, 96:3, 194:4, 250:1
**raised** [3] - 141:25, 158:21, 159:21
**raising** [3] - 32:22, 160:3, 160:25
**range** [3] - 10:19, 23:10, 23:11
**Rannazzisi** [3] - 34:21, 52:22, 54:4
**rapport** [1] - 209:16
**rather** [1] - 72:3
**rating** [3] - 136:13, 152:22, 152:24
**ratio** [5] - 142:13, 142:17, 235:12, 249:13, 250:12
**ratios** [1] - 249:25
**re** [5] - 13:23, 14:15, 51:21, 62:3, 64:4
**re-ask** [1] - 64:4
**re-orient** [1] - 62:3
**re-registering** [2] - 13:23, 14:15
**re-registration** [1] - 51:21
**reach** [2] - 81:13, 189:17
**reached** [2] - 73:23, 217:8
**reaction** [5] - 104:5, 104:18, 104:19, 108:7, 108:8
**read** [20] - 40:1, 53:17, 54:15, 54:19, 99:25, 100:4, 115:15, 116:19, 159:20, 159:24, 159:25, 170:21, 175:8, 222:1, 226:18, 227:15, 231:24, 232:3, 247:8
**ready** [1] - 26:14
**realize** [3] - 8:25, 72:12, 250:11
**Really** [1] - 214:9
**really** [12] - 23:14, 25:2, 72:23, 140:3, 140:10, 195:11, 195:24, 214:12, 228:13, 231:4, 231:8, 244:8
**reason** [12] - 9:21, 18:14, 45:21, 94:23, 159:8, 164:12, 172:25, 230:24, 237:7, 237:12, 237:15, 248:16

**rebar** [1] - 11:18
**rebate** [9] - 199:21, 199:23, 199:24, 199:25, 200:6, 200:11, 201:1, 247:16, 247:20
**Rebate** [1] - 200:1
**rebates** [1] - 248:19
**receive** [8] - 8:3, 20:24, 56:1, 56:18, 57:24, 58:6, 89:2, 202:3
**received** [8] - 21:2, 56:20, 57:23, 90:6, 90:11, 122:13, 156:7, 157:4
**receiving** [2] - 92:12, 127:10
**recent** [2] - 37:4, 65:6
**recently** [3] - 37:2, 37:5, 135:1
**recess** [3] - 66:14, 124:25, 189:12
**Recess** [2] - 66:16, 125:3
**recessed** [1] - 253:5
**recognize** [11] - 17:8, 19:5, 38:13, 52:13, 57:3, 111:1, 121:18, 133:19, 152:18, 236:16, 243:16
**recognizes** [1] - 53:14
**recollection** [2] - 132:15, 136:23
**record** [20] - 21:21, 26:6, 28:24, 52:4, 83:24, 91:14, 92:17, 92:20, 102:18, 173:11, 175:17, 175:24, 179:22, 192:12, 192:16, 193:3, 193:24, 194:2, 194:17, 254:5
**recorded** [1] - 6:19
**recordkeeping** [1] - 252:23
**records** [1] - 183:19
**red** [26] - 92:13, 93:7, 94:17, 95:23, 96:1, 96:2, 96:3, 96:5, 96:6, 96:9, 96:10, 96:11, 96:13, 96:16, 96:20, 97:10, 97:14, 97:17, 98:1, 98:17, 98:21, 98:24, 99:20, 132:18, 142:6, 143:1
**Red** [3] - 96:2, 97:9, 97:21
**redirect** [3] - 167:22, 242:19, 242:22

**REDIRECT** [2] - 167:24, 249:9
**reduce** [4] - 65:10, 65:14, 65:17, 135:24
**reduced** [1] - 70:23
**reducing** [1] - 32:15
**reduction** [3] - 200:15, 200:18, 201:7
**Reed** [2] - 6:4, 6:11
**refer** [5] - 34:21, 74:10, 132:9, 148:7, 151:13
**reference** [24] - 40:23, 42:6, 42:17, 44:4, 45:7, 67:7, 70:17, 72:20, 77:21, 78:3, 78:6, 78:24, 83:25, 112:19, 112:24, 128:17, 134:15, 135:25, 139:21, 158:18, 160:18, 172:22, 244:18, 247:4
**referenced** [2] - 122:8, 184:13
**references** [10] - 52:5, 117:11, 118:13, 121:23, 128:7, 129:3, 139:24, 150:12, 160:4, 166:11
**referencing** [6] - 117:14, 153:23, 158:5, 160:20, 182:12, 185:5
**referred** [2] - 42:23, 130:16
**referring** [5] - 40:12, 73:1, 117:4, 149:6, 218:4
**refers** [8] - 86:6, 103:6, 106:1, 123:18, 123:20, 153:20, 154:12, 244:5
**reflect** [3] - 151:15, 192:17, 193:4
**reflection** [2] - 65:2, 150:21
**refresh** [3] - 57:13, 70:8, 190:15
**refused** [1] - 90:13
**regard** [1] - 153:18
**regarding** [13] - 12:10, 15:3, 22:8, 34:7, 68:12, 117:20, 117:24, 128:2, 138:11, 147:25, 154:6, 155:23, 158:3
**region** [5] - 100:12,

137:14, 161:11, 230:2, 245:24
**regional** [4] - 20:6, 20:20, 79:21, 195:7
**Regional** [2] - 194:23, 225:5
**register** [1] - 31:2
**registered** [6] - 13:5, 31:5, 31:6, 53:15, 137:22, 137:25
**registering** [5] - 13:22, 13:23, 14:15, 31:17
**registrant** [2] - 31:15, 37:19
**registrants** [1] - 35:25
**registration** [9] - 13:8, 13:9, 13:10, 13:18, 15:11, 31:9, 51:21, 83:13
**registrations** [1] - 86:24
**regular** [1] - 92:1
**regularly** [10] - 49:12, 84:4, 84:5, 84:23, 122:4, 148:4, 162:15, 164:5, 164:9, 164:24
**regulation** [6] - 55:21, 80:19, 123:14, 127:5, 127:9, 127:11
**regulations** [2] - 39:25, 48:18
**Regulations** [1] - 50:22
**regulatory** [27] - 20:16, 61:16, 79:20, 80:6, 93:10, 106:15, 107:2, 129:11, 134:23, 137:18, 150:22, 187:16, 205:20, 206:15, 206:22, 210:7, 214:12, 214:14, 215:25, 226:17, 227:22, 239:18, 240:1, 248:12, 249:20, 252:6
**Regulatory** [34] - 9:20, 14:7, 20:1, 20:2, 20:5, 20:13, 20:22, 21:2, 36:16, 39:19, 50:9, 50:15, 57:16, 86:5, 129:6, 129:7, 129:15, 132:11, 141:6, 212:17, 213:8, 214:23, 215:3, 215:9, 215:14, 221:7, 221:18, 228:4,

229:11, 229:12, 230:1, 239:23, 245:23
**regulatory-related** [1] - 20:16
**Rehab** [1] - 238:3
**reinforced** [5] - 11:18, 164:5, 164:10, 164:16, 164:24
**reinforcement** [1] - 129:5
**reject** [1] - 139:3
**rejected** [1] - 138:17
**relate** [1] - 113:13
**related** [3] - 20:16, 139:25, 187:18
**Related** [1] - 68:7
**relates** [3] - 35:23, 51:6, 200:7
**relating** [3] - 34:3, 75:24, 179:3
**relation** [1] - 57:14
**relationship** [3] - 51:1, 199:5, 199:7
**relationships** [2] - 199:7, 199:9
**relative** [3] - 135:18, 146:4, 175:4
**released** [1] - 62:14
**releasing** [1] - 62:18
**relevance** [4] - 27:2, 27:4, 29:2, 187:3
**relevant** [3] - 39:12, 143:15, 143:18
**rely** [1] - 55:1
**remainder** [1] - 77:24
**remarkable** [1] - 157:10
**remedy** [1] - 149:23
**remember** [55] - 48:19, 49:10, 59:13, 59:18, 62:21, 65:7, 67:8, 68:9, 95:23, 99:10, 103:12, 109:7, 114:6, 127:6, 127:20, 142:15, 142:19, 142:21, 155:3, 155:20, 155:24, 159:4, 194:9, 202:25, 203:3, 203:5, 203:11, 205:22, 206:11, 208:25, 209:2, 211:2, 211:22, 215:14, 215:17, 215:18, 217:6, 217:7, 217:22, 219:5, 219:8, 220:7, 220:9, 220:11, 221:14,

221:21, 228:19, 228:22, 234:1, 235:24, 246:12, 247:17, 249:13, 250:10, 251:21
**remind** [1] - 69:2
**reminds** [1] - 7:13
**remiss** [1] - 52:7
**remove** [1] - 120:20
**renew** [3] - 176:3, 176:4, 227:9
**renewal** [5] - 13:13, 13:15, 13:19, 28:1, 176:22
**renewed** [3] - 13:10, 13:11, 13:19
**reorder** [1] - 62:16
**rep** [16] - 89:5, 195:11, 195:13, 195:15, 195:22, 196:4, 197:8, 210:25, 214:23, 218:20, 219:2, 219:3, 219:10, 221:16, 222:3, 231:5
**repeat** [4] - 33:17, 112:22, 144:12, 203:8
**Repeat** [2] - 236:2, 242:5
**repeatedly** [1] - 46:2
**repetitive** [1] - 175:13
**rephrase** [2] - 43:20, 46:10
**replace** [1] - 131:4
**replaced** [1] - 39:9
**replenish** [1] - 248:22
**reply** [1] - 158:20
**report** [31] - 42:24, 45:10, 45:23, 56:2, 56:4, 56:5, 58:3, 58:4, 58:5, 58:6, 58:15, 109:23, 117:22, 123:10, 133:1, 142:5, 148:18, 150:3, 153:7, 155:25, 159:1, 160:13, 168:17, 169:22, 170:18, 172:13, 175:10, 186:16, 188:25, 220:2, 248:11
**Report** [8] - 36:13, 41:25, 42:7, 42:12, 42:18, 66:5, 132:25, 155:15
**reported** [31] - 41:17, 41:20, 41:21, 43:6, 43:9, 43:22, 78:5,

