```
                 IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT CHARLESTON


_____x
                                :
THE CITY OF HUNTINGTON,         :      Civil Action
                                :
             Plaintiff,         :      No.  3:17-cv-01362
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
             Defendants.  :
_____x
                                :
CABELL COUNTY COMMISSION,       :      Civil Action
                                :
             Plaintiff,         :      No. 3:17-cv-01665
                                :
v.                              :
                                :
AMERISOURCEBERGEN DRUG          :
CORPORATION, et al.,            :
                                :
             Defendants.  :
_____x



                  BENCH TRIAL - VOLUME 18
     BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
                UNITED STATES DISTRICT COURT
                IN CHARLESTON, WEST VIRGINIA


                       MAY 26, 2021
```

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087

Court Reporter:              Ayme Cochran, RMR, CRR
Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1              PROCEEDINGS had before The Honorable David A.

 2     Faber, Senior Status Judge, United States District

 3     Court, Southern District of West Virginia, in

 4     Charleston, West Virginia, on May 26, 2021, at 9:00 a.m.

 5     as follows:

 6              THE COURT:  Good morning.  Are we ready to go

 7     here?

 8              MR. FARRELL:  Yes, Your Honor.

 9              THE COURT:  Mr. Farrell.

10         Mr. Fuller.

11              MR. FULLER:  Judge, I'm just going to move in some

12     more documents if that's okay with the Court.

13              THE COURT:  Well, we'll see.  Go quickly.

14              MR. FULLER:  What I've been told is it will be

15     easy.

16         The plaintiffs will move in 14296 which is a 1006

17     summary, and 14 -- excuse me -- 42432 which is another 1006

18     summary.

19              MR. SCHMIDT:  Mr. Fuller, I don't know what these

20     are.  Do these relate to McKesson?

21              MR. FULLER:  No, sir, they're Cardinal.

22              MS. WICHT:  No objection, Your Honor.

23              THE CLERK:  I need the documents.

24              THE COURT:  You need to --

25              MR. FULLER:  I'm bringing Allison copies now.
```

1          May I approach, Judge?

2               THE COURT:  All right.  They're admitted.

3               MR. FULLER:  Thank you, Your Honor.

4               MR. ACKERMAN:  Real quick, Your Honor, a little

5    bit of clean-up from yesterday.

6          There were three documents we had wanted to move in

7    with Mr. Ashworth.  But given the time, McKesson has agreed

8    that we can do it this morning instead of at 5:15 yesterday.

9          I believe two of them there are no objections to and

10   that is P-12820 and P-12883.  I have copies.

11              THE COURT:  If there's no objection, those two are

12   admitted.

13              MR. SCHMIDT:  No objection.

14              MR. ACKERMAN:  All right.  And then the third

15   document, which I can circulate, is P-54 which is an email,

16   McKesson email dated April 24th, 2013.  I'll circulate

17   copies now.

18              THE COURT:  Yes.

19              THE CLERK:  Where are the ones that just got

20   admitted?

21              MR. ACKERMAN:  Your Honor, the ones that just got

22   admitted are still sitting on the podium.  I'll give those

23   to you.  This is P-12820.  This is P-12883.

24          Your Honor, now that I've gotten my stips in, back to

25   P-54.  This is an internal McKesson email concerning the

```
1    process for approving Threshold Change Requests.
2         It is our position that the description of the
3    document, and especially the top two emails, describe a, a
4    process that is applied nationally consistent with the
5    testimony yesterday.  The document is not hearsay because it
6    is a statement of an employee within the scope of their
7    employment pursuant to Rule 801(d)(2)(D).
8              THE COURT:  Mr. Stanner.
9              MR. STANNER:  Thank you, Your Honor.
10        If you flip to the second page of the document you'll
11   see it concerns a couple pharmacies in Ohio.  It's not a
12   policy or a procedure.  It's an email between two employees
13   outside of this jurisdiction with no connection to Cabell
14   County talking about how threshold changes would be done.
15        It's our position this isn't a reflection of any
16   national policy or procedure.  It's just these two employees
17   in a different state talking about their policies for this
18   pharmacy.
19             THE COURT:  Well, I'm going to admit it.  I think
20   it goes to the weight rather than the admissibility and I'm
21   going to admit it for what it's worth.
22             MR. ACKERMAN:  Thank you, Your Honor.
23             THE COURT:  Now, you gave me two more.
24             MR. ACKERMAN:  Those are the two that there were
25   no objections to.  Those are already admitted.
```

```
 1                  THE COURT:  Oh, all right.  Okay.

 2         You can call your next witness.

 3                  MR. FARRELL:  Thank you, Judge.  Plaintiffs call

 4    expert witness James Rafalski.

 5                  THE CLERK:  Could you state your name for the

 6    record, please?

 7                  THE WITNESS:  James Rafalski, R-a-f-a-l-s-k-i.

 8                  THE CLERK:  Would you raise your right hand.

 9    JAMES RAFALSKI, PLAINTIFFS' WITNESS, SWORN

10                  THE CLERK:  You may have a seat right there,

11    please.

12                  THE WITNESS:  Thank you.

13         Good morning, Your Honor.

14                  THE COURT:  Mr. Rafalski.

15                       DIRECT EXAMINATION

16    BY MR. FARRELL:

17    Q.   Good morning.  Would you please state your name for

18    the record?

19    A.   James Rafalski.

20    Q.   Mr. Rafalski, what I'd like to do initially is have you

21    introduce yourself to the Court and explain a little bit

22    about your professional background.

23    A.   Good morning, Your Honor.  I'm James Rafalski again.

24         I'd like to start to tell you from my first law

25    enforcement employment.
```

1         In 1976 I joined the Wayne County Sheriff's Department

2    which is located in Detroit, Michigan.  I worked in the

3    Sheriff's Department for five years.

4         In 1981 there was an economic downturn in Detroit -- or

5    in Michigan and they started lay-offs.  So I left the Wayne

6    County Sheriff's Department and moved to the Romulus Police

7    Department for the City of Romulus.  That's also located in

8    Michigan.  It's about 20 miles outside of Detroit.

9         The unique thing about Romulus is the Detroit

10   Metropolitan Airport is right in the center of the city, so

11   they surround it.

12        I started as a patrol officer.  I worked my way up

13   through the ranks.  In '84 I became a uniform sergeant.  '86

14   I became a detective sergeant.  '87 I got a unique

15   opportunity.  The chief approached me and asked me to start

16   a Special Investigations Unit.

17        So I hand-picked three employees and started a special

18   unit within the police department, complex crime

19   investigations.  The start of that unit also coincided with

20   the crack cocaine issues that began in America, especially

21   in the Detroit area.  So a majority of the work was working

22   in narcotic cases.

23        It was during the three and a half years that I was

24   head of the Special Investigations Unit we started to have a

25   lot of contact with the DEA.  We worked cases that got to a

```
1    level that didn't exceed our ability, but it exceeded our

2    manpower and our funding.

3         So we would work joint cases with the DEA which led to

4    an invitation from the DEA for me to move from the DEA --

5    from Romulus to the DEA as a Task Force Officer.

6         I worked with the DEA for five years as a Task Force

7    Officer doing illicit drug cases, cocaine, heroin, marijuana

8    cases.

9         Around '95 is when I came back to the department.  I

10   took a promotion to uniform lieutenant.  So after a long

11   time not wearing a uniform, I came back and worked midnight

12   shift in uniform.  That was a tough transition.

13        I went to a community policing unit for a couple years.

14   And then at the end of my career probably around 2000 I was

15   promoted to Executive Lieutenant.  It would be similar to

16   actually a deputy chief position.  I ran the entire uniform

17   division.

18        In 2002 I got an unexpected offer for a buy-out, a

19   retirement buy-out.  The department made a decision to offer

20   retirement to all of the command officers.

21        So it was one of those offers -- I hadn't planned on

22   retiring.  I kind of had my eye on the police chief job

23   there.  And -- but it was too good to pass up, so I retired.

24        I was 48 years old and I knew that I wasn't not going

25   to work anymore.  Upon leaving, I put applications in at the
```

1    DEA and the Traffic Safety Administration.

2    **Q.**    Mr. Rafalski, I'm going to stop you right there before

3    we move on.

4           MR. FARRELL:  Judge, I have attempted to outline

5    and provide a roadmap to today's testimony.  And I have

6    demonstrative slides that I think you'll find that the

7    witness will testify is helpful in his testimony.

8        I've provided copies to counsel.  And what I would like

9    to do is I'd like to present you with a copy and publish the

10   front page.

11          MR. SCHMIDT:  Your Honor, two comments on these

12   slides.

13       The first is there is at least one slide in here that

14   we don't believe they have a proper foundation for because

15   it relates to data from Dr. McCann that was never presented

16   to the Court where that portion of Dr. McCann's testimony is

17   now over.

18       The second point, more broadly, that we can deal with

19   as it comes up is we had this happen with Dr. Waller, the

20   Court will remember, the first expert witness where slides

21   were used to lead him through his testimony.  And some of

22   these slides look like they would have the same effect.

23       We can object to them as we go, but it shouldn't be the

24   case that the witness is testifying by lawyers reading off

25   of slides or something like that.

```
1              MS. MAINIGI:  Your Honor, --

2              THE COURT:  We'll have to see where you go, Mr.

3    Farrell.

4         Yes, Ms. Mainigi.

5              MS. MAINIGI:  Your Honor, I join in Mr. Schmidt's

6    comments.  I think that there are a couple of slides in here

7    that we would also have objections to perhaps different than

8    McKesson, but I'm happy to take it as well.

9              THE COURT:  Okay.  Yes, Mr. Nicholas.

10             MR. NICHOLAS:  Just for the record, we don't

11   object to the concept of this.  I think we just have to take

12   it slide by slide.

13             THE COURT:  Well, I think we do too.

14        Go ahead, Mr. Farrell.

15             MR. FARRELL:  Thank you.

16        Judge, as you'll see, there's eight steps to what we

17   believe to be the testimony today:  The introduction, which

18   we've just gotten through, and then we intend go through his

19   qualifications, his methodology, the purpose of why he's

20   here, the guidance materials he relied upon, the reliance

21   materials that are in the record, which would be followed by

22   his findings and, if permitted, his final opinions.

23   BY MR. FARRELL:

24   Q.   So, Mr. Rafalski, what I'd like to do is let's jump

25   into the section of qualifications where you joined the
```

DEA.

Can you walk the Judge through what your role initially with the DEA was and what your function and job responsibilities were?

**A.**   Are you talking the first time I was there or are you talking my employment there when I began my employment as a diversion investigator?

**Q.**   I think we can skip over the Task Force participation. Let's talk about when you were formally hired by the DEA.

**A.**   In September of 2004 I received an employment offer from the DEA, Your Honor, and I accepted it.  And I went for 12 weeks to a -- we call it custodial academy, an in-house academy in Quantico, Virginia.

Upon the completion of the 12 weeks -- it was pretty rigorous academic training, actually, with some practical examinations.  I graduated and returned to the Detroit, Michigan, divisional office in December of 2004.

**Q.**   So what was your first assignment?  What was your first posting with the DEA?

**A.**   When I got there, the job was kind of three specific areas.  One is an administrative area.  Those are the duties that -- and assignments that just come at you as part of your employment.  Registration renewals.

**Q.**   Mr. Rafalski, I'm sorry.  Let me back up.  Maybe I missed it.  What was your actual title and job designation?

1    **A.**    Sure.  Diversion investigator.  And when -- I think the

2    Court's hearing people testify, and you may know this, Your

3    Honor.  As a diversion investigator, I'm different than an

4    agent.  I can do essentially some of the same things an

5    agent can do, but I'm not a law enforcement officer.

6         So I did not carry a gun.  I did not have arrest

7    powers, could not serve search warrants, could not handle

8    confidential informants.  So there were some restrictions on

9    my job, but I could conduct investigations.

10   **Q.**    Okay.  Now, for a diversion investigation, in general

11   what was the -- what is it that you were looking to

12   regulate?  What, what portions of America in the

13   transactions were you studying for purposes of the DEA?

14   **A.**    The job is focused, Your Honor, on registrants, those

15   people that hold DEA registrations and have the ability to

16   handle controlled substances.

17   **Q.**    Okay.  And will you walk the through judge -- the Judge

18   through briefly what different registrants there are in the

19   closed system?

20   **A.**    At the top of the system, the closed system would

21   probably be the importers.  Those would be the registrants

22   that could bring the raw narcotic material into the country.

23        Next would be the manufacturers.  And there's different

24   levels of manufacturers.  There's raw product manufacturers

25   and dosage manufacturers that eventually turn the narcotics

1    into pills and liquids and gels.

2        Those would flow through and down to the distributors.

3    And from the distributors, they would flow down to those

4    registrants that could purchase and handle the controlled

5    substances; pharmacies, practitioners.  And when I say a

6    practitioner, it would be a doctor.  But it could be

7    different kinds of doctors; veterinarians, dentists, medical

8    doctors.  There would also be researchers.

9        And I'm sure I've forgot one or two, but that would be

10   generally the, the circle of the people that would handle

11   the drugs in the closed system.

12   **Q.**   Which of those registrant classifications did, did you

13   participate in investigations with while you were at the

14   DEA?

15   **A.**   All, all of those classifications, or those types of

16   descriptions.  Maybe not researches -- I would investigate

17   them, but not for illicit purposes.  But I would have

18   contact and would do administrative investigations for all

19   of those types of businesses.

20   **Q.**   Were you assigned to a particular geographic area?

21   **A.**   Yes, sir.

22   **Q.**   Which was your geography?

23   **A.**   In the Detroit office I would cover the lower peninsula

24   of Michigan, the upper peninsula of Michigan, and I would

25   cover six counties in Ohio, six northern east counties in

1    Ohio.

2    **Q.**   Approximately how many investigations did you

3    participate in or did your, your Task Force -- your group in

4    Detroit participate in?

5    **A.**   Oh, over the 13 years I would say approximately 40 to

6    50 investigations.  Those would be major investigations.

7    There would be smaller investigations, maybe a doctor that

8    that had some licensing issues or had some issues at the

9    state level that I would investigate as part of our

10   administrative assignment.  I wouldn't count those.  These

11   are just more of higher level investigations.

12   **Q.**   Would you walk the Judge through a couple of examples

13   of notable investigations that you participated in?

14   **A.**   Certainly.

15       Your Honor, when I arrived it Detroit, immediately I

16   was assigned to assist in an investigation of a gentleman

17   named Dr. Leo Ognen.  He was a Yugoslavian lieutenant and a

18   military doctor that came to America.  He was in Toledo,

19   Ohio.

20       And I guess if you were hearing the term "pill mill,"

21   his office was the definition of a pill mill; patients

22   sleeping in the office, crowds in the parking lot, fights.

23   Sometimes the doctor would be out in the parking lot smoking

24   cigarettes with his patients.

25       He was writing Oxycontin 80 milligrams.  He was writing

1    sub drugs, other oxycodone combinations and Xanax.  A large

2    population of, of patients grew rather quickly in the Toledo

3    area and there was a big change in Toledo as a result of

4    Dr. Ognen's actions.

5        We investigated that case, took a lot of interviews and

6    record reviews.  And prior to trial, Dr. Ognen pled guilty.

7    Q.   Okay.  What other notable investigations?

8    A.   My next case was another doctor case, but it was a more

9    sophisticated distribution case.  As time went on, pill mill

10   doctors still were present, but this doctor was actually a

11   source of supply of some narcotic organizations.

12       So there were four organized groups with leaders.  And

13   this physician would meet them in the office or sometimes

14   outside the office in parking lots and he would sell them

15   prescriptions for cash.

16       So he was feeding prescriptions to these four groups.

17   And these four groups were primarily going to the same

18   pharmacy and cashing these prescriptions and distributing.

19   Again, it was an Oxycontin 80-milligram case, and the same

20   subset.  The Percocet 10-milligram combination oxycodone and

21   Xanax were the two most common drugs.

22   Q.   Have you participated in the investigation of any

23   wholesale distributors?

24   A.   Yes, sir, I have.

25   Q.   Would you please tell the Judge a couple of the notable

1  examples?

2  **A.**    The first case, Your Honor, would be the Harvard Drug

3  Group.  That case originated -- the management in Detroit,

4  because of the, the pill mill operations or pain clinic --

5  I'm sorry -- operations in Florida, tasked some people in

6  Detroit to, to check all of the distributors to make sure

7  none of the Detroit area distributors were sending opioids

8  or, more specifically, oxycodone down to Florida.

9       Well, a little advance investigation determined that

10  Harvard was sending a large amount of oxycodone 30-milligram

11  tablets to doctors in South Florida.

12       As a result of finding that information, I did some

13  background information which led to issuing an

14  administrative inspection warrant.

15       An administrative inspection warrant, Your Honor, is

16  similar to a search warrant, but it's restricted into what

17  you can see and what you can look at.  It's more of an

18  ability to go in and obtain the required records and conduct

19  the investigation.

20       I executed the administrative inspection warrant.  I

21  made contact with the management and compliance at Harvard.

22  I'd have to say that was a good experience for me.  They

23  were very helpful and very open and honest moving forward.

24       I took that information and came back and conducted

25  some interviews which led to an Immediate Suspension Order

1    and Order to Show Cause.

2         And what that, what that entails, Your Honor, is I get

3    an order from chief counsel in DEA and I walk in the door

4    and I essentially stop them from handling drugs.

5         In the first case I dealt with, I didn't realize the

6    totality of the things I did.  One of the things is I had to

7    count all of the pills in the facility before I left.  I

8    wasn't alone.  I took the whole group with me.  But there's

9    a lot of pills and liquids and things stored in a, in a

10   distributor.

11        So we spent the whole day and into the evening counting

12   all the pills.  And then upon leaving, we put some stickers

13   on the doors and, and they weren't able to handle controlled

14   substances while under the Immediate Suspension Order.

15             THE COURT:  Does it have any connection to Harvard

16   University?

17             THE WITNESS:  No, it does not, but they had a logo

18   that looked a little similar to Harvard.

19   BY MR. FARRELL:

20   **Q.**   So what was the year that the investigation began?

21   **A.**   2010, Your Honor.

22   **Q.**   When did it end?

23   **A.**   2011.  During the course of the investigation they had

24   some meetings with the United States Attorney's Office and

25   the chief counsel for DEA.  And they came to an agreement to

```
1    settle the case and they entered into a Memorandum of

2    Agreement.

3    Q.   Aside from the Harvard wholesale distributor, are there

4    any other notable investigations?

5    A.   While I was concluding Harvard, I was assigned by my

6    supervisor to begin an investigation on Masters

7    Pharmaceutical which was located just outside of Cincinnati,

8    Ohio, same basic methodology or investigation.

9    Q.   Mr. Rafalski, I'm going to interrupt you real quick

10   just to make one emphasized point.  Who was the lead

11   investigator in the Masters Pharmaceutical case which has

12   been referenced throughout this trial?

13   A.   That would be me, sir.

14   Q.   What year was Masters investigation began?

15   A.   I started looking at it in 2010.  Probably the official

16   case didn't start until early 2011.

17   Q.   And do you recall when that investigation -- or when

18   that case ended?

19   A.   It ended in -- I believe on June 30th of 2017.

20   Q.   Will you explain to the Judge now a little bit of the

21   history of your investigation into Masters Pharmaceutical?

22   A.   I did some background before going on-site.  They had

23   been under a Memorandum of Agreement, Your Honor, for their

24   handling of controlled substances and distribution during

25   the internet, illicit internet activity.
```

1          The DEA had done a case on them and they had come to a

2     resolution.  They were under an MOU.  I did a lot of

3     research on the Memorandum of Agreement.  I looked at their

4     distribution patterns.

5          When I looked at that case and I saw the amount of

6     oxycodone 30 going to some of the pharmacies, it had a

7     strong indication that it wasn't going to be a close call.

8          But, you know, moving forward, I gathered all the

9     information before I walked into the, to the business.  I

10    came in unannounced, sat down with the management the first

11    day.  We had a discussion.  I conducted some interviews,

12    reviewed some customer files, obtained some transaction data

13    from them, and started my investigation.

14    **Q.**   What did your investigation reveal?

15    **A.**   Well, I had a couple more steps.  I served an

16    administrative subpoena and I took a couple dozen customer

17    files.  We would call them customer files.  Some people

18    would refer to them as due diligence files.  Those would be

19    the files on all the, the activity they took to make sure

20    that they were maintaining effective controls for the

21    prevention of diversion.

22    **Q.**   Let me stop you there for a second.  When you go and

23    obtain a customer file, what is your expectation or what has

24    been your experience as to what that file looks like and

25    what's in it?

1    **A.**   My, my experience has been that they're sometimes

2    pretty voluminous files.  They're -- depending on the time

3    frame back then, they were probably a lot of paper.  So they

4    would come out with a paper file, and sometimes they would

5    also have electronic files that they could provide you on a

6    CD.  And it would be -- most of them would have a chronology

7    of what they had done with each of their customers.  Each of

8    the files was specific to a customer.

9    **Q.**   Okay.  And tell the Judge what the, or the findings

10   that you made on the investigation.

11   **A.**   Well, after looking at all of the information and, and

12   reviewing all of the customer files, to me it was clear that

13   they had a failure to maintain effective controls to prevent

14   diversion.

15        In this case they had a functioning Suspicious Order

16   Monitoring System.  But within their company, they had some

17   procedures they should follow when they identified a

18   suspicious order.  And they were avoiding those procedures

19   which allowed them to continue to ship large volumes of the

20   oxycodone 30 and 15 pills down to Florida.

21   **Q.**   And did you find and make the recommendation that the

22   pills -- the suspicious orders that Masters Pharmaceutical

23   failed to identify and detect were likely to be diverted?

24   **A.**   I did.

25   **Q.**   And did you make a finding that the continued

1    registration of this facility was -- posed imminent harm to

2    the public?

3    **A.**   Yes, I did, Your Honor.

4    **Q.**   So let's walk through the procedural history.

5              MR. FARRELL:  The case is a reported case, Judge.

6    BY MR. FARRELL:

7    **Q.**   I just want to walk through very briefly what your

8    experience was with the procedural history of the

9    administrative action.

10   **A.**   You mean post order to show cause?

11   **Q.**   Yes, please.

12   **A.**   Okay.

13             MS. MAINIGI:  Your Honor, I'm going to object on

14   relevance.  We've gotten some background on this.  I'm not

15   sure what the purpose is of going through the procedural

16   history of some other case all together that he investigated

17   as a DEA investigator.

18             THE COURT:  It has to do with his qualifications

19   as an expert, doesn't it?  Are you offering him as an

20   expert?

21             MR. FARRELL:  Yes.  If you like, I can go straight

22   to the proffer and see if they object.

23             THE COURT:  Well, that's up to you.  You're the

24   lawyer, Mr. Farrell.

25             MR. FARRELL:  We'll continue for a few minutes

1    then.

2              THE COURT:  I'll overrule the objection at this

3    point.

4    BY MR. FARRELL:

5    **Q.**   Okay.  Please continue.

6    **A.**   Once I assembled all of the, the data and files and

7    information I had and I reviewed them all, I, I take that

8    information and I complete a report, the report of my

9    findings.  And I submit that report up through my

10   management.  And then it goes to attorneys in headquarters,

11   chief counsel attorneys, and they review my work and, and

12   either confirm or not confirm my findings.

13        In that particular case, looking at all of the conduct

14   by the company, it was, it was a systematic long-term issue.

15   As I said earlier, this was not a close call of the conduct

16   of the company.

17        So I would fully document it and document, you know,

18   the information I found.  I would look at the customer files

19   and analyze those.  I would look at the transactional data.

20   I would conduct interviews and capture all that information

21   and, upon reviewing it, complete a report, detailed report.

22   **Q.**   All right.  So have you outlined in general the

23   framework of your methodology when performing investigations

24   while you were at the DEA?

25   **A.**   Yes, Your Honor.

1    **Q.**   So did you prepare a slide that outlined your

2    methodology?

3    **A.**   Yes, I did.

4    **Q.**   And would that slide be helpful and assist you in

5    outlining your methodology to the Court?

6    **A.**   Yes, it would.

7                MR. FARRELL:  Judge, at this time I'd like to

8    publish slide 2 unless there's objection.

9    BY MR. FARRELL:

10   **Q.**   All right.  Will you please explain to the Judge

11   and walk him through what it is that you prepared and

12   what it represents.

13   **A.**   The first one on the list, Your Honor, A is the

14   transactional data.  That would be the sales for Masters --

15   or their distribution of controlled substances.

16       Second one is the policy and procedures.  I would

17   obtain and gain the policies and procedures of the company.

18   I would also, upon getting them, try to have an interview

19   with the, the employees to try to determine if they actually

20   had knowledge of their policies and procedures and following

21   them.

22       I would also discuss with the employees and their SOMS,

23   which stands for Suspicious Order Monitoring system, I'd get

24   a verbal description, and hopefully in the procedures I'd

25   get a written description.

1      The purpose of discussing it was to make sure they

2  understood their system and that they were, they were using

3  it.

4      I would do interviews.  Some of those interviews would

5  be where companies were open, they'd give me access to

6  employees, not often in the Masters case.  The first day I

7  did some, some interviews on-site, but it was not as

8  cooperative as with the Harvard Drug Group.

9      I would obtain customer files.  I would look at some

10  on-site.  In the case of Masters, I would -- I had an

11  administrative subpoena with me to obtain some of the files

12  that I had already targeted prior to arriving.

13      I would also look at internal documents, another

14  essential part.  So those would be emails, communications,

15  any kind of documentation that had to deal with the handling

16  of controlled substances and the distribution.

17      And then, finally, I would ask for their suspicious

18  orders they had reported to the DEA, and also if they were

19  maintaining a list of all the orders they stopped prior to

20  shipping because of the suspicious order system.

21  **Q.**   After obtaining the information, what factual findings

22  would you make?

23  **A.**   I would look through all of that data and I would try

24  to make a determination -- I would make a determination

25  whether the registrant had effective controls to prevent

1    diversion of controlled substances.

2        And, secondly, I would also look to see if they had

3    designed and operated a suspicious order system that was

4    functioning and was able to actually accomplish the mission

5    of blocking a suspicious order.

6    **Q.**   And would you be the one to make the final

7    determination as to the action taken?

8    **A.**   I would not.

9    **Q.**   Who would make that decision?

10   **A.**   Well, in the case of when I was employed, I would

11   complete a report and I would push it through the channels

12   of the DEA.  And it would ultimately flow to the chief

13   counsel in Washington, D.C. and they'd make that decision.

14       I think today I'm here and I'm presenting my facts and

15   findings to you, Judge, instead of my prior employment with

16   the DEA.

17   **Q.**   That leads me to a nice transition point.  What is it

18   that you believe is your purpose and role here today?  What

19   have we asked you to come and do?

20   **A.**   I think you've asked me essentially, Your Honor, to do

21   the same thing I did when I was working with the DEA.  And

22   that's to examine those same types of records and documents

23   that are up on the screen in regards to the three

24   defendants, AmerisourceBergen, Cardinal, and McKesson, and

25   come to the same factual findings on whether these three

```
1    companies maintained effective controls to prevent the
2    diversion of controlled substances, which is the most
3    important because that's like the foundation of all security
4    regulations, and whether the registrants had designed and
5    operated a Suspicious Order Monitoring System to identify,
6    block, and report the distribution of controlled substances
7    that could be diverted.
8              MR. FARRELL:  Judge, at this time we ask that Mr.
9    Rafalski be qualified as an expert in the field of diversion
10   control investigations, Suspicious Order Monitoring Systems,
11   and maintenance of effective control to prevent diversion of
12   controlled substances into the illicit market, and ask that
13   he be permitted to present his investigative findings and
14   conclusions to the Court in this matter.
15             THE COURT:  Any objection?
16             MR. SCHMIDT:  Yes, Your Honor.
17       We filed a motion before trial, a Daubert motion
18   regarding Mr. Rafalski's methodology.  I think your Court's
19   ruling was that we would maintain those arguments subject to
20   a wide berth of examination on cross-examination.
21       So we will maintain that argument and then, as
22   appropriate, renew that motion at the end of trial.
23       Also, I did not hear this.  Is he being offered on
24   causation, Mr. Farrell?
25             THE COURT:  Ms. Mainigi.
```

 1              MS. MAINIGI:  Oh, I think there's a question

 2    pending, sir.

 3              MR. SCHMIDT:  Yeah.  We do have a qualifications

 4    challenge if he's being offered on causation.  I didn't

 5    understand that to be one of the topics which is why I asked

 6    that courtesy question, counsel.

 7              THE COURT:  Let me hear from counsel, Mr. Nicholas

 8    and then Ms. Mainigi.

 9              MR. NICHOLAS:  We reserve our objection on the

10    same grounds that Mr. Schmidt has articulated, and I would

11    have the same question.  I, I don't believe this witness is

12    being offered as an expert on causation.  If that were the

13    case, we would object on that ground as well, but I don't

14    think that's what we heard.

15              MS. MAINIGI:  Your Honor, on this last point, I do

16    not believe that the witness is being offered as an expert

17    on causation.  If he were, we would object.  But I've not

18    seen anything or heard anything that would be suggestive of

19    that.

20         In addition to the -- it does seem clear to us, as Mr.

21    Schmidt said, that Your Honor would like to make decisions

22    about the admissibility of certain testimony as you are

23    perhaps proceeding, or after you've had a chance to hear it

24    all.  So we're certainly mindful of that.

25         But I certainly think that some of what has been

```
 1    articulated for Mr. Rafalski as potential opinions goes also
 2    to the heart of what Your Honor excluded in the Geldhof
 3    motion.
 4        So I think as those opinions regarding what the law
 5    requires or whether certain conduct violated the law are,
 6    are certainly opinions that in advance I'll note that we
 7    would have objection to.
 8            THE COURT:  Are you offering him as an expert on
 9    causation?
10            MR. FARRELL:  To the extent that he has opinions
11    about whether or not the failure to maintain effective
12    controls more likely than not results in diversion, the
13    answer is "yes."  For purposes of specific causation, no.
14            MR. SCHMIDT:  Well, I'm not sure I understand that
15    distinction, but he's not qualified to give a causation
16    opinion.  He's not purported to do so in his report and he's
17    not used a valid methodology for doing so.
18            THE COURT:  Mr. Nicholas.
19            MR. NICHOLAS:  I agree.
20            THE COURT:  Well, I think the thing to do is hear
21    his testimony and reserve ruling on this.
22        And subject to that, I'll let you go ahead, Mr.
23    Farrell.
24            MR. FARRELL:  Thank you, Your Honor.
25    BY MR. FARRELL:
```

```
 1    Q.  Mr. Rafalski, --

 2              MR. FARRELL:  So do I need to repeat my request

 3    for his qualifications or do we accept it or just proceed?

 4              THE COURT:  I don't understand what you're driving

 5    at here.

 6              MR. FARRELL:  We've asked for the Court to

 7    recognize him as a qualified expert in certain fields and

 8    I'm not sure that we got to the answer.

 9              THE COURT:  Well, my answer was that that was

10    subject to objection, if I understood it correctly.  And I

11    thought I would go ahead and hear the testimony and reserve

12    ruling on that because if, if I agree with the defendants,

13    then, then it all goes out the window.  But I think I'll

14    hear it and give you a chance to put it in before I make

15    that decision.  So that's where we'll go.

16              MR. FARRELL:  Thank you, Judge.

17              THE COURT:  Okay.

18    BY MR. FARRELL:

19    Q.  Mr. Rafalski, in the course of your investigation

20    in this case, are there materials that you relied upon

21    for guidance?

22    A.  Yes, sir, there are.

23    Q.  And have you prepared a slide of the guidance materials

24    that you relied upon?

25    A.  Yes, I have.
```

1    **Q.**   Would that slide be helpful for you and assist you in

2    your testimony today?

3    **A.**   Yes, it would, Your Honor.

4           MR. FARRELL:  Judge, at this time I'd like to have

5    published the guidance material slide.

6         For orientation purposes, Your Honor, and to counsel,

7    the documents that are referenced in black have been

8    admitted.  The documents that are referenced in red are

9    pending and have not yet been admitted.

10        And the precedent that is in the -- for items 6, 8 and

11   9 are in red and they likewise are not admitted into the

12   record.

13   BY MR. FARRELL:

14   **Q.**   Mr. Rafalski, without belaboring the point, will

15   you -- are these the materials that you relied upon as

16   guidance when performing your investigation?

17   **A.**   Yes, sir, Your Honor, they were.

18          MR. FARRELL:  Judge, I think as a matter of

19   course, I'd like to have this Page 3, which would be

20   Demo223_0003, identified and tendered to the Court.

21          MR. SCHMIDT:  I don't object to it being a

22   demonstrative for the court record.  If you're moving it

23   into evidence, we do object to that.

24          MR. FARRELL:  I just would like it available to

25   the Court if the Court finds it helpful.

```
 1              THE COURT:  Well, if that's a demonstrative,
 2   that's proper, isn't it, Mr. Nicholas?
 3              MR. NICHOLAS:  Yes.  I just wanted to make sure I
 4   understand that this is meant to illustrate guidance for the
 5   witness and not guidance for the distributors.
 6              MR. FARRELL:  Yes, Your Honor.
 7              MS. MAINIGI:  That's exactly the clarification I
 8   wanted to make, Your Honor, because certainly there are a
 9   number of legal cases in this document which goes to my
10   earlier point.
11              THE COURT:  I understand.
12        And you do too, Mr. Farrell.
13              MR. FARRELL:  Yes, Your Honor.
14              THE COURT:  Go ahead, please.
15   BY MR. FARRELL:
16   Q.   Have you also prepared a list of the discovery
17   responses and the facts, the reliance materials during
18   your investigation?
19   A.   Yes, I have.
20   Q.   And have you compiled that list and disclosed it?
21   A.   Yes, I have.
22   Q.   So, very briefly, have you prepared an overview of the
23   types of documents that you relied upon?
24   A.   I have.
25   Q.   And have you placed those on a slide for the Court?
```

1    **A.**    Yes, I have, Your Honor.

2    **Q.**    And would reviewing that slide be helpful and assist

3    you in your testimony?

4    **A.**    Yes, it would.

5            MR. FARRELL:  I'd like to show it to the Court.

6    The next slide is already up.

7    BY MR. FARRELL:

8    **Q.**    So walking through 1 through 8 on Demo223_4, is

9    this the similar methodology that you used when you were

10   exercising and performing your responsibilities for the

11   DEA?

12   **A.**    Yes.  One of the -- not exceptions, but number 5, the

13   depositions, that would be a substitute for interviews.  I

14   did not have an opportunity to actually interview employees

15   of the defendants.  But everything else would be very

16   similar to what I used as an investigator with the DEA.

17           THE COURT:  I'm not clear, Mr. Farrell, on what

18   the difference is between the guidance materials and the

19   reliance materials.

20           MR. FARRELL:  So would you like me to answer or

21   the witness?

22           THE COURT:  Well, can you answer it, Mr. Rafalski?

23           THE WITNESS:  Yeah.  The previous list, those

24   guidance materials, it kind of gives a roadmap to me of some

25   of the activity historically that came down back from 1984,

1    gave me an idea of the history of what the guidance was to

2    the defendants.

3         Some important rulings were there.  *Southwood* was a

4    very important ruling.  That's an administrative action that

5    there was a hearing and it was published in the Code of

6    Federal Regulations.

7         The Rannazzisi letters, those were important to me.

8    What was the guidance --

9    BY MR. FARRELL:

10   **Q.**  Excuse me.  I think what might be a better

11   course -- can we back up one slide?

12        Let's just take the guidance materials and very briefly

13   walk through them, 1 through 12.

14        Will you tell the Court what you relied upon from the

15   NWDA SOMS from 1984 which is conditionally marked as P-2094?

16   **A.**  I believe that was -- NWDA is a trade association that

17   manufactures and distributors belong to.  That was a SOMS, a

18   Suspicious Order Monitoring System.  I think that was the,

19   the first time that there was a system that was designed and

20   it was by the NWDA.

21        Also included there, there was some participation with

22   the DEA.  There was a Mr. Gitchell (phonetic) that was

23   involved.  And I don't know if he provided guidance, but he

24   definitely was collaborating with the NWDA.  And he's had

25   some letter communications that had some interesting

1    guidance.

2         The next is the DEA investigators manual.  That was

3    actually obtained by Cardinal Health through a FOIA request.

4    The manual was 1996.  I believe they, they actually obtained

5    that some years later.

6         The next, number three, is the 1998 Reno report.  That

7    was a, a conference -- or actually a committee that met for

8    the Attorney General, and it was in regards to the

9    Methamphetamine Act.

10        They had some recommendations.  I think some of the --

11   I think the defendants -- some of the defendants relied on

12   some of the guidance in the Reno report that was targeting

13   List I chemicals and how to handle those because they were

14   used in the illicit manufacture of methamphetamine.

15        The next is the DEA Chemical Handlers Manual.  That's

16   tied in with the Reno report.  And I think the Reno report

17   relied on -- some of the information that the DEA published

18   in the Chemical Handlers Manual.  I believe it was specific

19   to List I chemicals and not to controlled substances.

20        And List I chemicals, Your Honor, are those chemicals

21   that can be used to directly manufacture illicit controlled

22   substances, the top one being in America for some time was

23   methamphetamine.

24        The next is a DEA Linden Barber memo.  That was

25   important because Linden Barber was the head of chief

1    counsel's office, attorney for the DEA.  And that memo

2    directly supported or confirmed Mr. Rannazzisi's letters

3    that went out sometime a little later from Mr. Linden

4    Barber's memo.

5         The next is the *Southwood Pharmacy, Inc*.  That was an

6    interesting case of distribution by a distributor, Southwood

7    Pharmacy, to rogue internet pharmacies.

8         Essentially, there were huge amounts of hydrocodone

9    products distributed.  The DEA took administrative action

10   and it led to an Order to Show Cause hearing which was

11   published in the Federal Register.

12        That's important to me because that was something that

13   was aware to the industry when it gets published.

14             THE COURT:  Mr. Schmidt.

15             MR. SCHMIDT:  Your Honor, I think we're just --

16   we're doing what Your Honor flagged in the pre-trial rulings

17   as impermissible, just reading things into the record and,

18   in this case, actually construing court decisions, making

19   comments that some defendants relied on some things, which

20   we don't agree with and there's no identification of who it

21   is.  It should be limited to questions and answers where we

22   can object properly as opposed to a narrative like the Court

23   addressed pre-trial.

24             THE COURT:  Well, I think I did.

25        If I understand your objection, this is a format where

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    you can't specifically object to parts of it.
 2              MR. SCHMIDT:  Yes, Your Honor.
 3              THE COURT:  Well, I'm going to let him go through
 4    it and maybe you can speed it up and summarize it a little
 5    better.
 6              THE WITNESS:  I can shorten it for you, Your
 7    Honor.
 8              THE COURT:  And --
 9              MR. SCHMIDT:  No, I was just -- I didn't want to
10    sit down before Your Honor was done.
11              THE COURT:  Well, let's do it that way and I'll,
12    I'll overrule your objection for now, Mr. Schmidt.
13        Go ahead, Mr. Farrell.
14              MR. SCHMIDT:  Thank you, Your Honor.
15              THE WITNESS:  If I understand --
16              THE COURT:  Go ahead, please.
17    BY MR. FARRELL:
18    Q.   So I think we've gotten down to the Southwood
19    Pharmacy case.  Is the Southwood Pharmacy case, this is
20    in the Federal Register and it's a DEA action against a
21    distributor; correct?
22    A.   Yes, sir.
23    Q.   And then the same goes for the Cardinal Health vs.
24    Holder and Masters Pharmaceutical.  Those are reported cases
25    of actions taken by the DEA against wholesale distributors?
```

1    **A.**    Yes, sir.

2    **Q.**    Now, looking up here at 1 and 7, NWDA Suspicious Order

3    Monitoring System and HDMA Industry Compliance Guidelines,

4    what's the difference between the NWDA and the HDMA, if you

5    know?

6    **A.**    It's the same organization, just a name change.

7    **Q.**    And, so, in 1984 and again in 2008 you relied upon as

8    guidance industry guidelines published by the trade group;

9    is that right?

10   **A.**    Yes, sir.

11   **Q.**    And then you also reviewed the Rannazzisi letters from

12   '06 and '07?

13   **A.**    Yes, sir.

14   **Q.**    And you reviewed the DEA administrative actions?

15   **A.**    Yes, sir.

16   **Q.**    And you also reviewed the CSA and CFR.  Does this

17   generally describe the materials that you relied upon in

18   guidance when you initiated the investigation on our behalf

19   in this case?

20   **A.**    Yes, I did, Your Honor.

21   **Q.**    Now go to the next slide, please.

22          Now, the types of documents that you reviewed in this

23   case, have you made a list of those materials that you

24   relied upon?

25   **A.**    Yes, I have.

```
1              MR. FARRELL:  Judge, without belaboring the

2      point -- I think I've already circulated this to

3      everybody -- this is again for demonstrative purposes.  This

4      is a copy from his expert witness report that we're simply

5      tendering that is a compilation of his reliance materials.

6      BY MR. FARRELL:

7      Q.   Will you advise the Court in general the types of

8      documents that you reviewed when performing this

9      investigation?

10     A.   As listed on my reliance materials, Your Honor,

11     discovery responses specific to the Cabell County and

12     Huntington City area; transaction data summaries; -- that

13     would be the distribution records of controlled

14     substances -- the policies and procedures for each of the

15     three companies; the SOMS systems, the Suspicious Order

16     Monitoring Systems for the three companies during the

17     timeline of the investigation; depositions of the employees

18     of the defendants or witnesses for the defendants; the

19     customer files for each of the three defendants, or what's

20     sometimes referred to as the due diligence files; internal

21     documents; -- those would be memos, communications,

22     emails -- and a list or compilation of the suspicious orders

23     both blocked and reported to the DEA.

24     Q.   Can we flip back to the original first page, please?

25              MR. FARRELL:  Judge, just for purposes of
```

1    orientation, we've gone through 1, 2, 3, 4, 5 and 6, and we

2    have two items left, 7 and 8, his findings and final

3    opinions.

4             THE COURT:  We're going to have to take an early

5    break here to change court reporters again.

6             MR. FARRELL:  I was stalling hoping that was --

7             THE COURT:  This is an appropriate time to do

8    that.  Let's come back at 10:00.

9         You can step down during the break.

10            THE WITNESS:  Thank you, Your Honor.

11        (Recess taken at 9:49 a.m.)

12            THE COURT:  Just so my ruling on this testimony

13   will be clear and, hopefully, I won't make it less clear by

14   saying this, but as I indicated before, I'm going to

15   conditionally admit this testimony and hear it.  I realize a

16   bench trial does not eliminate the need to decide whether

17   proper expert opinions meet the requirements of 702, which

18   means I'll have to do a *Daubert* analysis at some point.  It

19   does allow the Court to defer that determination until after

20   presentation of the witnesses.

21        And I'm going to exercise my discretion to allow the

22   challenged experts to testify and admit their testimony

23   conditionally subject to later determination as to whether

24   it meets the standards to qualify him as an expert and also

25   whether or not his opinions will be an admissible.  And so,

```
 1    it is going to be conditionally admitted at this point

 2    subject to later reconsideration.

 3              MR. FARRELL:  I'll take it, Judge.

 4              THE COURT:  You may resume, Mr. Farrell.

 5              BY MR. FARRELL:

 6    Q.   Mr. Rafalski, I think the next section that we're going

 7    to get into is your findings and can you bring up Slide 5?

 8    The first component of your methodology was to review

 9    transactional data.  So, I have a couple of preliminary

10    questions for you, sir.  Were you provided the transactional

11    data referencing the defendants and their distribution of

12    controlled substances into Huntington, Cabell County, West

13    Virginia?

14    A.   Yes, I was, Your Honor.

15    Q.   And were you able to identify the temporal scope of

16    that data?

17    A.   Yes, I was, Your Honor.

18    Q.   And did you prepare a slide that depicts your findings

19    regarding the temporal scope of the data which was provided?

20    A.   Yes, I did.

21    Q.   And would publishing that slide assist you in your

22    testimony today?

23    A.   Yes.

24              MR. FARRELL:  Judge, we'd ask for Slide 6 to be

25    published.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1          THE COURT:  All right.

2          BY MR. FARRELL:

3     **Q.**   Now, in general, this is a timeline from '95 through

4     2020.  Will you walk the Court through what you're trying to

5     communicate with this slide?

6     **A.**   Your Honor, looking at the slide, looking from the top

7     down, the top orange bar would indicate that's McKesson and

8     that bar would indicate that the distribution data that I

9     worked with would begin in 2004 through 2018.

10         Dropping down, the AmerisourceBergen Company, that

11    would be the blue bar.  That would be transactional data

12    from 2002 through 2018.

13         The third bar, Cardinal Health, that would indicate

14    there's transactional data from 1996 through 2018.

15         And then the green bar is the ARCOS data and that would

16    be the data that was obtained from the Drug Enforcement

17    Administration and that covered a time period of 2006

18    through 2014.

19              MS. MAINIGI:  Your Honor, I don't mean to

20    interrupt the flow.  I just want to put in an objection

21    simply for the record, an ongoing objection related to the

22    use of Cardinal data.  It significantly pre-dates the other

23    data.

24              THE COURT:  All right.  I'll overrule that

25    objection for now.

```
 1            Go ahead, Mr. Farrell.

 2                 BY MR. FARRELL:

 3   Q.   So, Mr. Rafalski, we're going to get into some

 4   discussion about the number of transactions and the volume

 5   of pills and, to Cardinal Health's point, we have a much

 6   longer time frame of data from Cardinal Health than we do

 7   the other two; is that right?

 8   A.   That's correct.

 9   Q.   And did you take that into account when you were doing

10   your investigation?

11   A.   Yes, I did.

12                 MS. MAINIGI:  Objection to the continuing use of

13   the word investigation, Your Honor.  Mr. Rafalski is a paid

14   expert.  He's not an investigator.

15                 THE COURT:  Well, don't call him an investigator

16   unless he is, Mr. Farrell.

17                 MR. FARRELL:  Yes, Your Honor.

18                 BY MR. FARRELL:

19   Q.   Were you able to identify the number of transactions by

20   each distributor into Huntington-Cabell County, West

21   Virginia during the time frame of the available data?

22   A.   I was.

23   Q.   Were you able to identify the number of hydrocodone

24   dose units distributed by each of the defendants into

25   Huntington-Cabell County, West Virginia during the time
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    frame of the available data?

2    **A.**    Yes, Your Honor, I was.

3    **Q.**    Were you able to identify the number of oxycodone

4    dosage units distributed by each defendant into

5    Huntington-Cabell County, West Virginia during the time

6    frame of the available data?

7    **A.**    Yes, I was.

8    **Q.**    And did you prepare a slide with your findings?

9    **A.**    Yes, I did, Your Honor.

10   **Q.**    And would that slide assist you in your testimony

11   today?

12   **A.**    Yes, it would.

13            MR. FARRELL:  Judge, at this time, we would ask to

14   publish Slide 7.

15            THE COURT:  It may be published.

16            BY MR. FARRELL:

17   **Q.**    So, would you please take a moment and describe for --

18   to the judge what your findings were regarding the number of

19   transactions, the number of hydrocodone dosage units, and

20   number of oxycodone dosage units for each of the three

21   defendants, AmerisourceBergen, Cardinal Health, and

22   McKesson, during the time frames of the available data?

23   **A.**    Your Honor, if we start at the top with

24   AmerisourceBergen and move from left to right, the first

25   column says number of transactions.  That's the number of

```
 1    actual sales, the actual distribution.  The next column is a

 2    number of --

 3              THE COURT:  Those would be prescriptions?

 4              THE WITNESS:  Pardon me?

 5              THE COURT:  Prescriptions?

 6              THE WITNESS:  No.  No.  Those would be the sales

 7    of the pill bottles, orders from the distributor down to the

 8    pharmacy, sir.

 9    Q.   So, let's take that -- let's take that apart a little

10    bit.  When a -- when a pharmacy makes an order or places an

11    order with a distributor, what is the volume or what is it

12    that they're asking to buy?

13    A.   Well, medications, but in the case of what I looked at,

14    controlled substances.

15    Q.   And so, what's the packaging or what's the -- how is it

16    they buy?  Do they buy by the bottle, by the crate, by the

17    box?

18    A.   They can buy in multiple ways.  They could buy one

19    bottle of a hundred tablets.  They could buy ten bottles of

20    a thousand tablets.  They could order of any quantity, but

21    an order would be a transaction, a sale.

22    Q.   Continue, please.

23    A.   The center column, number of hydrocodone, that's the

24    number of hydrocodone tablets that were distributed pursuant

25    to those transactions.  And the last column is the number of
```

1  oxycodone and that would be the number of oxycodone dosage

2  units or tablets that were distributed.  The time frame for

3  -- again, for AmerisourceBergen, is 2002 and 2018.

4  **Q.**   And for purposes of good order, would you please read

5  into the record the number of transactions for

6  AmerisourceBergen, Cardinal Health and McKesson?

7  **A.**   Again, Your Honor, left to right, the number of

8  transactions or sales would be 92,915.  Number of

9  hydrocodone tablets, 17,923,260.  And the number of

10  oxycodone tablets, 17,187,905.

11  **Q.**   And that would be for Cardinal Health?

12  **A.**   Yes, it would.

13  **Q.**   Okay.

14  **A.**   For the time frame of 1996 through 2018.

15  **Q.**   Well, I don't have the running transcript, but did we

16  already cover the AmerisourceBergen numbers?

17  **A.**   We did.

18  **Q.**   Okay.  So now, what's left is McKesson.  Would you read

19  into the record the transactions and the number of

20  hydrocodone dosage units and the number of oxycodone dosage

21  units from McKesson between 2004 and 2018?

22  **A.**   Yeah, Your Honor.  Again, the time frame is 2004 to

23  2018 for McKesson.  18,862 transactions.  3,732,930 tablets

24  of hydrocodone.  And 3,983,350 tablets of oxycodone.

25  **Q.**   Mr. Rafalski, were you able to identify any patterns in

1   the total volume of hydrocodone and oxycodone dosage units

2   distributed by each defendant into Huntington-Cabell County,

3   West Virginia during the time frame of the available data

4   for each?

5   **A.**   Yes, I was.

6   **Q.**   Were you able to identify the policies and procedures

7   for each defendant applicable during the time frames of the

8   available data?

9   **A.**   Yes, I was.

10   **Q.**   From the materials that you reviewed, were you able to

11   identify the individuals in charge of Diversion Control for

12   each of the defendants during the time frame of the

13   available data?

14   **A.**   Yes, I was, Your Honor.

15   **Q.**   And did you prepare a slide for each of the defendants

16   depicting your findings?

17   **A.**   I did, Your Honor.

18   **Q.**   And would these slides assist you in the presentation

19   of your findings?

20   **A.**   Yes, it would.

21           MR. FARRELL:  Judge, at this time, I would like to

22   publish Slide 8, which is AmerisourceBergen.

23           THE COURT:  It may be published.

24           MR. NICHOLAS:  Your Honor, may I interpose an

25   objection to this slide, please?  And the objection is that

```
1    the slide is -- the slide represents something which Mr.

2    McCann prepared, which was never introduced into evidence.

3    And so, this is simply something that another expert

4    prepared that's being published now for this expert to

5    reference, but there's no foundation for it, and I don't

6    think it ought to be used as a demonstrative here.

7              THE COURT:  Well, it's based on information that

8    he used in preparing his expert report, isn't it?

9              MR. NICHOLAS:  Well, it's based on a slide that

10   Mr. -- that Mr. -- Dr. McCann prepared, but it's unclear

11   whether that slide has been deemed to be admissible.  It

12   hasn't been used in this trial up until now.  And it's just

13   one expert looking at what another expert said.  And I'm not

14   sure that's -- that provides a basis for -- a proper basis

15   for him to rely -- upon which to rely.

16             THE COURT:  Mr. Schmidt?

17             MR. SCHMIDT:  Yes, Your Honor.  I think this issue

18   recurs because it's true for the McKesson version of this

19   slide, as well.  The concern we have, just to add to what

20   Mr. Nicholas said, is that we had Dr. McCann either

21   ostensibly to testify on his findings.  He did not testify

22   on at least the McKesson version of the slide and I hear Mr.

23   Nicholas saying the same is true for the ABDC version of

24   that slide.  Him having foregone that testimony and not

25   introducing these slides to the Court, it is improper for
```

```
 1    Mr. -- Mr. Rafalski to now come in and sponsor this data

 2    which he did not generate himself and which he cannot fairly

 3    be cross-examined about himself.

 4            THE COURT:  Ms. Mainigi, you want to make this

 5    unanimous, I see.

 6            MS. MAINIGI:  Your Honor, I will just join and

 7    stay quiet.

 8            THE COURT:  All right.

 9        Mr. Farrell, do you want to respond?

10            MR. FARRELL:  Yes, Your Honor.  So, two points.

11    Point number one is that Dr. McCann is able to come back and

12    testify and, as you recall, we attempted to bifurcate his

13    testimony between his facts and his opinions.  If there's

14    any question about the validity of this, I'm sure they can

15    -- or the accuracy of it, I'm sure that they can -- they can

16    address that with the witness directly.

17        You'll recall that we attempted to winnow down and

18    narrow down the scope of the actual documents we admitted

19    through Dr. McCann, but my ultimate point is that a document

20    does not have to be admissible for an expert to rely upon

21    it, and this is a document that has been disclosed.  This is

22    a document that's --

23            THE COURT:  Mr. Schmidt?

24            MR. SCHMIDT:  All I'll say on the McCann point is

25    we agreed to bifurcation with the understanding that he
```

```
 1    would present this type of data in round one and then lay

 2    the basis for some of these later flagging methodology

 3    slides that we haven't yet come to in round two.  They don't

 4    get a do-over.

 5              THE COURT:  Mr. Nicholas?

 6              MR. NICHOLAS:  That was the point I was going to

 7    make.

 8              MS. MAINIGI:  Join.

 9              THE COURT:  Mr. Ackerman?

10              MR. ACKERMAN:  Thank you, Your Honor.  Your Honor,

11    Rule 703 does not require evidence.  The admitted or even

12    admissible in order for it --

13              THE COURT:  Yes.  I'm going to cut this short and

14    rely on Rule 703, which the first sentence says an expert

15    may base an opinion on facts or data in the case that the

16    expert has been made aware of or personally observed.  He's

17    been aware of this data that comes from Dr. McCann,

18    apparently, or is consistent with what Dr. McCann said and I

19    think that since it's the basis of an expert opinion, it's

20    permissible, and I'm going to overrule the objection and let

21    him go ahead.

22              MR. FARRELL:  Thank you, Your Honor.

23          May I approach the screen?

24              THE COURT:  You may.

25              BY MR. FARRELL:
```

1    **Q.**   So, Mr. Rafalski, in general, what I want to do is I

2    want to start at the bottom and you'll see that there are

3    names and blocks below the timeline.  Will you explain to

4    the Court the -- what you've done here in creating these

5    labels of Zimmerman, Mays and May?

6    **A.**   The blocks would represent the policies, the policy

7    changes, and contained within the blocks would be the

8    employees that were responsible during those policy changes

9    or procedure changes by the company.

10   **Q.**   And the names that are in the blocks, what does that

11   represent?

12   **A.**   The person who was responsible during that time frame

13   of that policy and procedure.

14   **Q.**   So, taking your testimony, is this your attempt to

15   delineate the three iterations of the AmerisourceBergen

16   policies and procedures related to SOMS as established

17   earlier in the trial?

18   **A.**   Yes, Your Honor.

19   **Q.**   And the names that are in the blocks are your attempt

20   to identify the individuals who are in change of Diversion

21   Control during those time frames?

22   **A.**   That's correct, Your Honor.

23   **Q.**   All right.  Now, looking at the total volume of

24   hydrocodone and oxycodone that was sold by AmerisourceBergen

25   into Huntington-Cabell County, West Virginia, are you able

1    to identify any patterns or trends?

2    **A.**    It's pretty apparent, Your Honor, there's a steep

3    upward trend going up through 2010.  I'd point out to, Your

4    Honor, you see a steep decline after 2010.  That was a

5    change when -- a contract change when the Fruth Pharmacy

6    change shifted distributors from AmerisourceBergen.  I

7    think, if the next slide is my Cardinal slide, it would show

8    increase for Cardinal during that time period.

9    **Q.**    So, I'm going to draw a box, which I hope to capture

10   the backside of -- starting around 2010.  So, explain again,

11   what is it that you're saying is the -- what your findings

12   are of why there was a decline beginning in 2010 by

13   AmerisourceBergen?

14   **A.**    A contract shift to the Fruth Pharmacy chain had made a

15   change of distributor.  So, they were receiving all their

16   controlled substances from AmerisourceBergen or primarily

17   most of them and that shifted to the Cardinal Health.  So,

18   that would -- that would show a sudden decrease in the

19   amount of distribution.

20   **Q.**    And so, the measuring stick on the -- I always forget

21   if it's the X axis or the Y axis.  We'll call this the X

22   axis.  What is the measuring stick on an X axis?

23   **A.**    Those would be dosage units.

24   **Q.**    And on the Y axis, which is the horizontal one, each of

25   these individual pillars, what unit of time does that

```
 1    represent?
 2    A.   One month.
 3    Q.   And the geographic area for this, can you identify it?
 4    A.   Yes, sir.  Cabell County and City of Huntington, West
 5    Virginia, Your Honor.
 6    Q.   And which distributor?
 7    A.   AmerisourceBergen.
 8    Q.   So, is -- when you're looking at this, the light blue
 9    is what type of prescription opioid?
10    A.   Hydrocodone, Your Honor.  And the dark blue would be
11    oxycodone.
12    Q.   And so, looking at this graph, is this a visual
13    depiction of the monthly totals by AmerisourceBergen for the
14    entire county and City of Huntington?
15    A.   Yes, it is, Your Honor.
16    Q.   Go to the next slide, please.  Will you please orient
17    the judge to what Slide number 9 is?
18    A.   Starting from the bottom up, the three bars at the
19    bottom with the names inside, those would be the three
20    different procedural or policy changes for the company.
21         Moving up to the graph, the light pinkish or light red
22    would be the hydrocodone distribution, tablets listed on the
23    left and the timeline on the bottom.  The dark red are the
24    oxycodone.
25         Again, I'd remind you, Your Honor, that in 2010
```

1    Cardinal changes and becomes the distributor for the Fruth

2    Pharmacy chain.  So, that's why you see that sharp increase

3    in 2010.

4    **Q.**   And, again, orienting the judge, the X axis or the

5    vertical axis is in what increment?

6    **A.**   Dosage units, Your Honor.

7    **Q.**   And then on the horizontal timeline, this data goes

8    back to 1996, correct?

9    **A.**   Yes, it does.

10   **Q.**   And so, this is a longer timeline for Cardinal Health

11   than we have for the other two defendants and that's because

12   we have an expanded amount of transactional data to see,

13   correct?

14   **A.**   Yes.  That's correct, Your Honor.  That's because

15   Cardinal provided more transactional data for the

16   litigation.

17   **Q.**   All right.  And, again, when we look at the dosage

18   units this is for Cabell and the City of Huntington,

19   correct?

20   **A.**   That's correct, Your Honor.

21   **Q.**   And this is Cardinal Health; is that right?

22   **A.**   Yes, it is.

23   **Q.**   All right.  Now, I'm also going to note that there is

24   -- seems to be three iterations of the Cardinal Health

25   policy; is that right?

1    **A.**    That's correct.

2    **Q.**    And who are the names of these individuals?

3    **A.**    There's Mr. Reardon for the first bar.  Moving left to

4    right, Mr. Mone for the middle bar, and Mr. Cameron on the

5    far right bar.

6    **Q.**    Now, do you see any patterns so far between

7    AmerisourceBergen and Cardinal regarding the time frame of

8    the change between the first iteration and the second

9    iteration of the Suspicious Order Monitoring System?

10   **A.**    Yes, I do, Your Honor.  Both companies would have a

11   change around the 2007-2008 time period.

12   **Q.**    Now, let's move on to the next slide, please.  And this

13   is McKesson.  This is Slide 10.  Will you please orient the

14   judge to Slide 10?

15   **A.**    Looking at the bottom first, Your Honor, we have two

16   bars there and that would indicate there was only one change

17   in the policy and procedure.  The bar on the left, Mr.

18   Hilliard and Mr. Walker, and then around 2008, we have a

19   change in Mr. Gustin and Mr. Oriente.

20        Looking at the graph, just a reminder, the left is

21   dosage units and at the bottom is the timeline.  And the

22   gray bars are the hydrocodone.  Each bar would be indicative

23   of one month of transactions.  And we have the black bars,

24   which are the oxycodone.

25   **Q.**    Mr. Rafalski, during the course of your services as an

1    expert witness in this litigation, have you identified in

2    the record any evidence that the defendants monitored the

3    overall volume of hydrocodone and/or oxycodone each

4    distributed into Huntington-Cabell County, West Virginia

5    during the time frames of the available data?

6    **A.**   Your Honor, I did not find any indication in the review

7    of the material that I had that they were specifically

8    monitoring distributions into the geographic area of Cabell

9    County or City of Huntington, West Virginia.

10   **Q.**   Now, to be clear, what we're talking about is not by

11   pharmacy, but by county or geographic region.  What we just

12   walked through with volumes to the county, did you find any

13   evidence of any type of similar monitoring by any of the

14   defendants in this case?

15   **A.**   As I answered and I understand the question, no, I did

16   not, Your Honor.

17   **Q.**   All right.  Now, I hope we have a transition slide as

18   the next slide.  Yes.  Now, Mr. Rafalski --

19            MR. FARRELL:  Judge, we're about to get into a

20   little bit longer block.  Should I proceed?

21            THE COURT:  Yes, please.

22            MR. FARRELL:  Okay.

23            BY MR. FARRELL:

24   **Q.**   We talked about AmerisourceBergen and Cardinal Health

25   with the second iteration of their policies and procedures

1    around 2007.  Did you find any pattern or trend with the

2    same change or iteration with regard to McKesson?

3    **A.**   Yes, I did.

4    **Q.**   All right.  So, all three companies had a Suspicious

5    Order Monitoring System in place up until somewhere around

6    2007 when there was a change in the policies that you found?

7    **A.**   That's correct.

8    **Q.**   Okay.  Did you find any similarity or pattern amongst

9    the defendants for their policies and procedures for

10   suspicious order monitoring in the pre-2007 era?

11   **A.**   I did, Your Honor.

12   **Q.**   And have you prepared a slide that depicts a diagram of

13   your understanding of that type of system?

14   **A.**   I did, Your Honor, hopefully to make it easier to

15   understand.

16          MR. FARRELL:  And, Judge, I'd like to publish

17   Slide 11.

18          THE COURT:  Okay.  Slide 11?  That's 12, isn't it?

19          MR. FARRELL:  Yes, 12.  Yes, Your Honor.  And I

20   would ask and indulge the Court to allow Mr. Rafalski to

21   step down and to walk you through this slide, please.

22          THE COURT:  You may do so, sir.

23          THE WITNESS:  Simple illustration, Your Honor.

24   This is an order of pills.  Here's the pharmacy Rx.  They're

25   making an order to the distributor, making an order to the

1    distributor for the purchase of pills.  That purchase of

2    pills from the distributor shipped down.

3         As it happened pre-2008, two things would happen.  They

4    -- they would ship the pills and report to the DEA ARCOS and

5    this would indicate that they would ship these pills and

6    post-distribution, which meant after the pills had left the

7    distributor, they would submit an excessive purchase report

8    to the DEA.  Some companies -- all companies did it on a

9    monthly basis and some companies did it on a daily basis.

10   **Q.**   So, Mr. Rafalski, let's start with the ARCOS data.

11   When is the -- when is the ARCOS data reported based on your

12   experience?

13   **A.**   Your Honor, it changed a little bit over time, but it's

14   been quarterly or monthly.

15   **Q.**   And when we're talking about ARCOS data, please

16   distinguish the ARCOS data from the suspicious order

17   reporting.

18   **A.**   The ARCOS data is required by regulation and it only

19   covers the Schedule IIs and the Schedule III narcotics

20   drugs; primarily for this case the hydrocodone.

21   **Q.**   Is that what we're calling transactional data?

22   **A.**   Yes, it is.

23   **Q.**   And then this excessive purchase report, describe for

24   the Court your experience with excessive purchase reports

25   and what you found in the defendants' policies and

1     procedures related to the same.

2     **A.**   How the system would work, Your Honor, is they would

3     calculate an average.  Some of them would calculate an

4     average nationally or by distributor for a type of business.

5     So, in this case, it would be a pharmacy.  They would

6     calculate this average over a 12-month period of data.

7                 THE COURT:  Mr. Schmidt?

8                 MR. SCHMIDT:  I didn't mean to interrupt.  I'm

9     sorry, Mr. Rafalski.

10                THE WITNESS:  That's okay.

11                MR. SCHMIDT:  Maybe it was made clear, but I will

12    object as vague as to time frame.

13                THE COURT:  Well, I'll sustain the objection.  You

14    can ask him about the time frame.  I'm not sure it is vague

15    based upon his previous testimony, but you can ask him.

16                MR. FARRELL:  I can clarify.

17                MR. SCHMIDT:  Thank you.

18                BY MR. FARRELL:

19    **Q.**   To be clear, you're describing the systems that were in

20    place by each of the three defendants before 2007 or before

21    each of the defendants made a second iteration change of

22    their existing policies and procedures?

23                MS. MAINIGI:  And, Your Honor, my objection on

24    behalf of Cardinal is a little bit different than Mr.

25    Schmidt's.  I object to the extent -- I did hear him mention

1    that time period.  To the extent this purports to represent

2    Cardinal's system in the pre-2007 time period, I object

3    because it is not accurate.  It only reflects one step of a

4    two-step system.

5              MR. SCHMIDT:  I think there's inaccuracy as to

6    McKesson, too, and the last question was compound.

7              MR. NICHOLAS:  It is true that this slide does not

8    accurately reflect the pre-2007 system so we object on that

9    basis, as well.

10             THE COURT:  Well, I think it goes to the weight

11   rather than admissibility of his testimony and you will have

12   ample opportunity to cross examine him on this and I will

13   allow you to go ahead, Mr. Farrell.

14             MR. FARRELL:  Thank you.  You can take your seat,

15   please.

16             THE WITNESS:  Okay.  Thank you, Your Honor.

17             BY MR. FARRELL:

18   **Q.**   I think I've already distributed copies of this to the

19   parties.  Mr. Rafalski, have we identified -- have you

20   identified a particular excessive purchase report that you

21   would like to use as a demonstrative for the Court?

22   **A.**   Yes, sir.

23   **Q.**   And for the record, this is P-14288ii.  I believe it's

24   already admitted in the record.  Copies have been provided

25   from counsel.

```
 1        May I approach?

 2              THE COURT:  Yes.

 3              THE WITNESS:  Thank you.

 4              MR. FARRELL:  Would you please bring back up the

 5   last slide?

 6        You may not want to put it away just yet, Judge.  I'm

 7   going to make a particular point.

 8              THE COURT:  Okay.

 9              BY MR. FARRELL:

10   Q.   So, in general, Mr. Rafalski, we've heard testimony

11   about excessive purchase reports that were submitted by the

12   defendants to the DEA.

13   A.   That's correct, Your Honor.

14   Q.   And is this one such report?

15   A.   Yes, it is, Your Honor.

16   Q.   And, in fact, is this one report and, in particular,

17   Cardinal Health from their Wheeling Distribution Center?

18   A.   Yes, it is.

19   Q.   And is this for one month from one distribution center?

20   A.   I believe it is, yes, sir.

21   Q.   Okay.  And where would this report have been sent?

22   A.   It would have been mailed or delivered, but primarily

23   mailed to each of the DEA Offices in the areas.  Or for

24   Wheeling, it would have been mailed to the nearest DEA

25   Office that would have covered the Wheeling Distribution
```

```
 1    Center.

 2    Q.   So, by drawing the timeline here, around 2007 for each

 3    of the defendants, it was a little bit different, but

 4    between the first and second iteration of their SOMS policy,

 5    were each of the defendants in practice receiving orders

 6    from a pharmacy, shipping the order, and thereafter

 7    reporting the transaction to the ARCOS data, and then

 8    publishing these after-the-fact reports based on some metric

 9    to the DEA?

10         MR. SCHMIDT:  And we'll object.  He's not here as

11    a fact witness and his testimony directly contradicts the

12    testimony, for example, of a fact witness that was here just

13    yesterday.

14         MR. FARRELL:  Judge, if I may, this is not a

15    proper --

16         THE COURT:  Let me hear from Ms. Mainigi.

17         MS. MAINIGI:  Your Honor, my objection is that Mr.

18    Farrell -- we've indulged Mr. Farrell in leading this

19    witness because we know everybody wants to get through the

20    testimony, but he's both testifying and leading the witness

21    at this point.

22         THE COURT:  Mr. Nicholas?

23         MR. NICHOLAS:  I would just join.  Join.

24         THE COURT:  Well, you can ask him leading

25    questions to get him through this, Mr. Farrell, but don't
```

1    testify.  I mean, don't give him the answer in your

2    question.

3                   MR. FARRELL:  Yes, Your Honor.

4                   THE COURT:  Okay.

5                   BY MR. FARRELL:

6    **Q.**  So, is what we're -- what I'm holding in my hand from

7    Cardinal Health an exemplar of an after-the-fact report to

8    the DEA?

9    **A.**    That's correct, yes, it is.

10   **Q.**    And have you studied the criteria or have you found

11   evidence in the record of the criteria that Cardinal Health

12   was used -- using pre-2007 for how you wound up on their

13   ILR?

14   **A.**    I did.

15   **Q.**    Okay.  I would ask you to turn to Page -- Bates stamp

16   117 on the bottom.

17   **A.**    Okay.  I'm there, Your Honor.

18                  MR. FARRELL:  Judge, what I'm looking at is in the

19   right-hand corner.  It says 117.  You don't need to actually

20   pull it up.  I can put it on the camera, if you would like.

21                  THE COURT:  Okay.

22                  BY MR. FARRELL:

23   **Q.**    So, when you're looking at this document -- let me see

24   if I can get it a little more square.

25          Walk through for us what it is this document is

```
 1    intending to communicate.
 2    A.    Your Honor, this is part of the report, and this is
 3    specific for a customer.  So, a little bit down where you
 4    see the little dots it starts -- I'll take that particular
 5    customer.  Customer number, Medicine Shoppe number 290,
 6    Huntington.  It has the address, 2402 Adams, Huntington,
 7    West Virginia.  That would be the customer that's purchasing
 8    these products from Cardinal Health.
 9    Q.    And what was the run date or the date that this was
10    report was run?
11    A.    May 6th of 2007.
12    Q.    And what is the time frame that this report is
13    intending to cover?
14    A.    April of 2007.
15    Q.    All right.  And so, when you look at the report down at
16    the bottom right-hand corner, do you see this ingredient
17    limit?
18    A.    I do.
19    Q.    Total grams.  Do you see that here, total grams?
20    A.    I do.
21    Q.    Through -- through your review, have you been able to
22    determine what an ingredient limit is in Cardinal Health's
23    program?
24    A.    I did.
25    Q.    What is an ingredient limit?
```

1    **A.**   So, that's the -- the actual trigger or threshold that

2    they have calculated.  If you look below April, 2007, Your

3    Honor, you will see the factor used as four and for Cardinal

4    Health they would create an average for the distribution

5    center of the distribution of oxycodone products.  They'd go

6    back 12 months and create an average and then they would

7    times it by four.  And that four would be the ingredient

8    limit number at the very bottom, 104.82.816 grams.  So, that

9    essentially is four times the average of the pharmacies that

10   they -- they took into consideration from that distributor.

11   **Q.**   So, to be clear, every month Cardinal Health was

12   running this document and they were taking the average

13   retail pharmacy from that distribution center, they were

14   multiplying it by --

15              THE COURT:  Ms. Mainigi?

16              MS. MAINIGI:  Mr. -- Mr. Farrell is testifying at

17   this point.

18              MR. FARRELL:  I'm trying --

19              MS. MAINIGI:  And summarizing.

20              MR. FARRELL:  I'm summarizing, yes, Judge.

21              THE COURT:  Well, I'm going to overrule the

22   objection and let you do it.  I don't think this is

23   misleading and we're getting him through his testimony and

24   it's complicated and I need to understand it so I'm going to

25   let you do it, Mr. Farrell.

```
 1              MR. FARRELL:  Thank you.

 2              BY MR. FARRELL:

 3    Q.   So, Cardinal Health on a monthly basis, and this would

 4    be performed in May, but for the April transactions, would

 5    take the average from the retail pharmacies serviced by that

 6    distribution center and multiply it by four, correct?

 7    A.   That's correct.

 8    Q.   And, in this instance, that means 140 grams would be

 9    the ingredient limit, which is four times the average

10    pharmacy the Wheeling Distribution Center was servicing?

11    A.   That's correct, Your Honor.  Your Honor, the total --

12    the grams column, do you -- do you need me to explain what

13    those are to you?

14              MS. MAINIGI:  Perhaps Mr. Farrell can ask a

15    question.

16              THE WITNESS:  Oh, sorry.

17              THE COURT:  Yes.  I --

18              MR. FARRELL:  Yes, sir.  Yes, sir.

19              THE COURT:  Go ahead.

20              THE WITNESS:  I'm sorry, Your Honor.

21              BY MR. FARRELL:

22    Q.   So, before we get there, what we have -- what would you

23    describe this ingredient limit, this 104 grams, what does it

24    mean?

25    A.   The 104 grams is the actual active narcotic amount
```

1     that's contained in four times the average, 12-month

2     average.

3     **Q.**   And so --

4          THE COURT:  Let me interrupt you.  I'm unclear as

5     to what an excessive purchase is and how -- what the basis

6     is for determining if a purchase is excessive.  Are you

7     getting there?

8          MR. FARRELL:  I'm trying to, yes, Your Honor.

9          THE COURT:  Okay.

10         BY MR. FARRELL:

11    **Q.**   So, the ingredient limit of 104 grams is four times the

12    average of the retail pharmacies for that month for this

13    distribution center, correct?

14    **A.**   That's correct.

15    **Q.**   And was Cardinal Health using that as a benchmark to

16    determine what an excessive order was?

17    **A.**   Yes.  It would monitor the purchases of each of its

18    customers and any customer that exceeded that 104.82816

19    would fall onto the list.

20    **Q.**   Now, this particular customer in Huntington, West

21    Virginia and for oxycodone-based drug, you'll see here a

22    list of all of the orders from that month from The Medicine

23    Shoppe to Cardinal Health, correct?

24    **A.**   Yes.

25    **Q.**   And what type -- can you walk through briefly the types

1    of drugs that were ordered here?

2    **A.**    This is specific for oxycodone products, Your Honor.

3    So, every product that's on this list is -- contains

4    oxycodone.   The first one, Roxicet, those are combination

5    drugs, five milligrams of oxycodone and 325 milligrams of

6    acetaminophen.

7         You fall down below the next three.   Those are

8    OxyContin drugs.   Those are -- contain just oxycodone.   And

9    so, the 80 milligrams would be the active ingredient of

10   oxycodone in each pill.

11   **Q.**   So, let's -- let's stop right there for a second and

12   give just one example.   So, if we're looking at one

13   particular transaction here, this would be a quantity of

14   four, 100 tabs of Oxy 80s, correct?

15   **A.**    Yes.

16   **Q.**   So, that's a particular request or transaction for 400

17   oxy 80 tabs?

18   **A.**    That's correct, Your Honor.

19   **Q.**    Now, in the far right-hand corner what Cardinal Health

20   has done is they've taken the active ingredient for each of

21   these orders and then totalled them for a customer total; is

22   that right?

23   **A.**    That's correct.

24   **Q.**    So, in this month of April, 2007, Cardinal Health

25   shipped to The Medicine Shoppe 157 grams of oxycodone,

1    correct?

2    **A.**   That's correct.

3    **Q.**   And after shipping it, it then reported to the DEA and

4    this report that that month exceeded the cap of 104 grams?

5    **A.**   Yes.  The 104 grams, Your Honor, didn't stop the

6    distribution.  It was just the measure of when to place

7    these customers onto this list.

8            THE COURT:  I need to stop you.  My realtime has

9    gone awry.

10           COURT REPORTER:  Can I have one minute, please?

11           THE COURT:  Yes.

12       (Pause)

13           COURT REPORTER:  Is it on now?

14           THE COURT:  Yes.

15           COURT REPORTER:  I think something -- it's sorted

16   out.  Okay.

17           BY MR. FARRELL:

18   **Q.**   So, using --

19           MR. FARRELL:  I'm sorry, Judge.  May I continue?

20           THE COURT:  Yes.

21           BY MR. FARRELL:

22   **Q.**   So, using this as an exemplar, The Medicine Shoppe

23   would be the pharmacy, correct?

24   **A.**   That's correct.

25   **Q.**   And it made orders from Cardinal Health?

1    **A.**    That's correct.

2    **Q.**    And all of those orders got shipped that are on that

3    list?

4    **A.**    That's correct.

5    **Q.**    Those orders, either on a monthly or quarterly basis,

6    the transactions would be reported to the ARCOS database,

7    correct?

8    **A.**    Yes.

9    **Q.**    And because the orders for that month from this

10   pharmacy exceeded four times the average, this pharmacy got

11   included in an excessive purchase report sent to the DEA?

12   **A.**    That's a correct statement, Your Honor.

13   **Q.**    And so, whether you call it an ingredient limit report

14   or an excessive purchase report, the defendants pre-2007

15   were identifying some type of threshold that if you exceeded

16   it, got reported to the DEA?

17            THE COURT:  Mr. Schmidt?

18            MR. SCHMIDT:  And, Your Honor, he's giving very

19   specific testimony about Cardinal.  If he's going to make

20   these sweeping assertions, he should give the similar

21   testimony about McKesson, and I assume ABDC is taking the

22   same view.

23            MS. MAINIGI:  And, Your Honor, I have a continuing

24   objection because his testimony seems to reflect that

25   there's only a one-step process and there was a two-step

```
 1    process.
 2              MR. FARRELL:  Judge, if I may, these are --
 3              THE COURT:  Let me hear from Mr. Nicholas before
 4    that.
 5         You go ahead.
 6              MR. NICHOLAS:  I just join in both objections as
 7    are articulated.  I don't need to re-state them.
 8              THE COURT:  Mr. Farrell?
 9              MR. FARRELL:  These are improper objections, Your
10    Honor.  To stand up and say that I'm wrong is not the
11    appropriate time for this.  They have the opportunity to get
12    up and cross and ask these questions.
13              THE COURT:  Yeah.  I'll overrule the objection.
14    Let's press on.
15              BY MR. FARRELL:
16    Q.  Mr. Rafalski, sometime around the year 2007 from your
17    prior testimony each of the three distributors changed the
18    way in which they were performing their suspicious order
19    monitoring, correct?
20    A.  That's correct, Your Honor.
21    Q.  Have you prepared a diagram that illustrates the design
22    of the system used or the common design features used by
23    each of the three defendants after 2007?
24    A.  Yes, I have.
25              MR. FARRELL:  And, Judge, at this time what I
```

```
 1    would like to do is I would like to publish the second half
 2    of this slide and ask Mr. Rafalski to step down and describe
 3    it for the Court.
 4              THE COURT:  You may do so.
 5              THE WITNESS:  Thank you, Your Honor.
 6         Ready, Your Honor?
 7              MR. FARRELL:  Hold on.
 8              THE WITNESS:  As -- as the previous, this is the
 9    pharmacy and this is an order that's transmitted to the
10    distributor for purchase of controlled substances.  Upon --
11    prior to the shipment, we now have the change in the system.
12    This is a Suspicious Order Monitoring System.  You can kind
13    of characterize it as a little computer or little box.
14    Built into that is a way that they monitor the flow of drugs
15    and calculate the amounts and this makes a decision.
16         There's a trigger or threshold that's set inside of
17    this system and if it's below the trigger of the threshold,
18    the purchase flows through, goes to ship, and the -- and the
19    company also reports to ARCOS.
20         If it -- if it triggers the system, in other words,
21    like the ingredient limit report, if it hits that threshold,
22    it stops the order and it now holds it as part of this
23    system.
24              BY MR. FARRELL:
25    Q.   Now, Mr. Rafalski, once the system holds an order, how
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    -- what is the design process that's supposed to follow?

2    **A.**    So, when we talk about a suspicious order, Your Honor,

3    the suspicion is that this order could be diverted.  In

4    other words, it could fall into illicit hands.  The

5    maintenance of effective controls to prevent diversion is

6    what's the key issue here in that the company has -- has --

7    takes this held order and they make a decision on whether

8    they're going to ship it.

9        Part of that decision process is commonly called due

10   diligence.  It's an internal investigation where they look

11   at some internal information and facts and circumstances,

12   take some action as warranted, and the company would make a

13   decision.

14       If they believe that this suspicion is dispelled, that

15   dispels the potential for diversion, then that order would

16   flow down to the customer and also be reported to ARCOS.

17       If, in fact, they conduct this investigation and they

18   can't clear or dispel the suspicion, then that order would

19   be blocked and cancelled and it would be reported to the

20   DEA.

21            MR. FARRELL:  Thank you.  Take your seat, please.

22            MS. MAINIGI:  Your Honor, my objection is just the

23   characterization of the testimony is on its face different

24   from the characterization of the chart.  There is the

25   shipped order and the held order.  At that point, there's no

1    indication of suspicion.  The suspicious order reporting

2    comes later.

3            THE COURT:  I will overrule the objection.  You

4    have an opportunity to cross him on this and I think it's

5    more appropriate to cross him on that than it is to exclude

6    it entirely.  So, overruled.

7            BY MR. FARRELL:

8    **Q.**   So, Mr. Rafalski, we're going to talk in more detail

9    about this, but I am going to jump ahead and foreshadow

10   another issue.  Have you been able to discern from the

11   actual policies and procedures for the defendants what

12   should happen once the system is triggered for future

13   orders?

14   **A.**   They should be held, Your Honor, stopped.

15   **Q.**   Now, what that means is, is that a -- I'm asking you in

16   abstract.  A single order comes in to the distributor and it

17   flows down to the computer system.  And that computer system

18   has some type of threshold, or algorithm, or trigger and

19   let's say that that trigger happens and it institutes the

20   process, whatever it may be, to hold that order.

21       If due diligence takes, say, a month, what do the

22   policies and procedures from the defendants say should

23   happen to all subsequent orders until the initial order

24   finishes the due diligence process?

25            THE WITNESS:  Your Honor --

1              MR. SCHMIDT:  I'm sorry.  I have to object.  If I

2     heard the question right, it's what do our policies say.

3     He's not here to interpret what our policies say.  If he

4     wants to ask what the duty is as he understands it, he can

5     say that and we can cross examine him on it, but I don't

6     think he's here to say what our policies say.

7              THE COURT:  Sustained.

8              BY MR. FARRELL:

9     **Q.**   I'm going to be careful with this question.  Once a

10    suspicious order is flagged, what is the duty of the

11    defendants regarding all future orders that are placed by

12    the same customer?

13    **A.**   Specifically, to the family of the drugs that are held,

14    they should all be stopped.

15             THE COURT:  Even if they're just a tiny little

16    order?

17             THE WITNESS:  Just a small, tiny little order,

18    Your Honor.

19             MS. MAINIGI:  And, Your Honor, my objection is I

20    would like to clarify for the record that that's his

21    personal view.  He's not trying to state what the law is.

22             MR. NICHOLAS:  I have to add, Your Honor, that the

23    way this was described by Mr. Farrell and the question, it

24    was suggested that at this stage these are suspicious

25    orders.  These are not suspicious orders at this stage of

1    the game.  These are -- these are flagged orders, but they

2    are not suspicious orders, and that's an important

3    distinction and I think the record has to be clear on that.

4              THE COURT:  Well, these are things that can be

5    cleared up on cross, it seems to me, and I'm going to allow

6    you to go ahead.  Overruled.

7         Go ahead, Mr. Farrell.

8              MR. FARRELL:  All right.

9              BY MR. FARRELL:

10   **Q.**   So, in your analysis did you rely upon the fact that a

11   triggering order should block all future orders of the same

12   drug type?

13   **A.**   Yes.

14   **Q.**   And if the system is working as designed, there's an

15   immediate process to be able to determine whether to ship or

16   block?

17   **A.**   That's correct, Your Honor.

18   **Q.**   And if you ship, that means you have cleared the

19   suspicion that it's being diverted, correct?

20   **A.**   That's correct, Your Honor.

21   **Q.**   And if you block it, that means you're suspicious these

22   pills are getting diverted?

23   **A.**   You -- you've conducted your due diligence and you

24   can't dispel the suspicion, the potential for diversion,

25   Your Honor.

1    **Q.**   Now, to be clear --

2           THE COURT:  And your testimony is that that was

3    built into the system here that all three of these

4    defendants had in place?

5           THE WITNESS:  Yes, sir.  Starting between 2007 and

6    2008, they all designed a system to do exactly that.

7           THE COURT:  But that was your understanding of

8    what the system was and what it was designed to do?

9           THE WITNESS:  In general terms, yes, sir.

10          THE COURT:  Go ahead, Mr. Farrell.

11          BY MR. FARRELL:

12   **Q.**   So, the system is designed to have a trigger, correct?

13   **A.**   Yes.

14   **Q.**   Now, if you set that trigger at ten pills a month,

15   based on your experience, how many times will this system go

16   ding, ding, ding?

17   **A.**   A lot because they don't sell pills in -- ten pills.

18   So, usually, the smallest amount is a hundred, generally

19   speaking.  There's some drugs that are a little smaller.

20   So, every transaction would go ding, ding, ding, Your Honor.

21   **Q.**   And if you set this trigger at 40,000 pills a month,

22   how many times would the system go ding, ding, ding?

23   **A.**   It wouldn't until you bought 40,000 and 100 pills, Your

24   Honor.

25   **Q.**   And so, based on your experience -- well, no.  I'm

```
1    going to back up a minute.  We'll circle back to that.
2         So, what we're going to do now is we're going to talk
3    about the different triggers that you have seen from your
4    investigations, as well as from your review of this case.
5         Before we get there, just to be clear, once the system
6    triggers, the order should be held until due diligence can
7    make sure it's not being diverted, correct?
8    A.   Yes.  Yes, Your Honor, that's my opinion.
9              MR. FARRELL:  Judge, this is a bigger block that
10   we're about to go into, if you'd want to take a break.
11             THE COURT:  Well, does anybody need a break?
12   We've already taken one this morning.
13             MR. FARRELL:  I'm good.
14             THE COURT:  Let's go forward full speed ahead, Mr.
15   Farrell.
16             MR. FARRELL:  Yes, sir.
17        All right.  Let's go to the next slide, please.  Wait,
18   no.  Don't do that.
19             BY MR. FARRELL:
20   Q.   Mr. Rafalski --
21   A.   Yes, Mr. Farrell?
22   Q.   Have you identified methodologies by which registrants
23   have used or you have experienced or seen as a triggering
24   mechanism for their SOMS?
25   A.   Yes, I have.
```

1  **Q.**   And have you prepared a slide that identifies the

2  various methodologies that you have employed when reviewing

3  data?

4  **A.**   I have, Your Honor.

5  **Q.**   And would looking at that slide assist you in your

6  testimony with the Court?

7  **A.**   Yes, it would.

8         MR. FARRELL:  Judge, if permitted, I would like to

9  publish slide 14.

10       Okay.  I know that this is -- this is the slog.  And

11  so, Judge, I'm going to try to be very methodical, but this

12  is -- this is a technical portion.

13       THE COURT:  All right.

14       BY MR. FARRELL:

15 **Q.**   Mr. Rafalski, is there one particular golden rule on

16  what the trigger should be?

17 **A.**   No, Your Honor.

18 **Q.**   Okay.  Describe for the judge what guidance is

19  available out there for how high to set the trigger or how

20  low to set the trigger.

21 **A.**   Well, that determination, Your Honor, is for the

22  company, the registrant.  The regulation, the suspicious

23  order monitoring regulation, speaks to it and it says that

24  they would typically be trying to identify orders of unusual

25  size, deviating substantially from a normal pattern or an

1    unusual frequency.

2        In the cases of these systems, they're only looking at

3    the volume and it's a critical decision to try to determine

4    for each customer what would be the usual amount of drugs

5    that they were purchasing.

6    **Q.**   Now, have you been privy to the actual computer code

7    algorithm used by each of the defendants inside their

8    suspicious order monitoring systems?

9    **A.**   It was not provided as part of the litigation, Your

10   Honor.

11   **Q.**   But based on your experience as a DEA investigator,

12   have you been able to generally replicate what that number

13   should look like?

14   **A.**   I'm not sure I understand your question, what -- what

15   the numbers should look like.

16   **Q.**   The threshold.

17   **A.**   It would be calculated to depend on what the system is

18   or how they designed the system.

19   **Q.**   And have you been able to discern how each of these

20   systems have been generally designed?

21   **A.**   Yes, I have.

22   **Q.**   Now, to be clear, how many different systems are

23   possible?

24   **A.**   It would be a huge number, Your Honor, because you have

25   to take in consideration the range of types of registrants

1    that could purchase.  So, if you're distributing drugs to a

2    hospital, you could be looking at a large number.  You could

3    be distributing drugs to a veterinarian, a veterinarian's

4    office.  He would have the ability -- he or she would have

5    the ability to purchase drugs.

6         So, there, you would be looking at a smaller amount and

7    a smaller type, a different type.  Veterinarians wouldn't

8    have use for drugs like Adderall.  So, it's my belief that

9    the regulation, the way it is, allows the flexibility for a

10   registrant to desire a -- design a system to meet their

11   business needs and to service their customers.

12   **Q.**  So, this gets back to purpose.  When we're designing

13   this trigger, when we're designing this function, this

14   threshold, this algorithm at the stage of the transaction,

15   what is it that we're trying to flag?  What's the purpose of

16   flagging certain orders?

17   **A.**   We're trying to identify an order, Your Honor, that has

18   a suspicion of diversion, that is outside of what's normal

19   and what's usual.

20   **Q.**   So, looking at this, have you identified several

21   different methodologies and then -- and then applied those

22   methodologies to the data?

23   **A.**   I have.

24   **Q.**   And so, in general, will you identify for the record

25   what each of these, A, B, C, D, E and F are?  We're talking

1    a hundred thousand feet looking at it because we're going to

2    walk through each of them.

3    **A.**    The first one, Your Honor, is maximum monthly trailing

4    six-month threshold.  That is the system that was used by

5    Masters Pharmaceutical that was discussed in the DC

6    appellate ruling.

7        B, that's a -- the trailing six-month maximum monthly

8    fixed after first triggered threshold.  That's a repeat of

9    the Masters system, but used in my review, it's going to be

10   used a little differently.  I think we're going to explain

11   that.

12       The third one, C, twice trailing 12-month average,

13   that's based on the Mallinckrodt system that was in the

14   litigation in one of the other cases.

15       D, three times the 12-month average is ABDC and

16   Cardinal.  Was used at one of the systems that they used in

17   the time periods I showed you earlier.

18          MS. MAINIGI:  Objection, Your Honor, to the

19   testimony.  That is outside the scope of his report.  It was

20   not identified.  His number -- or his letter D methodology

21   was not disclosed in his report as identified with Cardinal.

22          THE COURT:  Mr. Farrell?

23          MR. FARRELL:  Judge, I'm not quite sure how to

24   respond to that.  It's an enormous report.  But I think it

25   was undisputed that Cardinal was running a three-times

```
 1   multiplier.
 2            MS. MAINIGI:  We looked -- we got these
 3   demonstratives at midnight, Your Honor, and we looked back
 4   at the report.  It was not identified with Cardinal.
 5            MR. FARRELL:  Judge, I believe the record and the
 6   testimony will indicate that Cardinal Health's witnesses
 7   testified repeatedly that they were using a three times
 8   12-month average methodology, but it doesn't matter.  These
 9   are -- these are attempts by Mr. Rafalski to run whatever
10   metric they want to run to show that the transactions should
11   have lit up like a Christmas tree.
12            THE COURT:  Well, I'm -- go ahead.  I'm sorry.
13            MS. MAINIGI:  No.  I'm sorry, Your Honor.  I -- I
14   don't want to get into an argument about this, Your Honor,
15   because I know you want to move on, but I'm just noting that
16   for the record.  It is completely outside of the scope of
17   the report.  I know Your Honor has no ability to confirm
18   that right now.
19            THE COURT:  I'm going to overrule your objection
20   and your objection will, of course, be preserved for the
21   record.
22        And you can go ahead, Mr. Farrell.
23            MR. FARRELL:  All right.
24            BY MR. FARRELL:
25   Q.   And so, to move through quickly, E and F are also
```

1    different types of algorithms or metrics that you're

2    attempting to replicate and run against certain datasets,

3    agreed?

4    **A.**    Datasets for each of the defendants, yes, sir, Mr.

5    Farrell.

6            MR. FARRELL:  So, I'm going to attempt to do this,

7    Judge, and I will abandon it if it is -- turns out to be a

8    mess.

9        But let's go to the next slide.

10           BY MR. FARRELL:

11   **Q.**    So, what we have here is we have a fictional

12   theoretical monthly distribution that escalates over time.

13   **A.**    That's correct, Your Honor.

14   **Q.**    And I have asked for you to explain each of the

15   methodologies based upon a fictional setting so the judge

16   can understand how each methodology works.

17       So, let's start with A, which is the Masters test,

18   maximum monthly trailing six-month threshold.  Would you

19   explain to the judge how that is supposed to work in theory?

20   **A.**    Your Honor, if you look down at the bottom of the

21   chart, it starts at number one through number six.  Each

22   number there, the bar would represent the number of pills

23   that are distributed for each of those months.

24       At the end of the sixth month, the system would look

25   back and, while it's monitoring the seven-month, if that

```
1   month exceeded the highest month in the previous six months,

2   it would stop that distribution.

3   Q.   All right.  So, what I'm attempting to do is I'm

4   attempting to follow you along.  It looks backwards six

5   months?

6   A.   That's correct.

7   Q.   And it identifies the highest amount of any prior six

8   months?

9   A.   That's correct.

10  Q.   And that creates the cap, correct?

11  A.   Yes.  That creates a trigger or a threshold.

12  Q.   Now, in this theoretical abstract in month seven you

13  will see there's just a little bit in excess, right?

14  A.   That's correct.

15  Q.   This would be the system, as designed, its objective

16  would just trigger that there is a hold being placed because

17  the highest amount in the past six months has been exceeded,

18  correct?

19  A.   That's correct, Your Honor.

20  Q.   And what should happen based on the design once the

21  trigger happens in month seven?

22  A.   Should stop, stop the distribution.

23  Q.   Until what?

24  A.   Until you clear that suspicion, due diligence is

25  applied.  And, Your Honor, just for clarification, it
```

1    doesn't wait until the end of the seventh month.  If at any

2    time in that month it exceeds that amount, it will stop it.

3    **Q.**   Now, under Scenario A, let's assume that no due

4    diligence is done and that the alarm, for lack of a better

5    word, the fire alarm, never gets turned off.

6    **A.**   Okay.

7    **Q.**   What should happen with all of the subsequent orders

8    until the fire alarm is turned off?

9    **A.**   They should not be shipped.

10   **Q.**   Okay.  Now, under B, tell the judge what the difference

11   between A and B is.

12   **A.**   Your Honor, this looks -- looks back the same way as I

13   just described.  So, on this particular chart everything

14   would look the same.  The trigger would stop in the seventh

15   month.  After the seventh month that would set a fixed

16   threshold that would run across all future transactions.

17   **Q.**   Now, under Methodology B, my understanding is, is that

18   until there's due diligence, there would be a cap placed at

19   the highest level of the last six months, correct?

20   **A.**   That's how the methodology was applied.

21   **Q.**   So, instead of blocking all of the orders until due

22   diligence resolves, the only thing that it blocks is the

23   orders in excess of the thresholds; is that right?

24            THE COURT:  Mr. Schmidt?

25            MR. SCHMIDT:  This is pure testimony, Your Honor,

```
1    and as an illustration of that, the question want to go --
2                COURT REPORTER:  I'm sorry.  Can you speak up for
3    me a little?
4                MR. SCHMIDT:  Yeah, of course.  And I'm sorry.  I
5    had the microphone off.
6         This is pure testimony, Your Honor, and as an example
7    of that, he led his witness into misstating his own
8    methodology in the last question.  I think he mixed up
9    Methodology B and Methodology A.
10               THE COURT:  Well, I'm going to overrule the
11   objection.  I'm just trying to understand this.
12        And go ahead, Mr. Farrell.
13               MR. FARRELL:
14   Q.   All right.  So, under Methodology A, we're looking at
15   the last six months.  And then, in present time, we live in
16   month seven.  Right?
17   A.   Yes.
18   Q.   So, in month seven, the way this system worked is it
19   would look at the past six months?
20               THE COURT:  You're going through what you've
21   already --
22               MR. FARRELL:  I'm sorry.
23               THE COURT:  -- taken him through, Mr. Farrell.
24               MR. FARRELL:  I was taking a cue that you were
25   asking for more explanation.
```

```
 1              THE COURT:  Well, I think I've -- I've got it so
 2     far.  So, let's move on to the next step.
 3              MR. FARRELL:  Yes, Your Honor.  I apologize.
 4              BY MR. FARRELL:
 5     Q.   So, now let's move on to C, twice trailing 12-month.
 6     A.   Can I make a correction on the previous one?
 7     Q.   Yes.
 8     A.   On the B methodology?  So, it doesn't -- it doesn't
 9     stop --
10              MR. SCHMIDT:  I didn't mean to interrupt.
11              THE COURT:  Yeah.  Go ahead.
12              MR. SCHMIDT:  But I would like to say something
13     after.
14              THE WITNESS:  It doesn't cut all of those orders
15     and only ship that amount.  It would only ship the orders
16     that didn't exceed that red line.
17              THE COURT:  Okay, Mr. Schmidt.
18              MR. SCHMIDT:  And that's what I flagged, Your
19     Honor.  That's my concern with the leading.  He actually led
20     him into improper testimony that had I not objected would
21     stand on the record.
22              MR. FARRELL:  Well, Judge, I would think that his
23     objection is what led him into this.
24              THE COURT:  Well, I'm going to overrule the
25     objection at this point and you can go ahead.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1          MR. FARRELL:  All right.

2          BY MR. FARRELL:

3   **Q.**   So, twice trailing 12 months, please walk the judge

4   through how that type of methodology would be employed.

5   **A.**   Your Honor, if we go back to the chart and you see the

6   transaction that would flow from month 1 to month 12, we get

7   to month 12 and that's the trailing 12 months.  So the

8   system would look back to 12 months.  It would take each of

9   the monthly transactions and create an average.  And then it

10  would take two times of that average.

11         Generally, in this kind of an illustration, that would

12  be right around six, month 6 approximately.  So, it would be

13  two times of month six.

14  **Q.**   So, backing up, the 12-month average, average of what?

15  **A.**   Distribution of pills.  Each one of those bars

16  represent the number of pills that go out each month but,

17  Your Honor, this is -- it's trailing 12 months so --

18  **Q.**   Mr. Rafalski, hold on a second.  Average of that

19  customer?  Average of that region?  Average of that nation?

20  What is it an average of?

21  **A.**   It depends how they -- how they set it, how the company

22  sets it.  They could set it by groups of pharmacies,

23  individual pharmacies.  And how we applied it, or how I

24  applied it, actually, in the methodology was it was applied

25  -- in one segment of time of the analysis, it was the State

1    of West Virginia transaction average.  And there was a

2    section during ARCOS period where it was the national

3    average.  And it would be two times the national average, if

4    that answers your question --

5    **Q.**   I think so.

6    **A.**   -- about the methodology or about the example.

7    **Q.**   Now, when we say the word trailing, explain to the

8    judge what that terminology, that lexicon means, trailing?

9    **A.**   So, as the transactions, Your Honor, move left to

10   right, when it goes to month 13, month 1 just falls off and

11   it recalculates the average.  And it would continue to do

12   that function system from that point on.

13   **Q.**   Now, under D, three times 12-month average, how does

14   that work?

15   **A.**   It essentially is the same description I gave you, Your

16   Honor, for the -- for the previous, the two times, but this

17   time it would go three times the average.

18        And, Your Honor, just for the illustration, the line

19   wouldn't go straight across because, as the next month hit,

20   as this chart is illustrated, it would bump up a little bit

21   each time.

22   **Q.**   All right.  Now, let's go to E, maximum 8,000 dosage

23   units.  Tell me how putting a threshold cap should work.

24   **A.**   That's what this describes.  In this case, there was a

25   decision that the maximum amount of drugs that could be

1    shipped on a monthly basis would be 8,000.

2              THE COURT:  To each individual customer?

3              THE WITNESS:  Yes.

4              BY MR. FARRELL:

5    **Q.**   Per month?  Per day?

6    **A.**   Per month.

7    **Q.**   Per month?  And so, if this is the 8,000 on our bar

8    graph, what happens to orders in excess of 8,000?

9    **A.**   They would be stopped by the system.

10   **Q.**   Unless what?

11   **A.**   They would conduct due diligence and clear the order of

12   the suspicion of diversion and then it would continue on.

13   **Q.**   And what about raising the threshold above 8,000, what

14   would be the expectation to raise a base hold threshold?

15   **A.**   Specific to a customer, Your Honor, I would expect to

16   see a pretty in-depth evaluation to increase a threshold,

17   some reasons and justification to make that change.  But

18   it's a possible -- it's a good thing to happen within a

19   system if there needs to be an increase of distribution.

20   **Q.**   Now, the final one that we're going to talk about is

21   letter F, and I think we have to go to the next slide to

22   explain it.  Tell the judge what F is, the sixth version.

23   **A.**   The sixth version is -- it's referred to sometimes as

24   the pickers and packers.  So, inside of the cage and the

25   vault area at the distributors, they hang a list.  And the

1    list provides the amount of drugs that can be shipped out in

2    one order.

3         So, for example, say arbitrary 500 dosage units of

4    oxycodone.  When the employees in the -- in the distribution

5    center are handling or filling an order or picking an order,

6    that's why they call them pickers and packers, if that order

7    exceeds 500 dosage units, then they -- I take it they stop

8    the order.

9    **Q.**   Now, let me step real quick.  When we're talk about

10   this final methodology, are we talking about monthly, weekly

11   or daily cap?

12   **A.**   It says a daily.  It would be a daily order.

13   **Q.**   So, every single day, there is a maximum amount of

14   pills that the pickers and checkers can put -- can fill on

15   behalf of a customer, correct?

16   **A.**   Yes.  Below the amount, it's just free to go.  Above

17   the amount, they --

18   **Q.**   How did you determine what those amounts should be in

19   this case?

20   **A.**   That was determined by using one of the defendants',

21   their system, those amounts.

22   **Q.**   Okay.  Now, were you able to take these methodologies,

23   A, B, C, D, E and F, and run them against the transactional

24   data provided by the defendants?

25   **A.**   I was.

1    **Q.**   And using each of those methodologies, were you able to

2    make findings as to what flags should have happened and

3    which order should have been blocked?

4    **A.**   Yes, I was, Your Honor.  Just -- just for technical

5    purposes, I didn't have the capabilities of a computer to do

6    that.  That was what Mr. McCann did, but I communicated my

7    request for Mr. McCann to produce that.

8              MR. FARRELL:  So, bring up Slide 17, please.

9              BY MR. FARRELL:

10   **Q.**   Mr. Rafalski, is this a depiction of your findings

11   running methodology A against the defendants' data?

12   **A.**   Yes, it is, Your Honor.

13   **Q.**   Okay.  So, this is the -- under A, this is the Masters

14   test that once the first order is flagged, it blocks

15   everything after it, correct?

16   **A.**   That's correct.

17   **Q.**   And under that assessment, what were your findings

18   regarding oxycodone and hydrocodone for AmerisourceBergen,

19   Cardinal and McKesson?

20   **A.**   Your Honor, the top for AmerisourceBergen, reading left

21   to right, the flagged orders of oxycodone in dosage units

22   was 11,610,920.  With a total amount of 90.6 percent of the

23   total dosage units.

24        The flagged orders of hydrocodone in dosage units is

25   20,621,360, or 91.1 percent of total dosage units.

1          Dropping down to Cardinal Health, 15,997,400, or

2    93.1 percent of the total dosage units.

3          And 14,795,350, or 82.5 percent of the dosage units.

4          And, finally, McKesson at the bottom, 3,501,970 dosage

5    units, or 87.9 percent of the total dosage units.

6          And for hydrocodone, 3,261,250, or 87.4 percent.

7    **Q.**   Now, Mr. Rafalski, am I correct that this is what

8    should have been blocked by the defendants assuming no due

9    diligence was performed?

10   **A.**   Yes, sir.  Another way of stating when the first block

11   occurred and the suspicion was not clear, the suspicion of

12   diversion wasn't dispelled, all subsequent ones.

13   **Q.**   So, to be clear, under A, the system was designed to

14   set off a fire alarm and if that fire alarm never got turned

15   off, the result would be as you would see on this screen, a

16   substantial volume of pills would never have been shipped

17   into Huntington-Cabell County, West Virginia?

18   **A.**   That's a correct statement, Your Honor.

19   **Q.**   Okay.  Now, under Scenario A -- well, we'll get back to

20   that.  Let's go to B.  Now, under B, it doesn't block all of

21   the subsequent orders, but it places a cap that blocks

22   everything in excess of the cap, correct?

23   **A.**   That's correct.  That would be the first time the

24   systems trigger.  It would be fixed.

25   **Q.**   And under Scenario B, what are your findings regarding

1    oxycodone dosage units and hydrocodone dosage units for

2    AmerisourceBergen, Cardinal and McKesson?

3    **A.**    Your Honor, for AmerisourceBergen, the flagged orders

4    of oxycodone in dosage units 3,763,580, or 29.4 percent.

5        Flagged orders of hydrocodone, 5,616,380, or 24.8

6    percent.

7        Dropping down to Cardinal Health, 11,325,200, or

8    65.9 percent.

9        7,252,580, or 40.5 percent, that's of dosage units.

10       And McKesson, 805,300 dosage units, 20.2 percent.  Or

11   2,390,800, or 64 percent of hydrocodone tablets.

12   **Q.**    Now, let's go to C, which is a different methodology,

13   and this is the trailing -- twice trailing 12-month average

14   or, in general, an average over 12 months multiplied by two.

15   When you run that methodology, what were your findings?

16   **A.**    As stated on the screen, Your Honor, AmerisourceBergen,

17   10,477,680 dosage units, or 81.8 percent.

18       Flagged orders of hydrocodone, 18,877,140, or

19   83.4 percent.

20       Cardinal Health, 14 -- 14,011,880, 81.5 percent.

21       Hydrocodone, 16,593,780, 92.6 percent.

22       Dropping down to McKesson in the bottom, Your Honor,

23   2,405,620, 60.4 percent for oxycodone and for hydrocodone,

24   2,362,420, 63.3 percent, sir.

25   **Q.**    And, Judge, we can continue to read into the record or

```
 1    I would submit Slides -- I think they're 17, 18, 19, 20, 21

 2    and 22 for the record as evidence.

 3              MR. SCHMIDT:  This is not evidence, Your Honor.

 4    At most, this is a demonstrative.  Even as a demonstrative,

 5    we object to it as methodologically unsound as we'll show in

 6    our cross examination, but it's certainly not evidence.

 7              THE COURT:  It certainly -- Mr. Nicholas?

 8              MR. NICHOLAS:  It's a demonstrative exhibit.  It's

 9    a demonstrative.  It's not -- it's not evidence.

10              THE COURT:  Yes.  I'm not going to admit it into

11    evidence, Mr. Farrell.  So, what are you going to do with

12    the rest of the slides?

13              MR. FARRELL:  I guess we'll read them in.

14              THE COURT:  Just leave them in?

15              MR. FARRELL:  Read them in?  Okay.

16              BY MR. FARRELL:

17    Q.   Go to D, please.

18              THE COURT:  I appreciate your effort to shorten

19    this.

20              THE WITNESS:  I do, too, Your Honor.

21              BY MR. FARRELL:

22    Q.   Methodology D is three times 12-month average which, as

23    you've explained, is taking a 12-month average, multiplying

24    it by three, to set the cap at threshold.  Would you please

25    read into the record and report to the judge what your
```

```
 1    findings are?

 2    A.   AmerisourceBergen for flagged orders of oxycodone,

 3    8,360,740, or 65.3 percent.

 4         Flagged orders of hydrocodone, 15,701,930, or 69.4

 5    percent dosage units.

 6         Cardinal Health, 9,567,580, or 55.7 percent of dosage

 7    units.

 8         Hydrocodone --

 9              THE COURT:  I'm sorry.  Go ahead.

10              THE WITNESS:  That's okay, Your Honor.  It's your

11    court.

12         14,957,360, 83.5 percent dosage units.

13         And for McKesson, 1,005,320 dosage units, or

14    25.2 percent of oxycodone.

15         And hydrocodone, 1,245,640, or 33.4 percent of dosage

16    units, Your Honor.

17              BY MR. FARRELL:

18    Q.   Now, let's go to methodology, E as in Echo.  This is

19    the maximum 8,000 dosage units a month.  Would you please

20    report to the Court your findings applying this methodology

21    to the data to the three defendants?

22    A.   For AmerisourceBergen for oxycodone, Your Honor,

23    10,446,280, 81.5 percent dosage units.

24         Hydrocodone, 21,679,760, 95.8 percent.

25         For Cardinal Health, 13,274,080, or 77.2 percent of
```

1    oxycodone dosage units.

2         For hydrocodone, 16,159,150, or 90.2 percent.

3         Finally, at the bottom, McKesson, for oxycodone

4    2,098,560, 52.7 percent.

5         And for hydrocodone dosage units, 2,484,640, or 66.6

6    percent.

7    **Q.**   And, finally, the last methodology, F, the pickers and

8    packers maximum daily dosage units, would you please report

9    to the Court your findings?

10   **A.**   AmerisourceBergen for oxycodone dosage units,

11   12,459,020, 97.3 percent.

12        For hydrocodone dosage units, 22,582,020, or

13   99.8 percent of dosage units.

14        Cardinal Health for oxycodone, 16,527,880 dosage units,

15   or 96.2 percent.

16        For hydrocodone, 17,688,100, or 98 percent of dosage

17   units.

18        McKesson for oxycodone dosage units, 3,713,000, or

19   93.2 percent dosage units.

20        And for hydrocodone dosage units, 3,648,650, 97.9

21   percent.

22   **Q.**   Very good.  Now, Mr. Rafalski, this -- these numbers

23   that you've just read into the record --

24   **A.**   Yes, sir.

25   **Q.**   -- are in the -- you're using the assumption that there

1    is no due diligence and this is what should have happened

2    when the fire alarm went off, correct?

3    **A.**    Assuming no due diligence.  What -- I don't --

4    **Q.**    So -- so, have we asked you to review all of the due

5    diligence files made available in this litigation?

6    **A.**    Yes, sir, you have.

7    **Q.**    And have you identified them in your reliance

8    materials?

9    **A.**    I have, Your Honor.

10    **Q.**    And have you gone through the customer files and the

11    documents produced by AmerisourceBergen, McKesson and

12    Cardinal Health?

13    **A.**    I have, Your Honor.

14    **Q.**    And have you found sufficient evidence in the record to

15    dispel the suspicion of any of these orders that -- that

16    were or should have been flagged?

17    **A.**    I have not, Your Honor.

18    **Q.**    Now, let's go to -- did we ask you to review the actual

19    suspicious orders that were reported and disclosed by the

20    defendants in this litigation?

21    **A.**    Yes.  I'm not sure you asked me to.  I mean, that was

22    part of what I did as part of my review of all of the

23    material, but that was one of the primary things that I

24    looked at.

25            MR. FARRELL:  Can we please bring up at that

```
1      AmerisourceBergen slide?

2              BY MR. FARRELL:

3      Q.   Mr. Rafalski, you previously testified that there were

4      77,398 transactions by AmerisourceBergen with pharmacies in

5      Huntington-Cabell County, West Virginia.  Based on your

6      review of the files, how many of those transactions were

7      reported by AmerisourceBergen to the DEA as suspicious?

8      A.   As listed there, Your Honor, by year, I believe that

9      total is 45.

10     Q.   And will you read into the record each of the years and

11     the numbers?

12     A.   2007, 2 pre-shipping reporting; 2008, 4 pre-shipment

13     reporting; 2009, 12 pre-shipment reporting; 2010, 5

14     pre-shipment reporting; 2011, 1 pre-shipment reporting;

15     2012, 4 pre-shipment reporting; and 2013, 11 pre-shipment

16     reporting.  And there were -- no reporting post-shipment.

17     Q.   How about -- I'm told that you missed 2014.

18     A.   Oh, I'm sorry.  Your Honor, 6 for 2014.

19     Q.   And then, in 2015, '16, '17 and '18, how many were

20     there?

21     A.   There were 0, Your Honor.

22     Q.   So, out of the 77,000-plus transactions, what's the

23     total number of orders reported as suspicious?

24     A.   45.

25     Q.   Now, what is it that we're suspicious of?  Let's talk
```

```
 1    to the judge briefly.  Why are -- what are we suspicious of

 2    happening?

 3    A.    Diversion.  Potential for diversion, Your Honor.

 4    Q.    Diversion of what?

 5    A.    Of the controlled substances, that they could leak or

 6    be not used properly.  It would be an illicit use.

 7    Q.    And so, if you're suspicious, are you suspicious of the

 8    orders more likely than not being diverted into the illicit

 9    market?

10    A.    That's correct.  If you don't dispel the suspicion of

11    that order and of future orders, if you hadn't removed that

12    suspicion of diversion or dispelled it, more likely than

13    not, that's what would occur, Your Honor, or my belief.

14    Q.    Let's go to the next slide.  This is Cardinal Health.

15    Of the 92,915 transactions, which admittedly go into a

16    longer data time frame than the other defendants, how many

17    suspicious orders were you able to find in the record

18    between 1996 and 2012 -- 2011?

19    A.    0.

20    Q.    Well, that's not true, is it, Mr. Rafalski?

21    A.    Oh, I think that's changed.  I'm sorry.  For 2010 would

22    be the first order that was discovered.

23    Q.    So, between -- in 1996, how many suspicious orders were

24    reported?

25    A.    0 up through 19 -- 2009.
```

1    **Q.**   And then in 2010, how many were reported?

2    **A.**   1.

3    **Q.**   And how about 2012?

4    **A.**   2012, 115.

5    **Q.**   I'm sorry.  I missed 2011.

6    **A.**   2011, 0.

7    **Q.**   And then, beginning in 2012, how many suspicious orders

8    were reported?

9    **A.**   15 for 2012; 86 for 2013; 5 for --

10                THE COURT:  Did you say 15 for 2012?

11                THE WITNESS:  115, Your Honor.  I'm sorry.  Again,

12   86 for 2013; 5 for 2014; 19 for 2015; 34 for 2016; 32 for

13   2017.

14   **Q.**   So, just for purposes of the record, between 1996 and

15   2011, Cardinal Health reported one suspicious order?

16   **A.**   That's correct, Your Honor.

17   **Q.**   Now, let's go to the next slide, please.  And, again,

18   this is McKesson and of the 18,862 transactions, how many

19   suspicious orders were reported by McKesson from 1996

20   through 2012?

21   **A.**   That would be 0, Your Honor.

22   **Q.**   And then beginning in 2013, how many suspicious orders

23   were reported?

24   **A.**   Five orders in 2013; 29 orders in 2014; 20 orders in

25   2015; 10 orders in 2016; 2 in 2017; and 13 in 2018, Your

1    Honor.

2    **Q.**   Now, with regard to Rite Aid, McKesson's relationship

3    with Rite Aid, did you find any evidence in the record that

4    McKesson conducted sufficient due diligence of the Rite Aid

5    stores in Huntington-Cabell County, West Virginia?

6    **A.**   I did not, Your Honor.

7    **Q.**   Did you find any evidence that McKesson conducted

8    sufficient due diligence when increasing thresholds of

9    hydrocodone and oxycodone for Rite Aid stores in

10   Huntington-Cabell County, West Virginia?

11   **A.**   Your Honor, I did not.

12   **Q.**   And did you find any evidence that McKesson was

13   sufficiently monitoring Rite Aid's self-distribution of

14   hydrocodone to its stores in Huntington-Cabell County, West

15   Virginia?

16          MR. SCHMIDT:  Objection, Your Honor.  Based on an

17   implied legal duty that doesn't exist, we can't monitor

18   someone's independent conduct from us.

19          THE COURT:  Well, overruled.

20       Go ahead, Mr. Farrell.

21          THE WITNESS:  No, they didn't, Your Honor.

22          BY MR. FARRELL:

23   **Q.**   And did you find sufficient evidence of an appropriate

24   Level I or Level II review by McKesson for retail national

25   account customers in Huntington-Cabell County, West

```
 1    Virginia?
 2    A.    I did not, Your Honor.
 3    Q.    Mr. Rafalski, do you have an opinion whether
 4    AmerisourceBergen maintained effective control to prevent
 5    diversion of prescription opioids into the illicit market in
 6    Huntington-Cabell County, West Virginia?
 7    A.    Yes, Your Honor, I do.
 8    Q.    What is that opinion?
 9    A.    Failure to maintain effective controls to prevent
10    diversion of controlled substances.
11          MR. NICHOLAS:  Your Honor, I'll object and ask to
12    strike that testimony as a legal conclusion.
13          THE COURT:  Well, overruled.
14          BY MR. FARRELL:
15    Q.    So, let's back up.  Do you have an opinion and I'll --
16    I'm going to use the collective to save us some time.
17          THE COURT:  Overrule the objection and deny the
18    motion to strike.
19       Go ahead, Mr. Farrell.
20          BY MR. FARRELL:
21    Q.    Do you have an opinion whether AmerisourceBergen
22    maintained effective control to prevent diversion of
23    prescription opioids into the illicit market in
24    Huntington-Cabell County, West Virginia?
25    A.    I do.
```

1    **Q.**    What is that opinion?

2    **A.**    That they did, Your Honor.

3    **Q.**    Do you have an opinion whether Cardinal Health

4    maintained effective control to prevent diversion of

5    prescription opioids into the illicit market in

6    Huntington-Cabell County, West Virginia?

7            MS. MAINIGI:  Objection, Your Honor.  Calls for a

8    legal conclusion inconsistent with the Geldhof ruling.

9            THE WITNESS:  I do, Your Honor.

10           BY MR. FARRELL:

11   **Q.**    What is that opinion?

12   **A.**    That they did.

13   **Q.**    That they did not?

14   **A.**    They did not.  I'm sorry.  Yes.

15   **Q.**    Do you have an opinion whether McKesson maintained

16   effective control to prevent diversion of prescription

17   opioids into the illicit market in Huntington-Cabell County,

18   West Virginia?

19           MR. SCHMIDT:  Same objection, Your Honor.

20           THE COURT:  Overruled.

21           THE WITNESS:  I do, Your Honor.

22           BY MR. FARRELL:

23   **Q.**    What is that opinion?

24   **A.**    That they did not.

25   **Q.**    Do you have an opinion whether AmerisourceBergen,

```
 1    Cardinal Health and McKesson each individually designed and

 2    operated an effective system to identify, block and report

 3    suspicious orders arising out of Huntington-Cabell County,

 4    West Virginia?

 5    A.   I do, Your Honor.

 6    Q.   And what is that opinion?

 7    A.   That they did not.

 8    Q.   Do you have an opinion whether these failures were

 9    systemic?

10    A.   I do, Your Honor.

11    Q.   And what is your opinion?

12    A.   That they were.

13    Q.   Do you have an opinion --

14         THE COURT:  What do you mean by systemic failure?

15         THE WITNESS:  Systemic would -- the difference

16    would be when I looked at the due diligence, maybe there was

17    a flaw or a missed one.  Systemic would mean that it was

18    widespread, that it was --

19         THE COURT:  Okay.  Ms. Mainigi?

20         MS. MAINIGI:  I object to that, Your Honor.  He

21    has absolutely no basis in terms of what he reviewed to do

22    that and ultimately it calls for a legal conclusion but we

23    can cross examine him on it.

24         THE COURT:  Overruled.

25         MR. FARRELL:  All right.  I'm being told that I
```

```
 1    need to -- because of the objections and the clarity, I need
 2    to go back and re-ask the first question on
 3    AmerisourceBergen.
 4              BY MR. FARRELL:
 5    Q.   You've stated earlier that you do -- let me start all
 6    over with that.  Do you have an opinion whether
 7    AmerisourceBergen maintained effective control to prevent
 8    diversion of prescription opioids into the illicit market in
 9    Cabell County, West Virginia?
10    A.   I do, Your Honor.
11    Q.   And what is your opinion?
12    A.   They did not.
13              THE COURT:  Haven't you already asked him that?
14              MR. FARRELL:  I was told that I --
15              THE COURT:  Oh, you wanted to rephrase the
16    question?
17              MR. FARRELL:  I was told I bollixed it and so I
18    was trying to fix it.
19              THE WITNESS:  I might have misunderstood it, Your
20    Honor.
21              THE COURT:  Okay.  All right.  I'm sorry.  Go
22    ahead.
23              BY MR. FARRELL:
24    Q.   Do you have an opinion whether these systemic failures
25    were a substantial factor in the diversion of prescription
```

```
 1    opioids into the illicit market in Huntington-Cabell County,

 2    West Virginia?

 3              MS. MAINIGI:  Objection, Your Honor.  This calls

 4    -- clearly calls for a legal conclusion.

 5              MR. SCHMIDT:  It also calls for an undisclosed

 6    causation opinion --

 7              MS. MAINIGI:  Join.

 8              MR. SCHMIDT:  -- that he's not qualified to give,

 9    he doesn't have a methodology for giving, and he's not

10    disclosed.

11              MR. NICHOLAS:  Joined on both objections on behalf

12    of AmerisourceBergen.

13              THE COURT:  All right.  I'm going to overrule the

14    objections and allow him to continue.

15              THE WITNESS:  I do.

16              BY MR. FARRELL:

17    Q.   And what is that opinion?

18    A.   Could you repeat the question, please?

19    Q.   Do you have an opinion whether these systemic failures

20    were a substantial factor in the diversion of prescription

21    opioids into the illicit market in Huntington-Cabell County,

22    West Virginia?

23    A.   They were, Your Honor.

24    Q.   I asked you first, do you have an opinion?

25    A.   I said I do.
```

1   **Q.**   And what is that opinion?

2   **A.**   That they were.

3   **Q.**   Do you have an opinion whether the orders the

4   defendants knew or should have known were suspicious were

5   likely to be diverted into the illicit market in

6   Huntington-Cabell County, West Virginia?

7   **A.**   I do.

8           MS. MAINIGI:  Same objection, Your Honor.

9           THE COURT:  Overruled.

10          MR. SCHMIDT:  Same objection and to avoid

11  disruption, may we just have a running objection to these

12  lines of questioning?

13          THE COURT:  You may.

14          MR. SCHMIDT:  Thank you.

15          MR. NICHOLAS:  I join in that.

16          THE COURT:  Right.  Right.  The record will show a

17  continuing objection to the entire line of questioning on

18  behalf of all three defendants.

19      You may proceed.

20          MR. SCHMIDT:  Thank you, Your Honor.

21          BY MR. FARRELL:

22  **Q.**   So, starting over, do you have an opinion whether the

23  orders the defendants knew or should have known were

24  suspicious were likely to be diverted into the illicit

25  market in Huntington-Cabell County, West Virginia?

1   **A.**   I do, Your Honor.

2   **Q.**   And what is that opinion?

3   **A.**   That they were.

4   **Q.**   And do you hold these opinions to a reasonable degree

5   of certainty?

6   **A.**   I do, Your Honor.

7             MR. FARRELL:  Judge, may I have a moment to

8   confer?

9             THE COURT:  Yes.

10      (Pause)

11            MR. FARRELL:  Judge, without belaboring the point,

12   can I have five minutes to see?  I believe I'm done.

13            THE COURT:  Well, I've got to quit early because

14   of a problem that came up with the noon hearing, so I'm

15   going to suggest we pull the plug on this now and come back

16   at 1:30.  Is that okay with everybody?

17            MR. FARRELL:  Yes, Your Honor.

18            THE COURT:  All right.

19      (Recess taken)

20      (Proceedings resumed at 1:30 p.m. as follows:)

21            THE COURT:  Mr. Rafalski, you can resume the

22   witness stand.  You're still under oath, sir.

23      Do you have anymore questions, Mr. Farrell?

24            MR. FARRELL:  A few, Your Honor.  May I proceed?

25            THE COURT:  Yes.

```
 1   BY MR. FARRELL:

 2   Q.   Mr. Rafalski, I have a few follow-up questions on

 3   the methodology of your methodologies.

 4   A.   Okay.

 5   Q.   Did you provide the methodologies to an expert with

 6   experience running searches on the ARCOS database?

 7   A.   I did.

 8   Q.   Who was that?

 9   A.   Mr. McCann, Dr. McCann.  I'm sorry.

10   Q.   Did you ask that Dr. McCann apply those methodologies

11   to the ARCOS database?

12   A.   I did, Your Honor.

13   Q.   Did Dr. McCann apply the methodologies as you

14   requested?

15   A.   He did, Your Honor.

16   Q.   And did Dr. McCann make you aware of the results?

17   A.   Yes, Your Honor.

18   Q.   Did you incorporate and rely upon those results?

19   A.   I did, Your Honor.

20   Q.   Are you familiar with Dr. McCann's work analyzing the

21   ARCOS database?

22   A.   I am.

23   Q.   In your experience, do you find his work reliable?

24   A.   I do, Your Honor.

25   Q.   Do DEA agents and diversion investigators commonly rely
```

1    on the DEA's computer professionals to run searches on the

2    ARCOS data?

3    **A.**    In some circumstances, yes, sir.

4    **Q.**    And do experts in your field reasonably rely on the

5    type of calculations Dr. McCann performed for you?

6    **A.**    Yes, Your Honor.

7              MR. FARRELL:  No further questions.

8              THE COURT:  You may cross-examine.

9              MR. SCHMIDT:  Thank you, Your Honor.

10        May I proceed, Your Honor?

11             THE COURT:  Yes.

12                          CROSS EXAMINATION

13   BY MR. SCHMIDT:

14   **Q.**    Mr. Rafalski, it's good to see you.  We were joking

15   in the hall that we've spent a lot of time together.

16   **A.**    We have, Mr. Schmidt.

17   **Q.**    I'm going to try to be very straight and direct in my

18   questions, very targeted.  I'm going to ask you, if you can,

19   to be just as concise as you were in answering Mr. Farrell's

20   questions as you are in answering mine.  Is that fair?

21   **A.**    Yeah, I understand that, Your Honor, and I'll do my

22   best to do that.

23   **Q.**    Okay.  Let me start off by asking you some questions

24   about your methodology and how your opinions fit into the

25   broader case.

1      The plaintiff lawyers in this case only asked you to

2   evaluate the three defendants in this case; correct?

3   **A.**   That's correct, Your Honor.

4   **Q.**   You did not evaluate any companies the plaintiff

5   lawyers are not suing in this case.  True?

6   **A.**   I did not, Your Honor, only the three defendants.

7   **Q.**   When it came to your work, you only evaluated the three

8   entities the lawyers pointed you to as opposed to evaluating

9   all distributors, all manufacturers, all pharmacies;

10  correct?

11  **A.**   Your Honor, that's a correct statement, only the three

12  defendants.

13  **Q.**   Let's talk about some of those other groups.  Let's

14  start with doctors.

15      You recognize that doctors and other prescribers are

16  responsible for determining medical need when they write

17  prescriptions for opioids?

18  **A.**   That's, that's one of the requirements for a physician,

19  Your Honor.

20  **Q.**   And they're only supposed to write prescriptions for

21  opioids if they have a doctor/patient relationship and make

22  a judgment that a patient has legitimate medical needs for

23  those opioids.  True?

24  **A.**   That's a correct statement, Your Honor.

25  **Q.**   And, in fact, the DEA regulations state that the

1    responsibility for the proper prescribing and dispensing of

2    controlled substances is upon the prescribing practitioner.

3    You're familiar with that law.  Correct?

4    **A.**    Yes, sir.

5    **Q.**    And that law governed the whole time you were at the

6    DEA; it still governs today.  Correct?

7    **A.**    The law is the same, Your Honor.

8    **Q.**    The DEA does not expect distributors to second-guess

9    the legitimate medical judgments of prescribers.  True?

10    **A.**    Well, I would agree with that, Your Honor, in general

11    terms unless they were to know some information or observe

12    something way outside of the normal.

13    **Q.**    That's why I asked about legitimate medical need.  When

14    it comes to legitimate medical judgments, the prescribers,

15    distributors are not supposed to second-guess those.  True?

16    **A.**    I guess if they -- Your Honor, if they determine

17    they're legitimate, then that's a correct statement.

18    **Q.**    There's no determination -- no requirement in the

19    regulations that distributors have to affirmatively

20    determine that prescribing decisions are legitimate, is

21    there?

22    **A.**    I'd agree with that.

23    **Q.**    Okay.  Thank you.  The vast majority of doctors, you

24    agree, are trying to do the right thing?

25    **A.**    Not that I'm an expert in that area, Your Honor, but

```
1    that's one of my beliefs.  I would hope that all doctors are

2    trying to do the right thing.

3    Q.   Are DEA policy statements important to you in your

4    work?

5    A.   I think they're a guide, yes.  I'd agree with that

6    statement, Your Honor.

7    Q.   When you talked to -- when you talk about guidance you

8    looked at, you look to guidance in DEA policy statements?

9    A.   There would be occasion, yes.

10            MR. SCHMIDT:  May I approach, Your Honor?

11            THE COURT:  Yes.

12   BY MR. SCHMIDT:

13   Q.   Sir, I've handed you what I've marked as

14   Defendants' West Virginia 3076.  Do you see that at the

15   top it's dated September 6th, 2006?

16   A.   I see that, Your Honor.

17   Q.   And do you see that it's written by the Drug

18   Enforcement Administration, your former employer?

19   A.   That is correct.  I do see that, Your Honor.

20   Q.   And if you look at the second page, do you see where it

21   says "Department of Justice Drug Enforcement Administration

22   Dispensing Controlled Substances for the Treatment of Pain"?

23   Do you see that?

24   A.   Yes, I do.

25   Q.   And below that it says "Agency DEA Action Policy
```

1    Statement."  Do you see that?  It's immediately below in the

2    upper left corner.

3    **A.**   I do see that under "Action," yes, sir.

4    **Q.**   This is the kind of DEA policy statement specifically

5    relating to prescription opioids that we were just

6    referencing; correct?

7    **A.**   Generally, yes.  I think this is a proposal for

8    multiple prescriptions for Schedule II.  But I agree that's

9    what the policy statement says.

10           MR. SCHMIDT:  We move this into evidence,

11   Defendants' West Virginia 3076.

12           THE COURT:  Is there any objection?

13           MR. FARRELL:  Yes, Your Honor.

14           THE COURT:  What is it?

15           MR. FARRELL:  Well, this is hearsay, and unless

16   this Court takes judicial notice of a public document.  But

17   in addition to that, there's been no foundation that this

18   witness is familiar with this policy statement from the DEA.

19           MR. SCHMIDT:  I don't think the witness -- an

20   expert witness gets to decide the scope of his cross

21   examination by a limited review of documents.  There is

22   foundation that this is the type of document he would look

23   at.

24           THE COURT:  This comes in under the public records

25   exception to the hearsay rule, does it not?

```
 1              MR. SCHMIDT:  Yes.
 2              THE COURT:  Objection is overruled.  I'll admit
 3    it.
 4    BY MR. SCHMIDT:
 5    Q.   Okay.  Let's put it up on the screen, please.  And
 6    we don't need to go back through the background
 7    information.
 8         What I want to do is go to Page 5 of the document
 9    looking at the numbers in the lower left-hand corner,
10    please.  And tell me when you're there.  And we also have it
11    up on the screen.  It's just to your right.  Do you see
12    that?
13    A.   Yes.  One second.
14    Q.   And, specifically, if we cull out the right column,
15    there's a heading that says, "The number of physicians who
16    prescribe controlled substances in violation of the CSA is
17    extremely small and there is no DEA crack-down on
18    physicians."
19         Do you see that?
20    A.   I see what that says, yes.
21    Q.   And then it says in 2006 in the Federal Register in
22    this official DEA policy statement, DEA recognizes that the
23    overwhelming majority of American physicians who prescribe
24    controlled substances do so for legitimate medical purposes.
25         Do you disagree with that statement?
```

1    **A.**    I do not.

2    **Q.**    You agree with that?

3    **A.**    Yes, Your Honor, I agree with that.

4    **Q.**    In fact, the overwhelming majority of physicians who

5    prescribe controlled substances do so in a legitimate manner

6    that will never warrant scrutiny by federal or state law

7    enforcement officials.

8         Do you agree with that?

9    **A.**    Your Honor, I do agree with that statement, too.

10   **Q.**    Do you recall when you were at the DEA that the head of

11   the Office of Diversion Control was Joseph Rannazzisi?

12   **A.**    I do, sir.

13   **Q.**    And you're aware that he has publicly stated under oath

14   in testimony that 99 point -- 99 percent of doctors

15   prescribe opioids for legitimate medical purposes?  You and

16   I have looked at that testimony together.  Correct?

17   **A.**    Your Honor, we have and I do recall that testimony.

18   **Q.**    And you agree with that testimony; correct?

19   **A.**    Yes.

20   **Q.**    You're aware that the former head of the DEA, Robert

21   Patterson, has similarly testified under oath to our United

22   States Congress that 99.99 percent of doctors are trying to

23   do right by their patients?

24   **A.**    I do not recall that testimony, hearing that testimony

25   before, Your Honor.

```
1    Q.   I've shown you that testimony.  Do you recall that?
2    A.   I do not.  99.99?  I do not.
3    Q.   Well, do you agree -- let me ask it this way.  Do you
4    agree with the statement made by Mr. Patterson of the DEA,
5    formerly of the DEA testifying in front of Congress that
6    99.99 percent of doctors are trying to do the right thing?
7         Do you agree or disagree with that statement?
8    A.   It's a difficult decision, Your Honor, because I'm
9    thinking about the approximately one million physicians in
10   the United States and calculating what one tenth of
11   one percent would be.  I guess generally I don't have any
12   information to disagree with it.
13   Q.   Okay.
14   A.   I'm not, I'm not as certain when you bring it down to
15   one tenth of one percent.
16   Q.   Okay.  No reason to disagree with it?
17   A.   No, I don't have any information to disagree other than
18   my experience in working with the DEA might taint my opinion
19   a little bit because I -- you know, prior to that, I didn't
20   have the same contact with physicians that were having
21   problems with dispensing and all other issues.  But other
22   than that, I do not, Mr. Schmidt.
23   Q.   You agree that the medical community bears some
24   responsibility for the opioid crisis; correct?
25   A.   Your Honor, I believe that probably everybody bears
```

1    some responsibility for the opioid crisis.  I, I don't think

2    that anyone can sit here today that took a role in trying to

3    combat it would ever say they did everything perfectly.

4    **Q.**    Does that include the DEA?

5    **A.**    That includes the DEA.

6    **Q.**    Does that include Joe Rannazzisi, former head of the

7    Office of Diversion Control of the DEA?

8    **A.**    I guess Mr. Rannazzisi would speak for himself.

9    **Q.**    I'm asking your view, sir.

10   **A.**    I, I've already stated I think everybody, if they were

11   able to look back and look at what they did, I don't think

12   there's anybody in America that could say, "I did everything

13   perfect."

14   **Q.**    Does that include Mr. Rannazzisi in your view?

15   **A.**    If I make a statement like that, I guess I would hope

16   that he could look back and feel the same way.

17   **Q.**    Now, I'll come back to my question and ask you about

18   doctors.  Do doctors -- do you agree that doctors bear some

19   responsibility for the opioid crisis?

20   **A.**    I believe they do.

21   **Q.**    You're testifying here as a DEA expert; correct?

22   **A.**    I don't know if I'm a DEA expert.  I'm not employed

23   anymore.  I'm an expert, I guess, with a DEA background.

24   **Q.**    Okay.  I don't want to split hairs.  You've come here

25   as an expert on DEA topics as a former employee of the DEA;

1    correct?

2    **A.**    Yes.  I just didn't want to be a DEA expert.

3    **Q.**    Are you aware of the DEA's 360 programs?

4    **A.**    Not in great detail.  It was something that was

5    starting right around my retirement.  I think it wasn't

6    really fully rolled out until after I left in 2017.

7    **Q.**    Okay.  Have you had occasion to look at the DEA's 360

8    program covering Cabell County in connection with your work

9    in this case?

10   **A.**    I have not, Your Honor.

11   **Q.**    Do you know what causes the DEA has identified through

12   their 360 project as causes of the opioid crisis in Cabell

13   County?

14   **A.**    No, I do not.

15   **Q.**    That's not something you've looked at in your work?

16   **A.**    I believe that I may have looked at a document or some

17   information regarding that.  I don't have a direct

18   recollection and I don't want to guess on that topic, Your

19   Honor.

20             MR. SCHMIDT:  May I approach, Your Honor?

21   BY MR. SCHMIDT:

22   **Q.**    I've handed you a document marked Defendants' West

23   Virginia 2628.  Do you see on the cover it says "DEA 360

24   Strategy"?

25   **A.**    I see that, Your Honor.

```
1    Q.   And if you look at Page 7 of the document --
2    A.   Okay.
3    Q.   -- do you see that it covers Cabell, among other
4    counties?
5    A.   I see that, sir.
6    Q.   It was launched in February, 2017.  Do you see that?
7    A.   I do.
8    Q.   And it covers Cabell County; correct?
9    A.   That's a correct statement, sir.
10   Q.   Do you see on Page 9 that they have a chart with
11   factors contributing to the opioid problem in West Virginia?
12   A.   I see that page, yeah, Your Honor.
13   Q.   And do you see under that the third factor is
14   over-prescribing of opioids?  Do you see that?
15   A.   I agree that that is what that statement says.
16   Q.   Do you agree that's a factor contributing to the opioid
17   problem in West Virginia, doctors over-prescribing opioids?
18   A.   I think that's a logical statement that there would be
19   some over-prescribing or prescribing issues that would lead
20   to that issue.
21   Q.   Do you see they have data and they cite someone named
22   Dr. Gupta who this Court has heard from already?
23             MR. FARRELL:  Can you give me a page number?
24             MR. SCHMIDT:  Oh, yes, of course.  I might have
25   read the wrong one, Page 9.  It's 4 on the document.  But if
```

```
 1   you look at the lower numbers, those are the numbers I'm
 2   going to be using all through the document.
 3   BY MR. SCHMIDT:
 4   Q.   Do you take any issue with the data cited here
 5   regarding prescribers over-prescribing opioids in West
 6   Virginia coming from the DEA and from Dr. Gupta?
 7   A.   Your Honor, I don't have any problems with the data.  I
 8   don't have any independent knowledge, or I haven't done any
 9   research or looked up, you know, to be able to give an
10   informed comment on that.  I don't have any reason to not
11   believe the data, sir.
12   Q.   Do you see that there's discussion in this DEA 360
13   publication citing Dr. Gupta, citing the DEA, citing the
14   National Institute on Drug Abuse talking about factors
15   contributing to the opioid problem in West Virginia?  There
16   is no mention of distributors?
17   A.   There is not, Your Honor, at least on the two pages
18   we've reviewed so far.
19            MR. SCHMIDT:  We'll move this into evidence, Your
20   Honor, Defendants' West Virginia 2628.
21            MR. FARRELL:  Objection; hearsay, foundation, and
22   geographic scope.
23            THE COURT:  How does it come in, Mr. Schmidt?
24            MR. SCHMIDT:  I think it's an official record, and
25   it's certainly a record of the type experts use and would
```

```
 1    rely on under 703.
 2              THE COURT:  Well, they can consider it under 703.
 3    That doesn't necessarily make it admissible under 703.  Is
 4    there an exception to the hearsay rule?
 5              MR. SCHMIDT:  I think it's a government
 6    publication.
 7    BY MR. SCHMIDT:
 8    Q.   Is this a document you reviewed before, Mr.
 9    Rafalski?
10    A.   I've never seen this before, sir.
11    Q.   Okay.
12              MR. SCHMIDT:  I won't move it in, then, Your
13    Honor.
14              THE COURT:  All right.
15    BY MR. SCHMIDT:
16    Q.   In terms of Cabell County and Huntington, you don't
17    know how many doctors in Cabell/Huntington -- Cabell
18    County and Huntington who wrote prescriptions for
19    opioids during the time period you were looking at in
20    this case; correct?
21    A.   Your Honor, I did not research that topic, so I do not
22    know.
23    Q.   So it follows that you conducted no analysis of how
24    many doctors were prescribing legitimately in
25    Huntington/Cabell versus illegitimately.  True?
```

1    **A.**   I did not conduct any research on that and I did not

2    look into that matter.  So I do not have an opinion on it.

3    **Q.**   I'm trying to get you off today, so I'm going to ask

4    you if you can answer just my question.  I'm just going to

5    try to ask "yes/no" questions where I can.

6    **A.**   Okay.  Your Honor, when I can answer "yes/no" I will.

7            THE COURT:  Okay.  And you can explain your answer

8    when you desire to do so.

9            THE WITNESS:  I understand, Your Honor.

10   BY MR. SCHMIDT:

11   **Q.**   Your report and your testimony doesn't identify a

12   single doctor who you have identified in Cabell County

13   or Huntington who was prescribing improperly or engaging

14   in diversion.  True?

15   **A.**   That's correct.

16   **Q.**   You talked about Dr. Ognen, a pill mill doctor you

17   investigated in -- was it Michigan?

18   **A.**   Toledo, Ohio, sir.

19   **Q.**   In Toledo, Ohio, during your work at the DEA.  Do you

20   recall that?

21   **A.**   I do.

22   **Q.**   You didn't conduct that type of investigation of any

23   doctors in Huntington or Cabell as part of your work in this

24   case; correct?

25   **A.**   I was not requested to do that type of analysis, Your

1    Honor.

2    **Q.**   So did you do it?

3    **A.**   I did not.

4    **Q.**   Okay.  You've not done any kind of analysis of the

5    medical needs for prescription opioids in Cabell County or

6    Huntington relative to the national average; correct?

7    **A.**   That's a correct statement.  I did not do that.

8    **Q.**   So it follows that you can't identify a single instance

9    where an order from McKesson or ABDC or Cardinal went to

10   fill a prescription written by a doctor in Cabell County or

11   Huntington where the doctor was prescribing improperly or

12   engaging in diversion.  True?

13   **A.**   I don't think that's a true statement.

14   **Q.**   Which doctors had prescriptions filled by one of these

15   defendants that was acting improperly or engaging in

16   diversion?

17   **A.**   Well, I'm aware of an incident through reviewing of

18   records, doing some research on some of the records for some

19   of the pharmacies that there was a, a pharmacy located in

20   Huntington that was filling prescriptions for the whole pain

21   clinic.

22   **Q.**   Okay.

23   **A.**   And all 12 of the people involved with the whole pain

24   clinic were all indicted.

25            During the time frame that those doctors were

1    prescribing, they were filling prescriptions.  There was a

2    pharmacy or pharmacies in this area filling prescriptions

3    for them.

4         Now, I don't have any independent knowledge to say

5    those specific prescriptions.  But based on the totality of

6    all the circumstances, I would say it's likely that there

7    were prescriptions issued that were illicit during that time

8    period.

9    **Q.**   Do you know of any pills shipped by McKesson, ABDC, or

10   Cardinal that specifically went to a pill mill doctor or an

11   improper prescription?

12   **A.**   As I just testified, I think in this case it's likely.

13   I think the pharmacy I recall being was a customer of

14   McKesson.

15   **Q.**   Do you know if that happened?

16   **A.**   The distribution?

17   **Q.**   Yes, the distribution of pills -- you just mentioned

18   McKesson -- by McKesson that went to fill a prescription

19   that was written by a pill mill doctor?

20   **A.**   I don't know that they filled that specific

21   prescription.  I just know they went to the pharmacy.

22   **Q.**   What was that McKesson customer?

23   **A.**   I'm drawing a blank on it.

24   **Q.**   It's no one you mentioned in your report; correct?

25   **A.**   It's not in my report, no, sir.

1   **Q.**   It's no one you mentioned in your testimony; correct?

2   **A.**   Not so far, that's correct.

3   **Q.**   And you realize we're done with your affirmative

4   testimony from Mr. Farrell; correct?

5   **A.**   I am.

6   **Q.**   Okay.  In a similar vein, are you aware of any pills

7   that were shipped by McKesson, ABDC, or Cardinal that ended

8   up filling a prescription that was dispensed other than in

9   response to a licensed prescriber writing a prescription?

10  **A.**   No, I'm not, Your Honor.

11  **Q.**   Let's talk about pharmacies.  Pharmacies dispense

12  prescription opioids in response to prescriptions; correct?

13  **A.**   That's correct, sir.

14  **Q.**   And the DEA registers the pharmacies, and the West

15  Virginia Board of Pharmacy licenses the pharmacies in West

16  Virginia; correct?

17  **A.**   That's correct.

18  **Q.**   And both of those, that registration, that licensing

19  are both important; correct?

20  **A.**   Yes.  It's required by law.

21  **Q.**   You're not aware of Cardinal, ABDC, or McKesson ever

22  supplying a pharmacy that was not licensed by the DEA?

23  **A.**   I do not, Your Honor.

24  **Q.**   You understand that under DEA rules when you were at

25  the DEA and to this day that pharmacies have a corresponding

1    responsibility to that of the doctor when it comes to

2    prescriptions?

3    **A.**    Yes, but, more specifically, the pharmacist.

4    **Q.**    The pharmacist?

5    **A.**    Not the pharmacy.

6    **Q.**    What is that corresponding responsibility that a

7    pharmacist has?

8    **A.**    They're supposed to ensure that that prescription was

9    issued for a legitimate medical need and, if necessary, that

10   there was a proper doctor/patient relationship.

11        If while filling the prescription they identify any

12   anomalies or red flags, they have an obligation to resolve

13   those before issuing the prescription.

14   **Q.**    And that language, that corresponding responsibility is

15   written into the regulation; correct?

16   **A.**    It is a regulation, sir.

17   **Q.**    There's no reference to a corresponding responsibility

18   of distributors, correct, in the regulation?

19   **A.**    There is not.

20   **Q.**    So is it accurate to say that pharmacies have

21   meaningful responsibilities when it comes to prescription

22   opioids?

23   **A.**    Yes, but, more specifically, pharmacists.

24   **Q.**    Are you aware of any prescription in this case relating

25   to the defendants that was dispensed without a pharmacist

1     present with that pharmacist having that corresponding

2     responsibility?

3     **A.**   I am not, Your Honor.  That was not part of what I did

4     research for for my report.

5     **Q.**   And it's because of that corresponding responsibility

6     that pharmacists have that at the DEA they're often referred

7     to as the last line of defense against diversion; correct?

8     **A.**   I've never heard that specific term about pharmacists

9     but --

10    **Q.**   Okay.

11    **A.**   -- I don't dispute that that could be a term used.

12    **Q.**   You never heard that in your work at DEA?

13    **A.**   No, I did not.

14    **Q.**   Okay.

15    **A.**   I, I heard that used for other entities in the closed

16    system, but not for pharmacists.

17    **Q.**   A pharmacy can't dispense a prescription opioid without

18    having a prescription from a licensed healthcare prescriber

19    and properly evaluating it.  True?

20    **A.**   Could you say the end again?  I'm sorry.

21    **Q.**   Sure.  A pharmacy can't dispense prescription opioids

22    without having a prescription in hand from a licensed

23    healthcare professional and properly evaluating it.

24    Correct?

25    **A.**   Generally speaking.  There's some emergency provisions,

1    Your Honor, where the prescription can follow-up within a

2    certain time frame.  So that's part of having it in hand.

3    But, basically, that's a true statement, Your Honor.

4    **Q.**    All right.  And that statement is true no matter how

5    many prescription opioids are distributed; correct?

6    **A.**    That's correct.

7    **Q.**    The number of pills that a pharmacy dispenses are

8    directed by the number of prescriptions written by

9    healthcare professionals.  True?

10   **A.**    Generally speaking, yes.

11   **Q.**    You don't know how many pharmacies dispensed

12   prescription opioids during the time period you were looking

13   at in Cabell County and Huntington; correct?

14   **A.**    I don't know them off of my -- off the top of my head,

15   but I do have a chart where I have for the three defendants

16   the number of pharmacies.  The totality of all the

17   pharmacies, if there were ones that were receiving

18   controlled substances outside of the three defendants, I

19   would not have those.  So --

20   **Q.**    You weren't -- you weren't tasked with evaluating the

21   pharmacies in Cabell County and Huntington in terms of

22   whether they were complying with their legal obligations;

23   correct?

24   **A.**    That's correct, Your Honor.  I wasn't evaluating

25   pharmacies.

1    **Q.**   You weren't asked to review specific pharmacy records,

2    how the records were maintained, whether they were

3    dispensed, whether their corresponding responsibility was

4    fulfilled by the pharmacists; correct?

5    **A.**   That's a correct statement, Mr. Schmidt.

6    **Q.**   So you did not undertake those reviews; correct?

7    **A.**   I did not, Your Honor.

8    **Q.**   Correspondingly, you do not know of any pharmacies in

9    Cabell County or Huntington -- let me actually ask you a

10   different question.  You're not offering any opinions about

11   whether diversion occurred at a pharmacy level; correct?

12   **A.**   I haven't put that opinion in my report, so I guess

13   that's a true statement, Your Honor.

14   **Q.**   You understand that some of the large pharmacy chains

15   act as distributors themselves by self-distributing to

16   themselves; correct?

17   **A.**   There's -- it's a possibility for a pharmacy, but

18   there's a rule, a percent rule of how much they can do that.

19   **Q.**   With respect, I didn't ask you -- I just asked you if

20   it's correct.  Is it correct that some chain pharmacies

21   self-distribute?

22   **A.**   General knowledge, I know that.  As far as within

23   Cabell County and Huntington, I don't have any knowledge of

24   that occurring.

25   **Q.**   Do you know of any pharmacy, chain pharmacy in

1    Huntington or Cabell County that self-distributes?

2    **A.**   No, I do not.

3    **Q.**   Okay.  Some of the pharmacies that are large chains are

4    pharmacies like CVS, Walgreens, Rite-Aid; correct?

5    **A.**   Yes.

6    **Q.**   And you know they self-distribute in other locations;

7    correct?

8    **A.**   I know I've seen things where they might transfer

9    controlled substances back and forth to each other, which is

10   permissible.

11   **Q.**   This is now, by my count, the fifth case where you're

12   giving opinions against various defendants, is that correct,

13   regarding prescription opioids?

14   **A.**   Yes.

15   **Q.**   In other cases you've given the opinions that those

16   chain pharmacies I mentioned have caused the opioid crisis;

17   correct?

18   **A.**   Yes.

19   **Q.**   In fact, you're going to leave this court and go to

20   give a deposition in another case where you're giving the

21   opinion that those chain pharmacies in another jurisdiction

22   have caused the opioid crisis; correct?

23   **A.**   That's correct.

24   **Q.**   You know that they had stores in Huntington/Cabell;

25   correct?

1    **A.**    They do.

2    **Q.**    Did you listen to Dr. McCann when he testified in

3    court?

4    **A.**    I did.

5    **Q.**    Did you hear him acknowledge that if you remove

6    McKesson's GA shipments, its share of distribution to

7    Huntington/Cabell is lower -- it's number 6 -- lower than

8    several of those chain pharmacies?

9    **A.**    I, I don't recall specifically that testimony.  I know

10   you and I have discussed that before also.  I don't disagree

11   with that statement.

12   **Q.**    Okay.  Thank you.  And you don't know if those

13   pharmacies that you're going next week or the week after to

14   testify about in another case but have not given opinions

15   about here helped cause the opioid crisis in

16   Huntington/Cabell; correct?

17   **A.**    Would you say that again, please?

18   **Q.**    Sure.  You don't know if those pharmacies we were just

19   talking about, those pharmacy chains, if they helped cause

20   the opioid crisis in Huntington/Cabell, do you?

21   **A.**    I do not, Your Honor.

22   **Q.**    Let's talk about manufacturers.  They actually make the

23   prescription opioids; correct?

24   **A.**    That is correct.

25   **Q.**    They're the ones charged with studying prescription

1    opioids.  True?

2    **A.**    Some of them, yes.

3    **Q.**    Before and after approval; correct?

4    **A.**    Yes, some of them, yes.

5    **Q.**    They're the ones that get FDA approval for them;

6    correct.

7    **A.**    That's correct.

8    **Q.**    And you're aware that manufacturers market prescription

9    opioids in various ways to doctors; correct?

10   **A.**    I'm aware of that, Your Honor.

11   **Q.**    In fact, I want to show you a document that you relied

12   on in that proposition.  This is a December, 2003, General

13   Accounting Office Report, Prescription Drugs, Oxycontin

14   Abuse and Diversion and Efforts to Address the Problem.

15        This is one of the documents you relied on in forming

16   your opinions; correct?

17   **A.**    I believe it's on my reliance list, yes, sir.

18            MR. SCHMIDT:  We move this into evidence, Your

19   Honor, MC-WV-1764.

20            THE COURT:  Any objection?

21            MR. FARRELL:  None.

22            THE COURT:  It's admitted.

23   BY MR. SCHMIDT:

24   **Q.**    Let's put that up on the screen, please.  Do you

25   see there the cover page I just read from?  Do you see

1    that?

2    **A.**    Yes, sir.

3    **Q.**    I'd like to ask you, if I could, to go to Page 2 of the

4    PDF, please.

5            MR. SCHMIDT:  And, again, just for reference for

6    the Court and the witness, it will be the little number in

7    the lower left-hand corner.  That will always be the number

8    I'll refer to.

9            THE WITNESS:  I've got it, sir.

10   BY MR. SCHMIDT:

11   **Q.**    Do you see it says why GAO did this study on the

12   left-hand column?

13   **A.**    Yes, top of the left-hand column.

14   **Q.**    Yes.  And at the bottom it talks about GAO reviewing

15   three things.  Do you see that?

16          Why don't you highlight it.

17   **A.**    I see it, sir, bottom of that same paragraph.

18   **Q.**    I want to focus on the second thing:  What factors

19   contributed to the abuse and diversion of Oxycontin.  Do you

20   see that?

21   **A.**    Yes.

22   **Q.**    Is that your understanding that that was one of the

23   purposes of this report to evaluate, in the words of the

24   GAO, what factors contributed to the abuse and diversion of

25   Oxycontin?

1    **A.**   I see that.  I don't disagree with it.

2    **Q.**   Do you agree with it?

3    **A.**   I said I do not disagree with it.  I agree.

4    **Q.**   I asked it the other way.

5    **A.**   I understand, same answer.

6    **Q.**   Okay.  Let's look at Page 8 again in the lower

7    left-hand corner.

8         And do you see that the GAO says -- I'm looking at the

9    bottom full paragraph.  They say, "To identify how Purdue

10   marketed and promoted Oxycontin, we interviewed Purdue

11   officials and analyzed company documents and data."

12        And then it says they also reviewed Purdue sales

13   representatives.  Do you see that?

14   **A.**   I do.

15   **Q.**   So when you cited this report, did you have the

16   understanding that the GAO not only interviewed Purdue

17   officials and sales reps, but they went into their documents

18   and their data?

19   **A.**   That's what the document says.

20   **Q.**   You don't take issue with that; right?

21   **A.**   I do not.

22   **Q.**   Let's go to the next page, please.  And if we look in

23   the top paragraph, toward the bottom of that top

24   paragraph --

25        Will you cull out that top paragraph, please?

1    They say, "We also interviewed --" I'm sorry.  They

2    say, "We interviewed FDA officials and examined FDA

3    information regarding the drug's approval and marketing and

4    promotion."

5        Do you see that?

6    **A.**   I see that, sir.

7    **Q.**   "We also interviewed DEA officials and examined how DEA

8    determined the prevalence of Oxycontin abuse and diversion

9    nationally."

10        Do you see that?

11   **A.**   I see that, Your Honor.

12   **Q.**   And do you understand that to be an accurate statement

13   of what was done in this report?

14   **A.**   That's what the report says.

15   **Q.**   You don't take any issue with that?

16   **A.**   No.  I don't know either way.  I don't take issue with

17   it, no, sir.

18   **Q.**   Let's look at the next paragraph, please, below

19   "Results."  They say "Results in Brief."

20        First sentence:  "Purdue conducted an extensive

21   marketing campaign --" I'm sorry.  Let me start again.

22        "Purdue conducted an extensive campaign to market and

23   promote Oxycontin using an expanded sales force and multiple

24   promotional approaches to encourage physicians, including

25   primary care specialists, to prescribe Oxycontin as an

1    initial opioid treatment for cancer [sic] pain."

2         Do you recognize the truth of that matter as a factual

3    matter?

4    **A.**   Yeah.  Even outside of this publication --

5    **Q.**   Yes.

6    **A.**   -- I recognize that statement.

7    **Q.**   Further down do you see that reference to DEA?  We've

8    got it highlighted on the screen.

9    **A.**   Oh, yeah.

10   **Q.**   "DEA has expressed concerns that Purdue's aggressive

11   marketing of Oxycontin focused on promoting the drugs to

12   treat a wide range of conditions to physicians who may not

13   have been adequately trained in pain management."

14        Do you see that?

15   **A.**   I do see that.

16   **Q.**   And do you take any issue with that finding?

17   **A.**   I do not, Your Honor.

18   **Q.**   Okay.  Now, let's go to Page 18, please.

19   **A.**   I'm sorry?

20   **Q.**   Page 18, please.

21   **A.**   18?

22   **Q.**   Yes, sir.  Again, in the bottom lower left corner.

23        Just very quickly, do you see that there is a

24   discussion of the DEA's regulation of controlled substances?

25   **A.**   I do.

1    **Q.**   And it discusses in the sentence, "DEA has the

2    authority to regulate transactions involving the sale and

3    distribution of controlled substances at the manufacturer

4    and wholesale distributor levels."

5         And then it goes on to talk about registrations.  Do

6    you see that?

7    **A.**   I do.

8    **Q.**   You understand that this report talks -- let's go back

9    to that second page, please, and that language I culled out

10   to you; what factors contributed to the abuse and diversion

11   of Oxycontin.  Do you see that?

12   **A.**   Yes.

13   **Q.**   You understand that this report talks about Purdue as a

14   factor that contributed to the abuse and diversion of

15   Oxycontin?

16   **A.**   I believe that's a true statement, sir.

17   **Q.**   There's no discussion in here, despite those DEA

18   interviews you talked about, about distributors as a factor

19   that contributed to the abuse and diversion of Oxycontin.

20   True?

21   **A.**   It's a lengthy document and I don't have a full

22   recollection of it.  I, I don't know that there's any

23   mention of distributors in there.

24   **Q.**   Okay.

25   **A.**   I don't think I'm going to have time to read it here

1    today.

2    **Q.**    I'm not going to ask you to do that.  I'll stand on

3    your recollection which I believe to be accurate.

4         Now, manufacturers can't sell prescription opioids or

5    make them unless they're licensed by both the DEA and the

6    state; is that correct?

7    **A.**    That's a correct statement, yes, sir.

8    **Q.**    And they can only make as many prescription opioids as

9    allowed by the DEA for its annual quota; correct?

10   **A.**    That's a correct statement, Your Honor.

11   **Q.**    You've offered opinions in some of your other cases

12   that at least some other manufacturers helped cause the

13   opioid crisis; correct?

14   **A.**    That's a correct statement, Your Honor.

15   **Q.**    And every one of those other manufacturers made

16   prescription opioids that were sold and used in Cabell

17   County and Huntington; correct?

18   **A.**    I don't know the accuracy of that statement.

19   **Q.**    Okay.  Can you carve any out that weren't --

20   **A.**    No, I cannot but I, I don't have any definitive

21   knowledge of any that did.  I think it's a logical statement

22   that manufacturers sent manufactured products into the

23   county.  But to name them specifically, I can't do that.

24   **Q.**    You're not offering opinions against any manufacturers

25   here; correct?

1    **A.**    I am not and I was not asked to.

2    **Q.**    And that's why you're not offering opinions because the

3    lawyers didn't ask you; correct?

4              MR. FARRELL:  Objection, Your Honor,

5    argumentative.

6              THE COURT:  What's the basis of the objection?

7              MR. FARRELL:  It's argumentative referencing

8    plaintiffs' lawyers.

9              THE COURT:  Overruled.

10        You can answer if you can.

11             THE WITNESS:  I can.  I was not asked to review

12   and to provide a report in regard to the manufacturers, Your

13   Honor.

14   BY MR. SCHMIDT:

15   **Q.**    And that's why you did not; correct?

16   **A.**    Yes.  I only did what I was asked to do.  I didn't go

17   outside of the scope of that.

18   **Q.**    And that's true even though in other jurisdictions you

19   have identified specific manufacturers as engaging in worse

20   conduct than you allege against any manufacturer here;

21   correct?

22   **A.**    I only provided opinions on those companies or drug

23   companies or manufacturers or distributors that I was asked

24   to.  That's a correct statement, yes.

25   **Q.**    I was asking you something different, sir.  Let me try

1    it a little differently.

2         You recognize that the companies, the manufacturers

3    you've testified about in other cases, you have alleged even

4    worse conduct against them than you have alleged against the

5    defendants here; correct?

6    **A.**   I don't think it's worse.  I think it's the same on

7    maintenance of effective controls to prevent diversion.

8    **Q.**   Every defendant here has had a SOMS for years and years

9    and years; correct?  A Suspicious Order Monitoring Program;

10   correct?

11   **A.**   Yes.

12   **Q.**   And you've alleged at least one manufacturer never had

13   one all the way up until 2018; correct?

14   **A.**   I don't directly recall that in one of my reports.  I'm

15   not saying it doesn't appear, but I don't have any direct

16   recollection right now of that, Your Honor.

17   **Q.**   You said that about a company called Insys, didn't you,

18   that they never had a SOMS all the way through 2018?

19   **A.**   I don't think I've provided an opinion on Insys.

20   **Q.**   Let's just cull it up on the screen.  Can we cull up

21   tab 14, Mr. Rafalski's MDL expert report?  Page 187, please.

22              MR. FARRELL:  Judge, I'm going to object.  I think

23   this is, first of all, improper impeachment if that's what

24   it is; or if he's going to refresh the witness's

25   recollection, then he should do so by presenting it first.

1          More importantly, this is outside the scope of the

2     purpose and role of Mr. Rafalski in this case.  As the Court

3     is aware, and the defendants are certainly aware, the reason

4     this case got remanded was because of a stipulation severing

5     the other defendants.

6          So to characterize Mr. Rafalski's testimony in the way

7     that Mr. Schmidt is doing so is contrary to the record, is

8     unfair to the witness, and is argumentative.

9               MR. SCHMIDT:  I think it's a fundamental

10    methodological question of why he's focusing on these

11    defendants and the role of other defendants.  I don't

12    understand how he could give a single opinion as he did at

13    the end when he gave a series of *ipsa dixit* opinions.

14              THE COURT:  I agree.  I think that this is proper

15    cross-examination.  He's issued other reports.  You're

16    entitled to inquire about his conclusions in his reports and

17    see if they're consistent with what he said here.  I'll let

18    you do it.

19              MR. SCHMIDT:  Thank you, Your Honor.

20         Could we go to Page 187, please?

21    BY MR. SCHMIDT:

22    **Q.**   Do you see your signature right there?

23    **A.**   I do.

24    **Q.**   Do you recognize that as your signature?

25    **A.**   That is my signature.

1   **Q.**   Dated April 15th, 2019?

2   **A.**   Yes, sir.

3   **Q.**   And do you see item 4 right above your signature,

4   "Deposition testimony by current Insys employees has

5   confirmed that Insys failed to implement any SOMS system or

6   maintain any SOMS protocols until 2018."

7          Do you see that?

8   **A.**   I see that, Your Honor.

9   **Q.**   Were you being truthful when you provided that report,

10  sir?

11  **A.**   I was.  I just didn't recall it, sir.

12  **Q.**   Let me ask you now about distributors.  Distributors

13  ship medications from the manufacturers that make them to

14  pharmacies and other entities that dispense them; correct?

15  **A.**   Yes, any registrant that has the ability to purchase

16  them, yes, sir.

17  **Q.**   In doing that, distributors play an important role in

18  ensuring an adequate and uninterrupted supply of legitimate

19  prescription opioids; correct?

20  **A.**   I believe that's the role -- one of the roles of a

21  distributor, yes, sir.

22  **Q.**   They don't fill prescriptions brought to them.  That's

23  the role of the pharmacy.  Correct?

24  **A.**   That's correct, Your Honor.

25  **Q.**   They don't check the prescriptions that patients bring

1    into a pharmacy; correct?

2    **A.**    That's a correct statement.

3    **Q.**    In fact, they don't have access to individual patient

4    prescriptions or individual patient data; correct?

5    **A.**    That's a correct statement.

6    **Q.**    Privacy laws actually prevent that; correct?

7    **A.**    HIPAA requirements would prohibit that, sir.

8    **Q.**    Those are privacy laws; right?

9    **A.**    Yes, they are.

10   **Q.**    So distributors don't have the information to evaluate

11   the medical need of an individual patient presenting an

12   individual prescription; correct?

13   **A.**    That's a correct statement, Your Honor, they do not.

14   **Q.**    You're not aware of any instance where one of the three

15   distributors in this case directly interacted with a doctor

16   or a patient in Huntington or Cabell County, are you?

17   **A.**    I'm not aware if that occurred, sir.

18   **Q.**    Let me ask you a question about the relationship

19   between pharmacies and distributors.  You're aware that when

20   a distributor cuts off a customer, it's common that that

21   pharmacy will go find another distributor to supply its

22   pills; right?

23   **A.**    That's true, yes, sir.

24   **Q.**    In fact, in your work experience you're aware of no

25   instance ever when a pharmacy has cut off -- I'm sorry -- a

```
 1    distributor has cut off a pharmacy and that pharmacy has
 2    gone out of business because they can't find another
 3    distributor; correct?
 4    A.   No, I'm not, not immediately.
 5    Q.   What does cut off a pharmacy is if the DEA pulls the
 6    pharmacist's registration -- or I'm sorry -- the pharmacy's
 7    registration; correct?
 8    A.   Yes.  If the DEA or the state was to remove the
 9    licensure from the pharmacy, they would stop immediately.
10    Q.   You agree that there are hundreds of distributors in
11    the United States?
12    A.   Yes.
13    Q.   And you agree from reviewing Dr. McCann's data that
14    dozens of distributors supply pharmacies in Huntington and
15    Cabell?
16    A.   Dozens?  I think that may be a little high, but I
17    don't, I don't have any direct recollection to dispute that.
18    Q.   Dr. McCann testified it was 36.  Is that accurate?
19    A.   If he testified, then that's accurate.
20    Q.   Okay.  And that's two and a half dozen; right?
21    A.   Yes.
22    Q.   You conducted no analysis of the distributors that
23    shipped into Huntington and Cabell County other than
24    McKesson, Cardinal, and ABDC; correct?
25    A.   That's correct, Your Honor.  Those are the only three I
```

1  reviewed.

2  **Q.**   To take one example of the distributors you failed to

3  address, the distributor Miami-Luken had a high level of

4  conduct in West Virginia; correct?

5  **A.**   I'm aware that they were distributing also into the

6  county and the city at considerable amounts, Your Honor.

7  **Q.**   Do they still exist?

8  **A.**   I believe they do.  I think they have some legal

9  matters pending, but I think they still have their

10 registration.

11 **Q.**   What are those legal matters pending?

12 **A.**   I believe there are some criminal charges pending

13 against the company.

14 **Q.**   And you did no analysis of Miami-Luken's efforts to

15 prevent diversion and comply with the CSA; correct?

16 **A.**   I was not asked to do that.  No, Your Honor, I did not.

17 **Q.**   Did you look at a pharmacy called A-Plus Pharmacy in

18 your work?

19 **A.**   In Cabell and Huntington?

20 **Q.**   Yes.  It was a Miami-Luken pharmacy.

21 **A.**   I believe so.

22 **Q.**   Do you know that -- then you know that ABDC, Cardinal,

23 and McKesson never supplied A-Plus Pharmacy?

24 **A.**   I'm not sure on that, sir.

25 **Q.**   Well, did you see in Dr. McCann's data that they never

```
 1    supplied?
 2    A.    I'm sure in all of that data, that data exists, but I
 3    don't directly recall that.  If you have something to
 4    refresh my memory, I'm welcome to look at it.
 5    Q.    Sure.  Let's do that.
 6          Can we cull up McCann Appendix A, Page 1,056.
 7          I'll just use this for demonstrative purposes, Your
 8    Honor, if I may approach.  I'm sorry for not asking that.
 9              THE WITNESS:  Thank you.
10    BY MR. SCHMIDT:
11    Q.    Do you recognize this as a table from Dr. McCann?
12    A.    I do.
13    Q.    Regarding Miami-Luken -- sorry -- regarding A-Plus
14    Pharmacy?
15    A.    Yes, up in the left-hand corner, A-Plus Pharmacy on 3
16    Chateau Lane.
17    Q.    Who is the only supplier of A-Plus Pharmacy?
18    A.    Miami-Luken.
19    Q.    Did you conduct any analysis of the amount of diversion
20    in Huntington or Cabell that A-Plus Pharmacy was responsible
21    for?
22    A.    I did not.
23    Q.    Do you know if it was 50 percent?  90 percent?
24    99 percent?
25    A.    I don't understand the question, sir.
```

1    **Q.**   Do you know how much of the pharmaceutical diversion

2    you allege occurred in Huntington or Cabell County was

3    attributable to Miami-Luken -- I'm sorry -- to A-Plus

4    Pharmacy?

5    **A.**   It would not be 99 percent with these numbers.

6    **Q.**   Do you know how much it is?

7    **A.**   I do not.

8    **Q.**   Do you know if it's more or less than 50 percent?

9    **A.**   It would be less than 50 percent.

10   **Q.**   And how do you know that?  Have you looked at their

11   orders?

12   **A.**   Well, I'm looking at the numbers here.

13   **Q.**   Have you looked at the actual orders to see which --

14   whether they were more or less likely to be diverted than

15   orders from other pharmacies?

16   **A.**   Oh, I misunderstood your question.  I thought you meant

17   in relation to the totality of distributions.

18   **Q.**   No, I meant specifically diversion.  Do you know how

19   much of the diversion they accounted for that you believe

20   occurred?

21   **A.**   I do not.

22   **Q.**   Do you know the percentage?

23   **A.**   I do not.

24   **Q.**   Okay.  You've addressed another distributor in some of

25   your other cases; correct?

1    **A.**    Possibility.  Tell me who.

2    **Q.**    Henry Schein.

3    **A.**    I did.

4    **Q.**    And do you know if Henry Schein distributed

5    prescription opioids in Huntington and Cabell?

6    **A.**    I believe I recall seeing them in some of Dr. McCann's

7    charts.

8    **Q.**    Is that another entity that you did not give an opinion

9    on here because the lawyers did not ask you to?

10              MR. FARRELL:  Objection, Your Honor.  This is

11   beginning to get cumulative again.  The defendants and the

12   plaintiffs stipulated to the severance of all of the other

13   defendants as a necessary condition for remand.

14        So he's made his point that there are other

15   distributors.  But to continue to blame this on the

16   plaintiffs' lawyers is a mischaracterization of the

17   procedural history of this case.

18              MR. SCHMIDT:  We don't agree with the procedural

19   history, Your Honor, but it's beside the point because he

20   easily could have done it if he was doing a complete report.

21   It's relevant to what he didn't do.

22              THE COURT:  I think this is proper

23   cross-examination that goes to the legitimacy and accuracy

24   of his report and is relevant and I'll overrule the

25   objection.

```
1              MR. SCHMIDT:  Thank you, Your Honor.

2              THE WITNESS:  Yes.  I'm sorry.  Could you repeat

3    that, Mr. Schmidt?

4    BY MR. SCHMIDT:

5    Q.   Of course.  Is the reason you did not give an

6    opinion here against Henry Schein because the

7    plaintiffs' lawyers didn't ask you to?

8    A.   That's a correct statement, Your Honor.  I was not

9    asked to.

10   Q.   And, in fact, there are a total of 10 defendants in

11   other cases that you have given opinions against that you

12   did not give an opinion against here for the sole reason

13   that the plaintiff lawyers did not ask you to; correct?

14   A.   That's a correct statement, Your Honor.  I only gave an

15   opinion on those companies that I was asked to.

16   Q.   Now, let me ask you some questions about the DEA.  The

17   DEA oversees the closed system of distribution.  True?

18   A.   They do.

19   Q.   They have an obligation to oversee all registrants who

20   handle controlled substances.  True?

21   A.   Yes, they do, Your Honor.

22   Q.   And all those entities we've been discussing,

23   distributors, manufacturers, pharmacies, prescribers, they

24   oversee them through registration and otherwise; correct?

25   A.   Through the registration process, yes, sir, and the
```

1    regulations.

2    **Q.**   You agree with me that we as United States citizens

3    should be able to rely on the DEA to carry out their

4    obligations under the law; correct?

5    **A.**   I think that's a reasonable expectation of the DEA or

6    any government entity.

7    **Q.**   And those obligations include the registration and

8    re-registration of the prescribers who can write

9    prescriptions for opioids; correct?

10   **A.**   That's one of the responsibilities, yes, sir.

11   **Q.**   Those obligations we should be able to rely on include

12   registering and re-registering the pharmacies that dispense

13   prescription opioids; correct?

14   **A.**   That's a correct statement, Your Honor.

15   **Q.**   If DEA fails to exercise its obligation to oversee

16   registrants appropriately, that can result in diversion of

17   opioids.  True?

18   **A.**   I think generally that's an accurate statement if they

19   weren't able to do that.

20   **Q.**   And in that regard, you agree that over the course of

21   the opioid statement, the DEA has probably registered,

22   issued controlled substance registrations to over a thousand

23   pill mill doctors?

24   **A.**   Well, I think that possibly could be a true statement,

25   Your Honor.  I don't know that they had knowledge that they

1    were pill mill doctors when they issued the registration.  I

2    don't have any direct knowledge of that occurring.

3    **Q.**   You would agree with that statement, sir?  Yes?

4    **A.**   No, I, I wouldn't agree with that.

5    **Q.**   Okay.  Let's -- do you recall giving testimony in front

6    of the judge in New York on August 17th, 2020, as part of a

7    *Frye* hearing?

8    **A.**   Yes.

9    **Q.**   Do you recall testifying truthfully in that proceeding?

10   **A.**   I do.

11   **Q.**   Let's cull up Page 225 of that testimony, August 17th,

12   2020.  And if we could look at pages -- at lines -- this

13   appears to be the wrong page.  I need page -- I might have

14   the wrong page number.  Yeah, I seem to have the wrong page

15   number.

16        Let me come back to that, sir.

17        Do you agree with me that a pill mill doctor should

18   never be registered?

19   **A.**   I agree with that statement 100 percent, Mr. Schmidt.

20   **Q.**   And you don't agree with me that over the course of the

21   opioid epidemic, the DEA probably licensed over a thousand

22   pill mill pharmacies; correct?

23   **A.**   So just so I answer that, you know, properly, if I

24   understand the question, might they have issued

25   registrations to doctors that were pill mill doctors, I

1    don't know of any where they actually had knowledge they

2    were pill mill doctors.  But if it occurred through renewals

3    and situations like that, then that's a possibility.

4    **Q.**   Are you aware that the DEA actually had a policy of

5    refusing to tell distributors whether or not they should

6    distribute to a given pharmacy?

7    **A.**   I'm aware of I think prior to my employment that there

8    was an issue in regards to the DEA publishing a list or

9    something of that matter that caused some concern, and they

10   stopped after that point forward.

11   **Q.**   So let's break that down a little bit.  There was a

12   period of time prior to your employment where the DEA

13   actually told distributors, "These might be problematic

14   pharmacies."  Right?

15   **A.**   I don't think it was a period of time.  I think an

16   employee of the DEA sent out a list.

17   **Q.**   Okay.  There was some point in time at which someone at

18   the DEA told distributors, "These are pharmacies you might

19   want to watch out for"?

20   **A.**   More accurately, I know that it happened once, Your

21   Honor.  I don't know if it was a regular occurrence or any

22   longer.  But I just -- I know there was some training in the

23   academy or something came out about that incident so that it

24   didn't happen again.

25   **Q.**   And do you know how many times that happened, how

1    regular a practice it was?

2    **A.**   I do not.

3    **Q.**   Do you know if it happened five years?  Ten years?

4    **A.**   Oh, I don't believe it happened that long.

5    **Q.**   So how long did it happen?

6    **A.**   I don't know, but I don't believe it happened for that

7    length of time, sir.

8    **Q.**   Was it before your time?

9    **A.**   Yes, it was.

10   **Q.**   Okay.  During your time, the DEA had a policy that

11   prohibits DEA investigators from calling and telling people

12   whether or not to distribute a drug or not to distribute to

13   a given pharmacy; correct?

14   **A.**   That's been a long-standing rule with the DEA.  We do

15   not tell -- if you're talking about a shipment, shipping,

16   there's a rule in the DEA since I've been hired that we

17   don't tell a registrant whether or not to ship.

18         We also are trained and we're told repeatedly we do not

19   tell a pharmacist whether or not to issue a prescription.

20   That's, that's, that's the decision that rests on that

21   registrant, Your Honor.

22   **Q.**   That includes not telling them if you have concerns

23   about a pharmacy they're supplying.  True?

24   **A.**   I wouldn't say that's a fully true statement.  I

25   think -- and I don't remember directly right now, but

1    there's been times when I was a DEA investigator I'd have a

2    week -- every fifth or sixth week I have a duty assignment.

3    The duty assignment is for the whole week I answer phone

4    calls from registrants all over the areas we cover.

5         So there would be times when somebody would call and

6    would have some questions; a pharmacist about a

7    prescription.  I can't tell a pharmacist to fill it or not,

8    but I can generally ask some questions and discuss the

9    corresponding responsibility.  And through that

10   conversation, I think the pharmacist was able to make a

11   better decision.

12        I don't remember directly with the distributor having

13   that same kind of conversation.  I know I've had on-site

14   discussions about, you know, whether or not to ship.  And I

15   think there's been discussions in my career where I've had

16   those similar discussions.

17             MR. SCHMIDT:  Your Honor, he's answering questions

18   I'm not asking.  I didn't ask about discussions with

19   pharmacists and general guidelines and issuing

20   prescriptions.  I asked him a simple question about whether

21   he --

22             THE COURT:  Well, just try to answer the specific

23   question.

24             THE WITNESS:  Okay.  I understand, Your Honor.

25             THE COURT:  But he can explain his answer.  So

1    there's kind of a gray area between those two propositions.

2              MR. SCHMIDT:  Understood, Your Honor.

3    BY MR. SCHMIDT:

4    **Q.**   Do you know of a time where you were investigating

5    a pharmacy and you made a point of telling the

6    distributors, "Don't ship to that pharmacy because we're

7    investigating it"?

8    **A.**   I've never made a direct statement like that.  That

9    would be against the policy of the DEA.

10   **Q.**   If a distributor called you up and said, "Should we

11   ship to this pharmacy?" And you were conducting an

12   investigation of that pharmacy, would you tell them?

13   **A.**   What would I tell them?

14   **Q.**   Would you tell them that you were conducting an

15   investigation?

16   **A.**   I would not.

17   **Q.**   And you understand sometimes your investigations could

18   go on for years and years and years; correct?

19   **A.**   That's a correct statement, Your Honor.

20   **Q.**   If they called you up every month during those years

21   and years and years and said, "Should we ship to this

22   pharmacy?" You would not tell them, "We are investigating

23   this pharmacy."  Correct?

24   **A.**   I might not make that statement.  I may have made some

25   other kind of statement.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   It would be against policy to tell them you were

2    investigating that pharmacy, true, as you understand it and

3    just articulated it two minutes ago?

4    **A.**   I don't know that there's a written policy.  That's

5    just kind of a standing understanding when I worked in the

6    DEA you didn't disclose an investigation.

7         But, on the other hand, to answer that question -- and

8    I don't want to go on and get in trouble again, Your Honor,

9    but if there was some public harm, the criminal

10   investigation wouldn't take precedence over public harm and

11   public safety.

12   **Q.**   Are you aware of the DEA ever telling one of the

13   distributors in these cases not to distribute to a pharmacy

14   in Huntington/Cabell?

15   **A.**   I'm not aware of that, no, sir.

16   **Q.**   The public should be able to rely on the DEA to act on

17   suspicious orders as appropriate; correct?

18   **A.**   I think that's an accurate statement, Your Honor.

19   **Q.**   I'd like to show you a document that's been admitted

20   into evidence, please.

21        And just to look at this document, you've seen this

22   document before which is in evidence.

23        You can put it up on the screen, Defendants' West

24   Virginia 1597.

25        Correct?

```
 1    A.    Yes, you and I have discussed it before, sir.

 2    Q.    You've read it a couple of times; right?

 3    A.    We have.

 4    Q.    You've read it a couple times; correct?

 5    A.    I have.

 6    Q.    Let's turn to Page 36, please.

 7          Do you understand --

 8          Actually, before we get there, can we put this up on

 9    the screen, please, Defendants' 1597.

10          This is a review of the Drug Enforcement

11    Administration's Regulatory and Enforcement Efforts to

12    Control the Diversion of Opioids.  Do you have that

13    understanding, sir?

14    A.    Yes.

15    Q.    All right.  Let's turn to Page 36 of this document.

16    It's the little numbers in the lower left corner.

17          And if you actually look back at Page 35, you'll see

18    that this appears in a section called "Suspicious Order

19    Reporting System."  Do you see that?

20    A.    I do.

21    Q.    If we look at the next page, Page 36 in the lower left

22    corner, it states -- and I'll start in the middle of the,

23    the middle paragraph, please.

24          Do you see the sentence that begins "however"?

25          Let's highlight "however," please.
```

1    **A.**    Okay.  I have it.  I'm sorry.

2    **Q.**    Do you understand that's talking about suspicious order

3    reports from distributors?

4    **A.**    I do.

5    **Q.**    It says, "However, when we asked DEA field division

6    staff to locate these reports at multiple sites throughout

7    the country, staff were unaware of the requirement to

8    maintain the reports and could not locate them."

9         Did I read that correctly?

10   **A.**    You did.

11   **Q.**    Do you take issue with the factual truth of that

12   statement that DEA did not keep individual suspicious order

13   reports sent to field offices?

14   **A.**    In the Detroit office we did.

15   **Q.**    Let's cull up -- go back to your New York testimony,

16   please.  Let's cull up February 7th, 2020, at Page 230,

17   lines 3 through 10.

18        And you can run the video, please.

19        February 7th, 2020, Page 230, lines 3 through 10.  I'm

20   going to ask you if you recall being asked the question and

21   giving the answer.

22        (A video clip was played as follows:)

23   **Q.**    "Do you take issue with the factual truth of that

24   statement that DEA did not keep individual suspicious order

25   reports sent to field offices?"

```
1    A.   "I'm not sure I take exception to it."

2         (Video clip concluded)

3    BY MR. SCHMIDT:

4    Q.   Were you testifying truthfully in that deposition,

5    sir?

6              MR. FARRELL:  Objection, Your Honor.  This is not

7    inconsistent with his testimony.  His testimony was that --

8    related to the Detroit field office.  I don't believe this

9    impeaches the witness at all.

10             MR. SCHMIDT:  It absolutely does.  It's directly

11   opposite to what he just said.  I asked him if he took

12   exception to it and he said, "We did it in Detroit."  He

13   said the exact opposite in his sworn testimony.

14             THE COURT:  Overruled.

15   BY MR. SCHMIDT:

16   Q.   Were you testifying truthfully when you gave that

17   testimony, sir?

18   A.   I believe I am here.  You know, I can't speak for

19   across the United States whether that occurred.  Obviously,

20   somebody has that opinion.  I'm just aware in Detroit when

21   those suspicious orders come in, we wrote a report on it and

22   documented them.

23             MR. SCHMIDT:  Your Honor, I have to move to strike

24   that.  That doesn't answer my question at all.  I asked him

25   if he was testifying truthfully when he gave that statement.
```

```
 1                    THE COURT:  Well, --

 2                    MR. FARRELL:  Judge, I object to striking the

 3       answer.

 4                    THE COURT:  I'm going to deny the motion to

 5       strike.  I think he's explaining his answer.

 6            Go ahead.

 7       BY MR. SCHMIDT:

 8       Q.   Were you testifying truthfully, sir?

 9       A.   Yes.

10       Q.   Okay.  Now, let's go on in the report, if we can go

11       back to the report, 1597, Page 36.

12            In the next sentence that we were looking at it says,

13       "One diversion program manager described the SORS database

14       as a joke, noting the DEA field division staff did not

15       receive access to the SORS database until 2017, nearly 10

16       years after it was created."  Do you see that?

17       A.   I see that.

18       Q.   The SORS database is the DEA's suspicious order

19       reporting system database; correct?

20       A.   Yes.

21       Q.   And the field offices that this sentence tells us did

22       not receive access to the database until 2017, nearly 10

23       years after it was created, they were often the agents

24       engaged in the investigations; correct?

25       A.   Yes.  Specifically, Your Honor, this, this speaks to an
```

```
1    on-line search database.  Prior to 2017 I had requested
2    suspicious orders from headquarters, but it was a manual
3    request.  You'd have to actually call and ask for someone to
4    provide them to you.  I think, just for clarification, this
5    talks about a database that went on-line in 2017.
6  Q.   Are you finished, sir?
7  A.   Yes.
8  Q.   Which field office had oversight of Huntington/Cabell?
9  A.   When I was working, it was the Washington office,
10   Washington, D.C.
11 Q.   Okay.  It's true, is it not, that DEA field division
12   staff did not receive access to the SORS database until
13   2017?
14 A.   The on-line database, that's correct.
15 Q.   Is it a good thing that they now have access to it?
16 A.   Sure.  They probably should have had access all along.
17 Q.   That was my next question.  They should have had access
18   all along; correct?
19 A.   Yes.
20 Q.   Let's go to Page 20 of this document, please.
21       And I was asking you a few minutes ago about being able
22   to rely on the DEA to carry out its registration
23   responsibilities in the number of pill mill doctors.  Do you
24   remember that?
25 A.   I do.
```

1    **Q.**   What I'd like to show you is this heading

2    "Pre-registration investigations did not adequately vet

3    applicants."  Do you see that heading?

4    **A.**   Yes.

5    **Q.**   Let's go to the last paragraph on that page, please.

6          "According to the associate section chief of DEA's

7    regulatory section, DEA conducts pre-registration

8    inspections only on Type B registrants."

9          Do you see that?

10   **A.**   I do.

11   **Q.**   And that includes distributors; correct?

12   **A.**   That's correct.

13   **Q.**   And applicants whose registration previously had been

14   suspended or revoked.  Do you see that?

15   **A.**   Yes.

16   **Q.**   That's a true statement; correct?

17   **A.**   Yes.

18   **Q.**   "Therefore, Type A registrants --" and we can carry

19   over to the next page, please -- "which include physicians,

20   dentists, and pharmacists are rarely required to undergo a

21   pre-registration investigation."

22          Do you see that?

23   **A.**   Yes.

24   **Q.**   True statement?

25   **A.**   It's -- for clarification, are we talking --

1    **Q.**   True statement, sir?

2    **A.**   I just -- so I answer this correctly --

3    **Q.**   It says, "Type A registrants, which include physicians,

4    dentists, and pharmacists are rarely required to undergo a

5    pre-registration investigation."

6        Do you take issue with the factual truth of that

7    statement?

8    **A.**   I do --

9    **Q.**   Okay.

10   **A.**   -- depending on the, on the meaning of the

11   pre-registration.  If they're talking about an on-site visit

12   like they are with the Type B registrants, then, then I

13   would, I would not take exception.  If they're saying they

14   undergo no pre-registration investigation, I would disagree

15   with that statement.

16   **Q.**   All right.  Well, let's take a look at what they found

17   in the study on just that point.  Let's go to the next

18   paragraph, please.

19       Can we cull up the next paragraph, please?

20       "During interviews --" the first full paragraph on the

21   page, please.

22       "During interviews, some field division staff expressed

23   concerns about the lack of vetting in pharmacies during the

24   pre-registration process."

25       Do you see that?

1    **A.**   I do.

2    **Q.**   And then it talks about how if a pharmacy sold to

3    another corporation, the new corporation could circumvent

4    the pre-registration process and DEA would have no

5    knowledge.

6         Do you see that?

7    **A.**   I see that.

8    **Q.**   And then let's go to the next paragraph, please.

9         "Further, we found that if a potential registrant does

10   not disclose past criminal history, suspensions,

11   revocations, or other unbecoming conduct, DEA does not

12   inquire further."

13        Do you see that?

14   **A.**   I see that's what it says.

15   **Q.**   Do you take issue with the factual truth of that

16   statement in this government report?

17   **A.**   I can only speak on this matter, Your Honor, from my

18   experience when I was working.

19        I know they did not run criminal histories on, on

20   practitioners on licensing or applications, but I know that

21   in the Detroit divisional office there was registration

22   clerks highly competent, and they would do a pretty

23   extensive background check.

24        If that suspension or revocation was of a medical

25   license, they would check that.  And if the registrant

1     applying had answered "yes" on the proper liability

2     question, or depending on what the previous violation was,

3     they would be referred for a review.

4         So I can, I can agree with you, Mr. Schmidt, on part of

5     this sentence, but there's other parts -- I think we talked

6     about this before -- I do not agree with.

7     **Q.**   Did Detroit register doctors or pharmacies or dentists

8     in Huntington/Cabell?

9     **A.**   They did not.  And I did not know we were speaking

10    specifically about --

11    **Q.**   Let's speak specifically about Huntington/Cabell.

12    **A.**   Okay.

13    **Q.**   Do you take issue with the truth of that statement as

14    to Huntington/Cabell?

15    **A.**   I don't have any knowledge one way or another to

16    answer, Mr. Schmidt, about Cabell in regard to the

17    registration.

18    **Q.**   "During interviews, several diversion investigators

19    told us that if an applicant with a valid state license does

20    not answer "yes" to the registrant applicant's liability

21    question," that you were just referring to, "as to whether

22    the applicant has had issues with previous state licenses or

23    allegations of misconduct, DEA approves the application

24    without further verification from the state medical board or

25    pharmacy board.  As a result, an applicant that falsifies

```
 1     answers on the application can fraudulently obtain a DEA
 2     registration."
 3          Do you see that?
 4     A.   I see it.
 5     Q.   Do you have any reason to question the truth of that as
 6     to registration decisions made for Huntington/Cabell?
 7     A.   I do not.
 8     Q.   Let's look at the last sentence.
 9          "Indeed, one diversion investigator told us that even
10     if an applicant answered "yes" to one or more of the
11     liability questions, some of her colleagues do not follow up
12     to determine whether the applicant should be denied a DEA
13     registration."
14          Do you see that?
15               MR. FARRELL:  Objection, Your Honor.
16               THE COURT:  What's the basis?
17               MR. FARRELL:  Hearsay within hearsay.
18               MR. SCHMIDT:  It's a report --
19               THE COURT:  Well, this is cross-examination.  He
20     can answer it if he can.
21     BY MR. SCHMIDT:
22     Q.   Do you see that?
23     A.   Yes, sir, I do see that.  Is this restricted to Cabell
24     County and Huntington?
25     Q.   I haven't asked a question.  I just asked if you saw
```

```
1    it.
2    A.   Oh, okay.  I'm sorry.
3    Q.   Do you have any reason to take issue with the truth of
4    that statement as applied to registration in
5    Huntington/Cabell?
6    A.   I do not, sir.
7    Q.   Do you know the DEA can use ARCOS data to determine the
8    volume of opioids supplied by all distributors to a
9    pharmacy; correct?
10   A.   I do.
11   Q.   They can use ARCOS data to determine the volume of
12   opioids supplied by all distributors to a county; correct?
13   A.   I'm sorry?  To a --
14   Q.   To a county.
15   A.   Yes.
16   Q.   You've seen this document that we have marked as
17   Defendants' West Virginia 642; correct?
18   A.   It looks familiar.  I'm not positive.
19   Q.   We had a chance to talk about it in your New York
20   deposition; correct?
21   A.   I believe so.
22   Q.   You'll remember we actually took a break from your
23   deposition so you could go and confirm on the DEA website
24   that this is, in fact, a publication available on the DEA
25   website talking about the ARCOS database; correct?
```

1    **A.**   I recall it except I think one of the attorneys for the

2    defendants actually found it but, yes.

3    **Q.**   Yes.  One of my colleagues in this room found it and

4    pointed you to it and you were able to confirm that this is

5    from the DEA's website?

6    **A.**   Yes.  And then I was willing to discuss it, yes, sir.

7             MR. SCHMIDT:  We move this into evidence, Your

8    Honor.

9             THE COURT:  Any objection?

10            MR. FARRELL:  Just a second, Your Honor.

11        (Pause)

12   BY MR. SCHMIDT:

13   **Q.**   And to lay just a further foundation, you've read

14   the testimony of Kyle Wright as taken in the broader

15   opioids litigation; correct?

16   **A.**   Yes, sir.

17   **Q.**   And this is an exhibit to his deposition because it

18   was, in fact, a presentation he conducted; correct?

19   **A.**   Yes.

20            MR. FARRELL:  No objection, Your Honor.

21            THE COURT:  It's admitted.

22   BY MR. SCHMIDT:

23   **Q.**   Let's put this up on the board.  It says "ARCOS

24   Automation of Reports and Consolidated Order System."

25   This is this ARCOS database we've been talking about;

1    correct?

2    **A.**    Yes.

3    **Q.**    And this is a presentation from 2011.  If you go to the

4    second page, you'll see it's from Kyle Wright, Unit Chief

5    Targeting and Analysis.  Correct?

6    **A.**    Yes.

7    **Q.**    You understand his roles included responsibilities

8    relating to ARCOS?

9    **A.**    Yes.

10   **Q.**    Let's look at Page 17, please.  Let's look at actually

11   Page 16 first.

12       Do you see -- do you recall from looking at this he has

13   a --

14   **A.**    I'm sorry?

15   **Q.**    He has a series of sample charts showing the ability of

16   ARCOS to analyze data in different ways; correct?

17   **A.**    Yes.

18   **Q.**    Let's look at the first chart on Page 17.  This shows

19   that you can use ARCOS, or the DEA could use ARCOS to

20   analyze trends in U.S. data across time, trends in state

21   data across time.  Correct?

22   **A.**    Yes.

23   **Q.**    And they had the ability to look at it on a per

24   population basis; correct?

25   **A.**    Yes, sir.

1    **Q.**   If we go to the next page, Page 18, the DEA could use

2    ARCOS to track the distribution of specific prescription

3    opioids on a per capita basis year by year, region by

4    region; correct?

5    **A.**   Yes.

6    **Q.**   If we go to Page 21, please, the DEA had the ability to

7    use ARCOS data to track the distribution of individual

8    prescription opioids, this time methadone, on a county by

9    county basis.  Here I think we're looking at North Carolina

10   as the example he's given.  Do you see that?

11   **A.**   I do.

12   **Q.**   And they could actually not only look at it on a county

13   by county basis, they could determine whether a given county

14   was average, above average, below average.  Correct?

15   **A.**   Yes, sir, they could do that.  Yes, Your Honor, they

16   could.

17   **Q.**   We don't need to go through every one of these.  Why

18   don't we flip ahead to -- actually, let's go to 23.

19       DEA had the ability to use this ARCOS data for both

20   investigative purposes and court, legal purposes; correct?

21   **A.**   That's what this slide says, yes, sir.

22   **Q.**   And just one example of that, if we go to slide 24,

23   please.  They could do things like look at purchases of

24   specific prescription opioids by individual pharmacies and

25   do things like compare that to what was the state average

```
1    for that pharmacy, what was the U.S. average for that

2    pharmacy; correct?

3    A.    Yes.

4    Q.    DEA refused to allow distributors any access to ARCOS

5    data until 2018; correct?

6    A.    I'm aware that they did not allow outside entities to

7    access that database.

8    Q.    Including distributors; correct?

9    A.    Everyone, yes, sir.

10   Q.    Including distributors?

11   A.    Including distributors.

12   Q.    They were criticized for not providing distributors

13   with that access to ARCOS prior to 2018; right?

14   A.    That's correct.  There was some criticism, Your Honor.

15   Q.    They were required to give distributors some access by

16   law?

17   A.    That's a correct statement, yes, sir.

18   Q.    And you agree that it was a good thing to give

19   distributors access to ARCOS?

20   A.    I think generally it was a good thing.  I can see some

21   potential faults or problems with it.  But, overall, if it

22   prevents diversion, it's a good thing.

23   Q.    Would it have been a good thing to do it even earlier?

24   A.    Yes.  I think anything that would have helped prevent

25   diversion --
```

1          THE COURT:  Do you know why DEA did not permit

2     disclosure before 2018?

3          THE WITNESS:  For a while, Your Honor, they used

4     to say it was proprietary.  But then I, I think also they

5     felt there, there was input from distributors and

6     manufacturers, that they would use the data as a tool to go

7     in and try to see what market share was and then try to

8     take -- fight each other on, you know, where they knew that

9     they could market a product and where it was being

10    distributed.  I think there was that visibility that was a

11    problem.

12    BY MR. SCHMIDT:

13    Q.   They were forced to overcome those concerns and

14    grant access; correct?

15    A.   I think the opioid epidemic helped them overcome those

16    concerns.

17    Q.   An act of Congress helped them overcome those concerns;

18    right?

19    A.   Yes.

20    Q.   The DEA failed to act in that regard; correct?

21    A.   I'm not sure what guidance they had to take that

22    position, but they did not act.  That's an accurate

23    statement.

24    Q.   Let's go back to 21, please.  Do you remember talking

25    about how the DEA had the ability to look at a county by

```
1    county basis and determine whether that county was average,

2    above average, below average?

3    A.   I do.

4    Q.   Are you aware of the DEA ever looking at City of

5    Huntington or Cabell County and telling any distributor the

6    level of distribution to that county was wrong?

7    A.   I'm not aware whether that did or did not occur, Your

8    Honor.

9    Q.   You were asked a question about whether distributors

10   ever analyzed volume to a specific county.  Did DEA, to your

11   knowledge, ever look at the overall distribution or any one

12   distributor's distribution to Huntington or Cabell County

13   and make a judgment that it should be different?

14   A.   Not that I'm aware of, Your Honor.

15   Q.   Was any such judgment ever communicated to any

16   distributor in this case?

17   A.   Not that I'm aware of, Your Honor.

18   Q.   I want to go back to the quotas for opioids that we

19   touched on earlier.  And let's go back -- do you still have

20   that Office of the Inspector General report in front of you?

21   A.   I do.

22   Q.   Exhibit DEF-WV-1597, please.  And if you could start by

23   looking at Page 7 of that document.  I'm sorry, Page 12 of

24   that document, again looking at the numbers in the bottom

25   right-hand corner.
```

1       If you look at the numbered paragraphs, I want to ask

2    you a question about that Paragraph Number 1, please.

3       Do you see that in Number 1 they're discussing the APQ,

4    aggregate production quota or, as they refer to it in the

5    first clause, the national quota?  Do you see that?

6    **A.**   I do.

7    **Q.**   I want to look at the second sentence if we could and

8    ask you if you have this understanding of what quota is.

9       Quote:  "The maximum amounts of each basic class of

10   Schedule I and II controlled substances the DEA

11   administrator deems necessary for manufacture in a calendar

12   year by all pharmaceutical manufacturers combined."

13       And this is the part I want you to focus on:

14       "For the estimated medical, scientific, research, and

15   industrial needs of the United States or for lawful export."

16       Is that your understanding of how the quota is supposed

17   to be set?

18   **A.**   I do.  That is my understanding, Your Honor.

19   **Q.**   And, specifically, is it your understanding that the

20   quota is supposed to be based on estimated medical need and

21   other delineated needs?

22   **A.**   Yes, Your Honor, that's the criteria.

23   **Q.**   Should citizens be able to rely on the DEA

24   appropriately setting quota based on medical and other

25   listed needs?  Yes or no?

1    **A.**    Yes, Your Honor.

2    **Q.**    Let's look at Page 18, please.

3         You're aware the DEA has been faulted for not meeting

4    that trust that has been given to it in terms of setting the

5    quota; correct?

6    **A.**    I'm, I'm aware that they've been criticized for their

7    handling of the quota, yes, sir.

8    **Q.**    Let's look at Page 18, please.

9         Do you see that -- if we cull out the first paragraph,

10   please.

11        In the second sentence it talks about the rising opioid

12   overdose death rate.  Do you see that?

13   **A.**    I do.

14   **Q.**    And then in the next sentence it says, "Yet, from 2003

15   to 2013, DEA authorized manufacturers to produce substantial

16   amounts of opioids."

17        And then it gives an example.  "For example, the

18   aggregate production quota, APQ, of oxycodone in the U.S.

19   increased over 400 percent from 34,482 kilograms in 2002 to

20   a high of 153,750 kilograms in 2013."

21        Do you see that?

22   **A.**    I do.

23   **Q.**    And you're aware that that's factually true?

24   **A.**    I don't dispute it.  I, I don't know that that's, you

25   know, a, a factual statement.  I don't have any reason to

1    not believe it either, Your Honor.

2    **Q.**   And if we look at the next page, it actually shows us

3    the amount by which the quota has gone up.  Do you see that?

4    **A.**   I do.

5    **Q.**   As the plaintiffs' diversion control investigations

6    expert in this case, do you take any issue with the numbers

7    in this report regarding the DEA's quota?

8    **A.**   I think it bears some scrutiny, but I wasn't present

9    when they -- I don't know what material they reviewed.  I

10   don't know how those decisions were made.  I know we

11   discussed it before.

12        I, I have some concerns about just whacking the quota.

13   I think that's what it was called for for a period of time.

14   But, obviously, with the opioid epidemic raging, I'm not

15   sure raising it is, was the most prudent.  But it's

16   difficult for me to give you an opinion when I wasn't

17   actually involved with that decision-making, Mr. Schmidt.

18   **Q.**   All I was asking you was do you take issue with these

19   numbers?

20   **A.**   I do not.

21   **Q.**   Okay.  Let's look back at the page we were looking at,

22   Page 18.

23   **A.**   Okay.

24   **Q.**   In the second paragraph it says, "However, it was not

25   until 2017 that then acting DEA administrator Chuck

1    Rosenberg reduced the APQ for most controlled substances,

2    including oxycodone, by 25 percent."

3       Do you see that?

4    **A.**   I do.

5    **Q.**   And if we look at the next page, you can see that

6    illustrated graphically.  Do you see that?

7    **A.**   I do.

8    **Q.**   Do you take any issue with the factual accuracy of

9    that?

10    **A.**   I do not.

11    **Q.**   Now, maybe you touched on this in that other answer.

12    Was it a good thing that the DEA reduced the quota?

13    **A.**   I think it's a good thing as long as they monitor to

14    make sure that cutting the quota didn't deprive people who

15    legitimately needed the medication to receive it.

16       And I say that because if you can start to diminish the

17    diversion, then it's okay to cut the quota.  But just

18    cutting the quota and there's a problem in America, you

19    know, one of the unintended consequences is always a concern

20    that people that need drugs don't get them.

21    **Q.**   Okay.  If you impose arbitrary limits, you might impact

22    diversion, but you might also keep it from people who need

23    it; correct?

24    **A.**   That's, that's my point, yes, sir.

25    **Q.**   And that's true at the DEA; correct?

1    **A.**    I just think that --

2    **Q.**    In terms of their quota.  I'm sorry.

3    **A.**    Pardon me?

4    **Q.**    In terms of their quota.

5    **A.**    I just think it's -- I think it's a by-product of

6    taking an act without realizing what the consequences are.

7    You know, it's -- if depriving people who need opioids

8    legitimately so that there's less diversion, I, I -- you

9    know, that's a decision that people way above where I was in

10   the DEA made, but it's a concern to me because, you know,

11   they're important medications for some people.

12   **Q.**    That would be a concern for distributors too.  If they

13   arbitrarily imposed limits on prescription opioids, that

14   could also deprive medication from people who needed it.

15   True?

16   **A.**    I hope it's a concern for everyone.  I hope there's not

17   somebody that would say, "I don't want people to be able to

18   obtain medication."

19   **Q.**    Is what I said true, sir?

20   **A.**    Yeah, it's true.

21   **Q.**    Thank you.  If we look at the heading -- let's go back

22   to 17.

23        Just -- not less than two years ago, the heading on

24   this page, the OIG was concluding DEA was slow to respond to

25   the dramatic increase in opioid abuse and needs to more

1     fully utilize its regulatory authorities and enforcement

2     resources to detect and combat the diversion of controlled

3     substances.

4          Do you see that?

5     **A.**   Yes.

6     **Q.**   Do you take any issue with that conclusion?

7     **A.**   No, because as I stated earlier, I think everybody that

8     plays a role in preventing the opioid crisis or its

9     standing, you know, I don't think they're immune from

10    criticism.

11    **Q.**   Now, we've, we've covered a range of different entities

12    that you say played some role in causing the opioid crisis;

13    doctors, pharmacies, manufacturers, distributors not present

14    here, DEA.

15         You're not offering an opinion on the full ranges of

16    the causes of the opioid crisis in Huntington or Cabell

17    County.  True?

18    **A.**   I am not, sir.  Those -- some of those are my personal

19    opinions based on my work experience.

20    **Q.**   And the reason you're not able to offer opinions on all

21    the causes of the opioid crisis in Huntington/Cabell County

22    is because you didn't look at all the participants in the

23    supply chain, all the participants involved in prescription

24    opioids and illegal conduct within Huntington/Cabell.

25    Correct?

1    **A.**    Could you say that one more time?  I'm sorry.

2    **Q.**    The reason that you're not able to offer opinions on

3    all the causes of the opioid crisis in Huntington and Cabell

4    is because you didn't evaluate all of the participants.

5    Correct?

6    **A.**    You're talking about registrants outside or entities

7    outside of distributors, I didn't evaluate all of those

8    entities?

9    **Q.**    I'm talking about entities outside of the three

10   distributors in this case that the plaintiff lawyers asked

11   you to look at.  You didn't look at any of them; correct?

12   **A.**    I did not look at them, no, sir.

13   **Q.**    And you would agree that at a minimum, thousands of

14   people and companies contributed to the opioid crisis in

15   Cabell County in your view?

16   **A.**    I don't know if it's thousands, but it's a considerable

17   amount of people.

18   **Q.**    Let's cull up Mr. Rafalski's testimony from

19   September 11th, 2020, Page 73, lines 1 through 15, please.

20   Let's put it up on the screen.  73, please.

21       At the top of the page, line 1, I asked you, "Between

22   those hundreds -- I take it between those different groups

23   you would agree with me that we're into the hundreds if

24   we're talking about manufacturers, doctors, pharmacies,

25   diverters, distributors?"

1        You say, "That's a very broad spectrum, but I would say

2   it would probably be higher than the number you quoted."

3        And then the next question, I asked, "Okay.  Maybe into

4   the thousands?"

5        Answer:  "Well, if you're just talking generally

6   diverters, people that passed, depending on if we are using

7   the broad definition or we're using the diversion the DEA,

8   my definition, broad definition I would say it's in the,

9   it's minimally in the thousands."  Did I read that

10  correctly?

11  **A.**   I did.

12       MR. FARRELL:  Objection, Your Honor.  This is not

13  inconsistent with what the witness just said.

14       THE COURT:  Well, I think it's directly

15  inconsistent with what he just said.

16       MR. FARRELL:  Maybe I misheard the line of

17  testimony, but I don't, I don't believe that his testimony

18  was a definitive statement one way or the other.

19       MR. SCHMIDT:  We have the record, Your Honor.  It

20  was.

21       THE COURT:  Yeah.  I've lost the statement here on

22  the monitor, but I was reading it very carefully and I think

23  this is inconsistent with his, with his statement.  I don't

24  know -- well, I'll leave it at that.  Your objection is

25  overruled, Mr. Farrell.

BY MR. SCHMIDT:

**Q.**    Sir, just to round this line of questions out, you agree that it's important that an expert serve as an expert and not an advocate?

**A.**    I do.

**Q.**    You should make decisions based on the facts and not be partial to either side?

**A.**    I agree with that statement, Your Honor.

**Q.**    It would be improper just to be a mouthpiece for the lawyers and say whatever they want you to say; correct?

**A.**    That's a correct statement.  I agree with that, Your Honor.

**Q.**    Are there any opinions you gave in this case that the lawyers did not ask you to give?

**A.**    The opinions in the report are my opinions.

**Q.**    Are there any opinions you gave in this case that the lawyers did not ask you to give?

**A.**    They didn't ask -- they asked me to just conduct my review of the documents and materials and to provide my opinion.  They didn't ask me to give a particular opinion or not to give a particular opinion.

**Q.**    Could we cull up the September 11th, 2020, transcript, line 81:23 to 82:1.

         Do you see where you were asked at the bottom of the page, line 23 -- let's just start with line 23, please.

```
1    We're going to need to carry over to the next page.

2         Do you see where you were asked the question I just

3    asked you twice.  "Are there any opinions you gave in this

4    case that the lawyers did not ask you to give?"

5         Your answer:  "No, sir."

6         Did I read that correctly?

7    A.   You did.

8    Q.   Were you being truthful?

9    A.   Yes.

10   Q.   You never told the plaintiff lawyers that you would not

11   give any of the opinions they asked you to give; correct?

12   A.   I guess I don't understand the question.

13   Q.   Let me rephrase it then.  Are there any opinions that

14   the lawyers asked you to give that you said, "No, I can't

15   give this opinion"?

16   A.   That's -- no, that did not occur.

17             THE COURT:  I think there's a difference between

18   asking him for a specific opinion and asking him to give an

19   opinion on a subject.  And I don't think your question, Mr.

20   Schmidt, is fair to the witness without straightening that

21   out.

22             MR. SCHMIDT:  Okay.

23             THE COURT:  And if I'm confused, you can

24   straighten me out.

25             MR. SCHMIDT:  Well, I think what I'm trying to
```

```
 1   point out is not that they wrote the opinions for them that
 2   has actually occurred in other litigation.
 3        My question, though, is -- he's only giving opinions on
 4   who he's been asked to give.  He's not giving opinions on
 5   anything else.  And there's no opinions they asked him to
 6   give that he said "no" to.
 7        Those are the only points I was covering and I think
 8   that's what he testified to.  And I think that is
 9   methodologically relevant.
10                THE COURT:  Okay.
11                MR. SCHMIDT:  Thank you, Your Honor.
12   BY MR. SCHMIDT:
13   Q.  Let me switch gears, Mr. Rafalski.
14        I want to show you a document that you've seen before,
15   another one of these government reports if I could.
16        Could I get Defendants' West Virginia 1598.
17                MR. SCHMIDT:  May I approach, Your Honor?
18                THE COURT:  Yes.
19                THE WITNESS:  Thank you.
20                MR. SCHMIDT:  May I have one minute to confer,
21   Your Honor?
22                THE COURT:  Uh-huh.
23        (Pause)
24   BY MR. SCHMIDT:
25   Q.  Sir, do you remember talking a moment ago just
```

1    before we got into this document about DEA being

2    criticized for not sharing ARCOS data with distributors

3    and then that law passing to require them to share that

4    data?

5    **A.**    I do, Your Honor.

6    **Q.**    What's your understanding of why they were criticized?

7    **A.**    Because denying them that data would also deny the

8    distributors the chance to have further information and make

9    decisions.

10   **Q.**    Why would that be useful?

11   **A.**    Well, because any amount of data or increased amount of

12   data to prevent diversion would be a good thing.

13   **Q.**    And that's why you think it's a good thing that

14   distributors now have access to some form of that data;

15   correct?

16   **A.**    Yes, but -- yes, Your Honor.

17   **Q.**    Let's look at Defense West Virginia 1598.  You've seen

18   this document before; correct?

19   **A.**    I have.

20   **Q.**    In fact, we've spent some time looking at it; correct?

21   **A.**    We have.

22   **Q.**    Do you recognize that this is a government report from

23   the government accountability office; correct?

24   **A.**    Yes, sir.

25   **Q.**    Just from January of last year, a little more than a

```
 1    year ago, over a year ago; correct?
 2    A.    Yes.
 3              MR. SCHMIDT:  Your Honor, we move Defense West
 4    Virginia 1598 into evidence.
 5              THE COURT:  Any objection?
 6              MR. FARRELL:  None, Your Honor.
 7              THE COURT:  All right.  It's admitted.
 8    BY MR. SCHMIDT:
 9    Q.    All right.  This report is called Drug Control,
10    Actions Needed to Ensure Usefulness of Data on
11    Suspicious Opioid Orders.
12        And I'd like to look at Page 11 of the document looking
13    in the lower left-hand corner.  There's a diagram called
14    Figure 1 on the document.
15        Mr. Reynolds, I don't know if it's worth doing, but if
16    there's a way to blow up the diagram with the feed that
17    appears under it, that might be useful.
18        So I want to just go through what we're looking at on
19    this image.  You've had a chance to study this specific
20    image before; correct?
21    A.    I've seen it before.  I don't know if I've studied it.
22    Q.    Well, we spent some time talking about it in your
23    deposition; correct?
24    A.    We did.
25    Q.    It says --
```

```
 1              MR. SCHMIDT:  May I approach the board, Your

 2   Honor?

 3              THE COURT:  Yes.

 4   BY MR. SCHMIDT:

 5   Q.   Figure 1, the prescription drug supply chain and

 6   examples of opportunity for abuse and diversion.  Do you

 7   see that?

 8   A.   I do.

 9   Q.   And you understand that this is talking about different

10   places in the system where abuse and diversion can occur,

11   including different types of abuse and diversion; correct?

12   A.   Yes.

13   Q.   Let's just orient ourselves to what this covers.  It

14   covers manufacturers.  Do you see that?

15   A.   Yes.

16   Q.   Distributors with the truck?  Do you see that?

17   A.   Yes.

18   Q.   Pharmacies?

19   A.   I see that, Mr. Schmidt.

20   Q.   And then the patients with doctors above the patient.

21   Do you see that?

22   A.   I see that also, Your Honor.

23   Q.   And then if you look at the keys, at the key down at

24   the bottom, it tells us that these boxes with the green

25   dotted lines around them are examples of where prescription
```

1    drug diversion can occur.  And there are four of those boxes

2    showing examples of where prescription drug diversion can

3    occur.  Correct?

4    A.    That's what this chart says, yes, sir.

5    Q.    The blue boxes, which include distributors, are

6    examples of the legitimate flow of prescription drugs.  Do

7    you see that?

8    A.    Yes.

9    Q.    Now, if we focus on distributors, there's one dotted

10   line to a diversion area coming off of distributors.  Do you

11   see that?

12   A.    I do.

13   Q.    And it lists three bullets in that box.  Do you see

14   that?

15   A.    I do.

16   Q.    The first is robbery or theft from manufacturers,

17   distributors, pharmacies.  That's a form of diversion that

18   can occur from distributors; correct?  Robbery, theft?

19   A.    Yes.

20   Q.    Are you aware of any of that that's impacted

21   Huntington/Cabell relating to any of the distributors here?

22   A.    I'm not aware of any robberies or thefts from

23   registrants in Cabell or Huntington, sir.

24   Q.    That's the only one that applies to distributors;

25   correct?

1    **A.**   That's correct, Your Honor.  That's the only one.

2    **Q.**   If we look at the other ones in this box, including

3    patients, those are both crimes or potential crimes;

4    correct?

5    **A.**   Yes, sir, Your Honor.

6    **Q.**   Let's go to the top right box.  That's patients

7    engaging in doctor shopping.  Do you see that?

8    **A.**   I do.

9    **Q.**   And then the box below is patients may provide

10   legitimately obtained drugs to friends or family for free;

11   correct?

12   **A.**   I see that one also.

13   **Q.**   Sometimes referred to as diversion from the medical

14   cabinet; correct?

15   **A.**   Yes.

16   **Q.**   And then another opportunity in the upper left is

17   healthcare providers participating in criminal drug

18   diversion schemes.  Do you see that?

19   **A.**   I do.

20   **Q.**   All of those activities that we just looked at on that

21   diagram are crimes or potential crimes; right?

22   **A.**   Yes, they are, Your Honor.

23   **Q.**   And with the exception of that one example we talked

24   about that you don't know of ever happening here involving

25   distributors, none of those other ones involve distributors;

```
 1    correct?
 2    A.    According to this chart, they do not.
 3    Q.    Okay.  So let's go back to that first -- that -- this
 4    type of diversion, patients may provide legitimately
 5    obtained drugs to friends or family for free.  That's that
 6    concept of medicine cabinet diversion.
 7          You agree that when a patient misuses medication that
 8    was prescribed for a legitimate medical use, whether it's
 9    giving it away or selling it, the patient is responsible for
10    that?
11    A.    Yes, sir.
12    Q.    And you have seen statistics indicating that more than
13    three out of four people who use or misuse prescription
14    painkillers use drugs prescribed to someone else; correct?
15    A.    I see some statistics.  I don't remember that exact
16    number.  But I'm not going to, you know, say that I don't
17    believe that number.  I just don't have a full recollection
18    of that exact number.
19    Q.    And, in fact, you don't take issue with that statistic,
20    do you?
21    A.    No, I do not.
22    Q.    In the course of your work regarding diversion and
23    serving here as the plaintiffs' diversion control expert,
24    have you reviewed CDC publications on levels of diversion
25    and which ones of these types of diversion are actually seen
```

```
 1    in the real world?
 2    A.   I believe I reviewed them.  I don't recall what the
 3    results of the review was, --
 4    Q.   Let me show you the --
 5    A.   -- were.
 6    Q.   -- CDC publication and tell me if this is one of the
 7    ones you've seen before.
 8            MR. SCHMIDT:  Sorry, Judge.  May I approach?
 9            THE WITNESS:  Thank you.
10    BY MR. SCHMIDT:
11    Q.   I've put in front of you a document, MC-WV-2096.
12    Do you see the CDC logo in the bottom right corner?
13    A.   I do.
14    Q.   Do you see the heading "Policy Impact Prescription
15    Painkiller Overdoses"?
16    A.   I do, Your Honor.
17    Q.   And if we turn to Page 7 of the document --
18            MR. SCHMIDT:  Actually, why don't I go ahead and
19    move this into evidence, Your Honor?
20            THE COURT:  Any objection?
21            MR. FARRELL:  I'm not sure, Judge.  I'm trying to
22    find the author and the date.
23            MR. SCHMIDT:  The author is the CDC, Your Honor.
24    The date is November, 2011 on the last page.
25            MR. FARRELL:  No objection to this.
```

```
1              MR. SCHMIDT:  Thank you.

2              THE COURT:  It's admitted.

3              MR. SCHMIDT:  Let's go ahead and put it up on the

4    screen.  If we could go to the second page of the document,

5    please.

6    BY MR. SCHMIDT:

7    Q.   Do you see it's got a heading called "Where the

8    Drugs Come From"?

9    A.   I do.

10   Q.   And the last sentence of that paragraph says, "More

11   than three out of four people who misuse prescription

12   painkillers use drugs prescribed to someone else."

13        Do you see that?

14   A.   Yes.

15   Q.   Do you take any issue with that, with that statistic?

16   A.   No, I do not.  That's I think a little different than

17   the previous one.  I think the previous one was more

18   directed at family members and friends.

19   Q.   You agree that when a prescription is legitimately

20   written and dispensed, distributors have no control over

21   what happens to it after that point?

22   A.   That's a correct statement.  I agree with that, Your

23   Honor.

24             THE COURT:  We probably ought to take a break when

25   you get to a stopping point.  Is this a good place?
```

```
1              MR. SCHMIDT:  This is that point, Your Honor.

2              THE COURT:  All right.  Let's be in recess for 10

3    minutes.

4         (Recess taken at 3:12 p.m.)

5              THE COURT:  You may resume, Mr. Schmidt.

6              MR. SCHMIDT:  Thank you.

7              BY MR. SCHMIDT:

8    Q.   Mr. Rafalski, let me pick up where we were.  Do you

9    have in front of you the CDC publication MCWV-2096?

10   A.   I do, sir.

11   Q.   Let me just go back to Page 7.  I'm told I read it into

12   the record wrong.  Is the statistic they provide on Page 7

13   the following:  Quote, more than three out of four people

14   who misuse prescription pain-killers use drugs prescribed to

15   someone else?  Is that the quote?

16   A.   Yes.

17   Q.   And you take no issue with that?

18   A.   I do not.

19   Q.   All right.  I want to come to your flagging

20   methodologies.  And before I come to your flagging

21   methodologies, I'm just going to ask you general questions

22   about the obligations that distributors have; fair?

23   A.   Yes.

24   Q.   Distributors have a duty to report all their sales to

25   the DEA for the DEA's ARCOS database, correct?
```

1    **A.**    All the ARCOS required drugs.

2    **Q.**    Yes.  And you agree that ARCOS uniquely has access to

3    all of the data submitted by each DEA registrant across the

4    country?

5    **A.**    I'd agree with that, Your Honor.

6    **Q.**    ARCOS is compiled by DEA in accordance with law,

7    correct?

8    **A.**    Yes, sir.

9    **Q.**    It's used for developing quota?

10   **A.**    That's correct, Your Honor.

11   **Q.**    It's used for analyzing distribution trends?

12   **A.**    That's correct a statement, Your Honor.

13   **Q.**    It's used for internal audits?

14   **A.**    Internal audits?

15   **Q.**    Yes, sir.

16   **A.**    Can you define that a little further for me?

17   **Q.**    Sure.

18            MR. SCHMIDT:  Could we put up the expert report

19   from Mr. Rafalski in this case, P-42216, just for

20   demonstrative purposes, and go to Page 17?  P-42216, please.

21   Now -- this is the wrong tab.  It should be Tab 18.  There

22   we go.  Could we look at Page 17, please?  And could we cull

23   out the second paragraph, please?

24            BY MR. SCHMIDT:

25   **Q.**    This is what I was reading to you from, sir.  Do you

```
 1   see that it states the ARCOS DADS system uniquely has access

 2   to all of the data submitted by each DEA registrant across

 3   the country?

 4   A.   I see that paragraph and I see what part you're

 5   speaking of, yes, sir.

 6   Q.   And then it says the data is compiled by DEA in

 7   accordance with law.  Do you see that?

 8   A.   I see that statement.

 9   Q.   Is that accurate?

10   A.   Yes, sir.

11   Q.   DEA uses it for inspections, correct?

12   A.   Yes.

13   Q.   They use it for investigations, correct?

14   A.   That's correct.

15   Q.   And they use it for other analyses, as well, correct?

16   A.   That's correct.

17   Q.   You're aware that Dr. McCann confirmed through his work

18   that the distributors in this case reported all of their

19   sales into DEA's ARCOS database, all of their required

20   sales, between 2006 and 2014?

21   A.   Except, I believe, there was a gap of data, I believe,

22   for Cardinal for a short period of time.

23   Q.   Okay.  And did you see his testimony where he explained

24   that that could have been due to a recordkeeping issue on

25   the DEA side?
```

1    **A.**    Yes.  I'm just trying to answer your question

2    accurately, sir.

3    **Q.**    And you don't take any issue with Dr. McCann's

4    conclusion that the ARCOS data received from the defendants

5    in this case is reliable, do you?

6    **A.**    I do not take an exception to that, Your Honor.

7    **Q.**    Distributors also have a duty to report suspicious

8    orders to the DEA, correct?

9    **A.**    Yes, sir, when discovered.

10   **Q.**    And let's -- let's take a look at that definition.  I

11   think this is a regulation, so I think the Court can take

12   notice of it without me moving it in as an exhibit.

13        So, if I may just put it up on the screen, please.

14   It's DEF-WV- 2254.  And this is the regulation as quoted

15   from the DEA website.

16        And if we could just cull out A paragraph.  Actually,

17   that's the wrong paragraph.  I'm sorry.

18            THE COURT:  Is there any objection to me taking

19   judicial notice of this, Mr. Farrell?

20            MR. FARRELL:  Not that I can think of.

21            MR. SCHMIDT:  Let's cull up Paragraph B, please.

22            THE COURT:  Well, I want to give you the

23   opportunity.

24            MR. FARRELL:  This is -- this is -- this is the

25   CFR, correct?

```
1              MR. SCHMIDT:  Yes.
2              THE COURT:  It's judicially noticed.
3              BY MR. SCHMIDT:
4    Q.    And do you see it defines suspicious orders and the
5    last sentence here is orders of unusual size, orders
6    deviating substantially from a normal pattern, and orders of
7    unusual frequency?  Do you recognize that as the regulatory
8    definition of a suspicious order?
9    A.    That's what the regulation says, yes, sir.
10   Q.    Are you aware that this -- how long has this regulation
11   been in place?
12   A.    1971, Your Honor.
13   Q.    Are you aware that just in the last year the DEA has
14   proposed amending this regulation?
15   A.    I am.
16   Q.    Are you aware that the subject of the proposed DEA
17   amendment is including in the regulation a do not ship
18   requirement?
19   A.    I am.
20   Q.    Are you aware that another subject of the proposed
21   amendment is including in the text of the regulation
22   provisions regarding recordkeeping?
23   A.    I'm aware of that, also.
24   Q.    There's no express reference in this definition of a
25   suspicious order to likely diversion, is there?
```

1    **A.**   Well, it's my belief, Your Honor, the word suspicious

2    is suspicious of the diversion, although I do agree with Mr.

3    Schmidt it does not say that, but it's what it's suspicious

4    of.

5    **Q.**   And that's -- that phrase you just used, suspicious of

6    diversion, that phrase appears nowhere in here?

7    **A.**   That's correct.

8    **Q.**   Instead, it refers to orders of unusual size,

9    frequency, pattern, correct?

10   **A.**   I think that qualifies some of the things that -- that

11   may define it.

12   **Q.**   And you're aware that there are all kinds of

13   circumstances when an order can be of unusual size, pattern

14   or frequency, but not be diverted?

15   **A.**   That's a correct statement.  I agree with that, Your

16   Honor.

17   **Q.**   One example of that is a pharmacy might have a Cancer

18   Center open nearby and suddenly they have an unusual

19   pattern, orders of unusual size, or orders of an unusual

20   frequency, right?

21   **A.**   That's correct.

22   **Q.**   That could show up as a suspicious order even though

23   none of them are being diverted, correct?

24   **A.**   Ultimately, if due diligence was done, that would be a

25   conclusion that a distributor could come to, that's correct.

1    **Q.**    Another example, a pharmacy could be across the street

2    from another pharmacy that closes and so, all of that closed

3    pharmacy's customers start coming to the pharmacy that's

4    still open, correct?

5    **A.**    Yes.  That's another scenario, although that -- that

6    also has some potential issues that would have to be

7    resolved, but I don't disagree with that statement.

8    **Q.**    And all I'm asking you, sir, is that can be an instance

9    where an order looks like it has unusual size, frequency or

10   pattern, but there's no diversion, correct?

11   **A.**    That's a possibility, yes, sir.

12   **Q.**    And do you have any idea, have you seen any studies

13   that tell us how many of the orders that meet this

14   definition are actually diverted?

15   **A.**    Well, I know there's a comment in the new proposed

16   rule.  Other than that, I've never seen anything that gave

17   an approximation.

18   **Q.**    Do you know if you take the body of suspicious orders

19   that have occurred over time how many of them are actually

20   diverted?

21   **A.**    I don't know that, no, sir.  I don't know that, Your

22   Honor.

23   **Q.**    Do you know if it's above or below five percent, ten

24   percent?

25   **A.**    I don't know, Your Honor.

1    Q.   Let me focus on some of the numbers that you showed the

2    Court.   I tried to count the numbers of Suspicious Order

3    Reports you identified in your 2007-2008 time period and I

4    got 416 from all three defendants.   Does that sound right?

5    A.   Yes, sir.

6    Q.   Including 79 from McKesson?

7    A.   That's correct.

8    Q.   And that's even though you didn't count any DU45s for

9    McKesson from before 2007, correct?

10   A.   That's correct.

11   Q.   Can you -- whether it's those pre-2007 orders or any of

12   the orders you identified, can you point to any action DEA

13   took on any suspicious order that McKesson, Cardinal or ABDC

14   made for Cabell County or Huntington?

15   A.   I cannot, Your Honor.

16   Q.   You're not aware of any Suspicious Order Reports

17   regarding pharmacies in Huntington or Cabell that led to any

18   investigation by DEA, correct?

19   A.   I am not, Your Honor, although I didn't review or look

20   to determine that, but I'm not independently aware of that.

21   Q.   You can't point me to any orders that any one of these

22   three defendants shipped into Huntington or Cabell where the

23   DEA came to them and said you should not have shipped that

24   specific order, correct?

25   A.   That's a true statement.   I didn't -- do not know that,

1    Your Honor.

2    **Q.**   Are you aware that since 2007 and 2008, ABDC, Cardinal

3    and McKesson have blocked orders that go above specific

4    thresholds?

5    **A.**   I'm aware of that, those changes upon that time period,

6    yes, sir.

7    **Q.**   How many have they blocked?

8    **A.**   I don't recall.

9    **Q.**   Do you recognize it's hundreds of thousands nationwide?

10   **A.**   I didn't look at nationwide.

11            MR. FARRELL:  Objection, Your Honor, geographic

12   scope.

13            THE COURT:  Overruled.

14            THE WITNESS:  I do not know, Mr. Schmidt.

15            BY MR. SCHMIDT:

16   **Q.**   Do you know how many it is in West Virginia?

17            MR. FARRELL:  Objection, Your Honor, on the same

18   basis.

19            THE COURT:  Overruled.

20            THE WITNESS:  I do not.

21            BY MR. SCHMIDT:

22   **Q.**   Do you know how many it is in Huntington-Cabell?

23   **A.**   In the totality, I do not.

24   **Q.**   You would agree that if you block an order, that

25   obviously keeps it from being distributed and it would not

1    lead to diversion, correct?

2    **A.**    Say one more time.  I'm sorry.

3    **Q.**    If you block an order, that would obviously keep it

4    from being distributed and it would not lead to diversion?

5    **A.**    That's a correct statement, Your Honor.  I agree with

6    that.

7    **Q.**    Blocking the order of opioid pills before shipment is

8    what prevents diversion from occurring, correct?

9    **A.**    Yes, Your Honor, that's what prevents it.

10   **Q.**    You'd agree that not reporting the suspicious order to

11   DEA is not what causes diversion, correct?

12   **A.**    That -- I agree with that statement, Your Honor.

13   **Q.**    Now, let's talk about your flagging methodologies.

14   You've performed them -- you showed some pretty big numbers

15   in those methodologies; do you remember that?

16   **A.**    Yes, I remember.  There were big numbers.

17   **Q.**    Some of them were 80-90 percent, correct?

18   **A.**    That's correct.

19   **Q.**    You've performed those across various jurisdictions,

20   correct?

21   **A.**    I performed them for Cabell County and for Huntington,

22   City of Huntington.  Is that your question?

23   **Q.**    No.  And for Cuyahoga County.  And for Summit County.

24   **A.**    Oh.

25   **Q.**    And for Nassau County.  And for Suffolk County.  And

1    for two counties in the State of Iowa; correct?

2    **A.**   That's -- that's accurate.  I thought we were talking

3    --

4              MR. FARRELL:  Objection, Your Honor.  Objection,

5    Your Honor, compound.

6              THE COURT:  Sustained.  You can break it up.

7              BY MR. SCHMIDT:

8    **Q.**   You performed it for Cuyahoga County?

9    **A.**   I did.

10   **Q.**   You performed it for Summit County?

11   **A.**   I did, Your Honor.

12   **Q.**   You performed it for Nassau County?

13   **A.**   I did, Your Honor.

14   **Q.**   Performed it for Suffolk County?

15   **A.**   Yes, I did, Your Honor.

16   **Q.**   You performed it for two counties in the State of Ohio

17   where you're going to go give testimony in two weeks

18   regarding pharmacies?

19   **A.**   That's correct, Your Honor.

20   **Q.**   And every one of those analyses, you always get similar

21   numbers to what you get here, right?

22   **A.**   They're high numbers.  I don't -- I don't remember -- I

23   don't recall if they're -- how close they are to being

24   similar, but they're all high numbers.  I agree with that

25   statement.

1    Q.    Sometimes, even a hundred percent, right?

2    A.    I don't recall one at a hundred percent.

3    Q.    You don't recall that the case you're going to testify

4    in has a hundred percent?

5    A.    I don't have a direct recollection of that.

6    Q.    Can you identify any jurisdiction or any one of the

7    more than a dozen defendants you've testified against or,

8    frankly, any distributor where you could run your analyses

9    and not get similarly high numbers?

10   A.    Well, since I've run it and I've got those numbers,

11   then I -- I can't identify them all.

12   Q.    In terms of how your methodologies were implemented,

13   each of the six methodologies were performed by Dr. McCann;

14   true?

15   A.    Yes.

16   Q.    You did not speak to Dr. McCann about those analyses

17   before you used them for the first time in your first report

18   in Cuyahoga and Summit County, correct?

19   A.    That's accurate.  I relayed my requests through

20   plaintiffs' counsel.

21   Q.    Dr. McCann did not provide you with a copy of his

22   computer code for you to review; correct?

23   A.    He did not, but if he did, Your Honor, I probably

24   wouldn't have known -- it wouldn't have been usable to me.

25   I wouldn't have known the code, but that's a correct

1    statement.

2    **Q.**   In fact, you didn't discuss his computer algorithms

3    with him until after you had already relied on his reports,

4    on his results for your reports in Cabell, Ohio and New

5    York, correct?

6    **A.**   I -- I don't recall when we had a conversation, if I

7    discussed it with him before those two or not.  I know I

8    discussed some -- had some discussions with him.  I don't

9    believe so, but I don't recall directly.

10   **Q.**   Would it help to show you your testimony on that?

11   **A.**   Sure, that would.

12   **Q.**   Okay.  Do you recall that your report in this case was

13   dated August 3rd, 2020?

14   **A.**   Pardon me?

15   **Q.**   Do you recall that your report in this case was dated

16   August 3rd, 2020?

17   **A.**   Yes.  Yes, sir.

18   **Q.**   And your report in New York was before that?

19   **A.**   Yes.

20   **Q.**   And your report in Ohio for Cuyahoga and Summit County

21   was before that?

22   **A.**   That's correct.

23            MR. SCHMIDT:  Can we cull up the September 1st,

24   2020 transcript at 101:11-14?

25            BY MR. SCHMIDT:

1    **Q.**   Oh, I'm sorry.  Actually, I was going to show you Dr.

2    McCann's testimony.  If Dr. McCann testified that you did

3    not talk to him before those three reports, would you take

4    issue with him?

5    **A.**   I wouldn't -- I'm not going to dispute what he said.  I

6    know I had a conversation with him about some concerns, not

7    concerns, but about some assumptions, and I don't recall

8    exactly when that conversation occurred, at what point in my

9    reports.

10   **Q.**   You didn't check the math on any of the six

11   methodologies, correct?

12   **A.**   I did not.

13   **Q.**   You don't know the assumptions Dr. McCann made when

14   coming up with this code to run the methodologies, correct?

15   **A.**   I did have a discussion with him about those

16   assumptions.  That's the conversation I'm talking about.

17   **Q.**   That conversation was August 29th, 2020; correct?

18   **A.**   That's a possibility.

19   **Q.**   Would it help to see Dr. McCann's testimony on that?

20   **A.**   If -- yes, if you want me to confirm that, I can.

21   **Q.**   Okay.  Let's cull up Dr. McCann's testimony,

22   September 1st, 2020 at 101, Lines 11-14.  Do you see where

23   Dr. McCann testifies before your August 29th, 2000

24   discussion -- 2020 discussion with Mr. Rafalski, did you

25   discuss your computer algorithms with him?  Answer, I did

1    not, no.  Do you see that?

2    **A.**   I see that, Your Honor.

3    **Q.**   Do you have any reason to take issue with that?

4    **A.**   I do not.

5    **Q.**   And to confirm, this is after your August 2nd, 2020

6    report in this case, correct?

7    **A.**   Yes, sir, Your Honor.

8    **Q.**   Thank you.  Are you aware that Dr. McCann testified

9    that he had to make certain design choices to operationalize

10   the methodologies?

11   **A.**   I am.

12   **Q.**   Are you aware that he had to make several choices to

13   the design of his computer algorithm?

14   **A.**   Yes, I am.

15   **Q.**   And you're not familiar with all the design choices Dr.

16   McCann made when coming up with his code for his

17   methodologies?

18   **A.**   I -- I think I discussed them all with him.  Whether I

19   have recollection of all of them, no, but I don't think that

20   -- as far as I'm aware, I don't think he didn't tell me any.

21   **Q.**   When we talked in your deposition, you weren't able to

22   tell me all the assumptions he made, correct?

23   **A.**   That's correct.  And I wouldn't be able to tell you

24   right now either.

25   **Q.**   Thank you.  Now, I want to --

```
 1              MR. SCHMIDT:  If I may approach the board, Your

 2    Honor?  May I approach?

 3              THE COURT:  Yes.

 4              MR. SCHMIDT:  Thank you.

 5              BY MR. SCHMIDT:

 6    Q.   I'd like to talk about your flagging methodology.  And,

 7    first of all, you recognize it flags tens of millions of

 8    orders, correct?

 9    A.   Yes.

10    Q.   And you have claimed that every one of those tens of

11    millions of orders were likely to be diverted?

12    A.   More likely than not, yes, sir.

13    Q.   You didn't actually review any of the orders flagged by

14    your methodologies, correct?

15    A.   I did not.

16    Q.   Not one of the initial orders, correct?

17    A.   Well, can I -- clarification of that, I have reviewed

18    them now, but at the time that we last spoke, I did not.

19    Q.   Okay.  And at the time I had the chance to take your

20    testimony, you did not; correct?

21    A.   That's correct.

22    Q.   And at the time you sponsored them in your expert

23    report, you did not?

24    A.   I did not go back and look at every trigger, that's

25    correct.
```

1    **Q.**   You didn't look at any of them at the time you wrote

2    your expert report and adopted them; correct?

3    **A.**   That's correct.

4    **Q.**   Not one of the initial orders; not one of the follow-up

5    orders; correct?

6    **A.**   That's correct.  I'm sorry.  I didn't know that was a

7    question.

8    **Q.**   And you -- as an illustration of that, you haven't

9    looked at which pharmacies generate the most flagged orders

10   under your methodology, correct?

11   **A.**   At the time we talked before, I didn't, we didn't, but

12   I've since went back and reviewed all of the triggers, so --

13   **Q.**   Okay.  Do you know which pharmacy triggered the least

14   orders under your method?

15   **A.**   Not as I sit here.  I didn't memorize and recite them,

16   but I did look and see which ones triggered and -- how quick

17   they triggered and the amounts they triggered based on our

18   previous conversations.

19   **Q.**   Where did Rite Aids fit in the picture?  Were they the

20   most?  Were they the least?  Were they somewhere in between?

21        COURT REPORTER:  I'm sorry.  Can you slow down

22   just a little for me?

23        MR. SCHMIDT:  Yes.  I'm sorry.

24        COURT REPORTER:  Were they the most --

25        MR. SCHMIDT:  Actually, I'll withdraw the

1    question.

2              BY MR. SCHMIDT:

3    **Q.**   None of that is in your report?  None of that was in

4    your opinions before the Court today, correct?

5    **A.**   That's correct.

6    **Q.**   And you performed no analysis in your report or in your

7    opinions today of whether pharmacies that took more or less

8    care to meet their corresponding responsibility had more or

9    less flagged orders, correct?

10   **A.**   That's -- I made no correlation between the

11   pharmacists' corresponding responsibility and the flagged

12   orders, Your Honor.

13   **Q.**   This is a long one.  I apologize for that.  I wrote no

14   correlation with corresponding responsibilities.  In terms

15   of these orders that you claim were likely diverted, you

16   don't know how many of those orders went to fill legitimate

17   medical need, correct?

18   **A.**   I do not, Your Honor.

19   **Q.**   You don't know whether it's 99 percent of the flagged

20   orders that went to legitimate medical need, 1 percent, or

21   some other number?

22   **A.**   I do not know, Your Honor.

23   **Q.**   So, the results of your methodologies are not based on

24   any estimate of medical need, correct?

25   **A.**   That's correct.  It doesn't include a basis for a -- or

1     a requirement for medical need.

2     **Q.**   And I believe you said in your direct examination at

3     one point that 90 percent of the pills should not have been

4     shipped.  Do you remember saying something to that effect?

5     **A.**   Yes.  Based on the assumption, that's correct.

6     **Q.**   Now, if that view were followed, how many cancer

7     patients would have been deprived of medication?

8     **A.**   Well --

9     **Q.**   How many, sir, do you know?

10    **A.**   So, what I report to the judge, what I report to you,

11    Your Honor, is -- is more likely than not how many of those

12    pills could have the potential for diversion because the

13    first order didn't have a due diligence inspection or didn't

14    dispel the diversion.

15        It's not saying that none of those 90 percent would

16    actually have been distributed because they actually were

17    when there was no due diligence.  What I'm saying is the

18    likeliness of the potential of diversion is based on the

19    fact that that first order wasn't clear and that that

20    suspicion of diversion is present.

21              MR. SCHMIDT:  Your Honor, may I ask the witness to

22    answer my question now?

23              THE COURT:  Yeah.  Yeah.  The question was how

24    many, wasn't it?

25              BY MR. SCHMIDT:

1    **Q.**   Yeah.  Do you know how many?

2    **A.**   I do not, Your Honor.

3    **Q.**   Do you know how many patients recovering from surgery

4    would be deprived of medication if your opinions were

5    followed?

6    **A.**   I do not.

7    **Q.**   Do you know how many patients receiving end of life

8    care would be deprived of medications if your opinions were

9    followed?

10   **A.**   Your Honor, I do not.

11   **Q.**   Do you know how many doctor prescriptions for

12   legitimate medical need would not be filled if your opinions

13   were followed?

14   **A.**   I do not, Your Honor.

15   **Q.**   And so, I take it you have not done a specific

16   assessment if you haven't looked at the orders and you've

17   not looked at which ones were based on medical need and

18   you've not done an assessment of whether specific flagged

19   orders led to specific harm; true?

20   **A.**   That's a correct statement, Your Honor.

21   **Q.**   So, I'll write not based on harm.  Now, I want to get

22   at this point in another way and I think what I'd like to do

23   is if I can show you some of those demonstratives that you

24   looked at with Mr. Farrell.

25        MR. SCHMIDT:  Do I need to switch the screen

```
 1    around?  This is fraught with possibility for disaster, but

 2    okay.  Could we put Slide 17 and Slide 18 up next to each

 3    other, please?

 4              BY MR. SCHMIDT:

 5    Q.   You talked about having six different methods.  This is

 6    just two of them, Method A, Method B, and those are going to

 7    be the ones I'm going to focus on most of all for reasons

 8    we'll talk about.

 9    A.   Okay.

10    Q.   I want to just give two illustrations.  You did Method

11    A and Method B for oxycodone for McKesson, correct?

12    A.   Yes.

13    Q.   And using Method A, you get 87.9 percent.  Do you see

14    that?

15    A.   Yes.

16    Q.   Using Method B, you get 22.2 percent.  Do you see that?

17    A.   I do.

18    Q.   Pretty big difference, right?

19    A.   That's a big difference.

20    Q.   87.9 percent is over 400 percent times this estimate of

21    20.2 percent, correct?

22    A.   It is.

23    Q.   Which of those two is the right number?

24    A.   I believe that the larger one is.

25    Q.   Okay.  We'll talk about the difference between those
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    two in a minute.

2    **A.**    Okay.

3    **Q.**    Is this wrong, yes or no?

4    **A.**    It's not wrong, but what it is, is it reflects allowing

5    shipments to occur without the consideration of due

6    diligence, removing the due diligence and just -- and

7    allowing shipments to occur.

8    **Q.**    So, I put 400 percent range across your methodologies

9    just based on that single figure.  Now, your methodologies

10   purport to be based -- and I think you said this on one of

11   your slides -- on real world methodologies that different

12   distributors were using, correct?

13   **A.**    Yes.

14   **Q.**    In truth, none of your methodologies precisely

15   implement any Suspicious Order Monitoring System used in the

16   real world, true?

17   **A.**    That's correct, Your Honor, because I was never

18   provided the code.  If I would have had the exact code to

19   provide to Mr. McCann, then they would be exactly the same.

20   **Q.**    And you will recall that we talked about how Dr.

21   McCann, who did use his code, recalled what you had done and

22   what you had relied on stylized illustrations of what might

23   have been happening in the real world?

24   **A.**    I -- I recall that he did use that term, Your Honor.

25   **Q.**    And do you recall that you agreed with that as an

1    appropriate term?

2    **A.**   I don't recall making a comment on that --

3    **Q.**   Okay.

4    **A.**   -- at this time.  I -- I could have, but I don't

5    recall.

6    **Q.**   Let's go to the September 11th, 2020 transcript at

7    123:19 and 120 -- I'm sorry.  124:7 -- 124:1-7.

8              MR. FARRELL:  Judge, I believe this is an improper

9    attempt to refreshing the witness's recollection.  He should

10   be shown the document.

11             MR. SCHMIDT:  Your Honor, it's a prior

12   inconsistent statement.  He said he didn't remember

13   endorsing that.  Here we say I don't take exception to that

14   statement.  It's directly inconsistent to the answer he just

15   gave.

16             THE WITNESS:  I acknowledge that.

17             MR. SCHMIDT:  Okay.  Okay.

18             THE COURT:  Well, if --

19             BY MR. SCHMIDT:

20   **Q.**   So, let me try it this way.  Do you agree with Dr.

21   McCann --

22             MR. SCHMIDT:  And was I talking over Your Honor?

23   I'm sorry.

24             THE COURT:  Yes.  Go ahead.

25             BY MR. SCHMIDT:

1    **Q.**    Do you agree with Dr. McCann that these are stylized

2    illustrations of what's happening in the real world?

3    **A.**    He is the doctor and if that's what he said they are,

4    then I agree with him.

5    **Q.**    I've written stylized illustrations on the board.  DEA

6    never used these methodologies that you present in your

7    report, correct?

8    **A.**    Not that I'm aware of, no, sir, Your Honor.

9    **Q.**    And you never used them while you were at DEA, correct?

10    **A.**    I did not, Your Honor.

11    **Q.**    Instead, you created these methodologies for the first

12    time for litigation, correct?

13    **A.**    Yes, sir.

14    **Q.**    Created for litigation on the board.  You were

15    initially told that you should come up with five

16    methodologies, correct?

17    **A.**    That's correct.

18    **Q.**    You were told that during a conversation with one of

19    the plaintiffs' counsel, correct?

20    **A.**    That is -- yes, sir.

21    **Q.**    Now, if these methodologies actually did flag orders

22    likely to be diverted, that could be tremendously helpful to

23    the public, correct?

24    **A.**    It could be.

25    **Q.**    Have you, since coming up with these methodologies,

1    gone back to any of your colleagues, your former colleagues

2    at the DEA, and said they should use these methodologies to

3    identify likely diversion in the real world?  Have you done

4    that?

5    **A.**   I have not done that and I guess in your question, I

6    didn't create these.  I tried to use methodologies that were

7    similar to the methodologies that were -- that I -- that I

8    discovered or found while doing this case.  So, it wasn't

9    something that I created.  Although they're not exactly the

10   same, they're, you know, the best that we could do to

11   recreate those methodologies used by the defendants.

12   **Q.**   Have you used these style -- have you taken these

13   stylized illustrations that were created for litigation and

14   tried to publish them so they could be peer-reviewed and

15   available for criticism and use if they were actually

16   valuable?

17   **A.**   I have not done that, Your Honor.

18   **Q.**   Have you attempted to use these stylized illustrations

19   that you never used at the DEA but that you prepared for

20   litigation in any way outside of testifying in a lawsuit?

21   **A.**   I have not.

22   **Q.**   Now, you've now been hired by plaintiff lawyers suing

23   on behalf of states, correct?

24   **A.**   Yes.

25   **Q.**   Cities, correct?

1    **A.**    Yes.

2    **Q.**    And counties, correct?

3    **A.**    That's correct.

4    **Q.**    Have you gone to any of your clients and said you

5    should use this to make your registration decisions for

6    pharmacies, or distributors, or your re-registration

7    decisions?

8    **A.**    I have not done that, but I have not been asked either,

9    Your Honor.  I haven't approached anyone to try to tell them

10    to do that.

11    **Q.**    Has anyone in the world that you know of adopted the

12    stylized illustrations that you have presented to the Court

13    in this case?

14    **A.**    I have no knowledge that anyone has used these based on

15    my publications in the -- in my report that's now open to

16    the public.

17    **Q.**    Okay.  So, it's been open to the public and no one has

18    used it, correct?

19    **A.**    Not that I'm aware of.  I said I'm not aware if anyone

20    has.

21    **Q.**    Let's go back to your slide presentation, please, and

22    if we could cull up Page 14 of your slide presentation.

23    This is your list of the six methodologies, correct?

24    **A.**    That's correct, Your Honor.

25    **Q.**    Let's go through a few of them.  Am I correct that when

1    it comes to methodologies, C through F, you have not used

2    those methods?

3    **A.**   Well, it wouldn't be up to me to use or not.  If -- if

4    you're asking me -- if he's asking me, Your Honor, would I

5    -- if someone was to come to me and say should I use these

6    methodologies, I'm not a DEA person anymore.  I would tell

7    them no and I would give them reasons why.

8    **Q.**   Let me try it one more time.  You would not use methods

9    C through F, correct?

10   **A.**   If I owned a company, a distributor, and I was going to

11   design a suspicious order system, that's the basis for your

12   question, that's correct, I would not use those.

13   **Q.**   Let's focus on these other two.  You say Masters here.

14   Do you see that?

15   **A.**   Yes.

16   **Q.**   That's a reference to the Masters decision, right?

17   **A.**   That's correct.

18   **Q.**   You don't say Masters here, correct?

19   **A.**   Only probably because it didn't fit on the slide, but

20   it's -- it's also a Masters.

21   **Q.**   It's also a Masters?  That's where I was going,

22   correct?

23   **A.**   Yes.  It just treats it different with removing the

24   assumption.

25   **Q.**   And you acknowledge that Method A differs from Masters

1    in important regards, correct?

2    **A.**   Yes.

3    **Q.**   Let's talk about that.  And before I do, I'm going to

4    talk about both Method A and Method B.  This case is the

5    first of your several cases where you've used these

6    methodologies that you used Method B; is that right?

7    **A.**   That's correct.

8    **Q.**   And you adopted Method B after we had the chance to

9    critique the way Method A was conducted in your other cases,

10    correct?

11    **A.**   That's part of the reason, Your Honor, in depositions,

12    questions in depositions, to take a look at it a different

13    way.

14    **Q.**   Okay.  Let's talk about that so the Court is on the

15    same page as us.  Method A and Method B are the same

16    generally except that Method A uses what you refer to as a

17    due diligence assumption and Method B does not, correct?

18    **A.**   That's correct.

19    **Q.**   And that's what explains that chasm between the two

20    numbers, 87 percent and 20 percent, right?

21    **A.**   Yes.  More specifically, A differs from B because B --

22    the assumption in B is, is that a suspicious order is

23    identified but yet, the shipping continues.  The only

24    difference is it's fixed after the first triggered threshold

25    and that's done for a different reason.

1    **Q.**   Okay.  And I'm going to dig into that but, first, I

2    just want to add to this point we've been discussing.

3        New methodology following criticism.  I want to talk

4    about that difference, that due diligence assumption.  When

5    Dr. McCann ran Method A for you, the way he ran Method A was

6    by using the assumption that distributors did not conduct

7    any diligence on the first flagged suspicious order,

8    correct?

9    **A.**   That's correct.

10   **Q.**   And so, what that means is anytime a first order gets

11   flagged, everything else gets flagged, correct?

12   **A.**   That's correct for each pharmacy.

13   **Q.**   And you have not looked at those initial orders for

14   McKesson, Cardinal and ABDC that are the initial flagged

15   orders under your Method A, correct?

16   **A.**   Could you -- could you ask that a little further and

17   rephrase it?  I'm --

18   **Q.**   Sure.  Of course, I can.

19   **A.**   -- not sure I understand.

20   **Q.**   I'll ask it just -- just the way we've talked about it

21   before.  Have you looked at those initial orders for

22   McKesson, Cardinal and ABDC that are the initial flagged

23   orders of your Method A?

24   **A.**   I have not, Your Honor.

25   **Q.**   Did you individually review any of them to see if you

1    just looked at the order on its face whether you would

2    consider it to be suspicious?

3    **A.**   I did not, Your Honor.

4    **Q.**   Did you review the diligence files for every one of

5    these tens of millions of flagged orders?

6    **A.**   Some, I would say, yes.

7    **Q.**   It wouldn't be possible to review all of them, though,

8    and you did not review all of them, correct?

9    **A.**   That's correct.  I -- I reviewed the files of the

10   defendants, so if -- and I believe those files were past the

11   trigger date.  So, I would have reviewed some of the files.

12   **Q.**   Okay.  You don't know how many of the orders initially

13   flagged under your methodologies were actually investigated

14   and determined not to be suspicious, correct?

15   **A.**   Based on the systemic failure, I guess I couldn't rule

16   out possibility that one of them or two of them were

17   investigated, Your Honor, but just based on my review, there

18   was very little to no due diligence investigations, so I

19   would say I wouldn't have to review that to have an opinion

20   on that.

21   **Q.**   Can we cull up the September 11th, 2020 transcript at

22   Page 99, Lines 9-17?  And do you see I asked you, do you

23   know of those initial flagged orders under Method A how many

24   between 0 and 100 percent were actually investigated and the

25   flag cleared by the defendants?  Answer, I don't have a

1    definitive answer to that, sir.  Okay.  That's not something

2    you tried to evaluate, correct?  Answer, I did not.  Did I

3    read that correctly?

4    **A.**    You did.

5    **Q.**    Were you being truthful in giving that testimony?

6    **A.**    I was.

7    **Q.**    And, in fact, you don't have a number as to how many of

8    these tens of millions of orders should have been reported

9    to the DEA as suspicious, correct?

10   **A.**    Well, in Methodology A, if the due diligence is not --

11   the -- the suspicion is not dispelled, there's no due

12   diligence, then every order after that first order.

13   **Q.**    Can we look at the September 11th, 2020 transcript at

14   Page 102, please, on Line 20-23?  Do you see where I asked

15   you how many of these tens of millions of orders should have

16   been reported to the DEA as suspicious?  Do you see that?

17   **A.**    I do.  And I believe that's a different question than

18   you asked me.

19   **Q.**    Okay.  What's the answer to how many of these -- the

20   record will say what it says.  Let me finish my impeachment

21   and then we can move on.  The answer is, I don't have a

22   number, sir.  Do you see that?

23   **A.**    I would agree with that statement.

24   **Q.**    So, in case we misunderstood each other, let me just

25   ask you.  Do you know how many of these tens of millions of

1    orders should have been reported to the DEA as suspicious?

2    **A.**    No, I do not.

3    **Q.**    For shorthand, I'm going to write don't know how many

4    reportable.

5        So, let's go back to this -- this difference between

6    Method A and Method B and I want to illustrate for the

7    Court, if I could, how it works --

8    **A.**    Sure.

9    **Q.**    -- in terms of that initial order gets flagged and

10   everything after gets flagged, okay?

11   **A.**    Sure.

12   **Q.**    And do you recall that in his report, Dr. McCann gives

13   an illustration, and I just don't remember if you copied it

14   into your report, but he gives an illustration of a pharmacy

15   where, in a six-month period, you had 5,000, and then

16   10,000, and then 7,000, and 8,000, and 9,000, and 9,500

17   pills.  Do you remember that illustration?  I can show it to

18   you, if you would like.

19   **A.**    I generally recall it.  I do not believe it's in my

20   report.

21            MR. SCHMIDT:  Okay.  So, let's -- if we could put

22   up McKesson Demonstrative 2, please, just for illustration.

23   Do I need to switch the screen?

24       So, we have tried to replicate that example.  It's

25   probably going to be covered by that offense.  There we go.

1      And could you show us the first illustration?

2              BY MR. SCHMIDT:

3      **Q.**   You'll see I've taken year one, just that illustration

4      I gave you.  I moved the months because, for some reason,

5      Dr. McCann started in February and, for ease, I started in

6      January.  5,000, 10,000, 7,000, 8,000, 9,000, 9,500.  Do you

7      see that?

8      **A.**   I do.

9      **Q.**   Under your Method A and under your Method B, anytime an

10     order goes over the highest of these first sixth months, it

11     flags it, right?

12     **A.**   That's correct.

13     **Q.**   So, any order over 10,000 flags, correct?

14     **A.**   That's a correct statement, Your Honor.

15     **Q.**   Okay.  So, let's fill in the next six months, please.

16     What we filled in for the next six months, you'll see these

17     months, the last four months, repeat the exact same numbers

18     as the first six months.  Do you see that pattern?

19     **A.**   I do.

20     **Q.**   And what we did in the first six months and the second

21     six months is they were at a hundred pills less in July and

22     a hundred pills more in August.  Do you see that?

23     **A.**   I do.

24     **Q.**   And under your method, because those hundred pills

25     shift -- shifted from July to August, that would flag,

1    right?

2  **A.**   That's correct.

3         MR. SCHMIDT:  And can we highlight that?

4         BY MR. SCHMIDT:

5  **Q.**   Now, the next thing we've done, if we click again, is

6  you know many of these pharmacies have multi-year

7  relationships with the distributors, correct?

8  **A.**   Yes, sir.

9  **Q.**   So, what I have done here is I've replicated that

10 pattern from the first six months for the entire 12-year

11 period shown here.  Do you see that?

12 **A.**   Is -- is this a demonstrative or --

13 **Q.**   This is a demonstrative, yes.

14 **A.**   Okay.

15 **Q.**   I'm trying to illustrate how your methodology works.

16 **A.**   I understand.

17 **Q.**   And the only month that is flagged is this one month

18 where, instead of ordering that hundred pills in July, they

19 ordered them in August.  Do you see that?

20 **A.**   I do.

21 **Q.**   Under your methodology, with that alone, every single

22 one of these orders after this would flag, correct?

23 **A.**   That's correct.

24 **Q.**   And that's true even though every single one of them

25 follows the exact pattern of the first six months, correct?

1    **A.**    That's correct.

2    **Q.**    And it would be correct that they would all flag even

3    if, instead of following the pattern of the first six months

4    again and again, every month was actually below the amount

5    of the first six months?  They would still flag, right?

6    **A.**    That's correct.  And that occurs, Your Honor, because

7    when that -- that trigger, no matter the amount, 100, 500 or

8    1,000, the maintenance of effective controls to prevent

9    diversion requires that the registrant take some action and

10   has to do some due diligence.

11        I'm not saying that I or the DEA would close them down

12   for that 100 pills, but they just need to do something to

13   confirm.  It's -- the theory here is that it's their system

14   and that's how they designed it and a hundred triggered it.

15   I watched the testimony, I think, of Mr. Mone and he said

16   the exact same thing.

17            MR. SCHMIDT:  Your Honor, I don't think he's in a

18   position to comment on other witnesses' testimony,

19   particularly when it goes well beyond anything I asked him.

20            THE COURT:  Well, I think that's right.

21            MR. FARRELL:  Judge, I respectfully disagree.

22   He's explaining his answer.

23            MR. SCHMIDT:  I won't make Cardinal's objections

24   for them.  I suspect he's misconstruing Mr. Mone's

25   testimony, but I don't think, in any event, it's his place

1    to comment on a witness's testimony when my simple question

2    was how does this work.

3              MR. FARRELL:  So, he asked how it works and the

4    witness is trying to explain it.

5              MR. SCHMIDT:  My question was simply would it

6    flag.

7              THE COURT:  Well, I'll sustain the objection to

8    the reference to Mone's testimony.  That -- that's what

9    you're objecting to, isn't it?

10             MR. SCHMIDT:  Yes.

11             MR. FARRELL:  I believe it was Mr. Smith's motion

12   to strike.

13             MR. SCHMIDT:  Yes.

14             MR. FARRELL:  I certainly didn't object to the

15   reference to Mr. Mone.

16             MR. SCHMIDT:  May I continue, Your Honor?

17             THE COURT:  Yes.

18             MR. SCHMIDT:  Okay.

19             BY MR. SCHMIDT:

20   **Q.**   Every -- if every month from year 2 to year 12 was a

21   hundred pills, every one of those months would still flag;

22   true or not true?

23   **A.**   That's a true statement, Your Honor, if that first

24   order didn't have the -- the due diligence didn't clear the

25   suspicion.

1    **Q.**   Thank you.  Now, the due diligence assumption that

2    we've been talking about here in your Method A was not used

3    in the Masters program in the real world, correct?

4    **A.**   Well, I think not the exact methodology, but I think

5    that application that in the Masters case the problem was,

6    is that Masters didn't do the proper due diligence and

7    continued to ship suspicious orders, which is similar to how

8    it's applied here.  So, I don't totally agree with that

9    statement that you made.

10   **Q.**   Okay.  Could we cull up the September 11th, 2020

11   transcript by video at 137:21-24.

12        (Recording played in open court)

13           BY MR. SCHMIDT:

14   **Q.**   Were you being truthful when you gave that horrible

15   looking testimony for both of us over Zoom?

16   **A.**   That's what I said at that time.

17   **Q.**   Okay.

18   **A.**   I'm not sure the questions were exactly the same, but

19   that was my answer.

20   **Q.**   Well, we have the record for that, thankfully.

21   **A.**   Okay.

22   **Q.**   If a distributor identifies -- let me ask you a very

23   precise yes or no question, if I may, Mr. Rafalski.

24   **A.**   If I can answer it, Your Honor.

25   **Q.**   If a customer identifies a suspicious order, does that

```
1    require the suspension of all orders or sales of other

2    controlled substances to that customer?

3    A.    If the question is all, the answer would be no.

4    Q.    And, in fact, you testified to that very point when you

5    were a government official, didn't you?

6    A.    Yes.

7    Q.    You're not aware of any company or regulator who has

8    ever run Masters Exhibit A with a due diligence assumption

9    to any set of data at any point in time, correct?

10   A.    That's a correct estimate, Your Honor.  I'm not aware

11   if someone did not.

12   Q.    There's no general acceptance you can point me to for

13   Method A with its due diligence assumption, whether it's by

14   distributors, regulators or academics, correct?

15   A.    That is a correct statement, Your Honor.

16   Q.    The DEA has never conducted this exercise of applying

17   your Method A to identify diversion, correct?

18   A.    That's a correct statement, Your Honor.

19   Q.    In fact, you've told me it wouldn't be a valid exercise

20   for the DEA to attempt to use your Masters A to identify

21   diversion, correct?

22   A.    And apply the assumption, that would be a correct

23   statement.  I believe I testified before that if, after the

24   ruling by the DC appellate court, I may be tempted to use

25   the Masters six-month evaluation if I was still working.  I
```

1    think the ruling there kind of validated it.

2    **Q.**   So, let's -- let's go back to how you came up with

3    Method B and this idea of it being a new methodology

4    following criticism.

5    **A.**   I don't agree with that statement.

6    **Q.**   Okay.  Well, let's talk about it.

7    **A.**   Okay.

8    **Q.**   Was Method B a new methodology?

9    **A.**   It was.

10   **Q.**   Was it a new methodology in this case after you had

11   failed to use it in two other cases?

12   **A.**   It was.

13   **Q.**   Was it a new methodology following criticism we offered

14   of Method A, including on just the very points we've

15   discussed today in earlier depositions?

16   **A.**   There was criticism, but I didn't run it specifically

17   because of the criticism.  I wanted to run it to see how

18   different it would turn out.

19   **Q.**   Okay.  My question is simply a temporal question.  You

20   had Method A.  We had the chance to take issue with it.

21   Point out issues with it.  Point out that it wasn't actually

22   Masters in terms of the due diligence assumption.  And then,

23   for the first time in this case, after two prior reports,

24   you got Method B, correct?

25   **A.**   That's correct.  I wanted to see what the results would

1    be to remove the assumption.

2    **Q.**  And the results show that your flagging drops by more

3    than a quarter when you remove that assumption, correct?

4    **A.**  It does.

5    **Q.**  Now, we have since been able to depose you regarding

6    your Method B, correct?

7    **A.**  Yes.

8          MR. SCHMIDT:  And can we actually go back to I --

9    believe it's slide 14 from the demonstrative deck?  It's the

10   one -- yeah, that's the one.  Thank you.  Put it back on the

11   screen.

12         BY MR. SCHMIDT:

13   **Q.**  One of the issues that we had the chance to discuss

14   with you regarding Method B, which you've told us is

15   supposed to be based on Masters, right?

16   **A.**  It's similar.

17   **Q.**  Okay.

18   **A.**  Yes.

19   **Q.**  One difference between Method B and Masters is the way

20   they calculate the calendar months, correct?

21   **A.**  That's correct.

22   **Q.**  And we had the chance to ask you about that concern

23   with Method B in your deposition in this case, correct?

24   **A.**  That's correct.

25   **Q.**  And following that, you've come up with yet another

```
 1    method in another new case not before this Court that
 2    doesn't appear on this screen, correct?
 3    A.   Yes.
 4    Q.   Are we done with your methods or will you continue to
 5    refine your methods?
 6              MR. FARRELL:  Objection, Your Honor,
 7    argumentative.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  I think -- I don't think anything is
10    etched in stone, Your Honor.  I think what I'm trying to do
11    is present something for you to be able to -- to evaluate
12    and make a decision on.  I think there's a limit to how many
13    different methodologies you'd do.  I'm -- you know, I use
14    the ones that are up there now, and then still continue to
15    use the Masters.  Only the one that we're speaking about now
16    goes to the 30-day instead of the month.  And because those
17    were just identified in this litigation to just arbitrarily
18    make one up, I don't think would be fair either, but I -- I
19    just want to present some facts and information to the Court
20    and that's the purpose of this.
21    Q.   So, let me just try to close out that question, Mr.
22    Rafalski.  You know we have a deposition coming up next week
23    in another one of your cases, correct?
24    A.   Yes.
25    Q.   And then, you've got that pharmacy deposition I've
```

1    mentioned a few times in a couple of weeks, correct?

2    **A.**    Yes.

3    **Q.**    And I trust you expect we might come up with new

4    critiques of some of these methods in those depositions as

5    we've done previously, correct?

6    **A.**    I fully expect it, Mr. Schmidt.

7    **Q.**    We try to do our job and we'll try not to disappoint

8    you.  I -- my question is --

9    **A.**    I'm not looking forward to it, just for clarification,

10   Your Honor.

11   **Q.**    Well, we've been here four weeks.  I'm not looking

12   forward to it either, for what it's worth.

13        My question to you simply is can you rule out the

14   possibility that following those critiques you'll come up

15   with another method?

16   **A.**    I think I might have run out of methodologies used by

17   the defendants, so I think that's a good possibility.  I

18   don't think any of the other ones could be modified in a way

19   that Masters would be, so --

20   **Q.**    Do you know what -- go ahead.  I'm sorry.

21   **A.**    So, I would probably say I don't think there would be

22   any further methodologies, but I wouldn't rule that out if I

23   thought something could, you know, provide another

24   opportunity for the Court to look at, the use of a

25   methodology and the results of it.

241

```
 1   Q.   And if we did this new Method G that you've done in the
 2   pharmacy case but not here, do you know precisely what it
 3   would show for these three defendants?
 4   A.   I do not know precisely.
 5   Q.   Okay.  I want to go back to the white board, if I
 6   could, and I'd like to ask you about one more point
 7   regarding your flagging methodologies.
 8        Am I correct that the way your Method B works is that
 9   the threshold under Method B never changes based on any
10   subsequent development?
11   A.   That's a correct assumption, Mr. Schmidt -- or Your
12   Honor.
13   Q.   I've written never changes based on development.  Do
14   you see that?
15   A.   I do see that.  There's a reason for that, if I could
16   explain it to you.
17   Q.   And it doesn't change to account for population shifts,
18   correct?
19   A.   That's correct.
20   Q.   It doesn't change to account for demographic changes,
21   correct?
22   A.   That's a correct statement, Your Honor.
23   Q.   And it doesn't change to account for shifts in medical
24   needs in Cabell County, correct?
25   A.   That's correct, too.
```

1   Q.   And you can't point me to any generally accepted

2   methodology for identifying and reporting suspicious orders

3   that ignores entirely what the medical community is doing in

4   terms of increased legitimate prescriptions, true?

5   A.   That's a correct statement.

6   Q.   Okay.  Are you -- are you aware that doctors in

7   Huntington and Cabell County were making the decision to

8   prescribe more and more?  I'm going to write doctors on

9   here.  More and more prescription opioids?

10  A.   Yes.  The charts that were used today would indicate

11  that.

12  Q.   How would they indicate that?

13  A.   Well, the more drugs that are being dispensed are

14  pursuant to a prescription.

15  Q.   You get the prescription, that goes up, and then the

16  distribution goes up, correct?

17  A.   That's correct.  No other way for those charts to

18  increase without prescriptions.

19  Q.   No other way, right?

20  A.   That's correct.

21  Q.   Okay.  And so -- I apologize.  I don't think I asked

22  this, but let me be sure I did.  Method B does not adjust

23  threshold levels at all based on whether doctors are making

24  the judgment to legitimately prescribe more or less

25  prescription opioids, correct?

1    **A.**    That's correct, Your Honor.  The reason why that

2    threshold is fixed, it also applies an assumption, a due

3    diligence assumption, in a different way.

4        If I was allowed, running that methodology, for the

5    threshold to change, then it means that I'd be accepting

6    potentially diverted orders.  If they were escalating and

7    it's fixed because of that purpose, that would be similar to

8    something I did if I was working.

9        Because when you're trying to evaluate some of the

10   cases I worked on, you wouldn't allow the potential diverted

11   months to be included in adjusting the threshold and it

12   wouldn't be accurate.  So, that's the reason why it was

13   fixed.

14              MR. SCHMIDT:  Can we go back to the slides that

15   were used with Mr. Rafalski?  And if we could look at Slide

16   15, please.

17              BY MR. SCHMIDT:

18   **Q.**    Do you remember talking with Mr. Farrell about this

19   slide, sir?

20   **A.**    I do.

21   **Q.**    And the idea in this slide is every month the level of

22   distribution is increasing?

23   **A.**    That examples, yes, sir.

24   **Q.**    Okay.  And when I looked at this slide, it looked

25   almost exactly like the level of prescribing that increased

1   month by month in Cabell and Huntington.  Do you know

2   whether this example you gave directly tracks what happened

3   in the real world in terms of prescribing in Huntington and

4   Cabell?

5   **A.**   That was just a demonstrative and I didn't try to copy

6   or recreate any particular graph or exhibit.

7   **Q.**   Understood.  Understood.  But you know generally that

8   prescribing in Huntington and Cabell for a multi-year

9   period, up until about 2012, in that window, increased just

10  like that?

11  **A.**   I don't disagree with that, Your Honor.  I would

12  probably say that most places in America probably increased

13  like that.

14  **Q.**   And excuse me.  I'm sorry.  If I tracked your

15  walkthrough of these different methods with Mr. Farrell,

16  under any of the methods, if you have that prescribing

17  increasing, even if it's for legitimate medical reasons, all

18  your methods will flag it at some point, right?

19  **A.**   If there's no due diligence done and to clear that

20  order or an evaluation by a distributor to raise or change

21  the threshold, if it's a legitimate use, then that's a

22  correct statement.

23  **Q.**   Well, Dr. McCann didn't review due diligence files, did

24  he?

25  **A.**   He did not.

**Q.**   He just applied these methods with assumptions, correct?

**A.**   Yes, my assumption, that's correct.

**Q.**   And so, to ask my question, just by normal growth in prescriptions, you're going to be flagging a large number of orders under every one of your methods, correct?

**A.**   If they grow in that manner, then that's correct, yes, Your Honor.

**Q.**   All right.  Let me give you a different example.  Your Method B -- and all your methods don't change even if the DEA raises its quota, do they?

**A.**   They do not.

**Q.**   And you remember, I'm not going to go back through it, but the DEA quota was constantly changing up until about 2013, correct?

**A.**   That's an accurate statement, Your Honor.

**Q.**   Is there anytime you know of where, when you were at the DEA, you told distributors you should pick six months of data as you do in Method B and never adjust your thresholds even if the DEA quota is going up?  Did you ever tell distributors that?

**A.**   No.  I wouldn't make -- first of all, as -- my agency restricts me from giving opinions or recommending systems to a registrant, but, you know, the basis for this is the due diligence issue and whether or not it's conducted.  I

1    understand what you're asking, but I wouldn't have ever went

2    to any registrant and advised them on any system.

3    **Q.**   Did you ever try to identify distributors who you

4    believed were improper, acting improperly, because even

5    though their levels were rising in connection with the

6    quota, they quickly started exceeding the first six months?

7    Did you ever take action against the distributor on that

8    basis while at DEA?

9    **A.**   Well, it would be Masters, but I don't know if it was

10   the first six months.

11   **Q.**   Okay.  Now, let me ask you this question.  If -- and

12   this goes back to my question about whether you might have a

13   new method down the road.

14            MR. SCHMIDT:  Can we go to Slide 14, please?

15            BY MR. SCHMIDT:

16   **Q.**   This is the slide with your six methods.  And if we

17   could add that Method G from the other case that doesn't

18   appear in this case.

19        If you took any one of your methods, let's say Method

20   B, and then -- let me pause for a second.

21        Method B works in a similar way to Method A where you

22   look at the first six months of data, correct?

23   **A.**   Yes, sir.

24   **Q.**   And the highest number in that first six months

25   controls, correct?

1    **A.**    Sets the threshold for the next month.

2    **Q.**    Right.  But you can never go above that highest number,

3    right?  Anytime you go above that highest number, you're

4    going to trigger, right?

5    **A.**    That's correct.

6    **Q.**    Okay.  So, have you ever tried to do a method where you

7    take something like that, look at the first six months of

8    data, and then for the next six months, instead of basing it

9    just on the highest month, you base it on the highest month

10   adjusted for how many more prescription opioids doctors are

11   writing?

12   **A.**    I have not.

13   **Q.**    Have you ever tried to conduct an analysis like that

14   where instead of just fixing it at the amount of the first

15   sixth months, that you take that number and adjust it based

16   on how much the quota is going up?

17   **A.**    I have not, Your Honor, and that's not the purpose for

18   this methodology to provide to you, but I have not done

19   that.

20   **Q.**    Do you know how many flagged orders you would generate

21   if you did take changes in prescribing or changes in the

22   quota and used them to adjust your maximum?

23   **A.**    No, I do not.

24   **Q.**    Do you know if you would flag any orders with

25   specificity?

1   **A.**   So that -- so I understand the question, the question B

2   is if I somehow used a methodology to incorporate the

3   increase in the quota?

4   **Q.**   Or prescribing levels?

5   **A.**   Or prescribing levels?

6   **Q.**   Do you know if you flag any orders?

7   **A.**   I think you still would.

8   **Q.**   Do you know how many it would be?

9   **A.**   I don't -- no, I do not but just, you know, the

10  diversion and how it occurs is unusual increases.  And so, I

11  believe that you would flag orders.

12  **Q.**   Okay.  Do you know if it would go from 80 to 20 to

13  something far south of 20 or if it would be different?

14  **A.**   I don't have any idea.

15  **Q.**   Okay.

16  **A.**   I believe it would be less than 80.

17  **Q.**   Okay.  Are you aware that the DEA has actually used

18  techniques to try to estimate the amount of diversion and

19  has produced estimates of the amount of diversion over the

20  past two years?

21  **A.**   The only one I'm aware of is in the -- this recent

22  Federal Register publication.

23  **Q.**   Okay.  That's the Support Act, correct?

24  **A.**   Yes.

25  **Q.**   And specifically what Congress did through the Support

1    Act is it charged the DEA with trying to come up with

2    estimates of diversion in the context of setting its quota,

3    right?

4    **A.**    Just so we're talking about the same Federal Register,

5    I'm talking about the proposed rules for the suspicious

6    orders system.

7    **Q.**    Okay.  I'm talking about something different.

8    **A.**    The one we had talked about previously?

9    **Q.**    Yes, sir.

10   **A.**    Okay.

11   **Q.**    So, now that we're re-oriented, let me try my question

12   again and see if you agree with me.  Are you aware that

13   through a law called the Support Act Congress has charged

14   the DEA with coming up with estimates of how much diversion

15   is occurring to inform their decisions about quota setting?

16   **A.**    Yes.  I recall us discussing that previously.

17   **Q.**    And that is something that -- they're charged with

18   trying to come up their best methodology to estimate levels

19   of diversion, correct?

20   **A.**    Yes.  And I recall, if we're talking about the same

21   one, there's a little criticism about the DEA being kind of

22   incomplete in their gathering of information to make that

23   estimation, if that's the correct one we're speaking about.

24   **Q.**    That's required by law, right?

25   **A.**    Yes.

1    **Q.**   And it's only been for the past couple of years,

2    correct?

3    **A.**   I believe I've only read one report based on that law.

4    **Q.**   And you recall that we've had the chance to do math

5    together on that and calculate that for the past couple

6    years for oxycodone and hydrocodone and the DEA's

7    calculations are less than .1 percent diversion using their

8    method, correct?

9    **A.**   Yes.  And I believe that I didn't agree with that.

10   **Q.**   You've done the type of calculation of actual diversion

11   that the DEA has conducted, correct?

12   **A.**   I have not.  I just draw -- I make that statement just

13   based on the pure number.

14   **Q.**   You've never published your estimates, your flagging

15   methods, with a source like the Federal Register as you know

16   the DEA has?

17   **A.**   I have not, Your Honor.

18   **Q.**   And you're not aware of anyone who has tried to conduct

19   the same types of calculations of actual diversion that the

20   DEA has conducted, which show less than .1 percent diversion

21   and come up with different numbers, are you?

22   **A.**   I am not.

23   **Q.**   Okay.  I'm going to change gears now and this will

24   probably take us through the day.  Starting in 2007 and

25   2008, are you aware that McKesson, ABDC and Cardinal began

1    automatically blocking orders that exceed thresholds?

2    **A.**   I am.  All of them develop new programs in that time

3    frame and all of them included a block of orders.

4    **Q.**   You can't point me to any company before 2007 that

5    blocked every order that went over a threshold or that it

6    reported to the DEA, correct?

7    **A.**   As I sit here, I'm not aware of one, but I can't say

8    that one didn't exist, Your Honor.

9    **Q.**   And do you know of a prior public occasion when the DEA

10   said any order you identify as suspicious should not be

11   shipped prior to this 2007 window we're talking about?

12   **A.**   In those exact terms, Your Honor, that's -- I do not

13   know of that.

14   **Q.**   DEA never specifically told McKesson, ABDC or Cardinal

15   not to ship an order identified as suspicious before that

16   time period, correct?

17   **A.**   Not in those exact terms, although I think there's been

18   discussions where they talk about the maintenance of

19   effective controls to prevent diversion, and they talk about

20   identifying a suspicious order, and they talk about

21   companies having a liability or a responsibility for public

22   interest.  So, I think if you put that together, it says

23   that, but to actually -- if I understand the correction to

24   say do not ship, no, I am not aware that they've said that

25   in that way.

1    **Q.**   Before 2007, DEA never took action against the company

2    because they reported orders, but did not block them,

3    correct?

4    **A.**   I don't want to split hairs.  Southwood might have been

5    in 2006, but --

6    **Q.**   Southwood was 2007, sir.  If you want to look back at

7    your slide with it on it, I can refresh you.  Why don't we

8    put that up?

9    **A.**   I think that may be the ruling, but I think the action

10   -- action might have been sooner, but I'm not disputing the

11   2007.

12   **Q.**   Okay.

13   **A.**   I don't want to argue about a year.

14   **Q.**   And you, yourself, acknowledged that there was no do

15   not ship requirement before 2007 when you were a DEA agent,

16   correct?

17   **A.**   I -- I recall that I was testifying.  We've discussed

18   it before and I was asked and I believe I said it was a

19   change in policy.

20   **Q.**   In this 2007 time frame, correct?

21   **A.**   I don't remember the exact time frame.  I think it was

22   just in reference to -- I don't remember if I testified in

23   reference to the distributor briefings or the Rannazzisi

24   letters.

25   **Q.**   Okay.  Those all happened in the 2006-2007 time frame,

1    correct?

2    **A.**    Well, the distributor briefings were in '05.

3    **Q.**    They started in early January 2006 and went into 2007

4    according to your testimony, correct?

5    **A.**    The distributor briefings?

6    **Q.**    The distributor initiative?

7    **A.**    I believe they occurred for the defendants in '5 and

8    '6.

9    **Q.**    Okay.  Well, whatever year we're talking about in that

10   window, you testified that before that time the DEA never

11   told distributors not to ship orders they were reporting,

12   correct?

13   **A.**    I don't know if I testified to those exact words.  I do

14   recall that, when questioned about it, I said it was a

15   change in policy and that was based on some information that

16   was provided me by another diversion investigator.

17   **Q.**    Okay.  Let me ask you about the context where this

18   testimony came up.  You were involved in a case called

19   *United States v. $463,497.72*.  Do you remember that?

20   **A.**    Yes, sir.

21   **Q.**    You were actually the chief investigator in that case,

22   correct?

23   **A.**    I was.

24   **Q.**    And you were deposed in that case?

25   **A.**    That's where I made the statement, sir.

1    **Q.**   And you testified at trial in that case?

2    **A.**   I didn't testify to that at trial, but I did at the

3    deposition, yes, sir.

4    **Q.**   In that case, you testified that distributors were

5    first told about the do not ship requirement as part of the

6    distributor initiative, correct?

7    **A.**   I believe -- I believe that's a true statement.  I

8    think that that's the first time the DEA made a more

9    definitive statement do not ship.

10   **Q.**   And you said -- I'm sorry.

11   **A.**   No, go ahead.

12   **Q.**   You said those distributors briefings began in January,

13   2006, correct?

14   **A.**   If that's what I testified to, looking at -- now

15   looking at some of the distributor briefings as part of my

16   review of records in this case, I see that they were in

17   2005.

18   **Q.**   And that's since you've been hired as a plaintiffs

19   expert and given documents by plaintiffs' attorneys,

20   correct?  True?

21   **A.**   Well, yes, looking at discovery material, that's

22   correct.

23   **Q.**   I want to focus on what you were doing when you were

24   severing the United States Government as a diversion

25   investigator.  At that time, you said distributor briefing

1    started in January, 2006, correct?

2    **A.**    If I made that statement, then that's what I believed

3    at that time and it would have been provided to me by

4    another diversion investigator, not actually looking at the

5    documents of the briefing.

6    **Q.**    And you testified that the do not ship requirement is

7    not contained in the regulations or the statutes, correct?

8    **A.**    The actual words do not ship do not appear anywhere in

9    the statute or in the regulations.

10   **Q.**    And you said that they were only informed of it by the

11   DEA in these distributor briefings, correct?

12   **A.**    I was aware they were informed of it then, yes, sir.

13   **Q.**    There was a published court decision based on your

14   testimony, correct?

15   **A.**    Yes, there was, Your Honor.

16   **Q.**    And you read that decision when it came out?

17   **A.**    I did.

18   **Q.**    You testified in that case, before the judge in that

19   case?

20   **A.**    I did, Your Honor.

21   **Q.**    And your colleagues testified in that case, before the

22   judge in that case?

23   **A.**    Yes, other diversion investigators, if you mean that,

24   yes, sir.

25   **Q.**    That is what I mean, sir.

1    **A.**    Yes, sir.

2    **Q.**    You had the chance to sit there and hear them testify?

3    **A.**    I did sit there.  I was the officer in charge of the

4    investigation, Your Honor.  I watched all their testimony.

5    **Q.**    Because you were the chief investigator in this case,

6    correct?

7    **A.**    I was.

8    **Q.**    Do you recognize what I've marked as DEF-WV-2661 as the

9    case where you testified and where you were, in fact, the

10   chief investigator?

11   **A.**    I do recognize this, Your Honor.

12          MR. SCHMIDT:  Your Honor, again, we don't think

13   it's appropriate to move a case into evidence, but I do

14   think it's relevant, and the Court can take judicial notice

15   of it.  So, absent objection, I will put it up on the

16   screen.

17          THE COURT:  All right.

18          MR. SCHMIDT:  Let's go to Page 5 of this decision.

19   And can we cull out the first paragraph under (f)?  It

20   states -- the second sentence there states the regulations

21   do not prescribe any particular form or style of monitoring

22   system.  Do you see that?

23   **A.**    I do see it and I believe that's an accurate statement.

24   **Q.**    Got me on my next question.  Thank you.  Let's go to

25   Page 6, please, and if we could cull out the third and the

```
 1    fourth paragraphs, please.
 2         And let's start with the first -- I'm sorry.  Let's
 3    start with the second sentence.  The government offered
 4    testimony that the DEA sought to expand drug wholesalers'
 5    obligations by a policy change in 2006 and 2007, although
 6    there was never a change to the regulations.  Do you see
 7    that?
 8    A.   I do.
 9    Q.   That's consistent with the testimony you gave in that
10    case, correct?
11    A.   I didn't give testimony in regards to that in the
12    federal trial.  That was -- I think we were discussing my
13    deposition testimony.
14    Q.   That's consistent with deposition testimony you gave in
15    that case, right?
16    A.   I did make that statement in the deposition, yes, only
17    in regards to a change in policy.
18    Q.   There was never a change to the regulation; that's
19    true, right?
20    A.   Yes.
21    Q.   One of the changes in interpretation by the DEA
22    concerned the circumstances under which a distributor should
23    suspend shipments to a customer if it identified an order as
24    suspicious.  Do you see that?
25    A.   I do.
```

1    **Q.**   And do you know that they're talking about the do not

2    ship requirement there?

3    **A.**   I believe that's what they're referring to.

4    **Q.**   And they say that change in policy apparently prompted

5    concern within the DEA compliance sectors that confusion

6    would result since the prior report only, that's the

7    opposite of blocking, right?  Yes?

8    **A.**   Yes.  Yes.  I'm sorry.  I didn't know you were done.  I

9    didn't know you were done speaking.  I'm sorry.

10    **Q.**   That change in policy apparently prompted concern

11    within the DEA compliance sectors that confusion would

12    result since the prior report-only policy had been in place

13    for 35 years.  Do you see that?

14    **A.**   That's what this says, yes, sir.

15    **Q.**   Therefore, DEA personnel began to conduct distributor

16    briefings to familiarize drug wholesalers with the new

17    policy.  Do you see that?

18    **A.**   That's what it says, Your Honor.

19    **Q.**   And that's the distributor briefings we've been talking

20    about in '06 and '07, correct?

21    **A.**   Yes, it is.

22    **Q.**   And then there's reference to Kyle Wright conducting

23    one of those distributor briefings, correct?

24    **A.**   That's correct.

25    **Q.**   And I think you might have been involved in some later,

1   but you were not involved in any during that time period,

2   correct?

3   **A.**   I went and actually watched a distributor briefing.

4   Didn't participate other than to observe it in the Fall of

5   2008.

6   **Q.**   And then, let's look down in the next paragraph.   In

7   all events, Wright -- that's a reference to Kyle Wright, one

8   of your colleagues at DEA, right?

9   **A.**   Yes.

10   **Q.**   Wright testified that the DEA was aware that it was

11   standard practice in the industry to file Suspicious Order

12   Reports while continuing to ship products.   Do you see that?

13   **A.**   I see that.

14   **Q.**   And you are aware that Agent Wright gave that

15   testimony, right?   You watched him give it?

16   **A.**   I'm aware of it, Your Honor.

17   **Q.**   It goes on to say and that practice had been approved

18   by the DEA.   You're aware he gave that testimony, correct?

19   **A.**   I'm aware he did.

20   **Q.**   You watched him give it, correct?

21   **A.**   I did.

22   **Q.**   And as the chief investigator on this case, you never

23   stood up to disagree with him, correct?

24   **A.**   I did not.

25   **Q.**   Let's go to Page 6, please, of the opinion.   I guess

1    we're actually on Page 6, further down, second paragraph

2    from the bottom.  Mentions another one of your colleagues in

3    this second sentence.  Do you know who Michael Mapes is?

4    **A.**    I do.

5    **Q.**    Also one of your colleagues at DEA?

6    **A.**    He was also employed at the DEA.  I guess he would be a

7    colleague.  To me, that infers there's some kind of like a

8    personal relationship versus just another employee, but

9    either way.

10   **Q.**    One of your fellow agents at DEA?

11   **A.**    Yes, investigators, that's correct.

12   **Q.**    Fellow investigators.  This says Wright's supervisor,

13   Michael Mapes, told distributors at the DEA's Pharmaceutical

14   Industry Conference on September 11th, 2007 that the DEA's

15   new interpretation of the suspicious order regulation was

16   that the distributors should suspend shipments if they

17   routinely report suspicious orders with no reason to -- with

18   reason to believe they are destined for the illicit market.

19   Mapes informed Wright of that policy interpretation as well.

20   Do you see that?

21   **A.**    I do.

22   **Q.**    Did you take any issue with that testimony when you

23   were there?

24   **A.**    I didn't at that time.  I don't agree with it now.

25   **Q.**    Well, do you have any facts that let you say

1    characterizing this as a new interpretation of a suspicious

2    order regulation is wrong?

3    **A.**    Well, in looking back now at getting -- you know,

4    looking at some of the information in some of the exhibits

5    or some of the information in reviewing, I see comments by

6    the DEA back as far as 1987.  There was a -- Ron Buzzeo had

7    a seminar and there was -- there was a report or a summation

8    of what happened in his report.  And one of the questions

9    asked if there was one of the -- he said it was an active

10   discussion which, to me, meant that it was not heated, but

11   active, and one of the registrants asked if we ship -- if we

12   ship and then report, can the DEA take action and his

13   comment back was, and I think I've talked about it earlier,

14   is to do that is a registrant's not taking the public safety

15   in effect.  Indirectly, I think that's what he's saying, but

16   it wasn't as clear as saying hold here and do not ship.

17   **Q.**    Can we cull up the September 11th, 2020 testimony at

18   219:10-13?  Do you see where you were asked last September

19   the same question I just read to you, do you have any facts

20   that let you say characterizing this as a new interpretation

21   of the suspicious order regulation is wrong?  Your answer, I

22   do not.  Did I read that correctly?

23   **A.**    You did.

24   **Q.**    Were you testifying truthfully at that time?

25   **A.**    I was.

1   **Q.**   Okay.  Let's look at another part of the opinion.

2   Actually, could we go back to where we were?

3   **A.**   Which -- which -- can I ask a question?  When was this

4   deposition?

5   **Q.**   September 11th, 2020.

6   **A.**   Okay, thank you.

7   **Q.**   After you've given your report in this case, correct?

8   **A.**   Yes.

9   **Q.**   After you've given your report in New York, correct?

10   **A.**   Yes, only --

11   **Q.**   After you've given your report in Cuyahoga County,

12   correct?

13   **A.**   That's correct.  Only I -- I'd like to read more of the

14   deposition.  I'm sorry.

15          MR. IRPINO:  Your Honor, could he let him finish?

16          THE COURT:  Yes.  Let him finish his answer, Mr.

17   --

18          MR. SCHMIDT:  I'm going to object to multiple

19   objectors.

20          COURT REPORTER:  I'm sorry.  What was your name?

21          MR. IRPINO:  Anthony Irpino.

22          THE COURT:  Overrule that objection.  You go

23   ahead.

24          BY MR. SCHMIDT:

25   **Q.**   May I go back to Page 6 of the opinion, please, just

1    the part that we were looking at?  Do you see where there's

2    this reference to this September 11th, 2007 conference?

3    **A.**   I do.

4    **Q.**   Were you at that conference?

5    **A.**   I was not.

6    **Q.**   Okay.  And you didn't hear what Michael Mapes had to

7    say at that conference?

8    **A.**   I did not.  I only saw the slides that were presented

9    at that conference.

10   **Q.**   You didn't hear what Chris Zimmerman of ABDC had to say

11   at that conference?

12   **A.**   I believe I was watching his testimony when he talked

13   about it.

14   **Q.**   Okay.  But you weren't at that conference?

15              MR. FARRELL:  Objection, Your Honor.

16              THE WITNESS:  Oh, I'm sorry.  I --

17              THE COURT:  Just a minute.

18         Mr. Farrell?

19              MR. FARRELL:  Totem-pole hearsay, Your Honor.

20              MR. SCHMIDT:  I'm not familiar with that concept.

21              MR. FARRELL:  A Frank Cleckley term of multiple

22   layers of hearsay within hearsay.  We now are referencing

23   what the people that are in this document are talking about

24   or said at another conference.

25              THE COURT:  Well, this is cross examination and I

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1   think this is a good faith reason to let him go ahead and

 2   ask the questions, so I'll overrule that objection.

 3           MR. SCHMIDT:  Let me move on.

 4           BY MR. SCHMIDT:

 5   Q.   And let's look at Page 9 of the opinion.  And here,

 6   there's a reference to your testimony in the third

 7   paragraph.

 8           Could we cull that third paragraph up?

 9           Do you see where it says in this third paragraph, for

10   example, Agent Rafalski testified that after HD Smith filed

11   a Suspicious Order Report from March, 2006, he did nothing

12   to look into why the amount -- and then it continues -- was

13   identified as suspicious.  Do you see that?

14   A.   Yes.

15   Q.   And, obviously, that's referencing your testimony in

16   this case?

17   A.   That's correct.

18   Q.   In response, George Euson testified that all HD Smith

19   did in terms of due diligence in 2006 and 2007 with respect

20   to suspicious orders was report them to DEA.  Do you see

21   that?

22   A.   That's correct.

23   Q.   And then the Court found, of course, that is all the

24   regulation requires.  Do you see that?

25   A.   I don't see that the Court said that.  My recollection
```

1    of this decision, it was a civil forfeiture case, Your

2    Honor, and what -- what was at issue here was whether there

3    was a willful blindness to the regulation or if the proof

4    was -- which later the Court ruled is that the distributor

5    had to have knowledge that there was criminal activity.

6         And going into the hearing, there was a ruling prior to

7    starting the case where Judge Lawson ruled that willful

8    blindness to the regulation would have been sufficient, but

9    seems there was -- it changed course at some point and the

10   actual ruling was whether or not the distributor had

11   knowledge of criminal activity.

12   **Q.**   Sir, my question was simple.  And why don't we

13   highlight it to make it easier.  Do you see where it says

14   after Mr. Euson testified that all he did with suspicious

15   orders was report them?  Do you see where it says, of

16   course, that is all the regulation requires?  Do you see

17   that now that we've highlighted it?

18   **A.**   That's the Court's opinion, yes, sir.  I see what it

19   says there.

20   **Q.**   I want to ask you a few other questions in this area

21   and then move on to another topic.

22        Can we go back to the demonstrative that you sponsored,

23   Mr. Rafalski, and specifically, to Slide 3 of that

24   demonstrative.

25        Here you list various guidance materials; is that

1    correct?

2    **A.**    Yes.

3    **Q.**    And here we see, as we were discussing earlier, the

4    Southwood decision of 2007.  Do you see that?

5    **A.**    Yes.

6    **Q.**    And that was published in the Federal Register at that

7    time so people could see it, right?

8    **A.**    Yes.

9    **Q.**    We see some Rannazzisi letters, 2006 and 2007.  Do you

10   see that?

11   **A.**    I do.

12   **Q.**    You're actually missing one in between, right?

13   **A.**    Yes.  It was a duplication of the first one.

14   **Q.**    Okay.  And then we see this Masters decision in 2017.

15   Do you see that?

16   **A.**    Yes.

17   **Q.**    And that's something you talked about in your report?

18   **A.**    The Masters decision?  Yes.  Yes, sir.

19   **Q.**    You cited it as a guidance material in this case,

20   right?

21   **A.**    Yes, I did, Your Honor.

22   **Q.**    And you actually worked on the case while you were at

23   DEA, right?

24   **A.**    I did.

25   **Q.**    And you specifically cite a D. C. Circuit opinion from

1    2017; is that right?

2    **A.**   Yes, I do, Your Honor.

3    **Q.**   All right.  Let's cull that decision up.  That's

4    DEF-WV-3532.

5         MR. SCHMIDT:  And, again, Your Honor because it's

6    a court decision, we're not moving it into evidence.  We're

7    asking the Court to take notice of it.

8         THE WITNESS:  Thank you.

9         MR. SCHMIDT:  Thank you.

10   And I will put it up on the screen absent objection.

11        BY MR. SCHMIDT:

12   **Q.**   Do you see that this is a copy of the Masters decision

13   we were just looking at from the D. C. Circuit decided June,

14   2017?

15   **A.**   Yes, I do, Your Honor.

16   **Q.**   And I would like to show you just one portion of that

17   decision.

18        Could we go to Page 14, please?  And if we could cull

19   out the paragraph in the bottom right corner.

20        And I want to look at the sentence that begins as noted

21   above.  Do you see that sentence, Mr. Rafalski?  As noted

22   above, the shipping requirement mandates that pharmaceutical

23   companies exercise due diligence before shipping any

24   suspicious order.  Do you see that?

25   **A.**   I do.

1    **Q.**   And that's the do not ship requirement we've been

2    talking about, correct?

3    **A.**   That's -- that's correct.

4    **Q.**   Let's read the next sentence now.  DEA first

5    articulated that requirement in Southwood, and Masters

6    claims that the administrator expanded on it here.  Did I

7    read that correctly without the legal citation?

8    **A.**   You did.

9    **Q.**   And this opinion that you rely on, and cite in your

10   report, and actually worked on while at the DEA says DEA

11   first articulated that do not ship requirement in Southwood.

12   Remind us again when the Southwood decision was.

13   **A.**   2007.

14   **Q.**   Thank you, sir.  One more question on this topic.  This

15   is in evidence for notice P-33.  This is the first of the

16   two letters from Mr. Rannazzisi that you cited on your list

17   of guidance materials.  You're familiar with this document,

18   sir?

19   **A.**   I am, Your Honor.

20   **Q.**   This is one of the two letters you cited as one of your

21   guidance materials?

22   **A.**   It is.

23   **Q.**   Dated September 27th, 2006?

24   **A.**   Yes, it is, Your Honor.

25   **Q.**   And it is from Joseph Rannazzisi, correct?

**A.**   That's correct.

**Q.**   So, this pre-dates that Southwood decision we just talked about that the Masters decision says was the first articulation of the do not ship requirement, correct?

**A.**   I'd agree with that statement, Your Honor.

**Q.**   All right.  Let's look at this letter predating that first articulation of the do not ship requirement.  Would you go with me to the second page, please?  If we look at the second paragraph, Mr. Rannazzisi writes, DEA recognizes that the overwhelming majority of registered distributors act lawfully and take appropriate measures to prevent diversion.  Did I read that correctly?

**A.**   You read it correctly.

**Q.**   Here's my question, sir.  At this time, when Mr. Rannazzisi said that the overwhelming majority of registered distributors act lawfully and take appropriate measures to prevent diversion from before this time period, before 2006, is there any distributor you can point me to that blocked every order it reported to the DEA?

**A.**   I'm not aware of that, Your Honor.

**Q.**   Switching gears.  There's not a specific record retention requirement under law for federal diligence files, correct?

**A.**   It doesn't -- in the Federal Register, it doesn't specifically speak to due diligence files.

1   **Q.**   It doesn't say how long they need to be maintained,

2   correct?

3   **A.**   No.  I believe that's one of the areas of the

4   maintenance of effective control is to prevent diversion to

5   keep those records to document your decisions and your

6   actions, but it doesn't specifically say that, Your Honor,

7   anywhere in the federal regulations.

8   **Q.**   There are specific recordkeeping requirements for some

9   types of documents, right?

10  **A.**   Yes, there are.  They are a part of what's used to

11  control and to guide the -- keep the closed system intact,

12  required records.

13  **Q.**   Just not for diligence files, correct?

14  **A.**   There is not -- doesn't speak to due diligence files.

15          MR. SCHMIDT:  Okay.  Let's -- I have one more

16  small topic I can start.  I'm not done.  I've got more to

17  ask, but I can do one more small topic, Your Honor, or I can

18  --

19          THE COURT:  We've got seven minutes before your

20  sand runs out of the glass here.

21          MR. SCHMIDT:  I think I can get it done in the

22  seven minutes.  If not, I'll pick up tomorrow.

23      Could we put back up the demonstrative?  And could we

24  go to Page 7?

25          BY MR. SCHMIDT:

1    **Q.**   This says number of transactions into Huntington and

2    Cabell County, West Virginia.  Do you see that?

3    **A.**   I do, Your Honor.

4    **Q.**   Lists that number of transactions in the Huntington and

5    Cabell County for AmerisourceBergen, Cardinal Health,

6    McKesson, correct?

7    **A.**   That's what it -- that's what it says, Your Honor.

8    **Q.**   And it purports to do that for different periods of

9    time for each one of those, correct?

10   **A.**   Yes.  That was based on the transaction data that was

11   provided.

12   **Q.**   Do you understand you're missing large numbers of

13   transactions into Huntington and Cabell on this slide?

14   **A.**   Yes, I do, and the slide probably more accurately

15   should have said retail pharmacies.

16   **Q.**   Okay.  You're missing the VA, correct?

17   **A.**   I am.

18   **Q.**   You're missing other hospitals, correct?

19   **A.**   Yes, hospitals.  Only -- only data that's on display

20   for you, Your Honor, as retail pharmacies as customers.

21   **Q.**   You're missing specialty pharmacies, like compounding

22   pharmacies?

23   **A.**   Yes.

24   **Q.**   Okay.  And why did you limit this in this way?  Why did

25   you exclude those categories when you wanted to talk about

1    number of transactions into Huntington and Cabell?

2    **A.**    Well, the business activities for the hospitals and the

3    VA Hospital, I didn't find it to be applicable to the

4    diversion topic.  The diversion is occurring at the retail

5    pharmacy level and to include a hospital wouldn't have been

6    a -- you know, a prudent way to look at the distribution.

7    **Q.**    Is this the right set of data to be looking at, in your

8    view, retail pharmacy minus compound pharmacies minus

9    hospitals minus the VA?

10   **A.**    I think, in looking at records, I've learned that some

11   compounders get involved with the dispensing of controlled

12   substances.  So, in retrospect, I may want to have included

13   some compounders.

14   **Q.**    So, this is incomplete?

15   **A.**    Well --

16   **Q.**    Let me try it this way.  Is this complete in your view?

17   **A.**    It's complete.  I believe it's complete.  It's retail

18   pharmacies.  That's the target group for that data.

19   **Q.**    Is it the right set of entities for you to include in

20   evaluating number of transactions in Huntington and Cabell

21   County?

22   **A.**    That's what my report is based on and, yes, I believe

23   it is, Your Honor.

24   **Q.**    And you limited it to hydrocodone and oxycodone.  Are

25   those the two right prescription opioids to limit to in

```
1    evaluating transactions into Huntington and Cabell?

2    A.    Yes, I believe they are.

3    Q.    Let's go to Page 10, please.  A few questions about

4    this.  This slide is all dispensers, correct?

5    A.    That's what that says.

6    Q.    That includes the VA?

7    A.    If it says all dispensers as the buyer, then it would.

8    Q.    That includes hospitals?

9    A.    If that's how it's labeled from Dr. McCann's

10   publication or his -- his production, then all buyers would

11   include that.  I'm not -- I'm not positive that that's

12   exactly what that means.  It may mean all buyers as retail

13   pharmacies, but --

14   Q.    Okay.

15   A.    So, I'm not sure, Your Honor.

16   Q.    Okay.  Do you know that the VA is over 75 percent of

17   McKesson's shipments to Huntington-Cabell, right?

18   A.    I've heard that figure used.  I don't know that for a

19   fact.

20   Q.    Do you know how much lower those numbers would be if

21   you took out the VA?

22   A.    I do not if, in fact, the VA is in there.

23   Q.    You said that there was one policy change for McKesson

24   that occurred in 2008.  Do you remember that?

25   A.    Yes.
```

1    Q.   I'll just put a mark here.  What was the policy before

2    2008 called?

3    A.   The DU45.  They were publishing that on a monthly and a

4    daily basis.

5    Q.   What was the name of the operating manual?

6    A.   Section 55.

7    Q.   What was it after 2008?

8    A.   Actually, between 2007 and 2008, they had the Lifestyle

9    Drug Program.

10   Q.   Okay.  Where does that appear on this?

11   A.   There should be a little gap between the -- the two --

12   it was a short period of time, 12 months or less.  So,

13   there's a small gap there.  Then after -- I guess maybe

14   closer to 2013, they started the new policy.

15   Q.   Okay.

16   A.   Or new procedure.

17   Q.   So, there's actually a fourth policy now?

18   A.   No.

19   Q.   One, two, three, four?

20   A.   No.  There's only -- there's only one after 2008.

21   Q.   Okay.  Well, let me ask you about that.  There was

22   Section 55, correct?

23   A.   Yes.

24   Q.   That's one.  LDMP, that's two?

25   A.   Yes.

1    **Q.**   CSMP from 2008 to 2013, correct?

2    **A.**   I believe a form of that runs -- runs all the way

3    through to 2018.

4    **Q.**   Were there significant enhancements made to the CSMP in

5    2013?

6    **A.**   Yes.  The 2013 and also 2015, they incorporated a red

7    flag program and statistical/non-statistical data,

8    observable data.  There were changes along the way.

9    **Q.**   Tell me what those significant enhancements were in

10   that 2013-2014 window.  One was red flags.  What else?

11   **A.**   The '15 was the -- was the -- the 2013, I don't think,

12   was the red flags.  I believe they had a new investigative

13   policy put into place in regards to their SOMS.  And then,

14   the 2015 would have been the red flags.

15   **Q.**   Okay.  What else was done in that 2013-2015 window that

16   we don't see reflected on this chart?

17   **A.**   I believe there's some new changes to the reporting and

18   the recordkeeping, just from my recollection.

19   **Q.**   You're aware that they began reporting more suspicious

20   orders, correct?

21   **A.**   Yes.

22   **Q.**   In fact, everywhere they blocked, correct?

23   **A.**   Yes.

24   **Q.**   You've not identified any orders they blocked following

25   this period, correct?

1    **A.**   Yes, but there was no change to the threshold

2    calculation.

3    **Q.**   Okay.  You don't know that the way they calculated

4    thresholds changed?

5    **A.**   It's my understanding they were doing the 12 months

6    trailing, picking the highest month, and then a ten-percent

7    buffer.

8    **Q.**   You didn't know that they used new statistical tools

9    starting in 2014 and '15 to calculate thresholds and then

10   they brought in a company after that called AGI to calculate

11   thresholds?

12   **A.**   Yes.  I knew that they were starting to integrate the

13   AGI, but it wasn't clear to me whether or not they actually

14   were using AGI until later, in '17 and '18, and that's when

15   they rolled in the new program and were fully using the AGI

16   system.

17   **Q.**   Do you know if they were conducting more diligence?

18   **A.**   Through the AGI or --

19   **Q.**   No.  In this time period after 2013?

20   **A.**   I believe there were more site visits and more

21   reporting.  I don't -- I did not see an improvement in

22   reviews of threshold changes and due diligence of suspicious

23   orders, but I did see more compliance activity.

24   **Q.**   And, in fact, there were more compliance -- more

25   employees specifically devoted to compliance, correct?

1    **A.**   In looking -- in my reviews, I wouldn't have a way to

2    know that.  I did hear some testimony where there was an

3    increase of hiring of employees.

4    **Q.**   You didn't look at the manuals that actually lay out

5    how many new employees McKesson hired or the presentations

6    that talk about that?

7    **A.**   If I did --

8    **Q.**   Or the testimony?

9            COURT REPORTER:  I'm sorry.  I can only take one

10   at a time.

11           MR. SCHMIDT:  My fault.  I said or the testimony.

12           THE WITNESS:  I remember -- I recall in the

13   testimony there was an increase hiring of more employees.  I

14   don't recall the number.

15           BY MR. SCHMIDT:

16   **Q.**   Okay.  Last question.  In terms of --

17           MR. SCHMIDT:  And I can just end there, Your

18   Honor.  We're over time.  I'm sorry.

19           THE COURT:  You can ask him the one more question,

20   Mr. Schmidt.

21           MR. SCHMIDT:  My one question is always five, so

22   let me stop there.  I know myself, Your Honor.

23           THE COURT:  Well, I've found in my experience that

24   one more question from a lawyer never means one more.

25           MR. SCHMIDT:  Yes.  I have, too, Your Honor.

```
1              THE COURT:  I can't think of a single time when it
2       is.
3           I'll see everybody at 9:00 in the morning.
4              MS. KEARSE:  Your Honor, one thing.  There's one
5       -- there's one demonstrative Mr. Schmidt showed that wasn't
6       -- was not marked, so I just want to -- I'll get with Mr.
7       Schmidt after, but I just want to make sure we get a copy.
8       It was the demonstrative for Method A.  It wasn't marked,
9       but if we could get a copy of it.  Thank you.
10             MR. SCHMIDT:  Of course.
11             THE COURT:  All right.
12             THE WITNESS:  Thank you, Your Honor.
13             THE COURT:  See you in the morning.
14             THE WITNESS:  I will, I'll be here.
15          (Trial recessed at 5:02 p.m.)
16
17      CERTIFICATION:
18              I, Ayme A. Cochran, Official Court
19      Reporter, and I, Lisa A. Cook, Official Court Reporter,
20      certify that the foregoing is a correct transcript from
21      the record of proceedings in the matter of The City of
22      Huntington, et al., Plaintiffs vs. AmerisourceBergen
23      Drug Corporation, et al., Defendants, Civil Action No.
24      3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as
25      reported on May 26, 2021.
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*



1

2            S\Ayme A. Cochran            s\Lisa A. Cook

3               Reporter                     Reporter

4        —

5

6            May 26, 2021

7               Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:17-cv-01362   Document 1379   Filed 05/26/21   Page 280 of 316 PageID #: 55782

1

**$**

**$463,497.72** [1] -
253:19

**'**

**'05** [1] - 253:2
**'06** [2] - 41:12, 258:20
**'07** [2] - 41:12, 258:20
**'15** [2] - 275:11, 276:9
**'16** [1] - 103:19
**'17** [2] - 103:19,
276:14
**'18** [2] - 103:19,
276:14
**'6** [1] - 253:8
**'84** [1] - 11:13
**'86** [1] - 11:13
**'87** [1] - 11:14
**'95** [2] - 12:9, 45:3

**0**

**0** [6] - 103:21, 104:19,
104:25, 105:6,
105:21, 228:24
**00907** [2] - 2:5, 2:17

**1**

**1** [17] - 36:8, 37:13,
41:2, 43:1, 92:6,
93:10, 103:14,
105:2, 180:2, 180:3,
186:19, 186:21,
192:14, 193:5,
216:20, 250:7,
250:20
**1,000** [1] - 233:8
**1,005,320** [1] - 100:13
**1,056** [1] - 152:6
**1,245,640** [1] - 100:15
**10** [10] - 58:13, 58:14,
105:25, 155:10,
164:17, 164:19,
166:15, 166:22,
199:2, 273:3
**10,000** [3] - 230:16,
231:6, 231:13
**10,446,280** [1] -
100:23
**10,477,680** [1] - 98:17
**10-milligram** [1] -
19:20
**100** [6] - 71:14, 80:23,
157:19, 228:24,
233:7, 233:12
**1001** [2] - 2:10, 4:6
**1006** [2] - 7:16, 7:17

**101** [1] - 212:22
**101:11-14** [1] - 211:24
**102** [1] - 229:14
**1022** [1] - 3:5
**104** [5] - 69:23, 69:25,
70:11, 72:4, 72:5
**104.82.816** [1] - 68:8
**104.82816** [1] - 70:18
**10:00** [1] - 43:8
**11** [4] - 60:17, 60:18,
103:15, 192:12
**11,325,200** [1] - 98:7
**11,610,920** [1] - 96:22
**11-14** [1] - 212:22
**115** [2] - 105:4, 105:11
**117** [2] - 66:16, 66:19
**11th** [1] - 186:19,
188:22, 221:6,
228:21, 229:13,
235:10, 260:14,
261:17, 262:5, 263:2
**12** [19] - 15:12, 15:14,
37:13, 60:18, 60:19,
68:6, 92:3, 92:6,
92:7, 92:8, 92:17,
98:14, 103:13,
129:23, 179:23,
234:20, 274:12,
276:5
**12,459,020** [1] -
101:11
**12-month** [1] - 62:6,
70:1, 85:12, 85:15,
86:8, 91:5, 92:14,
93:13, 98:13, 99:22,
99:23
**12-year** [1] - 232:10
**120** [1] - 221:7
**123:19** [1] - 221:7
**124:1-7** [1] - 221:7
**124:7** [1] - 221:7
**126** [1] - 3:5
**13** [3] - 18:5, 93:10,
105:25
**13,274,080** [1] -
100:25
**1300** [1] - 6:15
**1311** [2] - 2:4, 2:16
**137:21-24** [1] - 235:11
**14** [8] - 7:17, 82:9,
98:20, 146:21,
224:22, 238:9,
246:14, 267:18
**14,011,880** [1] - 98:20
**14,795,350** [1] - 97:3
**14,957,360** [1] -
100:12
**140** [1] - 69:8
**14296** [1] - 7:16
**15** [5] - 24:20, 105:9,

105:10, 186:19,
243:16
**15,701,930** [1] - 100:4
**15,997,400** [1] - 97:1
**153,750** [1] - 181:20
**157** [1] - 71:25
**15910** [1] - 3:18
**1597** [3] - 162:24,
163:9, 166:11
**1598** [3] - 190:16,
191:17, 192:4
**15th** [1] - 148:1
**16** [1] - 175:11
**16,159,150** [1] - 101:2
**16,527,880** [1] -
101:14
**16,593,780** [1] - 98:21
**1600** [1] - 3:17
**17** [8] - 96:8, 99:1,
175:10, 175:18,
184:22, 200:20,
200:22, 219:2
**17,187,905** [1] - 49:10
**17,688,100** [1] -
101:16
**17,923,260** [1] - 49:9
**1717** [2] - 6:6, 6:13
**17th** [2] - 157:6,
157:11
**18** [11] - 1:16, 99:1,
142:18, 142:20,
142:21, 176:1,
181:2, 181:8,
182:22, 200:21,
219:2
**18,862** [2] - 49:23,
105:18
**18,877,140** [1] - 98:18
**187** [2] - 146:21,
147:20
**19** [3] - 99:1, 104:25,
105:12
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1971** [1] - 203:12
**1976** [1] - 11:1
**1981** [1] - 11:4
**1984** [3] - 36:25,
37:15, 41:7
**1987** [1] - 261:6
**1996** [8] - 38:4, 45:14,
49:14, 57:8, 104:18,
104:23, 105:14,
105:19
**1998** [1] - 38:6
**1:30** [2] - 113:16,
113:20
**1st** [2] - 211:23,
212:22

**2**

**2** [7] - 27:8, 43:1,
103:12, 105:25,
139:3, 230:22,
234:20
**2,098,560** [1] - 101:4
**2,362,420** [1] - 98:24
**2,390,800** [1] - 98:11
**2,405,620** [1] - 98:23
**2,484,640** [1] - 101:5
**20** [7] - 11:8, 99:1,
105:24, 167:20,
226:20, 248:12,
248:13
**20,621,360** [1] - 96:25
**20-23** [1] - 229:14
**20.2** [2] - 98:10,
219:21
**2000** [2] - 12:14,
212:23
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16,
5:5
**2002** [4] - 12:18,
45:12, 49:3, 181:19
**2003** [2] - 138:12,
181:14
**2004** [5] - 15:10,
15:17, 45:9, 49:21,
49:22
**2005** [1] - 254:17
**2006** [14] - 45:17,
118:15, 120:21,
201:20, 252:5,
253:3, 254:13,
255:1, 257:5,
264:11, 264:19,
266:9, 268:23,
269:17
**2006-2007** [1] - 252:25
**2007** [31] - 60:1, 60:6,
62:20, 65:2, 67:11,
67:14, 68:2, 71:24,
74:16, 74:23, 80:5,
103:12, 206:9,
207:2, 250:24,
251:4, 251:11,
252:1, 252:6,
252:11, 252:15,
252:20, 253:3,
257:5, 260:14,
263:2, 264:19,
266:4, 266:9,
268:13, 274:8
**2007-2008** [2] - 58:11,
206:3
**2008** [13] - 41:7, 58:18,
80:6, 103:12, 207:2,

**250:25**, **259:5**,
273:24, 274:2,
274:7, 274:8,
274:20, 275:1
**2009** [2] - 103:13,
104:25
**2010** [11] - 21:21,
22:15, 55:3, 55:4,
55:10, 55:12, 56:25,
57:3, 103:13,
104:21, 105:1
**2011** [9] - 21:23,
22:16, 103:14,
104:18, 105:5,
105:6, 105:15,
175:3, 197:24
**2012** [9] - 103:15,
104:18, 105:3,
105:4, 105:7, 105:9,
105:10, 105:20,
244:9
**2013** [15] - 8:16,
103:15, 105:9,
105:12, 105:22,
105:24, 181:15,
181:20, 245:15,
274:14, 275:1,
275:5, 275:6,
275:11, 276:19
**2013-2014** [1] - 275:10
**2013-2015** [1] - 275:15
**2014** [7] - 45:18,
103:17, 103:18,
105:12, 105:24,
201:20, 276:9
**2015** [5] - 103:19,
105:12, 105:25,
275:6, 275:14
**2016** [2] - 105:12,
105:25
**2017** [14] - 22:19,
105:13, 105:25,
124:6, 125:6,
166:15, 166:22,
167:1, 167:5,
167:13, 182:25,
266:14, 267:1,
267:14
**2018** [15] - 45:9, 45:12,
45:14, 49:3, 49:14,
49:21, 49:23,
105:25, 146:13,
146:18, 148:6,
177:5, 177:13,
178:2, 275:3
**2019** [1] - 148:1
**202** [2] - 2:4, 2:16
**2020** [20] - 45:4, 157:6,
157:12, 164:16,
164:19, 186:19,

188:22, 211:13,
211:16, 211:24,
212:17, 212:22,
212:24, 213:5,
221:6, 228:21,
229:13, 235:10,
261:17, 262:5
**2021** [4] - 1:19, 7:4,
278:25, 279:6
**21** [1] - 99:1, 176:6,
178:24
**21,679,760** [1] -
100:24
**219:10-13** [1] - 261:18
**22** [1] - 99:2
**22,582,020** [1] -
101:12
**22.2** [1] - 219:16
**2216** [1] - 3:7
**225** [1] - 157:11
**2254** [1] - 202:14
**23** [3] - 176:18, 188:25
**230** [2] - 164:16,
164:19
**24** [1] - 176:22
**24.8** [1] - 98:5
**2402** [1] - 67:6
**24th** [1] - 8:16
**25** [2] - 5:5, 183:2
**25.2** [1] - 100:14
**25301** [3] - 2:8, 3:13,
4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26** [4] - 1:19, 7:4,
278:25, 279:6
**2628** [2] - 124:23,
126:20
**27th** [1] - 268:23
**28** [3] - 3:15, 4:3, 4:9
**29** [1] - 105:24
**29.4** [1] - 98:4
**290** [1] - 67:5
**29464** [3] - 3:15, 4:4,
4:9
**29th** [2] - 212:17,
212:23
**2nd** [1] - 213:5

## 3

**3** [6] - 34:19, 43:1,
152:15, 164:17,
164:19, 265:23
**3,261,250** [1] - 97:6
**3,501,970** [1] - 97:4
**3,648,650** [1] - 101:20
**3,713,000** [1] - 101:18
**3,732,930** [1] - 49:23

**3,763,580** [1] - 98:4
**3,983,350** [1] - 49:24
**30** [2] - 23:6, 24:20
**30-day** [1] - 239:16
**30-milligram** [1] -
20:10
**3076** [2] - 118:14,
119:11
**30th** [1] - 22:19
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**32** [1] - 105:12
**325** [1] - 71:5
**32502** [1] - 2:14
**33.4** [1] - 100:15
**34** [1] - 105:12
**34,482** [1] - 181:19
**35** [2] - 163:17, 258:13
**36** [5] - 150:18, 163:6,
163:15, 163:21,
166:11
**360** [5] - 124:3, 124:7,
124:12, 124:23,
126:12
**3843** [1] - 5:14
**3:12** [1] - 199:4
**3:17-cv-01362** [2] -
1:5, 278:24
**3:17-cv-01665** [2] -
1:11, 278:24
**3rd** [2] - 211:13,
211:16

## 4

**4** [5] - 43:1, 103:12,
103:15, 125:25,
148:3
**40** [1] - 18:5
**40,000** [2] - 80:21,
80:23
**40.5** [1] - 98:9
**400** [4] - 71:16,
181:19, 219:20,
220:8
**401** [2] - 2:10, 4:6
**405** [1] - 2:7
**416** [1] - 206:4
**42432** [1] - 7:17
**45** [2] - 103:9, 103:24
**48** [1] - 12:24

## 5

**5** [9] - 36:12, 43:1,
44:7, 103:13, 105:9,
105:12, 120:8,
253:7, 256:18
**5,000** [2] - 230:15,
231:6

**5,616,380** [1] - 98:5
**50** [4] - 18:6, 152:23,
153:8, 153:9
**500** [3] - 95:3, 95:7,
233:7
**52.7** [1] - 101:4
**55** [2] - 274:6, 274:22
**55.7** [1] - 100:6
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**5:02** [1] - 278:15
**5:15** [1] - 8:8

## 6

**6** [10] - 34:10, 43:1,
44:24, 92:12,
103:18, 137:7,
256:25, 259:25,
260:1, 262:25
**60.4** [1] - 98:23
**600** [1] - 2:13
**63.3** [1] - 98:24
**64** [1] - 98:11
**642** [1] - 173:17
**65.3** [1] - 100:3
**65.9** [1] - 98:8
**66.6** [1] - 101:5
**69.4** [1] - 100:4
**6th** [2] - 3:5, 67:11,
118:15

## 7

**7** [9] - 41:2, 43:2,
47:14, 125:1,
179:23, 197:17,
199:11, 199:12,
270:24
**7,000** [2] - 230:16,
231:6
**7,252,580** [1] - 98:9
**70130** [1] - 3:8
**702** [1] - 43:17
**703** [5] - 53:11, 53:14,
127:1, 127:2, 127:3
**707** [1] - 4:18
**716** [1] - 3:12
**725** [2] - 4:13, 4:15
**73** [2] - 186:19, 186:20
**75** [1] - 273:16
**77,000-plus** [1] -
103:22
**77,398** [1] - 103:4
**77.2** [1] - 100:25
**79** [1] - 206:6
**7th** [2] - 164:16,
164:19

## 8

**8** [5] - 34:10, 36:8,
43:2, 50:22, 140:6
**8,000** [8] - 93:22, 94:1,
94:7, 94:8, 94:13,
100:19, 230:16,
231:6
**8,360,740** [1] - 100:3
**80** [5] - 18:25, 71:9,
71:17, 248:12,
248:16
**80-90** [1] - 208:17
**80-milligram** [1] -
19:19
**801** [1] - 3:10
**801(d)(2)(D)** [1] - 9:7
**805,300** [1] - 98:10
**80s** [1] - 71:14
**81.5** [2] - 98:20,
100:23
**81.8** [1] - 98:17
**81:23** [1] - 188:23
**82.5** [1] - 97:3
**82:1** [1] - 188:23
**83.4** [1] - 98:19
**83.5** [1] - 100:12
**850** [1] - 5:12
**86** [2] - 105:9, 105:12
**87** [1] - 226:20
**87.4** [1] - 97:6
**87.9** [3] - 97:5, 219:13,
219:20

## 9

**9** [5] - 34:11, 56:17,
125:10, 125:25,
264:5
**9,000** [2] - 230:16,
231:6
**9,500** [2] - 230:16,
231:6
**9,567,580** [1] - 100:6
**9-17** [1] - 228:22
**90** [3] - 152:23, 217:3,
217:15
**90.2** [1] - 101:2
**90.6** [1] - 96:22
**901** [1] - 4:18
**91.1** [1] - 96:25
**91436** [1] - 3:18
**92,915** [2] - 49:8,
104:15
**92.6** [1] - 98:21
**93.1** [1] - 97:2
**93.2** [1] - 101:19
**95.8** [1] - 100:24
**96.2** [1] - 101:15
**97.3** [1] - 101:11

**97.9** [1] - 101:20
**98** [1] - 101:16
**99** [6] - 121:14,
152:24, 153:5,
216:19, 228:22
**99.8** [1] - 101:13
**99.99** [3] - 121:22,
122:2, 122:6
**9:00** [2] - 7:4, 278:3
**9:49** [1] - 43:11
**9th** [1] - 2:10

## A

**A-Plus** [7] - 151:17,
151:23, 152:13,
152:15, 152:17,
152:20, 153:3
**a.m** [2] - 7:4, 43:11
**abandon** [1] - 87:7
**ABDC** [16] - 51:23,
73:21, 85:15, 129:9,
130:9, 131:7,
131:21, 150:24,
151:22, 206:13,
207:2, 227:14,
227:22, 250:25,
251:14, 263:10
**ability** [12] - 12:1,
16:15, 20:18, 84:4,
84:5, 86:17, 148:15,
175:15, 175:23,
176:6, 176:19,
178:25
**able** [36] - 21:13, 29:4,
44:15, 46:19, 46:23,
47:3, 49:25, 50:6,
50:10, 52:11, 54:25,
67:21, 77:10, 79:15,
83:12, 83:19, 95:22,
96:1, 104:17,
123:11, 126:9,
156:3, 156:11,
156:19, 160:10,
162:16, 167:21,
174:4, 180:23,
184:17, 185:20,
186:2, 213:21,
213:23, 238:5,
239:11
**absent** [2] - 256:15,
267:10
**absolutely** [2] -
109:21, 165:10
**abstract** [2] - 77:16,
88:12
**abuse** [10] - 139:19,
139:24, 141:8,
143:10, 143:14,
143:19, 184:25,

193:6, 193:10, 193:11
**Abuse** [2] - 126:14, 138:14
**academic** [1] - 15:15
**academics** [1] - 236:14
**academy** [3] - 15:12, 15:13, 158:23
**accept** [1] - 33:3
**acceptance** [1] - 236:12
**accepted** [2] - 15:11, 242:1
**accepting** [1] - 243:5
**access** [17] - 28:5, 149:3, 166:15, 166:22, 167:12, 167:15, 167:16, 167:17, 177:4, 177:7, 177:13, 177:15, 177:19, 178:14, 191:14, 200:2, 201:1
**accomplish** [1] - 29:4
**accordance** [2] - 200:6, 201:7
**According** [2] - 168:6, 196:2
**according** [1] - 253:4
**account** [5] - 46:9, 106:25, 241:17, 241:20, 241:23
**accountability** [1] - 191:23
**accounted** [1] - 153:19
**Accounting** [1] - 138:13
**accuracy** [4] - 52:15, 144:18, 154:23, 183:8
**accurate** [15] - 63:3, 132:20, 141:12, 144:3, 150:18, 150:19, 156:18, 162:18, 178:22, 201:9, 209:2, 210:19, 243:12, 245:16, 256:23
**accurately** [4] - 63:8, 158:20, 202:2, 271:14
**acetaminophen** [1] - 71:6
**ACKERMAN** [7] - 2:9, 8:4, 8:14, 8:21, 9:22, 9:24, 53:10
**Ackerman** [1] - 53:9
**acknowledge** [3] -

137:5, 221:16, 225:25
**acknowledged** [1] - 252:14
**act** [8] - 135:15, 162:16, 178:17, 178:20, 178:22, 184:6, 269:11, 269:16
**Act** [4] - 38:9, 248:23, 249:1, 249:13
**acting** [3] - 129:15, 182:25, 246:4
**Action** [6] - 1:4, 1:10, 118:25, 119:3, 278:23, 278:24
**action** [13] - 25:9, 29:7, 37:4, 39:9, 40:20, 76:12, 206:12, 233:9, 246:7, 252:1, 252:9, 252:10, 261:12
**Actions** [1] - 192:10
**actions** [4] - 19:4, 40:25, 41:14, 270:6
**active** [5] - 69:25, 71:9, 71:20, 261:9, 261:11
**activities** [2] - 195:20, 272:2
**activity** [6] - 22:25, 23:19, 36:25, 265:5, 265:11, 276:23
**actual** [14] - 15:25, 48:1, 52:18, 68:1, 69:25, 77:11, 83:6, 102:18, 153:13, 250:10, 250:19, 255:8, 265:10
**Adams** [1] - 67:6
**add** [4] - 51:19, 78:22, 227:2, 246:17
**Adderall** [1] - 84:8
**addition** [2] - 31:20, 119:17
**address** [3] - 52:16, 67:6, 151:3
**Address** [1] - 138:14
**addressed** [2] - 39:23, 153:24
**adequate** [1] - 148:18
**adequately** [2] - 142:13, 168:2
**adjust** [4] - 242:22, 245:19, 247:15, 247:22
**adjusted** [1] - 247:10
**adjusting** [1] - 243:11
**Administration** [4] - 13:1, 45:17, 118:18,

118:21
**Administration's** [1] - 163:11
**administrative** [12] - 15:21, 17:18, 18:10, 20:14, 20:15, 20:20, 23:16, 25:9, 28:11, 37:4, 39:9, 41:14
**administrator** [3] - 180:11, 182:25, 268:6
**admissibility** [3] - 9:20, 31:22, 63:11
**admissible** [5] - 43:25, 51:11, 52:20, 53:12, 127:3
**admit** [6] - 9:19, 9:21, 43:15, 43:22, 99:10, 120:2
**admitted** [17] - 8:2, 8:12, 8:20, 8:22, 9:25, 34:8, 34:9, 34:11, 44:1, 52:18, 53:11, 63:24, 138:22, 162:19, 174:21, 192:7, 198:2
**admittedly** [1] - 104:15
**adopted** [3] - 215:2, 224:11, 226:8
**advance** [2] - 20:9, 32:6
**advise** [1] - 42:7
**advised** [1] - 246:2
**advocate** [1] - 188:4
**affirmatively** [1] - 117:19
**after-the-fact** [2] - 65:8, 66:7
**agency** [1] - 245:22
**Agency** [1] - 118:25
**agent** [3] - 16:4, 16:5, 252:15
**Agent** [2] - 259:14, 264:10
**agents** [3] - 114:25, 166:23, 260:10
**aggregate** [2] - 180:4, 181:18
**aggressive** [1] - 142:10
**AGI** [5] - 276:10, 276:13, 276:14, 276:15, 276:18
**ago** [6] - 162:3, 167:21, 184:23, 190:25, 192:1
**agree** [63] - 32:19, 33:12, 39:20, 117:10, 117:22,

117:24, 118:5, 119:8, 121:2, 121:3, 121:8, 121:9, 121:18, 122:3, 122:4, 122:7, 122:23, 123:18, 125:15, 125:16, 140:2, 140:3, 147:14, 150:10, 150:13, 154:18, 156:2, 156:20, 157:3, 157:4, 157:17, 157:19, 157:20, 171:4, 171:6, 177:18, 186:13, 186:23, 188:3, 188:8, 188:11, 196:7, 198:19, 198:22, 200:2, 200:5, 204:2, 204:15, 207:24, 208:5, 208:10, 208:12, 209:24, 221:20, 222:1, 222:4, 229:23, 235:8, 237:5, 249:12, 250:9, 260:24, 269:5
**agreed** [4] - 8:7, 52:25, 87:3, 220:25
**agreement** [1] - 21:25
**Agreement** [3] - 22:2, 22:23, 23:3
**ahead** [34] - 14:14, 32:22, 33:11, 35:14, 40:13, 40:16, 46:1, 53:21, 63:13, 69:19, 74:5, 77:9, 79:6, 79:7, 80:10, 81:14, 86:12, 86:22, 90:12, 91:11, 91:25, 100:9, 106:20, 107:19, 110:22, 166:6, 176:18, 197:18, 198:3, 221:24, 240:20, 254:11, 262:23, 264:1
**Aid** [5] - 106:2, 106:3, 106:4, 106:9, 136:4
**Aid's** [1] - 106:13
**Aids** [1] - 215:19
**Airport** [1] - 11:10
**al** [4] - 1:7, 1:13, 278:22, 278:23
**alarm** [6] - 89:4, 89:5, 89:8, 97:14, 102:2
**algorithm** [4] - 77:18, 83:7, 84:14, 213:13
**algorithms** [3] - 87:1, 211:2, 212:25

**allegations** [1] - 171:23
**allege** [2] - 145:20, 153:2
**alleged** [3] - 146:3, 146:4, 146:12
**Allison** [1] - 7:25
**allow** [9] - 43:19, 43:21, 60:20, 63:13, 79:5, 111:14, 177:4, 177:6, 243:10
**allowed** [3] - 24:19, 144:9, 243:4
**allowing** [2] - 220:4, 220:7
**allows** [1] - 84:9
**almost** [1] - 243:25
**alone** [2] - 21:8, 232:21
**amending** [1] - 203:14
**amendment** [2] - 203:17, 203:21
**America** [7] - 11:20, 16:12, 18:18, 38:22, 123:12, 183:18, 244:12
**American** [1] - 120:23
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**AmerisourceBergen** [38] - 6:2, 29:24, 45:10, 47:21, 47:24, 49:3, 49:6, 49:16, 50:22, 54:15, 54:24, 55:6, 55:13, 55:16, 56:7, 56:13, 58:7, 59:24, 96:18, 96:20, 98:2, 98:3, 98:16, 100:2, 100:22, 101:10, 102:11, 103:1, 103:4, 103:7, 107:4, 107:21, 108:25, 110:3, 110:7, 111:12, 271:5, 278:22
**amount** [29] - 20:10, 23:5, 55:19, 57:12, 69:25, 80:18, 83:4, 84:6, 88:7, 88:17, 89:2, 91:15, 93:25, 95:1, 95:13, 95:16, 95:17, 96:22, 152:19, 182:3, 186:17, 191:11, 233:4, 233:7, 247:14, 248:18, 248:19, 264:12
**amounts** [8] - 39:8, 75:15, 95:18, 95:21, 151:6, 180:9,

181:16, 215:17
**ample** [1] - 63:12
**analyses** [4] - 201:15, 209:20, 210:8, 210:16
**analysis** [11] - 43:18, 79:10, 92:25, 127:23, 128:25, 129:4, 150:22, 151:14, 152:19, 216:6, 247:13
**Analysis** [1] - 175:5
**analyze** [3] - 26:19, 175:16, 175:20
**analyzed** [2] - 140:11, 179:10
**analyzing** [2] - 114:20, 200:11
**ANDREW** [1] - 5:10
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**annual** [1] - 144:9
**anomalies** [1] - 132:12
**Answer** [1] - 187:5
**answer** [41] - 32:13, 33:8, 33:9, 36:20, 36:22, 66:1, 128:4, 128:6, 128:7, 140:5, 145:10, 157:23, 160:3, 160:22, 160:25, 162:7, 164:21, 165:24, 166:3, 166:5, 169:2, 171:16, 171:20, 172:20, 183:11, 189:5, 202:1, 212:25, 217:22, 221:14, 228:25, 229:1, 229:2, 229:19, 229:21, 233:22, 235:19, 235:24, 236:3, 261:21, 262:16
**answered** [3] - 59:15, 171:1, 172:10
**answering** [3] - 115:19, 115:20, 160:17
**answers** [3] - 39:21, 93:4, 172:1
**ANTHONY** [1] - 2:6
**anthony** [1] - 262:21
**anytime** [4] - 227:10, 231:9, 245:17, 247:3
**apart** [1] - 48:9
**apologize** [3] - 91:3, 216:13, 242:21
**apparent** [1] - 55:2
**appear** [5] - 146:15,

239:2, 246:18, 255:8, 274:10
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appellate** [2] - 85:6, 236:24
**Appendix** [1] - 152:6
**applicable** [2] - 50:7, 272:3
**applicant** [5] - 171:19, 171:22, 171:25, 172:10, 172:12
**applicant's** [1] - 171:20
**applicants** [2] - 168:3, 168:13
**application** [3] - 171:23, 172:1, 235:5
**applications** [2] - 12:25, 170:20
**applied** [10] - 9:4, 84:21, 88:25, 89:20, 92:23, 92:24, 173:4, 235:8, 245:1
**applies** [2] - 194:24, 243:2
**apply** [3] - 114:10, 114:13, 236:22
**applying** [3] - 100:20, 171:1, 236:16
**appreciate** [1] - 99:18
**approach** [11] - 8:1, 53:23, 64:1, 118:10, 124:20, 152:8, 190:17, 193:1, 197:8, 214:1, 214:2
**approached** [2] - 11:15, 224:9
**approaches** [1] - 141:24
**appropriate** [10] - 30:22, 43:7, 74:11, 77:5, 106:23, 162:17, 221:1, 256:13, 269:11, 269:16
**appropriately** [2] - 156:16, 180:24
**approval** [2] - 138:3, 138:5, 141:3
**approved** [1] - 259:17
**approves** [1] - 171:23
**approving** [1] - 9:1
**approximation** [1] - 205:17
**APQ** [3] - 180:3, 181:18, 183:1
**April** [6] - 8:16, 67:14, 68:2, 69:4, 71:24,

148:1
**arbitrarily** [2] - 184:13, 239:17
**arbitrary** [2] - 95:3, 183:21
**Arch** [2] - 6:6, 6:13
**ARCOS** [39] - 45:15, 61:4, 61:10, 61:11, 61:15, 61:16, 61:18, 65:7, 73:6, 75:19, 76:16, 93:2, 114:6, 114:11, 114:21, 115:2, 173:7, 173:11, 173:25, 174:23, 174:25, 175:8, 175:16, 175:19, 176:2, 176:7, 176:19, 177:4, 177:13, 177:19, 191:2, 199:25, 200:1, 200:2, 200:6, 201:1, 201:19, 202:4
**area** [14] - 11:21, 15:21, 17:20, 19:3, 20:7, 42:12, 56:3, 59:8, 94:25, 117:25, 130:2, 161:1, 194:10, 265:20
**areas** [4] - 15:21, 64:23, 160:4, 270:3
**argue** [1] - 252:13
**argument** [2] - 30:21, 86:14
**argumentative** [4] - 145:5, 145:7, 147:8, 239:7
**arguments** [1] - 30:19
**arising** [1] - 109:3
**arrest** [1] - 16:6
**arrived** [1] - 18:15
**arriving** [1] - 28:12
**articulated** [6] - 31:10, 32:1, 74:7, 162:3, 268:5, 268:11
**articulation** [2] - 269:4, 269:7
**ASHLEY** [1] - 5:3
**Ashworth** [1] - 8:7
**Aside** [1] - 22:3
**assembled** [1] - 26:6
**assertions** [1] - 73:20
**assessment** [3] - 96:17, 218:16, 218:18
**assigned** [3] - 17:20, 18:16, 22:5
**assignment** [2] - 15:18, 18:10, 160:2, 160:3

**assignments** [1] - 15:22
**assist** [8] - 18:16, 27:4, 34:1, 36:2, 44:21, 47:10, 50:18, 82:5
**associate** [1] - 168:6
**association** [1] - 37:16
**assume** [2] - 73:21, 89:3
**assuming** [2] - 97:8, 102:3
**assumption** [18] - 101:25, 217:5, 225:24, 226:17, 226:22, 227:4, 227:6, 235:1, 236:8, 236:13, 236:22, 237:22, 238:1, 238:3, 241:11, 243:2, 243:3, 245:3
**assumptions** [5] - 212:7, 212:13, 212:16, 213:22, 245:1
**AT** [1] - 1:2
**attempt** [5] - 54:14, 54:19, 87:6, 221:9, 236:20
**attempted** [4] - 13:4, 52:12, 52:17, 223:18
**attempting** [3] - 87:2, 88:3, 88:4
**attempts** [1] - 86:9
**attorney** [1] - 39:1
**Attorney** [1] - 38:8
**Attorney's** [1] - 21:24
**attorneys** [4] - 26:10, 26:11, 174:1, 254:19
**attributable** [1] - 153:3
**audits** [2] - 200:13, 200:14
**August** [10] - 157:6, 157:11, 211:13, 211:16, 212:17, 212:23, 213:5, 231:22, 231:25, 232:19
**author** [2] - 197:22, 197:23
**authorities** [1] - 185:1
**authority** [1] - 143:2
**authorized** [1] - 181:15
**automatically** [1] - 251:1
**Automation** [1] - 174:24

**available** [13] - 34:24, 46:21, 47:1, 47:6, 47:22, 50:3, 50:8, 50:13, 59:5, 82:19, 102:5, 173:24, 223:15
**average** [43] - 62:3, 62:4, 62:6, 68:4, 68:6, 68:9, 68:12, 69:5, 69:9, 70:1, 70:2, 70:12, 73:10, 85:12, 85:15, 86:8, 92:9, 92:10, 92:14, 92:18, 92:19, 92:20, 93:1, 93:3, 93:11, 93:13, 93:17, 98:13, 98:14, 99:22, 99:23, 129:6, 176:14, 176:25, 177:1, 179:1, 179:2
**Avin** [1] - 3:7
**avoid** [1] - 112:10
**avoiding** [1] - 24:18
**aware** [70] - 39:13, 53:16, 53:17, 114:16, 121:13, 121:20, 124:3, 129:17, 131:6, 131:21, 132:24, 138:8, 138:10, 147:3, 149:14, 149:17, 149:19, 149:24, 151:5, 158:4, 158:7, 162:12, 162:15, 165:20, 177:6, 179:4, 179:7, 179:14, 179:17, 181:3, 181:6, 181:23, 194:20, 194:22, 201:17, 203:10, 203:13, 203:16, 203:20, 203:23, 204:12, 206:16, 206:20, 207:2, 207:5, 213:8, 213:12, 213:20, 222:8, 224:19, 236:7, 236:10, 242:6, 248:17, 248:21, 249:12, 250:18, 250:25, 251:7, 251:24, 255:12, 259:10, 259:14, 259:16, 259:18, 259:19, 269:20, 275:19
**awry** [1] - 72:9
**axis** [7] - 55:21, 55:22, 55:24, 57:4, 57:5

**Ayme** [2] - 6:17, 278:18

**B**

**background** [7] - 10:22, 20:13, 22:22, 25:14, 120:6, 123:23, 170:23
**backing** [1] - 92:14
**backside** [1] - 55:10
**backwards** [1] - 88:4
**bar** [12] - 45:7, 45:8, 45:11, 45:13, 45:15, 58:3, 58:4, 58:5, 58:17, 58:22, 87:22, 94:7
**Barber** [2] - 38:24, 38:25
**Barber's** [1] - 39:4
**Baron** [1] - 3:17
**bars** [5] - 56:18, 58:16, 58:22, 58:23, 92:15
**base** [3] - 53:15, 94:14, 247:9
**based** [41] - 51:7, 51:9, 61:11, 62:15, 65:8, 70:21, 80:15, 80:25, 83:11, 85:13, 87:15, 88:20, 103:5, 106:16, 130:5, 180:20, 180:24, 185:19, 188:6, 215:17, 216:23, 217:5, 217:18, 218:17, 218:21, 220:9, 220:10, 224:14, 228:15, 228:17, 238:15, 241:9, 241:13, 242:23, 247:15, 250:3, 250:13, 253:15, 255:13, 271:10, 272:22
**basic** [2] - 22:8, 180:9
**basing** [1] - 247:8
**basis** [25] - 51:14, 53:2, 53:19, 61:9, 63:9, 69:3, 70:5, 73:5, 94:1, 109:21, 145:6, 172:16, 175:24, 176:3, 176:9, 176:13, 179:1, 207:18, 216:25, 225:11, 245:24, 246:8, 274:4
**Bates** [1] - 66:15
**Baylen** [1] - 2:13
**bear** [1] - 123:18

**bears** [3] - 122:23, 122:25, 182:8
**became** [2] - 11:13, 11:14
**becomes** [1] - 57:1
**BEFORE** [1] - 1:17
**began** [8] - 11:20, 15:6, 21:20, 22:14, 250:25, 254:12, 258:15, 275:19
**begin** [2] - 22:6, 45:9
**beginning** [4] - 55:12, 105:7, 105:22, 154:11
**begins** [2] - 163:24, 267:20
**behalf** [6] - 41:18, 62:24, 95:15, 111:11, 112:18, 223:23
**belaboring** [3] - 34:14, 42:1, 113:11
**belief** [3] - 84:8, 104:13, 204:1
**beliefs** [1] - 118:1
**belong** [1] - 37:17
**below** [13] - 54:3, 68:2, 71:7, 75:17, 95:16, 118:25, 119:1, 141:18, 176:14, 179:2, 195:9, 205:23, 233:4
**bench** [1] - 43:16
**BENCH** [1] - 1:16
**benchmark** [1] - 70:15
**berth** [1] - 30:20
**beside** [1] - 154:19
**best** [3] - 115:22, 223:10, 249:18
**better** [4] - 37:10, 40:5, 89:4, 160:11
**between** [28] - 9:12, 36:18, 41:4, 49:21, 52:13, 58:6, 58:8, 65:4, 80:5, 89:11, 104:18, 104:23, 105:14, 149:19, 161:1, 186:22, 189:17, 201:20, 215:20, 216:10, 219:25, 226:19, 228:24, 230:5, 238:19, 266:12, 274:8, 274:11
**Between** [1] - 186:21
**beyond** [1] - 233:19
**bifurcate** [1] - 52:12
**bifurcation** [1] - 52:25
**big** [5] - 19:3, 208:14, 208:16, 219:18,

219:19
**bigger** [1] - 81:9
**bit** [13] - 8:5, 10:21, 22:20, 48:10, 59:20, 61:13, 62:24, 65:3, 67:3, 88:13, 93:20, 122:19, 158:11
**black** [2] - 34:7, 58:23
**blame** [1] - 154:15
**blank** [1] - 130:23
**blindness** [2] - 265:3, 265:8
**block** [13] - 30:6, 59:20, 79:11, 79:16, 79:21, 81:9, 97:10, 97:20, 109:2, 207:24, 208:3, 251:3, 252:2
**blocked** [10] - 42:23, 76:19, 96:3, 97:8, 207:3, 207:7, 251:5, 269:18, 275:22, 275:24
**blocking** [5] - 29:5, 89:21, 208:7, 251:1, 258:7
**blocks** [8] - 54:3, 54:6, 54:7, 54:10, 54:19, 89:22, 96:14, 97:21
**blow** [1] - 192:16
**blue** [4] - 45:11, 56:8, 56:10, 194:5
**Blvd** [3] - 3:15, 4:3, 4:9
**board** [8] - 171:24, 171:25, 174:23, 193:1, 214:1, 222:5, 222:14, 241:5
**Board** [1] - 131:15
**body** [1] - 205:18
**bollixed** [1] - 110:17
**Bonasso** [1] - 5:14
**bottle** [2] - 48:16, 48:19
**bottles** [2] - 48:7, 48:19
**bottom** [24] - 54:2, 56:18, 56:19, 56:23, 58:15, 58:21, 66:16, 67:16, 68:8, 87:20, 97:4, 98:22, 101:3, 139:14, 139:17, 140:9, 140:23, 142:22, 179:24, 188:24, 193:24, 197:12, 260:2, 267:19
**bought** [1] - 80:23
**Boulevard** [1] - 3:18
**Box** [2] - 5:14, 6:8

**box** [7] - 48:17, 55:9, 75:13, 194:13, 195:2, 195:6, 195:9
**boxes** [3] - 193:24, 194:1, 194:5
**break** [8] - 43:5, 43:9, 81:10, 81:11, 158:11, 173:22, 198:24, 209:6
**Bridgeside** [3] - 3:15, 4:3, 4:9
**Brief** [1] - 141:19
**briefing** [3] - 254:25, 255:5, 259:3
**briefings** [9] - 252:23, 253:2, 253:5, 254:12, 254:15, 255:11, 258:16, 258:19, 258:23
**briefly** [6] - 16:18, 25:7, 35:22, 37:12, 70:25, 104:1
**bring** [7] - 16:22, 44:7, 64:4, 96:8, 102:25, 122:14, 148:25
**bringing** [1] - 7:25
**broad** [3] - 187:1, 187:7, 187:8
**broader** [2] - 115:25, 174:14
**broadly** [1] - 13:18
**brought** [2] - 148:22, 276:10
**Budd** [1] - 3:17
**buffer** [1] - 276:7
**built** [2] - 75:14, 80:3
**bullets** [1] - 194:13
**bump** [1] - 93:20
**Burling** [1] - 5:11
**business** [5] - 23:9, 62:4, 84:11, 150:2, 272:2
**businesses** [1] - 17:19
**buy** [8] - 12:18, 12:19, 48:12, 48:16, 48:18, 48:19
**buy-out** [2] - 12:18, 12:19
**buyer** [1] - 273:7
**buyers** [2] - 273:10, 273:12
**Buzzeo** [1] - 261:6
**BY** [112] - 10:16, 14:23, 21:19, 25:6, 26:4, 27:9, 32:25, 33:18, 34:13, 35:15, 36:7, 37:9, 40:17, 42:6, 44:5, 45:2, 46:2, 46:18, 47:16,

53:25, 59:23, 62:18, 63:17, 64:9, 66:5, 66:22, 69:2, 70:10, 72:17, 72:21, 74:15, 75:24, 77:7, 78:8, 79:9, 80:11, 81:19, 82:14, 86:24, 87:10, 91:4, 92:2, 94:4, 96:9, 99:16, 99:21, 100:17, 103:2, 106:22, 107:14, 107:20, 108:10, 108:22, 110:4, 110:23, 111:16, 112:21, 114:1, 115:13, 118:12, 120:4, 124:21, 126:3, 127:7, 127:15, 128:10, 138:23, 139:10, 145:14, 147:21, 152:10, 155:4, 161:3, 165:3, 165:15, 166:7, 172:21, 174:12, 174:22, 178:12, 188:1, 190:12, 190:24, 192:8, 193:4, 197:10, 198:6, 199:7, 200:24, 203:3, 207:15, 207:21, 209:7, 211:25, 214:5, 216:2, 217:25, 219:4, 221:19, 221:25, 231:2, 232:4, 234:19, 235:13, 238:12, 243:17, 246:15, 262:24, 264:4, 267:11, 270:25, 277:15
**by-product** [1] - 184:5

**C**

**CA** [1] - 3:18
**Cabell** [78] - 3:2, 9:13, 42:11, 44:12, 46:20, 46:25, 47:5, 50:2, 54:25, 56:4, 57:18, 59:4, 59:8, 97:17, 103:5, 106:5, 106:10, 106:14, 106:25, 107:6, 107:24, 108:6, 108:17, 109:3, 110:9, 111:1, 111:21, 112:6, 112:25, 124:8, 124:12, 125:3,

125:8, 127:16, 127:17, 128:12, 128:23, 129:5, 129:10, 134:13, 134:21, 135:9, 135:23, 136:1, 144:16, 149:16, 150:15, 150:23, 151:19, 152:20, 153:2, 154:5, 171:16, 172:23, 179:5, 179:12, 185:16, 186:3, 186:15, 194:23, 206:14, 206:17, 206:22, 207:22, 208:21, 211:4, 241:24, 242:7, 244:1, 244:4, 244:8, 271:2, 271:5, 271:13, 272:1, 272:20, 273:1, 273:17
CABELL [1] - 1:10
cabell [1] - 2:2
Cabell/Huntington [1] - 127:17
cabinet [2] - 195:14, 196:6
cage [1] - 94:24
calculate [8] - 62:3, 62:6, 75:15, 238:20, 250:5, 276:9, 276:10
calculated [3] - 68:2, 83:17, 276:3
calculating [1] - 122:10
calculation [2] - 250:10, 276:2
calculations [3] - 115:5, 250:7, 250:19
calendar [2] - 180:11, 238:20
CALLAS [1] - 6:7
camera [1] - 66:20
Cameron [1] - 58:4
campaign [2] - 141:21, 141:22
CAMPBELL [1] - 6:14
cancelled [1] - 76:19
Cancer [1] - 204:17
cancer [2] - 142:1, 217:6
cannot [3] - 52:2, 144:20, 206:15
cap [8] - 72:4, 88:10, 89:18, 93:23, 95:11, 97:21, 97:22, 99:24
capabilities [1] - 96:5
capita [1] - 176:3

Capitol [1] - 2:7
capture [2] - 26:20, 55:9
Cardinal [70] - 4:11, 5:2, 7:21, 29:24, 38:3, 40:23, 45:13, 45:22, 46:5, 46:6, 47:21, 49:6, 49:11, 55:7, 55:8, 55:17, 57:1, 57:10, 57:15, 57:21, 57:24, 58:7, 59:24, 62:24, 64:17, 66:7, 66:11, 67:8, 67:22, 68:3, 68:11, 69:3, 70:15, 70:23, 71:19, 71:24, 72:25, 73:19, 85:16, 85:21, 85:25, 86:4, 86:6, 96:19, 97:1, 98:2, 98:7, 98:20, 100:6, 100:25, 101:14, 102:12, 104:14, 105:15, 108:3, 109:1, 129:9, 130:10, 131:7, 131:21, 150:24, 151:22, 201:22, 206:13, 207:2, 227:14, 227:22, 250:25, 251:14, 271:5
Cardinal's [2] - 63:2, 233:23
care [3] - 141:25, 216:8, 218:8
career [2] - 12:14, 160:15
careful [1] - 78:9
carefully [1] - 187:22
Carey [1] - 4:17
Carolina [1] - 176:9
carry [5] - 16:6, 156:3, 167:22, 168:18, 189:1
carve [1] - 144:19
case [102] - 13:24, 19:5, 19:8, 19:9, 19:19, 20:2, 20:3, 21:5, 22:1, 22:11, 22:16, 22:18, 23:1, 23:5, 24:15, 25:5, 25:16, 26:13, 28:6, 28:10, 29:10, 31:13, 33:20, 39:6, 39:18, 40:19, 41:19, 41:23, 48:13, 53:15, 59:14, 61:20, 62:5, 81:4, 93:24, 95:19, 115:25, 116:1, 116:2, 116:5, 124:9,

127:20, 128:24, 130:12, 132:24, 136:11, 136:20, 137:14, 147:2, 147:4, 149:15, 154:17, 179:16, 182:6, 186:10, 188:13, 188:16, 189:4, 200:19, 201:18, 202:5, 210:3, 211:12, 211:15, 213:6, 223:8, 224:13, 226:4, 229:24, 235:5, 237:10, 237:23, 238:23, 239:1, 241:2, 246:17, 246:18, 253:18, 253:21, 253:24, 254:1, 254:4, 254:16, 255:18, 255:19, 255:21, 255:22, 256:5, 256:9, 256:13, 257:10, 257:15, 259:22, 262:7, 264:16, 265:1, 265:7, 266:19, 266:22
cases [20] - 11:22, 11:25, 12:3, 12:7, 12:8, 35:9, 40:24, 83:2, 85:14, 136:15, 144:11, 146:3, 153:25, 155:11, 162:13, 226:5, 226:9, 237:11, 239:23, 243:10
cash [1] - 19:15
cashing [1] - 19:18
categories [1] - 271:25
causation [8] - 30:24, 31:4, 31:12, 31:17, 32:9, 32:13, 32:15, 111:6
caused [3] - 136:16, 136:22, 158:9
causes [6] - 124:11, 124:12, 185:16, 185:21, 186:3, 208:11
causing [1] - 185:12
CD [1] - 24:6
CDC [5] - 196:24, 197:6, 197:12, 197:23, 199:9
Center [6] - 3:12, 5:11, 64:17, 65:1, 69:10, 204:18

center [8] - 11:10, 48:23, 64:19, 68:5, 68:13, 69:6, 70:13, 95:5
certain [8] - 31:22, 32:5, 33:7, 84:16, 87:2, 122:14, 134:2, 213:9
Certainly [1] - 18:14
certainly [9] - 31:24, 31:25, 32:6, 35:8, 99:6, 99:7, 126:25, 147:3, 234:14
certainty [1] - 113:5
CERTIFICATION [1] - 278:17
certify [1] - 278:20
CFR [2] - 41:16, 202:25
chain [9] - 55:14, 57:2, 135:20, 135:25, 136:16, 136:21, 137:8, 185:23, 193:5
chains [3] - 135:14, 136:3, 137:19
challenge [1] - 31:4
challenged [1] - 43:22
chance [12] - 31:23, 33:14, 173:19, 191:8, 192:19, 214:19, 226:8, 237:20, 238:13, 238:22, 250:4, 256:2
Change [1] - 9:1
change [34] - 19:3, 41:6, 43:5, 54:20, 55:5, 55:6, 55:15, 58:8, 58:11, 58:16, 58:19, 60:2, 60:6, 62:21, 75:11, 94:17, 241:17, 241:20, 241:23, 243:5, 244:20, 245:10, 250:23, 252:19, 253:15, 257:5, 257:6, 257:17, 257:18, 258:4, 258:10, 273:23, 276:1
changed [5] - 61:13, 74:17, 104:21, 265:9, 276:4
changes [16] - 9:14, 54:7, 54:8, 54:9, 56:20, 57:1, 207:5, 241:9, 241:13, 241:20, 247:21, 257:21, 275:8, 275:17, 276:22
changing [1] - 245:14

channels [1] - 29:11
characterization [2] - 76:23, 76:24
characterize [2] - 75:13, 147:6
characterizing [2] - 261:1, 261:20
charge [2] - 50:11, 256:3
charged [4] - 137:25, 249:1, 249:13, 249:17
charges [1] - 151:12
CHARLES [1] - 3:11
CHARLESTON [2] - 1:2, 1:18
Charleston [6] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:4
chart [11] - 76:24, 87:21, 89:13, 92:5, 93:20, 125:10, 134:15, 175:18, 194:4, 196:2, 275:16
charts [4] - 154:7, 175:15, 242:10, 242:17
Chase [1] - 4:18
chasm [1] - 226:19
Chateau [1] - 152:16
check [5] - 20:6, 148:25, 170:23, 170:25, 212:10
checkers [1] - 95:14
Chemical [2] - 38:15, 38:18
chemicals [4] - 38:13, 38:19, 38:20
Chesterbrook [1] - 6:15
Chief [1] - 175:4
chief [13] - 11:15, 12:16, 12:22, 21:3, 21:25, 26:11, 29:12, 38:25, 168:6, 253:21, 256:5, 256:10, 259:22
choices [3] - 213:9, 213:12, 213:15
Chris [1] - 263:10
Christmas [1] - 86:11
chronology [1] - 24:6
Chuck [1] - 182:25
cigarettes [1] - 18:24
Cincinnati [1] - 22:7
circle [2] - 17:10, 81:1
Circuit [2] - 266:25, 267:13
circulate [2] - 8:15, 8:16

**circulated** [1] - 42:2
**circumstances** [5] - 76:11, 115:3, 130:6, 204:13, 257:22
**circumvent** [1] - 170:3
**citation** [1] - 268:7
**cite** [3] - 125:21, 266:25, 268:9
**cited** [5] - 126:4, 140:15, 266:19, 268:16, 268:20
**cities** [1] - 223:25
**citing** [1] - 126:13
**citizens** [2] - 156:2, 180:23
**City** [11] - 4:1, 5:11, 11:7, 42:12, 56:4, 56:14, 57:18, 59:9, 179:4, 208:22, 278:21
**CITY** [1] - 1:4
**city** [2] - 11:10, 151:6
**Civil** [3] - 1:4, 278:23, 278:24
**civil** [2] - 1:10, 265:1
**claim** [1] - 216:15
**claimed** [1] - 214:10
**claims** [1] - 268:6
**clarification** [6] - 35:7, 88:25, 167:4, 168:25, 214:17, 240:9
**clarify** [2] - 62:16, 78:20
**clarity** [1] - 110:1
**class** [1] - 180:9
**classifications** [2] - 17:12, 17:15
**clause** [1] - 180:5
**clean** [1] - 8:5
**clean-up** [1] - 8:5
**clear** [23] - 24:12, 31:20, 36:17, 43:13, 59:10, 62:11, 62:19, 68:11, 76:18, 79:3, 80:1, 81:5, 83:22, 88:24, 94:11, 97:11, 97:13, 217:19, 234:24, 244:19, 261:16, 276:13
**cleared** [3] - 79:5, 79:18, 228:25
**clearly** [1] - 111:4
**Cleckley** [1] - 263:21
**CLERK** [5] - 7:23, 8:19, 10:5, 10:8, 10:10
**clerks** [1] - 170:22
**click** [1] - 232:5
**clients** [1] - 224:4

**clinic** [3] - 20:4, 129:21, 129:24
**clip** [2] - 164:22, 165:2
**close** [5] - 23:7, 26:15, 209:23, 233:11, 239:21
**closed** [7] - 16:19, 16:20, 17:11, 133:15, 155:17, 205:2, 270:11
**closer** [1] - 274:14
**closes** [1] - 205:2
**cocaine** [2] - 11:20, 12:7
**Cochran** [3] - 6:17, 278:18, 279:2
**Code** [1] - 37:5
**code** [8] - 83:6, 210:22, 210:25, 212:14, 213:16, 220:18, 220:21
**coincided** [1] - 11:19
**collaborating** [1] - 37:24
**colleague** [1] - 260:7
**colleagues** [8] - 172:11, 174:3, 223:1, 255:21, 259:8, 260:2, 260:5
**collective** [1] - 107:16
**column** [8] - 47:25, 48:1, 48:23, 48:25, 69:12, 120:14, 139:12, 139:13
**combat** [2] - 123:3, 185:2
**combination** [2] - 19:20, 71:4
**combinations** [1] - 19:1
**combined** [1] - 180:12
**coming** [8] - 126:6, 194:10, 205:3, 212:14, 213:16, 222:25, 239:22, 249:14
**command** [1] - 12:20
**comment** [6] - 126:10, 205:15, 221:2, 233:18, 234:1, 261:13
**comments** [4] - 13:11, 14:6, 39:19, 261:5
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2, 3:2
**committee** [1] - 38:7
**common** [3] - 19:21, 74:22, 149:20

**commonly** [2] - 76:9, 114:25
**communicate** [2] - 45:5, 67:1
**communicated** [2] - 96:6, 179:15
**communications** [3] - 28:14, 37:25, 42:21
**community** [3] - 12:13, 122:23, 242:3
**companies** [17] - 28:5, 30:1, 42:15, 42:16, 58:10, 60:4, 61:8, 61:9, 116:4, 145:22, 145:23, 146:2, 155:15, 186:14, 251:21, 267:23
**Company** [1] - 45:10
**company** [19] - 24:16, 26:14, 26:16, 27:17, 54:9, 56:20, 75:19, 76:6, 76:12, 82:22, 92:21, 140:11, 146:17, 151:13, 225:10, 236:7, 251:4, 252:1, 276:10
**compare** [1] - 176:25
**competent** [1] - 170:22
**compilation** [2] - 42:5, 42:22
**compiled** [3] - 35:20, 200:6, 201:6
**complete** [7] - 26:8, 26:21, 29:11, 154:20, 272:16, 272:17
**completely** [1] - 86:16
**completion** [1] - 15:14
**complex** [1] - 11:18
**Compliance** [1] - 41:3
**compliance** [6] - 20:21, 258:5, 258:11, 276:23, 276:24, 276:25
**complicated** [1] - 68:24
**comply** [1] - 151:15
**complying** [1] - 134:22
**component** [1] - 44:8
**compound** [3] - 63:6, 209:5, 272:8
**compounders** [2] - 272:11, 272:13
**compounding** [1] - 271:21
**computer** [11] - 6:19, 75:13, 77:17, 83:6, 96:5, 115:1, 210:22,

211:2, 212:25, 213:13
**concept** [3] - 14:11, 196:6, 263:20
**concern** [10] - 51:19, 91:19, 158:9, 183:19, 184:10, 184:12, 184:16, 238:22, 258:5, 258:10
**concerned** [1] - 257:22
**concerning** [1] - 8:25
**concerns** [10] - 9:11, 142:10, 159:22, 169:23, 178:13, 178:16, 178:17, 182:12, 212:6, 212:7
**concise** [1] - 115:19
**concluded** [1] - 165:2
**concluding** [2] - 22:5, 184:24
**conclusion** [7] - 107:12, 108:8, 109:22, 111:4, 185:6, 202:4, 204:25
**conclusions** [2] - 30:14, 147:16
**condition** [1] - 154:13
**conditionally** [4] - 37:15, 43:15, 43:23, 44:1
**conditions** [1] - 142:12
**conduct** [22] - 16:9, 20:18, 26:13, 26:15, 26:20, 32:5, 76:17, 94:11, 106:18, 128:1, 128:22, 145:20, 146:4, 151:4, 152:19, 170:11, 185:24, 188:18, 227:6, 247:13, 250:18, 258:15
**conducted** [15] - 20:24, 23:11, 79:23, 106:4, 106:7, 127:23, 141:20, 141:22, 150:22, 174:18, 226:9, 236:16, 245:25, 250:11, 250:20
**conducting** [4] - 161:11, 161:14, 258:22, 276:17
**conducts** [1] - 168:7
**confer** [2] - 113:8, 190:20
**conference** [8] - 38:7,

263:2, 263:4, 263:7, 263:9, 263:11, 263:14, 263:24
**Conference** [1] - 260:14
**confidential** [1] - 16:8
**confirm** [8] - 26:12, 86:17, 173:23, 174:4, 212:20, 213:5, 233:13
**confirmed** [1] - 39:2, 148:5, 201:17
**confused** [1] - 189:23
**confusion** [2] - 258:5, 258:11
**Congress** [5] - 121:22, 122:5, 178:17, 248:25, 249:13
**connection** [4] - 9:13, 21:15, 124:8, 246:5
**Connolly** [2] - 4:13, 5:4
**CONROY** [1] - 3:3
**consequences** [2] - 183:19, 184:6
**consider** [2] - 127:2, 228:2
**considerable** [2] - 151:6, 186:16
**consideration** [3] - 68:10, 83:25, 220:5
**consistent** [5] - 9:4, 53:18, 147:17, 257:9, 257:14
**Consolidated** [1] - 174:24
**constantly** [1] - 245:14
**construing** [1] - 39:18
**contact** [4] - 11:25, 17:18, 20:21, 122:20
**contain** [1] - 71:8
**contained** [3] - 54:7, 70:1, 255:7
**contains** [1] - 71:3
**context** [2] - 249:2, 253:17
**continue** [13] - 24:19, 25:25, 26:5, 48:22, 72:19, 93:11, 94:12, 98:25, 111:14, 154:15, 234:16, 239:4, 239:14
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continued** [2] - 24:25, 235:7
**continues** [2] - 226:23, 264:12

**continuing** [4] - 46:12,
73:23, 112:17,
259:12
**contract** [2] - 55:5,
55:14
**contradicts** [1] - 65:11
**contrary** [1] - 147:7
**contributed** [6] -
139:19, 139:24,
143:10, 143:14,
143:19, 186:14
**contributing** [3] -
125:11, 125:16,
126:15
**control** [12] - 30:10,
30:11, 107:4,
107:22, 108:4,
108:16, 110:7,
182:5, 196:23,
198:20, 270:4,
270:11
**Control** [6] - 50:11,
54:21, 121:11,
123:7, 163:12, 192:9
**controlled** [34] -
16:16, 17:4, 21:13,
22:24, 27:15, 28:16,
29:1, 30:2, 30:6,
30:12, 38:19, 38:21,
42:13, 44:12, 48:14,
55:16, 75:10, 104:5,
107:10, 117:2,
120:16, 120:24,
121:5, 134:18,
136:9, 142:24,
143:3, 155:20,
156:22, 180:10,
183:1, 185:2, 236:2,
272:11
**Controlled** [1] -
118:22
**controls** [11] - 23:20,
24:13, 28:25, 30:1,
32:12, 76:5, 107:9,
146:7, 233:8,
246:25, 251:19
**conversation** [8] -
160:10, 160:13,
211:6, 212:6, 212:8,
212:16, 212:17,
222:18
**conversations** [1] -
215:18
**Cook** [3] - 6:18,
278:19, 279:2
**cooperative** [1] - 28:8
**copied** [1] - 230:13
**copies** [6] - 7:25, 8:10,
8:17, 13:8, 63:18,
63:24

**copy** [7] - 13:9, 42:4,
210:21, 244:5,
267:12, 278:7, 278:9
**corner** [15] - 66:19,
67:16, 71:19, 119:2,
120:9, 139:7, 140:7,
142:22, 152:15,
163:16, 163:22,
179:25, 192:13,
197:12, 267:19
**corporation** [4] - 1:7,
1:13, 170:3
**Corporation** [2] - 6:2,
278:23
**correct** [426] - 40:21,
46:8, 54:22, 57:8,
57:13, 57:14, 57:19,
57:20, 58:1, 60:7,
64:13, 66:9, 69:6,
69:7, 69:11, 70:13,
70:14, 70:23, 71:14,
71:18, 71:23, 72:1,
72:2, 72:23, 72:24,
73:1, 73:4, 73:7,
73:12, 74:19, 74:20,
79:17, 79:19, 79:20,
80:12, 81:7, 87:13,
88:6, 88:9, 88:10,
88:14, 88:18, 88:19,
89:19, 95:15, 96:15,
96:16, 97:7, 97:18,
97:22, 97:23, 102:2,
104:10, 105:16,
116:2, 116:3,
116:10, 116:11,
116:24, 117:17,
118:19, 119:6,
121:18, 122:24,
123:21, 124:1,
125:8, 125:9,
127:20, 128:15,
128:24, 129:6,
129:7, 130:24,
131:1, 131:2, 131:4,
131:12, 131:13,
131:16, 131:17,
131:19, 132:15,
132:18, 133:7,
134:5, 134:6,
134:13, 134:23,
134:24, 135:4,
135:5, 135:6,
135:11, 135:16,
135:20, 136:4,
136:7, 136:12,
136:17, 136:22,
136:23, 136:25,
137:16, 137:23,
137:24, 138:3,
138:6, 138:7, 138:9,

138:16, 144:6,
144:7, 144:9,
144:10, 144:13,
144:14, 144:17,
144:25, 145:3,
145:15, 145:21,
145:24, 146:5,
146:9, 146:10,
146:13, 148:14,
148:19, 148:24,
149:1, 149:2, 149:4,
149:5, 149:6,
149:12, 149:13,
150:3, 150:7,
150:24, 150:25,
151:4, 151:15,
153:25, 155:8,
155:13, 155:14,
155:24, 156:4,
156:9, 156:13,
156:14, 157:22,
159:13, 161:18,
161:19, 162:17,
163:4, 166:19,
166:24, 167:14,
167:18, 168:11,
168:12, 168:16,
173:9, 173:12,
173:17, 173:20,
173:25, 174:15,
174:18, 175:1,
175:16, 175:24,
176:4, 176:20,
177:2, 177:5, 177:8,
177:14, 177:17,
178:14, 178:20,
181:5, 183:23,
183:25, 186:11,
188:10, 188:11,
189:11, 191:15,
191:18, 191:20,
191:23, 192:1,
192:20, 192:23,
193:11, 194:18,
194:25, 195:1,
195:4, 195:11,
195:14, 196:1,
196:14, 198:22,
199:25, 200:7,
200:10, 200:12,
201:11, 201:13,
201:14, 201:15,
201:16, 202:8,
202:25, 204:7,
204:9, 204:15,
204:21, 204:23,
204:25, 205:4,
205:10, 206:7,
206:9, 206:10,
206:18, 206:24,
208:1, 208:5, 208:8,

208:11, 208:17,
208:18, 208:20,
209:1, 209:19,
210:18, 210:22,
210:25, 211:5,
211:22, 212:11,
212:14, 212:17,
213:6, 213:22,
213:23, 214:8,
214:14, 214:16,
214:20, 214:21,
214:25, 215:2,
215:3, 215:5, 215:6,
215:10, 216:4,
216:5, 216:9,
216:17, 216:24,
216:25, 217:5,
218:20, 219:11,
219:21, 220:12,
220:17, 222:7,
222:9, 222:12,
222:16, 222:17,
222:19, 222:23,
223:23, 223:25,
224:2, 224:3,
224:18, 224:23,
224:24, 224:25,
225:9, 225:12,
225:17, 225:18,
225:22, 226:1,
226:7, 226:10,
226:17, 226:18,
227:8, 227:9,
227:11, 227:12,
227:15, 228:8,
228:9, 228:14,
229:2, 229:9,
231:12, 231:13,
231:14, 232:2,
232:7, 232:22,
232:23, 232:25,
233:1, 233:2, 233:6,
235:3, 236:9,
236:10, 236:14,
236:15, 236:17,
236:18, 236:21,
236:22, 237:24,
237:25, 238:3,
238:6, 238:20,
238:21, 238:23,
238:24, 239:2,
239:23, 240:1,
240:5, 241:8,
241:11, 241:18,
241:19, 241:21,
241:22, 241:24,
241:25, 242:5,
242:16, 242:17,
242:20, 242:25,
243:1, 244:22,
245:2, 245:3, 245:6,

245:7, 245:15,
246:22, 246:25,
247:5, 248:23,
249:19, 249:23,
250:2, 250:8,
250:11, 251:6,
251:16, 252:3,
252:16, 252:20,
253:1, 253:4,
253:12, 253:22,
254:6, 254:13,
254:20, 254:22,
255:1, 255:7,
255:11, 255:14,
256:6, 257:10,
258:20, 258:23,
258:24, 259:2,
259:18, 259:20,
259:23, 260:11,
262:7, 262:9,
262:12, 262:13,
264:17, 264:22,
266:1, 268:2, 268:3,
268:25, 269:1,
269:4, 269:23,
270:2, 270:13,
271:6, 271:9,
271:16, 271:18,
273:4, 274:22,
275:1, 275:20,
275:22, 275:25,
276:25, 278:20
**Correct** [13] - 117:3,
117:6, 121:16,
133:24, 148:23,
161:23, 162:25,
175:5, 175:21,
176:14, 185:25,
186:5, 194:3
**correction** [2] - 91:6,
251:23
**correctly** [10] - 33:10,
164:9, 169:2,
187:10, 189:6,
229:3, 261:22,
268:7, 269:12,
269:13
**correlation** [2] -
216:10, 216:14
**corresponding** [11] -
131:25, 132:6,
132:14, 132:17,
133:1, 133:5, 135:3,
160:9, 216:8,
216:11, 216:14
**Correspondingly** [1] -
135:8
**counsel** [11] - 13:8,
21:3, 21:25, 26:11,
29:13, 31:6, 31:7,

34:6, 63:25, 210:20, 222:19
**counsel's** [1] - 39:1
**count** [5] - 18:10, 21:7, 136:11, 206:2, 206:8
**counties** [6] - 17:25, 125:4, 209:1, 209:16, 224:2
**counting** [1] - 21:11
**country** [4] - 16:22, 164:7, 200:4, 201:3
**county** [17] - 56:14, 59:11, 59:12, 144:23, 151:6, 173:12, 173:14, 176:8, 176:9, 176:12, 176:13, 178:25, 179:1, 179:6, 179:10
**COUNTY** [1] - 1:10
**County** [72] - 2:2, 3:2, 9:14, 11:1, 11:6, 42:11, 44:12, 46:20, 46:25, 47:5, 50:2, 54:25, 56:4, 59:4, 59:9, 97:17, 103:5, 106:5, 106:10, 106:14, 106:25, 107:6, 107:24, 108:6, 108:17, 109:3, 110:9, 111:1, 111:21, 112:6, 112:25, 124:8, 124:13, 125:8, 127:16, 127:18, 128:12, 129:5, 129:10, 134:13, 134:21, 135:9, 135:23, 136:1, 144:17, 149:16, 150:23, 153:2, 172:24, 179:5, 179:12, 185:17, 185:21, 186:15, 206:14, 208:21, 208:23, 208:25, 209:8, 209:10, 209:12, 209:14, 210:18, 211:20, 241:24, 242:7, 262:11, 271:2, 271:5, 272:21
**couple** [13] - 9:11, 12:13, 14:6, 18:12, 19:25, 23:15, 23:16, 44:9, 163:2, 163:4, 240:1, 250:1, 250:5
**course** [17] - 21:23, 33:19, 34:19, 37:11,

58:25, 86:20, 90:4, 125:24, 155:5, 156:20, 157:20, 196:22, 227:18, 264:23, 265:9, 265:16, 278:10
**court** [11] - 34:22, 39:18, 43:5, 100:11, 136:19, 137:3, 176:20, 235:12, 236:24, 255:13, 267:6
**Court** [49] - 6:17, 6:18, 7:3, 7:12, 10:21, 13:16, 13:20, 27:5, 30:14, 33:6, 34:20, 34:25, 35:25, 36:5, 37:14, 39:22, 42:7, 43:19, 45:4, 51:25, 54:4, 60:20, 61:24, 63:21, 75:3, 82:6, 100:20, 101:9, 119:16, 125:22, 139:6, 147:2, 202:11, 206:2, 216:4, 224:12, 226:14, 230:7, 239:1, 239:19, 240:24, 256:14, 264:23, 264:25, 265:4, 267:7, 278:18, 278:19
**COURT** [211] - 1:1, 1:17, 7:6, 7:9, 7:13, 7:24, 8:2, 8:11, 8:18, 9:8, 9:19, 9:23, 10:1, 10:14, 14:2, 14:9, 14:13, 21:15, 25:18, 25:23, 26:2, 30:15, 30:25, 31:7, 32:8, 32:18, 32:20, 33:4, 33:9, 33:17, 35:1, 35:11, 35:14, 36:17, 36:22, 39:14, 39:24, 40:3, 40:8, 40:11, 40:16, 43:4, 43:7, 43:12, 44:4, 45:1, 45:24, 46:15, 47:15, 48:3, 48:5, 50:23, 51:7, 51:16, 52:4, 52:8, 52:23, 53:5, 53:9, 53:13, 53:24, 59:21, 60:18, 60:22, 62:7, 62:13, 63:10, 64:2, 64:8, 65:16, 65:22, 65:24, 66:4, 66:21, 68:15, 68:21, 69:17, 69:19, 70:4, 70:9, 72:8, 72:10, 72:11, 72:13, 72:14, 72:15, 72:20, 73:17,

74:3, 74:8, 74:13, 75:4, 77:3, 78:7, 78:15, 79:4, 80:2, 80:7, 80:10, 81:11, 81:14, 82:13, 85:22, 86:12, 86:19, 89:24, 90:2, 90:10, 90:20, 90:23, 91:1, 91:11, 91:17, 91:24, 94:2, 99:7, 99:10, 99:14, 99:18, 100:9, 105:10, 106:19, 107:13, 107:17, 108:20, 109:14, 109:19, 109:24, 110:13, 110:15, 110:21, 111:13, 112:9, 112:13, 112:16, 113:9, 113:13, 113:18, 113:21, 113:25, 115:8, 115:11, 118:11, 119:12, 119:14, 119:24, 120:2, 126:23, 127:2, 127:14, 128:7, 138:20, 138:22, 145:6, 145:9, 147:14, 154:22, 160:22, 160:25, 165:14, 166:1, 166:4, 172:16, 172:19, 174:9, 174:21, 178:1, 187:14, 187:21, 189:17, 189:23, 190:10, 190:18, 190:22, 192:5, 192:7, 193:3, 197:20, 198:2, 198:24, 199:2, 199:5, 202:18, 202:22, 203:2, 207:13, 207:19, 209:6, 214:3, 215:21, 215:24, 217:23, 221:18, 221:24, 233:20, 234:7, 234:17, 239:8, 256:17, 262:16, 262:20, 262:22, 263:17, 263:25, 270:19, 277:9, 277:19, 277:23, 278:1, 278:11, 278:13
**Court's** [3] - 16:2, 30:18, 265:18
**courtesy** [1] - 31:6
**cover** [7] - 17:23, 17:25, 49:16, 67:13,

124:23, 138:25, 160:4
**covered** [4] - 45:17, 64:25, 185:11, 230:25
**covering** [2] - 124:8, 190:7
**covers** [5] - 61:19, 125:3, 125:8, 193:13, 193:14
**Covington** [5] - 5:11
**crack** [2] - 11:20, 120:17
**crack-down** [1] - 120:17
**crate** [1] - 48:16
**create** [4] - 68:4, 68:6, 92:9, 223:6
**created** [6] - 166:16, 166:23, 222:11, 222:14, 223:9, 223:13
**creates** [2] - 88:10, 88:11
**creating** [1] - 54:4
**crime** [1] - 11:18
**crimes** [4] - 195:3, 195:21
**criminal** [7] - 151:12, 162:9, 170:10, 170:19, 195:17, 265:5, 265:11
**crisis** [15] - 122:24, 123:1, 123:19, 124:12, 136:16, 136:22, 137:15, 137:20, 144:13, 185:8, 185:12, 185:16, 185:21, 186:3, 186:14
**criteria** [3] - 66:10, 66:11, 180:22
**critical** [1] - 83:3
**criticism** [9] - 177:14, 185:10, 223:15, 227:3, 237:4, 237:13, 237:16, 237:17, 249:21
**criticized** [4] - 177:12, 181:6, 191:2, 191:6
**critique** [1] - 226:9
**critiques** [2] - 240:4, 240:14
**CROSS** [1] - 115:12
**cross** [16] - 30:20, 52:3, 63:12, 74:12, 77:4, 77:5, 78:5, 79:5, 99:6, 109:23, 115:8, 119:20, 147:15, 154:23,

172:19, 263:25
**cross-examination** [4] - 30:20, 147:15, 154:23, 172:19
**cross-examine** [1] - 115:8
**cross-examined** [1] - 52:3
**crowds** [1] - 18:22
**CRR** [2] - 6:17, 6:18
**CSA** [3] - 41:16, 120:16, 151:15
**CSMP** [2] - 275:1, 275:4
**cue** [1] - 90:24
**cull** [26] - 120:14, 140:25, 146:20, 152:6, 157:11, 164:15, 164:16, 169:19, 181:9, 186:18, 188:22, 200:22, 202:16, 202:21, 211:23, 212:21, 224:22, 228:21, 235:10, 256:19, 256:25, 261:17, 264:8, 267:3, 267:18
**culled** [1] - 143:9
**cumulative** [1] - 154:11
**current** [1] - 148:4
**custodial** [1] - 15:12
**customer** [30] - 23:12, 23:16, 23:17, 23:23, 24:8, 24:12, 26:18, 28:9, 42:19, 67:3, 67:5, 67:7, 70:18, 70:20, 71:21, 76:16, 78:12, 83:4, 92:19, 94:2, 94:15, 95:15, 102:10, 130:13, 130:22, 149:20, 235:25, 236:2, 257:23
**customers** [7] - 24:7, 70:18, 72:7, 84:11, 106:25, 205:3, 271:20
**cut** [6] - 53:13, 91:14, 149:25, 150:1, 150:5, 183:17
**cuts** [1] - 149:20
**cutting** [2] - 183:14, 183:18
**Cuyahoga** [5] - 208:23, 209:8, 210:18, 211:20, 262:11
**CVS** [1] - 136:4

# D

**D.C** [2] - 29:13, 167:10
**DADS** [1] - 201:1
**daily** [6] - 61:9, 95:11, 95:12, 101:8, 274:4
**dark** [2] - 56:10, 56:23
**Data** [1] - 192:10
**data** [90] - 13:15, 23:12, 26:6, 26:19, 27:14, 28:23, 42:12, 44:9, 44:11, 44:16, 44:19, 45:8, 45:11, 45:14, 45:15, 45:16, 45:22, 45:23, 46:6, 46:21, 47:1, 47:6, 47:22, 50:3, 50:8, 50:13, 52:1, 53:1, 53:15, 53:17, 57:7, 57:12, 57:15, 59:5, 61:10, 61:11, 61:15, 61:16, 61:18, 61:21, 62:6, 65:7, 82:3, 84:22, 95:24, 96:11, 100:21, 104:16, 115:2, 125:21, 126:4, 126:7, 126:11, 140:11, 140:18, 149:4, 150:13, 151:25, 152:2, 173:7, 173:11, 175:16, 175:20, 175:21, 176:7, 176:19, 177:5, 178:6, 191:2, 191:4, 191:7, 191:11, 191:12, 191:14, 200:3, 201:2, 201:6, 201:21, 202:4, 236:9, 245:19, 246:22, 247:8, 271:10, 271:19, 272:7, 272:18, 275:7, 275:8
**database** [18] - 73:6, 114:6, 114:11, 114:21, 166:13, 166:15, 166:18, 166:19, 166:22, 167:1, 167:5, 167:12, 167:14, 173:25, 174:25, 177:7, 199:25, 201:19
**datasets** [2] - 87:2, 87:4
**Date** [1] - 279:7
**date** [5] - 67:9, 197:22, 197:24, 228:11

**dated** [5] - 8:16, 118:15, 211:13, 211:15, 268:23
**Dated** [1] - 148:1
**dates** [2] - 45:22, 269:2
**Daubert** [2] - 30:17, 43:18
**David** [1] - 7:1
**DAVID** [2] - 1:17, 2:9
**DC** [8] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 85:5, 236:24
**De** [2] - 2:4, 2:16
**DEA** [222] - 11:25, 12:3, 12:4, 12:5, 12:6, 13:1, 15:1, 15:3, 15:9, 15:11, 15:19, 16:13, 16:15, 17:14, 21:3, 21:25, 23:1, 25:17, 26:24, 28:18, 29:12, 29:16, 29:21, 36:11, 36:16, 37:22, 38:2, 38:15, 38:17, 38:24, 39:1, 39:9, 40:20, 40:25, 41:14, 42:23, 61:4, 61:8, 64:12, 64:23, 64:24, 65:9, 66:8, 72:3, 73:11, 73:16, 76:20, 83:11, 103:7, 114:25, 116:25, 117:6, 117:8, 118:3, 118:8, 118:25, 119:4, 119:18, 120:17, 120:22, 121:10, 121:20, 122:4, 122:5, 122:18, 123:4, 123:5, 123:7, 123:21, 123:22, 123:23, 123:25, 124:2, 124:11, 124:23, 126:6, 126:12, 126:13, 128:19, 131:14, 131:22, 131:24, 131:25, 133:6, 133:12, 141:7, 142:7, 142:10, 143:1, 143:17, 144:5, 144:9, 150:5, 150:8, 155:16, 155:17, 156:3, 156:5, 156:15, 156:21, 157:21, 158:4, 158:8, 158:12, 158:16, 158:18, 159:10, 159:11, 159:14,

159:16, 160:1, 161:9, 162:6, 162:12, 162:16, 164:5, 164:12, 164:24, 166:14, 167:11, 167:22, 168:7, 170:4, 170:11, 171:23, 172:1, 172:12, 173:7, 173:23, 173:24, 175:19, 176:1, 176:6, 176:19, 177:4, 178:1, 178:20, 178:25, 179:4, 179:10, 180:10, 180:23, 181:3, 181:15, 182:25, 183:12, 183:25, 184:10, 184:24, 185:14, 187:7, 191:1, 199:25, 200:3, 200:6, 201:2, 201:6, 201:11, 201:25, 202:8, 202:15, 203:13, 203:16, 206:12, 206:18, 206:23, 208:11, 222:5, 222:9, 223:2, 223:19, 225:6, 229:9, 229:16, 230:1, 233:11, 236:16, 236:20, 245:11, 245:14, 245:18, 245:20, 246:8, 248:17, 249:1, 249:14, 249:21, 250:11, 250:16, 250:20, 251:6, 251:9, 251:14, 252:1, 252:15, 253:10, 254:8, 255:11, 257:4, 257:21, 258:5, 258:11, 258:15, 259:8, 259:10, 259:18, 260:5, 260:6, 260:10, 261:6, 261:12, 264:20, 266:23, 268:4, 268:10, 269:9, 269:19
**DEA's** [13] - 115:1, 124:3, 124:7, 142:24, 166:18, 168:6, 174:5, 182:7, 199:25, 201:19, 250:6, 260:13, 260:14

**deal** [2] - 13:18, 28:15
**dealt** [1] - 21:5
**death** [1] - 181:12
**December** [2] - 15:17, 138:12
**decide** [2] - 43:16, 119:20
**decided** [1] - 267:13
**decision** [32] - 12:19, 29:9, 29:13, 33:15, 75:15, 76:7, 76:9, 76:13, 83:3, 93:25, 122:8, 159:20, 160:11, 182:17, 184:9, 225:16, 239:12, 242:7, 255:13, 255:16, 256:18, 265:1, 266:4, 266:14, 266:18, 267:3, 267:6, 267:12, 267:17, 268:12, 269:2, 269:9
**decision-making** [1] - 182:17
**decisions** [11] - 31:21, 39:18, 117:20, 172:6, 182:10, 188:6, 191:9, 224:5, 224:7, 249:15, 270:5
**deck** [1] - 238:9
**decline** [2] - 55:4, 55:12
**decrease** [1] - 55:18
**deemed** [1] - 51:11
**deems** [1] - 180:11
**DEF** [1] - 202:14
**DEF-WV** [1] - 202:14
**DEF-WV-1597** [1] - 179:22
**DEF-WV-2661** [1] - 256:8
**DEF-WV-3532** [1] - 267:4
**Defendant** [4] - 4:10, 5:2, 5:7, 6:2
**defendant** [4] - 47:4, 50:2, 50:7, 146:8
**Defendants** [3] - 1:8, 1:14, 278:23
**defendants** [67] - 29:24, 33:12, 36:15, 37:2, 38:11, 39:19, 42:18, 42:19, 44:11, 46:24, 47:21, 50:12, 50:15, 57:11, 59:2, 59:14, 60:9, 62:20, 62:21, 64:12, 65:3, 65:5, 73:14, 74:23, 77:11, 77:22, 78:11,

80:4, 83:7, 87:4, 95:24, 97:8, 100:21, 102:20, 104:16, 112:4, 112:18, 112:23, 116:2, 116:6, 116:12, 129:15, 132:25, 134:15, 134:18, 136:12, 146:5, 147:3, 147:5, 147:11, 154:11, 154:13, 155:10, 174:2, 202:4, 206:4, 206:22, 210:7, 223:11, 228:10, 228:25, 240:17, 241:3, 253:7
**defendants'** [3] - 61:25, 95:20, 96:11
**Defendants'** [8] - 118:14, 119:11, 124:22, 126:20, 162:23, 163:9, 173:17, 190:16
**defense** [1] - 133:7
**Defense** [2] - 191:17, 192:3
**defer** [1] - 43:19
**define** [2] - 200:16, 204:11
**defines** [1] - 203:4
**definitely** [1] - 37:24
**definition** [8] - 18:21, 187:7, 187:8, 202:10, 203:8, 203:24, 205:14
**definitive** [4] - 144:20, 187:18, 229:1, 254:9
**degree** [1] - 113:4
**delineate** [1] - 54:15
**delineated** [1] - 180:21
**delivered** [1] - 64:22
**Demo223_0003** [1] - 34:20
**Demo223_4** [1] - 36:8
**demographic** [1] - 241:20
**demonstrative** [21] - 13:6, 34:22, 35:1, 42:3, 51:6, 63:21, 99:4, 99:8, 99:9, 152:7, 200:20, 232:12, 232:13, 238:9, 244:5, 265:22, 265:24, 270:23, 278:5, 278:8
**Demonstrative** [1] - 230:22
**demonstratives** [2] -

86:3, 218:23
**denied** [1] - 172:12
**dentists** [4] - 17:7, 168:20, 169:4, 171:7
**deny** [3] - 107:17, 166:4, 191:7
**denying** [1] - 191:7
**Department** [5] - 11:1, 11:3, 11:6, 11:7, 118:21
**department** [3] - 11:18, 12:9, 12:19
**depicting** [1] - 50:16
**depiction** [2] - 56:13, 96:10
**depicts** [2] - 44:18, 60:12
**depose** [1] - 238:5
**deposed** [1] - 253:24
**Deposition** [1] - 148:4
**deposition** [16] - 136:20, 165:4, 173:20, 173:23, 174:17, 192:23, 213:21, 238:23, 239:22, 239:25, 254:3, 257:13, 257:14, 257:16, 262:4, 262:14
**depositions** [6] - 36:13, 42:17, 226:11, 226:12, 237:15, 240:4
**deprive** [2] - 183:14, 184:14
**deprived** [3] - 217:7, 218:4, 218:8
**depriving** [1] - 184:7
**depth** [1] - 94:16
**deputy** [1] - 12:16
**describe** [7] - 9:3, 41:17, 47:17, 61:23, 69:23, 75:2, 82:18
**described** [3] - 78:23, 89:13, 166:13
**describes** [1] - 93:24
**describing** [1] - 62:19
**description** [4] - 9:2, 27:24, 27:25, 93:15
**descriptions** [1] - 17:16
**design** [9] - 74:21, 74:22, 76:1, 84:10, 88:20, 213:9, 213:13, 213:15, 225:11
**designation** [1] - 15:25
**designed** [13] - 29:3, 30:4, 37:19, 79:14,

80:6, 80:8, 80:12, 83:18, 83:20, 88:15, 97:13, 109:1, 233:14
**designing** [2] - 84:12, 84:13
**desire** [2] - 84:10, 128:8
**despite** [1] - 143:17
**destined** [1] - 260:18
**detail** [2] - 77:8, 124:4
**detailed** [1] - 26:21
**detect** [2] - 24:23, 185:2
**detective** [1] - 11:14
**determination** [7] - 28:24, 29:7, 43:19, 43:23, 82:21, 117:18
**determine** [14] - 27:19, 67:22, 70:16, 79:15, 83:3, 95:18, 117:16, 117:20, 172:12, 173:7, 173:11, 176:13, 179:1, 206:20
**determined** [4] - 20:9, 95:20, 141:8, 228:14
**determining** [2] - 70:6, 116:16
**Detroit** [18] - 11:2, 11:4, 11:8, 11:9, 11:21, 15:16, 17:23, 18:4, 18:15, 20:3, 20:6, 20:7, 164:14, 165:8, 165:12, 165:20, 170:21, 171:7
**develop** [1] - 251:2
**developing** [1] - 200:9
**development** [2] - 241:10, 241:13
**deviating** [2] - 82:25, 203:6
**devoted** [1] - 276:25
**diagram** [5] - 60:12, 74:21, 192:13, 192:16, 195:21
**difference** [12] - 36:18, 41:4, 89:10, 109:15, 189:17, 219:18, 219:19, 219:25, 226:24, 227:4, 230:5, 238:19
**different** [40] - 9:17, 14:7, 16:3, 16:18, 16:23, 17:7, 56:20, 62:24, 65:3, 76:23, 81:3, 83:22, 84:7, 84:21, 87:1, 98:12, 135:10, 145:25, 175:16, 179:13,

185:11, 186:22, 193:9, 193:11, 198:16, 219:5, 220:11, 225:23, 226:12, 226:25, 229:17, 237:18, 239:13, 243:3, 244:15, 245:9, 248:13, 249:7, 250:21, 271:8
**differently** [2] - 85:10, 146:1
**differs** [2] - 225:25, 226:21
**difficult** [2] - 122:8, 182:16
**dig** [1] - 227:1
**diligence** [50] - 23:18, 42:20, 76:10, 77:21, 77:24, 79:23, 81:6, 88:24, 89:4, 89:18, 89:22, 94:11, 97:9, 102:1, 102:3, 102:5, 106:4, 106:8, 109:16, 204:24, 217:13, 217:17, 220:6, 226:17, 227:4, 227:7, 228:4, 228:18, 229:10, 229:12, 233:10, 234:24, 235:1, 235:6, 236:8, 236:13, 237:22, 243:3, 244:19, 244:23, 245:25, 264:19, 267:23, 269:22, 269:25, 270:13, 270:14, 276:17, 276:22
**diminish** [1] - 183:16
**ding** [9] - 80:16, 80:20, 80:22
**DIRECT** [1] - 10:15
**direct** [8] - 115:17, 124:17, 146:15, 150:17, 157:2, 161:8, 210:5, 217:2
**directed** [2] - 134:8, 198:18
**directly** [14] - 38:21, 39:2, 52:16, 65:11, 146:14, 149:15, 152:3, 159:25, 160:12, 165:10, 187:14, 211:9, 221:14, 244:2
**disagree** [13] - 120:25, 122:7, 122:12, 122:16, 122:17, 137:10, 140:1,

140:3, 169:14, 205:7, 233:21, 244:11, 259:23
**disappoint** [1] - 240:7
**disaster** [1] - 219:1
**discern** [2] - 77:10, 83:19
**disclose** [2] - 162:6, 170:10
**disclosed** [5] - 35:20, 52:21, 85:21, 102:19, 111:10
**disclosure** [1] - 178:2
**discovered** [3] - 104:22, 202:9, 223:8
**discovery** [3] - 35:16, 42:11, 254:21
**discretion** [1] - 43:21
**discuss** [6] - 27:22, 160:8, 174:6, 211:2, 212:25, 238:13
**discussed** [5] - 85:5, 137:10, 163:1, 182:11, 211:7, 211:8, 213:18, 237:15, 252:17
**discusses** [1] - 143:1
**discussing** [7] - 28:1, 155:22, 180:3, 227:2, 249:16, 257:12, 266:3
**discussion** [9] - 23:11, 46:4, 126:12, 142:24, 143:17, 212:15, 212:24, 261:10
**discussions** [6] - 160:14, 160:15, 160:16, 160:18, 211:8, 251:18
**dispel** [5] - 76:18, 79:24, 102:15, 104:10, 217:14
**dispelled** [4] - 76:14, 97:12, 104:12, 229:11
**dispels** [1] - 76:15
**dispense** [5] - 131:11, 133:17, 133:21, 148:14, 156:12
**dispensed** [6] - 131:8, 132:25, 134:11, 135:3, 198:20, 242:13
**dispensers** [2] - 273:4, 273:7
**dispenses** [1] - 134:7
**dispensing** [3] - 117:1, 122:21, 272:11

**Dispensing** [1] - 118:22
**display** [1] - 271:19
**dispute** [4] - 133:11, 150:17, 181:24, 212:5
**disputing** [1] - 252:10
**disruption** [1] - 112:11
**distinction** [2] - 32:15, 79:3
**distinguish** [1] - 61:16
**distinguished** [6] - 135:21, 136:6, 158:6, 159:12, 162:13
**distributed** [15] - 39:9, 46:24, 47:4, 48:24, 49:2, 50:2, 59:4, 63:18, 87:23, 134:5, 154:4, 178:10, 207:25, 208:4, 217:16
**distributes** [1] - 136:1
**distributing** [5] - 19:18, 84:1, 84:3, 135:15, 151:5
**Distribution** [3] - 64:17, 64:25, 69:10
**distribution** [42] - 19:9, 22:24, 23:4, 27:15, 28:16, 30:6, 39:6, 42:13, 44:11, 45:8, 48:1, 55:19, 56:22, 61:6, 64:19, 68:4, 68:5, 68:13, 69:6, 70:13, 72:6, 87:12, 88:2, 88:22, 92:15, 94:19, 95:4, 106:13, 130:16, 130:17, 137:6, 143:3, 155:17, 176:2, 176:7, 179:6, 179:11, 179:12, 200:11, 242:16, 243:22, 272:6
**distributions** [2] - 59:8, 153:17
**distributor** [52] - 21:10, 22:3, 39:6, 40:21, 46:20, 48:7, 48:11, 55:15, 56:6, 57:1, 60:25, 61:1, 61:2, 61:7, 62:4, 68:10, 75:10, 77:16, 143:4, 148:21, 149:20, 149:21, 150:1, 150:3, 151:3, 153:24, 160:12, 161:10, 179:5, 179:16, 204:25,

210:8, 225:10, 235:22, 244:20, 246:7, 252:23, 253:2, 253:5, 253:6, 254:6, 254:15, 254:25, 255:11, 257:22, 258:15, 258:19, 258:23, 259:3, 265:4, 265:10, 269:18

**distributor's** [1] - 179:12

**distributors** [87] - 17:2, 17:3, 19:23, 20:6, 20:7, 35:5, 37:17, 40:25, 55:6, 74:17, 94:25, 116:9, 117:8, 117:15, 117:19, 126:16, 132:18, 135:15, 143:18, 143:23, 145:23, 148:12, 148:17, 149:10, 149:15, 149:19, 150:10, 150:14, 150:22, 151:2, 154:15, 155:23, 158:5, 158:13, 158:18, 161:6, 162:13, 164:3, 168:11, 173:8, 173:12, 177:4, 177:8, 177:10, 177:11, 177:12, 177:15, 177:19, 178:5, 179:9, 184:12, 185:13, 186:7, 186:10, 186:25, 191:2, 191:8, 191:14, 194:5, 194:9, 194:10, 194:17, 194:18, 194:21, 194:24, 195:25, 198:20, 199:22, 199:24, 201:18, 202:7, 220:12, 224:6, 227:6, 232:7, 236:14, 245:18, 245:21, 246:3, 253:11, 254:4, 254:12, 260:13, 260:16, 269:10, 269:16

**Distributors** [2] - 148:12, 193:16

**District** [2] - 7:2, 7:3

**DISTRICT** [3] - 1:1, 1:1, 1:17

**Diversion** [7] - 16:1,

50:11, 54:20, 121:11, 123:7, 138:14, 163:12

**diversion** [110] - 15:7, 16:3, 16:10, 23:21, 24:14, 29:1, 30:2, 30:9, 30:11, 32:12, 76:5, 76:15, 79:24, 84:18, 94:12, 97:12, 104:3, 104:4, 104:12, 107:5, 107:10, 107:22, 108:4, 108:16, 110:8, 110:25, 111:20, 114:25, 128:14, 129:12, 129:16, 133:7, 135:11, 139:19, 139:24, 141:8, 143:10, 143:14, 143:19, 146:7, 151:15, 152:19, 153:1, 153:18, 153:19, 156:16, 166:13, 171:18, 172:9, 177:22, 177:25, 182:5, 183:17, 183:22, 184:8, 185:2, 187:7, 191:12, 193:6, 193:10, 193:11, 194:1, 194:2, 194:10, 194:17, 195:13, 195:18, 196:4, 196:6, 196:22, 196:23, 196:24, 196:25, 203:25, 204:2, 204:6, 205:10, 208:1, 208:4, 208:8, 208:11, 217:12, 217:14, 217:18, 217:20, 223:3, 233:9, 236:17, 236:21, 248:10, 248:18, 248:19, 249:2, 249:14, 249:19, 250:7, 250:10, 250:19, 250:20, 251:19, 253:16, 254:24, 255:4, 255:23, 269:12, 269:17, 270:4, 272:4

**diverted** [19] - 24:23, 30:7, 76:3, 79:19, 79:22, 81:7, 104:8, 112:5, 112:24, 153:14, 204:14, 204:23, 205:14, 205:20, 214:11,

216:15, 222:22, 243:6, 243:10

**diverters** [2] - 186:25, 187:6

**division** [5] - 12:17, 164:5, 166:14, 167:11, 169:22

**divisional** [2] - 15:17, 170:21

**dixit** [1] - 147:13

**do-over** [1] - 53:4

**doctor** [18] - 17:6, 18:7, 18:18, 18:23, 19:8, 19:10, 128:12, 128:16, 129:10, 129:11, 130:10, 130:19, 132:1, 149:15, 157:17, 195:7, 218:11, 222:3

**doctor/patient** [2] - 116:21, 132:10

**doctors** [35] - 17:7, 17:8, 19:10, 20:11, 116:14, 116:15, 117:23, 118:1, 121:14, 121:22, 122:6, 123:18, 125:17, 127:17, 127:24, 128:23, 129:14, 129:25, 138:9, 156:23, 157:1, 157:25, 158:2, 167:23, 171:7, 185:13, 186:24, 193:20, 242:6, 242:8, 242:23, 247:10

**document** [45] - 8:15, 9:3, 9:5, 9:10, 26:17, 35:9, 52:19, 52:21, 52:22, 66:23, 66:25, 68:12, 119:16, 119:22, 120:8, 124:16, 124:22, 125:1, 125:25, 126:2, 127:8, 138:11, 140:19, 143:21, 162:19, 162:21, 162:22, 163:15, 167:20, 173:16, 179:23, 179:24, 190:14, 191:1, 191:18, 192:12, 192:14, 197:11, 197:17, 198:4, 221:10, 263:23, 268:17, 270:5

**documentation** [1] - 28:15

**documented** [1] - 165:22

**documents** [21] - 7:12, 7:23, 8:6, 28:13, 29:22, 34:7, 34:8, 35:23, 41:22, 42:8, 42:21, 52:18, 102:11, 119:21, 138:15, 140:11, 140:17, 188:19, 254:19, 255:5, 270:9

**done** [35] - 9:14, 23:1, 24:7, 40:10, 54:4, 71:20, 89:4, 113:12, 126:8, 129:4, 131:3, 141:13, 154:20, 204:24, 218:15, 218:18, 220:21, 223:3, 223:5, 223:17, 224:8, 226:25, 232:5, 232:9, 239:4, 240:5, 241:1, 244:19, 247:18, 250:10, 258:8, 258:9, 270:16, 270:21, 275:15

**door** [1] - 21:3

**doors** [1] - 21:13

**dosage** [47] - 16:25, 47:4, 47:19, 47:20, 49:1, 49:20, 50:1, 55:23, 57:6, 57:17, 58:21, 93:22, 95:3, 95:7, 96:21, 96:23, 96:24, 96:25, 97:2, 97:3, 97:4, 97:5, 98:1, 98:4, 98:9, 98:10, 98:17, 100:5, 100:6, 100:12, 100:13, 100:15, 100:19, 100:23, 101:1, 101:5, 101:8, 101:10, 101:12, 101:13, 101:14, 101:16, 101:18, 101:19, 101:20

**dose** [1] - 46:24

**dots** [1] - 67:4

**dotted** [2] - 193:25, 194:9

**Douglas** [1] - 4:17

**down** [36] - 17:2, 17:3, 20:8, 23:10, 24:20, 36:25, 40:10, 40:18, 43:9, 45:7, 45:10, 48:7, 52:17, 52:18, 60:21, 61:2, 67:3, 67:15, 71:7, 75:2, 76:16, 77:17, 87:20,

97:1, 98:7, 98:22, 120:17, 122:14, 142:7, 158:11, 193:23, 215:21, 233:11, 246:13, 259:6, 260:1

**downturn** [1] - 11:4

**dozen** [3] - 23:16, 150:20, 210:7

**dozens** [1] - 150:14

**Dozens** [1] - 150:16

**Dr** [49] - 13:15, 13:16, 13:19, 18:17, 19:4, 19:6, 51:10, 51:20, 52:11, 52:19, 53:17, 53:18, 114:9, 114:10, 114:13, 114:16, 114:20, 115:5, 125:22, 126:6, 126:13, 126:16, 137:2, 150:13, 150:18, 151:25, 152:11, 154:6, 201:17, 202:3, 210:13, 210:16, 210:21, 212:1, 212:2, 212:13, 212:19, 212:21, 212:23, 213:8, 213:15, 220:20, 221:20, 222:1, 227:5, 230:12, 231:5, 244:23, 273:9

**dramatic** [1] - 184:25

**draw** [2] - 55:9, 250:12

**drawing** [2] - 65:2, 130:23

**Drive** [1] - 6:15

**driving** [1] - 33:4

**dropping** [4] - 45:10, 97:1, 98:7, 98:22

**drops** [1] - 238:2

**DRUG** [2] - 1:7, 1:13

**Drug** [11] - 6:2, 20:2, 28:8, 45:16, 118:17, 118:21, 126:14, 163:10, 192:9, 274:9, 278:23

**drug** [11] - 12:7, 70:21, 79:12, 145:22, 159:12, 193:5, 194:1, 194:2, 195:17, 257:4, 258:16

**drug's** [1] - 141:3

**Drugs** [2] - 138:13, 198:8

**drugs** [28] - 17:11, 19:1, 19:21, 21:4,

61:20, 71:1, 71:5,
71:8, 75:14, 78:13,
80:19, 83:4, 84:1,
84:3, 84:5, 84:8,
93:25, 95:1, 142:11,
183:20, 194:6,
195:10, 196:5,
196:14, 198:12,
199:14, 200:1,
242:13
**DU45** [1] - 274:3
**DU45s** [1] - 206:8
**due** [46] - 23:18,
42:20, 76:9, 77:21,
77:24, 79:23, 81:6,
88:24, 89:3, 89:18,
89:21, 94:11, 97:8,
102:1, 102:3, 102:4,
106:4, 106:8,
109:16, 201:24,
204:24, 217:13,
217:17, 220:5,
220:6, 226:17,
227:4, 228:18,
229:10, 229:11,
233:10, 234:24,
235:1, 235:6, 236:8,
236:13, 237:22,
243:2, 244:19,
244:23, 245:24,
264:19, 267:23,
269:25, 270:14,
276:22
**duplication** [1] -
266:13
**During** [6] - 21:23,
129:25, 159:10,
169:20, 169:22,
171:18
**during** [27] - 11:23,
22:24, 35:17, 42:16,
43:9, 46:21, 46:25,
47:5, 47:22, 50:3,
50:7, 50:12, 54:8,
54:12, 54:21, 55:8,
58:25, 59:5, 93:2,
127:19, 128:19,
130:7, 134:12,
161:20, 169:23,
222:18, 259:1
**duties** [1] - 15:21
**duty** [7] - 78:4, 78:10,
106:17, 160:2,
160:3, 199:24, 202:7

**E**

**early** [4] - 22:16, 43:4,
113:13, 253:3
**ease** [1] - 231:5

**easier** [2] - 60:14,
265:13
**easily** [1] - 154:20
**East** [3] - 3:5, 3:12,
4:18
**east** [1] - 17:25
**easy** [1] - 7:15
**Echo** [1] - 100:18
**economic** [1] - 11:4
**effect** [3] - 13:22,
217:4, 261:15
**effective** [18] - 23:20,
24:13, 28:25, 30:1,
30:11, 32:11, 76:5,
107:4, 107:9,
107:22, 108:4,
108:16, 109:2,
110:7, 146:7, 233:8,
251:19, 270:4
**effort** [1] - 99:18
**Efforts** [2] - 138:14,
163:11
**efforts** [1] - 151:14
**eight** [1] - 14:16
**Eighth** [1] - 3:10
**either** [11] - 26:12,
51:20, 73:5, 141:16,
182:1, 188:7,
213:24, 224:8,
239:18, 240:12,
260:9
**electronic** [1] - 24:5
**eliminate** [1] - 43:16
**ELIZABETH** [1] - 6:14
**email** [4] - 8:15, 8:16,
8:25, 9:12
**emails** [3] - 9:3, 28:14,
42:22
**emergency** [1] -
133:25
**emphasized** [1] -
22:10
**employed** [3] - 29:10,
82:2, 92:4, 123:22,
260:6
**employee** [4] - 9:6,
123:25, 158:16,
260:8
**employees** [15] - 9:12,
9:16, 11:17, 27:19,
27:22, 28:6, 36:14,
42:17, 54:8, 95:4,
148:4, 276:25,
277:3, 277:5, 277:13
**employer** [1] - 118:18
**employment** [9] - 9:7,
10:25, 15:6, 15:10,
15:23, 29:15, 158:7,
158:12
**Encino** [1] - 3:18

**encourage** [1] -
141:24
**end** [9] - 12:14, 21:22,
30:22, 87:24, 89:1,
133:20, 147:13,
218:7, 277:17
**ended** [3] - 22:18,
22:19, 131:7
**endorsing** [1] - 221:13
**enforcement** [4] -
10:25, 16:5, 121:7,
185:1
**Enforcement** [5] -
45:16, 118:18,
118:21, 163:10,
163:11
**engaged** [1] - 166:24
**engaging** [5] - 128:13,
129:12, 129:15,
145:19, 195:7
**enhancements** [2] -
275:4, 275:9
**enormous** [1] - 85:24
**ensure** [1] - 132:8
**Ensure** [1] - 192:10
**ensuring** [1] - 148:18
**entails** [1] - 21:2
**entered** [1] - 22:1
**entire** [4] - 12:16,
56:14, 112:17,
232:10
**entirely** [2] - 77:6,
242:3
**entities** [10] - 116:8,
133:15, 148:14,
155:22, 177:6,
185:11, 186:6,
186:8, 186:9, 272:19
**entitled** [1] - 147:16
**entity** [2] - 154:8,
156:6
**ENU** [1] - 4:12
**epidemic** [3] - 157:21,
178:15, 182:14
**era** [1] - 60:10
**escalates** [1] - 87:12
**escalating** [1] - 243:6
**especially** [3] - 9:3,
11:20
**essential** [1] - 28:14
**Essentially** [1] - 39:8
**essentially** [5] - 16:4,
21:4, 29:20, 68:9,
93:15
**established** [1] -
54:16
**estimate** [5] - 216:24,
219:20, 236:10,
248:18, 249:18
**estimated** [2] -

180:14, 180:20
**estimates** [4] - 248:19,
249:2, 249:14,
250:14
**estimation** [1] -
249:23
**et** [4] - 1:7, 1:13,
278:22, 278:23
**etched** [1] - 239:10
**Euson** [2] - 264:18,
265:14
**evaluate** [9] - 116:2,
116:4, 139:23,
149:10, 186:4,
186:7, 229:2,
239:11, 243:9
**evaluated** [1] - 116:7
**evaluating** [7] - 116:8,
133:19, 133:23,
134:20, 134:24,
272:20, 273:1
**evaluation** [3] - 94:16,
236:25, 244:20
**evening** [1] - 21:11
**event** [1] - 233:25
**events** [1] - 259:7
**eventually** [1] - 16:25
**everywhere** [1] -
275:22
**evidence** [27] - 34:23,
51:2, 53:11, 59:2,
59:13, 66:11, 99:2,
99:3, 99:6, 99:9,
99:11, 102:14,
106:3, 106:7,
106:12, 106:23,
119:10, 126:19,
138:18, 162:20,
162:22, 174:7,
192:4, 197:19,
256:13, 267:6,
268:15
**exact** [12] - 165:13,
196:15, 196:18,
220:18, 231:17,
232:25, 233:16,
235:4, 251:12,
251:17, 252:21,
253:13
**exactly** [8] - 35:7,
80:6, 212:8, 220:19,
223:9, 235:18,
243:25, 273:12
**EXAMINATION** [2] -
10:15, 115:12
**examination** [9] -
30:20, 99:6, 119:21,
147:15, 154:23,
172:19, 217:2,
263:25

**examinations** [1] -
15:16
**examine** [5] - 29:22,
63:12, 78:5, 109:23,
115:8
**examined** [3] - 52:3,
141:2, 141:7
**example** [17] - 65:12,
71:12, 90:6, 93:6,
95:3, 151:2, 176:10,
176:22, 181:17,
195:23, 204:17,
205:1, 230:24,
244:2, 245:9, 264:10
**examples** [7] - 18:12,
20:1, 193:6, 193:25,
194:2, 194:6, 243:23
**exceed** [3] - 12:1,
91:16, 251:1
**exceeded** [7] - 12:1,
70:18, 72:4, 73:10,
73:15, 88:1, 88:17
**exceeding** [1] - 246:6
**exceeds** [2] - 89:2,
95:7
**except** [3] - 174:1,
201:21, 226:16
**exception** [8] -
119:25, 127:4,
165:1, 165:12,
169:13, 195:23,
202:6, 221:13
**exceptions** [1] - 36:12
**excess** [4] - 88:13,
89:23, 94:8, 97:22
**excessive** [10] - 61:7,
61:23, 61:24, 63:20,
64:11, 70:5, 70:6,
70:16, 73:11, 73:14
**exclude** [2] - 77:5,
271:25
**excluded** [1] - 32:2
**excuse** [2] - 7:17,
244:14
**Excuse** [1] - 37:10
**executed** [1] - 20:20
**Executive** [1] - 12:15
**exemplar** [2] - 66:7,
72:22
**exercise** [5] - 43:21,
156:15, 236:16,
236:19, 267:23
**exercising** [1] - 36:10
**exhibit** [4] - 99:8,
174:17, 202:12,
244:6
**Exhibit** [2] - 179:22,
236:8
**exhibits** [1] - 261:4
**exist** [3] - 106:17,

151:7, 251:8
**existing** [1] - 62:22
**exists** [1] - 152:2
**expand** [1] - 257:4
**expanded** [3] - 57:12, 141:23, 268:6
**expect** [4] - 94:15, 117:8, 240:3, 240:6
**expectation** [3] - 23:23, 94:14, 156:5
**experience** [16] - 20:22, 23:24, 24:1, 25:8, 61:12, 61:24, 80:15, 80:25, 83:11, 114:6, 114:23, 122:18, 149:24, 170:18, 185:19, 277:23
**experienced** [1] - 81:23
**expert** [40] - 10:4, 13:20, 25:19, 25:20, 30:9, 31:12, 31:16, 32:8, 33:7, 42:4, 43:17, 43:24, 46:14, 51:3, 51:4, 51:8, 51:13, 52:20, 53:14, 53:16, 53:19, 59:1, 114:5, 117:25, 119:20, 123:21, 123:22, 123:23, 123:25, 124:2, 146:21, 182:6, 188:3, 188:4, 196:23, 200:18, 214:22, 215:2, 254:19
**experts** [3] - 43:22, 115:4, 126:25
**explain** [15] - 10:21, 22:20, 27:10, 54:3, 55:10, 69:12, 85:10, 87:14, 87:19, 93:7, 94:22, 128:7, 160:25, 234:4, 241:16
**explained** [2] - 99:23, 201:23
**explaining** [2] - 166:5, 233:22
**explains** [1] - 226:19
**explanation** [1] - 90:25
**export** [1] - 180:15
**express** [1] - 203:24
**expressed** [2] - 142:10, 169:22
**extensive** [3] - 141:20, 141:22, 170:23
**extent** [3] - 32:10,

62:25, 63:1
**extremely** [1] - 120:17
**eye** [1] - 12:22

**F**

**FABER** [1] - 1:17
**Faber** [1] - 7:2
**face** [2] - 76:23, 228:1
**facility** [2] - 21:7, 25:1
**fact** [28] - 64:16, 65:8, 65:11, 65:12, 66:7, 76:17, 79:10, 116:25, 121:4, 136:19, 138:11, 149:3, 149:24, 155:10, 173:24, 174:18, 191:20, 196:19, 211:2, 217:19, 229:7, 236:4, 236:19, 256:9, 273:19, 273:22, 275:22, 276:24
**factor** [7] - 68:3, 110:25, 111:20, 125:13, 125:16, 143:14, 143:18
**factors** [5] - 125:11, 126:14, 139:18, 139:24, 143:10
**facts** [9] - 29:14, 35:17, 52:13, 53:15, 76:11, 188:6, 239:19, 260:25, 261:19
**factual** [9] - 28:21, 29:25, 142:2, 164:11, 164:23, 169:6, 170:15, 181:25, 183:8
**factually** [1] - 181:23
**failed** [5] - 24:23, 148:5, 151:2, 178:20, 237:11
**fails** [1] - 156:15
**failure** [5] - 24:13, 32:11, 107:9, 109:14, 228:15
**failures** [3] - 109:8, 110:24, 111:19
**fair** [4] - 115:20, 189:20, 199:22, 239:18
**fairly** [1] - 52:2
**faith** [1] - 264:1
**fall** [3] - 70:19, 71:7, 76:4
**Fall** [1] - 259:4
**falls** [1] - 93:10

**falsifies** [1] - 171:25
**familiar** [7] - 114:20, 117:3, 119:18, 173:18, 213:15, 263:20, 268:17
**familiarize** [1] - 258:16
**family** [4] - 78:13, 195:10, 196:5, 198:18
**far** [10] - 58:5, 58:6, 71:19, 91:2, 126:18, 131:2, 135:22, 213:20, 248:13, 261:6
**FARRELL** [173] - 2:3, 7:8, 10:3, 10:16, 13:4, 14:15, 14:23, 21:19, 25:5, 25:6, 25:21, 25:25, 26:4, 27:7, 27:9, 30:8, 32:10, 32:24, 32:25, 33:2, 33:6, 33:16, 33:18, 34:4, 34:13, 34:18, 34:24, 35:6, 35:13, 35:15, 36:5, 36:7, 36:20, 37:9, 40:17, 42:1, 42:6, 42:25, 43:6, 44:3, 44:5, 44:24, 45:2, 46:2, 46:17, 46:18, 47:13, 47:16, 50:21, 52:10, 53:22, 53:25, 59:19, 59:22, 59:23, 60:16, 60:19, 62:16, 62:18, 63:14, 63:17, 64:4, 64:9, 65:14, 66:3, 66:5, 66:18, 66:22, 68:18, 68:20, 69:1, 69:2, 69:18, 69:21, 70:8, 70:10, 72:17, 72:19, 72:21, 74:2, 74:9, 74:15, 74:25, 75:7, 75:24, 76:21, 77:7, 78:8, 79:8, 79:9, 80:11, 81:9, 81:13, 81:16, 81:19, 82:8, 82:14, 85:23, 86:5, 86:23, 86:24, 87:6, 87:10, 90:13, 90:22, 90:24, 91:3, 91:4, 91:22, 92:1, 92:2, 94:4, 96:8, 96:9, 99:13, 99:15, 99:16, 99:21, 100:17, 102:25, 103:2, 106:22, 107:14, 107:20, 108:10, 108:22, 109:25, 110:4,

110:14, 110:17, 110:23, 111:16, 112:21, 113:7, 113:11, 113:17, 113:24, 114:1, 115:7, 119:13, 119:15, 125:23, 126:21, 138:21, 145:4, 145:7, 146:22, 154:10, 165:6, 166:2, 172:15, 172:17, 174:10, 174:20, 187:12, 187:16, 192:6, 197:21, 197:25, 202:20, 202:24, 207:11, 207:17, 209:4, 221:8, 233:21, 234:3, 234:11, 234:14, 239:6, 263:15, 263:19, 263:21
**Farrell** [44] - 2:4, 2:15, 7:9, 14:3, 14:14, 25:24, 30:24, 32:23, 35:12, 36:17, 40:13, 44:4, 46:1, 46:16, 52:9, 63:13, 65:18, 65:25, 68:16, 68:25, 69:14, 74:8, 78:23, 79:7, 80:10, 81:15, 81:21, 85:22, 86:22, 87:5, 90:12, 90:23, 99:11, 106:20, 107:19, 113:23, 131:4, 187:25, 202:19, 218:24, 243:18, 244:15, 263:18
**Farrell's** [1] - 115:19
**fault** [1] - 277:11
**faulted** [1] - 181:3
**faults** [1] - 177:21
**FCRR** [1] - 6:18
**FDA** [3] - 138:5, 141:2
**features** [1] - 74:22
**February** [4] - 125:6, 164:16, 164:19, 231:5
**Federal** [9] - 37:6, 39:11, 40:20, 120:21, 248:22, 249:4, 250:15, 266:6, 269:24
**federal** [4] - 121:6, 257:12, 269:22, 270:7
**feed** [1] - 192:16
**feeding** [1] - 19:16

**feet** [1] - 85:1
**fellow** [2] - 260:10, 260:12
**felt** [1] - 178:5
**few** [8] - 25:25, 113:24, 114:2, 167:21, 224:25, 240:1, 265:20, 273:3
**fictional** [2] - 87:11, 87:15
**field** [11] - 30:9, 115:4, 164:5, 164:13, 164:25, 165:8, 166:14, 166:21, 167:8, 167:11, 169:22
**fields** [1] - 33:7
**fifth** [2] - 136:11, 160:2
**fight** [1] - 178:8
**fights** [1] - 18:22
**figure** [2] - 220:9, 273:18
**Figure** [2] - 192:14, 193:5
**file** [4] - 23:23, 23:24, 24:4, 259:11
**filed** [2] - 30:17, 264:10
**files** [27] - 23:12, 23:17, 23:18, 23:19, 24:2, 24:5, 24:8, 24:12, 26:6, 26:18, 28:9, 28:11, 42:19, 42:20, 102:5, 102:10, 103:6, 228:4, 228:9, 228:10, 228:11, 244:23, 269:22, 269:25, 270:13, 270:14
**fill** [7] - 95:14, 129:10, 130:18, 148:22, 160:7, 216:16, 231:15
**filled** [4] - 129:14, 130:20, 218:12, 231:16
**filling** [6] - 95:5, 129:20, 130:1, 130:2, 131:8, 132:11
**final** [5] - 14:22, 29:6, 43:2, 94:20, 95:10
**finally** [4] - 28:17, 97:4, 101:3, 101:7
**findings** [25] - 14:22, 24:9, 26:9, 26:12, 28:21, 29:15, 29:25, 30:13, 43:2, 44:7, 44:18, 47:8, 47:18,

50:16, 50:19, 51:21, 55:11, 96:2, 96:10, 96:17, 97:25, 98:15, 100:1, 100:20, 101:9
**finish** [3] - 229:20, 262:15, 262:16
**finished** [1] - 167:6
**finishes** [1] - 77:24
**fire** [5] - 89:5, 89:8, 97:14, 102:2
**Firm** [2] - 3:4, 3:7
**First** [1] - 141:20
**first** [77] - 10:24, 13:13, 13:20, 15:5, 15:18, 20:2, 21:5, 23:10, 27:13, 28:6, 37:19, 42:24, 44:8, 47:24, 53:14, 58:3, 58:8, 58:15, 65:4, 71:4, 85:3, 85:8, 96:14, 97:10, 97:23, 104:22, 110:2, 111:24, 146:23, 146:25, 169:20, 175:11, 175:18, 180:5, 181:9, 194:16, 196:3, 210:17, 214:7, 217:13, 217:19, 222:11, 226:5, 226:24, 227:1, 227:7, 227:10, 229:12, 231:1, 231:10, 231:18, 231:20, 232:10, 232:25, 233:3, 233:5, 234:23, 237:23, 245:22, 246:6, 246:10, 246:22, 246:24, 247:7, 247:14, 254:5, 254:8, 256:19, 257:2, 266:13, 268:4, 268:11, 268:15, 269:3, 269:7
**fit** [3] - 115:24, 215:19, 225:19
**five** [9] - 11:3, 12:6, 71:5, 105:24, 113:12, 159:3, 205:23, 222:15, 277:21
**fix** [1] - 110:18
**fixed** [7] - 85:8, 89:15, 97:24, 226:24, 243:2, 243:7, 243:13
**fixing** [1] - 247:14
**FL** [1] - 2:14
**flag** [14] - 84:15,

222:21, 228:25, 231:25, 232:22, 233:2, 233:5, 234:6, 234:21, 244:18, 247:24, 248:6, 248:11, 275:7
**flagged** [31] - 39:16, 78:10, 79:1, 91:18, 96:14, 96:21, 96:24, 98:3, 98:5, 98:18, 100:2, 100:4, 102:16, 214:13, 215:9, 216:9, 216:11, 216:19, 218:18, 227:7, 227:11, 227:14, 227:22, 228:5, 228:13, 228:23, 230:9, 230:10, 232:17, 247:20
**flagging** [10] - 53:2, 84:16, 199:19, 199:20, 208:13, 214:6, 238:2, 241:7, 245:5, 250:14
**flags** [8] - 96:2, 132:12, 214:7, 231:11, 231:13, 275:10, 275:12, 275:14
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flaw** [1] - 109:17
**flexibility** [1] - 84:9
**flip** [3] - 9:10, 42:24, 176:18
**Floor** [1] - 3:5
**Florida** [4] - 20:5, 20:8, 20:11, 24:20
**flow** [8] - 17:2, 17:3, 29:12, 45:20, 75:14, 76:16, 92:6, 194:6
**flows** [2] - 75:18, 77:17
**focus** [7] - 139:18, 180:13, 194:9, 206:1, 219:7, 225:13, 254:23
**focused** [2] - 16:14, 142:11
**focusing** [1] - 147:10
**FOIA** [1] - 38:3
**follow** [7] - 24:17, 76:1, 88:4, 114:2, 134:1, 172:11, 215:4
**follow-up** [3] - 114:2, 134:1, 215:4
**followed** [5] - 14:21, 217:6, 218:5, 218:9, 218:13

**following** [9] - 27:20, 199:13, 227:3, 233:3, 237:4, 237:13, 238:25, 240:14, 275:24
**follows** [6] - 7:5, 113:20, 127:23, 129:8, 164:22, 232:25
**FOR** [1] - 1:1
**Force** [4] - 12:5, 12:6, 15:8, 18:3
**force** [1] - 141:23
**forced** [1] - 178:13
**foregoing** [1] - 278:20
**foregone** [1] - 51:24
**foreshadow** [1] - 77:9
**forfeiture** [1] - 265:1
**forget** [1] - 55:20
**forgot** [1] - 17:9
**form** [4] - 191:14, 194:17, 256:21, 275:2
**formally** [1] - 15:9
**format** [1] - 39:25
**former** [5] - 118:18, 121:20, 123:6, 123:25, 223:1
**formerly** [1] - 122:5
**forming** [1] - 138:15
**forth** [1] - 136:9
**forward** [6] - 20:23, 23:8, 81:14, 158:10, 240:9, 240:12
**foundation** [7] - 13:14, 30:3, 51:5, 119:17, 119:22, 126:21, 174:13
**four** [20] - 19:12, 19:16, 19:17, 68:3, 68:7, 68:9, 69:6, 69:9, 70:1, 70:11, 71:14, 73:10, 194:1, 196:13, 198:11, 199:13, 231:17, 240:11, 274:19
**fourth** [2] - 257:1, 274:17
**frame** [22] - 24:3, 46:6, 46:21, 47:1, 47:6, 49:2, 49:14, 49:22, 50:3, 50:12, 54:12, 58:7, 62:12, 62:14, 67:12, 104:16, 129:25, 134:2, 251:3, 252:20, 252:21, 252:25
**frames** [4] - 47:22, 50:7, 54:21, 59:5
**framework** [1] - 26:23

**Frank** [1] - 263:21
**frankly** [1] - 210:8
**fraudulently** [1] - 172:1
**fraught** [1] - 219:1
**free** [3] - 95:16, 195:10, 196:5
**frequency** [6] - 83:1, 203:7, 204:9, 204:14, 204:20, 205:9
**friends** [3] - 195:10, 196:5, 198:18
**front** [6] - 13:10, 122:5, 157:5, 179:20, 197:11, 199:9
**Fruth** [3] - 55:5, 55:14, 57:1
**Frye** [1] - 157:7
**fulfilled** [1] - 135:4
**full** [6] - 81:14, 140:9, 143:21, 169:20, 185:15, 196:17
**FULLER** [6] - 2:15, 7:11, 7:14, 7:21, 7:25, 8:3
**Fuller** [4] - 2:4, 2:15, 7:10, 7:19
**fully** [6] - 26:17, 124:6, 159:24, 185:1, 240:6, 276:15
**function** [2] - 15:3, 84:13, 93:12
**functioning** [2] - 24:15, 29:4
**fundamental** [1] - 147:9
**funding** [1] - 12:2
**future** [5] - 77:12, 78:11, 79:11, 89:16, 104:11

## G

**GA** [1] - 137:6
**gain** [1] - 27:17
**game** [1] - 79:1
**GAO** [5] - 139:11, 139:14, 139:24, 140:8, 140:16
**gap** [3] - 201:21, 274:11, 274:13
**gathered** [1] - 23:8
**gathering** [1] - 249:22
**gears** [3] - 190:13, 250:23, 269:21
**Geldhof** [2] - 32:2, 108:8
**gels** [1] - 17:1

**General** [4] - 38:8, 135:22, 138:12, 179:20
**general** [13] - 16:10, 26:22, 42:7, 45:3, 54:1, 64:10, 80:9, 84:24, 98:14, 117:10, 160:19, 199:21, 236:12
**Generally** [3] - 119:7, 133:25, 134:10
**generally** [15] - 17:10, 41:17, 80:18, 83:12, 83:20, 92:11, 122:11, 156:18, 160:8, 177:20, 187:5, 226:16, 230:19, 242:1, 244:7
**generate** [3] - 52:2, 215:9, 247:20
**gentleman** [1] - 18:16
**geographic** [6] - 17:20, 56:3, 59:8, 59:11, 126:22, 207:11
**geography** [1] - 17:22
**George** [1] - 264:18
**Gitchell** [1] - 37:22
**given** [13] - 8:7, 136:15, 137:14, 155:11, 158:6, 159:13, 176:10, 176:13, 181:4, 254:19, 262:7, 262:9, 262:11
**glass** [1] - 270:20
**golden** [1] - 82:15
**governed** [1] - 117:5
**Government** [1] - 254:24
**government** [8] - 127:5, 156:6, 170:16, 190:15, 191:22, 191:23, 236:5, 257:3
**governs** [1] - 117:6
**graduated** [1] - 15:16
**grams** [1] - 67:19, 68:8, 69:8, 69:12, 69:23, 69:25, 70:11, 71:25, 72:4, 72:5
**grant** [1] - 178:14
**graph** [5] - 56:12, 56:21, 58:20, 94:8, 244:6
**graphically** [1] - 183:6
**gray** [2] - 58:22, 161:1
**great** [1] - 124:4
**green** [2] - 45:15, 193:24

**GRETCHEN** [1] - 6:7
**grew** [1] - 19:2
**ground** [1] - 31:13
**grounds** [1] - 31:10
**Group** [2] - 20:3, 28:8
**group** [4] - 18:3, 21:8, 41:8, 272:18
**groups** [6] - 19:12, 19:16, 19:17, 92:22, 116:13, 186:22
**grow** [1] - 245:7
**growth** [1] - 245:4
**guess** [17] - 18:20, 99:13, 117:8, 117:15, 117:16, 122:11, 123:8, 123:15, 123:23, 124:18, 135:12, 189:12, 223:5, 228:15, 259:25, 260:6, 274:13
**guidance** [25] - 14:20, 33:21, 33:23, 34:5, 34:16, 35:4, 35:5, 36:18, 36:24, 37:1, 37:8, 37:12, 37:23, 38:1, 38:12, 41:8, 41:18, 82:18, 118:7, 118:8, 178:21, 265:25, 266:19, 268:17, 268:21
**guide** [2] - 118:5, 270:11
**Guidelines** [1] - 41:3
**guidelines** [2] - 41:8, 160:19
**guilty** [1] - 19:6
**gun** [1] - 16:6
**Gupta** [2] - 125:22, 126:6, 126:13
**Gustin** [1] - 58:19

**H**

**hairs** [2] - 123:24, 252:4
**half** [3] - 11:23, 75:1, 150:20
**hall** [1] - 115:15
**hand** [17] - 10:8, 11:17, 66:6, 66:19, 67:16, 71:19, 120:9, 133:22, 134:2, 139:7, 139:12, 139:13, 140:7, 152:15, 162:7, 179:25, 192:13
**hand-picked** [1] - 11:17
**handed** [2] - 118:13,

124:22
**handle** [7] - 16:7, 16:16, 17:4, 17:10, 21:13, 38:13, 155:20
**Handlers** [2] - 38:15, 38:18
**handling** [5] - 21:4, 22:24, 28:15, 95:5, 181:7
**hands** [1] - 76:4
**hang** [1] - 94:25
**happy** [1] - 14:8
**HARDIN** [1] - 5:3
**harm** [5] - 25:1, 162:9, 162:10, 218:19, 218:21
**Harvard** [8] - 20:2, 20:10, 20:21, 21:15, 21:18, 22:3, 22:5, 28:8
**Hawkins** [1] - 3:7
**HD** [2] - 264:10, 264:18
**HDMA** [2] - 41:3, 41:4
**head** [6] - 11:24, 38:25, 121:10, 121:20, 123:6, 134:14
**heading** [7] - 120:15, 168:1, 168:3, 184:21, 184:23, 197:14, 198:7
**headquarters** [2] - 26:10, 167:2
**Health** [38] - 4:11, 5:2, 38:3, 40:23, 45:13, 46:6, 47:21, 49:6, 49:11, 55:17, 57:10, 57:21, 57:24, 59:24, 64:17, 66:7, 66:11, 67:8, 68:4, 68:11, 69:3, 70:15, 70:23, 71:19, 71:24, 72:25, 97:1, 98:7, 98:20, 100:6, 100:25, 101:14, 102:12, 104:14, 105:15, 108:3, 109:1, 271:5
**Health's** [3] - 46:5, 67:22, 86:6
**healthcare** [4] - 133:18, 133:23, 134:9, 195:17
**hear** [16] - 30:23, 31:7, 31:23, 32:20, 33:11, 33:14, 43:15, 51:22, 62:25, 65:16, 74:3, 137:5, 256:2, 263:6, 263:10, 277:2
**heard** [9] - 31:14,

31:18, 64:10, 78:2, 125:22, 133:8, 133:12, 133:15, 273:18
**hearing** [8] - 16:2, 18:20, 37:5, 39:10, 113:14, 121:24, 157:7, 265:6
**Hearsay** [1] - 172:17
**hearsay** [9] - 9:5, 119:15, 119:25, 126:21, 127:4, 172:17, 263:19, 263:22
**heart** [1] - 32:2
**heated** [1] - 261:10
**held** [5] - 76:7, 76:25, 77:14, 78:13, 81:6
**help** [2] - 211:10, 212:19
**helped** [4] - 137:15, 137:19, 144:12, 177:24, 178:15, 178:17
**helpful** [7] - 13:7, 20:23, 27:4, 34:1, 34:25, 36:2, 222:22
**Henry** [3] - 154:2, 154:4, 155:6
**heroin** [1] - 12:7
**HESTER** [1] - 5:9
**high** [7] - 82:19, 150:16, 151:3, 181:20, 209:22, 209:24, 210:9
**higher** [2] - 18:11, 187:2
**highest** [11] - 88:1, 88:7, 88:17, 89:19, 231:10, 246:24, 247:2, 247:3, 247:9, 276:6
**highlight** [4] - 139:16, 163:25, 232:3, 265:13
**highlighted** [2] - 142:8, 265:17
**highly** [1] - 170:22
**Hilliard** [1] - 58:18
**himself** [3] - 52:2, 52:3, 123:8
**HIPAA** [1] - 149:7
**hired** [5] - 15:9, 159:16, 223:22, 254:18, 277:5
**hiring** [2] - 277:3, 277:13
**historically** [1] - 36:25
**histories** [1] - 170:19
**history** [8] - 22:21,

25:4, 25:8, 25:16, 37:1, 154:17, 154:19, 170:10
**hit** [1] - 93:19
**hits** [1] - 75:21
**hold** [8] - 16:15, 75:7, 77:20, 88:16, 92:18, 94:14, 113:4, 261:16
**Holder** [1] - 40:24
**holding** [1] - 66:6
**holds** [2] - 75:22, 75:25
**honest** [1] - 20:23
**Honor** [428] - 7:8, 7:22, 8:3, 8:4, 8:21, 8:24, 9:9, 9:22, 10:13, 10:23, 13:11, 14:1, 14:5, 15:11, 16:3, 16:14, 18:15, 20:2, 20:15, 21:2, 21:21, 22:23, 25:3, 25:13, 26:25, 27:13, 29:20, 30:16, 31:15, 31:21, 32:2, 32:24, 34:3, 34:6, 34:17, 35:6, 35:8, 35:13, 36:1, 38:20, 39:15, 39:16, 40:2, 40:7, 40:10, 40:14, 41:20, 42:10, 43:10, 44:14, 44:17, 45:6, 45:19, 46:13, 46:17, 47:2, 47:9, 47:23, 49:7, 49:22, 50:14, 50:17, 50:24, 51:17, 52:6, 52:10, 53:10, 53:22, 54:18, 54:22, 55:2, 55:4, 56:5, 56:10, 56:15, 56:25, 57:6, 57:14, 57:20, 58:10, 58:15, 59:6, 59:16, 60:11, 60:14, 60:19, 60:23, 61:13, 62:2, 62:23, 63:16, 64:13, 64:15, 65:17, 66:3, 66:17, 67:2, 68:3, 69:11, 69:20, 70:8, 71:2, 71:18, 72:5, 73:12, 73:18, 73:23, 74:10, 74:20, 75:5, 75:6, 76:2, 76:22, 77:14, 77:25, 78:18, 78:19, 78:22, 79:17, 79:20, 79:25, 80:20, 80:24, 81:8, 82:4, 82:17, 82:21, 83:10, 83:24, 84:17, 85:3, 85:18, 86:3, 86:13, 86:14, 86:17, 87:13, 87:20, 88:19, 88:25,

89:12, 89:25, 90:6, 91:3, 91:19, 92:5, 92:17, 93:9, 93:16, 93:18, 94:15, 96:4, 96:12, 96:20, 97:18, 98:3, 98:16, 98:22, 99:3, 99:20, 100:10, 100:16, 100:22, 102:9, 102:13, 102:17, 103:8, 103:18, 103:21, 104:3, 104:13, 105:11, 105:16, 105:21, 106:1, 106:6, 106:11, 106:16, 106:21, 107:2, 107:7, 107:11, 108:2, 108:7, 108:9, 108:19, 108:21, 109:5, 109:10, 109:20, 110:10, 110:20, 111:3, 111:23, 112:8, 112:20, 113:1, 113:6, 113:17, 113:24, 114:12, 114:15, 114:17, 114:19, 114:24, 115:6, 115:9, 115:10, 115:21, 116:3, 116:6, 116:11, 116:19, 116:24, 117:7, 117:10, 117:16, 117:25, 118:6, 118:10, 118:16, 118:19, 119:13, 121:3, 121:9, 121:17, 121:25, 122:8, 122:25, 124:10, 124:19, 124:20, 124:25, 125:12, 126:7, 126:17, 126:20, 127:13, 127:21, 128:6, 128:9, 129:1, 131:10, 131:23, 133:3, 134:1, 134:3, 134:24, 135:7, 135:13, 137:21, 138:10, 138:19, 141:11, 142:17, 144:10, 144:14, 145:4, 145:13, 146:16, 147:19, 148:8, 148:24, 149:13, 150:25, 151:6, 151:16, 152:8, 154:10, 154:19, 155:1,

155:8, 155:14,
155:21, 156:14,
156:25, 158:21,
159:21, 160:17,
160:24, 161:2,
161:19, 162:8,
162:18, 165:6,
165:23, 166:25,
170:17, 172:15,
174:8, 174:10,
174:20, 176:15,
177:14, 178:3,
179:8, 179:14,
179:17, 180:18,
180:22, 181:1,
182:1, 187:12,
187:19, 188:8,
188:12, 190:11,
190:17, 190:21,
191:5, 191:16,
192:3, 192:6, 193:2,
193:22, 195:1,
195:5, 195:22,
197:16, 197:19,
197:23, 198:23,
199:1, 200:5,
200:10, 200:12,
202:6, 203:12,
204:1, 204:16,
205:22, 205:25,
206:15, 206:19,
207:1, 207:11,
207:17, 208:5,
208:9, 208:12,
209:4, 209:5,
209:11, 209:13,
209:15, 209:19,
210:23, 213:2,
213:7, 214:2,
216:12, 216:18,
216:22, 217:11,
217:21, 218:2,
218:10, 218:14,
218:20, 220:17,
220:24, 221:11,
221:22, 222:8,
222:10, 223:17,
224:9, 224:24,
225:4, 226:11,
227:24, 228:3,
228:17, 231:14,
233:6, 233:17,
234:16, 234:23,
235:24, 236:10,
236:15, 236:18,
239:6, 239:10,
240:10, 241:12,
241:22, 243:1,
244:11, 245:8,
245:16, 247:17,
250:17, 251:8,

251:12, 255:15,
255:20, 256:4,
256:11, 256:12,
258:18, 259:16,
262:15, 263:15,
263:19, 265:2,
266:21, 267:2,
267:5, 267:15,
268:19, 268:24,
269:5, 269:20,
270:6, 270:17,
271:3, 271:7,
271:20, 272:23,
273:15, 277:18,
277:22, 277:25,
278:4, 278:12
**HONORABLE** [1] -
1:17
**Honorable** [1] - 7:1
**hope** [6] - 55:9, 59:17,
118:1, 123:15,
184:16
**hopefully** [3] - 27:24,
43:13, 60:14
**hoping** [1] - 43:6
**horizontal** [2] - 55:24,
57:7
**horrible** [1] - 235:14
**Hospital** [1] - 272:3
**hospital** [2] - 84:2,
272:5
**hospitals** [5] - 271:18,
271:19, 272:2,
272:9, 273:8
**house** [1] - 15:12
**huge** [2] - 39:8, 83:24
**hundred** [12] - 48:19,
80:18, 85:1, 210:1,
210:2, 210:4,
231:21, 231:22,
231:24, 232:18,
233:14, 234:21
**hundreds** [4] - 150:10,
186:22, 186:23,
207:9
**HUNTINGTON** [1] -
1:4
**Huntington** [76] -
3:10, 4:1, 42:12,
44:12, 46:20, 46:25,
47:5, 50:2, 54:25,
56:4, 56:14, 57:18,
59:4, 59:9, 67:6,
70:20, 97:17, 103:5,
106:5, 106:10,
106:14, 106:25,
107:6, 107:24,
108:6, 108:17,
109:3, 111:1,
111:21, 112:6,

112:25, 127:16,
127:18, 128:13,
128:23, 129:6,
129:11, 129:20,
134:13, 134:21,
135:9, 135:23,
136:1, 144:17,
149:16, 150:14,
150:23, 151:19,
152:20, 153:2,
154:5, 172:24,
179:5, 179:12,
185:16, 186:3,
194:23, 206:14,
206:17, 206:22,
207:22, 208:21,
208:22, 242:7,
244:1, 244:3, 244:8,
271:1, 271:4,
271:13, 272:1,
272:20, 273:1,
273:17, 278:22
**Huntington-Cabell**
[23] - 46:20, 46:25,
47:5, 50:2, 54:25,
59:4, 97:17, 103:5,
106:5, 106:10,
106:14, 106:25,
107:6, 107:24,
108:6, 108:17,
109:3, 111:1,
111:21, 112:6,
112:25, 207:22,
273:17
**Huntington-Cabell**
[15] - 127:25, 136:24,
137:7, 137:16,
137:20, 162:14,
167:8, 171:8,
171:11, 171:14,
172:6, 173:5,
185:21, 185:24,
194:21
**hydrocodone** [37] -
39:8, 46:23, 47:19,
48:23, 48:24, 49:9,
49:20, 49:24, 50:1,
54:24, 56:10, 56:22,
58:22, 59:3, 61:20,
96:18, 96:24, 97:6,
98:1, 98:5, 98:11,
98:18, 98:21, 98:23,
100:4, 100:8,
100:15, 100:24,
101:2, 101:5,
101:12, 101:16,
101:20, 106:9,
106:14, 250:6,
272:24

## I

**idea** [5] - 37:1, 205:12,
237:3, 243:21,
248:14
**identification** [1] -
39:20
**identified** [22] - 24:17,
34:20, 59:1, 63:19,
63:20, 81:22, 84:20,
85:20, 85:21, 86:4,
102:7, 124:11,
128:12, 145:19,
206:3, 206:12,
226:23, 239:17,
251:15, 257:23,
264:13, 275:24
**identifies** [4] - 82:1,
88:7, 235:22, 235:25
**identify** [27] - 24:23,
30:5, 44:15, 46:19,
46:23, 47:3, 49:25,
50:6, 50:11, 54:20,
55:1, 56:3, 82:24,
84:17, 84:24, 109:2,
128:11, 129:8,
132:11, 140:9,
210:6, 210:11,
223:3, 236:17,
236:20, 246:3,
251:10
**identifying** [3] - 73:15,
242:2, 251:20
**ignores** [1] - 242:3
**II** [3] - 106:24, 119:8,
180:10
**III** [1] - 61:19
**IIs** [1] - 61:19
**illegal** [1] - 185:24
**illegitimately** [1] -
127:25
**illicit** [20] - 12:7,
17:17, 22:25, 30:12,
38:14, 38:21, 76:4,
104:6, 104:8, 107:5,
107:23, 108:5,
108:17, 110:8,
111:1, 111:21,
112:5, 112:24,
130:7, 260:18
**illustrate** [3] - 35:4,
230:6, 232:15
**illustrated** [2] - 93:20,
183:6
**illustrates** [1] - 74:21
**illustration** [11] -
60:23, 90:1, 92:11,
93:18, 215:8,
230:13, 230:14,
230:17, 230:22,

231:1, 231:3
**illustrations** [7] -
219:10, 220:22,
222:2, 222:5,
223:13, 223:18,
224:12
**ILR** [1] - 66:13
**image** [2] - 192:19,
192:20
**Immediate** [2] - 20:25,
21:14
**immediate** [1] - 79:15
**immediately** [4] -
18:15, 119:1, 150:4,
150:9
**imminent** [1] - 25:1
**immune** [1] - 185:9
**Impact** [1] - 197:14
**impact** [1] - 183:21
**impacted** [1] - 194:20
**impeaches** [1] - 165:9
**impeachment** [2] -
146:23, 229:20
**impermissible** [1] -
39:17
**implement** [2] - 148:5,
220:15
**implemented** [1] -
210:12
**implied** [1] - 106:17
**important** [13] - 30:3,
37:3, 37:4, 37:7,
38:25, 39:12, 79:2,
118:3, 131:19,
148:17, 184:11,
188:3, 226:1
**importantly** [1] - 147:1
**importers** [1] - 16:21
**impose** [1] - 183:21
**imposed** [1] - 184:13
**improper** [8] - 51:25,
74:9, 91:20, 130:11,
146:23, 188:9,
221:8, 246:4
**improperly** [4] -
128:13, 129:11,
129:15, 246:4
**improvement** [1] -
276:21
**IN** [2] - 1:1, 1:18
**in-depth** [1] - 94:16
**in-house** [1] - 15:12
**inaccuracy** [1] - 63:5
**Inc** [1] - 39:5
**incident** [2] - 129:17,
158:23
**include** [12] - 123:4,
123:6, 123:14,
156:7, 156:11,
168:19, 169:3,

194:5, 216:25, 272:5, 272:19, 273:11
**included** [6] - 37:21, 73:11, 175:7, 243:11, 251:3, 272:12
**includes** - 123:5, 159:22, 168:11, 273:6, 273:8
**including** [8] - 141:24, 183:2, 193:11, 195:2, 203:17, 203:21, 206:6, 237:14
**Including** [3] - 177:8, 177:10, 177:11
**incomplete** [2] - 249:22, 272:14
**inconsistent** [7] - 108:8, 165:7, 187:13, 187:15, 187:23, 221:12, 221:14
**incorporate** [2] - 114:18, 248:2
**incorporated** [1] - 275:6
**increase** [9] - 55:8, 57:2, 94:16, 94:19, 184:25, 242:18, 248:3, 277:3, 277:13
**increased** [6] - 181:19, 191:11, 242:4, 243:25, 244:9, 244:12
**increases** [1] - 248:10
**increasing** [3] - 106:8, 243:22, 244:17
**increment** [1] - 57:5
**Indeed** [1] - 172:9
**independent** [3] - 106:18, 126:8, 130:4
**independently** [1] - 206:20
**indicate** [8] - 45:7, 45:8, 45:13, 58:16, 61:5, 86:6, 242:10, 242:12
**indicated** [1] - 43:14
**indicating** [1] - 196:12
**indication** [3] - 23:7, 59:6, 77:1
**indicative** [1] - 58:22
**indicted** [1] - 129:24
**indirectly** [1] - 261:15
**individual** [11] - 55:25, 92:23, 94:2, 149:3, 149:4, 149:11, 149:12, 164:12,

164:24, 176:7, 176:24
**individually** [2] - 109:1, 227:25
**individuals** [3] - 50:11, 54:20, 58:2
**indulge** [1] - 60:20
**indulged** [1] - 65:18
**industrial** [1] - 180:15
**industry** [3] - 39:13, 41:8, 259:11
**Industry** [2] - 41:3, 260:14
**infers** [1] - 260:7
**inform** [1] - 249:15
**informants** [1] - 16:8
**information** [26] - 20:12, 20:13, 20:24, 23:9, 24:11, 26:7, 26:8, 26:18, 26:20, 28:21, 38:17, 51:7, 76:11, 117:11, 120:7, 122:12, 122:17, 124:17, 141:3, 149:10, 191:8, 239:19, 249:22, 253:15, 261:4, 261:5
**informed** [4] - 126:10, 255:10, 255:12, 260:19
**ingredient** [11] - 67:16, 67:22, 67:25, 68:7, 69:9, 69:23, 70:11, 71:9, 71:20, 73:13, 75:21
**initial** [10] - 77:23, 142:1, 214:16, 215:4, 227:13, 227:14, 227:21, 227:22, 228:23, 230:9
**initiated** [1] - 41:18
**initiative** [2] - 253:6, 254:6
**input** [1] - 178:5
**inquire** [2] - 147:16, 170:12
**inside** [4] - 56:19, 75:16, 83:7, 94:24
**inspection** [4] - 20:14, 20:15, 20:20, 217:13
**inspections** [2] - 168:8, 201:11
**Inspector** [1] - 179:20
**instance** [5] - 69:8, 129:8, 149:14, 149:25, 205:8
**instead** [10] - 8:8, 29:15, 89:21, 204:8,

222:11, 232:18, 233:3, 239:16, 247:8, 247:14
**Institute** [1] - 126:14
**institutes** [1] - 77:19
**Insys** [4] - 146:17, 146:19, 148:4, 148:5
**intact** [1] - 270:11
**integrate** [1] - 276:12
**intend** [1] - 14:18
**intending** [2] - 67:1, 67:13
**interacted** [1] - 149:15
**interest** [1] - 251:22
**interesting** [2] - 37:25, 39:6
**internal** [7] - 8:25, 28:13, 42:20, 76:10, 76:11, 200:13, 200:14
**internet** [3] - 22:25, 39:7
**interpose** [1] - 50:24
**interpret** [1] - 78:3
**interpretation** [5] - 257:21, 260:15, 260:19, 261:1, 261:20
**interrupt** [5] - 22:9, 45:20, 62:8, 70:4, 91:10
**interview** [2] - 27:18, 36:14
**interviewed** [5] - 140:10, 140:16, 141:1, 141:2, 141:7
**interviews** [12] - 19:5, 20:25, 23:11, 26:20, 28:4, 28:7, 36:13, 143:18, 169:20, 169:22, 171:18
**introduce** [1] - 10:21
**introduced** [1] - 51:2
**introducing** [1] - 51:25
**introduction** [1] - 14:17
**investigate** [2] - 17:16, 18:9
**investigated** [6] - 19:5, 25:16, 128:17, 228:13, 228:17, 228:24
**investigating** [4] - 161:4, 161:7, 161:22, 162:2
**investigation** [35] - 16:10, 18:16, 19:22, 20:9, 20:19, 21:20, 21:23, 22:6, 22:8,

22:14, 22:17, 22:21, 23:13, 23:14, 24:10, 33:19, 34:16, 35:18, 41:18, 42:9, 42:17, 46:10, 46:13, 76:10, 76:17, 128:22, 161:12, 161:15, 162:6, 162:10, 168:21, 169:5, 169:14, 206:18, 256:4
**Investigations** [2] - 11:16, 11:24
**investigations** [21] - 11:19, 16:9, 17:13, 17:18, 18:2, 18:6, 18:7, 18:11, 18:13, 19:7, 22:4, 26:23, 30:10, 81:4, 161:17, 166:24, 168:2, 182:5, 201:13, 228:18
**investigative** [3] - 30:13, 176:20, 275:12
**investigator** [18] - 15:7, 16:1, 16:3, 22:11, 25:17, 36:16, 46:14, 46:15, 83:11, 160:1, 172:9, 253:16, 253:21, 254:25, 255:4, 256:5, 256:10, 259:22
**investigators** [7] - 38:2, 114:25, 159:11, 171:18, 255:23, 260:11, 260:12
**invitation** [1] - 12:4
**involve** [1] - 195:25
**involved** [8] - 37:23, 129:23, 182:17, 185:23, 253:18, 258:25, 259:1, 272:11
**involving** [2] - 143:2, 195:24
**Iowa** [1] - 209:1
**ipsa** [1] - 147:13
**IRPINO** [2] - 262:15, 262:21
**Irpino** [2] - 3:7, 262:21
**ISIA** [1] - 5:4
**issue** [33] - 26:14, 51:17, 76:6, 77:10, 125:20, 126:4, 140:20, 141:15, 141:16, 142:16, 158:8, 159:19,

164:11, 164:23, 169:6, 170:15, 171:13, 173:3, 182:6, 182:18, 183:8, 185:6, 196:19, 198:15, 199:17, 201:24, 202:3, 212:4, 213:3, 237:20, 245:25, 260:22, 265:2
**issued** [6] - 130:7, 132:9, 147:15, 156:22, 157:1, 157:24
**issues** [9] - 11:20, 18:8, 122:21, 125:19, 171:22, 205:6, 237:21, 238:13
**issuing** [3] - 20:13, 132:13, 160:19
**item** [1] - 148:3
**items** [2] - 34:10, 43:2
**iteration** [6] - 58:8, 58:9, 59:25, 60:2, 62:21, 65:4
**iterations** [2] - 54:15, 57:24

---

**J**

**Jackson** [1] - 6:8
**James** [4] - 10:4, 10:7, 10:19, 10:23
**JAMES** [1] - 10:9
**January** [5] - 191:25, 231:6, 253:3, 254:12, 255:1
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**job** [7] - 12:22, 15:3, 15:20, 15:25, 16:9, 16:14, 240:7
**Joe** [1] - 123:6
**join** [8] - 14:5, 52:6, 53:8, 65:23, 74:6, 111:7, 112:15
**joined** [3] - 11:1, 14:25, 111:11
**joint** [1] - 12:3
**joke** [1] - 166:14
**joking** [1] - 115:14
**JOSEPH** [1] - 6:4
**Joseph** [2] - 121:11, 268:25
**JR** [2] - 2:3, 2:15
**Juan** [2] - 2:5, 2:17
**Judge** [37] - 7:2, 7:11, 8:1, 10:3, 13:4,

14:16, 15:2, 16:17,
18:12, 19:25, 22:20,
24:9, 25:5, 27:7,
27:10, 29:15, 30:8,
33:16, 34:4, 34:18,
42:1, 42:25, 44:3,
60:16, 64:6, 68:20,
72:19, 74:25, 82:11,
87:7, 91:22, 98:25,
146:22, 166:2,
197:8, 197:21, 265:7
**judge** [33] - 16:17,
44:24, 47:13, 47:18,
50:21, 56:17, 57:4,
58:14, 59:19, 65:14,
66:18, 74:2, 81:9,
82:8, 82:18, 85:23,
86:5, 87:15, 87:19,
89:10, 92:3, 93:8,
94:22, 99:25, 104:1,
113:7, 113:11,
157:6, 217:10,
221:8, 233:21,
255:18, 255:22
**JUDGE** [1] - 1:17
**judgment** [4] - 116:22,
179:13, 179:15,
242:24
**judgments** [2] - 117:9,
117:14
**judicial** [3] - 119:16,
202:19, 256:14
**judicially** [1] - 203:2
**July** [3] - 231:21,
231:25, 232:18
**jump** [2] - 14:24, 77:9
**June** [2] - 22:19,
267:13
**jurisdiction** [3] - 9:13,
136:21, 210:6
**jurisdictions** [2] -
145:18, 208:19
**Justice** [1] - 118:21
**justification** [1] -
94:17

### K

**KEARSE** [2] - 4:2,
278:4
**keep** [6] - 164:12,
164:24, 183:22,
208:3, 270:5, 270:11
**keeps** [1] - 207:25
**Kelly** [1] - 6:8
**Kessler** [1] - 4:17
**key** [2] - 76:6, 193:23
**keys** [1] - 193:23
**killers** [1] - 199:14
**kilograms** [2] -

181:19, 181:20
**kind** [15] - 12:22,
15:20, 28:15, 36:24,
75:12, 92:11, 119:4,
129:4, 160:13,
161:1, 161:25,
162:5, 237:1,
249:21, 260:7
**kinds** [2] - 17:7,
204:12
**knowledge** [15] -
27:20, 126:8, 130:4,
135:22, 135:23,
144:21, 156:25,
157:2, 158:1, 170:5,
171:15, 179:11,
224:14, 265:5,
265:11
**known** [4] - 112:4,
112:23, 210:24,
210:25
**KOUBA** [1] - 3:14
**Kyle** [4] - 174:14,
175:4, 258:22, 259:7

### L

**LA** [1] - 3:8
**labeled** [1] - 273:9
**labels** [1] - 54:5
**lack** [2] - 89:4, 169:23
**Lane** [1] - 152:16
**language** [2] - 132:14,
143:9
**Lanier** [1] - 3:4
**large** [8] - 19:1, 20:10,
24:19, 84:2, 135:14,
33:6, 245:5, 271:12
**larger** [1] - 219:24
**last** [20] - 31:15,
48:25, 63:6, 64:5,
89:19, 90:8, 90:15,
101:7, 133:7, 168:5,
172:8, 191:25,
197:24, 198:10,
203:5, 203:13,
214:18, 231:17,
261:18, 277:16
**launched** [1] - 125:6
**LAURA** [1] - 5:10
**law** [19] - 10:24, 16:5,
32:4, 32:5, 78:21,
117:3, 117:5, 117:7,
121:6, 131:20,
156:4, 177:16,
191:3, 200:6, 201:7,
249:13, 249:24,
250:3, 269:22
**Law** [3] - 3:4, 3:7, 3:12
**lawful** [1] - 180:15

**lawfully** [2] - 269:11,
269:16
**laws** [2] - 149:6, 149:8
**Lawson** [1] - 265:7
**lawsuit** [1] - 223:20
**lawyer** [2] - 25:24,
277:24
**lawyers** [18] - 13:24,
116:1, 116:5, 116:8,
145:3, 145:8, 154:9,
154:16, 155:7,
155:13, 186:10,
188:10, 188:14,
188:17, 189:4,
189:10, 189:14,
223:22
**lay** [4] - 11:5, 53:1,
174:13, 277:4
**lay-offs** [1] - 11:5
**layers** [1] - 263:22
**LDMP** [1] - 274:24
**lead** [5] - 13:21, 22:10,
125:19, 208:1, 208:4
**leaders** [1] - 19:12
**leading** [4] - 65:18,
65:20, 65:24, 91:19
**leads** [1] - 29:17
**leak** [1] - 104:5
**learned** [1] - 272:10
**least** [7] - 13:13,
51:22, 126:17,
144:12, 146:12,
215:13, 215:20
**leave** [3] - 99:14,
136:19, 187:24
**leaving** [2] - 12:25,
21:12
**led** [9] - 12:3, 20:13,
20:25, 39:10, 90:7,
91:19, 91:23,
206:17, 218:19
**Lee** [1] - 3:12
**left** [26] - 11:5, 21:7,
43:2, 47:24, 49:7,
49:18, 56:23, 58:3,
58:17, 58:20, 61:6,
93:9, 96:20, 119:2,
120:9, 124:6, 139:7,
139:12, 139:13,
140:7, 142:22,
152:15, 163:16,
163:21, 192:13,
195:16
**left-hand** [7] - 120:9,
139:7, 139:12,
139:13, 140:7,
152:15, 192:13
**legal** [1] - 35:9,
106:17, 107:12,
108:8, 109:22,

111:4, 134:22,
151:8, 151:11,
176:20, 268:7
**legitimacy** [1] - 154:23
**legitimate** [19] -
116:22, 117:9,
117:13, 117:14,
117:17, 117:20,
120:24, 121:5,
121:15, 132:9,
148:18, 194:6,
196:8, 216:16,
216:20, 218:12,
242:4, 244:17,
244:21
**legitimately** [7] -
127:24, 183:15,
184:8, 195:10,
196:4, 198:19,
242:24
**length** [1] - 159:7
**lengthy** [1] - 143:21
**Leo** [1] - 18:17
**Leon** [2] - 2:4, 2:16
**less** [14] - 43:13,
153:8, 153:9,
153:14, 184:8,
184:23, 216:7,
216:9, 231:21,
242:24, 248:16,
250:7, 250:20,
274:12
**letter** [4] - 37:25,
85:20, 94:21, 269:6
**letters** [7] - 37:7, 39:2,
41:11, 252:24,
266:9, 268:16,
268:20
**Level** [2] - 106:24
**level** [10] - 12:1, 18:9,
18:11, 89:19,
135:11, 151:3,
179:6, 243:21,
243:25, 272:5
**levels** [8] - 16:24,
143:4, 196:24,
242:23, 246:5,
248:4, 248:5, 249:18
**Levin** [1] - 2:12
**lexicon** [1] - 93:8
**LEYIMU** [1] - 4:8
**liability** [4] - 171:1,
171:20, 172:11,
251:21
**license** [2] - 170:25,
171:19
**licensed** [6] - 131:9,
131:22, 133:18,
133:22, 144:5,
157:21

**licenses** [2] - 131:15,
171:22
**licensing** [3] - 18:8,
131:18, 170:20
**licensure** [1] - 150:9
**lieutenant** [2] - 12:10,
18:17
**Lieutenant** [1] - 12:15
**life** [1] - 218:7
**Lifestyle** [1] - 274:8
**light** [2] - 56:8, 56:21
**likeliness** [1] - 217:18
**likely** [16] - 24:23,
32:12, 104:8,
104:12, 112:5,
112:24, 130:6,
130:12, 153:14,
203:25, 214:11,
214:12, 216:15,
217:11, 222:22,
223:3
**likewise** [1] - 34:11
**limit** [12] - 67:17,
67:22, 67:25, 68:8,
69:9, 69:23, 70:11,
73:13, 75:21,
239:12, 271:24,
272:25
**limited** [3] - 39:21,
119:21, 272:24
**limits** [2] - 183:21,
184:13
**LINDA** [1] - 4:5
**Linden** [3] - 38:24,
38:25, 39:3
**Line** [1] - 229:14
**line** [14] - 91:16,
93:18, 112:17,
133:7, 167:1, 167:5,
167:14, 186:21,
187:16, 188:2,
188:23, 188:25,
194:10
**Lines** [1] - 212:22,
228:22
**lines** [6] - 112:12,
157:12, 164:17,
164:19, 186:19,
193:25
**liquids** [2] - 17:1, 21:9
**Lisa** [2] - 6:18, 278:19
**List** [3] - 38:13, 38:19,
38:20
**list** [20] - 27:13, 28:19,
35:16, 35:20, 36:23,
41:23, 42:22, 70:19,
70:22, 71:3, 72:7,
73:3, 94:25, 95:1,
138:17, 158:8,
158:16, 224:23,

265:25, 268:16
**listed** [4] - 42:10,
56:22, 103:8, 180:25
**listen** [1] - 137:2
**lists** [2] - 194:13,
271:4
**lit** [1] - 86:11
**litigation** [13] - 57:16,
59:1, 83:9, 85:14,
102:5, 102:20,
174:15, 190:2,
222:12, 222:14,
223:13, 223:20,
239:17
**live** [1] - 90:15
**LLC** [1] - 2:4
**locate** [2] - 164:6,
164:8
**located** [4] - 11:2,
11:7, 22:7, 129:19
**locations** [1] - 136:6
**Logan** [2] - 6:5, 6:12
**logical** [2] - 125:18,
144:21
**logo** [2] - 21:17,
197:12
**long-standing** [1] -
159:14
**long-term** [1] - 26:14
**look** [87] - 13:22,
20:17, 26:18, 26:19,
28:9, 28:13, 28:23,
29:2, 57:17, 67:15,
68:2, 76:10, 83:13,
83:15, 87:20, 87:24,
89:14, 90:19, 92:8,
118:8, 118:20,
119:22, 123:11,
123:16, 124:7,
125:1, 126:1, 128:2,
140:6, 140:22,
141:18, 151:17,
152:4, 157:12,
162:21, 163:17,
163:21, 169:16,
172:8, 175:10,
175:18, 175:23,
176:12, 176:23,
178:25, 179:11,
180:1, 180:7, 181:2,
181:8, 182:2,
182:21, 183:5,
184:21, 185:22,
186:11, 186:12,
191:17, 192:12,
193:23, 195:2,
200:22, 202:10,
206:19, 207:10,
214:24, 215:1,
215:16, 226:12,

229:13, 240:24,
243:15, 246:22,
247:7, 252:6, 259:6,
262:1, 264:5,
264:12, 267:20,
269:6, 269:8, 272:6,
277:4
**looked** [25] - 21:18,
23:3, 23:5, 48:13,
86:2, 86:3, 102:24,
109:16, 118:8,
121:16, 124:15,
124:16, 126:9,
153:10, 153:13,
195:20, 215:9,
218:16, 218:17,
218:24, 227:13,
227:21, 228:1,
243:24
**looking** [52] - 16:11,
22:15, 24:11, 26:13,
41:2, 45:6, 51:13,
54:23, 56:8, 56:12,
58:15, 58:20, 66:18,
66:23, 71:12, 82:5,
83:2, 84:2, 84:6,
84:20, 85:1, 90:14,
120:9, 127:19,
134:12, 140:8,
153:12, 166:12,
175:12, 176:9,
179:4, 179:23,
179:24, 182:21,
191:20, 192:12,
192:18, 235:15,
240:9, 240:11,
254:14, 254:15,
254:21, 255:4,
261:3, 261:4, 263:1,
267:13, 272:7,
272:10, 277:1
**looks** [6] - 23:24, 88:4,
89:12, 173:18, 205:9
**lost** [1] - 187:21
**low** [1] - 82:20
**lower** [12] - 17:23,
120:9, 126:1, 137:7,
139:7, 140:6,
142:22, 163:16,
163:21, 192:13,
273:20
**Luken** [5] - 151:3,
151:20, 152:13,
152:18, 153:3
**Luken's** [1] - 151:14

---

# M

**Magazine** [1] - 3:7
**MAHADY** [1] - 6:4

**mailed** [3] - 64:22,
64:23, 64:24
**Mainigi** [7] - 14:4,
30:25, 31:8, 52:4,
65:16, 68:15, 109:19
**MAINIGI** [27] - 4:12,
14:1, 14:5, 25:13,
31:1, 31:15, 35:7,
45:19, 46:12, 52:6,
53:8, 62:23, 65:17,
68:16, 68:19, 69:14,
73:23, 76:22, 78:19,
85:18, 86:2, 86:13,
108:7, 109:20,
111:3, 111:7, 112:8
**maintain** [7] - 24:13,
30:19, 30:21, 32:11,
107:9, 148:6, 164:8
**maintained** [8] - 30:1,
107:4, 107:22,
108:4, 108:15,
110:7, 135:2, 270:1
**maintaining** [2] -
23:20, 28:19
**maintenance** [6] -
30:11, 76:5, 146:7,
233:8, 251:18, 270:4
**MAJESTRO** [1] - 2:6
**Majestro** [1] - 2:6
**major** [1] - 18:6
**majority** [6] - 11:21,
117:23, 120:23,
121:4, 269:10,
269:15
**Mallinckrodt** [1] -
85:13
**management** [5] -
20:3, 20:21, 23:10,
26:10, 142:13
**manager** [1] - 166:13
**mandates** [1] - 267:22
**manner** [2] - 121:5,
245:7
**manpower** [1] - 12:2
**manual** [4] - 38:2,
38:4, 167:2, 274:5
**Manual** [2] - 38:15,
38:18
**manuals** [1] - 277:4
**manufacture** [3] -
38:14, 38:21, 180:11
**manufactured** [1] -
144:22
**manufacturer** [3] -
143:3, 145:20,
146:12
**manufacturers** [25] -
16:23, 16:24, 16:25,
116:9, 137:22,
138:8, 144:4,

144:12, 144:15,
144:22, 144:24,
145:12, 145:19,
145:23, 146:2,
148:13, 155:23,
178:6, 180:12,
181:15, 185:13,
186:24, 193:14,
194:16
**manufactures** [1] -
37:17
**Mapes** [4] - 260:3,
260:13, 260:19,
263:6
**March** [1] - 264:11
**marijuana** [1] - 12:7
**MARK** [1] - 3:16
**mark** [1] - 274:1
**marked** [7] - 37:15,
118:13, 124:22,
173:16, 256:8,
278:6, 278:8
**market** [16] - 30:12,
104:9, 107:5,
107:23, 108:5,
108:17, 110:8,
111:1, 111:21,
112:5, 112:25,
138:8, 141:22,
178:7, 178:9, 260:18
**marketed** [1] - 140:10
**marketing** [3] - 141:3,
141:21, 142:11
**Masters** [36] - 22:6,
22:11, 22:14, 22:21,
24:22, 27:14, 28:6,
28:10, 40:24, 85:5,
85:9, 87:17, 96:13,
225:13, 225:16,
225:18, 225:20,
225:21, 225:25,
235:3, 235:5, 235:6,
236:8, 236:20,
236:25, 237:22,
238:15, 238:19,
239:15, 240:19,
246:9, 266:14,
266:18, 267:12,
268:5, 269:3
**McCann** [38] - 13:15,
51:2, 51:10, 51:20,
52:11, 52:19, 52:24,
53:17, 53:18, 96:6,
96:7, 114:9, 114:10,
114:13, 114:16,
115:5, 137:2,
150:18, 152:6,
152:11, 201:17,
210:13, 210:16,
210:21, 212:2,
212:13, 212:23,
213:8, 213:16,
220:19, 220:21,
221:21, 222:1,
227:5, 230:12,
231:5, 244:23
**McCann's** [10] - 13:16,
114:20, 150:13,
151:25, 154:6,
202:3, 212:2,
212:19, 212:21,
273:9
**MCCLURE** [1] - 6:3
**MCGINNESS** [1] - 4:2
**McKesson** [59] - 5:8,
7:20, 8:7, 8:16, 8:25,
14:8, 29:24, 45:7,
47:22, 49:6, 49:18,
49:21, 49:23, 51:18,
51:22, 58:13, 60:2,
63:6, 73:21, 96:19,
97:4, 98:2, 98:10,
98:22, 100:13,
101:3, 101:18,
102:11, 105:18,
105:19, 106:4,
106:7, 106:12,
106:24, 108:15,

**math** [2] - 212:10,
250:4
**matter** [11] - 30:14,
34:18, 86:8, 128:2,
134:4, 142:2, 142:3,
158:9, 170:17,
233:7, 278:21
**matters** [2] - 151:9,
151:11
**maximum** [10] - 85:3,
85:7, 87:18, 93:22,
93:25, 95:13,
100:19, 101:8,
180:9, 247:22
**MAY** [1] - 1:19
**Mays** [1] - 54:5
**MC-WV-1764** [1] -
138:19
**MC-WV-2096** [1] -
197:11

109:1, 129:9, 130:9,
130:14, 130:18,
130:22, 131:7,
131:21, 150:24,
151:23, 206:6,
206:9, 206:13,
207:3, 219:11,
227:14, 227:22,
230:22, 250:25,
251:14, 271:6,
273:23, 277:5
**McKesson's** [3] -
106:2, 137:6, 273:17
**MCWV-2096** [1] -
199:9
**MDL** [1] - 146:21
**mean** [12] - 25:10,
45:19, 62:8, 66:1,
69:24, 91:10,
102:21, 109:14,
109:17, 255:23,
255:25, 273:12
**meaning** [1] - 169:10
**meaningful** [1] -
132:21
**means** [10] - 43:18,
69:8, 77:15, 79:18,
79:21, 93:8, 227:10,
243:5, 273:12,
277:24
**meant** [5] - 35:4, 61:6,
153:16, 153:18,
261:10
**measure** [1] - 72:6
**measures** [2] -
269:11, 269:16
**measuring** [2] - 55:20,
55:22
**mechanical** [1] - 6:19
**mechanism** [1] -
81:24
**medical** [28] - 17:7,
116:16, 116:22,
117:9, 117:13,
117:14, 120:24,
121:15, 122:23,
129:5, 132:9,
149:11, 170:24,
171:24, 180:14,
180:20, 180:24,
195:13, 196:8,
216:17, 216:20,
216:24, 217:1,
218:12, 218:17,
241:23, 242:3,
244:17
**medication** [6] -
183:15, 184:14,
184:18, 196:7,
217:7, 218:4

**medications** [4] -
48:13, 148:13,
184:11, 218:8
**Medicine** [4] - 67:5,
70:22, 71:25, 72:22
**medicine** [1] - 196:6
**meet** [5] - 19:13,
43:17, 84:10,
205:13, 216:8
**meeting** [1] - 181:3
**meetings** [1] - 21:24
**meets** [1] - 43:24
**members** [1] - 198:18
**memo** [3] - 38:24,
39:1, 39:4
**Memorandum** [3] -
22:1, 22:23, 23:3
**memorize** [1] - 215:15
**memory** [1] - 152:4
**memos** [1] - 42:21
**mention** [3] - 62:25,
126:16, 143:23
**mentioned** [5] -
130:17, 130:24,
131:1, 136:16, 240:1
**mentions** [1] - 260:2
**mess** [1] - 87:8
**met** [1] - 38:7
**methadone** [1] - 176:8
**Methamphetamine** [1]
- 38:9
**methamphetamine** [2]
- 38:14, 38:23
**method** [7] - 215:14,
231:24, 239:1,
240:15, 246:13,
247:6, 250:8
**Method** [48] - 219:6,
219:10, 219:11,
219:13, 219:16,
225:25, 226:4,
226:6, 226:8, 226:9,
226:15, 226:16,
226:17, 227:5,
227:15, 227:23,
228:23, 230:6,
231:9, 235:2,
236:13, 236:17,
237:3, 237:8,
237:14, 237:20,
237:24, 238:6,
238:14, 238:19,
238:23, 241:1,
241:8, 241:9,
242:22, 245:10,
245:19, 246:17,
246:19, 246:21,
278:8
**methodical** [1] - 82:11
**methodological** [1] -

147:10
**methodologically** [2]
- 99:5, 190:9
**methodologies** [45] -
81:22, 82:2, 84:21,
84:22, 87:15, 95:22,
96:1, 114:3, 114:5,
114:10, 114:13,
199:20, 199:21,
208:13, 208:15,
210:12, 210:13,
212:11, 212:14,
213:10, 213:17,
214:14, 216:23,
220:8, 220:9,
220:11, 220:14,
222:6, 222:11,
222:16, 222:21,
222:25, 223:2,
223:6, 223:7,
223:11, 224:23,
225:1, 225:6, 226:6,
228:13, 239:13,
240:16, 240:22,
241:7
**methodology** [46] -
14:19, 22:8, 26:23,
27:2, 27:5, 30:18,
32:17, 36:9, 44:8,
53:2, 85:20, 86:8,
87:16, 89:20, 90:8,
91:8, 92:4, 92:24,
93:6, 95:10, 96:11,
98:12, 98:15, 99:22,
100:18, 100:20,
101:7, 111:9, 114:3,
115:24, 214:6,
215:10, 227:3,
232:15, 232:21,
235:4, 237:3, 237:8,
237:10, 237:13,
240:25, 242:2,
243:4, 247:18,
248:2, 249:18
**Methodology** [5] -
89:17, 90:9, 90:14,
229:10
**methods** [15] - 219:5,
225:2, 225:8, 239:4,
239:5, 240:4,
244:15, 244:16,
244:18, 245:1,
245:6, 245:10,
246:16, 246:19,
250:15
**metric** [2] - 65:8,
86:10
**metrics** [1] - 87:1
**Metropolitan** [1] -
11:10

**Miami** [6] - 151:3,
151:14, 151:20,
152:13, 152:18,
153:3
**Miami-Luken** [5] -
151:3, 151:20,
152:13, 152:18,
153:3
**Miami-Luken's** [1] -
151:14
**Michael** [3] - 260:3,
260:13, 263:6
**MICHAEL** [2] - 2:15,
3:9
**Michigan** [7] - 11:2,
11:5, 11:8, 15:17,
17:24, 128:17
**microphone** [1] - 90:5
**middle** [3] - 58:4,
163:22, 163:23
**midnight** [2] - 12:11,
86:3
**might** [21] - 37:10,
110:19, 122:18,
125:24, 136:8,
157:13, 157:24,
158:13, 158:18,
161:24, 183:21,
183:22, 192:17,
204:17, 220:22,
240:3, 240:16,
246:12, 252:4,
252:10, 258:25
**MILDRED** [1] - 3:3
**miles** [1] - 11:8
**military** [1] - 18:18
**mill** [14] - 18:20,
18:21, 19:9, 20:4,
128:16, 130:10,
130:19, 156:23,
157:1, 157:17,
157:22, 157:25,
158:2, 167:23
**milligrams** [4] - 18:25,
71:5, 71:9
**million** [1] - 122:9
**millions** [6] - 214:7,
214:11, 228:5,
229:8, 229:15,
229:25
**mindful** [1] - 31:24
**mine** [1] - 115:20
**minimally** [1] - 187:9
**minimum** [1] - 186:13
**minus** [3] - 272:8,
272:9
**minute** [5] - 72:10,
81:1, 190:20, 220:1,
263:17
**minutes** [7] - 25:25,

113:12, 162:3,
167:21, 199:3,
270:19, 270:22
**mischaracterization**
[1] - 154:16
**misconduct** [1] -
171:23
**misconstruing** [1] -
233:24
**misheard** [1] - 187:16
**misleading** [1] - 68:23
**missed** [4] - 15:25,
103:17, 105:5,
109:17
**missing** [5] - 266:12,
271:12, 271:16,
271:18, 271:21
**mission** [1] - 29:4
**misstating** [1] - 90:7
**misunderstood** [3] -
110:19, 153:16,
229:24
**misuse** [3] - 196:13,
198:11, 199:14
**misuses** [1] - 196:7
**Mitchell** [1] - 2:12
**mixed** [1] - 90:8
**modified** [1] - 240:18
**moment** [3] - 47:17,
113:7, 190:25
**Mone** [3] - 58:4,
233:15, 234:15
**Mone's** [2] - 233:24,
234:8
**monitor** [5] - 70:17,
75:14, 106:17,
183:13, 187:22
**monitored** [1] - 59:2
**Monitoring** [12] -
24:16, 27:23, 30:5,
30:10, 37:18, 41:3,
42:16, 58:9, 60:5,
75:12, 146:9, 220:15
**monitoring** [9] - 59:8,
59:13, 60:10, 74:19,
82:23, 83:8, 87:25,
106:13, 256:21
**month** [55] - 56:2,
58:23, 64:19, 68:11,
70:12, 70:22, 71:24,
72:4, 73:9, 77:21,
80:14, 80:21, 85:4,
85:7, 87:18, 87:24,
87:25, 88:1, 88:12,
88:21, 89:1, 89:2,
89:15, 90:16, 90:18,
92:6, 92:7, 92:12,
92:13, 92:16, 93:10,
93:19, 94:5, 94:6,
94:7, 100:19,

161:20, 230:15, 232:17, 233:4, 234:20, 236:25, 239:16, 243:21, 244:1, 247:1, 247:9, 276:6

**monthly** [13] - 56:13, 61:9, 61:14, 69:3, 73:5, 85:3, 85:7, 87:12, 87:18, 92:9, 94:1, 95:10, 274:3

**months** [40] - 68:6, 87:23, 88:1, 88:5, 88:8, 88:17, 89:19, 90:15, 90:19, 92:3, 92:7, 92:8, 92:17, 98:14, 231:4, 231:10, 231:15, 231:16, 231:17, 231:18, 231:20, 231:21, 232:10, 232:25, 233:3, 233:5, 234:21, 238:20, 243:11, 245:18, 246:6, 246:10, 246:22, 246:24, 247:7, 247:8, 247:15, 274:12, 276:5

**morning** [8] - 7:6, 8:8, 10:13, 10:17, 10:23, 81:12, 278:3, 278:13

**Morris** [1] - 6:15

**most** [12] - 19:21, 24:6, 30:2, 55:17, 99:4, 182:15, 183:1, 215:9, 215:20, 215:24, 219:7, 244:12

**motion** [7] - 30:17, 30:22, 32:3, 107:10, 166:4, 234:11

**Motley** [5] - 2:9, 3:14, 4:3, 4:5, 4:8

**MOU** [1] - 23:2

**MOUGEY** [1] - 2:12

**mouthpiece** [1] - 188:9

**move** [24] - 7:11, 7:16, 8:6, 12:4, 13:3, 47:24, 58:12, 86:15, 86:25, 91:2, 91:5, 93:9, 119:10, 126:19, 127:12, 138:18, 165:23, 174:7, 192:3, 197:19, 229:21, 256:13, 264:3, 265:21

**moved** [2] - 11:6,

231:4

**moving** [7] - 20:23, 23:8, 34:22, 56:21, 58:3, 202:12, 267:6

**MR** [378] - 2:3, 2:6, 2:9, 2:12, 2:15, 3:9, 3:11, 3:16, 4:17, 5:9, 5:10, 5:13, 6:4, 7:8, 7:11, 7:14, 7:19, 7:21, 7:25, 8:3, 8:4, 8:13, 8:14, 8:21, 9:9, 9:22, 9:24, 10:3, 10:16, 13:4, 13:11, 14:10, 14:15, 14:23, 21:19, 25:5, 25:6, 25:21, 25:25, 26:4, 27:7, 27:9, 30:8, 30:16, 31:3, 31:9, 32:10, 32:14, 32:19, 32:24, 32:25, 33:2, 33:6, 33:16, 33:18, 34:4, 34:13, 34:18, 34:21, 34:24, 35:3, 35:6, 35:13, 35:15, 36:5, 36:7, 36:20, 37:9, 39:15, 40:2, 40:9, 40:14, 40:17, 42:1, 42:6, 42:25, 43:6, 44:3, 44:5, 44:24, 45:2, 46:2, 46:17, 46:18, 47:13, 47:16, 50:21, 50:24, 51:9, 51:17, 52:10, 52:24, 53:6, 53:10, 53:22, 53:25, 59:19, 59:22, 59:23, 60:16, 60:19, 62:8, 62:11, 62:16, 62:17, 62:18, 63:5, 63:7, 63:14, 63:17, 64:4, 64:9, 65:10, 65:14, 65:23, 66:3, 66:5, 66:18, 66:22, 68:18, 68:20, 69:1, 69:2, 69:18, 69:21, 70:8, 70:10, 72:17, 72:19, 72:21, 73:18, 74:2, 74:6, 74:9, 74:15, 74:25, 75:7, 75:24, 76:21, 77:7, 78:1, 78:8, 78:22, 79:8, 79:9, 80:11, 81:9, 81:13, 81:16, 81:19, 82:8, 82:14, 85:23, 86:5, 86:23, 86:24, 87:6, 87:10, 89:25, 90:4, 90:13, 90:22, 90:24, 91:3, 91:4, 91:10, 91:12, 91:18, 91:22, 92:1, 92:2, 94:4, 96:8, 96:9, 99:3,

99:8, 99:13, 99:15, 99:16, 99:21, 100:17, 102:25, 103:2, 106:16, 106:22, 107:11, 107:14, 107:20, 108:10, 108:19, 108:22, 109:25, 110:4, 110:14, 110:17, 110:23, 111:5, 111:8, 111:11, 111:16, 112:10, 112:14, 112:15, 112:20, 112:21, 113:7, 113:11, 113:17, 113:24, 114:1, 115:7, 115:9, 115:13, 118:10, 118:12, 119:10, 119:13, 119:15, 119:19, 120:1, 120:4, 124:20, 124:21, 125:23, 125:24, 126:3, 126:19, 126:21, 126:24, 127:5, 127:7, 127:12, 127:15, 128:10, 138:18, 138:21, 138:23, 139:5, 139:10, 145:4, 145:7, 145:14, 146:22, 147:9, 147:19, 147:21, 152:10, 154:10, 154:18, 155:1, 155:4, 160:17, 161:2, 161:3, 165:3, 165:6, 165:10, 165:15, 165:23, 166:2, 166:7, 172:15, 172:17, 172:18, 172:21, 174:7, 174:10, 174:12, 174:20, 174:22, 178:12, 187:12, 187:16, 187:19, 188:1, 189:22, 189:25, 190:11, 190:12, 190:17, 190:20, 190:24, 192:3, 192:6, 192:8, 193:1, 193:4, 197:8, 197:10, 197:18, 197:21, 197:23, 197:25, 198:1, 198:3, 198:6, 199:1, 199:6, 199:7, 200:18, 200:24,

202:20, 202:21, 202:24, 203:1, 203:3, 207:11, 207:15, 207:17, 207:21, 209:4, 209:7, 211:23, 211:25, 214:1, 214:4, 214:5, 215:23, 215:25, 216:2, 217:21, 217:25, 218:25, 219:4, 221:8, 221:11, 221:17, 221:19, 221:22, 221:25, 230:21, 231:2, 232:3, 232:4, 233:17, 233:21, 233:23, 234:3, 234:5, 234:10, 234:11, 234:13, 234:14, 234:16, 234:18, 234:19, 235:13, 238:8, 238:12, 239:6, 243:14, 243:17, 246:14, 246:15, 256:12, 256:18, 262:15, 262:18, 262:21, 262:24, 263:15, 263:19, 263:20, 263:21, 264:3, 264:4, 267:5, 267:9, 267:11, 270:15, 270:21, 270:25, 277:11, 277:15, 277:17, 277:21, 277:25, 278:10

**MS** [43] - 3:3, 3:6, 3:14, 4:2, 4:5, 4:8, 4:12, 4:12, 4:15, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 7:22, 14:1, 14:5, 25:13, 31:1, 31:15, 35:7, 45:19, 46:12, 52:6, 53:8, 62:23, 65:17, 68:16, 68:19, 69:14, 73:23, 76:22, 78:19, 85:18, 86:2, 86:13, 108:7, 109:20, 111:3, 111:7, 112:8, 278:4

**Mt** [3] - 3:15, 4:4, 4:9

**multi** [2] - 232:6, 244:8

**multi-year** [2] - 232:6, 244:8

**multiple** [6] - 48:18, 119:8, 141:23, 164:6, 262:18,

263:21

**multiplied** [1] - 98:14

**multiplier** [1] - 86:1

**multiply** [1] - 69:6

**multiplying** [2] - 68:14, 99:23

## N

**name** [6] - 10:5, 10:17, 41:6, 144:23, 262:20, 274:5

**named** [2] - 18:17, 125:21

**names** [5] - 54:3, 54:10, 54:19, 56:19, 58:2

**narcotic** [4] - 11:22, 16:22, 19:11, 69:25

**narcotics** [2] - 16:25, 61:19

**narrative** [1] - 39:22

**narrow** [1] - 52:18

**Nassau** [2] - 208:25, 209:12

**nation** [1] - 92:19

**national** [6] - 9:16, 93:2, 93:3, 106:24, 129:6, 180:5

**National** [1] - 126:14

**nationally** [3] - 9:4, 62:4, 141:9

**nationwide** [2] - 207:9, 207:10

**nearby** [1] - 204:18

**nearest** [1] - 64:24

**nearly** [2] - 166:15, 166:22

**necessarily** [1] - 127:3

**necessary** [3] - 132:9, 154:13, 180:11

**need** [34] - 7:23, 7:24, 33:2, 43:16, 66:19, 68:24, 69:12, 72:8, 74:7, 81:11, 110:1, 116:16, 117:13, 120:6, 132:9, 149:11, 157:13, 176:17, 180:20, 183:20, 183:22, 184:7, 189:1, 216:17, 216:20, 216:24, 217:1, 218:12, 218:17, 218:25, 230:23, 233:12, 270:1

**needed** [2] - 183:15, 184:14

**Needed** [1] - 192:10

**needs** [9] - 84:11,

94:19, 116:22, 129:5, 180:15, 180:21, 180:25, 184:25, 241:24

**never** [34] - 13:15, 51:2, 89:5, 97:14, 97:16, 121:6, 127:10, 133:8, 133:12, 146:12, 146:18, 151:23, 151:25, 157:18, 161:8, 189:10, 205:16, 220:17, 222:6, 222:9, 223:19, 236:16, 241:9, 241:13, 245:19, 247:2, 250:14, 251:14, 252:1, 253:10, 257:6, 257:18, 259:22, 277:24

**new** [23] - 170:3, 205:15, 227:3, 237:3, 237:8, 237:10, 237:13, 239:1, 240:3, 241:1, 246:13, 251:2, 258:16, 260:15, 261:1, 261:20, 274:14, 274:16, 275:12, 275:17, 276:8, 276:15, 277:5

**New** [8] - 3:5, 3:8, 157:6, 164:15, 173:19, 211:4, 211:18, 262:9

**next** [49] - 10:2, 19:8, 36:6, 38:2, 38:6, 38:15, 38:24, 39:5, 41:21, 44:6, 48:1, 55:7, 56:16, 58:12, 59:18, 71:7, 81:17, 87:9, 91:2, 93:19, 94:21, 104:14, 105:17, 137:13, 140:22, 141:18, 163:21, 166:12, 167:17, 168:19, 169:17, 169:19, 170:8, 176:1, 181:14, 182:2, 183:5, 187:3, 189:1, 219:2, 231:15, 231:16, 232:5, 239:22, 247:1, 247:8, 256:24, 259:6, 268:4

**Next** [1] - 16:23

**nice** [1] - 29:17

**NICHOLAS** [16] - 6:11,

14:10, 31:9, 32:19, 35:3, 50:24, 51:9, 53:6, 63:7, 65:23, 74:6, 78:22, 99:8, 107:11, 111:11, 112:15

**Nicholas** [10] - 14:9, 31:7, 32:18, 35:2, 51:20, 51:23, 53:5, 65:22, 74:3, 99:7

**Ninth** [1] - 4:6

**none** [7] - 20:7, 195:25, 204:23, 216:3, 217:15, 220:14

**None** [2] - 138:21, 192:6

**noon** [1] - 113:14

**normal** [5] - 82:25, 84:18, 117:12, 203:6, 245:4

**North** [1] - 176:9

**northern** [1] - 17:25

**notable** [4] - 18:13, 19:7, 19:25, 22:4

**note** [2] - 32:6, 57:23

**noted** [2] - 267:20, 267:21

**nothing** [1] - 264:11

**notice** [6] - 119:16, 202:12, 202:19, 256:14, 267:7, 268:15

**noticed** [1] - 203:2

**noting** [2] - 86:15, 166:14

**November** [1] - 197:24

**nowhere** [1] - 204:6

**number** [68] - 35:9, 36:12, 38:6, 46:4, 46:19, 46:23, 47:3, 47:18, 47:19, 47:20, 47:25, 48:2, 48:23, 48:24, 48:25, 49:1, 49:5, 49:7, 49:8, 49:9, 49:19, 49:20, 52:11, 56:17, 67:5, 68:8, 83:12, 83:24, 84:2, 85:20, 87:21, 87:22, 92:16, 103:23, 120:15, 125:23, 134:7, 134:8, 134:16, 137:7, 139:6, 139:7, 157:14, 157:15, 167:23, 187:2, 196:16, 196:17, 196:18, 216:21, 219:23, 229:7, 229:22, 245:5,

246:24, 247:2, 247:3, 247:15, 250:13, 271:1, 271:4, 272:1, 272:20, 277:14

**Number** [2] - 180:2, 180:3

**numbered** [1] - 180:1

**numbers** [27] - 49:16, 83:15, 101:22, 103:11, 120:9, 126:1, 153:5, 153:12, 163:16, 179:24, 182:6, 182:19, 206:1, 206:2, 208:14, 208:16, 209:21, 209:22, 209:24, 210:9, 210:10, 226:20, 231:17, 250:21, 271:12, 273:20

**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12

**NWDA** [6] - 37:15, 37:16, 37:20, 37:24, 41:2, 41:4

**NY** [1] - 3:5

## O

**oath** [3] - 113:22, 121:13, 121:21

**object** [23] - 13:23, 14:11, 25:13, 25:22, 31:13, 31:17, 34:21, 34:23, 39:22, 40:1, 62:12, 62:25, 63:2, 63:8, 65:10, 78:1, 99:5, 107:11, 109:20, 146:22, 166:2, 234:14, 262:18

**objected** [1] - 91:20

**objecting** [1] - 234:9

**Objection** [8] - 120:2, 126:21, 145:4, 154:10, 165:6, 172:15, 187:12, 209:4

**objection** [63] - 7:22, 8:11, 8:13, 26:2, 27:8, 30:15, 31:9, 32:7, 33:10, 39:25, 40:12, 45:20, 45:21, 45:25, 46:12, 50:25, 53:20, 62:13, 62:23, 65:17, 68:22, 73:24, 74:13, 76:22, 77:3, 78:19, 85:18, 86:19,

86:20, 90:11, 91:23, 91:25, 106:16, 107:17, 108:7, 108:19, 111:3, 112:8, 112:10, 112:11, 112:17, 119:12, 138:20, 145:6, 154:25, 174:9, 174:20, 187:24, 192:5, 197:20, 197:25, 202:18, 207:11, 207:17, 209:4, 234:7, 239:6, 256:15, 262:22, 263:15, 264:2, 267:10

**objections** [9] - 8:9, 9:25, 14:7, 74:6, 74:9, 110:1, 111:11, 111:14, 233:23

**objective** [1] - 88:15

**objectors** [1] - 262:19

**obligation** [3] - 132:12, 155:19, 156:15

**obligations** [6] - 134:22, 156:4, 156:7, 156:11, 199:22, 257:5

**observable** [1] - 275:8

**observe** [2] - 117:11, 259:4

**observed** [1] - 53:16

**obtain** [7] - 20:18, 23:23, 27:17, 28:9, 28:11, 172:1, 184:18

**obtained** [6] - 23:12, 38:3, 38:4, 45:16, 195:10, 196:5

**obtaining** [1] - 28:21

**obviously** [4] - 182:14, 207:25, 208:3, 264:15

**Obviously** [1] - 165:19

**occasion** [3] - 118:9, 124:7, 251:9

**occur** [9] - 104:13, 179:7, 189:16, 193:10, 194:1, 194:3, 194:18, 220:5, 220:7

**occurred** [12] - 97:11, 135:11, 149:17, 153:2, 153:20, 158:2, 165:19, 190:2, 205:19, 212:8, 253:7, 273:24

**occurrence** [1] - 158:21

**occurring** [5] - 135:24, 157:2, 208:8, 249:15, 272:4

**occurs** [2] - 233:6, 248:10

**OF** [2] - 1:1, 1:4

**offense** [1] - 230:25

**offer** [5] - 12:18, 12:19, 15:10, 185:20, 186:2

**offered** [7] - 30:23, 31:4, 31:12, 31:16, 144:11, 237:13, 257:3

**offering** [6] - 25:19, 32:8, 135:10, 144:24, 145:2, 185:15

**offers** [1] - 12:21

**Office** [6] - 21:24, 64:25, 121:11, 123:7, 138:13, 179:20

**office** [14] - 15:17, 17:23, 18:21, 18:22, 19:13, 19:14, 39:1, 84:4, 164:14, 165:8, 167:8, 167:9, 170:21, 191:23

**officer** [3] - 11:12, 16:5, 256:3

**Officer** [2] - 12:5, 12:7

**officers** [1] - 12:20

**Offices** [1] - 64:23

**offices** [3] - 164:13, 164:25, 166:21

**Official** [2] - 278:18, 278:19

**official** [4] - 22:15, 120:22, 126:24, 236:5

**officials** [5] - 121:7, 140:11, 140:17, 141:2, 141:7

**offs** [1] - 11:5

**often** [3] - 28:6, 133:6, 166:23

**Ognen** [3] - 18:17, 19:6, 128:16

**Ognen's** [1] - 19:4

**Ohio** [10] - 9:11, 17:25, 18:1, 18:19, 22:8, 128:18, 128:19, 209:16, 211:4, 211:20

**OIG** [1] - 184:24

**old** [1] - 12:24

**on-line** [3] - 167:1, 167:5, 167:14

**on-site** [5] - 22:22,

28:7, 28:10, 160:13, 169:11
**once** [7] - 75:25, 77:12, 78:9, 81:5, 88:20, 96:14, 158:20
**Once** [1] - 26:6
**One** [7] - 5:11, 15:21, 21:6, 36:12, 120:13, 166:13, 174:3
**one** [159] - 12:21, 13:13, 17:9, 22:10, 27:13, 27:16, 29:6, 31:5, 37:11, 38:22, 48:18, 51:13, 52:11, 53:1, 55:24, 56:2, 58:16, 58:23, 63:3, 64:14, 64:16, 64:19, 71:4, 71:12, 72:10, 73:25, 81:12, 82:15, 85:3, 85:12, 85:14, 85:16, 87:21, 91:6, 92:15, 92:25, 94:20, 95:2, 95:20, 102:23, 105:15, 109:17, 116:18, 118:1, 122:9, 122:10, 122:11, 122:15, 125:25, 129:14, 130:24, 131:1, 138:15, 139:22, 144:15, 146:12, 146:13, 146:14, 148:20, 149:14, 151:2, 156:10, 162:12, 171:15, 172:9, 172:10, 174:1, 176:17, 176:22, 179:11, 183:19, 186:1, 187:18, 190:15, 190:20, 194:9, 194:24, 195:1, 195:12, 195:23, 197:6, 198:17, 204:17, 206:21, 208:2, 209:20, 210:2, 210:6, 214:10, 214:16, 215:4, 216:13, 217:3, 219:24, 220:10, 222:18, 224:17, 225:8, 228:4, 228:16, 231:3, 232:17, 232:22, 232:24, 234:21, 238:10, 238:13, 238:19, 239:15, 239:18, 239:23, 241:6, 245:6, 246:19, 248:21, 249:8,

249:21, 249:23, 250:3, 251:7, 251:8, 257:21, 258:23, 259:7, 260:2, 260:5, 260:10, 261:8, 261:9, 261:11, 266:12, 266:13, 267:16, 268:14, 268:20, 270:3, 270:15, 270:17, 271:9, 273:23, 274:19, 274:20, 274:24, 275:10, 277:9, 277:19, 277:21, 277:24, 278:4, 278:5
**one-step** [1] - 73:25
**ones** [15] - 8:19, 8:21, 97:12, 134:17, 137:25, 138:5, 195:2, 195:25, 196:25, 197:7, 215:16, 218:17, 219:7, 239:14, 240:18
**ongoing** [1] - 45:21
**open** [7] - 20:23, 28:5, 204:18, 205:4, 224:15, 224:17, 235:12
**operated** [3] - 29:3, 30:5, 109:2
**operating** [1] - 274:5
**operationalize** [1] - 213:9
**operations** [2] - 20:4, 20:5
**opinion** [56] - 32:16, 53:15, 53:19, 81:8, 107:3, 107:8, 107:15, 107:21, 108:1, 108:3, 108:11, 108:15, 108:23, 108:25, 109:6, 109:8, 109:11, 109:13, 110:6, 110:11, 110:24, 111:6, 111:17, 111:19, 111:24, 112:1, 112:3, 112:22, 113:2, 112:18, 128:2, 135:12, 136:21, 146:19, 147:12, 154:8, 155:6, 155:12, 155:15, 165:20, 182:16, 185:15, 188:20, 188:21, 189:15, 189:18,

189:19, 228:19, 259:25, 262:1, 262:25, 264:5, 265:18, 266:25, 268:9
**opinions** [42] - 14:22, 32:1, 32:4, 32:6, 32:10, 43:3, 43:17, 43:25, 52:13, 113:4, 115:24, 135:10, 136:12, 136:15, 137:14, 138:16, 144:11, 144:24, 145:2, 145:22, 147:13, 155:11, 185:19, 185:20, 186:2, 188:13, 188:15, 188:16, 189:3, 189:11, 189:13, 190:1, 190:3, 190:4, 190:5, 216:4, 216:7, 218:4, 218:8, 218:12, 245:23
**opioid** [28] - 56:9, 122:24, 123:1, 123:19, 124:12, 125:11, 125:16, 126:15, 133:17, 136:16, 136:22, 137:15, 137:20, 142:1, 144:13, 156:21, 157:21, 178:15, 181:11, 182:14, 184:25, 185:8, 185:12, 185:16, 185:21, 186:3, 186:14, 208:7
**Opioid** [1] - 192:11
**opioids** [50] - 20:7, 107:5, 107:23, 108:5, 108:17, 110:8, 111:1, 111:21, 116:17, 116:21, 116:23, 119:5, 121:15, 125:14, 125:17, 126:5, 127:19, 129:5, 131:12, 132:22, 133:21, 134:5, 134:12, 136:13, 137:23, 138:1, 138:9, 144:4, 144:8, 144:16, 148:19, 154:5, 156:9, 156:13, 156:17, 173:8, 173:12, 174:15, 176:3, 176:8, 176:24, 179:18, 181:16, 184:7,

184:13, 185:24, 242:9, 242:25, 247:10, 272:25
**Opioids** [1] - 163:12
**opportunity** [9] - 11:15, 36:14, 63:12, 74:11, 77:4, 193:6, 195:16, 202:23, 240:24
**opposed** [2] - 39:22, 116:8
**opposite** [3] - 165:11, 165:13, 258:7
**orange** [1] - 45:7
**Order** [22] - 20:25, 21:1, 21:14, 24:15, 27:23, 30:5, 30:10, 37:18, 39:10, 41:2, 42:15, 58:9, 60:5, 75:12, 146:9, 163:18, 174:24, 206:2, 206:16, 220:15, 259:11, 264:11
**order** [95] - 21:3, 24:18, 25:10, 28:20, 29:3, 29:5, 48:10, 48:11, 48:20, 48:21, 49:4, 53:12, 60:10, 60:24, 60:25, 61:16, 65:6, 70:16, 74:18, 75:9, 75:22, 75:25, 76:2, 76:3, 76:7, 76:15, 76:18, 76:25, 77:1, 77:16, 77:20, 77:23, 78:10, 78:16, 78:17, 79:11, 81:6, 82:23, 83:8, 84:17, 94:11, 95:2, 95:5, 95:6, 95:8, 95:12, 96:3, 96:14, 104:11, 104:22, 105:15, 129:9, 164:2, 164:12, 164:24, 166:18, 203:8, 203:25, 204:13, 204:22, 205:9, 206:13, 206:24, 207:24, 208:3, 208:7, 208:10, 217:13, 217:19, 225:11, 226:22, 227:7, 227:10, 228:1, 229:12, 230:9, 231:10, 231:13, 234:24, 235:25, 244:20, 251:5, 251:10, 251:15, 251:20, 257:23, 260:15,

261:2, 261:21, 267:24, 269:19
**ordered** [2] - 71:1, 232:19
**ordering** [1] - 232:18
**orders** [120] - 24:22, 28:18, 28:19, 42:22, 48:7, 65:5, 70:22, 71:21, 72:25, 73:2, 73:5, 73:9, 77:13, 77:23, 78:11, 78:25, 79:1, 79:2, 79:11, 82:24, 84:16, 89:7, 89:21, 89:23, 91:14, 91:15, 94:8, 96:21, 96:24, 97:21, 98:3, 98:5, 98:18, 100:2, 100:4, 102:15, 102:19, 103:23, 104:8, 104:11, 104:17, 104:23, 105:7, 105:19, 105:22, 105:24, 105:25, 109:3, 112:3, 112:23, 153:11, 153:13, 153:15, 162:17, 165:21, 167:2, 202:8, 203:4, 203:5, 203:6, 204:8, 204:19, 205:13, 205:18, 206:11, 206:12, 206:21, 207:3, 214:8, 214:11, 214:13, 214:16, 215:4, 215:5, 215:9, 215:14, 216:9, 216:12, 216:15, 216:16, 216:20, 218:16, 218:19, 222:21, 227:13, 227:15, 227:21, 227:23, 228:5, 228:12, 228:23, 229:8, 229:15, 230:1, 232:22, 235:7, 236:1, 242:2, 243:6, 245:6, 247:20, 247:24, 248:6, 248:11, 249:6, 251:1, 251:3, 252:2, 253:11, 260:17, 264:20, 265:15, 275:20, 275:24, 276:23
**Orders** [1] - 192:11
**organization** [1] - 41:6
**organizations** [1] - 19:11

**organized** [1] - 19:12
**orient** [3] - 56:16, 58:13, 193:13
**orientation** [2] - 34:6, 43:1
**Oriente** [1] - 58:19
**oriented** [1] - 249:11
**orienting** [1] - 57:4
**original** [1] - 42:24
**originated** [1] - 20:3
**Orleans** [1] - 3:8
**ostensibly** [1] - 51:21
**otherwise** [1] - 155:24
**ought** [2] - 51:6, 198:24
**ourselves** [1] - 193:13
**outline** [1] - 13:4
**outlined** [2] - 26:22, 27:1
**outlining** [1] - 27:5
**outside** [17] - 9:13, 11:8, 19:14, 22:7, 84:18, 85:19, 86:16, 117:12, 134:18, 142:4, 145:17, 147:1, 177:6, 186:6, 186:7, 186:9, 223:20
**over-prescribing** [4] - 125:14, 125:17, 125:19, 126:5
**overall** [3] - 59:3, 177:21, 179:11
**overcome** [3] - 178:13, 178:15, 178:17
**overdose** [1] - 181:12
**Overdoses** [1] - 197:15
**overrule** [15] - 26:2, 40:12, 45:24, 53:20, 68:21, 74:13, 77:3, 86:19, 90:10, 91:24, 107:17, 111:13, 154:24, 262:22, 264:2
**Overruled** [2] - 145:9, 165:14
**overruled** [12] - 77:6, 79:6, 106:19, 107:13, 108:20, 109:24, 112:9, 120:2, 187:25, 207:13, 207:19, 239:8
**oversee** [3] - 155:19, 155:24, 156:15
**oversees** [1] - 155:17
**oversight** [1] - 167:8
**overview** [1] - 35:22
**overwhelming** [4] -

120:23, 121:4, 269:10, 269:15
**own** [1] - 90:7
**owned** [1] - 225:10
**Oxy** [1] - 71:14
**oxy** [1] - 71:17
**oxycodone** [47] - 19:1, 19:20, 20:8, 20:10, 23:6, 24:20, 47:3, 47:20, 49:1, 49:10, 49:20, 49:24, 50:1, 54:24, 56:11, 56:24, 58:24, 59:3, 68:5, 70:21, 71:2, 71:4, 71:5, 71:8, 71:10, 71:25, 95:4, 96:18, 96:21, 98:1, 98:4, 98:23, 100:2, 100:14, 100:22, 101:1, 101:3, 101:10, 101:14, 101:18, 106:9, 181:18, 183:2, 219:11, 250:6, 272:24
**oxycodone-based** [1] - 70:21
**Oxycontin** [14] - 18:25, 19:19, 71:8, 138:13, 139:19, 139:25, 140:10, 141:8, 141:23, 141:25, 142:11, 143:11, 143:15, 143:19

---

**P**

**P-1200** [1] - 2:7
**P-12820** [2] - 8:10, 8:23
**P-12883** [2] - 8:10, 8:23
**P-14288ii** [1] - 63:23
**P-2094** [1] - 37:15
**P-33** [1] - 268:15
**P-42216** [2] - 200:19, 200:20
**P-54** [2] - 8:15, 8:25
**p.m** [3] - 113:20, 199:4, 278:15
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**packaging** [1] - 48:15
**packers** [3] - 94:24, 95:6, 101:8
**page** [30] - 9:10, 13:10, 42:24, 118:20, 125:12, 125:23, 138:25,

140:22, 143:9, 157:13, 157:14, 163:21, 168:5, 168:19, 169:21, 175:4, 176:1, 182:2, 182:21, 183:5, 184:24, 186:21, 188:25, 189:1, 197:24, 198:4, 226:15, 269:8
**Page** [51] - 34:19, 66:15, 120:8, 125:1, 125:10, 125:25, 139:3, 140:6, 142:18, 142:20, 146:21, 147:20, 152:6, 157:11, 163:6, 163:15, 163:17, 163:21, 164:16, 164:19, 166:11, 167:20, 175:10, 175:11, 175:18, 176:1, 176:6, 179:23, 181:2, 181:8, 182:22, 186:19, 192:12, 197:17, 199:11, 199:12, 200:20, 200:22, 224:22, 228:22, 229:14, 256:18, 256:25, 259:25, 260:1, 262:25, 264:5, 267:18, 270:24, 273:3
**pages** [2] - 126:17, 157:12
**paid** [1] - 46:13
**Pain** [1] - 118:22
**pain** [6] - 20:4, 129:20, 129:23, 142:1, 142:13, 199:14
**pain-killers** [1] - 199:14
**Painkiller** [1] - 197:15
**painkillers** [2] - 196:14, 198:12
**Papantonio** [1] - 2:12
**paper** [2] - 24:3, 24:4
**paragraph** [27] - 139:17, 140:9, 140:23, 140:24, 140:25, 141:18, 163:23, 168:5, 169:18, 169:19, 169:20, 170:8, 181:9, 182:24, 198:10, 200:23, 201:4, 202:16, 202:17, 256:19,

259:6, 260:1, 264:7, 264:8, 264:9, 267:19, 269:9
**Paragraph** [2] - 180:2, 202:21
**paragraphs** [2] - 180:1, 257:1
**pardon** [2] - 48:4, 211:14
**Pardon** [1] - 184:3
**parking** [3] - 18:22, 18:23, 19:14
**part** [22] - 15:22, 18:9, 28:14, 67:2, 75:22, 76:9, 83:9, 102:22, 128:23, 133:3, 134:2, 157:6, 171:4, 180:13, 201:4, 226:11, 254:5, 254:15, 262:1, 263:1, 270:10
**partial** [1] - 188:7
**participants** [3] - 185:22, 185:23, 186:4
**participate** [4] - 17:13, 18:3, 18:4, 259:4
**participated** [2] - 18:13, 19:22
**participating** [1] - 195:17
**participation** [2] - 15:8, 37:21
**particular** [15] - 17:20, 26:13, 63:20, 64:7, 64:16, 67:4, 70:20, 71:13, 71:16, 82:15, 89:13, 188:20, 188:21, 244:6, 256:21
**particularly** [1] - 233:19
**parties** [1] - 63:19
**parts** [2] - 40:1, 171:5
**pass** [1] - 12:23
**passed** [1] - 187:6
**passing** [1] - 191:3
**past** [7] - 88:17, 90:19, 170:10, 228:10, 248:20, 250:1, 250:5
**patient** [8] - 116:22, 149:3, 149:4, 149:11, 149:16, 193:20, 196:7, 196:9
**patients** [13] - 18:21, 18:24, 19:2, 121:23, 148:25, 193:20, 195:3, 195:6, 195:9, 196:4, 217:7, 218:3, 218:7

**patrol** [1] - 11:12
**pattern** [12] - 60:1, 60:8, 82:25, 203:6, 204:9, 204:13, 204:19, 205:10, 231:18, 232:10, 232:25, 233:3
**patterns** [4] - 23:4, 49:25, 55:1, 58:6
**Patterson** [2] - 121:21, 122:4
**PAUL** [2] - 2:3, 5:9
**Pause** [3] - 113:10, 174:11, 190:23
**pause** [2] - 72:12, 246:20
**PDF** [1] - 139:4
**PEARL** [1] - 3:6
**peer** [1] - 223:14
**peer-reviewed** [1] - 223:14
**pending** [5] - 31:2, 34:9, 151:9, 151:11, 151:12
**peninsula** [2] - 17:23, 17:24
**Pensacola** [1] - 2:14
**people** [26] - 16:2, 16:15, 17:10, 20:5, 23:17, 129:23, 159:11, 183:14, 183:20, 183:22, 184:7, 184:9, 184:11, 184:14, 184:17, 186:14, 186:17, 187:6, 196:13, 198:11, 199:13, 263:23, 266:7
**per** [6] - 94:5, 94:6, 94:7, 175:23, 176:3
**percent** [74] - 96:22, 96:25, 97:2, 97:3, 97:5, 97:6, 98:4, 98:6, 98:8, 98:9, 98:10, 98:11, 98:17, 98:19, 98:20, 98:21, 98:23, 98:24, 100:3, 100:5, 100:6, 100:12, 100:14, 100:15, 100:23, 100:24, 100:25, 101:2, 101:4, 101:6, 101:11, 101:13, 101:15, 101:16, 101:19, 101:21, 121:14, 121:22, 122:6, 122:11, 122:15, 135:18, 152:23, 152:24,

153:5, 153:8, 153:9, 157:19, 181:19, 183:2, 205:23, 205:24, 208:17, 210:1, 210:2, 210:4, 216:19, 216:20, 217:3, 217:15, 219:13, 219:16, 219:20, 219:21, 220:8, 226:20, 228:24, 250:7, 250:20, 273:16, 276:6
**percentage** [1] - 153:22
**Percocet** [1] - 19:20
**perfect** [1] - 123:13
**perfectly** [1] - 123:3
**performed** [13] - 69:4, 97:9, 115:5, 208:14, 208:19, 208:21, 209:8, 209:10, 209:12, 209:14, 209:16, 210:13, 216:6
**performing** [5] - 26:23, 34:16, 36:10, 42:8, 74:18
**perhaps** [3] - 14:7, 31:23, 69:14
**period** [25] - 45:17, 55:8, 58:11, 62:6, 63:1, 63:2, 93:2, 127:19, 130:8, 134:12, 158:12, 158:15, 182:13, 201:22, 206:3, 207:5, 230:15, 232:11, 244:9, 251:16, 259:1, 269:17, 274:12, 275:25, 276:19
**periods** [2] - 85:17, 271:8
**permissible** [2] - 53:20, 136:10
**permit** [1] - 178:1
**permitted** [3] - 14:22, 30:13, 82:8
**person** [2] - 54:12, 225:6
**personal** [3] - 78:21, 185:18, 260:8
**personally** [1] - 53:16
**personnel** [1] - 258:15
**PETER** [1] - 2:12
**Pharmaceutical** [7] - 22:7, 22:11, 22:21, 24:22, 40:24, 85:5, 260:13

pharmaceutical [3] - 153:1, 180:12, 267:22
**Pharmacies** [2] - 131:11, 193:18
**pharmacies** [60] - 9:11, 17:5, 23:6, 39:7, 68:9, 69:5, 70:12, 92:22, 92:23, 103:4, 116:9, 129:19, 130:2, 131:11, 131:14, 131:15, 131:25, 132:20, 134:11, 134:16, 134:17, 134:21, 134:25, 135:8, 135:20, 136:3, 136:4, 136:16, 136:21, 137:8, 137:13, 137:18, 148:14, 149:19, 150:14, 153:15, 155:23, 156:12, 157:22, 158:14, 158:18, 169:23, 171:7, 176:24, 185:13, 186:24, 194:17, 206:17, 209:18, 215:9, 216:7, 224:6, 232:6, 271:15, 271:20, 271:21, 271:22, 272:8, 272:18, 273:13
**pharmacist** [9] - 132:3, 132:4, 132:7, 132:25, 133:1, 159:19, 160:6, 160:7, 160:10
**pharmacist's** [1] - 150:6
**pharmacists** [8] - 132:23, 133:6, 133:8, 133:16, 135:4, 160:19, 168:20, 169:4
**pharmacists'** [1] - 216:11
**pharmacy** [67] - 9:18, 19:18, 48:8, 48:10, 59:11, 60:24, 62:5, 65:6, 68:13, 69:10, 72:23, 73:10, 75:9, 129:19, 130:2, 130:13, 130:21, 131:22, 132:5, 133:17, 133:21, 134:7, 135:1, 135:11, 135:14, 135:17, 135:25,

137:19, 148:23, 149:1, 149:21, 149:25, 150:1, 150:5, 150:9, 151:17, 151:20, 158:6, 159:13, 159:23, 161:5, 161:6, 161:11, 161:12, 161:22, 161:23, 162:2, 162:13, 170:2, 171:25, 173:9, 177:1, 177:2, 204:17, 205:1, 205:2, 205:3, 215:13, 227:12, 230:14, 239:25, 241:2, 272:5, 272:8
**Pharmacy** [15] - 39:5, 39:7, 40:19, 55:5, 55:14, 57:2, 131:15, 151:17, 151:23, 152:14, 152:15, 152:17, 152:20, 153:4
**pharmacy's** [2] - 150:6, 205:3
**Philadelphia** [2] - 6:6, 6:13
**phone** [1] - 160:3
**phonetic** [1] - 37:22
**phrase** [2] - 204:5, 204:6
**physician** [2] - 19:13, 116:18
**physicians** [10] - 120:15, 120:18, 120:23, 121:4, 122:9, 122:20, 141:24, 142:12, 168:19, 169:3
**pick** [3] - 199:8, 245:18, 270:22
**picked** [1] - 11:17
**pickers** [4] - 94:24, 95:6, 95:14, 101:7
**picking** [2] - 95:5, 276:6
**picture** [1] - 215:19
**PIFKO** [1] - 3:16
**pill** [16] - 18:20, 18:21, 19:9, 20:4, 48:7, 71:10, 128:16, 130:10, 130:19, 156:23, 157:1, 157:17, 157:22, 157:25, 158:2, 167:23
**pillars** [1] - 55:25
**pills** [39] - 17:1, 21:7,

21:9, 21:12, 24:20, 24:22, 46:5, 60:24, 61:1, 61:2, 61:4, 61:5, 61:6, 79:22, 80:14, 80:17, 80:21, 80:23, 87:22, 92:15, 92:16, 95:14, 97:16, 130:9, 130:17, 131:6, 134:7, 149:22, 208:7, 217:3, 217:12, 230:17, 231:21, 231:22, 231:24, 232:18, 233:12, 234:21
**pinkish** [1] - 56:21
**place** [9] - 60:5, 62:20, 72:6, 80:4, 198:25, 203:11, 233:25, 258:12, 275:13
**placed** [4] - 35:25, 78:11, 88:16, 89:18
**places** [4] - 48:10, 97:21, 193:10, 244:12
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**plaintiff** [6] - 116:1, 116:4, 155:13, 186:10, 189:10, 223:22
**Plaintiffs** [2] - 10:3, 278:22
**plaintiffs** [3] - 7:16, 154:12, 254:18
**PLAINTIFFS'** [1] - 10:9
**plaintiffs'** [8] - 145:8, 154:16, 155:7, 182:5, 196:23, 210:20, 222:19, 254:19
**planned** [1] - 12:21
**play** [1] - 148:17
**played** [3] - 164:22, 185:12, 235:12
**plays** [1] - 185:8
**Pleasant** [3] - 3:15, 4:4, 4:9
**pled** [1] - 19:6
**plug** [1] - 113:15
**Plus** [7] - 151:17, 151:23, 152:13, 152:15, 152:17, 152:20, 153:3
**podium** [1] - 8:22
**point** [52] - 13:18, 22:10, 26:3, 29:17, 31:15, 34:14, 35:10, 42:2, 43:18, 44:1,

46:5, 52:11, 52:19, 52:24, 53:6, 55:3, 64:7, 65:21, 68:17, 76:25, 91:25, 93:12, 113:11, 121:14, 154:14, 154:19, 158:10, 158:17, 161:5, 169:17, 183:24, 190:1, 198:21, 198:25, 199:1, 206:12, 206:21, 212:8, 217:3, 218:22, 227:2, 236:4, 236:9, 236:12, 237:21, 241:6, 242:1, 244:18, 251:4, 265:9, 269:18
**pointed** [2] - 116:8, 174:4
**points** [3] - 52:10, 190:7, 237:14
**pole** [1] - 263:19
**Police** [1] - 11:6
**police** [2] - 11:18, 12:22
**policies** [17] - 9:17, 27:17, 27:20, 42:14, 50:6, 54:6, 54:16, 59:25, 60:6, 60:9, 61:25, 62:22, 77:11, 77:22, 78:2, 78:3, 78:6
**policing** [1] - 12:13
**policy** [35] - 9:12, 9:16, 27:16, 54:6, 54:8, 54:13, 56:20, 57:25, 58:17, 65:4, 118:3, 118:8, 119:4, 119:9, 119:18, 120:22, 158:4, 159:10, 161:9, 162:1, 162:4, 252:19, 253:15, 257:5, 257:17, 258:4, 258:10, 258:12, 258:17, 260:19, 273:23, 274:1, 274:14, 274:17, 275:13
**Policy** [2] - 118:25, 197:14
**Ponc** [1] - 2:4
**Ponce** [1] - 2:16
**population** [3] - 19:2, 175:24, 241:17
**portion** [3] - 13:16, 82:12, 267:16
**portions** [1] - 16:12
**posed** [1] - 25:1

**position** [5] - 9:2, 9:15, 12:16, 178:22, 233:18
**positive** [2] - 173:18, 273:11
**Possibility** [1] - 154:1
**possibility** [8] - 135:17, 158:3, 205:11, 212:18, 219:1, 228:16, 240:14, 240:17
**possible** [3] - 83:23, 94:18, 228:7
**possibly** [1] - 156:24
**post** [3] - 25:10, 61:6, 103:16
**post-distribution** [1] - 61:6
**post-shipment** [1] - 103:16
**posting** [1] - 15:19
**potential** [12] - 32:1, 76:15, 79:24, 104:3, 170:9, 177:21, 195:3, 195:21, 205:6, 217:12, 217:18, 243:10
**potentially** [1] - 243:6
**Powell** [1] - 2:6
**powers** [1] - 16:7
**PR** [2] - 2:5, 2:17
**practical** [1] - 15:15
**practice** [4] - 65:5, 159:1, 259:11, 259:17
**practitioner** [2] - 17:6, 117:2
**practitioners** [2] - 17:5, 170:20
**Pre** [1] - 168:2
**pre** [18] - 39:16, 39:23, 45:22, 103:12, 103:13, 103:14, 103:15, 168:7, 168:21, 169:5, 169:11, 169:14, 169:24, 170:4, 269:2
**pre-2007** [6] - 60:10, 63:2, 63:8, 66:12, 73:14, 206:11
**pre-2008** [1] - 61:3
**pre-dates** [2] - 45:22, 269:2
**Pre-registration** [1] - 168:2
**pre-registration** [7] - 168:7, 168:21, 169:5, 169:11, 169:14, 169:24, 170:4

**pre-shipment** [6] - 103:12, 103:13, 103:14, 103:15
**pre-shipping** [1] - 103:12
**pre-trial** [2] - 39:16, 39:23
**precedence** [1] - 162:10
**precedent** [1] - 34:10
**precise** [1] - 235:23
**precisely** [3] - 220:14, 241:2, 241:4
**predating** [1] - 269:6
**preliminary** [1] - 44:9
**prepare** [4] - 27:1, 44:18, 47:8, 50:15
**prepared** [11] - 27:11, 33:23, 35:16, 35:22, 51:2, 51:4, 51:10, 60:12, 74:21, 82:1, 223:19
**preparing** [1] - 51:8
**prescribe** [8] - 120:16, 120:23, 121:5, 121:15, 141:25, 242:8, 242:24, 256:21
**prescribed** [4] - 196:8, 196:14, 198:12, 199:14
**prescriber** [2] - 131:9, 133:18
**prescribers** [6] - 116:15, 117:9, 117:14, 126:5, 155:23, 156:8
**prescribing** [19] - 117:1, 117:2, 117:20, 125:14, 125:17, 125:19, 126:5, 127:24, 128:13, 129:11, 130:1, 243:25, 244:3, 244:8, 244:16, 247:21, 248:4, 248:5
**prescription** [61] - 56:9, 107:5, 107:23, 108:5, 108:16, 110:8, 110:25, 111:20, 119:5, 129:5, 129:10, 130:11, 130:18, 130:21, 131:8, 131:9, 131:12, 132:8, 132:11, 132:13, 132:21, 132:24, 133:17, 133:18, 133:21,

133:22, 134:1, 134:5, 134:12, 136:13, 137:23, 137:25, 138:8, 144:4, 144:8, 144:16, 148:19, 149:12, 154:5, 156:13, 159:19, 160:7, 176:2, 176:8, 176:24, 184:13, 185:23, 193:5, 193:25, 194:2, 194:6, 196:13, 198:11, 198:19, 199:14, 242:9, 242:14, 242:15, 242:25, 247:10, 272:25
**Prescription** [2] - 138:13, 197:14
**prescriptions** [27] - 19:15, 19:16, 19:18, 48:3, 48:5, 116:17, 116:20, 119:8, 127:18, 129:14, 129:20, 130:1, 130:2, 130:5, 130:7, 131:12, 132:2, 134:8, 148:22, 148:25, 149:4, 156:9, 160:20, 218:11, 242:4, 242:18, 245:5
**present** [12] - 13:9, 19:10, 30:13, 53:1, 90:15, 133:1, 182:8, 185:13, 217:20, 222:6, 239:11, 239:19
**presentation** [6] - 43:20, 50:18, 174:18, 175:3, 224:21, 224:22
**presentations** [1] - 277:5
**presented** [3] - 13:15, 224:12, 263:8
**presenting** [3] - 29:14, 146:25, 149:11
**preserved** [1] - 86:20
**press** [1] - 74:14
**pretty** [7] - 15:14, 24:2, 55:2, 94:16, 170:22, 208:14, 219:18
**prevalence** [1] - 141:8
**prevent** [4] - 24:13, 28:25, 30:1, 30:11, 76:5, 107:4, 107:9, 107:22, 108:4,

108:16, 110:7, 146:7, 149:6, 151:15, 177:24, 191:12, 233:8, 251:19, 269:11, 269:17, 270:4
**preventing** [1] - 185:8
**prevention** [1] - 23:21
**prevents** [3] - 177:22, 208:8, 208:9
**previous** [1] - 36:23, 62:15, 75:8, 88:1, 91:6, 93:16, 171:2, 171:22, 198:17, 215:18
**previously** [5] - 103:3, 168:13, 240:5, 249:8, 249:16
**primarily** [4] - 19:17, 55:16, 61:20, 64:22
**primary** [2] - 102:23, 141:25
**Privacy** [1] - 149:8
**privacy** [1] - 149:8
**privy** [1] - 83:6
**problem** [7] - 113:14, 125:11, 125:17, 126:15, 178:11, 183:18, 235:5
**Problem** [1] - 138:14
**problematic** [1] - 158:13
**problems** [3] - 122:21, 126:7, 177:21
**procedural** [6] - 25:4, 25:8, 25:15, 56:20, 154:17, 154:18
**procedure** [6] - 9:12, 9:16, 54:9, 54:13, 58:17, 274:16
**procedures** [15] - 24:17, 24:18, 27:16, 27:17, 27:20, 27:24, 42:14, 50:6, 54:16, 59:25, 60:9, 62:1, 62:22, 77:11, 77:22
**proceed** [5] - 33:3, 59:20, 112:19, 113:24, 115:10
**proceeding** [2] - 31:23, 157:9
**Proceedings** [2] - 6:19, 113:20
**proceedings** [1] - 278:21
**PROCEEDINGS** [1] - 7:1
**process** [12] - 9:1, 9:4, 73:25, 74:1, 76:1, 76:9, 77:20, 77:24,

79:15, 155:25, 169:24, 170:4
**Proctor** [1] - 2:12
**produce** [2] - 96:7, 181:15
**produced** [3] - 6:19, 102:11, 248:19
**product** [4] - 16:24, 71:3, 178:9, 184:5
**production** [3] - 180:4, 181:18, 273:10
**products** [6] - 39:9, 67:8, 68:5, 71:2, 144:22, 259:12
**professional** [2] - 10:22, 133:23
**professionals** [2] - 115:1, 134:9
**proffer** [1] - 25:22
**Program** [2] - 146:9, 274:9
**program** [6] - 67:23, 124:8, 166:13, 235:3, 275:7, 276:15
**programs** [2] - 124:3, 251:2
**prohibit** [1] - 149:7
**prohibits** [1] - 159:11
**project** [1] - 124:12
**promote** [1] - 141:23
**promoted** [2] - 12:15, 140:10
**promoting** [1] - 142:11
**promotion** [2] - 12:10, 141:4
**promotional** [1] - 141:24
**prompted** [2] - 258:4, 258:10
**proof** [1] - 265:3
**proper** [11] - 13:14, 35:2, 43:17, 51:14, 65:15, 117:1, 132:10, 147:14, 154:22, 171:1, 235:6
**properly** [5] - 39:22, 104:6, 133:19, 133:23, 157:23
**proposal** [1] - 119:7
**proposed** [5] - 203:14, 203:16, 203:20, 205:15, 249:5
**proposition** [1] - 138:12
**propositions** [1] - 161:1
**proprietary** [1] - 178:4
**protocols** [1] - 148:6

**provide** [13] - 13:5, 24:5, 114:5, 145:12, 167:4, 188:19, 195:9, 196:4, 199:12, 210:21, 220:19, 240:23, 247:18
**provided** [15] - 13:8, 37:23, 44:10, 44:19, 57:15, 63:24, 83:9, 95:24, 145:22, 146:19, 148:9, 220:18, 253:16, 255:3, 271:11
**providers** [1] - 195:17
**provides** [2] - 51:14, 95:1
**providing** [1] - 177:12
**provisions** [2] - 133:25, 203:22
**prudent** [2] - 182:15, 272:6
**public** [13] - 25:2, 119:16, 119:24, 162:9, 162:10, 162:11, 162:16, 222:23, 224:16, 224:17, 251:9, 251:21, 261:14
**publication** [8] - 126:13, 127:6, 142:4, 173:24, 197:6, 199:9, 248:22, 273:10
**publications** [2] - 196:24, 224:15
**publicly** [1] - 121:13
**publish** [8] - 13:9, 27:8, 47:14, 50:22, 60:16, 75:1, 82:9, 223:14
**published** [13] - 34:5, 37:5, 38:17, 39:11, 39:13, 41:8, 44:25, 47:15, 50:23, 51:4, 250:14, 255:13, 266:6
**publishing** [4] - 44:21, 65:8, 158:8, 274:3
**pull** [2] - 66:20, 113:15
**pulls** [1] - 150:5
**purchase** [17] - 17:4, 61:1, 61:7, 61:23, 61:24, 63:20, 64:11, 70:5, 70:6, 73:11, 73:14, 75:10, 75:18, 84:1, 84:5, 148:15
**purchases** [2] - 70:17, 176:23
**purchasing** [2] - 67:7,

83:5
**Purdue** [7] - 140:9, 140:10, 140:12, 140:16, 141:20, 141:22, 143:13
**Purdue's** [1] - 142:10
**pure** [3] - 89:25, 90:6, 250:13
**purport** [1] - 220:10
**purported** [1] - 32:16
**purports** [2] - 63:1, 271:8
**purpose** [10] - 14:19, 25:15, 28:1, 29:18, 84:12, 84:15, 147:2, 239:20, 243:7, 247:17
**purposes** [16] - 16:13, 17:17, 32:13, 34:6, 42:3, 42:25, 49:4, 96:5, 105:14, 120:24, 121:15, 139:23, 152:7, 176:20, 200:20
**pursuant** [3] - 9:7, 48:24, 242:14
**push** [1] - 29:11
**put** [29] - 12:25, 21:12, 33:14, 45:20, 64:6, 66:20, 95:14, 120:5, 135:12, 138:24, 162:23, 163:8, 174:23, 186:20, 197:11, 198:3, 200:18, 202:13, 219:2, 220:8, 230:21, 238:10, 251:22, 252:8, 256:15, 267:10, 270:23, 274:1, 275:13
**putting** [1] - 93:23

# Q

**qualifications** [5] - 14:19, 14:25, 25:18, 31:3, 33:3
**qualified** [4] - 30:9, 32:15, 33:7, 111:8
**qualifies** [1] - 204:10
**qualify** [1] - 43:24
**Quantico** [1] - 15:13
**quantity** [2] - 48:20, 71:13
**quarter** [1] - 238:3
**quarterly** [2] - 61:14, 73:5
**questioned** [1] - 253:14

**questioning** [2] - 112:12, 112:17
**questions** [24] - 39:21, 44:10, 65:25, 74:12, 113:23, 114:2, 115:7, 115:18, 115:20, 115:23, 128:5, 155:16, 160:6, 160:8, 160:17, 172:11, 188:2, 199:21, 226:12, 235:18, 261:8, 264:2, 265:20, 273:3
**quick** [4] - 8:4, 22:9, 95:9, 215:16
**quickly** [5] - 7:13, 19:2, 86:25, 142:23, 246:6
**quiet** [1] - 52:7
**quit** [1] - 113:13
**quite** [1] - 85:23
**quota** [29] - 144:9, 180:4, 180:5, 180:8, 180:16, 180:20, 180:24, 181:5, 181:7, 181:18, 182:3, 182:7, 182:12, 183:12, 183:14, 183:17, 183:18, 184:2, 184:4, 200:9, 245:11, 245:14, 245:20, 246:6, 247:16, 247:22, 248:3, 249:2, 249:15
**quotas** [1] - 179:18
**quote** [2] - 199:13, 199:15
**Quote** [1] - 180:9
**quoted** [2] - 187:2, 202:14

# R

**R-a-f-a-l-s-k-i** [1] - 10:7
**Rafalski** [58] - 10:4, 10:7, 10:14, 10:19, 10:20, 10:23, 13:2, 14:24, 15:24, 22:9, 30:9, 32:1, 33:1, 33:19, 34:14, 36:22, 44:6, 46:3, 46:13, 49:25, 52:1, 54:1, 58:25, 59:18, 60:20, 61:10, 62:9, 63:19, 64:10, 74:16, 75:2, 75:25, 77:8, 81:20, 82:15, 86:9, 92:18,

96:10, 97:7, 101:22, 103:3, 104:20, 107:3, 113:21, 114:2, 115:14, 127:9, 147:2, 190:13, 199:8, 200:19, 212:24, 235:23, 239:22, 243:15, 264:10, 265:23, 267:21
**RAFALSKI** [1] - 10:9
**Rafalski's** [4] - 30:18, 146:21, 147:6, 186:18
**Rafferty** [1] - 2:12
**raging** [1] - 182:14
**raise** [3] - 10:8, 94:14, 244:20
**raises** [1] - 245:11
**raising** [2] - 94:13, 182:15
**ran** [3] - 12:16, 227:5
**range** [4] - 83:25, 142:12, 185:11, 220:8
**ranges** [1] - 185:15
**ranks** [1] - 11:13
**Rannazzisi** [12] - 37:7, 41:11, 121:11, 123:6, 123:8, 123:14, 252:23, 266:9, 268:16, 268:25, 269:9, 269:15
**Rannazzisi's** [1] - 39:2
**rarely** [2] - 168:20, 169:4
**rate** [1] - 181:12
**rather** [3] - 9:20, 19:2, 63:11
**raw** [1] - 16:22, 16:24
**re** [6] - 74:7, 110:2, 156:8, 156:12, 224:6, 249:11
**re-ask** [1] - 110:2
**re-oriented** [1] - 249:11
**re-registering** [1] - 156:12
**re-registration** [2] - 156:8, 224:6
**re-state** [1] - 74:7
**read** [28] - 49:4, 49:18, 98:25, 99:13, 99:15, 99:25, 101:23, 103:10, 125:25, 138:25, 143:25, 163:2, 163:4, 164:9, 174:13, 187:9, 189:6, 199:11,

229:3, 250:3, 255:16, 261:19, 261:22, 262:13, 268:4, 268:7, 269:12, 269:13
**reading** [5] - 13:24, 39:17, 96:20, 187:22, 200:25
**ready** [2] - 7:6, 75:6
**real** [10] - 22:9, 95:9, 197:1, 220:11, 220:16, 220:23, 222:2, 223:3, 235:3, 244:3
**Real** [1] - 8:4
**realize** [3] - 21:5, 43:15, 131:3
**realizing** [1] - 184:6
**really** [1] - 124:6
**realtime** [1] - 72:8
**Reardon** [1] - 58:3
**reason** [20] - 122:16, 126:10, 147:3, 155:5, 155:12, 172:5, 173:3, 181:25, 185:20, 186:2, 213:3, 226:11, 226:25, 231:4, 241:15, 243:1, 243:12, 260:17, 260:18, 264:1
**reasonable** [2] - 113:4, 156:5
**reasonably** [1] - 115:4
**reasons** [4] - 94:17, 219:7, 225:7, 244:17
**recalculates** [1] - 93:11
**recalled** [1] - 220:21
**receive** [4] - 166:15, 166:22, 167:12, 183:15
**received** [2] - 15:10, 202:4
**receiving** [4] - 55:15, 65:5, 134:17, 218:7
**recent** [1] - 248:21
**Recess** [3] - 43:11, 113:19, 199:4
**recess** [1] - 199:2
**recessed** [1] - 278:15
**recite** [1] - 215:15
**recognize** [13] - 33:7, 116:15, 142:2, 142:6, 146:2, 147:24, 152:11, 191:22, 203:7, 207:9, 214:7, 256:8, 256:11

**recognizes** [2] - 120:22, 269:9
**recollection** [12] - 124:18, 143:22, 144:3, 146:16, 146:25, 150:17, 196:17, 210:5, 213:19, 221:9, 264:25, 275:18
**recommendation** [1] - 24:21
**recommendations** [1] - 38:10
**recommending** [1] - 245:23
**reconsideration** [1] - 44:2
**record** [41] - 10:6, 10:18, 14:10, 14:21, 19:6, 34:12, 34:22, 39:17, 45:21, 49:5, 49:19, 59:2, 63:23, 63:24, 66:11, 78:20, 79:3, 84:24, 86:5, 86:16, 86:21, 91:21, 98:25, 99:2, 99:25, 101:23, 102:14, 103:10, 104:17, 105:14, 106:3, 112:16, 126:24, 126:25, 147:7, 187:19, 199:12, 229:20, 235:20, 269:21, 278:21
**recorded** [1] - 6:19
**Recording** [1] - 235:12
**recordkeeping** [4] - 201:24, 203:22, 270:8, 275:18
**records** [12] - 20:18, 29:22, 42:13, 119:24, 129:18, 135:1, 135:2, 254:16, 270:5, 270:12, 272:10
**recovering** [1] - 218:3
**recreate** [2] - 223:11, 244:6
**recurs** [1] - 51:18
**red** [10] - 34:8, 34:11, 56:21, 56:23, 91:16, 132:12, 275:6, 275:10, 275:12, 275:14
**reduced** [2] - 183:1, 183:12
**Reed** [2] - 6:4, 6:11
**refer** [4] - 23:18, 139:8, 180:4, 226:16

**reference** [14] - 51:5, 132:17, 139:5, 142:7, 203:24, 225:16, 234:8, 234:15, 252:22, 252:23, 258:22, 259:7, 263:2, 264:6
**referenced** [3] - 22:12, 34:7, 34:8
**referencing** [5] - 44:11, 119:6, 145:7, 263:22, 264:15
**referred** [5] - 42:20, 94:23, 133:6, 171:3, 195:13
**referring** [2] - 171:21, 258:3
**refers** [1] - 204:8
**refine** [1] - 239:5
**reflect** [2] - 63:8, 73:24
**reflected** [1] - 275:16
**reflection** [1] - 9:15
**reflects** [2] - 63:3, 220:4
**refresh** [3] - 146:24, 152:4, 252:7
**refreshing** [1] - 221:9
**refused** [1] - 177:4
**refusing** [1] - 158:5
**regard** [6] - 60:2, 106:2, 145:12, 156:20, 171:16, 178:20
**Regarding** [1] - 152:13
**regarding** [21] - 30:18, 32:4, 44:19, 47:18, 58:7, 78:11, 96:18, 97:25, 124:17, 126:5, 136:13, 141:3, 152:13, 182:7, 196:22, 203:22, 206:17, 209:18, 238:5, 238:14, 241:7
**regards** [7] - 29:23, 38:8, 158:8, 226:1, 257:11, 257:17, 275:13
**region** [4] - 59:11, 92:19, 176:3, 176:4
**Register** [8] - 39:11, 40:20, 120:21, 248:22, 249:4, 250:15, 266:6, 269:24
**register** [1] - 171:7
**registered** [4] - 156:21, 157:18,

269:10, 269:15
**registering** [2] - 156:12
**registers** [1] - 131:14
**registrant** [15] - 17:12, 28:25, 82:22, 84:10, 148:15, 159:17, 159:21, 170:9, 170:25, 171:20, 200:3, 201:2, 233:9, 245:24, 246:2
**registrant's** [1] - 261:14
**registrants** [17] - 16:14, 16:18, 16:21, 17:4, 30:4, 81:22, 83:25, 155:19, 156:16, 160:4, 168:8, 168:18, 169:3, 169:12, 186:6, 194:23, 261:11
**registration** [28] - 25:1, 131:18, 150:6, 150:7, 151:10, 155:24, 155:25, 156:7, 156:8, 157:1, 167:22, 168:2, 168:7, 168:13, 168:21, 169:5, 169:11, 169:14, 169:24, 170:4, 170:21, 171:17, 172:2, 172:6, 172:13, 173:4, 224:5, 224:6
**Registration** [1] - 15:23
**registrations** [4] - 16:15, 143:5, 156:22, 157:25
**regular** [2] - 158:21, 159:1
**regulate** [2] - 16:12, 143:2
**regulation** [23] - 61:18, 82:22, 82:23, 84:9, 132:15, 132:16, 132:18, 142:24, 202:11, 202:14, 203:9, 203:10, 203:14, 203:17, 203:21, 257:18, 260:15, 261:2, 261:21, 264:24, 265:3, 265:8, 265:16
**regulations** [9] - 30:4, 116:25, 117:19, 156:1, 255:7, 255:9,

256:20, 257:6, 270:7
**Regulations** [1] - 37:6
**regulator** [1] - 236:7
**regulators** [1] - 236:14
**Regulatory** [1] - 163:11
**regulatory** [3] - 168:7, 185:1, 203:7
**relate** [1] - 7:20
**related** [4] - 45:21, 54:16, 62:1, 165:8
**relates** [1] - 13:15
**relating** [4] - 119:5, 132:24, 175:8, 194:21
**relation** [1] - 153:17
**relationship** [5] - 106:2, 116:21, 132:10, 149:18, 260:8
**relationships** [1] - 232:7
**relative** [1] - 129:6
**relayed** [1] - 210:19
**relevance** [1] - 25:14
**relevant** [4] - 154:21, 154:24, 190:9, 256:14
**reliable** [2] - 114:23, 202:5
**reliance** [7] - 14:20, 35:17, 36:19, 42:5, 42:10, 102:7, 138:17
**relied** [16] - 14:20, 33:20, 33:24, 34:15, 35:23, 37:14, 38:11, 38:17, 39:19, 41:7, 41:17, 41:24, 138:11, 138:15, 211:3, 220:22
**rely** [15] - 51:15, 52:20, 53:14, 79:10, 114:18, 114:25, 115:4, 127:1, 156:3, 156:11, 162:16, 167:22, 180:23, 268:9
**remand** [1] - 154:13
**remanded** [1] - 147:4
**remember** [22] - 13:20, 159:25, 160:12, 167:24, 173:22, 178:24, 190:25, 196:15, 208:15, 208:16, 209:22, 217:4, 221:12, 230:13, 230:17, 243:18, 245:13, 252:21, 252:22, 253:19,

273:24, 277:12
**remind** [2] - 56:25, 268:12
**reminder** [1] - 58:20
**remove** [4] - 137:5, 150:8, 238:1, 238:3
**removed** [1] - 104:11
**removing** [2] - 220:6, 225:23
**renew** [1] - 30:22
**renewals** [2] - 15:23, 158:2
**Reno** [4] - 38:6, 38:12, 38:16
**repeat** [5] - 33:2, 85:8, 111:18, 155:2, 231:17
**repeatedly** [2] - 86:7, 159:18
**rephrase** [3] - 110:15, 189:13, 227:17
**replicate** [3] - 83:12, 87:2, 230:24
**replicated** [1] - 232:9
**report** [101] - 26:8, 26:9, 26:21, 29:11, 30:6, 32:16, 38:6, 38:12, 38:16, 42:4, 51:8, 61:4, 61:7, 61:23, 63:20, 64:14, 64:16, 64:21, 66:7, 67:2, 67:10, 67:12, 67:15, 72:4, 73:11, 73:13, 73:14, 75:21, 85:19, 85:21, 85:24, 86:4, 86:17, 99:25, 100:20, 101:8, 109:2, 128:11, 130:24, 130:25, 133:4, 135:12, 139:23, 140:15, 141:13, 141:14, 143:8, 143:13, 145:12, 146:21, 148:9, 154:20, 154:24, 165:21, 166:10, 166:11, 170:16, 172:18, 179:20, 182:7, 188:15, 191:22, 192:9, 199:24, 200:18, 202:7, 210:17, 211:12, 211:15, 211:18, 211:20, 213:6, 214:23, 215:2, 216:3, 216:6, 217:10, 222:7, 224:15, 230:12, 230:14, 230:20,

250:3, 258:6,
258:12, 260:17,
261:7, 261:8,
261:12, 262:7,
262:9, 262:11,
264:20, 265:15,
266:17, 268:10,
272:22
**Report** [2] - 138:13,
264:11
**report-only** [1] -
258:12
**reportable** [1] - 230:4
**reported** [27] - 25:5,
28:18, 40:24, 42:23,
61:11, 72:3, 73:6,
73:16, 76:16, 76:19,
102:19, 103:7,
103:23, 104:24,
105:1, 105:8,
105:15, 105:19,
105:23, 201:18,
229:8, 229:16,
230:1, 251:6, 252:2,
269:19, 278:25
**Reporter** [6] - 6:17,
6:18, 278:19, 279:3
**REPORTER** [8] -
72:10, 72:13, 72:15,
90:2, 215:21,
215:24, 262:20,
277:9
**reporters** [1] - 43:5
**Reporting** [1] - 163:19
**reporting** [18] - 61:17,
65:7, 77:1, 103:12,
103:13, 103:14,
103:15, 103:16,
166:19, 208:10,
242:2, 253:11,
275:17, 275:19,
276:21
**Reports** [4] - 174:24,
206:3, 206:16,
259:12
**reports** [18] - 61:24,
64:11, 65:8, 75:19,
146:14, 147:15,
147:16, 164:3,
164:6, 164:8,
164:13, 164:25,
190:15, 211:3,
211:4, 212:3, 212:9,
237:23
**represent** [6] - 54:6,
54:11, 56:1, 63:1,
87:22, 92:16
**representatives** [1] -
140:13
**represents** [2] - 27:12,

51:1
**reps** [1] - 140:17
**request** [5] - 33:2,
38:3, 71:16, 96:7,
167:3
**requested** [3] -
114:14, 128:25,
167:1
**Requests** [1] - 9:1
**requests** [1] - 210:19
**require** [3] - 53:11,
191:3, 236:1
**required** [10] - 20:18,
61:18, 131:20,
168:20, 169:4,
177:15, 200:1,
201:19, 249:24,
270:12
**requirement** [15] -
117:18, 164:7,
203:18, 217:1,
252:15, 254:5,
255:6, 258:2,
267:22, 268:1,
268:5, 268:11,
269:4, 269:7, 269:22
**requirements** [4] -
43:17, 116:18,
149:7, 270:8
**requires** [4] - 32:5,
233:9, 264:24,
265:16
**research** [7] - 23:3,
126:9, 127:21,
128:1, 129:18,
133:4, 180:14
**researchers** [1] - 17:8
**researches** [1] - 17:16
**reserve** [3] - 31:9,
32:21, 33:11
**resolution** [1] - 23:2
**resolve** [1] - 132:12
**resolved** [1] - 205:7
**resolves** [1] - 89:22
**resources** [1] - 185:2
**respect** [2] - 135:19,
264:19
**respectfully** [1] -
233:21
**respond** [3] - 52:9,
85:24, 184:24
**response** [3] - 131:9,
131:12, 264:18
**responses** [2] - 35:17,
42:11
**responsibilities** [7] -
15:4, 36:10, 132:21,
156:10, 167:23,
175:7, 216:14
**responsibility** [15] -

117:1, 122:24,
123:1, 123:19,
132:1, 132:6,
132:14, 132:17,
133:2, 133:5, 135:3,
160:9, 216:8,
216:11, 251:21
**responsible** [5] - 54:8,
54:12, 116:16,
152:20, 196:9
**rest** [1] - 99:12
**restricted** [2] - 20:16,
172:23
**restrictions** [1] - 16:8
**restricts** [1] - 245:23
**rests** [1] - 159:20
**result** [7] - 19:3,
20:12, 97:15,
156:16, 171:25,
258:6, 258:12
**Results** [2] - 141:19
**results** [9] - 32:12,
114:16, 114:18,
197:3, 211:4,
216:23, 237:25,
238:2, 240:25
**resume** [3] - 44:4,
113:21, 199:5
**resumed** [1] - 113:20
**retail** [10] - 68:13,
69:5, 70:12, 106:24,
271:15, 271:20,
272:4, 272:8,
272:17, 273:12
**retention** [1] - 269:22
**retired** [1] - 12:23
**retirement** [3] - 12:19,
12:20, 124:5
**retiring** [1] - 12:22
**retrospect** [1] - 272:12
**returned** [1] - 15:16
**reveal** [1] - 23:14
**review** [29] - 26:11,
44:8, 59:6, 67:21,
81:4, 85:9, 102:4,
102:18, 102:22,
103:6, 106:24,
119:21, 135:1,
145:11, 163:10,
171:3, 188:19,
197:3, 206:19,
210:22, 214:13,
227:25, 228:4,
228:7, 228:8,
228:17, 228:19,
244:23, 254:16
**reviewed** [21] - 23:12,
26:7, 41:11, 41:14,
41:16, 41:22, 42:8,
50:10, 109:21,

126:18, 127:8,
140:12, 151:1,
182:9, 196:24,
197:2, 214:17,
215:12, 223:14,
228:9, 228:11
**reviewing** [8] - 24:12,
26:21, 36:2, 82:2,
129:17, 139:14,
150:13, 261:5
**reviews** [4] - 19:6,
135:6, 276:22, 277:1
**revocation** [1] -
170:24
**revocations** [1] -
170:11
**revoked** [1] - 168:14
**Reynolds** [1] - 192:15
**Rice** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**right-hand** [4] - 66:19,
67:16, 71:19, 179:25
**rigorous** [1] - 15:15
**rising** [2] - 181:11,
246:5
**Rite** [7] - 106:2, 106:3,
106:4, 106:9,
106:13, 136:4,
215:19
**Rite-Aid** [1] - 136:4
**RMR** [2] - 6:17, 6:18
**road** [1] - 246:13
**roadmap** [2] - 13:5,
36:24
**robberies** [1] - 194:22
**robbery** [1] - 194:16
**Robbery** [1] - 194:18
**ROBERT** [1] - 6:11
**Robert** [1] - 121:20
**ROBERTSON** [1] - 3:6
**rogue** [1] - 39:7
**role** [10] - 15:2, 29:18,
123:2, 147:2,
147:11, 148:17,
148:20, 148:23,
185:8, 185:12
**roles** [2] - 148:20,
175:7
**rolled** [2] - 124:6,
276:15
**Romulus** [4] - 11:6,
11:7, 11:9, 12:5
**Ron** [1] - 261:6
**room** [1] - 174:3
**Rosenberg** [1] - 183:1
**round** [3] - 53:1, 53:3,
188:2
**routinely** [1] - 260:17
**Roxicet** [1] - 71:4
**RPR** [1] - 6:18

**RPR-RMR-CRR-
FCRR** [1] - 6:18
**RUBY** [1] - 4:17
**Ruby** [1] - 4:17
**rule** [11] - 82:15,
119:25, 127:4,
135:18, 159:14,
159:16, 205:16,
228:15, 240:13,
240:22
**Rule** [3] - 9:7, 53:11,
53:14
**ruled** [2] - 265:4,
265:7
**rules** [2] - 131:24,
249:5
**ruling** [12] - 30:19,
32:21, 33:12, 37:4,
43:12, 85:6, 108:8,
236:24, 237:1,
252:9, 265:6, 265:10
**rulings** [2] - 37:3,
39:16
**run** [18] - 67:9, 67:10,
86:9, 86:10, 87:2,
89:16, 95:23, 98:15,
115:1, 164:18,
170:19, 210:8,
210:10, 212:14,
236:8, 237:16,
237:17, 240:16
**running** [7] - 49:15,
68:12, 85:25, 96:11,
112:11, 114:6, 243:4
**runs** [3] - 270:20,
275:2
**Rx** [1] - 60:24

## S

**s\Ayme** [1] - 279:2
**s\Lisa** [1] - 279:2
**Safety** [1] - 13:1
**safety** [2] - 162:11,
261:14
**sale** [2] - 48:21, 143:2
**sales** [11] - 27:14,
48:1, 48:6, 49:8,
140:12, 140:17,
141:23, 199:24,
201:19, 201:20,
236:1
**SALGADO** [1] - 4:15
**sample** [1] - 175:15
**San** [2] - 2:5, 2:17
**sand** [1] - 270:20
**sat** [1] - 23:10
**save** [1] - 107:16
**saw** [3] - 23:5, 172:25,
263:8

**SC** [3] - 3:15, 4:4, 4:9
**Scenario** [3] - 89:3, 97:19, 97:25
**scenario** [1] - 205:5
**Schedule** [4] - 61:19, 119:8, 180:10
**Schein** [3] - 154:2, 154:4, 155:6
**schemes** [1] - 195:18
**SCHMIDT** [165] - 5:9, 7:19, 8:13, 13:11, 30:16, 31:3, 32:14, 34:21, 39:15, 40:2, 40:9, 40:14, 51:17, 52:24, 62:8, 62:11, 62:17, 63:5, 65:10, 73:18, 78:1, 89:25, 90:4, 91:10, 91:12, 91:18, 99:3, 106:16, 108:19, 111:5, 111:8, 112:10, 112:14, 112:20, 115:9, 115:13, 118:10, 118:12, 119:10, 119:19, 120:1, 120:4, 124:20, 124:21, 125:24, 126:3, 126:19, 126:24, 127:5, 127:7, 127:12, 127:15, 128:10, 138:18, 138:23, 139:5, 139:10, 145:14, 147:9, 147:19, 147:21, 152:10, 154:18, 155:1, 155:4, 160:17, 161:2, 161:3, 165:3, 165:10, 165:15, 165:23, 166:7, 172:18, 172:21, 174:7, 174:12, 174:22, 178:12, 187:19, 188:1, 189:22, 189:25, 190:11, 190:12, 190:17, 190:20, 190:24, 192:3, 192:8, 193:1, 193:4, 197:8, 197:10, 197:18, 197:23, 198:1, 198:3, 198:6, 199:1, 199:6, 199:7, 200:18, 200:24, 202:21, 203:1, 203:3, 207:15, 207:21, 209:7, 211:23, 211:25, 214:1, 214:4, 214:5,

215:23, 215:25, 216:2, 217:21, 217:25, 218:25, 219:4, 221:11, 221:17, 221:19, 221:22, 221:25, 230:21, 231:2, 232:3, 232:4, 233:17, 233:23, 234:5, 234:10, 234:13, 234:16, 234:18, 234:19, 235:13, 238:8, 238:12, 243:14, 243:17, 246:14, 246:15, 256:12, 256:18, 262:18, 262:24, 263:20, 264:3, 264:4, 267:5, 267:9, 267:11, 270:15, 270:21, 270:25, 277:11, 277:15, 277:17, 277:21, 277:25, 278:10
**Schmidt** [30] - 31:10, 31:21, 39:14, 40:12, 51:16, 52:23, 62:7, 73:17, 89:24, 91:17, 115:16, 122:22, 126:23, 135:5, 147:7, 155:3, 157:19, 171:4, 171:16, 182:17, 189:20, 193:19, 199:5, 204:3, 207:14, 240:6, 241:11, 277:20, 278:5, 278:7
**Schmidt's** [2] - 14:5, 62:25
**scientific** [1] - 180:14
**scope** [11] - 9:6, 44:15, 44:19, 52:18, 85:19, 86:16, 119:20, 126:22, 145:17, 147:1, 207:12
**screen** [20] - 29:23, 53:23, 97:15, 98:16, 120:5, 120:11, 138:24, 142:8, 146:20, 162:23, 163:9, 186:20, 198:4, 202:13, 218:25, 230:23, 238:11, 239:2, 256:16, 267:10
**scrutiny** [2] - 121:6, 182:8

**search** [3] - 16:7, 20:16, 167:1
**searches** [2] - 114:6, 115:1
**seat** [3] - 10:10, 63:14, 76:21
**second** [31] - 9:10, 13:18, 23:22, 58:8, 59:25, 62:21, 65:4, 71:11, 75:1, 92:18, 117:8, 117:15, 118:20, 120:13, 139:18, 143:9, 174:10, 175:4, 180:7, 181:11, 182:24, 198:4, 200:23, 231:20, 246:20, 256:20, 257:3, 260:1, 260:3, 269:8, 269:9
**Second** [1] - 27:16
**second-guess** [2] - 117:8, 117:15
**secondly** [1] - 29:2
**section** [6] - 14:25, 44:6, 93:2, 163:18, 168:6, 168:7
**Section** [2] - 274:6, 274:22
**sectors** [2] - 258:5, 258:11
**security** [1] - 30:3
**see** [196] - 7:13, 9:11, 14:2, 14:16, 20:17, 25:22, 29:2, 52:5, 54:2, 55:4, 57:2, 57:12, 58:6, 66:23, 67:4, 67:16, 67:19, 68:3, 70:21, 88:13, 92:5, 94:16, 97:15, 113:12, 115:14, 118:14, 118:16, 118:17, 118:19, 118:20, 118:23, 119:1, 119:3, 120:11, 120:19, 120:20, 124:23, 124:25, 125:3, 125:5, 125:6, 125:10, 125:12, 125:13, 125:14, 125:21, 126:12, 138:25, 139:11, 139:15, 139:17, 139:20, 140:1, 140:8, 140:13, 141:5, 141:6, 141:10, 141:11, 142:7, 142:14, 142:15, 142:23,

143:6, 143:11, 147:17, 147:22, 148:3, 148:7, 148:8, 151:25, 153:13, 163:17, 163:19, 163:24, 166:16, 166:17, 168:3, 168:9, 168:14, 168:22, 169:25, 170:6, 170:7, 170:13, 170:14, 172:3, 172:4, 172:14, 172:22, 172:23, 175:4, 175:12, 176:10, 177:20, 178:7, 180:3, 180:5, 181:9, 181:12, 181:21, 182:3, 183:3, 183:5, 183:6, 185:4, 188:24, 189:2, 193:7, 193:14, 193:16, 193:19, 193:21, 193:22, 194:7, 194:11, 194:13, 195:7, 195:12, 195:18, 196:15, 197:12, 197:14, 198:7, 198:13, 201:1, 201:4, 201:7, 201:8, 201:23, 203:4, 212:19, 212:22, 213:1, 213:2, 215:16, 219:13, 219:16, 225:14, 227:25, 228:22, 229:14, 229:16, 229:22, 231:3, 231:7, 231:16, 231:18, 231:22, 232:11, 232:19, 237:17, 237:25, 241:14, 241:15, 249:12, 254:16, 256:22, 256:23, 257:6, 257:24, 258:13, 258:17, 259:12, 259:13, 260:20, 261:5, 261:18, 263:1, 264:9, 264:13, 264:20, 264:24, 264:25, 265:13, 265:15, 265:16, 265:18, 266:3, 266:4, 266:7, 266:9, 266:10, 266:14, 266:15, 267:12, 267:21, 267:24, 271:2, 275:16,

276:21, 276:23, 278:3, 278:13
**seeing** [1] - 154:6
**seem** [2] - 31:20, 157:14
**segment** [1] - 92:25
**self** [5] - 106:13, 135:15, 135:21, 136:1, 136:6
**self-distribute** [2] - 135:21, 136:6
**self-distributes** [1] - 136:1
**self-distributing** [1] - 135:15
**self-distribution** [1] - 106:13
**sell** [3] - 19:14, 80:17, 144:4
**selling** [1] - 196:9
**seminar** [1] - 261:7
**sending** [2] - 20:7, 20:10
**Senior** [1] - 7:2
**SENIOR** [1] - 1:17
**Sensabaugh** [1] - 5:14
**sent** [6] - 64:21, 73:11, 144:22, 158:16, 164:13, 164:25
**sentence** [19] - 53:14, 141:20, 143:1, 163:24, 166:12, 166:21, 171:5, 172:8, 180:7, 181:11, 181:14, 198:10, 203:5, 256:20, 257:3, 260:3, 267:20, 267:21, 268:4
**September** [16] - 15:10, 118:15, 186:19, 188:22, 211:23, 212:22, 221:6, 228:21, 229:13, 235:10, 260:14, 261:17, 261:18, 262:5, 263:2, 268:23
**sergeant** [2] - 11:13, 11:14
**series** [2] - 147:13, 175:15
**serve** [2] - 16:7, 188:3
**served** [1] - 23:15
**service** [1] - 84:11
**serviced** [1] - 69:5
**services** [1] - 58:25
**servicing** [1] - 69:10
**serving** [1] - 196:23
**set** [14] - 75:16, 80:14,

80:21, 82:19, 82:20,
89:15, 92:21, 92:22,
97:14, 99:24,
180:17, 236:9,
272:7, 272:19
**sets** [2] - 92:22, 247:1
**setting** [5] - 87:15,
180:24, 181:4,
249:2, 249:15
**settle** [1] - 22:1
**seven** [7] - 87:25,
88:12, 88:21, 90:16,
90:18, 270:19,
270:22
**seven-month** [1] -
87:25
**seventh** [3] - 89:1,
89:14, 89:15
**several** [5] - 84:20,
137:8, 171:18,
213:12, 226:5
**severance** [1] - 154:12
**severing** [2] - 147:4,
254:24
**SHANNON** [1] - 6:3
**share** [3] - 137:6,
178:7, 191:3
**sharing** [1] - 191:2
**sharp** [1] - 57:2
**Sheriff's** [3] - 11:1,
11:3, 11:6
**shift** [3] - 12:12,
55:14, 231:25
**shifted** [3] - 55:6,
55:17, 231:25
**shifts** [2] - 241:17,
241:23
**ship** [34] - 24:19, 61:4,
61:5, 75:18, 76:8,
79:15, 79:18, 91:15,
148:13, 159:17,
160:14, 161:6,
161:11, 161:21,
203:17, 235:7,
251:15, 251:24,
252:15, 253:11,
254:5, 254:9, 255:6,
255:8, 258:2,
259:12, 261:11,
261:12, 261:16,
268:1, 268:11,
269:4, 269:7
**shipment** [10] - 75:11,
103:12, 103:13,
103:14, 103:15,
103:16, 159:15,
208:7
**shipments** [6] - 137:6,
220:5, 220:7,
257:23, 260:16,

273:17
**shipped** [15] - 61:2,
71:25, 73:2, 76:25,
89:9, 94:1, 95:1,
97:16, 130:9, 131:7,
150:23, 206:22,
206:23, 217:4,
251:11
**shipping** [8] - 28:20,
65:6, 72:3, 103:12,
159:15, 226:23,
267:22, 267:23
**Shoppe** [4] - 67:5,
70:23, 71:25, 72:22
**shopping** [1] - 195:7
**short** [3] - 53:13,
201:22, 274:12
**shorten** [2] - 40:6,
99:18
**shorthand** [1] - 230:3
**show** [22] - 25:10,
36:5, 55:7, 55:18,
86:10, 99:5, 112:16,
138:11, 162:19,
168:1, 190:14,
197:4, 204:22,
211:10, 212:1,
218:23, 230:17,
231:1, 238:2, 241:3,
250:20, 267:16
**Show** [2] - 21:1, 39:10
**showed** [4] - 85:17,
206:1, 208:14, 278:5
**showing** [2] - 175:15,
194:2
**shown** [3] - 122:1,
221:10, 232:11
**shows** [2] - 175:18,
182:2
**sic** [1] - 142:1
**side** [2] - 188:7,
201:25
**signature** [4] - 147:22,
147:24, 147:25,
148:3
**significant** [2] - 275:4,
275:9
**significantly** [1] -
45:22
**similar** [16] - 12:15,
20:16, 21:18, 36:9,
36:16, 59:13, 73:20,
131:6, 160:16,
209:20, 209:24,
223:7, 235:7,
238:16, 243:7,
246:21
**similarity** [1] - 60:8
**similarly** [2] - 121:21,
210:9

**simple** [4] - 60:23,
160:20, 234:1,
265:12
**simply** [6] - 42:4,
45:21, 51:3, 234:5,
237:19, 240:13
**SINGER** [1] - 4:5
**single** [9] - 77:16,
95:13, 128:12,
129:8, 147:12,
220:9, 232:21,
232:24, 278:1
**sit** [8] - 40:10, 123:2,
215:15, 251:7,
256:2, 256:3
**site** [6] - 22:22, 28:7,
28:10, 160:13,
169:11, 276:20
**sites** [1] - 164:6
**sitting** [1] - 8:22
**situations** [1] - 158:3
**six** [38] - 17:25, 85:4,
85:7, 87:18, 87:21,
88:1, 88:4, 88:7,
88:17, 89:19, 90:15,
90:19, 92:12, 92:13,
210:13, 212:10,
219:5, 224:23,
230:15, 231:15,
231:16, 231:18,
231:20, 231:21,
232:10, 232:25,
233:3, 233:5,
236:25, 245:18,
246:6, 246:10,
246:16, 246:22,
246:24, 247:7, 247:8
**six-month** [5] - 85:4,
85:7, 87:18, 230:15,
236:25
**sixth** [6] - 87:24,
94:22, 94:23, 160:2,
231:10, 247:15
**size** [6] - 82:25, 203:5,
204:8, 204:13,
204:19, 205:9
**skip** [1] - 15:8
**sleeping** [1] - 18:22
**slide** [64] - 13:13,
14:12, 27:1, 27:4,
27:8, 33:23, 34:1,
34:5, 35:25, 36:2,
36:6, 37:11, 41:21,
44:18, 44:21, 45:5,
45:6, 47:8, 47:10,
50:15, 50:25, 51:1,
51:9, 51:11, 51:19,
51:22, 51:24, 55:7,
56:16, 58:12, 59:17,
59:18, 60:12, 60:18,

60:21, 63:7, 64:5,
75:2, 81:17, 82:1,
82:5, 82:9, 87:9,
94:21, 103:1,
104:14, 105:17,
176:21, 176:22,
224:21, 224:22,
225:19, 238:9,
243:19, 243:21,
243:24, 246:16,
252:7, 271:13,
271:14, 273:4
**Slide** [14] - 44:7,
44:24, 47:14, 50:22,
56:17, 58:13, 58:14,
60:17, 96:8, 219:2,
243:15, 246:14,
265:23
**Slides** [1] - 99:1
**slides** [13] - 13:6,
13:12, 13:20, 13:22,
13:25, 14:6, 50:18,
51:25, 53:3, 99:12,
220:11, 243:14,
263:8
**slog** [1] - 82:10
**slow** [2] - 184:24,
215:21
**small** [5] - 78:17,
120:17, 270:16,
270:17, 274:13
**smaller** [4] - 18:7,
80:19, 84:6, 84:7
**smallest** [1] - 80:18
**Smith** [4] - 6:4, 6:11,
264:10, 264:18
**Smith's** [1] - 234:11
**smoking** [1] - 18:23
**sold** [3] - 54:24,
144:16, 170:2
**sole** [1] - 155:12
**someone** [8] - 125:21,
158:17, 167:3,
196:14, 198:12,
199:15, 225:5,
236:11
**sometime** [2] - 39:3,
74:16
**sometimes** [7] -
19:13, 24:1, 24:4,
42:20, 94:23,
161:17, 210:1
**Sometimes** [2] -
18:23, 195:13
**somewhere** [2] - 60:5,
215:20
**SOMS** [12] - 27:22,
37:15, 37:17, 42:15,
54:16, 65:4, 81:24,
146:8, 146:18,

148:5, 148:6, 275:13
**sooner** [1] - 252:10
**sophisticated** [1] -
19:9
**Sorry** [1] - 197:8
**sorry** [56] - 15:24,
20:5, 62:9, 69:16,
69:20, 72:19, 78:1,
86:12, 86:13, 90:2,
90:4, 90:22, 100:9,
103:18, 104:21,
105:5, 105:11,
108:14, 110:21,
114:9, 133:20,
141:1, 141:21,
142:19, 149:25,
150:6, 152:8,
152:13, 153:3,
155:2, 164:1, 173:2,
173:13, 175:14,
179:23, 184:2,
186:1, 202:17,
208:2, 212:1, 215:6,
215:21, 215:23,
221:7, 221:23,
240:20, 244:14,
254:10, 257:2,
258:8, 258:9,
262:14, 262:20,
263:16, 277:9,
277:18
**SORS** [4] - 166:13,
166:15, 166:18,
167:12
**sorted** [1] - 72:15
**sought** [1] - 257:4
**sound** [1] - 206:4
**source** [2] - 19:11,
250:15
**south** [1] - 248:13
**South** [2] - 2:13, 20:11
**Southern** [1] - 7:3
**SOUTHERN** [1] - 1:1
**Southwood** [12] -
37:3, 39:5, 39:6,
40:18, 40:19, 252:4,
252:6, 266:4, 268:5,
268:11, 268:12,
269:2
**speaking** [4] - 80:19,
133:25, 134:10,
171:9, 201:5,
239:15, 249:23,
258:9
**speaks** [2] - 82:23,
166:25
**Special** [2] - 11:16,
11:24
**special** [1] - 11:17
**specialists** [1] -

141:25
**specialty** [1] - 271:21
**specific** [27] - 15:20,
24:8, 32:13, 38:18,
42:11, 67:3, 71:2,
73:19, 94:15, 130:5,
130:20, 133:8,
135:1, 145:19,
160:22, 176:2,
176:24, 179:10,
189:18, 192:19,
206:24, 207:3,
218:15, 218:18,
218:19, 269:21,
270:8
**specifically** [24] -
20:8, 40:1, 59:7,
78:13, 119:4,
120:14, 130:10,
132:3, 132:23,
137:9, 144:23,
153:18, 171:10,
171:11, 180:19,
226:21, 237:16,
248:25, 251:14,
265:23, 266:25,
269:25, 270:6,
276:25
**Specifically** [1] -
166:25
**specificity** [1] - 247:25
**spectrum** [1] - 187:1
**speed** [2] - 40:4, 81:14
**spent** [4] - 21:11,
115:15, 191:20,
192:22
**split** [2] - 123:24,
252:4
**sponsor** [1] - 52:1
**sponsored** [2] -
214:22, 265:22
**Square** [2] - 6:5, 6:12
**square** [1] - 66:24
**staff** [5] - 164:6,
164:7, 166:14,
167:12, 169:22
**stage** [3] - 78:24,
78:25, 84:14
**stalling** [1] - 43:6
**stamp** [1] - 66:15
**stand** [4] - 74:10,
91:21, 113:22, 144:2
**standard** [1] - 259:11
**standards** [1] - 43:24
**standing** [3] - 159:14,
162:5, 185:9
**stands** [1] - 27:23
**Stanner** [1] - 9:8
**STANNER** [2] - 5:10,
9:9

**start** [20] - 10:24,
11:15, 11:19, 22:16,
47:23, 54:2, 61:10,
87:17, 110:5,
115:23, 116:14,
141:21, 163:22,
179:22, 183:16,
188:25, 205:3,
257:2, 257:3, 270:16
**started** [12] - 11:5,
11:12, 11:17, 11:24,
22:15, 23:13, 231:5,
246:6, 253:3, 255:1,
274:14
**starting** [9] - 55:10,
56:18, 80:5, 112:22,
124:5, 250:24,
265:7, 276:9, 276:12
**starts** [2] - 67:4, 87:21
**state** [15] - 9:17, 10:5,
10:17, 18:9, 74:7,
78:21, 116:25,
121:6, 144:6, 150:8,
171:19, 171:22,
171:24, 175:20,
176:25
**State** [3] - 92:25,
209:1, 209:16
**Statement** [1] - 119:1
**statement** [104] - 9:6,
73:12, 97:18,
116:11, 116:24,
117:17, 118:6,
119:4, 119:9,
119:18, 120:22,
120:25, 121:9,
122:4, 122:7,
123:15, 125:9,
125:15, 125:18,
129:7, 129:13,
134:3, 134:4, 135:5,
135:13, 137:11,
141:12, 142:6,
143:16, 144:7,
144:10, 144:14,
144:18, 144:21,
145:24, 149:2,
149:5, 149:13,
155:8, 155:14,
156:14, 156:18,
156:21, 156:24,
157:3, 157:19,
159:24, 161:8,
161:19, 161:24,
161:25, 162:18,
164:12, 164:24,
165:25, 168:16,
168:24, 169:1,
169:7, 169:15,
170:16, 171:13,

173:4, 177:17,
178:23, 181:25,
187:18, 187:21,
187:23, 188:8,
188:11, 198:22,
200:12, 201:8,
204:15, 205:7,
206:25, 208:5,
208:12, 209:25,
211:1, 218:20,
221:12, 221:14,
229:23, 231:14,
234:23, 235:9,
236:15, 236:18,
236:23, 237:5,
241:22, 242:5,
244:22, 245:16,
250:12, 253:25,
254:7, 254:9, 255:2,
256:23, 257:16,
269:5
**statements** [2] -
118:3, 118:8
**STATES** [2] - 1:1, 1:17
**states** [3] - 163:22,
201:1, 223:23,
256:20
**States** [10] - 7:2,
21:24, 121:22,
122:10, 150:11,
156:2, 165:19,
180:15, 253:19,
254:24
**stating** [1] - 97:10
**statistic** [3] - 196:19,
198:15, 199:12
**statistical** [2] - 275:7,
276:8
**statistical/non** [1] -
275:7
**statistical/non-**
**statistical** [1] - 275:7
**statistics** [2] - 196:12,
196:15
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**statute** [1] - 255:9
**statutes** [1] - 255:7
**stay** [1] - 52:7
**steep** [2] - 55:2, 55:4
**stenography** [1] - 6:19
**step** [9] - 43:9, 60:21,
63:3, 63:4, 73:25,
75:2, 91:2, 95:9
**steps** [2] - 14:16,
23:15
**STEVEN** [1] - 4:17
**stick** [2] - 55:20, 55:22
**stickers** [1] - 21:12
**still** [13] - 8:22, 19:10,

113:22, 117:6,
151:7, 151:9,
179:19, 205:4,
233:5, 234:21,
236:25, 239:14,
248:7
**stips** [1] - 8:24
**stipulated** [1] - 154:12
**stipulation** [1] - 147:4
**stone** [1] - 239:10
**stood** [1] - 259:23
**stop** [15] - 13:2, 21:4,
23:22, 71:11, 72:5,
72:8, 88:2, 88:22,
89:2, 89:14, 91:9,
95:7, 150:9, 277:22
**stopped** [5] - 28:19,
77:14, 78:14, 94:9,
158:10
**stopping** [1] - 198:25
**stops** [1] - 75:22
**stored** [1] - 21:9
**stores** [4] - 106:5,
106:9, 106:14,
136:24
**straight** [3] - 25:21,
93:19, 115:17
**straighten** [1] - 189:24
**straightening** [1] -
189:20
**Strategy** [1] - 124:24
**street** [1] - 205:1
**Street** [15] - 2:7, 2:10,
2:13, 3:5, 3:7, 3:10,
3:12, 4:6, 4:13, 4:15,
4:18, 5:5, 5:12, 6:6,
6:13
**strike** [5] - 107:12,
107:18, 165:23,
166:5, 234:12
**striking** [1] - 166:2
**strong** [1] - 23:7
**studied** [2] - 66:10,
192:21
**studies** [1] - 205:12
**study** [3] - 139:11,
169:17, 192:19
**studying** [2] - 16:13,
137:25
**style** [2] - 223:12,
256:21
**stylized** [6] - 220:22,
222:1, 222:5,
223:13, 223:18,
224:12
**sub** [1] - 19:1
**subject** [8] - 30:19,
32:22, 33:10, 43:23,
44:2, 189:19,
203:16, 203:20

**submit** [3] - 26:9,
61:7, 99:1
**submitted** [3] - 64:11,
200:3, 201:2
**subpoena** [2] - 23:16,
28:11
**subsequent** [5] -
77:23, 89:7, 97:12,
97:21, 241:10
**subset** [1] - 19:20
**substance** [1] -
156:22
**substances** [33] -
16:16, 17:5, 21:14,
22:24, 27:15, 28:16,
29:1, 30:2, 30:6,
30:12, 38:19, 38:22,
42:14, 44:12, 48:14,
55:16, 75:10, 104:5,
107:10, 117:2,
120:16, 120:24,
121:5, 134:18,
136:9, 142:24,
143:3, 155:20,
180:10, 183:1,
185:3, 236:2, 272:12
**Substances** [1] -
118:22
**substantial** [4] -
97:16, 110:25,
111:20, 181:15
**substantially** [2] -
82:25, 203:6
**substitute** [1] - 36:13
**sudden** [1] - 55:18
**suddenly** [1] - 204:18
**sufficient** [5] - 102:14,
106:4, 106:8,
106:23, 265:8
**sufficiently** [1] -
106:13
**Suffolk** [2] - 208:25,
209:14
**suggest** [1] - 113:15
**suggested** [1] - 78:24
**suggestive** [1] - 31:18
**suing** [2] - 116:5,
223:22
**Suite** [9] - 2:4, 2:7,
2:10, 2:13, 2:16,
3:17, 4:6, 6:5, 6:12
**summaries** [1] - 42:12
**summarize** [1] - 40:4
**summarizing** [2] -
68:19, 68:20
**summary** [2] - 7:17,
7:18
**summation** [1] - 261:7
**Summit** [4] - 208:23,
209:10, 210:18,

211:20
**supervisor** [2] - 22:6, 260:12
**supplied** [4] - 151:23, 152:1, 173:8, 173:12
**supplier** [1] - 152:17
**supply** [6] - 19:11, 148:18, 149:21, 150:14, 185:23, 193:5
**supplying** [2] - 131:22, 159:23
**Support** [3] - 248:23, 248:25, 249:13
**supported** [1] - 39:2
**supposed** [8] - 76:1, 87:19, 116:20, 117:15, 132:8, 180:16, 180:20, 238:15
**surgery** [1] - 218:3
**surround** [1] - 11:11
**suspect** [1] - 233:24
**suspend** [2] - 257:23, 260:16
**suspended** [1] - 168:14
**suspension** [2] - 170:24, 236:1
**Suspension** [2] - 20:25, 21:14
**suspensions** [1] - 170:10
**suspicion** [17] - 76:3, 76:14, 76:18, 77:1, 79:19, 79:24, 84:18, 88:24, 94:12, 97:11, 102:15, 104:10, 104:12, 217:20, 229:11, 234:25
**Suspicious** [18] - 24:15, 27:23, 30:5, 30:10, 37:18, 41:2, 42:15, 58:9, 60:4, 75:12, 146:9, 163:18, 192:11, 206:2, 206:16, 220:15, 259:11, 264:11
**suspicious** [80] - 24:18, 24:22, 28:17, 28:20, 29:3, 29:5, 42:22, 60:10, 61:16, 74:18, 76:2, 77:1, 78:10, 78:24, 78:25, 79:2, 79:21, 82:22, 83:8, 102:19, 103:7, 103:23, 103:25, 104:1, 104:7, 104:17, 104:23,

105:7, 105:15, 105:19, 105:22, 109:3, 112:4, 112:24, 162:17, 164:2, 164:12, 164:24, 165:21, 166:18, 167:2, 202:7, 203:4, 203:8, 203:25, 204:1, 204:2, 204:3, 204:5, 204:22, 205:18, 206:13, 208:10, 225:11, 226:22, 227:7, 228:2, 228:14, 229:9, 229:16, 230:1, 235:7, 235:25, 242:2, 249:5, 251:10, 251:15, 251:20, 257:24, 260:15, 260:17, 261:1, 261:21, 264:13, 264:20, 265:14, 267:24, 275:19, 276:22
**sustain** [2] - 62:13, 234:7
**sustained** [2] - 78:7, 209:6
**SUZANNE** [1] - 4:15
**sweeping** [1] - 73:20
**switch** [3] - 190:13, 218:25, 230:23
**switching** [1] - 269:21
**sworn** [1] - 165:13
**SWORN** [1] - 10:9
**system** [60] - 16:19, 16:20, 17:11, 27:23, 28:2, 28:20, 29:3, 37:19, 60:13, 62:2, 63:2, 63:4, 63:8, 74:22, 75:11, 75:17, 75:20, 75:23, 75:25, 77:12, 77:17, 79:14, 80:3, 80:6, 80:8, 80:12, 80:15, 80:22, 81:5, 83:17, 83:18, 84:10, 85:4, 85:9, 85:13, 87:24, 88:15, 90:18, 92:8, 93:12, 94:9, 94:19, 95:21, 97:13, 109:2, 133:16, 148:5, 155:17, 166:19, 193:10, 201:1, 225:11, 233:13, 246:2, 249:6, 256:22, 270:11, 276:16
**System** [10] - 24:16,

30:5, 37:18, 41:3, 58:9, 60:5, 75:12, 163:19, 174:24, 220:15
**systematic** [1] - 26:14
**systemic** [7] - 109:9, 109:14, 109:15, 109:17, 110:24, 111:19, 228:15
**Systems** [2] - 30:10, 42:16
**systems** [9] - 42:15, 62:19, 83:2, 83:8, 83:20, 83:22, 85:16, 97:24, 245:23

### T

**tab** [2] - 146:21, 200:21
**Tab** [1] - 200:21
**table** [1] - 152:11
**tablets** [11] - 20:11, 48:19, 48:20, 48:24, 49:2, 49:9, 49:10, 49:23, 49:24, 56:22, 98:11
**tabs** [2] - 71:14, 71:17
**taint** [1] - 122:18
**talks** [6] - 139:14, 143:8, 143:13, 167:5, 170:2, 181:11
**target** [1] - 272:18
**targeted** [2] - 28:12, 115:18
**targeting** [1] - 38:12
**Targeting** [1] - 175:5
**Task** [4] - 12:5, 12:6, 15:8, 18:3
**tasked** [2] - 20:5, 134:20
**technical** [2] - 82:12, 96:4
**techniques** [1] - 248:18
**TEMITOPE** [1] - 4:8
**temporal** [3] - 44:15, 44:19, 237:19
**tempted** [1] - 236:24
**ten** [5] - 48:19, 80:14, 80:17, 205:23, 276:6
**Ten** [1] - 159:3
**ten-percent** [1] - 276:6
**tendered** [1] - 34:20
**tendering** [1] - 42:5
**tens** [6] - 214:7, 214:10, 228:5, 229:8, 229:15, 229:25
**Tenth** [1] - 5:12

**tenth** [2] - 122:10, 122:15
**term** [7] - 18:20, 26:14, 133:8, 133:11, 220:24, 221:1, 263:21
**terminology** [1] - 93:8
**terms** [18] - 80:9, 109:21, 117:11, 127:16, 134:21, 181:4, 184:2, 184:4, 210:12, 216:14, 230:9, 237:22, 242:4, 244:3, 251:12, 251:17, 264:19, 277:16
**test** [2] - 87:17, 96:14
**testified** [28] - 86:7, 103:3, 121:21, 130:12, 137:2, 146:3, 150:18, 150:19, 190:8, 210:7, 212:2, 213:8, 236:4, 236:23, 252:22, 253:10, 253:13, 254:1, 254:4, 254:14, 255:6, 255:18, 255:21, 256:9, 259:10, 264:10, 264:18, 265:14
**testifies** [1] - 212:23
**testify** [11] - 13:7, 16:2, 43:22, 51:21, 52:12, 66:1, 137:14, 210:3, 254:2, 256:2
**testifying** [13] - 13:24, 65:20, 68:16, 122:5, 123:21, 157:9, 165:4, 165:16, 165:25, 166:8, 223:20, 252:17, 261:24
**testimony** [97] - 9:5, 13:5, 13:7, 13:16, 13:21, 14:17, 31:22, 32:21, 33:11, 34:2, 36:3, 43:12, 43:15, 43:22, 44:22, 47:10, 51:24, 52:13, 54:14, 62:15, 63:11, 64:10, 65:11, 65:12, 65:20, 68:23, 73:19, 73:21, 73:24, 74:17, 76:23, 80:2, 82:6, 85:19, 86:6, 89:25, 90:6, 91:20, 107:12, 121:14, 121:16, 121:17, 121:18, 121:24, 122:1,

128:11, 131:1, 131:4, 137:9, 147:6, 148:4, 157:5, 157:11, 164:15, 165:7, 165:13, 165:17, 174:14, 186:18, 187:17, 201:23, 209:17, 211:10, 212:2, 212:19, 212:21, 214:20, 229:5, 233:15, 233:18, 233:25, 234:1, 234:8, 235:15, 253:4, 253:18, 255:14, 256:4, 257:4, 257:9, 257:11, 257:13, 257:14, 259:15, 259:18, 260:22, 261:17, 263:12, 264:6, 264:15, 277:2, 277:8, 277:11, 277:13
**text** [1] - 203:21
**thankfully** [1] - 235:20
**THE** [260] - 1:1, 1:1, 1:4, 1:17, 7:6, 7:9, 7:13, 7:23, 7:24, 8:2, 8:11, 8:18, 8:19, 9:8, 9:19, 9:23, 10:1, 10:5, 10:7, 10:8, 10:10, 10:12, 10:14, 14:2, 14:9, 14:13, 21:15, 21:17, 25:18, 25:23, 26:2, 30:15, 30:25, 31:7, 32:8, 32:18, 32:20, 33:4, 33:9, 33:17, 35:1, 35:11, 35:14, 36:17, 36:22, 36:23, 39:14, 39:24, 40:3, 40:6, 40:8, 40:11, 40:15, 40:16, 43:4, 43:7, 43:10, 43:12, 44:4, 45:1, 45:24, 46:15, 47:15, 48:3, 48:4, 48:5, 48:6, 50:23, 51:7, 51:16, 52:4, 52:8, 52:23, 53:5, 53:9, 53:13, 53:24, 59:21, 60:18, 60:22, 60:23, 62:7, 62:10, 62:13, 63:10, 63:16, 64:2, 64:3, 64:8, 65:16, 65:22, 65:24, 66:4, 66:21, 68:15, 68:21, 69:16, 69:17, 69:19, 69:20, 70:4, 70:9, 72:8, 72:11, 72:14, 72:20, 73:17,

74:3, 74:8, 74:13, 75:4, 75:5, 75:8, 77:3, 77:25, 78:7, 78:15, 78:17, 79:4, 80:2, 80:5, 80:7, 80:9, 80:10, 81:11, 81:14, 82:13, 85:22, 86:12, 86:19, 89:24, 90:10, 90:20, 90:23, 91:1, 91:11, 91:14, 91:17, 91:24, 94:2, 94:3, 99:7, 99:10, 99:14, 99:18, 99:20, 100:9, 100:10, 105:10, 105:11, 106:19, 106:21, 107:13, 107:17, 108:9, 108:20, 108:21, 109:14, 109:15, 109:19, 109:24, 110:13, 110:15, 110:19, 110:21, 111:13, 111:15, 112:9, 112:13, 112:16, 113:9, 113:13, 113:18, 113:21, 113:25, 115:8, 115:11, 118:11, 119:12, 119:14, 119:24, 120:2, 126:23, 127:2, 127:14, 128:7, 128:9, 138:20, 138:22, 139:9, 145:6, 145:9, 145:11, 147:14, 152:9, 154:22, 155:2, 160:22, 160:24, 160:25, 165:14, 166:1, 166:4, 172:16, 172:19, 174:9, 174:21, 178:1, 178:3, 187:14, 187:21, 189:17, 189:23, 190:10, 190:18, 190:19, 190:22, 192:5, 192:7, 193:3, 197:9, 197:20, 198:2, 198:24, 199:2, 199:5, 202:18, 202:22, 203:2, 207:13, 207:14, 207:19, 207:20, 209:6, 214:3, 217:23, 221:16, 221:18, 221:24, 233:20, 234:7, 234:17, 239:8,

239:9, 256:17, 262:16, 262:22, 263:16, 263:17, 263:25, 267:8, 270:19, 277:12, 277:19, 277:23, 278:1, 278:11, 278:12, 278:13, 278:14
theft [2] - 194:16, 194:18
thefts [1] - 194:22
themselves [2] - 135:15, 135:16
theoretical [2] - 87:12, 88:12
theory [2] - 87:19, 233:13
thereafter [1] - 65:6
therefore [1] - 258:15
Therefore [1] - 168:18
they've [3] - 71:20, 181:6, 251:24
thinking [1] - 122:9
third [8] - 8:14, 45:13, 85:12, 125:13, 256:25, 264:6, 264:8, 264:9
Thomas [1] - 2:12
thousand [4] - 48:20, 85:1, 156:22, 157:21
thousands [5] - 186:13, 186:16, 187:4, 187:9, 207:9
Three [1] - 6:5
three [50] - 6:12, 8:6, 11:17, 11:23, 15:20, 29:23, 29:25, 38:6, 42:15, 42:16, 42:19, 47:20, 54:15, 56:18, 56:19, 57:24, 60:4, 62:20, 71:7, 74:17, 74:23, 80:3, 85:15, 85:25, 86:7, 93:13, 93:17, 99:22, 99:24, 100:21, 112:18, 116:2, 116:6, 116:7, 116:11, 134:15, 134:18, 139:15, 149:14, 150:25, 186:9, 194:13, 196:13, 198:11, 199:13, 206:4, 206:22, 212:3, 241:3, 274:19
three-times [1] - 85:25
Threshold [1] - 9:1
threshold [30] - 9:14, 68:1, 73:15, 75:16, 75:17, 75:21, 77:18,

83:16, 84:14, 85:4, 85:8, 87:18, 88:11, 89:16, 93:23, 94:13, 94:14, 94:16, 99:24, 226:24, 241:9, 242:23, 243:2, 243:5, 243:11, 244:21, 247:1, 251:5, 276:1, 276:22
thresholds [8] - 89:23, 106:8, 207:4, 245:19, 251:1, 276:4, 276:9, 276:11
throughout [2] - 22:12, 164:6
tied [1] - 38:16
timeline [8] - 42:17, 45:3, 54:3, 56:23, 57:7, 57:10, 58:21, 65:2
TIMOTHY [1] - 5:9
tiny [2] - 78:15, 78:17
title [1] - 15:25
today [14] - 14:17, 29:14, 29:18, 34:2, 44:22, 47:11, 117:6, 123:2, 128:3, 144:1, 216:4, 216:7, 237:15, 242:10
today's [1] - 13:5
together [5] - 25:16, 115:15, 121:16, 250:5, 251:22
Toledo [5] - 18:18, 19:2, 19:3, 128:18, 128:19
tomorrow [1] - 270:22
took [16] - 12:10, 19:5, 20:24, 21:8, 23:16, 23:19, 39:9, 68:10, 123:2, 165:11, 173:22, 206:13, 216:7, 246:19, 252:1, 273:21
tool [1] - 178:6
tools [1] - 276:8
top [15] - 9:3, 16:20, 38:22, 45:6, 45:7, 47:23, 96:20, 118:15, 134:14, 139:13, 140:23, 140:25, 186:21, 195:6
topic [7] - 124:18, 127:21, 265:21, 268:14, 270:16, 270:17, 272:4
topics [2] - 31:5, 123:25
total [14] - 50:1, 54:23,

67:19, 69:11, 71:21, 96:22, 96:23, 96:25, 97:2, 97:5, 103:9, 103:23, 155:10
totality [5] - 21:6, 130:5, 134:16, 153:17, 207:23
totalled [1] - 71:21
totally [1] - 235:8
totals [1] - 56:13
totem [1] - 263:19
totem-pole [1] - 263:19
touched [2] - 179:19, 183:11
tough [1] - 12:12
toward [1] - 140:23
Tower [2] - 3:4, 4:18
track [2] - 176:2, 176:7
tracked [1] - 244:14
tracks [1] - 244:2
trade [2] - 37:16, 41:8
Traffic [1] - 13:1
trailing [13] - 85:3, 85:7, 85:12, 87:18, 91:5, 92:3, 92:7, 92:17, 93:7, 93:8, 98:13, 276:6
trained [2] - 142:13, 159:18
training [2] - 15:15, 158:22
transaction [11] - 23:12, 42:12, 48:21, 65:7, 71:13, 71:16, 80:20, 84:14, 92:6, 93:1, 271:10
transactional [10] - 26:19, 27:14, 44:9, 44:10, 45:11, 45:14, 57:12, 57:15, 61:21, 95:23
transactions [29] - 16:13, 46:4, 46:19, 47:19, 47:25, 48:25, 49:5, 49:8, 49:19, 49:23, 58:23, 69:4, 73:6, 86:10, 89:16, 92:9, 93:9, 103:4, 103:6, 103:22, 104:15, 105:18, 143:2, 271:1, 271:4, 271:13, 272:1, 272:20, 273:1
transcript [9] - 6:19, 49:15, 188:22, 211:24, 221:6, 228:21, 229:13, 235:11, 278:20
transfer [1] - 136:8

transition [3] - 12:12, 29:17, 59:17
transmitted [1] - 75:9
treat [1] - 142:12
Treatment [1] - 118:22
treatment [1] - 142:1
treats [1] - 225:23
tree [1] - 86:11
tremendously [1] - 222:22
trend [2] - 55:3, 60:1
trends [4] - 55:1, 175:20, 200:11
Trial [1] - 278:15
TRIAL [1] - 1:16
trial [12] - 19:6, 22:12, 30:17, 30:22, 39:16, 39:23, 43:16, 51:12, 54:17, 254:1, 254:2, 257:12
tried [8] - 206:2, 223:6, 223:14, 229:2, 230:24, 247:6, 247:13, 250:18
trigger [21] - 68:1, 75:16, 75:17, 77:18, 77:19, 80:12, 80:14, 80:21, 82:16, 82:19, 82:20, 84:13, 88:11, 88:16, 88:21, 89:14, 97:24, 214:24, 228:11, 233:7, 247:4
triggered [8] - 77:12, 85:8, 215:13, 215:16, 215:17, 226:24, 233:14
triggering [2] - 79:11, 81:23
triggers [4] - 75:20, 81:3, 81:6, 215:12
trouble [1] - 162:8
truck [1] - 193:16
true [32] - 51:18, 51:23, 63:7, 104:20, 129:13, 134:3, 134:4, 135:13, 143:16, 145:18, 149:23, 156:24, 159:24, 162:2, 167:11, 168:16, 181:23, 183:25, 184:19, 184:20, 206:25, 210:14, 218:19, 220:16, 232:24, 234:22, 234:23, 242:4, 254:7, 254:20, 257:19
True [19] - 116:5,

116:23, 117:9, 117:15, 127:25, 128:14, 129:12, 133:19, 134:9, 138:1, 143:20, 155:17, 155:20, 156:17, 159:23, 168:24, 169:1, 184:15, 185:17
**trust** [2] - 181:4, 240:3
**truth** [9] - 142:2, 164:11, 164:23, 169:6, 170:15, 171:13, 172:5, 173:3, 220:14
**truthful** [4] - 148:9, 189:8, 229:5, 235:14
**truthfully** [6] - 157:9, 165:4, 165:16, 165:25, 166:8, 261:24
**try** [22] - 27:18, 27:19, 28:23, 82:11, 83:3, 115:17, 128:5, 145:25, 160:22, 178:7, 221:20, 224:9, 225:8, 239:21, 240:7, 244:5, 246:3, 248:18, 249:11, 272:16
**trying** [24] - 45:4, 68:18, 70:8, 78:21, 82:24, 84:15, 84:17, 90:11, 110:18, 117:24, 118:2, 121:22, 122:6, 123:2, 128:3, 189:25, 197:21, 202:1, 232:15, 234:4, 239:10, 243:9, 249:1, 249:18
**turn** [6] - 16:25, 66:15, 163:6, 163:15, 197:17, 237:18
**turned** [1] - 89:5, 89:8, 97:14
**turns** [1] - 87:7
**Twelfth** [3] - 4:13, 4:15, 5:5
**twice** [5] - 85:12, 91:5, 92:3, 98:13, 189:3
**two** [49] - 8:9, 8:11, 9:3, 9:12, 9:16, 9:23, 9:24, 13:11, 17:9, 19:21, 43:2, 46:7, 52:10, 53:3, 57:11, 58:15, 61:3, 63:4, 73:25, 92:10, 92:13, 93:3, 93:16, 98:14,

126:17, 150:20, 161:1, 162:3, 184:23, 209:1, 209:16, 209:17, 211:7, 219:6, 219:10, 219:23, 220:1, 225:13, 226:19, 228:16, 237:11, 237:23, 248:20, 268:16, 268:20, 272:25, 274:11, 274:19, 274:24
**two-step** [2] - 63:4, 73:25
**Type** [4] - 168:8, 168:18, 169:3, 169:12
**type** [19] - 53:1, 56:9, 59:13, 60:13, 62:4, 70:25, 73:15, 77:18, 79:12, 84:7, 92:4, 115:5, 119:22, 126:25, 128:22, 128:25, 196:4, 250:10
**types** [13] - 17:15, 17:19, 29:22, 35:23, 41:22, 42:7, 70:25, 83:25, 87:1, 193:11, 196:25, 250:19, 270:9
**typically** [1] - 82:24

## U

**U.S** [3] - 175:20, 177:1, 181:18
**ultimate** [1] - 52:19
**ultimately** [3] - 29:12, 109:22, 204:24
**unanimous** [1] - 52:5
**unannounced** [1] - 23:10
**unaware** [1] - 164:7
**unbecoming** [1] - 170:11
**unclear** [2] - 51:10, 70:4
**under** [41] - 21:14, 22:23, 23:2, 89:3, 89:10, 89:17, 90:14, 93:13, 96:13, 96:17, 97:13, 97:19, 97:20, 97:25, 113:22, 119:3, 119:24, 121:13, 121:21, 125:13, 127:1, 127:2, 127:3, 131:24, 156:4,

192:17, 215:10, 215:14, 227:15, 228:13, 228:23, 231:9, 231:24, 232:21, 241:9, 244:16, 245:6, 256:19, 257:22, 269:22
**undergo** [3] - 168:20, 169:4, 169:14
**Understood** [1] - 161:2
**understood** [4] - 28:2, 33:10, 244:7
**undertake** [1] - 135:6
**undisclosed** [1] - 111:5
**undisputed** [1] - 85:25
**unexpected** [1] - 12:18
**unfair** [1] - 147:8
**uniform** [5] - 11:13, 12:10, 12:11, 12:12, 12:16
**unintended** [1] - 183:19
**uninterrupted** [1] - 148:18
**unique** [2] - 11:9, 11:14
**uniquely** [2] - 200:2, 201:1
**Unit** [3] - 11:16, 11:24, 175:4
**unit** [4] - 11:18, 11:19, 12:13, 55:25
**United** [10] - 7:2, 21:24, 121:21, 122:10, 150:11, 156:2, 165:19, 180:15, 253:19, 254:24
**UNITED** [2] - 1:1, 1:17
**units** [47] - 46:24, 47:4, 47:19, 47:20, 49:2, 49:20, 49:21, 50:1, 55:23, 57:6, 57:18, 58:21, 93:23, 95:3, 95:7, 96:21, 96:23, 96:24, 96:25, 97:2, 97:3, 97:5, 98:1, 98:4, 98:9, 98:10, 98:17, 100:5, 100:7, 100:12, 100:13, 100:16, 100:19, 100:23, 101:1, 101:5, 101:8, 101:10, 101:12, 101:13, 101:14, 101:17, 101:18,

101:19, 101:20
**University** [1] - 21:16
**unless** [6] - 27:8, 46:16, 94:10, 117:11, 119:15, 144:5
**unsound** [1] - 99:5
**unusual** [11] - 82:24, 83:1, 203:5, 203:7, 204:8, 204:13, 204:18, 204:19, 205:9, 248:10
**up** [109] - 8:5, 11:12, 12:23, 13:19, 15:24, 25:23, 26:9, 29:23, 36:6, 37:11, 40:4, 41:2, 44:7, 51:12, 55:3, 56:18, 56:21, 60:5, 64:4, 66:12, 66:20, 74:10, 74:12, 79:5, 81:1, 86:11, 90:2, 90:8, 92:14, 93:20, 96:8, 102:25, 104:25, 107:15, 113:14, 114:2, 120:5, 120:11, 126:9, 131:8, 134:1, 138:24, 146:13, 146:20, 152:6, 152:15, 157:11, 161:10, 161:20, 162:23, 163:8, 164:15, 164:16, 169:19, 172:11, 174:23, 182:3, 186:18, 186:20, 188:22, 192:16, 198:3, 199:8, 200:18, 202:13, 202:21, 204:22, 209:6, 211:23, 212:14, 212:21, 213:16, 215:4, 219:2, 222:15, 222:25, 224:22, 225:3, 228:21, 230:22, 235:10, 237:2, 238:25, 239:14, 239:18, 239:22, 240:3, 240:14, 242:15, 242:16, 244:9, 245:14, 245:20, 247:16, 249:1, 249:14, 249:18, 250:21, 252:8, 253:18, 256:15, 259:23, 261:17, 264:8, 267:3, 267:10, 270:22,

270:23
**upper** [3] - 17:24, 119:2, 195:16
**upward** [1] - 55:3
**usable** [1] - 210:24
**useful** [2] - 191:10, 192:17
**Usefulness** [1] - 192:10
**uses** [2] - 201:11, 226:16
**usual** [2] - 83:4, 84:19
**utilize** [1] - 185:1

## V

**VA** [7] - 271:16, 272:3, 272:9, 273:6, 273:16, 273:21, 273:22
**vague** [2] - 62:12, 62:14
**valid** [3] - 32:17, 171:19, 236:19
**validated** [1] - 237:1
**validity** [1] - 52:14
**valuable** [1] - 223:16
**various** [5] - 82:2, 136:12, 138:9, 208:19, 265:25
**vast** [1] - 117:23
**vault** [1] - 94:25
**vein** [1] - 131:6
**Ventura** [1] - 3:18
**verbal** [1] - 27:24
**verification** [1] - 171:24
**version** [5] - 51:18, 51:22, 51:23, 94:22, 94:23
**versus** [2] - 127:25, 260:8
**vertical** [1] - 57:5
**vet** [1] - 168:2
**veterinarian** [1] - 84:3
**veterinarian's** [1] - 84:3
**veterinarians** [2] - 17:7, 84:7
**vetting** [1] - 169:23
**video** [3] - 164:18, 164:22, 235:11
**Video** [1] - 165:2
**view** [8] - 73:22, 78:21, 123:9, 123:14, 186:15, 217:6, 272:8, 272:16
**violated** [1] - 32:5
**violation** [2] - 120:16, 171:2

**VIRGINIA** [2] - 1:1, 1:18
**Virginia** [50] - 4:18, 7:3, 7:4, 15:13, 44:13, 46:21, 46:25, 47:5, 50:3, 54:25, 56:5, 59:4, 59:9, 67:7, 70:21, 93:1, 97:17, 103:5, 106:5, 106:10, 106:15, 107:1, 107:6, 107:24, 108:6, 108:18, 109:4, 110:9, 111:2, 111:22, 112:6, 112:25, 118:14, 119:11, 124:23, 125:11, 125:17, 126:6, 126:15, 126:20, 131:15, 131:16, 151:4, 162:24, 173:17, 190:16, 191:17, 192:4, 207:16, 271:2
**visibility** [1] - 178:10
**visit** [1] - 169:11
**visits** [1] - 276:20
**visual** [1] - 56:12
**volume** [10] - 46:4, 48:11, 50:1, 54:23, 59:3, 83:3, 97:16, 173:8, 173:11, 179:10
**VOLUME** [1] - 1:16
**volumes** [2] - 24:19, 59:12
**voluminous** [1] - 24:2
**vs** [2] - 40:23, 278:22

## W

**wait** [2] - 81:17, 89:1
**WAKEFIELD** [1] - 5:13
**Walgreens** [1] - 136:4
**walk** [14] - 15:2, 16:17, 18:12, 21:3, 25:4, 25:7, 27:11, 37:13, 45:4, 60:21, 66:25, 70:25, 85:2, 92:3
**walked** [2] - 23:9, 59:12
**walker** [1] - 58:18
**walking** [1] - 36:8
**walkthrough** [1] - 244:15
**Waller** [1] - 13:19
**wants** [2] - 65:19, 78:4
**warrant** [5] - 20:14, 20:15, 20:16, 20:20, 121:6

**warranted** [1] - 76:12
**warrants** [1] - 16:7
**Washington** [9] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 29:13, 167:9, 167:10
**watch** [1] - 158:19
**watched** [4] - 233:15, 256:4, 259:3, 259:15, 259:20
**watching** [1] - 263:12
**Wayne** [2] - 11:1, 11:5
**ways** [3] - 48:18, 138:9, 175:16
**wearing** [1] - 12:11
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**website** [4] - 173:23, 173:25, 174:5, 202:15
**week** [6] - 137:13, 160:2, 160:3, 239:22
**weekly** [1] - 95:10
**weeks** [5] - 15:12, 15:14, 209:17, 240:1, 240:11
**weight** [2] - 9:20, 63:10
**welcome** [1] - 152:4
**WEST** [2] - 1:1, 1:18
**West** [48] - 7:3, 7:4, 44:12, 46:20, 46:25, 47:5, 50:3, 54:25, 56:4, 59:4, 59:9, 67:7, 70:20, 93:1, 97:17, 103:5, 106:5, 106:10, 106:14, 106:25, 107:6, 107:24, 108:6, 108:18, 109:4, 110:9, 111:2, 111:22, 112:6, 112:25, 118:14, 119:11, 124:22, 125:11, 125:17, 126:5, 126:15, 126:20, 131:14, 131:15, 151:4, 162:23, 173:17, 190:16, 191:17, 192:3, 207:16, 271:2
**whacking** [1] - 182:12
**Wheeling** [4] - 64:17, 64:24, 64:25, 69:10
**white** [1] - 241:5
**whole** [6] - 21:8, 21:11, 117:5, 129:20, 129:23, 160:3
**wholesale** [4] - 19:23,

22:3, 40:25, 143:4
**wholesalers** [1] - 258:16
**wholesalers'** [1] - 257:4
**WICHT** [2] - 4:12, 7:22
**wide** [2] - 30:20, 142:12
**widespread** [1] - 109:18
**willful** [2] - 265:3, 265:7
**Williams** [2] - 4:13, 5:4
**willing** [1] - 174:6
**window** [6] - 33:13, 244:9, 251:11, 253:10, 275:10, 275:15
**winnow** [1] - 52:17
**withdraw** [1] - 215:25
**witness** [28] - 10:2, 10:4, 13:7, 13:20, 13:24, 31:11, 31:16, 35:5, 36:21, 42:4, 52:16, 59:1, 65:11, 65:12, 65:19, 65:20, 90:7, 113:22, 119:18, 119:19, 119:20, 139:6, 147:8, 165:9, 187:13, 189:20, 217:21, 234:4
**WITNESS** [51] - 10:7, 10:9, 10:12, 21:17, 36:23, 40:6, 40:15, 43:10, 48:4, 48:6, 60:23, 62:10, 63:16, 64:3, 69:16, 69:20, 75:5, 75:8, 77:25, 78:17, 80:5, 80:9, 91:14, 94:3, 99:20, 100:10, 105:11, 106:21, 108:9, 108:21, 109:15, 110:19, 111:15, 128:9, 139:9, 145:11, 152:9, 155:2, 160:24, 178:3, 190:19, 197:9, 207:14, 207:20, 221:16, 239:9, 263:16, 267:8, 277:12, 278:12, 278:14
**witness's** [3] - 146:24, 221:9, 234:1
**witnesses** [3] - 42:18, 43:20, 86:6
**witnesses'** [1] -

233:18
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**word** [4] - 46:13, 89:5, 93:7, 204:1
**words** [5] - 75:20, 76:4, 139:23, 253:13, 255:8
**works** [6] - 87:16, 230:7, 232:15, 234:3, 241:8, 246:21
**world** [9] - 197:1, 220:11, 220:16, 220:23, 222:2, 223:3, 224:11, 235:3, 244:3
**worse** [3] - 145:19, 146:4, 146:6
**worth** [3] - 9:21, 192:15, 240:12
**wound** [1] - 66:12
**Wright** [8] - 174:14, 175:4, 258:22, 259:7, 259:10, 259:14, 260:19
**Wright's** [1] - 260:12
**write** [6] - 116:16, 116:20, 156:8, 218:21, 230:3, 242:8
**writes** [1] - 269:9
**writing** [4] - 18:25, 131:9, 247:11
**written** [10] - 27:25, 118:17, 129:10, 130:19, 132:15, 134:8, 162:4, 198:20, 222:5, 241:13
**wrote** [5] - 127:18, 165:21, 190:1, 215:1, 216:13
**WU** [1] - 5:10
**WV** [7] - 2:8, 3:10, 3:13, 4:19, 5:15, 6:9, 202:14

## X

**Xanax** [2] - 19:1, 19:21

## Y

**year** [18] - 21:20, 22:14, 74:16, 103:8, 176:3, 180:12, 191:25, 192:1, 203:13, 231:3, 232:6, 234:20, 244:8, 252:13, 253:9

**years** [26] - 11:3, 11:23, 12:6, 12:13, 12:24, 18:5, 38:5, 103:10, 146:8, 146:9, 159:3, 161:18, 161:20, 161:21, 166:16, 166:23, 184:23, 248:20, 250:1, 250:6, 258:13
**yes/no** [2] - 128:5, 128:6
**yesterday** [4] - 8:5, 8:8, 9:5, 65:13
**York** [7] - 3:5, 157:6, 164:15, 173:19, 211:5, 211:18, 262:9
**yourself** [2] - 10:21, 252:14
**Yugoslavian** [1] - 18:17

## Z

**Zimmerman** [2] - 54:5, 263:10
**Zoom** [1] - 235:15