```
                 IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT CHARLESTON


_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
             Plaintiff,        :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
             Defendants.  :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
             Plaintiff,        :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
             Defendants.  :
_____x



                   BENCH TRIAL - VOLUME 19
      BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
                 UNITED STATES DISTRICT COURT
                IN CHARLESTON, WEST VIRGINIA


                      MAY 27, 2021
```

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:             Ayme Cochran, RMR, CRR
Court Reporter:             Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A. Faber,

 2    Senior Status Judge, United States District Court, Southern

 3    District of West Virginia, in Charleston, West Virginia, on

 4    May 27, 2021, at 9:00 a.m., as follows:

 5                THE COURT:  Good morning, Mr. Rafalski.

 6                THE WITNESS:  Good morning, Your Honor.

 7                MR. SCHMIDT:  May I proceed, Your Honor?

 8                THE COURT:  Yes, you may.

 9                MR. SCHMIDT:  Thank you.

10    BY MR. SCHMIDT:

11    Q.   Good morning, Mr. Rafalski.

12    A.   Good morning, Mr. Schmidt.

13    Q.   I hope you'll be pleased to hear that I spent some time

14    compressing overnight, so I hope that we can be relatively

15    brief.

16         But first I will ask if we could go back to where we

17    were with plaintiffs' demonstrative 223, Page 10, please.

18                MR. SCHMIDT:  If I may approach the board, Your

19    Honor.

20                THE COURT:  Yes.

21    BY MR. SCHMIDT:

22    Q.   I just want to ask you a few more questions about

23    this demonstrative.

24         Specifically, you have Mr. Hilliard and Mr. Walker

25    here, Mr. Gustin and Mr. Oriente here.  Why is that?
```

1    **A.**    I believe those are the people that were in charge

2    during those two different SOMS periods.

3    **Q.**    Did you know that Mr. Walker was in charge actually for

4    much longer than that?

5    **A.**    I'm not sure.  This is what I believed it was.

6    **Q.**    Did you know he actually left the company in 2015?

7    **A.**    I don't have a recollection of that, sir.

8    **Q.**    Did you know Mr. Hilliard had responsibilities for

9    longer than that time period?

10   **A.**    I'm not sure if I recall that.  I just believed that

11   Mr. Gustin and Mr. Oriente were the people in charge during

12   the period I have indicated there.

13   **Q.**    And do you know that Mr. Oriente actually had

14   responsibilities at the distribution center that included

15   controlled substances obligations going back well before

16   this '08 time period you have?

17   **A.**    Yes.  But I don't believe he specifically was in

18   control of the SOMS or running the SOMS program.

19   **Q.**    And are you aware that there are a number of other

20   individuals during this time period where you only have

21   Gustin and Oriente who had Regulatory Affairs

22   responsibilities?

23   **A.**    Yeah, I believe that's a true statement, Your Honor.

24   **Q.**    For example, are you familiar with Bill Mahoney who was

25   going to be a witness but who plaintiffs kindly pulled down

```
 1   as a witness?
 2   A.   I'm aware of him, yes.
 3   Q.   Are you aware of Gary Boggs who came in in the '13-'14
 4   window?
 5   A.   Yeah.  I believe he would be a supervisor above those
 6   two gentlemen.
 7   Q.   Do you know what his role was relative to Mr. Walker's
 8   role?
 9   A.   Mr. Boggs?
10   Q.   Yes.
11   A.   He was the level above Mr. Oriente and Gustin and he
12   had responsibility for the eastern part of the United
13   States.  I don't know -- I don't recall his exact title.
14   Q.   Okay.  Do you know what his responsibilities were
15   relative to Mr. Walker?
16   A.   I believe he supervised Mr. Walker.
17   Q.   Do you know they actually succeeded each other?
18   A.   Mr. Walker took Mr. Boggs' place?
19   Q.   The other way around.
20   A.   Vice versa?  No, I'm not aware of that.
21   Q.   Okay.  Let's go to Page 14, please.  Just very quickly,
22   we spent a lot of time talking about this chart.  I'm not
23   going to go back through it in detail.  I just want to ask
24   you about item E.  Do you see that?
25   A.   I do.
```

1  **Q.**   And just to be clear, this is one of the four

2  methodologies I asked you about yesterday that you said you

3  would not use; correct?

4  **A.**   That's correct.

5  **Q.**   You previously testified you wouldn't use them because

6  they're no plausible; correct?

7  **A.**   I believe they would not be effective, Your Honor.

8  **Q.**   Okay.  And as to the one that you say is McKesson,

9  you're aware that there was an 8,000 number in the LDMP that

10  was in place for those 11 months; correct?

11  **A.**   That is correct for four specific drugs.

12  **Q.**   But you're also aware that McKesson has never blocked

13  orders using a dosage of 8,000 per month for all pharmacies;

14  correct?

15  **A.**   Is that question you're asking me whether they blocked

16  that 8,000 of those four drugs during that time period?

17  **Q.**   That number when it was used was not used to block

18  orders; correct?

19  **A.**   That's correct.  That was used when they began to

20  monitor or review the order.

21  **Q.**   And, in fact, you can't point me to any company or any

22  regulator that has used a fixed number for every single

23  pharmacy in the country, whether it's 8,000 or otherwise, as

24  a means of blocking orders?

25  **A.**   That's correct.  That would be the only one I'm aware

1    of would be the McKesson during that 11-month period.

2    **Q.**   And it was not used to block it; correct?

3    **A.**   Well, I think there's some conflicting information in

4    some of the material I reviewed, but the practice was not to

5    block.

6    **Q.**   Okay.  And, in fact, the policy -- and we can look at

7    it if you'd like.  The policy did not say there would be

8    blocking at 8,000; correct?

9    **A.**   That's correct.  But there was other communications I

10   saw which indicated that some people interpreted it to be

11   blocked.

12   **Q.**   Let's talk about McKesson's Section 55 program which we

13   touched on briefly.

14        You're not aware of anyone from DEA between 1997, which

15   is the date of the program that we introduced into evidence,

16   and 2000 [sic], that told McKesson that a Section 55 program

17   was violating the CSA and its regulations; correct?

18   **A.**   Give me the time period again.

19   **Q.**   1997 to 2007.

20   **A.**   I believe there was some communications in the 2006

21   Rannazzisi letter that I believe indicated that the

22   excessive purchase reports were not a practical Suspicious

23   Order Monitoring System.

24             MR. SCHMIDT:  Can you pull up the video of May

25   13th, 2019, 344 5-11.

```
 1              (A video clip was played as follows:)

 2    Q.   "Are you aware of any DEA personnel that told McKesson

 3    between -- between 1997 and 2007 that its Section 55 program

 4    was violating the CSA and its regulations?"

 5    A.   "I'm not aware that anyone ever told them, made that

 6    statement to McKesson."

 7              (Video clip concluded)

 8    BY MR. SCHMIDT:

 9    Q.   Were you doing your best to be accurate in that

10    testimony?

11    A.   Yes.

12    Q.   Okay.  And you know the DEA conducted audits and

13    inspections and had discussions with distributors; right?

14    A.   I do.

15    Q.   You would expect that if they saw a concern during

16    their audits, they would raise them; correct?

17    A.   That would be the purpose of the audit if, in fact,

18    they discussed the Suspicious Order Monitoring System, Your

19    Honor.

20    Q.   You know before 2008 McKesson's reports were made using

21    a form called the DU45; correct?

22    A.   Yes, sir.

23    Q.   As I understand your testimony, you've looked, you

24    didn't find any DU45s for Huntington and Cabell County;

25    correct?
```

1    **A.**   In the discovery, there were none produced.

2    **Q.**   And you don't know whether that's because they just

3    weren't filed or they used to exist and they weren't kept;

4    correct?

5    **A.**   I don't have any knowledge why they were not produced,

6    sir.

7    **Q.**   But you do know that -- we touched on this yesterday --

8    there are regulations that say certain types of files have

9    to be kept for two years; right?

10   **A.**   In the C.F.R. there are what's called required records

11   that are specifically mentioned.

12   **Q.**   The suspicious order reports aren't part of the

13   two-year retention; correct?

14   **A.**   They're not a required record in the C.F.R., although I

15   believe under the maintenance of effective controls to

16   prevent diversion, that would be a document that there would

17   be some retention to be able to reflect back on.

18   **Q.**   I'm going to show you an example of that.  We don't

19   have one from Huntington/Cabell from 15 or 20 years ago.  We

20   do have one from another jurisdiction.  So I'm just going to

21   show you one for illustrative purposes as was done with the

22   Cardinal document.

23           MR. SCHMIDT:  May I approach, Your Honor?

24           THE WITNESS:  Is this a monthly or daily?

25           MR. SCHMIDT:  This is a monthly.

 1          I'm not going to move this into evidence, but it's

 2     Defendants' West Virginia 1560.

 3     BY MR. SCHMIDT:

 4     **Q.**   Do you recognize they were both daily and monthly

 5     reports?

 6     **A.**   Yes.  They, they -- the daily reports, at least the

 7     policy indicated those came out, Your Honor, every two

 8     hours.  The monthly would be an end-of-the-month report.

 9     **Q.**   Do you recognize if you look at the top right in the

10     center it says "McKesson Corporation Monthly Controlled

11     Substance Suspicious Purchase Report."

12          Do you see that?

13     **A.**   I do.

14     **Q.**   So this is a monthly report; correct?

15     **A.**   Yes.

16     **Q.**   And --

17     **A.**   Period ending in June, 2008.

18     **Q.**   Right.  And it's a suspicious substance purchase

19     report.  Do you see that?

20     **A.**   Yes.

21     **Q.**   If we look down right below where it says "DEA,"

22     there's a little bit of text.  Do you see where I'm looking,

23     "pursuant to"?

24     **A.**   After "Drug Enforcement Administration"?

25     **Q.**   Yes, sir, right below that.

1    **A.**   I do.

2    **Q.**   Do you see where it says "pursuant to" right below

3    that?

4    **A.**   Yes.

5    **Q.**   It says, "Pursuant to C.F.R. 21, Section 1301.74(b)."

6        Do you recognize that as the suspicious order

7    regulation?

8    **A.**   It is the regulation, Your Honor.

9    **Q.**   "We are sending a copy of the monthly controlled

10   substance suspicious purchase report for 6/08."

11       Do you see that?

12   **A.**   I do see that.

13   **Q.**   And then do you see pages and pages of material?

14   **A.**   I do.

15   **Q.**   And right before it ends with the nice little dot

16   matrix image back on this document, it goes up to about 180

17   pages of report; correct?

18   **A.**   That's correct.  I guess 181 to be exact.

19   **Q.**   And you don't have any knowledge to say these were

20   never done for Huntington/Cabell or they were done and just

21   not kept; correct?

22   **A.**   I don't have any knowledge either way, Your Honor.

23   They were not produced.

24   **Q.**   All right.  You gave opinions about Rite-Aids in Cabell

25   County.  Do you remember that briefly?

1      **A.**    Yes.

2      **Q.**    Do you know how many Rite-Aid customers McKesson had in

3      Huntington and Cabell?

4      **A.**    I do not.

5      **Q.**    Do you know what the average -- well, let me back up.

6      A lot of your analyses looked at the time period between

7      2006 and 2014; correct?

8      **A.**    Yes, sir.

9      **Q.**    I think you nodded, but you need to answer for the

10     record.

11     **A.**    I'm sorry.

12     **Q.**    Do you know what the average per month level of

13     oxycodone per pharmacy in the U.S. was during that time

14     period?

15     **A.**    It's in my report, or in one of McCann's data slides

16     that I referenced, but I don't have it memorized, no, sir.

17     **Q.**    And I've seen numbers that are average by the

18     defendants but not a national average for all distributors.

19     Do you know what the national average for all distributors,

20     pills per month per pharmacy in the United States for that

21     window is?

22     **A.**    I can't recite it to you here today.

23     **Q.**    Do you know what it is for West Virginia or

24     Huntington/Cabell County?

25     **A.**    No, sir.

1    **Q.**   Do you know if those Rite-Aids that you talked about in

2    Cabell County, however many there were, were at the average,

3    above the average, or below the average?

4    **A.**   Just sitting here, I can't tell you that right now,

5    sir.

6    **Q.**   You talked about due diligence specifically.  And I

7    want to ask you whether you recognize with the passage of

8    time there might be diligence that was conducted that we

9    just don't have anymore because it didn't make it in the

10   file or it made it in the file or another file and it wasn't

11   kept.  Do you recognize that fact, sir?

12   **A.**   Your Honor, I do recognize that.  I, I think I could

13   understand many years back.  I think as the industry

14   progressed, especially when the 2005 distributor briefings

15   came about, I would expect to see some due diligence from

16   that point forward.

17        After the administrative actions in 2007 and 2008, I

18   would expect to see a retention of records from that time

19   forward.  But to say all the way back to 1990 I, I can't say

20   that I would have an expectation that every document would

21   be retained.

22   **Q.**   Is there any document you can point me to from the DEA

23   saying every contact with a pharmacy needs to be retained,

24   let's pick a period, from 2012 forward?

25   **A.**   Well, --

1   **Q.**   Can you point me --

2   **A.**   I can't point to a specific document that would say

3   that.

4   **Q.**   Thank you.

5   **A.**   But I think as just, just as a common course of

6   retention when you're, you know, the topic of the means for

7   effective controls to prevent diversion is to have some way

8   to look back at the history of your activity to make

9   decisions moving forward.  So I, I think that's always part

10   of that regulation and that part of the law.

11   **Q.**   Do you know whether Rite-Aid had an internal regulatory

12   department while McKesson was supplying them?

13   **A.**   They didn't?

14   **Q.**   Do you know whether you have every record of every

15   phone call between the McKesson counterpart and the Rite-Aid

16   counterpart?

17   **A.**   I have no records of any phone calls.  But in regards

18   to some of the Rite-Aid files I looked at, I do not see any

19   other forms of communications.

20   **Q.**   Do you know if those Rite-Aid files you looked at came

21   from just one distribution center as opposed to all 28?

22   **A.**   Yes.

23   **Q.**   Okay.  Let's look at McKesson Demo 2.1, the last page.

24   Do you remember talking about this yesterday?

25   **A.**   I do.

1    **Q.**    And what we talked about with this image is suppose you

2    have August that flags because these hundred orders from

3    July go into August.  Everything else gets flagged.

4    Correct?

5    **A.**    That's correct.

6    **Q.**    And that's because when Dr. McCann ran these numbers,

7    he assumed after August that there was no diligence at all;

8    correct?

9    **A.**    That's correct.

10   **Q.**    If diligence was done, then under your method, every

11   month after August should not be flagged; correct?

12   **A.**    That would be correct.

13   **Q.**    For example, we were talking about Rite-Aid.  You know

14   McKesson had a long relationship with Rite-Aid; correct?

15   **A.**    That's correct.

16   **Q.**    If we were talking about Rite-Aid, if there was a call

17   and someone at Rite-Aid said, "We ordered an extra bottle in

18   August because we ordered a bottle less than July," and that

19   was reasonable, then the subsequent months should not be

20   flagged; correct?

21   **A.**    That's correct.

22   **Q.**    And then this red flag would look like this; correct?

23   **A.**    That's correct.  If, if there would have been a proper

24   due diligence done on the red A and that order would have

25   been cleared and there would have been an explanation for

1   that and the company was satisfied that it dispelled the

2   suspicion, then moving forward none of those orders would

3   have been suspicious orders.  That's how the system would

4   operate.

5   **Q.**   You never visited any pharmacies in Huntington and

6   Cabell County when you formed your opinions, did you?

7   **A.**   I did not, Your Honor.

8   **Q.**   And that includes the Rite-Aids; correct?

9   **A.**   That's correct, Your Honor.

10   **Q.**   And you were unaware at the time of your deposition

11   that the West Virginia Board of Pharmacy actually inspects

12   pharmacies every other year; correct?

13   **A.**   I don't have any direct knowledge, but I believe that's

14   the role of the Board of Pharmacy is to do inspections.

15   **Q.**   My job -- my question is different.  You did not know

16   how often the West Virginia Board of Pharmacy reviews

17   pharmacy licenses, renews them, and actually inspects the

18   pharmacies at the time of your deposition after you had

19   written your report; correct?

20   **A.**   I do not, Your Honor.  I understand the question now.

21   **Q.**   And you never reviewed depositions from West Virginia

22   Board of Pharmacy personnel in drafting your report;

23   correct?

24   **A.**   That's correct, Your Honor.

25   **Q.**   You never reviewed documents from the West Virginia

1    Board of Pharmacy when drafting your report; correct?

2    **A.**    That's a correct statement, Your Honor.

3            MR. SCHMIDT:  May I approach, Your Honor?

4            THE COURT:  Yes.

5            THE WITNESS:  Thank you.

6            MR. SCHMIDT:  You can take that down.

7        I'm going to move into evidence Defense West Virginia

8    1989 as a government record.

9            THE COURT:  Any objection?

10            MR. ACKERMAN:  Mr. Farrell, let me confer with you

11    for a minute.

12        (Pause)

13            MR. FARRELL:  Judge, assuming the representations

14    made by counsel as to what this is, we have no, no

15    objection.

16            THE COURT:  All right.  It's admitted.

17            MR. SCHMIDT:  Thank you.

18    BY MR. SCHMIDT:

19    **Q.**    So let's go to Page 4 of this document, please.

20        And if we look at Page 4, up in the left corner here it

21    refers to a Rite-Aid in Barboursville.  Do you know if

22    that's in Cabell County?

23    **A.**    It is.

24    **Q.**    And that's one of the Rite-Aids you talked about;

25    correct?

1    **A.**   I believe it is.

2    **Q.**   This is a document you've never seen before; correct?

3    **A.**   That's a correct statement, Your Honor.

4    **Q.**   If we look at the top, it says "West Virginia Board of

5    Pharmacy."  And you can see it's dated 11-07, 2017.  Do you

6    see that?

7    **A.**   I do see that.

8    **Q.**   And if you scroll through the, the next set of pages,

9    let's stop on Page 5.  You'll see there are various

10   questions that they inquire about as part of their biannual

11   inspection process.  Do you see that?

12   **A.**   I do see that, sir.

13   **Q.**   Just to focus quickly on a few of them, let's go to

14   question 70, please.  That -- actually 70, please.

15        70 says, "Is one full year of dispensing records

16   available online?"  And you can see it's been checked "yes."

17        Do you see that?

18   **A.**   I do see that, Your Honor.

19   **Q.**   71, "Can the pharmacy generate five full years of

20   dispensing on request?"  Also checked "yes."

21        Do you see that?

22   **A.**   I see that also, Your Honor.

23   **Q.**   If we go up to question 41, "Is there a reasonable

24   effort to obtain patient ID for the patient record?"

25   Answer:  "Yes."

1      Do you see that?

2  **A.**   I also see that, Your Honor.

3  **Q.**   If we go to Page 7, please, do you see that this form

4  is signed both by the pharmacist in charge, or the

5  pharmacist and by an inspector?

6  **A.**   I do see that.

7  **Q.**   You've not read any Board of Pharmacy testimony talking

8  about the detail that these inspectors go to when they do

9  these inspections every two years?

10  **A.**   I have not, Your Honor.

11  **Q.**   Let's just look at a couple more.  Let's go to Page 37,

12  please.

13      I believe if you look in the upper right corner, by

14  this point in time we're up to October of 2011.  Do you see

15  that?

16  **A.**   Yes, sir, I do.

17  **Q.**   Let's go to Page 38, question 43, please.

18      Do you see at this point in time they were checking

19  orders and seeing if they were for a legitimate medical

20  purpose?  Do you see that?

21  **A.**   I do see that.

22  **Q.**   And they've checked "yes."  Correct?

23  **A.**   Correct.

24  **Q.**   Let's go to the signature line on the next page I

25  think.  Do you see that this is also signed --

1    **A.**    One second, please.  I just wanted to check.

2    **Q.**    39.  Do you see that this is also signed by the

3    inspector?

4    **A.**    I do.

5    **Q.**    Let's go to Page 87.  This one is a little harder to

6    read if you look in the upper left corner, but it's clearer

7    when we get to the signature page.  Do you see this from

8    2005?

9    **A.**    I do see that.

10   **Q.**    And if we scroll down again to question 11, please, do

11   you see again they're asking if the medications are for a

12   legitimate medical purpose and checking "yes"?

13   **A.**    I see that notation, Your Honor.

14   **Q.**    And if we scroll down to the signature on Page 89, we

15   can see the signature and the date in 2005.  It's a little

16   more clear.  Do you see that?

17   **A.**    I do.

18   **Q.**    Let's go back to one more in this packet.  I'm not

19   going to go through the rest of this packet or the other

20   ones, but I want to show you one more in this packet.

21        Could we go to Page 18?

22        So we've looked at 17.  We jumped back to I think it

23   was 11 and then back to '05 skipping over some of the

24   intervening inspections.

25        Let's look at this one from November, 2015.  Do you see

1    that date in the upper right corner?

2    **A.**   I do.

3    **Q.**   And let's go to Page 38, please.

4    **A.**   Page 38?  I'm sorry.

5    **Q.**   Yeah, Page 38, please.  Let's look at question 43.

6         Do you see again that among this long list of questions

7    that they're asking, they're again asking whether this is

8    for a legitimate medical purpose?

9    **A.**   I do see that, Your Honor.

10   **Q.**   I'm sorry.  I jumped us ahead to the wrong page and a

11   different inspection.  I've already asked you about this

12   one.  I apologize.

13   **A.**   That's okay.  You can ask me another one.

14   **Q.**   I will, if I may.  Let's go back to Page 19.  I'm

15   sorry.  I don't mean to confuse the record.  That last

16   question I asked about was actually an earlier inspection

17   that I had already asked about.

18        So we're back in 2015 and I want to show you question

19   58 from 2015.

20        Do you see where they ask a variance of this question:

21   "Do all prescriptions appear prescribed for a legitimate

22   medical use?"  And they again checked "yes"?

23   **A.**   I do see that.

24   **Q.**   All right.  Let's go to Page 20 and look at the

25   signature.  Do you see this is again signed?

```
 1   A.   I do.

 2   Q.   And can you read us the text that they've put above the

 3   signature?

 4   A.   "Good pharmacy" exclamation mark?

 5   Q.   Yes.

 6   A.   I see that, Your Honor.

 7   Q.   Do you have any contrary facts about this pharmacy or

 8   any Rite-Aid in Cabell/Huntington?

 9   A.   Not specifically that I can sit here and say today.

10   But in regards to this document, it's pretty voluminous.

11   I -- if I was to look through this document, I would look to

12   see if they looked and inquired about orders, specific

13   drugs, if there had been increases over the years.

14        I would -- if I looked through this, I would look for

15   more volume-type related questions.  I don't know if those

16   occurred here.  Obviously, I haven't looked through it, but

17   --

18   Q.   And that's my question.  You haven't done that review?

19   A.   I have not, not for the West Virginia Board of

20   Pharmacy, sir.

21   Q.   And do you know that these same reports existed for the

22   other Rite-Aid pharmacies that McKesson serviced in

23   Huntington/Cabell?

24   A.   I, I would believe they probably exist for every

25   pharmacy in West Virginia.
```

1    **Q.**   And you've reviewed none of them; correct?

2    **A.**   That's correct.

3    **Q.**   Do you know if McKesson still services Rite-Aids in

4    Huntington/Cabell?

5    **A.**   I'm not sure.

6    **Q.**   Do you know when it stopped, if it did stop?

7    **A.**   I believe that information is in my report, but I don't

8    have it directly.

9    **Q.**   I didn't see it in your report.  Do you know without

10   looking at your report?

11   **A.**   I do not.

12   **Q.**   Do you know if it happened?

13   **A.**   I'm not sure.

14   **Q.**   Let me just ask a couple more questions on this topic.

15          You don't know whether Rite-Aid helped cause the opioid

16   crisis in Huntington and Cabell County.  True?

17   **A.**   Your Honor, I do not know if they did or did not.  I

18   know that there was some suspicious order filed for

19   Huntington and Cabell County regarding Rite-Aids.  There was

20   no due diligence effected on those.  There's actually no

21   file whatsoever.  But I don't have any direct knowledge if

22   that's the question.

23   **Q.**   And you don't know because you haven't had the

24   opportunity to review a sufficient amount of records and

25   documents to formulate an opinion on that; correct?

1    **A.**    Well, I don't think that's a true statement.

2    **Q.**    Okay.

3    **A.**    Well, I guess it is only because there's no records

4    that exist for any compliance initiatives involving the

5    Rite-Aids.  No file exists.

6    **Q.**    And, in fact, you've testified to that.  "I haven't had

7    the opportunity to review a sufficient amount of records and

8    documents to formulate an opinion on whether Rite-Aid helped

9    cause the opioid crisis in Huntington/Cabell."  True?

10   **A.**    That's correct.

11   **Q.**    Thank you.

12          MR. SCHMIDT:  That's all I have.

13       Thanks for your time, Mr. Rafalski.

14          THE WITNESS:  Thank you, Mr. Schmidt.

15          THE COURT:  All right.

16       Ms. Mainigi.

17          MS. MAINIGI:  Your Honor, I have no questions.

18   Thank you very much, Mr. Rafalski.

19          THE WITNESS:  Thank you.

20          THE COURT:  Do you, Mr. Nicholas?

21          MR. NICHOLAS:  I have no questions.  Thank you

22   very much.

23          THE COURT:  Any redirect, Mr. Farrell?

24          MR. FARRELL:  Yes.

25          THE COURT:  You may proceed.

```
 1              MR. FARRELL:  Judge, can I have 30 seconds to go
 2    in here?
 3              THE COURT:  Yes, you may.
 4              THE WITNESS:  Would it be okay if I stood up?
 5              THE COURT:  Oh, absolutely.
 6         (Pause)
 7              MR. FARRELL:  Caught me a little off guard, Judge.
 8              MR. SCHMIDT:  To be fair, I did say this morning
 9    that we would be brief.  But I think Mr. Farrell rightly had
10    a different view of what me being brief was that I was
11    trying to communicate.
12              THE COURT:  I don't think he expected the no
13    questions from two of the other parties.
14         Go ahead, Mr. Farrell.
15              MR. FARRELL:  Okay.  I hope to be likewise brief,
16    Judge.
17         I believe I have five topics of follow-up under the
18    rule of completeness to areas raised yesterday.  And I'd
19    like to kind of walk through a couple of them.
20                      REDIRECT EXAMINATION
21    BY MR. FARRELL:
22    Q.   The first thing that I'd like to do is -- you
23    recall yesterday there was a discussion about the
24    Masters Pharmaceutical case?
25    A.   I do.
```

1   **Q.**   And it's in direct reference to DEF-WV-03532.  This is

2   the actual *Masters* opinion.  It was, it was not submitted as

3   evidence in the court, but you were asked about.  And, in

4   particular, what I'd like to do is see if I can bring it up

5   on the screen.

6        You were asked during the examination and shown, quote.

7   And I think to the best of my ability I have actually

8   grabbed the quote that you were asked to read.

9             MR. FARRELL:  Judge, I have a bench copy for you

10  if you like, or if you prefer --

11            THE COURT:  That's fine.

12  BY MR. FARRELL:

13  **Q.**   And you'll see -- do you recall being asked about

14  the shipping requirement mandates that pharmaceutical

15  companies exercised due diligence before shipping any

16  suspicious order?  DEA first articulated that

17  requirement in *Southwood*.

18        Do you recall being read that?

19  **A.**   Yes, I do.

20  **Q.**   But before that, immediately before that in that same

21  paragraph, do you see where it says, "Masters insists that

22  the administrator unlawfully used this proceeding to create

23  new legal obligations by expansively reading existing law.

24  Foremost, Masters complains that," dot, dot, dot.

25        You weren't shown the fact that this statement that was

1    highlighted wasn't the dictate from the court, or the

2    mandate from the Court, it was actually the argument of the

3    pharmaceutical company, were you?

4            MR. SCHMIDT:  Your Honor, that's testimony and I

5    think it's inaccurate testimony.

6            THE COURT:  Well, overruled.

7        Go ahead, Mr. Farrell.  I'm not sure where you're going

8    but I'm going to let you do it.  Go ahead.

9    BY MR. FARRELL:

10   **Q.**   You weren't provided --

11           MR. SCHMIDT:  Sorry.  I apologize, Mr. Farrell.

12   May I just interrupt?  That was a false statement of the

13   opinion -- that was an incorrect -- that was an incorrect

14   statement of the opinion.  Objection, misleading.

15           THE COURT:  Well, I don't know whether it is or

16   not.

17       Go ahead, Mr. Farrell.

18   BY MR. FARRELL:

19   **Q.**   My, my only point for rule of completeness is, sir,

20   you were not -- did not read into the record the entire

21   paragraph in the *Masters Pharmaceutical.*  You were only

22   shown a portion.  Correct?

23   **A.**   That's a correct statement, Your Honor.

24   **Q.**   And you were not shown the portion in the *Masters*

25   *Pharmaceutical* opinion where the wholesale distributor

1    raised as an affirmative defense the record retention

2    policy, were you?

3    **A.**   I, I was not.

4    **Q.**   And you weren't shown in the *Masters* case where the

5    registrant raised as an affirmative defense the, quote, the

6    DEA said we could, end quote?

7    **A.**   I was not.

8    **Q.**   And you're aware, because you were the legal lead

9    investigator, that in the *Masters Pharmaceutical* defense

10    that the registrant also raised a governmental estoppel

11    defense?

12    **A.**   I, I am aware of that.

13    **Q.**   And you're aware that throughout this in the Circuit

14    Court level, the result of the opinion was that the

15    registrant lost its license?

16    **A.**   That's correct.

17    **Q.**   Now, I'd like to clear up a second area of inquiry.

18    You were asked about -- I can't remember the context.

19    You'll forgive me.  But something to the effect of that a

20    representation was made that the distributors keep asking

21    the DEA to release the ARCOS data to them from their

22    competitors and the DEA keeps saying "no."  Do you --

23         MR. SCHMIDT:  Your Honor, that I think is a

24    misconstruction.  I think the witness said he knew that it

25    happened.  It wasn't a representation as I recall it.

```
 1              THE COURT:  I think he did say you knew --
 2              THE WITNESS:  Your Honor, from early in my
 3    employment with the DEA, that was always a constant question
 4    is that distributors wanted to see the ARCOS, the full ARCOS
 5    data.
 6    BY MR. FARRELL:
 7    Q.   What you weren't shown, sir, is that there is a
 8    reported decision on this very issue, were you?
 9    A.   I was not.
10              MR. FARRELL:  Judge, what I would like to do is
11    not enter into evidence but place on the record an opinion
12    from the Eighth Circuit from 2015.  It's called Madel,
13    M-a-d-e-l, vs. The United States Department of Justice, 784
14    F.3d 448.
15    BY MR. FARRELL:
16    Q.   Mr. Rafalski, I'd just like to show you a couple
17    things and ask if you are familiar with the holding of
18    this case.
19              MR. SCHMIDT:  May we get a copy?
20              MR. FARRELL:  You would except for my box is on
21    its way over.
22              MR. SCHMIDT:  We can't redirect on this if we
23    don't have a copy.  This is the first we're hearing about
24    this decision.
25              MS. MAINIGI:  And, Your Honor, I have an objection
```

1    on geographic scope.  As I recall this case, *Madel*, it

2    relates -- it's in Michigan and relates to Georgia data.  So

3    I don't understand why this is relevant to anything we're

4    talking about here.

5                    THE COURT:  Okay.  I'll overrule that objection

6    and let him go ahead.

7          You don't have a copy you can give Mr. Schmidt?

8                    MR. SCHMIDT:  It looks like they just went in to

9    get a copy.  In the hopes that we get one, why don't we go

10   ahead and I'll do my best, Your Honor.  I don't want to

11   delay.

12                   THE COURT:  Okay.  Let's go ahead at this point.

13                   MR. FARRELL:  Oh, wait.  Judge, may I?

14                   THE COURT:  Yes.  You've got a copy now.

15                   MR. SCHMIDT:  I appreciate that.

16                   THE COURT:  Ask and you shall receive.

17                   MR. FARRELL:  They really did catch me by

18   surprise, Judge.

19   BY MR. FARRELL:

20   **Q.**   So up on the screen -- I'll see if I can walk you

21   through this.  You'll recognize this as the United

22   States Court of Appeals for the Eighth Circuit.  Are you

23   familiar with what that is?

24   **A.**   Yes.

25   **Q.**   All right.  And, so, you'll see here that this is a

1    case involving a FOIA request to the DEA for ARCOS data and

2    that it involved data from Cardinal Health,

3    AmerisourceBergen, and McKesson.  Do you see that?

4    **A.**    I do.

5    **Q.**    And if you flip through this reported opinion, what

6    you'll see is there's an entire section about the DEA's

7    position on the availability of ARCOS data, as well as the

8    position taken by these defendants regarding the DEA

9    disclosing ARCOS data.  Do you see that?

10   **A.**    I do.

11   **Q.**    And you'll see in here that the Eighth Circuit notes

12   that each of these four companies was provided notice by the

13   DEA pursuant to statute whether they consent to disclosure.

14           MR. SCHMIDT:  Again, I'll object.  It's

15   misleading.

16           THE COURT:  Well, go ahead.  Overruled.

17       Go ahead, Mr. Farrell.

18   BY MR. FARRELL:

19   **Q.**    So without belaboring the point, in the actual

20   pleadings of this case you're aware that the -- that

21   Cardinal Health, in fact, submitted an affidavit, a

22   declaration from one of their own parties.  And in that

23   declaration they made representations to the Federal

24   Court.

25       And, so, let me ask you this.  Were you aware that

1    Cardinal Health takes the position that the ARCOS data --

2            MS. MAINIGI:  Objection, Your Honor.

3            THE COURT:  Just a minute.

4            MS. MAINIGI:  Your Honor, Mr. Farrell is just

5    testifying.  I don't think we've established that Mr.

6    Rafalski has any idea what this case is about.  This is just

7    Mr. Farrell testifying at this point.

8        And what I would say, Your Honor, is that this is

9    completely irrelevant, not just because of geographic scope,

10   but the framework of this case, the *Madel* case relates to a

11   FOIA request to see if there is the ability to get ARCOS

12   released to the public.

13       That is completely in contrast to what Mr. Rafalski was

14   testifying about yesterday which is ARCOS being released

15   within the closed system to distributors.

16       So I would also say -- I also object, Your Honor,

17   because this is outside the scope of the cross.

18           MR. SCHMIDT:  Your Honor, just for the record,

19   what we had there was a lengthy statement -- I would be

20   curious to see how it was annotated on the record -- with a

21   period.  It sounded like a period.  And then launching into

22   a question.  That's not even leading.  That's testimony from

23   the lawyer.

24           THE COURT:  Well, I think that's right, Mr.

25   Farrell.  Where are you going with this?

1          MR. FARRELL:  I'm, I'm going to try to use

2     measured words.

3          Judge, I believe there's been a misrepresentation and

4     that this affidavit in Federal Court from these

5     defendants -- this is not a position taken lightly -- that

6     the defendants have told the DEA they're not allowed to

7     release their confidential business records not because it's

8     a FOIA request, but because they're afraid of poaching by

9     the other competitors.  It's in writing.  It's in the

10    federal record.  This is a judicial proceeding.

11         MR. SCHMIDT:  Your Honor, obviously we take

12    exception to the allegation that there's a

13    misrepresentation.

14         The witness was asked, "Has this been requested?"  The

15    witness just two minutes ago answered that question and

16    said, "No."

17         Mr. Farrell can make his point.  It's irrelevant to the

18    point we made.  I think it's outside the scope of the point

19    we made.  It didn't even involve leading the witness into

20    that point.  But he certainly can't testify about it and I

21    think he's made his point.

22         MS. MAINIGI:  And further, Your Honor, this case

23    is not even on the list of materials on which Mr. Rafalski

24    has relied.  So this is just Mr. Farrell trying to make a

25    point that he can make in closing or with some other

1   witness.

2           THE COURT:  Yeah.  How can you make a point

3   through this witness when -- in light of the testimony he

4   gave here?

5           MR. FARRELL:  Well, Judge, they made -- the

6   question that was presented to this witness, this is

7   evidence -- that he -- this is evidence to refute -- let me

8   put it this way.  I take your point.

9       May I proffer for the Court for the Court to consider

10  and take judicial notice of a single declaration filed in

11  Federal Court signed by a party admission for you to

12  consider and apply the weight to which you think is

13  appropriate on this issue?

14          MS. MAINIGI:  Your Honor, we would object to that

15  for the reasons previously stated.  This declaration is not

16  relevant at all and it's outside the geographic scope.  It

17  has to do with issues that are not relevant in this case.

18          THE COURT:  Yeah.  How is it relevant?

19      Do you want to say something, Mr. Schmidt?

20          MR. SCHMIDT:  Yeah.  I just want to note for the

21  record that if we look at Page -- the language that the

22  Court and that Mr. Rafalski was being shown, it refers to a

23  declaration.

24      The declaration on Page 452 of the decision indicates

25  that it comes from the DEA's chief -- the chief of the DEA's

1    FOIA privacy unit.

2         So those recitations, which present a serious hearsay

3    issue on their own, are actually from the DEA.  And the last

4    of those recitations are the declaration highlights that the

5    release of the data would permit competitors to circumvent

6    two of the company's existing anti-diversion measures.

7              MR. FARRELL:  Judge, that's my point.  I'm holding

8    the declaration.

9              THE COURT:  Well, how, how is that relative to

10   this witness's testimony?

11             MR. FARRELL:  Because the defendants continue to

12   assert conduct and blame on the DEA.  The DEA's not present

13   in the courtroom.  And I have direct evidence that is a

14   party admission that you can take judicial notice of

15   defending the DEA.

16             MS. MAINIGI:  Your Honor, if I may respond to

17   that, the DEA is going to be present in the courtroom.  Mr.

18   Rannazzisi is expected to testify, and defendants will be

19   submitting the depositions of Kyle Wright and Michael Mapes,

20   two DEA diversion unit employees who actually dealt with the

21   distributors for years and years and actually attended the

22   distributor initiative meeting and some of the other

23   meetings that Mr. Rafalski has referred to.  So there will

24   be DEA, DEA testimony.

25             THE COURT:  I'm going to sustain the objection and

```
 1    cut you off here, Mr. Farrell.  I can take judicial notice
 2    of the case for what it's worth.
 3    BY MR. FARRELL:
 4    Q.   Mr. Rafalski, you were asked at length about the
 5    capabilities of the DEA and their visibility and the use
 6    of ARCOS.  Do you recall seeing and talking about the,
 7    the 2019 OIG report?
 8    A.   I do, Your Honor.
 9    Q.   You were shown selected portions of the report.  And
10    what I'd like to do is I'd like to talk about just two
11    provisions in here that were not referenced and ask you
12    to -- your opinion on it.
13         Do you see there the paragraph that says "we found,"
14    the very top left-hand corner?
15    A.   Yes.
16    Q.   It says, "We found multiple deficiencies in ARCOS data.
17    Specifically, because some registrants report ordering
18    information to ARCOS on a monthly or quarterly basis, DEA
19    often must wait a full year before ARCOS contains all of the
20    ordering information DEA needs to fully analyze the data and
21    develop leads and trends."
22         Do you see that?
23    A.   I do.
24    Q.   Is that consistent with your experience?
25    A.   Yes.  As a diversion investigator, I'm aware that there
```

1    would be errors sometimes in the submission of the data.  So

2    besides the delay, the monthly delay of reporting or the

3    quarterly delay, there is always a time period where they

4    would say it would be a little more cautious with the data

5    until it would be, the errors would be fixed, Your Honor.

6         And how that would occur is that upon submission of the

7    ARCOS data, if there were errors, the registrant would be

8    notified of the errors and they would fix that.  And

9    sometimes the fixing of the errors would take another month

10   or quarter.

11   **Q.**   Mr. Rafalski, I'd like to direct you to the last

12   sentence of that same paragraph where it says, "Due to these

13   deficiencies, we believe that DEA is ill-equipped to

14   effectively monitor ordering patterns for all pharmaceutical

15   opioids, which could enable the diversion of these

16   prescription drugs and compromise public safety."

17        Did I read that accurately?

18   **A.**   You did, Your Honor.

19   **Q.**   And do you agree with that statement?

20   **A.**   I agree with that.

21   **Q.**   I'm going to direct your attention now to Page 27 which

22   is the more full blown-up discussion of that same, same

23   subject matter.  And this is the section that's talking

24   about quotas.

25        And you were asked about the quotas, which is

1    referenced in the first half of the section.

2         "While DEA is responsible for setting the annual quotas

3    for opioid production by manufacturers and, therefore, was

4    aware of the substantial growth in the demand for opioids

5    over the past 20 years," comma, you had great discussion

6    with counsel yesterday about that aspect of the case.

7    Correct?

8    **A.**   Yes, I did, Your Honor.

9    **Q.**   I'd like for you to read into the record what comes

10   after the comma.

11   **A.**   Starting with "we found"?

12   **Q.**   Yes, sir.

13   **A.**   "We found the that DEA did not capture (and still does

14   not capture) sufficient data at the manufacturer,

15   distributor, practitioner, and prescriber levels to enable

16   it to detect the diversion of opioids and identify emerging

17   drug abuse trends."

18   **Q.**   Do you agree with that statement, sir?

19   **A.**   Yes.  I'm aware that specifically the DEA has been

20   attempting for some time to get the prescription monitoring

21   program information, the PMP information, to help it do

22   proper analysis.

23   **Q.**   Sir, under the closed system of distribution, whose job

24   is it to detect the diversion of opioids?

25   **A.**   That's the responsibility that a registrant accepts

1    when they apply and are granted a DEA registration.

2    **Q.**   And whose job is it to identify emerging drug abuse

3    trends?

4    **A.**   Well, I definitely think it's, it's probably one of the

5    primary jobs for the manufacturers and distributors, but I'm

6    not going to say that it's all the responsibility of the

7    DEA.

8    **Q.**   Now, in this same report on Page 40 that's entered into

9    evidence by the defendants, there's actually a section on

10   West Virginia.  Were you shown this during your testimony?

11   **A.**   I was not.

12   **Q.**   And in this provision on Page 40 it references the fact

13   that by 2016 West Virginia had the highest rate of opioid

14   related overdose deaths in the United States.  Do you see

15   that?

16   **A.**   I do.

17   **Q.**   And this report from the OIG makes reference that,

18   "However, we found that until 2016, DEA had established only

19   one TDS to cover the entire State of West Virginia."

20        Sir, what is a TDS?

21   **A.**   That's a tactical diversion squad, Your Honor.  It's

22   comprised of special agents, a diversion investigator and

23   local law enforcements.  It's kind of a task force.

24   **Q.**   And you'll see in the next sentence it references that

25   in West Virginia, there's 10,000 registrants.  Do you see

1    that?

2    **A.**    I do.

3    **Q.**    So whose job is it, or whose job was it in West

4    Virginia to monitor for suspicious orders placed by

5    pharmacies?

6    **A.**    Well, by regulation, the manufacturers and the

7    distributors are supposed to have a Suspicious Order

8    Monitoring System to detect unusual orders.

9         And in a larger scale, you know, the maintenance of

10   effective controls to prevent diversion of controlled

11   substances is at the core of, you know, all registrants, but

12   especially at the higher levels.

13   **Q.**    Sir, in your legal career have you ever arrested a drug

14   dealer on the streets?

15   **A.**    I have.

16   **Q.**    And the drug dealers that are on the streets that

17   you -- if you don't -- if you, if you hadn't arrested them,

18   what would they continue to have done?

19   **A.**    Sold drugs.

20   **Q.**    Yeah.   And if you don't catch them, does that make it

21   right?

22   **A.**    No.

23             MS. MAINIGI:   Objection, Your Honor.   What is the

24   relevance of this?

25             THE COURT:   I'll sustain the objection to that.

BY MR. FARRELL:

**Q.**   One final area of inquiry.

You testified yesterday -- you were being asked about a particular provision in the C.F.R.  You were asked about whether or not there was a duty on the manufacturers, a duty on the pharmacists, a duty on the pharmacies, a duty on the doctors.  And they made reference to a particular C.F.R. provision relating to corresponding responsibility.

Do you recall that?

**A.**   I do.

**Q.**   I think I have the actual testimony.  You were asked about specific DEA rules, or a specific DEA regulation and you made the comment that that rule specifically says pharmacist.  Do you recall that?

**A.**   I do.

**Q.**   Now, aside from the fact that that regulation says pharmacist, you are aware, are you not, that the DEA has taken the position since as early as 2012 in the *Holiday CVS* case that that corresponding responsibility also extends to the pharmacy?

**A.**   I'm aware of that.

**Q.**   And that the DEA has routinely -- not routinely -- has regularly revoked the registration of pharmacies across the United States for failing to maintain effective control and failing to abide by its corresponding responsibility.

1    **A.**   That's a correct statement.  The, the pharmacist is the

2    person who evaluates the prescription.  And the actual DEA

3    registration is held by the pharmacy.  So that's why the,

4    the administrative action is against the DEA registration.

5    **Q.**   And, in fact, it's the pharmacy that pays the fine?

6    **A.**   That's correct.

7    **Q.**   The pharmacist can go to jail?

8    **A.**   Yes.  And -- yes.

9    **Q.**   And then, finally, -- I don't have the transcript

10   directly in front of me.  But there was a discussion briefly

11   yesterday where they were asked whether or not the failure

12   to report suspicious orders could result in diversion.  And

13   I wanted to revisit that to make sure the record is

14   perfectly clear.

15        If a registrant reports an order and still ships it, do

16   you believe that more likely than not that diversion will

17   occur?

18   **A.**   I do.

19             MS. MAINIGI:  Objection, Your Honor.  This is a

20   causation opinion and calls for a legal conclusion.

21             MR. SCHMIDT:  We join, and foundation.  There's no

22   methodology supporting this.

23             MR. NICHOLAS:  We join as well.

24             THE COURT:  I'll sustain the objection.

25   BY MR. FARRELL:

1    **Q.**   I believe you were asked yesterday whether or not

2    you believe that failure to report a suspicious order is

3    a, is a cause of diversion.  Do you recall that

4    testimony?

5    **A.**   If we're talking exact language, I don't -- I'm sorry,

6    I don't want to say I recall that exactly.

7    **Q.**   What's the purpose of identifying, blocking, and

8    reporting suspicious orders?

9    **A.**   Prevent diversion.

10   **Q.**   And if you fail to identify, block, and report

11   suspicious orders, what do you believe is the, is the likely

12   result?

13         MR. SCHMIDT:  Same objection, Your Honor.  There's

14   no foundation for that.

15         MS. MAINIGI:  Join.

16         MR. NICHOLAS:  Join.

17         THE COURT:  Well, I'll sustain the objection.  I

18   think -- well, sustained.

19         MR. FARRELL:  Yes.  And so to be clear, Judge, I

20   don't want there to be a particular question on cross that

21   winds up in a directed verdict motion that is based on an

22   area where the defendants have laid objections to the

23   inquiry.

24         MS. MAINIGI:  Your Honor, I believe this Court was

25   quite generous in the direct in allowing a huge number of

1    questions in this particular area.  I think there was some

2    cleanup on cross on that.  But I think Mr. Farrell covered

3    these areas adequately.

4           THE COURT:  Yeah, I agree.  I think we've been

5    over this at great length and it's a very simple point and I

6    understand it, Mr. Farrell.

7           MR. FARRELL:  Thank you, Judge.

8      May I confer for a moment?

9           THE COURT:  Yes.

10     (Pause)

11          MR. FARRELL:  Judge, I know it's early.  Can we

12    have five minutes because not only do I need to confer, but

13    I need to make some phone calls?

14          THE COURT:  Yes.  Let's, let's come back at

15    10:00 o'clock.

16     (Recess taken from 9:54 a.m. until 10:02 a.m.)

17          THE COURT:  All right, Mr. Farrell.

18    BY MR. FARRELL:

19    **Q.**  Mr. Rafalski, you were asked this morning about the

20    DU45s.  And you were asked about the ILRs the day

21    before.

22    **A.**  That's correct.

23    **Q.**  And just for framing purposes, these were the excessive

24    order reports that were used by the distributors pre-2008;

25    correct?

```
 1              MR. SCHMIDT:  Your Honor, the evidence in the

 2    record already indicates that's not a correct framing of our

 3    reporting.  It says "Suspicious Order Report" at the top.

 4    It cites the regulation.  It says "Suspicious Order Report"

 5    again.

 6              THE COURT:  Well, you're taking him to a -- I'll

 7    let you go ahead.  Overruled.

 8    BY MR. FARRELL:

 9    Q.   Yeah.  So, in general, whatever the label for the

10    DU45s and the ILRs are, it appears from the -- facially

11    on the documents that one was using a three times

12    multiplier and one was using a four times multiplier.

13    Do you recall that?

14    A.   I do recall that.

15    Q.   And so just to be clear to the Judge, you've expressed

16    opinions on whether or not multiplying an average by three

17    or multiplying an average by four is appropriate.  Correct?

18              MS. MAINIGI:  Objection, Your Honor, on several

19    grounds.

20         One, it's just form and compound.  But, more

21    importantly, this is completely outside the scope of the

22    cross.  He did this -- the four times multiplier, he did

23    this on direct, Mr. Farrell.  So he can't come back on his

24    own questioning.

25              MR. SCHMIDT:  Same objection, scope, outside the
```

```
 1   scope.
 2           MR. NICHOLAS:  It's outside the scope.
 3           THE COURT:  You're just repeating something you've
 4   done before if I understand it.
 5           MR. FARRELL:  I was hoping to clarify what was
 6   brought up on cross about the multipliers that were used in
 7   the DU45 versus the ILR.
 8           MR. SCHMIDT:  There was nothing brought up on
 9   cross on that point.
10           MS. MAINIGI:  Nothing.
11           THE COURT:  I'll sustain the objection.
12   BY MR. FARRELL:
13   Q.   Let's talk about the ARCOS and what it does not
14   include.
15        You're familiar with the ARCOS data maintained by the
16   DEA; correct?
17   A.   Yes, I am, Your Honor.
18   Q.   And this data does not contain percentages of
19   controlled versus non-controlled.  Correct?
20   A.   It does not.
21   Q.   And that's because the ARCOS data doesn't apply to
22   non-controlled?
23   A.   Yeah.  The regulation only requires the reporting on
24   Schedule I, Schedule II, and III narcotics.
25   Q.   And the ARCOS data only includes the data of actual
```

1    shipments?

2    **A.**    Yes, that's a correct statement.

3    **Q.**    So the ARCOS data that's in the ARCOS reporting, that

4    is data of actual shipments that are reported as

5    transactions to the DEA, and that data is supposed to have

6    already been -- or those transactions were supposed to have

7    already been screened by the distributors.  Correct?

8    **A.**    Your Honor, that would be an accurate statement.

9    **Q.**    You testified yesterday about the number of orders

10   flagged by your methodologies.  And you were asked whether

11   or not how many of those flagged orders were -- should have

12   been reported to the DEA as suspicious.  Do you recall that

13   testimony?

14   **A.**    I do.

15   **Q.**    And, and just to be clear, your methodologies that you

16   were flagging, you don't know whether or not an order is

17   suspicious and should be reported unless you do due

18   diligence; correct?

19   **A.**    That's correct.

20   **Q.**    And if you do due diligence on a flagged order and

21   clear it, you don't need to report it to the DEA?

22   **A.**    No.  You could ship it at that point.

23   **Q.**    But if you get a flagged order and you perform due

24   diligence and you can't eliminate the suspicion of

25   diversion, the obligation is to block and report; correct?

1    **A.**   It should remain blocked and then you should report it.

2              MR. FARRELL:  That's all I have.  Thank you,

3    Judge.

4              THE COURT:  All right.  Any, any recross?

5              MR. SCHMIDT:  None needed, Your Honor.

6              MS. MAINIGI:  None from us, Your Honor.

7              MR. NICHOLAS:  No, thank you, Your Honor.

8              THE COURT:  May Mr. Rafalski be excused?

9         Thank you, Mr. Rafalski.  You're free to go.  I wish

10   you the best.

11             THE WITNESS:  You too, Your Honor.  Have a great

12   holiday week.

13             MR. SCHMIDT:  May we address the Court, Your

14   Honor?

15             THE COURT:  Yes.

16             MR. SCHMIDT:  Your Honor, before trial we filed a

17   motion to exclude Mr. Rafalski's testimony.  Your Honor

18   allowed us to renew that during trial.  We now renew that.

19   If it would be useful, we can put in a paper but there are

20   two principal arguments that we're making.

21        The first is that we heard true *ipse dixit* opinions

22   yesterday.  Rule 702 requires the testimony be based on

23   sufficient facts or data, be the product of reliable

24   principles and methods where an opinion of *ipse dixit* is

25   properly excludable, *Cooper* vs. *Smith*, 259 F.3d 194.

1    His principal opinions fit that heartland.  He said our

2    programs were deficient.  He didn't say why.  He didn't link

3    the deficiencies to any orders that shouldn't have been

4    shipped.

5    In fact, he acknowledged yesterday at Page 242 that

6    they were just driven by prescriptions, in his words -- or

7    my question to him, "You get the prescription, that goes up,

8    and then the distribution goes up.  Correct?"

9    "That's correct.  No other way for those charts to

10   increase without prescriptions."

11   Then I asked, "No other way; right?"

12   Answer, "That's correct."

13   He acknowledged that this was driven by prescribing and

14   has no testimony linking any alleged deficiency to any

15   problems.

16   And that leads to the second *ipse dixit* problem.  He

17   testified that we were a substantial factor in causing the

18   opioid crisis.  He didn't review any other causes.  He

19   didn't analyze diversion in Huntington/Cabell.  And he

20   didn't identify wrongdoing, let alone link it to the opioid

21   crisis in Huntington/Cabell.

22   So for those reasons, he doesn't have any foundation

23   for his opinions.  It's pure *ipse dixit*.

24   As to the specific flagging methodologies that we spent

25   so much time talking about, there's just no expert support

1    for them.  They fail every indicia of expert reliability

2    including, I would submit, at a basic level him being able

3    to articulate what these are even for.

4        He comes up with the stunning proposition that

5    90 percent of pills should been blocked when he hasn't even

6    looked at a single order, done an assessment of medical

7    need, done underlying diligence, assessing harm, assessing

8    changes in medical practice.

9        And then if you just check through the indicia that are

10   relevant in assessing experts, he fails every one of them.

11   He admitted they weren't used in the real world.  He

12   admitted they weren't used at the DEA.

13       This Court would be the first Court to bless a

14   methodology that purports to have a 400 percent error rate

15   in terms of that 87 percent to 20 percent that we see in his

16   numbers.

17       He's not even settled on a specific methodology.  We

18   deposed him.  He comes up with a new one for this case.  We

19   depose him again.  He comes up with a new one for the next

20   case.

21       His methodology doesn't have an anchor.  There are

22   various hallmarks of unreliability regarding it.  It

23   deviates wildly from what he acknowledged was the DEA's

24   estimate of less than .1 percent with no explanation for why

25   that's so.

1    He acknowledges that it deviates from the sources he

2    purports to rely on.  And any time he tries to correct for

3    that, his numbers fall dramatically.  He made one correction

4    in response to us deposing him and moving to exclude him in

5    New York that brought it to 87 to 20 percent.

6        He's continued to correct errors since then.  He didn't

7    review specific orders to determine whether they were

8    generating reliable results.

9        And for all those reasons, he fails every one of the

10   *Daubert* factors.

11       The testing factor.  He admits he never used them.

12   They can't be tested because he can't link them up to

13   anything in the real world.  He can't link them to actual

14   diversion.

15       The peer review factor.  He's never peer-reviewed them

16   in any form other than proffering them in litigation which

17   is itself a hallmark sign of unreliability.

18       Error rate.  He conceded that there's a potential for

19   400 percent error rate.

20       Standards controlling its operation.  He has no

21   standards.  They're not based on anything in the real world.

22   He acknowledged that they weren't used by industry.  They

23   weren't used by *Masters*.

24       And then one of the most striking bits of testimony,

25   the general acceptance factor which is still a *Daubert*

1    factor -- and I'm drawing the *Daubert* factors from the

2    *Cooper* decision, 259 F.3d this time at Page 199.  He

3    acknowledged there's no general exceptions.

4         At 236, 12 to 15 from the transcript yesterday,

5    "There's no general acceptance you can point me to for

6    Method A with its due diligence assumption, whether it's by

7    distributors, regulators, or academics; correct?"

8         Answer, "That is a correct statement, Your Honor."

9         242, 1 to 5:  "And you can't point me to any generally

10   accepted methodology for identifying and reporting

11   suspicious orders that ignores entirely what the medical

12   community is doing in terms of increased legitimate

13   prescriptions.  True?"

14        "That's a correct statement."

15        So the general opinions fail because they don't have

16   any methodology.  They weren't proffered with any underlying

17   facts.  We had a walk-through of those slides and then *ipse*

18   *dixit* opinions at the end untethered to any facts.

19        And the flagging methodology specifically failed every

20   *Daubert* factor, every hallmark of, of reliability that's

21   required.

22        If it would be useful, we can put that in paper.  But

23   we renew our motion now.  And because it might have a

24   material impact on the shape of the trial, we urge the Court

25   to give it consideration in due time.

1          MS. MAINIGI:  We join, Your Honor, and underscore

2     that we're happy to brief this issue quickly for Your Honor.

3          THE COURT:  Mr. Nicholas?

4          MR. NICHOLAS:  We join.

5          THE COURT:  Mr. Farrell, do you want to respond?

6     I'm going to have this briefed and review this transcript

7     before I rule on it.  But if you want to say anything now,

8     you can.

9          MR. FARRELL:  Yes, Judge.

10        With all due respect, this is not a new fight.  This is

11    an old fight between these two sides on this issue.  And --

12        THE COURT:  Has he been excluded or affirmed?

13    Have you won or lost on this issue anywhere else?

14        MR. FARRELL:  We're undefeated, Judge.  So -- but

15    to be fair --

16        THE COURT:  You can be undefeated if you haven't

17    played a game, Mr. Farrell.

18        MR. FARRELL:  Judge, that was my next point.

19        In all reality, this is the kick-off.  There has never

20    been a trial of this substance, of this magnitude ever.

21        What we've been doing is maybe a pre-fight with the

22    *Daubert* motions in CT1 and in New York.  But this is the

23    first time there's been a trial on the distributors and an

24    expert witness in the country.  So it's, it's a pretty big

25    issue.  We accept the invitation to brief it.

1          I would like to take a moment to refrain, though, for a

2     second.

3          You know, the ultimate question this Court will make a

4     finding of, or if it was a jury trial, a jury would make the

5     finding of, is whether or not there is a public nuisance,

6     unreasonable interference.

7          And to bring in an expert witness on a -- is different

8     from a Court and a jury because an expert witness is

9     supposed to assist the trier of fact on issues that the

10    trier of fact needs help on.

11         You're a Federal Judge.  You've been sitting for a long

12    time in West Virginia.  And it's not up to me to say what

13    you need input on.

14         I think what Mr. Rafalski brings, and that's why we

15    spent some time going through with him the purpose of his

16    testimony was his job was to come in and say, "This is what

17    I did for the DEA.  But instead of reporting to chief legal

18    officer, I'm reporting to you."

19         I don't think the characterization that he's developing

20    a SOMS system is fair, or that he has the magic wand on

21    what's effective or not effective.

22         What he did was exactly what the DEA does in its

23    methodology and approach.  And I think that's the limited

24    purpose for which we're presenting him.

25         So we will brief it.  I just want to make it clear that

```
 1    we're not trying to come in and bring him for something that
 2    he's not.  And I think the defendants at times take liberty
 3    with what his role is in this court in an attempt to have
 4    him struck.
 5          And that's all I have to say on that.
 6                THE COURT:  Okay.
 7                MR. SCHMIDT:  And, Your Honor, I think what Mr.
 8    Farrell stated frames the central issue in this case, which
 9    is that our perception has been for much of their
10    presentation that they believe that if they show there's an
11    opioid crisis, whether it's a prescription drug crisis or a
12    heroin/fentanyl crisis, they've proven their case.
13          We haven't fought those propositions because the
14    dispute in this case is over whether we can be held
15    responsible for it, whether we did something wrong that they
16    have to connect that they can connect to the wrong they're
17    claiming.  We've said right from the beginning they can't
18    make that connection.
19          We had understood that Mr. Rafalski was the person to
20    make that connection for them, and that that was the purpose
21    for him trying to do these flagging methodologies.
22          They have no support.  They have no reliable basis.
23    The claim he made is staggering on its face that by running
24    these magic numbers that are simple and that no one has ever
25    done before and that ignore everything happening in the real
```

1    world, you can automatically identify 90 percent of pills

2    that should not be shipped.  That's a stunning claim on its

3    face.

4         And when we dig into it, we see why it's stunning.  No

5    one has done it and it's divorced from any indicia of

6    methodology or reliability.  That's why this is important.

7              THE COURT:  Yeah.  To be frank with you, Mr.

8    Farrell, I was shocked when he came up with the 90 percent

9    number.

10             MR. FARRELL:  Well, again, what that indicates is

11   that if the fire alarm gets pulled, it stays on until

12   somebody clears it.

13             THE COURT:  Yeah.

14             MR. FARRELL:  And, so, he's not suggesting that

15   all of those pills are suspicious.  He's not suggesting

16   those pills should be blocked.

17        What he's simply doing is pointing out in the absence

18   of due diligence, the fire alarm stays on.

19             MR. SCHMIDT:  He actually said they were more

20   likely than not to be diverted.  We can cite the Court to

21   that testimony.

22        And if he's not saying that, then he has no purpose in

23   this case.  It's a meaningless analysis.

24             THE COURT:  Well, this is crucially important to

25   the case and I'm not going to rule on it until I have the

```
 1    benefit of the briefs and review a written copy of the

 2    transcript.

 3         And, so, I'm not prepared to rule on it now.  I want to

 4    give the parties a full hearing on this.  So I'll wait to

 5    see your papers and we can move on.

 6              MR. FARRELL:  Thank you, Judge.

 7              MR. SCHMIDT:  On our end, we'll endeavor to get

 8    that paper on file as soon as possible.  I don't want to

 9    over-commit, but hopefully we will be in a position to have

10    it on file tomorrow, certainly over the weekend.  If we

11    could have it briefed by the time we appear in court next,

12    we would be grateful.

13              THE COURT:  Can we do that?

14              MR. MAJESTRO:  Yes, Your Honor.

15              MR. SCHMIDT:  Thank you.

16              MR. MAJESTRO:  You're saying after our break?

17              MR. SCHMIDT:  Yes.  I don't mean to occupy your

18    break with writing this brief.

19              THE COURT:  Well, I'd like to deal with this

20    during the break.  But you could send it --

21         If you need the time, Mr. Farrell, you can send it

22    early next week.  You can put it on the wire and I can get

23    it that way.

24              MR. FARRELL:  Well, we can get the briefing done

25    as soon as you say, Judge.
```

```
 1              THE COURT:  Well, can you get them to me tomorrow
 2    and I'll take them with me and use this to destroy my free
 3    time?
 4              MR. SCHMIDT:  Yes, Your Honor.
 5              MR. FARRELL:  I think we probably need a little
 6    more than tomorrow, Judge.  But we will have it to you
 7    before the break is up.
 8              THE COURT:  Okay, all right.
 9              MS. MAINIGI:  Your Honor, could we at least get it
10    by midweek so that Your Honor has time consider it if Your
11    Honor has availability over the break?
12              MR. SCHMIDT:  And if we could get the briefs at a
13    common time so we have regularity for the process.
14              MR. MAJESTRO:  I guess I don't understand.
15              MR. NICHOLAS:  I think there's some confusion.  I
16    think we're prepared to submit a brief as early as tomorrow.
17    Mr. Farrell suggested that we might want the weekend.  But I
18    think -- I think we all hope that we can get this to the
19    Court by like Monday of next week so that the Court has the
20    week to consider it and provide us with a ruling.
21              THE COURT:  Well, there's no need for a panic rush
22    on this that I see.  And I, I know the quality of the
23    briefing is going to be excellent no matter when I get it.
24    So let's say by midweek.
25              MS. MAINIGI:  And, Your Honor, just to clarify, do
```

1    you want simultaneous briefing or do you want --

2              MR. SCHMIDT:  We would request simultaneous if

3    we're not going to do the ordinary course where you --

4              THE COURT:  I don't see any reason to do the

5    normal.

6         Do you, Mr. Farrell?

7         I mean, I think one brief submitted at or near the same

8    time will cover this.

9              MR. FARRELL:  I'm getting triple-teamed.  But, in

10   general, in general, what we would prefer is we would prefer

11   for them to file their *Daubert* motion and for us to be able

12   to file a response brief.  It would be difficult for us --

13             THE COURT:  Okay, all right, let's do it that way.

14             MR. SCHMIDT:  If we do that, then we just want to

15   have the chance to reply, Your Honor, in the ordinary course

16   and we can do that in a day or so.

17             THE COURT:  Okay.

18             MS. MAINIGI:  We'll file our brief --

19             THE COURT:  I'm thinking, believe it or not.  When

20   can you conveniently get me your first brief?

21             MR. SCHMIDT:  We could get it by Sunday and we can

22   work to get it earlier than that if that's feasible.

23             THE COURT:  Okay.  And how much time do you need

24   to respond to that?

25             MR. MAJESTRO:  We'll commit to doing the response

```
 1    three days from when they get the brief.
 2              MR. SCHMIDT:  What about saying Monday just
 3    because I'm committing for other people and then Thursday
 4    and then Friday.
 5              MR. MAJESTRO:  That's fine.
 6              THE COURT:  That sounds fine to me.
 7              MR. SCHMIDT:  Is that good?
 8              MR. MAJESTRO:  Yes.
 9              THE COURT:  Okay.  Do you want to call another
10    witness?  Are we done with Mr. Rafalski?
11              MR. FARRELL:  Yes, we're done with Mr. Rafalski.
12              THE COURT:  And you say you're getting
13    triple-teamed and I look over here and see a whole table
14    full of plaintiffs' attorneys.
15              MR. FARRELL:  I'm framing it like I choose, Judge.
16              THE COURT:  Okay.  Let's call another witness.
17              MR. ACKERMAN:  Well, Your Honor, we're going to
18    have a short interlude before then I think.
19         Your Honor, we have a request for judicial notice to
20    raise with the Court.
21              THE COURT:  Okay.
22              MR. ACKERMAN:  Prior to the trial, Your Honor
23    granted the defendants' motion in limine concerning the
24    guilty plea of David Gustin.
25         In that order -- and that's Docket 1288 at Page 11 --
```

1    you said expressly, "Plaintiffs are not prohibited from

2    trying again."  Well, here we are.

3        Your Honor, during the questioning of Michael Oriente

4    on Tuesday, we believe that the defendants opened the door

5    to this.

6        Specifically at Page 69, line 18 of the transcript, I

7    think it was Mr. Schmidt asked the following question:

8        Question:  "Did you ever have an understanding that

9    Mr. Gustin was not able to conduct the level of diligence he

10   needed to do?"

11       And Mr. Oriente's answer was, "No, that was not my

12   understanding.  We took our positions very seriously.  We

13   did vent from time to time."

14       Well, Your Honor, that question and answer go directly

15   to Mr. Gustin's conduct of diligence with respect to

16   suspicious order reports.

17       And Mr. Gustin -- what we are requesting that the Court

18   take judicial notice of is Mr. Gustin's guilty plea in which

19   he pled guilty to a single count of knowingly failing to

20   file suspicious order reports.

21       Your Honor, Rule 201 provides that the Court may

22   judicially notice a fact that is not subject to reasonable

23   dispute because it -- and then Subsection (2) -- can be

24   accurately and readily determined from sources whose

25   accuracy cannot reasonably be questioned.

1        The Fourth Circuit has stated in *Colonial Penn*

2   *Insurance Company* vs. *Coil*, and that's 887 F.2d 1236, "The

3   most frequent use of judicial notice of ascertainable facts

4   is in noticing the content of court records."

5        In *Colonial Penn*, Your Honor, the Court took

6   judicial -- the Fourth Circuit took judicial notice of a

7   guilty plea in *United States* vs. *Cane*, which is 434 Federal

8   Appendix 175 -- it's a 2011 case out of the Fourth Circuit.

9   The Court took judicial notice of an indictment specifically

10   citing *Colonial Penn*.

11        What we offer for the Court, Your Honor, is P-44257,

12   which is a certified copy of the judgment against

13   Mr. Gustin, and P-13389, which is a copy of Mr. Gustin's

14   plea agreement.

15        We request that the Court take judicial notice.  And we

16   further note that under Rule 201(c) the rules provide that

17   the Court must take judicial if a party requests it and the

18   Court is supplied with the necessary information.

19        We have made the request.  We believe that the

20   certified copy of the judgment and the plea agreement

21   provide the Court with the necessary information.

22             THE COURT:  Mr. Hester.

23             MR. HESTER:  Thank you, Your Honor.

24        Your Honor, the issue of judicial notice cannot be

25   invoked to overcome a hearsay issue.  The Court's previously

1    ruled that this -- the information and the plea agreement

2    entered into by Mr. Gustin are inadmissible hearsay applying

3    the standards of Rule 803.22.

4         And the Court went through a very careful analysis of

5    these issues, also considered the question of whether 803(8)

6    applied and whether the residual hearsay exception of 803(7)

7    applied.  And the Court ruled that these two documents that

8    the plaintiffs now seek to admit were inadmissible hearsay.

9         And it's quite clear that judicial notice cannot be

10   invoked to bypass the hearsay rules.  If that were true,

11   Your Honor, it would drive a huge hole into the hearsay

12   exception that's found in 803.22.

13        The references that Mr. Ackerman made to instances

14   where the Fourth Circuit has applied concepts of judicial

15   notice involve felony convictions where the hearsay issue

16   was not presented that we have here.

17        As the Court recalls from its opinion, which was only

18   issued a month ago, excluding these two documents, if the

19   Court recalls from its opinion, this information and the

20   plea agreement do not fit within 803.22 because Mr. -- they

21   involve the misdemeanor, single misdemeanor count relating

22   to a pharmacy in Kentucky, not West Virginia.

23        But, in any event, it was a misdemeanor not punishable

24   by imprisonment for more than a year.  Therefore, 803.22

25   didn't apply and the Court found that these were

1    inadmissible hearsay.  And now to take judicial notice of

2    inadmissible hearsay would turn things on their head.

3            THE COURT:  How about his argument that the

4    testimony opened the door to this and I ought to reconsider

5    it on that basis?

6            MR. HESTER:  Well, first of all, their opening the

7    door to the question of Mr. Gustin's hearsay is not -- you

8    can't open the door that way.  If the plaintiffs, if the

9    plaintiffs want, there was a deposition taken of Mr. Gustin

10   in the MDL.  That's admissible evidence, but not, not

11   hearsay.  There's no concept of opening the door to hearsay

12   in the way suggested.

13       Furthermore, the question was simply a narrow one

14   focused on discharging of responsibilities.  It didn't go to

15   the question to which Mr. Gustin has pled guilty.

16       So I don't think it disturbs at all the, the Court's

17   prior ruling that this, these two papers are inadmissible as

18   hearsay.  And there was no door opened by the mere questions

19   about Mr. Gustin's ability to discharge his

20   responsibilities.  There's no contradiction between that

21   testimony and, and the Court's prior conclusion that this

22   plea agreement is inadmissible as hearsay.

23           THE COURT:  Well, Mr. Ackerman, do you want to say

24   anything else?

25           MR. ACKERMAN:  Yeah.  I want to just respond

 1    quickly, Your Honor.

 2         With respect to the hearsay claim, we are asking the

 3    Court to take judicial notice of the fact of the guilty

 4    plea.  The documents are submitted to the Court as evidence

 5    of the guilty plea.

 6         The Court can choose whether or not to admit the

 7    documents, but the Court can certainly take judicial notice

 8    of the guilty plea without admitting the documents into

 9    evidence which I think would resolve any hearsay concerns.

10         Regardless, Your Honor, I think this is a situation

11    where the residual exception would unquestionably apply.

12              THE COURT:  Well, what is your argument about the

13    relevance of the guilty plea?  Refresh me on that.

14              MR. ACKERMAN:  Sure.  And, Your Honor, the

15    relevance goes directly to the testimony that was elicited

16    during Mr. Oriente's testimony.  Mr. Schmidt --

17         I think it was you; right?  You questioned Oriente?

18              MR. SCHMIDT:  I questioned Mr. Oriente.

19              MR. ACKERMAN:  I wanted to make sure I got it

20    right.

21         Mr. Schmidt asked the following question of Mr. Oriente

22    directly:  "Did you ever have an understanding that

23    Mr. Gustin was not able to conduct the level of diligence he

24    needed to do?"

25         And, Your Honor, in the plea agreement that's exactly

1    what Mr. Gustin agreed that he did not do, that he did not

2    follow the DEA regulations.  That's what he pled guilty to,

3    violation concerning suspicious orders.

4         The question is not limited geographically.  The

5    question doesn't say:  Did Mr. Gustin always exercise

6    diligence with respect to Cabell and Huntington?

7              MR. SCHMIDT:  Your Honor, if I may briefly.  Two

8    brief points.

9         Mr. Gustin's plea related to a single pharmacy in

10   Kentucky.  That's irrelevant.

11        On the door opening argument, I want to make clear what

12   their position is.

13        Their position is they can ask questions repeatedly

14   about Mr. Gustin.  They can show emails about Mr. Gustin.

15   They can show emails suggesting he wasn't able to do his

16   job.

17        And if I have the temerity to respond squarely on the

18   four corners of those questions, I have somehow opened the

19   door.  That's not a legal argument.  That's a game.

20             THE COURT:  Okay.

21        Mr. Ackerman, I'm going to stick with my prior ruling.

22   And I don't want to be a smart aleck, but you get the nice

23   try award this morning.

24             MR. ACKERMAN:  Thank you, Your Honor.

25        Mr. Majestro.

1          MR. MAJESTRO:  Your Honor, I think we need to

2    discuss scheduling for today.  We were told as recently as

3    yesterday and last night that cross-examination of Mr.

4    Rafalski would extend to the end of the day and maybe we

5    ought to have a witness at the end of the day.

6        Mr. Zerkle who's next up is currently in the Cabell

7    County Commission meeting.  He can be here by 1:00.  But

8    until then, we're not in a position to call witnesses right

9    now.

10       I think it would have been nice if the defendants when

11   they decided they were not going to have any cross of Mr.

12   Rafalski if they had given us a little more notice on that.

13   We had previously been told to expect him to go through this

14   week and maybe not even finish this week.

15       So we are -- and I'm not saying they did anything

16   wrong.  I'm just asking in the future that would be helpful

17   information.  And -- but we are where we are and my

18   suggestion is that we take a very early lunch break and come

19   back at 1:00 if that works with the Court.

20          THE COURT:  Well, Mr. Majestro, I realize these

21   things happen, but it's your responsibility to have the

22   witnesses waiting on deck so if things like this develop, we

23   can move on.  And I hope you'll make an effort -- the

24   parties will make an effort not to let this problem come up

25   again.

```
1        Do you have enough witnesses to get us through the rest
2    of the week?
3            MR. MAJESTRO:  Yes, yes, Your Honor.  We'll, we'll
4    be giving them notice of some additional witnesses for
5    tomorrow.  Ms. O'Connell who is also supposed to be
6    testifying tomorrow, we're going to have her this afternoon.
7    So we'll be fine for today, and we're going to huddle at
8    lunchtime and figure out what's happening tomorrow.
9            THE COURT:  Well, this is coming out of your time.
10   I'm sure you realize that.
11           MR. MAJESTRO:  We do.  And, again, I would make
12   the request that even if it's late at night and the
13   defendants -- if we had known last night at midnight that
14   two of the three defendants were not going to cross-examine
15   Mr. Rafalski, we would have had a witness here.
16           MS. MAINIGI:  Your Honor, we obviously have no
17   objection to, to waiting until 1:00 o'clock.  For us, Mr.
18   Rafalski is not your typical witness.  I think for us it was
19   very much a game time decision.  My cross of Mr. Rafalski is
20   right here and I made the decision that it wasn't necessary
21   to use it.  So --
22           THE COURT:  I understand that.
23       Mr. Hester.
24           MR. HESTER:  Your Honor, I just want to make clear
25   that if there's any suggestion of, of Lyn O'Connell
```

```
 1    appearing today, we've not received any exhibits for her.
 2              THE COURT:  Well, I don't think anybody is saying
 3    that.
 4         Mr. Nicholas.
 5              MR. NICHOLAS:  I just feel the need to defend
 6    ourselves too.  We were not playing games at all.  I too had
 7    a cross, but I did tell Mr. Farrell yesterday that we didn't
 8    expect to be more than an hour even before considering all
 9    of this.
10              THE COURT:  Okay.  Let's do this.  If we come back
11    at 1:00 instead of 2:00, that will give you back an hour,
12    Mr. Majestro.  And, so, that's what we'll do.  We'll be in
13    recess.
14         (Recess taken at 10:35 a.m.)
15              MR. MAJESTRO:  Does anybody have anything before
16    we bring in the witness?
17              MS. CALLAS:  I do.  I'd like to come up to the
18    podium.
19              MR. MAJESTRO:  Okay.
20              MS. CALLAS:  Good afternoon.
21              THE COURT:  Good afternoon, Ms. Callas.
22              MS. CALLAS:  Nice to see you, Judge Faber.  I've
23    been waiting in the wings.
24         Your Honor, we expect the next witness to be Sheriff
25    Charles Zerkle with the Cabell County Sheriff's Department.
```

1    The parties, the defendants, filed a motion related to

2    certain expert disclosures made by the plaintiffs.  Sheriff

3    Zerkle was disclosed at one point as a potential

4    non-retained expert; that is, he would be offering 702

5    opinions.

6        Plaintiffs withdrew him.  That's fine.  And we're happy

7    that he will not be offering expert testimony.  We just

8    wanted to confirm that.

9        We do have some concern perhaps that he may venture

10   into opinion testimony.  Two critical areas.  One would be

11   what we've talked about as the gateway theory, the idea that

12   heroin use can be somehow traced to prescription opioids.

13   He has offered those opinions in his deposition.  There's no

14   foundation for those based on perception or observation.

15   So, we wanted to make sure that that sort of opinion, lay

16   opinion, would not be elicited today.

17       The second issue relates to an opinion by Sheriff

18   Zerkle regarding the percentage of crime in Cabell County

19   tied to drug use.  Again, there's no foundation or basis in

20   either his perception or observation and so we would ask

21   that the Court limit the witness in offering any opinions on

22   that.

23           THE COURT:  Do you want to respond to that, Mr.

24   Majestro?

25           MR. MAJESTRO:  Yes, Your Honor.  Thank you.  First

1    of all, he is not -- we are not asking him to give expert

2    testimony under -- under the expert rules, but under Rule

3    701, witnesses can give -- lay witnesses can give opinion

4    testimony.

5         The fourth Circuit has stated lay opinion testimony

6    could be permissible so long as the testimony is based on

7    investigation and reflects the witness's investigatory

8    findings and conclusions and was not rooted exclusively in

9    his or her expertise in the subject matter.  Such opinion

10   testimony is admitted not because of experience, training,

11   or -- experience, training or specialized knowledge within

12   the realm of an expert, but because of the particularized

13   knowledge that a witness has by virtue of his position in

14   the business.

15        What I intend to do and so -- and that was *U. S. v.*

16   *Chapman*, 409 Federal Appendix 253, at Page 267, Fourth

17   Circuit 2006.

18        What I intend to do is ask Sheriff Zerkle to give his

19   observations over decades of law enforcement regarding what

20   he has witnessed with respect to the opioid epidemic.  He is

21   going to talk about witnessing heroin use.  He's going to

22   talk about witnessing opioid problems from pills.

23        We're not asking him whether he has an opinion whether

24   -- on the gateway theory of any of those things, but he will

25   testify about what he saw in different time periods, and we

1    believe that testimony would be proper.

2            THE COURT:  Well, I think it depends on what he

3    says.  If he's just going to say that in his experience he's

4    seen people that commit crimes to support their drug abuse

5    and you can lay a proper foundation for that, I'll let that

6    in.

7        And, as far as the gateway is concerned, that depends

8    on, I would think, if he says specific -- relates it to

9    specific cases he's observed, that seems to me different

10   from giving a general opinion on an ultimate issue of

11   whether prescription drugs are, in general, a gateway to

12   heroin use and a specific percentage of crime related to

13   drug abuse.

14       And so, I think it depends on what he says, Ms. Callas,

15   and you can object whenever it comes up if you think they've

16   gone beyond what's permissible.

17           MS. CALLAS:  Thank you.

18           THE COURT:  All right, Mr. Majestro.

19           MR. MAJESTRO:  I think we're ready.

20           THE COURT:  The clerk will give you the oath here,

21   sir.

22           LAW CLERK:  Could you state your name for the

23   record?

24           THE WITNESS:  Charles N. Zerkle, Jr.

25           LAW CLERK:  Could you spell your last name?

```
 1                    THE WITNESS:  Z-e-r-k-l-e.

 2                    COURTROOM DEPUTY CLERK:  Raise your right hand,

 3       please.

 4        SHERIFF CHARLES "CHUCK" N. ZERKLE, JR., PLAINTIFF WITNESS,

 5                                    SWORN

 6                    LAW CLERK:  Please have a seat.

 7                    MR. MAJESTRO:  Sir, if you could take your mask

 8       off and adjust that mic so we can all hear you.

 9                    THE COURT:  Yes.  It will help me, Sheriff, if you

10       remove your mask so I can hear you.

11                    THE WITNESS:  I was going to ask you if that's

12       okay, sir.  Good.  That's awesome.

13                              DIRECT EXAMINATION

14                    BY MR. MAJESTRO:

15       Q.   Good afternoon, Sheriff.  Can you please introduce

16       yourself to the Court?

17       A.   My name is Charles N. Zerkle, Jr.  I usually go by

18       Chuck.

19       Q.   Sheriff, let's start with your background.  Where did

20       you graduate from high school?

21       A.    I graduated from a small high school in Mason County,

22       Wahama High School.

23       Q.   And when was that?

24       A.   1977.

25       Q.   Did you go right into law enforcement after high
```

1    school?

2    **A.**   No.  I did an array of things.  I kind of had a --

3    chose a law enforcement path later.  I left high school, got

4    into an apprenticeship program with the United Brotherhood

5    of Carpenters, worked construction for awhile.

6         And then I migrated into the Town of New Haven.  I

7    worked part-time for their Police Department and I also was

8    a water and sewer operator.

9    **Q.**   And when was that you worked with the New Haven Police

10    Department?

11    **A.**   That would have been in the early 80s.

12    **Q.**   And how long did you have that position?

13    **A.**   Off and on for three or four years.  I did some

14    part-time stuff, work for them, and then I actually -- in

15    '85, I enrolled in the West Virginia State Police Academy.

16    **Q.**   Can you tell us about the training you received at the

17    State Police Academy?

18    **A.**   Well, in West Virginia, the troopers go through a more

19    diligent training than what the basic officers do and that's

20    still today.  We went through 30 weeks of training,

21    military-type, paramilitary, kind of modeled after a

22    marine-type boot camp atmosphere.

23    **Q.**   And did you receive training on policing methods and

24    how to investigate crime, those sorts of things?  Tell the

25    Court about that.

1    **A.**    Yeah.  West Virginia is unlike some other states where

2    we do all the policing.  We do everything from traffic to

3    crimes, criminal investigations.  We do the whole gamut of

4    investigations.

5    **Q.**    And by we, who are you speaking of?

6    **A.**    We, the State Police.  I'm sorry.

7    **Q.**    That's fine.  When you graduated and finished your

8    training, did you become a member of the State Police?

9    **A.**    Oh, yeah.  I was sent in 1985, in July, roughly July, I

10   went to Huntington, West Virginia.  That was my first duty

11   post.

12   **Q.**    And, again, when was that?

13   **A.**    1985.

14   **Q.**    And when you were at the State Police in Huntington

15   what were your basic duties and responsibilities?

16   **A.**    The first several years I was a basic road trooper.  I

17   answered calls, went on calls, domestics, murders, whatever

18   it would happen to be, crash investigations, road patrol,

19   tickets, the whole gamut.

20   **Q.**    How long did you stay in Huntington as a field trooper?

21   **A.**    Well, actually, I stayed there until the early 90s and

22   then I did a short stint with Governor Caperton.  I was one

23   of his executive protection bodyguards for Governor Caperton

24   for a short stint of time and then I came back to

25   Huntington.

1    Q.   And where did you live at during that period of time?

2    Did you live in Charleston?

3    A.   No.  I always -- I moved to Barboursville, West

4    Virginia, about the time I got stationed down there and I've

5    been there ever since.

6    Q.   So, since 1995, you've been a resident of Cabell

7    County?

8    A.   1985.

9    Q.   Yes.

10   A.   Yes.

11   Q.   So, after you -- your stint with Governor Caperton,

12   tell us where you went next.

13   A.   Well, I started to try to, I guess, specialize my

14   skills and I moved into what they call the -- it was the

15   Motor Vehicle Inspection Commercial Driving and Driver's

16   Testing and Traffic Safety Division.

17   Q.   And what -- why don't you just walk us through your

18   career with the State Police.  What did you do after that?

19   A.   Well, after that, I -- I -- during that initial phase,

20   I was over about five counties.  We took care of driver's

21   testing, motor vehicle inspection, and all that.

22        And then, I had also -- I was still on detachment in

23   Huntington.  So, I answered calls and done things at the

24   detachment when one of the guys got behind or in a bind.

25        After that stint, I moved on up to Charleston as a

1    Deputy Director of Traffic Records.  Now, we were over the

2    Motor Vehicle Inspection Program predominantly then.

3         And then I got promoted to lieutenant and was the

4    Director of Traffic Records and, at that point, I was over

5    the entire inspection program, all the crash reports, all

6    the fatal crash reports.  The Commission on Drunk Driving

7    Prevention, I was the Executive Director of that.  And

8    basically took care of the highway safety issues, the

9    grants, and issues like that.

10   **Q.**   So, during this period of time when you were at

11   headquarters in the State Police were you aware of the

12   general crime trends that were happening in Cabell County

13   and throughout the state?

14   **A.**   Yeah.  I kept my -- my finger on the pulse of what was

15   going on around the state pretty much and more prominently

16   in my home county.

17   **Q.**   And ultimately what position did you -- what level did

18   you rise to?

19   **A.**   Toward the end of my career, I was promoted to Chief of

20   Staff.  I was the number two guy under the Chief of Staff.

21   We did the budgeting and all the procurement and detachments

22   and all that staff, kind of like maybe the number five guy

23   in State Police.

24   **Q.**   And did your work in that role require you to be aware

25   of the crime trends that were happening throughout the

1    state?

2    **A.**   Yeah.   Once you attain that level, you're what they

3    call up on brass row and everybody -- we interact with all

4    the field operations, the BCI, the undercover operations and

5    some of that stuff.   So, it wasn't in the day-to-day, but

6    kind of had -- we had staff meetings and we were kind of

7    brought up to speed on things.

8         MR. MAJESTRO:   Can you bring up the first page of

9    the demonstrative?

10        BY MR. MAJESTRO:

11   **Q.**   So, showing you Demonstrative 22101, can you describe

12   for the Court what that is?

13   **A.**   That's basically an organizational chart for the State

14   Police.   As you can see what ten years and on opioid

15   epidemic does to my hair.   It kind of took a toll on me.

16   **Q.**   So, that's you in the middle right picture?

17   **A.**   Yeah, that's me, the dark-haired guy.

18   **Q.**   When did you retire from the state police?

19   **A.**   2010.

20   **Q.**   And what did you do next?

21   **A.**   You know, I had some private businesses and I kind of

22   just took a break.   And I laid around and took care of some

23   of that stuff.   And then -- that was a convenience store.

24   And then, I had a campground and we just kind of hung out.

25        And then, I -- that was for a couple of years.   And

1    then, I -- in '13, the Mayor of Milton asked me to help him

2    out.  He was in a bind.  His Chief of Police went down and

3    we were friends and he asked me to come back and be the

4    Chief of Police of the City of Milton, which is in Cabell

5    County.

6                MR. MAJESTRO:  Yeah.  And why don't you put up

7    Page 2 of the demo?

8                BY MR. MAJESTRO:

9    **Q.**   So, can you identify for the Court what we have on the

10   screen?

11   **A.**   Yeah.  That's basically Cabell County and to the left

12   you see Huntington, which is predominantly where most of the

13   populous area of Cabell County is.  In the middle, you've

14   got Barboursville, which is a medium-sized community.  And

15   then to the far right you have Milton, which is a small

16   community, probably maybe 3,000-4,000 people.

17   **Q.**   And how long were you Chief in Milton?

18   **A.**   Approximately two years.  I had told the mayor when I

19   took that job that I had ambitions of being the sheriff and

20   that I would want to take an ample time to be able to pursue

21   that job.

22   **Q.**   Tell the Court what your responsibilities were as Chief

23   of Police in Milton.

24   **A.**   Well, at that point, I was basically an administrator.

25   I took care of all -- updating the policies and procedures,

```
 1    making sure the guys -- scheduling vehicles, equipment, the
 2    day-to-day operations of the Police Department.  I did not
 3    work the road or any -- answer calls or anything like that.
 4    Q.   As -- in your position as Chief of Police, did that
 5    require you to have a knowledge of what was going on with
 6    respect to various crimes occurring in Milton and
 7    surrounding areas?
 8    A.   Yeah.  By that time, we were pretty much involved in
 9    the heroin thing.  It kind of exploded on us.  And we had
10    started with the pills and then we had -- and it migrated
11    toward the heroin.
12    Q.   We'll talk about that in a little bit.  So, was -- when
13    did you retire from being Chief of Police?
14    A.   Roughly August of '15.
15    Q.   And you spent the next, what, year running for sheriff?
16    A.   Pretty much.
17    Q.   And as part of your campaign, did you make yourself
18    aware of what the law enforcement needs were for Cabell
19    County?
20    A.   Yeah.  I -- pretty much my whole adult life, I've been
21    in Cabell County and I know all the law enforcement by first
22    name basis and, yeah, I stayed in that circle.  I was trying
23    partially to campaign.
24         One of the reasons that I ran for sheriff was I felt
25    like that I could make a difference of what was happening in
```

1    our county to try to overcome some of it.  I had some ideas

2    of what -- the things that I wanted to do and the way I

3    wanted to pursue some of the drug activity.

4    **Q.**   And I take it, because you're sitting here wearing that

5    big star, that your election -- your election was

6    successful?

7    **A.**   I was successful.  And then on my second -- I just got

8    elected for my second term and I ran unopposed.

9    **Q.**   Sheriff, based upon your decades of experience in law

10   enforcement and -- both at various different levels

11   throughout the state, have you observed whether or not there

12   is an opioid epidemic in Huntington and Cabell County?

13   **A.**   There very much is.  We are -- we are starting to tail

14   off on that somewhat, but it really got going.  The pills

15   were very prominent in '07 to '10, in that area.

16       Huntington was flooded with pills.  You know, we had

17   some -- I call them pill mills and had a lot of doctors and

18   stuff prescribing medication, but we had an overwhelming

19   amount of prescription opioids being dispensed in our

20   county.

21       And then, somewhere around '10, as that trend started

22   to tail off because things changed and how they were

23   supplying, it was kind of like -- my analogy is like we got

24   the fire going, raging.  We had a great demand.  We had all

25   of this coming in.

```
 1              MS. CALLAS:  Objection.  I think we've ventured

 2    into the area of an expert opinion at this point.

 3              MR. MAJESTRO:  He's just describing what he

 4    observed.

 5              THE COURT:  Mr. Stanner, do you want to say

 6    anything?

 7              MR. STANNER:  Yes, Your Honor.  Thank you.

 8              THE COURT:  Well, you stood up first.

 9              MR. STANNER:  Yes, sir.  I didn't want to

10    interrupt the witness, Judge, but we would move to strike.

11    The testimony earlier was that by 2010 he was taking a break

12    and -- from law enforcement.  And so, what we're really

13    getting is kind a big picture overview of what happened from

14    a lay perspective.

15              MR. MAJESTRO:  Yeah.  I think the --

16              THE COURT:  Wait a minute.  We've got -- Ms. Wicht

17    wants to say something.

18              MS. WICHT:  Sorry, Your Honor.  Thank you.  I

19    would just add to that, following 2010, he testified that in

20    2013 he was in an administrative role and sort of wasn't

21    responding to calls like that.  So, I -- my understanding --

22    my assumption would be that a lot of this is coming from

23    hearsay, Your Honor.  So, I would join in that foundation

24    objection.

25              THE COURT:  Well, if you're going to go back to
```

```
 1    that early period, I think you need to lay a basis for it,

 2    Mr. Majestro, and I'll sustain the objection.

 3              MR. MAJESTRO:  So, okay.

 4              BY MR. MAJESTRO:

 5    Q.   Well, let's back up a little bit, Sheriff.  During the

 6    period of time when you were taking a break from law

 7    enforcement, where did you live?

 8    A.   Cabell County.

 9    Q.   And so, when you were testifying a few minutes ago

10    about your observations, would those observations you --

11    well, let me -- before I ask that question, during that

12    period of time, were you also -- did you also take pains to

13    make yourself aware of what was going on in the law

14    enforcement communities in Cabell County?

15    A.   I was very much so.

16    Q.   And -- and so, the observations you've relayed to the

17    Court are your observations based upon your skills learned

18    as a -- as a trooper and actually being there on the ground

19    in Cabell County; is that correct?

20    A.   Yes, sir.

21              THE COURT:  I'm going to overrule the objection.

22         Ms. Wicht?

23              MS. WICHT:  Well, I just -- respectfully, Your

24    Honor, I'm not -- I'm not sure how the witness can say that

25    he wasn't in law enforcement but he's testifying about
```

```
 1    things that he observed law enforcement doing from outside

 2    law enforcement.  It just seems to me that it must be

 3    hearsay.

 4              MR. MAJESTRO:  I think he testified things he

 5    observed.  He still lived in the community.

 6              THE COURT:  I'll overrule the objection and let

 7    him testify.

 8              MR. MAJESTRO:  So --

 9              THE COURT:  As long as he testifies on his own

10    personal observations and not what somebody told him.

11              MR. MAJESTRO:  Right.

12              By MR. MAJESTRO:

13    Q.   With respect -- let's back up a little bit.  So, you

14    started to testify about the prevalence of prescription

15    opioids in the area.  Based upon your experience in law

16    enforcement, when did you first observe the opioid epidemic

17    beginning?

18    A.   I was in State Police.  I would say that that was

19    somewhere -- become prevalent in '05-'10.

20    Q.   Okay.  And what did you -- what did you observe?  And,

21    by that point, you're in management in the State Police?

22    A.   Yes, sir.

23    Q.   And so, what were the -- what did the State Police

24    management have to deal with with respect to the opioid

25    epidemic and, in that role, what did you -- did you learn?
```

1    **A.**    Well, you know, being in headquarters, you know, we saw

2    all of the stuff.  And then, when we were engaged in raids

3    and things like that of large, large dispensaries and pills,

4    pill mills, things like that, and we would -- I would then

5    have knowledge of the -- we'd do like the pre --

6    pre-break-up, like the staging of the event.  I would be

7    aware of what was going on, where we were going, things like

8    that.

9    **Q.**    And that was part of your role in management?

10   **A.**    It was up there on headquarters, yes, sir, just trying

11   to keep in touch.

12   **Q.**    And can you give us an example of some of the raids the

13   State Police was involved during this time period?

14   **A.**    One of the more prominent ones that comes to mind, I

15   think, was in '10.  It was in Mingo County when we had a

16   doctor --

17              MS. CALLAS:  Objection, geographic scope.

18              THE COURT:  Overruled.  I think this is background

19   information for his testimony and I'll allow it.

20              THE WITNESS:  Okay.  It was in Mingo County where

21   we had a doctor who had a couple of clinics and dispensing

22   large volumes of opioid pills.  We sent our SWAT Team in and

23   we did a multiple-staged raid at the same time, the clinics,

24   the homes, the office managers.  Recovered almost

25   approximately a million dollars in cash and a large volume

1    of pills.

2    Q.    When you were at State Police Headquarters were you

3    made aware of the -- what was going on on the ground with

4    the opioid epidemic in Cabell County?  And add to that any

5    personal observations you might have as a resident of the

6    county.

7    A.    Well, yeah.  I mean, because I was -- I still lived

8    there.  I traveled there every day.  Most of my friends

9    still worked at Huntington, in the Huntington area.

10        You know, the influx was -- is astonishing how much it

11   was.  We didn't have an enormous amount of overdoses at that

12   time.  And I attribute that to they were taking pills that

13   they could trust.  They knew what the milligrams was.  They

14   knew what they were, so you didn't have a high volume of

15   overdose because they were taking something that was from a

16   trusted source, I would say.

17   Q.    After you came back to Cabell County to work in the

18   City of Milton, what did you experience with respect to the

19   opioid epidemic in Cabell County at that point?

20   A.    To her -- or objection, I was in administration, but I

21   saw all the reports.  I reviewed all the reports.  I was in

22   -- it's a small department.  You've got a team of ten

23   people.  So, anything that happened in that department, I

24   had my finger on the pulse of it.

25        I didn't physically go out there.  I'm too old for

 1   that.  But I was standing in the gallery, I would say.

 2        But it had started to evolve into more of a heroin

 3   situation at that point.  The medication, the pills, had

 4   started to slow up and it was kind of like we got the fire

 5   raging.  We had this massive demand and we had the supply.

 6   We cut the supply off.  They had no choice but to go to

 7   heroin.

 8   **Q.**   And what the time period?

 9             MS. WICHT:  Your Honor --

10             MR. STANNER:  Your Honor --

11             THE COURT:  Yes?

12             MS. WICHT:  You first.

13             MR. STANNER:  Sorry.

14             MS. WICHT:  That's okay.

15             MR. STANNER:  Respectfully, Your Honor, we would

16   move to strike the last couple of sentences there as to

17   creating demand and getting the fire started up.  That seems

18   like outside of the province of his observation.

19             THE COURT:  Well, do you want to say something,

20   Ms. Wicht?

21             MS. WICHT:  No, Your Honor.  Really, it was the

22   same objection.  Particularly, I would note the comment of

23   having no choice but to go to heroin, I think is not proper.

24             THE COURT:  I think, so far, he's still testifying

25   from what he personally observed and not giving an opinion

1    and I will let you go ahead, Mr. Majestro.

2         MR. MAJESTRO:  Thank you, Your Honor.

3         BY MR. MAJESTRO:

4    **Q.**   Can you tell us the time period where you started to

5    see the prevalence of opioid problems from prescription

6    pills decrease and then, at the same time, a -- an increase

7    --

8         MS. CALLAS:  Objection, leading.

9         THE COURT:  Sustained.

10        BY MR. MAJESTRO:

11   **Q.**   When did the -- when did you start to notice heroin

12   abuse increasing in Cabell County?

13   **A.**   I think it was somewhere probably '12, early '13.  When

14   I got back, everything was starting to surge toward the

15   heroin.  Large amounts of overdoses.  A lot of -- a lot of

16   people dying.

17   **Q.**   Was there an issue with heroin in West Virginia or

18   Cabell County prior to this time?

19   **A.**   You know, since 1985, I mean, we -- we have had drugs

20   in Cabell County, of course.  We were one of the most

21   populous counties in the State of West Virginia, so with had

22   drugs.  Not an enormous amount of heroin.  Not really.  We

23   had marijuana, a little bit of cocaine, quite a bit of pills

24   and some meth.

25   **Q.**   And then it -- and -- but heroin use, in your

1    experience, was -- could you characterize it?  Rare?

2    Common?

3    **A.**   No.  It was, I'd say, in my opinion, ten percent of the

4    drug use at that time.

5    **Q.**   And then how has that changed currently?

6    **A.**   I'd say during the height of this -- this thing, I

7    would say 60-70 percent.

8    **Q.**   So, let's go back to when we were talking still in your

9    days at Milton.  Did the opioid epidemic get worse while you

10   were Chief of Police?

11   **A.**   Yes.  It was -- it was pretty much heading toward the

12   peak.  It kept -- continued to rage on.  Huntington, you

13   know, was inundated with drug dealers from Michigan and

14   places like Ohio, places like that coming here to supply the

15   heroin.

16        And, you know, one of the things is that we learned is

17   that if we had drug dealers in Milton or anywhere else in

18   the county, it always came back to Huntington.  It always --

19   because it was easy to hide in Huntington.  You can't -- a

20   drug dealer is hard to hide in 3,000 people in town, but you

21   can hide in 70-80,000 people.

22   **Q.**   So, when you were Chief of Police, did you work with

23   the Cabell County Sheriff and the Huntington Police

24   Department?

25   **A.**   I did.  Us being small, I couldn't devote someone to a

 1    defined Drug Unit, but our intelligence that we uncovered

 2    would be reported to the county and the state officials,

 3    yes, sir.

 4    **Q.**   And so, let's move forward to your next job.  Now, 2017

 5    you became sheriff, correct?

 6    **A.**   Yes, sir.

 7    **Q.**   When you took office as sheriff, what did you observe

 8    about the opioid epidemic in Huntington and Cabell County?

 9    **A.**   Well, we -- we were -- we were at -- we were -- it was

10    really raging hard.  We were experiencing multiple overdose

11    deaths.

12        You know, when I was a young trooper, I don't want this

13    to sound wrong, but it was a rare occurrence when I saw a

14    dead body.  I mean, it had to be a crash, a car crash, an

15    occasional murder.  We didn't have that many.  An unattended

16    death or something like that.  I mean, it was a rare

17    occurrence when we saw dead bodies.  And in the one day, my

18    deputies encountered four dead, four deaths.

19        You know, so that in itself, all the death took a toll

20    on our people and things like that.  And it was mostly --

21    well, it was all.  Those deaths were all heroin deaths.

22    They were just heroin deaths.

23    **Q.**   And in addition to heroin, did -- were there other

24    illegal opiates that became a problem in Cabell County?

25    **A.**   We still had some pills in '16.  It was -- you know,

1    but it wasn't as prevalent as it was in the past.

2    **Q.**    How about other illegal substances?

3    **A.**    Well --

4    **Q.**    Illegal opiates?

5    **A.**    We had meth.  We had a lot of meth, but meth had

6    curtailed.

7    **Q.**    Did you have a problem with Fentanyl?

8    **A.**    Well, yeah.  The fentanyl brothers showed up,

9    carfentanil and fentanyl.  And they were -- the people that

10   came here to distribute the heroin to us, I use the analogy

11   that they were cutting it with everything from road paint to

12   anything else that they could get to enhance it.

13          And with -- with the fentanyl and the carfentanil, it

14   becomes a greater risk to our officers, you know, just from

15   the airborne possibility of being exposed.

16   **Q.**    So, did the fentanyl and the carfentanil pose a danger

17   to people beyond those people who are using it?

18   **A.**    Oh, most definitely.  You know, it's much more potent

19   than heroin.  And it also -- just casual contact, or opening

20   a car door, or whatever, sometimes we could get exposed.

21          I actually had had two deputies had went down on

22   fentanyl on a traffic stop.  They had become overcome.

23          And I think in -- I can't remember what year it is, but

24   we started carrying Narcan, not so much to disperse it to

25   the public, but for our own protection.  And those two

1    deputies had to be Narcan'd and transported to the hospital.

2    **Q.**    And can you explain to the Court how just coming into

3    contact with the fentanyl and the carfentanil caused these

4    deputies to overdose?

5    **A.**    It's so much more potent.  It's like a thousand times

6    more potent.  And just a micromolecule of it airborne can

7    actually overdose you.  And both of our -- our incidences

8    was people that were just driving erratic, high or whatever

9    you want to call it, were stopped and during the traffic

10   stop trying to remove them from the car is when they become

11   exposed.  It was either on the seat, on their clothing, or

12   something of that nature.

13         And then I had a third deputy in the last nine months

14   that was exposed, also, in a similar fashion.

15   **Q.**    Did he require -- I assume it's a he.  Did he require

16   medical treatment?

17   **A.**    They all did, yes, sir.  I took them and made sure that

18   they were treated at the hospital and decontaminated.

19   **Q.**    Based upon your role as sheriff, can you describe what

20   you've observed as to the present nature of the opioid

21   epidemic in Cabell County and Huntington?

22   **A.**    Well, when I took office in '17, the heroin overdoses,

23   the addiction was raging.  And if would you have come to me

24   and said my son or daughter needs a bed, they need somewhere

25   to be helped, I would basically tell you there was no place

1    because there was no place.

2          And what happened is, is over the last four years, I

3    will say that we have --

4                COURT REPORTER:  I need just a second, please.

5    I'm sorry.  One moment.

6          (Pause)

7          Okay, go ahead.

8                THE WITNESS:  Do you need me to repeat anything?

9                COURT REPORTER:  I just needed to plug in.  I

10   could hear the beep.  Sorry.

11               THE WITNESS:  Okay.  Since then, we have beds.  We

12   have several beds.  Kind of what we've turned into is a

13   recovery epicenter.  We were the epicenter of the opioid

14   epidemic and now we still have a heroin, a massive heroin

15   problem, but we've become a center for recovery.  That is

16   not always good.

17   **Q.**   What impact did the opioid epidemic have on the

18   Sheriff's Office itself?

19   **A.**   Well, I mean, basically other than -- you know, I done

20   elaborated on the fact that the guys were, you know, exposed

21   to it all the time, but the mental stress of the -- of

22   actually going on the calls, worried about getting stuck

23   with needles, exposure, the sight of the death and having to

24   go home to their families all the time.  It was a -- a lot

25   of stress and a lot of problems.

1        And then, it made us harder to recruit people.  And as

2   a whole in the United States, I mean, law enforcement is

3   down.  Not very many people want to do this job anymore, as

4   you probably well know.

5   **Q.**   Did it have a financial impact on the office?

6   **A.**   It did.  I mean, it's -- our resources were strapped.

7   At that time, when I came in office in '17, we had

8   incarcerated so many people in our jail that we were running

9   about -- we had had a deficit in our jail bill of

10  $3.3 million.  We were in the hole $3.3 million.  And we

11  were cranking a jail bill of about $360,000 a month.  And

12  that's based on roughly a $49.00 a day head count.

13       I decided that I would enhance our -- because, at that

14  point, right before I took office, the County Commission was

15  in such financial disarray, they cut all the elected

16  officials ten percent.  So, day one, I come in as sheriff.

17  I've already lost ten percent of my budget, my operating

18  budget.

19       So, I tried to come up with some creative ways to try

20  to save money to try to get my budget back to get my force

21  back to where I needed it to be.  I had nine vacancies at

22  the time when I took sheriff.

23       So, with all of this going on, jail bill,

24  incarcerations, I was running probably 60 or 70 people on

25  home confinement.  And that's a home incarceration where we

1  put an ankle bracelet on them and we monitor them at home.

2      I decided that I could take these lower offenders, most

3  of them drug addicts or drug dealers, the minor drug

4  dealers, not the major ones, and I would enhance my home

5  confinement.  And I took home confinement to approximately

6  150-160 people, saving the county approximately another

7  $1.4 million a year in fees.  And I also had slowly but

8  surely ate away at the arrearages to get us in good standing

9  with the State of West Virginia

10  **Q.**   So, the budget impact from the jail bill, how much of

11  that impact was a result of crime from -- stemming from the

12  opioid epidemic?

13  **A.**   Well, you've got to understand, when you're housing

14  that many people in jail, it's not all bad things.  It's bad

15  things, but our petit larceny surged.  Our prostitution

16  surged.  You know, breaking and enterings.  Just crimes of

17  property.  You know, if -- if --

18  **Q.**   Were those crimes related to the opioid epidemic?

19  **A.**   Yes.

20  **Q.**   Can you explain?

21  **A.**   They -- the people that we were dealing with were

22  addicted to drugs and if they had to break into your car and

23  steal the change out of your cup holder to get a shot of

24  dope or whatever, that's what they were going to do.

25  Whether it was your weed-eater when you mowed your grass and

1    left your weed-eater sitting out, your computer in your car,

2    whatever it was, it had to happen.  It had to happen.

3        So -- so then, your prostitution, your petit larceny,

4    your shoplifting, all of that stuff exploded to try to fuel

5    their need and it just overwhelmed us.

6    **Q.**   Does the Sheriff's Department participate in the -- in

7    the Drug Task Force?

8    **A.**   Well, when I became sheriff, we were in the Huntington

9    Violent Drug Task Force.  That was with us and the City of

10   Huntington and the FBI.  A few years in, it kind of

11   transformed into something else.  Huntington moved away and

12   went their separate way.  I stayed with the FBI with two

13   officers and we continued on in our Task Force.

14       I have recently entered a third deputy with the DEA.  I

15   try to not put all my eggs in one basket per se.  They're

16   basically doing the same thing, but we have two different

17   Task Force -- two different teams reaching out to try to

18   strike to take care of this stuff.

19   **Q.**   And by this stuff, what do you mean?

20   **A.**   Well, the drugs, the heroin, the meth, the pills,

21   marijuana, whatever.

22   **Q.**   And so, we all know recently we've gone through a COVID

23   epidemic.  Has the COVID epidemic impacted how you are

24   responding to the opioid epidemic?

25   **A.**   Yeah, most definitely.  With the COVID epidemic, I had

1    to worry about getting my deputies exposed but still trying

2    to do their functions and perform their duties.  And, you

3    know, we saw an insurgence of overdoses because the people

4    were staying home.  They weren't out as much and I guess

5    they were bored or whatever.  And it had a bigger impact on

6    that.

7         And then, at the end of the whole epidemic, I probably

8    -- out of 44 deputies, I probably had like 30 of them got

9    COVID.

10   **Q.**   And the overdoses you're speaking of, are those

11   overdoses to opioids?

12   **A.**   Predominantly, yes, sir.  Yeah.

13            THE COURT:  Let me interrupt you.  I'm curious.

14   Why, if you know, did the City of Huntington pull out of the

15   Drug Task Force?

16            THE WITNESS:  I don't know.  It was an FBI thing.

17   Now, they didn't dissolve their Drug Unit.  They just moved

18   over and kind of did their own thing.  They kind of

19   separated from the FBI.

20            THE COURT:  And you stayed with the FBI?

21            THE WITNESS:  I did.  I did, sir.  Yes, sir.  And

22   then, I have since added --

23             THE COURT:  Was DEA involved in that at all?

24            THE WITNESS:  No, sir, not at that time.  The DEA

25   was kind of operating in a different circle.  I kind of

1    liked what they were doing.  They had a different aspect of

2    some of it.  So, it was kind of like -- to me, it was best

3    of both worlds.

4        You know, they help me with my overtime and they give

5    me some vehicles and stuff.  So, it's kind of like I get

6    done what I need done, but I get some assistance with the

7    overtime, and the vehicles, and gasoline, things like that.

8    **Q.**  As a result of the COVID epidemic, did that change the

9    staffing for your deputies with respect to the various

10   responsibilities they have?

11   **A.**  It did.  Actually, the courts and things had shut down

12   and I was able to bring some of the people out of the courts

13   and put them on the road.

14   **Q.**  Explain to the judge what role the Sheriff's Department

15   has in our court system in state court.

16   **A.**  Well, West Virginia is kind of unique.  The primary job

17   of the sheriff is kind of like the Old English.  The high

18   sheriff is the tax -- the tax collection.  That's my primary

19   function.

20       But over time, in West Virginia, the law enforcement

21   has became more prevalent as the sheriff.  It's kind of like

22   -- it's kind of reversed its roles.  The people of your

23   county expect the sheriff to do more of the law enforcement,

24   the heavy lifting of the law enforcement, and the tax thing

25   just kind of takes care of itself.

1    And then, the courts, by law, I am in charge -- I am

2    charged to take care of the courts.  I have to have a

3    bailiff for every circuit judge.  I have to have a bailiff

4    in magistrate court.  I have seven magistrates.  I've got

5    four circuits.  And I've got three family law judges.  So,

6    it eats up a pretty good part of my staff.

7    **Q.**   So, as a result of the COVID epidemic, were you able to

8    take some of the staff that was previously being used for

9    court security and direct them to law enforcement?

10   **A.**   I was.  I was very, very fortunate.  It came at a good

11   time and, at that time, too, COVID, so they were kind of

12   replacing the people that were going down with COVID and

13   becoming exposed.

14   **Q.**   So, now that we're on -- hopefully, knock on wood,

15   we're on the other side of the COVID epidemic, are those

16   resources out of law enforcement and back into the court

17   system?

18   **A.**   It's starting to rev up again, yes, sir.  We have

19   changed up some of the way we do things with some video

20   arraignments and things like that that has made our life a

21   little easier but, you know, the judges kind of like to see

22   the people in front of them.  When they sentence someone or

23   something like that, they like to have a face-to-face

24   meeting with them.

25   **Q.**   I'm not sure if I asked you this question.  Back to

```
 1    discussing the jail, based upon your experience in law

 2    enforcement, the knowledge of the prison population, what

 3    percentage of Cabell County's prison, people in Cabell

 4    County sends to prison and has to pay for, is opioid

 5    drug-related?

 6              MR. WICHT:  Your Honor, I'm sorry.  Excuse me.  I

 7    guess there may be other objections as well.  Could we have

 8    some sort of a time frame on the question?

 9              BY MR. MAJESTRO:

10    Q.   Over the years since you've been sheriff?

11              MS. WICHT:  In the -- sheriff?

12              MR. MAJESTRO:  Yes.

13              MR. STANNER:  Judge, I'd just reiterate the

14    objection to the foundation for this.  It's a tough thing to

15    observe in the way that Mr. Majestro asked the question.

16              THE COURT:  I think we need a better foundation

17    and a time period, Mr. Majestro, so I will sustain the

18    objection to that extent.

19              BY MR. MAJESTRO:

20    Q.   So, let's start with time period back in 2017 --

21    A.   Okay.

22    Q.   When you became sheriff and you had the problem with a

23    $300,000 a month, plus a month, jail bill.  Did you -- did

24    you investigate what the prison population from Cabell

25    County was?
```

1    **A.**   I kept -- kept on it every day.  It was $40 -- $49

2    bucks a day to me.  I went down the jail list every day and

3    I had -- I had a girl, we had a person dedicated to

4    digesting and dissecting the jail bill.

5         And we went as far that I called it the band.  We put

6    together -- I got together with the public defender, a

7    prosecutor, a victims advocate.  We had someone from

8    Prestera Mental Health.

9         We had a group of individuals that met once a week and

10   we talked about the low-hanging fruit.  We had that list in

11   front of us.  Every person that was incarcerated in Cabell

12   County at the Western Regional Jail, whether it was

13   Huntington, Barboursville, Milton or whatever, I pay for it.

14   So, it's on my dime and I wanted to know what they were

15   doing and whether it was prostitution, petit larceny,

16   whatever, we had this meeting and every -- every week, we --

17   we kicked these people out of jail.

18        We had to either get them out or we put them on home

19   confinement to help thin the herd.  That was part of how we

20   saved the money.  So, of that, probably 70-80 percent of

21   those people all stemmed from drug arrests or drug -- like

22   the petit larcenies.  They also had an underlying charge or

23   they were addicted to drugs.

24   **Q.**   Is the -- that same percentage to be true today?

25   **A.**   Yes, sir.

1   **Q.**   What other changes in the department have you had to

2   make as a result of the opioid epidemic?  Has it changed how

3   you treat the county school systems?

4   **A.**   When I became sheriff, we had one SRO, school resource

5   officer, and I had ran on the platform that I would support

6   our children and try to be involved and engaged in the

7   schools with our children with the -- with the drugs.

8        So, I have expanded that to five.  I have five

9   full-time SROs that are in the schools.  I've got the middle

10  schools.  I've got three -- four middle schools and one high

11  school.  I've got the largest high school, Cabell Midland,

12  and then I have the other middle schools, total of five.

13       And we also have started a program with the Board of

14  Education.  It's called Handle With Care.  And basically

15  what happens is any -- any call or event that occurs out in

16  the county and it involves these children, whether it's

17  drugs, or domestic, or whatever, predominantly it's a -- an

18  underlying part of the drugs, but we take the kids' names

19  and phone -- and where they go to school.

20       And the Board of Education has a person that is staged

21  24 hours on call that we can call and say Billy and Suzie's

22  mom just got arrested, or Billy's mom died of an overdose,

23  or is in the hospital of an overdose.  You need to be --

24  handle this child with care the next day.

25       So, the counselors, the teachers, everybody -- there is

1    a little understanding that Johnny or Suzie don't have their

2    homework done and they kind of -- then, my SRO, if it's an

3    SRO school, he kind of buddies up to them.

4        You know, the SRO thing, it's a law enforcement

5    presence in the school, but it ain't about -- it ain't about

6    that.  It's about trying to mentor these kids and get

7    involved in their lives to show them that there's people

8    that care about them, that they mean something to somebody.

9        And these grandparents raising these children that did

10   a crappy job of raising their kids and now they're raising

11   their grandkids and we've got to have a role model of people

12   engaged.

13       We play basketball with them.  We goof around on the

14   playground with them.  But, at the same time, we may go home

15   with them when they tell us and trust us enough that their

16   parents are doing something wrong.  My officer will go home

17   with them to try to fix the problem.

18   **Q.**   So, the need for these SROs and the Handle With Care

19   program, has that need increased?

20   **A.**   It has.  And, you know, you've heard me talk about how

21   my resources -- and what I've got.  I've got five guys.

22   I've got over ten percent of my workforce, about 13 percent

23   of my workforce, dedicated to kids in the schools.

24   **Q.**   And what was it that caused that need to increase?

25             MS. CALLAS:  Object to the form, foundation and

1     hearsay.  Calls for hearsay.

2            THE COURT:  I'll overrule the objection.  I think

3     -- I think there's a basis for you to ask him that and I

4     will let him answer.

5         Go ahead, Sheriff.

6            THE WITNESS:  I -- you know, of course, the

7     schools talk to me.  I talk to them.  And the need is that

8     every day these kids are coming to school out of whack, out

9     of sorts, not wanting to do anything, and we had to do

10    something as a -- as Cabell County and the School Board and

11    me.  I was their -- their gateway, I guess, to intervene to

12    try to help these kids.  It's pathetic.  These kids are sad.

13    **Q.**   And maybe I'm not asking the question the right way.

14    But, Sheriff, what is it that happened in Cabell County that

15    got these kids out of whack and out of sorts?

16    **A.**   Well, they were -- were victims of --

17           MS. CALLAS:  Objection, hearsay and foundation.

18           THE COURT:  Yes.  You've got to lay a foundation

19    for that one, Mr. Majestro.

20           MR. MAJESTRO:  I'll just ask the question.

21           BY MR. MAJESTRO:  Do -- does your need for these

22    additional resources in schools, was it as a result of the

23    opioid epidemic you witnessed?

24           MS. CALLAS:  Again, objection.

25           THE COURT:  Sustained.

1          MR. CALLAS:  It's not what this witness had

2     witnessed.

3          THE COURT:  Sustained.

4          MR. MAJESTRO:

5     **Q.**   Let me back up and ask the question this way one more

6     time.  What kinds of problems were the kids describing to

7     the school resources officers?

8          MS. CALLAS:  Again, objection, hearsay.  He's

9     asking that Sheriff Zerkle report what he heard from school

10    officials.  That is hearsay.

11         THE COURT:  I will sustain the objection, Mr.

12    Majestro.

13         MR. MAJESTRO:  All right.  I'll move on.

14         THE WITNESS:  Well, can I say that I would like to

15    have more SROs?

16         BT MR. MAJESTRO:

17    **Q.**   I was going to ask that question.  Do you have enough

18    SROs?

19    **A.**   No.  I would like to have ten or eleven total.

20    **Q.**   And how would that help?

21    **A.**   I just -- you know, the things that my guys report back

22    to me, we do -- do incident reports and all this that we

23    review.  We have a system called Zerker.

24         COURT REPORTER:  I'm sorry.

25         THE WITNESS:  Zerker.  I don't know how it's

1  spelled.  I wish it was Zerkle because I'd be a rich man

2  from what I paid for that program, but it -- the -- what the

3  guys, my -- the counselors, you know, the principals, the

4  teachers, the bus drivers, they all feed this information to

5  the SROs.  The SROs generate reports and they, in turn,

6  start to initiate.

7        We may get DHHR, which is the Human Resources,

8  involved.  We may get Child Protective Services.  We --

9  based on what my officers observe and are told by the

10  teachers and the counselors and they interact with these

11  kids of whether it's Mommy and Daddy lay around all the time

12  with needles hanging out of their arms, or pills, or

13  whatever, we --

14              MS. WICHT:  Objection, hearsay.

15              THE COURT:  Well, I got the point here, Mr.

16  Majestro.

17              MR. MAJESTRO:  Okay.

18              THE COURT:  Loud and clear.

19              MR. MAJESTRO:  Then I will definitely move on.

20  You're my audience, Judge.

21              THE COURT:  Sorry, sir.  We have to play by the

22  rules.

23              THE WITNESS:  That's okay.  You're the boss,

24  Judge.  You tell me what to do.

25              BY MR. MAJESTRO:

1    **Q.**   So, why don't you put more deputies in schools?

2    **A.**   Because I cared.  Because --

3    **Q.**   No, my -- I don't think you heard my question.  I said

4    why don't you put -- you said --

5    **A.**   Oh, why don't I?  Oh.

6    **Q.**   Why don't you put one at every school?

7    **A.**   It's called follow the money.  There ain't no money.

8    **Q.**   The deputies you have in the schools, if you didn't

9    have to have those deputies in the schools, what would you

10   do with those resources?

11   **A.**   They would be on the road patrolling, answering the

12   calls, doing day-to-day deputy jobs.  And it was a big

13   undertaking for me.  It was a sacrifice to have to cut the

14   road patrol guys.

15        You know, we've got three shifts.  And so, basically, I

16   took like a guy and a third off of each shift to sustain the

17   schools and -- but in my mind, at the end of the day, we do

18   as much good or more good with the kids than we do answering

19   calls sometimes.

20   **Q.**   Do you have the funding in your budget to continue the

21   programs that you've described at their current levels?

22   **A.**   At the current levels, I think I do very well.  I'm

23   fiscally responsible.  I'm a pretty -- what they call a

24   tight guy.  I can squeeze a nickel when I need to.

25        But at the same time, I don't sacrifice my men's safety

1    or anything like that.  I have spent $120 -- I got a grant

2    for $120,000.00 to re-equip our SWAT Team.  It was in a

3    disarray when I came in.  And that's a vital source to our

4    -- to our Drug Task Force.

5         You know, we've got good cars.  We've got good

6    equipment.  But I would envision that we can do more if we

7    had more.

8    **Q.**   And you just described a grant.  Do you receive grants

9    to help with the opioid epidemic?

10   **A.**   I will apply for a grant for anything and I -- I do.  I

11   have a JAG grant, which is a grant that we obtain from the

12   Justice to help us with the drugs, the Drug Task Force.

13        And just for example, when I became sheriff in '17, I

14   got $90,000.00 in that grant.  Do you want to know what I

15   got last year?

16   **Q.**   I think the Court would like to hear that.

17   **A.**   $15.  So, we're going this way and they're going that

18   way (indicating).  So, I apply -- I am in the process of

19   applying for a federal COPS grant for over $100,000.00 for

20   mental health for my officers.  It's treatment, mental

21   health treatment, to deal with some of the things that

22   they've saw and deal with every day.  It is also to help

23   them try to live a healthier life, things like that, try to

24   have a better attitude.

25   **Q.**   Are the grants something you can count on?

1    **A.**   No.  It's just like if I could count on that $90,000.00

2    that went down, I would be -- and it's just like my drug

3    guys, they said, well, why are you wasting your time

4    applying for that?  It's $15-$20,000.00 I don't have.  It's

5    -- so, I'll apply for anything.

6    **Q.**   And that brings about another question.  Do you have to

7    devote department resources in order to obtain these grants?

8    **A.**   I have a -- I have a grant guy in my -- myself, I was

9    involved in grant writing and stuff when I was in the State

10   Police for the Highway Safety, things like that.  I have a

11   grant guy that pretty much does that.  He also does part of

12   -- he's a detective lieutenant, but he's kind of my go-to

13   grant guy, too.

14   **Q.**   How much of his time and resources do you have to

15   devote to obtain this money?

16   **A.**   30-40.  30-40 percent probably.

17   **Q.**   And if he wasn't -- if he didn't have to spend his time

18   applying for grants, what could he be doing for the

19   community?

20   **A.**   He would be working crime, doing criminal.  He's the

21   head of my Detective Unit.

22   **Q.**   Based upon your experience as sheriff, what else does

23   Cabell County Sheriff's Office need to address the opioid

24   epidemic?

25   **A.**   Well, of course, it would be nice to have more men.

1    And we need more equipment.  More men means more equipment.

2    I'd like to expand the Drug Unit more.  I've got an

3    opportunity to add more people to that, but I just

4    physically can't do that.

5         I -- you know, I guess I haven't thought a lot about it

6    because I didn't -- I don't know that I -- it don't look

7    good for the county as far as having a ton of money laying

8    around.

9    **Q.**   Explain to the Court what role the Sheriff's Office has

10   in a mental hygiene, mental health system.

11   **A.**   Well, unfortunately for the sheriffs, in the State of

12   West Virginia, we have the sole and distinct responsibility

13   to deal with every mental hygiene in the State of West

14   Virginia.  And a mental hygiene is a mental -- someone files

15   an affidavit saying someone is mentally -- mentally

16   challenged or having issues.  At that point, here in the

17   last two years, they've added guess what to that?  Not only

18   mental health, but addiction.

19        So, that has become intertwined.  And what we've found,

20   that drug addiction and mental health go hand-in-hand.  And

21   we process this.  So, once they're picked up, they have to

22   go to a Prestera Mental Health Center.  They're evaluated to

23   see if they think that they're having a problem either with

24   addiction or -- and/or mental health.

25        At that point, they go to medical clearance at the

1    hospital.  And then, from there, they go back to a Mental

2    Hygiene Commissioner, who has a final hearing, and then

3    there's placement for that person.  On an average, every

4    mental hygiene that I do is 10-12 hours before I can get rid

5    of them.

6    **Q.**   And how many of these mental hygiene warrants that the

7    department is having to address now are opioid

8    epidemic-related?

9    **A.**   Cabell County has the highest mental hygiene rate of

10   any county in the State of West Virginia and we almost have

11   the same -- the rate of all 55 counties.  I do about 700 a

12   year.

13   **Q.**   And how -- and can you tell the Court how many of those

14   approximately are related to opioid problems?

15   **A.**   Well, in the recent years, the last couple years, like

16   I said, I think it's kind of intertwined, but probably 60-70

17   percent of those hygiene people have a true addiction issue,

18   too.

19        And as I alluded to earlier about my recovery, I'm the

20   opioid recovery center of the world, I've got 3,000 recovery

21   beds in Cabell County at 65 recovery homes in the City of

22   Huntington.  So, what happens, when they fail, they get

23   kicked out of recovery, or they leave recovery, and then

24   they start wandering the streets, probably stealing a kid's

25   bike, get a backpack, ride around until somebody gets

1    aggravated enough with them.

2            MS. WICHT:  Your Honor, I'm going to object on

3    foundation.

4            THE COURT:  Overruled.  I think he's testifying

5    from his personal experience here.

6        You go right ahead.

7            BY MR. MAJESTRO:

8    **Q.**   Continue, sir.

9    **A.**   I'm at the courthouse.  I see it every day.  One of the

10   biggest recovery hangouts is right down the street called

11   Harmony House.  What happens is, once these -- these people

12   that are challenged, that are trying to get help, they get

13   kicked out of recovery.  They wander the street.  They

14   become homeless.  They start pilfering.  Stealing.

15       When all of the people that do the handouts are tired

16   of them, they do mental hygienes on them.  I mean, that's

17   the way it is.  And then we have to pick them up and try to

18   figure out whether they get certified or not, whether we put

19   them somewhere in a lockdown facility to try to facilitate

20   what's going on in their life.

21   **Q.**   Are there other ways that the opioid epidemic has

22   affected your department and the staff of your department?

23   **A.**   Well, we're strapped all the time.  I mean, we're

24   trying to do more of the mental health stuff.  The schools.

25   It's put a strain on us, yes, sir.

Q.   Has that strain filtered down to your officers?

A.   Sure, it is.  They -- like I alluded to before, I mean,
I can't get anybody to do this job.  My men are stressed.
Their mental health is suffering from seeing the things that
they see.

We -- anytime -- most of the time, when they encounter
a death or something, we try to intervene.  We have a QRT
Team in Cabell County, a Quick Response Team, and we
interact with those people.  And they also -- St. Mary's
offers some mental health counseling and stuff for our
people if they need it.

Q.   And the Court's heard from Connie Priddy about that
team.  And so, it is your testimony that your department
also participates in that?

A.   We -- we're in the fringe of it, but we're in the --
getting ready to wade into the deep water with Connie.
She's actually trying to expand that program.  She's got
some national recognition with that.  It's very viable.

Our ambulance run overdose reduced about 50 percent
since the QRT came.  So, it is something that we need to be
involved in.  But, then again, I don't know how I can do
that other than offer overtime.  I can't put a full-time
person in, but offer overtime on their off duty time to go
help.

Q.   And would those -- providing those services through

1  your department require more money that you don't have?

2  **A.**   Yeah.  I would have to find a source.  I mean, you

3  know, the overtime funding, and we're actually trying to

4  apply for a grant right now through the DOJ to try to fund

5  some of that.

6  **Q.**   Okay.  Have your officers had experience responding to

7  accidents resulting from people using opioids?

8  **A.**   As I alluded to before, when I was in the State Police,

9  I was the Executive Director of the Commission on Drunk

10  Driving Prevention.  In West Virginia, there's a tax on

11  liquor and wine that goes directly to that fund and that

12  generates -- I don't know what it is today, but back in '10,

13  it was about a million dollars a year.  And we have

14  checkpoints, DUI checkpoints.  And DUI in the State of West

15  Virginia is not just alcohol-related.  It involves drugs.

16  And predominantly what's happened in the last several years

17  is there's been a higher spike in drug driving.

18  **Q.**   And would those drugs, exposure to those drugs, would

19  those be opioids?

20  **A.**   Well, sure.  A lot of times we'll do crash reports and

21  when I review the crash report, I will see that there was

22  needles or things -- or heroin or whatever in the car,

23  pills, other illicit drugs that they were using at the time.

24  A lot of times, our crashes, the people have recently used

25  and basically just kind of black out and crash.

```
 1    Q.   Having lived in Cabell County for decades since 1985, I

 2    think --

 3    A.   Yes, sir.

 4    Q.   -- if I remember correctly, can you describe the impact

 5    the opioid epidemic has had on the community?

 6    A.   Well, at one time, I think West Virginia, and

 7    particularly Cabell County, we enjoyed having a great

 8    workforce.  You know, we had a lot of -- some development,

 9    economic development.

10         We've got an addicted workforce and we can't -- you

11    know, we talk to the local business leaders.  We go out and

12    interact with them.  They can't find employees.  If they

13    can, they can't pass a drug test.

14         You know, who -- who wants to come -- you know, we've

15    got this publicity of being the epicenter of this.  This

16    ain't good publicity.  This is bad.  If you owned a major

17    company, would you want to come to Cabell County, West

18    Virginia and build a multi-million-dollar plant knowing what

19    you're looking at?

20         Google -- Google Huntington, West Virginia and see what

21    you get.  It ain't good.  So, we've diminished the tax base.

22    We're diminishing -- nobody -- we can't get -- if they did

23    come, we can't get a workforce for them.  So, things aren't

24    going great.

25    Q.   Have the neighborhoods deteriorated as a result of the
```

1    opioid epidemic?

2    **A.**   What you saw since this happened is a larger decrease

3    -- a decrease in the City of Huntington and the outlying

4    areas that I showed you on my diagram, the Huntington, the

5    Barboursville, the outlying areas have grown.  And, as

6    Cabell County, we -- with this last Census, I think we're

7    down about 3-5 percent.

8    **Q.**   What impact has that had on the neighborhoods

9    themselves though?

10   **A.**   Well, predominantly down in Huntington, you know, down

11   in Huntington, right now, I'm involved in the tax collection

12   and when people don't pay their property taxes, the sheriff

13   seizes their homes and sells them on the courthouse steps.

14   People buy them for taxes and, if the person can redeem it,

15   they get it back, but if not, in 18 months, the person that

16   bought the house gets the house.

17        And right now -- I just talked to McCuskey, our

18   auditor.  Right now, in the city limits of Huntington, the

19   State of West Virginia owns over 350 homes.  That's homes

20   that have been abandoned or whatever and that nobody wants

21   so they -- if they don't sell on the courthouse steps for

22   taxes, they go to the State of West Virginia.

23        So, it's diminished.  Those neighborhoods of 300 homes,

24   you drive through some of these neighborhoods and they're

25   just burnt out, tore up houses.  It's -- it's terrible.

1    **Q.**   Do those abandoned houses create other problems for

2    crime in Cabell County?

3    **A.**   Well, sure.  The people that wash out of rehabs and

4    wash out of the other stuff, they've got to find a place to

5    sleep, so they get in these homes.

6        Huntington, we go with Huntington from time to time,

7    but Huntington is always on calls where they're going --

8    people are in these abandoned homes, I guess, squatting, I

9    guess you would call it.

10   **Q.**   Have you observed how the opioid epidemic affects the

11   people in Cabell County and Huntington who aren't addicts?

12   Can you explain?

13   **A.**   Well, predominantly down in Huntington, down in the

14   city, I mean, we've had a downturn, you know, in the

15   business community because people don't want to go down

16   there.  They're kind of afraid to go, especially after dark

17   with all the homeless and the people wandering the streets.

18   The thing is, is the people that live there and want to

19   raise their families there are concerned of what the future

20   holds for Cabell County.

21   **Q.**   During the period of time you served in law

22   enforcement, were you aware that there were pharmacies or

23   physicians in the area, Cabell County/Huntington area that

24   were dispensing a high volume of opioids in either a

25   clinical or pharmacy setting?

1    **A.**   Yes, sir.  There was -- there was a few that comes to

2    mind, but over time, as they finally got a handle on it,

3    they shut those down.

4    **Q.**   What did -- what kinds of things did law enforcement

5    see at those places?

6    **A.**   Well --

7              MS. CALLAS:  Objection, foundation.  I don't think

8    you've established any involvement by Sheriff Zerkle in any

9    investigations of pharmacies in Cabell County.

10             THE COURT:  I agree.  You can --

11             BY MR. MAJESTRO:

12   **Q.**   Sheriff, did you receive reports of investigations or

13   -- well, from your officers regarding the pill mill, as you

14   described them?

15             MS. CALLAS:  Objection again, foundation.  What

16   time period?  While he was State Police until 2010?

17             BY MR. MAJESTRO:

18   **Q.**   Let's start with the period --

19             THE COURT:  Sustained.

20             BY MR. MAJESTRO:

21   **Q.**   Let's start with the period while you were at the State

22   Police.

23   **A.**   I was aware that there were some things going on in

24   Cabell County.

25             MR. STANNER:  Sorry, Judge.  Then under those

1    circumstances, we'll object to hearsay.  The question is,

2    did you receive reports from others about these things.  I

3    think we've given Sheriff Zerkle plenty of latitude to

4    describe his observations, but this is pretty core hearsay.

5              THE COURT:  Sustained, Mr. Majestro.

6              MR. ACKERMAN:  Your Honor, if I may?

7              MR. MAJESTRO:  I'm phoning a friend.

8              MR. ACKERMAN:  I think we would contend, Your

9    Honor, that any police investigations that were reported to

10   Mr. Zerkle would be public records pursuant to 8038(a)(2),

11   matters --

12             THE COURT:  Well, if you have a specific one, I

13   think that would apply, but he's just drawing a conclusion

14   generally from whatever ones he's seen.  So, I'm not sure

15   that that hearsay exception covers a situation like that.

16   So, I'm going to sustain the objection.

17             MR. MAJESTRO:  We'll move on, Your Honor.  Thank

18   you.

19        Thank you, David.

20             BY MR. MAJESTRO:

21   Q.   So, you testified this is your second term as sheriff?

22   A.   It is.

23   Q.   And is this your last term?

24   A.   There's only two offices in the State of West Virginia

25   that are termed, Governor and Sheriff, and I am termed, yes.

1    This is my last.

2    **Q.**   And can you tell us why you -- you -- why you've been

3    involved in this testimony that you've given here today?

4    Why did you want to come and talk to the Court about the

5    opioid problems in Cabell County?

6    **A.**   You know, I --

7             MR. STANNER:  Objection, Your Honor, relevance.

8             THE COURT:  Sustained, Mr. Majestro.

9             BY MR. MAJESTRO:

10   **Q.**   Is the opioid epidemic over in Cabell County?

11   **A.**   No.  It's long over.  It's long from being over.  I --

12   I fear for what comes for my grandchildren and the next

13   generation.  This is not about me.  I'm an old guy.  I'm

14   done.

15       What's going to happen down the road?  That's what --

16   that's what I wonder about.  What -- what are we going to do

17   with the next generation of kids that I'm dealing with in

18   these schools that don't have parents, that have died from

19   this?  And who is going to raise these kids?  And what kind

20   of life is my grandkids going to have in Cabell County?

21   **Q.**   And one final question.  Can you describe for the Court

22   a recent experience you personally had with the opioid

23   epidemic?

24   **A.**   I was --

25             MR. STANNER:  We will object -- I'm sorry.  I'm

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    sorry, Sheriff.  I don't mean to interrupt.
 2              THE WITNESS:  It's okay.
 3              MR. STANNER:  We'll object, Your Honor.  The Court
 4    has had briefing from us on personal antidotes and
 5    experiences with the opioid epidemic.  It's not -- it's not
 6    relevant in a public nuisance case.
 7              MR. MAJESTRO:  I think if you give me a little
 8    latitude and let the sheriff answer, the relevance will be
 9    clear.
10              THE COURT:  Well, I'm going to let him answer this
11    question.  I'm not sure -- well, go ahead.
12              THE WITNESS:  You can -- you stop me at any time.
13              BY MR. MAJESTRO:
14    Q.   No, go ahead.
15    A.   I -- as the sheriff, I'm -- I notice things going on.
16    I was leaving the grocery store about two weeks ago and I
17    noticed across street three of my vehicles, my deputies,
18    were at a stop and I normally try to not -- like the boss
19    doesn't want to show up and coach, armchair quarterback it,
20    but as I pulled out of the light and I was making the turn,
21    I noticed a lady laying beside the car.
22         And so, I -- two small children.  So, I pull in and I
23    find out that -- I observed the lady.  She was -- she was
24    dying.  She was blue.  She was -- her mouth, her nailbeds
25    was gone.
```

1        The kid -- had a four-year-old and an eight-year-old

2    kid who were hysterical.  My deputy told me that the little

3    girl, the eight-year old, blocked -- went out in the middle

4    of traffic and blocked traffic to get someone to aid her.

5        I have explained to you in the past that I normally do

6    not Narcan people.  I leave that to the squad.  My deputy

7    had Narcan.  She was definitely dying.

8        I told the deputy, he said do you want me to hit her

9    and I said yes.  We bagged her.  And, you know, we tried to

10   move the kids off to the side.

11       You know, I had a friend with me.  The little girl said

12   are you going to be my new mom?  I mean, it's just crazy.

13   And -- and as I've -- and all of a sudden she just takes

14   this massive breath of air and sits up like what's going on

15   and I'm like I don't know.  You tell me what's going on.

16   And she says nothing.  I'm just out running around.

17       And the little girl starts screaming.  Mommy, you know

18   better.  You stopped at so-and-so's house and you got

19   something.  And then you fell asleep driving the car.

20       And she would have died.  She was dead.  And we -- you

21   know, we brought her back.  And those things --

22       And the little boy says -- he comes to me and he says,

23   I play tee ball.  Do you want to come and watch me play tee

24   ball?  And I've got a grandson that age.  I'm like, Buddy,

25   I'm sure -- he says I'm pretty good.  Why don't you come and

1    watch me play tee ball?  And I'm like, I'm sure you are,

2    Bud.

3         And, you know, I had to take and call -- get a parent,

4    another parent to come get the child, and we took her to

5    jail for child neglect, felony child neglect.  She thought

6    she was going home.  She ain't going home.  She needs help.

7         But who's going to take care of these kids?  That's

8    what I'm worried about.  What's going to happen?  What's

9    going to happen to these kids?  If we weren't there to

10   Narcan her, what's going to happen?

11              MR. MAJESTRO:  Thank you, Sheriff.  That's all the

12   questions I have.

13              THE COURT:  Okay.  Who wants to go first?

14              MS. WICHT:  Oh, Ms. Callas is going to question,

15   Your Honor.  I respectfully would object to the narrative

16   that was just offered on the grounds of hearsay and

17   relevance.

18              THE COURT:  Well, I don't want to be insulting

19   with the Chief, but I think it is of questionable relevance

20   and I'll -- and I'll disregard it.

21        You may cross examine, Ms. Callas.

22              MS. CALLAS:  Thank you, Your Honor.

23              THE COURT:  I called you Chief.  You're Sheriff.

24   You used to be a chief.

25              THE WITNESS:  Yeah.  You can call me anything, as

1    long as you don't call me late for dinner.

2                    **CROSS EXAMINATION**

3               **BY MS. CALLAS:**

4    **Q.**   Good afternoon, Sheriff Zerkle.

5    **A.**   Good afternoon.  How are you?

6    **Q.**   I'm all right.  I'm Gretchen Callas.  I represent

7    AmerisourceBergen.

8    **A.**   Yes, ma'am.

9    **Q.**   I have some questions for you.

10   **A.**   Sure.

11   **Q.**   You've talked a bit about your time at the State

12   Police.

13   **A.**   Yes, ma'am.

14   **Q.**   You retired in 2010; is that correct?

15   **A.**   I did, yes, ma'am.

16   **Q.**   And, again, at that time, is it correct to say you were

17   not involved in any sort of drug investigation or Drug Unit?

18   **A.**   I was not, but I was in a leadership role at

19   headquarters, and when we staged these events we had staging

20   events and staff meetings and I was prevalent to some of

21   that information, yes, ma'am.

22   **Q.**   So, you were in an administrative role with the State

23   Police; is that correct, at the time you retired?

24   **A.**   Yes, ma'am.

25   **Q.**   You spent several years after the State Police working

1   in private business you own in Mason County; is that right?

2   **A.**   Yes, ma'am.

3   **Q.**   And then, if I understand it, in 2013, you were invited

4   to be the Chief of Police of Milton, correct?

5   **A.**   That is true.

6   **Q.**   And what -- was that the middle of 2013?

7   **A.**   Not to be specific, but like June, July maybe,

8   something like that.

9   **Q.**   And then, when you were the Chief of Police of Milton,

10   did you go out on any drug investigations at that time?

11   **A.**   If we had a -- a drug arrest or a high profile arrest,

12   I would go and observe and assist with -- as far as like

13   administrative things, like do this.  Don't do this.  We've

14   got to be careful, that kind of stuff, but as far as active

15   role on the front line of arresting people, no.

16   **Q.**   Now, you came to understand while you were the Chief of

17   Police in Milton that there was a major problem with heroin

18   in Milton, right?

19   **A.**   In Milton, as well as Cabell County, yes, ma'am.

20   **Q.**   And you understood in 2013 that there was also a major

21   problem, prevalence of methamphetamines, correct?

22   **A.**   Meth has always been around.

23   **Q.**   Okay.  And those problems had been long-standing in

24   Milton and Cabell County?

25                MR. MAJESTRO:  Objection, Your Honor.  That

1    misstates his testimony.

2           THE COURT:  Well, this is cross examination.  I'm

3    going to allow this.

4           THE WITNESS:  Okay.

5           BY MS. CALLAS:

6    **Q.**   When you took over as Chief of Police in Milton, there

7    was already a problem in Milton with both heroin and

8    methamphetamines, correct?

9    **A.**   A more prevalent of heroin.  Meth, meth had kind of

10   slacked off a little bit at that time.

11   **Q.**   So, you do not recall that in 2013 methamphetamines

12   were prevalent in Milton?

13   **A.**   They were prevalent.  I don't know -- I'll go ahead and

14   say yes, prevalent.

15   **Q.**   Well, do you recall testifying that meth was being

16   flooded into Milton while you were the Chief of Police?

17   **A.**   It had been as long -- as well as heroin.

18   **Q.**   Okay.  So, there was a flood of methamphetamines

19   brought in by Mexican drug dealers; is that correct?

20   **A.**   That had increased, yes, ma'am.

21   **Q.**   And that methamphetamine was very pure, was that

22   correct, sir?

23   **A.**   It was -- yes, ma'am.  It was -- it was good stuff.

24   **Q.**   You've described drug dealers as entrepreneurs; is that

25   correct, sir?

1    **A.**   They're not doing it for fun.

2    **Q.**   They're businessmen who will sell what will sell; is

3    that right?

4    **A.**   Supply and demand.

5    **Q.**   They don't just stick to one thing, do they?

6    **A.**   In my experience, it is whatever is more prevalent in

7    that area at that time, what they --

8    **Q.**   But they will switch based on market requests or need,

9    right?

10   **A.**   Yes, ma'am.  Like the meth has made a stronger comeback

11   here lately because of all of the overdose [sic] and the

12   death.  So, meth is a little -- I'd call it safer, I guess,

13   if you want to call it that, a safer drug.  You don't have

14   as much chance of overdosing and dying from meth as you do

15   with heroin.

16   **Q.**   So, your experience right now is those using drugs now

17   use more meth, correct?

18   **A.**   It has -- it has picked up drastically.  Most of our

19   Drug Unit stuff is more toward the meth side now, but we're

20   pretty deep into this thing.  We've -- the recovery and the

21   efforts that we've made, we've got a lot of people in

22   recovery.  So, meth has came back.

23   **Q.**   Now, your predecessor as sheriff was a gentleman by the

24   name of McComas; is that right?

25   **A.**   Tom McComas.

1    **Q.**   And you understood when you took over his job in 2017

2    that he had been dealing with heroin problems in Cabell

3    County during his term; is that right?

4    **A.**   Yes, ma'am.

5    **Q.**   And he was the sheriff from 2008 to 2 -- end of '16,

6    correct?

7    **A.**   Yes, ma'am, he was.

8    **Q.**   And you understood while he was the sheriff that there

9    were heroin drug dealers coming in from California, Michigan

10   and Ohio; is that right?

11   **A.**   I would say that's true.

12   **Q.**   So, from 2008 to 2017, prior to your term as sheriff,

13   there were heroin issues in Cabell County, correct?

14   **A.**   There was, but at that same time frame, there was a

15   massive opioid pill problem, too.

16   **Q.**   Now, you understood that there were large quantities of

17   heroin coming into Cabell County during that time frame,

18   correct?

19   **A.**   As well as large quantities of pills.

20   **Q.**   Now, the current problem in Cabell County is fentanyl,

21   is it not?

22   **A.**   It is a factor, yes, ma'am.

23   **Q.**   And is it not leading to a number of the overdoses

24   you've seen in Cabell County?

25   **A.**   It plays a part in it.  As I alluded to before, you've

1    got someone that is not a manufacturer or whatever.  You've

2    got some guy with a third grade education mixing up this

3    dope and -- and these people get -- that buy it think they

4    can use a normal amount of what they usually use to get high

5    and if it's cut with fentanyl or carfentanil, then they

6    usually overdose, yes, ma'am.

7    **Q.**    And it's true the fentanyl trafficking goes

8    hand-in-hand with both heroin and meth; is that right?

9    **A.**    It's -- it's right there with it, yes, ma'am.

10   **Q.**    And fentanyl can be mixed with any number of different

11   drugs; isn't that correct?

12   **A.**    It has been known to be done that way, yes, ma'am.

13   **Q.**    So, you could have a fentanyl overdose that is caused

14   because you've taken some other drug that you believed was

15   something over than fentanyl; is that right?

16   **A.**    That happens on occasion.

17   **Q.**    So, the individual who overdoses with fentanyl may not

18   have believed they were taking an opioid, correct?

19   **A.**    I think that's true in some cases, yes, ma'am.

20   **Q.**    You were asked about individuals who may have started

21   taking prescription pills and then moved to heroin.  Has

22   your department ever investigated why an individual who has

23   suffered a heroin overdose started taking heroin?

24   **A.**    I think that's a pretty simple answer.  I think that if

25   I have became addicted to an opioid-based pill and that

1    supply is gone --

2    **Q.**   That's not my question, sir.

3    **A.**   Then I have to migrate to heroin, which is an opioid.

4    **Q.**   That's not my question, sir.  I asked if your

5    department has ever investigated why an individual who took

6    heroin started taking heroin?  Did you investigate that

7    question?

8    **A.**   If I answer it, you're going to say it's hearsay, so

9    no.

10   **Q.**   Do you remember giving a deposition, sir, last summer

11   in this litigation?

12   **A.**   I did.

13           MS. CALLAS:  Can we pull up Sheriff Zerkle's

14   deposition at Page 57?

15           BY MS. CALLAS:

16   **Q.**   You were asked, sir, when an arrest is made by the

17   Cabell County Sheriff's Department for someone who has

18   heroin in his possession, the Sheriff's Department -- where

19   there has been an overdose of heroin, is there an

20   investigation by -- done by the Sheriff's Department as to

21   what led the person to start using heroin and your answer

22   was no, not really; is that correct?

23   **A.**   I just -- I don't think I said yes.  And I said if I

24   said what I thought, you'd object.  So, I think that's still

25   relevant.

1   **Q.**   So, the answer is, sir, no, the Sheriff's Department

2   does not do an investigation as to --

3   **A.**   No, we don't.

4   **Q.**   You've talked quite a bit about funding and it's your

5   testimony, sir, that you currently are underfunded; is that

6   correct?

7   **A.**   I recently got my budget restored because of the fact

8   of what we did with the jail bill and we also changed

9   healthcare providers that saved an additional several

10   million dollars to the county.  So, my ten percent budget

11   cut was restored.

12   **Q.**   Okay.  And when did that occur?

13   **A.**   '19.

14   **Q.**   So, you now have -- is it 44 deputies in the Sheriff's

15   Department?

16   **A.**   I do.

17   **Q.**   You mentioned that you send five of those deputies to

18   area schools; is that correct?

19   **A.**   I do.

20   **Q.**   Isn't it true that you are reimbursed for the time of

21   those deputies by the Board, the School Board?

22   **A.**   Not -- not entirely, no.  I have a lot of skin in that

23   game.  They -- they reimburse me for a percentage of that.

24   I still pay their benefits, their car, their uniforms.

25       If they're not in school, I pay for them.  If they're

1    on Christmas break, I pay for them.  If they're on summer

2    break, I pay for them.  So, when they're in school, part of

3    their salary is reimbursed, yes, ma'am.

4    **Q.**   Okay.  So, when they are not in the school, are they

5    working for you as a sheriff's deputy?

6    **A.**   Yes, ma'am.

7    **Q.**   You testified about the jail bill and going over the

8    jail bill.  Do you have, sir, statistics in some sort of

9    form of the number of individuals who are on home

10    confinement due to a drug-related arrest?

11    **A.**   Not off the top of my head, no, ma'am, I don't.

12    **Q.**   Do you know if those documents, those statistics,

13    actually exist anywhere?

14    **A.**   I'm sure they do.

15    **Q.**   Is that something you have created or ordered someone

16    else to create?

17    **A.**   My Home Confinement Division is 11 people.  That's

18    another million dollars off County's budget that we have to

19    fund that.  They interact with those people a couple times a

20    week.  They bring them in once a week.  Every -- mandatory

21    they come in and do drug screening.

22        I'm sure somewhere in their file we know why they were

23    arrested and we probably have done some type of interview or

24    intervention to know whether they are drug users.

25    **Q.**   I have asked, sir, if you have those statistics

1    somewhere in your department?  Do you know if those exist?

2    **A.**   I'm sure they do, but I do not have those readily

3    available.

4    **Q.**   Have you looked at them anytime recently?

5    **A.**   No, I can't say that I have.

6    **Q.**   As it relates to drugs and the potential statistics

7    that may exist as to drug use, do you know if they're broken

8    down by the type of drug the individual on home confinement

9    would have been using?

10   **A.**   I wouldn't know that.

11   **Q.**   I think you've testified that the jail bill has been

12   reduced over the last year or two; is that correct?

13   **A.**   I wouldn't say it's been reduced.  It's been subsidized

14   by home confinement.

15   **Q.**   So, has the total amount that the County has had to pay

16   to house individuals in jail gone down or not?

17   **A.**   Sure, it has.  I -- I can put somebody on home

18   confinement for ten bucks.  Costs me $49 to put them in

19   jail.  Do the math.

20   **Q.**   Isn't it true that the jail bill has gone down

21   $100,000.00 a month for the County over the last year?

22   **A.**   Sure, it has.  Again, do the math.  A hundred people,

23   $48.00 a day times 30 times 12, a million-four.  Yep.  There

24   it is.

25   **Q.**   That is a million dollars a year saved by the County

1    for having individuals on home confinement instead of jail;

2    is that right?

3    **A.**   That's good business sense, yes, ma'am.

4    **Q.**   And do you understand, Sheriff Zerkle, that that has

5    resulted in a surplus in the County's budget?

6    **A.**   That resource, that is how I partially got my ten

7    percent back.  So, those -- those tactics and other things

8    have led to a swing to the County into a positive, yes,

9    ma'am.

10   **Q.**   And do you understand that the County actually has

11   $500,000.00 in a budget surplus for the last fiscal year?

12   **A.**   When you're operating on $20 million budget, is that a

13   lot of money?  Yeah.  I would say that's reason -- I would

14   say that's true.

15   **Q.**   Sheriff Zerkle, do you understand that this is a rainy

16   day fund of $500,000.00 and it's the first time that the

17   Cabell County Commission has ever had a surplus?

18   **A.**   I do.  And I was instrumental in doing that because

19   we've got a lot of rainy days ahead of us.

20   **Q.**   I think you -- I think you're aware, sir, of the West

21   Virginia Board of Pharmacy's database where they house

22   prescription information.  Are you generally familiar with

23   that?

24   **A.**   Somewhat.

25   **Q.**   Are you aware that law enforcement has limited access

```
 1    to that Board of Pharmacy database?

 2    A.    At one time, it was very difficult, but I think it has

 3    become better.

 4    Q.    I think you're aware that the State Police may have

 5    even lobbied at the legislature to gain access to that

 6    database; is that right?

 7    A.    We did.

 8    Q.    Since you've been the Sheriff in Cabell County in 2017,

 9    '18, '19 and '20, that's four years, correct?

10    A.    Yes, ma'am.

11    Q.    Have you ever investigated a pharmacy in Cabell County?

12    A.    I have not, but I --

13    Q.    Have you ever investigated a physician in Cabell County

14    during those four years?

15    A.    I'm going -- I have not, but my Drug Unit has

16    endeavored into those fields, but that's probably hearsay.

17    Q.    Okay.  Are you aware of the specifics of those

18    investigations?

19    A.    Most of the time, I am not, because they are federal

20    investigations and I try to stay out of those things.  I

21    don't ask my guys what they're doing to -- to very specific

22    things until they are cleared by either arrest, or

23    conviction, or whatever.

24    Q.    You testified a little bit about suspected overdose

25    calls.  The Sheriff's Department will sometimes be called to
```

1    an overdose event; is that correct?

2    **A.**    We do.

3    **Q.**    Okay, but not every -- every time there is an overdose,

4    a suspected overdose in Cabell County; is that correct?

5    **A.**    No, because -- and the recent trend is if someone

6    overdoses, the person that calls says they're having chest

7    pains and shortness of breath.  So, in those situations, we

8    wouldn't respond, but then later find out -- they call us

9    sometimes and say that it's an overdose situation.

10   **Q.**    If a Cabell County sheriff's deputy does respond to a

11   suspected overdose, is there a document that is prepared?

12   **A.**    That would be on our CAD system.  It would be in the

13   CAD system that when they finished the call or logged the

14   call, a true report may not be generated every time, but

15   they would clear it on what they call the CAD.

16   **Q.**    So, the CAD would house some record of the Sheriff's

17   Office responding to a suspected overdose; is that right?

18   **A.**    They should.

19   **Q.**    Have you ever collected those runs to see how many of

20   those you respond to in a given year?

21   **A.**    I have not.

22   **Q.**    You talked about crime in Cabell County.  And I did ask

23   you about specifications related to statistics.  Has your

24   department taken any effort to go through either arrest

25   records or incident reports to determine how many of the

1    crimes in Cabell County actually relate to drugs?

2    **A.**   I would say no.

3    **Q.**   And if we wanted to drill down even further to see how

4    many of the crimes or incidents in Cabell County related to

5    a specific type of drug, you would not have that data

6    collected, correct?

7    **A.**   I would have it, but it would be through my Zerker

8    system and I would have to actually compile it or talk to

9    one of my officers that actually has done that or compiled

10   that information.

11   **Q.**   And that has not been done, correct?

12   **A.**   Well, I think it has, but that's, again, probably

13   hearsay.

14   **Q.**   Well, you've not looked at any document that would show

15   that level of information, sir, the number of crimes?

16   **A.**   I --

17   **Q.**   And the drugs related, if at all?

18   **A.**   I have personally not.

19   **Q.**   Have you looked at any summaries of overall crime in

20   Cabell County over the last few years?

21   **A.**   I'm sure I have.  Nothing comes to mind, sticks out in

22   my mind specific, but I'm sure --

23   **Q.**   Are you aware of State Police summary records that

24   tally all the criminal incidents in the county?

25   **A.**   I used to be somewhat involved in that because we would

1    -- we collected all the NIBRS information at the State

2    Police.  All the cities and counties had to compile all of

3    their crime data and send it to the State Police.  So, yeah,

4    I would be familiar with what -- I know they do that.

5    **Q.**   I would like to show you a couple of documents that are

6    State Police summaries.

7    **A.**   Okay.

8    **Q.**   So, these are actually plaintiffs' exhibits.

9    **A.**   So, if you're going to make me look at something, I'm

10   going to have to wear my glasses.  I brought glasses just in

11   case.

12        Getting old, Judge.

13              MS. CALLAS:  May I approach, Your Honor?

14              THE COURT:  Yes, you may.

15              THE WITNESS:  You're going to give me all this in

16   small print, aren't you?

17              MS. CALLAS:  Here you go.

18              THE WITNESS:  Thank you, ma'am.

19              MS. CALLAS:  You're welcome.

20              BY MS. CALLAS:

21   **Q.**   So, Sheriff Zerkle, I've handed to you a document.

22   It's marked P-41044.  And it shows on one side the 2018

23   number of incidents and it should be on the other side the

24   2017 number of incidents, crimes in Cabell County.  Is this

25   document familiar to you?

1    **A.**    I would assume.  As I alluded to before, it's probably

2    NIBRS information that we've submitted to the State Police.

3    **Q.**    Okay.  You were sheriff for both years; is that

4    correct?

5    **A.**    I was.

6    **Q.**    And you will see -- let's look at 2017.  We have a

7    total crimes or incidents of 739.  Do you see that at the

8    bottom?

9    **A.**    I do, ma'am.

10   **Q.**    Okay.  There is a line item, is there not, for drug

11   narcotic violations?  Do you see that line?  I think it's

12   about six from the top or eight from the top.

13   **A.**    I see that.  33.

14   **Q.**    33.  Do you see any other line item that relates to a

15   drug-related offense or crime?

16   **A.**    I would say probably driving under the influence could

17   be considered part of that.

18   **Q.**    But it does not specify on this document what -- what

19   would specifically be the substance, intoxicant involved,

20   right?

21   **A.**    No, it doesn't, ma'am.

22   **Q.**    We can't tell from this document any other crimes on

23   this sheet that might relate to drugs, correct?

24   **A.**    No, ma'am, but as I've alluded to before, I mean, we

25   have a large amount of other offenses, of larcenies and

1    things like that, that normally inherently were done by drug

2    addicts.

3    **Q.**   But this drug document does not suggest any other drug

4    offense other than drugs and narcotics, correct?

5    **A.**   No, they don't.

6    **Q.**   Okay.  And to determine what you've just suggested

7    would require looking at actual arrest and incident records,

8    wouldn't it?

9    **A.**   Yes, ma'am.

10   **Q.**   Okay.  So, as we look at this document for 2017, and

11   this is a quick math problem I can ask you to do.

12   **A.**   Oh, boy.

13   **Q.**   Uh-huh.  Or you could --

14   **A.**   Rely on you.

15   **Q.**   Well, I'm not going to ask you to do that.  So, I'm

16   going to give you a calculator, okay?

17   **A.**   Oh, boy.  Am I certified on this thing?

18   **Q.**   I can tell you what to do.

19   **A.**   Thank you, ma'am.  I'm sure you will.

20   **Q.**   All right.  So, in 2017, in Cabell County, we had 739

21   -- it says incidents or crimes.  Would you agree that's what

22   this document shows?

23   **A.**   Yeah.  Those are actually what I would call a

24   reportable, yes, ma'am.

25   **Q.**   Okay.

1    **A.**    Actually done reports.

2    **Q.**    And I was going to ask you that.  That doesn't mean

3    somebody was necessarily convicted of a crime, correct?

4    **A.**    No, ma'am.

5    **Q.**    And there could be one person who may commit a number

6    of incidents or crimes at one time; is that right?

7    **A.**    Oh, yes.

8    **Q.**    Okay.  So, the 700 number does not mean individual

9    people?  It could be --

10   **A.**    It could be a multitude.  They could create -- create

11   -- commit a multiple crime in one event, yes, ma'am.

12   **Q.**    Okay.  So, let's do our math problem.

13   **A.**    Okay.

14   **Q.**    We have drug and narcotic violations, 33, and I'd like

15   you to divide into 33 739.

16   **A.**    .04.

17   **Q.**    Okay.  So, that's four percent; would you agree with

18   me?

19   **A.**    It is.

20   **Q.**    All right.  Now, let's look at the other side of this

21   document, which is 2018.  This is your second year as

22   sheriff; is that right?

23   **A.**    Yes, ma'am.  Can I interject something at this point?

24   **Q.**    Well, I'm going to have you answer my questions for

25   now, Sheriff Zerkle, if that's all right.

1    **A.**    Yes, ma'am.

2    **Q.**    So, for 2018, we have a total number of crimes.  It

3    appears to be a larger number; would you agree with me?

4    **A.**    I've got an answer for that, but yes, ma'am.

5    **Q.**    Okay.  Again, we have a line item for the drug and

6    narcotic violation.  That number is also higher; is that

7    correct?

8    **A.**    Much higher.

9    **Q.**    So, let's do the math again, 222 divided by 1946.

10    **A.**    .11.

11    **Q.**    Okay.

12    **A.**    11 percent.

13    **Q.**    11 percent.  I have a document that goes back to 2016,

14    as well.  Do you know the numbers for 2016 in Cabell County?

15    **A.**    I have no idea.

16    **Q.**    What about 2015, do you know those numbers?

17    **A.**    I don't, but if you show them to me, I'll be happy to

18    talk about them.

19    **Q.**    Well, you have testified today about exploding crime

20    and I'm just wondering if you have documentation or

21    knowledge related to these specific statistics that the

22    State Police collect?

23    **A.**    I see a -- I see a major increase between '17 and '18,

24    don't you?

25    **Q.**    I'm asking you, sir, if you've looked at 2015, 2016, or

1   even going back to 2010, the very same data points?

2   **A.**   Some of that, I guess, would be my personal experience

3   as sheriff.  As I have moved forward, it has continuously --

4   it has moved in a drastic upward fashion.

5   **Q.**   So -- so, you're saying that it has moved in a dramatic

6   upward fashion since when, sir?

7   **A.**   Well, my personal experience, I think it's been going

8   on for sometime, but if you've got other data that you would

9   want me to look at it, I'll be happy to look at it.

10   **Q.**   Well, I've asked you, sir, if you've looked at this

11   State Police data going back to prior to these two years

12   while you were in office?

13   **A.**   Do you not think four percent to 11 percent is a

14   drastic increase?

15   **Q.**   I've asked you, sir, if you've looked at the data for

16   the years prior to these two years?

17   **A.**   I have not.

18        MS. CALLAS:  Thank you.  That's all the questions

19   I have.

20        THE WITNESS:  Thank you.

21        THE COURT:  It might be a good time for a break.

22   Sheriff, you can stand up and move around, if you want

23   to.

24        Let's be in recess for about ten minutes.

25        (Recess taken)

```
 1              THE COURT:  Do you want to cross, Mr. Stanner?
 2              MR. STANNER:  Yes.  Thank you, Your Honor.
 3              THE COURT:  You may proceed.
 4              MR. STANNER:  Thank you, sir.
 5                        CROSS EXAMINATION
 6              BY MR. STANNER:
 7    Q.   Good afternoon, Sheriff.
 8    A.   Good afternoon.
 9    Q.   My name is Andrew Stanner.  I represent McKesson.  It's
10    nice to meet you.
11    A.   Nice to meet you, sir.
12    Q.   Sir, I think you said on direct examination that you
13    noticed pills most in the years 2005-2010, right?
14    A.   I said it was prominent in those timelines, yes, sir.
15    Q.   Yeah.  And I'm not trying to put words in your mouth.
16    That's just -- you were talking about pills, and then also
17    heroin and, if I understand it correctly, the big era for
18    pills in your estimation was '05-2010, right?
19    A.   That was probably predominantly the height of it from
20    my observations.
21    Q.   Right.  And in the -- you've been the sheriff since
22    2017, right?
23    A.   I have.
24    Q.   And in that time, the time you've been sheriff the last
25    4-5 years, whatever it is now, pills basically dried up
```

1    before that point, right?

2    **A.**   They were in the process, yes, sir.

3    **Q.**   And so, by the time you were sheriff, you haven't

4    really dealt with pills?  You've dealt with a lot of heroin?

5    **A.**   Lots of heroin.  Still some pills.

6    **Q.**   But heroin -- the overdoses and things that you were

7    describing earlier, that's predominantly heroin?  That's

8    what you said on direct, right?

9    **A.**   It is.  It -- predominantly, when the pills left, the

10   heroin came.

11   **Q.**   Okay.  So, I'm just asking you about your -- I'm not

12   asking you about when one left and when one came.  I'm

13   asking about your observations as Sheriff starting in 2017.

14   **A.**   Predominantly heroin.

15   **Q.**   And other illegal drugs, methamphetamine, things like

16   that?

17   **A.**   Yes, sir.

18   **Q.**   Right.  And the time -- when you say that pills were

19   prevalent, that '05-2010 period, that's not when you were

20   the Sheriff in Cabell, that's when you were in a different

21   job?

22   **A.**   I was in the State Police at that time.

23   **Q.**   Right.  I'm going to -- I'm going to come back and ask

24   you more about the time in the State Police, but at that --

25   at that point, when you talk about pills being prevalent,

1    what you mean is people were selling them on the street,

2    things like that?

3    **A.**   They were sold on the street and then massive amounts

4    were coming to our county, also.

5    **Q.**   Yeah.  I'm asking about people acquiring those -- when

6    you say you saw them, you mean you recovered them from

7    people during arrests, things like that?

8    **A.**   They were recovered.  There were also massive amounts

9    of pills being shipped to my county.

10   **Q.**   I understand, sir.  I thought your testimony was about

11   your observations of what you saw as a law enforcement

12   officer from arrests and things of that sort.

13   **A.**   Oh, okay.  Yes, sir.  Yeah, pills.  We covered pills

14   from individuals.

15   **Q.**   That's what I'm asking about.  So, you -- when you say

16   you saw pills in 2005-2010, you're talking about in the

17   context of arrests?

18   **A.**   In the combination of, yes.

19   **Q.**   Right.  And so, you would see people -- you would

20   arrest drug dealers, for example?

21   **A.**   We would arrest drug dealers and/or people who had

22   bought pills without prescriptions and things like that.

23   **Q.**   Right.  So, somebody who got a -- who got prescription

24   pills, you know, from a drug dealer on the street without a

25   prescription, that kind of thing?

**A.**   Yes, sir.

**Q.**   Okay.  And sometimes people stealing them out of medicine cabinets, things like that?

**A.**   Medicine cabinets.  I mean, we had people that would get on airplanes in Huntington and fly to Florida to go to the pain clinics to get pills and then come back.

**Q.**   I see.  So, it was -- and this is still 2005-2010 that you're talking about?

**A.**   I don't know exactly when the time frame was, but I knew that it had gone on awhile, for quite awhile.

**Q.**   Right.  And you had actual cases like that?  People would leave Huntington and go to some other state like Florida?

**A.**   They would do whatever it took to get the pills, the prescriptions, or whatever.

**Q.**   Right.  But that included -- I'm just using your example.

**A.**   Yeah.  Some people did go out of state, sure.

**Q.**   And then -- and then they would bring in loads of pills from Florida back to Huntington?

**A.**   Yes, sir.

**Q.**   And did you have busts like that, people coming in with -- you know, off the plane with boatloads of pills?

**A.**   I can't recall specifically that we had, but I'm sure that it did help in the arrest of things that had to be

```
 1    involved.

 2    Q.   Okay.  Anyplace other than Florida that comes to mind

 3    or just -- you just know they were coming from other states?

 4    A.   Always -- you know, they had the Allegiant flight that

 5    was -- they called it the Pill Express.

 6    Q.   I'm sorry.  Is Allegiant an airline?

 7    A.   Yeah, it's an airline.  Cheap flights out of Huntington

 8    to Florida.

 9    Q.   Got it.  Oh, okay.  Sorry.

10    A.   That's okay.

11    Q.   But it was like a regular flight?  People would just

12    come from -- is it just Florida?

13    A.   The one that comes to my mind that I'm prevalent with

14    would be the Florida flights.

15    Q.   Got it.  Did you ever look into -- or do you know if

16    anybody -- DEA or anybody looked into the pharmacies or drug

17    outfits or wherever it was that they were getting these

18    pills in Florida?

19    A.   I've watched some documentaries and things where those

20    people were -- those pill -- those pharmacy distributors and

21    people were arrested later.

22    Q.   Okay.  But that's just from the TV?

23    A.   Yeah.

24    Q.   Okay.  You said on direct that there's been a real

25    change in overdoses, right, that that time period, '05-2010,
```

```
1    didn't have the same kind of overdoses that you see

2    recently, right?

3    A.    My observations, no.

4    Q.    Right.

5    A.    Because, as I had said before, they were normally

6    abusing pills that they could rely on.  And then, when they

7    switched to heroin, they didn't have the reliability and

8    there was a more common overdose factor.

9    Q.    Sure.  So, really the spike in overdoses, the big

10   increase in overdoses, that's because of the illegal sort of

11   illicit drugs like the heroin, right?

12   A.    It is.

13   Q.    And methamphetamine?

14   A.    It is, but we had a huge supply of pills and it goes

15   away and now it's over here.  It's off-shifted to heroin.

16   In my mind, it's still all an opioid-based situation.

17   They're either taking pills and they don't have pills and

18   then they go to heroin.  That's my personal opinion.

19   Q.    I understand.  And, Sheriff, respectfully, do you think

20   you've had the chance to explain the transition from pills

21   to heroin that -- that is your opinion?

22   A.    Yeah.  I think that's how it happened, yes, sir.

23   Q.    Okay.  So, I just want to bring you back to my question

24   then.  My question was just the spike in overdoses that you

25   talked about --
```

1    **A.**    Right.

2    **Q.**    That was really about heroin and illegal drugs, right?

3    **A.**    Yes.

4    **Q.**    Okay.  You -- you also said though that during your

5    time as Sheriff things seemed to have gotten better on the

6    addiction front?

7    **A.**    You had no beds in '16.  You got 3,000 beds today.

8    Yes.

9    **Q.**    Yeah.  I'm -- I'm not disagreeing with you, Sheriff.  I

10   actually want to talk to you about it.

11   **A.**    Yeah.  I think it has.  Yeah.  I think it has.  Yeah.

12   We got a chance.  I think we're starting to have a chance to

13   try to fix some people.

14   **Q.**    Right.  So, you -- and, again, you've only been the

15   sheriff at least since 2017, so that's just a pretty short

16   time to have this kind of progress, right?

17   **A.**    Four -- four years, yep.

18   **Q.**    And what you've seen is that addiction sort of peaked

19   in 2017 in the county?

20   **A.**    I can't say that it peaked.  I don't know -- I think

21   it's peaked.  I think we're on the downward slope, but we

22   still have 3,000 beds.  That's disturbing.

23   **Q.**    Yeah.  And I'm going to --

24   **A.**    I mean, if we went from 3,000 beds down to 2,000 beds,

25   I'd say, man, we're doing some good.  We've done reduced it

1    33 percent, but we're still there.

2    **Q.**   Right.  But you have done -- don't sell yourself short,

3    right?  You have done -- you have done some good.  I think

4    the word you used was pinnacle.  At some point, you saw 2017

5    as a pinnacle for the addiction crisis, right?

6    **A.**   I think that it was a turning point, I do.

7    **Q.**   Turning point?  So, and that -- and that, since then,

8    you're starting to see progress?

9    **A.**   I see progress in my mind because of the resources that

10   we have found and utilized to begin to help people.

11   **Q.**   And I think you even sort of called it the Center For

12   Recovery.

13   **A.**   Unfortunately, we have been dubbed that.  We're the --

14   we were the epicenter of the opioid epidemic and now we have

15   kind of become the epicenter of the recovery, which is good

16   and bad.  I think it's bad for economic.  I mean, I don't

17   know that I want to move my family to the opioid recovery

18   center of the world.  You know, it's tough.

19   **Q.**   I understand.  The 3,000 beds that you mentioned --

20   **A.**   Right.

21   **Q.**   Those are -- is that -- is that a reference to

22   available beds or occupied beds?

23   **A.**   Well, I know that there's a total of 3,000 beds.  I

24   don't know the Census count today.  Like they may have -- in

25   Huntington, we may have a hundred empty beds, I don't know,

1    but I know that there must be a pretty good demand because

2    it's not getting less.  It seems like we're getting more

3    recovery homes.

4    **Q.**   So, I wonder if you could tell me a little bit more

5    about that.  You said 3,000 beds spread out in 65 different

6    houses?

7    **A.**   Give or take.

8    **Q.**   Do you know who pays for that?  Is that state funded?

9    Private funding?

10   **A.**   Well, I think it's a combination from what we've

11   understood from some of the things that we've done with

12   these patients and interviewed the patients.  I think part

13   of it is under the new healthcare laws.  The children or

14   young adults get to stay on their family's healthcare plan

15   until they're 26.  If they're fortunate enough to be an

16   addicted individual and their parents has got a great

17   healthcare plan, then I think their healthcare plan pays for

18   it.

19        If they don't, I think the government has subsidized

20   and funneled a ton of money into this thing now.  They're

21   starting to pump a ton of money into it.  You know, an

22   addicted person is basically like a disability now.

23   **Q.**   Okay.  And so, some people there, if I understand

24   correctly, some people that are in those beds are paying for

25   it through their insurance?

**A.**   I'm sure they are.

**Q.**   And then you said the government, but you probably --
maybe don't know, City, County, State?

**A.**   I would -- I would say it's probably like your
Medicaid, Medicare system.  I know the County is not paying
for any of it.  We don't have enough money of our own.

**Q.**   Right.  And as far as you know, the City is not -- the
City of Huntington is not paying for it?

**A.**   No.  I don't think so.  I just think that -- and some
of these people in recovery, the people that's doing it, may
not get paid.  It's like walking out on a hospital bill, I
would say.

You know, and hopefully, hopefully these recovery homes
and these beds are there for the right cause, that they're
there to try to fix these people.  Most of the people that
work in those in Huntington that I have interaction with are
former addicts.

**Q.**   Got it.  You said on direct, and correct me if I have
this wrong, but it's been your personal observation in your
time as Sheriff that 70 or 80 -- 60, 70, 80 percent of crime
might be traceable to drug use; is that right?

**A.**   I think that's my personal opinion, yes, sir.

**Q.**   Yeah.  And there's not -- in other words, you haven't
run statistics to prove that up?  That's just your
observation?

**A.**   No.  That's just my personal observation by my in-depth dissection of the jail bill and what they were incarcerated with and things like that.

**Q.**   Right.  And, I mean, to give you an example, you said when Ms. Callas -- I think it was Ms. Callas was asking you about -- I mean, I'm sorry.  I don't know which lawyer it was, but asking about crash reports.  You said a lot of times I review crash reports, things like that?

**A.**   I did more prevalent when I was in the State Police because we were in charge of all the fatal crashes.

**Q.**   Right.

**A.**   It's called FARS.

**Q.**   So, it's kind of your best estimate based on what you observed, talking to your troops, things like that?

**A.**   Talking to troops, talking to people, talking to, you know, my deputies, things like that.

**Q.**   Okay.  And if I were -- I assume if I were to ask you to break that down, could you tell me which specific numbers are traceable to which kind of drug?  You probably would say I can't do that.

**A.**   I can't do that.

**Q.**   Right.

**A.**   Good guess.

**Q.**   Sure.  I want to -- I want to talk a little bit about the work you and others have done to combat the illegal drug

1    problem in Huntington-Cabell County.

2    **A.**    Okay.

3    **Q.**    First of all, you said you started in the training

4    academy in the mid-80s, right?

5    **A.**    I did.

6    **Q.**    And you got trained -- that was for the State Police?

7    **A.**    Yes, sir.

8    **Q.**    And you got trained even all the way back then on

9    drugs, rights?

10   **A.**    We did, but --

11   **Q.**    I assume it's not -- I mean, I assume that would be

12   true at any State Police Office anywhere, right?

13   **A.**    Sure.  Yeah, we do, and we have in-service training,

14   things like that.  Every year, we go back for more training

15   and, as we go through there, I'm sure we had some updates on

16   drugs and drug -- you know, things like that.

17   **Q.**    Right.  And, obviously, we're going to get to the

18   present day.  I know the drug problem here is very different

19   than it was in the 80s, so I promise you we're going to get

20   there, but --

21   **A.**    It's -- it's a big change.

22   **Q.**    But back then, you got trained -- in the 80s, you got

23   trained on heroin?

24   **A.**    A little bit.  Touched on it.  Wasn't much going on, a

25   lot of heroin.

1  **Q.**   Right.

2  **A.**   Dirty needle using kind of thing.  Nobody liked it.

3  Kind of had a bad stigma.

4  **Q.**   Sorry.  There was dirty needle using by people and --

5  **A.**   Well, I mean just people weren't into IV drug use at

6  that point as prevalent as they are today.

7  **Q.**   Sure.  So, academy training included things like

8  heroin, methamphetamine, cocaine, marijuana back in the 80s?

9  **A.**   Talked about it, yes, sir.

10  **Q.**   Okay.  It did not, though, include training on

11  fentanyl?

12  **A.**   No, sir.

13  **Q.**   And it wouldn't have included any training or

14  carfentanil?

15  **A.**   No, sir.

16  **Q.**   Those are new, right?

17  **A.**   Newer, yes.

18  **Q.**   Right?  And certainly weren't around in the 80s or even

19  the 90s or --

20  **A.**   I wish they weren't around today but, yeah, you're

21  right.

22  **Q.**   We can agree on that?

23  **A.**   Yes, sir.

24  **Q.**   But they weren't there really until very recently?

25  **A.**   More prominent, yes, sir.

```
1    Q.    Yeah.  There was, though, illegal drug traffic,

2    obviously, into Huntington from other cities outside of West

3    Virginia, right?

4    A.    Sure.

5    Q.    I can be more specific.  Back in the 80s and the 90s,

6    there were -- there were drug trafficking organizations

7    coming from Detroit, places like that?

8    A.    There was, and there still is, and I -- and it's kind

9    of like I said before.  Follow the money.

10   Q.    Right.

11   A.    If you've got a -- if you've got a demand for something

12   and people are willing to pay for it, then they're going to

13   come.

14   Q.    Yeah.  And, specifically, drug trafficking

15   organizations, have you heard that term, drug trafficking

16   organization?

17   A.    I have.

18   Q.    DTO, is that what you guys call them?

19   A.    Yeah.  That's an acronym, yeah.

20   Q.    Those specifically, those drug trafficking

21   organizations have been coming from places like Detroit,

22   right?

23   A.    Detroit is more prevalent for Cabell.

24   Q.    And Columbus?

25   A.    Columbus, Akron.
```

```
 1    Q.   Some Chicago?

 2    A.   Chicago.

 3    Q.   Yeah.  And that's been happening for awhile, right,

 4    since at least the 90s?

 5    A.   I would assume, yeah.  Yes, sir.

 6    Q.   It was in 1992, I think, that the Huntington Violent

 7    Crime Drug Task Force was first started; is that right?

 8    A.   I'm going to rely on you and say yes.

 9    Q.   Oh, I'm sorry.  I don't want to put words in your

10    mouth.

11    A.   I don't know exactly when it was formed.

12    Q.   Do you do work with Huntington Violent Crime Task

13    Force?

14    A.   It has since been dissolved but, yes, we did.

15    Q.   Okay.  You talked earlier about funding.  You said you

16    apply for any grant you can?

17    A.   I do.

18    Q.   I would like to show you one of those, if I could.

19              MR. STANNER:  Could we see DEF-WV-00274?

20         Your Honor, permission to approach the witness?

21              BY MR. STANNER:

22    Q.   Here you go, Sheriff.  Sorry about the glasses.

23    A.   That's all right.  You're good.

24    Q.   All right.  Sheriff Zerkle, do you see the cover of

25    this document?
```

```
 1   A.   It looks like my --

 2              MR. MAJESTRO:  Your Honor, excuse me.  This

 3   document appears to not be a public record of any sort.  We

 4   would object on the basis of hearsay.

 5              THE COURT:  Well, what are you going to use it

 6   for, Mr. Stanner?

 7              MR. STANNER:  Well, Your Honor, it's an

 8   application from Cabell County.  Sheriff Zerkle is listed on

 9   it as one of the members of the JAG Team there, so we -- we

10   --

11              THE COURT:  Well, you can -- I'll let you question

12   him about it, but I'm not sure it's admissible.  And are you

13   going to offer it into evidence?

14              MR. STANNER:  I was going to try and lay a

15   foundation and put it into evidence.

16              THE COURT:  You can question him about it.  Go

17   ahead.

18              MR. STANNER:  Sure.

19              THE COURT:  And then we'll decide whether it's

20   admissible or not.

21              MR. STANNER:  Sure.

22              BY MR. STANNER:

23   Q.   Sheriff Zerkle, I think I might have cut you off.  Did

24   you say this was your JAG grant application?

25   A.   Well, it appears to be that.  It's got -- it's Cabell
```

1    County Commission on it, so I would say that's us.

2    **Q.**   Right.  So, that's you.

3    **A.**   That's me.

4    **Q.**   That's what I'm getting at.  So, you all submitted this

5    grant application for JAG funds, right?

6    **A.**   Yeah.  That's the application.  I don't know -- yeah, I

7    do.

8    **Q.**   I can -- I can point you to it.  If you look just at --

9    I should -- for the court reporter, when we say JAG funds,

10   we're talking about Justice Assistance Grants, right?

11   **A.**   Yes, sir.

12   **Q.**   J-A-G.  that's a DOJ grant?

13   **A.**   Yes, sir.

14   **Q.**   All right.  So, if you would turn to Page 2, you can

15   see it says up at the top left there, applicant agency.

16   That's Cabell County Commission?

17   **A.**   Yeah.  We -- we run everything through the commission.

18   **Q.**   Right.  And so this is your application, but it gets

19   run through the Cabell County Commission, right?

20   **A.**   It is.

21   **Q.**   And if we look at Page 26 --

22   **A.**   26?

23   **Q.**   If you go down to the bottom, do you see those numbers

24   on the bottom left, DEF-WV, and then it's 000274.000?

25   **A.**   Yeah.

1   **Q.**   Yeah.  If you go to the one that ends in 26.

2   **A.**   Okay.  Okay.

3   **Q.**   And you can see there's a paragraph there that says the

4   following individuals are members of the Governing Board for

5   the HVCDTF?

6   **A.**   Yeah.

7   **Q.**   Right?

8   **A.**   Yeah.

9   **Q.**   If we kept on reading, we would see on the next page

10   Sheriff Chuck Zerkle?  That's your name?

11   **A.**   That would be me.

12   **Q.**   And that's all listed -- now, if you can, I'm not --

13   I'm not trying to -- I'm sorry to run you around this

14   document, but if you go back to 25, that's where it asks for

15   this list of all the parties collaborating on this project.

16   Do you see that at the top of Page 25?

17   **A.**   Yeah.

18   **Q.**   The reason I'm doing all that, I just want to make

19   clear to the Court that you -- this is your application?

20   You collaborated on putting it together and submitting it

21   for a justice grant, right?

22   **A.**   I did.

23   **Q.**   Okay.

24           MR. STANNER:  At this time, Judge, we'd move 274

25   into evidence.

```
1              THE COURT:  Is there still an objection?

2              MR. MAJESTRO:  Yes, Your Honor.  It's still

3    hearsay.

4              THE COURT:  How is it relevant, Mr. Stanner?

5              MR. STANNER:  Well, Your Honor, we're going to

6    walk through some of the representations that the County

7    makes in its application about the illegal drug trafficking

8    in the county.

9              THE COURT:  Do you have an objection to that, Mr.

10   Majestro?

11             MR. ACKERMAN:  I mean, I think -- Your Honor, I

12   think we'd certainly object to introduction of the document

13   in evidence.  If Mr. Stanner wants to ask him questions

14   about it, he can, but it's -- we haven't established any

15   exception to the hearsay rule for this.

16             THE COURT:  Okay.  I'm not going to admit it now,

17   but I'm trying to see if you object to him questioning about

18   it.

19             MR. ACKERMAN:  No.  No.

20             THE COURT:  You don't?

21        Go ahead, Mr. Stanner.

22        Ms. Wicht?

23             MS. WICHT:  I'm sorry, Your Honor.  I didn't mean

24   to jump in late.  I believe it's a statement of a party

25   opponent under 801(d)(2).
```

1          MR. STANNER:  Yeah.  I'm sorry if I've been

2    unclear, Judge.  It's Cabell County's application.  It is an

3    admission of a party.  It's also filed with the Justice

4    Department on behalf of the County, so it's a public record

5    from the County.

6          THE COURT:  Well, we'll look through it.

7       (Pause)

8          THE COURT:  I think it's not hearsay under the

9    definition contained in the 801(b)(2) and 801(d)(2) and I'm

10   going to admit it.  It's admitted.

11         MR. STANNER:  Thank you.

12      Thank you, Ms. Wicht.  Sorry to be unclear.

13         BY MR. STANNER:

14   **Q.**   Sorry about all of that, Sheriff.  The -- can you turn

15   with me, if you will, to Page 7 of this document and we can

16   put it up on the screen if it's easier to look at.  Page 7

17   has got the -- something called the problem statement.  Do

18   you see that?

19   **A.**   Yep, I see that.

20   **Q.**   And this is -- this is -- just to orient you, if you

21   look at the beginning of the second paragraph there, it says

22   for many years and, Sheriff, there's a screen there to your

23   right.

24         THE COURT:  What page are you on, Mr. Stanner?

25         MR. STANNER:  Sorry, Judge.  Page 7 by our

```
 1    account, which is the bottom numbers on the left,

 2    DEF-WV-002749.  Sorry about that.

 3              BY MR. STANNER:

 4    Q.   And, Sheriff, if it's helpful to you, if you just look

 5    to your -- it's there.

 6    A.   Yeah, I'm good.  My glasses are working out pretty

 7    good.

 8    Q.   Okay.  It says there in the application for many years

 9    there's been a strong market for illegal drugs in the

10    Tri-State area, right?

11    A.   Yes, sir.

12    Q.   And the Tri-State area there, that's -- that's --

13    A.   Huntington.  That would be -- to me, the Tri-State is

14    -- because Huntington touches two other states, it would be

15    Ohio, Kentucky and West Virginia.

16    Q.   Got it.  So, and if you skip down, you'll see it says

17    much of the HVCDTF area of responsibility, that's that

18    Huntington Violent Crime Drug Task Force?

19    A.   It is.

20    Q.   Much of the are of responsibility has seen a

21    significant increase in the illegal use and distribution of

22    heroin and fentanyl?

23    A.   Yeah.

24    Q.   Along with Mexican methamphetamine?

25    A.   I see that.
```

1   **Q.**   And then down at the bottom, the very last sentence

2   there, heroin, fentanyl, and Mexican methamphetamine are the

3   most pressing drug problems in the area?

4   **A.**   I agree with that.

5   **Q.**   And that's still true?

6   **A.**   I would say, yeah, it's pretty -- it's holding up

7   pretty good.

8   **Q.**   So, I want to talk about some of the cases I think your

9   office and the State Police have worked on.  This -- this --

10  this trend of these -- these organizations coming from

11  outside Huntington-Cabell, that's been around, I think you

12  said, probably since the 90s, right?

13  **A.**   I didn't say that.  You said that.

14  **Q.**   Oh, I'm asking.  I thought you said that Detroit and

15  other cities had --

16  **A.**   In the 90s?

17  **Q.**   Yeah.

18  **A.**   I have not personally experienced the Detroit influx

19  until the later times in the -- in the teens.

20  **Q.**   Okay.  And --

21  **A.**   I think there's always been drug -- I mean, you're

22  trying to say that there's been drug trafficking in

23  Huntington.

24  **Q.**   Sure.

25  **A.**   I don't specifically know of the Detroit connection to

1    Huntington as much until the heroin exploded.

2    **Q.**   Well, let me -- let me ask you about a couple of cases

3    and see --

4    **A.**   Okay.

5    **Q.**   -- if I can make sense of it.  In 2002, you were at the

6    State Police, right?

7    **A.**   I was.

8    **Q.**   In 2002, there was a pretty prominent drug raid where

9    70 law enforcement officers, state troopers included, State

10   Police included, the National Guard got involved.  They

11   landed helicopters and did a big raid.  Do you have any

12   memory of that big raid in 2002?

13   **A.**   In Huntington?

14   **Q.**   Yes, sir, in Huntington.

15   **A.**   You may refresh my memory, but it doesn't -- that's not

16   coming -- that's almost 20 years ago.  I'm not -- just what

17   you're telling me does not ring a bell.

18   **Q.**   Okay.  You don't remember that one?

19   **A.**   I don't.

20   **Q.**   Okay.  In 2005, there was a big joint Task Force

21   operation back in 2005 as a result of a shooting of a couple

22   of prom students; do you remember that?

23   **A.**   I do remember that.

24   **Q.**   And that -- that 2005 incident really illustrated that

25   there was a -- there were some folks from Detroit coming in

1    and bringing illegal drugs into Huntington, right?

2    **A.**   I think that they have never solved those murders.   I

3    know that they're still unsolved to this day.   I think there

4    was strong speculation that the drug trafficking

5    organizations of some sort had played a part in that.

6    **Q.**   So, we found a couple of news stories about this.   I'm

7    just going to ask you if you think this is true.   There's a

8    news story that says well-documented Detroit was the major

9    supplier of crack cocaine in Huntington.   Is that true in

10   your view?

11           MR. ACKERMAN:   Objection, time frame.

12           MR. STANNER:   It's the -- I'm talking about the

13   2005 raid.

14           THE COURT:   Can you answer?

15           THE WITNESS:   Can I answer?   I didn't know if I

16   was supposed to shut up.   I would say crack cocaine was a

17   problem in that time frame, yes.

18           BY MR. STANNER:

19   **Q.**   Right.   And, specifically, is it your memory that in

20   2005 Detroit gangs were bringing in crack cocaine?

21   **A.**   I don't know.   I don't.   I can't say that I know where

22   it came from.

23   **Q.**   Okay.   Let me skip ahead and talk about some more

24   recent cases that I think you might know.

25   **A.**   Okay.

```
 1   Q.   Are you familiar with a drug trafficking organization
 2   run by a person named Robert Shorter?
 3   A.   What?
 4   Q.   Robert Shorter?  Do you remember that?
 5   A.   Shorter?  Was that -- no.  No.  I don't know that --
 6   when was that one?  What time frame?
 7   Q.   Yeah.  I'm happy to show it to you.  This is
 8   DEF-WV- 318.  This is from 2018, sheriff.
 9   A.   Okay.  I might be able to --
10           MR. STANNER:  Permission to approach, Your Honor.
11           THE WITNESS:  Did you say 2018?
12           MR. STANNER:  Yes, sir.
13           THE WITNESS:  Yeah, I remember this.
14           BY MR. STANNER:
15   Q.   You remember the Robert Shorter drug trafficking
16   organization?
17   A.   Well, I remember the -- this -- this document has kind
18   of helped refresh me, but I'm terrible with names, but I --
19   okay, yeah.
20   Q.   Sure.  So, this was a -- what you're looking at here,
21   DEF-WV-1318, this is an e-mail from David Hudson to a couple
22   of other folks, including you, right?
23   A.   My name is there, yes, sir.
24   Q.   Dave Hudson, he is the group supervisor for the HIDTA
25   Task Force?
```

**A.**    Yep, that's him.

**Q.**    HIDTA, for the court reporter, is H-I-D-T-A.  That's the High Intensity Drug Trafficking Area, right?

**A.**    That's what it is.

**Q.**    And Dave Hudson, he is with DEA, right?

**A.**    Yes, he is.

**Q.**    And he's writing to thank you and others for your coordination on this drug bust, right?

**A.**    Yes, sir.

**Q.**    And he says specifically, if you go down below, it provides some of the details for that drug bust and, in particular, that investigators seized 189 grams of fentanyl; is that right?

**A.**    Yes.

**Q.**    And then 293 grams of heroin?

**A.**    Yes.

**Q.**    And there's other items, there, too, right?  It says marijuana?

**A.**    Says oxycodone pills, too, 180.

**Q.**    Yeah.  I was -- I'm not trying to -- I'm not trying to trick you, Sheriff.

**A.**    Okay.

**Q.**    I'm just reading them off.

**A.**    Okay.  Yep.

**Q.**    It says marijuana.  And then it says oxy -- says 180

```
 1    oxycodone pills, right?

 2    A.    Right.

 3    Q.    And it says 1200 grams of unknown powder, suspected

 4    cutting agent?

 5    A.    Yes, sir.

 6    Q.    Right?  And Robert Shorter, this drug trafficking

 7    organization that your office helped to bring down, this was

 8    an operation being run out of Columbus, Ohio?

 9    A.    Yes, sir.

10    Q.    Is that right?

11    A.    Yes, sir.

12    Q.    And this investigation, I take it, went on for quite

13    sometime, right?

14    A.    As I alluded to before, that would be part of my Task

15    Force Group and I am not privy to a lot of that information.

16    Q.    Okay.  So, you didn't personally work on the Shorter

17    case?

18    A.    I did not.

19    Q.    Okay.

20    A.    I was probably there for the press event.  You know how

21    politicians are.  Try to get a little bit of that, but that

22    was it.  I'd learned more about it after the fact.

23    Q.    Okay.

24    A.    That's what I've tried to allude to, is I try to keep

25    myself out of this thing until after the fact when --
```

1    **Q.**   Right.

2    **A.**   I was hoping for more money, but they didn't get very

3    much money.

4    **Q.**   You mean recovery of money so you could have it in

5    forfeiture?

6    **A.**   Yes, sir.

7    **Q.**   Well, so, one of the -- in the course of working on the

8    case, did you learn that the Shorter organization had been

9    operating for five years, ten years?

10          THE COURT:  Just a minute.

11       Mr. Ackerman?

12          MR. ACKERMAN:  Objection, foundation.  The witness

13   just testified that he didn't work on the case and wasn't

14   really aware of it until after.

15          THE COURT:  Yeah.  I'll sustain the objection.

16   This -- he didn't remember any of this apart from what was

17   read to him out of this document that his name is on.  I'll

18   sustain the objection and you can move on, Mr. Stanner.

19          MR. STANNER:  Yes, sir.

20          BY MR. STANNER:

21   **Q.**   One last one I want to ask you about, Sheriff, that you

22   might know.  Are you familiar with an operation called

23   Operation Saigon Sunset?

24   **A.**   I was.

25   **Q.**   Did you come up with that name?

1    **A.**    No.  That would be our -- our federal prosecutor.

2    **Q.**    That's a good name.

3    **A.**    Yeah.

4    **Q.**    Operation Saigon Sunset was an operation you worked on;

5    is that right?

6    **A.**    I was a part of the press event after it was over,

7    sure.

8    **Q.**    Okay.  Operation Saigon Sunset brought down a drug

9    organization called the Peterson Drug Organization; do you

10   know that?

11   **A.**    I do.

12   **Q.**    And it's another -- it's one of these organizations

13   that's bringing drugs in from Detroit?

14   **A.**    They have been, yes, sir.  They were and they have for

15   sometime.

16   **Q.**    And that's what I'm getting at.  So, they -- your

17   office helped bring them down in 2018; is that right?

18   **A.**    Yes, sir.  I think that was the date and timeline.

19   **Q.**    But at the time, even in 2018, you had evidence you

20   knew they had been operating for something like 15 years; is

21   that right?

22   **A.**    I personally didn't have any operation for that, but

23   based on the press event that happened after the fact.

24   **Q.**    Okay.

25   **A.**    And once -- once you brought that up, I was kind of

```
 1    upset that we would let someone like this or we knew of

 2    operate in our county or our town for that amount of time.

 3    Kind of sickening to your stomach, honestly.

 4              THE COURT:  Mr. Stanner, I need to interrupt you

 5    and take five minutes to switch court reporters.

 6              MR. STANNER:  Okay, no problem.

 7              THE COURT:  We'll do that right now.

 8         (Recess taken)

 9         (Proceedings resumed at 3:36 p.m. as follows:)

10              THE COURT:  Okay, Mr. Stanner, whenever you're

11    ready.

12              MR. STANNER:  Thank you, Your Honor.

13    BY MR. STANNER:

14    Q.   Sheriff, I promise I don't have too much more.  I

15    did promise you we were going to talk about the current

16    illegal drug problem and I want to make sure we have a

17    chance to do that.

18    A.   Okay.

19    Q.   And that's it.  You've, you've already testified a

20    number of the drugs we've discussed are still a problem

21    today; heroin, methamphetamine, --

22    A.   They are.

23    Q.   -- fentanyl and carfentanil?

24    A.   They are.

25    Q.   Right.  But the heroin today is very different, I think
```

1    you said, than what it was back in the '80s when you were in

2    training?

3    **A.**   It's, it's so -- it's because it's so popular.

4    **Q.**   Right.

5    **A.**   It's became one of the most popular -- I guess it

6    sounds bad being popular, but it's one of the most abused

7    drugs.

8    **Q.**   Right.  And it's also just substantively different than

9    it used to be.  Instead of it being black tar, it's like --

10   it's a powder you can snort?

11   **A.**   Yeah.  It comes in different forms, yes, sir.

12   **Q.**   Right.  And it's so much more pure and potent?

13   **A.**   And that's -- yes, and that's one of the factors that

14   I've talked about is the reliability of who has done this to

15   this and altered it.  And the person that's using it is used

16   to a certain dose.  And then it gets altered with fentanyl,

17   carfentanil or whatever, and then we have massive overdose

18   and death.

19          THE COURT:  Does any of the heroin come from

20   Mexico?

21          THE WITNESS:  I think it does, but predominantly

22   the mass influx of meth is coming from, from -- that we're

23   seeing, the meth, most of the meth is coming from Mexico.

24   And then I'm not real sure where -- it migrates down from

25   Detroit and Ohio, but I'd say some of the heroin had to come

1    from Mexico, especially since they've opened up the borders

2    more so.

3    BY MR. STANNER:

4    **Q.**   And that actually was going to be my question too.

5    When it comes from Mexico, it comes and goes to local

6    gangs in these cities we've been talking about and then

7    to Huntington?

8    **A.**   That's, that's what we see mostly is that -- we've

9    always -- you know, most of our problems of late was coming

10   out of Detroit.  I've always said that when we arrest

11   someone, there's someone in Detroit saying, "Saddle your

12   horse.  You're going to Huntington.  Somebody just went

13   down.  You're up.  It's your turn.  Let's go."

14   **Q.**   Right.  And you -- what you mean by that is that

15   there's always going to be another drug dealer from Detroit

16   coming?

17   **A.**   Kind of like putting your hand in a bucket of water.

18   When you pull your hand out, you can't see where your hand's

19   been.

20   **Q.**   Right.  And for you all it's sort of like whack-a-mole?

21   **A.**   Whack-a-mole at great cost.

22   **Q.**   Yeah.  I wasn't trying to make light of it.  I just

23   mean --

24   **A.**   Oh, yeah, it is.  And it's -- the death and destruction

25   of it is horrible too.

1    **Q.**   And the Mexican cartel that you said is bringing the

2    methamphetamine and other drugs, these are huge,

3    billion-dollar illegal businesses?

4    **A.**   That's my impression, yes.

5    **Q.**   So this is -- part of what's happening is a concerted

6    effort to make these drugs more addictive; right?

7    **A.**   I would believe so.  I think we had an addicted

8    population that migrated toward those.

9    **Q.**   Sure.  But say today, if someone started using drugs

10   today, that can happen; right?

11   **A.**   Sure, it does.

12   **Q.**   And when that happens today, they're using drugs that

13   are infinitely more addictive than what they would have been

14   using in the '80s; --

15   **A.**   I agree with that, sir.

16   **Q.**   -- right?  And, so, not only that, these outfits from

17   Detroit and Mexico, they'll deliver drugs to your house if

18   you call them on the phone; right?

19   **A.**   No, no, they don't.

20   **Q.**   Maybe you can tell me how it works.  How, how -- if I

21   wanted to -- if a person wanted to get some illegal drugs in

22   Huntington, Cabell County, is there an open-air drug market?

23   **A.**   I think more areas of Cabell County and Huntington are

24   more predominantly -- we do that.  We work those areas of

25   town and that county to make small buys with people.

1          And then at that point, we try to work ourselves into a

2     situation where we take that person and we call it work

3     them.  We try to -- we're holding a carrot out there.  You

4     know, we're saying, "Hey, you're going to go to prison,"

5     bla, bla, bla.  "Do you want to help yourself a little bit?"

6          So we try to -- our goal is to try to get the bigger,

7     the bigger guy.

8     **Q.**   Okay.  So it's like a street-level, corner-level dealer

9     that you then roll up?

10    **A.**   Yeah.  One of the reasons that I diversified with the

11    FBI and the Task Force and the DEA, I can arrest people in

12    Cabell County and Huntington, West Virginia, but I need that

13    farther reach from the DEA and the FBI to go beyond that to

14    get the people that are actually bringing it.

15    **Q.**   You -- the last thing I want to talk to you about,

16    Sheriff, --

17    **A.**   Okay.

18    **Q.**   -- you said you'd love to have 10 or 15 more SROs?

19    **A.**   I would.

20    **Q.**   And you'd love to have more men.  If you had unlimited

21    money, you'd go get more men?

22    **A.**   Sure.

23    **Q.**   And go get more equipment?

24    **A.**   I think that if you're ambitious and you're trying do

25    your job and you want to serve your people of your town and

1    your county, I think you owe it to them to be ambitious and

2    try to get more, more, all resources.

3    **Q.**   Right.  At the same time, though, you all have been

4    able to do quite a bit?

5    **A.**   I have.

6    **Q.**   And I think you said -- I want to make sure I quote you

7    correctly.  But you do really well at the current levels?

8    **A.**   I do.  I do really well from where I was in '16 and '17

9    when I came.  I got my budget back, but it was a lot of hard

10   work and a lot of dedication and, and compromising and

11   finding ways to do new things and save money.  Do we have a

12   plethora of money?  No, we don't.

13   **Q.**   Certainly.  But you -- I think you said you have 44

14   officers; right?

15   **A.**   I do.  I'm proud of that.  I've, I've hired nine guys,

16   but it was a lot of hard work to get to that.

17   **Q.**   Right.  And you also -- you feel like you have what you

18   need to do the job?

19   **A.**   I'm sorry?

20   **Q.**   Do you feel like you have what you need to do the job

21   you're doing today?

22   **A.**   We get by.

23   **Q.**   Yeah.

24   **A.**   We're, we're covered.  You know, we do 17,000 calls to

25   service, just the Sheriff's Office.  I mean, you saw that

```
 1    number about the 700 and all that.  But, you know, there's a
 2    lot involved.  It's not just everything is a report.  I
 3    mean, we're chasing our tails a lot.
 4    Q.   Right, great.  Thank you, Sheriff.
 5    A.   Thank you.
 6              MR. STANNER:  Thank you, Your Honor.
 7              THE COURT:  Ms. Wicht, do you have anything?
 8              MS. WICHT:  No additional questions, Your Honor.
 9         Thank you, Sheriff.
10              THE COURT:  Do you have any redirect, Mr.
11    Majestro?
12              MR. MAJESTRO:  I do, Your Honor.
13              THE WITNESS:  You're not going to make me do math
14    problems, are you?
15              MR. MAJESTRO:  I'm not.  Math is why I became a
16    lawyer.
17                        REDIRECT EXAMINATION
18    BY MR. MAJESTRO:
19    Q.   So, Sheriff, we have before you P-4 -- on the
20    document camera it's P-41044_A?
21    A.   Is that the '18 document --
22    Q.   Yes.
23    A.   -- from the State Police?
24    Q.   Yes.
25    A.   Yes.
```

1    **Q.**   When you had the calculator, you, you calculated the

2    percentage of the crimes and incidents that were reported

3    there that were in the category of drug narcotic violations.

4    **A.**   222.

5    **Q.**   Correct.  Would you go through the other categories and

6    tell me where crimes related to the opioid epidemic also

7    show up?

8    **A.**   Well, --

9            MS. CALLAS:  Objection, foundation.  He's already

10   testified that this document doesn't indicate other drug

11   crimes.  And the witness has already testified as to his

12   belief personally.

13           THE COURT:  Well, this is becoming in the nature

14   of cross-examination and I'm going to -- you opened the door

15   to this, Ms. Callas, I believe.

16       So I'm going to let you question him, Mr. Majestro.

17   BY MR. MAJESTRO:

18   **Q.**   And I'm just asking you to go through, if you can,

19   and tell -- use these categories and describe which ones

20   of those categories involve people who are connected

21   with the opioid epidemic.

22   **A.**   Well, I think, I think you have all other larcenies

23   because a large part of our larcenies are shoplifting, stuff

24   like that are, are actually -- unless shoplifting is on

25   there that I don't see.  Oh, it's down there.  Shoplifting

1    is down there.  That's down toward the bottom.  I think that

2    would contribute to it.  All other larcenies may be

3    something like stealing a weed eater out of the yard, things

4    like that.

5          All other offenses -- I don't know.  Burglary.  I would

6    say the burglary part has a factor into that because trying

7    to get into people's homes to steal their guns and coins and

8    change, things like that.

9          Disorderly conduct, that's basically -- it's kind of a

10   catch-all.  If you can't get someone under control, they're

11   out of control and they won't do what you tell them and

12   they're just kind of off the rails, that would probably fall

13   under that because they won't do what you tell them.

14         Driving under the influence, we've done talked about

15   that.  I think that's a split.  You know, you've got alcohol

16   and then you've got your narcotics.

17         Shoplifting, I done talked about that at 449.  I think

18   that is, that is huge.  We're at Wal-Mart and these places

19   every day.

20         Theft from vehicles, talked about that.  Theft from

21   buildings.  That would be like outbuildings that have -- I

22   think all of those, those crimes directly involve valuables

23   that are taken or whatever that will, in turn, be sold.

24   **Q.**   And, so, when you testified that 60 to 70 percent of

25   the people in -- that are incarcerated that you see when

1    you're reviewing the jail bills are related to the opioid

2    epidemic, are these other areas that you've just described

3    additional crimes that they would be involved in in addition

4    to the narcotic drug violations Ms. Callas talked about with

5    you?

6    **A.**    Yes, sir.  And then sometimes, you know, if they were

7    an addict or whatever, sometimes we would arrest them for

8    shoplifting and they didn't have any drugs on them.  They

9    have may have been high or coming off a high or whatever.

10   But, you know, sometimes we didn't find drugs on people.

11   **Q.**    Okay.  Mr. Stanner asked you about your training in the

12   '80s.  In the '80s did your training include Narcan?

13   **A.**    No.

14   **Q.**    How about Oxycontin?

15   **A.**    No.

16   **Q.**    Oxycodone or hydrocodone?

17   **A.**    No.  I'm an old, I'm an old guy.  No, we didn't do that

18   stuff back then.

19   **Q.**    We've talked a lot about -- defense counsel talked a

20   lot about other drugs that are prevalent in Cabell County.

21   There was some discussion of methamphetamine.

22        The overdose deaths that you've seen in Cabell County,

23   are they primarily related to methamphetamine or opioids?

24   **A.**    Opioids.

25   **Q.**    Do you have any methamphetamine deaths?

1   **A.**   Occasionally, like the other attorney alluded to,

2   sometimes they will lace those with fentanyl, carfentanil

3   and we'll have some occasions of that happening.

4   **Q.**   And when that happens, do you know whether the person

5   was taking the drug because they wanted to take an opiate or

6   because they wanted to take methamphetamine?

7   **A.**   I wouldn't know the answer to that.

8   **Q.**   So you don't know whether those might be properly

9   characterized as opioids?

10  **A.**   Well, I would think if it was laced with fentanyl, I

11  think that they were thinking they were taking meth and it

12  was laced with fentanyl and ended up overdosing and possibly

13  dying, but they never had intended to do that.

14  **Q.**   Okay.

15  **A.**   And that leads back to what I said before where you've

16  got these people with limited education actually mixing and

17  concocting this mess.

18  **Q.**   Can you pull up the grant application, DEF-WV-274?

19  **A.**   Is that something I have in front of me?

20  **Q.**   You do.  Okay.  Go to Page 7.  And defense counsel had

21  you read -- can you highlight the third paragraph that

22  begins, "The HVC/DTF"?

23  **A.**   Yeah, I see that.

24  **Q.**   Can you read that for us?

25  **A.**   You want me to read it?

1    **Q.**   It's on the big screen if that helps.

2    **A.**   Oh, okay.  "The HVC/DTF has made strides in reducing

3    drugs and violent crime in the area in recent years.

4    Despite those efforts, beginning in about 2011, due to

5    focused efforts to reduce the abuse of prescription

6    medications, heroin quickly emerged as the replacement drug

7    for addicts."

8         I have said that the entire time.

9    **Q.**   Thank you, Sheriff.  And that's, that's consistent with

10   your beliefs and testimony?

11   **A.**   I believe that with all that's in me.

12   **Q.**   What is fentanyl most commonly cut with?  Do you know?

13   **A.**   I don't.

14   **Q.**   Okay.  We've had some other testimony about that.

15   **A.**   No.  I didn't know -- I'm not going into them weeds.

16   **Q.**   Okay.  My last question, Sheriff.  So you talked about

17   the whack-a-mole problem, putting your hand in the bucket

18   and pulling it out and not being able to tell that anything

19   had changed.

20        With respect to the problems from the -- caused -- that

21   resulted from the opioid epidemic, what do you need to do to

22   empty that bucket?

23   **A.**   Well, I think it's a multi-faceted problem.  I think

24   the start of where we've got opioid, you know, recovery

25   centers and beds, even though it's a pain, it's part of the

1    process that we can get better.  I think you have better

2    counseling, mental health.  I think you've got more recovery

3    teams and, and, again, to try to fix these people.

4         We have got to try to make sure that we are in a

5    process and stay between the guardrails that we can see the

6    light -- I don't think we can see the light at the end of

7    the tunnel.  I think we're in the tunnel.  But we've got to

8    be able to merge out of the tunnel and fix our next

9    generation.

10   **Q.**   Is sustainability of the kind of things you started

11   important to emptying that bucket?

12   **A.**   It has to be.  And as he alluded to right now, I'm

13   doing okay.  I don't know I'm going to be doing okay next

14   year.  I don't.  I hope I am.

15        I hope that the next sheriff -- it's not about -- like

16   I said before, it's not about me.  The sustainability is

17   going to be the next sheriff and the next Connie Priddy and

18   everybody else.  That's where, that's where we're going to

19   try to come out of the tunnel and see the light.

20   **Q.**   And to do that, it requires financial resources that

21   are, that are sustainable; correct?

22   **A.**   Like I said, you've got to follow the money.  Money

23   makes you a hero.  If you don't have it, you're a zero.

24   **Q.**   That's all I have.  Thank you, Sheriff.

25              THE COURT:  Any recross of the Sheriff?

```
1                    MS. CALLAS:  No, Your Honor.

2                    MR. STANNER:  No, Your Honor.

3                    MS. WICHT:  No.  Thank you.

4                    THE COURT:  Sheriff Zerkle, thank you, sir, very

5       much.  We wish you well in your work and you're free to go.

6                    THE WITNESS:  Thank you, sir.

7                    MS. QUEZON:  Good afternoon, Your Honor.  Amy

8       Quezon, Q-u-e-z-o-n, on behalf of the plaintiffs, and we

9       call Dr. Lyn O'Connell to the stand.

10                   THE COURT:  All right.

11                   THE CLERK:  Could you state your name for the

12      record?

13                   THE WITNESS:  Lyn O'Connell.

14                   THE CLERK:  Could you spell your last name?

15                   THE WITNESS:  O'-C-o-n-n-e-l-l.

16                   THE CLERK:  Okay.  Raise your right hand.

17      LYN O'CONNELL, PLAINTIFFS' WITNESS, SWORN

18                   MR. RUBY:  Your Honor, before we begin, just two

19      quick points hopefully to help us minimize interruptions

20      during the witness's testimony, one by way of reminder and

21      then the other by way of objection.

22           The Court will recall that there were a number of

23      witnesses that plaintiffs disclosed as non-retained experts.

24      And there was a motion practice regarding that.  Ultimately

25      the Court, the Court ruled that with the exception of Dr.
```

1    Gupta, who's already testified, that the witnesses that the

2    plaintiffs had disclosed as non-retained experts, their

3    opinion testimony was excluded.

4        Dr. O'Connell was one of the witnesses who was on that

5    list.  So we just wanted to flag that as background for the

6    Court in the event that this does veer into the territory of

7    opinion testimony that would have been in the category that

8    was excluded.

9        MS. QUEZON:  Your Honor, I think I can

10   short-circuit this.  I don't think that I'm going to be

11   asking Dr. O'Connell any opinions that would fall into the

12   category that Mr. Ruby is concerned about.  Certainly, if I,

13   if I veer into that lane, please -- I think we can take it

14   up.

15       THE COURT:  Well, let's go ahead with the

16   examination of Dr. O'Connell and you can object as they come

17   up, Mr. Ruby, if you find anything objectionable.

18       MR. RUBY:  Understood, Your Honor.

19       The second point I'd make is that there was a 36-page,

20   what appeared to be a PowerPoint or a slide show that was

21   disclosed to us over the lunch break as a demonstrative

22   exhibit for this witness.  We -- Dr. O'Connell is here as a

23   fact witness, not an expert witness.

24       And, so, we would object to the use of that slide show

25   to walk a fact witness through the witness's testimony.

1           MS. QUEZON:  Your Honor, I believe I can lay the

2     proper foundation that it will aid in her testimony and

3     there is no opinion testimony in the slide show that she's

4     created.

5           THE COURT:  Okay.  Well, we'll see where it goes,

6     Mr. Ruby.

7           MR. RUBY:  Thank you, Your Honor.

8                          DIRECT EXAMINATION

9     BY MS. QUEZON:

10    **Q.**   Good afternoon.

11    **A.**   Good afternoon.

12    **Q.**   Can you please introduce yourself to the Court by

13    telling him your name and your title, what you do?

14    **A.**   Your Honor, I'm Dr. Lyn O'Connell and I work for the

15    Joan C. Edward's School of Medicine as the Associate

16    Director of Addiction Sciences.

17    **Q.**   And where do you live, Dr. O'Connell?

18    **A.**   I currently reside in Chesapeake, Ohio.

19    **Q.**   And how long have you lived there?

20    **A.**   I have lived there -- we moved to Chesapeake

21    approximately four years ago.  Prior to that, I was in South

22    Point for two years.

23    **Q.**   And you said "we."  So are you married?

24    **A.**   I am.  My husband, Dr. Corey O'Connell, is a

25    metallurgical engineer at Special Metals Corporation in

1    Huntington, West Virginia.

2    **Q.**   And do you have any children?

3    **A.**   I do.  I am a new mom.  I have a

4    five-and-a-half-month-old named Bennett.

5    **Q.**   Dr. O'Connell, let's give the Court the benefit of your

6    educational background and experience now.  Where did you go

7    to undergraduate?

8    **A.**   I received my undergraduate from Franklin & Marshall

9    College.  That's in Lancaster, Pennsylvania.

10   **Q.**   And, and what did you obtain your degree in?

11   **A.**   It was a dual degree in psychology and philosophy.

12   They had a fancy name for it called scientific and

13   philosophical studies of mind.  And I was a religious

14   studies minor.

15   **Q.**   And how about your Master's Degree?  Where did you

16   obtain that?

17   **A.**   I went to the University of Connecticut in Storrs,

18   Connecticut.  And I received my Master's in marriage and

19   family therapy in human development and family science.

20   **Q.**   I've been calling you Doctor, so I assume you got your

21   doctorate.  Where did you obtain that?

22   **A.**   I did.  I went back to Virginia, which is where I'm

23   originally from, and went to Virginia Tech and became a

24   Hokie and I received my doctorate in human development and

25   family science in marriage and family therapy.

1          Is there another Hokie in the room?  Woo-hoo, let's go.

2    **Q.**   All right.  And what year was that?  I'm sorry, Dr.

3    O'Connell.

4    **A.**   I eventually graduated with my Ph.D. in 2018.  However,

5    I had left Virginia Tech prior to graduating.  I was

6    completing my dissertation once I moved.

7    **Q.**   And do you hold or have you held any other specialized

8    training or certificates?

9    **A.**   Other than sort of routine clinical counseling

10   certificates in, you know, a couple in family therapy, some

11   specific therapeutic training, like crisis intervention.

12   **Q.**   And how many clinical years of experience do you have?

13   **A.**   At this point, I have over 10 years of clinical

14   experience.

15   **Q.**   Now, Dr. O'Connell, while you were in the process of

16   obtaining your doctorate degree, did you also work?

17   **A.**   Yes.  I -- when I was at Virginia Tech, my first

18   position, I worked for the Department of Defense.  They had

19   a military grant at Virginia Tech to study reintegrating

20   military families and improve things like Yellow Ribbon

21   Programming and other -- Operation Military Kids.  And we

22   did evaluation for that for the national state.

23        I also worked at the counseling center at Virginia Tech

24   for individuals, couples, and families.  And I saw families

25   throughout my whole first three years there.

1          In my fourth year and my third year as well, I

2    transitioned to work both as a teaching and graduate

3    assistant to get more teaching experience.

4          And then I worked in New River Valley Community

5    Services as part of the doctoral degree.  There were two

6    years of course work, really a year of research, and then a

7    year of intensive intervention work.  And I worked for New

8    River Valley doing that as a treatment provider for the

9    highest level of case management care for children in

10   southwest Virginia.

11             MS. QUEZON:  Your Honor, may I approach the

12   witness?

13             THE COURT:  Yes.

14   BY MS. QUEZON:

15   Q.   Dr. O'Connell, I'm handing you what's marked as

16   Demo224 and ask if you recognize it.

17   A.   I do.

18   Q.   I'm sorry, Dr. O'Connell.  Do you recognize it?

19   A.   I do.

20   Q.   What is it?

21   A.   It is a PowerPoint that I sort of put together that's

22   out of our City of Solutions document.  It sort of just

23   walks through some of the work and efforts of ourselves in

24   Huntington.

25   Q.   And would using this help to explain to the Court some

1    of the different programs, the coordination that has taken

2    place between Marshall, Huntington, and Cabell?

3    **A.**   Absolutely.

4    **Q.**   Okay.  Let's go, if we can, and let's just pick up

5    where we left off.

6         In your fourth year of obtaining your Master's, did you

7    relocate?

8    **A.**   My fourth year of my doctorate I relocated to South

9    Point, Ohio, to join my husband as he had moved.  He had

10   graduated the year before me and relocated up to the area.

11   And, so, I moved up here to join him.

12   **Q.**   And did you begin working in the area?

13   **A.**   I did.  I was offered a job by Prestera Center and I

14   took a position with them.  And I worked actually in Dunbar

15   for my first year at what at the time was Park East, and was

16   the treatment coordinator -- treatment provider for half of

17   the residents of Mattie V. Lee which is a residential

18   treatment program here in Huntington, or here in Charleston

19   that serves women who have a substance abuse disorder and

20   their children.

21        MR. RUBY:  Your Honor, now that it's on the

22   screen, we would again object to the use of the PowerPoint

23   slide deck with a fact witness.  The witness is not

24   testifying as an expert.

25        The PowerPoint seems to be full of out-of-court

1    statements and being used as sort of a prompt or a guide to

2    walk the witness through her testimony.

3         We don't object to the witness giving testimony about

4    what she's done and programs that she's worked on, but it's

5    unorthodox to have this kind of a prompt or an aid to put in

6    front of a fact witness and walk her through her testimony.

7              MS. QUEZON:  Your Honor, I'm unaware of any rule

8    of evidence that says that a demonstrative to aid the fact

9    finder can't be used with a fact witness or an expert.

10             THE COURT:  Yeah, I think it will be helpful to

11   the Court potentially as we along.  And if it goes too far,

12   Mr. Ruby, you can object again.  But for now, I'm going to

13   allow it.

14        Go ahead.

15   BY MS. QUEZON:

16   **Q.**   Now, how did you and your husband make the choice

17   to stay in the Huntington area?

18   **A.**   I worked for Prestera for approximately one year.  And

19   as anyone who's driven I-64 for an extended period of time

20   knows that that becomes laborious.  And after driving that

21   highway for a year, I was looking for positions in

22   Huntington.

23        Corey and I had sat together and actually said --

24   neither one of us are from here.  He's from Michigan.  I was

25   from outside D.C.  We had no family or real hold on the

1    area.

2        And we sat downtown Huntington one night and we said

3    we're either all in or we're all out.  We give it one year.

4    We dive as far deep into our community as we can get, or

5    we're going to find somewhere else to live.  We're going to

6    move closer to family.

7    **Q.**   And, so, from there, did you find employment in the

8    Huntington area?

9    **A.**   I did.  I'd been looking for a position at Marshall as

10   I felt that that would be the best suited.  I was finishing

11   up my dissertation.  I was virtually done, although

12   virtually can be a long distance in a dissertation.  And I

13   completed that.

14       And, so, I moved -- or I was offered a position at

15   Marshall to become the clinical coordinator for their SBIRT

16   grants.

17   **Q.**   And what is SBIRT?

18   **A.**   SBIRT is an acronym that stands for Screening Brief

19   Intervention and Referral to Treatment.  It's considered

20   SAMHSA's gold standard for evidence-based interventions.

21   **Q.**   And what is SAMHSA?  We're using lots of abbreviations.

22   **A.**   I know.  I apologize.  SAMHSA is the Substance Abuse

23   and Mental Health Administration for the Federal Government,

24   so SAMHSA.  And they provide grant funding and programs and

25   research around substance use and mental health.

1    And they -- Marshall University had applied for a

2    three-year grant to implement SBIRTs across 11 -- at the

3    time, seven curriculums on campus.  And they were looking

4    for a clinical coordinator who could develop the curriculum,

5    do the trainings and the evaluation and research for that

6    project, and I was offered that position.

7    **Q.**   Now, you mentioned trainings.  What type of trainings

8    would you do and where and --

9    **A.**   Well, when it first started, SBIRT -- it teaches

10   individuals in health professions, for example nurses, how

11   to -- if someone comes in for a routine blood examination to

12   say, "You know, I'm noticing that you have elevated levels

13   and, so, I'd like to talk to you a little bit about your

14   substance use."

15   And they go through a screening tool that's 10

16   questions both for alcohol or drugs.  And then they ask the

17   person -- they're trained on how to briefly intervene by

18   using brief motivational interviewing questions.  So we

19   teach motivational interviewing, which is another

20   evidence-based technique.

21   And then they also are then trained on how to refer

22   someone to treatment.  So if someone says, "Yes, I need

23   help," they then need to know how to move that person from

24   that position to entering some form of treatment.

25   So we trained on campus social work, counseling,

1   psychology, nursing, pharmacy, the med school, the P.T.

2   school, and health sciences.

3        We later added in more unique disciplines such as

4   journalism because we found that many people wanted to know

5   how to intervene with not only people they were working with

6   but maybe loved ones.  And we also found that people wanted

7   to know more about substance use.

8        And, so, that training broke off into a stigma-free

9   training, appropriate language when talking about an

10  individual with a substance use disorder training, just a

11  motivational interviewing training, all different types.

12  And we trained over 5,000 people in three years.

13  **Q.**   And what types of groups of people would you provide

14  this training to?

15  **A.**   We worked with -- locally here.  I worked with the

16  family court judges and did a training for them, the

17  probation and parole officers.  We did extensive training

18  with faith leaders, journalism, media and marketing teams.

19       Also, most of the hospitals in the state eventually

20  were involved in some capacity; really, anyone who wanted

21  it.  It became front desk staff at healthcare providers, a

22  whole host of folks.

23  **Q.**   And what years did you do this training for SBIRT?

24  **A.**   This would have been 2015 to 2018.

25  **Q.**   And you mentioned that this was a grant?

1   **A.**   Yes, it was.

2   **Q.**   And was the grant a three-year grant?

3   **A.**   It was.

4   **Q.**   And did it end in 2018 or --

5   **A.**   We -- if you, if you do well with the SAMHSA or federal

6   money, you're often allowed a no-cost extension at the end.

7   So that's what it's called formally to apply.  You say,

8   "We've done everything you've asked us to do but we still

9   have money left over.  We'd like to continue doing that."

10        And if they grant that, it's a no-cost extension for

11   six months to a year.  They received a full year's no-cost

12   extension on the SBIRT grant at Marshall.

13   **Q.**   And then what happened in 2018?  Did you take a

14   different role?

15   **A.**   I did.  As the grant was winding down, I knew I was on,

16   quote/unquote, soft money, so grant funding in my position.

17   I began looking for other opportunities.  And in part

18   because of the amount of training I had done around the

19   state, I had been pulled in a lot of different directions.

20   I had helped write some grants at Marshall and I'd helped

21   work on some other projects.

22        And, so, because of that, Bob Hanson at the time was

23   working with the Joan C. Edward's School of Medicine and

24   Marshall Health on developing a coordinator response which

25   was a division of Addiction Sciences.  But he was leaving to

```
 1   become the Office of Drug Control Policy Director for the
 2   State of West Virginia.
 3       He recruited me over to Marshall Health in the position
 4   of the Associate Director for the division.
 5   Q.   Now, when was -- if you know, when was the Department
 6   of Addiction Sciences established at Marshall?
 7   A.   Formally I believe it's the 2017-2018 timeline.  Bob
 8   Hanson had been there in 2017 and had helped get it off the
 9   ground, was working to coordinate within the medical
10   schools.  And then he -- and he had a vista.
11       And then it was formally taken in-house in the
12   Department of Family and Community Medicine at Marshall.
13   And that was because they believed that substance use
14   disorders are a primary care disease and should be treated
15   as such.  And, so, it was important to house it under Family
16   and Community Health.
17       So we are now -- we sit under Family and Community
18   Medicine and Dr. Steve Petrany.
19   Q.   Do you know why it was created?
20   A.   To coordinate -- at that time, the university was
21   working to coordinate their response.  The City of
22   Huntington had developed the Office of Drug Control Policy
23   much prior and was looking to both the medical school and
24   the university to be coordinated.  It was such a large lift
25   that it needed everybody on the same page.
```

1    **Q.**   And what are your primary duties and responsibilities

2    as Associate Director of Addiction Sciences?

3    **A.**   In large part it has been to grow to meet the need of

4    the community.  So, like I said, when Bob started, there

5    were two people, himself included.  We now have a division

6    of over 70 individuals.

7         And that has all occurred since 2018, in large part

8    implementation folks, people doing on-the-ground work, but

9    also seeing, overseeing grants.

10        So we've written a large number of grants, received a

11   small number of those.  We've implemented research.  We've

12   helped with community programming.  We help with training.

13   We really try to be responsive to any community need.

14   **Q.**   In your role with the Department of Addiction Sciences,

15   have you conducted research on substance use within

16   Huntington and Cabell?

17   **A.**   Research has not been my main priority in the area as

18   most of it's been taken up with grants and program

19   implementation.  But we do extensive evaluation for our

20   projects.

21   **Q.**   And from your experience and observations, what

22   substance is most frequently abused by the patient

23   population?

24   **A.**   When I started, it was almost exclusively opioids.

25   **Q.**   And has that changed over time?

1    **A.**    Yes.  I think we've seen that morph into more

2    specifically heroin, fentanyl, carfentanil.

3    **Q.**    Now, the term "OUD" has been used throughout sort of

4    all of the testimony.  Can you, can you tell the Judge what

5    is OUD and what is the definition of it?

6    **A.**    Yeah.  So when we talk about substance use disorders,

7    that's a pretty broad term.  So I would say an addiction is

8    defined by a craving of the object, loss of control over its

9    use, and continued use despite adverse consequences which

10   could be nicotine, sugar, our cell phones.

11        But when we specifically then qualify it as an opioid

12   use or a substance use disorder, that's when the individual

13   has the medical craving and they're going to experience

14   withdrawal symptoms.  So if we take the substance away from

15   them, they're going to get sick.

16        It also has reached a threshold that they need more and

17   more of the substance to get the same feeling or to just

18   feel not sick in the future.

19   **Q.**    Dr. O'Connell, a moment ago you mentioned that the

20   community wanted a coordinated response as one of the

21   reasons for the Division of Addiction Sciences.  Were you

22   involved in this coordinative response?

23   **A.**    Yes.

24   **Q.**    And what is the -- what is Huntington's Road to

25   Recovery?

**A.**   So as Huntington -- you know, back in the day, not so

long ago, Huntington was known as the epicenter of the

epidemic.  We had so many negative headlines that were put

out about us.  News cameras came all the time, both from

local, national, and international news to really paint a

negative picture.

I, I used to joke that only black and white photography

happened in Huntington, not to dispel the importance of

that, that art, but it really took the life out of the, the

people who live there .

And as we coordinated the response, we saw people

recover.  We saw stories of hope and resiliency.  So it was

important that as a lot of local and national celebrities or

experts such as the Surgeon General, people from the

substance abuse and federal health administration came to

visit that we had something to show them what we were doing;

that it wasn't just a blip that we were doing things, and

that, that the effort was there and that we were building a

foundation in Huntington that was going somewhere and we

wanted to show them that in many cases because they often

could go back to those federal organizations and would make

allocations for grant funding.

And, so, the community developed this Road to Recovery

that is a small sampling of different programs that were

started and the timeline during which they were started to

1    highlight the success stories.

2    **Q.**   Dr. O'Connell, are you familiar with ASAM?

3    **A.**   Yes.

4    **Q.**   More abbreviations.  What does that stand for?

5    **A.**   The American Society of Addiction Medicine.

6    **Q.**   And what does that do?  What does ASAM do or how do you

7    use information from ASAM?

8    **A.**   So as we looked on our sort of retrospective analysis

9    of this Road to Recovery, we wanted to recognize that we

10   needed a coordinated response moving forward.  We needed to

11   be able to say this is why this is a gap and this is why we

12   need to fill it.

13        So the American Society of Addiction Medicine has

14   criteria for a community where they, they go through and

15   they say we're going to start at the bottom and this is the

16   most minimal level of intervention that a person needs and

17   this is the highest.  And they've actually corresponded most

18   insurance payments to it.

19        So if an insurance payer is going to pay you, they're

20   going to say -- if, for example, at a treatment program like

21   Mattie, it's going to be a 3.5 level of care, which means

22   that when that person comes in, they need to go through a

23   detailed intake that demonstrates that level of need.  They

24   need to be in crisis, just because they say they're in

25   crisis but because you can prove that in documentation.

```
 1        So it gives a validation for the type of levels of care
 2   that you need in a community, but also then a larger payer
 3   structure that's often how we have to structure programming.
 4   Q.    And to the right of this slide, is that the level of
 5   care standards that we're seeing?
 6   A.    Yes.  In the microscopic print, that is the standard of
 7   care practices that we're often asked to sort of go through.
 8   Q.    And beginning, obviously, with no treatment and up to
 9   four which is medically managed intensive --
10   A.    Yes.
11   Q.    -- inpatient?
12   A.    Exactly.  So as you start at the bottom, you're saying
13   obviously that person is not receiving any care, but that as
14   you move to the bottom, it is a high, high level of care.
15   Q.    Okay.  Now, how, how was this used in that coordinated
16   response that we've talked about?
17   A.    So as we looked at the coordination of care, we sort of
18   broke it down into different categories.  So we have -- we
19   made it a lot easier and we used this slide in basically
20   everything that we talked about in the community, and how we
21   as a community were saying we need to have a healthy
22   community.  We need health promotion events.
23        And that may mean recovery events down at the water
24   front.  It may mean the prevention coalition.  It would
25   include our faith community having active engagement events.
```

1    But we also need early intervention.  We need to insure that

2    if someone says, "I need help and I need help now," like the

3    Quick Response Team which I believe the Court has heard

4    about from Connie Priddy, that would be an example of an

5    early intervention.  It's meeting people where they're at.

6        But then you need the referral, where they go from

7    there.  We need to get them into out-patient services or

8    maybe residential, which is they're going to live somewhere

9    for a period of time.  And then most intensively they would

10    potentially need a medically managed hospitalization.

11        You can go up and down the continuum.  Ideally you

12    never enter.  You stay in the bottom.  You stay in health

13    promotion.  We create a healthy community.  You don't move

14    up the scale.

15        But to move to outpatient or residential, you may need

16    to start in a hospitalization setting and then step down.

17    **Q.**   Okay.  So let's go through and look at what the

18    community has done in regards to health promotion and

19    prevention programs.

20    **A.**   Okay.

21    **Q.**   And one of the things that was listed on that previous

22    slide was PEP.  What's --

23    **A.**   So PEP is the Prevention Empowerment Partnership.  And

24    it was -- previously in Cabell County we had CCSAPP, the

25    Cabell County Substance Abuse Prevention Partnership.  And

1    it had been around for approximately a decade.

2         And that was a group of individuals who were working

3    specifically on prevention education in the schools.  So

4    evidence-based curriculum in Cabell County to say how to

5    help kids understand the dangers of substance use and what

6    to do about that if they were offered or how to also have

7    healthy protective factors rather than drug use.

8         In two years, though, we identified that we wanted to

9    move away from the term "substance abuse."  In large part as

10   part of our stigma campaign, we've moved away from the term

11   "abuse" as it's a criminal act.  And, also, our youth wanted

12   to have PEP rallies moving forward.

13        So each year they launched their prevention efforts

14   with a PEP rally and that helps engage all of the students

15   in a fun event and brings in -- we do an education event for

16   the community on that day.

17   **Q.**   Now, we talked a little bit about SBIRT.  Is that part

18   of the Health Promotion Prevention Programs?

19   **A.**   It is.  So SBIRT is sort of the ground level to any

20   easy and early intervention because anybody can do it.  So

21   any individual could be trained to provide SBIRT.  It

22   doesn't require any background or degree.

23        So I didn't mention before, but we train our recovery

24   coaches.  So our certified peer recovery coaches are trained

25   in SBIRT because they're learning basic skills on how to

1    intervene and refer someone.

2         So it was something that really helped set the

3    groundwork and framework and brought together a lot of

4    community members because everybody kind of had this common

5    language from SBIRT.

6    **Q.**   Now, you mentioned that the -- that part of the

7    coordinated response involved the faith community.  Can you

8    tell the Court about Faith Community United?

9    **A.**   Yes.  So each time we were working or training with

10   SBIRT, for example, we said this is for health

11   professionals.  But after we worked with health

12   professionals, they said, "Well, our front desk staff need

13   to know this.  Our office managers need to know this.

14   Our -- wait, my minister needs to know this.  Our pastor

15   needs to know this."

16        And, so, they asked and we did a little bit of

17   research.  We went in and we brought together 60 faith

18   leaders and we asked them, "What do you need to know to

19   better work with your congregation when it comes to

20   substance abuse?"

21        And they said, "Seminary taught me nothing about

22   substance use, but I'm dealing with this every day and I

23   don't know what to do."

24        So we let them set everything.  They picked the day,

25   the time, the duration, the frequency, and the length of

1    every faith community setting.  So they were on Tuesday

2    morning from 10:00 to noon for two hours once a month.  And

3    we did six of those.  Then they asked for an evening

4    rotation and then a full day rotation.

5        And we went through all of the different elements of

6    substance use; what it is, how to talk to someone about it,

7    how the language that you use on the matter matters, how to

8    talk to your congregation, how to intervene, how to talk to

9    family members, and then a resource fair.  We did a big --

10   brought everyone together so everybody could meet everyone

11   so they knew who they were referring to.

12   **Q.**   Now, we're heard a little bit -- the Court has heard a

13   little bit from Connie Priddy and Jan Rader regarding help

14   for the helpers, for lack of a better term.  Can you talk to

15   the Court a little bit about the Compass Program?

16   **A.**   Yes.  This is -- well, I'll say that about everything.

17   This is, again, one of my favorites.  Compass I had the

18   opportunity to become involved with when I was -- after I

19   was doing SBIRT, they asked me if I would provide stigma

20   training for our first responders at the beginning of

21   Compass when it was just a pilot.

22       So that was -- the city was applying to the Bloomberg

23   philanthropy group for funding to support a wellness program

24   for first responders, which they had called a program to

25   address burn-out or compassion fatigue.

1    We've since moved away from those words because they

2    have their own stigma built in.  And after I did that

3    training, we recognized, one, that it didn't go well.  They

4    were not very responsive because we weren't acknowledging

5    their needs and feelings.  We were moving far to quickly to

6    the needs of people who it was too hard to feel compassion

7    for because they were seeing the same person over and over

8    again overdose.  They were seeing kids be exposed to the

9    parent's overdose.

10    And, so, they, as many people in our community, had a

11    the lot of frustration.  So I joined the Compass board and

12    we pursued a full grant.  And it pursued both physical and

13    mental wellness and embedding those inside Huntington police

14    and fire.

15    So instead of it being people who were dropping in to

16    put out the fire, we are embedded as part of the team.  So

17    we have a mental health coach and a physical trainer who are

18    there on-site.  And we've built a full wellness center on

19    the fifth floor of the Huntington Police Department that

20    allows for meetings and yoga and family activities.  And

21    it's a whole strength training center for functional fitness

22    for our Huntington police and fire.  So that just opened a

23    few months ago really.

24  Q.   Now, I think we've talked about health promotion and

25    prevention.  The next area I believe you talked to the Court

1    about earlier was early intervention.

2         What types of early intervention has, for instance, the

3    Cabell/Huntington Health Department put in place?

4    **A.**   So when we look at early intervention, it's challenging

5    because you're trying to intervene early and often with an

6    individual, especially before it gets too bad.

7    Unfortunately, a lot of our invention approaches are when

8    it's gotten bad.

9         So the health department does a phenomenal level of

10   services.  But the ones, obviously, that relate really

11   closely to substance abuse is our harm reduction program.

12   And it in the past has been very successful at drawing

13   people out of the shadows to ensure that they're seeking

14   access to a health professional.

15        You know, I always sort of joke.  I work in family

16   medicine.  My office is next to one of my doctors.  But if

17   PEIA didn't force me to go get my annual physical or they'd

18   raise my insurance, I probably wouldn't go.

19        So why are we assuming individuals with a substance use

20   disorder are making their primary care visits and showing up

21   annually?  They're not.

22        So we need to have low barrier access which includes

23   access -- and incentivize that, which includes access to

24   syringes, infectious disease testing, peer recovery coach

25   access, social work, and nursing care access.  And that's

1    one of those low intervention services.

2    **Q.**    All right.  In addition to what Cabell/Huntington is

3    doing -- and I think we talked a little bit about the, the

4    harm reduction that they're doing -- what about -- and the

5    Judge has heard a little bit about QRT, so we don't have to

6    go into great detail.  But is this another one of the early

7    intervention programs?

8    **A.**    Yes.  So the Quick Response Team, I'm sure -- I know

9    you got to hear from Connie.  So Cabell County was one of

10   the first Quick Response Teams in the state.  And that grew

11   out of the city's Office of Drug Control Policy.  And

12   they're going to visit Portsmouth, Ohio, coming back,

13   recognizing this need.

14        And then we worked on a grant with them to establish a

15   Quick Response Team.  That Quick Response Team has been very

16   successful, as you heard.  And recently the state has

17   approached Marshall Health and the Joan C. Edward's School

18   of Medicine to initiate three more Quick Response Teams.

19   Two of them are now active and the third is in the first

20   step.

21   **Q.**    And is that Putnam, Mason --

22   **A.**    Putnam and Wayne County now have active Quick Response

23   Teams, and Mason County is launching theirs through

24   community meetings.

25   **Q.**    So I think our next big section is out-patient

1    services.  Let's talk to the Court a little bit about

2    Huntington/Cabell, what they've done as far as out-patient

3    services.  What is PROACT?

4    **A.**   So PROACT would be one of the first what we call bricks

5    and mortar buildings for the Division of Addiction Sciences.

6    This was our first and largest endeavor.

7        And this came about because the community said -- many

8    folks I think used to say, "Well, if you need help, just go

9    get help."  But where?  Where would they go?

10       And some people would walk into the emergency

11   department, but that was a huge drain on emergency

12   department resources.  ER physicians don't need to be

13   talking to someone who just needs an appropriate referral to

14   treatment.

15       So we set up PROACT which is a lengthy acronym that

16   stands for Provider Response Organization for Addiction Care

17   and Treatment.  And that just meant that it was a one-stop

18   shop.

19       It's a hub that means any person can walk through the

20   door and receive an immediate intake and then referral to

21   effective treatment.  So that may be on-site where we offer

22   individual group family therapy, non-medication based

23   treatment, medication-based treatment, psychiatric services,

24   pharmacological services, and then peer-based services so

25   they can meet with a recovery coach.

```
 1          We also have a spiritual care provider on-site so they
 2     get to meet with someone to address the spiritual needs
 3     because we believe in the well-rounded person and addressing
 4     all of the facets of their health and wellness.
 5          And then referrals.  Not everything is offered on-site,
 6     so sometimes we refer to all of our other community
 7     partners; or maybe they're coming and they've come all the
 8     way from Mason County because they've heard they can walk in
 9     the door and get help.  And we refer them to something
10     that's going to be much better for their transportation
11     needs.
12          We also have another unique program there that works
13     around job placement and helping them get back into the work
14     force.
15     Q.   And approximately how many patients does PROACT see?
16     A.   Currently we're at about 547 patients.  So it has grown
17     every day.  We see more and more people.
18          I think -- if I could briefly share one anecdote.  The
19     door wasn't even hung on the front of PROACT.  The building
20     was set up.  The sign wasn't out.  The door wasn't yet hung.
21     And a woman came up and she walked through and she said,
22     "I've lost custody of my child.  My boyfriend just went to
23     jail.  I need help.  I heard you can help."
24          And they figured it out.  They got her in that day.
25     They made a referral.  They weren't ready, but they put her
```

1    in a car.  They took her to another organization.  They set

2    it up.  And she's still actually being monitored by some of

3    our organizations.

4        So it was very clear that it was much needed as it was

5    not yet in action and we already had people literally

6    banging down the door.

7    **Q.**   What is Healthy Connections?

8    **A.**   So as we look at the continuum, we recognize that a

9    really vulnerable population is obviously what we call PPW,

10   pregnant and parenting women.  I wish it would be PPF,

11   pregnant and parenting families.

12       But we recognize that many women would come into the

13   hospital and they would receive care.  And then they would

14   be discharged with, you know, maybe as many documents as you

15   have on your desk to suggest that they find treatment.  And

16   that would be all they were given.  You need to go whittle

17   through this and ask someone for care.

18       And that's just insurmountable.  As a new mom, I can

19   speak to I have no idea what documents I was handed when I

20   left the hospital, let alone if it was to get substance use

21   help.

22       So we developed this program where we coordinated all

23   of the people in the community who provide care to pregnant

24   or parenting women, and they all meet together to ensure

25   there are no gaps.

```
 1          And then we provided -- we hired staff to do this.  And
 2     what we call them are family navigators.  They would have
 3     been called case managers maybe back in the day.
 4          But they come alongside the mom or the family and they
 5     say, "What do you need to do?  Oh, we need to call your case
 6     worker?  Let's sit down and call them together.  Oh, you
 7     have court?  We need to get you a ride there in the
 8     morning."
 9          And they're going to both help and then promote mom and
10     family into doing what they need to do to find long-term
11     recovery.  And then we're going to also match them with a
12     peer recovery coach who can help them say, "Do you want to
13     go to an AA, Alcoholics Anonymous, or a Narcotics Anonymous
14     meeting?  Let's go together."
15          And, so, that peer coach can do that alongside them.
16     Q.   And what's KIDS?
17     A.   KIDS is our -- another acronym which stands for
18     Knowledge In Developmental Steps.  I didn't come up with
19     that one, so don't blame me.  The developmental psychologist
20     did.
21          But it's a great one.  It's our KIDS clinic for kids,
22     and it brought physical therapy, developmental psychology,
23     social work, and communication disorders together to do
24     early assessments and interventions for the kids.
25          So they all meet together and work with mom.  And
```

1   because that's pretty intimidating for a bunch of

2   professionals to show up and maybe tell you something's

3   wrong with your child, so instead they all come and they've

4   already built the relationship through the family navigator.

5        So together they all sit and assess and then help

6   develop little assessments to make sure that kids are

7   meeting milestones and, if they're not, ensure that they're

8   getting the right intervention early on.

9   **Q.**   Another one, MARC.  What is -- tell the Court about the

10  Maternal Addiction Recovery Center.

11  **A.**   So I mentioned with Healthy Connections some families

12  enter the hospital and they may enter to receive treatment.

13  So MARC would be one of those.

14       It's the first point of engagement for a pregnant

15  woman.  So if she's identified to have an opioid use

16  disorder, so if she's using opioids pregnant and wants help

17  and is picked up, is identified on any screening tool in our

18  community, she can be referred to MARC which is within

19  Marshall Health and the OB/GYN program.

20       So she gets weekly individual group and therapy there.

21  And all of her OB care, because she's now deemed high risk,

22  is all done there under one house.

23       So they're identified at MARC.  And then after the MARC

24  program, obviously they'll have their baby.  So we -- you

25  know, it's one of those things everyone said, "Oh, great

```
 1    job."  We've identified a need, pregnant women with
 2    substance use.  We need more intensive care.  It should be
 3    close their OB service.  Perfect.  We sort of addressed this
 4    gap in our services.
 5         Well, then, we recognized very quickly that we hadn't.
 6    We needed the next step.
 7    Q.   And what's the next step?
 8    A.   MOMS, which is the Cabell side.  It's the idea that
 9    after mom has the baby, she needs that service as
10    continuing, but she now needs to be around other moms with
11    new babies, not around other pregnant moms.
12         So now this is housed on the floor of the NTU, the
13    Neonatal Treatment Unit at Cabell-Huntington Hospital.  So
14    MOMS now transfers from MARC to MOMS and has that care --
15    that same level of care all coordinated in the hospital at
16    the same time that her baby is receiving services at the
17    NTU.
18         And MOMS can also identify moms who come to the
19    hospital but weren't being seen by for care while they were
20    pregnant.  So they're only being identified as having an
21    opioid use disorder post-delivery based on poor blood
22    screening or other -- urine drug screens that are done in
23    the hospital.
24    Q.   Talk to the Court a little bit about Project Engage.
25    What is it and how does it work?
```

1    **A.**    So, like I said, when we first started, we assumed if

2    you needed help, you could walk into the emergency

3    department and they would do something.  That's not what

4    they're trained to do.  They're trained to be an emergency

5    response situation.

6         So as we looked at that, we identified that the

7    hospital system together could have peer coaches in the

8    emergency room and on the floors of the hospital because we

9    had two sort of captive populations that needed help but

10   weren't getting access to it.

11        So if you came into the hospital for endocarditis or a

12   heart condition, often a result of prolonged opioid use,

13   that they would be on the floor of the hospital for a long

14   time.  They need, you know, six, eight months of antibiotic

15   treatment.

16        Now, Project Engage sought to identify those

17   individuals, screen them, and refer them to an addiction

18   specialist and a peer coach on the floor of the hospital so

19   that while they were receiving that required medical care,

20   they were also not just withdrawing miserably from opioid

21   use.

22   **Q.**    And I think the next one we're going to talk about is

23   Reverse the Cycle.  Can you talk to the Court about that?

24   **A.**    Exactly.  It builds on that.  So we looked at Engage

25   and said, "Oh, perfect.  We've addressed this need in the

1    hospital."  No.

2          We had a lot more to do because we had -- there's many

3    other hospitals around.  And, so, as we had been successful

4    in Cabell and St. Mary's which unite now under the Mountain

5    Health network, we recognized that there was a lot more need

6    in the emergency department.

7          And, so this -- the CDC offered funding -- or we

8    applied for funding to the CDC, received funding to -- or

9    between Joan C. Edward's School of Medicine and WVU Health

10   System to identify two rural hospitals to implement Reverse

11   the Cycle in those hospitals.

12         So that was peers trained in the emergency department

13   to both identify substance use disorder, work to address the

14   barriers to entering treatment in that emergency department,

15   and then refer.

16         The other piece of this one that builds on the

17   community is if they refer someone -- not everyone goes to

18   treatment.  Right?  We're asking in many cases people to

19   change their entire life and that's hard.  And the first

20   time you're asked, you may not be ready.

21         So they follow people for 90 days, in a positive way,

22   and they check in with them.  They call them.  They offer

23   again.  They say, "I'm going to a meeting.  Would you like

24   to go?"

25         And, so, they do all of that for up to 90 days.  And

1    this program has really just gotten off the ground right at

2    the beginning of COVID and over the past year.  But they've

3    had a 50 percent success rate of getting people in over

4    either that initial engagement or over those 90 days.

5    **Q.**    And what is the Great Rivers Regional System for

6    Addiction Care if you can talk to the Court a little bit

7    about that and how it works?

8    **A.**    So as we, as we've been working in Cabell County, you

9    know, I sort of mentioned we get folks from other areas

10   coming in and around our system and our need for care.  So

11   we developed the Great Rivers System for Regional Care.  And

12   that's Cabell, Putnam, Kanawha, and Jackson County.

13        And it's coordinated to ensure that all counties are

14   working on Naloxone distribution, all counties are working

15   collaboratively on Quick Response Teams, all counties are

16   working collaboratively on Project Engage, all of the

17   counties are working collaboratively on education, training,

18   and prevention.

19        So that instead of people saying, well, you know, the

20   buck stops at the end of the county line, we're saying, "Oh,

21   if you need that, we can make sure that we're coordinating

22   that," all the way up to the I-64 corridor.

23   **Q.**    Now, I think the next big section is residential

24   treatment.  Can you tell the Court about what this

25   collaborative coordination with the city and county and

1    Marshall, what have you all been able to accomplish in

2    residential treatment programs?

3    **A.**   So Project Hope was one of the first projects I worked

4    on when I was still at SBIRT.  So because my work at

5    Virginia Tech had led to grant writing for the Department of

6    Defense, it was identified that I could assist with grants.

7         And we worked on, at the time, a very large grant for

8    SAMHSA to develop a residential treatment center for

9    pregnant and parenting women.  Why?  Because we recognized

10   that the MARC program treated them in the hospital.  The

11   MOMS program picked them up after that.  But then what?

12   They were leaving and going back to communities and families

13   where they had no support for long-term recovery or they

14   needed a lot more support while pregnant.

15        So it provides a level of care which for ASAM after

16   that, American Society of Addiction Medicine, is 3.1 to 3.5.

17   So it means it's a very high intensive.  They're receiving

18   over 21 hours of therapeutic services weekly.  So they're in

19   individual and group therapy most of their days, and then

20   receiving peer services as well.

21        So we have 17 apartments, and each of those have two or

22   three bedrooms.  And then we have -- it's staffed 24-7.  We

23   have a full, both clinical staff during the daytime and then

24   just a residential treatment staff on nights and weekends.

25   And we work on anything that person could need.

1          It's really one of our pride and joys because it offers

2     person-centered care.  It's not just saying everybody gets

3     the same level of treatment.  But, rather, saying each mom

4     that comes in needs a different thing.

5          So we've had moms who need -- who came to us and they

6     were previously nutrition and fitness coaches and what they

7     needed was after -- or while they're in treatment, they

8     needed help getting those credentials back to be able to get

9     that job.

10          And, so, we work with them to do that.  We work with

11     them to work on legal issues if that means taking them up to

12     whatever court in the State of West Virginia to help and

13     assist in those, and providing really any individualized

14     support we can.

15          And our goal is that they reside with us for about six

16     months as that's the max in most cases that insurance would

17     ever allow.  That's a constant sort of reimbursement every

18     seven days for re-submittal for approval every seven days.

19          But we're also just seeking -- that's a groundwork for

20     some basic recovery, especially when, unfortunately, many of

21     our moms have been using substances for a long time before

22     they come to us.

23     **Q.**   And about how many families have you all served?

24     **A.**   We've had about 35 families in total since we opened.

25     We offered our first bed on the day after Christmas in 2018.

1   **Q.**   And then I think from that grew out the Hope House.   Is

2   that right?

3   **A.**   It did.   So we recognized that we had moms at Project

4   Hope who were graduating but couldn't get housing because

5   they had felony charges or other criminal offenses or they

6   had left an abusive relationship where they were still on

7   the hook for rent or mortgage or they were in such financial

8   straits that they weren't able to obtain housing.

9        So they were, unfortunately, staying with us.   We will

10   not kick people out.   We really do everything in our power

11   not to put a mom and a child out in not safe and supportive

12   housing.   So recovery housing isn't always safe and

13   supportive, especially for a mom and one, two, three, four

14   small children.

15        And, so, we worked to develop the Hope House.   And this

16   is a building over behind the med school that we renovated

17   and made into four separate apartments.   And then there's

18   office and group rooms in the basement.

19        And moms can move here after Project Hope for, you

20   know, another six months.   And this -- we still provide

21   services, so they're not just out in the community.   We

22   still have peer services.   They're expected to come to the

23   evening groups back at Project Hope.   And they're also

24   involved and required -- required loosely to be involved in

25   our nutrition and wellness program.

1      So our peer coach and nutrition coach take them grocery

2   shopping and ensure that they're making healthy -- or

3   promote healthy decisions.  And that's one of the other ways

4   we interact with the community.  They go downtown to the

5   Huntington Kitchen and do meal prep and how to make baby

6   food.  And they all got baby blenders.

7      So different programs like that to ensure they we're

8   maintaining connections with them.

9   **Q.**   Now, I think the next big section is medically managed

10  treatment.  Can you tell the Court a little bit about what

11  the community has done in that area?

12  **A.**   I think, you know, I know we're the only community that

13  has Lily's Place which is one of the older programs in

14  Huntington that addresses moms and infants with substance

15  use.

16     And this is a non-hospital based hospital center.  So

17  infants who are born with neonatal exposure can either stay

18  at the NTU, the Neonatal Treatment Unit at

19  Cabell/Huntington, or they can choose to go to Lily's Place

20  which as you sort of see there is much more of a, a nursery

21  and a home-style setup versus the medical setup within the

22  hospital.

23     And, so, it's one of the first of its kind.  They had

24  to seek special legislative permission and structure for

25  this organization.

**Q.**   Now, I think just before you took the stand, before we
get to community coordination, Sheriff Zerkle talked a
little bit about hygiene, mental hygienes.

**A.**   Uh-huh.

**Q.**   Can you tell the Court what your experience is with,
with those?

**A.**   A challenge.  A mental hygiene is such a valuable and
vulnerable time.  We're regularly approached by families who
are saying, "I have a loved one who is, you know,
considering suicide," is a risk to themselves or someone
else, whether they're under the influence or because of a
mental health issue.  And we often lack the ability to do
anything.

I can speak frankly that we recently had a client at
Project Hope who was struggling from a pretty severe mental
health episode and we struggled.  We struggled for four
days.

And it was balancing the risk of our clients, other
clients and our staff and her safely to figure out what to
do because it's very hard to get a mental hygiene process,
to get the right, you know, the officer in a timely manner
to deal with the situation, and then to find a bed for
someone who needs both substance use and mental healthcare.

That's completely removing the child from the
situation.  There's nothing that we can -- you know, there's

1   no services provided that they're going to allow family

2   reunification at that time.

3       But even if we just have to work with the individual in

4   any capacity, it's very challenging to receive that sort of

5   high-level, high-intensity care in our area right now.

6   **Q.**   What, what percentage of the population, based upon

7   your observations and your work in the community, would have

8   both a component of mental health and substance use

9   disorder?

10  **A.**   We generally say that it's 50 percent of individuals

11  with a substance use disorder have a co-occurring mental

12  health condition.  It's far greater than that because it

13  becomes a chicken and egg situation.

14      If you're using substances for an extended period of

15  time, your dopamine -- and I'm not the expert on this, but

16  your dopamine is going down over time.  And, you know,

17  that's not leading you to feel the same emotions and

18  expressions you've had in the past.  And, so, you are going

19  to experience depressive symptoms.

20      So as an individual with prolonged substance use, we're

21  going to see prolonged experiences of depression after that.

22      We also know that individuals coming off substances are

23  more anxious.  They may have been using substances because

24  of a trauma history.  And now they have no coping for that

25  trauma.  They have no coping for their experience of abuse

1    or neglect or sexual assault.

2        So there's a lot of things that it's hard because you

3    have to remove the substance, but also be sure that you're

4    treating those underlying causes, and the causes that came

5    about as a result of substance use because many people may

6    engage in behaviors or activities that they are not proud of

7    and would never have done if it were not that need and that

8    draw to just become not sick any longer.

9    Q.   And is there, is there a place -- is there a treatment

10   facility in the Cabell/Huntington area right now that, that

11   treats both at a high level substance use disorder and the

12   mental health side of it?

13   A.   If you have a primary mental health condition, which

14   means that your mental health disorder is first on your ASAM

15   evaluation, we do have Mildred Bateman Hospital and River

16   Park.  And there are sort of different discrepancies on how

17   those are used and the long-term use of, of mental health

18   institutions and hospitalizations.

19   Q.   All right.  Let's go to Community Coordination.  What

20   types of programs has the Cabell/Huntington and Marshall

21   done -- this one is SOR.  What is this?

22   A.   So as we've worked to address opioid use, we've

23   integrated with a lot of other programs.  So we work very

24   closely -- the, the state has often recognized that we're

25   doing a lot.  And, so, the state receives state opioid

1    response money.

2        And they have allocated a specific component of this

3    through WVU's med school, the Virginia -- West Virginia

4    Osteopathic School, and the Joan C. Edward's School of

5    Medicine.  And we receive this to address a big goal, which

6    is ensuring that professionals are ready and able to provide

7    medication assisted treatment, MAT, and that the other

8    fields that are necessary to support them are also ready.

9        So that means that if you have a, a physician who's

10   ready to prescribe, you also are required have the therapist

11   who can provide the required therapy and groups.  And we

12   also like to see it done with a peer so that they are

13   getting that peer support of someone who has the experience

14   of getting into long-term recovery.

15       So we, we have money that goes into different

16   departments on campus to address this, so to incentivize

17   addiction education, a curriculum in like social work

18   psychology.

19       Our physical therapy programs have developed a chronic

20   pain management program so that people aren't taking opioids

21   but are looking to other chronic pain management pills for

22   example.

23   **Q.**   All right.  And I think the next section is CORE.  Can

24   you tell the Court what CORE is?

25   **A.**   Yes.  Again, as we looked at our gaps, we realized that

1    we were getting folks into recovery, and then what?  We

2    would find that they couldn't get a job.  They didn't maybe

3    have the necessary education.  It was just -- it can become

4    very burdensome for someone to find employment.

5         So we developed CORE which is Creating Opportunities

6    for Recovery Employment, C-O-R-E.  And it's across 12

7    counties in southern West Virginia and it's funded through

8    the Appalachian Regional Commission, ARC, and the Benedum

9    Foundation.

10        And it works to ensure that folks are ready to get back

11   in the work force and that means doing whatever it takes to

12   get someone work force ready, and then also helping

13   employers become recovery friendly workplaces.

14        So it's true that an individual in recovery is actually

15   an ideal employee.  They become -- we have lots of

16   statistics out there about how they are reliable, they show

17   up, they're very invested in their work.  They have

18   something to prove.

19        And, so, we want to help employers know that.  And one

20   of the things we're about to roll out with the West Virginia

21   Chamber of Commerce is a big state tool kit for employers.

22        And then we also developed some funding for individuals

23   to do social entrepreneurships.  So sometimes in our

24   southern counties there may not be work for them in their

25   area or their training, or they could go actually hire more

1    people in recovery if they start their own business.

2         And, so, we work with programs likes Coalfield

3    Development which is a work force development program in

4    West Virginia and in Huntington to do that sort of social

5    entrepreneurship opportunity.

6    **Q.**   Now, the Great Rivers Regional System, we talked about

7    this a little while ago because this also kind of overlaps

8    into outpatient.  So I think we've talked -- is there

9    anything else that you wanted to say about Great Rivers that

10   we didn't cover earlier with the Court?

11   **A.**   I think I went through most of them because I'm used to

12   giving these little things.

13   **Q.**   All right.  Now, you had talked earlier about stigma

14   reduction.  And, first of all, why is that important?

15   **A.**   Stigma is -- you know, I like to give -- when I always

16   present on the topic, I ask people what figment of your

17   imagination has the ability to prevent funding from getting

18   to the right people, has the ability to prevent people from

19   receiving necessary treatment from a life-saving --

20   life-saving treatment a deadly disease, what figment of your

21   imagination has the ability to cost human lives, has the

22   ability to cause car accidents, death and destruction, and

23   destroy families?

24        There is no other figment of our imagination more

25   powerful than stigma.  It is not something that exists.  I

1    can say that this piece of paper represents stigma.  It's

2    something we hold in our brain that allows us to other-ize

3    individuals to say they're not worth it.  They don't deserve

4    it.  I don't need to help them because they're less than me.

5         And, so, when we don't address stigma, we promote those

6    beliefs.  And, so, we worked with Quality Insights, which is

7    an organization here in Charleston, to develop a campaign

8    and to see if it worked.  We want to know what we're doing

9    works.

10        So we did billboards, car signs, and then a whole media

11   toolkit.  This was the billboard that used to be on 64.  I

12   noticed today it was gone, which was sad, but it was up

13   there for a very long time and it's still on the backs of

14   buses in Cabell.

15        So we had this campaign with this website and people

16   could go to.  So we tracked that.  We also did a before and

17   after survey.  We surveyed the community on their beliefs

18   and perceptions and thoughts.

19        And then after we ran the campaign for 30, 60, 90 days,

20   we ran the survey again and we collected that data.  And

21   we've now presented that data at three national conferences

22   and we have a publication in the works.

23        The media campaign, which is that funny sort of little

24   things about Guns N' Roses was we gave each of the news --

25   each of the radio stations in Huntington specific intros for

1    musicians they were going to play on the radio.

2         So if it was country, Christian, classic rock, or

3    today's pop hits, before they would introduce an artist or a

4    band, we gave them a little opener.

5         So, for example, Guns N' Roses Velvet Revolver

6    guitarist is no stranger to addiction.  In recent years,

7    Slash has been open about his addiction to heroin.  And it

8    goes on.

9         So we gave them those little openers so that we were

10   normalizing stigma to say that, you know, Keith Urban has

11   shared his story of recovery, or so and so was lost to

12   addiction so that when they were opening music and bands

13   that they talking about substance use as a more commonplace

14   practice.

15        And that brought it more to the mainstream community

16   and it -- and they would then say, "Find out more

17   information at HDWD.org."

18            MS. QUEZON:  Your Honor, at this point I'm going

19   to be switching gears and I -- she's going to have to come

20   back tomorrow anyway.  I don't know if you want to go ahead

21   and break.

22            THE COURT:  Yeah, I think it would be appropriate.

23   Dr. O'Connell -- I almost called you McConnell.

24            THE WITNESS:  That's okay.  People do it all the

25   time.

```
1              THE COURT:  Can you be back here at 9:00 promptly

2    and we'll continue on and we'll see you then.

3              THE WITNESS:  I will.

4         (Trial recessed at 4:59 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        CERTIFICATION:

 2                   I, Ayme A. Cochran, Official Court

 3     Reporter, and I, Lisa A. Cook, Official Court Reporter,

 4     certify that the foregoing is a correct transcript from

 5     the record of proceedings in the matter of The City of

 6     Huntington, et al., Plaintiffs vs. AmerisourceBergen

 7     Drug Corporation, et al., Defendants, Civil Action No.

 8     3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

 9     reported on May 27, 2021.

10

11              S\Ayme A. Cochran          s\Lisa A. Cook

12                Reporter                   Reporter

13          _

14

15              May 27, 2021

16                Date

17

18

19

20

21

22

23

24

25
```

## $

**$100,000.00** [2] - 112:19, 137:21
**$120** [1] - 112:1
**$120,000.00** [1] - 112:2
**$15** [1] - 112:17
**$15-$20,000.00** [1] - 113:4
**$20** [1] - 138:12
**$300,000** [1] - 104:23
**$360,000** [1] - 98:11
**$40** [1] - 105:1
**$48.00** [1] - 137:23
**$49** [2] - 105:1, 137:18
**$49.00** [1] - 98:12
**$500,000.00** [2] - 138:11, 138:16
**$90,000.00** [2] - 112:14, 113:1

## '

**'05** [1] - 24:23
**'05-'10** [1] - 88:19
**'05-2010** [3] - 148:18, 149:19, 152:25
**'07** [1] - 85:15
**'08** [1] - 8:16
**'10** [4] - 85:15, 85:21, 89:15, 118:12
**'12** [1] - 92:13
**'13** [2] - 83:1, 92:13
**'13-'14** [1] - 9:3
**'15** [1] - 84:14
**'16** [4] - 94:25, 132:5, 154:7, 182:8
**'17** [5] - 96:22, 98:7, 112:13, 146:23, 182:8
**'18** [3] - 139:9, 146:23, 183:21
**'19** [2] - 135:13, 139:9
**'20** [1] - 139:9
**'80s** [4] - 178:1, 180:14, 186:12
**'85** [1] - 78:15

## 0

**000274.000** [1] - 164:24
**00907** [2] - 2:5, 2:17
**04** [1] - 145:16

## 1

**1** [2] - 54:24, 56:9
**1.4** [1] - 99:7
**10** [4] - 7:17, 181:18, 194:13, 199:15
**10,000** [1] - 43:25
**10-12** [1] - 115:4
**1001** [2] - 2:10, 4:6
**1022** [1] - 3:5
**10:00** [2] - 48:15, 211:2
**10:02** [1] - 48:16
**10:35** [1] - 73:14
**11** [10] - 10:10, 24:10, 24:23, 64:25, 136:17, 146:10, 146:12, 146:13, 147:13, 199:2
**11-07** [1] - 22:5
**11-month** [1] - 11:1
**12** [3] - 56:4, 137:23, 232:6
**1200** [1] - 174:3
**1236** [1] - 66:2
**126** [1] - 3:5
**1288** [1] - 64:25
**13** [1] - 107:22
**1300** [1] - 6:15
**1301.74(b)** [1] - 15:5
**1311** [2] - 2:4, 2:16
**13th** [1] - 11:25
**14** [1] - 9:21
**15** [4] - 13:19, 56:4, 176:20, 181:18
**150-160** [1] - 99:6
**1560** [1] - 14:2
**15910** [1] - 3:18
**1600** [1] - 3:17
**17** [2] - 24:22, 224:21
**17,000** [1] - 182:24
**1717** [2] - 6:6, 6:13
**175** [1] - 66:8
**18** [3] - 24:21, 65:6, 120:15
**180** [3] - 15:16, 173:19, 173:25
**181** [1] - 15:18
**189** [1] - 173:12
**19** [2] - 1:16, 25:14
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**194** [1] - 52:25
**1946** [1] - 146:9
**1977** [1] - 77:24
**1985** [5] - 79:9, 79:13, 80:8, 92:19, 119:1
**1989** [1] - 21:8
**199** [1] - 56:2
**1990** [1] - 17:19
**1992** [1] - 162:6
**1995** [1] - 80:6
**1997** [3] - 11:14,
11:19, 12:3
**1:00** [4] - 71:7, 71:19, 72:17, 73:11

## 2

**2** [4] - 65:23, 83:7, 132:5, 164:14
**2,000** [1] - 154:24
**2.1** [1] - 18:23
**20** [6] - 13:19, 25:24, 42:5, 54:15, 55:5, 170:16
**2000** [1] - 11:16
**20001** [1] - 5:12
**20005** [3] - 4:14, 4:16, 5:5
**2002** [3] - 170:5, 170:8, 170:12
**2005** [8] - 17:14, 24:8, 24:15, 170:20, 170:21, 170:24, 171:13, 171:20
**2005-2010** [3] - 148:13, 150:16, 151:7
**2006** [3] - 11:20, 16:7, 75:17
**2007** [3] - 11:19, 12:3, 17:17
**2008** [5] - 12:20, 14:17, 17:17, 132:5, 132:12
**201** [1] - 65:21
**201c** [1] - 66:16
**2010** [6] - 82:19, 86:11, 86:19, 122:16, 128:14, 147:1
**2011** [3] - 23:14, 66:8, 188:4
**2012** [2] - 17:24, 45:18
**2013** [5] - 86:20, 129:3, 129:6, 129:20, 130:11
**2014** [1] - 16:7
**2015** [8] - 8:6, 24:25, 25:18, 25:19, 33:12, 146:16, 146:25, 200:24
**2016** [5] - 43:13, 43:18, 146:13, 146:14, 146:25
**2017** [16] - 22:5, 94:4, 104:20, 132:1, 132:12, 139:8, 142:24, 143:6, 144:10, 144:20, 148:22, 149:13,
154:15, 154:19, 155:4, 202:8
**2017-2018** [1] - 202:7
**2018** [13] - 142:22, 145:21, 146:2, 172:8, 172:11, 176:17, 176:19, 194:4, 200:24, 201:4, 201:13, 203:7, 225:25
**2019** [2] - 11:25, 40:7
**202** [2] - 2:4, 2:16
**2021** [4] - 1:19, 7:4, 237:9, 237:15
**21** [2] - 15:5, 224:18
**22101** [1] - 82:11
**2216** [1] - 3:7
**222** [2] - 146:9, 184:4
**223** [1] - 7:17
**236** [1] - 56:4
**24** [1] - 106:21
**24-7** [1] - 224:22
**242** [2] - 53:5, 56:9
**25** [3] - 5:5, 165:14, 165:16
**253** [1] - 75:16
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**259** [2] - 52:25, 56:2
**26** [4] - 156:15, 164:21, 164:22, 165:1
**267** [1] - 75:16
**27** [5] - 1:19, 7:4, 41:21, 237:9, 237:15
**274** [1] - 165:24
**28** [4] - 3:15, 4:3, 4:9, 18:21
**293** [1] - 173:15
**29464** [3] - 3:15, 4:4, 4:9
**2:00** [1] - 73:11

## 3

**3,000** [8] - 93:20, 115:20, 154:7, 154:22, 154:24, 155:19, 155:23, 156:5
**3,000-4,000** [1] - 83:16
**3-5** [1] - 120:7
**3.1** [1] - 224:16
**3.3** [2] - 98:10
**3.5** [2] - 206:21, 224:16
**30** [5] - 29:1, 78:20,
101:8, 137:23, 234:19
**30-40** [2] - 40:2 - 113:16
**300** [1] - 120:23
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**318** [1] - 172:8
**32502** [1] - 2:14
**33** [5] - 143:13, 143:14, 145:14, 145:15, 155:1
**344** [1] - 11:25
**35** [1] - 225:24
**350** [1] - 120:19
**36-page** [1] - 191:19
**37** [1] - 23:11
**38** [4] - 23:17, 25:3, 25:4, 25:5
**3843** [1] - 5:14
**39** [1] - 24:2
**3:17-cv-01362** [2] - 1:5, 237:8
**3:17-cv-01665** [2] - 1:11, 237:8
**3:36** [1] - 177:9

## 4

**4** [2] - 21:19, 21:20
**4-5** [1] - 148:25
**40** [2] - 43:8, 43:12
**400** [2] - 54:14, 55:19
**401** [2] - 2:10, 4:6
**405** [1] - 2:7
**409** [1] - 75:16
**41** [1] - 22:23
**43** [2] - 23:17, 25:5
**434** [1] - 66:7
**44** [3] - 101:8, 135:14, 182:13
**448** [1] - 33:14
**449** [1] - 185:17
**452** [1] - 38:24
**4:59** [1] - 236:4

## 5

**5** [2] - 22:9, 56:9
**5,000** [1] - 200:12
**5-11** [1] - 11:25
**50** [3] - 117:19, 223:3, 229:10
**547** [1] - 216:16
**55** [4] - 11:12, 11:16, 12:3, 115:11
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**57** [1] - 134:14
**58** [1] - 25:19

## 6

**6/08** [1] - 15:10
**60** [5] - 98:24, 157:20, 185:24, 210:17, 234:19
**60-70** [2] - 93:7, 115:16
**600** [1] - 2:13
**64** [1] - 234:11
**65** [2] - 115:21, 156:5
**69** [1] - 65:6
**6th** [1] - 3:5

## 7

**7** [5] - 23:3, 167:15, 167:16, 167:25, 187:20
**70** [9] - 22:14, 22:15, 98:24, 157:20, 170:9, 185:24, 203:6
**70-80** [1] - 105:20
**70-80,000** [1] - 93:21
**700** [3] - 115:11, 145:8, 183:1
**701** [1] - 75:3
**70130** [1] - 3:8
**702** [2] - 52:22, 74:4
**707** [1] - 4:18
**71** [1] - 22:19
**716** [1] - 3:12
**725** [2] - 4:13, 4:15
**739** [3] - 143:7, 144:20, 145:15
**784** [1] - 33:13

## 8

**8,000** [5] - 10:9, 10:13, 10:16, 10:23, 11:8
**80** [2] - 157:20
**801** [1] - 3:10
**801(b)(2** [1] - 167:9
**801(d)(2** [1] - 167:9
**801(d)(2)** [1] - 166:25
**803(7** [1] - 67:6
**803(8** [1] - 67:5
**803.22** [4] - 67:3, 67:12, 67:20, 67:24
**8038(a)(2** [1] - 123:10
**80s** [6] - 78:11, 159:19, 159:22, 160:8, 160:18, 161:5
**850** [1] - 5:12
**87** [3] - 24:5, 54:15, 55:5
**887** [1] - 66:2
**89** [1] - 24:14

## 9

**90** [7] - 54:5, 60:1, 60:8, 222:21, 222:25, 223:4, 234:19
**901** [1] - 4:18
**90s** [6] - 79:21, 160:19, 161:5, 162:4, 169:12, 169:16
**91436** [1] - 3:18
**9:00** [2] - 7:4, 236:1
**9:54** [1] - 48:16
**9th** [1] - 2:10

## A

**a.m** [4] - 7:4, 48:16, 73:14
**AA** [1] - 218:13
**abandoned** [3] - 120:20, 121:1, 121:8
**abbreviations** [2] - 198:21, 206:4
**abide** [1] - 45:25
**ability** [8] - 30:7, 36:11, 68:19, 228:12, 233:17, 233:18, 233:21, 233:22
**able** [18] - 13:17, 54:2, 63:11, 65:9, 69:23, 70:15, 83:20, 102:12, 103:7, 172:9, 182:4, 188:18, 189:8, 206:11, 224:1, 225:8, 226:8, 231:6
**absence** [1] - 60:17
**Absolutely** [1] - 196:3
**absolutely** [1] - 29:5
**abuse** [13] - 42:17, 43:2, 76:4, 76:13, 92:12, 188:5, 196:19, 205:15, 209:9, 209:11, 210:20, 213:11, 229:25
**Abuse** [2] - 198:22, 208:25
**abused** [2] - 178:6, 203:22
**abusing** [1] - 153:6
**abusive** [1] - 226:6
**academics** [1] - 56:7
**academy** [2] - 159:4, 160:7
**Academy** [1] - 78:15, 78:17

**accept** [1] - 57:25
**acceptance** [2] - 55:25, 56:5
**accepted** [1] - 56:10
**accepts** [1] - 42:25
**access** [9] - 138:25, 139:5, 213:14, 213:22, 213:23, 213:25, 221:10
**accidents** [2] - 118:7, 233:22
**accomplish** [1] - 224:1
**account** [1] - 168:1
**accuracy** [1] - 65:25
**accurate** [2] - 12:9, 51:8
**accurately** [2] - 41:17, 65:24
**Ackerman** [4] - 67:13, 68:23, 70:21, 175:11
**ACKERMAN** [14] - 2:9, 21:10, 64:17, 64:22, 68:25, 69:14, 69:19, 70:24, 123:6, 123:8, 166:11, 166:19, 171:11, 175:12
**acknowledged** [5] - 53:5, 53:13, 54:23, 55:22, 56:3
**acknowledges** [1] - 55:1
**acknowledging** [1] - 212:4
**acquiring** [1] - 150:5
**acronym** [4] - 161:19, 198:18, 215:15, 218:17
**act** [1] - 209:11
**Action** [4] - 1:4, 1:10, 237:7, 237:8
**action** [2] - 46:4, 217:5
**actions** [1] - 17:17
**active** [4] - 129:14, 207:25, 214:19, 214:22
**activities** [2] - 212:20, 230:6
**activity** [2] - 18:8, 85:3
**actual** [9] - 30:2, 35:19, 45:11, 46:2, 50:25, 51:4, 55:13, 144:7, 151:11
**add** [3] - 86:19, 90:4, 114:3
**added** [3] - 101:22, 114:17, 200:3
**addict** [1] - 186:7
**addicted** [7] - 99:22,

105:23, 119:10, 133:25, 156:16, 156:22, 180:7
**addiction** [14] - 96:23, 114:18, 114:20, 114:24, 115:17, 154:6, 154:18, 155:5, 204:7, 221:17, 231:17, 235:6, 235:7, 235:12
**Addiction** [3] - 192:16, 201:25, 202:6, 203:2, 203:14, 204:21, 206:5, 206:13, 215:5, 215:16, 219:10, 223:6, 224:16
**addictive** [2] - 180:6, 180:13
**addicts** [5] - 99:3, 121:11, 144:2, 157:17, 188:7
**addition** [3] - 94:23, 186:3, 214:2
**additional** [5] - 72:4, 108:22, 135:9, 183:8, 186:3
**address** [10] - 52:13, 113:23, 115:7, 211:25, 216:2, 222:13, 230:22, 231:5, 231:16, 234:5
**addressed** [2] - 220:3, 221:25
**addresses** [1] - 227:14
**addressing** [1] - 216:3
**adequately** [1] - 48:3
**adjust** [1] - 77:8
**administration** [2] - 90:20, 205:15
**Administration** [2] - 14:24, 198:23
**administrative** [5] - 17:17, 46:4, 86:20, 128:22, 129:13
**administrator** [2] - 30:22, 83:24
**admissible** [3] - 68:10, 163:12, 163:20
**admission** [3] - 38:11, 39:14, 167:3
**admit** [4] - 67:8, 69:6, 166:16, 167:10
**admits** [1] - 55:11
**admitted** [5] - 21:16, 54:11, 54:12, 75:10, 167:10

**admitting** [1] - 69:8
**adult** [1] - 84:20
**adults** [1] - 156:14
**adverse** [1] - 204:9
**advocate** [1] - 105:7
**Affairs** [1] - 8:21
**affected** [1] - 116:22
**affects** [1] - 121:10
**affidavit** [3] - 35:21, 37:4, 114:15
**affirmed** [1] - 57:12
**afraid** [2] - 37:8, 121:16
**afternoon** [11] - 72:6, 73:20, 73:21, 77:15, 128:4, 128:5, 148:7, 148:8, 190:7, 192:10, 192:11
**age** [1] - 126:24
**agency** [1] - 164:15
**agent** [1] - 174:4
**agents** [1] - 43:22
**aggravated** [1] - 116:1
**ago** [11] - 13:19, 37:15, 67:18, 87:9, 125:16, 170:16, 192:21, 204:19, 205:2, 212:23, 233:7
**agree** [11] - 41:19, 41:20, 42:18, 48:4, 122:10, 144:21, 145:17, 146:3, 160:22, 169:4, 180:15
**agreed** [1] - 70:1
**agreement** [6] - 66:14, 66:20, 67:1, 67:20, 68:22, 69:25
**ahead** [25] - 25:10, 29:14, 31:7, 31:8, 31:17, 34:6, 34:10, 34:12, 35:16, 35:17, 49:7, 92:1, 97:7, 108:5, 116:6, 125:11, 125:14, 130:13, 138:19, 163:17, 166:21, 171:23, 191:15, 197:14, 235:20
**aid** [1] - 126:4, 192:2, 197:5, 197:8
**Aid** [14] - 16:2, 18:11, 18:15, 18:18, 18:20, 19:13, 19:14, 19:16, 19:17, 21:21, 26:8, 26:22, 27:15, 28:8
**Aids** [7] - 15:24, 17:1, 20:8, 21:24, 27:3, 27:19, 28:5
**ain't** [6] - 107:5, 111:7,

119:16, 119:21, 127:6
**air** [2] - 126:14, 180:22
**airborne** [2] - 95:15, 96:6
**airline** [2] - 152:6, 152:7
**airplanes** [1] - 151:5
**Akron** [1] - 161:25
**al** [4] - 1:7, 1:13, 237:6, 237:7
**alarm** [2] - 60:11, 60:18
**alcohol** [3] - 118:15, 185:15, 199:16
**alcohol-related** [1] - 118:15
**Alcoholics** [1] - 218:13
**aleck** [1] - 70:22
**allegation** [1] - 37:12
**alleged** [1] - 53:14
**Allegiant** [2] - 152:4, 152:6
**allocated** [1] - 231:2
**allocations** [1] - 205:22
**allow** [5] - 89:19, 130:3, 197:13, 225:17, 229:1
**allowed** [3] - 37:6, 52:18, 201:6
**allowing** [1] - 47:25
**allows** [2] - 212:20, 234:2
**allude** [1] - 174:24
**alluded** [9] - 115:19, 117:2, 118:8, 132:25, 143:1, 143:24, 174:14, 187:1, 189:12
**almost** [5] - 89:24, 115:10, 170:16, 203:24, 235:23
**alone** [2] - 53:20, 217:20
**alongside** [2] - 218:4, 218:15
**altered** [2] - 178:15, 178:16
**ambitions** [1] - 83:19
**ambitious** [2] - 181:24, 182:1
**ambulance** [1] - 117:19
**American** [3] - 206:5, 206:13, 224:16
**AmerisourceBergen** [4] - 6:2, 35:3, 128:7, 237:6

**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**amount** [10] - 27:24, 28:7, 85:19, 90:11, 92:22, 133:4, 137:15, 143:25, 177:2, 201:18
**amounts** [3] - 92:15, 150:3, 150:8
**ample** [1] - 83:20
**Amy** [1] - 190:7
**analogy** [2] - 85:23, 95:10
**analyses** [1] - 16:6
**analysis** [4] - 42:22, 60:23, 67:4, 206:8
**analyze** [2] - 40:20, 53:19
**anchor** [1] - 54:21
**Andrew** [1] - 148:9
**ANDREW** [1] - 5:10
**anecdote** [1] - 216:18
**ankle** [1] - 99:1
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**annotated** [1] - 36:20
**annual** [2] - 42:2, 213:17
**annually** [1] - 213:21
**Anonymous** [2] - 218:13
**Answer** [3] - 22:25, 53:12, 56:8
**answer** [16] - 16:9, 65:11, 65:14, 84:3, 108:4, 125:8, 125:10, 133:24, 134:8, 134:21, 135:1, 145:24, 146:4, 171:14, 171:15, 187:7
**answered** [3] - 37:15, 79:17, 80:23
**answering** [2] - 111:11, 111:18
**ANTHONY** [1] - 2:6
**anti** [1] - 39:6
**anti-diversion** [1] - 39:6
**antibiotic** [1] - 221:14
**antidotes** [1] - 125:4
**anxious** [1] - 229:23
**anyplace** [1] - 152:2
**anytime** [2] - 117:6, 137:4
**anyway** [1] - 235:20
**apart** [1] - 175:16
**apartments** [2] - 224:21, 226:17
**apologize** [3] - 25:12,

31:11, 198:22
**Appalachian** [1] - 232:8
**Appeals** [1] - 34:22
**appear** [2] - 25:21, 61:11
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appeared** [1] - 191:20
**appearing** [1] - 73:1
**Appendix** [2] - 66:8, 75:16
**applicant** [1] - 164:15
**application** [10] - 163:8, 163:24, 164:5, 164:6, 164:18, 165:19, 166:7, 167:2, 168:8, 187:18
**applied** [5] - 67:6, 67:7, 67:14, 199:1, 222:8
**apply** [12] - 38:12, 43:1, 50:21, 67:25, 69:11, 112:10, 112:18, 113:5, 118:4, 123:13, 162:16, 201:7
**applying** [5] - 67:2, 112:19, 113:4, 113:18, 211:22
**appreciate** [1] - 34:15
**apprenticeship** [1] - 78:4
**approach** [8] - 7:18, 13:23, 21:3, 58:23, 142:13, 162:20, 172:10, 195:11
**approached** [2] - 214:17, 228:8
**approaches** [1] - 213:7
**appropriate** [5] - 38:13, 49:17, 200:9, 215:13, 235:22
**approval** [1] - 225:18
**ARC** [1] - 232:8
**Arch** [2] - 6:6, 6:13
**ARCOS** [20] - 32:21, 33:4, 35:1, 35:7, 35:9, 36:1, 36:11, 36:14, 40:6, 40:16, 40:18, 40:19, 41:7, 50:13, 50:15, 50:21, 50:25, 51:3
**Area** [1] - 173:3
**area** [29] - 32:17, 45:2, 47:22, 48:1, 83:13, 85:15, 86:2, 88:15,

90:9, 121:23, 131:7, 135:18, 168:10, 168:12, 168:17, 169:3, 188:3, 196:10, 196:12, 197:17, 198:1, 198:8, 203:17, 212:25, 227:11, 229:5, 230:10, 232:25
**areas** [10] - 29:18, 48:3, 74:10, 84:7, 120:4, 120:5, 180:23, 180:24, 186:2, 223:9
**argument** [5] - 31:2, 68:3, 69:12, 70:11, 70:19
**arguments** [1] - 52:20
**armchair** [1] - 125:19
**arms** [1] - 110:12
**arraignments** [1] - 103:20
**array** [1] - 78:2
**arrearages** [1] - 99:8
**arrest** [13] - 129:11, 134:16, 136:10, 139:22, 140:24, 144:7, 150:20, 150:21, 151:25, 179:10, 181:11, 186:7
**arrested** [5] - 44:13, 44:17, 106:22, 136:23, 152:21
**arresting** [1] - 129:15
**arrests** [4] - 105:21, 150:7, 150:12, 150:17
**art** [1] - 205:9
**articulate** [1] - 54:3
**articulated** [1] - 30:16
**artist** [1] - 235:3
**ASAM** [5] - 206:2, 206:6, 206:7, 224:15, 230:14
**ascertainable** [1] - 66:3
**ASHLEY** [1] - 5:3
**aside** [1] - 45:16
**asleep** [1] - 126:19
**aspect** [2] - 42:6, 102:1
**assault** [1] - 230:1
**assert** [1] - 39:12
**assess** [1] - 219:5
**assessing** [2] - 54:7, 54:10
**assessment** [1] - 54:6
**assessments** [2] -

218:24, 219:6
**assist** [4] - 58:9, 129:12, 224:6, 225:13
**Assistance** [1] - 164:10
**assistance** [1] - 102:6
**assistant** [1] - 195:3
**assisted** [1] - 231:7
**Associate** [3] - 192:15, 202:4, 203:2
**assume** [7] - 96:15, 143:1, 158:17, 159:11, 162:5, 193:20
**assumed** [2] - 19:7, 221:1
**assuming** [2] - 21:13, 213:19
**assumption** [2] - 56:6, 86:22
**astonishing** [1] - 90:10
**AT** [1] - 1:2
**ate** [1] - 99:8
**atmosphere** [1] - 78:22
**attain** [1] - 82:2
**attempt** [1] - 59:3
**attempting** [1] - 42:20
**attended** [1] - 39:21
**attention** [1] - 41:21
**attitude** [1] - 112:24
**attorney** [1] - 187:1
**attorneys** [1] - 64:14
**attribute** [1] - 90:12
**audience** [1] - 110:20
**audit** [1] - 12:17
**auditor** [1] - 120:18
**audits** [2] - 12:12, 12:16
**August** [6] - 19:2, 19:3, 19:7, 19:11, 19:18, 84:14
**automatically** [1] - 60:1
**availability** [2] - 35:7, 62:11
**available** [3] - 22:16, 137:3, 155:22
**average** [11] - 16:5, 16:12, 16:17, 16:18, 16:19, 17:2, 17:3, 49:16, 49:17, 115:3
**Avin** [1] - 3:7
**award** [1] - 70:23
**aware** [34] - 8:19, 9:2, 9:3, 9:20, 10:9, 10:12, 10:25, 11:14, 12:2, 12:5, 32:8,

32:12, 32:13, 35:20, 35:25, 40:25, 42:4, 42:19, 45:17, 45:21, 81:11, 81:24, 84:18, 87:13, 89:7, 90:3, 121:22, 122:23, 138:20, 138:25, 139:4, 139:17, 141:23, 175:14
**awesome** [1] - 77:12
**awhile** [4] - 78:5, 151:10, 162:3
**Ayme** [2] - 6:17, 237:2

## B

**babies** [1] - 220:11
**baby** [5] - 219:24, 220:9, 220:16, 227:5, 227:6
**background** [5] - 77:19, 89:18, 191:5, 193:6, 209:22
**backpack** [1] - 115:25
**backs** [1] - 234:13
**bad** [9] - 99:14, 119:16, 155:16, 160:3, 178:6, 213:6, 213:8
**bagged** [1] - 126:9
**bailiff** [2] - 103:3
**balancing** [1] - 228:18
**ball** [3] - 126:23, 126:24, 127:1
**band** [2] - 105:5, 235:4
**bands** [1] - 235:12
**banging** [1] - 217:6
**Barboursville** [5] - 21:21, 80:3, 83:14, 105:13, 120:5
**Baron** [1] - 3:17
**barrier** [1] - 213:22
**barriers** [1] - 222:14
**base** [1] - 119:21
**based** [27] - 47:21, 52:22, 55:21, 74:14, 75:6, 85:9, 87:17, 88:15, 96:19, 98:12, 104:1, 110:9, 113:22, 131:8, 133:25, 153:16, 158:13, 176:23, 198:20, 199:20, 209:4, 215:22, 215:23, 215:24, 220:21, 227:16, 229:6
**basement** [1] - 226:18
**basic** [6] - 54:2, 78:19,

79:15, 79:16, 209:25, 225:20
**basis** [8] - 40:18, 59:22, 68:5, 74:19, 84:22, 87:1, 108:3, 163:4
**basket** [1] - 100:15
**basketball** [1] - 107:13
**Bateman** [1] - 230:15
**Baylen** [1] - 2:13
**BCI** [1] - 82:4
**became** [2] - 94:5, 94:24, 100:8, 102:21, 104:22, 106:4, 112:13, 133:25, 178:5, 183:15, 193:23, 200:21
**become** [16] - 79:8, 88:19, 95:22, 96:10, 97:15, 114:19, 116:14, 139:3, 155:15, 198:15, 202:1, 211:18, 230:8, 232:3, 232:13, 232:15
**becomes** [3] - 95:14, 197:20, 229:13
**becoming** [2] - 103:13, 184:13
**bed** [3] - 96:24, 225:25, 228:22
**bedrooms** [1] - 224:22
**beds** [17] - 97:11, 97:12, 115:21, 154:7, 154:22, 154:24, 155:19, 155:22, 155:23, 155:25, 156:5, 156:24, 157:14, 188:25
**beep** [1] - 97:10
**BEFORE** [1] - 1:17
**began** [2] - 10:19, 201:17
**begin** [3] - 155:10, 190:18, 196:12
**beginning** [7] - 59:17, 88:17, 167:21, 188:4, 207:8, 211:20, 223:2
**begins** [1] - 187:22
**behalf** [2] - 167:4, 190:8
**behaviors** [1] - 230:6
**behind** [2] - 80:24, 226:16
**belaboring** [1] - 35:19
**belief** [1] - 184:12

**beliefs** [3] - 188:10, 234:6, 234:17
**bell** [1] - 170:17
**below** [5] - 14:21, 14:25, 15:2, 17:3, 173:10
**bench** [1] - 30:9
**BENCH** [1] - 1:16
**Benedum** [1] - 232:8
**benefit** [2] - 61:1, 193:5
**benefits** [1] - 135:24
**Bennett** [1] - 193:4
**beside** [1] - 125:21
**best** [7] - 12:9, 30:7, 34:10, 52:10, 102:2, 158:13, 198:10
**better** [10] - 104:16, 112:24, 126:18, 139:3, 154:5, 189:1, 210:19, 211:14, 216:10
**between** [11] - 11:14, 12:3, 16:6, 18:15, 57:11, 68:20, 146:23, 189:5, 196:2, 222:9
**beyond** [3] - 76:16, 95:17, 181:13
**biannual** [1] - 22:10
**big** [17] - 57:24, 85:5, 86:13, 111:12, 148:17, 153:9, 159:21, 170:11, 170:12, 170:20, 188:1, 211:9, 214:25, 223:23, 227:9, 231:5, 232:21
**bigger** [3] - 101:5, 181:6, 181:7
**biggest** [1] - 116:10
**bike** [1] - 115:25
**bill** [13] - 98:9, 98:11, 98:23, 99:10, 104:23, 105:4, 135:8, 136:7, 136:8, 137:11, 137:20, 157:11, 158:2
**Bill** [1] - 8:24
**billboard** [1] - 234:11
**billboards** [1] - 234:10
**billion** [1] - 180:3
**billion-dollar** [1] - 180:3
**bills** [1] - 186:1
**Billy** [1] - 106:21
**Billy's** [1] - 106:22
**bind** [2] - 80:24, 83:2
**bit** [29] - 14:22, 84:12, 87:5, 88:13, 92:23,

128:11, 130:10, 135:4, 139:24, 156:4, 158:24, 159:24, 174:21, 181:5, 182:4, 199:13, 209:17, 210:16, 211:12, 211:13, 211:15, 214:3, 214:5, 215:1, 220:24, 223:6, 227:10, 228:3
**bits** [1] - 55:24
**bla** [3] - 181:5
**black** [3] - 118:25, 178:9, 205:7
**blame** [2] - 39:12, 218:19
**blenders** [1] - 227:6
**bless** [1] - 54:13
**blip** [1] - 205:17
**block** [5] - 10:17, 11:2, 11:5, 47:10, 51:25
**blocked** [8] - 10:12, 10:15, 11:11, 52:1, 54:5, 60:16, 126:3, 126:4
**blocking** [1] - 10:24, 11:8, 47:7
**blood** [2] - 199:11, 220:21
**Bloomberg** [1] - 211:22
**blown** [1] - 41:22
**blown-up** [1] - 41:22
**blue** [1] - 125:24
**Blvd** [3] - 3:15, 4:3, 4:9
**board** [2] - 7:18, 212:11
**Board** [16] - 20:11, 20:14, 20:16, 20:22, 21:1, 22:4, 23:7, 26:19, 106:13, 106:20, 108:10, 135:21, 138:21, 139:1, 165:4
**boatloads** [1] - 151:23
**Bob** [3] - 201:22, 202:7, 203:4
**bodies** [1] - 94:17
**body** [1] - 94:14
**bodyguards** [1] - 79:23
**Boggs** [2] - 9:3, 9:9
**Boggs'** [1] - 9:18
**Bonasso** [1] - 5:14
**boot** [1] - 78:22
**borders** [1] - 179:1
**bored** [1] - 101:5
**born** [1] - 227:17

**boss** [2] - 110:23, 125:18
**bottle** [2] - 19:17, 19:18
**bottom** [10] - 143:8, 164:23, 164:24, 168:1, 169:1, 185:1, 206:15, 207:12, 207:14, 208:12
**bought** [2] - 120:16, 150:22
**Boulevard** [1] - 3:18
**Box** [2] - 5:14, 6:8
**box** [1] - 33:20
**boy** [3] - 126:22, 144:12, 144:17
**boyfriend** [1] - 216:22
**bracelet** [1] - 99:1
**brain** [1] - 234:2
**brass** [1] - 82:3
**break** [17] - 61:16, 61:18, 61:20, 62:7, 62:11, 71:18, 82:22, 86:11, 87:6, 89:6, 99:22, 136:1, 136:2, 147:21, 158:18, 191:21, 235:21
**breaking** [1] - 99:16
**breath** [2] - 126:14, 140:7
**bricks** [1] - 215:4
**Bridgeside** [3] - 3:15, 4:3, 4:9
**Brief** [1] - 198:18
**brief** [16] - 7:15, 29:9, 29:10, 29:15, 57:2, 57:25, 58:25, 61:18, 62:16, 63:7, 63:12, 63:18, 63:20, 64:1, 70:8, 199:18
**briefed** [2] - 57:6, 61:11
**briefing** [4] - 61:24, 62:23, 63:1, 125:4
**briefings** [1] - 17:14
**briefly** [6] - 11:13, 15:25, 46:10, 70:7, 199:17, 216:18
**briefs** [2] - 61:1, 62:12
**bring** [11] - 30:4, 58:7, 59:1, 73:16, 82:8, 102:12, 136:20, 151:19, 153:23, 174:7, 176:17
**bringing** [5] - 171:1, 171:20, 176:13, 180:1, 181:14
**brings** [3] - 58:14, 113:6, 209:15
**broad** [1] - 204:7

**broke** [2] - 200:8, 207:18
**broken** [1] - 137:7
**Brotherhood** [1] - 78:4
**brothers** [1] - 95:8
**brought** [14] - 50:6, 50:8, 55:5, 82:7, 126:21, 130:19, 142:10, 176:8, 176:25, 210:3, 210:17, 211:10, 218:22, 235:15
**BT** [1] - 109:16
**buck** [1] - 223:20
**bucket** [4] - 179:17, 188:17, 188:22, 189:11
**bucks** [2] - 105:2, 137:18
**Bud** [1] - 127:2
**Budd** [1] - 3:17
**buddies** [1] - 107:3
**Buddy** [1] - 126:24
**budget** [12] - 98:17, 98:18, 98:20, 99:10, 111:20, 135:7, 135:10, 136:18, 138:5, 138:11, 138:12, 182:9
**budgeting** [1] - 81:21
**build** [1] - 119:18
**building** [3] - 205:18, 216:19, 226:16
**buildings** [2] - 185:21, 215:5
**builds** [2] - 221:24, 222:16
**built** [3] - 212:2, 212:18, 219:4
**bunch** [1] - 219:1
**burdensome** [1] - 232:4
**Burglary** [1] - 185:5
**burglary** [1] - 185:6
**Burling** [1] - 5:11
**burn** [1] - 211:25
**burn-out** [1] - 211:25
**burnt** [1] - 120:25
**bus** [1] - 110:4
**buses** [1] - 234:14
**business** [7] - 37:7, 75:14, 119:11, 121:15, 129:1, 138:3, 233:1
**businesses** [2] - 82:21, 180:3
**businessmen** [1] - 131:2
**bust** [2] - 173:8,

173:11
**busts** [1] - 151:22
**buy** [2] - 120:14, 133:3
**buys** [1] - 180:25
**BY** [53] - 7:10, 7:21, 12:8, 14:3, 21:18, 29:21, 30:12, 31:9, 31:18, 33:6, 33:15, 34:19, 35:18, 40:3, 45:1, 46:25, 48:18, 49:8, 50:12, 77:14, 82:10, 83:8, 87:4, 92:3, 92:10, 104:9, 104:19, 108:21, 110:25, 116:7, 122:11, 122:17, 122:20, 123:20, 124:9, 128:3, 130:5, 134:15, 142:20, 162:21, 163:22, 167:13, 168:3, 171:18, 172:14, 175:20, 177:13, 179:3, 183:18, 184:17, 192:9, 195:14, 197:15
**bypass** [1] - 67:10

**C**

**C-O-R-E** [1] - 232:6
**C.F.R** [5] - 13:10, 13:14, 15:5, 45:4, 45:7
**CAD** [4] - 140:12, 140:13, 140:15, 140:16
**CA** [1] - 3:18
**CABELL** [1] - 1:10
**Cabell** [105] - 3:2, 12:24, 15:24, 16:3, 17:2, 20:6, 21:22, 27:16, 27:19, 70:6, 71:6, 73:25, 74:18, 80:6, 81:12, 83:4, 83:11, 83:13, 84:18, 84:21, 85:12, 87:8, 87:14, 87:19, 90:4, 90:17, 90:19, 92:12, 92:18, 92:20, 93:23, 94:8, 94:24, 96:21, 104:3, 104:24, 105:11, 106:11, 108:10, 108:14, 113:23, 115:9, 115:21, 117:8, 119:1, 119:7, 119:17, 120:6, 121:2, 121:11, 121:20, 121:23, 122:9, 122:24, 124:5, 124:10, 124:20, 129:19,

129:24, 132:2, 132:13, 132:17, 132:20, 132:24, 134:17, 138:17, 139:8, 139:11, 139:13, 140:4, 140:10, 140:22, 141:1, 141:4, 141:20, 142:24, 144:20, 146:14, 149:20, 159:1, 161:23, 163:8, 163:25, 164:16, 164:19, 167:2, 169:11, 180:22, 180:23, 181:12, 186:20, 186:22, 196:2, 203:16, 208:24, 208:25, 209:4, 214:9, 220:8, 220:13, 222:4, 223:8, 223:12, 234:14
**cabell** [1] - 2:2
**Cabell-Huntington** [1] - 220:13
**Cabell/Huntington** [6] - 26:8, 213:3, 214:2, 227:19, 230:10, 230:20
**cabinets** [1] - 151:3, 151:4
**CAD** [4] - 140:12, 140:13, 140:15, 140:16
**calculated** [1] - 184:1
**calculator** [2] - 144:16, 184:1
**California** [1] - 132:9
**CALLAS** [27] - 6:7, 73:17, 73:20, 73:22, 76:17, 86:1, 89:17, 92:8, 107:25, 108:17, 108:24, 109:1, 109:8, 122:7, 122:15, 127:22, 128:3, 130:5, 134:13, 134:15, 142:13, 142:17, 142:19, 142:20, 147:18, 184:9, 190:1
**Callas** [9] - 73:21, 76:14, 127:14, 127:21, 128:6, 158:5, 184:15, 186:4
**camera** [1] - 183:20
**cameras** [1] - 205:4
**camp** [1] - 78:22
**campaign** [7] - 84:17, 84:23, 209:10,

234:7, 234:15, 234:19, 234:23
**CAMPBELL** [1] - 6:14
**campground** [1] - 82:24
**campus** [3] - 199:3, 199:25, 231:16
**Cane** [1] - 66:7
**cannot** [3] - 65:25, 66:24, 67:9
**capabilities** [1] - 40:5
**capacity** [2] - 200:20, 229:4
**Caperton** [3] - 79:22, 79:23, 80:11
**Capitol** [1] - 2:17
**captive** [1] - 221:9
**capture** [2] - 42:13, 42:14
**car** [12] - 94:14, 95:20, 96:10, 99:22, 100:1, 118:22, 125:21, 126:19, 135:24, 217:1, 233:22, 234:10
**Cardinal** [6] - 4:11, 5:2, 13:22, 35:2, 35:21, 36:1
**Care** [5] - 106:14, 107:18, 215:16, 223:6, 223:11
**care** [35] - 80:20, 81:8, 82:22, 83:25, 100:18, 102:25, 103:2, 106:24, 107:8, 127:7, 195:9, 202:14, 206:21, 207:1, 207:5, 207:7, 207:13, 207:14, 207:17, 213:20, 213:25, 216:1, 217:13, 217:17, 217:23, 219:21, 220:2, 220:14, 220:15, 220:19, 221:19, 223:10, 224:15, 225:2, 229:5
**cared** [1] - 111:2
**career** [3] - 44:13, 80:18, 81:19
**careful** [2] - 67:4, 129:14
**Carey** [1] - 4:17
**carfentanil** [10] - 95:9, 95:13, 95:16, 96:3, 133:5, 160:14, 177:23, 178:17, 187:2, 204:2
**Carpenters** [1] - 78:5
**carrot** [1] - 181:3

**carrying** [1] - 95:24
**cars** [1] - 112:5
**cartel** [1] - 180:1
**case** [30] - 29:24, 32:4, 33:18, 34:1, 35:1, 35:20, 36:6, 36:10, 37:22, 38:17, 40:2, 42:6, 45:19, 54:18, 54:20, 59:8, 59:12, 59:14, 60:23, 60:25, 66:8, 125:6, 142:11, 174:17, 175:8, 175:13, 195:9, 218:3, 218:5
**cases** [9] - 76:9, 133:19, 151:11, 169:8, 170:2, 171:24, 205:20, 222:18, 225:16
**cash** [1] - 89:25
**casual** [1] - 95:19
**catch** [3] - 34:17, 44:20, 185:10
**catch-all** [1] - 185:10
**categories** [4] - 184:5, 184:19, 184:20, 207:18
**category** [3] - 184:3, 191:7, 191:12
**Caught** [1] - 29:7
**causation** [1] - 46:20
**caused** [4] - 96:3, 107:24, 133:13, 188:20
**causes** [3] - 53:18, 230:4
**causing** [1] - 53:17
**cautious** [1] - 41:4
**CCSAPP** [1] - 208:24
**CDC** [2] - 222:7, 222:8
**celebrities** [1] - 205:13
**cell** [1] - 204:10
**Census** [2] - 120:6, 155:24
**center** [11] - 8:14, 14:10, 18:21, 97:15, 115:20, 155:18, 194:23, 212:18, 212:21, 224:8, 227:16
**Center** [6] - 3:12, 5:11, 114:22, 155:11, 196:13, 219:10
**centered** [1] - 225:2
**centers** [1] - 188:25
**central** [1] - 59:8
**certain** [3] - 13:8, 74:2, 178:16
**Certainly** [2] - 182:13,

191:12
certainly [5] - 37:20, 61:10, 69:7, 160:18, 166:12
certificates [2] - 194:8, 194:10
CERTIFICATION [1] - 237:1
certified [5] - 66:12, 66:20, 116:18, 144:17, 209:24
certify [1] - 237:4
challenge [1] - 228:7
challenged [2] - 114:16, 116:12
challenging [2] - 213:4, 229:4
Chamber [1] - 232:21
chance [6] - 63:15, 131:14, 153:20, 154:12, 177:17
change [6] - 99:23, 102:8, 152:25, 159:21, 185:8, 222:19
changed [7] - 85:22, 93:5, 103:19, 106:2, 135:8, 188:19, 203:25
changes [2] - 54:8, 106:1
Chapman [1] - 75:16
characterization [1] - 58:19
characterize [1] - 93:1
characterized [1] - 187:9
charge [7] - 8:1, 8:3, 8:11, 23:4, 103:1, 105:22, 158:10
charged [1] - 103:2
charges [1] - 226:5
CHARLES [2] - 3:11, 77:4
Charles [3] - 73:25, 76:24, 77:17
Charleston [10] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:3, 80:2, 80:25, 196:18, 234:7
CHARLESTON [2] - 1:2, 1:18
chart [2] - 9:22, 82:13
charts [1] - 53:9
Chase [1] - 4:18
chasing [1] - 183:3
cheap [1] - 152:7
check [3] - 24:1, 54:9, 222:22
checked [4] - 22:16,

22:20, 23:22, 25:22
checking [2] - 23:18, 24:12
checkpoints [2] - 118:14
Chesapeake [2] - 192:18, 192:20
chest [1] - 140:6
Chesterbrook [1] - 6:15
Chicago [2] - 162:1, 162:2
chicken [1] - 229:13
chief [4] - 38:25, 58:17, 127:24
Chief [17] - 81:19, 81:20, 83:2, 83:4, 83:17, 83:22, 84:4, 84:13, 93:10, 93:22, 127:19, 127:23, 129:4, 129:9, 129:16, 130:6, 130:16
Child [1] - 110:8
child [8] - 106:24, 127:4, 127:5, 216:22, 219:3, 226:11, 228:24
children [10] - 106:6, 106:7, 106:16, 107:9, 125:22, 156:13, 193:2, 195:9, 196:20, 226:14
choice [3] - 91:6, 91:23, 197:16
choose [3] - 64:15, 69:6, 227:19
chose [1] - 78:3
Christian [1] - 235:2
Christmas [2] - 136:1, 225:25
chronic [2] - 231:19, 231:21
CHUCK [1] - 77:4
Chuck [2] - 77:18, 165:10
circle [2] - 84:22, 101:25
Circuit [10] - 32:13, 33:12, 34:22, 35:11, 66:1, 66:6, 66:8, 67:14, 75:5, 75:17
circuit [2] - 103:3, 191:10
circuits [1] - 103:5
circumstances [1] - 123:1
circumvent [1] - 39:5
cite [1] - 60:20

cites [1] - 49:4
cities [4] - 142:2, 161:2, 169:15, 179:6
citing [1] - 66:10
CITY [1] - 1:4
city [4] - 120:18, 121:14, 211:22, 223:25
City [14] - 4:1, 5:11, 83:4, 90:18, 100:9, 101:14, 115:21, 120:3, 157:3, 157:7, 157:8, 195:22, 202:21, 237:5
city's [1] - 214:11
Civil [3] - 1:4, 237:7, 237:8
civil [1] - 1:10
claim [3] - 59:23, 60:2, 69:2
claiming [1] - 59:17
clarify [2] - 50:5, 62:25
classic [1] - 235:2
cleanup [1] - 48:2
clear [17] - 10:1, 24:16, 32:17, 46:14, 47:19, 49:15, 51:15, 51:21, 58:25, 67:9, 70:11, 72:24, 110:18, 125:9, 140:15, 165:19, 217:4
clearance [1] - 114:25
cleared [2] - 19:25, 139:22
clearer [1] - 24:6
clears [1] - 60:12
clerk [1] - 76:20
CLERK [7] - 76:22, 76:25, 77:2, 77:6, 190:11, 190:14, 190:16
client [1] - 228:14
clients [2] - 228:18, 228:19
clinic [1] - 218:21
clinical [7] - 121:25, 194:9, 194:12, 194:13, 198:15, 199:4, 224:23
clinics [3] - 89:21, 89:23, 151:6
clip [2] - 12:1, 12:7
close [1] - 220:3
closed [2] - 36:15, 42:23
closely [2] - 213:11, 230:24
closer [1] - 198:6
closing [1] - 37:25

clothing [1] - 96:11
co [1] - 229:11
co-occurring [1] - 229:11
coach [9] - 125:19, 212:17, 213:24, 215:25, 218:12, 218:15, 221:18, 227:1
coaches [4] - 209:24, 221:7, 225:6
Coalfield [1] - 233:2
coalition [1] - 207:24
cocaine [5] - 92:23, 160:8, 171:9, 171:16, 171:20
Cochran [3] - 6:17, 237:2, 237:11
Coil [1] - 66:2
coins [1] - 185:7
collaborated [1] - 165:20
collaborating [1] - 165:15
collaborative [1] - 223:25
collaboratively [3] - 223:15, 223:16, 223:17
collect [1] - 146:22
collected [4] - 140:19, 141:6, 142:1, 234:20
collection [2] - 102:18, 120:11
College [1] - 193:9
Colonial [3] - 66:1, 66:5, 66:10
Columbus [3] - 161:24, 161:25, 174:8
combat [1] - 158:25
combination [2] - 150:18, 156:10
comeback [1] - 131:10
coming [25] - 72:9, 85:25, 86:22, 93:14, 96:2, 108:8, 132:9, 132:17, 150:4, 151:22, 152:3, 161:7, 161:21, 169:10, 170:16, 170:25, 178:22, 178:23, 179:9, 179:16, 186:9, 214:12, 216:7, 223:10, 229:22
comma [2] - 42:5, 42:10
comment [2] - 45:13, 91:22

clothing → Commerce [1] - 232:21
Commercial [1] - 80:15
COMMISSION [1] - 1:10
commission [1] - 164:17
Commission [11] - 2:2, 3:2, 71:7, 81:6, 98:14, 118:9, 138:17, 164:1, 164:16, 164:19, 232:8
Commissioner [1] - 115:2
commit [5] - 61:9, 63:25, 76:4, 145:5, 145:11
committing [1] - 64:3
common [5] - 18:5, 62:13, 93:2, 153:8, 210:4
commonly [1] - 188:12
commonplace [1] - 235:13
communicate [1] - 29:11
communication [1] - 218:23
communications [3] - 11:9, 11:20, 18:19
communities [2] - 87:14, 224:12
Community [6] - 195:4, 202:12, 202:16, 202:17, 210:8, 230:19
community [40] - 56:12, 83:14, 83:16, 88:5, 113:19, 119:5, 121:15, 198:4, 203:4, 203:12, 203:13, 204:20, 205:23, 206:14, 207:2, 207:20, 207:21, 207:22, 207:25, 208:13, 208:18, 209:16, 210:4, 210:7, 211:1, 212:10, 214:24, 215:7, 216:6, 217:23, 219:18, 222:17, 226:21, 227:4, 227:11, 227:12, 228:2, 229:7, 234:17, 235:15
companies [2] -

30:15, 35:12
**company** [5] - 8:6,
10:21, 20:1, 31:3,
119:17
**Company** [1] - 66:2
**company's** [1] - 39:6
**Compass** [4] - 211:15,
211:17, 211:21,
212:11
**compassion** [2] -
211:25, 212:6
**competitors** [3] -
32:22, 37:9, 39:5
**compile** [2] - 141:8,
142:2
**compiled** [1] - 141:9
**complains** [1] - 30:24
**completed** [1] -
198:13
**completely** [4] - 36:9,
36:13, 49:21, 228:24
**completeness** [2] -
29:18, 31:19
**completing** [1] - 194:6
**compliance** [1] - 28:4
**component** [2] -
229:8, 231:2
**compound** [1] - 49:20
**compressing** [1] -
7:14
**comprised** [1] - 43:22
**compromise** [1] -
41:16
**compromising** [1] -
182:10
**computer** [2] - 6:19,
100:1
**conceded** [1] - 55:18
**concept** [1] - 68:11
**concepts** [1] - 67:14
**concern** [2] - 12:15,
74:9
**concerned** [3] - 76:7,
121:19, 191:12
**concerning** [2] -
64:23, 70:3
**concerns** [1] - 69:9
**concerted** [1] - 180:5
**concluded** [1] - 12:7
**conclusion** [3] -
46:20, 68:21, 123:13
**conclusions** [1] - 75:8
**concocting** [1] -
187:17
**condition** [3] - 221:12,
229:12, 230:13
**conduct** [5] - 39:12,
65:9, 65:15, 69:23,
185:9
**conducted** [3] - 12:12,

17:8, 203:15
**confer** [3] - 21:10,
48:8, 48:12
**conferences** [1] -
234:21
**confidential** [1] - 37:7
**Confinement** [1] -
136:17
**confinement** [9] -
98:25, 99:5, 105:19,
136:10, 137:8,
137:14, 137:18,
138:1
**confirm** [1] - 74:8
**conflicting** [1] - 11:3
**confuse** [1] - 25:15
**confusion** [1] - 62:15
**congregation** [2] -
210:19, 211:8
**connect** [2] - 59:16
**connected** [1] -
184:20
**Connecticut** [2] -
193:17, 193:18
**connection** [3] -
59:18, 59:20, 169:25
**Connections** [2] -
217:7, 219:11
**connections** [1] -
227:8
**Connie** [6] - 117:12,
117:16, 189:17,
208:4, 211:13, 214:9
**Connolly** [2] - 4:13,
5:4
**CONROY** [1] - 3:3
**consent** [1] - 35:13
**consequences** [1] -
204:9
**consider** [4] - 38:9,
38:12, 62:10, 62:20
**consideration** [1] -
56:25
**considered** [3] - 67:5,
143:17, 198:19
**considering** [2] - 73:8,
228:10
**consistent** [2] - 40:24,
188:9
**constant** [2] - 33:3,
225:17
**construction** [1] -
78:5
**contact** [3] - 17:23,
95:19, 96:3
**contain** [1] - 50:18
**contained** [1] - 167:9
**contains** [1] - 40:19
**contend** [1] - 123:8
**content** [1] - 66:4

**context** [2] - 32:18,
150:17
**continue** [6] - 39:11,
44:18, 111:20,
116:8, 201:9, 236:2
**continued** [4] - 55:6,
93:12, 100:13, 204:9
**Continued** [5] - 3:1,
5:1, 5:6, 6:1, 6:10
**continuing** [1] -
220:10
**continuously** [1] -
147:3
**continuum** [2] -
208:11, 217:8
**contradiction** [1] -
68:20
**contrary** [1] - 26:7
**contrast** [1] - 36:13
**contribute** [1] - 185:2
**control** [5] - 8:18,
45:24, 185:10,
185:11, 204:8
**Control** [3] - 202:1,
202:22, 214:11
**Controlled** [1] - 14:10
**controlled** [6] - 8:15,
15:9, 44:10, 50:19,
50:22
**controlling** [1] - 55:20
**controls** [3] - 13:15,
18:7, 44:10
**convenience** [1] -
82:23
**conveniently** [1] -
63:20
**convicted** [1] - 145:3
**conviction** [1] -
139:23
**convictions** [1] -
67:15
**Cook** [3] - 6:18, 237:3,
237:11
**Cooper** [2] - 52:25,
56:2
**coordinate** [3] - 202:9,
202:20, 202:21
**coordinated** [9] -
202:24, 204:20,
205:11, 206:10,
207:15, 210:7,
217:22, 220:15,
223:13
**coordinating** [1] -
223:21
**coordination** [5] -
173:8, 196:1,
207:17, 223:25,
228:2
**Coordination** [1] -

230:19
**coordinative** [1] -
204:22
**coordinator** [4] -
196:16, 198:15,
199:4, 201:24
**coping** [2] - 229:24,
229:25
**COPS** [1] - 112:19
**copy** [11] - 15:9, 30:9,
33:19, 33:23, 34:7,
34:9, 34:14, 61:1,
66:12, 66:13, 66:20
**core** [2] - 44:11, 123:4
**CORE** [3] - 231:23,
231:24, 232:5
**Corey** [2] - 192:24,
197:23
**corner** [6] - 21:20,
23:13, 24:6, 25:1,
40:14, 181:8
**corner-level** [1] -
181:8
**corners** [1] - 70:18
**cORPORATION** [2] -
1:7, 1:13
**Corporation** [4] - 6:2,
14:10, 192:25, 237:7
**Correct** [10] - 19:4,
23:22, 23:23, 31:22,
42:7, 49:17, 50:19,
51:7, 53:8, 184:5
**correct** [102] - 10:3,
10:4, 10:6, 10:10,
10:11, 10:14, 10:18,
10:19, 10:25, 11:2,
11:8, 11:9, 11:17,
12:16, 12:21, 12:25,
13:4, 13:13, 14:14,
15:17, 15:18, 15:21,
16:7, 19:5, 19:8,
19:9, 19:11, 19:12,
19:14, 19:15, 19:20,
19:21, 19:22, 19:23,
20:8, 20:9, 20:12,
20:19, 20:23, 20:24,
21:1, 21:2, 21:25,
22:2, 22:3, 27:1,
27:2, 27:25, 28:10,
31:23, 32:16, 46:1,
46:6, 48:22, 48:25,
49:2, 50:16, 51:2,
51:18, 51:19, 51:25,
53:9, 53:12, 55:2,
55:6, 56:7, 56:8,
56:14, 87:19, 94:5,
128:14, 128:16,
128:23, 129:4,
129:21, 130:8,
130:19, 130:22,

130:25, 131:17,
132:6, 132:13,
132:18, 133:11,
133:18, 134:22,
135:6, 135:18,
137:12, 139:9,
140:1, 140:4, 141:6,
141:11, 143:4,
143:23, 144:4,
145:3, 146:7,
157:18, 189:21,
237:4
**correction** [1] - 55:3
**correctly** [4] - 119:4,
148:17, 156:24,
182:7
**corresponded** [1] -
206:17
**corresponding** [3] -
45:8, 45:19, 45:25
**corridor** [1] - 223:22
**cost** [5] - 179:21,
201:6, 201:10,
201:11, 233:21
**costs** [1] - 137:18
**counsel** [4] - 21:14,
42:6, 186:19, 187:20
**counseling** [5] -
117:10, 189:2,
194:9, 194:23,
199:25
**counselors** [3] -
106:25, 110:3,
110:10
**count** [6] - 65:19,
67:21, 98:12,
112:25, 113:1,
155:24
**counterpart** [2] -
18:15, 18:16
**counties** [10] - 80:20,
92:21, 115:11,
142:2, 223:13,
223:14, 223:15,
223:17, 232:7,
232:24
**country** [3] - 10:23,
57:24, 235:2
**COUNTY** [1] - 1:10
**county** [23] - 81:16,
85:1, 85:20, 90:6,
93:18, 94:2, 99:6,
102:23, 106:3,
106:16, 114:7,
115:10, 135:10,
141:24, 150:4,
150:9, 154:19,
166:8, 177:2,
180:25, 182:1,
223:20, 223:25

**County** [110] - 2:2, 3:2, 12:24, 15:25, 16:24, 17:2, 20:6, 21:22, 27:16, 27:19, 71:7, 73:25, 74:18, 77:21, 80:7, 81:12, 83:5, 83:11, 83:13, 84:19, 84:21, 85:12, 87:8, 87:14, 87:19, 89:15, 89:20, 90:4, 90:17, 90:19, 92:12, 92:18, 92:20, 93:23, 94:8, 94:24, 96:21, 98:14, 104:4, 104:25, 105:12, 108:10, 108:14, 113:23, 115:9, 115:21, 117:8, 119:1, 119:7, 119:17, 120:6, 121:2, 121:11, 121:20, 122:9, 122:24, 124:5, 124:10, 124:20, 129:1, 129:19, 129:24, 132:3, 132:13, 132:17, 132:20, 132:24, 134:17, 137:15, 137:21, 137:25, 138:8, 138:10, 138:17, 139:8, 139:11, 139:13, 140:4, 140:10, 140:22, 141:1, 141:4, 141:20, 142:24, 144:20, 146:14, 157:3, 157:5, 159:1, 163:8, 164:1, 164:16, 164:19, 166:6, 167:4, 167:5, 180:22, 180:23, 181:12, 186:20, 186:22, 208:24, 208:25, 209:4, 214:9, 214:22, 214:23, 216:8, 223:8, 223:12
**County's** [4] - 104:3, 136:18, 138:5, 167:2
**County/Huntington** [1] - 121:23
**couple** [15] - 23:11, 27:14, 29:19, 33:16, 82:25, 89:21, 91:16, 115:15, 136:19, 142:5, 170:2, 170:21, 171:6, 172:21, 194:10
**couples** [1] - 194:24

**course** [8] - 18:5, 63:3, 63:15, 92:20, 108:6, 113:25, 175:7, 195:6
**COURT** [154] - 1:1, 1:17, 7:5, 7:8, 7:20, 21:4, 21:9, 21:16, 28:15, 28:20, 28:23, 28:25, 29:3, 29:5, 29:12, 30:11, 31:6, 31:15, 33:1, 34:5, 34:12, 34:14, 34:16, 35:16, 36:3, 36:24, 38:2, 38:18, 39:9, 39:25, 44:25, 46:24, 47:17, 48:4, 48:9, 48:14, 48:17, 49:6, 50:3, 50:11, 52:4, 52:8, 52:15, 57:3, 57:5, 57:12, 57:16, 59:6, 60:7, 60:13, 60:24, 61:13, 61:19, 62:1, 62:8, 62:21, 63:4, 63:13, 63:17, 63:19, 63:23, 64:6, 64:9, 64:12, 64:16, 64:21, 66:22, 68:3, 68:23, 69:12, 70:20, 71:20, 72:9, 72:22, 73:2, 73:10, 73:21, 74:23, 76:2, 76:18, 76:20, 77:9, 86:5, 86:8, 86:16, 86:25, 87:21, 88:6, 88:9, 89:18, 91:11, 91:19, 91:24, 92:9, 97:4, 101:13, 101:20, 101:23, 104:16, 108:2, 108:18, 108:25, 109:3, 109:11, 109:24, 110:15, 110:18, 110:21, 116:4, 122:10, 122:19, 123:5, 123:12, 124:8, 125:10, 127:13, 127:18, 127:23, 130:2, 142:14, 147:21, 148:1, 148:3, 163:5, 163:11, 163:16, 163:19, 166:1, 166:4, 166:9, 166:16, 166:20, 167:6, 167:8, 167:24, 171:14, 175:10, 175:15, 177:4, 177:7, 177:10, 178:19, 183:7, 183:10, 184:13, 189:25,

190:4, 190:10, 191:15, 192:5, 195:13, 197:10, 235:22, 236:1
**court** [18] - 30:3, 31:1, 59:3, 61:11, 66:4, 97:9, 102:15, 103:4, 103:9, 103:16, 164:9, 173:2, 177:5, 196:25, 200:16, 218:7, 225:12
**Court** [82] - 6:17, 6:18, 7:2, 31:2, 32:14, 34:22, 35:24, 37:4, 38:9, 38:11, 38:22, 47:24, 52:13, 54:13, 56:24, 58:3, 58:8, 60:20, 62:19, 64:20, 65:17, 65:21, 66:5, 66:9, 66:11, 66:15, 66:17, 66:18, 66:21, 67:4, 67:7, 67:17, 67:19, 67:25, 69:3, 69:4, 69:6, 69:7, 71:19, 74:21, 77:16, 78:25, 82:12, 83:9, 83:22, 87:17, 96:2, 112:16, 114:9, 115:13, 124:4, 124:21, 125:3, 165:19, 190:22, 190:25, 191:6, 192:12, 193:5, 195:25, 197:11, 208:3, 210:8, 211:12, 211:15, 212:25, 215:1, 219:9, 220:24, 221:23, 223:6, 223:24, 227:10, 228:5, 231:24, 233:10, 237:2, 237:3
**Court's** [4] - 66:25, 68:16, 68:21, 117:12
**courthouse** [1] - 116:9, 120:13, 120:21
**courtroom** [2] - 39:13, 39:17
**COURTROOM** [1] - 77:2
**courts** [4] - 102:11, 102:12, 103:1, 103:2
**cover** [4] - 43:19, 63:8, 162:24, 233:10
**covered** [3] - 48:2, 150:13, 182:24
**covers** [1] - 123:15
**COVID** [10] - 100:22, 100:23, 100:25,

101:9, 102:8, 103:7, 103:11, 103:12, 103:15, 223:2
**Covington** [1] - 5:11
**crack** [3] - 171:9, 171:16, 171:20
**cranking** [1] - 98:11
**crappy** [1] - 107:10
**crash** [10] - 79:18, 81:5, 81:6, 94:14, 118:20, 118:21, 118:25, 158:7, 158:8
**crashes** [2] - 118:24, 158:10
**craving** [2] - 204:8, 204:13
**crazy** [1] - 126:12
**create** [6] - 30:22, 121:1, 136:16, 145:10, 208:13
**created** [3] - 136:15, 192:4, 202:19
**creating** [1] - 91:17
**Creating** [1] - 232:5
**creative** [1] - 98:19
**credentials** [1] - 225:8
**crime** [17] - 74:18, 76:12, 78:24, 81:12, 81:25, 99:11, 113:20, 121:2, 140:22, 141:19, 142:3, 143:15, 145:3, 145:11, 146:19, 157:20, 188:3
**Crime** [3] - 162:7, 162:12, 168:18
**crimes** [19] - 76:4, 79:3, 84:6, 99:16, 99:18, 141:1, 141:4, 141:15, 142:24, 143:7, 143:22, 144:21, 145:6, 146:2, 184:2, 184:6, 184:11, 185:22, 186:3
**criminal** [5] - 79:3, 113:20, 141:24, 209:11, 226:5
**crisis** [11] - 27:16, 28:9, 53:18, 53:21, 59:11, 59:12, 155:5, 194:11, 206:24, 206:25
**criteria** [1] - 206:14
**critical** [1] - 74:10
**cross** [15] - 36:17, 47:20, 48:2, 49:22, 50:6, 50:9, 71:3, 71:11, 72:14, 72:19,

73:7, 127:21, 130:2, 148:1, 184:14
**CROSS** [2] - 128:2, 148:5
**cross-examination** [2] - 71:3, 184:14
**cross-examine** [1] - 72:14
**CRR** [2] - 6:17, 6:18
**crucially** [1] - 60:24
**CSA** [2] - 11:17, 12:4
**CT1** [1] - 57:22
**cup** [1] - 99:23
**curious** [2] - 36:20, 101:13
**current** [5] - 111:21, 111:22, 132:20, 177:15, 182:7
**curriculum** [3] - 199:4, 209:4, 231:17
**curriculums** [1] - 199:3
**curtailed** [1] - 95:6
**custody** [1] - 216:22
**customers** [1] - 16:2
**cut** [8] - 40:1, 91:6, 98:15, 111:13, 133:5, 135:11, 163:23, 188:12
**cutting** [2] - 95:11, 174:4
**CVS** [1] - 45:18
**Cycle** [2] - 221:23, 222:11

## D

**D.C** [1] - 197:25
**Daddy** [1] - 110:11
**daily** [3] - 13:24, 14:4, 14:6
**danger** [1] - 95:16
**dangers** [1] - 209:5
**dark** [2] - 82:17, 121:16
**dark-haired** [1] - 82:17
**data** [33] - 16:15, 32:21, 33:5, 34:2, 35:1, 35:2, 35:7, 35:9, 36:1, 39:5, 40:16, 40:20, 41:1, 41:4, 41:7, 42:14, 50:15, 50:18, 50:21, 50:25, 51:3, 51:4, 51:5, 52:23, 141:5, 142:3, 147:1, 147:8, 147:11, 147:15, 234:20, 234:21
**database** [3] - 138:21, 139:1, 139:6

**Date** [1] - 237:16
**date** [4] - 11:15, 24:15, 25:1, 176:18
**dated** [1] - 22:5
**Daubert** [6] - 55:10, 55:25, 56:1, 56:20, 57:22, 63:11
**daughter** [1] - 96:24
**dave** [1] - 172:24
**Dave** [1] - 173:5
**DAVID** [2] - 1:17, 2:9
**David** [4] - 7:1, 64:24, 123:19, 172:21
**day-to-day** [3] - 82:5, 84:2, 111:12
**days** [11] - 64:1, 93:9, 138:19, 222:21, 222:25, 223:4, 224:19, 225:18, 228:17, 234:19
**daytime** [1] - 224:23
**DC** [6] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12
**De** [2] - 2:4, 2:16
**DEA** [52] - 11:14, 12:2, 12:12, 14:21, 17:22, 30:16, 32:6, 32:21, 32:22, 33:3, 35:1, 35:8, 35:13, 37:6, 39:3, 39:12, 39:15, 39:17, 39:20, 39:24, 40:5, 40:18, 40:20, 41:13, 42:2, 42:13, 42:19, 43:1, 43:7, 43:18, 45:12, 45:17, 45:22, 46:2, 46:4, 50:16, 51:5, 51:12, 51:21, 54:12, 58:17, 58:22, 70:2, 100:14, 101:23, 101:24, 152:16, 173:5, 181:11, 181:13
**DEA's** [5] - 35:6, 38:25, 39:12, 54:23
**dead** [4] - 94:14, 94:17, 94:18, 126:20
**deadly** [1] - 233:20
**deal** [6] - 61:19, 88:24, 112:21, 112:22, 114:13, 228:22
**dealer** [5] - 44:14, 93:20, 150:24, 179:15, 181:8
**dealers** [10] - 44:16, 93:13, 93:17, 99:3, 99:4, 130:19, 130:24, 132:9, 150:20, 150:21
**dealing** [4] - 99:21, 124:17, 132:2,

210:22
**dealt** [3] - 39:20, 149:4
**death** [8] - 94:16, 94:19, 97:23, 117:7, 131:12, 178:18, 179:24, 233:22
**deaths** [8] - 43:14, 94:11, 94:18, 94:21, 94:22, 186:22, 186:25
**decade** [1] - 209:1
**decades** [3] - 75:19, 85:9, 119:1
**decide** [1] - 163:19
**decided** [3] - 71:11, 98:13, 99:2
**decision** [6] - 33:8, 33:24, 38:24, 56:2, 72:19, 72:20
**decisions** [2] - 18:9, 227:3
**deck** [2] - 71:22, 196:23
**declaration** [8] - 35:22, 35:23, 38:10, 38:15, 38:23, 38:24, 39:4, 39:8
**decontaminated** [1] - 96:18
**decrease** [3] - 92:6, 120:2, 120:3
**dedicated** [2] - 105:3, 107:23
**dedication** [1] - 182:10
**deemed** [1] - 219:21
**deep** [3] - 117:16, 131:20, 198:4
**DEF** [2] - 164:24, 172:8
**DEF-WV** [2] - 164:24, 172:8
**DEF-WV-00274** [1] - 162:19
**DEF-WV-002749** [1] - 168:2
**DEF-WV-03532** [1] - 30:1
**DEF-WV-1318** [1] - 172:21
**DEF-WV-274** [1] - 187:18
**defend** [1] - 73:5
**Defendant** [4] - 4:10, 5:2, 5:7, 6:2
**Defendants** [3] - 1:8, 1:14, 237:7
**defendants** [14] - 16:18, 35:8, 37:5, 37:6, 39:11, 39:18,

43:9, 47:22, 59:2, 65:4, 71:10, 72:13, 72:14, 74:1
**defendants'** [1] - 64:23
**Defendants'** [1] - 14:2
**defender** [1] - 105:6
**defending** [1] - 39:15
**Defense** [3] - 21:7, 194:18, 224:6
**defense** [6] - 32:1, 32:5, 32:9, 32:11, 186:19, 187:20
**deficiencies** [3] - 40:16, 41:13, 53:3
**deficiency** [1] - 53:14
**deficient** [1] - 53:2
**deficit** [1] - 98:9
**defined** [2] - 94:1, 204:8
**definitely** [5] - 43:4, 95:18, 100:25, 110:19, 126:7
**definition** [2] - 167:9, 204:5
**degree** [5] - 193:10, 193:11, 194:16, 195:5, 209:22
**Degree** [1] - 193:15
**delay** [4] - 34:11, 41:2, 41:3
**deliver** [1] - 180:17
**delivery** [2] - 220:21
**demand** [7] - 42:4, 85:24, 91:5, 91:17, 131:4, 156:1, 161:11
**demo** [1] - 83:7
**Demo** [1] - 18:23
**Demo224** [1] - 195:16
**demonstrates** [1] - 206:23
**Demonstrative** [1] - 82:11
**demonstrative** [5] - 7:17, 7:23, 82:9, 191:21, 197:8
**Department** [22] - 33:13, 73:25, 78:7, 78:10, 84:2, 93:24, 100:6, 102:14, 134:17, 134:18, 134:20, 135:1, 135:15, 139:25, 167:4, 194:18, 202:5, 202:12, 203:14, 212:19, 213:3, 224:5
**department** [21] - 18:12, 90:22, 90:23, 106:1, 113:7, 115:7,

116:22, 117:13, 118:1, 133:22, 134:5, 137:1, 140:24, 213:9, 215:11, 215:12, 221:3, 222:6, 222:12, 222:14
**departments** [1] - 231:16
**depose** [1] - 54:19
**deposed** [1] - 54:18
**deposing** [1] - 55:4
**deposition** [6] - 20:10, 20:18, 68:9, 74:13, 134:10, 134:14
**depositions** [2] - 20:21, 39:19
**depression** [1] - 229:21
**depressive** [1] - 229:19
**depth** [1] - 158:1
**deputies** [15] - 94:18, 95:21, 96:1, 96:4, 101:1, 101:8, 102:9, 111:1, 111:8, 111:9, 125:17, 135:14, 135:17, 135:21, 158:16
**deputy** [8] - 96:13, 100:14, 111:12, 126:2, 126:6, 126:8, 136:5, 140:10
**Deputy** [1] - 81:1
**DEPUTY** [1] - 77:2
**describe** [6] - 82:11, 96:19, 119:4, 123:4, 124:21, 184:19
**described** [5] - 111:21, 112:8, 122:14, 130:24, 186:2
**describing** [3] - 86:3, 109:6, 149:7
**deserve** [1] - 234:3
**desk** [3] - 200:21, 210:12, 217:15
**despite** [1] - 204:9
**Despite** [1] - 188:4
**destroy** [2] - 62:2, 233:23
**destruction** [2] - 179:24, 233:22
**detachment** [2] - 80:22, 80:24
**detachments** [1] - 81:21
**detail** [3] - 9:23, 23:8, 214:6
**detailed** [1] - 206:23

**details** [1] - 173:11
**detect** [3] - 42:16, 42:24, 44:8
**detective** [1] - 113:12
**Detective** [1] - 113:21
**deteriorated** [1] - 119:25
**determine** [3] - 55:7, 140:25, 144:6
**determined** [1] - 65:24
**Detroit** [15] - 161:7, 161:21, 161:23, 169:14, 169:18, 169:25, 170:25, 171:8, 171:20, 176:13, 178:25, 179:10, 179:11, 179:15, 180:17
**develop** [7] - 40:21, 71:22, 199:4, 219:6, 224:8, 226:15, 234:7
**developed** [7] - 202:22, 205:23, 217:22, 223:11, 231:19, 232:5, 232:22
**developing** [2] - 58:19, 201:24
**development** [5] - 119:8, 119:9, 193:19, 193:24, 233:3
**Development** [1] - 233:3
**Developmental** [1] - 218:18
**developmental** [2] - 218:19, 218:22
**deviates** [2] - 54:23, 55:1
**devote** [3] - 93:25, 113:7, 113:15
**DHHR** [1] - 110:7
**diagram** [1] - 120:4
**dictate** [1] - 31:1
**died** [3] - 106:22, 124:18, 126:20
**difference** [1] - 84:25
**different** [30] - 8:2, 20:15, 25:11, 29:10, 58:7, 75:25, 76:9, 85:10, 100:16, 100:17, 101:25, 102:1, 133:10, 149:20, 156:5, 159:18, 177:25, 178:8, 178:11, 196:1, 200:11, 201:14, 201:19, 205:24, 207:18,

211:5, 225:4, 227:7, 230:16, 231:15
**difficult** [2] - 63:12, 139:2
**dig** [1] - 60:4
**digesting** [1] - 105:4
**diligence** [18] - 17:6, 17:8, 17:15, 19:7, 19:10, 19:24, 27:20, 30:15, 51:18, 51:20, 51:24, 54:7, 56:6, 60:18, 65:9, 65:15, 69:23, 70:6
**diligent** [1] - 78:19
**dime** [1] - 105:14
**diminished** [2] - 119:21, 120:23
**diminishing** [1] - 119:22
**dinner** [1] - 128:1
**DIRECT** [2] - 77:13, 192:8
**direct** [13] - 20:13, 27:21, 30:1, 39:13, 41:11, 41:21, 47:25, 49:23, 103:9, 148:12, 149:8, 152:24, 157:18
**directed** [1] - 47:21
**directions** [1] - 201:19
**directly** [7] - 27:8, 46:10, 65:14, 69:15, 69:22, 118:11, 185:22
**Director** [8] - 81:1, 81:4, 81:7, 118:9, 192:16, 202:1, 202:4, 203:2
**dirty** [2] - 160:2, 160:4
**disability** [1] - 156:22
**disagreeing** [1] - 154:9
**disarray** [2] - 98:15, 112:3
**discharge** [1] - 68:19
**discharged** [1] - 217:14
**discharging** [1] - 68:14
**disciplines** [1] - 200:3
**disclosed** [4] - 74:3, 190:23, 191:2, 191:21
**disclosing** [1] - 35:9
**disclosure** [1] - 35:13
**disclosures** [1] - 74:2
**discovery** [1] - 13:1
**discrepancies** [1] - 230:16
**discuss** [1] - 71:2

discussed [2] - 12:18, 177:20
**discussing** [1] - 104:1
**discussion** [5] - 29:23, 41:22, 42:5, 46:10, 186:21
**discussions** [1] - 12:13
**disease** [3] - 202:14, 213:24, 233:20
**disorder** [11] - 196:19, 200:10, 204:12, 213:20, 219:16, 220:21, 222:13, 229:9, 229:11, 230:11, 230:14
**Disorderly** [1] - 185:9
**disorders** [3] - 202:14, 204:6, 218:23
**dispel** [1] - 205:8
**dispelled** [1] - 20:1
**dispensaries** [1] - 89:3
**dispensed** [1] - 85:19
**dispensing** [4] - 22:15, 22:20, 89:21, 121:24
**disperse** [1] - 95:24
**dispute** [2] - 59:14, 65:23
**disregard** [1] - 127:20
**dissecting** [1] - 105:4
**dissection** [1] - 158:2
**dissertation** [3] - 194:6, 198:11, 198:12
**dissolve** [1] - 101:17
**dissolved** [1] - 162:14
**distance** [1] - 198:12
**distinct** [1] - 114:12
**distribute** [1] - 95:10
**distribution** [6] - 8:14, 18:21, 42:23, 53:8, 168:21, 223:14
**distributor** [4] - 17:14, 31:25, 39:22, 42:15
**distributors** [14] - 12:13, 16:18, 16:19, 32:20, 33:4, 36:15, 39:21, 43:5, 44:7, 48:24, 51:7, 56:7, 57:23, 152:20
**District** [2] - 7:2, 7:3
**DISTRICT** [3] - 1:1, 1:1, 1:17
**disturbing** [1] - 154:22
**disturbs** [1] - 68:16
**dive** [1] - 198:4
**diversified** [1] -

181:10
**diversion** [18] - 13:16, 18:7, 39:6, 39:20, 40:25, 41:15, 42:16, 42:24, 43:21, 43:22, 44:10, 46:12, 46:16, 47:3, 47:9, 51:25, 53:19, 55:14
**diverted** [1] - 60:20
**divide** [1] - 145:15
**divided** [1] - 146:9
**division** [3] - 201:25, 202:4, 203:5
**Division** [4] - 80:16, 136:17, 204:21, 215:5
**divorced** [1] - 60:5
**dixit** [5] - 52:21, 52:24, 53:16, 53:23, 56:18
**Docket** [1] - 64:25
**doctor** [2] - 89:16, 89:21
**Doctor** [1] - 193:20
**doctoral** [1] - 195:5
**doctorate** [4] - 193:21, 193:24, 194:16, 196:8
**doctors** [3] - 45:7, 85:17, 213:16
**document** [32] - 13:16, 13:22, 15:16, 17:20, 17:22, 18:2, 21:19, 22:2, 26:10, 26:11, 140:11, 141:14, 142:21, 142:25, 143:18, 143:22, 144:3, 144:10, 144:22, 145:21, 146:13, 162:25, 163:3, 165:14, 166:12, 167:15, 172:17, 175:17, 183:20, 183:21, 184:10, 195:22
**documentaries** [1] - 152:19
**documentation** [2] - 146:20, 206:25
**documented** [1] - 171:8
**documents** [13] - 20:25, 27:25, 28:8, 49:11, 67:7, 67:18, 69:4, 69:7, 69:8, 136:12, 142:5, 217:14, 217:19
**DOJ** [2] - 118:4, 164:12
**dollar** [2] - 119:18,

180:3
**dollars** [5] - 89:25, 118:13, 135:10, 136:18, 137:25
**domestic** [1] - 106:17
**domestics** [1] - 79:17
**done** [49] - 13:21, 15:20, 19:10, 19:24, 26:18, 44:18, 50:4, 54:6, 54:7, 59:25, 60:5, 61:24, 64:10, 64:11, 80:23, 97:19, 102:6, 107:2, 124:14, 133:12, 134:20, 136:23, 141:9, 141:11, 144:1, 145:1, 154:25, 155:2, 155:3, 156:11, 158:25, 178:14, 185:14, 185:17, 197:4, 198:11, 201:8, 201:18, 208:18, 215:2, 219:22, 220:22, 227:11, 230:7, 230:21, 231:12
**door** [15] - 65:4, 68:4, 68:7, 68:8, 68:11, 68:18, 70:11, 70:19, 95:20, 184:14, 215:20, 216:9, 216:19, 216:20, 217:6
**dopamine** [2] - 229:15, 229:16
**dope** [2] - 99:24, 133:3
**dosage** [1] - 10:13
**dose** [1] - 178:16
**dot** [4] - 15:15, 30:24
**Douglas** [1] - 4:17
**down** [49] - 8:25, 14:21, 21:6, 24:10, 24:14, 80:4, 83:2, 95:21, 98:3, 102:11, 103:12, 105:2, 113:2, 116:10, 117:1, 120:7, 120:10, 121:13, 121:15, 122:3, 124:15, 137:8, 137:16, 137:20, 141:3, 154:24, 158:18, 164:23, 168:16, 169:1, 173:10, 174:7, 176:8, 176:17, 178:24, 179:13, 184:25, 185:1,

201:15, 207:18, 207:23, 208:11, 208:16, 217:6, 218:6, 229:16
**downtown** [2] - 198:2, 227:4
**downturn** [1] - 121:14
**downward** [1] - 154:21
**Dr** [19] - 19:6, 190:9, 190:25, 191:4, 191:11, 191:16, 191:22, 192:14, 192:17, 192:24, 193:5, 194:2, 194:15, 195:15, 195:18, 202:18, 204:19, 206:2, 235:23
**drafting** [2] - 20:22, 21:1
**drain** [1] - 215:11
**dramatic** [1] - 147:5
**dramatically** [1] - 55:3
**drastic** [2] - 147:4, 147:14
**drastically** [1] - 131:18
**draw** [1] - 230:8
**drawing** [3] - 56:1, 123:13, 213:12
**dried** [1] - 148:25
**drill** [1] - 141:3
**drive** [2] - 67:11, 120:24
**Drive** [1] - 6:15
**driven** [3] - 53:6, 53:13, 197:19
**Driver's** [1] - 80:15
**driver's** [1] - 80:20
**drivers** [1] - 110:4
**driving** [5] - 96:8, 118:17, 126:19, 143:16, 197:20
**Driving** [4] - 80:15, 81:6, 118:10, 185:14
**dropping** [1] - 212:15
**drug** [81] - 42:17, 43:2, 44:13, 44:16, 59:11, 74:19, 76:4, 76:13, 85:3, 93:4, 93:13, 93:17, 93:20, 99:3, 104:5, 105:21, 113:2, 114:20, 118:17, 119:13, 128:17, 129:10, 129:11, 130:19, 130:24, 131:13, 132:9, 133:14, 136:10, 136:21,

136:24, 137:7, 137:8, 141:5, 143:10, 143:15, 144:1, 144:3, 145:14, 146:5, 150:20, 150:21, 150:24, 152:16, 157:21, 158:19, 158:25, 159:16, 159:18, 160:5, 161:1, 161:6, 161:14, 161:15, 161:20, 166:7, 169:3, 169:21, 169:22, 170:8, 171:4, 172:1, 172:15, 173:8, 173:11, 174:6, 176:8, 177:16, 179:15, 180:22, 184:3, 184:10, 186:4, 187:5, 188:6, 209:7, 220:22
**Drug** [21] - 6:2, 14:24, 94:1, 100:7, 100:9, 101:15, 101:17, 112:4, 112:12, 114:2, 128:17, 131:19, 139:15, 162:7, 168:18, 173:3, 176:9, 202:1, 202:22, 214:11, 237:7
**DRUG** [2] - 1:7, 1:13
**drug-related** [3] - 104:5, 136:10, 143:15
**drugs** [47] - 10:11, 10:16, 26:13, 41:16, 44:19, 76:11, 92:19, 92:22, 99:22, 100:20, 105:23, 106:7, 106:17, 106:18, 112:12, 118:15, 118:18, 118:23, 131:16, 133:11, 137:6, 141:1, 141:17, 143:23, 144:4, 149:15, 153:11, 154:2, 159:9, 159:16, 168:9, 171:1, 176:13, 177:20, 178:7, 180:2, 180:6, 180:9, 180:12, 180:17, 180:21, 186:8, 186:10, 186:20, 188:3, 199:16
**Drunk** [2] - 81:6, 118:9

**DTO** [1] - 161:18
**DU45** [2] - 12:21, 50:7
**DU45s** [3] - 12:24, 48:20, 49:10
**dual** [1] - 193:11
**dubbed** [1] - 155:13
**due** [14] - 17:6, 17:15, 19:24, 27:20, 30:15, 51:17, 51:20, 51:23, 56:6, 56:25, 57:10, 60:18, 136:10, 188:4
**Due** [1] - 41:12
**DUI** [2] - 118:14
**Dunbar** [1] - 196:14
**duration** [1] - 210:25
**during** [30] - 8:2, 8:11, 8:20, 10:16, 11:1, 12:15, 16:13, 30:6, 43:10, 52:18, 61:20, 65:3, 69:16, 80:1, 80:19, 81:10, 87:5, 87:11, 89:13, 93:6, 96:9, 121:21, 132:3, 132:17, 139:14, 150:7, 154:4, 190:20, 205:25, 224:23
**duties** [3] - 79:15, 101:2, 203:1
**duty** [6] - 45:5, 45:6, 79:10, 117:23
**dying** [5] - 92:16, 125:24, 126:7, 131:14, 187:13

## E

**e-mail** [1] - 172:21
**early** [20] - 33:2, 45:18, 48:11, 61:22, 62:16, 71:18, 78:11, 79:21, 87:1, 92:13, 208:1, 208:5, 209:20, 213:1, 213:2, 213:4, 213:5, 214:6, 218:24, 219:8
**easier** [3] - 103:21, 167:16, 207:19
**East** [4] - 3:5, 3:12, 4:18, 196:15
**eastern** [1] - 9:12
**easy** [2] - 93:19, 209:20
**eater** [3] - 99:25, 100:1, 185:3
**eats** [1] - 103:6
**economic** [2] - 119:9, 155:16
**Education** [2] - 106:14, 106:20

**education** [7] - 133:2, 187:16, 209:3, 209:15, 223:17, 231:17, 232:3
**educational** [1] - 193:6
**Edward's** [5] - 192:15, 201:23, 214:17, 222:9, 231:4
**effect** [1] - 32:19
**effected** [1] - 27:20
**effective** [8] - 10:7, 13:15, 18:7, 44:10, 45:24, 58:21, 215:21
**effectively** [1] - 41:14
**effort** [6] - 22:24, 71:23, 71:24, 140:24, 180:6, 205:18
**efforts** [5] - 131:21, 188:4, 188:5, 195:23, 209:13
**egg** [1] - 229:13
**eggs** [1] - 100:15
**eight** [4] - 126:1, 126:3, 143:12, 221:14
**eight-year** [1] - 126:3
**eight-year-old** [1] - 126:1
**Eighth** [4] - 3:10, 33:12, 34:22, 35:11
**either** [12] - 15:22, 74:20, 96:11, 105:18, 114:23, 121:24, 139:22, 140:24, 153:17, 198:3, 223:4, 227:17
**elaborated** [1] - 97:20
**elected** [2] - 85:8, 98:15
**election** [2] - 85:5
**elements** [1] - 211:5
**elevated** [1] - 199:12
**eleven** [1] - 109:19
**elicited** [2] - 69:15, 74:16
**eliminate** [1] - 51:24
**ELIZABETH** [1] - 6:14
**emails** [2] - 70:14, 70:15
**embedded** [1] - 212:16
**embedding** [1] - 212:13
**emerged** [1] - 188:6
**emergency** [8] - 215:10, 215:11, 221:2, 221:4, 221:8, 222:6, 222:12,

222:14
**emerging** [2] - 42:16, 43:2
**emotions** [1] - 229:17
**employee** [1] - 232:15
**employees** [2] - 39:20, 119:12
**employers** [3] - 232:13, 232:19, 232:21
**employment** [3] - 33:3, 198:7, 232:4
**Employment** [1] - 232:6
**Empowerment** [1] - 208:23
**empty** [2] - 155:25, 188:22
**emptying** [1] - 189:11
**enable** [2] - 41:15, 42:15
**Encino** [1] - 3:18
**encounter** [1] - 117:6
**encountered** [1] - 94:18
**end** [14] - 14:8, 32:6, 56:18, 61:7, 71:4, 71:5, 81:19, 101:7, 111:17, 132:5, 189:6, 201:4, 201:6, 223:20
**end-of-the-month** [1] - 14:8
**endeavor** [2] - 61:7, 215:6
**endeavored** [1] - 139:16
**ended** [1] - 187:12
**ending** [1] - 14:17
**endocarditis** [1] - 221:11
**ends** [2] - 15:15, 165:1
**enforcement** [26] - 75:19, 77:25, 78:3, 84:18, 84:21, 85:10, 86:12, 87:7, 87:14, 87:25, 88:1, 88:2, 88:16, 98:2, 102:20, 102:23, 102:24, 103:9, 103:16, 104:2, 107:4, 121:22, 122:4, 138:25, 150:11, 170:9
**Enforcement** [1] - 14:24
**enforcements** [1] - 43:23
**Engage** [4] - 220:24, 221:16, 221:24,

223:16
**engage** [2] - 209:14, 230:6
**engaged** [3] - 89:2, 106:6, 107:12
**engagement** [3] - 207:25, 219:14, 223:4
**engineer** [1] - 192:25
**English** [1] - 102:17
**enhance** [2] - 95:12, 98:13, 99:4
**enjoyed** [1] - 119:7
**enormous** [2] - 90:11, 92:22
**enrolled** [1] - 78:15
**ensure** [7] - 213:13, 217:24, 219:7, 223:13, 227:2, 227:7, 232:10
**ensuring** [1] - 231:6
**enter** [4] - 33:11, 208:12, 219:12
**entered** [3] - 43:8, 67:2, 100:14
**entering** [2] - 199:24, 222:14
**enterings** [1] - 99:16
**entire** [6] - 31:20, 35:6, 43:19, 81:5, 188:8, 222:19
**entirely** [2] - 56:11, 135:22
**entrepreneurs** [1] - 130:24
**entrepreneurship** [1] - 233:5
**entrepreneurships** [1] - 232:23
**ENU** [1] - 4:12
**envision** [1] - 112:6
**epicenter** [6] - 97:13, 119:15, 155:14, 155:15, 205:2
**epidemic** [40] - 75:20, 82:15, 85:12, 88:16, 88:25, 90:4, 90:19, 93:9, 94:8, 96:21, 97:14, 97:17, 99:12, 99:18, 100:23, 100:24, 100:25, 101:7, 102:8, 103:7, 103:15, 106:2, 108:23, 112:9, 113:24, 115:8, 116:21, 119:5, 120:1, 121:10, 124:10, 124:23, 125:5, 155:14, 184:6, 184:21,

186:2, 188:21, 205:3
**epidemic-related** [1] - 115:8
**episode** [1] - 228:16
**equip** [1] - 112:2
**equipment** [5] - 84:1, 112:6, 114:1, 181:23
**equipped** [1] - 41:13
**ER** [1] - 215:12
**era** [1] - 148:17
**erratic** [1] - 96:8
**error** [2] - 54:14, 55:19
**Error** [1] - 55:18
**errors** [6] - 41:1, 41:5, 41:7, 41:8, 41:9, 55:6
**especially** [7] - 17:14, 44:12, 121:16, 179:1, 213:6, 225:20, 226:13
**establish** [1] - 214:14
**established** [5] - 36:5, 43:18, 122:8, 166:14, 202:6
**estimate** [2] - 54:24, 158:13
**estimation** [1] - 148:18
**estoppel** [1] - 32:10
**et** [4] - 1:7, 1:13, 237:6, 237:7
**evaluated** [1] - 114:22
**evaluates** [1] - 46:2
**evaluation** [4] - 194:22, 199:5, 203:19, 230:15
**evening** [2] - 211:3, 226:23
**event** [11] - 67:23, 89:6, 106:15, 140:1, 145:11, 174:20, 176:6, 176:23, 191:6, 209:15
**events** [5] - 128:19, 128:20, 207:22, 207:23, 207:25
**eventually** [2] - 194:4, 200:19
**evidence** [22] - 11:15, 14:1, 21:7, 30:3, 33:11, 38:7, 39:13, 43:9, 49:1, 68:10, 69:4, 69:9, 163:13, 163:15, 165:25, 166:13, 176:19, 197:8, 198:20, 199:20, 209:4
**evidence-based** [1] - 198:20, 199:20, 209:4

**evolve** [1] - 91:2
**exact** [3] - 9:13, 15:18, 47:5
**exactly** [5] - 47:6, 58:22, 69:25, 151:9, 162:11
**Exactly** [2] - 207:12, 221:24
**EXAMINATION** [6] - 29:20, 77:13, 128:2, 148:5, 183:17, 192:8
**examination** [7] - 30:6, 71:3, 130:2, 148:12, 184:14, 191:16, 199:11
**examine** [2] - 72:14, 127:21
**example** [8] - 8:24, 13:18, 19:13, 89:12, 112:13, 150:20, 151:17, 158:4, 199:10, 206:20, 208:4, 210:10, 231:22, 235:5
**excellent** [1] - 62:23
**except** [1] - 33:20
**exception** [7] - 37:12, 67:6, 67:12, 69:11, 123:15, 166:15, 190:25
**exceptions** [1] - 56:3
**excessive** [2] - 11:22, 48:23
**exclamation** [1] - 26:4
**excludable** [1] - 52:25
**exclude** [2] - 52:17, 55:4
**excluded** [3] - 57:12, 191:3, 191:8
**excluding** [1] - 67:18
**exclusively** [2] - 75:8, 203:24
**excuse** [2] - 104:6, 163:2
**excused** [1] - 52:8
**executive** [1] - 79:23
**Executive** [2] - 81:7, 118:9
**exercise** [1] - 70:5
**exercised** [1] - 30:15
**exhibit** [1] - 191:22
**exhibits** [2] - 73:1, 142:8
**exist** [6] - 13:3, 26:24, 28:4, 136:13, 137:1, 137:7
**existed** [1] - 26:21
**existing** [2] - 30:23, 39:6
**exists** [2] - 28:5,

233:25
**expand** [2] - 114:2, 117:17
**expanded** [1] - 106:8
**expansively** [1] - 30:23
**expect** [7] - 12:15, 17:15, 17:18, 71:13, 73:8, 73:24, 102:23
**expectation** [1] - 17:20
**expected** [3] - 29:12, 39:18, 226:22
**experience** [27] - 40:24, 75:10, 75:11, 76:3, 85:9, 88:15, 90:18, 93:1, 104:1, 113:22, 116:5, 118:6, 124:22, 131:6, 131:16, 147:2, 147:7, 193:6, 194:12, 194:14, 195:3, 203:21, 204:13, 228:5, 229:19, 229:25, 231:13
**experienced** [1] - 169:18
**experiences** [2] - 125:5, 229:21
**experiencing** [1] - 94:10
**expert** [16] - 53:25, 54:1, 57:24, 58:7, 58:8, 74:2, 74:4, 74:7, 75:1, 75:2, 75:12, 86:2, 191:23, 196:24, 197:9, 229:15
**expertise** [1] - 75:9
**experts** [4] - 54:10, 190:23, 191:2, 205:14
**explain** [7] - 96:2, 99:20, 102:14, 114:9, 121:12, 153:20, 195:25
**explained** [1] - 126:5
**explanation** [2] - 19:25, 54:24
**exploded** [3] - 84:9, 100:4, 170:1
**exploding** [1] - 146:19
**exposed** [8] - 95:15, 95:20, 96:11, 96:14, 97:20, 101:1, 103:13, 212:8
**exposure** [3] - 97:23, 118:18, 227:17
**Express** [1] - 152:5

**expressed** [1] - 49:15
**expressions** [1] - 229:18
**expressly** [1] - 65:1
**extend** [1] - 71:4
**extended** [2] - 197:19, 229:14
**extends** [1] - 45:19
**extension** [3] - 201:6, 201:10, 201:12
**extensive** [2] - 200:17, 203:19
**extent** [1] - 104:18
**extra** [1] - 19:17

---

**F**

---

**F.2d** [1] - 66:2
**F.3d** [3] - 33:14, 52:25, 56:2
**Faber** [2] - 7:1, 73:22
**FABER** [1] - 1:17
**face** [4] - 59:23, 60:3, 103:23
**face-to-face** [1] - 103:23
**faceted** [1] - 188:23
**facets** [1] - 216:4
**facially** [1] - 49:10
**facilitate** [1] - 116:19
**facility** [2] - 116:19, 230:10
**fact** [26] - 10:21, 11:6, 12:17, 17:11, 28:6, 30:25, 35:21, 43:12, 45:16, 46:5, 53:5, 58:9, 58:10, 65:22, 69:3, 97:20, 135:7, 174:22, 174:25, 176:23, 191:23, 191:25, 196:23, 197:6, 197:8, 197:9
**factor** [9] - 53:17, 55:11, 55:15, 55:25, 56:1, 56:20, 132:22, 153:8, 185:6
**factors** [4] - 55:10, 56:1, 178:13, 209:7
**facts** [5] - 26:7, 52:23, 56:17, 56:18, 66:3
**fail** [4] - 47:10, 54:1, 56:15, 115:22
**failed** [1] - 56:19
**failing** [1] - 45:24, 45:25, 65:19
**fails** [2] - 54:10, 55:9
**failure** [2] - 46:11, 47:2
**fair** [4] - 29:8, 57:15, 58:20, 211:9

**faith** [5] - 200:18, 207:25, 210:7, 210:17, 211:1
**Faith** [1] - 210:8
**fall** [3] - 55:3, 185:12, 191:11
**false** [1] - 31:12
**familiar** [10] - 8:24, 33:17, 34:23, 50:15, 138:22, 142:4, 142:25, 172:1, 175:22, 206:2
**families** [12] - 97:24, 121:19, 194:20, 194:24, 217:11, 219:11, 224:12, 225:23, 225:24, 228:8, 233:23
**Family** [3] - 202:12, 202:15, 202:17
**family** [19] - 103:5, 155:17, 193:19, 193:25, 194:10, 197:25, 198:6, 200:16, 211:9, 212:20, 213:15, 215:22, 218:2, 218:4, 218:10, 219:4, 229:1
**family's** [1] - 156:14
**fancy** [1] - 193:12
**far** [13] - 76:7, 83:15, 91:24, 105:5, 114:7, 129:12, 129:14, 157:7, 197:11, 198:4, 212:5, 215:2, 229:12
**FARRELL** [45] - 2:3, 21:13, 28:24, 29:1, 29:7, 29:15, 29:21, 30:9, 30:12, 31:9, 31:18, 33:6, 33:10, 33:15, 33:20, 34:13, 34:17, 34:19, 35:18, 37:1, 38:5, 39:7, 39:11, 40:3, 45:1, 46:25, 47:19, 48:7, 48:11, 48:18, 49:8, 50:5, 50:12, 52:2, 57:9, 57:14, 57:18, 60:10, 60:14, 61:6, 61:24, 62:5, 63:9, 64:11, 64:15
**Farrell** [28] - 2:4, 2:15, 21:10, 28:23, 29:9, 29:14, 31:7, 31:11, 31:17, 35:17, 36:4, 36:7, 36:25, 37:17, 37:24, 40:1, 48:2, 48:6, 48:17, 49:23,

57:5, 57:17, 59:8,
60:8, 61:21, 62:17,
63:6, 73:7
**FARS** [1] - 158:12
**fashion** [3] - 96:14,
147:4, 147:6
**fatal** [2] - 81:6, 158:10
**fatigue** [1] - 211:25
**favorites** [1] - 211:17
**FBI** [7] - 100:10,
100:12, 101:16,
101:19, 101:20,
181:11, 181:13
**FCRR** [1] - 6:18
**fear** [1] - 124:12
**feasible** [1] - 63:22
**federal** [7] - 37:10,
112:19, 139:19,
176:1, 201:5,
205:15, 205:21
**Federal** [7] - 35:23,
37:4, 38:11, 58:11,
66:7, 75:16, 198:23
**feed** [1] - 110:4
**feelings** [1] - 212:5
**fees** [1] - 99:7
**fell** [1] - 126:19
**felony** [3] - 67:15,
127:5, 226:5
**felt** [2] - 84:24, 198:10
**Fentanyl** [1] - 95:7
**fentanyl** [24] - 95:8,
95:9, 95:13, 95:16,
95:22, 96:3, 132:20,
133:5, 133:7,
133:10, 133:13,
133:15, 133:17,
160:11, 168:22,
169:2, 173:12,
177:23, 178:16,
187:2, 187:10,
187:12, 188:12,
204:2
**few** [7] - 7:22, 22:13,
87:9, 100:10, 122:1,
141:20, 212:23
**field** [2] - 79:20, 82:4
**fields** [2] - 139:16,
231:8
**fifth** [1] - 212:19
**fight** [3] - 57:10,
57:11, 57:21
**figment** [3] - 233:16,
233:20, 233:24
**figure** [3] - 72:8,
116:18, 228:19
**figured** [1] - 216:24
**file** [12] - 17:10, 27:21,
28:5, 61:8, 61:10,
63:11, 63:12, 63:18,

65:20, 136:22
**filed** [6] - 13:3, 27:18,
38:10, 52:16, 74:1,
167:3
**files** [4] - 13:8, 18:18,
18:20, 114:14
**fill** [1] - 206:12
**filtered** [1] - 117:1
**final** [3] - 45:2, 115:2,
124:21
**finally** [2] - 46:9, 122:2
**financial** [4] - 98:5,
98:15, 189:20, 226:7
**finder** [1] - 197:9
**findings** [1] - 75:8
**fine** [7] - 30:11, 46:5,
64:5, 64:6, 72:7,
74:6, 79:7
**finger** [2] - 81:14,
90:24
**finish** [1] - 71:14
**finished** [2] - 79:7,
140:13
**finishing** [1] - 198:10
**fire** [8] - 60:11, 60:18,
85:24, 91:4, 91:17,
212:14, 212:16,
212:22
**Firm** [2] - 3:4, 3:7
**first** [40] - 7:16, 29:22,
30:16, 33:23, 42:1,
52:21, 54:13, 57:23,
63:20, 68:6, 74:25,
79:10, 79:16, 82:8,
84:21, 86:8, 88:16,
91:12, 127:13,
138:16, 159:3,
162:7, 194:17,
194:25, 196:15,
199:9, 211:20,
211:24, 214:10,
214:19, 215:4,
215:6, 219:14,
221:1, 222:19,
224:3, 225:25,
227:23, 230:14,
233:14
**fiscal** [1] - 138:11
**fiscally** [1] - 111:23
**fit** [2] - 53:1, 67:20
**fitness** [2] - 212:21,
225:6
**five** [3] - 22:19,
29:17, 48:12, 80:20,
81:22, 106:8,
106:12, 107:21,
135:17, 175:9,
177:5, 193:4
**five-and-a-half-
month-old** [1] -

193:4
**fix** [6] - 41:8, 107:17,
154:13, 157:15,
189:3, 189:8
**fixed** [2] - 10:22, 41:5
**fixing** [1] - 41:9
**FL** [1] - 2:14
**flag** [2] - 19:22, 191:5
**flagged** [7] - 19:3,
19:11, 19:20, 51:10,
51:11, 51:20, 51:23
**flagging** [4] - 51:16,
53:24, 56:19, 59:21
**flags** [1] - 19:2
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flight** [2] - 152:4,
152:11
**flights** [2] - 152:7,
152:14
**flip** [1] - 35:5
**flood** [1] - 130:18
**flooded** [2] - 85:16,
130:16
**floor** [4] - 212:19,
220:12, 221:13,
221:18
**Floor** [1] - 3:5
**floors** [1] - 221:8
**Florida** [8] - 151:5,
151:13, 151:20,
152:2, 152:8,
152:12, 152:14,
152:18
**fly** [1] - 151:5
**focus** [1] - 22:13
**focused** [2] - 68:14,
188:5
**FOIA** [4] - 35:1, 36:11,
37:8, 39:1
**folks** [8] - 170:25,
172:22, 200:22,
203:8, 215:8, 223:9,
232:1, 232:10
**follow** [6] - 29:17,
70:2, 111:7, 161:9,
189:22, 222:21
**follow-up** [1] - 29:17
**following** [4] - 65:7,
69:21, 86:19, 165:4
**follows** [5] - 7:4, 12:1,
177:9
**food** [1] - 227:6
**FOR** [1] - 1:1
**force** [7] - 43:23,
98:20, 213:17,
216:14, 232:11,
232:12, 233:3
**Force** [14] - 100:7,
100:9, 100:13,

100:17, 101:15,
112:4, 112:12,
162:7, 162:13,
168:18, 170:20,
172:25, 174:15,
181:11
**foregoing** [1] - 237:4
**Foremost** [1] - 30:24
**forfeiture** [1] - 175:5
**forgive** [1] - 32:19
**form** [7] - 12:21, 23:3,
49:20, 55:16,
107:25, 136:9,
199:24
**Formally** [1] - 202:7
**formally** [2] - 201:7,
202:11
**formed** [2] - 20:6,
162:11
**former** [1] - 157:17
**forms** [2] - 18:19,
178:11
**formulate** [2] - 27:25,
28:8
**fortunate** [2] - 103:10,
156:15
**forward** [9] - 17:16,
17:19, 17:24, 18:9,
20:2, 94:4, 147:3,
206:10, 209:12
**fought** [1] - 59:13
**foundation** [20] -
46:21, 47:14, 53:22,
74:14, 74:19, 76:5,
86:23, 104:14,
104:16, 107:25,
108:17, 108:18,
116:3, 122:7,
122:15, 163:15,
175:12, 184:9,
192:2, 205:19
**Foundation** [1] -
232:9
**four** [27] - 10:1, 10:11,
10:16, 35:12, 49:12,
49:17, 49:22, 70:18,
78:13, 94:18, 97:2,
103:5, 106:10,
126:1, 137:23,
139:9, 139:14,
145:17, 147:13,
154:17, 192:21,
207:9, 226:13,
226:17, 228:16
**four-year-old** [1] -
126:1
**Fourth** [5] - 66:1, 66:6,
66:8, 67:14, 75:16
**fourth** [4] - 75:5,
195:1, 196:6, 196:8

**frame** [7] - 104:8,
132:14, 132:17,
151:9, 171:11,
171:17, 172:6
**frames** [1] - 59:8
**framework** [2] - 36:10,
210:3
**framing** [3] - 48:23,
49:2, 64:15
**frank** [1] - 60:7
**Franklin** [1] - 193:8
**frankly** [1] - 228:14
**free** [4] - 52:9, 62:2,
190:5, 200:8
**frequency** [1] - 210:25
**frequent** [1] - 66:3
**frequently** [1] - 203:22
**Friday** [1] - 64:4
**friend** [2] - 123:7,
126:11
**friendly** [1] - 232:13
**friends** [2] - 83:3, 90:8
**fringe** [1] - 117:15
**front** [11] - 46:10,
103:22, 105:11,
129:15, 154:6,
187:19, 197:6,
200:21, 207:24,
210:12, 216:19
**fruit** [1] - 105:10
**frustration** [1] -
212:11
**fuel** [1] - 100:4
**full** [15] - 22:15, 22:19,
33:4, 40:19, 41:22,
61:4, 64:14, 106:9,
117:22, 196:25,
201:11, 211:4,
212:12, 212:18,
224:23
**full-time** [2] - 106:9,
117:22
**Fuller** [2] - 2:4, 2:15
**FULLER** [1] - 2:15
**fully** [1] - 40:20
**fun** [2] - 131:1, 209:15
**function** [1] - 102:19
**functional** [1] - 212:21
**functions** [1] - 101:2
**fund** [4] - 118:4,
118:11, 136:19,
138:16
**funded** [2] - 156:8,
232:7
**funding** [14] - 111:20,
118:3, 135:4, 156:9,
162:15, 198:24,
201:16, 205:22,
211:23, 222:7,
222:8, 232:22,

14

233:17
**funds** [2] - 164:5,
164:9
**funneled** [1] - 156:20
**funny** [1] - 234:23
**Furthermore** [1] -
68:13
**future** [3] - 71:16,
121:19, 204:18

**G**

**gain** [1] - 139:5
**gallery** [1] - 91:1
**game** [4] - 57:17,
70:19, 72:19, 135:23
**games** [1] - 73:6
**gamut** [2] - 79:3,
79:19
**gangs** [2] - 171:20,
179:6
**gap** [2] - 206:11, 220:4
**gaps** [2] - 217:25,
231:25
**Gary** [1] - 9:3
**gasoline** [1] - 102:7
**gateway** [5] - 74:11,
75:24, 76:7, 76:11,
108:11
**gears** [1] - 235:19
**General** [1] - 205:14
**general** [10] - 49:9,
55:25, 56:3, 56:5,
56:15, 63:10, 76:10,
76:11, 81:12
**generally** [4] - 56:9,
123:14, 138:22,
229:10
**generate** [2] - 22:19,
110:5
**generated** [1] - 140:14
**generates** [1] - 118:12
**generating** [1] - 55:8
**generation** [3] -
124:13, 124:17,
189:9
**generous** [1] - 47:25
**gentleman** [1] -
131:23
**gentlemen** [1] - 9:6
**geographic** [4] - 34:1,
36:9, 38:16, 89:17
**geographically** [1] -
70:4
**Georgia** [1] - 34:2
**girl** [4] - 105:3, 126:3,
126:11, 126:17
**given** [5] - 71:12,
123:3, 124:3,
140:20, 217:16

**glasses** [4] - 142:10,
162:22, 168:6
**go-to** [1] - 113:12
**goal** [3] - 181:6,
225:15, 231:5
**gold** [1] - 198:20
**goof** [1] - 107:13
**Google** [2] - 119:20
**Governing** [1] - 165:4
**government** [3] - 21:8,
156:19, 157:2
**Government** [1] -
198:23
**governmental** [1] -
32:10
**Governor** [4] - 79:22,
79:23, 80:11, 123:25
**grabbed** [1] - 30:8
**grade** [1] - 133:2
**graduate** [2] - 77:20,
195:2
**graduated** [4] - 77:21,
79:7, 194:4, 196:10
**graduating** [2] -
194:5, 226:4
**grams** [3] - 173:12,
173:15, 174:3
**grandchildren** [1] -
124:12
**grandkids** [2] -
107:11, 124:20
**grandparents** [1] -
107:9
**grandson** [1] - 126:24
**grant** [33] - 112:1,
112:8, 112:10,
112:11, 112:14,
112:19, 113:8,
113:9, 113:11,
113:13, 118:4,
162:16, 163:24,
164:5, 164:12,
165:21, 187:18,
194:19, 198:24,
199:2, 200:25,
201:2, 201:10,
201:12, 201:15,
201:16, 205:22,
212:12, 214:14,
224:5, 224:7
**granted** [2] - 43:1,
64:23
**grants** [11] - 81:9,
112:8, 112:25,
113:7, 113:18,
198:16, 201:20,
203:9, 203:10,
203:18, 224:6
**Grants** [1] - 164:10
**grass** [1] - 99:25

**grateful** [1] - 61:12
**Great** [4] - 223:5,
223:11, 233:6, 233:9
**great** [12] - 42:5, 48:5,
52:11, 85:24, 119:7,
119:24, 156:16,
179:21, 183:4,
214:6, 218:21,
219:25
**greater** [2] - 95:14,
229:12
**GRETCHEN** [1] - 6:7
**Gretchen** [1] - 128:6
**grew** [2] - 214:10,
226:1
**grocery** [2] - 125:16,
227:1
**ground** [6] - 87:18,
90:3, 202:9, 203:8,
209:19, 223:1
**grounds** [2] - 49:19,
127:16
**groundwork** [2] -
210:3, 225:19
**Group** [1] - 174:15
**group** [8] - 105:9,
172:24, 209:2,
211:23, 215:22,
219:20, 224:19,
226:18
**groups** [3] - 200:13,
226:23, 231:11
**grow** [1] - 203:3
**grown** [2] - 120:5,
216:16
**growth** [1] - 42:4
**guard** [1] - 29:7
**Guard** [1] - 170:10
**guardrails** [1] - 189:5
**guess** [15] - 15:18,
28:3, 62:14, 80:13,
101:4, 104:7,
108:11, 114:5,
114:17, 121:8,
121:9, 131:12,
147:2, 158:23, 178:5
**guide** [1] - 197:1
**guilty** [10] - 64:24,
65:18, 65:19, 66:7,
68:15, 69:3, 69:5,
69:8, 69:13, 70:2
**guitarist** [1] - 235:6
**guns** [1] - 185:7
**Guns** [2] - 234:24,
235:5
**Gupta** [1] - 191:1
**Gustin** [16] - 7:25,
8:11, 8:21, 9:11,
64:24, 65:9, 65:17,
66:13, 67:2, 68:9,

68:15, 69:23, 70:1,
70:5, 70:14
**Gustin's** [6] - 65:15,
65:18, 66:13, 68:7,
68:19, 70:9
**guy** [12] - 81:20,
81:22, 82:17,
111:16, 111:24,
113:8, 113:11,
113:13, 124:13,
133:2, 181:7, 186:17
**guys** [11] - 80:24,
84:1, 97:20, 107:21,
109:21, 110:3,
111:14, 113:3,
139:21, 161:18,
182:15

**H**

**H-I-D-T-A** [1] - 173:2
**hair** [1] - 82:15
**haired** [1] - 82:17
**half** [3] - 42:1, 193:4,
196:16
**hallmark** [2] - 55:17,
56:20
**hallmarks** [1] - 54:22
**hand** [10] - 40:14,
77:2, 114:20, 133:8,
179:17, 179:18,
188:17, 190:16
**hand's** [1] - 179:18
**hand-in-hand** [2] -
114:20, 133:8
**handed** [2] - 142:21,
217:19
**handing** [1] - 195:15
**Handle** [2] - 106:14,
107:18
**handle** [2] - 106:24,
122:2
**handouts** [1] - 116:15
**hanging** [1] - 105:10,
110:12
**hangouts** [1] - 116:10
**Hanson** [2] - 201:22,
202:8
**happy** [5] - 57:2, 74:6,
146:17, 147:9, 172:7
**hard** [8] - 93:20,
94:10, 182:9,
182:16, 212:6,
222:19, 228:20,
230:2
**harder** [2] - 24:5, 98:1
**HARDIN** [1] - 5:3
**harm** [5] - 54:7,
213:11, 214:4
**Harmony** [1] - 116:11

**Haven** [2] - 78:6, 78:9
**Hawkins** [1] - 3:7
**HDWD.org** [1] -
235:17
**head** [4] - 68:2, 98:12,
113:21, 136:11
**heading** [1] - 93:11
**headlines** [1] - 205:3
**headquarters** [4] -
81:11, 89:1, 89:10,
128:19
**Headquarters** [1] -
90:2
**Health** [17] - 4:11, 5:2,
35:2, 35:21, 36:1,
105:8, 114:22,
198:23, 201:24,
202:3, 202:16,
209:18, 213:3,
214:17, 219:19,
222:5, 222:9
**health** [32] - 112:20,
112:21, 114:10,
114:18, 114:20,
114:24, 116:24,
117:4, 117:10,
189:2, 198:25,
199:10, 200:2,
205:15, 207:22,
208:12, 208:18,
210:10, 210:11,
212:17, 212:24,
213:9, 213:14,
216:4, 228:12,
228:16, 229:8,
229:12, 230:12,
230:13, 230:14,
230:17
**healthcare** [7] - 135:9,
156:13, 156:14,
156:17, 200:21,
228:23
**healthier** [1] - 112:23
**Healthy** [2] - 217:7,
219:11
**healthy** [5] - 207:21,
208:13, 209:7,
227:2, 227:3
**hear** [6] - 7:13, 77:8,
77:10, 97:10,
112:16, 214:9
**heard** [13] - 52:21,
107:20, 109:9,
111:3, 117:12,
161:15, 208:3,
211:12, 214:5,
214:16, 216:8,
216:23
**hearing** [3] - 33:23,
61:4, 115:2

**hearsay** [36] - 39:2, 66:25, 67:2, 67:6, 67:8, 67:10, 67:11, 67:15, 68:1, 68:2, 68:7, 68:11, 68:18, 68:22, 69:2, 69:9, 86:23, 88:3, 108:1, 108:17, 109:8, 109:10, 110:14, 123:1, 123:4, 123:15, 127:16, 134:8, 139:16, 141:13, 163:4, 166:3, 166:15, 167:8
**heart** [1] - 221:12
**heartland** [1] - 53:1
**heavy** [1] - 102:24
**height** [2] - 93:6, 148:19
**held** [3] - 46:3, 59:14, 194:7
**helicopters** [1] - 170:11
**help** [41] - 42:21, 58:10, 77:9, 83:1, 102:4, 105:19, 108:12, 109:20, 112:9, 112:12, 112:22, 116:12, 117:24, 127:6, 151:25, 155:10, 181:5, 190:19, 195:25, 199:23, 203:12, 208:2, 209:5, 211:13, 215:8, 215:9, 216:9, 216:23, 217:21, 218:9, 218:12, 219:5, 219:16, 221:2, 221:9, 225:8, 225:12, 232:19, 234:4
**helped** [11] - 27:15, 28:8, 96:25, 172:18, 174:7, 176:17, 201:20, 202:8, 203:12, 210:2
**helpers** [1] - 211:14
**helpful** [3] - 71:16, 168:4, 197:10
**helping** [2] - 216:13, 232:12
**helps** [2] - 188:1, 209:14
**herd** [1] - 105:19
**hero** [1] - 189:23
**heroin** [70] - 74:12, 75:21, 76:12, 84:9, 84:11, 91:2, 91:7, 91:23, 92:11, 92:15,

92:17, 92:22, 92:25, 93:15, 94:21, 94:22, 94:23, 95:10, 95:19, 96:22, 97:14, 100:20, 118:22, 129:17, 130:7, 130:9, 130:17, 131:15, 132:2, 132:9, 132:13, 132:17, 133:8, 133:21, 133:23, 134:3, 134:6, 134:18, 134:19, 134:21, 148:17, 149:4, 149:5, 149:6, 149:7, 149:10, 149:14, 153:7, 153:11, 153:15, 153:18, 153:21, 154:2, 159:23, 159:25, 160:8, 168:22, 169:2, 170:1, 173:15, 177:21, 177:25, 178:19, 178:25, 188:6, 204:2, 235:7
**heroin/fentanyl** [1] - 59:12
**Hester** [2] - 66:22, 72:23
**HESTER** [4] - 5:9, 66:23, 68:6, 72:24
**hide** [3] - 93:19, 93:20, 93:21
**HIDTA** [2] - 172:24, 173:2
**high** [21] - 77:20, 77:21, 77:25, 78:3, 90:14, 96:8, 102:17, 106:10, 106:11, 121:24, 129:11, 133:4, 186:9, 207:14, 219:21, 224:17, 229:5, 230:11
**High** [2] - 77:22, 173:3
**high-intensity** [1] - 229:5
**high-level** [1] - 229:5
**higher** [4] - 44:12, 118:17, 146:6, 146:8
**highest** [4] - 43:13, 115:9, 195:9, 206:17
**highlight** [2] - 187:21, 206:1
**highlighted** [1] - 31:1
**highlights** [1] - 39:4
**highway** [2] - 81:8, 197:21
**Highway** [1] - 113:10

**Hilliard** [2] - 7:24, 8:8
**himself** [1] - 203:5
**hire** [1] - 232:25
**hired** [2] - 182:15, 218:1
**history** [2] - 18:8, 229:24
**hit** [1] - 126:8
**hits** [1] - 235:3
**Hokie** [2] - 193:24, 194:1
**hold** [3] - 194:7, 197:25, 234:2
**holder** [1] - 99:23
**holding** [4] - 33:17, 39:7, 169:6, 181:3
**holds** [1] - 121:20
**hole** [2] - 67:11, 98:10
**Holiday** [1] - 45:18
**holiday** [1] - 52:12
**Home** [1] - 136:17
**home** [19] - 81:16, 97:24, 98:25, 99:1, 99:4, 99:5, 101:4, 105:18, 107:14, 107:16, 127:6, 136:9, 137:8, 137:14, 137:17, 138:1, 227:21
**home-style** [1] - 227:21
**homeless** [2] - 116:14, 121:17
**homes** [11] - 89:24, 115:21, 120:13, 120:19, 120:23, 121:5, 121:8, 156:3, 157:13, 185:7
**homework** [1] - 107:2
**honestly** [1] - 177:3
**Honor** [142] - 7:6, 7:7, 7:19, 8:23, 10:7, 12:19, 13:23, 14:7, 15:8, 15:22, 17:12, 20:7, 20:9, 20:20, 20:24, 21:2, 21:3, 22:3, 22:18, 22:22, 23:2, 23:10, 24:13, 25:9, 26:6, 27:17, 28:17, 31:4, 31:23, 32:23, 33:2, 33:25, 34:10, 36:2, 36:4, 36:8, 36:16, 36:18, 37:11, 37:22, 38:14, 39:16, 40:8, 41:5, 41:18, 42:8, 43:21, 44:23, 46:19, 47:13, 47:24, 49:1, 49:18, 50:17, 51:8, 52:5, 52:6, 52:7, 52:11,

52:14, 52:16, 52:17, 56:8, 57:1, 57:2, 59:7, 61:14, 62:4, 62:9, 62:10, 62:11, 62:25, 63:15, 64:17, 64:19, 64:22, 65:3, 65:14, 65:21, 66:5, 66:11, 66:23, 66:24, 67:11, 69:1, 69:10, 69:14, 69:25, 70:7, 70:24, 71:1, 72:3, 72:16, 72:24, 73:24, 74:25, 86:7, 86:18, 86:23, 87:24, 91:9, 91:10, 91:15, 91:21, 92:2, 104:6, 116:2, 123:6, 123:9, 123:17, 124:7, 125:3, 127:15, 127:22, 129:25, 142:13, 148:2, 162:20, 163:2, 163:7, 166:2, 166:5, 166:11, 166:23, 172:10, 177:12, 183:6, 183:8, 183:12, 190:1, 190:2, 190:7, 190:18, 191:9, 191:18, 192:1, 192:7, 192:14, 195:11, 196:21, 197:7, 235:18
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**hoo** [1] - 194:1
**hook** [1] - 226:7
**Hope** [7] - 224:3, 226:1, 226:4, 226:15, 226:19, 226:23, 228:15
**hope** [8] - 7:13, 7:14, 29:15, 62:18, 71:23, 189:14, 189:15, 205:12
**hopefully** [5] - 61:9, 103:14, 157:13, 190:19
**hopes** [1] - 34:9
**hoping** [2] - 50:5, 175:2
**horrible** [1] - 179:25
**horse** [1] - 179:12
**hospital** [21] - 96:1, 96:18, 106:23, 115:1, 157:11, 217:13, 217:20, 219:12, 220:15, 220:19, 220:23,

221:7, 221:8, 221:11, 221:13, 221:18, 222:1, 224:10, 227:16, 227:22
**Hospital** [2] - 220:13, 230:15
**hospitalization** [2] - 208:10, 208:16
**hospitalizations** [1] - 230:18
**hospitals** [4] - 200:19, 222:3, 222:10, 222:11
**host** [1] - 200:22
**hour** [2] - 73:8, 73:11
**hours** [5] - 14:8, 106:21, 115:4, 211:2, 224:18
**House** [3] - 116:11, 226:1, 226:15
**house** [10] - 120:16, 126:18, 137:16, 138:21, 140:16, 180:17, 202:11, 202:15, 219:22
**housed** [1] - 220:12
**houses** [3] - 120:25, 121:1, 156:6
**housing** [5] - 99:13, 226:4, 226:8, 226:12
**hub** [1] - 215:19
**huddle** [1] - 72:7
**Hudson** [3] - 172:21, 172:24, 173:5
**huge** [6] - 47:25, 67:11, 153:14, 180:2, 185:18, 215:11
**Human** [1] - 110:7
**human** [3] - 193:19, 193:24, 233:21
**hundred** [3] - 19:2, 137:22, 155:25
**hung** [3] - 82:24, 216:19, 216:20
**Huntington** [90] - 3:10, 4:1, 12:24, 16:3, 20:5, 27:16, 27:19, 70:6, 79:10, 79:14, 79:20, 79:25, 80:23, 83:12, 85:12, 85:16, 90:9, 93:12, 93:18, 93:19, 93:23, 94:8, 96:21, 100:8, 100:10, 100:11, 101:14, 105:13, 115:22, 119:20, 120:3, 120:4, 120:10, 120:11,

120:18, 121:6, 121:7, 121:11, 121:13, 151:5, 151:12, 151:20, 152:7, 155:25, 157:8, 157:16, 159:1, 161:2, 162:6, 162:12, 168:13, 168:14, 168:18, 169:11, 169:23, 170:1, 170:13, 170:14, 171:1, 171:9, 179:7, 179:12, 180:22, 180:23, 181:12, 193:1, 195:24, 196:2, 196:18, 197:17, 197:22, 198:2, 198:8, 202:22, 203:16, 205:1, 205:2, 205:8, 205:19, 212:13, 212:19, 212:22, 220:13, 227:5, 227:14, 233:4, 234:25, 237:6

**HUNTINGTON** [1] - 1:4

**Huntington's** [1] - 204:24

**Huntington-Cabell** [2] - 159:1, 169:11

**Huntington/Cabell** [9] - 13:19, 15:20, 16:24, 26:23, 27:4, 28:9, 53:19, 53:21, 215:2

**husband** [3] - 192:24, 196:9, 197:16

**HVC/DTF** [2] - 187:22, 188:2

**HVCDTF** [2] - 165:5, 168:17

**hydrocodone** [1] - 186:16

**Hygiene** [1] - 115:2

**hygiene** [10] - 114:10, 114:13, 114:14, 115:4, 115:6, 115:9, 115:17, 228:3, 228:7, 228:20

**hygienes** [2] - 116:16, 228:3

**hysterical** [1] - 126:2

---

**I**

**I-64** [2] - 197:19, 223:22

**ID** [1] - 22:24

**idea** [5] - 36:6, 74:11, 146:15, 217:19, 220:8

**ideal** [1] - 232:15

**Ideally** [1] - 208:11

**ideas** [1] - 85:1

**identified** [8] - 209:8, 219:15, 219:17, 219:23, 220:1, 220:20, 221:6, 224:6

**identify** [12] - 42:16, 43:2, 47:10, 53:20, 60:1, 83:9, 220:18, 221:16, 222:10, 222:13

**identifying** [2] - 47:7, 56:10

**ignore** [1] - 59:25

**ignores** [1] - 56:11

**II** [1] - 50:24

**III** [1] - 50:24

**ill** [1] - 41:13

**ill-equipped** [1] - 41:13

**illegal** [15] - 94:24, 95:2, 95:4, 149:15, 153:10, 154:2, 158:25, 161:1, 166:7, 168:9, 168:21, 171:1, 177:16, 180:3, 180:21

**illicit** [2] - 118:23, 153:11

**illustrated** [1] - 170:24

**illustrative** [1] - 13:21

**ILR** [1] - 50:7

**ILRs** [2] - 48:20, 49:10

**image** [2] - 15:16, 19:1

**imagination** [3] - 233:17, 233:21, 233:24

**immediate** [1] - 215:20

**immediately** [1] - 30:20

**impact** [8] - 56:24, 97:17, 98:5, 99:10, 99:11, 101:5, 119:4, 120:8

**impacted** [1] - 100:23

**implement** [2] - 199:2, 222:10

**implementation** [2] - 203:8, 203:19

**implemented** [1] - 203:11

**importance** [1] - 205:8

**important** [6] - 60:6, 60:24, 189:11,

202:15, 205:13, 233:14

**importantly** [1] - 49:21

**impression** [1] - 180:4

**imprisonment** [1] - 67:24

**improve** [1] - 194:20

**IN** [2] - 1:1, 1:18

**in-depth** [1] - 158:1

**in-house** [1] - 202:11

**in-service** [1] - 159:13

**inaccurate** [1] - 31:5

**inadmissible** [6] - 67:2, 67:8, 68:1, 68:2, 68:17, 68:22

**incarcerated** [4] - 98:8, 105:11, 158:2, 185:25

**incarceration** [1] - 98:25

**incarcerations** [1] - 98:24

**incentivize** [2] - 213:23, 231:16

**incidences** [1] - 96:7

**incident** [4] - 109:22, 140:25, 144:7, 170:24

**incidents** [8] - 141:4, 141:24, 142:23, 142:24, 143:7, 144:21, 145:6, 184:2

**include** [4] - 50:14, 160:10, 186:12, 207:25

**included** [6] - 8:14, 151:16, 160:7, 160:13, 170:9, 170:10, 203:5

**includes** [4] - 20:8, 50:25, 213:22, 213:23

**including** [1] - 54:2, 172:22

**incorrect** [2] - 31:13

**increase** [7] - 53:10, 92:6, 107:24, 146:23, 147:14, 153:10, 168:21

**increased** [3] - 56:12, 107:19, 130:20

**increases** [1] - 26:13

**increasing** [1] - 92:12

**indicate** [1] - 184:10

**indicated** [4] - 8:12, 11:10, 11:21, 14:7

**indicates** [3] - 38:24, 49:2, 60:10

**indicating]** [1] - 112:18

**indicia** [3] - 54:1, 54:9, 60:5

**indictment** [1] - 66:9

**individual** [16] - 133:17, 133:22, 134:5, 137:8, 145:8, 156:16, 200:10, 204:12, 209:21, 213:6, 215:22, 219:20, 224:19, 229:3, 229:20, 232:14

**individualized** [1] - 225:13

**individuals** [18] - 8:20, 105:9, 133:20, 136:9, 137:16, 138:1, 150:14, 165:4, 194:24, 199:10, 203:6, 209:2, 213:19, 221:17, 229:10, 229:22, 232:22, 234:3

**industry** [2] - 17:13, 55:22

**infants** [2] - 227:14, 227:17

**infectious** [1] - 213:24

**infinitely** [1] - 180:13

**influence** [3] - 143:16, 185:14, 228:11

**influx** [3] - 90:10, 169:18, 178:22

**information** [22] - 11:3, 27:7, 40:18, 40:20, 42:21, 66:18, 66:21, 67:1, 67:19, 71:17, 89:19, 110:4, 128:21, 138:22, 141:10, 141:15, 142:1, 143:2, 174:15, 206:7, 235:17

**inherently** [1] - 144:1

**initial** [2] - 80:19, 223:4

**initiate** [2] - 110:6, 214:18

**initiative** [1] - 39:22

**initiatives** [1] - 28:4

**inpatient** [1] - 207:11

**input** [1] - 58:13

**inquire** [1] - 22:10

**inquired** [1] - 26:12

**inquiry** [3] - 32:17, 45:2, 47:23

**inside** [1] - 212:13

**Insights** [1] - 234:6

**insists** [1] - 30:21

**Inspection** [2] - 80:15, 81:2

**inspection** [5] - 22:11, 25:11, 25:16, 80:21, 81:5

**inspections** [4] - 12:13, 20:14, 23:9, 24:24

**inspector** [2] - 23:5, 24:3

**inspectors** [1] - 23:8

**inspects** [2] - 20:11, 20:17

**instance** [1] - 213:2

**instances** [1] - 67:13

**instead** [6] - 58:17, 73:11, 138:1, 212:15, 219:3, 223:19

**Instead** [1] - 178:9

**institutions** [1] - 230:18

**instrumental** [1] - 138:18

**insulting** [1] - 127:18

**insurance** [5] - 156:25, 206:18, 206:19, 213:18, 225:16

**Insurance** [1] - 66:2

**insure** [1] - 208:1

**insurgence** [1] - 101:3

**insurmountable** [1] - 217:18

**intake** [2] - 206:23, 215:20

**integrated** [1] - 230:23

**intelligence** [1] - 94:1

**intend** [2] - 75:15, 75:18

**intended** [1] - 187:13

**intensity** [1] - 229:5

**Intensity** [1] - 173:3

**intensive** [4] - 195:7, 207:9, 220:2, 224:17

**intensively** [1] - 208:9

**interact** [6] - 82:3, 110:10, 117:9, 119:12, 136:19, 227:4

**interaction** [1] - 157:16

**interference** [1] - 58:6

**interject** [1] - 145:23

**interlude** [1] - 64:18

**internal** [1] - 18:11

**international** [1] - 205:5

**interpreted** [1] - 11:10

**interrupt** [5] - 31:12,

86:10, 101:13,
125:1, 177:4
**interruptions** [1] -
190:19
**intertwined** [2] -
114:19, 115:16
**intervene** [7] - 108:11,
117:7, 199:17,
200:5, 210:1, 211:8,
213:5
**intervening** [1] - 24:24
**Intervention** [1] -
198:19
**intervention** [13] -
136:24, 194:11,
195:7, 206:16,
208:1, 208:5,
209:20, 213:1,
213:2, 213:4, 214:1,
214:7, 219:8
**interventions** [2] -
198:20, 218:24
**interview** [1] - 136:23
**interviewed** [1] -
156:12
**interviewing** [3] -
199:18, 199:19,
200:11
**intimidating** [1] -
219:1
**intoxicant** [1] - 143:19
**introduce** [3] - 77:15,
192:12, 235:3
**introduced** [1] - 11:15
**introduction** [1] -
166:12
**intros** [1] - 234:25
**inundated** [1] - 93:13
**invention** [1] - 213:7
**invested** [1] - 232:17
**investigate** [3] -
78:24, 104:24, 134:6
**investigated** [4] -
133:22, 134:5,
139:11, 139:13
**investigation** [5] -
75:7, 128:17,
134:20, 135:2,
174:12
**investigations** [9] -
79:3, 79:4, 79:18,
122:9, 122:12,
123:9, 129:10,
139:18, 139:20
**investigator** [2] - 32:9,
40:25, 43:22
**investigators** [1] -
173:12
**investigatory** [1] -
75:7

**invitation** [1] - 57:25
**invited** [1] - 129:3
**invoked** [2] - 66:25,
67:10
**involve** [5] - 37:19,
67:15, 67:21,
184:20, 185:22
**involved** [24] - 35:2,
84:8, 89:13, 101:23,
106:6, 107:7, 110:8,
113:9, 117:21,
120:11, 124:3,
128:17, 141:25,
143:19, 152:1,
170:10, 183:2,
186:3, 200:20,
204:22, 210:7,
211:18, 226:24
**involvement** [1] -
122:8
**involves** [2] - 106:16,
118:15
**involving** [2] - 28:4,
35:1
**ipse** [5] - 52:21, 52:24,
53:16, 53:23, 56:17
**Irpino** [1] - 3:7
**irrelevant** [3] - 36:9,
37:17, 70:10
**ISIA** [1] - 5:4
**issue** [16] - 33:8,
38:13, 39:3, 57:2,
57:11, 57:13, 57:25,
59:8, 66:24, 66:25,
67:15, 74:17, 76:10,
92:17, 115:17,
228:12
**issued** [1] - 67:18
**issues** [8] - 38:17,
58:9, 67:5, 81:8,
81:9, 114:16,
132:13, 225:11
**item** [4] - 9:24, 143:10,
143:14, 146:5
**items** [1] - 173:17
**itself** [4] - 55:17,
94:19, 97:18, 102:25
**IV** [1] - 160:5
**ize** [1] - 234:2

### J

**J-A-G** [1] - 164:12
**Jackson** [2] - 6:8,
223:12
**JAG** [5] - 112:11,
163:9, 163:24,
164:5, 164:9
**jail** [24] - 46:7, 98:8,
98:9, 98:11, 98:23,

99:10, 99:14, 104:1,
104:23, 105:2,
105:4, 105:17,
127:5, 135:8, 136:7,
136:8, 137:11,
137:16, 137:19,
137:20, 138:1,
158:2, 186:1, 216:23
**Jail** [1] - 105:12
**Jan** [1] - 211:13
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**Joan** [5] - 192:15,
201:23, 214:17,
222:9, 231:4
**job** [24] - 20:15, 42:23,
43:2, 44:3, 58:16,
70:16, 83:19, 83:21,
94:4, 98:3, 102:16,
107:10, 117:3,
132:1, 149:21,
181:25, 182:18,
182:20, 196:13,
216:13, 220:1,
225:9, 232:2
**jobs** [2] - 43:5, 111:12
**Johnny** [1] - 107:1
**join** [7] - 46:21, 46:23,
57:1, 57:4, 86:23,
196:9, 196:11
**Join** [2] - 47:15, 47:16
**joined** [1] - 212:11
**joint** [1] - 170:20
**joke** [2] - 205:7,
213:15
**JOSEPH** [1] - 6:4
**journalism** [2] - 200:4,
200:18
**joys** [1] - 225:1
**JR** [3] - 2:3, 2:15, 77:4
**Jr** [2] - 76:24, 77:17
**Juan** [2] - 2:5, 2:17
**judge** [3] - 102:14,
103:3, 104:13
**Judge** [36] - 7:2,
21:13, 29:1, 29:7,
29:16, 30:9, 33:10,
34:13, 34:18, 37:3,
38:5, 39:7, 47:19,
48:7, 48:11, 49:15,
52:3, 57:9, 57:14,
57:18, 58:11, 61:6,
61:25, 62:6, 64:15,
73:22, 86:10,
110:20, 110:24,
122:25, 142:12,
165:24, 167:2,
167:25, 204:4, 214:5
**JUDGE** [1] - 1:17

**judges** [3] - 103:5,
103:21, 200:16
**judgment** [2] - 66:12,
66:20
**judicial** [18] - 37:10,
38:10, 39:14, 40:1,
64:19, 65:18, 66:3,
66:6, 66:9, 66:15,
66:17, 66:24, 67:9,
67:14, 68:1, 69:3,
69:7
**judicially** [1] - 65:22
**July** [5] - 19:3, 19:18,
79:9, 129:7
**jump** [1] - 166:24
**jumped** [2] - 24:22,
25:10
**June** [2] - 14:17, 129:7
**jurisdiction** [1] - 13:20
**jury** [3] - 58:4, 58:8
**justice** [1] - 165:21
**Justice** [4] - 33:13,
112:12, 164:10,
167:3

### K

**Kanawha** [1] - 223:12
**KEARSE** [1] - 4:2
**keep** [3] - 32:20,
89:11, 174:24
**keeps** [1] - 32:22
**Keith** [1] - 235:10
**Kelly** [1] - 6:8
**Kentucky** [3] - 67:22,
70:10, 168:15
**kept** [9] - 13:3, 13:9,
15:21, 17:11, 81:14,
93:12, 105:1, 165:9
**Kessler** [1] - 4:17
**kick** [2] - 57:19,
226:10
**kick-off** [1] - 57:19
**kicked** [3] - 105:17,
115:23, 116:13
**kid** [2] - 126:1, 126:2
**kid's** [1] - 115:24
**KIDS** [3] - 218:16,
218:17, 218:21
**kids** [20] - 107:6,
107:10, 107:23,
108:8, 108:12,
108:15, 109:6,
110:11, 111:18,
124:17, 124:19,
126:10, 127:7,
127:9, 209:5, 212:8,
218:21, 218:24,
219:6
**Kids** [1] - 194:21

**kids'** [1] - 106:18
**kind** [57] - 29:19,
43:23, 78:2, 78:21,
81:22, 82:6, 82:15,
82:21, 82:24, 84:9,
85:23, 86:13, 91:4,
97:12, 100:10,
101:18, 101:25,
102:2, 102:5,
102:16, 102:17,
102:21, 102:22,
102:25, 103:11,
103:21, 107:2,
107:3, 113:12,
115:16, 118:25,
121:16, 124:19,
129:14, 130:9,
150:25, 153:1,
154:16, 155:15,
158:13, 158:19,
160:2, 160:3, 161:8,
172:17, 176:25,
177:3, 185:9,
185:12, 189:10,
197:5, 210:4,
227:23, 233:7
**Kind** [1] - 179:17
**kindly** [1] - 8:25
**kinds** [2] - 109:6,
122:4
**kit** [1] - 232:21
**Kitchen** [1] - 227:5
**knock** [1] - 103:14
**knowing** [1] - 119:18
**knowingly** [1] - 65:19
**knowledge** [13] - 13:5,
15:19, 15:22, 20:13,
27:21, 75:11, 75:13,
84:5, 89:5, 104:2,
146:21
**Knowledge** [1] -
218:18
**known** [3] - 72:13,
133:12, 205:2
**knows** [1] - 197:20
**KOUBA** [1] - 3:14
**Kyle** [1] - 39:19

### L

**LA** [1] - 3:8
**label** [1] - 49:9
**laborious** [1] - 197:20
**lace** [1] - 187:2
**laced** [2] - 187:10,
187:12
**lack** [2] - 211:14,
228:12
**lady** [2] - 125:21,
125:23

**laid** [2] - 47:22, 82:22
**Lancaster** [1] - 193:9
**landed** [1] - 170:11
**lane** [1] - 191:13
**language** [5] - 38:21, 47:5, 200:9, 210:5, 211:7
**Lanier** [1] - 3:4
**larcenies** [5] - 105:22, 143:25, 184:22, 184:23, 185:2
**larceny** [3] - 99:15, 100:3, 105:15
**large** [15] - 89:3, 89:22, 89:25, 92:15, 132:16, 132:19, 143:25, 184:23, 202:24, 203:3, 203:7, 203:10, 209:9, 224:7
**larger** [4] - 44:9, 120:2, 146:3, 207:2
**largest** [2] - 106:11, 215:6
**last** [28] - 18:23, 25:15, 39:3, 41:11, 71:3, 72:13, 76:25, 91:16, 96:13, 97:2, 112:15, 114:17, 115:15, 118:16, 120:6, 123:23, 124:1, 134:10, 137:12, 137:21, 138:11, 141:20, 148:24, 169:1, 175:21, 181:15, 188:16, 190:14
**late** [4] - 72:12, 128:1, 166:24, 179:9
**lately** [1] - 131:11
**latitude** [2] - 123:3, 125:8
**launched** [1] - 209:13
**launching** [2] - 36:21, 214:23
**LAURA** [1] - 5:10
**Law** [3] - 3:4, 3:7, 3:12
**LAW** [3] - 76:22, 76:25, 77:6
**law** [31] - 18:10, 30:23, 43:23, 75:19, 77:25, 78:3, 84:18, 84:21, 85:9, 86:12, 87:6, 87:13, 87:25, 88:1, 88:2, 88:15, 98:2, 102:20, 102:23, 102:24, 103:1, 103:5, 103:9, 103:16, 104:1, 107:4, 121:21,

122:4, 138:25, 150:11, 170:9
**laws** [1] - 156:13
**lawyer** [3] - 36:23, 158:6, 183:16
**lay** [10] - 74:15, 75:3, 75:5, 76:5, 86:14, 87:1, 108:18, 110:11, 163:14, 192:1
**laying** [2] - 114:7, 125:21
**LDMP** [1] - 10:9
**lead** [1] - 32:8
**leaders** [3] - 119:11, 200:18, 210:18
**leadership** [1] - 128:18
**leading** [5] - 36:22, 37:19, 92:8, 132:23, 229:17
**leads** [3] - 40:21, 53:16, 187:15
**learn** [2] - 88:25, 175:8
**learned** [3] - 87:17, 93:16, 174:22
**learning** [1] - 209:25
**least** [4] - 14:6, 62:9, 154:15, 162:4
**leave** [3] - 115:23, 126:6, 151:12
**leaving** [5] - 125:16, 201:25, 224:12
**led** [3] - 134:21, 138:8, 224:5
**Lee** [2] - 3:12, 196:17
**left** [17] - 8:6, 21:20, 24:6, 40:14, 78:3, 83:11, 100:1, 149:9, 149:12, 164:15, 164:24, 168:1, 194:5, 196:5, 201:9, 217:20, 226:6
**left-hand** [1] - 40:14
**legal** [7] - 30:23, 32:8, 44:13, 46:20, 58:17, 70:19, 225:11
**legislative** [1] - 227:24
**legislature** [1] - 139:5
**legitimate** [5] - 23:19, 24:12, 25:8, 25:21, 56:12
**length** [3] - 40:4, 48:5, 210:25
**lengthy** [2] - 36:19, 215:15
**Leon** [2] - 2:4, 2:16
**less** [4] - 19:18, 54:24, 156:2, 234:4

**letter** [1] - 11:21
**level** [24] - 9:11, 16:12, 32:14, 54:2, 65:9, 69:23, 81:17, 82:2, 141:15, 181:8, 195:9, 206:16, 206:21, 206:23, 207:4, 207:14, 209:19, 213:9, 220:15, 224:15, 225:3, 229:5, 230:11
**levels** [8] - 42:15, 44:12, 85:10, 111:21, 111:22, 182:7, 199:12, 207:1
**Levin** [1] - 2:12
**LEYIMU** [1] - 4:8
**liberty** [1] - 59:2
**license** [1] - 32:15
**licenses** [1] - 20:17
**lieutenant** [2] - 81:3, 113:12
**life** [9] - 84:20, 103:20, 112:23, 116:20, 124:20, 205:9, 222:19, 233:19, 233:20
**life-saving** [2] - 233:19, 233:20
**lift** [1] - 202:24
**lifting** [1] - 102:24
**light** [6] - 38:3, 125:20, 179:22, 189:6, 189:19
**lightly** [1] - 37:5
**likely** [3] - 46:16, 47:11, 60:20
**likewise** [1] - 29:15
**Lily's** [2] - 227:13, 227:19
**limine** [1] - 64:23
**limit** [1] - 74:21
**limited** [4] - 58:23, 70:4, 138:25, 187:16
**limits** [1] - 120:18
**LINDA** [1] - 4:5
**line** [8] - 23:24, 65:6, 129:15, 143:10, 143:11, 143:14, 146:5, 223:20
**link** [4] - 53:2, 53:20, 55:12, 55:13
**linking** [1] - 53:14
**liquor** [1] - 118:11
**Lisa** [2] - 6:18, 237:3
**list** [6] - 25:6, 37:23, 105:2, 105:10, 165:15, 191:5
**listed** [3] - 163:8, 165:12, 208:21

**literally** [1] - 217:5
**litigation** [2] - 55:16, 134:11
**live** [9] - 80:1, 80:2, 87:7, 112:23, 121:18, 192:17, 198:5, 205:10, 208:8
**lived** [5] - 88:5, 90:7, 119:1, 192:19, 192:20
**lives** [2] - 107:7, 233:21
**LLC** [1] - 2:4
**loads** [1] - 151:19
**lobbied** [1] - 139:5
**local** [5] - 43:23, 119:11, 179:5, 205:5, 205:13
**locally** [1] - 200:15
**lockdown** [1] - 116:19
**Logan** [2] - 6:5, 6:12
**logged** [1] - 140:13
**long-standing** [1] - 129:23
**long-term** [4] - 218:10, 224:13, 230:17, 231:14
**look** [36] - 11:6, 14:9, 14:21, 18:8, 18:23, 19:22, 21:20, 22:4, 23:11, 23:13, 24:6, 24:25, 25:5, 25:24, 26:11, 26:14, 38:21, 64:13, 114:6, 142:9, 143:6, 144:10, 145:20, 147:9, 152:15, 164:8, 164:21, 167:6, 167:16, 167:21, 168:4, 208:17, 213:4, 217:8
**looked** [21] - 12:23, 16:6, 18:18, 18:20, 24:22, 26:12, 26:14, 26:16, 54:6, 137:4, 141:14, 141:19, 146:25, 147:10, 147:15, 152:16, 206:8, 207:17, 221:6, 221:24, 231:25
**looking** [11] - 14:22, 27:10, 119:19, 144:7, 172:20, 197:21, 198:9, 199:3, 201:17, 202:23, 231:21
**looks** [3] - 34:8, 163:1
**loosely** [1] - 226:24
**loss** [1] - 204:8

**lost** [5] - 32:15, 57:13, 98:17, 216:22, 235:11
**loud** [1] - 110:18
**love** [2] - 181:18, 181:20
**loved** [2] - 200:6, 228:9
**low** [1] - 105:10, 213:22, 214:1
**low-hanging** [1] - 105:10
**lower** [1] - 99:2
**lunch** [2] - 71:18, 191:21
**lunchtime** [1] - 72:8
**LYN** [1] - 190:17
**Lyn** [4] - 72:25, 190:9, 190:13, 192:14

## M

**ma'am** [35] - 128:8, 128:13, 128:15, 128:21, 128:24, 129:2, 129:19, 130:20, 130:23, 131:10, 132:4, 132:7, 132:22, 133:6, 133:9, 133:12, 133:19, 136:3, 136:6, 136:11, 138:3, 138:9, 139:10, 142:18, 143:9, 143:21, 143:24, 144:9, 144:19, 144:24, 145:4, 145:11, 145:23, 146:1, 146:4
**Madel** [3] - 33:12, 34:1, 36:10
**MADEL** [1] - 33:13
**Magazine** [1] - 3:7
**magic** [2] - 58:20, 59:24
**magistrate** [1] - 103:4
**magistrates** [1] - 103:4
**magnitude** [1] - 57:20
**MAHADY** [1] - 6:4
**Mahoney** [1] - 8:24
**mail** [1] - 172:21
**main** [1] - 203:17
**Mainigi** [1] - 28:16
**MAINIGI** [20] - 4:12, 28:17, 33:25, 36:2, 36:4, 37:22, 38:14, 39:16, 44:23, 46:19, 47:15, 47:24, 49:18,

50:10, 52:6, 57:1, 62:9, 62:25, 63:18, 72:16
**mainstream** [1] - 235:15
**maintain** [1] - 45:24
**maintained** [1] - 50:15
**maintaining** [1] - 227:8
**maintenance** [2] - 13:15, 44:9
**MAJESTRO** [60] - 2:6, 61:14, 61:16, 62:14, 63:25, 64:5, 64:8, 71:1, 72:3, 72:11, 73:15, 73:19, 74:25, 76:19, 77:7, 77:14, 82:8, 82:10, 83:6, 83:8, 86:3, 86:15, 87:3, 87:4, 88:4, 88:8, 88:11, 88:12, 92:2, 92:3, 92:10, 104:9, 104:12, 104:19, 108:20, 108:21, 109:4, 109:13, 109:16, 110:17, 110:19, 110:25, 116:7, 122:11, 122:17, 122:20, 123:7, 123:17, 123:20, 124:9, 125:7, 125:13, 127:11, 129:25, 163:2, 166:2, 183:12, 183:15, 183:18, 184:17
**Majestro** [18] - 2:6, 70:25, 71:20, 73:12, 74:24, 76:18, 87:2, 92:1, 104:15, 104:17, 108:19, 109:12, 110:16, 123:5, 124:8, 166:10, 183:11, 184:16
**major** [6] - 99:4, 119:16, 129:17, 129:20, 146:23, 171:8
**man** [2] - 110:1, 154:25
**managed** [3] - 207:9, 208:10, 227:9
**management** [6] - 88:21, 88:24, 89:9, 195:9, 231:20, 231:21
**managers** [3] - 89:24, 210:13, 218:3

**mandate** [1] - 31:2
**mandates** [1] - 30:14
**mandatory** [1] - 136:20
**manner** [1] - 228:21
**manufacturer** [2] - 42:14, 133:1
**manufacturers** [4] - 42:3, 43:5, 44:6, 45:5
**Mapes** [1] - 39:19
**MARC** [7] - 219:9, 219:13, 219:18, 219:23, 220:14, 224:10
**marijuana** [5] - 92:23, 100:21, 160:8, 173:18, 173:25
**marine** [1] - 78:22
**marine-type** [1] - 78:22
**mark** [1] - 26:4
**MARK** [1] - 3:16
**marked** [2] - 142:22, 195:15
**market** [3] - 131:8, 168:9, 180:22
**marketing** [1] - 200:18
**marriage** [2] - 193:18, 193:25
**married** [1] - 192:23
**Marshall** [15] - 193:8, 196:2, 198:9, 198:15, 199:1, 201:12, 201:20, 201:24, 202:3, 202:6, 202:12, 214:17, 219:19, 224:1, 230:20
**Mart** [1] - 185:18
**Mary's** [2] - 117:9, 222:4
**mask** [2] - 77:7, 77:10
**Mason** [5] - 77:21, 129:1, 214:21, 214:23, 216:8
**mass** [1] - 178:22
**massive** [7] - 91:5, 97:14, 126:14, 132:15, 150:3, 150:8, 178:17
**Master's** [3] - 193:15, 193:18, 196:6
**Masters** [9] - 29:24, 30:2, 30:21, 30:24, 31:21, 31:24, 32:4, 32:9, 55:23
**MAT** [1] - 231:7
**match** [1] - 218:11
**material** [3] - 11:4,

15:13, 56:24
**materials** [1] - 37:23
**Maternal** [1] - 219:10
**math** [6] - 137:19, 137:22, 144:11, 145:12, 146:9, 183:13
**Math** [1] - 183:15
**matrix** [1] - 15:16
**matter** [5] - 41:23, 62:23, 75:9, 211:7, 237:5
**matters** [2] - 123:11, 211:7
**Mattie** [2] - 196:17, 236:21
**max** [1] - 225:16
**MAY** [1] - 1:19
**Mayor** [1] - 83:1
**mayor** [1] - 83:18
**McCann** [1] - 19:6
**McCann's** [1] - 16:15
**MCCLURE** [1] - 6:3
**McComas** [2] - 131:24, 131:25
**McConnell** [1] - 235:23
**McCuskey** [1] - 120:17
**MCGINNESS** [1] - 4:2
**McKesson** [17] - 5:8, 10:8, 10:12, 11:1, 11:16, 12:2, 12:6, 14:10, 16:2, 18:12, 18:15, 18:23, 19:14, 26:22, 27:3, 35:3, 148:9
**McKesson's** [2] - 11:12, 12:20
**MDL** [1] - 68:10
**meal** [1] - 227:5
**mean** [41] - 25:15, 61:17, 63:7, 90:7, 92:19, 94:14, 94:16, 97:19, 98:2, 98:6, 100:19, 107:8, 116:16, 116:23, 117:2, 118:2, 121:14, 125:1, 126:12, 143:24, 145:2, 145:8, 150:1, 150:6, 151:4, 154:24, 155:16, 158:4, 158:6, 159:11, 160:5, 166:11, 166:23, 169:21, 175:4, 179:14, 179:23, 182:25, 183:3, 207:23, 207:24

**meaningless** [1] - 60:23
**means** [10] - 10:24, 18:6, 114:1, 206:21, 215:19, 224:17, 225:11, 230:14, 231:9, 232:11
**meant** [1] - 215:17
**measured** [1] - 37:2
**measures** [1] - 39:6
**mechanical** [1] - 6:19
**med** [3] - 200:1, 226:16, 231:3
**media** [3] - 200:18, 234:10, 234:23
**Medicaid** [1] - 157:5
**medical** [14] - 23:19, 24:12, 25:8, 25:22, 54:6, 54:8, 56:11, 96:16, 114:25, 202:9, 202:23, 204:13, 221:19, 227:21
**medically** [3] - 207:9, 208:10, 227:9
**Medicare** [1] - 157:5
**medication** [5] - 85:18, 91:3, 215:22, 215:23, 231:7
**medication-based** [1] - 215:23
**medications** [2] - 24:11, 188:6
**Medicine** [10] - 192:15, 201:23, 202:12, 202:18, 206:5, 206:13, 214:18, 222:9, 224:16, 231:5
**medicine** [3] - 151:3, 151:4, 213:16
**medium** [1] - 83:14
**medium-sized** [1] - 83:14
**meet** [8] - 148:10, 148:11, 203:3, 211:10, 215:25, 216:2, 217:24, 218:25
**meeting** [8] - 39:22, 71:7, 103:24, 105:16, 208:5, 218:14, 219:7, 222:23
**meetings** [5] - 39:23, 82:6, 128:20, 212:20, 214:24
**member** [1] - 79:8
**members** [4] - 163:9, 165:4, 210:4, 211:9

**memorized** [1] - 16:16
**memory** [3] - 170:12, 170:15, 171:19
**men** [5] - 113:25, 114:1, 117:3, 181:20, 181:21
**men's** [1] - 111:25
**Mental** [2] - 105:8, 114:22, 115:1, 198:23
**mental** [34] - 97:21, 112:20, 114:10, 114:13, 114:14, 114:18, 114:20, 114:24, 115:4, 115:6, 115:9, 116:16, 116:24, 117:4, 117:10, 189:2, 198:25, 212:13, 212:17, 228:3, 228:7, 228:12, 228:15, 228:20, 228:23, 229:8, 229:11, 230:12, 230:13, 230:14, 230:17
**mentally** [2] - 114:15
**mention** [1] - 209:23
**mentioned** [9] - 13:11, 135:17, 155:19, 199:7, 200:25, 204:19, 210:6, 219:11, 223:9
**mentor** [1] - 107:6
**mere** [1] - 68:18
**merge** [1] - 189:8
**mess** [1] - 187:17
**met** [1] - 105:9
**metallurgical** [1] - 192:25
**Metals** [1] - 192:25
**meth** [20] - 92:24, 95:5, 100:20, 129:22, 130:9, 130:15, 131:10, 131:12, 131:14, 131:17, 131:19, 131:22, 133:8, 178:22, 178:23, 187:11
**methamphetamine** [12] - 130:21, 149:15, 153:13, 160:8, 168:24, 169:2, 177:21, 180:2, 186:21, 186:23, 186:25, 187:6
**methamphetamines** [4] - 129:21, 130:8, 130:11, 130:18

**Method** [1] - 56:6
**method** [1] - 19:10
**methodologies** [5] - 10:2, 51:10, 51:15, 53:24, 59:21
**methodology** [9] - 46:22, 54:14, 54:17, 54:21, 56:10, 56:16, 56:19, 58:23, 60:6
**methods** [2] - 52:24, 78:23
**Mexican** [4] - 130:19, 168:24, 169:2, 180:1
**Mexico** [5] - 178:20, 178:23, 179:1, 179:5, 180:17
**mic** [1] - 77:8
**Michael** [2] - 39:19, 65:3
**MICHAEL** [2] - 2:15, 3:9
**Michigan** [4] - 34:2, 93:13, 132:9, 197:24
**micromolecule** [1] - 96:6
**microscopic** [1] - 207:6
**mid-80s** [1] - 159:4
**middle** [7] - 82:16, 83:13, 106:9, 106:10, 106:12, 126:3, 129:6
**Midland** [1] - 106:11
**midnight** [1] - 72:13
**midweek** [2] - 62:10, 62:24
**might** [12] - 17:8, 56:23, 62:17, 90:5, 143:23, 147:21, 157:21, 163:23, 171:24, 172:9, 175:22, 187:8
**migrate** [1] - 134:3
**migrated** [3] - 78:6, 84:10, 180:8
**migrates** [1] - 178:24
**MILDRED** [1] - 3:3
**Mildred** [1] - 230:15
**milestones** [1] - 219:7
**Military** [1] - 194:21
**military** [3] - 78:21, 194:19, 194:20
**military-type** [1] - 78:21
**mill** [1] - 122:13
**milligrams** [1] - 90:13
**million** [11] - 89:25, 98:10, 99:7, 118:13, 119:18, 135:10, 136:18, 137:23,

137:25, 138:12
**million-four** [1] - 137:23
**mills** [2] - 85:17, 89:4
**Milton** [20] - 83:1, 83:4, 83:15, 83:17, 83:23, 84:6, 90:18, 93:9, 93:17, 105:13, 129:4, 129:9, 129:17, 129:18, 129:19, 129:24, 130:6, 130:7, 130:12, 130:16
**mind** [10] - 89:14, 111:17, 122:2, 141:21, 141:22, 152:2, 152:13, 153:16, 155:9, 193:13
**Mingo** [2] - 89:15, 89:20
**minimal** [1] - 206:16
**minimize** [1] - 190:19
**minister** [1] - 210:14
**minor** [2] - 99:3, 193:14
**minute** [4] - 21:11, 36:3, 86:16, 175:10
**minutes** [5] - 37:15, 48:12, 87:9, 147:24, 177:5
**misconstruction** [1] - 32:24
**misdemeanor** [2] - 67:21, 67:23
**miserably** [1] - 221:20
**misleading** [2] - 31:14, 35:15
**misrepresentation** [2] - 37:3, 37:13
**misstates** [1] - 130:1
**Mitchell** [1] - 2:12
**mixed** [1] - 133:10
**mixing** [2] - 133:2, 187:16
**model** [1] - 107:11
**modeled** [1] - 78:21
**mole** [3] - 179:20, 179:21, 188:17
**mom** [12] - 106:22, 126:12, 193:3, 217:18, 218:4, 218:9, 218:25, 220:9, 225:3, 226:11, 226:13
**moment** [4] - 48:8, 58:1, 97:5, 204:19
**mommy** [1] - 126:17
**Mommy** [1] - 110:11
**MOMS** [5] - 220:8,

220:14, 220:18, 224:11
**moms** [4] - 220:10, 220:11, 220:18, 225:5, 225:21, 226:3, 226:19, 227:14
**Monday** [2] - 62:19, 64:2
**money** [24] - 98:20, 105:20, 111:7, 113:15, 114:7, 118:1, 138:13, 156:20, 156:21, 157:6, 161:9, 175:2, 175:3, 175:4, 181:21, 182:11, 182:12, 189:22, 201:6, 201:9, 201:16, 231:1, 231:15
**Money** [1] - 189:22
**monitor** [4] - 10:20, 41:14, 44:4, 99:1
**monitored** [1] - 217:2
**Monitoring** [3] - 11:23, 12:18, 44:8
**monitoring** [1] - 42:20
**month** [13] - 10:13, 14:8, 16:12, 16:20, 19:11, 41:9, 67:18, 98:11, 104:23, 137:21, 193:4, 211:2
**monthly** [8] - 13:24, 13:25, 14:4, 14:8, 14:14, 15:9, 40:18, 41:2
**Monthly** [1] - 14:10
**months** [9] - 10:10, 19:19, 96:13, 120:15, 201:11, 212:23, 221:14, 225:16, 226:20
**morning** [9] - 7:5, 7:6, 7:11, 7:12, 29:8, 48:19, 70:23, 211:2, 218:8
**morph** [1] - 204:1
**Morris** [1] - 6:15
**mortar** [1] - 215:5
**mortgage** [1] - 226:7
**most** [28] - 55:24, 66:3, 83:12, 90:8, 92:20, 95:18, 99:2, 100:25, 117:6, 131:18, 139:19, 148:13, 157:15, 169:3, 178:5, 178:6, 178:23, 179:9, 188:12, 200:19,

203:18, 203:22, 206:16, 206:17, 208:9, 224:19, 225:16, 233:11
**mostly** [2] - 94:20, 179:8
**motion** [7] - 47:21, 52:17, 56:23, 63:11, 64:23, 74:1, 190:24
**motions** [1] - 57:22
**motivational** [3] - 199:18, 199:19, 200:11
**Motley** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**Motor** [2] - 80:15, 81:2
**motor** [1] - 80:21
**MOUGEY** [1] - 2:12
**Mountain** [1] - 222:4
**mouth** [3] - 125:24, 148:15, 162:10
**move** [22] - 14:1, 21:7, 61:5, 71:23, 86:10, 91:16, 94:4, 109:13, 110:19, 123:17, 126:10, 147:22, 155:17, 165:24, 175:18, 198:6, 199:23, 207:14, 208:13, 208:15, 209:9, 226:19
**moved** [16] - 80:3, 80:14, 80:25, 100:11, 101:17, 133:21, 147:3, 147:4, 147:5, 192:20, 194:6, 196:9, 196:11, 198:14, 209:10, 212:1
**moving** [6] - 18:9, 20:2, 55:4, 206:10, 209:12, 212:5
**mowed** [1] - 99:25
**MR** [233] - 2:3, 2:6, 2:9, 2:12, 2:15, 3:9, 3:11, 3:16, 4:17, 5:9, 5:10, 5:13, 6:4, 7:7, 7:9, 7:10, 7:18, 7:21, 11:24, 12:8, 13:23, 13:25, 14:3, 21:3, 21:6, 21:10, 21:13, 21:17, 21:18, 28:12, 28:21, 28:24, 29:1, 29:7, 29:8, 29:15, 29:21, 30:9, 30:12, 31:4, 31:9, 31:11, 31:18, 32:23, 33:6, 33:10, 33:15, 33:19, 33:20, 33:22, 34:8,

34:13, 34:15, 34:17, 34:19, 35:14, 35:18, 36:18, 37:1, 37:11, 38:5, 38:20, 39:7, 39:11, 40:3, 45:1, 46:21, 46:23, 46:25, 47:13, 47:16, 47:19, 48:7, 48:11, 48:18, 49:1, 49:8, 49:25, 50:2, 50:5, 50:8, 50:12, 52:2, 52:5, 52:7, 52:13, 52:16, 57:4, 57:9, 57:14, 57:18, 59:7, 60:10, 60:14, 60:19, 61:6, 61:7, 61:14, 61:15, 61:16, 61:17, 61:24, 62:4, 62:5, 62:12, 62:14, 62:15, 63:2, 63:9, 63:14, 63:21, 63:25, 64:2, 64:5, 64:7, 64:8, 64:11, 64:15, 64:17, 64:22, 66:23, 68:6, 68:25, 69:14, 69:18, 69:19, 70:7, 70:24, 71:1, 72:3, 72:11, 72:24, 73:5, 73:15, 73:19, 74:25, 76:19, 77:7, 77:14, 82:8, 82:10, 83:6, 83:8, 86:3, 86:7, 86:9, 86:15, 87:3, 87:4, 88:4, 88:8, 88:11, 88:12, 91:10, 91:13, 91:15, 92:2, 92:3, 92:10, 104:6, 104:9, 104:13, 104:19, 108:20, 108:21, 109:1, 109:4, 109:13, 109:16, 110:17, 110:19, 110:25, 116:7, 122:11, 122:17, 122:20, 122:25, 123:6, 123:7, 123:8, 123:17, 123:20, 124:7, 124:9, 124:25, 125:3, 125:7, 125:13, 127:11, 129:25, 148:2, 148:4, 148:6, 162:19, 162:21, 163:2, 163:7, 163:14, 163:18, 163:21, 163:22, 165:24, 166:2, 166:5, 166:11, 166:19, 167:1, 167:11, 167:13, 167:25, 168:3,

171:11, 171:12, 171:18, 172:12, 172:14, 175:12, 175:19, 175:20, 177:6, 177:12, 177:13, 179:3, 183:6, 183:12, 183:15, 183:18, 184:17, 190:2, 190:18, 191:18, 192:7, 196:21
**MS** [81] - 3:3, 3:6, 3:14, 4:2, 4:5, 4:8, 4:12, 4:12, 4:15, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 28:17, 33:25, 36:2, 36:4, 37:22, 38:14, 39:16, 44:23, 46:19, 47:15, 47:24, 49:18, 50:10, 52:6, 57:1, 62:9, 62:25, 63:18, 72:16, 73:17, 73:20, 73:22, 76:17, 86:1, 86:18, 87:23, 89:17, 91:9, 91:12, 91:14, 91:21, 92:8, 104:11, 107:25, 108:17, 108:24, 109:8, 110:14, 116:2, 122:7, 122:15, 127:14, 127:22, 128:3, 130:5, 134:13, 134:15, 142:13, 142:17, 142:19, 142:20, 147:18, 166:23, 183:8, 184:9, 190:1, 190:3, 190:7, 191:9, 192:1, 192:9, 195:11, 195:14, 197:7, 197:15, 235:18
**Mt** [3] - 3:15, 4:4, 4:9
**multi** [2] - 119:18, 188:23
**multi-faceted** [1] - 188:23
**multi-million-dollar** [1] - 119:18
**multiple** [4] - 40:16, 89:23, 94:10, 145:11
**multiple-staged** [1] - 89:23
**multiplier** [3] - 49:12, 49:22
**multipliers** [1] - 50:6
**multiplying** [2] - 49:16, 49:17
**multitude** [1] - 145:10
**murder** [1] - 94:15

**murders** [2] - 79:17, 171:2
**music** [1] - 235:12
**musicians** [1] - 235:1
**must** [4] - 40:19, 66:17, 88:2, 156:1

## N

**N'** [2] - 234:24, 235:5
**nailbeds** [1] - 125:24
**Naloxone** [1] - 223:14
**name** [15] - 76:22, 76:25, 77:17, 84:22, 131:24, 148:9, 165:10, 172:23, 175:17, 175:25, 176:2, 190:11, 190:14, 192:13, 193:12
**named** [2] - 172:2, 193:4
**names** [2] - 106:18, 172:18
**Narcan** [5] - 95:24, 126:6, 126:7, 127:10, 186:12
**Narcan'd** [1] - 96:1
**narcotic** [5] - 143:11, 145:14, 146:6, 184:3, 186:4
**Narcotics** [1] - 218:13
**narcotics** [3] - 50:24, 144:4, 185:16
**narrative** [1] - 127:15
**narrow** [1] - 68:13
**National** [1] - 170:10
**national** [7] - 16:18, 16:19, 117:18, 194:22, 205:5, 205:13, 234:21
**nature** [3] - 96:12, 96:20, 184:13
**navigator** [1] - 219:4
**navigators** [1] - 218:2
**near** [1] - 63:7
**necessarily** [1] - 145:3
**necessary** [6] - 66:18, 66:21, 72:20, 231:8, 232:3, 233:19
**need** [80] - 16:9, 48:12, 48:13, 51:21, 54:7, 58:13, 61:21, 62:5, 62:21, 63:23, 71:1, 73:5, 87:1, 96:24, 97:4, 97:8, 100:5, 102:6, 104:16, 106:23, 107:18, 107:19, 107:24, 108:7,

108:21, 111:24, 113:23, 114:1, 117:11, 117:20, 131:8, 177:4, 181:12, 182:18, 182:20, 188:21, 199:22, 199:23, 203:3, 203:13, 204:16, 206:12, 206:22, 206:23, 206:24, 207:2, 207:21, 207:22, 208:1, 208:2, 208:6, 208:7, 208:10, 208:15, 210:12, 210:13, 210:18, 213:22, 214:13, 215:8, 215:12, 216:23, 217:16, 218:5, 218:7, 218:10, 220:1, 220:2, 221:14, 221:25, 222:5, 223:10, 223:21, 224:25, 225:5, 230:7, 234:4
**needed** [15] - 52:5, 65:10, 69:24, 97:9, 98:21, 202:25, 206:10, 217:4, 220:6, 221:2, 221:9, 224:14, 225:7, 225:8
**needle** [2] - 160:2, 160:4
**needles** [3] - 97:23, 110:12, 118:22
**needs** [18] - 17:23, 40:20, 58:10, 84:18, 96:24, 127:6, 206:16, 210:14, 210:15, 212:5, 212:6, 215:13, 216:2, 216:11, 220:9, 220:10, 225:4, 228:23
**negative** [2] - 205:3, 205:6
**neglect** [3] - 127:5, 230:1
**neighborhoods** [4] - 119:25, 120:8, 120:23, 120:24
**Neonatal** [2] - 220:13, 227:18
**neonatal** [1] - 227:17
**network** [1] - 222:5
**never** [13] - 10:12, 15:20, 20:5, 20:21, 20:25, 22:2, 55:11, 55:15, 57:19, 171:2,

187:13, 208:12, 230:7
**New** [8] - 3:5, 3:8, 55:5, 57:22, 78:6, 78:9, 195:4, 195:7
**new** [11] - 30:23, 54:18, 54:19, 57:10, 126:12, 156:13, 160:16, 182:11, 193:3, 217:18, 220:11
**newer** [1] - 160:17
**News** [1] - 205:4
**news** [4] - 171:6, 171:8, 205:5, 234:24
**next** [32] - 22:8, 23:24, 43:24, 54:19, 57:18, 61:11, 61:22, 62:19, 71:6, 73:24, 80:12, 82:20, 84:15, 94:4, 106:24, 124:12, 124:17, 165:9, 189:8, 189:13, 189:15, 189:17, 212:25, 213:16, 214:25, 220:6, 220:7, 221:22, 223:23, 227:9, 231:23
**NIBRS** [2] - 142:1, 143:2
**nice** [7] - 15:15, 70:22, 71:10, 73:22, 113:25, 148:10, 148:11
**NICHOLAS** [9] - 6:11, 28:21, 46:23, 47:16, 50:2, 52:7, 57:4, 62:15, 73:5
**Nicholas** [3] - 28:20, 57:3, 73:4
**nickel** [1] - 111:24
**nicotine** [1] - 204:10
**night** [4] - 71:3, 72:12, 72:13, 198:2
**nights** [1] - 224:24
**nine** [3] - 96:13, 98:21, 182:15
**Ninth** [1] - 4:6
**no-cost** [3] - 201:6, 201:10, 201:11
**nobody** [3] - 119:22, 120:20, 160:2
**non** [7] - 50:19, 50:22, 74:4, 190:23, 191:2, 215:22, 227:16
**non-controlled** [2] - 50:19, 50:22
**non-hospital** [1] - 227:16

**non-medication** [1] - 215:22
**non-retained** [3] - 74:4, 190:23, 191:2
**none** [3] - 13:1, 20:2, 27:1
**None** [2] - 52:5, 52:6
**noon** [1] - 211:2
**normal** [2] - 63:5, 133:4
**normalizing** [1] - 235:10
**normally** [4] - 125:18, 126:5, 144:1, 153:5
**notation** [1] - 24:13
**note** [3] - 38:20, 66:16, 91:22
**notes** [1] - 35:11
**nothing** [5] - 50:8, 126:16, 141:21, 210:21, 228:25
**Nothing** [1] - 50:10
**notice** [21] - 35:12, 38:10, 39:14, 40:1, 64:19, 65:18, 65:22, 66:3, 66:6, 66:9, 66:15, 66:24, 67:9, 67:15, 68:1, 69:3, 69:7, 71:12, 72:4, 92:11, 125:15
**noticed** [4] - 125:17, 125:21, 148:13, 234:12
**noticing** [2] - 66:4, 199:12
**notified** [1] - 41:8
**November** [1] - 24:25
**NTU** [3] - 220:12, 220:17, 227:18
**nuisance** [2] - 58:5, 125:6
**number** [25] - 8:19, 10:9, 10:17, 10:22, 47:25, 51:9, 60:9, 81:20, 81:22, 132:23, 133:10, 136:9, 141:15, 142:23, 142:24, 145:5, 145:8, 146:2, 146:3, 146:6, 177:20, 183:1, 190:22, 203:10, 203:11
**numbers** [10] - 16:17, 19:6, 54:16, 55:3, 59:24, 146:14, 146:16, 158:18, 164:23, 168:1
**nursery** [1] - 227:20
**nurses** [1] - 199:10

**nursing** [2] - 200:1, 213:25
**nutrition** [3] - 225:6, 226:25, 227:1
**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

## O

**O'-C-o-n-n-e-l-l** [1] - 190:15
**o'clock** [2] - 48:15, 72:17
**O'Connell** [19] - 72:5, 72:25, 190:9, 190:13, 191:4, 191:11, 191:16, 191:22, 192:14, 192:17, 192:24, 193:5, 194:3, 194:15, 195:15, 195:18, 204:19, 206:2, 235:23
**O'CONNELL** [1] - 190:17
**oath** [1] - 76:20
**OB** [2] - 219:21, 220:3
**OB/GYN** [1] - 219:19
**object** [20] - 35:14, 36:16, 38:14, 76:15, 107:25, 116:2, 123:1, 124:25, 125:3, 127:15, 134:24, 163:4, 166:12, 166:17, 191:16, 191:24, 196:22, 197:3, 197:12, 204:8
**objection** [41] - 21:9, 21:15, 33:25, 34:5, 39:25, 44:25, 46:24, 47:13, 47:17, 49:25, 50:11, 72:17, 86:1, 86:24, 87:2, 87:21, 88:6, 89:17, 90:20, 91:22, 92:8, 104:14, 104:18, 108:2, 108:17, 108:24, 109:8, 109:11, 110:14, 122:7, 122:15, 123:16, 124:7, 129:25, 166:1, 166:9, 171:11, 175:12, 175:15, 175:18, 190:21
**Objection** [6] - 31:14, 36:2, 44:23, 46:19, 49:18, 184:9

**objectionable** [1] - 191:17
**objections** [2] - 47:22, 104:7
**obligation** [1] - 51:25
**obligations** [2] - 8:15, 30:23
**observation** [6] - 74:14, 74:20, 91:18, 157:19, 157:25, 158:1
**observations** [14] - 75:19, 87:10, 87:16, 87:17, 88:10, 90:5, 123:4, 148:20, 149:13, 150:11, 153:3, 203:21, 229:7
**observe** [4] - 88:16, 88:20, 94:7, 104:15, 110:9, 129:12
**observed** [10] - 76:9, 85:11, 86:4, 88:1, 88:5, 91:25, 96:20, 121:10, 125:23, 158:14
**obtain** [8] - 22:24, 112:11, 113:7, 113:15, 193:10, 193:16, 193:21, 226:8
**obtaining** [2] - 194:16, 196:6
**obviously** [9] - 37:11, 72:16, 159:17, 161:2, 207:8, 207:13, 213:10, 217:9, 219:24
**Obviously** [1] - 26:16
**occasion** [1] - 133:16
**occasional** [1] - 94:15
**Occasionally** [1] - 187:1
**occasions** [1] - 187:3
**occupied** [1] - 155:22
**occupy** [1] - 61:17
**occur** [3] - 41:6, 46:17, 135:12
**occurred** [2] - 26:16, 203:7
**occurrence** [2] - 94:13, 94:17
**occurring** [2] - 84:6, 229:11
**occurs** [1] - 106:15
**October** [1] - 23:14
**OF** [2] - 1:1, 1:4
**off-shifted** [1] - 153:15
**offenders** [1] - 99:2
**offense** [2] - 143:15,

144:4
**offenses** [3] - 143:25, 185:5, 226:5
**offer** [6] - 66:11, 117:22, 117:23, 163:13, 215:21, 222:22
**offered** [9] - 74:13, 127:16, 196:13, 198:14, 199:6, 209:6, 216:5, 222:7, 225:25
**offering** [3] - 74:4, 74:7, 74:21
**offers** [2] - 117:10, 225:1
**office** [13] - 89:24, 94:7, 96:22, 98:5, 98:7, 98:14, 147:12, 169:9, 174:7, 176:17, 210:13, 213:16, 226:18
**Office** [9] - 97:18, 113:23, 114:9, 140:17, 159:12, 182:25, 202:1, 202:22, 214:11
**officer** [5] - 58:18, 106:5, 107:16, 150:12, 228:21
**officers** [13] - 78:19, 95:14, 100:13, 109:7, 110:9, 112:20, 117:1, 118:6, 122:13, 141:9, 170:9, 182:14, 200:17
**offices** [1] - 123:24
**Official** [2] - 237:2, 237:3
**officials** [3] - 94:2, 98:16, 109:10
**often** [10] - 20:16, 40:19, 201:6, 205:20, 207:3, 207:7, 213:5, 221:12, 228:12, 230:24
**Ohio** [8] - 93:14, 132:10, 168:15, 174:8, 178:25, 192:18, 196:9, 214:12
**OIG** [2] - 40:7, 43:17
**old** [10] - 57:11, 90:25, 124:13, 126:1, 126:3, 142:12, 186:17, 193:4
**Old** [1] - 102:17
**older** [1] - 227:13

**on-site** [4] - 212:18, 215:21, 216:1, 216:5
**on-the-ground** [1] - 203:8
**once** [9] - 82:2, 105:9, 114:21, 116:11, 136:20, 176:25, 194:6, 211:2
**One** [6] - 5:11, 24:1, 45:2, 49:20, 97:5, 181:10
**one** [108] - 10:1, 10:8, 10:25, 13:19, 13:20, 13:21, 16:15, 18:21, 21:24, 22:15, 24:5, 24:18, 24:20, 24:25, 25:12, 25:13, 34:9, 35:22, 43:4, 43:19, 49:11, 49:12, 54:10, 54:18, 54:19, 55:3, 55:9, 55:24, 59:24, 60:5, 63:7, 68:13, 74:3, 74:10, 79:22, 80:24, 84:24, 89:14, 92:20, 93:16, 94:17, 98:16, 100:15, 106:4, 106:10, 108:19, 109:5, 111:6, 116:9, 119:6, 123:12, 124:21, 131:5, 139:2, 141:9, 142:22, 145:5, 145:6, 145:11, 149:12, 152:13, 162:18, 163:9, 165:1, 170:18, 172:6, 175:7, 175:21, 176:12, 178:5, 178:6, 178:13, 190:20, 191:4, 197:18, 197:24, 198:2, 198:3, 204:20, 208:21, 211:17, 212:3, 213:16, 214:1, 214:6, 214:9, 215:4, 215:17, 216:18, 218:19, 218:21, 219:9, 219:13, 219:22, 219:25, 221:22, 222:16, 224:3, 225:1, 226:13, 227:3, 227:13, 227:23, 228:9, 230:21, 232:19
**one-stop** [1] - 215:17
**ones** [7] - 24:20, 89:14, 99:4, 123:14, 184:19, 200:6,

213:10
**online** [1] - 22:16
**open** [3] - 68:8, 180:22, 235:7
**open-air** [1] - 180:22
**opened** [8] - 65:4, 68:4, 68:18, 70:18, 179:1, 184:14, 212:22, 225:24
**opener** [1] - 235:4
**openers** [1] - 235:9
**opening** [5] - 68:6, 68:11, 70:11, 95:19, 235:12
**operate** [2] - 20:4, 177:2
**operating** [5] - 98:17, 101:25, 138:12, 175:9, 176:20
**Operation** [4] - 175:23, 176:4, 176:8, 194:21
**operation** [6] - 55:20, 170:21, 174:8, 175:22, 176:4, 176:22
**operations** [3] - 82:4, 84:2
**operator** [1] - 78:8
**opiate** [1] - 187:5
**opiates** [2] - 94:24, 95:4
**opinion** [32] - 27:25, 28:8, 30:2, 31:13, 31:14, 31:25, 32:14, 33:11, 35:5, 40:12, 46:20, 52:24, 67:17, 67:19, 74:10, 74:15, 74:16, 74:17, 75:3, 75:5, 75:9, 75:23, 76:10, 86:2, 91:25, 93:3, 153:18, 153:21, 157:22, 191:3, 191:7, 192:3
**opinions** [12] - 15:24, 20:6, 49:16, 52:21, 53:1, 53:23, 56:15, 56:18, 74:5, 74:13, 74:21, 191:11
**opioid** [60] - 27:15, 28:9, 42:3, 43:13, 53:18, 53:20, 59:11, 75:20, 75:22, 82:14, 85:12, 88:16, 88:24, 89:22, 90:4, 90:19, 92:5, 93:9, 94:8, 96:20, 97:13, 97:17, 99:12, 99:18, 100:24, 104:4, 106:2, 108:23,

112:9, 113:23, 115:7, 115:14, 115:20, 116:21, 119:5, 120:1, 121:10, 124:5, 124:10, 124:22, 125:5, 132:15, 133:18, 133:25, 134:3, 153:16, 155:14, 155:17, 184:6, 184:21, 186:1, 188:21, 188:24, 204:11, 219:15, 220:21, 221:12, 221:20, 230:22, 230:25

**opioid-based** [2] - 133:25, 153:16

**opioids** [16] - 41:15, 42:4, 42:16, 42:24, 74:12, 85:19, 88:15, 101:11, 118:7, 118:19, 121:24, 186:23, 187:9, 203:24, 219:16, 231:20

**Opioids** [1] - 186:24

**opponent** [1] - 166:25

**Opportunities** [1] - 232:5

**opportunities** [1] - 201:17

**opportunity** [5] - 27:24, 28:7, 114:3, 211:18, 233:5

**opposed** [1] - 18:21

**Order** [5] - 11:23, 12:18, 44:7, 49:3, 49:4

**order** [17] - 10:20, 13:12, 15:6, 19:24, 27:18, 30:16, 46:15, 47:2, 48:24, 51:16, 51:20, 51:23, 54:6, 64:25, 65:16, 65:20, 113:7

**ordered** [3] - 19:17, 19:18, 136:15

**ordering** [3] - 40:17, 40:20, 41:14

**orders** [19] - 10:13, 10:18, 10:24, 19:2, 20:2, 20:3, 23:19, 26:12, 44:4, 44:8, 46:12, 47:8, 47:11, 51:9, 51:11, 53:3, 55:7, 56:11, 70:3

**ordinary** [2] - 63:3, 63:15

**Organization** [2] -

176:9, 215:16

**organization** [9] - 161:16, 172:1, 172:16, 174:7, 175:8, 176:9, 217:1, 227:25, 234:7

**organizational** [1] - 82:13

**organizations** [8] - 161:6, 161:15, 161:21, 169:10, 171:5, 176:12, 205:21, 217:3

**orient** [1] - 167:20

**Oriente** [9] - 7:25, 8:11, 8:13, 8:21, 9:11, 65:3, 69:17, 69:18, 69:21

**Oriente's** [2] - 65:11, 69:16

**originally** [1] - 193:23

**Orleans** [1] - 3:8

**Osteopathic** [1] - 231:4

**other-ize** [1] - 234:2

**otherwise** [1] - 10:23

**OUD** [2] - 204:3, 204:5

**ought** [2] - 68:4, 71:5

**ourselves** [3] - 73:6, 181:1, 195:23

**out-of-court** [1] - 196:25

**out-patient** [3] - 208:7, 214:25, 215:2

**outbuildings** [1] - 185:21

**outfits** [2] - 152:17, 180:16

**outlying** [2] - 120:3, 120:5

**outpatient** [2] - 208:15, 233:8

**outside** [11] - 36:17, 37:18, 38:16, 49:21, 49:25, 50:2, 88:1, 91:18, 161:2, 169:11, 197:25

**over-commit** [1] - 61:9

**overall** [1] - 141:19

**overcome** [3] - 66:25, 85:1, 95:22

**overdose** [25] - 43:14, 90:15, 94:10, 96:4, 96:7, 106:22, 106:23, 117:19, 131:11, 133:6, 133:13, 133:23, 134:19, 139:24, 140:1, 140:3, 140:4, 140:9, 140:11,

140:17, 153:8, 178:17, 186:22, 212:8, 212:9

**overdoses** [15] - 90:11, 92:15, 96:22, 101:3, 101:10, 101:11, 132:23, 133:17, 140:6, 149:6, 152:25, 153:1, 153:9, 153:10, 153:24

**overdosing** [2] - 131:14, 187:12

**overlaps** [1] - 233:7

**overnight** [1] - 7:14

**overrule** [4] - 34:5, 87:21, 88:6, 108:2

**overruled** [3] - 31:6, 89:18, 116:4

**Overruled** [2] - 35:16, 49:7

**overseeing** [1] - 203:9

**overtime** [5] - 102:4, 102:7, 117:22, 117:23, 118:3

**overview** [1] - 86:13

**overwhelmed** [1] - 100:5

**overwhelming** [1] - 85:18

**owe** [1] - 182:1

**own** [10] - 35:22, 39:3, 49:24, 88:9, 95:25, 101:18, 129:1, 157:6, 212:2, 233:1

**owned** [1] - 119:16

**owns** [1] - 120:19

**oxy** [1] - 173:25

**Oxycodone** [1] - 186:16

**oxycodone** [3] - 16:13, 173:19, 174:1

**Oxycontin** [1] - 186:14

## P

**P-1200** [1] - 2:7

**P-13389** [1] - 66:13

**P-4** [1] - 183:19

**P-41044** [1] - 142:22

**P-41044_A** [1] - 183:20

**P-44257** [1] - 66:11

**p.m** [2] - 177:9, 236:4

**P.O** [2] - 5:14, 6:8

**P.T** [1] - 200:1

**PA** [3] - 6:6, 6:13, 6:15

**packet** [3] - 24:18, 24:19, 24:20

**Page** [35] - 7:17, 9:21,

21:19, 21:20, 22:9, 23:3, 23:11, 23:17, 24:5, 24:14, 24:21, 25:3, 25:4, 25:5, 25:14, 25:24, 38:21, 38:24, 41:21, 43:8, 43:12, 53:5, 56:2, 64:25, 65:6, 75:16, 83:7, 134:14, 164:14, 164:21, 165:16, 167:15, 167:16, 167:25, 187:20

**page** [8] - 18:23, 23:24, 24:7, 25:10, 82:8, 165:9, 167:24, 202:25

**pages** [4] - 15:13, 15:17, 22:8

**paid** [2] - 110:2, 157:11

**pain** [4] - 151:6, 188:25, 231:20, 231:21

**pains** [2] - 87:12, 140:7

**paint** [2] - 95:11, 205:5

**panic** [1] - 62:21

**Papantonio** [1] - 2:12

**paper** [4] - 52:19, 56:22, 61:8, 234:1

**papers** [2] - 61:5, 68:17

**paragraph** [7] - 30:21, 31:21, 40:13, 41:12, 165:3, 167:21, 187:21

**paramilitary** [1] - 78:21

**parent** [2] - 127:3, 127:4

**parent's** [1] - 212:9

**parenting** [4] - 217:10, 217:11, 217:24, 224:9

**parents** [3] - 107:16, 124:18, 156:16

**Park** [2] - 196:15, 230:16

**parole** [1] - 200:17

**part** [33] - 9:12, 13:12, 18:9, 18:10, 22:10, 78:7, 78:14, 84:17, 89:9, 103:6, 105:19, 106:18, 113:11, 132:25, 136:2, 143:17, 156:12, 171:5, 174:14, 176:6, 180:5,

184:23, 185:6, 188:25, 195:5, 201:17, 203:3, 203:7, 209:9, 209:10, 209:17, 210:6, 212:16

**part-time** [2] - 78:7, 78:14

**partially** [2] - 84:23, 138:6

**participate** [1] - 100:6

**participates** [1] - 117:14

**particular** [6] - 30:4, 45:4, 45:7, 47:20, 48:1, 173:12

**particularized** [1] - 75:12

**particularly** [2] - 91:22, 119:7

**parties** [6] - 29:13, 35:22, 61:4, 71:24, 74:1, 165:15

**partners** [1] - 216:7

**Partnership** [2] - 208:23, 208:25

**party** [5] - 38:11, 39:14, 66:17, 166:24, 167:3

**pass** [1] - 119:13

**passage** [1] - 17:7

**past** [6] - 42:5, 95:1, 126:5, 213:12, 223:2, 229:18

**pastor** [1] - 210:14

**path** [1] - 78:3

**pathetic** [1] - 108:12

**patient** [6] - 22:24, 203:22, 208:7, 214:25, 215:2

**patients** [4] - 156:12, 216:15, 216:16

**patrol** [2] - 79:18, 111:14

**patrolling** [1] - 111:11

**patterns** [1] - 41:14

**PAUL** [2] - 2:3, 5:9

**Pause** [4] - 21:12, 29:6, 48:10, 167:7

**pause** [1] - 97:6

**pay** [10] - 104:4, 105:13, 120:12, 135:24, 135:25, 136:1, 136:2, 137:15, 161:12, 206:19

**payer** [2] - 206:19, 207:2

**paying** [3] - 156:24, 157:5, 157:8

**payments** [1] - 206:18
**pays** [3] - 46:5, 156:8, 156:17
**peak** [1] - 93:12
**peaked** [3] - 154:18, 154:20, 154:21
**PEARL** [1] - 3:6
**peer** [14] - 55:15, 209:24, 213:24, 215:24, 218:12, 218:15, 221:7, 221:18, 224:20, 226:22, 227:1, 231:12, 231:13
**peer-based** [1] - 215:24
**peer-reviewed** [1] - 55:15
**peers** [1] - 222:12
**PEIA** [1] - 213:17
**Penn** [3] - 66:1, 66:5, 66:10
**Pennsylvania** [1] - 193:9
**Pensacola** [1] - 2:14
**people** [120] - 8:1, 8:11, 11:10, 64:3, 76:4, 83:16, 90:23, 92:16, 93:20, 93:21, 94:20, 95:9, 95:17, 96:8, 98:1, 98:3, 98:8, 98:24, 99:6, 99:14, 99:21, 101:3, 102:12, 102:22, 103:12, 103:22, 104:3, 105:17, 105:21, 107:7, 107:11, 114:3, 115:17, 116:11, 116:15, 117:9, 117:11, 118:7, 118:24, 120:12, 120:14, 121:3, 121:8, 121:11, 121:15, 121:17, 121:18, 126:6, 129:15, 131:21, 133:3, 136:17, 136:19, 137:22, 145:9, 150:1, 150:5, 150:7, 150:19, 150:21, 151:2, 151:4, 151:11, 151:18, 151:22, 152:20, 152:21, 154:13, 155:10, 156:23, 156:24, 157:10, 157:15, 158:15, 160:4, 160:5, 161:12,

180:25, 181:11, 181:14, 181:25, 184:20, 185:25, 186:10, 187:16, 189:3, 200:4, 200:5, 200:6, 200:12, 200:13, 203:5, 203:8, 205:10, 205:11, 205:14, 208:5, 212:6, 212:10, 212:15, 213:13, 215:10, 216:17, 217:5, 217:23, 222:18, 222:21, 223:3, 223:19, 226:10, 230:5, 231:20, 233:1, 233:16, 233:18, 234:15
**People** [2] - 152:11, 235:24
**people's** [1] - 185:7
**PEP** [4] - 208:22, 208:23, 209:12, 209:14
**per** [6] - 10:13, 16:12, 16:13, 16:20, 100:15
**percent** [32] - 54:5, 54:14, 54:15, 54:24, 55:5, 55:19, 60:1, 60:8, 93:3, 93:7, 98:16, 98:17, 105:20, 107:22, 113:16, 115:17, 117:19, 120:7, 135:10, 138:7, 145:17, 146:12, 146:13, 147:13, 155:1, 157:20, 185:24, 223:3, 229:10
**percentage** [7] - 74:18, 76:12, 104:3, 105:24, 135:23, 184:2, 229:6
**percentages** [1] - 50:18
**perception** [3] - 59:9, 74:14, 74:20
**perceptions** [1] - 234:18
**Perfect** [1] - 220:3
**perfect** [1] - 221:25
**perfectly** [1] - 46:14
**perform** [2] - 51:23, 101:2
**perhaps** [1] - 74:9
**period** [32] - 8:9, 8:12, 8:16, 8:20, 10:16, 11:1, 11:18, 16:6,

16:14, 17:24, 36:21, 41:3, 80:1, 81:10, 87:1, 87:6, 87:12, 89:13, 91:8, 92:4, 104:17, 104:20, 121:21, 122:16, 122:18, 122:21, 149:19, 152:25, 197:19, 208:9, 229:14
**Period** [1] - 14:17
**periods** [2] - 8:2, 75:25
**permissible** [2] - 75:6, 76:16
**permission** [3] - 162:20, 172:10, 227:24
**permit** [1] - 39:5
**person** [28] - 46:2, 59:19, 105:3, 105:11, 106:20, 115:3, 117:23, 120:14, 120:15, 134:21, 140:6, 145:5, 156:22, 172:2, 178:15, 180:21, 181:2, 187:4, 199:17, 199:23, 206:16, 206:22, 207:13, 212:7, 215:19, 216:3, 224:25, 225:2
**person-centered** [1] - 225:2
**personal** [10] - 88:10, 90:5, 116:5, 125:4, 147:2, 147:7, 153:18, 157:19, 157:22, 158:1
**personally** [7] - 91:25, 124:22, 141:18, 169:18, 174:16, 176:22, 184:12
**personnel** [2] - 12:2, 20:22
**perspective** [1] - 86:14
**PETER** [1] - 2:12
**Peterson** [1] - 176:9
**petit** [4] - 99:15, 100:3, 105:15, 105:22
**Petrany** [1] - 202:18
**Ph.D** [1] - 194:4
**Pharmaceutical** [4] - 29:24, 31:21, 31:25, 32:9
**pharmaceutical** [3] - 30:14, 31:3, 41:14

**pharmacies** [11] - 10:13, 20:5, 20:12, 20:18, 26:22, 44:5, 45:6, 45:23, 121:22, 122:9, 152:16
**pharmacist** [6] - 23:4, 23:5, 45:14, 45:17, 46:1, 46:7
**pharmacists** [1] - 45:6
**pharmacological** [1] - 215:24
**pharmacy** [18] - 10:23, 16:13, 16:20, 17:23, 20:17, 22:19, 26:4, 26:7, 26:25, 45:20, 46:3, 46:5, 67:22, 70:9, 121:25, 139:11, 152:20, 200:1
**Pharmacy** [9] - 20:11, 20:14, 20:16, 20:22, 21:1, 22:5, 23:7, 26:20, 139:1
**Pharmacy's** [1] - 138:21
**phase** [1] - 80:19
**phenomenal** [1] - 213:9
**Philadelphia** [2] - 6:6, 6:13
**philanthropy** [1] - 211:23
**philosophical** [1] - 193:13
**philosophy** [1] - 193:11
**phone** [5] - 18:15, 18:17, 48:13, 106:19, 180:18
**phones** [1] - 204:10
**phoning** [1] - 123:7
**photography** [1] - 205:7
**physical** [5] - 212:12, 212:17, 213:17, 218:22, 231:19
**physically** [2] - 90:25, 114:4
**physician** [2] - 139:13, 231:9
**physicians** [2] - 121:23, 215:12
**pick** [3] - 17:24, 116:17, 196:4
**picked** [5] - 114:21, 131:18, 210:24, 219:17, 224:11
**picture** [2] - 82:16, 86:13, 205:6
**piece** [2] - 222:16,

234:1
**PIFKO** [1] - 3:16
**pilfering** [1] - 116:14
**Pill** [1] - 152:5
**pill** [6] - 85:17, 89:4, 122:13, 132:15, 133:25, 152:20
**pills** [50] - 16:20, 54:5, 60:1, 60:15, 60:16, 75:22, 84:10, 85:14, 85:16, 89:3, 89:22, 90:1, 90:12, 91:3, 92:6, 92:23, 94:25, 100:20, 110:12, 118:23, 132:19, 133:21, 148:13, 148:16, 148:18, 148:25, 149:4, 149:5, 149:9, 149:18, 149:25, 150:9, 150:13, 150:16, 150:22, 150:24, 151:6, 151:14, 151:19, 151:23, 152:18, 153:6, 153:14, 153:17, 153:20, 173:19, 174:1, 231:21
**pilot** [1] - 211:21
**pinnacle** [2] - 155:4, 155:5
**Place** [2] - 227:13, 227:19
**place** [9] - 9:18, 10:10, 33:11, 96:25, 97:1, 121:4, 196:2, 213:3, 230:9
**placed** [1] - 44:4
**placement** [2] - 115:3, 216:13
**places** [6] - 93:14, 122:5, 161:7, 161:21, 185:18
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**PLAINTIFF** [1] - 77:4
**Plaintiffs** [2] - 65:1, 237:6
**plaintiffs** [9] - 8:25, 67:8, 68:8, 68:9, 74:2, 74:6, 190:8, 190:23, 191:2
**PLAINTIFFS'** [1] - 190:17
**plaintiffs'** [3] - 7:17, 64:14, 142:8
**plan** [2] - 156:14, 156:17
**plane** [1] - 151:23

**plant** [1] - 119:18
**platform** [1] - 106:5
**plausible** [1] - 10:6
**play** [6] - 107:13,
110:21, 126:23,
127:1, 235:1
**played** [3] - 12:1,
57:17, 171:5
**playground** [1] -
107:14
**playing** [1] - 73:6
**plays** [1] - 132:25
**plea** [14] - 64:24,
65:18, 66:7, 66:14,
66:20, 67:1, 67:20,
68:22, 69:4, 69:5,
69:8, 69:13, 69:25,
70:9
**pleadings** [1] - 35:20
**Pleasant** [3] - 3:15,
4:4, 4:9
**pleased** [1] - 7:13
**pled** [3] - 65:19, 68:15,
70:2
**plenty** [1] - 123:3
**plethora** [1] - 182:12
**plug** [1] - 97:9
**plus** [1] - 104:23
**PMP** [1] - 42:21
**poaching** [1] - 37:8
**podium** [1] - 73:18
**point** [50] - 10:21,
17:16, 17:22, 18:1,
18:2, 23:14, 23:18,
31:19, 34:12, 35:19,
36:7, 37:17, 37:18,
37:20, 37:21, 37:25,
38:2, 38:8, 39:7,
48:5, 50:9, 51:22,
56:5, 56:9, 57:18,
74:3, 81:4, 83:24,
86:2, 88:21, 90:19,
91:3, 98:14, 110:15,
114:16, 114:25,
145:23, 149:1,
149:25, 155:4,
155:6, 155:7, 160:6,
164:8, 181:1,
191:19, 194:13,
219:14, 235:18
**Point** [2] - 192:22,
196:9
**pointing** [1] - 60:17
**points** [3] - 70:8,
147:1, 190:19
**Police** [55] - 78:7,
78:9, 78:15, 78:17,
79:6, 79:8, 79:14,
80:18, 81:11, 81:23,
82:14, 83:2, 83:4,

83:23, 84:2, 84:4,
84:13, 88:18, 88:21,
88:23, 89:13, 90:2,
93:10, 93:22, 93:23,
113:10, 118:8,
122:16, 122:22,
128:12, 128:23,
128:25, 129:4,
129:9, 129:17,
130:6, 130:16,
139:4, 141:23,
142:2, 142:3, 142:6,
143:2, 146:22,
147:11, 149:22,
149:24, 158:9,
159:6, 159:12,
169:9, 170:6,
170:10, 183:23,
212:19
**police** [4] - 82:18,
123:9, 212:13,
212:22
**policies** [1] - 83:25
**policing** [2] - 78:23,
79:2
**Policy** [3] - 202:1,
202:22, 214:11
**policy** [4] - 11:6, 11:7,
14:7, 32:1
**politicians** [1] -
174:21
**Ponc** [1] - 2:4
**Ponce** [1] - 2:16
**poor** [1] - 220:21
**pop** [1] - 235:3
**popular** [3] - 178:3,
178:5, 178:6
**population** [6] - 104:2,
104:24, 180:8,
203:23, 217:9, 229:6
**populations** [1] -
221:9
**populous** [2] - 83:13,
92:21
**portion** [2] - 31:22,
31:24
**portions** [1] - 40:9
**Portsmouth** [1] -
214:12
**pose** [1] - 95:16
**position** [21] - 35:7,
35:8, 36:1, 37:5,
45:18, 61:9, 70:12,
70:13, 71:8, 75:13,
78:12, 81:17, 84:4,
194:18, 196:14,
198:9, 198:14,
199:6, 199:24,
201:16, 202:3
**positions** [2] - 65:12,

197:21
**positive** [2] - 138:8,
222:21
**possession** [1] -
134:18
**possibility** [1] - 95:15
**possible** [1] - 61:8
**possibly** [1] - 187:12
**post** [2] - 79:11,
220:21
**post-delivery** [1] -
220:21
**potent** [4] - 95:18,
96:5, 96:6, 178:12
**potential** [3] - 55:18,
74:3, 137:6
**potentially** [2] -
197:11, 208:10
**powder** [2] - 174:3,
178:10
**Powell** [1] - 2:6
**power** [1] - 226:10
**powerful** [1] - 233:25
**PowerPoint** [4] -
191:20, 195:21,
196:22, 196:25
**PPF** [1] - 217:10
**PPW** [1] - 217:9
**PR** [2] - 2:5, 2:17
**practical** [1] - 11:22
**practice** [4] - 11:4,
54:8, 190:24, 235:14
**practices** [1] - 207:7
**practitioner** [1] -
42:15
**pre** [3] - 57:21, 89:5,
89:6
**pre-2008** [1] - 48:24
**pre-break-up** [1] -
89:6
**pre-fight** [1] - 57:21
**predecessor** [1] -
131:23
**predominantly** [13] -
81:2, 83:12, 101:12,
106:17, 118:16,
120:10, 121:13,
148:19, 149:7,
149:9, 149:14,
178:21, 180:24
**prefer** [3] - 30:10,
63:10
**pregnant** [10] -
217:10, 217:11,
217:23, 219:14,
219:16, 220:1,
220:11, 220:20,
224:9, 224:14
**prep** [1] - 227:5
**prepared** [3] - 61:3,

62:16, 140:11
**prescribe** [1] - 231:10
**prescribed** [1] - 25:21
**prescriber** [1] - 42:15
**prescribing** [2] -
53:13, 85:18
**prescription** [15] -
41:16, 42:20, 46:2,
53:7, 59:11, 74:12,
76:11, 85:19, 88:14,
92:5, 133:21,
138:22, 150:23,
150:25, 188:5
**prescriptions** [6] -
25:21, 53:6, 53:10,
56:13, 150:22,
151:15
**presence** [1] - 107:5
**present** [6] - 39:2,
39:12, 39:17, 96:20,
159:18, 233:16
**presentation** [1] -
59:10
**presented** [3] - 38:6,
67:16, 234:21
**presenting** [1] - 58:24
**press** [3] - 174:20,
176:6, 176:23
**pressing** [1] - 169:3
**Prestera** [4] - 105:8,
114:22, 196:13,
197:18
**pretty** [23] - 26:10,
57:24, 81:15, 84:8,
84:16, 84:20, 93:11,
103:6, 111:23,
113:11, 123:4,
126:25, 131:20,
133:24, 154:15,
156:1, 168:6, 169:6,
169:7, 170:8, 204:7,
219:1, 228:15
**prevalence** [3] -
88:14, 92:5, 129:21
**prevalent** [16] - 88:19,
95:1, 102:21,
128:20, 130:9,
130:12, 130:13,
130:14, 131:6,
149:19, 149:25,
152:13, 158:9,
160:6, 161:23,
186:20
**Prevent** [1] - 47:9
**prevent** [5] - 13:16,
18:7, 44:10, 233:17,
233:18
**prevention** [6] -
207:24, 208:19,
209:3, 209:13,

212:25, 223:18
**Prevention** [5] - 81:7,
118:10, 208:23,
208:25, 209:18
**previous** [1] - 208:21
**previously** [7] - 10:5,
38:15, 66:25, 71:13,
103:8, 208:24, 225:6
**Priddy** [4] - 117:12,
189:17, 208:4,
211:13
**pride** [1] - 225:1
**primarily** [1] - 186:23
**primary** [7] - 43:5,
102:16, 102:18,
202:14, 203:1,
213:20, 230:13
**principal** [2] - 52:20,
53:1
**principals** [1] - 110:3
**principles** [1] - 52:24
**print** [2] - 142:16,
207:6
**priority** [1] - 203:17
**prison** [5] - 104:2,
104:3, 104:4,
104:24, 181:4
**privacy** [1] - 39:1
**private** [3] - 82:21,
129:1, 156:9
**privy** [1] - 174:15
**PROACT** [5] - 215:3,
215:4, 215:15,
216:15, 216:19
**probation** [1] - 200:17
**problem** [24] - 53:16,
71:24, 94:24, 95:7,
97:15, 104:22,
107:17, 114:23,
129:17, 129:21,
130:7, 132:15,
132:20, 144:11,
145:12, 159:1,
159:18, 167:17,
171:17, 177:6,
177:16, 177:20,
188:17, 188:23
**problems** [14] - 53:15,
75:22, 92:5, 97:25,
109:6, 115:14,
121:1, 124:5,
129:23, 132:2,
169:3, 179:9,
183:14, 188:20
**procedures** [1] - 83:25
**proceed** [3] - 7:7,
28:25, 148:3
**proceeding** [2] -
30:22, 37:10
**proceedings** [1] -

237:5
**Proceedings** [2] - 6:19, 177:9
**PROCEEDINGS** [1] - 7:1
**process** [9] - 22:11, 62:13, 112:18, 114:21, 149:2, 189:1, 189:5, 194:15, 228:20
**Proctor** [1] - 2:12
**procurement** [1] - 81:21
**produced** [4] - 6:19, 13:1, 13:5, 15:23
**product** [1] - 52:23
**production** [1] - 42:3
**professional** [1] - 213:14
**professionals** [4] - 210:11, 210:12, 219:2, 231:6
**professions** [1] - 199:10
**proffer** [1] - 38:9
**proffered** [1] - 56:16
**proffering** [1] - 55:16
**profile** [1] - 129:11
**program** [28] - 8:18, 11:12, 11:15, 11:16, 12:3, 42:21, 78:4, 81:5, 106:13, 107:19, 110:2, 117:17, 196:18, 203:18, 206:20, 211:23, 211:24, 213:11, 216:12, 217:22, 219:19, 219:24, 223:1, 224:10, 224:11, 226:25, 231:20, 233:3
**Program** [2] - 81:2, 211:15
**programming** [2] - 203:12, 207:3
**Programming** [1] - 194:21
**programs** [15] - 53:2, 111:21, 196:1, 197:4, 198:24, 205:24, 208:19, 214:7, 224:2, 227:7, 227:13, 230:20, 230:23, 231:19, 233:2
**Programs** [1] - 209:18
**progress** [3] - 154:16, 155:8, 155:9
**progressed** [1] - 17:14

**prohibited** [1] - 65:1
**project** [2] - 165:15, 199:6
**Project** [8] - 220:24, 221:16, 223:16, 224:3, 226:3, 226:19, 226:23, 228:15
**projects** [3] - 201:21, 203:20, 224:3
**prolonged** [3] - 221:12, 229:20, 229:21
**prom** [1] - 170:22
**prominent** [5] - 85:15, 89:14, 148:14, 160:25, 170:8
**prominently** [1] - 81:15
**promise** [3] - 159:19, 177:14, 177:15
**promote** [3] - 218:9, 227:3, 234:5
**promoted** [2] - 81:3, 81:19
**promotion** [4] - 207:22, 208:13, 208:18, 212:24
**Promotion** [1] - 209:18
**prompt** [2] - 197:1, 197:5
**promptly** [1] - 236:1
**proper** [6] - 19:23, 42:22, 76:1, 76:5, 91:23, 192:2
**properly** [2] - 52:25, 187:8
**property** [2] - 99:17, 120:12
**proposition** [1] - 54:4
**propositions** [1] - 59:13
**prosecutor** [2] - 105:7, 176:1
**prostitution** [3] - 99:15, 100:3, 105:15
**protection** [2] - 79:23, 95:25
**Protective** [1] - 110:8
**protective** [1] - 209:7
**proud** [2] - 182:15, 230:6
**prove** [3] - 157:24, 206:25, 232:18
**proven** [1] - 59:12
**provide** [11] - 62:20, 66:16, 66:21, 198:24, 200:13, 209:21, 211:19,

217:23, 226:20, 231:6, 231:11
**provided** [4] - 31:10, 35:12, 218:1, 229:1
**Provider** [1] - 215:16
**provider** [3] - 195:8, 196:16, 216:1
**providers** [2] - 135:9, 200:21
**provides** [3] - 65:21, 173:11, 224:15
**providing** [2] - 117:25, 225:13
**province** [1] - 91:18
**provision** [3] - 43:12, 45:4, 45:8
**provisions** [1] - 40:11
**psychiatric** [1] - 215:23
**psychologist** [1] - 218:19
**psychology** [4] - 193:11, 200:1, 218:22, 231:18
**public** [9] - 36:12, 41:16, 58:5, 95:25, 105:6, 123:10, 125:6, 163:3, 167:4
**publication** [1] - 234:22
**publicity** [2] - 119:15, 119:16
**pull** [6] - 11:24, 101:14, 125:22, 134:13, 179:18, 187:18
**pulled** [4] - 8:25, 60:11, 125:20, 201:19
**pulling** [1] - 188:18
**pulse** [2] - 81:14, 90:24
**pump** [1] - 156:21
**punishable** [1] - 67:23
**purchase** [3] - 11:22, 14:18, 15:10
**Purchase** [1] - 14:11
**pure** [3] - 53:23, 130:21, 178:12
**purports** [2] - 54:14, 55:2
**purpose** [9] - 12:17, 23:20, 24:12, 25:8, 47:7, 58:15, 58:24, 59:20, 60:22
**purposes** [3] - 13:21, 48:23
**pursuant** [4] - 14:23, 15:2, 35:13, 123:10
**Pursuant** [1] - 15:5

**pursue** [2] - 83:20, 85:3
**pursued** [2] - 212:12
**put** [30] - 26:2, 38:8, 52:19, 56:22, 61:22, 83:6, 99:1, 100:15, 102:13, 105:5, 105:18, 111:1, 111:4, 111:6, 116:18, 116:25, 117:22, 137:17, 137:18, 148:15, 162:9, 163:15, 167:16, 195:21, 197:5, 205:3, 212:16, 213:3, 216:25, 226:11
**Putnam** [3] - 214:21, 214:22, 223:12
**putting** [3] - 165:20, 179:17, 188:17

---

**Q**

**QRT** [3] - 117:7, 117:20, 214:5
**qualify** [1] - 204:11
**Quality** [1] - 234:6
**quality** [1] - 62:22
**quantities** [2] - 132:16, 132:19
**quarter** [1] - 41:10
**quarterback** [1] - 125:19
**quarterly** [2] - 40:18, 41:3
**questionable** [1] - 127:19
**questioned** [3] - 65:25, 69:17, 69:18
**questioning** [3] - 49:24, 65:3, 166:17
**questions** [20] - 7:22, 22:10, 25:6, 26:15, 27:14, 28:17, 28:21, 29:13, 48:1, 68:18, 70:13, 70:18, 127:12, 128:9, 145:24, 147:18, 166:13, 183:8, 199:16, 199:18
**QUEZON** [10] - 190:7, 190:8, 191:9, 192:1, 192:9, 195:11, 195:14, 197:7, 197:15, 235:18
**Quezon** [1] - 190:8
**Quick** [9] - 117:8, 208:3, 214:8, 214:10, 214:15,

214:18, 214:22, 223:15
**quick** [2] - 144:11, 190:19
**quickly** [7] - 9:21, 22:13, 57:2, 69:1, 188:6, 212:5, 220:5
**quite** [7] - 47:25, 67:9, 92:23, 135:4, 151:10, 174:12, 182:4
**quotas** [3] - 41:24, 41:25, 42:2
**quote** [5] - 30:6, 30:8, 32:5, 32:6, 182:6
**quote/unquote** [1] - 201:16

---

**R**

**Rader** [1] - 211:13
**radio** [2] - 234:25, 235:1
**Rafalski** [24] - 7:5, 7:11, 28:13, 28:18, 33:16, 36:6, 36:13, 37:23, 38:22, 39:23, 40:4, 41:11, 48:19, 52:8, 52:9, 58:14, 59:19, 64:10, 64:11, 71:4, 71:12, 72:15, 72:18, 72:19
**Rafalski's** [1] - 52:17
**Rafferty** [1] - 2:12
**rage** [1] - 93:12
**raging** [4] - 85:24, 91:5, 94:10, 96:23
**raid** [5] - 89:23, 170:8, 170:11, 170:12, 171:13
**raids** [2] - 89:2, 89:12
**rails** [1] - 185:12
**rainy** [2] - 138:15, 138:19
**raise** [6] - 12:16, 64:20, 77:2, 121:19, 124:19, 213:18
**Raise** [1] - 190:16
**raised** [4] - 29:18, 32:1, 32:5, 32:10
**raising** [3] - 107:9, 107:10
**rallies** [1] - 209:12
**rally** [1] - 209:14
**ran** [6] - 19:6, 84:24, 85:8, 106:5, 234:19, 234:20
**Rannazzisi** [2] - 11:21, 39:18
**rare** [3] - 93:1, 94:13,

94:16
**rate** [7] - 43:13, 54:14, 55:18, 55:19, 115:9, 115:11, 223:3
**rather** [2] - 209:7, 225:3
**re** [2] - 112:2, 225:18
**re-equip** [1] - 112:2
**re-submittal** [1] - 225:18
**reach** [1] - 181:13
**reached** [1] - 204:16
**reaching** [1] - 100:17
**read** [12] - 23:7, 24:6, 26:2, 30:8, 30:18, 31:20, 41:17, 42:9, 175:17, 187:21, 187:24, 187:25
**readily** [2] - 65:24, 137:2
**reading** [3] - 30:23, 165:9, 173:23
**ready** [10] - 76:19, 117:16, 177:11, 216:25, 222:20, 231:6, 231:8, 231:10, 232:10, 232:12
**real** [7] - 54:11, 55:13, 55:21, 59:25, 152:24, 178:24, 197:25
**reality** [1] - 57:19
**realize** [2] - 71:20, 72:10
**realized** [1] - 231:25
**really** [28] - 34:17, 85:14, 86:12, 91:21, 92:22, 94:10, 134:22, 149:4, 153:9, 154:2, 160:24, 170:24, 175:14, 182:7, 182:8, 195:6, 200:20, 203:13, 205:5, 205:9, 210:2, 212:23, 213:10, 217:9, 223:1, 225:1, 225:13, 226:10
**realm** [1] - 75:12
**reason** [3] - 63:4, 138:13, 165:18
**reasonable** [3] - 19:19, 22:23, 65:22
**reasonably** [1] - 65:25
**reasons** [6] - 38:15, 53:22, 55:9, 84:24, 181:10, 204:21
**receive** [10] - 34:16, 78:23, 112:8,

122:12, 123:2, 215:20, 217:13, 219:12, 229:4, 231:5
**received** [8] - 73:1, 78:16, 193:8, 193:18, 193:24, 201:11, 203:10, 222:8
**receives** [1] - 230:25
**receiving** [6] - 207:13, 220:16, 221:19, 224:17, 224:20, 233:19
**recent** [6] - 115:15, 124:22, 140:5, 171:24, 188:3, 235:6
**recently** [10] - 71:2, 100:14, 100:22, 118:24, 135:7, 137:4, 153:2, 160:24, 214:16, 228:14
**recess** [2] - 73:13, 147:24
**Recess** [4] - 48:16, 73:14, 147:25, 177:8
**recessed** [1] - 236:4
**recitations** [2] - 39:2, 39:4
**recite** [1] - 16:22
**recognition** [1] - 117:18
**recognize** [12] - 14:4, 14:9, 15:6, 17:7, 17:11, 17:12, 34:21, 195:16, 195:18, 206:9, 217:8, 217:12
**recognized** [6] - 212:3, 220:5, 222:5, 224:9, 226:3, 230:24
**recognizing** [1] - 214:13
**recollection** [1] - 8:7
**reconsider** [1] - 68:4
**record** [22] - 13:14, 16:10, 18:14, 21:8, 22:24, 25:15, 31:20, 32:1, 33:11, 36:18, 36:20, 37:10, 38:21, 42:9, 46:13, 49:2, 76:23, 140:16, 163:3, 167:4, 190:12, 237:5
**recorded** [1] - 6:19
**Records** [2] - 81:1, 81:4
**records** [13] - 13:10, 17:18, 18:17, 22:15, 27:24, 28:3, 28:7, 37:7, 66:4, 123:10,

140:25, 141:23, 144:7
**recover** [1] - 205:12
**recovered** [3] - 89:24, 150:6, 150:8
**Recovery** [2] - 155:12, 204:25, 205:23, 206:9, 219:10, 232:6
**recovery** [36] - 97:13, 97:15, 115:19, 115:20, 115:21, 115:23, 116:10, 116:13, 131:20, 131:22, 155:15, 155:17, 156:3, 157:10, 157:13, 175:4, 188:24, 189:2, 207:23, 209:23, 209:24, 213:24, 215:25, 218:11, 218:12, 224:13, 225:20, 226:12, 231:14, 232:1, 232:13, 232:14, 233:1, 235:11
**recross** [2] - 52:4, 189:25
**recruit** [1] - 98:1
**recruited** [1] - 202:3
**red** [2] - 19:22, 19:24
**redeem** [1] - 120:14
**redirect** [3] - 28:23, 33:22, 183:10
**REDIRECT** [2] - 29:20, 183:17
**reduce** [1] - 188:5
**reduced** [4] - 117:19, 137:12, 137:13, 154:25
**reducing** [1] - 188:2
**reduction** [3] - 213:11, 214:4, 233:14
**Reed** [2] - 6:4, 6:11
**refer** [7] - 199:21, 210:1, 216:6, 216:9, 221:17, 222:15, 222:17
**reference** [4] - 30:1, 43:17, 45:7, 155:21
**referenced** [3] - 16:16, 40:11, 42:1
**references** [3] - 43:12, 43:24, 67:13
**Referral** [1] - 198:19
**referral** [4] - 208:6, 215:13, 215:20, 216:25
**referrals** [1] - 216:5
**referred** [2] - 39:23,

219:18
**referring** [1] - 211:11
**refers** [2] - 21:21, 38:22
**reflect** [1] - 13:17
**reflects** [1] - 75:7
**refrain** [1] - 58:1
**Refresh** [1] - 69:13
**refresh** [2] - 170:15, 172:18
**refute** [1] - 38:7
**regarding** [8] - 27:19, 35:8, 54:22, 74:18, 75:19, 122:13, 190:24, 211:13
**Regardless** [1] - 69:10
**regards** [3] - 18:17, 26:10, 208:18
**Regional** [5] - 105:12, 223:5, 223:11, 232:8, 233:6
**registrant** [6] - 32:5, 32:10, 32:15, 41:7, 42:25, 46:15
**registrants** [3] - 40:17, 43:25, 44:11
**registration** [4] - 43:1, 45:23, 46:3, 46:4
**regular** [1] - 152:11
**regularity** [1] - 62:13
**regularly** [2] - 45:23, 228:8
**regulation** [8] - 15:7, 15:8, 18:10, 44:6, 45:12, 45:16, 49:4, 50:23
**regulations** [4] - 11:17, 12:4, 13:8, 70:2
**regulator** [1] - 10:22
**regulators** [1] - 56:7
**Regulatory** [1] - 8:21
**regulatory** [1] - 18:11
**rehabs** [1] - 121:3
**reimburse** [1] - 135:23
**reimbursed** [2] - 135:20, 136:3
**reimbursement** [1] - 225:17
**reintegrating** [1] - 194:19
**reiterate** [1] - 104:13
**relate** [3] - 141:1, 143:23, 213:10
**related** [19] - 26:15, 43:14, 70:9, 74:1, 76:12, 99:18, 104:5, 115:8, 115:14, 118:15, 136:10, 140:23, 141:4,

141:17, 143:15, 146:21, 184:6, 186:1, 186:23
**relates** [7] - 34:2, 36:10, 74:17, 76:8, 137:6, 143:14
**relating** [4] - 45:8, 67:21
**relationship** [3] - 19:14, 219:4, 226:6
**relative** [3] - 9:7, 9:15, 39:9
**relatively** [1] - 7:14
**relayed** [1] - 87:16
**release** [3] - 32:21, 37:7, 39:5
**released** [2] - 36:12, 36:14
**relevance** [7] - 44:24, 69:13, 69:15, 124:7, 125:8, 127:17, 127:19
**relevant** [8] - 34:3, 38:16, 38:17, 38:18, 54:10, 125:6, 134:25, 166:4
**reliability** [5] - 54:1, 56:20, 60:6, 153:7, 178:14
**reliable** [4] - 52:23, 55:8, 59:22, 232:16
**relied** [1] - 37:24
**religious** [1] - 193:13
**relocate** [1] - 196:7
**relocated** [2] - 196:8, 196:10
**rely** [4] - 55:2, 144:14, 153:6, 162:8
**remain** [1] - 52:1
**remember** [14] - 15:25, 18:24, 32:18, 95:23, 119:4, 134:10, 170:18, 170:22, 170:23, 172:4, 172:13, 172:15, 172:17, 175:16
**reminder** [1] - 190:20
**remove** [3] - 77:10, 96:10, 230:3
**removing** [1] - 228:24
**renew** [3] - 52:18, 56:23
**renews** [1] - 20:17
**renovated** [1] - 226:16
**rent** [1] - 226:7
**repeat** [1] - 97:8
**repeatedly** [1] - 70:13
**repeating** [1] - 50:3
**replacement** [1] -

188:6
**replacing** [1] - 103:12
**reply** [1] - 63:15
**report** [28] - 14:8,
14:14, 14:19, 15:10,
15:17, 16:15, 20:19,
20:22, 21:1, 27:7,
27:9, 27:10, 40:7,
40:9, 40:17, 43:8,
43:17, 46:12, 47:2,
47:10, 51:21, 51:25,
52:1, 109:9, 109:21,
118:21, 140:14,
183:2
**Report** [3] - 14:11,
49:3, 49:4
**reportable** [1] - 144:24
**reported** [9] - 33:8,
35:5, 51:4, 51:12,
51:17, 94:2, 123:9,
184:2, 237:9
**reporter** [2] - 164:9,
173:2
**REPORTER** [3] - 97:4,
97:9, 109:24
**Reporter** [6] - 6:17,
6:18, 237:3, 237:12
**reporters** [1] - 177:5
**reporting** [8] - 41:2,
47:8, 49:3, 50:23,
51:3, 56:10, 58:17,
58:18
**reports** [23] - 11:22,
12:20, 13:12, 14:5,
14:6, 26:21, 46:15,
48:24, 65:16, 65:20,
81:5, 81:6, 90:21,
109:22, 110:5,
118:20, 122:12,
123:2, 140:25,
145:1, 158:7, 158:8
**represent** [2] - 128:6,
148:9
**representation** [2] -
32:20, 32:25
**representations** [3] -
21:13, 35:23, 166:6
**represents** [1] - 234:1
**request** [9] - 22:20,
35:1, 36:11, 37:8,
63:2, 64:19, 66:15,
66:19, 72:12
**requested** [1] - 37:14
**requesting** [1] - 65:17
**requests** [2] - 66:17,
131:8
**require** [7] - 81:24,
84:5, 96:15, 118:1,
144:7, 209:22
**required** [8] - 13:10,

13:14, 56:21,
221:19, 226:24,
231:10, 231:11
**requirement** [2] -
30:14, 30:17
**requires** [5] - 50:23,
52:22, 189:20
**Research** [1] - 203:17
**research** [6] - 195:6,
198:25, 199:5,
203:11, 203:15,
210:17
**reside** [2] - 192:18,
225:15
**resident** [2] - 80:6,
90:5
**residential** [7] -
196:17, 208:8,
208:15, 223:23,
224:2, 224:8, 224:24
**residents** [1] - 196:17
**residual** [2] - 67:6,
69:11
**resiliency** [1] - 205:12
**resolve** [1] - 69:9
**resource** [3] - 106:4,
138:6, 211:9
**resources** [12] - 98:6,
103:16, 107:21,
108:22, 109:7,
111:10, 113:7,
113:14, 155:9,
182:2, 189:20,
215:12
**Resources** [1] - 110:7
**respect** [11] - 57:10,
65:15, 69:2, 70:6,
75:20, 84:6, 88:13,
88:24, 90:18, 102:9,
188:20
**respectfully** [4] -
87:23, 91:15,
127:15, 153:19
**respond** [9] - 39:16,
57:5, 63:24, 68:25,
70:17, 74:23, 140:8,
140:10, 140:20
**responders** [2] -
211:20, 211:24
**responding** [4] -
86:21, 100:24,
118:6, 140:17
**Response** [10] -
117:8, 208:3, 214:8,
214:10, 214:15,
214:18, 214:22,
215:16, 223:15
**response** [13] - 55:4,
63:12, 63:25,
201:24, 202:21,

204:20, 204:22,
205:11, 206:10,
207:16, 210:7,
221:5, 231:1
**responsibilities** [10] -
8:8, 8:14, 8:22, 9:14,
68:14, 68:20, 79:15,
83:22, 102:10, 203:1
**responsibility** [10] -
9:12, 42:25, 43:6,
45:8, 45:19, 45:25,
71:21, 114:12,
168:17, 168:20
**responsible** [3] - 42:2,
59:15, 111:23
**responsive** [2] -
203:13, 212:4
**rest** [2] - 24:19, 72:1
**restored** [2] - 135:7,
135:11
**result** [12] - 32:14,
46:12, 47:12, 99:11,
102:8, 103:7, 106:2,
108:22, 119:25,
170:21, 221:12,
230:5
**resulted** [2] - 138:5,
188:21
**resulting** [1] - 118:7
**results** [1] - 55:8
**resumed** [1] - 177:9
**retained** [5] - 17:21,
17:23, 74:4, 190:23,
191:2
**retention** [5] - 13:13,
13:17, 17:18, 18:6,
32:1
**retire** [2] - 82:18,
84:13
**retired** [2] - 128:14,
128:23
**retrospective** [1] -
206:8
**reunification** [1] -
229:2
**rev** [1] - 103:18
**Reverse** [2] - 221:23,
222:10
**reversed** [1] - 102:22
**review** [9] - 10:20,
26:18, 27:24, 28:7,
53:18, 55:7, 55:15,
57:6, 61:1, 109:23,
118:21, 158:8
**reviewed** [6] - 11:4,
40:21, 20:25, 27:1,
55:15, 90:21
**reviewing** [1] - 186:1
**reviews** [1] - 20:16
**revisit** [1] - 46:13

**revoked** [1] - 45:23
**Revolver** [1] - 235:5
**Ribbon** [1] - 194:20
**Rice** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**rich** [1] - 110:1
**rid** [1] - 115:4
**ride** [2] - 115:25,
218:7
**rightly** [1] - 29:9
**rights** [1] - 159:9
**ring** [1] - 170:17
**rise** [1] - 81:18
**risk** [4] - 95:14,
219:21, 228:10,
228:18
**Rite** [21] - 15:24, 16:2,
17:1, 18:11, 18:15,
18:18, 18:20, 19:13,
19:14, 19:16, 19:17,
20:8, 21:21, 21:24,
26:8, 26:22, 27:3,
27:15, 27:19, 28:5,
28:8
**Rite-Aid** [14] - 16:2,
18:11, 18:15, 18:18,
18:20, 19:13, 19:14,
19:16, 19:17, 21:21,
26:8, 26:22, 27:15,
28:8
**Rite-Aids** [7] - 15:24,
17:1, 20:8, 21:24,
27:3, 27:19, 28:5
**River** [3] - 195:4,
195:8, 230:15
**Rivers** [4] - 223:5,
223:11, 233:6, 233:9
**RMR** [2] - 6:17, 6:18
**Road** [3] - 204:24,
205:23, 206:9
**road** [8] - 79:16,
79:18, 84:3, 95:11,
102:13, 111:11,
111:14, 124:15
**ROBERT** [1] - 6:11
**Robert** [4] - 172:2,
172:4, 172:15, 174:6
**ROBERTSON** [1] - 3:6
**rock** [1] - 235:2
**role** [17] - 9:7, 9:8,
20:14, 59:3, 81:24,
86:20, 88:25, 89:9,
96:19, 102:14,
107:11, 114:9,
128:18, 128:22,
129:15, 201:14,
203:14
**roles** [1] - 102:22
**roll** [2] - 181:9, 232:20
**room** [2] - 194:1,

221:8
**rooms** [1] - 226:18
**rooted** [1] - 75:8
**Roses** [2] - 234:24,
235:5
**rotation** [2] - 211:4
**roughly** [3] - 79:9,
84:14, 98:12
**rounded** [1] - 216:3
**routine** [2] - 194:9,
199:11
**routinely** [1] - 45:22
**row** [1] - 82:3
**RPR** [1] - 6:18
**RPR-RMR-CRR-
FCRR** [1] - 6:18
**RUBY** [5] - 4:17,
190:18, 191:18,
192:7, 196:21
**Ruby** [5] - 4:17,
191:12, 191:17,
192:6, 197:12
**Rule** [5] - 52:22,
65:21, 66:16, 67:3,
75:2
**rule** [8] - 29:18, 31:19,
45:13, 57:7, 60:25,
61:3, 166:15, 197:7
**ruled** [3] - 67:1, 67:7,
190:25
**rules** [5] - 45:12,
66:16, 67:10, 75:2,
110:22
**ruling** [3] - 62:20,
68:17, 70:21
**run** [7] - 117:19,
157:24, 164:17,
164:19, 165:13,
172:2, 174:8
**running** [6] - 8:18,
59:23, 84:15, 98:8,
98:24, 126:16
**runs** [1] - 140:19
**rural** [1] - 222:10
**rush** [1] - 62:21

**S**

**s\Ayme** [1] - 237:11
**s\Lisa** [1] - 237:11
**sacrifice** [2] - 111:13,
111:25
**sad** [2] - 108:12,
234:12
**Saddle** [1] - 179:11
**safe** [2] - 226:11,
226:12
**safely** [1] - 228:19
**safer** [2] - 131:12,
131:13

**Safety** [2] - 80:16, 113:10
**safety** [3] - 41:16, 81:8, 111:25
**Saigon** [3] - 175:23, 176:4, 176:8
**salary** [1] - 136:3
**SALGADO** [1] - 4:15
**SAMHSA** [5] - 198:21, 198:22, 198:24, 201:5, 224:8
**SAMHSA's** [1] - 198:20
**sampling** [1] - 205:24
**San** [2] - 2:5, 2:17
**sat** [2] - 197:23, 198:2
**satisfied** [1] - 20:1
**save** [2] - 98:20, 182:11
**saved** [3] - 105:20, 135:9, 137:25
**saving** [3] - 99:6, 233:19, 233:20
**saw** [18] - 11:10, 12:15, 75:25, 89:1, 90:21, 94:13, 94:17, 101:3, 112:22, 120:2, 150:6, 150:11, 150:16, 155:4, 182:25, 194:24, 205:11, 205:12
**SBIRT** [14] - 198:15, 198:17, 198:18, 199:9, 200:23, 201:12, 209:17, 209:19, 209:21, 209:25, 210:5, 210:10, 211:19, 224:4
**SBIRTs** [1] - 199:2
**SC** [3] - 3:15, 4:4, 4:9
**scale** [2] - 44:9, 208:14
**Schedule** [2] - 50:24
**scheduling** [2] - 71:2, 84:1
**SCHMIDT** [50] - 5:9, 7:7, 7:9, 7:10, 7:18, 7:21, 11:24, 12:8, 13:23, 13:25, 14:3, 21:3, 21:6, 21:17, 21:18, 28:12, 29:8, 31:4, 31:11, 32:23, 33:19, 33:22, 34:8, 34:15, 35:14, 36:18, 37:11, 38:20, 46:21, 47:13, 49:1, 49:25, 50:8, 52:5, 52:13, 52:16, 59:7, 60:19,

61:7, 61:15, 61:17, 62:4, 62:12, 63:2, 63:14, 63:21, 64:2, 64:7, 69:18, 70:7
**Schmidt** [7] - 7:12, 28:14, 34:7, 38:19, 65:7, 69:16, 69:21
**school** [23] - 77:20, 77:21, 78:1, 78:3, 106:3, 106:4, 106:11, 106:19, 107:3, 107:5, 108:8, 109:7, 109:9, 111:6, 135:25, 136:2, 136:4, 200:1, 200:2, 202:23, 226:16, 231:3
**School** [9] - 77:22, 108:10, 135:21, 192:15, 201:23, 214:17, 222:9, 231:4
**schools** [17] - 106:7, 106:9, 106:10, 106:12, 107:23, 108:7, 108:22, 111:1, 111:8, 111:9, 111:17, 116:24, 124:18, 135:18, 202:10, 209:3
**science** [2] - 193:19, 193:25
**sciences** [1] - 200:2
**Sciences** [7] - 192:16, 201:25, 202:6, 203:2, 203:14, 204:21, 215:5
**scientific** [1] - 193:12
**scope** [10] - 34:1, 36:9, 36:17, 37:18, 38:16, 49:21, 49:25, 50:1, 50:2, 89:17
**screaming** [1] - 126:17
**screen** [8] - 30:5, 34:20, 83:10, 167:16, 167:22, 188:1, 196:22, 221:17
**screened** [1] - 51:7
**screening** [4] - 136:21, 199:15, 219:17, 220:22
**Screening** [1] - 198:18
**screens** [1] - 220:22
**scroll** [3] - 22:8, 24:10, 24:14
**se** [1] - 100:15
**seat** [2] - 77:6, 96:11
**second** [12] - 24:1, 32:17, 53:16, 58:2,

74:17, 85:7, 85:8, 97:4, 123:21, 145:21, 167:21, 191:19
**seconds** [1] - 29:1
**section** [8] - 35:6, 41:23, 42:1, 43:9, 214:25, 223:23, 227:9, 231:23
**Section** [4] - 11:12, 11:16, 12:3, 15:5
**security** [1] - 103:9
**see** [124] - 9:24, 14:12, 14:19, 14:22, 15:2, 15:11, 15:12, 15:13, 17:15, 17:18, 18:18, 22:5, 22:6, 22:7, 22:9, 22:11, 22:12, 22:16, 22:17, 22:18, 22:21, 22:22, 23:1, 23:2, 23:3, 23:6, 23:14, 23:18, 23:20, 23:21, 23:25, 24:2, 24:7, 24:9, 24:11, 24:13, 24:15, 24:16, 24:25, 25:6, 25:9, 25:20, 25:23, 25:25, 26:6, 26:12, 27:9, 30:4, 30:13, 30:21, 33:4, 34:20, 34:25, 35:3, 35:6, 35:9, 35:11, 36:11, 36:20, 40:13, 40:22, 43:14, 43:24, 43:25, 54:15, 60:4, 61:5, 62:22, 63:4, 64:13, 73:22, 82:14, 83:12, 92:5, 103:21, 114:23, 116:9, 117:5, 118:21, 119:20, 122:5, 140:19, 141:3, 143:6, 143:7, 143:11, 143:13, 143:14, 146:23, 150:19, 151:7, 153:1, 155:8, 155:9, 162:19, 162:24, 164:15, 164:23, 165:3, 165:9, 165:16, 166:17, 167:18, 167:19, 168:16, 168:25, 170:3, 179:8, 179:18, 184:25, 185:25, 187:23, 189:5, 189:6, 189:19, 192:5, 216:15, 216:17, 227:20, 229:21, 231:12, 234:8, 236:2

**seeing** [8] - 23:19, 40:6, 117:4, 178:23, 203:9, 207:5, 212:7, 212:8
**seek** [2] - 67:8, 227:24
**seeking** [2] - 213:13, 225:19
**seized** [1] - 173:12
**seizes** [1] - 120:13
**selected** [1] - 40:9
**sell** [4] - 120:21, 131:2, 155:2
**selling** [1] - 150:1
**sells** [1] - 120:13
**Seminary** [1] - 210:21
**send** [4] - 61:20, 61:21, 135:17, 142:3
**sending** [1] - 15:9
**sends** [1] - 104:4
**SENIOR** [1] - 1:17
**Senior** [1] - 7:2
**Sensabaugh** [1] - 5:14
**sense** [2] - 138:3, 170:5
**sent** [2] - 79:9, 89:22
**sentence** [4] - 41:12, 43:24, 103:22, 169:1
**sentences** [1] - 91:16
**separate** [2] - 100:12, 226:17
**separated** [1] - 101:19
**serious** [1] - 39:2
**seriously** [1] - 65:12
**serve** [1] - 181:25
**served** [2] - 121:21, 225:23
**serves** [1] - 196:19
**service** [4] - 159:13, 182:25, 220:3, 220:9
**serviced** [1] - 26:22
**Services** [2] - 110:8, 195:5
**services** [17] - 27:3, 117:25, 208:7, 213:10, 214:1, 215:1, 215:3, 215:23, 215:24, 220:4, 220:16, 224:18, 224:20, 226:21, 226:22, 229:1
**set** [6] - 22:8, 210:2, 210:24, 215:15, 216:20, 217:1
**setting** [4] - 42:2, 121:25, 208:16, 211:1
**settled** [1] - 54:17
**setup** [2] - 227:21
**seven** [4] - 103:4,

199:3, 225:18
**several** [6] - 49:18, 79:16, 97:12, 118:16, 128:25, 135:9
**severe** [1] - 228:15
**sewer** [1] - 78:8
**sexual** [1] - 230:1
**shadows** [1] - 213:13
**shall** [1] - 34:16
**SHANNON** [1] - 6:3
**shape** [1] - 56:24
**share** [1] - 216:18
**shared** [1] - 235:11
**sheet** [1] - 143:23
**SHERIFF** [1] - 77:4
**Sheriff** [50] - 73:24, 74:17, 75:18, 77:9, 77:15, 87:5, 93:23, 108:5, 108:14, 109:9, 122:8, 123:3, 123:25, 125:1, 127:11, 127:23, 128:4, 134:13, 138:4, 138:15, 139:8, 142:21, 145:25, 148:7, 149:13, 149:20, 153:19, 154:5, 154:9, 157:20, 162:22, 162:24, 163:8, 165:10, 167:14, 167:22, 168:4, 173:21, 175:21, 177:14, 181:16, 183:4, 183:9, 183:19, 188:9, 188:16, 189:24, 189:25, 190:4, 228:2
**sheriff** [43] - 74:2, 77:19, 83:19, 84:15, 84:24, 85:9, 94:5, 94:7, 96:19, 98:16, 98:22, 100:8, 102:17, 102:18, 102:21, 102:23, 104:10, 104:11, 104:22, 106:4, 112:13, 113:22, 120:12, 122:12, 123:21, 125:8, 125:15, 131:23, 132:5, 132:8, 132:12, 143:3, 145:22, 147:3, 147:22, 148:21, 148:24, 149:3, 154:15, 163:23, 172:8, 189:15,

189:17
**sheriff's** [2] - 136:5, 140:10
**Sheriff's** [14] - 73:25, 97:18, 100:6, 102:14, 113:23, 114:9, 134:17, 134:18, 134:20, 135:1, 135:14, 139:25, 140:16, 182:25
**sheriffs** [1] - 114:11
**shift** [1] - 111:16
**shifted** [1] - 153:15
**shifts** [1] - 111:15
**ship** [1] - 51:22
**shipments** [2] - 51:1, 51:4
**shipped** [3] - 53:4, 60:2, 150:9
**shipping** [2] - 30:14, 30:15
**ships** [1] - 46:15
**shocked** [1] - 60:8
**shooting** [1] - 170:21
**shop** [1] - 215:18
**Shoplifting** [2] - 184:25, 185:17
**shoplifting** [4] - 100:4, 184:23, 184:24, 186:8
**shopping** [1] - 227:2
**short** [6] - 64:18, 79:22, 79:24, 154:15, 155:2, 191:10
**short-circuit** [1] - 191:10
**Shorter** [6] - 172:2, 172:4, 172:15, 174:6, 174:16, 175:8
**shorter** [1] - 172:5
**shortness** [1] - 140:7
**shot** [1] - 99:23
**show** [23] - 13:18, 13:21, 24:20, 25:18, 33:16, 59:10, 70:14, 70:15, 107:7, 125:19, 141:14, 142:5, 146:17, 162:18, 172:7, 184:7, 191:20, 191:24, 192:3, 205:16, 205:20, 219:2, 232:16
**showed** [2] - 95:8, 120:4
**showing** [2] - 82:11, 213:20
**shown** [9] - 30:6,

30:25, 31:22, 31:24, 32:4, 33:7, 38:22, 40:9, 43:10
**shows** [2] - 142:22, 144:22
**shut** [3] - 102:11, 122:3, 171:16
**sic** [2] - 11:16, 131:11
**sick** [3] - 204:15, 204:18, 230:8
**sickening** [1] - 177:3
**side** [8] - 103:15, 126:10, 131:19, 142:22, 142:23, 145:20, 220:8, 230:12
**sides** [1] - 57:11
**sight** [1] - 97:23
**sign** [2] - 55:17, 216:20
**signature** [6] - 23:24, 24:7, 24:14, 24:15, 25:25, 26:3
**signed** [5] - 23:4, 23:25, 24:2, 25:25, 38:11
**significant** [1] - 168:21
**signs** [1] - 234:10
**similar** [1] - 96:14
**simple** [3] - 48:5, 59:24, 133:24
**simply** [2] - 60:17, 68:13
**simultaneous** [2] - 63:1, 63:2
**SINGER** [1] - 4:5
**single** [6] - 10:22, 38:10, 54:6, 65:19, 67:21, 70:9
**sit** [4] - 26:9, 202:17, 218:6, 219:5
**site** [4] - 212:18, 215:21, 216:1, 216:5
**sits** [1] - 126:14
**sitting** [4] - 17:4, 58:11, 85:4, 100:1
**situation** [10] - 69:10, 91:3, 123:15, 140:9, 153:16, 181:2, 221:5, 228:22, 228:25, 229:13
**situations** [1] - 140:7
**six** [6] - 143:12, 201:11, 211:3, 221:14, 225:15, 226:20
**sized** [1] - 83:14
**skills** [2] - 80:14, 87:17, 209:25

**skin** [1] - 135:22
**skip** [2] - 168:16, 171:23
**skipping** [1] - 24:23
**slacked** [1] - 130:10
**Slash** [1] - 235:7
**sleep** [1] - 121:5
**slide** [7] - 191:20, 191:24, 192:3, 196:23, 207:4, 207:19, 208:22
**slides** [2] - 16:15, 56:17
**slope** [1] - 154:21
**slow** [1] - 91:4
**slowly** [1] - 99:7
**small** [10] - 77:21, 83:15, 90:22, 93:25, 125:22, 142:16, 180:25, 203:11, 205:24, 226:14
**smart** [1] - 70:22
**Smith** [3] - 6:4, 6:11, 52:25
**snort** [1] - 178:10
**so's** [1] - 126:18
**so-and-so's** [1] - 126:18
**social** [6] - 199:25, 213:25, 218:23, 231:17, 232:23, 233:4
**Society** [3] - 206:5, 206:13, 224:16
**soft** [1] - 201:16
**sold** [2] - 150:3, 185:23
**Sold** [1] - 44:19
**sole** [1] - 114:12
**Solutions** [1] - 195:22
**solved** [1] - 171:2
**someone** [31] - 19:17, 93:25, 103:22, 105:7, 114:14, 114:15, 126:4, 133:1, 134:17, 136:15, 140:5, 177:1, 179:11, 180:9, 185:10, 199:11, 199:22, 208:2, 210:1, 211:6, 215:13, 216:2, 217:17, 222:17, 228:10, 228:23, 231:13, 232:4, 232:12
**something's** [1] - 219:2
**sometime** [3] - 147:8, 174:13, 176:15

**sometimes** [13] - 41:1, 41:9, 95:20, 111:19, 139:25, 140:9, 151:2, 186:6, 186:7, 186:10, 187:2, 216:6, 232:23
**somewhat** [3] - 85:14, 138:24, 141:25
**somewhere** [10] - 85:21, 88:19, 92:13, 96:24, 116:19, 136:22, 137:1, 198:5, 205:19, 208:8
**SOMS** [4] - 8:2, 8:18, 58:20
**son** [1] - 96:24
**soon** [2] - 61:8, 61:25
**SOR** [1] - 230:21
**sorry** [29] - 16:11, 25:4, 25:10, 25:15, 47:5, 79:6, 86:18, 97:5, 104:6, 109:24, 110:21, 122:25, 124:25, 125:1, 152:6, 158:6, 160:4, 162:9, 162:22, 165:13, 166:23, 167:1, 167:12, 167:14, 167:25, 168:2, 182:19, 194:2, 195:18
**Sorry** [4] - 31:11, 91:13, 97:10, 152:9
**sort** [31] - 74:15, 86:20, 104:8, 128:17, 136:8, 150:12, 153:10, 154:18, 155:11, 163:3, 171:5, 179:20, 194:9, 195:21, 195:22, 197:1, 204:3, 206:8, 207:7, 207:17, 209:19, 213:15, 220:3, 221:9, 223:9, 225:17, 227:20, 229:4, 230:16, 233:4, 234:23
**sorts** [3] - 78:24, 108:9, 108:15
**sought** [1] - 221:16
**sound** [1] - 94:13
**sounded** [1] - 36:21
**sounds** [2] - 64:6, 178:6
**source** [3] - 90:16, 112:3, 118:2
**sources** [2] - 55:1, 65:24
**South** [3] - 2:13,

192:21, 196:8
**Southern** [1] - 7:2
**southern** [2] - 232:7, 232:24
**SOUTHERN** [1] - 1:1
**southwest** [1] - 195:10
**Southwood** [1] - 30:17
**speaking** [2] - 79:5, 101:10
**special** [2] - 43:22, 227:24
**Special** [1] - 192:25
**specialist** [1] - 221:18
**specialize** [1] - 80:13
**specialized** [2] - 75:11, 194:7
**specific** [22] - 10:11, 18:2, 26:12, 45:12, 53:24, 54:17, 55:7, 76:8, 76:9, 76:12, 123:12, 129:7, 139:21, 141:5, 141:22, 146:21, 158:18, 161:5, 194:11, 231:2, 234:25
**Specifically** [3] - 7:24, 40:17, 65:6
**specifically** [18] - 8:17, 13:11, 17:6, 26:9, 42:19, 45:13, 56:19, 66:9, 143:19, 151:24, 161:14, 161:20, 169:25, 171:19, 173:10, 204:2, 204:11, 209:3
**specifications** [1] - 140:23
**specifics** [1] - 139:17
**specify** [1] - 143:18
**speculation** [1] - 171:4
**speed** [1] - 82:7
**spell** [2] - 76:25, 190:14
**spelled** [1] - 110:1
**spend** [1] - 113:17
**spent** [7] - 7:13, 9:22, 53:24, 58:15, 84:15, 112:1, 128:25
**spike** [3] - 118:17, 153:9, 153:24
**spiritual** [2] - 216:1, 216:2
**split** [1] - 185:15
**spread** [1] - 156:5
**squad** [2] - 43:21, 126:6

**Square** [2] - 6:5, 6:12
**squarely** [1] - 70:17
**squatting** [1] - 121:8
**squeeze** [1] - 111:24
**SRO** [4] - 106:4, 107:2, 107:3, 107:4
**SROs** [7] - 106:9, 107:18, 109:15, 109:18, 110:5, 181:18
**St** [2] - 117:9, 222:4
**Staff** [2] - 81:20
**staff** [12] - 81:22, 82:6, 103:6, 103:8, 116:22, 128:20, 200:21, 210:12, 218:1, 224:23, 224:24, 228:19
**staffed** [1] - 224:22
**staffing** [1] - 102:9
**staged** [3] - 89:23, 106:20, 128:19
**staggering** [1] - 59:23
**staging** [2] - 89:6, 128:19
**stand** [4] - 147:22, 190:9, 206:4, 228:1
**standard** [2] - 198:20, 207:6
**Standards** [1] - 55:20
**standards** [3] - 55:21, 67:3, 207:5
**standing** [3] - 91:1, 99:8, 129:23
**stands** [3] - 198:18, 215:16, 218:17
**STANNER** [41] - 5:10, 86:7, 86:9, 91:10, 91:13, 91:15, 104:13, 122:25, 124:7, 124:25, 125:3, 148:2, 148:4, 148:6, 162:19, 162:21, 163:7, 163:14, 163:18, 163:21, 163:22, 165:24, 166:5, 167:1, 167:11, 167:13, 167:25, 168:3, 171:12, 171:18, 172:10, 172:12, 172:14, 175:19, 175:20, 177:6, 177:12, 177:13, 179:3, 183:6, 190:2
**Stanner** [10] - 86:5, 148:9, 163:6, 166:13, 166:21, 167:24, 175:18,

177:4, 177:10, 186:11
**stanner** [2] - 148:1, 166:4
**star** [1] - 85:5
**start** [14] - 77:19, 92:11, 104:20, 110:6, 115:24, 116:14, 122:18, 122:21, 134:21, 188:24, 206:15, 207:12, 208:16, 233:1
**started** [23] - 80:13, 84:10, 85:21, 88:14, 91:2, 91:4, 91:17, 92:4, 95:24, 106:13, 133:20, 133:23, 134:6, 159:3, 162:7, 180:9, 189:10, 199:9, 203:4, 203:24, 205:25, 221:1
**starting** [7] - 85:13, 92:14, 103:18, 149:13, 154:12, 155:8, 156:21
**Starting** [1] - 42:11
**starts** [1] - 126:17
**state** [22] - 76:22, 81:13, 81:15, 82:1, 82:18, 85:11, 94:2, 102:15, 151:12, 151:18, 156:8, 170:9, 190:11, 194:22, 200:19, 201:19, 214:10, 214:16, 230:24, 230:25, 232:21
**State** [54] - 43:19, 78:15, 78:17, 79:6, 79:8, 79:14, 80:18, 81:11, 81:23, 82:13, 88:18, 88:21, 88:23, 89:13, 90:2, 92:21, 99:9, 113:9, 114:11, 114:13, 115:10, 118:8, 118:14, 120:19, 120:22, 122:16, 122:21, 123:24, 128:11, 128:22, 128:25, 139:4, 141:23, 142:1, 142:3, 142:6, 143:2, 146:22, 147:11, 149:22, 149:24, 157:3, 158:9, 159:6, 159:12, 168:10, 168:12, 168:13,

169:9, 170:6, 170:9, 183:23, 202:2, 225:12
**statement** [19] - 8:23, 12:6, 21:2, 22:3, 28:1, 30:25, 31:12, 31:14, 31:23, 36:19, 41:19, 42:18, 46:1, 51:2, 51:8, 56:8, 56:14, 166:24, 167:17
**statements** [1] - 197:1
**states** [3] - 79:1, 152:3, 168:14
**STATES** [2] - 1:1, 1:17
**States** [9] - 7:2, 9:13, 16:20, 33:13, 34:22, 43:14, 45:24, 66:7, 98:2
**stationed** [1] - 80:4
**stations** [1] - 234:25
**statistics** [8] - 136:8, 136:12, 136:25, 137:6, 140:23, 146:21, 157:24, 232:16
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**statute** [1] - 35:13
**stay** [8] - 79:20, 139:20, 156:14, 189:5, 197:17, 208:12, 227:17
**stayed** [4] - 79:21, 84:22, 100:12, 101:20
**staying** [2] - 101:4, 226:9
**stays** [2] - 60:11, 60:18
**steal** [2] - 99:23, 185:7
**stealing** [4] - 115:24, 116:14, 151:2, 185:3
**stemmed** [1] - 105:21
**stemming** [1] - 99:11
**stenography** [1] - 6:19
**step** [4] - 208:16, 214:20, 220:6, 220:7
**steps** [2] - 120:13, 120:21
**Steps** [1] - 218:18
**Steve** [1] - 202:18
**STEVEN** [1] - 4:17
**stick** [2] - 70:21, 131:5
**sticks** [1] - 141:21
**stigma** [10] - 160:3, 200:8, 209:10, 211:19, 212:2, 233:13, 233:25, 234:1, 234:5, 235:10

**Stigma** [1] - 233:15
**stigma-free** [1] - 200:8
**still** [34] - 27:3, 42:13, 46:15, 55:25, 78:20, 80:22, 88:5, 90:7, 90:9, 91:24, 93:8, 94:25, 97:14, 101:1, 134:24, 135:24, 149:5, 151:7, 153:16, 154:22, 155:1, 161:8, 166:1, 166:2, 169:5, 171:3, 177:20, 201:8, 217:2, 224:4, 226:6, 226:20, 226:22, 234:13
**stint** [4] - 79:22, 79:24, 80:11, 80:25
**stomach** [1] - 177:3
**stood** [2] - 29:4, 86:8
**stop** [7] - 22:9, 27:6, 95:22, 96:10, 125:12, 125:18, 215:17
**stopped** [3] - 27:6, 96:9, 126:18
**stops** [1] - 223:20
**store** [2] - 82:23, 125:16
**stories** [3] - 171:6, 205:12, 206:1
**Storrs** [1] - 193:17
**story** [2] - 171:8, 235:11
**strain** [2] - 116:25, 117:1
**straits** [1] - 226:8
**stranger** [1] - 235:6
**strapped** [2] - 98:6, 116:23
**street** [7] - 116:10, 116:13, 125:17, 150:1, 150:3, 150:24, 181:8
**Street** [15] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15, 4:18, 5:5, 5:12, 6:6, 6:13
**street-level** [1] - 181:8
**streets** [4] - 44:14, 44:16, 115:24, 121:17
**strength** [1] - 212:21
**stress** [2] - 97:21, 97:25
**stressed** [1] - 117:3
**strides** [1] - 188:2
**strike** [3] - 86:10, 91:16, 100:18

**striking** [1] - 55:24
**strong** [2] - 168:9, 171:4
**stronger** [1] - 131:10
**struck** [1] - 59:4
**structure** [3] - 207:3, 227:24
**struggled** [2] - 228:16
**struggling** [1] - 228:15
**stuck** [1] - 97:22
**students** [2] - 170:22, 209:14
**studies** [2] - 193:13, 193:14
**study** [1] - 194:19
**stuff** [18] - 78:14, 82:5, 82:23, 85:18, 89:2, 100:4, 100:18, 100:19, 102:5, 113:9, 116:24, 117:10, 121:4, 129:14, 130:23, 131:19, 184:23, 186:18
**stunning** [3] - 54:4, 60:2, 60:4
**style** [1] - 227:21
**subject** [3] - 41:23, 65:22, 75:9
**submission** [2] - 41:1, 41:6
**submit** [2] - 54:2, 62:16
**submittal** [1] - 225:18
**submitted** [6] - 30:2, 35:21, 63:7, 69:4, 143:2, 164:4
**submitting** [2] - 39:19, 165:20
**Subsection** [1] - 65:23
**subsequent** [1] - 19:19
**subsidized** [2] - 137:13, 156:19
**Substance** [3] - 14:11, 198:22, 208:25
**substance** [36] - 14:18, 15:10, 57:20, 143:19, 196:19, 198:25, 199:14, 200:7, 200:10, 202:13, 203:15, 203:22, 204:6, 204:12, 204:14, 204:17, 205:15, 209:5, 209:9, 210:20, 210:22, 211:6, 213:11, 213:19, 217:20,

220:2, 222:13, 227:14, 228:23, 229:8, 229:11, 229:20, 230:3, 230:5, 230:11, 235:13
**substances** [7] - 8:15, 44:11, 95:2, 225:21, 229:14, 229:22, 229:23
**substantial** [2] - 42:4, 53:17
**substantively** [1] - 178:8
**succeeded** [1] - 9:17
**success** [2] - 206:1, 223:3
**successful** [5] - 85:6, 85:7, 213:12, 214:16, 222:3
**sudden** [1] - 126:13
**suffered** [1] - 133:23
**suffering** [1] - 117:4
**sufficient** [4] - 27:24, 28:7, 42:14, 52:23
**sugar** [1] - 204:10
**suggest** [2] - 144:3, 217:15
**suggested** [3] - 62:17, 68:12, 144:6
**suggesting** [3] - 60:14, 60:15, 70:15
**suggestion** [2] - 71:18, 72:25
**suicide** [1] - 228:10
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12
**suited** [1] - 198:10
**summaries** [2] - 141:19, 142:6
**summary** [1] - 141:23
**summer** [2] - 134:10, 136:1
**Sunday** [1] - 63:21
**Sunset** [3] - 175:23, 176:4, 176:8
**supervised** [1] - 9:16
**supervisor** [2] - 9:5, 172:24
**supplied** [1] - 66:18
**supplier** [1] - 171:9
**supply** [6] - 91:5, 91:6, 93:14, 131:4, 134:1, 153:14
**supplying** [2] - 18:12, 85:23
**support** [10] - 53:25, 59:22, 76:4, 106:5, 211:23, 224:13,

224:14, 225:14, 231:8, 231:13
**supporting** [1] - 46:22
**supportive** [2] - 226:11, 226:13
**suppose** [1] - 19:1
**supposed** [6] - 44:7, 51:5, 51:6, 58:9, 72:5, 171:16
**surely** [1] - 99:8
**surge** [1] - 92:14
**surged** [2] - 99:15, 99:16
**Surgeon** [1] - 205:14
**surplus** [3] - 138:5, 138:11, 138:17
**surprise** [1] - 34:18
**surrounding** [1] - 84:7
**survey** [2] - 234:17, 234:20
**surveyed** [1] - 234:17
**suspected** [5] - 139:24, 140:4, 140:11, 140:17, 174:3
**suspicion** [2] - 20:2, 51:24
**Suspicious** [6] - 11:22, 12:18, 14:11, 44:7, 49:3, 49:4
**suspicious** [19] - 13:12, 14:18, 15:6, 15:10, 20:3, 27:18, 30:16, 44:4, 46:12, 47:2, 47:8, 47:11, 51:12, 51:17, 56:11, 60:15, 65:16, 65:20, 70:3
**sustain** [12] - 39:25, 44:25, 46:24, 47:17, 50:11, 87:2, 104:17, 109:11, 111:16, 123:16, 175:15, 175:18
**sustainability** [2] - 189:10, 189:16
**sustainable** [1] - 189:21
**sustained** [7] - 47:18, 92:9, 108:25, 109:3, 122:19, 123:5, 124:8
**SUZANNE** [1] - 4:15
**Suzie** [1] - 107:1
**Suzie's** [1] - 106:21
**SWAT** [2] - 89:22, 122:2
**swing** [1] - 138:8
**switch** [2] - 131:8, 177:5
**switched** [1] - 153:7

**switching** [1] - 235:19
**SWORN** [2] - 77:5, 190:17
**symptoms** [2] - 204:14, 229:19
**syringes** [1] - 213:24
**system** [14] - 20:3, 36:15, 42:23, 58:20, 102:15, 103:17, 109:23, 114:10, 140:12, 140:13, 141:8, 157:5, 221:7, 223:10
**System** [7] - 11:23, 12:18, 44:8, 222:10, 223:5, 223:11, 233:6
**systems** [1] - 106:3

## T

**table** [1] - 64:13
**tactical** [1] - 43:21
**tactics** [1] - 138:7
**tail** [2] - 85:13, 85:22
**tails** [1] - 183:3
**tally** [1] - 141:24
**tar** [1] - 178:9
**task** [1] - 43:23
**Task** [14] - 100:7, 100:9, 100:13, 100:17, 101:15, 112:4, 112:12, 162:7, 162:12, 168:18, 170:20, 172:25, 174:14, 181:11
**taught** [1] - 210:21
**tax** [6] - 102:18, 102:24, 118:10, 119:21, 120:11
**taxes** [3] - 120:12, 120:14, 120:22
**TDS** [2] - 43:19, 43:20
**teach** [1] - 199:19
**teachers** [3] - 106:25, 110:4, 110:10
**teaches** [1] - 199:9
**teaching** [2] - 195:2, 195:3
**Team** [9] - 89:22, 112:2, 117:8, 163:9, 208:3, 214:8, 214:15
**team** [3] - 90:22, 117:13, 212:16
**teamed** [2] - 63:9, 64:13
**teams** [3] - 100:17, 189:3, 200:18
**Teams** [4] - 214:10, 214:18, 214:23,

223:15
**Tech** [6] - 193:23, 194:5, 194:17, 194:19, 194:23, 224:5
**technique** [1] - 199:20
**tee** [3] - 126:23, 127:1
**teens** [1] - 169:19
**temerity** [1] - 70:17
**TEMITOPE** [1] - 4:8
**ten** [12] - 82:14, 90:22, 93:3, 98:16, 98:17, 107:22, 109:19, 135:10, 137:18, 138:6, 147:24, 175:9
**Tenth** [1] - 5:12
**term** [15] - 85:8, 123:21, 123:23, 132:3, 132:12, 161:15, 204:3, 204:7, 209:9, 209:10, 211:14, 218:10, 224:13, 230:17, 231:14
**termed** [2] - 123:25
**terms** [2] - 54:15, 56:12
**terrible** [2] - 120:25, 172:18
**territory** [1] - 191:6
**test** [1] - 119:13
**tested** [1] - 55:12
**testified** [18] - 10:5, 28:6, 45:3, 51:9, 53:17, 86:19, 88:4, 123:21, 136:7, 137:11, 139:24, 146:19, 175:13, 177:19, 184:10, 184:11, 185:24, 191:1
**testifies** [1] - 88:9
**testify** [5] - 37:20, 39:18, 75:25, 88:7, 88:14
**testifying** [10] - 36:5, 36:7, 36:14, 72:6, 87:9, 87:25, 91:24, 116:4, 130:15, 196:24
**testimony** [50] - 12:10, 12:23, 23:7, 31:4, 31:5, 36:22, 38:3, 39:10, 39:24, 43:10, 45:11, 47:4, 51:13, 52:17, 52:22, 53:14, 55:24, 58:16, 60:21, 68:4, 68:21, 69:15, 69:16, 74:7, 74:10, 75:2, 75:4, 75:5,

75:6, 75:10, 76:1, 86:11, 89:19, 117:13, 124:3, 130:1, 135:5, 150:10, 188:10, 188:14, 190:20, 191:3, 191:7, 191:25, 192:2, 192:3, 197:2, 197:3, 197:6, 204:4
**testing** [3] - 55:11, 80:21, 213:24
**Testing** [1] - 80:16
**text** [2] - 14:22, 26:2
**THE** [195] - 1:1, 1:1, 1:4, 1:17, 7:5, 7:6, 7:8, 7:20, 13:24, 21:4, 21:5, 21:9, 21:16, 28:14, 28:15, 28:19, 28:20, 28:23, 28:25, 29:3, 29:4, 29:5, 29:12, 30:11, 31:6, 31:15, 33:1, 33:2, 34:5, 34:12, 34:14, 34:16, 35:16, 36:3, 36:24, 38:2, 38:18, 39:9, 39:25, 44:25, 46:24, 47:17, 48:4, 48:9, 48:14, 48:17, 49:6, 50:3, 50:11, 52:4, 52:8, 52:11, 52:15, 57:3, 57:5, 57:12, 57:16, 59:6, 60:7, 60:13, 60:24, 61:13, 61:19, 62:1, 62:8, 62:21, 63:4, 63:13, 63:17, 63:19, 63:23, 64:6, 64:9, 64:12, 64:16, 64:21, 66:22, 68:3, 68:23, 69:12, 70:20, 71:20, 72:9, 72:22, 73:2, 73:10, 73:21, 74:23, 76:2, 76:18, 76:20, 76:24, 77:1, 77:9, 77:11, 86:5, 86:8, 86:16, 86:25, 87:21, 88:6, 88:9, 89:18, 89:20, 91:11, 91:19, 91:24, 92:9, 97:8, 97:11, 101:13, 101:16, 101:20, 101:21, 101:23, 101:24, 104:16, 108:2, 108:6, 108:18, 108:25, 109:3, 109:11, 109:14, 109:25, 110:15, 110:18, 110:21, 110:23, 116:4, 122:10,

122:19, 123:5,
123:12, 124:8,
125:2, 125:10,
125:12, 127:13,
127:18, 127:23,
127:25, 130:2,
130:4, 142:14,
142:15, 142:18,
147:20, 147:21,
148:1, 148:3, 163:5,
163:11, 163:16,
163:19, 166:1,
166:4, 166:9,
166:16, 166:20,
167:6, 167:8,
167:24, 171:14,
171:15, 172:11,
172:13, 175:10,
175:15, 177:4,
177:7, 177:10,
178:19, 178:21,
183:7, 183:10,
183:13, 184:13,
189:25, 190:4,
190:6, 190:10,
190:11, 190:13,
190:14, 190:15,
190:16, 191:15,
192:5, 195:13,
197:10, 235:22,
235:24, 236:1, 236:3
**Theft** [2] - 185:20
**theirs** [1] - 214:23
**themselves** [2] -
120:9, 228:10
**theory** [2] - 74:11,
75:24
**therapeutic** [2] -
194:11, 224:18
**therapist** [1] - 231:10
**therapy** [9] - 193:19,
193:25, 194:10,
215:22, 218:22,
219:20, 224:19,
231:11, 231:19
**therefore** [1] - 42:3
**Therefore** [1] - 67:24
**they've** [14] - 23:22,
26:2, 59:12, 76:15,
112:22, 114:17,
121:4, 179:1,
206:17, 215:2,
216:7, 216:8, 219:3,
223:2
**thin** [1] - 105:19
**thinking** [2] - 63:19,
187:11
**third** [7] - 96:13,
100:14, 111:16,
133:2, 187:21,

195:1, 214:19
**Thomas** [1] - 2:12
**thoughts** [1] - 234:18
**thousand** [1] - 96:5
**Three** [1] - 6:5
**three** [18] - 6:12,
49:11, 49:16, 64:1,
72:14, 78:13, 103:5,
106:10, 111:15,
125:17, 194:25,
199:2, 200:12,
201:2, 214:18,
224:22, 226:13,
234:21
**three-year** [2] - 199:2,
201:2
**threshold** [1] - 204:16
**throughout** [6] -
32:13, 81:13, 81:25,
85:11, 194:25, 204:3
**Thursday** [1] - 64:3
**tickets** [1] - 79:19
**tied** [1] - 74:19
**tight** [1] - 111:24
**timeline** [3] - 176:18,
202:7, 205:25
**timelines** [1] - 148:14
**timely** [1] - 228:21
**TIMOTHY** [1] - 5:9
**tired** [1] - 116:15
**title** [2] - 9:13, 192:13
**today** [22] - 16:22,
26:9, 71:2, 72:7,
73:1, 74:16, 78:20,
105:24, 118:12,
124:3, 146:19,
154:7, 155:24,
160:6, 160:20,
177:21, 177:25,
180:9, 180:10,
180:12, 182:21,
234:12
**today's** [1] - 235:3
**together** [15] - 105:6,
165:20, 195:21,
197:23, 210:3,
210:17, 211:10,
217:24, 218:6,
218:14, 218:23,
218:25, 219:5, 221:7
**toll** [2] - 82:15, 94:19
**Tom** [1] - 131:25
**tomorrow** [8] - 61:10,
62:1, 62:6, 62:16,
72:5, 72:6, 72:8,
235:20
**ton** [3] - 114:7,
156:20, 156:21
**took** [29] - 9:18, 65:12,
66:5, 66:6, 66:9,

80:20, 81:8, 82:15,
82:22, 83:19, 83:25,
94:7, 94:19, 96:17,
96:22, 98:14, 98:22,
99:5, 111:16, 127:4,
130:6, 132:1, 134:5,
151:14, 196:14,
205:9, 217:1, 228:1
**tool** [3] - 199:15,
219:17, 232:21
**toolkit** [1] - 234:11
**top** [9] - 14:9, 22:4,
40:14, 49:3, 136:11,
143:12, 164:15,
165:16
**topic** [3] - 18:6, 27:14,
233:16
**topics** [1] - 29:17
**tore** [1] - 120:25
**total** [7] - 106:12,
109:19, 137:15,
143:7, 146:2,
155:23, 225:24
**touch** [1] - 89:11
**touched** [3] - 11:13,
13:7, 159:24
**touches** [1] - 168:14
**tough** [2] - 104:14,
155:18
**toward** [7] - 81:19,
84:11, 92:14, 93:11,
131:19, 180:8, 185:1
**Tower** [2] - 3:4, 4:18
**Town** [1] - 78:6
**town** [4] - 93:20,
177:2, 180:25,
181:25
**traceable** [2] - 157:21,
158:19
**traced** [1] - 74:12
**tracked** [1] - 234:16
**Traffic** [3] - 80:16,
81:1, 81:4
**traffic** [6] - 79:2,
95:22, 96:9, 126:4,
161:1
**trafficking** [11] -
133:7, 161:6,
161:14, 161:15,
161:20, 166:7,
169:22, 171:4,
172:1, 172:15, 174:6
**Trafficking** [1] - 173:3
**train** [1] - 209:23
**trained** [13] - 159:6,
159:8, 159:22,
159:23, 199:17,
199:21, 199:25,
200:12, 209:21,
209:24, 221:4,

222:12
**trainer** [1] - 212:17
**training** [34] - 75:10,
75:11, 78:16, 78:19,
78:20, 78:23, 79:8,
159:3, 159:13,
159:14, 160:7,
160:10, 160:13,
178:2, 186:11,
186:12, 194:8,
194:11, 200:8,
200:9, 200:10,
200:11, 200:14,
200:16, 200:17,
200:23, 201:18,
203:12, 210:9,
211:20, 212:3,
212:21, 223:17,
232:25
**trainings** [3] - 199:5,
199:7
**transactions** [2] -
51:5, 51:6
**transcript** [7] - 6:19,
46:9, 56:4, 57:6,
61:2, 65:6, 237:4
**transfers** [1] - 220:14
**transformed** [1] -
100:11
**transition** [1] - 153:20
**transitioned** [1] -
195:2
**transportation** [1] -
216:10
**transported** [1] - 96:1
**trauma** [2] - 229:24,
229:25
**traveled** [1] - 90:8
**treat** [1] - 106:3
**treated** [3] - 96:18,
202:14, 224:10
**treating** [1] - 230:4
**Treatment** [4] -
198:19, 215:17,
220:13, 227:18
**treatment** [31] - 96:16,
112:20, 112:21,
195:8, 196:16,
196:18, 199:22,
199:24, 206:20,
207:8, 215:14,
215:21, 215:23,
217:15, 219:12,
221:15, 222:14,
222:18, 223:24,
224:2, 224:8,
224:24, 225:3,
225:7, 227:10,
230:9, 231:7,
233:19, 233:20

**treats** [1] - 230:11
**trend** [3] - 85:21,
140:5, 169:10
**trends** [5] - 40:21,
42:17, 43:3, 81:12,
81:25
**Tri** [3] - 168:10,
168:12, 168:13
**Tri-State** [3] - 168:10,
168:12, 168:13
**trial** [7] - 52:16, 52:18,
56:24, 57:20, 57:23,
58:4, 64:22
**Trial** [1] - 236:4
**TRIAL** [1] - 1:16
**trick** [1] - 173:21
**tried** [3] - 98:19,
126:9, 174:24
**trier** [2] - 58:9, 58:10
**tries** [1] - 55:2
**triple** [2] - 63:9, 64:13
**triple-teamed** [2] -
63:9, 64:13
**trooper** [4] - 79:16,
79:20, 87:18, 94:12
**troopers** [2] - 78:18,
170:9
**troops** [2] - 158:14,
158:15
**true** [19] - 8:23, 28:1,
52:21, 67:10,
105:24, 115:17,
129:5, 132:11,
133:7, 133:19,
135:20, 137:20,
138:14, 140:14,
159:12, 169:5,
171:7, 171:9, 232:14
**True** [3] - 27:16, 28:9,
56:13
**trust** [2] - 90:13,
107:15
**trusted** [1] - 90:16
**try** [34] - 37:1, 70:23,
80:13, 85:1, 98:19,
98:20, 100:4,
100:15, 100:17,
106:6, 107:17,
108:12, 112:23,
116:17, 116:19,
117:7, 118:4,
125:18, 139:20,
154:13, 157:15,
163:14, 174:21,
174:24, 181:1,
181:3, 181:6, 182:2,
189:3, 189:4,
189:19, 203:13
**trying** [24] - 29:11,
37:24, 59:1, 59:21,

65:2, 84:22, 89:10, 96:10, 101:1, 107:6, 116:12, 116:24, 117:17, 118:3, 148:15, 165:13, 166:17, 169:22, 173:20, 179:22, 181:24, 185:6, 213:5
**Tuesday** [2] - 65:4, 211:1
**tunnel** [4] - 189:7, 189:8, 189:19
**turn** [7] - 68:2, 110:5, 125:20, 164:14, 167:14, 179:13, 185:23
**turned** [1] - 97:12
**turning** [2] - 155:6, 155:7
**TV** [1] - 152:22
**Twelfth** [3] - 4:13, 4:15, 5:5
**two** [43] - 8:2, 9:6, 13:9, 13:13, 14:7, 23:9, 29:13, 37:15, 39:6, 39:20, 40:10, 52:20, 57:11, 67:7, 67:18, 68:17, 72:14, 74:10, 81:20, 83:18, 95:21, 95:25, 100:12, 100:16, 100:17, 114:17, 123:24, 125:16, 125:22, 137:12, 147:11, 147:16, 168:14, 190:18, 192:22, 195:5, 203:5, 209:8, 211:2, 221:9, 222:10, 224:21, 226:13
**Two** [2] - 70:7, 214:19
**two-year** [1] - 13:13
**type** [8] - 26:15, 78:21, 78:22, 136:23, 137:8, 141:5, 199:7, 207:1
**types** [5] - 13:8, 200:11, 200:13, 213:2, 230:20
**typical** [1] - 72:18

## U

**U.S** [1] - 16:13
**ultimate** [2] - 58:3, 76:10
**Ultimately** [1] - 190:24
**ultimately** [1] - 81:17
**unattended** [1] - 94:15
**unaware** [1] - 20:10,

197:7
**unclear** [2] - 167:2, 167:12
**uncovered** [1] - 94:1
**undefeated** [2] - 57:14, 57:16
**under** [22] - 13:15, 19:10, 29:17, 42:23, 66:16, 75:2, 81:20, 122:25, 143:16, 156:13, 166:25, 167:8, 185:10, 185:13, 185:14, 202:15, 202:17, 219:22, 222:4, 228:11
**undercover** [1] - 82:4
**underfunded** [1] - 135:5
**undergraduate** [2] - 193:7, 193:8
**underlying** [5] - 54:7, 56:16, 105:22, 106:18, 230:4
**underscore** [1] - 57:1
**understood** [6] - 59:19, 129:20, 132:1, 132:8, 132:16, 156:11
**Understood** [1] - 191:18
**undertaking** [1] - 111:13
**Unfortunately** [1] - 213:7
**unfortunately** [4] - 114:11, 155:13, 225:20, 226:9
**uniforms** [1] - 135:24
**unique** [3] - 102:16, 200:3, 216:12
**unit** [2] - 39:1, 39:20
**Unit** [9] - 94:1, 101:17, 113:21, 114:2, 128:17, 131:19, 139:15, 220:13, 227:18
**unite** [1] - 222:4
**United** [11] - 7:2, 9:12, 16:20, 33:13, 34:21, 43:14, 45:24, 66:7, 78:4, 98:2, 210:8
**UNITED** [2] - 1:1, 1:17
**university** [2] - 202:20, 202:24
**University** [2] - 193:17, 199:1
**unknown** [1] - 174:3
**unlawfully** [1] - 30:22
**unless** [1] - 51:17,

184:24
**unlike** [1] - 79:1
**unlimited** [1] - 181:20
**unopposed** [1] - 85:8
**unorthodox** [1] - 197:5
**unquestionably** [1] - 69:11
**unreasonable** [1] - 58:6
**unreliability** [2] - 54:22, 55:17
**unsolved** [1] - 171:3
**untethered** [1] - 56:18
**unusual** [1] - 44:8
**up** [94] - 11:24, 15:16, 16:5, 21:20, 22:23, 23:14, 29:4, 29:17, 30:4, 32:17, 34:20, 41:22, 47:21, 50:6, 50:8, 53:7, 53:8, 54:4, 54:18, 54:19, 55:12, 58:12, 60:8, 62:7, 71:6, 71:24, 73:17, 76:15, 80:25, 82:3, 82:7, 82:8, 83:6, 86:8, 87:5, 88:13, 89:6, 89:10, 91:4, 91:17, 95:8, 98:19, 103:6, 103:18, 103:19, 107:3, 109:5, 114:21, 116:17, 120:25, 125:19, 126:14, 131:18, 133:2, 134:13, 147:22, 148:25, 157:24, 164:15, 167:16, 169:6, 171:16, 175:25, 176:25, 179:1, 179:13, 181:9, 184:7, 187:12, 187:18, 191:14, 191:17, 196:4, 196:10, 196:11, 198:11, 203:18, 207:8, 208:11, 208:14, 213:20, 215:15, 216:20, 216:21, 217:2, 218:18, 219:2, 219:17, 222:25, 223:22, 224:11, 225:11, 232:17, 234:12
**updates** [1] - 159:15
**updating** [1] - 83:25
**upper** [3] - 23:13, 24:6, 25:1

**upset** [1] - 177:1
**upward** [2] - 147:4, 147:6
**Urban** [1] - 235:10
**urge** [1] - 56:24
**urine** [1] - 220:22
**useful** [2] - 52:19, 56:22
**users** [1] - 136:24
**utilized** [1] - 155:10

## V

**vacancies** [1] - 98:21
**validation** [1] - 207:1
**Valley** [2] - 195:4, 195:8
**valuable** [1] - 228:7
**valuables** [1] - 185:22
**variance** [1] - 25:20
**various** [5] - 22:9, 54:22, 84:6, 85:10, 102:9
**veer** [2] - 191:6, 191:13
**vehicle** [1] - 80:21
**Vehicle** [2] - 80:15, 81:2
**vehicles** [5] - 84:1, 102:5, 102:7, 125:17, 185:20
**Velvet** [1] - 235:5
**vent** [1] - 65:13
**Ventura** [1] - 3:18
**venture** [1] - 74:9
**ventured** [1] - 86:1
**verdict** [1] - 47:21
**versa** [1] - 9:20
**versus** [3] - 50:7, 50:19, 227:21
**viable** [1] - 117:18
**Vice** [1] - 9:20
**victims** [2] - 105:7, 108:16
**video** [3] - 11:24, 12:1, 103:19
**Video** [1] - 12:7
**view** [2] - 29:10, 171:10
**violating** [2] - 11:17, 12:4
**violation** [2] - 70:3, 146:6
**violations** [4] - 143:11, 145:14, 184:3, 186:4
**Violent** [4] - 100:9, 162:6, 162:12, 168:18
**violent** [1] - 188:3

**VIRGINIA** [2] - 1:1, 1:18
**Virginia** [61] - 4:18, 7:3, 14:2, 16:23, 20:11, 20:16, 20:21, 20:25, 21:7, 22:4, 26:19, 26:25, 43:10, 43:13, 43:19, 43:25, 44:4, 58:12, 67:22, 78:15, 78:18, 79:1, 79:10, 80:4, 92:17, 92:21, 99:9, 102:16, 102:20, 114:12, 114:14, 115:10, 118:10, 118:15, 119:6, 119:18, 119:20, 120:19, 120:22, 123:24, 138:21, 161:3, 168:15, 181:12, 193:1, 193:22, 193:23, 194:5, 194:17, 194:19, 194:23, 195:10, 202:2, 224:5, 225:12, 231:3, 232:7, 232:20, 233:4
**virtually** [2] - 198:11, 198:12
**virtue** [1] - 75:13
**visibility** [1] - 40:5
**visit** [2] - 205:16, 214:12
**visited** [1] - 20:5
**visits** [1] - 213:20
**vista** [1] - 202:10
**vital** [1] - 112:3
**volume** [4] - 26:15, 89:25, 90:14, 121:24
**VOLUME** [1] - 1:16
**volume-type** [1] - 26:15
**volumes** [1] - 89:22
**voluminous** [1] - 26:10
**vs** [5] - 33:13, 52:25, 66:2, 66:7, 237:6
**vulnerable** [2] - 217:9, 228:8

## W

**wade** [1] - 117:16
**Wahama** [1] - 77:22
**wait** [5] - 34:13, 40:19, 61:4, 86:16, 210:14
**waiting** [3] - 71:22, 72:17, 73:23
**WAKEFIELD** [1] - 5:13
**Wal** [1] - 185:18

**Wal-Mart** [1] - 185:18
**walk** [12] - 29:19, 34:20, 56:17, 80:17, 166:6, 191:25, 197:2, 197:6, 215:10, 215:19, 216:8, 221:2
**walk-through** [1] - 56:17
**walked** [1] - 216:21
**Walker** [5] - 7:24, 8:3, 9:15, 9:16, 9:18
**Walker's** [1] - 9:7
**walking** [1] - 157:11
**walks** [1] - 195:23
**wand** [1] - 58:20
**wander** [1] - 116:13
**wandering** [2] - 115:24, 121:17
**wants** [6] - 86:17, 119:14, 120:20, 127:13, 166:13, 219:16
**warrants** [1] - 115:6
**wash** [2] - 121:3, 121:4
**Washington** [6] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12
**wasting** [1] - 113:3
**watch** [2] - 126:23, 127:1
**watched** [1] - 152:19
**water** [4] - 78:8, 117:16, 179:17, 207:23
**Wayne** [1] - 214:22
**ways** [4] - 98:19, 116:21, 182:11, 227:3
**wear** [1] - 142:10
**wearing** [1] - 85:4
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**website** [1] - 234:15
**weed** [3] - 99:25, 100:1, 185:3
**weed-eater** [2] - 99:25, 100:1
**weeds** [1] - 188:15
**week** [11] - 52:12, 61:22, 62:19, 62:20, 71:14, 72:2, 105:9, 105:16, 136:20
**weekend** [2] - 61:10, 62:17
**weekends** [1] - 224:24
**weekly** [2] - 219:20, 224:18
**weeks** [2] - 78:20,

125:16
**weight** [1] - 38:12
**welcome** [1] - 142:19
**well-documented** [1] - 171:8
**well-rounded** [1] - 216:3
**wellness** [5] - 211:23, 212:13, 212:18, 216:4, 226:25
**West** [51] - 7:3, 14:2, 16:23, 20:11, 20:16, 20:21, 20:25, 21:7, 22:4, 26:19, 26:25, 43:10, 43:13, 43:19, 43:25, 44:3, 58:12, 67:22, 78:15, 78:18, 79:1, 79:10, 80:3, 92:17, 92:21, 99:9, 102:16, 102:20, 114:12, 114:13, 115:10, 118:10, 118:14, 119:6, 119:17, 119:20, 120:19, 120:22, 123:24, 138:20, 161:2, 168:15, 181:12, 193:1, 202:2, 225:12, 231:3, 232:7, 232:20, 233:4
**WEST** [2] - 1:1, 1:18
**Western** [1] - 105:12
**Whack** [1] - 179:21
**whack** [4] - 108:8, 108:15, 179:20, 188:17
**Whack-a-mole** [1] - 179:21
**whack-a-mole** [2] - 179:20, 188:17
**whatsoever** [1] - 27:21
**white** [1] - 205:7
**whittle** [1] - 217:16
**whole** [10] - 64:13, 79:3, 79:19, 84:20, 98:2, 101:7, 194:25, 200:22, 212:21, 234:10
**wholesale** [1] - 31:25
**Wicht** [6] - 86:16, 87:22, 91:20, 166:22, 167:12, 183:7
**WICHT** [15] - 4:12, 86:18, 87:23, 91:9, 91:12, 91:14, 91:21, 104:6, 104:11, 110:14, 116:2,

127:14, 166:23, 183:8, 190:3
**wildly** [1] - 54:23
**Williams** [2] - 4:13, 5:4
**willing** [1] - 161:12
**winding** [1] - 201:15
**window** [2] - 9:4, 16:21
**winds** [1] - 47:21
**wine** [1] - 118:11
**wings** [1] - 73:23
**wire** [1] - 61:22
**wish** [5] - 52:9, 110:1, 160:20, 190:5, 217:10
**withdrawal** [1] - 204:14
**withdrawing** [1] - 221:20
**withdrew** [1] - 74:6
**witness** [38] - 8:25, 9:1, 32:24, 37:14, 37:15, 37:19, 38:1, 38:3, 38:6, 57:24, 58:7, 58:8, 64:10, 64:16, 71:5, 72:15, 72:18, 73:16, 73:24, 74:21, 75:13, 86:10, 87:24, 109:1, 162:20, 175:12, 184:11, 191:22, 191:23, 191:25, 195:12, 196:23, 197:2, 197:3, 197:6, 197:9
**WITNESS** [40] - 7:6, 13:24, 21:5, 28:14, 28:19, 29:4, 33:2, 52:11, 76:24, 77:1, 77:4, 77:11, 89:20, 97:8, 97:11, 101:16, 101:21, 101:24, 108:6, 109:14, 109:25, 110:23, 125:2, 125:12, 127:25, 130:4, 142:15, 142:18, 147:20, 171:15, 172:11, 172:13, 178:21, 183:13, 190:6, 190:13, 190:15, 190:17, 235:24, 236:3
**witness's** [4] - 39:10, 75:7, 190:20, 191:25
**witnessed** [3] - 75:20, 108:23, 109:2
**witnesses** [9] - 71:8, 71:22, 72:1, 72:4,

75:3, 190:23, 191:1, 191:4
**witnessing** [2] - 75:21, 75:22
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**woman** [2] - 216:21, 219:15
**women** [6] - 196:19, 217:10, 217:12, 217:24, 220:1, 224:9
**won** [1] - 57:13
**wonder** [2] - 124:16, 156:4
**wondering** [1] - 146:20
**Woo** [1] - 194:1
**Woo-hoo** [1] - 194:1
**wood** [1] - 103:14
**word** [1] - 155:4
**words** [6] - 37:2, 53:6, 148:15, 157:23, 162:9, 212:1
**worker** [1] - 218:6
**workforce** [5] - 107:22, 107:23, 119:8, 119:10, 119:23
**workplaces** [1] - 232:13
**works** [7] - 71:19, 180:20, 216:12, 223:7, 232:10, 234:9, 234:22
**world** [6] - 54:11, 55:13, 55:21, 60:1, 115:20, 155:18
**worlds** [1] - 102:3
**worried** [2] - 97:22, 127:8
**worry** [1] - 101:1
**worse** [1] - 93:9
**worth** [2] - 40:2, 234:3
**Wright** [1] - 39:19
**write** [1] - 201:20
**writing** [5] - 37:9, 61:18, 113:9, 173:7, 224:5
**written** [3] - 20:19, 61:1, 203:10
**wrongdoing** [1] - 53:20
**WU** [1] - 5:10
**WV** [8] - 2:8, 3:10, 3:13, 4:19, 5:15, 6:9, 164:24, 172:8
**WVU** [1] - 222:9
**WVU's** [1] - 231:3

**Y**

**yard** [1] - 185:3
**year** [39] - 13:13, 20:12, 22:15, 40:19, 67:24, 84:15, 95:23, 99:7, 112:15, 115:12, 118:13, 126:1, 126:3, 137:12, 137:21, 137:25, 138:11, 140:20, 145:21, 159:14, 189:14, 194:2, 195:1, 195:6, 195:7, 196:6, 196:8, 196:10, 196:15, 197:18, 197:21, 198:3, 199:2, 201:2, 201:11, 209:13, 223:2
**year's** [1] - 201:11
**years** [49] - 13:9, 13:19, 17:13, 22:19, 23:9, 26:13, 39:21, 42:5, 78:13, 79:16, 82:14, 82:25, 83:18, 97:2, 100:10, 104:10, 114:17, 115:15, 118:16, 128:25, 139:9, 139:14, 141:20, 143:3, 147:11, 147:16, 148:13, 148:25, 154:17, 167:22, 168:8, 170:16, 175:9, 176:20, 188:3, 192:21, 192:22, 194:12, 194:13, 194:25, 195:6, 200:12, 200:23, 209:8, 235:6
**Yellow** [1] - 194:20
**yesterday** [16] - 10:2, 13:7, 18:24, 29:18, 29:23, 36:14, 42:6, 45:3, 46:11, 47:1, 51:9, 52:22, 53:5, 56:4, 71:3, 73:7
**yoga** [1] - 212:20
**York** [3] - 3:5, 55:5, 57:22
**young** [2] - 94:12, 156:14
**yourself** [6] - 77:16, 84:17, 87:13, 155:2, 181:5, 192:12
**youth** [1] - 209:11

| Z |
|---|

**Z-e-r-k-l-e** [1] - 77:1
**Zerker** [3] - 109:23,
   109:25, 141:7
**ZERKLE** [1] - 77:4
**Zerkle** [23] - 71:6,
   73:25, 74:3, 74:18,
   75:18, 76:24, 77:17,
   109:9, 110:1, 122:8,
   123:3, 123:10,
   128:4, 138:4,
   138:15, 142:21,
   145:25, 162:24,
   163:8, 163:23,
   165:10, 190:4, 228:2
**Zerkle's** [1] - 134:13
**zero** [1] - 189:23