IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
```

BENCH TRIAL - VOLUME 20
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

MAY 28, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:                    Ayme Cochran, RMR, CRR
Court Reporter:                    Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A. Faber,
 2     Senior Status Judge, United States District Court, Southern
 3     District of West Virginia, in Charleston, West Virginia, on
 4     May 28, 2021, at 9:00 a.m., as follows:
 5               THE COURT:  Mr. Farrell, you have a matter you
 6     want to take up with the Court?
 7               MR. FARRELL:  Your Honor.  As you know, ECF 1301
 8     is the order that was entered regarding public access and
 9     media contact.  The plaintiffs are receiving requests
10     pursuant to Paragraph 8 to make reproductions and disclose
11     documents that are admitted in the record and we just would
12     seek further guidance from the Court on our obligations,
13     whether that is a may or shall, or what our obligations are.
14               THE COURT:  Okay.
15               MR. SCHMIDT:  On the McKesson side, Your Honor, we
16     appreciate Mr. Farrell raising this in the manner he did.
17     We're troubled to be in this position given what's happened
18     before in the course of this trial.  We're dealing with
19     something here that was an inappropriate e-mail, but it's
20     not relevant to any issue in this case and it wasn't
21     relevant, candidly, to the two witnesses who testified in
22     this case.  One did not receive it --
23               COURT REPORTER:  I'm having trouble hearing.  Is
24     your microphone on?
25               MR. SCHMIDT:  Let me try to speak closely.
```

1          COURT REPORTER:  Thank you.

2          MR. SCHMIDT:  Yeah.  It's just not relevant to

3     them.  Neither of them wrote it.  One of them didn't even

4     see it.  And that leads us to be concerned about unfair harm

5     to the people who live and work in this community and had

6     nothing to do with the e-mail.

7          All that being said, we're in a tough position where we

8     are -- where we are now.  So, we don't take a position on

9     the request that Mr. Farrell has made other than that

10    expression of concern about something like this being an

11    issue that, in our view, shouldn't be because of its clear

12    lack of relevance.

13          THE COURT:  Well, I'm concerned about the tendency

14    of -- well, I don't want to be unduly critical of the press,

15    but there is a tendency to seize on things like this and

16    create publicity that makes these things appear more

17    significant than, in my view, they really are, but I think I

18    have to disclose this.  I don't think I have a choice.

19          The Fourth Circuit in *Doe v. Public Citizens,* 749 F.3d

20    246, at Page 269, a 2014 Fourth Circuit case, pointed out

21    that there's certain confidential information that -- such

22    as proprietary and trade secret information which may

23    justify a partial a sealing of court records.

24          The court went on to say, we are unaware, however, of

25    any case in which this court has found a company's bare

1    allegation of reputational harm to be a compelling interest

2    sufficient to defeat the public's First Amendment right of

3    access.

4         And the Court went on and said every case we've located

5    has reached the opposite result under the less demanding

6    common law standard.

7         So, I think I have to disclose this and -- and I think

8    that rule would apply here even though we're talking about

9    embarrassment as to employees of the corporation, not

10   completely to the corporation itself but, certainly, there

11   is some embarrassment.

12        I think I've got to disclose this and I think the

13   public has a right to it and, relying on this case, that's

14   the ruling of the Court.

15             MR. FARRELL:  Judge, may I?  Can we ask for a

16   modification of 1301 and allow the party presenting the

17   evidence to reproduce or make available at the end of the

18   week instead of on a daily basis?

19             THE COURT:  Why would you want to do that?

20             MR. FARRELL:  Well, because my staff is pretty

21   busy and we're -- we are preparing for our case in chief.

22   And so, to coordinate what's been admitted, what's been

23   conditionally admitted, what's been demonstrative, is

24   something that I am personally going to oversee and I'm just

25   trying to get a little bit of guidance on whether or not I

```
 1    need to be doing this on a daily basis or a weekly basis.
 2              THE COURT:  Make it available to who?  What are
 3    you --
 4              MR. FARRELL:  So, the Paragraph 8 says that -- of
 5    1301 says that the party presenting the evidence is
 6    responsible for providing copies to media.  And so, what
 7    that means is somebody needs to screen what has been
 8    admitted, what has been conditionally admitted, what's not
 9    been admitted, and what's been used as a demonstrative and
10    then provide copies.
11         And so, I'm going to personally oversee that and
12    pursuant to the order what I'd like to do is I'd like to be
13    able to wait until the end of the week to be able to compile
14    the exhibits that have been introduced by the plaintiffs
15    during that week for the media rather than having to do it
16    and spend an hour a day going through the record waiting for
17    the transcript to confirm it.
18              THE COURT:  Well, let me hear from the defendants
19    about this.
20              MS. MAINIGI:  Your Honor, just as a general
21    matter, that's fine with us.
22              THE COURT:  Mr. Schmidt?
23              MR. SCHMIDT:  We don't take a position on that,
24    Your Honor.
25              THE COURT:  All right.  Mr. Nicholas?
```

```
 1              MR. NICHOLAS:  No position.

 2              THE COURT:  Well, if it will help you out, Mr.

 3    Farrell, that's what we'll do.

 4              MR. SCHMIDT:  I guess I would just reinforce I

 5    don't think Mr. Farrell's proposing this and, as I said, I

 6    appreciate the way he raised this specific issue.  I don't

 7    think this should be tacit just providing stories to the

 8    media in a selective manner, but --

 9              THE COURT:  Well, I agree with that.  I -- well,

10    I've voiced my concern earlier about -- about what can

11    happen with information like this and there just isn't

12    anything I can do about it.  The public has a right to it

13    and we have to disclose it.

14              MR. FARRELL:  Thank you.

15              THE COURT:  And the 1301 is modified so that you

16    -- you have to make the disclosures at the end of the week.

17    That will take some of the heat off of you during the week

18    and make a whole lot -- make it a whole lot worse on Friday.

19              MR. FARRELL:  Thank you, Judge.

20              THE COURT:  Okay.  Okay.  We're having a technical

21    problem here.  We will just take a couple of minutes and get

22    that fixed.

23         (Pause)

24              THE COURT:  Is Dr. O'Connell in the courtroom?

25              MS. QUEZON:  Yes, Your Honor, she is.
```

1          THE COURT:  Do you want to come on up and resume

2     the witness stand, Dr. O'Connell?

3       And it's my duty to remind you you're still under oath,

4     which I'm sure you knew before I told you.

5          THE WITNESS:  Yes, sir.

6     Good morning.

7          THE COURT:  Okay.  We're ready to go.

8          BY MS. QUEZON:

9  **Q.**   Good morning Dr. O'Connell.

10 **A.**   Good morning.

11 **Q.**   I wanted to circle back to a term that we used a few

12    times yesterday and just make sure that it's clear for the

13    record what you were -- what you were talking about.

14       On a number of occasions in some different -- some of

15    the different programs that you were discussing with the

16    Court you used the term recovery coach or recovery peer.

17    Can you explain in a little bit more detail what a recovery

18    coach or recovery peer is?

19 **A.**   Yes.  A certified peer recovery coach is an individual

20    in long-term recovery and the State of West Virginia

21    classifies that as having two years of recovery time so that

22    they can establish and prove that.

23       They also take over 40 hours of courses on substance

24    use and motivational interviewing and other skills so that

25    they can use and harness their lived experience to work with

1    another individual who is not yet in recovery so they use

2    their time from having a Substance Use Disorder to engage

3    with other folks and bring them into the recovery process.

4    So, they would not have a mental health certification and be

5    a social worker or psychologist, but they can use their own

6    experience to then say I was in that same situation.  I

7    found recovery and I can show you that we can go to a

8    meeting together or show you how to do this with me.

9    **Q.**    Thanks.  All right.  I think where we were in the slide

10   deck -- and did you bring yours with you, as well?

11   **A.**    I did.

12   **Q.**    Perfect.  Was at the City of Solutions, can you explain

13   to the Court how the City of -- what the City of Solutions

14   is and how it came to be?

15   **A.**    Absolutely.  As we were doing some of our presentations

16   around town and around the around the State of West

17   Virginia, we had been re-branded, right?  We had stopped

18   talking about the epicenter of the epidemic and we'd started

19   saying we were the epicenter of solution.  And we started

20   terming that the City of Solutions.  And we heard that from

21   our mayor, and our medical school, and our university.  And

22   our community started talking more about solutions.

23        And so, we really took to heart this idea and we were

24   asked by a funder of the McDonough Foundation up in the

25   northern panhandle if we would be willing to compile all of

1    the work that we were saying out in the community into a

2    singular location and that he was willing to pay for

3    someone's time to do this work, to bring all of that

4    together.  And he wanted this because he believed that the

5    work we were doing in our region could be replicated in

6    other parts of the state.  So, he asked us to compile this

7    and we did so and called it the City of Solutions.

8         He then wanted it expanded upon and not only in a book

9    format, but presentations.  And so, we did 14 presentations

10   around the State of West Virginia to touch all 55 counties

11   and we followed that up with TA, it's technical assistance,

12   for counties that said we see that you have a Quick Response

13   Team.  How would we do that?  So, we offered the opportunity

14   to receive support through us on grant writing or pursuing

15   grants to explore that opportunity.

16   **Q.**   And, Dr. O'Connell, the information that we've gone

17   through with the Court already yesterday afternoon and the

18   programs and the different things that we -- we talked

19   about, is -- are those programs described in the City of

20   Solutions?

21   **A.**   Yes.  In much greater detail.  Most of what you've --

22   or some of what you've seen thus far is pulled almost

23   directly or a pared down version from the book *The City of*

24   *Solutions* and it also then includes contact information from

25   each of the individuals who run those programs.  It includes

1    budgets for those programs.  And just much greater detail.

2    But the PowerPoint from yesterday is some of the slides from

3    what is really a four-hour presentation as part of the City

4    of Solutions.

5    **Q.**   And does the City of Solutions look at the present or

6    does it look forward?

7    **A.**   It looks at the historical perspective of our community

8    up into the present.  And as we sort of subtitled it, a

9    Guide to What Works and What Doesn't, it was also

10   acknowledging there were things that may not have been as

11   successful or were a challenge to implement.  So, we looked

12   historically at programs that we started and continued and

13   also things that were necessary to move us forward but then

14   maybe not necessary to continue or weren't able to be

15   continued in some cases.  So, the -- it was really

16   historical up to the present day with some recommendations

17   for moving forward, but that was a shorter element.

18   **Q.**   And was there a time, Dr. O'Connell, that the lawyers

19   representing both the County and the City met with community

20   leaders regarding the City of Solutions and what was

21   happening within the community?

22   **A.**   There was.  When the City of Solutions was developed,

23   it was developed long before I, for one, knew anything about

24   this matter and that there would be any future events

25   involving litigation.  This was purely done with a

1    retrospective look at our community and at the request of

2    another community to help them move forward.  At one point,

3    in approximately two years ago, there was a -- or three

4    years ago, I apologize for the COVID year.

5    **Q.**   COVID year, we don't count that one.

6    **A.**   Approximately three years ago, there was a meeting of

7    individuals of the City of all leaders across the community

8    who did meet together and, at that meeting, Paul Farrell was

9    in attendance.

10   **Q.**   And was there a request that, as opposed to just

11   looking at the present and the historical and present what

12   was happening, that the community leaders begin looking what

13   do we need in the future?

14   **A.**   At that time, it was a discussion around sort of where

15   the community was going and what it would take to move the

16   community out of the current situation.  And my boss, Dr.

17   Steve Petrany, had invited me to that meeting and as the

18   discussion came up about does the community have a next

19   step, do we have a strategic plan for moving forward, I said

20   to him we're already doing that.  We're already working on

21   that because, as we had finished the City of Solutions,

22   there was this brief discussion about where we were and we

23   needed much more information about where to go next.

24        And so, our division had discussed an in-depth

25   strategic planning session.  We believed it was time that we

1    stop what I sort of would call the tail wagging the dog.

2    When a grant application would come out, we would say what

3    do we need to do to fit that application versus saying is

4    that grant application the right fit for our community

5    because we -- that's how we'd been for so long.  And we

6    wanted to be more strategic and selective in our time and

7    resources as we moved forward.

8        And so, at that time, we -- we realized that it would

9    be necessary to have a strategic plan moving forward and I

10   saw that conversation as the opportunity to do so and that

11   our division could lead that.

12   **Q.**   And so, did you volunteer?

13   **A.**   I did.

14   **Q.**   How did Dr. Petrany feel about that?  No, I'm teasing.

15   **A.**   I still have my job.

16   **Q.**   Yes.  And can you tell the Court what you did, what

17   measures you undertook, in order to make determinations

18   about the future needs of the community?

19   **A.**   At that time, we went back to our offices and said that

20   this would really be a detailed examination and we would

21   want to do it in a way that invoked all of our community

22   members.  I really like to use the royal "we" when we talk

23   about Huntington because there's no one person or entity

24   that's doing much of the work you heard about yesterday or

25   today but, rather, we are working collaboratively together

1    to move the community forward.

2         So, we pulled together focus groups and that meant

3    myself and one of our employees and another researcher on

4    our team pulled together what we call focus groups.  So, in

5    the world of qualitative research versus quantitative,

6    quantitative being numbers and surveys, we wanted to pull

7    together qualitative work which meant focus groups that we

8    brought the different parts of the continuum that we talked

9    about yesterday.

10        So, early intervention, community outreach, the

11   outpatient treatment, residential, but also target

12   populations like law enforcement and first responders, the

13   faith community, the unstably housed or the homeless

14   populations.  And so, throughout all of those, we pulled

15   together experts from the community and those with lived

16   experience in each of those areas to have a meeting.

17        And in that meeting we asked them what are your

18   short-term needs and what are your long-term needs.  And

19   this was hard because so many folks were used to just

20   responding to putting out the fire, sort of living on the

21   day-to-day crisis.

22        And so, we -- the opportunity to get creative and think

23   what it was going to take in the long-term to move us

24   forward to not only be reactive, but in a healthy way

25   responsive was what those meetings were done to do.

```
 1          And, so out of that, we pulled what became the
 2    Resiliency Plan and we called it that because we believe the
 3    community is resilient.  We believe it is flexible, and
 4    valuable, and it's able to change with whatever happens
 5    because the day that you write something about Huntington,
 6    it could change the very next moment.  A new grant could
 7    come in or a new issue could be presented that we didn't
 8    think of or see.
 9          And so, we need to be able to be learning on the ground
10    and it also means that we need to be out of our,
11    quote-unquote, ivory tower of the university and working
12    with people who are on the ground every day living with
13    Substance Use Disorder or working directly with those with a
14    Substance Use Disorder.
15    Q.   And, Dr. O'Connell, were there multiple drafts of this
16    before it took its ultimate form?
17    A.   I don't even want to count how many.  As we went
18    through it, there were multiple drafts a day in many cases.
19    There were -- there was a day I think there were probably
20    three or four drafts an hour as we moved between three
21    people writing and looking at it and then sending it to --
22    we also used a panel of experts and leaders in the community
23    as an advisory board.
24          So, we would bring it to them.  They would give
25    feedback.  Then we'd have to incorporate that feedback.
```

1    Then it would go back out.

2         In some cases then a grant might change and so we would

3    change an example or a forward-looking plan, but it was

4    something that down to the moment that we chose to release

5    it publicly, it changed.

6    **Q.**   And was there any attempt to put a price tag on what it

7    was going to cost to do what needed to be done in the

8    community?

9    **A.**   There was.  I, at one point, sort of took -- and I

10   remember taking Project Hope as an example.  So, I said

11   Project Hope, we were given $1.4 million renovations of a

12   building that was previously owned by the Huntington City

13   Mission.  And they were going to be not able to use that

14   building anymore.

15        And we now lease that building from them, but we gutted

16   it and completely re-did it to become what Project Hope is

17   today.  And -- and that took $1.4 million, I believe, and

18   then we received $2.1 in SAMHSA money, that grant from the

19   Substance Abuse and Mental Health Administration.

20        When we had both of those, I kind of looked at that and

21   said, well, that housed 17 families and, if we times that

22   by, I don't know, five years, that would sort of extrapolate

23   to this much money.  And then I said, well, five years isn't

24   going to do any -- much on this sort of epidemic.  What

25   about 10, 15, 20?

1    And I, at one point said, well, this really needs to be

2    like a three-generation plan because we already have these

3    infants affected.  We won't know what their needs are for

4    quite sometime.  So, we need to have that built into the

5    idea that there's long-term child development growing in

6    Project Hope, for example.  And all of that sort of would

7    come out to something different.

8    And then, at one point, I recognized I had no idea what

9    I was doing.  I am not a health economist.  I am not in any

10   way trained in that area.  And my expertise did not fall

11   there because my only experience had been SAMHSA says you

12   can write a grant for $2 million.  You don't submit a grant

13   to SAMHSA for $5 million.  You do whatever it takes to

14   submit a grant for $1,999,999.95.  Give them the extra $0.05

15   back, right?

16   So, we would always write to that amount.  If it's a

17   $50,000.00 grant, we're going to write to $50,000.00.  So, I

18   have no idea what something actually costs to turn around

19   and say this is what's needed.  I know this is what I'm

20   offered, this is what I can write to, and work to make some

21   good happen with that small amount of money.

22   And so, as we went through these types of things, I

23   very quickly recognized I had no expertise; whereas, the

24   rest of the plan had been community driven from experts.

25   This was an area we had no expertise both in the folks who

```
 1    were writing it or in our local community.
 2         And so, that was not the goal of our plan.  It had not
 3    been the goal of our prior efforts with the City of
 4    Solutions and it was something that was going to dilute the
 5    effort of the community.  And so, it was removed from any
 6    and all drafts.
 7    Q.   So, ultimately, are there any costs put forth in the
 8    resiliency plan?
 9    A.   Not by us.
10    Q.   Okay.  Now, in the resiliency plan were there certain
11    areas of focus that the community determined through the
12    focus groups and through your discussions with the
13    community?  Were there particular areas of focus that --
14    that kind of came into focus?
15    A.   Yes.  So, as we looked at it, we'd obviously started
16    with that same continuum of care, right?  We want to -- we
17    are nothing but consistent.
18         So, as we started yesterday, I said we looked at the
19    continuum of care looking backwards.  As we moved forward,
20    we wanted to use that same thing.  It's -- it's a national
21    standard.  Let's focus on that.  So we wanted to make sure
22    we had greater areas in all of this.
23         So, if I take just quickly, for example, prevention,
24    the top blue circle, prevention is often overlooked because
25    how do you prove prevention works, right?
```

1    How do I prove to you that I didn't smart smoking

2    because I went to a class that told me not to smoke, right?

3    It's much easier to prove that you were smoking and I

4    stopped you smoking and, therefore, I saved money because

5    the future cost of you smoking can be based on your past

6    cost of smoking.

7        But if you never started smoking, how do I indicate

8    it's because we did this intervention, or you had this

9    class, or you saw that crazy photo of lungs on a cigarette

10   packet?  It's hard to do.  And so, prevention is a huge

11   challenge, but it's also, in many cases, how we -- we

12   struggle because people don't have the healthy foundation.

13       And so, we're not getting upstream enough to stop folks

14   from entering the stream when we're right now trying to pull

15   them out as they're about to go off the waterfall or off the

16   cliff.

17       So, as the community sort of looked we focused more

18   in-depth on some of these areas and heard from folks in

19   these areas.  So, when I think of prevention I think of the

20   work that PEP, Prevention Empowerment Partnership, has done

21   and how that's been small but is definitely an area for

22   growing.

23       And then, as we sort of looked around that circle, it's

24   the continuum again.  It just goes early intervention,

25   outpatient services, inpatient and residential.  Then sort

1    of healthy communities.

2        But we started to expand it out also to economic

3    development because, as I mentioned yesterday, one of our

4    projects is CORE, Creating Opportunities for Recovery

5    Employment, and CORE is needed because we can get people

6    into recovery, but if we can't get them back to work, why

7    are they going to stay in recovery?  If they can't make

8    money, they're going to go find a way to make money in a way

9    that they did in the past.  And so, they need a reliable

10   sustainable job.

11       That's also part of a healthy community.  So, we wanted

12   to focus more on economic development and that meant that we

13   needed to have the educational and vocational training to

14   support that and that we needed to also have our responders,

15   our helpers being helped at the small scale they are being

16   currently, but also sort of capping all of this that

17   continued to come into focus, is we've done all of this

18   rapidly.

19       And people often ask, you know, where's -- where's the

20   publications?  Where's all your research behind it?  And I

21   often say we've been running around with our hair on fire.

22   I don't have time.  My priority is saving a life right now.

23   It's not getting out my name on a publication.

24       And that's important.  And as a -- you know, a doctoral

25   student of a large research university like Virginia Tech,

1    that is the priority in most cases, but that's not been

2    ours.  And so we want to, though, make sure we're

3    prioritizing that because we know what we're doing works.

4    It's being shown through the evaluation of our grants, but

5    as we move forward, we want to make sure that we're

6    automatically moving hand-in-hand with this is working or,

7    if it's not, being able to pivot.

8    **Q.**    And were there some short-term approaches that -- that

9    the group concluded would be in the best interest of the

10   community?

11   **A.**    There were.  It was, again, a challenge to summarize

12   this down, but our goal was to make this a brief document.

13   *The City of Solutions* book is thick.  I don't know how many

14   pages it ended up being, but it would sit, you know, about

15   that wide (indicating).

16        Whereas this, the Resiliency Plan, our goal, I think,

17   was 20 pages and sometimes writing 20 pages is harder than a

18   hundred.  And so, we really tried to condense down what the

19   community had said from each of those meetings.  So, if they

20   said short-term goals and long-term goals.

21        And so, just a few of those would be that we know that

22   we want to know a lot more about what the children are

23   experiencing.  So, if the children -- a child is exposed to

24   neo -- or is born with exposure and born with Neonatal

25   Abstinence Syndrome, we want to know what does that look

 1    like at six months, at a year, at a year and one month?  You

 2    know, what types of early interventions are needed and

 3    what's working?

 4         And then what types of interventions are needed when

 5    they get to school?  Because, in most cases, we can't just

 6    forget about it when they show up in kindergarten.  And

 7    there's, you know, very little research out there, but there

 8    is, you know, a study out of Australia that shows that there

 9    are deficits at different times of school populations when

10    in comparison.

11         So, we want to make sure that we have remember search

12    that's growing with kids and that's a challenge to do.  And

13    so, we want to -- we want to make sure we get that set up.

14         We want to make sure that the education we're providing

15    -- you know, prevention education in the United States often

16    still sits around the topic of maybe don't do drugs or

17    putting out the bashed up car the night before prom to tell

18    kids not to drink and drive.

19         We need to do a lot more than that when it comes to

20    using medications and -- and taking illicit drugs of any

21    kind.  And so, expanding that type of education and finding

22    out what works and what doesn't.

23         And so, we also looked at harm reduction and how we

24    could expand and sustain those.  And so, in some cases, it's

25    not saying we need a different service maybe today, but we

1    need to sustain what we have now and be ready to grow to

2    what we have a need for in the future.

3    **Q.**    So, through both the road to recovery that you

4    discussed with the judge yesterday, and then through the

5    City of Solutions, and then finally to the Resiliency Plan,

6    does the community have the foundation and the

7    infrastructure to do what it needs to do?

8    **A.**    Yes.   We have -- I think one of the -- the most proud

9    sort of feelings in Huntington is that the groundwork is

10   there, that we -- I think we can say it does feel to me like

11   we're standing on a solid foundation right now, that we have

12   the community partners, that we're uniquely situated because

13   we, as a community, chose not to bury our heads in the sand

14   and not acknowledge our problems, but rather said we are

15   living in an epidemic.   We are losing people every day.   How

16   can we unite to get out of this?   And so, most, if not all

17   groups have set egos aside and collaborate on small amounts

18   of money and grant applications to ensure that we're

19   successful to show, you know, that we can go up against the

20   big dogs and big cities.

21        I remember the first time we applied for the Project

22   Hope grant, we didn't receive it.   It went to like Dallas,

23   Austin, Boston, New York, Los Angeles.   And we just looked

24   at that and said, well, no wonder.   I mean, we can't

25   compete.   Most people probably couldn't find Huntington on

```
 1    the map.  And that's not fair because our numbers were far
 2    worse per capita.
 3         And so, that took some legislative efforts and -- and a
 4    re-configuring for the way that we were demonstrating our
 5    worth but, you know, the second time, we did receive that
 6    grant.
 7         So, that goes to show both that our community is doing
 8    what it takes to have that foundation, but also, even in
 9    that case, that the federal government recognized early on
10    that we were already starting to build those collaborative
11    pathways to be able to implement a really big lift.
12    Q.   So, with the foundation, infrastructure and the plan
13    moving forward, can you tell the Court what's needed?
14    A.   Well, do you have the rest of a day?  I know you get
15    out early on Friday.
16              THE COURT:  Only until noon.
17              THE WITNESS:  Only until noon?  Okay.  Well, I'll
18    make this quick then.  No, we -- there's a lot that sort of
19    -- needs as we move forward and we want to be flexible
20    because as we -- one of the big things we outlined was a
21    transportation plan, for example.  If you live ten miles
22    outside the City of Huntington, it's going to be really hard
23    to get into the City of Huntington some days.
24         If you need to be at treatment -- okay.  So, if I, you
25    know, needed to be at my medication-assisted treatment
```

```
 1    appointment today and I had to be -- let's say court was in
 2    Huntington but I needed to be at treatment but I also had to
 3    figure out child care, and to be here on time, and to make
 4    sure I made that appointment.  It would be impossible.  I
 5    wouldn't be able do it, especially if I didn't have a car.
 6    So, transportation becomes this large barrier to getting
 7    people into care.
 8         Also, 9 to 5 outpatient treatment is a barrier because,
 9    like I said, today I wouldn't have been able to make that,
10    to make my medication appointment, to keep me in long-term
11    recovery.  So, we wanted -- we recognized that we need
12    expansive levels of care.
13         So, things that are going really 24/7; that if you at
14    2:00 a.m. recognize you need help, it needs to be there.  Or
15    if you get out of work at 5:00, you need to be able to see
16    someone at 7:00 p.m.  And so that just takes a lot more
17    manpower to sustain and a lot more opportunities.
18         It also means that we can set up -- or we would like
19    the idea of hubs and spokes.  If it's working at PROACT, for
20    example, could work out of a mobile clinic ten miles outside
21    of town so you don't need to drive out into town, we can
22    meet you where you're at, then that needs to happen.
23    So, if we look at transportation sort of as a link.
24         But even when I take that simple example, when we wrote
25    this, we got a small transportation grant to start using
```

1    Uber, as an example, or Lyft, as an opportunity that people

2    could call Lyft and that we would cover that if they showed

3    up for a medical -- a substance use treatment appointment.

4        The State of West Virginia has implemented an expanded

5    TTA, transportation hours of the bus.  They'll come out and

6    get you if you live in a rural community to bring you to

7    substance use.  Those are both very small pilot programs,

8    but they give us hope for future things.

9        So, I say that to sort of highlight even one of the

10   things we wrote 18 months ago, two years ago, a year ago, is

11   -- is -- would be updated today to say, hey, here was

12   something that worked that we didn't think about at the time

13   that could work moving forward.  So, transportation would be

14   sort of one example of how it's connected.

15       Expanding resources across the community out into the

16   rural areas around our area.  Expanding prevention and early

17   intervention efforts.  The goal of sustaining harm reduction

18   and harm reduction efforts, not just potentially in a

19   singular location, but that they're meeting people again

20   where they're at.

21       We've set up something like Project Hope that meets a

22   small portion of the pregnant and parenting need, but we

23   don't have anything in that example that would treat

24   parenting fathers.  So, that's automatically a gap that we

25   acknowledged when we started treating parenting women.

1          When we look at the workforce population with even

2     CORE, we're every day recognizing there's more and greater

3     need for training, education and resources to get people

4     workforce ready and to help them overcome legal fines or

5     custodial fines and get their ID.

6          If we just walk through the experience of someone

7     trying to get out of incarceration, we know that we need

8     greater efforts around re-entry services and the linking

9     between incarceration and successful connection.

10         And in most of these cases, we know that it works if

11    someone is there supporting you, whether that's a peer or a

12    family navigator, we know that if someone comes alongside

13    and says I can help you do this, they're -- they're much

14    more likely to be successful.  And so, we need that systemic

15    network to work around the individual, the family, and even

16    the community system.

17         And so, as we sort of looked through those long-term

18    approaches, that's sort of the recurring theme, that as we

19    look at early intervention, we want a system built around

20    that.  If we look at high school and college age youth and

21    their intervention, we want a healthy system built around

22    them.

23         If we look at law enforcement, we want to ensure that

24    they are healthy themselves and that they're also doing best

25    practice with the people they're engaging and that doesn't

1      always need to be jail or incarceration, that there might be

2      other diversions or pathways for folks.

3          And then, similarly, that as we look at the long-term,

4      we need healthy grand families.  We have lots of

5      grandparents raising grandchildren and we need -- or kinship

6      care, which means another loved one of an individual raising

7      a child, and those often don't go through the formal foster

8      care system.  And so, they need support.  And the foster

9      care system needs support.

10          So, as we look at all of those systems the long-term

11     approaches go through each of those and how they can be

12     connected because all of this is what we would deem

13     intersectional.  It all intersects with each other and you

14     can't kind of address one issue without addressing the

15     others.

16     **Q.**   And have most of the programs that you have discussed

17     with the Court, have those been grant funded?

18     **A.**   All exclusively have been grant funded.

19     **Q.**   And what's the difficulty with that?

20     **A.**   Well, the grant cycle changes, so you never know what

21     grant is going to come out.  So, at any given time the

22     federal government can change their funding structure and

23     goals and then they're going to release a grant.  And what

24     happens is you --

25          Let's take SAMSHA, for example, the Substance Abuse and

```
 1    Mental Health Administration.  They may release a grant and
 2    that grant is only eligible to academic institutions or
 3    community behavioral health centers that have two years of a
 4    licensed behavioral healthcare center certificate, which for
 5    a long time, we didn't have.  We didn't have two years of an
 6    LBHC, a licensed behavior, which means we've gone through
 7    all of the codes and credentialing for the State of West
 8    Virginia and the Medicaid payers, the MCOs.  So, Project
 9    Hope and PROACT are now LBHCs.
10        But before, we weren't eligible because we didn't have
11    that two-year experience.  So, any grant that they released
12    that required that, we couldn't apply for.  Now we can.
13        But so, if we take any grant before, automatically we
14    weren't eligible for that federal funding.  If we now say
15    we're eligible for that funding we have to write -- the
16    grant will come out and it will say this grant targets the
17    expansion of medication assisted treatment in rural
18    communities and, if that's SAMHSA, that's one definition of
19    a rural community, and if that's HRSA, which is another
20    funder, the Human -- Health and Human Resources
21    Administration, they have a completely different definition
22    of rural communities.  So, each of those would lead to
23    Cabell County being eligible or not eligible for the grant.
24        So again, we might get into it and realize we can't do
25    it.  But let's say we are perfectly eligible and the grant
```

1    is to expand medication assisted treatment.  You are

2    required to respond to what they call the RFA and -- or the

3    call for applications, call for funding applications or

4    awards, and you write normally 10 or 20 pages of a specific

5    format.  It's a very, very detailed format with a budget and

6    a budget narrative defining exactly how you'll spend that

7    money.

8         And then any -- if awarded any deviation of any line

9    item of ten percent has to go back to the funder to explain

10    why.  And there's normally stipulations.  A certain amount

11    can go to what we call overhead or indirect costs like

12    through the university.  A certain amount of the grant could

13    be used for the evaluation purposes and they might require

14    ten percent or twenty percent to go to evaluation.

15         And they might say -- and none of that is ever allowed

16    for what we call bricks and mortar.  So, no federal funding

17    is normally allowed for any type of construction or

18    renovation of any kind, this being one of our largest

19    barriers often.  It was our barrier to the Project Hope

20    grant.

21         So, as -- you then sort of go through that process.

22    You write it and you'll say this is exactly what we'll do

23    with this amount of money.  And they say, if awarded, you

24    have six months to implement the project or -- or start

25    project and, if you can't demonstrate it, you lose your

1    funding.

2         So, if awarded -- now, everybody across the country is

3    applying and everybody believes they deserve it just as much

4    as everyone else.  And simple things could be used to kick

5    you out of the cycle.  Incorrect, you know, page, not

6    following the format guidelines is an automatic dismissal,

7    but we hope we wouldn't make such a silly mistake over such

8    big, important things, but little things can happen.

9         And then that goes in and it's graded or rated normally

10   by a series of reviewers that move you forward in the

11   process and then to a final review process that is either

12   awarded or not.

13        And they may say there's a number of awards, like ten

14   awards, or they say we have $20 million and so, submit your

15   project for no more than this amount and we'll dole out that

16   money across the project.  So, they may hold some of it if

17   they don't feel as though all the projects -- that there's

18   enough projects that meet their standards.  So, at any given

19   time, we can spend a lengthy period of time working on a

20   grant, getting all of the community partners because they

21   always require collaboration, and all the letters and

22   Memorandums of Understanding that dictate that, and then

23   submit, and then you wait.

24        And it could be 6-9 months before you find out and

25   sometimes it's just an e-mail that says thank you for

1    applying.  You were not awarded.  Sometimes you see the

2    press release from another community that says they were

3    awarded.  And sometimes you get the very lucky e-mail that

4    says you were awarded.

5         And then you scramble.  You figure out how to start

6    doing the work immediately.  And that's both an exciting and

7    anxious process because it means we're going to make change,

8    but it means we have often 4-6 months to get that up and off

9    the ground.  And we've -- we have not returned any of our

10   grants for noncompliance in that timeline.

11   **Q.**   And, Dr. O'Connell, as opposed to depending upon the

12   grant process, what's needed in the community?

13   **A.**   Long-term sustainable reliable funding.  If I didn't

14   have to spend -- maybe sometimes this past two months, maybe

15   half of my time was spent on three grants that we've

16   submitted that we won't know if we'll receive.  And we work

17   on those -- I worked on a grant until the night before I

18   delivered.  That's how important these grants are to get

19   out.

20        And so, we're constantly sort of working on that and we

21   don't know if we'll get awarded.  So, if we knew that there

22   was reliable funding, I can't even imagine what all that

23   could be done to actually make a difference if it wasn't

24   chasing the new guidelines from the federal administration

25   and the next new grant that launches.

```
 1              MS. QUEZON:  Your Honor, may I have a moment to
 2   confer?
 3              THE COURT:  Yes.
 4         (Pause)
 5              MS. QUEZON:  We pass the witness at this time,
 6   Your Honor.
 7              THE COURT:  All right.  Cross examine, Mr. Ruby?
 8              MR. RUBY:  Yes, Your Honor.
 9         May I proceed, Your Honor?
10              THE COURT:  Yes.
11                        CROSS EXAMINATION
12              BY MR. RUBY:
13   Q.   Good morning, Dr. O'Connell.  How are you?
14   A.   Good morning.  Thank you.  I'm fine.  How are you?
15   Q.   Fine, thanks.  My name is Steve Ruby.  I'm representing
16   Cardinal Health.  It's good to see you.
17   A.   Good to see you, as well.
18   Q.   You were on the radio not long ago, weren't you,
19   Doctor?
20   A.   I was.
21   Q.   I think -- I think I heard your voice on my drive into
22   work the other day.  You had an interview on West Virginia
23   Public Broadcasting?
24   A.   I did.
25   Q.   And in that interview you were commenting on this case;
```

1    is that right?

2    **A.**    Yes.

3    **Q.**    And in particular you were asked what do you think a

4    big settlement for the County and City could accomplish; is

5    that right?

6    **A.**    That is true.

7    **Q.**    And in your answer you said ideally it would mean

8    multi-millions of dollars coming to these communities; is

9    that right?

10   **A.**    I don't remember my exact quote.

11   **Q.**    But fair to say that before you came here to testify,

12   you were in the news media talking about what you thought

13   the plaintiffs ought to get out of this case, right?

14   **A.**    I was asked what I believed a settlement could do and I

15   responded.

16   **Q.**    Let's talk about the Resiliency Plan, Dr. O'Connell.

17   You spoke about that with Ms. Quezon, correct?

18   **A.**    Yes.

19   **Q.**    And you were one of the key people who was involved in

20   preparing that plan?

21   **A.**    Yes.

22   **Q.**    Now, you talked about the meeting that was the genesis

23   of the origin of the Resiliency Plan, correct?

24   **A.**    Yes.

25   **Q.**    And that was a meeting that happened around March of

```
1    2019; does that sound right?
2    A.   I believe so.
3    Q.   And plaintiffs' counsel, counsel for Cabell County
4    here, was present at that meeting; is that right?
5    A.   Paul Farrell was present for the meeting.
6    Q.   And Mr. Farrell spoke in the meeting?
7    A.   He did.
8    Q.   He took a leadership role in the meeting?
9    A.   He spoke in the meeting.
10   Q.   I'm going to show you, Dr. O'Connell, an e-mail that
11   was sent in the -- in the wake of that meeting and this is a
12   document that's been marked as DEF-WV-778.  Do you have that
13   document in front of you, Dr. O'Connell?
14   A.   I do.
15   Q.   And this -- this document is an e- mail from Dr.
16   Stephen Petrany; is that right?
17   A.   This is.
18   Q.   And I believe you testified earlier that Dr. Petrany is
19   your boss?
20   A.   He is.
21   Q.   He's the Chair of the Department of Family Medicine and
22   Community Health at Marshall, correct?
23   A.   Correct.
24   Q.   He's been teaching and practicing medicine in
25   Huntington since 1989 or thereabouts?
```

1    **A.**    I have no idea.

2    **Q.**    He's -- he's one of the founders of PROACT; is that

3    right?

4    **A.**    He is a member of the PROACT Board.

5    **Q.**    And you testified about PROACT yesterday?

6    **A.**    I did.

7    **Q.**    That's a major provider now of addiction treatment

8    services in Huntington, right?

9    **A.**    One of the -- one of them.

10   **Q.**    And Dr. Petrany sent the e-mail that you have in your

11   hand now to a group of people who were present at the

12   meeting that Mr. Farrell convened; is that right?

13   **A.**    Correct.

14   **Q.**    And is that -- is that correct to say the meeting was

15   convened by Mr. Farrell?

16   **A.**    I don't know.

17   **Q.**    It was held at a -- at his family's law firm; is that

18   right?

19   **A.**    It was held at a law firm downtown.  To say that I know

20   any of the law firms downtown would be above my expertise.

21   **Q.**    And one of the people who received this e-mail was you,

22   correct?

23   **A.**    I am on this e-mail.

24   **Q.**    And you recognize this as an e-mail that Dr. Petrany

25   did send to you, correct?

1    **A.**   I believe so.

