IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
             Plaintiff,        :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
             Defendants.       :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
             Plaintiff,        :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
             Defendants.       :
_____x
```

BENCH TRIAL - VOLUME 21
BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

JUNE 7, 2021

**APPEARANCES:**

**For the Plaintiff,
Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:              Ayme Cochran, RMR, CRR
Court Reporter:              Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A.

 2   Faber, Senior Status Judge, United States District

 3   Court, Southern District of West Virginia, in

 4   Charleston, West Virginia, on June 7, 2021, at 9:00

 5   a.m., as follows:

 6              THE COURT:  Good morning, everybody.

 7          Dr. O'Connell, are you here?

 8              THE WITNESS:  Yes.

 9              MS. QUEZON:  She is, Your Honor.

10              MS. MCCLURE:  Your Honor, before we get started,

11   the defendants do have one issue to raise that's unrelated

12   to Dr. O'Connell.

13              THE COURT:  Okay.

14              MS. MCCLURE:  Pursuant to the parties' joint trial

15   stipulation, which was entered by the Court at ECF 1029, the

16   parties are each obligated to provide notice under Section 6

17   of that document regarding witnesses and who's going to be

18   called the following week.

19          So Monday at 7:00 p.m. witnesses are due for the

20   following week.  For witnesses this week, that would be in

21   the week of June 7th, disclosure would have been due this

22   past Monday, May 31st.

23          As Your Honor is, of course, aware, we were off this

24   past week.  Plaintiffs did provide a list on May 31st of

25   eight witnesses for this week.
```

1    Yesterday evening plaintiffs for the first time

2  disclosed that they intend to call a marketing expert, Jakki

3  Mohr, this week, Dr. Jakki Mohr on Thursday, this Thursday,

4  contending that there are scheduling issues that require

5  that she be called this week.

6    Your Honor, pursuant to the parties' stipulation, the

7  plaintiffs were obligated to give notice on May 31st of

8  witnesses for this entire week, June 7th.  They did not.

9  They disclosed O'Connell, Dial, Davies, Joe Rannazzisi,

10 Gordon Smith, Lacey Keller, Dr. Keyes, and Saxe, with Keller

11 and Keyes being experts.

12    So now just six, six days after the disclosure was due

13 and three days before they intend to call her, they've added

14 this purported expert, Jakki Mohr, to their list.

15    This violates the parties' stipulation.  It violates

16 the Court's order.  And we object to this being insufficient

17 notice under the stipulation.

18    And so, Your Honor, we request an order from the Court

19 that would say -- we have no objection to Dr. Jakki Mohr

20 coming next week.  They've disclosed her in plenty of time

21 for next week.

22    Our objection is that this late disclosure simply

23 violates the rule.  It's inexcusable, provides us with

24 insufficient notice to prepare for an expert this week with

25 that little notice.

```
 1              THE COURT:  Okay.  Let me hear from your opponent,

 2     Mr. Ackerman.

 3              MR. ACKERMAN:  I'll go up to the podium, Your

 4     Honor.

 5              THE COURT:  So I don't have to peek around the

 6     screen.

 7              MR. ACKERMAN:  Exactly.  It's a whole lot easier

 8     from up here.

 9         Your Honor, there's no gamesmanship here.  I can advise

10     the Court, as I advised defendants yesterday, exactly what

11     happened in discussions with Dr. Mohr.

12         We learned that Dr. Mohr has a scheduling conflict due

13     to family events.  Dr. Mohr is located in Missoula, Montana.

14     There aren't direct flights, unfortunately, from Missoula to

15     Charleston, West Virginia.  So Dr. Mohr's travel here and

16     back requires some significant planning.

17         We told the defendants as soon as we could.  We're not

18     putting her up today or tomorrow.  We're going to do it

19     Thursday afternoon or Friday morning as we advised the

20     defendants.

21         They have notice of this witness.  She's been on our

22     witness list.  She's an expert.  She's a -- she filed an

23     expert report.  They took her deposition.

24         This is not a habitual problem.  This is a one-time

25     issue due to a scheduling conflict and we would ask the
```

 1    Court's indulgence.

 2            MS. MCCLURE:  May I respond, Your Honor?

 3        We don't think there's any gamesmanship.  I'm -- my

 4    argument is not dependent on gamesmanship.  They agreed to

 5    this time provision.  Their witnesses' schedule are within

 6    their knowledge and control, not ours.

 7        I don't even have to prove prejudice because it's their

 8    stipulation that we agreed to as well and it was entered as

 9    a court order.

10        That said, the prejudice is essentially baked into the

11    timing that is set forth in that schedule.  And, so, Your

12    Honor, they, they can call her next week.  We have no

13    objection to that.

14        The fact that there's no gamesmanship here does not

15    resolve the issue.  I don't think there is gamesmanship.  I

16    understand there's a scheduling problem.  I accept that for

17    purposes of this argument.  But that doesn't fix the problem

18    that we were entitled to notice that was not six days late.

19            THE COURT:  What's her scheduling conflict, Mr.

20    Ackerman?

21            MR. ACKERMAN:  She has, she has not visited family

22    due to the pandemic and had made plans to visit family that

23    she hasn't seen in a year.  We're trying not to alter her

24    family visit plans.

25        Now, Your Honor, I would note that if she was going to

1    testify today and we had disclosed her on last Monday, they

2    would have had seven days notice.  We disclosed her

3    yesterday.  Monday, Tuesday, Wednesday, Thursday, that's

4    four, five days notice.  It's not that much different.

5         MS. MCCLURE:  Your Honor, they disclosed eight

6    witnesses this past Monday who we've been spending our time

7    preparing for based on their representations required under

8    the stipulation that that is who they were going to call.

9         Now they've added at the last minute a ninth witness

10   into the mix who is an expert witness with insufficient

11   notice.

12        And I don't believe that family issues -- we all have

13   had trouble seeing family during the pandemic.  This is a

14   paid expert who should be able to arrange her schedule, and

15   the plaintiff should be able to work with her to have her

16   called next week.

17        THE COURT:  If you put her at the end of your

18   batting order here, you probably won't get to her this week

19   anyway, will you, Mr. Ackerman?

20        MR. ACKERMAN:  Well, I hope, Your Honor, -- we had

21   put her at the -- in the eighth slot of the, of the ninth

22   slot batting order.  Our hope was that as we plotted out the

23   week, we thought if we got to her, it would be Thursday

24   afternoon or Friday morning.

25        MS. MCCLURE:  And, Your Honor, I believe what

```
 1   they're doing is actually rearranging the schedule to ensure

 2   that she goes this week, meaning that --

 3            THE COURT:  Well, you had notice of all the other

 4   witnesses except her, right, that they plan to call this

 5   week?

 6            MS. MCCLURE:  We had notice of eight witnesses

 7   that they plan to call this week.  The key here is that this

 8   is a marketing expert, a paid, a paid expert.

 9       My microphone has gone off.

10       And, Your Honor, we've been spending time pursuant to

11   the stipulation preparing for the witnesses that they did

12   indicate they plan to call.

13            THE COURT:  Well, --

14            MS. MCCLURE:  And a family obligation simply to us

15   for a paid expert does not warrant the undue prejudice to

16   defendants.

17            THE COURT:  Well, I don't see any significant

18   danger of undue prejudice.  And if you get to her by Friday,

19   I'll let her testify on Friday, Mr. Ackerman.

20            MR. ACKERMAN:  Thank you, Your Honor.

21            THE COURT:  Okay.

22       Good morning, Dr. O'Connell.

23            THE WITNESS:  Good morning, Your Honor.

24            THE COURT:  And, of course, you're still under the

25   oath you took several days ago to tell the truth in this
```

```
 1    trial.
 2              THE WITNESS:  Yes, sir.
 3              THE COURT:  Mr. Hester, you may proceed.
 4              MR. HESTER:  Good morning, Your Honor.  It's good
 5    to be back.
 6                        CROSS EXAMINATION
 7    BY MR. HESTER:
 8    Q.   Good morning, Dr. O'Connell.
 9    A.   Good morning.
10    Q.   Welcome back.  Dr. O'Connell, in your testimony before
11    the break you had described various opioid related programs,
12    treatment programs and the like at Cabell and Huntington.
13    Right?  And I'm going to want to circle back to those and
14    discuss them in more detail.
15         But I'd first like to set the table of your
16    relationship within the Division of Addiction Sciences and,
17    more broadly, within Marshall.
18              THE COURT:  Let me interrupt you.  I'm sorry,
19    Mr. Hester.  But apparently we've got a technical -- our
20    first technological glitch.  We don't have anything in the
21    overflow courtroom.
22         Now, do we need to fix that before we go ahead?
23         Have we got somebody working on it?
24              THE CLERK:  Yes.
25              THE COURT:  Well, let's go ahead and make the best
```

1    of it here.  I don't want to interrupt your cross here,

2    Mr. Hester.  It's already been interrupted for 10 days.

3              MR. HESTER:  I had a chance to polish it to a fine

4    queue, Your Honor.

5              MS. QUEZON:  And, Your Honor, in that same vein, I

6    don't want to interrupt Mr. Hester either and I believe he's

7    going to use the board.  Would it be all right if I

8    reposition myself so that I can --

9              THE COURT:  Sure.

10             MS. QUEZON:  Thank you so much.

11             THE COURT:  Get where you can see, absolutely.

12             MS. QUEZON:  Thank you.

13             MR. HESTER:  Your Honor, may I approach?

14             THE COURT:  Yes, you may.

15   BY MR. HESTER:

16   Q.   Dr. O'Connell, we've handed you what's been marked

17   as MC-West Virginia-02134 which appears on its face to

18   be Marshall Family Medicine Annual Report for fiscal

19   year 2018.

20        I take it you're familiar with this report, Dr.

21   O'Connell?

22   A.   I'm familiar predominantly with my section of the

23   report.

24   Q.   And you were involved in drafting the sections of the

25   report that relate to the Division of Addiction Sciences;

1    correct?

2    **A.**    Correct.

3    **Q.**    And this report -- this annual report on Marshall

4    Family Medicine is issued every year?

5    **A.**    It is.

6    **Q.**    And Dr. Petrany is the Chair of the Department of

7    Family Medicine which is also called Marshall Family

8    Medicine; is that right?

9    **A.**    Can you repeat that?

10   **Q.**    Sure.  It is -- I'm trying to understand the

11   nomenclature a little bit.  There's a Department of Family

12   Medicine; correct?

13   **A.**    Correct.

14   **Q.**    And that's also called the Marshall Family Medicine; is

15   that right?

16   **A.**    It -- the way it's situated in the Joan C. Edward's

17   School of Medicine, we have the Department of Family and

18   Community Health.  And how they practice as physicians is

19   under Marshall Health which is then the Family Medicine

20   Department.

21   **Q.**    So Marshall Family Medicine is the unit within Marshall

22   Health?  Is that fair to say?

23   **A.**    Correct.

24   **Q.**    And Marshall Family Medicine includes the Division of

25   Addiction Sciences where you work; correct?

1    **A.**   Correct.

2    **Q.**   And Marshall Health is not a part of the City of

3    Huntington or Cabell County; correct?

4    **A.**   Correct.

5    **Q.**   And Marshall Health does not receive any funding from

6    the City of Huntington or Cabell County; correct?

7    **A.**   I do not know.

8    **Q.**   You're aware that, that the Marshall entities don't

9    receive funding from Cabell County?

10   **A.**   I don't believe so, but I'm not involved in the budget

11   of the school.

12   **Q.**   So this annual report is prepared each year I take it;

13   correct?

14   **A.**   Correct.

15   **Q.**   And it's prepared by persons with knowledge of its

16   subject matters covered; correct?

17   **A.**   Each division within the department is responsible for

18   detailing their section and reporting that.

19            MR. HESTER:  We would move, Your Honor, at this

20   time for MC-WV-02134 to be admitted into evidence.

21            THE COURT:  Is there any objection to this?

22            MS. QUEZON:  I would object to both relevance and

23   hearsay, Your Honor.

24            MR. HESTER:  Your Honor, it's, it's a business

25   record.  It's a record of a regularly conducted activity.

1          MS. QUEZON:  I don't believe that foundation has

2    been laid, Your Honor.

3          THE COURT:  Well, you haven't laid -- if you want

4    it in as a business record, you have to go through the

5    hoops, Mr. Hester.

6    BY MR. HESTER:

7    **Q.**   So this report, this annual report is prepared each

8    year by Marshall Family Medicine; correct?

9    **A.**   The report is compiled by individuals in -- within the

10   department and the large organization, or just within Family

11   Medicine.

12   **Q.**   And it's prepared each year by at the time -- at the

13   time it's prepared, the persons who prepare it have

14   knowledge of the materials they're writing about in this

15   annual report; correct?

16   **A.**   Individuals within each of the divisions compile their

17   section, and then our admin team put it together.

18   **Q.**   And Marshall Family Medicine publishes this annual

19   report each year as a record of its activities during the

20   year; correct?

21   **A.**   I don't know where it goes.

22   **Q.**   Do you know it's published each year?

23   **A.**   I do not know where the final division input goes.

24         MR. HESTER:  Well, I would again, Your Honor, move

25   it into evidence as a business record.

```
 1              THE COURT:  I'm going to admit it.  It's admitted

 2      as a business record.

 3      BY MR. HESTER:

 4      Q.   And if you turn to Page 7 of this document, Dr.

 5      O'Connell, -- and just to help you orient, I'm going to

 6      use the numbers at the bottom left corner to lead you

 7      through.  You can see there it says 2134.7.  Do you see

 8      that?

 9      A.   Yes, I do.

10      Q.   So that's where -- so we'll be on the same page.

11              And it states here at the bottom of Page 7 that, that

12      Marshall Family Medicine had established a new Division of

13      Addiction Sciences built upon four main foci activity:

14      Research, education, clinical service, and community

15      engagement.

16              Do you see that?

17      A.   Yes.

18      Q.   And is that a fair summary of the focuses of the

19      activity for the Division of Addiction Sciences?

20      A.   That was the original four pillars.

21      Q.   And you're the Associate Director of that division, as

22      we've discussed; correct?

23      A.   Correct.

24      Q.   If you look at Page 34 of the document, at the bottom

25      of the page it says that the, the Division of Addiction
```

```
 1    Sciences has been established to address the scourge of
 2    substance use disorder that's affecting our community, the
 3    region, and the nation.
 4         Do you see that?
 5    A.   I do.
 6    Q.   And is that a correct statement of what the Division of
 7    Addiction Sciences was intended to do?
 8    A.   I believe so.
 9    Q.   And, in particular, the Division of Addiction Sciences
10    is focused on opioid abuse and OUD in the local community;
11    is that right?
12    A.   We use opioid use.
13    Q.   Opioid use.  Okay.  So you don't use the phrase OUD?
14    A.   We would use opioid use or opioid use disorder.
15    Q.   Okay.  So not opioid abuse?
16    A.   Correct.
17    Q.   That's the point you're taking issue with?
18    A.   We don't use the term "abuse."
19    Q.   Fair enough.  So I'll use OUD.  Is that, is that the
20    right terminology?
21    A.   Yes.
22    Q.   Okay.  And if you look at, at the bottom of 34 and over
23    to the top of 35, it says that the department secured over
24    5.6 million dollars in state and external grant funding to
25    expand services, institute new programs, and collaborate
```

1    with community partners.

2         Do you see that?

3    **A.**   I do.

4    **Q.**   And is that a true statement to your understanding,

5    that in the first year the Division of Addiction Sciences

6    secured 5.6 million dollars in state and external grant

7    funding?

8    **A.**   It is an accurate statement that we -- the division had

9    secured that through June 30th, 2018.

10   **Q.**   And all of those grants were then renewed in the next

11   year; correct?

12   **A.**   Not necessarily.

13   **Q.**   Let me pull up, please, -- well, I'll skip that for

14   now, Dr. O'Connell.

15        The division received approximately 7.1 million in

16   grant funding for substance use programs in 2019; is that

17   correct?

18   **A.**   I'm not sure.  I'd have to check.

19   **Q.**   Would it refresh your recollection if I were to show

20   you your deposition transcript from last summer where you

21   discussed this point?

22   **A.**   Sure.

23   **Q.**   All right.

24        Could we pull up, please, the transcript, Page 65,

25   lines 15 to 21.

1          There's a question that reads:

2          "If you had to estimate approximately how much funding

3     you received from the Federal Government in an average year

4     the last -- you know, this year and last year."

5          And your answer was, "Our department, or our division

6     received approximately $7.1 million in external funding in

7     FY 2019."

8          Do you see that?

9     **A.**   I do.

10    **Q.**   Does that refresh your recollection?

11    **A.**   It does.  And, as I said, which is estimating

12    approximately.

13    **Q.**   But that's -- that accords with your understanding that

14    it was approximately $7.1 million in external funding?

15    **A.**   For 2019.

16    **Q.**   Yes.  And the Division of Addiction Sciences services,

17    the services that the division provides, are not limited to

18    individuals in Cabell and Huntington; correct?

19    **A.**   That is correct.

20    **Q.**   And let me ask you a little bit more about Marshall

21    Health just so we understand how it fits within Marshall

22    University.

23         Marshall Health is the medical practice arm of Marshall

24    University; is that right?

25    **A.**   Yes.

1  **Q.**   And Marshall Health, I assume, covers other health

2  services beyond the Family Medicine services that are

3  covered that we've already been discussing?

4  **A.**   Yes.  There's other departments.

5  **Q.**   Can you just describe the difference between Marshall

6  Health and Marshall Family Medicine?

7  **A.**   Marshall Family Medicine sits under Marshall Health.

8  It's a department within the practice arm of Marshall

9  Health.

10  **Q.**   What's the difference between the services provided by

11  Marshall Family Medicine and Marshall Health?

12  **A.**   It would be the same as -- Marshall University has the

13  Department of Social Work and the Department of Health

14  Sciences or Journalism in the same way Marshall Health would

15  have Departments of Family Medicine and Orthopedics.

16  **Q.**   And is it fair to say that the Division of Addiction

17  Sciences is funded almost exclusively from grants and from

18  funding from Marshall Health?

19  **A.**   It is funded almost exclusively from grants.

20  **Q.**   And also it receives funding from Marshall Health?

21  **A.**   It is funded almost exclusively by grants.

22  **Q.**   Okay.  Let me show you another document if I could.

23          MR. HESTER:  May I approach, Your Honor?

24          THE COURT:  Yes.

25  BY MR. HESTER:

1    **Q.**   Dr. O'Connell, we've handed you a document marked

2    Defendants' West Virginia 2653.  On its face it says

3    "The City of Solutions, Huntington, West Virginia."

4         Have you seen this document before?

5    **A.**   Yes.

6    **Q.**   And, and you're familiar with this?

7    **A.**   Quite.

8    **Q.**   You were involved in the preparation of it; correct?

9    **A.**   Correct.

10   **Q.**   And this report was, in fact, put together by the

11   Division of Addiction Sciences; is that correct?

12   **A.**   Correct.

13   **Q.**   And it was prepared for the Cabell and Huntington

14   community; correct?

15   **A.**    It was prepared as a retrospective analysis of programs

16   that were working in the City of Huntington and Cabell

17   County.

18   **Q.**   And it was -- was it prepared at the request of the

19   City of Huntington or Cabell County?

20   **A.**   No.

21   **Q.**   It was prepared by the Division of Addiction Sciences

22   and then provided to the city and the county?

23   **A.**    It was prepared by the Division of Addiction Sciences

24   and provided to the public.

25   **Q.**   And there's a, there's a Forward I'd like to point you

1    to at Page 7.  Actually, I'll follow my convention.  I'm

2    going to work off of the little numbers at the bottom left,

3    so .5 of the document if you follow those small numbers at

4    the bottom left.  And there's a Forward here written by

5    Mayor Steve Williams.  Do you see that?

6    **A.**   I do.

7    **Q.**   And I take it you're familiar with this Forward that

8    Mayor Williams wrote?

9    **A.**   I am.

10   **Q.**   And was Mayor Williams involved in reviewing this

11   report after it was finished?

12   **A.**   Mayor Williams was provided a copy of the report.

13   **Q.**   And is it your understanding that he reviewed the

14   contents before writing this Forward?

15   **A.**   I'm not sure.

16   **Q.**   I, I assume that you were aware that he was including

17   this Forward in the document as it was published; is that

18   right?

19   **A.**   Yes.

20   **Q.**   And at the end of the Forward he states, "We're proud

21   to have become known as a City of Solutions."

22        Do you see that?

23   **A.**   I do.

24   **Q.**   And that was part of the nature of this title of this

25   document; correct?

```
 1                MR. HESTER:  Your Honor, at this time I would move
 2   Defendants' 2653 into evidence as a statement that a party
 3   manifested that it adopted.
 4                THE COURT:  Any objection?
 5                MS. QUEZON:  I don't believe so, Your Honor.
 6           Just to clarify, the entire document, City of
 7   Solutions, is being moved in?
 8                MR. HESTER:  Yes, Your Honor.
 9                MS. QUEZON:  No objection whatsoever.
10                THE COURT:  Okay.  It's admitted.
11   BY MR. HESTER:
12   Q.   Let me point you first to Pages 9-10 of this
13   document.  At the bottom of the page using those small
14   numbers at the bottom left, it says, "Recognizing the
15   vast need for more addiction services and research early
16   on --"
17   A.   Sorry.  I'm not keeping up with the tiny numbers versus
18   big numbers.
19                MS. QUEZON:  I'm not either.
20                MR. HESTER:  Well, if you -- it's Page 11 in the
21   document.
22                THE WITNESS:  Perfect.
23                MR. HESTER:  If you look at those production
24   numbers at the bottom, it's Page 9.  Sorry for the confusion
25   on the numbers.
```

1          MS. QUEZON:  I've got it.

2          THE WITNESS:  Thank you.

3    BY MR. HESTER:

4    **Q.**   Do you see where it says, "Recognizing the vast

5    need for more addiction services and research early on,

6    Marshall Health established a Division of Addiction

7    Sciences to begin to develop and implement the programs

8    and projects that would address all of the concerns and

9    priorities established in the conceptualization phase."

10         Do you see that?

11   **A.**   I do.

12   **Q.**   And is that an accurate statement?

13   **A.**   I believe so.

14   **Q.**   And then the next sentence says, "This department

15   continues to grow to address the growing needs of the

16   community and currently employs nearly 30 individuals

17   working to support community solutions."

18         Do you see that?

19   **A.**   I do.

20   **Q.**   And is that also a correct statement?

21   **A.**   I would argue that the word should be "division"

22   instead of "department," but we've used them

23   interchangeably.

24   **Q.**   So if we call it division, you would agree with the

25   statement in that sentence?

```
 1    A.    Yes.

 2    Q.    And, so, this report lists many of the programs that

 3    have been put in place to deal with OUD issues in Cabell and

 4    Huntington; correct?

 5    A.    Correct.

 6    Q.    And that was the purpose of the report?

 7    A.    To demonstrate what programs were working and what

 8    programs were not.

 9    Q.    And, and Marshall was -- and remains involved in the

10    implementation of these programs; correct?

11    A.    Not all programs designated in the City of Solutions

12    are Marshall programs.

13    Q.    Many of them are?

14    A.    Some of them are.

15    Q.    And the Division of Addiction Sciences continues to

16    assist with the number of these programs that are listed in

17    the City of Solutions?

18    A.    Correct.

19    Q.    And many of these programs focus on the treatment of

20    substance use disorder; correct?

21    A.    Correct.

22    Q.    And I'd like to talk in more detail about a number of

23    these treatment programs now, Dr. O'Connell.

24          I'm going to go to the board.

25          So, Dr. O'Connell, I'm just going to list up here on
```

```
 1    the board some of these treatment programs so that we have
 2    common ground.  One of the perils of being left-handed is
 3    trying to write on a board I will say, one of the many
 4    perils.
 5        During your testimony previously when you were here,
 6    Dr. O'Connell, you spoke about a program called PROACT; is
 7    that right?
 8    A.   Yes.
 9    Q.   And that was included -- that was one of the programs
10    you highlighted in the slides that you did; right?
11    A.   Correct.
12    Q.   And PROACT stands for Physician Organization for
13    Addiction Care and Treatment; is that right?
14    A.   Provider Response Organization for Addiction Care and
15    Treatment.
16    Q.   Say that again.
17    A.   Provider Response Organization for Addiction Care and
18    Treatment.
19    Q.   Okay.
20    A.   I believe "provider" and "physician" have -- it may
21    have started with "physician" and moved to "provider" to be
22    more inclusive.
23    Q.   And let me -- so we'll put PROACT up on the board.
24    PROACT is a treatment program; correct?
25    A.   Correct.
```

1   **Q.**   And let me show you another document.

2          MR. HESTER:  May I approach, Your Honor?

3          THE COURT:  Yes.

4   BY MR. HESTER:

5   **Q.**   Dr. O'Connell, we've handed you a document marked

6   Defendant's Exhibit 1352.  At the top of the page it

7   says "Marshall University Joan C. Edwards School of

8   Medicine Major Initiatives in Response to the State's

9   SUD Crisis."

10         Have you seen this document before?

11  **A.**   I think so.

12  **Q.**   And this is, this is a document that summarizes a

13  number of programs undertaken by the Marshall University

14  School of Medicine; correct?

15  **A.**   All except one.  The Neonatal Treatment Unit is housed

16  at Cabell-Huntington Hospital, but it's supported by

17  Marshall Health physicians.

18  **Q.**   And the rest of these programs that are listed here you

19  would view as Marshall University programs?

20  **A.**   No.  They would be viewed as Joan C. Edward's School of

21  Medicine slash Marshall Health Program.

22  **Q.**   Okay.  This -- the organization -- I'll try to keep up

23  with you on this.  But --

24  **A.**   You and everybody else.  It is confusing.

25  **Q.**   So -- but the programs listed here are ones that are

1      run by the Marshall University School of Medicine with the

2      exception of the Neonatal Therapeutic Unit; correct?

3      **A.**   The -- it is accurate to state that any program we work

4      on is under the umbrella of Marshall University.  However,

5      just specifically, we identify as the umbrella of the Joan

6      C. Edward's School of Medicine which is the medical school

7      for Marshall University.

8      **Q.**   Let me point you to the second sentence of the

9      document.  And it's referring here again to the Division of

10     Addiction Sciences where you work; correct?

11     **A.**   Correct.

12     **Q.**   And it says in the second sentence, "The division has

13     rapidly grown in the past three years in leading

14     comprehensive, coordinated efforts to respond to substance

15     use at local community and regional levels."  Is that right?

16     **A.**   Correct.

17     **Q.**   And I wanted to ask you there -- first of all, is that

18     a true statement?

19     **A.**   We rapidly grew in the first three years of the

20     division, and our goal is to respond in a coordinated

21     fashion.

22     **Q.**   To substance use at the local community and regional

23     levels; correct?

24     **A.**   Correct.

25     **Q.**   So you would view that as a true statement?

1    **A.**    I believe so.

2    **Q.**    And is there an effort to coordinate efforts at the

3    regional level to think about some of these substance use

4    programs across a wider geography than simply an individual

5    city or an individual county?

6    **A.**    Yes.

7    **Q.**    And what are the benefits of doing that looking across

8    a region?

9    **A.**    Substance use is not isolated into any singular city or

10   county.

11   **Q.**    So there's an effort to look at solutions to substance

12   use that cut across many counties or across a region;

13   correct?

14   **A.**    Our goal is to help save lives, whether they reside as

15   our neighbor or across town.

16   **Q.**    And is it also fair to say that there are efficiencies

17   from looking across a broader geography and thinking about

18   how you would handle a substance use program or treatment

19   program?

20   **A.**    There are both strengths and weaknesses to that

21   perspective.

22   **Q.**    Let me go halfway down the page and focus you on the

23   discussion of PROACT.

24        PROACT -- and it states that PROACT was opened in 2018

25   through the collaboration of Marshall Health, Valley Health,

1    Cabell-Huntington Hospital, St. Mary's Medical Center, and

2    Thomas Health.  Do you see that?

3    **A.**    I do.

4    **Q.**    Is that a true statement?

5    **A.**    That is.

6    **Q.**    And those organizations all operate in the

7    Cabell/Huntington community; correct?

8    **A.**    At the time of conception, those were the five

9    organizations.  There are now four organizations and three

10   of which provide treatment in Cabell County.

11   **Q.**    And none of those -- and the three organizations that

12   are now running PROACT are which ones?

13   **A.**    So Thomas Health was included, although they're in

14   Charleston, with the hopes of expansion to Charleston.  So

15   Thomas Health does not provide services.

16        Valley Health, the federally qualified healthcare

17   center, SQHC, is no longer operating at PROACT.

18   **Q.**    So the three that are operating at PROACT now are

19   Marshall Health, Cabell-Huntington Hospital, and St. Mary's

20   Medical Center; is that right?

21   **A.**    Correct.

22   **Q.**    And none of those are run by -- none of those three

23   organizations are run by Cabell County or the City of

24   Huntington; correct?

25   **A.**    Correct.

1    **Q.**   And it states that PROACT is a coordinated effort of

2    the medical community to provide comprehensive assessment,

3    education, intervention, and treatment in a single

4    accessible service hub to adults suffering from substance

5    use disorder.

6         That's a true statement; correct?

7    **A.**   Correct.

8    **Q.**   And it says that PROACT provides services that include

9    clinical assessments, medication-assisted treatment, peer

10   recovery supports, individual and group therapy, spiritual

11   support, career placement, and career readiness training.

12        Do you see that?

13   **A.**   Yes.

14   **Q.**   Is that a true statement?

15   **A.**   Yes.

16   **Q.**   And PROACT provides all those services?

17   **A.**   Under the roof of PROACT, all those services are

18   offered.

19   **Q.**   And, so, PROACT, it's fair to say, is a program for

20   outpatient management of people suffering from substance use

21   disorder of various types; correct?

22   **A.**   Correct.

23   **Q.**   And that's going to include people who have a substance

24   use disorder based on opioid use; correct?

25   **A.**   Correct.

1    **Q.**   So PROACT provides treatment services for those with

2    OUD in the Cabell/Huntington community; correct?

3    **A.**   Correct.

4    **Q.**   And it is fair to say that PROACT provides a full range

5    of addiction treatment services for people with OUD;

6    correct?

7    **A.**   We're working towards a comprehensive intake and

8    treatment provision.

9    **Q.**   And that includes clinical assessments of people with

10   OUD; correct?

11   **A.**   That would be the ASAM, the American Society of

12   Addiction Medicine, intake on that continuum of care that we

13   talked about on the first day.

14   **Q.**   And that would also include what's called

15   medication-assisted treatment or MAT; correct?

16   **A.**   Based on the intake, some individuals may be identified

17   that they could benefit from being on medication to assist

18   them coming off of other drugs.  Some individuals may choose

19   medication-based treatment and others may not.  So MAT is

20   one of the treatments offered.

21   **Q.**   And just explain what MAT is.

22   **A.**   Medication-assisted treatment most commonly includes

23   treatment such as their brand name being Suboxone, which is

24   a sublingual strip that an individual puts under their

25   tongue daily.

1        If it does not have the, the blocker, which is

2    Naltrexone, in it, then it's called Subutex.  And that's

3    often given to pregnant women.  However, the guidelines just

4    changed for that.  Or it could include Vivitrol which is the

5    shot that's administered monthly.

6        And they have had, I believe, one or two patients get

7    the new injectable which goes under the skin and is a slow

8    release form of Subutex.

9    **Q.**   And, so -- and PROACT provides all of those three forms

10   of treatment?

11   **A.**   PROACT predominantly provides Subutex or Suboxone to

12   individuals who are choosing the MAT pathway.

13   **Q.**   PROACT also provides peer recovery support?

14   **A.**   Correct.

15   **Q.**   Provides individual and group therapy; correct?

16   **A.**   Correct.

17   **Q.**   Spiritual support?

18   **A.**   Correct.

19   **Q.**   It provides career placement and career readiness

20   training?

21   **A.**   And that's done through the final category on the

22   sheet, CORE.

23   **Q.**   Okay.  So let's, let's make sure we've got these other

24   categories.

25       So listed on the same sheet is a program called CORE

```
1    and we'll come back to that.  But that CORE is a program run
2    by the Marshall University School of Medicine that provides
3    career placement and career readiness training?
4    A.   Among other things, yes.
5    Q.   And, so, I take it that these -- this range of services
6    we've just gone through are meant to be a comprehensive menu
7    of treatment options for people with OUD; correct?
8    A.   Yes.  We would -- some individuals may choose MAT
9    pathways.  So they may choose a medication-based recovery.
10   Other individuals may choose abstinence or a non-medicated
11   recovery.  And, so, there are different options there for
12   folks.
13   Q.   And PROACT, I take it, is affiliated with Marshall
14   Health; correct?
15   A.   Correct.  Our physicians are some of the providers
16   within PROACT.  PROACT has its own governing board, so
17   they're a little bit different.  But they count as the
18   employees of the Division of Addiction Sciences.
19   Q.   And, so -- yeah, so, that was my next question
20   actually.  Is it part -- is PROACT part of the Division of
21   Addiction Sciences?
22   A.   Yes.
23   Q.   And PROACT is not run by the city or the county;
24   correct?
25   A.   Correct.
```

1    **Q.**   All right.  I'm going to put that on the board.

2         When I said city or county there, Dr. O'Connell, I

3    meant City of Huntington or Cabell County.  Is that how you

4    understood it too?  It's not run by the City of Huntington.

5    **A.**   It's not run by.

6    **Q.**   The City of Huntington or Cabell County; --

7    **A.**   Correct.

8    **Q.**   -- correct?

9         Let me show you another document.

10            MR. HESTER:  May I approach, Your Honor?

11            THE COURT:  Yes, you may.

12            THE WITNESS:  Thank you.

13   BY MR. HESTER:

14   **Q.**   Dr. O'Connell, I've handed you a document that's

15   marked P-41051.  It's headed on the first page -- it

16   appears to be an email from Tina Ramirez dated

17   12/19/2018 and attaches a Director's Report to it.

18        Dr. O'Connell, I take it you've received this document;

19   correct?

20   **A.**   Correct.

21   **Q.**   And your email -- you received it in the email that's

22   listed from the note from Tina Ramirez; right?  It's about

23   halfway through.

24   **A.**   Correct, yep.

25   **Q.**   And this is discussing PROACT; correct?

1   **A.**   Correct.

2   **Q.**   So you, you received this email?

3   **A.**   Yes.

4   **Q.**   Do you remember seeing it?

5   **A.**   No, but I did receive this email back in 2018.

6   **Q.**   And Tina Ramirez is the Director of the Great Rivers

7   Regional System of Addiction Care at Marshall Health;

8   correct?

9   **A.**   Correct.  Tina reports to me.

10  **Q.**   All right.  So she, she directs the Great Rivers

11  Regional System Program?

12  **A.**   Addiction Care, yes.

13  **Q.**   Yes.  And that's one of the, one of the programs that's

14  listed on the prior page that we were looking at,

15  Defendant's Exhibit 1352; correct?

16  **A.**   It is.

17  **Q.**   And she includes an attachment which is a Director's

18  Report for PROACT.  I assume you've seen this.  Correct?

19  **A.**   I've seen most of the Director's Reports for PROACT,

20  yes.

21  **Q.**   And the Director's Report is published each year;

22  correct?

23  **A.**   Quarterly.

24  **Q.**   Quarterly you think?

25  **A.**   I think so.  I'm not involved in the preparation of

1    this document.

2    **Q.**   But you receive it in your role as the Associate

3    Director of the Division of Addiction Sciences; correct?

4    **A.**   Correct, and we share it widely which is why it's on

5    this email.

6    **Q.**   Do you share it widely with the community or only

7    within -- is it an internal document?

8    **A.**   This would indicate that it was shared with people who

9    are in the Great Rivers Regional System of Addiction Care.

10   That's who I believe this email listed.

11   **Q.**   And this terminology of Great Rivers, I know it refers

12   to some of the great rivers in West Virginia.  But what,

13   what area are you talking about when you refer to the Great

14   Rivers?

15   **A.**   For this specific project, when it was written it was

16   Cabell, Cabell County, Putnam County, Kanawha County, and

17   Jackson County.

18   **Q.**   And, so, there's an effort to think about those

19   counties as a region when you're thinking about some of

20   these addiction treatment services?

21   **A.**   I did not write that grant, but the implementation was

22   to coordinate existing programs across those four counties

23   where there's a QRT -- a Quick Response Team in one county.

24   If there was a Quick Response Team in another county, they

25   should be sharing what works and what doesn't work.

1   **Q.**   So the effort is to look at, at some of the programs

2   and to run some of the programs across a four-county region?

3   **A.**   Not necessary to run, purely to coordinate to say if

4   Cabell County has a successful Quick Response Team, how are

5   they doing documentation?  So Cabell County's person,

6   through Great Rivers, got with Jackson County's person or

7   Kanawha County and they talked about what program successes

8   they had.

9   **Q.**   So let's look at Page 6 of this Director's Report,

10  please.  And I wanted to point you to the top of the page.

11  **A.**   Which tiny number is that?

12  **Q.**   The tiny number -- now we're at the bottom right tiny

13  number.

14  **A.**   Yes.

15  **Q.**   Do you see that Number 6?

16  **A.**   Six.

17  **Q.**   Sorry for the multiplicity of numbers, but it's the

18  bottom number at the right-hand corner.

19  **A.**   00006.

20  **Q.**   And do you see there's a table at the top of the page,

21  and it says, "The majority of our intakes continue to

22  request referral for MAT services, mostly Suboxone through

23  [sic] 11 requested Vivatrol."

24      Do you see that?

25  **A.**   I do.

1    Q.    I'm sorry.  "Though 11 requested Vivitrol."  I misread

2    that.  Do you see that?

3    A.    I do.

4    Q.    And does that accord with your understanding that the

5    majority of your -- of the intakes for PROACT when the

6    program began were requesting referral for MAT services?

7    A.    I believe the Director's Report.

8    Q.    And it indicates, if you look over to the next page,

9    that PROACT provided MAT treatment to 57 individuals in

10   October, 2018.  Do you see that?

11   A.    Yes.

12   Q.    And does that accord with your understanding?

13   A.    I believe the Director's Report.

14   Q.    And to be clear, when PROACT provides MAT treatment,

15   it's providing that regardless of whether someone is abusing

16   a prescription opioid or an illegal drug such as heroin;

17   correct?

18   A.    The medications Suboxone and Vivitrol are most commonly

19   provided for an individual using -- who's trying to come off

20   opioids.

21   Q.    And, so, that could include an individual who's trying

22   to come off of heroin; correct?

23   A.    Correct.

24   Q.    And it could include an individual who's been abusing

25   prescription opioids; correct?

1   **A.**   Correct.  Vivitrol can also be used for alcohol

2   withdrawal.

3   **Q.**   And, so, so Vivitrol, which is one of the ones

4   requested there, is that also used for OUD treatment?

5   **A.**   Yes, can be.

6   **Q.**   Now, a number of, of people receiving treatment through

7   PROACT are -- have substance abuse issues involving

8   non-opioids; correct?

9   **A.**   Individuals can seek treatment at PROACT for any

10   substance use disorder.

11   **Q.**   So that could run a wide gamut from alcohol to

12   methamphetamine to cocaine to heroin?

13   **A.**   Correct.

14   **Q.**   It could be a very wide range; right?

15        Now, it indicates -- if you look at the bottom of Page

16   7, there's a table there that indicates that 122 people

17   receiving treatment were abusing heroin.  Do you see that?

18   **A.**   I do.

19   **Q.**   And that's far more than any other category, including

20   prescription opioids; correct?

21   **A.**   Correct.

22   **Q.**   And does that accord with your understanding that the,

23   that the vast majority of individuals seeking treatment in

24   PROACT were abusing heroin?

25   **A.**   I believe the Director's Report.

```
 1    Q.   So let me show you another Director's Report which
 2    you'll probably also agree with.
 3              MR. HESTER:  May I approach, Your Honor?
 4    BY MR. HESTER:
 5    Q.   So, Dr. O'Connell, we've handed you what's been
 6    marked as MC-West Virginia-2136.  On its face it appears
 7    to be the PROACT Director's Report dated May 8th, 2019.
 8    Have you seen this document before, Dr. O'Connell?
 9    A.   I'm sure I have.
10    Q.   And you would have received this, again, in your role
11    as Associate Director of the Division of Addiction Sciences;
12    correct?
13    A.   Correct.
14    Q.   Let's turn to the fifth page of this document and again
15    look at the numbers at the very bottom.
16         And, so, this list -- this table at the bottom of the
17    page lists the various alternative forms of treatment being
18    provided for people with substance use disorder; correct?
19    A.   Correct.
20    Q.   And that's going to include people who have opioid use
21    disorder who are going to PROACT; correct?
22    A.   Correct.
23    Q.   And if we look at this listing, it lists abstinence as
24    one form of treatment; correct?  That just means withdrawing
25    entirely from the drug; correct?
```

1    **A.**   Most likely that's how they're defining that, that

2    they're not using any form of pharmaceutical intervention

3    for substance use.

4    **Q.**   And the next treatment listed is IOP.  What does that

5    stand for?

6    **A.**   Intensive outpatient.  So it is a -- on that continuum

7    of care, it follows at the higher range but not residential.

8    **Q.**   So intensive outpatient would mean what?  Could you

9    describe roughly what it is?

10   **A.**   Based on, based on the criteria from the ASAM

11   assessment, the American Society of Addiction Medicine

12   assessment, an individual may fall in the higher levels of a

13   two-point intervention.

14        So if they're in the threes, they're being referred to

15   residential.  If they're below that and it's not just going

16   to therapy once a week or once a month, intensive outpatient

17   normally involves at least daily interventions.  But they're

18   not residing at the location of those interventions.

19   **Q.**   So for somebody who's in intensive outpatient, how

20   often would they get treated a week?

21   **A.**   It would vary from almost, sometimes four to eight

22   hours a day every day to maybe two hours three times a week.

23   **Q.**   And, in contrast, if somebody's just in outpatient

24   care, how often would they get seen?

25   **A.**   An individual could go to outpatient care daily as

1  well, but maybe meet with a therapist one hour a week.  For

2  MAT treatment that would be considered outpatient in most

3  cases.

4      Some individuals in residential care are also on MAT.

5  But if they were just outpatient, it involves one hour of

6  therapy monthly and eight hours of group therapy monthly,

7  and then one hour of physician engagement across that time

8  span, or two hours monthly of that can be broken down in

9  different categories.

10 **Q.**   And if somebody is taking MAT in addition to that

11 outpatient care, do they just stop by and get the medicine

12 and then go on about their business or --

13 **A.**   No.

14 **Q.**   They have to get that by going to, to a treatment?

15 **A.**   There are very strict guidelines around the provision

16 of MAT services and what other support services need to be

17 provided to an individual.

18     So if you're on medication-assisted treatment, you're

19 also -- you need to meet with your prescribing physician

20 weekly.  You need to be meeting in group therapy weekly.

21 And you would receive some form of one-on-one individual

22 therapy.  Sometimes they do it 30 minutes weekly or one hour

23 weekly or one hour every two weeks.

24 **Q.**   And, and PROACT is providing all those services;

25 correct?

1    **A.**    Correct.

2    **Q.**    And, so, just so we have the record clear, the -- this

3    treatment type listing shows abstinence at 62 individuals;

4    correct?

5    **A.**    Correct.

6    **Q.**    It shows one person in intensive outpatient; correct?

7    **A.**    They're very hard to get in and maintain any type of

8    job or -- so it's much rarer.

9    **Q.**    It's rare that people want to do intensive outpatient?

10   **A.**    It's a narrow window where you would maybe be better

11   served by residential.  And your need is so high that you

12   need to be in that much -- that high a level of care.  But

13   to be in that high level of care and maintain anything with

14   child care or a job would be very challenging.

15   **Q.**    The next, the next treatment type listed is mental

16   health.  One person listed for that; correct?

17   **A.**    Correct.

18   **Q.**    And that's, again, a service -- a mental health service

19   that PROACT provides?

20   **A.**    I believe that's probably just an individual seeking

21   therapy with no other supportive services.  And their mental

22   health may be the primary diagnosis and/or a

23   no-longer-remaining substance use disorder diagnosis.

24   **Q.**    Okay.  The next one over -- I'll skip a couple of these

25   others.  But then there's two listed for residential.  Does

1    that mean somebody who's in inpatient care?

2    **A.**    So it means that PROACT referred an individual to --

3    and the same would be true of IOP.  The intake happens and

4    they refer the individual to intensive outpatient or refer

5    the individual to residential treatment.

6    **Q.**    So some other, some other facility actually provides

7    that treatment?

8    **A.**    Yes.

9    **Q.**    And then there's a reference -- we see 461 being

10   treated with Suboxone.  So that's a form of MAT; correct?

11   **A.**    Correct.

12   **Q.**    And, so, by far, the predominant form of treatment

13   reflected here was the MAT; correct?

14   **A.**    Correct.

15   **Q.**    And then Vivitrol, that's the other one you had

16   mentioned which can be used for alcohol abuse but also could

17   be used for OUD; correct?

18   **A.**    It's the injectable.  So it's injected whereas Suboxone

19   is taken daily.

20          THE COURT:  Mr. Hester, my apologies, but I've got

21   to interrupt you so we can switch out court reporters.

22          MR. HESTER:  Sure, Your Honor.

23          THE COURT:  I've got to accommodate Judge Berger.

24   So we'll be in recess for about 10 minutes.

25          MR. HESTER:  How long, Your Honor?

```
 1              THE COURT:  Ten minutes.

 2              MR. HESTER:  About 10?  Okay, sure.

 3         (Recess taken at 9:55 a.m.)

 4              THE COURT:  Whenever you're ready, Mr. Hester.

 5              MR. HESTER:  All right.  Thank you, Your Honor.

 6              BY MR. HESTER:

 7    Q.   Dr. O'Connell, it's fair to say that many, if not most

 8    of PROACT's treatment services, are covered by health

 9    insurance, correct?

10    A.   I do not know the percentage of served versus

11    underserved.

12    Q.   Let me ask you to look at Page 7 of the document, this

13    one we were just looking at, which is MC-2136 and this has a

14    page that's headed "Payer Mix."  Do you see that?

15    A.   I do.

16    Q.   And maybe I could ask you a top-level question first.

17    You understand that the treatment services provided by

18    PROACT, many of them are subjected to reimbursement by

19    insurance, correct?

20    A.   Medication assisted treatment is subject to

21    reimbursement.

22    Q.   And also inpatient and outpatient treatments are

23    subject to reimbursement, correct?

24    A.   Those would be intensive outpatient, IOP, and

25    residential would be referred to other organizations, not
```

1     provided at PROACT.

2     **Q.**    Those are also subject to reimbursement when they're

3     referred, correct?

4     **A.**    They can be, yes.

5     **Q.**    And here, if we look at Page 7, there's a payer mix and

6     it -- this first sentence leads the payer mix for patients

7     has been primarily West Virginia Medicaid 67% percent.  Do

8     you see that?

9     **A.**    I do.

10    **Q.**    Does it accord with your understanding that roughly 67%

11    of the patients served by PROACT are paid for by Medicaid?

12    **A.**    I believe the director's report.

13    **Q.**    And does it also accord with your understanding where

14    it goes on to say private insurance is the next most common

15    payer with 12%, followed by self-paid; do you see that?

16    **A.**    I do.

17    **Q.**    So, does that accord with your understanding, as well,

18    that private insurance makes up the next largest share of

19    payers for the services at PROACT?

20    **A.**    I believe the director's report.

21    **Q.**    And it also states in the next sentence that Medicare

22    made up 7% of the payer mix and Kentucky and Ohio Medicaid

23    were at 1% and 3% respectively.  And I take it you agree

24    with those numbers, too?

25    **A.**    I do.

1    **Q.**   Dr. O'Connell, is it fair to say that PROACT has the

2    capacity to treat about 700 people with substance use

3    disorder at any one time?

4    **A.**   I am not sure.

5    **Q.**   If I were to show you a document that -- could I

6    refresh your recollection on what the number is?

7    **A.**   That would be great.

8    **Q.**   Let me --

9            MR. HESTER:  May I approach, Your Honor?

10           THE COURT:  Yes.

11           THE WITNESS:  Thank you.

12           BY MR. HESTER:

13   **Q.**   Dr. O'Connell, we've handed you a document that is

14   marked Defendants' Exhibit 3555.  It appears to be an

15   article, a newspaper article, dated May 21, 2019.  Have you

16   seen this document before, Dr. O'Connell?

17   **A.**   One moment.  I have never read this document in full,

18   but I have seen it.  I recall Dr. Petrany being interviewed

19   and so, I was trying to find him.

20   **Q.**   There's a photograph of Dr. Petrany on Page 10,

21   correct?

22   **A.**   There is.

23   **Q.**   He's your boss, correct?

24   **A.**   He is.

25   **Q.**   And over on Page 9, this is the only reference I wanted

1    to show you in the document.  In the next to the last

2    paragraph on that page, it says -- it refers to the mayor.

3    I take it that's Mayor Williams, correct?

4    A.    I believe so.

5    Q.    And it refers to PROACT here and it says that there's a

6    new initiative called -- called a provider response

7    organization for addiction care and treatment, or PROACT,

8    and then it goes on in the next sentence to say that the

9    clinic has capacity of 700.  Do you see that?

10   A.    I do.

11   Q.    Does that accord with your understanding?

12   A.    So, capacity would change based on the number of

13   treatment providers we have.  So, I can say that the

14   capacity is currently less than that based on the number of

15   prescribing physicians due to the three organizations, not

16   four, currently providing treatment.

17   Q.    Was this where the capacity was in 2019, to your

18   recollection?

19   A.    I have no reason to dispute this number, but I can't --

20   I can't say from my other than experience or knowledge of

21   the providers that were currently there.

22   Q.    Dr. O'Connell, as of March, 2020, when your deposition

23   was taken, is it correct that PROACT had seen at least 1,800

24   individuals for treatment?

25   A.    Did I state that in my deposition?

1   **Q.**   I can -- I could show you if you want.  I just wanted

2   to ask if that accorded with your memory, that it had seen

3   about 1,800 people for treatment since -- as of March, 2020?

4   **A.**   I recall trying to do the math quickly.  And so, if

5   that was my identified number at the time, I'd stand by it.

6   **Q.**   Well, I don't want you to guess.  Do you want me to

7   show you the transcript?  Would that help you?

8   **A.**   Sure.  I haven't actually seen my deposition.

9   **Q.**   Why don't we pull that up, please.  It's transcript

10   Page 182, Lines 13 to 20.  And the question, you were asked

11   is approximately how many individuals is PROACT currently

12   treating.  And then your answer was, they have done 1,800

13   intakes since opening, I believe.  So, does that accord with

14   your understanding, 1800 intakes since PROACT had opened?

15   **A.**   Correct.  And I do go on to ask for clarification

16   between treating and intakes because those are two different

17   things.

18   **Q.**   Right.  That's fair.  So -- so, there might be an

19   intake and some of the intakes might be referred to some

20   other facility, correct?

21   **A.**   We have people who come in for an intake and never

22   return.  They come in and they don't follow through with any

23   care.  We have individuals who have an intake and are seen

24   at PROACT.  And individuals who have an intake and are

25   referred elsewhere.

1    **Q.**   Do you know roughly how many people PROACT has treated

2    since it's opened?

3    **A.**   I do not.

4    **Q.**   It's -- would it be somewhere in the range of 1,800

5    people?

6    **A.**   Their current case load I believe to be just a little

7    above 500 currently.

8    **Q.**   And that's 500 people being currently treated by

9    PROACT?

10   **A.**   I believe so.

11   **Q.**   And then cumulatively over time would that suggest

12   roughly, what, 2,000 people since PROACT opened?

13   **A.**   I'm not sure.  I just know their current census.

14   **Q.**   The number that you gave here of 1,800 intakes since

15   opening, that's referring from -- from PROACT's opening in

16   the Fall of 2018 to March, 2020, correct?

17   **A.**   Until -- when was my deposition?

18   **Q.**   March, 2020.

19   **A.**   Then yes.

20   **Q.**   Okay.  And that seems right to you?  That number sounds

21   right?

22   **A.**   I would have had a reason for stating it at the time.

23   I haven't been in their census in quite sometime.

24   **Q.**   Let me ask you to look at another document, please.

25        MR. HESTER:  May I approach, Your Honor?

1            THE COURT:  Yes.

2            THE WITNESS:  Thank you.

3            MR. HESTER:  And, Your Honor, before we go on, I

4    would like to move into evidence the two director's reports

5    that we've discussed.  One is MC-2136 and the other is

6    Plaintiffs' Exhibit 41051.  These are two director's reports

7    that we've discussed with Dr. O'Connell.

8            THE COURT:  Is there any objection to either of

9    those?

10           MS. QUEZON:  No, Your Honor.

11           THE COURT:  They're both admitted.

12           By MR. HESTER:

13   **Q.**   All right.  Dr. O'Connell, we've shown you another

14   document.  It's labeled MCWV-2139.  It's headed on the first

15   page "Pro-active Executive Summary".  Have you seen this

16   document before, Dr. O'Connell?

17   **A.**   I'm not sure.

18   **Q.**   Do you believe you would have received this in your

19   role as Associate Director of Addiction Sciences?

20   **A.**   Do you have a date for this document?

21   **Q.**   I can point you to Page 4 and, again, using the page,

22   the small numbers at the bottom, if you look at the heading

23   for outcomes, it refers to PROACT's first year of operation.

24   So, it would have been sometime after the Fall of 2019 that

25   this would have been prepared, correct?  I'm trying to

1    figure out whether you would have received this.

2    **A.**    I'm trying to see if it's part of the -- because an

3    Executive Summary would have only been compiled -- I'm just

4    trying to get a date on it so I kind of know when it was.

5    My version of this is clickable, so -- oh, okay.

6    **Q.**    Do you believe you received this document?

7    **A.**    I am not sure.  I cannot recall when I would have

8    received it, but as with other documentation with PROACT, I

9    often am included.

10   **Q.**    Okay.  Let me ask you to look just at Page 4, please.

11   At the top of the page there's a heading for outcomes.  Do

12   you see that?

13   **A.**    Yes.

14   **Q.**    And it says in the first sentence, in the first year of

15   operation, PROACT saw over 1,000 unique individuals for

16   assessment by program clinicians and referred to an

17   appropriate level of care.  Do you see that?

18   **A.**    Yep.

19   **Q.**    Does that accord with your understanding as to roughly

20   how many individuals PROACT saw in its first year of

21   operations?

22   **A.**    I have no doubt.  I have no reason to doubt this.

23   **Q.**    And it goes on in the next sentence to say, of the

24   individuals assessed, so of that group of 1,000, almost 70%

25   were retained as patients at PROACT.  Do you see that?

1    **A.**   I do.

2    **Q.**   And does that also accord with your understanding that

3    roughly 70% or roughly 700 people would have been retained

4    as patients at PROACT in the first year of operation?

5    **A.**   I have no reason to doubt this.

6    **Q.**   And it also says that 86% of those retained, so that

7    would be 86% of the 70%; is that right?

8    **A.**   Yes.

9    **Q.**   Were identified as appropriate for MAT services.  Does

10   that accord with your understanding?

11   **A.**   I have no reason to doubt it.

12   **Q.**   So, roughly speaking, about 560 people would have been

13   treated for MAT services by PROACT in the first year of

14   operation, correct?

15   **A.**   Percentages were never my forte', but I'll take your

16   word for the 86% of the --

17   **Q.**   I'm multiplying seven by eight.

18   **A.**   Okay.

19   **Q.**   Roughly, it's 560 or so, correct?

20   **A.**   Okay.

21   **Q.**   And it would have been roughly 700 people treated as

22   patients by PROACT in the first year, correct?

23   **A.**   Correct.

24   **Q.**   And then it goes on in the final sentence of that

25   paragraph, PROACT currently has a 52% patient retention rate

1    following 90 days of treatment date.  Does that mean how

2    many people continue to be treated by PROACT after 90 days;

3    is that what it's referring to?

4    **A.**    Within the realm of addiction treatment tracking out 90

5    days for medication based treatment and identifying the

6    number of patients who were seen for an intake and then are

7    continuing to be seen at 90 days is a benchmark and this

8    would indicate that 52% of those initially seen were still

9    being seen at 90 days.

10   **Q.**    And I take it some of the people who are not retained

11   by PROACT might have resolved their issue within 90 days,

12   correct?  In other words --

13   **A.**    Highly unlikely.

14   **Q.**    And so -- so, the retention rate is what, measuring

15   people who don't continue to choose to come back?

16   **A.**    As with any treatment of a Substance Use Disorder, the

17   first time is not successful for many individuals.  On

18   average, we say that it takes nine times to quit smoking.

19   So, if it's taking an individual on average nine times to

20   quit smoking, we know that abstaining and stopping opioid

21   use and finding a life of what we define as long-term

22   recovery often takes individuals many attempts.  So, they

23   may start at PROACT and they may unfortunately end up

24   incarcerated because they identify fines or warrants that

25   are out for their arrest.

1      We would have individuals who come once, twice, three

2  times, don't come back.  They go back to using.  And we have

3  some who may need, you know, a higher level of care.  And

4  so, they're seen and then referred out to another service.

5      For medication assisted treatment, the standard is that

6  an individual should receive treatment for no less than one

7  year.  So, the majority, I would say almost all individuals,

8  would not have resolved their Substance Use Disorder within

9  90 days.  You do, however, have the same way with anything,

10  people who smoke for 30 years and quit one day and never

11  look back.

12  **Q.**  So, some people might resolve in 90 days, but you're

13  saying not -- that's not -- you don't view that as the norm?

14  **A.**  I wouldn't -- if I had to guess, I'd say maybe one

15  individual has had that sort of intervention and resolution.

16  **Q.**  And do you typically see that after a year people have

17  resolved?

18  **A.**  Medication assisted treatment providing and prescribing

19  is something not my expertise, but some individuals need to

20  be on medication assisted treatment for a year; others, five

21  years; others, it may be a lifetime in the same way that

22  with -- as we look at other chronic diseases like asthma and

23  hypertension, we see those have a -- what we call a

24  recurrence of symptomatology in the same way that substance

25  use disorders have a recurrence of symptomatology, but if

1    you can work on maintenance, you can find that people can

2    enter a life of long-term recovery.

3    **Q.**   And you can, in fact, see after a year's time people

4    are able to get back to a life?

5    **A.**   For some individuals, a year is just -- we don't have a

6    lot of long-term research in that we weren't providing

7    medication assisted treatment 25 years ago.  So, we don't

8    know if it takes 25 years because it wasn't being provided

9    at the -- in the way it is now.  So, we know from our

10   initial guidelines from SAMHSA is that medication assisted

11   treatment should be provided for at least a year to see what

12   we define as efficacy in a program or effectiveness.

13   **Q.**   And the -- the technology is also changing.  You

14   mentioned some of the medicated assisted treatment is now

15   like a -- for instance, a shot that might be once a month,

16   correct?

17   **A.**   There are different types of medication assisted

18   treatment on the market.  However, they vary widely in

19   compliance, and effectiveness, and also reimbursement,

20   whether we can get -- we can't get anybody to get Sublocade

21   covered, for example, right now.

22   **Q.**   But medicated assisted treatment that PROACT provides

23   is subject to reimbursement by insurance, correct?

24   **A.**   Currently, Suboxone and Subutex are often able to be

25   reimbursed through a process of receiving -- the MCL

language --

**Q.**   The either Medicaid or private insurance, correct?

**A.**   Yes.  In some cases, those can be reimbursed.

**Q.**   In most cases, correct?

**A.**   In most cases, there is a reimbursement structure.

**Q.**   For medicated assisted treatment?

**A.**   For some forms of medication assisted treatment.

**Q.**   Let me ask you to look back at the City of Solutions document.  And I'm going to toggle back and forth a little bit with the City of Solutions document.  If you look, do you have that one there, Dr. O'Connell?

**A.**   One moment.  Sorry.  Got it.

**Q.**   And if you look at the City of Solutions document, which -- which again is -- for the record, is Defendants' Exhibit 2653, I wanted to point you to Page 62, again, using the small numbers at the bottom.  And this is a summary of PROACT, right?  Do you see that?

**A.**   Yes.

**Q.**   And the first sentence I wanted to ask you about, it says PROACT required $1.3 million in renovation costs of a building to set it up, correct?

**A.**   Correct.

**Q.**   Is that your -- is that consistent with your understanding?

**A.**   It is.

1    **Q.**   And then, if you go a few sentences further down, it

2    says initial funding of $1,000,000.00 per year from Cabell

3    Huntington Hospital and St. Mary's Medical Center for PROACT

4    was received for the first five years.  Do you see that?

5    **A.**   I do.

6    **Q.**   So, does that reflect that the funding for PROACT was a

7    million dollars a year from Cabell-Huntington Hospital and

8    St. Mary's Medical Center together?  They were giving a

9    million dollars each year to fund PROACT?

10   **A.**   I believed it to be $400,000.00, so I would like to

11   check that.

12   **Q.**   You believed it to be $400,000.00?  Well, is that --

13   could that be $400,000.00 from each, accounting for the

14   million?

15   **A.**   Well, that would account for $800,000.00.

16   **Q.**   Well --

17   **A.**   My percentages aren't great, but I do add.  That may be

18   the case, but that's -- I'm trying to -- the hospitals -- to

19   open PROACT, as there was no grant funding to support

20   PROACT, committed to -- they were tired of seeing

21   individuals in their Emergency Department and on the floors

22   of the hospital that they weren't -- that they deemed

23   recurrent visitors or frequent fliers.  And so, to offset

24   those costs, the hospitals engaged in the setup and

25   foundation of PROACT.

1    Q.   And is --

2    A.   I assume -- I have no doubt, reason to doubt this, but

3    I thought it was $400,000.00 from each of them.

4    Q.   So, if it was $400,000.00 from each of them, it would

5    be $800,000.00 in total that they committed over a five-year

6    period?

7    A.   Uh-huh.

8    Q.   And that's your understanding of what the funding was?

9    A.   Yes.

10   Q.   And the hospitals viewed this as a form of cost savings

11   because they were able to set up PROACT as an alternative so

12   they didn't have as many of these folks coming into their

13   hospitals on a regular basis, correct?

14   A.   I don't know if they perceived it as cost savings but,

15   rather, they were seeing a patient population that they were

16   unable to treat and we required some sort of treatment and

17   they believe in healthcare and treatment.  And so, that was

18   how PROACT was established.

19   Q.   All right.  Let me show you another document.

20        MR. HESTER:  May I approach, Your Honor?

21        BY MR. HESTER:

22   Q.   Dr. O'Connell, we've given you a document marked as

23   DEF-WV Exhibit 03 -- no, sorry -- 03542, Defendants'

24   Exhibit 03542.  It's -- the first page says, "Produced in

25   native format", which is just a mechanical point about how

```
 1    it was produced.  And then, there's a spreadsheet
 2    underneath.  Dr. O'Connell, I take it you're familiar with
 3    this spreadsheet, right?
 4    A.    Generally, yes.
 5    Q.    And this is a spreadsheet of the finances for the
 6    Division of Addiction Sciences, right?
 7    A.    It is.
 8    Q.    And this was prepared by people with knowledge of the
 9    activities that are reflected here?
10    A.    Yes.
11    Q.    And it's kept in the course of regularly conducted
12    activity within the division, correct?
13    A.    Correct.
14    Q.    And making budgetary records like this is a regular
15    practice of the division?
16    A.    All of our grants have to be accounted for.  So, these
17    are cost centers where invoices are sent to.
18              MR. HESTER:  So, Your Honor, I would move for
19    admission of this document as a business record.
20              THE COURT:  Is there any objection?
21              MS. QUEZON:  I'm not going to object to hearsay.
22    I'm not sure about relevance, but I'm sure Mr. Hester will
23    --
24              THE COURT:  Well, I'm going to admit it.
25              MS. QUEZON:  -- clear that up.
```

```
 1              THE COURT:  I think Mr. Hester has laid a
 2     foundation for it.  It's admitted.
 3              BY MR. HESTER:
 4     Q.   So, I wanted to --
 5              MR. ACKERMAN:  Your Honor, I apologize.  If I may,
 6     the bottom of this document, it appears, has some hash tags.
 7              THE WITNESS:  The number is too small -- or too
 8     large for the column designation.
 9              MR. ACKERMAN:  Yeah.  That's my -- that's my
10     concern, is that I just want to make sure the document is
11     accurate.  I noticed that the Excel spreadsheet came on and
12     that's what flagged this issue for me.
13          So, for instance, if you look at the third column down
14     here, the third column of numbers under administration,
15     there's total surplus.  And it's got pound signs there.  And
16     I don't know what it says on the actual native document.
17          If you can pull it up, it appears that it just didn't
18     print correctly.  So, I just wanted to note that for the
19     record.
20              MR. HESTER:  Well, if there's a problem, we can
21     substitute another version of this, Your Honor.
22              THE COURT:  Well, okay.
23              MR. HESTER:  I -- I only have a few questions
24     about a few numbers on this, but if there's a problem, we
25     can substitute another one.
```

```
 1              BY MR. HESTER:
 2   Q.   Dr. O'Connell, I wanted to ask you about the column for
 3   PROACT.  There's some entries you can see at the top for
 4   PROACT and this is where you said this is a -- there's a
 5   program that the Division of Addiction Sciences oversees and
 6   so, you keep the finances for PROACT, correct?
 7   A.   Correct.
 8   Q.   And it reflects that in 2020, the total revenue for
 9   PROACT was $823,216.00, correct?
10   A.   Yes.
11   Q.   And if you look at the column that says PROACT for 2020
12   total surplus deficit, excluding grant funding, it was
13   $168,000.00, correct, down at the very bottom?  If you look
14   at the very bottom, you'll see --
15   A.   Yes.  Mine has the pound sign.  Sorry.
16   Q.   Yours has the pound sign?
17   A.   Doesn't it?
18   Q.   I'm holding one that doesn't.  I can show you this one,
19   if you wish, Dr. O'Connell.  Do you see -- and let me -- let
20   me point you to the screen.  Do you see on the screen, Dr.
21   O'Connell, there's a number $168,644?
22   A.   Yes.
23   Q.   And so, that -- that shows -- that's the net.  That's
24   the revenue less the expenses and it shows expenses for
25   PROACT of $991,860, correct?
```

**A.**    That, it does.

**Q.**    And so, the -- so, the deficit for 2020 was $168,000.00 for PROACT, correct?

**A.**    I don't -- I am not responsible for our financial structure of both budgeting, or this document, or any of the accounting for it.  So, I cannot speak to when these numbers indicate in the fiscal year, whether that's a remaining advancement or deficit, in that our financial year does not end in May, 2020.  So, I know that much.

MR. ACKERMAN:  And, Your Honor, I just want to note for the record that there's a number that's highlighted on the screen that doesn't appear on the piece of paper that's handed out to everybody.  So, this is the issue that I flagged.

MR. HESTER:  I can give you mine that has it, if you want to see it.  If you want --

MR. ACKERMAN:  I trust what's on the screen.  I'm just saying that --

MR. HESTER:  I mean, I may not -- I'm telling -- there may be a mechanical point with the printing.

MR. ACKERMAN:  Yeah.

MR. HESTER:  I don't think there's a doubt that that's what it says because I'm holding it in my hand.

THE COURT:  The one that I have also has the pounds at the bottom rather than the numbers.  So, make sure

1    the one that gets in the record has the numbers in it.

2              MR. HESTER:  I apologize, Your Honor.  I don't

3    know if you've ever had the joy of working with Excel.  It's

4    dreadful.  And I try to avoid it whenever I can.

5              MR. FARRELL:  Judge, just to give my colleague an

6    assist, that's what happens when you -- the print program

7    tries to squeeze --

8              THE WITNESS:  To one page.

9              MR. FARRELL:  The Excel spreadsheet down onto the

10   paper.  If it exceeds the column, it goes "XXXXX".

11             MR. HESTER:  Mr. Farrell, thank you.

12        Thank you, Your Honor.

13             THE COURT:  I'm going to trust counsel to get the

14   right copy in the official record.

15             MR. HESTER:  Okay.

16             BY MR. HESTER:

17   **Q.**  So -- so, Dr. O'Connell, all I really wanted to

18   establish is that when we look at this document we can see a

19   revenue line and we can see an expense line for PROACT as of

20   the date it was prepared for 2020, correct?

21   **A.**  Correct.

22   **Q.**  So then, if we can go back to the City of Solutions

23   document again.  And, again, if you can look at Page 38.

24   No, it's 68.  I'm sorry.

25   **A.**  In the tiny numbers?

**Q.**   62.  Sorry, Dr. O'Connell.  My apologies.  62 in the little numbers.

**A.**   Yeah.

**Q.**   The last sentence of that discussion of PROACT says the long-term goal is to make all of the services billable.  Do you see that?

**A.**   I do.

**Q.**   And that's referring to the long-term goal for PROACT to make all of the services it provides billable; true?

**A.**   That is our goal.

**Q.**   And it would be billable to insurance; is that correct?

**A.**   The -- with any of our programs we do not open a program that we are not willing to commit to sustain.  So, whether that means it breaks even or has a deficit, that it sits within a larger organization that's committed to the philosophy of that program.

With the medical services we provide we expect them to be reimbursable.  With efforts around certified peer recovery coaching, we expect that to be reimbursable. Workforce development will never be reimbursable.  There is no structure currently in place or even theoreticized in place for that.

**Q.**   Well, but when you say that the long-term goal is to make the services billable, is that -- is that services billable to whom, to insurance?

 1    **A.**    Correct.

 2    **Q.**    And so, the long-term goal is to make PROACT

 3    self-sustaining, correct?

 4    **A.**    Our goal is to not run a deficit on PROACT.

 5    **Q.**    But the other point you made is that Marshall has

 6    committed to support these programs it's running even if

 7    some of them run a deficit, correct?

 8    **A.**    Our goal is to not start something we're not willing to

 9    continue.

10    **Q.**    And that would apply to all the programs that Marshall

11    has started?

12    **A.**    That would apply to our treatment services.  I would

13    say it would apply to PROACT and Project Hope for women and

14    children.

15    **Q.**    And PROACT does not receive any funding from the City

16    of Huntington or Cabell County, correct?

17    **A.**    Correct.

18    **Q.**    Let me ask you to now -- we're going to switch to

19    another program, another treatment program.  In your slides

20    you had referred to a program called Maternal Addiction

21    Recovery Center, correct?

22    **A.**    Correct.

23    **Q.**    And that's sometimes abbreviated as MARC?

24    **A.**    Correct.

25                 MR. HESTER:  Can you get this board back up?

1          BY MR. HESTER:

2    **Q.**   And that's another -- that's another form of treatment

3    program, Dr. O'Connell?

4    **A.**   That is not through the Division of Addiction Sciences.

5    **Q.**   But it's -- but it's -- it's a treatment program in the

6    community, correct?

7    **A.**   It is a program run by Marshall Health OB/GYN,

8    obstetrics and gynecology for pregnant women who are

9    currently struggling from Substance Use Disorder.

10   **Q.**   So, it would be -- it would be a treatment or a

11   maternal support system for women who have Substance Use

12   Disorder and who are pregnant; is that correct?

13   **A.**   For women who have Opioid Use Disorder.  It is an

14   entirely MAT-based program.  So, women who are identified as

15   being pregnant and needing services who are going through

16   Marshall OB/GYN are offered treatment in the MARC program,

17   which would include weekly individual, group and medication

18   assisted treatment, along with the high risk assessment

19   necessary to monitor a woman who is -- is or was using

20   substances while pregnant.

21   **Q.**   Let me ask you to turn back again to the City of

22   Solutions document, Exhibit 2653, and if you could look at

23   Page 40, and using the small numbers, there's a description

24   of MARC.  Do you see that?

25   **A.**   Yes.

1    **Q.**   And I think this confirms what you've said but let me

2    just make sure.  If you look a few sentences down under that

3    heading for MARC, it says, the MARC program provides

4    specialized comprehensive care for women with high risk

5    pregnancies.  Do you see that?

6    **A.**   Yes.

7    **Q.**   And it's referring to women with high risk pregnancies

8    who have OUD?

9    **A.**   Correct.

10   **Q.**   Let's turn back to -- let's look at Page 59 of the City

11   of Solutions document.  This -- this summarizes a number of

12   these programs, correct?

13   **A.**   Correct.

14   **Q.**   And you can see that MARC is on there three from the

15   bottom, correct?

16   **A.**   Correct.

17   **Q.**   And then over the on the right-hand side, there's a

18   column for individuals served and it says moderate.  Do you

19   see that?

20   **A.**   Yes.

21   **Q.**   And if you turn over the page, there's -- there's a

22   heading for individuals served and it's defined in the City

23   of Solutions document as high, can serve hundreds to

24   thousands of individuals across the entire community.

25   Moderate can serve up to hundreds of individuals in specific

1   circumstances.  And low can serve a small, very specific

2   group of individuals.  Do you see that?

3   **A.**   Yes.

4   **Q.**   And -- and does that -- does that accord with your

5   understanding of what was being done here on Page -- if we

6   look back then on Page 59 where it lists the individuals

7   served, it's using those definitions of either high,

8   moderate or low?

9   **A.**   Yes.

10  **Q.**   And so, if we look at MARC, it says moderate, which

11  means it has a capacity to serve up to hundreds of

12  individuals in specific circumstances in the community; is

13  that right?

14  **A.**   I would disagree with that designation, but that is

15  what it states.

16  **Q.**   What's your understanding of the capacity for MARC?

17  **A.**   They only have one prescribing physician, so it -- it's

18  based on that, which means that a singular prescribing

19  physician who has gone through credentialing and certain

20  time frames of training in medication assisted treatment can

21  build their caseload from less than 20 to over a hundred.

22  So, that means any singular prescribing physician can work

23  to have a caseload of over a hundred.  That is limited by

24  the number of therapists and group.  MARC runs normally

25  three groups, which are capped at 12 people.

1   **Q.**   So, but you're saying any individual treating physician

2   could be running a capacity up to about a hundred; is that

3   right?

4   **A.**   Based on training, credentialing and time framing of

5   MAT history, they can eventually have a larger caseload that

6   is subjective of -- that's subject to the limitations of the

7   mental health providing, as well.  So, you have to have --

8   you can only have 12 people in a therapeutic group if you're

9   going it bill.  So, you cannot have 13 or 14 people.  You

10   can only have 12.  So, although a provider could have a

11   hundred people, they have one therapist, they're limited to

12   the number of groups that therapist could run to the number

13   of people they could provide treatment to.

14   **Q.**   The cost associated with this MARC program are covered

15   by most health insurers and by Medicaid, correct?

16   **A.**   The medication assisted treatment component would be

17   covered.

18   **Q.**   And the other costs, as well, right?

19   **A.**   I'm not sure.  And I do not know MARC's standing

20   budget.

21   **Q.**   Let me ask you to look at another document.

22           MR. HESTER:  May I approach, Your Honor?

23           THE COURT:  Yes.

24           THE WITNESS:  Thank you.  Oh, I got two.

25           MR. HESTER:  Oh, you have two?

```
 1            THE WITNESS:  You're used to giving me big
 2   documents.
 3            BY MR. HESTER:
 4   Q.   Dr. O'Connell, we've handed you a document marked as
 5   MCWV-2119.  This appears to be a printout from a website for
 6   Marshall Health dealing with MARC.  Have you seen this
 7   before?
 8   A.   I believe this is their website.
 9   Q.   And I just wanted to ask you one piece about this.  If
10   you look over on the second page of the document, please.
11   A.   Yep.
12   Q.   And there's a second bullet that says costs associated
13   with the program are covered by most health insurances and
14   Medicaid programs in the Tri-State area.  Do you see that?
15   A.   I do.
16   Q.   Does that accord with your understanding?
17   A.   I assume.  That's their report.
18   Q.   And you have no reason to doubt that?
19   A.   No.
20   Q.   The MARC program that we've been discussing is not run
21   by the City of Huntington or Cabell County, correct?
22   A.   Correct.
23   Q.   And the City and the County don't provide any funding
24   to the MARC program, correct?
25   A.   I do not believe so.
```

```
 1    Q.   Let's go to the next program.  Your slides also

 2    summarize something called the Maternal Opioid Medical

 3    Support Program, right?

 4    A.   Correct.

 5    Q.   And that's referred to as MOMS?

 6    A.   Yes.

 7    Q.   Fantastic use of acronyms, I would say, Dr. O'Connell.

 8    A.   I cannot take credit for any of the current acronyms.

 9    Q.   So, let's look at Page 43 of the City of Solutions

10    document, please.

11              MS. QUEZON:  I'm sorry, Mr. Hester, the page

12    again?

13              MR. HESTER:  43.

14              THE WITNESS:  Teeny tiny 41.

15              MR. HESTER:  No, I'm sorry.  For the small

16    numbers, 41.  Sorry.

17              BY MR. HESTER:

18    Q.   And this is where it's discussing the MOMS program,

19    correct?

20    A.   Yes.

21    Q.   And it says that -- at the top it says that MOMS was

22    developed to provide substance abuse disorder recovery

23    support for both postpartum women and their babies and to

24    provide it in a convenient location, correct?

25    A.   Substance Abuse Disorder recovery support, yes.
```

```
 1   Q.   And so, that would include support for babies born with

 2   NAS, correct?

 3   A.   No.  They operate in conjunction with the Neonatal

 4   Treatment Unit, but they are -- they are providing services

 5   to the MOMS.

 6   Q.   Okay.  So this is providing a service to a mother who

 7   has delivered a baby with NAS?

 8   A.   Correct.

 9   Q.   And so, what kind of services are being provided?  Are

10   these treatment services being provided?

11   A.   MOMS is not my program.  It is run by Cabell-Huntington

12   Hospital.  However, they provide where the MARC -- the

13   easiest way for me to think about it is where the MARC

14   program drops off, MOMS picks up.  So, if you were pregnant

15   and you had a child who was then born with exposure of some

16   kind the MOMS program would then work with you in the

17   hospital or if you were -- had a child born with exposure

18   and you were not previously in a program, MOMS could sort of

19   pick you up and work with you while your child is being

20   treated in the NTU.

21   Q.   And if you look down to the third paragraph on this

22   page, the third sentence, it reads the nurse practitioner in

23   collaboration with the physician provides medication

24   services included but not limited to Buprenorphine,

25   Naloxone, et cetera.  And so, this is a form of treatment
```

1    provided to mothers who've delivered babies with NAS?

2    **A.**   Women in the program are offered medication assisted

3    treatment.

4    **Q.**   And if you look at Page 59 again in the City of

5    Solutions document, again, I'm going back to this discussion

6    on capacity we were having previously and it lists MOMS as

7    moderate, which is defined as can serve up to hundreds of

8    individuals.  Do you see that?

9    **A.**   I do.

10   **Q.**   And is that consistent with your understanding?

11   **A.**   I believe it's going to be the same capacity in that

12   although there may be a treatment providing -- treatment

13   provider who has a larger medication assisted treatment

14   capacity, the limitation is those supplemental services.

15   **Q.**   Supplemental services provided by a doctor?

16   **A.**   The mental health services that are being provided, the

17   individual and treatment capacity.  To my knowledge, MOMS

18   normally, at its peak, I think, had a census of

19   approximately 60.

20   **Q.**   60 people being served?

21   **A.**   Yes.

22   **Q.**   And that would be 60 people who are -- have recently

23   given birth to a baby with NAS?

24   **A.**   Recently given birth to a child with exposure.

25   **Q.**   Exposure to --

1    **A.**    To a substance.  So, not all infants are diagnosed with

2    Neonatal Abstinence Syndrome.

3    **Q.**    But it could be mothers who have given birth to a baby

4    with any kind of substance abuse, not just opioid abuse?

5    **A.**    Because this is a medication assisted treatment

6    program, it's going to be predominantly far and away opioid

7    use because Suboxone, and Vivitrol, and Subutex are all used

8    to treatment opioid use disorders only.

9    **Q.**    And so, that would include, for instance, mothers who

10   were using heroin during their pregnancy, gave birth to a

11   baby, and then still having heroin problems after giving

12   birth, correct?

13   **A.**    It could include a woman who was using a substance,

14   opioid based, and then has an infant born with some level of

15   exposure or withdrawal symptoms that has them identified and

16   detected and then served by the Neonatal Treatment Unit

17   because that's different than the NICU, which is just the

18   Neonatal Intensive Care Unit.  They're separate.

19   **Q.**    Yeah.  And I wanted to clarify, that would include

20   heroin abusers who have given birth to a baby, correct?

21   **A.**    It would include individuals who have used heroin.

22   **Q.**    The MOMS program is part of the Hoops Family Children's

23   Hospital at Cabell Huntington Hospital; is that right?

24   **A.**    Correct.

25   **Q.**    And it's funded through grants and donations; is that

1    correct?

2    **A.**    I do not know.

3    **Q.**    MOMS is also billed to Medicaid; is that right?

4    **A.**    I assume they are billing their medication assisted

5    treatment services.

6    **Q.**    And the MOMS program is not run by Cabell County or the

7    City of Huntington, correct?

8    **A.**    No, it is not.

9    **Q.**    And the MOMS program does not receive funding from

10    Cabell County or the City of Huntington, correct?

11    **A.**    I do not believe so.

12    **Q.**    Let me ask you to turn to another program.  In your

13    slides you had discussed Prestera; is that right?

14    **A.**    Yes.

15    **Q.**    And Prestera offers a variety of treatment programs,

16    including detoxification and stabilization; is that right?

17    **A.**    Prestera has historically provided withdrawal

18    management or detox.  I do not currently know their detox

19    management services.

20    **Q.**    And is it serving a community focused on OUD or is it

21    focused more broadly on substance use disorders?

22    **A.**    Prestera is one of the long -- or one of the oldest

23    sort of community-based mental health and substance use

24    treatment centers.

25    **Q.**    So, it's surely be treating people with OUD, correct?

```
 1   A.   I would assume so.

 2   Q.   And it focuses on the Cabell-Huntington community?

 3   A.   I don't know their captured area.

 4   Q.   But it includes Cabell-Huntington?

 5   A.   It would.

 6   Q.   And Prestera offers outpatient treatment as well?

 7   A.   I believe so.

 8   Q.   And does it offer residential treatment?

 9   A.   In the City of Huntington?

10   Q.   Or Cabell County?

11   A.   Not for all populations.

12   Q.   For some populations with OUD, it offers residential

13   services?

14   A.   I believe they have a men's treatment center.

15   Q.   So it treats men with OUD, but not women?

16   A.   Their women's based program is in Charleston.

17   Q.   Okay.  So, their men's based program is based in

18   Huntington?

19   A.   I believe so.  I do not have the interworking of

20   Prestera, so --

21   Q.   Prestera also offers medication assisted treatment; is

22   that right?

23   A.   They do.

24   Q.   So, they're another treatment program we should list,

25   right?
```

1    **A.**   Yes.

2    **Q.**   Prestera has three locations in Cabell County and one

3    location in Wayne County; is that right?

4    **A.**   I don't know their location in Wayne.

5    **Q.**   Do you know they have three locations in Cabell County?

6    **A.**   They have two locations on Route 60.  I'm trying to

7    think of where their third location is.

8    **Q.**   Route 60 is in Cabell County?

9    **A.**   It is.

10   **Q.**   Let me show you a document, please.

11          MR. HESTER:  May I approach, Your Honor?

12          THE COURT:  Yes.

13          THE WITNESS:  Thank you.

14          BY MR. HESTER:

15   **Q.**   Dr. O'Connell, I've shown you a document marked

16   MCWV-2167.  It's a printout of the Prestera website.  Have

17   you seen the Prestera website?

18   **A.**   I know that it exists.

19   **Q.**   Let me -- I have just a simple question, I think, for

20   you.  It states that -- in the first sentence, Prestera

21   Center impacts over 20,000 adults, children and families

22   across West Virginia each year and has been helping people

23   lead happier, more fulfilling lives since 1967.  Do you see

24   that?

25   **A.**   I do.

```
 1    Q.   Does that accord with your understanding that Prestera

 2    serves about 20,000 people across West Virginia each year?

 3    A.   I have no reason to doubt their website.

 4    Q.   And do you have any understanding as to how many people

 5    Prestera serves in Cabell County and Huntington?

 6    A.   I have no idea.

 7    Q.   I take it it would be thousands of people in Cabell

 8    County and Huntington?

 9    A.   I have no idea.

10    Q.   They have three centers there.  Do you think they would

11    be serving a population of thousands or --

12    A.   I truly don't know.

13    Q.   Do you have an understanding that Prestera bills

14    Medicaid and other insurance for the services it provides?

15    A.   I believe so.

16    Q.   And Prestera is not run by the City of Huntington or by

17    Cabell County; is that right?

18    A.   It is not.

19    Q.   And it does not receive funding from the City or the

20    County, correct?

21    A.   I do not know.

22    Q.   But it's not run by the City or the County?

23    A.   It is not.

24    Q.   Let me ask you about Lily's Place.  This was another

25    treatment center and treatment service that your slides
```

1    discussed previously; is that right?

2    **A.**   Yes.

3    **Q.**   Let me ask you again, maybe just to set the table here,

4    Lily's Place provides service -- treatment services for

5    babies born with NAS and their mothers; is that right?

6    **A.**   Lily's Place is unique in that it's the first

7    non-hospital based neonatal abstinence treatment center.

8    **Q.**   So, it's treating babies born with --

9    **A.**   Infants born with exposure.

10   **Q.**   And when we say "exposure", you mean infants born with

11   NAS?

12   **A.**   Infants born with exposure to substances.

13   **Q.**   And that would include infants with exposure to

14   opioids; is that correct?

15   **A.**   It would.

16   **Q.**   So, that's another treatment sort of program we should

17   list?

18   **A.**   It's a treatment program for infants in the same way

19   that the Neonatal Treatment Unit at Cabell Huntington

20   Hospital is.  It's just an outside-of-hospital-based

21   setting.

22   **Q.**   And if you look at the -- well, I think maybe I can ask

23   you this broadly.  Do you have an understanding of the

24   capacity that Lily's Place can serve?

25   **A.**   They have less than ten nursery rooms.

1    **Q.**   And that's based in the City of Huntington; is that

2    right, Lily's Place?

3    **A.**   It is.

4    **Q.**   Do they have other facilities outside of the City of

5    Huntington?

6    **A.**   They do not.

7    **Q.**   Lily's Place treats infants with NAS who are born to

8    mothers who live outside of Cabell and Huntington, correct?

9    **A.**   They -- they may treat individuals -- yes.  They would

10   have individuals who delivered at Cabell-Huntington or

11   another hospital and chose treatment for their infant at

12   Lily's Place.

13   **Q.**   And is it fair to say that a number of the babies who

14   are born in the hospitals in the City of Huntington might be

15   from the broader region outside of Cabell County and

16   Huntington?

17   **A.**   Yes.

18   **Q.**   So, it would be fair to say, as well, that then a

19   substantial proportion of the babies born with NAS might be

20   born to mothers who live outside of Cabell and Huntington?

21   **A.**   I cannot speak to whether it's substantial or an equal

22   proportion.

23   **Q.**   You don't know what percentage it is, whether it's 10%,

24   or 90%, or 50% born to mothers who live outside of

25   Cabell-Huntington?

1    **A.**   I do not know.  However, Lily's Place is not able to

2    serve those outside of the state.

3    **Q.**   So, Lily's Place can only serve babies who are born to

4    mothers who live somewhere in West Virginia; is that right?

5    **A.**   I believe so.

6    **Q.**   And Lily's Place is a non-profit organization; correct?

7    **A.**   They are.

8    **Q.**   And it's not affiliated with the City of Huntington or

9    Cabell County, correct?

10   **A.**   It is not.

11   **Q.**   And it's not run by the City of Huntington or Cabell

12   County?

13   **A.**   It is not.

14   **Q.**   And Lily's Place is not funded by the City of

15   Huntington or Cabell County, correct?

16   **A.**   They are not.

17   **Q.**   And the services that Lily's Place provides are subject

18   to reimbursement by insurance, correct?

19   **A.**   Some.

20   **Q.**   And Lily's Place also receives funding from the State

21   of West Virginia, correct?

22   **A.**   I believe they receive grant funding as a large number

23   of their services originally were not covered by any

24   insurance.

25   **Q.**   And then, over time, more of their services are

1    provided -- are paid for by insurance?

2    **A.**    I don't currently know their status, but they had to

3    pursue legislative changes to receive any type of

4    reimbursement because they were a non-hospital based medical

5    center.

6    **Q.**    You mentioned before that Lily's Place could only serve

7    babies born to mothers who live in West Virginia.  Is that

8    because the State of West Virginia is providing funding for

9    it?

10   **A.**    I'm not sure.

11   **Q.**    Let me ask you about Project Hope.  Your slides

12   discussed Project Hope; is that right?

13   **A.**    Yes.

14   **Q.**    You've been personally involved with Project Hope,

15   correct?

16   **A.**    Yes.

17   **Q.**    And at a high level, Project Hope provides treatment

18   and housing for women with Substance Abuse Disorders and

19   their children; is that right?

20   **A.**    Substance Use Disorders, yes.

21   **Q.**    And that would include women who have Opioid Use

22   Disorders, correct?

23   **A.**    It would.

24   **Q.**    If we look at the City of Solutions document,

25   Exhibit 2653, I wanted to point you to Page 38.

1    **A.**    Or tiny font 36?

2    **Q.**    Oh, you're way ahead of me.  It's, yes, 36 at the

3    bottom.  Thank you.  And at the bottom of the first

4    paragraph it says that Project Hope is under Marshall

5    Health's License Behavioral Center, Behavioral Health

6    Center, and provides services at the ASAM 3.5 level.  Do you

7    see that?

8    **A.**    Yes.

9    **Q.**    So that's for people with relatively more severe

10   diagnoses; is that right?

11   **A.**    To meet criteria for residential treatment you have to

12   be unable to thrive in the community.

13   **Q.**    And that's what ASAM 3.5 means?

14   **A.**    The American Society of Addiction Medicine 3.5 criteria

15   has a whole host of objectives that must be met to submit

16   for authorization of that level of care.

17   **Q.**    And so, Project Hope is providing 24-hour residential

18   inpatient services for mothers with Substance Use Disorders,

19   correct?

20   **A.**    Correct.

21   **Q.**    And it can house 17 families at any one time; is that

22   correct?

23   **A.**    16, but yes.  It was 17.  We altered an apartment

24   status to 16.

25   **Q.**    And so, in the first year, Project Hope housed 12

1   families at one point and the most it housed during the

2   first year was 14; is that right?

3   **A.**   That is correct.

4   **Q.**   And so, when we talk about families there, we're

5   talking about a mother with a new baby; is that correct?

6   **A.**   We have initially established seven two-bedrooms and 11

7   three-bedrooms.  And so, Mom may have had existing children

8   or had twins.  And so, it would include Mom -- to meet

9   criteria, Mom has to be either pregnant or parenting a child

10   and currently experiencing a Substance Use Disorder.

11   **Q.**   And does the baby have to be born with NAS --

12   **A.**   No.

13   **Q.**   -- to meet the criteria?  It's really focused on the

14   mother?

15   **A.**   It's focused on the family unit.

16   **Q.**   And so, you could -- the point you're making is you

17   could have the mother there with other children including

18   the newborn?

19   **A.**   We often do.

20   **Q.**   And Marshall Health is responsible for the oversight

21   and therapeutic services of Project Hope; is that right?

22   **A.**   We are the Medical Director and we do offer -- the

23   services are provided through Marshall Health and Marshall

24   Family Medicine.  Some do continue to see a pre-existing

25   treatment provider.

1          MR. HESTER:  So, let me pass out now -- Your

2     Honor, I think we now have happily a new version of this

3     document, Defendants' Exhibit 03542 that resolves the "XXX"

4     that we had before on that.  So, may I approach?

5          THE COURT:  Yes.

6          MR. HESTER:  For the record, I believe this

7     document was introduced into evidence, Your Honor, and we

8     were going to fix it so that it printed more properly.

9          BY MR. HESTER:

10    **Q.**   And I think this one is correct, Dr. O'Connell.  This

11    one now has numbers at the bottom of the page.

12    **A.**   I appreciate that.  Thank you.

13    **Q.**   Okay.  And I wanted to ask you now about the column for

14    Project Hope.  Do you see on this -- on this spreadsheet

15    there's a column shown for Project Hope?

16    **A.**   I do.

17    **Q.**   And it reflects that the funding for Project Hope comes

18    from patient collections and contractual medical fees.  Do

19    you see that?

20    **A.**   Yes.

21    **Q.**   When it says contractual medical fees, there's a line

22    entry there for Project Hope contractual medical fees.  Does

23    that mean medical fees being provided by Project Hope?  I'm

24    sorry, medical services being provided by Project Hope under

25    some sort of treatment contract?

**A.**   I am not sure what is designated by that category.

**Q.**   But it reflects that the total revenue for Project Hope that's shown for 2020 is $1.63 million, correct?

**A.**   Again, I just -- I want to hold discrepancy to the idea that it's 2020 in that the document was dated May, which is not the end of our fiscal year.

**Q.**   Well, you could have a document prepared in May that would recap the number of fiscal years, correct?

**A.**   But it doesn't include the 2020 fiscal year and I just know that because what the grant income is annually remains the same in that we have a five-year SAMHSA grant, Substance Abuse and Mental Health Administration grant, and the grant amount should be the same annually and this is only reflecting a small portion of that grant income.  So, for 2020, it's not accurate in that -- a fiscal year.  It seems to be maybe a quarter.

**Q.**   So, your point is that the 2020 numbers that we're looking at here might be for less than a full year?

**A.**   I'd almost guarantee it.

**Q.**   Probably are less than a full year, but if we look at the 2020 for whatever period, would your estimation be that it's for the first quarter of 2020?

**A.**   I'm not sure what the estimation is.

**Q.**   Can you eyeball it by seeing the difference in the grant income between 2019 and 2020?

1    **A.**    Seems to be less than a quarter than.

2    **Q.**    And so, but for whatever period of time covered here

3    for 2020, it shows total revenue of $1.6 million; is that

4    right, for Project Hope?

5    **A.**    To that cost center, yes.

6    **Q.**    And it shows total expenses for Project Hope for the

7    same time period of $616,000.00, correct?

8    **A.**    Correct.

9    **Q.**    And it shows a total surplus, excluding grant funding

10    for that same time period, that was a surplus of

11    $655,000.00; is that correct?

12    **A.**    Considering Project Hope has yet to break even, I'm

13    aware that there's inaccuracies in that.

14    **Q.**    I'm asking you what it shows here.

15    **A.**    It shows in that line $6,555 -- 700 --798.

16    **Q.**    It's not 6,655.00.

17    **A.**    $655,798.  Sorry.

18    **Q.**    So, that's -- so, it's showing here a surplus for

19    Project Hope, correct?

20    **A.**    Whatever date this was compiled, yes, to that cost

21    center.

22    **Q.**    When we look at the -- for that same period of time for

23    2020, it shows patient collections of $989,000.00 for

24    Project Hope.  Do you see that?

25    **A.**    I do.

1    **Q.**   And so, that means those are patient collections coming

2    from billing to Medicaid and other insurance, correct?

3    **A.**   Yeah.   That's the total -- I believe what's designated

4    on here is that's indicating the total collections for the

5    existence of Project Hope and we did not receive anything

6    for the first year.   It took a very long time to receive

7    finances for it.

8    **Q.**   But I was trying to get to the source of the

9    collections.   When we talk about collections here, that's

10   reflecting reimbursements coming from insurance for the

11   treatment services being provided by Project Hope; is that

12   right?

13   **A.**   That is often how we denote collections, so I assume

14   that that's what's denoted here.

15   **Q.**   And most of the payments that are shown is patient

16   collections that would be coming from insurance

17   reimbursement, correct?

18   **A.**   Correct.

19   **Q.**   Project Hope is not run by the City of Huntington or by

20   Cabell County, correct?

21   **A.**   Correct.

22   **Q.**   And Project Hope does not receive any funding from the

23   City of Huntington or Cabell County, correct?

24   **A.**   Correct.

25   **Q.**   We forgot to put this on the board.

1    **A.**    We abbreviate it PHWC, if that helps.

2    **Q.**    I won't remember that.

3    **A.**    Project Hope for Women & Children is lengthy.

4    **Q.**    Let me go on to another program that Marshall is

5    involved in, another treatment program.  I believe it's a

6    treatment program I want to ask you about, Recovery Point?

7    **A.**    Not involved.

8    **Q.**    Let me ask you to look -- do you know about Recovery

9    Point?  You know it exists?

10   **A.**    Yes.

11   **Q.**    Let me ask you to look at Page 47 of the City of

12   Solutions document.

13   **A.**    Do you mean 45?

14   **Q.**    Yes, I do.  Sorry.  Page 45 on the small numbers.  And

15   there's -- in the second paragraph, there's a reference to

16   Recovery Point.  Do you see that?

17   **A.**    I do.

18   **Q.**    And it says Recovery Point is a six-location facility

19   across West Virginia with headquarters and original facility

20   located in the heart of the City of Huntington.  Does that

21   accord with your understanding?

22   **A.**    Yes.

23   **Q.**    And it says Recovery Point has been a leader in

24   expanding Peer Recovery services through the community.  Do

25   you see that?

1    **A.**   Yes.

2    **Q.**   And is that what it focuses on, is peer recovery

3    services?

4    **A.**   So, in that the other programs we've discussed are

5    physician or mental health led, Recovery Point West Virginia

6    is based purely on peer services.  So, as individuals move

7    through the program and graduate, they then take on

8    leadership roles within the organization.  And so, almost

9    all individuals working for the organization are individuals

10    in long-term recovery themselves who almost always went

11    through Recovery Point or a similar peer based program.

12    **Q.**   And so, then they are -- they have gotten through the

13    program or have gotten to a certain point of recovery and

14    then they're assisting new people who are coming into the

15    program who need help dealing with OUD or other Substance

16    Use Disorders?

17    **A.**   Correct.

18    **Q.**   And -- and that's been a successful program, correct?

19    **A.**   They -- they report success in that model.

20    **Q.**   And if you look at Page 64 of the City of Solutions

21    document, it says Recovery Point does not charge individuals

22    for their stay and operates mostly off of annual and ongoing

23    fundraising and grants.  Do you see that?  Sorry.  You're

24    not caught up to me yet.

25    **A.**   Nope.  Went back to the tiny ones.  Yes.  Recovery

1    Point had -- does not receive any reimbursement for their

2    services.

3    **Q.**   And they serve -- is it correct that the next sentence

4    says the facility serves 110 participants at a time?  Does

5    that accord with your understanding?

6    **A.**   It does.

7    **Q.**   And let me ask you to look at another document, please.

8              MR. HESTER:  May I approach, Your Honor?

9              THE WITNESS:  Thank you.

10             BY MR. HESTER:

11   **Q.**   Dr. O'Connell, we've shown you a document marked

12   MCWV-2130.  It's a printout from the Recovery Point website.

13   Have you seen Recovery Point's website before?

14   **A.**   I have been on it, yes.

15   **Q.**   Let me ask you just one question about it.  There's a

16   -- at Page 3 of the document, there's a final paragraph that

17   says Recovery Point West Virginia's long-term recovery

18   program alumni maintain a 68% sobriety rate one year after

19   graduating the program.  Do you see that?

20   **A.**   I do.

21   **Q.**   Does that accord with your understanding?

22   **A.**   I have not seen their data.

23   **Q.**   Do you have any reason to disagree with that?

24   **A.**   When we talk about efficacy, when we mentioned PROACT,

25   you said at 90 days it was -- you know, of the initial

1    intakes, 70% remained.  Of those, 56, I think, or above 50%

2    were retained at 90 days.  So, retention rate at 90 days is

3    a significant benchmark in that people drop out in those

4    90 days at a much higher rate than they do the longer you

5    have them.

6         So, an individual receiving on -- or an individual

7    receiving care is likely to start and stop and start and

8    stop until they stabilize.  And once they're stabilized,

9    they're believed to have a -- you're just going to have more

10   success.  So, people drop out early.  And then, once they're

11   sort of in and they're working through stuff, they're more

12   likely to sustain.

13        So, with the PROACT benchmark, we were measuring at

14   90 days because we -- our goal is to improve that retention

15   rate.  It's not the same to compare that number to one year

16   following graduation.  So, I just think it's important that

17   we -- anytime I'm measuring efficacy, those are two

18   different conversations.

19   **Q.**   Yeah.  And I wasn't purporting to put that together

20   with the prior one.

21   **A.**   Okay.

22   **Q.**   I was really just asking you about this one-year figure

23   that's cited here.

24   **A.**   They're reporting that individuals who complete their

25   program, which is at least a year program, they're

```
 1    indicating that 68% of those, that they have graduated,

 2    continue to maintain sobriety.

 3    Q.   And do you have any reason to doubt that?

 4    A.   I have -- I have not seen their data, but I have no

 5    reason to doubt their website.

 6    Q.   And Recovery Point is not run by the City of Huntington

 7    or by Cabell County, correct?

 8    A.   It is not.

 9    Q.   And it's not funded by the City of Huntington or Cabell

10    County, correct?

11    A.   I don't believe so.

12    Q.   Just a couple more, but I'm running out of real estate

13    on my board.

14    A.   I see that.

15    Q.   Your slides also discussed Project Engage; is that

16    right?

17    A.   Yep.  Yes.

18    Q.   Let's turn to Page 15 of the City of Solutions

19    document, please, 13 under the small numbers.

20    A.   What was the small number?

21    Q.   13.

22    A.   13?

23    Q.   Do you have that?

24    A.   Yes.

25    Q.   Do you have that one, Dr. O'Connell?
```

98

1    **A.**    I have it, yes.  Thank you.

2    **Q.**    Okay.  And there's a second sentence in the second

3    paragraph that says an initiative called Project Engage was

4    developed to screen all patients admitted into the hospital

5    for Substance Use Disorder and provide specific care to

6    those with such needs.  Do you see that?

7    **A.**    I do.

8    **Q.**    Is that consistent with your understanding of what

9    Project Engage does?

10   **A.**    It is what we hoped Project Engage would do.

11   **Q.**    And are you saying it doesn't do that?

12   **A.**    I am.

13   **Q.**    Do you see there's a statement down in the bullets?  It

14   refers to rapid treatment of withdrawal by a medical team.

15   Does Project Engage do that?

16   **A.**    Christiana Health Care's approach does that.

17   **Q.**    And is Project Engage associated with Christiana

18   Healthcare?

19   **A.**    They came in and demonstrated their model, which is

20   where the term "Project Engage" came from.

21   **Q.**    And does Project Engage still exist?

22   **A.**    Yes and no.

23   **Q.**    Your slides discuss them.

24   **A.**    Yeah.

25   **Q.**    I'm confused.

1    **A.**    When we discussed them, I had indicated it had changed

2    over time to the bridging the gap, the mosaic model.

3    **Q.**    The mosaic model?

4    **A.**    Uh-huh.  That was the last one with the --

5    **Q.**    And is it a form -- does Project Engage provide

6    treatment services?

7    **A.**    The goal was that Cabell Huntington Hospital and St.

8    Mary's would have addiction specialists who were screening

9    individuals who were coming through -- who had been admitted

10   to the hospital and were there often for endocranitis or

11   other health concerns.  And then it was identified that they

12   have a substance -- it was identified they had an existing

13   Substance Use Disorder.

14        At that time, this has ebbed and flowed in that one of

15   the addiction specialists left the hospital.  It took quite

16   sometime to replace them.  St. Mary's moved forward in a

17   different, much more structured policy format; whereas

18   Cabell moved forward with peers.  So, it exists in different

19   formats across the two.

20   **Q.**    Is it -- Project Engage essentially is part then of

21   programs provided by these hospitals?

22   **A.**    Yes.

23   **Q.**    And Project Engage is not run by the City of Cabell --

24   or the City of Huntington or Cabell County, correct?

25   **A.**    It is not.

1    **Q.**   It's not funded by Cabell County or the City of

2    Huntington?

3    **A.**   It is not.

4    **Q.**   I have one more to ask you about, one more program, I

5    think, which is the Great Rivers Regional System for

6    Addiction Care that you discussed in your slides.  Marshall

7    has a leadership role in the Great Rivers Regional System

8    for Addiction Care; is that right?

9    **A.**   The grant runs through us.

10   **Q.**   And the objective of that program is to focus on

11   treatment programs across the region; is that right?

12   **A.**   The goal of that grant is coordination, to bring

13   together the six objective areas of the grant, to coordinate

14   them through meetings and engagement.  It provides no

15   services or treatment.

16   **Q.**   So, Great Rivers is a -- somewhat of an umbrella

17   organization that's helping with --

18   **A.**   Coalition.

19   **Q.**   And it's --

20   **A.**   It's not even --

21           COURT REPORTER:  I'm sorry.  Can you finish the

22   question?  I couldn't --

23           MR. HESTER:  Sorry.

24           BY MR. HESTER:

25   **Q.**   It's helping with the administration of programs across

1    the region; is that fair to say?

2    **A.**    It is a coalition.  So, it's a group of individuals

3    across four counties that meet together to discuss and

4    overcome roadblocks and hurdles, but it does not provide any

5    direct services or treatment.

6              MR. HESTER:  May I approach, Your Honor?

7              THE WITNESS:  Thank you, sir.

8              BY MR. HESTER:

9    **Q.**    Dr. O'Connell, I've handed you a document marked

10   MCWV-2135.  It's headed "Great Rivers Regional System for

11   Addiction Care 2019-22 Strategic Plan".

12   **A.**    Yes.

13   **Q.**    I take it you've seen this document before?

14   **A.**    I have.

15   **Q.**    And you were involved in the preparation of the

16   document?

17   **A.**    My team was in the preparation of the document.

18   **Q.**    And your name is listed as -- as an acknowledgment on

19   the second page; is that right?

20   **A.**    Correct.

21   **Q.**    And the document was -- is prepared by this coalition,

22   this Great Rivers Regional System Coalition; is that right?

23   **A.**    Correct.

24   **Q.**    And is this a document that was prepared by persons

25   with knowledge of the activities of Great Rivers Regional

1    System?

2    **A.**   I believe the document is compiled by our Director of

3    the grant and the external evaluator.

4    **Q.**   And it was prepared by Tina Ramirez; is that right?

5    **A.**   Yes.

6    **Q.**   And you said she works for you?

7    **A.**   She does.

8    **Q.**   And does she regularly prepare these plans for the

9    Great Rivers Regional System for Addiction Care?

10   **A.**   This was a singular plan in compliance with the grant.

11   **Q.**   Oh, I see.  So, this was -- this was a document that

12   had to be put together for purposes of the grant?

13   **A.**   Correct.

14   **Q.**   And this was a grant that was received from MERCK; is

15   that right?

16   **A.**   MERCK Foundation is the funder of this project.

17   **Q.**   Right.

18            MR. HESTER:  Your Honor, I would move this into

19   evidence.

20            THE COURT:  Any objection to 2135?

21            MS. QUEZON:  No, Judge.

22            THE COURT:  It's admitted.

23            BY MR. HESTER:

24   **Q.**   So, let me ask you to look in this document, Dr.

25   O'Connell, at Page 26.  This is where it lists different

1    components for a -- an effective opioid response plan, is

2    that right?

3    **A.**    These are the six components that Great Rivers chose to

4    target at the request of the MERCK Foundation.

5    **Q.**    So, just so I'm clear on this, so these were the pieces

6    that Great Rivers had targeted as the constituent elements

7    for an effective opioid response plan; is that fair?

8    **A.**    These are the six pillars of the -- of the grant that

9    they're seeking to coordinate across the four counties.  So,

10   they were -- PROACT, as being a highly innovative model, was

11   detected by the MERCK Foundation and the others are all

12   similarly unique.  And so there -- the goal was to

13   coordinate and collaborate across those six areas.

14   **Q.**    And it reflects here on Page 26, as we're looking at

15   it, that these components are found -- all six of these

16   component elements are found in Cabell County; is that

17   right?

18   **A.**    Yes.

19   **Q.**    And that's what the X's denote in that column?

20   **A.**    As of February 21st, 2019.

21   **Q.**    And if you look over on the next page, Page 27, there's

22   a table that shows about four or five rows down that says

23   number of MAT providers office-based, do you see that?

24   **A.**    Yes.

25   **Q.**    And it shows that there are 14 facilities providing MAT

1    services in Cabell County; is that right?

2    **A.**    I see that, yes.

3    **Q.**    More than any other -- more than the other three

4    counties except for Kanawha, right?

5    **A.**    Correct.

6    **Q.**    Let me ask you to look at Pages 28-29 and there's a

7    discussion on Page 28 right in the paragraph in the middle

8    of the page that refers to a system called CAST, Calculating

9    For an Adequate System Tool, and an evidence-based tool

10   developed by the Centers for Disease Control and Prevention

11   and the Substance Abuse and Mental Health Services

12   Administration, SAMHSA.  Those are two federal government

13   organizations, right?

14   **A.**    They are.

15   **Q.**    And are you familiar with this tool called CAST?

16   **A.**    I had never used it before this.

17   **Q.**    But you learned about it in connection with developing

18   this plan?

19   **A.**    Yes.

20   **Q.**    And over on the next page, it says that CAST projects

21   there are 178,000 substance users within the Great Rivers

22   Region, of which 24,389 are opioid users.  Do you see that?

23   **A.**    I do.

24   **Q.**    Does that -- is that confined to people who have Opioid

25   Use Disorder?  When it refers to 24,389 opioid users, does

```
1    it include people who misuse opioids but maybe do not have

2    Opioid Use Disorder?  Do you understand what I mean?

3    A.   Are you asking if there's a distinction between opioid

4    misuse and Opioid Use Disorder?

5    Q.   Yes.

6    A.   It's a highly subjective area for discussion in that

7    Opioid Use Disorder would be the formalized medical

8    diagnosis provided.  However, many individuals with Opioid

9    Use Disorder are not being seen by a provider and have not

10   been diagnosed with that.

11   Q.   But there can also be people who misuse opioids who do

12   not have Opioid Use Disorder, correct?

13   A.   If you're taking more of your prescribed medication

14   than is prescribed, you may have opioid misuse or dependency

15   and may be on the verge or have an existing Opioid Use

16   Disorder that you're not aware of until you attempt to stop

17   that medication because withdrawal and tolerance are two of

18   the diagnostic criteria.

19   Q.   But you also might misuse opioids without having an

20   Opioid Use Disorder at all, right?

21   A.   I don't know if I can answer that in -- in sort of

22   medical expertise, but in our work with folks, if you're

23   misusing your opioid, you have an Opioid Use Disorder.

24   Q.   So, somebody who takes one more pill than they're

25   prescribed, you would consider them to have an Opioid Use
```

1    Disorder?

2    **A.**   I cannot diagnose that.

3    **Q.**   So, I -- what I wanted to clarify here is when it says

4    24,389 are opioid users, do you construe that to mean people

5    who have Opioid Use Disorder?

6    **A.**   I do.

7    **Q.**   Okay.  And then it says 6,341 of those opioid users are

8    individuals seeking treatment.  Do you see that?  It's the

9    next sentence.

10   **A.**   Yes.

11   **Q.**   And so, that means of that, that group of people,

12   roughly 25,000 or 24,000 people with Opioid Use Disorder,

13   about a quarter of them are actually seeking treatment; is

14   that correct?

15   **A.**   Based on the CAST data at that time, yes.

16   **Q.**   And these numbers are for the entire Great Rivers

17   Region?

18   **A.**   That is what it indicates.

19   **Q.**   And it reflects the total population covered here,

20   364,000 people.  Do you see that?

21   **A.**   Yes.

22   **Q.**   And do you know in Cabell County and the City of

23   Huntington, roughly speaking, there's about 90,000 people?

24   **A.**   I believe so.

25   **Q.**   So -- so that that means, roughly speaking, Cabell

```
 1   County is about 25% of the population of this Great Rivers

 2   Region, correct?

 3   A.    The only area larger is Kanawha County.  So, Kanawha

 4   County being the largest in the state; Cabell County being

 5   second; and then Putnam and Jackson being less.

 6   Q.    It's really 360 divided by 90,000.  About 25%, right?

 7   A.    Right.

 8   Q.    Does that sound right?

 9   A.    Yes.

10   Q.    And then we just talked about the fact that the

11   estimate here from the CAST data is that 6,300 people are

12   opioid users seeking treatment, correct, across the entire

13   Great Rivers Region?

14   A.    Correct.

15   Q.    So, if Cabell County holds 25% of the population of

16   that region, you expect about 1,500 opioid users would be

17   seeking treatment who reside in Cabell County or City of

18   Huntington, right?

19            MR. ACKERMAN:  Objection, Your Honor.

20            THE COURT:  What's the basis?

21            MR. ACKERMAN:  Foundation.  And are we just

22   reading out of this document or --

23            THE COURT:  Overruled.

24            MR. ACKERMAN:  Okay.

25            THE WITNESS:  Can you repeat the question?
```

```
 1              BY MR. HESTER:

 2    Q.    Yeah, sorry.  So, just to make sure that we've got the

 3    logic right, we've established that Cabell County, City of

 4    Huntington, accounts for about 25% of the population of this

 5    Great Rivers Region that was being looked at here, right?

 6    A.    Yes.

 7    Q.    And we've also talked previously that across this Great

 8    Rivers Region there's about 6,300 people who are people with

 9    OUD seeking treatment, correct?

10    A.    As defined by the CAST data at that time.

11    Q.    Right.  So, that would suggest, roughly speaking, if we

12    just apply that percentage, suggests roughly that about

13    1,500 people in Cabell County and the City of Huntington

14    would be seeking treatment?

15    A.    Based on those percentages of the CAST data, that would

16    be accurate.  Our limitation of this, which is stated both

17    for the partner and the CAST, is that completion rates were

18    significantly low causing a barrier to tool analysis.

19    Q.    But if we take these CAST data as they're written here,

20    that would be the conclusion that would be roughly speaking

21    of a group of about 1,500 people in Cabell County, City of

22    Huntington, seeking treatment?

23    A.    Based on the limitations of the CAST data at that time,

24    that's what those numbers would indicate.  That's also why

25    that data was not published, as it was not deemed to be
```

1    accurate.

2    Q.   The CAST data is the data set developed by the federal

3    government, by the CDC, and SAMHSA, correct?

4    A.   The CAST is just a tool, so it's an incredibly lengthy

5    tool that we sent out to all of the people who are part of

6    the coalition.  So, we had difficulties with completion

7    rates.  We had difficulties with the designee for the

8    organization having all of the knowledge for that

9    organization to complete it accurately.  And we had just

10   fatigue.  People stopped completing it, as it is a

11   burdensome tool, to be honest.  It's not a survey that took

12   someone a few minutes.  So, as you can see, the categories

13   on the following pages are just an example of some of those

14   capacity questions.

15   Q.   Let me ask you to look back at the City of Solutions

16   document, please.

17   A.   Sure.

18   Q.   And if I could point you to Page 59 on the -- using the

19   small numbers.

20   A.   Yes.

21   Q.   It lists the program for Great Rivers here.  Is it

22   suggesting that Great Rivers here is a treatment program or

23   is it really just a coordination program?

24   A.   Suggesting that it is what it is, which is a

25   coordination program, as it -- that's why the category for

1    that is program or initiative and not treatment.

2    **Q.**   So, maybe I'll -- then I need a little help from you on

3    -- if you go to Page 62 of the document.  I'm sorry.  City

4    of Solutions document.  If you look at the bottom of that

5    paragraph talking about Great Rivers Regional System,

6    there's a final sentence that reads, in addition, with the

7    advent of the Medicaid SUD waiver, many of the services will

8    be reimbursed by Medicaid.  Do you see that?

9    **A.**   I do.

10   **Q.**   And so, what services are they talking about there,

11   treatment services?

12   **A.**   So, if Great Rivers is seeking to coordinate PROACT or

13   seeking to establish Quick Response Teams across the four

14   communities, part of those discussions for collaboration is,

15   Putnam County, if you set up a Quick Response Team, the goal

16   and sustainability would hope that over time those services

17   would be provided or Great Rivers is willing to work with

18   you to apply for a grant.

19   **Q.**   So --

20   **A.**   The latter is true for Great Rivers.  Great Rivers

21   directed Putnam County Coalition members to the state when

22   the state released a request for funding and Putnam County

23   applied for that funding to receive a Quick Response Team.

24   **Q.**   So, the services being provided by Great Rivers would

25   be coordinating services?

1    **A.**    Purely.

2    **Q.**    And then those would be subject to reimbursement by

3    Medicaid?

4    **A.**    None of the services -- we will not be able to sustain

5    Tina and her staff through reimbursable services.

6    **Q.**    So, what does it mean when it says many of the services

7    will be reimbursed by Medicaid?

8    **A.**    That Great Rivers is staffed by Tina Ramirez.  She is

9    the director.  So, she brings together people like Connie

10   Priddy from the Huntington Quick Response Team and the

11   Charleston Police Department for the Charleston -- or

12   Kanawha County Quick Response Team.

13        So, a specific example would be Connie is using core

14   data and that's how they're pulling information out of the

15   EMS records and then collecting that info to know where and

16   how to intervene.

17        Charleston was not using that data system, so we got

18   Charleston with Connie and said Connie has figured out how

19   to create a drop-down menu in your EMS health care system,

20   health records system, that plugs into core data.  You

21   should do the same.  Now, Charleston has a drop-down menu.

22        So, these little things that may -- well, they're not

23   little.  These are huge barriers to providing effective

24   treatment that take a lot of time and energy.  So, if one

25   community has figured it out, we would like to share that

```
 1    with another community.  And that is the goal of Great
 2    Rivers.
 3         So, it's not providing any direct treatment services.
 4    There are no mental health providers.  There are no
 5    physicians on the grant.  It's purely how do we bring
 6    together systems to communicate better.
 7    Q.   And then Great Rivers is helping people figure out ways
 8    to get reimbursement for different services through
 9    Medicaid?
10    A.   If Putnam County -- and this literally just happened.
11    Putnam County was agreeable to starting a Quick Response
12    Team.  So, they did not have any funding for that.  So, we
13    -- so, Great Rivers directed them to the State's RF open
14    funding request for Quick Response Teams and that funding
15    was pursued by Putnam County with the support of these other
16    parties because they were then all talking.  So, Cabell
17    could say we will write a letter to say you can do this and
18    we'll show you how.  And Marshall wrote a letter and said we
19    will help you with finding peers to go out with the Quick
20    Response Team.
21    Q.   So, your point is, for instance, on the Quick Response
22    Team example, that's funded by the State, correct, different
23    counties?
24    A.   Cabell County does not receive state funding.  They
25    receive Bureau of Justice funding and ECI, Empowering the
```

1    Communities.  The State recognized that Quick Response Teams

2    were highly effective and designated startup funds to

3    counties to start Quick Response Teams.

4    **Q.**   And you said Cabell County receives other kinds of

5    funding.  It receives federal funding for that?

6    **A.**   The Bureau of Justice is a Department of Corrections

7    funding stream, I believe, from the federal system.

8    Empowering Communities Initiative, I believe it's -- it

9    might be under HRSA, the Health and Human Services.  That's

10   -- it's probably spelled out in here.

11   **Q.**   But your point is the Quick Response Team is funded

12   either by federal or state money?

13   **A.**   They'll lose their funding in September of this year.

14   **Q.**   But they have been funded that way?

15   **A.**   The initial funds for the first three years were

16   through those two grants.

17   **Q.**   And then the State is now funding Quick Response Teams

18   in different communities?

19   **A.**   The State has provided startup funds to get Quick

20   Response Teams off the ground and then counties had to apply

21   for that.  I believe they were $50- to $70,000.00 worth of

22   funds.

23   **Q.**   Dr. O'Connell, we've -- we're almost through this

24   board.  Are there any other treatment programs serving

25   Cabell-Huntington that you're aware of besides the ones

1    we've listed here?  And I mean treatment programs for Opioid

2    Use Disorder, NAS, et cetera.

3    **A.**    Yes.

4    **Q.**    And which ones are those?

5    **A.**    So, of those 14 MAT treatment programs identified in

6    the partner tool, there's OVP, which is the Ohio Valley

7    Physicians.  They have an office.  Huntington Behavioral

8    Health has an office.  There is a Methadone clinic that has

9    an office.

10    **Q.**    Others that occur to you?

11    **A.**    Not off the top of my head.  I would have to take a

12    second and think it through.  There's medication assisted

13    treatment like a physician could provide treatment out of a

14    primary care office.  Oh, Valley Health has a treatment

15    program.

16    **Q.**    Are there others?

17    **A.**    Project Engage would include Cabell-Huntington and St.

18    Mary's, correct.

19    **Q.**    So, we've got Project Engage already.

20    **A.**    Of direct treatment, I can't think of --

21    **Q.**    So, we've talked about OVP, Ohio Valley --

22    **A.**    Valley Physicians.  I think they just re-branded.

23    **Q.**    Huntington Behavioral Health, a Methadone clinic, MAT

24    provided via individual doctors and Valley Health, which is

25    a hospital, correct?

1   A.   They're a federally qualified healthcare center.  They

2   are not a hospital.

3   Q.   And as to those five we've just listed out, none of

4   those are run by Cabell County or the City of Huntington,

5   correct?

6   A.   They are healthcare services.

7   Q.   And none of them are funded by Cabell County or the

8   City of Huntington, correct?

9   A.   These are healthcare services.

10   Q.   And these are healthcare services that would be able to

11   seek reimbursement for their services from Medicaid and

12   private insurance, correct?

13   A.   Correct.

14   Q.   Dr. O'Connell, we've been discussing a number of these

15   treatment programs, of course, and talking about the

16   different forms of treatment, outpatient treatment,

17   residential treatment, medicated assisted treatment and so

18   forth.  Do you agree that the level of treatment that an

19   individual needs for OUD depends on the severity of their

20   OUD?

21   A.   Yes.

22   Q.   And the treatment should be individualized based on

23   what the individual circumstances are for that person?

24   A.   All treatment should be patient centered.

25   Q.   And not everyone who has OUD needs every kind of

1    treatment, correct?

2    **A.**    Correct.

3    **Q.**    And not everyone who has OUD needs the same length of

4    treatment, correct?

5    **A.**    Treatment should be evidence based.  So, treatment

6    criteria should be for residential efficacy -- national

7    research indicates no efficacy in less than 90 days for

8    outpatient non-medication based treatment or residential

9    treatment specifically and medication assisted treatment

10   shows efficacy starting at one year.

11   **Q.**    But not everyone is going to need that same length of

12   treatment, correct?

13   **A.**    That standard is based on efficacy, which is

14   effectiveness of a program.  So, it is saying that, with

15   less than that, you are not likely to receive evidence based

16   care.  It would be the same as if your provider says you

17   should receive eight weeks of chemotherapy and you receive

18   six.

19   **Q.**    And that might be a judgment made by individual

20   providers, right?

21   **A.**    Not the efficacy standard, no.  That's from national

22   data.

23   **Q.**    If someone starts at a more intensive level of

24   treatment, they don't always go to the lesser forms of

25   treatment, do they?

1    **A.**   We believe they should, that it should be a gradual

2    stepdown and not just a clear-cut.  We, in fact, often base

3    that on the idea that -- we worked with a woman who had

4    started her path of opioid misuse and dependency through a

5    breast cancer diagnosis and she said the follow-up she

6    received monthly, weekly and annually for many years after

7    being in remission from cancer embarrassed her follow-up for

8    substance use care and that it was deemed she graduated and

9    there was not follow up.  And so, our goal is these

10   long-term engagements in the same way we do with other

11   diseases.

12   **Q.**   And is it a uniform path for everyone, though, through

13   those steps or do they vary by individual?

14   **A.**   We will always intervene with the individual's focus in

15   mind.  So, if an individual leaves Project Hope and

16   graduates they, to do so, had to have started at a 3.5 and

17   dropped to a 3.1.  Once they're below a 3.1, we are not

18   providing that care, but if -- we know that to maintain

19   long-term success they need to be plugged into other levels

20   that often wouldn't be intensive outpatient because they'd

21   never be able to have the child care necessary to go to that

22   many hours of outpatient treatment.

23   **Q.**   So, they might not going to intensive?  They might just

24   go right to outpatient care?

25   **A.**   So, we would try and find something that was going to

```
 1    be effective for them that may include just outpatient
 2    services or in conjunction with other supports.
 3    Q.   So, your point is that people who start in inpatient
 4    might not necessarily progress to intensive outpatient but
 5    might just go to some other form of outpatient?
 6    A.   Because of the barriers around child care and
 7    workforce.
 8    Q.   You've discussed that some of the programs you work
 9    with have received grants from SAMHSA; is that right?
10    A.   Correct.
11    Q.   And SAMHSA, we've discussed, I think, but let's just be
12    clear on this.  It's the United States Substance Abuse and
13    Mental Health Services Administration?
14    A.   Correct.
15    Q.   And SAMHSA provides grants to programs like the ones
16    you've discussed that address substance use -- or substance
17    abuse issues, correct?
18    A.   Correct.
19    Q.   It also does research on substance abuse and treatment?
20    A.   Correct.
21    Q.   And publishes data, correct?
22    A.   Yes.
23    Q.   And do you have an understanding that SAMHSA's data
24    provides useful insights and inputs on substance abuse
25    treatment programs?
```

```
 1    A.    Yes.

 2    Q.    Let me --

 3              MR. HESTER:  May I approach, Your Honor?

 4              THE COURT:  Yes.

 5              THE WITNESS:  Thank you.

 6              THE COURT:  Mr. Hester, this might be a good place

 7    to stop.  I've got another matter.

 8              MR. HESTER:  All right, Your Honor.  I'm sorry

 9    this is taking awhile, but --

10              THE COURT:  Yeah.  Your hour and a half has gone

11    on a little bit longer.

12              MR. HESTER:  I know.  It's a little bit longer

13    than I thought.  Sorry, Your Honor.

14              MS. QUEZON:  For the record, he promised he'd be

15    done with this witness by lunch.  He's not going to forgive

16    me for this, Your Honor.  I think I've used up all of my

17    brownie points.

18              THE COURT:  Well, as I said before, I've learned

19    not to rely too much on lawyers' predictions.

20              MR. HESTER:  Sorry, Your Honor.  I'm getting close

21    to the end.  I will give you that much.

22              THE COURT:  All right.  Well, we'll come back at

23    2:00, Doctor.

24              THE WITNESS:  I'll be here.

25              THE COURT:  All right.
```

```
 1         (Recess taken)

 2              MR. SCHMIDT:  Your Honor, may I say something

 3    briefly?

 4              THE COURT:  Yes.

 5              MR. SCHMIDT:  I just wanted to alert the Court

 6    that parties have started a discussion about whether there

 7    should be extra time in the plaintiffs' case and we're

 8    waiting to hear further specificity on that point from the

 9    plaintiffs and we'll certainly confer with them.

10         I did just want to say for the record that we have

11    tried to be very disciplined in our case in terms of

12    foregoing crosses on several witnesses, being shorter on a

13    lot of witnesses.  As a result, just time on the record,

14    we're about 11 hours less than the plaintiffs, close to

15    50 minutes for the plaintiffs, 5-0, and 38, 12 for the

16    defense.  When we add in deposition designations, it gets

17    even more divergent.  13 hours so far, 13 and a half hours

18    so far from the plaintiffs, with the intention of calling

19    more.

20         And I just want to put that on the record because that

21    informs that discipline we've had and that caution we've had

22    about using our time and the fact that we've come in much

23    under time informs the position that we take, but we will

24    confer with the plaintiffs.

25              THE COURT:  Well, do we need to have an argument
```

```
 1    about this now, Mr. Majestro?

 2              MR. MAJESTRO:  Yes, Your Honor.  What I explained

 3    to defense counsel, we -- tonight at 7:00, we'll disclose

 4    our witnesses for next week and we're taking a close look at

 5    who we think we need to put on.  We'll come back to the

 6    Court tomorrow with a specific ask and, prior to that, we

 7    will consult with defendants to see if we can reach an

 8    agreement.

 9         We don't think we need to have an argument now.  We'd

10    like to get Dr. O'Connell off the stand.  I'm sure she would

11    like to, too.

12              MR. SCHMIDT:  We don't have anything to ask

13    beyond, Your Honor.  We're prepared to move on with Dr.

14    O'Connell.  I simply wanted to note that for the record as

15    we started discussing this.

16              THE COURT:  Okay.  Well, we'll fight this out as

17    necessary.

18              MR. SCHMIDT:  But I'm alerted to the fact there's

19    an issue and I'm not the least bit surprised by that.

20              MR. HESTER:  Good afternoon, Doctor.

21              THE COURT:  Go ahead when you're ready, Mr.

22    Hester.

23              MR. HESTER:  Thank you, Your Honor.

24              BY MR. HESTER:

25    Q.   Good afternoon, Dr. O'Connell.
```

```
1    A.    Good afternoon.

2    Q.    Just one housekeeping matter before we move on to just

3    a few final questions.  My colleagues told me they weren't

4    sure that I had gotten a complete answer on one piece of

5    this board and I just wanted to make sure that we had this.

6          So, we put up on the board when I asked you were there

7    other treatment programs that you were aware of in

8    Cabell-Huntington and you listed out five, OVP, the

9    Huntington --

10   A.    Behavioral Health.

11   Q.    Behavioral Health, Methadone clinics, MAT available via

12   doctors, and Valley Health.  And I just wanted to confirm as

13   to all of those five that you have added to this list we

14   have worked on, those are not run by the City of Huntington

15   or by Cabell County, right?

16   A.    They are not.

17   Q.    And those are not paid for or funded by the City of

18   Huntington or Cabell County, correct?

19   A.    They are not.

20   Q.    And, in fact, the services, the treatment services that

21   those five entities provide, are all paid for by or subject

22   to reimbursement by insurance; is that right?

23   A.    They would be able to submit for reimbursement.

24   Q.    Thank you.

25               MR. HESTER:  Your Honor, we would -- we would like
```

1    to mark this as Defendants' Demonstrative Exhibit 5 just so

2    we don't lose track of it.

3              THE COURT:  All right.  It may be done.

4              BY MR. HESTER:

5    Q.   Right before the lunch break, Dr. O'Connell, I had

6    handed you a document marked as MC-WV-2126 [sic].  And on

7    the first page, it bears the title "Treatment Episode Data

8    Set 2018".  Do you have that with you Dr. O'Connell?

9    A.   I do.

10   Q.   And this dataset, this TEDS dataset, is something

11   that's published by SAMHSA; is that right?

12   A.   It appears so.

13   Q.   And you're familiar with this database, the TEDS

14   database?

15   A.   Yes.

16   Q.   Let me ask you to look at Page 43, again, working off

17   of the small numbers at the bottom, and it states under the

18   introduction, this report presents national and state level

19   data from the treatment episode dataset for admissions and

20   discharges occurring in 2018 and trend data from 2008 to

21   2018.  Do you see that?

22   A.   I do.

23   Q.   And then it goes on to say it summarizes demographic

24   information and the characteristics and outcomes of

25   treatment for alcohol and/or drug use.  Do you see that?

1    **A.**    I do.

2    **Q.**    And is that consistent with your understanding of what

3    the TEDS database does?

4    **A.**    Honestly, we don't use the TEDS database for much, so i

5    have no reason to doubt SAMHSA's writing in their own

6    report.

7    **Q.**    And SAMHSA, again, as we discussed, is a federal agency

8    that oversees drug abuse issues at the federal level?

9    **A.**    Substance abuse and mental health.

10   **Q.**    Let me ask you to look at Page 79 of this document,

11   please, again, using the small numbers at the bottom of the

12   page.  And so, this -- I wanted to ask you about figure 15

13   and the last bullet on the page there.  And it refers to the

14   median length of -- median LOS and "LOS" means length of

15   stay, correct?

16   **A.**    Correct.

17   **Q.**    And it says the median length of stay among discharges

18   that completed treatment was 143 days for outpatient

19   medicated assisted -- medicated [sic] assisted opioid

20   therapy.  Do you see that?

21   **A.**    I do.

22   **Q.**    And is that consistent with your understanding that the

23   median length of stay for people with OUD that completed

24   treatment was 143 days for outpatient medicated assisted

25   opioid therapy?

**A.**   I would only have the information that's presented in that chart.

**Q.**   Do you have any reason to doubt this information?

**A.**   I -- if it's calling into question the idea of the reporting on 90 days of efficacy and over a hundred -- or a hundred for treatment, I would just acknowledge that treatment centers and treatment services that are provided are often based and limited by reimbursement.

For example, there's no actual research behind 28-day treatment, which became a name and then a length of stay due to that was the only amount of treatment that insurance would initially reimburse for.  And so, it became a length of stay limited by the funding structure available.

**Q.**   Well, but I wanted to ask you just about the data that's stated here and my question is do you have any reason to doubt the data stating that the median length of stay for outpatient medication assisted opioid therapy was 143 days? Do you have any reason to doubt that data?

**A.**   No.  I imagine they should update to the fact that length of stay for outpatient residential -- or outpatient medication assisted treatment wouldn't be actual stay.

**Q.**   Well, it's a duration of treatment, correct?

**A.**   Yeah.  According to this, yes.

**Q.**   So, if we understand that to be stating a median length of duration, 143 days for outpatient medication assisted

1    opioid therapy, you don't have any reason to doubt that

2    that's correct?

3    **A.**    That they are reporting that the median length of stay,

4    the average, is -- just shy of 150 days.

5    **Q.**    Well, it's 143.

6    **A.**    143 days.

7    **Q.**    Correct?

8    **A.**    Correct.

9    **Q.**    And then -- and then it states the median length of

10   stay for intensive outpatient treatment among people who

11   completed treatment was 82 days.  Do you see that?

12   **A.**    Yes.

13   **Q.**    And do you have any reason to doubt that data?

14   **A.**    I'm not going to doubt SAMSHA's charting, no.

15   **Q.**    And it states next, the median length of stay for

16   people who completed treatment was 75 days for long-term

17   residential treatment.  Do you see that?

18   **A.**    Yes.

19   **Q.**    Do you have any reason to doubt that data?

20   **A.**    That that is an average length of stay nationally, no.

21   **Q.**    And then it states the median length of stay for people

22   who completed treatment was 71 days for outpatient

23   treatment.  Do you have any reason to doubt that data?

24   **A.**    No.

25   **Q.**    And then it states the median length of stay for people

1    who completed treatment was 25 days for short-term

2    residential treatment.  Do you see that?

3    **A.**   Yes.

4    **Q.**   Do you have any reason to doubt that data?

5    **A.**   No.  And that would be conducive to the idea that most

6    people leave treatment early if they're going to leave.

7    **Q.**   Well, this is stating people who've completed

8    treatment, correct?

9    **A.**   Right, but if it's an average, that means that there's

10   individuals surpassing that, but short-term treatment is

11   capped at 28 days.  So, to put it to 25 means the average

12   was higher.

13   **Q.**   Let me ask you to look back at a document you had

14   discussed in your testimony before our break.  It's -- no.

15   Actually, I'm sorry.  I'm going to ask you about another

16   document first.

17        Do you recall discussing before the break, before --

18   before our week break from trial, you've discussed a

19   Resiliency Plan that you and others had worked on.  Do you

20   recall that?

21   **A.**   Yes.

22   **Q.**   And I want to show you a document relating to that

23   Resiliency Plan.

24             MR. HESTER:  May I approach, Your Honor?

25             THE WITNESS:  Thank you.

```
 1              BY MR. HESTER:

 2    Q.   Dr. O'Connell, we've handed you a document, this one

 3    page e-mail marked as DEF-WV Exhibit 185.  It appears to be

 4    an e-mail from Stephen Petrany dated April 19, 2019.  Do you

 5    see that?

 6    A.   I do.

 7    Q.   And you received this e-mail, correct?

 8    A.   Yes.

 9    Q.   And this is discussing the Resiliency Plan that you and

10    others worked on, correct?

11    A.   Correct.

12    Q.   And if you look -- if you look at the e-mail, the text

13    of the e-mail -- and, again, Dr. Petrany was your -- is your

14    boss, correct?

15    A.   Correct.

16    Q.   And he -- he states in the second sentence, attached,

17    you will find a listing of active programs in our community

18    addressing some aspect of Substance Use Disorder.  Do you

19    see that?

20    A.   I do.

21    Q.   And do you recall that there was this development of an

22    initial list of programs that were engaged in treating

23    Substance Use Disorder?

24    A.   Vaguely.  I recall that -- yes.

25    Q.   And then, it goes on to say in the second paragraph,
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    our next survey asks you to consider ideas for building upon

2    what we're already doing in our community.  Do you see that?

3    **A.**    Yes.

4    **Q.**    So, here, the idea was build upon what is already being

5    done in terms of treatment programs, correct?

6    **A.**    Not necessarily.

7    **Q.**    It states building upon what we're already doing in our

8    community.  Did you understand that to mean building upon

9    what was already being done with treatment programs?

10   **A.**    You're specifying treatment programs and that's not

11   accurate.

12   **Q.**    Okay.  So, it's broader?  Building upon everything that

13   was being done in the community?

14   **A.**    When we look at the City of Solutions, we are outlining

15   a strong foundation that our community has.  The Resiliency

16   Plan is our goal of building a structure upon that strong

17   foundation.

18   **Q.**    So, starting with the foundation and then expanding it

19   further, correct?

20   **A.**    Correct.

21   **Q.**    And that would include starting with the foundation of

22   treatment programs that were already in place and expanding

23   those further, correct?

24   **A.**    Our treatment programs are one component of the current

25   foundation in Huntington.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1  **Q.**   And that was one piece of what you were looking at

2  expanding upon, correct?

3  **A.**   Correct.

4  **Q.**   And then, Dr. Petrany says in the next sentence, if

5  given unlimited resources, what ideas do you have for

6  addressing the problem today and for the future.  Do you see

7  that?

8  **A.**   I do.

9  **Q.**   And did you understand that was the objective of this

10  Resiliency Plan project, was to consider what you would be

11  looking for if there were unlimited resources?

12  **A.**   As I stated on the first day -- was that 2019?  No,

13  last -- two weeks ago, that our goal and what we had said

14  with our focus groups was that we had asked folks to

15  identify where we currently were, what short-term goals they

16  had, and what long-term goals they had, and that the

17  struggle there was that we are often limited in our thoughts

18  based on our current process which, like I mentioned, is

19  federal funding and grant opportunities.  So, working beyond

20  that scope was a challenge, but it was a goal.

21  **Q.**   So, the goal was not to assume a budget?  You weren't

22  assuming some maximum budget?  You were thinking of what you

23  would do if you had unlimited resources, correct?

24  **A.**   In each individual focus group, the -- it was stated

25  what do you need in regards to this patient population or

1    area of issue or concern.  So, in working with individuals

2    who are unstably housed or not able to obtain safe and

3    supportive housing, we started to think broadly about all of

4    the areas that those individuals and those people working

5    with those individuals knew to build upon.

6    **Q.**   And without assuming any limit on the resources that

7    you could -- could add to that?

8    **A.**   We weren't tied to money.  We were tied to the

9    discussion about what the community needed to become

10   healthy.

11   **Q.**   And so, that's what Dr. Petrany meant to your

12   understanding when he said unlimited resources, correct?

13   **A.**   He was asking people to extrapolate and build.

14   **Q.**   All right.  Then I'd like to go back and just look

15   quickly at the Resiliency Plan again.

16              MR. HESTER:  May I approach, Your Honor?

17              THE WITNESS:  Thank you.

18              MR. HESTER:  Yes.

19              BY MR. HESTER:

20   **Q.**   And, Dr. O'Connell, we've handed you what's been marked

21   as Defendant's Exhibit 1447.  This is the September 3, 2019

22   draft of the Resiliency Plan that you discussed in your

23   prior testimony, correct?

24   **A.**   Correct.

25              MR. HESTER:  And I believe this is already in

1    evidence, Your Honor.

2              BY MR. HESTER:

3    **Q.**   And I wanted to ask you to look at Page 32 again, using

4    the small numbers at the bottom, please, and I wanted to ask

5    you about the entry for outpatient and inpatient/residential

6    services.  Do you see that?

7    **A.**   I do.

8    **Q.**   And to the right-hand side, it provides examples of the

9    expenditures that were in that category; is that correct?

10   **A.**   In this current version of the draft, yes.

11   **Q.**   So, one piece was, for instance, an expansion of MAT

12   providers and services offered.  That was one idea for

13   expanding the services, correct?

14   **A.**   Correct.

15   **Q.**   And another was to expand the hospital inpatient unit

16   for treatment drug hospitalization, correct?

17   **A.**   Correct.

18   **Q.**   And another idea was to increase capacity for

19   addressing the effects of SUD over someone's lifespan,

20   correct?

21   **A.**   Yes.  These are some examples.

22   **Q.**   And am I correct that all of the treatment issues, all

23   the treatment categories for OUD and NAS, were included

24   within this category?  This was the category where the

25   expanded treatment was covered?

1    **A.**    I believe so.

2    **Q.**    And that would include treatment for NAS babies as an

3    example?

4    **A.**    Treatment for infants who were neonatally exposed would

5    fall in part under that, but also understanding child -- the

6    challenges with understanding the lifespan development of a

7    child who is born neonatally exposed is not clearly

8    understood as of right now.  And so, that falls also under

9    safe and supportive child care that's growing and advocating

10   with that child and data and research so that we are doing

11   longitudinal work to explore the needs of those children and

12   families.

13   **Q.**    The treatment of the -- of an NAS baby during the time

14   that it has NAS would be included within the outpatient and

15   inpatient residential services, correct?

16   **A.**    Natal Abstinence Syndrome is only at birth, so the

17   long-term diagnostic criteria for that child is unknown how

18   long that -- what types of treatment and interventions are

19   going to be necessary for the long-term.

20   **Q.**    We just don't know, correct?

21   **A.**    That's not my area of expertise as to current research

22   and data on that.

23   **Q.**    Would the treatment programs related with people with

24   HIV or hepatitis arising out of intravenous drug use, that

25   would be included within the outpatient and inpatient

1    residential services category, correct?

2    **A.**    As the document states, there's multiple subsections

3    and headings under each of the short-term and long-term

4    outcomes.

5    **Q.**    But I'm trying to understand if we're looking at any

6    expansion for, for instance, hepatitis or HIV treatment,

7    that would be an outpatient and inpatient/residential

8    services, correct?

9    **A.**    It could fall under some of the other categories.

10   **Q.**    Which other category?

11   **A.**    Community health, social support, early intervention,

12   as well.

13   **Q.**    The -- in terms of the expansion of services to treat

14   people with OUD, that would be within the inpatient and

15   outpatient and residential services category that we're

16   looking at, correct?

17   **A.**    Correct.

18          MR. HESTER:  Those are all the questions I have,

19   Dr. O'Connell.  Thank you very much.

20          THE COURT:  Is there any redirect?

21          MS. QUEZON:  Yes, Your Honor.  And I'm going to

22   try to be brief and restore your confidence in the veracity

23   of law, Your Honor.

24          THE COURT:  Okay.

25          MS. QUEZON:  Hope I'm successful.

```
 1              THE COURT:  I have plenty of confidence.

 2                     REDIRECT EXAMINATION

 3              BY MS. QUEZON:

 4    Q.   Dr. O'Connell, I'm going to start where Mr. Hester just

 5    left off with that Resiliency Plan and, as we could see in

 6    that particular Resiliency Plan, there were still numbers

 7    included; is that right?

 8    A.   That is correct.

 9    Q.   Can you remind the judge whether in the final version

10    there were any costs, money, associated with the needs of

11    the community?

12    A.   There were not.  When we -- as all of the many drafts

13    that we saw in court were labeled drafts and watermarked to

14    that effect, it was our work while we were working through

15    it to build off the research and the focus groups that we

16    had and -- and ensure that our expertise in those areas was

17    highlighted in that plan and the money and calculations were

18    not deemed accurate or representative of our community and,

19    therefore, were removed from our final and publicized

20    document.

21    Q.   And, Dr. O'Connell, Mr. Ruby spent a great amount of

22    time going through those drafts and listing out the

23    contributing individuals and contributing organizations.  Do

24    you remember that line of cross examination?

25    A.   I do.
```

```
 1    Q.   And during -- and not taking away from any of their

 2    expertise in their own areas, but during the time that you

 3    and others were working on this Resiliency Plan, did you

 4    have a healthcare economist, a public health economist,

 5    working with you?

 6    A.   We did not.

 7    Q.   You were asked a number of questions by Mr. Ruby, I

 8    believe it was, regarding meetings with Mr. Farrell, myself,

 9    Ms. Kearse.  Do you remember that line of cross examination?

10    A.   I do.

11    Q.   And in one of those meetings, do you recall whether or

12    not there were any experts that had been retained by both

13    the County and City present?

14    A.   I believe in what I've referenced as the fourth meeting

15    there were experts in attendance.

16    Q.   And were -- did -- were other communities leaders

17    present?

18    A.   Yes.

19    Q.   Did community leaders speak and give -- well, tell the

20    judge.  What did the community leaders do at these -- at

21    this meeting?

22    A.   The fourth meeting was the last one that I was in

23    attendance and that was at Campbell Woods and, at that

24    meeting, many community leaders addressed sort of where we

25    were, what work had been done.  We took the opportunity to
```

1  sort of reflect on, you know, another positive -- positive

2  movements in the community and I believe both -- and

3  predominantly shared some updates involving the future of

4  litigation for the County and the community and some experts

5  were introduced at that time.

6  **Q.**   Now, I want to talk to you -- I think this was Mr.

7  Mahady.  And forgive me.  It's been a week since we were

8  here, but I think it was Mr. Mahady that talked to you about

9  the grant application for the Great Rivers Region.  Do you

10  recall that?

11  **A.**   I do.

12  **Q.**   And I believe that was entered into evidence.  And if

13  we can pull that up.  Yes, here we go.  Now, did you write

14  this grant?

15  **A.**   I did not.

16  **Q.**   Are you familiar with this grant?

17  **A.**   I am.

18  **Q.**   And do you know what the available monies were for the

19  grant?

20  **A.**   I believe, as I've indicated before, that -- and it was

21  money that I had used the $2 million example before in

22  saying we always left some money on the table.  I believe

23  that the opportunity was there for approximately $2 million

24  to request.

25  **Q.**   And so, from that, what was requested in this grant

1    application?

2    **A.**    Was $1,999,206.00.

3    **Q.**    Had the grant been for $1.4 billion, what would you

4    have requested?

5    **A.**    $100 billion, 999 thousand, 995, and maybe left some

6    change on the table.

7    **Q.**    All right.  Now, and I do recall that Mr. Hester talked

8    to you about the strategic plan earlier today; is that

9    right?

10   **A.**    That is correct.

11   **Q.**    And if you can, explain to the Court what is this and

12   what significance, if any, does it have?

13   **A.**    As part of the Great Rivers Regional System for

14   addiction care, the MERCK Foundation is really interested in

15   seeing if what we've done is able to be replicated.  So,

16   they want in-depth dives into some of our programs like

17   PROACT.  They really like PROACT.

18        They're interested in the use of the Quick Response

19   Teams in the use of harm reduction to address infectious

20   disease and Substance Use Disorders.  So, as part of that,

21   because that grant is not treatment focused, it is purely a

22   -- a coordination grant.  The goal is to bring people

23   together who are working on things and have them share

24   resources and ideas.  And resources in that case often being

25   expertise or grant draft examples to share so that people

1    don't have to rewrite things.

2         So, as part of that, we were required to develop a

3    strategic plan that sort of highlighted some disparities.

4    The problem was the two evidence based tools that were used,

5    the partner and the CAST, were incredibly burdensome and it

6    actually also coincided with us removing an external

7    evaluator from the grant who was not meeting their

8    objectives.  And so, we removed them and replaced them with

9    a new evaluator.

10        So, but as part of that, we'd identified that the

11   partner and the CAST and the evaluation tools that went into

12   the strategic plan were not meeting our standards for

13   responsiveness.

14        So, if I sent out a survey to find out about, you know,

15   childhood mental health, you have to have so many people

16   respond who can speak to that subject to say that it's

17   accurate.  And so, that is one limitation that I noted we've

18   written into that strategic plan.  Overall, its goal was to

19   show multiple programs and different areas for need as we

20   moved forward.

21   Q.   Now, if we could bring up Defendant -- I think it's

22   2653, City of Solutions, and I know Mr. Hester spent some

23   time on this particular document.  And I want to talk to you

24   a little bit about it.  And if we can go to Page 6, under

25   conceptualization, and before we go into detail on this

1    particular page, can you basically explain to the Court who

2    all was involved in coming together and not -- you don't

3    have to say specific names, but generally, who all was

4    involved in coming together in order to put this document of

5    what the community was doing together?

6    **A.**   We tried to engage everyone who was doing things for

7    the most part.  We reached out to the executive of any of

8    the major organizations and they either delegated someone

9    who was on the ground doing the work or had multiple

10   different individuals meet with us to go over the

11   information.

12        And those were done through one-on-one interviews,

13   information off websites, or just our knowledge of working

14   side by side with these programs, which is why I was able to

15   address programs that don't fall under the Marshall Health

16   guidelines.  We work very closely together in collaborative

17   fashion.

18   **Q.**   Dr. O'Connell, it lists some here with these initial

19   stakeholders and it's got the City of Huntington and

20   Marshall Health, Marshall University, the hospitals, the

21   Cabell-Huntington Health Department and the Office of Drug

22   Control Policy.  Who is the Office of Drug Control Policy?

23   Where does that come from?

24   **A.**   The -- so, we are intimately connected with the state,

25   the West Virginia ODCP, Office of Drug Control Policy, as

1   Bob Hansen had previously sat in my position -- or as

2   director of the division and moved to become the Director of

3   the Office Drug Control Policy.

4        And, as part of that, Marshall Health maintains a

5   relationship.  So, when Bob Hansen stepped down from the

6   ODCP position, Dr. Matt Christiansen is now the newest

7   Director of ODCP and he is a family medicine physician who

8   sits in family and community health.

9   **Q.**   Is it fair to say that the City and the County were

10  involved in the creation of and coming to the table as key

11  leaders of the City of Solutions?

12  **A.**   It is.  The tag line City of Solutions does come from

13  the mayor's re-branding of the City of Huntington from the

14  epicenter of the epidemic and as our -- our mayor, we

15  started incorporating that new language and that is what got

16  us both statewide and national recognition for these

17  efforts.

18            MS. QUEZON:  Now, if we could, can we bring up the

19  -- and I don't know how to do it, Defendant's demonstrative

20  5 so I can see the list?  I'm not going to write on it.

21            MR. HESTER:  I think it's still there.  I hope it

22  is.

23            MS. QUEZON:  Okay, I'll try.  Oh, you got it?  Oh,

24  there we go.  Okay.

25            BY MS. QUEZON:

1   **Q.**   So, Dr. O'Connell, Mr. Hester went through treatment

2   programs.  They are listed on the left.  And I think that

3   all except perhaps Recovery Point, and that might be a

4   little bit of a separate one, but in general, all of the

5   treatment programs, are those healthcare programs?

6   **A.**   MARC and MOMS both sit in the hospital system.  Lily's

7   Place is a separate but hospital medical based system.  And

8   Project Engage sits within the hospital system.  PROACT

9   being an -- external to the hospital, but run by the

10  hospital system treatment center.  And Project Hope also

11  being an external from the hospital but medical based

12  treatment center.

13  **Q.**   And are there healthcare providers and, as you said,

14  medical providers engaged in each of these treatment

15  programs?

16  **A.**   Recovery Point has a primary care team, but they do not

17  -- you cannot be on medication assisted treatment and

18  residing at Recovery Point.

19  **Q.**   Okay.  And you mentioned that one of the goals if you

20  are running a healthcare program or a treatment program is

21  to become fully reimbursable.  Why is that so important?

22  **A.**   Well, with any program that we set up, our goal is

23  never to open and then shut the doors on people.  That would

24  be bad for treatment and the community.  You don't want to

25  provide hope and then take it away.

1          So, when we're working on anything, it's also a fact

2     that as a part of any grant, you have to report a

3     sustainability plan and, oftentimes, we report that as

4     working towards billable services because that is one of the

5     only current configurations for long-term sustainability in

6     our community.  There is no other set or structure.

7          So, we often then advocate to the State for changes in

8     what they call like substance use waivers.  And so, that may

9     allow different treatment to be covered by a waiver that

10     wasn't previously.

11          For example, certified peer recovery coaches can now be

12     billed for under very strict guidelines and only under an

13     LBHC, a licensed behavioral healthcare center, only in

14     15-minute increments, only after two years of recovery, and

15     completion of certification.

16     **Q.**   And so, as part of the goal in -- in having reimbursed

17     programs so that there is reliable sustainable funding?

18     **A.**   Yes.

19     **Q.**   Now, Mr. Hester focused on treatment programs, but you

20     and I talked a lot about some other programs that were part

21     of the County.  And I think the point here is are these run

22     by the City or County and I want to talk a little bit about

23     those and whether they can be reimbursed.

24          So, let's start if we can, and if you want to bring her

25     slides back up, that might be the easiest way to do it.  One

1   of the -- one of the programs you mentioned was the

2   prevention empowerment program, PEP?

3   **A.**   PEP.

4   **Q.**   And let me just ask you, is that -- does Medicaid

5   reimburse that?  Is that reimbursable by any insurance?

6   **A.**   No.

7   **Q.**   How is that funded?

8   **A.**   Exclusively grant funding and support originally from

9   United Way of the River Cities.

10  **Q.**   And we can go to Compass, which is I think about maybe

11  seven slides in.  Yes, there we go.  Is this reimbursable by

12  Medicaid or by any insurance program?

13  **A.**   No.  This is the program to address the helpers who

14  need help, which is our Huntington Police and Fire

15  Departments.  There is no structure currently for any of

16  those services to become reimbursable.

17        They are -- they started and are currently under the

18  Bloomberg Philanthropy Grant and the City of Huntington has

19  stepped in for the future of that for some of the staffing.

20  **Q.**   Now, the -- I think the next maybe two slides over,

21  there we go, the Cabell-Huntington Health Department and the

22  Harm Reduction Services, and I -- and I don't know the

23  answer to this.  Are some of those reimbursable?

24  **A.**   The reason that we integrated the peer recovery coach

25  services there was to try and initiate services.  However,

1    those cannot be employed by the Health Department because

2    they're not a licensed behavioral healthcare center.  So,

3    they couldn't bill for that.  So, Marshall Health can employ

4    peers that we then establish at the Health Department.

5        And just briefly, if we take peers, for example, on

6    reimbursement, peers can be reimbursed for up -- for

7    approximately 15-minute increments.  Well, a lot of peer

8    engagement is informal.  That's the goal, is to come

9    alongside someone and say I can help you.  I was also in

10   your shoes.  I can take you to that meeting.

11       Now, that meeting wouldn't be covered or reimbursable.

12   The trip, the car ride there, may now be reimbursable, but

13   then, for example, the supervision of our peers where we

14   make sure that we're covering their recovery, we don't want

15   to just let people out and then not provide them support and

16   care because they're individuals in recovery who need their

17   own support when they're engaging regularly with their old

18   negative people, places and things, which are the things we

19   tell them to change.  So, we have to provide a lot of

20   supervision services.  None of those would be covered.

21   **Q.**   Now, how about the Quick Response Team?  And that is --

22   and I know kind of already testified before the Court, so we

23   won't go into great detail, but this is started by the

24   Cabell County EMS, correct?

25   **A.**   Correct.

1    **Q.**   And are any of these reimbursable through either

2    Medicaid or insurance?

3    **A.**   Not currently.  Again, the only way that we're trying

4    to set this up moving forward would be to support the peer

5    through a -- another licensed center.  So, Prestera Center,

6    for example, has their peer on loan to the Quick Response

7    Team so that they can reimburse or often eat that cost and

8    wrap it under the larger structure and hope that there's

9    reimbursement somewhere else that covers these other

10   supportive services that we know we need.

11        So, we have to do that a lot.  If there's -- we know we

12   can be reimbursed for A, but to keep that person in

13   recovery, meaning B and C, we'll cover those through the

14   in-house.

15   **Q.**   And then, finally, let's just talk about CORE, the

16   Creating Opportunities for Recovery Employment.  Again, same

17   question.  Are any of those services reimbursed by Medicaid

18   or by private insurance?

19   **A.**   They are not.  And this would be the example

20   specifically if we can have someone in long-term recovery

21   but they can't get a job, why are they going to stay in

22   long-term recovery?  We have to be providing all of these

23   auxiliary supports that aren't really auxiliary.  They're

24   key to that person's long-term success.

25        And so, for CORE, we build it under PROACT in hopes

1    that when PROACT eventually breaks even that CORE would

2    continue to be supported and invested in because, without

3    it, sometimes we're wasting money, right, or we're never

4    wasting money on an individual.  A single day in recovery is

5    worth spending money on, but if we're not providing the

6    consistent wrap-around support services, then that person

7    ends up back in substance use when we know we could have

8    intervened with something that we should be intervening with

9    that other thing.

10   **Q.**   And then, finally, Dr. O'Connell, if we could bring up

11   Defendant's Demonstrative 5 again.  Now, I know Prestera

12   started back in the 60s, late 60s or something like that?

13   **A.**   I was surprised even how old they were according to

14   their website.

15   **Q.**   Wait a second.  '67, which is my birth year, so let's

16   not go crazy here.  All right.  Now, but let's look at the

17   others, if we can here.  PROACT, do you know when that

18   began?

19   **A.**   2017, 2018.

20   **Q.**   And why is it necessary in the community?  Why did it

21   have to start in the first place?

22   **A.**   We -- we still do, but at that time, if you wanted

23   treatment there was nowhere you could walk in the door and

24   say I have a problem.  I need help.  You would be told there

25   was a 60, 90, forever long wait list and no Emergency

1    Department or even treatment center allowed you really just

2    to walk into the lobby and say you needed help.  PROACT

3    exclusively does that.

4    **Q.**   And was it necessary for the community?

5    **A.**   It's paramount to the success of our community.

6    **Q.**   All right.  Let's talk about MARC.  When was that

7    created?  And that's the Maternal --

8    **A.**   Addiction Recovery Center.

9    **Q.**   Would the Road to Recovery have the --

10   **A.**   It would have the dates on it.

11   **Q.**   Is that the easiest way?

12   **A.**   I know it's in one of these.

13   **Q.**   Can you pull up the recovery?

14   **A.**   Dates are not my forte'.

15   **Q.**   Might be like the third page of the slides, the Road to

16   Recovery.

17   **A.**   Oh, yeah.

18   **Q.**   Looking at the Road to Recovery -- oh, there we go.

19   All right.

20   **A.**   The MARC Program, so MOMS started in 2018.  The MARC

21   Program did exist before then.

22   **Q.**   Yeah.  It is --

23   **A.**   Yeah.  Okay, yeah.  The MARC Program started in 2012

24   and that, I believe, was when they saw a significant -- the

25   NICU, the Neonatal Intensive Care Unit, was being

1    overwhelmed by infants with exposure.

2    **Q.**   And was that necessary for the community?

3    **A.**   That dramatically changed the treatment of infants with

4    exposure.

5    **Q.**   All right.  Let's go on to MOMS.  I think that's the

6    next one that was on Mr. Hester's list.

7    **A.**   It is 2018 down at the bottom there.

8    **Q.**   And why did that have to be created?

9    **A.**   Again, that idea that we would identify -- we would

10   identify something, develop a program, and then it would

11   illuminate three other needs or ten other needs.

12         So, we had the MARC Program and we're saying great.  We

13   have women who are pregnant able to receive treatment and

14   care while they're pregnant.  Well, then they would deliver

15   the baby and the baby would receive treatment in the NTU,

16   but Mom wasn't and she was being held responsible for not

17   being there for visitation for the NTU because she would

18   maybe be off somewhere getting help.  So, the MOMS Program

19   then picked up on that need.

20   **Q.**   And was it necessary for the community at the time?

21   **A.**   I believe so.

22   **Q.**   What about Lily's Place?

23   **A.**   Lily's Place recognized the need after the NTU and the

24   MARC Program that there was an even greater need than just

25   the hospital based care and that the hospital setting

 1   continues to be a struggle for infants who are exposed

 2   because of the stimulus and Mom's inability to visit all the

 3   time.  And so, Lily's Place provided a much needed

 4   community-based setting for that to occur.

 5   **Q.**   And if we go back to demonstrative 5 -- so, Dr.

 6   O'Connell, not to belabor the point, but were each of these

 7   created other than, again, Prestera, which was an older

 8   program, were each of these created because of the need in

 9   the community?

10   **A.**   Absolutely.  They met a specific need and a population

11   that was not being served.

12             MS. QUEZON:  May I have a moment, Your Honor?

13             THE COURT:  Yes.

14      (Pause)

15             MS. QUEZON:  No further questions, Your Honor.

16             THE COURT:  All right.  Is there any re-cross?

17             MR. HESTER:  Yes, Your Honor, just a little bit.

18             THE COURT:  An hour and a half, Mr. Hester?

19             MR. HESTER:  I promise you I'll be better than

20   that, Your Honor.

21                     **RE-CROSS EXAMINATION**

22             **BY MR. HESTER:**

23   **Q.**   Dr. O'Connell, just a few questions and then we'll let

24   you go.  Let me ask you if we could pull up the plaintiffs'

25   slide deck, Demo 224, Page 8, please.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1        Dr. O'Connell, you were asked about PEP.  How much
 2   money does the community spend on PEP?
 3   A.   Not enough.
 4   Q.   There's no money spent on it, correct?
 5   A.   The community -- the money that we receive for PEP is
 6   run through the United Way of River Cities.
 7   Q.   So, the City of Huntington and Cabell County don't put
 8   money into PEP?
 9   A.   There is money from the Cabell County school system, so
10   I do not know if that runs through the Cabell County budget.
11   Q.   Most of the funding for PEP comes from United Way?
12   A.   Through the CADCA grant, which stands for something.
13   Stands for -- I do not actually recall what the CADCA grant
14   stands for, but it's federal funding for prevention.
15   Q.   And how much money is that, do you know?
16   A.   In their first five years, I believe, annually they had
17   SAPT funding, which is student-something prevention funds.
18   And that was $70,000.00.  And then the -- the DFC funding,
19   that's what it is.  It'S -- CADCA runs through the
20   Department of Family and Children's and I believe they
21   received maybe around $200,000.00 and those funds for both
22   of those, SAPT funding has ended and DF -- DCF or DFC
23   funding will end in October of this year.
24   Q.   But the annual funding during the time that the funding
25   was available, the annual funding was in the range of
```

1    $250,000.00?

2    **A.**    Probably.

3    **Q.**    Let me ask you about Compass, Page 11, please.  This is

4    another one you were asked about, correct?

5    **A.**    Correct.

6    **Q.**    And this is not providing treatment to people with OUD,

7    correct?  It's dealing with first responders?

8    **A.**    This -- it works with the Huntington Police and Fire

9    Department irregardless of their substance use experience.

10   **Q.**    But when it says designed to provide first responders

11   with tools to improve their ability to deal with high stress

12   situations, that's not an OUD issue, is it?

13   **A.**    In some cases, it is.

14   **Q.**    So, this would be treating people who've had OUD?

15   **A.**    We have had Huntington Police and Fire, unfortunately,

16   experience Substance Use Disorder and Compass in part grew

17   out of the need to not only address that, but overall health

18   and wellness, including suicidality.

19   **Q.**    So, it's health and wellness for the first responders

20   community, correct?

21   **A.**    And their families.

22   **Q.**    And how much money goes into that?  Is it correct to

23   say it's about $350,000.00 annually?

24   **A.**    I am not sure.  That may be the -- well, it was funded

25   by the Bloomberg grant initially, which was a million-dollar

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    award for -- there's three full-time staff on the project

2    and the construction of some wellness resources and the

3    three staff are now part of the City's budget.

4    **Q.**   And so, it's roughly in the range of $350,000.00, or

5    you don't know?

6    **A.**   It was a million-dollar grant.

7    **Q.**   Over multiple years?

8    **A.**   Over -- well, we got $100,000.00 to pilot the grant

9    initially.  And then, I believe it was two years with the

10   remaining funds.

11   **Q.**   So, a million-dollar grant covering two years?

12   **A.**   I believe so.

13   **Q.**   And then --

14   **A.**   Three.  Probably three.  They're normally three years.

15   **Q.**   Covering three years, do you think it was?

16   **A.**   I believe so.

17   **Q.**   So, it was a million-dollar covering three years of the

18   program?

19   **A.**   I believe so.

20   **Q.**   Let me ask you at Slide 13, please, you were asked

21   about these Harm Reduction Services provided by Cabell

22   Huntington Health Department, all that.  Is it correct that

23   all of those Harm Reduction Services are subject to

24   reimbursement except for provision of needles?

25   **A.**   Narcan training is not covered for reimbursement

1     status.  Social work services are not necessarily covered by

2     reimbursement status.  I already explained the peer

3     services.  And then any -- any services providing syringes

4     or other auxiliary, clean water, other tools, are not

5     covered both by any reimbursement nor by grant funding.

6     **Q.**   So, some pieces of the Harm Reduction Program are

7     subject to reimbursement?

8     **A.**   As I said, the majority of those listed are not.

9     **Q.**   And the total budget for the Harm Reduction Services

10    each year is in the range of $220,000.00, correct?

11    **A.**   I have no idea what their current budget is.

12    **Q.**   That would be shown on the City budget?

13    **A.**   I don't know.  I believe they operate -- I don't know.

14    **Q.**   You were asked about the Quick Response Team.  The

15    annual spending for the Quick Response Team is about

16    $225,000.00, right?

17    **A.**   That is correct.

18    **Q.**   And some of that's provided for by grant funding; is

19    that correct?

20    **A.**   All of that is currently -- the Quick Response Team is

21    singularly supported by grant funding or matched because the

22    -- one of the two grants, whether it was ECI or BJA,

23    requires a match for funds.  And so we use -- for example,

24    the vehicle.  Cabell County EMS provided the vehicle and

25    then could be used as a match towards the grant funding.

1    **Q.**   And the -- some of the funding is coming from the State

2    of West Virginia, correct?

3    **A.**   No.

4    **Q.**   For the QRT?

5    **A.**   Not for the Huntington Quick Response Team.

6    **Q.**   You say the match funding.  Where does that come from?

7    **A.**   So, Cabell EMS would provide some.  I work on the grant

8    and my time is not reimbursed, so that's matched.  They

9    receive trainings from the domestic violence shelter.  That

10   would be considered matched in hours.  The Narcan that they

11   receive could be considered matched funding.  So, it's --

12   time is often how we match.  We don't have a lot of other

13   money to throw at this in a financial way.

14   **Q.**   And when you say matched, do you mean you're providing

15   in kind services to support the QRT?

16   **A.**   That is required by the grant, for the awarding of the

17   grant.

18            MR. HESTER:  Thank you, Dr. O'Connell.  That's all

19   I have.

20        Thank you, Your Honor.

21            THE COURT:  Is there anything else of Dr.

22   O'Connell?

23            MS. QUEZON:  Mercifully not from the plaintiff.

24            MR. RUBY:  Judge, I have one question.  Just one.

25            THE COURT:  Okay.

**RE-CROSS EXAMINATION**

        **BY MR. RUBY:**

Q.   And I promise, Doctor, this is the only one.

A.   Multiple parts?

Q.   Pardon me?  Pardon me?

A.   Multiple parts?

Q.   No, just one.

    There was never a version of the Resiliency Plan that included more than $50 million over 40 years for treatment, was there?

A.   There is no final draft or final version of the Resiliency Plan with money tied to it.

Q.   Was there ever a version that included more than $50 million over 40 years for treatment?

A.   There are no drafts of the Resiliency Plan that change that financial amount and because we didn't believe that we knew what we were doing with the money accounting, there is no final draft with money tied to it.

Q.   Okay.  Well, I want to make sure we're communicating. I understand you're talking about the final draft.  Was there ever any draft of the Resiliency Plan that included more than $50 million over 40 years for treatment?

A.   I want to stand behind the final version of the document and not multiple iterations of it where there were changes made consistently to different sections.

1    **Q.**   And I'm trying to stick to my one question.  You are

2    aware that there were multiple drafts of the document,

3    correct?

4    **A.**   There were countless drafts of the document.

5    **Q.**   And some of those drafts included cost figures,

6    correct?

7    **A.**   There are draft versions that contained finances.

8    **Q.**   And in any of the versions -- let's just focus on the

9    versions that contained the finances.  In any of the

10   versions that contained cost figures or finances, were there

11   any of those that included more than $50 million over

12   40 years for treatment?

13   **A.**   I believe I recall last Friday going through multiple

14   versions and having answered this and said no.

15            MR. RUBY:  Thank you.

16            THE COURT:  Anything else of the doctor, Mr.

17   Mahady?

18            MR. MAHADY:  I have no further questions.  Thank

19   you for your time.

20            THE COURT:  Going once --

21            THE WITNESS:  Sold.  Sold.  Done.  Don't auction

22   it off.

23            THE COURT:  Thank you, Dr. O'Connell --

24            THE WITNESS:  Thank you.

25            THE COURT:  -- for your patience with us.

```
 1                    THE WITNESS:  No problem.  Thank you for having

 2     me.

 3                    THE COURT:  And you're free to go.  Thank you very

 4     much.

 5                    THE WITNESS:  Thank you.  Should I leave all of

 6     this somewhere?

 7                    THE COURT:  You can just -- just leave it and

 8     somebody will get it.

 9                    THE WITNESS:  Okay.  The recycling bin, please

10     tell me.

11          Thank you, Your Honor.  Have a good day.

12                    MS. SINGER:  Good afternoon, Your Honor.

13                    THE COURT:  Good afternoon.

14                    MS. SINGER:  Linda Singer for the City of

15     Huntington.  I see all of these people rising.

16                    COURT REPORTER:  I'm sorry.  What was your name

17     again, ma'am?

18                    MS. SINGER:  Linda Singer.  So, Your Honor, I

19     think, as you're aware, the plaintiffs intend to call Joseph

20     Rannazzisi to the stand and anticipate the defendants may

21     have some issues I wanted to raise.  I wanted to, very

22     briefly, with the Court's permission, raise a few

23     preliminary issues.

24                    COURT REPORTER:  Is your mic on?

25                    MS. SINGER:  Can you not hear me?
```

```
 1              COURT REPORTER:  Is it on?

 2              MS. SINGER:  It is.

 3              COURT REPORTER:  Okay.

 4              MS. SINGER:  And you would think I'd be close to

 5    it.

 6         First, Your Honor, as you may be aware, Mr. Rannazzisi

 7    is appearing with authorization from the U. S. Department of

 8    Justice pursuant to a Touhy authorization.  I am happy -- I

 9    will show it to the witness.  I am happy to provide a copy

10    to the Court, but I did want to make sure the Court is aware

11    that his testimony will be constrained both by the terms of

12    his Touhy authorization.

13         I understand, with the Court's permission and the

14    consent of the parties, that there is a representative of

15    the U. S. Attorney's Office here who will stand in for the

16    Department of Justice to raise any objections.  I don't know

17    if that person wants to introduce themselves and enter an

18    appearance, but I did want to create that space.

19              MR. WESTFALL:  Your Honor, Fred Westfall for the

20    U. S. Attorney's Office on behalf of the Department of

21    Justice.

22              THE COURT:  All right, Mr. Westfall.

23              MS. SINGER:  And I'm ready to start if the

24    defendants don't have any issues they want to raise.

25              MR. SCHMIDT:  No.  We -- we had raised our concern
```

```
1    with the plaintiffs when we got their exhibits that they

2    were well outside of what the representation was made to the

3    Court this was only a fact witness constrained by his MDL

4    testimony.

5         We've been told -- haven't talked directly to Ms.

6    Singer, but by her colleagues, that they'll stick within

7    that.  So, I'm hoping we won't need to object to many of the

8    materials that they identified last night which would be

9    objectionable, but we'll deal with that as it arises, Your

10   Honor.

11            THE COURT:  All right.  I will deal with those as

12   they come up and I have ruled that Mr. Rannazzisi is a fact

13   witness, but not an expert, and we'll have to -- just want

14   the facts, Ms. Singer.

15            MS. SINGER:  That's my job, Your Honor, and I'm

16   sure that's what Mr. Rannazzisi is prepared to do.

17        I will note that the other aspect of Your Honor's

18   ruling is that on defendants' motion and with plaintiffs'

19   agreement, we are not offering Mr. Rannazzisi for anything

20   beyond the scope of his prior deposition in the MDL.  To the

21   extent that there are issues, I know that we will deal with

22   them.

23        And I assure Your Honor that that was a two-day very

24   vigorous and expansive deposition which covered many of the

25   issues the Court has heard about over the last several
```

1  weeks, ARCOS, and suspicious orders, and DEA's guidance, and

2  enforcement.  So, I think there will still be plenty that

3  Mr. Rannazzisi can cover as a fact witness within those

4  bounds and, with the Court's permission, we'll go ahead and

5  bring Mr. Rannazzisi into the courtroom.

6           THE COURT:  All right.

7           MS. SINGER:  Thank you.

8           THE COURT:  You may proceed.

9       Mr. Rannazzisi, if you want to come up and take the

10  oath.

11          COURTROOM DEPUTY CLERK:  Would you please state

12  your full name?

13          THE WITNESS:  Joseph Rannazzisi.

14          COURTROOM DEPUTY CLERK:  Thank you.  Please raise

15  your right hand.

16      **JOSEPH RANNAZZISI, PLAINTIFF WITNESS, SWORN**

17          COURTROOM DEPUTY CLERK:  Thank you.  Please take a

18  seat.

19          THE WITNESS:  Good afternoon, Judge.

20          THE COURT:  Good afternoon, Mr. Rannazzisi.

21          MS. SINGER:  I think I was taller when we got

22  started with this trial, Your Honor, but I will try to make

23  it over the podium.

24                  **DIRECT EXAMINATION**

25          **BY MS. SINGER:**

1    Q.   All right.  Mr. Rannazzisi, can you introduce yourself

2    to the Court, please?

3    A.   My name is Joseph Rannazzisi.  I'm a retired DEA

4    special agent.

5    Q.   And, Mr. Rannazzisi, are you aware that you are

6    authorized to testify today pursuant to the terms of a Touhy

7    authorization?

8    A.   Yes, ma'am.

9    Q.   And have you seen that Touhy authorization?

10   A.   Yes, ma'am.

11          MS. SINGER:  Your Honor, may I approach the

12   witness?

13          THE COURT:  Yes, you may.

14          BY MS. SINGER:

15   Q.   And, Mr. Rannazzisi, do you recognize the document that

16   we've just handed you?

17   A.   Yes, ma'am.

18   Q.   And what do you recognize it to be?

19   A.   The Touhy letter that was sent to me outlining what I

20   can and can't disclose in testimony.

21   Q.   Okay.  And you're aware that you're here as a fact

22   witness, are you not?

23   A.   Yes, ma'am.

24   Q.   Have you prepared a report related to opioid

25   distribution or diversion in Huntington or Cabell County?

1    **A.**    No, ma'am.

2    **Q.**    Are you offering any expert opinions?

3    **A.**    No, ma'am.

4    **Q.**    Are you -- are you receiving any compensation for being

5    here today?

6    **A.**    No, ma'am.

7    **Q.**    Why did you agree to testify here?

8    **A.**    I believe that the facts should be presented in this

9    case, as well as the other opioid cases that are across the

10   country, because the public needs to be aware of what went

11   on and this is my opportunity to do that.

12            MS. SINGER:  All right.  Gina, can we bring up the

13   demonstrative road map, please?

14            BY MS. SINGER:

15   **Q.**    Well, hopefully, given where we are in the day, Mr.

16   Rannazzisi, I don't think we have too long a journey.  I did

17   want to lay out just briefly an outline for what my hope is

18   that you will cover over the course of this day.

19            We will go through your background, closed system,

20   guidance that DEA provided to registrants, ARCOS data,

21   suspicious orders, enforcement, the DEA's enforcement

22   related to these defendants.  What I've put here is

23   endorsement, which is whether DEA approved any of these

24   programs, prescribers, some of your prior testimony, quota,

25   and then wrap up.

```
1            So, I just wanted to lay that out for the Court and for

2      you.  Hopefully, we can get through all of that efficiently.

3      If it's too much, I think it's too late now.

4            MR. SCHMIDT:  And just -- I would request a copy

5      of the demonstratives.  We got a demonstrative last night.

6      It did not include this.

7            MS. SINGER:  It's not a demonstrative, but you

8      have all of the other slides.

9            MR. SCHMIDT:  We don't have this one.  If we could

10     get a copy of any slides you plan to use.

11           BY MS. SINGER:

12  Q.   So, Mr. Rannazzisi, how long did you work for the Drug

13     Enforcement Administration?

14           THE COURT:  Well, just a minute.

15           MR. SCHMIDT:  Your Honor, may I get the -- we have

16     a copy of that.  No, the demonstrative that they just used.

17     It would be helpful for us to have one.

18           THE COURT:  Oh, the one she just put on the board?

19           MR. SCHMIDT:  Yes, please.

20           THE COURT:  Do you have a copy of that you can

21     give him, Ms. Singer?

22           MS. SINGER:  We will get one.

23           MR. SCHMIDT:  I appreciate that.

24           BY MS. SINGER:

25  Q.   Mr. Rannazzisi, let me ask you again, how long did you
```

1  work for the Drug Enforcement Administration?

2  **A.**   Worked for the Drug Enforcement Administration from

3  March of 1986 until October 31st, 2015.

4  **Q.**   What position did you hold?  I think you said you

5  retired.  What position did you hold at DEA when you

6  retired?

7  **A.**   It was a Deputy Assistant Administrator for the Office

8  of Diversion Control.

9  **Q.**   Now, prior to becoming Deputy Assistant Administrator,

10  what other positions did you hold at the DEA?

11  **A.**   I was a Deputy Chief of Enforcement Operations, the

12  Deputy Director of the Office of Diversion Control for a

13  brief period of time.  I was an Assistant Special Agent in

14  Charge in the Detroit Field Division.  I was a Section Chief

15  in the Dangerous Drugs and Chemicals Section in DEA

16  headquarters.  I was a Staff Coordinator in that same

17  section.

18       I was also a Group Supervisor in the Detroit Red Room,

19  Homicide Task Force.  Prior to that, I was a special agent.

20  And before that, I was a diversion investigator.

21  **Q.**   All right.  So how much of your career have you spent

22  at the DEA?

23  **A.**   I've been at the DEA --

24  **Q.**   Yes.  Meaning have you worked anyplace else?  Has this

25  been your entire career?

**A.**    Prior -- prior to my entry employment with the Drug
Enforcement Administration, I was a staff pharmacist at the
Veterans Administration Hospital in Indianapolis, Indiana.

**Q.**    So, would it be fair to say that you've had both field
and headquarters positions at the DEA?

**A.**    Oh, absolutely, yes.

**Q.**    And let's turn back before your time at the DEA.  What
was your major in college?

**A.**    I received a Bachelor of Science in Pharmacy from
Butler University in Indianapolis.

**Q.**    And why Pharmacy?

**A.**    My career choices.  I was going to move into law
enforcement.  I wanted to be in narcotics and law
enforcement, I figured the pharmacy background would present
a very good background to get into narcotics law
enforcement.

**Q.**    And did you work when you were in college?

**A.**    Yes.  I worked multiple jobs.  I was a security guard
at a children's museum.  I was a library tech.  I was also
in the Fire Department.  I was both a firefighter and EMT.

**Q.**    And after college, Mr. Rannazzisi, did you have any
additional education?

**A.**    After college, after a few years, I went back and
received a law degree from Detroit College of Law at
Michigan State University.

**Q.**   And you said that your major in college was in

Pharmacy.  Did you ever practice as a pharmacist?

**A.**   Yes, ma'am.  The -- I was both -- I interned at Hook's

Drugstore, which was a retail pharmacy.  And then, when I

passed my pharmacy boards, I worked at the Veterans

Administration, both inpatient and outpatient pharmacy.

**Q.**   Why did you join the DEA?

**A.**   I wanted to be in narcotics law enforcement.  I grew up

in the 70s.  There were a lot of issues with drug abuse and

drug addiction.

In the neighborhood that I grew up in, it was mostly

firemen and police officers.  In fact, my best friend's

father, who I looked up to, was a police officer.

There was a former DEA -- a DEA agent that was killed

during an undercover operation.  And all of that just worked

into my reasoning that, you know, this is something that

will help the public and, because of that, I decided that

was going to be my chosen profession.

**Q.**   At some point, I think you mentioned in your career at

DEA, did you move into drug diversion in particular?

**A.**   Yes.

**Q.**   And explain how that came about and when that was.

**A.**   Well, again, in -- as a diversion investigator, when I

start -- when I initially joined the Drug Enforcement

Administration, when I initially applied to the Drug

1    Enforcement Administration, the special agent slots were

2    extremely hard to get.  You needed experience.  And, while I

3    was a pharmacist, I didn't have the law enforcement

4    experience.

5        I became a diversion investigator because I obtained

6    that experience and then moved into the special agent role.

7    So, yes, I was a diversion investigator for two years and,

8    at the back end of my career, I again oversaw diversion.

9    **Q.**   And other than your work in diversion at the beginning

10   and end of your career, did you do street level enforcement

11   on non-diversion investigations?

12   **A.**   Yes.

13   **Q.**   And did your work in drug diversion connect with any of

14   the non-diversion cases that you had been working on before?

15   Was there any kind of common thread?

16   **A.**   Well, DEA investigations, be it from illicit drugs or

17   pharmaceuticals, are basically the same.  You're going --

18   you're investigating people who are selling drugs that are

19   harmful to the public.  So, yeah, there was a lot of

20   crossover.

21       I did undercover on -- on pill cases.  I also did

22   undercover on cocaine, and methamphetamine, heroin cases.

23   But they really converge because pills, like the drugs, are

24   harmful to the community if they're provided in a manner

25   that's unsupervised and, you know, illicit.

Q.   At some point during your career, did you observe an
increase in the diversion of prescription opioids?

A.   Yes, sir -- yes, ma'am.

Q.   And can you explain when -- when that happened?

A.   We -- we observed prescription opioids throughout the
80s and 90s.  Before -- right before I was transferred into
headquarters to become the Deputy Director of the Office of
Diversion Control, I received a group of briefings before I
got there, and then when I got there, and we were looking at
pharmaceuticals, specifically pharmaceuticals that are being
trafficked off the internet.

     And so, yes, I noticed based on the numbers and based
on other things that I was seeing from headquarters that
this internet trafficking was taking over a lot of the
pharmaceutical issues and diversion that was happening in
the United States across the country.

Q.   And then even before internet pharmacies, had you
noticed, before you were in headquarters, any increase or
change in prescription drug diversion?

A.   Yes.  The problem with prescription drug diversion, it
was very localized in the 80s and throughout the mid-90s.
We were -- you had bad doctors, a few bad pharmacies.  The
numbers weren't really -- they weren't huge numbers.

     Towards the mid- to late-90s and into the early 2000s
we started seeing increases in the amount of drugs both

170

1    coming out of the -- into the pharmacies and coming out of

2    the pharmacies and they were oxycodone products, hydrocodone

3    products secondly.  And as we started seeing these drugs

4    more and more, you know, we -- we understood that the

5    problem was getting progressively worse.

6    **Q.**    And was it a difference in scale, in number, or in type

7    of diversion?  How would you describe that?

8    **A.**    Well, the normal diversion, when we -- when you say

9    diversion in the sense of the 80s and 90s, we were seeing a

10   lot of prescription fraud.  We were seeing a lot of doctor

11   shopping.  We were seeing robberies, burglaries, things like

12   that.  Those are your normal diversion patterns.  Bad

13   doctors who were writing scripts.

14        As we got into the 2000s and to the early to

15   mid-2000s, it wasn't anymore that a doctor or a pharmacy was

16   dispensing a few thousand tablets.  It was a pharmacy or --

17   was dispensing a few hundred thousand tablets.  The volume

18   increased dramatically and it switched to hydrocodone.

19   We started seeing a huge quantity of hydrocodone coming out.

20        We saw Alprazolam, which is a Benzodiazepine.  We saw

21   Phentermine.  So, the quantities were increasing

22   dramatically.  So, we went from a -- a locally based --

23   groups that were burglarizing, they were passing bad paper,

24   -- passing bad prescriptions, doctor shopping, bad doctors.

25   We were moving into this -- this nationwide problem where

1    the numbers were out of control.

2        Excuse me.  I need some water, please.

3            THE COURT:  Mr. Rannazzisi, will that help you?

4            THE WITNESS:  Yes, sir.  Thank you very much, sir.

5            MS. SINGER:  That's throwing yourself on the mercy

6    of the Court, I think.

7            THE WITNESS:  Thank you, sir.

8            BY MS. SINGER:

9    Q.   So, Mr. Rannazzisi, where in this cycle in the

10   development of prescription drug diversion did you move into

11   headquarters?

12   A.   I was right at the -- I was probably a year into --

13   when I got there, we were a year into maybe -- a year to two

14   years into the internet at that point in time.  We started

15   seeing -- by 2004, by mid to late 2004, we were seeing large

16   volumes of hydrocodone and Alprazolam coming out of the

17   internet and, yeah, when I got to headquarters, that's what

18   we were looking at.

19   Q.   All right.  And what year did you become Deputy

20   Assistant Administrator?

21   A.   When I got into headquarters, I was Deputy Director,

22   which was the number two position in the Office of Diversion

23   Control.  I didn't -- I left there towards the end of 2004

24   to become the Deputy Chief of Enforcement Operations and I

25   returned basically in July of 2005 to take over the office

```
1    because the then Deputy Assistant Administrator was deployed

2    in the military and they needed to keep that position open.

3    Q.   And where does -- so, let's move to the time when you

4    became Deputy Assistant Administrator in the Office of

5    Diversion Control.  Where does that sit within the DEA

6    hierarchy?

7    A.   The Office of Diversion Control Deputy Assistant

8    Administrator doesn't really exist anymore.  It's now an

9    Assistant Administrator position.  When I was there, I

10   reported to the Chief of Operations, who was an Assistant

11   Administrator, and I also had reporting authority to the

12   Deputy Administrator and the Administrator, depending on

13   what -- what I was doing at the time.  So, I had overall

14   control of all diversion operations.

15        I was also a Deputy Chief of Enforcement Operations

16   under the Enforcement Chief and I also reported to the

17   Deputy Administrator and, depending on what we were doing,

18   the Administrator.

19   Q.   And so, within that suite of responsibilities, what

20   specifically were your duties as Deputy Assistant

21   Administrator?

22   A.   My duties, oversee all major investigations regarding

23   pharmaceuticals and listed chemicals, clandestine lab

24   operations, promulgating regulations.  I was the liaison to

25   law enforcement related to clandestine laboratories
```

1    pharmaceutical investigations.  I was industry liaison.

2         I was pretty much anything that diversion touched.  I

3    was the competent authority for chemicals.  Anything that

4    diversion touched, I oversaw.

5    **Q.**   And did you have any responsibility with respect to

6    quota, or advocacy, or other law enforcement entities?

7    **A.**   One of my duties was the -- overseeing the

8    establishment of the aggregate production quota in the

9    United States for Schedule II and Schedule II products,

10   Schedule I products and Schedule III narcotics.

11   **Q.**   And did you have any liaison responsibilities outside

12   of the Federal Drug Enforcement Administration?

13   **A.**   Again, I -- I was the liaison to law enforcement

14   agencies.  I was liaison to International Association of

15   Chiefs of Police, all the regulatory agencies, and also

16   industry.

17   **Q.**   Have you received any recognitions during your career

18   for your service?

19   **A.**   In I believe it was 2008 I received the Presidential

20   Meritorious Service Award from Attorney General Holder.  I

21   think it was submitted under Attorney General Gonzales.  I

22   was also given a Hosta [sic] Award from the National

23   Association of Boards of Pharmacy for service, public

24   service.  The National Narcotics Office Association Award

25   for services narcotics officer and Oklahoma Board of

1   Pharmacy gave me an honorary Doctor of Pharmacy award.

2   **Q.**   All right.  Let's turn and I won't pull the road map

3   up, but let's turn from your background to the closed system

4   was the next place on our journey.  So, can we pull up

5   demonstrative slide 2, please,

6           MS. SONGER:  May I approach, Your Honor?

7           THE COURT:  Yes.

8           BY MS. SONGER:

9   **Q.**   Mr. Rannazzisi, have you heard the term closed system

10  applied to the supply chain for distributing controlled

11  substances?

12  **A.**   Yes, ma'am.

13  **Q.**   And take a look at the slide that's up on the screen,

14  sir, that I just handed you.  Do you recognize this graphic?

15  **A.**   Yes, ma'am.

16  **Q.**   And what do you recognize it to be?

17  **A.**   This is a depiction of the Closed System of

18  Distribution, how the Closed System of Distribution should

19  work.  And we use this slide pretty -- well, when I was with

20  DEA, we used that slide pretty regularly.

21  **Q.**   And what does Closed System mean with respect to

22  pharmaceutical -- pharmaceutical controlled substances?

23  **A.**   The Closed System Distribution is a system of security

24  and accountability.  Theoretically, we should be able to

25  account for any amount of drug that starts at the

```
 1    manufacturing import level and goes all the way down to the

 2    pharmacy and hospital level before it's dispensed to

 3    patients.  That system of accountability is done on any

 4    number of things, but things like audits, inventories,

 5    security checks.  We ensure that all the security is

 6    appropriately maintained, both electronic, physical, vaults,

 7    cages, things like that.

 8        So, this Closed System of Distribution overall is just

 9    a system of accountability to ensure that nothing is leaving

10    the system and going into the illicit marketplace, in a

11    system where we could either retrospectively find out that

12    it's been -- it left the system and investigated it or

13    prevented from our system of -- from our inspections and

14    audits.  That's all the closed system is.

15  Q.    And who are the participants in the closed system?

16  A.    The DEA registrants throughout the supply chain,

17    importers, exporters, manufacturers, distributors, doctors,

18    pharmacists -- or pharmacies, hospitals, pretty much anybody

19    that touches drugs except for pharmacies and -- pharmacists

20    and nurses are -- are registrants and they all are involved

21    in the closed system of distribution.

22            THE COURT:  I'm sorry to interrupt you, but we

23    need to take a short break here.

24        You can step down during the break, Mr. Rannazzisi.

25            THE WITNESS:  Thank you very much.
```

```
 1              THE COURT:  We'll be in recess for -- try to keep
 2     it to ten minutes.
 3          (Recess taken)
 4              THE COURT:  You may resume the stand, Mr.
 5     Rannazzisi.
 6              THE COURT:  Go ahead, Ms. Singer.
 7     BY MS. SINGER:
 8     Q.   So, Mr. Rannazzisi, I don't know if you've ever
 9     been accused of being soft-spoken, but please make sure
10     to keep your voice up.  I know it's late in the day, but
11     for the court reporter's benefit, please.
12     A.   Yes, ma'am.
13     Q.   Okay.  I think you were at the participants in the
14     closed system.  So each of the arrows are different
15     participants in the closed system; is that correct?
16     A.   Yes, ma'am.
17     Q.   And are each of those participants called registrants?
18     A.   Yes, each one of those are registrants with the
19     exception of the patient.
20     Q.   And when you worked for the DEA, how many registrants
21     were there?
22     A.   Approximately one point -- I'll say 1.6 million.
23     Q.   And how did that break down among the different
24     categories?
25     A.   The vast majority of the registrant population are
```

1  prescribers, either doctors or mid-level prescribers,

2  physicians.

3  **Q.**   And beyond doctors, what are the other major

4  categories?

5  **A.**   You have pharmacies, between 65- and 70,000 at that

6  time; hospitals, I can't give you a quantity of hospitals.

7  Then you had manufacturers, distributors, probably a little

8  over a thousand of those total.  So --

9  **Q.**   Now, is the DEA a participant in the closed system?

10  **A.**   The DEA oversees the closed system.  The DEA provides

11  oversight and -- regulatory oversight over the closed system

12  of distribution.

13  **Q.**   Okay.  But it's not in the circle itself; correct?

14  **A.**   No, ma'am.

15  **Q.**   What is the reason for the closed system of

16  distribution for pharmaceutical drugs?

17  **A.**   We would like -- we need to know exactly what is in the

18  system at the time from the manufacturing point all the way

19  down to the retail hospital level.  And we need to prevent

20  those drugs from being diverted into the illicit market.

21      So the purpose of the closed system is to ensure that

22  there is tools in place to ensure that the drugs aren't

23  flowing to the illicit marketplace.

24  **Q.**   And what happens if drugs escape from the closed

25  system?

1    **A.**   You get diversion.

2    **Q.**   And what happens when drugs are diverted?

3    **A.**   They're used illicitly.  People become addicted, people

4    overdose, and people die.

5    **Q.**   What are the obligations of participants -- or

6    registrants or participants in the closed system?

7    **A.**   They all have their own specific set of obligations

8    under the Controlled Substances Act.  Manufacturers and

9    distributors share certain aspects or obligations under the

10    Controlled Substances Act.  Practitioners and pharmacies

11    also share some of the same provisions, but they also have

12    different provisions within the Act as well.

13    But they all have an obligation to maintain effective

14    controls against diversion.  That's the one thing common

15    among all of those registrants in the closed system of

16    distribution.  They must maintain effective controls against

17    diversion.

18    **Q.**   Can the DEA police all of the different participants in

19    the closed system?

20    **A.**   It's extremely difficult with the number of people that

21    we have to look at, all the practitioners and all the retail

22    pharmacies, and then concentrate on the manufacturers and

23    the distributors as well.  We don't have a huge amount of

24    resources to do that.

25    **Q.**   And is that a constraint that you disclosed to the

1    regulated entities or the registrants?

2    **A.**    Oh, absolutely.  That's the basis of the closed system

3    of distribution and the basis of why Congress implemented

4    certain provisions within the Act and regulations -- and in

5    the regulations to ensure that there was assistance being

6    provided and oversight being provided by the industry.

7    **Q.**    Now, help us understand.  At DEA you have warrants,

8    better than subpoenas.  You have guns.  Why do you need

9    participants in the closed system to do that job?

10   **A.**    Because, again, our resources are limited.  The

11   Controlled Substances Act was set up so a supply chain could

12   police itself all the way down to the doctor and pharmacy

13   level.

14            THE COURT:  Just a minute, Mr. Rannazzisi.

15            MR. SCHMIDT:  Your Honor, I don't think he's an

16   expert on why the Controlled Substances Act was set up.

17   I'll move to strike that testimony and ask that he be

18   limited to his understanding and his role.

19            THE COURT:  Well, Ms. Singer.

20            MS. SINGER:  I think I am, Your Honor.  My

21   intention is to ask him of his understanding and what was

22   communicated about the role of participants.

23            THE COURT:  Yeah.  I think you can ask him what's

24   in his understanding, but that's all.

25            MS. SINGER:  Okay.

```
 1    BY MS. SINGER:

 2    Q.    So, Mr. Rannazzisi, let me rephrase.  What is your

 3    understanding of why the closed system was set up to

 4    distribute responsibility for maintaining effective

 5    controls?

 6    A.    Because there -- the closed system was set up to

 7    prevent diversion.  And the way that they set the closed

 8    system up for distribution was to ensure that the registrant

 9    population had a function in policing itself as well as, you

10    know, being policed by regulatory law enforcement.

11    Q.    And in your experience, do distributors have the tools

12    to prevent diversion?

13    A.    Absolutely, absolutely.  You know, you talked about

14    guns and subpoenas.  You don't need a gun or a subpoena to,

15    to police your customers.  You know, a gun is just a tool in

16    law enforcement.

17          You have that same tool.  Your Suspicious Order

18    Monitoring Program is your tool.  And as far as a subpoena,

19    yeah, it's an investigative tool to obtain information.  You

20    don't need a subpoena.  You could walk into your customer

21    and ask them the same information.  The idea they don't

22    provide it, you just don't supply them anymore.

23    Q.    And in your experience, what happens when the closed

24    system doesn't function?

25    A.    If there's a breach in the integrity of the closed
```

1    system, drugs are funneled out of that supply chain into the

2    illicit market.  It's a total -- it's a breakdown.  A

3    breakdown of the system will cause diversion.  And that's --

4    it's as simple as that.  It doesn't get anymore simple.

5    **Q.**   And did you observe a breach in the closed system

6    during your tenure as Deputy Assistant Administrator?

7    **A.**   Yes, multiple times.

8    **Q.**   And did you observe the impact of that breach?

9    **A.**   Yes.

10   **Q.**   And what was that impact that you observed?

11   **A.**   The market being flooded, the illicit marketplace being

12   flooded with opioids, benzodiazepines, mild stimulants,

13   people becoming addicted, people overdosing, police officers

14   required, being required to carry naloxone, which is not

15   part of their duties up until a few years ago when we had to

16   start carrying it because the overdoses were outrageous, and

17   of course, you know, losing loved ones.

18   **Q.**   All right.  Let's turn from the closed system to the

19   next stage in our, in our map and talk about guidance.

20        Did DEA provide guidance to defendants on their

21   obligations to prevent diversion?

22   **A.**   Yes, ma'am.

23   **Q.**   And why did -- why did DEA provide that guidance?

24   **A.**   Because it was one of those situations where we were

25   seeing large breaches within the closed system of

1   distribution.  We were watching large quantities of drugs

2   leave and going into the illicit marketplace, and we needed

3   to stop it.  We needed to stop the hemorrhaging.

4        So we began an initiative to ensure that they knew what

5   their obligations were under the Act, to reiterate what

6   their obligations were under the Act, and reinforce the fact

7   that they must do their part and help us do our part to

8   police the system, this closed system so drugs will not be

9   diverted.

10  **Q.**   And when you talk about the Act, Mr. Rannazzisi, what

11  are you referring to?

12  **A.**   The Controlled Substances Act, Title 21.

13  **Q.**   Okay.  And through -- stepping back from the initiative

14  you were describing, what are the different ways through

15  which the DEA provides guidance to registrants?

16  **A.**   We, of course, start out by -- we'll provide letters.

17  We'll do face-to-face visits.  We'll do inspections and do Q

18  and As and inspections.  We'll issue final orders on a

19  registrant investigation where the registrants could see

20  exactly what happened to a particular registrant, why the

21  action was taken, why there was a revocation.

22       We, we have several methods of, of getting the word

23  out.  We do presentations in DEA-sponsored conferences.  And

24  that's all the way up and down through the supply chain

25  from, from pharmacists and doctors to distributors up to

1    manufacturers.

2    **Q.**    Okay, all right.  So let's turn back to the distributor

3    initiative.  And I'm sorry.  Just to clear up one part of

4    your testimony, when you said you would or you could, are

5    those all things you did when you were at DEA as Deputy

6    Assistant Administrator?

7    **A.**    Yes.  All of those functions of providing notice,

8    providing guidance were done by me and also my predecessors.

9    **Q.**    Okay.  So I think you started to talk about an

10   initiative.  What was the initiative you were describing a

11   few minutes ago?

12   **A.**    The distributor initiative.

13   **Q.**    And what is the distributor initiative?

14   **A.**    The distributor initiative was started by -- was

15   started by a team of investigators under then Deputy

16   Assistant Administrator William Walker.  And it was started

17   because there was a, a flow of pharmaceuticals, particularly

18   hydrocodone, Alprazolam, and phentermine going into

19   pharmacies from distributors.  But those pharmacies were

20   internet-based pharmacies, which at that time were illegal.

21   I mean, they were operating in an illegal manner.

22   **Q.**    And, and when was it under I think you said Deputy

23   Administrator Walker that the distributor initiative was

24   launched?  What year are we talking about?

25   **A.**    2005.  It was right during transition.  I think that

1    was the last thing he did before he left for military

2    service.

3    Q.   And, Mr. Rannazzisi, you've mentioned some drugs that

4    are familiar to us.  But can you, can you explain what

5    Alprazolam is, if I said that right?

6    A.   Yes, ma'am.  Alprazolam is a benzodiazepine.  The trade

7    name is generally Xanax, but they sell generic brands.  It's

8    in a group of class -- a class of drugs called anti-anxiety

9    agents.  It's in there with Diazapam, which is Valium, and

10   Clonazepam, which is Klonopin.

11        So those drugs are given to people to, to treat

12   anxiety.  Also two of those drugs are used for, for

13   seizures.

14   Q.   And you mentioned internet pharmacies.  So at some

15   point did the DEA turn its attention centrally to dealing

16   with internet pharmacies?

17   A.   Yes.  From -- obviously, when we, we started looking at

18   this huge volume of controlled substances going into these

19   internet pharmacies from the distributors, we decided that

20   at that point in time we would, we would shift and start

21   concentrating on, on internet pharmacies that didn't take us

22   away from doctor and pharmacy cases, pill mill type cases.

23        But those internet pharmacies were an immediate threat

24   that we had to deal with.  So we kind of shifted and used

25   the distributors as a choke point to stop that flow.

1  **Q.**   And what kind of volume were you seeing -- volume of

2  pills coming out of these internet pharmacies?

3  **A.**   They were -- well, the internet pharmacies were

4  actually facilitation centers.  The pharmacies that were

5  supplying those -- the people who were accessing those

6  facilitation centers, those brick and mortar pharmacies,

7  were dispensing millions of tablets in a year.

8      Some pharmacies would get, you know, in a very short

9  period of time five hundred thousand tablets, and the

10  quantities were outrageous.  They are quantities that are

11  not usable that should have immediately struck a cord with

12  somebody who is looking at those, those purchase patterns.

13  **Q.**   And where were the internet pharmacies getting the

14  drugs?

15  **A.**   They were getting them from the distributors.

16  **Q.**   From which distributors?

17  **A.**   A few distributors, but Amerisource, McKesson, and

18  Cardinal had a big role in those internet pharmacies.

19  **Q.**   Okay.  Let's turn to P-44540, please.

20      MS. SINGER:  Your Honor, may I approach?

21      THE COURT:  Yes.

22  BY MS. SINGER:

23  **Q.**   So, Mr. Rannazzisi, I've given you two copies, a

24  color version and a black and white that has the exhibit

25  sticker.  You can look at either of them.  Can you read

1    the title of this document?

2    **A.**    The title of the document is "Internet Pharmacies."

3    **Q.**    And do you recognize the document?

4    **A.**    Yeah.  This is a standard -- this is a standard

5    presentation that we gave probably right up to 2008, maybe

6    2009, probably right up to 2008.

7    **Q.**    And "we" being the DEA; is that right?

8    **A.**    Yes, the DEA.

9    **Q.**    All right.  And your name is on this presentation; is

10   that right?

11   **A.**    Yes.

12   **Q.**    Okay.  And is this a presentation that you personally

13   gave?

14   **A.**    I gave this presentation numerous times.

15   **Q.**    And do you -- where did you give this presentation or

16   to whom?

17   **A.**    I gave it to professional medical organizations,

18   pharmacy organizations, law enforcement, IACP, International

19   Association of Chiefs of Police, regulatory agencies, Boards

20   of Pharmacy.

21        We, we received a lot of requests for information

22   regarding different aspects of the drug problem in the U.S.

23   and the internet was a very big requested presentation.

24        So we gave that pretty much across the United States.

25   And it wasn't just me.  This was one of my presentations,

1    but there were several people that were giving the same

2    presentation using the same slots.

3    **Q.**   And did you give this presentation to registrants?

4    **A.**   Registrants would get the presentation.  Generally,

5    they would be in the audience with everybody, with the

6    rest -- especially in those professional organizations, yes.

7    This presentation was also given by people in my office to

8    registrant organizations and advocacy groups.

9    **Q.**   And was this a presentation you gave as part of your

10   duties at DEA?

11   **A.**   Yes, ma'am.

12   **Q.**   And the purpose of the presentation -- you may have

13   spoken to this.  But just to be clear, what was the purpose?

14   **A.**   To basically enlighten the audience on what is

15   happening as far as drug trafficking through internet

16   pharmacies.

17   **Q.**   And you mentioned the volume.  Was there anything else

18   that was troubling to DEA about internet pharmacies?

19   **A.**   Well, there were a lot of things troubling DEA about

20   internet pharmacies.  But you had the volume, the types of

21   drugs, the classes of drugs, the ratio of controlled

22   substances to non-controlled drugs, the amount of drugs

23   going into small areas, the fact that the internet

24   pharmacies that were distributing these drugs had no

25   doctor/patient relationship with their patients, the fact

1    that the pharmacies were not seeing any patients.  All of

2    this really troubled us, yes.

3    **Q.**   And how would you --

4         MS. WICHT:  I'm sorry to interrupt you, Ms.

5    Singer.

6         Your Honor, I didn't want to interrupt the witness.

7    I'll just object that, that Ms. Singer is asking questions

8    about things that were troubling to DEA as a whole and the

9    witness is answering them that way.  And he's not here to

10   speak for DEA today, and I would ask that he be confined to

11   his own personal knowledge and experience.

12        MS. SINGER:  So, Your Honor, this is a

13   presentation that Mr. Rannazzisi testified he gave while at

14   DEA for the DEA.

15        THE COURT:  Yeah, overruled.

16     Mr. Westfall.

17        MR. WESTFALL:  Your Honor, --

18        THE COURT:  I thought we'd hear from you.

19        MR. WESTFALL:  As long as he doesn't get into

20   information that's going to be covered by the deliberative

21   process privilege, attorney/client privilege, or law

22   enforcement privilege, we don't have a problem with him

23   giving that information.  But anything that's non-public or

24   covered by those privileges he understands he's not allowed

25   to give that information.

```
 1              THE COURT:  Well, I'll overrule the objection for
 2    now and we'll see where we go, Ms. Singer.
 3              MS. SINGER:  All right.  Right now we're on a
 4    public presentation, so hopefully we won't get into too much
 5    trouble here.
 6    BY MS. SINGER:
 7    Q.   Let's turn, Mr. Rannazzisi, to slide 26.
 8         Can you pull that up, please?
 9              MS. SINGER:  You know, before we do, I'd like to
10    move to admit P-44540.
11              MR. SCHMIDT:  We'll object, Your Honor, insofar as
12    there's a lot of hearsay in there.  If they want to focus on
13    individual parts, we would withdraw it as to individual
14    parts that are proffered, but there's a lot of hearsay in
15    there.
16              MR. NICHOLAS:  We agree.  Same objection.
17              MS. WICHT:  I would join that, Your Honor, and
18    just note in addition that I don't think there's been any
19    evidence or any suggestion in this case of any internet
20    pharmacies that have existed in Cabell/Huntington or
21    presented any problem in Cabell/Huntington.  So we would
22    also object on geographic scope and relevance.
23              MR. SCHMIDT:  And, actually, one other relevance
24    objection.  I apologize, Your Honor.
25         I think Mr. Rannazzisi's testified that he didn't give
```

1    the distributor briefings to the defendants in this case.  I

2    don't know that this was ever given by him to us.  And, so,

3    on that ground, we'll object on relevance.

4             THE COURT:  Did you give the, this briefing to any

5    of the three defendants in this case, the distributors, Mr.

6    Rannazzisi?

7             THE WITNESS:  I don't believe that I personally

8    gave this presentation to the individual defendants.  I gave

9    this presentation to organizations that they may have been

10   present, but not --

11            THE COURT:  I'm going to sustain the objection,

12   Ms. Singer.

13            MR. ACKERMAN:  Your Honor, notwithstanding that

14   won't be -- notwithstanding that won't be moved in, may Ms.

15   Singer question Mr. Rannazzisi about, about the

16   presentation?

17            THE COURT:  Well, if he, if he didn't give the

18   presentation to these defendants, it's irrelevant, isn't it?

19            MR. ACKERMAN:  Well, no, I don't think it is, Your

20   Honor.  I think for a couple reasons it would be relevant.

21        I think, first of all, with respect to the hearsay, he

22   testified that he gave it on behalf of the DEA.  So it could

23   be a public record under 803(8)(A)(i) setting out the

24   office's activities.

25        I think it is offered to rebut a claim that many

```
1   defendant witnesses have made earlier, that the DEA changed

2   its interpretation of regulation at some point in time.  And

3   this is a prior consistent statement which -- so it's

4   offered for non-hearsay purposes as well.

5               THE COURT:  Mr. Nicholas.

6               MR. NICHOLAS:  Well, I'm not sure I followed all

7   of that reasoning.  But, number one, this -- as you said,

8   Your Honor, this was not given to any of the defendants

9   here.

10       And, number two, as Ms. Wicht said, there's no issue

11  about internet pharmacies in this case.

12       So I don't think this should be admitted.

13              THE COURT:  I'll sustain the objection.

14       You can go ahead, Ms. Singer.

15  BY MS. SINGER:

16  Q.   Mr. Rannazzisi, where did the drugs from internet

17  pharmacies go?

18  A.   They went to brick and mortar -- well, they went to the

19  public.  These drugs were -- people would get on the

20  internet, access one of these facilitation sites, and

21  basically order drugs without any kind of oversight from

22  brick and mortar -- that ended up going to them from brick

23  and mortar pharmacies that were supplied by distributors.

24  Q.   And were they limited to any particular geographic

25  area?
```

1    **A.**    No.  They were across the country.

2    **Q.**    And across all of the states in your experience?

3    **A.**    Yes, yes.

4    **Q.**    And what was the volume of these internet pharmacies,

5    in your experience, compared to traditional pharmacies that

6    DEA had seen before?

7    **A.**    The internet pharmacies were ordering huge volumes, you

8    know, hundreds of thousands of tablets, you know, in a month

9    because they, they had such a huge, a huge customer base.

10       And the reason they had a huge customer base was people

11   were using the internet to, to veil their activities, to, to

12   cover their activities.  No one knew who the customers were.

13   They were using all sorts of payment methods.

14       And, so, they were ordering drugs basically in the

15   darkness, you know.  So it would be difficult to find them.

16   **Q.**    And were the signs of an internet pharmacy, the

17   physical appearance, would that also have been a red flag

18   that they were engaged in diversion?

19   **A.**    Yes.

20   **Q.**    And what were those signs?

21   **A.**    Oh, we had internet pharmacies -- we had pharmacies

22   turn into closed-door pharmacies.  They would see no

23   patients and they would just start -- they would just be

24   mailing out packages.

25       We had internet pharmacies that were set up in

```
 1   warehouses.  We had internet pharmacies that were set up in

 2   basements.

 3        It, it got to a point where the internet pharmacies

 4   were basically if you had a room and you could store drugs,

 5   you could open up an internet pharmacy.

 6   Q.   And, so, would that have been evident to a distributor

 7   if it visited an internet pharmacy that it wasn't a

 8   traditional brick and mortar pharmacy?

 9   A.   Absolutely.

10             MR. NICHOLAS:  Your Honor, could I object?

11        I mean, I didn't object to every question about the

12   internet pharmacies, but we're now at a place where I really

13   think this is not relevant and not pertinent to this case or

14   the issues in this case.

15             MS. SINGER:  Your Honor, Mr., -- if I may, Mr.

16   Rannazzisi has testified first that these defendants

17   supplied internet pharmacies.  They supplied them in volumes

18   that were unprecedented, and that those pills traveled

19   throughout the country into every state.  They are, I think,

20   absolutely relevant to the --

21             THE COURT:  Well, the question was what would have

22   been evident to a distributor, and I'll sustain the

23   objection to that and you can ask the next question.

24             MR. SCHMIDT:  Your Honor, just on the point of the

25   internet pharmacies, he does have a chart in his slides that
```

```
 1    were excluded that tracks the trail of internet pharmacies
 2    that conspicuously does not go to West Virginia.  We don't
 3    think there's been a foundation laid for Huntington/Cabell
 4    which is what this case is about.  Saying it went to all 50
 5    states is kind of a --
 6              THE COURT:  Well, I think I've already sustained
 7    the objection to the slides.
 8              MR. SCHMIDT:  Thank you, Your Honor.
 9              THE COURT:  Mr. Farrell.
10              MR. FARRELL:  Yes.  What I wanted to point out,
11    Judge, is that as you recall from three weeks ago, we put
12    into evidence already the distributor initiative summaries
13    and the slide decks from those visits to the three
14    distributors.
15         So the reason the internet pharmacies are important is
16    because in 2005, the volume of pills sold by the
17    distributors to the internet pharmacies triggered the DEA
18    visiting with each of them beginning --
19              THE COURT:  Well, we're not there yet.
20              MR. FARRELL:  Yes, sir.
21    BY MS. SINGER:
22    Q.   All right.  Maybe with the Court's permission,
23    we'll move to those.
24         Did you, without, without getting into any non-public
25    information, develop a strategy to deal with internet
```

1    pharmacies?

2    **A.**    Yes, we did.

3         MR. WESTFALL:  Your Honor, I don't have -- sorry.

4    This is Fred Westfall.  I don't have a problem with him

5    giving a general answer to the question.  But if he gets

6    into anything as to how it was developed or why it was

7    developed, we're in the deliberative process and we're in

8    privileged information.

9         So, again, I think the general answer is "yes."  But if

10   we get much beyond that, we're getting into privileged

11   information that the government wants to protect with DEA.

12        MR. SCHMIDT:  And just, without objecting to that

13   objection at all, it does put us in a tough position if he's

14   allowed to say just a little bit and then we can't follow up

15   in our examination.

16        So we take no issue with the objection, but I think it

17   becomes preclusive because it means Mr. Rannazzisi can give

18   testimony and we can't follow up on it.

19        THE COURT:  Mr. Westfall, you don't have any

20   problem with it so far.  You're just concerned about where

21   he might be going next.  Right?

22        MR. WESTFALL:  That's correct, Your Honor.

23        THE COURT:  Well, let's wait and see if that

24   problem develops.

25        MR. WESTFALL:  Yes, Your Honor.

1    BY MS. SINGER:

2    **Q.**    Did you as part of your internet strategy, again

3    without going into anything that was non-public, turn to

4    meetings with these individual defendants, Mr.

5    Rannazzisi?

6    **A.**    We met with the individual defendants, yes.

7    **Q.**    And what was the reason for those meetings?

8    **A.**    To discuss their obligations under the Controlled

9    Substances Act and show them very specific instances of, of

10   distribution that should have triggered some type of query

11   into the, into the orders and due diligence.

12   **Q.**    And what -- were those meetings part of the distributor

13   initiative that you were talking about earlier?

14   **A.**    Yes, those would have been the distributor initiative.

15   **Q.**    So let's turn to -- all right.  Did you participate in

16   the distributor initiative meetings?

17   **A.**    No.  My staff did -- I only, I only participated in one

18   distributor initiative meeting.

19   **Q.**    And were you -- and which one was that?

20   **A.**    It was the second follow -- it was the follow-up to the

21   initial McKesson meeting.

22   **Q.**    And were you briefed on the distributor initiative

23   meetings that DEA had with each of these defendants?

24   **A.**    Yes.  We were -- we were briefed.  I was briefed on

25   every distributor initiative meeting that occurred at

```
 1   headquarters, yes.

 2   Q.    And how were you briefed?

 3   A.    Generally, after the meeting we would sit down, hand in

 4   materials, and go through and tell me what actually went on

 5   in the meeting, what questions were asked, things like that.

 6   Q.    And in addition to the, the personal briefing, did you

 7   also receive any written summaries of those meetings?

 8   A.    Yes.  I was -- I required them to give me all the

 9   written summaries in a memo form.  And that memo, I retained

10   a copy in my office.  There was copies given to two other,

11   two other sections within the Office of Diversion Control.

12   Q.    And when were those summaries provided to you?

13   A.    Probably within the month after the presentation.

14   Q.    And was it ever provided to you more quickly than that?

15   A.    Oh, absolutely.  But, you know, things happen during

16   the vetting process, so sometimes it takes a little longer.

17   Q.    And who prepared those summaries?

18   A.    Depends who the principal briefer was.

19   Q.    And can you remember any of the individuals at DEA who

20   were involved in those briefings?

21   A.    Could have been Mapes, Mike Mapes, could have been

22   Barbara Boockholdt.  It could have been any number of the

23   liaison policy chiefs.  It depends on who was, who was going

24   to write the memo and who was at the meeting, who took the

25   lead at the meeting.
```

1    **Q.**   And are these individuals who you mentioned all people

2    within your direct reports?

3    **A.**   Yes, they were all direct reports.

4    **Q.**   And were the summaries and the oral briefings you

5    received prepared and shared with you as part of the DEA's

6    regular duties?

7    **A.**   Yes.  Any time we had a meeting like that, a memo had

8    to be done and it had to be filed, yes.

9    **Q.**   And did the DEA present standard material -- did the

10   DEA present any materials during the distributor initiative

11   meetings with the defendants?

12   **A.**   The --

13              MR. SCHMIDT:  Objection, foundation.  He has

14   testified he wasn't there.

15              THE COURT:  Just a minute.  I'll overrule the

16   objection.

17   BY MS. SINGER:

18   **Q.**   Go ahead.

19   **A.**   The presentation had --

20              THE COURT:  I think you objected on foundation.  I

21   think she's laying the foundation right now, Mr. Schmidt.

22   So the objection is overruled.

23              MR. SCHMIDT:  I'll also object, then, on hearsay.

24              THE COURT:  All right.

25              MR. FARRELL:  I will point out, Judge, this is

```
 1    a -- we resolved this several weeks ago.  These documents

 2    are in evidence.

 3              THE COURT:  They're already in evidence?

 4              MS. SINGER:  Some of them are.

 5              THE COURT:  And some of them aren't.  Okay, all

 6    right.

 7    BY MS. SINGER:

 8    Q.   I'm sorry.  Where were we?

 9         Are you aware whether there were materials presented to

10    defendants during these distributor initiative briefings?

11    A.   Yes.

12    Q.   And did you see those materials?

13    A.   Yes.

14    Q.   Did you approve those materials?

15    A.   Yes.

16    Q.   And what did those materials cover generally?

17    A.   Well, the materials had, had case law, slides on case

18    law.  So those were standard -- there were certain slides

19    that were standardized to the distributor initiative

20    briefing.  Then there were other slides and other

21    information that were specific to that particular

22    distributor.

23              MS. SINGER:  So I'm going to ask that we circulate

24    P-09114, P-12805, and P-09112.

25         Your Honor, may I approach?
```

```
 1              THE COURT:  You may.
 2    BY MS. SINGER:
 3    Q.   I have gummed up the works by doing three documents
 4    at once.  I apologize.
 5         So, Mr. Rannazzisi, while we're passing these around,
 6    can you look at each of these documents and let us know
 7    whether you recognize the documents.
 8         Why don't you start with 9114 and let me know when you
 9    have that up, please.
10    A.   I have it.
11    Q.   Okay.  And what is that -- what is the subject of that
12    document?
13    A.   It's a meeting with Cardinal Health.
14    Q.   And what is the date of the document?
15    A.   The date of that document -- of the document is
16    August 23rd, 2005.
17    Q.   And do you recognize the document?
18    A.   Yes.
19    Q.   What do you recognize it to be?
20    A.   It's the closing memo from the meeting that occurred
21    with -- it's just an analysis of what happened at the
22    meeting.
23    Q.   Okay.  And who is the memo addressed to?
24    A.   It's addressed to Joseph Rannazzisi, me.
25    Q.   Okay.  And who was it from?
```

**A.**   Michael Mapes.

        MS. SINGER:  Your Honor, I'd move to admit P-9114.

        MS. WICHT:  Your Honor, we'll object on the basis

of hearsay and relevance as to geographic scope for the

reasons that we discussed earlier about the internet

pharmacies.

        MR. ACKERMAN:  Your Honor, --

        THE COURT:  All right.  Do I hear from the other

side here?

    I assume all -- that's an objection for all the

defendants, Ms. Wicht.

        MS. WICHT:  Well, I would probably assume that's

correct too, Your Honor, although this is the memo that's

about Cardinal Health in particular which is why I stood up

and --

        THE COURT:  Oh, okay.

    Mr. Ackerman.

        MR. ACKERMAN:  All right, Your Honor.  So this

document is a public record.  Federal Rule of Evidence

803(8)(A)(i), it is a record or statement of a public office

that sets out the office's activity.  There is no indication

of untrustworthiness per 803(8)(B).  And, therefore, it's

admissible on that ground.

    It is also offered for non-hearsay purposes for notice

to establish that the communications were made to Cardinal.

```
 1              THE COURT:  Well, I could also admit it as a

 2     record that it's regularly conducted activity based on the

 3     questions Ms. Singer asked him, couldn't I?

 4              MR. ACKERMAN:  I think you could as well, yes.

 5              THE COURT:  All right.  The objection is

 6     overruled.  It's admitted.

 7     BY MS. SINGER:

 8     Q.   All right.  And, Mr. Rannazzisi, after the, the

 9     initial closing memo, as I think you referred to it, do

10     you recognize the pages that follow?

11     A.   Yes, ma'am.  This is the distributor -- this is the

12     PowerPoint that's used in the distributor briefing.

13     Q.   And was this the PowerPoint that you reviewed and

14     approved?

15     A.   Yes.

16     Q.   And was it -- what was its purpose again?

17     A.   To basically explain what the problem is, explain what

18     the obligations are under 823 --

19              THE COURT:  Let me interrupt you and just clean up

20     the record here a little bit.

21          You objected based on relevancy as well, did you not,

22     Ms. Wicht?

23              MS. WICHT:  Yes, Your Honor.

24              THE COURT:  How is this not relevant?

25              MS. WICHT:  Your Honor, because, again, it relates
```

1    to internet pharmacies and it's the same geographic issue

2    that we had discussed earlier with respect to the lack of

3    evidence of internet pharmacies in this case at all, Your

4    Honor.

5              MR. SCHMIDT:  And just to get this out of the way

6    on a recurring basis because we have our memos coming up, we

7    have the same objection.

8         But even -- I would add one more thing.  Even if he is

9    allowed to talk about it, he's now interpreting what the

10   slides mean and what they said to distributors.  That is

11   certainly not proper.  That's hearsay at best.

12             MS. SINGER:  So --

13             MR. NICHOLAS:  I just -- you will appreciate this.

14   I will not be objecting to the AmerisourceBergen version

15   because it's already in evidence.  So --

16             THE COURT:  Well, I'm going to overrule the

17   objection.  I think it -- I think it is -- even though it

18   embraces much more than the geographical area we're involved

19   with here, I think it certainly has relevance to what the

20   individual defendant here was told, which would cover, I

21   assume, all of their operations which would embrace the

22   geographical area.

23        So I think it's relevant for that reason and other

24   reasons and I'll overrule the objection.

25             MS. SINGER:  And --

1              THE COURT:  Now, as far as the, the attachments,

2      the slide presentation, where are you going to go with that?

3              MS. SINGER:  I am not planning to explore it, Your

4      Honor, except to ask him a few questions related to the

5      guidance that DEA provided to these defendants.

6          So the witness has testified that these slides were the

7      slides he approved and that were shared with defendants at

8      each of these briefings.

9              THE COURT:  Has he testified to that?

10             MS. SINGER:  He did.

11             THE COURT:  Mr. Farrell, do you want to get your

12     oar in the water here?

13             MR. FARRELL:  Yeah.  Before we rehash it, this is

14     the exact same slide deck that was used that's already in

15     evidence with AmerisourceBergen.

16             THE COURT:  Okay.

17         Ms. Wicht.

18             MS. WICHT:  I'm sorry, Your Honor.

19         On the slide deck, I'll just object on the basis of

20     foundation to the extent that he's purporting to describe

21     what was said in the meeting when he wasn't present for the

22     meeting.

23             MR. SCHMIDT:  Yeah.  And that's what distinguishes

24     Mr. Farrell's example.  It's one thing to bring these in for

25     an expert and say this is what they show.  It's another

1    thing for someone to testify about a meeting he was not at.

2            MS. SINGER:  So, Your Honor, if I may, Mr.

3    Rannazzisi testified that he reviewed this deck.  He

4    approved this deck.

5    BY MS. SINGER:

6    **Q.**   And, Mr. Rannazzisi, if I may, just to add one

7    other piece to the foundation, did you direct your staff

8    to provide this, this presentation to each of the

9    defendants when they met with them?

10   **A.**    Yeah, this -- the deck was -- yes, the deck was part of

11   the binder of information that they received when they met.

12           THE COURT:  Did you go over the slides ahead of

13   time and approve them?

14           THE WITNESS:  I went -- since all of these slides

15   are standardized, Your Honor, I did go over them.  I didn't

16   go over every, every time this presentation, but they always

17   used the same standardized slides with the exception of the

18   slides that used the ARCOS data.  And those slides I did not

19   go over.

20           THE COURT:  You get one more try, Ms. Wicht.

21           MS. WICHT:  Respectfully, Your Honor, I think the

22   foundation that has been laid would allow him to say this is

23   what's on the slide which, of course, the Court doesn't -- I

24   would submit doesn't need him to do.  But it would not allow

25   him to say this is what was said to Cardinal Health because

1    he wasn't there for that.

2            MS. SINGER:  Your Honor, again, I think Mr.

3    Rannazzisi has said that within his sphere of authority,

4    this was the presentation he approved, directed his staff to

5    give, and that his staff sent back summary memos which

6    described what happened at this meeting, including the

7    presentations of the slide deck.

8            THE COURT:  I'm going to overrule the objection

9    and admit it.

10   BY MS. SINGER:

11   **Q.**   Mr. Rannazzisi, just for the record, can you turn

12   to Bates Number Page 13, please.  It has a very darkened

13   picture of an internet pharmacy at the top, and it has a

14   summary slide.  So it has Page Number 12 to confuse you.

15   **A.**   I have it.

16   **Q.**   And can you read the last bullet on that summary slide?

17   **A.**   "Not limited to internet pharmacies."

18   **Q.**   And was it your understanding that the guidance that

19   DEA provided at these meetings related more broadly -- or

20   was it directed more broadly than just internet pharmacies?

21   **A.**   Yes, ma'am.  The presentation followed the regulations.

22           MS. WICHT:  Your Honor, I -- the witness has

23   already answered, but I would just preserve our objection to

24   that last question.

25           THE COURT:  The objection is overruled, but the

1    record will show it was made loud and clear.

2    BY MS. SINGER:

3    Q.   All right.  Let's move, without too much

4    trepidation, then, to P-09112 which was -- I'm sorry.

5    That's the wrong one.  P-12805.  Let me know, Mr.

6    Rannazzisi, when you have that one in front of you.

7    A.   I have it.

8    Q.   Okay.  And what is the subject for that memo, or that

9    document?

10   A.   "Internet Presentation with McKesson Corp."

11   Q.   And the date of that memo?

12   A.   September -- the date of the memo is October 20th,

13   2005.

14   Q.   And do you recognize this document?

15   A.   Yes, I do.

16   Q.   What is it?

17   A.   It's a summary of the internet pharmacy presentation

18   done for McKesson Corp.

19   Q.   And who is the memo addressed to?

20   A.   Joseph Rannazzisi.

21   Q.   And who is it from?

22   A.   Michael Mapes.

23   Q.   And what does this memo describe?

24   A.   The memo discusses who was at the presentation and what

25   was discussed and any significant detail -- any significant

1     thing that happened at the meeting.

2     **Q.**   And do you recognize the pages that follow that memo?

3     **A.**   Yes.  It's the same presentation that's been given.

4     **Q.**   And was that the presentation that DEA gave to

5     McKesson?

6     **A.**   Yes.

7              MS. SINGER:  Your Honor, I'd move to admit

8     P-12805.

9              MR. SCHMIDT:  We'll just preserve our objection on

10    geographic scope and relevance, and if I may do that just on

11    a running basis.

12             THE COURT:  All right.  Yes, you may.  And I'm

13    going to admit it using the same rationale that I admitted

14    the one relating to Cardinal Health which was 9114.

15             MR. SCHMIDT:  Thank you, Your Honor.

16    BY MS. SINGER:

17    **Q.**   Mr. Rannazzisi, just to close out the record, do

18    you also have in front of you P-09112?

19    **A.**   Yes, ma'am.

20    **Q.**   And what is that document?

21    **A.**   That's, again, another memorandum on the internet

22    presentation for AmerisourceBergen.

23    **Q.**   Okay.  And do you recognize this document?

24    **A.**   Yes.

25             MS. SINGER:  This one is already admitted, Your

```
 1    Honor.

 2    BY MS. SINGER:

 3    Q.   All right.  Do these presentations and summary

 4    memos accurately reflect the guidance that DEA provided

 5    to these defendants at the distributor initiative

 6    meeting?

 7    A.   Yes.

 8              MR. SCHMIDT:  Objection, foundation.  He wasn't

 9    there.

10              MS. WICHT:  Join.

11              THE COURT:  Well, Ms. Wicht, do you want to --

12              MS. WICHT:  No, Your Honor.  I was simply --

13              MR. NICHOLAS:  I have -- I would register the same

14    objection.

15              THE COURT:  Well, I think he's testified that

16    these memos reflect guidance given to the defendants at the

17    meetings that are recounted in the, in the exhibits and I'll

18    overrule the objection.

19    BY MS. SINGER:

20    Q.   Go ahead, Mr. Rannazzisi.  Please answer.

21    A.   Could you repeat the question, please?

22    Q.   Sure.  Do these presentations and summary memos

23    accurately reflect the guidance DEA provided to these

24    defendants at the distributor initiative briefing?

25    A.   Yes.
```

1    **Q.**   Now, do these distributor initiative briefings happen

2    in person?

3    **A.**   These three were all in person, but we did distributor

4    initiative meetings by phone.  But these three were in

5    person, yes.

6    **Q.**   And why did they take place in person?

7    **A.**   Well, because we wanted to sit down with them, talk to

8    them, look face-to-face, and answer any questions they have.

9    That was, that was important to us.  We wanted to understand

10   the seriousness of the problem that we were dealing with and

11   give them every opportunity to ask questions.

12   **Q.**   And I think you mentioned who participated from DEA.

13   Do you know who -- what type of staff participated from

14   defendants?

15   **A.**   Well, we had asked for senior managers, senior managers

16   within their, their headquarter's hierarchy I guess.

17   **Q.**   And can we turn back for a moment, Mr. Rannazzisi, to

18   P-12805 which is the McKesson briefing?

19   **A.**   Yes.

20           MS. SINGER:  And can we put it up, please?

21   BY MS. SINGER:

22   **Q.**   And can you take a look at the last paragraph.  And

23   what does the last paragraph say?

24   **A.**   "Mr. Mapes finalized the presentation by advising the

25   representatives of McKesson that they needed to thoroughly

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    review the materials which had been presented to them and

2    review in-depth the purchasing patterns and quantities of

3    their customers.  Representatives of McKesson acknowledged

4    understanding of the material presented."

5            MR. SCHMIDT:  Object to the hearsay within hearsay

6    in the last sentence.

7            MS. SINGER:  This is a party admission, Your

8    Honor, particularly in light of defendants' repeated

9    representations that they did not understand the guidance

10   that was provided.

11           THE COURT:  Mr. Ackerman.

12           MR. ACKERMAN:  She said it all, Your Honor.

13           THE COURT:  Objection is overruled.

14   BY MS. SINGER:

15   **Q.**   One of the slides -- and we can pull that down.

16   One of the slides covered a Supreme Court case.  Are you

17   familiar with that?

18   **A.**   There were two Supreme Court cases, *Moore* and *Direct*

19   *Sales*.

20   **Q.**   Okay.  Let's focus on *Direct Sales*.  Was there a reason

21   you included *Direct Sales* in the, in the distributor

22   initiative briefings?

23           MR. WESTFALL:  Objection, Your Honor.  To the

24   extent that he's relying on opinions of general counsel for

25   the in-house counsel with DEA, it's covered by the

```
 1    attorney/client privilege.  I'd object to any kind of

 2    disclosure of attorney/client privilege information.

 3              THE COURT:  Do you agree with that, Ms. Singer?

 4    BY MS. SINGER:

 5    Q.   Mr. Rannazzisi, can you answer that question

 6    without disclosing privileged information, meaning

 7    without --

 8    A.   I understand.  The slide deck that was prepared was

 9    prepared.  There were -- there was input.  But just on the

10    cases, I believe the cases we, we picked ourselves because

11    Moore was -- Moore and Direct Sales are very well-known

12    cases related to diversion.

13              THE COURT:  Well, he said there was input.  I'll

14    sustain the objection and you might be able to ask him a

15    question that gets around that problem.

16    BY MS. SINGER:

17    Q.   So, Mr. Rannazzisi, without discussing any input or

18    advice from counsel, what did you want to communicate by

19    including Direct Sales in the presentation?

20    A.   Direct Sales was a case that involved a distributor

21    that was back in the 19-, late '30s, early '40s, mid '30s,

22    early '40s.  And it involved the distribution of morphine,

23    small multi-grain tablets of morphine to a doctor.

24         And the purchase patterns from that doctor were, were

25    extremely large and they were an anomaly.  And we included
```

1    *Direct Sales* to show that even back in the '30s and '40s

2    there was an obligation from a distributor to ensure that

3    the customers were, were not diverting drugs, that they were

4    actually getting those drugs for a legitimate medical

5    purpose.

6         So that's why *Direct Sales* was included, and *Moore* was

7    included -- discussed the legitimate patient -- the

8    obligation of a doctor to prescribe for a legitimate medical

9    purpose in the usual course of professional practice.

10   **Q.**   So let's turn in the McKesson presentation, if you

11   still have that in front of you, --

12   **A.**   Yes.

13   **Q.**   -- to slide eight, which is Page 10 on the Bates

14   number.  It says "Suspicious Orders" at the top.  Have you

15   found it?

16   **A.**   I can just go off the screen.

17   **Q.**   Okay, all right.  Looking at the slide on suspicious

18   orders, what guidance was DEA providing -- or was DEA

19   providing at this presentation regarding reporting a

20   suspicious order -- I'm sorry.  Let me just read it,

21   withdrawing the question.

22        "Reporting a suspicious order to DEA does not relieve

23   the distributor of the responsibility to maintain effective

24   controls against diversion."

25        Have I read that slide correctly?

1    **A.**    Yes.

2    **Q.**    Okay.  And what guidance was DEA providing in that

3    slide?

4    **A.**    Just reporting an order does not relieve the, the

5    distributor of, of doing their due diligence.  So if they,

6    if they report the order but ship, ship the order, that's

7    not maintaining effective controls against diversion if they

8    don't resolve the suspicions within the order.

9         So if, if it's an order that's suspicious, you either

10   resolve and ship or you report.  But you can't say, well,

11   it's suspicious.  Here's the order.  Oh, and, by the way, we

12   shipped it or they just shipped it.  That's, that's what

13   that slide was saying.

14   **Q.**    And moving to the, to the next slide below that, it

15   says, "DEA cannot tell a distributor if an order is

16   legitimate or not.  Distributor must determine which orders

17   are suspicious and make a sales decision."

18        Have I read that correctly?

19   **A.**    Yes.  That's absolutely correct, yes.

20   **Q.**    Okay.  And what did DEA mean when -- what guidance was

21   DEA providing with that second bullet?

22   **A.**    Well, DEA's not in a position to determine whether an

23   order should be shipped or not.  It's a business decision.

24   And this is why.  We don't know the customer.  We don't know

25   where the customer sits.  We don't know the demographics of

1    the area.  We don't know historically what the customer has

2    purchased, what he hasn't purchased, how many times he's

3    been questioned on his purchases.  We don't know if he's

4    near a hospital or a hospice center or a palliative care

5    center.  We don't know any of that.

6         So we can't make that due diligence -- do that due

7    diligence review and then make that decision because we

8    don't have any of that information.  And even if we did, we

9    couldn't do that on a daily basis because all of our

10   investigators and our agents would be tied up doing those,

11   those decisions rather than doing what they're supposed to

12   be doing which is policing the supply chain and doing

13   investigations.

14   **Q.**   Okay.  Now, during the distributor initiative

15   briefings, does the presentation in the slide deck also

16   provide examples to distributors to these defendants of

17   suspicious orders?

18   **A.**   That was the whole basis of the, of the distributor

19   initiative.  That's exactly what they were supposed to be

20   doing, showing real-life examples.

21   **Q.**   So let's turn to the next slide.

22            THE COURT:  What's the purpose of reporting the

23   suspicious orders?

24            THE WITNESS:  We report the -- they report the

25   suspicious orders, and then we take the suspicious orders

1    and, and do a follow-up, look at the order, look at the

2    customer.

3        The suspicious order is -- think of it as a pointer

4    system.  Here's an order that we found suspicious.  We

5    didn't ship the order.  We need to look at this.  And

6    that's -- and we would take it from there.

7    BY MS. SINGER:

8    **Q.**   Mr. Rannazzisi, following up on the Court's

9    question, why is it, why is it that -- did DEA provide

10   guidance to defendants on why they shouldn't ship a

11   suspicious order?

12   **A.**   Yes.

13   **Q.**   What happens -- I'm sorry.  Why does a distributor have

14   to block a suspicious order?  Why is that important?

15   **A.**   Because if the order is suspicious and it's

16   unresolvable, they can't resolve the suspicions in the

17   order, chances are that order is going to be diverted down

18   the road, somewhere down the road.

19       If a pharmacy is ordering a quantity that they can't

20   resolve, they're just facilitating diversion by continuing

21   to ship to that pharmacy.

22   **Q.**   And --

23            MS. WICHT:  Your Honor --

24       I'm sorry to interrupt again, Ms. Singer.

25       I just would object to that answer which was full of

1    speculation on causation that there's no foundation for.

2              MR. SCHMIDT:  We join in that, Your Honor.

3              MR. NICHOLAS:  As do we.

4              THE COURT:  I'll sustain that objection.

5    BY MS. SINGER:

6    **Q.**   So let me ask it differently.  How long does it

7    take DEA to, to act on a suspicious order report?

8    **A.**   To -- you're going to have to clarify the question.

9    **Q.**   So can DEA -- when DEA receives a suspicious order

10   report, what's already happened with the drugs that are

11   covered by that suspicious order report?

12   **A.**   Well, nothing should have happened with those drugs.

13   Those drugs should have never been shipped.

14   **Q.**   And if they were shipped?

15   **A.**   Well, there's a chance that they could be diverted if

16   they were shipped.

17   **Q.**   And that would happen before DEA ever receives the

18   suspicious order report; correct?

19   **A.**   Yes.

20   **Q.**   All right.  So let's -- if we may turn to Page 9, which

21   is Bates Number 11 on the slide.

22          Do you recognize these slides, Mr. Rannazzisi?

23   **A.**   Yes.

24   **Q.**   And what are they?

25   **A.**   These are slides that just show a purchase pattern or a

1    pattern of, of pharmacy purchases that could -- things that

2    should trigger a due diligence review.

3    **Q.**   Okay.  And, and let's turn to the next example, so the

4    next slide, please.

5         So is there a second example that was provided in the

6    distributor initiative briefing?

7    **A.**   Yes.

8    **Q.**   And were those other red flags that DEA explained to

9    distributors?

10   **A.**   They're things that a distributor should look at when

11   questioning and performing due diligence on a specific

12   order, yes.

13   **Q.**   And did you provide a third example?

14   **A.**   Yes.

15        THE COURT:  You said DEA followed up on a

16   suspicious order.  Did DEA follow up on every suspicious

17   order report you see?

18        THE WITNESS:  That's, that's a question that,

19   unfortunately, the department's directed me not to answer

20   questions on what we do with the suspicious orders because

21   it gets into the investigative process and also

22   communication between -- the investigative communication

23   between --

24        MR. SCHMIDT:  If that's the case, Your Honor, then

25   we move to strike his testimony on suspicious orders.  The

```
 1    idea that he can come in and make allegations about
 2    suspicious orders and not even answer the Court's basic
 3    question of whether they did anything about it, that's not
 4    fair to us.
 5              THE COURT:  Well, I'm confused and I probably
 6    shouldn't stick my nose in this that deeply, but I'm
 7    confused.  The witness testified about the lack of person
 8    power and resources to do these investigations.
 9         And then if I understood you correctly, you said you
10    followed up on all the suspicious order reports.  How did
11    you rationalize those two propositions, --
12              THE WITNESS:  Yes, Your Honor.
13              THE COURT:  -- Mr. Rannazzisi?
14              THE WITNESS:  We did follow up on suspicious
15    orders.  But understand the volume of suspicious orders that
16    should come in is not a huge quantity of orders.  It
17    shouldn't be like boxes of orders.  It should be a very
18    specific order that outlines why it's suspicious, what
19    triggered the suspicion, what triggered the order, what's
20    the historical ordering pattern.  And then we would follow
21    up.
22         But, but we're not talking about 100, 1,000 orders.
23    We're talking about specific suspicious orders.  And that,
24    that -- I can't go over every order.  But if you do
25    suspicious orders appropriately and correctly, you're not
```

 1    going to get 1,000 suspicious orders coming into a, to DEA

 2    in one day.

 3         What you will get is suspicious orders go into the

 4    offices that if they're done appropriately, the agents could

 5    use -- agents and investigators can use that to build cases.

 6              MR. SCHMIDT:  And, Your Honor, our objection still

 7    stands.  He did not answer Your Honor's question, which is:

 8    Do you follow up on all of them?  I think by design he

 9    didn't answer that question.

10         If we're not allowed to ask him about the details of

11    individual suspicious orders, particularly the relevant ones

12    in this community, whatever his Goldilocks standard is for

13    just the right amount of suspicious orders, then we can't

14    fairly examine him.  The testimony should be stricken.

15              MR. NICHOLAS:  I think just to -- I agree and I

16    would only add that it is a contested issue as to whether

17    the DEA did do anything with suspicious orders.  I mean, we

18    don't agree, and we're challenging that statement.

19         And if we don't have the ability to, to hear the

20    witness testify about it, we -- it's like we're on ice

21    without ice skates or something.  We don't have any footing.

22    We can't deal with it.

23              THE COURT:  Let me make sure I understand the

24    issue here.

25         The question was probing the, the policies of DEA with

1    regard to suspicious orders.

2         And your objection, Mr. Westfall, was that that would

3    get into their internal regulations and that's outside the

4    scope of the two leading authorizations.

5              MR. WESTFALL:  I think if it gets into individual

6    cases of what was happening with suspicious orders except

7    probably perhaps the defendants because anything that

8    they've discussed, that's a little bit different situation,

9    but getting into all the others as far as what happened on

10   an individual basis with each suspicious order I think would

11   be a problem, Your Honor.

12             MS. SINGER:  Well, Your Honor, if I may, what I

13   understand the guardrails to be here is that Mr. Rannazzisi

14   can talk about the general practice of the DEA in dealing

15   with suspicious orders.  And I think what he's also talking

16   about here are excessive purchase reports, which I'm happy

17   to go into to help address the Court's question.

18        But what he can't do is talk about a particular

19   suspicious order, what the basis for that was, how DEA

20   investigated that order.  And I think that is completely

21   consistent with the defendants' ability to probe generally

22   what DEA did or didn't do, as defendants' own motion makes

23   clear.

24        Mr. Rannazzisi is not here to testify about suspicious

25   orders in West Virginia.  He's not an expert.  His testimony

1    is limited as a matter of their motion to his prior

2    deposition which didn't relate to suspicious orders in West

3    Virginia.

4        My questioning and the Court's question here relates

5    only to the general practices of the DEA which they are

6    absolutely free to explore.

7            MR. NICHOLAS:  Just one thing.  I thought the

8    Court's question was pretty direct to Mr. Rannazzisi:

9    "Well, did you investigate suspicious orders?"  And his

10   answer was, "I can't answer that question."

11       He didn't -- he was unable to say anything about

12   investigating any suspicious orders.  So I really think

13   we're just not in a position to explore any of this.

14           MR. SCHMIDT:  We're here trying a case on

15   Huntington/Cabell where there's been a suggestion that not

16   reporting suspicious orders, with the shifting definition of

17   what that constitutes, that not reporting can lead to

18   diversion.

19       That only can be true if they acted on them.  And if we

20   can't say, well, what happened in Huntington/Cabell, did

21   anything ever happen with them, then we're getting the

22   opinion without the ability to challenge it.

23           MS. SINGER:  So there's no opinion, if I may, Your

24   Honor.  What -- we have here the senior most DEA official

25   responsible for the DEA's handling of diversion.  These

```
 1    defendants have said from the minute we came in that DEA
 2    didn't act to catch them at diverting drugs.
 3         Mr. Rannazzisi is explaining the guidance that he
 4    provided to defendants in dealing with this.  But, frankly,
 5    whether or -- whether or not defendants did -- whether or
 6    not DEA did anything with respect to these suspicious
 7    orders, their obligation was to report and, as Mr.
 8    Rannazzisi just explained, not to ship these suspicious
 9    orders.
10         But Mr. Rannazzisi is here to explain what DEA's
11    policies and practices are, and defendants will be free to
12    cross-examine him on that.
13              MR. NICHOLAS:  Your Honor, just one more thing
14    which is that we sought discovery.  We sought discovery on
15    what the DEA did with regard to suspicious orders in West
16    Virginia and were blocked from obtaining that discovery.
17              MR. SCHMIDT:  And just because it was such an
18    inflammatory statement, our allegation is not that they
19    didn't catch us.  That's absolutely not our allegation.
20         Please don't interrupt.  I didn't interrupt you.
21         Our allegation is that they -- the plaintiffs in this
22    case and Mr. Rannazzisi are trying to blame us for other
23    actors that were regulated by the DEA; and in this case,
24    actors outside of Huntington/Cabell.
25              THE COURT:  Well, your objection, Mr. Westfall, is
```

```
 1    that the specifics of individual investigations and the --

 2    am I understanding you correctly?

 3              MR. WESTFALL:  That's correct, Your Honor, dealing

 4    with the law enforcement privilege to get into any details

 5    about what was done with regard to specific suspicious

 6    orders as far as what kind of follow-up was done and things

 7    of that nature.  If it gets into investigative techniques,

 8    then that type of information is protected under the law

 9    enforcement privilege.

10              THE COURT:  Well, I'll sustain the objection to

11    that.  But I don't see why you can't ask him generally what

12    the policies and procedures were.

13         Do you object to that, Mr. Westfall?

14              MR. WESTFALL:  No.  I think he can ask a

15    general -- answer questions generally what the public, what

16    was publicly known about what they did on this.

17              THE COURT:  When I get in a jam, I consult

18    counsel.

19         (Pause)

20              THE COURT:  Well, I think --

21         Mr. Nicholas.

22              MR. NICHOLAS:  Well, I don't want -- maybe, maybe

23    you'll address whatever I was going to say.

24         But what I would say is even if he's allowed to give

25    some sort of general answer as to what DEA generally
```

1    supposedly did or didn't do with suspicious orders does not

2    really solve our problem because we're not permitted to, to

3    probe as to what they actually did with suspicious orders in

4    Cabell County and Huntington, which is exactly the

5    information we tried to obtain and were prevented from

6    obtaining from the DEA.

7        So I don't want to anticipate the Court's ruling, but I

8    don't think such an outcome would resolve our issue.

9            THE COURT:  Well, I don't think my question went

10   to the problem that Mr. Westfall raised.  It was a very

11   general question and the witness said he couldn't answer it

12   and that got us into this quagmire.

13       But I'm going to sustain the objection to any questions

14   about specific investigations in Cabell/Huntington.  But if

15   you want to ask him general questions about overarching

16   policies and things, then I think I'll permit that and you

17   may go ahead.

18       And to that extent, I'm going to overrule the objection

19   that's on the table now.  But I don't want to cut you off

20   from raising it again depending on where we go because I

21   don't know where we're going to go.

22           MS. SINGER:  All right.  Thank you, Your Honor.

23   I'll resume, although in fairness I think it was your

24   question.  And, so, I think --

25           THE COURT:  Well, there's a lesson in that for the

1    Court.  Don't ask any questions.

2    BY MS. SINGER:

3    **Q.**    I think what Your Honor had asked, and if I may

4    follow your lead, what did DEA do as a matter of general

5    practice with suspicious order reports that were

6    received from defendants around this time period of

7    2005-2006?

8              MR. NICHOLAS:  I will object to the, to that

9    question as, as vague, probably misleading, and not, not

10   designed to elicit any probative information.

11             THE COURT:  Mr. Farrell, Ms. Singer, whoever wants

12   to talk.

13             MR. FARRELL:  Judge, what I wanted to point out,

14   in fairness to all of my colleagues here, is, as you can

15   probably tell, this is not a new argument between the

16   parties, nor is it a new argument with the Department of

17   Justice.

18        The *Touhy* line has been debated all the way back in the

19   MDL.  And, so, I think what we're really getting to here is,

20   is to the heart of it, what was going on at this period of

21   time, what was being reported and, in general, how was the

22   DEA reacting.

23        I don't think anybody in the courtroom believes that

24   that falls within the *Touhy* prohibitions.  But, again, this

25   is something --

```
 1              THE COURT:  Okay.  I'll overrule the last
 2    objection and you can press on, Ms. Singer.
 3    BY MS. SINGER:
 4    Q.   Okay.  Can you answer that question, Mr.
 5    Rannazzisi?
 6    A.   Could you repeat it?
 7    Q.   I was afraid you were going to say that.
 8         Mr. Rannazzisi, what was DEA doing as a matter of
 9    general practice and policy with suspicious order reports
10    received from defendants in 2005 and 2006?
11    A.   If they were truly suspicious order reports, true
12    suspicious order reports, they would be followed up on.
13              MS. SINGER:  And I would like to show the witness
14    P-14288ii.
15         May I approach, Your Honor?
16    BY MS. SINGER:
17    Q.   Mr. Rannazzisi, do you recognize the document that
18    I just showed you, or the type of document that I just
19    showed you?
20    A.   This is a sales -- or an Ingredient Limit Report, but
21    it just is -- it's talking about sales, particular
22    pharmacies.
23    Q.   Do you recognize -- do you recall seeing reports like
24    this when you were at DEA?
25    A.   Yes.
```

1    **Q.**   And in what context did you see these kinds of reports?

2    **A.**   These were not suspicious order reports.  These were

3    Ingredient Limit Reports, excessive purchase reports,

4    whatever you want to call them, but they're not a suspicious

5    order report.

6        This is just a -- I don't even know what the time frame

7    is in this one.  Oh, it's a month -- this is a monthly

8    report.  So what this has is for April, 2007, all of the

9    sales that were above a certain quantity.

10   **Q.**   And do you know who -- do you know who generated this

11   report?

12             MS. WICHT:  Your Honor, I'll object on the basis

13   of foundation.

14             MR. ACKERMAN:  Your Honor, this is a stipulated

15   document that's in evidence.

16             MS. WICHT:  It is in evidence.  I agree, Your

17   Honor.  I'm objecting to the foundation to question this

18   witness about it.

19             MR. ACKERMAN:  He just said he recognized it.

20             THE COURT:  Well, this has already been admitted?

21             MS. SINGER:  It's been admitted and the witness

22   has testified that he recognized the document.

23             THE COURT:  Well, I'll overrule the objection and

24   we'll see where we go.

25             THE WITNESS:  This is a standard report that

1    was -- that would be sent in.  And all, all of the -- many

2    of the distributors would send these reports, not

3    necessarily calling them Ingredient Limit Reports, but

4    they'd call them something else, excessive purchase reports,

5    whatever.  But it's just a standard monthly report.

6    BY MS. SINGER:

7    **Q.**   Okay.  And who -- which, which entity generated the

8    report that's in front of you?

9    **A.**   This one was from Cardinal Health.

10   **Q.**   And what was it called?

11   **A.**   Ingredient Limit Report.

12   **Q.**   And do you see a date on this report?

13   **A.**   April of 2007 was the month.  And it was a run date of

14   May 6th, 2007.

15   **Q.**   Okay.  And is this typical of the kind of reports that

16   DEA was receiving from these defendants in 2005 and 2006?

17   **A.**   Yeah, these, these are excessive purchase reports that

18   we would get.  It's -- they all have different -- they all

19   have different set-ups, but these are the same reports that

20   basically just talk about sales that were over a certain

21   ingredient limit or threshold, whatever you want to call it.

22   **Q.**   And were these reports provided to DEA at the time the

23   order was shipped?

24   **A.**   I -- this report is a monthly report, but it's not a

25   suspicious order report.  There's no, there's no indication

1    of why they thought any of these things were suspicious.

2    It's an Ingredient Limit Report.

3        A suspicious order report, like I said before, is a

4    very specific report.  It shows why there's a suspicion.  It

5    shows why it's been triggered as a, as a suspicious order.

6        All this is is a sales, sales to different pharmacies

7    and hospitals and based on the ingredient limit purchase,

8    which is not a suspicious order.

9        And I don't even know if this was done in real-time

10   because, remember, a suspicious order is supposed to be done

11   when discovered according to 1301.  This looks like just a

12   monthly report.  It's not a suspicious order report.

13   **Q.**   And during the 2005-2006 period where DEA was meeting

14   with these -- met with these defendants in the distributor

15   initiative briefings, is that the kind of reporting that DEA

16   was getting from them in lieu of suspicious order reports?

17            MR. SCHMIDT:  Objection, vague.  I don't think --

18   I apologize.  I don't think he has that foundation as to

19   McKesson.  And the only document that's in evidence on this

20   point is to the contrary.

21            MR. NICHOLAS:  Same objection on behalf of

22   AmerisourceBergen.

23            MS. WICHT:  Same objection, Your Honor.

24            THE COURT:  I'll sustain the objection, but I'm

25   not going to cut you off from this line if you can ask him a

1    more specific question and get around it.  But I'll sustain

2    the objection to that question.

3    BY MS. SINGER:

4    **Q.**   All right.  Mr. Rannazzisi, did you get a similar

5    report from McKesson that you're looking at from

6    Cardinal, this kind of excessive purchase report?

7    **A.**   All three distributors sent some type of report, but it

8    wasn't -- they weren't suspicious order reports.  So if --

9    yes, I think -- yes, we received these type of reports.  The

10   office received these type of reports as excessive purchase

11   reports, but not suspicious order reports.

12   **Q.**   And were these reports useful to DEA in detecting

13   diversion?

14   **A.**   We accepted the reports because if you're going to send

15   us things, we, you know, obviously if we get a chance, we'll

16   look at them.  But as you can see the volume of this,

17   without knowing why it's suspicious, without understanding

18   why the company felt that this was, quote/unquote,

19   suspicious doesn't tell us anything.  It's just an excessive

20   purchase report.

21       It needs to be more than that.  It needs to be when

22   discovered.  It's not a monthly report.  Those drugs have

23   been shipped already.  I need to know when they were

24   discovered.  I need to know why you think it's suspicious.

25       It's your customer.  Tell me why it's suspicious.  What

1    triggered the suspicion, and what did you do to resolve it?

2        This is -- this doesn't say that.  This is just a --

3    and this is the same -- we've been seeing these since I was,

4    since I was diversion investigator, just volumes of, of,

5    volumes of, of transactions with no guidance on why.

6            MR. NICHOLAS:  May I just interpose an objection

7    to suggest that the witness is offering legal conclusions as

8    to whether these are suspicious orders or not.  He's just

9    offering a legal conclusion as far as I can tell.

10           MS. SINGER:  I think Mr. --

11           THE COURT:  Well, --

12           MS. SINGER:  I'm sorry, Your Honor, please.

13           THE COURT:  Go ahead.

14           MS. SINGER:  Okay.  I'm sorry.  I think he has

15   just testified that these weren't suspicious order reports.

16   They didn't comply with the requirement that they be

17   reported promptly.

18       And to the point that, you know, what DEA was doing

19   with these reports, I think Mr. Rannazzisi has testified

20   that the whole purpose of a suspicious order report is to

21   allow the DEA to identify and stop diversion.  He's

22   described these as after-the-fact shipment reports.

23           MR. ACKERMAN:  Your Honor, if I may, I think the

24   distinction is that Mr. Rannazzisi is opining on the reports

25   and not on the orders within the reports.

```
 1                  MR. NICHOLAS:  Well, I think --

 2                  THE COURT:  Let me hear from the other defendants

 3       here.

 4            Mr. Schmidt, did you want to say something?

 5                  MS. WICHT:  I think Ms. Singer's argument

 6       basically said it all.  He's opining on whether the reports

 7       comply with the regulations.  It's a legal conclusion.  It

 8       doesn't have to do with whether it's, the order is in it or

 9       not.  He's opining about whether the reports comply with the

10       law which he's not permitted to do.

11                  THE COURT:  I'll sustain the objection.

12       BY MS. SINGER:

13       Q.   Did you, did you provide guidance to defendants on

14       whether these reports were suspicious order reports?

15       A.   I personally, I personally did not.

16       Q.   And did DEA, to your knowledge, provide feedback to

17       these defendants that these were not suspicious order

18       reports?

19       A.   Yes.  It was in the letters.  Also, we talked about it

20       in the -- it was discussed in the distributor initiative

21       briefings.  It was discussed in the letters.  It was

22       discussed in court, court documents, the final orders.  Yes,

23       it was discussed.

24                  THE COURT:  When you get to a stopping place, Ms.

25       Singer, we're going to --
```

```
 1              MS. SINGER:  We can stop now, Your Honor.

 2              THE COURT:  Is this a good place?

 3         Mr. Rannazzisi, I'm going to have to make you come back

 4    in the morning.

 5              THE WITNESS:  That's all right, Your Honor.

 6              THE COURT:  Be here ready to go at 9:00.

 7              THE WITNESS:  I will be.  Thank you very much.

 8              THE COURT:  Until then, you're excused.

 9              THE WITNESS:  Thank you, sir.

10              THE COURT:  And I'll see everybody at 9:00.

11         (Trial recessed at 5:02 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      CERTIFICATION:

2              I, Ayme A. Cochran, Official Court

3   Reporter, and I, Lisa A. Cook, Official Court Reporter,

4   certify that the foregoing is a correct transcript from

5   the record of proceedings in the matter of The City of

6   Huntington, et al., Plaintiffs vs. AmerisourceBergen

7   Drug Corporation, et al., Defendants, Civil Action No.

8   3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9   reported on June 7, 2021.

10

11        S\Ayme A. Cochran          s\Lisa A. Cook

12           Reporter                  Reporter

13     _

14

15        June 7, 2021

16           Date

17

18

19

20

21

22

23

24

25

## $

**$1,000,000.00** [1] - 61:2
**$1,999,206.00** [1] - 138:2
**$1.63** [1] - 90:3
**$100** [1] - 138:5
**$100,000.00** [1] - 153:8
**$168,000.00** [2] - 65:13, 66:2
**$168,644** [1] - 65:21
**$200,000.00** [1] - 151:21
**$220,000.00** [1] - 154:10
**$225,000.00** [1] - 154:16
**$250,000.00** [1] - 152:1
**$350,000.00** [2] - 152:23, 153:4
**$400,000.00** [5] - 61:10, 61:12, 61:13, 62:3, 62:4
**$50** [5] - 113:21, 156:9, 156:13, 156:22, 157:11
**$6,555** [1] - 91:15
**$616,000.00** [1] - 91:7
**$655,000.00** [1] - 91:11
**$655,798** [1] - 91:17
**$70,000.00** [2] - 113:21, 151:18
**$800,000.00** [2] - 61:15, 62:5
**$823,216.00** [1] - 65:9
**$989,000.00** [1] - 91:23
**$991,860** [1] - 65:25

## '

**'30s** [3] - 212:21, 213:1
**'40s** [3] - 212:21, 212:22, 213:1
**'67** [1] - 147:15

## 0

**00006** [1] - 40:19
**00907** [2] - 2:5, 2:17
**03** [1] - 62:23
**03542** [3] - 62:23, 62:24, 89:3

## 1

**1%** [1] - 49:23
**1,000** [4] - 55:15, 55:24, 219:22, 220:1
**1,500** [3] - 107:16, 108:13, 108:21
**1,800** [5] - 51:23, 52:3, 52:12, 53:4, 53:14
**1.3** [1] - 60:20
**1.4** [1] - 138:3
**1.6** [2] - 91:3, 176:22
**10** [5] - 14:2, 47:24, 48:2, 50:20, 213:13
**10%** [1] - 84:23
**100** [1] - 219:22
**1001** [2] - 2:10, 4:6
**1022** [1] - 3:5
**1029** [1] - 7:15
**11** [7] - 25:20, 40:23, 41:1, 88:6, 120:14, 152:3, 217:21
**110** [1] - 95:4
**12** [6] - 72:25, 73:8, 73:10, 87:25, 120:15, 206:14
**12%** [1] - 49:15
**12/19/2018** [1] - 37:17
**122** [1] - 42:16
**126** [1] - 3:5
**13** [9] - 52:10, 73:9, 97:19, 97:21, 97:22, 120:17, 153:20, 206:12
**1300** [1] - 6:15
**1301** [1] - 230:11
**1311** [2] - 2:4, 2:16
**1352** [2] - 29:6, 38:15
**14** [4] - 73:9, 88:2, 103:25, 114:5
**143** [6] - 124:18, 124:24, 125:17, 125:25, 126:5, 126:6
**1447** [1] - 131:21
**15** [3] - 20:25, 97:18, 124:12
**15-minute** [2] - 143:14, 145:7
**150** [1] - 126:4
**15910** [1] - 3:18
**16** [2] - 87:23, 87:24
**1600** [1] - 3:17
**17** [2] - 87:21, 87:23
**1717** [2] - 6:6, 6:13
**178,000** [1] - 104:21
**1800** [1] - 52:14
**182** [1] - 52:10
**185** [1] - 128:3
**19** [2] - 128:4, 212:21

## 19087

**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1967** [1] - 81:23
**1986** [1] - 165:3

## 2

**2** [3] - 137:21, 137:23, 174:5
**2,000** [1] - 53:12
**20** [2] - 52:10, 72:21
**20,000** [2] - 81:21, 82:2
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5
**2000s** [2] - 169:24, 170:14
**2004** [3] - 171:15, 171:23
**2005** [7] - 171:25, 183:25, 194:16, 200:16, 207:13, 227:10, 229:16
**2005-2006** [2] - 226:7, 230:13
**2006** [2] - 227:10, 229:16
**2007** [3] - 228:8, 229:13, 229:14
**2008** [4] - 123:20, 173:19, 186:5, 186:6
**2009** [1] - 186:6
**2012** [1] - 148:23
**2015** [1] - 165:3
**2017** [1] - 147:19
**2018** [11] - 14:19, 20:9, 31:24, 38:5, 41:10, 53:16, 123:20, 123:21, 147:19, 148:20, 149:7
**2018"** [1] - 123:8
**2019** [12] - 20:16, 21:7, 21:15, 43:7, 50:15, 51:17, 54:24, 90:25, 103:20, 128:4, 130:12, 131:21
**2019-22** [1] - 101:11
**202** [2] - 2:4, 2:16
**2020** [19] - 51:22, 52:3, 53:16, 53:18, 65:8, 65:11, 66:2, 66:9, 67:20, 90:3, 90:5, 90:9, 90:15, 90:17, 90:21, 90:22, 90:25, 91:3, 91:23
**2021** [4] - 1:19, 7:4, 235:9, 235:15
**20th** [1] - 207:12

## 21

**21** [4] - 1:16, 20:25, 50:15, 182:12
**2134.7** [1] - 18:7
**2135** [1] - 102:20
**21st** [1] - 103:20
**2216** [1] - 3:7
**224** [1] - 150:25
**23rd** [1] - 200:16
**24,000** [1] - 106:12
**24,389** [3] - 104:22, 104:25, 106:4
**24-hour** [1] - 87:17
**25** [5] - 5:5, 59:7, 59:8, 127:1, 127:11
**25%** [4] - 107:1, 107:6, 107:15, 108:4
**25,000** [1] - 106:12
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**26** [3] - 102:25, 103:14, 189:7
**2653** [6] - 23:2, 25:2, 60:15, 70:22, 86:25, 139:22
**27** [1] - 103:21
**28** [5] - 3:15, 4:3, 4:9, 104:7, 127:11
**28-29** [1] - 104:6
**28-day** [1] - 125:9
**29464** [3] - 3:15, 4:4, 4:9
**2:00** [1] - 119:23

## 3

**3** [2] - 95:16, 131:21
**3%** [1] - 49:23
**3.1** [2] - 117:17
**3.5** [4] - 87:6, 87:13, 87:14, 117:16
**30** [3] - 26:16, 45:22, 58:10
**30th** [1] - 20:9
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**31st** [4] - 7:22, 7:24, 8:7, 165:3
**32** [1] - 132:3
**32502** [1] - 2:14
**34** [2] - 18:24, 19:22
**35** [1] - 19:23
**3555** [1] - 50:14
**36** [2] - 87:1, 87:2
**360** [1] - 107:6
**364,000** [1] - 106:20
**38** [3] - 67:23, 86:25, 120:15

## 3843

**3843** [1] - 5:14
**3:17-cv-01362** [2] - 1:5, 235:8
**3:17-cv-01665** [2] - 1:11, 235:8

## 4

**4** [2] - 54:21, 55:10
**40** [5] - 70:23, 156:9, 156:14, 156:22, 157:12
**401** [2] - 2:10, 4:6
**405** [1] - 2:7
**41** [2] - 75:14, 75:16
**41051** [1] - 54:6
**43** [3] - 75:9, 75:13, 123:16
**45** [2] - 93:13, 93:14
**461** [1] - 47:9
**47** [1] - 93:11

## 5

**5** [5] - 24:3, 123:1, 141:20, 147:11, 150:5
**5-0** [1] - 120:15
**5.6** [2] - 19:24, 20:6
**50** [2] - 120:15, 194:4
**50%** [2] - 84:24, 96:1
**500** [2] - 53:7, 53:8
**52%** [2] - 56:25, 57:8
**553** [1] - 6:8
**56** [2] - 3:4, 96:1
**560** [2] - 56:12, 56:19
**56th** [1] - 3:5
**57** [1] - 4:19
**59** [4] - 71:10, 72:6, 77:4, 109:18
**5:02** [1] - 234:11

## 6

**6** [4] - 7:16, 40:9, 40:15, 139:24
**6,300** [2] - 107:11, 108:8
**6,341** [1] - 106:7
**6,655.00** [1] - 91:16
**60** [6] - 77:19, 77:20, 77:22, 81:6, 81:8, 147:25
**600** [1] - 2:13
**60s** [2] - 147:12
**62** [5] - 46:3, 60:15, 68:1, 110:3
**64** [1] - 94:20
**65** [2] - 20:24, 177:5
**67%** [2] - 49:7, 49:10

**68** [1] - 67:24
**68%** [2] - 95:18, 97:1
**6th** [2] - 3:5, 229:14

## 7

**7** [10] - 1:19, 7:4, 18:4,
18:11, 24:1, 42:16,
48:12, 49:5, 235:9,
235:15
**7%** [1] - 49:22
**7.1** [3] - 20:15, 21:6,
21:14
**70%** [4] - 55:24, 56:3,
56:7, 96:1
**70,000** [1] - 177:5
**700** [5] - 50:2, 51:9,
56:3, 56:21, 91:15
**70130** [1] - 3:8
**707** [1] - 4:18
**70s** [1] - 167:9
**71** [1] - 126:22
**716** [1] - 3:12
**725** [2] - 4:13, 4:15
**75** [1] - 126:16
**79** [1] - 124:10
**798** [1] - 91:15
**7:00** [2] - 7:19, 121:3
**7th** [1] - 7:21, 8:8

## 8

**8** [1] - 150:25
**801** [1] - 3:10
**803(8)(A)(i** [2] -
190:23, 201:20
**803(8)(B)** [1] - 201:22
**80s** [3] - 169:6,
169:21, 170:9
**82** [1] - 126:11
**823** [1] - 202:18
**850** [1] - 5:12
**86%** [3] - 56:6, 56:7,
56:16
**8th** [1] - 43:7

## 9

**9** [3] - 25:24, 50:25,
217:20
**9-10** [1] - 25:12
**90** [16] - 57:1, 57:2,
57:4, 57:7, 57:9,
57:11, 58:9, 58:12,
95:25, 96:2, 96:4,
96:14, 116:7, 125:5,
147:25
**90%** [1] - 84:24
**90,000** [2] - 106:23,
107:6

**901** [1] - 4:18
**90s** [2] - 169:6, 170:9
**9114** [2] - 200:8,
208:14
**91436** [1] - 3:18
**995** [1] - 138:5
**999** [1] - 138:5
**9:00** [3] - 7:4, 234:6,
234:10
**9:55** [1] - 48:3
**9th** [1] - 2:10

## A

**a.m** [2] - 7:5, 48:3
**abbreviate** [1] - 93:1
**abbreviated** [1] -
69:23
**ability** [4] - 152:11,
220:19, 221:21,
222:22
**able** [16] - 11:14,
11:15, 59:4, 59:24,
62:11, 85:1, 111:4,
115:10, 117:21,
122:23, 131:2,
138:15, 140:14,
149:13, 174:24,
212:14
**absolutely** [10] -
14:11, 150:10,
166:6, 179:2,
180:13, 193:20,
197:15, 214:19,
222:6, 223:19
**Absolutely** [2] -
180:13, 193:9
**abstaining** [1] - 57:20
**abstinence** [4] -
36:10, 43:23, 46:3,
83:7
**Abstinence** [2] - 78:2,
133:16
**abuse** [14] - 19:10,
19:15, 19:18, 42:7,
47:16, 75:22, 78:4,
118:17, 118:19,
118:24, 124:8,
124:9, 167:9
**Abuse** [5] - 75:25,
86:18, 90:12,
104:11, 118:12
**abusers** [1] - 78:20
**abusing** [4] - 41:15,
41:24, 42:17, 42:24
**accept** [1] - 10:16
**accepted** [1] - 231:14
**access** [1] - 191:20
**accessible** [1] - 33:4
**accessing** [1] - 185:5

**accommodate** [1] -
47:23
**accord** [17] - 41:4,
41:12, 42:22, 49:10,
49:13, 49:17, 51:11,
52:13, 55:19, 56:2,
56:10, 72:4, 74:16,
82:1, 93:21, 95:5,
95:21
**accorded** [1] - 52:2
**according** [3] -
125:23, 147:13,
230:11
**accords** [1] - 21:13
**account** [2] - 61:15,
174:25
**accountability** [3] -
174:24, 175:3, 175:9
**accounted** [1] - 63:16
**accounting** [3] -
61:13, 66:6, 156:17
**accounts** [1] - 108:4
**accurate** [10] - 20:8,
26:12, 30:3, 64:11,
90:15, 108:16,
109:1, 129:11,
135:18, 139:17
**accurately** [3] - 109:9,
209:4, 209:23
**accused** [1] - 176:9
**ACKERMAN** [23] - 2:9,
9:3, 9:7, 10:21,
11:20, 12:20, 64:5,
64:9, 66:10, 66:17,
66:21, 107:19,
107:21, 107:24,
190:13, 190:19,
201:7, 201:18,
202:4, 211:12,
228:14, 228:19,
232:23
**Ackerman** [6] - 9:2,
10:20, 11:19, 12:19,
201:17, 211:11
**acknowledge** [1] -
125:6
**acknowledged** [1] -
211:3
**acknowledgment** [1] -
101:18
**acronyms** [2] - 75:7,
75:8
**Act** [11] - 178:8,
178:10, 178:12,
179:4, 179:11,
179:16, 182:5,
182:6, 182:10,
182:12, 196:9
**act** [2] - 217:7, 223:2
**acted** [1] - 222:19

**Action** [4] - 1:4, 1:10,
235:7, 235:8
**action** [1] - 182:21
**active** [2] - 54:15,
128:17
**activities** [6] - 17:19,
63:9, 101:25,
190:24, 192:11,
192:12
**activity** [6] - 16:25,
18:13, 18:19, 63:12,
201:21, 202:2
**actors** [2] - 223:23,
223:24
**actual** [3] - 64:16,
125:9, 125:21
**add** [6] - 61:17,
120:16, 131:7,
203:8, 205:6, 220:16
**added** [3] - 8:13, 11:9,
122:13
**addicted** [2] - 178:3,
181:13
**addiction** [11] - 25:15,
26:5, 34:5, 39:20,
51:7, 57:4, 99:8,
99:15, 138:14,
148:8, 167:10
**Addiction** [39] - 13:16,
14:25, 15:25, 18:13,
18:19, 18:25, 19:7,
19:9, 20:5, 21:16,
22:16, 23:11, 23:21,
23:23, 26:6, 27:15,
28:13, 28:14, 28:17,
30:10, 34:12, 36:18,
36:21, 38:7, 38:12,
39:3, 39:9, 43:11,
44:11, 54:19, 63:6,
65:5, 69:20, 70:4,
87:14, 100:6, 100:8,
101:11, 102:9
**addition** [4] - 45:10,
110:6, 189:18, 197:6
**additional** [1] - 166:22
**address** [10] - 19:1,
26:8, 26:15, 118:16,
138:19, 140:15,
144:13, 152:17,
221:17, 224:23
**addressed** [4] -
136:24, 200:23,
200:24, 207:19
**addressing** [3] -
128:18, 130:6,
132:19
**Adequate** [1] - 104:9
**admin** [1] - 17:17
**administered** [1] -
35:5

**administration** [2] -
64:14, 100:25
**Administration** [12] -
90:12, 104:12,
118:13, 164:13,
165:1, 165:2, 166:2,
166:3, 167:6,
167:25, 168:1,
173:12
**Administrator** [17] -
165:7, 165:9,
171:20, 172:1,
172:4, 172:8, 172:9,
172:11, 172:12,
172:17, 172:18,
172:21, 181:6,
183:6, 183:16,
183:23
**admissible** [1] -
201:23
**admission** [2] - 63:19,
211:7
**admissions** [1] -
123:19
**admit** [8] - 18:1,
63:24, 189:10,
201:2, 202:1, 206:9,
208:7, 208:13
**admitted** [14] - 16:20,
18:1, 25:10, 54:11,
64:2, 98:4, 99:9,
102:22, 191:12,
202:6, 208:13,
208:25, 228:20,
228:21
**adopted** [1] - 25:3
**adults** [2] - 33:4,
81:21
**advancement** [1] -
66:8
**advent** [1] - 110:7
**advice** [1] - 212:18
**advise** [1] - 9:9
**advised** [2] - 9:10,
9:19
**advising** [1] - 210:24
**advocacy** [2] - 173:6,
187:8
**advocate** [1] - 143:7
**advocating** [1] - 133:9
**affecting** [1] - 19:2
**affiliated** [2] - 36:13,
85:8
**afraid** [1] - 227:7
**after-the-fact** [1] -
232:22
**afternoon** [9] - 9:19,
11:24, 121:20,
121:25, 122:1,
158:12, 158:13,

161:19, 161:20
**agencies** [3] - 173:14, 173:15, 186:19
**agency** [1] - 124:7
**agent** [5] - 162:4, 165:19, 167:14, 168:1, 168:6
**Agent** [1] - 165:13
**agents** [4] - 184:9, 215:10, 220:4, 220:5
**aggregate** [1] - 173:8
**ago** [7] - 12:25, 59:7, 130:13, 181:15, 183:11, 194:11, 199:1
**agree** [10] - 26:24, 43:2, 49:23, 115:18, 163:7, 189:16, 212:3, 220:15, 220:18, 228:16
**agreeable** [1] - 112:11
**agreed** [2] - 10:4, 10:8
**agreement** [2] - 121:8, 160:19
**ahead** [12] - 13:22, 13:25, 87:2, 121:21, 161:4, 176:6, 191:14, 198:18, 205:12, 209:20, 225:17, 232:13
**al** [4] - 1:7, 1:13, 235:6, 235:7
**alcohol** [4] - 42:1, 42:11, 47:16, 123:25
**alert** [1] - 120:5
**alerted** [1] - 121:18
**allegation** [3] - 223:18, 223:19, 223:21
**allegations** [1] - 219:1
**allow** [4] - 143:9, 205:22, 205:24, 232:21
**allowed** [6] - 148:1, 188:24, 195:14, 203:9, 220:10, 224:24
**almost** [10] - 22:17, 22:19, 22:21, 44:21, 55:24, 58:7, 90:19, 94:8, 94:10, 113:23
**alongside** [1] - 145:9
**Alprazolam** [5] - 170:20, 171:16, 183:18, 184:5, 184:6
**alter** [1] - 10:23
**altered** [1] - 87:23
**alternative** [2] - 43:17, 62:11
**alumni** [1] - 95:18

**American** [3] - 34:11, 44:11, 87:14
**Amerisource** [1] - 185:17
**AmerisourceBergen** [6] - 6:2, 203:14, 204:15, 208:22, 230:22, 235:6
**AMERISOURCEBERGEN** [2] - 1:7, 1:13
**amount** [9] - 90:13, 125:11, 135:21, 156:16, 169:25, 174:25, 178:23, 187:22, 220:13
**analysis** [3] - 23:15, 108:18, 200:21
**ANDREW** [1] - 5:10
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**Annual** [1] - 184:8
**annual** [9] - 15:3, 16:12, 17:7, 17:15, 17:18, 94:22, 151:24, 151:25, 154:15
**annually** [5] - 90:10, 90:13, 117:6, 151:16, 152:23
**anomaly** [1] - 212:25
**answer** [21] - 21:5, 52:12, 105:21, 122:4, 144:23, 195:5, 195:9, 209:20, 210:8, 212:5, 216:25, 218:19, 219:2, 220:7, 220:9, 222:10, 224:15, 224:25, 225:11, 227:4
**answered** [2] - 157:14, 206:23
**answering** [1] - 188:9
**ANTHONY** [1] - 2:6
**anti** [1] - 184:8
**anti-anxiety** [1] - 184:8
**anticipate** [2] - 158:20, 225:7
**anxiety** [2] - 184:8, 184:12
**anyplace** [1] - 165:24
**anytime** [1] - 96:17
**anyway** [1] - 11:19
**apartment** [1] - 87:23
**apologies** [2] - 47:20, 68:1
**apologize** [5] - 64:5, 67:2, 189:24, 200:4,

230:18
**appear** [1] - 66:12
**appearance** [2] - 159:18, 192:17
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**appearing** [1] - 159:7
**application** [2] - 137:9, 138:1
**applied** [3] - 110:23, 167:25, 174:10
**apply** [6] - 69:10, 69:12, 69:13, 108:12, 110:18, 113:20
**appreciate** [3] - 89:12, 164:23, 203:13
**approach** [22] - 14:13, 22:23, 29:2, 37:10, 43:3, 50:9, 53:25, 62:20, 73:22, 81:11, 89:4, 95:8, 98:16, 101:6, 119:3, 127:24, 131:16, 162:11, 174:6, 185:20, 199:25, 227:15
**appropriate** [2] - 55:17, 56:9
**appropriately** [3] - 175:6, 219:25, 220:4
**approve** [2] - 199:14, 205:13
**approved** [5] - 163:23, 202:14, 204:7, 205:4, 206:4
**April** [3] - 128:4, 228:8, 229:13
**Arch** [2] - 6:6, 6:13
**ARCOS** [3] - 161:1, 163:20, 205:18
**area** [11] - 39:13, 74:14, 80:3, 105:6, 107:3, 131:1, 133:21, 191:25, 203:18, 203:22, 215:1
**areas** [7] - 100:13, 103:13, 131:4, 135:16, 136:2, 139:19, 187:23
**argue** [1] - 26:21
**argument** [7] - 10:4, 10:17, 120:25, 121:9, 226:15, 226:16, 233:5
**arises** [1] - 160:9
**arising** [1] - 133:24
**arm** [2] - 21:23, 22:8

**arrange** [1] - 11:14
**arrest** [1] - 57:25
**arrows** [1] - 176:14
**article** [1] - 50:15
**ASAM** [4] - 34:11, 44:10, 87:6, 87:13
**ASHLEY** [1] - 5:3
**aspect** [2] - 128:18, 160:17
**aspects** [2] - 178:9, 186:22
**assessed** [1] - 55:24
**assessment** [5] - 33:2, 44:11, 44:12, 55:16, 70:18
**assessments** [2] - 33:9, 34:9
**assist** [3] - 27:16, 34:17, 67:6
**assistance** [1] - 179:5
**Assistant** [13] - 165:7, 165:9, 165:13, 171:20, 172:1, 172:4, 172:7, 172:9, 172:10, 172:20, 181:6, 183:6, 183:16
**assisted** [33] - 33:9, 34:15, 34:22, 45:18, 48:20, 58:5, 58:18, 58:20, 59:7, 59:10, 59:14, 59:17, 59:22, 60:6, 60:7, 70:18, 72:20, 73:16, 77:2, 77:13, 78:5, 79:4, 80:21, 114:12, 115:17, 116:9, 124:19, 124:24, 125:17, 125:21, 125:25, 142:17
**assisting** [1] - 94:14
**Associate** [4] - 18:21, 39:2, 43:11, 54:19
**associated** [4] - 73:14, 74:12, 98:17, 135:10
**Association** [4] - 173:14, 173:23, 173:24, 186:19
**assume** [12] - 22:1, 24:16, 38:18, 62:2, 74:17, 79:4, 80:1, 92:13, 130:21, 201:10, 201:12, 203:21
**assuming** [2] - 130:22, 131:6
**assure** [1] - 160:23
**asthma** [1] - 58:22
**AT** [1] - 1:2
**attached** [1] - 128:16

**attaches** [1] - 37:17
**attachment** [1] - 38:17
**attachments** [1] - 204:1
**attempt** [1] - 105:16
**attempts** [1] - 57:22
**attendance** [2] - 136:15, 136:23
**attention** [1] - 184:15
**Attorney** [2] - 173:20, 173:21
**Attorney's** [2] - 159:15, 159:20
**attorney/client** [3] - 188:21, 212:1, 212:2
**auction** [1] - 157:21
**audience** [2] - 187:5, 187:14
**audits** [2] - 175:4, 175:14
**August** [1] - 200:16
**authority** [3] - 172:11, 173:3, 206:3
**authorization** [6] - 87:16, 159:7, 159:8, 159:12, 162:7, 162:9
**authorizations** [1] - 221:4
**authorized** [1] - 162:6
**auxiliary** [3] - 146:23, 154:4
**available** [4] - 122:11, 125:13, 137:18, 151:25
**average** [7] - 21:3, 57:18, 57:19, 126:4, 126:20, 127:9, 127:11
**Avin** [1] - 3:7
**avoid** [1] - 67:4
**award** [2] - 153:1, 174:1
**Award** [3] - 173:20, 173:22, 173:24
**awarding** [1] - 155:16
**aware** [15] - 7:23, 16:8, 24:16, 91:13, 105:16, 113:25, 122:7, 157:2, 158:19, 159:6, 159:10, 162:5, 162:21, 163:10, 199:9
**awhile** [1] - 119:9
**Ayme** [2] - 6:17, 235:2

**B**

**babies** [10] - 75:23, 76:1, 77:1, 83:5,

83:8, 84:13, 84:19, 85:3, 86:7, 133:2

**baby** [10] - 76:7, 77:23, 78:3, 78:11, 78:20, 88:5, 88:11, 133:13, 149:15

**Bachelor** [1] - 166:9

**background** [4] - 163:19, 166:14, 166:15, 174:3

**bad** [7] - 142:24, 169:22, 170:12, 170:23, 170:23

**baked** [1] - 10:10

**Barbara** [1] - 197:22

**Baron** [1] - 3:17

**barrier** [1] - 108:18

**barriers** [2] - 111:23, 118:6

**base** [3] - 117:2, 192:9, 192:10

**Based** [2] - 34:16, 44:10

**based** [46] - 11:7, 33:24, 34:19, 36:9, 44:10, 51:12, 51:14, 57:5, 70:14, 72:18, 73:4, 78:14, 79:23, 80:16, 80:17, 83:7, 83:20, 84:1, 86:4, 94:6, 94:11, 103:23, 104:9, 106:15, 108:15, 108:23, 115:22, 116:5, 116:8, 116:13, 116:15, 125:8, 130:18, 139:4, 142:7, 142:11, 149:25, 150:4, 169:12, 170:22, 183:20, 202:2, 202:21, 230:7

**basements** [1] - 193:2

**basic** [1] - 219:2

**basis** [13] - 62:13, 107:20, 179:2, 179:3, 201:3, 203:6, 204:19, 208:11, 215:9, 215:18, 221:10, 221:19, 228:12

**Bates** [3] - 206:12, 213:13, 217:21

**batting** [2] - 11:18, 11:22

**Baylen** [1] - 2:13

**bears** [1] - 123:7

**became** [4] - 125:10, 125:12, 168:5, 172:4

**become** [9] - 24:21,

131:9, 141:2, 142:21, 144:16, 169:7, 171:19, 171:24, 178:3

**becomes** [1] - 195:17

**becoming** [2] - 165:9, 181:13

**bedrooms** [2] - 88:6, 88:7

**BEFORE** [1] - 1:17

**began** [3] - 41:6, 147:18, 182:4

**begin** [1] - 26:7

**beginning** [2] - 168:9, 194:18

**behalf** [3] - 159:20, 190:22, 230:21

**Behavioral** [5] - 87:5, 114:7, 114:23, 122:11

**behavioral** [3] - 122:10, 143:13, 145:2

**behind** [2] - 125:9, 156:23

**belabor** [1] - 150:6

**below** [3] - 44:15, 117:17, 214:14

**BENCH** [1] - 1:16

**benchmark** [3] - 57:7, 96:3, 96:13

**benefit** [2] - 34:17, 176:11

**benefits** [1] - 31:7

**benzodiazepine** [1] - 184:6

**Benzodiazepine** [1] - 170:20

**benzodiazepines** [1] - 181:12

**Berger** [1] - 47:23

**best** [3] - 13:25, 167:12, 203:11

**better** [4] - 46:10, 112:6, 150:19, 179:8

**between** [9] - 22:5, 22:10, 52:16, 90:25, 105:3, 177:5, 218:22, 218:23, 226:15

**beyond** [6] - 22:2, 121:13, 130:19, 160:20, 177:3, 195:10

**big** [4] - 25:18, 74:1, 185:18, 186:23

**bill** [2] - 73:9, 145:3

**billable** [6] - 68:5, 68:9, 68:11, 68:24,

68:25, 143:4

**billed** [2] - 79:3, 143:12

**billing** [2] - 79:4, 92:2

**billion** [2] - 138:3, 138:5

**bills** [1] - 82:13

**bin** [1] - 158:9

**binder** [1] - 205:11

**birth** [8] - 77:23, 77:24, 78:3, 78:10, 78:12, 78:20, 133:16, 147:15

**bit** [14] - 15:11, 21:20, 36:17, 60:10, 119:11, 119:12, 121:19, 139:24, 142:4, 143:22, 150:17, 195:14, 202:20, 221:8

**BJA** [1] - 154:22

**black** [1] - 185:24

**blame** [1] - 223:22

**block** [1] - 216:14

**blocked** [1] - 223:16

**blocker** [1] - 35:1

**Bloomberg** [2] - 144:18, 152:25

**Blvd** [3] - 3:15, 4:3, 4:9

**board** [14] - 14:7, 27:24, 28:1, 28:3, 28:23, 36:16, 37:1, 69:25, 92:25, 97:13, 113:24, 122:5, 122:6, 164:18

**Board** [1] - 173:25

**boards** [1] - 167:5

**Boards** [2] - 173:23, 186:19

**Bob** [2] - 141:1, 141:5

**Bonasso** [1] - 5:14

**Boockholdt** [1] - 197:22

**born** [18] - 76:1, 76:15, 76:17, 78:14, 83:5, 83:8, 83:9, 83:10, 83:12, 84:7, 84:14, 84:19, 84:20, 84:24, 85:3, 86:7, 88:11, 133:7

**boss** [2] - 50:23, 128:14

**bottom** [29] - 18:6, 18:11, 18:24, 19:22, 24:2, 24:4, 25:13, 25:14, 25:24, 40:12, 40:18, 42:15, 43:15, 43:16, 54:22, 60:16, 64:6, 65:13, 65:14,

66:25, 71:15, 87:3, 89:11, 110:4, 123:17, 124:11, 132:4, 149:7

**Boulevard** [1] - 3:18

**bounds** [1] - 161:4

**Box** [2] - 5:14, 6:8

**boxes** [1] - 219:17

**brand** [1] - 34:23

**branded** [1] - 114:22

**branding** [1] - 141:13

**brands** [1] - 184:7

**breach** [3] - 180:25, 181:5, 181:8

**breaches** [1] - 181:25

**break** [9] - 13:11, 91:12, 123:5, 127:14, 127:17, 127:18, 175:23, 175:24, 176:23

**breakdown** [2] - 181:2, 181:3

**breaks** [2] - 68:14, 147:1

**breast** [1] - 117:5

**brick** [5] - 185:6, 191:18, 191:22, 193:8

**Bridgeside** [3] - 3:15, 4:3, 4:9

**bridging** [1] - 99:2

**brief** [2] - 134:22, 165:13

**briefed** [4] - 196:22, 196:24, 197:2

**briefer** [1] - 197:18

**briefing** [7] - 190:4, 197:6, 199:20, 202:12, 209:24, 210:18, 218:6

**briefings** [11] - 169:8, 190:1, 197:20, 198:4, 199:10, 204:8, 210:1, 211:22, 215:15, 230:15, 233:21

**briefly** [4] - 120:3, 145:5, 158:22, 163:17

**bring** [10] - 100:12, 112:5, 138:22, 139:21, 141:18, 143:24, 147:10, 161:5, 163:12, 204:24

**brings** [1] - 111:9

**broader** [3] - 31:17, 84:15, 129:12

**broadly** [6] - 13:17, 79:21, 83:23, 131:3,

206:19, 206:20

**broken** [1] - 45:8

**brownie** [1] - 119:17

**Budd** [1] - 3:17

**budget** [9] - 16:10, 73:20, 130:21, 130:22, 151:10, 153:3, 154:9, 154:11, 154:12

**budgetary** [1] - 63:14

**budgeting** [1] - 66:5

**build** [7] - 72:21, 129:4, 131:5, 131:13, 135:15, 146:25, 220:5

**building** [6] - 60:21, 129:1, 129:7, 129:8, 129:12, 129:16

**built** [1] - 18:13

**bullet** [4] - 74:12, 124:13, 206:16, 214:21

**bullets** [1] - 98:13

**Buprenorphine** [1] - 76:24

**burdensome** [2] - 109:11, 139:5

**Bureau** [2] - 112:25, 113:6

**burglaries** [1] - 170:11

**burglarizing** [1] - 170:23

**Burling** [1] - 5:11

**business** [16] - 16:24, 17:4, 17:25, 18:2, 45:12, 63:19, 214:23

**Butler** [1] - 166:10

**BY** [67] - 13:7, 14:15, 17:6, 18:3, 22:25, 25:11, 26:3, 29:4, 37:13, 43:4, 48:6, 50:12, 62:21, 67:16, 70:1, 74:3, 75:17, 81:14, 89:9, 95:10, 100:24, 101:8, 102:23, 108:1, 121:24, 123:4, 128:1, 131:19, 132:2, 135:3, 141:25, 150:22, 156:2, 161:25, 162:14, 163:14, 164:24, 171:8, 176:7, 180:1, 185:22, 189:6, 191:15, 194:21, 196:1, 198:17, 199:7, 200:2, 202:7, 205:5, 206:10, 207:2, 208:16,

209:2, 209:19, 210:21, 211:14, 212:4, 212:16, 216:7, 217:5, 226:2, 227:3, 227:16, 229:6, 231:3, 233:12

## C

**CA** [1] - 3:18
**Cabell** [87] - 3:2, 13:12, 16:3, 16:6, 16:9, 21:18, 23:13, 23:16, 23:19, 27:3, 29:16, 32:1, 32:10, 32:19, 32:23, 37:3, 37:6, 39:16, 40:4, 40:5, 61:2, 61:7, 69:16, 74:21, 76:11, 78:23, 79:6, 79:10, 80:2, 80:4, 80:10, 81:2, 81:5, 81:8, 82:5, 82:7, 82:17, 83:19, 84:8, 84:10, 84:15, 84:20, 84:25, 85:9, 85:11, 85:15, 92:20, 92:23, 97:7, 97:9, 99:7, 99:18, 99:23, 99:24, 100:1, 103:16, 104:1, 106:22, 106:25, 107:4, 107:15, 107:17, 108:3, 108:13, 108:21, 112:16, 112:24, 113:4, 113:25, 114:17, 115:4, 115:7, 122:8, 122:15, 122:18, 140:21, 144:21, 145:24, 151:7, 151:9, 151:10, 153:21, 154:24, 155:7, 162:25, 225:4
**CABELL** [1] - 1:10
**cabell** [1] - 2:2
**Cabell-Huntington** [14] - 29:16, 32:1, 32:19, 61:7, 76:11, 80:2, 80:4, 84:10, 84:25, 113:25, 114:17, 122:8, 140:21, 144:21
**Cabell/Huntington** [5] - 32:7, 34:2, 189:20, 189:21, 225:14
**CADCA** [3] - 151:12, 151:13, 151:19
**cages** [1] - 175:7
**Calculating** [1] - 104:8

**calculations** [1] - 135:17
**CALLAS** [1] - 6:7
**Campbell** [1] - 136:23
**CAMPBELL** [1] - 6:14
**cancer** [2] - 117:5, 117:7
**cannot** [9] - 55:7, 66:6, 73:9, 75:8, 84:21, 106:2, 142:17, 145:1, 214:15
**capacity** [15] - 50:2, 51:9, 51:12, 51:14, 51:17, 72:11, 72:16, 73:2, 77:6, 77:11, 77:14, 77:17, 83:24, 109:14, 132:18
**Capitol** [1] - 2:7
**capped** [2] - 72:25, 127:11
**captured** [1] - 80:3
**car** [1] - 145:12
**Cardinal** [10] - 4:11, 5:2, 185:18, 200:13, 201:14, 201:25, 205:25, 208:14, 229:9, 231:6
**Care** [12] - 28:13, 28:14, 28:17, 38:7, 38:12, 39:9, 78:18, 100:6, 100:8, 101:11, 102:9, 148:25
**care** [33] - 34:12, 44:7, 44:24, 44:25, 45:4, 45:11, 46:12, 46:13, 46:14, 47:1, 51:7, 52:23, 55:17, 58:3, 71:4, 87:16, 96:7, 98:5, 111:19, 114:14, 116:16, 117:8, 117:18, 117:21, 117:24, 118:6, 133:9, 138:14, 142:16, 145:16, 149:14, 149:25, 215:4
**Care's** [1] - 98:16
**career** [14] - 33:11, 35:19, 36:3, 165:21, 165:25, 166:12, 167:19, 168:8, 168:10, 169:1, 173:17
**Carey** [1] - 4:17
**carry** [1] - 181:14
**carrying** [1] - 181:16
**case** [22] - 53:6, 61:18, 120:7, 120:11,

138:24, 163:9, 189:19, 190:1, 190:5, 191:11, 193:13, 193:14, 194:4, 199:17, 203:3, 211:16, 212:20, 218:24, 222:14, 223:22, 223:23
**caseload** [3] - 72:21, 72:23, 73:5
**cases** [17] - 45:3, 60:3, 60:4, 60:5, 152:13, 163:9, 168:14, 168:21, 168:22, 184:22, 211:18, 212:10, 212:12, 220:5, 221:6
**CAST** [14] - 104:8, 104:15, 104:20, 106:15, 107:11, 108:10, 108:15, 108:17, 108:19, 108:23, 109:2, 109:4, 139:5, 139:11
**catch** [2] - 223:2, 223:19
**categories** [7] - 35:24, 45:9, 109:12, 132:23, 134:9, 176:24, 177:4
**category** [10] - 35:21, 42:19, 90:1, 109:25, 132:9, 132:24, 134:1, 134:10, 134:15
**caught** [1] - 94:24
**causation** [1] - 217:1
**causing** [1] - 108:18
**caution** [1] - 120:21
**CDC** [1] - 109:3
**census** [3] - 53:13, 53:23, 77:18
**Center** [12] - 3:12, 5:11, 32:1, 32:20, 61:3, 61:8, 69:21, 81:21, 87:5, 87:6, 145:6, 148:8
**center** [16] - 32:17, 80:14, 82:25, 83:7, 86:5, 91:5, 91:21, 115:1, 142:10, 142:12, 143:13, 145:2, 146:5, 148:1, 215:4, 215:9
**centered** [1] - 115:24
**centers** [6] - 63:17, 79:24, 82:10, 125:7, 185:4, 185:6
**Centers** [1] - 104:10

**centrally** [1] - 184:15
**certain** [7] - 72:19, 94:13, 178:9, 179:4, 199:18, 228:9, 229:20
**certainly** [3] - 120:9, 203:11, 203:19
**certification** [1] - 143:15
**CERTIFICATION** [1] - 235:1
**certified** [2] - 68:18, 143:11
**certify** [1] - 235:4
**cetera** [2] - 76:25, 114:2
**chain** [6] - 174:10, 175:16, 179:11, 181:1, 182:24, 215:12
**Chair** [1] - 15:6
**challenge** [2] - 130:20, 222:22
**challenges** [1] - 133:6
**challenging** [2] - 46:14, 220:18
**chance** [3] - 14:3, 217:15, 231:15
**chances** [1] - 216:17
**change** [5] - 51:12, 138:6, 145:19, 156:15, 169:19
**changed** [4] - 35:4, 99:1, 149:3, 191:1
**changes** [3] - 86:3, 143:7, 156:25
**changing** [1] - 59:13
**characteristics** [1] - 123:24
**charge** [1] - 94:21
**Charge** [1] - 165:14
**CHARLES** [1] - 3:11
**CHARLESTON** [2] - 1:2, 1:18
**Charleston** [15] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:4, 9:15, 32:14, 80:16, 111:11, 111:17, 111:18, 111:21
**chart** [2] - 125:2, 193:25
**charting** [1] - 126:14
**Chase** [1] - 4:18
**check** [2] - 20:18, 61:11
**checks** [1] - 175:5
**chemicals** [2] - 172:23, 173:3
**Chemicals** [1] -

165:15
**chemotherapy** [1] - 116:17
**Chesterbrook** [1] - 6:15
**Chief** [6] - 165:11, 165:14, 171:24, 172:10, 172:15, 172:16
**chiefs** [1] - 197:23
**Chiefs** [2] - 173:15, 186:19
**child** [13] - 46:14, 76:15, 76:17, 76:19, 77:24, 88:9, 117:21, 118:6, 133:5, 133:7, 133:9, 133:10, 133:17
**childhood** [1] - 139:15
**children** [6] - 69:14, 81:21, 86:19, 88:7, 88:17, 133:11
**Children** [1] - 93:3
**children's** [1] - 166:19
**Children's** [2] - 78:22, 151:20
**choices** [1] - 166:12
**choke** [1] - 184:25
**choose** [5] - 34:18, 36:8, 36:9, 36:10, 57:15
**choosing** [1] - 35:12
**chose** [2] - 84:11, 103:3
**chosen** [1] - 167:18
**Christiana** [2] - 98:16, 98:17
**Christiansen** [1] - 141:6
**chronic** [1] - 58:22
**circle** [2] - 13:13, 177:13
**circulate** [1] - 199:23
**circumstances** [3] - 72:1, 72:12, 115:23
**cited** [1] - 96:23
**Cities** [2] - 144:9, 151:6
**City** [76] - 4:1, 5:11, 16:2, 16:6, 23:3, 23:16, 23:19, 24:21, 25:6, 27:11, 27:17, 32:23, 37:3, 37:4, 37:6, 60:8, 60:10, 60:13, 67:22, 69:15, 70:21, 71:10, 71:22, 74:21, 74:23, 75:9, 77:4, 79:7, 79:10, 80:9, 82:16, 82:19, 82:22, 84:1, 84:4,

84:14, 85:8, 85:11, 85:14, 86:24, 92:19, 92:23, 93:11, 93:20, 94:20, 97:6, 97:9, 97:18, 99:23, 99:24, 100:1, 106:22, 107:17, 108:3, 108:13, 108:21, 109:15, 110:3, 115:4, 115:8, 122:14, 122:17, 129:14, 136:13, 139:22, 140:19, 141:9, 141:11, 141:12, 141:13, 143:22, 144:18, 151:7, 154:12, 158:14, 235:5
**city** [5] - 23:22, 31:5, 31:9, 36:23, 37:2
**CITY** [1] - 1:4
**City's** [1] - 153:3
**Civil** [3] - 1:4, 235:7, 235:8
**civil** [1] - 1:10
**claim** [1] - 190:25
**clandestine** [2] - 172:23, 172:25
**clarification** [1] - 52:15
**clarify** [4] - 25:6, 78:19, 106:3, 217:8
**class** [2] - 184:8
**classes** [1] - 187:21
**clean** [2] - 154:4, 202:19
**clear** [10] - 41:14, 46:2, 63:25, 103:5, 117:2, 118:12, 183:3, 187:13, 207:1, 221:23
**clear-cut** [1] - 117:2
**clearly** [1] - 133:7
**CLERK** [4] - 13:24, 161:11, 161:14, 161:17
**clickable** [1] - 55:5
**clinic** [3] - 51:9, 114:8, 114:23
**clinical** [3] - 18:14, 33:9, 34:9
**clinicians** [1] - 55:16
**clinics** [1] - 122:11
**Clonazepam** [1] - 184:10
**close** [5] - 119:20, 120:14, 121:4, 159:4, 208:17
**Closed** [5] - 174:17, 174:18, 174:21,

174:23, 175:8
**closed** [29] - 163:19, 174:3, 174:9, 175:14, 175:15, 175:21, 176:14, 176:15, 177:9, 177:10, 177:11, 177:15, 177:21, 177:24, 178:6, 178:15, 178:19, 179:2, 179:9, 180:3, 180:6, 180:7, 180:23, 180:25, 181:5, 181:18, 181:25, 182:8, 192:22
**closed-door** [1] - 192:22
**closely** [1] - 140:16
**closing** [2] - 200:20, 202:9
**coach** [1] - 144:24
**coaches** [1] - 143:11
**coaching** [1] - 68:19
**coalition** [4] - 100:18, 101:2, 101:21, 109:6
**Coalition** [2] - 101:22, 110:21
**cocaine** [2] - 42:12, 168:22
**Cochran** [3] - 6:17, 235:2, 235:11
**coincided** [1] - 139:6
**collaborate** [2] - 19:25, 103:13
**collaboration** [3] - 31:25, 76:23, 110:14
**collaborative** [1] - 140:16
**colleague** [1] - 67:5
**colleagues** [3] - 122:3, 160:6, 226:14
**collecting** [1] - 111:15
**collections** [8] - 89:18, 91:23, 92:1, 92:4, 92:9, 92:13, 92:16
**college** [5] - 166:8, 166:17, 166:21, 166:23, 167:1
**College** [1] - 166:24
**color** [1] - 185:24
**column** [10] - 64:8, 64:13, 64:14, 65:2, 65:11, 67:10, 71:18, 89:13, 89:15, 103:19
**coming** [19] - 8:20, 34:18, 62:12, 92:1, 92:10, 92:16, 94:14, 99:9, 140:2, 140:4,

141:10, 155:1, 170:1, 170:19, 171:16, 185:2, 203:6, 220:1
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2, 3:2
**commit** [1] - 68:13
**committed** [4] - 61:20, 62:5, 68:15, 69:6
**common** [4] - 28:2, 49:14, 168:15, 178:14
**commonly** [2] - 34:22, 41:18
**communicate** [2] - 112:6, 212:18
**communicated** [1] - 179:22
**communicating** [1] - 156:19
**communication** [2] - 218:22
**communications** [1] - 201:25
**communities** [3] - 110:14, 113:18, 136:16
**Communities** [2] - 113:1, 113:8
**Community** [1] - 15:18
**community** [53] - 18:14, 19:2, 19:10, 20:1, 23:14, 26:16, 26:17, 30:15, 30:22, 32:7, 33:2, 34:2, 39:6, 70:6, 71:24, 72:12, 79:20, 79:23, 80:2, 87:12, 93:24, 111:25, 112:1, 128:17, 129:2, 129:8, 129:13, 129:15, 131:9, 134:11, 135:11, 135:18, 136:19, 136:20, 136:24, 137:2, 137:4, 140:5, 141:8, 142:24, 143:6, 147:20, 148:4, 148:5, 149:2, 149:20, 150:4, 150:9, 151:2, 151:5, 152:20, 168:24, 220:12
**community-based** [2] - 79:23, 150:4
**company** [2] - 231:18
**compare** [1] - 96:15

**compared** [1] - 192:5
**Compass** [3] - 144:10, 152:3, 152:16
**compensation** [1] - 163:4
**competent** [1] - 173:3
**compile** [1] - 17:16
**compiled** [4] - 17:9, 55:3, 91:20, 102:2
**complete** [3] - 96:24, 109:9, 122:4
**completed** [7] - 124:18, 124:23, 126:11, 126:16, 126:22, 127:1, 127:7
**completely** [1] - 221:20
**completing** [1] - 109:10
**completion** [3] - 108:17, 109:6, 143:15
**compliance** [2] - 59:19, 102:10
**comply** [3] - 232:16, 233:7, 233:9
**component** [3] - 73:16, 103:16, 129:24
**components** [3] - 103:1, 103:3, 103:15
**comprehensive** [5] - 30:14, 33:2, 34:7, 36:6, 71:4
**computer** [1] - 6:19
**concentrate** [1] - 178:22
**concentrating** [1] - 184:21
**conception** [1] - 32:8
**conceptualization** [2] - 26:9, 139:25
**concern** [2] - 64:10, 131:1, 159:25
**concerned** [1] - 195:20
**concerns** [2] - 26:8, 99:11
**conclusion** [3] - 108:20, 232:9, 233:7
**conclusions** [1] - 232:7
**conducive** [1] - 127:5
**conducted** [3] - 16:25, 63:11, 202:2
**confer** [2] - 120:9, 120:24
**conferences** [1] - 182:23
**confidence** [2] -

134:22, 135:1
**configurations** [1] - 143:5
**confined** [2] - 104:24, 188:10
**confirm** [1] - 122:12
**confirms** [1] - 71:1
**conflict** [3] - 9:12, 9:25, 10:19
**confuse** [1] - 206:14
**confused** [3] - 98:25, 219:5, 219:7
**confusing** [1] - 29:24
**confusion** [1] - 25:24
**Congress** [1] - 179:3
**conjunction** [2] - 76:3, 118:2
**connect** [1] - 168:13
**connected** [1] - 140:24
**connection** [1] - 104:17
**Connie** [3] - 111:9, 111:13, 111:18
**Connolly** [2] - 4:13, 5:4
**CONROY** [1] - 3:3
**consent** [1] - 159:14
**consider** [3] - 105:25, 129:1, 130:10
**considered** [3] - 45:2, 155:10, 155:11
**considering** [1] - 91:12
**consistent** [8] - 60:23, 77:10, 98:8, 124:2, 124:22, 147:6, 191:3, 221:21
**consistently** [1] - 156:25
**conspicuously** [1] - 194:2
**constituent** [1] - 103:6
**constitutes** [1] - 222:17
**constrained** [2] - 159:11, 160:3
**constraint** [1] - 178:25
**construction** [1] - 153:2
**construe** [1] - 106:4
**consult** [2] - 121:7, 224:17
**contained** [3] - 157:7, 157:9, 157:10
**contending** [1] - 8:4
**contents** [1] - 24:14
**contested** [2] - 220:16
**context** [1] - 228:1
**continue** [7] - 40:21,

57:2, 57:15, 69:9,
88:24, 97:2, 147:2
**Continued** [5] - 3:1,
5:1, 5:6, 6:1, 6:10
**continues** [3] - 26:15,
27:15, 150:1
**continuing** [2] - 57:7,
216:20
**continuum** [2] - 34:12,
44:6
**contract** [1] - 89:25
**contractual** [3] -
89:18, 89:21, 89:22
**contrary** [1] - 230:20
**contrast** [1] - 44:23
**contributing** [2] -
135:23
**Control** [2] - 104:10,
140:22, 140:25,
141:3, 165:8,
165:12, 169:8,
171:23, 172:5,
172:7, 197:11
**control** [3] - 10:6,
171:1, 172:14
**controlled** [5] -
174:10, 174:22,
184:18, 187:21,
187:22
**Controlled** [6] - 178:8,
178:10, 179:11,
179:16, 182:12,
196:8
**controls** [5] - 178:14,
178:16, 180:5,
213:24, 214:7
**convenient** [1] - 75:24
**convention** [1] - 24:1
**converge** [1] - 168:23
**conversations** [1] -
96:18
**Cook** [3] - 6:18, 235:3,
235:11
**coordinate** [7] - 31:2,
39:22, 40:3, 100:13,
103:9, 103:13,
110:12
**coordinated** [3] -
30:14, 30:20, 33:1
**coordinating** [1] -
110:25
**coordination** [4] -
100:12, 109:23,
109:25, 138:22
**Coordinator** [1] -
165:16
**copies** [2] - 185:23,
197:10
**copy** [8] - 24:12,
67:14, 159:9, 164:4,

164:10, 164:16,
164:20, 197:10
**cord** [1] - 185:11
**core** [2] - 111:13,
111:20
**CORE** [6] - 35:22,
35:25, 36:1, 146:15,
146:25, 147:1
**corner** [2] - 18:6,
40:18
**Corp** [2] - 207:10,
207:18
**Corporation** [2] - 6:2,
235:7
**cORPORATION** [2] -
1:7, 1:13
**correct** [257] - 15:1,
15:12, 15:25, 16:3,
16:6, 16:13, 16:16,
17:8, 17:15, 17:20,
18:22, 19:6, 20:11,
20:17, 21:18, 21:19,
23:8, 23:11, 23:14,
24:25, 26:20, 27:4,
27:10, 27:20, 28:24,
29:14, 30:2, 30:10,
30:23, 31:13, 32:7,
32:24, 33:6, 33:21,
33:24, 34:2, 34:6,
34:10, 34:15, 35:15,
36:7, 36:14, 36:24,
37:8, 37:19, 37:25,
38:8, 38:15, 38:22,
39:3, 41:17, 41:22,
41:25, 42:8, 42:20,
43:12, 43:18, 43:21,
43:24, 43:25, 45:25,
46:4, 46:6, 46:16,
47:10, 47:13, 47:17,
48:9, 48:19, 48:23,
49:3, 50:21, 50:23,
51:3, 51:23, 52:15,
52:20, 53:16, 54:25,
56:14, 56:19, 56:22,
56:23, 57:12, 59:16,
59:23, 60:2, 60:4,
60:21, 60:22, 62:13,
63:12, 63:13, 65:6,
65:7, 65:9, 65:13,
65:25, 66:3, 67:20,
67:21, 68:11, 69:1,
69:3, 69:7, 69:16,
69:17, 69:21, 69:22,
69:24, 70:6, 70:12,
71:9, 71:12, 71:13,
71:15, 71:16, 73:15,
74:21, 74:22, 74:24,
75:4, 75:19, 75:24,
76:2, 76:8, 78:12,
78:20, 78:24, 79:1,

79:7, 79:10, 79:25,
82:20, 83:14, 84:8,
85:6, 85:9, 85:15,
85:18, 85:21, 86:15,
86:22, 87:19, 87:20,
87:22, 88:3, 88:5,
89:10, 90:3, 90:8,
91:7, 91:8, 91:11,
91:19, 92:2, 92:17,
92:18, 92:20, 92:21,
92:23, 92:24, 94:17,
94:18, 95:3, 97:7,
97:10, 99:24,
101:20, 101:23,
102:13, 104:5,
105:12, 106:14,
107:2, 107:12,
107:14, 108:9,
109:3, 112:22,
114:18, 114:25,
115:5, 115:8,
115:12, 115:13,
116:1, 116:2, 116:4,
116:12, 118:10,
118:14, 118:17,
118:18, 118:20,
118:21, 122:18,
124:15, 124:16,
125:22, 126:2,
126:7, 126:8, 127:8,
128:7, 128:10,
128:11, 128:14,
128:15, 129:5,
129:19, 129:20,
129:23, 130:2,
130:3, 130:23,
131:12, 131:23,
131:24, 132:9,
132:13, 132:14,
132:16, 132:17,
132:20, 132:22,
133:15, 133:20,
134:1, 134:8,
134:16, 134:17,
135:8, 138:10,
145:24, 145:25,
151:4, 152:4, 152:5,
152:7, 152:20,
152:22, 153:22,
154:10, 154:17,
154:19, 155:2,
157:3, 157:6,
176:15, 177:13,
195:22, 201:13,
214:19, 217:18,
224:3, 235:4
**Correct** [48] - 15:2,
15:13, 15:23, 16:1,
16:4, 16:14, 18:23,
19:16, 23:9, 23:12,
27:5, 27:18, 27:21,

28:11, 28:25, 30:11,
30:16, 30:24, 32:21,
32:25, 33:7, 33:22,
33:25, 34:3, 35:14,
35:16, 35:18, 36:15,
36:25, 37:7, 37:20,
37:24, 38:1, 38:9,
38:18, 39:4, 41:23,
42:1, 42:13, 42:21,
43:13, 43:19, 43:22,
46:1, 46:5, 46:17,
47:11, 47:14
**Corrections** [1] -
113:6
**correctly** [6] - 64:18,
213:25, 214:18,
219:9, 219:25, 224:2
**cost** [9] - 62:10, 62:14,
63:17, 73:14, 91:5,
91:20, 146:7, 157:5,
157:10
**costs** [5] - 60:20,
61:24, 73:18, 74:12,
135:10
**counsel** [6] - 67:13,
121:3, 211:24,
211:25, 212:18,
224:18
**count** [1] - 36:17
**counties** [9] - 31:12,
39:19, 39:22, 101:3,
103:9, 104:4,
112:23, 113:3,
113:20
**countless** [1] - 157:4
**country** [4] - 163:10,
169:16, 192:1,
193:19
**county** [8] - 23:22,
31:5, 31:10, 36:23,
37:2, 39:23, 39:24,
40:2
**COUNTY** [1] - 1:10
**County** [79] - 2:2, 3:2,
16:3, 16:6, 16:9,
23:17, 23:19, 32:10,
32:23, 37:3, 37:6,
39:16, 39:17, 40:4,
40:7, 69:16, 74:21,
74:23, 79:6, 79:10,
80:10, 81:2, 81:3,
81:5, 81:8, 82:5,
82:8, 82:17, 82:20,
82:22, 84:15, 85:9,
85:12, 85:15, 92:20,
92:23, 97:7, 97:10,
99:24, 100:1,
103:16, 104:1,
106:22, 107:1,
107:3, 107:4,

107:15, 107:17,
108:3, 108:13,
108:21, 110:15,
110:21, 110:22,
111:12, 112:10,
112:11, 112:15,
112:24, 113:4,
115:4, 115:7,
122:15, 122:18,
136:13, 137:4,
141:9, 143:21,
143:22, 145:24,
151:7, 151:9,
151:10, 154:24,
162:25, 225:4
**County's** [2] - 40:5,
40:6
**couple** [3] - 46:24,
97:12, 190:20
**course** [9] - 7:23,
12:24, 63:11,
115:15, 163:18,
181:17, 182:16,
205:23, 213:9
**COURT** [166] - 1:1,
1:17, 7:6, 7:13, 9:1,
9:5, 10:19, 11:17,
12:3, 12:13, 12:17,
12:21, 12:24, 13:3,
13:18, 13:25, 14:9,
14:11, 14:14, 16:21,
17:3, 18:1, 22:24,
25:4, 25:10, 29:3,
37:11, 47:20, 47:23,
48:1, 48:4, 50:10,
54:1, 54:8, 54:11,
63:20, 63:24, 64:1,
64:22, 66:24, 67:13,
73:23, 81:12, 89:5,
100:21, 102:20,
102:22, 107:20,
107:23, 119:4,
119:6, 119:10,
119:18, 119:22,
119:25, 120:4,
120:25, 121:16,
121:21, 123:3,
134:20, 134:24,
135:1, 150:13,
150:16, 150:18,
155:21, 155:25,
157:16, 157:20,
157:23, 157:25,
158:3, 158:7,
158:13, 158:16,
158:24, 159:1,
159:3, 159:22,
160:11, 161:6,
161:8, 161:20,
162:13, 164:14,
164:18, 164:20,

171:3, 174:7, 175:22, 176:1, 176:4, 176:6, 179:14, 179:19, 179:23, 185:21, 188:15, 188:18, 189:1, 190:4, 190:11, 190:17, 191:5, 191:13, 193:21, 194:6, 194:9, 194:19, 195:19, 195:23, 198:15, 198:20, 198:24, 199:3, 199:5, 200:1, 201:8, 201:16, 202:1, 202:5, 202:19, 202:24, 203:16, 204:1, 204:9, 204:11, 204:16, 205:12, 205:20, 206:8, 206:25, 208:12, 209:11, 209:15, 211:11, 211:13, 212:3, 212:13, 215:22, 217:4, 218:15, 219:5, 219:13, 220:23, 223:25, 224:10, 224:17, 224:20, 225:9, 225:25, 226:11, 227:1, 228:20, 228:23, 230:24, 232:11, 232:13, 233:2, 233:11, 233:24, 234:2, 234:6, 234:8, 234:10
**court** [6] - 10:9, 47:21, 135:13, 176:11, 233:22
**Court** [24] - 6:17, 6:18, 7:3, 7:15, 8:18, 9:10, 120:5, 121:6, 138:11, 140:1, 145:22, 159:10, 160:3, 160:25, 162:2, 164:1, 171:6, 205:23, 211:16, 211:18, 226:1, 235:2, 235:3
**Court's** [12] - 8:16, 10:1, 158:22, 159:13, 161:4, 194:22, 216:8, 219:2, 221:17, 222:4, 222:8, 225:7
**COURTROOM** [3] - 161:11, 161:14, 161:17

**courtroom** [3] - 13:21, 161:5, 226:23
**cover** [6] - 146:13, 161:3, 163:18, 192:12, 199:16, 203:20
**covered** [23] - 16:16, 22:3, 48:8, 59:21, 73:14, 73:17, 74:13, 85:23, 91:2, 106:19, 132:25, 143:9, 145:11, 145:20, 153:25, 154:1, 154:5, 160:24, 188:20, 188:24, 211:16, 211:25, 217:11
**covering** [4] - 145:14, 153:11, 153:15, 153:17
**covers** [2] - 22:1, 146:9
**Covington** [1] - 5:11
**crazy** [1] - 147:16
**create** [2] - 111:19, 159:18
**created** [4] - 148:7, 149:8, 150:7, 150:8
**Creating** [1] - 146:16
**creation** [1] - 141:10
**credentialing** [2] - 72:19, 73:4
**credit** [1] - 75:8
**Crisis** [1] - 29:9
**criteria** [8] - 44:10, 87:11, 87:14, 88:9, 88:13, 105:18, 116:6, 133:17
**CROSS** [3] - 13:6, 150:21, 156:1
**cross** [5] - 14:1, 135:24, 136:9, 150:16, 223:12
**cross-examine** [1] - 223:12
**crosses** [1] - 120:12
**crossover** [1] - 168:20
**CRR** [2] - 6:17, 6:18
**cumulatively** [1] - 53:11
**current** [9] - 53:6, 53:13, 75:8, 129:24, 130:18, 132:10, 133:21, 143:5, 154:11
**customer** [8] - 180:20, 192:9, 192:10, 214:24, 214:25, 215:1, 216:2, 231:25
**customers** [4] -

180:15, 192:12, 211:3, 213:3
**cut** [4] - 31:12, 117:2, 225:19, 230:25
**cycle** [1] - 171:9

# D

**daily** [5] - 34:25, 44:17, 44:25, 47:19, 215:9
**danger** [1] - 12:18
**Dangerous** [1] - 165:15
**darkened** [1] - 206:12
**darkness** [1] - 192:15
**Data** [1] - 123:7
**data** [30] - 95:22, 97:4, 106:15, 107:11, 108:10, 108:15, 108:19, 108:23, 108:25, 109:2, 111:14, 111:17, 111:20, 116:22, 118:21, 118:23, 123:19, 123:20, 125:14, 125:16, 125:18, 126:13, 126:19, 126:23, 127:4, 133:10, 133:22, 163:20, 205:18
**database** [4] - 123:13, 123:14, 124:3, 124:4
**dataset** [3] - 123:10, 123:19
**date** [11] - 54:20, 55:4, 57:1, 67:20, 91:20, 200:14, 200:15, 207:11, 207:12, 229:12, 229:13
**Date** [1] - 235:16
**dated** [5] - 37:16, 43:7, 50:15, 90:5, 128:4
**dates** [2] - 148:10, 148:14
**DAVID** [2] - 1:17, 2:9
**David** [1] - 7:1
**Davies** [1] - 8:9
**days** [33] - 8:12, 8:13, 10:18, 11:2, 11:4, 12:25, 14:2, 57:1, 57:2, 57:5, 57:7, 57:9, 57:11, 58:9, 58:12, 95:25, 96:2, 96:4, 96:14, 116:7, 124:18, 124:24, 125:5, 125:17, 125:25, 126:4,

126:6, 126:11, 126:16, 126:22, 127:1, 127:11
**DC** [6] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12
**DCF** [1] - 151:22
**De** [2] - 2:4, 2:16
**DEA** [96] - 162:3, 163:20, 163:23, 165:5, 165:10, 165:15, 165:22, 165:23, 166:5, 166:7, 167:7, 167:14, 167:20, 168:16, 172:5, 174:20, 175:16, 176:20, 177:9, 177:10, 178:18, 179:7, 181:20, 181:23, 182:15, 182:23, 183:5, 184:15, 186:7, 186:8, 187:10, 187:18, 187:19, 188:8, 188:10, 188:14, 190:22, 191:1, 192:6, 194:17, 195:11, 196:23, 197:19, 198:9, 198:10, 204:5, 206:19, 208:4, 209:4, 209:23, 210:12, 211:25, 213:18, 213:22, 214:2, 214:15, 214:20, 214:21, 216:9, 217:7, 217:9, 217:17, 218:8, 218:15, 218:16, 220:1, 220:17, 220:25, 221:14, 221:19, 221:22, 222:5, 222:24, 223:1, 223:6, 223:15, 223:23, 224:25, 225:6, 226:4, 226:22, 227:8, 227:24, 229:16, 229:22, 230:13, 230:15, 231:12, 232:18, 232:21, 233:16
**DEA's** [6] - 161:1, 163:21, 198:5, 214:22, 222:25, 223:10
**DEA-sponsored** [1] - 182:23
**deal** [8] - 27:3, 152:11,

160:9, 160:11, 160:21, 184:24, 194:25, 220:22
**dealing** [8] - 74:6, 94:15, 152:7, 184:15, 210:10, 221:14, 223:4, 224:3
**debated** [1] - 226:18
**decided** [2] - 167:17, 184:19
**decision** [3] - 214:17, 214:23, 215:7
**decisions** [1] - 215:11
**deck** [10] - 150:25, 204:14, 204:19, 205:3, 205:4, 205:10, 206:7, 212:8, 215:15
**decks** [1] - 194:13
**deemed** [4] - 61:22, 108:25, 117:8, 135:18
**deeply** [1] - 219:6
**DEF** [2] - 62:23, 128:3
**DEF-WV** [2] - 62:23, 128:3
**defendant** [2] - 191:1, 203:20
**Defendant** [5] - 4:10, 5:2, 5:7, 6:2, 139:21
**Defendant's** [5] - 29:6, 38:15, 131:21, 141:19, 147:11
**Defendants** [3] - 1:8, 1:14, 235:7
**defendants** [43] - 7:11, 9:10, 9:17, 9:20, 12:16, 121:7, 158:20, 159:24, 163:22, 181:20, 190:1, 190:5, 190:8, 190:18, 191:8, 193:16, 196:4, 196:6, 196:23, 198:11, 199:10, 201:11, 204:5, 204:7, 205:9, 209:5, 209:16, 209:24, 210:14, 215:16, 216:10, 221:7, 223:1, 223:4, 223:5, 223:11, 226:6, 227:10, 229:16, 230:14, 233:2, 233:13, 233:17
**Defendants'** [7] - 23:2, 25:2, 50:14, 60:14, 62:23, 89:3, 123:1
**defendants'** [4] - 160:18, 211:8,

221:21, 221:22
**defense** [2] - 120:16, 121:3
**deficit** [6] - 65:12, 66:2, 66:8, 68:14, 69:4, 69:7
**define** [2] - 57:21, 59:12
**defined** [3] - 71:22, 77:7, 108:10
**defining** [1] - 44:1
**definition** [1] - 222:16
**definitions** [1] - 72:7
**degree** [1] - 166:24
**delegated** [1] - 140:8
**deliberative** [2] - 188:20, 195:7
**deliver** [1] - 149:14
**delivered** [3] - 76:7, 77:1, 84:10
**Demo** [1] - 150:25
**demographic** [1] - 123:23
**demographics** [1] - 214:25
**demonstrate** [1] - 27:7
**demonstrated** [1] - 98:19
**demonstrative** [7] - 141:19, 150:5, 163:13, 164:5, 164:7, 164:16, 174:5
**Demonstrative** [2] - 123:1, 147:11
**demonstratives** [1] - 164:5
**denote** [2] - 92:13, 103:19
**denoted** [1] - 92:14
**Department** [22] - 15:6, 15:11, 15:17, 15:20, 22:13, 61:21, 111:11, 113:6, 140:21, 144:21, 145:1, 145:4, 148:1, 151:20, 152:9, 153:22, 159:7, 159:16, 159:20, 166:20, 226:16
**department** [7] - 16:17, 17:10, 19:23, 21:5, 22:8, 26:14, 26:22
**department's** [1] - 218:19
**departments** [1] - 22:4
**Departments** [2] - 22:15, 144:15
**dependency** [2] - 105:14, 117:4

**dependent** [1] - 10:4
**depiction** [1] - 174:17
**deployed** [1] - 172:1
**deposition** [10] - 9:23, 20:20, 51:22, 51:25, 52:8, 53:17, 120:16, 160:20, 160:24, 222:2
**depth** [2] - 138:16, 211:2
**DEPUTY** [3] - 161:11, 161:14, 161:17
**Deputy** [19] - 165:7, 165:9, 165:11, 165:12, 169:7, 171:19, 171:21, 171:24, 172:1, 172:4, 172:7, 172:12, 172:15, 172:17, 172:20, 181:6, 183:5, 183:15, 183:22
**describe** [5] - 22:5, 44:9, 170:7, 204:20, 207:23
**described** [3] - 13:11, 206:6, 232:22
**describing** [2] - 182:14, 183:10
**description** [1] - 70:23
**design** [1] - 220:8
**designated** [4] - 27:11, 90:1, 92:3, 113:2
**designation** [2] - 64:8, 72:14
**designations** [1] - 120:16
**designed** [2] - 152:10, 226:10
**designee** [1] - 109:7
**detail** [5] - 13:14, 27:22, 139:25, 145:23, 207:25
**detailing** [1] - 16:18
**details** [2] - 220:10, 224:4
**detected** [2] - 78:16, 103:11
**detecting** [1] - 231:12
**determine** [2] - 214:16, 214:22
**detox** [2] - 79:18
**detoxification** [1] - 79:16
**Detroit** [3] - 165:14, 165:18, 166:24
**develop** [4] - 26:7, 139:2, 149:10, 194:25

**developed** [6] - 75:22, 98:4, 104:10, 109:2, 195:6, 195:7
**developing** [1] - 104:17
**development** [4] - 68:20, 128:21, 133:6, 171:10
**develops** [1] - 195:24
**DF** [1] - 151:22
**DFC** [2] - 151:18, 151:22
**diagnose** [1] - 106:2
**diagnosed** [2] - 78:1, 105:10
**diagnoses** [1] - 87:10
**diagnosis** [4] - 46:22, 46:23, 105:8, 117:5
**diagnostic** [2] - 105:18, 133:17
**Dial** [1] - 8:9
**Diazapam** [1] - 184:9
**die** [1] - 178:4
**difference** [4] - 22:5, 22:10, 90:24, 170:6
**different** [29] - 11:4, 36:11, 36:17, 45:9, 52:16, 59:17, 78:17, 96:18, 99:17, 99:18, 102:25, 112:8, 112:22, 113:18, 115:16, 139:19, 140:10, 143:9, 156:25, 176:14, 176:23, 178:12, 178:18, 182:14, 186:22, 221:8, 229:18, 229:19, 230:6
**differently** [1] - 217:6
**difficult** [2] - 178:20, 192:15
**difficulties** [2] - 109:6, 109:7
**diligence** [6] - 196:11, 214:5, 215:6, 215:7, 218:2, 218:11
**DIRECT** [1] - 161:24
**Direct** [8] - 211:18, 211:20, 211:21, 212:11, 212:19, 212:20, 213:1, 213:6
**direct** [8] - 9:14, 101:5, 112:3, 114:20, 198:2, 198:3, 205:7, 222:8
**directed** [5] - 110:21, 112:13, 206:4, 206:20, 218:19
**directly** [1] - 160:5

**director** [2] - 111:9, 141:2
**Director** [12] - 18:21, 38:6, 39:3, 43:11, 54:19, 88:22, 102:2, 141:2, 141:7, 165:12, 169:7, 171:21
**director's** [4] - 49:12, 49:20, 54:4, 54:6
**Director's** [10] - 37:17, 38:17, 38:19, 38:21, 40:9, 41:7, 41:13, 42:25, 43:1, 43:7
**directs** [1] - 38:10
**disagree** [2] - 72:14, 95:23
**discharges** [2] - 123:20, 124:17
**discipline** [1] - 120:21
**disciplined** [1] - 120:11
**disclose** [2] - 121:3, 162:20
**disclosed** [7] - 8:2, 8:9, 8:20, 11:1, 11:2, 11:5, 178:25
**disclosing** [1] - 212:6
**disclosure** [4] - 7:21, 8:12, 8:22, 212:2
**discovered** [3] - 230:11, 231:22, 231:24
**discovery** [3] - 223:14, 223:16
**discrepancy** [1] - 90:4
**discuss** [4] - 13:14, 98:23, 101:3, 196:8
**discussed** [27] - 18:22, 20:21, 54:5, 54:7, 79:13, 83:1, 86:12, 94:4, 97:15, 99:1, 100:6, 118:8, 118:11, 118:16, 124:7, 127:14, 127:18, 131:22, 201:5, 203:2, 207:25, 213:7, 221:8, 233:20, 233:21, 233:22, 233:23
**discusses** [1] - 207:24
**discussing** [9] - 22:3, 37:25, 74:20, 75:18, 115:14, 121:15, 127:17, 128:9, 212:17
**discussion** [7] - 31:23, 68:4, 77:5, 104:7, 105:6, 120:6,

131:9
**discussions** [2] - 9:11, 110:14
**Disease** [1] - 104:10
**disease** [1] - 138:20
**diseases** [2] - 58:22, 117:11
**Disorder** [25] - 57:16, 58:8, 70:9, 70:12, 70:13, 75:25, 88:10, 98:5, 99:13, 104:25, 105:2, 105:4, 105:7, 105:9, 105:12, 105:16, 105:20, 105:23, 106:1, 106:5, 106:12, 114:2, 128:18, 128:23, 152:16
**disorder** [12] - 19:2, 19:14, 27:20, 33:5, 33:21, 33:24, 42:10, 43:18, 43:21, 46:23, 50:3, 75:22
**disorders** [3] - 58:25, 78:8, 79:21
**Disorders** [6] - 86:18, 86:20, 86:22, 87:18, 94:16, 138:20
**disparities** [1] - 139:3
**dispensed** [1] - 175:2
**dispensing** [3] - 170:16, 170:17, 185:7
**dispute** [1] - 51:19
**distinction** [2] - 105:3, 232:24
**distinguishes** [1] - 204:23
**distribute** [1] - 180:4
**distributing** [2] - 174:10, 187:24
**distribution** [10] - 162:25, 175:21, 177:12, 177:16, 178:16, 179:3, 180:8, 182:1, 196:10, 212:22
**Distribution** [4] - 174:18, 174:23, 175:8
**Distributor** [1] - 214:16
**distributor** [2] - 183:2, 183:12, 183:13, 183:14, 183:23, 190:1, 193:6, 193:22, 194:12, 196:12, 196:14, 196:16, 196:18, 196:22,

196:25, 198:10,
199:10, 199:19,
199:22, 202:11,
202:12, 209:5,
209:24, 210:1,
210:3, 211:21,
212:20, 213:2,
213:23, 214:5,
214:15, 215:14,
215:18, 216:13,
218:6, 218:10,
230:14, 233:20
**distributors** [21] -
175:17, 177:7,
178:9, 178:23,
180:11, 182:25,
183:19, 184:19,
184:25, 185:15,
185:16, 185:17,
190:5, 191:23,
194:14, 194:17,
203:10, 215:16,
218:9, 229:2, 231:7
**DISTRICT** [3] - 1:1,
1:1, 1:17
**District** [2] - 7:2, 7:3
**divergent** [1] - 120:17
**diversion** [40] -
162:25, 165:20,
167:20, 167:23,
168:5, 168:7, 168:8,
168:9, 168:11,
168:13, 168:14,
169:2, 169:15,
169:19, 169:20,
170:7, 170:8, 170:9,
170:12, 171:10,
172:14, 173:2,
173:4, 178:1,
178:14, 178:17,
180:7, 180:12,
181:3, 181:21,
192:18, 212:12,
213:24, 214:7,
216:20, 222:18,
222:25, 231:13,
232:4, 232:21
**Diversion** [7] - 165:8,
165:12, 169:8,
171:22, 172:5,
172:7, 197:11
**diverted** [5] - 177:20,
178:2, 182:9,
216:17, 217:15
**diverting** [2] - 213:3,
223:2
**dives** [1] - 138:16
**divided** [1] - 107:6
**division** [14] - 16:17,
17:23, 18:21, 20:8,

20:15, 21:5, 21:17,
26:21, 26:24, 30:12,
30:20, 63:12, 63:15,
141:2
**Division** [25] - 13:16,
14:25, 15:24, 18:12,
18:19, 18:25, 19:6,
19:9, 20:5, 21:16,
22:16, 23:11, 23:21,
23:23, 26:6, 27:15,
30:9, 36:18, 36:20,
39:3, 43:11, 63:6,
65:5, 70:4, 165:14
**divisions** [1] - 17:16
**doctor** [10] - 77:15,
157:16, 170:10,
170:15, 170:24,
179:12, 184:22,
212:23, 212:24,
213:8
**Doctor** [4] - 119:23,
121:20, 156:3, 174:1
**doctor/patient** [1] -
187:25
**doctors** [9] - 114:24,
122:12, 169:22,
170:13, 170:24,
175:17, 177:1,
177:3, 182:25
**document** [113] - 7:17,
18:4, 18:24, 22:22,
23:1, 23:4, 24:3,
24:17, 24:25, 25:6,
25:13, 25:21, 29:1,
29:5, 29:10, 29:12,
30:9, 37:9, 37:14,
37:18, 39:1, 39:7,
43:8, 43:14, 48:12,
50:5, 50:13, 50:16,
50:17, 51:1, 53:24,
54:14, 54:16, 54:20,
55:6, 60:9, 60:10,
60:13, 62:19, 62:22,
63:19, 64:6, 64:10,
64:16, 66:5, 67:18,
67:23, 70:22, 71:11,
71:23, 73:21, 74:4,
74:10, 75:10, 77:5,
81:10, 81:15, 86:24,
89:3, 89:7, 90:5,
90:7, 93:12, 94:21,
95:7, 95:11, 95:16,
97:19, 101:9,
101:13, 101:16,
101:17, 101:21,
101:24, 102:2,
102:11, 102:24,
107:22, 109:16,
110:3, 110:4, 123:6,
124:10, 127:13,

127:16, 127:22,
128:2, 134:2,
135:20, 139:23,
140:4, 156:24,
157:2, 157:4,
162:15, 186:1,
186:2, 186:3,
200:12, 200:14,
200:15, 200:17,
201:19, 207:9,
207:14, 208:20,
208:23, 227:17,
227:18, 228:15,
228:22, 230:19
**documentation** [2] -
40:5, 55:8
**documents** [6] - 74:2,
199:1, 200:3, 200:6,
200:7, 233:22
**dollar** [4] - 152:25,
153:6, 153:11,
153:17
**dollars** [4] - 19:24,
20:6, 61:7, 61:9
**domestic** [1] - 155:9
**donations** [1] - 78:25
**done** [21] - 35:21,
52:12, 72:5, 119:15,
123:3, 129:5, 129:9,
129:13, 136:25,
138:15, 140:12,
157:21, 175:3,
183:8, 198:8,
207:18, 220:4,
224:5, 224:6, 230:9,
230:10
**door** [2] - 147:23,
192:22
**doors** [1] - 142:23
**doubt** [21] - 55:22,
56:5, 56:11, 62:2,
66:22, 74:18, 82:3,
97:3, 97:5, 124:5,
125:3, 125:16,
125:18, 126:1,
126:13, 126:14,
126:19, 126:23,
127:4
**Douglas** [1] - 4:17
**down** [25] - 31:22,
45:8, 61:1, 64:13,
65:13, 67:9, 71:2,
76:21, 98:13,
103:22, 111:19,
111:21, 141:5,
149:7, 175:1,
175:24, 176:23,
177:19, 179:12,
182:24, 197:3,
210:7, 211:15,

216:17, 216:18
**Dr** [79] - 7:7, 7:12, 8:3,
8:10, 8:19, 9:11,
9:12, 9:13, 9:15,
12:22, 13:8, 13:10,
14:16, 14:20, 15:6,
18:4, 20:14, 23:1,
27:23, 27:25, 28:6,
29:5, 37:2, 37:14,
37:18, 43:5, 43:8,
48:7, 50:1, 50:13,
50:16, 50:18, 50:20,
51:22, 54:7, 54:13,
54:16, 60:11, 62:22,
63:2, 65:2, 65:19,
65:20, 67:17, 68:1,
70:3, 74:4, 75:7,
81:15, 89:10, 95:11,
97:25, 101:9,
102:24, 113:23,
115:14, 121:10,
121:13, 121:25,
123:5, 123:8, 128:2,
128:13, 130:4,
131:11, 131:20,
134:19, 135:4,
135:21, 140:18,
141:6, 142:1,
147:10, 150:5,
150:23, 151:1,
155:18, 155:21,
157:23
**draft** [8] - 131:22,
132:10, 138:25,
156:11, 156:18,
156:20, 156:21,
157:7
**drafting** [1] - 14:24
**drafts** [7] - 135:12,
135:13, 135:22,
156:15, 157:2,
157:4, 157:5
**dramatically** [3] -
149:3, 170:18,
170:22
**dreadful** [1] - 67:4
**Drive** [1] - 6:15
**drop** [4] - 96:3, 96:10,
111:19, 111:21
**drop-down** [2] -
111:19, 111:21
**dropped** [1] - 117:17
**drops** [1] - 76:14
**drug** [16] - 41:16,
43:25, 123:25,
124:8, 132:16,
133:24, 167:9,
167:10, 167:20,
168:13, 169:19,
169:20, 171:10,

174:25, 186:22,
187:15
**Drug** [13] - 6:2,
140:21, 140:22,
140:25, 141:3,
164:12, 165:1,
165:2, 166:1,
167:24, 167:25,
173:12, 235:7
**DRUG** [2] - 1:7, 1:13
**drugs** [37] - 34:18,
168:16, 168:18,
168:23, 169:25,
170:3, 175:19,
177:16, 177:20,
177:22, 177:24,
178:2, 181:1, 182:1,
182:8, 184:3, 184:8,
184:11, 184:12,
185:14, 187:21,
187:22, 187:24,
191:16, 191:19,
191:21, 192:14,
193:4, 213:3, 213:4,
217:10, 217:12,
217:13, 223:2,
231:22
**Drugs** [1] - 165:15
**Drugstore** [1] - 167:4
**due** [14] - 7:19, 7:21,
8:12, 9:12, 9:25,
10:22, 51:15,
125:10, 196:11,
214:5, 215:6, 218:2,
218:11
**duration** [2] - 125:22,
125:25
**During** [1] - 28:5
**during** [19] - 11:13,
17:19, 78:10, 88:1,
133:13, 136:1,
136:2, 151:24,
167:15, 169:1,
173:17, 175:24,
181:6, 183:25,
197:15, 198:10,
199:10, 215:14,
230:13
**duties** [6] - 172:20,
172:22, 173:7,
181:15, 187:10,
198:6

**E**

**e-mail** [5] - 128:3,
128:4, 128:7,
128:12, 128:13
**early** [9] - 25:15, 26:5,
96:10, 127:6,

134:11, 169:24, 170:14, 212:21, 212:22
**easier** [1] - 9:7
**easiest** [3] - 76:13, 143:25, 148:11
**East** [3] - 3:5, 3:12, 4:18
**eat** [1] - 146:7
**ebbed** [1] - 99:14
**ECF** [1] - 7:15
**ECI** [2] - 112:25, 154:22
**economist** [2] - 136:4
**education** [3] - 18:14, 33:3, 166:22
**Edward's** [3] - 15:16, 29:20, 30:6
**Edwards** [1] - 29:7
**effect** [1] - 135:14
**effective** [10] - 103:1, 103:7, 111:23, 113:2, 118:1, 178:13, 178:16, 180:4, 213:23, 214:7
**effectiveness** [3] - 59:12, 59:19, 116:14
**effects** [1] - 132:19
**efficacy** [9] - 59:12, 95:24, 96:17, 116:6, 116:7, 116:10, 116:13, 116:21, 125:5
**efficiencies** [1] - 31:16
**efficiently** [1] - 164:2
**effort** [5] - 31:2, 31:11, 33:1, 39:18, 40:1
**efforts** [4] - 30:14, 31:2, 68:18, 141:17
**eight** [8] - 7:25, 11:5, 12:6, 44:21, 45:6, 56:17, 116:17, 213:13
**eighth** [1] - 11:21
**Eighth** [1] - 3:10
**either** [13] - 14:6, 25:19, 54:8, 60:2, 72:7, 88:9, 113:12, 140:8, 146:1, 175:11, 177:1, 185:25, 214:9
**electronic** [1] - 175:6
**elements** [2] - 103:6, 103:16
**elicit** [1] - 226:10
**ELIZABETH** [1] - 6:14
**elsewhere** [1] - 52:25
**email** [7] - 37:16, 37:21, 38:2, 38:5,

39:5, 39:10
**embarrassed** [1] - 117:7
**embrace** [1] - 203:21
**embraces** [1] - 203:18
**Emergency** [2] - 61:21, 147:25
**employ** [1] - 145:3
**employed** [1] - 145:1
**employees** [1] - 36:18
**Employment** [1] - 146:16
**employment** [1] - 166:1
**employs** [1] - 26:16
**Empowering** [1] - 112:25
**empowering** [1] - 113:8
**empowerment** [1] - 144:2
**EMS** [5] - 111:15, 111:19, 145:24, 154:24, 155:7
**EMT** [1] - 166:20
**Encino** [1] - 3:18
**end** [10] - 11:17, 24:20, 57:23, 66:9, 90:6, 119:21, 151:23, 168:8, 168:10, 171:23
**ended** [2] - 151:22, 191:22
**endocranitis** [1] - 99:10
**endorsement** [1] - 163:23
**ends** [1] - 147:7
**energy** [1] - 111:24
**enforcement** [18] - 161:2, 163:21, 166:13, 166:14, 166:16, 167:8, 168:3, 168:10, 172:25, 173:6, 173:13, 180:10, 180:16, 186:18, 188:22, 224:4, 224:9
**Enforcement** [11] - 164:13, 165:1, 165:2, 165:11, 166:2, 167:24, 168:1, 171:24, 172:15, 172:16, 173:12
**engage** [1] - 140:6
**Engage** [14] - 97:15, 98:3, 98:9, 98:10, 98:15, 98:17, 98:20, 98:21, 99:5, 99:20,

99:23, 114:17, 114:19, 142:8
**engaged** [4] - 61:24, 128:22, 142:14, 192:18
**engagement** [4] - 18:15, 45:7, 100:14, 145:8
**engagements** [1] - 117:10
**engaging** [1] - 145:17
**enlighten** [1] - 187:14
**ensure** [10] - 12:1, 135:16, 175:5, 175:9, 177:21, 177:22, 179:5, 180:8, 182:4, 213:2
**enter** [2] - 59:2, 159:17
**entered** [3] - 7:15, 10:8, 137:12
**entire** [6] - 8:8, 25:6, 71:24, 106:16, 107:12, 165:25
**entirely** [2] - 43:25, 70:14
**entities** [4] - 16:8, 122:21, 173:6, 179:1
**entitled** [1] - 10:18
**entity** [1] - 229:7
**entries** [1] - 65:3
**entry** [3] - 89:22, 132:5, 166:1
**ENU** [1] - 4:12
**epicenter** [1] - 141:14
**epidemic** [1] - 141:14
**Episode** [1] - 123:7
**episode** [1] - 123:19
**equal** [1] - 84:21
**escape** [1] - 177:24
**especially** [1] - 187:6
**essentially** [2] - 10:10, 99:20
**establish** [4] - 67:18, 110:13, 145:4, 201:25
**established** [7] - 18:12, 19:1, 26:6, 26:9, 62:18, 88:6, 108:3
**establishment** [1] - 173:8
**estate** [1] - 97:12
**estimate** [2] - 21:2, 107:11
**estimating** [1] - 21:11
**estimation** [2] - 90:21, 90:23
**et** [6] - 1:7, 1:13, 76:25, 114:2, 235:6,

235:7
**evaluation** [1] - 139:11
**evaluator** [3] - 102:3, 139:7, 139:9
**evening** [1] - 9:13
**events** [1] - 9:13
**eventually** [2] - 73:5, 147:1
**evidence** [22] - 16:20, 17:25, 25:2, 54:4, 89:7, 102:19, 104:9, 116:5, 116:15, 132:1, 137:12, 139:4, 189:19, 194:12, 199:2, 199:3, 203:3, 203:15, 204:15, 228:15, 228:16, 230:19
**Evidence** [1] - 201:19
**evidence-based** [1] - 104:9
**evident** [2] - 193:6, 193:22
**exact** [1] - 204:14
**Exactly** [1] - 9:7
**exactly** [5] - 9:10, 177:17, 182:20, 215:19, 225:4
**EXAMINATION** [5] - 13:6, 135:2, 150:21, 156:1, 161:24
**examination** [3] - 135:24, 136:9, 195:15
**examine** [2] - 220:14, 223:12
**example** [17] - 59:21, 109:13, 111:13, 112:22, 125:9, 133:3, 137:21, 143:11, 145:5, 145:13, 146:6, 146:19, 154:23, 204:24, 218:3, 218:5, 218:13
**examples** [5] - 132:8, 132:21, 138:25, 215:16, 215:20
**exceeds** [1] - 67:10
**Excel** [3] - 64:11, 67:3, 67:9
**except** [8] - 12:4, 29:15, 104:4, 142:3, 153:24, 175:19, 204:4, 221:6
**exception** [3] - 30:2, 176:19, 205:17
**excessive** [7] -

221:16, 228:3, 229:4, 229:17, 231:6, 231:10, 231:19
**excluded** [1] - 194:1
**excluding** [2] - 65:12, 91:9
**exclusively** [5] - 22:17, 22:19, 22:21, 144:8, 148:3
**excuse** [1] - 171:2
**excused** [1] - 234:8
**executive** [1] - 140:7
**Executive** [2] - 54:15, 55:3
**exhibit** [1] - 185:24
**Exhibit** [13] - 29:6, 38:15, 50:14, 54:6, 60:15, 62:23, 62:24, 70:22, 86:25, 89:3, 123:1, 128:3, 131:21
**exhibits** [2] - 160:1, 209:17
**exist** [3] - 98:21, 148:21, 172:8
**existed** [1] - 189:20
**existence** [1] - 92:5
**existing** [5] - 39:22, 88:7, 88:24, 99:12, 105:15
**exists** [3] - 81:18, 93:9, 99:18
**expand** [2] - 19:25, 132:15
**expanded** [1] - 132:25
**expanding** [5] - 93:24, 129:18, 129:22, 130:2, 132:13
**expansion** [4] - 32:14, 132:11, 134:6, 134:13
**expansive** [1] - 160:24
**expect** [3] - 68:17, 68:19, 107:16
**expenditures** [1] - 132:9
**expense** [1] - 67:19
**expenses** [3] - 65:24, 91:6
**experience** [11] - 51:20, 152:9, 152:16, 168:2, 168:4, 168:6, 180:11, 180:23, 188:11, 192:2, 192:5
**experiencing** [1] - 88:10
**expert** [15] - 8:2, 8:14, 8:24, 9:22, 9:23, 11:10, 11:14, 12:8,

12:15, 160:13,
163:2, 179:16,
204:25, 221:25
**expertise** [6] - 58:19,
105:22, 133:21,
135:16, 136:2,
138:25
**experts** [4] - 8:11,
136:12, 136:15,
137:4
**explain** [9] - 34:21,
138:11, 140:1,
167:22, 169:4,
184:4, 202:17,
223:10
**explained** [4] - 121:2,
154:2, 218:8, 223:8
**explaining** [1] - 223:3
**explore** [4] - 133:11,
204:3, 222:6, 222:13
**exporters** [1] - 175:17
**exposed** [3] - 133:4,
133:7, 150:1
**exposure** [11] - 76:15,
76:17, 77:24, 77:25,
78:15, 83:9, 83:10,
83:12, 83:13, 149:1,
149:4
**extent** [4] - 160:21,
204:20, 211:24,
225:18
**external** [8] - 19:24,
20:6, 21:6, 21:14,
102:3, 139:6, 142:9,
142:11
**extra** [1] - 120:7
**extrapolate** [1] -
131:13
**extremely** [3] - 168:2,
178:20, 212:25
**eyeball** [1] - 90:24

## F

**Faber** [1] - 7:2
**FABER** [1] - 1:17
**face** [7] - 14:17, 23:2,
43:6, 182:17, 210:8
**face-to-face** [2] -
182:17, 210:8
**facilitating** [1] -
216:20
**facilitation** [3] - 185:4,
185:6, 191:20
**facilities** [2] - 84:4,
103:25
**facility** [5] - 47:6,
52:20, 93:18, 93:19,
95:4
**fact** [19] - 10:14,

23:10, 59:3, 107:10,
117:2, 120:22,
121:18, 122:20,
125:19, 143:1,
160:3, 160:12,
161:3, 162:21,
167:12, 182:6,
187:23, 187:25,
232:22
**facts** [2] - 160:14,
163:8
**Fair** [1] - 19:19
**fair** [16] - 15:22, 18:18,
22:16, 31:16, 33:19,
34:4, 48:7, 50:1,
52:18, 84:13, 84:18,
101:1, 103:7, 141:9,
166:4, 219:4
**fairly** [1] - 220:14
**fairness** [2] - 225:23,
226:14
**fall** [4] - 44:12, 133:5,
134:9, 140:15
**Fall** [2] - 53:16, 54:24
**falls** [2] - 133:8,
226:24
**familiar** [10] - 14:20,
14:22, 23:6, 24:7,
63:2, 104:15,
123:13, 137:16,
184:4, 211:17
**families** [6] - 81:21,
87:21, 88:1, 88:4,
133:12, 152:21
**family** [10] - 9:13,
10:21, 10:22, 10:24,
11:12, 11:13, 12:14,
88:15, 141:7, 141:8
**Family** [2] - 14:18,
15:4, 15:7, 15:11,
15:14, 15:17, 15:19,
15:21, 15:24, 17:8,
17:10, 17:18, 18:12,
22:2, 22:6, 22:7,
22:11, 22:15, 78:22,
88:24, 151:20
**fantastic** [1] - 75:7
**far** [12] - 42:19, 47:12,
78:6, 120:17,
120:18, 180:18,
187:15, 195:20,
204:1, 221:9, 224:6,
232:9
**FARRELL** [8] - 2:3,
67:5, 67:9, 194:10,
194:20, 198:25,
204:13, 226:13
**Farrell** [7] - 2:4, 2:15,
67:11, 136:8, 194:9,
204:11, 226:11

**Farrell's** [1] - 204:24
**fashion** [2] - 30:21,
140:17
**father** [1] - 167:13
**fatigue** [1] - 109:10
**FCRR** [1] - 6:18
**February** [1] - 103:20
**Federal** [3] - 21:3,
173:12, 201:19
**federal** [9] - 104:12,
109:2, 113:5, 113:7,
113:12, 124:7,
124:8, 130:19,
151:14
**federally** [2] - 32:16,
115:1
**feedback** [1] - 233:16
**fees** [4] - 89:18, 89:21,
89:22, 89:23
**felt** [1] - 231:18
**few** [16] - 61:1, 64:23,
64:24, 71:2, 109:12,
122:3, 150:23,
158:22, 166:23,
169:22, 170:16,
170:17, 181:15,
183:11, 185:17,
204:4
**field** [1] - 166:4
**Field** [1] - 165:14
**fifth** [1] - 43:14
**fight** [1] - 121:16
**figure** [4] - 55:1,
96:22, 112:7, 124:12
**figured** [3] - 111:18,
111:25, 166:14
**figures** [2] - 157:5,
157:10
**filed** [2] - 9:22, 198:8
**final** [15] - 17:23,
35:21, 56:24, 95:16,
110:6, 122:3, 135:9,
135:19, 156:11,
156:18, 156:20,
156:23, 182:18,
233:22
**finalized** [1] - 210:24
**finally** [2] - 146:15,
147:10
**finances** [6] - 63:5,
65:6, 92:7, 157:7,
157:9, 157:10
**financial** [4] - 66:4,
66:8, 155:13, 156:16
**fine** [1] - 14:3
**fines** [1] - 57:24
**finish** [1] - 100:21
**finished** [1] - 24:11
**Fire** [4] - 144:14,
152:8, 152:15,

166:20
**firefighter** [1] - 166:20
**firemen** [1] - 167:12
**Firm** [2] - 3:4, 3:7
**first** [42] - 8:1, 13:15,
13:20, 20:5, 25:12,
30:17, 30:19, 34:13,
37:15, 48:16, 49:6,
54:14, 54:23, 55:14,
55:20, 56:4, 56:13,
56:22, 57:17, 60:19,
61:4, 62:24, 81:20,
83:6, 87:3, 87:25,
88:2, 90:22, 92:6,
113:15, 123:7,
127:16, 130:12,
147:21, 151:16,
152:7, 152:10,
152:19, 159:6,
190:21, 193:16
**fiscal** [6] - 14:18, 66:7,
90:6, 90:8, 90:9,
90:15
**fits** [1] - 21:21
**five** [13] - 11:4, 32:8,
58:20, 61:4, 62:5,
90:11, 103:22,
115:3, 122:8,
122:13, 122:21,
151:16, 185:9
**five-year** [2] - 62:5,
90:11
**fix** [3] - 10:17, 13:22,
89:8
**FL** [1] - 2:14
**flag** [1] - 192:17
**flagged** [2] - 64:12,
66:14
**flags** [1] - 218:8
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**fliers** [1] - 61:23
**flights** [1] - 9:14
**flooded** [2] - 181:11,
181:12
**Floor** [1] - 3:5
**floors** [1] - 61:21
**flow** [2] - 183:17,
184:25
**flowed** [1] - 99:14
**flowing** [1] - 177:23
**foci** [1] - 18:13
**focus** [10] - 27:19,
31:22, 100:10,
117:14, 130:14,
130:24, 135:15,
157:8, 189:12,
211:20
**focused** [7] - 19:10,
79:20, 79:21, 88:13,

88:15, 138:21,
143:19
**focuses** [3] - 18:18,
80:2, 94:2
**folks** [4] - 36:12,
62:12, 105:22,
130:14
**follow** [19] - 24:1,
24:3, 52:22, 117:5,
117:7, 117:9,
195:14, 195:18,
196:20, 202:10,
208:2, 216:1,
218:16, 219:14,
219:20, 220:8,
224:6, 226:4
**follow-up** [5] - 117:5,
117:7, 196:20,
216:1, 224:6
**followed** [6] - 49:15,
191:6, 206:21,
218:15, 219:10,
227:12
**following** [6] - 7:18,
7:20, 57:1, 96:16,
109:13, 216:8
**follows** [2] - 7:5, 44:7
**font** [1] - 87:1
**footing** [1] - 220:21
**FOR** [1] - 1:1
**Force** [1] - 165:19
**foregoing** [2] -
120:12, 235:4
**forever** [1] - 147:25
**forgive** [2] - 119:15,
137:7
**forgot** [1] - 92:25
**form** [12] - 35:8, 43:24,
44:2, 45:21, 47:10,
47:12, 62:10, 70:2,
76:25, 99:5, 118:5,
197:9
**formalized** [1] - 105:7
**format** [2] - 62:25,
99:17
**formats** [1] - 99:19
**former** [1] - 167:14
**forms** [5] - 35:9,
43:17, 60:7, 115:16,
116:24
**forte'** [2] - 56:15,
148:14
**forth** [3] - 10:11, 60:9,
115:18
**Forward** [6] - 23:25,
24:4, 24:7, 24:14,
24:17, 24:20
**forward** [4] - 49:16,
99:18, 139:20, 146:4
**foundation** [21] - 17:1,

61:25, 64:2, 107:21, 129:15, 129:17, 129:18, 129:21, 129:25, 194:3, 198:13, 198:20, 198:21, 204:20, 205:7, 205:22, 209:8, 217:1, 228:13, 228:17, 230:18

**Foundation** [4] - 102:16, 103:4, 103:11, 138:14

**four** [12] - 11:4, 18:13, 18:20, 32:9, 39:22, 40:2, 44:21, 51:16, 101:3, 103:9, 103:22, 110:13

**four-county** [1] - 40:2

**fourth** [2] - 136:14, 136:22

**frame** [1] - 228:6

**frames** [1] - 72:20

**framing** [1] - 73:4

**frankly** [1] - 223:4

**fraud** [1] - 170:10

**Fred** [2] - 159:19, 195:4

**free** [3] - 158:3, 222:6, 223:11

**frequent** [1] - 61:23

**Friday** [5] - 9:19, 11:24, 12:18, 12:19, 157:13

**friend's** [1] - 167:12

**front** [4] - 207:6, 208:18, 213:11, 229:8

**fulfilling** [1] - 81:23

**full** [7] - 34:4, 50:17, 90:18, 90:20, 153:1, 161:12, 216:25

**full-time** [1] - 153:1

**Fuller** [2] - 2:4, 2:15

**FULLER** [1] - 2:15

**fully** [1] - 142:21

**function** [2] - 180:9, 180:24

**functions** [1] - 183:7

**fund** [1] - 61:9

**funded** [14] - 22:17, 22:19, 22:21, 78:25, 85:14, 97:9, 100:1, 112:22, 113:11, 113:14, 115:7, 122:17, 144:7, 152:24

**funder** [1] - 102:16

**funding** [57] - 16:5, 16:9, 19:24, 20:7,

---

20:16, 21:2, 21:6, 21:14, 22:18, 22:20, 61:2, 61:6, 61:19, 62:8, 65:12, 69:15, 74:23, 79:9, 82:19, 85:20, 85:22, 86:8, 89:17, 91:9, 92:22, 110:22, 110:23, 112:12, 112:14, 112:24, 112:25, 113:5, 113:7, 113:13, 113:17, 125:13, 130:19, 143:17, 144:8, 151:11, 151:14, 151:17, 151:18, 151:22, 151:23, 151:24, 151:25, 154:5, 154:18, 154:21, 154:25, 155:1, 155:6, 155:11

**fundraising** [1] - 94:23

**funds** [8] - 113:2, 113:15, 113:19, 113:22, 151:17, 151:21, 153:10, 154:23

**funneled** [1] - 181:1

**future** [3] - 130:6, 137:3, 144:19

**FY** [1] - 21:7

## G

**gamesmanship** [5] - 9:9, 10:3, 10:4, 10:14, 10:15

**gamut** [1] - 42:11

**gap** [1] - 99:2

**general** [13] - 142:4, 195:5, 195:9, 211:24, 221:14, 222:5, 224:15, 224:25, 225:11, 225:15, 226:4, 226:21, 227:9

**General** [2] - 173:20, 173:21

**generally** [8] - 63:4, 140:3, 184:7, 199:16, 221:21, 224:11, 224:15, 224:25

**Generally** [2] - 187:4, 197:3

**generated** [2] - 228:10, 229:7

**generic** [1] - 184:7

**geographic** [5] -

---

189:22, 191:24, 201:4, 203:1, 208:10

**geographical** [2] - 203:18, 203:22

**geography** [2] - 31:4, 31:17

**Gina** [1] - 163:12

**given** [17] - 35:3, 62:22, 77:23, 77:24, 78:3, 78:20, 130:5, 163:15, 173:22, 184:11, 185:23, 187:7, 190:2, 191:8, 197:10, 208:3, 209:16

**glitch** [1] - 13:20

**goal** [25] - 30:20, 31:14, 68:5, 68:8, 68:10, 68:23, 69:2, 69:4, 69:8, 96:14, 99:7, 100:12, 103:12, 110:15, 112:1, 117:9, 129:16, 130:13, 130:20, 130:21, 138:22, 139:18, 142:22, 143:16, 145:8

**goals** [3] - 130:15, 130:16, 142:19

**Goldilocks** [1] - 220:12

**Gonzales** [1] - 173:21

**Gordon** [1] - 8:10

**governing** [1] - 36:16

**government** [2] - 104:12, 109:3, 195:11

**Government** [1] - 21:3

**gradual** [1] - 117:1

**graduate** [1] - 94:7

**graduated** [2] - 97:1, 117:8

**graduates** [1] - 117:16

**graduating** [1] - 95:19

**graduation** [1] - 96:16

**grain** [1] - 212:23

**Grant** [1] - 144:18

**grant** [50] - 19:24, 20:6, 20:16, 39:21, 61:19, 65:12, 85:22, 90:10, 90:11, 90:12, 90:14, 90:25, 91:9, 100:9, 100:12, 100:13, 102:3, 102:10, 102:12, 102:14, 103:8, 110:18, 112:5, 130:19, 137:9, 137:14, 137:16,

---

137:19, 137:25, 138:3, 138:21, 138:22, 138:25, 139:7, 143:2, 144:8, 151:12, 151:13, 152:25, 153:6, 153:8, 153:11, 154:5, 154:18, 154:21, 154:25, 155:7, 155:16, 155:17

**grants** [11] - 20:10, 22:17, 22:19, 22:21, 63:16, 78:25, 94:23, 113:16, 118:9, 118:15, 154:22

**graphic** [1] - 174:14

**great** [6] - 39:12, 50:7, 61:17, 135:21, 145:23, 149:12

**Great** [35] - 38:6, 38:10, 39:9, 39:11, 39:13, 40:6, 100:5, 100:7, 100:16, 101:10, 101:22, 101:25, 102:9, 103:3, 103:6, 104:21, 106:16, 107:1, 107:13, 108:5, 108:7, 109:21, 109:22, 110:5, 110:12, 110:17, 110:20, 110:24, 111:8, 112:1, 112:7, 112:13, 137:9, 138:13

**greater** [1] - 149:24

**GRETCHEN** [1] - 6:7

**grew** [4] - 30:19, 152:16, 167:8, 167:11

**ground** [5] - 28:2, 113:20, 140:9, 190:3, 201:23

**group** [15] - 33:10, 35:15, 45:6, 45:20, 55:24, 70:17, 72:2, 72:24, 73:8, 101:2, 106:11, 108:21, 130:24, 169:8, 184:8

**Group** [1] - 165:18

**groups** [6] - 72:25, 73:12, 130:14, 135:15, 170:23, 187:8

**grow** [1] - 26:15

**growing** [2] - 26:15, 133:9

**grown** [1] - 30:13

---

**guarantee** [1] - 90:19

**guard** [1] - 166:18

**guardrails** [1] - 221:13

**guess** [3] - 52:6, 58:14, 210:16

**guidance** [20] - 161:1, 163:20, 181:19, 181:20, 181:23, 182:15, 183:8, 204:5, 206:18, 209:4, 209:16, 209:23, 211:9, 213:18, 214:2, 214:20, 216:10, 223:3, 232:5, 233:13

**guidelines** [5] - 35:3, 45:15, 59:10, 140:16, 143:12

**gummed** [1] - 200:3

**gun** [2] - 180:14, 180:15

**guns** [2] - 179:8, 180:14

**gynecology** [1] - 70:8

## H

**habitual** [1] - 9:24

**half** [3] - 119:10, 120:17, 150:18

**halfway** [2] - 31:22, 37:23

**hand** [6] - 40:18, 66:23, 71:17, 132:8, 161:15, 197:3

**handed** [15] - 14:16, 23:1, 28:2, 29:5, 37:14, 43:5, 50:13, 66:13, 74:4, 101:9, 123:6, 128:2, 131:20, 162:16, 174:14

**handle** [1] - 31:18

**handling** [1] - 222:25

**Hansen** [2] - 141:1, 141:5

**happier** [1] - 81:23

**happily** [1] - 89:2

**happy** [3] - 159:8, 159:9, 221:16

**hard** [2] - 46:7, 168:2

**HARDIN** [1] - 5:3

**harm** [1] - 138:19

**Harm** [5] - 144:22, 153:21, 153:23, 154:6, 154:9

**harmful** [2] - 168:19, 168:24

**hash** [1] - 64:6

**Hawkins** [1] - 3:7

head [1] - 114:11
headed [4] - 37:15,
48:14, 54:14, 101:10
heading [4] - 54:22,
55:11, 71:3, 71:22
headings [1] - 134:3
headquarter's [1] -
210:16
headquarters [10] -
93:19, 165:16,
166:5, 169:7,
169:13, 169:18,
171:11, 171:17,
171:21, 197:1
health [22] - 22:1,
46:16, 46:18, 46:22,
48:8, 73:7, 73:15,
74:13, 77:16, 79:23,
94:5, 99:11, 111:19,
111:20, 112:4,
124:9, 134:11,
136:4, 139:15,
141:8, 152:17,
152:19
Health [61] - 4:11, 5:2,
15:18, 15:19, 15:22,
16:2, 16:5, 21:21,
21:23, 22:1, 22:6,
22:7, 22:9, 22:11,
22:13, 22:14, 22:18,
22:20, 26:6, 29:17,
29:21, 31:25, 32:2,
32:13, 32:15, 32:16,
32:19, 36:14, 38:7,
70:7, 74:6, 87:5,
88:20, 88:23, 90:12,
98:16, 104:11,
113:9, 114:8,
114:14, 114:23,
114:24, 118:13,
122:10, 122:11,
122:12, 140:15,
140:20, 140:21,
141:4, 144:21,
145:1, 145:3, 145:4,
153:22, 200:13,
201:14, 205:25,
208:14, 229:9
Health's [1] - 87:5
Healthcare [1] - 98:18
healthcare [12] -
32:16, 62:17, 115:1,
115:6, 115:9,
115:10, 136:4,
142:5, 142:13,
142:20, 143:13,
145:2
healthy [1] - 131:10
hear [7] - 9:1, 120:8,
158:25, 188:18,

201:8, 220:19, 233:2
heard [2] - 160:25,
174:9
hearsay [12] - 16:23,
63:21, 189:12,
189:14, 190:21,
191:4, 198:23,
201:4, 201:24,
203:11, 211:5
heart [2] - 93:20,
226:20
held [1] - 149:16
help [16] - 18:5, 31:14,
52:7, 94:15, 110:2,
112:19, 144:14,
145:9, 147:24,
148:2, 149:18,
167:17, 171:3,
179:7, 182:7, 221:17
helpers [1] - 144:13
helpful [1] - 164:17
helping [4] - 81:22,
100:17, 100:25,
112:7
helps [1] - 93:1
hemorrhaging [1] -
182:3
hepatitis [2] - 133:24,
134:6
heroin [10] - 41:16,
41:22, 42:12, 42:17,
42:24, 78:10, 78:11,
78:20, 78:21, 168:22
HESTER [93] - 5:9,
13:4, 13:7, 14:3,
14:13, 14:15, 16:19,
16:24, 17:6, 17:24,
18:3, 22:23, 22:25,
25:1, 25:8, 25:11,
25:20, 25:23, 26:3,
29:2, 29:4, 37:10,
37:13, 43:3, 43:4,
47:22, 47:25, 48:2,
48:5, 48:6, 50:9,
50:12, 53:25, 54:3,
54:12, 62:20, 62:21,
63:18, 64:3, 64:20,
64:23, 65:1, 66:15,
66:19, 66:22, 67:2,
67:11, 67:15, 67:16,
69:25, 70:1, 73:22,
73:25, 74:3, 75:13,
75:15, 75:17, 81:11,
81:14, 89:1, 89:6,
89:9, 95:8, 95:10,
100:23, 100:24,
101:6, 101:8,
102:18, 102:23,
108:1, 119:3, 119:8,
119:12, 119:20,

121:20, 121:23,
121:24, 122:25,
123:4, 127:24,
128:1, 131:16,
131:18, 131:19,
131:25, 132:2,
134:18, 141:21,
150:17, 150:19,
150:22, 155:18
Hester [18] - 13:3,
13:19, 14:2, 14:6,
17:5, 47:20, 48:4,
63:22, 64:1, 75:11,
119:6, 121:22,
135:4, 138:7,
139:22, 142:1,
143:19, 150:18
Hester's [1] - 149:6
hierarchy [2] - 172:6,
210:16
high [10] - 46:11,
46:12, 46:13, 70:18,
71:4, 71:7, 71:23,
72:7, 86:17, 152:11
higher [5] - 44:7,
44:12, 58:3, 96:4,
127:12
highlighted [4] -
28:10, 66:11,
135:17, 139:3
highly [4] - 57:13,
103:10, 105:6, 113:2
historical [1] - 219:20
historically [2] -
79:17, 215:1
history [1] - 73:5
HIV [2] - 133:24, 134:6
hold [4] - 90:4, 165:4,
165:5, 165:10
Holder [1] - 173:20
holding [2] - 65:18,
66:23
holds [1] - 107:15
Homicide [1] - 165:19
honest [1] - 109:11
honestly [1] - 124:4
Honor [149] - 7:9,
7:10, 7:23, 8:6, 8:18,
9:4, 9:9, 10:2, 10:12,
10:25, 11:5, 11:20,
11:25, 12:10, 12:20,
12:23, 13:4, 14:4,
14:5, 14:13, 16:19,
16:23, 16:24, 17:2,
17:24, 22:23, 25:1,
25:5, 25:8, 29:2,
37:10, 43:3, 47:22,
47:25, 48:5, 50:9,
53:25, 54:3, 54:10,
62:20, 63:18, 64:5,

64:21, 66:10, 67:2,
67:12, 73:22, 81:11,
89:2, 89:7, 95:8,
101:6, 102:18,
107:19, 119:3,
119:8, 119:13,
119:16, 119:20,
120:2, 121:2,
121:13, 121:23,
122:25, 127:24,
131:16, 132:1,
134:21, 134:23,
150:12, 150:15,
150:17, 150:20,
155:20, 158:11,
158:12, 158:18,
159:6, 159:19,
160:10, 160:15,
160:23, 161:22,
162:11, 164:15,
174:6, 179:15,
179:20, 185:20,
188:6, 188:12,
188:17, 189:11,
189:17, 189:24,
190:13, 190:20,
191:8, 193:10,
193:15, 193:24,
194:8, 195:3,
195:22, 195:25,
199:25, 201:2,
201:3, 201:7,
201:13, 201:18,
202:23, 202:25,
203:4, 204:4,
204:18, 205:2,
205:15, 205:21,
206:2, 206:22,
208:7, 208:15,
209:1, 209:12,
211:8, 211:12,
211:23, 216:23,
217:2, 218:24,
219:12, 220:6,
221:11, 221:12,
222:24, 223:13,
224:3, 225:22,
226:3, 227:15,
228:12, 228:14,
228:17, 230:23,
232:12, 232:23,
234:1, 234:5
Honor's [2] - 160:17,
220:7
HONORABLE [1] -
1:17
Honorable [1] - 7:1
honorary [1] - 174:1
Hook's [1] - 167:3
hoops [1] - 17:5

Hoops [1] - 78:22
Hope [28] - 69:13,
86:11, 86:12, 86:14,
86:17, 87:4, 87:17,
87:25, 88:21, 89:14,
89:15, 89:17, 89:22,
89:23, 89:24, 90:2,
91:4, 91:6, 91:12,
91:19, 91:24, 92:5,
92:11, 92:19, 92:22,
93:3, 117:15, 142:10
hope [8] - 11:20,
11:22, 110:16,
134:25, 141:21,
142:25, 146:8,
163:17
hoped [1] - 98:10
hopefully [1] - 163:15,
164:2, 189:4
hopes [2] - 32:14,
146:25
hoping [1] - 160:7
hospice [1] - 215:4
hospital [23] - 61:22,
76:17, 83:7, 83:20,
84:11, 86:4, 98:4,
99:10, 99:15,
114:25, 115:2,
132:15, 142:6,
142:7, 142:8, 142:9,
142:10, 142:11,
149:25, 175:2,
177:19, 215:4
Hospital [11] - 29:16,
32:1, 32:19, 61:3,
61:7, 76:12, 78:23,
83:20, 99:7, 166:3
hospitalization [1] -
132:16
hospitals [11] - 61:18,
61:24, 62:10, 62:13,
84:14, 99:21,
140:20, 175:18,
177:6, 230:7
host [1] - 87:15
Hosta [1] - 173:22
hour [7] - 45:1, 45:5,
45:7, 45:22, 45:23,
119:10, 150:18
hours [9] - 44:22,
45:6, 45:8, 117:22,
120:14, 120:17,
155:10
house [3] - 87:21,
146:14, 211:25
housed [4] - 29:15,
87:25, 88:1, 131:2
housekeeping [1] -
122:2
housing [2] - 86:18,

131:3
**HRSA** [1] - 113:9
**hub** [1] - 33:4
**huge** [10] - 111:23,
169:23, 170:19,
178:23, 184:18,
192:7, 192:9,
192:10, 219:16
**Human** [1] - 113:9
**hundred** [8] - 72:21,
72:23, 73:2, 73:11,
125:5, 125:6,
170:17, 185:9
**hundreds** [5] - 71:23,
71:25, 72:11, 77:7,
192:8
**HUNTINGTON** [1] -
1:4
**Huntington** [85] -
3:10, 4:1, 13:12,
16:3, 16:6, 21:18,
23:3, 23:13, 23:16,
23:19, 27:4, 29:16,
32:1, 32:19, 32:24,
37:3, 37:4, 37:6,
61:3, 61:7, 69:16,
74:21, 76:11, 78:23,
79:7, 79:10, 80:2,
80:4, 80:9, 80:18,
82:5, 82:8, 82:16,
83:19, 84:1, 84:5,
84:8, 84:10, 84:14,
84:16, 84:20, 84:25,
85:8, 85:11, 85:15,
92:19, 92:23, 93:20,
97:6, 97:9, 99:7,
99:24, 100:2,
106:23, 107:18,
108:4, 108:13,
108:22, 111:10,
113:25, 114:7,
114:17, 114:23,
115:4, 115:8, 122:8,
122:9, 122:14,
122:18, 129:25,
140:19, 140:21,
141:13, 144:14,
144:18, 144:21,
151:7, 152:8,
152:15, 153:22,
155:5, 158:15,
162:25, 225:4, 235:6
**Huntington/Cabell** [4]
- 194:3, 222:15,
222:20, 223:24
**hurdles** [1] - 101:4
**hydrocodone** [5] -
170:2, 170:18,
170:19, 171:16,
183:18

**hypertension** [1] -
58:23

**I**

**IACP** [1] - 186:18
**ice** [2] - 220:20,
220:21
**idea** [13] - 82:6, 82:9,
90:4, 117:3, 125:4,
127:5, 129:4,
132:12, 132:18,
149:9, 154:11,
180:21, 219:1
**ideas** [3] - 129:1,
130:5, 138:24
**identified** [10] - 34:16,
52:5, 56:9, 70:14,
78:15, 99:11, 99:12,
114:5, 139:10, 160:8
**identify** [6] - 30:5,
57:24, 130:15,
149:9, 149:10,
232:21
**identifying** [1] - 57:5
**II** [2] - 173:9
**III** [1] - 173:10
**illegal** [3] - 41:16,
183:20, 183:21
**illicit** [8] - 168:16,
168:25, 175:10,
177:20, 177:23,
181:2, 181:11, 182:2
**illicitly** [1] - 178:3
**illuminate** [1] - 149:11
**imagine** [1] - 125:19
**immediate** [1] -
184:23
**immediately** [1] -
185:11
**impact** [2] - 181:8,
181:10
**impacts** [1] - 81:21
**implement** [1] - 26:7
**implementation** [2] -
27:10, 39:21
**implemented** [1] -
179:3
**import** [1] - 175:1
**important** [5] - 96:16,
142:21, 194:15,
210:9, 216:14
**importers** [1] - 175:17
**improve** [2] - 96:14,
152:11
**IN** [2] - 1:1, 1:18
**in-depth** [2] - 138:16,
211:2
**in-house** [2] - 146:14,
211:25

**inability** [1] - 150:2
**inaccuracies** [1] -
91:13
**incarcerated** [1] -
57:24
**include** [23] - 33:8,
33:23, 34:14, 35:4,
41:21, 41:24, 43:20,
70:17, 76:1, 78:9,
78:13, 78:19, 78:21,
83:13, 86:21, 88:8,
90:9, 105:1, 114:17,
118:1, 129:21,
133:2, 164:6
**included** [17] - 28:9,
32:13, 55:9, 76:24,
132:23, 133:14,
133:25, 135:7,
156:9, 156:13,
156:21, 157:5,
157:11, 211:21,
212:25, 213:6, 213:7
**includes** [5] - 15:24,
34:9, 34:22, 38:17,
80:4
**including** [7] - 24:16,
42:19, 79:16, 88:17,
152:18, 206:6,
212:19
**inclusive** [1] - 28:22
**income** [3] - 90:10,
90:14, 90:25
**incorporating** [1] -
141:15
**increase** [3] - 132:18,
169:2, 169:18
**increased** [1] - 170:18
**increases** [1] - 169:25
**increasing** [1] -
170:21
**incredibly** [2] - 109:4,
139:5
**increments** [2] -
143:14, 145:7
**Indiana** [1] - 166:3
**Indianapolis** [2] -
166:3, 166:10
**indicate** [5] - 12:12,
39:8, 57:8, 66:7,
108:24
**indicated** [2] - 99:1,
137:20
**indicates** [5] - 41:8,
42:15, 42:16,
106:18, 116:7
**indicating** [2] - 92:4,
97:1
**indication** [2] -
201:21, 229:25
**individual** [42] - 31:4,

31:5, 33:10, 34:24,
35:15, 41:19, 41:21,
41:24, 44:12, 44:25,
45:17, 45:21, 46:20,
47:2, 47:4, 47:5,
57:19, 58:6, 58:15,
70:17, 73:1, 77:17,
96:6, 114:24,
115:19, 115:23,
116:19, 117:13,
117:15, 130:24,
147:4, 189:13,
190:8, 196:4, 196:6,
203:20, 220:11,
221:5, 221:10, 224:1
**individual's** [1] -
117:14
**individualized** [1] -
115:22
**individuals** [55] - 17:9,
21:18, 26:16, 34:16,
34:18, 35:12, 36:8,
36:10, 41:9, 42:23,
45:4, 46:3, 51:24,
52:11, 52:23, 52:24,
55:15, 55:20, 55:24,
57:17, 57:22, 58:1,
58:7, 58:19, 59:5,
61:21, 71:18, 71:22,
71:24, 71:25, 72:2,
72:6, 72:12, 77:8,
78:21, 84:9, 84:10,
94:6, 94:9, 94:21,
96:24, 99:9, 101:2,
105:8, 106:8,
127:10, 131:1,
131:4, 131:5,
135:23, 140:10,
145:16, 197:19,
198:1
**Individuals** [2] -
17:16, 42:9
**indulgence** [1] - 10:1
**industry** [3] - 173:1,
173:16, 179:6
**inexcusable** [1] - 8:23
**infant** [2] - 78:14,
84:11
**infants** [11] - 78:1,
83:9, 83:10, 83:12,
83:13, 83:18, 84:7,
133:4, 149:1, 149:3,
150:1
**infectious** [1] - 138:19
**inflammatory** [1] -
223:18
**info** [1] - 111:15
**informal** [1] - 145:8
**information** [23] -
111:14, 123:24,

125:1, 125:3,
140:11, 140:13,
180:19, 180:21,
186:21, 188:20,
188:23, 188:25,
194:25, 195:8,
195:11, 199:21,
205:11, 212:2,
212:6, 215:8, 224:8,
225:5, 226:10
**informs** [2] - 120:21,
120:23
**Ingredient** [5] -
227:20, 228:3,
229:3, 229:11, 230:2
**ingredient** [2] -
229:21, 230:7
**initial** [8] - 59:10, 61:2,
95:25, 113:15,
128:22, 140:18,
196:21, 202:9
**initiate** [1] - 144:25
**Initiative** [1] - 113:8
**initiative** [32] - 51:6,
98:3, 110:1, 182:4,
182:13, 183:3,
183:10, 183:12,
183:13, 183:14,
183:23, 194:12,
196:13, 196:14,
196:16, 196:18,
196:22, 196:25,
198:10, 199:10,
199:19, 209:5,
209:24, 210:1,
210:4, 211:22,
215:14, 215:19,
218:6, 230:15,
233:20
**Initiatives** [1] - 29:8
**injectable** [2] - 35:7,
47:18
**injected** [1] - 47:18
**innovative** [1] -
103:10
**inpatient** [9] - 47:1,
48:22, 87:18, 118:3,
132:15, 133:15,
133:25, 134:14,
167:6
**inpatient/residential**
[2] - 132:5, 134:7
**input** [4] - 17:23,
212:9, 212:13,
212:17
**inputs** [1] - 118:24
**insights** [1] - 118:24
**insofar** [1] - 189:11
**inspections** [3] -
175:13, 182:17,

182:18
**instance** [6] - 59:15, 64:13, 78:9, 112:21, 132:11, 134:6
**instances** [1] - 196:9
**instead** [1] - 26:22
**institute** [1] - 19:25
**insufficient** [3] - 8:16, 8:24, 11:10
**insurance** [22] - 48:9, 48:19, 49:14, 49:18, 59:23, 60:2, 68:11, 68:25, 82:14, 85:18, 85:24, 86:1, 92:2, 92:10, 92:16, 115:12, 122:22, 125:11, 144:5, 144:12, 146:2, 146:18
**insurances** [1] - 74:13
**insurers** [1] - 73:15
**intake** [9] - 34:7, 34:12, 34:16, 47:3, 52:19, 52:21, 52:23, 52:24, 57:6
**intakes** [8] - 40:21, 41:5, 52:13, 52:14, 52:16, 52:19, 53:14, 96:1
**integrated** [1] - 144:24
**integrity** [1] - 180:25
**intend** [3] - 8:2, 8:13, 158:19
**intended** [1] - 19:7
**Intensive** [3] - 44:6, 78:18, 148:25
**intensive** [12] - 44:8, 44:16, 44:19, 46:6, 46:9, 47:4, 48:24, 116:23, 117:20, 117:23, 118:4, 126:10
**intention** [2] - 120:18, 179:21
**interchangeably** [1] - 26:23
**interested** [2] - 138:14, 138:18
**internal** [2] - 39:7, 221:3
**International** [2] - 173:14, 186:18
**interned** [1] - 167:3
**Internet** [2] - 186:2, 207:10
**internet** [50] - 169:11, 169:14, 169:17, 171:14, 171:17, 183:20, 184:14, 184:16, 184:19,

184:21, 184:23, 185:2, 185:3, 185:13, 185:18, 186:23, 187:15, 187:18, 187:20, 187:23, 189:19, 191:11, 191:16, 191:20, 192:4, 192:7, 192:11, 192:16, 192:21, 192:25, 193:1, 193:3, 193:5, 193:7, 193:12, 193:17, 193:25, 194:1, 194:15, 194:17, 194:25, 196:2, 201:5, 203:1, 203:3, 206:13, 206:17, 206:20, 207:17, 208:21
**internet-based** [1] - 183:20
**interpose** [1] - 232:6
**interpretation** [1] - 191:2
**interpreting** [1] - 203:9
**interrupt** [1] - 13:18, 14:1, 14:6, 47:21, 175:22, 188:4, 188:6, 202:19, 216:24, 223:20
**interrupted** [1] - 14:2
**intervene** [2] - 111:16, 117:14
**intervened** [1] - 147:8
**intervening** [1] - 147:8
**intervention** [5] - 33:3, 44:2, 44:13, 58:15, 134:11
**interventions** [3] - 44:17, 44:18, 133:18
**interviewed** [1] - 50:18
**interviews** [1] - 140:12
**interworking** [1] - 80:19
**intimately** [1] - 140:24
**intravenous** [1] - 133:24
**introduce** [2] - 159:17, 162:1
**introduced** [2] - 89:7, 137:5
**introduction** [1] - 123:18
**inventories** [1] - 175:4
**invested** [1] - 147:2
**investigate** [1] - 222:9
**investigated** [2] -

175:12, 221:20
**investigating** [2] - 168:18, 222:12
**investigation** [1] - 182:19
**investigations** [8] - 168:11, 168:16, 172:22, 173:1, 215:13, 219:8, 224:1, 225:14
**investigative** [4] - 180:19, 218:21, 218:22, 224:7
**investigator** [5] - 165:20, 167:23, 168:5, 168:7, 232:4
**investigators** [3] - 183:15, 215:10, 220:5
**invoices** [1] - 63:17
**involved** [18] - 14:24, 16:10, 23:8, 24:10, 27:9, 38:25, 86:14, 93:5, 93:7, 101:15, 140:2, 140:4, 141:10, 175:20, 197:20, 203:18, 212:20, 212:22
**involves** [2] - 44:17, 45:5
**involving** [2] - 42:7, 137:3
**IOP** [3] - 44:4, 47:3, 48:24
**Irpino** [1] - 3:7
**irregardless** [1] - 152:9
**irrelevant** [1] - 190:18
**ISIA** [1] - 5:4
**isolated** [1] - 31:9
**issue** [17] - 7:11, 9:25, 10:15, 19:17, 57:11, 64:12, 66:13, 121:19, 131:1, 152:12, 182:18, 191:10, 195:16, 203:1, 220:16, 220:24, 225:8
**issued** [1] - 15:4
**issues** [15] - 8:4, 11:12, 27:3, 42:7, 118:17, 124:8, 132:22, 158:21, 158:23, 159:24, 160:21, 160:25, 167:9, 169:15, 193:14
**iterations** [1] - 156:24
**itself** [3] - 177:13, 179:12, 180:9

**J**

**Jackson** [4] - 6:8, 39:17, 40:6, 107:5
**Jakki** [4] - 8:2, 8:3, 8:14, 8:19
**jam** [1] - 224:17
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**Joan** [4] - 15:16, 29:7, 29:20, 30:5
**job** [5] - 46:8, 46:14, 146:21, 160:15, 179:9
**jobs** [1] - 166:18
**Joe** [1] - 8:9
**Join** [1] - 209:10
**join** [3] - 167:7, 189:17, 217:2
**joined** [1] - 167:24
**joint** [1] - 7:14
**Joseph** [5] - 158:19, 161:13, 162:3, 200:24, 207:20
**JOSEPH** [2] - 6:4, 161:16
**Journalism** [1] - 22:14
**journey** [2] - 163:16, 174:4
**joy** [1] - 67:3
**JR** [2] - 2:3, 2:15
**Juan** [2] - 2:5, 2:17
**Judge** [7] - 7:2, 47:23, 102:21, 161:19, 194:11, 198:25, 226:13
**judge** [4] - 67:5, 135:9, 136:20, 155:24
**JUDGE** [1] - 1:17
**judgment** [1] - 116:19
**July** [1] - 171:25
**June** [6] - 7:4, 7:21, 8:8, 20:9, 235:9, 235:15
**JUNE** [1] - 1:19
**Justice** [6] - 112:25, 113:6, 159:8, 159:16, 159:21, 226:17

**K**

**Kanawha** [6] - 39:16, 40:7, 104:4, 107:3, 111:12
**Kearse** [1] - 136:9
**KEARSE** [1] - 4:2
**keep** [6] - 29:22, 65:6,

146:12, 172:2, 176:1, 176:10
**keeping** [1] - 25:17
**Keller** [2] - 8:10
**Kelly** [1] - 6:8
**Kentucky** [1] - 49:22
**kept** [1] - 63:11
**Kessler** [1] - 4:17
**key** [3] - 12:7, 141:10, 146:24
**Keyes** [2] - 8:10, 8:11
**killed** [1] - 167:14
**kind** [17] - 55:4, 76:9, 76:16, 78:4, 115:25, 145:22, 155:15, 168:15, 184:24, 185:1, 191:21, 194:5, 212:1, 224:6, 229:15, 230:15, 231:6
**kinds** [2] - 113:4, 228:1
**Klonopin** [1] - 184:10
**knowing** [1] - 231:17
**knowledge** [11] - 10:6, 16:15, 17:14, 51:20, 63:8, 77:17, 101:25, 109:8, 140:13, 188:11, 233:16
**known** [3] - 24:21, 212:11, 224:16
**KOUBA** [1] - 3:14

**L**

**LA** [1] - 3:8
**lab** [1] - 172:23
**labeled** [2] - 54:14, 135:13
**laboratories** [1] - 172:25
**Lacey** [1] - 8:10
**lack** [2] - 203:2, 219:7
**laid** [5] - 17:2, 17:3, 64:1, 194:3, 205:22
**language** [2] - 60:1, 141:15
**Lanier** [1] - 3:4
**large** [7] - 17:10, 64:8, 85:22, 171:15, 181:25, 182:1, 212:25
**larger** [5] - 68:15, 73:5, 77:13, 107:3, 146:8
**largest** [2] - 49:18, 107:4
**last** [22] - 11:1, 11:9, 20:20, 21:4, 51:1, 68:4, 99:4, 124:13,

130:13, 136:22, 157:13, 160:8, 160:25, 164:5, 184:1, 206:16, 206:24, 210:22, 210:23, 211:6, 227:1
**late** [7] - 8:22, 10:18, 147:12, 164:3, 171:15, 176:10, 212:21
**late-90s** [1] - 169:24
**latter** [1] - 110:20
**launched** [1] - 183:24
**LAURA** [1] - 5:10
**Law** [4] - 3:4, 3:7, 3:12, 166:24
**law** [19] - 134:23, 166:12, 166:13, 166:15, 166:24, 167:8, 168:3, 172:25, 173:6, 173:13, 180:10, 180:16, 186:18, 188:21, 199:17, 199:18, 224:4, 224:8, 233:10
**lawyers'** [1] - 119:19
**lay** [2] - 163:17, 164:1
**laying** [1] - 198:21
**LBHC** [1] - 143:13
**lead** [5] - 18:6, 81:23, 197:25, 222:17, 226:4
**leader** [1] - 93:23
**leaders** [5] - 136:16, 136:19, 136:20, 136:24, 141:11
**leadership** [2] - 94:8, 100:7
**leading** [2] - 30:13, 221:4
**leads** [1] - 49:6
**learned** [3] - 9:12, 104:17, 119:18
**least** [5] - 44:17, 51:23, 59:11, 96:25, 121:19
**leave** [5] - 127:6, 158:5, 158:7, 182:2
**leaves** [1] - 117:15
**leaving** [1] - 175:9
**led** [1] - 94:5
**Lee** [1] - 3:12
**left** [13] - 18:6, 24:2, 24:4, 25:14, 28:2, 99:15, 135:5, 137:22, 138:5, 142:2, 171:23, 175:12, 184:1
**left-handed** [1] - 28:2

**legal** [3] - 232:7, 232:9, 233:7
**legislative** [1] - 86:3
**legitimate** [4] - 213:4, 213:7, 213:8, 214:16
**length** [17] - 116:3, 116:11, 124:14, 124:17, 124:23, 125:10, 125:12, 125:16, 125:20, 125:24, 126:3, 126:9, 126:15, 126:20, 126:21, 126:25
**lengthy** [2] - 93:3, 109:4
**Leon** [2] - 2:4, 2:16
**less** [12] - 51:14, 58:6, 65:24, 72:21, 83:25, 90:18, 90:20, 91:1, 107:5, 116:7, 116:15, 120:14
**lesser** [1] - 116:24
**lesson** [1] - 225:25
**letter** [3] - 112:17, 112:18, 162:19
**letters** [3] - 182:16, 233:19, 233:21
**level** [20] - 31:3, 46:12, 46:13, 48:16, 55:17, 58:3, 78:14, 86:17, 87:6, 87:16, 115:18, 116:23, 123:18, 124:8, 168:10, 175:1, 175:2, 177:1, 177:19, 179:13
**levels** [4] - 30:15, 30:23, 44:12, 117:19
**Levin** [1] - 2:12
**LEYIMU** [1] - 4:8
**liaison** [6] - 172:24, 173:1, 173:11, 173:13, 173:14, 197:23
**library** [1] - 166:19
**License** [1] - 87:5
**licensed** [3] - 143:13, 145:2, 146:5
**lieu** [1] - 230:16
**life** [4] - 57:21, 59:2, 59:4, 215:20
**lifespan** [2] - 132:19, 133:6
**lifetime** [1] - 58:21
**light** [1] - 211:8
**likely** [4] - 44:1, 96:7, 96:12, 116:15
**Lily's** [18] - 82:24, 83:4, 83:6, 83:24, 84:2, 84:7, 84:12,

85:1, 85:3, 85:6, 85:14, 85:17, 85:20, 86:6, 142:6, 149:22, 149:23, 150:3
**Limit** [5] - 227:20, 228:3, 229:3, 229:11, 230:2
**limit** [3] - 131:6, 229:21, 230:7
**limitation** [3] - 77:14, 108:16, 139:17
**limitations** [2] - 73:6, 108:23
**limited** [12] - 21:17, 72:23, 73:11, 76:24, 125:8, 125:13, 130:17, 179:10, 179:18, 191:24, 206:17, 222:1
**Linda** [1] - 158:14
**LINDA** [1] - 4:5
**linda** [1] - 158:18
**line** [9] - 67:19, 89:21, 91:15, 135:24, 136:9, 141:12, 226:10, 230:25
**lines** [1] - 20:25
**Lines** [1] - 52:10
**Lisa** [2] - 6:18, 235:3
**list** [12] - 7:24, 8:14, 9:22, 27:25, 43:16, 80:24, 83:17, 122:13, 128:22, 141:20, 147:25, 149:6
**listed** [18] - 27:16, 29:18, 29:25, 35:25, 37:22, 38:14, 39:10, 44:4, 46:15, 46:16, 46:25, 101:18, 114:1, 115:3, 122:8, 142:2, 154:8, 172:23
**listing** [4] - 43:23, 46:3, 128:17, 135:22
**lists** [8] - 27:2, 43:17, 43:23, 72:6, 77:6, 102:25, 109:21, 140:18
**literally** [1] - 112:10
**litigation** [1] - 137:4
**live** [5] - 84:8, 84:20, 84:24, 85:4, 86:7
**lives** [2] - 31:14, 81:23
**LLC** [1] - 2:4
**load** [1] - 53:6
**loan** [1] - 146:6
**lobby** [1] - 148:2
**local** [3] - 19:10, 30:15, 30:22
**localized** [1] - 169:21

**locally** [1] - 170:22
**located** [2] - 9:13, 93:20
**location** [6] - 44:18, 75:24, 81:3, 81:4, 81:7, 93:18
**locations** [3] - 81:2, 81:5, 81:6
**Logan** [2] - 6:5, 6:12
**logic** [1] - 108:3
**long-term** [20] - 57:21, 59:2, 59:6, 68:5, 68:8, 68:23, 69:2, 94:10, 95:17, 117:10, 117:19, 126:16, 130:16, 133:17, 133:19, 134:3, 143:5, 146:20, 146:22, 146:24
**longitudinal** [1] - 133:11
**look** [69] - 18:24, 19:22, 25:23, 31:11, 40:1, 40:9, 41:8, 42:15, 43:15, 43:23, 48:12, 49:5, 53:24, 54:22, 55:10, 58:11, 58:22, 60:8, 60:10, 60:13, 64:13, 65:11, 65:13, 67:18, 67:23, 70:22, 71:2, 71:10, 72:6, 72:10, 73:21, 74:10, 75:9, 76:21, 77:4, 83:22, 86:24, 90:20, 91:22, 93:8, 93:11, 94:20, 95:7, 102:24, 103:21, 104:6, 109:15, 110:4, 121:4, 123:14, 124:10, 127:13, 128:12, 129:14, 131:14, 132:3, 147:16, 174:13, 178:21, 185:25, 200:6, 210:8, 210:22, 216:1, 216:5, 218:10, 231:16
**looked** [2] - 108:5, 167:13
**looking** [16] - 31:7, 31:17, 38:14, 48:13, 90:18, 103:14, 130:1, 130:11, 134:5, 134:16, 148:18, 169:9, 171:18, 184:17, 185:12, 231:5
**Looking** [1] - 213:17

**looks** [1] - 230:11
**LOS** [2] - 124:14
**lose** [2] - 113:13, 123:2
**losing** [1] - 181:17
**loud** [1] - 207:1
**loved** [1] - 181:17
**low** [3] - 72:1, 72:8, 108:18
**lunch** [2] - 119:15, 123:5

## M

**ma'am** [21] - 158:17, 162:8, 162:10, 162:17, 162:23, 163:1, 163:3, 163:6, 167:3, 169:3, 174:12, 174:15, 176:12, 176:16, 177:14, 181:22, 184:6, 187:11, 202:11, 206:21, 208:19
**Magazine** [1] - 3:7
**MAHADY** [2] - 6:4, 157:18
**Mahady** [2] - 137:7, 137:8, 157:17
**mail** [5] - 128:3, 128:4, 128:7, 128:12, 128:13
**mailing** [1] - 192:24
**main** [1] - 18:13
**MAINIGI** [1] - 4:12
**maintain** [8] - 46:7, 46:13, 95:18, 97:2, 117:18, 178:13, 178:16, 213:23
**maintained** [1] - 175:6
**maintaining** [2] - 180:4, 214:7
**maintains** [1] - 141:4
**maintenance** [1] - 59:1
**MAJESTRO** [2] - 2:6, 121:2
**Majestro** [2] - 2:6, 121:1
**major** [5] - 140:8, 166:8, 167:1, 172:22, 177:3
**Major** [1] - 29:8
**majority** [6] - 40:21, 41:5, 42:23, 58:7, 154:8, 176:25
**management** [3] - 33:20, 79:18, 79:19
**managers** [2] - 210:15

**manifested** [1] - 25:3
**manner** [2] - 168:24, 183:21
**manufacturers** [4] - 175:17, 177:7, 178:22, 183:1
**Manufacturers** [1] - 178:8
**manufacturing** [2] - 175:1, 177:18
**map** [3] - 163:13, 174:2, 181:19
**Mapes** [5] - 197:21, 201:1, 207:22, 210:24
**MARC** [22] - 69:23, 70:16, 70:24, 71:3, 71:14, 72:10, 72:16, 72:24, 73:14, 74:6, 74:20, 74:24, 76:12, 76:13, 142:6, 148:6, 148:20, 148:23, 149:12, 149:24
**MARC's** [1] - 73:19
**March** [5] - 51:22, 52:3, 53:16, 53:18, 165:3
**MARK** [1] - 3:16
**mark** [1] - 123:1
**marked** [14] - 14:16, 23:1, 29:5, 37:15, 43:6, 50:14, 62:22, 74:4, 81:15, 95:11, 101:9, 123:6, 128:3, 131:20
**market** [4] - 59:18, 177:20, 181:2, 181:11
**marketing** [2] - 8:2, 12:8
**marketplace** [4] - 175:10, 177:23, 181:11, 182:2
**Marshall** [64] - 13:17, 14:18, 15:3, 15:7, 15:14, 15:19, 15:21, 15:24, 16:2, 16:5, 16:8, 17:8, 17:18, 18:12, 21:20, 21:21, 21:23, 22:1, 22:5, 22:6, 22:7, 22:8, 22:11, 22:12, 22:14, 22:18, 22:20, 26:6, 27:9, 27:12, 29:7, 29:13, 29:17, 29:19, 29:21, 30:1, 30:4, 30:7, 31:25, 32:19, 36:2, 36:13, 38:7, 69:5, 69:10, 70:7, 70:16, 74:6, 87:4,

88:20, 88:23, 93:4, 100:6, 112:18, 140:15, 140:20, 141:4, 145:3
**Mary's** [7] - 32:1, 32:19, 61:3, 61:8, 99:8, 99:16, 114:18
**MAT** [25] - 34:15, 34:19, 34:21, 35:12, 36:8, 40:22, 41:6, 41:9, 41:14, 45:2, 45:4, 45:10, 45:16, 47:10, 47:13, 56:9, 56:13, 70:14, 73:5, 103:23, 103:25, 114:5, 114:23, 122:11, 132:11
**MAT-based** [1] - 70:14
**match** [4] - 154:23, 154:25, 155:6, 155:12
**matched** [5] - 154:21, 155:8, 155:10, 155:11, 155:14
**material** [2] - 198:9, 211:4
**materials** [10] - 17:14, 160:8, 197:4, 198:10, 199:9, 199:12, 199:14, 199:16, 199:17, 211:1
**Maternal** [3] - 69:20, 75:2, 148:7
**maternal** [1] - 70:11
**math** [1] - 52:4
**Matt** [1] - 141:6
**matter** [6] - 119:7, 122:2, 222:1, 226:4, 227:8, 235:5
**matters** [1] - 16:16
**maximum** [1] - 130:22
**Mayor** [5] - 24:5, 24:8, 24:10, 24:12, 51:3
**mayor** [2] - 51:2, 141:14
**mayor's** [1] - 141:13
**MC** [2] - 14:17, 43:6
**MC-2136** [2] - 48:13, 54:5
**MC-West** [2] - 14:17, 43:6
**MC-WV-02134** [1] - 16:20
**MC-WV-2126** [1] - 123:6
**MCCLURE** [8] - 6:3, 7:10, 7:14, 10:2, 11:5, 11:25, 12:6, 12:14

**MCGINNESS** [1] - 4:2
**McKesson** [12] - 5:8, 185:17, 196:21, 207:10, 207:18, 208:5, 210:18, 210:25, 211:3, 213:10, 230:19, 231:5
**MCL** [1] - 59:25
**MCWV-2119** [1] - 74:5
**MCWV-2130** [1] - 95:12
**MCWV-2135** [1] - 101:10
**MCWV-2139** [1] - 54:14
**MCWV-2167** [1] - 81:16
**MDL** [3] - 160:3, 160:20, 226:19
**mean** [19] - 44:8, 47:1, 57:1, 66:19, 83:10, 89:23, 93:13, 105:2, 106:4, 111:6, 114:1, 129:8, 155:14, 174:21, 183:21, 193:11, 203:10, 214:20, 220:17
**meaning** [4] - 12:2, 146:13, 165:24, 212:6
**means** [14] - 43:24, 47:2, 68:14, 72:11, 72:18, 72:22, 87:13, 92:1, 106:11, 106:25, 124:14, 127:9, 127:11, 195:17
**meant** [3] - 36:6, 37:3, 131:11
**measuring** [3] - 57:14, 96:13, 96:17
**mechanical** [2] - 6:19, 62:25, 66:20
**median** [11] - 124:14, 124:17, 124:23, 125:16, 125:24, 126:3, 126:9, 126:15, 126:21, 126:25
**Medicaid** [19] - 49:7, 49:11, 49:22, 60:2, 73:15, 74:14, 79:3, 82:14, 92:2, 110:7, 110:8, 111:3, 111:7, 112:9, 115:11, 144:4, 144:12, 146:2, 146:17
**medical** [19] - 21:23, 30:6, 33:2, 68:17,

86:4, 89:18, 89:21, 89:22, 89:23, 89:24, 98:14, 105:7, 105:22, 142:7, 142:11, 142:14, 186:17, 213:4, 213:8
**Medical** [6] - 32:1, 32:20, 61:3, 61:8, 75:2, 88:22
**Medicare** [1] - 49:21
**medicated** [8] - 36:10, 59:14, 59:22, 60:6, 115:17, 124:19, 124:24
**medication** [33] - 33:9, 34:15, 34:17, 34:19, 36:9, 45:18, 48:20, 57:5, 58:5, 58:18, 58:20, 59:7, 59:10, 59:17, 60:7, 70:17, 72:20, 73:16, 76:23, 77:2, 77:13, 78:5, 79:4, 80:21, 105:13, 105:17, 114:12, 116:8, 116:9, 125:17, 125:21, 125:25, 142:17
**Medication** [1] - 34:22
**medication-assisted** [3] - 33:9, 34:15, 45:18
**Medication-assisted** [1] - 34:22
**medication-based** [2] - 34:19, 36:9
**medications** [1] - 41:18
**Medicine** [29] - 14:18, 15:4, 15:7, 15:8, 15:12, 15:14, 15:17, 15:19, 15:21, 15:24, 17:8, 17:11, 17:18, 18:12, 22:2, 22:6, 22:7, 22:11, 22:15, 29:8, 29:14, 29:21, 30:1, 30:6, 34:12, 36:2, 44:11, 87:14, 88:24
**medicine** [2] - 45:11, 141:7
**meet** [7] - 45:1, 45:19, 87:11, 88:8, 88:13, 101:3, 140:10
**meeting** [27] - 45:20, 136:14, 136:21, 136:22, 136:24, 139:7, 139:12, 145:10, 145:11, 196:18, 196:21, 196:25, 197:3,

197:5, 197:24, 197:25, 198:7, 200:13, 200:20, 200:22, 204:21, 204:22, 205:1, 206:6, 208:1, 209:6, 230:13
**meetings** [13] - 100:14, 136:8, 136:11, 196:4, 196:7, 196:12, 196:16, 196:23, 197:7, 198:11, 206:19, 209:17, 210:4
**members** [1] - 110:21
**memo** [15] - 197:9, 197:24, 198:7, 200:20, 200:23, 201:13, 202:9, 207:8, 207:11, 207:12, 207:19, 207:23, 207:24, 208:2
**memorandum** [1] - 208:21
**memory** [1] - 52:2
**memos** [5] - 203:6, 206:5, 209:4, 209:16, 209:22
**men** [1] - 80:15
**men's** [2] - 80:14, 80:17
**Mental** [3] - 90:12, 104:11, 118:13
**mental** [10] - 46:15, 46:18, 46:21, 73:7, 77:16, 79:23, 94:5, 112:4, 124:9, 139:15
**mentioned** [13] - 47:16, 59:14, 86:6, 95:24, 130:18, 142:19, 144:1, 167:19, 184:3, 184:14, 187:17, 198:1, 210:12
**menu** [3] - 36:6, 111:19, 111:21
**mercifully** [1] - 155:23
**MERCK** [5] - 102:14, 102:16, 103:4, 103:11, 138:14
**mercy** [1] - 171:5
**Meritorious** [1] - 173:20
**met** [6] - 87:15, 150:10, 196:6, 205:9, 205:11, 230:14
**Methadone** [3] -

114:8, 114:23, 122:11
**methamphetamine** [2] - 42:12, 168:22
**methods** [2] - 182:22, 192:13
**mic** [1] - 158:24
**MICHAEL** [2] - 2:15, 3:9
**Michael** [2] - 201:1, 207:22
**Michigan** [1] - 166:25
**microphone** [1] - 12:9
**mid** [4] - 169:24, 171:15, 177:1, 212:21
**mid-2000s** [1] - 170:15
**mid-90s** [1] - 169:21
**mid-level** [1] - 177:1
**middle** [1] - 104:7
**might** [21] - 52:18, 52:19, 57:11, 58:12, 59:15, 84:14, 84:19, 90:18, 105:19, 113:9, 116:19, 117:23, 118:4, 118:5, 119:6, 142:3, 143:25, 148:15, 195:21, 212:14
**Mike** [1] - 197:21
**mild** [1] - 181:12
**MILDRED** [1] - 3:3
**military** [2] - 172:2, 184:1
**mill** [1] - 184:22
**million** [22] - 19:24, 20:6, 20:15, 21:6, 21:14, 60:20, 61:7, 61:9, 61:14, 90:3, 91:3, 137:21, 137:23, 152:25, 153:6, 153:11, 153:17, 156:9, 156:14, 156:22, 157:11, 176:22
**million-dollar** [4] - 152:25, 153:6, 153:11, 153:17
**millions** [1] - 185:7
**mind** [1] - 117:15
**mine** [2] - 65:15, 66:15
**minute** [5] - 11:9, 164:14, 179:14, 198:15, 223:1
**minutes** [7] - 45:22, 47:24, 48:1, 109:12, 120:15, 176:2, 183:11
**misleading** [1] - 226:9
**misread** [1] - 41:1

**Missoula** [2] - 9:13, 9:14
**misuse** [6] - 105:1, 105:4, 105:11, 105:14, 105:19, 117:4
**misusing** [1] - 105:23
**Mitchell** [1] - 2:12
**mix** [4] - 11:10, 49:5, 49:6, 49:22
**Mix** [1] - 48:14
**model** [5] - 94:19, 98:19, 99:2, 99:3, 103:10
**moderate** [5] - 71:18, 71:25, 72:8, 72:10, 77:7
**Mohr** [7] - 8:3, 8:14, 8:19, 9:11, 9:12, 9:13
**Mohr's** [1] - 9:15
**Mom** [4] - 88:7, 88:8, 88:9, 149:16
**Mom's** [1] - 150:2
**moment** [4] - 50:17, 60:12, 150:12, 210:17
**MOMS** [18] - 75:5, 75:18, 75:21, 76:5, 76:11, 76:14, 76:16, 76:18, 77:6, 77:17, 78:22, 79:3, 79:6, 79:9, 142:6, 148:20, 149:5, 149:18
**Monday** [5] - 7:19, 7:22, 11:1, 11:3, 11:6
**money** [20] - 113:12, 131:8, 135:10, 135:17, 137:21, 137:22, 147:3, 147:4, 147:5, 151:2, 151:4, 151:5, 151:8, 151:9, 151:15, 152:22, 155:13, 156:12, 156:17, 156:18
**monies** [1] - 137:18
**monitor** [1] - 70:19
**Monitoring** [1] - 180:18
**Montana** [1] - 9:13
**month** [6] - 44:16, 59:15, 192:8, 197:13, 228:7, 229:13
**monthly** [10] - 35:5, 45:6, 45:8, 117:6, 228:7, 229:5, 229:24, 230:12,

231:22
**Moore** [4] - 211:18, 212:11, 213:6
**morning** [9] - 7:6, 9:19, 11:24, 12:22, 12:23, 13:4, 13:8, 13:9, 234:4
**morphine** [2] - 212:22, 212:23
**Morris** [1] - 6:15
**mortar** [5] - 185:6, 191:18, 191:22, 191:23, 193:8
**mosaic** [2] - 99:2, 99:3
**most** [16] - 34:22, 38:19, 41:18, 45:2, 48:7, 49:14, 60:4, 60:5, 73:15, 74:13, 88:1, 92:15, 127:5, 140:7, 151:11, 222:24
**Most** [1] - 44:1
**mostly** [3] - 40:22, 94:22, 167:11
**mother** [4] - 76:6, 88:5, 88:14, 88:17
**mothers** [10] - 77:1, 78:3, 78:9, 83:5, 84:8, 84:20, 84:24, 85:4, 86:7, 87:18
**motion** [3] - 160:18, 221:22, 222:1
**Motley** [5] - 2:9, 3:14, 4:3, 4:5, 4:8
**MOUGEY** [1] - 2:12
**move** [20] - 16:19, 17:24, 25:1, 54:4, 63:18, 94:6, 102:18, 121:13, 122:2, 166:12, 167:20, 171:10, 172:3, 179:17, 189:10, 194:23, 201:2, 207:3, 208:7, 218:25
**moved** [8] - 25:7, 28:21, 99:16, 99:18, 139:20, 141:2, 168:6, 190:14
**movements** [1] - 137:2
**moving** [3] - 146:4, 170:25, 214:14
**MR** [192] - 2:3, 2:6, 2:9, 2:12, 2:15, 3:9, 3:11, 3:16, 4:17, 5:9, 5:10, 5:13, 6:4, 9:3, 9:7, 10:21, 11:20, 12:20, 13:4, 13:7, 14:3, 14:13, 14:15, 16:19, 16:24, 17:6,

17:24, 18:3, 22:23, 22:25, 25:1, 25:8, 25:11, 25:20, 25:23, 26:3, 29:2, 29:4, 37:10, 37:13, 43:3, 43:4, 47:22, 47:25, 48:2, 48:5, 48:6, 50:9, 50:12, 53:25, 54:3, 54:12, 62:20, 62:21, 63:18, 64:3, 64:5, 64:9, 64:20, 64:23, 65:1, 66:10, 66:15, 66:17, 66:19, 66:21, 66:22, 67:2, 67:5, 67:9, 67:11, 67:16, 69:25, 70:1, 73:22, 73:25, 74:3, 75:13, 75:15, 75:17, 81:11, 81:14, 89:1, 89:6, 89:9, 95:8, 95:10, 100:23, 100:24, 101:6, 101:8, 102:18, 102:23, 107:19, 107:21, 107:24, 108:1, 119:3, 119:8, 119:12, 119:20, 120:2, 120:5, 121:2, 121:12, 121:18, 121:20, 121:23, 121:24, 122:25, 123:4, 127:24, 128:1, 131:16, 131:18, 131:19, 131:25, 132:2, 134:18, 141:21, 150:17, 150:19, 150:22, 155:18, 155:24, 156:2, 157:15, 157:18, 159:19, 159:25, 164:4, 164:9, 164:15, 164:19, 164:23, 179:15, 188:17, 188:19, 189:11, 189:16, 189:23, 190:13, 190:19, 191:6, 193:10, 193:24, 194:8, 194:10, 194:20, 195:3, 195:12, 195:22, 195:25, 198:13, 198:23, 198:25, 201:7, 201:18, 202:4, 203:5, 203:13, 204:13, 204:23, 208:9, 208:15, 209:8, 209:13, 211:5, 211:12, 211:23,

217:2, 217:3, 218:24, 220:6, 220:15, 221:5, 222:7, 222:14, 223:13, 223:17, 224:3, 224:14, 224:22, 226:8, 226:13, 228:14, 228:19, 230:17, 230:21, 232:6, 232:23, 233:1
**MS** [144] - 3:3, 3:6, 3:14, 4:2, 4:5, 4:8, 4:12, 4:12, 4:15, 5:3, 5:4, 5:10, 6:3, 6:7, 6:14, 7:9, 7:10, 7:14, 10:2, 11:5, 11:25, 12:6, 12:14, 14:5, 14:10, 14:12, 16:22, 17:1, 25:5, 25:9, 25:19, 26:1, 54:10, 63:21, 63:25, 75:11, 102:21, 119:14, 134:21, 134:25, 135:3, 141:18, 141:23, 141:25, 150:12, 150:15, 155:23, 158:12, 158:14, 158:18, 158:25, 159:2, 159:4, 159:23, 160:15, 161:7, 161:21, 161:25, 162:11, 162:14, 163:12, 163:14, 164:7, 164:11, 164:22, 164:24, 171:5, 171:8, 174:6, 174:8, 176:7, 179:20, 179:25, 180:1, 185:20, 185:22, 188:4, 188:12, 189:3, 189:6, 189:9, 189:17, 191:15, 193:15, 194:21, 196:1, 198:17, 199:4, 199:7, 199:23, 200:2, 201:2, 201:3, 201:12, 202:7, 202:23, 202:25, 203:12, 203:25, 204:3, 204:10, 204:18, 205:2, 205:5, 205:21, 206:2, 206:10, 206:22, 207:2, 208:7, 208:16, 208:25, 209:2, 209:10, 209:12,

209:19, 210:20, 210:21, 211:7, 211:14, 212:4, 212:16, 216:7, 216:23, 217:5, 221:12, 222:23, 225:22, 226:2, 227:3, 227:13, 227:16, 228:12, 228:16, 228:21, 229:6, 230:23, 231:3, 232:10, 232:12, 232:14, 233:5, 233:12, 234:1
**Mt** [3] - 3:15, 4:4, 4:9
**multi** [1] - 212:23
**multi-grain** [1] - 212:23
**multiple** [11] - 134:2, 139:19, 140:9, 153:7, 156:4, 156:6, 156:24, 157:2, 157:13, 166:18, 181:7
**multiplicity** [1] - 40:17
**multiplying** [1] - 56:17
**museum** [1] - 166:19
**must** [4] - 87:15, 178:16, 182:7, 214:16

## N

**naloxone** [1] - 181:14
**Naloxone** [1] - 76:25
**Naltrexone** [1] - 35:2
**name** [8] - 34:23, 101:18, 125:10, 158:16, 161:12, 162:3, 184:7, 186:9
**names** [1] - 140:3
**Narcan** [2] - 153:25, 155:10
**Narcotics** [1] - 173:24
**narcotics** [5] - 166:13, 166:15, 167:8, 173:10, 173:25
**narrow** [1] - 46:10
**NAS** [14] - 76:2, 76:7, 77:1, 77:23, 83:5, 83:11, 84:7, 84:19, 88:11, 114:2, 132:23, 133:2, 133:13, 133:14
**natal** [1] - 133:16
**nation** [1] - 19:3
**national** [4] - 116:6, 116:21, 123:18, 141:16
**National** [2] - 173:22,

173:24
**nationally** [1] - 126:20
**nationwide** [1] - 170:25
**native** [2] - 62:25, 64:16
**nature** [2] - 24:24, 224:7
**near** [1] - 215:4
**nearly** [1] - 26:16
**necessarily** [5] - 20:12, 118:4, 129:6, 154:1, 229:3
**necessary** [9] - 40:3, 70:19, 117:21, 121:17, 133:19, 147:20, 148:4, 149:2, 149:20
**need** [41] - 13:22, 25:15, 26:5, 45:16, 45:19, 45:20, 46:11, 46:12, 58:3, 58:19, 94:15, 110:2, 116:11, 117:19, 120:25, 121:5, 121:9, 130:25, 139:19, 144:14, 145:16, 146:10, 147:24, 149:19, 149:23, 149:24, 150:8, 150:10, 152:17, 160:7, 171:2, 175:23, 177:17, 177:19, 179:8, 180:14, 180:20, 205:24, 216:5, 231:23, 231:24
**needed** [8] - 131:9, 148:2, 150:3, 168:2, 172:2, 182:2, 182:3, 210:25
**needing** [1] - 70:15
**needles** [1] - 153:24
**needs** [12] - 26:15, 98:6, 115:19, 115:25, 116:3, 133:11, 135:10, 149:11, 163:10, 231:21
**negative** [1] - 145:18
**neighbor** [1] - 31:15
**neighborhood** [1] - 167:11
**neonatal** [1] - 83:7
**Neonatal** [8] - 29:15, 30:2, 76:3, 78:2, 78:16, 78:18, 83:19, 148:25
**neonatally** [2] - 133:4,

133:7
**net** [1] - 65:23
**never** [11] - 50:17, 52:21, 56:15, 58:10, 68:20, 104:16, 117:21, 142:23, 147:3, 156:8, 217:13
**new** [11] - 18:12, 19:25, 35:7, 51:6, 88:5, 89:2, 94:14, 139:9, 141:15, 226:15, 226:16
**New** [2] - 3:5, 3:8
**newborn** [1] - 88:18
**newest** [1] - 141:6
**newspaper** [1] - 50:15
**next** [37] - 8:20, 8:21, 10:12, 11:16, 20:10, 26:14, 36:19, 41:8, 44:4, 46:15, 46:24, 49:14, 49:18, 49:24, 51:1, 51:8, 55:23, 75:1, 95:3, 103:21, 104:20, 106:9, 121:4, 126:15, 129:1, 130:4, 144:20, 149:6, 174:4, 181:19, 193:23, 195:21, 214:14, 215:21, 218:3, 218:4
**Nicholas** [2] - 191:5, 224:21
**NICHOLAS** [15] - 6:11, 189:16, 191:6, 193:10, 203:13, 209:13, 217:3, 220:15, 222:7, 223:13, 224:22, 226:8, 230:21, 232:6, 233:1
**NICU** [2] - 78:17, 148:25
**night** [2] - 160:8, 164:5
**nine** [2] - 57:18, 57:19
**Ninth** [1] - 4:6
**ninth** [2] - 11:9, 11:21
**no-longer-remaining** [1] - 46:23
**nomenclature** [1] - 15:11
**non** [14] - 36:10, 42:8, 83:7, 85:6, 86:4, 116:8, 168:11, 168:14, 187:22, 188:23, 191:4, 194:24, 196:3, 201:24
**non-controlled** [1] -

187:22
**non-diversion** [2] - 168:11, 168:14
**non-hearsay** [2] - 191:4, 201:24
**non-hospital** [2] - 83:7, 86:4
**non-medicated** [1] - 36:10
**non-medication** [1] - 116:8
**non-opioids** [1] - 42:8
**non-profit** [1] - 85:6
**non-public** [3] - 188:23, 194:24, 196:3
**none** [7] - 32:11, 32:22, 111:4, 115:3, 115:7, 145:20
**norm** [1] - 58:13
**normal** [2] - 170:8, 170:12
**normally** [4] - 44:17, 72:24, 77:18, 153:14
**nose** [1] - 219:6
**note** [7] - 10:25, 37:22, 64:18, 66:11, 121:14, 160:17, 189:18
**noted** [1] - 139:17
**nothing** [2] - 175:9, 217:12
**notice** [14] - 7:16, 8:7, 8:17, 8:24, 8:25, 9:21, 10:18, 11:2, 11:4, 11:11, 12:3, 12:6, 183:7, 201:24
**noticed** [3] - 64:11, 169:12, 169:18
**notwithstanding** [2] - 190:13, 190:14
**nowhere** [1] - 147:23
**NTU** [4] - 76:20, 149:15, 149:17, 149:23
**number** [39] - 27:16, 27:22, 29:13, 40:11, 40:12, 40:13, 40:18, 42:6, 50:6, 51:12, 51:14, 51:19, 52:5, 53:14, 53:20, 57:6, 64:7, 65:21, 66:11, 71:11, 72:24, 73:12, 84:13, 85:22, 90:8, 96:15, 97:20, 103:23, 115:14, 136:7, 170:6, 171:22, 175:4, 178:20, 191:7, 191:10, 197:22,

213:14
**Number** [4] - 40:15, 206:12, 206:14, 217:21
**numbers** [37] - 18:6, 24:2, 24:3, 25:14, 25:17, 25:18, 25:24, 25:25, 40:17, 43:15, 49:24, 54:22, 60:16, 64:14, 64:24, 66:6, 66:25, 67:1, 67:25, 68:2, 70:23, 75:16, 89:11, 90:17, 93:14, 97:19, 106:16, 108:24, 109:19, 123:17, 124:11, 132:4, 135:6, 169:12, 169:23, 171:1
**numerous** [1] - 186:14
**nurse** [1] - 76:22
**nursery** [1] - 83:25
**nurses** [1] - 175:20
**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

## O

**O'Connell** [66] - 7:7, 7:12, 8:9, 12:22, 13:8, 13:10, 14:16, 14:21, 18:5, 20:14, 23:1, 27:23, 27:25, 28:6, 29:5, 37:2, 37:14, 37:18, 43:5, 43:8, 48:7, 50:1, 50:13, 50:16, 51:22, 54:7, 54:13, 54:16, 60:11, 62:22, 63:2, 65:2, 65:19, 65:21, 67:17, 68:1, 70:3, 74:4, 75:7, 81:15, 89:10, 95:11, 97:25, 101:9, 102:25, 113:23, 115:14, 121:10, 121:14, 121:25, 123:5, 123:8, 128:2, 131:20, 134:19, 135:4, 135:21, 140:18, 142:1, 147:10, 150:6, 150:23, 151:1, 155:18, 155:22, 157:23
**oar** [1] - 204:12
**oath** [2] - 12:25, 161:10
**OB/GYN** [2] - 70:7,

70:16
**object** [18] - 8:16,
16:22, 63:21, 160:7,
188:7, 189:11,
189:22, 190:3,
193:10, 193:11,
198:23, 201:3,
204:19, 212:1,
216:25, 224:13,
226:8, 228:12
**Object** [1] - 211:5
**objected** [2] - 198:20,
202:21
**objecting** [3] - 195:12,
203:14, 228:17
**objection** [48] - 8:19,
8:22, 10:13, 16:21,
25:4, 25:9, 54:8,
63:20, 102:20,
107:19, 189:1,
189:16, 189:24,
190:11, 191:13,
193:23, 194:7,
195:13, 195:16,
198:16, 198:22,
201:10, 202:5,
203:7, 203:17,
203:24, 206:8,
206:23, 206:25,
208:9, 209:14,
209:18, 212:14,
217:4, 220:6, 221:2,
223:25, 224:10,
225:13, 225:18,
227:2, 228:23,
230:21, 230:23,
230:24, 231:2,
232:6, 233:11
**Objection** [5] -
198:13, 209:8,
211:13, 211:23,
230:17
**objectionable** [1] -
160:9
**objections** [1] -
159:16
**objective** [3] - 100:10,
100:13, 130:9
**objectives** [2] - 87:15,
139:8
**obligated** [2] - 7:16,
8:7
**obligation** [5] - 12:14,
178:13, 213:2,
213:8, 223:7
**obligations** [8] -
178:5, 178:7, 178:9,
181:21, 182:5,
182:6, 196:8, 202:18
**observe** [3] - 169:1,

181:5, 181:8
**observed** [2] - 169:5,
181:10
**obstetrics** [1] - 70:8
**obtain** [3] - 131:2,
180:19, 225:5
**obtained** [1] - 168:5
**obtaining** [2] - 223:16,
225:6
**obviously** [2] -
184:17, 231:15
**occur** [2] - 114:10,
150:4
**occurred** [2] - 196:25,
200:20
**occurring** [1] - 123:20
**October** [4] - 41:10,
151:23, 165:3,
207:12
**ODCP** [3] - 140:25,
141:6, 141:7
**OF** [2] - 1:1, 1:4
**offer** [2] - 80:8, 88:22
**offered** [8] - 33:18,
34:20, 70:16, 77:2,
132:12, 190:25,
191:4, 201:24
**offering** [4] - 160:19,
163:2, 232:7, 232:9
**offers** [4] - 79:15,
80:6, 80:12, 80:21
**Office** [14] - 140:21,
140:22, 140:25,
141:3, 159:15,
159:20, 165:7,
165:12, 169:7,
171:22, 172:4,
172:7, 173:24,
197:11
**office** [10] - 103:23,
114:7, 114:8, 114:9,
114:14, 171:25,
187:7, 197:10,
201:20, 231:10
**office's** [2] - 190:24,
201:21
**office-based** [1] -
103:23
**officer** [2] - 167:13,
173:25
**officers** [2] - 167:12,
181:13
**offices** [1] - 220:4
**Official** [2] - 235:2,
235:3
**official** [2] - 67:14,
222:24
**offset** [1] - 61:23
**often** [17] - 35:3,
44:20, 44:24, 55:9,

57:22, 59:24, 88:19,
92:13, 99:10, 117:2,
117:20, 125:8,
130:17, 138:24,
143:7, 146:7, 155:12
**oftentimes** [1] - 143:3
**Ohio** [3] - 49:22,
114:6, 114:21
**Oklahoma** [1] - 173:25
**old** [2] - 145:17,
147:13
**older** [1] - 150:7
**oldest** [1] - 79:22
**once** [9] - 44:16, 58:1,
59:15, 96:8, 96:10,
117:17, 157:20,
200:4
**one** [116] - 7:11, 9:24,
28:3, 28:9, 29:15,
34:20, 35:6, 38:13,
39:23, 42:3, 43:24,
45:1, 45:5, 45:7,
45:21, 45:22, 45:23,
46:6, 46:24, 47:15,
48:13, 50:3, 50:17,
54:5, 58:6, 58:10,
58:14, 60:11, 60:12,
64:25, 65:18, 66:24,
67:1, 67:8, 72:17,
73:11, 74:9, 79:22,
81:2, 87:21, 88:1,
89:10, 89:11, 95:15,
95:18, 96:15, 96:20,
96:22, 97:25, 99:4,
99:14, 100:4,
105:24, 111:24,
116:10, 122:2,
122:4, 128:2,
129:24, 130:1,
132:11, 132:12,
136:11, 136:22,
139:17, 140:12,
142:4, 142:19,
143:4, 143:25,
144:1, 148:12,
149:6, 152:4,
154:22, 155:24,
156:3, 156:7, 157:1,
164:9, 164:17,
164:18, 164:22,
173:7, 176:18,
176:22, 178:14,
181:24, 183:3,
186:25, 189:23,
191:7, 191:20,
192:12, 196:17,
196:19, 203:8,
204:24, 205:6,
205:20, 207:5,
207:6, 208:14,

208:25, 220:2,
222:7, 223:13,
228:7, 229:9
**One** [5] - 5:11, 28:2,
46:16, 211:15,
211:16
**one-on-one** [2] -
45:21, 140:12
**one-time** [1] - 9:24
**one-year** [1] - 96:22
**ones** [9] - 29:25,
32:12, 42:3, 94:25,
113:25, 114:4,
118:15, 181:17,
220:11
**ongoing** [1] - 94:22
**open** [6] - 61:19,
68:12, 112:13,
142:23, 172:2, 193:5
**opened** [4] - 31:24,
52:14, 53:2, 53:12
**opening** [3] - 52:13,
53:15
**operate** [3] - 32:6,
76:3, 154:13
**operates** [1] - 94:22
**operating** [3] - 32:17,
32:18, 183:21
**operation** [5] - 54:23,
55:15, 56:4, 56:14,
167:15
**Operations** [4] -
165:11, 171:24,
172:10, 172:15
**operations** [4] - 55:21,
172:14, 172:24,
203:21
**opining** [1] - 232:24,
233:6, 233:9
**opinion** [2] - 222:22,
222:23
**opinions** [2] - 163:2,
211:24
**opioid** [32] - 13:11,
19:10, 19:12, 19:14,
19:15, 33:24, 41:16,
43:20, 57:20, 78:4,
78:6, 78:8, 78:14,
103:1, 103:7,
104:22, 104:25,
105:3, 105:14,
105:23, 106:4,
106:7, 107:12,
107:16, 117:4,
124:19, 124:25,
125:17, 126:1,
162:24, 163:9
**Opioid** [17] - 19:13,
70:13, 75:2, 86:21,
104:24, 105:2,

105:4, 105:7, 105:8,
105:12, 105:15,
105:20, 105:23,
105:25, 106:5,
106:12, 114:1
**opioids** [11] - 41:20,
41:25, 42:8, 42:20,
83:14, 105:1,
105:11, 105:19,
169:2, 169:5, 181:12
**opponent** [1] - 9:1
**Opportunities** [1] -
146:16
**opportunities** [1] -
130:19
**opportunity** [4] -
136:25, 137:23,
163:11, 210:11
**options** [2] - 36:7,
36:11
**oral** [1] - 198:4
**Order** [1] - 180:17
**order** [61] - 8:16, 8:18,
10:9, 11:18, 11:22,
140:4, 191:21,
213:20, 213:22,
214:4, 214:6, 214:8,
214:9, 214:11,
214:15, 214:23,
216:1, 216:3, 216:4,
216:5, 216:11,
216:14, 216:15,
216:17, 217:7,
217:9, 217:11,
217:18, 218:12,
218:16, 218:17,
219:10, 219:18,
219:19, 219:24,
221:10, 221:19,
221:20, 226:5,
227:9, 227:11,
227:12, 228:2,
228:5, 229:23,
229:25, 230:3,
230:5, 230:8,
230:10, 230:12,
230:16, 231:8,
231:11, 232:15,
232:20, 233:8,
233:14, 233:17
**ordering** [4] - 192:7,
192:14, 216:19,
219:20
**Orders** [1] - 213:14
**orders** [42] - 161:1,
163:21, 182:18,
196:11, 213:18,
214:16, 215:17,
215:23, 215:25,
218:20, 218:25,

219:2, 219:15,
219:16, 219:17,
219:22, 219:23,
219:25, 220:1,
220:3, 220:11,
220:13, 220:17,
221:1, 221:6,
221:15, 221:25,
222:2, 222:9,
222:12, 222:16,
223:7, 223:9,
223:15, 224:6,
225:1, 225:3, 232:8,
232:25, 233:22
**Organization** [3] -
28:12, 28:14, 28:17
**organization** [10] -
17:10, 29:22, 51:7,
68:15, 85:6, 94:8,
94:9, 100:17, 109:8,
109:9
**organizations** [15] -
32:6, 32:9, 32:11,
32:23, 48:25, 51:15,
104:13, 135:23,
140:8, 186:17,
186:18, 187:6,
187:8, 190:9
**orient** [1] - 18:5
**original** [2] - 18:20,
93:19
**originally** [2] - 85:23,
144:8
**Orleans** [1] - 3:8
**Orthopedics** [1] -
22:15
**OUD** [27] - 19:10,
19:13, 19:19, 27:3,
34:2, 34:5, 34:10,
36:7, 42:4, 47:17,
71:8, 79:20, 79:25,
80:12, 80:15, 94:15,
108:9, 115:19,
115:20, 115:25,
116:3, 124:23,
132:23, 134:14,
152:6, 152:12,
152:14
**ourselves** [1] - 212:10
**outcome** [1] - 225:8
**outcomes** [4] - 54:23,
55:11, 123:24, 134:4
**outline** [1] - 163:17
**outlines** [1] - 219:18
**outlining** [2] - 129:14,
162:19
**outpatient** [38] -
33:20, 44:6, 44:8,
44:16, 44:19, 44:23,
44:25, 45:2, 45:5,

45:11, 46:6, 46:9,
47:4, 48:22, 48:24,
80:6, 115:16, 116:8,
117:20, 117:22,
117:24, 118:1,
118:4, 118:5,
124:18, 124:24,
125:17, 125:20,
125:25, 126:10,
126:22, 132:5,
133:14, 133:25,
134:7, 134:15, 167:6
**outrageous** [2] -
181:16, 185:10
**outside** [11] - 83:20,
84:4, 84:8, 84:15,
84:20, 84:24, 85:2,
160:2, 173:11,
221:3, 223:24
**outside-of-hospital-
based** [1] - 83:20
**overall** [4] - 139:18,
152:17, 172:13,
175:8
**overarching** [1] -
225:15
**overcome** [1] - 101:4
**overdose** [1] - 178:4
**overdoses** [1] -
181:16
**overdosing** [1] -
181:13
**overflow** [1] - 13:21
**overrule** [9] - 189:1,
198:15, 203:16,
203:24, 206:8,
209:18, 225:18,
227:1, 228:23
**overruled** [6] - 107:23,
188:15, 198:22,
202:6, 206:25,
211:13
**oversaw** [2] - 168:8,
173:4
**oversee** [1] - 172:22
**overseeing** [1] - 173:7
**oversees** [3] - 65:5,
124:8, 177:10
**oversight** [5] - 88:20,
177:11, 179:6,
191:21
**overwhelmed** [1] -
149:1
**OVP** [3] - 114:6,
121:14, 122:8
**own** [7] - 36:16, 124:5,
136:2, 145:17,
178:7, 188:11,
221:22
**oxycodone** [1] - 170:2

## P

**P-09112** [3] - 199:24,
207:4, 208:18
**P-09114** [1] - 199:24
**P-1200** [1] - 2:7
**P-12805** [4] - 199:24,
207:5, 208:8, 210:18
**P-14288ii** [1] - 227:14
**P-41051** [1] - 37:15
**P-44540** [2] - 185:19,
189:10
**P-9114** [1] - 201:2
**p.m** [2] - 7:19, 234:11
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**packages** [1] - 192:24
**Page** [45] - 18:4,
18:11, 18:24, 20:24,
24:1, 25:20, 25:24,
40:9, 42:15, 48:12,
49:5, 50:20, 50:25,
52:10, 54:21, 55:10,
60:15, 67:23, 70:23,
71:10, 72:5, 72:6,
75:9, 77:4, 86:25,
93:11, 94:20, 95:16,
97:18, 102:25,
103:14, 103:21,
104:7, 109:18,
110:3, 123:16,
124:10, 132:3,
139:24, 150:25,
152:3, 206:12,
206:14, 213:13,
217:20
**page** [35] - 18:10,
18:25, 25:13, 29:6,
31:22, 37:15, 38:14,
40:10, 40:20, 41:8,
43:14, 43:17, 48:14,
51:2, 54:15, 54:21,
55:11, 62:24, 67:8,
71:21, 74:10, 75:11,
76:22, 89:11, 93:14,
101:19, 103:21,
104:8, 104:20,
123:7, 124:12,
124:13, 128:3,
140:1, 148:15
**Pages** [2] - 25:12,
104:6
**pages** [3] - 109:13,
202:10, 208:2
**paid** [9] - 11:14, 12:8,
12:15, 49:11, 49:15,
86:1, 122:17, 122:21
**palliative** [1] - 215:4
**pandemic** [2] - 10:22,
11:13

**Papantonio** [1] - 2:12
**paper** [3] - 66:12,
67:10, 170:23
**paragraph** [12] - 51:2,
56:25, 76:21, 87:4,
93:15, 95:16, 98:3,
104:7, 110:5,
128:25, 210:22,
210:23
**paramount** [1] - 148:5
**pardon** [1] - 156:5
**Pardon** [1] - 156:5
**parenting** [1] - 88:9
**part** [30] - 16:2, 24:24,
36:20, 55:2, 78:22,
99:20, 109:5,
110:14, 133:5,
138:13, 138:20,
139:2, 139:10,
140:7, 141:4, 143:2,
143:16, 143:20,
152:16, 153:3,
181:15, 182:7,
183:3, 187:9, 196:2,
196:12, 198:5,
205:10
**participant** [1] - 177:9
**participants** [10] -
95:4, 175:15,
176:13, 176:15,
176:17, 178:5,
178:6, 178:18,
179:9, 179:22
**participate** [1] -
196:15
**participated** [3] -
196:17, 210:12,
210:13
**particular** [11] - 19:9,
135:6, 139:23,
140:1, 167:20,
182:20, 191:24,
199:21, 201:14,
221:18, 227:21
**particularly** [3] -
183:17, 211:8,
220:11
**parties** [5] - 7:16,
112:16, 120:6,
159:14, 226:16
**parties'** [3] - 7:14, 8:6,
8:15
**partner** [4] - 108:17,
114:6, 139:5, 139:11
**partners** [1] - 20:1
**parts** [4] - 156:4,
156:6, 189:13,
189:14
**party** [2] - 25:2, 211:7
**pass** [1] - 89:1

**passed** [1] - 167:5
**passing** [3] - 170:23,
170:24, 200:5
**past** [4] - 7:22, 7:24,
11:6, 30:13
**path** [2] - 117:4,
117:12
**pathway** [1] - 35:12
**pathways** [1] - 36:9
**patience** [1] - 157:25
**patient** [10] - 56:25,
62:15, 89:18, 91:23,
92:1, 92:15, 115:24,
130:25, 176:19,
213:7
**patients** [12] - 35:6,
49:6, 49:11, 55:25,
56:4, 56:22, 57:6,
98:4, 175:3, 187:25,
188:1, 192:23
**pattern** [3] - 217:25,
218:1, 219:20
**patterns** [4] - 170:12,
185:12, 211:2,
212:24
**PAUL** [2] - 2:3, 5:9
**Pause** [2] - 150:14,
224:19
**Payer** [1] - 48:14
**payer** [4] - 49:5, 49:6,
49:15, 49:22
**payers** [1] - 49:19
**payment** [1] - 192:13
**payments** [1] - 92:15
**peak** [1] - 77:18
**PEARL** [1] - 3:6
**peek** [1] - 9:5
**Peer** [1] - 93:24
**peer** [12] - 33:9, 35:13,
68:18, 94:2, 94:6,
94:11, 143:11,
144:24, 145:7,
146:4, 146:6, 154:2
**peers** [6] - 99:18,
112:19, 145:4,
145:5, 145:6, 145:13
**Pensacola** [1] - 2:14
**People** [1] - 178:3
**people** [97] - 33:20,
33:23, 34:5, 34:9,
36:7, 39:8, 42:6,
42:16, 43:18, 43:20,
46:9, 50:2, 52:3,
52:21, 53:1, 53:5,
53:8, 53:12, 56:3,
56:12, 56:21, 57:2,
57:10, 57:15, 58:10,
58:12, 58:16, 59:1,
59:3, 63:8, 72:25,
73:8, 73:9, 73:11,

73:13, 77:20, 77:22, 79:25, 81:22, 82:2, 82:4, 82:7, 87:9, 94:14, 96:3, 96:10, 104:24, 105:1, 105:11, 106:4, 106:11, 106:12, 106:20, 106:23, 107:11, 108:8, 108:13, 108:21, 109:5, 109:10, 111:9, 112:7, 118:3, 124:23, 126:10, 126:16, 126:21, 126:25, 127:6, 127:7, 131:4, 131:13, 133:23, 134:14, 138:22, 138:25, 139:15, 142:23, 145:15, 145:18, 152:6, 152:14, 158:15, 168:18, 178:3, 178:4, 178:20, 181:13, 184:11, 185:5, 187:1, 187:7, 191:19, 192:10, 198:1

**PEP** [7] - 144:2, 144:3, 151:1, 151:2, 151:5, 151:8, 151:11

**per** [2] - 61:2, 201:22

**perceived** [1] - 62:14

**percent** [1] - 49:7

**percentage** [3] - 48:10, 84:23, 108:12

**percentages** [3] - 56:15, 61:17, 108:15

**Perfect** [1] - 25:22

**performing** [1] - 218:11

**perhaps** [2] - 142:3, 221:7

**perils** [2] - 28:2, 28:4

**period** [11] - 62:6, 90:21, 91:2, 91:7, 91:10, 91:22, 165:13, 185:9, 226:6, 226:20, 230:13

**permission** [4] - 158:22, 159:13, 161:4, 194:22

**permit** [1] - 225:16

**permitted** [2] - 225:2, 233:10

**person** [13] - 40:5, 40:6, 46:6, 46:16, 115:23, 146:12, 147:6, 159:17,

210:2, 210:3, 210:5, 210:6, 219:7

**person's** [1] - 146:24

**personal** [2] - 188:11, 197:6

**personally** [5] - 86:14, 186:12, 190:7, 233:15

**persons** [3] - 16:15, 17:13, 101:24

**perspective** [1] - 31:21

**pertinent** [1] - 193:13

**PETER** [1] - 2:12

**Petrany** [7] - 15:6, 50:18, 50:20, 128:4, 128:13, 130:4, 131:11

**pharmaceutical** [6] - 44:2, 169:15, 173:1, 174:22, 177:16

**pharmaceuticals** [5] - 168:17, 169:10, 172:23, 183:17

**Pharmacies** [1] - 186:2

**pharmacies** [56] - 169:17, 169:22, 170:1, 170:2, 175:18, 175:19, 177:5, 178:10, 178:22, 183:19, 183:20, 184:14, 184:16, 184:19, 184:21, 184:23, 185:2, 185:3, 185:4, 185:6, 185:8, 185:13, 185:18, 187:16, 187:18, 187:20, 187:24, 188:1, 189:20, 191:11, 191:17, 191:23, 192:4, 192:5, 192:7, 192:21, 192:22, 192:25, 193:1, 193:3, 193:12, 193:17, 193:25, 194:1, 194:15, 194:17, 195:1, 201:6, 203:1, 203:3, 206:17, 206:20, 227:22, 230:6

**pharmacist** [3] - 166:2, 167:2, 168:3

**pharmacists** [3] - 175:18, 175:19, 182:25

**Pharmacy** [7] - 166:9, 166:11, 167:2,

173:23, 174:1, 186:20

**pharmacy** [12] - 166:14, 167:4, 167:5, 167:6, 170:15, 170:16, 175:2, 179:12, 184:22, 186:18, 192:16, 193:5, 193:7, 193:8, 206:13, 207:17, 216:19, 216:21, 218:1

**phase** [1] - 26:9

**phentermine** [1] - 183:18

**Phentermine** [1] - 170:21

**Philadelphia** [2] - 6:6, 6:13

**Philanthropy** [1] - 144:18

**philosophy** [1] - 68:16

**phone** [1] - 210:4

**photograph** [1] - 50:20

**phrase** [1] - 19:13

**PHWC** [1] - 93:1

**physical** [2] - 175:6, 192:17

**Physician** [1] - 28:12

**physician** [12] - 28:20, 28:21, 45:7, 45:19, 72:17, 72:19, 72:22, 73:1, 76:23, 94:5, 114:13, 141:7

**physicians** [6] - 15:18, 29:17, 36:15, 51:15, 112:5, 177:2

**Physicians** [2] - 114:7, 114:22

**pick** [1] - 76:19

**picked** [2] - 149:19, 212:10

**picks** [1] - 76:14

**picture** [1] - 206:13

**piece** [6] - 66:12, 74:9, 122:4, 130:1, 132:11, 205:7

**pieces** [2] - 103:5, 154:6

**PIFKO** [1] - 3:16

**pill** [3] - 105:24, 168:21, 184:22

**pillars** [2] - 18:20, 103:8

**pills** [4] - 168:23, 185:2, 193:18, 194:16

**pilot** [1] - 153:8

**place** [12] - 27:3, 68:21, 68:22, 119:6, 129:22, 147:21, 174:4, 177:22, 193:12, 210:6, 233:24, 234:2

**Place** [18] - 82:24, 83:4, 83:6, 83:24, 84:2, 84:7, 84:12, 85:1, 85:3, 85:6, 85:14, 85:17, 85:20, 86:6, 142:7, 149:22, 149:23, 150:3

**placement** [3] - 33:11, 35:19, 36:3

**places** [1] - 145:18

**plaintiff** [2] - 11:15, 155:23

**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1

**PLAINTIFF** [1] - 161:16

**Plaintiffs** [2] - 7:24, 235:6

**plaintiffs** [10] - 8:1, 8:7, 120:9, 120:14, 120:15, 120:18, 120:24, 158:19, 160:1, 223:21

**Plaintiffs'** [1] - 54:6

**plaintiffs'** [3] - 120:7, 150:24, 160:18

**Plan** [14] - 127:19, 127:23, 128:9, 129:16, 130:10, 131:15, 131:22, 135:5, 135:6, 136:3, 156:8, 156:12, 156:15, 156:21

**plan** [14] - 12:4, 12:7, 12:12, 102:10, 103:1, 103:7, 104:18, 135:17, 138:8, 139:3, 139:12, 139:18, 143:3, 164:10

**Plan"** [1] - 101:11

**planning** [2] - 9:16, 204:3

**plans** [3] - 10:22, 10:24, 102:8

**Pleasant** [3] - 3:15, 4:4, 4:9

**plenty** [3] - 8:20, 135:1, 161:2

**plotted** [1] - 11:22

**plugged** [1] - 117:19

**plugs** [1] - 111:20

**podium** [2] - 9:3, 161:23

**point** [41] - 19:17, 20:21, 23:25, 25:12, 30:8, 40:10, 44:13, 54:21, 60:15, 62:25, 65:20, 66:20, 69:5, 86:25, 88:1, 88:16, 90:17, 94:13, 109:18, 112:21, 113:11, 118:3, 120:8, 143:21, 150:6, 167:19, 169:1, 171:14, 176:22, 177:18, 184:15, 184:20, 184:25, 191:2, 193:3, 193:24, 194:10, 198:25, 226:13, 230:20, 232:18

**Point** [15] - 93:6, 93:9, 93:16, 93:18, 93:23, 94:5, 94:11, 94:21, 95:1, 95:12, 95:17, 97:6, 142:3, 142:16, 142:18

**Point's** [1] - 95:13

**pointer** [1] - 216:3

**points** [1] - 119:17

**Police** [6] - 111:11, 144:14, 152:8, 152:15, 173:15, 186:19

**police** [7] - 167:12, 167:13, 178:18, 179:12, 180:15, 181:13, 182:8

**policed** [1] - 180:10

**policies** [4] - 220:25, 223:11, 224:12, 225:16

**policing** [2] - 180:9, 215:12

**policy** [3] - 99:17, 197:23, 227:9

**Policy** [4] - 140:22, 140:25, 141:3

**polish** [1] - 14:3

**Ponc** [1] - 2:4

**Ponce** [1] - 2:16

**population** [10] - 62:15, 82:11, 106:19, 107:1, 107:15, 108:4, 130:25, 150:10, 176:25, 180:9

**populations** [2] - 80:11, 80:12

**portion** [1] - 90:14

**position** [11] - 120:23, 141:1, 141:6, 165:4,

165:5, 171:22, 172:2, 172:9, 195:13, 214:22, 222:13
**positions** [2] - 165:10, 166:5
**positive** [2] - 137:1
**postpartum** [1] - 75:23
**pound** [3] - 64:15, 65:15, 65:16
**pounds** [1] - 66:25
**Powell** [1] - 2:6
**power** [1] - 219:8
**PowerPoint** [2] - 202:12, 202:13
**PR** [2] - 2:5, 2:17
**practice** [9] - 15:18, 21:23, 22:8, 63:15, 167:2, 213:9, 221:14, 226:5, 227:9
**practices** [2] - 222:5, 223:11
**practitioner** [1] - 76:22
**Practitioners** [1] - 178:10
**practitioners** [1] - 178:21
**pre** [1] - 88:24
**pre-existing** [1] - 88:24
**preclusive** [1] - 195:17
**predecessors** [1] - 183:8
**predictions** [1] - 119:19
**predominant** [1] - 47:12
**predominantly** [4] - 14:22, 35:11, 78:6, 137:3
**pregnancies** [2] - 71:5, 71:7
**pregnancy** [1] - 78:10
**pregnant** [9] - 35:3, 70:8, 70:12, 70:15, 70:20, 76:14, 88:9, 149:13, 149:14
**prejudice** [4] - 10:7, 10:10, 12:15, 12:18
**preliminary** [1] - 158:23
**preparation** [4] - 23:8, 38:25, 101:15, 101:17
**prepare** [3] - 8:24, 17:13, 102:8
**prepared** [24] - 16:12,

16:15, 17:7, 17:12, 17:13, 23:13, 23:15, 23:18, 23:21, 23:23, 54:25, 63:8, 67:20, 90:7, 101:21, 101:24, 102:4, 121:13, 160:16, 162:24, 197:17, 198:5, 212:8, 212:9
**preparing** [2] - 11:7, 12:11
**prescribe** [1] - 213:8
**prescribed** [3] - 105:13, 105:14, 105:25
**prescribers** [3] - 163:24, 177:1
**prescribing** [6] - 45:19, 51:15, 58:18, 72:17, 72:18, 72:22
**prescription** [9] - 41:16, 41:25, 42:20, 169:2, 169:5, 169:19, 169:20, 170:10, 171:10
**prescriptions** [1] - 170:24
**present** [7] - 136:13, 136:17, 166:14, 190:10, 198:9, 198:10, 204:21
**presentation** [35] - 186:5, 186:9, 186:12, 186:14, 186:15, 186:23, 187:2, 187:3, 187:4, 187:7, 187:9, 187:12, 188:13, 189:4, 190:8, 190:9, 190:16, 190:18, 197:13, 198:19, 204:2, 205:8, 205:16, 206:4, 206:21, 207:17, 207:24, 208:3, 208:4, 208:22, 210:24, 212:19, 213:10, 213:19, 215:15
**Presentation** [1] - 207:10
**presentations** [5] - 182:23, 186:25, 206:7, 209:3, 209:22
**presented** [6] - 125:1, 163:8, 189:21, 199:9, 211:1, 211:4
**presents** [1] - 123:18
**preserve** [2] - 206:23, 208:9

**Presidential** [1] - 173:19
**press** [1] - 227:2
**Prestera** [18] - 79:13, 79:15, 79:17, 79:22, 80:6, 80:20, 80:21, 81:2, 81:16, 81:17, 81:20, 82:1, 82:5, 82:13, 82:16, 146:5, 147:11, 150:7
**pretty** [6] - 173:2, 174:19, 174:20, 175:18, 186:24, 222:8
**prevent** [4] - 177:19, 180:7, 180:12, 181:21
**prevented** [2] - 175:13, 225:5
**Prevention** [1] - 104:10
**prevention** [3] - 144:2, 151:14, 151:17
**previously** [7] - 28:5, 76:18, 77:6, 83:1, 108:7, 141:1, 143:10
**Priddy** [1] - 111:10
**primarily** [1] - 49:7
**primary** [3] - 46:22, 114:14, 142:16
**principal** [1] - 197:18
**print** [2] - 64:18, 67:6
**printed** [1] - 89:8
**printing** [1] - 66:20
**printout** [3] - 74:5, 81:16, 95:12
**priorities** [1] - 26:9
**private** [5] - 49:14, 49:18, 60:2, 115:12, 146:18
**privilege** [7] - 188:21, 188:22, 212:1, 212:2, 224:4, 224:9
**privileged** [3] - 195:8, 195:10, 212:6
**privileges** [1] - 188:24
**Pro** [1] - 54:15
**Pro-active** [1] - 54:15
**PROACT** [100] - 28:6, 28:12, 28:23, 28:24, 31:23, 31:24, 32:12, 32:17, 32:18, 33:1, 33:8, 33:16, 33:17, 33:19, 34:1, 34:4, 35:9, 35:11, 35:13, 36:13, 36:16, 36:20, 36:23, 37:25, 38:18, 38:19, 41:5, 41:9, 41:14, 42:7, 42:9, 42:24, 43:7, 43:21,

45:24, 46:19, 47:2, 48:18, 49:1, 49:11, 49:19, 50:1, 51:5, 51:7, 51:23, 52:11, 52:14, 52:24, 53:1, 53:9, 53:12, 55:8, 55:15, 55:20, 55:25, 56:4, 56:13, 56:22, 56:25, 57:2, 57:11, 57:23, 59:22, 60:17, 60:20, 61:3, 61:6, 61:9, 61:19, 61:20, 61:25, 62:11, 62:18, 65:3, 65:4, 65:6, 65:9, 65:11, 65:25, 66:3, 67:19, 68:4, 68:8, 69:2, 69:4, 69:13, 69:15, 95:24, 96:13, 103:10, 110:12, 138:17, 142:8, 146:25, 147:1, 147:17, 148:2
**PROACT's** [3] - 48:8, 53:15, 54:23
**probative** [1] - 226:10
**probe** [2] - 221:21, 225:3
**probing** [1] - 220:25
**problem** [24] - 9:24, 10:16, 10:17, 64:20, 64:24, 130:6, 139:4, 147:24, 158:1, 169:20, 170:5, 170:25, 186:22, 188:22, 189:21, 195:4, 195:20, 195:24, 202:17, 210:10, 212:15, 221:11, 225:2, 225:10
**problems** [1] - 78:11
**procedures** [1] - 224:12
**proceed** [2] - 13:3, 161:8
**Proceedings** [1] - 6:19
**proceedings** [1] - 235:5
**PROCEEDINGS** [1] - 7:1
**process** [6] - 59:25, 130:18, 188:21, 195:7, 197:16, 218:21
**Proctor** [1] - 2:12
**Produced** [1] - 62:24
**produced** [2] - 6:19, 63:1
**production** [2] -

25:23, 173:8
**products** [4] - 170:2, 170:3, 173:9, 173:10
**profession** [1] - 167:18
**professional** [3] - 186:17, 187:6, 213:9
**proffered** [1] - 189:14
**profit** [1] - 85:6
**program** [76] - 28:6, 28:24, 30:3, 31:18, 31:19, 33:19, 35:25, 36:1, 40:7, 41:6, 55:16, 59:12, 65:5, 67:6, 68:13, 68:16, 69:19, 69:20, 70:3, 70:5, 70:7, 70:14, 70:16, 71:3, 73:14, 74:13, 74:20, 74:24, 75:1, 75:18, 76:11, 76:14, 76:16, 76:18, 77:2, 78:6, 78:22, 79:6, 79:9, 79:12, 80:16, 80:17, 80:24, 83:16, 83:18, 93:4, 93:5, 93:6, 94:7, 94:11, 94:13, 94:15, 94:18, 95:18, 95:19, 96:25, 100:4, 100:10, 109:21, 109:22, 109:23, 109:25, 110:1, 114:15, 116:14, 142:20, 142:22, 144:2, 144:12, 144:13, 149:10, 150:8, 153:18
**Program** [11] - 29:21, 38:11, 75:3, 148:20, 148:21, 148:23, 149:12, 149:18, 149:24, 154:6, 180:18
**programs** [65] - 13:11, 13:12, 19:25, 20:16, 23:15, 26:7, 27:2, 27:7, 27:8, 27:10, 27:11, 27:12, 27:16, 27:19, 27:23, 28:1, 28:9, 29:13, 29:18, 29:19, 29:25, 31:4, 38:13, 39:22, 40:1, 40:2, 68:12, 69:6, 69:10, 71:12, 74:14, 79:15, 94:4, 99:21, 100:11, 100:25, 113:24, 114:1, 114:5, 115:15, 118:8, 118:15, 118:25, 122:7,

128:17, 128:22,
129:5, 129:9,
129:10, 129:22,
129:24, 133:23,
138:16, 139:19,
140:14, 140:15,
142:2, 142:5,
142:15, 143:17,
143:19, 143:20,
144:1, 163:24
**progress** [1] - 118:4
**progressively** [1] -
170:5
**prohibitions** [1] -
226:24
**Project** [42] - 69:13,
86:11, 86:12, 86:14,
86:17, 87:4, 87:17,
87:25, 88:21, 89:14,
89:15, 89:17, 89:22,
89:23, 89:24, 90:2,
91:4, 91:6, 91:12,
91:19, 91:24, 92:5,
92:11, 92:19, 92:22,
93:3, 97:15, 98:3,
98:9, 98:10, 98:15,
98:17, 98:20, 98:21,
99:5, 99:20, 99:23,
114:17, 114:19,
117:15, 142:8,
142:10
**project** [4] - 39:15,
102:16, 130:10,
153:1
**projects** [2] - 26:8,
104:20
**promise** [2] - 150:19,
156:3
**promised** [1] - 119:14
**promptly** [1] - 232:17
**promulgating** [1] -
172:24
**proper** [1] - 203:11
**properly** [1] - 89:8
**proportion** [2] - 84:19,
84:22
**propositions** [1] -
219:11
**protect** [1] - 195:11
**protected** [1] - 224:8
**proud** [1] - 24:20
**prove** [1] - 10:7
**provide** [32] - 7:16,
7:24, 32:10, 32:15,
33:2, 68:17, 73:13,
74:23, 75:22, 75:24,
76:12, 98:5, 99:5,
101:4, 114:13,
122:21, 142:25,
145:15, 145:19,

152:10, 155:7,
159:9, 180:22,
181:20, 181:23,
182:16, 205:8,
215:16, 216:9,
218:13, 233:13,
233:16
**provided** [48] - 22:10,
23:22, 23:24, 24:12,
41:9, 41:19, 43:18,
45:17, 48:17, 49:1,
59:8, 59:11, 76:9,
76:10, 77:1, 77:15,
77:16, 79:17, 86:1,
88:23, 89:23, 89:24,
92:11, 99:21, 105:8,
110:17, 110:24,
113:19, 114:24,
125:7, 150:3,
153:21, 154:18,
154:24, 163:20,
168:24, 179:6,
197:12, 197:14,
204:5, 206:19,
209:4, 209:23,
211:10, 218:5,
223:4, 229:22
**Provider** [2] - 28:14,
28:17
**provider** [8] - 28:20,
28:21, 51:6, 73:10,
77:13, 88:25, 105:9,
116:16
**providers** [9] - 36:15,
51:13, 51:21,
103:23, 112:4,
116:20, 132:12,
142:13, 142:14
**provides** [29] - 8:23,
21:17, 33:8, 33:16,
34:1, 34:4, 35:9,
35:11, 35:13, 35:19,
36:2, 41:14, 46:19,
47:6, 59:22, 68:9,
71:3, 76:23, 82:14,
83:4, 85:17, 86:17,
87:6, 100:14,
118:15, 118:24,
132:8, 177:10,
182:15
**Provides** [1] - 35:15
**providing** [26] - 41:15,
45:24, 51:16, 58:18,
59:6, 73:7, 76:4,
76:6, 77:12, 86:8,
87:17, 103:25,
111:23, 112:3,
117:18, 146:22,
147:5, 152:6, 154:3,
155:14, 183:7,

183:8, 213:18,
213:19, 214:2,
214:21
**provision** [4] - 10:5,
34:8, 45:15, 153:24
**provisions** [3] -
178:11, 178:12,
179:4
**public** [15] - 23:24,
136:4, 163:10,
167:17, 168:19,
173:23, 188:23,
189:4, 190:23,
191:19, 194:24,
196:3, 201:19,
201:20, 224:15
**publicized** [1] -
135:19
**publicly** [1] - 224:16
**published** [5] - 17:22,
24:17, 38:21,
108:25, 123:11
**publishes** [2] - 17:18,
118:21
**pull** [11] - 20:13,
20:24, 52:9, 64:17,
137:13, 148:13,
150:24, 174:2,
174:4, 189:8, 211:15
**pulling** [1] - 111:14
**purchase** [11] -
185:12, 212:24,
217:25, 221:16,
228:3, 229:4,
229:17, 230:7,
231:6, 231:10,
231:20
**purchased** [2] - 215:2
**purchases** [2] - 215:3,
218:1
**purchasing** [1] - 211:2
**purely** [5] - 40:3, 94:6,
111:1, 112:5, 138:21
**purported** [1] - 8:14
**purporting** [2] - 96:19,
204:20
**purpose** [9] - 27:6,
177:21, 187:12,
187:13, 202:16,
213:5, 213:9,
215:22, 232:20
**purposes** [4] - 10:17,
102:12, 191:4,
201:24
**Pursuant** [1] - 7:14
**pursuant** [4] - 8:6,
12:10, 159:8, 162:6
**pursue** [1] - 86:3
**pursued** [1] - 112:15
**put** [21] - 11:17, 11:21,

17:17, 23:10, 27:3,
28:23, 37:1, 92:25,
96:19, 102:12,
120:20, 121:5,
122:6, 127:11,
140:4, 151:7,
163:22, 164:18,
194:11, 195:13,
210:20
**Putnam** [8] - 39:16,
107:5, 110:15,
110:21, 110:22,
112:10, 112:11,
112:15
**puts** [1] - 34:24
**putting** [1] - 9:18

## Q

**QRT** [3] - 39:23,
155:4, 155:15
**quagmire** [1] - 225:12
**qualified** [2] - 32:16,
115:1
**quantities** [5] -
170:21, 182:1,
185:10, 211:2
**quantity** [5] - 170:19,
177:6, 216:19,
219:16, 228:9
**quarter** [4] - 90:16,
90:22, 91:1, 106:13
**Quarterly** [2] - 38:23,
38:24
**query** [1] - 196:10
**questioned** [1] - 215:3
**questioning** [2] -
218:11, 222:4
**questions** [19] - 64:23,
109:14, 122:3,
134:18, 136:7,
150:15, 150:23,
157:18, 188:7,
197:5, 202:3, 204:4,
210:8, 210:11,
218:20, 224:15,
225:13, 225:15,
226:1
**queue** [1] - 14:4
**QUEZON** [25] - 7:9,
14:5, 14:10, 14:12,
16:22, 17:1, 25:5,
25:9, 25:19, 26:1,
54:10, 63:21, 63:25,
75:11, 102:21,
119:14, 134:21,
134:25, 135:3,
141:18, 141:23,
141:25, 150:12,
150:15, 155:23

**Quick** [24] - 39:23,
39:24, 40:4, 110:13,
110:15, 110:23,
111:10, 111:12,
112:11, 112:14,
112:19, 112:21,
113:1, 113:3,
113:11, 113:17,
113:19, 138:18,
145:21, 146:6,
154:14, 154:15,
154:20, 155:5
**quickly** [3] - 52:4,
131:15, 197:14
**quit** [3] - 57:18, 57:20,
58:10
**Quite** [1] - 23:7
**quite** [2] - 53:23,
99:15
**quota** [3] - 163:24,
173:6, 173:8
**quote/unquote** [1] -
231:18

## R

**Rafferty** [1] - 2:12
**raise** [6] - 7:11,
158:21, 158:22,
159:16, 159:24,
161:14
**raised** [2] - 159:25,
225:10
**raising** [1] - 225:20
**Ramirez** [5] - 37:16,
37:22, 38:6, 102:4,
111:8
**range** [8] - 34:4, 36:5,
42:14, 44:7, 53:4,
151:25, 153:4,
154:10
**rannazzisi** [3] -
164:12, 164:25,
174:9
**Rannazzisi** [66] - 8:9,
158:20, 159:6,
160:12, 160:16,
160:19, 161:3,
161:5, 161:9,
161:13, 161:20,
162:1, 162:3, 162:5,
162:15, 163:16,
166:21, 171:3,
171:9, 175:24,
176:5, 176:8,
179:14, 180:2,
182:10, 184:3,
185:23, 188:13,
189:7, 190:6,
190:15, 191:16,

193:16, 195:17, 196:5, 200:5, 200:24, 202:8, 205:3, 205:6, 206:3, 206:11, 207:6, 207:20, 208:17, 209:20, 210:17, 212:5, 212:17, 216:8, 217:22, 219:13, 221:13, 221:24, 222:8, 223:3, 223:8, 223:10, 223:22, 227:5, 227:8, 227:17, 231:4, 232:19, 232:24, 234:3

**RANNAZZISI** [1] - 161:16

**Rannazzisi's** [1] - 189:25

**rapid** [1] - 98:14

**rapidly** [2] - 30:13, 30:19

**rare** [1] - 46:9

**rarer** [1] - 46:8

**rate** [6] - 56:25, 57:14, 95:18, 96:2, 96:4, 96:15

**rates** [2] - 108:17, 109:7

**rather** [3] - 62:15, 66:25, 215:11

**ratio** [1] - 187:21

**rationale** [1] - 208:13

**rationalize** [1] - 219:11

**re** [3] - 114:22, 141:13, 150:16

**RE** [2] - 150:21, 156:1

**re-branded** [1] - 114:22

**re-branding** [1] - 141:13

**re-cross** [1] - 150:16

**RE-CROSS** [2] - 150:21, 156:1

**reach** [1] - 121:7

**reached** [1] - 140:7

**reacting** [1] - 226:22

**read** [6] - 50:17, 185:25, 206:16, 213:20, 213:25, 214:18

**readiness** [3] - 33:11, 35:19, 36:3

**reading** [1] - 107:22

**reads** [3] - 21:1, 76:22, 110:6

**ready** [4] - 48:4,

121:21, 159:23, 234:6

**real** [3] - 97:12, 215:20, 230:9

**real-life** [1] - 215:20

**real-time** [1] - 230:9

**really** [17] - 67:17, 88:13, 96:22, 107:6, 109:23, 138:14, 138:17, 146:23, 148:1, 168:23, 169:23, 172:8, 188:2, 193:12, 222:12, 225:2, 226:19

**realm** [1] - 57:4

**rearranging** [1] - 12:1

**reason** [27] - 51:19, 53:22, 55:22, 56:5, 56:11, 62:2, 74:18, 82:3, 95:23, 97:3, 97:5, 124:5, 125:3, 125:15, 125:18, 126:1, 126:13, 126:19, 126:23, 127:4, 144:24, 177:15, 192:10, 194:15, 196:7, 203:23, 211:20

**reasoning** [2] - 167:16, 191:7

**reasons** [3] - 190:20, 201:5, 203:24

**rebut** [1] - 190:25

**recap** [1] - 90:8

**receive** [27] - 16:5, 16:9, 38:5, 39:2, 45:21, 58:6, 69:15, 79:9, 82:19, 85:22, 86:3, 92:5, 92:6, 92:22, 95:1, 110:23, 112:24, 112:25, 116:15, 116:17, 149:13, 149:15, 151:5, 155:9, 155:11, 197:7

**received** [29] - 20:15, 21:3, 21:6, 37:18, 37:21, 38:2, 43:10, 54:18, 55:1, 55:6, 55:8, 61:4, 102:14, 117:6, 118:9, 128:7, 151:21, 166:9, 166:24, 169:8, 173:17, 173:19, 186:21, 198:5, 205:11, 226:6, 227:10, 231:9, 231:13

**receives** [6] - 22:20,

85:20, 113:4, 113:5, 217:9, 217:17

**receiving** [7] - 42:6, 42:17, 59:25, 96:6, 96:7, 163:4, 229:16

**recently** [2] - 77:22, 77:24

**recess** [2] - 47:24, 176:1

**Recess** [3] - 48:3, 120:1, 176:3

**recessed** [1] - 234:11

**recognition** [1] - 141:16

**recognitions** [1] - 173:17

**recognize** [15] - 162:15, 162:18, 174:14, 174:16, 186:3, 200:7, 200:17, 200:19, 202:10, 207:14, 208:2, 208:23, 217:22, 227:17, 227:23

**recognized** [4] - 113:1, 149:23, 228:19, 228:22

**Recognizing** [2] - 25:14, 26:4

**recollection** [4] - 20:19, 21:10, 50:6, 51:18

**record** [28] - 16:25, 17:4, 17:19, 17:25, 18:2, 46:2, 60:14, 63:19, 64:19, 66:11, 67:1, 67:14, 89:6, 119:14, 120:10, 120:13, 120:20, 121:14, 190:23, 201:19, 201:20, 202:2, 202:20, 206:11, 207:1, 208:17, 235:5

**recorded** [1] - 6:19

**records** [3] - 63:14, 111:15, 111:20

**recounted** [1] - 209:17

**recovery** [23] - 33:10, 35:13, 36:9, 36:11, 57:22, 59:2, 68:19, 75:22, 75:25, 94:2, 94:10, 94:13, 95:17, 143:11, 143:14, 144:24, 145:14, 145:16, 146:13, 146:20, 146:22, 147:4, 148:13

**Recovery** [23] - 69:21,

93:6, 93:8, 93:16, 93:18, 93:23, 93:24, 94:5, 94:11, 94:21, 94:25, 95:12, 95:13, 95:17, 97:6, 142:3, 142:16, 142:18, 146:16, 148:8, 148:9, 148:16, 148:18

**recurrence** [2] - 58:24, 58:25

**recurrent** [1] - 61:23

**recurring** [1] - 203:6

**recycling** [1] - 158:9

**Red** [1] - 165:18

**red** [2] - 192:17, 218:8

**redirect** [1] - 134:20

**REDIRECT** [1] - 135:2

**reduction** [1] - 138:19

**Reduction** [5] - 144:22, 153:21, 153:23, 154:6, 154:9

**Reed** [2] - 6:4, 6:11

**refer** [3] - 39:13, 47:4

**reference** [3] - 47:9, 50:25, 93:15

**referenced** [1] - 136:14

**referral** [2] - 40:22, 41:6

**referred** [11] - 44:14, 47:2, 48:25, 49:3, 52:19, 52:25, 55:16, 58:4, 69:20, 75:5, 202:9

**referring** [6] - 30:9, 53:15, 57:3, 68:8, 71:7, 182:11

**refers** [8] - 39:11, 51:2, 51:5, 54:23, 98:14, 104:8, 104:25, 124:13

**reflect** [5] - 61:6, 137:1, 209:4, 209:16, 209:23

**reflected** [2] - 47:13, 63:9

**reflecting** [2] - 90:14, 92:10

**reflects** [5] - 65:8, 89:17, 90:2, 103:14, 106:19

**refresh** [3] - 20:19, 21:10, 50:6

**regard** [3] - 221:1, 223:15, 224:5

**regarding** [5] - 7:17, 136:8, 172:22, 186:22, 213:19

**regardless** [1] - 41:15

**regards** [1] - 130:25

**Region** [7] - 104:22, 106:17, 107:2, 107:13, 108:5, 108:8, 137:9

**region** [9] - 19:3, 31:8, 31:12, 39:19, 40:2, 84:15, 100:11, 101:1, 107:16

**Regional** [11] - 38:7, 38:11, 39:9, 100:5, 100:7, 101:10, 101:22, 101:25, 102:9, 110:5, 138:13

**regional** [3] - 30:15, 30:22, 31:3

**register** [1] - 209:13

**registrant** [5] - 176:25, 180:8, 182:19, 182:20, 187:8

**Registrants** [1] - 187:4

**registrants** [12] - 163:20, 175:16, 175:20, 176:17, 176:18, 176:20, 178:6, 178:15, 179:1, 182:15, 182:19, 187:3

**regular** [3] - 62:13, 63:14, 198:6

**regularly** [6] - 16:25, 63:11, 102:8, 145:17, 174:20, 202:2

**regulated** [2] - 179:1, 223:23

**regulation** [1] - 191:2

**regulations** [6] - 172:24, 179:4, 179:5, 206:21, 221:3, 233:7

**regulatory** [4] - 173:15, 177:11, 180:10, 186:19

**rehash** [1] - 204:13

**reimbursable** [12] - 68:18, 68:19, 68:20, 111:5, 142:21, 144:5, 144:11, 144:16, 144:23, 145:11, 145:12, 146:1

**reimburse** [3] - 125:12, 144:5, 146:7

**reimbursed** [10] - 59:25, 60:3, 110:8, 111:7, 143:16, 143:23, 145:6, 146:12, 146:17,

155:8
**reimbursement** [24] -
48:18, 48:21, 48:23,
49:2, 59:19, 59:23,
60:5, 85:18, 86:4,
92:17, 95:1, 111:2,
112:8, 115:11,
122:22, 122:23,
125:8, 145:6, 146:9,
153:24, 153:25,
154:2, 154:5, 154:7
**reimbursements** [1] -
92:10
**reinforce** [1] - 182:6
**reiterate** [1] - 182:5
**relate** [2] - 14:25,
222:2
**related** [8] - 13:11,
133:23, 162:24,
163:22, 172:25,
204:4, 206:19,
212:12
**relates** [2] - 202:25,
222:4
**relating** [2] - 127:22,
208:14
**relationship** [3] -
13:16, 141:5, 187:25
**relatively** [1] - 87:9
**release** [1] - 35:8
**released** [1] - 110:22
**relevance** [8] - 16:22,
63:22, 189:22,
189:23, 190:3,
201:4, 203:19,
208:10
**relevancy** [1] - 202:21
**relevant** [6] - 190:20,
193:13, 193:20,
202:24, 203:23,
220:11
**reliable** [1] - 143:17
**relieve** [2] - 213:22,
214:4
**rely** [1] - 119:19
**relying** [1] - 211:24
**remained** [1] - 96:1
**remaining** [3] - 46:23,
66:7, 153:10
**remains** [2] - 27:9,
90:10
**remember** [6] - 38:4,
93:2, 135:24, 136:9,
197:19, 230:10
**remind** [1] - 135:9
**remission** [1] - 117:7
**removed** [2] - 135:19,
139:8
**removing** [1] - 139:6
**renewed** [1] - 20:10

renovation [1] - 60:20
**repeat** [4] - 15:9,
107:25, 209:21,
227:6
**repeated** [1] - 211:8
**rephrase** [1] - 180:2
**replace** [1] - 99:16
**replaced** [1] - 139:8
**replicated** [1] - 138:15
**Report** [13] - 14:18,
37:17, 38:18, 38:21,
40:9, 41:7, 41:13,
42:25, 43:1, 43:7,
227:20, 229:11,
230:2
**reposition** [1] - 14:8
**representation** [1] -
160:2
**representations** [2] -
11:7, 211:9
**representative** [2] -
135:18, 159:14
**representatives** [1] -
210:25
**Representatives** [1] -
211:3
**request** [8] - 8:18,
23:18, 40:22, 103:4,
110:22, 112:14,
137:24, 164:4
**requested** [6] - 40:23,
41:1, 42:4, 137:25,
138:4, 186:23
**requesting** [1] - 41:6
**requests** [1] - 186:21
**require** [1] - 8:4
**required** [8] - 11:7,
60:20, 62:16, 139:2,
155:16, 181:14,
197:8
**requirement** [1] -
232:16
**requires** [2] - 9:16,
154:23
**research** [9] - 25:15,
26:5, 59:6, 116:7,
118:19, 125:9,
133:10, 133:21,
135:15
**Research** [1] - 18:14
**reside** [2] - 31:14,
107:17
**residential** [20] - 44:7,
44:15, 45:4, 46:11,
46:25, 47:5, 48:25,
80:8, 80:12, 87:11,
87:17, 115:17,
116:6, 116:8,
125:20, 126:17,
127:2, 133:15,

227:12, 227:23,
228:1, 228:2, 228:3,
229:2, 229:4,
229:15, 229:17,
229:19, 229:22,
230:16, 231:8,
231:9, 231:10,
231:11, 231:12,
231:14, 232:15,
232:19, 232:22,
232:24, 232:25,
233:6, 233:9,
233:14, 233:18
**Reports** [3] - 38:19,
228:3, 229:3
**report** [56] - 9:23,
14:20, 14:23, 14:25,
15:3, 16:12, 17:7,
17:9, 17:15, 17:19,
23:10, 24:11, 24:12,
27:2, 27:6, 49:12,
49:20, 74:17, 94:19,
123:18, 124:6,
143:2, 143:3,
162:24, 214:6,
214:10, 215:24,
217:7, 217:10,
217:11, 217:18,
218:17, 223:7,
228:5, 228:8,
228:11, 228:25,
229:5, 229:8,
229:12, 229:24,
229:25, 230:3,
230:4, 230:12,
231:5, 231:6, 231:7,
231:20, 231:22,
232:20
**reported** [5] - 172:10,
172:16, 226:21,
232:17, 235:9
**Reporter** [6] - 6:17,
6:18, 235:3, 235:12
**REPORTER** [5] -
100:21, 158:16,
158:24, 159:1, 159:3
**reporter's** [1] - 176:11
**reporters** [1] - 47:21
**Reporting** [1] - 213:22
**reporting** [11] - 16:18,
96:24, 125:5, 126:3,
172:11, 213:19,
214:4, 215:22,
222:16, 222:17,
230:15
**reports** [39] - 38:9,
54:4, 54:6, 198:2,
198:3, 219:10,
221:16, 226:5,
227:9, 227:11,

134:1, 134:15
**residing** [2] - 44:18,
142:18
**Resiliency** [14] -
127:19, 127:23,
128:9, 129:15,
130:10, 131:15,
131:22, 135:5,
135:6, 136:3, 156:8,
156:12, 156:15,
156:21
**resolution** [1] - 58:15
**resolve** [8] - 10:15,
58:12, 214:8,
214:10, 216:16,
216:20, 225:8, 232:1
**resolved** [4] - 57:11,
58:8, 58:17, 199:11
**resolves** [1] - 89:3
**resources** [11] -
130:5, 130:11,
130:23, 131:6,
131:12, 138:24,
153:2, 178:24,
179:10, 219:8
**respect** [5] - 173:5,
174:21, 190:21,
203:2, 223:6
**Respectfully** [1] -
205:21
**respectively** [1] -
49:23
**respond** [4] - 10:2,
30:14, 30:20, 139:16
**responders** [3] -
152:7, 152:10,
152:19
**response** [3] - 51:6,
103:1, 103:7
**Response** [27] -
28:14, 28:17, 29:8,
39:23, 39:24, 40:4,
110:13, 110:15,
110:23, 111:10,
111:12, 112:11,
112:14, 112:20,
112:21, 113:1,
113:3, 113:11,
113:17, 113:20,
138:18, 145:21,
146:6, 154:14,
154:15, 154:20,
155:5
**responsibilities** [2] -
172:19, 173:11
**responsibility** [3] -
173:5, 180:4, 213:23
**responsible** [5] -
16:17, 66:4, 88:20,
149:16, 222:25

**responsiveness** [1] -
139:13
**rest** [2] - 29:18, 187:6
**restore** [1] - 134:22
**result** [1] - 120:13
**resume** [2] - 176:4,
225:23
**retail** [3] - 167:4,
177:19, 178:21
**retained** [7] - 55:25,
56:3, 56:6, 57:10,
96:2, 136:12, 197:9
**retention** [4] - 56:25,
57:14, 96:2, 96:14
**retired** [3] - 162:3,
165:5, 165:6
**retrospective** [1] -
23:15
**retrospectively** [1] -
175:11
**return** [1] - 52:22
**returned** [1] - 171:25
**revenue** [5] - 65:8,
65:24, 67:19, 90:2,
91:3
**review** [4] - 211:1,
211:2, 215:7, 218:2
**reviewed** [3] - 24:13,
202:13, 205:3
**reviewing** [1] - 24:10
**revocation** [1] -
182:21
**rewrite** [1] - 139:1
**RF** [1] - 112:13
**Rice** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**ride** [1] - 145:12
**right-hand** [3] - 40:18,
71:17, 132:8
**rising** [1] - 158:15
**risk** [3] - 70:18, 71:4,
71:7
**River** [2] - 144:9,
151:6
**Rivers** [35] - 38:6,
38:10, 39:9, 39:11,
39:14, 40:6, 100:5,
100:7, 100:16,
101:10, 101:22,
101:25, 102:9,
103:3, 103:6,
104:21, 106:16,
107:1, 107:13,
108:5, 108:8,
109:21, 109:22,
110:5, 110:12,
110:17, 110:20,
110:24, 111:8,
112:2, 112:7,
112:13, 137:9,

138:13
**rivers** [1] - 39:12
**RMR** [2] - 6:17, 6:18
**road** [4] - 163:13, 174:2, 216:18
**Road** [3] - 148:9, 148:15, 148:18
**roadblocks** [1] - 101:4
**robberies** [1] - 170:11
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**role** [8] - 39:2, 43:10, 54:19, 100:7, 168:6, 179:18, 179:22, 185:18
**roles** [1] - 94:8
**roof** [1] - 33:17
**room** [1] - 193:4
**Room** [1] - 165:18
**rooms** [1] - 83:25
**roughly** [17] - 44:9, 49:10, 53:1, 53:12, 55:19, 56:3, 56:12, 56:19, 56:21, 106:12, 106:23, 106:25, 108:11, 108:12, 108:20, 153:4
**Route** [2] - 81:6, 81:8
**rows** [1] - 103:22
**RPR** [1] - 6:18
**RPR-RMR-CRR-FCRR** [1] - 6:18
**Ruby** [3] - 4:17, 135:21, 136:7
**RUBY** [4] - 4:17, 155:24, 156:2, 157:15
**rule** [1] - 8:23
**Rule** [1] - 201:19
**ruled** [1] - 160:12
**ruling** [2] - 160:18, 225:7
**run** [29] - 30:1, 32:22, 32:23, 36:1, 36:23, 37:4, 37:5, 40:2, 40:3, 42:11, 69:4, 69:7, 70:7, 73:12, 74:20, 76:11, 79:6, 82:16, 82:22, 85:11, 92:19, 97:6, 99:23, 115:4, 122:14, 142:9, 143:21, 151:6, 229:13
**running** [6] - 32:12, 69:6, 73:2, 97:12, 142:20, 208:11
**runs** [4] - 72:24, 100:9, 151:10, 151:19

**S**

**s\Ayme** [1] - 235:11
**s\Lisa** [1] - 235:11
**safe** [2] - 131:2, 133:9
**Sales** [8] - 211:19, 211:20, 211:21, 212:11, 212:19, 212:20, 213:1, 213:6
**sales** [7] - 214:17, 227:20, 227:21, 228:9, 229:20, 230:6
**SALGADO** [1] - 4:15
**SAMHSA** [9] - 59:10, 90:11, 104:12, 109:3, 118:9, 118:11, 118:15, 123:11, 124:7
**SAMHSA's** [2] - 118:23, 124:5
**SAMSHA's** [1] - 126:14
**San** [2] - 2:5, 2:17
**SAPT** [2] - 151:17, 151:22
**sat** [1] - 141:1
**save** [1] - 31:14
**savings** [2] - 62:10, 62:14
**saw** [6] - 55:15, 55:20, 135:13, 148:24, 170:20
**Saxe** [1] - 8:10
**SC** [3] - 3:15, 4:4, 4:9
**scale** [1] - 170:6
**schedule** [4] - 10:5, 10:11, 11:14, 12:1
**Schedule** [4] - 173:9, 173:10
**scheduling** [5] - 8:4, 9:12, 9:25, 10:16, 10:19
**Schmidt** [2] - 198:21, 233:4
**SCHMIDT** [31] - 5:9, 120:2, 120:5, 121:12, 121:18, 159:25, 164:4, 164:9, 164:15, 164:19, 164:23, 179:15, 189:11, 189:23, 193:24, 194:8, 195:12, 198:13, 198:23, 203:5, 204:23, 208:9, 208:15, 209:8, 211:5, 217:2, 218:24, 220:6, 222:14, 223:17, 230:17

**School** [7] - 15:17, 29:7, 29:14, 29:20, 30:1, 30:6, 36:2
**school** [3] - 16:11, 30:6, 151:9
**Science** [1] - 166:9
**Sciences** [26] - 13:16, 14:25, 15:25, 18:13, 18:19, 19:1, 19:7, 19:9, 20:5, 21:16, 22:14, 22:17, 23:11, 23:21, 23:23, 26:7, 27:15, 30:10, 36:18, 36:21, 39:3, 43:11, 54:19, 63:6, 65:5, 70:4
**scope** [6] - 130:20, 160:20, 189:22, 201:4, 208:10, 221:4
**scourge** [1] - 19:1
**screen** [8] - 9:6, 65:20, 66:12, 66:17, 98:4, 174:13, 213:16
**screening** [1] - 99:8
**scripts** [1] - 170:13
**seat** [1] - 161:18
**second** [16] - 30:8, 30:12, 74:10, 74:12, 93:15, 98:2, 101:19, 107:5, 114:12, 128:16, 128:25, 147:15, 196:20, 214:21, 218:5
**secondly** [1] - 170:3
**Section** [3] - 7:16, 165:14, 165:15
**section** [4] - 14:22, 16:18, 17:17, 165:17
**sections** [3] - 14:24, 156:25, 197:11
**secured** [3] - 19:23, 20:6, 20:9
**security** [4] - 166:18, 174:23, 175:5
**see** [99] - 12:17, 14:11, 18:7, 18:16, 19:4, 20:2, 21:8, 24:5, 24:22, 26:4, 26:10, 26:18, 32:2, 33:12, 40:15, 40:20, 40:24, 41:2, 41:10, 42:17, 47:9, 48:14, 49:8, 49:15, 51:9, 55:2, 55:12, 55:17, 55:25, 58:16, 58:23, 59:3, 59:11, 60:17, 61:4, 65:3, 65:14, 65:19, 65:20, 66:16, 67:18, 67:19, 68:6, 70:24, 71:5, 71:14, 71:19,

72:2, 74:14, 77:8, 81:23, 87:7, 88:24, 89:14, 89:19, 91:24, 93:16, 93:25, 94:23, 95:19, 97:14, 98:6, 98:13, 102:11, 103:23, 104:2, 104:22, 106:8, 106:20, 109:12, 110:8, 121:7, 123:21, 123:25, 124:20, 126:11, 126:17, 127:2, 128:5, 128:19, 129:2, 130:6, 132:6, 135:5, 141:20, 158:15, 182:19, 189:2, 192:22, 195:23, 199:12, 218:17, 224:11, 228:1, 228:24, 229:12, 231:16, 234:10
**seeing** [20] - 11:13, 38:4, 61:20, 62:15, 90:24, 138:15, 169:13, 169:25, 170:3, 170:9, 170:10, 170:11, 170:19, 171:15, 181:25, 185:1, 188:1, 227:23, 232:3
**seek** [2] - 42:9, 115:11
**seeking** [12] - 42:23, 46:20, 103:9, 106:8, 106:13, 107:12, 107:17, 108:9, 108:14, 108:22, 110:12, 110:13
**seizures** [1] - 184:13
**self** [2] - 49:15, 69:3
**self-paid** [1] - 49:15
**self-sustaining** [1] - 69:3
**sell** [1] - 184:7
**selling** [1] - 168:18
**send** [2] - 229:2, 231:14
**SENIOR** [1] - 1:17
**senior** [3] - 210:15, 222:24
**Senior** [1] - 7:2
**Sensabaugh** [1] - 5:14
**sense** [1] - 170:9
**sent** [7] - 63:17, 109:5, 139:14, 162:19, 206:5, 229:1, 231:7
**sentence** [21] - 26:14, 26:25, 30:8, 30:12, 49:6, 49:21, 51:8,

55:14, 55:23, 56:24, 60:19, 68:4, 76:22, 81:20, 95:3, 98:2, 106:9, 110:6, 128:16, 130:4, 211:6
**sentences** [2] - 61:1, 71:2
**separate** [3] - 78:18, 142:4, 142:7
**September** [3] - 113:13, 131:21, 207:12
**seriousness** [1] - 210:10
**serve** [10] - 71:23, 71:25, 72:1, 72:11, 77:7, 83:24, 85:2, 85:3, 86:6, 95:3
**served** [9] - 46:11, 48:10, 49:11, 71:18, 71:22, 72:7, 77:20, 78:16, 150:11
**serves** [3] - 82:2, 82:5, 95:4
**Service** [1] - 173:20
**service** [12] - 18:14, 33:4, 46:18, 58:4, 76:6, 82:25, 83:4, 173:18, 173:23, 173:24, 184:2
**Services** [7] - 104:11, 113:9, 118:13, 144:22, 153:21, 153:23, 154:9
**services** [103] - 19:25, 21:16, 21:17, 22:2, 22:10, 25:15, 26:5, 32:15, 33:8, 33:16, 33:17, 34:1, 34:5, 36:5, 39:20, 40:22, 41:6, 45:16, 45:24, 46:21, 48:8, 48:17, 49:19, 56:9, 56:13, 68:5, 68:9, 68:17, 68:24, 69:12, 70:15, 76:4, 76:9, 76:10, 76:24, 77:14, 77:15, 77:16, 79:5, 79:19, 80:13, 82:14, 83:4, 85:17, 85:23, 85:25, 87:6, 87:18, 88:21, 88:23, 89:24, 92:11, 93:24, 94:3, 94:6, 95:2, 99:6, 100:15, 101:5, 104:1, 110:7, 110:10, 110:11, 110:16, 110:24, 110:25, 111:4, 111:5, 111:6, 112:3, 112:8, 115:6, 115:9,

115:10, 115:11, 118:2, 122:20, 125:7, 132:6, 132:12, 132:13, 133:15, 134:1, 134:8, 134:13, 134:15, 143:4, 144:16, 144:25, 145:20, 146:10, 146:17, 147:6, 154:1, 154:3, 155:15, 173:25

**serving** [3] - 79:20, 82:11, 113:24

**Set** [1] - 123:8

**set** [19] - 10:11, 13:15, 60:21, 62:11, 83:3, 109:2, 110:15, 142:22, 143:6, 146:4, 178:7, 179:11, 179:16, 180:3, 180:6, 180:7, 192:25, 193:1, 229:19

**set-ups** [1] - 229:19

**sets** [1] - 201:21

**setting** [4] - 83:21, 149:25, 150:4, 190:23

**setup** [1] - 61:24

**seven** [4] - 11:2, 56:17, 88:6, 144:11

**several** [6] - 12:25, 120:12, 160:25, 182:22, 187:1, 199:1

**severe** [1] - 87:9

**severity** [1] - 115:19

**SHANNON** [1] - 6:3

**share** [8] - 39:4, 39:6, 49:18, 111:25, 138:23, 138:25, 178:9, 178:11

**shared** [4] - 39:8, 137:3, 198:5, 204:7

**sharing** [1] - 39:25

**sheet** [2] - 35:22, 35:25

**shelter** [1] - 155:9

**shift** [1] - 184:20

**shifted** [1] - 184:24

**shifting** [1] - 222:16

**ship** [7] - 214:6, 214:10, 216:5, 216:10, 216:21, 223:8

**shipment** [1] - 232:22

**shipped** [8] - 214:12, 214:23, 217:13, 217:14, 217:16, 229:23, 231:23

**shoes** [1] - 145:10

**shopping** [2] - 170:11, 170:24

**short** [6] - 127:1, 127:10, 130:15, 134:3, 175:23, 185:8

**short-term** [4] - 127:1, 127:10, 130:15, 134:3

**shorter** [1] - 120:12

**shot** [2] - 35:5, 59:15

**show** [22] - 20:19, 22:22, 29:1, 37:9, 43:1, 50:5, 51:1, 52:1, 52:7, 62:19, 65:18, 81:10, 112:18, 127:22, 139:19, 159:9, 196:9, 204:25, 207:1, 213:1, 217:25, 227:13

**showed** [2] - 227:18, 227:19

**showing** [2] - 91:18, 215:20

**shown** [7] - 54:13, 81:15, 89:15, 90:3, 92:15, 95:11, 154:12

**shows** [15] - 46:3, 46:6, 65:23, 65:24, 91:3, 91:6, 91:9, 91:14, 91:15, 91:23, 103:22, 103:25, 116:10, 230:4, 230:5

**shut** [1] - 142:23

**shy** [1] - 126:4

**sic** [3] - 40:23, 124:19, 173:22

**sic]** [1] - 123:6

**side** [5] - 71:17, 132:8, 140:14, 201:9

**sign** [2] - 65:15, 65:16

**significance** [1] - 138:12

**significant** [6] - 9:16, 12:17, 96:3, 148:24, 207:25

**significantly** [1] - 108:18

**signs** [3] - 64:15, 192:16, 192:20

**similar** [2] - 94:11, 231:4

**similarly** [1] - 103:12

**simple** [3] - 81:19, 181:4

**simply** [5] - 8:22, 12:14, 31:4, 121:14, 209:12

**SINGER** [79] - 4:5,

158:12, 158:14, 158:18, 158:25, 159:2, 159:4, 159:23, 160:15, 161:7, 161:21, 161:25, 162:11, 162:14, 163:12, 163:14, 164:7, 164:11, 164:22, 164:24, 171:8, 176:7, 179:20, 179:25, 180:1, 185:20, 185:22, 188:12, 189:3, 189:6, 189:9, 191:15, 193:15, 194:21, 196:1, 198:17, 199:4, 199:7, 199:23, 200:2, 201:2, 202:7, 203:12, 203:25, 204:3, 204:10, 205:2, 205:5, 206:2, 206:10, 207:2, 208:7, 208:16, 208:25, 209:2, 209:19, 210:20, 210:21, 211:7, 211:14, 212:4, 212:16, 216:7, 217:5, 221:12, 222:23, 225:22, 226:2, 227:3, 227:13, 227:16, 228:21, 229:6, 231:3, 232:10, 232:12, 232:14, 233:12, 234:1

**Singer** [18] - 158:14, 158:18, 160:6, 164:21, 176:6, 179:19, 188:5, 188:7, 189:2, 190:12, 190:15, 191:14, 202:3, 212:3, 216:24, 226:11, 227:2, 233:25

**singer** [2] - 160:14, 171:5

**Singer's** [1] - 233:5

**single** [2] - 33:3, 147:4

**singular** [4] - 31:9, 72:18, 72:22, 102:10

**singularly** [1] - 154:21

**sit** [4] - 142:6, 172:5, 197:3, 210:7

**sites** [1] - 191:20

**sits** [5] - 22:7, 68:15, 141:8, 142:8, 214:25

**situated** [1] - 15:16

**situation** [1] - 221:8

**situations** [2] - 152:12, 181:24

**Six** [1] - 40:16

**six** [10] - 8:12, 10:18, 93:18, 100:13, 103:3, 103:8, 103:13, 103:15, 116:18

**six-location** [1] - 93:18

**skates** [1] - 220:21

**skin** [1] - 35:7

**skip** [2] - 20:13, 46:24

**slash** [1] - 29:21

**slide** [25] - 150:25, 174:5, 174:13, 174:19, 174:20, 189:7, 194:13, 204:2, 204:14, 204:19, 205:23, 206:7, 206:14, 206:16, 212:8, 213:13, 213:17, 213:25, 214:3, 214:13, 214:14, 215:15, 215:21, 217:21, 218:4

**Slide** [1] - 153:20

**slides** [32] - 28:10, 69:19, 75:1, 79:13, 82:25, 86:11, 97:15, 98:23, 100:6, 143:25, 144:11, 144:20, 148:15, 164:8, 164:10, 193:25, 194:7, 199:17, 199:18, 199:20, 203:10, 204:6, 204:7, 205:12, 205:14, 205:17, 205:18, 211:15, 211:16, 217:22, 217:25

**slot** [2] - 11:21, 11:22

**slots** [2] - 168:1, 187:2

**slow** [1] - 35:7

**small** [18] - 24:3, 25:13, 54:22, 60:16, 64:7, 70:23, 72:1, 75:15, 90:14, 93:14, 97:19, 97:20, 109:19, 123:17, 124:11, 132:4, 187:23, 212:23

**Smith** [3] - 6:4, 6:11, 8:10

**smoke** [1] - 58:10

**smoking** [2] - 57:18,

57:20

**sobriety** [2] - 95:18, 97:2

**social** [2] - 134:11, 154:1

**Social** [1] - 22:13

**Society** [3] - 34:11, 44:11, 87:14

**soft** [1] - 176:9

**soft-spoken** [1] - 176:9

**sold** [3] - 157:21, 194:16

**Solutions** [24] - 23:3, 24:21, 25:7, 27:11, 27:17, 60:8, 60:10, 60:13, 67:22, 70:22, 71:11, 71:23, 75:9, 77:5, 86:24, 93:12, 94:20, 97:18, 109:15, 110:4, 129:14, 139:22, 141:11, 141:12

**solutions** [2] - 26:17, 31:11

**solve** [1] - 225:2

**someone** [7] - 41:15, 109:12, 116:23, 140:8, 145:9, 146:20, 205:1

**sometime** [3] - 53:23, 54:24, 99:16

**Sometimes** [1] - 45:22

**sometimes** [4] - 44:21, 69:23, 147:3, 197:16

**somewhat** [1] - 100:16

**somewhere** [6] - 53:4, 85:4, 146:9, 149:18, 158:6, 216:18

**SONGER** [2] - 174:6, 174:8

**soon** [1] - 9:17

**sorry** [34] - 13:18, 41:1, 60:12, 62:23, 65:15, 67:24, 68:1, 75:11, 75:15, 75:16, 89:24, 91:17, 93:14, 94:23, 100:21, 108:2, 110:3, 119:8, 119:13, 119:20, 127:15, 158:16, 175:22, 183:3, 188:4, 195:3, 199:8, 204:18, 207:4, 213:20, 216:13, 216:24, 232:12, 232:14

**Sorry** [4] - 25:17,

25:24, 40:17, 100:23
**sort** [12] - 58:15,
62:16, 76:18, 79:23,
83:16, 89:25, 96:11,
105:21, 136:24,
137:1, 139:3, 224:25
**sorts** [1] - 192:13
**sought** [2] - 223:14
**sound** [1] - 107:8
**sounds** [1] - 53:20
**source** [1] - 92:8
**South** [1] - 2:13
**Southern** [1] - 7:3
**SOUTHERN** [1] - 1:1
**space** [1] - 159:18
**span** [1] - 45:8
**speaking** [5] - 56:12,
106:23, 106:25,
108:11, 108:20
**special** [4] - 162:4,
165:19, 168:1, 168:6
**Special** [1] - 165:13
**specialists** [2] - 99:8,
99:15
**specialized** [1] - 71:4
**specific** [19] - 39:15,
71:25, 72:1, 72:12,
98:5, 111:13, 121:6,
140:3, 150:10,
178:7, 196:9,
199:21, 218:11,
219:18, 219:23,
224:5, 225:14,
230:4, 231:1
**specifically** [5] - 30:5,
116:9, 146:20,
169:10, 172:20
**specificity** [1] - 120:8
**specifics** [1] - 224:1
**specifying** [1] -
129:10
**speculation** [1] -
217:1
**spelled** [1] - 113:10
**spend** [1] - 151:2
**spending** [4] - 11:6,
12:10, 147:5, 154:15
**spent** [4] - 135:21,
139:22, 151:4,
165:21
**sphere** [1] - 206:3
**Spiritual** [1] - 35:17
**spiritual** [1] - 33:10
**spoken** [2] - 176:9,
187:13
**sponsored** [1] -
182:23
**spreadsheet** [6] -
63:1, 63:3, 63:5,
64:11, 67:9, 89:14

**SQHC** [1] - 32:17
**Square** [2] - 6:5, 6:12
**squeeze** [1] - 67:7
**St** [7] - 32:1, 32:19,
61:3, 61:8, 99:7,
99:16, 114:17
**stabilization** [1] -
79:16
**stabilize** [1] - 96:8
**stabilized** [1] - 96:8
**staff** [9] - 111:5,
153:1, 153:3, 166:2,
196:17, 205:7,
206:4, 206:5, 210:13
**Staff** [1] - 165:16
**staffed** [1] - 111:8
**staffing** [1] - 144:19
**stage** [1] - 181:19
**stakeholders** [1] -
140:19
**stand** [7] - 44:5, 52:5,
121:10, 156:23,
158:20, 159:15,
176:4
**standard** [10] - 58:5,
116:13, 116:21,
186:4, 198:9,
199:18, 220:12,
228:25, 229:5
**standardized** [3] -
199:19, 205:15,
205:17
**standards** [1] - 139:12
**standing** [1] - 73:19
**stands** [5] - 28:12,
151:12, 151:13,
151:14, 220:7
**STANNER** [1] - 5:10
**start** [16] - 57:23, 69:8,
96:7, 113:3, 118:3,
135:4, 143:24,
147:21, 159:23,
167:24, 181:16,
182:16, 184:20,
192:23, 200:8
**started** [24] - 7:10,
28:21, 69:11, 117:4,
117:16, 120:6,
121:15, 131:3,
141:15, 144:17,
145:23, 147:12,
148:20, 148:23,
161:22, 169:25,
170:3, 170:19,
171:14, 183:9,
183:14, 183:15,
183:16, 184:17
**starting** [4] - 112:11,
116:10, 129:18,
129:21

**starts** [2] - 116:23,
174:25
**startup** [2] - 113:2,
113:19
**state** [14] - 19:24,
20:6, 30:3, 51:25,
85:2, 107:4, 110:21,
110:22, 112:24,
113:12, 123:18,
140:24, 161:11,
193:19
**State** [10] - 74:14,
85:20, 86:8, 112:22,
113:1, 113:17,
113:19, 143:7,
151:5, 166:25
**State's** [2] - 29:8,
112:13
**statement** [17] - 19:6,
20:4, 20:8, 25:2,
26:12, 26:20, 26:25,
30:18, 30:25, 32:4,
33:6, 33:14, 98:13,
191:3, 201:20,
220:18, 223:18
**STATES** [2] - 1:1, 1:17
**States** [5] - 7:2,
118:12, 169:16,
173:9, 186:24
**states** [17] - 18:11,
24:20, 31:24, 33:1,
49:21, 72:15, 81:20,
123:17, 126:9,
126:15, 126:21,
126:25, 128:16,
129:7, 134:2, 192:2,
194:5
**statewide** [1] - 141:16
**stating** [4] - 53:22,
125:16, 125:24,
127:7
**status** [4] - 86:2,
87:24, 154:1, 154:2
**STATUS** [1] - 1:17
**Status** [1] - 7:2
**stay** [16] - 94:22,
124:15, 124:17,
124:23, 125:10,
125:13, 125:16,
125:20, 125:21,
126:3, 126:10,
126:15, 126:20,
126:21, 126:25,
146:21
**stenography** [1] - 6:19
**step** [1] - 175:24
**stepdown** [1] - 117:2
**Stephen** [1] - 128:4
**stepped** [2] - 141:5,
144:19

**stepping** [1] - 182:13
**steps** [1] - 117:13
**Steve** [1] - 24:5
**STEVEN** [1] - 4:17
**stick** [3] - 157:1,
160:6, 219:6
**sticker** [1] - 185:25
**still** [10] - 12:24, 57:8,
78:11, 98:21, 135:6,
141:21, 147:22,
161:2, 213:11, 220:6
**stimulants** [1] -
181:12
**stimulus** [1] - 150:2
**stipulated** [1] - 228:14
**stipulation** [7] - 7:15,
8:6, 8:15, 8:17, 10:8,
11:8, 12:11
**stood** [1] - 201:14
**stop** [10] - 45:11, 96:7,
96:8, 105:16, 119:7,
182:3, 184:25,
232:21, 234:1
**stopped** [1] - 109:10
**stopping** [2] - 57:20,
233:24
**store** [1] - 193:4
**strategic** [4] - 138:8,
139:3, 139:12,
139:18
**Strategic** [1] - 101:11
**strategy** [2] - 194:25,
196:2
**stream** [1] - 113:7
**street** [1] - 168:10
**Street** [15] - 2:7, 2:10,
2:13, 3:5, 3:7, 3:10,
3:12, 4:6, 4:13, 4:15,
4:18, 5:5, 5:12, 6:6,
6:13
**strengths** [1] - 31:20
**stress** [1] - 152:11
**stricken** [1] - 220:14
**strict** [2] - 45:15,
143:12
**strike** [2] - 179:17,
218:25
**strip** [1] - 34:24
**strong** [2] - 129:15,
129:16
**struck** [1] - 185:11
**structure** [8] - 60:5,
66:5, 68:21, 125:13,
129:16, 143:6,
144:15, 146:8
**structured** [1] - 99:17
**struggle** [2] - 130:17,
150:1
**struggling** [1] - 70:9
**student** [1] - 151:17

**student-something**
[1] - 151:17
**stuff** [1] - 96:11
**subject** [14] - 16:16,
48:20, 48:23, 49:2,
59:23, 73:6, 85:17,
111:2, 122:21,
139:16, 153:23,
154:7, 200:11, 207:8
**subjected** [1] - 48:18
**subjective** [2] - 73:6,
105:6
**sublingual** [1] - 34:24
**Sublocade** [1] - 59:20
**submit** [3] - 87:15,
122:23, 205:24
**submitted** [1] - 173:21
**Suboxone** [8] - 34:23,
35:11, 40:22, 41:18,
47:10, 47:18, 59:24,
78:7
**subpoena** [3] -
180:14, 180:18,
180:20
**subpoenas** [2] -
179:8, 180:14
**subsections** [1] -
134:2
**substance** [36] - 19:2,
20:16, 27:20, 30:14,
30:22, 31:3, 31:11,
31:18, 33:4, 33:20,
33:23, 42:7, 42:10,
43:18, 44:3, 46:23,
50:2, 58:24, 75:22,
78:1, 78:4, 78:13,
79:21, 79:23, 86:20,
99:12, 104:21,
117:8, 118:16,
118:19, 118:24,
124:9, 143:8, 147:7,
152:9
**Substance** [19] - 31:9,
57:16, 58:8, 70:9,
70:11, 75:25, 86:18,
87:18, 88:10, 90:11,
94:15, 98:5, 99:13,
104:11, 118:12,
128:18, 128:23,
138:20, 152:16
**substances** [6] -
70:20, 83:12,
174:11, 174:22,
184:18, 187:22
**Substances** [6] -
178:8, 178:10,
179:11, 179:16,
182:12, 196:9
**substantial** [2] -
84:19, 84:21

substitute [2] - 64:21, 64:25
Subutex [5] - 35:2, 35:8, 35:11, 59:24, 78:7
success [5] - 94:19, 96:10, 117:19, 146:24, 148:5
successes [1] - 40:7
successful [4] - 40:4, 57:17, 94:18, 134:25
SUD [3] - 29:9, 110:7, 132:19
suffering [2] - 33:4, 33:20
suggest [3] - 53:11, 108:11, 232:7
suggesting [2] - 109:22, 109:24
suggestion [2] - 189:19, 222:15
suggests [1] - 108:12
suicidality [1] - 152:18
Suite [9] - 2:4, 2:7, 2:10, 2:13, 2:16, 3:17, 4:6, 6:5, 6:12
suite [1] - 172:19
summaries [6] - 194:12, 197:7, 197:9, 197:12, 197:17, 198:4
summarize [1] - 75:2
summarizes [3] - 29:12, 71:11, 123:23
summary [8] - 18:18, 60:16, 206:5, 206:14, 206:16, 207:17, 209:3, 209:22
Summary [1] - 55:3
Summary" [1] - 54:15
summer [1] - 20:20
supervision [2] - 145:13, 145:20
Supervisor [1] - 165:18
supplemental [2] - 77:14, 77:15
supplied [3] - 191:23, 193:17
supply [7] - 174:10, 175:16, 179:11, 180:22, 181:1, 182:24, 215:12
supplying [1] - 185:5
Support [1] - 75:3
support [19] - 26:17, 33:11, 35:13, 35:17, 45:16, 61:19, 69:6, 70:11, 75:23, 75:25,

76:1, 112:15, 134:11, 144:8, 145:15, 145:17, 146:4, 147:6, 155:15
supported [3] - 29:16, 147:2, 154:21
supportive [4] - 46:21, 131:3, 133:9, 146:10
supports [3] - 33:10, 118:2, 146:23
supposed [3] - 215:11, 215:19, 230:10
supposedly [1] - 225:1
Supreme [2] - 211:16, 211:18
surely [1] - 79:25
surpassing [1] - 127:10
surplus [5] - 64:15, 65:12, 91:9, 91:10, 91:18
surprised [2] - 121:19, 147:13
survey [3] - 109:11, 129:1, 139:14
suspicion [3] - 219:19, 230:4, 232:1
suspicions [2] - 214:8, 216:16
suspicious [78] - 161:1, 163:21, 213:17, 213:20, 213:22, 214:9, 214:11, 214:17, 215:17, 215:23, 215:25, 216:3, 216:4, 216:11, 216:14, 216:15, 217:7, 217:9, 217:11, 217:18, 218:16, 218:20, 218:25, 219:2, 219:10, 219:14, 219:15, 219:18, 219:23, 219:25, 220:1, 220:3, 220:11, 220:13, 220:17, 221:1, 221:6, 221:10, 221:15, 221:19, 221:24, 222:2, 222:9, 222:12, 222:16, 223:6, 223:8, 223:15, 224:5, 225:1, 225:3, 226:5, 227:9, 227:11, 227:12, 228:2, 228:4,

229:25, 230:1, 230:3, 230:5, 230:8, 230:10, 230:12, 230:16, 231:8, 231:11, 231:17, 231:19, 231:24, 231:25, 232:8, 232:15, 232:20, 233:14, 233:17
Suspicious [2] - 180:17, 213:14
sustain [13] - 68:13, 96:12, 111:4, 190:11, 191:13, 193:22, 212:14, 217:4, 224:10, 225:13, 230:24, 231:1, 233:11
sustainability [3] - 110:16, 143:3, 143:5
sustainable [1] - 143:17
sustained [1] - 194:6
sustaining [1] - 69:3
SUZANNE [1] - 4:15
switch [2] - 47:21, 69:18
switched [1] - 170:18
SWORN [1] - 161:16
symptomatology [2] - 58:24, 58:25
symptoms [1] - 78:15
Syndrome [2] - 78:2, 133:16
syringes [1] - 154:3
system [50] - 70:11, 104:8, 111:17, 111:19, 111:20, 113:7, 142:6, 142:7, 142:8, 142:10, 151:9, 163:19, 174:3, 174:9, 174:23, 175:3, 175:9, 175:10, 175:11, 175:12, 175:13, 175:14, 175:15, 175:21, 176:14, 176:15, 177:9, 177:10, 177:11, 177:15, 177:18, 177:21, 177:25, 178:6, 178:15, 178:19, 179:2, 179:9, 180:3, 180:6, 180:8, 180:24, 181:1, 181:3, 181:5, 181:18, 181:25, 182:8, 216:4
System [17] - 38:7,

38:11, 39:9, 100:5, 100:7, 101:10, 101:22, 102:1, 102:9, 104:9, 110:5, 138:13, 174:17, 174:18, 174:21, 174:23, 175:8
systems [1] - 112:6

──────────

T

──────────

table [10] - 13:15, 40:20, 42:16, 43:16, 83:3, 103:22, 137:22, 138:6, 141:10, 225:19
tablets [6] - 170:16, 170:17, 185:7, 185:9, 192:8, 212:23
tag [1] - 141:12
tags [1] - 64:6
taller [1] - 161:21
target [1] - 103:4
targeted [1] - 103:6
Task [1] - 165:19
team [5] - 17:17, 98:14, 101:17, 142:16, 183:15
Team [17] - 39:23, 39:24, 40:4, 110:15, 110:23, 111:10, 111:12, 112:12, 112:20, 112:22, 113:11, 145:21, 146:7, 154:14, 154:15, 154:20, 155:5
Teams [7] - 110:13, 112:14, 113:1, 113:3, 113:17, 113:20, 138:19
tech [1] - 166:19
technical [1] - 13:19
techniques [1] - 224:7
technological [1] - 13:20
technology [1] - 59:13
TEDS [4] - 123:10, 123:13, 124:3, 124:4
teeny [1] - 75:14
TEMITOPE [1] - 4:8
ten [3] - 83:25, 149:11, 176:2
Ten [1] - 48:1
Tenth [1] - 5:12
tenure [1] - 181:6
term [27] - 19:18, 57:21, 59:2, 59:6, 68:5, 68:8, 68:23, 69:2, 94:10, 95:17,

98:20, 117:10, 117:19, 126:16, 127:1, 127:10, 130:15, 130:16, 133:17, 133:19, 134:3, 143:5, 146:20, 146:22, 146:24, 174:9
terminology [2] - 19:20, 39:11
terms [5] - 120:11, 129:5, 134:13, 159:11, 162:6
testified [14] - 145:22, 188:13, 189:25, 190:22, 193:16, 198:14, 204:6, 204:9, 205:3, 209:15, 219:7, 228:22, 232:15, 232:19
testify [7] - 11:1, 12:19, 162:6, 163:7, 205:1, 220:20, 221:24
testimony [14] - 13:10, 28:5, 127:14, 131:23, 159:11, 160:4, 162:20, 163:24, 179:17, 183:4, 195:18, 218:25, 220:14, 221:25
text [1] - 128:12
THE [205] - 1:1, 1:1, 1:4, 1:17, 7:6, 7:8, 7:13, 9:1, 9:5, 10:19, 11:17, 12:3, 12:13, 12:17, 12:21, 12:23, 12:24, 13:2, 13:3, 13:18, 13:24, 13:25, 14:9, 14:11, 14:14, 16:21, 17:3, 18:1, 22:24, 25:4, 25:10, 25:22, 26:2, 29:3, 37:11, 37:12, 47:20, 47:23, 48:1, 48:4, 50:10, 50:11, 54:1, 54:2, 54:8, 54:11, 63:20, 63:24, 64:1, 64:7, 64:22, 66:24, 67:8, 67:13, 73:23, 73:24, 74:1, 75:14, 81:12, 81:13, 89:5, 95:9, 101:7, 102:20, 102:22, 107:20, 107:23, 107:25, 119:4, 119:5, 119:6, 119:10, 119:18, 119:22, 119:24,

119:25, 120:4,
120:25, 121:16,
121:21, 123:3,
127:25, 131:17,
134:20, 134:24,
135:1, 150:13,
150:16, 150:18,
155:21, 155:25,
157:16, 157:20,
157:21, 157:23,
157:24, 157:25,
158:1, 158:3, 158:5,
158:7, 158:9,
158:13, 159:22,
160:11, 161:6,
161:8, 161:13,
161:19, 161:20,
162:13, 164:14,
164:18, 164:20,
171:3, 171:4, 171:7,
174:7, 175:22,
175:25, 176:1,
176:4, 176:6,
179:14, 179:19,
179:23, 185:21,
188:15, 188:18,
189:1, 190:4, 190:7,
190:11, 190:17,
191:5, 191:13,
193:21, 194:6,
194:9, 194:19,
195:19, 195:23,
198:15, 198:20,
198:24, 199:3,
199:5, 200:1, 201:8,
201:16, 202:1,
202:5, 202:19,
202:24, 203:16,
204:1, 204:9,
204:11, 204:16,
205:12, 205:14,
205:20, 206:8,
206:25, 208:12,
209:11, 209:15,
211:11, 211:13,
212:3, 212:13,
215:22, 215:24,
217:4, 218:15,
218:18, 219:5,
219:12, 219:13,
219:14, 220:23,
223:25, 224:10,
224:17, 224:20,
225:9, 225:25,
226:11, 227:1,
228:20, 228:23,
228:25, 230:24,
232:11, 232:13,
233:2, 233:11,
233:24, 234:2,
234:5, 234:6, 234:7,

234:8, 234:9, 234:10
**themselves** [2] -
94:10, 159:17
**theoretically** [1] -
174:24
**theoreticized** [1] -
68:21
**therapeutic** [2] - 73:8,
88:21
**Therapeutic** [1] - 30:2
**therapist** [3] - 45:1,
73:11, 73:12
**therapists** [1] - 72:24
**therapy** [12] - 33:10,
35:15, 44:16, 45:6,
45:20, 45:22, 46:21,
124:20, 124:25,
125:17, 126:1
**therefore** [2] - 135:19,
201:22
**they've** [3] - 8:13,
11:9, 221:8
**They've** [1] - 8:20
**thinking** [3] - 31:17,
39:19, 130:22
**third** [7] - 64:13,
64:14, 76:21, 76:22,
81:7, 148:15, 218:13
**Thomas** [4] - 2:12,
32:2, 32:13, 32:15
**thoroughly** [1] -
210:25
**thoughts** [1] - 130:17
**thousand** [5] - 138:5,
170:16, 170:17,
177:8, 185:9
**thousands** [4] - 71:24,
82:7, 82:11, 192:8
**thread** [1] - 168:15
**threat** [1] - 184:23
**Three** [1] - 6:5
**three** [35] - 6:12, 8:13,
30:13, 30:19, 32:9,
32:11, 32:18, 32:22,
35:9, 44:22, 51:15,
58:1, 71:14, 72:25,
81:2, 81:5, 82:10,
88:7, 104:3, 113:15,
149:11, 153:1,
153:3, 153:14,
153:15, 153:17,
190:5, 194:11,
194:13, 200:3,
210:3, 210:4, 231:7
**three-bedrooms** [1] -
88:7
**threes** [1] - 44:14
**threshold** [1] - 229:21
**thrive** [1] - 87:12
**throughout** [4] -

169:5, 169:21,
175:16, 193:19
**throw** [1] - 155:13
**throwing** [1] - 171:5
**Thursday** [5] - 8:3,
9:19, 11:3, 11:23
**tied** [5] - 131:8,
156:12, 156:18,
215:10
**timing** [1] - 10:11
**TIMOTHY** [1] - 5:9
**Tina** [7] - 37:16, 37:22,
38:6, 38:9, 102:4,
111:5, 111:8
**tiny** [8] - 25:17, 40:11,
40:12, 67:25, 75:14,
87:1, 94:25
**tired** [1] - 61:20
**title** [4] - 24:24, 123:7,
186:1, 186:2
**Title** [1] - 182:12
**today** [7] - 9:18, 11:1,
130:6, 138:8, 162:6,
163:5, 188:10
**together** [14] - 17:17,
23:10, 61:8, 96:19,
100:13, 101:3,
102:12, 111:9,
112:6, 138:23,
140:2, 140:4, 140:5,
140:16
**toggle** [1] - 60:9
**tolerance** [1] - 105:17
**tomorrow** [2] - 9:18,
121:6
**tongue** [1] - 34:25
**tonight** [1] - 121:3
**took** [7] - 9:23, 12:25,
92:6, 99:15, 109:11,
136:25, 197:24
**Tool** [1] - 104:9
**tool** [11] - 104:9,
104:15, 108:18,
109:4, 109:5,
109:11, 114:6,
180:15, 180:17,
180:18, 180:19
**tools** [6] - 139:4,
139:11, 152:11,
154:4, 177:22,
180:11
**top** [11] - 19:23, 29:6,
40:10, 40:20, 48:16,
55:11, 65:3, 75:21,
114:11, 206:13,
213:14
**top-level** [1] - 48:16
**total** [14] - 62:5, 64:15,
65:8, 65:12, 90:2,
91:3, 91:6, 91:9,

92:3, 92:4, 106:19,
154:9, 177:8, 181:2
**touched** [2] - 173:2,
173:4
**touches** [1] - 175:19
**tough** [1] - 195:13
**Touhy** [7] - 159:8,
159:12, 162:6,
162:9, 162:19,
226:18, 226:24
**towards** [5] - 34:7,
143:4, 154:25,
169:24, 171:23
**Tower** [2] - 3:4, 4:18
**town** [1] - 31:15
**track** [1] - 123:2
**tracking** [1] - 57:4
**tracks** [1] - 194:1
**trade** [1] - 184:6
**traditional** [2] - 192:5,
193:8
**trafficked** [1] - 169:11
**trafficking** [2] -
169:14, 187:15
**trail** [1] - 194:1
**training** [6] - 33:11,
35:20, 36:3, 72:20,
73:4, 153:25
**trainings** [1] - 155:9
**transactions** [1] -
232:5
**transcript** [6] - 6:19,
20:20, 20:24, 52:7,
52:9, 235:4
**transferred** [1] - 169:6
**transition** [1] - 183:25
**travel** [1] - 9:15
**traveled** [1] - 193:18
**treat** [5] - 50:2, 62:16,
84:9, 134:13, 184:11
**treated** [8] - 44:20,
47:10, 53:1, 53:8,
56:13, 56:21, 57:2,
76:20
**treating** [7] - 52:12,
52:16, 73:1, 79:25,
83:8, 128:22, 152:14
**Treatment** [8] - 28:13,
28:15, 28:18, 29:15,
76:4, 78:16, 83:19,
123:7
**treatment** [208] -
13:12, 27:19, 27:23,
28:1, 28:24, 31:18,
32:10, 33:3, 33:9,
34:1, 34:5, 34:8,
34:15, 34:19, 34:22,
34:23, 35:10, 36:7,
39:20, 41:9, 41:14,
42:4, 42:6, 42:9,

42:17, 42:23, 43:17,
43:24, 44:4, 45:2,
45:14, 45:18, 46:3,
46:15, 47:5, 47:7,
47:12, 48:8, 48:17,
48:20, 51:7, 51:13,
51:16, 51:24, 52:3,
57:1, 57:4, 57:5,
57:16, 58:5, 58:6,
58:18, 58:20, 59:7,
59:11, 59:14, 59:18,
59:22, 60:6, 60:7,
62:16, 62:17, 69:12,
69:19, 70:2, 70:5,
70:10, 70:16, 70:18,
72:20, 73:13, 73:16,
76:10, 76:25, 77:3,
77:12, 77:13, 77:17,
78:5, 78:8, 79:5,
79:15, 79:24, 80:6,
80:8, 80:14, 80:21,
80:24, 82:25, 83:4,
83:7, 83:16, 83:18,
84:11, 86:17, 87:11,
88:25, 89:25, 92:11,
93:5, 93:6, 98:14,
99:6, 100:11,
100:15, 101:5,
106:8, 106:13,
107:12, 107:17,
108:9, 108:14,
108:22, 109:22,
110:1, 110:11,
111:24, 112:3,
113:24, 114:1,
114:5, 114:13,
114:14, 114:20,
115:15, 115:16,
115:17, 115:18,
115:22, 115:24,
116:1, 116:4, 116:5,
116:8, 116:9,
116:12, 116:24,
116:25, 117:22,
118:19, 118:25,
122:7, 122:20,
123:19, 123:25,
124:18, 124:24,
125:6, 125:7,
125:10, 125:11,
125:21, 125:22,
126:10, 126:11,
126:16, 126:17,
126:22, 126:23,
127:1, 127:2, 127:6,
127:8, 127:10,
129:5, 129:9,
129:10, 129:22,
129:24, 132:16,
132:22, 132:23,
132:25, 133:2,

133:4, 133:13, 133:18, 133:23, 134:6, 138:21, 142:1, 142:5, 142:10, 142:12, 142:14, 142:17, 142:20, 142:24, 143:9, 143:19, 147:23, 148:1, 149:3, 149:13, 149:15, 152:6, 156:9, 156:14, 156:22, 157:12
**treatments** [2] - 34:20, 48:22
**treats** [2] - 80:15, 84:7
**trend** [1] - 123:20
**trepidation** [1] - 207:4
**Tri** [1] - 74:14
**Tri-State** [1] - 74:14
**Trial** [1] - 234:11
**trial** [4] - 7:14, 13:1, 127:18, 161:22
**TRIAL** [1] - 1:16
**tried** [3] - 120:11, 140:6, 225:5
**tries** [1] - 67:7
**trigger** [1] - 218:2
**triggered** [6] - 194:17, 196:10, 219:19, 230:5, 232:1
**trip** [1] - 145:12
**trouble** [2] - 11:13, 189:5
**troubled** [1] - 188:2
**troubling** [3] - 187:18, 187:19, 188:8
**true** [11] - 20:4, 30:18, 30:25, 32:4, 33:6, 33:14, 47:3, 68:9, 110:20, 222:19, 227:11
**truly** [2] - 82:12, 227:11
**trust** [2] - 66:17, 67:13
**truth** [1] - 12:25
**try** [9] - 29:22, 67:4, 117:25, 134:22, 141:23, 144:25, 161:22, 176:1, 205:20
**trying** [18] - 10:23, 15:10, 28:3, 41:19, 41:21, 50:19, 52:4, 54:25, 55:2, 55:4, 61:18, 81:6, 92:8, 134:5, 146:3, 157:1, 222:14, 223:22
**Tuesday** [1] - 11:3
**turn** [24] - 18:4, 43:14,

70:21, 71:10, 71:21, 79:12, 97:18, 166:7, 174:2, 174:3, 181:18, 183:2, 184:15, 185:19, 189:7, 192:22, 196:3, 196:15, 206:11, 210:17, 213:10, 215:21, 217:20, 218:3
**Twelfth** [1] - 4:13, 4:15, 5:5
**twice** [1] - 58:1
**twins** [1] - 88:8
**two** [37] - 35:6, 44:13, 44:22, 45:8, 45:23, 46:25, 52:16, 54:4, 54:6, 73:24, 73:25, 81:6, 88:6, 96:17, 99:19, 104:12, 105:17, 113:16, 130:13, 139:4, 143:14, 144:20, 153:9, 153:11, 154:22, 160:23, 168:7, 171:13, 171:22, 184:12, 185:23, 191:10, 197:10, 197:11, 211:18, 219:11, 221:4
**two-bedrooms** [1] - 88:6
**two-day** [1] - 160:23
**two-point** [1] - 44:13
**type** [13] - 46:3, 46:7, 46:15, 86:3, 170:6, 184:22, 196:10, 210:13, 224:8, 227:18, 231:7, 231:9, 231:10
**types** [4] - 33:21, 59:17, 133:18, 187:20
**typical** [1] - 229:15
**typically** [1] - 58:16

## U

**U.S** [1] - 186:22
**umbrella** [3] - 30:4, 30:5, 100:16
**unable** [3] - 62:16, 87:12, 222:11
**under** [40] - 7:16, 8:17, 11:7, 12:24, 15:19, 22:7, 30:4, 34:24, 35:7, 64:14, 71:2, 87:4, 89:24, 97:19, 113:9, 120:23,

123:17, 133:5, 133:8, 134:3, 134:9, 139:24, 140:15, 143:12, 144:17, 146:8, 146:25, 172:16, 173:21, 178:8, 178:9, 182:5, 182:6, 183:15, 183:22, 190:23, 196:8, 202:18, 224:8
**Under** [1] - 33:17
**undercover** [3] - 167:15, 168:21, 168:22
**underneath** [1] - 63:2
**underserved** [1] - 48:11
**understood** [4] - 37:4, 133:8, 170:4, 219:9
**undertaken** [1] - 29:13
**undue** [2] - 12:15, 12:18
**unfortunately** [4] - 9:14, 57:23, 152:15, 218:19
**uniform** [1] - 117:12
**unique** [3] - 55:15, 83:6, 103:12
**unit** [3] - 15:21, 88:15, 132:15
**Unit** [7] - 29:15, 30:2, 76:4, 78:16, 78:18, 83:19, 148:25
**United** [8] - 7:2, 118:12, 144:9, 151:6, 151:11, 169:16, 173:9, 186:24
**UNITED** [2] - 1:1, 1:17
**University** [13] - 21:22, 21:24, 22:12, 29:7, 29:13, 29:19, 30:1, 30:4, 30:7, 36:2, 140:20, 166:10, 166:25
**unknown** [1] - 133:17
**unlikely** [1] - 57:13
**unlimited** [4] - 130:5, 130:11, 130:23, 131:12
**unprecedented** [1] - 193:18
**unrelated** [1] - 7:11
**unresolvable** [1] - 216:16
**unstably** [1] - 131:2
**unsupervised** [1] - 168:25
**untrustworthiness** [1] - 201:22

**up** [90] - 9:3, 9:8, 9:18, 20:13, 20:24, 25:17, 27:25, 28:23, 29:22, 49:18, 49:22, 52:9, 57:23, 60:21, 62:11, 63:25, 64:17, 69:25, 71:25, 72:11, 73:2, 76:14, 76:19, 77:7, 94:24, 110:15, 117:5, 117:7, 117:9, 119:16, 122:6, 137:13, 139:21, 141:18, 142:22, 143:25, 145:6, 146:4, 147:7, 147:10, 148:13, 149:19, 150:24, 160:12, 161:9, 163:12, 163:25, 167:8, 167:11, 167:13, 174:3, 174:4, 174:13, 176:10, 179:11, 179:16, 180:3, 180:6, 180:8, 181:15, 182:24, 182:25, 183:3, 186:5, 186:6, 189:8, 191:22, 192:25, 193:1, 193:5, 195:14, 195:18, 196:20, 200:3, 200:9, 201:14, 202:19, 203:6, 210:20, 215:10, 216:1, 216:8, 218:15, 218:16, 219:10, 219:14, 219:21, 220:8, 224:6, 227:12
**update** [1] - 125:19
**updates** [1] - 137:3
**ups** [1] - 229:19
**usable** [1] - 185:11
**useful** [2] - 118:24, 231:12
**users** [7] - 104:21, 104:22, 104:25, 106:4, 106:7, 107:12, 107:16
**usual** [1] - 213:9

## V

**vague** [2] - 226:9, 230:17
**vaguely** [1] - 128:24
**Valium** [1] - 184:9
**Valley** [7] - 31:25, 32:16, 114:6,

114:14, 114:21, 114:24, 122:12
**valley** [1] - 114:22
**variety** [1] - 79:15
**various** [3] - 13:11, 33:21, 43:17
**vary** [3] - 44:21, 59:18, 117:13
**vast** [4] - 25:15, 26:4, 42:23, 176:25
**vaults** [1] - 175:6
**vehicle** [2] - 154:24
**veil** [1] - 192:11
**vein** [1] - 14:5
**Ventura** [1] - 3:18
**veracity** [1] - 134:22
**verge** [1] - 105:15
**version** [11] - 55:5, 64:21, 89:2, 132:10, 135:9, 156:8, 156:11, 156:13, 156:23, 185:24, 203:14
**versions** [5] - 157:7, 157:8, 157:9, 157:10, 157:14
**versus** [2] - 25:17, 48:10
**Veterans** [2] - 166:3, 167:5
**vetting** [1] - 197:16
**via** [2] - 114:24, 122:11
**view** [2] - 29:19, 30:25, 58:13
**viewed** [2] - 29:20, 62:10
**vigorous** [1] - 160:24
**violates** [3] - 8:15, 8:23
**violence** [1] - 155:9
**Virginia** [22] - 4:18, 7:3, 7:4, 9:15, 23:2, 23:3, 39:12, 49:7, 81:22, 82:2, 85:4, 85:21, 86:7, 86:8, 93:19, 94:5, 140:25, 155:2, 194:2, 221:25, 222:3, 223:16
**VIRGINIA** [2] - 1:1, 1:18
**Virginia's** [1] - 95:17
**Virginia-02134** [1] - 14:17
**Virginia-2136** [1] - 43:6
**visit** [3] - 10:22, 10:24, 150:2
**visitation** [1] - 149:17

visited [2] - 10:21, 193:7
visiting [1] - 194:18
visitors [1] - 61:23
visits [2] - 182:17, 194:13
Vivatrol [1] - 40:23
Vivitrol [7] - 35:4, 41:1, 41:18, 42:1, 42:3, 47:15, 78:7
voice [1] - 176:10
volume [10] - 170:17, 184:18, 185:1, 187:17, 187:20, 192:4, 194:16, 219:15, 231:16
VOLUME [1] - 1:16
volumes [5] - 171:16, 192:7, 193:17, 232:4, 232:5
vs [1] - 235:6

## W

wait [3] - 147:15, 147:25, 195:23
waiting [1] - 120:8
waiver [2] - 110:7, 143:9
waivers [1] - 143:8
WAKEFIELD [1] - 5:13
walk [3] - 147:23, 148:2, 180:20
Walker [2] - 183:16, 183:23
wants [3] - 159:17, 195:11, 226:11
warehouses [1] - 193:1
warrant [1] - 12:15
warrants [2] - 57:24, 179:7
Washington [6] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12
wasting [2] - 147:3, 147:4
watching [1] - 182:1
water [3] - 154:4, 171:2, 204:12
watermarked [1] - 135:13
Wayne [2] - 81:3, 81:4
ways [2] - 112:7, 182:14
weaknesses [1] - 31:20
WEBB [1] - 3:11
Webb [1] - 3:12
website [9] - 74:5,

74:8, 81:16, 81:17, 82:3, 95:12, 95:13, 97:5, 147:14
websites [1] - 140:13
Wednesday [1] - 11:3
week [26] - 7:18, 7:20, 7:21, 7:24, 7:25, 8:3, 8:5, 8:8, 8:20, 8:21, 8:24, 10:12, 11:16, 11:18, 11:23, 12:2, 12:5, 12:7, 44:16, 44:20, 44:22, 45:1, 121:4, 127:18, 137:7
weekly [6] - 45:20, 45:22, 45:23, 70:17, 117:6
weeks [6] - 45:23, 116:17, 130:13, 161:1, 194:11, 199:1
Welcome [1] - 13:10
well-known [1] - 212:11
wellness [3] - 152:18, 152:19, 153:2
WEST [2] - 1:1, 1:18
West [24] - 7:3, 7:4, 9:15, 14:17, 23:2, 23:3, 39:12, 43:6, 49:7, 81:22, 82:2, 85:4, 85:21, 86:7, 86:8, 93:19, 94:5, 95:17, 140:25, 155:2, 194:2, 221:25, 222:2, 223:15
WESTFALL [10] - 159:19, 188:17, 188:19, 195:3, 195:22, 195:25, 211:23, 221:5, 224:3, 224:14
Westfall [9] - 159:19, 159:22, 188:16, 195:4, 195:19, 221:2, 223:25, 224:13, 225:10
whatsoever [1] - 25:9
whereas [2] - 47:18, 99:17
white [1] - 185:24
who've [3] - 77:1, 127:7, 152:14
whole [5] - 9:7, 87:15, 188:8, 215:18, 232:20
WICHT [17] - 4:12, 188:4, 189:17, 201:3, 201:12, 202:23, 202:25, 204:18, 205:21,

206:22, 209:10, 209:12, 216:23, 228:12, 228:16, 230:23, 233:5
Wicht [6] - 191:10, 201:11, 202:22, 204:17, 205:20, 209:11
wide [2] - 42:11, 42:14
widely [3] - 39:4, 39:6, 59:18
wider [1] - 31:4
William [1] - 183:16
Williams [7] - 4:13, 5:4, 24:5, 24:8, 24:10, 24:12, 51:3
willing [3] - 68:13, 69:8, 110:17
window [1] - 46:10
wish [1] - 65:19
withdraw [1] - 189:13
withdrawal [5] - 42:2, 78:15, 79:17, 98:14, 105:17
withdrawing [2] - 43:24, 213:21
WITNESS [42] - 7:8, 12:23, 13:2, 25:22, 26:2, 37:12, 50:11, 54:2, 64:7, 67:8, 73:24, 74:1, 75:14, 81:13, 95:9, 101:7, 107:25, 119:5, 119:24, 127:25, 131:17, 157:21, 157:24, 158:1, 158:5, 158:9, 161:13, 161:16, 161:19, 171:4, 171:7, 175:25, 190:7, 205:14, 215:24, 218:18, 219:12, 219:14, 228:25, 234:5, 234:7, 234:9
witness [22] - 9:21, 9:22, 11:9, 11:10, 119:15, 159:9, 160:3, 160:13, 161:3, 162:12, 162:22, 188:6, 188:9, 204:6, 206:22, 219:7, 220:20, 225:11, 227:13, 228:18, 228:21, 232:7
witnesses [13] - 7:17, 7:19, 7:20, 7:25, 8:8, 11:6, 12:4, 12:6, 12:11, 120:12,

120:13, 121:4, 191:1
witnesses' [1] - 10:5
WOELFEL [1] - 3:9
Woelfel [2] - 3:9
woman [3] - 70:19, 78:13, 117:3
Women [1] - 93:3
women [14] - 35:3, 69:13, 70:8, 70:11, 70:13, 70:14, 71:4, 71:7, 75:23, 77:2, 80:15, 86:18, 86:21, 149:13
women's [1] - 80:16
Woods [1] - 136:23
word [3] - 26:21, 56:16, 182:22
words [1] - 57:12
workforce [2] - 68:20, 118:7
works [4] - 39:25, 102:6, 152:8, 200:3
worse [1] - 170:5
worth [2] - 113:21, 147:5
wrap [2] - 146:8, 147:6, 163:25
wrap-around [1] - 147:6
write [6] - 28:3, 39:21, 112:17, 137:13, 141:20, 197:24
writing [4] - 17:14, 24:14, 124:5, 170:13
written [6] - 24:4, 39:15, 108:19, 139:18, 197:7, 197:9
wrote [2] - 24:8, 112:18
WU [1] - 5:10
WV [8] - 2:8, 3:10, 3:13, 4:19, 5:15, 6:9, 62:23, 128:3

## X

X's [1] - 103:19
Xanax [1] - 184:7
XXX [1] - 89:3
XXXXX" [1] - 67:10

## Y

year [58] - 10:23, 14:19, 15:4, 16:12, 17:8, 17:12, 17:19, 17:20, 17:22, 20:5, 20:11, 21:3, 21:4, 38:21, 54:23, 55:14, 55:20, 56:4, 56:13,

56:22, 58:7, 58:16, 58:20, 59:5, 59:11, 61:2, 61:7, 61:9, 62:5, 66:7, 66:8, 81:22, 82:2, 87:25, 88:2, 90:6, 90:9, 90:11, 90:15, 90:18, 90:20, 92:6, 95:18, 96:15, 96:22, 96:25, 113:13, 116:10, 147:15, 151:23, 154:10, 171:12, 171:13, 171:19, 183:24, 185:7
year's [1] - 59:3
years [26] - 30:13, 30:19, 58:10, 58:21, 59:7, 59:8, 61:4, 90:8, 113:15, 117:6, 143:14, 151:16, 153:7, 153:9, 153:11, 153:14, 153:15, 153:17, 156:9, 156:14, 156:22, 157:12, 166:23, 168:7, 171:14, 181:15
yesterday [2] - 9:10, 11:3
Yesterday [1] - 8:1
York [1] - 3:5
yourself [2] - 162:1, 171:5