```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT CHARLESTON


_____x
                               :
THE CITY OF HUNTINGTON,        :      Civil Action
                               :
            Plaintiff,         :      No.  3:17-cv-01362
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
                               :
CABELL COUNTY COMMISSION,      :      Civil Action
                               :
            Plaintiff,         :      No. 3:17-cv-01665
                               :
v.                             :
                               :
AMERISOURCEBERGEN DRUG         :
CORPORATION, et al.,           :
                               :
            Defendants.        :
_____x
```

                    BENCH TRIAL - VOLUME 22
      BEFORE THE HONORABLE DAVID A. FABER, SENIOR STATUS JUDGE
                  UNITED STATES DISTRICT COURT
                  IN CHARLESTON, WEST VIRGINIA


                        JUNE 8, 2021

**APPEARANCES:**

**For the Plaintiff,**
**Cabell County Commission:**

**MR. PAUL T. FARRELL, JR.**
Farrell & Fuller, LLC
1311 Ponc De Leon, Suite 202
San Juan, PR  00907

**MR. ANTHONY J. MAJESTRO**
Powell & Majestro
Suite P-1200
405 Capitol Street
Charleston, WV  25301

**MR. DAVID I. ACKERMAN**
Motley Rice
Suite 1001
401 9th Street NW
Washington, DC

**MR. PETER J. MOUGEY**
Levin Papantonio Thomas Mitchell Rafferty & Proctor
Suite 600
316 South Baylen Street
Pensacola, FL  32502

**MR. MICHAEL J. FULLER, JR.**
Farrell & Fuller
Suite 202
1311 Ponce De Leon
San Juan, PR  00907

**APPEARANCES (Continued):**

**For the Plaintiff,**
**Cabell County Commission:**

**MS. MILDRED CONROY**
The Lanier Law Firm
Tower 56
126 East 56th Street, 6th Floor
New York, NY  1022

**MS. PEARL A. ROBERTSON**
Irpino Avin Hawkins Law Firm
2216 Magazine Street
New Orleans, LA  70130

**MR. MICHAEL W. WOELFEL**
Woelfel & Woelfel
801 Eighth Street
Huntington, WV  25701

**MR. CHARLES R. WEBB**
The Webb Law Center
716 Lee Street East
Charleston, WV  25301

**MS. ANNIE KOUBA**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MR. MARK P. PIFKO**
Baron & Budd
Suite 1600
15910 Ventura Boulevard
Encino, CA  91436

**For the Plaintiff,**
**City of Huntington:**

**MS. ANNE MCGINNESS KEARSE**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**MS. LINDA J. SINGER**
Motley Rice
Suite 1001
401 Ninth Street NW
Washington, DC  20004

**MS. TEMITOPE LEYIMU**
Motley Rice
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**For the Defendant,**
**Cardinal Health:**

**MS. ENU MAINIGI**
**MS. JENNIFER WICHT**
Williams Connolly
725 Twelfth Street NW
Washington, DC  20005

**MS. SUZANNE SALGADO**
725 Twelfth Street NW
Washington, DC  20005

**MR. STEVEN R. RUBY**
Carey Douglas Kessler & Ruby
901 Chase Tower
707 Virginia Street, East
Charleston, WV  25301

**APPEARANCES (Continued):**

**For the Defendant,**
**Cardinal Health:**

**MS. ASHLEY W. HARDIN**
**MS. ISIA JASIEWICZ**
Williams & Connolly
25 Twelfth Street, NW
Washington, DC  20005

**APPEARANCES (Continued):**

**For the Defendant,**
**McKesson:**

**MR. TIMOTHY C. HESTER**
**MR. PAUL W. SCHMIDT**
**MS. LAURA M. FLAHIVE WU**
**MR. ANDREW STANNER**
Covington & Burling
One City Center
850 Tenth Street NW
Washington, DC  20001

**MR. JEFFREY M. WAKEFIELD**
Flaherty Sensabaugh & Bonasso
P.O. Box 3843
Charleston, WV  25338-3843

**APPEARANCES (Continued):**

**For the Defendant,**
**AmerisourceBergen Drug Corporation:**

**MS. SHANNON E. MCCLURE**
**MR. JOSEPH J. MAHADY**
Reed Smith
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103

**MS. GRETCHEN M. CALLAS**
Jackson Kelly
P.O. Box 553
Charleston, WV  25322

**APPEARANCES (Continued):**

**MR. ROBERT A. NICHOLAS**
Reed Smith
Suite 3100
Three Logan Square
1717 Arch Street
Philadelphia, PA  19103

**MS. ELIZABETH CAMPBELL**
1300 Morris Drive
Chesterbrook, PA  19087


Court Reporter:            Ayme Cochran, RMR, CRR
Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1          PROCEEDINGS had before The Honorable David A.

 2   Faber, Senior Status Judge, United States District

 3   Court, Southern District of West Virginia, in

 4   Charleston, West Virginia, on June 8, 2021, at 9:00

 5   a.m., as follows:

 6               THE COURT:  Ms. Singer?

 7               MS. SINGER:  Good morning, Your Honor.  Shall we

 8   call the witness back to the stand?

 9               THE COURT:  Okay.

10        Resume the witness stand, Mr. Rannazzisi.  Good

11   morning, sir.

12               THE WITNESS:  Good morning, sir.

13               THE COURT:  You're still under oath.

14               THE WITNESS:  Thank you.

15               BY MS. SINGER:

16   Q.   All right.  Good morning, Mr. Rannazzisi.  Yesterday I

17   promised we would start with a road map or follow a road

18   map.  Today, we may go a little off road.  So, please bear

19   with me.

20        So, I want to pick up where we were after the

21   distributor initiative briefings that you testified about

22   yesterday.  Now, after the DEA met with each of the

23   defendants in 2005, did you and your staff check to see

24   whether the meetings had had any impact?

25   A.   Yes, we did.
```

1   **Q.**   And what did you do?

2   **A.**   After a brief period of time, we --

3              MR. WESTFALL:  Your Honor --

4              THE WITNESS:  -- requested an ARCOS review for

5   sales.

6              MR. WESTFALL:  Your Honor, in terms of his

7   testimony, again, he can disclose anything that's not

8   privileged, any public information, but anything that he

9   discussed and --

10             COURT REPORTER:  I can't hear you, Mr. Westfall.

11  I'm sorry.

12             MR. WESTFALL:  He can disclose any public

13  information or any non-privilege information, but any answer

14  that he gives that would be based upon attorney-client

15  communications, deliberative process privilege or would

16  reveal law enforcement sensitive techniques, he's been

17  instructed not to answer.  That's what I wanted to indicate

18  on the record.

19             THE COURT:  Well, we understand all that.

20             MR. WESTFALL:  Thank you, Your Honor.

21             THE COURT:  The only way I can handle it is deal

22  with specific questions as they come up, Mr. Westfall.  So,

23  if you have any problem with any of Ms. Singer's questions,

24  you can interject.

25             MR. WESTFALL:  Thank you, Your Honor.

```
 1            THE COURT:  Otherwise, we'll press on.

 2            BY MS. SINGER:

 3   Q.   All right.  So, Mr. Rannazzisi, what did you do?

 4   A.   I asked for an ARCOS review in December to determine

 5   what happened to the flow to specific pharmacies downstream

 6   from specific wholesalers.

 7   Q.   And when you say December, do you mean -- what year do

 8   you mean?

 9   A.   December of 2005.

10   Q.   Okay.  And what did you find when you -- when you

11   undertook that review?

12   A.   They continued -- one particular defendant continued to

13   distribute large volumes of controlled substances

14   downstream.

15   Q.   And which defendant was that?

16   A.   McKesson.

17   Q.   And so, what did you do?

18   A.   I asked them to come in for a meeting.

19   Q.   And did that meeting take place?

20   A.   Yes.

21   Q.   And what happened?  Well, first of all, when was that

22   meeting; do you recall?

23   A.   That would have been probably January 3rd.  January 3rd

24   or January 4th of 2006.

25   Q.   Right after the new year, yes?
```

```
 1    A.    Yes.

 2    Q.    All right.

 3          MS. SINGER:  Can we have P-09116, please?

 4    Your Honor, may I approach?

 5          THE COURT:  Yes.

 6          BY MS. SINGER:

 7    Q.    All right.  Mr. Rannazzisi, do you recognize this

 8    document?

 9    A.    Yes, ma'am.

10    Q.    And what do you recognize it to be?

11    A.    This is basically the results of the meeting, the

12    written results of the meeting.

13    Q.    And by "the meeting", you mean the meeting between DEA

14    and McKesson?

15    A.    Yes, ma'am.

16    Q.    Okay.

17          MS. SINGER:  All right.  And let me just ask, are

18    you -- can you hear him?  Is he speaking loud enough?

19          COURT REPORTER:  Yes.  Thank you.

20          MS. SINGER:  Okay.

21          BY MS. SINGER:

22    Q.    All right.  Now, who was this memo to?

23    A.    Joseph Rannazzisi, me.

24    Q.    And who was it from?

25    A.    Michael Mapes.
```

1    **Q.**   Okay.  And I think you mentioned Mr. Mapes yesterday,

2    but who is he?

3    **A.**   Michael Mapes was the Section Chief for E-commerce.

4    **Q.**   And what was the purpose of this memo?

5    **A.**   To document exactly what happened during the meeting.

6    **Q.**   And were you at the meeting?

7    **A.**   Yes, I was.

8    **Q.**   And do you know whether this memo accurately reflects

9    what happened at that meeting?

10   **A.**   Yes, it does.

11          MS. SINGER:  Your Honor, I would move to admit

12   P-09116.

13          THE COURT:  Mr. Schmidt?

14          MR. SCHMIDT:  We maintain our geographic scope

15   objection.  The document is clear on its face.  It relates

16   to pharmacies in the Tampa, Florida area.

17          THE COURT:  Well, I'm going to overrule that

18   objection for the reasons I overruled the similar objection

19   yesterday during Mr. Rannazzisi's testimony.  I think it --

20   it embraces the entire situation here with regard to

21   McKesson, which would include the geographic area issue

22   here.  So, to that extent, it goes to the weight rather than

23   the admissibility and your objection is overruled.

24          MR. SCHMIDT:  May I just preserve that on a

25   running basis, Your Honor?

```
 1              THE COURT:  Absolutely.

 2              MR. SCHMIDT:  Thank you.

 3              BY MS. SINGER:

 4    Q.   Mr. Rannazzisi, where was the meeting with McKesson

 5    held?

 6    A.   At the DEA Headquarters.

 7    Q.   And do you recall who was there for McKesson?

 8    A.   It was their senior leadership.

 9    Q.   And how did the meeting open?

10    A.   We started to discuss the transactions.  Mike Mapes

11    discussed the meeting.  The -- actually, Mike Mapes started

12    by discussing the initial meeting.

13              MR. SCHMIDT:  This is literally hearsay, Your

14    Honor.

15              THE COURT:  I will sustain the objection to the

16    hearsay.

17              MS. SINGER:  Your Honor, I would say that this is

18    an account of the guidance that -- that the DEA provided to

19    McKesson and we would ask that it be -- that Mr.

20    Rannazzisi's testimony be allowed to go to notice to this

21    defendant about what the DEA was instructing them.

22              THE COURT:  Well, you can question him about what

23    he knows about it, but what Mr. Mapes said, I think, is out

24    of bounds.  It is hearsay.

25              BY MS. SINGER:
```

1    Q.   All right.  Mr. Rannazzisi, subject to that direction,

2    can you recount what you recall happened at that meeting?

3    What did DEA say to McKesson?

4    A.   We presented --

5              MR. SCHMIDT:  Same.  Same objection, Your Honor.

6              THE COURT:  Sustained.  Just -- you can ask him

7    what his recollection is and what happened at the meeting,

8    but don't ask him what anybody said.

9              MS. SINGER:  Okay.

10             BY MS. SINGER:

11   Q.   Mr. Rannazzisi, I'm going to ask you the Court's

12   question, which is what happened at that meeting?

13   A.   We presented information concerning ARCOS data that

14   showed that they were continuing to ship large volumes

15   downstream of hydrocodone to specific pharmacies that we

16   told them were showing patterns of suspicion, suspicious

17   orders, and we requested an answer why they were shipping,

18   continuing to ship these -- these huge quantities of

19   hydrocodone to these pharmacies after they were directed to

20   review the pharmacies' purchases and make a determination.

21   Q.   And between the distributor initiative meeting and this

22   meeting with McKesson at DEA Headquarters on January 3rd,

23   had there been other communications with McKesson about

24   these issues?

25   A.   I've got to -- could you please repeat the question?

**Q.**   Yes.  Let me actually direct you to the document that's
in evidence rather than repeat the question.  Can you look
at the bullets at the bottom of the page, Mr. Rannazzisi,
the first page?

**A.**   Yes.

**Q.**   Okay.  And does the memo recount that there were
communications between DEA and McKesson about its shipment
to these pharmacies between the distributor initiative and
the January 3rd meeting.

          MR. SCHMIDT:  Objection, Your Honor.  Vague.  I
think the fact is the earlier memo told us two pharmacies
were mentioned.  Now we're up to six.

          THE COURT:  Well, overruled.  If you can clear it
up, Ms. Singer, please.

          THE WITNESS:  Yes.  At the -- at the initial
meeting two pharmacies were presented, yes, and they were
told that this is a -- this is a suspicious order.  This is
what you're supposed to be looking for.  These are the
quantities you're supposed to be looking for.  This is --
these are the flags you're supposed to be looking for, the
red flags, black flags, whatever you want to call them.

          MR. SCHMIDT:  And, again, Your Honor, I'm going to
move to strike.  He wasn't at that earlier meeting.  If they
want to show him a document and have read him a document,
that's fine, but he's literally testifying about a meeting

```
 1    he was not at and I don't believe that level of detail is
 2    contained in the document we were sent.
 3              MS. SINGER:  I believe Mr. Rannazzisi is
 4    testifying as to his recollection of what occurred.
 5              THE COURT:  Overruled.  Overruled.  I will let him
 6    answer.
 7              BY MS. SINGER:
 8    Q.   Mr. Rannazzisi, had you finished your answer?
 9    A.   Yes.
10    Q.   Okay.  And so, between the distributor initiative
11    meeting, does this memo recount additional communications
12    between DEA and McKesson?
13    A.   May I have a second?
14    Q.   Of course.
15    A.   Yes, it does.
16    Q.   And what were those communications?
17    A.   Between DEA Section Chief and counsel for McKesson.
18    Q.   And do you know how many communications there were?
19    A.   At least one.
20    Q.   Okay.
21    A.   And then there was -- there was communication between a
22    DEA investigator in Tampa and the McKesson Distribution
23    Center at Lakeland.
24    Q.   And let's turn to Page 2 of the memo, please.
25    A.   Yes.
```

1          MS. SINGER:  And can we pull up, Gina, the second

2     page at the top, please?

3          BY MS. SINGER:

4     Q.   Mr. Rannazzisi, I direct you to the third bullet on the

5     second page of the memo.  Can you read what it says there?

6     A.   The E-commerce section retrieved ARCOS data which

7     revealed that between October 10th and October 21st, 2005,

8     the following alleged internet pharmacies received the

9     identified quantities of hydrocodone.  So that's an 11-day

10    period.

11    Q.   Okay.  And where -- I see the names of the pharmacies

12    are redacted, but what is the number that follows each of

13    those names?

14    A.   The 11-day period, first pharmacy was at 252,100 dosage

15    units of hydrocodone.

16    Q.   And what's a dosage unit?

17    A.   It could be a 5-milligram, 7-and-a-half-milligram, or a

18    10-milligram tablet.

19    Q.   So, a dosage unit is a pill, correct?

20    A.   Yes.

21    Q.   Okay.  And these volumes that you see in this memo, was

22    that an unusual volume of pills for McKesson to have

23    shipped?

24    A.   For 11 days, absolutely.

25    Q.   And so, did you ask McKesson for an explanation about

1    that volume of pills?

2    **A.**   Yes, I did.

3    **Q.**   And what did McKesson say?

4    **A.**   They couldn't give me a reason.

5    **Q.**   And can you recall precisely how McKesson responded to

6    your request for an explanation to the extent you recall?

7    **A.**   When I went through the numbers, I asked them could you

8    give me any type of explanation about why you were shipping

9    these quantities of drugs and I stared at them and they

10   shuffled papers and looked around.  And then a guy, one of

11   the gentlemen, kind of gave me a little smile and said,

12   "Well, I guess you got us."

13   **Q.**   And so, what happened after that?

14   **A.**   I was floored by that statement.  You know, they said,

15   "We can't tell you why.  We -- we don't know."  And it -- it

16   upset me.  It really upset me.

17   **Q.**   And why did it upset you?

18   **A.**   In 11 days, a pharmacy is getting --

19           MR. SCHMIDT:  Objection, relevance.  The fact that

20   he's upset is not a relevant fact in this case.

21           MS. SINGER:  It goes to explain DEA's --

22           THE COURT:  Yeah.  I'll overrule the objection.

23   You can answer it.

24           THE WITNESS:  In 11 days a pharmacy got 520,000

25   hydrocodone tablets.  Doing the math, you know, that's what,

```
1    four -- that's just -- it's a crazy number.  It would be
2    over 500 hydrocodone prescriptions a day.  That's -- that's
3    insane.  At 120 doses, that's insane.  And -- and there's --
4    there's no legitimate reason to have that much.
5              BY MS. SINGER:
6    Q.   And so, after McKesson responded, and I don't want to
7    re-state your words, but you considered that, what happened
8    after that?
9    A.   Well, they called later and said that their system was
10   not picking up generic drugs in the hydrocodone basic class.
11   Q.   And what do you mean their system?
12   A.   Their -- the system to identify suspicious orders.
13   Q.   Okay.  And it was not picking up generic --
14   A.   Hydrocodone products.
15   Q.   Okay.  And was that a surprising fact to you?
16   A.   Yeah, because the -- the Suspicious Order Monitoring
17   Program is supposed to pick up all controlled substances, be
18   it generic or brand name.
19   Q.   And was it a big issue in terms of McKesson's
20   compliance that its system was not monitoring generic drugs?
21   A.   Yeah.  It's a systemic failure.  If one -- if one
22   facility was not picking that up, then chances are all the
23   facilities weren't picking it up because it was a nationwide
24   system.
25              MR. SCHMIDT:  Objection.  Object to foundation,
```

```
 1    Your Honor.  Pure speculation.
 2            MS. WICHT:  Your Honor, sorry.  I would add to
 3    that that I believe it's calling for a legal conclusion in
 4    terms of system failure and whether it's compliant, which I
 5    believe is how he phrased it.
 6            MR. SCHMIDT:  Yeah.
 7            MS. SINGER:  So, Your Honor --
 8            THE COURT:  I think it's -- I'll sustain the
 9    objection.  I think it's speculation on his part.  I'll
10    sustain the objection.  Go ahead and ask him the next
11    question.
12            BY MS. SINGER:
13    Q.   Mr. Rannazzisi, did you have reason to know back in
14    2006, when you met with McKesson, whether McKesson operated
15    a single national compliance system?
16    A.   At that point in time, yes.  There was supposed to be.
17    I -- I -- at that point in time, I knew based on my
18    briefings that they were operating a single system, yes.
19    Q.   And so, was -- was McKesson's failure to identify
20    generic or monitor generic drugs that it was shipping a
21    systemic failure?
22            MR. SCHMIDT:  Same objection, Your Honor.  The
23    fact that this happened at one location and the fact that he
24    knew he had a national policy, that doesn't bridge to the
25    opinion, the legal opinion they're trying to elicit from him
```

```
 1    now, or give a factual basis for it.
 2                MS. SINGER:  Your Honor --
 3                THE COURT:  Well, I will overrule the objection,
 4    if he knows.  He can answer.
 5                THE WITNESS:  Could you repeat the question?
 6                BY MS. SINGER:
 7    Q.   I'm asking whether you knew back in 2006 whether the
 8    failure to monitor generic drugs was a systemic failure at
 9    McKesson?
10    A.   Based on what I knew of the system, yes.
11    Q.   And do you have any doubt about that?
12    A.   No.
13    Q.   Now, yesterday, we talked about internet pharmacies and
14    we're not going to re-tread that ground except for a minute.
15    The internet pharmacies that DEA was focused on, where were
16    most of those pharmacies located?
17    A.   Most of the internet pharmacies were located in
18    Florida.  The brick and mortar pharmacies were located in
19    Florida.
20    Q.   And can you explain briefly the relationship between an
21    internet pharmacy and a brick and mortar pharmacy?
22    A.   Well, an internet pharmacy is not really a pharmacy.
23    It's a facilitation center in cyberspace.  They take orders.
24    They give you questionnaires to fill out.
25          They -- they're like a traffic cop.  They send those
```

1    questionnaires to a doctor.  A doctor looks at the

2    questionnaire.  He might call the patient, might not, but in

3    either case, whether he calls or not, he approves a

4    prescription, goes back to the facilitation center, and it

5    goes up on to a bulletin board where a pharmacy somewhere

6    pulls it down and fills it and ships it to a patient, to a

7    drug-seeking patient.

8    **Q.**   And, to your knowledge, is there any interaction

9    between the doctor who is prescribing and the patient who is

10   receiving those prescriptions?

11   **A.**   The cases that DEA did, for the most part, there was no

12   doctor-patient interaction.  There may have been a phone

13   call.  That's about it.  But almost all the cases, it was

14   just a review of a questionnaire, sign -- approve the

15   prescription.  Prescription gets sent to the facilitation

16   center, up onto the bulletin board where a pharmacy fills

17   the prescription.

18   **Q.**   So, was there any kind of a physical examination of the

19   patient?

20   **A.**   No.

21   **Q.**   And over time did internet pharmacies give way to other

22   kinds of diversion?

23   **A.**   Yes.

24   **Q.**   And specifically with respect to the diversion of

25   opioids, what kind of diversion emerged?

1    **A.**    After Congress passed *Ryan Haight,* we saw -- basically

2    shut down the brick and mortar pharmacies in the United

3    States who are facilitating internet sales.  At that point

4    in time, we started seeing a massive increase in pain

5    clinics, rogue pain clinics.

6    **Q.**    And what is a rogue pain clinic?

7    **A.**    A rogue pain clinic is just that.  It's a group of

8    doctors, of prescribers, that are operating in a clinic

9    setting, but they're really not providing medical care.

10   It's just a prescription mill.

11        You walk in.  They might give you a cursory

12   examination.  You pay cash and they -- they write the

13   prescriptions that you want, for the drugs you want.

14   **Q.**    And where were these rogue pill mills?

15   **A.**    They started in Florida and then they moved throughout

16   the United States.

17   **Q.**    And did you deploy resources to address the internet

18   and then the pain mill pharmacies or the pill mill, sorry,

19   pharmacies?

20        MS. WICHT:  Your Honor, I'll just object because I

21   don't believe the witness has used the term "pill mill".

22   So, I'm not sure where that's coming from.  I could be wrong

23   about that.

24        MS. SINGER:  I'm sorry.  You're right.

25        I will rephrase the question, Your Honor.

```
 1            THE COURT:  He called it a prescription mill, I
 2  believe.  Prescription mill.
 3            MS. SINGER:  Or pain clinic.
 4            THE COURT:  I will sustain the objection to pill
 5  mill.
 6            BY MS. SINGER:
 7  Q.   All right.  Mr. Rannazzisi, can you answer that
 8  question modified, meaning did DEA modify resources to
 9  address the internet pharmacies and then the pain clinics or
10  prescription mills that you were seeing?
11  A.   Yeah.  We -- yes, we did deploy resources.  And we had
12  to because our resources had to be concentrated down in the
13  area of -- of the most activity, which would have been at
14  that point in time Florida.  So, we deployed a significant
15  amount of manpower and deployed attorneys.  We deployed
16  pretty much everything we needed to to run operations down
17  there, in addition to the manpower that we had in the Miami
18  Field Division.
19  Q.   And so, how many officers are we talking about or how
20  many people?
21  A.   Again, it was -- it was groups.  Probably at any one
22  time 30 more personnel, maybe 40.
23  Q.   And was that a big commitment for DEA at the time?
24  A.   Yes.
25  Q.   And have you heard the term "Oxy Express" during your
```

1    tenure at DEA?

2    **A.**    Yes.

3    **Q.**    And what do you understand that term to mean?

4    **A.**    "Oxy Express" was a term given to people that go down

5    to Florida to visit pill mills.  They might go three, four,

6    five at a time and then load up either by car, or by bus, or

7    even by plane and take the drugs back to where they came

8    from.  But Oxy Express originally was the I-75 Corridor

9    going up into -- going up through Georgia, past Georgia, and

10   then spreading out into the Midwest.

11   **Q.**    And have you also heard the term "Blue Highway"?

12   **A.**    Yes.

13   **Q.**    And what do you understand that term to mean?

14   **A.**    Same concept, different -- different roads, but it's

15   the same concept.  When -- the term "blue" is -- was taken

16   from a particular tablet that was blue that they were all

17   looking for, an Oxy 30 tablet, Oxy milligram -- 30-milligram

18   tablet.  That's why they called it the Blue Highway.

19   **Q.**    And in your experience were pills that were dispensed

20   either by internet pharmacies or prescription mills

21   transported to other states along, I think you said, the

22   I-75 Corridor?

23   **A.**    Yes.  That was the whole idea behind it.  You go down,

24   you visit multiple pill mills, multiple prescription mills.

25   You get your drug from pharmacies in the area and you take

1    them back to wherever you came from.  Some of these people

2    just got the prescriptions loaded up and then headed back

3    north to wherever they came from and had the prescriptions

4    actually filled at their local pharmacies.

5    **Q.**   And what drugs were being distributed through these --

6    these prescription mills?

7    **A.**   Well, we saw a massive shift in the types of drugs.

8    Everybody -- we were seeing large quantities of hydrocodone

9    during the internet phase of this problem.  And then, we

10   started seeing oxycodone, specifically the high dose

11   oxycodone, 10-milligram, 15-milligram and 30-milligram

12   tablets coming out, the prescriptions coming out.

13       We did see a small -- you know, smaller amounts of the

14   other doses, but they were looking for 10-milligram, 15 and

15   30s when they were going down to Florida.

16   **Q.**   And did DEA communicate to its registrants and to

17   distributors in particular that you were seeing this kind of

18   diversion of hydrocodone and oxycodone?

19   **A.**   Yes.  When we'd go out and do our presentations, that

20   was part of the presentations.  If you look at the

21   presentations I've done throughout the country at different

22   -- different venues when I was with DEA, not after DEA, but

23   when I was with DEA, we always talked about oxy 15, oxy 30

24   and how the pill mills were operating.  We were always

25   talking about looking at Alprazolam still because Alprazolam

1    was still being used in that trinity or that -- that trinity

2    of drugs with Carisoprodol and Oxycodone.  We were talking

3    about all of that during that time period.

4    **Q.**   And do you know --

5              THE COURT:  Just a minute.

6              MS. WICHT:  Your Honor, object to general

7    testimony about things that DEA purportedly was saying in

8    various places without any link to the defendants in this

9    courtroom, any link to Cabell-Huntington, any demonstrable

10   nexus to anything that happened here.

11             MS. SINGER:  So, Your Honor --

12             MS. WICHT:  And the objection is on the ground of

13   relevance.

14             THE COURT:  Well, I will overrule the objection.

15   I think he's discussing the general situation here and

16   practices that embrace the entire operation of the

17   defendants, or at least McKesson, which would include the

18   geographical area at issue here.  I will overrule the

19   objection.

20        Go ahead, Ms. Singer.

21             BY MS. SINGER:

22   **Q.**   Do you know if these defendants were present at any of

23   these presentations that you provided?

24   **A.**   I gave a lot of presentations to industry, to

25   pharmacists and industry.  I can't tell you exactly if they

 1    were present, but they had to know because I was not the

 2    only one out there.

 3              MS. WICHT:  Objection, Your Honor, to what

 4    defendants had to know.  I'm sorry to interrupt the witness.

 5              THE COURT:  Sustained.  If you can lay a basis of

 6    what he really knew, you can ask him, but he's speculating

 7    here as to what --

 8              BY MS. SINGER:

 9    **Q.**   So, Mr. Rannazzisi, focusing on --

10              COURT REPORTER:  I'm sorry.  I didn't --

11              MS. SINGER:  I'm sorry.

12              COURT REPORTER:  -- get the end of that, Your

13    Honor.  I'm sorry.

14              MS. SINGER:  I'm sorry.

15              THE COURT:  Go ahead, Ms. Singer.

16              MS. SINGER:  I'm terribly sorry.

17              THE COUR:  That's all right.

18              BY MS. SINGER:

19    **Q.**   Mr. Rannazzisi, focusing on what DEA said, did DEA

20    provide through other staff, to your knowledge,

21    communications about the diversion of oxycodone and

22    hydrocodone that you just talked about?

23              MR. SCHMIDT:  Objection, vague.  I think they're

24    trying to cure a problem by suggesting we had this

25    information without laying that foundation.  They're trying

```
1    to put in the testimony before they lay that foundation.

2              MS. SINGER:  Your Honor, I think --

3              THE COURT:  Well, overruled.  You can ask him what

4    he -- what he knows and you said to your knowledge.  If he

5    knows, he can answer.

6              THE WITNESS:  The distributor meetings, the

7    distributor conferences that were done, this information was

8    presented.

9              BY MS. SINGER:

10   Q.   Okay.  Mr. Rannazzisi, shifting gear, what is -- do you

11   know the term "Immediate Suspension Order"?

12   A.   Yes.

13   Q.   What is an Immediate Suspension Order?

14   A.   Immediate Suspension Order is -- generally, it is

15   always attached to an Order to Show Cause.  So, I mean,

16   generally an Order to Show Cause, I -- I'm presented with a

17   number of violations and we decide that we're going to show

18   cause that the registrant, whoever it is, a doctor,

19   pharmacy, a distributor, and we give them the opportunity to

20   appear before an administrative law judge and show cause as

21   to why their registration should not be -- action should not

22   be taken against the registration.

23   Q.   And were you responsible at DEA for initiating

24   immediate suspension orders during your tenure?

25   A.   If I can continue, Order to Show Cause by itself is
```

1    just -- is just a notice and, when you come in, you can

2    still practice whatever you're doing, pharmacy, medicine,

3    whatever.

4        An Order to Show Cause with an Immediate Suspension

5    Order is different.  At that point in time, I can stop you

6    from doing whatever you're doing with controlled substances.

7    So, if it's a distributor, I could stop them from

8    distributing controlled substances until they appear before

9    an administrative law judge and a final order is issued.

10   Same thing with a doctor.  Same thing with a pharmacy.

11       So, now, what was the question, ma'am?

12   **Q.**   Were you responsible for recommending or deciding on

13   Immediate Suspension Orders at DEA during your tenure?

14   **A.**   What would happen at DEA is if an immediate suspension

15   -- if there was an Order to Show Cause, it would be my

16   responsibility to review the Order to Show Cause, determine

17   the violation, and sign off on the Order to Show Cause.

18       If it's an Immediate Suspension Order, I would review

19   the Immediate Order to Show Cause and the Immediate

20   Suspension Order and then it would be -- it would be sent to

21   the Deputy Administrator of DEA and they would make the

22   determination, but I would -- I would sign off on it before

23   it would go up to the Deputy Administrator.

24   **Q.**   And what is the standard that DEA applied during your

25   tenure for initiating an Immediate Suspension Order?

**A.**   An imminent threat to public health and safety.

**Q.**   And can you explain what that means?

**A.**   It means that while you're operating under our registration, what you're doing and how you are doing your position -- your job, be it being a pharmacy, or a doctor, or a distributor, or a manufacturer, how you're doing your job is an imminent threat because you're not maintaining effective controls against diversion.

**Q.**   And did you initiate Immediate Suspension Orders during your tenure as Deputy Assistant Administrator?

**A.**   I reviewed Orders to Show Cause and if I felt there was an imminent threat, I would suggest that they go back and look.

**Q.**   And "they" in that answer is who?

**A.**   Would be the investigators, but the vast majority of the time they had already come to the conclusion it was an imminent threat when it hit my desk.

**Q.**   And did you make recommendations to the Deputy Administrator during your tenure to issue Immediate Suspension Orders against any of the defendant?

**A.**   I made recommendations on the Order to Show Cause.  I didn't make recommendations.  It was up to the Administrator, the Deputy Administrator, to look at the four corners of the document and make a determination there was an imminent threat.  That was solely in her purview.

1    **Q.**   Okay.  And I'm sorry because you had explained that.

2    Did you make recommendations with respect to Orders to Show

3    Cause related to these three defendants during your tenure?

4    **A.**   Yes.

5    **Q.**   And in recommending an Order to Show Cause what was

6    your goal as Deputy Assistant Administrator?  What were you

7    trying to accomplish?

8    **A.**   To stop the hemorrhaging.  You know, when -- when we're

9    doing an Order to Show Cause, we don't take those lightly.

10   An Order to Show Cause is a significant step because there's

11   violations afoot that are causing large scale diversion and

12   it has to be addressed.  So, an Order to Show Cause is that

13   step.

14       I talked to you.  I briefed you.  I told you what your

15   responsibilities are.  And you continue to do it.  So now,

16   you appear before an administrative law judge and the agency

17   and explain why you continue to do it.

18   **Q.**   Did you reach a point during your tenure that you

19   recommended an Order to Show Cause against McKesson?

20   **A.**   Yes.  It was shortly after that meeting.

21   **Q.**   And by "that meeting", what are you referring to?

22   **A.**   January 3rd meeting.

23   **Q.**   Of what year?

24   **A.**   2006.

25          MS. SINGER:  Let's pull P-00016, please.

```
 1            May I approach, Your Honor?

 2                 THE COURT:  Yes.

 3                 BY MS. SINGER:

 4    Q.   Mr. Rannazzisi, do you recognize what has just been

 5    shown to you as P-00016?

 6    A.   Yes.

 7    Q.   And what do you recognize it to be?

 8    A.   It looks like the administrative record for -- for the

 9    initial McKesson Order to Show Cause.

10    Q.   And did you recommend that Order to Show Cause to the

11    Deputy Administrator?

12    A.   Yes.  I -- yes.

13    Q.   And can you turn to Page 6 of the document, please?

14    A.   Yes.

15    Q.   And is that your signature on Page 6 of the Order to

16    Show Cause?

17    A.   Yes, it is.

18    Q.   And do you know, referring just to the Order to Show

19    Cause, which I think is Pages 4 to 6, did DEA issue this

20    Order to Show Cause after a legally authorized

21    investigation?

22    A.   Yes.

23    Q.   And do you know whether this document sets forth the

24    findings of that investigation?

25    A.   Yes, it does.
```

1          MS. SINGER:  Your Honor, I would move to admit

2     just Pages 4 to 6, the Order to Show Cause that Mr.

3     Rannazzisi signed.

4          MR. SCHMIDT:  Your Honor, we'll object to that

5     motion in terms of, number one, these are simply allegations

6     that were made in a court filing.  Number two, the entire

7     court filing is McKesson's response to these allegations.

8     So, if it was going to come in, it would have to come in,

9     all of it, not just the cherry-picked allegations of the

10    government, but the governmental allegations themselves

11    should not come in.

12         THE COURT:  So, you think I ought to admit the

13    whole file?

14         MR. SCHMIDT:  I think none of it should come in,

15    but if anything comes in, it should all come in.

16         THE COURT:  Ms. Wicht?

17         MS. WICHT:  Your Honor, I'm rising only because I

18    saw Mr. Ackerman rise and I wanted to note that Ms. Singer

19    and Mr. Ackerman represent the same party in this case.

20    They work for the same law firm.  And I believe that it

21    would be proper for there to be only one person objecting

22    and arguing objections during the examination.  Thank you.

23         MR. ACKERMAN:  Can I address that, Your Honor?  I

24    will try to do it quickly.

25         THE COURT:  Okay, go ahead.

1            MR. ACKERMAN:  I don't think there's a rule that

2    they can cite that says one person can't argue objections.

3    We're trying to do this in order to keep -- in order to move

4    the trial along.  We know we've got timing issues and this

5    is an efficiency issue.

6            THE COURT:  Well, I took this up a long time ago

7    way back in the early history of this case and I think I

8    ruled that it was one lawyer per witness per party and I've

9    consistently violated that ruling, there being no objection

10   to it, but there's an objection now, so I'm going to sustain

11   Ms. Wicht's objection.

12       And it's up to you, Ms. Singer.

13           MS. SINGER:  Oh, Your Honor, that breaks my heart.

14   All right.  Maybe there could be an exception given that DOJ

15   is here so we've now got one more on that side, but I will

16   try to fill Mr. Ackerman's shoes.

17           THE COURT:  Mr. Farrell?

18           MR. FARRELL:  I'd be willing to lend my proxy to

19   Mr. Ackerman as counsel for Cabell County.

20           THE COURT:  Well, I'm sure that's a generous

21   offer, but I don't think it falls within the purview of the

22   Court's ruling.

23       So, go ahead, Ms. Singer.

24           MS. SINGER:  I will do my best, Your Honor.

25           MS. SINGER:  Under FRE 8038(a)(1), this document

```
 1     is a record of a public office that, quote, sets out the
 2     office's activities.
 3               THE COURT:  Shouldn't the whole file come in
 4     rather than just the part you've pulled out?
 5               MS. SINGER:  We -- we don't object to that, Your
 6     Honor.
 7               THE COURT:  Is that what you want, Mr. Schmidt?
 8               MR. SCHMIDT:  If any of it comes in, that's what
 9     we want.  We maintain our objection to any of it coming in.
10               THE COURT:  You object to all of this, but if I
11     let any of it in at all, you want it all in?
12               MR. SCHMIDT:  Yes, Your Honor.
13               THE COURT:  Okay.  I'm going to admit P-00016.
14     It's admitted, the whole file.
15               BY MS. SINGER:
16     Q.   When did DEA issue this Order to Show Cause against
17     McKesson?
18     A.   The Order to Show Cause was issued August 4th.
19     Q.   Of what year?
20     A.   2006.
21     Q.   Take a drink, please.
22     A.   May I have another bottle of water, please?  Thank you.
23               THE COURT:  Absolutely.  Is there a bottle
24     anywhere?
25               THE WITNESS:  Thank you.
```

```
1              THE COURT:  Mr. Rannazzisi, do you need to take a
2      break?
3              THE WITNESS:  Oh, no, I'm fine.  As long as I have
4      water, I'm fine.
5              THE COURT:  We usually go until 10:30.  Is that
6      okay?
7              THE WITNESS:  That's fine, Your Honor.  That's
8      perfect, Your Honor.
9              THE COURT:  All right.  Go ahead, Ms. Singer.
10             BY MS. SINGER:
11     Q.   Mr. Rannazzisi, can you say again what day, date and
12     year, was the Order to Show Cause issued?
13     A.   August 4th, 2006.
14     Q.   And that was, if I can do the math, eight months after
15     you met with McKesson on January 3rd, 2006?
16     A.   Yes, ma'am.
17     Q.   Okay.  I'd like you to turn to Paragraph 5 on Page 2 of
18     the Order to Show Cause.  And can you read that paragraph
19     out loud, please?
20     A.   Subsequently, DEA officials reviewed ARCOS reports for
21     the period October 1st, 2005 to January 31st, 2006, and
22     found that seven Florida pharmacies were still acquiring
23     extraordinary quantities of hydrocodone.  Despite its
24     knowledge of suspicious internet practices, McKesson
25     Lakeland was engaging -- or was engaged in a continuing
```

1     practice of supplying hydrocodone to these seven pharmacies.

2     **Q.**   Now, did DEA seek -- so, I'm sorry.  This Order to Show

3     Cause, did it also include a request for an immediate

4     suspension -- or Immediate Suspension Order?

5     **A.**   I don't believe this one did, no.

6     **Q.**   Okay.  So, what were you seeking with this Order to

7     Show Cause?

8     **A.**   I was seeking compliance, but I was also seeking an

9     explanation for why they weren't -- they weren't proceeding

10    in a manner that's compliant with the act and what -- the

11    direction we gave them.

12    **Q.**   And the Order to Show Cause, I think, as you explained,

13    would seek the revocation of registration of the -- of the

14    revocation of the registration of McKesson's Lakeland

15    Distribution Center; is that right?  Or explain what it

16    does.

17    **A.**   Well, yeah.  An Order to Show Cause is specific to a

18    DEA registration number, which is specific to a facility.

19    So, if the facility is the Lakeland Distribution Center,

20    that would be the only facility within the McKesson

21    Corporation that we were -- we were looking at.  We were

22    seeking either a revocation or -- or some type of

23    modification to the registration.

24    **Q.**   And was it -- was it your view at the time this Order

25    to Show Cause was filed that McKesson's noncompliance was

```
 1   limited to the Lakeland Distribution Center?
 2   A.   Well, I only --
 3        MR. SCHMIDT:  Objection, foundation.  We have here
 4   a document where they proceeded against one distribution
 5   center.  It did not regularly supply Huntington-Cabell and
 6   they're now trying to bootstrap that without a foundation
 7   into a broader opinion from a fact witness.
 8        THE COURT:  Well, I --
 9        MS. SINGER:  Your Honor --
10        THE COURT:  Go ahead.
11        MS. SINGER:  I'm sorry.
12        THE COURT:  Go ahead, please.
13        MS. SINGER:  Two points, if I may.  One, I would
14   ask that Mr. Schmidt not argue in terms of his objection
15   when there's been no testimony from this witness about where
16   it distributed.
17        But that said, Mr. Rannazzisi has testified that this
18   was a national system.  I'm asking him to address his
19   knowledge of whether the problem was limited to Lakeland or
20   national.
21        MR. SCHMIDT:  And I'm fine not having speaking
22   objections.  There was just a speaking objection when the
23   witness was on the stand to hear the speaking objection.
24   So, I will object to foundation.
25        THE COURT:  All right.  I'll overrule the
```

1    objection.  You can ask him.

2              BY MS. SINGER:

3    **Q.**   Do you need me to re-state the question or do you have

4    it?

5    **A.**   Yes.  Please re-state the question.

6    **Q.**   Did you believe that McKesson's noncompliance was

7    limited to the Lakeland Distribution Center?

8    **A.**   The Lakeland Distribution Center was the target of this

9    Order to Show Cause, but as I testified previously, it was

10   my belief, based on what I knew, that it was a systemic

11   failure within their system.

12   **Q.**   So, why then did DEA only seek an Order to Show Cause

13   against the Lakeland Distribution Center?

14   **A.**   Because, at that point in time, that's where we found

15   the violations.  That's where the violations -- we -- we --

16   when we went into those meetings, we set out a specific, a

17   very specific set of ARCOS data.  We told them look at these

18   particular pharmacies from this particular center, okay, and

19   we expected them to comply with our guidance and, instead,

20   they continued to ship.  So, that's why we took action

21   against that one specific distribution center.

22             THE COURT:  Mr. Rannazzisi, why did you think it

23   was a systemic failure within McKesson's entire system?

24   What was the basis for that?

25             THE WITNESS:  Because when I was briefed on the

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1   systems before we went into the meeting, the second meeting,
 2   I was told that the systems that they have are basically a
 3   nationwide system.  So, when I looked at the system and
 4   looked at what they were doing, when they told us later on
 5   it's not picking up generic products, it didn't make sense
 6   that it was only at that facility because they were
 7   operating a nationwide system.
 8            MR. SCHMIDT:  I will object to that portion of the
 9   answer as hearsay.
10            THE COURT:  Well, they -- if I understood his
11   testimony, the statements that he referred to were coming
12   from McKesson, so I will --
13            MR. SCHMIDT:  No.  I think what he referenced was
14   when I was briefed before that meeting was the language.  I
15   don't have the live stream in front of me.  That would not
16   have been from McKesson.  That would have been from his
17   reports.
18            MS. SINGER:  Your Honor, I think the testimony --
19            MR. SCHMIDT:  And I think the witness is nodding
20   along.
21            COURT REPORTER:  I'm sorry.  I didn't hear that.
22            MR. SCHMIDT:  I believe -- well, I shouldn't --
23   I'll just stand on what I said, Your Honor.
24            MS. SINGER:  I think the witness is testifying as
25   to information that he had as a basis of an action he took
```

```
 1    and the effect that that information had on his decision

 2    making.

 3             THE COURT:  I'll overrule the objection.  You can

 4    proceed.  I think he's already answered the question.

 5             BY MS. SINGER:

 6    Q.   So, Mr. Rannazzisi, did DEA have resources -- or how --

 7    how much -- how much time and resource does it take for DEA

 8    to -- to initiate an Order to Show Cause?

 9    A.   It takes quite a bit of time because we have to -- we

10    kind of -- I've got to -- at this point in time, it's

11    difficult to talk about it because I'm prohibited from

12    talking about certain things.  We create an administrative

13    record and --

14             MR. SCHMIDT:  I'll object.  If he's limiting his

15    answer, that means we can't cross examine him on this.

16             BY MS. SINGER:

17    Q.   So, without -- if I may re --

18             THE COURT:  Well, wait a minute.  What about the

19    things that he is not permitted to answer, Ms. Singer?

20             MS. SINGER:  So, Your Honor, I can make clear that

21    I'm not directing the question -- any law enforcement

22    sensitive information.  I just want to know is it a major

23    commitment of resources.

24             THE COURT:  Well, I think Mr. Rannazzisi

25    understands the limitations here.
```

1          Mr. Westfall?

2              MR. WESTFALL:  I think he does understand, Your

3    Honor.  He can't disclose the law enforcement sensitive

4    techniques that goes into the decision or deliberate

5    processes, so I think he understands that.

6              THE COURT:  Well, I don't think he's there yet,

7    Mr. Schmidt.

8              MR. SCHMIDT:  We do object to the continuing

9    testimony on behalf of the DEA.  He's not here on behalf of

10   the DEA and he continues to state what sounds like opinions

11   on behalf of the DEA.

12             THE COURT:  All right.  Overruled.

13         Ms. Wicht?

14             MS. WICHT:  Your Honor, I would add that I --

15   looking at the Touhy authorization that we have for Mr.

16   Rannazzisi to be here today, it's not clear to me how this

17   topic fits within the scope of what's been authorized.

18             MS. SINGER:  Your Honor, I don't know that a party

19   other than the Department of Justice has standing to object

20   on the scope of a Touhy authorization.

21             THE COURT:  Well, that's right.  I'm going to rely

22   on Mr. Westfall here and I will overrule your objection, Ms.

23   Wicht.  And Fred's on his feet back there.

24             MR. WESTFALL:  Your Honor, under the authorization

25   he's allowed to testify about his personal recollection

1    related to the enforcement with regard to the defendants and

2    his interactions with them but, again, with the caveat that

3    we explained that we can't release law enforcement sensitive

4    techniques and privileged information.

5              THE COURT:  Okay.

6              MR. WESTFALL:  So, he's limited in that regard.

7    And I don't know if, Your Honor, if it would help the Court.

8    I have an extra copy of the Touhy letter that was sent to

9    him if that would help the Court in considering any of the

10   objections of the parties.

11             THE COURT:  Well, I think I have a copy of that

12   letter here somewhere.

13        I think we all understand the limitations here.  So,

14   you go ahead, Ms. Singer.

15             BY MS. SINGER:

16   **Q.**   Okay.  Mr. Rannazzisi, I think the question before you

17   is, is it a big commitment of resources for DEA to -- to

18   move forward with an Order to Show Cause?

19   **A.**   Yes, it is a very large commitment of resources.

20   **Q.**   And speaking to your knowledge, is the fact that DEA

21   took action against only one distribution center or a few

22   distribution centers an indication that there weren't

23   problems in other distribution centers?

24   **A.**   No.  As I had testified before, the focus of this Order

25   to Show Cause was based on what we saw in this distribution

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    center.  That doesn't mean that other distribution centers

 2    weren't involved.  It doesn't mean they were involved.  Just

 3    that this distribution center was where the violations were

 4    at the time.

 5              MS. SINGER:  Okay.  Let's turn to P-23733.

 6              Sorry.  May I approach, Your Honor?

 7              BY MS. SINGER:

 8    Q.   All right.  Mr. Rannazzisi, do you recognize P-23733?

 9    A.   Yes, I do.

10    Q.   And what do you recognize that document to be?

11    A.   This is a Settlement and Release Agreement.

12    Q.   And with -- among whom?

13    A.   With McKesson.  Between McKesson and DEA.

14    Q.   Okay.  And are you familiar with this Settlement

15    Agreement from your time at DEA?

16    A.   Yes, sir.  [Sic]  Yes, ma'am.  Yes, ma'am.

17    Q.   Oh, you've done that twice now.  I'm going to keep

18    track.

19    A.   I know.  I'm sorry.

20    Q.   I wish I'd say it was the worst thing somebody had

21    called me.

22    A.   No, no, no.  I'm sorry.  I apologize.

23    Q.   Before we go into this Settlement Agreement, this has

24    already been admitted into evidence.  I wanted to just go

25    back for a second.  How many distribution centers do
```

```
 1   defendants operate?
 2   A.    It depends on the defendant.  I guess -- I guess, you
 3   know, more than 20.  You know, the number 26 or 27 comes up,
 4   comes to mind.  But, you know, I just can't tell you for
 5   sure, but a lot, because they're operating nationwide.
 6   They're out there distributing all across the country.  So,
 7   you know, more than 20, less than 50.  How about that?
 8   Q.    And do you have facts within your personal knowledge to
 9   indicate whether these -- these compliance systems you've
10   been talking about were centrally located?
11   A.    Well, it depends on the -- on the distributor.
12   Q.    And how about for these defendants?
13   A.    I believe -- yes.  I think all three defendants have a
14   centrally located system.  They operated the systems out of
15   their distribution centers, but they were centrally located.
16   Q.    And the system design and management happened
17   centrally, to your knowledge, or was that distributed?
18   A.    I'm sorry.  Could you repeat that?
19   Q.    Was the design and implementation of each of
20   defendants' compliance systems managed out of the central
21   headquarters, if you know?
22   A.    I -- I couldn't tell you if it was centrally managed
23   out of headquarters or not.
24   Q.    All right.  Let's turn back to the Settlement
25   Agreement, P-23733.  After the McKesson Lakeland Order to
```

```
 1    Show Cause, did you subsequently issue Orders to Show Cause

 2    for McKesson's Distribution Center elsewhere?

 3    A.   Yes.

 4    Q.   And which distribution center was that?

 5    A.   Landover, Maryland.

 6    Q.   And where's -- okay.  And did you sign that Order to

 7    Show Cause?

 8    A.   Yes, I did.

 9    Q.   And did you also find a failure to maintain effective

10    controls in McKesson's Conroe, Texas Distribution Center?

11    A.   Yes.

12         MR. SCHMIDT:  Objection.  There's a difference

13    between issuing an Order to Show Cause and some suggestion

14    that the DEA has made a finding.

15         BY MS. SINGER:

16    Q.   MR. Rannazzisi --

17         THE WITNESS:  There's no -- there was no Order to

18    Show Cause issued in Conroe.  Conroe was an add-on to this

19    memorandum.

20    Q.   Okay.  But --

21         MR. SCHMIDT:  Even more so then, I object, Your

22    Honor.  There was no finding.

23         BY MS. SINGER:

24    Q.   Mr. Rannazzisi, what is the document --

25         THE COURT:  Overruled.  Go ahead, Ms. Singer.
```

```
 1              MS. SINGER:  Okay.  I'm sorry.
 2              BY MS. SINGER:
 3   Q.   What does the document say with respect to the Conroe,
 4   Texas Distribution Center at Page 1?
 5   A.   DEA alleges that McKesson failed to maintain effective
 6   controls against -- at its Conroe, Texas Distribution
 7   Center, the Conroe facility, against diversion of a
 8   particular controlled substance into other legitimate
 9   medical, scientific and industrial channels by sales to
10   certain customers of McKesson.
11   Q.   Okay.  So, you see on the screen Landover and the
12   paragraph below that is Conroe, correct?
13   A.   Yes.
14   Q.   And then let's turn to Page 2.  Can you read the top of
15   at that paragraph, please?
16   A.   Whereas DEA alleges that McKesson failed to maintain
17   effective controls at its Denver, Colorado Distribution
18   Center, the Denver facility, against diversion of particular
19   controlled substances into other than legitimate medical,
20   scientific and industrial channels by sales to certain
21   customers of McKesson.
22   Q.   Okay.  So, we've now talked about several McKesson
23   Distribution Centers; is that correct?
24   A.   Four, yes.
25   Q.   Okay.  So, let's turn to the bottom of Page 1, please,
```

1    Paragraph 2, where it says covered conduct.

2    **A.**   Okay.

3    **Q.**   Are you with me?

4    **A.**   Yes.

5    **Q.**   Okay.  And can you -- can you read the definition of

6    covered conduct starting at (1)?

7    **A.**   Covered conduct.  For purposes of this agreement,

8    covered conduct shall mean the following:  The conduct

9    alleged in the orders.

10    **Q.**   Okay.  And then moving to the next page, please?

11    **A.**   The alleged failure of McKesson to maintain adequate

12    controls against the diversion of controlled substances on

13    or prior to December 31st, 2007 at all distribution

14    facilities operated, owned, or controlled by it.

15    **Q.**   And then why don't you skip, please, to Paragraph 4?

16    **A.**   The alleged failure of McKesson to detect and report

17    suspicious orders of the controlled substances as required

18    by 21 C. F. R. 1301.7(4)(b) on or before December 31st,

19    2007.

20    **Q.**   And I'd like you to turn to Paragraph 6, please, on the

21    following -- on the following page, I believe.  Yes.  So,

22    Page 4, if you look at (e), can you read that paragraph, as

23    well?

24    **A.**   McKesson agrees that any express or implied approval by

25    DEA of any previously implemented system to detect and

1    report suspicious orders is hereby rescinded and is of no

2    legal effect with respect to McKesson's obligations to

3    detect and report suspicious orders in accordance with 21 C.

4    F. R. 1301.74(b).

5    **Q.**   And do you know why DEA included this provision in the

6    agreement?

7    **A.**   Yes, I do.

8    **Q.**   And --

9    **A.**   There was -- there was --

10         MR. WESTFALL:  Your Honor, again, I would object

11   to the extent that they're (unintelligible).

12         COURT REPORTER:  I can't hear.  I'm sorry.

13         MR. WESTFALL:  I'm sorry.

14   I object to the extent we're getting into

15   attorney-client privilege information as to why this was

16   included and also a deliberate process in law enforcement

17   sensitive information.  He can talk about what's publicly

18   known and certainly why, but as far as any of these other

19   areas that are privileged, he can't disclose those.

20         MR. SCHMIDT:  I would note, Your Honor, not to

21   argue with the privilege claim, Mr. Rannazzisi has given

22   testimony under oath in answer to this question.

23         MR. WESTFALL:  And I don't have a problem, Your

24   Honor, with him disclosing what he's testified under oath.

25   That's not -- that's not an issue.

1           THE COURT:  Well, I don't think he's reached the

2      forbidden area here, so let's go on from here and see where

3      we go.

4           MR. WESTFALL:  Thank you, Your Honor.

5           MS. SINGER:  Mr. Schmidt agrees.  Now I'm nervous

6      about the question, Your Honor, but I'll go ahead.

7           BY MS. SINGER:

8      **Q.**   Mr. Rannazzisi, can you answer consistent with --

9      **A.**   Can you repeat the question, please.

10     **Q.**   Do you know why this provision was included in this

11     agreement?

12     **A.**   Because there was information out there that DEA was

13     approving Suspicious Order Monitoring Programs and that was

14     not correct and not true.

15          MR. SCHMIDT:  And I'll object to the second half

16     of the question on foundation.  Second half of the answer.

17     I apologize.

18          MS. SINGER:  "And that was not true"?

19          MR. SCHMIDT:  Yes, because it pre-dates his role.

20          THE COURT:  Wait just a minute.

21          MR. SCHMIDT:  And because he's acknowledged he

22     doesn't know what happened prior to him taking --

23          THE COURT:  Well, I will sustain the objection to

24     the foundation.  Maybe you can clear it up.

25          MS. SINGER:  All right.

```
 1              BY MS. SINGER:
 2    Q.   Mr. Rannazzisi, during your tenure at DEA and around
 3    the time of this Settlement Agreement, did you have
 4    information that caused you to believe that there was a
 5    belief that DEA was approving suspicious order monitoring
 6    systems?
 7    A.   Yes.  That was the information that was not correct.
 8    Q.   And so, what --
 9              MR. SCHMIDT:  And, again, Your Honor, after Your
10    Honor just sustained a statement from him, he just made the
11    same statement that that's correct.  That does not have a
12    foundation.
13              MR. NICHOLAS:  I'll join in this objection, Your
14    Honor, on the basis of foundation for ABDC.
15              MR. SCHMIDT:  And, Your Honor, may -- sorry.
16              THE COURT:  I'll sustain the objection.
17              BY MS. SINGER:
18    Q.   So, Mr. Rannazzisi --
19              THE COURT:  You've got to show how he knew, if you
20    can.
21              MS. SINGER:  Okay.
22              THE COURT:  And what the basis was.
23              BY MS. SINGER:
24    Q.   So, how did you know that that -- I'm sorry.  Did you
25    have -- did you have reason to believe that -- I'm sorry.
```

```
1    How do you know, Mr. Rannazzisi?

2            MR. SCHMIDT:  And objection, Your Honor.  She's

3    asking him to explain an answer that's been struck.  The

4    answer is struck, so he can't explain how he knew something

5    that -- they've got to lay the foundation first, not accept

6    the answer as true and then ask him to explain how it's

7    true.

8            THE COURT:  Well, if she can do it, I'll give her

9    the chance do it.  Go ahead.

10           MS. SINGER:  All right.

11           BY MS. SINGER:

12   Q.   I think third try, hopefully, Mr. Rannazzisi.

13        Mr. Rannazzisi, how -- how did you know that -- that --

14   did you know that these defendants, let's focus on these

15   defendants, had a belief -- I'm going to try again.

16        Striking that, did defendants, to your knowledge,

17   suggest that DEA had approved prior suspicious order

18   monitoring systems?

19   A.   Yes.  There were some -- yes.

20   Q.   And how did you know that?

21   A.   Because my staff advised me that we need to make it

22   clear that we're not approving those systems.

23   Q.   And to your knowledge -- sorry.  Strike the to your

24   knowledge.  Did DEA approve suspicious order monitoring

25   systems?
```

```
 1          MR. SCHMIDT:  And this is where this is pure
 2   hearsay.  As an expert witness, Your Honor -- may I explain
 3   my objection?
 4          THE COURT:  Yes.  Please go ahead.
 5          MR. SCHMIDT:  As an expert witness he purported to
 6   go back and review materials before his time.  We believe
 7   those materials actually support him -- support us, I'm
 8   sorry, but the key, whatever the debate is over those
 9   materials, is that he did not review them in the course of
10   his work.  He acknowledged that he reviewed them to serve as
11   an expert witness.
12      He came into his role in '05 and '06.  If he wants to
13   -- he should be able to testify about his knowledge from
14   that time period, including being told in that time period
15   that people understood they had approval from the DEA, but
16   to go back and try to say that that was incorrect when he
17   was not involved in that time period and has acknowledged
18   that he only learned about that time period to serve as an
19   expert is improper.
20          THE COURT:  Mr. Nicholas?
21          MR. NICHOLAS:  I think we may, in part, be talking
22   about the approval of AmerisourceBergen's Suspicious Order
23   Monitoring System from 1998.
24      And just to buttress what Mr. Schmidt has said, this
25   witness has already testified with regard to that approval
```

```
1    that he did not -- he had not spoken to any of the people

2    that were involved in the putting together of that program

3    or the approval of that program.  He's testified about that

4    in a different matter.

5        So, I -- I agree and second Mr. Schmidt's objection on

6    this basis.

7            MS. SINGER:  So, Your Honor -- and now that we

8    don't have Mr. Ackerman, I fear we have Mr. Farrell.  But in

9    any event, I have asked the witness about his knowledge

10   during his time period.  I don't know that we want to spend,

11   I certainly don't, much more time on this issue.  I'm simply

12   seeking to ask the witness his understanding.  He's

13   testified to that and the basis for his understanding to his

14   knowledge.

15           BY MS. SINGER:

16   Q.  And, Mr. Rannazzisi, I'm happy to make clear I'm based

17   -- I'm asking my question about what you knew during your

18   tenure at DEA and not anything you've learned since you

19   left.

20           MR. SCHMIDT:  Your Honor, the objection is that

21   would be pure hearsay.  We know from testimony from I think

22   witnesses from every company that they believed their

23   systems were approved by the DEA.  We know that Mr.

24   Rannazzisi felt a need to rescind that in this letter and in

25   other sources because it was true.
```

```
 1        For him to say I was told they didn't really get

 2   approval, that's pure hearsay.  There's no foundation that

 3   can be laid for that and it's something he's tried to do as

 4   an expert and it's bringing in expert testimony.

 5            MR. NICHOLAS:  The witness was asked -- what the

 6   witness said was in response to a question that the DEA did

 7   not approve suspicious order monitoring systems.  That, I

 8   don't believe he can say based on -- based on the

 9   limitations of his testimony -- to his testimony as a fact

10   witness in a -- in a defined period of time.

11            THE COURT:  Ms. Wicht, do you want to make it

12   unanimous here?

13            MS. WICHT:  That's all I was looking to do, Your

14   Honor.  I don't believe I need to do this under the

15   protocols if we have in place but I just on this particular

16   issue wanted to make sure I stood up and said that we join

17   in the objections.

18            THE COURT:  And, Mr. Farrell, I don't have my

19   score card.  You represent a different party from Ms.

20   Singer?

21            MR. FARRELL:  Yes, Your Honor.

22            THE COURT:  Okay.  I'll hear from you.

23            MR. FARRELL:  This is also a subject that is

24   discussed at length in the DEA 30(b)(6) deposition of Thomas

25   Prevosnik which includes the manuals from '96 moving
```

1   forward.  And so, this is within the purview of the role of

2   Mr. Rannazzisi and consistent with facts that are already in

3   the record.  This is not an expert opinion, Judge.  We would

4   submit that in the Prevosnick deposition this would be a

5   fact.

6           MR. SCHMIDT:  The fact that a witness who had

7   factual knowledge testified about that doesn't give Mr.

8   Rannazzisi that knowledge.

9           MS. SINGER:  Well, Mr. Rannazzisi has testified,

10  Your Honor, that he has that knowledge and I would suggest

11  that if defendants wish to cross examine, they will no doubt

12  have ample time to do that, but I think this has turned into

13  legal argument when Mr. Rannazzisi has testified as to what

14  he knew and did at DEA.

15          THE COURT:  Let's start here and go around this

16  way.

17          MS. WICHT:  I'll just add with respect to Mr.

18  Prevoznik, Your Honor, that that is, in fact, some of the

19  testimony from Mr. Prevoznik that there is a pending motion

20  to strike on the basis of lack of personal knowledge.

21          THE COURT:  Mr. Schmidt?

22          MR. SCHMIDT:  I think he's testified if he had

23  that knowledge at all it was told to him.  It was hearsay.

24          MR. NICHOLAS:  Nothing to add.

25          THE COURT:  Well, if I understood him correctly,

1    he said that the basis for the opinion on the approval of

2    the suspicious ordering systems was what he had been told by

3    others and that's hearsay and I'm going to sustain the --

4    use Occam's razor here and go straight to that one ground

5    and sustain the objection.

6         You can move on, Ms. Singer.

7              MS. SINGER:  All right.  Understood.

8              BY MS. SINGER:

9    **Q.**   Mr. Rannazzisi, just to go back for one second, prior

10   to beginning or at any point during your tenure at DEA did

11   you go back and look at DEA's prior guidance to

12   distributors?

13   **A.**   I was briefed on prior guidance at one point in time.

14   **Q.**   And during your tenure as Deputy Assistant

15   Administrator, do you believe that the guidance you provided

16   and DEA provided under your direction was consistent with

17   DEA's past guidance to distributors?

18             MR. SCHMIDT:  Objection, hearsay.  He was asked

19   very specifically did you review it.  Instead of saying he

20   reviewed, it he said, "I was briefed on it."

21             THE COURT:  Sustained.

22             MS. SINGER:

23   **Q.**   All right.  Let's turn to the substance of the -- let's

24   turn to one other provision in the Memorandum of Agreement,

25   Page 6, Paragraph F, please.  Are you there, Mr. Rannazzisi?

```
 1    A.   Yes.

 2    Q.   Okay.  And what does this Paragraph F discuss?

 3    A.   Discusses the compliance reviews that are being done by

 4    DEA to ensure that they're operating within the guidance of

 5    the memo.

 6    Q.   And by memo, you mean the Settlement Agreement?

 7    A.   The Settlement Agreement, yeah.

 8    Q.   Okay.  And can you read the last sentence of Paragraph

 9    F, please?

10    A.   In the event that DEA provides such written notice of a

11    compliance review failure, DEA shall meet and confer with

12    McKesson --

13    Q.   Mr. Rannazzisi --

14    A.   Oh, I'm sorry.  That's the wrong one.

15         A finding of satisfactory does not otherwise express

16    DEA's approval of the compliance program implemented at any

17    particular distribution center.

18    Q.   Okay.  We'll come back to that point later.  All right.

19    We can put aside this Settlement Agreement.

20         After the distributor initiative and the McKesson Order

21    to Show Cause did DEA file another Order to Show Cause

22    against one of the defendants here?

23    A.   Yes.

24    Q.   And did DEA file an Order to Show Cause against

25    AmerisourceBergen after the McKesson Order to Show Cause?
```

1    **A.**   Yes.  There was -- I don't recall the exact date, but

2    there was an Order to Show Cause filed against

3    AmerisourceBergen.

4    **Q.**   And are you familiar with the Order to Show Cause that

5    DEA filed against AmerisourceBergen?

6    **A.**   Yes.

7         MS. SINGER:  Okay.  Let's pull P-00049, please.

8         Your Honor, may I approach?

9         THE COURT:  Yes.

10        BY MS. SINGER:

11   **Q.**   All right.  Mr. Rannazzisi, what is P-00049?

12   **A.**   This is an Order to Show Cause and Immediate Suspension

13   of Registration, an Immediate Suspension Order.

14   **Q.**   Against which defendant?

15   **A.**   Against AmerisourceBergen.

16   **Q.**   And what is the date of this Order to Show Cause?

17   **A.**   April 19th, 2007.

18   **Q.**   Okay.  And this one, I think, as you indicated, also

19   included an Immediate Suspension Order; is that correct?

20   **A.**   Yes.

21   **Q.**   And did you recommend to the Deputy Administrator that

22   DEA initiate this Order to Show Cause, an Immediate

23   Suspension Order?

24   **A.**   Again, I reviewed the Order to Show Cause and initialed

25   off on it and sent it up for review.

1    **Q.**   Okay.

2    **A.**   Put my initials on it.

3    **Q.**   Excuse me?

4    **A.**   My initials on it meant that it was -- that I had

5    reviewed it and I didn't find problems with it.

6    **Q.**   Okay.  And in this Order to Show Cause and Immediate

7    Suspension Order, did it lay out the specific conduct that

8    DEA believed violated the Controlled Substances Act?

9    **A.**   Yes.

10   **Q.**   And can you turn to Paragraph 5 at the top of Page 3?

11   And I direct you to notwithstanding.  Do you see that at the

12   top of Page 3?

13   **A.**   Yes.

14   **Q.**   And can you read that sentence out loud, please?

15   **A.**   Notwithstanding the information provided to respondent,

16   after the August 10th, 2005, meeting.

17   **Q.**   And let me interject for just one second.  Was the --

18   what was the August 10th, 2005 meeting?

19   **A.**   It was a distributor initiative meeting.

20   **Q.**   Okay.  Keep going.  I'm sorry.

21   **A.**   Respondent sold over 5.2 million dosage units of

22   hydrocodone to pharmacies that bore the characteristics that

23   DEA described in the August 10th meeting.

24   **Q.**   And so, to your knowledge, did AmerisourceBergen

25   continue to sell hydrocodone to -- to pharmacies even after

```
 1    the date of the Immediate Suspension Order?
 2    A.   Yes, ma'am.
 3    Q.   I'm sorry.  Even as to the date --
 4    A.   As to the date, yes.
 5    Q.   -- of the Immediate Suspension Order?  And is that the
 6    same conduct you had seen with McKesson prior to its Order
 7    to Show Cause meeting a continuation of selling to
 8    problematic pharmacies even after warned?
 9    A.   Yes.
10    Q.   And had you concluded in initialing the Order to Show
11    Cause an Immediate Suspension Order against
12    AmerisourceBergen that the distribution of controlled
13    substances by AmerisourceBergen's Distribution Center
14    represented an imminent threat to public safety?
15    A.   Well, again, that's up to the administrator to
16    determine whether there's an imminent threat to public
17    health, the Deputy Administrator.  However, I did initial it
18    when I was -- I chopped off, or initialed, whatever you want
19    to say, on the total package, yes.
20    Q.   And did that express your agreement that this conduct
21    was -- represented an imminent threat to public safety?
22    A.   Well, I wouldn't have signed it if I didn't believe it
23    to be accurate, or initialed it.
24    Q.   And -- and did you -- had you found that -- had DEA
25    found that these violations by AmerisourceBergen were
```

```
 1   systemic, as well?
 2            MR. NICHOLAS:  Your Honor, I will object to this
 3   question on the basis of lack of foundation.  I guess the
 4   other ground I will object to is that the witness has
 5   already testified that this ISO is limited to this
 6   distribution center and without more.
 7            MS. SINGER:  So, I don't think he has testified
 8   yet, but --
 9            THE COURT:  Well, you need to lay a foundation for
10   it, but if you can, I'll allow him to answer.
11            BY MS. SINGER:
12   Q.   And had -- had DEA, to your knowledge, had a chance to
13   observe AmerisourceBergen's compliance with the Controlled
14   Substances Act, its anti-diversion program?
15            MR. NICHOLAS:  I will object, Your Honor.  That's
16   too vague.
17            THE COURT:  Overruled.
18            THE WITNESS:  Could you repeat the question one
19   more time?
20            MS. SINGER:  Yes.
21            BY MS. SINGER:
22   Q.   Did DEA have a chance to observe AmerisourceBergen's
23   compliance with the Controlled Substances Act and its
24   anti-diversion program?
25            THE COURT:  What period of time are we talking
```

1   about here?

2          MS. SINGER:  Prior.  I'm sorry, Your Honor.  Prior

3   to the 2007 Order to Show Cause and Immediate Suspension

4   Order.

5          MR. NICHOLAS:  I will renew my objection based on

6   vagueness and time period.

7          THE COURT:  All right.  Overruled.  He can answer

8   if he can.

9          THE WITNESS:  The distributor initiative was based

10  on the systems that they were operating.  That's why they

11  were called in, because we wanted to make sure that they

12  understood what their obligations were, and to make the

13  appropriate corrections to their -- their systems.  So --

14  so, yes, I was aware of this system at that point in time.

15  I was aware of all three, you know, the systems that they

16  had.

17          BY MS. SINGER:

18  Q.   And by all three, what do you mean, Mr. Rannazzisi?

19  A.   The three defendants.

20  Q.   And did you have reason to believe -- did you believe

21  at the time that this Order to Show Cause and Immediate

22  Suspension Order was issued that AmerisourceBergen's conduct

23  was -- that its compliance deficiencies were national and

24  systemic?

25          MR. NICHOLAS:  Your Honor, I will object.  I've

1    listened carefully to the question and the answer.  There is

2    no basis -- there is no foundation laid here for this

3    witness to answer that question.

4            MS. SINGER:  I think, Your Honor, he has just

5    testified that he was familiar with all of their systems.

6            MR. NICHOLAS:  That is all he has said about

7    AmerisourceBergen's program, is that he was familiar with

8    the system and the fact that they had a system, period.

9    Full stop.

10           THE COURT:  Well, I'm going to overrule the

11   objection and let him answer.

12           THE WITNESS:  When the system did not identify

13   these -- these orders as suspicious, I took that to be,

14   again, a systemic failure in their system and, therefore,

15   their system was not operating within the confines of

16   1301.74(b) to identify and report suspicious orders.

17   **Q.**   So, let's turn --

18           MS. WICHT:  Your Honor, I object to the legal

19   conclusion stated by the witness.

20           MR. NICHOLAS:  Yes.  I was --

21           MS. WICHT:  Sorry, Mr. Nicholas.

22           MR. NICHOLAS:  Forgive me.  I should have been the

23   first one to make that objection, but that is the objection

24   I would make, as well.

25           THE COURT:  And I will sustain that objection.

1          MS. SINGER:  So, Your Honor, I would ask that --

2     that the witness's testimony up until the legal conclusion

3     be committed -- be permitted, meaning -- and I'm happy to

4     ask him again and with Your Honor's instruction that he not

5     offer a legal conclusion.

6          THE COURT:  Well, ask him again and --

7          MR. NICHOLAS:  Well, I'm standing up just in case.

8     I don't know what -- I don't know what she's going to ask.

9          THE COURT:  Well --

10         MS. SINGER:  But you assume you're not going to

11    like it, so fair enough.

12         THE COURT:  Ask him the question and see if you

13    can get around the legal conclusion.

14         MS. SINGER:  All right.

15         BY MS. SINGER:

16  **Q.**   All right.  Mr. Rannazzisi, prior to the time that this

17    Order to Show Cause and Immediate Suspension Order was

18    issued -- now I have to remember the question -- had you

19    reached a conclusion --

20         MS. SINGER:  I'm sorry.  Can I ask the court

21    reporter to read back the question that I originally asked?

22    Mr. Rannazzisi may be doing fine, but I may need a break,

23    Your Honor.

24         (Court reporter read back requested portion)

25         BY MS. SINGER:

1    **Q.**   So, let me ask that question again.  Did you have

2    reason to -- did you believe prior to the Order to Show

3    Cause and Immediate Suspension Order that

4    AmerisourceBergen's compliance deficiencies were national

5    and systemic?

6    **A.**   Based upon --

7              MR. NICHOLAS:  I object.  I'm sorry, Mr.

8    Rannazzisi.  Forgive me.

9              THE WITNESS:  That's all right.

10             MR. NICHOLAS:  I object both on the basis of lack

11   of foundation and specifically because there's no time

12   limitation being placed on this question.  I don't think

13   this witness is in a position to provide any personal

14   information that pre-dates 2005 when he -- when he took over

15   his -- in his role here.  So, I object on that basis.

16      The question did not limit -- had no time limitation

17   and, in addition, I do believe that there's no foundation

18   that's been laid here.

19             THE COURT:  I'm going to overrule the objection

20   and let him answer, Ms. Singer, and get you off the hook

21   here.

22             MS. SINGER:  Thank you.

23             THE WITNESS:  Could you repeat the question one

24   more time?

25             MS. SING:  Oh, that's sad.

1          MR. NICHOLAS:  No, I will not -- I'm going to just

2   -- I'm going to -- I'm going to ask that my -- I'm not going

3   to object this time around.  I just want to -- provided that

4   my objection is sort of preserved for the record.

5          THE COURT:  Well, your objection is loud and clear

6   on the record, Mr. Nicholas, and it will be shown.

7          BY MS. SINGER:

8   **Q.**   Did you believe, Mr. Rannazzisi, that prior to the

9   Order to Show Cause and Immediate Suspension Order against

10  AmerisourceBergen that the conduct that was described in

11  that order was nationwide and systemic?

12  **A.**   As previously testified, the amounts of drugs that were

13  not identified during -- by their systems at the Orlando

14  facility or wherever they were operating was -- it was a

15  total breakdown of system and, therefore, systemic

16  throughout their -- their systems in general throughout the

17  country.

18          THE COURT:  Is this a good place for a time-out?

19          MS. SINGER:  Yes, Your Honor.

20          THE COURT:  Okay.  We will be in recess for ten

21  minutes.

22      You can step down, Mr. Rannazzisi.

23          THE WITNESS:  Thank you very much, Judge.

24      (Recess taken)

25      (Proceedings resumed at 10:34 a.m. as follows:)

```
 1              MS. SINGER:  May I proceed, Your Honor?

 2              THE COURT:  Yes.

 3   BY MS. SINGER:

 4   Q.   Mr. Rannazzisi, I want to show you P-00009.

 5              MS. SINGER:  May I approach, Your Honor?

 6              THE COURT:  Yes.

 7   BY MS. SINGER:

 8   Q.   Mr. Rannazzisi, do you recognize this document?

 9   A.   Yes, I do.

10   Q.   And what do you recognize this document to be?

11   A.   A Settlement and Release Agreement.

12   Q.   Between who?

13   A.   AmerisourceBergen and the Drug Enforcement

14   Administration.

15   Q.   And did you review this agreement while you were at

16   DEA?

17   A.   Yes.

18   Q.   All right.  Let's turn -- I'm sorry.  Do you know the

19   date of this agreement?

20   A.   June 22nd of 2007.

21   Q.   Let's turn to Page 2 of the agreement, if you could

22   look at Paragraph 3, "Covered Conduct."  Can you read that

23   paragraph out loud, please?

24   A.   "Covered conduct shall mean the conduct alleged in the

25   order and/or the modified order --"
```

1    **Q.**   Let me interject for a second.  What does that order or

2    modified order refer to?

3    **A.**   The Order to Show Cause.

4    **Q.**   The one you were just talking about?

5    **A.**   Yes.

6    **Q.**   Okay, all right.  Keep going, please.

7    **A.**   "-- the alleged failure of AmerisourceBergen to

8    maintain adequate controls against diversion of controlled

9    substances, on or prior to May 22nd 2007, at the Orlando

10   facility and all other distribution facilities controlled by

11   AmerisourceBergen, with respect to all sales of Automation

12   of Reports and Consolidated Orders System reportable

13   controlled substances, benzodiazepines and phentermine; and,

14   three, the alleged failure to detect and report suspicious

15   orders of sales of the controlled substances set forth in

16   Subsection I(3)(ii) of this agreement as required by 21,

17   C.F.R., 1301.74(b)."

18   **Q.**   Were these -- did these controlled substances described

19   in this agreement include opioids?

20   **A.**   Yes.

21   **Q.**   And were these serious -- was this serious conduct that

22   this Settlement Agreement was resolving?

23          MR. NICHOLAS:  Objection, no foundation and vague.

24          THE COURT:  Sustained.

25   BY MS. SINGER:

```
 1    Q.   Mr. Rannazzisi, were you familiar with the nature

 2    of the conduct that this Settlement Agreement was

 3    resolving?

 4    A.   Yes.

 5    Q.   And was it serious misconduct in your eyes?

 6              MR. NICHOLAS:  Same objection.

 7              THE COURT:  Sustained.

 8    BY MS. SINGER:

 9    Q.   Does this agreement reflect the conduct that DEA

10    had observed with respect to AmerisourceBergen?

11              MR. NICHOLAS:  Objection, unclear, lack of

12    foundation.

13              THE COURT:  Well, I think he's got to define his

14    understanding of serious misconduct, Ms. Singer.

15              MS. SINGER:  I'm sorry, Your Honor.  Can you

16    repeat that?

17              THE COURT:  I think he needs to define, if he can,

18    what his understanding of serious misconduct is.

19              MS. SINGER:  Okay.

20    BY MS. SINGER:

21    Q.   And, Mr. Rannazzisi, you started to testify about

22    the nature of the conduct.  What do you mean by serious

23    misconduct?  What is that to you?

24    A.   Allowing the diversion of hundreds of thousands of

25    dosage units into the illicit market.  That's serious
```

1    misconduct, allowing diversion to occur.

2    **Q.**   And --

3          MR. NICHOLAS:  Your Honor, I'll object to, to --

4    and ask that the answer be struck.  There's no foundation

5    for it.

6          THE COURT:  Well, overruled.

7       Go ahead, Ms. Singer.

8    BY MS. SINGER:

9    **Q.**   And was the conduct that this Settlement Agreement

10   with AmerisourceBergen resolved serious as you've

11   defined it?

12          MR. NICHOLAS:  I'm sorry to continue to object.

13   These are allegations.  They're not proven out.  There's no

14   evidence of diversion that's been established here and I

15   will object.

16          THE COURT:  I'll overrule the objection and you

17   can go ahead, Ms. Singer.

18          THE WITNESS:  This was based on the Order to Show

19   Cause.  The Order to Show Cause had hundreds of thousands --

20          COURT REPORTER:  I'm sorry.  Can you speak up just

21   a little?

22          THE WITNESS:  I'm sorry.

23       It's based on the Order to Show Cause.  The Order to

24   Show Cause detailed hundreds of thousands of tablets going

25   downstream.  So, yeah, that's -- it's an Order to Show Cause

1    and those are very serious violations.

2              MR. NICHOLAS:  Same objection for the same

3    reasons, Your Honor.

4              THE COURT:  Overruled.

5    BY MS. SINGER:

6    **Q.**  Mr. Rannazzisi, did DEA bring additional actions

7    against AmerisourceBergen during your tenure as Deputy

8    Assistant Administrator?

9    **A.**  I don't recall any additional actions against

10   AmerisourceBergen.

11   **Q.**  And was the fact that DEA, to your knowledge, did not

12   initiate an enforcement action against AmerisourceBergen a

13   sign that, that you had found, or that DEA had found

14   AmerisourceBergen's compliance with the Controlled

15   Substances Act?

16   **A.**  No.  The fact that there was no enforcement action

17   doesn't mean they were compliant, doesn't mean they weren't

18   compliant.  We just didn't have -- during our, our

19   investigations, they did not come up.

20   **Q.**  Okay.  Let's turn to P-08873, please.

21              MS. SINGER:  Your Honor, may I approach?

22   BY MS. SINGER:

23   **Q.**  Mr. Rannazzisi, do you recognize P-08873?  You

24   might want to turn back -- I'm sorry.  Let me direct you

25   to a page.  It's a composite exhibit.  And I should note

1    that it's already been admitted.

2         Let's start -- sorry.  Let's start at Bates Number 49,

3    please.

4              MS. WICHT:  I'm sorry.  Is there a Bates number?

5              MS. SINGER:  I'm sorry, the P number.

6              MS. WICHT:  P number.  Thank you.

7    BY MS. SINGER:

8    **Q.**   Mr. Rannazzisi, have you found that page?

9    **A.**   Yes, I have.

10   **Q.**   Okay.  Why don't you turn one more page.  Do you

11   recognize this document?

12   **A.**   Yes, I do.

13   **Q.**   And what do you recognize it to be?

14   **A.**   An Order to Show Cause and Immediate Suspension Order.

15   **Q.**   I'm sorry, I didn't hear the last part.

16   **A.**   An Order to Show Cause and Immediate Suspension Order.

17   **Q.**   Against who?

18   **A.**   Against Cardinal Health, their Auburn facility.

19             MS. WICHT:  Your Honor, objection to this line of

20   questioning with this witness.  The Court may recall that

21   prior to trial, the issue of the scope of Mr. Rannazzisi's

22   testimony was addressed.

23        And the Court ruled that Mr. Rannazzisi's testimony

24   would be limited to the scope of his deposition taken in

25   Track 1 of the MDL.  And that's at Docket 1260.

1          Mr. Rannazzisi was not questioned in his MDL deposition

2     about the 2008 enforcement action against Cardinal Health at

3     all by either party, either side.

4          And, so, we object to questioning of him on this

5     general subject matter here.

6               THE COURT:  How about that, Ms. Singer?

7               MS. SINGER:  So two points on this, Your Honor.

8          All of these documents were provided to defendants

9     prior to Mr. Rannazzisi's testimony on Sunday.

10         I'll note that Cardinal did not object at that time to

11    testimony about this document.  And that's particularly

12    difficult in this instance where, you know, it leaves us

13    unable on the, on the fly to provide you with specific

14    references.

15         However, that said, I would note that Mr. Rannazzisi

16    was questioned extensively by both parties about DEA

17    enforcement action against all of the defendants.

18              THE COURT:  Is that right, Ms. Wicht?

19              MS. WICHT:  He was questioned generally about DEA

20    enforcement actions.  But, Your Honor, we've gone and looked

21    at the transcript and he specifically was not questioned

22    about the 2008 enforcement action against Cardinal Health.

23         With respect to the objections, I would note that when

24    we transmitted the objections to all of the identified

25    Rannazzisi exhibits, the defendants also expressly reserved

```
 1   their right to object to testimony or the use of exhibits in
 2   a manner that exceeds the scope of the Court's order that I
 3   referenced which is docket entry 1260, limiting him to the
 4   scope of his Track 1 MDL deposition.
 5            MR. ACKERMAN:  Your Honor, may I be permitted to
 6   address this?
 7            MS. SINGER:  I think he's asking for dispensation,
 8   Your Honor, to this particular point.
 9            THE COURT:  Why don't you go talk to him, Ms.
10   Singer.
11            MR. ACKERMAN:  All right.
12       (Ms. Singer and Mr. Ackerman conferred off the record
13   after which the following occurred:)
14            MS. SINGER:  So, Your Honor, without engaging in
15   hearsay, you will understand where this is coming from.  But
16   that said, I would note that in the objections that
17   defendants provided, Cardinal offered an outside of scope
18   objection for other documents, but not this one.
19       And particularly where we're tying testimony to
20   particular cites, it seems very unfair to then walk into
21   court on a general reservation and ask us to explain where
22   something was referenced.
23       I can assure the Court that over the two days of
24   testimony, Mr. Rannazzisi was questioned extensively on, on,
25   on enforcement actions, including the 2012 action which
```

1    incorporated this specific Order to Show Cause as an

2    attachment.

3         I would note that Cardinal also offered specific

4    objections on this document not related --

5              THE COURT:  Well, let me give Ms. Wicht the last

6    word here.

7              MS. WICHT:  Your Honor, just a couple of points.

8         We did object with respect to scope of this document as

9    to geographic scope and also as to personal knowledge for

10   the witness.

11        And then the second thing I would note, Your Honor, is

12   simply that it's a court order.  It's an order that you've

13   already issued, Your Honor, saying that he's restricted to

14   the scope of that deposition.  So I don't, I don't --

15             THE COURT:  Well, they're saying that that's not

16   within the -- this is not within the Court's ruling on

17   scope.

18             MS. WICHT:  Well, I would, I would invite the

19   plaintiffs to identify for us where in the Track 1 MDL

20   deposition Mr. Rannazzisi testified about the 2008

21   enforcement action against Cardinal Health because he did

22   not.  There was a question -- there was --

23             THE COURT:  Well, I'm going to cut this short and

24   overrule the objection and let, let him testify.

25   BY MS. SINGER:

1    **Q.**   All right.  Mr. Rannazzisi, I think you testified

2    that you were familiar with the first immediate -- the

3    first Order to Show Cause and Immediate Suspension Order

4    against the Auburn facility; is that correct?

5    **A.**   Yes.

6    **Q.**   Okay.  Let's turn the page, then, to the next Order to

7    Show Cause at P Number 54 and 55.  Do you recognize this

8    document?

9    **A.**   Yes.

10   **Q.**   And what do you recognize that document as?

11   **A.**   An Order to Show Cause and Immediate Suspension Order.

12   **Q.**   Against whom?

13   **A.**   Cardinal Health Lakeland.

14   **Q.**   And where is the Lakeland distribution center?

15   **A.**   In Florida.

16   **Q.**   And what is the date of this Order to Show Cause and

17   Immediate Suspension Order?

18   **A.**   December 5th, 2007.

19   **Q.**   Okay.  And let's turn to P Number, please, 61.  Are you

20   familiar with this document?

21   **A.**   Yes.

22   **Q.**   And what is it?

23   **A.**   Another Order to Show Cause and Immediate Suspension

24   Order.

25   **Q.**   And which, which defendant and facility does this one

1    relate to?

2    **A.**    Cardinal Health in Swedesboro, New Jersey.

3    **Q.**    And what is the date of this Order to Show Cause and

4    Immediate Suspension Order?

5    **A.**    December 7th, 2007.

6    **Q.**    All right.  And then let's turn to P Number 67.  Do you

7    recognize this document?

8    **A.**    Yes.

9    **Q.**    And what do you recognize this document to be?

10   **A.**    This is a straight Order to Show Cause.

11   **Q.**    And what does this relate to?

12   **A.**    Cardinal Health Facility in Stafford, Texas.

13   **Q.**    And what is the date of this Order to Show Cause?

14   **A.**    January 30th, 2008.

15   **Q.**    Okay.  And were you involved in signing off on each of

16   these enforcement actions against Cardinal?

17   **A.**    Yes.  They -- I was generally the last signature or

18   initial before it went to the administrator, or deputy

19   administrator except for the last one I signed.  I'm sure I

20   signed that because it's an Order to Show Cause.  Yes, I did

21   sign that.

22   **Q.**    And what had DEA found with respect to Cardinal's

23   dis- -- Cardinal's distribution of controlled substances?

24         MS. WICHT:  Your Honor, I'll object to the

25   characterization of "found" as alleged.  These are

```
 1    allegations.
 2             MS. SINGER:  I think they reflect, Your Honor,
 3    DEA's --
 4             THE COURT:  Overrule the objection.  Go ahead and
 5    answer.
 6    BY MS. SINGER:
 7    Q.   Just speak in general, Mr. Rannazzisi.
 8    A.   Just generally that, again, they were not identifying,
 9    reporting, or stopping large volumes of, of controlled
10    substances, hydrocodone, going downstream to pharmacies.
11    Q.   And you mentioned hydrocodone.  Does the failures reach
12    opioids beyond hydrocodone, if you know?
13    A.   I don't, I don't remember, but hydrocodone for sure.
14    Q.   Now, was there ultimately a Settlement Agreement
15    between DEA and Cardinal?
16    A.   Yes, I believe there was.
17    Q.   And were you -- let's turn to Page 34 of the P Number,
18    please.
19             MS. WICHT:  Your Honor, just while we're finding
20    that page, may I assume -- I understand the Court has
21    overruled the objection.  May I assume a continuing
22    objection on this line of questioning has been preserved?
23             THE COURT:  Yes, you may.
24             MS. WICHT:  Thank you, Your Honor.
25    BY MS. SINGER:
```

```
 1    Q.   Mr. Rannazzisi, are you on that P Number 34?

 2    A.   Yes.

 3    Q.   Okay.  Do you recognize this document?

 4    A.   Yes.  It's a Settlement and Release Agreement.

 5    Q.   And who is that Settlement Agreement between?

 6    A.   Cardinal Health and DEA.

 7    Q.   And does this Settlement Agreement resolve the Orders

 8    to Show Cause and Immediate Suspension Orders that you just

 9    went through?

10    A.   Yes, they do.

11    Q.   And, by the way, had you -- were you familiar with this

12    Settlement Agreement in your time at DEA?

13    A.   Yes.

14    Q.   Okay.  Let's turn to Page P Number 35, Paragraph 3,

15    "Covered Conduct."  And can you again read that paragraph,

16    please?

17    A.   "Covered Conduct.  For purposes of this agreement,

18    covered conduct shall mean the following:  The conduct

19    alleged in the Orders to Show Cause, Appendices B through E,

20    the alleged failure of Cardinal to maintain adequate

21    controls against the diversion of controlled substances, on

22    or prior to September 30, 2008, at all distribution

23    facilities listed in Appendix A operated, owned, or

24    controlled by it."

25    Q.   Let's stop there for a second and just flip, if we
```

1       could, to Appendix A which I believe is at Page 46.

2           Do you recognize this Appendix A of the distribution

3       centers covered by this Settlement Agreement?

4       **A.**   Yes.

5       **Q.**   All right.  I'm sorry.  If you could flip back to what

6       you were reading.  I think you were at Paragraph B.

7       **A.**   "The conduct described in Appendix F, Paragraph 8 to

8       this agreement; and the alleged failure of Cardinal to

9       detect and report suspicious orders of controlled substances

10      as required by 21 C.F.R. 1301.74(b) on or before

11      September 30, 2008."

12      **Q.**   And had, had you concluded that the distribution of

13      controlled substances by Cardinal's distribution centers

14      represented an imminent threat to public safety?

15              MS. WICHT:  Objection, calls for a legal

16      conclusion.

17              THE COURT:  Overruled.

18              THE WITNESS:  The Orders to Show Cause and

19      Immediate Suspension Orders when I reviewed them, I felt --

20      I wouldn't have initialed off and moved them on if I didn't

21      feel that was the case, however, again, with the caveat that

22      only the deputy administrator can make that call.

23      BY MS. SINGER:

24      **Q.**   And had, had you found that the conduct laid out in

25      these Orders to Show Cause and Immediate Suspension

1    Orders was systemic and nationwide?

2              MS. WICHT:  Objection, foundation.

3              THE COURT:  Overruled.

4              THE WITNESS:  Yes, based on the conduct that

5    was -- alleged conduct that was in the Orders to Show Cause,

6    I believed that it was a systemic breakdown nationwide.

7    BY MS. SINGER:

8    **Q.**   Did each of the Immediate Suspension Orders and

9    Orders to Show Cause and Settlement Agreements that

10   we've talked about this morning cover conduct that DEA

11   had warned defendants about in the distributor

12   initiative briefings?

13   **A.**   Yes.

14   **Q.**   And does each of these Settlement Agreements -- you

15   said you're familiar with them -- require defendants to

16   follow the law?

17   **A.**   Yes, that was a requirement that we -- that was a

18   requirement, yes.

19   **Q.**   And did it require each -- did these Settlement

20   Agreements require each of these defendants to report and

21   not ship suspicious orders?

22   **A.**   Yes, I believe each one of them has that provision in

23   it, yes.

24   **Q.**   And did any of the defendants indicate at the time that

25   they entered into these Settlement Agreements that they did

1    not know what was required of them?

2              MS. WICHT:  Objection, hearsay, foundation.

3              MR. SCHMIDT:  Yeah, and, and literally asking us

4    about what we didn't say is hearsay and foundation and it

5    couldn't be an admission.

6              THE COURT:  Well, the question was did any of the

7    defendants indicate at the time they entered into these

8    Settlement Agreements that they did not know what was

9    required of them.  We don't know what his answer is, so I

10   don't know whether it's hearsay or not.  Overruled.

11             THE WITNESS:  Nobody indicated to me.  None of the

12   defendants indicated to me that they didn't understand the

13   provisions of the Settlement Agreement.

14   BY MS. SINGER:

15   **Q.**   And if they had made that represen- -- expressed

16   that concern to your staff, would you expect to have

17   been told of that?

18   **A.**   Oh, absolutely.

19   **Q.**   And --

20   **A.**   But I think that if those reservations were expressed,

21   there wouldn't have been signatures on the Settlement

22   Agreement.

23   **Q.**   Did DEA have occasion to turn back to enforcement

24   activities and investigation of these defendants after these

25   Settlement Agreements?

1   **A.**   There -- well, at least two of the defendants, yes.

2   **Q.**   Okay.  And when was that?

3   **A.**   It was later on after 2010, I believe.  Yeah, we

4   started around 2010, yes.

5   **Q.**   Okay.  And what, what turned your attention back to

6   those defendants?

7   **A.**   The same, the same conduct; large quantities of

8   controlled substances going downstream to pharmacies without

9   any appropriate review, due diligence, reporting.  They were

10   just shipping.

11           THE COURT:  Which two of the defendants are we

12   talking about?

13           THE WITNESS:  I'm sorry, Your Honor.  It would

14   have been McKesson and Cardinal.

15           THE COURT:  Okay.

16   BY MS. SINGER:

17   **Q.**   All right.  Let's turn to P-00298.

18           MS. SINGER:  May I approach, Your Honor?

19   BY MS. SINGER:

20   **Q.**   All right.  Before asking you about this particular

21   document, Mr. Rannazzisi, are you aware of whether your

22   senior staff met with staff of the Health

23   Distributors -- HDMA in 2011?

24   **A.**   Oh, I'm, I'm sure they, they met multiple times

25   including 2011.

1    **Q.**   Okay.  And would you typically talk with your staff

2    before they participated in those meetings?

3    **A.**   Sometimes I would.  Sometimes I wouldn't.  But it just

4    depends on the nature of the meeting, yes.

5    **Q.**   And were you briefed by your staff after those meetings

6    about what had happened?

7    **A.**   Yes, I would always be briefed on, on industry

8    meetings, yes.

9    **Q.**   And I want to ask you to turn -- I'd like you to turn

10    to -- I'm sorry.  I need to catch up with myself.

11            MS. SINGER:  May I take a moment, Your Honor?

12            THE COURT:  Yes.

13        (Pause)

14            MS. SINGER:  I've got it.  I'm sorry.

15        All right.  We're going to come back to this document.

16    I certainly don't want to waste everyone's time.

17    BY MS. SINGER:

18    **Q.**   All right.  Let's move to the next.  Let's turn to

19    P-08873, please.  Okay.  It's the large packet of

20    Cardinal documents you just were looking at.  So we're

21    going to turn back to that.  Do you have it back in

22    front of you?

23    **A.**   Yes.

24    **Q.**   Okay.  Let's turn to Bates -- P number, I'm sorry, 27.

25    **A.**   Okay.

1    **Q.**    All right.  Turn now to the next page, P-28.  Do you

2    recognize this document, Mr. Rannazzisi?

3    **A.**    Yes, I do.

4    **Q.**    And what do you recognize this document to be?

5    **A.**    It's an Order to Show Cause and Immediate Suspension

6    Order, the Cardinal facility in Lakeland, Florida.

7    **Q.**    And were you involved in the decision to recommend --

8            THE COURT:  Just a minute, Ms. Singer.

9        Ms. Wicht.

10            MS. WICHT:  I'm sorry, Your Honor.  I'm trying to

11    find my notes.  My -- I believe that this particular

12    document was previously excluded by the Court on May 20th.

13    This was introduced and Your Honor sustained the objection

14    to the Lakeland warrant.

15            MS. SINGER:  Your Honor, if I may, there has been

16    additional testimony by this witness that it was DEA's

17    knowledge and his knowledge in particular that these systems

18    were nationwide.

19        And I think on that basis we'd ask that Mr. Rannazzisi

20    be permitted to testify about what he observed and, in

21    particular, to lay a foundation to allow us to move to admit

22    this document.

23            THE COURT:  The clerk has it down as admitted, Ms.

24    Wicht.

25            MS. WICHT:  Your Honor, I have -- our records show

```
 1    that the document, that 8873 was admitted, but that the 2011
 2    Lakeland warrant contained within it, the objection was
 3    sustained as to that.
 4              MS. SINGER:  And, Your Honor, on our end we show
 5    the entire document to have been admitted.
 6              THE COURT:  Well, I don't remember.  We don't
 7    remember.  And the only way to find out for sure is to go
 8    back and look at the transcript.
 9              MS. WICHT:  Understood, Your Honor.  And I
10    apologize for not having that for the Court this morning.
11    We will take a look at that and come back to you.
12              THE COURT:  Well, I'm going to conditionally admit
13    it so we can get on with this.  And if you can show me that
14    it shouldn't be admitted, Ms. Wicht, I'll make a
15    determination not to consider it.
16       Mr. Farrell.
17              MR. FARRELL:  Yes. I believe that this is a
18    composite exhibit and I believe Ms. Wicht was right that you
19    allowed certain aspects of it and, and there was a
20    foundation problem on this document.  And I would suspect
21    that's why Ms. Singer is attempting to cure that with this
22    witness.
23              MS. WICHT:  We don't object to proceeding
24    conditionally as Your Honor laid out and sorting that out,
25    if need be, later on.  Thank you.
```

```
 1              THE COURT:  All right.
 2   BY MS. SINGER:
 3   Q.   All right.  So, Mr. Rannazzisi, I think you
 4   established that you recognized this document.  Did DEA
 5   issue this Order to Show Cause following a legally
 6   authorized investigation?
 7   A.   Yes, it did.
 8   Q.   And does this document set forth the findings from that
 9   investigation?
10   A.   Yes, it does.
11              MS. SINGER:  So, Your Honor, to the extent that
12   this hasn't been admitted, I would move its admission.
13              THE COURT:  Is there any objection now, Ms. Wicht?
14              MS. WICHT:  In addition to what we've already
15   discussed, Your Honor, we would object on the basis of
16   geographic scope.  This document relates to four particular
17   pharmacies located in Florida.
18              THE COURT:  Well, I've dealt with the geographic
19   scope objections before and I think the theory is that there
20   is a systemic failure that transcended the -- pretty much
21   the entire operation which would have encompassed
22   Cabell/Huntington and -- Cabell/Huntington.
23       So I'm going to overrule the geographic scope
24   objection.  I think that that goes to the weight rather than
25   the admissibility.  And we'll proceed conditionally with
```

1    regard to the other objections.

2    BY MS. SINGER:

3    **Q.**   Now, as with, as with other Orders to Show Cause

4    and Immediate Suspension Orders, did you approve and

5    recommend this Order to Show Cause and Immediate

6    Suspension Order to the deputy administrator?

7    **A.**   Again, I reviewed, like the others, the Immediate

8    Suspension -- the Order to Show Cause and Immediate

9    Suspension Order.  I gave my initial approval and sent it

10   up.  Only the deputy administrator can make a decision on

11   imminent threat.

12   **Q.**   And can you read Paragraph 5 of this Order to Show

13   Cause and Immediate Suspension Order?

14   **A.**   "Notwithstanding the large quantities of controlled

15   substances ordered by Cardinal's top retail pharmacy

16   customers, Cardinal failed to conduct meaningful due

17   diligence to ensure that the controlled substances were not

18   diverted into other than legitimate channels, including

19   Cardinal's failure to conduct due diligence of its retail

20   pharmacy chain customers.  Furthermore, Cardinal failed to

21   detect and report suspicious orders of oxycodone products by

22   its pharmacy customers, as required by 21 C.F.R. 1301.74(b).

23   In addition, Cardinal's conduct described herein violated

24   the provisions of the administrative memorandum of

25   agreement."

1    **Q.**   And does that accurately reflect DEA's assessment of

2    Cardinal's distribution -- I'm sorry -- DEA's findings in

3    this investigation?

4    **A.**   Yes.

5    **Q.**   And do you believe that the failures described here

6    were limited to these customers of the Cardinal -- of that

7    Cardinal distribution center?

8                MS. WICHT:  Objection, foundation.

9                THE COURT:  Overruled.

10               THE WITNESS:  Could you repeat the question one

11   more time?  I didn't catch it.

12   BY MS. SINGER:

13   **Q.**   Did, did, did the paragraph you just read

14   accurately reflect DEA's -- I'm sorry.  That's two

15   questions ago.

16      Were the failures described here in Paragraph 5 that

17   you just read limited to the four Cardinal customers at this

18   distribution center, or did you believe that they were

19   systemic failings as well?

20               MS. WICHT:  I'll object only to clarify that we're

21   speaking within the scope of his own personal individual

22   knowledge.

23               THE COURT:  Well, overruled, if he knows.

24               THE WITNESS:  Well, I believe that because there

25   was, again, another systemic failure that was happening

1    elsewhere as well.

2    BY MS. SINGER:

3    **Q.**   Now, had DEA communicated with Cardinal prior to

4    issuing this Immediate Suspension Order about the issues

5    raised in the Order to Show Cause?

6    **A.**   Yes, I believe there were communications.

7    **Q.**   And do you recall the details of those communications,

8    how many, with whom, et cetera?

9    **A.**   I believe the communications occurred at the division

10   level with DPM and the group supervisor as well as

11   headquarters staff.

12   **Q.**   And do you recall whether -- roughly how many

13   communications there were?

14   **A.**   I don't recall.

15   **Q.**   Is there a document that might refresh your

16   recollection?

17   **A.**   I'm sure there's a document that, that has the content

18   of the discussions that, between -- yes, there should be a

19   document.

20   **Q.**   And do you recall, did Cardinal challenge this

21   immediate -- this Order to Show Cause and Immediate

22   Suspension Order in Federal Court in the District of

23   Columbia?

24   **A.**   Oh, yes, yes, they did.

25   **Q.**   And do you recall whether you submitted a declaration

```
 1    in connection with that action?

 2    A.    I did submit a declaration.

 3    Q.    And do you know whether that declaration describes the

 4    details of DEA's investigation and its interactions with

 5    Cardinal prior to the Order to Show Cause and Immediate

 6    Suspension Order?

 7    A.    Yes, it does.

 8    Q.    And do you think looking at that declaration would

 9    refresh your recollection as to those communications?

10    A.    Yes, it would.

11          MS. SINGER:  Can you give me please P-00013.

12          P-09399.

13          May I approach, Your Honor?

14    BY MS. SINGER:

15    Q.    So, Mr. Rannazzisi, just reading to yourself and

16    not aloud, I direct you to Paragraph 73.

17    A.    Paragraph 73?

18    Q.    I hope so.

19          THE COURT:  Does that refresh your recollection?

20          THE WITNESS:  Paragraph 73 does not.  I'll

21    continue to look.  I'm sure it's in here, though.  I think

22    it's in Paragraph 59.  Try Paragraph 59.

23    BY MS. SINGER:

24    Q.    Sorry about that.  All right.

25          Having looked at that paragraph, Mr. Rannazzisi, does
```

1  that refresh your recollection as to communications or

2  interactions between DEA and Cardinal Health in advance of

3  the Order to Show Cause?

4  **A.**   Yes.

5  **Q.**   Okay.  And can you now testify as to the details of

6  those communications and interactions?

7          THE COURT:  Just a minute.  We've got an objection

8  here.

9          MS. WICHT:  Well, I'm not sure -- maybe Ms. Singer

10  hasn't gotten there yet but, obviously, the document should

11  be removed from the witness before he testifies.

12          THE COURT:  Absolutely.

13      You need to read it, Mr. Rannazzisi, and say whether or

14  not it refreshes your recollection.  If it does, then you

15  have to testify from memory rather than reading into the

16  record the declaration.

17          THE WITNESS:  Yes.  I just -- there were two

18  sections, so I just wanted to read both sections.

19          THE COURT:  Well, go ahead and read them.

20          THE WITNESS:  Thank you, sir.

21          MR. WESTFALL:  I just want to make sure if the

22  question posed is the communication between -- between the

23  DEA and Cardinal or communications that he had with other

24  people within the agency.

25          MS. SINGER:  I think I've asked for his

1        interactions -- the DEA's interactions with Cardinal.

2                    MR. WESTFALL:  Okay.

3            (Pause)

4                    THE WITNESS:  Okay.

5                    THE COURT:  You can retrieve the document and

6        question him about it, Ms. Singer.

7        BY MS. SINGER:

8        Q.   So, Mr. Rannazzisi, having reviewed your

9        declaration, does that refresh your recollection as to

10       the interactions between DEA and Cardinal in advance of

11       the Order to Show Cause and Immediate Suspension Order?

12       A.   Yes.

13       Q.   And what were those interactions?

14       A.   There was an inspection done at the Peabody facility in

15       Massachusetts.  And during that inspection, DEA found that

16       there was no due diligence being conducted on chain drug

17       stores.

18           The, the lead investigator, inspector was in contact

19       with the Cardinal, the Cardinal people and told them, "You

20       must do due diligence."

21                    MS. WICHT:  Objection, hearsay.  I'm sorry.

22                    THE COURT:  How does it come in?

23                    MS. SINGER:  Your Honor, I believe that the -- the

24       hearsay exception is that it's being offered to provide

25       notice to the defendant about the guidance that DEA was

1    providing about what was required of it.

2            THE COURT:  Well, it might come in as an

3    admission, but not hearsay.  I'll overrule the objection and

4    see what he says.

5            THE WITNESS:  They must do due diligence on chain

6    drug stores, which -- and they were put on notice of that.

7        Moving ahead to the Order to Show Cause, if you notice

8    in the Order to Show Cause there were several -- two

9    particular pharmacies, 5195 and 219 in Sanford, Florida.

10   And both of those pharmacies were chain drug stores.  And

11   the volumes going to those pharmacies were outrageous.

12       And they didn't do due diligence that was told they

13   must do by I think at that point in time it was Inspector

14   Arpaio, Mike Arpaio.

15   Q.   And the failures to do due diligence that you have just

16   described, were those the same types of failures, if you

17   know, that DEA had observed in 2008?

18           MS. WICHT:  Objection, foundation.

19           THE COURT:  Overruled.

20           THE WITNESS:  Due diligence is due diligence.  So,

21   yes, it's the same due diligence problems.  You're not,

22   you're not reviewing the customers' orders.  You're not

23   comparing those orders.  You're just not doing what's

24   appropriate to determine what's suspicious and what's not,

25   and then stop those orders from going downstream.

1    BY MS. SINGER:

2    **Q.**   In 2012 -- are you aware that Cardinal entered into

3    a second Settlement Agreement with the DEA in 2012?

4    **A.**   Yes.

5    **Q.**   Okay.  We're going to turn back to that big set of

6    documents at 208873.  We're going to go to P Number 15.  Do

7    you have that page in front of you?

8    **A.**   Yes, I do.

9    **Q.**   Okay.  And have you seen that -- I'm sorry.  What is

10   that document?

11   **A.**   It's an Administrative Memorandum of Agreement.

12   **Q.**   Okay.  And is that the Settlement Agreement that

13   resolved the 2012 Order to Show Cause and Immediate

14   Suspension Order?

15   **A.**   Yes.

16   **Q.**   And had you seen this Settlement Agreement while you

17   were at DEA?

18   **A.**   Yes.

19   **Q.**   And do you know whether this Settlement Agreement

20   included enhanced compliance procedures that Cardinal agreed

21   to undertake, including with respect to chain pharmacies?

22   **A.**   I believe that was in the agreement, yes.

23   **Q.**   All right.  And we can put that aside.  I want to try

24   again with the document that I was struggling with before,

25   P-00298.  Do you have that in front of you, Mr. Rannazzisi?

**A.**   Yes, I do.

**Q.**   Okay.  I had asked you previously about whether you were aware of staff -- meetings between DEA and the HDMA. Do you recall that testimony?

**A.**   Yes.

**Q.**   And are you aware that during 2011 and 2012 DEA staff met with the HDMA?

**A.**   Yes, I am.

**Q.**   And what is the HDMA?

**A.**   Well, the HDMA, the Healthcare Distribution Management --

**Q.**   Can you get closer to the mic?

**A.**   The Healthcare Distribution Management Association.  I think they're the had now.

**Q.**   And do you know what the had or HDMA is?

**A.**   They're an advocacy organization for the distributors.

**Q.**   And did you know at the time at the DEA whether these defendants were members of the HDMA?

**A.**   Yes, they were all -- the defendants were all members of the HDMA.

**Q.**   And do you know whether they served a leadership position with the HDMA?

**A.**   I believe they were all on the executive board at one time or another, yes.

**Q.**   All right.  And I just want to ask you to turn to P

1    Number 37 in the document that I've shown you.

2    **A.**   Okay.

3         MS. WICHT:  Your Honor, I'm sorry.  I'm going to

4    lodge an objection to the use of this document with this

5    witness.  There's been no indication that he's seen it

6    before.  It recites on its face that it's an HDMA members

7    only document not for external circulation.  I don't think

8    that the witness can consult it as he's testifying to inform

9    his answers.

10        MS. SINGER:  So, Your Honor, if I may, these

11   minutes, or this document recounts a meeting between DEA and

12   the HDMA at which one of Mr. Rannazzisi's staff conveyed the

13   position of the DEA.  And I want to ask Mr. Rannazzisi

14   whether he agrees with that statement.  I think Mr. Hester

15   did the same thing with Dr. O'Connell yesterday.

16        MR. SCHMIDT:  Your Honor, we'll object to

17   foundation if he doesn't have a basis to give specific

18   foundation testimony as to this document.  Just reading a

19   statement from a document he's never seen seems improper.

20   That makes him an expert.

21        THE COURT:  Yeah.  I think you have to lay a

22   foundation, Ms. Singer, if you want to ask him about it.

23   BY MS. SINGER:

24   **Q.**   So, so, Mr. Rannazzisi, are you familiar with a

25   meeting that took place in December of 2011 between DEA

```
 1    and HDMA?

 2    A.    Yes.

 3    Q.    And do you know which DEA staff were present at that

 4    meeting?

 5    A.    My executive assistant was present and my staff.

 6    Q.    And what was the name of your executive assistant at

 7    that time?

 8    A.    Gary Boggs.

 9    Q.    Okay.  And prior to that meeting did you have a

10    conversation with Mr. Boggs about, about what would happen

11    at that meeting?

12    A.    Yes.  We would discuss those meetings.  When he's

13    attending in my place or as my representative, we would

14    always discuss, yes.

15    Q.    And did you --

16          MR. SCHMIDT:  No objection.

17    BY MS. SINGER:

18    Q.    Did you talk with Mr. Boggs about the, about any

19    message that the DEA might convey, that he might

20    convey --

21          MR. SCHMIDT:  Now --

22    BY MS. SINGER:

23    Q.    -- on your behalf at that meeting?

24          MR. SCHMIDT:  Now I'll object on hearsay.

25          THE WITNESS:  We wanted them --
```

```
 1              THE COURT:  Just a minute.

 2         I'll sustain the objection on the hearsay ground, Ms.

 3    Singer.

 4              MS. SINGER:  So, Your Honor, I think this

 5    testimony goes to his supervision of his direct report who

 6    he has directed to convey a message to HDMA which goes to

 7    the non-hearsay purpose of what DEA communicated to these

 8    defendants.

 9              THE COURT:  Well, what about that, Mr. Schmidt?

10              MR. SCHMIDT:  I think his -- he doesn't have a

11    basis.  He can, I guess, say, "Did you intend for Mr. Boggs

12    to do something?"  But to then say it was actually done,

13    that would be hearsay.

14         And I think that this is all a setup to try to have him

15    testify about not what Mr. Boggs said because that's not

16    what these slides are, but about what HDMA said, which is

17    what these slides are.

18              THE COURT:  Well, what DEA communicated to these

19    defendants is hearsay if he is the witness testifying about

20    it and he wasn't there.  Isn't that right?

21              MS. SINGER:  So, Your Honor, I think it's not

22    hearsay because it goes to the notice question.  This was a

23    communication by DEA to express the view of the regulator

24    about the regulated entity, these defendants' noncompliance

25    with the law.
```

1           MR. SCHMIDT:  That argument would apply if he were

2      the one that directly made the communication.  But there's

3      hearsay within hearsay if he's purporting to say that

4      Mr. Boggs actually said that.

5           THE COURT:  I'll sustain the objection, Ms.

6      Singer.

7           MS. SINGER:  All right.

8      BY MS. SINGER:

9      **Q.**   Do you know, Mr. Rannazzisi, -- you can put the

10     document aside -- what message was delivered by DEA at

11     this meeting?

12     **A.**   Yes.

13     **Q.**   And what was that message?

14          MR. SCHMIDT:  Same objection, Your Honor.

15          THE COURT:  Yeah.  You need to show how he knows.

16     And if he knows because of what somebody told him, it's

17     hearsay.

18     BY MS. SINGER:

19     **Q.**   How do you know what message was conveyed at that

20     meeting?

21     **A.**   Because they were conveying a message that I wanted

22     them to convey at the time.

23     **Q.**   And how do you know that, Mr. Rannazzisi?

24     **A.**   Because I told them what to say.

25     **Q.**   And this was within the scope of your authority and

```
 1    their responsibility?
 2    A.   Yes.
 3              MR. SCHMIDT:  I think the witness is very artfully
 4    not answering the question, which is someone told him
 5    something about what was said.  If no one told him and he
 6    doesn't know, he has no foundation.  If someone told him,
 7    it's hearsay.
 8              THE COURT:  I'll sustain the objection.
 9              MS. SINGER:  I'll move on.
10    BY MS. SINGER:
11    Q.   All right.  Mr. Rannazzisi, I want to return very
12    briefly to a subject we discussed yesterday.  But I
13    think when we recessed for the day, I didn't take the
14    time to finish the conversation.
15         To your knowledge, as Deputy Assistant Administrator,
16    prior to the distributor initiative meetings that we talked
17    about yesterday, were these defendants reporting suspicious
18    orders to DEA?
19              MR. SCHMIDT:  Objection, calls for a legal
20    conclusion --
21              THE COURT:  Overruled.
22              MR. SCHMIDT:  -- and asked and answered.
23              THE COURT:  Mr. Nicholas.
24              MR. NICHOLAS:  And there's a lack of personal
25    knowledge.
```

```
1              THE COURT:  Ms. Wicht.

2              MS. WICHT:  Foundation, Your Honor.

3              THE COURT:  Overruled.

4       Go ahead, Ms. Singer.

5              MS. SINGER:  I'm sorry, Your Honor.  Was that

6    overruled or sustained?

7              THE COURT:  The objection is overruled.  You can

8    ask him.

9    BY MS. SINGER:

10   Q.   So were you aware, Mr. Rannazzisi, whether these

11   defendants were reporting suspicious orders to DEA prior

12   to the distributor initiative briefing?

13   A.   No, that was the reason for the distributor initiative

14   meetings because we weren't getting suspicious orders.  We

15   weren't getting the suspicious orders that basically

16   pinpointed or was a pointer system to potential diverters.

17   What we were getting was excessive purchase reports and, and

18   the like of the excessive purchase reports which are not

19   suspicious orders.

20   Q.   And were those excessive purchase reports submitted at

21   the time an order was shipped or days or weeks after the

22   order was shipped?

23   A.   I don't recall any suspicious -- any excessive order

24   report that was given to DEA at the time it was shipped.

25   And that, that wouldn't be a suspicious order.  It would
```

1    have to resolve before they ship.

2        But even though most of the orders we received, those

3    excessive purchase orders were, you know, maybe weekly,

4    every two weeks, every month.

5    **Q.**   And, so, does that mean in your experience, based on

6    your observations, that Cardinal, McKesson and

7    AmerisourceBergen were identifying orders as potentially

8    suspicious and then sending it to their customers anyway?

9    **A.**   Well, if we weren't receiving suspicious orders and the

10   orders on a suspicious order didn't indicate that they were

11   stopping the shipment, then, yeah, my -- yes, then they

12   would be shipping those orders.  Those excessive purchases

13   would be shipped.

14   **Q.**   And do you know why these defendants were shipping

15   controlled substances that they suspected might be being

16   diverted?

17               MR. SCHMIDT:  Objection, foundation, Your Honor.

18               MS. SINGER:  If you know.

19               MR. SCHMIDT:  How could he know?

20               MS. WICHT:  The question incorporates a state of

21   mind of the defendant.  I don't see how he possibly could

22   answer that, has foundation to answer that question.

23               MR. NICHOLAS:  We join.

24               THE COURT:  I'll sustain -- sustained.

25   BY MS. SINGER:

1    **Q.**   Did you ever -- did you ever get any information or

2    did the defendants ever convey to you why they were

3    shipping suspicious -- shipping controlled substances

4    they thought might be diverted?

5           MR. SCHMIDT:  Objection, characterization.  That's

6    a misstatement of the record.

7           MR. NICHOLAS:  Join.

8           MS. WICHT:  Join in the objection as to

9    foundation.

10           THE COURT:  Sustained.  We don't have a time

11    period on this at all.

12           MS. SINGER:  I'm sorry, Your Honor.  I'll make

13    that clear.  This is all prior to the distributor initiative

14    briefings in 2005.

15    BY MS. SINGER:

16    **Q.**   So with that qualification, Mr. Rannazzisi, -- and

17    I'm certain that there will be an objection as well --

18    did you ever get any information as to why defendants

19    were shipping orders that they suspected might be

20    diverted?

21           MR. SCHMIDT:  Objection.  There's no foundation

22    for that question.  The testimony from every company witness

23    has been contrary to that.

24           THE COURT:  Well, the question was:  Did you ever

25    get any information as to why defendants were shipping

1    orders that they suspected might be diverted?

2        I'm going to let him answer that question and then

3    we'll see where we go from there.

4            MR. WESTFALL:  Your Honor, on behalf of the United

5    States we would object to the question inasmuch as his

6    answers are going to give a lot of attorney/client

7    privileged information or law enforcement privileged

8    information.  He can't disclose that.

9            THE COURT:  Well, I don't see -- I'm going to have

10   him answer it.

11           MR. SCHMIDT:  And I'll also just note that there's

12   a foundation issue.  He did not talk to us prior to the

13   distributor initiative.

14           MR. NICHOLAS:  There's also -- forgive me, but

15   baked into the question is the assumption that the

16   distributors thought that particular orders might be

17   diverted.  And there's been absolutely no foundation for

18   that at all.

19       It's sort of a -- he's building -- Ms. Singer is, is

20   layering in an assumption, you know, in the question which

21   is, which is -- for which there has been no foundation laid.

22           MR. SCHMIDT:  That's a better way of saying what I

23   was trying to say.

24           THE COURT:  Ms. Wicht.

25           MS. WICHT:  I join in the objection, Your Honor.

```
 1              THE COURT:  Well, the question was, if I
 2   understood it, was did he ever get any information that the
 3   defendants were shipping orders that they believed to be
 4   suspicious.  And he can answer that question and then we'll
 5   see where we go from there.
 6              MR. SCHMIDT:  And that's fine.  That's different
 7   than what he was asked which is likely to be diverted.
 8              THE COURT:  Okay.  Can you answer that question,
 9   Mr. Rannazzisi?
10              THE WITNESS:  Your Honor, I apologize.  I don't
11   remember the question.
12              MS. SINGER:  Oh, no.
13              THE COURT:  The question was, if I understood it,
14   did you ever get any information that the defendants were
15   shipping orders that they believed to be suspicious.
16              THE WITNESS:  I cannot recall any information that
17   was specific that they were shipping orders that they knew
18   to be specific (verbatim) that I received.
19              THE COURT:  Okay.
20   BY MS. SINGER:
21   Q.   All right.  And yesterday, Mr. Rannazzisi, I showed
22   you an Ingredient Limit Report.  Do you recall that?
23   A.   Yes.
24   Q.   Okay.  And do you still have it up there in front of
25   you?
```

```
 1    A.    Yes.

 2    Q.    Okay.  And I just want to ask you briefly now, the ILR

 3    report you have that's P-28091 is an example of an

 4    Ingredient Limit Report.  Is that right?

 5              MS. WICHT:  I'm sorry.  Could you say that number

 6    again, Ms. Singer?  That's not the number that I have for

 7    the exhibit.

 8              MS. SINGER:  Okay.  I'm sorry.

 9              MS. WICHT:  I may be wrong.

10              MS. SINGER:  It's -- I'm sorry, P-14288.  Is that

11    the correct number?

12              MS. WICHT:  That's what I have.  Thank you.

13    BY MS. SINGER:

14    Q.    Mr. Rannazzisi, is that what you have?

15    A.    That's what I have.

16    Q.    Okay.  So P-14288, is that an example of an Ingredient

17    Limit Report that DEA received from Cardinal?

18    A.    Yes.

19    Q.    Okay.

20              MS. SINGER:  And then can we see P-42747, please?

21         May I approach, Your Honor?

22              THE COURT:  Yes.

23              MS. SINGER:  And because this is a voluminous

24    exhibit, I think we only have five copies per the

25    stipulation.
```

```
 1    BY MS. SINGER:

 2    Q.   And, Mr. Rannazzisi, do you recognize the type of

 3    document that, that we've shown you in P-42747?

 4    A.   It's, it's just another monthly report of transactions.

 5    That's all it is.

 6    Q.   And do you know which, which company, which defendant

 7    that report is from?

 8    A.   McKesson.

 9    Q.   Okay.  And let's also do P-28007, please.

10         MS. SINGER:  May I approach again, Your Honor?

11         THE COURT:  Yes.

12    BY MS. SINGER:

13    Q.   And, Mr. Rannazzisi, do you recognize what type of

14    document that is?

15    A.   This is an Excessive Purchase Report.

16    Q.   And are each of these examples the kinds of excessive

17    purchase reports that DEA was receiving prior to the

18    distributor initiative briefings in 2005?

19         MR. SCHMIDT:  Object to the characterization.

20         MS. WICHT:  I'll object on the basis of

21    foundation.

22         THE COURT:  Overruled.

23         THE WITNESS:  Yes.

24    BY MS. SINGER:

25    Q.   And how many orders are in -- let's take P-42747,
```

1    the McKesson report.  Roughly how many transactions are

2    in that report?

3    **A.**   A lot.  I can't tell you how many transactions.

4    **Q.**   Hundreds?  More than that?

5    **A.**   It looks that way.

6    **Q.**   And would DEA receive these reports for different

7    distribution centers from each defendant?

8    **A.**   Yeah, the reports would come from the distribution

9    centers.

10   **Q.**   And I think you said you would receive them every

11   couple weeks or every month; is that right?

12   **A.**   It depends --

13          MS. WICHT:  I'm sorry.  Could we have a

14   clarification on time period?

15   BY MS. SINGER:

16   **Q.**   This is all prior to the distributor initiative

17   briefings?

18   **A.**   Yes.  It depends on the -- it depends on the

19   distributor.  But, yeah, a month is generally what we would

20   see.

21   **Q.**   And did these reports provide DEA with, with the

22   details or intelligence that allowed you to determine

23   whether these transactions were actually suspicious?

24   **A.**   No.

25          MS. WICHT:  Objection, foundation, vague.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  No, they don't.  It's just

 3    transactions.  It looks like transactions above a threshold.

 4    That's basically it.

 5    BY MS. SINGER:

 6    Q.   So did it give you information on why a distributor

 7    thought DEA should be aware of any of those

 8    transactions?

 9    A.   No, there's nothing, there's nothing in here that has

10    any explanation of why it would be deemed suspicious.

11    Q.   And were these reports useful to DEA?

12              MR. SCHMIDT:  Objection, foundation.  I think he

13    can answer as to himself, not as to DEA.

14              THE COURT:  Well, if he knows.  I'll overrule the

15    objection.

16         You can answer if you can, Mr. Rannazzisi.

17              THE WITNESS:  To me, no, these, these, these have

18    no value because all it is is reporting transactions over a

19    threshold.  I don't know anything about any of these

20    pharmacies.  I don't have an explanation of why this would

21    be deemed suspicious.  They're not, they're not given to us

22    when discovered.  It's just a monthly printout of

23    transactions, you know, above a certain threshold.  So, no,

24    I -- no.

25    BY MS. SINGER:
```

1    **Q.**   And when DEA received suspicious order reports as

2    opposed to excessive purchase reports, did DEA

3    investigate those reports?

4    **A.**   Again --

5            MR. NICHOLAS:  Objection.  I think this goes back

6    to the debate we had yesterday.  And I'm not sure exactly

7    where we landed, but I think since the witness is unable to

8    provide any, any specific information here, I would object

9    based on, on foundation and lack of ability to probe as to

10   whatever his answer might be.

11           MR. SCHMIDT:  Join.

12           THE COURT:  Well, the question was:  When DEA

13   received suspicious order reports as opposed to excessive

14   purchase reports, did DEA investigate those reports?

15       I think that's a perfectly proper question and I'll

16   overrule the objection and you can answer it if you can, Mr.

17   Rannazzisi.

18           THE WITNESS:  I know investigative -- I know

19   suspicious order reports were investigated.  I know that.  I

20   can't tell you every suspicious order report was ever -- you

21   know, every one that was ever submitted was investigated.

22   But I know they were investigated and I know that was the

23   protocol to investigate those suspicious order reports.

24   BY MS. SINGER:

25   **Q.**   And did suspicious order reports sometimes lead to

```
 1   an action being taken against a registrant?

 2   A.   Suspicious order reports, like I said before, are a

 3   pointer system.  So it would lead the investigators to, if

 4   not open an investigation, assist in an on-going

 5   investigation.

 6   Q.   Now, did DEA give these defendants feedback that the

 7   excessive purchase reports that we just looked at weren't

 8   helpful to DEA?

 9           MR. SCHMIDT:  Objection as to time frame, if we

10   could just specify the time frame.

11   BY MS. SINGER:

12   Q.   This is all prior to the --

13           THE COURT:  Overruled.

14   BY MS. SINGER:

15   Q.   Okay.  Go ahead and answer, please.

16           THE COURT:  Well, the time -- have you put a time

17   frame on it?

18           MS. SINGER:  I haven't, Your Honor.

19   BY MS. SINGER:

20   Q.   At any point during your tenure at DEA, did DEA

21   tell defendants that these excessive purchase reports

22   weren't helpful?

23   A.   Yes, during, during my tenure, we did, yes, absolutely.

24           MR. WESTFALL:  Your Honor, just so it's clear on

25   the record, he's testifying from his own personal
```

1    recollection.  I think that's what he's limited to because

2    he doesn't know everything about all aspects of the DEA.

3              MR. SCHMIDT:  And I think what this goes to in my

4    objection was that did happen during the distributor

5    initiative.  That's not a contested fact.

6         Our objection is any suggestion that it happened

7    before, that he raised issues about the format of the

8    reporting before.

9              And, actually, just so -- let me restate what I said.

10   They have raised -- Mr. Rannazzisi has raised the issue that

11   he gave us guidance on suspicious orders.  It's contested

12   what that guidance was and whether it was details or not.

13        I don't think it's contested that there was no such

14   even attempted guidance certainly from Mr. Rannazzisi before

15   the distributor initiative.

16             MS. SINGER:  Your Honor, if I may, --

17             THE COURT:  Well, I'm going to let him answer.

18   Overruled.  Go ahead.

19             THE WITNESS:  During, during my tenure when I was

20   there from 2005 on -- I forgot -- I apologize.  I forgot the

21   question.

22   BY MS. SINGER:

23   Q.   Did you give feedback to defendants that excessive

24   purchase reports were not helpful to the DEA?

25   A.   During my tenure, yes, I did.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   And did you tell them that these excessive purchase

2    reports weren't suspicious order reports?

3    **A.**   Yes, I did.

4            MS. SINGER:  Your Honor, I'm about to start the

5    next block of questions.  I'm happy to go as far as I can

6    until noon.  But just as a courtesy, I wanted to raise that.

7            THE COURT:  Well, I have mixed feelings here.

8    I've got another hearing at noon, but I understand there's

9    going to be a big argument about us being behind in time.

10   So why don't you press on for a few more minutes.

11           MS. SINGER:  Okay.

12   BY MS. SINGER:

13   **Q.**   All right, Mr. Rannazzisi, we focused this morning

14   on enforcement actions.  I want to turn back to

15   guidance, what we were just talking about.

16        Even during the Orders to Show Cause and Immediate

17   Suspension Orders you've talked about, did DEA continue to

18   provide guidance to distributors?

19   **A.**   Yes.

20   **Q.**   And did you, did you send distributors and other

21   registrants a series of letters about their obligations

22   under the Controlled Substances Act?

23   **A.**   Yes, I did.

24   **Q.**   And did you approve each of those letters?

25   **A.**   Yes, I did.

1    **Q.**   And why did you send the letters?

2    **A.**   The letters were sent to, again, reiterate what the

3    registrants' responsibilities were under the, under the

4    Controlled Substances Act, but specifically to suspicious

5    order monitoring, identification of suspicious orders

6    reporting and shipment.

7    **Q.**   And I want to turn first to P-00032, please.

8         MS. SINGER:  May I approach, Your Honor?

9         And just for purposes of the record, each of these

10   letters has already been admitted.

11        MS. WICHT:  Your Honor, just to clarify, I think

12   they've been limited -- they've been admitted for the

13   limited purpose of notice over our objection.

14   BY MS. SINGER:

15   **Q.**   So, Mr. Rannazzisi, let's turn first to the second

16   page of this exhibit.

17   **A.**   Yes.

18   **Q.**   Actually, let's turn to the September 27th letter.  Do

19   you recognize this document?

20   **A.**   Yes, I do.

21   **Q.**   Okay.  And who was this -- and what is the document?

22   **A.**   It's the first letter post distributor initiative that

23   reinforces both what was in the distributor initiative, and

24   it provides information concerning obligations under the

25   Controlled Substances Act relating to suspicious order

```
 1    monitoring.

 2    Q.   And to whom was this letter sent?

 3    A.   It was sent to all distributors and manufacturers

 4    because manufacturers have coincidental authority to

 5    distribute.

 6    Q.   And let's turn to the second page of the letter, if you

 7    would.  It says distributors have a statutory

 8    responsibility --

 9    A.   Did you say the second page?

10    Q.   Yes.  If you can look at the second sentence of the

11    second paragraph, can you read that, please?

12    A.   "DEA recognizes that the overwhelming majority of

13    registered distributors act lawfully and take appropriate

14    measures to prevent diversion.  Moreover, all registrants,

15    manufacturers, distributors, pharmacies, and practitioners,

16    share responsibility for maintaining appropriate safeguards

17    against diversion.  Nonetheless, given the extent of

18    prescription drug abuse in the United States, along with the

19    dangerous and potentially lethal consequences of such abuse,

20    even just one distributor that uses its DEA registration to

21    facilitate diversion can cause enormous harm.  Accordingly,

22    DEA will use its authority to revoke and suspend

23    registrations in appropriate cases."

24    Q.   And does that reflect the guidance that you provided to

25    DEA registrants in this letter?
```

1    **A.**    Yes.

2    **Q.**    And then let's turn to the third paragraph from the

3    bottom, please.  Can you read that as well and read it out

4    loud, please?

5    **A.**    "Thus, in addition to reporting all suspicious orders,

6    a distributor has a statutory responsibility to exercise due

7    diligence to avoid filling suspicious orders that might be

8    diverted into other than legitimate medical, scientific, and

9    industrial channels.  Failure to exercise such due diligence

10   could, as circumstances warrant, provide a statutory basis

11   for revocation or suspension of a distributor's

12   registration."

13   **Q.**    And then the last paragraph I want to ask you to look

14   at is the next paragraph, and if you could read that first

15   sentence of that next paragraph out loud, please.

16   **A.**    "In addition, distributors are required to file reports

17   of distributions of certain controlled substances to the DEA

18   ARCOS unit in the time and manner specified in the --"

19   **Q.**    I think we're at a different place.  I'm sorry.  "In a

20   similar vein," the paragraph above.

21   **A.**    I'm sorry.

22        "In a similar vein, given the requirement under Section

23   823(e) that a distributor maintain effective controls

24   against diversion, a distributor may not simply rely on the

25   fact that the person placing the suspicious order is a DEA

1    registrant and turn a blind eye to the suspicious

2    circumstances."

3    **Q.**   Why don't you go ahead and finish out that paragraph,

4    if you would.

5    **A.**   "Again, to maintain effective controls against

6    diversion as Section 823(e) requires, the distributor should

7    exercise due care in confirming the legitimacy of all orders

8    prior to filling."

9    **Q.**   So why can't a distributor rely on the fact that DEA

10   has approved one of its customer's registrations or hasn't

11   revoked a registration?

12   **A.**   DEA, when they register an entity, be it a doctor or

13   pharmacy, a distributor, we can't guarantee you that they're

14   going to conform with the law somewhere down the road.  And,

15   in fact, we might not know that they're not conforming to

16   the law.

17        It's kind of like a, a driver's license, you know.

18   Just because you give somebody a driver's license doesn't

19   mean they're not going to speed.  It's the same concept.

20        That's why suspicious orders are so important because

21   if, if a registrant goes off track and decides to, decides

22   to get involved in illegal activity, that will give us a

23   point, give us an idea of what they're doing and how they're

24   doing it and then we can proceed with the investigation.

25   **Q.**   So let's turn to the third page of the letter, if you

1    would.  Can you tell us generally what the third page of the

2    letter lays out?

3    **A.**   It just, it just lays out what they should be looking

4    for when it comes to diversion in their customer base.

5    **Q.**   Okay.  And "they" in your response means who or what?

6    **A.**   The -- well, the whole distributor population and the

7    manufacturers.

8    **Q.**   And then I'd like to draw your attention to Paragraph

9    7.  So can you read Paragraph 7, please, the Number 7?

10   **A.**   Number 7?

11   **Q.**   Uh-huh.

12   **A.**   "Are one or more practitioners writing a

13   disproportionate share of the prescriptions for controlled

14   substances being filled by a pharmacy?"

15   **Q.**   And why did DEA suggest that as one of the signs or a

16   question that a distributor should be asking?

17            MS. WICHT:  Object to the characterization of

18   "should" which mischaracterizes the document which says that

19   distributors may wish to inquire.

20            MR. WESTFALL:  Again, Your Honor, for the United

21   States, he can only testify as to matters which are not

22   privileged by attorney/client privilege or the deliberative

23   process privilege or law enforcement privilege.  He can only

24   testify as to public information.

25            THE COURT:  I'm going to overrule the objections

1    and allow him to answer that one.  Why did DEA suggest as

2    one of the signs or questions that a -- you remember the

3    question.

4              THE WITNESS:  Yes, Your Honor.  Thank you.

5         That's a red flag that we, we look at, what we've seen

6    in cases.  One pharmacy with -- you know, this wide range of

7    practitioners that are prescribing, prescribing all sorts of

8    drugs but only one or two of them prescribe the vast

9    majority of controlled substances, that's something that you

10   have to look at and address and resolve.  And, you know,

11   it's just a major red flag.

12   BY MS. SINGER:

13   **Q.**   And did this first Rannazzisi letter -- and I'm

14   going to call it the Rannazzisi letter if that's okay

15   with you.  Did the first Rannazzisi letter reflect a new

16   interpretation of the Controlled Substances Act or new

17   guidance from the DEA?

18   **A.**   No.

19   **Q.**   Was it consistent, to your knowledge, with the guidance

20   DEA had provided to distributors in the past?

21             MS. WICHT:  Objection, foundation.

22             THE COURT:  Overruled.

23             THE WITNESS:  Yes, it did.

24   BY MS. SINGER:

25   **Q.**   And -- okay.  Let's turn to P-19525, please.

1          THE COURT:  Is this a good place to stop, Ms.

2     Singer?

3          MS. SINGER:  It is, Your Honor.

4          THE COURT:  Okay.  Let's be in recess until 2:00.

5     Oh, yeah, we'll come back at 1:45, 1:45.

6        (Recess taken at 11:53 a.m.)

7          THE COURT:  Mr. Majestro.

8          MR. MAJESTRO:  Thank you, Your Honor.  I

9     appreciate you coming back early to hear this, what we think

10    is a very important request.

11        As of yesterday, we had 20 -- we've had 21 days of

12    trial.  We're into our 22nd day today and, as of yesterday,

13    there were 93 hours of testimony.  Of that, defendants used

14    a little more than 39 hours, which is 42 percent of the

15    time, and plaintiffs used almost 54 hours, which is 57.8

16    percent of the time.

17        Now, while we have more time, that's not surprising.

18    We have the burden of proof.  It's our case.  It's our

19    witness.  And that's generally the way -- the way trials --

20    trials go.

21        As of now, under the current schedule, we have 45 hours

22    of trial time remaining and that's as -- as of 1:00 today --

23    or 2:00 today.

24        With respect to deposition designations, which is

25    another issue I suspect my friends on the other side will

1    talk about, plaintiffs have designated 18.9 hours and

2    defendants have designated 7.3 of testimony for a total of

3    26.2 hours.  Of that testimony designated, however, over

4    one-third of the testimony is subject to defendants'

5    objections, which we haven't received rulings from the

6    Court, so we don't know whether it's in or not, but just --

7    I wanted just to give you that background on that.

8         In these past 20-some days, or over the course of the

9    schedule, six of our 30 trial days are scheduled to be

10   half-days and we think roughly those afternoons we miss

11   roughly account for our deposition designations and they

12   should be treated that way.

13        What's left?  Plaintiffs have 14 witnesses left after

14   we finish with Mr. Rannazzisi.  It is possible a couple of

15   those witnesses could be dropped depending on how the other

16   testimony comes in and we continue to re-evaluate what our

17   -- what case we're putting on.

18        This morning, we decided to drop Dr. Davies from our

19   list, so we went from 15 to 14 witnesses.  We've really done

20   our homework in trimming the case down to what we think is

21   the bare bones left of what we need.  The witnesses are both

22   necessary for our case and non-cumulative.

23        Most of the witnesses are very short witnesses.  We

24   estimate that nine of the witnesses will take an hour or

25   less on direct.

```
 1            In total after --

 2                 THE COURT:  You have to prove that to me, Mr.

 3     Majestro.

 4                 MR. MAJESTRO:  And I -- and I -- somebody said

 5     that to me last night.  The witness I put on was an hour and

 6     I -- and so, it can be done.  Mr. Farrell does a very good

 7     job of putting short witnesses on.  We can do it and we

 8     think we will.

 9            So, in total, and what I have is this.  These are the

10     witnesses and the range of the time we believe we have left.

11     The number in the left column is the low end.  The number in

12     the right column is the high end.  As you can see from the

13     total, which I had Excel do the math because otherwise --

14                 THE COURT:  Can you put that up over here where I

15     can see it?  If you can't, it's okay.

16                 MR. MAJESTRO:  How about -- Your Honor, if I can

17     approach, I'll let you have my copy.

18                 THE COURT:  Yes.  That will be fine.  You probably

19     will need this back, Mr. Majestro.

20                 MR. MAJESTRO:  And if I got it back, I would

21     probably lose it, so you're -- you're welcome to it.

22            So, those are the -- those are the witnesses that we

23     think we have left, left in this case.  As you can see,

24     they're all important witnesses and we believe they are key

25     to our ability to prove our case.
```

 1       If defendants' cross examination is in the same

 2    proportion as it's been throughout the trial, that average

 3    of the -- and I think I said it was the 57/42 percent of the

 4    time there's a chance we could finish by next Friday, but

 5    what we -- our fear is and how things have been bogging down

 6    lately is that the cross examinations will be long and that

 7    we are not -- we will not be in control over whether or not

 8    we need to put on those important witnesses if we are stuck

 9    with a set time.

10       So, the other -- the other point I would make is, and

11    we talked to Ms. Skinner about this and mentioned that we

12    also do have the two Friday afternoons remaining, which we

13    would not object to hearing testimony at that time, if the

14    Court -- if that's okay with the Court.  But we understand

15    -- you know, we're just putting that -- we're just putting

16    that out there.

17            THE COURT:  That's only going to give you the

18    equivalent of one more day.

19            MR. MAJESTRO:  Exactly.  I'm not sure that would

20    be enough and, really, whether it's enough or not is not in

21    our control other than by removing witnesses.  That's the

22    only -- that's -- that's essentially the problem we have.

23       And, you know, we acknowledge that this trial has taken

24    longer than any of us anticipated.  This is -- but this is

25    an important case.  We could pick at the defendants for

1    their -- for individual crosses, like the five hours cross

2    on Dr. McConnell after a two-hour direct, but they would

3    likely point out Jan Rader and Dr. Courtright where they

4    didn't cross at all.

5        While it was our choice to call defendants' witnesses

6    in our side of the case, a large portion of defendants' case

7    was put in during that period of time.

8        Testimony in this case has gone slower because, for

9    what I'm experiencing, it is an unprecedented number of

10   objections in this case.  And many of the objections -- and,

11   you know, just watching this morning while I was preparing

12   this argument, many of those objections either get overruled

13   or cured.  That slows the case down.

14       Now, we're not saying they don't have the right to make

15   those objections, but we're pointing out that the nature of

16   the objections in this trial has lengthened it beyond what

17   we had anticipated.  And, again, I'm not saying they're at

18   fault.  I'm just saying this is where we are and why we're

19   there.

20       And in conclusion, Your Honor, we believe this is an

21   important case.  This is a complex case.  This is the very

22   first trial against an opioid distributor and we have three

23   of them on the other side.

24       The parties are working their way through facts and

25   evidence and evidentiary objections that have never --

```
 1    they've never been dealt with by other judges.

 2         I've been joking with some of my friends that when this

 3    trial is over, I'm going to do a seminar for the trial

 4    lawyers entitled "Evidence Rules You Never Knew Existed"

 5    because I've really learned a whole lot about evidence in

 6    the course of -- in the course of this trial.

 7              THE COURT:  You can have Mr. Ackerman help you.

 8              MR. MAJESTRO:  He'd show me up, so I will let him

 9    go do the one in South Carolina.

10         You know, if we started over, I think we probably could

11    do this trial -- we could be further ahead knowing all --

12    everything we know now, but that's not the world we live in.

13         So, given the importance and the complexity of this

14    case to the parties, we believe it's important for us to be

15    allowed to put on these last witnesses and if it means that

16    we bleed over into the week after the break, then those

17    couple days, given the importance of the trial, are worth

18    that sacrifice.

19         We don't believe that prejudices the defendants.  They

20    still get their week break to plan.  The witnesses at the

21    end are likely going to be their -- witnesses they're going

22    to be rebutting at the end of their case and it's not like

23    they don't know what they're going to say.  They've deposed

24    all of these witnesses.

25         With respect to the last couple of experts -- the last
```

```
 1    couple that are experts, Dr. Alexander and Mr. Barrett,
 2    we're not allowed to have them testify to anything different
 3    than they've already given in their reports or their
 4    depositions.  So, they can plan based on those -- those
 5    documents that they already know about and be prepared to
 6    start -- to start their case a few days, however long it
 7    takes, after we get to the end of our case.
 8          But, again, this is an important case.  We'd like the
 9    time to do it right.  We've spent a lot -- we've invested a
10    lot of time, a lot of money, a lot of blood, sweat and
11    tears, and so have they.  We think it's necessary to have
12    this extra time.
13          THE COURT:  Well, every case is an important case
14    to the litigants and it's like somebody said, there are a
15    lot of battles in history that haven't been written about,
16    but the participants in them have found them totally
17    unforgettable.
18          MR. MAJESTRO:  Well, I doubt any of us will ever
19    forget this, but I would point out this is the first
20    bellwether trial.  So, it's not just important to those --
21    to our clients here.  The rest of the country is watching
22    this case.
23          Unless you have any questions, I'll --
24          THE COURT:  Well, let me hear from somebody on the
25    other side.
```

1        Mr. Hester?

2            MR. HESTER:  Yes, Your Honor.  Thank you, Your

3    Honor.  I guess I would begin by highlighting that the Court

4    in the first status conference we had last March said this

5    was going to be six weeks for each side and the Court's been

6    very clear on that all the way through.

7        And I don't think Mr. Majestro has really identified

8    any changed circumstances that alter that calculus.  I think

9    the Court was clear right from the get-go that there was

10   going to be a six-week period for each side and I think the

11   vision was, if I can at least intuit the way we saw it, Your

12   Honor, the Court was allowing sufficient time for each side

13   to present its case, but it was also setting the time in a

14   way to encourage sensible choices among the witnesses and to

15   make sensible choices about the evidence.

16       In other words, it wasn't an unlimited time.  The Court

17   was encouraging the parties to winnow down their witnesses

18   and to think hard about the decisions they should make.

19       And as we look at this list that the plaintiffs have

20   given to the Court and that they've given to us, it includes

21   ten experts, Your Honor, from among that list of 14.  It's

22   simply not plausible that they can be put on in an hour or

23   so, as the plaintiffs have suggested.  It's not going to

24   happen that way.

25       And, frankly, if they're only put on for an hour, the

1    explanation of their methodology and opinions is not going

2    to be helpful to the Court with respect.  And so, we think

3    what the plaintiffs are proposing is something that could

4    really stretch this trial out.

5         And just to illustrate this -- the lack of winnowing,

6    they're including on this list three epidemiologists; not

7    one, three, plus an economist who's speaking to the same

8    subjects that Dr. Alexander and Mr. Barrett are speaking to.

9    So, there's a lot of overlap in this list.

10        And I think the right answer is not to give the

11   plaintiffs some sort of extra time, unlimited extra time if

12   they run over but, rather, to force them to winnow this list

13   down so that there's good choices being made.

14        We were surprised, frankly, to get this list and to see

15   how long it is.  And to give the Court some perspective on

16   it, in the first four weeks of trial, the plaintiffs

17   presented 19 witnesses.  Here we are on the last two weeks

18   and the plaintiffs are proposing 14.  It's just not

19   workable.

20        But I don't think what you're hearing from the

21   plaintiffs is some articulated reason, some change of

22   circumstance, nor any particular identification of why they

23   need so many witnesses who are overlapping.  It includes,

24   for instance, witnesses who are going to testify on things

25   the Court has already heard about at quite some length.  We

```
1    can't understand the rationale for multiple epidemiologists
2    as an example again.
3        And I think the -- the point is the plaintiffs should
4    be put to the task of winnowing down their case and Mr.
5    Majestro's request is, well, if we run over, we run over,
6    but they're clearly going to run way over.  It's not going
7    to be a half a day.  It's going to be radically longer than
8    that.
9        And I think we can see from what's happened in this
10   trial to date it's just not plausible to think 14 witnesses
11   could be presented in this amount of time given that it's
12   taken us four weeks to get through 19, plus the witnesses
13   among that 19, there were many fact witnesses and now we're
14   into a heavy expert phase where the crosses will necessarily
15   be longer and I think the plaintiffs are going to have to do
16   more than an hour to present these experts to the Court.
17       So, our --
18          THE COURT:  Do you expect the defendants to take
19   the full six weeks?
20          MR. HESTER:  I do not, Your Honor.  We -- we
21   haven't fully figured that out, but we're not expecting
22   we're going to need the full six weeks.
23          THE COURT:  But you probably wouldn't be willing
24   to give some of your six weeks over to Mr. Majestro, would
25   you?
```

```
 1          MR. HESTER:  Well, our vision has been, Your
 2    Honor, that the Court gave us pretty clear directions a long
 3    time ago to be thoughtful about choices we are making.
 4    We've tried very hard to coordinate our cases as much as we
 5    could.
 6          We've certainly had some cross examinations by all
 7    three, but many of the crosses have been done just by one of
 8    the parties.  And we've taken under advisement from the
 9    Court that this would be the time allotted and we would make
10    the choices within that framework.
11          So -- and we think the situation here, the plaintiffs
12    are not really saying they're prejudiced.  They're just
13    saying they want to throw in more witnesses.  We don't
14    understand the benefit to the Court of having three
15    epidemiologists in the last two weeks of trial, again, as an
16    example of the point.
17          I think the plaintiffs should be put to the task of
18    winnowing down their witness list rather than just an
19    indefinite extension of time.  That would be our position,
20    Your Honor.
21          THE COURT:  Why do you need three epidemiologists,
22    Mr. Majestro?
23          MR. MAJESTRO:  Your Honor, I think there are
24    different areas and they're going to talk about different
25    things.  And, I mean, I guess, you know, if we had put one
```

1    of them up and had them talk about all of these areas, we'd

2    get the objection that --

3              THE COURT:  They're outside the reports.

4              MR. MAJESTRO:  Outside the reports.  And that's

5    why -- and that's why they're short times.  The times are

6    not five hours for each expert.  It's an hour and a half,

7    two for some of them because they have a very discrete area

8    that they're going to cover.

9              THE COURT:  Okay.  Are you speaking for everybody

10   here?

11             MR. HESTER:  Yes, Your Honor, I am.  And I would

12   just -- in addition to the epidemiologist example that I

13   gave to the Court, the other example I would give is law

14   enforcement.  The Court has heard quite a bit from law

15   enforcement and individuals in the community and their

16   proposal now is for, again, more law enforcement witnesses.

17        And we feel this is not a sensible winnowing as we're

18   down toward the end of the case.  There should be an effort

19   to narrow down what the plaintiffs are proposing.  16 or 14

20   witnesses in the last two weeks after we've gone through 19,

21   it's -- it's totally unworkable.

22             THE COURT:  Well, here's what I propose we do.

23   Finish this week and see where we are at the end of this

24   week.  We'll have one more week left and we'll take a look

25   at that at that time.

```
 1            MR. MAJESTRO:  Okay.
 2            MR. HESTER:  Your Honor, I would also highlight
 3     this point about the deposition designations.  They are a
 4     substantial amount of time that's being presented to the
 5     Court for its viewing pleasure.
 6            THE COURT:  Yeah.  And if you didn't have a lazy
 7     judge, I could have spent last week taking care of those.
 8            MR. HESTER:  I don't think we have one, Your
 9     Honor.  I think we have somebody who works pretty darn hard.
10        We -- and that's a real problem, too, and we've been
11     surprised to see the volume of deposition designations and,
12     as the Court will recall, the plaintiffs agreed that the
13     deposition designations would count against their trial
14     time.  So that is another factor that needs to be added in.
15        And the plaintiffs have already designated quite a bit
16     of deposition testimony, but we believe they're proposing to
17     designate even more.  And we think it has to end, as I think
18     all good things must come to an end, and there's some
19     benefit in having a time constraint that forces choices.
20            MR. MAJESTRO:  Yeah.  On the deposition
21     designations, Your Honor, we're done.  We've designated them
22     all.  And they're not submitted yet.  Still going through
23     the process of objections and things, but the numbers I gave
24     you in terms of hours include every -- all of our
25     designations.
```

1        And, you know, and there is -- as I said, there is a

2    substantial amount of counter-designation including, you

3    know, one deposition we designated a witness and they aren't

4    designating his other testimony in the deposition.  They're

5    designating a deposition that was taken in another --

6    another deposition that was taken in another case.  So,

7    there's a lot of testimony they're putting in through the

8    designation process.

9        And, again, when you count the afternoons that we

10   haven't had trial testimony, we think it roughly -- it

11   roughly balances out, especially when -- when, I mean, I

12   think I might be more inclined to agree to count the

13   deposition time if the defendants were to withdraw all of

14   their other objections, also, but I don't see that

15   happening.

16       And, you know, the one thing I want to -- want to point

17   out on in terms of the reason these witnesses are going to

18   be -- we think they'll go faster, is the ones that we got

19   bogged down on were the adverse witnesses.  And so, we can

20   put on these -- our experts and our direct testimony, we

21   believe that can come in quicker because we're in more

22   control over the -- over what the topics are going to be and

23   we know and we have -- we aren't cross examining actual

24   adverse witnesses.  So, we think that that would work.

25            THE COURT:  Well, let's -- let's see where we go

```
 1    in the next couple of days and you can be mindful of the

 2    clock running out on you, Mr. Majestro.

 3              MR. MAJESTRO:  We are acutely aware.  I picture

 4    the hour glass with the sand dropping down.

 5         One other question, a note Mr. Ackerman passed me, and

 6    I'll pass on.  Is -- would going this Friday afternoon be an

 7    option or should we just take -- we take that as the week

 8    goes?

 9              THE COURT:  Well, I think -- I think it would be.

10         Do you have any objection to that, Mr. Hester?

11              MR. HESTER:  Well, I don't, Your Honor, but Mr.

12    Majestro is using that time twice.  He proposed to use that

13    time to count against his deposition designations, too.

14         And so, there has to be -- again, I think the

15    plaintiffs have some choices to make if they -- if their

16    proposal is to use that for in-court time, the deposition

17    designations have to count against the balance of their

18    time.

19              THE COURT:  Well, and the quitting at noon on

20    Friday, there were two reasons for that.  I knew that people

21    would want to get out of town and probably and go cover

22    their home front and everything.  And the other thing was

23    just to help me out a little bit.

24         Ms. Wicht, you've been standing there.  Do you want to

25    say something?
```

1              MS. WICHT:  I'm sorry, Your Honor.  I wanted to

2    just add one point, not disagreeing, obviously, with

3    anything Mr. Hester spoke to.

4         I did just want to add, Your Honor had inquired about

5    the time for the defense case and I just want to make sure

6    that we're clear that we do reserve the right to take the

7    full six weeks.  I mean, we've seen in the plaintiffs' case

8    that, you know, they -- they've added this late designation

9    of an expert, Jakki Mohr, who is on an entirely new subject

10   that has not been discussed in the trial yet at all.  So,

11   without knowing what's coming in the next, you know,

12   remaining time that they have, I just want to be clear on

13   that.

14             MR. MAJESTRO:  And a final point I'd make, Your

15   Honor, is, you know, law enforcement witnesses, Mr. Dial has

16   roles other than law enforcement.  That's why he's being

17   called.  And I would note that we have a bunch of subpoenas

18   from the defendants for more law enforcement people, so

19   evidently they haven't heard enough about what the local law

20   enforcement have to say because they're going to call them

21   in their case.

22             THE COURT:  Well, let's -- let's see.  You have

23   something else to say, Mr. Hester?

24             MR. HESTER:  Well, not really, Your Honor.  I just

25   -- I guess I wanted to have a little clarity on what the

```
 1    marching orders are.  I mean, should the objective be that
 2    we're working as hard as we can to finish by the 18th of
 3    June?
 4              THE COURT:  I think so.  I think the plaintiffs
 5    should make an effort to finish within the time allotted and
 6    use the time as efficiently as you can the rest of this week
 7    and, on Thursday on Friday, I'll look at this again.
 8              MR. MAJESTRO:  Well, hopefully, we'll have this
 9    witness off the stand by then.  Thank you, Your Honor.
10              MR. HESTER:  Thank you, Your Honor.
11              THE COURT:  That was a shot across the bow, wasn't
12    it?
13        Okay, Ms. Singer and Mr. Rannazzisi.
14        I'll say one thing.  I know we had an inquiry about
15    whether we had to keep wearing a mask and I'm looking
16    forward to the moment where we don't have to wear them
17    anymore.  I'm working on that.  I don't want to get my --
18    get cross threaded with my chief judge or get my court clerk
19    in trouble, but we're mindful of the fact that we need to do
20    something about that or at least if we can.
21        Okay.  You can resume the witness stand, Mr.
22    Rannazzisi.
23              THE WITNESS:  Thank you, Judge.
24              BY MS. SINGER:
25    Q.   All right.  Mr. Rannazzisi, let's, if we may, briefly
```

1    finish off our discussion about guidance from the DEA to

2    defendants and I want to start with P-08861, please.

3              MS. SINGER:  Your Honor, may I approach?

4              BY MS. SINGER:

5    **Q.**   Mr. Rannazzisi, I'll ask you to turn to P number 10 in

6    the document I just handed you.  And do you recognize the

7    document that begins at P-10?

8    **A.**   Yes, I do.

9    **Q.**   And what do you recognize it to be?

10   **A.**   The Diversion Investigators Manual.

11   **Q.**   And what is the Diversion Investigators Manual?

12   **A.**   It's a manual that -- diversion investigators are

13   trained with at Quantico, Virginia and then the manual that

14   they are supposed to make reference to during their

15   day-to-day diversion activities.

16   **Q.**   And did you see this manual during your time at DEA?

17   **A.**   Yes.

18   **Q.**   And do you know the date of this manual?

19   **A.**   This one is dated April 16th, 1996.

20   **Q.**   Now, is this a document that's typically shared with

21   registrants?

22   **A.**   No, it's not.

23   **Q.**   And do you happen to know whether this Diversion

24   Investigator Manual was shared with any distributor?

25   **A.**   It appears that this manual was shared or provisions of

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    the manual were shared.
 2    Q.   So, let's turn, please, to Page 11.  So, that first
 3    full page of this manual.  I'd direct you to 5126,
 4    requirement to report suspicious orders.  Do you see where
 5    that is?
 6    A.   Yes.
 7    Q.   And can you read the second sentence of that first
 8    paragraph beginning DEA Field Offices?
 9    A.   DEA Field Offices will provide the supplier with the
10    related registration information whether the customer is
11    currently registered with DEA.
12    Q.   I think we're in different places.  I'm talking about
13    DEA Field Offices are not to approve or disapprove.  It's
14    the second sentence of the second paragraph -- of the first
15    paragraph under 5126.
16    A.   Oh.  DEA field offices are not to approve or disapprove
17    supplier shipments of controlled substances.
18    Q.   And the next sentence?
19    A.   The responsibility for making the decision to ship
20    rests with the supplier.  An exception to this occurs when a
21    supplier complies with DEA Field Office's request to
22    initiate controlled delivery of controlled substances.
23    Q.   And then let's go to the bottom of the page,
24    registrants who routinely report.
25    A.   Registrants who routinely report suspicious orders, yet
```

1    fill these orders, with reason to believe they are destined

2    for the illicit marked, are expressing an attitude of

3    irresponsibility.  It is a detriment to the public health

4    and safety as set forth in 21 U. S. C. Section 823 and 824.

5    **Q.**   And just the one last section.  If you look down that

6    paragraph to this activity over extended periods of time.

7    **A.**   This activity over extended periods of time would lead

8    a reasonable person to believe that controlled substances

9    possibly are being diverted.  An investigation will be

10   conducted for possible violation of the CSA and regulations

11   upon determining that the reporting registrant, as a general

12   practice, does not voluntarily halt shipments of controlled

13   substances to registrants involved in suspected diversion or

14   to registrants against whom previous action has been taken.

15   **Q.**   Okay.  You can stop there, Mr. Rannazzisi.  And does

16   this reflect the instructions that DEA provided to its

17   diversion investigators?

18   **A.**   Yes, it does.

19   **Q.**   And is that the direction they were given for their

20   communications with registrants?

21   **A.**   Yes.

22   **Q.**   Okay.  Let's turn now please to the second Rannazzisi

23   letter, P-00032.  It's back?  Okay.  I think you have that

24   in front of you.  It's part of a packet you received

25   previously.

```
 1    A.    Yes, I've got it.

 2    Q.    Okay.  And do you recognize this document?

 3    A.    Yes.

 4    Q.    And what do you recognize it to be?

 5    A.    A letter to Cardinal Health.  In this case, it was to

 6    the Syracuse, New York facility.

 7    Q.    Okay.  And was this a letter you approved?

 8    A.    Yes.

 9    Q.    And is it a letter that you signed?

10    A.    Yes.

11          MS. WICHT:  Ms. Singer, I'm sorry to interrupt

12    you.  I'm trying to make sure the witness testified this was

13    to Cardinal Health at Syracuse and I'm not seeing that on

14    the document.  I'm just trying to determine if I am on the

15    same document that the witness and that you are on.

16          MS. SINGER:  So, the witness is looking at

17    hopefully --

18          BY MS. SINGER:

19    Q.    What is the date of the letter you are looking at, Mr.

20    Rannazzisi?

21    A.    December 27, 2007.

22    Q.    Okay.  So, can you move, Mr. Rannazzisi, to the one

23    that's February 7th, 2007?

24          MS. WICHT:  Could we have the P number perhaps,

25    Ms. Singer?  I think maybe I --
```

```
 1                    MS. SINGER:  It is P-00032.  And we're actually
 2      not going to discuss the document itself.
 3                    MS. WICHT:  I'm just -- it's not to Cardinal
 4      Health.
 5                    BY MS. SINGER:
 6      Q.   So, Mr. Rannazzisi, if you don't mind just following on
 7      the screen --
 8                    THE COURT:  Do you have the right one?
 9                    MS. WICHT:  Well, I do have the one that Ms.
10      Singer referred to.  I'm concerned that I don't have the
11      same one that the witness is referring to because the
12      version that Ms. Singer and I are talking about is not
13      directed to Cardinal Health.
14                    MS. SINGER:  So, rather than, with the Court's
15      permission, spend time on this, I'm just going to ask the
16      witness to identify the document and then move on.
17                    THE COURT:  Okay.
18                    BY MS. SINGER:
19      Q.   So, Mr. Rannazzisi, looking at the screen, do you
20      recognize this document?
21      A.   Yes.
22      Q.   And what do you recognize it to be?
23      A.   A letter to the registrants on February 7th, 2007.
24      Q.   And was this a letter you approved and signed?
25      A.   Yes.
```

1    Q.    And why did you send this letter?

2    A.    That is almost the exact same letter as the September

3    letter and -- it is the same letter as the September letter.

4    We felt that there were some registrants who did not get the

5    September letter, so we re-sent it.

6    Q.    Okay.  And why was that -- why did you want to make

7    sure everyone had seen it?

8    A.    Because, again, we wanted to make sure that everybody

9    understood their obligations under the Controlled Substances

10   Act.

11   Q.    All right.  Let's turn in the same package and we're

12   also going to move through this letter quickly to P-00032,

13   Page 3, and it should be the December 7th -- December 27th

14   letter.

15   A.    Okay.

16   Q.    All right.  Do you have that letter?

17   A.    Yes.

18   Q.    And do you recognize this letter, Mr. Rannazzisi?

19   A.    Yes.

20   Q.    And is this -- did you approve this letter?

21   A.    Yes.

22   Q.    And did you sign and did DEA send this letter?

23   A.    Yes.

24   Q.    And to whom was this letter sent?

25   A.    Again, all distributors and manufacturers in the United

1    States.

2    **Q.**   Okay.  And I just want you to take a moment rather than

3    reading out loud.  Could you just look at Paragraphs 3 and 4

4    and explain to the Court what guidance or direction you were

5    providing in that part of the letter?

6    **A.**   Just saying that a suspicious --

7              THE COURT:  I'm sorry.

8              THE WITNESS:  Paragraph 3 brings attention to the

9    requirement to report suspicious orders when discovered and

10   filing the Excessive Purchase Report, or whatever you want

11   to call it, it doesn't meet the regulatory requirement to a

12   suspicious order.

13   **Q.**   And then, turning the page to the second page, second

14   full paragraph, what direction is DEA providing in that

15   paragraph beginning when reporting?

16   **A.**   All this is saying is if you rely on a rigid formula

17   you may be missing suspicious orders and, therefore, not

18   complying with the act.  We use the example that if you

19   started your system when a pharmacy was ordering very large

20   quantities it's not going to pick up a suspicious order

21   because that -- that pharmacy began by ordering large

22   quantities.

23   **Q.**   Now, does this letter from you to registrants impose

24   any new requirements or different guidance?

25             MR. SCHMIDT:  Objection, foundation for the same

1    reasons said this morning.  He's testified that he doesn't

2    -- he wasn't involved before 2005.

3              MS. WICHT:  And I'm sorry.

4              MS. SINGER:  This is a 2007 letter.

5              MS. WICHT:  I would further object that it's a

6    legal conclusion to the extent that Ms. Singer is asking

7    about requirements as opposed to just guidance.

8              THE COURT:  Well, I'll sustain the objection to

9    the specific question.  Maybe you can get at it another way,

10   Ms. Singer.

11             BY MS. SINGER:

12   **Q.**   To your knowledge, Mr. Rannazzisi, were you saying

13   anything different in this letter than DEA said before?

14   **A.**   No.

15   **Q.**   Did you receive, to your knowledge, any response from

16   defendants after you sent these letters?

17   **A.**   No.

18   **Q.**   Do you expect you would have been told if there were

19   complaints or questions about these letters?

20             MR. SCHMIDT:  Objection, speculation and

21   relevance.

22             THE COURT:  Well, I'll overrule the objection.

23   You can answer it, if you can, Mr. Rannazzisi.

24             THE WITNESS:  If there was some problem with the

25   letters, I would have been notified because they were my

 1    letters by my staff.

 2              BY MS. SINGER:

 3    **Q.**   Now, do you consider each of those three letters to be

 4    official guidance of DEA?

 5    **A.**   Yes.

 6              MR. WICHT:  Object to the extent that I'm not sure

 7    what the term "official guidance" is, if it's -- I mean,

 8    there is law about that, so I will object to the extent that

 9    it's being asked as a legal conclusion.

10              THE COURT:  Overruled.  The question is do you

11    consider each of these three letters to be official guidance

12    of the DEA.  You can answer that, Mr. Rannazzisi, if you

13    can.

14              THE WITNESS:  Yes, I do consider it.

15              BY MS. SINGER:

16    **Q.**   And is there a reason you sent this guidance through

17    letters rather than, for instance, a formal rule making?

18    **A.**   Because these letters were -- there was no change in

19    the regulation or the law.  We sent these letters just to,

20    again, reiterate what the responsibilities were.

21    **Q.**   All right.  You can put those documents aside.

22              Do you remember, Mr. Rannazzisi, whether in the last

23    letter you referred to a particular administrative order or

24    a particular case?

25    **A.**   Yes, ma'am.

1    **Q.**   And what was that case?

2    **A.**   Southwood Pharmaceutical.

3             MS. SINGER:  I'm going to circulate P-23726,

4    please.

5         May I approach, Your Honor?

6             BY MS. SINGER:

7    **Q.**   Mr. Rannazzisi, do you recognize P-23736?

8    **A.**   Yes, I do.

9    **Q.**   And what is it?

10   **A.**   This is a final decision and a revocation of

11   registration of Southwood Pharmaceuticals.

12   **Q.**   And what was Southwood?

13   **A.**   Southwood was -- I guess you would consider them a

14   manufacturer, but they were a re-packager.  So, they

15   re-packaged drugs and distributed them.  They had

16   distribution authority just like the distributors would.

17   **Q.**   And did you play a role in the Southwood revocation?

18   **A.**   Yes.

19   **Q.**   And what was that role?

20   **A.**   I approved -- I chopped off, read and gave my approval

21   on the Order to Show Cause and we attached an Immediate

22   Suspension Order that would be sent to the Deputy

23   Administrator for final review and approval.

24   **Q.**   And I know you've used this term before, "chopped".

25   What does that mean?

1    **A.**    When these come through my office, if it's an Immediate

2    Suspension Order, there's a list of people who look at it

3    before it gets to me and, once I read it, read the whole

4    document, make sure that it's correct and violations are in

5    place, at that point in time, I'll initial it and it goes up

6    to the Administrator, the Deputy Administrator.

7    **Q.**    And that process is what you refer to as a "chop"?

8    **A.**    It's a chop, yeah.

9    **Q.**    And was there a hearing in the Southwood revocation

10   proceeding?

11   **A.**    Yes, there was.

12   **Q.**    And was there a decision after that hearing on the show

13   cause?

14   **A.**    Yes, there was.

15   **Q.**    And was there a published decision?

16   **A.**    Yes.

17   **Q.**    Do you remember when and where that decision was

18   published?

19   **A.**    Well, the decision was published in July of 2007.

20   **Q.**    And where was it published, do you know?

21   **A.**    In Federal Register.

22   **Q.**    And do you know if that decision was available to these

23   defendants?

24   **A.**    The Federal Register is our vehicle for putting out

25   decisions.  So, yes, it was available to anybody.

```
 1    Q.   Now, does the DEA provide guidance to registrants

 2    through these kinds of administrative orders?

 3    A.   Yes.

 4    Q.   And does the DEA advise registrants to pay attention to

 5    enforcement actions and decisions?

 6    A.   Yes.  That's why we also put it on our website.

 7    Q.   And do you recognize this document as the final order

 8    revoking Southwood's registration?

 9    A.   This is the website version of the final order.  The

10    Federal Register version is in Federal Register format, but

11    this is the website, the DEA website version of it, yes.

12         MS. SINGER:  Your Honor, I would move to admit

13    P-23736.

14         THE COURT:  Is there any objection?

15         MR. SCHMIDT:  No objection, Your Honor.

16         THE COURT:  It is admitted.

17    Ms. Wicht, do you want to say something?

18         MS. WICHT:  No, no.  I'm sorry, Your Honor.

19         MR. SCHMIDT:  Your Honor, can I amend what I said?

20    I think the Court can take notice of it.  I don't think --

21    because it's a legal decision, I don't think it's properly

22    in evidence.  We haven't been doing that with the other

23    decisions, but we don't object to the Court taking notice of

24    it.

25         THE COURT:  Well, I will admit it.  I think you're
```

1    right, but I will admit it anyway.

2            BY MS. SINGER:

3    **Q.**   Now, did Southwood reflect or express an expectation

4    that distributors needed to know about their customers'

5    business practices in order to prevent diversion?

6    **A.**   Yes.  That was the whole basis of the Southwood

7    decision.  They had to know their decision and they had to

8    do due diligence on their customer.

9    **Q.**   And did the decision identify red flags of diversion?

10   **A.**   Yes, it did.

11   **Q.**   Now, I want to turn your attention to Page 13, please,

12   middle of the page, Footnote 23.  And it's very small but,

13   hopefully, Gina can help us out.  And I will go ahead and

14   try to read this.

15           Respondent attempts to excuse its conduct on the

16   grounds that it repeatedly asked DEA officials whether it

17   should stop selling to the pharmacies only to be told by DEA

18   officials that they could not tell them whether or not to

19   sell because that was a business decision.  Respondents'

20   Brief 33.

21           Several courts have held, however, that DEA has no

22   authority under the CSA to tell a distributor whether to

23   sell or not.  And then another citation.

24           Have I read that correctly?

25   **A.**   Yes.

1    **Q.**   And is that your understanding of the DEA's practices?

2    **A.**   Yes.

3    **Q.**   And did Southwood provide guidance on whether a

4    distributor may ship a suspicious order?

5    **A.**   Yes.

6    **Q.**   And what did it say on that point?

7    **A.**   They have to evaluate the orders and if they find that

8    -- it's their decision whether to ship, but if they continue

9    to ship orders without resolving suspicions, then they're

10   not maintaining effective controls against diversion.

11   **Q.**   And, to your knowledge, was the guidance provided in

12   the Southwood order consistent with the guidance that DEA

13   had provided in the past?

14   **A.**   Yes.

15   **Q.**   All right.  Let's turn to -- I'm sorry.  Before we do,

16   you mentioned previously, I think yesterday, Mr. Rannazzisi,

17   that DEA provided guidance through presentations at various

18   conferences and events; is that right?

19   **A.**   Yes.

20   **Q.**   Now, are you familiar with a pharmaceutical industry

21   conference?

22   **A.**   Yes, I am.

23   **Q.**   Okay.  And what is that?

24   **A.**   It brings in -- Pharmaceutical Industry Conference

25   brings in manufacturers and distributors, there's regulators

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1    there, to just discuss things of importance in the field of
 2    controlled substances.
 3              MS. SINGER:  Can we circulate P-02291, please?
 4         May I approach, Your Honor?
 5              BY MS. SINGER:
 6    Q.   Mr. Rannazzisi, are you familiar with the document I
 7    just passed up to you?
 8    A.   Yes.
 9    Q.   And what do you recognize it to be?
10    A.   This was part of a presentation done at one of the
11    conferences, at one of the -- the conferences.
12    Q.   And was this -- have you seen this presentation before?
13    A.   Yes.
14    Q.   While you were at DEA had you seen it?
15    A.   Yes.
16    Q.   And is this guidance that DEA provided to distributors
17    and other registrants?
18    A.   Yes.
19    Q.   Do you know whether this was posted on the DEA's
20    website or whether it was the practice of the DEA to post
21    materials like this on its website?
22    A.   Anytime DEA has a conference for transparency reasons
23    we post the conference -- the conference materials and the
24    presentations we're allowed to post, yes.
25    Q.   And do you know whether this material was prepared and
```

1    provided as a part of DEA's official activities?

2    **A.**   Yes, it was.

3              MS. SINGER:  Move to admit P-02291, Your Honor.

4              THE COURT:  Any objection to 2291?  Hearing none,

5    it's admitted.

6              MS. SINGER:  All right.

7              MR. NICHOLAS:  No.  I was just going to say no

8    objection.

9              THE COURT:  It's admitted.

10             MS. SINGER:  Let's move, please, to P-09616.

11       May I approach again, Your Honor?

12             BY MS. SINGER:

13   **Q.**   Mr. Rannazzisi, do you recognize this document?

14   **A.**   Yes.

15   **Q.**   Have you seen it before during your tenure at DEA?

16   **A.**   Yes.

17   **Q.**   And what do you recognize this document to be?

18   **A.**   In our -- in our meetings and presentations,

19   conferences, the Office of Chief Counsel also gives

20   presentations on -- on certain aspects of the Controlled

21   Substances Act.

22   **Q.**   And turning to Page 2 of this document, do you

23   recognize who gave this presentation?  Do you happen to know

24   who gave this presentation?

25   **A.**   Well, this presentation has been given by a number of

```
 1    people.  I could list names, if you like.

 2    Q.   Do you know if this presentation was presented at DEA

 3    conferences?

 4    A.   Yes.

 5    Q.   And do you know whether this presentation would have

 6    been posted on DEA's website?

 7    A.   Yes.

 8            MS. SINGER:  I would move to admit P-09616.

 9            THE COURT:  Any objection?

10            MR. SCHMIDT:  Our only objection is foundation.  I

11    don't think there's a foundation laid with this witness.  He

12    is not an expert.

13            THE COURT:  Overruled.  I'm going to admit it.

14            BY MS. SINGER:

15    Q.   Mr. Rannazzisi, can you turn to Slide 9, please?  Do

16    you know what these bullet points on this slide represent?

17    A.   I'm sorry?

18    Q.   Do you know what the bullet points on this slide

19    reflect?

20    A.   Oh, they reflect excuses that the DEA has heard about

21    why they are not living up to their obligations under the

22    act.

23            MS. WICHT:  Objection, foundation and hearsay,

24    Your Honor.

25            THE COURT:  Overruled.
```

1          BY MS. SINGER:

2     **Q.**   And was it your -- do you believe that any of these

3     were valid reasons for DEA -- for DEA registrants not to

4     identify suspicious orders or practices?

5     **A.**   No.

6     **Q.**   Let's turn to Slide 13, please.  And does this slide

7     also reflect guidance that DEA provided to registrants?

8     **A.**   Yes.  This is -- this slide is consistent with

9     guidance.

10    **Q.**   All right.  All right.  We can put that one away.

11         All right.  Mr. Rannazzisi, I think the next stop on

12    our road tour that we talked about yesterday was ARCOS and I

13    want to turn there now.  Did you have a chance to work with

14    ARCOS data as a law enforcement officer at the DEA?

15    **A.**   I worked with ARCOS data as a diversion investigator in

16    the late 80s and then in my role as Deputy Director and then

17    Deputy Assistant Administrator.

18    **Q.**   And does the DEA receive ARCOS data from distributors,

19    from these defendants?

20    **A.**   Yes.

21    **Q.**   And do you know when they receive ARCOS data?  How

22    often is it reported?

23    **A.**   It depends.  Some -- some people report it monthly.

24    Some quarterly.  Just depends on the registrant and their --

25    how they want to report.

1   **Q.**   Okay.  And how is that -- how is that requirement set?

2   Is that a matter of discretion?

3   **A.**   If we allow the registrants to make that determination,

4   yes.

5   **Q.**   Okay.  And is it governed by any statutory framework?

6   **A.**   I believe it's in P-27.

7   **Q.**   And do you know whether the settlement agreements with

8   any defendants require them during the time of those

9   agreements to report ARCOS data more frequently?

10   **A.**   Yes.  I believe in the settle agreements we did have a

11   modified ARCOS Report in the settlement agreements, yes.

12   **Q.**   Now, what happens after DEA receives that information?

13   Is there anything that DEA needs to do with it?

14   **A.**   Well, the problem with ARCOS is it's kind of raw data

15   and it's got to be validated and to validate it, we have to

16   go through it, look at the transactions, and make sure that

17   the transactions are within -- do not container errors.

18   **Q.**   And have there been issues in the past where DEA --

19   DEA's validation process founders errors in the ARCOS data?

20   **A.**   Yes, we have founder errors in the ARCOS data.

21   **Q.**   And can you provide an example of the type of error

22   that you might find?

23   **A.**   Just quantity errors, strength errors, things like that

24   that could throw the system off.

25   **Q.**   Now, how long does it take DEA to validate ARCOS data

1    after it receives it?

2    **A.**   I can't tell you how long it takes now, but when I was

3    there, anywhere from three to five months for validation.

4    **Q.**   And is that something that DEA has to do in order to

5    use that ARCOS data to conduct investigations or enforcement

6    actions?

7    **A.**   Yes.

8    **Q.**   And why is that?

9    **A.**   We can't use the raw data because we don't want to open

10   an investigation based on data that's flawed.

11             MS. SINGER:   So, I want to try, with the Court's

12   permission, to use our white board, if my technological

13   skills are up to it.

14             BY MS. SINGER:

15   **Q.**   All right.  Mr. Rannazzisi, is there certain data --

16   and let me get my mic.

17        Is there certain data that distributors have that is

18   different than the data DEA has?

19   **A.**   Well, yeah.  There's a lot of data that distributors

20   have that the DEA doesn't have.

21   **Q.**   So, for instance, does -- do defendants report through

22   ARCOS every controlled substance they ship?

23   **A.**   No, ma'am.

24   **Q.**   And what controlled substances are reported by

25   distributors through ARCOS?

1   **A.**   Schedule I and II and III narcotics.  The distributors

2   wouldn't have Schedule I.  So, Schedule -- say Schedule II

3   and III narcotics.  All Schedule IIs and III narcotics.

4   **Q.**   Now, do contributors have data on all of their

5   controlled substances that they sell?

6   **A.**   Yes.  That's a requirement.

7   **Q.**   Okay.  So, if I put all drugs here, is that accurate?

8   **A.**   All -- all controlled substances, yes.

9   **Q.**   All controlled substances and DEA has Schedule I,

10  Schedule II?

11  **A.**   Schedule II and Schedule III narcotics.

12  **Q.**   Schedule II and III.  Thank you.  And in terms of

13  timing, when do defendants have access to controlled

14  substance shipments or orders?  Is that available right away

15  or is there a time lag?

16  **A.**   What, the distributors, whether they -- they have it

17  available immediately.  They've taken the orders.

18  **Q.**   And I think you testified a minute ago that DEA only

19  gets that data sometime after; is that correct?

20  **A.**   Yeah.  Well, it depends on the month or every quarter,

21  yeah.

22          MR. NICHOLAS:  Your Honor, could I interpose a

23  modest request or an objection for a time period?

24          THE COURT:  Yes.  I think that would be

25  appropriate.

```
 1          Do you have a time period?
 2               BY MS. SINGER:
 3   Q.   So, can we speak, Mr. Rannazzisi, to your tenure as
 4   Deputy Assistant Administrator?  Is what you've testified to
 5   true to that time period?
 6   A.   Yes.
 7               MS. SINGER:  I thought you might have objected to
 8   my handwriting, which would have been fair.
 9               BY MS. SINGER:
10   Q.   Now, did -- do distributors have data, to your
11   knowledge, on drugs other than controlled substances that
12   they sell?
13   A.   I'm sure they do, but it's not in -- they don't have to
14   report anything that's not a controlled substance, so I
15   concentrate strictly on controlled substances.
16   Q.   So does DEA get access through any vehicle to
17   non-controlled substance data through ARCOS or other
18   reporting by distributors?
19   A.   No.
20   Q.   Now, is it important in detecting diversion to know how
21   many controlled substances a customer is buying versus
22   non-controlled substances?
23   A.   Yes.
24   Q.   And why is that important?
25   A.   Because if a customer is ordering an inordinate amount
```

1    of controls as compared to non-controls, that's a red flag.

2    That's an anomaly.  That doesn't happen.

3    Q.   And do you know whether defendants have data on whether

4    a pharmacy's drugs are being paid for by -- with cash?

5              MS. WICHT:  Your Honor, may we lay some foundation

6    as to how this witness has any knowledge of what data

7    distributors, any particular distributor has or does not

8    have?

9              THE COURT:  Well, I'll sustain the objection and

10   you can lay the foundation, Ms. Singer.

11             MS. SINGER:  All right.

12             BY MS. SINGER:

13   Q.   Mr. Rannazzisi, in your capacity in supervising

14   investigations and as the Chief Enforcement Officer, did you

15   come to learn what data distributors have and use in their

16   compliance programs?

17   A.   Yes.

18   Q.   And how did you come to know that?

19   A.   Because I used to review those cases.

20   Q.   All right.  So, let me ask you again.  Do you know

21   whether defendants had access to information on whether

22   drugs were -- what drugs purchased from their customers were

23   paid for in cash?

24             MR. WICHT:  Your Honor, I apologize.  I don't --

25   Mr. Rannazzisi has referred to learning this through various

1   cases.  Ms. Singer is asking very generally about all

2   distributors.  I don't think there's any foundation for him

3   to say anything like that as to all distributors or as to

4   the particular distributors who are in this room as of right

5   now.

6           MR. SCHMIDT:  We join, especially because this is

7   being presented as kind of a categorical, we've always had

8   this, they never did, and he doesn't have the foundation for

9   that.

10          MR. NICHOLAS:  We'd join, as well.

11          THE COURT:  Well, ask him how he knows, if he

12   knows.

13          BY MS. SINGER:

14   **Q.**   So, Mr. Rannazzisi, do you know, first of all, whether

15   these defendants had data on -- on whether drugs -- whether

16   drugs were being purchased with cash from their customers?

17   **A.**   I don't know if they had that data.

18   **Q.**   And did DEA have that data?

19   **A.**   No.  DEA definitely didn't have the data.

20   **Q.**   And do you know in your capacity as Deputy Assistant

21   Administrator whether there was other data that distributors

22   had access to that was useful in identifying potential

23   diversion?

24          MS. WICHT:  I'm sorry.  I'm just again going to

25   ask for it not to be posed as distributors generally.

1    That's not relevant and he needs to have foundation to talk

2    about these distributors.

3          THE COURT:  Well, I'm going to overrule the

4    objection and let her go ahead.

5          THE WITNESS:  Yes.  There's other data that could

6    be purchased that could help them find that information.

7          BY MS. SINGER:

8    **Q.**   And what kind of information are you talking about?

9    **A.**   IMS Health data, Switch data, Chargeback data, any

10   number of things that they had access to.

11   **Q.**   And what does that Chargeback, IMS and Switch data

12   show?

13   **A.**   Well, it depends on the aggregator.  It depends on the

14   company.  But it could show anything from third party --

15   third party payers in the prescription arena to cash sales.

16   It could show you how much a pharmacy is dispensing out and

17   you could make your comparison based on what you're

18   dispensing -- what you're distributing to the pharmacy and

19   how much you're dispensing out to figure out if there was

20   another distributor out there distributing to that pharmacy.

21   So, there's a lot of different things you could find with

22   this data.

23   **Q.**   And do you know whether distributors had access to

24   prescribing data, as well?

25         MR. SCHMIDT:  We'll make the same objection.  I

1    think the problem with this is -- and he's actually giving

2    opinions in other cases as an expert that we should have

3    acquired some of this data that we did not, in fact, have.

4    The problem with this suggestion is all distributors

5    necessarily includes us and necessarily includes all data in

6    this area.  So, I guess the objection is vague.  No

7    foundation.

8              THE COURT:  Well, I'm going to over -- I'm sorry,

9    Ms. Wicht.  Go ahead.

10             MS. WICHT:  I'm sorry, Your Honor.  I just -- I

11   would join the foundation objection and say that it's

12   assuming facts that are not in evidence in this case and

13   that I think that the demonstrative that's being created is

14   -- is misleading, respectfully, in that it lists things

15   under distributors that he's not testified he has any

16   knowledge that distributors had.

17             THE COURT:  Well, I'm going to overrule the

18   objection.  I think cross examination can probably take care

19   of any problems here and let's get on with it and get this

20   done.

21             BY MS. SINGER:

22   **Q.**   So, Mr. Rannazzisi, I think I asked you about

23   prescribing data and I'm not sure whether you answered.

24   **A.**   I guess -- what type of prescribing data are you

25   looking for?

1   **Q.**   Who was prescribing controlled substances and what

2   dosages, et cetera?

3   **A.**   I'm sure that -- well, that could be obtained through a

4   third party aggregator, as well, or they could just ask

5   their customers.

6   **Q.**   And did DEA have this information that you just

7   described, payers dispensing or prescribing?

8   **A.**   I can't -- this is one of those areas where the

9   Department has directed me not to discuss what law

10  enforcement tools we used.

11          MR. SCHMIDT:  In that case, Your Honor, we'll move

12  to strike this testimony because the point is to show that

13  we were doing something DEA didn't have and we can't even

14  challenge that.

15          THE COURT:  Mr. Farrell?

16          MR. FARRELL:  Again, I would just simply point out

17  that this is a -- an issue with a long tail to it.  The

18  Department of Justice is here and if the Department of

19  Justice doesn't object, I would assume this witness is being

20  careful and can proceed.

21          THE COURT:  Mr. Westfall?

22          MR. WESTFALL:  Yes, Your Honor.  This situation

23  was covered in his deposition.  There are certain types of

24  databases that are law enforcement tools and techniques that

25  are used and we have instructed him not to disclose those

```
 1    and we're kind of -- it's one thing to talk about databases
 2    that are public, but now we're getting into the areas that
 3    are starting to approach some of our law enforcement tools.
 4    And so, I would instruct him not to disclose any of that
 5    information that is basically non-public.
 6             MR. NICHOLAS:  Well, in that case, Your Honor, I
 7    do think this line of questioning and the demonstrative is
 8    highly prejudicial and misleading.
 9             MS. SINGER:  So, Your Honor, if I may, I think
10    putting aside whether an objection to the tools and data
11    that was available to DEA in 2015 when Mr. Rannazzisi was
12    there, so we're talking about data now six years old, would
13    reveal confidential informant law enforcement strategies,
14    the fact is that Mr. Rannazzisi has testified about all of
15    the data that distributors had or had access to to detect
16    diversion.
17        Frankly, whether DEA had none of it or all of it only
18    goes to show an imbalance but doesn't -- doesn't make any
19    less relevant the data distributors had to implement their
20    own programs.
21             MR. SCHMIDT:  I think the witness to that point
22    has gone back and forth between saying maybe we had it,
23    maybe we didn't, maybe we should have bought it.  That would
24    be an expert opinion absent some historical tether.  He
25    doesn't know.  He doesn't have the foundation as to us.
```

1          THE COURT:  Well, I'm going to go ahead and let

2     him testify and then I will decide to what extent, if at

3     all, I'll consider it.

4          Is it your position that the defendants had an

5     obligation to go out and find other data and determine

6     whether that revealed diversion or not?  Is that the point?

7          MS. SINGER:  So, I think the testimony, for

8     instance, in Mr. Prevoznik's deposition for the DEA, which

9     we've designated, is that the defendants had an obligation

10    to use any data available to prevent diversion, the data

11    they had, and I don't think Mr. Rannazzisi has offered

12    testimony as to should.  I think he's only testified as to

13    what they could have done or had access to or had.

14          THE COURT:  Well, I'm going to go ahead and take

15    the testimony and then I'll decide to what extent, if any,

16    I'm going to consider it.

17          BY MS. SINGER:

18    **Q.**   Now, putting aside the demonstrative, did DEA still

19    make use of ARCOS data with what it had and when you got it

20    during your tenure?

21    **A.**   Yes, we did make use of ARCOS data.

22    **Q.**   And without going into sensitive law enforcement

23    details, how did DEA use ARCOS data?

24    **A.**   We looked at drugs going downstream in volume to see

25    what pharmacies were getting larger volumes of drugs.

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

1    **Q.**   And did you personally use ARCOS data as an

2    investigative tool?

3    **A.**   I have been involved with, you know, others in my

4    office going through ARCOS data, yes.

5    **Q.**   And is that something you did frequently?

6    **A.**   It was done during a period of time, yes.  It was

7    frequent during a period of time.

8    **Q.**   And did -- did the data distributors have, in your

9    experience, to your knowledge, provide defendants with the

10   ability to identify diversion?

11   **A.**   Yes, based on the -- on the ARCOS data, there's certain

12   things they should have picked up.  Regardless of what we

13   didn't have, they should have picked up the large

14   quantities, such as the quantities that were going into

15   those internet pharmacies and then later on, the pharmacies,

16   going into the pharmacies that were involved in the pill

17   mills.

18   **Q.**   Now, did distributors ask for access to ARCOS data that

19   showed them what -- I'm sorry.  Did defendants ask for

20   access to ARCOS data that would show them what other

21   distributors shipped?

22   **A.**   Yes.  I believe defendants did at one time ask for that

23   data.

24   **Q.**   And did DEA provide that data to them?

25   **A.**   No, we did not.

1   **Q.**   Why not?

2   **A.**   We cannot -- that's another I have been instructed by

3   the Department of Justice not to answer this question.

4   **Q.**   And are you aware that defendants raised concerns about

5   sharing confidential proprietary data with their

6   competitors?

7   **A.**   Yes.  I was aware that there was -- there were concerns

8   generally.  There were concerns within the registrant

9   community, yes, I was aware.

10  **Q.**   Now, in your -- in your experience using only data on

11  their own orders and shipments, could defendants identify

12  suspicious orders and diversion?

13  **A.**   Yes, they could.

14  **Q.**   Would access to other distributors' ARCOS data have

15  helped them prevent diversion?  Did they need it?

16          MR. SCHMIDT:  Objection.  We're now in a pure

17  opinion.  An opinion where -- I apologize.  We're now in an

18  opinion where he said if we asked him what he was told in

19  order to challenge the opinion, we're not going to be able

20  to get an answer.

21          THE COURT:  I'm going to sustain the objection to

22  that.

23          BY MS. SINGER:

24  **Q.**   Would -- did DEA take steps to address the volume of

25  shipments that DEA was seeing through ARCOS?

1    **A.**    Yes.  We retrospectively looked at those volumes and

2    then again investigated them.

3    **Q.**    And what do you mean retrospectively?

4    **A.**    Well, remember ARCOS is only -- is generally behind

5    three to five months, maybe longer.  So, those shipments

6    were already completed.  So, we went back and started to

7    backtrack, looking at what was happening with that

8    particular pharmacy, and then we went back up the chain.

9    **Q.**    And did you use ARCOS data and your knowledge of the

10   volume of pills defendants were selling to take enforcement

11   actions to address the volumes you were seeing at DEA?

12            MR. WESTFALL:  Your Honor -- excuse me, Your

13   Honor.  He can testify as to public information regarding

14   what they did with the data, but as we start getting into

15   law enforcement sensitive techniques, anything outside of

16   the information that would be publicly available --

17            THE WITNESS:  That's all --

18            THE COURT:  Just a minute.

19            THE WITNESS:  Yes, sir.  I'm sorry.

20            THE COURT:  I think he can answer that question

21   without running afoul of what he's been told he can say and

22   not say.

23        So, you can answer the question, Mr. Rannazzisi.

24            MR. WESTFALL:  Thank you, Your Honor.

25            THE WITNESS:  That is all detailed in the Order to

1    Show Cause where information came from.  So --

2            BY MS. SINGER:

3    **Q.**   And was it -- do you believe it was possible for DEA,

4    was DEA able during your tenure, to respond to all of the

5    diversion that it was seeing at the retail level?

6    **A.**   It was very difficult based on the resources we had at

7    that time, yes.  It was very difficult.

8    **Q.**   And can you explain that?

9    **A.**   Well, these investigations take a lot of time.  There's

10   -- at the time, there was probably about 65,000 pharmacies,

11   retail pharmacies in the United States and, you know,

12   1.3-1.4 million prescribers.  So, you know, we were -- we

13   were definitely out-manned.  And so, we needed help.  That's

14   why the Controlled Substances Act had those obligations at

15   all levels.  So, yeah, it was very difficult with all of

16   that, all those pharmacies and prescribers.

17           MS. WICHT:  I believe Your Honor has previously

18   sustained objections to testimony about why the Controlled

19   Substances Act says what it says given that Mr. Rannazzisi

20   wasn't involved in its passage in 1970.

21           THE COURT:  Well, I'll sustain that objection, but

22   it only goes to part of his answer.

23        So, go ahead, Ms. Singer.

24           BY MS. SINGER:

25   **Q.**   Let's turn please to Demonstrative 226, please, Slide

1    3.  All right.  So, turning to Demonstrative 226, Slide 3,

2    Mr. Rannazzisi, are you familiar with 21 C. F. R. 130174?

3    **A.**   Yes.

4    **Q.**   And what is that?

5    **A.**   That's a security provision with the act.

6    **Q.**   I'm sorry.  Can you say that again?

7    **A.**   Security provisions with the act.

8    **Q.**   And (b)?

9    **A.**   74(b)?

10   **Q.**   Yes.

11   **A.**   That is the suspicious order reporting provision.

12   **Q.**   All right.  Thank you.  All right.  And do you

13   recognize this as 1301.74(b)?

14   **A.**   Yes.

15   **Q.**   And is that the regulation that, as you've said,

16   defines what constitutes a suspicious order?

17   **A.**   Yes.

18   **Q.**   And did you feel a need beyond this regulation and the

19   guidance we've discussed to provide a further definition of

20   a suspicious order to defendants?

21   **A.**   During my tenure?

22   **Q.**   That's right.

23   **A.**   No.  I thought it was pretty straightforward.

24   **Q.**   And did you ever pursue a rule making to more fully

25   describe what a constitutes a suspicious order?

```
 1    A.    No.  It was pretty straightforward.
 2    Q.    And did you provide any guidance to registrants
 3    regarding what records they should maintain regarding their
 4    investigation of customers or orders?
 5    A.    I don't recall if I provided guidance.  I don't know.
 6    I don't believe it was in those letters.  It might have been
 7    in those letters, but I don't recall.
 8    Q.    Do you recall whether it was DEA's position or do you
 9    -- let me put that more simply.  Do you believe that
10    maintaining records is part of a distributor's obligation in
11    knowing their customers?
12          MR. SCHMIDT:  Objection.  This is a pure opinion
13    and it is an opinion where he has just said he doesn't
14    recall ever giving this guidance.
15          MR. NICHOLAS:  In addition, it sounds like a
16    question that would yield a legal conclusion.
17          MS. WICHT:  I join that, Your Honor.
18          THE COURT:  Sustained.
19          BY MS. SINGER:
20    Q.    Mr. Rannazzisi, are you aware of whether in conducting
21    inspections DEA -- or investigations DEA would look to what
22    records a distributor maintained on its customers?
23    A.    Yes.  They would ask for due diligence files, yes.
24    Q.    And would it also look for records of Suspicious Order
25    Reports and investigations?
```

1    **A.**    Yes.  That would be in the due diligence files.

2    **Q.**    And why was DEA looking for that information?

3    **A.**    Because we wanted to see -- basically the customers,

4    what they were -- how they were evaluating their customers

5    to see how their system was working.

6    **Q.**    Did you -- full stop.  Did DEA ever tell distributors

7    about customers that were under investigation by DEA during

8    your tenure?

9         MR. WESTFALL:  Objection, Your Honor.  I think

10   we're getting -- those kinds of conversations are getting

11   deep into law enforcement sensitive techniques and perhaps

12   things of that nature because of, again, whatever might have

13   transpired between customers or -- DEA customers in those

14   areas --

15        THE COURT:  I think all she's asking is if they

16   ever told distributors certain customers were under

17   investigation.  I don't think that goes to the techniques

18   they were using or any sensitive law enforcement information

19   if the question was did he -- did the DEA tell them there

20   were investigations.  I'll let him answer.

21        Go ahead.

22        THE WITNESS:  No.  We wouldn't tell them of -- of

23   companies under investigation

24        BY MS. SINGER:

25   **Q.**    And why was that?

1   **A.**   Because there were due process concerns.  If we told

2   them that this company is under investigation and they

3   stopped shipping to them because of what we told them, we

4   would have due process issues.

5   **Q.**   And were there also concerns about compromising current

6   investigations, or confidential informants, or issues like

7   that?

8          MR. SCHMIDT:  Objection, leading.  We now have

9   testimony --

10          THE COURT:  Sustained.

11          BY MS. SINGER:

12   **Q.**   I'll try to un-ring that bell.  Were there other

13   reasons, Mr. Rannazzisi, that you wouldn't share this

14   information with distributors?

15   **A.**   Well, the other reason is the Department of Justice

16   policy is that we can't disclose ongoing investigations.

17   **Q.**   Was that always, during your tenure, DEA's policy?

18   **A.**   Yes.

19   **Q.**   And was there a period of time or did you come to learn

20   that any staff at DEA were not complying with that policy?

21   **A.**   Yes.

22   **Q.**   And can you explain what happened?

23   **A.**   Staff put out an e-mail to distributors explaining that

24   a group of pharmacies were being cut off by another

25   distributor and -- just for information purposes.

1    **Q.**    And do you know when or for how long that happened?

2    **A.**    It wasn't too long.  It was -- as soon as it was

3    brought to my attention, I had it stopped.

4              MS. SINGER:  All right.  I'm going to move into a

5    different subject area, Your Honor.  Do you want to keep

6    going?

7              THE COURT:  Let's try to keep going.  I'd like to

8    get close to 3:30 so -- so the long haul to the end is not

9    too long.

10             MS. SINGER:  Yeah.

11             BY MS. SINGER:

12   **Q.**    Turning now to inspections, Mr. Rannazzisi, does DEA

13   periodically inspect defendants' distribution centers?

14   **A.**    Yes.

15   **Q.**    And how often do those inspections take place?

16   **A.**    I can't tell you how long now, but when I was there, we

17   moved it from five years to three years.  So, every three

18   years, there would be a cyclic investigation or inspection.

19   **Q.**    And what's a cyclic investigation?

20   **A.**    It just cycles through different areas -- different

21   registrants within a Field Division or a Field Office's area

22   of responsibility.  They would cycle through every -- every

23   three years to make sure that all of their registrants,

24   their distributors, their manufacturers, whatever, have gone

25   through a full inspection.

```
 1    Q.    And I think you said that the frequencies of those --

 2    frequency of those investigations changed during your

 3    tenure; is that right?

 4    A.    Yeah.  We -- we -- it was five when I got there and we

 5    changed it to every three years after that.

 6    Q.    Why did do you that?

 7    A.    Because we wanted them in the facilities more.

 8    Q.    And who is "them"?

 9    A.    The inspectors, the diversion investigators.

10    Q.    And how long does a cyclic investigation typically

11    last?

12    A.    It depends on the size of the facility.  It could be a

13    few days.  It could be a few weeks.

14    Q.    And during those cyclic inspections -- and I take it

15    among those inspections DEA performed during your tenure

16    were inspections of each of these defendants' distribution

17    centers; is that right?

18    A.    Yes.

19    Q.    And during those cyclic inspections did DEA review

20    defendants' policies and procedures for maintaining

21    effective controls against diversion?

22    A.    Yes, they did.

23    Q.    And did DEA look at customer due diligence files?

24    A.    They can, yes.  Yes.

25    Q.    And are there -- are there limits to what DEA can
```

1    observe in inspecting a distributor's Suspicious Order

2    Monitoring System or compliance system when it's on-site?

3    **A.**    Yes.

4    **Q.**    And what are those limits?

5    **A.**    You can review protocols and procedures, but to

6    actually see if the system works, you have to sit there with

7    the system day in and day out and watch how orders are being

8    processed out and identified and then suspicions resolved.

9    And they're not there full-time doing that.  They're there

10   actually doing the inspection of the facility.  So they look

11   at the processes and the procedures.  They walk through how

12   -- how the systems work and then they move on.

13   **Q.**    And in four days, or a few weeks, can an inspector

14   determine whether a Suspicious Order Monitoring System is

15   working effectively?

16        MR. SCHMIDT:  Objection.  I apologize.  Objection,

17   foundation and calls for a legal opinion or an expert

18   opinion.

19        THE COURT:  Well, I'm going to let him answer.  I

20   think he's shown that he's got experience with the

21   inspections and I'll overrule the objection.

22        You can answer, Mr. Rannazzisi.

23        THE WITNESS:  No.  You -- you have to be at that

24   facility looking at that system and looking at the incoming

25   orders and the outgoing orders over an extended period of

1    time.  So, they don't have the time during that inspection

2    to sit there and do that.  It's -- it would take too much

3    time and it would be an extended period of time, so they

4    don't do that.

5    **Q.**   And does your inspection tell you about a distributor's

6    Suspicious Order Monitoring System outside of the window of

7    time you're there?

8    **A.**   No, it doesn't.  It's just when we look at the

9    protocols and procedures they might review some suspicious

10   orders to see what they've captured.  It's just while we're

11   there.

12   **Q.**   And while DEA is conducting a cyclic inspection are you

13   doing things other than looking at the Suspicious Order

14   Monitoring System?

15   **A.**   Yes, quite a bit.

16   **Q.**   What other kinds of things are you looking at?

17   **A.**   They have to look at recordkeeping.  They have to do an

18   accountability audit.  They have to do a full security sweep

19   and a security audit.  They have to look to make sure that

20   the alarm systems are up to date, that the cage is compliant

21   with the federal -- with the Code of Federal Regulations,

22   that the vault is compliant with the Code of Federal

23   Regulations.

24       The security of the drugs on the floor.  The security

25   of the drugs on the -- on the warehouse where the -- where

1    it's shipped out.  How it's shipped out.  How it's secure

2    before it gets shipped out.

3        All of that is part of the inspection process and the

4    audit takes a lot of time because they have to pick certain

5    ones and audit them to see if there's any shortages.

6    **Q.**   And after DEA is finished with all of those tasks in

7    doing an inspection, does it convey its findings to the

8    distributor?

9    **A.**   Yes.  They should have a closeout after every

10   inspection.  When I was there, that's what they did.  They

11   had a closeout after every inspection.

12   **Q.**   And what is a closeout?

13   **A.**   They'd present their findings to the distributor.

14   **Q.**   And is there any kind of written document that's

15   created in that process?

16   **A.**   I believe there's a closeout for it, yes.

17   **Q.**   Okay.  And does that include positive and negative

18   observations?

19   **A.**   Yes.

20   **Q.**   Now, during your tenure as Deputy Assistant

21   Administrator did DEA determine in carrying out its

22   inspections of defendants' distributor -- distribution

23   centers that defendants failed to maintain effective

24   controls against diversion?

25   **A.**   Could you repeat that again?  I got failed to maintain

```
 1   effective controls and I didn't get the first part.

 2   Q.   Yeah.  In conducting inspections of defendants'

 3   distribution centers during your tenure did DEA find the

 4   defendants failed to maintain effective controls against

 5   diversion?

 6   A.   Yeah.  I don't recall.  There were so many inspections

 7   in the distributor -- the distributor population as a whole,

 8   yes, I'm sure they have, but I just can't recall if these

 9   three defendants had that type of, you know --

10   Q.   And did your findings and visits -- and I'm sorry.

11   Beyond inspections did DEA visit distribution centers

12   outside of the cyclic investigations?

13   A.   DEA can go in on a -- on a -- you know, could go in a

14   facility pretty much whenever they wanted.  It's a question

15   of whether we've actually done an inspection within a year

16   and whether we executed a notice of inspection but, yes, DEA

17   could go into the facilities if need be.

18   Q.   And did your findings during those inspections and

19   other visits inform the enforcement actions that DEA took

20   during your tenure as Deputy Assistant Administrator?

21   A.   In some circumstances, yes.

22   Q.   Now, in addition to inspections, did defendants meet

23   with DEA to discuss their compliance programs in other

24   settings?

25   A.   I -- I don't -- I don't recall that.
```

1    **Q.**   And do you know whether DEA provided feedback to these

2    defendants on the design of their Suspicious Order

3    Monitoring Systems?

4    **A.**   They may have said the system -- generally what they

5    would say is the system looks -- looks like it's operational

6    or it looks -- it looks like it's operating appropriately.

7    That's about it.  It can't -- it can't confirm it, but based

8    on the policies and procedures that they're looking at, they

9    would say it looks like it's operating appropriately.

10   **Q.**   And did DEA have a policy or procedure of its own on

11   whether it could approve a defendant or distributor's

12   Suspicious Order Monitoring System?

13   **A.**   No.  There's no approval process.  That's why they

14   would say it's operating satisfactorily.  From what you've

15   shown me, it looks to be operating satisfactory, something

16   to that, but there was never an approval given for a

17   Suspicious Order Monitoring Program.

18   **Q.**   And did DEA communicate to defendants that it could not

19   approve their Suspicious Order Monitoring Systems?

20   **A.**   Yes.

21   **Q.**   And do you know when those communications took place?

22   **A.**   Just the letters to start off.  The distributor

23   initiative, then the letters following the distributor

24   initiative.  Then the Memorandums of Understanding and the

25   settlement agreements.  They just continued on and on.

1   **Q.**   Are you aware that during your tenure defendants used

2   thresholds as one -- as a way of identifying suspicious

3   orders?

4   **A.**   I'm aware that the defendants used hard -- some of the

5   defendants used hard numbers during that time period, yes.

6   **Q.**   And what do you mean by "hard numbers"?

7   **A.**   Yeah.  So, there would be a ceiling level or they would

8   create -- yeah.  There would be a ceiling level where that

9   -- that would be the ceiling and then, anything above that

10  would be however they termed it, a breach, order of

11  interest.

12  **Q.**   And do you know what defendants' thresholds were based

13  on during your tenure as Deputy Assistant Administrator?

14  **A.**   I'm not sure.

15  **Q.**   Do you know whether defendants used any kind of

16  multipliers of past orders as a vehicle for setting

17  thresholds?

18          MR. SCHMIDT:  Objection, leading after the witness

19  has said he doesn't know.

20          THE COURT:  Sustained.

21          BY MS. SINGER:

22  **Q.**   To your knowledge, did DEA ever provide guidance to

23  defendants about whether they could use thresholds or

24  multipliers of orders to identify suspicious orders?

25  **A.**   No.  As far as I know from my time there, no.  That

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

```
 1   would have never -- that would not have occurred during my
 2   time, yes.
 3   Q.   And did -- all right.  Moving on to another topic --
 4              THE COURT:  This may be a good time for a break.
 5              MS. SINGER:  Yes, Your Honor.
 6              THE COURT:  We'll come back about 3:30.  It looks
 7   like we're at a convenient stopping point.
 8        (Recess taken)
 9        (Proceedings resumed at 3:31 p.m. as follows:)
10              THE COURT:  All right, Ms. Singer.
11   BY MS. SINGER:
12   Q.   All right, Mr. Rannazzisi, just a few more topics
13   this afternoon.
14        Now, I think you mentioned at the start of your
15   testimony that healthcare providers who prescribe controlled
16   substances are registered with the DEA; is that correct?
17   A.   Yes.
18   Q.   And based on your experience at DEA, were most
19   healthcare providers prescribing appropriately?
20   A.   Yes.
21   Q.   And have you offered any numbers as to what percentage
22   of the universe of prescribers you think are prescribing
23   appropriately and consistent with the law?
24   A.   Yeah.  We usually said 99 percent of the prescribers in
25   the United States are operating -- treating their patients
```

1    appropriately.

2    **Q.**    And have you ever done the math to figure out how many

3    prescribers then aren't prescribing lawfully?

4    **A.**    Do the math as far as -- I'm sorry.

5    **Q.**    So how many -- that one percent, how many prescribers

6    is that?

7    **A.**    Oh, depending on the population of prescribers at the

8    time.  It's thousands, you know, over 10,000, 15,000.

9    **Q.**    And in your experience, how much harm can 16,000

10   prescribers who are prescribing unlawfully do?

11           MS. WICHT:  Objection, vague and lack of

12   foundation.

13           MR. NICHOLAS:  And speculative and leading.  I

14   object as well.

15           THE COURT:  Sustained.

16   BY MS. SINGER:

17   **Q.**    Can DEA take action to investigate or revoke the

18   registration of all of those prescribers?

19   **A.**    It would -- that is a lot of prescribers and that would

20   be a lot of -- we -- no, we couldn't do that, not with the

21   manpower that we had at the time and now -- well, I don't

22   know what it is now, but when I was there, that would have

23   been an awful lot of work and quite a bit of -- I just don't

24   think we could have handled thousands of Orders to Show

25   Cause and Immediate Suspension Orders.

1    **Q.**    And did DEA during your tenure take action against some

2    prescribers?

3    **A.**    Of course we did, yes.

4    **Q.**    And did defendants ever raise a concern with DEA, to

5    your knowledge, that they couldn't make judgments about

6    whether a prescriber was acting lawfully or whether a

7    prescription was valid?

8    **A.**    That was a -- one of the statements that was made, yes.

9    **Q.**    And what did, what did DEA tell them?  What kind of

10   guidance did DEA provide?

11   **A.**    We're not asking them to, to become doctors and figure

12   out what's legitimate and what's not.  What we're asking

13   them to do is look at anomalies within their ordering

14   patterns and identify suspicious orders.

15         We never required them to look at what doctors were

16   doing, questioning a doctor's, a doctor's prescribing

17   habits.  What we asked them to do is look at your

18   suspicious -- your pharmacy population, your customer

19   population, identify anomalies within that population,

20   ordering patterns, and then do your due diligence and see

21   why those anomalies exist.

22   **Q.**    And I want to do just a few housekeeping items before

23   we turn to the next set of questions.

24         As part of your duties as Deputy Assistant

25   Administrator, did you testify before Congress?

1    **A.**   Yes, I did.

2    **Q.**   About how many times?

3    **A.**   I seem to remember 33 as being the number.

4    **Q.**   All right.  I want to show you P-016726, please.

5    Actually, I'm sorry.  That's -- I think it's P-01207.

6          MS. SINGER:  May I approach, Your Honor?

7    BY MS. SINGER:

8    **Q.**   Mr. Rannazzisi, do you recognize the -- recognize

9    the document that I've just shown you?

10   **A.**   Yes, I do.

11   **Q.**   And what do you recognize it as?

12   **A.**   This is my testimony before House Judiciary,

13   Subcommittee on Crime, Terrorism & Homeland Security.

14   **Q.**   And when you testified at that hearing, did you testify

15   in your personal capacity or as a representative of the DEA?

16   **A.**   I was, I was the Drug Enforcement -- actually, I was

17   the administration representative.  So I was representing

18   DOJ and the administration.

19   **Q.**   And when you testified at that hearing, were you

20   conveying the official position of the DOJ to Congress?

21   **A.**   It would be the official administration position

22   through the DOJ.

23   **Q.**   And does this reflect the remarks you gave as your

24   testimony?

25   **A.**   Yes.

```
 1              MS. SINGER:  We move to admit P-01207, Your Honor.
 2              THE COURT:  Any objection?
 3              MS. WICHT:  I think it's hearsay, Your Honor.
 4    It's a prior out-of-court statement by the witness.  I don't
 5    know for what purpose it's being offered.  Yes, we object.
 6    It's hearsay.
 7              MS. SINGER:  So, Your Honor, I would submit that
 8    this is a public record under F.R.E. 803(8)(A)(i).  It is a
 9    record or statement of a public office that sets out the
10    office's activities.
11         Also under 803(8)(A)(iii), the record statement of a --
12    oops, I need to set one other foundation element if you need
13    me to go there.
14         And I would also cite, Your Honor, SEC vs. Pentagon
15    Capital Management, 722 F.Supp. 2d 440, a case from the
16    Southern District of New York finding congressional
17    testimony from the SEC Director of the Division of
18    Enforcement was a public record and admissible pursuant to
19    F.R.E. 803.
20              THE COURT:  It's admitted.
21    BY MS. SINGER:
22    Q.   All right.  One other document.
23         All right.  I'm going to show the witness, with the
24    Court's permission, P-16726.
25         Mr. Rannazzisi, do you recognize that document?
```

```
 1   A.    Yes.

 2   Q.    And what do you recognize that document to be?

 3   A.    This is testimony before the International Narcotics

 4   Control Caucus in 2012.

 5   Q.    And is that testimony that you gave to Congress?

 6   A.    Yes.

 7   Q.    And when you testified at that hearing, did you testify

 8   in your personal capacity or as a representative of DEA?

 9   A.    It's always as a representative of the administration

10   DOJ and DEA.

11   Q.    And when you testified at that hearing, were you

12   conveying the official position of the DEA to Congress or

13   the administration?

14   A.    Yes.

15   Q.    Did you -- does that document represent the testimony

16   that you gave?

17   A.    Yes.

18             MS. SINGER:  Your Honor, I would move to admit

19   P-016726, please.

20             THE COURT:  Ms. Wicht.

21             MS. WICHT:  I would make the same objection, Your

22   Honor, and I don't -- we'd make the same objection.

23             THE COURT:  All right.  Overruled.  It's admitted.

24             MR. SCHMIDT:  Your Honor, obviously I take it we

25   can still object to individual use of these documents if
```

1     they're just kind of putting them in the record.

2            THE COURT:  Yes.

3            MR. SCHMIDT:  Thank you.

4     BY MS. SINGER:

5     **Q.**   Mr. Rannazzisi, on P-01207, the first testimony you

6     looked at, may I ask you to turn to Page 6 under the P

7     number which is Page 5 of the document page number?

8     **A.**   Okay.

9            MS. SINGER:  And can we put that up on the screen,

10    please?

11    BY MS. SINGER:

12    **Q.**   Mr. Rannazzisi, while we get that up on the screen,

13    would you mind just reading the beginning of that

14    paragraph, please?

15    **A.**   Which paragraph?

16    **Q.**   I'm sorry.  That would help.  "The sheer volume of

17    controlled substances."  It's the second full paragraph.

18    **A.**   "The sheer volume of controlled substances being

19    illicitly dispensed anonymously over the internet

20    contributes significantly to other downstream methods of

21    diversion; examples, children and young adults getting

22    controlled substances from the medicine cabinet or family

23    and friends.  While studies such as the national survey on

24    drug use and health indicate that only a small percent and,

25    less than one percent, get controlled pharmaceuticals via

1   the internet, the majority obtaining substances illicitly

2   from family and friends or by stealing them from the

3   medicine cabinet.  They typically acquire less pills than on

4   the internet.  By contrast, DEA investigations clearly

5   reveal that individuals illicitly ordering via the internet

6   frequently receive 100 to 120 pills at a time.  Thus, those

7   who receive their drugs via rogue internet pharmacies are

8   netting more pills than they would from friends or the

9   family medicine cabinets.  Our investigations have led us to

10  believe that the internet is one of the major upstream

11  sources.  For example, a 2006 DEA investigation revealed

12  that one rogue internet pharmacy distributed in excess of

13  15 million hydrocodone tablets in a single year."

14  **Q.**   And does that reflect the official testimony that you

15  provided to Congress?

16  **A.**   On behalf of the administration, yes.

17  **Q.**   And is this statement also true of other sources of

18  diversion besides the internet such as pill mills?

19          MR. SCHMIDT:  Objection, vague.  I'm sorry.

20  Objection, vague and also calls for an expert opinion.

21          THE COURT:  I'll overrule the objection.

22          THE WITNESS:  Yes, any type of large-scale

23  diversion such as pill mills would be in the same, the same

24  place as this.

25  BY MS. SINGER:

1    **Q.**    All right.  You can put those testimonies aside.  I

2    want to show you P-42383.

3         I think we're going out with a bang, or at least a big

4    mess, Your Honor.

5         May I approach?

6              THE COURT:  Yes.

7    BY MS. SINGER:

8    **Q.**    I will try not to shower you with paper, Mr.

9    Rannazzisi.

10        Mr. Rannazzisi, I would direct you to the first page

11   after that cover email.  Do you recognize this document?

12   **A.**    Yeah.  This is a PDAC, or Pharmacy Diversion Awareness

13   Conference presentation.

14   **Q.**    And do you recognize this as an official DEA

15   presentation that was provided at that conference?

16   **A.**    Yes.

17   **Q.**    And what is the date of this presentation?

18   **A.**    March 2nd and 3rd, 2013.

19   **Q.**    And do you know whether this presentation -- I'm sorry.

20   I may have asked this -- was part of your -- nevermind.  I'm

21   sure I asked that.  We're just going to look at one page of

22   it --

23   **A.**    Sure.

24   **Q.**    -- which is 745 which is the Bates number.  It's Bates

25   number, not P number.

```
 1              MR. SCHMIDT:  We offer two objections to this,

 2    Your Honor.

 3        The first is this document is hearsay, and using it for

 4    this purpose is hearsay.  And the second is they appear to

 5    be trying to elicit a gateway opinion from someone who's not

 6    an expert and using a slide that someone else used for that

 7    purpose.

 8              THE COURT:  Do you want to respond to that?

 9              MS. SINGER:  Sure, Your Honor.  This is a slide

10    that represents the DEA's not expert opinion but its

11    practical experience as a law enforcement agency as to what

12    the agency observed about the use and migration or

13    transition from prescription opioids to heroin, which is

14    something that it determined in carrying out its law

15    enforcement function.

16              THE COURT:  You're offering one page of this?

17              MS. SINGER:  Just one page and just for the

18    witness's testimony.  I'm not going to move it --

19              THE COURT:  What page is it?

20              MS. SINGER:  It's Bates Number 745, Your Honor.

21    We can also put it up on the screen, I hope, if you just

22    want to take a look at it that way.

23              THE COURT:  I'm having trouble finding the page

24    number.  745?

25              MS. SINGER:  Yeah.  I assume it's on your screen
```

```
 1    as well, Your Honor.
 2              MR. SCHMIDT:  It's Page 120 of the exhibit.
 3              THE COURT:  It's Page --
 4              MR. SCHMIDT:  Page 120 of the exhibit, Your Honor.
 5              THE COURT:  Oh, okay.  Thank you.  All right.
 6    I've got it.
 7         What's the purpose of this?  Why are you offering it?
 8              MS. SINGER:  I just wanted to ask the witness to
 9    explain what this slide and DEA's official presentation to
10    industry offer.  And I would use it, Your Honor, as notice
11    to industry about what was happening with prescription
12    drugs.
13              MR. SCHMIDT:  So that highlights our objection.
14    Notice to industry has nothing necessarily to do with the
15    defendants in this case.  It was a presentation by someone
16    other than him where I suspect he can't even say what was
17    said about the slide or whether it was actually used in this
18    massive presentation deck.  And it still runs into this
19    problem we're very clearly trying to elicit an expert
20    opinion on gateway.
21              MR. NICHOLAS:  The one thing I'll add is that it
22    doesn't appear that, that my client, for example, attended
23    this conference.  So in terms of the notice point, I'm not
24    sure this gets it done.
25              MS. WICHT:  I don't think there's any foundation
```

1    about any defendant attending the conference, Your Honor, at

2    this point.

3            THE COURT:  Yeah.  I'm going to sustain the

4    objection to the exhibit.  You can ask him questions about

5    that general subject area and we'll see where we go with

6    that.

7    BY MS. SINGER:

8    Q.   So, Mr. Rannazzisi, during your tenure at DEA, both

9    before and during your service as Deputy Assistant

10   Administrator, did you have a chance to form any

11   observations with respect to use of opioids and its

12   relationship to heroin?

13           MR. SCHMIDT:  And, Your Honor, this is pure expert

14   testimony.  They have experts to cover this.  Mr. Rannazzisi

15   is not an expert on this.  I don't believe this was ever

16   covered at his trial deposition.  So it's outside the scope

17   as well as improper expert testimony.

18           MR. NICHOLAS:  Outside the scope is what I was

19   going to say.

20           THE COURT:  I'll sustain the objection.

21   BY MS. SINGER:

22   Q.   Mr. Rannazzisi, in your experience with law

23   enforcement, and I'll ask one more question on this, did

24   you observe that prescription -- that, that heroin users

25   had often started as prescription opioid users and/or --

```
 1    I'm sorry.  Let me rephrase.  I'm sorry.  I'll take one
 2    more crack at this.
 3        Did you observe that DEA's enforcement activities
 4    transitioned to heroin as a result of the diversion of
 5    prescription opioids?
 6            MR. NICHOLAS:  I would interpose the same
 7    objection.
 8            MR. SCHMIDT:  Same, scope and expert opinion.
 9            THE COURT:  I'm going to sustain the objection,
10    Ms. Singer.
11            MS. SINGER:  We'll move on.
12    BY MS. SINGER:
13    Q.   Mr. Rannazzisi, for our last substantive topic I
14    want to turn to quota and it's something I think we've
15    talked about for a while.
16        Can you briefly at a 20,000-foot level explain to the
17    Court how quota for controlled substances works?
18    A.   The quota is an estimate of the total amount of a
19    specific substance that can be made in the United States.
20    It's governed by 21, U.S.C., 826 which provides a road map
21    of what we need to include in our assessment in order to
22    establish that quota.
23        It's -- during my time, it was only established by a
24    base code of drug.  And what that means is we'll establish
25    quota for hydrocodone.  That's it.  But not by dosage units,
```

but by the amount of powder, the amount of drug that's actually being made.

Now, Congress gave us many different things to look at to establish this quota, knowing that the quota was necessary, not only because, one, it was required under, under UN treaties, but the second reason was Congress wanted to ensure that there was enough drug in the system to meet the legitimate medical, scientific, and industrial needs of the country.  It's in 826.

What Congress, and what we're -- our charge was under 826 is to ensure that legitimate patients were getting their medication and not having shortages so a patient would do without.  That was the whole basis of the quota.

The problem with quota is there's so many different things involved that you have to look at not just how much is being allowed to be made for patients, but also how much is being allotted for research and development, for validation studies, for export, for all those things that are necessary for scientific and industrial purposes.  That quota will never -- would never get to a patient.

So there's two parts to quota.  There's a first part where it's the amount of drug that would go to a patient, go to patient population.  And the second part of quota is the amount of drug that goes to research development, export, validation, scientific and medical needs.  That's how quota

1    is generally set up.  But it's -- we're required to follow

2    the road map that Congress gave us in 826.

3    **Q.**   All right.  I was going to put up a slide, but I don't

4    know that you need to see the statute, Mr. Rannazzisi.

5        Did you take -- I'm sorry.  What was your role at DEA

6    when you were Deputy Assistant Administrator with respect to

7    setting quota?

8    **A.**   I oversaw the quota unit, the UN reporting quota unit.

9    And that was a group of scientists.  And those scientists

10   day in and day out would look at quota requests and look at

11   the available materials, what both the manufacturers

12   requested and what we could find, and then make a

13   determination if their quota request was in line with how

14   much need there would be.

15       Now, my job was to look at what they did and eventually

16   sign off on their letters, but also sign off on the overall

17   aggregate quota so the administrator could certify it and

18   publish it.

19   **Q.**   And in your role in overseeing the quota section and

20   making recommendations to the administrator --

21   **A.**   Deputy administrator.

22   **Q.**   -- deputy administrator, did you also take diversion

23   into account?

24   **A.**   Yes.  There's, there's a specific provision in the 826

25   that allows us to look at other things, and we did take

1    diversion into account.

2    **Q.**    Now, did quota for oxycodone and hydrocodone increase

3    significantly during your tenure?

4    **A.**    Absolutely.

5    **Q.**    And why was that?

6    **A.**    Because part of the quota involves the amount of

7    disposal or the amount that's being, that's being either

8    prescribed out or used in hospitals.  And as that number

9    kept going up, we would have to adjust the quota every year

10   to ensure that there was enough quota for patients.

11        So the way it worked was if, if more prescriptions were

12   going out of pharmacies, if more patients in hospitals were

13   getting more drug, that quota was going to increase because

14   we have to meet the needs of the patient population.

15        But in the same token, we also had during that time

16   period research on certain drugs, research on new

17   formulations of, say, hydrocodone or oxycodone.  And the

18   researchers, the companies that were conducting the

19   research, that were conducting validation, they had to have

20   quota.

21        Now, that quota may never, ever see a patient, but it

22   had to be given out because if we can't give them the quota

23   for, for that research and development, for the industrial

24   use, for the export, if they can't get that, then they can't

25   continue their research.

1    So we had to make sure that there was enough in place

2    to take care of the patients, but then also to make sure

3    there was enough to handle the research and development and

4    all the other things that go on with scientific research

5    regarding specific drug products.

6    **Q.**   So, Mr. Rannazzisi, as the opioid epidemic and opioid

7    diversion grew, why didn't DEA lower quota?

8    **A.**   You can't just lower quota.  It, it doesn't work that

9    way.  And I know people have said this over and over again.

10   Quota -- it's a scientific and mathematical exercise to

11   ensure that there's enough drug in the system.

12       I always think of it this way.  If you have 100 people

13   and all of those people are trying to get oxycodone and some

14   of them are, are drug seekers who shouldn't have it and some

15   of them are legitimate patients that need it, maybe they're

16   palliative care, maybe they're chronic pain, but they need

17   that drug, the quota is established so they will get their

18   drug.

19       But if I come in and say, you know what, I'm just going

20   to cut it by 20 percent, then that's 20 percent less but

21   that patient -- the patient population and those drug

22   seekers are competing for now 20 percent less.  And that's

23   how shortages occur.

24       I can't do anything about the people who are seeking

25   drugs other than fine them and either get them help or put

```
1    them in jail.  But I have to maintain enough drug in the

2    system so those legitimate patients, palliative care,

3    hospice, end of life care, those patients have their

4    medication because if I don't do that, I'm not meeting my

5    charge under 826.  And I'm not doing the patients any good

6    either.

7         And, and that's my problem.  I'm, I'm -- we're

8    balancing -- we're doing this balancing act to ensure that

9    there's enough drug in the system, but not enough drug where

10   it could sit on a shelf somewhere so somebody could break

11   into a facility and steal it.  And that's the problem.

12        And we didn't even talk about inventory because 826

13   requires us to give a percentage of inventory allotment in

14   addition to the quota.

15        So there is so many different dynamics with quota.  So

16   when I hear people say just reduce it by 20 percent, well,

17   we might reduce it by 20 percent, but if we don't reduce the

18   amount of patients that are actually seeking -- that need

19   that drug by 20 percent, then, then we're going to have a

20   shortage.

21        And a perfect example of that, if I may, a perfect

22   example of that is hydrocodone.  Hydrocodone at one point in

23   time was the number one drug in the United States.  It

24   wasn't the number one controlled substance.  It was the

25   number one drug in the United States.  More people had
```

1    prescriptions of hydrocodone than any other drug.

2         We knew that was a problem between the internet and the

3    pill mills and we decided to make a change.  We went through

4    the controlled substances.  We decided we were going to take

5    hydrocodone and down-schedule it from Schedule III to

6    Schedule II.

7         Now, that's a very important -- that's a very important

8    distinction.  A Schedule II controlled substance, there is

9    no refills.  You have to give a written prescription.  A

10   Schedule III controlled substance, you have to go -- you

11   could have five refills, you don't need a written

12   prescription.  You could call it in.

13        When we made that change in 2014, by 2017 hydrocodone

14   had decreased dramatically.  The number of prescriptions

15   went down.  It, it was reduced from the number one drug to

16   way down the list.

17        Now, why was that?  Because we required the doctors to

18   change the way they did business with hydrocodone.  They

19   could no longer call it in, no refills.  They had to write

20   that prescription.

21        And that caused the quota to decrease dramatically.

22   Within three years, it went down almost 33 percent or

23   something like that.

24        That's how quota works.  It's based on need.  It's

25   based on the patient need, not the, not the people who are

1    drug seekers because they'll get the drug at the expense of

2    legitimate patients if we can't put enough drug in the

3    system.

4        So when we say let's just cut it by 20 percent, quite

5    frankly, that's a very ignorant statement.

6    **Q.**   Mr. Rannazzisi, can you use quota to direct drugs to

7    legitimate patients versus drug seekers, as you say?  Does

8    quota let you do that?

9    **A.**   I'm sorry.  Could you repeat that one more time?

10   **Q.**   Can you use -- can -- does the quota system let you

11   direct controlled substances to legitimate patients rather

12   than drug seekers?

13   **A.**   No, it doesn't.  The, the, the quota provision of the

14   Controlled Substances Act just says that we must make sure

15   that there's enough quota in the system, enough base code

16   drug in the system to, to, for legitimate medical,

17   scientific, and industrial needs of the country, which means

18   legitimate patients as the medical portion of that.

19   **Q.**   And, so, if it's not quota, what in your experience

20   does work to keep drug diversions down and keep drugs out of

21   the hands of drug seekers?

22        MR. SCHMIDT:  Expert opinion, outside the scope of

23   the MDL deposition.

24        THE COURT:  Overruled.  I think he can answer that

25   based upon his experience.

1          THE WITNESS:  Can you repeat that?  I want to make

2     sure I get it right.

3     BY MS. SINGER:

4     **Q.**    In your experience -- if it's not quota, what in

5     your experience works to prevent diversion and keep

6     drugs out of the hands of drug seekers?

7     **A.**    Compliance with the Controlled Substances Act at every

8     level of the distribution chain, making sure that, you know,

9     there's, there's abatement of drugs going to pharmacies that

10    shows suspicious ordering patterns.  That's, that's what

11    stops -- that's what stops drug-seeking behavior because if

12    they can't get the drug, if they can't go into the pharmacy

13    to get the drug, they're shut off.

14    **Q.**    Okay.  All right.  Let's move on and wrap up the last

15    stop on our road trip.

16         Mr. Rannazzisi, can you remind us how long did you

17    serve as Deputy Assistant Administrator?

18    **A.**    In an acting capacity from July of 2005 to January of

19    2006.  And then I took over the Office of Diversion Control

20    in January of 2006.

21    **Q.**    And how long in total were you at the DEA?

22    **A.**    29 plus years.

23    **Q.**    What kept you at DEA throughout your career?

24    **A.**    I think the reason I stayed was because it was my

25    ability to serve, and seeing, seeing what drugs did to

1    people, you know, in my neighborhood, you know, people I

2    went to school with, people I went to college with.  It, it

3    just was -- just -- the way I thought I could serve was to

4    do this job.  And, you know, I stayed with it for 29 plus

5    years.

6    **Q.**   And over the course of your tenure, particularly as

7    Deputy Assistant Administrator, did your relationship with

8    distributors change, with these defendants in particular?

9    **A.**   I don't know if the relationship changed.  My

10   relationship was the regulator.  So I had to regulate that

11   community of registrants.  Did it change?  Yeah.  They, they

12   didn't want to -- they didn't want --

13           MR. SCHMIDT:  He's literally giving an opinion

14   about our client's state of mind that he has no basis to

15   give.

16           THE COURT:  Sustained.

17   BY MS. SINGER:

18   **Q.**   So can you answer the question, Mr. Rannazzisi,

19   with respect to what you observed about your

20   relationship with these defendants?

21   **A.**   As, as time went on, it got more adversarial.

22   **Q.**   And did you, did you ever say publicly that you were at

23   war with industry?

24   **A.**   Yes, I did.

25   **Q.**   And what did you mean?

**A.**   I think I said that right after the, the Cardinal -- I think it was right after we executed the 2012 Orders to Show Cause -- the Orders to Show Cause and Immediate Suspension Order on Cardinal and CVS.  And, and that came about because I was called over to the department and they were just trying to circumvent me and what we were trying to do.

MR. SCHMIDT:  Your Honor -- go ahead.  Sorry.

MS. WICHT:  I'll object to the witness purporting to say what the company was intending to do.

MR. SCHMIDT:  Yeah, same objection.  I think the witness obviously has strong views, but they don't form facts.

BY MS. SINGER:

**Q.**   Mr. Rannazzisi, I know the Judge directed us to stick to the facts.  So what did you, what did you observe?

**A.**   I think I observed that they were not complying and they continued to not comply.  And that's what I observed. And, so, we just continued to do what we were doing, which was enforcing the law.

THE COURT:  Ms. Wicht.

MS. WICHT:  Objection to the legal conclusion, Your Honor.

THE COURT:  I'll overrule the objection.

BY MS. SINGER:

```
1    Q.   And, so, Mr. Rannazzisi, when you said you were,

2    you were at war with industry, who started the war from

3    your perspective?

4              MS. WICHT:  Objection, Your Honor.

5              MR. SCHMIDT:  Objection, Your Honor.  The

6    witness --

7              THE COURT:  Yeah, this is, this is -- this line

8    has gone far enough, Ms. Singer.  You made your point and

9    I'll sustain that objection.

10   BY MS. SINGER:

11   Q.   Okay.  What have you done since you left the DEA?

12   A.   I'm, I'm a consultant for other states that were, that

13   are taking action against the opioid manufacturers and

14   distributors.

15   Q.   And is that for state government?

16   A.   Yes.

17   Q.   And do you do anything in addition to your consulting

18   or expert work?

19   A.   I, I -- well, I haven't in a long time because of

20   COVID, but I used to speak for different groups.

21   Q.   What kind of groups?

22   A.   It depends.  Some, some paid me.  Others I did for

23   free.  If it was a law enforcement group or a group whose

24   lost loved ones, you know, anti-addiction group, a support

25   group, those, those are all -- regulators, state regulators,
```

1    state regulators, continuing education, I did all those for

2    free.  I just asked them to pay my way out and back.

3    **Q.**   And I take it you have been paid for your work as an

4    expert consultant to states in the opioid litigation?

5    **A.**   Yes.

6    **Q.**   And how much have you been paid?

7    **A.**   Since 2017, I think it was July of 2017, about

8    $860,000.

9    **Q.**   And how does that compare with the salary on an annual

10   basis that you made in law enforcement?

11   **A.**   Law enforcement my last year, last two or three years I

12   made about $180,000 a year.

13   **Q.**   Now, after you left the DEA, did you also agree to be

14   interviewed by the news show *60 Minutes*?

15   **A.**   Yes, I did.

16   **Q.**   And were you interviewed by the *Washington Post*?

17          MR. SCHMIDT:  Objection, Your Honor, relevance.

18          THE COURT:  What's the relevance of his interview

19   with *60 Minutes*?

20          MS. SINGER:  Going to this witness's motives for

21   being here.

22          MR. SCHMIDT:  He's explained his motives for being

23   here.  He's got a bias.  He said he's at war with us.  The

24   fact that he went and did interviews doesn't speak to that,

25   Your Honor.

```
 1              MS. SINGER:  I think he didn't testify to his bias
 2     as being at war with you.  I think he testified to your
 3     non-compliance.
 4              THE COURT:  I'm going to sustain the objection on
 5     relevance grounds.
 6              MR. IRPINO:  Your Honor, Anthony Irpino on behalf
 7     of Cabell County.  If they're not going to go into it on
 8     cross, then that's fine.  If they're not going into 60
 9     Minutes, they're not going into the Washington Post, then
10     that's fine.
11              THE COURT:  Well, we'll see where we go.  I can't
12     prejudge that at this point, but I'm sustaining the
13     objection that was made now.
14              MS. SINGER:  All right.  Your Honor, may I have
15     just a moment, please?
16              THE COURT:  Yes.
17              MS. SINGER:  Thank you.
18          (Pause)
19              MS. SINGER:  Your Honor, I have nothing further
20     for the witness.
21              THE COURT:  All right, Mr. Schmidt.
22                        CROSS EXAMINATION
23     BY MR. SCHMIDT:
24     Q.   Good afternoon, Mr. Rannazzisi.
25              MR. SCHMIDT:  May I proceed, Your Honor?
```

```
1                    THE COURT:  Yes, you may.

2                    THE WITNESS:  Good afternoon.

3       BY MR. SCHMIDT:

4       Q.   Just to start at the basics, the DEA is the federal

5       agency charged with overseeing the entire closed system

6       of distribution; correct?

7       A.   That is correct.

8       Q.   They're the gatekeeper of that system; correct?

9       A.   They are there to oversee that the system works.

10      Q.   They're the ones who choose whether to open that gate

11      and allow entities to be part of the closed system; correct?

12      In that sense, they're the gatekeeper; correct?

13      A.   We register people, yes, to be in the closed system,

14      yes.

15      Q.   And you can't be in the closed system if the DEA

16      doesn't open that gate through registration; correct?

17      A.   For the most part, that's correct, yes.

18      Q.   Now, just because you touched on this a couple times, I

19      want to just ask you some questions about resources at the

20      DEA.

21           While you were head of the Office of Diversion Control,

22      you oversaw approximately 300 personnel.  True?

23      A.   In my office, yes.

24      Q.   You had an annual budget of nearly 350, five

25      zero, million; correct?
```

1    **A.**    That's correct.

2    **Q.**    And that was annual; correct?

3    **A.**    Yes.

4    **Q.**    There were nearly 1,000 field personnel to whom you

5    provided strategic direction; correct?

6    **A.**    That's correct.

7    **Q.**    We've heard a little bit about this, but I'll ask you

8    what this is.  What's a Tactical Diversion Squad?

9    **A.**    I'm sorry.  What was the question?

10   **Q.**    What is a Tactical Diversion Squad, or a TDS it's

11   sometimes called?

12   **A.**    A Tactical Diversion Squad is basically a diversion

13   Task Force.  It contains both DEA diversion investigators,

14   special agents, and state, local police officers who form a

15   group to run cooperative investigations on anybody, anybody

16   in that system, anybody in the closed system.

17   **Q.**    And by the time you left DEA, you had somewhere on the

18   order of 66 of these Tactical Diversion Squads; correct?

19   **A.**    Approximately, yes.

20   **Q.**    Now, let me focus on your role.  You gave some very

21   broad views, and I want to focus on your relevant time

22   period as it relates to distributors.  Okay?

23       You were head of the Office of Diversion Control for 10

24   years; correct?

25   **A.**    Yes.

1   Q.   That was from July, 2005, to October, 2015; correct?

2   A.   Yes.

3   Q.   And that was through some of the very worst of the

4   opioid crisis; correct?

5   A.   That is correct.

6   Q.   In terms of your role prior to that time, and even

7   during that time, we've heard about distributor meetings

8   that happened in 2005.  Do you remember talking about those

9   distributor meetings?

10  A.   Yes.

11  Q.   You did not attend any of those with McKesson,

12  Cardinal, or ABDC.  True?

13  A.   No, I attended that second meeting with McKesson.

14  Q.   Okay.  Let's cull up the July 16th, 2020 -- let me just

15  give you -- ask it one more time.  You did not attend the

16  distributor briefings for McKesson, Cardinal, or ABDC that

17  happened in 2005; correct?

18  A.   In 2005, that's correct.

19  Q.   Okay.  Prior to that time, prior to the time you came

20  into your role in 2005, you did not regularly interact with

21  wholesale distributors.  True?

22  A.   That's correct.

23  Q.   Prior to that time -- actually, throughout your time,

24  you did not perform any sort of regulatory inspection of

25  distribution centers; correct?

1   **A.**   No, that's not correct.  I was a diversion investigator

2   in the '80s, late '80s.  So I did do regulatory inspections

3   on distributors and manufacturers.

4          MR. SCHMIDT:  Could we cull up April 26th, 2019,

5   Page 229, lines 17 to 22.

6   BY MR. SCHMIDT:

7   **Q.**   Do you remember being deposed --

8   **A.**   Yes.

9   **Q.**   -- in April of 2019?

10  **A.**   Yes.

11  **Q.**   Let's go to Page 229, please.

12         And do you see on line 17 you were asked:  "And you

13  didn't perform any sort of regulatory inspections of

14  distribution centers; correct?"

15         And do you see your answer:  "That -- that's correct."

16         Did I read that correctly?

17  **A.**   That's what it says, yes.

18  **Q.**   Were you trying to testify truthfully in that

19  testimony?

20  **A.**   That's correct.

21  **Q.**   Prior to this time period in 2005, you didn't review

22  what you call excessive purchase reports; correct?

23  **A.**   Is it possible -- I didn't get to see what was before

24  those when I made that statement.

25  **Q.**   In the interest of time, I'm going to try to ask you my

```
 1    next question unless the Judge directs me to show it to you.

 2    I'll leave that for counsel for the plaintiffs.

 3              MR. ACKERMAN:  Your Honor --

 4              MR. SCHMIDT:  We have a lot to cover.

 5              MR. ACKERMAN:  I'm sorry.  I thought you were

 6    done.

 7              MR. SCHMIDT:  That's okay.

 8              MR. ACKERMAN:  I do believe that the question

 9    before clarifies that question and in the interest of

10    completeness should be shown.

11              MR. SCHMIDT:  I don't think it does, Your Honor.

12    The question before was about regularly interacting with

13    wholesale distributors in a certain period --

14              MR. ACKERMAN:  As a time frame.

15              THE COURT:  Let's move on.

16              MR. SCHMIDT:  Okay.

17    BY MR. SCHMIDT:

18    Q.   You did not review what you refer to as excessive

19    purchase orders prior to your position in Diversion

20    Control in 2005; correct?

21    A.   No.  I -- again, back in the '80s we had excessive

22    purchase reports.  They used to come in boxes.

23    Q.   Let me try to narrow it.  From 1988 to 2004 you did not

24    review those excessive purchase reports; correct?

25    A.   That's correct, yes.
```

1    **Q.**    From that time period, you didn't provide guidance on

2    suspicious order reporting, 1988 through 2004; correct?

3    **A.**    That's correct.

4    **Q.**    Now, I want to touch on some of the topics that you've

5    covered.  And first you talked about internet pharmacies.

6    Those arose in the early 2000s; correct?

7    **A.**    Yes.

8    **Q.**    And the shipments that you talked about from the

9    defendants occurred before 2007; correct?  The ones focused

10   on Florida?

11   **A.**    Yes.

12   **Q.**    In 2008 Congress passed a statute that pretty much shut

13   down most of the internet pharmacies; correct?

14   **A.**    Yes, Ryan Haight.

15   **Q.**    And there have been no shipments by defendants to the

16   internet pharmacies you described for over a dozen years;

17   correct?

18   **A.**    Since Ryan Haight, I'm not aware of any shipments.

19   **Q.**    Okay.  And that's over a dozen years; right?

20   **A.**    Yes.

21   **Q.**    You knew that each defendant changed their policies of

22   suspicious order monitoring policies as a result of the

23   guidance DEA gave them during that time period, that

24   2006-2007 time period?

25   **A.**    I would, I would hope so.

1    **Q.**   Do you know that, sir, given the testimony you've

2    given?  Did you check that or do you know that?

3    **A.**   Based on the, based on the Settlement Agreements and

4    what they purported, yes, they were supposed to change -- I

5    assume they did.

6    **Q.**   Do you know if they did given the testimony you've

7    given here today?  Did you look at that when you were at

8    DEA?

9    **A.**   Which part of the --

10   **Q.**   If they changed their policy, sir.

11   **A.**   But which part of the policy?  The policies pertaining

12   to the internet or policies pertaining to suspicious order

13   monitoring in general?

14   **Q.**   The Suspicious Order Monitoring System, sir.  Do you

15   know if they changed it from your work at DEA?

16   **A.**   I believe they did change it, yes.

17   **Q.**   Thank you.  Do you know of any internet pharmacies

18   during that window of time you were talking about that were

19   located in Huntington or Cabell County?

20   **A.**   I'm not aware of an internet pharmacy operating in

21   Huntington or Cabell County.

22   **Q.**   The ones you were talking about were located in

23   Florida; is that right?

24   **A.**   Florida and other places in the United States.

25   **Q.**   You know that those internet pharmacies while

1    defendants supplied them were licensed or registered,

2    rather, by the DEA; correct?

3    **A.**    Could you repeat that?

4    **Q.**    Those internet pharmacies, while defendants supplied

5    them, were registered by the DEA; correct?

6    **A.**    That's correct.

7    **Q.**    And when DEA raised concerns about their volumes, DEA

8    knew those volumes from the ARCOS data; correct?  You

9    testified to that; right?

10   **A.**    Yes, retrospectively we did, yes.

11   **Q.**    And that ARCOS data came from the distributors;

12   correct?

13   **A.**    The ARCOS data did come from distributors, yes.

14   **Q.**    They provided the data that allowed the DEA to flag

15   those concerns; correct?

16   **A.**    They provided the data, yes.

17   **Q.**    And did you know that they actually submitted

18   suspicious orders for those pharmacies?

19   **A.**    I'm not aware of suspicious orders being submitted for

20   those pharmacies, no.

21   **Q.**    Did you undertake to search for that?

22   **A.**    Yes, we did.

23   **Q.**    Okay.  Did you personally?

24   **A.**    I -- well, personally, no, but the staff did, yes.

25   **Q.**    Do you know that the defendants cut off those internet

1    pharmacies, but that they remained open for a period of time

2    and registered for a period of time with the DEA after the

3    defendants cut them off?

4           MS. SINGER:  Objection, Your Honor, misstates the

5    witness's testimony.

6           MR. SCHMIDT:  I didn't state the witness's

7    testimony, Your Honor.

8           THE COURT:  Yeah, overruled.

9    BY MR. SCHMIDT:

10   **Q.**   Do you need my question again?

11   **A.**   Yes, I'm sure there was a lag time between the time we

12   shut those pharmacies off because the administrative process

13   takes time.

14   **Q.**   Okay.  And during that time, they continued to provide

15   pills into the community; correct?

16   **A.**   Well, not if you shut them off.

17   **Q.**   Not from us, from other distributors when they remained

18   open.  You know that happened?

19   **A.**   No, I don't know that it happened.

20   **Q.**   Okay.  Well, let's take a look at that.

21   **A.**   Okay.

22   **Q.**   I want to start by talking about McKesson and I want to

23   show you a document that we didn't look at in your direct

24   exam but that I'd like to look at with you.

25   **A.**   Okay.

```
 1                 MR. SCHMIDT:  May I approach, Your Honor?

 2                 THE COURT:  Yes.

 3                 MR. SCHMIDT:  Thank you.

 4      BY MR. SCHMIDT:

 5      Q.   Do you remember that January 23rd, 2006, memo that

 6      summarized the meeting between McKesson and DEA that you

 7      talked about on direct examination regarding the

 8      Lakeland pharmacies?

 9                 MS. SINGER:  Your Honor --

10          Mr. Schmidt, I don't mean to interject, but we don't

11      have copies of the document.

12                 MR. SCHMIDT:  We passed out this document and

13      marked it into evidence.  It's P --

14                 MR. ACKERMAN:  Can we just get a P number?

15                 MR. SCHMIDT:  Yeah.  It's one you used for

16      probably half an hour.  It's P-9116.

17      BY MR. SCHMIDT:

18      Q.   Do you remember being asked about P-9116 which was

19      a January 23rd DEA memo talking about the January 3rd

20      meeting between McKesson and DEA?

21      A.   Yes.

22      Q.   Do you know that McKesson followed up on that meeting

23      in writing?

24      A.   I don't know that for sure, no.

25      Q.   You don't know if they wrote a letter directly to you
```

1    personally?

2    **A.**   I don't recall a letter being written.

3    **Q.**   Okay.  I'm passing you a copy of what's been marked

4    Defense West Virginia 1557.  This is a letter from

5    January 18th, 2006, from Mr. Paul Julian at McKesson to you.

6    Do you see that?

7    **A.**   Yes.

8    **Q.**   And do you see that it says, "This letter is in

9    response to recent meetings between McKesson Corporation and

10   the Drug Enforcement Administration over concerns about

11   distribution of certain controlled substances from our

12   Lakeland, Florida distribution center."  Do you see that?

13   **A.**   Yes.

14   **Q.**   And this is just a few weeks after that meeting we were

15   just referencing, correct, between DEA and McKesson?

16   **A.**   Yes.

17   **Q.**   Let's go to the second page of this letter, please.

18        And if you look at the second paragraph do you see that

19   it tells you McKesson has distributed educational

20   information on internet pharmacies to operations and sales

21   personnel?

22   **A.**   Yes.

23   **Q.**   And then further down, a couple sentences down he says

24   McKesson is in the process of revising its procedures to

25   quantify customer sales of controlled substances identified

1    as life-style drugs through a central review process.

2         Do you see that?

3    **A.**    Yes.

4    **Q.**    Does that fit with your knowledge that McKesson

5    immediately began modifying its policies to try to address

6    the concerns that the DEA was raising?

7    **A.**    Well, according to this, yes.

8    **Q.**    Let's continue on.  If we go to the -- actually, if we

9    stay on the second page of the letter and go to the next

10   paragraph, it says on November 21st, 2005, DEA notified

11   McKesson through outside counsel that DEA was extremely

12   concerned.  Do you see that?

13   **A.**    Yes.

14   **Q.**    And it identifies six specific pharmacies.  Those are

15   the same pharmacies -- if you want a copy of it, I can give

16   you -- you should have it in front of you in that

17   January 23rd memo.  Correct?

18   **A.**    Could you repeat that, please?

19   **Q.**    Yeah.  It was a little funky.  The DEA identified six

20   pharmacies to McKesson in its January 23rd memo; correct?

21   **A.**    Yes.

22   **Q.**    And in that memo -- in this letter, rather, Mr. Julian

23   is writing back and referencing those six pharmacies.  Do

24   you see that?

25   **A.**    Yes.

1    **Q.**   He then says McKesson immediately imposed a limitation

2    on all of these pharmacies and cut sales of hydrocodone to

3    these pharmacies to only 10 percent of their prior orders.

4         Do you see that?

5    **A.**   Yes.

6    **Q.**   The DEA never told McKesson to put that limitation in

7    place; correct?

8    **A.**   The DEA did not tell them what they should do with

9    these customers.

10   **Q.**   And if we go to the next page, please, do you see at

11   the top there's a reference to the meeting we've been

12   talking about?  This says January 6th.  The memo says it's

13   January 3rd.  But do you see that?

14   **A.**   Yes.

15   **Q.**   And if we look in the second to last paragraph, the

16   last full paragraph, it says, "Nevertheless, in light of

17   DEA's strong assertion at the January meeting that these

18   pharmacies are internet pharmacies, McKesson as of

19   January 9th, 2006, has terminated all sales of controlled

20   substances to all six pharmacies."

21        Did I read that correctly?

22   **A.**   I'm sorry.  I don't know where you are.

23   **Q.**   I'm on Page 2.

24   **A.**   Page 2, okay.

25   **Q.**   I'm sorry, Page 3 of the letter.

1    **A.**    Okay.

2    **Q.**    And if you look, it's the last full paragraph right

3    there, "Nevertheless."

4    **A.**    "Nevertheless," okay.  Got it.

5    **Q.**    And do you see where he notifies you that as of January

6    9th, 2006, these pharmacies have been terminated by

7    McKesson?

8    **A.**    Okay, yes.

9    **Q.**    And that's correct; right?  You have no contrary

10   information, do you?

11   **A.**    I don't have any contrary information.

12          MR. SCHMIDT:  We move this into evidence, Your

13   Honor, Defense West Virginia 1557.

14          THE COURT:  Any objection?

15          MR. IRPINO:  Yes, hearsay.

16          MR. SCHMIDT:  Relevant for the effect on the

17   recipient, Your Honor.

18          MR. IRPINO:  That doesn't cure hearsay.

19          MR. SCHMIDT:  It actually does.  It's notice to

20   the witness.

21          MR. IRPINO:  So you're offering it not for the

22   truth of the matter asserted as opposed to what you just

23   said.

24          MR. SCHMIDT:  I think it's pretty clearly a

25   contemporaneous recording and a business record.  So I'd

```
 1    offer it for those purposes.  At a minimum, it comes in for

 2    notice.

 3              THE COURT:  Okay.  I'll admit it for the limited

 4    purpose stated.

 5              MR. IRPINO:  Did you say for the limited purpose,

 6    just for notice?

 7              THE COURT:  For the limited purpose as stated.

 8              MR. IRPINO:  Okay.

 9    BY MR. SCHMIDT:

10    Q.   Now, I'm going to give you a copy, if I could, of

11    that memo.  Do you remember the memo you showed the

12    Court that had blacked-out names on it?  Maybe you

13    don't.  Let me be more precise.

14         The January 23rd, 2006, DEA memo to you from Mr. Mapes

15    blacked out the names of the pharmacies.  I don't know if

16    you recall that.  Do you recall that?

17    A.   Yes, I do.

18    Q.   I'm going to show you one with the names.

19    A.   Okay.

20              MR. SCHMIDT:  May I approach?

21              THE COURT:  Yes.

22    BY MR. SCHMIDT:

23    Q.   And if you look at this document, you will see that

24    this is the January 23rd, 2006, memo from Michael Mapes

25    to you.  Do you see that on the first page?
```

1    **A.**   Yes.

2    **Q.**   If we look at the second page, for some reason there

3    still is some blackout on the second page.  But if we look

4    up at the third bullet, we can see the pharmacy names.  Do

5    you see that?

6    **A.**   Yes.

7              MR. SCHMIDT:  We'll move this into evidence while

8    preserving our objection to this issue if we could, Your

9    Honor, just so we have something in the record with the

10   names.

11             THE COURT:  Any objection?

12             MR. IRPINO:  No objection, Your Honor.

13             THE COURT:  It's admitted.

14   BY MR. SCHMIDT:

15   **Q.**   So let's look at some of those pharmacies and let's

16   go back to that statement you said that you didn't know

17   they remained in business.

18        Do you see that one of the pharmacies is called Bi-Wise

19   Pharmacy?

20   **A.**   Yes.

21   **Q.**   Do you remember giving testimony about being upset

22   about these pharmacies?

23   **A.**   I'm -- I don't recall the testimony.

24   **Q.**   Okay.  Do you know that Bi-Wise remained licensed,

25   registered by the DEA for at least nine months after

1    McKesson cut them off?

2    **A.**    Okay.  I didn't know that, but that's fine.

3    **Q.**    Let's, let's take a look at that.  Do you still have

4    that Southwood decision that you looked at in front of you?

5    It's P-23736.

6    **A.**    Yes.

7    **Q.**    If you want to just keep these two documents in front

8    of you -- let's put -- since it's in evidence, let's put

9    Defense West Virginia 1549 up on the board, Page 2, please.

10   And if we can cull out the Bi-Wise language so we know what

11   we're looking at.

12        Do you see the reference to Bi-Wise there?

13   **A.**    Yes.

14   **Q.**    All right.  And then let's put up P-23736, please, Page

15   3.  And if we could magnify that bottom block, please.  And

16   I think I need the text above it as well.  I'm sorry,

17   Mr. Reynolds.

18        If you look on the first line do you see that this is

19   talking about hydrocodone sales by this company Southwood,

20   --

21   **A.**    Uh-huh.

22   **Q.**    -- another distributor not in this court; correct?

23   **A.**    That's correct.

24   **Q.**    Southwood to Bi-Wise from January 25th after they were

25   cut off by McKesson through October, 2006.  Do you see that?

1    **A.**    Yes.

2    **Q.**    And there's a helpful listing of month by month sales

3    that just this distributor is making to Bi-Wise; correct?

4    **A.**    Okay.

5    **Q.**    And you can see from looking at that, those volumes,

6    that there's over 1.2 million pills shipped to this pharmacy

7    after McKesson cut it off after it remained registered with

8    the DEA before DEA took action against Southwood; correct?

9    **A.**    Okay.

10   **Q.**    Let's look at -- let's go back to -- can we pull down

11   that image and look back at the memo itself.

12        Do you see that there is a pharmacy here -- let me make

13   sure I get the right one -- called Medipharm?  Do you see

14   that, Medipharm?

15   **A.**    Yes.

16   **Q.**    And if we go to Page 2 in the Southwood opinion,

17   P-23736, and -- exactly.  Thank you.

18        Do you see that there's reference to sales through

19   October, 2006 from respondent to Medipharm?

20   **A.**    Yes.

21   **Q.**    And can you tell from looking at those that Medipharm

22   received close to 10 million pills after McKesson cut it

23   off --

24        And, actually, the first bullet should not be

25   highlighted, but the other one should be.

1          -- 10 million pills after McKesson cut it off during

2     that nine-month period when they remained registered by the

3     DEA?

4     **A.**   Yes.

5     **Q.**   These pharmacies -- you talked about a concept called

6     the choke point.  Do you remember that?

7     **A.**   Yes.

8     **Q.**   But these pharmacies, the choke point wasn't McKesson,

9     was it, because they remained open, they remained supplied;

10    correct?

11    **A.**   No.  McKesson supplied that Bi-Wise -- that pharmacy

12    with over 500,000, 500,000 tablets in 11 days.

13    **Q.**   After McKesson cut them off, they continued to get

14    tablets and they continued to dispense; correct?

15    **A.**   And there was an on-going --

16    **Q.**   Is that true, sir?

17    **A.**   Yeah, until the investigation was over.

18    **Q.**   Correct.  The only thing that shut them down, the choke

19    point in the real world was the DEA taking action in this

20    case nine months later; correct?

21    **A.**   Once we got enough evidence, yes, we went after and

22    shut them down as well --

23    **Q.**   Okay.  And you're aware --

24    **A.**   -- just like we shut down Southwood when Southwood was

25    distributing to them as well.

1    **Q.**   And you're aware that this happened with every one of

2    the pharmacies listed in the McKesson memo, Defense West

3    Virginia 1549; correct?

4    **A.**   Well, I don't know because the memo we have was blacked

5    out so --

6    **Q.**   I've given you the un-blacked out one.

7    **A.**   Now I have the un-blacked out one.

8    **Q.**   Now you know; right?

9    **A.**   Yeah, but it doesn't matter because they dispensed

10   500,000 dosage units in 11 days.  I defy you to see a

11   pharmacy that dispenses that much in 11 days.

12   **Q.**   Sir, did you cut them off immediately after that?

13   **A.**   I couldn't because of due process.  Obviously, you know

14   about due process.  Due process means that I have to do my

15   investigation in line to ensure that it's done appropriately

16   and I have enough evidence to shut them down.

17           MR. SCHMIDT:  Your Honor, I think the witness is

18   pretty clearly arguing with me.  I'd ask him just to answer

19   the questions.

20           THE COURT:  He can explain his answer.  Go ahead

21   and ask him the next question.

22           MR. SCHMIDT:  My reaction was just to, you know,

23   the due process.  I recognize I'm dealing with a lawyer as a

24   witness, but I'm trying to keep it polite.

25   BY MR. SCHMIDT:

```
 1   Q.   You can't point me to a single pharmacy you know of

 2   that has ever gone out of business because a single

 3   distributor cut them off; correct?

 4   A.   I can't -- I mean, do you know how many pharmacies have

 5   been cut off?  I have no idea.

 6   Q.   You can't point me to pharmacies that have been cut off

 7   because the DEA takes away their registration.  True?

 8   A.   And it takes time, as I've said.  You just don't take

 9   away a registration.  It takes time.

10   Q.   Can you answer my question now, sir?

11   A.   Yes.

12   Q.   Thank you.  Now, you, you in your testimony talked

13   about whether there was a systemic issue at this point in

14   time with McKesson.  Do you remember that testimony?

15   A.   Yes.

16   Q.   Do you know what the name of McKesson's suspicious

17   Order Monitoring Program was at this time?

18   A.   I believe it was, it was Section 55 I think.

19   Q.   Section 55 in the operations manual?

20   A.   Yes.

21   Q.   Okay.  You never went on-site, though, in your career

22   and reviewed a Suspicious Order Monitoring System; correct?

23   A.   No, I did not.

24   Q.   So that testimony that you gave about inspections just

25   a little while ago, that comes without you actually having
```

1   inspected yourself a Suspicious Order Monitoring System

2   on-site at a company; correct?

3   **A.**   I don't believe back then I did inspections on -- I was

4   doing audits when I did -- when I went out on-site.

5   **Q.**   Sir, let me try one more time.  Is it true that you

6   have never gone on-site and reviewed a Suspicious Order

7   Monitoring System?

8   **A.**   That's correct.  I did not do a Suspicious Order

9   Monitoring System, no.

10   **Q.**   Did you know that McKesson implemented its policy at

11   the distribution center level, Section 55 that we're

12   discussing?

13   **A.**   Okay.

14   **Q.**   Did you know that?

15   **A.**   Did I know that -- yeah, yes.  It's a centralized

16   system.  But the system is centralized, but it operates out

17   of the facilities, but that doesn't mean it's not a

18   centralized system.

19   **Q.**   So let's go back to that memo.  Do you still have that

20   memo --

21   **A.**   Which one?

22   **Q.**   -- in front of you?  Defense West Virginia 1549, the

23   January 23rd, 2006 DEA memo.

24   **A.**   Yes.

25   **Q.**   Do you see that?

1    **A.**    Yes.

2    **Q.**    I want you to -- I want to just walk through a few

3    details in this memo, please.

4         Do you remember saying on direct examination that it

5    takes three to five months, sometimes longer, to use ARCOS

6    data?

7    **A.**    Yes.

8    **Q.**    What's the date of the meeting that this memo

9    summarizes?

10   **A.**    January 23rd.

11   **Q.**    And what is the date of the period of sales that it

12   discusses on Page 2 in the third bullet?

13   **A.**    October 10th through October 21st, 2005.

14   **Q.**    Is that more or less than the three to five months you

15   told us about?

16   **A.**    Well, they didn't pull them on October 10th, 2005.  If

17   I remember correctly, it's going back, but I seem to

18   remember those were pulled in December.

19   **Q.**    Was it more or less than the three to five months you

20   told us about, sir?

21   **A.**    Again, it's a little less than the three months.

22   **Q.**    If we go back into December, is from October 21st to

23   December more or less than the three to five months,

24   sometimes longer, that you told us about?

25   **A.**    It's, it's less.  But if you notice, that's why we did

1    a 10-day or 11-day period because that information was

2    already validated.

3    **Q.**   I'm just finding a document.  While I'm looking for it

4    do you have P-1207?  Let me make sure I have the number

5    right.  Yeah, P-1207.

6        Why don't I come back to this document in a moment,

7    sir.

8        Actually, do you still have in front of you P-1207?

9    It's a statement from June 24th, 2008, to the House of

10   Representatives.

11   **A.**   Okay, got it.

12   **Q.**   Look with me, if you would, at Page 7 of this document

13   while we're on the subject of ARCOS data, please.

14   **A.**   Yes.

15   **Q.**   And do you see that there's a legislative response --

16       And why don't we put this up on the screen, please?

17   **A.**   Sure.

18   **Q.**   P-1207, Page 8 of the numbering in the bottom right.

19       Do you see in the bottom half it says "DEA's response"?

20   Do you see that, Mr. Rannazzisi?

21   **A.**   Yes.

22   **Q.**   You talked about challenges.  Do you see up above those

23   challenges, the challenges of internet pharmacies?

24   **A.**   Yes.

25   **Q.**   Despite these internet pharmacy challenges, DEA has

1    been successfully using the tools that we have to counter

2    this growing threat.  We are using all current regulatory

3    tools possible to identify and shut down those that choose

4    to operate outside of the Controlled Substances Act.

5        Do you see that?

6    **A.**    Yes.

7    **Q.**    And then it says, "DEA is using the --" and it gives

8    the full name but I'm going to use ARCOS, "to identify high

9    or excessive volume purchases and determine which retail

10   pharmacies and practitioners are likely to be involved in

11   the illicit distribution of controlled substances via the

12   internet."

13       Do you see that statement you made to Congress?

14   **A.**    Yes.

15   **Q.**    Was that true?

16   **A.**    Yes.

17   **Q.**    Were you able to use ARCOS to identify high or

18   excessive volume purchases and determine which retail

19   pharmacies and practitioners are likely to be involved in

20   the illicit distribution of controlled substances via the

21   internet?

22   **A.**    Yes, retrospectively we can.

23   **Q.**    And you were able to do that successfully, correct, as

24   you say in your first line?

25   **A.**    Yes.

1  Q.   And then if we go down, you say, "Both manufacturers

2  and distributors are only required to provide information

3  electronically to the ARCOS database about any sale of

4  narcotic substances.  Although this data is limited to

5  narcotics, DEA is able to develop leads and augment

6  investigations from this information."

7       Was that truthful that you could develop leads and

8  augment investigations with ARCOS data?

9  A.   Yes.

10 Q.   And there's no reference in here to ARCOS data being --

11 requiring three to five months, sometimes longer, to be

12 validated; correct?

13 A.   No.  It's -- I've already said that.

14 Q.   Thank you.

15 A.   Our analysis using ARCOS is always retrospective and

16 it's always behind.  That's, that's just the way it is.  We

17 don't have the ability to look at real-time data unless

18 you're supplying a suspicious order.

19 Q.   Nothing you just said appears in this statement to

20 Congress, does it?

21 A.   No, that doesn't appear.

22 Q.   Let's go back to the memo, please, the January 23rd,

23 2006 memo, Defense West Virginia 1549.

24      And when you're caught up with me, I'm going to go to

25 the second page, please, sir.

```
 1    A.    Okay.

 2    Q.    In the third paragraph from the bottom it says,

 3    "Through the course of the above discussions, McKesson

 4    Corporation by their own admission was unable to provide a

 5    plausible explanation for the sales."

 6          Do you see that?

 7    A.    Yes.

 8    Q.    And you understand that that's DEA characterizing

 9    McKesson's response; correct?

10    A.    Yes.

11    Q.    Now, you told us a story that you looked at someone at

12    McKesson and they smiled and they said, "You got us."

13    A.    Yes.

14    Q.    Who was that?

15    A.    Whoever was there.  I don't know the gentleman who was

16    there.  That was a long time ago.  But, yes, that's --

17    Q.    I think there were three or four gentlemen there.

18    Which one of them said it?  It's on the front page of the

19    memo if you need to look at it.

20    A.    I don't recall which one to be honest with you.  But I

21    do recall right after that was when I asked them for the

22    voluntary surrender of their registration.

23    Q.    This memo doesn't document someone from McKesson

24    saying, "You got us," and smiling, does it?

25    A.    I don't think the memo that we put that in there.
```

1    **Q.**   Let's go back to the first page, please.  And if we

2    look at the second and third paragraphs on the first page,

3    do you see it talks about representatives of McKesson?

4    **A.**   Yes.

5    **Q.**   And do you see it talks about representatives of the

6    Drug Enforcement Administration?

7    **A.**   Yes.

8    **Q.**   And for McKesson let's highlight Donald Walker, Bill

9    Mahoney, Gary Hilliard, please.  Do you see those names?  Do

10   you remember meeting those gentlemen?

11   **A.**   Like I said, it was a meeting.  I remember the person

12   having that little smile and saying, "I guess you got us."

13   I can't explain it.

14   **Q.**   Which one is that?

15   **A.**   I don't remember.

16   **Q.**   Okay.  Michael Mapes from the DEA, do you see that?

17   **A.**   Yes.

18   **Q.**   Kyle Wright from the DEA?

19   **A.**   Yes.

20   **Q.**   Are you aware that everyone that's been highlighted has

21   been deposed and not one of them has told that story about a

22   smile and, "You got us"?

23   **A.**   Well, I'm telling you it happened.  And that's when I

24   asked them for their voluntary surrender.

25   **Q.**   Can you answer my question now, sir?

1    **A.**   Yes.

2    **Q.**   Are you aware that every one of those people who have

3    been highlighted have been deposed and not one of them has

4    told that story?

5    **A.**   Okay.

6    **Q.**   Are you aware of that?

7    **A.**   No, I'm not aware of that.

8    **Q.**   Are you aware that Michael Mapes, the DEA agent,

9    testified under oath that, quote, if McKesson had said, hey,

10   we're doing this or we're selling with blinders on and we're

11   not looking or we haven't been following this stuff or we

12   haven't been checking the diversion the way the law says, if

13   they told you that at the meeting, you surely would have

14   noted it, wouldn't you?  Did you know he agreed with that

15   statement in sworn testimony?

16            MR. IRPINO:  Your Honor, we're now reading

17   deposition testimony from a witness outside of this court.

18   It's actually hearsay beyond hearsay.

19            THE COURT:  He's cross -- this is proper

20   cross-examination.  Overruled.

21       Go ahead, Mr. Schmidt.

22   BY MR. SCHMIDT:

23   **Q.**   Are you aware that -- you've looked at Mr. Mapes's

24   testimony; correct?

25   **A.**   No, I don't believe I have.

1    Q.   Okay.  Did you know he gave that testimony, that if

2    that kind of statement was made to him, he would have noted

3    it in that memo?

4    A.   I, I don't know what Mr. Mapes would or wouldn't do.

5    Q.   Let's go back to the second page, if we could.  I want

6    to ask you a few questions about this language down at the

7    bottom, please, sir.

8         And this is -- this paragraph at the bottom references

9    this point you made that during the meeting, Mr. Hilliard --

10   or at the conclusion of the meeting, Mr. Hilliard said we

11   weren't picking up the hydrocodone generics in the run of

12   our data that we were doing.  Do you remember giving

13   testimony about that?

14   A.   Yes.

15   Q.   Are you aware that he's testified, Mr. Hilliard, that

16   that was an acute issue as opposed to a chronic issue?

17   A.   I'm not aware of that, but it still allowed 500,000, or

18   two million dosage units to go downstream.

19   Q.   Do you have any contrary information indicating that

20   this was a chronic issue outside of this report at this

21   distribution center?

22   A.   No.

23   Q.   And are you aware that McKesson after immediately fixed

24   that reporting issue after they realized it at this

25   distribution center at this point in time?

1    **A.**   Well, I would hope so.

2    **Q.**   Did you check to make sure they did as part of your

3    work?

4    **A.**   I'm sure the staff did, yes.

5    **Q.**   All right.  And to be clear, this was 16 years ago;

6    correct?

7    **A.**   Yes.  It was a long time ago.

8    **Q.**   And McKesson changed its Suspicious Order Monitoring

9    Programs as a result of these discussions; correct?

10   **A.**   Yes.

11   **Q.**   And, in fact, you know McKesson has gone through

12   several iterations of its Suspicious Order Monitoring

13   Programs trying to change them as diversion and DEA guidance

14   changes over time; correct?

15   **A.**   Am I talking about back then or now?  I mean --

16   **Q.**   Up through your tenure.  Are you aware --

17   **A.**   Through my tenure I know they changed their system,

18   yes.

19   **Q.**   Okay.  I'd like to go back to P-16 which was that Order

20   to Show Cause document.  Let me know when you've got it in

21   front of you, sir.

22   **A.**   I'm not sure which one it is.

23   **Q.**   If it helps, it's a pretty thick packet and I can put

24   what I'm going to show you up on the screen too.

25   **A.**   Okay.

1    **Q.**   What I'd like to do, in the interest of time, I'll just

2    go straight there, is -- let's go to Page 42 of the

3    document, please.

4         Do you remember not 15 minutes ago telling me about due

5    process?

6    **A.**   Yes.

7    **Q.**   What due process is is both sides in a contested matter

8    get to have their say; right?

9    **A.**   Yes.

10   **Q.**   And you understand that when you issued your Order to

11   Show Cause McKesson stated their position starting on Page

12   42 of this document?

13   **A.**   Yes.

14   **Q.**   You know they had facts that they thought were

15   important; right?  I think you nodded, but she's got to have

16   an oral answer.

17   **A.**   Yes.

18   **Q.**   Thank you.

19            MS. SINGER:  Objection.  The witness can't testify

20   to McKesson's state of mind.

21            MR. SCHMIDT:  I don't think that's what I asked,

22   Your Honor.

23            THE COURT:  No, overruled.  I don't think that was

24   the question.

25   BY MR. SCHMIDT:

```
 1    Q.   Let's go to Page 43, please.

 2    A.   I'm at 43.

 3    Q.   If you look at the bottom there's Mr. Mahoney who we

 4    saw in the memo.  And if we go to Page 44, do you see

 5    there's nine different witnesses listed in total?

 6    A.   Yes.

 7    Q.   And let's continue on to Page 45.  It starts "proposed

 8    testimony of Mr. Mahoney."  Do you see that?

 9    A.   Yes.

10    Q.   And let's go to page -- in the interest of time, I'm

11    just going to go through some quick points on this.  Can we

12    go to Page 48, please?

13    A.   Yes.

14    Q.   Do you see where it says "Verification of customers"

15    and it talks about steps McKesson takes to verify its

16    customers?

17    A.   Yes.

18    Q.   Have you personally reviewed the details of everything

19    McKesson was doing at this point in time to verify

20    customers?

21    A.   Based on this document or based on when I was at DEA?

22    Q.   Yeah.  Did you do that?  Did you personally look at how

23    McKesson -- all the details of how it verified its customers

24    at this point in time?

25    A.   When I was at DEA?
```

1    Q.    Yes.

2    A.    The staff would do that.

3    Q.    Did you do it?  That's my question, sir.

4    A.    If I was preparing for -- I don't recall if I did it or

5    not.  Depends on if I was preparing for testimony or not.

6    Q.    Do you recall any details about how McKesson verified

7    its customers at this point in time that you personally

8    reviewed?

9    A.    I don't recall.

10   Q.    Okay.  Let's go to the next page.  Do you see that

11   there's a reference about four lines down to the reports

12   that McKesson would generate?  "He will discuss the reports

13   generated."  Do you see that?

14   A.    Four lines down on what page?

15   Q.    49, sir.

16   A.    Okay.  "He will discuss --" yes.

17   Q.    Do you see there's a reference to daily reports that

18   went to the DEA?

19   A.    Okay.

20   Q.    Were you aware that McKesson was providing daily

21   reports to the DEA from its distribution centers?

22   A.    Back then?

23   Q.    Yes.

24   A.    I don't remember daily.  I remember -- I don't remember

25   the daily reports, no.

1    **Q.**   Okay.  Let's go to Page 50, please.  In the first full

2    paragraph it states, "He will discuss procedures that

3    Lakeland DC uses to follow up on customers, with customers

4    on potential suspicious orders."

5         Do you see that?

6    **A.**   Yes.

7    **Q.**   Do you know right now whether you personally reviewed

8    all the details and the procedures that this distribution

9    center or any other distribution center at McKesson at this

10   point in time used to follow up with customers on potential

11   suspicious orders?

12   **A.**   I'm sorry.  You're going to have to repeat that

13   question.

14   **Q.**   Sure.  Do you know -- can you tell us now whether you,

15   in fact, looked at all of the details regarding the

16   procedures that McKesson distribution centers used to follow

17   up with customers on potential suspicious orders at this

18   point in time?

19   **A.**   No, I didn't -- I was briefed -- as I said previously,

20   I was briefed on their procedures prior to the issuance of

21   the orders.

22   **Q.**   Just if we go back to Page 49.  Do you remember saying

23   you don't -- you didn't recall the daily reports?  Do you

24   remember that?

25   **A.**   Yes.

1    **Q.**   You don't have any information that they were not sent,

2    do you?

3    **A.**   I don't have any information they were not sent.  I

4    don't remember being briefed on daily reports, though.

5    **Q.**   Sometimes you hear it, sometimes you don't.  That's why

6    it's called brief.  Right?

7    **A.**   No.  I took those briefings pretty seriously.  I

8    listened to everything.

9    **Q.**   I'm not suggesting you didn't listen, sir.

10   **A.**   Okay.

11   **Q.**   Do you understand "brief" means a summary of what's

12   important; correct?

13   **A.**   I understand that, but the word "brief" doesn't really

14   capture these briefings.  A brief briefing could be two,

15   three hours.  So that's not really brief.

16   **Q.**   Let's look at Page 51, please.

17        Do you see it talks about how in the bottom carry-over

18   paragraph Mr. Mahoney will testify as to the due diligence

19   completed for each of the seven pharmacies identified in

20   DEA's Order to Show Cause.  Do you see that?

21   **A.**   I'm sorry.  Which paragraph are you on?

22   **Q.**   Bottom paragraph, Page 51.  It's also up on the screen

23   if you need it.

24   **A.**   Okay.

25   **Q.**   Do you see that?

1    **A.**    Yes.

2    **Q.**    And did you personally review the full due diligence

3    McKesson completed for each of those pharmacies?

4    **A.**    No, I did not review those due diligence.

5    **Q.**    Let's look at Page 59, please.  Do you see that there's

6    proposed testimony from Gary Hilliard?

7    **A.**    Yes.

8    **Q.**    Do you know if you've ever met Mr. Hilliard?

9    **A.**    I'm sure I did.

10   **Q.**    Okay.  You couldn't pick him out I take it?

11   **A.**    From 16 years ago?

12   **Q.**    Yeah.

13   **A.**    Probably not.

14   **Q.**    Okay.  Let's look at his testimony, his proposed

15   testimony on Page 61.  Do you see there's a heading that

16   says "Suspicious Orders"?

17   **A.**    Got it.

18   **Q.**    Under that heading it says, "Mr. Hilliard will testify

19   as to McKesson's participation in the DEA Suspicious Orders

20   Task Force."

21         Do you see that?

22   **A.**    Yes.

23   **Q.**    "He will testify that the Suspicious Order Task Force

24   was created in cooperation with DEA in the mid to late

25   1990s."

1        Do you see that?

2  **A.**    Yes.

3  **Q.**    Were you part of that DEA Suspicious Orders Task Force?

4  **A.**    No.  That Suspicious Orders Task Force, though, was for

5  chemicals, not for controlled substances.

6  **Q.**    Did you attend meetings of that Suspicious Order Task

7  Force?

8  **A.**    No, but I received reports on the Suspicious Orders

9  Task Force because I was the clandestine lab coordinator for

10 the Detroit field division at the time.

11 **Q.**    Do you see where he says five lines down, "Mr. Hilliard

12 will testify that the industry and DEA agreed on a variation

13 factor to allow for seasonal fluctuations."  But then he

14 says, "The threshold criteria established for suspicious

15 orders involved a factor of three times the average for

16 CII --"

17       Do you recognize that as Schedule II controlled

18 substances?

19 **A.**    Yes.

20 **Q.**    And a factor of eight times average for III to V.

21       Do you recognize that as Schedule III to V controlled

22 substances?

23 **A.**    Yes.

24 **Q.**    And List I products.  Do you see that?

25 **A.**    Yes.

1    **Q.**   Were you at any of those meetings, sir?

2    **A.**   No, I was not.

3    **Q.**   Let's go to Page 71, and then we'll be done with this

4    document.

5         Do you see that there's reference to testimony from

6    Donald Walker at McKesson?

7    **A.**   Yes.

8    **Q.**   If we flip over to Page 72, do you see on Page 72 there

9    is reference to educational information that McKesson has

10   provided to its employees and operations and sales regarding

11   internet pharmacies?

12   **A.**   I'm sorry.  Where are we?  I'm on Page 72.

13   **Q.**   Very bottom paragraph.  It's up on the screen as well

14   if that helps.

15   **A.**   Yes.

16   **Q.**   Do you see that?

17   **A.**   Yes.

18   **Q.**   Am I correct that you've not reviewed those materials

19   in any detail?

20   **A.**   No, I have not.

21        MR. SCHMIDT:  Your Honor, I can do a new topic but

22   I think I'm out of time.

23        THE COURT:  Is this a good place to stop?

24        MR. SCHMIDT:  This is a great place to stop.

25        THE COURT:  Okay.

1          Mr. Rannazzisi, we'll have to have you back here at

2    9:00 in the morning, sir.

3               THE WITNESS:  Thank you very much.

4               THE COURT:  Okay.  We'll be in recess until 9:00.

5               MR. SCHMIDT:  Thank you, Your Honor.

6          (Trial recessed at 5:01 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1        CERTIFICATION:

2               I, Ayme A. Cochran, Official Court

3   Reporter, and I, Lisa A. Cook, Official Court Reporter,

4   certify that the foregoing is a correct transcript from

5   the record of proceedings in the matter of The City of

6   Huntington, et al., Plaintiffs vs. AmerisourceBergen

7   Drug Corporation, et al., Defendants, Civil Action No.

8   3:17-cv-01362 and Civil Action No. 3:17-cv-01665, as

9   reported on June 8, 2021.

10

11          S\Ayme A. Cochran              s\Lisa A. Cook

12             Reporter                      Reporter

13       _

14

15          June 8, 2021

16             Date

17

18

19

20

21

22

23

24

25
```

## $

**$180,000** [1] - 208:12
**$860,000** [1] - 208:8

## '

**'05** [1] - 53:12
**'06** [1] - 53:12
**'80s** [3] - 213:2, 214:21
**'96** [1] - 55:25

## 0

**00907** [2] - 2:5, 2:17

## 1

**1** [6] - 47:4, 47:25, 48:6, 73:25, 75:4, 76:19
**1,000** [1] - 211:4
**1.2** [1] - 227:6
**1.3-1.4** [1] - 171:12
**10** [5] - 139:5, 211:23, 222:3, 227:22, 228:1
**10,000** [1] - 185:8
**10-day** [1] - 233:1
**10-milligram** [3] - 16:18, 25:11, 25:14
**100** [2] - 191:6, 200:12
**1001** [2] - 2:10, 4:6
**1022** [1] - 3:5
**10:30** [1] - 36:5
**10:34** [1] - 67:25
**10th** [6] - 16:7, 60:16, 60:18, 60:23, 232:13, 232:16
**11** [7] - 16:24, 17:18, 17:24, 140:2, 228:12, 229:10, 229:11
**11-day** [1] - 16:9, 16:14, 233:1
**11:53** [1] - 122:6
**120** [4] - 18:3, 191:6, 194:2, 194:4
**126** [1] - 3:5
**1260** [2] - 73:25, 75:3
**13** [2] - 151:11, 156:6
**1300** [1] - 6:15
**1301.7(4)(b** [1] - 48:18
**1301.74(b** [3] - 64:16, 81:10, 172:13
**1301.74(b)** [1] - 49:4, 69:17, 89:22
**130174** [1] - 172:2
**1311** [2] - 2:4, 2:16
**14** [6] - 123:13,

**123**:19, 129:21, 130:18, 131:10, 133:19
**15** [6] - 25:14, 25:23, 96:6, 123:19, 191:13, 241:4
**15,000** [1] - 185:8
**15-milligram** [1] - 25:11
**1549** [4] - 226:9, 229:3, 231:22, 235:23
**1557** [2] - 220:4, 223:13
**15910** [1] - 3:18
**16** [3] - 133:19, 240:5, 246:11
**16,000** [1] - 185:9
**1600** [1] - 3:17
**16th** [2] - 139:19, 212:14
**17** [2] - 213:5, 213:12
**1717** [2] - 6:6, 6:13
**18.9** [1] - 123:1
**18th** [2] - 138:2, 220:5
**19** [4] - 130:17, 131:12, 131:13, 133:20
**19087** [1] - 6:15
**19103** [2] - 6:6, 6:13
**1970** [1] - 171:20
**1988** [2] - 214:23, 215:2
**1990s** [1] - 246:25
**1996** [1] - 139:19
**1998** [1] - 53:23
**19th** [1] - 59:17
**1:00** [1] - 122:22
**1:45** [2] - 122:5
**1st** [1] - 36:21

## 2

**2** [11] - 15:24, 36:17, 47:14, 48:1, 68:21, 154:22, 222:23, 222:24, 226:9, 227:16, 232:12
**20** [10] - 45:3, 45:7, 122:11, 200:20, 200:22, 201:16, 201:17, 201:19, 203:4
**20,000-foot** [1] - 196:16
**20-some** [1] - 123:8
**20001** [1] - 5:12
**20004** [1] - 4:7
**20005** [3] - 4:14, 4:16, 5:5

**2000s** [1] - 215:6
**2004** [2] - 214:23, 215:2
**2005** [22] - 7:23, 9:9, 16:7, 36:21, 60:16, 60:18, 66:14, 105:14, 109:18, 114:20, 146:2, 204:18, 212:1, 212:8, 212:17, 212:18, 212:20, 213:21, 214:20, 221:10, 232:13, 232:16
**2006** [21] - 9:24, 19:14, 20:7, 31:24, 35:20, 36:13, 36:15, 36:21, 191:11, 204:19, 204:20, 219:5, 220:5, 222:19, 223:6, 224:14, 224:24, 226:25, 227:19, 231:23, 235:23
**2006-2007** [1] - 215:24
**2007** [14] - 48:13, 48:19, 59:17, 63:3, 68:20, 69:9, 77:18, 78:5, 142:21, 142:23, 143:23, 146:4, 149:19, 215:9
**2008** [9] - 74:2, 74:22, 76:20, 78:14, 80:22, 81:11, 95:17, 215:12, 233:9
**2010** [2] - 84:3, 84:4
**2011** [5] - 84:23, 84:25, 87:1, 97:6, 98:25
**2012** [7] - 75:25, 96:2, 96:3, 96:13, 97:6, 189:4, 206:2
**2013** [1] - 192:18
**2014** [1] - 202:13
**2015** [2] - 166:11, 212:1
**2017** [2] - 202:13, 208:7
**2019** [2] - 213:4, 213:9
**202** [2] - 2:4, 2:16
**2020** [1] - 212:14
**2021** [4] - 1:19, 7:4, 250:9, 250:15
**208873** [1] - 96:6
**20th** [1] - 86:12
**21** [9] - 48:18, 49:3, 69:16, 81:10, 89:22, 122:11, 141:4, 172:2, 196:20
**219** [1] - 95:9

**21st** [4] - 16:7, 221:10, 232:13, 232:22
**22** [2] - 1:16, 213:5
**2216** [1] - 3:7
**226** [2] - 171:25, 172:1
**229** [2] - 213:5, 213:11
**2291** [1] - 154:4
**22nd** [3] - 68:20, 69:9, 122:12
**23** [1] - 151:12
**23rd** [9] - 219:5, 219:19, 221:17, 221:20, 224:14, 224:24, 231:23, 232:10, 235:22
**24th** [1] - 233:9
**25** [1] - 5:5
**252,100** [1] - 16:14
**25301** [3] - 2:8, 3:13, 4:19
**25322** [1] - 6:9
**25338-3843** [1] - 5:15
**25701** [1] - 3:10
**25th** [1] - 226:24
**26** [1] - 45:3
**26.2** [1] - 123:3
**26th** [1] - 213:4
**27** [3] - 45:3, 85:24, 142:21
**27th** [2] - 116:18, 144:13
**28** [3] - 3:15, 4:3, 4:9
**29** [2] - 204:22, 205:4
**29464** [3] - 3:15, 4:4, 4:9
**2:00** [2] - 122:4, 122:23
**2d** [1] - 188:15
**2nd** [1] - 192:18

## 3

**3** [11] - 60:10, 60:12, 68:22, 80:14, 144:13, 145:3, 145:8, 172:1, 222:25, 226:15
**30** [6] - 23:22, 24:17, 25:23, 80:22, 81:11, 123:9
**30(b)(6** [1] - 55:24
**30-milligram** [2] - 24:17, 25:11
**300** [1] - 210:22
**30s** [1] - 25:15
**30th** [1] - 78:14
**3100** [2] - 6:5, 6:12
**316** [1] - 2:13
**31st** [3] - 36:21, 48:13, 48:18

**32502** [1] - 2:14
**33** [3] - 151:20, 187:3, 202:22
**34** [2] - 79:17, 80:1
**35** [1] - 80:14
**350** [1] - 210:24
**37** [1] - 98:1
**3843** [1] - 5:14
**39** [1] - 122:14
**3:17-cv-01362** [2] - 1:5, 250:8
**3:17-cv-01665** [2] - 1:11, 250:8
**3:30** [2] - 176:8, 184:6
**3:31** [1] - 184:9
**3rd** [9] - 9:23, 13:22, 14:9, 31:22, 36:15, 192:18, 219:19, 222:13

## 4

**4** [5] - 32:19, 33:2, 48:15, 48:22, 145:3
**40** [1] - 23:22
**401** [2] - 2:10, 4:6
**405** [1] - 2:7
**42** [3] - 122:14, 241:2, 241:12
**43** [2] - 242:1, 242:2
**44** [1] - 242:4
**440** [1] - 188:15
**45** [2] - 122:21, 242:7
**46** [1] - 81:1
**48** [1] - 242:12
**49** [3] - 73:2, 243:15, 244:22
**4th** [3] - 9:24, 35:18, 36:13

## 5

**5** [5] - 36:17, 60:10, 89:12, 90:16, 190:7
**5-milligram** [1] - 16:17
**5.2** [1] - 60:21
**50** [2] - 45:7, 244:1
**500** [1] - 18:2
**500,000** [4] - 228:12, 229:10, 239:17
**51** [2] - 245:16, 245:22
**5126** [2] - 140:3, 140:15
**5195** [1] - 95:9
**520,000** [1] - 17:24
**54** [2] - 77:7, 122:15
**55** [4] - 77:7, 230:18, 230:19, 231:11
**553** [1] - 6:8
**56** [1] - 3:4

**56th** [1] - 3:5
**57.8** [1] - 122:15
**57/42** [1] - 125:3
**59** [3] - 92:22, 246:5
**5:01** [1] - 249:6
**5th** [1] - 77:18

## 6

**6** [7] - 32:13, 32:15,
32:19, 33:2, 48:20,
57:25, 190:6
**60** [3] - 208:14,
208:19, 209:8
**600** [1] - 2:13
**61** [2] - 77:19, 246:15
**65,000** [1] - 171:10
**66** [1] - 211:18
**67** [1] - 78:6
**6th** [2] - 3:5, 222:12

## 7

**7** [5] - 120:9, 120:10,
233:12
**7-and-a-half-
milligram** [1] - 16:17
**7.3** [1] - 123:2
**70130** [1] - 3:8
**707** [1] - 4:18
**71** [1] - 248:3
**716** [1] - 3:12
**72** [3] - 248:8, 248:12
**722** [1] - 188:15
**725** [2] - 4:13, 4:15
**73** [3] - 92:16, 92:17,
92:20
**74(b** [1] - 172:9
**745** [3] - 192:24,
193:20, 193:24
**7th** [4] - 78:5, 142:23,
143:23, 144:13

## 8

**8** [6] - 1:19, 7:4, 81:7,
233:18, 250:9,
250:15
**801** [1] - 3:10
**803** [1] - 188:19
**803(8)(A)(i)** [1] - 188:8
**803(8)(A)(iii** [1] -
188:11
**8038(a)(1** [1] - 34:25
**80s** [1] - 156:16
**823** [1] - 141:4
**823(e** [2] - 118:23,
119:6
**824** [1] - 141:4
**826** [7] - 196:20,

197:9, 197:11,
198:2, 198:24,
201:5, 201:12
**850** [1] - 5:12
**8873** [1] - 87:1

## 9

**9** [1] - 155:15
**901** [1] - 4:18
**91436** [1] - 3:18
**93** [1] - 122:13
**99** [1] - 184:24
**9:00** [3] - 7:4, 249:2,
249:4
**9th** [3] - 2:10, 222:19,
223:6

## A

**a.m** [3] - 7:5, 67:25,
122:6
**abatement** [1] - 204:9
**ABDC** [3] - 51:14,
212:12, 212:16
**ability** [5] - 112:9,
124:25, 168:10,
204:25, 235:17
**able** [6] - 53:13,
169:19, 171:4,
234:17, 234:23,
235:5
**absent** [1] - 166:24
**Absolutely** [2] - 93:12,
199:4
**absolutely** [6] - 12:1,
16:24, 35:23, 83:18,
106:17, 113:23
**abuse** [2] - 117:18,
117:19
**accept** [1] - 52:5
**access** [11] - 159:13,
160:16, 161:21,
162:22, 163:10,
163:23, 166:15,
167:13, 168:18,
168:20, 169:14
**accomplish** [1] - 31:7
**accordance** [1] - 49:3
**according** [1] - 221:7
**Accordingly** [1] -
117:21
**account** [4] - 12:18,
123:11, 198:23,
199:1
**accountability** [1] -
179:18
**accurate** [2] - 61:23,
159:7
**accurately** [3] - 11:8,

90:1, 90:14
**ACKERMAN** [10] - 2:9,
33:23, 34:1, 75:5,
75:11, 214:3, 214:5,
214:8, 214:14,
219:14
**Ackerman** [7] - 33:18,
33:19, 34:19, 54:8,
75:12, 127:7, 136:5
**Ackerman's** [1] -
34:16
**acknowledge** [1] -
125:23
**acknowledged** [3] -
50:21, 53:10, 53:17
**acquire** [1] - 191:3
**acquired** [1] - 164:3
**acquiring** [1] - 36:22
**Act** [15] - 60:8, 62:14,
62:23, 72:15,
115:22, 116:4,
116:25, 121:16,
144:10, 154:21,
171:14, 171:19,
203:14, 204:7, 234:4
**act** [7] - 37:10, 117:13,
145:18, 155:22,
172:5, 172:7, 201:8
**acting** [2] - 186:6,
204:18
**action** [19] - 28:21,
39:20, 40:25, 43:21,
72:12, 72:16, 74:2,
74:17, 74:22, 75:25,
76:21, 92:1, 113:1,
141:14, 185:17,
186:1, 207:13,
227:8, 228:19
**Action** [4] - 1:4, 1:10,
250:7, 250:8
**actions** [10] - 72:6,
72:9, 74:20, 75:25,
78:16, 115:14,
150:5, 158:6,
170:11, 181:19
**activities** [6] - 35:2,
83:24, 139:15,
154:1, 188:10, 196:3
**activity** [4] - 23:13,
119:22, 141:6, 141:7
**actual** [1] - 135:23
**acute** [1] - 239:16
**acutely** [1] - 136:3
**add** [8] - 19:2, 42:14,
46:18, 56:17, 56:24,
137:2, 137:4, 194:21
**add-on** [1] - 46:18
**added** [2] - 134:14,
137:8
**addiction** [1] - 207:24

**addition** [11] - 23:17,
66:17, 88:14, 89:23,
118:5, 118:16,
133:12, 173:15,
181:22, 201:14,
207:17
**additional** [4] - 15:11,
72:6, 72:9, 86:16
**address** [9] - 22:17,
23:9, 33:23, 38:18,
75:6, 121:10,
169:24, 170:11,
221:5
**addressed** [2] - 31:12,
73:22
**adequate** [3] - 48:11,
69:8, 80:20
**adjust** [1] - 199:9
**administration** [6] -
187:17, 187:18,
187:21, 189:9,
189:13, 191:16
**Administration** [3] -
68:14, 220:10, 237:6
**Administrative** [1] -
96:11
**administrative** [9] -
28:20, 29:9, 31:16,
32:8, 41:12, 89:24,
147:23, 150:2,
218:12
**administrator** [10] -
61:15, 78:18, 78:19,
81:22, 89:6, 89:10,
198:17, 198:20,
198:21, 198:22
**Administrator** [27] -
29:21, 29:23, 30:10,
30:19, 30:23, 31:6,
32:11, 57:15, 59:21,
61:17, 72:8, 102:15,
148:23, 149:6,
156:17, 160:4,
162:21, 180:21,
181:20, 183:13,
186:25, 195:10,
198:6, 204:17, 205:7
**admissibility** [2] -
11:23, 88:25
**admissible** [1] -
188:18
**admission** [4] - 83:5,
88:12, 95:3, 236:4
**admit** [15] - 11:11,
33:1, 33:12, 35:13,
86:21, 87:12,
150:12, 150:25,
151:1, 154:3, 155:8,
155:13, 188:1,
189:18, 224:3

**admitted** [16] - 35:14,
44:24, 73:1, 86:23,
87:1, 87:5, 87:14,
88:12, 116:10,
116:12, 150:16,
154:5, 154:9,
188:20, 189:23,
225:13
**adults** [1] - 190:21
**advance** [2] - 93:2,
94:10
**adversarial** [1] -
205:21
**adverse** [2] - 135:19,
135:24
**advise** [1] - 150:4
**advised** [1] - 52:21
**advisement** [1] -
132:8
**advocacy** [1] - 97:16
**afoot** [1] - 31:11
**afoul** [1] - 170:21
**afternoon** [4] - 136:6,
184:13, 209:24,
210:2
**afternoons** [3] -
123:10, 125:12,
135:9
**agency** [5] - 31:16,
93:24, 193:11,
193:12, 210:5
**agent** [1] - 238:8
**agents** [1] - 211:14
**aggregate** [1] - 198:17
**aggregator** [2] -
163:13, 165:4
**ago** [10] - 34:6, 90:15,
132:3, 159:18,
230:25, 236:16,
240:5, 240:7, 241:4,
246:11
**agree** [3] - 54:5,
135:12, 208:13
**agreed** [4] - 96:20,
134:12, 238:14,
247:12
**Agreement** [26] -
44:11, 44:15, 44:23,
45:25, 51:3, 57:24,
58:6, 58:7, 58:19,
68:11, 69:22, 70:2,
71:9, 79:14, 80:4,
80:5, 80:7, 80:12,
81:3, 83:13, 83:22,
96:3, 96:11, 96:12,
96:16, 96:19
**agreement** [14] - 48:7,
49:6, 50:11, 61:20,
68:15, 68:19, 68:21,
69:16, 69:19, 70:9,

80:17, 81:8, 89:25, 96:22
**agreements** [5] - 157:7, 157:9, 157:10, 157:11, 182:25
**Agreements** [7] - 82:9, 82:14, 82:20, 82:25, 83:8, 83:25, 216:3
**agrees** [3] - 48:24, 50:5, 98:14
**ahead** [33] - 19:10, 26:20, 27:15, 33:25, 34:23, 36:9, 38:10, 38:12, 43:14, 46:25, 50:6, 52:9, 53:4, 71:7, 71:17, 79:4, 93:19, 95:7, 103:4, 113:15, 114:18, 119:3, 127:11, 151:13, 163:4, 164:9, 167:1, 167:14, 171:23, 174:21, 206:7, 229:20, 238:21
**al** [4] - 1:7, 1:13, 250:6, 250:7
**alarm** [1] - 179:20
**Alexander** [2] - 128:1, 130:8
**allegations** [6] - 33:5, 33:7, 33:9, 33:10, 71:13, 79:1
**alleged** [12] - 16:8, 48:9, 48:11, 48:16, 68:24, 69:7, 69:14, 78:25, 80:19, 80:20, 81:8, 82:5
**alleges** [2] - 47:5, 47:16
**allotment** [1] - 201:13
**allotted** [3] - 132:9, 138:5, 197:17
**allow** [6] - 62:10, 86:21, 121:1, 157:3, 210:11, 247:13
**allowed** [10] - 12:20, 42:25, 87:19, 110:22, 127:15, 128:2, 153:24, 197:16, 217:14, 239:17
**Allowing** [1] - 70:24
**allowing** [2] - 71:1, 129:12
**allows** [1] - 198:25
**almost** [4] - 21:13, 122:15, 144:2, 202:22

**aloud** [1] - 92:16
**Alprazolam** [2] - 25:25
**alter** [1] - 129:8
**amend** [1] - 150:19
**AmerisourceBergen** [19] - 6:2, 58:25, 59:3, 59:5, 59:15, 60:24, 61:12, 61:25, 67:10, 68:13, 69:7, 69:11, 70:10, 71:10, 72:7, 72:10, 72:12, 104:7, 250:6
**AMERISOURCEBER GEN** [2] - 1:7, 1:13
**AmerisourceBergen' s** [8] - 53:22, 61:13, 62:13, 62:22, 63:22, 64:7, 66:4, 72:14
**amount** [13] - 23:15, 131:11, 134:4, 135:2, 160:25, 196:18, 197:1, 197:22, 197:24, 199:6, 199:7, 201:18
**amounts** [2] - 25:13, 67:12
**ample** [1] - 56:12
**analysis** [1] - 235:15
**ANDREW** [1] - 5:10
**ANNE** [1] - 4:2
**ANNIE** [1] - 3:14
**annual** [3] - 208:9, 210:24, 211:2
**anomalies** [3] - 186:13, 186:19, 186:21
**anomaly** [1] - 161:2
**anonymously** [1] - 190:19
**answer** [60] - 8:13, 8:17, 13:17, 15:6, 15:8, 17:23, 20:4, 23:7, 28:5, 30:14, 40:9, 41:15, 41:19, 49:22, 50:8, 50:16, 52:3, 52:4, 52:6, 62:10, 63:7, 64:1, 64:3, 64:11, 66:20, 71:4, 79:5, 83:9, 104:22, 106:2, 106:10, 107:4, 107:8, 111:13, 111:16, 112:10, 112:16, 113:15, 114:17, 121:1, 130:10, 146:23, 147:12, 169:3, 169:20, 170:20, 170:23, 171:22, 174:20, 178:19,

178:22, 203:24, 205:18, 213:15, 229:18, 229:20, 230:10, 237:25, 241:16
**answered** [3] - 41:4, 102:22, 164:23
**answering** [1] - 102:4
**answers** [2] - 98:9, 106:6
**Anthony** [1] - 209:6
**ANTHONY** [1] - 2:6
**anti** [2] - 62:14, 62:24, 207:24
**anti-addiction** [1] - 207:24
**anti-diversion** [2] - 62:14, 62:24
**anticipated** [2] - 125:24, 126:17
**anytime** [1] - 153:22
**anyway** [2] - 104:8, 151:1
**apologize** [8] - 44:22, 50:17, 87:10, 107:10, 114:20, 161:24, 169:17, 178:16
**appear** [6] - 28:20, 29:8, 31:16, 193:4, 194:22, 235:21
**APPEARANCES** [6] - 2:1, 3:1, 5:1, 5:6, 6:1, 6:10
**Appendices** [1] - 80:19
**Appendix** [4] - 80:23, 81:1, 81:2, 81:7
**applied** [1] - 29:24
**apply** [1] - 101:1
**appreciate** [1] - 122:9
**approach** [21] - 10:4, 32:1, 44:6, 59:8, 68:5, 72:21, 84:18, 92:13, 108:21, 109:10, 116:8, 124:17, 139:3, 148:5, 153:4, 154:11, 166:3, 187:6, 192:5, 219:1, 224:20
**appropriate** [7] - 63:13, 84:9, 95:24, 117:13, 117:16, 117:23, 159:25
**appropriately** [6] - 182:6, 182:9, 184:19, 184:23, 185:1, 229:15
**approval** [13] - 48:24,

53:15, 53:22, 53:25, 54:3, 55:2, 57:1, 58:16, 89:9, 148:20, 148:23, 182:13, 182:16
**approve** [10] - 21:14, 52:24, 55:7, 89:4, 115:24, 140:13, 140:16, 144:20, 182:11, 182:19
**approved** [6] - 52:17, 54:23, 119:10, 142:7, 143:24, 148:20
**approves** [1] - 21:3
**approving** [3] - 50:13, 51:5, 52:22
**April** [4] - 59:17, 139:19, 213:4, 213:9
**Arch** [2] - 6:6, 6:13
**ARCOS** [45] - 8:4, 9:4, 13:13, 16:6, 36:20, 39:17, 118:18, 156:12, 156:14, 156:15, 156:18, 156:21, 157:9, 157:11, 157:14, 157:19, 157:20, 157:25, 158:5, 158:22, 158:25, 160:17, 167:19, 167:21, 167:23, 168:1, 168:4, 168:11, 168:18, 168:20, 169:14, 169:25, 170:4, 170:9, 217:8, 217:11, 217:13, 232:5, 233:13, 234:8, 234:17, 235:3, 235:8, 235:10, 235:15
**area** [11] - 11:16, 11:21, 23:13, 24:25, 26:18, 50:2, 133:7, 164:6, 176:5, 176:21, 195:5
**areas** [7] - 49:19, 132:24, 133:1, 165:8, 166:2, 174:14, 176:20
**arena** [1] - 163:15
**argue** [3] - 34:2, 38:14, 49:21
**arguing** [2] - 33:22, 229:18
**argument** [4] - 56:13, 101:1, 115:9, 126:12
**arose** [1] - 215:6
**Arpaio** [2] - 95:14

**artfully** [1] - 102:3
**articulated** [1] - 130:21
**ASHLEY** [1] - 5:3
**aside** [7] - 58:19, 96:23, 101:10, 147:21, 166:10, 167:18, 192:1
**aspects** [3] - 87:19, 114:2, 154:20
**asserted** [1] - 223:22
**assertion** [1] - 222:17
**assessment** [2] - 90:1, 196:21
**assist** [1] - 113:4
**Assistant** [16] - 30:10, 31:6, 57:14, 72:8, 102:15, 156:17, 160:4, 162:20, 180:20, 181:20, 183:13, 186:24, 195:9, 198:6, 204:17, 205:7
**assistant** [2] - 99:5, 99:6
**Association** [1] - 97:13
**assume** [6] - 65:10, 79:20, 79:21, 165:19, 193:25, 216:5
**assuming** [1] - 164:12
**assumption** [2] - 106:15, 106:20
**assure** [1] - 75:23
**AT** [1] - 1:2
**attached** [2] - 28:15, 148:21
**attachment** [1] - 76:2
**attempted** [1] - 114:14
**attempting** [1] - 87:21
**attempts** [1] - 151:15
**attend** [3] - 212:11, 212:15, 247:6
**attended** [2] - 194:22, 212:13
**attending** [2] - 99:13, 195:1
**attention** [6] - 84:5, 120:8, 145:8, 150:4, 151:11, 176:3
**attitude** [1] - 141:2
**attorney** [2] - 8:14, 49:15
**attorney-client** [2] - 8:14, 49:15
**attorney/client** [2] - 106:6, 120:22
**attorneys** [1] - 23:15
**Auburn** [1] - 73:18,

77:4
**audit** [4] - 179:18, 179:19, 180:4, 180:5
**audits** [1] - 231:4
**augment** [2] - 235:5, 235:8
**August** [5] - 35:18, 36:13, 60:16, 60:18, 60:23
**authority** [5] - 101:25, 117:4, 117:22, 148:16, 151:22
**authorization** [3] - 42:15, 42:20, 42:24
**authorized** [3] - 32:20, 42:17, 88:6
**Automation** [1] - 69:11
**available** [8] - 149:22, 149:25, 159:14, 159:17, 166:11, 167:10, 170:16, 198:11
**average** [3] - 125:2, 247:15, 247:20
**Avin** [1] - 3:7
**avoid** [1] - 118:7
**aware** [31] - 63:14, 63:15, 84:21, 96:2, 97:3, 97:6, 103:10, 111:7, 136:3, 169:4, 169:7, 169:9, 173:20, 183:1, 183:4, 215:18, 216:20, 217:19, 228:23, 229:1, 237:20, 238:2, 238:6, 238:7, 238:8, 238:23, 239:15, 239:17, 239:23, 240:16, 243:20
**Awareness** [1] - 192:12
**awful** [1] - 185:23
**Ayme** [2] - 6:17, 250:2

**B**

**background** [1] - 123:7
**backtrack** [1] - 170:7
**baked** [1] - 106:15
**balance** [1] - 136:17
**balances** [1] - 135:11
**balancing** [2] - 201:8
**bang** [1] - 192:3
**bare** [1] - 123:21
**Baron** [1] - 3:17
**Barrett** [2] - 128:1, 130:8

**base** [3] - 120:4, 196:24, 203:15
**based** [29] - 8:14, 19:17, 20:10, 39:10, 43:25, 54:16, 55:8, 63:5, 63:9, 66:6, 71:18, 71:23, 82:4, 104:5, 112:9, 128:4, 158:10, 163:17, 168:11, 171:6, 182:7, 183:12, 184:18, 202:24, 202:25, 203:25, 216:3, 242:21
**Based** [2] - 216:3, 242:21
**basic** [1] - 18:10
**basics** [1] - 210:4
**basis** [25] - 11:25, 20:1, 27:5, 39:24, 40:25, 51:14, 51:22, 54:6, 54:13, 56:20, 57:1, 62:3, 64:2, 66:10, 66:15, 86:19, 88:15, 98:17, 100:11, 109:20, 118:10, 151:6, 197:13, 205:14, 208:10
**Bates** [6] - 73:2, 73:4, 85:24, 192:24, 193:20
**battles** [1] - 128:15
**Baylen** [1] - 2:13
**bear** [1] - 7:18
**become** [1] - 186:11
**BEFORE** [1] - 1:17
**began** [2] - 145:21, 221:5
**begin** [1] - 129:3
**beginning** [4] - 57:10, 140:8, 145:15, 190:13
**begins** [1] - 139:7
**behalf** [7] - 42:9, 42:11, 99:23, 106:4, 191:16, 209:6
**behavior** [1] - 204:11
**behind** [4] - 24:23, 115:9, 170:4, 235:16
**belief** [3] - 39:10, 51:5, 52:15
**bell** [1] - 175:12
**bellwether** [1] - 128:20
**below** [1] - 47:12
**BENCH** [1] - 1:16
**benefit** [2] - 132:14, 134:19
**benzodiazepines** [1] -

69:13
**best** [1] - 34:24
**better** [1] - 106:22
**Between** [1] - 68:12
**between** [31] - 10:13, 13:21, 14:7, 14:8, 15:10, 15:12, 15:17, 15:21, 16:7, 20:20, 21:9, 44:13, 46:13, 79:15, 80:5, 91:18, 93:2, 93:22, 94:10, 97:3, 98:11, 98:25, 166:22, 174:13, 202:2, 218:11, 219:6, 219:20, 220:9, 220:15
**beyond** [5] - 79:12, 126:16, 172:18, 181:11, 238:18
**Bi** [7] - 225:18, 225:24, 226:10, 226:12, 226:24, 227:3, 228:11
**Bi-Wise** [7] - 225:18, 225:24, 226:10, 226:12, 226:24, 227:3, 228:11
**bias** [2] - 208:23, 209:1
**big** [6] - 18:19, 23:23, 43:17, 96:5, 115:9, 192:3
**Bill** [1] - 237:8
**bit** [7] - 41:9, 133:14, 134:15, 136:23, 179:15, 185:23, 211:7
**black** [1] - 14:21
**blacked** [5] - 224:12, 224:15, 229:4, 229:6, 229:7
**blacked-out** [1] - 224:12
**blackout** [1] - 225:3
**bleed** [1] - 127:16
**blind** [1] - 119:1
**blinders** [1] - 238:10
**block** [2] - 115:5, 226:15
**blood** [1] - 128:10
**Blue** [2] - 24:11, 24:18
**blue** [2] - 24:15, 24:16
**Blvd** [3] - 3:15, 4:3, 4:9
**board** [5] - 21:5, 21:16, 97:23, 158:12, 226:9
**bogged** [1] - 135:10
**bogging** [1] - 125:5
**Boggs** [6] - 99:8,

99:10, 99:18, 100:11, 100:15, 101:4
**Bonasso** [1] - 5:14
**bones** [1] - 123:21
**bootstrap** [1] - 38:6
**bore** [1] - 60:22
**bottle** [2] - 35:22, 35:23
**bottom** [13] - 14:3, 47:25, 118:3, 140:23, 226:15, 233:18, 233:19, 236:2, 239:7, 239:8, 242:3, 245:17, 248:13
**Bottom** [1] - 245:22
**bought** [1] - 166:23
**Boulevard** [1] - 3:18
**bounds** [1] - 12:24
**bow** [1] - 138:11
**Box** [2] - 5:14, 6:8
**boxes** [1] - 214:22
**brand** [1] - 18:18
**breach** [1] - 183:10
**break** [6] - 36:2, 65:22, 127:16, 127:20, 184:4, 201:10
**breakdown** [2] - 67:15, 82:6
**breaks** [1] - 34:13
**brick** [3] - 20:18, 20:21, 22:2
**bridge** [1] - 19:24
**Bridgeside** [3] - 3:15, 4:3, 4:9
**Brief** [1] - 151:20
**brief** [6] - 8:2, 245:6, 245:11, 245:13, 245:14, 245:15
**briefed** [10] - 31:14, 39:25, 40:14, 57:13, 57:20, 85:5, 85:7, 244:19, 244:20, 245:4
**briefing** [2] - 103:12, 245:14
**briefings** [9] - 7:21, 19:18, 82:12, 105:14, 109:18, 110:17, 212:16, 245:7, 245:14
**briefly** [5] - 20:20, 102:12, 108:2, 138:25, 196:16
**bring** [1] - 72:6
**bringing** [1] - 55:4
**brings** [3] - 145:8, 152:24, 152:25

**broad** [1] - 211:21
**broader** [1] - 38:7
**brought** [1] - 176:3
**Budd** [1] - 3:17
**budget** [1] - 210:24
**building** [1] - 106:19
**bullet** [6] - 16:4, 155:16, 155:18, 225:4, 227:24, 232:12
**bulletin** [2] - 21:5, 21:16
**bullets** [1] - 14:3
**bunch** [1] - 137:17
**burden** [1] - 122:18
**Burling** [1] - 5:11
**bus** [1] - 24:6
**business** [6] - 151:5, 151:19, 202:18, 223:25, 225:17, 230:2
**buttress** [1] - 53:24
**buying** [1] - 160:21
**BY** [149] - 7:15, 9:2, 10:6, 12:3, 12:25, 13:10, 15:7, 16:3, 18:5, 19:12, 20:6, 23:6, 26:21, 27:8, 27:18, 28:9, 32:3, 35:15, 36:10, 39:2, 41:5, 41:16, 43:15, 44:7, 46:15, 46:23, 47:2, 50:7, 51:1, 51:17, 51:23, 54:15, 57:8, 59:10, 62:11, 62:21, 63:17, 65:15, 67:7, 68:3, 68:7, 69:25, 70:8, 70:20, 71:8, 72:5, 72:22, 73:7, 76:25, 79:6, 79:25, 81:23, 82:7, 83:14, 84:16, 84:19, 85:17, 88:2, 89:2, 90:12, 91:2, 92:14, 92:23, 94:7, 96:1, 98:23, 99:17, 99:22, 101:8, 101:18, 102:10, 103:9, 104:25, 105:15, 107:20, 108:13, 109:1, 109:12, 109:24, 110:15, 111:5, 111:25, 112:24, 113:11, 113:14, 113:19, 114:22, 115:12, 116:14, 121:12, 121:24, 138:24, 139:4, 142:18, 143:5, 143:18,

146:11, 147:2, 147:15, 151:2, 153:5, 154:12, 155:14, 156:1, 158:14, 160:2, 160:9, 161:12, 162:13, 163:7, 164:21, 167:17, 169:23, 171:2, 171:24, 173:19, 174:24, 175:11, 176:11, 183:21, 184:11, 185:16, 187:7, 188:21, 190:4, 190:11, 191:25, 192:7, 195:7, 195:21, 196:12, 204:3, 205:17, 206:13, 206:25, 207:10, 209:23, 210:3, 213:6, 214:17, 218:9, 219:4, 219:17, 224:9, 224:22, 225:14, 229:25, 238:22, 241:25

**C**

**C.F.R** [3] - 69:17, 81:10, 89:22
**CA** [1] - 3:18
**Cabell** [3] - 3:2, 26:9, 34:19, 38:5, 209:7, 216:19, 216:21
**CABELL** [1] - 1:10
**cabell** [2] - 2:2
**Cabell-Huntington** [1] - 26:9
**Cabell/Huntington** [2] - 88:22
**cabinet** [2] - 190:22, 191:3
**cabinets** [1] - 191:9
**cage** [1] - 179:20
**calculus** [1] - 129:8
**CALLAS** [1] - 6:7
**CAMPBELL** [1] - 6:14
**cannot** [2] - 107:16, 169:2
**capacity** [5] - 161:13, 162:20, 187:15, 189:8, 204:18
**Capital** [1] - 188:15
**Capitol** [1] - 2:7
**capture** [1] - 245:14
**captured** [1] - 179:10
**car** [1] - 24:6
**card** [1] - 55:19

**Cardinal** [46] - 4:11, 5:2, 73:18, 74:2, 74:10, 74:22, 75:17, 76:3, 76:21, 77:13, 78:2, 78:12, 78:16, 79:15, 80:6, 80:20, 81:8, 84:14, 85:20, 86:6, 89:16, 89:20, 90:6, 90:7, 90:17, 91:3, 91:20, 92:5, 93:2, 93:23, 94:1, 94:10, 94:19, 96:2, 96:20, 104:6, 108:17, 142:5, 142:13, 143:3, 143:13, 206:1, 206:4, 212:12, 212:16
**Cardinal's** [7] - 78:22, 78:23, 81:13, 89:15, 89:19, 89:23, 90:2
**care** [8] - 22:9, 119:7, 134:7, 164:18, 200:2, 200:16, 201:2, 201:3
**career** [2] - 204:23, 230:21
**careful** [1] - 165:20
**carefully** [1] - 64:1
**Carey** [1] - 4:17
**Carisoprodol** [1] - 26:2
**Carolina** [1] - 127:9
**carry** [1] - 245:17
**carry-over** [1] - 245:17
**carrying** [2] - 180:21, 193:14
**case** [44] - 17:20, 21:3, 33:19, 34:7, 65:7, 81:21, 122:18, 123:17, 123:20, 123:22, 124:23, 124:25, 125:25, 126:6, 126:8, 126:10, 126:13, 126:21, 127:14, 127:22, 128:6, 128:7, 128:8, 128:13, 128:22, 129:13, 131:4, 133:18, 135:6, 137:5, 137:7, 137:21, 142:5, 147:24, 148:1, 164:12, 165:11, 166:6, 188:15, 194:15, 228:20
**cases** [8] - 21:11, 21:13, 117:23, 121:6, 132:4,

161:19, 162:1, 164:2
**cash** [5] - 22:12, 161:4, 161:23, 162:16, 163:15
**catch** [2] - 85:10, 90:11
**categorical** [1] - 162:7
**Caucus** [1] - 189:4
**caught** [1] - 235:24
**caused** [2] - 51:4, 202:21
**causing** [1] - 31:11
**caveat** [2] - 43:2, 81:21
**ceiling** [3] - 183:7, 183:8, 183:9
**Center** [15] - 3:12, 5:11, 15:23, 37:15, 37:19, 38:1, 39:7, 39:8, 39:13, 46:2, 46:10, 47:4, 47:7, 47:18, 61:13
**center** [21] - 20:23, 21:4, 21:16, 38:5, 39:18, 39:21, 43:21, 44:1, 44:3, 46:4, 58:17, 62:6, 77:14, 90:7, 90:18, 220:12, 231:11, 239:21, 239:25, 244:9
**Centers** [1] - 47:23
**centers** [18] - 43:22, 43:23, 44:1, 44:25, 45:15, 81:3, 81:13, 110:7, 110:9, 176:13, 177:17, 180:23, 181:3, 181:11, 212:25, 213:14, 243:21, 244:16
**central** [2] - 45:20, 221:1
**centralized** [3] - 231:15, 231:16, 231:18
**centrally** [5] - 45:10, 45:14, 45:15, 45:17, 45:22
**certain** [17] - 41:12, 47:10, 47:20, 87:19, 105:17, 111:23, 118:17, 154:20, 158:15, 158:17, 165:23, 168:11, 174:16, 180:4, 199:16, 214:13, 220:11
**certainly** [5] - 49:18, 54:11, 85:16, 114:14, 132:6

**CERTIFICATION** [1] - 250:1
**certify** [2] - 198:17, 250:4
**cetera** [2] - 91:8, 165:2
**chain** [7] - 89:20, 94:16, 95:5, 95:10, 96:21, 170:8, 204:8
**challenge** [3] - 91:20, 165:14, 169:19
**challenges** [4] - 233:22, 233:23, 233:25
**chance** [6] - 52:9, 62:12, 62:22, 125:4, 156:13, 195:10
**chances** [1] - 18:22
**change** [10] - 130:21, 147:18, 202:3, 202:13, 202:18, 205:8, 205:11, 216:4, 216:16, 240:13
**changed** [9] - 129:8, 177:2, 177:5, 205:9, 215:21, 216:10, 216:15, 240:8, 240:17
**changes** [1] - 240:14
**channels** [4] - 47:9, 47:20, 89:18, 118:9
**characteristics** [1] - 60:22
**characterization** [4] - 78:25, 105:5, 109:19, 120:17
**characterizing** [1] - 236:8
**charge** [2] - 197:10, 201:5
**Chargeback** [2] - 163:9, 163:11
**charged** [1] - 210:5
**CHARLES** [1] - 3:11
**CHARLESTON** [2] - 1:2, 1:18
**Charleston** [6] - 2:8, 3:13, 4:19, 5:15, 6:9, 7:4
**Chase** [1] - 4:18
**check** [3] - 7:23, 216:2, 240:2
**checking** [1] - 238:12
**chemicals** [1] - 247:5
**cherry** [1] - 33:9
**cherry-picked** [1] - 33:9
**Chesterbrook** [1] - 6:15
**Chief** [4] - 11:3, 15:17,

154:19, 161:14
**chief** [1] - 138:18
**children** [1] - 190:21
**choice** [1] - 126:5
**choices** [7] - 129:14, 129:15, 130:13, 132:3, 132:10, 134:19, 136:15
**choke** [3] - 228:6, 228:8, 228:18
**choose** [2] - 210:10, 234:3
**chop** [2] - 149:7, 149:8
**chopped** [2] - 61:18, 148:20
**chopped"** [1] - 148:24
**chronic** [3] - 200:16, 239:16, 239:20
**CII** [1] - 247:16
**circulate** [2] - 148:3, 153:3
**circulation** [1] - 98:7
**circumstance** [1] - 130:22
**circumstances** [4] - 118:10, 119:2, 129:8, 181:21
**circumvent** [1] - 206:6
**citation** [1] - 151:23
**cite** [2] - 34:2, 188:14
**cites** [1] - 75:20
**City** [3] - 4:1, 5:11, 250:5
**CITY** [1] - 1:4
**Civil** [3] - 1:4, 250:7, 250:8
**civil** [1] - 1:10
**claim** [1] - 49:21
**clandestine** [1] - 247:9
**clarification** [1] - 110:14
**clarifies** [1] - 214:9
**clarify** [2] - 90:20, 116:11
**clarity** [1] - 137:25
**class** [1] - 18:10
**clear** [16] - 11:15, 14:13, 41:20, 42:16, 50:24, 52:22, 54:16, 67:5, 105:13, 113:24, 129:6, 129:9, 132:2, 137:6, 137:12, 240:5
**clearly** [5] - 131:6, 191:4, 194:19, 223:24, 229:18
**clerk** [2] - 86:23, 138:18

**client** [3] - 8:14, 49:15, 194:22
**client's** [1] - 205:14
**clients** [1] - 128:21
**clinic** [4] - 22:6, 22:7, 22:8, 23:3
**clinics** [3] - 22:5, 23:9
**clock** [1] - 136:2
**close** [2] - 176:8, 227:22
**closed** [5] - 210:5, 210:11, 210:13, 210:15, 211:16
**closeout** [4] - 180:9, 180:11, 180:12, 180:16
**closer** [1] - 97:12
**Cochran** [3] - 6:17, 250:2, 250:11
**code** [2] - 196:24, 203:15
**Code** [2] - 179:21, 179:22
**coincidental** [1] - 117:4
**college** [1] - 205:2
**Colorado** [1] - 47:17
**Columbia** [1] - 91:23
**column** [2] - 124:11, 124:12
**coming** [8] - 22:22, 25:12, 35:9, 40:11, 75:15, 122:9, 137:11
**commerce** [2] - 11:3, 16:6
**COMMISSION** [1] - 1:10
**Commission** [2] - 2:2, 3:2
**commitment** [4] - 23:23, 41:23, 43:17, 43:19
**committed** [1] - 65:3
**communicate** [2] - 25:16, 182:18
**communicated** [3] - 91:3, 100:7, 100:18
**communication** [4] - 15:21, 93:22, 100:23, 101:2
**communications** [17] - 8:15, 13:23, 14:7, 15:11, 15:16, 15:18, 27:21, 91:6, 91:7, 91:9, 91:13, 92:9, 93:1, 93:6, 93:23, 141:20, 182:21
**community** [4] - 133:15, 169:9, 205:11, 218:15

**companies** [2] - 174:23, 199:18
**company** [8] - 54:22, 105:22, 109:6, 163:14, 175:2, 206:9, 226:19, 231:2
**compare** [1] - 208:9
**compared** [1] - 161:1
**comparing** [1] - 95:23
**comparison** [1] - 163:17
**competing** [1] - 200:22
**competitors** [1] - 169:6
**complaints** [1] - 146:19
**completed** [3] - 170:6, 245:19, 246:3
**completeness** [1] - 214:10
**complex** [1] - 126:21
**complexity** [1] - 127:13
**compliance** [18] - 18:20, 19:15, 37:8, 45:9, 45:20, 58:3, 58:11, 58:16, 62:13, 62:23, 63:23, 66:4, 72:14, 96:20, 161:16, 178:2, 181:23, 209:3
**Compliance** [1] - 204:7
**compliant** [6] - 19:4, 37:10, 72:17, 72:18, 179:20, 179:22
**complies** [1] - 140:21
**comply** [2] - 39:19, 206:18
**complying** [3] - 145:18, 175:20, 206:17
**composite** [2] - 72:25, 87:18
**compromising** [1] - 175:5
**computer** [1] - 6:19
**concentrate** [1] - 160:15
**concentrated** [1] - 23:12
**concept** [4] - 24:14, 24:15, 119:19, 228:5
**concern** [2] - 83:16, 186:4
**concerned** [2] - 143:10, 221:12
**concerning** [2] - 13:13, 116:24

**concerns** [9] - 169:4, 169:7, 169:8, 175:1, 175:5, 217:7, 217:15, 220:10, 221:6
**concluded** [2] - 61:10, 81:12
**conclusion** [15] - 19:3, 30:16, 64:19, 65:2, 65:5, 65:13, 65:19, 81:16, 102:20, 126:20, 146:6, 147:9, 173:16, 206:22, 239:10
**conditionally** [3] - 87:12, 87:24, 88:25
**Conduct** [3] - 68:22, 80:15, 80:17
**conduct** [30] - 48:1, 48:6, 48:7, 48:8, 60:7, 61:6, 61:20, 63:22, 67:10, 68:24, 69:21, 70:2, 70:9, 70:22, 71:9, 80:18, 81:7, 81:24, 82:4, 82:5, 82:10, 84:7, 89:16, 89:19, 89:23, 151:15, 158:5
**conducted** [2] - 94:16, 141:10
**conducting** [5] - 173:20, 179:12, 181:2, 199:18, 199:19
**confer** [1] - 58:11
**conference** [8] - 129:4, 152:21, 153:22, 153:23, 192:15, 194:23, 195:1
**Conference** [2] - 152:24, 192:13
**conferences** [6] - 28:7, 152:18, 153:11, 154:19, 155:3
**conferred** [1] - 75:12
**confidential** [3] - 166:13, 169:5, 175:6
**confines** [1] - 64:15
**confirm** [1] - 182:7
**confirming** [1] - 119:7
**conform** [1] - 119:14
**conforming** [1] - 119:15
**Congress** [13] - 22:1, 186:25, 187:20, 189:5, 189:12, 191:15, 197:3,

197:6, 197:10, 198:2, 215:12, 234:13, 235:20
**congressional** [1] - 188:16
**connection** [1] - 92:1
**Connolly** [2] - 4:13, 5:4
**Conroe** [7] - 46:10, 46:18, 47:3, 47:6, 47:7, 47:12
**CONROY** [1] - 3:3
**consequences** [1] - 117:19
**consider** [7] - 87:15, 147:3, 147:11, 147:14, 148:13, 167:3, 167:16
**considered** [1] - 18:7
**considering** [1] - 43:9
**consistent** [7] - 50:8, 56:2, 57:16, 121:19, 152:12, 156:8, 184:23
**consistently** [1] - 34:9
**Consolidated** [1] - 69:12
**constitutes** [2] - 172:16, 172:25
**constraint** [1] - 134:19
**consult** [1] - 98:8
**consultant** [2] - 207:12, 208:4
**consulting** [1] - 207:17
**contact** [1] - 94:18
**contained** [2] - 15:2, 87:2
**container** [1] - 157:17
**contains** [1] - 211:13
**contemporaneous** [1] - 223:25
**content** [1] - 91:17
**contested** [4] - 114:5, 114:11, 114:13, 241:7
**continuation** [1] - 61:7
**continue** [12] - 28:25, 31:15, 31:17, 60:25, 71:12, 92:21, 115:17, 123:16, 152:8, 199:25, 221:8, 242:7
**Continued** [5] - 3:1, 5:1, 5:6, 6:1, 6:10
**continued** [9] - 9:12, 39:20, 182:25, 206:18, 206:19, 218:14, 228:13,

228:14
**continues** [1] - 42:10
**continuing** [6] - 13:14, 13:18, 36:25, 42:8, 79:21, 208:1
**contrary** [4] - 105:23, 223:9, 223:11, 239:19
**contrast** [1] - 191:4
**contributes** [1] - 190:20
**contributors** [1] - 159:4
**control** [3] - 125:7, 125:21, 135:22
**Control** [5] - 189:4, 204:19, 210:21, 211:23, 214:20
**Controlled** [15] - 60:8, 62:13, 62:23, 72:14, 115:22, 116:4, 116:25, 121:16, 144:9, 154:20, 171:14, 171:18, 203:14, 204:7, 234:4
**controlled** [67] - 9:13, 18:17, 29:6, 29:8, 47:8, 47:19, 48:12, 48:14, 48:17, 61:12, 69:8, 69:10, 69:13, 69:15, 69:18, 78:23, 79:9, 80:21, 80:24, 81:9, 81:13, 84:8, 89:14, 89:17, 104:15, 105:3, 118:17, 120:13, 121:9, 140:17, 140:22, 141:8, 141:12, 153:2, 158:22, 158:24, 159:5, 159:8, 159:9, 159:13, 160:11, 160:14, 160:15, 160:17, 160:21, 160:22, 165:1, 184:15, 190:17, 190:18, 190:22, 190:25, 196:17, 201:24, 202:4, 202:8, 202:10, 203:11, 220:11, 220:25, 222:19, 234:11, 234:20, 247:5, 247:17, 247:21
**controls** [16] - 30:8, 46:10, 47:6, 47:17, 48:12, 69:8, 80:21, 118:23, 119:5, 152:10, 161:1,

177:21, 180:24, 181:1, 181:4
**convenient** [1] - 184:7
**conversation** [2] - 99:10, 102:14
**conversations** [1] - 174:10
**convey** [6] - 99:19, 99:20, 100:6, 101:22, 105:2, 180:7
**conveyed** [2] - 98:12, 101:19
**conveying** [3] - 101:21, 187:20, 189:12
**Cook** [3] - 6:18, 250:3, 250:11
**cooperation** [1] - 246:24
**cooperative** [1] - 211:15
**coordinate** [1] - 132:4
**coordinator** [1] - 247:9
**cop** [1] - 20:25
**copies** [2] - 108:24, 219:11
**copy** [6] - 43:8, 43:11, 124:17, 220:3, 221:15, 224:10
**corners** [1] - 30:24
**Corporation** [5] - 6:2, 37:21, 220:9, 236:4, 250:7
**cORPORATION** [2] - 1:7, 1:13
**correct** [80] - 16:19, 47:12, 47:23, 50:14, 51:7, 51:11, 59:19, 77:4, 108:11, 149:4, 159:19, 184:16, 210:6, 210:7, 210:8, 210:11, 210:12, 210:16, 210:17, 210:25, 211:1, 211:2, 211:5, 211:6, 211:18, 211:24, 212:1, 212:4, 212:5, 212:17, 212:18, 212:22, 212:25, 213:1, 213:14, 213:15, 213:20, 213:22, 214:20, 214:24, 214:25, 215:2, 215:3, 215:6, 215:9, 215:13, 215:17, 217:2, 217:5, 217:6, 217:8, 217:12, 217:15, 218:15, 220:15,

221:20, 222:7, 223:9, 226:22, 226:23, 227:3, 227:8, 228:10, 228:14, 228:20, 229:3, 230:3, 230:22, 231:2, 231:8, 234:23, 235:12, 236:9, 238:24, 240:6, 240:9, 240:14, 245:12, 248:18, 250:4
**Correct** [2] - 221:17, 228:18
**corrections** [1] - 63:13
**correctly** [5] - 56:25, 151:24, 213:16, 222:21, 232:17
**Corridor** [2] - 24:8, 24:22
**counsel** [4] - 15:17, 34:19, 214:2, 221:11
**Counsel** [1] - 154:19
**count** [5] - 134:13, 135:9, 135:12, 136:13, 136:17
**counter** [2] - 135:2, 234:1
**counter-designation** [1] - 135:2
**country** [6] - 25:21, 45:6, 67:17, 128:21, 197:9, 203:17
**COUNTY** [1] - 1:10
**County** [6] - 2:2, 3:2, 34:19, 209:7, 216:19, 216:21
**couple** [9] - 76:7, 110:11, 123:14, 127:17, 127:25, 128:1, 136:1, 210:18, 220:23
**COUR** [1] - 27:17
**course** [8] - 15:14, 53:9, 123:8, 127:6, 186:3, 205:6, 236:3
**Court** [39] - 6:17, 6:18, 7:3, 43:7, 43:9, 65:24, 73:20, 73:23, 75:23, 79:20, 86:12, 87:10, 91:22, 123:6, 125:14, 129:3, 129:9, 129:12, 129:16, 129:20, 130:2, 130:15, 130:25, 131:16, 132:2, 132:9, 132:14, 133:13, 133:14, 134:5,

134:12, 145:4, 150:20, 150:23, 196:17, 224:12, 250:2, 250:3
**COURT** [270] - 1:1, 1:17, 7:6, 7:9, 7:13, 8:10, 8:19, 8:21, 9:1, 10:5, 10:19, 11:13, 11:17, 12:1, 12:15, 12:22, 13:6, 14:13, 15:5, 17:22, 19:8, 20:3, 23:1, 23:4, 26:5, 26:14, 27:5, 27:10, 27:12, 27:15, 28:3, 32:2, 33:12, 33:16, 33:25, 34:6, 34:17, 34:20, 35:3, 35:7, 35:10, 35:13, 35:23, 36:1, 36:5, 36:9, 38:8, 38:10, 38:12, 38:25, 39:22, 40:10, 40:21, 41:3, 41:18, 41:24, 42:6, 42:12, 42:21, 43:5, 43:11, 46:25, 49:12, 50:1, 50:20, 50:23, 51:16, 51:19, 51:22, 52:8, 53:4, 53:20, 55:11, 55:18, 55:22, 56:15, 56:21, 56:25, 57:21, 59:9, 62:9, 62:17, 62:25, 63:7, 64:10, 64:25, 65:6, 65:9, 65:12, 66:19, 67:5, 67:18, 67:20, 68:2, 68:6, 69:24, 70:7, 70:13, 70:17, 71:6, 71:16, 71:20, 72:4, 74:6, 74:18, 75:9, 76:5, 76:15, 76:23, 79:4, 79:23, 81:17, 82:3, 83:6, 84:11, 84:15, 85:12, 86:8, 86:23, 87:6, 87:12, 88:1, 88:13, 88:18, 90:9, 90:23, 92:19, 93:7, 93:12, 93:19, 94:5, 94:22, 95:2, 95:19, 98:21, 100:1, 100:9, 100:18, 101:5, 101:15, 102:8, 102:21, 102:23, 103:1, 103:3, 103:7, 104:24, 105:10, 105:24, 106:9, 106:24, 107:1, 107:8, 107:13, 107:19, 108:22, 109:11, 109:22, 111:1, 111:14,

112:12, 113:13, 113:16, 114:17, 115:7, 120:25, 121:22, 122:1, 122:4, 122:7, 124:2, 124:14, 124:18, 125:17, 127:7, 128:13, 128:24, 131:18, 131:23, 132:21, 133:3, 133:9, 133:22, 134:6, 135:25, 136:9, 136:19, 137:22, 138:4, 138:11, 143:8, 143:17, 145:7, 146:8, 146:22, 147:10, 150:14, 150:16, 150:25, 154:4, 154:9, 155:9, 155:13, 155:25, 159:24, 161:9, 162:11, 163:3, 164:8, 164:17, 165:15, 165:21, 167:1, 167:14, 169:21, 170:18, 170:20, 171:21, 173:18, 174:15, 175:10, 176:7, 178:19, 183:20, 184:4, 184:6, 184:10, 185:15, 188:2, 188:20, 189:20, 189:23, 190:2, 191:21, 192:6, 193:8, 193:16, 193:19, 193:23, 194:3, 194:5, 195:3, 195:20, 196:9, 203:24, 205:16, 206:21, 206:24, 207:7, 208:18, 209:4, 209:11, 209:16, 209:21, 210:1, 214:15, 218:8, 219:2, 223:14, 224:3, 224:7, 224:21, 225:11, 225:13, 229:20, 238:19, 241:23, 248:23, 248:25, 249:4
**court** [10] - 33:6, 33:7, 65:20, 75:21, 76:12, 136:16, 138:18, 188:4, 226:22, 238:17
**Court's** [8] - 13:11, 34:22, 75:2, 76:16,

129:5, 143:14, 158:11, 188:24
**courtesy** [1] - 115:6
**Courtright** [1] - 126:3
**courtroom** [1] - 26:9
**courts** [1] - 151:21
**cover** [6] - 82:10, 133:8, 136:21, 192:11, 195:14, 214:4
**covered** [9] - 48:1, 48:6, 48:7, 48:8, 80:18, 81:3, 165:23, 195:16, 215:5
**Covered** [4] - 68:22, 68:24, 80:15, 80:17
**COVID** [1] - 207:20
**Covington** [1] - 5:11
**crack** [1] - 196:2
**crazy** [1] - 18:1
**create** [2] - 41:12, 183:8
**created** [2] - 164:13, 180:15, 246:24
**Crime** [1] - 187:13
**crisis** [1] - 212:4
**criteria** [1] - 247:14
**cross** [13] - 41:15, 56:11, 125:1, 125:6, 126:1, 126:4, 132:6, 135:23, 138:18, 164:18, 209:8, 238:19, 238:20
**CROSS** [1] - 209:22
**cross-examination** [1] - 238:20
**crosses** [3] - 126:1, 131:14, 132:7
**CRR** [2] - 6:17, 6:18
**CSA** [2] - 141:10, 151:22
**cull** [3] - 212:14, 213:4, 226:10
**cumulative** [1] - 123:22
**cure** [3] - 27:24, 87:21, 223:18
**cured** [1] - 126:13
**current** [3] - 122:21, 175:5, 234:2
**cursory** [1] - 22:11
**customer** [8] - 120:4, 140:10, 151:8, 160:21, 160:25, 177:23, 186:18, 220:25
**customer's** [1] - 119:10
**customers** [30] - 47:10, 47:21, 89:16,

89:20, 89:22, 90:6, 90:17, 104:8, 161:22, 162:16, 165:5, 173:4, 173:11, 173:22, 174:3, 174:4, 174:7, 174:13, 174:16, 222:9, 242:14, 242:16, 242:20, 242:23, 243:7, 244:3, 244:10, 244:17

**customers'** [2] - 95:22, 151:4

**cut** [17] - 76:23, 175:24, 200:20, 203:4, 217:25, 218:3, 222:2, 226:1, 226:25, 227:7, 227:22, 228:1, 228:13, 229:12, 230:3, 230:5, 230:6

**CVS** [1] - 206:4

**cyberspace** [1] - 20:23

**cycle** [1] - 176:22

**cycles** [1] - 176:20

**cyclic** [7] - 176:18, 176:19, 177:10, 177:14, 177:19, 179:12, 181:12

## D

**daily** [6] - 243:17, 243:20, 243:24, 243:25, 244:23, 245:4

**dangerous** [1] - 117:19

**darn** [1] - 134:9

**data** [77] - 13:13, 16:6, 39:17, 156:14, 156:15, 156:18, 156:21, 157:9, 157:14, 157:19, 157:20, 157:25, 158:5, 158:9, 158:10, 158:15, 158:17, 158:18, 158:19, 159:4, 159:19, 160:10, 160:17, 161:3, 161:6, 161:15, 162:15, 162:17, 162:18, 162:19, 162:21, 163:5, 163:9, 163:11, 163:22, 163:24, 164:3, 164:5,

164:23, 164:24, 166:10, 166:12, 166:15, 166:19, 167:5, 167:10, 167:19, 167:21, 167:23, 168:1, 168:4, 168:8, 168:11, 168:18, 168:20, 168:23, 168:24, 169:5, 169:10, 169:14, 170:9, 170:14, 217:8, 217:11, 217:13, 217:14, 217:16, 232:6, 233:13, 235:4, 235:8, 235:10, 235:17, 239:12

**database** [1] - 235:3

**databases** [2] - 165:24, 166:1

**date** [17] - 36:11, 59:1, 59:16, 61:1, 61:3, 61:4, 68:19, 77:16, 78:3, 78:13, 131:10, 139:18, 142:19, 179:20, 192:17, 232:8, 232:11

**Date** [1] - 250:16

**dated** [1] - 139:19

**dates** [2] - 50:19, 66:14

**David** [1] - 7:1

**DAVID** [2] - 1:17, 2:9

**Davies** [1] - 123:18

**day-to-day** [1] - 139:15

**days** [17] - 16:24, 17:18, 17:24, 75:23, 103:21, 122:11, 123:8, 123:9, 123:10, 127:17, 128:6, 136:1, 177:13, 178:13, 228:12, 229:10, 229:11

**DC** [7] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 244:3

**De** [2] - 2:4, 2:16

**DEA** [295] - 7:22, 10:13, 12:6, 12:18, 12:21, 13:3, 13:22, 14:7, 15:12, 15:17, 15:22, 20:15, 21:11, 23:8, 23:23, 24:1, 25:16, 25:22, 25:23, 26:7, 27:19, 28:23, 29:13, 29:14, 29:21, 29:24, 32:19, 35:16,

36:20, 37:2, 37:18, 39:12, 41:6, 41:7, 42:9, 42:10, 42:11, 43:17, 43:20, 44:13, 44:15, 46:14, 47:5, 47:16, 48:25, 49:5, 50:12, 51:2, 51:5, 52:17, 52:24, 53:15, 54:18, 54:23, 55:6, 55:24, 56:14, 57:10, 57:16, 58:4, 58:10, 58:11, 58:21, 58:24, 59:5, 59:22, 60:8, 60:23, 61:24, 62:12, 62:22, 68:16, 70:9, 72:6, 72:11, 72:13, 74:16, 74:19, 78:22, 79:15, 80:6, 80:12, 82:10, 83:23, 88:4, 91:3, 93:2, 93:23, 94:10, 94:15, 94:25, 95:17, 96:3, 96:17, 97:3, 97:6, 97:17, 98:11, 98:13, 98:25, 99:3, 99:19, 100:7, 100:18, 100:23, 101:10, 102:18, 103:11, 103:24, 108:17, 109:17, 110:6, 110:21, 111:7, 111:11, 111:13, 112:1, 112:2, 112:12, 112:14, 113:6, 113:8, 113:20, 114:2, 114:24, 115:17, 117:12, 117:20, 117:22, 117:25, 118:17, 118:25, 119:9, 119:12, 120:15, 121:1, 121:17, 121:20, 139:1, 139:16, 140:8, 140:9, 140:11, 140:13, 140:16, 140:21, 141:16, 144:22, 145:14, 146:13, 147:4, 147:12, 150:1, 150:4, 150:11, 151:16, 151:17, 151:21, 152:12, 152:17, 153:14, 153:16, 153:20, 153:22, 154:15, 155:2, 155:20, 156:3, 156:7, 156:14, 156:18, 157:12, 157:13, 157:18, 157:25,

158:4, 158:18, 158:20, 159:9, 159:18, 160:16, 162:18, 162:19, 165:6, 165:13, 166:11, 166:17, 167:8, 167:18, 167:23, 168:24, 169:24, 169:25, 170:11, 171:3, 171:4, 173:21, 174:2, 174:6, 174:7, 174:13, 174:19, 175:20, 176:12, 177:15, 177:19, 177:23, 177:25, 179:12, 180:6, 180:21, 181:3, 181:11, 181:13, 181:16, 181:19, 181:23, 182:1, 182:10, 182:18, 183:22, 184:16, 184:18, 185:17, 186:1, 186:4, 186:9, 186:10, 187:15, 189:8, 189:10, 189:12, 191:4, 191:11, 192:14, 195:8, 198:5, 200:7, 204:21, 204:23, 207:11, 208:13, 210:4, 210:15, 210:20, 211:13, 211:17, 215:23, 216:8, 216:15, 217:2, 217:5, 217:7, 217:14, 218:2, 219:6, 219:19, 219:20, 220:15, 221:6, 221:10, 221:11, 221:19, 222:6, 222:8, 224:14, 225:25, 227:8, 228:3, 228:19, 230:7, 231:23, 233:25, 234:7, 235:5, 236:8, 237:16, 237:18, 238:8, 240:13, 242:21, 242:25, 243:18, 243:21, 246:19, 246:24, 247:3, 247:12

**DEA's** [24] - 17:21, 57:11, 57:17, 58:16, 79:3, 86:16, 90:1, 90:2, 90:14, 92:4, 94:1, 152:1, 153:19, 154:1, 155:6, 157:19, 173:8,

175:17, 193:10, 194:9, 196:3, 222:17, 233:19, 245:20

**deal** [1] - 8:21

**dealing** [1] - 229:23

**dealt** [2] - 88:18, 127:1

**debate** [2] - 53:8, 112:6

**December** [14] - 9:4, 9:7, 9:9, 48:13, 48:18, 77:18, 78:5, 98:25, 142:21, 144:13, 232:18, 232:22, 232:23

**decide** [3] - 28:17, 167:2, 167:15

**decided** [3] - 123:18, 202:3, 202:4

**decides** [2] - 119:21

**deciding** [1] - 29:12

**decision** [18] - 41:1, 42:4, 86:7, 89:10, 140:19, 148:10, 149:12, 149:15, 149:17, 149:19, 149:22, 150:21, 151:7, 151:9, 151:19, 152:8, 226:4

**decisions** [4] - 129:18, 149:25, 150:5, 150:23

**deck** [1] - 194:18

**declaration** [6] - 91:25, 92:2, 92:3, 92:8, 93:16, 94:9

**decrease** [1] - 202:21

**decreased** [1] - 202:14

**deemed** [2] - 111:10, 111:21

**deep** [1] - 174:11

**Defendant** [4] - 4:10, 5:2, 5:7, 6:2

**defendant** [14] - 9:12, 9:15, 12:21, 30:20, 45:2, 59:14, 77:25, 94:25, 104:21, 109:6, 110:7, 182:11, 195:1, 215:21

**Defendants** [3] - 1:8, 1:14, 250:7

**defendants** [92] - 7:23, 26:8, 26:17, 26:22, 27:4, 31:3, 43:1, 45:1, 45:12, 45:13, 52:14, 52:15, 52:16, 56:11, 58:22, 63:19, 74:8, 74:17,

74:25, 75:17, 82:11, 82:15, 82:20, 82:24, 83:7, 83:12, 83:24, 84:1, 84:6, 84:11, 97:18, 97:19, 100:8, 100:19, 102:17, 103:11, 104:14, 105:2, 105:18, 105:25, 107:3, 107:14, 113:6, 113:21, 114:23, 122:13, 123:2, 125:25, 127:19, 131:18, 135:13, 137:18, 139:2, 146:16, 149:23, 156:19, 157:8, 158:21, 159:13, 161:3, 161:21, 162:15, 167:4, 167:9, 168:9, 168:19, 168:22, 169:4, 169:11, 170:10, 172:20, 180:23, 181:4, 181:9, 181:22, 182:2, 182:18, 183:1, 183:4, 183:5, 183:15, 183:23, 186:4, 194:15, 205:8, 205:20, 215:9, 215:15, 217:1, 217:4, 217:25, 218:3

**defendants'** [12] - 45:20, 100:24, 123:4, 125:1, 126:5, 126:6, 176:13, 177:16, 177:20, 180:22, 181:2, 183:12

**Defense** [6] - 220:4, 223:13, 226:9, 229:2, 231:22, 235:23

**defense** [1] - 137:5

**deficiencies** [2] - 63:23, 66:4

**define** [2] - 70:13, 70:17

**defined** [2] - 55:10, 71:11

**defines** [1] - 172:16

**definitely** [2] - 162:19, 171:13

**definition** [2] - 48:5, 172:19

**defy** [1] - 229:10

**deliberate** [2] - 42:4, 49:16

**deliberative** [2] - 8:15, 120:22

**delivered** [1] - 101:10

**delivery** [1] - 140:22

**demonstrable** [1] - 26:9

**demonstrative** [3] - 164:13, 166:7, 167:18

**Demonstrative** [2] - 171:25, 172:1

**Denver** [2] - 47:17, 47:18

**Department** [6] - 42:19, 165:9, 165:18, 169:3, 175:15

**department** [1] - 206:5

**deploy** [2] - 22:17, 23:11

**deployed** [3] - 23:14, 23:15

**deposed** [4] - 127:23, 213:7, 237:21, 238:3

**deposition** [26] - 55:24, 56:4, 73:24, 74:1, 75:4, 76:14, 76:20, 122:24, 123:11, 134:3, 134:11, 134:13, 134:16, 134:20, 135:3, 135:4, 135:5, 135:6, 135:13, 136:13, 136:16, 165:23, 167:8, 195:16, 203:23, 238:17

**depositions** [1] - 128:4

**deputy** [5] - 78:18, 81:22, 89:6, 89:10, 198:22

**Deputy** [27] - 29:21, 29:23, 30:10, 30:18, 30:23, 31:6, 32:11, 57:14, 59:21, 61:17, 72:7, 102:15, 148:22, 149:6, 156:16, 156:17, 160:4, 162:20, 180:20, 181:20, 183:13, 186:24, 195:9, 198:6, 198:21, 204:17, 205:7

**describe** [1] - 172:25

**described** [10] - 60:23, 67:10, 69:18, 81:7, 89:23, 90:5, 90:16, 95:16, 165:7, 215:16

**describes** [1] - 92:3

**design** [3] - 45:16, 45:19, 182:2

**designate** [1] - 134:17

**designated** [7] - 123:1, 123:2, 123:3, 134:15, 134:21, 135:3, 167:9

**designating** [2] - 135:4, 135:5

**designation** [3] - 135:2, 135:8, 137:8

**designations** [9] - 122:24, 123:11, 134:3, 134:11, 134:13, 134:21, 134:25, 136:13, 136:17

**desk** [1] - 30:17

**despite** [1] - 36:23

**Despite** [1] - 233:25

**destined** [1] - 141:1

**detail** [2] - 15:1, 248:19

**detailed** [2] - 71:24, 170:25

**details** [12] - 91:7, 92:4, 93:5, 110:22, 114:12, 167:23, 232:3, 242:18, 242:23, 243:6, 244:8, 244:15

**detect** [7] - 48:16, 48:25, 49:3, 69:14, 81:9, 89:21, 166:15

**detecting** [1] - 160:20

**determination** [6] - 13:20, 29:22, 30:24, 87:15, 157:3, 198:13

**determine** [11] - 9:4, 29:16, 61:16, 95:24, 110:22, 142:14, 167:5, 178:14, 180:21, 234:9, 234:18

**determined** [1] - 193:14

**determining** [1] - 141:11

**detriment** [1] - 141:3

**Detroit** [1] - 247:10

**develop** [2] - 235:5, 235:7

**development** [4] - 197:17, 197:24, 199:23, 200:3

**dial** [1] - 137:15

**difference** [1] - 46:12

**different** [26] - 24:14, 25:21, 25:22, 29:5,

54:4, 55:19, 107:6, 110:6, 118:19, 128:2, 132:24, 140:12, 145:24, 146:13, 158:18, 163:21, 176:5, 176:20, 197:3, 197:14, 201:15, 207:20, 242:5

**difficult** [5] - 41:11, 74:12, 171:6, 171:7, 171:15

**diligence** [2] - 84:9, 89:17, 89:19, 94:16, 94:20, 95:5, 95:12, 95:15, 95:20, 95:21, 118:7, 118:9, 151:8, 173:23, 174:1, 177:23, 186:20, 245:18, 246:2, 246:4

**direct** [16] - 14:1, 16:4, 60:11, 72:24, 92:16, 100:5, 123:25, 126:2, 135:20, 140:3, 192:10, 203:6, 203:11, 218:23, 219:7, 232:4

**directed** [5] - 13:19, 100:6, 143:13, 165:9, 206:14

**directing** [1] - 41:21

**direction** [7] - 13:1, 37:11, 57:16, 141:19, 145:4, 145:14, 211:15

**directions** [1] - 132:2

**directly** [2] - 101:2, 219:25

**Director** [2] - 156:16, 188:17

**directs** [1] - 214:1

**dis** [1] - 78:23

**disagreeing** [1] - 137:2

**disapprove** [2] - 140:13, 140:16

**disclose** [8] - 8:7, 8:12, 42:3, 49:19, 106:8, 165:25, 166:4, 175:16

**disclosing** [1] - 49:24

**discovered** [2] - 111:22, 145:9

**discrete** [1] - 133:7

**discretion** [1] - 157:2

**discuss** [11] - 12:10, 58:2, 99:12, 99:14, 143:2, 153:1, 165:9, 181:23, 243:12, 243:16, 244:2

**discussed** [7] - 8:9, 12:11, 55:24, 88:15, 102:12, 137:10, 172:19

**discusses** [2] - 58:3, 232:12

**discussing** [3] - 12:12, 26:15, 231:12

**discussion** [1] - 139:1

**discussions** [3] - 91:18, 236:3, 240:9

**dispensation** [1] - 75:7

**dispense** [1] - 228:14

**dispensed** [3] - 24:19, 190:19, 229:9

**dispenses** [1] - 229:11

**dispensing** [4] - 163:16, 163:18, 163:19, 165:7

**disposal** [1] - 199:7

**disproportionate** [1] - 120:13

**distinction** [1] - 202:8

**distribute** [2] - 9:13, 117:5

**distributed** [6] - 25:5, 38:16, 45:17, 148:15, 191:12, 220:19

**distributing** [5] - 29:8, 45:6, 163:18, 163:20, 228:25

**Distribution** [16] - 15:22, 37:15, 37:19, 38:1, 39:7, 39:8, 39:13, 46:2, 46:10, 47:4, 47:6, 47:17, 47:23, 61:13, 97:10, 97:13

**distribution** [48] - 38:4, 39:21, 43:21, 43:22, 43:23, 43:25, 44:1, 44:3, 44:25, 45:15, 46:4, 48:13, 58:17, 61:12, 62:6, 69:10, 77:14, 78:23, 80:22, 81:2, 81:12, 81:13, 90:2, 90:7, 90:18, 110:7, 110:8, 148:16, 176:13, 177:16, 180:22, 181:3, 181:11, 204:8, 210:6, 212:25, 213:14, 220:11, 220:12, 231:11, 234:11, 234:20, 239:21, 239:25, 243:21,

244:8, 244:9, 244:16
**distributions** [1] -
118:17
**distributor** [57] - 7:21,
13:21, 14:8, 15:10,
28:6, 28:7, 28:19,
29:7, 30:6, 45:11,
58:20, 60:19, 63:9,
82:11, 102:16,
103:12, 103:13,
105:13, 106:13,
109:18, 110:16,
110:19, 111:6,
114:4, 114:15,
116:22, 116:23,
117:20, 118:6,
118:23, 118:24,
119:6, 119:9,
119:13, 120:6,
120:16, 126:22,
139:24, 151:22,
152:4, 161:7,
163:20, 173:22,
175:25, 180:8,
180:13, 180:22,
181:7, 182:22,
182:23, 212:7,
212:9, 212:16,
226:22, 227:3, 230:3
**distributor's** [5] -
118:11, 173:10,
178:1, 179:5, 182:11
**Distributors** [1] -
84:23
**distributors** [59] -
25:17, 57:12, 57:17,
97:16, 106:16,
115:18, 115:20,
117:3, 117:7,
117:13, 117:15,
118:16, 120:19,
121:20, 144:25,
148:16, 151:4,
152:25, 153:16,
156:18, 158:17,
158:19, 158:25,
159:1, 159:16,
160:10, 160:18,
161:7, 161:15,
162:2, 162:3, 162:4,
162:21, 162:25,
163:2, 163:23,
164:4, 164:15,
164:16, 166:15,
166:19, 168:8,
168:18, 168:21,
174:6, 174:16,
175:14, 175:23,
176:24, 205:8,
207:14, 211:22,

212:21, 213:3,
214:13, 217:11,
217:13, 218:17,
235:2
**distributors'** [1] -
169:14
**DISTRICT** [3] - 1:1,
1:1, 1:17
**District** [4] - 7:2, 7:3,
91:22, 188:16
**diversion** [57] - 21:22,
21:24, 21:25, 25:18,
27:21, 30:8, 31:11,
47:7, 47:18, 48:12,
62:14, 62:24, 69:8,
70:24, 71:1, 71:14,
80:21, 117:14,
117:17, 117:21,
118:24, 119:6,
120:4, 139:12,
139:15, 141:13,
141:17, 151:5,
151:9, 152:10,
156:15, 160:20,
162:23, 166:16,
167:6, 167:10,
168:10, 169:12,
169:15, 171:5,
177:9, 177:21,
180:24, 181:5,
190:21, 191:18,
191:23, 196:4,
198:22, 199:1,
200:7, 204:5,
211:12, 211:13,
213:1, 238:12,
240:13
**Diversion** [12] -
139:10, 139:11,
139:23, 192:12,
204:19, 210:21,
211:8, 211:10,
211:12, 211:18,
211:23, 214:19
**diversions** [1] -
203:20
**diverted** [9] - 89:18,
104:16, 105:4,
105:20, 106:1,
106:17, 107:7,
118:8, 141:9
**diverters** [1] - 103:16
**division** [2] - 91:9,
247:10
**Division** [3] - 23:18,
176:21, 188:17
**Docket** [1] - 73:25
**docket** [1] - 75:3
**doctor** [8] - 21:1, 21:9,
21:12, 28:18, 29:10,

30:5, 119:12
**doctor's** [2] - 186:16
**doctor-patient** [1] -
21:12
**doctors** [4] - 22:8,
186:11, 186:15,
202:17
**document** [95] - 10:8,
11:5, 11:15, 14:1,
14:24, 15:2, 30:24,
32:13, 32:23, 34:25,
38:4, 44:10, 46:24,
47:3, 68:8, 68:10,
73:11, 74:11, 76:4,
76:8, 77:8, 77:10,
77:20, 78:7, 78:9,
80:3, 84:21, 85:15,
86:2, 86:4, 86:12,
86:22, 87:1, 87:5,
87:20, 88:4, 88:8,
88:16, 91:15, 91:17,
91:19, 93:10, 94:5,
96:10, 96:24, 98:1,
98:4, 98:7, 98:11,
98:18, 98:19,
101:10, 109:3,
109:14, 116:19,
116:21, 120:18,
139:6, 139:7,
139:20, 142:2,
142:14, 142:15,
143:2, 143:16,
143:20, 149:4,
150:7, 153:6,
154:13, 154:17,
154:22, 180:14,
187:9, 188:22,
188:25, 189:2,
189:15, 190:7,
192:11, 193:3,
218:23, 219:11,
219:12, 224:23,
233:3, 233:6,
233:12, 236:23,
240:20, 241:3,
241:12, 242:21,
248:4
**documents** [8] - 74:8,
75:18, 85:20, 96:6,
128:5, 147:21,
189:25, 226:7
**DOJ** [5] - 34:14,
187:18, 187:20,
187:22, 189:10
**Donald** [2] - 237:8,
248:6
**done** [21] - 25:21,
28:7, 44:17, 58:3,
94:14, 100:12,
123:19, 124:6,

132:7, 134:21,
153:10, 164:20,
167:13, 168:6,
181:15, 185:2,
194:24, 207:11,
214:6, 229:15, 248:3
**dosage** [8] - 16:14,
16:16, 16:19, 60:21,
70:25, 196:25,
229:10, 239:18
**dosages** [1] - 165:2
**dose** [1] - 25:10
**doses** [2] - 18:3, 25:14
**doubt** [3] - 20:11,
56:11, 128:18
**Douglas** [1] - 4:17
**down** [41] - 21:6, 22:2,
23:12, 23:16, 24:4,
24:23, 25:15, 67:22,
86:23, 119:14,
123:20, 125:5,
126:13, 129:17,
130:13, 131:4,
132:18, 133:18,
133:19, 135:19,
136:4, 141:5, 202:5,
202:15, 202:16,
202:22, 203:20,
215:13, 220:23,
227:10, 228:18,
228:22, 228:24,
229:16, 234:3,
235:1, 239:6,
243:11, 243:14,
247:11
**down-schedule** [1] -
202:5
**downstream** [10] -
9:5, 9:14, 13:15,
71:25, 79:10, 84:8,
95:25, 167:24,
190:20, 239:18
**dozen** [2] - 215:16,
215:19
**DPM** [1] - 91:10
**Dr** [6] - 98:15, 123:18,
126:2, 126:3, 128:1,
130:8
**dramatically** [2] -
202:14, 202:21
**draw** [1] - 120:8
**drink** [1] - 35:21
**Drive** [1] - 6:15
**driver's** [2] - 119:17,
119:18
**drop** [1] - 123:18
**dropped** [1] - 123:15
**dropping** [1] - 136:4
**drug** [39] - 21:7, 24:25,
94:16, 95:6, 95:10,

117:18, 190:24,
196:24, 197:1,
197:7, 197:22,
197:24, 199:13,
200:5, 200:11,
200:14, 200:17,
200:18, 200:21,
201:1, 201:9,
201:19, 201:23,
201:25, 202:1,
202:15, 203:1,
203:2, 203:7,
203:12, 203:16,
203:20, 203:21,
204:6, 204:11,
204:12, 204:13
**Drug** [6] - 6:2, 68:13,
187:16, 220:10,
237:6, 250:7
**DRUG** [2] - 1:7, 1:13
**drug-seeking** [2] -
21:7, 204:11
**drugs** [34] - 17:9,
18:10, 18:20, 19:20,
20:8, 22:13, 24:7,
25:5, 25:7, 26:2,
67:12, 121:8,
148:15, 159:7,
160:11, 161:4,
161:22, 162:15,
162:16, 167:24,
167:25, 179:24,
179:25, 191:7,
194:12, 199:16,
200:25, 203:6,
203:20, 204:6,
204:9, 204:25, 221:1
**due** [28] - 84:9, 89:16,
89:19, 94:16, 94:20,
95:5, 95:12, 95:15,
95:20, 95:21, 118:6,
118:9, 119:7, 151:8,
173:23, 174:1,
175:1, 175:4,
177:23, 186:20,
229:13, 229:14,
229:23, 241:4,
241:7, 245:18,
246:2, 246:4
**Due** [2] - 95:20,
229:14
**during** [66] - 11:5,
11:19, 23:25, 25:9,
26:3, 28:24, 29:13,
29:24, 30:9, 30:19,
31:3, 31:18, 33:22,
51:2, 54:10, 54:17,
57:10, 57:14, 67:13,
72:7, 72:18, 94:15,
97:6, 113:20,

113:23, 114:4, 114:19, 115:16, 126:7, 139:14, 139:16, 154:15, 157:8, 167:20, 168:6, 168:7, 171:4, 172:21, 174:7, 175:17, 177:2, 177:14, 177:15, 177:19, 179:1, 180:20, 181:3, 181:18, 181:20, 183:1, 183:5, 183:13, 184:1, 186:1, 195:8, 195:9, 196:23, 199:3, 199:15, 212:7, 215:23, 216:18, 218:14, 228:1, 239:9
**During** [2] - 114:19, 114:25
**duties** [1] - 186:24
**dynamics** [1] - 201:15

## E

**E-commerce** [2] - 11:3, 16:6
**e-mail** [1] - 175:23
**early** [3] - 34:7, 122:9, 215:6
**East** [3] - 3:5, 3:12, 4:18
**economist** [1] - 130:7
**education** [1] - 208:1
**educational** [2] - 220:19, 248:9
**effect** [3] - 41:1, 49:2, 223:16
**effective** [11] - 30:8, 46:9, 47:5, 47:17, 118:23, 119:5, 152:10, 177:21, 180:23, 181:1, 181:4
**effectively** [1] - 178:15
**efficiency** [1] - 34:5
**efficiently** [1] - 138:6
**effort** [2] - 133:18, 138:5
**eight** [2] - 36:14, 247:20
**Eighth** [1] - 3:10
**either** [10] - 21:3, 24:6, 24:20, 37:22, 74:3, 126:12, 199:7, 200:25, 201:6
**electronically** [1] - 235:3
**element** [1] - 188:12
**elicit** [3] - 19:25,

193:5, 194:19
**ELIZABETH** [1] - 6:14
**elsewhere** [2] - 46:2, 91:1
**email** [1] - 192:11
**embrace** [1] - 26:16
**embraces** [1] - 11:20
**emerged** [1] - 21:25
**employees** [1] - 248:10
**Encino** [1] - 3:18
**encompassed** [1] - 88:21
**encourage** [1] - 129:14
**encouraging** [1] - 129:17
**end** [13] - 27:12, 87:4, 124:11, 124:12, 127:21, 127:22, 128:7, 133:18, 133:23, 134:17, 134:18, 176:8, 201:3
**Enforcement** [6] - 68:13, 161:14, 187:16, 188:18, 220:10, 237:6
**enforcement** [46] - 8:16, 41:21, 42:3, 43:1, 43:3, 49:16, 72:12, 72:16, 74:2, 74:17, 74:20, 74:22, 75:25, 76:21, 78:16, 83:23, 106:7, 115:14, 120:23, 133:14, 133:15, 133:16, 137:15, 137:16, 137:18, 137:20, 150:5, 156:14, 158:5, 165:10, 165:24, 166:3, 166:13, 167:22, 170:10, 170:15, 174:11, 174:18, 181:19, 193:11, 193:15, 195:23, 196:3, 207:23, 208:10, 208:11
**enforcing** [1] - 206:20
**engaged** [1] - 36:25
**engaging** [2] - 36:25, 75:14
**enhanced** [1] - 96:20
**enormous** [1] - 117:21
**ensure** [8] - 58:4, 89:17, 197:7, 197:11, 199:10, 200:11, 201:8, 229:15

**entered** [3] - 82:25, 83:7, 96:2
**entire** [7] - 11:20, 26:16, 33:6, 39:23, 87:5, 88:21, 210:5
**entirely** [1] - 137:9
**entities** [1] - 210:11
**entitled** [1] - 127:4
**entity** [2] - 100:24, 119:12
**entry** [1] - 75:3
**ENU** [1] - 4:12
**epidemic** [1] - 200:6
**epidemiologist** [1] - 133:12
**epidemiologists** [4] - 130:6, 131:1, 132:15, 132:21
**equivalent** [1] - 125:18
**error** [1] - 157:21
**errors** [5] - 157:17, 157:19, 157:20, 157:23
**especially** [2] - 135:11, 162:6
**essentially** [1] - 125:22
**establish** [3] - 196:22, 196:24, 197:4
**established** [5] - 71:14, 88:4, 196:23, 200:17, 247:14
**estimate** [2] - 123:24, 196:18
**et** [6] - 1:7, 1:13, 91:8, 165:2, 250:6, 250:7
**evaluate** [2] - 123:16, 152:7
**evaluating** [1] - 174:4
**event** [2] - 54:9, 58:10
**events** [1] - 152:18
**eventually** [1] - 198:15
**evidence** [14] - 14:2, 44:24, 71:14, 126:25, 127:5, 129:15, 150:22, 164:12, 219:13, 223:12, 225:7, 226:8, 228:21, 229:16
**Evidence** [1] - 127:4
**evidentiary** [1] - 126:25
**evidently** [1] - 137:19
**exact** [2] - 59:1, 144:2
**exactly** [5] - 11:5, 26:25, 112:6, 125:19, 227:17
**exam** [1] - 218:24

**EXAMINATION** [1] - 209:22
**examination** [8] - 21:18, 22:12, 33:22, 125:1, 164:18, 219:7, 232:4, 238:20
**examinations** [2] - 125:6, 132:6
**examine** [2] - 41:15, 56:11
**examining** [1] - 135:23
**example** [12] - 108:3, 108:16, 131:2, 132:16, 133:12, 133:13, 145:18, 157:21, 191:11, 194:22, 201:21, 201:22
**examples** [2] - 109:16, 190:21
**exceeds** [1] - 75:2
**Excel** [1] - 124:13
**except** [2] - 20:14, 78:19
**exception** [3] - 34:14, 94:24, 140:20
**excess** [1] - 191:12
**Excessive** [2] - 109:15, 145:10
**excessive** [7] - 103:17, 103:18, 103:20, 103:23, 104:3, 104:12, 109:16, 112:2, 112:13, 113:7, 113:21, 114:23, 115:1, 213:22, 214:18, 214:21, 214:24, 234:9, 234:18
**excluded** [1] - 86:12
**excuse** [3] - 60:3, 151:15, 170:12
**excuses** [1] - 155:20
**executed** [2] - 181:16, 206:2
**executive** [3] - 97:23, 99:5, 99:6
**exercise** [4] - 118:6, 118:9, 119:7, 200:10
**exhibit** [8] - 72:25, 87:18, 108:7, 108:24, 116:16, 194:2, 194:4, 195:4
**exhibits** [2] - 74:25, 75:1
**exist** [1] - 186:21
**Existed** [1] - 127:4
**expect** [3] - 83:16,

131:18, 146:18
**expectation** [1] - 151:3
**expected** [1] - 39:19
**expecting** [1] - 131:21
**expense** [1] - 203:1
**experience** [13] - 24:19, 104:5, 168:9, 169:10, 178:20, 184:18, 185:9, 193:11, 195:22, 203:19, 203:25, 204:4, 204:5
**experiencing** [1] - 126:9
**expert** [25] - 53:2, 53:5, 53:11, 53:19, 55:4, 56:3, 98:20, 131:14, 133:6, 137:9, 155:12, 164:2, 166:24, 178:17, 191:20, 193:6, 193:10, 194:19, 195:13, 195:15, 195:17, 196:8, 207:18, 208:4
**Expert** [1] - 203:22
**experts** [6] - 127:25, 128:1, 129:21, 131:16, 135:20, 195:14
**explain** [17] - 17:21, 20:20, 30:2, 31:17, 37:15, 52:3, 52:4, 52:6, 53:2, 75:21, 145:4, 171:8, 175:22, 194:9, 196:16, 229:20, 237:13
**explained** [4] - 31:1, 37:12, 43:3, 208:22
**explaining** [1] - 175:23
**explanation** [8] - 16:25, 17:6, 17:8, 37:9, 111:10, 111:20, 130:1, 236:5
**export** [3] - 197:18, 197:24, 199:24
**Express** [3] - 23:25, 24:4, 24:8
**express** [5] - 48:24, 58:15, 61:20, 100:23, 151:3
**expressed** [2] - 83:15, 83:20
**expressing** [1] - 141:2
**expressly** [1] - 74:25
**extended** [4] - 141:6, 141:7, 178:25, 179:3

**extension** [1] - 132:19
**extensively** [2] - 74:16, 75:24
**extent** [11] - 11:22, 17:6, 49:11, 49:14, 88:11, 117:17, 146:6, 147:6, 147:8, 167:2, 167:15
**external** [1] - 98:7
**extra** [4] - 43:8, 128:12, 130:11
**extraordinary** [1] - 36:23
**extremely** [1] - 221:11
**eye** [1] - 119:1
**eyes** [1] - 70:5

**F**

**F.R.E** [2] - 188:8, 188:19
**F.Supp** [1] - 188:15
**Faber** [1] - 7:2
**FABER** [1] - 1:17
**face** [2] - 11:15, 98:6
**facilitate** [1] - 117:21
**facilitating** [1] - 22:3
**facilitation** [3] - 20:23, 21:4, 21:15
**facilities** [7] - 18:23, 48:14, 69:10, 80:23, 177:7, 181:17, 231:17
**Facility** [1] - 78:12
**facility** [20] - 18:22, 37:18, 37:19, 37:20, 40:6, 47:7, 47:18, 67:14, 69:10, 73:18, 77:4, 77:25, 86:6, 94:14, 142:6, 177:12, 178:10, 178:24, 181:14, 201:11
**fact** [26] - 14:11, 17:19, 17:20, 18:15, 19:23, 38:7, 43:20, 55:9, 56:5, 56:6, 56:18, 64:8, 72:11, 72:16, 114:5, 118:25, 119:9, 119:15, 131:13, 138:19, 164:3, 166:14, 208:24, 240:11, 244:15
**factor** [4] - 134:14, 247:13, 247:15, 247:20
**facts** [7] - 45:8, 56:2, 126:24, 164:12, 206:12, 206:15,

241:14
**factual** [2] - 20:1, 56:7
**failed** [7] - 47:5, 47:16, 89:16, 89:20, 180:23, 180:25, 181:4
**failings** [1] - 90:19
**Failure** [1] - 118:9
**failure** [20] - 18:21, 19:4, 19:19, 19:21, 20:8, 39:11, 39:23, 46:9, 48:11, 48:16, 58:11, 64:14, 69:7, 69:14, 80:20, 81:8, 88:20, 89:19, 90:25
**failures** [5] - 79:11, 90:5, 90:16, 95:15, 95:16
**fair** [2] - 65:11, 160:8
**falls** [1] - 34:21
**familiar** [13] - 44:14, 59:4, 64:5, 64:7, 70:1, 77:2, 77:20, 80:11, 82:15, 98:24, 152:20, 153:6, 172:2
**family** [3] - 190:22, 191:2, 191:9
**far** [5] - 49:18, 115:5, 183:25, 185:4, 207:8
**FARRELL** [6] - 2:3, 34:18, 55:21, 55:23, 87:17, 165:16
**Farrell** [8] - 2:4, 2:15, 34:17, 54:8, 55:18, 87:16, 124:6, 165:15
**faster** [1] - 135:18
**fault** [1] - 126:18
**FCRR** [1] - 6:18
**fear** [2] - 54:8, 125:5
**February** [2] - 142:23, 143:23
**Federal** [7] - 91:22, 149:21, 149:24, 150:10, 179:21, 179:22
**federal** [2] - 179:21, 210:4
**feedback** [3] - 113:6, 114:23, 182:1
**feelings** [1] - 115:7
**feet** [1] - 42:23
**felt** [4] - 30:11, 54:24, 81:19, 144:4
**few** [11] - 43:21, 115:10, 128:6, 177:13, 178:13, 184:12, 186:22, 220:14, 232:2, 239:6
**Field** [7] - 23:18, 140:8, 140:9,

140:13, 140:21, 176:21
**field** [4] - 140:16, 153:1, 211:4, 247:10
**figure** [3] - 163:19, 185:2, 186:11
**figured** [1] - 131:21
**file** [6] - 33:13, 35:3, 35:14, 58:21, 58:24, 118:16
**filed** [3] - 37:25, 59:2, 59:5
**files** [3] - 173:23, 174:1, 177:23
**filing** [3] - 33:6, 33:7, 145:10
**fill** [3] - 20:24, 34:16, 141:1
**filled** [2] - 25:4, 120:14
**filling** [2] - 118:7, 119:8
**fills** [2] - 21:6, 21:16
**final** [6] - 29:9, 137:14, 148:10, 148:23, 150:7, 150:9
**findings** [5] - 32:24, 88:8, 90:2, 180:7, 180:13, 181:10, 181:18
**fine** [12] - 14:25, 36:3, 36:4, 36:7, 38:21, 65:22, 107:6, 124:18, 200:25, 209:8, 209:10, 226:2
**finish** [8] - 102:14, 119:3, 123:14, 125:4, 133:23, 138:2, 138:5, 139:1
**finished** [2] - 15:8, 180:6
**Firm** [2] - 3:4, 3:7
**firm** [1] - 33:20
**first** [34] - 9:21, 14:4, 16:14, 52:5, 64:23, 77:2, 77:3, 116:7, 116:15, 116:22, 118:14, 121:13, 121:15, 126:22, 128:19, 129:4, 130:16, 140:2, 140:7, 140:14, 162:14, 181:1, 190:5, 192:10, 193:3, 197:21, 215:5, 224:25, 226:18, 227:24, 234:24, 237:1, 237:2, 244:1
**fit** [1] - 221:4
**fits** [1] - 42:17

**five** [16] - 24:6, 108:24, 126:1, 133:6, 158:3, 170:5, 176:17, 177:4, 202:11, 210:24, 232:5, 232:14, 232:19, 232:23, 235:11, 247:11
**fixed** [1] - 239:23
**FL** [1] - 2:14
**flag** [4] - 121:5, 121:11, 161:1, 217:14
**flags** [4] - 14:20, 14:21, 151:9
**Flaherty** [1] - 5:14
**FLAHIVE** [1] - 5:10
**flawed** [1] - 158:10
**flip** [3] - 80:25, 81:5, 248:8
**Floor** [1] - 3:5
**floor** [1] - 179:24
**floored** [1] - 17:14
**Florida** [16] - 11:16, 20:18, 20:19, 22:15, 23:14, 24:5, 25:15, 36:22, 77:15, 86:6, 88:17, 95:9, 215:10, 216:23, 216:24, 220:12
**flow** [1] - 9:5
**fluctuations** [1] - 247:13
**fly** [1] - 74:13
**focus** [4] - 43:24, 52:14, 211:20, 211:21
**focused** [3] - 20:15, 115:13, 215:9
**focusing** [2] - 27:9, 27:19
**follow** [6] - 7:17, 82:16, 198:1, 244:3, 244:10, 244:16
**followed** [1] - 219:22
**following** [10] - 16:8, 48:8, 48:21, 75:13, 80:18, 88:5, 143:6, 182:23, 238:11
**follows** [4] - 7:5, 16:12, 67:25, 184:9
**Footnote** [1] - 151:12
**FOR** [1] - 1:1
**forbidden** [1] - 50:2
**force** [1] - 130:12
**Force** [7] - 211:13, 246:20, 246:23, 247:3, 247:4, 247:7, 247:9
**forces** [1] - 134:19

**foregoing** [1] - 250:4
**forget** [1] - 128:19
**forgive** [3] - 64:22, 66:8, 106:14
**forgot** [1] - 114:20
**form** [3] - 195:10, 206:11, 211:14
**formal** [1] - 147:17
**format** [2] - 114:7, 150:10
**formula** [1] - 145:16
**formulations** [1] - 199:17
**forth** [5] - 32:23, 69:15, 88:8, 141:4, 166:22
**forward** [3] - 43:18, 56:1, 138:16
**Foundation** [1] - 103:2
**foundation** [59] - 18:25, 27:25, 28:1, 38:3, 38:6, 38:24, 50:16, 50:24, 51:12, 51:14, 52:5, 55:2, 62:3, 62:9, 64:2, 66:11, 66:17, 69:23, 70:12, 71:4, 82:2, 83:2, 83:4, 86:21, 87:20, 90:8, 95:18, 98:17, 98:18, 98:22, 102:6, 104:17, 104:22, 105:9, 105:21, 106:12, 106:17, 106:21, 109:21, 110:25, 111:12, 112:9, 121:21, 145:25, 155:10, 155:11, 155:23, 161:5, 161:10, 162:2, 162:8, 163:1, 164:7, 164:11, 166:25, 178:17, 185:12, 188:12, 194:25
**founder** [1] - 157:20
**founders** [1] - 157:19
**four** [11] - 18:1, 24:5, 30:23, 47:24, 88:16, 90:17, 130:16, 131:12, 178:13, 236:17, 243:11
**Four** [1] - 243:14
**frame** [4] - 113:9, 113:10, 113:17, 214:14
**framework** [2] - 132:10, 157:5
**frankly** [4] - 129:25, 130:14, 166:17,

203:5
**FRE** [1] - 34:25
**Fred's** [1] - 42:23
**free** [2] - 207:23, 208:2
**frequencies** [1] -
177:1
**frequency** [1] - 177:2
**frequent** [1] - 168:7
**frequently** [3] - 157:9,
168:5, 191:6
**Friday** [5] - 125:4,
125:12, 136:6,
136:20, 138:17
**friends** [5] - 122:25,
127:2, 190:23,
191:2, 191:8
**front** [14] - 40:15,
85:22, 96:7, 96:25,
107:24, 136:22,
141:24, 221:16,
226:4, 226:7,
231:22, 233:8,
236:18, 240:21
**full** [15] - 131:19,
131:22, 137:7,
140:3, 145:14,
174:6, 176:25,
178:9, 179:18,
190:17, 222:16,
223:2, 234:8, 244:1,
246:2
**Full** [1] - 64:9
**full-time** [1] - 178:9
**FULLER** [1] - 2:15
**Fuller** [2] - 2:4, 2:15
**fully** [2] - 131:21,
172:24
**function** [1] - 193:15
**funky** [1] - 221:19
**Furthermore** [1] -
89:20

## G

**Gary** [3] - 99:8, 237:9,
246:6
**gate** [2] - 210:10,
210:16
**gatekeeper** [2] -
210:8, 210:12
**gateway** [2] - 193:5,
194:20
**gear** [1] - 28:10
**general** [9] - 26:6,
26:15, 67:16, 74:5,
75:21, 79:7, 141:11,
195:5, 216:13
**generally** [14] - 28:14,
28:16, 74:19, 78:17,
79:8, 110:19, 120:1,

122:19, 162:1,
162:25, 169:8,
170:4, 182:4, 198:1
**generate** [1] - 243:12
**generated** [1] - 243:13
**generic** [8] - 18:10,
18:13, 18:18, 18:20,
19:20, 20:8, 40:5
**generics** [1] - 239:11
**generous** [1] - 34:20
**gentleman** [1] -
236:15
**gentlemen** [3] - 17:11,
236:17, 237:10
**geographic** [6] -
11:14, 11:21, 76:9,
88:16, 88:18, 88:23
**geographical** [1] -
26:18
**Georgia** [2] - 24:9
**get-go** [1] - 129:9
**Gina** [2] - 16:1, 151:13
**given** [23] - 24:4,
34:14, 49:21,
103:24, 111:21,
117:17, 118:22,
127:13, 127:17,
128:3, 129:20,
131:11, 141:19,
154:25, 171:19,
182:16, 199:22,
216:1, 216:2, 216:6,
216:7, 229:6
**glass** [1] - 136:4
**goal** [1] - 31:6
**governed** [2] - 157:5,
196:20
**government** [2] -
33:10, 207:15
**governmental** [1] -
33:10
**great** [1] - 248:24
**GRETCHEN** [1] - 6:7
**grew** [1] - 200:7
**ground** [5] - 20:14,
26:12, 57:4, 62:4,
100:2
**grounds** [2] - 151:16,
209:5
**group** [9] - 22:7,
91:10, 175:24,
198:9, 207:23,
207:24, 207:25,
211:15
**groups** [3] - 23:21,
207:20, 207:21
**growing** [1] - 234:2
**guarantee** [1] - 119:13
**guess** [12] - 17:12,
45:2, 62:3, 100:11,

129:3, 132:25,
137:25, 148:13,
164:6, 164:24,
237:12
**guidance** [41] - 12:18,
39:19, 57:11, 57:13,
57:15, 57:17, 58:4,
94:25, 114:11,
114:12, 114:14,
115:15, 115:18,
117:24, 121:17,
121:19, 139:1,
145:4, 145:24,
146:7, 147:4, 147:7,
147:11, 147:16,
150:1, 152:3,
152:11, 152:12,
152:17, 153:16,
156:7, 156:9,
172:19, 173:2,
173:5, 173:14,
183:22, 186:10,
215:1, 215:23,
240:13
**guy** [1] - 17:10

## H

**habits** [1] - 186:17
**Haight** [3] - 22:1,
215:14, 215:18
**half** [7] - 50:15, 50:16,
123:10, 131:7,
133:6, 219:16,
233:19
**half-days** [1] - 123:10
**halt** [1] - 141:12
**handed** [1] - 139:6
**handle** [2] - 8:21,
200:3
**handled** [1] - 185:24
**hands** [2] - 203:21,
204:6
**handwriting** [1] -
160:8
**happy** [3] - 54:16,
65:3, 115:5
**hard** [7] - 129:18,
132:4, 134:9, 138:2,
183:4, 183:5, 183:6
**HARDIN** [1] - 5:3
**harm** [2] - 117:21,
185:9
**haul** [1] - 176:8
**Hawkins** [1] - 3:7
**HDMA** [14] - 84:23,
97:3, 97:7, 97:9,
97:10, 97:15, 97:18,
97:20, 97:22, 98:6,
98:12, 99:1, 100:6,

100:16
**head** [2] - 210:21,
211:23
**headed** [1] - 25:2
**heading** [2] - 246:15,
246:18
**headquarters** [3] -
45:21, 45:23, 91:11
**Headquarters** [2] -
12:6, 13:22
**Health** [17] - 4:11, 5:2,
73:18, 74:2, 74:22,
76:21, 77:13, 78:2,
78:12, 80:6, 84:22,
93:2, 142:5, 142:13,
143:4, 143:13, 163:9
**health** [4] - 30:1,
61:17, 141:3, 190:24
**healthcare** [2] -
184:15, 184:19
**Healthcare** [2] - 97:10,
97:13
**hear** [11] - 8:10, 10:18,
38:23, 40:21, 49:12,
55:22, 73:15, 122:9,
128:24, 201:16,
245:5
**heard** [8] - 23:25,
24:11, 130:25,
133:14, 137:19,
155:20, 211:7, 212:7
**hearing** [10] - 115:8,
125:13, 130:20,
149:9, 149:12,
154:4, 187:14,
187:19, 189:7,
189:11
**hearsay** [36] - 12:13,
12:16, 12:24, 40:9,
53:2, 54:21, 55:2,
56:23, 57:3, 57:18,
75:15, 83:2, 83:4,
83:10, 94:21, 94:24,
95:3, 99:24, 100:2,
100:7, 100:13,
100:19, 100:22,
101:3, 101:17,
102:7, 155:23,
188:3, 188:6, 193:3,
193:4, 223:15,
223:18, 238:18
**heart** [1] - 34:13
**heavy** [1] - 131:14
**held** [2] - 12:5, 151:21
**help** [6] - 43:7, 43:9,
127:7, 136:23,
151:13, 163:6,
171:13, 190:16,
200:25
**helped** [1] - 169:15

**helpful** [5] - 113:8,
113:22, 114:24,
130:2, 227:2
**helps** [2] - 240:23,
248:14
**hemorrhaging** [1] -
31:8
**hereby** [1] - 49:1
**herein** [1] - 89:23
**heroin** [4] - 193:13,
195:12, 195:24,
196:4
**Hester** [5] - 98:14,
129:1, 136:10,
137:3, 137:23
**HESTER** [10] - 5:9,
129:2, 131:20,
132:1, 133:11,
134:2, 134:8,
136:11, 137:24,
138:10
**high** [4] - 25:10,
124:12, 234:8,
234:17
**highlight** [2] - 134:2,
237:8
**highlighted** [3] -
227:25, 237:20,
238:3
**highlighting** [1] -
129:3
**highlights** [1] - 194:13
**highly** [1] - 166:8
**Highway** [2] - 24:11,
24:18
**Hilliard** [8] - 237:9,
239:9, 239:10,
239:15, 246:6,
246:8, 246:18,
247:11
**himself** [1] - 111:13
**historical** [1] - 166:24
**history** [2] - 34:7,
128:15
**hit** [1] - 30:17
**home** [1] - 136:22
**Homeland** [1] - 187:13
**homework** [1] -
123:20
**honest** [1] - 236:20
**Honor** [221] - 7:7, 8:3,
8:6, 8:20, 8:25, 10:4,
11:11, 11:25, 12:14,
12:17, 13:5, 14:10,
14:22, 19:1, 19:2,
19:7, 19:20, 20:2,
22:20, 22:25, 26:6,
26:11, 27:3, 27:13,
28:2, 32:1, 33:1,
33:4, 33:17, 33:23,

34:13, 34:24, 35:6, 35:12, 36:7, 36:8, 38:9, 40:18, 40:23, 41:20, 42:3, 42:14, 42:18, 42:24, 43:7, 44:6, 46:22, 49:10, 49:20, 49:24, 50:4, 50:6, 51:9, 51:10, 51:14, 51:15, 52:2, 53:2, 54:7, 54:20, 55:14, 55:21, 56:10, 56:18, 59:8, 62:2, 62:15, 63:2, 63:25, 64:4, 64:18, 65:1, 65:23, 67:19, 68:1, 68:5, 70:15, 71:3, 72:3, 72:21, 73:19, 74:7, 74:20, 75:5, 75:8, 75:14, 76:7, 76:11, 76:13, 78:24, 79:2, 79:19, 79:24, 84:13, 84:18, 85:11, 86:10, 86:13, 86:15, 86:25, 87:4, 87:9, 87:24, 88:11, 88:15, 92:13, 94:23, 98:3, 98:10, 98:16, 100:4, 100:21, 101:14, 103:2, 103:5, 104:17, 105:12, 106:4, 106:25, 107:10, 108:21, 109:10, 113:18, 113:24, 114:16, 115:4, 116:8, 116:11, 120:20, 121:4, 122:3, 122:8, 124:16, 126:20, 129:2, 129:3, 129:12, 129:21, 131:20, 132:2, 132:20, 132:23, 133:11, 134:2, 134:9, 134:21, 136:11, 137:1, 137:4, 137:15, 137:24, 138:9, 138:10, 139:3, 148:5, 150:12, 150:15, 150:18, 150:19, 153:4, 154:3, 154:11, 155:24, 159:22, 161:5, 161:24, 164:10, 165:11, 165:22, 166:6, 166:9, 170:12, 170:13, 170:24, 171:17, 173:17, 174:9, 176:5, 184:5, 187:6, 188:1, 188:3,

188:7, 188:14, 189:18, 189:22, 189:24, 192:4, 193:2, 193:9, 193:20, 194:1, 194:4, 194:10, 195:1, 195:13, 206:7, 206:23, 207:4, 207:5, 208:17, 208:25, 209:6, 209:14, 209:19, 209:25, 214:3, 214:11, 218:4, 218:7, 219:1, 219:9, 223:13, 223:17, 225:9, 225:12, 229:17, 238:16, 241:22, 248:21, 249:5
**Honor's** [1] - 65:4
**HONORABLE** [1] - 1:17
**Honorable** [1] - 7:1
**hook** [1] - 66:20
**hope** [4] - 92:18, 193:21, 215:25, 240:1
**hopefully** [4] - 52:12, 138:8, 142:17, 151:13
**hospice** [1] - 201:3
**hospitals** [2] - 199:8, 199:12
**hour** [9] - 123:24, 124:5, 126:2, 129:22, 129:25, 131:16, 133:6, 136:4, 219:16
**hours** [10] - 122:13, 122:14, 122:15, 122:21, 123:1, 123:3, 126:1, 133:6, 134:24, 245:15
**House** [2] - 187:12, 233:9
**housekeeping** [1] - 186:22
**huge** [1] - 13:18
**Hundreds** [1] - 110:4
**hundreds** [3] - 70:24, 71:19, 71:24
**HUNTINGTON** [1] - 1:4
**Huntington** [7] - 3:10, 4:1, 26:9, 38:5, 216:19, 216:21, 250:6
**Huntington-Cabell** [1] - 38:5
**hydrocodone** [31] -

13:15, 13:19, 16:9, 16:15, 17:25, 18:2, 18:10, 18:14, 25:8, 25:18, 27:22, 36:23, 37:1, 60:22, 60:25, 79:10, 79:11, 79:12, 79:13, 191:13, 196:25, 199:2, 199:17, 201:22, 202:1, 202:5, 202:13, 202:18, 222:2, 226:19, 239:11
**Hydrocodone** [1] - 201:22

# I

**I(3)(ii** [1] - 69:16
**I-75** [2] - 24:8, 24:22
**idea** [3] - 24:23, 119:23, 230:5
**identification** [2] - 116:5, 130:22
**identified** [8] - 16:9, 67:13, 74:24, 129:7, 178:8, 220:25, 221:19, 245:19
**identifies** [1] - 221:14
**identify** [16] - 18:12, 19:19, 64:12, 64:16, 76:19, 143:16, 151:9, 156:4, 168:10, 169:11, 183:24, 186:14, 186:19, 234:3, 234:8, 234:17
**identifying** [4] - 79:8, 104:7, 162:22, 183:2
**ignorant** [1] - 203:5
**II** [8] - 159:1, 159:2, 159:10, 159:11, 159:12, 202:6, 202:8, 247:17
**III** [9] - 159:1, 159:3, 159:11, 159:12, 202:5, 202:10, 247:20, 247:21
**IIs** [1] - 159:3
**illegal** [1] - 119:22
**illicit** [4] - 70:25, 141:2, 234:11, 234:20
**illicitly** [3] - 190:19, 191:1, 191:5
**illustrate** [1] - 130:5
**ILR** [1] - 108:2
**image** [1] - 227:11
**imbalance** [1] - 166:18

**Immediate** [52] - 28:11, 28:13, 28:14, 29:4, 29:13, 29:18, 29:19, 29:25, 30:9, 30:19, 37:4, 59:12, 59:13, 59:19, 59:22, 60:6, 61:1, 61:5, 61:11, 63:3, 63:21, 65:17, 66:3, 67:9, 73:14, 73:16, 77:3, 77:11, 77:17, 77:23, 78:4, 80:8, 81:19, 81:25, 82:8, 86:5, 89:4, 89:5, 89:7, 89:8, 89:13, 91:4, 91:21, 92:5, 94:11, 96:13, 115:16, 148:21, 149:1, 185:25, 206:3
**immediate** [5] - 28:24, 29:14, 37:3, 77:2, 91:21
**immediately** [5] - 159:17, 221:5, 222:1, 229:12, 239:23
**imminent** [10] - 30:1, 30:7, 30:12, 30:17, 30:25, 61:14, 61:16, 61:21, 81:14, 89:11
**impact** [1] - 7:24
**implement** [1] - 166:19
**implementation** [1] - 45:19
**implemented** [3] - 48:25, 58:16, 231:10
**implied** [1] - 48:24
**importance** [3] - 127:13, 127:17, 153:1
**important** [16] - 119:20, 122:10, 124:24, 125:8, 125:25, 126:21, 127:14, 128:8, 128:13, 128:20, 160:20, 160:24, 202:7, 241:15, 245:12
**impose** [1] - 145:23
**imposed** [1] - 222:1
**improper** [3] - 53:19, 98:19, 195:17
**IMS** [2] - 163:9, 163:11
**IN** [2] - 1:1, 1:18
**in-court** [1] - 136:16
**inasmuch** [1] - 136:16
**inclined** [1] - 135:12
**include** [7] - 11:21,

26:17, 37:3, 69:19, 134:24, 180:17, 196:21
**included** [5] - 49:5, 49:16, 50:10, 59:19, 96:20
**includes** [5] - 55:25, 129:20, 130:23, 164:5
**including** [7] - 53:14, 75:25, 84:25, 89:18, 96:21, 130:6, 135:2
**incoming** [1] - 178:24
**incorporated** [1] - 76:1
**incorporates** [1] - 104:20
**incorrect** [1] - 53:16
**increase** [3] - 22:4, 199:2, 199:13
**indefinite** [1] - 132:19
**indicate** [6] - 8:17, 45:9, 82:24, 83:7, 104:10, 190:24
**indicated** [2] - 59:18, 83:11, 83:12
**indicating** [1] - 239:19
**indication** [2] - 43:22, 98:5
**individual** [3] - 90:21, 126:1, 189:25
**individuals** [2] - 133:15, 191:5
**industrial** [7] - 47:9, 47:20, 118:9, 197:8, 197:19, 199:23, 203:17
**Industry** [1] - 152:24
**industry** [10] - 26:24, 26:25, 85:7, 152:20, 194:10, 194:11, 194:14, 205:23, 207:2, 247:12
**inform** [2] - 98:8, 181:19
**informant** [1] - 166:13
**informants** [1] - 175:6
**information** [53] - 8:8, 8:13, 13:13, 27:25, 28:7, 40:25, 41:1, 41:22, 43:4, 49:15, 49:17, 50:12, 51:4, 51:7, 60:15, 66:14, 105:1, 105:18, 105:25, 106:7, 106:8, 107:2, 107:14, 107:16, 111:6, 112:8, 116:24, 120:24, 140:10, 157:12,

161:21, 163:6, 163:8, 165:6, 166:5, 170:13, 170:16, 171:1, 174:2, 174:18, 175:14, 175:25, 220:20, 223:10, 223:11, 233:1, 235:2, 235:6, 239:19, 245:1, 245:3, 248:9
**Ingredient** [3] - 107:22, 108:4, 108:16
**initial** [7] - 12:12, 14:15, 32:9, 61:17, 78:18, 89:9, 149:5
**initialed** [4] - 59:24, 61:18, 61:23, 81:20
**initialing** [1] - 61:10
**initials** [2] - 60:2, 60:4
**initiate** [5] - 30:9, 41:8, 59:22, 72:12, 140:22
**initiating** [2] - 28:23, 29:25
**initiative** [21] - 7:21, 13:21, 14:8, 15:10, 58:20, 60:19, 63:9, 82:12, 102:16, 103:12, 103:13, 105:13, 106:13, 109:18, 110:16, 114:5, 114:15, 116:22, 116:23, 182:23, 182:24
**inordinate** [1] - 160:25
**inquire** [1] - 120:19
**inquired** [1] - 137:4
**inquiry** [1] - 138:14
**insane** [1] - 18:3
**inspect** [1] - 176:13
**inspected** [1] - 231:1
**inspecting** [1] - 178:1
**inspection** [15] - 94:14, 94:15, 176:18, 176:25, 178:10, 179:1, 179:5, 179:12, 180:3, 180:7, 180:10, 180:11, 181:15, 181:16, 212:24
**inspections** [18] - 173:21, 176:12, 176:15, 177:14, 177:15, 177:16, 177:19, 178:21, 180:22, 181:2, 181:6, 181:11, 181:18, 181:22,

213:2, 213:13, 230:24, 231:3
**inspector** [2] - 94:18, 178:13
**Inspector** [1] - 95:13
**inspectors** [1] - 177:9
**instance** [5] - 74:12, 130:24, 147:17, 158:21, 167:8
**instead** [2] - 39:19, 57:19
**instruct** [1] - 166:4
**instructed** [3] - 8:17, 165:25, 169:2
**instructing** [1] - 12:21
**instruction** [1] - 65:4
**instructions** [1] - 141:16
**intelligence** [1] - 110:22
**intend** [1] - 100:11
**intending** [1] - 206:9
**interact** [1] - 212:20
**interacting** [1] - 214:12
**interaction** [2] - 21:8, 21:12
**interactions** [8] - 43:2, 92:4, 93:2, 93:6, 94:1, 94:10, 94:13
**interest** [5] - 183:11, 213:25, 214:9, 241:1, 242:10
**interject** [4] - 8:24, 60:17, 69:1, 219:10
**International** [1] - 189:3
**internet** [39] - 16:8, 20:13, 20:15, 20:17, 20:21, 20:22, 21:21, 22:3, 22:17, 23:9, 24:20, 25:9, 36:24, 168:15, 190:19, 191:1, 191:4, 191:5, 191:7, 191:10, 191:12, 191:18, 202:2, 215:5, 215:13, 215:16, 216:12, 216:17, 216:20, 216:25, 217:4, 217:25, 220:20, 222:18, 233:23, 233:25, 234:12, 234:21, 248:11
**interpose** [2] - 159:22, 196:6
**interpretation** [1] - 121:16
**interrupt** [2] - 27:4,

142:11
**interview** [1] - 208:18
**interviewed** [2] - 208:14, 208:16
**interviews** [1] - 208:24
**introduced** [1] - 86:13
**intuit** [1] - 129:11
**inventory** [2] - 201:12, 201:13
**invested** [1] - 128:9
**investigate** [4] - 112:3, 112:14, 112:23, 185:17
**investigated** [4] - 112:19, 112:21, 112:22, 170:2
**investigation** [23] - 32:21, 32:24, 83:24, 88:6, 88:9, 90:3, 92:4, 113:4, 113:5, 119:24, 141:9, 158:10, 173:4, 174:7, 174:17, 174:23, 175:2, 176:18, 176:19, 177:10, 191:11, 228:17, 229:15
**investigations** [16] - 72:19, 158:5, 161:14, 171:9, 173:21, 173:25, 174:20, 175:6, 175:16, 177:2, 181:12, 191:4, 191:9, 211:15, 235:6, 235:8
**investigative** [2] - 112:18, 168:2
**investigator** [4] - 15:22, 94:18, 156:15, 213:1
**Investigator** [1] - 139:24
**investigators** [6] - 30:15, 113:3, 139:12, 141:17, 177:9, 211:13
**Investigators** [2] - 139:10, 139:11
**invite** [1] - 76:18
**involved** [16] - 44:2, 53:17, 54:2, 78:15, 86:7, 119:22, 141:13, 146:2, 168:3, 168:16, 171:20, 197:15, 234:10, 234:19, 247:15
**involves** [1] - 199:6
**Irpino** [2] - 3:7, 209:6

**IRPINO** [8] - 209:6, 223:15, 223:18, 223:21, 224:5, 224:8, 225:12, 238:16
**irresponsibility** [1] - 141:3
**ISIA** [1] - 5:4
**ISO** [1] - 62:5
**issuance** [1] - 244:20
**issue** [23] - 11:21, 18:19, 26:18, 30:19, 32:19, 34:5, 35:16, 46:1, 49:25, 54:11, 55:16, 73:21, 88:5, 106:12, 114:10, 122:25, 165:17, 225:8, 230:13, 239:16, 239:20, 239:24
**issued** [8] - 29:9, 35:18, 36:12, 46:18, 63:22, 65:18, 76:13, 241:10
**issues** [7] - 13:24, 34:4, 91:4, 114:7, 157:18, 175:4, 175:6
**issuing** [2] - 46:13, 91:4
**items** [1] - 186:22
**iterations** [1] - 240:12
**itself** [3] - 28:25, 143:2, 227:11

## J

**Jackson** [1] - 6:8
**jail** [1] - 201:1
**Jakki** [1] - 137:9
**Jan** [1] - 126:3
**January** [28] - 9:23, 9:24, 13:22, 14:9, 31:22, 36:15, 36:21, 78:14, 204:18, 204:20, 219:5, 219:19, 220:5, 221:17, 221:20, 222:12, 222:13, 222:17, 222:19, 223:5, 224:14, 224:24, 226:24, 231:23, 232:10, 235:22
**JASIEWICZ** [1] - 5:4
**JEFFREY** [1] - 5:13
**JENNIFER** [1] - 4:12
**Jersey** [1] - 78:2
**job** [5] - 30:5, 30:7, 124:7, 198:15, 205:4
**Join** [3] - 105:7, 105:8,

112:11
**join** [8] - 51:13, 55:16, 104:23, 106:25, 162:6, 162:10, 164:11, 173:17
**joking** [1] - 127:2
**Joseph** [1] - 10:23
**JOSEPH** [1] - 6:4
**JR** [2] - 2:3, 2:15
**Juan** [2] - 2:5, 2:17
**Judge** [6] - 7:2, 56:3, 67:23, 138:23, 206:14, 214:1
**judge** [5] - 28:20, 29:9, 31:16, 134:7, 138:18
**JUDGE** [1] - 1:17
**judges** [1] - 127:1
**judgments** [1] - 186:5
**Judiciary** [1] - 187:12
**Julian** [2] - 220:5, 221:22
**July** [5] - 149:19, 204:18, 208:7, 212:1, 212:14
**JUNE** [1] - 1:19
**June** [6] - 7:4, 68:20, 138:3, 233:9, 250:9, 250:15
**Justice** [5] - 42:19, 165:18, 165:19, 169:3, 175:15

## K

**KEARSE** [1] - 4:2
**keep** [11] - 34:3, 44:17, 60:20, 138:15, 176:5, 176:7, 203:20, 204:5, 226:7, 229:24
**Keep** [1] - 69:6
**Kelly** [1] - 6:8
**kept** [2] - 199:9, 204:23
**Kessler** [1] - 4:17
**key** [2] - 53:8, 124:24
**kind** [16] - 17:11, 21:18, 21:25, 25:17, 41:10, 119:17, 157:14, 162:7, 163:8, 166:1, 180:14, 183:15, 186:9, 190:1, 207:21, 239:2
**kinds** [5] - 21:22, 109:16, 150:2, 174:10, 179:16
**knowing** [4] - 127:11, 137:11, 173:11,

197:4
**knowledge** [40] - 21:8, 27:20, 28:4, 36:24, 38:19, 43:20, 45:8, 45:17, 52:16, 52:23, 52:24, 53:13, 54:9, 54:14, 56:7, 56:8, 56:10, 56:20, 56:23, 60:24, 62:12, 72:11, 76:9, 86:17, 90:22, 102:15, 102:25, 121:19, 146:12, 146:15, 152:11, 160:11, 161:6, 164:16, 168:9, 170:9, 183:22, 186:5, 221:4
**known** [1] - 49:18
**knows** [10] - 12:23, 20:4, 28:4, 28:5, 90:23, 101:15, 101:16, 111:14, 162:11, 162:12
**KOUBA** [1] - 3:14
**Kyle** [1] - 237:18

**L**

**LA** [1] - 3:8
**lab** [1] - 247:9
**lack** [8] - 56:20, 62:3, 66:10, 70:11, 102:24, 112:9, 130:5, 185:11
**lag** [2] - 159:15, 218:11
**laid** [7] - 55:3, 64:2, 66:18, 81:24, 87:24, 106:21, 155:11
**Lakeland** [18] - 15:23, 36:25, 37:14, 37:19, 38:1, 38:19, 39:7, 39:8, 39:13, 45:25, 77:13, 77:14, 86:6, 86:14, 87:2, 219:8, 220:12, 244:3
**landed** [1] - 112:7
**Landover** [2] - 46:5, 47:11
**language** [2] - 40:14, 226:10, 239:6
**Lanier** [1] - 3:4
**large** [14] - 9:13, 13:14, 25:8, 31:11, 43:19, 79:9, 84:7, 85:19, 89:14, 126:6, 145:19, 145:21, 168:13, 191:22
**large-scale** [1] - 191:22

**larger** [1] - 167:25
**last** [25] - 58:8, 73:15, 76:5, 78:17, 78:19, 118:13, 124:5, 127:15, 127:25, 129:4, 130:17, 132:15, 133:20, 134:7, 141:5, 147:22, 177:11, 196:13, 204:14, 208:11, 222:15, 222:16, 223:2
**late** [4] - 137:8, 156:16, 213:2, 246:24
**lately** [1] - 125:6
**LAURA** [1] - 5:10
**law** [41] - 8:16, 28:20, 29:9, 31:16, 33:20, 41:21, 42:3, 43:3, 49:16, 82:16, 100:25, 106:7, 119:14, 119:16, 120:23, 133:13, 133:14, 133:16, 137:15, 137:16, 137:18, 137:19, 147:8, 147:19, 156:14, 165:9, 165:24, 166:3, 166:13, 167:22, 170:15, 174:11, 174:18, 184:23, 193:11, 193:14, 195:22, 206:20, 207:23, 208:10, 238:12
**Law** [4] - 3:4, 3:7, 3:12, 208:11
**lawfully** [3] - 117:13, 185:3, 186:6
**lawyer** [2] - 34:8, 229:23
**lawyers** [1] - 127:4
**lay** [9] - 27:5, 28:1, 52:5, 60:7, 62:9, 86:21, 98:21, 161:5, 161:10
**layering** [1] - 106:20
**laying** [1] - 27:25
**lays** [2] - 120:2, 120:3
**lazy** [1] - 134:6
**lead** [4] - 94:18, 112:25, 113:3, 141:7
**leadership** [2] - 12:8, 97:21
**leading** [3] - 175:8, 183:18, 185:13
**leads** [2] - 235:5, 235:7

**learn** [2] - 161:15, 175:19
**learned** [3] - 53:18, 54:18, 127:5
**learning** [1] - 161:25
**least** [7] - 15:19, 26:17, 84:1, 129:11, 138:20, 192:3, 225:25
**leave** [1] - 214:2
**leaves** [1] - 74:12
**led** [1] - 191:9
**Lee** [1] - 3:12
**left** [12] - 54:19, 123:13, 123:21, 124:10, 124:11, 124:23, 133:24, 207:11, 208:13, 211:17
**legal** [16] - 19:3, 19:25, 49:2, 56:13, 64:18, 65:2, 65:5, 65:13, 81:15, 102:19, 146:6, 147:9, 150:21, 173:16, 178:17, 206:22
**legally** [2] - 32:20, 88:5
**legislative** [1] - 233:15
**legitimacy** [1] - 119:7
**legitimate** [15] - 18:4, 47:8, 47:19, 89:18, 118:8, 186:12, 197:8, 197:11, 200:15, 201:2, 203:2, 203:7, 203:11, 203:16, 203:18
**lend** [1] - 34:18
**length** [2] - 55:24, 130:25
**lengthened** [1] - 126:16
**Leon** [2] - 2:4, 2:16
**less** [12] - 45:7, 123:25, 166:19, 190:25, 191:3, 200:20, 200:22, 232:14, 232:19, 232:21, 232:23, 232:25
**lethal** [1] - 117:19
**letter** [46] - 43:8, 43:12, 54:24, 116:18, 116:22, 117:2, 117:6, 117:25, 119:25, 120:2, 121:13, 121:14, 121:15,

141:23, 142:5, 142:7, 142:9, 142:19, 143:23, 143:24, 144:1, 144:2, 144:3, 144:5, 144:12, 144:14, 144:16, 144:18, 144:20, 144:22, 144:24, 145:5, 145:23, 146:4, 146:13, 147:23, 219:25, 220:2, 220:4, 220:8, 220:17, 221:9, 221:22, 222:25
**letters** [19] - 115:21, 115:24, 116:1, 116:2, 116:10, 146:16, 146:19, 146:25, 147:1, 147:3, 147:11, 147:17, 147:18, 147:19, 173:6, 173:7, 182:22, 182:23, 198:16
**level** [8] - 15:1, 91:10, 171:5, 183:7, 183:8, 196:16, 204:8, 231:11
**levels** [1] - 171:15
**Levin** [1] - 2:12
**LEYIMU** [1] - 4:8
**license** [2] - 119:17, 119:18
**licensed** [2] - 217:1, 225:24
**life** [2] - 201:3, 221:1
**life-style** [1] - 221:1
**light** [1] - 222:16
**lightly** [1] - 31:9
**likely** [5] - 107:7, 126:3, 127:21, 234:10, 234:19
**limit** [1] - 66:16
**Limit** [3] - 107:22, 108:4, 108:17
**limitation** [4] - 66:12, 66:16, 222:1, 222:6
**limitations** [3] - 41:25, 43:13, 55:9
**limited** [15] - 38:1, 38:19, 39:7, 43:6, 62:5, 73:24, 90:6, 90:17, 114:1, 116:12, 116:13, 224:3, 224:5, 224:7, 235:4
**limiting** [2] - 41:14, 75:3
**limits** [2] - 177:25,

178:4
**LINDA** [1] - 4:5
**line** [9] - 73:19, 79:22, 166:7, 198:13, 207:7, 213:12, 226:18, 229:15, 234:24
**lines** [4] - 213:5, 243:11, 243:14, 247:11
**link** [2] - 26:8, 26:9
**Lisa** [2] - 6:18, 250:3
**List** [1] - 247:24
**list** [11] - 123:19, 129:19, 129:21, 130:6, 130:9, 130:12, 130:14, 132:18, 149:2, 155:1, 202:16
**listed** [3] - 80:23, 229:2, 242:5
**listen** [1] - 245:9
**listened** [2] - 64:1, 245:8
**listing** [1] - 227:2
**lists** [1] - 164:14
**literally** [4] - 12:13, 14:25, 83:25, 205:13
**litigants** [1] - 128:14
**litigation** [1] - 208:4
**live** [2] - 40:15, 127:12
**living** [1] - 155:21
**LLC** [1] - 2:4
**load** [1] - 24:6
**loaded** [1] - 25:2
**local** [3] - 25:4, 137:19, 211:14
**located** [9] - 20:16, 20:17, 20:18, 45:10, 45:14, 45:15, 88:17, 216:19, 216:22
**location** [1] - 19:23
**lodge** [1] - 98:4
**Logan** [2] - 6:5, 6:12
**look** [63] - 14:2, 25:20, 30:13, 30:23, 39:17, 48:22, 57:11, 68:22, 87:8, 87:11, 92:21, 117:10, 118:13, 121:5, 121:10, 129:19, 133:24, 138:7, 141:5, 145:3, 149:2, 157:16, 173:21, 173:24, 177:23, 178:10, 179:8, 179:17, 179:19, 186:13, 186:15, 186:17, 192:21, 193:22, 197:3, 197:15,

198:10, 198:15, 198:25, 216:7, 218:20, 218:23, 218:24, 220:18, 222:15, 223:2, 224:23, 225:2, 225:3, 225:15, 226:3, 226:18, 227:10, 227:11, 235:17, 236:19, 237:2, 242:3, 242:22, 245:16, 246:5, 246:14
**Look** [1] - 233:12
**looked** [13] - 17:10, 40:3, 40:4, 74:20, 92:25, 113:7, 167:24, 170:1, 190:6, 226:4, 236:11, 238:23, 244:15
**looking** [29] - 14:18, 14:19, 14:20, 24:17, 25:14, 25:25, 37:21, 42:15, 55:13, 85:20, 92:8, 120:3, 138:15, 142:16, 142:19, 143:19, 164:25, 170:7, 174:2, 178:24, 179:13, 179:16, 182:8, 226:11, 227:5, 227:21, 233:3, 238:11
**looks** [11] - 21:1, 32:8, 110:5, 111:3, 182:5, 182:6, 182:9, 182:15, 184:6
**lose** [1] - 124:21
**lost** [1] - 207:24
**loud** [8] - 10:18, 36:19, 60:14, 67:5, 68:23, 118:4, 118:15, 145:3
**loved** [1] - 207:24
**low** [1] - 124:11
**lower** [2] - 200:7, 200:8

## M

**ma'am** [9] - 10:9, 10:15, 29:11, 36:16, 44:16, 61:2, 147:25, 158:23
**Magazine** [1] - 3:7
**magnify** [1] - 226:15
**MAHADY** [1] - 6:4
**Mahoney** [4] - 237:9, 242:3, 242:8, 245:18

**mail** [1] - 175:23
**MAINIGI** [1] - 4:12
**maintain** [15] - 11:14, 35:9, 46:9, 47:5, 47:16, 48:11, 69:8, 80:20, 118:23, 119:5, 173:3, 180:23, 180:25, 181:4, 201:1
**maintained** [1] - 173:22
**maintaining** [5] - 30:7, 117:16, 152:10, 173:10, 177:20
**MAJESTRO** [15] - 2:6, 122:8, 124:4, 124:16, 124:20, 125:19, 127:8, 128:18, 132:23, 133:4, 134:1, 134:20, 136:3, 137:14, 138:8
**Majestro** [9] - 2:6, 122:7, 124:3, 124:19, 129:7, 131:24, 132:22, 136:2, 136:12
**Majestro's** [1] - 131:5
**major** [3] - 41:22, 121:11, 191:10
**majority** [4] - 30:15, 117:12, 121:9, 191:1
**managed** [2] - 45:20, 45:22
**Management** [3] - 97:11, 97:13, 188:15
**management** [1] - 45:16
**manned** [1] - 171:13
**manner** [3] - 37:10, 75:2, 118:18
**manpower** [3] - 23:15, 23:17, 185:21
**Manual** [3] - 139:10, 139:11, 139:24
**manual** [4] - 139:12, 139:13, 139:16, 139:18, 139:25, 140:1, 140:3, 230:19
**manuals** [1] - 55:25
**manufacturer** [2] - 30:6, 148:14
**manufacturers** [11] - 117:3, 117:4, 117:15, 120:7, 144:25, 152:25, 176:24, 198:11, 207:13, 213:3, 235:1
**map** [4] - 7:17, 7:18, 196:20, 198:2

**Mapes** [11] - 10:25, 11:1, 11:3, 12:10, 12:11, 12:23, 224:14, 224:24, 237:16, 238:8, 239:4
**Mapes's** [1] - 238:23
**March** [2] - 129:4, 192:18
**marching** [1] - 138:1
**MARK** [1] - 3:16
**marked** [3] - 141:2, 219:13, 220:3
**market** [1] - 70:25
**Maryland** [1] - 46:5
**mask** [1] - 138:15
**Massachusetts** [1] - 94:15
**massive** [3] - 22:4, 25:7, 194:18
**material** [1] - 153:25
**materials** [7] - 53:6, 53:7, 53:9, 153:21, 153:23, 198:11, 248:18
**math** [5] - 17:25, 36:14, 124:13, 185:2, 185:4
**mathematical** [1] - 200:10
**matter** [7] - 54:4, 74:5, 157:2, 223:22, 229:9, 241:7, 250:5
**matters** [1] - 120:21
**MCCLURE** [1] - 6:3
**McConnell** [1] - 126:2
**MCGINNESS** [1] - 4:2
**McKesson** [101] - 5:8, 9:16, 10:14, 11:21, 12:4, 12:7, 12:19, 13:3, 13:22, 13:23, 14:7, 15:12, 15:17, 15:22, 16:22, 16:25, 17:3, 17:5, 18:6, 19:14, 20:9, 26:17, 31:19, 32:9, 35:17, 36:15, 36:24, 37:20, 40:12, 40:16, 44:13, 45:25, 47:5, 47:10, 47:16, 47:21, 47:22, 48:11, 48:16, 48:24, 58:12, 58:20, 58:25, 61:6, 84:14, 104:6, 109:8, 110:1, 212:11, 212:13, 212:16, 218:22, 219:6, 219:20, 219:22, 220:5, 220:9, 220:19, 220:24, 221:4, 221:11,

221:20, 222:1, 222:6, 222:18, 223:7, 226:1, 226:25, 227:7, 227:22, 228:1, 228:8, 228:11, 228:13, 229:2, 230:14, 231:10, 236:3, 236:12, 236:23, 237:3, 237:8, 238:9, 239:23, 240:8, 240:11, 241:11, 242:15, 242:19, 242:23, 243:6, 243:12, 243:20, 244:9, 244:16, 246:3, 248:6, 248:9
**McKesson's** [14] - 18:19, 19:19, 33:7, 37:14, 37:25, 39:6, 39:23, 46:2, 46:10, 49:2, 230:16, 236:9, 241:20, 246:19
**MDL** [5] - 73:25, 74:1, 75:4, 76:19, 203:23
**mean** [32] - 9:7, 9:8, 10:13, 18:11, 24:3, 24:13, 28:15, 44:1, 44:2, 48:8, 58:6, 63:18, 68:24, 70:22, 72:17, 80:18, 104:5, 119:19, 132:25, 135:11, 137:7, 138:1, 147:7, 148:25, 170:3, 183:6, 205:25, 219:10, 230:4, 231:17, 240:15
**meaning** [2] - 23:8, 65:3
**meaningful** [1] - 89:16
**means** [9] - 30:2, 30:3, 41:15, 120:5, 127:15, 196:24, 203:17, 229:14, 245:11
**meant** [1] - 60:4
**measures** [1] - 117:14
**mechanical** [1] - 6:19
**medical** [8] - 22:9, 47:9, 47:19, 118:8, 197:8, 197:25, 203:16, 203:18
**medication** [2] - 197:12, 201:4
**medicine** [4] - 29:2, 190:22, 191:3, 191:9
**Medipharm** [4] - 227:13, 227:14,

227:19, 227:21
**meet** [5] - 58:11, 145:11, 181:22, 197:7, 199:14
**meeting** [58] - 9:18, 9:19, 9:22, 10:11, 10:12, 10:13, 11:5, 11:6, 11:9, 12:4, 12:9, 12:11, 12:12, 13:2, 13:7, 13:12, 13:21, 13:22, 14:9, 14:16, 14:23, 14:25, 15:11, 31:20, 31:21, 31:22, 40:1, 40:14, 60:16, 60:18, 60:19, 60:23, 61:7, 85:4, 98:11, 98:25, 99:4, 99:9, 99:11, 99:23, 101:11, 101:20, 201:4, 212:13, 219:6, 219:20, 219:22, 220:14, 222:11, 222:17, 232:8, 237:10, 237:11, 238:13, 239:9, 239:10
**meetings** [16] - 7:24, 28:6, 39:16, 85:2, 85:5, 85:8, 97:3, 99:12, 102:16, 103:14, 154:18, 212:7, 212:9, 220:9, 247:6, 248:1
**members** [3] - 97:18, 97:19, 98:6
**memo** [36] - 10:22, 11:4, 11:8, 14:6, 14:11, 15:11, 15:24, 16:5, 16:21, 58:5, 58:6, 219:5, 219:19, 221:17, 221:20, 221:22, 222:12, 224:11, 224:14, 224:24, 227:11, 229:2, 229:4, 231:19, 231:20, 231:23, 232:3, 232:8, 235:22, 235:23, 236:19, 236:23, 236:25, 239:3, 242:4
**memorandum** [2] - 46:19, 89:24
**Memorandum** [2] - 57:24, 96:11
**Memorandums** [1] - 182:24
**memory** [1] - 93:15
**mentioned** [6] - 11:1, 14:12, 79:11,

125:11, 152:16,
184:14
**mess** [1] - 192:4
**message** [6] - 99:19,
100:6, 101:10,
101:13, 101:19,
101:21
**met** [7] - 7:22, 19:14,
36:15, 84:22, 84:24,
97:7, 246:8
**methodology** [1] -
130:1
**methods** [1] - 190:20
**Miami** [1] - 23:17
**mic** [2] - 97:12, 158:16
**Michael** [5] - 10:25,
11:3, 224:24,
237:16, 238:8
**MICHAEL** [2] - 2:15,
3:9
**mid** [1] - 246:24
**middle** [1] - 151:12
**Midwest** [1] - 24:10
**might** [24] - 21:2,
22:11, 24:5, 72:24,
91:15, 95:2, 99:19,
104:15, 105:4,
105:19, 106:1,
106:16, 112:10,
118:7, 119:15,
135:12, 157:22,
160:7, 173:6,
174:12, 179:9,
201:17
**migration** [1] - 193:12
**Mike** [3] - 12:10,
12:11, 95:14
**MILDRED** [1] - 3:3
**mill** [6] - 22:10, 22:18,
23:1, 23:2, 23:5
**mill"** [1] - 22:21
**milligram** [1] - 24:17
**million** [8] - 60:21,
171:12, 191:13,
210:25, 227:6,
227:22, 228:1,
239:18
**mills** [12] - 22:14,
23:10, 24:5, 24:20,
24:24, 25:6, 25:24,
168:17, 191:18,
191:23, 202:3
**mind** [6] - 45:4,
104:21, 143:6,
190:13, 205:14,
241:20
**mindful** [2] - 136:1,
138:19
**minimum** [1] - 224:1
**minute** [9] - 20:14,

26:5, 41:18, 50:20,
86:8, 93:7, 100:1,
159:18, 170:18
**Minutes** [3] - 208:14,
208:19, 209:9
**minutes** [4] - 67:21,
98:11, 115:10, 241:4
**mischaracterizes** [1] -
120:18
**misconduct** [5] - 70:5,
70:14, 70:18, 70:23,
71:1
**misleading** [2] -
164:14, 166:8
**miss** [1] - 123:10
**missing** [1] - 145:17
**misstatement** [1] -
105:6
**misstates** [1] - 218:4
**Mitchell** [1] - 2:12
**mixed** [1] - 115:7
**modest** [1] - 159:23
**modification** [1] -
37:23
**modified** [4] - 23:8,
68:25, 69:2, 157:11
**modify** [1] - 23:8
**modifying** [1] - 221:5
**Mohr** [1] - 137:9
**moment** [5] - 85:11,
138:16, 145:2,
209:15, 233:6
**money** [1] - 128:10
**monitor** [2] - 19:20,
20:8
**Monitoring** [19] -
18:16, 50:13, 53:23,
178:2, 178:14,
179:6, 179:14,
182:3, 182:12,
182:17, 182:19,
216:14, 230:17,
230:22, 231:1,
231:7, 231:9, 240:8,
240:12
**monitoring** [9] -
18:20, 51:5, 52:18,
52:24, 55:7, 116:5,
117:1, 215:22,
216:13
**month** [7] - 104:4,
110:11, 110:19,
159:20, 227:2, 228:2
**monthly** [3] - 109:4,
111:22, 156:23
**months** [11] - 36:14,
158:3, 170:5,
225:25, 228:20,
232:5, 232:14,
232:19, 232:21,

232:23, 235:11
**Moreover** [1] - 117:14
**morning** [11] - 7:7,
7:11, 7:12, 7:16,
82:10, 87:10,
115:13, 123:18,
126:11, 146:1, 249:2
**Morris** [1] - 6:15
**mortar** [3] - 20:18,
20:21, 22:2
**most** [9] - 20:16,
20:17, 21:11, 23:13,
104:2, 123:23,
184:18, 210:17,
215:13
**motion** [2] - 33:5,
56:19
**motives** [2] - 208:20,
208:22
**Motley** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**MOUGEY** [1] - 2:12
**move** [28] - 11:11,
14:23, 33:1, 34:3,
43:18, 57:6, 85:18,
86:21, 88:12, 102:9,
142:22, 143:16,
144:12, 150:12,
154:3, 154:10,
155:8, 165:11,
176:4, 178:12,
188:1, 189:18,
193:18, 196:11,
204:14, 214:15,
223:12, 225:7
**moved** [3] - 22:15,
81:20, 176:17
**Moving** [1] - 95:7
**moving** [3] - 48:10,
55:25, 184:3
**MR** [244] - 2:3, 2:6,
2:9, 2:12, 2:15, 3:9,
3:11, 3:16, 4:17, 5:9,
5:10, 5:13, 6:4, 8:3,
8:6, 8:12, 8:20, 8:25,
11:14, 11:24, 12:2,
12:13, 13:5, 14:10,
14:22, 17:19, 18:25,
19:6, 19:22, 27:23,
33:4, 33:14, 33:23,
34:1, 34:18, 35:8,
35:12, 38:3, 38:21,
40:8, 40:13, 40:19,
40:22, 41:14, 42:2,
42:8, 42:24, 43:6,
46:12, 46:21, 49:10,
49:13, 49:20, 49:23,
50:4, 50:15, 50:19,
50:21, 51:9, 51:13,
51:15, 52:2, 53:1,

53:5, 53:21, 54:20,
55:5, 55:21, 55:23,
56:6, 56:22, 56:24,
57:18, 62:2, 62:15,
63:5, 63:25, 64:6,
64:20, 64:22, 65:7,
66:7, 66:10, 67:1,
69:23, 70:6, 70:11,
71:3, 71:12, 72:2,
75:5, 75:11, 83:3,
87:17, 93:21, 94:2,
98:16, 99:16, 99:21,
99:24, 100:10,
101:1, 101:14,
102:3, 102:19,
102:22, 102:24,
104:17, 104:19,
104:23, 105:5,
105:7, 105:21,
106:4, 106:11,
106:14, 106:22,
107:6, 109:19,
111:12, 112:5,
112:11, 113:9,
113:24, 114:3,
120:20, 122:8,
124:4, 124:16,
124:20, 125:19,
127:8, 128:18,
129:2, 131:20,
132:1, 132:23,
133:4, 133:11,
134:1, 134:2, 134:8,
134:20, 136:3,
136:11, 137:14,
137:24, 138:8,
138:10, 145:25,
146:20, 147:6,
150:15, 150:19,
154:7, 155:10,
159:22, 161:24,
162:6, 162:10,
163:25, 165:11,
165:16, 165:22,
166:6, 166:21,
169:16, 170:12,
170:24, 173:12,
173:15, 174:9,
175:8, 178:16,
183:18, 185:13,
189:24, 190:3,
191:19, 193:1,
194:2, 194:4,
194:13, 194:21,
195:13, 195:18,
196:6, 196:8,
203:22, 205:13,
206:7, 206:10,
207:5, 208:17,
208:22, 209:6,
209:23, 209:25,

210:3, 213:4, 213:6,
214:3, 214:4, 214:5,
214:7, 214:8,
214:11, 214:14,
214:16, 214:17,
218:6, 218:9, 219:1,
219:3, 219:4,
219:12, 219:14,
219:15, 219:17,
223:12, 223:15,
223:16, 223:18,
223:19, 223:21,
223:24, 224:5,
224:8, 224:9,
224:20, 224:22,
225:7, 225:12,
225:14, 229:17,
229:22, 229:25,
238:16, 238:22,
241:21, 241:25,
248:21, 248:24,
249:5
**MS** [355] - 3:3, 3:6,
3:14, 4:2, 4:5, 4:8,
4:12, 4:12, 4:15, 5:3,
5:4, 5:10, 6:3, 6:7,
6:14, 7:7, 7:15, 9:2,
10:3, 10:6, 10:17,
10:20, 10:21, 11:11,
12:3, 12:17, 12:25,
13:9, 13:10, 15:3,
15:7, 16:1, 16:3,
17:21, 18:5, 19:2,
19:7, 19:12, 20:2,
20:6, 22:20, 22:24,
23:3, 23:6, 26:6,
26:11, 26:12, 26:21,
27:3, 27:8, 27:11,
27:14, 27:16, 27:18,
28:2, 28:9, 31:25,
32:3, 33:1, 33:17,
34:13, 34:24, 34:25,
35:5, 35:15, 36:10,
38:9, 38:11, 38:13,
39:2, 40:18, 40:24,
41:5, 41:16, 41:20,
42:14, 42:18, 43:15,
44:5, 44:7, 46:15,
46:23, 47:2, 50:5,
50:7, 50:18, 50:25,
51:1, 51:17, 51:21,
51:23, 52:10, 52:11,
54:7, 54:15, 55:13,
56:9, 56:17, 57:7,
57:8, 57:22, 59:7,
59:10, 62:7, 62:11,
62:20, 62:21, 63:2,
63:17, 64:4, 64:18,
64:21, 65:1, 65:10,
65:14, 65:15, 65:20,
65:25, 66:22, 66:25,

67:7, 67:19, 68:1, 68:3, 68:5, 68:7, 69:25, 70:8, 70:15, 70:19, 70:20, 71:8, 72:5, 72:21, 72:22, 73:4, 73:5, 73:6, 73:7, 73:19, 74:7, 74:19, 75:7, 75:14, 76:7, 76:18, 76:25, 78:24, 79:2, 79:6, 79:19, 79:24, 79:25, 81:15, 81:23, 82:2, 82:7, 83:2, 83:14, 84:16, 84:18, 84:19, 85:11, 85:14, 85:17, 86:10, 86:15, 86:25, 87:4, 87:9, 87:23, 88:2, 88:11, 88:14, 89:2, 90:8, 90:12, 90:20, 91:2, 92:11, 92:14, 92:23, 93:9, 93:25, 94:7, 94:21, 94:23, 95:18, 96:1, 98:3, 98:10, 98:23, 99:17, 99:22, 100:4, 100:21, 101:7, 101:8, 101:18, 102:9, 102:10, 103:2, 103:5, 103:9, 104:18, 104:20, 104:25, 105:8, 105:12, 105:15, 106:25, 107:12, 107:20, 108:5, 108:8, 108:9, 108:10, 108:12, 108:13, 108:20, 108:23, 109:1, 109:10, 109:12, 109:20, 109:24, 110:13, 110:15, 110:25, 111:5, 111:25, 112:24, 113:11, 113:14, 113:18, 113:19, 114:16, 114:22, 115:4, 115:11, 115:12, 116:8, 116:11, 116:14, 120:17, 121:12, 121:21, 121:24, 122:3, 137:1, 138:24, 139:3, 139:4, 142:11, 142:16, 142:18, 142:24, 143:1, 143:3, 143:5, 143:9, 143:14, 143:18, 146:3, 146:4, 146:5, 146:11, 147:2, 147:15, 148:3,

148:6, 150:12, 150:18, 151:2, 153:3, 153:5, 154:3, 154:6, 154:10, 154:12, 155:8, 155:14, 155:23, 156:1, 158:11, 158:14, 160:2, 160:7, 160:9, 161:5, 161:11, 161:12, 162:13, 162:24, 163:7, 164:10, 164:21, 166:9, 167:7, 167:17, 169:23, 171:2, 171:17, 171:24, 173:17, 173:19, 174:24, 175:11, 176:4, 176:10, 176:11, 183:21, 184:5, 184:11, 185:11, 185:16, 187:6, 187:7, 188:1, 188:3, 188:7, 188:21, 189:18, 189:21, 190:4, 190:9, 190:11, 191:25, 192:7, 193:9, 193:17, 193:20, 193:25, 194:8, 194:25, 195:7, 195:21, 196:11, 196:12, 204:3, 205:17, 206:8, 206:13, 206:22, 206:25, 207:4, 207:10, 208:20, 209:1, 209:14, 209:17, 209:19, 218:4, 219:9, 241:19
**Mt** [3] - 3:15, 4:4, 4:9
**multiple** [4] - 24:24, 84:24, 131:1
**multipliers** [2] - 183:16, 183:24
**must** [5] - 94:20, 95:5, 95:13, 134:18, 203:14

---

**N**

---

**name** [4] - 18:18, 99:6, 230:16, 234:8
**names** [9] - 16:11, 16:13, 155:1, 224:12, 224:15, 224:18, 225:4, 225:10, 237:9
**narcotic** [1] - 235:4
**narcotics** [5] - 159:1,

159:3, 159:11, 235:5
**Narcotics** [1] - 189:3
**narrow** [2] - 133:19, 214:23
**national** [7] - 19:15, 19:24, 38:18, 38:20, 63:23, 66:4, 190:23
**nationwide** [8] - 18:23, 40:3, 40:7, 45:5, 67:11, 82:1, 82:6, 86:18
**nature** [5] - 70:1, 70:22, 85:4, 126:15, 174:12
**nearly** [2] - 210:24, 211:4
**necessarily** [4] - 131:14, 164:5, 194:14
**necessary** [4] - 123:22, 128:11, 197:5, 197:19
**need** [36] - 36:1, 39:3, 52:21, 54:24, 55:14, 62:9, 65:22, 85:10, 87:25, 93:13, 101:15, 123:21, 124:19, 125:8, 130:23, 131:22, 132:21, 138:19, 169:15, 172:18, 181:17, 188:12, 196:21, 198:4, 198:14, 200:15, 200:16, 201:18, 202:11, 202:24, 202:25, 218:10, 226:16, 236:19, 245:23
**needed** [2] - 23:16, 151:4, 171:13
**needs** [8] - 70:17, 134:14, 157:13, 163:1, 197:8, 197:25, 199:14, 203:17
**negative** [1] - 180:17
**neighborhood** [1] - 205:1
**nervous** [1] - 50:5
**netting** [1] - 191:8
**never** [13] - 98:19, 126:25, 127:1, 162:8, 182:16, 184:1, 186:15, 197:20, 199:21, 222:6, 230:21, 231:6
**Never** [1] - 127:4
**nevermind** [1] - 192:20

**Nevertheless** [3] - 222:16, 223:3, 223:4
**new** [7] - 9:25, 121:15, 121:16, 137:9, 145:24, 199:16, 248:21
**New** [5] - 3:5, 3:8, 78:2, 142:6, 188:16
**news** [1] - 208:14
**next** [19] - 19:10, 48:10, 77:6, 85:18, 86:1, 115:5, 118:14, 118:15, 125:4, 136:1, 137:11, 140:18, 156:11, 186:23, 214:1, 221:9, 222:10, 229:21, 243:10
**nexus** [1] - 26:10
**Nicholas** [4] - 53:20, 64:21, 67:6, 102:23
**NICHOLAS** [36] - 6:11, 51:13, 53:21, 55:5, 56:24, 62:2, 62:15, 63:5, 63:25, 64:6, 64:20, 64:22, 65:7, 66:7, 66:10, 67:1, 69:23, 70:6, 70:11, 71:3, 71:12, 72:2, 102:24, 104:23, 105:7, 106:14, 112:5, 154:7, 159:22, 162:10, 166:6, 173:15, 185:13, 194:21, 195:18, 196:6
**night** [1] - 124:5
**nine** [5] - 123:24, 225:25, 228:2, 228:20, 242:5
**nine-month** [1] - 228:2
**Ninth** [1] - 4:6
**Nobody** [1] - 83:11
**non** [8] - 8:13, 100:7, 123:22, 160:17, 160:22, 161:1, 166:5, 209:3
**non-compliance** [1] - 209:3
**non-controlled** [2] - 160:17, 160:22
**non-controls** [1] - 161:1
**non-cumulative** [1] - 123:22
**non-hearsay** [1] - 100:7
**non-privilege** [1] - 8:13

**non-public** [1] - 166:5
**noncompliance** [3] - 37:25, 39:6, 100:24
**None** [1] - 83:11
**none** [3] - 33:14, 154:4, 166:17
**Nonetheless** [1] - 117:17
**noon** [3] - 115:6, 115:8, 136:19
**north** [1] - 25:3
**note** [12] - 33:18, 49:20, 72:25, 74:10, 74:15, 74:23, 75:16, 76:3, 76:11, 106:11, 136:5, 137:17
**noted** [2] - 238:14, 239:2
**notes** [1] - 86:11
**Nothing** [1] - 235:19
**nothing** [5] - 56:24, 111:9, 194:14, 209:19
**Notice** [1] - 194:14
**notice** [17] - 12:20, 29:1, 58:10, 94:25, 95:6, 95:7, 100:22, 116:13, 150:20, 150:23, 181:16, 194:10, 194:23, 223:19, 224:2, 224:6, 232:25
**notified** [2] - 146:25, 221:10
**notifies** [1] - 223:5
**notwithstanding** [2] - 60:11, 60:15
**Notwithstanding** [1] - 89:14
**November** [1] - 221:10
**number** [36] - 16:12, 18:1, 28:17, 33:5, 33:6, 37:18, 45:3, 73:4, 73:5, 73:6, 85:24, 108:5, 108:6, 108:11, 124:11, 126:9, 139:5, 142:24, 154:25, 163:10, 187:3, 190:7, 192:24, 192:25, 193:24, 199:8, 201:23, 201:24, 201:25, 202:14, 202:15, 219:14, 233:4
**Number** [12] - 73:2, 77:7, 77:19, 78:6, 79:17, 80:1, 80:14, 96:6, 98:1, 120:9, 120:10, 193:20

**numbering** [1] - 233:18
**numbers** [5] - 17:7, 134:23, 183:5, 183:6, 184:21
**NW** [6] - 2:10, 4:6, 4:13, 4:15, 5:5, 5:12
**NY** [1] - 3:5

# O

**O'Connell** [1] - 98:15
**oath** [4] - 7:13, 49:22, 49:24, 238:9
**Object** [2] - 109:19, 120:17
**object** [50] - 18:25, 22:20, 26:6, 33:4, 35:5, 35:10, 38:24, 40:8, 41:14, 42:8, 42:19, 46:21, 49:10, 49:14, 50:15, 62:2, 62:4, 62:15, 63:25, 64:18, 66:7, 66:10, 66:15, 67:3, 71:3, 71:12, 71:15, 74:4, 74:10, 75:1, 76:8, 78:24, 87:23, 88:15, 90:20, 98:16, 99:24, 106:5, 109:20, 112:8, 125:13, 146:5, 147:6, 147:8, 150:23, 165:19, 185:14, 188:5, 189:25, 206:8
**objected** [1] - 160:7
**objecting** [1] - 33:21
**Objection** [26] - 69:23, 70:11, 81:15, 82:2, 83:2, 90:8, 94:21, 95:18, 102:19, 104:17, 105:5, 105:21, 110:25, 111:12, 112:5, 113:9, 121:21, 185:11, 191:19, 191:20, 206:22, 207:4, 207:5, 208:17, 218:4, 241:19
**objection** [128] - 11:15, 11:18, 11:23, 12:15, 13:5, 14:10, 17:19, 17:22, 18:25, 19:9, 19:10, 19:22, 20:3, 23:4, 26:12, 26:14, 26:19, 27:3, 27:23, 34:9, 34:10, 34:11, 35:9, 38:3, 38:14, 38:22, 38:23,

39:1, 41:3, 42:22, 46:12, 50:23, 51:13, 51:16, 52:2, 53:3, 54:5, 54:20, 57:5, 57:18, 63:5, 64:11, 64:23, 64:25, 66:19, 67:4, 67:5, 70:6, 71:16, 72:2, 73:19, 75:18, 76:24, 79:4, 79:21, 79:22, 86:13, 87:2, 88:13, 88:24, 93:7, 95:3, 98:4, 99:16, 100:2, 101:5, 101:14, 102:8, 103:7, 105:8, 105:17, 106:25, 111:15, 112:16, 114:4, 114:6, 116:13, 133:2, 136:10, 145:25, 146:8, 146:20, 146:22, 150:14, 150:15, 154:4, 154:8, 155:9, 155:10, 155:23, 159:23, 161:9, 163:4, 163:25, 164:6, 164:11, 164:18, 166:10, 169:16, 169:21, 171:21, 173:12, 174:9, 175:8, 178:16, 178:21, 183:18, 188:2, 189:21, 189:22, 191:21, 194:13, 195:4, 195:20, 196:7, 196:9, 206:10, 206:24, 207:9, 209:4, 209:13, 223:14, 225:8, 225:11, 225:12
**objections** [23] - 33:22, 34:2, 38:22, 43:10, 55:17, 74:23, 74:24, 75:16, 76:4, 88:19, 89:1, 120:25, 123:5, 126:10, 126:12, 126:15, 126:16, 126:25, 134:23, 135:14, 171:18, 193:1
**objective** [1] - 138:1
**obligation** [3] - 167:5, 167:9, 173:10
**obligations** [7] - 49:2, 63:12, 115:21, 116:24, 144:9, 155:21, 171:14

**observations** [3] - 104:6, 180:18, 195:11
**observe** [6] - 62:13, 62:22, 178:1, 195:24, 196:3, 206:16
**observed** [7] - 70:10, 86:20, 95:17, 193:12, 205:19, 206:17, 206:18
**obtained** [1] - 165:3
**obtaining** [1] - 191:1
**Obviously** [1] - 229:13
**obviously** [4] - 93:10, 137:2, 189:24, 206:11
**Occam's** [1] - 57:4
**occasion** [1] - 83:23
**occur** [2] - 71:1, 200:23
**occurred** [5] - 15:4, 75:13, 91:9, 184:1, 215:9
**occurs** [1] - 140:20
**October** [10] - 16:7, 36:21, 212:1, 226:25, 227:19, 232:13, 232:16, 232:22
**OF** [2] - 1:1, 1:4
**offer** [5] - 34:21, 65:5, 193:1, 194:10, 224:1
**offered** [6] - 75:17, 76:3, 94:24, 167:11, 184:21, 188:5
**offering** [3] - 193:16, 194:7, 223:21
**office** [5] - 35:1, 149:1, 168:4, 188:9, 210:23
**Office** [4] - 154:19, 204:19, 210:21, 211:23
**Office's** [2] - 140:21, 176:21
**office's** [2] - 35:2, 188:10
**Officer** [1] - 161:14
**officer** [1] - 156:14
**officers** [2] - 23:19, 211:14
**Offices** [3] - 140:8, 140:9, 140:13
**offices** [1] - 140:16
**Official** [2] - 250:2, 250:3
**official** [10] - 147:4, 147:7, 147:11, 154:1, 187:20,

187:21, 189:12, 191:14, 192:14, 194:9
**officials** [3] - 36:20, 151:16, 151:18
**often** [3] - 156:22, 176:15, 195:25
**old** [1] - 166:12
**on-going** [2] - 113:4, 228:15
**on-site** [5] - 178:2, 230:21, 231:2, 231:4, 231:6
**Once** [1] - 228:21
**once** [1] - 149:3
**One** [3] - 5:11, 121:6, 188:22
**one** [111] - 9:12, 15:19, 17:10, 18:21, 19:23, 23:21, 27:2, 33:5, 33:21, 34:2, 34:8, 34:15, 37:5, 38:4, 38:13, 39:21, 43:21, 57:4, 57:9, 57:13, 57:24, 58:14, 58:22, 59:18, 60:17, 62:18, 64:23, 66:23, 69:4, 73:10, 75:18, 77:25, 78:19, 82:22, 90:10, 97:23, 98:12, 101:2, 102:5, 112:21, 117:20, 119:10, 120:12, 120:15, 121:1, 121:2, 121:8, 123:4, 125:18, 127:9, 130:7, 132:7, 132:25, 133:24, 134:8, 135:3, 135:16, 136:5, 137:2, 138:14, 139:19, 141:5, 142:22, 143:8, 143:9, 143:11, 153:10, 153:11, 156:10, 165:8, 166:1, 168:22, 183:2, 185:5, 186:8, 188:12, 190:25, 191:10, 191:12, 192:21, 193:16, 193:17, 194:21, 195:23, 196:1, 197:5, 201:22, 201:23, 201:24, 201:25, 202:15, 203:9, 212:15, 219:15, 224:18, 225:18, 227:13, 227:25, 229:1, 229:6, 229:7, 231:5,

231:21, 236:18, 236:20, 237:14, 237:21, 238:2, 238:3, 240:22
**one-third** [1] - 123:4
**ones** [6] - 135:18, 180:5, 207:24, 210:10, 215:9, 216:22
**ongoing** [1] - 175:16
**oops** [1] - 188:12
**open** [8] - 12:9, 113:4, 158:9, 210:10, 210:16, 218:1, 218:18, 228:9
**operate** [2] - 45:1, 234:4
**operated** [4] - 19:14, 45:14, 48:14, 80:23
**operates** [1] - 231:16
**operating** [16] - 19:18, 22:8, 25:24, 30:3, 40:7, 45:5, 58:4, 63:10, 64:15, 67:14, 182:6, 182:9, 182:14, 182:15, 184:25, 216:20
**operation** [2] - 26:16, 88:21
**operational** [1] - 182:5
**operations** [4] - 23:16, 220:20, 230:19, 248:10
**opinion** [22] - 19:25, 38:7, 56:3, 57:1, 166:24, 169:17, 169:18, 169:19, 173:12, 173:13, 178:17, 178:18, 191:20, 193:5, 193:10, 194:20, 196:8, 203:22, 205:13, 227:16
**opinions** [3] - 42:10, 130:1, 164:2
**opioid** [7] - 126:22, 195:25, 200:6, 207:13, 208:4, 212:4
**opioids** [6] - 21:25, 69:19, 79:12, 193:13, 195:11, 196:5
**opportunity** [1] - 28:19
**opposed** [5] - 112:2, 112:13, 146:7, 223:22, 239:16
**option** [1] - 136:7
**oral** [1] - 241:16
**Order** [153] - 18:16,

28:11, 28:13, 28:14, 28:15, 28:16, 28:25, 29:4, 29:5, 29:15, 29:16, 29:17, 29:18, 29:19, 29:20, 29:25, 30:21, 31:5, 31:9, 31:10, 31:12, 31:19, 32:9, 32:10, 32:15, 32:18, 32:20, 33:2, 35:16, 35:18, 36:12, 36:18, 37:2, 37:4, 37:6, 37:12, 37:17, 37:24, 39:9, 39:12, 41:8, 43:18, 43:24, 45:25, 46:6, 46:13, 46:17, 50:13, 53:22, 58:20, 58:21, 58:24, 58:25, 59:2, 59:4, 59:12, 59:13, 59:16, 59:19, 59:22, 59:23, 59:24, 60:6, 60:7, 61:1, 61:5, 61:6, 61:10, 61:11, 63:3, 63:4, 63:21, 63:22, 65:17, 66:2, 66:3, 67:9, 69:3, 71:18, 71:19, 71:23, 71:25, 73:14, 73:16, 76:1, 77:3, 77:6, 77:11, 77:16, 77:17, 77:23, 77:24, 78:3, 78:4, 78:10, 78:13, 78:20, 86:5, 86:6, 88:5, 89:5, 89:6, 89:8, 89:9, 89:12, 89:13, 91:4, 91:5, 91:21, 91:22, 92:5, 92:6, 93:3, 94:11, 95:7, 95:8, 96:13, 96:14, 148:21, 148:22, 149:2, 170:25, 173:24, 178:1, 178:14, 179:6, 179:13, 182:2, 182:12, 182:17, 182:19, 206:4, 216:14, 230:17, 230:22, 231:1, 231:6, 231:8, 240:8, 240:12, 240:19, 241:10, 245:20, 246:23, 247:6

**order** [53] - 14:17, 29:9, 34:3, 51:5, 52:17, 52:24, 55:7, 67:11, 68:25, 69:1, 69:2, 75:2, 76:12, 103:21, 103:22, 103:23, 103:25, 104:10, 112:1, 112:13, 112:19,

112:20, 112:23, 112:25, 113:2, 115:2, 116:5, 116:25, 118:25, 145:12, 145:20, 147:23, 150:7, 150:9, 151:5, 152:4, 152:12, 158:4, 169:19, 172:11, 172:16, 172:20, 172:25, 183:10, 196:21, 211:18, 215:2, 215:22, 216:12, 235:18
**ordered** [1] - 89:15
**ordering** [8] - 57:2, 145:19, 145:21, 160:25, 186:13, 186:20, 191:5, 204:10
**Orders** [30] - 29:13, 30:9, 30:11, 30:20, 31:2, 46:1, 69:12, 80:7, 80:8, 80:19, 81:18, 81:19, 81:25, 82:1, 82:5, 82:8, 82:9, 89:3, 89:4, 115:16, 115:17, 185:24, 185:25, 206:2, 206:3, 246:16, 246:19, 247:3, 247:4, 247:8
**orders** [74] - 13:17, 18:12, 20:23, 28:24, 48:9, 48:17, 49:1, 49:3, 64:13, 64:16, 69:15, 81:9, 82:21, 89:21, 95:22, 95:23, 95:25, 102:18, 103:11, 103:14, 103:15, 103:19, 104:2, 104:3, 104:7, 104:9, 104:10, 104:12, 105:19, 106:1, 106:16, 107:3, 107:15, 107:17, 109:25, 114:11, 116:5, 118:5, 118:7, 119:7, 119:20, 138:1, 140:4, 140:25, 141:1, 145:9, 145:17, 150:2, 152:7, 152:9, 156:4, 159:14, 159:17, 169:11, 169:12, 173:4, 178:7, 178:25, 179:10, 183:3, 183:16, 183:24, 186:14, 214:19, 217:18,

217:19, 222:3, 244:4, 244:11, 244:17, 244:21, 247:15
**organization** [1] - 97:16
**originally** [2] - 24:8, 65:21
**Orlando** [2] - 67:13, 69:9
**Orleans** [1] - 3:8
**otherwise** [3] - 9:1, 58:15, 124:13
**ought** [1] - 33:12
**out-manned** [1] - 85:21
**out-of-court** [1] - 188:4
**outgoing** [1] - 178:25
**outrageous** [1] - 95:11
**outside** [12] - 75:17, 133:3, 133:4, 170:15, 179:6, 181:12, 195:16, 203:22, 221:11, 234:4, 238:17, 239:20
**Outside** [1] - 195:18
**overall** [1] - 198:16
**overlap** [1] - 130:9
**overlapping** [1] - 130:23
**overrule** [23] - 11:17, 17:22, 20:3, 26:14, 26:18, 38:25, 41:3, 42:22, 64:10, 66:19, 71:16, 76:24, 88:23, 95:3, 111:14, 112:16, 120:25, 146:22, 163:3, 164:17, 178:21, 191:21, 206:24
**Overrule** [1] - 79:4
**Overruled** [16] - 72:4, 81:17, 82:3, 83:10, 90:9, 95:19, 102:21, 103:3, 109:22, 111:1, 113:13, 114:18, 121:22, 189:23, 203:24, 238:20
**overruled** [21] - 11:18, 11:23, 14:13, 15:5, 28:3, 42:12, 46:25, 62:17, 63:7, 71:6, 79:21, 90:23, 103:6, 103:7, 126:12, 147:10, 155:13, 155:25, 218:8,

241:23
**oversaw** [2] - 198:8, 210:22
**oversee** [1] - 210:9
**overseeing** [2] - 198:19, 210:5
**overwhelming** [1] - 117:12
**own** [6] - 90:21, 113:25, 166:20, 169:11, 182:10, 236:4
**owned** [2] - 48:14, 80:23
**Oxy** [4] - 23:25, 24:8, 24:17
**oxy** [2] - 24:4, 25:23
**oxycodone** [8] - 25:10, 25:11, 25:18, 27:21, 89:21, 199:2, 199:17, 200:13
**Oxycodone** [1] - 26:2

**P**

**P-00009** [1] - 68:4
**P-00013** [1] - 92:11
**P-00016** [3] - 31:25, 32:5, 35:13
**P-00032** [4] - 116:7, 141:23, 143:1, 144:12
**P-00049** [2] - 59:7, 59:11
**P-00298** [2] - 84:17, 96:25
**P-01207** [3] - 187:5, 188:1, 190:5
**P-016726** [2] - 187:4, 189:19
**P-02291** [2] - 153:3, 154:3
**P-08861** [1] - 139:2
**P-08873** [3] - 72:20, 72:23, 85:19
**P-09116** [2] - 10:3, 11:12
**P-09399** [1] - 92:12
**P-09616** [2] - 154:10, 155:8
**P-10** [1] - 139:7
**P-1200** [1] - 2:7
**P-1207** [4] - 233:4, 233:5, 233:8, 233:18
**P-14288** [2] - 108:10, 108:16
**P-16** [1] - 240:19
**P-16726** [1] - 188:24
**P-19525** [1] - 121:25
**P-23726** [1] - 148:3

**P-23733** [3] - 44:5, 44:8, 45:25
**P-23736** [5] - 148:7, 150:13, 226:5, 226:14, 227:17
**P-27** [1] - 157:6
**P-28** [1] - 86:1
**P-28007** [1] - 109:9
**P-28091** [1] - 108:3
**P-42383** [1] - 192:2
**P-42747** [3] - 108:20, 109:3, 109:25
**P-9116** [2] - 219:16, 219:18
**p.m** [2] - 184:9, 249:6
**P.O** [2] - 5:14, 6:8
**PA** [3] - 6:6, 6:13, 6:15
**package** [2] - 61:19, 144:11
**packaged** [1] - 148:15
**packager** [1] - 148:14
**packet** [3] - 85:19, 141:24, 240:23
**page** [44] - 14:3, 14:4, 16:2, 16:5, 48:10, 48:21, 72:25, 73:8, 73:10, 77:6, 79:20, 86:1, 96:7, 116:16, 117:6, 117:9, 119:25, 120:1, 140:3, 140:23, 145:13, 151:12, 190:7, 192:10, 192:21, 193:16, 193:17, 193:19, 193:23, 220:17, 221:9, 222:10, 224:25, 225:2, 225:3, 235:25, 236:18, 237:1, 237:2, 239:5, 242:10, 243:10, 243:14
**Page** [51] - 15:24, 32:13, 32:15, 36:17, 47:4, 47:14, 47:25, 48:22, 57:25, 60:10, 60:12, 68:21, 79:17, 80:14, 81:1, 140:2, 144:13, 151:11, 154:22, 190:6, 190:7, 194:2, 194:3, 194:4, 213:5, 213:11, 222:23, 222:24, 222:25, 226:9, 226:14, 227:16, 232:12, 233:12, 233:18, 241:2, 241:11, 242:1, 242:4, 242:7,

242:12, 244:1,
244:22, 245:16,
245:22, 246:5,
246:15, 248:3,
248:8, 248:12
**Pages** [2] - 32:19,
33:2
**paid** [5] - 161:4,
161:23, 207:22,
208:3, 208:6
**pain** [8] - 22:4, 22:5,
22:6, 22:7, 22:18,
23:3, 23:9, 200:16
**palliative** [2] - 200:16,
201:2
**Papantonio** [1] - 2:12
**paper** [1] - 192:8
**papers** [1] - 17:10
**Paragraph** [22] -
36:17, 48:1, 48:15,
48:20, 57:25, 58:2,
58:8, 60:10, 68:22,
80:14, 81:6, 81:7,
89:12, 90:16, 92:16,
92:17, 92:20, 92:22,
120:8, 120:9, 145:8
**paragraph** [36] -
36:18, 47:12, 47:15,
48:22, 68:23, 80:15,
90:13, 92:25,
117:11, 118:2,
118:13, 118:14,
118:15, 118:20,
119:3, 140:8,
140:14, 140:15,
141:6, 145:14,
145:15, 190:14,
190:15, 190:17,
220:18, 221:10,
222:15, 222:16,
223:2, 236:2, 239:8,
244:2, 245:18,
245:21, 245:22,
248:13
**paragraphs** [1] - 237:2
**Paragraphs** [1] -
145:3
**part** [25] - 19:9, 21:11,
25:20, 35:4, 53:21,
73:15, 141:24,
145:5, 153:10,
154:1, 171:22,
173:10, 180:3,
181:1, 186:24,
192:20, 197:21,
197:23, 199:6,
210:11, 210:17,
216:9, 216:11,
240:2, 247:3
**participants** [1] -

128:16
**participated** [1] - 85:2
**participation** [1] -
246:19
**particular** [25] - 9:12,
24:16, 25:17, 39:18,
47:8, 47:18, 55:15,
58:17, 75:8, 75:20,
84:20, 86:11, 86:17,
86:21, 88:16, 95:9,
106:16, 130:22,
147:23, 147:24,
161:7, 162:4, 170:8,
205:8
**particularly** [3] -
74:11, 75:19, 205:6
**parties** [6] - 43:10,
74:16, 126:24,
127:14, 129:17,
132:8
**parts** [1] - 197:21
**party** [8] - 33:19, 34:8,
42:18, 55:19, 74:3,
163:14, 163:15,
165:4
**pass** [1] - 136:6
**passage** [1] - 171:20
**passed** [5] - 22:1,
136:5, 153:7,
215:12, 219:12
**passing** [1] - 220:3
**past** [7] - 24:9, 57:17,
121:20, 123:8,
152:13, 157:18,
183:16
**patient** [15] - 21:2,
21:6, 21:7, 21:9,
21:12, 21:19,
197:12, 197:20,
197:22, 197:23,
199:14, 199:21,
200:21, 202:25
**patients** [15] - 184:25,
197:11, 197:16,
199:10, 199:12,
200:2, 200:15,
201:2, 201:3, 201:5,
201:18, 203:2,
203:7, 203:11,
203:18
**patterns** [4] - 13:16,
186:14, 186:20,
204:10
**PAUL** [2] - 2:3, 5:9
**Paul** [1] - 220:5
**Pause** [3] - 85:13,
94:3, 209:18
**pay** [3] - 22:12, 150:4,
208:2
**payers** [2] - 163:15,

165:7
**PDAC** [1] - 192:12
**Peabody** [1] - 94:14
**PEARL** [1] - 3:6
**pending** [1] - 56:19
**Pensacola** [1] - 2:14
**Pentagon** [1] - 188:14
**people** [24] - 23:20,
24:4, 25:1, 53:15,
54:1, 93:24, 94:19,
136:20, 137:18,
149:2, 155:1,
156:23, 200:9,
200:12, 200:13,
200:24, 201:16,
201:25, 202:25,
205:1, 205:2,
210:13, 238:2
**per** [3] - 34:8, 108:24
**percent** [16] - 122:14,
122:16, 125:3,
184:24, 185:5,
190:24, 190:25,
200:20, 200:22,
201:16, 201:17,
201:19, 202:22,
203:4, 222:3
**percentage** [2] -
184:21, 201:13
**perfect** [3] - 36:8,
201:21
**perfectly** [1] - 112:15
**perform** [2] - 212:24,
213:13
**performed** [1] -
177:15
**perhaps** [2] - 142:24,
174:11
**period** [39] - 8:2,
16:10, 16:14, 26:3,
36:21, 53:14, 53:17,
53:18, 54:10, 55:10,
62:25, 63:6, 64:8,
105:11, 110:14,
126:7, 129:10,
159:23, 160:1,
160:5, 168:6, 168:7,
175:19, 178:25,
179:3, 183:5,
199:16, 211:22,
213:21, 214:13,
215:1, 215:23,
215:24, 218:1,
218:2, 228:2,
232:11, 233:1
**periodically** [1] -
176:13
**periods** [2] - 141:6,
141:7
**permission** [3] -

143:15, 158:12,
188:24
**permitted** [4] - 41:19,
65:3, 75:5, 86:20
**person** [5] - 33:21,
34:2, 118:25, 141:8,
237:11
**personal** [10] - 42:25,
45:8, 56:20, 66:13,
76:9, 90:21, 102:24,
113:25, 187:15,
189:8
**personally** [9] - 168:1,
217:23, 217:24,
220:1, 242:18,
242:22, 243:7,
244:7, 246:2
**personnel** [4] - 23:22,
210:22, 211:4,
220:21
**perspective** [2] -
130:15, 207:3
**pertaining** [2] -
216:11, 216:12
**PETER** [1] - 2:12
**Pharmaceutical** [2] -
148:2, 152:24
**pharmaceutical** [1] -
152:20
**pharmaceuticals** [1] -
190:25
**Pharmaceuticals** [1] -
148:11
**pharmacies** [86] - 9:5,
11:16, 13:15, 13:19,
14:8, 14:11, 14:16,
16:8, 16:11, 20:13,
20:15, 20:16, 20:17,
20:18, 21:21, 22:2,
22:18, 22:19, 23:9,
24:20, 24:25, 25:4,
36:22, 37:1, 39:18,
60:22, 60:25, 61:8,
79:10, 84:8, 88:17,
95:9, 95:10, 95:11,
96:21, 111:20,
117:15, 151:17,
167:25, 168:15,
168:16, 171:10,
171:11, 171:16,
175:24, 191:7,
199:12, 204:9,
215:5, 215:13,
215:16, 216:17,
216:25, 217:4,
217:18, 217:20,
218:1, 218:12,
219:8, 220:20,
221:14, 221:15,
221:20, 221:23,

222:2, 222:3,
222:18, 222:20,
223:6, 224:15,
225:15, 225:18,
225:22, 228:5,
228:8, 229:2, 230:4,
230:6, 233:23,
234:10, 234:19,
245:19, 246:3,
248:11
**pharmacies'** [1] -
13:20
**pharmacists** [1] -
26:25
**pharmacy** [36] - 16:14,
17:18, 17:24, 20:21,
20:22, 21:5, 21:16,
28:19, 29:2, 29:10,
30:5, 89:15, 89:20,
89:22, 119:13,
120:14, 121:6,
145:19, 145:21,
163:16, 163:18,
163:20, 170:8,
186:18, 191:12,
204:12, 216:20,
225:4, 227:6,
227:12, 228:11,
229:11, 230:1,
233:25
**Pharmacy** [2] -
192:12, 225:19
**pharmacy's** [1] -
161:4
**phase** [2] - 25:9,
131:14
**phentermine** [1] -
69:13
**Philadelphia** [2] - 6:6,
6:13
**phone** [1] - 21:12
**phrased** [1] - 19:5
**physical** [1] - 21:18
**pick** [6] - 7:20, 18:17,
125:25, 145:20,
180:4, 246:10
**picked** [3] - 33:9,
168:12, 168:13
**picking** [6] - 18:10,
18:13, 18:22, 18:23,
40:5, 239:11
**picture** [1] - 136:3
**PIFKO** [1] - 3:16
**pill** [12] - 16:19, 22:14,
22:18, 22:21, 23:4,
24:5, 24:24, 25:24,
168:16, 191:18,
191:23, 202:3
**pills** [11] - 16:22, 17:1,
24:19, 170:10,

191:3, 191:6, 191:8, 218:15, 227:6, 227:22, 228:1
**pinpointed** [1] - 103:16
**place** [15] - 9:19, 55:15, 67:18, 98:25, 99:13, 118:19, 122:1, 149:5, 176:15, 182:21, 191:24, 200:1, 222:7, 248:23, 248:24
**placed** [1] - 66:12
**places** [3] - 26:8, 140:12, 216:24
**placing** [1] - 118:25
**Plaintiff** [5] - 1:5, 1:11, 2:2, 3:2, 4:1
**plaintiffs** [21] - 76:19, 122:15, 123:1, 123:13, 129:19, 129:23, 130:3, 130:11, 130:16, 130:18, 130:21, 131:3, 131:15, 132:11, 132:17, 133:19, 134:12, 134:15, 136:15, 138:4, 214:2
**Plaintiffs** [1] - 250:6
**plaintiffs'** [1] - 137:7
**plan** [2] - 127:20, 128:4
**plane** [1] - 24:7
**plausible** [3] - 129:22, 131:10, 236:5
**play** [1] - 148:17
**Pleasant** [3] - 3:15, 4:4, 4:9
**pleasure** [1] - 134:5
**plus** [4] - 130:7, 131:12, 204:22, 205:4
**point** [50] - 19:16, 19:17, 22:3, 23:14, 29:5, 31:18, 39:14, 41:10, 57:10, 57:13, 58:18, 63:14, 75:8, 95:13, 113:20, 119:23, 125:10, 126:3, 128:19, 131:3, 132:16, 134:3, 135:16, 137:2, 137:14, 149:5, 152:6, 165:12, 165:16, 166:21, 167:6, 184:7, 194:23, 195:2, 201:22,

207:8, 209:12, 228:6, 228:8, 228:19, 230:1, 230:6, 230:13, 239:9, 239:25, 242:19, 242:24, 243:7, 244:10, 244:18
**pointer** [2] - 103:16, 113:3
**pointing** [1] - 126:15
**points** [6] - 38:13, 74:7, 76:7, 155:16, 155:18, 242:11
**police** [1] - 211:14
**policies** [7] - 177:20, 182:8, 215:21, 215:22, 216:11, 216:12, 221:5
**policy** [8] - 19:24, 175:16, 175:17, 175:20, 182:10, 216:10, 216:11, 231:10
**polite** [1] - 229:24
**Ponc** [1] - 2:4
**Ponce** [1] - 2:16
**population** [9] - 120:6, 181:7, 185:7, 186:18, 186:19, 197:23, 199:14, 200:21
**portion** [4] - 40:8, 65:24, 126:6, 203:18
**posed** [2] - 93:22, 162:25
**position** [12] - 30:5, 66:13, 97:22, 98:13, 132:19, 167:4, 173:8, 187:20, 187:21, 189:12, 214:19, 241:11
**positive** [1] - 180:17
**possible** [5] - 123:14, 141:10, 171:3, 213:23, 234:3
**possibly** [2] - 104:21, 141:9
**Post** [2] - 208:16, 209:9
**post** [4] - 116:22, 153:20, 153:23, 153:24
**posted** [2] - 153:19, 155:6
**potential** [5] - 103:16, 162:22, 244:4, 244:10, 244:17
**potentially** [2] - 104:7, 117:19

**powder** [1] - 197:1
**Powell** [1] - 2:6
**PR** [2] - 2:5, 2:17
**practical** [1] - 193:11
**practice** [4] - 29:2, 37:1, 141:12, 153:20
**practices** [5] - 26:16, 36:24, 151:5, 152:1, 156:4
**practitioners** [5] - 117:15, 120:12, 121:7, 234:10, 234:19
**pre** [2] - 50:19, 66:14
**pre-dates** [2] - 50:19, 66:14
**precise** [1] - 224:13
**precisely** [1] - 17:5
**prejudge** [1] - 209:12
**prejudiced** [1] - 132:12
**prejudices** [1] - 127:19
**prejudicial** [1] - 166:8
**prepared** [2] - 128:5, 153:25
**preparing** [3] - 126:11, 243:4, 243:5
**prescribe** [2] - 121:8, 184:15
**prescribed** [1] - 199:8
**prescriber** [1] - 186:6
**prescribers** [12] - 22:8, 171:12, 171:16, 184:22, 184:24, 185:3, 185:5, 185:7, 185:10, 185:18, 185:19, 186:2
**prescribing** [13] - 21:9, 121:7, 163:24, 164:23, 164:24, 165:1, 165:7, 184:19, 184:22, 185:3, 185:10, 186:16
**prescription** [22] - 21:4, 21:15, 21:17, 22:10, 23:1, 23:2, 23:10, 24:20, 24:24, 25:6, 117:18, 163:15, 186:7, 193:13, 194:11, 195:24, 195:25, 196:5, 202:9, 202:12, 202:20
**prescriptions** [10] - 18:2, 21:10, 22:13, 25:2, 25:3, 25:12, 120:13, 199:11,

202:1, 202:14
**present** [7] - 26:22, 27:1, 99:3, 99:5, 129:13, 131:16, 180:13
**presentation** [14] - 153:10, 153:12, 154:23, 154:24, 154:25, 155:2, 155:5, 192:13, 192:15, 192:17, 192:19, 194:9, 194:15, 194:18
**presentations** [9] - 25:19, 25:20, 25:21, 26:23, 26:24, 152:17, 153:24, 154:18, 154:20
**presented** [10] - 13:4, 13:13, 14:16, 28:8, 28:16, 130:17, 131:11, 134:4, 155:2, 162:7
**preserve** [1] - 11:24
**preserved** [2] - 67:4, 79:22
**preserving** [1] - 225:8
**press** [2] - 9:1, 115:10
**pretty** [12] - 23:16, 88:20, 132:2, 134:9, 172:23, 173:1, 181:14, 215:12, 223:24, 229:18, 240:23, 245:7
**prevent** [5] - 117:14, 151:5, 167:10, 169:15, 204:5
**previous** [1] - 141:14
**previously** [9] - 39:9, 48:25, 67:12, 86:12, 97:2, 141:25, 152:16, 171:17, 244:19
**Prevosnick** [1] - 56:4
**Prevosnik** [1] - 55:25
**Prevoznik** [2] - 56:18, 56:19
**Prevoznik's** [1] - 167:8
**printout** [1] - 111:22
**privilege** [7] - 8:13, 8:15, 49:15, 49:21, 120:22, 120:23
**privileged** [6] - 8:8, 43:4, 49:19, 106:7, 120:22
**probe** [1] - 112:9
**problem** [7] - 8:23, 25:9, 27:24, 38:19, 49:23, 87:20,

125:22, 134:10, 146:24, 157:14, 164:1, 164:4, 194:19, 197:14, 201:7, 201:11, 202:2
**problematic** [1] - 61:8
**problems** [4] - 43:23, 60:5, 95:21, 164:19
**procedure** [1] - 182:10
**procedures** [11] - 96:20, 177:20, 178:5, 178:11, 179:9, 182:8, 220:24, 244:2, 244:8, 244:16, 244:20
**proceed** [6] - 41:4, 68:1, 88:25, 119:24, 165:20, 209:25
**proceeded** [1] - 38:4
**proceeding** [3] - 37:9, 87:23, 149:10
**Proceedings** [3] - 6:19, 67:25, 184:9
**proceedings** [1] - 250:5
**PROCEEDINGS** [1] - 7:1
**process** [21] - 8:15, 49:16, 120:23, 134:23, 135:8, 149:7, 157:19, 175:1, 175:4, 180:3, 180:15, 182:13, 218:12, 220:24, 221:1, 229:13, 229:14, 229:23, 241:5, 241:7
**processed** [1] - 178:8
**processes** [2] - 42:5, 178:11
**Proctor** [1] - 2:12
**produced** [1] - 6:19
**products** [5] - 18:14, 40:5, 89:21, 200:5, 247:24
**program** [6] - 54:2, 54:3, 58:16, 62:14, 62:24, 64:7
**Program** [3] - 18:17, 182:17, 230:17
**Programs** [3] - 50:13, 240:9, 240:13
**programs** [3] - 161:16, 166:20, 181:23
**prohibited** [1] - 41:11
**promised** [1] - 7:17
**proof** [1] - 122:18
**proper** [3] - 33:21, 112:15, 238:19

**properly** [1] - 150:21
**proportion** [1] - 125:2
**proposal** [2] - 133:16, 136:16
**propose** [1] - 133:22
**proposed** [4] - 136:12, 242:7, 246:6, 246:14
**proposing** [4] - 130:3, 130:18, 133:19, 134:16
**proprietary** [1] - 169:5
**protocol** [1] - 112:23
**protocols** [3] - 55:15, 178:5, 179:9
**prove** [2] - 124:2, 124:25
**proven** [1] - 71:13
**provide** [22] - 27:20, 66:13, 74:13, 94:24, 110:21, 112:8, 115:18, 118:10, 140:9, 150:1, 152:3, 157:21, 168:9, 168:24, 172:19, 173:2, 183:22, 186:10, 215:1, 218:14, 235:2, 236:4
**provided** [25] - 12:18, 26:23, 57:15, 57:16, 60:15, 67:3, 74:8, 75:17, 117:24, 121:20, 141:16, 152:11, 152:13, 152:17, 153:16, 154:1, 156:7, 173:5, 182:1, 191:15, 192:15, 211:5, 217:14, 217:16, 248:10
**providers** [2] - 184:15, 184:19
**provides** [3] - 58:10, 116:24, 196:20
**providing** [5] - 22:9, 95:1, 145:5, 145:14, 243:20
**provision** [8] - 49:5, 50:10, 57:24, 82:22, 172:5, 172:11, 198:24, 203:13
**provisions** [4] - 83:13, 89:24, 139:25, 172:7
**proxy** [1] - 34:18
**public** [16] - 8:8, 8:12, 30:1, 35:1, 61:14, 61:16, 61:21, 81:14, 120:24, 141:3, 166:2, 166:5, 170:13, 188:8, 188:9, 188:18

**publicly** [3] - 49:17, 170:16, 205:22
**publish** [1] - 198:18
**published** [4] - 149:15, 149:18, 149:19, 149:20
**pull** [5] - 16:1, 31:25, 59:7, 227:10, 232:16
**pulled** [2] - 35:4, 232:18
**pulls** [1] - 21:6
**Purchase** [2] - 109:15, 145:10
**purchase** [15] - 103:17, 103:18, 103:20, 104:3, 109:17, 112:2, 112:14, 113:7, 113:21, 114:24, 115:1, 213:22, 214:19, 214:22, 214:24
**purchased** [3] - 161:22, 162:16, 163:6
**purchases** [4] - 13:20, 104:12, 234:9, 234:18
**pure** [7] - 19:1, 53:1, 54:21, 55:2, 169:16, 173:12, 195:13
**purported** [2] - 53:5, 216:4
**purportedly** [1] - 26:7
**purporting** [2] - 101:3, 206:8
**purpose** [10] - 11:4, 100:7, 116:13, 188:5, 193:4, 193:7, 194:7, 224:4, 224:5, 224:7
**purposes** [6] - 48:7, 80:17, 116:9, 175:25, 197:19, 224:1
**pursuant** [1] - 188:18
**pursue** [1] - 172:24
**purview** [3] - 30:25, 34:21, 56:1
**put** [37] - 28:1, 58:19, 60:2, 95:6, 96:23, 101:9, 113:16, 124:5, 124:14, 125:8, 126:7, 127:15, 129:22, 129:25, 131:4, 132:17, 132:25, 135:20, 147:21, 150:6, 156:10, 159:7, 173:9,

175:23, 190:9, 192:1, 193:21, 198:3, 200:25, 203:2, 222:6, 226:8, 226:14, 233:16, 235:26, 240:23
**putting** [10] - 54:2, 123:17, 124:7, 125:15, 135:7, 149:24, 166:10, 167:18, 190:1

## Q

**qualification** [1] - 105:16
**Quantico** [1] - 139:13
**quantify** [1] - 220:25
**quantities** [12] - 13:18, 14:19, 16:9, 17:9, 25:8, 36:23, 84:7, 89:14, 145:20, 145:22, 168:14
**quantity** [1] - 157:23
**quarter** [1] - 159:20
**quarterly** [1] - 156:24
**questioned** [5] - 74:1, 74:16, 74:19, 74:21, 75:24
**questioning** [5] - 73:20, 74:4, 79:22, 166:7, 186:16
**questionnaire** [2] - 21:2, 21:14
**questionnaires** [2] - 20:24, 21:1
**questions** [12] - 8:22, 8:23, 90:15, 115:5, 121:2, 128:23, 146:19, 186:23, 195:4, 210:19, 229:19, 239:6
**quick** [1] - 242:11
**quicker** [1] - 135:21
**quickly** [2] - 33:24, 144:12
**quite** [7] - 41:9, 130:25, 133:14, 134:15, 179:15, 185:23, 203:4
**quitting** [1] - 136:19
**quota** [42] - 196:14, 196:17, 196:18, 196:22, 196:25, 197:4, 197:13, 197:14, 197:20, 197:21, 197:23, 197:25, 198:7, 198:8, 198:10, 198:13, 198:17,

198:19, 199:2, 199:6, 199:9, 199:10, 199:13, 199:20, 199:21, 199:22, 200:7, 200:8, 200:17, 201:14, 201:15, 202:21, 202:24, 203:6, 203:8, 203:10, 203:13, 203:15, 203:19, 204:4
**Quota** [1] - 200:10
**quote** [2] - 35:1, 238:9

## R

**Rader** [1] - 126:3
**radically** [1] - 131:7
**Rafferty** [2] - 2:12
**raise** [2] - 115:6, 186:4
**raised** [6] - 91:5, 114:7, 114:10, 169:4, 217:7
**raising** [1] - 221:6
**range** [2] - 221:6, 124:10
**Rannazzisi** [157] - 7:10, 7:16, 9:3, 10:7, 10:23, 12:4, 13:1, 13:11, 14:3, 15:3, 15:8, 16:4, 19:13, 23:7, 27:9, 27:19, 28:10, 32:4, 33:3, 36:1, 36:11, 38:17, 39:22, 41:6, 41:24, 42:16, 43:16, 44:8, 46:16, 46:24, 49:21, 50:8, 51:2, 51:18, 52:1, 52:12, 52:13, 54:16, 54:24, 56:2, 56:8, 56:9, 56:13, 57:9, 57:25, 58:13, 59:11, 63:18, 65:16, 65:22, 66:8, 67:8, 67:22, 68:4, 68:8, 70:1, 70:21, 72:6, 72:23, 73:8, 74:1, 74:15, 74:25, 75:24, 76:20, 77:1, 79:7, 80:1, 84:21, 86:2, 86:19, 88:3, 92:15, 92:25, 93:13, 94:8, 96:25, 98:13, 98:24, 101:9, 101:23, 102:11, 103:10, 105:16, 107:9, 107:21, 108:14, 109:2, 109:13, 111:16, 112:17,

114:10, 114:14, 115:13, 116:15, 121:13, 121:14, 121:15, 123:14, 138:13, 138:22, 138:25, 139:5, 141:15, 141:22, 142:20, 142:22, 143:6, 143:19, 144:18, 146:12, 146:23, 147:12, 147:22, 148:7, 152:16, 153:6, 154:13, 155:15, 156:11, 158:15, 160:3, 161:13, 161:25, 162:14, 164:22, 166:11, 166:14, 167:11, 170:23, 171:19, 172:2, 173:20, 175:13, 176:12, 178:22, 184:12, 187:8, 188:25, 190:5, 190:12, 192:9, 192:10, 195:8, 195:14, 195:22, 196:13, 198:4, 200:6, 203:6, 204:16, 205:18, 206:14, 207:1, 209:24, 233:20, 249:1
**Rannazzisi's** [6] - 11:19, 12:20, 73:21, 73:23, 74:9, 98:12
**rather** [13] - 11:22, 14:2, 35:4, 88:24, 93:15, 130:12, 132:18, 143:14, 145:2, 147:17, 203:11, 217:2, 221:22
**rationale** [1] - 131:1
**raw** [2] - 157:14, 158:9
**razor** [1] - 57:4
**re** [9] - 18:7, 20:14, 39:3, 39:5, 41:17, 123:16, 144:5, 148:14, 148:15
**re-evaluate** [1] - 123:16
**re-packaged** [1] - 148:15
**re-packager** [1] - 148:14
**re-sent** [1] - 144:5
**re-state** [3] - 18:7, 39:3, 39:5
**re-tread** [1] - 20:14

**reach** [2] - 31:18, 79:11
**reached** [2] - 50:1, 65:19
**reaction** [1] - 229:22
**read** [31] - 14:24, 16:5, 36:18, 47:14, 48:5, 48:22, 58:8, 60:14, 65:21, 65:24, 68:22, 80:15, 89:12, 90:13, 90:17, 93:13, 93:18, 93:19, 117:11, 118:3, 118:14, 120:9, 140:7, 148:20, 149:3, 151:14, 151:24, 213:16, 222:21
**reading** [7] - 81:6, 92:15, 93:15, 98:18, 145:3, 190:13, 238:16
**real** [3] - 134:10, 228:19, 235:17
**real-time** [1] - 235:17
**realized** [1] - 239:24
**really** [14] - 17:16, 20:22, 22:9, 27:6, 55:1, 123:19, 125:20, 127:5, 129:7, 130:4, 132:12, 137:24, 245:13, 245:15
**reason** [15] - 17:4, 18:4, 19:13, 51:25, 63:20, 66:2, 103:13, 130:21, 135:17, 141:1, 147:16, 175:15, 197:6, 204:24, 225:2
**reasonable** [1] - 141:8
**reasons** [7] - 11:18, 72:3, 136:20, 146:1, 153:22, 156:3, 175:13
**rebutting** [1] - 127:22
**receive** [7] - 110:6, 110:10, 146:15, 156:18, 156:21, 191:6, 191:7
**received** [10] - 16:8, 104:2, 107:18, 108:17, 112:1, 112:13, 123:5, 141:24, 227:22, 247:8
**receives** [2] - 157:12, 158:1
**receiving** [3] - 21:10, 104:9, 109:17
**recent** [1] - 220:9

**recess** [3] - 67:20, 122:4, 249:4
**Recess** [3] - 67:24, 122:6, 184:8
**recessed** [2] - 102:13, 249:6
**recipient** [1] - 223:17
**recites** [1] - 98:6
**recognize** [46] - 10:7, 10:10, 32:4, 32:7, 44:8, 44:10, 68:8, 68:10, 72:23, 73:11, 73:13, 77:7, 77:10, 78:7, 78:9, 80:3, 81:2, 86:2, 86:4, 109:2, 109:13, 116:19, 139:6, 139:9, 142:2, 142:4, 143:20, 143:22, 144:18, 148:7, 150:7, 153:9, 154:13, 154:17, 154:23, 172:13, 187:8, 187:11, 188:25, 189:2, 192:11, 192:14, 229:23, 247:17, 247:21
**recognized** [1] - 88:4
**recognizes** [1] - 117:12
**recollection** [10] - 13:7, 15:4, 42:25, 91:16, 92:9, 92:19, 93:1, 93:14, 94:9, 114:1
**recommend** [4] - 32:10, 59:21, 86:7, 89:5
**recommendations** [5] - 30:18, 30:21, 30:22, 31:2, 198:20
**recommended** [1] - 31:19
**recommending** [2] - 29:12, 31:5
**record** [20] - 8:18, 32:8, 35:1, 41:13, 56:3, 67:4, 67:6, 75:12, 93:16, 105:6, 113:25, 116:9, 188:8, 188:9, 188:11, 188:18, 190:1, 223:25, 225:9, 250:5
**recorded** [1] - 6:19
**recording** [1] - 223:25
**recordkeeping** [1] - 179:17
**records** [5] - 86:25,

173:3, 173:10, 173:22, 173:24
**recount** [3] - 13:2, 14:6, 15:11
**recounts** [1] - 98:11
**red** [5] - 14:21, 121:5, 121:11, 151:9, 161:1
**redacted** [1] - 16:12
**reduce** [3] - 201:16, 201:17
**reduced** [1] - 202:15
**Reed** [2] - 6:4, 6:11
**refer** [3] - 69:2, 149:7, 214:18
**reference** [9] - 139:14, 222:11, 226:12, 227:18, 235:10, 243:11, 243:17, 248:5, 248:9
**referenced** [3] - 40:13, 75:3, 75:22
**references** [2] - 74:14, 239:8
**referencing** [2] - 220:15, 221:23
**referred** [4] - 40:11, 143:10, 147:23, 161:25
**referring** [3] - 31:21, 32:18, 143:11
**refills** [3] - 202:9, 202:11, 202:19
**reflect** [13] - 70:9, 79:2, 90:1, 90:14, 117:24, 121:15, 141:16, 151:3, 155:19, 155:20, 156:7, 187:23, 191:14
**reflects** [1] - 11:8
**refresh** [5] - 91:15, 92:9, 92:19, 93:1, 94:9
**refreshes** [1] - 93:14
**regard** [5] - 11:20, 43:1, 43:6, 53:25, 89:1
**regarding** [7] - 170:13, 173:3, 200:5, 219:7, 244:15, 248:10
**regardless** [1] - 168:12
**Register** [4] - 149:21, 149:24, 150:10
**register** [2] - 119:12, 210:13
**registered** [9] - 117:13, 140:11, 184:16, 217:1,

217:5, 218:2, 225:25, 227:7, 228:2
**registrant** [7] - 28:18, 113:1, 119:1, 119:21, 141:11, 156:24, 169:8
**registrants** [23] - 25:16, 115:21, 117:14, 117:25, 139:21, 140:24, 140:25, 141:13, 141:14, 141:20, 143:23, 144:4, 145:23, 150:1, 150:4, 153:17, 156:3, 156:7, 157:3, 173:2, 176:21, 176:23, 205:11
**registrants'** [1] - 116:3
**Registration** [1] - 59:13
**registration** [18] - 28:21, 28:22, 30:4, 37:13, 37:14, 37:18, 37:23, 117:20, 118:12, 119:11, 140:10, 148:11, 150:8, 185:18, 210:16, 230:7, 230:9, 236:22
**registrations** [2] - 117:23, 119:10
**regularly** [3] - 38:5, 212:20, 214:12
**regulate** [1] - 205:10
**regulated** [1] - 100:24
**regulation** [3] - 147:19, 172:15, 172:18
**Regulations** [2] - 179:21, 179:23
**regulations** [1] - 141:10
**regulator** [2] - 100:23, 205:10
**regulators** [4] - 152:25, 207:25, 208:1
**regulatory** [5] - 145:11, 212:24, 213:2, 213:13, 234:2
**reinforces** [1] - 116:23
**reiterate** [2] - 116:2, 147:20
**relate** [2] - 78:1, 78:11
**related** [4] - 31:3, 43:1, 76:4, 140:10
**relates** [3] - 11:15, 88:16, 211:22
**relating** [1] - 116:25

**relationship** [6] - 20:20, 195:12, 205:7, 205:9, 205:10, 205:20
**release** [1] - 43:3
**Release** [3] - 44:11, 68:11, 80:4
**relevance** [6] - 17:19, 26:13, 146:21, 208:17, 208:18, 209:5
**Relevant** [1] - 223:16
**relevant** [4] - 17:20, 163:1, 166:19, 211:21
**rely** [4] - 42:21, 118:24, 119:9, 145:16
**remained** [8] - 218:1, 218:17, 225:17, 225:24, 227:7, 228:2, 228:9
**remaining** [3] - 122:22, 125:12, 137:12
**remarks** [1] - 187:23
**remember** [32] - 65:18, 79:13, 87:6, 87:7, 107:11, 121:2, 147:22, 149:17, 170:4, 187:3, 212:8, 213:7, 219:5, 219:18, 224:11, 225:21, 228:6, 230:14, 232:4, 232:17, 232:18, 237:10, 237:11, 237:15, 239:12, 241:4, 243:24, 244:22, 244:24, 245:4
**remind** [1] - 204:16
**removed** [1] - 93:11
**removing** [1] - 125:21
**renew** [1] - 63:5
**repeat** [15] - 13:25, 14:2, 20:5, 45:18, 50:9, 62:18, 66:23, 70:16, 90:10, 180:25, 203:9, 204:1, 217:3, 221:18, 244:12
**repeatedly** [1] - 151:16
**rephrase** [2] - 22:25, 196:1
**report** [26] - 48:16, 49:1, 49:3, 64:16, 69:14, 81:9, 82:20, 89:21, 100:5,

103:24, 108:3,
109:4, 109:7, 110:1,
110:2, 112:20,
140:4, 140:24,
140:25, 145:9,
156:23, 156:25,
157:9, 158:21,
160:14, 239:20
**Report** [6] - 107:22,
108:4, 108:17,
109:15, 145:10,
157:11
**reportable** [1] - 69:12
**reported** [3] - 156:22,
158:24, 250:9
**Reporter** [6] - 6:17,
6:18, 250:3, 250:12
**REPORTER** [7] - 8:10,
10:19, 27:10, 27:12,
40:21, 49:12, 71:20
**reporter** [2] - 65:21,
65:24
**reporting** [15] - 79:9,
84:9, 102:17,
103:11, 111:18,
114:8, 116:6, 118:5,
141:11, 145:15,
160:18, 172:11,
198:8, 215:2, 239:24
**reports** [40] - 36:20,
40:17, 103:17,
103:18, 103:20,
109:17, 110:6,
110:8, 110:21,
111:11, 112:1,
112:2, 112:3,
112:13, 112:14,
112:19, 112:23,
112:25, 113:2,
113:7, 113:21,
114:24, 115:2,
118:16, 128:3,
133:3, 133:4,
213:22, 214:22,
214:24, 243:11,
243:12, 243:17,
243:21, 243:25,
244:23, 245:4, 247:8
**Reports** [2] - 69:12,
173:25
**represen** [1] - 83:15
**represent** [4] - 33:19,
55:19, 155:16,
189:15
**representative** [1] -
99:13, 187:15,
187:17, 189:8, 189:9
**Representatives** [1] -
233:10
**representatives** [2] -

237:3, 237:5
**represented** [3] -
61:14, 61:21, 81:14
**representing** [1] -
187:17
**represents** [1] -
193:10
**request** [7] - 17:6,
37:3, 122:10, 131:5,
140:21, 159:23,
198:13
**requested** [4] - 8:4,
13:17, 65:24, 198:12
**requests** [1] - 198:10
**require** [4] - 82:15,
82:19, 82:20, 157:8
**required** [13] - 48:17,
69:16, 81:10, 83:1,
83:9, 89:22, 95:1,
118:16, 186:15,
197:5, 198:1,
202:17, 235:2
**requirement** [8] -
82:17, 82:18,
118:22, 140:4,
145:9, 145:11,
157:1, 159:6
**requirements** [2] -
145:24, 146:7
**requires** [2] - 119:6,
201:13
**requiring** [1] - 235:11
**rescind** [1] - 54:24
**rescinded** [1] - 49:1
**research** [9] - 197:17,
197:24, 199:16,
199:19, 199:23,
199:25, 200:3, 200:4
**researchers** [1] -
199:18
**reservation** [1] - 75:21
**reservations** [1] -
83:20
**reserve** [1] - 137:6
**reserved** [1] - 74:25
**resolve** [3] - 80:7,
104:1, 121:10
**resolved** [3] - 71:10,
96:13, 178:8
**resolving** [3] - 69:22,
70:3, 152:9
**resource** [1] - 41:7
**resources** [10] -
22:17, 23:8, 23:11,
23:12, 41:6, 41:23,
43:17, 43:19, 171:6,
210:19
**respect** [17] - 21:24,
31:2, 47:3, 49:2,
56:17, 69:11, 70:10,

74:23, 76:8, 78:22,
96:21, 122:24,
127:25, 130:2,
195:11, 198:6,
205:19
**respectfully** [1] -
164:14
**respond** [2] - 171:4,
193:8
**responded** [2] - 17:5,
18:6
**respondent** [4] -
60:15, 60:21,
151:15, 227:19
**respondents'** [1] -
151:19
**response** [8] - 33:7,
55:6, 120:5, 146:15,
220:9, 233:15,
233:19, 236:9
**responsibilities** [3] -
31:15, 116:3, 147:20
**responsibility** [7] -
29:16, 102:1, 117:8,
117:16, 118:6,
140:19, 176:22
**responsible** [2] -
28:23, 29:12
**rest** [2] - 128:21, 138:6
**restate** [1] - 114:9
**restricted** [1] - 76:13
**rests** [1] - 140:20
**result** [3] - 196:4,
215:22, 240:9
**results** [2] - 10:11,
10:12
**resume** [2] - 7:10,
138:21
**resumed** [1] - 67:25,
184:9
**retail** [6] - 89:15,
89:19, 171:5,
171:11, 234:9,
234:18
**retrieve** [1] - 94:5
**retrieved** [1] - 16:6
**retrospective** [1] -
235:15
**retrospectively** [4] -
170:1, 170:3,
217:10, 234:22
**return** [1] - 102:11
**reveal** [3] - 8:16,
166:13, 191:5
**revealed** [3] - 16:7,
167:6, 191:11
**review** [25] - 8:4, 9:4,
9:11, 13:20, 21:14,
29:16, 29:18, 53:6,
53:9, 57:19, 58:11,

59:25, 68:15, 84:9,
148:23, 161:19,
177:19, 178:5,
179:9, 213:21,
214:18, 214:24,
221:1, 246:2, 246:4
**reviewed** [15] - 30:11,
36:20, 53:10, 57:20,
59:24, 60:5, 81:19,
89:7, 94:8, 230:22,
231:6, 242:18,
243:8, 244:7, 248:18
**reviewing** [1] - 95:22
**reviews** [1] - 58:3
**revising** [1] - 220:24
**revocation** [7] - 37:13,
37:14, 37:22,
118:11, 148:10,
148:17, 149:9
**revoke** [2] - 117:22,
185:17
**revoked** [1] - 119:11
**revoking** [1] - 150:8
**Reynolds** [1] - 226:17
**Rice** [5] - 2:9, 3:14,
4:3, 4:5, 4:8
**rigid** [1] - 145:16
**ring** [1] - 175:12
**rise** [1] - 33:18
**rising** [1] - 33:17
**RMR** [2] - 6:17, 6:18
**road** [8] - 7:17, 7:18,
119:14, 156:12,
196:20, 198:2,
204:15
**roads** [1] - 24:14
**ROBERT** [1] - 6:11
**ROBERTSON** [1] - 3:6
**rogue** [6] - 22:5, 22:6,
22:7, 22:14, 191:7,
191:12
**role** [12] - 50:19,
53:12, 56:1, 66:15,
148:17, 148:19,
156:16, 198:5,
198:19, 211:20,
212:6, 212:20
**roles** [1] - 137:16
**room** [1] - 162:4
**roughly** [5] - 91:12,
123:10, 123:11,
135:10, 135:11
**Roughly** [1] - 110:1
**routinely** [2] - 140:24,
140:25

**RPR** [1] - 6:18
**RPR-RMR-CRR-**
**FCRR** [1] - 6:18
**Ruby** [1] - 4:17
**RUBY** [1] - 4:17

**rule** [3] - 34:1, 147:17,
172:24
**ruled** [2] - 34:8, 73:23
**Rules** [1] - 127:4
**ruling** [3] - 34:9,
34:22, 76:16
**rulings** [1] - 123:5
**run** [7] - 23:16,
130:12, 131:5,
131:6, 211:15,
239:11
**running** [3] - 11:25,
136:2, 170:21
**runs** [1] - 194:18
**Ryan** [3] - 22:1,
215:14, 215:18

---

**S**

**s\Ayme** [1] - 250:11
**s\Lisa** [1] - 250:11
**sacrifice** [1] - 127:18
**sad** [1] - 66:25
**safeguards** [1] -
117:16
**safety** [5] - 30:1,
61:14, 61:21, 81:14,
141:4
**salary** [1] - 208:9
**sale** [1] - 235:3
**sales** [17] - 8:5, 22:3,
47:9, 47:20, 69:11,
69:15, 163:15,
220:20, 220:25,
222:2, 222:19,
226:19, 227:2,
227:18, 232:11,
236:5, 248:10
**SALGADO** [1] - 4:15
**San** [2] - 2:5, 2:17
**sand** [1] - 136:4
**Sanford** [1] - 95:9
**satisfactorily** [1] -
182:14
**satisfactory** [2] -
58:15, 182:15
**saw** [6] - 22:1, 25:7,
33:18, 43:25,
129:11, 242:4
**SC** [3] - 3:15, 4:4, 4:9
**scale** [2] - 31:11,
191:22
**Schedule** [16] - 159:1,
159:2, 159:3, 159:9,
159:10, 159:11,
159:12, 202:5,
202:6, 202:8,
202:10, 247:17,
247:21
**schedule** [3] - 122:21,

123:9, 202:5
**scheduled** [1] - 123:9
**Schmidt** [11] - 11:13,
35:7, 38:14, 42:7,
50:5, 53:24, 56:21,
100:9, 209:21,
219:10, 238:21
**SCHMIDT** [129] - 5:9,
11:14, 11:24, 12:2,
12:13, 13:5, 14:10,
14:22, 17:19, 18:25,
19:6, 19:22, 27:23,
33:4, 33:14, 35:8,
35:12, 38:3, 38:21,
40:8, 40:13, 40:19,
40:22, 41:14, 42:8,
46:12, 46:21, 49:20,
50:15, 50:19, 50:21,
51:9, 51:15, 52:2,
53:1, 53:5, 54:20,
56:6, 56:22, 57:18,
83:3, 98:16, 99:16,
99:21, 99:24,
100:10, 101:1,
101:14, 102:3,
102:19, 102:22,
104:17, 104:19,
105:5, 105:21,
106:11, 106:22,
107:6, 109:19,
111:12, 112:11,
113:9, 114:3,
145:25, 146:20,
150:15, 150:19,
155:10, 162:6,
163:25, 165:11,
166:21, 169:16,
173:12, 175:8,
178:16, 183:18,
189:24, 190:3,
191:19, 193:1,
194:2, 194:4,
194:13, 195:13,
196:8, 203:22,
205:13, 206:7,
206:10, 207:5,
208:17, 208:22,
209:23, 209:25,
210:3, 213:4, 213:6,
214:4, 214:7,
214:11, 214:16,
214:17, 218:6,
218:9, 219:1, 219:3,
219:4, 219:12,
219:15, 219:17,
223:12, 223:16,
223:19, 223:24,
224:9, 224:20,
224:22, 225:7,
225:14, 229:17,
229:22, 229:25,

238:22, 241:21,
241:25, 248:21,
248:24, 249:5
**Schmidt's** [1] - 54:5
**school** [1] - 205:2
**scientific** [9] - 47:9,
47:20, 118:8, 197:8,
197:19, 197:25,
200:4, 200:10,
203:17
**scientists** [2] - 198:9
**scope** [21] - 11:14,
42:17, 42:20, 73:21,
73:24, 75:2, 75:4,
75:17, 76:8, 76:9,
76:14, 76:17, 88:16,
88:19, 88:23, 90:21,
101:25, 195:16,
195:18, 196:8,
203:22
**score** [1] - 55:19
**screen** [11] - 47:11,
143:7, 143:19,
190:9, 190:12,
193:21, 193:25,
233:16, 240:24,
245:22, 248:13
**search** [1] - 217:21
**seasonal** [1] - 247:13
**SEC** [2] - 188:14,
188:17
**second** [39] - 15:13,
16:1, 16:5, 40:1,
44:25, 50:15, 50:16,
54:5, 57:9, 60:17,
69:1, 76:11, 80:25,
96:3, 116:15, 117:6,
117:9, 117:10,
117:11, 140:7,
140:14, 141:22,
145:13, 190:17,
193:4, 197:6,
197:23, 212:13,
220:17, 220:18,
221:9, 222:15,
225:2, 225:3,
235:25, 237:2, 239:5
**Section** [8] - 11:3,
15:17, 118:22,
119:6, 141:4,
230:18, 230:19,
231:11
**section** [3] - 16:6,
141:5, 198:19
**sections** [2] - 93:18
**secure** [1] - 180:1
**Security** [1] - 187:13
**security** [6] - 172:5,
172:7, 179:18,
179:19, 179:24

**see** [96] - 7:23, 16:11,
16:21, 25:13, 47:11,
50:2, 60:11, 65:12,
95:4, 104:21, 106:3,
106:9, 107:5,
108:20, 110:20,
124:12, 124:15,
124:23, 130:14,
131:9, 133:23,
134:11, 135:14,
135:25, 137:22,
139:16, 140:4,
167:24, 174:3,
174:5, 178:6,
179:10, 180:5,
186:20, 195:5,
198:4, 199:21,
209:11, 213:12,
213:15, 213:23,
220:6, 220:8,
220:12, 220:18,
221:2, 221:12,
221:24, 222:4,
222:10, 222:13,
223:5, 224:23,
224:25, 225:4,
225:5, 225:18,
226:12, 226:18,
226:25, 227:5,
227:12, 227:13,
227:18, 229:10,
231:25, 233:15,
233:19, 233:20,
233:22, 234:5,
234:13, 236:6,
237:3, 237:5, 237:9,
237:16, 242:4,
242:8, 242:14,
243:10, 243:13,
243:17, 244:5,
245:17, 245:20,
245:25, 246:5,
246:15, 246:21,
247:1, 247:11,
247:24, 248:5,
248:8, 248:16
**seeing** [11] - 22:4,
23:10, 25:8, 25:10,
25:17, 142:13,
169:25, 170:11,
171:5, 204:25
**seek** [3] - 37:2, 37:13,
39:12
**seekers** [7] - 200:14,
200:22, 203:1,
203:7, 203:12,
203:21, 204:6
**seeking** [9] - 21:7,
37:6, 37:8, 37:22,
54:12, 200:24,

201:18, 204:11
**seem** [2] - 187:3,
232:17
**sell** [5] - 60:25,
151:19, 151:23,
159:5, 160:12
**selling** [4] - 61:7,
151:17, 170:10,
238:10
**seminar** [1] - 127:3
**send** [5] - 20:25,
115:20, 116:1,
144:1, 144:22
**sending** [1] - 104:8
**senior** [2] - 12:8,
84:22
**SENIOR** [1] - 1:17
**Senior** [1] - 7:2
**Sensabaugh** [1] - 5:14
**sense** [2] - 40:5,
210:12
**sensible** [3] - 129:14,
129:15, 133:17
**sensitive** [9] - 8:16,
41:22, 42:3, 43:3,
49:17, 167:22,
170:15, 174:11,
174:18
**sent** [17] - 15:2, 21:15,
29:20, 43:8, 59:25,
89:9, 116:2, 117:2,
117:3, 144:5,
144:24, 146:16,
147:16, 147:19,
148:22, 245:1, 245:3
**sentence** [7] - 58:8,
60:14, 117:10,
118:15, 140:7,
140:14, 140:18
**sentences** [1] - 220:23
**September** [6] - 80:22,
81:11, 116:18,
144:2, 144:3, 144:5
**series** [1] - 115:21
**serious** [9] - 69:21,
70:5, 70:14, 70:18,
70:22, 70:25, 71:10,
72:1
**seriously** [1] - 245:7
**serve** [5] - 53:10,
53:18, 204:17,
204:25, 205:3
**served** [1] - 97:21
**service** [1] - 195:9
**set** [11] - 39:16, 39:17,
69:15, 88:8, 96:5,
125:9, 141:4, 157:1,
186:23, 188:12,
198:1
**sets** [3] - 32:23, 35:1,

188:9
**setting** [4] - 22:9,
129:13, 183:16,
198:7
**settings** [1] - 181:24
**settle** [1] - 157:10
**Settlement** [31] -
44:11, 44:14, 44:23,
45:24, 51:3, 58:6,
58:7, 58:19, 68:11,
69:22, 70:2, 71:9,
79:14, 80:4, 80:5,
80:7, 80:12, 81:3,
82:9, 82:14, 82:19,
82:25, 83:8, 83:13,
83:21, 83:25, 96:3,
96:12, 96:16, 96:19,
216:3
**settlement** [3] - 157:7,
157:11, 182:25
**setup** [1] - 100:14
**seven** [3] - 36:22,
37:1, 245:19
**several** [4] - 47:22,
95:8, 151:21, 240:12
**shall** [5] - 7:7, 48:8,
58:11, 68:24, 80:18
**SHANNON** [1] - 6:3
**share** [3] - 117:16,
120:13, 175:13
**shared** [4] - 139:20,
139:24, 139:25,
140:1
**sharing** [1] - 169:5
**sheer** [2] - 190:16,
190:18
**shelf** [1] - 201:10
**shift** [1] - 25:7
**shifting** [1] - 28:10
**ship** [10] - 13:14,
13:18, 39:20, 82:21,
104:1, 140:19,
152:4, 152:8, 152:9,
158:22
**shipment** [3] - 14:7,
104:11, 116:6
**shipments** [9] -
140:17, 141:12,
159:14, 169:11,
169:25, 170:5,
215:8, 215:15,
215:18
**shipped** [10] - 16:23,
103:21, 103:22,
103:24, 104:13,
168:21, 180:1,
180:2, 227:6
**shipping** [14] - 13:17,
17:8, 19:20, 84:10,
104:12, 104:14,

105:3, 105:19, 105:25, 107:3, 107:15, 107:17, 175:3

**ships** [1] - 21:6

**shoes** [1] - 34:16

**short** [4] - 76:23, 123:23, 124:7, 133:5

**shortage** [1] - 201:20

**shortages** [3] - 180:5, 197:12, 200:23

**shortly** [1] - 31:20

**shot** [1] - 138:11

**show** [25] - 14:24, 28:17, 28:20, 51:19, 68:4, 86:25, 87:4, 87:13, 101:15, 127:8, 149:12, 163:12, 163:14, 163:16, 165:12, 166:18, 168:20, 187:4, 188:23, 192:2, 208:14, 214:1, 218:23, 224:18, 240:24

**Show** [106] - 28:15, 28:16, 28:25, 29:4, 29:15, 29:16, 29:17, 29:19, 30:11, 30:21, 31:2, 31:5, 31:9, 31:10, 31:12, 31:19, 32:9, 32:10, 32:16, 32:18, 32:20, 33:2, 35:16, 35:18, 36:12, 36:18, 37:2, 37:7, 37:12, 37:17, 37:25, 39:9, 39:12, 41:8, 43:18, 43:25, 46:1, 46:7, 46:13, 46:18, 58:21, 58:24, 58:25, 59:2, 59:4, 59:12, 59:16, 59:22, 59:24, 60:6, 61:7, 61:10, 63:3, 63:21, 65:17, 66:2, 67:9, 69:3, 71:18, 71:19, 71:23, 71:24, 71:25, 73:14, 73:16, 76:1, 77:3, 77:7, 77:11, 77:16, 77:23, 78:3, 78:10, 78:13, 78:20, 80:8, 80:19, 81:18, 81:25, 82:5, 82:9, 86:5, 88:5, 89:3, 89:5, 89:8, 89:12, 91:5, 91:21, 92:5, 93:3, 94:11, 95:7, 95:8, 96:13, 115:16, 148:21, 171:1, 185:24, 206:2,

206:3, 240:20, 241:11, 245:20

**showed** [4] - 13:14, 107:21, 168:19, 224:11

**shower** [1] - 192:8

**showing** [1] - 13:16

**shown** [8] - 32:5, 67:6, 98:1, 109:3, 178:20, 182:15, 187:9, 214:10

**shows** [1] - 204:10

**shuffled** [1] - 17:10

**shut** [10] - 22:2, 204:13, 215:12, 218:12, 218:16, 228:18, 228:22, 228:24, 229:16, 234:3

**sic** [1] - 44:16

**side** [9] - 34:15, 74:3, 122:25, 126:6, 126:23, 128:25, 129:5, 129:10, 129:12

**sides** [1] - 241:7

**sign** [9] - 21:14, 29:17, 29:22, 46:6, 72:13, 78:21, 144:22, 198:16

**signature** [2] - 32:15, 78:17

**signatures** [1] - 83:21

**signed** [6] - 33:3, 61:22, 78:19, 78:20, 142:9, 143:24

**significant** [2] - 23:14, 31:10

**significantly** [2] - 190:20, 199:3

**signing** [1] - 78:15

**signs** [2] - 120:15, 121:2

**similar** [3] - 11:18, 118:20, 118:22

**simply** [7] - 33:5, 54:11, 76:12, 118:24, 129:22, 165:16, 173:9

**SING** [1] - 66:25

**Singer** [23] - 27:15, 70:14, 71:7, 71:17, 74:6, 75:10, 75:12, 86:8, 87:21, 93:9, 94:6, 98:22, 100:3, 101:6, 103:4, 106:19, 108:6, 122:2, 143:10, 146:10, 184:10, 196:10, 207:8

**singer** [21] - 7:6, 14:14, 26:20, 33:18, 34:12, 34:23, 36:9, 41:19, 43:14, 46:25, 55:20, 57:6, 66:20, 138:13, 142:11, 142:25, 143:12, 146:6, 161:10, 162:1, 171:23

**SINGER** [273] - 4:5, 7:7, 7:15, 9:2, 10:3, 10:6, 10:17, 10:20, 10:21, 11:11, 12:3, 12:17, 12:25, 13:9, 13:10, 15:3, 15:7, 16:1, 16:3, 17:21, 18:5, 19:7, 19:12, 20:2, 20:6, 22:24, 23:3, 23:6, 26:11, 26:21, 27:8, 27:11, 27:14, 27:16, 27:18, 28:2, 28:9, 31:25, 32:3, 33:1, 34:13, 34:24, 34:25, 35:5, 35:15, 36:10, 38:9, 38:11, 38:13, 39:2, 40:18, 40:24, 41:5, 41:16, 41:20, 42:18, 43:15, 44:5, 44:7, 46:15, 46:23, 47:1, 47:2, 50:5, 50:7, 50:18, 50:25, 51:1, 51:17, 51:21, 51:23, 52:10, 52:11, 54:7, 54:15, 56:9, 57:7, 57:8, 57:22, 59:7, 59:10, 62:7, 62:11, 62:20, 62:21, 63:2, 63:17, 64:4, 65:1, 65:10, 65:14, 65:15, 65:20, 65:25, 66:22, 67:7, 67:19, 68:1, 68:3, 68:5, 68:7, 69:25, 70:8, 70:15, 70:19, 70:20, 71:8, 72:5, 72:21, 72:22, 73:5, 73:7, 74:7, 75:7, 75:14, 76:25, 79:2, 79:6, 79:25, 81:23, 82:7, 83:14, 84:16, 84:18, 84:19, 85:11, 85:14, 85:17, 86:15, 87:4, 88:2, 88:11, 89:2, 90:12, 91:2, 92:11, 92:14, 92:23, 93:25, 94:7, 94:23, 96:1, 98:10, 98:23, 99:17, 99:22, 100:4, 100:21, 101:7, 101:8, 101:18, 102:9,

102:10, 103:5, 103:9, 104:18, 104:25, 105:12, 105:15, 107:12, 107:20, 108:8, 108:10, 108:13, 108:20, 108:23, 109:1, 109:10, 109:12, 109:24, 110:15, 111:5, 111:25, 112:24, 113:11, 113:14, 113:18, 113:19, 114:16, 114:22, 115:4, 115:11, 115:12, 116:8, 116:14, 121:12, 121:24, 122:3, 138:24, 139:3, 139:4, 142:16, 142:18, 143:1, 143:5, 143:14, 143:18, 146:4, 146:11, 147:2, 147:15, 148:3, 148:6, 150:12, 151:2, 153:3, 153:5, 154:3, 154:6, 154:10, 154:12, 155:8, 155:14, 156:1, 158:11, 158:14, 160:2, 160:7, 160:9, 161:11, 161:12, 162:13, 163:7, 164:21, 166:9, 167:7, 167:17, 169:23, 171:2, 171:24, 173:19, 174:24, 175:11, 176:4, 176:10, 176:11, 183:21, 184:5, 184:11, 185:16, 187:6, 187:7, 188:1, 188:7, 188:21, 189:18, 190:4, 190:9, 190:11, 191:25, 192:7, 193:9, 193:17, 193:20, 193:25, 194:8, 195:7, 195:21, 196:11, 196:12, 204:3, 205:17, 206:13, 206:25, 207:10, 208:20, 209:1, 209:14, 209:17, 209:19, 218:4, 219:9, 241:19

**Singer's** [1] - 8:23

**single** [5] - 19:15,

19:18, 191:13, 230:1, 230:2

**sit** [3] - 178:6, 179:2, 201:10

**site** [5] - 178:2, 230:21, 231:2, 231:4, 231:6

**situation** [4] - 11:20, 26:15, 132:11, 165:22

**six** [13] - 14:12, 123:9, 129:5, 129:10, 131:19, 131:22, 131:24, 137:7, 166:12, 221:14, 221:19, 221:23, 222:20

**six-week** [1] - 129:10

**size** [1] - 177:12

**skills** [1] - 158:13

**Skinner** [1] - 125:11

**skip** [1] - 48:15

**Slide** [4] - 155:15, 156:6, 171:25, 172:1

**slide** [9] - 155:16, 155:18, 156:6, 156:8, 193:6, 193:9, 194:9, 194:17, 198:3

**slides** [2] - 100:16, 100:17

**slower** [1] - 126:8

**slows** [1] - 126:13

**small** [3] - 25:13, 151:12, 190:24

**smaller** [1] - 25:13

**smile** [3] - 17:11, 237:12, 237:22

**smiled** [1] - 236:12

**smiling** [1] - 236:24

**Smith** [2] - 6:4, 6:11

**sold** [1] - 60:21

**solely** [1] - 30:25

**someone** [7] - 102:4, 102:6, 193:5, 193:6, 194:15, 236:11, 236:23

**sometime** [1] - 159:19

**sometimes** [6] - 112:25, 211:11, 232:5, 232:24, 235:11, 245:5

**Sometimes** [3] - 85:3, 245:5

**somewhere** [5] - 21:5, 43:12, 119:14, 201:10, 211:17

**soon** [1] - 176:2

**Sorry** [2] - 92:24, 206:7

**sorry** [93] - 8:11, 19:2,

22:18, 22:24, 27:4, 27:10, 27:11, 27:13, 27:14, 27:16, 31:1, 37:2, 38:11, 40:21, 44:6, 44:19, 44:22, 45:18, 47:1, 49:12, 49:13, 51:15, 51:24, 51:25, 52:23, 53:8, 58:14, 60:20, 61:3, 63:2, 64:21, 65:20, 66:7, 68:18, 70:15, 71:12, 71:20, 71:22, 72:24, 73:2, 73:4, 73:5, 73:15, 81:5, 84:13, 85:10, 85:14, 85:24, 86:10, 90:2, 90:14, 94:21, 96:9, 98:3, 103:5, 105:12, 108:5, 108:8, 108:10, 110:13, 118:19, 118:21, 137:1, 142:11, 145:7, 146:3, 150:18, 152:15, 155:17, 162:24, 164:8, 164:10, 168:19, 170:19, 172:6, 181:10, 185:4, 187:5, 190:16, 191:19, 192:19, 196:1, 198:5, 203:9, 211:9, 214:5, 222:22, 222:25, 226:16, 244:12, 245:21, 248:12

**sort** [5] - 67:4, 106:19, 130:11, 212:24, 213:13

**sorting** [1] - 87:24

**sorts** [1] - 121:7

**sounds** [2] - 42:10, 173:15

**sources** [3] - 54:25, 191:11, 191:17

**South** [2] - 2:13, 127:9

**SOUTHERN** [1] - 1:1

**Southern** [2] - 7:3, 188:16

**Southwood** [17] - 148:2, 148:11, 148:12, 148:13, 148:17, 149:9, 151:3, 151:6, 152:3, 152:12, 226:4, 226:19, 226:24, 227:8, 227:16, 228:24

**Southwood's** [1] - 150:8

**speaking** [9] - 10:18, 38:21, 38:22, 38:23, 43:20, 90:21, 130:7, 130:8, 133:9

**special** [1] - 211:14

**specific** [22] - 8:22, 9:5, 9:6, 13:15, 37:17, 37:18, 39:16, 39:17, 39:21, 60:7, 74:13, 76:1, 76:3, 98:17, 107:17, 107:18, 112:8, 146:9, 196:19, 198:24, 200:5, 221:14

**specifically** [6] - 21:24, 25:10, 57:19, 66:11, 74:21, 116:4

**specified** [1] - 118:18

**specify** [1] - 113:10

**speculating** [1] - 27:6

**speculation** [3] - 19:1, 19:9, 146:20

**speculative** [1] - 185:13

**speed** [1] - 119:19

**spend** [2] - 54:10, 143:15

**spent** [2] - 128:9, 134:7

**spoken** [1] - 54:1

**spreading** [1] - 24:10

**Squad** [3] - 211:8, 211:10, 211:12

**Squads** [1] - 211:18

**Square** [2] - 6:5, 6:12

**staff** [20] - 7:23, 27:20, 52:21, 83:16, 84:22, 85:1, 85:5, 91:11, 97:3, 97:6, 98:12, 99:3, 99:5, 147:1, 175:20, 175:23, 217:24, 240:4, 243:2

**Stafford** [1] - 78:12

**stand** [6] - 7:8, 7:10, 38:23, 40:23, 138:9, 138:21

**standard** [1] - 29:24

**standing** [3] - 42:19, 65:7, 136:24

**STANNER** [1] - 5:10

**stared** [1] - 17:9

**start** [13] - 7:17, 56:15, 73:2, 115:4, 128:6, 139:2, 170:14, 182:22, 184:14, 210:4, 218:22

**started** [12] - 12:10, 12:11, 22:4, 22:15, 25:10, 70:21, 84:4,

127:10, 145:19, 170:6, 195:25, 207:2

**starting** [3] - 48:6, 166:3, 241:11

**starts** [1] - 242:7

**state** [12] - 18:7, 39:3, 39:5, 42:10, 104:20, 205:14, 207:15, 207:25, 208:1, 211:14, 218:6, 241:20

**statement** [17] - 17:14, 51:10, 51:11, 98:14, 98:19, 188:4, 188:9, 188:11, 191:17, 203:5, 213:24, 225:16, 233:9, 234:13, 235:19, 238:15, 239:2

**statements** [2] - 40:11, 186:8

**states** [4] - 24:21, 207:12, 208:4, 244:2

**States** [13] - 7:2, 22:3, 22:16, 106:5, 117:18, 120:21, 145:1, 171:11, 184:25, 196:19, 201:23, 201:25, 216:24

**STATES** [2] - 1:1, 1:17

**status** [1] - 129:4

**STATUS** [1] - 1:17

**Status** [1] - 7:2

**statute** [2] - 198:4, 215:12

**statutory** [4] - 117:7, 118:6, 118:10, 157:5

**stay** [1] - 221:9

**stayed** [2] - 204:24, 205:4

**steal** [1] - 201:11

**stealing** [1] - 191:2

**stenography** [1] - 6:19

**step** [3] - 31:10, 31:13, 67:22

**steps** [2] - 169:24, 242:15

**STEVEN** [1] - 4:17

**stick** [1] - 206:15

**still** [16] - 7:13, 25:25, 26:1, 29:2, 36:22, 107:24, 127:20, 134:22, 167:18, 189:25, 194:18, 225:3, 226:3, 231:19, 233:8, 239:17

**stipulation** [1] - 108:25

**stood** [1] - 55:16

**stop** [14] - 29:5, 29:7, 31:8, 64:9, 80:25, 95:25, 122:1, 141:15, 151:17, 156:11, 174:6, 204:15, 248:23, 248:24

**stopped** [2] - 175:3, 176:3

**stopping** [3] - 79:9, 104:11, 184:7

**stops** [2] - 204:11

**stores** [3] - 94:17, 95:6, 95:10

**story** [3] - 236:11, 237:21, 238:4

**straight** [3] - 57:4, 78:10, 241:2

**straightforward** [2] - 172:23, 173:1

**strategic** [1] - 211:5

**strategies** [1] - 166:13

**stream** [1] - 40:15

**Street** [15] - 2:7, 2:10, 2:13, 3:5, 3:7, 3:10, 3:12, 4:6, 4:13, 4:15, 4:18, 5:5, 5:12, 6:6, 6:13

**strength** [1] - 157:23

**stretch** [1] - 130:4

**strictly** [1] - 160:15

**strike** [4] - 14:23, 52:23, 56:20, 165:12

**striking** [1] - 52:16

**strong** [2] - 206:11, 222:17

**struck** [3] - 52:3, 52:4, 71:4

**struggling** [1] - 96:24

**stuck** [1] - 125:8

**studies** [2] - 190:23, 197:18

**stuff** [1] - 238:11

**style** [1] - 221:1

**Subcommittee** [1] - 187:13

**subject** [9] - 13:1, 55:23, 74:5, 102:12, 123:4, 137:9, 176:5, 195:5, 233:19

**subjects** [1] - 130:8

**submit** [3] - 56:4, 92:2, 188:7

**submitted** [6] - 91:25, 103:20, 112:21, 134:22, 217:17, 217:19

**subpoenas** [1] - 137:17

**Subsection** [1] - 69:16

**subsequently** [2] - 36:20, 46:1

**substance** [10] - 47:8, 57:23, 158:22, 159:14, 160:14, 160:17, 196:19, 201:24, 202:8, 202:10

**Substances** [15] - 60:8, 62:14, 62:23, 72:15, 115:22, 116:4, 116:25, 121:16, 144:9, 154:21, 171:14, 171:19, 203:14, 204:7, 234:4

**substances** [56] - 9:13, 18:17, 29:6, 29:8, 47:19, 48:12, 48:17, 61:13, 69:9, 69:13, 69:15, 69:18, 78:23, 79:10, 80:21, 81:9, 81:13, 84:8, 89:15, 89:17, 104:15, 105:3, 118:17, 120:14, 121:9, 140:17, 140:22, 141:8, 141:13, 153:2, 158:24, 159:5, 159:8, 159:9, 160:11, 160:15, 160:21, 160:22, 165:1, 184:16, 190:17, 190:18, 190:22, 191:1, 196:17, 202:4, 203:11, 220:11, 220:25, 222:20, 234:11, 234:20, 235:4, 247:5, 247:18, 247:22

**substantial** [2] - 134:4, 135:2

**substantive** [1] - 196:13

**successfully** [2] - 234:1, 234:23

**sufficient** [1] - 129:12

**suggest** [5] - 30:12, 52:17, 56:10, 120:15, 121:1

**suggested** [1] - 129:23

**suggesting** [2] - 27:24, 245:9

**suggestion** [3] - 46:13, 114:6, 164:4

**Suite** [9] - 2:4, 2:7,

2:10, 2:13, 2:16,
3:17, 4:6, 6:5, 6:12
**summarized** [1] -
219:6
**summarizes** [1] -
232:9
**summary** [1] - 245:11
**Sunday** [1] - 74:9
**supervising** [1] -
161:13
**supervision** [1] -
100:5
**supervisor** [1] - 91:10
**supplied** [4] - 217:1,
217:4, 228:9, 228:11
**supplier** [4] - 140:9,
140:17, 140:20,
140:21
**supply** [1] - 38:5
**supplying** [2] - 37:1,
235:18
**support** [3] - 53:7,
207:24
**supposed** [7] - 14:18,
14:19, 14:20, 18:17,
19:16, 139:14, 216:4
**surely** [1] - 238:13
**surprised** [2] - 130:14,
134:11
**surprising** [2] - 18:15,
122:17
**surrender** [2] -
236:22, 237:24
**survey** [1] - 190:23
**suspect** [3] - 87:20,
122:25, 194:16
**suspected** [4] -
104:15, 105:19,
106:1, 141:13
**suspend** [1] - 117:22
**Suspension** [51] -
28:11, 28:13, 28:14,
29:4, 29:13, 29:18,
29:20, 29:25, 30:9,
30:20, 37:4, 59:12,
59:13, 59:19, 59:23,
60:7, 61:1, 61:5,
61:11, 63:3, 63:22,
65:17, 66:3, 67:9,
73:14, 73:16, 77:3,
77:11, 77:17, 77:23,
78:4, 80:8, 81:19,
81:25, 82:8, 86:5,
89:4, 89:6, 89:8,
89:9, 89:13, 91:4,
91:22, 92:6, 94:11,
96:14, 115:17,
148:22, 149:2,
185:25, 206:3
**suspension** [4] -

28:24, 29:14, 37:4,
118:11
**suspicion** [1] - 13:16
**suspicions** [2] -
152:9, 178:8
**suspicious** [27] -
18:16, 50:13, 53:22,
113:2, 173:24,
178:1, 178:14,
179:6, 179:13,
182:2, 182:12,
182:17, 182:19,
216:14, 230:22,
231:1, 231:6, 231:8,
240:8, 240:12,
246:16, 246:19,
246:23, 247:3,
247:4, 247:6, 247:8
**suspicious** [82] -
13:16, 14:17, 18:12,
36:24, 48:17, 49:1,
49:3, 51:5, 52:17,
52:24, 55:7, 57:2,
64:13, 64:16, 69:14,
81:9, 82:21, 89:21,
95:24, 102:17,
103:11, 103:14,
103:15, 103:19,
103:23, 103:25,
104:8, 104:9,
104:10, 105:3,
107:4, 107:15,
110:23, 111:10,
111:21, 112:1,
112:13, 112:19,
112:20, 112:23,
112:25, 114:11,
115:2, 116:4, 116:5,
116:25, 118:5,
118:7, 118:25,
119:1, 119:20,
140:4, 140:25,
145:6, 145:9,
145:12, 145:17,
145:20, 152:4,
156:4, 169:12,
172:11, 172:16,
172:20, 172:25,
179:9, 183:2,
183:24, 186:14,
186:18, 204:10,
215:2, 215:22,
216:12, 217:18,
217:19, 230:16,
235:18, 244:4,
244:11, 244:17,
247:14
**sustain** [23] - 12:15,
19:8, 19:10, 23:4,
34:10, 50:23, 51:16,

57:3, 57:5, 64:25,
100:2, 101:5, 102:8,
104:24, 146:8,
161:9, 169:21,
171:21, 195:3,
195:20, 196:9,
207:9, 209:4
**Sustained** [5] - 69:24,
70:7, 105:10,
185:15, 205:16
**sustained** [12] - 13:6,
27:5, 51:10, 57:21,
86:13, 87:3, 103:6,
104:24, 171:18,
173:18, 175:10,
183:20
**sustaining** [1] -
209:12
**SUZANNE** [1] - 4:15
**sweat** [1] - 128:10
**Swedesboro** [1] - 78:2
**sweep** [1] - 179:18
**Switch** [2] - 163:9,
163:11
**sworn** [1] - 238:15
**Syracuse** [2] - 142:6,
142:13
**system** [56] - 18:9,
18:11, 18:12, 18:20,
18:24, 19:4, 19:15,
19:18, 20:10, 38:18,
39:11, 39:23, 40:3,
40:7, 45:14, 45:16,
48:25, 63:14, 64:8,
64:12, 64:14, 64:15,
67:15, 103:16,
113:3, 145:19,
157:24, 174:5,
178:2, 178:6, 178:7,
178:24, 182:4,
182:5, 197:7,
200:11, 201:2,
201:9, 203:3,
203:10, 203:15,
203:16, 210:5,
210:8, 210:9,
210:11, 210:13,
210:15, 211:16,
231:16, 231:18,
240:17
**System** [12] - 53:23,
69:12, 178:2,
178:14, 179:6,
179:14, 182:12,
216:14, 230:22,
231:1, 231:7, 231:9
**systemic** [17] - 18:21,
19:21, 20:8, 39:10,
39:23, 62:1, 63:24,
64:14, 66:5, 67:11,

67:15, 82:1, 82:6,
88:20, 90:19, 90:25,
230:13
**Systems** [2] - 182:3,
182:19
**systems** [21] - 40:1,
40:2, 45:9, 45:14,
45:20, 51:6, 52:18,
52:22, 52:25, 54:23,
55:7, 57:2, 63:10,
63:13, 63:15, 64:5,
67:13, 67:16, 86:17,
178:12, 179:20

---

# T

**tablet** [4] - 16:18,
24:16, 24:17, 24:18
**tablets** [6] - 17:25,
25:12, 71:24,
191:13, 228:12,
228:14
**Tactical** [4] - 211:8,
211:10, 211:12,
211:18
**tail** [1] - 165:17
**talks** [4] - 237:3,
237:5, 242:15,
245:17
**Tampa** [2] - 11:16,
15:22
**target** [1] - 39:8
**task** [2] - 131:4,
132:17
**Task** [7] - 211:13,
246:20, 246:23,
247:3, 247:4, 247:6,
247:9
**tasks** [1] - 180:6
**TDS** [1] - 211:10
**tears** [1] - 128:11
**techniques** [7] - 8:16,
42:4, 43:4, 165:24,
170:15, 174:11,
174:17
**technological** [1] -
158:12
**TEMITOPE** [1] - 4:8
**ten** [2] - 67:20, 129:21
**Tenth** [1] - 5:12
**tenure** [37] - 24:1,
28:24, 29:13, 29:25,
30:10, 30:19, 31:3,
31:18, 51:2, 54:18,
57:10, 57:14, 72:7,
113:20, 113:23,
114:19, 114:25,
154:15, 160:3,
167:20, 171:4,
172:21, 174:8,

175:17, 177:3,
177:15, 180:20,
181:3, 181:20,
183:1, 183:13,
186:1, 195:8, 199:3,
205:6, 240:16,
240:17
**term** [10] - 22:21,
23:25, 24:3, 24:4,
24:11, 24:13, 24:15,
28:11, 147:7, 148:24
**termed** [1] - 183:10
**terminated** [2] -
222:19, 223:6
**terms** [10] - 8:6, 18:19,
19:4, 33:5, 38:14,
134:24, 135:17,
159:12, 194:23,
212:6
**terribly** [1] - 27:16
**Terrorism** [1] - 187:13
**testified** [33] - 7:21,
38:17, 39:9, 43:24,
49:24, 53:25, 54:3,
54:13, 56:7, 56:9,
56:13, 56:22, 62:5,
62:7, 64:5, 67:12,
76:20, 77:1, 142:12,
146:1, 159:18,
160:4, 164:15,
166:14, 167:12,
187:14, 187:19,
189:7, 189:11,
209:2, 217:9, 238:9,
239:15
**testifies** [1] - 93:11
**testify** [24] - 42:25,
53:13, 70:21, 76:24,
86:20, 93:5, 93:15,
100:15, 120:21,
120:24, 128:2,
130:24, 167:2,
170:13, 186:25,
187:14, 189:7,
209:1, 213:18,
241:19, 245:18,
246:18, 246:23,
247:12
**testifying** [6] - 14:25,
15:4, 40:24, 98:8,
100:19, 113:25
**testimonies** [1] -
192:1
**testimony** [79] - 8:7,
11:19, 12:20, 26:7,
28:1, 38:15, 40:11,
40:18, 42:9, 49:22,
54:21, 55:4, 55:9,
56:19, 65:2, 73:22,
73:23, 74:9, 74:11,

75:1, 75:19, 75:24, 86:16, 97:4, 98:18, 100:5, 105:22, 122:13, 123:2, 123:3, 123:4, 123:16, 125:13, 126:8, 134:16, 135:4, 135:7, 135:10, 135:20, 165:12, 167:7, 167:12, 167:15, 171:18, 175:9, 184:15, 187:12, 187:24, 188:17, 189:3, 189:5, 189:15, 190:5, 191:14, 193:18, 195:14, 195:17, 213:19, 216:1, 216:6, 218:5, 218:7, 225:21, 225:23, 230:12, 230:14, 230:24, 238:15, 238:17, 238:24, 239:1, 239:13, 242:8, 243:5, 246:6, 246:14, 246:15, 248:5
tether [1] - 166:24
Texas [4] - 46:10, 47:4, 47:6, 78:12
text [1] - 226:16
THE [322] - 1:1, 1:1, 1:4, 1:17, 7:6, 7:9, 7:12, 7:13, 7:14, 8:4, 8:19, 8:21, 9:1, 10:5, 11:13, 11:17, 12:1, 12:15, 12:22, 13:6, 14:13, 14:15, 15:5, 17:22, 17:24, 19:8, 20:3, 20:5, 23:1, 23:4, 26:5, 26:14, 27:5, 27:15, 27:17, 28:3, 28:6, 32:2, 33:12, 33:16, 33:25, 34:6, 34:17, 34:20, 35:3, 35:7, 35:10, 35:13, 35:23, 35:25, 36:1, 36:3, 36:5, 36:7, 36:9, 38:8, 38:10, 38:12, 38:25, 39:22, 39:25, 40:10, 41:3, 41:18, 41:24, 42:6, 42:12, 42:21, 43:5, 43:11, 46:17, 46:25, 50:1, 50:20, 50:23, 51:16, 51:19, 51:22, 52:8, 53:4, 53:20, 55:11, 55:18, 55:22, 56:15, 56:21, 56:25, 57:21, 59:9,

62:9, 62:17, 62:18, 62:25, 63:7, 63:9, 64:10, 64:12, 64:25, 65:6, 65:9, 65:12, 66:9, 66:19, 66:23, 67:5, 67:18, 67:20, 67:23, 68:2, 68:6, 69:24, 70:7, 70:13, 70:17, 71:6, 71:16, 71:18, 71:22, 72:4, 74:6, 74:18, 75:9, 76:5, 76:15, 76:23, 79:4, 79:23, 81:17, 81:18, 82:3, 82:4, 83:6, 83:11, 84:11, 84:13, 84:15, 85:12, 86:8, 86:23, 87:6, 87:12, 88:1, 88:13, 88:18, 90:9, 90:10, 90:23, 90:24, 92:19, 92:20, 93:7, 93:12, 93:17, 93:19, 93:20, 94:4, 94:5, 94:22, 95:2, 95:5, 95:19, 95:20, 98:21, 99:25, 100:1, 100:9, 100:18, 101:5, 101:15, 102:8, 102:21, 102:23, 103:1, 103:3, 103:7, 104:24, 105:10, 105:24, 106:9, 106:24, 107:1, 107:8, 107:10, 107:13, 107:16, 107:19, 108:22, 109:11, 109:22, 109:23, 111:1, 111:2, 111:14, 111:17, 112:12, 112:18, 113:13, 113:16, 114:17, 114:19, 115:7, 120:25, 121:4, 121:22, 121:23, 122:1, 122:4, 122:7, 124:2, 124:14, 124:18, 125:17, 127:7, 128:13, 128:24, 131:18, 131:23, 132:21, 133:3, 133:9, 133:22, 134:6, 135:25, 136:9, 136:19, 137:22, 138:4, 138:11, 138:23, 143:8, 143:17, 145:7, 145:8, 146:8, 146:22, 146:24, 147:10, 147:14,

150:14, 150:16, 150:25, 154:4, 154:9, 155:9, 155:13, 155:25, 159:24, 161:9, 162:11, 163:3, 163:5, 164:8, 164:17, 165:15, 165:21, 167:1, 167:14, 169:21, 170:17, 170:18, 170:19, 170:20, 170:25, 171:21, 173:18, 174:15, 174:22, 175:10, 176:7, 178:19, 178:23, 183:20, 184:4, 184:6, 184:10, 185:15, 188:2, 188:20, 189:20, 189:23, 190:2, 191:21, 191:22, 192:6, 193:8, 193:16, 193:19, 193:23, 194:3, 194:5, 195:3, 195:20, 196:9, 203:24, 204:1, 205:16, 206:21, 206:24, 207:7, 208:18, 209:4, 209:11, 209:16, 209:21, 210:1, 210:2, 214:15, 218:8, 219:2, 223:14, 224:3, 224:7, 224:21, 225:11, 225:13, 229:20, 238:19, 241:23, 248:23, 248:25, 249:3, 249:4
themselves [1] - 33:10
theory [1] - 88:19
therefore [3] - 64:14, 67:15, 145:17
they've [10] - 52:5, 116:12, 127:1, 127:23, 128:3, 129:20, 137:8, 159:17, 179:10
thick [1] - 240:23
third [13] - 16:4, 52:12, 118:2, 119:25, 120:1, 123:4, 163:14, 163:15, 165:4, 225:4, 232:12, 236:2, 237:2
Thomas [2] - 2:12, 55:24
thoughtful [1] - 132:3

thousands [5] - 70:24, 71:19, 71:24, 185:8, 185:24
threaded [1] - 138:18
threat [11] - 30:1, 30:7, 30:12, 30:17, 30:25, 61:14, 61:16, 61:21, 81:14, 89:11, 234:2
Three [1] - 6:5
three [34] - 6:12, 24:5, 31:3, 45:13, 63:15, 63:18, 63:19, 69:14, 126:22, 130:6, 130:7, 132:7, 132:14, 132:21, 147:3, 147:11, 158:3, 170:5, 176:17, 176:23, 177:5, 181:9, 202:22, 208:11, 232:5, 232:14, 232:19, 232:21, 232:23, 235:11, 236:17, 245:15, 247:15
threshold [4] - 111:3, 111:19, 111:23, 247:14
thresholds [4] - 183:2, 183:12, 183:17, 183:23
throughout [7] - 22:15, 25:21, 67:16, 125:2, 204:23, 212:23
throw [2] - 132:13, 157:24
Thursday [1] - 138:7
time-out [1] - 67:18
timing [2] - 34:4, 159:13
TIMOTHY [1] - 5:9
today [6] - 7:18, 42:16, 122:12, 122:22, 122:23, 216:7
together [1] - 54:2
token [1] - 199:15
took [12] - 34:6, 39:20, 40:25, 43:21, 64:13, 66:14, 98:25, 181:19, 182:21, 204:19, 227:8, 245:7
tool [1] - 168:2
tools [6] - 165:10, 165:24, 166:3, 166:10, 234:1, 234:3
top [6] - 16:2, 47:14, 60:10, 60:12, 89:15, 222:11
topic [4] - 42:17,

184:3, 196:13, 248:21
topics [3] - 135:22, 184:12, 215:4
total [9] - 61:19, 67:15, 123:2, 124:1, 124:9, 124:13, 196:18, 204:21, 242:5
totally [2] - 128:16, 133:21
touch [1] - 215:4
touched [1] - 210:18
Touhy [3] - 42:15, 42:20, 43:8
tour [1] - 156:12
toward [1] - 133:18
Tower [2] - 3:4, 4:18
town [1] - 136:21
Track [3] - 73:25, 75:4, 76:19
track [2] - 44:18, 119:21
traffic [1] - 20:25
trained [1] - 139:13
transactions [12] - 12:10, 109:4, 110:1, 110:3, 110:23, 111:3, 111:8, 111:18, 111:23, 157:16, 157:17
transcended [1] - 88:20
transcript [4] - 6:19, 74:21, 87:8, 250:4
transition [1] - 193:13
transitioned [1] - 196:4
transmitted [1] - 74:24
transparency [1] - 153:22
transpired [1] - 174:13
transported [1] - 24:21
tread [1] - 20:14
treated [1] - 123:12
treaties [1] - 197:6
treating [1] - 184:25
Trial [1] - 249:6
trial [23] - 34:4, 73:21, 122:12, 122:22, 123:9, 125:2, 125:23, 126:16, 126:22, 127:3, 127:6, 127:11, 127:17, 128:20, 130:4, 130:16, 131:10, 132:15, 134:13, 135:10, 137:10, 195:16

**TRIAL** [1] - 1:16
**trials** [2] - 122:19, 122:20
**tried** [2] - 55:3, 132:4
**trimming** [1] - 123:20
**trinity** [2] - 26:1
**trip** [1] - 204:15
**trouble** [2] - 138:19, 193:23
**true** [10] - 50:14, 50:18, 52:6, 52:7, 54:25, 160:5, 191:17, 228:16, 231:5, 234:15
**True** [4] - 210:22, 212:12, 212:21, 230:7
**truth** [1] - 223:22
**truthful** [1] - 235:7
**truthfully** [1] - 213:18
**try** [16] - 33:24, 34:16, 52:12, 52:15, 53:16, 96:23, 100:14, 151:14, 158:11, 175:12, 176:7, 192:8, 213:25, 214:23, 221:5, 231:5
**Try** [1] - 92:22
**trying** [18] - 19:25, 27:24, 27:25, 31:7, 34:3, 38:6, 86:10, 106:23, 142:12, 142:14, 193:5, 194:19, 200:13, 206:6, 213:18, 229:24, 240:13
**Turn** [1] - 86:1
**turn** [53] - 15:24, 32:13, 36:17, 44:5, 45:24, 47:14, 47:25, 48:20, 57:23, 57:24, 60:10, 64:17, 68:18, 68:21, 72:20, 72:24, 73:10, 77:6, 77:19, 78:6, 79:17, 80:14, 83:23, 84:17, 85:9, 85:18, 85:21, 85:24, 96:5, 97:25, 115:14, 116:7, 116:15, 116:18, 117:6, 118:2, 119:1, 119:25, 121:25, 139:5, 140:2, 141:22, 144:11, 151:11, 152:15, 155:15, 156:6, 156:13, 171:25, 186:23, 190:6, 196:14
**turned** [2] - 56:12,

84:5
**turning** [4] - 145:13, 154:22, 172:1, 176:12
**Twelfth** [3] - 4:13, 4:15, 5:5
**twice** [2] - 44:17, 136:12
**two** [26] - 14:11, 14:16, 33:6, 38:13, 74:7, 75:23, 84:1, 84:11, 90:14, 93:17, 95:8, 104:4, 121:8, 125:12, 126:2, 130:17, 132:15, 133:7, 133:20, 136:20, 193:1, 197:21, 208:11, 226:7, 239:18, 245:14
**two-hour** [1] - 126:2
**tying** [1] - 75:19
**type** [8] - 17:8, 37:22, 109:2, 109:13, 157:21, 164:24, 193:9, 191:22
**types** [3] - 25:7, 95:16, 165:23
**typically** [4] - 85:1, 139:20, 177:10, 191:3

## U

**U.S.C** [1] - 196:20
**ultimately** [1] - 79:14
**UN** [2] - 197:6, 198:8
**un-blacked** [2] - 229:6, 229:7
**un-ring** [1] - 175:12
**unable** [3] - 74:13, 112:7, 236:4
**unanimous** [1] - 55:12
**unclear** [1] - 70:11
**under** [32] - 7:13, 30:3, 34:25, 42:24, 49:22, 49:24, 55:14, 57:16, 115:22, 116:3, 116:24, 118:22, 122:21, 132:8, 140:15, 144:9, 151:22, 155:21, 164:15, 174:7, 174:16, 174:23, 175:2, 188:8, 188:11, 190:6, 197:5, 197:6, 197:10, 201:5, 238:9
**Under** [1] - 246:18
**understood** [8] -

40:10, 53:15, 56:25, 57:7, 63:12, 107:2, 107:13, 144:9
**Understood** [1] - 87:9
**undertake** [2] - 96:21, 217:21
**undertook** [1] - 9:11
**unfair** [1] - 75:20
**unforgettable** [1] - 128:17
**unintelligible)** [1] - 49:11
**unit** [5] - 16:16, 16:19, 118:18, 198:8
**United** [13] - 7:2, 22:2, 22:16, 106:4, 117:18, 120:20, 144:25, 171:11, 184:25, 196:19, 201:23, 201:25, 216:24
**UNITED** [2] - 1:1, 1:17
**units** [6] - 16:15, 60:21, 70:25, 196:25, 229:10, 239:18
**universe** [1] - 184:22
**unlawfully** [1] - 185:10
**unless** [3] - 128:23, 214:1, 235:17
**unlimited** [2] - 129:16, 130:11
**unprecedented** [1] - 126:9
**unusual** [1] - 16:22
**unworkable** [1] - 133:21
**Up** [1] - 240:16
**up** [68] - 7:20, 8:22, 14:12, 14:14, 16:1, 18:10, 18:13, 18:17, 18:22, 18:23, 21:5, 21:16, 24:6, 24:9, 25:2, 29:23, 30:22, 34:6, 34:12, 40:5, 45:3, 50:24, 55:16, 59:25, 61:15, 65:2, 65:7, 71:20, 72:19, 85:10, 89:10, 107:24, 124:14, 127:8, 133:1, 145:20, 149:5, 153:7, 155:21, 158:13, 168:12, 168:13, 170:8, 179:20, 190:9, 190:12, 193:21, 198:1, 198:3, 199:9, 204:14, 212:14,

213:4, 219:22, 225:4, 226:9, 226:14, 233:16, 233:22, 235:24, 239:11, 240:24, 244:3, 244:10, 244:17, 245:22, 248:13
**upset** [5] - 17:16, 17:17, 17:20, 225:21
**upstream** [1] - 191:10
**useful** [2] - 111:11, 162:22
**users** [2] - 195:24, 195:25
**uses** [2] - 117:20, 244:3

## V

**vague** [9] - 14:10, 27:23, 62:16, 69:23, 110:25, 164:6, 185:11, 191:19, 191:20
**vagueness** [1] - 63:6
**valid** [2] - 156:3, 186:7
**validate** [2] - 157:15, 157:25
**validated** [3] - 157:15, 233:2, 235:12
**validation** [5] - 157:19, 158:3, 197:18, 197:25, 199:19
**value** [1] - 111:18
**variation** [1] - 247:12
**various** [3] - 26:8, 152:17, 161:25
**vast** [2] - 30:15, 121:8
**vault** [1] - 179:22
**vehicle** [3] - 149:24, 160:16, 183:16
**vein** [2] - 118:20, 118:22
**Ventura** [1] - 3:18
**venues** [1] - 25:22
**verbatim** [1] - 107:18
**Verification** [1] - 242:14
**verified** [2] - 242:23, 243:6
**verify** [2] - 242:15, 242:19
**version** [4] - 143:12, 150:9, 150:10, 150:11
**versus** [2] - 160:21, 203:7
**via** [5] - 190:25, 191:5,

191:7, 234:11, 234:20
**view** [2] - 37:24, 100:23
**viewing** [1] - 134:5
**views** [2] - 206:11, 211:21
**violated** [3] - 34:9, 60:8, 89:23
**violation** [2] - 29:17, 141:10
**violations** [8] - 28:17, 31:11, 39:15, 44:3, 61:25, 72:1, 149:4
**Virginia** [10] - 4:18, 7:3, 7:4, 139:13, 220:4, 223:13, 226:9, 229:3, 231:22, 235:23
**VIRGINIA** [2] - 1:1, 1:18
**vision** [2] - 129:11, 132:1
**visit** [3] - 24:5, 24:24, 181:11
**visits** [2] - 181:10, 181:19
**volume** [10] - 16:22, 17:1, 134:11, 167:24, 169:24, 170:10, 190:16, 190:18, 234:9, 234:18
**VOLUME** [1] - 1:16
**volumes** [11] - 9:13, 13:14, 16:21, 79:9, 95:11, 167:25, 170:1, 170:11, 217:7, 217:8, 227:5
**voluminous** [1] - 108:23
**voluntarily** [1] - 141:12
**voluntary** [2] - 236:22, 237:24
**vs** [2] - 188:14, 250:6

## W

**wait** [2] - 41:18, 50:20
**WAKEFIELD** [1] - 5:13
**walk** [4] - 22:11, 75:20, 178:11, 232:2
**Walker** [2] - 237:8, 248:6
**wants** [1] - 53:12
**war** [5] - 205:23, 207:2, 208:23, 209:2
**warehouse** [1] - 179:25

**warned** [2] - 61:8, 82:11
**warrant** [3] - 86:14, 87:2, 118:10
**Washington** [8] - 2:11, 4:7, 4:14, 4:16, 5:5, 5:12, 208:16, 209:9
**waste** [1] - 85:16
**watch** [1] - 178:7
**watching** [2] - 126:11, 128:21
**water** [2] - 35:22, 36:4
**wear** [1] - 138:16
**wearing** [1] - 138:15
**WEBB** [1] - 3:11
**Webb** [1] - 3:12
**website** [7] - 150:6, 150:9, 150:11, 153:20, 153:21, 155:6
**week** [9] - 127:16, 127:20, 129:10, 133:23, 133:24, 134:7, 136:7, 138:6
**weekly** [1] - 104:3
**weeks** [16] - 103:21, 104:4, 110:11, 129:5, 130:16, 130:17, 131:12, 131:19, 131:22, 131:24, 132:15, 133:20, 137:7, 177:13, 178:13, 220:14
**weight** [2] - 11:22, 88:24
**welcome** [1] - 124:21
**WEST** [2] - 1:1, 1:18
**West** [8] - 7:3, 7:4, 220:4, 223:13, 226:9, 229:2, 231:22, 235:23
**WESTFALL** [21] - 8:3, 8:6, 8:12, 8:20, 8:25, 42:2, 42:24, 43:6, 49:10, 49:13, 49:23, 50:4, 93:21, 94:2, 106:4, 113:24, 120:20, 165:22, 170:12, 170:24, 174:9
**Westfall** [5] - 8:10, 8:22, 42:1, 42:22, 165:21
**whereas** [1] - 47:16
**white** [1] - 158:12
**whole** [10] - 24:23, 33:13, 35:3, 35:14, 120:6, 127:5, 149:3,

151:6, 181:7, 197:13
**wholesale** [2] - 212:21, 214:13
**wholesalers** [1] - 9:6
**wicht** [1] - 33:16
**WICHT** [71] - 4:12, 19:2, 22:20, 26:6, 26:12, 27:3, 33:17, 42:14, 55:13, 56:17, 64:18, 64:21, 73:4, 73:6, 73:19, 74:19, 76:7, 76:18, 78:24, 79:19, 79:24, 81:15, 82:2, 83:2, 86:10, 86:25, 87:9, 87:23, 88:14, 90:8, 90:20, 93:9, 94:21, 95:18, 98:3, 103:2, 104:20, 105:8, 106:25, 108:5, 108:9, 108:12, 109:20, 110:13, 110:25, 116:11, 120:17, 121:21, 137:1, 142:11, 142:24, 143:3, 143:9, 146:3, 146:5, 147:6, 150:18, 155:23, 161:5, 161:24, 162:24, 164:10, 171:17, 173:17, 185:11, 188:3, 189:21, 194:25, 206:8, 206:22, 207:4
**Wicht** [17] - 42:13, 42:23, 55:11, 74:18, 76:5, 86:9, 86:24, 87:14, 87:18, 88:13, 103:1, 106:24, 136:24, 150:17, 164:9, 189:20, 206:21
**Wicht's** [1] - 34:11
**wide** [1] - 121:6
**Williams** [2] - 4:13, 5:4
**willing** [2] - 34:18, 131:23
**window** [2] - 179:6, 216:18
**winnow** [2] - 129:17, 130:12
**winnowing** [4] - 130:5, 131:4, 132:18, 133:17
**Wise** [7] - 225:18, 225:24, 226:10, 226:12, 226:24, 227:3, 228:11
**wish** [3] - 44:20,

56:11, 120:19
**withdraw** [1] - 135:13
**witness** [63] - 7:8, 7:10, 22:21, 27:4, 34:8, 38:7, 38:15, 38:23, 40:19, 40:24, 53:2, 53:5, 53:11, 53:25, 54:9, 54:12, 55:5, 55:6, 55:10, 56:6, 62:4, 64:3, 64:19, 66:13, 73:20, 76:10, 86:16, 87:22, 93:11, 98:5, 98:8, 100:19, 102:3, 105:22, 112:7, 122:19, 124:5, 132:18, 135:3, 138:9, 138:21, 142:12, 142:15, 142:16, 143:11, 143:16, 155:11, 161:6, 165:19, 166:21, 183:18, 188:4, 188:23, 194:8, 206:8, 206:11, 207:6, 209:20, 223:20, 229:17, 229:24, 238:17, 241:19
**WITNESS** [56] - 7:12, 7:14, 8:4, 14:15, 17:24, 20:5, 28:6, 35:25, 36:3, 36:7, 39:25, 46:17, 62:18, 63:9, 64:12, 66:9, 66:23, 67:23, 71:18, 71:22, 81:18, 82:4, 83:11, 84:13, 90:10, 90:24, 92:20, 93:17, 93:20, 94:4, 95:5, 95:20, 99:25, 107:10, 107:16, 109:23, 111:2, 111:17, 112:18, 114:19, 121:4, 121:23, 138:23, 145:8, 146:24, 147:14, 163:5, 170:17, 170:19, 170:25, 174:22, 178:23, 191:22, 204:1, 210:2, 249:3
**witness's** [5] - 65:2, 193:18, 208:20, 218:5, 218:6
**witnesses** [35] - 54:22, 123:13, 123:15, 123:19, 123:21, 123:23, 123:24, 124:7,

124:10, 124:22, 124:24, 125:8, 125:21, 126:5, 127:15, 127:20, 127:21, 127:24, 129:14, 129:17, 130:17, 130:23, 130:24, 131:10, 131:12, 131:13, 132:13, 133:16, 133:20, 135:17, 135:19, 135:24, 137:15, 242:5
**WOELFEL** [1] - 3:9
**Woelfel** [2] - 3:9
**word** [2] - 76:6, 245:13
**words** [2] - 18:7, 129:16
**workable** [1] - 130:19
**works** [6] - 134:9, 178:6, 196:17, 202:24, 204:5, 210:9
**world** [2] - 127:12, 228:19
**worst** [2] - 44:20, 212:3
**worth** [1] - 127:17
**wrap** [1] - 204:14
**Wright** [1] - 237:18
**write** [2] - 22:12, 202:19
**writing** [3] - 120:12, 219:23, 221:23
**written** [7] - 10:12, 58:10, 128:15, 180:14, 202:9, 202:11, 220:2
**wrote** [1] - 219:25
**WU** [1] - 5:10
**WV** [6] - 2:8, 3:10, 3:13, 4:19, 5:15, 6:9

**Y**

**year** [10] - 9:7, 9:25, 31:23, 35:19, 36:12, 181:15, 191:13, 199:9, 208:11, 208:12
**years** [15] - 166:12, 176:17, 176:18, 176:23, 177:5, 202:22, 204:22, 205:5, 208:11, 211:24, 215:16, 215:19, 240:5, 246:11
**yesterday** [14] - 7:16, 7:22, 11:1, 11:19,

20:13, 98:15, 102:12, 102:17, 107:21, 112:6, 122:11, 122:12, 152:16, 156:12
**yield** [1] - 173:16
**York** [3] - 3:5, 142:6, 188:16
**young** [1] - 190:21
**yourself** [2] - 92:15, 231:1

**Z**

**zero** [1] - 210:25