79:1, 79:2, 80:22, 80:24, 81:10, 81:11, 81:13, 109:21, 110:4, 113:7, 124:2, 125:21, 130:4, 161:18, 185:22, 185:23, 186:3, 186:6, 186:16, 187:7, 187:16, 188:25, 189:4, 254:9
**reporter** [1] - 193:22
**Reporter** [6] - 6:17, 6:18, 254:3, 254:12
**Reporting** [1] - 132:22
**reporting** [36] - 40:12, 40:16, 43:3, 44:6, 44:12, 45:15, 45:18, 45:22, 51:24, 51:25, 54:14, 54:18, 55:14, 56:8, 56:9, 58:17, 81:5, 81:8, 81:17, 100:23, 102:22, 109:2, 112:20, 113:1, 113:11, 113:14, 118:6, 123:24, 124:13, 125:24, 130:2, 132:1, 133:13, 187:23, 188:7, 250:3
**Reports** [5] - 40:10, 45:8, 56:13, 129:10, 161:9
**reports** [11] - 42:1, 43:11, 56:15, 57:24, 66:3, 66:23, 80:3, 160:21, 161:5, 188:16, 219:25
**represent** [3] - 120:9, 217:2, 226:1
**representation** [2] - 38:10, 226:5
**Representative** [2] - 85:20, 89:12
**representative** [2] - 210:16, 213:7
**representatives** [1] - 85:23
**reps** [3] - 68:22, 204:17, 229:10
**request** [20] - 33:7, 57:23, 65:1, 68:23, 75:6, 75:8, 112:23, 119:10, 120:22, 145:8, 145:10, 159:15, 166:9, 172:11, 186:14, 219:18, 229:8, 232:8, 239:19, 250:15
**Request** [7] - 67:21,

75:12, 108:14, 166:13, 236:18, 239:25, 252:7
**requested** [4] - 120:21, 187:9, 187:11, 237:16
**requesting** [2] - 248:11, 248:15
**requests** [11] - 33:5, 33:9, 37:1, 66:7, 92:12, 129:5, 138:17, 150:8, 163:9, 171:21, 237:4
**require** [3] - 11:3, 239:12, 240:22
**required** [12] - 39:11, 78:14, 86:21, 138:13, 148:16, 151:10, 164:1, 217:14, 217:15, 217:25, 219:1, 226:18
**requirement** [5] - 24:12, 31:7, 31:11, 45:23, 166:25
**requirements** [5] - 12:5, 15:12, 50:21, 53:23, 123:13
**Requirements** [1] - 39:20
**requires** [2] - 158:25, 240:23
**resolved** [7] - 77:25, 79:4, 96:10, 96:12, 96:16, 96:22, 142:6
**resources** [1] - 229:12
**Resources** [1] - 195:19
**respect** [10] - 8:24, 52:5, 166:20, 200:12, 200:18, 207:10, 207:16, 210:3, 210:11, 222:8
**respond** [1] - 142:3
**responded** [2] - 127:13, 127:14
**responds** [2] - 159:1, 159:4
**response** [15] - 28:25, 55:10, 156:3, 156:4, 157:15, 159:8, 160:9, 160:16, 168:9, 168:15, 186:13, 186:15, 187:1, 187:21
**Responses** [1] - 98:4
**responsibilities** [8] - 19:23, 31:12, 147:7, 198:9, 198:13, 198:20, 212:13,

222:9
**Responsibility** [1] - 41:5
**responsibility** [15] - 20:15, 22:4, 166:24, 169:19, 171:6, 179:12, 207:25, 208:9, 208:12, 208:21, 210:16, 211:4, 211:6, 222:10, 223:16
**responsible** [6] - 20:7, 20:16, 25:21, 75:18, 161:8, 217:1
**rest** [5] - 55:25, 120:15, 121:10, 151:16, 224:13
**result** [2] - 165:18, 171:4
**resulted** [1] - 178:15
**Results** [2] - 77:2, 151:5
**results** [3] - 77:21, 151:8, 166:6
**resume** [1] - 125:4
**resumed** [1] - 189:13
**Retail** [2] - 106:5, 225:7
**retail** [20] - 106:10, 106:14, 107:7, 107:16, 111:11, 133:25, 137:1, 137:3, 137:7, 137:8, 137:17, 137:21, 138:14, 139:2, 139:4, 195:4, 216:24, 233:24, 234:17, 235:17
**retain** [1] - 58:11
**retains** [1] - 58:8
**retention** [8] - 43:10, 43:25, 102:18, 152:3, 152:7, 172:15, 172:20, 172:23
**return** [1] - 154:11
**reverse** [1] - 25:12
**Review** [4] - 73:19, 86:4, 86:5, 86:7
**review** [79] - 9:12, 13:18, 14:8, 14:9, 15:3, 19:6, 20:9, 26:22, 37:13, 61:10, 61:17, 62:18, 65:22, 68:4, 68:6, 76:22, 77:1, 77:3, 77:5, 77:6, 77:13, 77:14, 77:15, 78:6, 78:13, 78:14, 78:19, 78:21, 79:14, 80:2, 80:14,

81:14, 83:21, 84:7, 86:9, 86:25, 90:21, 95:14, 102:18, 106:15, 107:5, 109:8, 112:12, 112:13, 112:24, 112:25, 113:5, 118:16, 135:15, 135:16, 142:4, 144:17, 145:9, 148:10, 150:21, 172:7, 214:6, 214:8, 214:21, 215:21, 217:11, 217:14, 217:16, 218:3, 218:7, 218:19, 221:15, 221:16, 221:21, 223:10, 239:17, 240:2, 248:12, 249:20
**reviewed** [5] - 33:7, 63:15, 68:5, 107:4, 213:8
**reviewing** [6] - 63:10, 93:16, 116:3, 116:14, 131:17, 141:23
**reviews** [30] - 14:25, 66:2, 67:23, 79:2, 80:12, 95:16, 106:22, 115:19, 115:21, 115:25, 116:4, 116:5, 116:7, 116:14, 116:21, 118:3, 118:10, 118:13, 126:23, 126:24, 129:14, 177:23, 218:1, 221:10, 221:13, 221:24, 223:9, 229:5, 239:15
**revised** [1] - 39:10
**revision** [1] - 60:19
**rewarding** [1] - 20:18
**Rice** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**right-hand** [1] - 216:15
**rigorous** [1] - 129:4
**Rio** [1] - 127:21
**rip** [1] - 120:14
**Ripping** [1] - 121:2
**Rite** [35] - 104:12, 105:2, 105:4, 105:7, 105:10, 106:20, 137:1, 139:7, 140:11, 140:12, 140:14, 140:16, 140:20, 141:2, 141:13, 141:15,

141:17, 141:22,
142:1, 142:5, 142:7,
146:7, 181:1, 181:9,
182:11, 182:12,
182:20, 183:5,
183:17, 184:10,
184:16, 185:18,
185:19, 195:8,
233:21
**Rite-Aid** [5] - 105:2,
105:4, 105:7, 195:8,
233:21
**Rite-Aids** [3] - 104:12,
105:10, 106:20
**river** [1] - 67:8
**RMR** [2] - 6:17, 6:18
**RNA** [9] - 133:24,
134:18, 134:20,
134:21, 134:22,
140:4, 140:11,
140:12
**road** [4] - 198:22,
198:23, 199:1, 246:6
**Robbinsville** [1] - 18:9
**Robert** [1] - 155:16
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**robust** [1] - 151:19
**role** [21] - 19:25, 20:4,
20:21, 20:22, 20:24,
21:10, 32:3, 36:16,
37:23, 166:18,
204:22, 205:9,
205:16, 205:18,
206:8, 206:12,
206:20, 206:21,
206:23, 220:21
**roles** [1] - 34:2
**rolling** [1] - 113:23
**roughly** [3] - 11:10,
43:1, 136:20
**round** [3] - 34:1,
69:12, 81:23
**route** [1] - 188:1
**RPR** [1] - 6:18
**RPR-RMR-CRR-**
**FCRR** [1] - 6:18
**RSM** [1] - 225:5
**RUBY** [1] - 4:17
**Ruby** [1] - 4:17
**Rule** [1] - 158:24
**rules** [4] - 11:24, 12:4,
12:5, 12:7
**ruling** [1] - 72:2
**run** [4] - 135:7,
192:19, 205:20,
247:6
**running** [2] - 10:15,
119:13
**runs** [5] - 18:19,

29:15, 136:5,
167:12, 192:19
**rural** [1] - 23:16
**Russell** [1] - 57:12
**Rx** [5] - 10:21, 11:1,
16:1, 83:2, 94:13