2           MR. RUBY:  Your Honor, I would move the admission

3    of DEF-WV- 778.

4           THE COURT:  Is there any objection?

5           MS. QUEZON:  No, Your Honor.

6           THE COURT:  It's admitted.

7           BY MR. RUBY:

8    **Q.**   The subject line of this e-mail, Dr. O'Connell, is

9    Comprehensive Plan to Address the Impact of the Opioid

10   Crisis.  Do you see that?

11   **A.**   I do.

12   **Q.**   And it begins, hello all.  I am writing you as a

13   participant in the meeting last week that focused on

14   developing a comprehensive integrated "abatement" plan for

15   our community to address the impact of the opioid crisis

16   going forward.  Did I read that correctly?

17   **A.**   You did.

18   **Q.**   And you understood that that plan was going to be used

19   in this litigation, right?

20   **A.**   I did not.

21   **Q.**   Do you recall, Dr. O'Connell, giving a deposition in

22   this case last year --

23          MS. QUEZON:  Mr. Ruby, I'm sorry.  Objection to

24   the time frame of when she either -- if you could just clear

25   that up.  It may -- it may clear it up.

1          THE COURT:  Can you clear that up, Mr. Ruby?

2          MR. RUBY:  Yes.

3          BY MR. RUBY:

4    **Q.**   So, at any point Dr. O'Connell, did you understand that

5    the -- that the plan that was discussed at that meeting was

6    going to be used in this litigation?

7    **A.**   Anytime did I understand?  When in that initial meeting

8    I did not -- it was not my awareness that the plan was

9    necessarily something that was going to be used in further

10   -- future litigations.

11   **Q.**   But the litigation, this litigation, was discussed in

12   that meeting, correct?

13   **A.**   I believe it was brought up.

14   **Q.**   And the plan that ultimately became the Resiliency Plan

15   was discussed in that meeting, correct?

16   **A.**   The idea of the community having a strategic plan

17   moving forward was braced.

18   **Q.**   And, in particular, in the e-mail that Dr. Petrany sent

19   shortly after the meeting, he described it as an "abatement"

20   plan; is that right?

21   **A.**   With quotes, yes.

22   **Q.**   And do you know what he meant by those quotes?

23   **A.**   I do not.  Not my e-mail.

24   **Q.**   And, at some point, you did come to understand that the

25   plan was going to be used in this litigation, correct?

1    **A.**   Can you clarify?  At some point, did I understand that

2    our plan could be used?  I knew that we were creating a

3    strategic plan for our community that would be utilized to

4    move the community forward.  If that was then to be chosen

5    to be a part of opioid litigation, that was beyond my --

6    beyond my recommendations.

7    **Q.**   And to set the time frame a little more precisely, the

8    meeting that we're talking about right now with Mr. Farrell

9    was held -- well, the e-mail is from March the 5th, 2019 and

10   it says -- it refers to a meeting last week.  So, the

11   meeting was held sometime end of February, early March,

12   2019, right?

13   **A.**   Seems that way, yes.

14   **Q.**   And the plan was developed primarily between that point

15   and September of 2019; is that right?

16   **A.**   Plan was initiated in the Summer of 2019, yes.

17   **Q.**   And I'll ask the question a slightly different way.  At

18   some point in that time period, you came to believe that the

19   plan was going to be used in this litigation, correct?

20   **A.**   We believed at some point during that time it was made

21   -- it was -- we knew that we were working on a strategic

22   plan for our community that could be utilized by whomever it

23   was necessary to do whatever it was necessary with for the

24   benefit of our community.

25   **Q.**   Let me go back to your deposition and let me just ask

1    to make the question a little more precise, Dr. O'Connell.

2    You said could be used.  It was, in fact, your belief that

3    the plan would be used in this litigation, correct?  And I

4    will emphasize the word "would".

5    **A.**   Would be used?  I assumed that it would likely be used

6    as we were putting forward a plan that was going to be for

7    the health of our community.

8    **Q.**   And, again, I just want to make sure I have a clear

9    record.  When you say you assumed that it would be used, do

10    you mean that you assumed that it would be used in this

11    litigation?

12    **A.**   I guess so.

13    **Q.**   Let's -- let's look at some of the other people who

14    were involved in the meeting with Mr. Farrell.  If you've

15    got the e-mail there, Dr. O'Connell --

16    **A.**   Uh-huh.

17    **Q.**   Do you see the name Brian Gallagher?

18    **A.**   I do.

19    **Q.**   Who is Brian Gallagher?

20    **A.**   Brian Gallagher works for the School of Pharmacy and he

21    is also through Marshall Health as working for the Office of

22    Drug Control Policy or the Governor's Council.

23    **Q.**   He is a professor at Marshall School of Medicine -- or,

24    sorry, School of Pharmacy?

25    **A.**   Yes.

1    **Q.**    He is a pharmacist?

2    **A.**    I believe so.

3    **Q.**    And he is, in fact, the Chair of the Governor's Council

4    on Substance Abuse in West Virginia, right?

5    **A.**    Yes.

6    **Q.**    And that council covers substance abuse issues

7    throughout the entire state, correct?

8    **A.**    Correct.

9    **Q.**    Jerome Gilbert, do you see that name?

10   **A.**    Yes.

11   **Q.**    Who is Jerome Gilbert?

12   **A.**    The current President of Marshall University.

13   **Q.**    Do you see Michael Kilkenny?

14   **A.**    Yes.

15   **Q.**    Who is Dr. Kilkenny?

16   **A.**    He is the Cabell-Huntington -- the Director of the

17   Cabell-Huntington Health Department.

18   **Q.**    Do you see the name Gordon Merry?

19   **A.**    I do.

20   **Q.**    Who is Gordon Merry?

21   **A.**    The Director of Cabell County EMS.

22   **Q.**    Let's see.  Connie Priddy?

23   **A.**    She is -- works for Cabell County EMS and is the

24   coordinator for the Quick Response Team.

25   **Q.**    ggwhite@jrw-advisors.com, do you recognize that?

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **A.**    I do not.

2    **Q.**    Do you know who Gary White is?

3    **A.**    I do not.

4    **Q.**    If I asked you if you remember that Gary White is the

5    former President of Marshall University, would that ring a

6    bell?

7    **A.**    It would not.

8    **Q.**    karen.yost@prestera.org, do you see that?

9    **A.**    She is the past CEO of Prestera.

10   **Q.**    And what's Prestera?

11   **A.**    Prestera is a community behavioral health organization,

12   one of the -- the hubs for behavioral health in West

13   Virginia, and the first organization I worked for when I

14   moved to West Virginia.

15   **Q.**    And behavioral health, specifically, one of the things

16   that Prestera provides is addiction treatment; is that

17   right?

18   **A.**    Correct.

19   **Q.**    It's the largest or one of the largest addiction

20   treatment providers in the Tri-State area?

21   **A.**    I would assume so.

22   **Q.**    Beth Thompson, do you see that name?

23   **A.**    Yes.

24   **Q.**    Who is Beth Thompson?

25   **A.**    I am not sure.

1    **Q.**    Do you see kellisobonya@gmail.com?

2    **A.**    Yes.

3    **Q.**    Who's that?

4    **A.**    Kelli Sobonya is a Cabell County Commissioner.

5    **Q.**    And she -- before she was a Cabell County Commissioner,

6    she was also a member of the Select Committee on Substance

7    Abuse Prevention and Treatment in the West Virginia House of

8    Delegates?

9    **A.**    I will take your word for it.

10   **Q.**    Kevin Yingling, do you see that name?

11   **A.**    Yes.

12   **Q.**    Who is Dr. Yingling?

13   **A.**    Jack of all trades.  He is an internal medicine

14   physician and he does many things.  He sat on, I think --

15   I'm not sure if he currently sits on the board of the

16   hospital.  He is somewhat retired, but many are retired on

17   that.

18   **Q.**    He's a doctor?

19   **A.**    Yes.

20   **Q.**    And he's a pharmacist?

21   **A.**    Internal medicine, I think.

22   **Q.**    Was he, at one point, the Dean of the School of

23   Pharmacy?

24   **A.**    I don't think so.

25   **Q.**    He was a former Chairman of the Board of Cabell

1    Huntington Hospital; is that right?

2    **A.**    Yes, I believe so.

3    **Q.**    And Cabell-Huntington is the largest hospital in the

4    Tri-State region; is that right?

5    **A.**    It's now part of the Mountain Health System, but yes.

6    **Q.**    That's a billion-dollar-a-year healthcare enterprise,

7    right?

8    **A.**    I do not see their books.

9    **Q.**    And all of these people -- I left off Todd Davies.  Who

10   is Todd Davies?

11   **A.**    Todd works in our department as a -- he's the Associate

12   Director of Research; whereas, I'm (unintelligible) --

13            COURT REPORTER:  I'm sorry?

14            THE WITNESS:  He's the Associate Director of

15   Research.

16            BY MR. RUBY:

17   **Q.**    Mr. Davies, Dr. Davies, is the Associate Director of

18   Research for the Department of Family Medicine and Community

19   Health?

20   **A.**    For the Division of Addiction Sciences.

21   **Q.**    For the Division of Addiction Science.  And all of

22   these people were in this meeting in February, March of 2019

23   about the development of the abatement plan Dr. Petrany

24   refers to in the e-mail, correct?

25   **A.**    I believe they were in attendance.  I can recall most

1    of them.  There's a few I don't remember being there.

2    **Q.**   Now, collectively, this is a group with a tremendous

3    amount of knowledge about addiction treatment in Cabell

4    County specifically, right?

5    **A.**   Yes.

6    **Q.**   And it's a group that has a tremendous amount of

7    knowledge about healthcare in Cabell County; is that right?

8    **A.**   Yes.

9    **Q.**   And that includes Huntington, of course, correct?

10   **A.**   Yes.

11   **Q.**   And one of the results of the meeting Dr. Petrany

12   refers to in the e-mail is that Dr. Petrany himself was

13   selected to lead the development of the Resiliency Plan,

14   right?

15   **A.**   Yes.

16   **Q.**   And you worked closely with him to do that, correct?

17   **A.**   Yes.

18   **Q.**   After the meeting with Mr. Farrell, you and Dr. Petrany

19   and others in your -- in your department started developing

20   a plan, correct?

21   **A.**   Correct.

22   **Q.**   And to do that, you talked a little bit about the

23   process with Ms. Quezon.  You had meetings with community

24   leaders, correct?

25   **A.**   Uh-huh.

1   Q.   Including the people who were listed on this e-mail?

2   A.   Most of them were not part of the focus groups but,

3   rather, we -- as the plan was developed was brought back to

4   them for feedback and input.

5   Q.   These would be part of what you referred to in your

6   earlier testimony as the Advisory Board, right?

7   A.   We call -- in any of our grants that's sort of common

8   language and so that's what I refer to any governing group

9   that we get together.

10  Q.   And you worked with people -- these folks who are on

11  this e-mail, but also other folks who have expertise in

12  addiction treatment; is that right?

13  A.   Correct.

14  Q.   You work with people who have been working in addiction

15  treatment in Cabell County for a long time, have been,

16  right?

17  A.   Correct.

18  Q.   And you work with people -- including these people, but

19  also other people who have expertise in healthcare?

20  A.   Yes.

21  Q.   People who have been providing healthcare in Cabell

22  County for a long time?

23  A.   Yes.

24  Q.   People who have been -- who have been in the leadership

25  of healthcare organizations in Cabell County for a long

1    time, correct?

2    **A.**    This would be the most senior group of people.  The

3    folks that we met with for the focus groups were more folks

4    who were on the ground, implementation, doing different

5    projects and how they were struggling or succeeding in

6    those.

7    **Q.**    And over a period of months, as you described a few

8    minutes ago, that group put together a draft of what

9    ultimately became the Resiliency Plan, correct?

10   **A.**    Correct.

11   **Q.**    Dr. O'Connell, we have marked one of those drafts as

12   DEF-WV-929.  Doctor, do you recognize this as a draft of the

13   Resiliency Plan?

14   **A.**    Yes.

15   **Q.**    And the date on this is August 19th.  Just August 19th,

16   correct?

17   **A.**    Correct.

18   **Q.**    But that means August 19th, 2019?

19   **A.**    It does.

20   **Q.**    That was the period of time when you were developing

21   this, correct?

22   **A.**    Correct.

23   **Q.**    I want to direct you first, Dr. O'Connell, to the

24   acknowledgments page.  This is Page 1, if you're looking at

25   the pages on the document itself.

1    **A.**    Yes.

2    **Q.**    We also have page numbers in the lower left-hand corner

3    here, and if you're looking at those long numbers, it ends

4    with 005.  Do you see that page?

5    **A.**    Yes.

6    **Q.**    So, this is a list in the Resiliency Plan of

7    organizations and people who contributed to the development

8    of the plan, correct?

9    **A.**    Correct.

10   **Q.**    And first, we have contributing organizations.  Do you

11   see that section a little bit below the top part of the

12   page?

13   **A.**    Yes.

14            MR. RUBY:  And, Your Honor, just so we can get

15   this on the screen, I'll go ahead and move to admit

16   DEF-WV-929.

17            THE COURT:  Is there any objection?

18            MS. QUEZON:  It's hearsay.  I don't mind it as a

19   demonstrative if she wants to talk about it.

20            MR. RUBY:  And, Judge, we're not offering it --

21   certainly not offering it for the truth of the statements

22   that it contains.  This is being offered as a series of

23   documents that are going to show notice to the -- to the

24   plaintiffs of what local experts estimated the appropriate

25   cost for an abatement plan would be.

```
 1              THE COURT:  I'll admit it for the limited purpose.
 2              BY MR. RUBY:
 3    Q.   All right.  So, we have contributing organizations, Dr.
 4    O'Connell.  Do you see that section?
 5    A.   Uh-huh, yep.
 6    Q.   The very first one is the Cabell County Commission; is
 7    that right?
 8    A.   Correct.
 9    Q.   Cabell County Commission is one of the two plaintiffs
10    in this case.  Did you know that?
11    A.   Yes.
12    Q.   And the Cabell County Commission contributed to this
13    plan, correct?
14    A.   The -- with any Advisory Board there are members who
15    sit on that Advisory Board who were offered drafts or
16    examples in meetings and drafts or examples of the plan.
17    People who -- anybody who sat in one of those meetings was
18    designated a contributing organization.
19         As I referred to earlier, in Huntington, we like the
20    royal "we" and it's very important that if someone attended
21    or participated, even in a small capacity, that we engage
22    them as a contributing organization as to ensure that we're
23    collaborative as a community and not leaving folks out.  So,
24    people's involvement on this list would vary greatly.
25         As -- the Joan C. Edwards School of Medicine would be
```

1     the writer and the predominant folks on it who did 99

2     probably percent of that work and community members who sat

3     in these different groups would be people who made up some

4     of the focus groups and/or the advisory groups, which means

5     they attended a meeting and may never have said a word.  So,

6     I can't speak to each group's percentage of engagement.

7     **Q.**   And I appreciate that.  But when you put -- or whoever

8     put Cabell County Commission on the list of contributing

9     organizations here, they weren't making that up, were they?

10    **A.**   No.

11    **Q.**   Cabell County EMS, that's Emergency Medical Services,

12    right?

13    **A.**   Yes.

14    **Q.**   They're listed as a contributing organization here?

15    **A.**   Uh-huh.

16    **Q.**   The Cabell-Huntington Health Department, that's the

17    organization that is in charge of public health in Cabell

18    County and Huntington, right?

19    **A.**   They're the Health Department.

20    **Q.**   And they have a significant leadership role in public

21    health in the community?

22    **A.**   Yes.

23    **Q.**   And the Health Department is listed as a contributing

24    organization here, correct?

25    **A.**   Yes.

1    **Q.**   Cabell Huntington Hospital, we already talked about

2    them.  Largest hospital in the county, right?

3    **A.**   Yep.

4    **Q.**   And they're listed as a contributing organization here?

5    **A.**   Yep.

6    **Q.**   Marshall Health, that's the medical practice side of

7    Marshall; is that right?

8    **A.**   Yes.  We need a Venn diagram if you'd like me to

9    explain the Marshall, Marshall Health, Marshall Joan C.

10   Edwards School of Medicine and Marshall University Research

11   Corporation.

12   **Q.**   But it is correct to say that Marshall Health is an

13   organization affiliated with the university that handles the

14   clinical or practical treatment side of the university's

15   healthcare mission?

16   **A.**   Just for the sake of clarification, Marshall University

17   has, as part of it, both separate and equal, the Joan C.

18   Edwards School of Medicine, which is the med school.  The

19   physicians who practice as part of the med school, so the --

20   the educators and the medical school also practice.  They

21   practice under Marshall Health.

22        So, when we sit in the Department of Family and

23   Community Health, that's academic under the Joan C. Edwards

24   School of Medicine, but also, physicians as family doctors

25   under family medicine under Marshall Health.

1          And then, because it will come up, the Marshall

2    University Research Corporation, which we refer to as MURC,

3    M-U-R-C, which is the second of the second column, is the

4    organization where we -- all federal funds go through

5    because that's how a university works.  You have a research

6    corporation.  So they're the grant managers for any federal

7    money.

8    **Q.**   And Marshall Health is a -- it's a big medical

9    practice, right?

10   **A.**   Yes.

11   **Q.**   I'm sorry.  Go ahead.

12   **A.**   Yes.

13   **Q.**   40-plus clinical locations, correct?

14   **A.**   I assume.  I'll take your word for that.

15   **Q.**   And over $200 million a year in revenue from that

16   medical practice, correct?

17   **A.**   I do not know.

18   **Q.**   Marshall University's listed here as a contributor.  Do

19   you see that?

20   **A.**   Yes.

21   **Q.**   And Marshall University is another institution that's

22   there in Cabell-Huntington, in Huntington, correct?

23   **A.**   Yes.  That umbrella structure of the university.

24   **Q.**   And Marshall University itself, separate and apart from

25   the healthcare side of the house, also has a

1    $200 million-plus budget annually, correct?

2    **A.**    I do not know.

3    **Q.**    Mountain Health Network, you mentioned them.  That's

4    the umbrella entity that now sort of encompasses Cabell

5    Huntington Hospital and St. Mary's Hospital; is that right?

6    **A.**    Cabell Huntington Hospital and St. Mary's Hospital

7    merged two, three years ago and they are now united under

8    the Mountain Health Network.

9    **Q.**    Prestera.  We talked about them.  They do addiction

10   treatment is that right?

11   **A.**    Yes, as one facet.

12   **Q.**    PROACT, again, you talked a little bit about PROACT

13   yesterday.  Now, as I understand it, PROACT is a

14   collaborative project of Cabell Huntington Hospital, St.

15   Mary's Hospital, Marshall Health, maybe some other

16   organizations, who are all focused through PROACT on

17   addiction treatment, correct?

18   **A.**    Yes.  Cabell Huntington Hospital, St. Mary's Hospital,

19   Marshall Health, the Joan C. Edwards School of Medicine and

20   Thomas Health.

21   **Q.**    And PROACT treats hundreds of people every year who are

22   suffering from addiction, correct?

23   **A.**    Since its conception, currently sits with 540-plus

24   individuals right now.

25   **Q.**    St. Mary's Medical Center is listed as a contributor.

1    Do you see that?

2    **A.**    Yes.

3    **Q.**    St. Mary's is the other major hospital in Cabell

4    County, correct?

5    **A.**    Yes.

6    **Q.**    It serves patients from all over the Tri-State area,

7    right?

8    **A.**    Yes.

9    **Q.**    And St. Mary's Medical Center has over a $450 million

10   annual budget, correct?

11   **A.**    I don't know.

12   **Q.**    Valley Health Systems, they're listed as a contributor.

13   Do you see that?

14   **A.**    Yes.

15   **Q.**    That's the federally funded healthcare clinic in Cabell

16   County, correct?

17   **A.**    They are a federally qualified healthcare center, an

18   FQHC, in our community.

19   **Q.**    And they're also a major provider of healthcare

20   services in the community, correct?

21   **A.**    Yes.

22   **Q.**    Including addiction treatment services?

23   **A.**    Uh-huh.

24   **Q.**    And then, last, we have the West Virginia DHHR Office

25   of Drug Control Policy.  Do you see that?

1    **A.**   Yes.

2    **Q.**   And that is the statewide coordinating body here in

3    West Virginia for substance abuse issues, correct?

4    **A.**   Correct.

5    **Q.**   Let's look at some of the individual contributors to

6    the development of this plan.  And I won't name everybody --

7    **A.**   Okay.

8    **Q.**   -- because it's a long list, but do you see the name

9    Carol Bailey?

10    **A.**   Yes.

11    **Q.**   And Ms. Bailey is Director of the United Way of the

12    River Cities, correct?

13    **A.**   Correct.

14    **Q.**   We talked about Dr. Davies.

15        Do you see Brian Gallagher --

16    **A.**   Yes.

17    **Q.**   -- here again on this list?  We talked about him

18    earlier.  In addition to being a pharmacist, he's also an

19    attorney, correct?

20    **A.**   I don't know.

21    **Q.**   You aren't aware that he used to be the General Counsel

22    for WVU Hospitals?

23    **A.**   I don't know.

24    **Q.**   WVU Hospitals, though, you do know is the largest

25    medical provider in the state, correct?

```
 1    A.   I believe so.

 2    Q.   Dr. Gilbert is here.  There's a new name that we didn't

 3    see before on the e-mail, Zach Hansen.  Do you see that?

 4    A.   Yes.

 5    Q.   Mr. Hansen -- Dr. Hansen is a physician, correct?

 6    A.   Correct.

 7    Q.   And he worked for a number of years in addiction

 8    treatment at Valley Health, which we talked about just a

 9    minute ago, correct?

10    A.   Correct.

11    Q.   And now he works for you?

12    A.   Correct.

13    Q.   He's the Medical Director recently hired at the

14    Division of Addiction Sciences?

15    A.   Correct.

16    Q.   And did you, yourself, hire him or choose him to be the

17    medical director?

18    A.   I was involved in that process.

19    Q.   Tim Hazelett, do you see that name?

20    A.   Yep.

21    Q.   Mr. Hazelett is the Chief Operating Officer of the

22    Cabell-Huntington Health Department, correct?

23    A.   Correct.

24    Q.   And Dr. Kilkenny we've talked about already.  He's in

25    charge of the Health Department, correct?
```

```
 1    A.    Correct.

 2    Q.    You see Dr. Petrany.  He, of course, we've already

 3    discussed.

 4          Steve Williams, do you see that name?

 5    A.    I do.

 6    Q.    Mr. Williams is the Mayor of the City of Huntington,

 7    correct?

 8    A.    Correct.

 9    Q.    And I'll go to the last name on the list.  You

10    mentioned Karen Yost previously with Prestera.

11          Lisa Zappia, do you recognize that name?

12    A.    I do.

13    Q.    And Lisa Zappia, within the last couple of months, took

14    Ms. Yost's place as the CEO of Prestera; is that correct?

15    A.    Correct.

16    Q.    And prior to that, Ms. Zappia, for many years, was the

17    Clinical Director at Prestera, correct?

18    A.    Correct.

19    Q.    And in that capacity she, of course, worked with

20    addiction treatment, correct?

21    A.    Correct.

22    Q.    These -- these folks that are listed here, are these

23    folks, or at least some of these folks, the members of which

24    you referred to as the Advisory Board for the development of

25    the plan?
```

1    **A.**   Correct.

2    **Q.**   So, you -- you or others who were involved in

3    developing the plan sent drafts of it over time as it

4    developed to the folks who are on this list, correct?

5    **A.**   Not necessarily.

6    **Q.**   Did you send any drafts of the plan to the people on

7    this list?

8    **A.**   Some.

9    **Q.**   Some drafts or some people?

10   **A.**   Both.

11   **Q.**   And the people that -- the people that are on this list

12   that received the drafts of the Resiliency Plan as it was

13   developed, many of them commented on those drafts, correct?

14   **A.**   Many.

15   **Q.**   I will ask you, Doctor, if you would, to turn to Page

16   25 --

17   **A.**   Yep.

18   **Q.**   -- of the plan.  It's 029, if you're looking at the

19   number all the way at the bottom left.  Do you see that?

20   **A.**   Yes.

21   **Q.**   And the heading on this page is Allocation of Funds,

22   correct?

23   **A.**   Correct.

24   **Q.**   And, again, just to orient us as to time, the date on

25   this draft was August 19th, 2019, correct?

1    **A.**    Correct.

2    **Q.**    And on this allocation of funds page, there's a chart

3    that breaks down all of the various components of the

4    Resiliency Plan, correct?

5    **A.**    Correct.

6    **Q.**    And then next to each one of those there's a dollar

7    figure, right?

8    **A.**    Correct.

9    **Q.**    And so, at the top the very first item, you see the

10   phrase Addiction Science Institute, correct?

11   **A.**    Correct.

12   **Q.**    And the idea with that in the Resiliency Plan was to

13   build a new institute at Marshall that would expand on the

14   work that your division does, correct?

15   **A.**    It was to have the ability to move flexibly within the

16   plan, the structure for that.

17   **Q.**    And part of what was contemplated in the Resiliency

18   Plan for the Addiction Science Institute was, and I will

19   quote here, "bricks and mortar for housing the institute";

20   is that right?

21   **A.**    Correct.

22   **Q.**    And -- go ahead.  I'm sorry.

23   **A.**    On this draft.

24   **Q.**    Okay.  And part of what's contemplated was faculty

25   positions, correct?

1   **A.**   Correct.

2   **Q.**   And part of what's contemplated, of course, would be an

3   operating budget for this institute that was being proposed

4   here, correct?

5   **A.**   Correct.

6   **Q.**   And the cost that is listed here for that on the

7   allocation of funds page from August the 19th of 2019 was

8   $172 million, correct?

9   **A.**   Uh-huh, correct.

10   **Q.**   We'll cover some of the other larger items on the list,

11   Doctor, and I want to focus particularly on treatment.  Do

12   you see the line -- I think it's one, two, three, four, five

13   lines down on the chart here that says outpatient and

14   inpatient/residential services?

15   **A.**   Yes.

16   **Q.**   So that -- that line, what that's referring to is

17   various forms of treatment for addiction or Substance Use

18   Disorder, correct?

19   **A.**   Correct.

20   **Q.**   And that would include medically assisted treatment,

21   correct?

22   **A.**   Correct.

23   **Q.**   Which is a phrase that encompasses treatment with

24   things like Suboxone or Methadone, correct?

25   **A.**   Correct.

1   **Q.**   The treatment item that's listed here also includes

2   outpatient treatment as the title of the item suggests,

3   right?

4   **A.**   Correct.

5   **Q.**   And it would cover inpatient treatment, as well?

6   **A.**   Correct.

7   **Q.**   And it would also cover residential treatment, correct?

8   **A.**   Correct.

9   **Q.**   And if you look at the notes here in the third column,

10  this category would also cover treatment or efforts relating

11  to Neonatal Abstinence Syndrome, correct?

12  **A.**   Correct.

13  **Q.**   And the cost that is listed for this, this addiction

14  treatment item, is $23 million, correct?

15  **A.**   That's what it says.

16  **Q.**   What period of time -- I'll back up.  You spoke in your

17  testimony when Ms. Quezon was questioning you about the

18  various time periods that you or others working on the plan

19  had in mind when you were developing it.  What period of

20  time was this $23 million for treatment supposed to cover?

21  **A.**   I don't recall.

22  **Q.**   I'm not asking you for a precise number.  Was it a

23  year, five years, 10 years, 15 years?

24  **A.**   Based on the small amount, probably my first estimate

25  of the 3-5 year range.

1    **Q.**   Do you see the next item, Community Health/Social

2    Supports?

3    **A.**   Yes.

4    **Q.**   And this item -- and you can take a minute, if you

5    want, and look at the note in the last column, but that

6    includes building housing, correct?

7    **A.**   Yes.  Development doesn't necessarily mean

8    construction, but yeah.

9    **Q.**   Development of housing, correct?

10   **A.**   We sort of refer to stuff like we need to work on the

11   development around this idea.  I don't mean it necessarily

12   as a developer of construction but --

13   **Q.**   And it also includes in some fashion the creation of a

14   transportation network.  Do you see that?

15   **A.**   Yes.

16   **Q.**   And the cost for that item that includes housing and a

17   transportation network, that's $20 million, right?

18   **A.**   That's what it says.

19   **Q.**   Below that, a few more lines down, do you see data and

20   research?

21   **A.**   I do.

22   **Q.**   And this one, if you look at the notes there on the

23   last line, this one includes another research facility,

24   right?

25   **A.**   It -- it says the words research facility.

**Q.**   So, there's another building involved in this one?

**A.**   No.

**Q.**   What was the research facility there?

**A.**   I believe when we were sort of just referring to data and research that it's the space for, you know, a lab or out -- any type of technical space for that.

**Q.**   And it includes a research staff for this aspect of the project; is that right?

**A.**   It -- yes.

**Q.**   And the cost that's listed for that item is $25 million, right?

**A.**   That's with it says.

**Q.**   And then the list item here on the list is education and economic development, right?

**A.**   Yes.

**Q.**   So, economic development, according to the description that we have here in the document, includes things like investment in new local businesses; is that right?

**A.**   Uh-huh.

**Q.**   And a community career needs assessment; is that right?

**A.**   Uh-huh.

**Q.**   And the dollar figure that's listed for the category that includes those things is $30 million, correct?

**A.**   That's what it says.

**Q.**   Now, that was the August 19th version of the plan.  Do

1    you recall, Doctor, that in a later version of the plan

2    those cost figures increased?

3    **A.**   They did.

4    **Q.**   The -- so the -- well, strike that.  Let's go ahead and

5    look at the document where the cost figures did increase as

6    you just indicated.  I'm going to ask you to take a look at

7    what's been marked as DEF-WV-1457.

8    **A.**   Okay.

9    **Q.**   Dr. O'Connell, do you recognize this as another draft

10   of the Resiliency Plan?

11   **A.**   One of many.

12   **Q.**   And I'll represent to you incidentally that although

13   the date on the front of this document says October 3rd, the

14   name of the file, the actual pdf file -- sorry, the word

15   file, is Huntington Resiliency Plan 8/20 draft JLM.docx and

16   that it was attached to an e-mail dated August 20th of 2019.

17   Do you recall that the date field on the front of the

18   Resiliency Plan working document was one of those that

19   updates automatically when you open it?

20   **A.**   I don't believe so, actually.

21   **Q.**   I will -- I'll orient this in the -- well, just for the

22   sake of having it, if you don't recall that, I'm going to go

23   ahead and show you the e-mail that this was attached to.

24   **A.**   Okay.

25   **Q.**   Which is DEF-WV-1456.  And, Dr. O'Connell, I show you

1   this just to orient you in time as we walk through the

2   various drafts.  The document that is now marked DEF-WV-1457

3   --

4   **A.**   Yes.

5   **Q.**   -- which is the version of the plan that you just got,

6   was an attachment to this e-mail sent from Dr. Petrany on

7   August the 20th, 2019 to Jodi Maiolo in the document that is

8   marked 1456.  Do you see that in the -- sorry -- the e-mail,

9   the one page?

10  **A.**   I assume so.

11  **Q.**   Who is Jodi Maiolo?

12  **A.**   She is -- she works for me.  She's one of our special

13  projects.  All other duties as assigned.

14          MR. RUBY:  And, Your Honor, I would move to admit

15  DEF-WV-1456 and 1457.

16          THE COURT:  Any objection?

17          MS. QUEZON:  I'm not sure it's an objection, but

18  there's no Bates number on the -- we were trying to locate

19  it on 1457, Mr. Ruby.  I just --

20          MR. RUBY:  You mean the original production Bates

21  number?

22          MR. ACKERMAN:  Yes.  Just to confirm.

23          MR. RUBY:  Well, we can get you that.  There is a

24  version that -- oh, I see.  It's because it's native.

25          MS. QUEZON:  I see.

```
 1              MR. RUBY:  It was a Word document.

 2              MS. QUEZON:  Okay.

 3              MR RUBY:  We can match it up later, if you all

 4    want.

 5              MS. QUEZON:  If he's offering it for the same

 6    purpose as the previous one, then I assume your ruling will

 7    stand.

 8              THE COURT:  Offered for the limited purpose, Your

 9    Honor?

10              MR. RUBY:  Yes, Your Honor.

11              THE COURT:  What's the relevance to 1456?

12              MR. RUBY:  1456 is simply to orient this in time,

13    Your Honor, to -- we're walking through a chronology of

14    these drafts and the date was messed on 1457 because of a

15    computer issue.

16              THE COURT:  All right.  They're admitted.

17              MR. RUBY:  Thank you, Your Honor.

18              BY MR. RUBY:

19    Q.  Dr. O'Connell, I will ask you in 1457, which is the

20    version of the plan that you were just handed, to turn to

21    Page -- the internal pagination is obscured, so I will ask

22    you to look at Page 030.

23    A.  Yep.

24    Q.  And this is another version of the allocation of funds

25    page, correct?
```

1     **A.**   Correct.

2     **Q.**   Do you see the first item there is the Addiction

3     Science Institute?

4     **A.**   Yep.

5     **Q.**   And here in this version from August the 20th, the cost

6     of that line or the cost associated with that line, has gone

7     up to $365 million, correct?

8     **A.**   Correct.

9     **Q.**   And do you see the line -- do you recall that we looked

10    at the line for treatment a few minutes ago, Outpatient and

11    Inpatient/Residential Services?  Do you see that?

12    **A.**   Yes.

13    **Q.**   And that line in this draft from August the 20th, a day

14    after the one we looked at initially, has gone up to

15    $50 million; is that right?

16    **A.**   Correct.

17    **Q.**   And then, if you look at the bottom of the page, or

18    near the bottom of the page, just below the chart, there's a

19    line in bold with an asterisk beside it.  Do you see that?

20    **A.**   Yep.

21    **Q.**   And that says each figure includes funding for

22    necessary long-term sustainability of all areas listed

23    considering estimated impacts over four decades.  Do you see

24    that?

25    **A.**   Yes.

1   **Q.**   So, the dollar figures that are listed here were

2   increased based on a 40-year or 4-decade projection of

3   funding needs; is that right?

4   **A.**   I guess.

5   **Q.**   The -- and that was, in fact, as a result -- that

6   increase was because of input that you received from the

7   Advisory Board of the larger team that was working on this,

8   correct?

9   **A.**   I don't know.

10  **Q.**   And I'll ask the question in a more specific way.  Do

11  you recall that the increase that's reflected in this draft

12  of the plan was because of the input that you received from

13  the larger team that was assisting with it?

14  **A.**   I don't believe so.

15  **Q.**   I'm going to have to find the date on this deposition.

16  Do you recall that last year you gave a deposition in this

17  case, Doctor?

18  **A.**   Yes.

19  **Q.**   There we go.  And that was on July the 31st of 2020?

20  **A.**   Yes.

21  **Q.**   And when you gave a deposition you were under oath,

22  correct?

23  **A.**   Yes.

24  **Q.**   And you told the truth in that deposition?

25  **A.**   Yes.

1          MR. RUBY:  Mr. Simmons, if you have the

2     deposition, could we go to Page 215, please?

3          BY MR. RUBY:

4     **Q.**   And there's a back-and-forth here, Dr. O'Connell, about

5     -- and I'll direct your attention to Line 4.  We'll start

6     there in the transcript.  And I'll represent to you that

7     this is a transcript of the deposition that you gave on

8     July 31st of last year.

9     **A.**   Yes.

10    **Q.**   And, again, this is just to orient you as to the

11    subject that was being discussed.  The question was, okay.

12    Now, if we compare the August 19th draft for the Addiction

13    Sciences Institute at $172 million with the August 21st

14    draft, it goes up almost $200 million, right?  And your

15    answer is uh-huh.  Do you see that?

16    **A.**   Yes.

17    **Q.**   And that increase in $200 million from one draft to

18    another, that refers to the increased figures that we were

19    just looking in the 40-year version of the plan, correct?

20    **A.**   Yes.

21         MR. RUBY:  And, Mr. Simmons, if you can clear that

22    and then cull out the -- beginning with Line 9.

23         BY MR. RUBY:

24    **Q.**   Dr. O'Connell, the question here is, okay.  Can you

25    tell me what analysis was done between August 19th and

1    August 21st to increase the costs of the Addiction Sciences

2    Institute by $200 million?  Do you see that?

3    **A.**   Yes.

4    **Q.**   And the answer is the meeting that occurred on the 20th

5    was to bring any proposal like we did with everything, was

6    this iterative process where we started with focus groups,

7    qualitative analysis, brought the qualitative analysis back

8    to the team, worked on the drafts back and forth.  The same

9    thing was done with this.  So, when the larger team saw the

10   amounts allocated, they disagreed strongly and said,

11   obviously, that this was meant to be a multi-generational

12   approach and not just the expansion of the existing

13   services.  Do you see that?

14   **A.**   Yes.

15   **Q.**   And when you gave that, answer you were testifying

16   truthfully, correct?

17   **A.**   Yes.

18   **Q.**   And so, it was input from the larger --

19   **A.**   I did not recall that we had a meeting on August 20th

20   of 2019.

21   **Q.**   And just for clarity of the record, Doctor, it was, in

22   fact, the input of the larger team that led to the increase

23   or the change to the 40-year version of the plan?

24   **A.**   That led to their acknowledgment that the prior numbers

25   were woefully incorrect.

1    **Q.**   And to be specific, it was -- it was the input from the

2    larger team that led to the shift that we saw in the most

3    recent draft of the 40-year version of the plan, correct?

4    **A.**   And it was the input of the larger team that those

5    numbers were consistently woefully incorrect and that we did

6    not have the expertise to make those decisions.

7    **Q.**   We'll talk about that.

8         Now, the contributors to this version of the plan,

9    Doctor, I'll direct you again to Page -- it's Page 1 and

10   it's Page 4, if you're looking at the numbers at the bottom.

11   I'll give you a minute to take a look at it.

12        Contributors for this version of the plan which shows

13   $50 million for treatment over a period of 40 years --

14   **A.**   Sorry, which one are you -- you're on the same plan?

15   **Q.**   The 40-year version.

16   **A.**   Okay.

17   **Q.**   The contributors to this version of the plan which

18   shows $50 million for addiction treatment over 40 years,

19   that's the same list of contributors that was on the version

20   we previously looked at, correct?

21   **A.**   I actually think there's differences.

22   **Q.**   Well, it includes here on the 40-year version of the

23   plan with $50 million for treatment over 40 years.  The

24   contributors include Cabell Huntington Hospital, right?