## S

**s\Ayme** [1] - 254:11
**s\Lisa** [1] - 254:11
**safe** [1] - 11:19
**sake** [1] - 35:10
**salary** [2] - 201:18,
201:25
**sale** [2] - 199:19,
210:3
**Sales** [6] - 85:20,
162:9, 194:23,
195:22, 225:5, 225:7
**sales** [29] - 14:21,
68:22, 85:23, 89:5,
195:10, 195:11,
195:12, 195:13,
195:15, 195:16,
196:4, 196:17,
197:8, 204:17,
210:16, 210:25,
213:6, 217:20,
218:20, 219:2,
219:3, 219:10,
220:14, 221:16,
222:3, 229:10
**salespeople** [4] -
204:22, 205:9,
205:16, 227:4
**SALGADO** [1] - 4:15
**San** [2] - 2:5, 2:17
**satisfactory** [4] -
116:22, 117:18,
152:24, 153:4
**satisfied** [2] - 159:13,
198:14
**satisfying** [1] - 20:18
**saw** [8] - 44:7, 62:20,
93:8, 95:15, 96:12,
138:8, 150:17,
166:5, 244:13
**SC** [3] - 3:15, 4:4, 4:9
**scale** [2] - 49:21,
136:13
**schedule** [1] - 105:13
**Schedule** [7] - 11:17,
11:20, 11:21, 11:22,
12:1, 105:6, 105:11,
105:14, 145:21,
145:23, 146:1
**Schedules** [3] - 44:7,
44:8, 105:5
**Schmidt** [23] - 27:5,

33:16, 40:19, 52:6,
71:9, 72:5, 111:25,
120:5, 125:8,
138:22, 159:17,
168:5, 168:8,
171:23, 174:1,
174:3, 177:10,
177:19, 178:1,
179:16, 180:9,
185:24, 189:18
**SCHMIDT** [58] - 5:9,
7:8, 7:10, 7:17, 7:20,
17:3, 17:6, 17:7,
17:11, 17:15, 17:18,
17:20, 17:21, 18:25,
19:1, 19:8, 19:12,
21:11, 21:14, 21:15,
21:25, 26:2, 26:4,
26:18, 26:25, 27:6,
27:11, 27:12, 28:12,
28:14, 28:21, 29:6,
29:23, 30:3, 30:6,
30:7, 33:19, 33:20,
35:5, 35:8, 35:9,
38:2, 38:4, 38:9,
38:12, 38:24, 39:2,
39:4, 40:22, 41:2,
46:2, 46:5, 46:6,
52:9, 52:11, 53:5,
53:9, 53:11, 56:22,
56:25, 57:1, 57:6,
57:9, 57:10, 60:3,
60:6, 60:12, 61:4,
61:6, 66:9, 66:13,
66:17, 66:19, 66:20,
71:7, 71:11, 71:13,
72:6, 72:7, 72:16,
72:18, 75:4, 82:18,
82:20, 84:15, 84:18,
84:25, 85:4, 85:5,
97:2, 97:4, 97:7,
101:4, 101:10,
101:24, 102:3,
110:10, 110:13,
110:20, 110:25,
111:23, 112:1,
112:9, 113:20,
114:1, 114:3, 119:2,
119:4, 119:7,
119:13, 119:22,
120:9, 120:12,
120:19, 121:1,
121:6, 121:8,
121:10, 121:17,
124:15, 124:19,
125:6, 125:9,
125:11, 125:12,
130:22, 131:2,
131:3, 131:7, 134:1,
134:6, 138:23,
138:25, 139:1,

139:15, 139:18,
143:25, 144:8,
144:14, 145:16,
147:11, 147:14,
147:15, 152:13,
152:16, 152:17,
155:12, 155:13,
156:10, 156:11,
157:6, 157:9,
157:14, 159:10,
159:18, 159:19,
162:2, 162:5, 162:6,
162:18, 162:21,
162:22, 163:12,
163:14, 165:4,
165:7, 165:8,
167:15, 170:19,
171:8, 173:2,
173:10, 173:17,
175:12, 175:24,
176:10, 178:17,
179:9, 180:1,
181:19, 183:9,
186:18, 187:12,
187:14, 187:24,
189:15, 190:1,
190:6, 190:12,
190:17, 190:20,
190:24, 191:8,
191:12, 191:15,
191:18, 192:3,
252:23
**scope** [5] - 175:13,
186:19, 187:24,
188:2, 188:6
**Scott** [2] - 194:3,
194:18
**SCOTT** [1] - 194:5
**screen** [26] - 17:16,
17:22, 17:23, 17:24,
18:2, 39:5, 60:13,
72:9, 78:22, 79:13,
85:6, 114:4, 115:1,
127:18, 131:3,
131:5, 134:8,
147:23, 149:16,
158:12, 163:22,
165:18, 166:6,
168:25, 174:4,
224:17
**screens** [1] - 52:15
**Script** [23] - 198:7,
215:8, 234:1, 234:3,
234:7, 234:14,
235:13, 235:21,
236:19, 236:25,
237:9, 237:12,
237:24, 239:20,
241:8, 241:15,
241:20, 241:23,

246:1, 249:11,
250:11, 251:19
**scroll** [18] - 27:22,
52:21, 76:24, 77:2,
77:4, 77:20, 79:12,
84:1, 86:16, 87:6,
89:4, 97:20, 98:7,
127:25, 134:14,
155:16, 155:17,
158:11
**scrolling** [1] - 86:18
**search** [4] - 87:19,
165:18, 166:6, 166:8
**searches** [1] - 91:6
**searching** [1] - 91:19
**seat** [1] - 194:6
**second** [29] - 27:23,
27:24, 29:8, 41:7,
45:6, 52:17, 53:1,
53:12, 53:13, 54:4,
54:10, 54:11, 68:3,
70:2, 70:17, 72:8,
72:19, 99:5, 129:11,
131:16, 155:14,
155:24, 156:25,
157:16, 164:19,
224:15, 229:24,
232:4, 249:12
**secondary** [6] - 85:17,
100:6, 100:11,
100:19, 146:6,
146:11
**Section** [10] - 11:25,
12:1, 38:14, 38:17,
39:18, 50:22, 51:6,
51:19, 59:12, 97:21
**section** [10] - 40:17,
73:19, 79:13, 86:13,
89:24, 94:12,
175:10, 187:6,
212:10
**security** [5] - 48:18,
89:17, 94:3, 102:19,
160:6
**See** [1] - 217:7
**see** [250] - 9:21, 10:24,
11:19, 13:24, 14:25,
17:1, 17:22, 18:2,
18:18, 21:22, 23:9,
23:18, 24:3, 26:19,
27:13, 27:16, 27:24,
28:1, 28:5, 28:7,
28:8, 28:17, 29:8,
29:9, 29:14, 29:19,
33:3, 37:20, 39:6,
39:17, 39:20, 40:7,
40:18, 41:3, 42:9,
43:19, 43:21, 44:3,
44:5, 44:9, 45:12,
47:25, 49:25, 50:1,

50:6, 50:9, 50:12, 50:22, 51:5, 51:13, 52:19, 53:5, 53:7, 60:14, 60:18, 60:20, 61:8, 61:12, 61:24, 63:17, 64:10, 70:3, 70:10, 70:17, 72:19, 73:21, 73:25, 75:14, 76:22, 77:1, 77:3, 77:4, 77:21, 78:15, 78:21, 80:12, 80:15, 82:21, 83:10, 84:2, 85:7, 85:9, 85:21, 86:13, 86:14, 87:10, 88:6, 88:16, 89:12, 91:4, 91:8, 91:21, 93:11, 94:9, 94:16, 97:11, 97:22, 97:24, 98:5, 98:8, 98:24, 99:2, 99:8, 99:22, 100:2, 100:18, 101:16, 102:19, 103:1, 104:13, 105:8, 105:23, 106:2, 106:5, 107:18, 107:25, 111:7, 113:11, 114:18, 115:2, 115:4, 115:8, 115:12, 115:23, 116:4, 116:24, 117:10, 118:1, 120:17, 121:22, 121:25, 122:23, 123:15, 127:24, 128:1, 128:3, 128:20, 128:23, 129:1, 131:8, 131:10, 131:20, 132:13, 132:21, 133:3, 134:15, 138:6, 139:21, 139:23, 140:3, 140:4, 141:18, 143:13, 144:16, 147:23, 148:1, 148:2, 148:10, 148:15, 148:18, 148:19, 149:9, 149:12, 149:17, 150:12, 151:5, 151:11, 151:20, 152:21, 152:24, 153:8, 153:15, 154:12, 154:14, 154:19, 154:21, 155:18, 156:1, 156:7, 156:12, 156:19, 157:2, 157:18, 157:21, 158:3, 158:12,