25   **A.**   Right.  I mean, the individual contributor list did

```
 1    make a change, just for the sake of accuracy.

 2    Q.   I'm sorry.  Did or did not?

 3    A.   Did.

 4    Q.   And who was the -- what was the change?

 5    A.   I'm trying to look, but you note the columns are

 6    different between the two.  So --

 7    Q.   Oh, I see.  Well, the -- what I wanted to ask you about

 8    is the Health Department is still there?

 9    A.   Yes.

10    Q.   Cabell Huntington Hospital is still there?

11    A.   Yes.

12    Q.   Prestera is still there?

13    A.   Yes.

14    Q.   St. Mary's is still there?

15    A.   Yes.

16    Q.   Kevin Yingling is still there?

17    A.   Yes.

18    Q.   Brian Gallagher is still there?  Karen Yost is still

19    there?  I'm sorry.  I --

20    A.   Yes.

21    Q.   Did you answer as to Gallagher?

22    A.   Yes.  Yes.

23    Q.   Karen Yost is still there?

24    A.   Yes.

25    Q.   Lisa Zappia is still there?
```

1    **A.**    Yes.

2    **Q.**    Zach Hansen is still there?

3    **A.**    Yes.

4    **Q.**    And shortly after this, Doctor --

5              MR. RUBY:  Judge, do you want to break?

6              THE COURT:  This is a good place for a break.

7    Let's take about ten minutes.

8         (Recess taken)

9         (Proceedings resumed at 10:40 a.m. as follows:)

10             THE COURT:  You may proceed.

11             MR. RUBY:  Thank you, Your Honor.

12   BY MR. RUBY:

13   **Q.**    Dr. O'Connell, before the break we were talking

14   about the 40-year version of the Resiliency Plan;

15   correct?

16   **A.**    Correct.

17   **Q.**    And that was, I think, the -- the transmittal date on

18   that was August the 20th of 2019; correct?

19   **A.**    According to the email.

20   **Q.**    Now, shortly after that, the plan was sent to Mr.

21   Farrell, counsel for the county; correct?

22   **A.**    I don't know.

23   **Q.**    You did meet with Mr. Farrell about this case in

24   September of 2019; correct?

25   **A.**    I believe so.

```
 1    Q.   And that meeting was at Mr. Farrell's law firm;
 2    correct?
 3    A.   I'm not sure.
 4    Q.   Do you recall a meeting -- a September 21st, 2019,
 5    meeting that occurred on Ninth Street in Huntington?
 6    A.   I believe so.
 7    Q.   At the Greene Ketchum law firm?
 8    A.   I believe if that's the name of it.
 9    Q.   And there were other lawyers at the meeting there as
10    well; correct?
11    A.   If it's the meeting that I'm recalling, there were six
12    or seven folks in the room.
13    Q.   Ms. Kearse was there?
14    A.   I believe so.
15    Q.   Ms. Quezon was there?
16    A.   I believe so.
17    Q.   There was someone who's a data specialist or works on
18    data for the plaintiffs' lawyers who was also there?
19    A.   I believe so.
20    Q.   And the plan -- the Resiliency Plan, the draft of it
21    was sent to Mr. Farrell before that September 21st meeting;
22    is that right?
23    A.   Not by me.
24    Q.   Was it sent by somebody else?
25    A.   I don't know.
```

1    **Q.**   I'm going to show you, Doctor, -- we'll do two

2    documents.  One is Defendants' West Virginia 1450.  Let's

3    start with this one and then we'll take a look at the

4    attachment, Doctor.

5         The email that has just been handed to you, that's an

6    email that was sent by Dr. Petrany; correct?

7    **A.**   I believe so.

8    **Q.**   And the recipient on the "to" line is

9    Paul@greeneketchum.com; is that correct?

10   **A.**   It is.

11   **Q.**   And that is -- that's my friend, Mr. Farrell; correct?

12   **A.**   Yes.

13   **Q.**   And this is dated August 22nd, 2019; correct?

14   **A.**   Yes.

15   **Q.**   Which is a just a couple days after the August 20th

16   email that the 40-year version of the plan was attached to;

17   correct?

18   **A.**   Yes.

19   **Q.**   And this email from Dr. Petrany with whom you were

20   working on the Resiliency Plan says --

21        MS. QUEZON:  Judge, I'm going to object to

22   hearsay.  The foundation hasn't been laid for this.  She's

23   not on the email.

24        MR. RUBY:  Your Honor, two points.

25        Number one, the email itself I'll offer in a minute.

```
 1     But the email itself is -- it constitutes notice to
 2     plaintiffs of the, the qualifications of the group that was
 3     involved in preparing the Resiliency Plan.  And, so, the
 4     email itself comes in at least for that limited purpose.
 5          And, number two, Your Honor, the witness has testified
 6     already, correctly, that she was intimately involved in the
 7     development of the Resiliency Plan.  She worked very closely
 8     with Dr. Petrany on the Resiliency Plan.  And it's proper to
 9     question her -- setting aside the question of admissibility
10     of the document, it's proper to question her about the
11     information that Dr. Petrany provided on the Resiliency
12     Plan.
13               THE COURT:  Well, it certainly provides a basis
14     for you to question her.  I'm not sure if that makes it
15     admissible.  What about admitting it for the limited
16     purpose?
17               MS. QUEZON:  Judge, I don't see how this email
18     does anything to, to talk about the qualifications of those
19     involved with the development of the, of the plan.  And
20     she's already testified that she doesn't know whether it was
21     sent to Mr. Farrell.  She has no knowledge of whether it was
22     sent to Mr. Farrell.
23               MR. RUBY:  Judge, --
24               THE COURT:  I'm going to let you -- I'm not going
25     to admit it.  You can use it as a basis to question her.
```

```
 1              MR. RUBY:  Thank you, Your Honor.
 2              THE COURT:  Sustain the objection to the admission
 3      of the document.
 4      BY MR. RUBY:
 5      Q.   Dr. O'Connell, the, the email that you have in
 6      front of you, Defendants' 1450, according to the
 7      document, there was an attachment that was sent with it;
 8      correct?
 9      A.   Correct.
10      Q.   Huntington Resiliency Plan 8-22-19, that PDF?
11      A.   Correct.
12      Q.   And it says, "Hello Paul.  Please find attached the
13      culmination of several months of work by many of the leaders
14      in our community in the fight against the opioid crisis."
15              Do you see that?
16      A.   I do.
17      Q.   And my question is whether you agree with the statement
18      here by Dr. Petrany that the Resiliency Plan was the
19      culmination of several months of work by leaders in the
20      community in the fight against the opioid crisis?
21      A.   Do I agree with that's what's written?
22      Q.   No.  Do you agree with that statement by Dr. Petrany
23      that that correctly describes the group of people who worked
24      on the Resiliency Plan?
25      A.   I believe that describes the contributing organization
```

1    and individuals.

2    **Q.**   It goes on to say, Doctor, "These individuals have come

3    together to develop a visionary plan for dealing with the

4    present and future effects of that crisis upon Cabell

5    County."

6         Did I read that correctly, Doctor?

7    **A.**   Correct.

8    **Q.**   And my question is:  Do you agree with that

9    characterization of the Resiliency Plan that Dr. Petrany

10   made, that it is a visionary plan for dealing with the

11   present and future effects of that crisis upon Cabell

12   County?

13   **A.**   I believe so.

14   **Q.**   And then the last sentence in that paragraph says, "In

15   coordinating this effort, I have been very impressed with

16   the intelligence and sincerity of all who took time from

17   their busy schedules to contribute."

18        Do you see that?

19   **A.**   Yes.

20   **Q.**   Did you agree with Dr. Petrany that you were impressed

21   with the intelligence and the sincerity of everybody who was

22   involved in putting this plan together?

23   **A.**   It would be very rude to say otherwise.

24   **Q.**   I'm going to -- actually, I'll ask you to take a look

25   at the last sentence here.  It says, "As we discussed, I am

1    looking forward to the opportunity to review the plan with

2    you.  Please let me know when you are available to meet."

3         Were you aware that Dr. Petrany had, had made this plan

4    to meet with Mr. Farrell about the Resiliency Plan?

5    **A.**   I am not.

6    **Q.**   Were you at the time?

7    **A.**   I was not.

8    **Q.**   The next document we're going to look at, Dr.

9    O'Connell, has been marked as Defendants' West Virginia

10   1451.  And it is another version of the Resiliency Plan.

11        Dr. O'Connell, do you see that the date on this version

12   of the plan is August 22nd, 2019?

13   **A.**   I do.

14   **Q.**   Which is the same as the date of the email that we just

15   looked at from Dr. Petrany to Mr. Farrell; correct?

16   **A.**   It is.

17   **Q.**   And I will represent to you that this is the, this is

18   the version of the plan that was attached to that email.

19        And I will ask you to go to the Allocation of Funding

20   Allocation of Funds -- excuse me --

21   **A.**   Yes.

22   **Q.**   -- that's Page 27 in this version.

23   **A.**   Yep.

24   **Q.**   And what I'll ask you to look at first is the note, the

25   bolded note with the asterisk beside it at the bottom of the

1    page.  Do you see that?

2    **A.**   Yes.

3    **Q.**   We looked at a similar note in the August 20th version

4    of the plan.  Do you recall that?

5    **A.**   Yes.

6    **Q.**   And the version here says, "Each figure includes

7    funding for the essential long-term (multi-generational)

8    sustainability of all areas listed."

9         Did I read that correctly?

10   **A.**   You did.

11   **Q.**   Multi-generational isn't quite as precise as the four

12   decades language that we saw in the previous version, but it

13   clearly indicates a long period of time; is that right?

14   **A.**   It does.

15   **Q.**   And in this version with the multi-generational

16   footnote on the Allocation of Funds page, let's look again

17   at the treatment line.  It has Outpatient and

18   Inpatient/Residential Services.  Do you see that?

19   **A.**   I do.

20   **Q.**   And the dollar amount that's listed there in the

21   multi-generational version of the plan is $50 million; is

22   that right?

23   **A.**   It is.

24            MR. RUBY:  Your Honor, I move to admit Defendants'

25   1451.

```
 1              THE COURT:  Any objection?

 2              MS. QUEZON:  I'm assuming for the same limited

 3    purpose.

 4              MR. RUBY:  For the same limited purpose, Your

 5    Honor, to show notice that was provided of the, the amount

 6    that this group of experts thought was appropriate.

 7              THE COURT:  Well, this goes to the cost of

 8    abatement, doesn't it?

 9              MR. RUBY:  Yes, Your Honor.

10              THE COURT:  I'll admit it for the limited purpose.

11    BY MR. RUBY:

12    Q.   I will next ask you to take a look, Doctor, at

13    what's been marked Defendants' West Virginia 1446.

14              MS. QUEZON:  Judge, I'm going to object to this as

15    hearsay and she's not on this email either.

16              THE COURT:  Well, --

17              MR. RUBY:  Can I call Mr. Farrell, Your Honor?

18              THE COURT:  Pardon me?

19              MR. RUBY:  Can I call Mr. Farrell to authenticate

20    it?

21              MR. FARRELL:  Yes, Your Honor.

22              THE COURT:  He's not a credible witness, Mr. Ruby.

23         (Laughter)

24              MR. RUBY:  Did you get that, Lisa?

25              COURT REPORTER:  Yes.
```

```
 1              MR. RUBY:  I'm not going to move to admit this
 2    with this witness, Your Honor.
 3              THE COURT:  Here again, I think this provides a
 4    basis for you to question her but I'm not going to admit the
 5    document.
 6              MR. RUBY:  Understood, Your Honor.
 7    BY MR. RUBY:
 8    Q.   Dr. O'Connell, what you've just been handed as
 9    Defendants' 1446 is an email from Dr. Petrany to Paul
10    Farrell dated September 3rd, 2019; is that right?
11    A.   Sorry.  I missed the last part.
12    Q.   Dated -- I'll just redo the question.  What you have
13    here as Defendants' 1446 is an email from Dr. Petrany to
14    Paul Farrell dated September 3rd, 2019; correct?
15    A.   Correct.
16    Q.   And the subject again is Cabell County Resiliency
17    (Abatement) Plan.  Do you see that?
18    A.   Yes.
19    Q.   And the email says, "Paul, appreciate the time you took
20    to review the Resiliency (Abatement) Plan with me."
21         Did I read that correctly?
22    A.   You did.
23    Q.   And then it talks about some changes that were made in
24    the plan as a result of that meeting.
25         The next sentence says, "After speaking with you, I
```

```
 1    felt we needed to add some emphasis to the issue with
 2    respect to infants and children for both immediate needs and
 3    long-term (multi-generational) needs.  There is a new
 4    section added to the lists (first rectangle) on pages 15 and
 5    22 and a description for each of these on the following
 6    pages (16 and 23)."
 7         Do you see that?
 8    A.   Yes.
 9    Q.   My question, Dr. O'Connell, is whether you recall that
10    those changes were made to the Resiliency Plan as a result
11    of Dr. Petrany's meeting with Mr. Farrell?
12    A.   I believe Dr. Petrany said these have been integrated
13    into other sections and do not change the plan, but the
14    additions added emphasis.
15         So I recall moving components over time.  We moved
16    multiple sections to highlight a need or a population to
17    another section.
18    Q.   In particular, Dr. O'Connell, the -- I guess the second
19    sentence there in that paragraph that I read said there is a
20    new section added.  So that does refer to a change; correct?
21    A.   And then he said these had already been integrated into
22    other sections and do not change the plan, but the additions
23    provided some emphasis that seemed important.
24         So I believe -- I don't recall all the iterations to
25    the draft, as there were countless iterations.  So as we
```

1  moved, there were many times that we moved, added,

2  integrated, changed -- the little bubbles that were on the

3  slide earlier weren't in quite a few versions of the draft

4  and, so, we summarized them.  So --

5  **Q.**   And my question, Doctor, is whether you recall that the

6  new section that's referred to here was added as a result of

7  Dr. Petrany's meeting with Mr. Farrell.

8  **A.**   I don't know.  I was not in -- I don't know if I was in

9  attendance at that meeting.

10  **Q.**   And I just want to make sure we're communicating with

11  each other.  Setting aside whether you were at the meeting,

12  do you recall that the new section that's referred to here

13  was added as a result of that meeting?

14  **A.**   I cannot say that I recall that at one time we moved

15  something on this date.  I, I truly don't remember if there

16  was a section moved or added at any particular time.

17  **Q.**   Okay.  Again, I, I apologize.  Let me try to ask a

18  better question.  I'm not asking about the date or the time.

19       My question is do you recall that the section that is

20  referred to here -- strike that.  Do you recall a section or

21  language being added to the plan as a result of a meeting

22  between Dr. Petrany and Mr. Farrell?

23  **A.**   I recall countless changes to the plan.  I cannot say

24  what necessarily necessitated any of those changes with all

25  certainty.

```
 1    Q.   Okay.  And I hate to belabor this.  My question is a

 2    simple one.  Do you recall any section of the plan being

 3    added as a result of the meeting with Mr. Farrell?

 4              MS. QUEZON:  Judge, I think she's answered that a

 5    few times now.  She doesn't recall.

 6              MR. RUBY:  Judge, with respect, I don't think --

 7              THE COURT:  I'm going to sustain the objection,

 8    Mr. Ruby.  You can move on.

 9    BY MR. RUBY:

10    Q.   Doctor, do you see the paragraph after the one

11    we've been looking at?

12    A.   I do.

13    Q.   It says, "Todd Davies has been able to collect --" and

14    we talked about Todd Davies; correct?

15    A.   Yes.

16    Q.   He's a Professor at Marshall?

17    A.   He is the Associate Director of Research for the

18    Division of Addiction Sciences.

19    Q.   "Todd Davies has been able to collect some of the data

20    you thought important, including ODs and OD deaths in the

21    county and NAS babies at Cabell Huntington Hospital's

22    special unit."  Do you see that?

23    A.   I do.

24    Q.   And my question here is a similar one, which is whether

25    you were aware that Dr. Davis was collecting data that Mr.
```

1    Farrell thought important to include in this plan?

2    **A.**   I cannot speak to Dr. Davies's work.

3    **Q.**   And then at the end, the last sentence there, it says,

4    "I have not heard from Amy Quezon."  Correct?

5    **A.**   Correct.

6    **Q.**   And Ms. Quezon, of course, is one the counsel for the

7    plaintiffs; correct?

8    **A.**   She is.

9    **Q.**   Let's look at the version of the plan that was attached

10   to this email.  And this is marked Defendants' West Virginia

11   1447.

12        Doctor, do you recognize this, Defendants' 1447, as

13   another version of the Resiliency Plan?

14   **A.**   One of many.

15   **Q.**   And this one is dated September 3rd, 2019; correct?

16   **A.**   That it is.

17   **Q.**   And I'll represent to you, I think I already did, that

18   this was attached to the email that we were just looking at

19   from Dr. Petrany to Mr. Farrell.  And you can probably guess

20   what page I'm going to ask you to look at.

21   **A.**   Are we going to the money?

22   **Q.**   29.  Are you there, Doctor?

23   **A.**   I am.

24   **Q.**   This is the Allocation of Funds page.  Do you see that?

25   **A.**   I do.

1   **Q.**   And this is the version that existed, according to the

2   data on the document, as of the date that Dr. Petrany sent

3   his email about changes back to Mr. Farrell; correct?

4   **A.**   You indicated that this was the document attached to

5   the email that we were just looking at?

6   **Q.**   And the date on that email was September the 3rd;

7   correct?

8   **A.**   Correct.

9   **Q.**   And the date on this version of the Resiliency Plan is

10   September the 3rd; correct?

11   **A.**   Correct.

12   **Q.**   And the email from Dr. Petrany to Mr. Farrell indicated

13   that he and Mr. Farrell had discussed the plan prior to

14   September the 3rd; is that right?

15   **A.**   Correct.

16   **Q.**   Let's look at the line for treatment, Outpatient and

17   Inpatient/Residential Services.  Do you see that, Doctor?

18   **A.**   I do.

19   **Q.**   And the dollar figure there is still 50 million; is

20   that correct?

21   **A.**   It is.

22   **Q.**   And then there's a total number.  I think this is a

23   little bit of a difference from the previous version.

24   There's a total number on this document; correct?

25   **A.**   Correct.

1    **Q.**   And the total is $537 million.  Do you see that?

2    **A.**   I do.

3    **Q.**   And it has the same note at the bottom that we saw in

4    the previous August 22nd version of the Resiliency Plan.

5    "Each figure includes funding for the essential long-term

6    (multi-generational) sustainability of all areas listed."

7    Correct?

8    **A.**   Yes.

9    **Q.**   The 537 million-dollar figure, that, that includes

10   $175 million for the institute that was going to be built at

11   Marshall; is that right?

12   **A.**   Yes.

13   **Q.**   That was significantly lower than the 365

14   million-dollar figure for the institute that we saw in the

15   August 22nd version of the plan; correct?

16   **A.**   Yes, it is.

17   **Q.**   And why was the money -- why was that dollar figure

18   lowered?

19   **A.**   I don't know.

20   **Q.**   Was it, was it the case that there was push-back about

21   the perceived amount of money that would be allocated to

22   Marshall Health?

23   **A.**   I believe -- are you referencing a question from my

24   deposition?

25   **Q.**   Good guess.

1    **A.**   Can I have the context for that question?

2    **Q.**   Sure.

3           MR. RUBY:  Mr. Simmons, could we have 233, please?

4           THE WITNESS:  Yes.  So this would indicate --

5    thanks for jogging my memory.  This would indicate that we

6    had a community meeting or the advisory group had probably

7    met to discuss some of this at the time.

8           MR. RUBY:  We'll go back to the Allocation of

9    Funds page, Mr. Simmons.

10   BY MR. RUBY:

11   **Q.**   There is in this version, the September 3rd

12   version, that followed the discussion between

13   Dr. Petrany and Mr. Farrell, there's still $60 million

14   for the category that includes building housing and a

15   transportation network and so on, right, the community

16   health and social supports?

17   **A.**   There is.

18   **Q.**   And there's now $75 million toward the big research

19   project on data; correct?

20   **A.**   You said there's now.  There was in the prior.

21   **Q.**   You're right.  And there's -- I don't think we focused

22   on that in the prior version.  But in the August 19th

23   version, the first version we looked at, it was a lower

24   number; correct?

25   **A.**   I believe on all funds it was lower.

1    **Q.**   And in this multi-generational version that we have

2    here, the number for data and research is $75 million;

3    right?

4    **A.**   It appears to be.

5    **Q.**   And then the number for the economic development

6    category, the one that involves investing money in local

7    businesses, that one is now $100 million in this version;

8    correct?

9    **A.**   Uh-huh.

10   **Q.**   So the total is $537 million.  The month after this

11   email, Mr. Farrell announced to the media that he was going

12   to seek $500 million in this case; is that right?

13   **A.**   I don't know.

14            MS. QUEZON:  Objection, hearsay.

15            THE COURT:  Overruled.  It's not for the truth of

16   the matter, but if it was said --

17        Do you know whether he said that or not?

18            THE WITNESS:  I know there was -- at one point,

19   there was a large declaration made by Paul Farrell to the

20   media.  I don't know the amount that was declared on that

21   date.

22            THE COURT:  Okay.  I'll sustain the objection.

23   BY MR. RUBY:

24   **Q.**   Do you recall that you've previously seen an

25   article in which Paul Farrell says he's going to want

```
 1      $500 million from the defendants in this lawsuit?

 2              MS. QUEZON:  Same objection.

 3              THE COURT:  Sustained.

 4              MR. RUBY:  Let me ask you, Mr. Simmons, to pull up

 5      Page 213 in Dr. O'Connell's transcript.

 6          I'll direct you to line 16, Dr. O'Connell.

 7              MS. QUEZON:  Judge, I'm objecting to this.  He

 8      showed her an article in the deposition which was rank

 9      hearsay and asked her about it.  You can't make it not

10      hearsay by showing something in a deposition.

11              MR. RUBY:  Your Honor, the question is whether the

12      witness is aware that Mr. Farrell said to the media that he

13      was going to seek $500 million --

14              THE COURT:  You've already been through that and

15      I've sustained the objection to it.  Let's move on to some

16      other point.

17      BY MR. RUBY:

18      Q.   Dr. O'Connell, in December of 2019 Mr. Farrell told

19      Dr. Petrany that he was ready for the Resiliency Plan to

20      be released to the public; correct?

21              MS. QUEZON:  Objection, hearsay.

22              THE COURT:  Just a minute.

23              THE WITNESS:  I don't know.

24              THE COURT:  Just a minute.

25          How is that not -- how is that admissible, Mr. Ruby?
```

```
 1              MR. RUBY:  The witness, the witness has seen the
 2    correspondence.
 3              THE COURT:  You're cross-examining her and I think
 4    it's a proper basis for cross.
 5         You can answer it if you can, Dr. O'Connell.
 6              MS. QUEZON:  Your Honor, may I be heard briefly?
 7              THE COURT:  Pardon me?
 8              MS. QUEZON:  May I be heard briefly?
 9              THE COURT:  Yes, you may.
10              MS. QUEZON:  Thank you, Your Honor.
11         What, what's happening is that in her deposition
12    defense counsel showed her a number of documents.  So now
13    she's seen them.  She didn't have prior knowledge of them.
14    They used them to cross her in her depo and now they want to
15    talk to her about it on the stand, but it's still hearsay.
16              MR. RUBY:  Judge, I think I can short-circuit
17    this.
18         The witness is on the document where this communication
19    was made, so we'll just --
20              MS. QUEZON:  If that's, if that's the case, then,
21    Your Honor, I'll wait and see what Mr. Ruby does.
22              THE COURT:  Okay.  See what you can do, Mr. Ruby.
23    BY MR. RUBY:
24    Q.   Dr. O'Connell, I'm going to show you now what's
25    been marked as Defendants' West Virginia 1432.
```

1        Dr. O'Connell, do you recognize this as a

2   December 18th, 2019, email from Dr. Petrany to Paul Farrell

3   on which you were included on the cc line?

4   **A.**   My email doesn't actually appear.  It's just my name.

5   **Q.**   But you are on the cc line of the email; correct?

6   **A.**   My name is, but my email does not appear.

7   **Q.**   I don't know that we need to get into a debate about

8   how the Marshall Health email system works or what it

9   displays on the --

10  **A.**   It appeared on the other one.  I'm noting that.  I find

11  it interesting.

12  **Q.**   Well, let me, let me -- if we need to do this, let me

13  direct you to the "from" line.  It's from Dr. Petrany who's

14  also in the Marshall University computer system.  Do you see

15  that?

16  **A.**   Yes.

17  **Q.**   And his email doesn't appear either; right?

18  **A.**   No.

19  **Q.**   It has a line, a different line than the email address

20  which reflects his status in the Marshall University email

21  system; correct?

22  **A.**   Uh-huh.

23  **Q.**   And after your name is a similar line that reflects

24  that you are in the Marshall University email system;

25  correct?

1   **A.**   I guess so.  I've never seen that before.

2   **Q.**   And the, the subject line of the email is Cabell County

3   Resiliency (Abatement) Plan.  Do you see that?

4   **A.**   Yes.

5   **Q.**   And on the attachment line it says "Huntington

6   Resiliency Plan Final September 3 FINAL.pdf."

7       Do you see that?

8   **A.**   I do.

9   **Q.**   There's another email -- this is a two email chain and

10  there's another email at the bottom of it that was forwarded

11  to you in the top email from Dr. Petrany.  Do you see that?

12  **A.**   Say that again.

13  **Q.**   Do you see the email at the bottom of the chain here?

14  **A.**   Yes.

15  **Q.**   And that was included in the email that Dr. Petrany

16  copied you on at the time; correct?

17  **A.**   I assume so.

18  **Q.**   And --

19  **A.**   That part is embedded in the prior email?

20  **Q.**   Yes.

21  **A.**   Okay.

22  **Q.**   And the, the email on the bottom that you received when

23  Dr. Petrany replied is from, from Paul Farrell; correct?

24  **A.**   It is.

25  **Q.**   It's dated December 17th, 2019; correct?

```
 1    A.    It is.

 2    Q.    And it's to Dr. Petrany; correct?

 3    A.    Yes.

 4    Q.    And copied to Ms. Quezon?

 5    A.    Yes.

 6    Q.    Ms. Kearse?

 7    A.    Yes.

 8    Q.    To Ann Ritter at Ms. Kearse's law firm; correct?

 9    A.    Yes.

10    Q.    And then to Erin Dickinson.  Do you know who Erin

11    Dickinson is?

12    A.    I do not.

13    Q.    And it says in the body of the email, "Dr. Petrany,

14    circling back to you.  Gonna disclose the Resiliency Plan

15    and ready for you to release to the public."

16          Do you see that?

17    A.    I do.

18    Q.    And, so, my question is, is it correct to say that in

19    December of 2019 Mr. Farrell told Dr. Petrany that he was

20    ready for the Resiliency Plan to be released to the public?

21    A.    In December of 2019 it is correct to say that -- only

22    what I know in this email.  We're going to disclose the plan

23    and ready for you to release to public.

24              MR. RUBY:  Your Honor, I'd move to admit

25    Defendants' 1432.
```

```
 1              MS. QUEZON:  No objection, Your Honor.
 2              THE COURT:  It's admitted.
 3    BY MR. RUBY:
 4    Q.   And after that email from Mr. Farrell, Doctor, the
 5    Resiliency Plan was, in fact, released to the public;
 6    correct?
 7    A.   Yes.
 8    Q.   I will show you what's been marked as Defendants' West
 9    Virginia 1361.
10              MR. HESTER:  Your Honor, may I have just a moment
11    to consult with Mr. Ruby?
12              THE COURT:  Yes, you may.
13         (Pause)
14              MR. RUBY:  Judge, Mr. Hester reminded me that I
15    have failed to move in Defendant's 1447 which is the
16    September 3rd version of the, of the Resiliency Plan that
17    was sent to Mr. Farrell.
18         And I would move that one in for all purposes on two
19    bases, both under Rule 801(d)(2), number one, that, that
20    given the correspondence between plaintiffs' counsel,
21    there -- the response from Mr. Farrell to Marshall that this
22    version of the plan was, was adopted by the -- by a party,
23    and in particular given Mr. Farrell's subsequent
24    announcement to the public.
25         And the second basis, Your Honor, is that given the
```

1    sequence of events that's emerged from the witness's

2    testimony, it is clear that for purposes of the development

3    of the Resiliency Plan, and -- that Marshall and the folks

4    at Marshall, including Dr. O'Connell and Dr. Petrany who

5    were working on the plan were serving as agents of

6    plaintiffs in preparing this abatement plan to be used in

7    the litigation.

8            MS. QUEZON:  I certainly object to that.  I'm not

9    even sure what you're trying to move in.  But the -- her

10   testimony has been clear, Your Honor.

11       Are you just trying to move in -- which date of the

12   Resiliency Plan?

13           MR. RUBY:  This is the September 3rd version and

14   it's marked Defendants' 1447.

15           MS. QUEZON:  Judge, I have no objection to the

16   limited purpose that, that you had discussed earlier

17   regarding the abatement numbers.

18           THE COURT:  Well, he offered it for all purposes.

19       So you're trying to get around the hearsay objection,

20   aren't you, Mr. Ruby?

21           MR. RUBY:  Correct, Your Honor.  And this is a

22   version of the plan that given the correspondence between

23   plaintiffs' counsel and Dr. Petrany was, was adopted by a

24   party.

25       And it's also clear, again, that given the, given the

1    evidence and the testimony that we've seen so far about the

2    role of plaintiffs' counsel in the development --

3            THE COURT:  You're saying it's not hearsay because

4    it comes -- it's excluded from hearsay under Rule 801(d)(2)?

5            MR. RUBY:  Yes, Your Honor.

6            MS. QUEZON:  Your Honor, just so we're clear, this

7    is not the Resiliency Plan that was released to the public.

8    This was still a draft of the Resiliency Plan.  It was not

9    formally adopted by either, either plaintiff.

10       So for the limited purpose that you've allowed the

11   other Resiliency Plans in, I certainly, you know, would

12   assume that your ruling is going to be consistent.

13       But this was not the final draft.  The final draft is,

14   as Dr. O'Connell has already testified, had no numbers in it

15   whatsoever.

16       So for the limited purposes the Court has allowed these

17   to come in, I assume you'll be consistent in that ruling.

18   But for any other matter, Your Honor, this again was simply

19   a draft that was not the final product released to the

20   public.

21           MR. RUBY:  That doesn't resolve the agency issue,

22   Your Honor.  It's still -- the evidence to this point has

23   been that the --

24           THE COURT:  Let me hear from your colleague over

25   here, Mr. Ruby.

```
 1              MR. RUBY:  Yes, Your Honor.

 2              MR. HESTER:  Yes, Your Honor.

 3       I just wanted to reinforce Mr. Ruby's point under Rule

 4   801(d)(2)(B).  Statement is offered against an opposing

 5   party and is one the party manifested that it adopted and

 6   believed to be true.

 7          Mr. Farrell is stating to Dr. Petrany that he's going

 8   to release this plan to the public.  I think that falls

 9   within that hearsay exception.

10              MR. ACKERMAN:  Your Honor, there hasn't been any

11   evidence that Mr. Farrell adopted everything in a draft plan

12   based on a set of -- a single email that you -- that this

13   witness had no knowledge of.

14       I think defense is overreaching here.  This is a draft.

15   There can't be an argument that somehow Huntington or Cabell

16   adopted a draft when what was actually released by the

17   parties was a different document.

18              MR. RUBY:  Your Honor, I'd return to the point

19   that Mr. Hester made is, and this is in 1432 which the Court

20   has in front of it, in which Mr. Farrell says, "Gonna

21   disclose the Resiliency Plan and ready for you to release to

22   the public."

23              MR. MAHADY:  Your Honor, in addition to Mr.

24   Farrell, the witness has already testified, and it's stated

25   on the documents, that the plaintiff, Cabell County
```

 1      Commission, is a contributing organization to the plan.

 2      They're part of the plan, their statement.

 3          MS. QUEZON:  Judge, I'd point out, just for the

 4      record, that the "gonna disclose," that's to the defendants.

 5      The Resiliency Plan was going to be disclosed to the

 6      defendants.

 7          But the final product -- and they got every single

 8      draft, clearly, of the Resiliency Plan prior to it being

 9      disclosed to the public prior to the final version that

10      arguably could have been adopted by Cabell and the City of

11      Huntington.  And that one didn't have any numbers in it

12      whatsoever.

13          MR. RUBY:  Your Honor, with respect to Ms. Quezon,

14      we need to read the entire sentence.  The sentence says,

15      "Gonna disclose the Resiliency Plan and ready for you to

16      release to the public."  And this is the version that --

17          THE COURT:  Rather than belabor this, I'm going to

18      overrule the objection and admit it.  I think it's covered

19      by Rule 801 and it's admitted.

20          Now, what about the email?  Did you move the email into

21      evidence?

22          MR. RUBY:  There's the one, Judge, that you

23      overruled and I've lost track of where I am.  I don't know

24      if we -- I had intended to move 1432 in and I don't know if

25      I did or not.

```
 1              MR. HESTER:  That was admitted without objection.

 2              MS. QUEZON:  Yes.

 3              THE COURT:  All right.  Is that right?

 4              MS. QUEZON:  That's correct, Your Honor.  That one

 5      was admitted without objection.

 6              THE COURT:  All right, very good.

 7              MR. RUBY:  Judge, I think now we're on 1361.

 8              MS. QUEZON:  To which I do object in that

 9      Ms. O'Connell -- Dr. O'Connell -- pardon me, Doctor -- is

10      not on this email.  At this point, I would -- the Court may

11      want him -- permit him to ask some questions about it, but I

12      would object to it.

13              MR. RUBY:  We'll lay the foundation, Your Honor.

14              THE COURT:  Okay.  Go ahead.

15      BY MR. RUBY:

16      Q.   Dr. O'Connell, do you have Defendants' 1361 in

17      front of you?

18      A.   I do.

19      Q.   And I'm going to first -- I'm going to first direct

20      you, Dr. O'Connell, to the, the email at the bottom of this

21      chain.  This is an email from Dr. Petrany dated Monday,

22      February 3rd, 2020.  And it says "Resiliency Plan Public

23      Release" on the subject line.  Do you see that?

24      A.   I do.

25      Q.   And the recipients -- the group of recipients on this
```

```
 1    email are undisclosed in the email itself; correct?
 2    A.    I believe so.
 3    Q.    Do you recall receiving this email?
 4    A.    Do you have context from my deposition?
 5    Q.    I do.  Would you like to see that before you answer the
 6    question?
 7    A.    It would be helpful.
 8           MR. RUBY:  Mr. Simmons, 251, please.
 9    BY MR. RUBY:
10    Q.    And I'll direct you to line 14, Doctor.
11    A.    I believe so.
12    Q.    All right.
13           THE COURT:  Do you believe so now?
14           THE WITNESS:  I do.
15    BY MR. RUBY:
16    Q.    Thank you, Dr. O'Connell.
17           MS. QUEZON:  Your Honor, again I'm going to renew
18    my objection.  Simply -- she did receive the bottom email
19    and she did testify to that in deposition and in -- and
20    today.  But the email above that on which she is not a
21    recipient is the portion that I object to as hearsay.
22           MR. RUBY:  And, Your Honor, I would move in -- you
23    can see that there is an email at the top about which I may
24    ask the witness a couple of questions.
25           What I would move in, if we can do this, or move in for
```

1    the Court's consideration is the bottom portion of the

2    email, the email from Dr. Petrany.

3        And I'm certainly happy for the Court to rule that it

4    would not consider the top portion of the email for the

5    truth of the matter asserted.

6                THE COURT:  What about that?

7                MS. QUEZON:  I don't know how we do this without

8    redacting or not considering at all the top portion.  I

9    mean, certainly he can ask some questions to her but --

10               THE COURT:  Well, I'm going to sustain objection

11   to the admission of the document to move this along.

12       You can question her about it, Mr. Ruby, but I'm not

13   going to admit the document.  I think there are hearsay

14   problems with it.  But it does, in my view, provide a good

15   faith basis for you to question her.  So go ahead.

16               MR. RUBY:  Judge, consistent with the practice

17   we've used in the past with these sort of split documents,

18   would we be able to do what plaintiffs have done and prepare

19   a redacted version for admission?

20               THE COURT:  So you want to redact the top email

21   and admit the bottom one?

22               MR. RUBY:  Yes, Your Honor.

23               THE COURT:  How is the bottom one admissible

24   through this witness?

25               MR. RUBY:  The witness just testified after

```
 1    looking at her deposition transcript that she believes she

 2    has received this document.  She was on the list of people

 3    --

 4              THE COURT:  That doesn't get you around the

 5    hearsay problem, does it?  Maybe I better hear from, from

 6    your opponent.

 7              MS. QUEZON:  Your Honor, it -- the bottom portion,

 8    although I agree with the Court that it doesn't really get

 9    you around the hearsay objection, I have no, I have no issue

10    with the bottom portion of it and she did receive it.  So

11    if -- I'll leave it to the Court's discretion as to whether

12    you want him to go through the redaction process.

13              THE COURT:  Well, this is a bench trial.  Will you

14    be satisfied if I say I'm just not going to consider the top

15    part?

16              MS. QUEZON:  Yes, sir, I will.

17              THE COURT:  Okay.  Well, that solves that problem.

18    And the bottom part is admitted, there being no objection to

19    that.  Did I get that right?

20              MS. QUEZON:  Yes, sir.

21              THE COURT:  Okay.

22              MR. RUBY:  Thank you, Your Honor.

23    BY MR. RUBY:

24    Q.   Dr. O'Connell, here in the bottom part of the email

25    chain we have an email from Dr. Petrany again to an
```

1    undisclosed recipient list.  And the subject is

2    "Resiliency Plan Public Release."  Right?

3    **A.**   Yes, it is.

4    **Q.**   And Dr. Petrany begins, "I am writing to you as an

5    active participate in the community group that developed the

6    attached Resiliency Plan for addressing the substance use

7    disorder crisis that has affected our county and city."

8         Do you see that?

9    **A.**   Yes.

10   **Q.**   Do you recall that Dr. Petrany sent this email to the

11   entire group of people who had worked on the Resiliency

12   Plan?

13   **A.**   I do not know who's on the redacted list.

14   **Q.**   It says -- if you would look at the -- skip a sentence.

15   There's a sentence that begins, "We have been encouraged."

16   Do you see that?

17   **A.**   Yes.

18   **Q.**   It says, "We have been encouraged to make that plan

19   public and I am writing to inform you of our intention to do

20   so later this week."

21        Did I read that correctly?

22   **A.**   Yes.

23   **Q.**   And this came after the email that Mr. Farrell had sent

24   to Dr. Petrany in which he said, "Gonna disclose the

25   Resiliency Plan and ready for you to release to the public."

1    Correct?

2    **A.**    Yes.

3    **Q.**    A few sentences down, Dr. O'Connell, there's a sentence

4    that begins -- the beginning of it is almost all the way

5    over to the right-hand side.  It says, "It was recommended."