160:9, 160:23, 161:6, 161:19, 161:20, 162:10, 162:24, 163:6, 163:15, 163:18, 163:19, 163:21, 163:24, 164:2, 164:14, 164:15, 164:22, 165:11, 165:16, 168:18, 168:25, 169:7, 169:24, 170:6, 170:11, 171:21, 175:2, 177:24, 178:3, 180:8, 180:13, 181:1, 181:2, 181:4, 183:2, 183:8, 185:5, 189:5, 194:16, 224:12, 224:18, 225:10, 225:21, 227:10, 229:20, 229:23, 229:25, 230:4, 230:9, 230:23, 232:16, 232:23, 237:1, 237:15, 243:23, 244:2, 244:9, 244:20, 244:24, 245:8, 249:25, 250:10, 253:3
**seeing** [6] - 33:2, 64:3, 64:4, 88:23, 104:19, 249:1
**seem** [1] - 93:12
**sees** [1] - 232:7
**selected** [1] - 118:19
**self** [8] - 105:4, 137:24, 140:7, 144:20, 145:18, 145:24, 145:25, 146:3
**self-distribute** [1] - 145:24
**self-distributed** [2] - 144:20, 145:25
**self-distributing** [2] - 137:24, 146:3
**self-distribution** [1] - 145:18
**self-distributor** [1] - 140:7
**sell** [12] - 195:4, 196:12, 197:11, 197:13, 197:15, 202:9, 204:4, 209:18, 210:13, 212:18, 212:22
**selling** [4] - 184:16, 196:7, 196:9, 198:13

**sending** [1] - 163:3
**sends** [1] - 58:8
**SENIOR** [1] - 1:17
**senior** [2] - 79:10, 79:19
**Senior** [2] - 7:2, 57:15
**Sensabaugh** [1] - 5:14
**sense** [9] - 10:19, 11:6, 22:18, 34:19, 45:1, 48:21, 92:1, 92:20, 241:24
**sensed** [1] - 189:20
**sent** [5] - 27:16, 43:2, 128:7, 219:24, 230:24
**sentence** [16] - 39:23, 39:24, 53:14, 53:19, 54:12, 54:15, 54:25, 72:8, 72:19, 74:8, 99:5, 99:25, 116:19, 151:16, 151:17, 161:15
**sentences** [4] - 161:12, 231:24, 232:1, 232:2
**separate** [5] - 9:13, 41:15, 42:1, 114:10, 149:15
**separately** [3] - 41:20, 60:9, 91:19
**September** [2] - 52:14, 52:20
**serial** [1] - 58:10
**series** [1] - 205:25
**seriously** [4] - 40:3, 69:21, 147:4, 166:24
**serve** [3] - 50:20, 64:9, 88:5
**served** [2] - 143:16, 174:21
**service** [2] - 94:10, 197:13
**Service** [2] - 220:17, 221:1
**serviced** [2] - 25:23, 122:4
**services** [3] - 196:13, 197:13, 198:14
**servicing** [2] - 238:21, 244:15
**sessions** [1] - 162:15
**set** [25] - 11:24, 12:5, 25:24, 31:25, 50:21, 61:22, 63:11, 64:23, 83:22, 85:16, 103:10, 111:8, 123:14, 135:17, 136:7, 136:21, 141:10, 146:11, 211:3, 213:6,

213:15, 218:16, 246:8, 252:4, 252:5
**sets** [2] - 12:4, 31:23
**setting** [4] - 24:25, 65:24, 145:4, 146:3
**settled** [1] - 122:20
**Settlement** [4] - 160:19, 171:7, 173:25, 174:17
**settlement** [11] - 113:21, 114:7, 119:9, 121:12, 121:18, 122:9, 168:24, 177:1, 177:11, 178:15, 179:10
**seven** [1] - 127:22
**several** [6] - 25:23, 64:15, 96:5, 161:12, 175:1, 240:15
**shall** [5] - 115:19, 116:7, 169:4, 170:5, 177:23
**shampoo** [1] - 234:15
**SHANNON** [1] - 6:3
**share** [1] - 147:3
**shelf** [4] - 24:10, 24:16, 24:18, 24:20
**shift** [3] - 20:13, 21:8, 136:24
**Shinnston** [1] - 196:24
**ship** [4] - 16:19, 24:7, 31:8, 210:4
**shipment** [1] - 183:5
**shipments** [9] - 20:8, 23:4, 35:24, 36:7, 36:9, 38:20, 58:4, 61:17, 149:7
**shipped** [12] - 36:5, 36:11, 36:12, 41:19, 45:12, 45:17, 62:13, 74:3, 144:23, 149:10, 213:3, 213:21
**shipping** [9] - 16:21, 45:18, 45:20, 45:21, 46:8, 51:25, 55:13, 149:9, 166:20
**short** [4] - 29:10, 93:14, 124:20, 207:6
**short-term** [1] - 29:10
**shorthand** [1] - 58:2
**shortly** [2] - 122:17, 156:12
**show** [19] - 39:14, 52:24, 53:4, 54:3, 93:4, 96:25, 101:4, 119:8, 130:10, 131:14, 133:16,

139:13, 140:1, 156:7, 157:10, 175:19, 242:12, 246:9, 246:16
**showing** [2] - 91:9, 93:23
**shown** [25] - 52:12, 52:19, 54:5, 54:8, 58:21, 62:21, 69:23, 97:1, 104:4, 119:9, 127:16, 127:20, 128:6, 147:17, 147:18, 147:24, 150:15, 152:12, 152:19, 153:17, 158:8, 162:8, 162:23, 168:8, 176:21
**shows** [3] - 176:19, 187:6, 238:20
**side** [3] - 61:2, 120:10, 149:16
**sift** [1] - 71:8
**sign** [6] - 15:5, 89:6, 89:7, 89:23, 89:24
**signage** [1] - 89:18
**signatory** [2] - 170:6, 170:10
**signature** [2] - 89:11, 170:10
**signed** [4] - 148:18, 154:20, 160:17
**significance** [1] - 136:14
**significant** [2] - 88:23, 129:1
**significantly** [1] - 242:11
**signing** [2] - 87:23, 170:6
**similar** [3] - 56:16, 110:15, 136:17
**similarity** [1] - 23:9
**simple** [1] - 232:17
**simply** [3] - 63:1, 73:11, 223:12
**SINGER** [1] - 4:5
**single** [6] - 16:22, 24:24, 41:16, 215:3, 215:14, 226:19
**Sissonville** [1] - 233:16
**Sistersville** [1] - 196:23
**Sistersville** [1] - 196:22
**sit** [4] - 24:16, 24:17, 93:5, 210:18
**site** [23] - 68:20, 83:19, 90:24, 91:23, 91:24, 92:21, 92:24,

93:20, 94:3, 94:21, 98:2, 143:12, 166:2, 166:3, 206:13, 210:17, 212:14, 214:24, 215:4, 215:9, 215:15, 228:23

**sitting** [3] - 24:20, 43:5, 93:24

**six** [3] - 20:8, 102:8, 108:19

**size** [14] - 10:14, 24:24, 46:22, 47:4, 47:10, 47:16, 48:1, 48:16, 48:23, 49:5, 49:14, 49:22, 92:7, 127:6

**skew** [1] - 235:20

**skip** [2] - 40:16, 164:19

**Slide** [2] - 104:9, 180:25

**slide** [4] - 101:12, 104:4, 104:9, 128:1

**slightly** [1] - 130:10

**slogan** [1] - 155:3

**slow** [1] - 163:12

**slowed** [1] - 242:25

**small** [7] - 11:11, 64:9, 66:9, 103:9, 106:1, 181:14, 199:5

**smaller** [2] - 23:15, 63:23

**Smith** [2] - 6:4, 6:11

**Smith's** [1] - 213:23

**snapshot** [1] - 63:13

**Snider** [1] - 149:24

**sold** [5] - 37:20, 144:24, 181:12, 199:16, 214:17

**solely** [1] - 159:5

**solicit** [1] - 209:9

**solicitation** [1] - 28:4

**solicited** [1] - 210:1

**someone** [6] - 11:24, 77:17, 155:16, 213:5, 215:3, 235:3

**Someone** [1] - 75:21

**sometime** [2] - 40:15, 228:21

**Sometimes** [2] - 86:1, 246:8

**sometimes** [7] - 22:8, 67:18, 85:25, 86:2, 100:13, 182:25, 246:9

**somewhat** [1] - 202:3

**somewhere** [1] - 132:14

**soon** [1] - 122:21

**sophisticated** [1] - 129:3

**SOPs** [1] - 151:11

**sorry** [42] - 17:17, 17:19, 26:4, 40:19, 40:25, 46:10, 53:12, 56:20, 82:18, 89:25, 104:21, 112:18, 112:22, 143:24, 151:2, 152:11, 168:14, 170:4, 172:24, 181:23, 186:13, 187:14, 190:23, 191:6, 191:18, 202:12, 202:14, 203:8, 204:10, 205:12, 209:3, 221:22, 224:20, 225:8, 230:9, 236:2, 241:23, 242:5, 243:13, 251:9, 252:20

**Sorry** [2] - 189:15, 208:16

**sort** [2] - 136:13, 147:5

**source** [2] - 99:14, 234:24

**sources** [1] - 143:20

**South** [1] - 2:13

**Southern** [1] - 7:2

**SOUTHERN** [1] - 1:1

**space** [2] - 24:18, 85:7

**speaking** [2] - 136:20, 145:20

**Special** [2] - 77:2, 157:21

**specializes** [1] - 234:11

**specialty** [3] - 143:16, 143:18, 234:11

**specific** [30] - 10:1, 35:25, 36:1, 48:17, 54:14, 54:19, 55:7, 64:1, 64:2, 79:16, 80:1, 82:13, 82:24, 83:3, 134:11, 134:19, 136:11, 137:15, 150:16, 153:21, 154:13, 159:4, 164:12, 164:13, 164:20, 197:15, 206:25, 234:12, 244:23