6    Do you see that?

7    **A.**    I do.

8    **Q.**    And that sentence says, "It was recommended that any

9    reference to a specific budget for the plan be removed from

10   the document to be released."  Do you see that?

11   **A.**    I do.

12   **Q.**    And in this version of the plan that was released to

13   the public, as you've already testified, the Allocation of

14   Funds page that we've looked at a number of times was cut;

15   correct?

16   **A.**    It was removed.

17   **Q.**    Now, let's orient this in time.  The version from

18   August the 19th, the version of the Resiliency Plan from

19   August the 19th of 2019 had shown $23 million for addiction

20   treatment; correct?

21   **A.**    The last plan we looked at was September 3rd.

22   **Q.**    The first version that we looked at was August the

23   13th.  And I don't mean to test your memory.

24   **A.**    You want the one that's been photocopied, that one?

25   **Q.**    Pardon me?

1   **A.**   The one that's been photocopied?

2   **Q.**   The one that is Defendants' West Virginia 929.

3   **A.**   Yes.

4   **Q.**   In that version from August the 19th the number that

5   was shown for addiction treatment was $23 million; correct?

6   **A.**   Outpatient and Inpatient/Residential Services?

7   **Q.**   Yes.

8   **A.**   Yes.

9   **Q.**   And in the version, then, from August 20th, the 40-year

10  version, that number changed to $50 million over 40 years;

11  correct?

12  **A.**   Is that 1457?

13  **Q.**   I believe so, yes.

14  **A.**   And Outpatient and Inpatient/Residential Services

15  changed to $50 million.

16  **Q.**   Over 40 years?

17  **A.**   Yes, over 40 -- four decades.

18  **Q.**   Four decades?

19  **A.**   Four decades.

20  **Q.**   40 years?

21  **A.**   40 years.

22  **Q.**   And then the version of the Resiliency Plan from

23  September the 3rd after Mr. Farrell had, had reviewed the

24  plan with Dr. Petrany, that one -- and that's the one that

25  we looked at most recently -- that still showed $50 million

1   for addiction treatment over a, quote, multi-generational

2   time period.  Correct?

3   **A.**   The August 22nd plan showed Outpatient and

4   Inpatient/Residential Services at $50 million for, asterisk,

5   long-term multi-generational.

6   **Q.**   And, Doctor, the one that I was just referring to -- I

7   should have been clearer.  There's so many versions of this

8   floating around.  The one that I was just referring to was

9   the September 3rd version.

10   **A.**   Your 1447?

11   **Q.**   It was 1447.

12   **A.**   Right.  It shows Outpatient and Inpatient/Residential

13   Services at $50 million.

14   **Q.**   And that was for a time period that the plan described

15   as multi-generational; is that right?

16   **A.**   It is.

17   **Q.**   And then in the version that was ultimately released in

18   February of 2020, the budget, the Allocation of Funds paid

19   was deleted; correct?

20   **A.**   It was removed from the plan.

21   **Q.**   Let's talk about what happened between September of

22   2019 and February of 2020.

23        Did you know that between September of 2019, the

24   version with the $50 million treatment budget, and

25   February of 2020 when that budget was deleted that this case

1    was sent back to this court for trial?

2    **A.**   I don't.

3            MS. QUEZON:  Objection, relevance.

4            THE COURT:  Overruled.  I'll let you proceed.  I

5    don't know where you're going with this, but I want to see.

6    So I'll overrule the objection.

7    BY MR. RUBY:

8    **Q.**   Did you know, Dr. O'Connell, that now instead of

9    the $50 million that local experts in Cabell County said

10   was needed for addiction treatment over 40 years, now

11   the plaintiffs are asking for $1.6 billion for addiction

12   treatment over just 15 years?

13   **A.**   I do not know what's being asked.

14   **Q.**   You've testified earlier that you thought that one of

15   the reasons that the budget, the Allocation of Funds page

16   was deleted from the Resiliency Plan was because no health

17   economist had been involved in the process.  Is that right?

18   **A.**   As I stated before, I believe the Allocation of Funds

19   page was removed as I had started it in the same way that I

20   had said over Project Hope; that we had $2.1 million in

21   residential treatment times 17 people times five years times

22   40 years gave items that I would not be able to defend in a

23   court of law.  And, therefore, it was removed as we did not

24   have the expertise to make that decision.

25           THE COURT:  And that's what you testified to a

1    while ago, wasn't it?

2              THE WITNESS:  Yes.

3    BY MR. RUBY:

4    **Q.**   And you testified about the, the role of the health

5    economist, though; correct?

6    **A.**   I stated, for example, that I have no health economist

7    training.

8    **Q.**   And did you think that it was important for someone

9    with health economist training to be involved in the

10   budgeting for the Resiliency Plan?

11   **A.**   I would assume in the same way that I would want an

12   oncologist to consult on cancer, I'd want an expert in

13   health and policy to -- someone with an economy knowledge to

14   consult on financial planning for a healthcare plan.

15   **Q.**   And the person who put together the plaintiffs' current

16   budget for their abatement plan, did you know that that

17   person's specialty is estimating lost wages in personal

18   injury cases?

19   **A.**   I did not.

20             MR. RUBY:  I'll pass the witness, Your Honor.

21             THE COURT:  All right.

22        How much do you expect to have, Mr. Mahady?

23             MR. MAHADY:  I'm going to take you to break, Your

24   Honor, I think.  I might get done a little bit earlier.

25             THE COURT:  Can you do it in a half hour?

```
 1              MR. MAHADY:  I can do mine in a half hour.  I
 2    don't think Mr. Hester can.
 3              THE COURT:  I hate to pull the plug in the middle
 4    of your cross.  On the other hand, I promised everybody we
 5    would quit at noon, including my wife.
 6         (Laughter)
 7              MR. MAHADY:  I promised mine as well, so I don't
 8    want --
 9              THE COURT:  We'll see how far we can go.
10              MR. MAHADY:  All right.  I'll go as fast as I can
11    here.
12         Good morning, Your Honor.
13                        CROSS EXAMINATION
14    BY MR. MAHADY:
15    Q.   Good morning, Dr. O'Connell.  We have met before
16    via Zoom.  I don't really count that.  So nice to meet
17    you in person.
18    A.   I thought you looked familiar.
19    Q.   Dr. O'Connell, I believe you testified yesterday that
20    in your role, you conducted extensive evaluation on the
21    opioid epidemic for projects in Cabell; correct?
22    A.   I reported that I had -- that as part of our grants, we
23    have an evaluation component required for each.
24    Q.   Okay.  But you said you personally have conducted
25    extensive evaluation; correct?
```

```
 1    A.    I assume you're quoting my testimony from yesterday.
 2    Q.    I'm trying to.  I don't know if I'm doing it right.  Do
 3    you have extensive evaluation -- extensive experience
 4    evaluating the opioid epidemic?
 5    A.    I have evaluation experience of our projected and
 6    federal funding.
 7    Q.    Okay.  And as part of your extensive evaluation, you
 8    have looked into understanding the opioid epidemic; correct?
 9    A.    Can you clarify the question?
10    Q.    You've given presentations on understanding the opioid
11    epidemic; correct?
12    A.    Yes.
13    Q.    Okay.  And as part of those presentations, you have
14    noted the high prescribing rates in West Virginia for
15    opioids and benzodiazepines; correct?
16    A.    Do you have a specific presentation that you're
17    referencing?
18    Q.    I am, but I'm asking you specifically right now, but I
19    will show you the presentation.  But you have noted as part
20    of your presentations understanding the opioid epidemic the
21    high rate of prescribing in West Virginia for prescription
22    opioids; correct?
23    A.    I believe so.
24    Q.    And you've also noted the high rate of prescribing for
25    benzodiazepines; correct?
```

```
 1    A.    I believe so.

 2    Q.    And you have stated, or made the conclusion that those

 3    high prescribing rates were a leading contributor to the

 4    opioid epidemic; right?

 5    A.    I believe I state them as a factor.

 6    Q.    You've actually identified them as a leading

 7    contributor; correct?

 8    A.    Correct.

 9    Q.    They are a leading contributor in the opioid epidemic

10    in West Virginia; correct?

11    A.    If I have stated that in a presentation, would you be

12    willing to show it?

13    Q.    I'm just asking you -- I will show you the presentation

14    and I will show you your speaker notes.  Let's just do that.

15    I'm not trying to play games here.

16    A.    Okay.

17              MR. MAHADY:  Your Honor, may I approach?

18              THE COURT:  Yes, you may.

19    BY MR. MAHADY:

20    Q.    Dr. O'Connell, what I'm handing you is a color

21    version of a presentation and the presentation with

22    speaker notes.

23    A.    Okay.

24    Q.    That one is a little hard to follow, but you'll be able

25    to see the speaker notes.
```

**A.** Okay.

MR. MAHADY: Your Honor, are you okay with me publishing it? I'm not going to seek to get this document admitted. It's more of a demonstrative.

THE COURT: Yes.

MR. MAHADY: Sir, can you please pull up the presentation that has the speaker notes and we'll look at the page ending in 55092.

BY MR. MAHADY:

**Q.** Dr. O'Connell, before we go to that page, do you recognize this presentation?

**A.** It's been a while.

**Q.** Okay. But do you recognize this presentation?

**A.** Yes, I believe so.

**Q.** And that's your name, Lyn O'Connell, MA IMFT; correct?

**A.** That shows you how long ago it is, yes.

**Q.** Okay. And this is around 2017, 2018?

**A.** Maybe 2016, 2017.

**Q.** Okay. And you gave this -- you prepared this presentation; correct?

**A.** I did. It's one of the variations of the SBIRT training.

**Q.** Okay. If you can turn to the page ending at the bottom 5092, the slide is "Prescription Drug Abuse."

And I'm really going to focus on two of the bullets and

1    then the speaker notes.  I'm not going to focus on the right

2    side of the presentation.  Okay.

3         Dr. O'Connell, can you please read the two bullets that

4    are being highlighted?

5    **A.**    "West Virginia has the highest prescribing rate for

6    benzos, 71.9 out of 100 persons."

7         "West Virginia has the third highest prescribing rate

8    for opioid pain relievers, 137.6 out of 100 persons."

9    **Q.**    Okay.  And the speaker notes to the slide, did you

10   prepare those speaker notes?

11   **A.**    I don't mean this to sound flip.  I don't use speaker

12   notes when I present.  So it has to have been if I was

13   preparing for someone else to use the presentation or it was

14   added for one of our GAs.

15   **Q.**    Okay.  But if we can look at the speaker notes and I

16   want to focus on the sentence right here.  Can you please

17   read the sentence starting "West Virginia has one of"?

18   **A.**    "West Virginia has one of the highest opioid and

19   benzodiazepine prescribing rates in the country, which is a

20   leading contributor to the opioid epidemic and unlikely to

21   be explained by differences in the health status of the

22   population alone."

23   **Q.**    Okay.

24   **A.**    "West Virginia --"

25   **Q.**    I'm sorry.  Do you agree that the high prescribing

```
 1    rates in West Virginia is a leading contributor to the

 2    opioid epidemic as set forth in your presentation?

 3    A.   I believe these speaker notes are pulled from the

 4    citation that is at the bottom.

 5    Q.   Okay.

 6    A.   So I believe I've copied in from there as context to

 7    any questions that would come up above.

 8    Q.   You gave this presentation; correct?

 9    A.   Yes.

10    Q.   You featured the high prescribing rates in West

11    Virginia; correct?

12    A.   As one of the factors.

13    Q.   Okay.  And as the author of this presentation, do you

14    agree that high prescribing rates were a leading contributor

15    to the opioid epidemic?

16    A.   The part of the presentation that I would state is that

17    West Virginia has the highest prescribing rates for benzos

18    and West Virginia has the third highest prescribing rates

19    for opioid pain relievers.

20    Q.   Okay.  And they contributed to the opioid epidemic;

21    correct?

22    A.   I, I stand with West Virginia has the highest

23    prescribing rates for benzos and the third highest

24    prescribing rates for opioid pain relievers, and that

25    prescription drug abuse was one of the factors for the
```

```
 1    opioid epidemic as this is a series of factors I go through,

 2    adverse experiences.

 3    Q.   Okay.  And we will look at that.  But at least the

 4    presentation says it was a, quote, leading contributor to

 5    the opioid epidemic; correct?

 6    A.   The speaker notes that are copied out of wvha.org do

 7    state that.

 8    Q.   Okay.  I want to turn back to the color version of

 9    this.

10         And if we could pull up the slide that ends in 1537.

11    And it's the wheel.

12         Okay.  This was a slide from your presentation;

13    correct?

14    A.   Yes.

15    Q.   It was not speaker notes; correct?

16    A.   Correct.

17    Q.   Now, if we look at the box it says, "Multiple factors

18    have played a role in the development of the substance abuse

19    epidemic."  Correct?

20    A.   Correct.

21    Q.   Okay.  Can you start at the top, "pain scale," and just

22    read the factors that have played a role in the substance

23    abuse epidemic according to your slide?

24    A.   Pain scale, Oxycontin, marketing, lack of behavioral

25    healthcare, lack of integrated care, healthcare professional
```

1    education.

2    **Q.**    Okay.   There's no bubble for wholesale distributors;

3    correct?

4    **A.**    There is not.

5    **Q.**    There's no reference to AmerisourceBergen on that

6    slide; correct?

7    **A.**    There is not.

8    **Q.**    There's no reference to Cardinal Health?

9    **A.**    There is not.

10   **Q.**    And there's no reference to McKesson Corporation;

11   correct?

12   **A.**    There is not.

13   **Q.**    Okay.   Dr. O'Connell, do you have this document that I

14   believe Mr. Ruby used?   It's a one-page email that ends in

15   0078, subject line, Comprehensive Plan to Address the Impact

16   of the Opioid Crisis.

17   **A.**    Yes.

18   **Q.**    All right.   Before we move on, pain scale, that refers

19   to pain as the fifth vital sign; correct?

20   **A.**    Yes.

21   **Q.**    Okay.   Do you have this email in front of you?   It's

22   dated March 5, 2019; correct?

23   **A.**    Yes.

24   **Q.**    Okay.   And if I recall correctly, you testified that

25   this stems from the meeting that you had with various

1    community leaders, including Mr. Farrell, to develop a

2    comprehensive plan to address the opioid epidemic; correct?

3    **A.**    Correct.

4    **Q.**    Okay.  And this was March 5th, 2019; correct?

5    **A.**    Correct.

6    **Q.**    Okay.  Did you advise anyone at that meeting that

7    Marshall had already come up with a comprehensive plan to

8    address the opioid epidemic prior to the meeting?

9    **A.**    No.

10   **Q.**    Okay.  Did you advise anyone at the meeting that

11   Marshall had already submitted a comprehensive plan to the

12   Merck Foundation?

13   **A.**    No.

14   **Q.**    Okay.

15            MR. MAHADY:  Ms. Pierce, can you hand me that?

16        Your Honor, may I approach?

17            THE COURT:  Yes.

18            MR. MAHADY:  Okay.  Could you pull up Defendant WV

19   00417?

20            MS. QUEZON:  Can you lay some foundation for this

21   document before we start?

22            MR. MAHADY:  Sure.

23            MS. QUEZON:  Thank you.

24   BY MR. MAHADY:

25   **Q.**    Dr. O'Connell, I believe you testified at your

1    deposition that you are very familiar with this

2    document; is that correct?

3    **A.**   I am.

4    **Q.**   Okay.

5            MS. QUEZON:  What is it?

6            MR. MAHADY:  Okay.  I thought that was enough.

7    BY MR. MAHADY:

8    **Q.**   Is this the grant application for the Merck

9    Foundation?

10   **A.**   M-e-r-c-k, yes.

11   **Q.**   Okay.

12           MR. MAHADY:  Please pull it up.

13   BY MR. MAHADY:

14   **Q.**   Okay.  And before we turn to this document, I just

15   want to compare the subject line of the email with the

16   title of the grant application.  So the subject line of

17   the email is "Comprehensive Plan to Address the Impact

18   of the Opioid Crisis."  Correct?

19   **A.**   Yes.

20   **Q.**   And the subject line of the grant which pre- --

21   application which pre-dated the meeting with the community

22   leaders is "A Comprehensive Approach to the Opioid Epidemic

23   in the Great Rivers Region of West Virginia."  Correct?

24   **A.**   Correct.

25   **Q.**   And the Great Rivers Region of West Virginia, that's

1    broader than just Cabell County; correct?

2    **A.**    Correct.

3    **Q.**    What does that include?

4    **A.**    As we discussed yesterday, the Great Rivers Regional

5    System of Addiction Care was this one.  And it was Cabell,

6    Kanawha, Jackson, and Putnam County.

7    **Q.**    Thank you.  If we can please go to Page 3, Section A,

8    Abstract -- Program Abstract/Summary.

9         Okay.  Dr. O'Connell, will you please read the

10    highlighted text?

11    **A.**    "This program will establish an innovative,

12    comprehensive approach to reduce overdoses and overdose

13    deaths, increase treatment and treatment retention, and

14    enhance public health education to save lives and improve

15    health outcomes."

16    **Q.**    Okay.  And the program that's being described, that's

17    the subject of the grant that Marshall was seeking to

18    obtain; correct?

19    **A.**    Incorrect.

20    **Q.**    Please explain.

21    **A.**    As we went through in my deposition, I indicated that

22    the Great Rivers system and the system that we have --

23         First off, the way grants work -- and when you write an

24    application for a grant is to indicate we're doing all of

25    the things.  If you give us money, we're going to implement

1    X, Y, and Z and then you sort of break that down.

2         For the Merck Foundation they wanted coordination

3    between systems and they approached us to explore that

4    opportunity.  This was before I was the Director --

5    Associate Director of Addiction Sciences as Bob Hansen and

6    Deb Keyster (phonetic) are the authors on this grant.

7         This grant purely hired a project director and

8    prevention education coordinators to work across systems

9    that existed.  So their goals were to reduce opioid overdose

10   deaths, increase access -- increased -- enhanced access to

11   care for hepatitis, and improve public health.

12        So what they do is convene a monthly meeting of all

13   parties who are working in that area to see how we can

14   promote cross collaboration to reduce overdose deaths,

15   improve access to treatment, and enhance education.

16   **Q.**   Okay.  Thank you.  That was helpful.

17        And, so, what this plan was to do in part was to

18   leverage existing resources and programs in the community;

19   correct?

20   **A.**   It was to bring together community partners.

21   **Q.**   Okay.  And you agree, though, that part of the plan,

22   right, was to establish an innovative comprehensive approach

23   to reduce overdose and overdose deaths; correct?

24   **A.**   In the way that I just stated, yes.

25   **Q.**   Okay.  And if we go down and look at the purpose of

1    this program, it was to develop -- "This program will

2    leverage funding to establish a mechanization that will

3    enable full implementation and coordination of each of the

4    components of the Great Rivers Regional System for Addiction

5    Care."  Correct?

6    **A.**    Correct.

7    **Q.**    And if we look at the program goals starting with B-2,

8    Program Goals and Objectives, the four goals of the

9    program -- and I'm going to simplify this given the time --

10   the first one was to reduce overdoses and overdose deaths.

11   Correct?

12   **A.**    Yes.

13   **Q.**    The second one was to increase the number of

14   individuals entering treatment and treatment retention.

15   Correct?

16   **A.**    Yes.

17   **Q.**    The third one was to increase the availability of

18   educational opportunities and resources.  Correct?

19   **A.**    Correct.

20   **Q.**    And the fourth one was to conduct formal process and

21   outcome evaluation and dissemination of findings?  Correct?

22   **A.**    Correct.

23   **Q.**    Okay.  And if you can turn to Page 300.

24   **A.**    I don't understand.

25   **Q.**    I'm sorry.

```
 1              MS. QUEZON:  On the right-hand side.
 2    BY MR. MAHADY:
 3    Q.   Bottom right.  Thank you.  Okay.
 4         So another representation that Marshall made to Merck
 5    was that this plan it was putting forward was sustainable;
 6    correct?
 7    A.   All grants require a sustainability plan.
 8    Q.   Okay.  And the representations that Marshall made for
 9    this comprehensive plan was that this program will be
10    sustained through the on-going engagement of partners
11    representing key sectors and all system components across
12    the region.  Correct?
13    A.   Yes.
14    Q.   And it further stated that in addition, with the advent
15    of the Medicaid SUD waiver, many of the services will be
16    reimbursed by Medicaid; correct?
17    A.   That was written, yes.
18    Q.   Okay.  That was a representation that Marshall made to
19    Merck; correct?
20    A.   When the grant was submitted, yes.
21    Q.   Okay.  We can go back to the first page just so we can
22    see the amount of funding requested for this comprehensive
23    approach to the opioid epidemic in the Great Rivers Region
24    of West Virginia.
25         Can you please read what the amount of funding
```

```
 1   requested is.

 2   A.   $1,999,206 was requested from the Merck Foundation.

 3   Q.   Okay.  Marshall did not consult the plaintiffs' lawyers

 4   with this request; correct?

 5   A.   This was submitted in 2017.

 6   Q.   Prior to the meeting with the plaintiffs' lawyers?

 7   A.   Significantly.

 8           MS. QUEZON:  Objection, Your Honor.  This is

 9   argumentative.

10           MR. MAHADY:  Your Honor, the witness has talked at

11   length about -- I won't characterize her testimony.  The

12   witness has testified about the involvement of plaintiffs'

13   lawyers.

14           THE COURT:  I'll overrule the objection.  Go

15   ahead, Mr. Mahady.

16   BY MR. MAHADY:

17   Q.   This grant proposal for a comprehensive approach to

18   the opioid epidemic for 1.99 million was submitted

19   without the input of the plaintiffs' lawyers; correct?

20   A.   Yes.

21   Q.   Thank you.

22           MR. MAHADY:  I have no further questions, Your

23   Honor.

24           THE COURT:  How long are you going to take,

25   Mr. Hester?
```

```
 1              MR. HESTER:  I'm going to take a substantial

 2   amount of time.

 3              THE COURT:  More than 10 minutes?

 4              MR. HESTER:  More than 10 minutes I'm afraid.

 5              THE COURT:  Well, I'm going to pull the plug on

 6   this now unless there's any objection.

 7              MR. MAHADY:  Your Honor, I would like to --

 8              MS. QUEZON:  I think the witness would like to

 9   object, Your Honor.

10              MR. MAHADY:  Your Honor, I would like to move this

11   proposal into the record.

12              THE COURT:  Is there any objection to that?

13              MS. QUEZON:  I don't understand the relevance --

14              MR. MAHADY:  I think the relevance --

15              MS. QUEZON:  -- or the hearsay.

16              MR. ACKERMAN:  Or the hearsay.

17              THE COURT:  The relevance of the abatement damages

18   or whatever you want to call it.

19              MR. MAHADY:  Thank you, Your Honor.

20              MS. QUEZON:  It's also hearsay.  She did not write

21   that.  She was familiar with it, but she didn't write it.

22              MR. MAHADY:  Your Honor, the witness has testified

23   that a big part of her division at Marshall, which this

24   comes from, is writing grants.  This is a grant written by

25   the division.  It's a business record.  I think it falls
```

```
 1    under that exception.

 2              MS. QUEZON:  There's no foundation for the

 3    document.  Sorry about that.

 4              MR. ACKERMAN:  No, we're going to say the same

 5    thing.  There's no foundation laid for being a business

 6    record.  It's hearsay from a third party.

 7              THE COURT:  Well, I'm not going to admit it at

 8    this time, Mr. Mahady.  I let you question her about it and

 9    we'll leave it at that for now.

10       And Ms. -- Dr. O'Connell, I'm going to have to ask you

11    to come back a week from Monday.  I believe that's the 7th

12    of June.

13              MS. QUEZON:  It is, Your Honor.

14              THE COURT:  We'll resume at 9:00 in the morning on

15    June the 7th and I'll see you then.  Thank you very much.

16              THE WITNESS:  Thank you, Your Honor.  Have a good

17    holiday.

18              THE COURT:  Thank you.

19       Is there anything we need to do before we adjourn until

20    the 7th of June?

21       Hearing nothing, I'll see everybody a week from Monday

22    morning and I hope everybody comes back well rested and

23    happy and ready to go.

24              MR. ACKERMAN:  Oh, sugar.  Your Honor, I

25    apologize.
```

1       Ms. Christenson has deposition designations to formally

2  present to the Court.

3              THE COURT:  Okay.

4              MR. CHRISTENSON:  Good morning, Your Honor.

5  Monique Christenson representing the City of Huntington.

6              THE COURT:  Yes.

7              MR. CHRISTENSON:  We have six deposition

8  designations to present today.

9       We have Gary Boggs, Gary Hilliard, Vic Brown, Eric

10  Brantley and -- I forgot my list.  Apologies.  Steve Reardon

11  and Stephen Lawrence.  There we go.  Their names are on the

12  boxes.

13              THE COURT:  All right.

14              MS. MAINIGI:  Your Honor, what we would -- with

15  respect to the Cardinal designations, we would request the

16  opportunity to do what the McKesson team did with the had

17  designations, which is put the objections in a format that

18  will be much more easily reviewable by Your Honor.  So we

19  will obviously -- I think we're already -- we've already

20  begun on that process and we will get that expeditiously to

21  you.