**Specifically** [1] - 67:3

**specifically** [16] - 105:22, 123:24, 125:20, 133:6, 137:1, 137:6,

142:17, 174:2, 175:18, 176:5, 176:7, 176:14, 177:18, 186:4, 187:11, 207:15

**specificity** [1] - 48:22

**specify** [1] - 27:23

**spectrum** [1] - 25:9

**speculation** [4] - 173:3, 201:13, 204:24, 220:18

**spelled** [1] - 138:9

**spelling** [1] - 179:22

**spend** [2] - 8:15, 8:18

**spent** [2] - 8:13, 62:1

**Spine** [1] - 238:3

**spot** [1] - 37:24

**spreadsheet** [5] - 70:18, 70:21, 71:2, 71:14, 71:15

**Square** [2] - 6:5, 6:12

**stack** [4] - 19:3, 19:13, 56:16, 176:21

**stacks** [1] - 29:24

**staff** [1] - 185:12

**staffing** [1] - 25:24

**stage** [6] - 78:1, 78:25, 79:5, 80:2, 113:6

**stagnant** [1] - 63:15

**stand** [6] - 7:14, 59:24, 125:5, 146:15, 146:16, 146:19

**standard** [1] - 151:19

**standards** [1] - 55:8

**standings** [1] - 86:23

**STANNER** [35] - 5:10, 193:22, 201:13, 202:12, 203:18, 204:6, 204:24, 208:2, 208:14, 208:16, 211:19, 213:10, 218:9, 220:3, 220:18, 222:20, 224:7, 224:20, 227:9, 230:15, 231:16, 231:18, 236:6, 236:15, 239:3, 239:5, 242:13, 242:18, 243:3, 243:9, 243:12, 243:15, 246:23, 247:1, 251:12

**Stanner** [2] - 193:24, 193:25, 222:19, 231:14, 238:24, 242:17

**start** [28] - 7:24, 21:16, 26:11, 29:7, 35:17,

39:16, 50:6, 53:25, 55:15, 58:24, 77:13, 83:1, 83:7, 83:14, 83:15, 90:17, 100:22, 102:15, 122:17, 122:19, 137:1, 157:17, 179:22, 182:19, 196:4, 209:3, 209:6, 219:17

**start-up** [3] - 83:7, 83:14, 83:15

**started** [22] - 32:6, 55:16, 59:1, 63:3, 66:25, 107:15, 136:22, 139:5, 176:1, 178:15, 178:20, 179:3, 179:18, 179:20, 195:10, 201:20, 217:18, 218:2, 218:23, 219:8, 227:4

**starting** [9] - 19:4, 55:14, 63:4, 151:4, 187:5, 206:6, 218:16, 249:6

**starts** [4] - 120:2, 178:9, 178:10, 178:24

**State** [10] - 16:2, 16:6, 16:9, 16:23, 17:8, 18:3, 19:3, 129:22, 186:7, 196:20

**state** [18] - 9:25, 16:3, 16:12, 28:24, 50:18, 83:12, 86:23, 94:1, 194:1, 194:17, 196:25, 197:1, 217:8, 217:13, 223:12, 223:14, 227:11

**statement** [13] - 54:23, 55:4, 74:18, 97:10, 199:8, 205:17, 213:12, 216:24, 220:15, 229:14, 230:12, 249:17, 249:21

**states** [9] - 15:12, 16:13, 50:18, 51:11, 108:6, 114:13, 160:17, 231:5, 237:18

**STATES** [2] - 1:1, 1:17

**States** [2] - 7:2, 13:2

**static** [1] - 136:8

**stating** [1] - 46:1

**statistical** [3] - 98:24, 135:7, 136:18

**statistics** [1] - 136:1

**STATUS** [1] - 1:17

**Status** [1] - 7:2

**status** [1] - 193:4

**statute** [1] - 123:15

**stays** [1] - 215:19

**stenography** [1] - 6:19

**step** [5] - 130:1, 206:24, 209:17, 226:11

**stepped** [2] - 19:25, 125:6

**steps** [8] - 83:3, 83:6, 94:18, 128:13, 131:22, 142:9, 163:22, 217:11

**STEVEN** [1] - 4:17

**sticking** [1] - 48:15

**still** [19] - 7:13, 19:25, 52:8, 52:14, 58:13, 59:2, 59:4, 66:4, 68:2, 72:9, 76:17, 96:14, 107:1, 108:17, 138:11, 140:24, 230:9, 231:21, 244:15

**stipulated** [1] - 187:20

**stipulation** [2] - 190:7, 230:11

**stock** [1] - 248:23

**stood** [3] - 59:19, 59:23, 153:11

**stop** [2] - 113:10, 227:23

**stopped** [3] - 67:1, 108:23, 219:8

**stopping** [1] - 223:24

**storage** [4] - 10:18, 11:12, 12:9, 38:20

**store** [5] - 8:4, 107:5, 137:15, 185:19, 227:6

**stored** [4] - 10:17, 11:13, 11:17, 11:22

**stores** [11] - 106:16, 130:18, 138:12, 138:18, 139:4, 139:10, 141:12, 142:4, 146:9, 181:15, 233:23

**storing** [2] - 11:21, 14:13

**street** [1] - 23:23

**Street** [16] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15, 4:18, 5:5, 5:12, 6:6, 6:13, 213:23

**strengths** [1] - 62:7

**stringent** [1] - 151:19

**structure** [1] - 202:1

**studies** [1] - 22:2
**Style** [1] - 206:25
**sub** [1] - 105:23
**subject** [7] - 118:9, 140:23, 169:12, 230:4, 230:6, 230:8
**submit** [2] - 108:14, 120:20
**submitted** [5] - 144:1, 161:4, 163:19, 168:20, 239:18
**submitting** [3] - 36:18, 36:19, 107:5
**subpoenas** [2] - 174:22, 175:5
**Subsection** [1] - 115:13
**subsequent** [3] - 73:24, 74:8, 217:9
**substance** [10] - 20:8, 70:9, 117:21, 143:23, 155:25, 160:14, 168:17, 207:16, 249:12, 249:13
**Substance** [18] - 42:7, 45:8, 58:23, 59:3, 60:14, 101:12, 128:3, 128:22, 130:17, 131:9, 133:24, 135:11, 167:1, 167:12, 207:7, 207:19, 213:14, 216:10
**Substances** [3] - 18:5, 217:4, 222:9
**substances** [38] - 10:18, 11:21, 12:11, 13:4, 16:1, 21:18, 35:25, 38:20, 61:11, 61:23, 79:15, 79:18, 83:2, 100:1, 117:22, 117:25, 141:14, 142:14, 142:18, 142:19, 196:10, 196:14, 197:11, 197:16, 204:19, 210:4, 210:5, 210:13, 211:18, 211:25, 212:2, 212:19, 212:23, 213:4, 213:20, 235:9, 244:20, 244:23
**substantial** [1] - 8:19
**substantially** [1] - 46:23
**substituting** [1] - 120:24
**suggests** [1] - 204:7

**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12
**sum** [1] - 204:4
**summarize** [1] - 160:2
**sums** [1] - 52:5
**superiors** [1] - 95:13
**supplied** [1] - 88:2
**supplier** [7] - 85:13, 100:6, 100:19, 100:20, 146:7, 146:12
**suppliers** [2] - 100:13, 100:14
**Supply** [1] - 192:18
**supply** [6] - 21:10, 30:9, 47:23, 146:8, 146:10, 148:4
**supplying** [1] - 22:21
**support** [1] - 185:11
**supposed** [1] - 153:21
**surge** [2] - 241:2, 241:3
**surgeries** [1] - 23:4
**surprise** [1] - 93:4
**surveillance** [1] - 12:9
**suspect** [1] - 122:22
**suspected** [1] - 99:6
**Suspicious** [12] - 41:4, 41:25, 42:7, 42:12, 42:18, 45:8, 56:13, 128:12, 132:22, 132:25, 161:9
**suspicious** [86] - 9:9, 9:13, 41:10, 41:12, 41:17, 41:20, 42:1, 42:24, 43:3, 44:6, 44:14, 44:18, 44:25, 45:2, 46:20, 46:25, 47:14, 47:15, 48:5, 48:15, 49:1, 51:1, 51:6, 51:7, 51:24, 51:25, 54:14, 54:18, 55:14, 55:22, 56:1, 56:8, 56:9, 58:15, 58:17, 66:23, 78:5, 79:1, 80:3, 80:14, 80:18, 80:23, 80:25, 81:4, 81:10, 81:11, 81:17, 89:17, 95:11, 100:23, 102:22, 109:2, 109:21, 109:22, 110:4, 112:20, 113:1, 113:7, 113:14, 117:22, 118:6, 123:12, 123:20, 123:24, 124:2, 125:21, 126:1,