22              THE COURT:  That would be very helpful to me,

23  Ms. Mainigi.

24              MR. CHRISTENSON:  If there are any additional

25  formatting changes requested, we are very willing to hear

```
 1    anything back from Your Honor as to how you might prefer
 2    reading those with the transcripts.
 3              THE COURT:  Thank you.
 4              MR. ACKERMAN:  I would just note I understand that
 5    the defendants believe their format is more easily noted for
 6    you.  I don't know that we necessarily agree with that.  But
 7    we're certainly happy to allow the Court to evaluate the two
 8    formats and let us know how you want it and we will make
 9    sure to do that going forward.
10              THE COURT:  Okay.
11              MR. HESTER:  Your Honor, may I just ask one more
12    point?  I'm sorry.  We kept you for a minute and now it's
13    multiplying.  We just wanted an instruction that the witness
14    not consult with counsel while she's under cross
15    examination.
16              MS. QUEZON:  I know the rules, Your Honor.
17              MR. HESTER:  Thank you.
18              THE COURT:  The witness as already gone, so I
19    can't instruct her.
20          Is Dr. O'Connell still in the courtroom?
21              MR. FARRELL:  This is Paul Farrell.  On the way
22    out I told her that she isn't prohibited from talking to
23    Farrells or any other lawyer, but she's not allowed to
24    discuss her testimony or the substance of her testimony
25    between now and when she comes back.
```

```
 1              THE COURT:  Okay.  Are you satisfied with that,

 2    Mr. Hester?

 3              MR. HESTER:  Yes, Your Honor.  Thank you.

 4              THE COURT:  All right.

 5         (Trial recessed at 11:55 a.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        CERTIFICATION:

2                  I, Ayme A. Cochran, Official Court

3    Reporter, and I, Lisa A. Cook, Official Court Reporter,

4    certify that the foregoing is a correct transcript from

5    the record of proceedings in the matter of The City of

6    Huntington, et al., Plaintiffs vs. AmerisourceBergen

7    Drug Corporation, et al., Defendants, Civil Action No.

8    3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9    reported on May 28, 2021.

10

11              S\Ayme A. Cochran              s\Lisa A. Cook

12                 Reporter                       Reporter

13        _

14

15              May 28, 2021

16                 Date

17

18

19

20

21

22

23

24

25

## $

**$0.05** [1] - 21:14
**$1,999,206** [1] - 129:2
**$1,999,999.95** [1] - 21:14
**$100** [1] - 94:7
**$172** [2] - 64:8, 73:13
**$175** [1] - 92:10
**$20** [2] - 35:14, 66:17
**$200** [5] - 56:15, 57:1, 73:14, 73:17, 74:2
**$23** [4] - 65:14, 65:20, 110:19, 111:5
**$25** [1] - 67:11
**$30** [1] - 67:23
**$365** [1] - 71:7
**$450** [1] - 58:9
**$50** [12] - 71:15, 75:13, 75:18, 75:23, 84:21, 111:10, 111:15, 111:25, 112:4, 112:13, 112:24, 113:9
**$50,000.00** [2] - 21:17
**$500** [3] - 94:12, 95:1, 95:13
**$537** [2] - 92:1, 94:10
**$60** [1] - 93:13
**$75** [2] - 93:18, 94:2

## 0

**00417** [1] - 123:19
**005** [1] - 52:4
**0078** [1] - 122:15
**00907** [2] - 2:5, 2:17
**029** [1] - 62:18
**030** [1] - 70:22

## 1

**1** [2] - 51:24, 75:9
**1.4** [2] - 20:11, 20:17
**1.6** [1] - 113:11
**1.99** [1] - 129:18
**10** [5] - 20:25, 34:4, 65:23, 130:3, 130:4
**100** [2] - 119:6, 119:8
**1001** [2] - 2:10, 4:6
**1022** [1] - 3:5
**10:40** [1] - 77:9
**11:55** [1] - 134:5
**126** [1] - 3:5
**1300** [1] - 6:15
**1301** [4] - 7:7, 9:16, 10:5, 11:15
**1311** [2] - 2:4, 2:16
**1361** [3] - 100:9, 105:7, 105:16

**137.6** [1] - 119:8
**13th** [1] - 110:23
**14** [2] - 14:9, 106:10
**1432** [4] - 96:25, 99:25, 103:19, 104:24
**1446** [3] - 85:13, 86:9, 86:13
**1447** [6] - 90:11, 90:12, 100:15, 101:14, 112:10, 112:11
**1450** [2] - 79:2, 81:6
**1451** [2] - 83:10, 84:25
**1456** [3] - 69:8, 70:11, 70:12
**1457** [5] - 69:15, 69:19, 70:14, 70:19, 111:12
**15** [4] - 20:25, 65:23, 87:4, 113:12
**1537** [1] - 121:10
**15910** [1] - 3:18
**16** [2] - 87:6, 95:6
**1600** [1] - 3:17
**17** [2] - 20:21, 113:21
**1717** [2] - 6:6, 6:13
**17th** [1] - 98:25
**18** [1] - 30:10
**18th** [1] - 97:2
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1989** [1] - 39:25
**19th** [12] - 51:15, 51:18, 62:25, 64:7, 67:25, 73:12, 73:25, 93:22, 110:18, 110:19, 111:4

## 2

**2** [1] - 21:12
**2.1** [2] - 20:18, 113:20
**20** [5] - 1:16, 20:25, 25:17, 34:4
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2014** [1] - 8:20
**2016** [1] - 118:18
**2017** [3] - 118:17, 118:18, 129:5
**2018** [1] - 118:17
**2019** [30] - 39:1, 43:9, 43:12, 43:15, 43:16, 48:22, 51:18, 62:25, 64:7, 68:16, 69:7, 74:20, 77:18, 77:24, 78:4, 79:13, 83:12,

86:10, 86:14, 90:15, 95:18, 97:2, 98:25, 99:19, 99:21, 110:19, 112:22, 112:23, 122:22, 123:4
**202** [2] - 2:4, 2:16
**2020** [5] - 72:19, 105:22, 112:18, 112:22, 112:25
**2021** [4] - 1:19, 74:4, 135:9, 135:15
**20th** [10] - 68:16, 69:7, 71:5, 71:13, 74:4, 74:19, 77:18, 79:15, 84:3, 111:9
**213** [1] - 95:5
**215** [1] - 73:2
**21st** [4] - 73:13, 74:1, 78:4, 78:21
**22** [1] - 87:5
**2216** [1] - 3:7
**22nd** [5] - 79:13, 83:12, 92:4, 92:15, 112:3
**23** [1] - 87:6
**233** [1] - 93:3
**24/7** [1] - 29:13
**246** [1] - 8:20
**25** [2] - 5:5, 62:16
**251** [1] - 106:8
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**269** [1] - 8:20
**27** [1] - 83:22
**28** [7] - 1:19, 3:15, 4:3, 4:9, 7:4, 135:9, 135:15
**29** [1] - 90:22
**29464** [3] - 3:15, 4:4, 4:9
**2:00** [1] - 29:14

## 3

**3** [2] - 98:6, 125:7
**3-5** [1] - 65:25
**300** [1] - 127:23
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**31st** [2] - 72:19, 73:8
**32502** [1] - 2:14
**365** [1] - 92:13
**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 135:8
**3:17-cv-01665** [2] -

1:11, 135:8
**3rd** [14] - 68:13, 86:10, 86:14, 90:15, 91:6, 91:10, 91:14, 93:11, 100:16, 101:13, 105:22, 110:21, 111:23, 112:9

## 4

**4** [2] - 73:5, 75:10
**4-6** [1] - 36:8
**4-decade** [1] - 72:2
**40** [11] - 12:23, 75:13, 75:18, 75:23, 111:10, 111:16, 111:17, 111:20, 111:21, 113:10, 113:22
**40-plus** [1] - 56:13
**40-year** [9] - 72:2, 73:19, 74:23, 75:3, 75:15, 75:22, 77:14, 79:16, 111:9
**401** [2] - 2:10, 4:6
**405** [1] - 2:7

## 5

**5** [3] - 21:13, 29:8, 122:22
**50** [1] - 91:19
**5092** [1] - 118:24
**537** [1] - 92:9
**540-plus** [1] - 57:23
**55** [1] - 14:10
**55092** [1] - 118:8
**553** [1] - 6:8
**56** [1] - 3:4
**56th** [1] - 3:5
**5:00** [1] - 29:15
**5th** [2] - 43:9, 123:4

## 6

**6-9** [1] - 35:24
**600** [1] - 2:13
**6th** [1] - 3:5

## 7

**70130** [1] - 3:8
**707** [1] - 4:18
**71.9** [1] - 119:6
**716** [1] - 3:12
**725** [2] - 4:13, 4:15
**749** [1] - 8:19
**778** [1] - 41:3
**7:00** [1] - 29:16
**7th** [3] - 131:11,

131:15, 131:20

## 8

**8** [2] - 7:10, 10:4
**8-22-19** [1] - 81:10
**8/20** [1] - 68:15
**801** [2] - 3:10, 104:19
**801(d)(2** [2] - 100:19, 102:4
**801(d)(2)(B)** [1] - 103:4
**850** [1] - 5:12

## 9

**9** [2] - 29:8, 73:22
**901** [1] - 4:18
**91436** [1] - 3:18
**929** [1] - 111:2
**99** [1] - 54:1
**9:00** [2] - 7:4, 131:14
**9th** [1] - 2:10

## A

**a.m** [4] - 7:4, 29:14, 77:9, 134:5
**abatement** [9] - 41:14, 42:19, 48:23, 52:25, 85:8, 101:6, 101:17, 114:16, 130:17
**Abatement** [3] - 86:17, 86:20, 98:3
**ability** [1] - 63:15
**able** [16] - 10:13, 15:14, 19:4, 19:9, 20:13, 25:7, 28:11, 29:5, 29:9, 29:15, 89:13, 89:19, 107:18, 113:22, 117:24
**absolutely** [1] - 13:15
**Abstinence** [2] - 25:25, 65:11
**Abstract** [1] - 125:8
**Abstract/Summary** [1] - 125:8
**abuse** [5] - 45:6, 59:3, 120:25, 121:18, 121:23
**Abuse** [5] - 20:19, 32:25, 45:4, 47:7, 118:24
**academic** [2] - 33:2, 55:23
**access** [5] - 7:8, 9:3, 126:10, 126:15
**accomplish** [1] - 38:4
**according** [4] - 67:16,

81:6, 91:1, 121:23
**According** [1] - 77:19
**accuracy** [1] - 76:1
**ACKERMAN** [7] - 2:9, 69:22, 103:10, 130:16, 131:4, 131:24, 133:4
**acknowledge** [1] - 27:14
**acknowledged** [1] - 30:25
**acknowledging** [1] - 15:10
**acknowledgment** [1] - 74:24
**acknowledgments** [1] - 51:24
**Action** [4] - 1:4, 1:10, 135:7, 135:8
**active** [1] - 109:5
**actual** [1] - 68:14
**add** [1] - 87:1
**added** [10] - 87:4, 87:14, 87:20, 88:1, 88:6, 88:13, 88:16, 88:21, 89:3, 119:14
**Addiction** [12] - 48:20, 48:21, 60:14, 63:10, 63:18, 71:2, 73:12, 74:1, 89:18, 125:5, 126:5, 127:4
**addiction** [20] - 40:7, 46:16, 46:19, 49:3, 50:12, 50:14, 57:9, 57:17, 57:22, 58:22, 60:7, 61:20, 64:17, 65:13, 75:18, 110:19, 111:5, 112:1, 113:10, 113:11
**addition** [3] - 59:18, 103:23, 128:14
**additional** [1] - 132:24
**additions** [2] - 87:14, 87:22
**address** [5] - 32:14, 41:15, 97:19, 123:2, 123:8
**Address** [3] - 41:9, 122:15, 124:17
**addressing** [2] - 32:14, 109:6
**adjourn** [1] - 131:19
**Administration** [3] - 20:19, 33:1, 33:21
**administration** [1] - 36:24
**admissibility** [1] - 80:9
**admissible** [3] -

110:13, 112:18, 113:15, 113:18
**allocation** [3] - 63:2, 64:7, 70:24
**allow** [2] - 9:16, 133:7
**allowed** [5] - 34:15, 34:17, 102:10, 102:16, 133:23
**almost** [3] - 14:22, 73:14, 110:4
**alone** [1] - 119:22
**alongside** [1] - 31:12
**Amendment** [1] - 9:2
**AMERISOURCEBER
  GEN** [2] - 1:7, 1:13
**AmerisourceBergen**
  [3] - 6:2, 122:5, 135:6
**amount** [16] - 21:16, 21:21, 34:10, 34:12, 34:23, 35:15, 49:3, 49:6, 65:24, 84:20, 85:5, 92:21, 94:20, 128:22, 128:25, 130:2
**amounts** [2] - 27:17, 74:10
**Amy** [1] - 90:4
**analysis** [3] - 73:25, 74:7
**ANDREW** [1] - 5:10
**Angeles** [1] - 27:23
**Ann** [1] - 99:8
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**announced** [1] - 94:11
**announcement** [1] - 100:24
**annual** [1] - 58:10
**annually** [1] - 57:1
**answer** [7] - 38:7, 73:15, 74:4, 74:15, 76:21, 96:5, 106:5
**answered** [1] - 89:4
**ANTHONY** [1] - 2:6
**anxious** [1] - 36:7
**anytime** [1] - 42:7
**apart** [1] - 56:24
**Apologies** [1] - 132:10
**apologize** [3] - 16:4, 88:17, 131:25
**appear** [4] - 8:16, 97:4, 97:6, 97:17
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appeared** [1] - 97:10
**application** [7] - 17:2, 17:3, 17:4, 124:8, 124:16, 124:21, 125:24

**applications** [3] - 27:18, 34:3
**applied** [1] - 27:21
**apply** [2] - 9:8, 33:12
**applying** [2] - 35:3, 36:1
**appointment** [4] - 29:1, 29:4, 29:10, 30:3
**appreciate** [4] - 7:16, 11:6, 54:7, 86:19
**approach** [7] - 74:12, 117:17, 123:16, 125:12, 126:22, 128:23, 129:17
**Approach** [1] - 124:22
**approached** [1] - 126:3
**approaches** [3] - 25:8, 31:18, 32:11
**appropriate** [2] - 52:24, 85:6
**Arch** [2] - 6:6, 6:13
**area** [7] - 21:10, 21:25, 23:21, 30:16, 46:20, 58:6, 126:13
**areas** [18] - 18:16, 22:11, 22:13, 22:22, 23:18, 23:19, 30:16, 71:22, 84:8, 92:6
**arguably** [1] - 104:10
**argument** [1] - 103:15
**argumentative** [1] - 129:9
**article** [2] - 94:25, 95:8
**ASHLEY** [1] - 5:3
**aside** [3] - 27:17, 80:9, 88:11
**aspect** [1] - 67:7
**asserted** [1] - 107:5
**assessment** [1] - 67:20
**assigned** [1] - 69:13
**assistance** [1] - 14:11
**assisted** [4] - 28:25, 33:17, 34:1, 64:20
**assisting** [1] - 72:13
**Associate** [5] - 48:11, 48:14, 48:17, 89:17, 126:5
**associated** [1] - 71:6
**assume** [9] - 46:21, 56:14, 69:10, 70:6, 98:17, 102:12, 102:17, 114:11, 116:1
**assumed** [3] - 44:5, 44:9, 44:10
**assuming** [1] - 85:2

**asterisk** [3] - 71:19, 83:25, 112:4
**AT** [1] - 1:2
**attached** [9] - 68:16, 68:23, 79:16, 81:12, 83:18, 90:9, 90:18, 91:4, 109:6
**attachment** [4] - 69:6, 79:4, 81:7, 98:5
**attempt** [1] - 20:6
**attendance** [3] - 16:9, 48:25, 88:9
**attended** [2] - 53:20, 54:5
**attention** [1] - 73:5
**attorney** [1] - 59:19
**August** [29] - 51:15, 51:18, 62:25, 64:7, 67:25, 68:16, 69:7, 71:5, 71:13, 73:12, 73:13, 73:25, 74:1, 74:19, 77:18, 79:13, 79:15, 83:12, 84:3, 92:4, 92:15, 93:22, 110:18, 110:19, 110:22, 111:4, 111:9, 112:3
**Austin** [1] - 27:23
**Australia** [1] - 26:8
**authenticate** [1] - 85:19
**author** [1] - 120:13
**authors** [1] - 126:6
**automatic** [1] - 35:6
**automatically** [4] - 25:6, 30:24, 33:13, 68:19
**availability** [1] - 127:17
**available** [4] - 9:17, 10:2, 83:2
**Avin** [1] - 3:7
**awarded** [7] - 34:8, 34:23, 35:2, 35:12, 36:1, 36:3, 36:4, 36:21
**awards** [3] - 34:4, 35:13, 35:14
**aware** [4] - 59:21, 83:3, 89:25, 95:12
**awareness** [1] - 42:8
**Ayme** [2] - 6:17, 135:2

## B

**B-2** [1] - 127:7
**babies** [1] - 89:21
**back-and-forth** [1] - 73:4
**backwards** [1] - 22:19

80:15, 95:25, 107:23
**admission** [4] - 41:2, 81:2, 107:11, 107:19
**admit** [13] - 52:15, 53:1, 69:14, 80:25, 84:24, 85:10, 86:1, 86:4, 99:24, 104:18, 107:13, 107:21, 131:7
**admitted** [14] - 7:11, 9:22, 9:23, 10:8, 10:9, 41:6, 70:16, 100:2, 104:19, 105:1, 105:5, 108:18, 118:4
**admitting** [1] - 80:15
**adopted** [7] - 100:22, 101:23, 102:9, 103:5, 103:11, 103:16, 104:10
**advent** [1] - 128:14
**adverse** [1] - 121:2
**advise** [2] - 123:6, 123:10
**advisors.com** [1] - 45:25
**Advisory** [5] - 50:6, 53:14, 53:15, 61:24, 72:7
**advisory** [3] - 19:23, 54:4, 93:6
**affected** [2] - 21:3, 109:7
**affiliated** [1] - 55:13
**afraid** [1] - 130:4
**afternoon** [1] - 14:17
**age** [1] - 31:20
**agency** [1] - 102:21
**agents** [1] - 101:5
**ago** [13] - 16:3, 16:4, 16:6, 30:10, 37:18, 51:8, 57:7, 60:9, 71:10, 114:1, 118:16
**agree** [11] - 11:9, 81:17, 81:21, 81:22, 82:8, 82:20, 108:8, 119:25, 120:14, 126:21, 133:6
**ahead** [8] - 52:15, 56:11, 63:22, 68:4, 68:23, 105:14, 107:15, 129:15
**al** [4] - 1:7, 1:13, 135:6, 135:7
**allegation** [1] - 9:1
**allocated** [2] - 74:10, 92:21
**Allocation** [10] - 62:21, 83:19, 83:20, 84:16, 90:24, 93:8,

**Bailey** [2] - 59:9, 59:11
**bare** [1] - 8:25
**Baron** [1] - 3:17
**barrier** [3] - 29:6, 29:8, 34:19
**barriers** [1] - 34:19
**based** [4] - 23:5, 65:24, 72:2, 103:12
**bases** [1] - 100:19
**bashed** [1] - 26:17
**basis** [9] - 9:18, 10:1, 80:13, 80:25, 86:4, 96:4, 100:25, 107:15
**Bates** [2] - 69:18, 69:20
**Baylen** [1] - 2:13
**became** [3] - 19:1, 42:14, 51:9
**become** [1] - 20:16
**becomes** [1] - 29:6
**BEFORE** [1] - 1:17
**begin** [1] - 16:12
**beginning** [2] - 73:22, 110:4
**begins** [4] - 41:12, 109:4, 109:15, 110:4
**begun** [1] - 132:20
**behavior** [1] - 33:6
**behavioral** [6] - 33:3, 33:4, 46:11, 46:12, 46:15, 121:24
**behind** [1] - 24:20
**belabor** [2] - 89:1, 104:17
**belief** [1] - 44:2
**believes** [2] - 35:3, 108:1
**bell** [1] - 46:6
**below** [3] - 52:11, 66:19, 71:18
**BENCH** [1] - 1:16
**bench** [1] - 108:13
**benefit** [1] - 43:24
**benzodiazepine** [1] - 119:19
**benzodiazepines** [2] - 116:15, 116:25
**benzos** [3] - 119:6, 120:17, 120:23
**beside** [2] - 71:19, 83:25
**best** [2] - 25:9, 31:24
**Beth** [2] - 46:22, 46:24
**better** [2] - 88:18, 108:5
**between** [13] - 19:20, 31:9, 43:14, 73:25, 76:6, 88:22, 93:12, 100:20, 101:22, 112:21, 112:23,

126:3, 133:25
**beyond** [2] - 43:5, 43:6
**big** [9] - 27:20, 28:11, 28:20, 35:8, 38:4, 56:8, 93:18, 130:23
**billion** [2] - 48:6, 113:11
**billion-dollar-a-year** [1] - 48:6
**bit** [7] - 9:25, 12:17, 49:22, 52:11, 57:12, 91:23, 114:24
**blue** [1] - 22:24
**Blvd** [3] - 3:15, 4:3, 4:9
**Board** [7] - 40:4, 47:25, 50:6, 53:14, 53:15, 61:24, 72:7
**board** [2] - 19:23, 47:15
**Bob** [1] - 126:5
**body** [2] - 59:2, 99:13
**Boggs** [1] - 132:9
**bold** [1] - 71:19
**bolded** [1] - 83:25
**Bonasso** [1] - 5:14
**book** [3] - 14:8, 14:23, 25:13
**books** [1] - 48:8
**born** [2] - 25:24
**boss** [2] - 16:16, 39:19
**Boston** [1] - 27:23
**Bottom** [1] - 128:3
**bottom** [20] - 62:19, 71:17, 71:18, 75:10, 83:25, 92:3, 98:10, 98:13, 98:22, 105:20, 106:18, 107:1, 107:21, 107:23, 108:7, 108:10, 108:18, 108:24, 118:23, 120:4
**Boulevard** [1] - 3:18
**box** [1] - 121:17
**Box** [2] - 5:14, 6:8
**boxes** [1] - 132:12
**braced** [1] - 42:17
**branded** [1] - 13:17
**Brantley** [1] - 132:10
**break** [5] - 77:5, 77:6, 77:13, 114:23, 126:1
**breaks** [1] - 63:3
**Brian** [5] - 44:17, 44:19, 44:20, 59:15, 76:18
**bricks** [2] - 34:16, 63:19
**Bridgeside** [3] - 3:15,

4:3, 4:9
**brief** [2] - 16:22, 25:12
**briefly** [2] - 96:6, 96:8
**bring** [7] - 13:3, 13:10, 14:3, 19:24, 30:6, 74:5, 126:20
**Broadcasting** [1] - 37:23
**broader** [1] - 125:1
**brought** [4] - 18:8, 42:13, 50:3, 74:7
**Brown** [1] - 132:9
**bubble** [1] - 122:2
**bubbles** [1] - 88:2
**Budd** [1] - 3:17
**budget** [11] - 34:5, 34:6, 57:1, 58:10, 64:3, 110:9, 112:18, 112:24, 112:25, 113:15, 114:16
**budgeting** [1] - 114:10
**budgets** [1] - 15:1
**build** [2] - 28:10, 63:13
**building** [6] - 20:12, 20:14, 20:15, 66:6, 67:1, 93:14
**built** [4] - 21:4, 31:19, 31:21, 92:10
**bullets** [2] - 118:25, 119:3
**Burling** [1] - 5:11
**bury** [1] - 27:13
**bus** [1] - 30:5
**business** [2] - 130:25, 131:5
**businesses** [2] - 67:18, 94:7
**busy** [2] - 9:21, 82:17
**BY** [33] - 12:8, 37:12, 41:7, 42:3, 48:16, 53:2, 70:18, 73:3, 73:23, 77:12, 81:4, 85:11, 86:7, 89:9, 93:10, 94:23, 95:17, 96:23, 100:3, 105:15, 106:9, 106:15, 108:23, 113:7, 114:3, 115:14, 117:19, 118:9, 123:24, 124:7, 124:13, 128:2, 129:16

---

**C**

---

**CA** [1] - 3:18
**Cabell** [46] - 3:2, 33:23, 39:3, 45:16, 45:17, 45:21, 45:23,

47:4, 47:5, 47:25, 48:3, 49:3, 49:7, 50:15, 50:21, 50:25, 53:6, 53:9, 53:12, 54:8, 54:11, 54:16, 54:17, 55:1, 56:22, 57:4, 57:6, 57:14, 57:18, 58:3, 58:15, 60:22, 75:24, 76:10, 82:4, 82:11, 86:16, 89:21, 98:2, 103:15, 103:25, 104:10, 113:9, 115:21, 125:1, 125:5
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell-Huntington** [6] - 45:16, 45:17, 48:3, 54:16, 56:22, 60:22
**CALLAS** [1] - 6:7
**CAMPBELL** [1] - 6:14
**cancer** [1] - 114:12
**candidly** [1] - 7:21
**cannot** [3] - 88:14, 88:23, 90:2
**capacity** [2] - 53:21, 61:19
**capita** [1] - 28:2
**Capitol** [1] - 2:7
**capping** [1] - 24:16
**car** [2] - 26:17, 29:5
**Cardinal** [5] - 4:11, 5:2, 37:16, 122:8, 132:15
**Care** [2] - 125:5, 127:5
**care** [10] - 22:16, 22:19, 29:3, 29:7, 29:12, 32:6, 32:8, 32:9, 121:25, 126:11
**career** [1] - 67:20
**Carey** [1] - 4:17
**Carol** [1] - 59:9
**case** [18] - 7:20, 7:22, 8:20, 8:25, 9:4, 9:13, 9:21, 28:9, 37:25, 38:13, 41:22, 53:10, 72:17, 77:23, 92:20, 94:12, 96:20, 112:25
**cases** [9] - 15:15, 19:18, 20:2, 23:11, 25:1, 26:5, 26:24, 31:10, 114:18
**category** [4] - 65:10, 67:22, 93:14, 94:6
**cc** [2] - 97:3, 97:5
**center** [2] - 33:4, 58:17
**Center** [4] - 3:12, 5:11, 57:25, 58:9
**centers** [1] - 33:3

**CEO** [2] - 46:9, 61:14
**certain** [4] - 8:21, 22:10, 34:10, 34:12
**certainly** [8] - 9:10, 52:21, 80:13, 101:8, 102:11, 107:3, 107:9, 133:7
**certainty** [1] - 88:25
**certificate** [1] - 33:4
**certification** [1] - 13:4
**CERTIFICATION** [1] - 135:1
**certified** [1] - 12:19
**certify** [1] - 135:4
**chain** [4] - 98:9, 98:13, 105:21, 108:25
**Chair** [2] - 39:21, 45:3
**Chairman** [1] - 47:25
**challenge** [4] - 15:11, 23:11, 25:11, 26:12
**change** [12] - 19:4, 19:6, 20:2, 20:3, 32:22, 36:7, 74:23, 76:1, 76:4, 87:13, 87:20, 87:22
**changed** [4] - 20:5, 88:2, 111:10, 111:15
**changes** [7] - 32:20, 86:23, 87:10, 88:23, 88:24, 91:3, 132:25
**characterization** [1] - 82:9
**characterize** [1] - 129:11
**charge** [2] - 54:17, 60:25
**CHARLES** [1] - 3:11
**Charleston** [6] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:3
**CHARLESTON** [2] - 1:2, 1:18
**chart** [3] - 63:2, 64:13, 71:18
**Chase** [1] - 4:18
**chasing** [1] - 36:24
**Chesterbrook** [1] - 6:15
**Chief** [1] - 60:21
**chief** [1] - 9:21
**child** [4] - 21:5, 25:23, 29:3, 32:7
**children** [3] - 25:22, 25:23, 87:2
**choice** [1] - 8:18
**choose** [1] - 60:16
**chose** [2] - 20:4, 27:13
**chosen** [1] - 43:4
**Christensen** [2] - 132:1, 132:5

**CHRISTENSEN** [3] - 132:4, 132:7, 132:24
**chronology** [1] - 70:13
**cigarette** [1] - 23:9
**circle** [3] - 12:11, 22:24, 23:23
**circling** [1] - 99:14
**Circuit** [2] - 8:19, 8:20
**circuit** [1] - 96:16
**citation** [1] - 120:4
**cities** [1] - 27:20
**Cities** [1] - 59:12
**Citizens** [1] - 8:19
**City** [27] - 4:1, 5:11, 13:12, 13:13, 13:20, 14:7, 14:19, 14:23, 15:3, 15:5, 15:19, 15:20, 15:22, 16:7, 16:21, 20:12, 22:3, 25:13, 27:5, 28:22, 28:23, 38:4, 61:6, 104:10, 132:5, 135:5
**city** [1] - 109:7
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 135:7, 135:8
**civil** [1] - 1:10
**clarification** [1] - 55:16
**clarify** [2] - 43:1, 116:9
**clarity** [1] - 74:21
**class** [2] - 23:2, 23:9
**classifies** [1] - 12:21
**clear** [11] - 8:11, 12:12, 41:24, 41:25, 42:1, 44:8, 73:21, 101:2, 101:10, 101:25, 102:6
**clearer** [1] - 112:7
**clearly** [2] - 84:13, 104:8
**cliff** [1] - 23:16
**clinic** [2] - 29:20, 58:15
**Clinical** [1] - 61:17
**clinical** [2] - 55:14, 56:13
**closely** [3] - 7:25, 49:16, 80:7
**coach** [3] - 12:16, 12:18, 12:19
**Cochran** [3] - 6:17, 135:2, 135:11
**codes** [1] - 33:7
**collaborate** [1] - 27:17
**collaboration** [2] - 35:21, 126:14
**collaborative** [3] - 28:10, 53:23, 57:14

**collaboratively** [1] - 17:25
**colleague** [1] - 102:24
**collect** [2] - 89:13, 89:19
**collecting** [1] - 89:25
**collectively** [1] - 49:2
**college** [1] - 31:20
**color** [2] - 117:20, 121:8
**column** [3] - 56:3, 65:9, 66:5
**columns** [1] - 76:5
**coming** [1] - 38:8
**commented** [1] - 62:13
**commenting** [1] - 37:25
**COMMISSION** [1] - 1:10
**Commission** [7] - 2:2, 3:2, 53:6, 53:9, 53:12, 54:8, 104:1
**Commissioner** [2] - 47:4, 47:5
**Committee** [1] - 47:6
**common** [2] - 9:6, 50:7
**communicating** [1] - 88:10
**communication** [1] - 96:18
**communities** [4] - 24:1, 33:18, 33:22, 38:8
**community** [68] - 8:5, 13:22, 14:1, 15:7, 15:19, 15:21, 16:1, 16:2, 16:7, 16:12, 16:15, 16:16, 16:18, 17:4, 17:18, 17:21, 18:1, 18:10, 18:13, 18:15, 19:3, 19:22, 20:8, 21:24, 22:1, 22:5, 22:11, 22:13, 23:17, 24:11, 25:10, 25:19, 27:6, 27:12, 27:13, 28:7, 30:6, 30:15, 31:16, 33:3, 33:19, 35:20, 36:2, 36:12, 41:15, 42:16, 43:3, 43:4, 43:22, 43:24, 44:7, 46:11, 49:23, 53:23, 54:2, 54:21, 58:18, 58:20, 67:20, 81:14, 81:20, 93:6, 93:15, 109:5, 123:1, 124:21, 126:18, 126:20
**Community** [4] -

39:22, 48:18, 55:23, 66:1
**company's** [1] - 8:25
**compare** [2] - 73:12, 124:15
**comparison** [1] - 26:10
**compelling** [1] - 9:1
**compete** [1] - 27:25
**compile** [3] - 10:13, 13:25, 14:6
**completely** [3] - 9:10, 20:16, 33:21
**component** [1] - 115:23
**components** [4] - 63:3, 87:15, 127:4, 128:11
**comprehensive** [9] - 41:14, 123:2, 123:7, 123:11, 125:12, 126:22, 128:9, 128:22, 129:17
**Comprehensive** [4] - 41:9, 122:15, 124:17, 124:22
**computer** [3] - 6:19, 70:15, 97:14
**conception** [1] - 57:23
**concern** [2] - 8:10, 11:10
**concerned** [2] - 8:4, 8:13
**concluded** [1] - 25:9
**conclusion** [1] - 117:2
**condense** [1] - 25:18
**conditionally** [2] - 9:23, 10:8
**conduct** [1] - 127:20
**conducted** [2] - 115:20, 115:24
**confer** [1] - 37:2
**confidential** [1] - 8:21
**configuring** [1] - 28:4
**confirm** [2] - 10:17, 69:22
**connected** [2] - 30:14, 32:12
**connection** [1] - 31:9
**Connie** [1] - 45:22
**Connolly** [2] - 4:13, 5:4
**CONROY** [1] - 3:3
**consider** [2] - 107:4, 108:14
**consideration** [1] - 107:1
**considering** [2] - 71:23, 107:8
**consistent** [4] - 22:17,

102:12, 102:17, 107:16
**consistently** [1] - 75:5
**constantly** [1] - 36:20
**constitutes** [1] - 80:1
**construction** [3] - 34:17, 66:8, 66:12
**consult** [5] - 100:11, 114:12, 114:14, 129:3, 133:14
**contact** [2] - 7:9, 14:24
**contains** [1] - 52:22
**contemplated** [3] - 63:17, 63:24, 64:2
**context** [3] - 93:1, 106:4, 120:6
**continue** [1] - 15:14
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continued** [3] - 15:12, 15:15, 24:17
**continuum** [4] - 18:8, 22:16, 22:19, 23:24
**contribute** [1] - 82:17
**contributed** [3] - 52:7, 53:12, 120:20
**contributing** [10] - 52:10, 53:3, 53:18, 53:22, 54:8, 54:14, 54:23, 55:4, 81:25, 104:1
**contributor** [11] - 56:18, 57:25, 58:12, 75:25, 117:3, 117:7, 117:9, 119:20, 120:1, 120:14, 121:4
**contributors** [6] - 59:5, 75:8, 75:12, 75:17, 75:19, 75:24
**Control** [2] - 44:22, 58:25
**convene** [1] - 126:12
**convened** [2] - 40:12, 40:15
**conversation** [1] - 17:10
**Cook** [3] - 6:18, 135:3, 135:11
**coordinate** [1] - 9:22
**coordinating** [2] - 59:2, 82:15
**coordination** [2] - 126:2, 127:3
**coordinator** [1] - 45:24
**coordinators** [1] - 126:8
**copied** [4] - 98:16, 99:4, 120:6, 121:6

**copies** [2] - 10:6, 10:10
**CORE** [3] - 24:4, 24:5, 31:2
**corner** [1] - 52:2
**corporation** [5] - 1:7, 1:13, 9:9, 9:10, 56:6
**Corporation** [5] - 6:2, 55:11, 56:2, 122:10, 135:7
**Correct** [34] - 77:16, 81:9, 81:11, 82:7, 86:15, 90:4, 90:5, 91:8, 91:11, 91:15, 91:25, 92:7, 101:21, 110:1, 112:2, 117:8, 121:16, 121:19, 121:20, 123:3, 123:5, 124:18, 124:23, 124:24, 125:2, 127:5, 127:6, 127:11, 127:15, 127:19, 127:21, 127:22, 128:12
**correct** [200] - 38:17, 38:23, 39:22, 39:23, 40:13, 40:14, 40:22, 40:25, 42:12, 42:15, 42:25, 43:19, 44:3, 45:7, 45:8, 46:18, 48:24, 49:9, 49:16, 49:20, 49:21, 49:24, 50:13, 50:17, 51:1, 51:9, 51:10, 51:16, 51:17, 51:21, 51:22, 52:8, 52:9, 53:8, 53:13, 54:24, 55:12, 56:13, 56:16, 56:22, 57:1, 57:17, 57:22, 58:4, 58:10, 58:16, 58:20, 59:3, 59:4, 59:12, 59:13, 59:19, 59:25, 60:5, 60:6, 60:9, 60:10, 60:12, 60:15, 60:22, 60:23, 60:25, 61:1, 61:7, 61:8, 61:14, 61:15, 61:17, 61:18, 61:20, 61:21, 62:1, 62:4, 62:13, 62:22, 62:23, 62:25, 63:1, 63:4, 63:5, 63:8, 63:10, 63:11, 63:14, 63:21, 63:25, 64:1, 64:4, 64:5, 64:8, 64:9, 64:18, 64:19, 64:21, 64:22, 64:24, 64:25, 65:4, 65:6, 65:7, 65:8, 65:11, 65:12,

65:14, 66:6, 66:9, 67:23, 70:25, 71:1, 71:7, 71:8, 71:16, 72:8, 72:22, 73:19, 74:16, 75:3, 75:20, 77:15, 77:18, 77:21, 77:24, 78:2, 78:10, 79:6, 79:9, 79:11, 79:13, 79:17, 81:8, 83:15, 86:14, 87:20, 89:14, 90:7, 90:15, 91:3, 91:7, 91:10, 91:20, 91:24, 92:15, 93:19, 93:24, 94:8, 95:20, 97:5, 97:21, 97:25, 98:16, 98:23, 98:25, 99:2, 99:8, 99:18, 99:21, 100:6, 105:4, 106:1, 110:15, 110:20, 111:5, 111:11, 112:19, 114:5, 115:21, 115:25, 116:8, 116:11, 116:15, 116:22, 116:25, 117:7, 117:10, 118:15, 118:20, 120:8, 120:11, 120:21, 121:5, 121:13, 121:15, 122:3, 122:6, 122:11, 122:19, 122:22, 123:2, 123:4, 124:2, 125:1, 125:18, 126:19, 126:23, 128:6, 128:16, 128:19, 129:4, 129:19, 135:4
**correctly** [8] - 41:16, 80:6, 81:23, 82:6, 84:9, 86:21, 109:21, 122:24
**correspondence** [3] - 96:2, 100:20, 101:22
**cost** [13] - 20:7, 23:5, 23:6, 52:25, 64:6, 65:13, 66:16, 67:10, 68:2, 68:5, 71:5, 71:6, 85:7
**costs** [4] - 21:18, 22:7, 34:11, 74:1
**Council** [2] - 44:22, 45:3
**council** [1] - 45:6
**Counsel** [1] - 59:21
**counsel** [9] - 39:3, 77:21, 90:6, 96:12, 100:20, 101:23, 102:2, 133:14

**count** [3] - 16:5, 19:17, 115:16
**counties** [2] - 14:10, 14:12
**countless** [1] - 87:25, 88:23
**country** [2] - 35:2, 119:19
**COUNTY** [1] - 1:10
**county** [4] - 55:2, 77:21, 89:21, 109:7
**County** [31] - 2:2, 3:2, 15:19, 33:23, 38:4, 39:3, 45:21, 45:23, 47:4, 47:5, 49:4, 49:7, 50:15, 50:22, 50:25, 53:6, 53:9, 53:12, 54:8, 54:11, 54:18, 58:4, 58:16, 82:5, 82:12, 86:16, 98:2, 103:25, 113:9, 125:1, 125:6
**couple** [4] - 11:21, 61:13, 79:15, 106:24
**course** [6] - 7:18, 49:9, 61:2, 61:19, 64:2, 90:6
**courses** [1] - 12:23
**COURT** [102] - 1:1, 1:17, 7:5, 7:14, 7:23, 8:1, 8:13, 9:19, 10:2, 10:18, 10:22, 10:25, 11:2, 11:9, 11:15, 11:20, 11:24, 12:1, 12:7, 28:16, 37:3, 37:7, 37:10, 41:4, 41:6, 42:1, 48:13, 52:17, 53:1, 69:16, 70:8, 70:11, 70:16, 77:6, 77:10, 80:13, 80:24, 81:2, 85:1, 85:7, 85:10, 85:16, 85:18, 85:22, 85:25, 86:3, 89:7, 94:15, 94:22, 95:3, 95:14, 95:22, 95:24, 96:3, 96:7, 96:9, 96:22, 100:2, 100:12, 101:18, 102:3, 102:24, 104:17, 105:3, 105:6, 105:14, 106:13, 107:6, 107:10, 107:20, 107:23, 108:4, 108:13, 108:17, 108:21, 113:4, 113:25, 114:21, 114:25, 115:3, 115:9, 117:18, 118:5,

123:17, 129:14, 129:24, 130:3, 130:5, 130:12, 130:17, 131:7, 131:14, 131:18, 132:3, 132:6, 132:13, 132:22, 133:3, 133:10, 133:18, 134:1, 134:4