127:4, 128:8, 130:2, 132:2, 153:8, 155:25, 160:14, 160:22, 161:5, 161:18, 168:17, 169:24, 170:18, 175:11, 187:7, 187:15, 187:23, 188:7, 227:25
**sustain** [4] - 171:11, 175:15, 176:17, 218:14
**Sustained** [1] - 204:8
**sustained** [3] - 173:4, 183:12, 186:24
**SUZANNE** [1] - 4:15
**SVP** [2] - 79:21, 192:18
**switch** [3] - 20:11, 124:22, 155:9
**switched** [1] - 32:7
**swore** [1] - 206:3
**SWORN** [1] - 194:5
**synonymous** [1] - 92:18
**system** [19] - 31:17, 54:14, 54:17, 54:19, 55:6, 55:7, 74:6, 160:5, 192:20, 202:3, 203:24, 204:13, 204:14, 204:16, 204:21, 205:8, 205:15, 211:3
**System** [2] - 40:11, 107:21
**systematic** [2] - 63:3, 154:22
**systematically** [4] - 9:8, 9:9, 62:12, 219:24
**systems** [1] - 10:15

## T

**talks** [6] - 46:22, 72:10, 76:21, 77:21, 162:9, 240:5
**tally** [1] - 184:21
**targets** [1] - 202:5
**TCR** [11] - 67:20, 75:12, 106:25, 150:17, 150:24, 163:20, 163:22, 229:8, 236:18, 241:7, 248:14
**TCRs** [6] - 33:5, 163:5, 163:16, 165:19, 166:13, 172:24
**team** [4] - 141:4, 142:1, 147:6, 232:18

**Team** [5] - 129:6, 129:7, 129:15, 173:23, 230:24
**tech** [1] - 199:25
**technically** [1] - 33:14
**technology** [1] - 199:25
**TEMITOPE** [1] - 4:8
**template** [2] - 84:20, 106:19
**ten** [3] - 66:14, 142:18, 191:8
**Tenth** [1] - 5:12
**tenure** [2] - 49:8
**term** [11] - 8:21, 11:1, 24:23, 29:10, 57:19, 59:25, 92:16, 95:21, 95:23, 195:12, 237:2
**terminate** [1] - 95:7, 95:12, 95:13
**terminated** [2] - 95:4, 161:5
**terminating** [1] - 80:8
**terminations** [1] - 161:10
**terminology** [1] - 96:2
**terms** [30] - 11:12, 14:5, 22:17, 22:21, 24:3, 24:25, 30:14, 30:20, 34:13, 37:23, 39:13, 44:18, 48:25, 82:12, 91:13, 98:2, 105:8, 113:3, 125:14, 132:10, 137:22, 139:11, 145:18, 155:5, 160:3, 167:5, 176:25, 186:23, 192:14, 195:14
**territory** [4] - 196:17, 197:10, 233:11, 233:12
**tertiary** [1] - 100:20
**testified** [4] - 111:21, 185:13, 251:19
**testify** [1] - 188:3
**testifying** [2] - 183:10, 193:3
**testimony** [8] - 179:1, 184:15, 187:22, 188:7, 205:22, 215:13, 242:7, 250:9
**testing** [1] - 153:5
**Texas** [1] - 220:16
**text** [3] - 149:19, 149:20
**THD** [1] - 232:8
**THE** [244] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:9, 7:11, 7:12, 7:13,

7:15, 7:16, 17:4, 17:5, 17:12, 17:14, 19:11, 21:13, 21:24, 26:3, 26:7, 26:10, 26:14, 27:4, 27:9, 28:13, 28:23, 29:1, 29:4, 30:1, 30:2, 30:5, 33:13, 33:17, 35:7, 38:3, 38:7, 38:8, 39:3, 46:4, 53:7, 53:10, 56:23, 56:24, 57:8, 60:4, 60:5, 60:11, 66:11, 66:14, 66:18, 71:12, 72:4, 72:11, 74:15, 74:17, 74:22, 74:25, 75:3, 84:17, 85:3, 97:3, 97:6, 101:8, 101:9, 101:25, 102:2, 110:11, 110:12, 110:22, 110:24, 111:24, 112:8, 113:25, 114:2, 118:18, 118:20, 118:24, 119:1, 119:12, 119:20, 119:21, 120:1, 120:24, 121:5, 121:7, 121:9, 121:13, 121:16, 124:17, 124:23, 125:2, 125:4, 125:8, 125:10, 130:24, 131:1, 134:3, 134:5, 138:21, 139:16, 139:17, 144:6, 144:9, 144:12, 144:19, 144:25, 145:4, 145:8, 145:13, 145:15, 147:12, 147:13, 152:14, 152:15, 155:11, 156:9, 157:7, 157:12, 158:23, 159:13, 159:16, 162:3, 162:4, 162:19, 162:20, 165:5, 165:6, 167:17, 167:21, 170:23, 171:11, 173:4, 173:15, 174:5, 175:15, 175:22, 176:17, 178:18, 178:19, 179:1, 179:15, 179:24, 180:5, 181:21, 181:24, 182:3, 182:6, 183:12, 183:21, 183:22, 184:1, 184:23,

186:11, 186:24,
187:3, 188:6,
188:10, 188:13,
188:18, 188:19,
188:21, 188:22,
188:24, 189:8,
189:11, 189:14,
189:19, 189:21,
190:5, 190:8,
190:15, 190:19,
190:21, 191:2,
191:5, 191:11,
191:14, 191:16,
191:20, 191:22,
191:23, 191:24,
191:25, 192:2,
192:6, 192:7,
192:10, 193:6,
193:16, 193:18,
193:21, 193:25,
194:1, 194:3, 194:4,
194:6, 194:9,
194:11, 201:15,
202:15, 202:17,
203:19, 203:21,
204:8, 205:2, 205:4,
208:4, 208:15,
208:18, 213:11,
213:12, 216:6,
218:12, 220:19,
220:21, 222:16,
222:18, 223:3,
223:19, 223:22,
224:1, 224:5, 224:8,
224:12, 224:18,
227:12, 229:17,
230:14, 230:21,
231:14, 236:10,
236:12, 236:14,
238:24, 242:16,
242:21, 242:24,
246:25, 249:3,
249:6, 251:16,
252:17, 252:21,
253:2
**thefts** [1] - 87:15
**themselves** [4] -
134:23, 137:20,
137:22, 137:23
**therapies** [3] - 240:18,
240:22, 241:19
**therefore** [2] - 175:19,
184:7
**thereto** [1] - 187:18
**they've** [1] - 54:24,
187:19, 213:3
**thinking** [1] - 94:18
**third** [8] - 101:15,
106:4, 107:23,
113:5, 129:13,

165:14, 192:13,
248:13
**Thomas** [1] - 2:12
**Three** [2] - 6:5, 220:17
**three** [38] - 6:12, 28:1,
28:15, 28:21, 29:16,
29:20, 35:11, 35:14,
36:14, 44:7, 49:24,
51:9, 77:6, 88:19,
91:1, 100:13, 113:4,
116:23, 117:23,
147:24, 148:7,
148:9, 150:15,
150:18, 154:6,
173:8, 173:20,
178:2, 198:3, 198:6,
204:9, 223:25,
224:2, 224:9,
225:25, 233:19,
249:5, 252:12
**three-level** [1] - 91:1
**threshold** [107] -
24:25, 33:5, 33:9,
33:22, 46:9, 46:12,
55:17, 62:3, 62:9,
63:13, 64:1, 65:22,
66:3, 66:7, 66:24,
67:24, 70:14, 72:22,
73:4, 73:6, 73:10,
73:12, 73:14, 73:24,
74:19, 75:6, 75:7,
75:18, 75:24, 75:25,
77:7, 77:9, 77:19,
81:8, 85:16, 103:10,
107:21, 107:24,
108:4, 108:13,
108:24, 111:19,
129:4, 129:12,
130:5, 133:7, 133:8,
133:14, 138:17,
139:3, 143:9, 150:8,
150:12, 150:19,
163:9, 171:20,
172:8, 172:10,
172:11, 213:24,
214:6, 214:7,
214:21, 214:25,
215:1, 215:20,
215:24, 216:19,
217:9, 217:14,
218:7, 218:18,
218:25, 219:12,
219:13, 219:14,
219:16, 219:18,
219:20, 219:21,
219:22, 219:24,
220:24, 221:25,
225:9, 225:19,
226:3, 226:5,
226:19, 227:6,

228:7, 229:2, 229:7,
237:1, 237:3, 237:4,
237:9, 237:13,
239:16, 239:19,
247:25, 250:15,
252:4, 252:5,
252:11, 252:14
**Threshold** [12] -
67:21, 73:19, 73:20,
75:12, 103:3,
108:14, 166:13,
216:17, 225:11,
236:18, 239:25,
252:7
**Thresholds** [1] - 103:1
**thresholds** [67] - 9:7,
33:5, 33:7, 33:23,
55:15, 61:23, 62:2,
62:20, 62:23, 62:25,
63:6, 63:9, 63:11,
63:15, 63:17, 64:3,
64:5, 64:11, 64:15,
64:16, 64:24, 64:25,
65:3, 65:7, 65:10,
65:14, 65:17, 65:19,
65:21, 66:1, 66:6,
70:22, 70:25, 71:17,
71:18, 71:22, 83:22,
85:19, 103:4, 103:7,
103:21, 104:3,
104:16, 106:18,
107:12, 107:15,
108:18, 108:21,
111:8, 124:3,
135:17, 135:19,
135:21, 135:24,
136:21, 145:4,
146:4, 146:10,
153:7, 180:13,
213:15, 213:19,
214:1, 214:2,
214:16, 220:1
**throughout** [11] -
9:17, 10:15, 12:14,
12:15, 36:13, 139:8,
143:9, 182:12,
183:8, 185:23, 187:8
**tightened** [1] - 70:10,
72:10
**Tim** [3] - 193:20,
225:2, 229:23
**timing** [1] - 192:15
**TIMOTHY** [2] - 5:9,
194:5
**Timothy** [2] - 194:3,
194:18
**Title** [1] - 50:21
**today** [18] - 20:1,
26:23, 38:1, 43:5,
59:2, 59:4, 75:1,