**Court** [22] - 6:17, 6:18, 7:2, 7:6, 7:12, 9:4, 9:14, 12:16, 13:13, 14:17, 17:16, 28:13, 32:17, 102:16, 103:19, 105:10, 107:3, 108:8, 132:2, 133:7, 135:2, 135:3
**court** [6] - 8:23, 8:24, 8:25, 29:1, 113:1, 113:23
**Court's** [2] - 107:1, 108:11
**courtroom** [2] - 11:24, 133:20
**cover** [6] - 30:2, 64:10, 65:5, 65:7, 65:10, 65:20
**covered** [1] - 104:18
**covers** [1] - 45:6
**COVID** [2] - 16:4, 16:5
**Covington** [1] - 5:11
**crazy** [1] - 23:9
**create** [1] - 8:16
**Creating** [1] - 24:4
**creating** [1] - 43:2
**creation** [1] - 66:13
**creative** [1] - 18:22
**credentialing** [1] - 33:7
**credible** [1] - 85:22
**Crisis** [3] - 41:10, 122:16, 124:18
**crisis** [7] - 18:21, 41:15, 81:14, 81:20, 82:4, 82:11, 109:7
**critical** [1] - 8:14
**cross** [7] - 37:7, 96:3, 96:4, 96:14, 115:4, 126:14, 133:14
**CROSS** [2] - 37:11, 115:13
**cross-examining** [1] - 96:3
**CRR** [2] - 6:17, 6:18
**cull** [1] - 73:22
**culmination** [2] - 81:13, 81:19
**current** [3] - 16:16, 45:12, 114:15
**custodial** [1] - 31:5

**cut** [1] - 110:14
**cycle** [2] - 32:20, 35:5

## D

**daily** [2] - 9:18, 10:1
**Dallas** [1] - 27:22
**damages** [1] - 130:17
**data** [9] - 66:19, 67:4, 78:17, 78:18, 89:19, 89:25, 91:2, 93:19, 94:2
**Date** [1] - 135:16
**date** [16] - 51:15, 62:24, 68:13, 68:17, 70:14, 72:15, 77:17, 83:11, 83:14, 88:15, 88:18, 91:2, 91:6, 91:9, 94:21, 101:11
**dated** [9] - 68:16, 79:13, 86:10, 86:14, 90:15, 98:25, 105:21, 122:22, 124:21
**Dated** [1] - 86:12
**DAVID** [2] - 1:17, 2:9
**David** [1] - 7:1
**Davies** [8] - 48:9, 48:10, 48:17, 59:14, 89:13, 89:14, 89:19
**Davies's** [1] - 90:2
**Davis** [1] - 89:25
**day-to-day** [1] - 18:21
**days** [2] - 28:23, 79:15
**DC** [6] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12
**De** [2] - 2:4, 2:16
**dealing** [3] - 7:18, 82:3, 82:10
**Dean** [1] - 47:22
**deaths** [6] - 89:20, 125:13, 126:10, 126:14, 126:23, 127:10
**Deb** [1] - 126:6
**debate** [1] - 97:7
**decades** [5] - 71:23, 84:12, 111:17, 111:18, 111:19
**December** [5] - 95:18, 97:2, 98:25, 99:19, 99:21
**decision** [1] - 113:24
**decisions** [1] - 75:6
**deck** [1] - 13:10
**declaration** [1] - 94:19
**declared** [1] - 94:20
**deem** [1] - 32:12
**DEF** [1] - 41:3
**DEF-WV** [1] - 41:3

**DEF-WV-1456** [2] - 68:25, 69:15
**DEF-WV-1457** [2] - 68:7, 69:2
**DEF-WV-778** [1] - 39:12
**DEF-WV-929** [2] - 51:12, 52:16
**defeat** [1] - 9:2
**defend** [1] - 113:22
**Defendant** [5] - 4:10, 5:2, 5:7, 6:2, 123:18
**Defendant's** [1] - 100:15
**defendants** [5] - 10:18, 95:1, 104:4, 104:6, 133:5
**Defendants** [3] - 1:8, 1:14, 135:7
**Defendants'** [15] - 79:2, 81:6, 83:9, 84:24, 85:13, 86:9, 86:13, 90:10, 90:12, 96:25, 99:25, 100:8, 101:14, 105:16, 111:2
**defense** [2] - 96:12, 103:14
**deficits** [1] - 26:9
**defining** [1] - 34:6
**definitely** [1] - 23:21
**definition** [2] - 33:18, 33:21
**Delegates** [1] - 47:8
**deleted** [3] - 112:19, 112:25, 113:16
**delivered** [1] - 36:18
**demanding** [1] - 9:5
**demonstrate** [1] - 34:25
**demonstrating** [1] - 28:4
**demonstrative** [4] - 9:23, 10:9, 52:19, 118:4
**Department** [10] - 39:21, 45:17, 48:18, 54:16, 54:19, 54:23, 55:22, 60:22, 60:25, 76:8
**department** [2] - 48:11, 49:19
**depo** [1] - 96:14
**deposition** [19] - 41:21, 43:25, 72:15, 72:16, 72:21, 72:24, 73:2, 73:7, 92:24, 95:8, 95:10, 96:11, 106:4, 106:19, 108:1, 124:1,

125:21, 132:1, 132:7
**depth** [2] - 16:24, 23:18
**described** [5] - 14:19, 42:19, 51:7, 112:14, 125:16
**describes** [2] - 81:23, 81:25
**description** [2] - 67:16, 87:5
**deserve** [1] - 35:3
**designated** [1] - 53:18
**designations** [4] - 132:1, 132:8, 132:15, 132:17
**detail** [3] - 12:17, 14:21, 15:1
**detailed** [2] - 17:20, 34:5
**determinations** [1] - 17:17
**determined** [1] - 22:11
**develop** [2] - 82:3, 123:1, 127:1
**developed** [7] - 15:22, 15:23, 43:14, 50:3, 62:4, 62:13, 109:5
**developer** [1] - 66:12
**developing** [5] - 41:14, 49:19, 51:20, 62:3, 65:19
**development** [19] - 21:5, 24:3, 24:12, 48:23, 49:13, 52:7, 59:6, 61:24, 66:7, 66:9, 66:11, 67:14, 67:16, 80:7, 80:19, 94:5, 101:2, 102:2, 121:18
**deviation** [1] - 34:8
**DHHR** [1] - 58:24
**diagram** [1] - 55:8
**Dickinson** [2] - 99:10, 99:11
**dictate** [1] - 35:22
**difference** [2] - 36:23, 91:23
**differences** [2] - 75:21, 119:21
**different** [14] - 12:14, 12:15, 14:18, 18:8, 21:7, 26:9, 26:25, 33:21, 43:17, 51:4, 54:3, 76:6, 97:19, 103:17
**difficulty** [1] - 32:19
**dilute** [1] - 22:4
**direct** [7] - 51:23, 73:5, 75:9, 95:6, 97:13, 105:19,

106:10
**directly** [2] - 14:23, 19:13
**Director** [11] - 45:16, 45:21, 48:12, 48:14, 48:17, 59:11, 60:13, 61:17, 89:17, 126:4, 126:5
**director** [2] - 60:17, 126:7
**disagreed** [1] - 74:10
**disclose** [11] - 7:10, 8:18, 9:7, 9:12, 11:13, 99:14, 99:22, 103:21, 104:4, 104:15, 109:24
**disclosed** [2] - 104:5, 104:9
**disclosures** [1] - 11:16
**discretion** [1] - 108:11
**discuss** [2] - 93:7, 133:24
**discussed** [12] - 16:24, 27:4, 32:16, 42:5, 42:11, 42:15, 61:3, 73:11, 82:25, 91:13, 101:16, 125:4
**discussing** [1] - 12:15
**discussion** [4] - 16:14, 16:18, 16:22, 93:12
**discussions** [1] - 22:12
**dismissal** [1] - 35:6
**disorder** [1] - 109:7
**Disorder** [4] - 13:2, 19:13, 19:14, 64:18
**displays** [1] - 97:9
**dissemination** [1] - 127:21
**distributors** [1] - 122:2
**DISTRICT** [3] - 1:1, 1:1, 1:17
**District** [2] - 7:2, 7:3
**diversions** [1] - 32:2
**division** [5] - 16:24, 17:11, 63:14, 130:23, 130:25
**Division** [4] - 48:20, 48:21, 60:14, 89:18
**Doctor** [23] - 37:19, 51:12, 62:15, 64:11, 68:1, 72:17, 74:21, 75:9, 77:4, 79:1, 79:4, 82:2, 82:6, 85:12, 88:5, 89:10, 90:12, 90:22, 91:17, 100:4, 105:9,

106:10, 112:6
**doctor** [1] - 47:18
**doctoral** [1] - 24:24
**doctors** [1] - 55:24
**document** [32] - 25:12, 39:12, 39:13, 39:15, 51:25, 67:17, 68:5, 68:13, 68:18, 69:2, 69:7, 70:1, 80:10, 81:3, 81:7, 83:8, 86:5, 91:2, 91:4, 91:24, 96:18, 103:17, 107:11, 107:13, 108:2, 110:10, 118:3, 122:13, 123:21, 124:2, 124:14, 131:3
**documents** [6] - 7:11, 52:23, 79:2, 96:12, 103:25, 107:17
**Doe** [1] - 8:19
**dog** [1] - 17:1
**dogs** [1] - 27:20
**dole** [1] - 35:15
**dollar** [9] - 48:6, 63:6, 67:22, 72:1, 84:20, 91:19, 92:9, 92:14, 92:17
**dollars** [1] - 38:8
**done** [10] - 15:25, 18:25, 20:7, 23:20, 24:17, 36:23, 73:25, 74:9, 107:18, 114:24
**Douglas** [1] - 4:17
**down** [10] - 14:23, 20:4, 25:12, 25:18, 63:3, 64:13, 66:19, 110:3, 126:1, 126:25
**downtown** [2] - 40:19, 40:20
**Dr** [117] - 11:24, 12:2, 12:9, 14:16, 15:18, 16:16, 17:14, 19:15, 36:11, 37:13, 38:16, 39:10, 39:13, 39:15, 39:18, 40:10, 40:24, 41:8, 41:21, 42:4, 42:18, 44:1, 44:15, 45:15, 47:12, 48:17, 48:23, 49:11, 49:12, 49:18, 51:11, 51:23, 53:3, 59:14, 60:2, 60:5, 60:24, 61:2, 68:9, 68:25, 69:6, 70:19, 73:4, 73:24, 77:13, 79:6, 79:19, 80:8, 80:11, 81:5, 81:18, 81:22, 82:9, 82:20, 83:3, 83:8, 83:11, 83:15, 86:8,

86:9, 86:13, 87:9, 87:11, 87:12, 87:18, 88:7, 88:22, 89:25, 90:2, 90:19, 91:2, 91:12, 93:13, 95:5, 95:6, 95:18, 95:19, 96:5, 96:24, 97:1, 97:2, 97:13, 98:11, 98:15, 98:23, 99:2, 99:13, 99:19, 101:4, 101:23, 102:14, 103:7, 105:9, 105:16, 105:20, 105:21, 106:16, 107:2, 108:24, 108:25, 109:4, 109:10, 109:24, 110:3, 111:24, 113:8, 115:15, 115:19, 117:20, 118:10, 119:3, 122:13, 123:25, 125:9, 131:10, 133:20
**draft** [23] - 51:8, 51:12, 62:25, 63:23, 68:9, 68:15, 71:13, 72:11, 73:12, 73:14, 73:17, 75:3, 78:20, 87:25, 88:3, 102:8, 102:13, 102:19, 103:11, 103:14, 103:16, 104:8
**drafts** [15] - 19:15, 19:18, 19:20, 22:6, 51:11, 53:15, 53:16, 62:3, 62:6, 62:9, 62:12, 62:13, 69:2, 70:14, 74:8
**drink** [1] - 26:18
**Drive** [1] - 6:15
**drive** [3] - 26:18, 29:21, 37:21
**driven** [1] - 21:24
**DRUG** [2] - 1:7, 1:13
**drug** [1] - 120:25
**Drug** [5] - 6:2, 44:22, 58:25, 118:24, 135:7
**drugs** [2] - 26:16, 26:20
**during** [3] - 10:15, 11:17, 43:20
**duties** [1] - 69:13
**duty** [1] - 12:3

## E

**e-mail** [23] - 7:19, 8:6, 35:25, 36:3, 39:10, 40:10, 40:21, 40:23,

40:24, 41:8, 42:18, 42:23, 43:9, 44:15, 48:24, 49:12, 50:1, 50:11, 60:3, 68:16, 68:23, 69:6, 69:8
**early** [8] - 18:10, 23:24, 26:2, 28:9, 28:15, 30:16, 31:19, 43:11
**easier** [1] - 23:3
**easily** [2] - 132:18, 133:5
**East** [3] - 3:5, 3:12, 4:18
**ECF** [1] - 7:7
**economic** [5] - 24:2, 24:12, 67:14, 67:16, 94:5
**economist** [5] - 21:9, 113:17, 114:5, 114:6, 114:9
**economy** [1] - 114:13
**education** [9] - 26:14, 26:15, 26:21, 31:3, 67:13, 122:1, 125:14, 126:8, 126:15
**educational** [2] - 24:13, 127:18
**educators** [1] - 55:20
**Edwards** [5] - 53:25, 55:10, 55:18, 55:23, 57:19
**effects** [2] - 82:4, 82:11
**effort** [2] - 22:5, 82:15
**efforts** [6] - 22:3, 28:3, 30:17, 30:18, 31:8, 65:10
**egos** [1] - 27:17
**Eighth** [1] - 3:10
**either** [6] - 35:11, 41:24, 85:15, 97:17, 102:9
**element** [1] - 15:17
**eligible** [7] - 33:2, 33:10, 33:14, 33:15, 33:23, 33:25
**ELIZABETH** [1] - 6:14
**email** [69] - 77:19, 79:5, 79:6, 79:16, 79:19, 79:23, 79:25, 80:1, 80:4, 80:17, 81:5, 83:14, 83:18, 85:15, 86:9, 86:13, 86:19, 90:10, 90:18, 91:3, 91:5, 91:6, 91:12, 94:11, 97:2, 97:4, 97:5, 97:6, 97:8, 97:17, 97:19,

97:20, 97:24, 98:2, 98:9, 98:10, 98:11, 98:13, 98:15, 98:19, 98:22, 99:13, 99:22, 100:4, 103:12, 104:20, 105:10, 105:20, 105:21, 106:1, 106:3, 106:18, 106:20, 106:23, 107:2, 107:4, 107:20, 108:24, 108:25, 109:10, 109:23, 122:14, 122:21, 124:15, 124:17

**embarrassment** [2] - 9:9, 9:11
**embedded** [1] - 98:19
**emerged** [1] - 101:1
**Emergency** [1] - 54:11
**emphasis** [3] - 87:1, 87:14, 87:23
**emphasize** [1] - 44:4
**employees** [2] - 9:9, 18:3
**Employment** [1] - 24:5
**Empowerment** [1] - 23:20
**EMS** [3] - 45:21, 45:23, 54:11
**enable** [1] - 127:3
**Encino** [1] - 3:18
**encompasses** [2] - 57:4, 64:23
**encouraged** [2] - 109:15, 109:18
**end** [5] - 9:17, 10:13, 11:16, 43:11, 90:3
**ended** [1] - 25:14
**ending** [2] - 118:8, 118:23
**ends** [3] - 52:3, 121:10, 122:14
**enforcement** [2] - 18:12, 31:23
**engage** [2] - 13:2, 53:21
**engagement** [2] - 54:6, 128:10
**engaging** [1] - 31:25
**enhance** [2] - 125:14, 126:15
**enhanced** [1] - 126:10
**ensure** [3] - 27:18, 31:23, 53:22
**entered** [1] - 7:8
**entering** [2] - 23:14, 127:14
**enterprise** [1] - 48:6
**entire** [3] - 45:7,

104:14, 109:11
**entity** [2] - 17:23, 57:4
**entry** [1] - 31:8
**ENU** [1] - 4:12
**epicenter** [2] - 13:18, 13:19
**Epidemic** [1] - 124:22
**epidemic** [22] - 13:18, 20:24, 27:15, 115:21, 116:4, 116:8, 116:11, 116:20, 117:4, 117:9, 119:20, 120:2, 120:15, 120:20, 121:1, 121:5, 121:19, 121:23, 123:2, 123:8, 128:23, 129:18
**equal** [1] - 55:17
**Eric** [1] - 132:9
**Erin** [2] - 99:10
**especially** [1] - 29:5
**essential** [2] - 84:7, 92:5
**establish** [4] - 12:22, 125:11, 126:22, 127:2
**estimate** [1] - 65:24
**estimated** [2] - 52:24, 71:23
**estimating** [1] - 114:17
**et** [4] - 1:7, 1:13, 135:6, 135:7
**evaluate** [1] - 133:7
**evaluating** [1] - 116:4
**evaluation** [10] - 25:4, 34:13, 34:14, 115:20, 115:23, 115:25, 116:3, 116:5, 116:7, 127:21
**events** [2] - 15:24, 101:1
**evidence** [6] - 9:17, 10:5, 102:1, 102:22, 103:11, 104:21
**exact** [1] - 38:10
**exactly** [2] - 34:6, 34:22
**EXAMINATION** [2] - 37:11, 115:13
**examination** [2] - 17:20, 133:15
**examine** [1] - 37:7
**examining** [1] - 96:3
**example** [12] - 20:3, 20:10, 21:6, 22:23, 28:21, 29:20, 29:24, 30:1, 30:14, 30:23,

32:25, 114:6
**examples** [2] - 53:16
**exception** [2] - 103:9, 131:1
**exciting** [1] - 36:6
**excluded** [1] - 102:4
**exclusively** [2] - 32:18
**excuse** [1] - 83:20
**exhibits** [1] - 10:14
**existed** [2] - 91:1, 126:9
**existing** [2] - 74:12, 126:18
**expand** [4] - 24:2, 26:24, 34:1, 63:13
**expanded** [2] - 14:8, 30:4
**expanding** [3] - 26:21, 30:15, 30:16
**expansion** [2] - 33:17, 74:12
**expansive** [1] - 29:12
**expect** [1] - 114:22
**expeditiously** [1] - 132:20
**experience** [8] - 12:25, 13:6, 18:16, 21:11, 31:6, 33:11, 116:3, 116:5
**experiences** [1] - 121:2
**experiencing** [1] - 25:23
**expert** [1] - 114:12
**expertise** [8] - 21:10, 21:23, 21:25, 40:20, 50:11, 50:19, 75:6, 113:24
**experts** [6] - 18:15, 19:22, 21:24, 52:24, 85:6, 113:9
**explain** [5] - 12:17, 13:12, 34:9, 55:9, 125:20
**explained** [1] - 119:21
**explore** [2] - 14:15, 126:3
**exposed** [1] - 25:23
**exposure** [1] - 25:24
**expression** [1] - 8:10
**extensive** [5] - 115:20, 115:25, 116:3, 116:7
**extra** [1] - 21:14
**extrapolate** [1] - 20:22

## F

**F.3d** [1] - 8:19
**Faber** [1] - 7:1
**FABER** [1] - 1:17

**facet** [1] - 57:11
**facility** [3] - 66:23, 66:25, 67:3
**fact** [5] - 44:2, 45:3, 72:5, 74:22, 100:5
**factor** [1] - 117:5
**factors** [5] - 120:12, 120:25, 121:1, 121:17, 121:22
**faculty** [1] - 63:24
**failed** [1] - 100:15
**fair** [2] - 28:1, 38:11
**faith** [2] - 18:13, 107:15
**fall** [1] - 21:10
**falls** [2] - 103:8, 130:25
**familiar** [3] - 115:18, 124:1, 130:21
**families** [2] - 20:21, 32:4
**family** [4] - 31:12, 31:15, 55:24, 55:25
**Family** [3] - 39:21, 48:18, 55:22
**family's** [1] - 40:17
**far** [4] - 14:22, 28:1, 102:1, 115:9
**FARRELL** [5] - 2:3, 7:7, 9:15, 9:20, 10:4, 11:14, 11:19, 85:21, 133:21
**Farrell** [5] - 2:4, 2:15, 7:5, 7:16, 8:9, 11:3, 16:8, 39:5, 39:6, 40:12, 40:15, 43:8, 44:14, 49:18, 77:21, 77:23, 78:21, 79:11, 80:21, 80:22, 83:4, 83:15, 85:17, 85:19, 86:10, 86:14, 87:11, 88:7, 88:22, 89:3, 90:1, 90:19, 91:3, 91:12, 91:13, 93:13, 94:11, 94:19, 94:25, 95:12, 95:18, 97:2, 98:23, 99:19, 100:4, 100:17, 100:21, 103:7, 103:11, 103:20, 103:24, 109:23, 111:23, 123:1, 133:21
**Farrell's** [3] - 11:5, 78:1, 100:23
**Farrells** [1] - 133:23
**fashion** [1] - 66:13
**fast** [1] - 115:10
**fathers** [1] - 30:24
**FCRR** [1] - 6:18
**featured** [1] - 120:10

**February** [6] - 43:11, 48:22, 105:22, 112:18, 112:22, 112:25
**federal** [8] - 28:9, 32:22, 33:14, 34:16, 36:24, 56:4, 56:6, 116:6
**federally** [2] - 58:15, 58:17
**feedback** [3] - 19:25, 50:4
**feelings** [1] - 27:9
**felt** [1] - 87:1
**few** [9] - 12:11, 25:21, 49:1, 51:7, 66:19, 71:10, 88:3, 89:5, 110:3
**field** [1] - 68:17
**fifth** [1] - 122:19
**fight** [2] - 81:14, 81:20
**figure** [11] - 29:3, 36:5, 63:7, 67:22, 71:21, 84:6, 91:19, 92:5, 92:9, 92:14, 92:17
**figures** [4] - 68:2, 68:5, 72:1, 73:18
**file** [2] - 68:14, 68:15
**Final** [1] - 98:6
**final** [6] - 35:11, 102:13, 102:19, 104:7, 104:9
**FINAL.pdf** [1] - 98:6
**finally** [1] - 27:5
**financial** [1] - 114:14
**findings** [1] - 127:21
**fine** [3] - 10:21, 37:14, 37:15
**fines** [2] - 31:4, 31:5
**finished** [1] - 16:21
**fire** [2] - 18:20, 24:21
**Firm** [2] - 3:4, 3:7
**firm** [5] - 40:17, 40:19, 78:1, 78:7, 99:8
**firms** [1] - 40:20
**First** [2] - 9:2, 125:23
**first** [17] - 18:12, 27:21, 46:13, 51:23, 52:10, 53:6, 63:9, 65:24, 71:2, 83:24, 87:4, 93:23, 105:19, 110:22, 127:10, 128:21
**fit** [2] - 17:3, 17:4
**five** [5] - 20:22, 20:23, 64:12, 65:23, 113:21
**fixed** [1] - 11:22
**FL** [1] - 2:14
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10

**flexible** [2] - 19:3, 28:19
**flexibly** [1] - 63:15
**flip** [1] - 119:11
**floating** [1] - 112:8
**Floor** [1] - 3:5
**focus** [18] - 18:2, 18:4, 18:7, 22:11, 22:12, 22:13, 22:14, 22:21, 24:12, 24:17, 50:2, 51:3, 54:4, 64:11, 74:6, 118:25, 119:1, 119:16
**focused** [4] - 23:17, 41:13, 57:16, 93:21
**folks** [18] - 13:3, 18:19, 21:25, 23:13, 23:18, 32:2, 50:10, 50:11, 51:3, 53:23, 54:1, 61:22, 61:23, 62:4, 78:12, 101:3
**follow** [1] - 117:24
**followed** [2] - 14:11, 93:12
**following** [2] - 35:6, 87:5
**follows** [2] - 7:4, 77:9
**footnote** [1] - 84:16
**FOR** [1] - 1:1
**foregoing** [1] - 135:4
**forget** [1] - 26:6
**forgot** [1] - 132:10
**form** [1] - 19:16
**formal** [2] - 32:7, 127:20
**formally** [2] - 102:9, 132:1
**format** [6] - 14:9, 34:5, 35:6, 132:17, 133:5
**formats** [1] - 133:8
**formatting** [1] - 132:25
**former** [2] - 46:5, 47:25
**forms** [1] - 64:17
**forth** [4] - 22:7, 73:4, 74:8, 120:2
**forward** [23] - 15:6, 15:13, 15:17, 16:2, 16:19, 17:7, 17:9, 18:1, 18:24, 20:3, 22:19, 25:5, 28:13, 28:19, 30:13, 35:10, 41:16, 42:17, 43:4, 44:6, 83:1, 128:5, 133:9
**forward-looking** [1] - 20:3
**forwarded** [1] - 98:10
**foster** [2] - 32:7, 32:8

**Foundation** [5] - 13:24, 123:12, 124:9, 126:2, 129:2
**foundation** [10] - 23:12, 27:6, 27:11, 28:8, 28:12, 79:22, 105:13, 123:20, 131:2, 131:5
**founders** [1] - 40:2
**Four** [2] - 111:18, 111:19
**four** [7] - 15:3, 19:20, 64:12, 71:23, 84:11, 111:17, 127:8
**four-hour** [1] - 15:3
**fourth** [1] - 127:20
**Fourth** [2] - 8:19, 8:20
**FQHC** [1] - 58:18
**frame** [2] - 41:24, 43:7
**Friday** [2] - 11:18, 28:15
**friend** [1] - 79:11
**front** [7] - 39:13, 68:13, 68:17, 81:6, 103:20, 105:17, 122:21
**full** [1] - 127:3
**Fuller** [2] - 2:4, 2:15
**FULLER** [1] - 2:15
**funded** [3] - 32:17, 32:18, 58:15
**funder** [3] - 13:24, 33:20, 34:9
**Funding** [1] - 83:19
**funding** [16] - 32:22, 33:14, 33:15, 34:3, 34:16, 35:1, 36:13, 36:22, 71:21, 72:3, 84:7, 92:5, 116:6, 127:2, 128:22, 128:25
**funds** [5] - 56:4, 63:2, 64:7, 70:24, 93:25
**Funds** [9] - 62:21, 83:20, 84:16, 90:24, 93:9, 110:14, 112:18, 113:15, 113:18
**future** [9] - 15:24, 16:13, 17:18, 23:5, 27:2, 30:8, 42:10, 82:4, 82:11

**G**

**Gallagher** [6] - 44:17, 44:19, 44:20, 59:15, 76:18, 76:21
**games** [1] - 117:15
**gap** [1] - 30:24

**Gary** [4] - 46:2, 46:4, 132:9
**GAs** [1] - 119:14
**General** [1] - 59:21
**general** [1] - 10:20
**generation** [1] - 21:2
**generational** [11] - 74:11, 84:7, 84:11, 84:15, 84:21, 87:3, 92:6, 94:1, 112:1, 112:5, 112:15
**genesis** [1] - 38:22
**ggwhite@jrw** [1] - 45:25
**ggwhite@jrw-advisors.com** [1] - 45:25
**Gilbert** [3] - 45:9, 45:11, 60:2
**given** [12] - 7:17, 20:11, 32:21, 35:18, 100:20, 100:23, 100:25, 101:22, 101:25, 116:10, 127:9
**goal** [5] - 22:2, 22:3, 25:12, 25:16, 30:17
**goals** [6] - 25:20, 32:23, 126:9, 127:7, 127:8
**Goals** [1] - 127:8
**gonna** [1] - 104:4
**Gonna** [4] - 99:14, 103:20, 104:15, 109:24
**Gordon** [2] - 45:18, 45:20
**governing** [1] - 50:8
**government** [2] - 28:9, 32:22
**Governor's** [2] - 44:22, 45:3
**graded** [1] - 35:9
**grand** [1] - 32:4
**grandchildren** [1] - 32:5
**grandparents** [1] - 32:5
**grant** [44] - 14:14, 17:2, 17:4, 19:6, 20:2, 20:18, 21:12, 21:14, 21:17, 27:18, 27:22, 28:6, 29:25, 32:17, 32:18, 32:20, 32:21, 32:23, 33:1, 33:2, 33:11, 33:13, 33:16, 33:23, 33:25, 34:12, 34:20, 35:20, 36:12, 36:17, 36:25, 56:6, 124:8, 124:16,

124:20, 125:17, 125:24, 126:6, 126:7, 128:20, 129:17, 130:24
**grants** [10] - 14:15, 25:4, 36:10, 36:15, 36:18, 50:7, 115:22, 125:23, 128:7, 130:24
**Great** [6] - 124:23, 124:25, 125:4, 125:22, 127:4, 128:23
**greater** [5] - 14:21, 15:1, 22:22, 31:2, 31:8
**greatly** [1] - 53:24
**Greene** [1] - 78:7
**GRETCHEN** [1] - 6:7
**ground** [4] - 19:9, 19:12, 36:9, 51:4
**groundwork** [1] - 27:9
**group** [14] - 25:9, 40:11, 49:2, 49:6, 50:8, 51:2, 51:8, 80:2, 81:23, 85:6, 93:6, 105:25, 109:5, 109:11
**group's** [1] - 54:6
**groups** [11] - 18:2, 18:4, 18:7, 22:12, 27:17, 50:2, 51:3, 54:3, 54:4, 74:6
**grow** [1] - 27:1
**growing** [3] - 21:5, 23:22, 26:12
**guess** [7] - 11:4, 44:12, 72:4, 87:18, 90:19, 92:25, 98:1
**guidance** [2] - 7:12, 9:25
**Guide** [1] - 15:9
**guidelines** [2] - 35:6, 36:24
**gutted** [1] - 20:15

**H**

**hair** [1] - 24:21
**half** [3] - 36:15, 114:25, 115:1
**hand** [8] - 25:6, 40:11, 52:2, 110:5, 115:4, 123:15, 128:1
**hand-in-hand** [1] - 25:6
**handed** [3] - 70:20, 79:5, 86:8
**handing** [1] - 117:20
**handles** [1] - 55:13

**Hansen** [5] - 60:3, 60:5, 77:2, 126:5
**happy** [1] - 107:3, 131:23, 133:7
**hard** [4] - 18:19, 23:10, 28:22, 117:24
**harder** [1] - 25:17
**HARDIN** [1] - 5:3
**harm** [5] - 8:4, 9:1, 26:23, 30:17, 30:18
**harness** [1] - 12:25
**hate** [2] - 89:1, 115:3
**Hawkins** [1] - 3:7
**Hazelett** [2] - 60:19, 60:21
**heading** [1] - 62:21
**heads** [1] - 27:13
**health** [19] - 13:4, 21:9, 33:3, 44:7, 46:11, 46:12, 46:15, 54:17, 54:21, 93:16, 113:16, 114:4, 114:6, 114:9, 114:13, 119:21, 125:14, 125:15, 126:11
**Health** [34] - 4:11, 5:2, 20:19, 33:1, 33:20, 37:16, 39:22, 44:21, 45:17, 48:5, 48:19, 54:16, 54:19, 54:23, 55:6, 55:9, 55:12, 55:21, 55:23, 55:25, 56:8, 57:3, 57:8, 57:15, 57:19, 57:20, 58:12, 60:8, 60:22, 60:25, 76:8, 92:22, 97:8, 122:8
**Health/Social** [1] - 66:1
**healthcare** [14] - 33:4, 48:6, 49:7, 50:19, 50:21, 50:25, 55:15, 56:25, 58:15, 58:17, 58:19, 114:14, 121:25
**healthy** [7] - 18:24, 23:12, 24:1, 24:11, 31:21, 31:24, 32:4
**hear** [4] - 10:18, 102:24, 108:5, 132:25
**heard** [7] - 13:20, 17:24, 23:18, 37:21, 90:4, 96:6, 96:8
**hearing** [1] - 7:23
**Hearing** [1] - 131:21
**hearsay** [20] - 52:18, 79:22, 85:15, 94:14, 95:9, 95:10, 95:21,

96:15, 101:19, 102:3, 102:4, 103:9, 106:21, 107:13, 108:5, 108:9, 130:15, 130:16, 130:20, 131:6
**heart** [1] - 13:23
**heat** [1] - 11:17
**held** [4] - 40:17, 40:19, 43:9, 43:11
**hello** [1] - 41:12
**Hello** [1] - 81:12
**help** [5] - 11:2, 16:2, 29:14, 31:4, 31:13
**helped** [1] - 24:15
**helpers** [1] - 24:15
**helpful** [3] - 106:7, 126:16, 132:22
**hepatitis** [1] - 126:11
**HESTER** [9] - 5:9, 100:10, 103:2, 105:1, 130:1, 130:4, 133:11, 133:17, 134:3
**Hester** [5] - 100:14, 103:19, 115:2, 129:25, 134:2
**high** [8] - 31:20, 116:14, 116:21, 116:24, 117:3, 119:25, 120:10, 120:14
**highest** [7] - 119:5, 119:7, 119:18, 120:17, 120:18, 120:22, 120:23
**highlight** [2] - 30:9, 87:16
**highlighted** [2] - 119:4, 125:10
**Hilliard** [1] - 132:9
**himself** [1] - 49:12
**hire** [1] - 60:16
**hired** [2] - 60:13, 126:7
**historical** [3] - 15:7, 15:16, 16:11
**historically** [1] - 15:12
**hold** [1] - 35:16
**holiday** [1] - 131:12
**homeless** [1] - 18:13
**Honor** [79] - 7:7, 7:15, 10:20, 10:24, 11:25, 37:1, 37:6, 37:8, 37:9, 41:2, 41:5, 52:14, 69:14, 70:9, 70:10, 70:13, 70:17, 77:11, 79:24, 80:5, 81:1, 84:24, 85:5, 85:9, 85:17, 85:21,

86:2, 86:6, 95:11, 96:6, 96:10, 96:21, 99:24, 100:1, 100:10, 100:25, 101:10, 101:21, 102:5, 102:6, 102:18, 102:22, 103:1, 103:2, 103:10, 103:18, 103:23, 104:13, 105:4, 105:13, 106:17, 106:22, 107:22, 108:7, 108:22, 114:20, 114:24, 115:12, 117:17, 118:2, 123:16, 129:8, 129:10, 129:23, 130:7, 130:9, 130:10, 130:19, 130:22, 131:13, 131:16, 131:24, 132:4, 132:14, 132:18, 133:1, 133:11, 133:16, 134:3
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**hope** [3] - 30:8, 35:7, 131:22
**Hope** [9] - 20:10, 20:11, 20:16, 21:6, 27:22, 30:21, 33:9, 34:19, 113:20
**hospital** [4] - 47:16, 48:3, 55:2, 58:3
**Hospital** [12] - 48:1, 55:1, 57:5, 57:6, 57:14, 57:15, 57:18, 75:24, 76:10
**Hospital's** [1] - 89:21
**Hospitals** [2] - 59:22, 59:24
**hour** [5] - 10:16, 15:3, 19:20, 114:25, 115:1
**hours** [2] - 12:23, 30:5
**house** [1] - 56:25
**House** [1] - 47:7
**housed** [2] - 18:13, 20:21
**housing** [5] - 63:19, 66:6, 66:9, 66:16, 93:14
**HRSA** [1] - 33:19
**hubs** [2] - 29:19, 46:12
**huge** [1] - 23:10
**Human** [2] - 33:20
**hundred** [1] - 25:18

**hundreds** [1] - 57:21
**HUNTINGTON** [1] - 1:4
**Huntington** [40] - 3:10, 4:1, 17:23, 19:5, 20:12, 27:9, 27:25, 28:22, 28:23, 29:2, 39:25, 40:8, 45:16, 45:17, 48:1, 48:3, 49:9, 53:19, 54:16, 54:18, 55:1, 56:22, 57:5, 57:6, 57:14, 57:18, 60:22, 61:6, 68:15, 75:24, 76:10, 78:5, 81:10, 89:21, 98:5, 103:15, 104:11, 132:5, 135:6

---

# I

**ID** [1] - 31:5
**idea** [9] - 13:23, 21:5, 21:8, 21:18, 29:19, 40:1, 42:16, 63:12, 66:11
**ideally** [1] - 38:7
**identified** [1] - 117:6
**illicit** [1] - 26:20
**imagine** [1] - 36:22
**IMFT** [1] - 118:15
**immediate** [1] - 87:2
**immediately** [1] - 36:6
**Impact** [3] - 41:9, 122:15, 124:17
**impact** [1] - 41:15
**impacts** [1] - 71:23
**implement** [4] - 15:11, 28:11, 34:24, 125:25
**implementation** [2] - 51:4, 127:3
**implemented** [1] - 30:4
**important** [8] - 24:24, 35:8, 36:18, 53:20, 87:23, 89:20, 90:1, 114:8
**impossible** [1] - 29:4
**impressed** [2] - 82:15, 82:20
**improve** [3] - 125:14, 126:11, 126:15
**IN** [2] - 1:1, 1:18
**in-depth** [2] - 16:24, 23:18
**inappropriate** [1] - 7:19
**incarceration** [3] - 31:7, 31:9, 32:1
**incidentally** [1] - 68:12

**include** [4] - 64:20, 75:24, 90:1, 125:3
**included** [2] - 97:3, 98:15
**includes** [17] - 14:24, 14:25, 49:9, 65:1, 66:6, 66:13, 66:16, 66:23, 67:7, 67:17, 67:23, 71:21, 75:22, 84:6, 92:5, 92:9, 93:14
**including** [7] - 50:1, 50:18, 58:22, 89:20, 101:4, 115:5, 123:1
**incorporate** [1] - 19:25
**incorrect** [3] - 35:5, 74:25, 75:5
**Incorrect** [1] - 125:19
**increase** [10] - 68:5, 72:6, 72:11, 73:17, 74:1, 74:22, 125:13, 126:10, 127:13, 127:17
**increased** [4] - 68:2, 72:2, 73:18, 126:10
**indicate** [4] - 23:7, 93:4, 93:5, 125:24
**indicated** [4] - 68:6, 91:4, 91:12, 125:21
**indicates** [1] - 84:13
**indicating)** [1] - 25:15
**indirect** [1] - 34:11
**individual** [6] - 12:19, 13:1, 31:15, 32:6, 59:5, 75:25
**individuals** [6] - 14:25, 16:7, 57:24, 82:1, 82:2, 127:14
**infants** [2] - 21:3, 87:2
**inform** [1] - 109:19
**information** [7] - 8:21, 8:22, 11:11, 14:16, 14:24, 16:23, 80:11
**infrastructure** [2] - 27:7, 28:12
**initial** [1] - 42:7
**initiated** [1] - 43:16
**injury** [1] - 114:18
**innovative** [2] - 125:11, 126:22
**inpatient** [2] - 23:25, 65:5
**Inpatient/Residential** [7] - 71:11, 84:18, 91:17, 111:6, 111:14, 112:4, 112:12
**inpatient/residential** [1] - 64:14

**input** [8] - 50:4, 72:6, 72:12, 74:18, 74:22, 75:1, 75:4, 129:19
**instead** [2] - 9:18, 113:8
**Institute** [5] - 63:10, 63:18, 71:3, 73:13, 74:2
**institute** [5] - 63:13, 63:19, 64:3, 92:10, 92:14
**institution** [1] - 56:21
**institutions** [1] - 33:2
**instruct** [1] - 133:19
**instruction** [1] - 133:13
**integrated** [5] - 41:14, 87:12, 87:21, 88:2, 121:25
**intelligence** [2] - 82:16, 82:21
**intended** [1] - 104:24
**intention** [1] - 109:19
**interest** [2] - 9:1, 25:9
**interesting** [1] - 97:11
**internal** [3] - 47:13, 47:21, 70:21
**intersectional** [1] - 32:13
**intersects** [1] - 32:13
**intervention** [6] - 18:10, 23:8, 23:24, 30:17, 31:19, 31:21
**interventions** [2] - 26:2, 26:4
**interview** [2] - 37:22, 37:25
**interviewing** [1] - 12:24
**intimately** [1] - 80:6
**introduced** [1] - 10:14
**investing** [1] - 94:6
**investment** [1] - 67:18
**invited** [1] - 16:17
**invoked** [1] - 17:21
**involved** [11] - 38:19, 44:14, 60:18, 62:2, 67:1, 80:3, 80:6, 80:19, 82:22, 113:17, 114:9
**involvement** [2] - 53:24, 129:12
**involves** [1] - 94:6
**involving** [1] - 15:25
**Irpino** [1] - 3:7
**ISIA** [1] - 5:4
**issue** [9] - 7:20, 8:11, 11:6, 19:7, 32:14, 70:15, 87:1, 102:21, 108:9

**issues** [2] - 45:6, 59:3
**item** [11] - 34:9, 63:9,
  65:1, 65:2, 65:14,
  66:1, 66:4, 66:16,
  67:10, 67:13, 71:2
**items** [2] - 64:10,
  113:22
**iterations** [2] - 87:24,
  87:25
**iterative** [1] - 74:6
**itself** [7] - 9:10, 51:25,
  56:24, 79:25, 80:1,
  80:4, 106:1
**ivory** [1] - 19:11

**J**

**jack** [1] - 47:13
**Jackson** [2] - 6:8,
  125:6
**jail** [1] - 32:1
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**Jerome** [2] - 45:9,
  45:11
**JLM.docx** [1] - 68:15
**Joan** [5] - 53:25, 55:9,
  55:17, 55:23, 57:19
**job** [2] - 17:15, 24:10
**Jodi** [2] - 69:7, 69:11
**jogging** [1] - 93:5
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:15
**Juan** [2] - 2:5, 2:17
**Judge** [17] - 7:2,
  11:19, 52:20, 79:21,
  80:17, 80:23, 85:14,
  89:4, 89:6, 95:7,
  96:16, 100:14,
  101:15, 104:3,
  104:22, 105:7,
  107:16
**JUDGE** [1] - 1:17
**judge** [3] - 9:15, 27:4,
  77:5
**July** [2] - 72:19, 73:8
**June** [3] - 131:12,
  131:15, 131:20
**justify** [1] - 8:23

**K**

**Kanawha** [1] - 125:6
**Karen** [2] - 61:10,
  76:18, 76:23
**karen.yost@**
  **prestera.org** [1] -
  46:8
**Kearse** [2] - 78:13,

99:6
**KEARSE** [1] - 4:2
**Kearse's** [1] - 99:8
**keep** [1] - 29:10
**Kelli** [1] - 47:4
**kellisobonya@gmail**
  **.com** [1] - 47:1
**Kelly** [1] - 6:8
**kept** [1] - 133:12
**Kessler** [1] - 4:17
**Ketchum** [1] - 78:7
**Kevin** [2] - 47:10,
  76:16