76:6, 95:22, 95:24,
145:2, 160:7, 168:5,
194:16, 196:13,
212:1, 242:25,
250:19
**Todd** [1] - 192:15
**together** [5] - 28:15,
134:19, 151:22,
192:25, 232:18
**tomorrow** [1] - 243:5
**took** [8] - 20:6, 20:24,
69:20, 83:3, 166:24,
223:7, 223:16,
228:17
**tool** [1] - 37:12
**toolbox** [1] - 37:12
**tools** [2] - 12:10,
102:18
**top** [24] - 27:13, 27:14,
29:9, 39:17, 41:4,
57:11, 60:14, 61:2,
77:1, 85:7, 92:7,
103:9, 105:16,
113:10, 115:12,
157:17, 165:11,
182:23, 189:4,
216:9, 224:24,
236:21, 243:23,
244:18
**topic** [7] - 26:12,
66:10, 67:1, 124:22,
142:12, 146:13,
165:14
**total** [3] - 144:15,
145:10, 247:22
**totally** [1] - 211:23
**touch** [2] - 95:21,
111:6
**touched** [1] - 48:6
**touching** [1] - 7:24
**toward** [1] - 229:24
**towards** [2] - 42:5,
45:5
**Tower** [2] - 3:4, 4:18
**tracking** [2] - 60:8,
76:11
**traffic** [3] - 93:6,
235:17, 246:20
**trained** [7] - 207:10,
207:16, 207:20,
209:18, 213:5,
216:12, 217:5
**training** [19] - 20:24,
21:2, 21:4, 21:5,
102:18, 128:10,
130:6, 130:8,
162:15, 207:24,
208:6, 208:8,
208:20, 208:23,
209:1, 209:2, 209:4,

211:4, 217:17
**transaction** [2] -
14:22, 80:13
**transactions** [2] -
80:13, 94:4
**transcript** [2] - 6:19,
254:4
**transmits** [1] - 160:21
**transmitted** [1] - 133:2
**treat** [3] - 80:18,
109:22, 120:15
**treated** [4] - 78:5,
83:16, 109:20, 113:7
**treating** [2] - 112:19,
112:25
**treats** [1] - 80:3
**trend** [3] - 163:5,
163:16, 232:7
**trends** [2] - 98:20,
99:18
**TRIAL** [1] - 1:16
**Trial** [1] - 253:5
**tried** [4] - 36:25, 62:9,
167:2, 186:19
**trigger** [6] - 46:9,
214:7, 214:21,
215:21, 226:12,
248:9
**triggered** [2] - 215:1
**triggering** [1] - 220:1
**triggers** [3] - 44:5,
215:24, 217:10
**tripled** [1] - 202:23
**Tristate** [2] - 18:11,
18:21
**trouble** [2] - 247:7,
250:19
**true** [14] - 25:12,
170:18, 171:7,
196:1, 197:6,
197:17, 200:9,
201:20, 204:23,
218:7, 218:22,
225:10, 229:13,
237:23
**True** [37] - 195:19,
198:15, 198:20,
200:9, 200:18,
201:5, 201:8,
201:12, 201:18,
202:6, 202:9, 204:5,
204:19, 207:20,
208:13, 210:5,
211:11, 212:5,
212:11, 212:24,
213:9, 213:15,
213:21, 213:24,
214:3, 214:8,
214:21, 218:20,
219:13, 219:22,

220:17, 221:10,
225:3, 225:9,
225:23, 227:19
**trust** [3] - 38:10,
87:22, 182:8
**truth** [4] - 50:3, 159:8,
206:3, 229:10
**try** [11] - 34:6, 34:9,
35:1, 76:6, 124:19,
166:19, 168:3,
242:18, 242:19,
243:3, 246:12
**trying** [11] - 37:23,
44:18, 49:16, 61:20,
71:21, 72:17, 93:14,
94:7, 195:13,
211:22, 228:15
**tsunami** [1] - 67:7
**Tukey** [1] - 136:3
**tune** [1] - 231:6
**turn** [7] - 58:16, 110:9,
170:3, 170:8,
181:18, 217:13,
244:8
**turned** [1] - 228:4
**turning** [1] - 109:4
**Twelfth** [3] - 4:13,
4:15, 5:5
**twice** [2] - 231:5,
238:25
**Two** [1] - 203:13
**two** [51] - 14:2, 14:7,
16:10, 28:1, 29:16,
29:21, 32:18, 41:25,
43:10, 43:25, 45:14,
45:17, 47:23, 53:25,
59:23, 67:3, 67:5,
68:2, 68:24, 80:10,
82:1, 100:13, 106:7,
114:10, 117:21,
121:1, 123:14,
125:23, 146:4,
147:16, 150:17,
151:22, 153:19,
155:23, 158:13,
158:16, 159:20,
170:8, 177:2, 177:5,
198:6, 203:4, 228:3,
228:17, 228:20,
228:21, 232:1,
248:11, 250:14,
250:15, 252:11
**two-week** [1] - 47:23
**two-year** [4] - 28:1,
29:16, 29:21, 228:3
**type** [10] - 10:23,
36:17, 45:14, 84:7,
87:12, 88:3, 93:19,
134:11, 240:21
**typed** [1] - 225:20

**types** [5] - 24:3, 86:11,
146:4, 162:15,
165:25
**typical** [4] - 234:7,
234:17, 238:8,
238:16
**typically** [2] - 92:3,
239:12

**U**

**ultimate** [1] - 171:6
**ultimately** [2] - 122:9,
176:7
**umpire** [2] - 26:14,
26:16
**unannounced** [3] -
92:24, 93:4, 246:10
**uncommon** [1] - 100:5
**under** [33] - 7:14, 22:4,
39:22, 45:6, 47:10,
62:4, 62:23, 80:18,
81:20, 101:16,
106:7, 116:1,
132:24, 134:18,
150:8, 151:3, 152:3,
152:7, 153:3,
153:19, 158:24,
169:8, 169:18,
175:9, 177:19,
214:6, 214:7,
214:20, 215:19,
221:16, 222:9,
225:20, 230:11
**Under** [1] - 75:5
**underlined** [1] - 39:23
**understood** [11] -
207:24, 208:1,
208:6, 208:8,
208:10, 208:12,
209:4, 214:18,
214:20, 215:22,
227:3
**undertake** [1] - 125:18
**undertaking** [1] -
128:13
**undertook** [2] - 82:14,
126:10
**unduly** [1] - 108:15
**unfortunately** [1] -
132:6
**uniform** [1] - 63:18
**United** [1] - 7:2, 13:2
**UNITED** [2] - 1:1, 1:17
**units** [4] - 184:10,
244:22, 245:16,
251:23
**unknowingly** [1] -
231:2
**unless** [4] - 116:22,

117:18, 145:12,
243:6
**unresolved** [2] -
96:11, 96:14
**unusual** [11] - 46:22,
46:23, 47:4, 47:12,
47:16, 47:25, 48:16,
49:14, 127:6
**Unusual** [1] - 89:18
**Up** [4] - 202:10, 220:6,
243:23, 244:18
**up** [96] - 7:21, 8:17,
17:16, 17:23, 18:18,
26:15, 29:24, 32:7,
38:9, 39:5, 43:4,
44:15, 49:13, 53:25,
54:5, 60:13, 60:19,
61:4, 62:11, 63:14,
64:3, 64:4, 65:4,
66:25, 67:24, 70:10,
72:9, 72:10, 73:13,
77:18, 78:21, 79:25,
83:7, 83:14, 83:15,
85:6, 85:18, 91:3,
92:14, 93:4, 93:23,
103:23, 103:25,
114:4, 115:21,
117:11, 123:8,
125:13, 127:18,
131:3, 132:7, 134:7,
134:14, 135:19,
135:23, 143:11,
147:23, 147:24,
148:14, 150:10,
153:18, 155:21,
157:17, 168:4,
168:7, 168:14,
169:15, 169:17,
169:20, 173:15,
176:12, 181:17,
182:23, 183:25,
184:21, 195:14,
204:4, 211:3, 213:6,
213:15, 214:9,
216:1, 216:2,
218:16, 219:19,
220:8, 224:16,
224:24, 231:5,
241:10, 242:19,
246:8, 246:9,
246:16, 246:18,
252:25
**update** [3] - 98:16,
98:17, 130:13
**updated** [4] - 39:11,
99:19, 130:14,
248:10
**updating** [1] - 248:10
**upward** [1] - 49:21
**usage** [2] - 164:12,