**key** [2] - 38:19, 128:11
**Keyster** [1] - 126:6
**kick** [1] - 35:4
**kids** [2] - 26:12, 26:18
**Kilkenny** [3] - 45:13,
  45:15, 60:24
**kind** [5] - 20:20, 22:14,
  26:21, 32:14, 34:18
**kindergarten** [1] -
  26:6
**kinship** [1] - 32:5
**knowledge** [6] - 49:3,
  49:7, 80:21, 96:13,
  103:13, 114:13
**KOUBA** [1] - 3:14

**L**

**LA** [1] - 3:8
**lab** [1] - 67:5
**lack** [3] - 8:12, 121:24,
  121:25
**laid** [2] - 79:22, 131:5
**language** [3] - 50:8,
  84:12, 88:21
**Lanier** [1] - 3:4
**large** [3] - 24:25, 29:6,
  94:19
**larger** [8] - 64:10,
  72:7, 72:13, 74:9,
  74:18, 74:22, 75:2,
  75:4
**largest** [6] - 34:18,
  46:19, 48:3, 55:2,
  59:24
**last** [15] - 41:13,
  41:22, 43:10, 58:24,
  61:9, 61:13, 66:5,
  66:23, 72:16, 73:8,
  82:14, 82:25, 86:11,
  90:3, 110:21
**Laughter** [2] - 85:23,
  115:6
**launches** [1] - 36:25
**LAURA** [1] - 5:10
**Law** [3] - 3:4, 3:7, 3:12
**law** [10] - 9:6, 18:12,

31:23, 40:17, 40:19,
  40:20, 78:1, 78:7,
  99:8, 113:23
**Lawrence** [1] - 132:11
**lawsuit** [1] - 95:1
**lawyer** [1] - 133:23
**lawyers** [7] - 15:18,
  78:9, 78:18, 129:3,
  129:6, 129:13,
  129:19
**lay** [2] - 105:13,
  123:20
**LBHC** [1] - 33:6
**LBHCs** [1] - 33:9
**lead** [3] - 17:11, 33:22,
  49:13
**leaders** [9] - 15:20,
  16:7, 16:12, 19:22,
  49:24, 81:13, 81:19,
  123:1, 124:22
**leadership** [3] - 39:8,
  50:24, 54:20
**leading** [7] - 117:3,
  117:6, 117:9,
  119:20, 120:1,
  120:14, 121:4
**leads** [1] - 8:4
**learning** [1] - 19:9
**lease** [1] - 20:15
**least** [3] - 61:23, 80:4,
  121:3
**leave** [2] - 108:11,
  131:9
**leaving** [1] - 53:23
**led** [3] - 74:22, 74:24,
  75:2
**Lee** [1] - 3:12
**left** [3] - 48:9, 52:2,
  62:19
**left-hand** [1] - 52:2
**legal** [1] - 31:4
**legislative** [1] - 28:3
**length** [1] - 129:11
**lengthy** [1] - 35:19
**Leon** [2] - 2:4, 2:16
**less** [1] - 9:5
**letters** [1] - 35:21
**levels** [1] - 29:12
**leverage** [2] - 126:18,
  127:2
**Levin** [1] - 2:12
**LEYIMU** [1] - 4:8
**licensed** [2] - 33:4,
  33:6
**life** [1] - 24:22
**lift** [1] - 28:11
**likely** [2] - 31:14, 44:5
**limited** [10] - 53:1,
  70:8, 80:4, 80:15,
  85:2, 85:4, 85:10,

101:16, 102:10,
  102:16
**LINDA** [1] - 4:5
**Line** [2] - 73:5, 73:22
**line** [29] - 34:8, 41:8,
  64:12, 64:16, 66:23,
  71:6, 71:9, 71:10,
  71:13, 71:19, 79:8,
  84:17, 91:16, 95:6,
  97:3, 97:5, 97:13,
  97:19, 97:23, 98:2,
  98:5, 105:23,
  106:10, 122:15,
  124:15, 124:16,
  124:20
**lines** [2] - 64:13, 66:19
**link** [1] - 29:23
**linking** [1] - 31:8
**Lisa** [6] - 6:18, 61:11,
  61:13, 76:25, 85:24,
  135:3
**list** [18] - 52:6, 53:24,
  54:8, 59:8, 59:17,
  61:9, 62:4, 62:7,
  62:11, 64:10, 67:13,
  75:19, 75:25, 108:2,
  109:1, 109:13,
  132:10
**listed** [18] - 50:1,
  54:14, 54:23, 55:4,
  56:18, 57:25, 58:12,
  61:22, 64:6, 65:1,
  65:13, 67:10, 67:22,
  71:22, 72:1, 84:8,
  84:20, 92:6
**lists** [1] - 87:4
**litigation** [11] - 15:25,
  41:19, 42:6, 42:11,
  42:25, 43:5, 43:19,
  44:3, 44:11, 101:7
**litigations** [1] - 42:10
**live** [3] - 8:5, 28:21,
  30:6
**lived** [2] - 12:25, 18:15
**lives** [1] - 125:14
**living** [3] - 18:20,
  19:12, 27:15
**LLC** [1] - 2:4
**local** [5] - 22:1, 52:24,
  67:18, 94:6, 113:9
**locate** [1] - 69:18
**located** [1] - 9:4
**location** [2] - 14:2,
  30:19
**locations** [1] - 56:13
**Logan** [2] - 6:5, 6:12
**long-term** [15] - 12:20,
  18:18, 18:23, 21:5,
  25:20, 29:10, 31:17,
  32:3, 32:10, 36:13,

71:22, 84:7, 87:3,
  92:5, 112:5
**look** [38] - 15:5, 15:6,
  16:1, 25:25, 29:23,
  31:1, 31:19, 31:20,
  31:23, 32:3, 32:10,
  44:13, 59:5, 65:9,
  66:5, 66:22, 68:5,
  68:6, 70:22, 71:17,
  75:11, 76:5, 79:3,
  82:24, 83:8, 83:24,
  84:16, 85:12, 90:9,
  90:20, 91:16,
  109:14, 118:7,
  119:15, 121:3,
  121:17, 126:25,
  127:7
**looked** [21] - 15:11,
  20:20, 22:15, 22:18,
  23:17, 23:23, 26:23,
  27:23, 31:17, 71:9,
  71:14, 75:20, 83:15,
  84:3, 93:23, 110:14,
  110:21, 110:22,
  111:25, 115:18,
  116:8
**looking** [15] - 16:11,
  16:12, 19:21, 20:3,
  22:19, 51:24, 52:3,
  62:18, 73:19, 75:10,
  83:1, 89:11, 90:18,
  91:5, 108:1
**looks** [1] - 15:7
**Los** [1] - 27:23
**lose** [1] - 34:25
**losing** [1] - 27:15
**lost** [2] - 104:23,
  114:17
**loved** [1] - 32:6
**lower** [4] - 52:2, 92:13,
  93:23, 93:25
**lowered** [1] - 92:18
**lucky** [1] - 36:3
**lungs** [1] - 23:9
**Lyft** [2] - 30:1, 30:2
**Lyn** [1] - 118:15

**M**

**MA** [1] - 118:15
**Magazine** [1] - 3:7
**MAHADY** [29] - 6:4,
  103:23, 114:23,
  115:1, 115:7,
  115:10, 115:14,
  117:17, 117:19,
  118:2, 118:6, 118:9,
  123:15, 123:18,
  123:22, 123:24,
  124:6, 124:7,

124:12, 124:13,
128:2, 129:10,
129:16, 129:22,
130:7, 130:10,
130:14, 130:19,
130:22
**Mahady** [3] - 114:22,
129:15, 131:8
**mail** [24] - 7:19, 8:6,
35:25, 36:3, 39:10,
39:15, 40:10, 40:21,
40:23, 40:24, 41:8,
42:18, 42:23, 43:9,
44:15, 48:24, 49:12,
50:1, 50:11, 60:3,
68:16, 68:23, 69:6,
69:8
**Mainigi** [1] - 132:23
**MAINIGI** [3] - 4:12,
10:20, 132:14
**Maiolo** [2] - 69:7,
69:11
**MAJESTRO** [1] - 2:6
**Majestro** [1] - 2:6
**major** [3] - 40:7, 58:3,
58:19
**managers** [1] - 56:6
**manifested** [1] - 103:5
**manner** [2] - 7:16,
11:8
**manpower** [1] - 29:17
**map** [1] - 28:1
**March** [6] - 38:25,
43:9, 43:11, 48:22,
122:22, 123:4
**MARK** [1] - 3:16
**marked** [11] - 39:12,
51:11, 68:7, 69:2,
69:8, 83:9, 85:13,
90:10, 96:25, 100:8,
101:14
**marketing** [1] - 121:24
**Marshall** [41] - 39:22,
44:21, 44:23, 45:12,
46:5, 55:6, 55:7,
55:9, 55:10, 55:12,
55:16, 55:21, 55:25,
56:1, 56:8, 56:18,
56:21, 56:24, 57:15,
57:19, 63:13, 89:16,
92:11, 92:22, 97:8,
97:14, 97:20, 97:24,
100:21, 101:3,
101:4, 123:7,
123:11, 125:17,
128:4, 128:8,
128:18, 129:3,
130:23
**Mary's** [8] - 57:5, 57:6,
57:15, 57:18, 57:25,

58:3, 58:9, 76:14
**match** [1] - 70:3
**matter** [7] - 7:5, 10:21,
15:24, 94:16,
102:18, 107:5, 135:5
**MAY** [1] - 1:19
**Mayor** [1] - 61:6
**mayor** [1] - 13:21
**MCCLURE** [1] - 6:3
**McDonough** [1] -
13:24
**MCGINNESS** [1] - 4:2
**McKesson** [4] - 5:8,
7:15, 122:10, 132:16
**MCOs** [1] - 33:8
**mean** [10] - 27:24,
38:7, 44:10, 66:7,
66:11, 69:20, 75:25,
107:9, 110:23,
119:11
**means** [9] - 10:7,
19:10, 29:18, 32:6,
33:6, 36:7, 36:8,
51:18, 54:4
**meant** [5] - 18:2, 18:7,
24:12, 42:22, 74:11
**measures** [1] - 17:17
**mechanical** [1] - 6:19
**mechanization** [1] -
127:2
**med** [2] - 55:18, 55:19
**media** [8] - 7:9, 10:6,
10:15, 11:8, 38:12,
94:11, 94:20, 95:12
**Medicaid** [3] - 33:8,
128:15, 128:16
**medical** [8] - 13:21,
30:3, 55:6, 55:20,
56:8, 56:16, 59:25,
60:17
**Medical** [4] - 54:11,
57:25, 58:9, 60:13
**medically** [1] - 64:20
**medication** [4] -
28:25, 29:10, 33:17,
34:1
**medication-assisted**
[1] - 28:25
**medications** [1] -
26:20
**Medicine** [8] - 39:21,
44:23, 48:18, 53:25,
55:10, 55:18, 55:24,
57:19
**medicine** [4] - 39:24,
47:13, 47:21, 55:25
**meet** [7] - 16:8, 29:22,
35:18, 77:23, 83:2,
83:4, 115:16
**meeting** [55] - 13:8,

16:6, 16:8, 16:17,
18:16, 18:17, 30:19,
38:22, 38:25, 39:4,
39:5, 39:6, 39:8,
39:9, 39:11, 40:12,
40:14, 41:13, 42:5,
42:7, 42:12, 42:15,
42:19, 43:8, 43:10,
43:11, 44:14, 48:22,
49:11, 49:18, 54:5,
74:4, 74:19, 78:1,
78:4, 78:5, 78:9,
78:11, 78:21, 86:24,
87:11, 88:7, 88:9,
88:11, 88:13, 88:21,
89:3, 93:6, 122:25,
123:6, 123:8,
123:10, 124:21,
126:12, 129:6
**meetings** [5] - 18:25,
25:19, 49:23, 53:16,
53:17
**meets** [1] - 30:21
**member** [2] - 40:4,
47:6
**members** [4] - 17:22,
53:14, 54:2, 61:23
**Memorandums** [1] -
35:22
**memory** [2] - 93:5,
110:23
**Mental** [2] - 20:19,
33:1
**mental** [1] - 13:4
**mentioned** [3] - 24:3,
57:3, 61:10
**Merck** [6] - 123:12,
124:8, 126:12, 128:4,
128:19, 129:2
**MERCK** [1] - 124:10
**merged** [1] - 57:7
**Merry** [2] - 45:18,
45:20
**messed** [1] - 70:14
**met** [4] - 15:19, 51:3,
93:7, 115:15
**Methadone** [1] - 64:24
**MICHAEL** [2] - 2:15,
3:9
**Michael** [1] - 45:13
**microphone** [1] - 7:24
**middle** [1] - 115:3
**might** [7] - 20:2, 32:1,
33:24, 34:13, 34:15,
114:24, 133:1
**MILDRED** [1] - 3:3
**miles** [2] - 28:21,
29:20
**million** [48] - 20:11,
20:17, 21:12, 21:13,

35:14, 56:15, 57:1,
58:9, 64:8, 65:14,
65:20, 66:17, 67:11,
67:23, 71:7, 71:15,
73:13, 73:14, 73:17,
74:2, 75:13, 75:18,
75:23, 84:21, 91:19,
92:1, 92:9, 92:10,
92:14, 93:13, 93:18,
94:2, 94:7, 94:10,
94:12, 95:1, 95:13,
110:19, 111:5,
111:10, 111:15,
111:25, 112:4,
112:13, 112:24,
113:9, 113:20,
129:18
**million-dollar** [2] -
92:9, 92:14
**million-plus** [1] - 57:1
**millions** [1] - 38:8
**mind** [2] - 52:18,
65:19
**mine** [2] - 115:1, 115:7
**minute** [7] - 60:9,
66:4, 75:11, 79:25,
95:22, 95:24, 133:12
**minutes** [6] - 11:21,
51:8, 71:10, 77:7,
130:3, 130:4
**missed** [1] - 86:11
**Mission** [1] - 20:13
**mission** [1] - 55:15
**mistake** [1] - 35:7
**Mitchell** [1] - 2:12
**mobile** [1] - 29:20
**modification** [1] - 9:16
**modified** [1] - 11:15
**moment** [4] - 19:6,
20:4, 37:1, 100:10
**Monday** [3] - 105:21,
131:11, 131:21
**money** [16] - 20:18,
20:23, 21:21, 23:4,
24:8, 27:18, 34:7,
34:23, 35:16, 56:7,
90:21, 92:17, 92:21,
94:6, 125:25
**Monique** [1] - 132:5
**month** [2] - 26:1,
94:10
**monthly** [1] - 126:12
**months** [10] - 26:1,
30:10, 34:24, 35:24,
36:8, 36:14, 51:7,
61:13, 81:13, 81:19
**morning** [10] - 12:6,
12:9, 12:10, 37:13,
37:14, 115:12,
115:15, 131:14,

131:22, 132:4
**Morris** [1] - 6:15
**mortar** [2] - 34:16,
63:19
**most** [13] - 14:21,
25:1, 26:5, 27:8,
27:16, 27:25, 31:10,
32:16, 48:25, 50:2,
51:2, 75:2, 111:25
**motivational** [1] -
12:24
**Motley** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**MOUGEY** [1] - 2:12
**Mountain** [3] - 48:5,
57:3, 57:8
**move** [30] - 15:13,
16:2, 16:15, 18:1,
18:23, 25:5, 28:19,
35:10, 41:2, 43:4,
52:15, 63:15, 69:14,
84:24, 86:1, 89:8,
95:15, 99:24,
100:15, 100:18,
101:9, 101:11,
104:20, 104:24,
106:22, 106:25,
107:11, 122:18,
130:10
**moved** [9] - 17:7,
19:20, 22:19, 46:14,
87:15, 88:1, 88:14,
88:16
**moving** [8] - 15:17,
16:19, 17:9, 25:6,
28:13, 30:13, 42:17,
87:15
**MR** [150] - 2:3, 2:6,
2:9, 2:12, 2:15, 3:9,
3:11, 3:16, 4:17, 5:9,
5:10, 5:13, 6:4, 7:7,
7:15, 7:25, 8:2, 9:15,
9:20, 10:4, 10:23,
11:1, 11:4, 11:14,
11:19, 37:8, 37:12,
41:2, 41:7, 42:2,
42:3, 48:16, 52:14,
52:20, 53:2, 69:14,
69:20, 69:22, 69:23,
70:1, 70:3, 70:10,
70:12, 70:17, 70:18,
73:1, 73:3, 73:21,
73:23, 77:5, 77:11,
77:12, 79:24, 80:23,
81:1, 81:4, 84:24,
85:4, 85:9, 85:11,
85:17, 85:19, 85:21,
85:24, 86:1, 86:6,
86:7, 89:6, 89:9,
93:3, 93:8, 93:10,

94:23, 95:4, 95:11, 95:17, 96:1, 96:16, 96:23, 99:24, 100:3, 100:10, 100:14, 101:13, 101:21, 102:5, 102:21, 103:1, 103:2, 103:10, 103:18, 103:23, 104:13, 104:22, 105:1, 105:7, 105:13, 105:15, 106:8, 106:9, 106:15, 106:22, 107:16, 107:22, 107:25, 108:22, 108:23, 113:7, 114:3, 114:20, 114:23, 115:1, 115:7, 115:10, 115:14, 117:17, 117:19, 118:2, 118:6, 118:9, 123:15, 123:18, 123:22, 123:24, 124:6, 124:7, 124:12, 124:13, 128:2, 129:10, 129:16, 129:22, 130:1, 130:4, 130:7, 130:10, 130:14, 130:16, 130:19, 130:22, 131:4, 131:24, 132:4, 132:7, 132:24, 133:4, 133:11, 133:17, 133:21, 134:3

**MS** [67] - 3:3, 3:6, 3:14, 4:2, 4:5, 4:8, 4:12, 4:12, 4:15, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 10:20, 11:25, 12:8, 37:1, 37:5, 41:5, 41:23, 52:18, 69:17, 69:25, 70:2, 70:5, 79:21, 80:17, 85:2, 85:14, 89:4, 94:14, 95:2, 95:7, 95:21, 96:6, 96:8, 96:10, 96:20, 100:1, 101:8, 101:15, 102:6, 104:3, 105:2, 105:4, 105:8, 106:17, 107:7, 108:7, 108:16, 108:20, 113:3, 123:20, 123:23, 124:5, 128:1, 129:8, 130:8, 130:13, 130:15, 130:20, 131:2, 131:13,

132:14, 133:16
**Mt** [3] - 3:15, 4:4, 4:9
**multi** [11] - 38:8, 74:11, 84:7, 84:15, 84:21, 87:3, 92:6, 94:1, 112:1, 112:5, 112:15
**Multi** [1] - 84:11
**multi-generational** [10] - 74:11, 84:7, 84:15, 84:21, 87:3, 92:6, 94:1, 112:1, 112:5, 112:15
**Multi-generational** [1] - 84:11
**multi-millions** [1] - 38:8
**Multiple** [1] - 121:17
**multiple** [3] - 19:15, 19:18, 87:16
**multiplying** [1] - 133:13
**MURC** [2] - 56:2, 56:3

## N

**name** [20] - 24:23, 37:15, 44:17, 45:9, 45:18, 46:22, 47:10, 59:6, 59:8, 60:2, 60:19, 61:4, 61:9, 61:11, 68:14, 78:8, 97:4, 97:6, 97:23, 118:15
**names** [1] - 132:11
**narrative** [1] - 34:6
**NAS** [1] - 89:21
**national** [1] - 22:20
**native** [1] - 69:24
**navigator** [1] - 31:12
**near** [1] - 71:18
**necessarily** [6] - 42:9, 62:5, 66:7, 66:11, 88:24, 133:6
**necessary** [6] - 15:13, 15:14, 17:9, 43:23, 71:22
**necessitated** [1] - 88:24
**need** [31] - 10:1, 16:13, 17:3, 19:9, 19:10, 21:4, 24:9, 26:19, 26:25, 27:1, 27:2, 28:24, 29:11, 29:14, 29:15, 29:21, 30:22, 31:3, 31:7, 31:14, 32:1, 32:4, 32:5, 32:8, 55:8, 66:10, 87:16, 97:7, 97:12, 104:14,

131:19
**needed** [14] - 16:23, 20:7, 21:19, 24:5, 24:13, 24:14, 26:2, 26:4, 28:13, 28:25, 29:2, 36:12, 87:1, 113:10
**needs** [15] - 10:7, 17:18, 18:18, 21:1, 21:3, 27:7, 28:19, 29:14, 29:22, 32:9, 67:20, 72:3, 87:2, 87:3
**neo** [1] - 25:24
**Neonatal** [2] - 25:24, 65:11
**Network** [2] - 57:3, 57:8
**network** [4] - 31:15, 66:14, 66:17, 93:15
**never** [4] - 23:7, 32:20, 54:5, 98:1
**new** [11] - 19:6, 19:7, 36:24, 36:25, 60:2, 63:13, 67:18, 87:3, 87:20, 88:6, 88:12
**New** [3] - 3:5, 3:8, 27:23
**news** [1] - 38:12
**next** [9] - 16:18, 16:23, 19:6, 36:25, 63:6, 66:1, 83:8, 85:12, 86:25
**nice** [1] - 115:16
**NICHOLAS** [2] - 6:11, 11:1
**Nicholas** [1] - 10:25
**night** [2] - 26:17, 36:17
**Ninth** [2] - 4:6, 78:5
**noncompliance** [1] - 36:10
**none** [1] - 34:15
**noon** [3] - 28:16, 28:17, 115:5
**normally** [4] - 34:4, 34:10, 34:17, 35:9
**northern** [1] - 13:25
**note** [7] - 66:5, 76:5, 83:24, 83:25, 84:3, 92:3, 133:4
**noted** [4] - 116:14, 116:19, 116:24, 133:5
**notes** [14] - 65:9, 66:22, 117:14, 117:22, 117:25, 118:7, 119:1, 119:9, 119:10, 119:12, 119:15, 120:3,

121:6, 121:15
**nothing** [3] - 8:6, 22:17, 131:21
**notice** [3] - 52:23, 80:1, 85:5
**noting** [1] - 97:10
**number** [19] - 12:14, 35:13, 60:7, 62:19, 65:22, 69:18, 69:21, 80:5, 91:22, 91:24, 93:24, 94:2, 94:5, 96:12, 100:19, 110:14, 111:4, 111:10, 127:13
**Number** [1] - 79:25
**numbers** [10] - 18:6, 28:1, 52:2, 52:3, 74:24, 75:5, 75:10, 101:17, 102:14, 104:11
**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

## O

**O'Connell** [57] - 11:24, 12:2, 12:9, 14:16, 15:18, 19:15, 36:11, 37:13, 38:16, 39:10, 39:13, 41:8, 41:21, 42:4, 44:1, 44:15, 51:11, 51:23, 53:4, 68:9, 68:25, 70:19, 73:4, 73:24, 77:13, 81:5, 83:9, 83:11, 86:8, 87:9, 87:18, 95:6, 95:18, 96:5, 96:24, 97:1, 101:4, 102:14, 105:9, 105:16, 105:20, 106:16, 108:24, 110:3, 113:8, 115:15, 115:19, 117:20, 118:10, 118:15, 119:3, 122:13, 123:25, 125:9, 131:10, 133:20
**O'Connell's** [1] - 95:5
**oath** [2] - 12:3, 72:21
**object** [7] - 79:21, 85:14, 101:8, 105:8, 105:12, 106:21, 130:9
**objecting** [1] - 95:7
**objection** [25] - 41:4, 41:23, 52:17, 69:16, 69:17, 81:2, 85:1, 89:7, 94:22, 95:2,

95:15, 100:1, 101:15, 101:19, 104:18, 105:1, 105:5, 106:18, 107:10, 108:9, 108:18, 113:6, 129:14, 130:6, 130:12
**Objection** [4] - 94:14, 95:21, 113:3, 129:8
**objections** [1] - 132:17
**Objectives** [1] - 127:8
**obligations** [2] - 7:12, 7:13
**obscured** [1] - 70:21
**obtain** [1] - 125:18
**obviously** [3] - 22:15, 74:11, 132:19
**occasions** [1] - 12:14
**occurred** [2] - 74:4, 78:5
**October** [1] - 68:13
**OD** [1] - 89:20
**ODs** [1] - 89:20
**OF** [2] - 1:1, 1:4
**offer** [1] - 79:25
**offered** [7] - 14:13, 21:20, 52:22, 53:15, 70:8, 101:18, 103:4
**offering** [3] - 52:20, 52:21, 70:5
**Office** [2] - 44:21, 58:24
**Officer** [1] - 60:21
**offices** [1] - 17:19
**Official** [2] - 135:2, 135:3
**often** [7] - 22:24, 24:19, 24:21, 26:15, 32:7, 34:19, 36:8
**on-going** [1] - 128:10
**oncologist** [1] - 114:12
**One** [4] - 5:11, 7:22, 79:2, 90:14
**one** [90] - 8:3, 15:23, 16:2, 16:5, 17:23, 18:3, 20:9, 21:1, 21:8, 24:3, 26:1, 27:8, 28:20, 30:9, 30:14, 32:6, 32:14, 33:18, 34:18, 38:19, 40:2, 40:9, 40:21, 46:12, 46:15, 46:19, 47:22, 49:11, 51:11, 53:6, 53:9, 53:17, 57:11, 63:6, 64:12, 66:22, 66:23, 67:1, 68:11, 68:18, 69:9,

69:12, 70:6, 71:14, 73:17, 75:14, 79:3, 79:25, 88:14, 89:2, 89:10, 89:24, 90:6, 90:15, 94:6, 94:7, 94:18, 97:10, 100:18, 100:19, 103:5, 104:11, 104:22, 105:4, 107:21, 107:23, 110:24, 111:1, 111:2, 111:24, 112:6, 112:8, 113:14, 117:24, 118:21, 119:14, 119:17, 119:18, 120:12, 120:25, 122:14, 125:5, 127:10, 127:13, 127:17, 127:20, 133:11

**one-page** [1] - 122:14
**open** [1] - 68:19
**operating** [1] - 64:3
**Operating** [1] - 60:21
**Opioid** [4] - 41:9, 122:16, 124:18, 124:22
**opioid** [26] - 41:15, 43:5, 81:14, 81:20, 115:21, 116:4, 116:8, 116:10, 116:20, 117:4, 117:9, 119:8, 119:18, 119:20, 120:2, 120:15, 120:19, 120:20, 120:24, 121:1, 121:5, 123:2, 123:8, 126:9, 128:23, 129:18
**opioids** [2] - 116:15, 116:22
**opponent** [1] - 108:6
**Opportunities** [1] - 24:4
**opportunities** [2] - 29:17, 127:18
**opportunity** [8] - 14:13, 14:15, 17:10, 18:22, 30:1, 83:1, 126:4, 132:16
**opposed** [2] - 16:10, 36:11
**opposing** [1] - 103:4
**opposite** [1] - 9:5
**order** [3] - 7:8, 10:12, 17:17
**organization** [12] - 46:11, 46:13, 53:18,

53:22, 54:14, 54:17, 54:24, 55:4, 55:13, 56:4, 81:25, 104:1
**organizations** [6] - 50:25, 52:7, 52:10, 53:3, 54:9, 57:16
**orient** [6] - 62:24, 68:21, 69:1, 70:12, 73:10, 110:17
**origin** [1] - 38:23
**original** [1] - 69:20
**Orleans** [1] - 3:8
**otherwise** [1] - 82:23
**ought** [1] - 38:13
**outcome** [1] - 127:21
**outcomes** [1] - 125:15
**outlined** [1] - 28:20
**Outpatient** [7] - 71:10, 84:17, 91:16, 111:6, 111:14, 112:3, 112:12
**outpatient** [5] - 18:11, 23:25, 29:8, 64:13, 65:2
**outreach** [1] - 18:10
**outside** [2] - 28:22, 29:20
**overcome** [1] - 31:4
**overdose** [5] - 125:12, 126:9, 126:14, 126:23, 127:10
**overdoses** [2] - 125:12, 127:10
**overhead** [1] - 34:11
**overlooked** [1] - 22:24
**overreaching** [1] - 103:14
**overrule** [3] - 104:18, 113:6, 129:14
**Overruled** [2] - 94:15, 113:4
**overruled** [1] - 104:23
**oversee** [2] - 9:24, 10:11
**own** [1] - 13:5
**owned** [1] - 20:12
**Oxycontin** [1] - 121:24

**P**

**P-1200** [1] - 2:7
**p.m** [1] - 29:16
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**packet** [1] - 23:10
**Page** [13] - 8:20, 51:24, 62:15, 70:21, 70:22, 73:2, 75:9, 75:10, 83:22, 95:5, 125:7, 127:23

**page** [25] - 35:5, 51:24, 52:2, 52:4, 52:12, 62:21, 63:2, 64:7, 69:9, 70:25, 71:17, 71:18, 84:1, 84:16, 90:20, 90:24, 93:9, 110:14, 113:15, 113:19, 118:8, 118:10, 118:23, 122:14, 128:21
**pages** [7] - 25:14, 25:17, 34:4, 51:25, 87:4, 87:6
**pagination** [1] - 70:21
**paid** [1] - 112:18
**pain** [6] - 119:8, 120:19, 120:24, 121:21, 122:18, 122:19
**Pain** [1] - 121:24
**panel** [1] - 19:22
**panhandle** [1] - 13:25
**Papantonio** [1] - 2:12
**paragraph** [3] - 82:14, 87:19, 89:10
**Paragraph** [2] - 7:10, 10:4
**pardon** [1] - 105:9
**Pardon** [3] - 85:18, 96:7, 110:25
**pared** [1] - 14:23
**parenting** [3] - 30:22, 30:24, 30:25
**part** [26] - 15:3, 24:11, 43:5, 48:5, 50:2, 50:5, 52:11, 55:17, 55:19, 63:17, 63:24, 64:2, 86:11, 98:19, 104:2, 108:15, 108:18, 108:24, 115:22, 116:7, 116:13, 116:19, 120:16, 126:17, 126:21, 130:23
**partial** [1] - 8:23
**participant** [1] - 41:13
**participate** [1] - 109:5
**participated** [1] - 53:21
**particular** [6] - 22:13, 38:3, 42:18, 87:18, 88:16, 100:23
**particularly** [1] - 64:11
**parties** [2] - 103:17, 126:13
**partners** [4] - 27:12, 35:20, 126:20, 128:10
**Partnership** [1] -

23:20
**parts** [2] - 14:6, 18:8
**party** [7] - 9:16, 10:5, 100:22, 101:24, 103:5, 131:6
**pass** [2] - 37:5, 114:20
**past** [5] - 23:5, 24:9, 36:14, 46:9, 107:17
**pathways** [2] - 28:11, 32:2
**patients** [1] - 58:6
**Paul** [11] - 16:8, 39:5, 81:12, 86:9, 86:14, 86:19, 94:19, 94:25, 97:2, 98:23, 133:21
**PAUL** [2] - 2:3, 5:9
**Paul@ greeneketchum. com** [1] - 79:9
**Pause** [3] - 11:23, 37:4, 100:13
**pay** [1] - 14:2
**payers** [1] - 33:8
**pdf** [1] - 68:14
**PDF** [1] - 81:10
**PEARL** [1] - 3:6
**peer** [4] - 12:16, 12:18, 12:19, 31:11
**Pensacola** [1] - 2:14
**people** [40] - 8:5, 19:12, 19:21, 23:12, 24:5, 24:19, 27:15, 27:25, 29:7, 30:1, 30:19, 31:3, 31:25, 38:19, 40:11, 40:21, 44:13, 48:9, 48:22, 50:1, 50:10, 50:14, 50:18, 50:19, 50:21, 50:24, 51:2, 52:7, 53:17, 54:3, 57:21, 62:6, 62:9, 62:11, 81:23, 108:2, 109:11, 113:21
**people's** [1] - 53:24
**PEP** [1] - 23:20
**per** [1] - 28:2
**perceived** [1] - 92:21
**percent** [4] - 34:9, 34:14, 54:2
**percentage** [1] - 54:6
**perfect** [1] - 13:12
**perfectly** [1] - 33:25
**period** [10] - 35:19, 43:18, 51:7, 51:20, 65:16, 65:19, 75:13, 84:13, 112:2, 112:14
**periods** [1] - 65:18
**permit** [1] - 105:11
**person** [3] - 17:23, 114:15, 115:17

**person's** [1] - 114:17
**personal** [1] - 114:17
**personally** [3] - 9:24, 10:11, 115:24
**persons** [2] - 119:6, 119:8
**perspective** [1] - 15:7
**PETER** [1] - 2:12
**Petrany** [50] - 16:17, 17:14, 39:16, 39:18, 40:10, 40:24, 42:18, 48:23, 49:11, 49:12, 49:18, 61:2, 69:6, 79:6, 79:19, 80:8, 80:11, 81:18, 81:22, 82:9, 82:20, 83:3, 83:15, 86:9, 86:13, 87:12, 88:22, 90:19, 91:2, 91:12, 93:13, 95:19, 97:2, 97:13, 98:11, 98:15, 98:23, 99:2, 99:13, 99:19, 101:4, 101:23, 103:7, 105:21, 107:2, 108:25, 109:4, 109:10, 109:24, 111:24
**Petrany's** [2] - 87:11, 88:7
**pharmacist** [3] - 45:1, 47:20, 59:18
**Pharmacy** [3] - 44:20, 44:24, 47:23
**Philadelphia** [2] - 6:6, 6:13
**phonetic** [1] - 126:6
**photo** [1] - 23:9
**photocopied** [2] - 110:24, 111:1
**phrase** [2] - 63:10, 64:23
**physician** [2] - 47:14, 60:5
**physicians** [2] - 55:19, 55:24
**Pierce** [1] - 123:15
**PIFKO** [1] - 3:16
**pilot** [1] - 30:7
**pivot** [1] - 25:7
**place** [2] - 61:14, 77:6
**plaintiff** [2] - 102:9, 103:25
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**plaintiffs** [10] - 7:9, 10:14, 38:13, 52:24, 53:9, 80:2, 90:7, 101:6, 107:18, 113:11
**Plaintiffs** [1] - 135:6

**plaintiffs'** [10] - 39:3, 78:18, 100:20, 101:23, 102:2, 114:15, 129:3, 129:6, 129:12, 129:19

**Plan** [63] - 19:2, 25:16, 27:5, 38:16, 38:23, 41:9, 42:14, 49:13, 51:9, 51:13, 52:6, 62:12, 63:4, 63:12, 63:18, 68:10, 68:15, 68:18, 77:14, 78:20, 79:20, 80:3, 80:7, 80:8, 80:12, 81:10, 81:18, 81:24, 82:9, 83:4, 83:10, 86:17, 86:20, 87:10, 90:13, 91:9, 92:4, 95:19, 98:3, 98:6, 99:14, 99:20, 100:5, 100:16, 101:3, 101:12, 102:7, 102:8, 103:21, 104:5, 104:8, 104:15, 105:22, 109:2, 109:6, 109:12, 109:25, 110:18, 111:22, 113:16, 114:10, 122:15, 124:17

**plan** [104] - 16:19, 17:9, 20:3, 21:2, 21:24, 22:2, 22:8, 22:10, 28:12, 28:21, 38:20, 41:14, 41:18, 42:5, 42:8, 42:14, 42:16, 42:20, 42:25, 43:2, 43:3, 43:14, 43:16, 43:19, 43:22, 44:3, 44:6, 48:23, 49:20, 50:3, 52:8, 52:25, 53:13, 53:16, 59:6, 61:25, 62:3, 62:6, 62:18, 63:16, 65:18, 67:25, 68:1, 69:5, 70:20, 72:12, 73:19, 74:23, 75:3, 75:8, 75:12, 75:14, 75:17, 75:23, 77:20, 78:20, 79:16, 80:19, 82:3, 82:10, 82:22, 83:1, 83:3, 83:12, 83:18, 84:4, 84:21, 86:24, 87:13, 87:22, 88:21, 88:23, 89:2, 90:1, 90:9, 91:13, 92:15, 99:22, 100:22, 101:5, 101:6, 101:22, 103:8, 103:11,

104:1, 104:2, 109:18, 110:9, 110:12, 110:21, 111:24, 112:3, 112:14, 112:20, 114:14, 114:16, 123:2, 123:7, 123:11, 126:17, 126:21, 128:5, 128:7, 128:9

**planning** [2] - 16:25, 114:14

**Plans** [1] - 102:11

**play** [1] - 117:15

**played** [2] - 121:18, 121:22

**Pleasant** [3] - 3:15, 4:4, 4:9

**plug** [2] - 115:3, 130:5

**plus** [1] - 57:1

**point** [19] - 16:2, 20:9, 21:1, 21:8, 42:4, 42:24, 43:1, 43:14, 43:18, 43:20, 47:22, 94:18, 95:16, 102:22, 103:3, 103:18, 104:3, 105:10, 133:12

**pointed** [1] - 8:20

**points** [1] - 79:24

**Policy** [2] - 44:22, 58:25

**policy** [1] - 114:13

**Ponc** [1] - 2:4

**Ponce** [1] - 2:16

**population** [3] - 31:1, 87:16, 119:22

**populations** [3] - 18:12, 18:14, 26:9

**portion** [7] - 30:22, 106:21, 107:1, 107:4, 107:8, 108:7, 108:10

**position** [5] - 7:17, 8:7, 8:8, 10:23, 11:1

**positions** [1] - 63:25

**potentially** [1] - 30:18

**Powell** [1] - 2:6

**PowerPoint** [1] - 15:2

**PR** [2] - 2:5, 2:17

**practical** [1] - 55:14

**practice** [8] - 31:25, 55:6, 55:19, 55:20, 55:21, 56:9, 56:16, 107:16

**practicing** [1] - 39:24

**pre** [2] - 124:20, 124:21

**pre-dated** [1] - 124:21

**precise** [3] - 44:1,

65:22, 84:11

**precisely** [1] - 43:7

**predominant** [1] - 54:1

**prefer** [1] - 133:1

**pregnant** [1] - 30:22

**prepare** [2] - 107:18, 119:10

**prepared** [1] - 118:19

**preparing** [5] - 9:21, 38:20, 80:3, 101:6, 119:13

**prescribing** [14] - 116:14, 116:21, 116:24, 117:3, 119:5, 119:7, 119:19, 119:25, 120:10, 120:14, 120:17, 120:18, 120:23, 120:24

**Prescription** [1] - 118:24

**prescription** [2] - 116:21, 120:25

**present** [13] - 15:5, 15:8, 15:16, 16:11, 39:4, 39:5, 40:11, 82:4, 82:11, 119:12, 132:2, 132:8

**presentation** [19] - 15:3, 116:16, 116:19, 117:11, 117:13, 117:21, 118:7, 118:11, 118:13, 118:20, 119:2, 119:13, 120:2, 120:8, 120:13, 120:16, 121:4, 121:12

**presentations** [6] - 13:15, 14:9, 116:10, 116:13, 116:20

**presented** [1] - 19:7

**presenting** [2] - 9:16, 10:5

**President** [2] - 45:12, 46:5

**press** [2] - 8:14, 36:2

**Prestera** [9] - 46:9, 46:10, 46:11, 46:16, 57:9, 61:10, 61:14, 61:17, 76:12

**pretty** [1] - 9:20

**prevention** [8] - 22:23, 22:24, 22:25, 23:10, 23:19, 26:15, 30:16, 126:8

**Prevention** [2] - 23:20, 47:7

**previous** [4] - 70:6,

84:12, 91:23, 92:4

**previously** [4] - 20:12, 61:10, 75:20, 94:24

**price** [1] - 20:6

**Priddy** [1] - 45:22

**primarily** [1] - 43:14

**prioritizing** [1] - 25:3

**priority** [2] - 24:22, 25:1

**PROACT** [10] - 29:19, 33:9, 40:2, 40:4, 40:5, 57:12, 57:13, 57:16, 57:21

**problem** [3] - 11:21, 108:5, 108:17

**problems** [2] - 27:14, 107:14

**proceed** [2] - 37:9, 77:10, 113:4

**proceedings** [1] - 135:5

**Proceedings** [2] - 6:19, 77:9

**PROCEEDINGS** [1] - 7:1

**process** [13] - 13:3, 34:21, 35:11, 36:7, 36:12, 49:23, 60:18, 74:6, 108:12, 113:17, 127:20, 132:20

**Proctor** [1] - 2:12

**produced** [1] - 6:19

**product** [2] - 102:19, 104:7

**production** [1] - 69:20

**professional** [1] - 121:25

**Professor** [1] - 89:16

**professor** [1] - 44:23

**Program** [2] - 125:8, 127:8

**program** [7] - 125:11, 125:16, 127:1, 127:7, 127:9, 128:9

**programs** [9] - 12:15, 14:18, 14:19, 14:25, 15:1, 15:12, 30:7, 32:16, 126:18

**prohibited** [1] - 133:22

**Project** [9] - 20:10, 20:11, 20:16, 21:6, 27:21, 30:21, 33:8, 34:19, 113:20

**project** [8] - 34:24, 34:25, 35:15, 35:16, 57:14, 67:8, 93:19, 126:7

**projected** [1] - 116:5

**projection** [1] - 72:2

**projects** [6] - 24:4, 35:17, 35:18, 51:5, 69:13, 115:21

**prom** [1] - 26:17

**promised** [2] - 115:4, 115:7

**promote** [1] - 126:14

**proper** [3] - 80:8, 80:10, 96:4

**proposal** [3] - 74:5, 129:17, 130:11

**proposed** [1] - 64:3

**proposing** [1] - 11:5

**proprietary** [1] - 8:22

**proud** [1] - 27:8

**prove** [4] - 12:22, 22:25, 23:1, 23:3

**provide** [2] - 10:10, 107:14

**provided** [3] - 80:11, 85:5, 87:23

**provider** [2] - 40:7, 58:19, 59:25

**providers** [1] - 46:20

**provides** [3] - 46:16, 80:13, 86:3

**providing** [4] - 10:6, 11:7, 26:14, 50:21

**psychologist** [1] - 13:5

**public** [22] - 7:8, 9:13, 11:12, 54:17, 54:20, 95:20, 99:15, 99:20, 99:23, 100:5, 100:24, 102:7, 102:20, 103:8, 103:22, 104:9, 104:16, 109:19, 109:25, 110:13, 125:14, 126:11

**Public** [4] - 8:19, 37:23, 105:22, 109:2

**public's** [1] - 9:2

**publication** [1] - 24:23

**publications** [1] - 24:20

**publicity** [1] - 8:16

**publicly** [1] - 20:5

**publishing** [1] - 118:3

**pull** [9] - 18:6, 23:14, 95:4, 115:3, 118:6, 121:10, 123:18, 124:12, 130:5

**pulled** [6] - 14:22, 18:2, 18:4, 18:14, 19:1, 120:3

**purely** [2] - 15:25, 126:7

**purpose** [11] - 53:1,

70:6, 70:8, 80:4, 80:16, 85:3, 85:4, 85:10, 101:16, 102:10, 126:25