241:2
**useful** [2] - 37:14,
90:6

**V**

**VA** [6] - 25:16, 25:23,
26:20, 28:18, 64:8,
64:12
**vacation** [1] - 47:22
**vague** [3] - 173:3,
211:19, 220:3
**valid** [3] - 18:22,
19:20, 86:24
**value** [1] - 209:18
**variabilities** [1] -
23:17
**variability** [14] - 23:10,
23:11, 23:18, 24:2,
24:3, 24:21, 44:21,
44:24, 45:1, 47:8,
49:4, 64:4, 103:16,
103:18
**variables** [1] - 249:19
**varies** [1] - 209:25
**Various** [1] - 87:8
**various** [10] - 60:18,
87:4, 97:13, 123:8,
139:24, 162:8,
169:20, 174:23,
222:24
**vary** [1] - 100:9
**varying** [1] - 182:21
**vast** [1] - 64:12
**vault** [9] - 10:17,
11:18, 11:19, 11:24,
12:1, 12:14, 12:16,
160:5
**vent** [1] - 69:21
**venting** [2] - 67:10,
69:15
**Ventura** [1] - 3:18
**verbal** [1] - 57:23
**verbatim** [1] - 206:17
**verification** [1] - 83:20
**verify** [2] - 87:19,
87:22
**version** [8] - 39:12,
39:14, 60:7, 60:22,
119:17, 119:18,
130:10, 212:1
**versus** [4] - 47:13,
140:14, 175:7,
238:16
**vet** [2] - 165:16,
165:21
**Veterans** [3] - 25:18,
27:14, 28:8
**via** [2] - 106:24, 166:8
**vice** [1] - 79:23

**Vice** [1] - 57:15
**view** [5] - 126:19,
141:15, 141:16,
141:21, 141:22
**viewed** [3] - 31:14,
78:25, 114:21
**views** [2] - 53:21,
53:22
**VIRGINIA** [2] - 1:1,
1:18
**Virginia** [27] - 4:18,
7:3, 15:22, 15:24,
16:2, 16:6, 16:9,
16:11, 16:22, 16:23,
17:8, 18:3, 18:6,
19:3, 122:5, 174:11,
174:13, 175:21,
176:15, 186:7,
187:17, 196:20,
197:1, 197:2, 223:1,
233:9
**Virginia/West** [1] -
197:2
**visibility** [2] - 14:23,
145:3
**visit** [24] - 13:20,
13:24, 83:10, 83:19,
89:20, 92:3, 92:5,
92:11, 92:14, 92:21,
93:4, 138:13,
138:14, 143:12,
210:17, 212:14,
214:25, 215:4,
215:9, 215:15,
228:23, 246:1,
246:13
**visiting** [3] - 198:25,
246:7
**visits** [18] - 68:20,
90:24, 91:23, 91:24,
92:24, 93:20, 94:21,
98:2, 166:2, 166:3,
166:16, 209:11,
209:22, 214:24,
215:18, 246:5,
246:12
**voice** [1] - 71:25
**volume** [6] - 25:7,
36:9, 49:19, 125:20,
241:24, 241:25
**VOLUME** [1] - 1:16
**voluminous** [1] - 26:4
**vouch** [1] - 50:3
**VP** [2] - 79:19, 79:22
**Vs** [2] - 11:22, 35:25
**vs** [1] - 254:6

**W**

**wait** [4] - 122:18,

122:20, 222:21, 240:2
**WAKEFIELD** [1] - 5:13
**walk** [5] - 93:9, 105:17, 107:20, 165:24, 192:4
**walked** [1] - 234:14
**walker** [4] - 173:7, 173:11, 173:13, 173:19
**Walker** [8] - 57:12, 57:13, 57:15, 79:21, 112:3, 128:7, 162:8, 180:18
**walking** [1] - 26:16
**Wallace** [2] - 240:11, 240:12
**wants** [2] - 73:9, 248:25
**warehouse** [4] - 8:3, 10:13, 10:25, 11:7
**warn** [5] - 218:17, 218:19, 219:2, 219:11, 220:14
**Warning** [3] - 42:7, 42:18, 45:8
**warning** [5] - 219:15, 219:25, 220:15, 221:4, 229:1
**Warnings** [1] - 77:2
**warnings** [3] - 22:7, 220:17, 247:25
**warrant** [4] - 121:24, 174:8, 174:16, 175:3
**warranted** [1] - 39:10
**Washington** [35] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 15:15, 15:19, 15:20, 16:9, 19:16, 112:4, 118:18, 118:22, 148:1, 148:15, 150:9, 154:9, 155:22, 160:22, 161:1, 161:16, 168:10, 168:16, 169:10, 170:18, 171:25, 174:25, 175:4, 175:8, 175:20, 175:23, 176:25, 177:2, 177:6
**waste** [1] - 210:9
**watch** [1] - 94:16
**watching** [4] - 93:24, 93:25, 94:15, 94:19
**WEBB** [1] - 3:11
**Webb** [4] - 3:12, 250:23, 251:1, 251:7
**website** [6] - 88:4, 91:3, 91:13, 91:14,

133:3, 166:7
**Wednesday** [1] - 229:21
**week** [11] - 47:12, 47:22, 47:23, 67:23, 67:25, 68:2, 68:3, 194:8, 198:24
**weekends** [1] - 67:19
**weekly** [3] - 44:22, 47:13, 92:3
**welcome** [9] - 30:5, 101:11, 133:18, 147:14, 152:16, 156:10, 162:5, 162:21, 165:3
**West** [24] - 7:3, 15:21, 15:24, 16:2, 16:6, 16:9, 16:11, 16:22, 16:23, 17:8, 18:3, 18:6, 19:3, 122:4, 174:11, 174:13, 175:20, 176:15, 186:7, 187:17, 196:20, 223:1, 233:9
**WEST** [2] - 1:1, 1:18
**whereby** [1] - 213:6
**whole** [4] - 68:9, 203:8, 219:17, 233:9
**Wholesale** [2] - 18:4, 243:24
**wholesaler** [1] - 145:1
**Wholesaler** [1] - 18:4
**wholesalers** [3] - 34:22, 83:19, 212:5
**WICHT** [1] - 4:12
**wide** [2] - 23:10, 23:11
**Williams** [2] - 4:13, 5:4
**window** [2] - 89:19, 118:4
**withdraw** [1] - 13:19
**witness** [19] - 7:6, 7:14, 45:25, 46:2, 72:2, 72:13, 97:5, 119:8, 125:5, 183:10, 187:22, 188:2, 189:14, 191:12, 192:4, 192:13, 192:15, 193:18, 223:14
**WITNESS** [53] - 7:12, 7:15, 17:5, 26:7, 30:2, 30:5, 33:17, 38:8, 56:24, 60:5, 71:12, 74:17, 74:25, 84:17, 97:6, 101:9, 110:12, 114:2, 118:20, 119:1, 119:21, 125:2, 139:17, 144:12,

144:25, 145:8, 145:15, 147:13, 152:15, 155:11, 156:9, 162:4, 162:20, 165:6, 178:19, 183:22, 184:1, 186:11, 188:13, 188:18, 188:21, 188:24, 191:22, 191:24, 192:2, 192:7, 194:3, 194:5, 202:17, 203:21, 205:4, 213:12, 220:21
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**word** [4] - 56:19, 82:3, 87:24, 225:20
**words** [4] - 27:22, 70:14, 151:5, 232:23
**Workers'** [2] - 251:2, 251:10
**workload** [1] - 33:4
**works** [6] - 14:5, 61:1, 161:23, 210:21, 214:1, 240:20
**worth** [1] - 188:11
**wrap** [1] - 242:19
**wrath** [1] - 38:10
**write** [3] - 57:21, 82:9, 238:22
**writing** [10] - 21:16, 24:10, 32:10, 32:12, 32:21, 33:10, 33:24, 49:9, 103:22, 156:19
**written** [7] - 48:12, 50:11, 70:1, 114:19, 118:2, 157:21, 165:11
**wrote** [5] - 33:6, 49:19, 57:4, 155:22, 157:25
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10, 3:13, 4:19, 5:15, 6:9

## Y

**year** [26] - 18:23, 19:21, 28:1, 29:16, 29:21, 31:19, 32:2, 53:24, 54:6, 54:7, 63:4, 103:24, 146:14, 196:3, 202:4, 202:20, 202:23, 203:2, 203:6, 207:13, 215:10, 228:3, 241:7, 241:8, 241:10, 251:24

**yearly** [2] - 13:13, 32:2
**years** [29] - 8:16, 14:2, 14:7, 32:13, 43:6, 43:10, 43:25, 64:15, 76:4, 95:11, 152:9, 177:3, 177:5, 196:6, 196:9, 198:1, 198:22, 200:12, 203:4, 203:13, 219:4, 219:6, 228:17, 228:20, 228:21, 240:15, 242:4, 242:6, 251:6
**yellow** [1] - 152:25
**Yesterday** [1] - 99:4
**yesterday** [62] - 7:6, 7:22, 14:17, 15:15, 47:2, 47:5, 52:13, 52:20, 52:25, 53:6, 58:23, 59:11, 62:1, 65:6, 67:2, 69:24, 70:6, 73:19, 75:23, 95:23, 95:24, 97:1, 97:14, 99:10, 103:12, 107:10, 108:3, 113:21, 114:7, 119:9, 121:11, 121:19, 126:11, 127:16, 127:20, 136:25, 139:14, 140:2, 140:19, 146:21, 147:17, 151:4, 152:22, 153:17, 153:20, 154:25, 155:21, 156:4, 157:1, 158:8, 162:8, 162:23, 165:10, 165:15, 176:5, 186:20, 186:21, 190:13, 190:25, 222:20, 238:25
**York** [1] - 3:5
**yourself** [3] - 70:9, 159:21, 159:25

## Z

**zero** [3] - 105:1, 105:2, 186:3
**zeroed** [1] - 74:20
**zoom** [1] - 51:4