**purposes** [5] - 34:13, 100:18, 101:2, 101:18, 102:16
**pursuant** [2] - 7:10, 10:12
**pursuing** [1] - 14:14
**push** [1] - 92:20
**push-back** [1] - 92:20
**put** [7] - 20:6, 22:7, 51:8, 54:7, 54:8, 114:15, 132:17
**Putnam** [1] - 125:6
**putting** [5] - 18:20, 26:17, 44:6, 82:22, 128:5

## Q

**qualifications** [2] - 80:2, 80:18
**qualified** [1] - 58:17
**qualitative** [4] - 18:5, 18:7, 74:7
**quantitative** [2] - 18:5, 18:6
**questioning** [1] - 65:17
**questions** [5] - 105:11, 106:24, 107:9, 120:7, 129:22
**Quezon** [8] - 38:17, 49:23, 65:17, 78:15, 90:4, 90:6, 99:4, 104:13
**QUEZON** [50] - 11:25, 12:8, 37:1, 37:5, 41:5, 41:23, 52:18, 69:17, 69:25, 70:2, 70:5, 79:21, 80:17, 85:2, 85:14, 89:4, 94:14, 95:2, 95:7, 95:21, 96:6, 96:8, 96:10, 96:20, 100:1, 101:8, 101:15, 102:6, 104:3, 105:2, 105:4, 105:8, 106:17, 107:7, 108:7, 108:16, 108:20, 113:3, 123:20, 123:23, 124:5, 128:1, 129:8, 130:8, 130:13, 130:15, 130:20, 131:2, 131:13, 133:16
**Quick** [2] - 14:12,

45:24
**quick** [1] - 28:18
**quickly** [2] - 21:23, 22:23
**quit** [1] - 115:5
**quite** [3] - 21:4, 84:11, 88:3
**quote** [5] - 19:11, 38:10, 63:19, 112:1, 121:4
**quote-unquote** [1] - 19:11
**quotes** [2] - 42:21, 42:22
**quoting** [1] - 116:1

## R

**radio** [1] - 37:18
**Rafferty** [1] - 2:12
**raised** [1] - 11:6
**raising** [3] - 7:16, 32:5, 32:6
**range** [1] - 65:25
**rank** [1] - 95:8
**rapidly** [1] - 24:18
**rate** [4] - 116:21, 116:24, 119:5, 119:7
**rated** [1] - 35:9
**rates** [10] - 116:14, 117:3, 119:19, 120:1, 120:10, 120:14, 120:17, 120:18, 120:23, 120:24
**Rather** [1] - 104:17
**rather** [4] - 10:15, 17:25, 27:14, 50:3
**re** [4] - 13:17, 20:16, 28:4, 31:8
**re-branded** [1] - 13:17
**re-configuring** [1] - 28:4
**re-did** [1] - 20:16
**re-entry** [1] - 31:8
**reached** [1] - 9:5
**reactive** [1] - 18:24
**read** [12] - 41:16, 82:6, 84:9, 86:21, 87:19, 104:14, 109:21, 119:3, 119:17, 121:22, 125:9, 128:25
**reading** [1] - 133:2
**ready** [11] - 12:7, 27:1, 31:4, 95:19, 99:15, 99:20, 99:23, 103:21, 104:15, 109:25, 131:23
**realize** [1] - 33:24

**realized** [1] - 17:8
**really** [14] - 8:17, 13:23, 15:3, 15:15, 17:20, 17:22, 21:1, 25:18, 28:11, 28:22, 29:13, 108:8, 115:16, 118:25
**Reardon** [1] - 132:10
**reasons** [1] - 113:15
**recalling** [1] - 78:11
**receive** [7] - 7:22, 14:14, 27:22, 28:5, 36:16, 106:18, 108:10
**received** [7] - 20:18, 40:21, 62:12, 72:6, 72:12, 98:22, 108:2
**receiving** [2] - 7:9, 106:3
**recent** [1] - 75:3
**recently** [2] - 60:13, 111:25
**Recess** [1] - 77:8
**recessed** [1] - 134:5
**recipient** [3] - 79:8, 106:21, 109:1
**recipients** [2] - 105:25
**recognize** [10] - 29:14, 40:24, 45:25, 51:12, 61:11, 68:9, 90:12, 97:1, 118:11, 118:13
**recognized** [4] - 21:8, 21:23, 28:9, 29:11
**recognizing** [1] - 31:2
**recommendations** [2] - 15:16, 43:6
**recommended** [2] - 110:5, 110:8
**record** [10] - 7:11, 10:16, 12:13, 44:9, 74:21, 104:4, 130:11, 130:25, 131:6, 135:5
**recorded** [1] - 6:19
**records** [1] - 8:23
**recovery** [14] - 12:16, 12:17, 12:18, 12:19, 12:20, 12:21, 13:1, 13:3, 13:7, 24:6, 24:7, 27:3, 29:11
**Recovery** [1] - 24:4
**rectangle** [1] - 87:4
**recurring** [1] - 31:18
**redact** [1] - 107:20
**redacted** [2] - 107:19, 109:13
**redacting** [1] - 107:8
**redaction** [1] - 108:12
**redo** [1] - 86:12
**reduce** [5] - 125:12,

126:9, 126:14, 126:23, 127:10
**reduction** [3] - 26:23, 30:17, 30:18
**Reed** [2] - 6:4, 6:11
**refer** [4] - 50:8, 56:2, 66:10, 87:20
**reference** [4] - 110:9, 122:5, 122:8, 122:10
**referencing** [2] - 92:23, 116:17
**referred** [6] - 50:5, 53:19, 61:24, 88:6, 88:12, 88:20
**referring** [4] - 64:16, 67:4, 112:6, 112:8
**refers** [5] - 43:10, 48:24, 49:12, 73:18, 122:18
**reflected** [1] - 72:11
**reflects** [2] - 97:20, 97:23
**regarding** [3] - 7:8, 15:20, 101:17
**region** [3] - 14:5, 48:4, 128:12
**Region** [3] - 124:23, 124:25, 128:23
**Regional** [2] - 125:4, 127:4
**reimbursed** [1] - 128:16
**reinforce** [2] - 11:4, 103:3
**relating** [1] - 65:10
**Release** [2] - 105:23, 109:2
**release** [10] - 20:4, 32:23, 33:1, 36:2, 99:15, 99:23, 103:8, 103:21, 104:16, 109:25
**released** [10] - 33:11, 95:20, 99:20, 100:5, 102:7, 102:19, 103:16, 110:10, 110:12, 112:17
**relevance** [4] - 8:12, 70:11, 113:3, 130:13, 130:14, 130:17
**relevant** [3] - 7:20, 7:21, 8:2
**reliable** [3] - 24:9, 36:13, 36:22
**relievers** [1] - 119:8, 120:19, 120:24
**relying** [1] - 9:13
**remember** [7] - 20:10, 26:11, 27:21, 38:10,

46:4, 49:1, 88:15
**remind** [1] - 12:3
**reminded** [1] - 100:14
**removed** [6] - 22:5, 110:9, 110:16, 112:20, 113:19, 113:23
**renew** [1] - 106:17
**renovation** [1] - 34:18
**renovations** [1] - 20:11
**replicated** [1] - 14:5
**replied** [1] - 98:23
**reported** [2] - 115:22, 135:9
**REPORTER** [4] - 7:23, 8:1, 48:13, 85:25
**Reporter** [6] - 6:17, 6:18, 135:3, 135:12
**represent** [4] - 68:12, 73:6, 83:17, 90:17
**representation** [2] - 128:4, 128:18
**representations** [1] - 128:8
**representing** [4] - 15:19, 37:15, 128:11, 132:5
**reproduce** [1] - 9:17
**reproductions** [1] - 7:10
**reputational** [1] - 9:1
**request** [5] - 8:9, 16:1, 16:10, 129:4, 132:15
**requested** [4] - 128:22, 129:1, 129:2, 132:25
**requests** [1] - 7:9
**require** [3] - 34:13, 35:21, 128:7
**required** [3] - 33:12, 34:2, 115:23
**Research** [4] - 48:12, 48:15, 48:18, 55:10, 56:2, 89:17
**research** [13] - 18:5, 24:20, 24:25, 26:7, 56:5, 66:20, 66:23, 66:25, 67:3, 67:5, 67:7, 93:18, 94:2
**researcher** [1] - 18:3
**residential** [4] - 18:11, 23:25, 65:7, 113:21
**resiliency** [2] - 22:8, 22:10
**Resiliency** [61] - 19:2, 25:16, 27:5, 38:16, 38:23, 42:14, 49:13, 51:9, 51:13, 52:6, 62:12, 63:4, 63:12,

63:17, 68:10, 68:15, 68:18, 77:14, 78:20, 79:20, 80:3, 80:7, 80:8, 80:11, 81:10, 81:18, 81:24, 82:9, 83:4, 83:10, 86:16, 86:20, 87:10, 90:13, 91:9, 92:4, 95:19, 98:3, 98:6, 99:14, 99:20, 100:5, 100:16, 101:3, 101:12, 102:7, 102:8, 102:11, 103:21, 104:5, 104:8, 104:15, 105:22, 109:2, 109:6, 109:11, 109:25, 110:18, 111:22, 113:16, 114:10

**resilient** [1] - 19:3

**resolve** [1] - 102:21

**Resources** [1] - 33:20

**resources** [5] - 17:7, 30:15, 31:3, 126:18, 127:18

**respect** [4] - 87:2, 89:6, 104:13, 132:15

**respond** [1] - 34:2

**responded** [1] - 38:15

**responders** [2] - 18:12, 24:14

**responding** [1] - 18:20

**Response** [2] - 14:12, 45:24

**response** [1] - 100:21

**responsible** [1] - 10:6

**responsive** [1] - 18:25

**rest** [2] - 21:24, 28:14

**rested** [1] - 131:22

**result** [8] - 9:5, 72:5, 86:24, 87:10, 88:6, 88:13, 88:21, 89:3

**results** [1] - 49:11

**resume** [2] - 12:1, 131:14

**resumed** [1] - 77:9

**retention** [2] - 125:13, 127:14

**retired** [2] - 47:16

**retrospective** [1] - 16:1

**return** [1] - 103:18

**returned** [1] - 36:9

**revenue** [1] - 56:15

**review** [3] - 35:11, 83:1, 86:20

**reviewable** [1] - 132:18

**reviewed** [1] - 111:23

**reviewers** [1] - 35:10

**RFA** [1] - 34:2

**Rice** [5] - 2:9, 3:14, 4:3, 4:5, 4:8

**right-hand** [2] - 110:5, 128:1

**ring** [1] - 46:5

**Ritter** [1] - 99:8

**River** [1] - 59:12

**Rivers** [6] - 124:23, 124:25, 125:4, 125:22, 127:4, 128:23

**RMR** [2] - 6:17, 6:18

**road** [1] - 27:3

**ROBERT** [1] - 6:11

**ROBERTSON** [1] - 3:6

**role** [7] - 39:8, 54:20, 102:2, 114:4, 115:20, 121:18, 121:22

**room** [1] - 78:12

**royal** [2] - 17:22, 53:20

**RPR** [1] - 6:18

**RPR-RMR-CRR-FCRR** [1] - 6:18

**RUBY** [79] - 4:17, 37:8, 37:12, 41:2, 41:7, 42:2, 42:3, 48:16, 52:14, 52:20, 53:2, 69:14, 69:20, 69:23, 70:1, 70:3, 70:10, 70:12, 70:17, 70:18, 73:1, 73:3, 73:21, 73:23, 77:5, 77:11, 77:12, 79:24, 80:23, 81:1, 81:4, 84:24, 85:4, 85:9, 85:11, 85:17, 85:19, 85:24, 86:1, 86:6, 86:7, 89:6, 89:9, 93:3, 93:8, 93:10, 94:23, 95:4, 95:11, 95:17, 96:1, 96:16, 96:23, 99:24, 100:3, 100:14, 101:13, 101:21, 102:5, 102:21, 103:1, 103:18, 104:13, 104:22, 105:7, 105:13, 105:15, 106:8, 106:9, 106:15, 106:22, 107:16, 107:22, 107:25, 108:22, 108:23, 113:7, 114:3, 114:20

**Ruby** [16] - 4:17, 37:7, 37:15, 41:23, 42:1,

69:19, 85:22, 89:8, 95:25, 96:21, 96:22, 100:11, 101:20, 102:25, 107:12, 122:14

**Ruby's** [1] - 103:3

**rude** [1] - 82:23

**rule** [2] - 9:8, 107:3

**Rule** [4] - 100:19, 102:4, 103:3, 104:19

**rules** [1] - 133:16

**ruling** [4] - 9:14, 70:6, 102:12, 102:17

**run** [1] - 14:25

**running** [1] - 24:21

**rural** [5] - 30:6, 30:16, 33:17, 33:19, 33:22

## S

**s\Ayme** [1] - 135:11

**s\Lisa** [1] - 135:11

**sake** [3] - 55:16, 68:22, 76:1

**SALGADO** [1] - 4:15

**SAMHSA** [4] - 20:18, 21:11, 21:13, 33:18

**SAMSHA** [1] - 32:25

**San** [2] - 2:5, 2:17

**sand** [1] - 27:13

**sat** [3] - 47:14, 53:17, 54:2

**satisfied** [2] - 108:14, 134:1

**save** [1] - 125:14

**saved** [1] - 23:4

**saving** [1] - 24:22

**saw** [7] - 17:10, 23:9, 74:9, 75:2, 84:12, 92:3, 92:14

**SBIRT** [1] - 118:21

**SC** [3] - 3:15, 4:4, 4:9

**scale** [4] - 24:15, 121:21, 121:24, 122:18

**schedules** [1] - 82:17

**SCHMIDT** [6] - 5:9, 7:15, 7:25, 8:2, 10:23, 11:4

**Schmidt** [1] - 10:22

**school** [7] - 13:21, 26:5, 26:9, 31:20, 55:18, 55:19, 55:20

**School** [9] - 44:20, 44:23, 44:24, 47:22, 53:25, 55:10, 55:18, 55:24, 57:19

**Science** [4] - 48:21, 63:10, 63:18, 71:3

**Sciences** [6] - 48:20,

60:14, 73:13, 74:1, 89:18, 126:5

**scramble** [1] - 36:5

**screen** [2] - 10:7, 52:15

**sealing** [1] - 8:23

**search** [1] - 26:11

**second** [6] - 28:5, 56:3, 87:18, 100:25, 127:13

**secret** [1] - 8:22

**section** [11] - 52:11, 53:4, 87:4, 87:17, 87:20, 88:6, 88:12, 88:16, 88:19, 88:20, 89:2

**Section** [1] - 125:7

**sections** [3] - 87:13, 87:16, 87:22

**sectors** [1] - 128:11

**See** [1] - 96:22

**see** [84] - 8:4, 14:12, 19:8, 29:15, 36:1, 37:16, 37:17, 41:10, 44:17, 45:9, 45:13, 45:18, 45:22, 46:8, 46:22, 47:1, 47:10, 48:8, 52:4, 52:11, 53:4, 56:19, 58:1, 58:13, 58:25, 59:8, 59:15, 60:3, 60:19, 61:2, 61:4, 62:19, 63:9, 64:12, 66:1, 66:14, 66:19, 69:8, 69:24, 69:25, 71:2, 71:9, 71:11, 71:19, 71:23, 73:15, 74:2, 74:13, 76:7, 80:17, 81:15, 82:18, 83:11, 84:1, 84:18, 86:17, 87:7, 89:10, 89:22, 90:24, 91:17, 92:1, 96:21, 97:14, 98:3, 98:7, 98:11, 98:13, 99:16, 105:23, 106:5, 106:23, 109:8, 109:16, 110:6, 110:10, 113:5, 115:9, 117:25, 126:13, 128:22, 131:15, 131:21

**seek** [4] - 7:12, 94:12, 95:13, 118:3

**seeking** [1] - 125:17

**seize** [1] - 8:15

**Select** [1] - 47:6

**selected** [1] - 49:13

**selective** [2] - 11:8, 17:6

**send** [2] - 40:25, 62:6

**sending** [1] - 19:21

**Senior** [1] - 7:2

**senior** [1] - 51:2

**SENIOR** [1] - 1:17

**Sensabaugh** [1] - 5:14

**sent** [17] - 39:11, 40:10, 42:18, 62:3, 69:6, 77:20, 78:21, 78:24, 79:6, 80:21, 80:22, 81:7, 91:2, 100:17, 109:10, 109:23, 113:1

**sentence** [13] - 82:14, 82:25, 86:25, 87:19, 90:3, 104:14, 109:14, 109:15, 110:3, 110:8, 119:16, 119:17

**sentences** [1] - 110:3

**separate** [2] - 55:17, 56:24

**September** [19] - 43:15, 77:24, 78:4, 78:21, 86:10, 86:14, 90:15, 91:6, 91:10, 91:14, 93:11, 98:6, 100:16, 101:13, 110:21, 111:23, 112:9, 112:21, 112:23

**sequence** [1] - 101:1

**series** [3] - 35:10, 52:22, 121:1

**serves** [1] - 58:6

**service** [1] - 26:25

**Services** [8] - 54:11, 71:11, 84:18, 91:17, 111:6, 114:14, 112:4, 112:13

**services** [8] - 23:25, 31:8, 40:8, 58:20, 58:22, 64:14, 74:13, 128:15

**serving** [1] - 101:5

**session** [1] - 16:25

**set** [7] - 26:13, 27:17, 29:18, 30:21, 43:7, 103:12, 120:2

**setting** [1] - 80:9

**Setting** [1] - 88:11

**settlement** [2] - 38:4, 38:14

**seven** [1] - 78:12

**several** [2] - 81:13, 116:15

**shall** [1] - 7:13

**SHANNON** [1] - 6:3

**shift** [1] - 75:2

**short** [4] - 18:18, 25:8,

25:20, 96:16
**short-circuit** [1] - 96:16
**short-term** [3] - 18:18, 25:8, 25:20
**shorter** [1] - 15:17
**shortly** [3] - 42:19, 77:4, 77:20
**show** [17] - 13:7, 13:8, 26:6, 27:19, 28:7, 39:10, 52:23, 68:23, 68:25, 79:1, 85:5, 96:24, 100:8, 116:19, 117:12, 117:13, 117:14
**showed** [5] - 30:2, 95:8, 96:12, 111:25, 112:3
**showing** [1] - 95:10
**shown** [3] - 25:4, 110:19, 111:5
**shows** [5] - 26:8, 75:12, 75:18, 112:12, 118:16
**side** [7] - 7:15, 55:6, 55:14, 56:25, 110:5, 119:2, 128:1
**sign** [1] - 122:19
**significant** [2] - 8:17, 54:20
**Significantly** [1] - 129:7
**significantly** [1] - 92:13
**silly** [1] - 35:7
**similar** [3] - 84:3, 89:24, 97:23
**similarly** [1] - 32:3
**Simmons** [6] - 73:1, 73:21, 93:3, 93:9, 95:4, 106:8
**simple** [3] - 29:24, 35:4, 89:2
**simplify** [1] - 127:9
**simply** [2] - 70:12, 102:18
**Simply** [1] - 106:18
**sincerity** [2] - 82:16, 82:21
**SINGER** [1] - 4:5
**single** [2] - 103:12, 104:7
**singular** [2] - 14:2, 30:19
**sit** [3] - 25:14, 53:15, 55:22
**sits** [3] - 26:16, 47:15, 57:23
**situated** [1] - 27:12
**situation** [2] - 13:6,

16:16
**six** [4] - 26:1, 34:24, 78:11, 132:7
**skills** [1] - 12:24
**skip** [1] - 109:14
**slide** [8] - 13:9, 88:3, 118:24, 119:9, 121:10, 121:12, 121:23, 122:6
**slides** [1] - 15:2
**slightly** [1] - 43:17
**small** [9] - 21:21, 23:21, 24:15, 27:17, 29:25, 30:7, 30:22, 53:21, 65:24
**smart** [1] - 23:1
**Smith** [2] - 6:4, 6:11
**smoke** [1] - 23:2
**smoking** [6] - 23:1, 23:3, 23:4, 23:5, 23:6, 23:7
**Sobonya** [1] - 47:4
**social** [2] - 13:5, 93:16
**solid** [1] - 27:11
**solution** [1] - 13:19
**Solutions** [14] - 13:12, 13:13, 13:20, 14:7, 14:20, 14:24, 15:4, 15:5, 15:20, 15:22, 16:21, 22:4, 25:13, 27:5
**solutions** [1] - 13:22
**solves** [1] - 108:17
**someone** [9] - 29:16, 31:6, 31:11, 31:12, 53:20, 78:17, 114:8, 114:13, 119:13
**sometime** [2] - 21:4, 43:11
**sometimes** [5] - 25:17, 35:25, 36:1, 36:3, 36:14
**somewhat** [1] - 47:16
**Sorry** [2] - 86:11, 131:3
**sorry** [13] - 41:23, 44:24, 48:13, 56:11, 63:22, 68:14, 69:8, 75:14, 76:2, 76:19, 119:25, 127:25, 133:12
**sort** [27] - 15:8, 16:14, 17:1, 18:20, 20:9, 20:22, 20:24, 21:6, 23:17, 23:23, 23:25, 24:16, 27:9, 28:18, 29:23, 30:9, 30:14, 31:17, 31:18, 34:21, 36:20, 50:7, 57:4, 66:10, 67:4, 107:17,

126:1
**sound** [2] - 39:1, 119:11
**South** [1] - 2:13
**SOUTHERN** [1] - 1:1
**Southern** [1] - 7:2
**space** [2] - 67:5, 67:6
**speaker** [12] - 117:14, 117:22, 117:25, 118:7, 119:1, 119:9, 119:10, 119:11, 119:15, 120:3, 121:6, 121:15
**speaking** [1] - 86:25
**special** [2] - 69:12, 89:22
**specialist** [1] - 78:17
**specialty** [1] - 114:17
**specific** [6] - 11:6, 34:4, 72:10, 75:1, 110:9, 116:16
**specifically** [3] - 46:15, 49:4, 116:18
**spend** [4] - 10:16, 34:6, 35:19, 36:14
**spent** [1] - 36:15
**split** [1] - 107:17
**spokes** [1] - 29:19
**Square** [2] - 6:5, 6:12
**St** [8] - 57:5, 57:6, 57:14, 57:18, 57:25, 58:3, 58:9, 76:14
**staff** [2] - 9:20, 67:7
**stand** [4] - 12:2, 70:7, 96:15, 120:22
**standard** [2] - 9:6, 22:21
**standards** [1] - 35:18
**standing** [1] - 27:11
**STANNER** [1] - 5:10
**start** [7] - 29:25, 34:24, 36:5, 73:5, 79:3, 121:21, 123:21
**started** [12] - 13:18, 13:19, 13:22, 15:12, 22:15, 22:18, 23:7, 24:2, 30:25, 49:19, 74:6, 113:19
**starting** [3] - 28:10, 119:17, 127:7
**State** [8] - 12:20, 13:16, 14:10, 30:4, 33:7, 46:20, 48:4, 58:6
**state** [6] - 14:6, 45:7, 59:25, 117:5, 120:16, 121:7
**Statement** [1] - 103:4
**statement** [3] - 81:17, 81:22, 104:2

**statements** [1] - 52:21
**States** [2] - 7:2, 26:15
**STATES** [2] - 1:1, 1:17
**statewide** [1] - 59:2
**stating** [1] - 103:7
**STATUS** [1] - 1:17
**status** [2] - 97:20, 119:21
**Status** [1] - 7:2
**stay** [1] - 24:7
**stems** [1] - 122:25
**stenography** [1] - 6:19
**step** [1] - 16:19
**Stephen** [2] - 39:16, 132:11
**Steve** [4] - 16:17, 37:15, 61:4, 132:10
**STEVEN** [1] - 4:17
**still** [20] - 12:3, 17:15, 26:16, 76:8, 76:10, 76:12, 76:14, 76:16, 76:18, 76:23, 76:25, 77:2, 91:19, 93:13, 96:15, 102:8, 102:22, 111:25, 133:20
**stipulations** [1] - 34:10
**stop** [2] - 17:1, 23:13
**stopped** [2] - 13:17, 23:4
**stories** [1] - 11:7
**strategic** [7] - 16:19, 16:25, 17:6, 17:9, 42:16, 43:3, 43:21
**stream** [1] - 23:14
**Street** [16] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15, 4:18, 5:5, 5:12, 6:6, 6:13, 78:5
**strike** [2] - 68:4, 88:20
**strongly** [1] - 74:10
**structure** [3] - 32:22, 56:23, 63:16
**struggle** [1] - 23:12
**struggling** [1] - 51:5
**student** [1] - 24:25
**study** [1] - 26:8
**stuff** [1] - 66:10
**subject** [11] - 41:8, 73:11, 86:16, 98:2, 105:23, 109:1, 122:15, 124:15, 124:16, 124:20, 125:17
**submit** [4] - 21:12, 21:14, 35:14, 35:23
**submitted** [5] - 36:16, 123:11, 128:20,

129:5, 129:18
**Suboxone** [1] - 64:24
**subsequent** [1] - 100:23
**substance** [9] - 12:23, 30:3, 30:7, 45:6, 59:3, 109:6, 121:18, 121:22, 133:24
**Substance** [8] - 13:2, 19:13, 19:14, 20:19, 32:25, 45:4, 47:6, 64:17
**substantial** [1] - 130:1
**subtitled** [1] - 15:8
**succeeding** [1] - 51:5
**successful** [4] - 15:11, 27:19, 31:9, 31:14
**SUD** [1] - 128:15
**suffering** [1] - 57:22
**sufficient** [1] - 9:2
**sugar** [1] - 131:24
**suggests** [1] - 65:2
**Suite** [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12
**summarize** [1] - 25:11
**summarized** [1] - 88:4
**Summer** [1] - 43:16
**support** [4] - 14:14, 24:14, 32:8, 32:9
**supporting** [1] - 31:11
**supports** [1] - 93:16
**Supports** [1] - 66:2
**supposed** [1] - 65:20
**surveys** [1] - 18:6
**sustain** [6] - 26:24, 27:1, 29:17, 89:7, 94:22, 107:10
**Sustain** [1] - 81:2
**sustainability** [4] - 71:22, 84:8, 92:6, 128:7
**sustainable** [3] - 24:10, 36:13, 128:5
**Sustained** [1] - 95:3
**sustained** [2] - 95:15, 128:10
**sustaining** [1] - 30:17
**SUZANNE** [1] - 4:15
**Syndrome** [2] - 25:25, 65:11
**System** [3] - 48:5, 125:5, 127:4
**system** [12] - 31:16, 31:19, 31:21, 32:8, 32:9, 97:8, 97:14, 97:21, 97:24, 125:22, 128:11
**systemic** [1] - 31:14

**Systems** [1] - 58:12
**systems** [3] - 32:10,
126:3, 126:8

## T

**TA** [1] - 14:11
**tacit** [1] - 11:7
**tag** [1] - 20:6
**tail** [1] - 17:1
**talks** [1] - 86:23
**target** [1] - 18:11
**targets** [1] - 33:16
**teaching** [1] - 39:24
**Team** [2] - 14:13,
45:24
**team** [9] - 18:4, 72:7,
72:13, 74:8, 74:9,
74:22, 75:2, 75:4,
132:16
**teasing** [1] - 17:14
**Tech** [1] - 24:25
**technical** [3] - 11:20,
14:11, 67:6
**TEMITOPE** [1] - 4:8
**ten** [6] - 28:21, 29:20,
34:9, 34:14, 35:13,
77:7
**tendency** [2] - 8:13,
8:15
**Tenth** [1] - 5:12
**term** [20] - 12:11,
12:16, 12:20, 18:18,
18:23, 21:5, 25:8,
25:20, 29:10, 31:17,
32:3, 32:10, 36:13,
71:22, 84:7, 87:3,
92:5, 112:5
**terming** [1] - 13:20
**test** [1] - 110:23
**testified** [17] - 7:21,
39:18, 40:5, 80:5,
80:20, 102:14,
103:24, 107:25,
110:13, 113:14,
113:25, 114:4,
115:19, 122:24,
123:25, 129:12,
130:22
**testify** [2] - 38:11,
106:19
**testifying** [1] - 74:15
**testimony** [9] - 50:6,
65:17, 101:2,
101:10, 102:1,
116:1, 129:11,
133:24
**text** [1] - 125:10
**THE** [109] - 1:1, 1:1,
1:4, 1:17, 7:5, 7:14,

8:13, 9:19, 10:2,
10:18, 10:22, 10:25,
11:2, 11:9, 11:15,
11:20, 11:24, 12:1,
12:5, 12:7, 28:16,
28:17, 37:3, 37:7,
37:10, 41:4, 41:6,
42:1, 48:14, 52:17,
53:1, 69:16, 70:8,
70:11, 70:16, 77:6,
77:10, 80:13, 80:24,
81:2, 85:1, 85:7,
85:10, 85:16, 85:18,
85:22, 86:3, 89:7,
93:4, 94:15, 94:18,
94:22, 95:3, 95:14,
95:22, 95:23, 95:24,
96:3, 96:7, 96:9,
96:22, 100:2,
100:12, 101:18,
102:3, 102:24,
104:17, 105:3,
105:6, 105:14,
106:13, 106:14,
107:6, 107:10,
107:20, 107:23,
108:4, 108:13,
108:17, 108:21,
113:4, 113:25,
114:2, 114:21,
114:25, 115:3,
115:9, 117:18,
118:5, 123:17,
129:14, 129:24,
130:3, 130:5,
130:12, 130:17,
131:7, 131:14,
131:16, 131:18,
132:3, 132:6,
132:13, 132:22,
133:3, 133:10,
133:18, 134:1, 134:4
**theme** [1] - 31:18
**themselves** [1] - 31:24
**thereabouts** [1] -
39:25
**therefore** [2] - 23:4,
113:23
**thick** [1] - 25:13
**third** [6] - 65:9, 119:7,
120:18, 120:23,
127:17, 131:6
**Thomas** [2] - 2:12,
57:20
**Thompson** [2] - 46:22,
46:24
**Three** [1] - 6:5
**three** [9] - 6:12, 16:3,
16:6, 19:20, 21:2,
36:15, 57:7, 64:12

**three-generation** [1] -
21:2
**throughout** [2] -
18:14, 45:7
**Tim** [1] - 60:19
**timeline** [1] - 36:10
**TIMOTHY** [1] - 5:9
**title** [2] - 65:2, 124:16
**today** [8] - 17:25,
20:17, 26:25, 29:1,
29:9, 30:11, 106:20,
132:8
**Todd** [6] - 48:9, 48:10,
48:11, 89:13, 89:14,
89:19
**together** [14] - 13:8,
14:4, 16:8, 17:25,
18:2, 18:4, 18:7,
18:15, 50:9, 51:8,
82:3, 82:22, 114:15,
126:20
**took** [9] - 13:23,
19:16, 20:9, 20:17,
28:3, 39:8, 61:13,
82:16, 86:19
**top** [10] - 22:24, 52:11,
63:9, 98:11, 106:23,
107:4, 107:8,
107:20, 108:14,
121:21
**topic** [1] - 26:16
**total** [4] - 91:22,
91:24, 92:1, 94:10
**touch** [1] - 14:10
**tough** [1] - 8:7
**toward** [1] - 93:18
**tower** [1] - 19:11
**Tower** [2] - 3:4, 4:18
**town** [3] - 13:16, 29:21
**track** [1] - 104:23
**trade** [1] - 8:22
**trades** [1] - 47:13
**trained** [1] - 21:10
**training** [5] - 24:13,
31:3, 114:7, 114:9,
118:22
**transcript** [7] - 6:19,
10:17, 73:6, 73:7,
95:5, 108:1, 135:4
**transcripts** [1] - 133:2
**transmittal** [1] - 77:17
**transportation** [9] -
28:21, 29:6, 29:23,
29:25, 30:5, 30:13,
66:14, 66:17, 93:15
**treat** [1] - 30:23
**treating** [1] - 30:25
**Treatment** [1] - 47:7
**treatment** [49] - 18:11,
28:24, 28:25, 29:2,

29:8, 30:3, 33:17,
34:1, 40:7, 46:16,
46:20, 49:3, 50:12,
50:15, 55:14, 57:10,
57:17, 58:22, 60:8,
61:20, 64:11, 64:17,
64:20, 64:23, 65:1,
65:2, 65:5, 65:7,
65:10, 65:14, 65:20,
71:10, 75:13, 75:18,
75:23, 84:17, 91:16,
110:20, 111:5,
112:1, 112:24,
113:10, 113:12,
113:21, 125:13,
126:15, 127:14
**treats** [1] - 57:21
**tremendous** [2] -
49:2, 49:6
**Tri** [3] - 46:20, 48:4,
58:6
**Tri-State** [3] - 46:20,
48:4, 58:6
**trial** [3] - 7:18, 108:13,
113:1
**Trial** [1] - 134:5
**TRIAL** [1] - 1:16
**tried** [1] - 25:18
**trouble** [1] - 7:23
**troubled** [1] - 7:17
**true** [2] - 38:6, 103:6
**truly** [1] - 88:15
**truth** [4] - 52:21,
72:24, 94:15, 107:5
**truthfully** [1] - 74:16
**try** [2] - 7:25, 88:17
**trying** [10] - 9:25,
23:14, 31:7, 69:18,
76:5, 101:9, 101:11,
101:19, 116:2,
117:15
**TTA** [1] - 30:5
**turn** [7] - 21:18, 62:15,
70:20, 118:23,
121:8, 124:14,
127:23
**Twelfth** [3] - 4:13,
4:15, 5:5
**twenty** [1] - 34:14
**two** [20] - 7:21, 12:21,
16:3, 30:10, 33:3,
33:5, 33:11, 36:14,
53:9, 57:7, 64:12,
76:6, 79:1, 79:24,
80:5, 98:9, 100:18,
118:25, 119:3, 133:7
**two-year** [1] - 33:11
**type** [3] - 26:21, 34:17,
67:6
**types** [3] - 21:22, 26:2,

26:4

## U

**Uber** [1] - 30:1
**ultimate** [1] - 19:16
**ultimately** [4] - 22:7,
42:14, 51:9, 112:17
**umbrella** [2] - 56:23,
57:4
**unaware** [1] - 8:24
**under** [13] - 9:5, 12:3,
55:21, 55:23, 55:25,
57:7, 72:21, 100:19,
102:4, 103:3, 131:1,
133:14
**understood** [1] -
41:18
**Understood** [1] - 86:6
**undertook** [1] - 17:17
**undisclosed** [2] -
106:1, 109:1
**unduly** [1] - 8:14
**unfair** [1] - 8:4
**unintelligible** [1] -
48:12
**uniquely** [1] - 27:12
**unit** [1] - 89:22
**unite** [1] - 27:16
**UNITED** [2] - 1:1, 1:17
**united** [1] - 57:7
**United** [3] - 7:2, 26:15,
59:11
**university** [7] - 13:21,
19:11, 24:25, 34:12,
55:13, 56:5, 56:23
**University** [10] -
45:12, 46:5, 55:10,
55:16, 56:2, 56:21,
56:24, 97:14, 97:20,
97:24
**university's** [1] -
55:14
**University's** [1] -
56:18
**unless** [1] - 130:6
**unlikely** [1] - 119:20
**unquote** [1] - 19:11
**unstably** [1] - 18:13
**up** [35] - 7:6, 12:1,
13:24, 14:11, 15:8,
15:16, 16:18, 25:14,
26:6, 26:13, 26:17,
27:19, 29:18, 30:3,
30:21, 36:8, 41:25,
42:1, 42:13, 54:3,
54:9, 56:1, 65:16,
70:3, 71:7, 71:14,
73:14, 95:4, 118:6,
120:7, 121:10,

123:7, 123:18, 124:12
**updated** [1] - 30:11
**updates** [1] - 68:19
**upstream** [1] - 23:13
**utilized** [2] - 43:3, 43:22

## V

**Valley** [2] - 58:12, 60:8
**valuable** [1] - 19:4
**variations** [1] - 118:21
**various** [5] - 63:3, 64:17, 65:18, 69:2, 122:25
**vary** [1] - 53:24
**Venn** [1] - 55:8
**Ventura** [1] - 3:18
**version** [62] - 14:23, 67:25, 68:1, 69:5, 69:24, 70:20, 70:24, 71:5, 73:19, 74:23, 75:3, 75:8, 75:12, 75:15, 75:17, 75:19, 75:22, 77:14, 79:16, 83:10, 83:11, 83:18, 83:22, 84:3, 84:6, 84:12, 84:15, 84:21, 90:9, 90:13, 91:1, 91:9, 91:23, 92:4, 92:15, 93:11, 93:12, 93:22, 93:23, 94:1, 94:7, 100:16, 100:22, 101:13, 101:22, 104:9, 104:16, 107:19, 110:12, 110:17, 110:18, 110:22, 111:4, 111:9, 111:10, 111:22, 112:9, 112:17, 112:24, 117:21, 121:8
**versions** [2] - 88:3, 112:7
**versus** [2] - 17:3, 18:5
**via** [1] - 115:16
**Vic** [1] - 132:9
**view** [3] - 8:11, 8:17, 107:14
**VIRGINIA** [2] - 1:1, 1:18
**Virginia** [39] - 4:18, 7:3, 12:20, 13:17, 14:10, 24:25, 30:4, 33:8, 37:22, 45:4, 46:13, 46:14, 47:7, 58:24, 59:3, 79:2, 83:9, 85:13, 90:10,

96:25, 100:9, 111:2, 116:14, 116:21, 117:10, 119:5, 119:7, 119:17, 119:18, 119:24, 120:1, 120:11, 120:17, 120:18, 120:22, 124:23, 124:25, 128:24
**visionary** [2] - 82:3, 82:10
**vital** [1] - 122:19
**vocational** [1] - 24:13
**voice** [1] - 37:21
**voiced** [1] - 11:10
**VOLUME** [1] - 1:16
**volunteer** [1] - 17:12
**vs** [1] - 135:6

## W

**wages** [1] - 114:17
**wagging** [1] - 17:1
**wait** [3] - 10:13, 35:23, 96:21
**waiting** [1] - 10:16
**waiver** [1] - 128:15
**wake** [1] - 39:11
**WAKEFIELD** [1] - 5:13
**walk** [2] - 31:6, 69:1
**walking** [1] - 70:13
**wants** [1] - 52:19
**Washington** [6] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12
**waterfall** [1] - 23:15
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**week** [10] - 9:18, 10:13, 10:15, 11:16, 11:17, 41:13, 43:10, 109:20, 131:11, 131:21
**weekly** [1] - 10:1
**West** [37] - 7:3, 12:20, 13:16, 14:10, 30:4, 33:7, 37:22, 45:4, 46:12, 46:14, 47:7, 58:24, 59:3, 79:2, 83:9, 85:13, 90:10, 96:25, 100:8, 111:2, 116:14, 116:21, 117:10, 119:5, 119:7, 119:17, 119:18, 119:24, 120:1, 120:10, 120:17, 120:18, 120:22, 124:23, 124:25, 128:24
**WEST** [2] - 1:1, 1:18

**whatsoever** [2] - 102:15, 104:12
**wheel** [1] - 121:11
**whereas** [3] - 21:23, 25:16, 48:12
**White** [2] - 46:2, 46:4
**whole** [2] - 11:18
**wholesale** [1] - 122:2
**WICHT** [1] - 4:12
**wide** [1] - 25:15
**wife** [1] - 115:5
**Williams** [4] - 4:13, 5:4, 61:4, 61:6
**willing** [4] - 13:25, 14:2, 117:12, 132:25
**WITNESS** [9] - 12:5, 28:17, 48:14, 93:4, 94:18, 95:23, 106:14, 114:2, 131:16
**witness** [21] - 12:2, 37:5, 80:5, 85:22, 86:2, 95:12, 96:1, 96:18, 103:13, 103:24, 106:24, 107:24, 107:25, 114:20, 129:10, 129:12, 130:8, 130:22, 133:13, 133:18
**witness's** [1] - 101:1
**witnesses** [1] - 7:21
**woefully** [2] - 74:25, 75:5
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**women** [1] - 30:25
**wonder** [1] - 27:24
**Word** [1] - 70:1
**word** [5] - 44:4, 47:9, 54:5, 56:14, 68:14
**words** [1] - 66:25
**worker** [1] - 13:5
**workforce** [2] - 31:1, 31:4
**Works** [1] - 15:9
**works** [12] - 22:25, 25:3, 26:22, 31:10, 44:20, 45:23, 48:11, 56:5, 60:11, 69:12, 78:17, 97:8
**world** [1] - 18:5
**worse** [2] - 11:18, 28:2
**worth** [1] - 28:5
**would"** [1] - 44:4
**write** [11] - 19:5, 21:12, 21:16, 21:17, 21:20, 33:15, 34:4, 34:22, 125:23, 130:20, 130:21

**writer** [1] - 54:1
**writing** [8] - 14:14, 19:21, 22:1, 25:17, 41:12, 109:4, 109:19, 130:24
**written** [3] - 81:21, 128:17, 130:24
**wrote** [3] - 8:3, 29:24, 30:10
**WU** [1] - 5:10
**WV** [8] - 2:8, 3:10, 3:13, 4:19, 5:15, 6:9, 41:3, 123:18
**wvha.org** [1] - 121:6
**WVU** [2] - 59:22, 59:24

## Y

**year** [14] - 16:4, 16:5, 26:1, 30:10, 33:11, 41:22, 48:6, 56:15, 57:21, 65:23, 65:25, 72:16, 73:8
**years** [26] - 12:21, 16:3, 16:4, 16:6, 20:22, 20:23, 30:10, 33:3, 33:5, 57:7, 60:7, 61:16, 65:23, 75:13, 75:18, 75:23, 111:10, 111:16, 111:20, 111:21, 113:10, 113:12, 113:21, 113:22
**yesterday** [13] - 12:12, 14:17, 15:2, 17:24, 18:9, 22:18, 24:3, 27:4, 40:5, 57:13, 115:19, 116:1, 125:4
**Yingling** [3] - 47:10, 47:12, 76:16
**York** [2] - 3:5, 27:23
**Yost** [3] - 61:10, 76:18, 76:23
**Yost's** [1] - 61:14
**yourself** [1] - 60:16
**youth** [1] - 31:20

## Z

**Zach** [2] - 60:3, 77:2
**Zappia** [3] - 61:11, 61:13, 76:25
**zappia** [1] - 61:16
**Zoom** [1] - 115:16